**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 17-cv-60426-UU**

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.

  Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

  Defendants.

_____/

## <u>DECLARATION OF KATHERINE M. BOLGER</u>

    I, Katherine M. Bolger, declare as follows:

    1.     I am a partner at Levine, Sullivan Koch & Schulz, LLP counsel to Defendants,

BuzzFeed Inc. ("BuzzFeed") and Ben Smith, in this action.  I submit this declaration in support

of Defendants' motion to dismiss this action for lack of personal jurisdiction pursuant to Rule

12(b)(2) or, in the alternative, transfer it to the Southern District of New York pursuant to 28

U.S.C. § 1404(a).  I am familiar with the facts herein and make this declaration from my own

personal knowledge.

    **Relevant Documents**

    2.     Attached hereto as Exhibit 1 is a true and correct copy of the State Court

Complaint in this action.

    3.     Attached hereto as Exhibit 2 is a true and correct copy of Defendants' Notice of

Removal in this action.

4.      Attached hereto as Exhibit 3 is a true and correct copy of the registration information for Webzilla, Inc. from the website of the Florida Department of State's Division of Corporations.

5.      Attached hereto as Exhibit 4 is a true and correct copy of the registration information for Webzilla Dallas, Inc. from the website of the Texas Comptroller of Public Accounts.

6.      Attached hereto as Exhibit 5 is a true and correct copy of the registration information for Webzilla Apps Inc. from the website of the Delaware Department of State's Division of Corporations.

7.      Attached hereto as Exhibit 6 is a true and correct copy of the registration information for Webzilla Limited from the website of the Republic of Cyprus Department of Registrar of Companies and Official Receiver.

8.      Attached hereto as Exhibit 7 is a true and correct copy of the registration information for Webzilla B.V. from the website of the Netherlands business register.

9.      Attached hereto as Exhibit 8 is a true and correct copy of the registration information for XBT Holding S.A. from the website of the Luxembourg Trade and Companies Register.

10.      A February 13, 2017 search of the online business registry maintained by the Florida Department of State's Division of Corporations revealed no records of Corporations, Limited Liability Companies, or Limited Partnerships under the name XBT Holding S.A.

11.      Attached hereto as Exhibit 9 is a true and correct copy of the registration information for XBT Holdings, LLC from the website of the Florida Department of State's Division of Corporations.

12.     Attached hereto as Exhibit 10 is a true and correct copy of the homepage from Webzilla Inc.'s website (the "Webzilla Website") at http://www.webzilla.com/.

13.     Attached hereto as Exhibit 11 is a true and correct copy of a February 2015 news release from Webzilla (available on the Webzilla Website at https://webzilla.com/blog/2015/02/webzilla-lines-up-equinix-sg1.html), which is datelined "Amsterdam, Netherlands."

14.     Attached hereto as Exhibit 12 is a true and correct copy of the "Contact Webzilla" page from the Webzilla Website at http://www.webzilla.com/contacts.html.

15.     Attached hereto as Exhibit 13 is a true and correct copy of the "Fast Facts" page from XBT Holding S.A.'s website (the "XBT Website") at http://www.xbt.com/fast-facts.html.

16.     Attached hereto as Exhibit 14 is a true and correct copy of the "Geography" page from the XBT Website at http://www.xbt.com/geography.html, which lists the company's Netherlands operations.

17.     Attached hereto as Exhibit 15 is a true and correct copy of the "Geography" page from the XBT Website at http://www.xbt.com/geography.html, which lists the company's United States operations.

18.     Attached hereto as Exhibit 16 is a true and correct copy of the "Global Contact Details" page from the XBT Website at http://xbt.com/contacts.html.

19.     Attached hereto as Exhibit 17 is a true and correct copy of an article by Kevin G. Hall and Tim Johnson entitled "Russian tech expert named in Trump report says US intelligence never contacted him", published by the McClatchy DC Bureau on January 11, 2017.  It is available at http://www.mcclatchydc.com/news/nation-world/national/article125910774.html.

20.     Attached hereto as Exhibit 18 is a true and correct copy of an article by Jose Pagiery entitled "Russian tech exec sues Buzzfeed for publishing unverified Trump dossier", published by CNN on February 3, 2017.  It is available at http://money.cnn.com/2017/02/03/media/trump-dossier-buzzfeed-lawsuit/.

21.     Attached hereto as Exhibit 19 is a true and correct copy of an article entitled "Tech firm named in Russian hacking report has operations in Dallas", published by the Dallas Morning News.  It is available at http://www.dallasnews.com/business/technology/2017/01/11/tech-firm-named-russian-hacking-report-operations-dallas.

22.     Attached hereto as Exhibit 20 is a true and correct copy of an article entitled "'It's fake news': Russian IT expert responds to unverified report alleging ties to Trump & Kremlin", published by RT on January 12, 2017.  It is available at https://www.rt.com/news/373511-russia-company-it-trump/.

23.     Attached hereto as Exhibit 21 is a true and correct copy of an article entitled "Trump Dossier: 'I'd Really Like to Find Out Why My Name is in This Report'", published by Sputnik News on January 16, 2017.  It is available at https://sputniknews.com/world/201701161049629580-russian-tech-expert-trump-report/.

24.     Attached hereto as Exhibit 22 is a true and correct copy of the slip opinion dated February 1, 2017 in *Trump v. Tarpley*, Case No. 424492-V, (Md. Cir. Ct.).

25.     Or about February 7, 2017, Val Gurvits, Plaintiffs' counsel in this action, stated in a televised interview with Tucker Carlson of Fox News that "Webzilla and XBT are approximately a $250 million company."

**Defendants' Anticipated Evidence at Trial**

26.     If this case proceeds to trial, Defendants anticipate requiring the testimony of the following BuzzFeed employees, among others (none of whom are located in Florida):

a.   Defendant Ben Smith, editor-in-chief of BuzzFeed, who made the decision to publish the Article and the Dossier, and edited the Article before publication.  Mr. Smith lives in Brooklyn, New York, and works at BuzzFeed's headquarters in Manhattan.

b.   Miriam Elder, the world editor for BuzzFeed News.  Ms. Elder, an author of the Article, was involved in the process of deciding whether to publish the Dossier, and also worked on BuzzFeed's investigation into the Dossier.  Ms. Elder lives in Brooklyn, New York, and works at BuzzFeed's headquarters in Manhattan.

c.   Mark Schoofs, the investigations and projects editor for BuzzFeed News.  He is also an author of the Article, and was involved in the process of deciding whether to publish the Dossier.  He also worked on BuzzFeed's investigation into the Dossier.  Mr. Schoofs lives in New York, New York, and works at BuzzFeed's headquarters in Manhattan.

d.   Ken Bensinger, an investigations and projects editor for BuzzFeed News.  Mr. Bensinger led BuzzFeed's investigation into the Dossier.  He lives and works in California.

27.     Many potential non-party witnesses mentioned in, or otherwise associated with the Dossier, live in New York to our knowledge.  These include, by way of example, Sergei Millian, who has been identified in media reports as a likely source for the Dossier.  *See, e.g.,* Mark Marmont, "Key Claims in Trump Dossier Said to Come From Head of Russian-American

Business Group", Wall Street Journal (Jan. 24, 2017) (a true and correct copy of which is attached hereto as Exhibit 23); Michael Cohen, Donald Trump's personal lawyer, who is discussed in the same section of the Dossier as the Plaintiffs; and Carter Page, a foreign policy advisor to Donald Trump's presidential campaign.

28.     In addition, Defendants may require the testimony of government officials who have publicly acknowledged seeing the Dossier before BuzzFeed made it public.  Most of those officials live in Washington, DC – and none live in Florida.

29.     The relevant documentary evidence in Defendants' possession is located in New York City, California, and Washington, DC.  None of it is located in Florida.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  March 14, 2017

Katherine M. Bolger

Exhibit 1

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA
CASE NO:

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.,
                              Plaintiffs,
vs.

BUZZFEED, INC. AND BEN SMITH,

                    Defendants.

_____/

## COMPLAINT FOR DAMAGES

Plaintiffs, Aleksej Gubarev ("Mr. Gubarev"), XBT Holding S.A. ("XBT"), and Webzilla,

Inc. ("Webzilla")(collectively, "Plaintiffs") sue Defendants Buzzfeed, Inc. ("Buzzfeed") and Ben

Smith ("Mr. Smith") for damages.   In support, Plaintiffs allege the following:

## INTRODUCTORY STATEMENT

1.     On January 10, 2017, in perhaps one of the most reckless and irresponsible moments

in modern "journalism," Defendant Buzzfeed and its Editor in Chief Ben Smith chose to publish a

"dossier" of unverified information compiled by a private security company in which various

allegations were made concerning, among other things, computer hacking allegedly carried out

by persons or organizations with ties to Russia, the Russian Government, and/or the Federal

Security Service of the Russian Federation ("FSB").

2.     And, although Buzzfeed and Smith specifically knew that at least portions of the

dossier were untrue, they printed the entire document – without meaningful redactions –

including those portions that falsely accused the Plaintiffs of participating in an alleged

conspiracy to commit crimes against the Democratic Leadership, not to mention a conspiracy to

undermine American Democracy and the 2016 election.  With respect to the Plaintiffs, these allegations were wholly and completely false.

3.      Buzzfeed and Smith published these allegations without having even taken the most basic step of contacting the Plaintiffs to ask if the allegations had any merit.  Indeed, in its original publication of the dossier, Buzzfeed itself *admitted* it had no idea what – if anything – in the dossier was truthful, writing:

> The dossier, which is a collection of memos written over a period of months, includes specific, unverified, and potentially unverifiable allegations… BuzzFeed News reporters in the US and Europe have been investigating various alleged facts in the dossier but have not verified or falsified them. …[The dossier] is not just unconfirmed: It includes some clear errors.

4.      As of the date of this filing, the original Buzzfeed article has been viewed almost six million times and Buzzfeed has published eight additional follow-up articles, each of which links back to the original defamatory publication.

5.      Plaintiff Aleksej Gubarev, who is married with three young children is not, in any way, shape, or form, a public figure.  As a result of Buzzfeed and Mr. Smith's reckless publication of defamatory materials, he has found his personal and professional reputation in tatters.  His wife has found herself a target of online harassment and the family's personal security has been compromised.  Similarly, the economic damage to XBT and Webzilla (a Florida Corporation), including the harm to the companies' previously-unblemished reputations with their clients, lenders, vendors, and others has been immediate and ongoing.

## PARTIES

6.      Plaintiff Aleksej Gubarev is an individual who resides in the Republic of Cyprus.  Mr. Gubarev has lived in Cyprus since 2002.  Mr. Gubarev is the Chairman and CEO and director of Plaintiff XBT Holding S.A.

7.      Plaintiff XBT Holding S.A. is a company organized under the laws of Luxembourg. XBT has offices in Florida and Texas as well as other locations across the globe.  XBT has various subsidiary companies, including Webzilla, Inc.

8.      Plaintiff Webzilla, Inc. is a Florida corporation with offices in Fort Lauderdale.

9.      Defendant Buzzfeed, Inc. is a Delaware Corporation.  According to Buzzfeed, it has offices in "18 cities around the world including New York, Los Angeles, San Francisco, London, Sydney, Sao Paulo, and Tokyo."  Buzzfeed owns and operates the Buzzfeed.com website as well as the Buzzfeed mobile app.  According to Buzzfeed's media kit, it has in excess of 200 million unique monthly views.  Buzzfeed.com is one of the most trafficked websites in the United States, currently ranked in the top 100 websites visited in the U.S.

10.      Defendant Ben Smith is an individual who, on information and belief, resides in Brooklyn, New York.  Mr. Smith is the Editor in Chief of Buzzfeed.

<u>**JURISDICTION, VENUE, AND CONDITIONS PRECEDENT**</u>

11.      This Court has subject matter jurisdiction over Plaintiffs' claim for damages as each claim is in excess of $15,000.

12.      This Court has personal jurisdiction over the Defendants pursuant to Florida Statute 48.193(1)(b).  The Defendants posted defamatory materials concerning the Plaintiffs on their website (and through their mobile app), which materials were accessed in Florida, constituting the commission of the tortious act of defamation within Florida under section 48.193(1)(b).

13.      This Court also has personal jurisdiction over the Defendants pursuant to Florida Statute 48.193 because:

      (a)     Defendants have caused injury to persons or property within Florida, arising out of acts or omissions undertaken outside of the state and Defendants regularly solicit advertising and viewers within Florida;

      (b)     Defendants have committed intentional torts expressly aimed at one or more of the Plaintiffs, the effects of which were suffered in this circuit. Defendants' intentional conduct was calculated to cause injury to one or more of the Plaintiffs in Florida and has caused injury to one or more of the Plaintiffs in Florida. Based on their intentional torts, Defendants should have reasonably anticipated being haled into this Court and due process is satisfied. .

14.     Venue is proper in Broward County because the tort occurred in Broward County and the harm to the Plaintiffs was felt in Broward County in that Plaintiff regularly conducts business in Broward County, Florida.

15.     All conditions precedent to this action have been performed.  Specifically, although not actually required to do so, Plaintiffs provided Defendants with pre-suit notice and a demand for a retraction pursuant to Florida Statutes Chapter 770.01, *et seq.*  See **Exhibit 1.**

## FACTUAL ALLEGATIONS

16.     Mr. Gubarev is an individual who lives, with his wife and three children, in Cyprus. He is a 36 year-old venture capitalist and tech expert.  In 2002, at the age of 22, he moved from Russia to Cyprus and, in 2005, he founded Webzilla Limited (an XBT predecessor) – a company that specializes in internet hosting, data, and web-development.

17.     Over the next 12 years, Mr. Gubarev grew XBT to an international business with various subsidiary companies, employing approximately 300 employees in three different continents.  XBT has offices in Texas, Florida, and Luxembourg, among others.

18.     Mr. Gubarev has never been involved in politics and is not a public figure.  Outside of technology circles, he is not known at all.

19.     Webzilla, Inc., one of XBT's subsidiaries, is a Florida corporation with offices in Fort Lauderdale, Florida and Dallas, Texas.

20.     XBT and its subsidiaries operate approximately 37,000 servers across the globe, with approximately 40 percent of its business being handled over the servers run out of Dallas, Texas.  Approximately 27 percent of XBT's global business comes from within the United States.

21.     Given that XBT's and Webzilla's businesses focus on internet hosting solutions, network services, and web development services, their reputation for providing secure services has been carefully cultivated and paramount to the success of the businesses.

22.     Similarly, prior to the Defendants' publication of defamatory materials, Mr. Gubarev's own professional reputation has been untarnished and key to his ability to build XBT and Webzilla into successful international hosting companies.

23.     On January 10, 2017, Buzzfeed and Mr. Smith published an online article entitled, "These Reports Allege Trump Has Deep Ties To Russia" (the "Defamatory Article")  The Defamatory Article, which at the time of this writing has been viewed more than 5.9 million times, can be found at https://www.buzzfeed.com/kenbensinger/these-reports-allege-trump-has-deep-ties-to-russia?utm_term=.fvQvex17e#.yezx3nBr3.  A true and accurate copy of the Defamatory Article is attached hereto as **Exhibit 2.**  On information and belief, the Defamatory Article has (conservatively) been viewed in Florida tens of thousands of times.

24.     This Defamatory Article attached a 35-page unverified "dossier" of information compiled by a private security company.  On information and belief, the dossier was created as part of opposition research conducted as part of the 2016 election campaign; it is not an official

document and was not created by any government entity.  A true and accurate copy of the dossier

attached to the Defamatory Article is attached hereto as **Exhibit 3.**

    25.    The dossier included various allegations concerning, among other things,

allegations of computer hacking of the Democratic Party allegedly carried out by persons or

organizations with ties to Russia, the Russian Government, and/or the Federal Security Service

of the Russian Federation ("FSB").[1]

    26.    With respect to the Plaintiffs, the dossier included the following assertions of fact:

> *[redacted] reported that over the period March-September 2016 a company called XBT/Webzilla and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct "altering operations" against the Democratic Party leadership. Entities linked to one Alexei GUBAROV [sic] were involved and he and another hacking expert, both recruited under duress by the FSB, Seva KAPSUGOVICH, were significant players in this operation. In Prague, COHEN agreed contingency plans for various scenarios to protect the operations, but in particular what was to be done in the event that Hillary CLINTON won the presidency. It was important in this event that all cash payments owed were made quickly and discreetly and that cyber and that cyber and other operators were stood down / able to go effectively to ground to cover their traces.*

    27.    Not a single portion of this statement (as it applies to Mr. Gubarev, XBT, or

Webzilla) has any basis in fact whatsoever.  Specifically:

    a.    Neither XBT nor Webzilla nor any of their affiliates had been "*using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct 'altering operations'*" against the Democratic Party leadership or anyone else;

    b.    No "*entities linked*" to Mr. Gubarev were involved in any alleged cyber-attacks;

    c.    Mr. Gubarev was not "*recruited under duress by the FSB*" (to be clear, he was not recruited at all – whether under duress or otherwise), nor was he recruited for such activities by anyone else at any other time or in any other circumstances whatsoever.  Additionally, he has no knowledge of, has never met and has never spoken to a person known as Seva Kapsugovich;

---

[1] The FSB is the main successor agency to the USSR's Committee of State Security ("KGB").

d.   Mr. Gubarev and his companies have never acted with "*another hacking expert*" to mount a cyber-attack on the Democratic Party Leadership or on any other person; and

e.   Not having been involved in the activities attributed to them in the "dossier," neither Mr. Gubarev nor any of his companies would have had any need to "*go effectively to ground to cover their traces*" in the event that Ms. Clinton won the presidency.

28.   Although Buzzfeed and Mr. Smith claim that they had the dossier in their possession for weeks prior to its publication, and despite their claims that they had four reporters working near full-time on attempting to verify the claims made in the dossier, prior to publishing the Defamatory Article and the dossier, neither Buzzfeed nor Mr. Smith contacted the Plaintiffs to determine if the allegations made against them had any basis in fact. After the dossier's publication numerous journalists (more than 30) contacted Mr. Gubarev with some even arranging to travel to Cyprus to discuss the publication with Mr. Gubarev. During this time, and up to the present day, neither Buzfeed nor Mr. Smith contacted the Plaintiffs to determine if the allegations made against them had any basis in fact.

29.   At the time the Defendants published the Defamatory Article and accompanying dossier, they knew, without a doubt, that at least certain portions of the dossier were untrue. Indeed, the Defamatory Article stated specifically that:

> The dossier, which is a collection of memos written over a period of months, includes specific, unverified, and potentially unverifiable allegations… BuzzFeed News reporters in the US and Europe have been investigating various alleged facts in the dossier but have not verified or falsified them. …[The dossier] is not just unconfirmed: It includes some clear errors.

30.   In other words, Buzzfeed and Mr. Smith knew for sure *only* that certain parts of the dossier were *untrue*.  Other than the portions confirmed by them to be false, Buzzfeed and Mr. Smith had been unable to verify the veracity of any of the claims made in the dossier.

31.     Indeed, Mr. Smith has admitted that Buzzfeed knew at the time that it published the Defamatory Article and dossier that there were "real solid reasons to distrust" the veracity of the allegations contained therein.

32.     Despite these concerns, Buzzfeed and Mr. Smith took no steps to redact out the names of the Plaintiffs from the dossier, a step they could have taken easily and which would not have changed the character of their reporting.

33.     Buzzfeed and Mr. Smith immediately faced an onslaught of criticism for their irresponsible decision to publish the unverified dossier and the Defamatory Article – drawing condemnation from media outlets and journalism experts across the political spectrum including The Washington Post, CNN, MSNBC, Fox News, and the Poynter Institute to name a few.

34.     Despite this condemnation, Buzzfeed published eight additional follow-up articles, each of which contained a link back to the original Defamatory Article.

30.     In addition, Mr. Smith published an Op-Ed in the New York Times and appeared in numerous television and radio interviews defending his decision to publish the Defamatory Article and the dossier.  Some of these articles and interviews actually compounded the defamatory effect by implying that Buzzfeed had verified the claims made.

35.     For example in his New York Times Op-Ed, Mr. Smith stated that Buzzfeed decided to publish the dossier "only after we had spent weeks with reporters in the United States and Europe trying to confirm or disprove specific claims."  What the New York Times Op-Ed omitted, however, is that Buzzfeed had failed entirely in these efforts.  The Op-Ed also failed to state that Buzzfeed had made no attempts to contact Mr. Gubarev, XBT, or Webzilla and – on information and belief – had made no attempts to verify the claims made as to the Plaintiffs.

36.     Similarly, Mr. Smith stated on CNN's Reliable Sources that Buzzfeed was "running it down every way we could" and told MSNBC's Meet the Press Daily that "we, like many other organizations had had [the dossier] for weeks.  We had reporters in Europe and the United States trying to stand up or knock down specific details."

37.     Buzzfeed and Mr. Smith's decision to publish the unverified dossier not only flew in the face of all journalistic standards and ethics, but also violated Mr. Smith's own claims of how Buzzfeed operates.  Less than two months before it published the Defamatory Article and dossier, Mr. Smith wrote an article for the Columbia Journalism Review in which he claimed that Buzzfeed not only routinely took steps to verify the facts that they published but that doing so was "not complicated."  Specifically, in an article entitled "How tech and media can fight fake news," published on November 17, 2016, Mr. Smith wrote:

> Mark Zuckerberg recently wrote that "identifying the 'truth' is complicated." Maybe for algorithms and epistemologists. But it's something that professional journalists are asked to do every day, and it's not actually that complicated. The everyday reporting truths–who said what, when did they say it, what does the document say, where did the money go–are the sorts of thing we're good at pinning down.

## COUNT I – DEFAMATION AND DEFAMATION PER SE

38.     Plaintiff re-alleges and re-asserts the allegations set forth in paragraphs 1-37 as if fully set forth herein.

39.     Defendants Buzzfeed and Mr. Smith, by and through their representatives, published false and defamatory statements concerning Plaintiffs without privilege to do so.

40.     The false and defamatory statements included, but are not limited to, allegations that:

a.      XBT and Webzilla used "*botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct 'altering operations'*" against the Democratic Party leadership;

b.      "*entities linked*" to Mr. Gubarev were involved in cyber-attacks;

    c.      Mr. Gubarev was "*recruited under duress by the FSB*"

    d.      Mr. Gubarev and his companies acted with "*another hacking expert*" to mount a cyber-attack on the Democratic Party Leadership; and

    e.      Mr. Gubarev and his companies would need to "*go effectively to ground to cover their traces*" in the event that Ms. Clinton won the presidency.

41.    The defamatory statements were published without privilege to third parties, including thousands or tens of thousands (or more) residents of Florida.

42.    None of the Plaintiffs are public figures, nor are they limited public figures for purposes of a defamation analysis.

43.    The defamatory statements were made negligently; without reasonable care as to their truth or falsity; with knowledge of their falsity; and/or with reckless disregard for the truth.

44.    The statements allege that the Plaintiffs committed crimes including (but not limited to) computer hacking and that the Plaintiffs engaged in behavior designed to undermine American democracy and the 2016 Presidential election.

45.    The statement are of the kind that they would tend to prejudice the Plaintiffs in the eyes of a substantial and respectable minority of their communities.

46.    The statements have caused, and will continue to cause, the Plaintiffs injury in their personal, social, and business relations.

47.    XBT and Webzilla have suffered, and will continue to suffer, actual injury as a result of injury to their corporate reputations.  At least one lender has declined to do business with XBT and/or Webzilla based on the defamatory statements published by the Defendants and, on information and belief, the defamatory statements have also cost Webzilla and XBT clients.

48.    Mr. Gubarev has suffered, and will continue to suffer, actual injury as a result of the injury to his personal reputation.

49.     The defamatory statements tend to injure the Plaintiffs in their business trade as the allegations call into question the security and proper operation of the Plaintiffs' businesses. Additionally, the above statements subject Plaintiffs to distrust, scorn, ridicule, hatred, and contempt.  As such, the defamatory statements constitute defamation *per se*.

50.     In addition, as a direct and proximate result of the defamatory statements made by Defendants, Plaintiff has suffered, and continue to suffer, substantial damages.

51.     It is clear from the statements made by Buzzfeed and Mr. Smith, discussed above, that they had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage to the Plaintiffs would result and that, despite that knowledge, the Defendants intentionally pursued that course of conduct, resulting in injury or damage.  Accordingly, and in conformity with Florida Statute §768.72, the Plaintiffs will seek leave of court to seek an award of punitive damages against Defendants.  In the alternative, Plaintiffs will also seek leave of court to seek punitive damages under Florida Statute §768.72 because the Defendants' actions, as described above, were so reckless or wanting in care that they constituted a conscious disregard or indifference to the rights of the Plaintiffs.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs Aleksej Gubarev, XBT Holding S.A., and Webzilla, Inc. pray for judgment against defendants Buzzfeed, Inc. and Ben Smith as follows:

1.     For an award of general and special in an amount in excess fifteen thousand dollars ($15,000.00) in accordance with proof at trial together with interest thereon at the maximum legal rate; and Plaintiffs reserve the right to seek leave of court to seek punitive damages against Defendants in accordance with the facts and claims stated herein and established through discovery;

2.     For costs of suit incurred herein; and

3.     For such other and further relief as to this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted this 3rd day of February, 2017 by:

> The Plaintiffs,
> Aleksej Gubarev,
> XBT Holding S.A.
> Webzilla, Inc.
> By their Attorneys,
>
> COBB EDDY, PLLC
> *Local Counsel for Plaintiffs*
> 642 Northeast Third Avenue
> Fort Lauderdale, Florida 33304
> Telephone: (954) 527-4111
> Facsimile:  (954) 900-5507
> www.cobbeddy.com
>
> **By: /s/ BRADY J. COBB_____**
> BRADY J. COBB, ESQUIRE
> Florida Bar No. 031018
> bcobb@cobbeddy.com
> DYLAN M. FULOP, ESQUIRE
> Florida Bar No. 123809
> dfulop@cobbeddy.com
>
> BOSTON LAW GROUP, PC
> *Lead Counsel for Plaintiffs*
> 825 Beacon Street, Suite 20
> Newton Centre, MA 02459
> Tel:     (617) 928-1804
> Fax:     (617) 928-1802
>
> **By: /s/ Valentin D. Gurvits_____**
> VALENTIN D. GURVITS, ESQUIRE
> *Pro Hac Vice Pending*
> Massachusetts BBO# 643572
> vgurvits@bostonlawgroup.com

EXHIBIT 1

# BOSTON LAW GROUP, PC

### ATTORNEYS AT LAW

825 BEACON STREET, SUITE 20
NEWTON CENTRE, MASSACHUSETTS 02459

Main (617) 928-1800                                                                                    Fax (617) 928-1802

January 28, 2017

**By Email and By Hand Delivery**

Mr. Ben Smith, Editor in Chief
BuzzFeed, Inc.
111 E. 18th Street
13th Floor
New York, NY 10003

Re:    **Aleksej Gubarev, XBT Holding, S.A., and Webzilla, Inc.**

Dear Mr. Smith:

Please be advised that this office represents Mr. Aleksej Gurarev ("Mr. Gubarev"), XBT Holding, S.A. ("XBT"), and Webzilla, Inc., a Florida Corporation ("Webzilla"). Please direct all future communications to me directly.

I am writing to you in accordance with Florida Statutes Chapter 770.01, *et seq.* to provide you with pre-suit notice that Mr. Gubarev, XBT, and Webzilla intend to initiate litigation against Buzzfeed and you individually in connection with the Buzzfeed article published on January 10, 2017 entitled, "These Reports Allege Trump Has Deep Ties To Russia." The article, which at the time of this writing has been viewed more than 5.8 million times, can be found at https://www.buzzfeed.com/kenbensinger/these-reports-allege-trump-has-deep-ties-to-russia?utm_term=.fvQvex17e#.yezx3nBr3.

As you are aware, this article attached a 35-page so-called "dossier" of information allegedly compiled by a private security company in which various allegations were made concerning, among other things, allegations of computer hacking of the Democratic Party allegedly carried out by persons or organizations with ties to Russia, the Russian Government, and/or the Federal Security Service of the Russian Federation ("FSB").[1]

---

[1] The FSB is the main successor agency to the USSR's Committee of State Security ("KGB").

Mr. Ben Smith
January 28, 2017
Page 2

Of particular concern to my clients, the dossier which you published contained the following assertions of fact:

> *[redacted] reported that over the period March-September 2016 a company called XBT/Webzilla and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct "altering operations" against the Democratic Party leadership. Entities linked to one Alexei GUBAROV [sic] were involved and he and another hacking expert, both recruited under duress by the FSB, Seva KAPSUGOVICH, were significant players in this operation. In Prague, COHEN agreed contingency plans for various scenarios to protect the operations, but in particular what was to be done in the event that Hillary CLINTON won the presidency. It was important in this event that all cash payments owed were made quickly and discreetly and that cyber and that cyber and other operators were stood down / able to go effectively to ground to cover their traces.*

I want to be abundantly clear: Not a single portion of this statement (as it applies to Mr. Guberav, XBT, or Webzilla) has any basis in fact whatsoever. Specifically:

1. Neither XBT nor Webzilla nor any of their affiliates had been "*using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct 'altering operations'*" against the Democratic Party leadership or anyone else;

2. No "*entities linked*" to Mr. Gubarev were involved in any alleged cyber-attacks;

3. Mr. Gubarev was not "*recruited under duress by the FSB*" (to be clear, he was not recruited at all – whether under duress or otherwise), nor was he recruited for such activities by anyone else at any other time or in any other circumstances whatsoever. Additionally, he has no knowledge of, has never met and has never spoken to a person known as Seva Kapsugovich;

4. Mr. Gubarev and his companies have never acted with "*another hacking expert*" to mount a cyber-attack on the Democratic Party Leadership or on any other person; and

5. Not having been involved in the activities you attribute to them in the "dossier," neither Mr. Gubarev nor any of his companies would have had any need to "*go effectively to ground to cover their traces*" in the event that Ms. Clinton won the presidency.

I would be remiss if I did not mention that this is not the ordinary case in which a media outlet, in good faith, published information that it reasonably believed to be true. Buzzfeed (and you, specifically) explicitly did *not* believe that all aspects of the report were true – and, indeed, you have said as much. Buzzfeed did nothing to confirm the truth or falsity of the information with respect to Mr. Gubarev, XBT, or Webzilla. Buzzfeed made no attempts to contact Mr. Gubarev, XBT, or Webzilla and – perhaps most disturbingly – Buzzfeed did not even bother to

Mr. Ben Smith
January 28, 2017
Page 3

take the simple step of redacting my clients' names, something that would have taken no time, cost no money, and not changed the character of your "reporting" at all. This was, in short, a complete abdication of journalistic standards and ethics.

Despite your explicit knowledge that certain facts contained in the report were untrue, you published the allegations concerning Mr. Gubarev, XBT, and Webzilla apparently without the slightest care as to how such publication would adversely impact Mr. Gubarev, XBT, and Webzilla.

Mr. Gubarev is not, in any way, shape, or form, a public figure. He is a private individual who woke up one day to find that your website had – shockingly – tied him to an alleged Russian conspiracy to commit crimes against Democratic Leaders, not to mention a conspiracy to undermine American Democracy. The resulting damage was immediate, ongoing, and completely predictable. Mr. Gubarev is married with three young children. As a result of the publication of your article, his wife has found herself a target of online harassment and the family's personal security compromised. Mr. Gubarev has found his professional and personal reputation left in tatters. Similarly, the economic damages to XBT and Webzilla – including (but not limited to) the harm to the company's previously-unblemished reputation with its clients, lenders, vendors, and others has been immediate. That Webzilla would be harmed in Florida, where it is incorporated and has offices, as well as in other locations across the globe was also fully predictable.

Pursuant to the Florida Statute, my clients are demanding an immediate and complete retraction of the libelous materials in a manner designed to be as visible as the original article. Such retraction should take place immediately and, at the latest, prior to February 3, 2017. As noted, Mr. Gubarev, XBT, and Webzilla intend to initiate litigation in Florida. Please understand, however, that the issuance of such a retraction – while absolutely necessary – will *not* relieve you of the potential for punitive damages because the original report was not "published in good faith; that its falsity was due to an honest mistake of the facts; [or] that there were reasonable grounds for believing that the statements in said article or broadcast were true." Florida Statutes Chapter 770.02(a). Nevertheless, my clients consider such a retraction to be a precursor to any possible discussion of an amicable resolution to this matter.

If you or your counsel would like to discuss this matter prior to the initiation of litigation, please feel free to contact me before February 3, 2017.

Sincerely,

Val Gurvits

Filing # 52031663 E-Filed 02/03/2017 11:55:42 AM

# EXHIBIT 2

Buzzfeed **NEWS**

News   Videos   Quizzes   Tasty   DIY   More   Get Our News App

       

TOP POST
5,950,378 VIEWS 

# These Reports Allege Trump Has Deep Ties To Russia

A dossier, compiled by a person who has claimed to be a former British intelligence official, alleges Russia has compromising information on Trump. The allegations are unverified, and the report contains errors.

Originally posted on Jan. 10, 2017, at 6:20 p.m.
Updated on Jan. 10, 2017, at 9:09 p.m.

 **Ken Bensinger**
BuzzFeed News Reporter

 **Miriam Elder**
BuzzFeed News World Editor

 **Mark Schoofs**
BuzzFeed News Investigations Editor

    


*Drew Angerer / Getty Images*

A dossier making explosive — but unverified — allegations that the Russian government has been "cultivating, supporting and assisting" President-elect Donald Trump for years and gained compromising information about him has been

## In The News Today

- President Trump's senior adviser Kellyanne Conway says she meant to say "Bowling Green terrorists" after citing a nonexistent "massacre."

- Hundreds of US residents are still trapped by Trump's executive immigration orders, fueling a bitter battle between civil rights attorneys and border patrol agents.

- Uber CEO Travis Kalanick is dropping out of Donald Trump's economic advisory panel after backlash among customers led to the "Delete Uber" hashtag.

- A pharmaceutical company hiked the price of its life-saving overdose antidote from $575 to $4,100 in the middle of an opioid epidemic.

Download the BuzzFeed News app


This Is How France's Nationalist Party Is Winning Gay Support
by J. Lester Feder

### Connect With USNews

Like Us On Facebook

Follow Us On Twitter

circulating among elected officials, intelligence agents, and journalists for weeks.

The dossier, which is a collection of memos written over a period of months, includes specific, unverified, and potentially unverifiable allegations of contact between Trump aides and Russian operatives, and graphic claims of sexual acts documented by the Russians. BuzzFeed News reporters in the US and Europe have been investigating various alleged facts in the dossier but have not verified or falsified them. CNN reported Tuesday that a two-page synopsis of the report was given to President Obama and Trump.

Now BuzzFeed News is publishing the full document so that Americans can make up their own minds about allegations about the president-elect that have circulated at the highest levels of the US government.

The document was prepared for political opponents of Trump by a person who is understood to be a former British intelligence agent. It is not just unconfirmed: It includes some clear errors. The report misspells the name of one company, "Alpha Group," throughout. It is Alfa Group. The report says the settlement of Barvikha, outside Moscow, is "reserved for the residences of the top leadership and their close associates." It is not reserved for anyone, and it is also populated by the very wealthy.

The Trump administration's transition team did not immediately respond to BuzzFeed News' request for comment. However, the president-elect's attorney, Michael Cohen, told *Mic* that the allegations were absolutely false.

"It's so ridiculous on so many levels," he said. "Clearly, the person who created this did so from their imagination or did so hoping that the liberal media would run with this fake story for whatever rationale they might have."

And Trump shot back against the reports a short time later on Twitter.

His former campaign manager and current senior White House adviser, Kellyanne Conway, also denied the claims during an appearance on *Late Night With Seth Meyers,* adding that "nothing has been confirmed." She also said Trump was "not aware" of any briefing on the matter.

The documents have circulated for months and acquired a kind of legendary status among journalists, lawmakers, and intelligence officials who have seen them. *Mother Jones* writer David Corn referred to the documents in a late October column.

Harry Reid spokesman Adam Jentleson tweeted Tuesday that the former Senate Democratic leader had seen the documents before writing a public letter to FBI Director James Comey about Trump's ties to Russia. And CNN reported Tuesday that Arizona Republican John McCain gave a "full copy" of the memos to Comey on Dec. 9, but that the FBI already had copies of many of the memos.

**If you have tips related to this story, write us at trumpstories@buzzfeed.com. To send us information confidentially, go here.**

News moves fast. Keep up with the BuzzFeed News daily email.



## More News



Mexico's President Canceled His Meeting With Trump Rather Than Pay For The Wall



Gorsuch Would Join The Supreme Court Millionaires' Club If He's Confirmed



The White House Thinks Crimea Sanctions Should Stay Until Russia Returns It



Pentagon Report: The Military Spun Their Intel To Make ISIS Seem Weaker

**Read the report here:**





Israeli Officials Actually Don't Want The US To Move Its Embassy To Jerusalem



Trump To Publish Weekly List Of Crimes Committed By Undocumented Immigrants In Sanctuary Cities



Trump's Immigration Order Is Seriously Complicating The CIA's Job



Thousands Of Harvard Alumni Implore Jared Kushner For A Meeting



Meet The "Good Trolls" Secretly Spying On Trump Supporters And Neo-Nazis



Fox News Deleted A Tweet About The Quebec Shooting After Canada's Government Objected

More News

Ken Bensinger is an investigative reporter for BuzzFeed News and is based in Los Angeles. His secure PGP fingerprint is 97CC 6E32 10A2 23FE 4E84 98B4 9CFF 4214 9D26 8AA7
Contact Ken Bensinger at ken.bensinger@buzzfeed.com.

Miriam Elder is the world editor for BuzzFeed News and is based in New York. Her secure PGP fingerprint is 5B5F EC17 C20B C11F 226D 3EBE 6205 F92F AC14 DCB1
Contact Miriam Elder at miriam.elder@buzzfeed.com.

Pulitzer-prize winner Mark Schoofs is the investigations and projects editor for BuzzFeed News. While working at The Village Voice, Schoofs won the 2000 Pulitzer Prize for International Reporting for his series on AIDS in Africa.
Contact Mark Schoofs at mark.schoofs@buzzfeed.com.

Filing # 52031663 E-Filed 02/03/2017 11:55:42 AM

# EXHIBIT 3

CONFIDENTIAL/SENSITIVE SOURCE

COMPANY INTELLIGENCE REPORT 2016/080

## US PRESIDENTIAL ELECTION: REPUBLICAN CANDIDATE DONALD TRUMP'S ACTIVITIES IN RUSSIA AND COMPROMISING RELATIONSHIP WITH THE KREMLIN

### Summary

- Russian regime has been cultivating, supporting and assisting TRUMP for at least 5 years. Aim, endorsed by PUTIN, has been to encourage splits and divisions in western alliance

- So far TRUMP has declined various sweetener real estate business deals offered him in Russia in order to further the Kremlin's cultivation of him. However he and his inner circle have accepted a regular flow of intelligence from the Kremlin, including on his Democratic and other political rivals

- Former top Russian intelligence officer claims FSB has compromised TRUMP through his activities in Moscow sufficiently to be able to blackmail him. According to several knowledgeable sources, his conduct in Moscow has included perverted sexual acts which have been arranged/monitored by the FSB

- A dossier of compromising material on Hillary CLINTON has been collated by the Russian Intelligence Services over many years and mainly comprises bugged conversations she had on various visits to Russia and intercepted phone calls rather than any embarrassing conduct. The dossier is controlled by Kremlin spokesman, PESKOV, directly on PUTIN's orders. However it has not as yet been distributed abroad, including to TRUMP. Russian intentions for its deployment still unclear

### Detail

1. Speaking to a trusted compatriot in June 2016 sources A and B, a senior Russian Foreign Ministry figure and a former top level Russian intelligence officer still active inside the Kremlin respectively, the Russian authorities had been cultivating and supporting US Republican presidential candidate, Donald TRUMP for at least 5 years. Source B asserted that the TRUMP operation was both supported and directed by Russian President Vladimir PUTIN. Its aim was to sow discord and

CONFIDENTIAL/SENSITIVE SOURCE

CONFIDENTIAL/SENSITIVE SOURCE

disunity both within the US itself, but more especially within the Transatlantic alliance which was viewed as inimical to Russia's interests. Source C, a senior Russian financial official said the TRUMP operation should be seen in terms of PUTIN's desire to return to Nineteenth Century 'Great Power' politics anchored upon countries' interests rather than the ideals-based international order established after World War Two. S/he had overheard PUTIN talking in this way to close associates on several occasions.

2. In terms of specifics, Source A confided that the Kremlin had been feeding TRUMP and his team valuable intelligence on his opponents, including Democratic presidential candidate Hillary CLINTON, for several years (see more below). This was confirmed by Source D, a close associate of TRUMP who had organized and managed his recent trips to Moscow, and who reported, also in June 2016, that this Russian intelligence had been "very helpful". The Kremlin's cultivation operation on TRUMP also had comprised offering him various lucrative real estate development business deals in Russia, especially in relation to the ongoing 2018 World Cup soccer tournament. However, so far, for reasons unknown, TRUMP had not taken up any of these.

3. However, there were other aspects to TRUMP's engagement with the Russian authorities. One which had borne fruit for them was to exploit TRUMP's personal obsessions and sexual perversion in order to obtain suitable 'kompromat' (compromising material) on him. According to Source D, where s/he had been present, TRUMP's (perverted) conduct in Moscow included hiring the presidential suite of the Ritz Carlton Hotel, where he knew President and Mrs OBAMA (whom he hated) had stayed on one of their official trips to Russia, and defiling the bed where they had slept by employing a number of prostitutes to perform a 'golden showers' (urination) show in front of him. The hotel was known to be under FSB control with microphones and concealed cameras in all the main rooms to record anything they wanted to.

4. The Moscow Ritz Carlton episode involving TRUMP reported above was confirmed by Source E, ██████████████████████████████████████ who said that s/he and several of the staff were aware of it at the time and subsequently. S/he believed it had happened in 2013. Source E provided an introduction for a company ethnic Russian operative to Source F, a female staffer at the hotel when TRUMP had stayed there, who also confirmed the story. Speaking separately in June 2016, Source B (the former top level Russian intelligence officer) asserted that TRUMP's unorthodox behavior in Russia over the years had provided the authorities there with enough embarrassing material on the now Republican presidential candidate to be able to blackmail him if they so wished.

5. Asked about the Kremlin's reported intelligence feed to TRUMP over recent years and rumours about a Russian dossier of 'kompromat' on

CONFIDENTIAL/SENSITIVE SOURCE

CONFIDENTIAL/SENSITIVE SOURCE

Hillary CLINTON (being circulated), Source B confirmed the file's existence. S/he confided in a trusted compatriot that it had been collated by Department K of the FSB for many years, dating back to her husband Bill's presidency, and comprised mainly eavesdropped conversations of various sorts rather than details/evidence of unorthodox or embarrassing behavior. Some of the conversations were from bugged comments CLINTON had made on her various trips to Russia and focused on things she had said which contradicted her current position on various issues. Others were most probably from phone intercepts.

6. Continuing on this theme, Source G, a senior Kremlin official, confided that the CLINTON dossier was controlled exclusively by chief Kremlin spokesman, Dmitriy PESKOV, who was responsible for compiling/handling it on the explicit instructions of PUTIN himself. The dossier however had not as yet been made available abroad, including to TRUMP or his campaign team. At present it was unclear what PUTIN's intentions were in this regard.

20 June 2016

CONFIDENTIAL/SENSITIVE SOURCE

COMPANY INTELLIGENCE REPORT 2016/086

## RUSSIA/CYBER CRIME: A SYNOPSIS OF RUSSIAN STATE SPONSORED AND OTHER CYBER OFFENSIVE (CRIMINAL) OPERATIONS

### Summary

- Russia has extensive programme of state-sponsored offensive cyber operations. External targets include foreign governments and big corporations, especially banks. FSB leads on cyber within Russian apparatus. Limited success in attacking top foreign targets like G7 governments, security services and IFIs but much more on second tier ones through IT back doors, using corporate and other visitors to Russia

- FSB often uses coercion and blackmail to recruit most capable cyber operatives in Russia into its state-sponsored programmes. Heavy use also, both wittingly and unwittingly, of CIS emigres working in western corporations and ethnic Russians employed by neighbouring governments e.g. Latvia

- Example cited of successful Russian cyber operation targeting senior Western business visitor. Provided back door into important Western institutions.

- Example given of US citizen of Russian origin approached by FSB and offered incentive of "investment" in his business when visiting Moscow.

- Problems however for Russian authorities themselves in countering local hackers and cyber criminals, operating outside state control. Central Bank claims there were over 20 serious attacks on correspondent accounts held by CBR in 2015, comprising Roubles several billion in fraud

- Some details given of leading non-state Russian cyber criminal groups

### Details

1. Speaking in June 2016, a number of Russian figures with a detailed knowledge of national cyber crime, both state-sponsored and otherwise, outlined the current situation in this area. A former senior intelligence officer divided Russian state-sponsored offensive cyber operations into four categories (in order of priority):- targeting foreign, especially

CONFIDENTIAL/SENSITIVE SOURCE

western governments; penetrating leading foreign business corporations, especially banks; domestic monitoring of the elite; and attacking political opponents both at home and abroad. The former intelligence officer reported that the Federal Security Service (FSB) was the lead organization within the Russian state apparatus for cyber operations.

2. In terms of the success of Russian offensive cyber operations to date, a senior government figure reported that there had been only limited success in penetrating the "first tier" foreign targets. These comprised western (especially G7 and NATO) governments, security and intelligence services and central banks, and the IFIs. To compensate for this shortfall, massive effort had been invested, with much greater success, in attacking the "secondary targets", particularly western private banks and the governments of smaller states allied to the West. S/he mentioned Latvia in this regard. Hundreds of agents, either consciously cooperating with the FSB or whose personal and professional IT systems had been unwittingly compromised, were recruited. Many were people who had ethnic and family ties to Russia and/or had been incentivized financially to cooperate. Such people often would receive monetary inducements or contractual favours from the Russian state or its agents in return. This had created difficulties for parts of the Russian state apparatus in obliging/indulging them e.g. the Central Bank of Russia knowingly having to cover up for such agents' money laundering operations through the Russian financial system.

3. In terms of the FSB's recruitment of capable cyber operatives to carry out its, ideally deniable, offensive cyber operations, a Russian IT specialist with direct knowledge reported in June 2016 that this was often done using coercion and blackmail. In terms of 'foreign' agents, the FSB was approaching US citizens of Russian (Jewish) origin on business trips to Russia. In one case a US citizen of Russian ethnicity had been visiting Moscow to attract investors in his new information technology program. The FSB clearly knew this and had offered to provide seed capital to this person in return for them being able to access and modify his IP, with a view to targeting priority foreign targets by planting a Trojan virus in the software. The US visitor was told this was common practice. The FSB also had implied significant operational success as a result of installing cheap Russian IT games containing their own malware unwittingly by targets on their PCs and other platforms.

4. In a more advanced and successful FSB operation, an IT operator inside a leading Russian SOE, who previously had been employed on conventional (defensive) IT work there, had been under instruction for the last year to conduct an offensive cyber operation against a foreign director of the company. Although the latter was apparently an infrequent visitor to Russia, the FSB now successfully had penetrated his personal IT and through this had managed to access various important institutions in the West through the back door.

5

CONFIDENTIAL/SENSITIVE SOURCE

5.  In terms of other technical IT platforms, an FSB cyber operative flagged
    up the 'Telegram' enciphered commercial system as having been of
    especial concern and therefore heavily targeted by the FSB, not least
    because it was used frequently by Russian internal political activists and
    oppositionists. His/her understanding was that the FSB now successfully
    had cracked this communications software and therefore it was no longer
    secure to use.

6.  The senior Russian government figure cited above also reported that
    non-state sponsored cyber crime was becoming an increasing problem
    inside Russia for the government and authorities there. The Central Bank
    of Russia claimed that in 2015 alone there had been more than 20
    attempts at serious cyber embezzlement of money from corresponding
    accounts held there, comprising several billions Roubles. More generally,
    s/he understood there were circa 15 major organised crime groups in the
    country involved in cyber crime, all of which continued to operate largely
    outside state and FSB control. These included the so-called 'Anunak',
    'Buktrap' and 'Metel' organisations.

**26 July 2015**

COMPANY INTELLIGENCE REPORT 2016/095

## RUSSIA/US PRESIDENTIAL ELECTION: FURTHER INDICATIONS OF EXTENSIVE CONSPIRACY BETWEEN TRUMP'S CAMPAIGN TEAM AND THE KREMLIN

### Summary

- Further evidence of extensive conspiracy between TRUMP's campaign team and Kremlin, sanctioned at highest levels and involving Russian diplomatic staff based in the US

- TRUMP associate admits Kremlin behind recent appearance of DNC e-mails on WikiLeaks, as means of maintaining plausible deniability

- Agreed exchange of information established in both directions. TRUMP's team using moles within DNC and hackers in the US as well as outside in Russia. PUTIN motivated by fear and hatred of Hillary CLINTON. Russians receiving intel from TRUMP's team on Russian oligarchs and their families in US

- Mechanism for transmitting this intelligence involves "pension" disbursements to Russian emigres living in US as cover, using consular officials in New York, DC and Miami

- Suggestion from source close to TRUMP and MANAFORT that Republican campaign team happy to have Russia as media bogeyman to mask more extensive corrupt business ties to China and other emerging countries

### Detail

1. Speaking in confidence to a compatriot in late July 2016, Source E, an ethnic Russian close associate of Republican US presidential candidate Donald TRUMP, admitted that there was a well-developed conspiracy of co-operation between them and the Russian leadership. This was managed on the TRUMP side by the Republican candidate's campaign manager, Paul MANAFORT, who was using foreign policy advisor, Carter PAGE, and others as intermediaries. The two sides had a mutual interest in defeating Democratic presidential candidate Hillary CLINTON, whom President PUTIN apparently both hated and feared.

2. Inter alia, Source E, acknowledged that the Russian regime had been behind the recent leak of embarrassing e-mail messages, emanating from the Democratic National Committee (DNC), to the WikiLeaks platform.

CONFIDENTIAL/SENSITIVE SOURCE

CONFIDENTIAL/SENSITIVE SOURCE

The reason for using WikiLeaks was "plausible deniability" and the operation had been conducted with the full knowledge and support of TRUMP and senior members of his campaign team. In return the TRUMP team had agreed to sideline Russian intervention in Ukraine as a campaign issue and to raise US/NATO defence commitments in the Baltics and Eastern Europe to deflect attention away from Ukraine, a priority for PUTIN who needed to cauterise the subject.

3. In the wider context of TRUMP campaign/Kremlin co-operation, Source E claimed that the intelligence network being used against CLINTON comprised three elements. Firstly there were agents/facilitators within the Democratic Party structure itself; secondly Russian émigré and associated offensive cyber operators based in the US; and thirdly, state-sponsored cyber operatives working in Russia. All three elements had played an important role to date. On the mechanism for rewarding relevant assets based in the US, and effecting a two-way flow of intelligence and other useful information, Source E claimed that Russian diplomatic staff in key cities such as New York, Washington DC and Miami were using the émigré 'pension' distribution system as cover. The operation therefore depended on key people in the US Russian émigré community for its success. Tens of thousands of dollars were involved.

4. In terms of the intelligence flow from the TRUMP team to Russia, Source E reported that much of this concerned the activities of business oligarchs and their families' activities and assets in the US, with which PUTIN and the Kremlin seemed preoccupied.

5. Commenting on the negative media publicity surrounding alleged Russian interference in the US election campaign in support of TRUMP, Source E said he understood that the Republican candidate and his team were relatively relaxed about this because it deflected media and the Democrats' attention away from TRUMP's business dealings in China and other emerging markets. Unlike in Russia, these were substantial and involved the payment of large bribes and kickbacks which, were they to become public, would be potentially very damaging to their campaign.

6. Finally, regarding TRUMP's claimed minimal investment profile in Russia, a separate source with direct knowledge said this had not been for want of trying. TRUMP's previous efforts had included exploring the real estate sector in St Petersburg as well as Moscow but in the end TRUMP had had to settle for the use of extensive sexual services there from local prostitutes rather than business success.

CONFIDENTIAL/SENSITIVE SOURCE

COMPANY INTELLIGENCE REPORT 2016/94

## RUSSIA: SECRET KREMLIN MEETINGS ATTENDED BY TRUMP ADVISOR, CARTER PAGE IN MOSCOW (JULY 2016)

### Summary

- TRUMP advisor Carter PAGE holds secret meetings in Moscow with SECHIN and senior Kremlin Internal Affairs official, DIVYEKIN

- SECHIN raises issues of future bilateral US-Russia energy co-operation and associated lifting of western sanctions against Russia over Ukraine. PAGE non-committal in response

- DIVEYKIN discusses release of Russian dossier of 'kompromat' on TRUMP's opponent, Hillary CLINTON, but also hints at Kremlin possession of such material on TRUMP

### Detail

1. Speaking in July 2016, a Russian source close to Rosneft President, PUTIN close associate and US-sanctioned individual, Igor SECHIN, confided the details of a recent secret meeting between him and visiting Foreign Affairs Advisor to Republican presidential candidate Donald TRUMP, Carter PAGE.

2. According to SECHIN's associate, the Rosneft President (CEO) had raised with PAGE the issues of future bilateral energy cooperation and prospects for an associated move to lift Ukraine-related western sanctions against Russia. PAGE had reacted positively to this demarche by SECHIN but had been generally non-committal in response.

3. Speaking separately, also in July 2016, an official close to Presidential Administration Head, S. IVANOV, confided in a compatriot that a senior colleague in the Internal Political Department of the PA, DIVYEKIN (nfd) also had met secretly with PAGE on his recent visit. Their agenda had included DIVEYKIN raising a dossier of 'kompromat' the Kremlin possessed on TRUMP's Democratic presidential rival, Hillary CLINTON, and its possible release to the Republican's campaign team.

4. However, the Kremlin official close to S. IVANOV added that s/he believed DIVEYKIN also had hinted (or indicated more strongly) that the Russian leadership also had 'kompromat' on TRUMP which the latter should bear in mind in his dealings with them.

9

**19 July 2016**

COMPANY INTELLIGENCE REPORT 2016/097

**RUSSIA-US PRESIDENTIAL ELECTION: KREMLIN CONCERN THAT POLITICAL FALLOUT FROM DNC E-MAIL HACKING AFFAIR SPIRALLING OUT OF CONTROL**

**Summary**

- Kremlin concerned that political fallout from DNC e-mail hacking operation is spiralling out of control. Extreme nervousness among TRUMP's associates as result of negative media attention/accusations

- Russians meanwhile keen to cool situation and maintain 'plausible deniability' of existing /ongoing pro-TRUMP and anti-CLINTON operations. Therefore unlikely to be any ratcheting up offensive plays in immediate future

- Source close to TRUMP campaign however confirms regular exchange with Kremlin has existed for at least 8 years, including intelligence fed back to Russia on oligarchs' activities in US

- Russians apparently have promised not to use 'kompromat' they hold on TRUMP as leverage, given high levels of voluntary co-operation forthcoming from his team

**Detail**

1. Speaking in confidence to a trusted associate in late July 2016, a Russian émigré figure close to the Republican US presidential candidate Donald TRUMP's campaign team commented on the fallout from publicity surrounding the Democratic National Committee (DNC) e-mail hacking scandal. The émigré said there was a high level of anxiety within the TRUMP team as a result of various accusations levelled against them and indications from the Kremlin that President PUTIN and others in the leadership thought things had gone too far now and risked spiralling out of control.

2. Continuing on this theme, the émigré associate of TRUMP opined that the Kremlin wanted the situation to calm but for 'plausible deniability' to be maintained concerning its (extensive) pro-TRUMP and anti-CLINTON operations. S/he therefore judged that it was unlikely these would be ratcheted up, at least for the time being.

3. However, in terms of established operational liaison between the TRUMP team and the Kremlin, the émigré confirmed that an intelligence exchange had been running between them for at least 8 years. Within this context PUTIN's priority requirement had been for intelligence on the activities, business and otherwise, in the US of leading Russian oligarchs and their families. TRUMP and his associates duly had obtained and supplied the Kremlin with this information.

4. Finally, the émigré said s/he understood the Kremlin had more intelligence on CLINTON and her campaign but he did not know the details or when or if it would be released. As far as 'kompromat' (compromising information) on TRUMP were concerned, although there was plenty of this, he understood the Kremlin had given its word that it would not be deployed against the Republican presidential candidate given how helpful and co-operative his team had been over several years, and particularly of late.

30 July 2016

COMPANY INTELLIGENCE REPORT 2016/100

## RUSSIA/USA: GROWING BACKLASH IN KREMLIN TO DNC HACKING AND TRUMP SUPPORT OPERATIONS

### Summary

- Head of PA IVANOV laments Russian intervention in US presidential election and black PR against CLINTON and the DNC. Vows not to supply intelligence to Kremlin PR operatives again. Advocates now sitting tight and denying everything

- Presidential spokesman PESKOV the main protagonist in Kremlin campaign to aid TRUMP and damage CLINTON. He is now scared and fears being made scapegoat by leadership for backlash in US. Problem compounded by his botched intervention in recent Turkish crisis

- Premier MEDVEDEV's office furious over DNC hacking and associated anti-Russian publicity. Want good relations with US and ability to travel there. Refusing to support or help cover up after PESKOV

- Talk now in Kremlin of TRUMP withdrawing from presidential race altogether, but this still largely wishful thinking by more liberal elements in Moscow

### Detail

1. Speaking in early August 2016, two well-placed and established Kremlin sources outlined the divisions and backlash in Moscow arising from the leaking of Democratic National Committee (DNC) e-mails and the wider pro-TRUMP operation being conducted in the US. Head of Presidential Administration, Sergei IVANOV, was angry at the recent turn of events. He believed the Kremlin "team" involved, led by presidential spokesman Dmitriy PESKOV, had gone too far in interfering in foreign affairs with their "elephant in a china shop black PR". IVANOV claimed always to have opposed the handling and exploitation of intelligence by this PR "team". Following the backlash against such foreign interference in US politics, IVANOV was advocating that the only sensible course of action now for the Russian leadership was to "sit tight and deny everything".

2. Continuing on this theme the source close to IVANOV reported that PESKOV now was "scared shitless" that he would be scapegoated by PUTIN and the Kremlin and held responsible for the backlash against Russian political interference in the US election. IVANOV was determined

to stop PESKOV playing an independent role in relation to the US going forward and the source fully expected the presidential spokesman now to lay low. PESKOV's position was not helped by a botched attempt by him also to interfere in the recent failed coup in Turkey from a government relations (GR) perspective (no further details).

3. The extent of disquiet and division within Moscow caused by the backlash against Russian interference in the US election was underlined by a second source, close to premier Dmitriy MEDVEDEV (DAM). S/he said the Russian prime minister and his colleagues wanted to have good relations with the US, regardless of who was in power there, and not least so as to be able to travel there in future, either officially or privately. They were openly refusing to cover up for PESKOV and others involved in the DNC/TRUMP operations or to support his counter-attack of allegations against the USG for its alleged hacking of the Russian government and state agencies.

4. According to the first source, close to IVANOV, there had been talk in the Kremlin of TRUMP being forced to withdraw from the presidential race altogether as a result of recent events, ostensibly on grounds of his psychological state and unsuitability for high office. This might not be so bad for Russia in the circumstances but in the view of the source, it remained largely wishful thinking on the part of those in the regime opposed to PESKOV and his "botched" operations, at least for the time being.

**5 August 2016**

COMPANY INTELLIGENCE REPORT 2016/101

RUSSIA/US PRESIDENTIAL ELECTION: SENIOR KREMLIN FIGURE OUTLINES EVOLVING RUSSIAN TACTICS IN PRO-TRUMP, ANTI-CLINTON OPERATION

Summary

- Head of PA, IVANOV assesses Kremlin intervention in US presidential election and outlines leadership thinking on operational way forward

- No new leaks envisaged, as too politically risky, but rather further exploitation of (WikiLeaks) material already disseminated to exacerbate divisions

- Educated US youth to be targeted as protest (against CLINTON) and swing vote in attempt to turn them over to TRUMP

- Russian leadership, including PUTIN, celebrating perceived success to date in splitting US hawks and elite

- Kremlin engaging with several high profile US players, including STEIN, PAGE and (former DIA Director Michael Flynn), and funding their recent visits to Moscow

Details

1.  Speaking in confidence to a close colleague in early August 2016, Head of the Russian Presidential Administration (PA), Sergei IVANOV, assessed the impact and results of Kremlin intervention in the US presidential election to date. Although most commentators believed that the Kremlin was behind the leaked DNC/CLINTON e-mails, this remained technically deniable. Therefore the Russians would not risk their position for the time being with new leaked material, even to a third party like WikiLeaks. Rather the tactics would be to spread rumours and misinformation about the content of what already had been leaked and make up new content.

2.  Continuing on this theme, IVANOV said that the audience to be targeted by such operations was the educated youth in America as the PA assessed that there was still a chance they could be persuaded to vote for Republican candidate Donald TRUMP as a protest against the Washington establishment (in the form of Democratic candidate Hillary CLINTON). The hope was that even if she won, as a result of this CLINTON in power would be bogged down in working for internal reconciliation in the US, rather than being able to focus on foreign policy which would damage Russia's interests. This also should give President PUTIN more room for manoeuvre in the run-up to Russia's own presidential election in 2018.

3.  IVANOV reported that although the Kremlin had underestimated the strength of US media and liberal reaction to the DNC hack and TRUMP's links to Russia, PUTIN was generally satisfied with the progress of the anti-CLINTON operation to date. He recently had had a drink with PUTIN to mark this. In IVANOV's view, the US had tried to divide the Russian elite with sanctions but failed, whilst they, by contrast, had succeeded in splitting the US hawks inimical to Russia and the Washington elite more generally, half of whom had refused to endorse any presidential candidate as a result of Russian intervention.

4.  Speaking separately, also in early August 2016, a Kremlin official involved in US relations commented on aspects of the Russian operation to date. Its goals had been threefold- asking sympathetic US actors how Moscow could help them; gathering relevant intelligence; and creating and disseminating compromising information ('kompromat'). This had involved the Kremlin supporting various US political figures, including funding indirectly their recent visits to Moscow. S/he named a delegation from Lyndon LAROUCHE; presidential candidate Jill STEIN of the Green Party; TRUMP foreign policy adviser

Carter PAGE; and former DIA Director Michael Flynn, in this regard and as successful in terms of perceived outcomes.

10 August 2016

COMPANY INTELLIGENCE REPORT 2016/102

RUSSIA/US PRESIDENTIAL ELECTION: REACTION IN TRUMP CAMP TO RECENT NEGATIVE PUBLICITY ABOUT RUSSIAN INTERFERENCE AND LIKELY RESULTING TACTICS GOING FORWARD

Summary

- TRUMP campaign insider reports recent DNC e-mail leaks were aimed at switching SANDERS (protest) voters away from CLINTON and over to TRUMP

- Admits Republican campaign underestimated resulting negative reaction from US liberals, elite and media and forced to change course as result

- Need now to turn tables on CLINTON's use of PUTIN as bogeyman in election, although some resentment at Russian president's perceived attempt to undermine USG and system over and above swinging presidential election

Detail

1. Speaking in confidence on 9 August 2016, an ethnic Russian associate of Republican US presidential candidate Donald TRUMP discussed the reaction inside his camp, and revised tactics therein resulting from recent negative publicity concerning Moscow's clandestine involvement in the campaign. TRUMP's associate reported that the aim of leaking the DNC e-mails to WikiLeaks during the Democratic Convention had been to swing supporters of Bernie SANDERS away from Hillary CLINTON and across to TRUMP. These voters were perceived as activist and anti-status quo and anti-establishment and in that regard sharing many features with the TRUMP campaign, including a visceral dislike of Hillary CLINTON. This objective had been conceived and promoted, inter alia, by TRUMP's foreign policy adviser Carter PAGE who had discussed it directly with the ethnic Russian associate.

2. Continuing on this theme, the ethnic Russian associate of TRUMP assessed that the problem was that the TRUMP campaign had underestimated the strength of the negative reaction from liberals and especially the conservative elite to Russian interference. This was forcing a rethink and a likely change of tactics. The main objective in the short term was to check Democratic candidate Hillary CLINTON's successful exploitation of the PUTIN as bogeyman/Russian interference story to tarnish TRUMP and bolster her own (patriotic) credentials. The TRUMP campaign was focusing on tapping into support in the American television media to achieve this, as they reckoned this resource had been underused by them to date.

3. However, TRUMP's associate also admitted that there was a fair amount of anger and resentment within the Republican candidate's team at what was perceived by PUTIN as going beyond the objective of weakening CLINTON and bolstering TRUMP, by attempting to exploit the situation to undermine the US government and democratic system more generally. It was unclear at present how this aspect of the situation would play out in the weeks to come.

10 August 2016

COMPANY INTELLIGENCE REPORT 2016/136

## RUSSIA/US PRESIDENTIAL ELECTION: FURTHER DETAILS OF TRUMP LAWYER COHEN'S SECRET LIAISON WITH THE KREMLIN

### Summary

- Kremlin insider reports TRUMP lawyer COHEN's secret meeting/s with Kremlin officials in August 2016 was/were held in Prague

- Russian parastatal organisation Rossotrudnichestvo used as cover for this liaison and premises in Czech capital may have been used for the meeting/s

- Pro-PUTIN leading Duma figure, KOSACHEV, reportedly involved as "plausibly deniable" facilitator and may have participated in the August meeting/s with COHEN

### Detail

1. Speaking to a compatriot and friend on 19 October 2016, a Kremlin insider provided further details of reported clandestine meeting/s between Republican presidential candidate, Donald TRUMP's lawyer Michael COHEN and Kremlin representatives in August 2016. Although the communication between them had to be cryptic for security reasons, the Kremlin insider clearly indicated to his/her friend that the reported contact/s took place in Prague, Czech Republic.

2. Continuing on this theme, the Kremlin insider highlighted the importance of the Russian parastatal organisation, Rossotrudnichestvo, in this contact between TRUMP campaign representative/s and Kremlin officials. Rossotrudnichestvo was being used as cover for this relationship and its office in Prague may well have been used to host the COHEN/Russian Presidential Administration (PA) meeting/s. It was considered a "plausibly deniable" vehicle for this, whilst remaining entirely under Kremlin control.

3. The Kremlin insider went on to identify leading pro-PUTIN Duma figure, Konstantin KOSACHEV (Head of the Foreign Relations Committee) as an important figure in the TRUMP campaign-Kremlin liaison operation. KOSACHEV, also "plausibly deniable" being part of the Russian legislature rather than executive, had facilitated the contact in Prague and by implication, may have attended the meeting/s with COHEN there in August.

### Company Comment

We reported previously, in our Company Intelligence Report 2016/135 of 19 October 2016 from the same source, that COHEN met officials from the PA Legal Department clandestinely in an EU country in August 2016. This was in order to clean up the mess left behind by western media revelations of TRUMP ex-campaign manager MANAFORT's corrupt relationship with the former pro-Russian YANUKOVYCH regime in Ukraine and TRUMP foreign policy advisor, Carter PAGE's secret meetings in Moscow with senior regime figures in July 2016. According to the Kremlin advisor, these meeting/s were originally scheduled for COHEN in Moscow but shifted to

what was considered an operationally "soft" EU country when it was judged too compromising for him to travel to the Russian capital.

20 October 2016

COMPANY INTELLIGENCE REPORT 2016/105

## RUSSIA/UKRAINE: THE DEMISE OF TRUMP'S CAMPAIGN MANAGER PAUL MANAFORT

### Summary

- Ex-Ukrainian President YANUKOVYCH confides directly to PUTIN that he authorised kick-back payments to MANAFORT, as alleged in western media. Assures Russian President however there is no documentary evidence/trail

- PUTIN and Russian leadership remain worried however and sceptical that YANUKOVYCH has fully covered the traces of these payments to TRUMP's former campaign manager

- Close associate of TRUMP explains reasoning behind MANAFORT's recent resignation. Ukraine revelations played part but others wanted MANAFORT out for various reasons, especially LEWANDOWSKI who remains influential

### Detail

1. Speaking in late August 2016, in the immediate aftermath of Paul MANAFORT's resignation as campaign manager for US Republican presidential candidate Donald TRUMP, a well-placed Russian figure reported on a recent meeting between President PUTIN and ex-President YANUKOVYCH of Ukraine. This had been held in secret on 15 August near Volgograd, Russia and the western media revelations about MANAFORT and Ukraine had featured prominently on the agenda. YANUKOVYCH had confided in PUTIN that he did authorise and order substantial kick-back payments to MANAFORT as alleged but sought to reassure him that there was no documentary trail left behind which could provide clear evidence of this.

2. Given YANUKOVYCH's (unimpressive) record in covering up his own corrupt tracks in the past, PUTIN and others in the Russian leadership were sceptical about the ex-Ukrainian president's reassurances on this as relating to MANAFORT. They therefore still feared the scandal had legs, especially as MANAFORT had been commercially active in Ukraine right up to the time (in March 2016) when he joined TRUMP's campaign team. For them it therefore remained a point of potential political vulnerability and embarrassment.

3.  Speaking separately, also in late August 2016, an American political figure associated with Donald TRUMP and his campaign outlined the reasons behind MANAFORT's recent demise. S/he said it was true that the Ukraine corruption revelations had played a part in this but also, several senior players close to TRUMP had wanted MANAFORT out, primarily to loosen his control on strategy and policy formulation. Of particular importance in this regard was MANAFORT's predecessor as campaign manager, Corey LEWANDOWSKI, who hated MANAFORT personally and remained close to TRUMP with whom he discussed the presidential campaign on a regular basis.

**22 August 2016**

COMPANY INTELLIGENCE REPORT 2016/111

**RUSSIA/US: KREMLIN FALLOUT FROM MEDIA EXPOSURE OF MOSCOW'S INTERFERENCE IN THE US PRESIDENTIAL CAMPAIGN**

**Summary**

- Kremlin orders senior staff to remain silent in media and private on allegations of Russian interference in US presidential campaign

- Senior figure however confirms gist of allegations and reports IVANOV sacked as Head of Administration on account of giving PUTIN poor advice on issue. VAINO selected as his replacement partly because he was not involved in pro-TRUMP, anti-CLINTON operation/s

- Russians do have further 'kompromat' on CLINTON (e-mails) and considering disseminating it after Duma (legislative elections) in late September. Presidential spokesman PESKOV continues to lead on this

- However, equally important is Kremlin objective to shift policy consensus favourably to Russia in US post-OBAMA whoever wins. Both presidential candidates' opposition to TPP and TTIP viewed as a result in this respect

- Senior Russian diplomat withdrawn from Washington embassy on account of potential exposure in US presidential election operation/s

**Detail**

1. Speaking in confidence to a trusted compatriot in mid-September 2016, a senior member of the Russian Presidential Administration (PA) commented on the political fallout from recent western media revelations about Moscow's intervention, in favour of Donald TRUMP and against Hillary CLINTON, in the US presidential election. The PA official reported that the issue had become incredibly sensitive and that President PUTIN had issued direct orders that Kremlin and government insiders should not discuss it in public or even in private.

2. Despite this, the PA official confirmed, from direct knowledge, that the gist of the allegations was true. PUTIN had been receiving conflicting advice on interfering from three separate and expert groups. On one side had been the Russian ambassador to the US, Sergei KISLYAK, and the Ministry of Foreign Affairs, together with an independent and informal network run by presidential foreign policy advisor, Yuri USHAKOV

22

(KISLYAK's predecessor in Washington) who had urged caution and the potential negative impact on Russia from the operation/s. On the other side was former PA Head, Sergei IVANOV, backed by Russian Foreign Intelligence (SVR), who had advised PUTIN that the pro-TRUMP, anti-CLINTON operation/s would be both effective and plausibly deniable with little blowback. The first group/s had been proven right and this had been the catalyst in PUTIN's decision to sack IVANOV (unexpectedly) as PA Head in August. His successor, Anton VAINO, had been selected for the job partly because he had not been involved in the US presidential election operation/s.

3. Continuing on this theme, the senior PA official said the situation now was that the Kremlin had further 'kompromat' on candidate CLINTON and had been considering releasing this via "plausibly deniable" channels after the Duma (legislative) elections were out of the way in mid-September. There was however a growing train of thought and associated lobby, arguing that the Russians could still make candidate CLINTON look "weak and stupid" by provoking her into railing against PUTIN and Russia without the need to release more of her e-mails. Presidential Spokesman, Dmitriy PESKOV remained a key figure in the operation, although any final decision on dissemination of further material would be taken by PUTIN himself.

4. The senior PA official also reported that a growing element in Moscow's intervention in the US presidential election campaign was the objective of shifting the US political consensus in Russia's perceived interests regardless of who won. It basically comprised of pushing candidate CLINTON away from President OBAMA's policies. The best example of this was that both candidates now openly opposed the draft trade agreements, TPP and TTIP, which were assessed by Moscow as detrimental to Russian interests. Other issues where the Kremlin was looking to shift the US policy consensus were Ukraine and Syria. Overall however, the presidential election was considered still to be too close to call.

5. Finally, speaking separately to the same compatriot, a senior Russian MFA official reported that as a prophylactic measure, a leading Russian diplomat, Mikhail KULAGIN, had been withdrawn from Washington at short notice because Moscow feared his heavy involvement in the US presidential election operation, including the so-called veterans' pensions ruse (reported previously), would be exposed in the media there. His replacement, Andrei BONDAREV however was clean in this regard.

**Company Comment**

The substance of what was reported by the senior Russian PA official in paras 1 and 2 above, including the reasons for Sergei IVANOV's dismissal, was corroborated independently by a former top level Russian intelligence officer and Kremlin insider, also in mid-September.

14 September 2016

COMPANY INTELLIGENCE REPORT 2016/112

## RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP CO-OPERATION

### Summary

- Top level Russian official confirms current closeness of Alpha Group-PUTIN relationship. Significant favours continue to be done in both directions and FRIDMAN and AVEN still giving informal advice to PUTIN, especially on the US

- Key intermediary in PUTIN-Alpha relationship identified as Oleg GOVORUN, currently Head of a Presidential Administration department but throughout the 1990s, the Alpha executive who delivered illicit cash directly to PUTIN

- PUTIN personally unbothered about Alpha's current lack of investment in Russia but under pressure from colleagues over this and able to exploit it as lever over Alpha interlocutors

### Detail

1. Speaking to a trusted compatriot in mid-September 2016, a top level Russian government official commented on the history and current state of relations between President PUTIN and the Alpha Group of businesses led by oligarchs Mikhail FRIDMAN, Petr AVEN and German KHAN. The Russian government figure reported that although they had had their ups and downs, the leading figures in Alpha currently were on very good terms with PUTIN. Significant favours continued to be done in both directions, primarily political ones for PUTIN and business/legal ones for Alpha. Also, FRIDMAN and AVEN continued to give informal advice to PUTIN on foreign policy, and especially about the US where he distrusted advice being given to him by officials.

2. Although FRIDMAN recently had met directly with PUTIN in Russia, much of the dialogue and business between them was mediated through a senior Presidential Administration official, Oleg GOVORUN, who currently headed the department therein responsible for Social Co-operation With the CIS. GOVORUN was trusted by PUTIN and recently had accompanied him to Uzbekistan to pay respects at the tomb of former president KARIMOV. However according to the top level Russian government official, during the 1990s GOVORUN had been Head of Government Relations at Alpha Group and in reality, the "driver" and "bag carrier"

used by FRIDMAN and AVEN to deliver large amounts of illicit cash to the Russian president, at that time deputy Mayor of St Petersburg. Given that and the continuing sensitivity of the PUTIN-Alpha relationship, and need for plausible deniability, much of the contact between them was now indirect and entrusted to the relatively low profile GOVORUN.

3.  The top level Russian government official described the PUTIN-Alpha relationship as both carrot and stick. Alpha held 'kompromat' on PUTIN and his corrupt business activities from the 1990s whilst although not personally overly bothered by Alpha's failure to reinvest the proceeds of its TNK oil company sale into the Russian economy since, the Russian president was able to use pressure on this count from senior Kremlin colleagues as a lever on FRIDMAN and AVEN to make them do his political bidding.

**14 September 2016**

COMPANY INTELLIGENCE REPORT 2016/113

## RUSSIA/US PRESIDENTIAL ELECTION- REPUBLICAN CANDIDATE TRUMP'S PRIOR ACTIVITIES IN ST PETERSBURG

### Summary

- Two knowledgeable St Petersburg sources claim Republican candidate TRUMP has paid bribes and engaged in sexual activities there but key witnesses silenced and evidence hard to obtain

- Both believe Azeri business associate of TRUMP, Araz AGALAROV will know the details

### Detail

1. Speaking to a trusted compatriot in September 2016, two well-placed sources based in St Petersburg, one in the political/business elite and the other involved in the local services and tourist industry, commented on Republican US presidential candidate Donald TRUMP's prior activities in the city.

2. Both knew TRUMP had visited St Petersburg on several occasions in the past and had been interested in doing business deals there involving real estate. The local business/political elite figure reported that TRUMP had paid bribes there to further his interests but very discreetly and only through affiliated companies, making it very hard to prove. The local services industry source reported that TRUMP had participated in sex parties in the city too, but that all direct witnesses to this recently had been "silenced" i.e. bribed or coerced to disappear.

3. The two St Petersburg figures cited believed an Azeri business figure, Araz AGALAROV (with offices in Baku and London) had been closely involved with TRUMP in Russia and would know most of the details of what the Republican presidential candidate had got up to there.

14 September 2016

27

COMPANY INTELLIGENCE REPORT 2016/130

RUSSIA: KREMLIN ASSESSMENT OF TRUMP AND RUSSIAN INTERFERENCE IN US PRESIDENTIAL ELECTION

Summary

- Buyer's remorse sets in with Kremlin over TRUMP support operation in US presidential election. Russian leadership disappointed that leaked e-mails on CLINTON have not had greater impact in campaign

- Russians have injected further anti-CLINTON material into the 'plausibly deniable' leaks pipeline which will continue to surface, but best material already in public domain

- PUTIN angry with senior officials who "overpromised" on TRUMP and further heads likely to roll as result. Foreign Minister LAVROV may be next

- TRUMP supported by Kremlin because seen as divisive, anti-establishment candidate who would shake up current international status quo in Russia's favor. Lead on TRUMP operation moved from Foreign Ministry to FSB and then to presidential administration where it now sits

Detail

1. Speaking separately in confidence to a trusted compatriot in early October 2016, a senior Russian leadership figure and a Foreign Ministry official reported on recent developments concerning the Kremlin's operation to support Republican candidate Donald TRUMP in the US presidential election. The senior leadership figure said that a degree of buyer's remorse was setting in among Russian leaders concerning TRUMP. PUTIN and his colleagues were surprised and disappointed that leaks of Democratic candidate, Hillary CLINTON's hacked e-mails had not had greater impact on the campaign.

2. Continuing on this theme, the senior leadership figure commented that a stream of further hacked CLINTON material already had been injected by the Kremlin into compliant western media outlets like Wikileaks, which remained at least "plausibly deniable", so the stream of these would continue through October and up to the election. However s/he understood that the best material the Russians had already was out and there were no real game-changers to come.

3. The Russian Foreign Ministry official, who had direct access to the TRUMP support operation, reported that PUTIN was angry at his subordinate's "over-promising" on the Republican presidential candidate, both in terms of his chances and reliability and being able to cover and/or contain the US backlash over Kremlin interference. More heads therefore were likely to roll, with the MFA the easiest target. Ironically, despite his consistent urging of caution on the issue, Foreign Minister LAVROV could be the next one to go.

4. Asked to explain why PUTIN and the Kremlin had launched such an aggressive TRUMP support operation in the first place, the MFA official said that Russia needed to upset the liberal international status quo, including on Ukraine-related sanctions, which was seriously

disadvantaging the country. TRUMP was viewed as divisive in disrupting the whole US political system; anti-Establishment; and a pragmatist with whom they could do business. As the TRUMP support operation had gained momentum, control of it had passed from the MFA to the FSB and then into the presidential administration where it remained, a reflection of its growing significance over time. There was still a view in the Kremlin that TRUMP would continue as a (divisive) political force even if he lost the presidency and may run for and be elected to another public office.

12 October 2016

29

COMPANY INTELLIGENCE REPORT 2016/134

RUSSIA/US PRESIDENTIAL ELECTION: FURTHER DETAILS OF KREMLIN LIAISON WITH TRUMP CAMPAIGN

Summary

- Close associate of SECHIN confirms his secret meeting in Moscow with Carter PAGE in July

- Substance included offer of large stake in Rosneft in return for lifting sanctions on Russia. PAGE confirms this is TRUMP's intention

- SECHIN continued to think TRUMP could win presidency up to 17 October. Now looking to reorientate his engagement with the US

- Kremlin insider highlights importance of TRUMP's lawyer, Michael COHEN in covert relationship with Russia. COHEN's wife is of Russian descent and her father a leading property developer in Moscow

Detail

1. Speaking to a trusted compatriot in mid October 2016, a close associate of Rosneft President and PUTIN ally Igor' SECHIN elaborated on the reported secret meeting between the latter and Carter PAGE, of US Republican presidential candidate's foreign policy team, in Moscow in July 2016. The secret meeting had been confirmed to him/her by a senior member of SECHIN's staff, in addition to by the Rosneft President himself. It took place on either 7 or 8 July, the same day or the one after Carter PAGE made a public speech to the Higher Economic School in Moscow.

2. In terms of the substance of their discussion, SECHIN's associate said that the Rosneft President was so keen to lift personal and corporate western sanctions imposed on the company, that he offered PAGE/TRUMP's associates the brokerage of up to a 19 per cent (privatised) stake in Rosneft in return. PAGE had expressed interest and confirmed that were TRUMP elected US president, then sanctions on Russia would be lifted.

3. According to SECHIN's close associate, the Rosneft President had continued to believe that TRUMP could win the US presidency right up to 17 October, when he assessed this was no longer possible. SECHIN was keen to re-adapt accordingly and put feelers out to other business and political contacts in the US instead.

4. Speaking separately to the same compatriot in mid-October 2016, a Kremlin insider with direct access to the leadership confirmed that a key role in the secret TRUMP campaign/Kremlin relationship was being played by the Republican candidate's personal lawyer Michael COHEN. ███████████

30

### Source Comment

5. SECHIN's associate opined that although PAGE had not stated it explicitly to SECHIN, he had clearly implied that in terms of his comment on TRUMP's intention to lift Russian sanctions if elected president, he was speaking with the Republican candidate's authority.

### Company Comment

6.

18 October 2016

31

**COMPANY INTELLIGENCE REPORT 2016/135**

**RUSSIA/US PRESIDENTIAL ELECTION: THE IMPORTANT ROLE OF TRUMP LAWYER, COHEN IN CAMPAIGN'S SECRET LIAISON WITH THE KREMLIN**

**Summary**

- Kremlin insider outlines important role played by TRUMP's lawyer COHEN in secret liaison with Russian leadership

- COHEN engaged with Russians in trying to cover up scandal of MANAFORT and exposure of PAGE and meets Kremlin officials secretly in the EU in August in pursuit of this goal

- These secret contacts continue but are now farmed out to trusted agents in Kremlin-linked institutes so as to remain "plausibly deniable" for Russian regime

- Further confirmation that sacking of IVANOV and appointments of VAINO and KIRIYENKO linked to need to cover up Kremlin's TRUMP support operation

**Detail**

1. Speaking in confidence to a longstanding compatriot friend in mid-October 2016, a Kremlin insider highlighted the importance of Republican presidential candidate Donald TRUMP's lawyer, Michael COHEN, in the ongoing secret liaison relationship between the New York tycoon's campaign and the Russian leadership. COHEN's role had grown following the departure of Paul MANNAFORT as TRUMP's campaign manager in August 2016. Prior to that MANNAFORT had led for the TRUMP side.

2. According to the Kremlin insider, COHEN now was heavily engaged in a cover up and damage limitation operation in the attempt to prevent the full details of TRUMP's relationship with Russia being exposed. In pursuit of this aim, COHEN had met secretly with several Russian Presidential Administration (PA) Legal Department officials in an EU country in August 2016. The immediate issues had been to contain further scandals involving MANNAFORT's commercial and political role in Russia/Ukraine and to limit the damage arising from exposure of former TRUMP foreign policy advisor, Carter PAGE's secret meetings with Russian leadership figures in Moscow the previous month. The

overall objective had been to "to sweep it all under the carpet and make sure no connections could be fully established or proven"

3. Things had become even "hotter" since August on the TRUMP-Russia track. According to the Kremlin insider, this had meant that direct contact between the TRUMP team and Russia had been farmed out by the Kremlin to trusted agents of influence working in pro-government policy institutes like that of Law and Comparative Jurisprudence. COHEN however continued to lead for the TRUMP team.

4. Referring back to the (surprise) sacking of Sergei IVANOV as Head of PA in August 2016, his replacement by Anton VAINO and the appointment of former Russian premier Sergei KIRIYENKO to another senior position in the PA, the Kremlin insider repeated that this had been directly connected to the TRUMP support operation and the need to cover up now that it was being exposed by the USG and in the western media.

## Company Comment

The Kremlin insider was unsure of the identities of the PA officials with whom COHEN met secretly in August, or the exact date/s and locations of the meeting/s. There were significant internal security barriers being erected in the PA as the TRUMP issue became more controversial and damaging. However s/he continued to try to obtain these.

19 October 2016

33

COMPANY INTELLIGENCE REPORT 2016/166

US/RUSSIA: FURTHER DETAILS OF SECRET DIALOGUE BETWEEN TRUMP
CAMPAIGN TEAM, KREMLIN AND ASSOCIATED HACKERS IN PRAGUE

Summary

- TRUMP's representative COHEN accompanied to Prague in
  August/September 2016 by 3 colleagues for secret discussions with
  Kremlin representatives and associated operators/hackers

- Agenda included how to process deniable cash payments to operatives;
  contingency plans for covering up operations; and action in event of a
  CLINTON election victory

- Some further details of Russian representatives/operatives involved;
  Romanian hackers employed; and use of Bulgaria as bolt hole to "lie low"

- Anti-CLINTON hackers and other operatives paid by both TRUMP team
  and Kremlin, but with ultimate loyalty to Head of PA, IVANOV and his
  successor/s

Detail

1. We reported previously (2016/135 and /136) on secret meeting/s held
   in Prague, Czech Republic in August 2016 between then Republican
   presidential candidate Donald TRUMP's representative, Michael COHEN
   and his interlocutors from the Kremlin working under cover of Russian
   'NGO' Rossotrudnichestvo.

2. ███████████████████████████████████████████

   provided further details of these meeting/s and associated anti-
   CLINTON/Democratic Party operations. COHEN had been accompanied
   to Prague by 3 colleagues and the timing of the visit was either in the last
   week of August or the first week of September. One of their main Russian
   interlocutors was Oleg SOLODUKHIN operating under
   Rossotrudnichestvo cover. According to ████████████, the agenda
   comprised questions on how deniable cash payments were to be made to
   hackers who had worked in Europe under Kremlin direction against the
   CLINTON campaign and various contingencies for covering up these
   operations and Moscow's secret liaison with the TRUMP team more
   generally.

34

3. [REDACTED] reported that over the period March-September 2016 a company called XBT/Webzilla and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct "altering operations" against the Democratic Party leadership. Entities linked to one Aleksei GUBAROV were involved and he and another hacking expert, both recruited under duress by the FSB, Seva KAPSUGOVICH, were significant players in this operation. In Prague, COHEN agreed contingency plans for various scenarios to protect the operation, but in particular what was to be done in the event that Hillary CLINTON won the presidency. It was important in this event that all cash payments owed were made quickly and discreetly and that cyber and other operators were stood down/able to go effectively to ground to cover their traces. (We reported earlier that the involvement of political operatives Paul MANAFORT and Carter PAGE in the secret TRUMP-Kremlin liaison had been exposed in the media in the run-up to Prague and that damage limitation of these also was discussed by COHEN with the Kremlin representatives).

4. In terms of practical measures to be taken, it was agreed by the two sides in Prague to stand down various "Romanian hackers" (presumably based in their homeland or neighbouring eastern Europe) and that other operatives should head for a bolt-hole in Plovdiv, Bulgaria where they should "lay low". On payments, IVANOV's associate said that the operatives involved had been paid by both TRUMP's team and the Kremlin, though their orders and ultimate loyalty lay with IVANOV, as Head of the PA and thus ultimately responsible for the operation, and his designated successor/s after he was dismissed by president PUTIN in connection with the anti-CLINTON operation in mid August.

**13 December 2016**

Exhibit 2

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.,

      Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

      Defendants.

_____/

## <u>DEFENDANTS' NOTICE OF REMOVAL</u>

      Defendants BuzzFeed, Inc. ("BuzzFeed") and Ben Smith ("Smith," and collectively "Defendants") submit this Notice of Removal under 28 U.S.C. § 1446 because the parties are citizens of different states and of foreign states, and the damages sought exceed $75,000.00.  In support, Defendants state:

      1.      28 U.S.C. § 1441(a) provides in relevant part that any action over which this Court has original jurisdiction may be removed by the defendant to the appropriate district court of the United States.

      2.      28 U.S.C. § 1332(a)(3) provides that district courts shall have original jurisdiction where the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and is between citizens of a state and citizens of different states with citizens or subjects of foreign states as additional parties.  Section 1332(c)(1) further provides that a corporation shall be deemed a citizen of any U.S. and foreign state by which it is incorporated and of the U.S. or foreign state where it has its principal place of business.

3.      Plaintiffs Aleksej Gubarev ("Gubarev"), XBT Holding S.A. ("XBT"), and Webzilla, Inc. ("Webzilla", and collectively "Plaintiffs") instituted this action in the Seventeenth Judicial Circuit Court in and for Broward County, Florida on February 3, 2017, asserting a claim for defamation and defamation per se arising out of Defendants' publication of a January 10, 2017 article entitled *These Reports Allege Trump Has Deep Ties to Russia* (the "Article").

4.      Attached as **Exhibit A** is a true and correct copies of the complaint in this action. Defendants were served with the summons and complaint on February 8, 2017.  Removal is therefore timely pursuant to 28 U.S.C. § 1446(b).

5.      This court has jurisdiction over this matter under 28 U.S.C. § 1332(a)(3) because the case is between citizens of different states with citizens of foreign states as additional parties, and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

6.      Plaintiff Gubarev is a citizen of Russia, who pleads in the Complaint that he lives in the Republic of Cyprus.  Compl. ¶ 6.  Gubarev was born in Ust-Ilinmsk, Irkutsk Oblast, Russia. *See* Speaker Biography from Best Invest Cyprus Conference (attached as **Exhibit B**); *see, e.g.,* Eli Rosenberg, *Russian Executive Sues BuzzFeed Over Unverified Trump Dossier*, N.Y. Times, Feb. 4, 2017 (attached as **Exhibit C**); Lukas I. Alpert, *Russian Tech Executive Files Lawsuit Against BuzzFeed Over Dossier*, Wall Street Journal, Feb. 3, 2017 (attached as **Exhibit D**); Kevin G. Hall and Tim Johnson, *Russian tech expert named in Trump report says US intelligence never contacted him*, McClatchy DC, Jan. 11, 2017 (attached as **Exhibit E**).

7.      Plaintiff XBT alleges that it is, and was at the time of the institution of this civil action, a corporation organized and existing under and by virtue of the laws of the Grand Duchy of Luxembourg.  *See* Compl.  at ¶ 7.  According to XBT's website, a true and correct copy of

which is attached as **Exhibit F**, its principal place of business is also in Luxembourg.  XBT is therefore a citizen of Luxembourg for purposes of 28 U.S.C. § 1332.

8.      Plaintiff Webzilla alleges that it is, and was at the time of the institution of this civil action, a corporation organized and existing under by virtue of the laws of the state of Florida.  Compl. ¶ 8.  According to the State of Florida's Division of Corporations' website, a true and correct copy of which is attached as **Exhibit G**, Webzilla's principal place of business is in Texas.  *See also* Compl. at ¶ 8.  It is therefore a citizen of Florida and Texas for purposes of 28 U.S.C. § 1332.

9.      Defendant BuzzFeed is, and was at the time of the institution of this civil action, a corporation organized and existing under and by virtue of the laws of the state of Delaware, *see* Compl. at ¶ 9, with its principal place of business in the state of New York.  BuzzFeed is therefore a citizen of Delaware and New York, for purposes of 28 U.S.C. § 1332.

10.      Defendant Smith is, and was at the time of institution of this civil action, a United States citizen domiciled in the state of New York.  *See* Compl. at ¶ 10.  It is well settled that for purposes of 28 U.S.C. § 1332, a United States citizen is for diversity purposes considered a citizen of the state where that person is domiciled – that is, "the place of his true, fixed and permanent home and principal establishment, and to which he has the intention of returning whenever he is absent therefrom." *McCormick v. Aderholt,* 293 F.3d 1254, 1257-58 (11th Cir. 2002) (citing *Mas v. Perry*, 489 F.2d 1396, 1399 (5th Cir. 1974)).  Smith is therefore a citizen of New York for purposes of 28 U.S.C. § 1332.

11.      This action is accordingly between citizens of different U.S. states (Plaintiff Webzilla, a citizen of Florida and Texas, and Defendants, citizens of New York and also in BuzzFeed's case Delaware), and includes as additional parties citizens of foreign states

(Plaintiffs Gubarev and XBT).  *See Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242 (11th Cir. 2005).

12.     Regarding damages, Plaintiffs' Complaint alleges only that this matter exceeds the state circuit court's minimum jurisdictional amount of $15,000.00.  Compl. Prayer for Relief ¶ 1.  However, a plaintiff "cannot avoid removal by declining to allege the jurisdictional amount."  *Angrignon v. KLI, Inc.,* 2009 WL 506954, at * 3 (S.D. Fla. Feb 27, 2009).

13.     Rather, where the complaint does not allege a specific amount of damages sought, the Notice of Removal must plausibly allege that the amount in controversy exceeds the jurisdictional threshold.  *Dart Cherokee Basin Operating Co. v. Owens*, 135 S. Ct. 547, 554 (2014). "[T]he pertinent question is what is *in controversy* in the case, not how much the plaintiffs are ultimately likely to recover."  *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 751 (11th Cir. 2010) (emphasis in original) (citation omitted).

14.     Here, there is no dispute that the amount in controversy exceeds $75,000.00.  In fact, Plaintiffs' counsel stated in a February 7, 2017 television interview (the "February 7 Interview") that "our damages as of now are in the millions if not tens of millions…We have credit lines that banks refuse to give us in the millions of dollars, we have clients that refuse to do business with us, we have prospective employees that we wanted to hire that refuse to be hired by us."

15.     Plaintiff's counsel's representation that the matter in controversy here exceeds $75,000.00 comports with common sense.  Plaintiffs are suing a major international media organization for compensatory and potentially punitive damages over a news report that the Complaint alleges was viewed more than 5.9 million times, *see* Compl. ¶ 23, and they have retained two law firms to litigate the case.  Plaintiffs' counsel has also represented in the

February 7 Interview that the corporate Plaintiffs are collectively worth approximately $250 million.  Ex. H.

16.     Based on the foregoing, this case meets the amount-in-controversy requirement for this Court's jurisdiction set out in 28 U.S.C. § 1332(a).

17.     This case is being removed to the United States District Court for the Southern District of Florida because this district encompasses the state court from which this case is being removed, that being the Seventeenth Judicial Circuit Court in and for Broward County, Florida. *See* 28 U.S.C. § 89(c).

18.     Written notice of the filing of this Notice of Removal will be provided to plaintiff pursuant to 28 U.S.C. § 1446(d).  A true and correct copy of the Notice of Filing Notice of Removal is attached as **Exhibit H**.  A duplicate copy of this Notice of Removal will be filed with the Clerk of the Broward County Circuit Court, pursuant to 28 U.S.C. § 1446(d).

WHEREFORE, the Defendants, desiring to remove this case to the United States District Court for the Southern District of Florida, requests that the filing of this Notice of Removal with this Court and the filing the Notice of Removal with the Clerk of the Seventeenth Judicial Circuit Court in and for Broward County, Florida shall effect the removal of this case.

Dated: February 28, 2017                    Respectfully submitted,

                                            LEVINE KELLOGG LEHMAN
                                            SCHNEIDER + GROSSMAN LLP
                                            201 S. Biscayne Blvd., 22nd Floor
                                            Miami, Florida  33131-4301
                                            (305) 403-8788 Main
                                            (305) 403-8789 Facsimile

                                            By: /s/ Lawrence A. Kellogg, P.A.
                                                LAWRENCE A. KELLOGG, P.A.
                                                Florida Bar No. 328601
                                                E-Mail: lak@lklsg.com
                                                Secondary Email: cod@lklsg.com

JEZABEL P. LIMA, ESQ.
Florida Bar No. 519431
E-Mail: jl@lklsg.com
Secondary Email: kh@lklsg.com

and

Katherine M. Bolger
(*pro hac vice forthcoming*)
Nathan Siegel
(*pro hac vice forthcoming*)
Adam Lazier
(*pro hac vice forthcoming*)
LEVINE SULLIVAN KOCH & SCHULZ LLP
321 West 44th Street, Suite 1000
New York, NY 10036
(212) 850-6100

*Counsel for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on February 28, 2017, the foregoing was filed with the

Court's CM/ECF Service, and provided by email to counsel of record:

Brady J. Cobb, Esquire
Dylan M. Fulop, Esquire
COBB EDDY, PLLC
*Local Counsel for Plaintiffs*
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: (954) 527-4111
Facsimile: (954) 900-5507
bcobb@cobbeddy.com
dfulop@cobbeddy.com

Valentin D. Gurvits, Esquire
BOSTON LAW GROUP, PC
*Lead Counsel for Plaintiffs*
825 Beacon Street, Suite 20
Newton Centre, MA 02459
Tel: (617) 928-1804
Fax: (617) 928-1802
vgurvits@bostonlawgroup.com

By: */s/ Lawrence A. Kellogg, P.A.*
LAWRENCE A. KELLOGG, P.A.

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
ALEKSEJ GUBAREV, XBT HOLDING S.A., AND WEBZILLA, INC.,

## DEFENDANTS
BUZZFEED, INC. AND BEN SMITH,

**(b)** County of Residence of First Listed Plaintiff   Republic of Cyprus
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Delaware/New York
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Brady J. Cobb, Esq. and Dylan M. Fulop, Esq. Cobb Eddy, PLLC, 642 NE 3 Ave, Ft. Lauderdale, FL 33304 (954) 527-4111

Attorneys (If Known)
Levine Kellogg Lehman Schneider + Grossman LLP, 201 S. Biscayne Blvd., 22nd Floor, Miami, FL 33131 (305) 403-8788

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☒ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment | |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. § 1332(a)(3)
Brief description of cause:
defamation and defamation per se

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):

JUDGE _____ DOCKET NUMBER _____

DATE
02/28/2016

SIGNATURE OF ATTORNEY OF RECORD
/s/Lawrence A. Kellogg, P.A.

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

JS 44 Reverse (Rev. 11/04)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.    (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.    Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.    Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.    Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.    Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**      Example:      U.S. Civil Statute: 47 USC 553
                                          Brief Description: Unauthorized reception of cable service

**VII.    Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.    Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# Exhibit A

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA
CASE NO:

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.,
                        Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

                    Defendants.

_____/

**COMPLAINT FOR DAMAGES**

Plaintiffs, Aleksej Gubarev ("Mr. Gubarev"), XBT Holding S.A. ("XBT"), and Webzilla,

Inc. ("Webzilla")(collectively, "Plaintiffs") sue Defendants Buzzfeed, Inc. ("Buzzfeed") and Ben

Smith ("Mr. Smith") for damages.   In support, Plaintiffs allege the following:

**INTRODUCTORY STATEMENT**

1.      On January 10, 2017, in perhaps one of the most reckless and irresponsible moments

in modern "journalism," Defendant Buzzfeed and its Editor in Chief Ben Smith chose to publish a

"dossier" of unverified information compiled by a private security company in which various

allegations were made concerning, among other things, computer hacking allegedly carried out

by persons or organizations with ties to Russia, the Russian Government, and/or the Federal

Security Service of the Russian Federation ("FSB").

2.      And, although Buzzfeed and Smith specifically knew that at least portions of the

dossier were untrue, they printed the entire document – without meaningful redactions –

including those portions that falsely accused the Plaintiffs of participating in an alleged

conspiracy to commit crimes against the Democratic Leadership, not to mention a conspiracy to

undermine American Democracy and the 2016 election.  With respect to the Plaintiffs, these allegations were wholly and completely false.

3.      Buzzfeed and Smith published these allegations without having even taken the most basic step of contacting the Plaintiffs to ask if the allegations had any merit.  Indeed, in its original publication of the dossier, Buzzfeed itself *admitted* it had no idea what – if anything – in the dossier was truthful, writing:

> The dossier, which is a collection of memos written over a period of months, includes specific, unverified, and potentially unverifiable allegations… BuzzFeed News reporters in the US and Europe have been investigating various alleged facts in the dossier but have not verified or falsified them. …[The dossier] is not just unconfirmed: It includes some clear errors.

4.      As of the date of this filing, the original Buzzfeed article has been viewed almost six million times and Buzzfeed has published eight additional follow-up articles, each of which links back to the original defamatory publication.

5.      Plaintiff Aleksej Gubarev, who is married with three young children is not, in any way, shape, or form, a public figure.  As a result of Buzzfeed and Mr. Smith's reckless publication of defamatory materials, he has found his personal and professional reputation in tatters.  His wife has found herself a target of online harassment and the family's personal security has been compromised.  Similarly, the economic damage to XBT and Webzilla (a Florida Corporation), including the harm to the companies' previously-unblemished reputations with their clients, lenders, vendors, and others has been immediate and ongoing.

## PARTIES

6.      Plaintiff Aleksej Gubarev is an individual who resides in the Republic of Cyprus.  Mr. Gubarev has lived in Cyprus since 2002.  Mr. Gubarev is the Chairman and CEO and director of Plaintiff XBT Holding S.A.

7.      Plaintiff XBT Holding S.A. is a company organized under the laws of Luxembourg. XBT has offices in Florida and Texas as well as other locations across the globe.  XBT has various subsidiary companies, including Webzilla, Inc.

8.      Plaintiff Webzilla, Inc. is a Florida corporation with offices in Fort Lauderdale.

9.      Defendant Buzzfeed, Inc. is a Delaware Corporation.  According to Buzzfeed, it has offices in "18 cities around the world including New York, Los Angeles, San Francisco, London, Sydney, Sao Paulo, and Tokyo."  Buzzfeed owns and operates the Buzzfeed.com website as well as the Buzzfeed mobile app.  According to Buzzfeed's media kit, it has in excess of 200 million unique monthly views.  Buzzfeed.com is one of the most trafficked websites in the United States, currently ranked in the top 100 websites visited in the U.S.

10.     Defendant Ben Smith is an individual who, on information and belief, resides in Brooklyn, New York.  Mr. Smith is the Editor in Chief of Buzzfeed.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

11.     This Court has subject matter jurisdiction over Plaintiffs' claim for damages as each claim is in excess of $15,000.

12.     This Court has personal jurisdiction over the Defendants pursuant to Florida Statute 48.193(1)(b).   The Defendants posted defamatory materials concerning the Plaintiffs on their website (and through their mobile app), which materials were accessed in Florida, constituting the commission of the tortious act of defamation within Florida under section 48.193(1)(b).

13.     This Court also has personal jurisdiction over the Defendants pursuant to Florida Statute 48.193 because:

(a)     Defendants have caused injury to persons or property within Florida, arising out of acts or omissions undertaken outside of the state and Defendants regularly solicit advertising and viewers within Florida;

(b)     Defendants have committed intentional torts expressly aimed at one or more of the Plaintiffs, the effects of which were suffered in this circuit. Defendants' intentional conduct was calculated to cause injury to one or more of the Plaintiffs in Florida and has caused injury to one or more of the Plaintiffs in Florida. Based on their intentional torts, Defendants should have reasonably anticipated being haled into this Court and due process is satisfied.

14.     Venue is proper in Broward County because the tort occurred in Broward County and the harm to the Plaintiffs was felt in Broward County in that Plaintiff regularly conducts business in Broward County, Florida.

15.     All conditions precedent to this action have been performed.  Specifically, although not actually required to do so, Plaintiffs provided Defendants with pre-suit notice and a demand for a retraction pursuant to Florida Statutes Chapter 770.01, *et seq.*  See **Exhibit 1.**

## FACTUAL ALLEGATIONS

16.     Mr. Gubarev is an individual who lives, with his wife and three children, in Cyprus. He is a 36 year-old venture capitalist and tech expert.  In 2002, at the age of 22, he moved from Russia to Cyprus and, in 2005, he founded Webzilla Limited (an XBT predecessor) – a company that specializes in internet hosting, data, and web-development.

17.     Over the next 12 years, Mr. Gubarev grew XBT to an international business with various subsidiary companies, employing approximately 300 employees in three different continents.  XBT has offices in Texas, Florida, and Luxembourg, among others.

4

18.     Mr. Gubarev has never been involved in politics and is not a public figure.  Outside of technology circles, he is not known at all.

19.     Webzilla, Inc., one of XBT's subsidiaries, is a Florida corporation with offices in Fort Lauderdale, Florida and Dallas, Texas.

20.     XBT and its subsidiaries operate approximately 37,000 servers across the globe, with approximately 40 percent of its business being handled over the servers run out of Dallas, Texas.  Approximately 27 percent of XBT's global business comes from within the United States.

21.     Given that XBT's and Webzilla's businesses focus on internet hosting solutions, network services, and web development services, their reputation for providing secure services has been carefully cultivated and paramount to the success of the businesses.

22.     Similarly, prior to the Defendants' publication of defamatory materials, Mr. Gubarev's own professional reputation has been untarnished and key to his ability to build XBT and Webzilla into successful international hosting companies.

23.     On January 10, 2017, Buzzfeed and Mr. Smith published an online article entitled, "These Reports Allege Trump Has Deep Ties To Russia" (the "Defamatory Article")  The Defamatory Article, which at the time of this writing has been viewed more than 5.9 million times, can be found at https://www.buzzfeed.com/kenbensinger/these-reports-allege-trump-has-deep-ties-to-russia?utm_term=.fvQvex17e#.yezx3nBr3.  A true and accurate copy of the Defamatory Article is attached hereto as **Exhibit 2.**  On information and belief, the Defamatory Article has (conservatively) been viewed in Florida tens of thousands of times.

24.     This Defamatory Article attached a 35-page unverified "dossier" of information compiled by a private security company.  On information and belief, the dossier was created as part of opposition research conducted as part of the 2016 election campaign; it is not an official

document and was not created by any government entity.  A true and accurate copy of the dossier

attached to the Defamatory Article is attached hereto as **Exhibit 3.**

25.    The dossier included various allegations concerning, among other things,

allegations of computer hacking of the Democratic Party allegedly carried out by persons or

organizations with ties to Russia, the Russian Government, and/or the Federal Security Service

of the Russian Federation ("FSB").[1]

26.    With respect to the Plaintiffs, the dossier included the following assertions of fact:

> *[redacted] reported that over the period March-September 2016 a company called XBT/Webzilla and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct "altering operations" against the Democratic Party leadership. Entities linked to one Alexei GUBAROV [sic] were involved and he and another hacking expert, both recruited under duress by the FSB, Seva KAPSUGOVICH, were significant players in this operation. In Prague, COHEN agreed contingency plans for various scenarios to protect the operations, but in particular what was to be done in the event that Hillary CLINTON won the presidency. It was important in this event that all cash payments owed were made quickly and discreetly and that cyber and that cyber and other operators were stood down / able to go effectively to ground to cover their traces.*

27.    Not a single portion of this statement (as it applies to Mr. Gubarev, XBT, or

Webzilla) has any basis in fact whatsoever.  Specifically:

a.    Neither XBT nor Webzilla nor any of their affiliates had been "*using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct 'altering operations'*" against the Democratic Party leadership or anyone else;

b.    No "*entities linked*" to Mr. Gubarev were involved in any alleged cyber-attacks;

c.    Mr. Gubarev was not "*recruited under duress by the FSB*" (to be clear, he was not recruited at all – whether under duress or otherwise), nor was he recruited for such activities by anyone else at any other time or in any other circumstances whatsoever.  Additionally, he has no knowledge of, has never met and has never spoken to a person known as Seva Kapsugovich;

---

[1] The FSB is the main successor agency to the USSR's Committee of State Security ("KGB").

6

    d.      Mr. Gubarev and his companies have never acted with "*another hacking expert*" to mount a cyber-attack on the Democratic Party Leadership or on any other person; and

    e.      Not having been involved in the activities attributed to them in the "dossier," neither Mr. Gubarev nor any of his companies would have had any need to "*go effectively to ground to cover their traces*" in the event that Ms. Clinton won the presidency.

    28.      Although Buzzfeed and Mr. Smith claim that they had the dossier in their possession for weeks prior to its publication, and despite their claims that they had four reporters working near full-time on attempting to verify the claims made in the dossier, prior to publishing the Defamatory Article and the dossier, neither Buzzfeed nor Mr. Smith contacted the Plaintiffs to determine if the allegations made against them had any basis in fact. After the dossier's publication numerous journalists (more than 30) contacted Mr. Gubarev with some even arranging to travel to Cyprus to discuss the publication with Mr. Gubarev. During this time, and up to the present day, neither Buzfeed nor Mr. Smith contacted the Plaintiffs to determine if the allegations made against them had any basis in fact.

    29.      At the time the Defendants published the Defamatory Article and accompanying dossier, they knew, without a doubt, that at least certain portions of the dossier were untrue. Indeed, the Defamatory Article stated specifically that:

> The dossier, which is a collection of memos written over a period of months, includes specific, unverified, and potentially unverifiable allegations… BuzzFeed News reporters in the US and Europe have been investigating various alleged facts in the dossier but have not verified or falsified them. …[The dossier] is not just unconfirmed: It includes some clear errors.

    30.      In other words, Buzzfeed and Mr. Smith knew for sure **only** that certain parts of the dossier were **untrue**.  Other than the portions confirmed by them to be false, Buzzfeed and Mr. Smith had been unable to verify the veracity of any of the claims made in the dossier.

31.    Indeed, Mr. Smith has admitted that Buzzfeed knew at the time that it published the Defamatory Article and dossier that there were "real solid reasons to distrust" the veracity of the allegations contained therein.

32.    Despite these concerns, Buzzfeed and Mr. Smith took no steps to redact out the names of the Plaintiffs from the dossier, a step they could have taken easily and which would not have changed the character of their reporting.

33.    Buzzfeed and Mr. Smith immediately faced an onslaught of criticism for their irresponsible decision to publish the unverified dossier and the Defamatory Article – drawing condemnation from media outlets and journalism experts across the political spectrum including The Washington Post, CNN, MSNBC, Fox News, and the Poynter Institute to name a few.

34.    Despite this condemnation, Buzzfeed published eight additional follow-up articles, each of which contained a link back to the original Defamatory Article.

30.    In addition, Mr. Smith published an Op-Ed in the New York Times and appeared in numerous television and radio interviews defending his decision to publish the Defamatory Article and the dossier.  Some of these articles and interviews actually compounded the defamatory effect by implying that Buzzfeed had verified the claims made.

35.    For example in his New York Times Op-Ed, Mr. Smith stated that Buzzfeed decided to publish the dossier "only after we had spent weeks with reporters in the United States and Europe trying to confirm or disprove specific claims."  What the New York Times Op-Ed omitted, however, is that Buzzfeed had failed entirely in these efforts.  The Op-Ed also failed to state that Buzzfeed had made no attempts to contact Mr. Gubarev, XBT, or Webzilla and – on information and belief – had made no attempts to verify the claims made as to the Plaintiffs.

8

36.     Similarly, Mr. Smith stated on CNN's Reliable Sources that Buzzfeed was "running it down every way we could" and told MSNBC's Meet the Press Daily that "we, like many other organizations had had [the dossier] for weeks.  We had reporters in Europe and the United States trying to stand up or knock down specific details."

37.     Buzzfeed and Mr. Smith's decision to publish the unverified dossier not only flew in the face of all journalistic standards and ethics, but also violated Mr. Smith's own claims of how Buzzfeed operates.  Less than two months before it published the Defamatory Article and dossier, Mr. Smith wrote an article for the Columbia Journalism Review in which he claimed that Buzzfeed not only routinely took steps to verify the facts that they published but that doing so was "not complicated."  Specifically, in an article entitled "How tech and media can fight fake news," published on November 17, 2016, Mr. Smith wrote:

> Mark Zuckerberg recently wrote that "identifying the 'truth' is complicated." Maybe for algorithms and epistemologists. But it's something that professional journalists are asked to do every day, and it's not actually that complicated. The everyday reporting truths–who said what, when did they say it, what does the document say, where did the money go–are the sorts of thing we're good at pinning down.

## COUNT I – DEFAMATION AND DEFAMATION PER SE

38.     Plaintiff re-alleges and re-asserts the allegations set forth in paragraphs 1-37 as if fully set forth herein.

39.     Defendants Buzzfeed and Mr. Smith, by and through their representatives, published false and defamatory statements concerning Plaintiffs without privilege to do so.

40.     The false and defamatory statements included, but are not limited to, allegations that:

  a.     XBT and Webzilla used "*botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct 'altering operations'*" against the Democratic Party leadership;

  b.     "*entities linked*" to Mr. Gubarev were involved in cyber-attacks;

9

    c.       Mr. Gubarev was "*recruited under duress by the FSB*"

    d.       Mr. Gubarev and his companies acted with "*another hacking expert*" to mount a cyber-attack on the Democratic Party Leadership; and

    e.       Mr. Gubarev and his companies would need to "*go effectively to ground to cover their traces*" in the event that Ms. Clinton won the presidency.

41.     The defamatory statements were published without privilege to third parties, including thousands or tens of thousands (or more) residents of Florida.

42.     None of the Plaintiffs are public figures, nor are they limited public figures for purposes of a defamation analysis.

43.     The defamatory statements were made negligently; without reasonable care as to their truth or falsity; with knowledge of their falsity; and/or with reckless disregard for the truth.

44.     The statements allege that the Plaintiffs committed crimes including (but not limited to) computer hacking and that the Plaintiffs engaged in behavior designed to undermine American democracy and the 2016 Presidential election.

45.     The statement are of the kind that they would tend to prejudice the Plaintiffs in the eyes of a substantial and respectable minority of their communities.

46.     The statements have caused, and will continue to cause, the Plaintiffs injury in their personal, social, and business relations.

47.     XBT and Webzilla have suffered, and will continue to suffer, actual injury as a result of injury to their corporate reputations.  At least one lender has declined to do business with XBT and/or Webzilla based on the defamatory statements published by the Defendants and, on information and belief, the defamatory statements have also cost Webzilla and XBT clients.

48.     Mr. Gubarev has suffered, and will continue to suffer, actual injury as a result of the injury to his personal reputation.

10

49.     The defamatory statements tend to injure the Plaintiffs in their business trade as the allegations call into question the security and proper operation of the Plaintiffs' businesses. Additionally, the above statements subject Plaintiffs to distrust, scorn, ridicule, hatred, and contempt.  As such, the defamatory statements constitute defamation *per se*.

50.     In addition, as a direct and proximate result of the defamatory statements made by Defendants, Plaintiff has suffered, and continue to suffer, substantial damages.

51.     It is clear from the statements made by Buzzfeed and Mr. Smith, discussed above, that they had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage to the Plaintiffs would result and that, despite that knowledge, the Defendants intentionally pursued that course of conduct, resulting in injury or damage.  Accordingly, and in conformity with Florida Statute §768.72, the Plaintiffs will seek leave of court to seek an award of punitive damages against Defendants.  In the alternative, Plaintiffs will also seek leave of court to seek punitive damages under Florida Statute §768.72 because the Defendants' actions, as described above, were so reckless or wanting in care that they constituted a conscious disregard or indifference to the rights of the Plaintiffs.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs Aleksej Gubarev, XBT Holding S.A., and Webzilla, Inc. pray for judgment against defendants Buzzfeed, Inc. and Ben Smith as follows:

1.     For an award of general and special in an amount in excess fifteen thousand dollars ($15,000.00) in accordance with proof at trial together with interest thereon at the maximum legal rate; and Plaintiffs reserve the right to seek leave of court to seek punitive damages against Defendants in accordance with the facts and claims stated herein and established through discovery;

2.     For costs of suit incurred herein; and

11

3.    For such other and further relief as to this court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted this 3rd day of February, 2017 by:

> The Plaintiffs,
> Aleksej Gubarev,
> XBT Holding S.A.
> Webzilla, Inc.
> By their Attorneys,
>
> COBB EDDY, PLLC
> *Local Counsel for Plaintiffs*
> 642 Northeast Third Avenue
> Fort Lauderdale, Florida 33304
> Telephone: (954) 527-4111
> Facsimile:  (954) 900-5507
> www.cobbeddy.com
>
> **By: /s/ BRADY J. COBB_____**
> BRADY J. COBB, ESQUIRE
> Florida Bar No. 031018
> bcobb@cobbeddy.com
> DYLAN M. FULOP, ESQUIRE
> Florida Bar No. 123809
> dfulop@cobbeddy.com
>
> BOSTON LAW GROUP, PC
> *Lead Counsel for Plaintiffs*
> 825 Beacon Street, Suite 20
> Newton Centre, MA 02459
> Tel:    (617) 928-1804
> Fax:    (617) 928-1802
>
> **By: /s/ Valentin D. Gurvits_____**
> VALENTIN D. GURVITS, ESQUIRE
> *Pro Hac Vice Pending*
> Massachusetts BBO# 643572
> vgurvits@bostonlawgroup.com

Filing # 52031663 E-Filed 02/03/2017 11:55:42 AM

EXHIBIT 1

# BOSTON LAW GROUP, PC

### ATTORNEYS AT LAW

Main (617) 928-1800

825 BEACON STREET, SUITE 20
NEWTON CENTRE, MASSACHUSETTS 02459

Fax (617) 928-1802

January 28, 2017

**By Email and By Hand Delivery**

Mr. Ben Smith, Editor in Chief
BuzzFeed, Inc.
111 E. 18th Street
13th Floor
New York, NY 10003.

**Re:   Aleksej Gubarev, XBT Holding, S.A., and Webzilla, Inc.**

Dear Mr. Smith:

Please be advised that this office represents Mr. Aleksej Gurarev ("Mr. Gubarev"), XBT Holding, S.A. ("XBT"), and Webzilla, Inc., a Florida Corporation ("Webzilla"). Please direct all future communications to me directly.

I am writing to you in accordance with Florida Statutes Chapter 770.01, *et seq.* to provide you with pre-suit notice that Mr. Gubarev, XBT, and Webzilla intend to initiate litigation against Buzzfeed and you individually in connection with the Buzzfeed article published on January 10, 2017 entitled, "These Reports Allege Trump Has Deep Ties To Russia." The article, which at the time of this writing has been viewed more than 5.8 million times, can be found at https://www.buzzfeed.com/kenbensinger/these-reports-allege-trump-has-deep-ties-to-russia?utm_term=.fvQvex17e#.yezx3nBr3.

As you are aware, this article attached a 35-page so-called "dossier" of information allegedly compiled by a private security company in which various allegations were made concerning, among other things, allegations of computer hacking of the Democratic Party allegedly carried out by persons or organizations with ties to Russia, the Russian Government, and/or the Federal Security Service of the Russian Federation ("FSB").[1]

---

[1] The FSB is the main successor agency to the USSR's Committee of State Security ("KGB").

Mr. Ben Smith
January 28, 2017
Page 2

Of particular concern to my clients, the dossier which you published contained the following assertions of fact:

> *[redacted] reported that over the period March-September 2016 a company called XBT/Webzilla and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct "altering operations" against the Democratic Party leadership. Entities linked to one Alexei GUBAROV [sic] were involved and he and another hacking expert, both recruited under duress by the FSB, Seva KAPSUGOVICH, were significant players in this operation. In Prague, COHEN agreed contingency plans for various scenarios to protect the operations, but in particular what was to be done in the event that Hillary CLINTON won the presidency. It was important in this event that all cash payments owed were made quickly and discreetly and that cyber and that cyber and other operators were stood down / able to go effectively to ground to cover their traces.*

I want to be abundantly clear: Not a single portion of this statement (as it applies to Mr. Guberav, XBT, or Webzilla) has any basis in fact whatsoever.  Specifically:

1.  Neither XBT nor Webzilla nor any of their affiliates had been *"using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct 'altering operations'"* against the Democratic Party leadership or anyone else;

2.  No *"entities linked"* to Mr. Gubarev were involved in any alleged cyber-attacks;

3.  Mr. Gubarev was not *"recruited under duress by the FSB"* (to be clear, he was not recruited at all – whether under duress or otherwise), nor was he recruited for such activities by anyone else at any other time or in any other circumstances whatsoever.  Additionally, he has no knowledge of, has never met and has never spoken to a person known as Seva Kapsugovich;

4.  Mr. Gubarev and his companies have never acted with *"another hacking expert"* to mount a cyber-attack on the Democratic Party Leadership or on any other person; and

5.  Not having been involved in the activities you attribute to them in the "dossier," neither Mr. Gubarev nor any of his companies would have had any need to *"go effectively to ground to cover their traces"* in the event that Ms. Clinton won the presidency.

I would be remiss if I did not mention that this is not the ordinary case in which a media outlet, in good faith, published information that it reasonably believed to be true.  Buzzfeed (and you, specifically) explicitly did *not* believe that all aspects of the report were true – and, indeed, you have said as much.  Buzzfeed did nothing to confirm the truth or falsity of the information with respect to Mr. Gubarev, XBT, or Webzilla.  Buzzfeed made no attempts to contact Mr. Gubarev, XBT, or Webzilla and – perhaps most disturbingly – Buzzfeed did not even bother to

Mr. Ben Smith
January 28, 2017
Page 3

take the simple step of redacting my clients' names, something that would have taken no time, cost no money, and not changed the character of your "reporting" at all.  This was, in short, a complete abdication of journalistic standards and ethics.

Despite your explicit knowledge that certain facts contained in the report were untrue, you published the allegations concerning Mr. Gubarev, XBT, and Webzilla apparently without the slightest care as to how such publication would adversely impact Mr. Gubarev, XBT, and Webzilla.

Mr. Gubarev is not, in any way, shape, or form, a public figure.  He is a private individual who woke up one day to find that your website had – shockingly – tied him to an alleged Russian conspiracy to commit crimes against Democratic Leaders, not to mention a conspiracy to undermine American Democracy.  The resulting damage was immediate, ongoing, and completely predictable.  Mr. Gubarev is married with three young children.  As a result of the publication of your article, his wife has found herself a target of online harassment and the family's personal security compromised.  Mr. Gubarev has found his professional and personal reputation left in tatters.  Similarly, the economic damages to XBT and Webzilla – including (but not limited to) the harm to the company's previously-unblemished reputation with its clients, lenders, vendors, and others has been immediate.  That Webzilla would be harmed in Florida, where it is incorporated and has offices, as well as in other locations across the globe was also fully predictable.

Pursuant to the Florida Statute, my clients are demanding an immediate and complete retraction of the libelous materials in a manner designed to be as visible as the original article.  Such retraction should take place immediately and, at the latest, prior to February 3, 2017.  As noted, Mr. Gubarev, XBT, and Webzilla intend to initiate litigation in Florida.  Please understand, however, that the issuance of such a retraction – while absolutely necessary – will *not* relieve you of the potential for punitive damages because the original report was not "published in good faith; that its falsity was due to an honest mistake of the facts; [or] that there were reasonable grounds for believing that the statements in said article or broadcast were true." Florida Statutes Chapter 770.02(a).  Nevertheless, my clients consider such a retraction to be a precursor to any possible discussion of an amicable resolution to this matter.

If you or your counsel would like to discuss this matter prior to the initiation of litigation, please feel free to contact me before February 3, 2017.

Sincerely,

Val Gurvits

Case 0:17-cv-60426-UU   Document 1-2   Entered on FLSD Docket 02/28/2017   Page 18 of 51

Filing # 52031663 E-Filed 02/03/2017 11:55:42 AM

EXHIBIT 2

These Reports Allege Trump Has Deep Ties To Russia - BuzzFeed News



| News | Videos | Quizzes | Tasty | DIY | More | Get Our News App |

 

*TOP POST*
5,950,378 VIEWS

# These Reports Allege Trump Has Deep Ties To Russia

A dossier, compiled by a person who has claimed to be a former British intelligence official, alleges Russia has compromising information on Trump. The allegations are unverified, and the report contains errors.

Originally posted on Jan. 10, 2017, at 6:20 p.m.
Updated on Jan. 10, 2017, at 9:09 p.m.



**Ken Bensinger**
BuzzFeed News Reporter

**Miriam Elder**
BuzzFeed News World Editor

**Mark Schoofs**
BuzzFeed News Investigations Editor

    

### In The News Today

- President Trump's senior adviser Kellyanne Conway says she meant to say "Bowling Green terrorists" after citing a nonexistent "massacre."

- Hundreds of US residents are still trapped by Trump's executive immigration orders, fueling a bitter battle between civil rights attorneys and border patrol agents.

- Uber CEO Travis Kalanick is dropping out of Donald Trump's economic advisory panel after backlash among customers led to the "Delete Uber" hashtag.

- A pharmaceutical company hiked the price of its life-saving overdose antidote from $575 to $4,100 in the middle of an opioid epidemic.

Download the BuzzFeed News app



**This Is How France's Nationalist Party Is Winning Gay Support**

*by J. Lester Feder*

**Connect With USNews**

Like Us On Facebook

Follow Us On Twitter



Drew Angerer / Getty Images

A dossier making explosive — but unverified — allegations that the Russian government has been "cultivating, supporting and assisting" President-elect Donald Trump for years and gained compromising information about him has been

These Reports Allege Trump Has Deep Ties To Russia - BuzzFeed News

circulating among elected officials, intelligence agents, and journalists for weeks.

The dossier, which is a collection of memos written over a period of months, includes specific, unverified, and potentially unverifiable allegations of contact between Trump aides and Russian operatives, and graphic claims of sexual acts documented by the Russians. BuzzFeed News reporters in the US and Europe have been investigating various alleged facts in the dossier but have not verified or falsified them. CNN reported Tuesday that a two-page synopsis of the report was given to President Obama and Trump.

Now BuzzFeed News is publishing the full document so that Americans can make up their own minds about allegations about the president-elect that have circulated at the highest levels of the US government.

The document was prepared for political opponents of Trump by a person who is understood to be a former British intelligence agent. It is not just unconfirmed: It includes some clear errors. The report misspells the name of one company, "Alpha Group," throughout. It is Alfa Group. The report says the settlement of Barvikha, outside Moscow, is "reserved for the residences of the top leadership and their close associates." It is not reserved for anyone, and it is also populated by the very wealthy.

The Trump administration's transition team did not immediately respond to BuzzFeed News' request for comment. However, the president-elect's attorney, Michael Cohen, told Mic that the allegations were absolutely false.

"It's so ridiculous on so many levels," he said. "Clearly, the person who created this did so from their imagination or did so hoping that the liberal media would run with this fake story for whatever rationale they might have."

And Trump shot back against the reports a short time later on Twitter.

His former campaign manager and current senior White House adviser, Kellyanne Conway, also denied the claims during an appearance on *Late Night With Seth Meyers,* adding that "nothing has been confirmed." She also said Trump was "not aware" of any briefing on the matter.

The documents have circulated for months and acquired a kind of legendary status among journalists, lawmakers, and intelligence officials who have seen them. *Mother Jones* writer David Corn referred to the documents in a late October column.

Harry Reid spokesman Adam Jentleson tweeted Tuesday that the former Senate Democratic leader had seen the documents before writing a public letter to FBI Director James Comey about Trump's ties to Russia. And CNN reported Tuesday that Arizona Republican John McCain gave a "full copy" of the memos to Comey on Dec. 9, but that the FBI already had copies of many of the memos.

**If you have tips related to this story, write us at trumpstories@buzzfeed.com. To send us information confidentially, go here.**

---

News moves fast. Keep up with the BuzzFeed News daily email.



## More News



Mexico's President Canceled His Meeting With Trump Rather Than Pay For The Wall



Gorsuch Would Join The Supreme Court Millionaires' Club If He's Confirmed



The White House Thinks Crimea Sanctions Should Stay Until Russia Returns It



Pentagon Report: The Military Spun Their Intel To Make ISIS Seem Weaker

These Reports Allege Trump Has Deep Ties To Russia - BuzzFeed News

**Read the report here:**



Ken Bensinger is an investigative reporter for BuzzFeed News and is based in Los Angeles. His secure PGP fingerprint is 97CC 6E32 10A2 23FE 4E84 98B4 9CFF 4214 9D26 8AA7
Contact Ken Bensinger at ken.bensinger@buzzfeed.com.

Miriam Elder is the world editor for BuzzFeed News and is based in New York. Her secure PGP fingerprint is 5B5F EC17 C20B C11F 226D 3EBE 6205 F92F AC14 DCB1
Contact Miriam Elder at miriam.elder@buzzfeed.com.

Pulitzer-prize winner Mark Schoofs is the investigations and projects editor for BuzzFeed News. While reporting at The Village Voice, Schoofs won the 2000 Pulitzer Prize for International Reporting for his series on AIDS in Africa.
Contact Mark Schoofs at mark.schoofs@buzzfeed.com.



Israeli Officials Actually Don't Want The US To Move Its Embassy To Jerusalem



Trump To Publish Weekly List Of Crimes Committed By Undocumented Immigrants In Sanctuary Cities



Trump's Immigration Order Is Seriously Complicating The CIA's Job



Thousands Of Harvard Alumni Implore Jared Kushner For A Meeting



Meet The "Good Trolls" Secretly Spying On Trump Supporters And Neo-Nazis



Fox News Deleted A Tweet About The Quebec Shooting After Canada's Government Objected

More News

# Exhibit B

Best Invest Cyprus - Aleksej Gubarev                                http://www.bestcyprusbusiness.com/speakers/43-speakers-2016/129-alek...





**FOUR SEASONS HOTEL**
**LIMASSOL, CYPRUS**
Map

| HOME | PROGRAM 2017 | SPEAKERS | SPONSORS | EXHIBITORS | CONTACT US |

Home / Speakers / SPEAKERS BEST INVEST CONFERENCE - 2016 / Aleksej Gubarev



## Aleksej Gubarev
### Co-founder and CEO at XBT Holding

Aleksej Gubarev was born on 20 June, 1980 in Ust-Ilimsk, Irkutsk Oblast.

In 1996 Aleksej entered Novosibirsk State University where he studied at Faculty of Mechanics and Mathematics. He has been working in IT industry from year 2000 when he run various local projects.

In 2005, when he was 25, he founded XBT – company that specializes in hosting, data and web-development. XBT Holding now has 11 subsidiaries collaborating over 9 countries. XBT Holding is a parent company for such projects as Fozzy.com, IaaS hosting provider Servers.com, secureVPN.

Best Invest Cyprus - Aleksej Gubarev                    http://www.bestcyprusbusiness.com/speakers/43-speakers-2016/129-alek...

# VESTNIK KIPRA GROUP

- Publishing House
- PR & Promotion Agency
- Educational Center
- Translation Bureau
- Event Management Company
- Travel & Tours Agency
- Association of Russian-speaking residents

# CONTACT US



+357 25590530

+357 97745594

E-mail us: ip@vkcyprus.com

# SUCCESSFUL BUSINESS



COPYRIGHT © 2017 BEST INVEST CYPRUS

# Exhibit C

**The New York Times** | https://nyti.ms/2k8xon7

U.S.

# Russian Executive Sues BuzzFeed Over Unverified Trump Dossier

By ELI ROSENBERG    FEB. 4, 2017

A Russian technology executive who was named in a dossier containing unverified allegations about connections between President Trump and the Russian government has sued BuzzFeed News, which published the information.

The defamation suit was filed in court on Friday in Broward County, Fla., according to lawyers for the executive, Aleksej Gubarev, the chief of XBT, a technology company based in Luxembourg. The suit focuses on allegations, made near the end of the dossier, that Mr. Gubarev and his company were involved in hacking operations against the leadership of the Democratic Party.

In the complaint, Mr. Gubarev's lawyers say that BuzzFeed acted recklessly; that none of the statements have any basis in fact; and that Mr. Gubarev's association with the dossier has left his reputation "in tatters," compromised his family's security and damaged his company's business prospects. It called BuzzFeed's decision "perhaps one of the most reckless and irresponsible moments in modern 'journalism.'"

The publishing of the dossier was one of the most startling moments of the weeks before Mr. Trump's inauguration.

Russian Executive Sues BuzzFeed Over Unverified Trump Dossier - The...          https://www.nytimes.com/2017/02/04/us/russia-trump-buzzfeed-sue.html

Compiled by a former British intelligence operative who was hired by Mr. Trump's Republican rivals and later by supporters of Hillary Clinton, the document had circulated for months among high-ranking government officials and journalists. The veracity of its claims had been investigated but never proved.

But after CNN reported last month that intelligence officials had presented a summary of the allegations to Mr. Trump and President Barack Obama, BuzzFeed decided to publish the document in full, saying that "Americans can make up their own minds about allegations about the president-elect that have circulated at the highest levels of the U.S. government."

When it published the dossier, BuzzFeed noted that it contained errors and that its claims had not been verified. The publication's editor in chief, Ben Smith, later wrote that its reporters in the United States and Europe spent weeks investigating the report.

BuzzFeed ignited a debate over both the claims in the report as well as the outlet's decision to break from typical journalistic practices in publishing it. Mr. Trump denounced the unproven claims as a Nazi-esque smear, and called BuzzFeed a "failing pile of garbage" during a heated news conference on Jan. 11.

Mr. Gubarev's lawsuit claims that while more than 30 publications tried to contact him after the dossier's publication, he was not contacted by BuzzFeed for his response to the allegations.

Mr. Gubarev, 36, lives in Cyprus with his wife and three children. He founded the site Webzilla — which is also identified in the report, the complaint notes — and built it into an international business, XBT, with more than 300 employees around the world.

The lawsuit was filed in Florida, where Webzilla is registered.

A federal lawsuit over the publishing of a sex tape featuring the wrestler Hulk Hogan that led the website Gawker to file for bankruptcy and eventually shut down was also filed in the state. That case, over invasion of privacy, remains a cautionary tale in the media world.

Russian Executive Sues BuzzFeed Over Unverified Trump Dossier - The...                https://www.nytimes.com/2017/02/04/us/russia-trump-buzzfeed-sue.html

After learning of the lawsuit on Friday, BuzzFeed removed the names of Mr. Gubarev and his company from the dossier. "We have redacted Mr. Gubarev's name from the published dossier, and apologize for including it," the company said in an emailed statement to The New York Times.

A spokesman for BuzzFeed said it had redacted other names in the document and should have redacted Mr. Gubarev's, but the spokesman defended the company's decision to publish the dossier.

Mr. Gubarev's lawyers have also filed a lawsuit in Britain against the former intelligence agent who compiled the report and his consulting company.

The lawsuit against BuzzFeed comes at a tense moment for the news media. Mr. Trump's administration has castigated journalists for challenging unverified or false claims presented by the White House as fact, and the president's chief strategist, Stephen K. Bannon, has labeled the news media "the opposition party."

Floyd Abrams, a First Amendment scholar and lawyer, said the lawsuit was a "difficult situation for BuzzFeed to be confronted with."

"It seems inevitable that BuzzFeed will say in some fashion that subjecting it to crippling damages for publishing the dossier would, in the end, imperil the public's right to know just what misconduct an American president" is suspected of, he said. He added that he could foresee lawyers arguing to move the case to federal court or to a court outside Florida. In the complaint, Mr. Gubarev's lawyers argue that he is not a public figure. But if the court disagrees, Mr. Gubarev's lawyers would have to prove that BuzzFeed acted not only negligently, but also maliciously.

One potential argument for defense lawyers is a principle called neutral reportage, which defends the publishing of some defamatory material if it is a matter of public interest and "does it in a fair and disinterested manner, without endorsing a defamatory charge," Mr. Abrams said. The principle has been rejected by some courts, however, and has not been tested widely, he added.

"I would think that wherever this case is heard, an absolutely central issue will be whether a court would adopt the neutral reportage principle and say basically

precisely what the editor of BuzzFeed has been saying — that this is an enormous matter of public interest, we reported it fairly, we did not endorse it, we made very clear that these were simply charges that were well known to everyone but the American public," he said.

---

© 2017 The New York Times Company

# Exhibit D

Russian Tech Executive Files Lawsuit Against BuzzFeed Over Dossier - WSJ   https://www.wsj.com/articles/russian-tech-executive-files-lawsuit-agains...

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

https://www.wsj.com/articles/russian-tech-executive-files-lawsuit-against-buzzfeed-over-dossier-1486175951

BUSINESS

# Russian Tech Executive Files Lawsuit Against BuzzFeed Over Dossier

Aleksej Gubarev, chief executive of a web-hosting company, was identified in dossier as hacking expert involved in stealing data from Democratic Party



While many news organizations had seen the dossier but withheld publication because they were unable to verify its claims, BuzzFeed published the full dossier online on Jan. 10. *PHOTO: BRENDAN MCDERMID/REUTERS*

By **LUKAS I. ALPERT**

Feb. 3, 2017 9:39 p.m. ET

A Russian tech executive whose name appeared in an unsubstantiated intelligence dossier on President Donald Trump has filed defamation lawsuits against BuzzFeed, which published the dossier online, and the former British intelligence officer who is believed to have compiled it.

Aleksej Gubarev, chief executive of XBT Holding, a Luxembourg web-hosting company, was identified in the dossier as a hacking expert involved in stealing data from the Democratic Party.

The suit against BuzzFeed, which was filed in state court in Broward County, Fla., called the site's publication of the dossier "perhaps one of the most reckless and irresponsible moments in modern 'journalism.'" The suit also names the

Russian Tech Executive Files Lawsuit Against BuzzFeed Over Dossier - WSJ   https://www.wsj.com/articles/russian-tech-executive-files-lawsuit-agains...

website's editor in chief, Ben Smith, as a defendant.

It alleged that even though "BuzzFeed and Smith specifically knew that at least portions of the dossier were untrue, they printed the entire document—without meaningful redactions."

A spokesman for BuzzFeed said in a statement that the site, which had redacted some names and information when it originally published the full document, has since "redacted Mr. Gubarev's name from the published dossier, and apologizes for including it."

The 35-page dossier purported to contain intelligence that Russian officials have compromising personal and financial information about Mr. Trump and that the Kremlin colluded with members of Mr. Trump's team to help get him elected. Both Mr. Trump and the Russian government have dismissed the allegations.

While many news organizations had seen the dossier but withheld publication because they were unable to verify its claims, BuzzFeed published the full dossier online on Jan. 10. BuzzFeed posted the dossier after CNN broke the news that U.S. intelligence agencies had included a two-page summary of the document in a briefing given to then-President Barack Obama and Mr. Trump before his inauguration.

In a statement, Mr. Gubarev called the allegations about himself "libelous, unverified and untrue" and said he was seeking an undetermined amount of compensation for damages he and his company suffered.

BuzzFeed's decision to publish the unverified document was controversial in the journalism world. Mr. Smith defended the move in a staff memo at the time, saying the information was circulating at the highest levels of the U.S. government and readers had a right to make up their own minds about it.

A separate lawsuit, filed in the High Court of Justice, Queen's Bench Division in London, accused former intelligence officer Christopher Steele and his firm, Orbis Intelligence Ltd., of tarnishing Mr. Gubarev's name and his company, causing them to lose clients and damaging their relationship with lenders.

Mr. Steele, who people familiar with the matter have told The Wall Street Journal was responsible for compiling the report, couldn't immediately be reached for comment.

2/24/2017 2:32 PM

Russian Tech Executive Files Lawsuit Against BuzzFeed Over Dossier - WSJ   https://www.wsj.com/articles/russian-tech-executive-files-lawsuit-agains...

In an interview with the Journal in January, Mr. Gubarev, who lives in Cyprus, said he hasn't resided in Russia for 15 years and wasn't involved in politics. He insisted he runs a legitimate business and doesn't employ hackers.

In the Florida lawsuit, Mr. Gubarev said his wife has become the target of online harassment and his "family's personal security has been compromised."

**Write to** Lukas I. Alpert at lukas.alpert@wsj.com

Copyright &copy;2017 Dow Jones &amp; Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

2/24/2017 2:32 PM

# Exhibit E

Aleksej Gubarev, of Russia's Webzilla, says hacking charges false | McCla...     http://www.mcclatchydc.com/news/nation-world/national/article1259107...

**NATIONAL**     JANUARY 11, 2017 3:08 PM

# Russian tech expert named in Trump report says US intelligence never contacted him



An image of Alexsej Gubarev from the Russian website of Servers.com, which is owned by his parent company, XBT Holding. From Servers.ru website

BY KEVIN G. HALL AND TIM JOHNSON
McClatchy Washington Bureau

WASHINGTON — A Russian venture capitalist and tech expert whose name and company are mentioned in the now-notorious document alleging connections between the Donald Trump campaign and Russian hackers says no intelligence officers have ever contacted him about the accusations, which he says are false.

A report compiled by a former Western intelligence official as opposition research against Trump was made public Tuesday when BuzzFeed posted its 35 pages. The document included unsubstantiated claims of collusion between the Trump campaign team and the Kremlin.

▶

f | 𝕏 | ✉ | ⤴

**Trump addresses Russia accusations, business dealings in**

Aleksej Gubarev, of Russia's Webzilla, says hacking charges false | McCla...    http://www.mcclatchydc.com/news/nation-world/national/article1259107...

## post-election press conference

President-elect Donald Trump on Wednesday delivered his first press conference since the November presidential election. Trump addressed his relationship with Russia and how he will handle his business once taking office.

C-SPAN

It also alleged that global tech firm XBT Holding, with operations in Dallas, was instrumental in the hack of leaked Democratic Party emails that embarrassed Hillary Clinton and fellow Democrats.

XBT, owner of Dallas-based enterprise-hosting company Webzilla, is run by a successful Russian tech startup expert, Aleksej Gubarev. In a phone interview from Cyprus, where he said he'd lived since 2002, Gubarev said he was surprised to see his name in the report.

"I don't know why I was there," Gubarev said, adding that perhaps a competitor sought to discredit him. "I still don't understand the true reason for this report."

The salacious innuendoes in the periodic reports about Trump's personal life dominated social media headlines. The mention of Webzilla and Gubarev was among the more specific allegations: that XBT and affiliates "had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct 'altering operations' against the Democratic Party leadership."

Aleksej Gubarev, of Russia's Webzilla, says hacking charges false | McCla...     http://www.mcclatchydc.com/news/nation-world/national/article1259107...

Gubarev said he operated 75,000 servers across the globe and got real-time information if there had been hacking or illicit activity tied to his businesses. There is no evidence of that, he said, adding that no one has contacted him.

"I have a physical office in Dallas. Nobody contacted me," said Gubarev, adding that 40 percent of his business is handled over the servers it runs in Dallas and the United States accounts for about 27 percent of his global business.

President-elect Trump confirmed Wednesday at a news conference that he had seen the 35-page report, and he blasted it as "fake news" and an "absolute disgrace.''

McClatchy has reported that Sen. John McCain, R-Ariz., gave the bulk of the report to FBI Director James Comey on Dec. 9. The final pages of the report are dated Dec. 11. McClatchy had the report earlier but couldn't verify any of its allegations.

A federal law enforcement source told McClatchy that the document was being examined as part of a broader FBI inquiry into Russia's influence on the U.S. election but wouldn't characterize its credibility. A source familiar with the former Western intelligence expert who compiled the dossier told McClatchy that the ex-spy has extensive experience in tracking activities in the Kremlin.

The report alleges that Gubarev and another

Aleksej Gubarev, of Russia's Webzilla, says hacking charges false | McCla...   http://www.mcclatchydc.com/news/nation-world/national/article1259107...

hacking expert were recruited under duress by the FSB, the Russian intelligence-agency successor to the KGB. Gubarev said he had not been threatened or blackmailed, nor had his mother, who lives in Russia.

Gubarev's Facebook page shows his wife, Anna Gubareva, and him on the bow rail of a fast-moving luxury yacht. His profile picture shows him behind the wheel of a vintage convertible Citroen. He is the public face of a number of tech companies around the globe.

XBT offers an array of tech services, from dedicated hosting of servers and cloud-based storage to developing apps for mobile phones and offering virtual private servers. His company advertises specialized services to software developers, advertisers, gaming companies and electronic-commerce enterprises. It also operates data centers in Russia, Asia, Europe and Dallas.

XBT has been on a buying spree in recent years, accumulating companies in the web-hosting and related fields, including DDoS.com, 1-800-HOSTING, SecureVPN.com, ColocateUSA, Server.lu in Luxembourg, Singapore's 8 to Infinity, and a site used heavily to host pornography, fozzy.com. It acquired Webzilla about a decade ago, which is a medium-sized web-hosting company.

Although Webzilla operates from Texas, it has a "pretty deep Russian client base," analyst Carl Brooks of 451 Research, a Boston-based

consultancy, said in a December interview. "They don't have a bad reputation, by any means."

He said the same went for XBT Holding: "To the best of my knowledge, XBT is not particularly nefarious." He estimated annual revenues for XBT between $50 million and $200 million.

Gubarev suspected he might have been named in the report because of comments to Bloomberg's Russia business columnist Leonid Bershidsky. Bershidsky wrote on Nov. 1 that Gubarev questioned allegations that the Trump organization maintained a server found to have communicated with two servers at Russia's Alfa Bank, which is also named in the 35 pages of unproven allegations.

"Bloomberg asked me my expert opinion," he said, noting it was the only time he'd ever commented about a U.S. election or U.S. politics.

In that column, Gubarev expressed doubt about the conclusions of outside experts who said they had studied the server connections between Alfa Bank and the Trump organization. These experts, Gubarev said, would not have had access to the complete logs of a server they didn't control.

The Russian-born Cyprus resident may not be a household name in the United States, but he is tied to millions of iPhones belonging to ordinary Americans. Gubarev was a major investor in the app now called Prism. It was

Aleksej Gubarev, of Russia's Webzilla, says hacking charges false | McCla...      http://www.mcclatchydc.com/news/nation-world/national/article1259107...

one of the most downloaded of 2016 and uses artificial intelligence to turn ordinary cellphone photos into a wide range of painting styles.

If law enforcement wants to talk with him, Gubarev said, his door is open.

"I'm ready for any investigation. I'm ready to cooperate with everybody, he said.

GREG GORDON AND MCCLATCHY SPECIAL CORRESPONDENT PETER STONE CONTRIBUTED TO THIS ARTICLE.

Kevin G. Hall: 202-383-6038, @KevinGHall

Tim Johnson: 202-383-6028, @timjohnson4

## RELATED CONTENT

• Democrats didn't stand a chance against Russia's elite hackers. They're too good.

• After leak accusations, Clapper attempts to smooth things over with Trump

• FBI, CIA, DNI, NSA all agreed: Tell Trump about explosive Russia claims

• Senior Democrat calls for House-Senate inquiry of hacking accusations

• Trump admits Russia was behind election hacking, then backtracks

• Russia may take hacking to next level by framing politicians with crimes, senator warns

• Trump 'said he's not aware' of being briefed on Russia report, Conway says

2/15/2017 4:20 PM

Aleksej Gubarev, of Russia's Webzilla, says hacking charges false | McCla...       http://www.mcclatchydc.com/news/nation-world/national/article1259107...



**MORE NATIONAL**

**SUGGESTED FOR YOU**

Trump Supporters Leave DC Waitress $450 Tip, Message Of Hope

PoliticsChatter

The Extended Family Of President Obama

PoliticsChatter

Christie Brinkley, 63, And Her Daughters Rock Bikinis For Sports Illustrated

CelebChatter

Alice Woman Caught With Illegals

Alice Echo-News Journal, Alice, TX

**COMMENTS**

Aleksej Gubarev, of Russia's Webzilla, says hacking charges false | McCla...     http://www.mcclatchydc.com/news/nation-world/national/article1259107...

**60 Comments**                    Sort by    Newest

 | Add a comment...

 **Tim Kinnaird** ·
Western University

Hunter S. Thompson, where art thou? Fear and loathing is the new American political zeitgeist and the helter skelter of the Trump victory appears to have driven some down the rabbit hole of rabid resistance to the point of almost Monty Python-esque absurdity. The Clinton KoolAide Drinkers seem to be contriving their own Private Political Jonestown with hallucinations of depravity and wild paranoia . Indeed, Ralph Steadman's portraiture appears most apt to capture this Hillary in defeat moment: wild-eyed and delirious, naked and ugly, perched over a toilet vomiting a psychedelic brew of delusion.

Like · Reply ·   1 · Jan 14, 2017 9:21am

 **Bardi Jonssen** ·
UC Berkeley

"Russian tech expert named in Trump report says US intelligence never contacted him"

How would he know? Does US intelligence walk around with a special hat?

Like · Reply · Jan 13, 2017 9:32am

 **Dawn J Benko**

Obviously, intelligence eludes you.

Like · Reply ·   3 · Jan 13, 2017 7:33pm

 **Bardi Jonssen** ·
UC Berkeley

Dawn J Benko : When members of the IC, not the FBI, talk with you, they do not have to identify themselves as such or even, gasp, set up an appointment. Besides not understanding the questions, you obviously watch way too much TV.

9 of 10                                                                    2/15/2017 4:20 PM

Aleksej Gubarev, of Russia's Webzilla, says hacking charges false | McCla...       http://www.mcclatchydc.com/news/nation-world/national/article1259107...

# Exhibit F



| 12,000 | 37000 | 40 | 5 | 1,500 |
|---|---|---|---|---|
| Customers | Servers | Countries | Datacenters | Gbps Network |

Home / Contacts

# GLOBAL CONTACT DETAILS

XBT greatly appreciates your interest. If you have any enquiries regarding our services or companies, please feel free to contact us using the details below:

**Postal address**
3, op der Poukewiss,
7795, Roost, Luxembourg

**Email address**
finance@xbt.com

**Phone number**
+352.20.500.500

## CONTACT FORM

Your name *

Email *        Website

Your message *

Fields marked with (*) are mandatory          SUBMIT

## ON THE MAP



## COMPANY
About XBT Holding
Services
Geography
Newsroom
Subsidiaries

## INVESTOR RELATIONS
Business Portfolio
Financial Information
Corporate Governance
Quarterly Reports
Investor FAQ

For investor related issues call:
**+352.20.500.500**

Investor Relations
Press and Media

**HEAD OFFICE ADDRESS**

3, op der Poukewiss,
7795, Roost,
Luxembourg

Copyright © 2011-2015 XBT Holding, S.A. All Rights Reserved | Sitemap

# Exhibit G

Florida Department of State                                         DIVISION OF CORPORATIONS



Department of State  /  Division of Corporations  /  Search Records  /  Detail By Document Number  /

# Detail by Entity Name

Florida Profit Corporation
WEBZILLA INC.

**Filing Information**

| | |
|---|---|
| **Document Number** | P09000064327 |
| **FEI/EIN Number** | N/A |
| **Date Filed** | 07/29/2009 |
| **Effective Date** | 07/29/2009 |
| **State** | FL |
| **Status** | ACTIVE |
| **Last Event** | AMENDMENT |
| **Event Date Filed** | 07/16/2012 |
| **Event Effective Date** | NONE |

**Principal Address**

2777 Stemmons Fwy.
Suite 1655
Dallas, TX 75207

Changed: 01/17/2014

**Mailing Address**

2777 Stemmons Fwy.
Suite 1655
Dallas, TX 75207

Changed: 01/17/2014

**Registered Agent Name & Address**

INCORPORATE NOW
6750 N. Andrews Ave.
Suite 200
Fort Lauderdale, FL 33309

Name Changed: 03/01/2010

Address Changed: 03/31/2013

**Officer/Director Detail**

**Name & Address**

http://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityName&directionT...

Title D

Mishara, Rajesh Kumar
2777 Stemmons Fwy.
Suite 1655
Dallas, TX 75207

Title D

Bezruchenko, Kostyantyn
2777 Stemmons Fwy.
Suite 1655
Dallas, TX 75207

**Annual Reports**

| Report Year | Filed Date |
| --- | --- |
| 2014 | 01/17/2014 |
| 2015 | 02/04/2015 |
| 2016 | 02/23/2016 |

**Document Images**

| | |
| --- | --- |
| 02/23/2016 -- ANNUAL REPORT | View image in PDF format |
| 02/04/2015 -- ANNUAL REPORT | View image in PDF format |
| 01/17/2014 -- ANNUAL REPORT | View image in PDF format |
| 03/31/2013 -- ANNUAL REPORT | View image in PDF format |
| 07/16/2012 -- Amendment | View image in PDF format |
| 02/20/2012 -- ANNUAL REPORT | View image in PDF format |
| 04/19/2011 -- ANNUAL REPORT | View image in PDF format |
| 11/08/2010 -- Amendment | View image in PDF format |
| 04/05/2010 -- Amendment | View image in PDF format |
| 03/01/2010 -- ANNUAL REPORT | View image in PDF format |
| 07/29/2009 -- Domestic Profit | View image in PDF format |

# Exhibit H

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

ALEKSEJ GUBAREV, XBT HOLDING S.A.,  :
and WEBZILLA, INC.                  :
                                    :   Case No.:  CACE-17-002364
                  Plaintiffs,       :   Division:  21
                                    :
          vs.                       :
                                    :
BUZZFEED, INC. and BEN SMITH        :
                                    :
                  Defendants.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

**DEFENDANTS' NOTICE TO THE CIRCUIT
COURT OF FILING NOTICE OF REMOVAL**

Defendants hereby give notice of having filed in the United States District Court for the

Southern District of Florida their notice of removal of this action, Case No. CACE-17-002364,

pending in the Circuit Court in and for Broward County, Florida.  A copy of Defendants' notice

of removal is attached.

Dated: February 28, 2017        LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
                                201 South Biscayne Boulevard
                                22nd Floor
                                Miami, FL 33131
                                Phone:  (305) 403-8791
                                Fax:  (305) 403-8789

                                By:    /s/ Lawrence A. Kellogg
                                       Lawrence A. Kellogg

                                              and

                                Katherine M. Bolger (*pro hac vice forthcoming*)
                                Nathan Siegel (*pro hac vice forthcoming*)
                                Adam Lazier (*pro hac vice forthcoming*)
                                LEVINE SULLIVAN KOCH & SCHULZ LLP
                                321 West 44th Street, Suite 1000
                                New York, NY 10036
                                (212) 850-6100

                                *Counsel for Defendants*

Case 0:17-cv-60426-UU   Document 14-1   Entered on FLSD Docket 03/14/2017   Page 125 of 228
Case 0:17-cv-60426-UU   Document 1-3   Entered on FLSD Docket 02/28/2017   Page 1 of 12
Filing # 52031663 E-Filed 02/05/2017 11:55:42 AM

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA
CASE NO:

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.,
                              Plaintiffs,
vs.

BUZZFEED, INC. AND BEN SMITH,

                    Defendants.
_____/

## COMPLAINT FOR DAMAGES

Plaintiffs, Aleksej Gubarev ("Mr. Gubarev"), XBT Holding S.A. ("XBT"), and Webzilla,

Inc. ("Webzilla")(collectively, "Plaintiffs") sue Defendants Buzzfeed, Inc. ("Buzzfeed") and Ben

Smith ("Mr. Smith") for damages.   In support, Plaintiffs allege the following:

## INTRODUCTORY STATEMENT

1.      On January 10, 2017, in perhaps one of the most reckless and irresponsible moments

in modern "journalism," Defendant Buzzfeed and its Editor in Chief Ben Smith chose to publish a

"dossier" of unverified information compiled by a private security company in which various

allegations were made concerning, among other things, computer hacking allegedly carried out

by persons or organizations with ties to Russia, the Russian Government, and/or the Federal

Security Service of the Russian Federation ("FSB").

2.      And, although Buzzfeed and Smith specifically knew that at least portions of the

dossier were untrue, they printed the entire document – without meaningful redactions –

including those portions that falsely accused the Plaintiffs of participating in an alleged

conspiracy to commit crimes against the Democratic Leadership, not to mention a conspiracy to

undermine American Democracy and the 2016 election.  With respect to the Plaintiffs, these allegations were wholly and completely false.

3.     Buzzfeed and Smith published these allegations without having even taken the most basic step of contacting the Plaintiffs to ask if the allegations had any merit.  Indeed, in its original publication of the dossier, Buzzfeed itself *admitted* it had no idea what – if anything – in the dossier was truthful, writing:

> The dossier, which is a collection of memos written over a period of months, includes specific, unverified, and potentially unverifiable allegations… BuzzFeed News reporters in the US and Europe have been investigating various alleged facts in the dossier but have not verified or falsified them. …[The dossier] is not just unconfirmed: It includes some clear errors.

4.     As of the date of this filing, the original Buzzfeed article has been viewed almost six million times and Buzzfeed has published eight additional follow-up articles, each of which links back to the original defamatory publication.

5.     Plaintiff Aleksej Gubarev, who is married with three young children is not, in any way, shape, or form, a public figure.  As a result of Buzzfeed and Mr. Smith's reckless publication of defamatory materials, he has found his personal and professional reputation in tatters.  His wife has found herself a target of online harassment and the family's personal security has been compromised.  Similarly, the economic damage to XBT and Webzilla (a Florida Corporation), including the harm to the companies' previously-unblemished reputations with their clients, lenders, vendors, and others has been immediate and ongoing.

## PARTIES

6.     Plaintiff Aleksej Gubarev is an individual who resides in the Republic of Cyprus.  Mr. Gubarev has lived in Cyprus since 2002.  Mr. Gubarev is the Chairman and CEO and director of Plaintiff XBT Holding S.A.

7.     Plaintiff XBT Holding S.A. is a company organized under the laws of Luxembourg. XBT has offices in Florida and Texas as well as other locations across the globe.  XBT has various subsidiary companies, including Webzilla, Inc.

8.     Plaintiff Webzilla, Inc. is a Florida corporation with offices in Fort Lauderdale.

9.     Defendant Buzzfeed, Inc. is a Delaware Corporation.  According to Buzzfeed, it has offices in "18 cities around the world including New York, Los Angeles, San Francisco, London, Sydney, Sao Paulo, and Tokyo."  Buzzfeed owns and operates the Buzzfeed.com website as well as the Buzzfeed mobile app.  According to Buzzfeed's media kit, it has in excess of 200 million unique monthly views.  Buzzfeed.com is one of the most trafficked websites in the United States, currently ranked in the top 100 websites visited in the U.S.

10.     Defendant Ben Smith is an individual who, on information and belief, resides in Brooklyn, New York.  Mr. Smith is the Editor in Chief of Buzzfeed.

**<u>JURISDICTION, VENUE, AND CONDITIONS PRECEDENT</u>**

11.     This Court has subject matter jurisdiction over Plaintiffs' claim for damages as each claim is in excess of $15,000.

12.     This Court has personal jurisdiction over the Defendants pursuant to Florida Statute 48.193(1)(b).  The Defendants posted defamatory materials concerning the Plaintiffs on their website (and through their mobile app), which materials were accessed in Florida, constituting the commission of the tortious act of defamation within Florida under section 48.193(1)(b).

13.     This Court also has personal jurisdiction over the Defendants pursuant to Florida Statute 48.193 because:

3

(a)     Defendants have caused injury to persons or property within Florida, arising out of acts or omissions undertaken outside of the state and Defendants regularly solicit advertising and viewers within Florida;

(b)     Defendants have committed intentional torts expressly aimed at one or more of the Plaintiffs, the effects of which were suffered in this circuit. Defendants' intentional conduct was calculated to cause injury to one or more of the Plaintiffs in Florida and has caused injury to one or more of the Plaintiffs in Florida. Based on their intentional torts, Defendants should have reasonably anticipated being haled into this Court and due process is satisfied.

14.     Venue is proper in Broward County because the tort occurred in Broward County and the harm to the Plaintiffs was felt in Broward County in that Plaintiff regularly conducts business in Broward County, Florida.

15.     All conditions precedent to this action have been performed.  Specifically, although not actually required to do so, Plaintiffs provided Defendants with pre-suit notice and a demand for a retraction pursuant to Florida Statutes Chapter 770.01, *et seq.*  See **Exhibit 1.**

## FACTUAL ALLEGATIONS

16.     Mr. Gubarev is an individual who lives, with his wife and three children, in Cyprus. He is a 36 year-old venture capitalist and tech expert.  In 2002, at the age of 22, he moved from Russia to Cyprus and, in 2005, he founded Webzilla Limited (an XBT predecessor) – a company that specializes in internet hosting, data, and web-development.

17.     Over the next 12 years, Mr. Gubarev grew XBT to an international business with various subsidiary companies, employing approximately 300 employees in three different continents.  XBT has offices in Texas, Florida, and Luxembourg, among others.

18.     Mr. Gubarev has never been involved in politics and is not a public figure.  Outside of technology circles, he is not known at all.

19.     Webzilla, Inc., one of XBT's subsidiaries, is a Florida corporation with offices in Fort Lauderdale, Florida and Dallas, Texas.

20.     XBT and its subsidiaries operate approximately 37,000 servers across the globe, with approximately 40 percent of its business being handled over the servers run out of Dallas, Texas.  Approximately 27 percent of XBT's global business comes from within the United States.

21.     Given that XBT's and Webzilla's businesses focus on internet hosting solutions, network services, and web development services, their reputation for providing secure services has been carefully cultivated and paramount to the success of the businesses.

22.     Similarly, prior to the Defendants' publication of defamatory materials, Mr. Gubarev's own professional reputation has been untarnished and key to his ability to build XBT and Webzilla into successful international hosting companies.

23.     On January 10, 2017, Buzzfeed and Mr. Smith published an online article entitled, "These Reports Allege Trump Has Deep Ties To Russia" (the "Defamatory Article")  The Defamatory Article, which at the time of this writing has been viewed more than 5.9 million times, can be found at https://www.buzzfeed.com/kenbensinger/these-reports-allege-trump-has-deep-ties-to-russia?utm_term=.fvQvex17e#.yezx3nBr3.  A true and accurate copy of the Defamatory Article is attached hereto as **Exhibit 2.**  On information and belief, the Defamatory Article has (conservatively) been viewed in Florida tens of thousands of times.

24.     This Defamatory Article attached a 35-page unverified "dossier" of information compiled by a private security company.  On information and belief, the dossier was created as part of opposition research conducted as part of the 2016 election campaign; it is not an official

document and was not created by any government entity.  A true and accurate copy of the dossier attached to the Defamatory Article is attached hereto as **Exhibit 3.**

25.     The dossier included various allegations concerning, among other things, allegations of computer hacking of the Democratic Party allegedly carried out by persons or organizations with ties to Russia, the Russian Government, and/or the Federal Security Service of the Russian Federation ("FSB").[1]

26.     With respect to the Plaintiffs, the dossier included the following assertions of fact:

> *[redacted] reported that over the period March-September 2016 a company called XBT/Webzilla and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct "altering operations" against the Democratic Party leadership. Entities linked to one Alexei GUBAROV [sic] were involved and he and another hacking expert, both recruited under duress by the FSB, Seva KAPSUGOVICH, were significant players in this operation. In Prague, COHEN agreed contingency plans for various scenarios to protect the operations, but in particular what was to be done in the event that Hillary CLINTON won the presidency. It was important in this event that all cash payments owed were made quickly and discreetly and that cyber and that cyber and other operators were stood down / able to go effectively to ground to cover their traces.*

27.     Not a single portion of this statement (as it applies to Mr. Gubarev, XBT, or Webzilla) has any basis in fact whatsoever.  Specifically:

a.     Neither XBT nor Webzilla nor any of their affiliates had been "*using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct 'altering operations'*" against the Democratic Party leadership or anyone else;

b.     No "*entities linked*" to Mr. Gubarev were involved in any alleged cyber-attacks;

c.     Mr. Gubarev was not "*recruited under duress by the FSB*" (to be clear, he was not recruited at all – whether under duress or otherwise), nor was he recruited for such activities by anyone else at any other time or in any other circumstances whatsoever.  Additionally, he has no knowledge of, has never met and has never spoken to a person known as Seva Kapsugovich;

---

[1] The FSB is the main successor agency to the USSR's Committee of State Security ("KGB").

    d.      Mr. Gubarev and his companies have never acted with "*another hacking expert*" to mount a cyber-attack on the Democratic Party Leadership or on any other person; and

    e.      Not having been involved in the activities attributed to them in the "dossier," neither Mr. Gubarev nor any of his companies would have had any need to "*go effectively to ground to cover their traces*" in the event that Ms. Clinton won the presidency.

28.      Although Buzzfeed and Mr. Smith claim that they had the dossier in their possession for weeks prior to its publication, and despite their claims that they had four reporters working near full-time on attempting to verify the claims made in the dossier, prior to publishing the Defamatory Article and the dossier, neither Buzzfeed nor Mr. Smith contacted the Plaintiffs to determine if the allegations made against them had any basis in fact. After the dossier's publication numerous journalists (more than 30) contacted Mr. Gubarev with some even arranging to travel to Cyprus to discuss the publication with Mr. Gubarev. During this time, and up to the present day, neither Buzfeed nor Mr. Smith contacted the Plaintiffs to determine if the allegations made against them had any basis in fact.

29.      At the time the Defendants published the Defamatory Article and accompanying dossier, they knew, without a doubt, that at least certain portions of the dossier were untrue. Indeed, the Defamatory Article stated specifically that:

> The dossier, which is a collection of memos written over a period of months, includes specific, unverified, and potentially unverifiable allegations… BuzzFeed News reporters in the US and Europe have been investigating various alleged facts in the dossier but have not verified or falsified them. …[The dossier] is not just unconfirmed: It includes some clear errors.

30.      In other words, Buzzfeed and Mr. Smith knew for sure **only** that certain parts of the dossier were **untrue**.  Other than the portions confirmed by them to be false, Buzzfeed and Mr. Smith had been unable to verify the veracity of any of the claims made in the dossier.

7

31.     Indeed, Mr. Smith has admitted that Buzzfeed knew at the time that it published the Defamatory Article and dossier that there were "real solid reasons to distrust" the veracity of the allegations contained therein.

32.     Despite these concerns, Buzzfeed and Mr. Smith took no steps to redact out the names of the Plaintiffs from the dossier, a step they could have taken easily and which would not have changed the character of their reporting.

33.     Buzzfeed and Mr. Smith immediately faced an onslaught of criticism for their irresponsible decision to publish the unverified dossier and the Defamatory Article – drawing condemnation from media outlets and journalism experts across the political spectrum including The Washington Post, CNN, MSNBC, Fox News, and the Poynter Institute to name a few.

34.     Despite this condemnation, Buzzfeed published eight additional follow-up articles, each of which contained a link back to the original Defamatory Article.

30.     In addition, Mr. Smith published an Op-Ed in the New York Times and appeared in numerous television and radio interviews defending his decision to publish the Defamatory Article and the dossier.  Some of these articles and interviews actually compounded the defamatory effect by implying that Buzzfeed had verified the claims made.

35.     For example in his New York Times Op-Ed, Mr. Smith stated that Buzzfeed decided to publish the dossier "only after we had spent weeks with reporters in the United States and Europe trying to confirm or disprove specific claims."  What the New York Times Op-Ed omitted, however, is that Buzzfeed had failed entirely in these efforts.  The Op-Ed also failed to state that Buzzfeed had made no attempts to contact Mr. Gubarev, XBT, or Webzilla and – on information and belief – had made no attempts to verify the claims made as to the Plaintiffs.

8

36.     Similarly, Mr. Smith stated on CNN's Reliable Sources that Buzzfeed was "running it down every way we could" and told MSNBC's Meet the Press Daily that "we, like many other organizations had had [the dossier] for weeks.  We had reporters in Europe and the United States trying to stand up or knock down specific details."

37.     Buzzfeed and Mr. Smith's decision to publish the unverified dossier not only flew in the face of all journalistic standards and ethics, but also violated Mr. Smith's own claims of how Buzzfeed operates.  Less than two months before it published the Defamatory Article and dossier, Mr. Smith wrote an article for the Columbia Journalism Review in which he claimed that Buzzfeed not only routinely took steps to verify the facts that they published but that doing so was "not complicated."  Specifically, in an article entitled "How tech and media can fight fake news," published on November 17, 2016, Mr. Smith wrote:

> Mark Zuckerberg recently wrote that "identifying the 'truth' is complicated." Maybe for algorithms and epistemologists. But it's something that professional journalists are asked to do every day, and it's not actually that complicated. The everyday reporting truths– who said what, when did they say it, what does the document say, where did the money go–are the sorts of thing we're good at pinning down.

### COUNT I – DEFAMATION AND DEFAMATION PER SE

38.     Plaintiff re-alleges and re-asserts the allegations set forth in paragraphs 1-37 as if fully set forth herein.

39.     Defendants Buzzfeed and Mr. Smith, by and through their representatives, published false and defamatory statements concerning Plaintiffs without privilege to do so.

40.     The false and defamatory statements included, but are not limited to, allegations that:

    a.     XBT and Webzilla used "*botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct 'altering operations'*" against the Democratic Party leadership;

    b.     "*entities linked*" to Mr. Gubarev were involved in cyber-attacks;

9

    c.      Mr. Gubarev was "*recruited under duress by the FSB*"

    d.      Mr. Gubarev and his companies acted with "*another hacking expert*" to mount a cyber-attack on the Democratic Party Leadership; and

    e.      Mr. Gubarev and his companies would need to "*go effectively to ground to cover their traces*" in the event that Ms. Clinton won the presidency.

41.    The defamatory statements were published without privilege to third parties, including thousands or tens of thousands (or more) residents of Florida.

42.    None of the Plaintiffs are public figures, nor are they limited public figures for purposes of a defamation analysis.

43.    The defamatory statements were made negligently; without reasonable care as to their truth or falsity; with knowledge of their falsity; and/or with reckless disregard for the truth.

44.    The statements allege that the Plaintiffs committed crimes including (but not limited to) computer hacking and that the  Plaintiffs engaged in behavior designed to undermine American democracy and the 2016 Presidential election.

45.    The statement are of the kind that they would tend to prejudice the Plaintiffs in the eyes of a substantial and respectable minority of their communities.

46.    The statements have caused, and will continue to cause, the Plaintiffs injury in their personal, social, and business relations.

47.    XBT and Webzilla have suffered, and will continue to suffer, actual injury as a result of injury to their corporate reputations.  At least one lender has declined to do business with XBT and/or Webzilla based on the defamatory statements published by the Defendants and, on information and belief, the defamatory statements have also cost Webzilla and XBT clients.

48.    Mr. Gubarev has suffered, and will continue to suffer, actual injury as a result of the injury to his personal reputation.

49.     The defamatory statements tend to injure the Plaintiffs in their business trade as the allegations call into question the security and proper operation of the Plaintiffs' businesses. Additionally, the above statements subject Plaintiffs to distrust, scorn, ridicule, hatred, and contempt. As such, the defamatory statements constitute defamation *per se*.

50.     In addition, as a direct and proximate result of the defamatory statements made by Defendants, Plaintiff has suffered, and continue to suffer, substantial damages.

51.     It is clear from the statements made by Buzzfeed and Mr. Smith, discussed above, that they had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage to the Plaintiffs would result and that, despite that knowledge, the Defendants intentionally pursued that course of conduct, resulting in injury or damage. Accordingly, and in conformity with Florida Statute §768.72, the Plaintiffs will seek leave of court to seek an award of punitive damages against Defendants. In the alternative, Plaintiffs will also seek leave of court to seek punitive damages under Florida Statute §768.72 because the Defendants' actions, as described above, were so reckless or wanting in care that they constituted a conscious disregard or indifference to the rights of the Plaintiffs.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs Aleksej Gubarev, XBT Holding S.A., and Webzilla, Inc. pray for judgment against defendants Buzzfeed, Inc. and Ben Smith as follows:

1.     For an award of general and special in an amount in excess fifteen thousand dollars ($15,000.00) in accordance with proof at trial together with interest thereon at the maximum legal rate; and Plaintiffs reserve the right to seek leave of court to seek punitive damages against Defendants in accordance with the facts and claims stated herein and established through discovery;

2.     For costs of suit incurred herein; and

3.     For such other and further relief as to this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted this 3rd day of February, 2017 by:

The Plaintiffs,
Aleksej Gubarev,
XBT Holding S.A.
Webzilla, Inc.
By their Attorneys,

COBB EDDY, PLLC
*Local Counsel for Plaintiffs*
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: (954) 527-4111
Facsimile:  (954) 900-5507
www.cobbeddy.com

**By: /s/ BRADY J. COBB_____**
BRADY J. COBB, ESQUIRE
Florida Bar No. 031018
bcobb@cobbeddy.com
DYLAN M. FULOP, ESQUIRE
Florida Bar No. 123809
dfulop@cobbeddy.com

BOSTON LAW GROUP, PC
*Lead Counsel for Plaintiffs*
825 Beacon Street, Suite 20
Newton Centre, MA 02459
Tel:    (617) 928-1804
Fax:    (617) 928-1802

**By: /s/ Valentin D. Gurvits_____**
VALENTIN D. GURVITS, ESQUIRE
*Pro Hac Vice Pending*
Massachusetts BBO# 643572
vgurvits@bostonlawgroup.com

Exhibit 3

DIVISION OF CORPORATIONS



Department of State  /  Division of Corporations  /  Search Records  /  Detail By Document Number  /

# Detail by Entity Name

Florida Profit Corporation
WEBZILLA INC.

**Filing Information**

| | |
|---|---|
| **Document Number** | P09000064327 |
| **FEI/EIN Number** | N/A |
| **Date Filed** | 07/29/2009 |
| **Effective Date** | 07/29/2009 |
| **State** | FL |
| **Status** | ACTIVE |
| **Last Event** | AMENDMENT |
| **Event Date Filed** | 07/16/2012 |
| **Event Effective Date** | NONE |

**Principal Address**

2777 Stemmons Fwy.
Suite 1655
Dallas, TX 75207

Changed: 01/17/2014

**Mailing Address**

2777 Stemmons Fwy.
Suite 1655
Dallas, TX 75207

Changed: 01/17/2014

**Registered Agent Name & Address**

INCORPORATE NOW
6750 N. Andrews Ave.
Suite 200
Fort Lauderdale, FL 33309

Name Changed: 03/01/2010

Address Changed: 03/31/2013

**Officer/Director Detail**

**Name & Address**

Title D

Mishara, Rajesh Kumar
2777 Stemmons Fwy.
Suite 1655
Dallas, TX 75207

Title D

Bezruchenko, Kostyantyn
2777 Stemmons Fwy.
Suite 1655
Dallas, TX 75207

**Annual Reports**

| Report Year | Filed Date |
|-------------|------------|
| 2014 | 01/17/2014 |
| 2015 | 02/04/2015 |
| 2016 | 02/23/2016 |

**Document Images**

| | |
|---|---|
| 02/23/2016 -- ANNUAL REPORT | View image in PDF format |
| 02/04/2015 -- ANNUAL REPORT | View image in PDF format |
| 01/17/2014 -- ANNUAL REPORT | View image in PDF format |
| 03/31/2013 -- ANNUAL REPORT | View image in PDF format |
| 07/16/2012 -- Amendment | View image in PDF format |
| 02/20/2012 -- ANNUAL REPORT | View image in PDF format |
| 04/19/2011 -- ANNUAL REPORT | View image in PDF format |
| 11/08/2010 -- Amendment | View image in PDF format |
| 04/05/2010 -- Amendment | View image in PDF format |
| 03/01/2010 -- ANNUAL REPORT | View image in PDF format |
| 07/29/2009 -- Domestic Profit | View image in PDF format |

Exhibit 4





# Franchise Tax Account Status

As of : 03/12/2017 13:09:51

---

**This Page is Not Sufficient for Filings with the Secretary of State**

---

| | |
|---|---|
| **WEBZILLA DALLAS, INC** | |
| **Texas Taxpayer Number** | 30119266812 |
| **Mailing Address** | 2777 N STEMMONS FWY STE 1655 DALLAS, TX 75207-2268 |
| ❷ **Right to Transact Business in Texas** | ACTIVE |
| **State of Formation** | TX |
| **Effective SOS Registration Date** | 12/30/1996 |
| **Texas SOS File Number** | 0142731700 |
| **Registered Agent Name** | C T CORPORATION SYSTEM |
| **Registered Office Street Address** | 1999 BRYAN STREET - SUITE 900 DALLAS, TX 75201 |

# Officers and Directors Info

**Officers and Directors**
**WEBZILLA DALLAS, INC**
Report Year :2015

Officer and director information on this site is obtained from the most recent Public Information Report (PIR) processed by the Secretary of State (SOS). PIRs filed with annual franchise tax reports are forwarded to the SOS. After processing, the SOS sends the Comptroller an electronic copy of the information, which is displayed on this web site.The information will be updated as changes are received from the SOS.
You may order a copy of a Public Information Report from open.records@cpa.texas.gov or Comptroller of Public Accounts, Open Government Division, PO Box 13528, Austin, Texas 78711.

| Title | Name and Address |
|-------|------------------|
| DIRECTOR | **RAJESH KUMAR MISHRA**<br>2777 STEMMONS FRWY, SUITE 1045 DALLAS, TX 75207 |
| PRESIDENT | **RAJESH KUMAR MISHRA**<br>2777 STEMMONS FRWY, SUITE 1655 DALLAS, TX 75207 |

Exhibit 5

Delaware.gov

Governor | General Assembly | Courts | Elected Officials | State Agencies

Logout

**Department of State: Division of Corporations**

Allowable Characters

Frequently Asked Questions    View Search Results

HOME
About Agency
Secretary's Letter
Newsroom
Frequent Questions
Related Links
Contact Us
Office Location

SERVICES
Pay Taxes
File UCC's
Delaware Laws Online
Name Reservation
Entity Search
Status
Validate Certificate
Customer Service Survey

INFORMATION
Corporate Forms
Corporate Fees
UCC Forms and Fees
Taxes
Expedited Services
Service of Process
Registered Agents
GetCorporate Status
Submitting a Request
How to Form a New Business Entity
Certifications, Apostilles & Authentication of Documents

## Entity Details

| | | | |
|---|---|---|---|
| File Number: | **5717022** | Incorporation Date / Formation Date: | **3/25/2015** (mm/dd/yyyy) |
| Entity Name: | **WEBZILLA APPS INC** | | |
| Entity Kind: | **Corporation** | Entity Type: | **General** |
| Residency: | **Domestic** | State: | **State:** |
| Status: | **Good Standing** | Status Date: | **3/9/2017** |

**TAX INFORMATION**

| | | | |
|---|---|---|---|
| Last Annual Report Filed: | **2016** | Tax Due: | **$ 0** |
| Annual Tax Assessment: | **$ 175** | Total Authorized Shares: | **1500** |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | **HARVARD BUSINESS SERVICES, INC.** | | |
| Address: | **16192 COASTAL HWY** | | |
| City: | **LEWES** | County: | **Sussex** |
| State: | **DE** | Postal Code: | **19958** |
| Phone: | **302-645-7400** | | |

**FILING HISTORY (Last 5 Filings)**

| Seq | Description | No. of pages | Filing Date (mm/dd/yyyy) | Filing Time | Effective Date (mm/dd/yyyy) |
|---|---|---|---|---|---|
| 1 | Amendment Name SECUREVPN.COM INC | 1 | 11/2/2015 | 3:23 PM | 11/2/2015 |
| 2 | Stock Corporation | 1 | 3/25/2015 | 3:46 PM | 3/25/2015 |

Back to Entity Search     Email Status

For help on a particular field click on the Field Tag to take you to the help area.

Exhibit 6

🖶 Exit Print

**Organisation Details**

**Pay Special Contribution**

**Choose Year:**  [Choose Year:   ] [?]

**Current Details**

| | |
|---|---|
| **Name** | WEBZILLA LIMITED |
| **Reg. Number** | ! ? 163643 |
| **Type** | Limited Company |
| **SubType** | Private |
| **Name Status** | Current Name |
| **Registration Date** | 27/07/2005 |
| **Organisation Status** | Active |
| **Status Date** | |

**Last Annual Return Date**  31/12/2013

| File Status | Directors & Secretaries | Registered Office | Statement of Annual Company Fee |
|---|---|---|---|

**File Status**

**File Last Update**  07/02/2017
**Pending Services**  1

| Service Description | Order Date | Order Number | Order Service Number |
|---|---|---|---|
| Filing of Annual Return of private company with share capital | 03/01/2017 | 2030288 | 3 |

1 of 1

◄◄ ◄ ► ►◄

! ##$%' * | Türkçe

Login    Print

**Home**
- About Us
- Press Room
- Hamonization with the European Acquis
- Services
- Statistics
- Applications
- International Trade Marks Classification
- Fees
- On-line Application for Name Approval
- Results of Name Examination
- **Online Services**
  - Organisation and Name Search / Study File
  - Organisation and Name Search / Annual Company Fee
  - Electronic Filing
  - Confirmation of Authenticity of Certificates and Certified Copies

Return To Search Results    New Search

Add To Basket    Orders Basket (0)

**Organisation Details**

### Pay Special Contribution

Choose Year:  [Choose Year: ____]  [?]

### Current Details

| | |
|---|---|
| Name | WEBZILLA LIMITED |
| Reg. Number | +! 163643 |
| Type | Limited Company |
| SubType | Private |
| Name Status | Current Name |
| Registration Date | 27/07/2005 |
| Organisation Status | Active |
| Status Date | |

Last Annual Return Date    31/12/2013

File Status    **Directors & Secretaries**    Registered Office    Statement of Annual Company Fee

### Directors & Secretaries

| Name | |
|---|---|
| REGINA BIKTIMIROVA | Director |
| RAJESH KUMAR MISHRA | Director |
| KOSTYANTYN BEZRUCHENKO | Director |
| REGINA BIKTIMIROVA | Secretary |



The project is co-financed by the European Regional Development Fund
The Website is best viewed with screen resolution: 1024 with 768 pixels
©2005 - 2011 Republic of Cyprus, Ministry of Commerce, Industry and Tourism
Department of Registrar of Companies and Official Receiver



EUROPEAN UNION

Home Page| Disclaimer| Webmaster

! ##$%&*+ | Türkçe

Login    Print

□ Home

Return To Search Results    New Search

Add To Basket    Orders Basket (0)

About Us
Press Room
Hamonization with the European Acquis
Services
Statistics
Applications
International Trade Marks Classification
Fees
On-line Application for Name Approval
Results of Name Examination

□ Online Services

Organisation and Name Search / Study File
Organisation and Name Search / Annual Company Fee
Electronic Filing
Confirmation of Authenticity of Certificates and Certified Copies



**Organisation Details**

**Pay Special Contribution**

Choose Year:    Choose Year:    ?

**Current Details**

| | |
|---|---|
| Name | WEBZILLA LIMITED |
| Reg. Number | . ! 163643 |
| Type | Limited Company |
| SubType | Private |
| Name Status | Current Name |
| Registration Date | 27/07/2005 |
| Organisation Status | Active |
| Status Date | |

Last Annual Return Date    31/12/2013

File Status    Directors & Secretaries    Registered Office    Statement of Annual Company Fee

**Registered Office**

9; <=> 9@J%JQ<=>, 53-55,
MICHAELANGELO HOUSE,
'9: i=V 9@J%+QI=V
4102, XYμYQ[V, \] ^_=V



The project is co-financed by the European Regional Development Fund
The Website is best viewed with screen resolution: 1024 with 768 pixels
©2005 - 2011 Republic of Cyprus, Ministry of Commerce, Industry and Tourism
Department of Registrar of Companies and Official Receiver



EUROPEAN UNION

Home Page| Disclaimer | Webmaster

! ##$%&' * | Türkçe

Login   Print

- Home

  About Us
  Press Room
  Hamonization with the European Acquis
  Services
  Statistics
  Applications
  International Trade Marks Classification
  Fees
  On-line Application for Name Approval
  Results of Name Examination

- Online Services

  Organisation and Name Search / Study File
  Organisation and Name Search / Annual Company Fee
  Electronic Filing
  Confirmation of Authenticity of Certificates and Certified Copies

Return To Search Results    New Search

Add To Basket    Orders Basket (0)



**Organisation Details**

**Pay Special Contribution**

Choose Year:  Choose Year: [    ] [?]

**Current Details**

| | |
|---|---|
| Name | WEBZILLA LIMITED |
| Reg. Number | +! 163643 |
| Type | Limited Company |
| SubType | Private |
| Name Status | Current Name |
| Registration Date | 27/07/2005 |
| Organisation Status | Active |
| Status Date | |

Last Annual Return Date    31/12/2013

File Status     Directors & Secretaries     Registered Office     **Statement of Annual Company Fee**

| Annual fee paid |
|---|
| 2017 |
| 2016 |
| 2015 |
| 2014 |
| 2013 |
| 2012 |
| 2011 |



The project is co-financed by the European Regional Development Fund
The Website is best viewed with screen resolution: 1024 with 768 pixels
©2005 - 2011 Republic of Cyprus, Ministry of Commerce, Industry and Tourism
Department of Registrar of Companies and Official Receiver



EUROPEAN UNION

Home Page| Disclaimer| Webmaster

Exhibit 7

# Bedrijfsprofiel - Webzilla (08152605)

Kamer van Koophandel, 13 maart 2017 - 20:22

## Uittreksel

**KvK-nummer** 08152605

**Rechtspersoon**

| | |
|---|---|
| RSIN | 817185276 |
| Rechtsvorm | Besloten Vennootschap |
| Statutaire naam | Webzilla B.V. |
| Statutaire zetel | Amsterdam |
| Eerste inschrijving handelsregister | 12-01-2007 |
| Datum akte van oprichting | 10-01-2007 |
| Datum akte laatste statutenwijziging | 30-05-2016 |
| Geplaatst kapitaal | EUR 3.018.000,00 |
| Gestort kapitaal | EUR 3.018.000,00 |
| Deponering jaarstuk | De jaarrekening over boekjaar 2015 is gedeponeerd op 01-08-2016. |

**Onderneming**

| | |
|---|---|
| Handelsnamen | Webzilla B.V. |
| | Webzilla |
| Startdatum onderneming | 01-11-2006 |
| Activiteiten | SBI-code: 6311 - Gegevensverwerking, webhosting en aanverwante activiteiten |
| Werkzame personen | 5 |

**Vestiging**

| | |
|---|---|
| Vestigingsnummer | 000016455657 |
| Handelsnamen | Webzilla B.V. |
| | Webzilla |
| Bezoekadres | Tingietersweg 56, 2031ES Haarlem |
| Internetadres | www.webzilla.nl |
| Datum vestiging | 01-11-2006 |
| Deze rechtspersoon drijft de vestiging sinds | 10-01-2007 |
| Activiteiten | SBI-code: 6311 - Gegevensverwerking, webhosting en aanverwante activiteiten |
| | Webhosting, internetgerelateerde diensten |
| Werkzame personen | 5 |

**Enig aandeelhouder**

| | |
|---|---|
| Naam | XBT Holding Ltd |
| Bezoekadres | Agios Athanasios 53-55, MICHAEL ANGELO HOUSE, 4102, Limassol, Cyprus |
| Ingeschreven in | Registrar of Companies |
| | Nicosia , Cyprus |
| | onder nummer HE 265343 |
| Enig aandeelhouder sedert | 23-08-2011 (datum registratie: 24-08-2011) |

**Bestuurders**

| | |
|---|---|
| Naam | Mishra, Rajesh Kumar |
| Geboortedatum en -plaats | 31-01-1976, Havli Kharagpur Munger Bihar, India |
| Datum in functie | 29-08-2016 (datum registratie: 02-09-2016) |
| Titel | Algemeen directeur |
| Bevoegdheid | Alleen/zelfstandig bevoegd |

| | |
|---|---|
| Naam | Bezruchenko, Kostyantyn |
| Geboortedatum en -plaats | 24-02-1981, Lugansk, Sovjet-Unie |
| Datum in functie | 29-08-2016 (datum registratie: 07-09-2016) |
| Titel | Algemeen directeur |
| Bevoegdheid | Alleen/zelfstandig bevoegd |

Gegevens zijn vervaardigd op 13-03-2017 om 20.22 uur.

# Historie

34 08152605 Webzilla B.V.
Tingietersweg 56 2031ES Haarlem

**Oude statutaire namen zoals vastgelegd sinds 01-10-1993**

| | |
|---|---|
| Statutaire naam | Webazilla B.V. |
| Datum ingang | 10-01-2007 |
| Datum einde | 31-10-2012 |

**Oude handelsnamen zoals vastgelegd sinds 01-10-1993**

| | |
|---|---|
| Handelsnaam | Webazilla B.V. |
| Datum ingang | 01-11-2006 |
| Datum einde | 31-10-2012 |

**Oude vestigingsadressen zoals vastgelegd sinds 01-10-1993**

| | |
|---|---|
| Adres | Touwbaan 4, 3841GA Harderwijk |
| Datum ingang | ***Onbekend*** |
| Adres | Touwbaan 4, 3841GA Harderwijk |
| Datum ingang | 10-01-2007 |
| Adres | Ganzenstraat 1, 3815JA Amersfoort |
| Datum ingang | 10-01-2007 |
| Adres | Barchman Wuytierslaan 81 -63, 3819AB Amersfoort |
| Datum ingang | 01-06-2007 |
| Adres | Oliesteeg 13, 3811JW Amersfoort |
| Datum ingang | 01-11-2007 |
| Adres | Achter de Kamp 63, 3811JE Amersfoort |
| Datum ingang | 20-11-2008 |
| Adres | Beestenmarkt 12, 3811JA Amersfoort |
| Datum ingang | 15-04-2010 |
| Adres | Ganzenstraat 1, 3815JA Amersfoort |
| Datum ingang | 28-12-2011 |
| Adres | Ganzenstraat 1, 3815JA Amersfoort |
| Datum ingang | 07-02-2014 |

**Oude rechtsvormen zoals vastgelegd sinds 01-10-1993**

Rechtsvorm                      Rechtspersoon in oprichting
Datum ingang                    01-11-2006

**Oude bedrijfsomschrijvingen zoals vastgelegd sinds 01-10-1993**

Datum ingang                    01-11-2006
Bedrijfsomschrijving            Webhosting, internetgerelateerde diensten.
Datum ingang                    01-11-2006
Bedrijfsomschrijving            Webhosting, internetgerelateerde diensten.
Datum ingang                    01-11-2006
Bedrijfsomschrijving            Webhosting, internetgerelateerde diensten.

**Functionarisgegevens Uitgetreden functionaris(sen) rechtspers.**

Enig aandeelhouder:

Naam                            Webazilla Limited / 4
Adres                           Omirou 23 A, HOMER COMPLEX, PC 3095 Limassol,
                                Cyprus
Ingeschreven in                 Ingeschreven onder nummer HE 163643, in het
                                Registrar of Companies, Ministery of Commerce,
                                Industry and Tourism, Department of Registrar
                                of Companies and Official Receiver, te Nicosia
                                (Cyprus).
Enig aandeelhouder              10-01-2007
sedert
Uit functie                     23-08-2011

**Functionarisgegevens Uitgetreden functionaris(sen) onderneming**

Bevoegde functionaris(sen):

Naam                            Webazilla Limited / 1
Adres                           Omirou 23 A, HOMER COMPLEX, PC 3095 Limassol,
                                Cyprus
Ingeschreven in                 Ingeschreven onder nummer HE 163643, in het
                                Registrar of Companies, Ministery of Commerce,
                                Industry and Tourism, Department of Registrar
                                of Companies and Official Receiver, te Nicosia
                                (Cyprus).
Infunctietreding                01-11-2006
Uit functie                     10-01-2007

**Functionarisgegevens Uitgetreden functionaris(sen) rechtspers.**

Bestuurder(s):

Naam                            Webazilla Limited / 5
Adres                           Omirou 23 A, HOMER COMPLEX, PC 3095 Limassol,
                                Cyprus
Ingeschreven in                 Ingeschreven onder nummer HE 163643, in het
                                Registrar of Companies, Ministery of Commerce,
                                Industry and Tourism, Department of Registrar

of Companies and Official Receiver, te Nicosia (Cyprus).

| | |
|---|---|
| Infunctietreding | 10-01-2007 |
| Titel | Algemeen directeur |
| Bevoegdheid | Alleen/zelfstandig bevoegd |
| Uit functie | 23-08-2011 |

| | |
|---|---|
| Naam | XBT Holding Ltd / 8 |
| Adres | Agios Athanasios 53-55 MICHAEL ANGE, 4102, Limassol, Cyprus |
| Ingeschreven in | Registrar of Companies te Nicosia, Cyprus onder nummer HE 265343. |
| Infunctietreding | 23-08-2011 |
| Titel | Algemeen directeur |
| Bevoegdheid | Alleen/zelfstandig bevoegd |
| Uit functie | 29-08-2016 |

| | |
|---|---|
| Naam | Gubarev, Aleksej / 9 |
| Geboortedatum en -plaats | 20-06-1980, Oest-Ilimsk, Sovjet-Unie |
| Infunctietreding | 29-08-2016 |
| Titel | Algemeen directeur |
| Bevoegdheid | Alleen/zelfstandig bevoegd |
| Uit functie | 14-11-2016 |

| | |
|---|---|
| Naam | Dvas, Nikolay / 12 |
| Geboortedatum en -plaats | 29-12-1988, Leningrad, Sovjet-Unie |
| Infunctietreding | 14-11-2016 |
| Titel | Algemeen directeur |
| Bevoegdheid | Alleen/zelfstandig bevoegd |
| Uit functie | 01-02-2017 |

**Functionarisgegevens Uitgetreden functionaris(sen) onderneming**

Gevolmachtigde(n):

| | |
|---|---|
| Naam | Eurobank B.V. / 2 |
| Adres | Touwbaan 4, 3841GA Harderwijk |
| Inschrijving handelsregister onder dossiernummer | 08075051 |
| Infunctietreding | 01-11-2006 |
| Titel | Procuratiehouder |
| Bevoegdheid | Volledige volmacht |
| Uit functie | 10-01-2007 |

| | |
|---|---|
| Naam | Eurobank B.V. / 6 |
| Adres | Touwbaan 4, 3841GA Harderwijk |
| Inschrijving handelsregister onder dossiernummer | 08075051 |
| Infunctietreding | 10-01-2007 |
| Bevoegdheid | Volledige volmacht |

Uit functie                      ■ 10-04-2008

**Overige functionarisgegevens Uitgetreden**

\*\*\* Geen historie voor dit onderdeel\*\*\*

# Deponeringen

**algemene gegevens**

| | |
|---|---|
| naam | Webzilla B.V. |
| ingeschreven onder nummer | 08152605 |

**Deponeringen**

| | |
|---|---|
| Boekjaar | 2015 |
| Datum deponering | 1-8-2016 |
| Maand einde boekjaar | 12 |
| Soort jaarstukken | Jaarrekening |
| Datum vaststelling jaarstuk | 27-7-2016 |

| | |
|---|---|
| Boekjaar | 2014 |
| Datum deponering | 9-11-2015 |
| Omvang | klein |
| Maand einde boekjaar | 12 |
| Soort jaarstukken | Jaarrekening |
| Datum vaststelling jaarstuk | 6-11-2015 |

| | |
|---|---|
| Boekjaar | 2013 |
| Datum deponering | 13-1-2015 |
| Omvang | klein |
| Maand einde boekjaar | 12 |
| Soort jaarstukken | Jaarrekening |
| Datum vaststelling jaarstuk | 7-1-2015 |

| | |
|---|---|
| Boekjaar | 2012 |
| Datum deponering | 18-7-2013 |
| Omvang | klein |
| Maand einde boekjaar | 12 |
| Soort jaarstukken | Jaarrekening |
| Datum vaststelling jaarstuk | 6-6-2013 |

| | |
|---|---|
| Boekjaar | 2011 |
| Datum deponering | 6-3-2012 |
| Omvang | klein |
| Maand einde boekjaar | 12 |
| Soort jaarstukken | Jaarrekening |
| Datum vaststelling jaarstuk | 22-2-2012 |

| | |
|---|---|
| Boekjaar | 2010 |
| Datum deponering | 19-3-2012 |

| | |
|---|---|
| Omvang | ▉klein |
| Maand einde boekjaar | 12 |
| Soort jaarstukken | Jaarrekening |
| Datum vaststelling jaarstuk | 15-9-2011 |

| | |
|---|---|
| Boekjaar | 2009 |
| Datum deponering | 21-7-2011 |
| Omvang | klein |
| Maand einde boekjaar | 12 |
| Soort jaarstukken | Jaarrekening |
| Datum vaststelling jaarstuk | 31-1-2011 |

| | |
|---|---|
| Boekjaar | 2008 |
| Datum deponering | 13-7-2010 |
| Omvang | klein |
| Maand einde boekjaar | 12 |
| Soort jaarstukken | Jaarrekening |
| Datum vaststelling jaarstuk | 2-7-2010 |

| | |
|---|---|
| Boekjaar | 2007 |
| Datum deponering | 17-12-2008 |
| Omvang | klein |
| Maand einde boekjaar | 12 |
| Soort jaarstukken | Jaarrekening |
| Datum vaststelling jaarstuk | 12-8-2008 |

**Juridische gegevens**

| | |
|---|---|
| Rechtspersoon : | |
| Rechtsvorm | Besloten vennootschap met gewone structuur |
| Statutaire zetel | Amsterdam |
| Eerste inschrijving in het Handelsregister | 12-1-2007 |
| Akte van oprichting | 10-1-2007 |
| Akte laatste statuten wijziging | 30-5-2016 |
| Geplaatst kapitaal | EUR  3.018.000,00 |
| Gestort kapitaal | EUR  3.018.000,00 |

# Concernrelaties

Inzoomen op één niveau

| Naam | Plaats | KvK-nummer |
|---|---|---|
| **100 %** XBT Holding Ltd | 4102, Limassol | Cyprus |
| Webzilla | Haarlem | 08152605 |

Door een inschrijving aan te klikken kunt u meer informatie over betreffende inschrijving inzien.

# Jaarrekening(en)

**Meest recente vennootschappelijke jaarrekeningen van inschrijvingsnr. : 08152605**

| | |
|---|---|
| Naam rechtspersoon: | Webzilla B.V. |
| Adres: | Tingietersweg  56 |

| | 2031 ES  Haarlem |
|---|---|
| Statutair gevestigd: | Amsterdam |
| Datum oprichting: | 10-1-2007 |
| Rechtsvorm: | Besloten vennootschap met gewone structuur |

**Algemene gegevens over de jaarrekening**

| Boekjaar: | **2015** | **2014** | **2013** |
|---|---|---|---|
| Balansdatum: | 31-12-2015 | 31-12-2014 | 31-12-2013 |
| Datum deponering: | 1-8-2016 | 9-11-2015 | 13-1-2015 |
| Vastgesteld: | definitief | definitief | definitief |
| Winstbestemming: | na | voor | onbekend |
| Lengte boekjaar in maanden: | 12 | 12 | 12 |
| Werknemers: | | 7 | |
| 100% dochters: | | | |
| Overige deelnemingen: | | | |
| Accountantscontrole: | Accountantskantoor onbekend | | |
| Oordeel: | Goedkeurend | | |

**Balans**

| Boekjaar: | **2015** | **2014** | **2013** |
|---|---|---|---|
| Type jaarrekening: | vennootschappelijk | vennootschappelijk | vennootschappelijk |
| Winstbestemming: | na | voor | onbekend |
| Bedrag: | x 1 | x 1 | x 1 |
| Valuta: | USD | USD | USD |

**Activa**

| | **2015** | **2014** | **2013** |
|---|---|---|---|
| immateriële vaste activa | 93.888 | 4.543 | 6.974 |
| materiële vaste activa | 11.901.044 | 8.316.438 | 7.877.677 |
| financiële vaste activa | | 514.594 | |
| **VASTE ACTIVA** | **11.994.932** | **8.835.575** | **7.884.651** |
| voorraden | | 670.716 | 1.190.238 |
| vorderingen en overlopende activa | | 816.252 | 806.465 |
| handelsdebiteuren | 30.779 | | |
| overige vorderingen | 5.491.171 | | |
| liquide middelen | 578.797 | 22.998 | 568.324 |
| **VLOTTENDE ACTIVA** | **6.100.747** | **1.509.966** | **2.565.027** |
| **TOTAAL ACTIVA** | **18.095.679** | **10.345.541** | **10.449.678** |

**Passiva**

| | **2015** | **2014** | **2013** |
|---|---|---|---|
| gestort en opgevraagd kapitaal | 1.265.963 | 1.237.379 | 1.265.963 |
| agio | | 193.231 | |
| herwaarderingsreserve | | 28.584 | |
| overige reserves | 2.144.111 | 1.279.361 | 1.279.361 |
| onverdeelde winst | | 305.716 | |
| **EIGEN VERMOGEN** | **3.410.074** | **3.044.271** | **2.545.324** |

| | | | |
|---|---|---|---|
| langlopende schulden > 1 jaar | 6.956.278 | 6.341.049 | 7.428.606 |
| kortlopende schulden < 1 jaar | | 960.221 | 475.748 |
| handelscrediteuren | 306.709 | | |
| overige kortlopende schulden | 7.422.618 | | |
| **OVERIGE PASSIVA** | **14.685.605** | **7.301.270** | **7.904.354** |
| | | | |
| **TOTAAL PASSIVA** | **18.095.679** | **10.345.541** | **10.449.678** |

**Winst- en verliesrekening**

| | |
|---|---|
| **Boekjaar:** | **2015** |
| Type jaarrekening: | vennootschappelijk |
| Bedrag: | x 1 |
| Valuta: | USD |
| Indeling: | functioneel |

| | |
|---|---|
| netto-omzet | 10.566.026 |
| kostprijs van de omzet | 3.089.716 |
| bruto-omzetresultaat | 7.476.310 |
| | |
| verkoop- en algemene beheerskosten | 6.222.464 |
| **bedrijfsresultaat** | **1.253.846** |
| | |
| andere rentebaten en soortgelijke opbrengsten | 179.413 |
| rentelasten en soortgelijke kosten | 613.500 |
| saldo financiële baten/lasten | 434.087- |
| | |
| **resultaat voor belastingen** | **819.759** |
| | |
| belastingen | 386.490 |
| **resultaat na belastingen** | **433.269** |
| | |
| **NETTO RESULTAAT** | **433.269** |

**Kengetallen**

| Boekjaar: | 2015 | 2014 | 2013 |
|---|---|---|---|
| **Liquiditeit** | | | |
| current ratio | 0,79 | 1,57 | 5,39 |
| quick ratio | 0,79 | 0,87 | 2,89 |
| gouden balans | 1,16 | 0,94 | 0,79 |
| | | | |
| **Solvabiliteit** | | | |
| balanstotaal/ vreemd vermogen | 1,23 | 1,42 | 1,32 |
| eigen vermogen/ balanstotaal | 0,19 | 0,29 | 0,24 |
| | 0,23 | 0,42 | 0,32 |

eigen vermogen/ vreemd
vermogen

| | | | |
|---|---|---|---|
| garantievermogen[1]/ balanstotaal | 0,19 | 0,29 | 0,24 |

1) garantievermogen = eigen vermogen + achtergestelde lening

**Rentabiliteit**

| | |
|---|---|
| bedrijfsresultaat/ balanstotaal | 0,07 |
| netto resultaat/ eigen vermogen | 0,13 |
| bruto-winstmarge | 0,12 |

**Overige kengetallen**

| | | |
|---|---|---|
| hefboomeffect | 0,12 | |
| omloopsnelheid eigen vermogen | 3,10 | |
| omloopsnelheid totaal vermogen | 0,58 | |
| omloopsnelheid vaste activa | 0,88 | |
| omloopsnelheid handelsdebiteuren (in dagen) | 1 | |
| aantal werknemers | | 7 |

| | | | |
|---|---|---|---|
| Bedrag: | x 1 | x 1 | x 1 |
| Valuta: | USD | USD | USD |
| werkkapitaal | 1.628.580- | 549.745 | 2.089.279 |

Bron: gedeponeerde jaarrekeningen Kamer van Koophandel

Exhibit 8



Registre de Commerce
et des Sociétés

Registre de Commerce
et des Sociétés
Luxembourg

Homepage > Search > Details of the person

## XBT HOLDING S.A.
## B191313

### Information

**Trade name(s) or trading name(s)**
XBT HOLDING S.A.

**Registered office**
3, op der Poukewiss
L - 7795 Roost

**Registration date**
28/10/2014

**Legal form**
Société anonyme

**Available services**

Order a company profile

Order a negative certification

monitor this person

## *View record*



**List of filings as from the 1st of February 2003**

| 5 | Items per page | | Presentation | Full list | | |
|---|---|---|---|---|---|---|
| **Filing Nr** | **Date** | **Type of filing** | | **Details** | **Filing** | **Certified** |
| Log onto the website to access the filing list. | | | | | | |

**Learn more**

User guide : Detail of a person

Version : 4.3.1

Copyright © RCSL gie | Legal aspects

Exhibit 9



# Detail by Entity Name

**Florida Limited Liability Company**
**XBT HOLDINGS, LLC**

**Filing Information**

| | |
|---|---|
| **Document Number** | L15000101925 |
| **FEI/EIN Number** | 47-4239606 |
| **Date Filed** | 06/11/2015 |
| **Effective Date** | 06/08/2015 |
| **State** | FL |
| **Status** | ACTIVE |

**Principal Address**

7999 N Federal Hwy
Suite 407
BOCA RATON, FL 33487

Changed: 01/28/2016

**Mailing Address**

7999 N Federal Hwy
Suite 407
BOCA RATON, FL 33487

Changed: 01/28/2016

**Registered Agent Name & Address**

FRYE, ROBERT
7999 N FEDERAL HWY
4th Floor
BOCA RATON, FL 33487

Address Changed: 01/28/2016

**Authorized Person(s) Detail**

**Name & Address**

Title MGR

FRYE, ROBERT
3587 SILVER LACE LN #59
BOYNTON BEACH, FL 33436

**Annual Reports**

| Report Year | Filed Date |
|---|---|
| 2016 | 01/28/2016 |

**Document Images**

| | |
|---|---|
| 01/28/2016 -- ANNUAL REPORT | View image in PDF format |
| 06/11/2015 -- Florida Limited Liability | View image in PDF format |

Exhibit 10



**Sales** +31.20.893.2774     EMAIL     **LOG IN**

Dedicated          Cloud          Services          Company          Contact
Servers            NEW

# Make the Complex Simple

Fully managed, multi-layer IT infrastructure delivered by dedicated hosting experts

Find Out How

**Latest News:  Webzilla Lines-Up Equinix SG1**



## Managed Servers

From OS management to equipment
upgrades. Expert support for your customized
dedicated server configurations

**MORE**



## Cloud

Instant files combine ingenuity and reliability
to become the ultimate cloud solution
ready to accommodate any storage
requirements

**MORE**



## CDN

Accelerate the delivery of data-rich
content and boost business-critical
application performance

**MORE**

### WEBZILLA
### ENTERPRISE CLASS
### HOSTING SOLUTIONS

**Tailored Hosting Solutions.
Scalability. Global Reach.**

**WATCH**

## What Our Customers Say

With Webzilla we got a customized server
and network solution bundle that helped
us ensure secure and uninterrupted data
interchange with our customers and
partners.

**SAGE DEBAN**
**HEAD OF MARKETING, NORDFX**     

# Cloud Storage, CDN, Colocation Services

### 1.3 Tbps. 13 PoPs. 3 Continents

Plus, partnerships with the leading global network providers and interconnections throughout the world. All of this enables us to deliver you
with the low-latency connectivity you need to gain and maintain a competative advantage.



7 NETWORK PARTNERS     13 NETWORK POPS     14 INTERNET EXCHANGES

**More about our network**

DELL    SUPERMICRO    CISCO.    JUNIPER    Microsoft·    Linux    FreeBSD

WE ARE HERE FOR YOU  24/7/365     SALES +31.20.893.2774     LIVE CHAT     EMAIL US

**WEBZILLA**
About Us
Network
Infrastructure

**SERVICES**
Dedicated Servers
Cloud
Colocation
Managed Services
CDN

**SALES CONTACTS**
Phone   +31.20.893.2774
Email   sales@webzilla.com
Chat   Live Chat
Skype   awebzilla

**SUPPORT CONTACTS**
Email   support@webzilla.com
Chat   Live Chat

**MEDIA**
Newsroom

**LINKS**
XBT Holding Website

**FOLLOW US**

© 2005 - 2016 Webzilla Enterprise Hosting  |  Sitemap  |  Legal

Exhibit 11



Home    Dedicated Servers    Cloud    Services    Company        **Sales** +31.20.893.2774      EMAIL

**Press releases**    Events    Videos    [Search]

**NEWSROOM**

# Webzilla Lines-Up Equinix SG1

on February 13, 2015                                    Share this on:

**Amsterdam, Netherlands, February 13, 2015** - Webzilla, a global enterprise hosting provider and a subsidiary of XBT Holding Ltd., joined the Singapore-based Equinix Internet Exchange. The move continues the positive relationship between the two companies, as Webzilla is already a member of 7 out of the 19 IXs Equinix operates.  By further strengthening its network and connectivity, Webzilla aims to expand its reach in the Asia-Pacific region.

The Asia-Pacific is drawing significant foreign investment and the development of local economies shows that the trend will continue. Financial institutions, Forex companies, game developers, e-commerce and other businesses that rely on quality IT services are the main reason for the increase in demand. Webzilla has recognized the importance of IXs and the benefits they provide in terms of network, latency and bandwidth.

Equinix is a leading brand in the IX field, operating over a hundred datacenters around the globe. The company is connecting peers at 19 Internet Exchange Point (IXP) locations, positioned in 17 global metropolitan areas. Their services are among the most revered in the industry due to their consistent end-to-end performance, speed and overall excellent reliability. The Singapore branch has more than 16,000 square meters of colocation space, soon to be upgraded through a third datacenter that will open in 2015.

Equinix's SG1 IX, which Webzilla joined, maintains the highest standards in terms of security, both physical and electronic. All ingress and egress to the DC buildings is managed with control lists. In addition, there is an intelligence control & alarm system, motion detectors and a network of CCTV recorders. In terms of connectivity, the IX has established an excellent connection to the international and regional networks. This guarantees access to almost 190 networks, which allows for widespread leverage of service and creates a business ecosystem that is beneficial to both the companies and their customers. Moreover, the IX operates on a well-developed hybrid platform, offering optimal performance through top-tier fiber-optic connection. As the demand for Webzilla's new cloud solutions continues to increase, the company will greatly benefit from Equinix's hub and its stemming advantages.

Already a member of the biggest IXs in Europe, the German DE-CIX and the Dutch AMS-IX, Webzilla will significantly reduce latency to the Asia-Pacific. This will be particularly important to industries like Forex, which rely on speed of execution. Furthermore, Webzilla will also be able to provide extra redundancy and quality bandwidth to a broader customer base that share an interest in the region.

"We are glad to announce that we have joined SG1 IX. Our working experience with Equinix has been nothing short of positive. At Webzilla, we value professionalism and integrity which, together with technological excellence, is exactly what Equinix has shown us," said Rajesh Kumar Mishra, CFO of Webzilla. "Our growth in the region is mainly due to the pursuit of quality and reliability. Adding IXs to our portfolio will assist us not only in maintaining but also improving our standards."

**About Webzilla**

Webzilla is a world leader in enterprise hosting and cloud services, with a private backbone network linking multiple carrier-neutral datacenters in Europe (Luxembourg and the Netherlands), North America (Texas) and Asia (India and Singapore). Partnerships with most major Tier 1 providers ensure 1,500 Gbps capacity and the best connectivity, allowing seamless handling of high-volume traffic at optimal speed and lowest latency. Webzilla's engineering staff is adept at building scalable server architecture optimized for specific business requirements. Webzilla is the trusted hosting infrastructure partner of more than 1500 enterprise customers in the most data-intensive industries, including e-commerce, game and software developers, payment platforms, FX brokers and video streaming companies. Visit Webzilla online at webzilla.com.

**About XBT Holding**

XBT Holding Ltd. is a privately-owned global hosting, network solutions and web development provider founded in 2005, with offices in eight countries. Worldwide enterprise and SMB customers rely on XBT's international expertise and comprehensive service portfolio, including managed dedicated hosting,

---

2015      2014      2013

Webzilla Lines-Up Equinix SG1 »

    **Webzilla Bytes-Up Its Cloud Storage »**

**Subscribe**
Get latest updates and hosting industry insights delivered to you by Webzilla Technical Experts. Subscribe now!

or

**Subscribe by email**
Enter your email address

[Email]

SUBMIT

colocation, shared and VPS hosting, high-performance network, cloud, web and application development services. The company operates a worldwide proprietary network through five carrier-neutral datacenters and 13 points of presence in the United States, Europe and Asia, with more than 16,000 servers throughout seven subsidiaries. XBT Holding partners with most major Tier 1 networks to ensure high-speed international connectivity up to 1.5 Tbps. XBT is now one of the fastest-growing companies in the Internet infrastructure industry. Visit XBT online at xbt.com.

DELL    SUPERMICRO    cisco.    JUNIPER    Microsoft    Linux    FreeBSD

WE ARE HERE FOR YOU  24/7/365          SALES +31.20.893.2774          LIVE CHAT          EMAIL US

**WEBZILLA**

About Us

Network

Infrastructure

**SERVICES**

Dedicated Servers

Cloud

Colocation

Managed Services

CDN

**SALES CONTACTS**

Phone   +31.20.893.2774

Email   sales@webzilla.com

Chat    Live Chat

Skype   awebzilla

**SUPPORT CONTACTS**

Email   support@webzilla.com

Chat    Live Chat

**MEDIA**

Newsroom

**LINKS**

XBT Holding Website

**FOLLOW US**

© 2005 - 2015 Webzilla Enterprise Hosting  |  Sitemap  |  Legal

Exhibit 12

Sales +31.20.893.2774    EMAIL    **LOG IN**



Dedicated    Cloud    Services    Company    **Contact**
Servers      NEW

# Contact Information

Home > Contact

# Contact Webzilla

## Corporate

### Europe

**WEBZILLA Europe**

Srtawinskylaan 601, 1077XX Amsterdam, The Netherlands

Phone    +31.20.893.2774

### Europe

**WEBZILLA Limited (Cyprus)**

53-55 Agios Athanasios Street, 2nd Floor, Limassol, 4102

Phone    +357.25.345.346

### North America

**WEBZILLA INC.**

110 E. Broward Blvd., Suite 1700, Fort Lauderdale, FL 33301, USA

Phone    +1.954.237.3587

## Sales

Email    sales@webzilla.com
Chat     Live Chat
Skype    awebzilla

## Support

Email    support@webzilla.com
Chat     Live Chat

## Billing Department

Email    billing@webzilla.com

## Acceptable Use Policy

Email    legal@webzilla.com

## Media Inquiries

Email    pr@webzilla.com

# Contact Form

Please fill out the form below to be connected to Webzilla.

First Name *                         Last Name *

Email *                              Phone

**Company**

**Department** | Sales

**Comments**

**DELL**   SUPERMICRO   cisco.   JUNIPER   **Microsoft·**   Linux   FreeBSD

WE ARE HERE FOR YOU 24/7/365          SALES +31.20.893.2774          LIVE CHAT          EMAIL US

**WEBZILLA**

About Us

Network

Infrastructure

**SERVICES**

Dedicated Servers

Cloud

Colocation

Managed Services

CDN

**SALES CONTACTS**

**Phone** +31.20.893.2774

**Email** sales@webzilla.com

**Chat** Live Chat

**Skype** awebzilla

**SUPPORT CONTACTS**

**Email** support@webzilla.com

**Chat** Live Chat

**MEDIA**

Newsroom

**LINKS**

XBT Holding Website

**FOLLOW US**

© 2005 - 2016 Webzilla Enterprise Hosting | Sitemap | Legal

Exhibit 13

Search    OUR WEBSITES

# xbt®

ABOUT XBT     SERVICES     INVESTOR RELATIONS     CONTACTS

COMPANY OVERVIEW    SUBSIDIARIES    GEOGRAPHY    **FAST FACTS**    EVENTS    NEWSROOM

| 12,000 | 37000 | 40 | 5 | 1,500 |
|--------|-------|-----|-----|-------|
| Customers | Servers | Countries | Datacenters | Gbps Network |

Home / About XBT / Fast Facts

## FAST FACTS

One provider for all IT infrastructure needs of business customers around the world.

At XBT, we focus on delivering a wide variety of services to our customers. Incorporating every aspect of an IT infrastructure enables us to meet any requirements our business clients might have. From our quality of service, supporting seven languages and operating in thirteen points of presence to the standard of our hardware and amount of servers managed, we intent to become the only partner you need to secure efficient IT operations for your business.


**>600 Gbps**
Current Traffic


**7** Subsidiary Companies


**>1K** Peering Partners


**13** Points of Presence


**8** Major Tier 1 Networks/Providers


**>16K** Servers Managed


**1500 Gbps** Capacity


**4.6K** Customer Base


**7** Support Languages


**5** Data Centers


**>1K** Racks Utilized

## xbt

**HEAD OFFICE ADDRESS**

3, op der Poukewiss,
7795, Roost,
Luxembourg

**COMPANY**

About XBT Holding
Services
Geography
Newsroom
Subsidiaries

**INVESTOR RELATIONS**

Business Portfolio
Financial Information
Corporate Governance
Quarterly Reports
Investor FAQ

For investor related issues call:
+352.20.500.500

Investor Relations
Press and Media

Copyright © 2011-2015 XBT Holding, S.A. All Rights Reserved | Sitemap



Exhibit 14



| Phone number: | Email: |
|---|---|
| +352.20.500.500 | finance@xbt.com |

COMPANY OVERVIEW    SUBSIDIARIES    GEOGRAPHY    FAST FACTS    EVENTS    NEWSROOM

| 12,000 | 37000 | 40 | 5 | 1,500 |
|---|---|---|---|---|
| Customers | Servers | Countries | Datacenters | Gbps Network |

Home / About XBT / Geography

# GEOGRAPHY

Choose the location you are interested in and click on the map.

XBT Holding's facilities are strategically positioned, spanning three continents, to establish the lowest possible latency and the most effective data transfer confirming XBT as the provider of choice for a truly transnational operation.



# WHERE WE ARE



| USA |
|---|
| Luxembourg |
| India |



| Netherlands |
|---|
| Datacenter |
| 6K Servers |
| Webzilla |

| Bulgaria |
|---|
| Cyprus |





Phone number:
**+352.20.500.500**

Email:
**finance@xbt.com**

Copyright © 2011-2015 XBT Holding, S.A. All Rights Reserved | Sitemap



# Exhibit 15



| | Phone number: | Email: |
|---|---|---|
| | +352.20.500.500 | finance@xbt.com |

COMPANY OVERVIEW    SUBSIDIARIES    GEOGRAPHY    FAST FACTS    EVENTS    NEWSROOM

| 12,000 | 37000 | 40 | 5 | 1,500 |
|---|---|---|---|---|
| Customers | Servers | Countries | Datacenters | Gbps Network |

Home / About XBT / Geography

# GEOGRAPHY

Choose the location you are interested in and click on the map.

XBT Holding's facilities are strategically positioned, spanning three continents, to establish the lowest possible latency and the most effective data transfer confirming XBT as the provider of choice for a truly transnational operation.



# WHERE WE ARE



**USA**
- Datacenter
- 3K Servers
- Fozzy
- IP Transit

**Netherlands**

**Ukraine**

**Singapore**

**Bulgaria**

**Cyprus**





Phone number:
**+352.20.500.500**

Email:
**finance@xbt.com**

Copyright © 2011-2015 XBT Holding, S.A. All Rights Reserved | Sitemap



Exhibit 16



Search     OUR WEBSITES

ABOUT XBT        SERVICES        INVESTOR RELATIONS        CONTACTS

| 12,000 | 37000 | 40 | 5 | 1,500 |
|--------|-------|-----|---|-------|
| Customers | Servers | Countries | Datacenters | Gbps Network |

Home / Contacts

# GLOBAL CONTACT DETAILS

XBT greatly appreciates your interest. If you have any enquiries regarding our services or companies, please feel free to contact us using the details below:

**Postal address**
3, op der Poukewiss,
7795, Roost, Luxembourg

**Email address**
finance@xbt.com

**Phone number**
+352.20.500.500

### CONTACT FORM

Your name *

Email *          Website

Your message *

Fields marked with (*) are mandatory          SUBMIT

### ON THE MAP



Map data ©2017 GeoBasis-DE/BKG   Report a map error



**HEAD OFFICE ADDRESS**

3, op der Poukewiss,
7795, Roost,
Luxembourg

**COMPANY**
About XBT Holding
Services
Geography
Newsroom
Subsidiaries

**INVESTOR RELATIONS**
Business Portfolio
Financial Information
Corporate Governance
Quarterly Reports
Investor FAQ

For investor related issues call:
+352.20.500.500

Investor Relations
Press and Media

Copyright © 2011-2015 XBT Holding, S.A. All Rights Reserved | Sitemap









Exhibit 17

**NATIONAL**   **JANUARY 11, 2017 3:08 PM**

# Russian tech expert named in Trump report says US intelligence never contacted him



Цены на аренду выделенных серверов в Москве начинаются от 8900 рублей



BY KEVIN G. HALL AND TIM JOHNSON
*McClatchy Washington Bureau*

WASHINGTON — A Russian venture capitalist and tech expert whose name and company are mentioned in the now-notorious document alleging connections between the Donald Trump campaign and Russian hackers says no intelligence officers have ever contacted him about the accusations, which he says are false.

A report compiled by a former Western intelligence official as opposition research against Trump was made public Tuesday when BuzzFeed posted its 35 pages. The document included unsubstantiated claims of collusion between the Trump campaign team and the Kremlin.

▶



**Trump addresses Russia accusations, business dealings in post-election press conference**

President-elect Donald Trump on Wednesday delivered his first press conference since the November presidential election. Trump addressed his relationship with Russia and how he will handle his business once taking office.

C-SPAN

It also alleged that global tech firm XBT Holding, with operations in Dallas, was instrumental in the hack of leaked Democratic Party emails that embarrassed Hillary Clinton and fellow Democrats.

ADVERTISING

XBT, owner of Dallas-based enterprise-hosting company Webzilla, is run by a successful Russian tech startup expert, Aleksej Gubarev. In a phone interview from Cyprus, where he said he'd lived since 2002, Gubarev said he was surprised to see his name in the report.

"I don't know why I was there," Gubarev said, adding that perhaps a competitor sought to discredit him. "I still don't understand the true reason for this report."

The salacious innuendoes in the periodic reports about Trump's personal life dominated social media headlines. The mention of Webzilla and Gubarev was among the more specific allegations: that XBT and affiliates "had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct 'altering operations' against the Democratic Party leadership."

Gubarev said he operated 75,000 servers across the globe and got real-time information if there had been hacking or illicit activity tied to his businesses. There is no evidence of that, he said, adding that no one has contacted him.

"I have a physical office in Dallas. Nobody contacted me," said Gubarev, adding that 40 percent of his business is handled over the servers it runs in Dallas and the United States accounts for about 27 percent of his global business.

President-elect Trump confirmed Wednesday at a news conference that he had seen the 35-page report, and he blasted it as "fake news" and an "absolute disgrace."

McClatchy has reported that Sen. John McCain, R-Ariz., gave the bulk of the report to FBI Director James Comey on Dec. 9. The final pages of the report are dated Dec. 11. McClatchy had the report earlier but couldn't verify any of its allegations.

A federal law enforcement source told McClatchy that the document was being examined as part of a broader FBI inquiry into Russia's influence on the U.S. election but wouldn't characterize its credibility. A source familiar with the former Western intelligence expert who compiled the dossier told McClatchy that the ex-spy has extensive experience in tracking activities in the Kremlin.

The report alleges that Gubarev and another hacking expert were recruited under duress by the FSB, the Russian intelligence-agency successor to the KGB. Gubarev said he had not been threatened or blackmailed, nor had his mother, who lives in Russia.

Gubarev's Facebook page shows his wife, Anna Gubareva, and him on the bow rail of a fast-moving luxury yacht. His profile picture shows him behind the wheel of a vintage convertible Citroen. He is the public face of a number of tech companies around the globe.

XBT offers an array of tech services, from dedicated hosting of servers and cloud-based storage to developing apps for mobile phones and offering virtual private servers. His company advertises specialized services to software developers, advertisers, gaming companies and electronic-commerce enterprises. It also operates data centers in Russia, Asia, Europe and Dallas.

XBT has been on a buying spree in recent years, accumulating companies in the web-hosting and related fields, including DDoS.com, 1-800-HOSTING, SecureVPN.com, ColocateUSA, Server.lu in Luxembourg, Singapore's 8 to Infinity, and a site used heavily to host pornography, fozzy.com. It acquired Webzilla about a decade ago, which is a medium-sized web-hosting company.

Although Webzilla operates from Texas, it has a "pretty deep Russian client base," analyst Carl Brooks of 451 Research, a Boston-based consultancy, said in a December interview. "They don't have a bad reputation, by any means."

He said the same went for XBT Holding: "To the best of my knowledge, XBT is not particularly nefarious." He estimated annual revenues for XBT between $50 million and $200 million.

Gubarev suspected he might have been named in the report because of comments to Bloomberg's Russia business columnist Leonid Bershidsky. Bershidsky wrote on Nov. 1 that Gubarev questioned allegations that the Trump organization maintained a server found to have communicated with two servers at Russia's Alfa Bank, which is also named in the 35 pages of unproven allegations.

"Bloomberg asked me my expert opinion," he said, noting it was the only time he'd ever commented about a U.S. election or U.S. politics.

In that column, Gubarev expressed doubt about the conclusions of outside experts who said they had studied the server connections between Alfa Bank and the Trump organization. These experts, Gubarev said, would not have had access to the complete logs of a server they didn't control.

The Russian-born Cyprus resident may not be a household name in the United States, but he is tied to millions of iPhones belonging to ordinary Americans. Gubarev was a major investor in the app now called Prism. It was one of the most downloaded of 2016 and uses artificial intelligence to turn ordinary cellphone photos into a wide range of painting styles.

If law enforcement wants to talk with him, Gubarev said, his door is open.

"I'm ready for any investigation. I'm ready to cooperate with everybody, he said.

*GREG GORDON AND MCCLATCHY SPECIAL CORRESPONDENT PETER STONE CONTRIBUTED TO THIS ARTICLE.*

*Kevin G. Hall: 202-383-6038, @KevinGHall*

*Tim Johnson: 202-383-6028, @timjohnson4*

## RELATED CONTENT

- Democrats didn't stand a chance against Russia's elite hackers. They're too good.
- After leak accusations, Clapper attempts to smooth things over with Trump
- FBI, CIA, DNI, NSA all agreed: Tell Trump about explosive Russia claims
- Senior Democrat calls for House-Senate inquiry of hacking accusations
- Trump admits Russia was behind election hacking, then backtracks
- Russia may take hacking to next level by framing politicians with crimes, senator warns
- Trump 'said he's not aware' of being briefed on Russia report, Conway says



Exhibit 18

**Our Terms of Service and Privacy Policy have changed.**

By continuing to use this site, you are agreeing to the new Privacy Policy and Terms of Service.

✕

‹ To CNNMoney

 media   Reliable Sources   Think   Profit   Newtube   Entertainment    

Cyber-Safe

# Russian tech exec sues Buzzfeed for publishing unverified Trump dossier

by Jose Pagliery   @Jose_Pagliery

February 3, 2017: 8:47 PM ET

Recommend 846   ✉  f  ⌄  i



Exclusive interview with BuzzFeed Editor

Social Surge - What's Trending


This Rolls Roy
painted with r
diamond dust


California is of
embracing the
driving car


Scenes from
abandoned
amusement p



A Russian technology executive has sued BuzzFeed and its editor Ben Smith for publishing the unverified Trump dossier, calling it "perhaps one of the most reckless and irresponsible moments in modern 'journalism.'"

Within hours of the lawsuit's filing, BuzzFeed blacked out the name of Aleksej Gubarev in the dossier on its site and apologized.

"We have redacted Mr. Gubarev's name from the published dossier, and apologize for including it," BuzzFeed spokesman Matt Mittenthal told CNNMoney.

Aleksej Gubarev is the CEO of XBT, a company that hosts websites and runs thousands of computer servers worldwide.

The lawsuit claims that the anti-Trump dossier, put together by a former British intelligence operative, falsely alleged that Gubarev was "recruited under duress by the FSB" and became a "significant player" in the Russian government operation to hack the Democratic National Committee.

Gubarev filed a separate lawsuit in the United Kingdom against Christopher Steele, the former MI6 agent who, multiple sources tell CNN, compiled controversial opposition research against Donald Trump. In it, the Russian executive claims Steele was "prepared to tarnish" him "without... conducting even the most basic attempt at verification."

Although several news organizations had obtained the 35 pages of memos, BuzzFeed was the only one to publish them in full.

**Related: BuzzFeed's publication of Trump memos draws controversy**

On Friday, Gubarev sued Buzzfeed and Smith for defamation in Broward County, Florida.

In his lawsuit, Gubarev said "he has found his personal and professional reputation in tatters." He also notes that his wife has become "a target of online harassment," while the safety of his three children is now in jeopardy. Gubarev also claims his companies, XBT and Webzilla, have been severely damaged by the unsubstantiated accusations.



Aleksej Gubarev, a Russian technology executive named in the unverified anti-Trump dossier.

The lawsuit criticizes BuzzFeed for publishing the memos, alleging that "BuzzFeed itself admitted it had no idea what -- if anything -- in the dossier was truthful."

Indeed, when the news website published the memos on January 10, it justified "publishing the full document so that Americans can make up their own minds about allegations about the president-elect that have circulated at the highest levels of the US government."

Gubarev's suit claims that the initial posting has been viewed almost six million times, and the news site has written eight follow-up articles that all link back to the unsubstantiated dossier.

Before he filed the lawsuit, Gubarev spoke to CNNMoney about the damage he had already experienced from the leaked dossier.

"I'm really damaged by this story. This is why I'm ready to spend money and go to court about this," he told CNNMoney in mid-January.

"I have a multimillion dollar business. Why do I need these connections with hackers?" he said, speaking by phone from the Mediterranean island of Cyprus where he lives. "It's absolutely not true, and I can go to the court and say this."

Advertisement

Newsletter

RELIABLE SOUR

Big personalities. Big controve exclusives.

Sign up for the tip sheet of the media i brought to you by Brian Stelter, Dylan B the best media team in the business.

Enter email address

Subscribe   >

Paid Content


A Lion Captur
Petrified Babo
Does the Last
Deposta


Why Doctors I
Know No Long
Prescribe Met
Vibrant Health Netw


Hiring a Handy
The Best Solut
Your Small Ho
HomeAdvisor


This Company
It So Easy To C
Tailored Suit
Indochino

Most Popular Videos


Kimbal Musk v
reengineer the
American stor


Does the FDA
almonds 'unhe


Will recreation
marijuana soo
legal nationwi


This Tesla will
you $500

In his interview with CNNMoney, Gubarev said that three of XBT's European bank partners froze the company's $5 million credit line because of reports about the memos. Gubarev declined to provide CNNMoney proof of those frozen credit lines.

He was named on the very last page of a salacious 35-page report that was financed by anti-Trump Democrats and Republicans.

Gubarev's lawsuit claims XBT's servers were never used to infect computers and steal information from "Democratic Party leadership or anyone else."

**Related: Donald Trump attacks press, conflates CNN, BuzzFeed reporting at news conference**

Gubarev's company helped launch the popular photo-editing app Prisma and runs the Dallas-based website hosting service Webzilla. He said he was shocked at any allegations he would act against American interests, given that 40% of his company's servers are located in the United States. He said they're located in Dallas, Texas, and Vienna, Virginia.

Like anyone in the technology industry, Gubarev acknowledged that he has tangential ties to the computer security and hacking community. He has to defend his computer servers from attackers. And hackers routinely rely on data centers, like those owned by Gubarev's company, to position themselves and launch cyberattacks. But Gubarev said his company acts fast to stop hackers from using its systems.

And he's willing to cooperate with any investigation -- by the FBI or other law enforcement agencies -- into claims he helped hack the DNC.

"I'm willing to do any investigation. Come to my office. Do what you want. Check all my servers," he said.

CNNMoney (New York)
First published February 3, 2017: 5:51 PM ET

Paid Content                                                          Recommended by



Reclusive Millionaire Warns: "Get Out Of Cash Now"
DailyWealth



Everyone Else Is Hiring A Handyman: Why Are You Doing It Yourself?
HomeAdvisor



The Sweatshirt Designed by an Apple Engineer That's Bringing Manufacturing Back to America
American Giant on Business Insider



Finally, a snoring solution that beats CPAP
Lifestyle Journal



15 of the Most Hated Actresses of All Time
The Cheat Sheet



Thinking About Installing Solar Panels? Read This First
Energy Bill Cruncher



Advertisement

Paid Content                          More from CNN Money

CNNMoney Sponsors

WE PUT THE EDGE IN HEDGING

NextAdvisor

Pay no interest until May 2018 this card

Top 7 credit cards for those w excellent credit

The best credit cards for 2017

10 cards charging 0% interes 2018

The highest paying cash bac has arrived

NerdWallet

The search is over. We found best stock brokers for online

Looking for a low-interest loa Check out our review of Prosp

How much do you need to re Use this calculator to find out

Current mortgage rates can't beat. Get the best rate with o

Can you afford your dream h Find out with our mortgage calculator.

Exhibit 19







  

 **BUSINESS**

TOPICS ▾

**TECHNOLOGY**    **JAN 11**

# Tech firm named in Russian hacking report has operations in Dallas



*Wire Services*

Don't miss a story. Like us on Facebook.     **Like** 355K



WASHINGTON -- A Russian venture capitalist and tech expert whose name and company are mentioned in the now-notorious document alleging connections between the Donald Trump campaign and Russian

hackers says no intelligence officers have ever contacted him about the accusations, which he says are false.

A report compiled by a former Western intelligence official as opposition research against Trump was made public Tuesday when BuzzFeed posted its 35 pages. The document included unsubstantiated claims of collusion between the Trump campaign team and the Kremlin.

It also alleged that global tech firm XBT Holding, with operations in Dallas, was instrumental in the hack of leaked Democratic Party emails that embarrassed Hillary Clinton and fellow Democrats.

XBT, owner of Dallas-based enterprise-hosting company Webzilla, is run by a successful Russian tech startup expert, Aleksej Gubarev. In a phone interview from Cyprus, where he said he'd lived since 2002, Gubarev said he was surprised to see his name in the report.

"I don't know why I was there," Gubarev said, adding that perhaps a competitor sought to discredit him. "I still don't understand the true reason for this report."

## Trump calls reports on Russia ties 'a disgrace'

President-elect Donald Trump on Wednesday adamantly denied reports that Russia had obtained compromising informati...



The salacious innuendoes in the periodic reports about Trump's personal life dominated social media headlines. The mention of Webzilla and Gubarev was among the more specific allegations: that XBT and affiliates "had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct 'altering operations' against the Democratic Party leadership."

Gubarev said he operated 75,000 servers across the globe and got real-time information if there had been hacking or illicit activity tied to his businesses. There is no evidence of that, he said, adding that no one has contacted him.

"I have a physical office in Dallas. Nobody contacted me," said Gubarev, adding that 40 percent of his business is handled over the servers it runs in Dallas and the United States accounts for about 27 percent of his global business. TechCrunch wrote about the opening of the Dallas data center in 2015.



**DONALD TRUMP**

**Reports: Officials told Obama, Trump that Russia claims to have damaging info on president-elect**

President-elect Trump confirmed Wednesday at a news conference that he had seen the 35-page report, and he blasted it as "fake news" and an "absolute disgrace."

McClatchy has reported that Sen. John McCain, R-Ariz., gave the bulk of the report to FBI Director James Comey on Dec. 9. The final pages of the report are dated Dec. 11. McClatchy had the report earlier but couldn't verify any of its allegations.

A federal law enforcement source told McClatchy that the document was being examined as part of a broader FBI inquiry into Russia's influence on the U.S. election but wouldn't characterize its credibility. A source familiar with the former Western intelligence expert who compiled the dossier told McClatchy that the ex-spy has extensive experience in tracking activities in the Kremlin.

The report alleges that Gubarev and another hacking expert were recruited under duress by the FSB, the Russian intelligence-agency successor to the KGB. Gubarev said he had not been threatened or blackmailed, nor had his mother, who lives in Russia.

Gubarev's Facebook page shows his wife, Anna Gubareva, and him on the bow rail of a fast-moving luxury yacht. His profile picture shows him behind the wheel of a vintage convertible Citroen. He is the public face of a number of tech companies around the globe.




**GET STARTED**
**Purchase required. Click for details.**

XBT offers an array of tech services, from dedicated hosting of servers and cloud-based storage to developing apps for mobile phones and offering virtual private servers. His company advertises specialized services to software developers, advertisers, gaming companies and electronic-commerce enterprises. It also operates data centers in Russia, Asia, Europe and Dallas.



**POLITICS**
**Trump pick Rex Tillerson won't call Putin a war criminal but wants tough response to Russia**

XBT has been on a buying spree in recent years, accumulating companies in the web-hosting and related fields, including DDoS.com, 1-800-HOSTING, SecureVPN.com, ColocateUSA, Server.lu in Luxembourg, Singapore's 8 to Infinity, and a site used heavily to host pornography, fozzy.com. It acquired Webzilla about a decade ago, which is a medium-sized web-hosting company.

Although Webzilla operates from Texas, it has a "pretty deep Russian client base," analyst Carl Brooks of 451 Research, a Boston-based consultancy, said in a December interview. "They don't have a bad reputation, by any means."

He said the same went for XBT Holding: "To the best of my knowledge, XBT is not particularly nefarious." He estimated annual revenues for XBT between $50 million and $200 million.

Gubarev suspected he might have been named in the report because of comments to Bloomberg's Russia business columnist Leonid Bershidsky. Bershidsky wrote on Nov. 1 that Gubarev questioned allegations that the Trump organization maintained a server found to have communicated with two servers at Russia's Alfa Bank, which is also named in the 35 pages of unproven allegations.

"Bloomberg asked me my expert opinion," he said, noting it was the only time he'd ever commented about a U.S. election or U.S. politics.

In that column, Gubarev expressed doubt about the conclusions of outside experts who said they had studied the server connections between Alfa Bank and the Trump organization. These experts, Gubarev said, would not have had access to the complete logs of a server they didn't control.

The Russian-born Cyprus resident may not be a household name in the United States, but he is tied to millions of iPhones belonging to ordinary Americans. Gubarev was a major investor in the app now called Prism. It was one of the most downloaded of 2016 and uses artificial intelligence to turn ordinary cellphone photos into a wide range of painting styles.

If law enforcement wants to talk with him, Gubarev said, his door is open.

"I'm ready for any investigation. I'm ready to cooperate with everybody, he said.

*Kevin G. Hall and Tim Johnson, McClatchy Washington Bureau (TNS). Writers Greg Gordon and Peter Stone also contributed to this report.*

## MORE FROM DALLAS NEWS

- Developer ready to start Dallas North Tollway office project, replacing car dealership | Real Estate
- Flight attendant grounds herself after 54 years with American Airlines | Airlines
- HGTV's 'Fixer Upper' stars Chip and Joanna Gaines have purchased Waco's Elite Café | Business
- Money tool can provide some money magic for retirement planning | Personal Finance
- One of Dallas' grandest estates just hit the market priced at $27.5 million | Real Estate

Recommended by

○ VIEW COMMENTS

SPONSORED STORIES

Recommended by

Exhibit 20

QUESTION MORE            LIVE



23:08 GMT, Mar 13, 2017



**Home** / **News** /

# 'It's fake news': Russian IT expert responds to unverified report alleging ties to Trump & Kremlin

Published time: 12 Jan, 2017 21:09
Edited time: 12 Jan, 2017 23:06

© imago stock&people / www.globallookpress.com

746

Tech expert Aleksey Gubarev, who alongside his IT company, has been listed in a report alleging close ties between Donald Trump and Russia, told RT that he was never contacted by any intelligence service on the matter and that the report is "fake news."

Text of the report alleging cooperation between Donald Trump's camp and Russian hackers, and also claiming that Moscow has been blackmailing the US president-elect for past sex adventures, was published on Buzzfeed website Tuesday. However, the allegations, reportedly compiled by a former UK intelligence agent Christopher Steel are unverified and also contain mistakes (like misspelling Russia's Alfa Bank as 'Alpha' Bank).

**Read more**



Trump slams BuzzFeed as 'failing pile of garbage,' rejects CNN question over 'fake' report

Among others, the paper in question included Gubarev's name and his global tech Holding XBT, which also runs a Dallas operated company Webzilla. It is alleged in the report that XBT was linked to the recent hacking scandal with the US Democratic Party and a following leak of the emails from its institutions and members.

*"We were shocked to find our names there,"* Gubarev told RT, saying he had *"never met"* anyone listed in the report. *"Nobody from the intelligence agency contacted me about this story... to verify this information,"* he said.

Neither did any journalists reach out to him, Gubarev said.

The published report is *"fake news,"* Gubarev said. *"I still do not understand why our names [are] there and we do not understand a reason of this report in general,"* he told RT.

The IT expert also noted that he is not *"living in Russia for already 15 years."* Yet, the XBT chief said he and his company *"are open for any investigation"* and that they have *"nothing to hide."*

Following the publication of the report on Buzzfeed, its author has been apparent identified, turning out to be a British ex-intelligence member, Christopher Steele. He is one of two directors at Orbis Business Intelligence Ltd, a private security-and-investigations company.

**Read more**



Gubarev told RT he will now take legal action against Steele over false claims. *"We are 100 percent filing a lawsuit against Christopher Steele who created this report and his company in the United Kingdom. We are*



**Washington seems on brink of 'civil war' as elites fuel anti-Trump hostility – former German MP**

*already working on that."* The XBT chief said that a *"competitor"* might be behind the allegations against his company, while *"another option"* would be his professional activity.

*"Recently I was giving some comments to Bloomberg,"* Gubarev said in the interview with RT. The IT expert stated to Bloomberg that there was *"no connection between Donald Trump servers and Alfa Bank servers."*

"It was a technical analysis from our site which we sent to Bloomberg." It was reported in November that a server owned by Alfa Bank (listed in paper published on Buzzfeed), allegedly had communications with a server hosting the Trump Organization domain address. Yet there has been no serious evidence backing the claim.

During a press conference on Wednesday, Donald Trump called BuzzFeed a *"failing pile of garbage"* and also refused to answer a question by a CNN reporter (the outlet also published parts of the report). The information in the report was in fact *"false and fake and never happened,"* Trump said.

## From The Web

Sponsored Links by Taboola

**Teen Vanished In 2009, But Years Later The Police Uncover Truth**
Greeningz

**Save $200 On The Amazingly Light & Versatile ThinkPad X1 Yoga 2-in-1 Laptop Computer**
Microsoft

**Don't Buy Furniture Until You See This Site!**
Wayfair

**The Best Travel Reward Credit Cards**
Earn Rewards Credit Cards Offers

**Wondering which applications to move to the cloud?**
Microsoft

Exhibit 21

**Sputnik International**
**SEARCH**

GET UNLIMITED DATA FROM AT&T.   LEARN MORE

After 22 GB of data usage, AT&T may slow speeds.

Plan will include Stream Saver. Fees, charges, add'l usage & other restr's apply. Plan details.



© AFP 2017/ THOMAS SAMSON

# Trump Dossier: 'I'd Really Like to Find Out Why My Name is in This Report'

**WORLD**    11:01 16.01.2017

**For Russian tech expert Alexei Gubarev the news that he was mentioned in the unsubstantiated report alleging that the Kremlin has compromising information on US President-elect Donald Trump came as a shock. Nobody contacted him to verify the information, he told Radio Sputnik, saying that he was determined to go to court.**

> *"We have a very big high-tech company. We have thousands of servers around the world. I have data centers in eight countries and I have offices in nine countries, including the United States. Imagine how I felt when I found out," he said.*

The dossier accused Gubarev's Dallas-based tech company XBT Holding of using botnets and porn traffic to launch cyberattacks on the Democratic Party during the 2016 presidential election. The document also alleged that Gubarev, whom it refers to as Gubarov, and another hacking expert were recruited under duress by the Russian intelligence agency FSB.



The tech expert, however, has <u>denied</u> the accusations, saying that they are completely false.

> *"Nobody contacted us before this. Neither intelligence services nor journalists contacted us to verify this information," he said.* Intelligence officials have not appeared even after the dossier was made public. *"Only journalists are calling me."*

<u>Gubarev</u> has been involved in the IT and telecom business for eleven years. His company offers hosting and network solutions around the world. XBT Holding has data centers in the United States, the Netherlands, Luxembourg, Singapore, India, Hong Kong and Russia.

"I have around 5,000 B2B clients around the globe. We work as a hosting provider," he detailed. "All of my business is in the United States, Europe and Asia."

Gubarev's business has already taken a hit.

"I was planning to open a data center in London, but I cannot do this now," he said. The company has lost its contact who was supposed to help them open a data center in the United Kingdom after it was mentioned in the dossier.  "My career has been negatively impacted" by the allegations, he added.



© FOTOLIA/ SERKAT PHOTOGRAPHY

**Who is Really Behind Unverified 'Trump Dossier'?**

> *The tech expert added that he "would really like to find out why my name is in this report. And that's why we will go to court ... I am working now on a legal case against this story. We will open a court case in London."*

Have you heard the news? Sign up to our Telegram channel and we'll keep you up to speed!

## You May Like

Sponsored Links by Taboola

**This Credit Card is Charging 0% interest Until December 2018**
Credit Cards by Offers.com

**Get Unsecured Business Loans in 24 hours up to $600k**
Snapcap.com

**Did This Shave Club Just Beat Gillette at Their Own Game?**
Dollar Shave Club

**'If Erdogan Starts Confronting Moscow It Will Bury Turkey'**

**Nationalist 'Soldiers of Odin' Clash With Militant Leftists in Sweden**

**What is Known So Far About New Russian Surface-to-Air Long-Range Guided Missile**



© 2017 Sputnik. All rights reserved

Exhibit 22

IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

MELANIA TRUMP                    :

    Plaintiff                    :

    v.                           :    Case No. 424492-V

WEBSTER GRIFFIN TARPLEY, et al.  :

    Defendants                   :

### MEMORANDUM OPINION

This matter came before the Court on January 27, 2017, on Defendant Mail Media, Inc.'s motion to dismiss. The Court has considered the memoranda filed by the parties, argument of counsel and applicable case law.

### BACKGROUND

In August 2016, articles were published on the internet allegedly containing several false and highly defamatory statements about Plaintiff Melania Trump. Plaintiff filed a three count complaint against Defendants Mail Media, Inc. ("MMI") and Webster Griffin Tarpley ("Tarpley") alleging defamation against Tarpley (Count I), defamation against MMI (Count II), and interference with actual and/or prospective business relationships against both defendants (Count III).[1]

Defendant MMI moved to dismiss the Complaint against it on the grounds that this Court lacks personal jurisdiction over it under Md. Rule 2-322 (a)(1) and, in the alternative, the lawsuit against it should be dismissed under the doctrine of forum non conveniens, pursuant to Md. Code Ann., Cts. and Jud. Proc. §6-104(a).

---

[1] The Court dismissed without prejudice Plaintiff's claim in Count III as to Defendant Tarpley.

## **DISCUSSION**

### **A. Whether Mail Media, Inc. is Subject to Jurisdiction in Maryland**

Plaintiff filed this lawsuit against MMI based on an article about her that was published in August 2016 on the news website MailOnline during the height of the U.S. Presidential campaign. The parties dispute whether Mail Media is the publisher of the website located at www.dailymail.com / www.dailymail.co.uk (collectively "MailOnline") on which the subject articles were placed. Plaintiff contends that MMI is the publisher and that the Chief Executive Officer of MMI is also the publisher of MailOnline. Defendant MMI asserts that MailOnline is owned and published by Associated Newspapers Ltd. ("ANL"), a United Kingdom-based company. But rather than argue that Plaintiff has sued the wrong entity and the case should be dismissed on that ground alone, Defendant MMI has moved to dismiss on jurisdictional grounds that would apply even if it were the correct entity or if the correct entity had been sued.

MMI argues that although Plaintiff is a resident of the State of New York, the MailOnline website is owned and published by a United Kingdom company and has its principal office in New York, Plaintiff chose to file her lawsuit in Maryland -- a jurisdiction with no connection to the claims against MMI or MailOnline. Moreover, MMI argues that Plaintiff's Complaint does not contain any allegations connecting the MailOnline article at issue ("the Article") directly to Maryland. The Article is about Plaintiff, a New York resident, and the statements that form the basis of her claims concern events that allegedly took place in New York or foreign countries.

Plaintiff on the other hand contends that the publication of defamatory statements by a national publication with significant circulation in the forum state gives rise to personal jurisdiction. In addition, the interactivity and targeted conduct of MMI and its website, MailOnline, is more than sufficient to justify the assertion of jurisdiction of Plaintiff's claims.

Plaintiff further contends that MMI purposefully injects itself into the United States to reap an economic benefit. Plaintiff argues that MailOnline has approximately 4,600 article views per hour in Maryland and 72,600 unique browsers per day from Maryland and that MailOnline has a special U.S.-facing homepage that publishes extensive local coverage, including coverage of events in Maryland, and targets advertisements to Maryland residents, from Maryland-area businesses. Plaintiff's Opposition, Exhibit B-4. MMI targets its stories and its advertising to its U.S. readers, and specifically to its Maryland readers, generating revenue in U.S. advertising. Plaintiff asserts these specific ads to local Maryland businesses, as shown in the evidence provided in support of her opposition, are not "random" and "fortuitous" contacts.

The Court of Appeals of Maryland in *Beyond Systems, Inc. v. Realtime Gaming Holding Co., LLC*, 388 Md. 1, 14 (2005), reaffirmed the conditions necessary for a court to exercise personal jurisdiction over a foreign defendant:

> Whether a court may exert personal jurisdiction over a foreign defendant entails dual considerations. First, we consider whether the exercise of jurisdiction is authorized under Maryland's long arm statute, Md. Code (1973, 2002 Repl. Vol.), § 6-103 of the Courts and Judicial Proceedings Article.... Our second task is to determine whether the exercise of jurisdiction comports with due process requirements of the Fourteenth Amendment. We have consistently held that the purview of the long arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Federal Constitution.

(Citations omitted). The Court also reaffirmed the constitutional considerations in determining personal jurisdiction:

> Because we have consistently held that the reach of the long arm statute is coextensive with the limits of personal jurisdiction delineated under the due process clause of the Federal Constitution, our statutory inquiry merges with our constitutional examination . . . A court's exercise of personal jurisdiction over a nonresident defendant satisfies due process requirements if the defendant has "minimum contacts" with the forum, so that to require the defendant to defend its interests in the forum state "does not offend traditional notions of fair play and substantial justice."

*     *     *     *

The standard for determining the existence of personal jurisdiction over a nonresident defendant depends upon whether the defendant's contacts with the forum state also provide the basis for the suit. If the defendant's contacts with the State are not the basis for the suit, then jurisdiction over the defendant must arise from the defendant's general, more persistent contacts with the State. "To establish general jurisdiction, the defendant's activities in the State must have been 'continuous and systematic.' "

*Id.* at 22 (citations omitted).

The Maryland long arm statute, Md. Code Ann. Cts. & Jud. Proc. § 6-103, provides:

(a) *Condition.* If jurisdiction over a person is based solely upon this section, he may only be sued on a cause of action arising from any act enumerated in this section.

(b) *In general.* A court may exercise personal jurisdiction over a person, who directly or by an agent:

(1) transacts any business or performs any character of work or services in this State;

(2) contracts to supply goods, food, services, or manufactured products in the State;

(3) causing tortious injury in this State by an act or omission in this State;

(4) causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;

(5) has an interest in, uses, or possesses real property in the State; or

(6) Contracts to insure or act as a surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

(c) *Applicability to computer information and computer programs.*-(1)(i) In this subsection the following terms have the meanings indicated.

(ii) "Computer information" has the meaning stated in § 22-102 of the Commercial Law Article.

(iii) "Computer program" has the meaning stated in § 22-102 of the Commercial Law Article.

(2) The provisions of this section apply to computer information and computer programs in the same manner as they apply to goods and services.

The burden is on Plaintiff to establish that the Court has jurisdiction over MMI. Plaintiff must demonstrate that MMI has sufficient "minimum contacts" with Maryland "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"

4

*Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  This test requires a showing that the defendant has "purposely avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protection of its laws," such that it should "reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985).  The "'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous" or "attenuated" contacts.'" *Burger King*, 471 U.S. at 475.  Moreover, personal jurisdiction based on minimum contacts can be either "general" or "specific," with specific jurisdiction requiring a demonstration that "the defendant has 'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King*, 471 U.S. at 472.

In a jurisdictional analysis, "it is petitioner's purposeful contacts with [that] state, not with the United States, that alone are relevant." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 885-86 (2011).  In *Eagle Coffee Co. v. Eagle Coffee Int'l, Inc.*, No. CIV. L-09-2585, 2010 WL 481201, at *4 (D. Md. Feb. 4, 2010), in discussing the facts the Court stated that, "nothing on [the defendant's] website suggests that it intended to target the residents of Maryland . . . more than residents of any other state."  In *Young v. New Haven Advocate*, 315 F. 3d 256, 263 (4th Cir. 2002), a Virginia prison warden brought an action against the publishers of Connecticut newspapers that published allegedly libelous articles on the papers' websites (which were accessible in Virginia).  The Court of Appeals for the Fourth Circuit found that Virginia lacked personal jurisdiction.  The Court explained:

> [T]he fact that the newspapers' websites could be accessed anywhere, including Virginia, does not by itself demonstrate that the newspapers were intentionally directing their website content to a Virginia audience. Something more than posting and accessibility is needed to indicate that the newspapers purposefully

(albeit electronically) directed their activity in a substantial way to the forum state.

315 F. 3d at 263.

The Supreme Court set forth an "effects" test in *Calder v. Jones*, 465 U.S. 783 (1984), and *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770 (1984), that determines whether jurisdiction is proper concerning the effects of the defendant's wrongful conduct. In *Calder*, a newspaper based in Florida published an allegedly defamatory story about Shirley Jones, an actress who lived and worked in California. The Supreme Court held that there was personal jurisdiction over the journalists who wrote the story in California because their "intentional, and allegedly tortious, actions were expressly aimed" at a California resident." 465 U.S. at 789. In *Keeton*, the Supreme Court held that New Hampshire could assert jurisdiction over the publisher of Hustler Magazine in a libel case concerning articles appearing in five different issues of the monthly magazine. The defendant in *Keeton* sold thousands of copies of the magazine a month in New Hampshire. The Court found that because "a substantial number of copies [we]re regularly sold and distributed" in the state, the defendant had "exploited the New Hampshire market" and there was "no unfairness in calling it to answer for the contents of [its] publication" there. 465 U.S. at 781.

Plaintiff relies on *Keeton* in arguing for personal jurisdiction in this case. She focuses on the distribution of the defendant's publication in the jurisdiction, not the targeting of harm towards the plaintiff residing in the jurisdiction. According to the "Stats" page on MailOnline, the average "Article Views" for Maryland is approximately 4,595 per hour, or approximately 72,600 daily unique browsers in Maryland. Plaintiff relies on an article on *Advertising Age*, that MailOnline earns revenues primarily, if not exclusively, from advertising, which are tied directly to the number of visitors to MailOnline. MMI contends that *Keeton* does not apply because the

6

Supreme Court's ruling was based on Hustler's paid circulation, while MailOnline is viewed and circulated on the internet without charge.   Moreover, the Article Views and daily unique browsers in Maryland represent a very small percentage of the total.

The overwhelming weight of authority holds that merely operating a website - even if it is a popular website that makes money from advertising, like those operated by *The Guardian*, *Gawker*, *New York Post*, or *Facebook* - does not constitute "purposeful availment" under *Keeton*. In *Huizenga v. Gwynn, et al.,* 2016 WL 7385730 (E.D. Mich. 2016), the Court expressly "declined [plaintiff's] invitation to consider as part of [the court's] *Keeton* reasonableness analysis the number of visits to the [New York] Post's website by Michigan residents." 2016 WL 7385730 at *9 n.5. As the Court explained, "*Keeton* is focused on the extent to which the defendant publication *intentionally* enters the forum market, and the Post does not intentionally enter the Michigan market when Michigan residents visit its webpage." *Id.* Similar to *Huizenga*, in the case at hand, MMI does not intentionally enter the Maryland market specifically, but rather the United States market as a whole.

Based on the affidavits and exhibits submitted by the parties, the unrebutted evidence establishes that MMI's influence in the United States is on a national basis.   The standard contacts associated with outlets like *The Guardian*, *Gawker*, *New York Post*, or *Facebook*, and the revenue resulting from advertisements associated with those contacts, have been ruled insufficient to establish personal jurisdiction over the publishers, because there was no evidence that the website specifically targeted the residents of the forum state more than, or in a different way than, any other state. *See Johnson v. Gawker Media, LLC*, 2016 WL 193390 (E.D. Mo. Jan. 15, 2016); *Brennerman v. Guardian News & Media Ltd.*, 2016 WL 9484466, at *8 (D. De. Dec. 29, 2015); *Gullen v. Facebook.com, Inc.*, 2016 WL 245910, at *2 (N.D. Ill. Jan. 21, 2016).

Plaintiff argues that advertisements on MailOnline target users based, in part, upon their geographic location, including Maryland. She produced evidence that during a ten-day period from December 19-29, 2016, MailOnline displayed various advertisements to a Maryland resident, from Maryland-area business and institutions, including a Bethesda-based real estate agent, a Germantown hospital, and a Rockville jeweler. *See* Plaintiff's Opposition, Exhibits C-1 to C-12. But the fact that MailOnline maintains a webpage through which it solicits advertisers in the United States is insufficient.

Plaintiff failed to establish that MMI has targeted Maryland specifically with its advertisements. Affidavit testimony provided by Chief Operating Officer of Mail Online Richard Caccappolo explained that advertisements are sold two ways: directly to business owners, or via third party "programmatic advertising," which MMI has no control or knowledge of how ads are dispersed. Since it is documented that MMI has sold no advertisements directly to Maryland business owners, any advertisements seen by Maryland residents while viewing MailOnline are a result of programmatic advertising, not MMI's direct targeting. The requirement that a defendant website operator "manifest intent of engaging in business or other interactions within that state in particular" has been the consistent law of courts in Maryland and elsewhere. *Carefirst of Md., Inc. v. Carefirst Pregnancy Cntrs., Inc.*, 334 F.3d 390, 402 (4th Cir. 2003); *Am. Ass'n of Blood Banks v. Boston Paternity, LLC*, 2009 WL 2366175, at \*9 (D. Md. July 28, 2009) (finding no jurisdiction where defendant website promoted "nationwide service," which "courts have repeatedly found insufficient to satisfy the '[manifest] intent' standard").

While Plaintiff contends that in the four months leading up to the filing of this action, MailOnline published no less than 141 articles and 14 videos on topics that are local to Maryland and not of broader national or international interest, this is insufficient to subject MMI to this

8

Court's jurisdiction.  Plaintiff's reliance on *Mavrix Photo, Inc. v. Brand Technologies, Inc.*, 647 F.3d 1218, 1230-31 (9th Cir. 2011), is misplaced.

In *Mavrix Photo*, the U.S. Court of Appeals for the Ninth Circuit held that an Ohio-based publisher of an online-only publication that exploited the national market was subject to jurisdiction in the state of California in a suit brought by a Florida corporation. Like MailOnline, the defendant made money from third-party advertisements on the website for jobs, hotels, and vacations, among other things, in California. The Court in *Mavrix Photo* found that defendant "expressly aimed [its conduct] at the forum state" because it used plaintiff's copyrighted photographs "as part of its exploitation of the California market for its own commercial gain." *Id.* at 1219.  But as stated in the Supplemental Affidavit of Alexander Bannister, of the 141 articles that Plaintiff argues were "local to Maryland and not of broader . . . interest," two-thirds of them are actually wire stories primarily from the Associated Press. Much like the third party advertisements in programmatic advertising, these wire stories are uploaded automatically to the Website from third party wire services and are not created, or even selected, by MailOnline's editorial staff. *See* Supplemental Affidavit of Alexander Bannister, Group Managing Editor of Associated Newspapers, Ltd., ¶ 4.

Moreover, the Court in *Mavrix Photo* held that there was jurisdiction over a copyright claim against the operator of the website because of the "specific focus on the California-centered celebrity and entertainment industries." The Court went on to say that, "[b]ased on the website's subject matter, as well as the size and commercial value of the California market," it was not unreasonable to find jurisdiction in California over "a website whose economic value turns, in significant measure, on its appeal to Californians." 647 F.3d at 1230. The same cannot be said about MailOnline, which indisputably has a national/international focus, with, at most,

9

occasional stories about Maryland, primarily from wire service stories, and no "specific focus" on the state.

*Hare v. Richie*, 2012 WL 3773116 (D. Md. 2012), also does not support a finding of personal jurisdiction in this case. In *Hare* the Court found that "[thedirty.com] website specifically directs electronic activity toward Maryland though the 'Baltimore' section of its website," which "demonstrates an intent to direct the content to users in that geographic area." *Id.* at *11. Although thedirty.com did "not tailor its advertisements to a geographic area," the Court held that "targeting advertisements to Maryland might demonstrate intent to engage in business with Marylanders." *Id.* at *12. Moreover, in *Hare*, the libel plaintiff was a Maryland resident, and the defendant operated a gossip website. The website's front page provided a menu with a list of cities, including Baltimore, where the plaintiff lived. Clicking on a city brought the reader to gossip associated with a specific city. The plaintiff was referenced in headlines multiple times as a "Baltimore Stalker" in the specific Baltimore section of the website, with posts warning "the woman of Baltimore" about him. *Id.* at *2. In the case at hand, the Article was written about a New York resident by a newspaper in the United Kingdom, and also published on a general news website that cannot be described as having a Maryland focus, thus distinguishing this case from *Hare*.

In this case the Article was researched, written for and published in a United Kingdom newspaper and published on a general news website that did not focus on Maryland. The Article was uploaded by MailOne staff in London and MailOne staff in New York posted the Article to the U.S. homepage of MailOnline. No reporter or editor traveled to Maryland in the course of reporting, editing, or publishing the Article. *See* Affidavit of Alexander Bannister. There are no advertising or business acts conducted by MMI that were purposefully directed to Maryland.

10

Further there is nothing about the parties that connects the case against MMI to Maryland – MMI does not have an office in Maryland, Plaintiff does not live in Maryland, and the witnesses are not located in Maryland. It would be unreasonable as a matter of constitutional due process for this Court to exert jurisdiction over MMI or MailOnline in the State of Maryland. While the Court in ruling on the motion to dismiss filed by Defendant Tarpley found that Plaintiff has sufficiently stated a claim for defamation, thus allowing the case against Tarpley to proceed forward in this Court, that does not mean that the case against MMI should proceed in this Court as well. Accordingly, the motion to dismiss of MMI is granted.

### B. Whether Additional Discovery is Necessary

MMI filed a Motion for Protective Order and Stay of Discovery (DE 44) on December 9, 2016. At that time it had not filed its motion to dismiss but counsel for MMI informed the Court at the scheduling hearing held on December 12, 2016, that a motion to dismiss would be filed shortly. The Court informed the parties that MMI would be held harmless from the discovery requests until the Court ruled on the motion for protective order. MMI filed its motion to dismiss on December 19, 2016. (DE 66) The motion was supported by affidavits and exhibits.

Plaintiff filed her opposition on January 3, 2017. (DE 71) Her opposition was supported by three declarations with attached exhibits. The Declarations and attached exhibits are approximately two inches thick. Exhibit A is the Declaration of Ryan J. Stonerock, an attorney with the firm Harder Mirell & Abrams LLP, counsel for Plaintiff, and an attorney of record in this case. Mr. Stonerock stated that discovery had been served on MMI but had not been responded to. Mr. Stonerock attached thirty-four exhibits to his declaration, all but four of which contained publicly available information about MMI that was used to support Plaintiff's opposition. *See* Exhibit A to Plaintiff's Opposition.

11

Exhibit B contained that Declaration of Theodore S. Nguyen, Esquire, an attorney with the firm Harder Mirell & Abrams LLP, counsel for Plaintiff. Mr. Nguyen stated that he had conducted a search on MailOnline and attached the results pertaining to Maryland in nineteen exhibits.

Exhibit C is the Declaration of Callie Carnemark, an attorney with the law firm of Miller, Miller & Canby, Chtd. She attached to her Declaration sixteen exhibits that were copies of relevant excerpts of preservation of webpages referencing Maryland. *See* Exhibit C to Plaintiff's Opposition.

While Plaintiff supported her Opposition with affidavits and extensive exhibits, she contended that jurisdictional discovery was warranted because there was a "substantial factual dispute between the parties as to MMI's targeting (as the Plaintiff suggests) or lack thereof (as MMI suggests) of Maryland Residents." Opposition, p. 20. Plaintiff further noted that MMI had not "responded to any discovery, including discovery relevant to personal jurisdiction issues." *Id.* Despite its motion for protective order and stay of discovery, MMI subsequently did respond to Plaintiff's request for discovery pertaining to the jurisdictional issue.

At the hearing on MMI's motion to dismiss, MMI's counsel informed the Court that all of the jurisdictional discovery requested by Plaintiff had been provided and that any further items sought did not exist. Plaintiff's counsel took contradictory positions on whether additional discovery was necessary. Plaintiff's counsel at one point stated that more jurisdictional discovery was needed because he wanted the opportunity to depose the persons who had provided affidavits in support of MMI's motion to dismiss as well as a corporate designee. Counsel also contended that some of the written discovery responses provided by MMI were not sufficient. When asked by the Court to list the specific deficiencies, however, counsel was unable to

12

provide any examples.  Moreover, counsel also stated that he did not believe that jurisdictional discovery was necessary because there was so much information in the public record that supported Plaintiff's position.  Counsel referred to the information as "overwhelming."

Despite the extensive affidavits submitted by Plaintiff with her opposition, and the affidavits and exhibits submitted by MMI, Plaintiff was able to offer only speculation and conclusory assertions about contacts between MMI and Maryland.  And as the Court of Appeals for the Fourth Circuit held in *Carefirst of Md. Inc. v. Carefirst Pregnancy Cntrs., Inc.*, 334 F.3d 390, 402 (4th Cir. 2003), "[w]hen a plaintiff offers only speculation or conclusory assertions about contacts with a forum state, a court is within its discretion in denying jurisdictional discovery."

In *Beyond Systems, Inc. v. Realtime Gaming Holding Company, LLC, et al.*, 388 Md. 1 (2005), a business that received numerous spam e-mails advertising online gambling sued the company that developed the software and its holding company. Defendants moved to dismiss for lack of jurisdiction and submitted an affidavit establishing that neither company had any contacts with the State of Maryland because they were not incorporated in Maryland, they did not conduct business in Maryland, and they were not involved in the transmission of the e-mails in issue. This Court dismissed the complaint and the plaintiff appealed.  One of the allegations raised in the appeal was whether the lower court had abused its discretion in denying the plaintiff's request for discovery.  The Court of Appeals found that the plaintiff had failed to provide any evidence to support any substantive contact with Maryland or connection with the conduct giving rise to this suit. It further found that the trial court did not abuse its discretion in denying the plaintiff's request for discovery:

> We do not find that the trial court's decision in the present case is beyond the decision that a reasonable person would make in light of the fact that BSI was

13

unable to produce *any* evidence of a connection between Realtime Gaming and KDMS, on the one hand, and windowscasino.com and Thom, on the other, beyond a link leading to an IP address at which individuals could download the software designed by KDMS.

388 Md. at 28-29.

In her Opposition, Plaintiff relies on *Androutsos v. Fairfax Hospital*, 323 Md. 634 (1991), and *Swarey v. Stephenson*, 222 Md. App. 65 (2015), in arguing that jurisdictional discovery is warranted. But as indicated, MMI did provide discovery on the jurisdiction issue. Plaintiff is not entitled to take depositions of the persons who submitted affidavits or corporate designees. The Court of Appeals in *Beyond Systems, Inc.* noted that "[i]f facts are necessary in deciding the motion [to dismiss] the court may consider affidavits or other evidence adduced during an evidentiary hearing." 388 Md. at 12. This Court properly considered the affidavits and exhibits submitted by both parties. But even considering the "overwhelming" information that Plaintiff submitted in support of her motion, Plaintiff did not present factual allegations that suggested with reasonable particularity the possible existence of the necessary minimum contacts. Accordingly, the Court finds that no additional discovery is required.

### CONCLUSION

For the foregoing reasons, Defendant Mail Media, Inc.'s motion to dismiss is GRANTED. Plaintiff's request for further jurisdictional discovery is DENIED.

A separate order will be entered.

February 1, 2017

**SHARON V. BURRELL, Judge**
Circuit Court for Montgomery County, Maryland

14

**IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND**

| | |
|---|---|
| **MELANIA TRUMP** | : |
| **Plaintiff** | : |
| **v.** | :     **Case No. 424492-V** |
| **WEBSTER GRIFFIN TARPLEY, et al.** | : |
| **Defendants** | : |

## <u>ORDER</u>

Upon consideration of Defendant Mail Media's Motion to Dismiss and Plaintiff's Opposition, and for the reasons set forth in the accompanying memorandum opinion, it is this 1st day of February, 2017, by the Circuit Court for Montgomery County, Maryland, hereby

ORDERED, that Defendant Mail Media's Motion to Dismiss (DE 66) is GRANTED; and it is further

ORDERED, that the Complaint against Defendant Mail Media is DISMISSED WITHOUT PREJUDICE.  However, the claims against this Defendant may not be refiled in Maryland; and it is further

ORDERED, that Mail Media's Motion for Protective Order and Stay of Discovery (DE 44) is GRANTED.

_Sharon V. Burrell_
**SHARON V. BURRELL, Judge**
Circuit Court for Montgomery County, Maryland

Exhibit 23

# THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

http://www.wsj.com/articles/key-claims-in-trump-dossier-came-from-head-of-russian-american-business-group-source-1485253804

U.S.

# Key Claims in Trump Dossier Said to Come From Head of Russian-American Business Group

Belarus-born head of a Russian-American business group is said to have passed along unverified allegations of Donald Trump's ties to Russia



Sergei Millian against a backdrop for inauguration celebrations. *PHOTO: SERGEI MILLIAN*

By **MARK MAREMONT**

Jan. 24, 2017 5:30 a.m. ET

Some of the most explosive parts of a dossier containing unverified allegations that President Donald Trump had secret ties to Russian leaders originated from the Belarus-born head of a Russian-American business group, according to a person familiar with the matter.

Sergei Millian, a 38-year-old American citizen who has claimed he helped market Trump properties to Russian buyers, wasn't a direct source for the 35-page dossier, this person said. Rather, his statements about the Trump-Russia relationship were relayed by at least one third party to the British ex-spy who

prepared the dossier, the person said.

Among the unverified allegations of Mr. Millian's that an intermediary passed along, the person said: The claim that the Russians had compromising video of Mr. Trump that could be used to blackmail him, and a claim that there was a "conspiracy of cooperation" between the Trump camp and Russian leadership that involved hacking the computers of Mr. Trump's Democratic opponents.

The

RELATED

- U.S. East Coast Braces for Late-Winter Blizzard March 13, 2017
- Ex-Penn State Officials Plead Guilty in Sandusky Case March 13, 2017
- Study Suggests High-Spending Doctors Could Do Less Without Harming Patients March 13, 2017

emergence of Mr. Millian as a key but indirect source highlights the messy nature of intelligence gathering and the uncertainties behind the dossier, which was funded by Mr. Trump's political opponents.

Both Mr. Trump and Russian officials have dismissed the dossier's claims as false. Then-Director of National Intelligence James Clapper said earlier this month that "the [intelligence community] has not made any judgment that the information in this document is reliable." The Wall Street Journal hasn't been able to verify any of its contents.

Mr. Millian, who posted photos of himself at several VIP events at the Trump inauguration last week, said in an email that the information in the dossier was "fake news (created by sick minds)," and was "an attempt to distract the future president from real work."

Mr. Millian didn't respond to a long list of other questions, including whether he was a source for the dossier.

Michael Cohen, a Trump Organization executive vice president who is resigning to become Mr. Trump's personal attorney, said he was baffled by the idea that Mr. Millian could have been a source for claims in the dossier about events, such as a 2013 Moscow hotel stay, that he had nothing to do with.

Mr. Cohen said "there is not an ounce of truth" to Mr. Millian's claims to have had a relationship with Mr. Trump or the Trump Organization. Mr. Millian had met Mr. Trump once, at a photo op, Mr. Cohen said.

Mr. Millian may not have realized he was feeding information to anyone acting on behalf of the ex-spy. In the dossier, the source believed to be Mr. Millian is referred to at various times as both Source D and Source E and is cited as somebody "speaking in confidence to a compatriot" or "speaking in confidence to a trusted associate."

This is a common technique among spies, according to a former CIA case officer, who said "it makes it a lot easier to get your target to open up if they think they are talking to somebody of the same background."

Secondhand intelligence like that typically would need to be corroborated, said John Sipher, another former CIA official. "You would use that information as a lead, to find other sources who could prove that or not prove that." Another concern: the target and the intermediary could be colluding to provide false information.

The dossier states that some of the key assertions Mr. Millian made were backed up by other sources, also unnamed.

Mr. Millian, who uses the name Siarhei Kukuts in legal documents, came to the U.S. about 15 years ago, and speaks six languages, according to his LinkedIn profile. Before moving to New York he lived in Atlanta, where he worked for a local law firm and had a translation business on the side. He also became a licensed real-estate broker, state records show.

Among the clients for whom Mr. Millian provided translation or interpreting work, according to an online resume: The Russian Ministry of Foreign Affairs and a Belarus-based arms exporter. Mr. Millian didn't respond to questions about those clients.

In 2006, Mr. Millian founded the Russian American Chamber of Commerce in the USA Inc. Despite the grand-sounding name, the nonprofit had less than $50,000 in annual donations and program revenue, according to its tax filings.

But the Chamber provided a bigger stage for Mr. Millian, who was interviewed by news media and posted photos of his frequent travels to Russia and beyond. The Chamber helped arrange U.S. meetings for visiting Russian government officials and companies, according to its website.

As for his relationship with Mr. Trump, Mr. Millian early last year told a Russian news agency that he had first met the future president in 2007, at the Moscow Millionaire Fair, after "common acquaintances of ours" arranged Mr. Trump's

trip. Mr. Millian said Mr. Trump then invited him to meet at a Florida racetrack and, later, at Mr. Trump's New York office "where he introduced me to his right-hand man, Michael Cohen."

Later, in a 2009 newsletter, Mr. Millian claimed that he had "formal agreements" with the Trump Organization to service the real estate needs of Russian clients.

Mr. Cohen said Mr. Trump didn't go to Moscow in 2007, and that the Trump Organization never had any agreement with Mr. Millian. He also said he had never met Mr. Millian in person, but instead had exchanged a few emails after Mr. Millian got in touch with him via LinkedIn.

After media reports focused on Mr. Millian last summer as a link between Mr. Trump and Russia, Mr. Millian began distancing himself. There had been "quite negative press related to Russia so I don't want to be involved," Mr. Millian told The Daily Beast in September, adding that "I didn't represent him personally ever" but merely worked on some Trump projects.

Mike Costache, a friend of Mr. Millian who attended inaugural events with him last week, said "there's a confidentiality clause there. When all this happened, he wasn't allowed to speak, because he was going to get sued by Trump's lawyers."

**Write to** Mark Maremont at mark.maremont@wsj.com

Copyright &copy;2017 Dow Jones &amp; Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.