**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| ALEKSEJ GUBAREV, XBT HOLDINGS S.A., and WEBZILLA, INC.      Plaintiffs,  v.  BUZZFEED, INC. and BEN SMITH      Defendants. | **Case No.**  **0:17-cv-60426-UU** |

**SIX WAYS BUZZFEED HAS MISLED THE COURT**
**(NUMBER TWO WILL AMAZE YOU) …**
**AND A PICTURE OF A KITTEN[1]**

In a somewhat remarkable Motion to Dismiss, Plaintiffs Buzzfeed, Inc. ("Buzzfeed") and Ben Smith ("Mr. Smith") intimate that their ties to Florida are so sparse that, collectively, they can barely find Florida on a map and that, as a result, the present case should be dismissed for lack of jurisdiction or transferred to the Southern District of New York.

In truth, however, this case does not present a "close call" jurisdictionally: Defendants have extensive and continuing ties to Florida; committed an intentional tort in Florida; and caused harm to a Florida corporation.  Defendants regularly and routinely send their reporters to Florida; report on Florida-centric stories; host celebrity-laden parties in Florida; livestream events from Florida; work with Florida advertisers; and generally target and solicit an audience in Florida. Indeed, it could be argued that Buzzfeed is as much "at home" in Florida as are sunny beaches and Florida orange juice, particularly since Buzzfeed has created and circulated on its website dozens of articles specifically created for its clients, VisitFlorida.com (the Official Florida Tourism Industry Marketing Corporation) and the Florida Department of Citrus (the official promoters of Florida Orange Juice).

What is most surprising about Defendants' motion is that it was brought at all.  Buzzfeed

---

[1] Hereinafter referred to as "Plaintiffs' Opposition to Defendants' Motion to Dismiss."  (The picture of a kitten can be found at Exhibit 41 to the Shayefar Declaration.)

published a defamatory article – and Mr. Smith admits to having made the final decision to publish the article – concerning the Plaintiffs, including Webzilla, Inc., a Florida Corporation ("Webzilla").  The article was circulated in Florida; Defendants have pervasive contacts with Florida; there is every reason for Defendants to have expected that their actions would subject them to jurisdiction in Florida; and there is no hardship to Defendants in being required to defend an action in Florida.

Defendants simply do not want to be in Florida, because they believe they will receive more favorable treatment in New York.  This is not a reason to defeat personal jurisdiction or to ignore Plaintiffs' recognized right to choose the forum in which it wishes to litigate an action.  In support of its Opposition to Defendants' Motion to Dismiss or Transfer, Plaintiffs state as follows.

<u>FACTS</u>

I.      <u>The Defamatory Article</u>

On January 10, 2017, Buzzfeed and Mr. Smith published an online article entitled, "These Reports Allege Trump Has Deep Ties To Russia" (the "Defamatory Article").  Complaint, ¶ 23.  At the time the Complaint was filed, the Defamatory Article had been viewed more than 5.9 million times.  *Id.*  The Defamatory Article attached a 35-page unverified "dossier" of information compiled by a private security company.  *Id.*, ¶ 24.

The dossier included various allegations concerning, among other things, allegations of computer hacking of the Democratic Party allegedly carried out by persons or organizations with ties to Russia, the Russian Government, and/or the Federal Security Service of the Russian Federation ("FSB").[2]  *Id.*, ¶ 25.  With respect to the Plaintiffs, the dossier included the following assertions of fact:

> *[redacted] reported that over the period March-September 2016 a company called XBT/Webzilla and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct "altering operations" against the Democratic Party leadership. Entities linked to one Alexei GUBAROV [sic] were involved and he and another hacking expert, both recruited under duress by the FSB, Seva KAPSUGOVICH, were significant players in this operation. In Prague, COHEN agreed contingency plans for various scenarios to protect the operations, but in particular what was to be done in the event that Hillary CLINTON won the presidency. It was important in this event that all cash payments owed were made quickly and discreetly and that cyber and that cyber and other operators were stood down / able to go effectively to ground to cover their traces.*

*Id.*, ¶ 26.

---

[2] The FSB is the main successor agency to the USSR's Committee of State Security ("KGB").

Not a single portion of this statement (as it applies to Mr. Gubarev, XBT, or Webzilla) has any basis in fact whatsoever.  Specifically:

    a.    Neither XBT nor Webzilla nor any of their affiliates had been "*using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct 'altering operations'*" against the Democratic Party leadership or anyone else;

    b.    No "*entities linked*" to Mr. Gubarev were involved in any alleged cyber-attacks;

    c.    Mr. Gubarev was not "*recruited under duress by the FSB*" (to be clear, he was not recruited at all – whether under duress or otherwise), nor was he recruited for such activities by anyone else at any other time or in any other circumstances whatsoever.  Additionally*, he has no knowledge of, has never met and has never spoken to a person known as Seva Kapsugovich;

    d.    Mr. Gubarev and his companies have never acted with "*another hacking expert*" to mount a cyber-attack on the Democratic Party Leadership or on any other person; and

    e.    Not having been involved in the activities attributed to them in the "dossier," neither Mr. Gubarev nor any of his companies would have had any need to "*go effectively to ground to cover their traces*" in the event that Ms. Clinton won the presidency.

*Id.*, ¶ 27.

Although Buzzfeed and Mr. Smith claim that they had the dossier in their possession for weeks prior to its publication, and despite their claims that they had four reporters working near full-time on attempting to verify the claims made in the dossier, prior to publishing the Defamatory Article and the dossier, neither Buzzfeed nor Mr. Smith contacted the Plaintiffs to determine if the allegations made against them had any basis in fact.  *Id.*, ¶ 28.

At the time the Defendants published the Defamatory Article and accompanying dossier, they knew, without a doubt, that at least certain portions of the dossier were untrue. Indeed, the Defamatory Article stated specifically that:

The dossier, which is a collection of memos written over a period of months, includes specific, unverified, and potentially unverifiable allegations… BuzzFeed News reporters in the US and Europe have been investigating various alleged facts in the dossier but have not verified or falsified them. … [The dossier] is not just unconfirmed: It includes some clear errors.

*Id.*, ¶ 29.

According to his own Declaration, Mr. Smith personally made the ultimate decision to publish the Defamatory Article and the Dossier.  Smith Declaration, Docket No. 15-5, ¶ 3.  Mr.

Smith made this decision despite his belief that there were "real solid reasons to distrust" the veracity of the allegations contained therein.  Complaint, ¶ 31.

## II.   Defendants Have Misrepresented Webzilla's Connections to Florida

Throughout their Memorandum of Law, Defendants attempt to portray Webzilla's presence in Florida as a paper-only presence.  *See, e.g.,* Defendants' Memorandum, pp. 1-2; 4. Defendants are mistaken.

Webzilla is incorporated as a domestic for-profit corporation in Florida and has been continuously registered as such with Florida's Division of Corporations since 2009.  *See* Declaration of Constantin Luchian ["Luchian Decl."], filed herewith, ¶ 5.  Indeed, despite Defendants' preposterous claim that Webzilla's website (webzilla.com) does not list its Florida address, one need only click on the "Contact Us" link on the website to see that the North America Corporate Contact address listed for Webzilla is in Fort Lauderdale, Florida.  *Id.*, ¶ 8.

Webzilla's Financial Director, Constantin Luchian, has been a full-time resident of Florida since 2009 and he has performed all of his duties for Webzilla – including processing of payments to Webzilla; oversight of Webzilla's billing; and overseeing Webzilla's accounting – from Florida. *Id.*, ¶¶ 2-7, 25.  Mr. Luchian is also an owner, employee, and director of Incorporate Now – also located in Fort Lauderdale, Florida – which serves as Webzilla's Resident Agent in Florida.  *Id.*, ¶¶ 21-22.  Additionally, Mr. Luchian is Webzilla's registered agent to receive notifications of claimed infringement, as registered with the United States Copyright Office.  *Id.*, ¶ 23.

Webzilla has always maintained a physical presence in Florida.  *Id.*, ¶ 7; Declaration of Kostyantyn Bezruchenko ["Bezruchenko Decl."], filed hereto, ¶ 4.  At various times, that physical presence was at a separate office maintained by Webzilla (and sublet from executive office space providers such as Regus); sometimes it was as part of Incorporate Now's offices; and sometimes it maintained a presence in both locations.  Luchian Decl., ¶ 9.  Whenever Mr. Luchian was told that mail had arrived at one of Webzilla's Florida offices, Mr. Luchian would personally go to the office to pick up the mail, or have it forwarded to him in Florida.  *Id*, ¶ 11.  The United States telephone number listed on the Webzilla.com website is 954-237-3587.  *Id.*, ¶¶ 8, 12.  The 954 exchange is a Broward County exchange.  *Id.*, ¶ 12.  The telephone company bills Mr. Luchian in Florida for the telephone number.  *Id.*, ¶ 13.  Calls to that telephone number go directly to Mr. Luchian who is, again, a full-time Florida resident.  *Id.*, ¶ 14.

Webzilla has previously employed other personnel based in Florida, including Konstantin

Bolotin who was Webzilla's director of operations through 2013.  Luchian Decl., ¶ 15; Bezruchenko Decl., ¶ 5.  Webzilla files Florida tax returns in Florida and, since 2009, Webzilla has maintained a bank account in Florida with Bank of America.  Luchian Decl., ¶¶ 17-20. Webzilla has been a named defendant in at least three different actions in state or federal courts within Florida, with the Courts exercising jurisdiction over Webzilla in each case.  *Id.*, ¶ 24. Webzilla has (and has had) clients located in Florida.  *Id.*, ¶ 28.

Finally, it bears noting that XBT Holdings, S.A. ("XBT") also has additional connections with Florida.  In addition to being the parent corporation of Webzilla, XBT is also parent to IP Transit, Inc. and Dedicated Services Inc., both of which are also for-profit corporations incorporated under the laws of Florida.  Luchian Decl., ¶ 26; Bezruchenko Decl., ¶ 7.  IP Transit's website lists a Florida address and Florida phone number.  Luchian Decl., ¶ 27.

Defendants try to make much of a "map" they found on Webzilla's website.  The map is neither a complete map of Webzilla's operations nor does it accurately describe how those operations are owned and operated.  Bezruchenko Decl., ¶ 8.  The map is not intended to show physical offices for Webzilla or XBT, but instead the map shows locations of *servers and other networking equipment* used by those companies.  *Id.*, ¶ 11.  For example, IP Transit, Inc's Network POP in New York (shown on the map) is little more than some networking equipment installed in rented rack space in a hosting center operated by an unrelated company.  *Id.*, ¶ 12.  The Network POPs shown in Palo Alto, Los Angeles, Chicago and Ashburn are similarly owned and operated by IP Transit, Inc. and similarly constitute networking equipment installed in a rented rack space in a hosting center operated by an unrelated company.  *Id.*, ¶ 13.  The map does not take into account offices and physical locations of Webzilla and the XBT family around the world, except to the extent that those offices also contain networking equipment.  *Id.*, ¶ 13.  Specifically, the map does not account for Webzilla's physical presence in Florida.  *Id.*, ¶ 14. As another example, the map also does not show XBT's corporate offices in the Republic of Cyprus, where the XBT family has over 70 staff members.  *Id.*, ¶ 15.  Any claim that the map represents Webzilla's or XBT's physical office locations would simply be incorrect.  *Id.*, ¶ 16.

## III.    <u>Defendants Have *Radically* Misrepresented Their Own Connections to Florida.</u>

In their Memorandum of Law, Defendants state that: (1) they have no offices or employees in Florida, (2) they do not own or rent property in Florida, and (3) "their only connection to Florida is publishing the Article and the Dossier on a website accessible anywhere in the world."

Defendants' Memorandum, pp. 3, 6.  Given the breadth and depth of the Defendants' connections with Florida, these statements are nothing short of remarkable.

Although Plaintiffs currently only have access to publicly-available information, it should prove to be more than sufficient.[3]  As a starting point, it is important to have an understanding of the vast reach of the Buzzfeed.com website and mobile app.  By Buzzfeed's own account, it receives more than 200 million unique visitors every month, with more than 60% of its traffic coming from its mobile app.  *See* Declaration of Matthew Shayefar ["Shayefar Dec."], filed herewith, Ex. 22.  Approximately 50% of Buzzfeed's website traffic comes from the United States.  Shayefar Decl., Ex. 40.  For comparison's sake, the Alexa.com website – which measures website traffic ranks the Buzzfeed.com website as the 52nd most trafficked website in the United States.  *Id.*  FoxNews.com is ranked number 58; Forbes.com is ranked number 93; USAToday.com is ranked 111; NPR.org is ranked 135; WSJ.com is 157; and Politico.com is ranked 175.  Shayefar Decl., Ex. 37.  After the most recent round of investments, Buzzfeed's estimated valuation is 1.7 *billion* dollars.  Shayefar Decl., Ex. 38.

Buzzfeed's connections to Florida are vast and extensive.  For example, Buzzfeed regularly sends reporters to Florida (or employs stringers[4] in Florida) to cover Florida-based stories.  Shayefar Decl., ¶¶ 5-13.  Indeed, just last month, Buzzfeed not only sent its reporter, Lissandra Villa, to Melbourne, Florida to cover a Trump rally, it also livestreamed the event on Facebook live.[5]  Shayefar Decl., Ex. 1.  It was far from the only time that Buzzfeed sent reporters to Florida or livestreamed events from Florida.  Shayefar Decl., ¶¶ 6-13 (listing eight other articles in which Buzzfeed sent its reporters to Florida).

In 2012, when Florida hosted the Republican National Convention, Buzzfeed sent ten (10) of its reporters to Florida to cover the convention, where it also put out live segments in a partnership with the New York Times.  Shayefar Decl., Exs. 12, 20-21.  Ben Smith was part of the Buzzfeed contingent covering the 2012 Convention in Florida.  Shayefar Decl., Exs. 11-12, 16.  Indeed, Mr. Smith and Buzzfeed took over the Florida Aquarium to host a convention party.  Shayefar Decl., Exs. 20.  Nor was this Mr. Smith's only trip to Florida for Buzzfeed-related

---

[3] To the extent that the Court believes additional materials are necessary, Plaintiffs request leave to take jurisdictional discovery.
[4] Stringers are freelance reporters hired by news outlets, often to cover specific news events.
[5] Livestreaming is broadcasting video live over the internet; Facebook live is a service of Facebook that allows users to livestream video through the Facebook.com website.

activities.  Mr. Smith also traveled to Florida in 2012 to participate in a Poynter Institute sponsored TEDx talk about the future of journalism.  Shayefar Decl., Ex. 27.  And, in what it undoubtedly saw as a crucial public service, Buzzfeed published a list of the best strip clubs for convention-goers to visit, complete with Google Map directions from the convention site to each strip club.  Shayefar Decl., Ex. 17.

Buzzfeed's coverage of Florida news is so extensive that a Google search for the term "Florida," with results restricted just to the Buzzfeed.com domain, results in approximately 13,900 hits.  Shayefar Decl., Ex. 19.  For the Court's convenience, Plaintiffs provide the first 7 pages of results, which include articles clearly aimed at a Florida audience such as:

* 32 Unbelievable Things That Happened In Florida In 2016
* The 101 Most Insane Things That Have Ever Happened In Florida
* 21 Pictures That Will Make Everyone From Florida Say "OMG, Yes"
* These Women Went Blind After A Florida Clinic Injected Fat Cells Into Their Eyeballs
* As Florida Early Voting Begins, 99% More Latinos Have Already Voted Than In 2012
* Here's How Clinton And Trump Are Responding To Florida's Toxic Algae
* Florida's New Death Sentencing Law Is Unconstitutional, State High Court Rules
* Can We Guess Which Florida College You Went To In 5 Questions
* Trump Beach Resort In Florida Seeks More Foreign Workers
* Florida Investigating Whether Zika Case Came From Local Mosquito
* Which Florida Attraction Should You Visit
* 52 Examples Why Florida Is Still The Craziest State.

Shayefar Decl., Ex. 19.  *See*, *also*, Shayefar Decl., Exs. 29-30, 32-34 (some of the articles aimed at Florida audiences).

Similarly, a search of Buzzfeed's page using its internal search service for the word "Florida" returns dozens of articles.  *Id.*, Ex. 18.  Buzzfeed also maintains a separate subpage for stories specifically tagged by Buzzfeed itself as relating to Florida.  *Id.*, Ex. 13.

Perhaps most shocking, though, given Defendants' representations of their allegedly limited connections to Florida, are Buzzfeed's Florida-based advertising clients.  Buzzfeed's revenue is derived "primarily from social content sold to leading brands."  Shayefar Decl., Ex. 23.  In short, Buzzfeed creates articles for its advertising clients that it then posts on its website and mobile app in the same way that it posts actual news and entertainment stories.  *Id.*, Exs. 22, 24, 31, 35.  Two such clients are VisitFlorida.com (the Official Florida Tourism Industry Marketing Corporation) and the Florida Department of Citrus (the official promoters of Florida Orange Juice).  Shayefar Decl., Exs. 10, 26, 28.  Articles created by, and published by Buzzfeed for

VisitFlorida.com include:

- 11 Reasons Why Outdoor Concerts In Florida Rock
- 10 Florida Wonders You Can Only See If You Venture Underwater
- 11 Unexpected Ways To Get Around Florida
- 10 Reasons Florida Is Coaster Heaven On Earth
- 18 Reasons Florida Should Also Be Called "The Adventure State"
- 14 Stages Of Florida Beach Concert Excitement

Shayefar Decl., Ex. 28.

Articles created by, and published by Buzzfeed for Florida Orange Juice include:

- 14 Things Every Self-Respecting Floridian Can Tell You
- 10 Color Palettes Inspired By The Beauty Of Florida
- 15 Delicious Foods That Florida Does Best

Shayefar Decl., Ex. 26.

## IV.  **Defendants Have Misrepresented the Connection Between This Action and Florida.**

Defendants also misrepresent the extent to which this action relates to Florida, first by minimizing the Plaintiffs' connections to Florida (addressed above) and then by ignoring other factors connecting this action to Florida.  Perhaps the most crucial factor, ignored entirely by Defendants, is the number of times the defamatory article was viewed in Florida – a fact solely within the knowledge of the Defendants.[6]  An examination of the identities of individuals who publicly commented on the defamatory article through their Facebook accounts, however (at a point in time before the Plaintiffs' identities were redacted) reveals that dozens of individuals from Florida viewed and commented on the article.[7]  Shayefar Decl., ¶ 4.  Mr. Luchian also viewed the unredacted defamatory article while in Florida.  Luchian Decl., ¶ 29.

Finally, Defendants try to minimize their financial interest in having published the defamatory article (and it being accessible in Florida) by pointing out that the only commercial product Buzzfeed sells is a cookbook with no connection to the defamatory article.  This might be

---

[6] Given that the defamatory article had approximately six million views before the Plaintiffs' names were redacted and 50% of Buzzfeed's traffic comes from the United States, approximately three million U.S. visitors viewed the defamatory article.  The United States Census Bureau estimates that approximately 9.6% of the U.S. population resides in Florida.  Shayefar Decl., Ex. 36.  As such, it is reasonable to assume that approximately 288,000 Florida residents viewed the defamatory article.  Of course, if Defendants wish to contest these estimates, they could presumably provide the Court with the precise number of viewers from Florida.

[7] More individuals from Florida may have commented on the article on Facebook, but Plaintiffs were only able to determine individuals that publicly indicated that they reside in Florida.  Shayefar Decl., ¶ 4.

interesting or relevant if Buzzfeed made the majority of its money from selling cookbooks. It does not. Buzzfeed makes its money by selling (and creating) advertising and advertising rates are governed by the amount of traffic a website receives. According to the Google Trends tool, which allows users to see trends in Google search terms over time, indicate that searches *originating from Florida* for the terms "Buzzfeed" and "Dossier" spiked just after Buzzfeed published the defamatory article. Shayefar Decl., Exs. 14-15.

**ARGUMENT**

I.      **This Court Clearly Has Personal Jurisdiction Over the Defendants.**

A plaintiff must allege a *prima facie* case of personal jurisdiction. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1351 (11th Cir. 2013). "[T]he plaintiffs' factual allegations are accepted as true, unless those allegations are contested by a defendant's affidavit." *R&R Games, Inc. v. Fundex Games, Ltd.*, 2013 WL 3729309, 2013 U.S. Dist. LEXIS 97621, at *5 (M.D. Fla. July 12, 2013) (citing *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990)). The burden is then on the defendant to submit an affidavit that "must contain specific factual declarations within the affiant's personal knowledge" that rebut personal jurisdiction. *Louis Vuitton Malletier, S.A,* 736 F.3d at 1351; *Kitroser v. Hurt*, 85 So. 3d 1084, 1087 (Fla. 2012). "If a defendant fully refutes the jurisdictional allegations, then the burden shifts back to the plaintiff to prove the basis for jurisdiction." *Kitroser*, 85 So. 3d at 1087. If jurisdiction is contested, "all reasonable inferences are drawn in favor of the plaintiff." *R&R Games*, 2013 U.S. Dist. LEXIS 97621, at *5. That is because in reviewing a motion to dismiss for lack of personal jurisdiction, a court should not dismiss the plaintiff's claims "unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish personal jurisdiction over the defendants." *Moltz v. Seneca Balance, Inc.,* 606 F. Supp. 612, 614 (S.D. Fla. 1985) (citing *McKinnis v. Mosely,* 693 F.2d 1054, 1058 (11th Cir. 1982)).

In deciding a Motion to Dismiss based on personal jurisdiction, the Court engages in a two-step analysis: first, the Court must determine if jurisdiction is authorized under Florida's long-arm statute and then the Court must determine if an exercise of jurisdiction comports with traditional notions of fair play and substantial justice under the Due Process clause of the Fourteenth Amendment. *See, e.g.*, *Shells & Fish Import & Export Co. v. Process Engineering and Fabrication, Inc.*, 2013 U.S. Dist. LEXIS 182639, *4 (S.D. Fla. 2013) (*citing Future Tech Today, Inc. v. OSF Healthcare Systems*, 218 F.3d 1247, 1249 (11th Cir. 2000)); *In re W. Caribbean Crew*

9

*Members*, 2009 U.S. Dist. LEXIS 34306, *5 (S.D. Fla. 2009) (*citing Mutual Serv. Ins. Co. v. Frit Indus., Inc.*, 358 F.3d 1312, 1319 (11th Cir. 2004)).  In the present case, Plaintiffs have met the requirements of both steps of the analysis.

    A.   <u>Defendants Have Misrepresented the Scope of Florida's Long-Arm Statute.</u>

One of the oddest contentions in Defendants' Memorandum of Law is Defendants' argument that Florida's Long Arm Statute may "preclude" an exercise of personal jurisdiction against the Defendants.  Defendants' Memorandum, p. 5.  Nothing could be further from the truth.  Section 1(a) of Fla. Sta. 48.193 provides, in relevant part, that specific jurisdiction lies if the defendants do any of the following acts: "Committing a tortious act within this state" or "Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury … the defendant was engaged in solicitation or service activities within this state."

In the present case, Defendants' actions meet each of these bases for the exercise of jurisdiction.  First, there can be no question but that the Defendants committed a tortious act within Florida.  The law on this point is not in any way ambiguous.  "Under Florida law, the tort of libel is not completed until the statements are published."  *Silver v. Levinson*, 648 So.2d 240, 242 (Fla. App. 1994).  In *Silver,* the Court found that a defendant who mailed a defamatory letter into Florida was subject to personal jurisdiction under 48.193(1)(b) because the "final element of the tort was not satisfied until the letters were received by the addressees in Florida.  Until that time, no tort had been 'committed.'" *Id.*

More directly, as the Florida Supreme Court, the Eleventh Circuit, this Court, and other federal courts within Florida have all consistently held that, in the context of a defamation case brought against foreign defendants, the requirements of Florida's long arm statute are met if the defendants post defamatory materials on a website concerning a Florida resident and the website is both accessible within Florida and accessed within Florida.  The seminal case, which is directly on point here, is *Internet Solutions Corp. v. Marshall*, 39 So.3d 1201 (2010), where the Court held (in response to a question certified to it by the Eleventh Circuit Court of Appeals) that an out of state website operator was subject to personal jurisdiction under 48.193(1)(b) for defamatory materials posted on Defendants' website:

> We conclude that allegedly defamatory material about a Florida resident placed on the Web and accessible in Florida constitutes an "electronic communication into Florida" when the material is accessed (or "published") in Florida. In the context of

the World Wide Web, given its pervasiveness, an alleged tortfeasor who posts allegedly defamatory material on a website has intentionally made the material almost instantly available everywhere the material is accessible. By posting allegedly defamatory material on the Web about a Florida resident, the poster has directed the communication about a Florida resident to readers worldwide, including potential readers within Florida. When the posting is then accessed by a third party in Florida, the material has been "published" in Florida and the poster has communicated the material "into" Florida, thereby committing the tortious act of defamation within Florida.

*Id.* at 1214-15.[8]

Courts within the Eleventh Circuit have consistently reaffirmed the holding of *Internet Solutions Corp. See, e.g., Internet Solutions Corp. v. Marshall*, 611 F.3d 1368 (11th Cir. 2010) (recognizing the Florida Supreme Court's answer to the certified question); *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F. 3d 1339, 1353-54 (11th Cir. 2013) ("[U]nder the 'tortious acts' provision in §48.193(a)(2), a trademark infringement on an Internet website causes injury and occurs in Florida 'by virtue of the website's accessibility in Florida." (*quoting Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008))); *Cross Match Techs, Inc. v. CrossResolve, LLC*, 2016 U.S. Dist. LEXIS 75842, *10-11 (S.D. Fla. 2016) ("[T]he 'tortious acts' provision of Florida's long-arm statute is satisfied where a website containing an infringing mark is accessible in Florida…. This is so regardless of whether the tortfeasor was outside Florida when he created the website or posted the infringing material."); *Tobinick v. Novella,* 2015 U.S. Dist. LEXIS 8085, *14-15 (S.D. Fla. 2015) (holding that even where the defamatory article in question "contained minimal references to the state of Florida," the long-arm statute was still satisfied where the defamatory article was accessible and accessed within Florida); *Vasquez v. Maya Publ. Grp., LLC*, 2015 U.S. Dist. LEXIS 60577, *8 (S.D. Fla. 2015) ("Plaintiff's amended complaint alleges that not only was she able to access the allegedly defamatory material online in California, but her family and friends were able to access the materials in Florida. Because third parties accessed the material, Florida law is clear that the material has been 'published' and 'communicated into' Florida, which thereby constitutes the commission of a tort in Florida."); *Kamau v. Slate*, 2012 U.S. Dist. LEXIS 158213, *8-9 (N.D. Fla. 2012) ("Because Plaintiffs are located in Florida and indicate they accessed and viewed the allegedly defamatory material, this Court will have personal jurisdiction over those Defendants who are alleged to have committed tortious acts by use of a

---

[8] In light of the clear case law, it is hard to understand how Defendants' argument on this point comports with their obligations under Fed. R. Civ. P. 11.

website or by sending electronic communications into Florida.").

In the present case, there is no dispute that the Buzzfeed website and the Buzzfeed app are each accessible in Florida; the Defamatory Article was accessible in Florida; and was unquestionably accessed in Florida.  Accordingly, Buzzfeed and Mr. Smith (who admits to having made the final decision to publish the Defamatory Article) have committed a tort in Florida. Additionally, because Webzilla is located in Florida, the Defendants have also caused injury within Florida by their acts or omissions.  As such, the requirements of Florida's Long Arm Statute are easily met.

B.    Defendants Misrepresented the Outcome of a Due Process Analysis.

Once a court is satisfied that Florida's long arm statute authorizes jurisdiction over the Defendants, the court must also determine whether an exercise of jurisdiction over the Defendants comports with the Due Process requirements of the Fourteenth Amendment.  In doing so, Courts within the Eleventh Circuit apply a three-prong test, "which examines: (1) whether the plaintiff's claims arise out of or relate to at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant purposefully availed himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013) (internal citations and quotation marks omitted).  The present action meets each of these three prongs.

1.    *"Arising Out Of" or Relatedness*

"[A] fundamental element of the specific jurisdiction calculus is that plaintiff's claim must arise out of or relate to at least one of the defendant's contacts with the forum." *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1355 (*quoting Fraser v. Smith*, 594 F.3d 842, 850 (11th Cir. 2010)). Here, the Plaintiffs' defamation claim arises directly out of the Defamatory Article published on a website accessible in – and accessed in – the State of Florida.  Additionally, at least one of the Plaintiffs is located in Florida.  Under such circumstances (indeed, under lesser circumstances), Courts have found the "relatedness" prong to have been met.  *See, e.g.*, *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1356 (plaintiff's trademark claims, based on infringements which occurred on defendant's website, accessible in Florida, met the relatedness test); *Tobinick,* 2015 U.S. Dist LEXIS 8085 at *17-21 (relatedness test met in defamation case where the action "stem[s] from content posted by Defendant Novella on a website accessible in the forum state" (and numerous

citations contained therein)); *Cross Match Techs., Inc.*, 2016 U.S. Dist. LEXIS 75842 at *19 (first prong satisfied where there was a "direct causal relationship between the instances of CrossResolve's display of the allegedly infringing name and trademark in Florida and Cross Match's claims").

2.   *Purposeful Availment*

"In intentional tort cases, there are two applicable tests for determining whether purposeful availment occurred." *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1356.  Purposeful availment can be established either by applying the "effects test," which the Supreme Court articulated in *Calder v. Jones*, 465 U.S. 783 (1984), or under a traditional minimum contacts test.  Here, under either test, purposeful availment is met.

"Under the 'effects test," a nonresident defendant's single tortious act can establish purposeful availment, without regard to whether the defendant had any other contacts with the forum state. *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1356 (*citing Licciardello v. Lovelady*, 544 F.3d 1280, 1285 (11th Cir. 2008)).  "This occurs when the tort: '(1) [was] intentional; (2) [was] aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state.'"  *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1356 (*quoting Licciardello*, 544 F.3d at 1285-86, 1287-88).  "In Lovelady, this Court concluded the defendant's use of the Florida plaintiff's trademarked name and picture on a website accessible in Florida 'satisfied the Calder 'effects test' for personal jurisdiction—the commission of an intentional tort aimed at a specific individual in the forum whose effects were suffered in the forum.'"  *Id.*

Here, the effects test is similarly met.  Buzzfeed and Mr. Smith intentionally published the Defamatory Article and Dossier, which was "aimed" at Florida by virtue of it naming a Florida corporation, Webzilla, and Plaintiffs could have easily anticipated such harm being felt in Florida: Webzilla's Florida contact information is listed prominently on its website, recorded at the Secretary of State's Office, and registered with the United States Copyright Office.  *See, e.g., Licciardello*, 544 F.3d at 1287-88 ("In this case, Lovelady is alleged to have committed an intentional tort against Carman -- using his trademarked name and his picture on a website accessible in Florida in a manner to imply Carman's endorsement of Lovelady and his products. The use was not negligent, but intentional.  The purpose was to make money from Carman's implied endorsement.  The unauthorized use of Carman's mark, therefore, individually targeted Carman in order to misappropriate his name and reputation for commercial gain.  These

allegations satisfy the Calder effects test for personal jurisdiction -- the commission of an intentional tort, expressly aimed at a specific individual in the forum whose effects were suffered in the forum.").

The Defendants' extensive contacts with Florida also support a traditional finding of minimum contacts with Florida.  In performing the minimum contacts analysis, the Court must "identify all contacts between a nonresident defendant and a forum state and ask whether, individually or collectively, those contacts satisfy these criteria."  *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1357 (citations omitted).  Indeed, the purposeful availment test can be met simply upon a showing of "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.…  [I]ntentional torts are such acts, and may support the exercise of personal jurisdiction over the nonresident defendant who has no other contacts with the forum."  *Vasquez v. Maya Publ. Grp.*, *LLC*, 2015 U.S. Dist. LEXIS 60577, *10 (S.D. Fla. 2015) (citations omitted).

The Supreme Court decision in *Keeton v. Hustler Magazine*, 465 U.S. 770 (1984), is particularly instructive here.  In *Keeton*, the Petitioner was a resident of New York, who brought a defamation action in New Hampshire against Defendant Hustler Magazine, an Ohio Corporation.  Hustler's only connection to New Hampshire was that the magazine had a monthly circulation between 10,000 and 15,000 copies in New Hampshire.  The District Court and Appeals Court each found that an exercise of personal jurisdiction over Hustler would not comport with the Due Process Clause of the Constitution.  In reversing those decisions, the Supreme Court first noted that, while a plaintiff's *absence* from the jurisdiction was not a relevant factor in deciding jurisdiction, a plaintiff's *presence* in the jurisdiction "may well play an important role in determining the propriety of entertaining a suit against the defendant in the forum.  That is, plaintiff's residence in the forum may, because of defendant's relationship with the plaintiff, enhance defendant's contacts with the forum.  Plaintiff's residence may be the focus of the activities of the defendant out of which the suit arises."  *Id.*, at 779-80.  The Supreme Court then held, unambiguously, that the publisher of a national magazine was subject to jurisdiction in every location in which it was routinely circulated, even if "the bulk of the harm done to petitioner occurred outside [the forum]."  *Id.* at 780.  With respect to the due process analysis, the Supreme Court held:

> Where, as in this case, respondent Hustler Magazine, Inc., has continuously and deliberately exploited the New Hampshire market, it must reasonably anticipate

being haled into court there in a libel action based on the contents of its magazine.… And, since respondent can be charged with knowledge of the "single publication rule," it must anticipate that such a suit will seek nationwide damages. Respondent produces a national publication aimed at a nationwide audience. There is no unfairness in calling it to answer for the contents of that publication wherever a substantial number of copies are regularly sold and distributed.

*Id.* at 781.

The Fifth Circuit Court of Appeals held similarly in *Rebozo v. Washington Post Co.*, 515 F.2d 1208 (5th Cir. 1975). There, the petitioner brought a defamation action against the Washington Post based on a newspaper article that was written outside Florida, but circulated within the state. The Court first noted that the Washington Post was "not qualified or authorized to transact business in Florida. It has neither offices, telephone listings, real property, nor other assets in Florida. In addition, there are no Company agents or employees residing in the forum." *Id.*, at 1210.

Nevertheless, the Court found jurisdiction over the paper based in large part on the fact that the paper had a regular circulation in Florida; derived advertising revenues from Florida-related advertisers; and regularly conducted newsgathering activities in Florida. In finding that the Due Process requirements were met, the Court held:

[T]he Washington Post Company constitutionally susceptible to the jurisdiction of Florida. As previously mentioned, the Company, in addition to circulating relatively few issues of "The Washington Post" in Florida, also derived $42,000 from Florida-related advertising published in the "Post." Reporters from the "Post", including the author of the allegedly defamatory newsstory giving rise to this suit, spent substantial amounts of time in the forum. Their activities could hardly be characterized as casual or sporadic.

… Here, the Company, while on notice of the possibility of resulting legal action, circulated an allegedly defamatory news story in a state in which it engaged in substantial news gathering and news distributing activities -- activities from which the Company derived considerable pecuniary benefit. …We feel that the assertion of jurisdiction over the Washington Post Company is fair in the circumstances and under the undisputed facts of this case.

*Id.*, at 1215-16.

In the present case, Buzzfeed's website and mobile app are widely accessible and widely accessed within Florida; Buzzfeed creates social media advertising for Florida business and the State of Florida itself; Buzzfeed receives advertising revenue from Florida advertisers; Buzzfeed and Mr. Smith regularly and routinely engage in newsgathering efforts both in Florida and aimed at Florida; Buzzfeed regularly sends its employees (including Mr. Smith) to Florida for work

purposes; and Buzzfeed has published thousands of articles concerning Florida-centric topics. Clearly, the minimum contacts prong is also met.

### 3.   *Fair Play and Substantial Justice*

Finally, the Defendants cannot show that interests of "fair play and substantial justice" counsel against jurisdiction in this Court.  In this prong, the court considers: "(1) the burden on the defendant; (2) the forum's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; and (4) the judicial system's interest in resolving the dispute." *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1358 (*quoting Lovelady*, 544 F.3d at 1288).

Here, the burden on the defendants is minimal: defendants conduct regular newsgathering activities in Florida; routinely send reporters to Florida; and have extensive contacts with Florida. *Cross Match Techs., Inc*, *supra* at *23 ("[T]he fact that Evanoff, CrossResolve's CEO, travels to Florida at least annually suggests no burden exists.").  Florida has strong interests both in preventing the publication of defamatory materials in Florida and protecting its residents from damages from such publication.  *See*, *e.g.*, *Keeton*, 465 U.S. at 776 ("A state has an especial interest in exercising judicial jurisdiction over those who commit torts within its territory."); *Silver v. Levinson*, 648 So.2d 240, 244 (Fla. App. 1994) ("This state has an interest in adjudicating a dispute where the reputation of one of its citizens has been allegedly damaged as a result of purposeful actions of a nonresident aimed specifically at Florida."); *Kamau v. Slate,* 2012 U.S. Dist. LEXIS 158213, *14 (N.D. Fla. 2012) ("four of the named defendants were involved in postings on various websites aimed at harming the reputations of Florida residents, and were involved in sending electronic communications with a similar purpose, it should come as no surprise that litigation would arise in the state of Florida where the targets of those actions reside.").

The Plaintiff's interest in obtaining complete and effective relief supports jurisdiction in Florida both because Webzilla is in Florida and because the most recently available statistics from the Administrative Office of the United States Courts demonstrate that cases in the Southern District of Florida reach trial in *half* the time (15.7 months as opposed to 30.3 months) than cases filed in the Southern District of New York.  *See* Shayefar Decl., Ex. 39.  Finally, the interests of judicial efficiency counsel against transferring this case – with the attendant delay that such a transfer would bring – to a Court more congested than the one where the case presently resides.

## II.     Defendants Have Misrepresented the Outcome of a Transfer Analysis.

Defendants next seek transfer of this action to the Southern District of New York.  It is, of course, true that a district court may, in its discretion, transfer a matter under 28 U.S.C. § 1404(a) to another district court if "convenience and the interest of justice require transfer…." *Vivant Pharmaceuticals, LLC v. Clinical Formula, LLC*, 2011 U.S. Dist. LEXIS 37343 (S.D. Fla. 2011). The purpose of § 1404(a) is to "prevent the waste of time, energy and money and to protect litigants, witnesses, and the public against unnecessary inconvenience and expenses." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (citations and quotation marks omitted).

However, "there is ordinarily a strong presumption in favor of the plaintiff's choice of forum, which may only be rebutted when the private and public interest factors clearly point toward trial in the alternative forum." *Iconic Leaf Cigars LLC v. Kendall*, 2013 U.S. Dist. LEXIS 192239, *3-4 (S.D. Fla. Nov. 21, 2013) (*quoting Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981)); *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 260 (11th Cir. 1996) ("[T]he plaintiff's choice of forum should not be disturbed unless it is clearly outweighed by other considerations."); *Ares Def. Sys. v. Karras*, 2016 U.S. Dist. LEXIS 51633, *39-40 (M.D. Fla. Mar. 10, 2016) ("Unless the balance strongly favors the movant, 'plaintiff's choice of forum will rarely be disturbed.'").

Transfer under 28 U.S.C. §1404(a) is a two step-process: first, the Court must determine if the action could have originally been brought in the District to which transfer is sought and, if so, the Court examines whether the factors of convenience and interests of justice outweigh the strong presumption in favor of the plaintiff's choice of forum.  In the present case, Plaintiffs do not dispute that this action could have been brought in the Southern District of New York.

Looking to the second prong, then, the Court of Appeals for the Eleventh Circuit has listed the following factors as relevant: (1) the convenience of the witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances. *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005).  "The Court applies these factors in a manner that speaks to the practical concerns identified by the Supreme Court in *Van Dusen* and that make sense within

the context of a particular action, rather than by tallying them as with a scorecard." *Iconic Leaf Cigars LLC v. Kendall*, 2013 U.S. Dist. LEXIS 192239, *4 (S.D. Fla. Nov. 21, 2013). An examination of the factors reveals that Defendants fall far short of meeting their burden, required to overcome the strong presumption in favor of Plaintiffs' choice of venue.

 A. <u>Convenience of the Witnesses</u> – Defendants argue that this factor weighs in its favor because three of Buzzfeed's employees connected to the Defamatory article live in New York (while acknowledging that a fourth lives in California). Buzzfeed gives no indication as to any of these witnesses' expected testimony. Buzzfeed also claims that other, unnamed "potential witnesses" may live in New York or the Washington area.[9] As is discussed in detail above, Buzzfeed regularly sends its reporters to Florida – and Mr. Smith has visited Florida on Buzzfeed business – strongly suggesting that even these witnesses will be little inconvenienced by the need to appear for trial in Florida.[10]

 In addition to Buzzfeed's own employees, it is likely that Christopher Steele, a resident of London and the individual who comprised the dossier; Mr. Gubarev, a resident of Cyprus and a named Plaintiff herein; and Constantin Luchian, Webzilla's Financial Director, a Florida resident who viewed the Defamatory Article in Florida will also be called as witnesses.

 Consideration of the convenience of witnesses, then, would appear to be neutral.

 B. <u>Location of Documents and Sources of Proof</u> – As this court (and others) have recognized "courts generally hold that the location of documents outside of plaintiff's chosen forum is not a critical factor." *Elite Flower Servs. v. Elite Floral & Produce, LLC*, 2013 U.S. Dist. LEXIS 197267, *14 (S.D. Fla. June 17, 2013) (*citing Coker v. Bank of Am.*, 984 F. Supp. 757, 766 (S.D.N.Y. 1997) (concluding that location of documents is a non-factor in modern era of communications technology)). Nor is it likely that this will be a particularly document-heavy

---

[9] Buzzfeed's speculation is not entitled to any weight in this analysis. *See Elite Flower Servs. v. Elite Floral & Produce*, LLC, 2013 U.S. Dist. LEXIS 197267, *14 (S.D. Fla. June 17, 2013) (rejecting Defendants' argument for transfer because it requires the Court to engage in speculation that another venue may be more convenient based on Defendant's vague reference to its non-Miami based customers); *Hupp v. SiroFlex of America, Inc.* 848 F. Supp. 744, 749 (S.D. Tex. 1994) (holding that a defendant seeking transfer must "specifically identify the key witnesses and outline the substance of their testimony" for the convenience of the witnesses to favor defendant); *Orb Favot, Ltd. v. Design Science Toys Ltd.*, 6 F. Supp. 2d 203, 208 (S.D.N.Y. 1998) (providing that a defendant moving for transfer must "identify the potential principal witnesses to be called and [provide] a general statement of the substance of their testimony").
[10] Other than trial, there is no need for the witnesses to travel to Florida. Plaintiffs readily concede that these witnesses' depositions can take place where they reside.

case.  Given the parties' ability to exchange documents electronically (which they would undoubtedly do regardless of where this case was heard), this factor, too, is neutral.

C.   <u>Convenience of the Parties</u> – As noted, above, witnesses in this action reside in Florida, New York, California, (supposedly) Washington, D.C., Cyprus, and London.  To the extent that the witnesses are in New York, those witnesses are all Buzzfeed's employees.  Buzzfeed regularly sends its reporters to Florida and Mr. Smith has travelled here for business as well.  As such, the factor is largely neutral, which counsels *against* transfer.  *See*, *e.g.*, *Elite Flower Servs.*, *supra* (*citing GelTech Solutions Inc. v. Marteal Ltd.*, 2010 U.S. Dist. LEXIS 44118, at *24 (S.D. Fla. May 5, 2010) (denying transfer in trademark case when convenience of the parties factor was "in equipoise")); *Trinity Christian Center of Santa Ana Inc. v. New Frontier Media Inc.*, 761 F. Supp. 2d 1322, 1328-9 (M.D. Fla. 2010) (holding that where "transfer of venue would merely shift the inconvenience from the defendant to the plaintiff, the plaintiffs' choice of forum should not be disturbed").

D.   <u>Locus of the Operative Facts</u> – Although it is certainly true that Defendants committed made many of their decisions in New York, it is also true that the defamation was completed when the Defamatory Article was accessed in Florida.  This factor is largely neutral.

E.   <u>Compelling Attendance of Unwilling Witnesses</u> – This factor also weighs against transfer.  The witnesses located in New York are all Buzzfeed employees and, as such, can be compelled to testify in Florida.  The non-party witnesses located outside of New York (assuming they exist) could no more be compelled to testify in New York than they could in Florida.  Where, as here the "Defendant fails to identify any non-party witnesses who could only be compelled to appear by a federal court in the [place of proposed transfer] … this factor weighs against transfer."  *Elite Flower Servs.*, *supra*.

F.   <u>Relative Means/Financial Position of the Parties</u> – Buzzfeed is currently valued at approximately 1.7 billion dollars.  Plaintiffs, similarly have the financial means to litigate in either forum.  As such, this factor is neutral.

G.   <u>Forum's Familiarity with the Governing Law</u> – Despite Defendants' odd contention to the contrary, the present action – which states a claim under Florida's defamation laws, for materials published in Florida, causing injury to at least one Florida plaintiff – will be governed by Florida law.  *Waterproof Gear, Inc. v. Leisure Pro, Ltd.,* 2009 U.S. Dist. LEXIS 37437, *14-15 (M.D. Fla. Apr. 20, 2009) ("The forum's familiarity with the governing law also weighs against

transfer. Waterproof's complaint alleges causes of actions pursuant to violations of Florida law, specifically, a Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204, claim as well as a defamation and disparagement claim.…  Accordingly, were this case to be transferred to New York, the New York district court would have to apply Florida law to Waterproof's state law claims.  A New York district court would not be as familiar with Florida law as a Florida district court would be."); *McVicar v. Standard Insulations, Inc*., 824 F.2d 920, 921 (11th Cir. 1987) ("The transferee court must apply the law of the state in which the transferor court sits.").  This factor, then, weighs against transfer.

   H. <u>Plaintiff's Choice of Forum</u> – As noted above, plaintiff's choice of forum should not be disturbed unless "clearly outweighed" by other considerations. *Robinson*, 74 F.3d at 260.  None of the other factors clearly weigh in favor of disturbing Plaintiffs' choice of forum and, as such, this factor weighs against transfer.

   I. <u>Trial Efficiency and Interest of Justice</u> – According to the most recently available statistics from the Administrative Office of the United States Courts, cases in the Southern District of Florida reach trial in *half* the time (15.7 months as opposed to 30.3 months) than cases filed in the Southern District of New York.  Shayefar Decl., Ex. 39.  And, the time that it takes to transfer a civil action would only add to the delay that the parties would face if their case were tried in the Southern District of New York. Thus, this factor also militates against transfer.

<u>**CONCLUSION**</u>

   For the reasons stated hereinabove, Defendants' Motion to Dismiss or Transfer should be denied in its entirety.  If, for some reason, the Court believes additional facts are needed to decide Defendants' Motion, Plaintiffs request leave to take jurisdictional discovery.

**Respectfully Submitted:**

/s/ Evan Fray-Witzer
Evan Fray-Witzer (Mass. Bar No. 564349 – *pro hac vice*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-0000
Facsimile: 617-423-4855
Evan@CFWLegal.com

/s/ Valentin Gurvits
Valentin D. Gurvits (Mass. Bar No. 643572 – *pro hac vice* application forthcoming)
Matthew Shayefar (Fla. Bar No. 0126465)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1804
Facsimile: 617-928-1802
vgurvits@bostonlawgroup.com
matt@bostonlawgroup.com

/s/ Brady J. Cobb
Brady J. Cobb (Fla. Bar No. 031018)
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com

*Attorneys for Plaintiffs*

Dated: March 27, 2017

## CERTIFICATE OF SERVICE

**I hereby certify** that a true and correct copy of the foregoing was served electronically via the CM/ECF electronic filing system on all counsel or parties of record on the service list below this 27th day of March, 2017.


/s/ Matthew Shayefar
Matthew Shayefar

## SERVICE LIST

Katherine M. Bolger
Adam Lazier
Nathan Siegel
Levine Sullivan Koch & Schulz, LLP
321 West 44 Street, Suite 1000
New York, New York 10036
kbolger@lskslaw.com
alazier@lskslaw.com
nsiegel@lskslaw.com

*Attorneys for Defendants*

Lawrence Allan Kellogg
Jezabel Pereira Lima
Levine Kellogg Lehman Schneider & Grossman LLP
Miami Center
201 So. Biscayne Boulevard, 22nd Floor
Miami, Florida 33131
lak@lklsg.com
jl@lklsg.com

*Attorneys for Defendants*