UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:17-cv-60426-UU

ALEKSEJ GUBAREV, XBT HOLDING
S.A., AND WEBZILLA, INC.,

       Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

       Defendants.

_____/

## DEFENDANTS' MEMORANDUM OF LAW REGARDING THE REPORTER'S PRIVILEGE REQUESTED BY JUDGE O'SULLIVAN

Defendants BuzzFeed, Inc. ("BuzzFeed") and Ben Smith respectfully submit this memorandum of law regarding their assertion of the reporter's privilege in response to the motion made by Plaintiffs to compel them to disclose the identity of the confidential source ("the Source") who provided Defendants with a copy of the dossier (the "Dossier") at issue in this case.

PRELIMINARY STATEMENT

The issue presented by Plaintiffs' request to compel Defendants to disclose a confidential source is serious, and stark.  Plaintiffs demand that this Court order Defendants to violate a promise of confidentiality to a source, an act that for any journalist would constitute the ultimate breach of his or her professional ethics and sense of duty.  Yet Plaintiffs have made this extraordinary demand by invoking what are essentially phantom claims about their purported need for this information, and without having made even the slightest effort to explore any alternatives.  Under any version of the reporter's privilege to protect confidential sources, the balance here decidedly tips in Defendants' favor.

Specifically, this Court should deny Plaintiffs' request to compel Defendants to identify the Source, because both the law of the forum (Florida) and the law of the state with the greatest connection to BuzzFeed's communications with the Source (New York) protect Defendants' right to withhold the identity of the Source, as does the First Amendment reporter's privilege recognized by the Eleventh Circuit.  However, if the Court were to find that the qualified reporter's privilege recognized by both Florida law and the First Amendment does not protect this information, then it must proceed to conduct a choice-of-law analysis because the State that has by far the most significant connection to BuzzFeed's newsgathering, including its communications with the Source, is New York.  New York provides an absolute privilege for confidential source information, and in the circumstances of this case Florida's choice-of-law rules would require the application of New York privilege law in the event of any conflict.

Moreover, Defendants have not waived the right to invoke the reporter's privilege, for either of two reasons.  First, Defendants are not seeking to use the identity of the Source as a "sword."  Defendants have never contended that any of their affirmative defenses is predicated on who the Source is, and Plaintiffs' claim that the fair report privilege defense turns on whether the Source is a government official is flatly wrong, as a matter of law.  Second, in any event it is well-settled in both Florida and New York that a court may not, as a matter of law, compel the defendant

1

in a libel case to identify a confidential source based on the "sword and shield" doctrine.

## FACTUAL BACKGROUND

### A.      BuzzFeed Obtains the Dossier

This litigation arises out of BuzzFeed's publication of an article entitled "These Reports Allege Trump Has Deep Ties to Russia" (the "Article") and embedded Dossier on January 10, 2017. *See* Ex. 1 ("Compl.") ¶¶ 23-26.   The Dossier consists of a series of memoranda written between June and December 2016 by a private British intelligence company founded by Christopher Steele, a former British government intelligence officer.  BuzzFeed News is a news organization that publishes news on the internet.  Ken Bensinger, a BuzzFeed News reporter with 20 years' experience, obtained the Dossier from the Source in December 2016.  Ex. 2 (Declaration of Ken Bensinger executed October 16, 2017) ("Bensinger Oct. Decl.") ¶ 9.   Mr. Bensinger promised the Source that BuzzFeed would keep his or her identity confidential.

### B.       Government Action Concerning the Dossier

By the time BuzzFeed published the Article on January 10, 2017, the Dossier had become the subject of substantial official activity.  For example, as the Article notes, during the 2016 election campaign then-Senate Minority Leader Harry Reid publicly released two letters he wrote to then-FBI Director James Comey, which asked the FBI to make public information about alleged Russian collaboration with the Trump campaign.  Exs. 3-4. Those letters relied on Reid's review of the Dossier.  Ex. 5.  In November 2016, a former British diplomat made Senator John McCain aware of the Dossier.  Senator McCain subsequently reviewed it and delivered it to the FBI.  Ex. 6.  According to multiple news reports, the FBI had obtained the Dossier much earlier directly from its authors, and continued to investigate it as it was updated.  Ex. 7.

### C.      The Publication of BuzzFeed's Article with the Dossier

On January 10, 2017, CNN reported that a two-page synopsis of the Dossier had been given to President Obama and President-elect Trump, and that both had been briefed on its contents.  Ex. 8.   CNN also reported that the FBI was investigating the Dossier's allegations.  *Id.*  Shortly thereafter, BuzzFeed published the Article with the embedded Dossier.

The Article explained that the memos in the Dossier had been "circulating among elected officials, intelligence agents, and journalists for weeks."  Compl., Ex.  2 at 1-2.  The Article summarized what had been reported about official use of the Dossier up to that point, including by

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

hyperlinking to the CNN and *Mother Jones* reports: the Dossier's use in briefing the President and President-elect, the actions by Senators Reid and McCain, and an FBI investigation into its content. *Id.*  The Article also explained who the author of the Dossier was, noting that "the document was prepared for political opponents of Trump by a person who is understood to be a former British intelligence agent", and the news reports the Article linked to include an interview with that agent (who was almost immediately publicly identified as Christopher Steele).  The Article never mentioned, or in any way purported to rely on, who had given BuzzFeed access to the actual physical document itself.

**D.     This Action**

     In the Complaint, Plaintiffs allege claims for defamation based on a paragraph on the last page of the Dossier, which reads in relevant part:

> ██████████  reported that over the period March-September 2016 a company called XBT/Webzilla and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct "altering operations" against the Democratic Party leadership.   Entities liked to one Aleksei GUBAROV were involved and he and another hacking expert, both recruited under duress by the FSB, Seva KAPSUGOVICH, were significant players in this operation….

Compl. ¶ 26 and Ex. 3 at 35 (redaction and capital letters in original).

     Defendants' Amended Answer pleads a number of affirmative defenses, including the Second Affirmative Defense, which asserts:

> Defendants' publication of the allegedly defamatory statements in the Dossier, within the context of the Article, is protected by the fair report privilege pursuant to New York Civil Rights Law § 74 and/or the New York state constitution.  In the alternative, Defendants' publication of the allegedly defamatory statements is protected by the fair report privilege pursuant to Florida common law and/or the Florida constitution, or Texas law pursuant to Tex. Civ. Prac. & Rem. Code § 73.002(b)(1) and the Texas constitution.

*See* Ex. 9, Second Affirmative Defense.  In addition, it bears mentioning that BuzzFeed was also sued for defamation based on the publication of the same Article and Dossier in New York State court in the matter *Fridman, et al. v. BuzzFeed, et al.*, Index No. 154895/2017 (N.Y. Sup. Ct., filed May 26, 2017), and filed an Amended Answer in that case asserting the same fair report privilege affirmative defense.  Ex. 10, Second Defense.  The Amended Answer in the *Fridman* case pleads in more detail both the facts and the legal elements that Defendants allege

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

substantiate their privilege defense.[1]   Importantly, nowhere in the affirmative defenses pled in either case do Defendants allege anything at all about how or from whom they obtained the Dossier, let alone plead that the identity, employment status, or reliability of the Source is a fact upon which they rely to establish any of their defenses.

## E.    The London Action

In addition to filing this lawsuit, most of the same Plaintiffs filed a companion defamation lawsuit in the United Kingdom against Christopher Steele (the Dossier's author) and Mr. Steele's private investigative company.  Ex. 12.  That case has already produced some discovery, in which Mr. Steele explained in detail his knowledge regarding some of the ways in which the Dossier was transmitted from specific persons in the United Kingdom to specific individuals in the United States.  Ex. 13.  Nonetheless, as detailed below, Plaintiffs have yet to depose, or for the most part make any meaningful efforts to depose, anyone based on the information they have learned in their English lawsuit.

## F.    Discovery in this Action to Date

After Defendants answered the Complaint, Plaintiffs served Interrogatories and Document Requests.  Where relevant, Defendants objected to the requests and interrogatories to the extent that they sought the identity of any confidential source, and (for purposes relevant here) invoked the reporter's privilege provided by Florida and New York statutory and common law, as well as the First Amendment.  *See* Ex. 14, Responses 1-4, 25-46, 48-52, and 57; Ex. 15, Responses 2-12,

---

[1] The differences in Defendants' pleadings in their Amended Answers filed in this and the *Fridman* case are purely the product of different tactical approaches taken by the respective counsel for the plaintiffs in those cases, not any differences in the substance of the fair report privilege affirmative defense.  In this case, after Defendants filed their original Answer, to the credit of Plaintiffs' counsel he informally raised several objections to how the affirmative defenses were pled and threatened to file a motion to strike if those objections were not satisfied.  The Parties then negotiated mutually-acceptable changes to the pleadings to avoid motion practice, which are reflected in Defendants' Amended Answer.  By contrast, in the *Fridman* case, the plaintiffs filed a motion to dismiss several affirmative defenses, including the fair and true report defense, without attempting to first meet and confer.  The parties' counsel then met and conferred, and ultimately agreed that Defendants would file an Amended Answer and the *Fridman* plaintiffs would withdraw their motion to dismiss, without prejudice to their right to file a new motion to dismiss directed at the Amended Answer in that case.  *See* Ex. 11.

15, 17, 24-25.[2]  At the September 28 hearing before this Court (the "September 28 Hearing"), Plaintiffs' counsel stated that the only source-related information Plaintiffs are seeking to compel is the identity of the Source – or, as Plaintiffs' counsel put it, "[w]here did BuzzFeed get the dossier?"  Ex. 16 ("Sept. 28 Tr.") at 6.

To date, Plaintiffs have not taken any non-party depositions that might yield any information about the identity of the Source.  In fact, for whatever strategic reasons Plaintiffs have not taken steps even readily available to them.  For example, on August 10, 2017, Plaintiffs' counsel obtained from Judge Ungaro an executed copy of a Letter of Request to depose Christopher Steele in London.  ECF No. 54.  But as of the last status conference in this case, held on September 29 (the "September 29 Conference"), Plaintiffs had not taken any steps to try to set that deposition.  *See* Ex. 17 ("September 29 Tr.") at 3-4.

Moreover, it has been widely reported, and confirmed by various government officials, that the FBI and several intelligence agencies had obtained the Dossier long before BuzzFeed published it.  *See, e.g.*, Exs. 2-7, 18.  As a result, on June 28, 2017, Defendants issued subpoenas to various government agencies to provide testimony confirming the various official actions they took with the Dossier.  On September 27, 2017, Defendants filed a motion to compel certain limited categories of testimony, which is pending in the United States District Court for the District of Columbia.  *See BuzzFeed, Inc. v. Dep't of Justice*, Case No. 1:17-mc-02429-APM (D.D.C.), ECF No. 1.  Yet Plaintiffs have never sought any documents or testimony from the Government to determine whether a government official was the source of any leak to the news media, including to Defendants.

The only non-party Plaintiffs have subpoenaed to date is Fusion GPS, which had originally commissioned Mr. Steele to prepare the Dossier.  Fusion has moved to quash the subpoena, and that dispute is likewise pending in the United States District Court for the District of Columbia.  *See In re Third Party Subpoena to Fusion GPS*, Case No. 1:17-mc-02171-TSC (D.D.C.).

**G.     The September 28 Hearing Before this Court**

At the September 28 Hearing, Plaintiffs' counsel stated that they wanted the identity of the

---

[2] As the Court ordered following the September 28 Hearing, Defendants have since served revised objections and responses to Plaintiffs' discovery requests, which removed the reporter's privilege objection to all requests for which it was not relevant and thus did not result in any documents being redacted or withheld on that basis.

5

Source for two reasons.

First, counsel said that Plaintiffs want to know what, if anything, the Source may have told BuzzFeed about the Dossier.  Counsel offered multiple, speculative hypotheticals about what the Source might have said, starting with whether the Source told BuzzFeed that the dossier was unverified.  *Id*. at 7.[3]  Second, counsel argued that they were entitled to know the identity of the Source because, he asserted, Defendants were relying on the identity of the Source to invoke the fair and true report defense.  Notably, counsel never pointed to a single representation in this case (or the *Fridman* case) in which Defendants have *ever* asserted that they are relying on the Source's identity to invoke that defense, or any other.  Instead, counsel claimed that the fair report privilege applies only to "reports of information received from government officials or contained in official government documents," *id*. at 8, and thus speculated that Defendants must be relying on some unspecified assertion that the Source was a government official in order to establish that privilege.  Based on the same reasoning, counsel contended that Defendants are trying to use the reporter's privilege as both a sword and a shield, and have thus waived it.  *Id.* at 12-13.

Plaintiffs also acknowledged that there were only a "limited number of parties that were actually given a copy of the dossier" who could have served as the Source.  *Id.* at 7.  Indeed, Plaintiff's counsel went so far as to name some possibilities – including by way of example James Comey, Christopher Steele and John McCain.  *Id*. at 32 and 42.  Nonetheless, Plaintiffs' counsel conceded that he had not made any efforts to depose any of those potential sources, but claimed that he had no obligation to do so.  *Id.* at 33.  The only effort that counsel contended he had made to learn the identity of the Source was to informally ask Fusion GPS's counsel if Fusion was the Source, and he said the answer was no.  *Id.* at 8-9.

## ARGUMENT

This Court should deny Plaintiffs' request to compel Defendants to identify the Source because that information is privileged under the laws of both New York and Florida.

**A.**     **There Is No Conflict of Laws Because The Source Is Protected Against Compelled Disclosure By The Reporter's Privilege Under Both Florida And New York Law, As**

---

[3] In response to that hypothetical, the Court remarked "Didn't they say that it was unverified in the article?"  Sept. 28 Tr. at 7.

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

**Well As The First Amendment**

While the parties disagree on which State's law should, in the abstract, apply to Defendants' assertion of privilege, Defendants do not believe it is necessary for this Court to apply Florida's choice-of-law rules to conduct a full-blown conflicts analysis.[4]  That is because the first step in that analysis is to determine whether there is actually a conflict between the respective laws that the parties maintain should apply here. "[I]f no conflict exists between two bodies of law the court does not need to make a choice of law determination." *AIG Premier Ins. Co. v. RLI Ins. Co.*, 812 F. Supp. 2d 1315, 1321 (M.D. Fla. 2011); *see also Howard v. Antilla,* 191 F.R.D. 39, 43 (D.N.H. 1999) (no need to conduct conflict of laws analysis between New York and New Hampshire reporter's privileges where "both states' privilege rules protect Antilla's confidential sources from discovery").  And here, no conflict exists because while the tests applied by Florida and New York may differ, the identity of the Source is protected from compelled disclosure under either state's law.

      1.      <u>The Confidential Source Information is Privileged Under Florida Law</u>

            A.   *The Florida Reporter's Privilege*

The reporter's privilege for protecting the identity of confidential sources is so important to the public policy of Florida that there are actually three independent bodies of law recognizing that privilege:  Florida common law, the Florida Shield Law enacted by the Legislature, and the First Amendment as applied by both the Eleventh Circuit and Florida courts.

      i)    <u>The Common Law Privilege</u>:  The Florida Supreme Court first recognized the existence of a qualified reporter's privilege grounded in the First Amendment to the United States Constitution more than 40 years ago in *Morgan v. State*, 337 So. 2d 951 (Fla. 1976).  *See also Gadsden Cty. Times, Inc. v. Horne*, 426 So. 2d 1234, 1240 (1st DCA 1983).  The Court subsequently clarified that the privilege is recognized by Florida common law as well.  *State v. Davis*, 720 So. 2d 220, 225 (Fla. 1998); *Tribune Co. v. Huffstetler*, 489 So. 2d 722, 723-24 (Fla. 1986).  The privilege protects a journalist's newsgathering information unless the subpoenaing party shows that 1) the information sought is relevant to the specific issues in the case, 2) the

---

    [4] Plaintiffs maintain that Florida law applies, while Defendants maintain that if any conflict exists, New York law applies.

information cannot be obtained by alternative means, and 3) there is a compelling interest in disclosure. *See Davis*, 720 So. 2d at 224.

ii)     <u>The Florida Shield Law</u>:  In 1998 the Florida Legislature also adopted a statutory privilege, which provides in relevant part,

(1) DEFINITIONS.--For purposes of this section, the term:

(a) "Professional journalist" means a person regularly engaged in collecting, photographing, recording, writing, editing, reporting, or publishing news, for gain or livelihood, who obtained the information sought while working as a salaried employee of, or independent contractor for, a newspaper, news journal, news agency, press association, wire service, radio or television station, network, or news magazine. Book authors and others who are not professional journalists, as defined in this paragraph, are not included in the provisions of this section.

(b) "News" means information of public concern relating to local, statewide, national, or worldwide issues or events.

(2) PRIVILEGE.--A professional journalist has a qualified privilege not to be a witness concerning, and not to disclose the information, including the identity of any source, that the professional journalist has obtained while actively gathering news. This privilege applies only to information or eyewitness observations obtained within the normal scope of employment and does not apply to physical evidence, eyewitness observations, or visual or audio recording of crimes. A party seeking to overcome this privilege must make a clear and specific showing that:

(a) The information is relevant and material to unresolved issues that have been raised in the proceeding for which the information is sought;

(b) The information cannot be obtained from alternative sources; and

(c) A compelling interest exists for requiring disclosure of the information.

(3) DISCLOSURE.--A court shall order disclosure pursuant to subsection (2) only of that portion of the information for which the showing under subsection (2) has been made and shall support such order with clear and specific findings made after a hearing.

Fl. Stat. § 90.5015.

iii)     <u>The First Amendment Privilege</u>:  In addition, the Eleventh Circuit recognizes a privilege grounded in the First Amendment that may only be pierced if the party seeking the reporter's confidential source presents: "substantial evidence[:][1] that the challenged statement was published and is both factually untrue and defamatory; [2] that reasonable efforts to discover the information from alternative sources have been made and that no other reasonable source is available; and [3] that knowledge of the identity of the informant is necessary to proper preparation

8

and presentation of the case." *Miller v. Transamerican Press, Inc.*, 628 F.2d 931, 932 (5th Cir. 1980) (per curiam) ("*Miller II*"); *accord Price v. Time, Inc.*, 416 F.3d 1327 (11th Cir. 2005); *United States v. Caporale*, 806 F.2d 1487, 1504 (11th Cir. 1986).

B)   *Defendants Are Entitled To Invoke The Reporter's Privilege*

There can be no reasonable dispute that Defendants are entitled to invoke the Shield Law, as well as the common-law and constitutional privileges.  Florida courts have already determined that the Shield Law applies to internet-based entities, as long that they report news.  *TheStreet.com, Inc. v. Carroll*, 20 So. 3d 947 (4th DCA 2009) (per curiam); *see also Carroll v. TheStreet.com, Inc.*, 2014 WL 5474048, at *6 (S.D. Fla. Apr. 10, 2014).  There can be no dispute that BuzzFeed News publishes "information of public concern relating to local, statewide, national, or worldwide issues or events," *see* Bensinger Oct. Decl. ¶¶ 2-3, which is how the Shield Law defines "news," and that the Article and Dossier at issue here are clearly "news."  Fl. Stat. § 90.5015(1)(b).  Likewise, Mr. Bensinger, who last year won a National Magazine Award for his work at BuzzFeed News and has been a finalist for the Pulitzer Prize, is plainly a "professional journalist" employed by BuzzFeed News.  *Id*. § 90.5015(1)(a); *see* Bensinger Oct. Decl. ¶¶ 4-6.  Both the First Amendment and common-law privileges also apply to "reporters," *see Price*, 416 F.3d at 1343; *Davis*, 720 So. 2d at 227, so they are properly invoked as well.

Once the privilege is properly invoked, the burden then shifts to the Plaintiffs to prove that they are entitled to overcome the qualified privilege.  Plaintiffs bear a "heavy burden" to overcome these privileges.  *McCarty v. Bankers Ins. Co.*, 195 F.R.D. 39, 47 (N.D. Fla. 1998).  To overcome the statutory privilege Plaintiffs must make a "clear and specific showing" that they have overcome all elements of the three-part test, Fl. Stat. § 90.5015(2), and for purposes of the First Amendment privilege must present "substantial evidence."  *Miller II*, 628 F.2d at 932.  Importantly, mere speculation cannot suffice to overcome the reporter's privilege.  *Smoliak v. Greyhound Lines, Inc.*, 2005 WL 3434742, at *3 (N.D. Fla. Oct. 17, 2005).

C.   *Plaintiffs Cannot Overcome the Florida or First Amendment Reporter's Privileges*

While Defendants bear no burden to prove a negative – i.e., that Plaintiffs cannot meet their heavy burden of piercing the privilege – this Memorandum will summarize several reasons why Plaintiffs cannot likely do so in the circumstances of this case.

i)   <u>The Source's Identity Has Not Been "Raised in the Proceeding."</u>   *First*, it is

9

doubtful that Plaintiffs could even demonstrate that the Source is material to any "unresolved issues that have been raised in the proceeding," the first prong of the Shield Law.  Plaintiffs claim that they need to know the identity of the Source because Defendants have purportedly relied on it in invoking the fair and true report defense.  But this dog of an argument simply will not hunt because Defendants have done no such thing.  Defendants have never referenced or even alluded to the Source in asserting the fair report privilege, whether as pled in the original or the Amended Answer, or even for that matter in the Amended Answer in the *Fridman* case.  *See* Ex. 8, Second Affirmative Defense; Ex. 9, Second Defense; Ex. 19, Third Affirmative Defense.  Plaintiffs have simply created this rationale out of whole cloth.

Rather than point to any *actual* reliance on the Source, Plaintiffs offer a convoluted argument whereby they posit that Defendants could only assert the fair and true report defense if they received the document from a government official, and so they speculate that Defendants must be intending to assert that the Source was a government official.  Sept. 28 Tr. at 8.  Not only have Defendants never made that assertion, but even at first blush the argument makes no sense.  The whole point of invoking the reporter's privilege is so that Defendants may avoid saying anything that would provide any clues about who the Source is.  Thus, revealing information such as whether the Source is or is not a "government official" is precisely what Defendants are asserting they will *not* do by invoking the reporter's privilege.

In any event, Plaintiffs' premise that the fair report privilege turns on whether a document is obtained from a government official is also simply incorrect.  Rather, the fair and true report privilege "extends to 'the report of any official proceeding, *or any action taken by any officers or agency of the government of the United States, or of any State or of any of its subdivisions*.'"  *OAO Alpha Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 40 (D.D.C. 2005) (quoting Restatement (Second) of Torts § 611 cmt. d (1977)) (emphasis added).   Thus, it is well-settled that under both New York and Florida law, the privilege applies regardless of who BuzzFeed received the Dossier from – or for that matter, whether BuzzFeed found it on a park bench – as long as the Dossier was the subject of government action.  *See Friedman v. Bloomberg L.P.*, 871 F.3d 185, 195 n.6 (2d Cir. 2017) (where statement in news article accurately summarized judicial proceeding, plaintiff was not entitled to discovery of its source because "how a reporter gathers his information concerning a judicial proceeding is immaterial provided his or her story is a fair and substantially accurate portrayal of the events in question.") (citation omitted); *Ortega v. Post-Newsweek*

10

*Stations, Fla., Inc.*, 510 So. 2d 972, 976 (3d DCA 1987) ("[T]he fact that a reporter gathers information of an official proceeding second-hand 'is immaterial provided his story is a fair and substantially accurate portrayal of the events in question.'") (citation omitted).  In fact, courts have repeatedly confirmed that the privilege applies even if the "source" is not a person at all, but is merely another news article.  *See, e.g.*, *Cholowsky v. Civiletti*, 69 A.D.3d 110, 115 (N.Y. App. Div. 2009) ("[T]he fact that the defendants derived information about the judicial proceedings from secondary sources did not mean that [the fair report privilege] was inapplicable."); *Adelson v. Harris*, 973 F. Supp. 2d 467, 486 n.14 (S.D.N.Y. 2013), *certifying question,* 774 F.3d 803 (2d Cir. 2014), *answering certified question*, --- P.3d ----, 2017 WL 4294562 (Nev. Sept. 27, 2017) (Nevada law); *Hanish v. Westinghouse Broad. Co.*, 487 F. Supp. 397, 399 (E.D. Pa. 1980); *Simonson v. United Press Int'l, Inc.*, 500 F. Supp. 1261, 1264 (D. Wisc. 1980), *aff'd on other grounds*, 654 F.2d 478 (7th Cir. 1981).

  This point is perhaps most clearly illustrated by *Howell v. Enterprise Publishing Co.*, a recent Massachusetts case involving newspaper reports about a town's investigation into a local official based on information received from anonymous sources.  920 N.E.2d 1, 7-13 (Mass. 2010). *Howell* held that the fair report privilege applied because it was "of no moment" who the anonymous source was, as long as the newspaper's reports accurately described the investigation. *Id.* at 19; *see also id.* at 18 ("[T]he privilege extends to reports of official actions based on information provided by nonofficial third-party sources.").  Accordingly, the identity of the Source is simply not an "issue that ha[s] been raised" in this case, which would be necessary to satisfy even the first prong of the Shield Law.

  ii) <u>Plaintiffs Cannot Make a Clear and Specific Showing that the Information Cannot Be Obtained From Alternative Sources.</u>  To satisfy the requirements of § 90.5015(2), or the First Amendment privilege, the party seeking disclosure must "show that he has exhausted *all* alternatives to compelling the testimony" of the reporter.  *McCarty v. Bankers Ins. Co.*, 195 F.R.D. 39, 46-47 (1998)*; see also Redd v. U.S. Sugar Corp.*, 1993 WL 428667, at *2 (Fla. Cir. Ct. May 27, 1993) (party seeking disclosure is required to "exhaust or make reasonable effort to exhaust non-media sources for the information sought"); *Gadsden Cty. Times*, 426 So. 2d at 1242 (reversing lower court's decision as "clearly erroneous" where lower court found that party seeking discovery was not required to "pursue other avenues in attempting to identify … confidential sources").

Florida courts take this rule so seriously that they have required the party seeking disclosure to depose, or at lease interview, as many as 117 possible sources before moving to compel the identity of a confidential source.  *See, e.g.*, *Overstreet v. Neighbor*, 9 Media L. Rep. 2255, 2256 (Fla. Cir. Ct. Sept. 13, 1983) (requiring exhaustion of at least 117 individuals to defeat common law privilege) (attached hereto as Ex. 20); *Muhammad v. State*, 132 So. 3d 176, 190 (Fla. 2013) (affirming lower court decision quashing subpoena on exhaustion grounds because "[t]here were twenty-eight witnesses to the Happ execution. Muhammad failed to explain why he could not discover the identity of even one of those witnesses."*); see also Price*, 416 F.3d at 1346 ("Price has taken some depositions, but not enough" to meet the second prong of the First Amendment test).  The test is not, therefore, whether it would be burdensome for the party seeking to compel disclosure to seek other sources, or whether that party believes the news organization could offer the most credible evidence; "[t]he test is simply whether other sources for the same information are available." *Florida v. Abreu*, 16 Med. L. Rep. 2493, 2494 (Fla. Cir. Ct. Oct. 31, 1989) (attached hereto as Ex. 21); *see also Smoliak*, 2005 WL 3434742, at *3 (requiring party seeking disclosure to "actually question[] the[] witnesses … to determine exactly what they know or whether they could identify" other possible sources).  Moreover, the Eleventh Circuit has explicitly held that merely interviewing a potential source of knowledge is not enough; rather, actual sworn depositions are required to satisfy this prong of the First Amendment privilege.  *Price*, 416 F.3d at 1347.

Here, despite a wealth of information pointing to persons who might have knowledge about this information – evidence that Plaintiffs themselves discussed during the September 28 Hearing, Sept. 28 Tr. at 31-32 – Plaintiffs have made no credible effort to get evidence from these alternative sources.  They cannot, therefore, make the clear and specific showing required to overcome the Shield Law or any version of the reporter's privilege.

This case is much like *WTVJ-NBC 6 v. Shehadeh*, 56 So. 3d 104 (3d DCA 2011).  In that case, the plaintiff believed that his former employer, the City of Homestead, had leaked a CD of information to the local television network affiliate.  Instead of seeking the CD in a freedom of information request or even seeking to depose city employees, the plaintiff sought the identity of the source from the television station.  The Third District Court of Appeal held that the plaintiff had failed to demonstrate that the information was unavailable from other sources because he had failed to use the "array of discovery procedures available to determine" the identity of the leaker.

12

56 So. 3d at 106.  The same holds true here.

iii)   <u>There is No Compelling Need to Require Disclosure</u>.  Finally, Plaintiffs cannot demonstrate a compelling need to know the Source's identity.  This prong of the privilege is designed to balance the interest in disclosure against the strong public policy interest in protecting journalists.  *Gadsden*, 426 So. 2d at 1242; *Morgan*, 337 So. 2d at 954.  As a result, courts have routinely quashed subpoenas when the moving party cannot demonstrate the compelling necessity of the requested information.  *See McCarty*, 195 F.R.D. at 47 (refusing to compel identity of source because "the relevancy is outweighed by the other factors and the compelling need to uphold the journalist's privilege" is so great.); *State v. Smith*, 2001 WL 1750827, at *1 (Fla. Cir. Ct. Mar. 15, 2001) (no compelling need for letter sent to newspaper).

As previously discussed, the fact that Defendants have pled the fair report privilege defense presents no compelling need, because the Source's identity is simply irrelevant to that defense.  Moreover, the Eleventh Circuit has articulated a clear guideline for assessing compelling need in the context of a defamation lawsuit, which makes clear why there is no such need here.  Specifically, a compelling need may be established where the "only source for the allegedly libelous comments is the [confidential] informant."  *Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 726 (1980) ("*Miller I*"); *see also Price*, 416 F.3d at 1345 ("As the *Miller* Court explained, where the 'only source for the allegedly libelous comments is the informant,'" a compelling need may be established.).  But here the source of the allegedly defamatory statements is Mr. Steele, whose identity is already known (or, even more indirectly, one or more of Mr. Steele's sources), not some "informant" of BuzzFeed's.  As a result, even if knowing the identity of the Source who simply conveyed the document might have some speculative relevance to Plaintiffs' case, that would fall far short of what is necessary to clearly establish a "compelling need."

Finally, the fact that Plaintiffs have so utterly failed to seek alternative sources of information also negates a finding that they have a compelling need for it.  Put simply, if this information was really so important, Plaintiffs could reasonably be expected to have tried much harder to obtain it.  In *Gadsden*, for example, the First District Court of Appeal reversed an order compelling production of source information in a libel case because there were no facts in the record that demonstrated a compelling need and because the "fact that [the plaintiff] had failed to attempt to obtain the information from alternative sources would negate any such finding."  426 So. 2d at 1242; *see also WTVJ-NBC-6*, 56 So. 3d at 106 (plaintiff has shown "no compelling

13

interest" in face of failure to seek discovery of third parties).

For all these reasons, Plaintiffs cannot sustain their heavy burden to overcome the Shield Law, Florida common law, or the First Amendment reporter's privilege.  Under Florida law, therefore, Defendants cannot be compelled to identify the Source.

2.      The Confidential Source Information is Privileged Under New York Law

If, however, this Court were to conclude that Plaintiffs have sustained their burden under Florida law, then it would be required to conduct a choice-of-law analysis.  That is because there is no question that under New York law Plaintiffs are absolutely precluded from compelling the disclosure of the Source's identity, so a conflict would exist.  The New York Shield Law provides in relevant part:

> Notwithstanding the provisions of any general or specific law to the contrary, no professional journalist … presently … employed or otherwise associated with any newspaper, magazine, news agency, press association, wire service, radio or television transmission station or network or other professional medium of communicating news or information to the public shall be adjudged in contempt by any court in connection with any civil or criminal proceeding, … for refusing or failing to disclose any news obtained or received in confidence or the identity of the source of such news coming into such person's possession in the course of gathering or obtaining news for publication or to be published in a newspaper, magazine, … or for public dissemination by any other professional medium or agency which has as one of its main functions the dissemination of news to the public, by which such person is professionally employed or otherwise associated in a news gathering capacity ….

N.Y. Civil Rights Law § 79-h(b).  As New York's highest court has held, "the statute grants an absolute privilege precluding reporters from being compelled to reveal the identity of confidential sources." *Holmes v. Winter*, 22 N.Y.3d 300, 308 (2013); *see also Sharon v. Time, Inc.*, 599 F. Supp. 538, 582 (S.D.N.Y. 1984) (Shield Law "may be asserted by press defendants in libel cases," and gives defendant "right to withhold identifying details" about confidential sources in response to discovery); *Sprewell v. NYP Holdings, Inc.*, 43 A.D.3d 16, 21 (N.Y. App. Div. 2007) (granting newspaper summary judgment in libel case based in part on information obtained from confidential source).

Here, as discussed above, Bensinger is a professional journalist who works for a professional news organization.  Bensinger Oct. Decl. ¶¶ 2-6.  Bensinger also obtained the Dossier only after promising confidentiality to the Source.  *Id.* ¶ 9.  Under New York law, the identity of the Source is therefore absolutely privileged and Plaintiffs' request to compel the Source must be

14

denied.

**B.      If New York and Florida Law Conflict, This Court Should Apply New York Law**

        In determining *which* state privilege law to apply in the event of a conflict, the Court looks to the choice-of-law rules of the state in which it sits.  *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 694 (11th Cir. 2016).  Florida applies the approach of section 139 of the Restatement (Second) of Conflict of Laws (the "Restatement") to choice of law questions involving privilege issues in tort cases.  *Anas v. Blecker*, 141 F.R.D. 530, 532 (M.D. Fla. 1992).  The choice of law analysis for which state's privilege law applies is distinct from the analysis governing the choice of substantive law, and so it is possible to reach different results on those questions in the same case.  *See, e.g., Indep. Petrochem. Corp. v. Aetna Cas. and Sur. Co.*, 117 F.R.D. 292, 296 (D.D.C. 1987).

        Section 139 provides, in relevant part, that:

> (2) Evidence that is privileged under the local law of the state which has the most significant relationship with the communication but which is not privileged under the local law of the forum will be admitted unless there is some special reason why the forum policy favoring admission should not be given effect.

Thus, Section 139(2) provides that Florida law should be applied, unless New York has the most significant relationship with the communication and there are other reasons why its law should be preferred.  In making that determination, the Restatement provides that "[a]mong the factors that the forum will consider in determining whether or not to admit the evidence are (1) the number and nature of the contacts that the state of the forum has with the parties and with the transaction involved, (2) the relative materiality of the evidence that is sought to be excluded, (3) the kind of privilege involved and (4) fairness to the parties."  Restatement § 139, cmt. d.  This list is not exhaustive, however, and it is not a balancing test.  Courts have recognized that even a single consideration may justify applying the foreign privilege.  *See, e.g.*, *Anas*, 141 F.R.D. at 532 (finding "special reason" to apply Illinois law where applying Florida law would make the party resisting disclosure "subject … to the privilege laws of all fifty states"); *Compuware Corp. v. Moody's Inv'rs Servs., Inc*., 222 F.R.D. 124, 133 (E.D. Mich. 2004) (finding "special reason" to apply New York Shield Law because "New York is the center of the financial publishing industry, and the New York companies who gave these materials to Moody's, also a New York company, surely relied on the protections of New York law").  Applying this test here, it is clear that New York law should apply.

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

First, New York is the State with the most significant relationship to the Dossier.  *See Mazzella v. Philadelphia Newspapers, Inc.*, 479 F. Supp. 523, 527 (E.D.N.Y. 1979) (in defamation case, applying the reporter's privilege of the State where "the events that led to the … article" in question took place, including the newsgathering).   BuzzFeed's investigation into the Dossier was organized and directed from BuzzFeed's headquarters in New York by New York residents – BuzzFeed editor-in-chief Ben Smith and BuzzFeed News investigations editor Mark Schoofs. Bensinger Oct. Decl. ¶ 8.  The decision to publish the Dossier was made by Smith in New York after discussing it with others at BuzzFeed's headquarters, and the Article accompanying the Dossier was written and edited by Miriam Elder, Smith, and Schoofs in New York.  Ex. 22 (Declaration of Ben Smith executed March 9, 2017) ("Smith Decl.") ¶¶ 3-4; Ex. 23 (Declaration of Mark Schoofs executed March 13, 2017) ("Schoofs Decl.") ¶ 4; Ex. 24 (Declaration of Miriam Elder executed March 9, 2017) ("Elder Decl.") ¶ 4.  While Mr. Bensinger is not a New York resident, everything he did in connection with this story was as part of team based in New York. Bensinger Oct. Decl. ¶¶ 8-9.

In contrast, there is simply no connection whatsoever between the Source's communications with BuzzFeed and Florida.  Smith, Schoofs, Elder, and Bensinger have all submitted sworn evidence that *no part* of the communications with the Source, the investigation into the Dossier, the decision to publish it, or the writing or editing of the Article (with the exception of the fortuitous fact that Bensinger happened to be on vacation at Disney World on the day of publication, and took some phone calls and reviewed a draft of the Article from there) took place in Florida.  Bensinger Oct. Decl. ¶¶ 10-11; Smith Decl. ¶¶ 3-4; Schoofs Decl. ¶¶ 3-4; Elder Decl. ¶¶ 3-4; Ex. 25 (Declaration of Ken Bensinger executed March 13, 2017) ¶¶ 3-5.  In addition, none of the BuzzFeed employees involved in obtaining the Dossier or publishing it have any meaningful connections to this State, and BuzzFeed itself has no physical presence or employees in Florida.  Bensinger Oct. Decl. ¶ 7; Smith Decl. ¶ 2; Schoofs Decl. ¶ 1; Elder Decl. ¶ 1; Ex. 26 (Declaration of Roy Cysner executed March 13, 2017) ¶¶ 3-5.  Finally, Plaintiffs' connections to this State, which are minimal to begin with,[5] are simply irrelevant to the choice of law question

---

[5] All Plaintiffs have ever alleged in that one of them, Webzilla, Inc., is incorporated here and has some virtual office space and one employee or independent contractor in this State.  *See* ECF No. 21 at 4-5.  But there is no dispute that Plaintiff XBT Holding S.A. is both incorporated and headquartered in Luxembourg, Plaintiff Aleksej Gubarev is a resident of Cyprus, and even

16

presented here because the Restatement looks to the state with the most significant relationship with "the communication." Restatement § 139(2).

Similarly, the four factors set forth in the Restatement favor New York law. First, as discussed *supra*, New York's contacts with the publication of the Dossier are far more "numerous and important" than Florida's. *Id.* at cmt. d. Second, the identity of the Source is of, at most, marginal relevance either to the defense or the prosecution of this action. The first two, very practical factors, thus clearly favor New York. As to the third factor, the kind of privilege at issue, the Restatement looks to whether the foreign privilege, though different, is "generally similar to" a privilege the forum also recognizes, and whether it is the kind of privilege that "is well established and recognized in many states." *Id.* That factor clearly favors New York. For one thing, Florida also recognizes a strong reporter's privilege, as does virtually every other state. More importantly, however, all three jurisdictions with any plausible connection to BuzzFeed's investigation and publication of the Dossier – New York, California (Bensinger's domicile), and the District of Columbia (the center of government action related to the Dossier that supports the fair and true report defense) – recognize an absolute privilege for confidential sources. *See* N.Y. Civil Rights Law § 79-h(b); Cal. Const., art. I, § 2(b); D.C. Code § 16-4702.

The fourth factor, fairness to the parties, also strongly favors applying New York law. This factor primarily looks to whether the parties could reasonably have relied "on the fact that communications of the sort are treated in strict confidence in the state of the most significant relationship." Restatement § 139(2), cmt. d. Here the communications had nothing to do with Plaintiffs, but Mr. Bensinger has sworn that he has often promised confidentiality to sources, has never had those promises called into question, and that it never occurred to him when he was communicating with the Source that his ability to honor that promise could be called into question by a court in Florida. Bensinger Oct. Decl. ¶¶ 12-13. Indeed, where one state has "superior contacts with the dispute," the court may infer that the parties to the communication relied on its law. *Harrisburg Auth. v. CIT Capital USA, Inc.*, 716 F. Supp. 2d 380, 393 n.19 (M.D. Pa. 2010); *Equity Residential v. Kendall Risk Mgmt., Inc.*, 246 F.R.D. 557, 566 (N.D. Ill. 2007) (applying Connecticut attorney-client privilege law under Restatement because "[h]ad they sought guidance

---

Webzilla, Inc. has its principal place of business in Texas. *See* ECF No. 15-1, Exs. 4 and 9; Sept. 28 Tr. at 12.

on the scope of the privilege, all of the individuals involved in these communications would likely have consulted Connecticut law rather than Illinois law, to determine whether their discussions would be privileged").

In this way, this case is much like *Mazzella*. In that case, a New York plaintiff sued a Philadelphia newspaper in New York and the defendant invoked the Pennsylvania Shield Law. Even though the action was pending in New York, the court held that the Pennsylvania privilege law applied. 479 F. Supp. at 527. As the Court wrote, "although plaintiffs are New York citizens, defendants are citizens of Pennsylvania, and by Plaintiff's admissions, circulate the Inquirer principally in the metropolitan area of Philadelphia … the events that led to the newspaper article, including the news gathering and confidential communications, apparently occurred in Pennsylvania." *Id*.

Similarly, in *Compuware*, the court held that, because the allegedly defamatory statement was published and distributed in New York, and "New York is the center of the financial publishing industry, and the New York companies who gave these materials to Moody's, also a New York company, surely relied on the protections of New York law," the New York Shield Law applied even though the case was brought in Michigan. 222 F.R.D. at 133. [6]

---

[6] Finally, while not dispositive either way, one additional factor that favors the application of the law of the state with the most significant relationship to the privilege issue is that it remains unsettled whether Florida law will even apply to this case at all. Nothing in Judge Ungaro's May 22, 2017 order denying Defendants' motion to dismiss this case for lack of personal jurisdiction or transfer it to the Southern District of New York, ECF No. 27, precludes ultimately applying New York law to Plaintiffs' defamation claims. Judge Ungaro simply wrote in the context of her transfer analysis that, at that preliminary stage, she did "not agree that Defendants have shown that New York law should apply to this defamation case." *Id*. at 28. Judge Ungaro did not conduct a full choice of law analysis and certainly did not hold that Florida law applies or that Florida has a more significant connection to the case than did New York. Judge Ungaro confirmed this at the most recent status conference, stating that "there is this choice of law issue that's kicking around," which "pervades the [entire] case." Sept. 29 Tr. at 8.

Under the Restatement, the law that would typically apply to an internet defamation case would be either the domicile of an individual plaintiff, or the principal place of business of a corporate plaintiff. *Restatement (Second) Conflict of Laws* § 150 (2) & (3). Florida does not even make that list as a potential candidate, since the relevant jurisdictions would be Cyprus, Luxembourg, or Texas. Given the absence of any substantial connections to this or any other state by Plaintiffs, the factors the Restatement then points to are "(a) the state or states where the defendant did his act or acts of communication, such as assembling, printing and distributing a magazine or book and (b) the state or states of the defendant's domicile, incorporation or

18

Finally, an additional "special factor" here is that the reporter's privilege will also be raised by Defendants in the *Fridman* case if there is any discovery concerning the Source. The parties to that case agree that it is governed by New York law. Subjecting the same journalist-source communications to two different standards would be unfair to both Defendants and the Source, and would only illustrate the importance of ensuring that a news organization like BuzzFeed is not "subject … to the privilege laws of all fifty states" and "[t]he possibility of conflicting decisions in different states." *Anas*, 141 F.R.D. at 532. In such circumstances, earning the confidence of sources who need confidentiality becomes impossible, and the public's access to important information suffers. *See, e.g.*, *Miller I*, 621 F.2d at 725 ("[F]orced disclosure of journalists' sources might deter informants from giving their stories to newsmen, except anonymously. This might cause the press to face the unwelcome alternatives of not publishing because of the inherent unreliability of anonymous tips, or publishing anonymous tips and becoming vulnerable to charges of recklessness."); *see also* Bensinger Oct. Decl. ¶¶ 12-13.

For all these reasons, to the extent that there is a conflict between New York and Florida law, this Court should apply New York's absolute protection for confidential sources.

## C.   Defendants Have Not Waived The Privilege

Finally, at the September 28 Hearing this Court asked Defendants to address Plaintiffs' argument that the reporter's privilege was waived because Defendants were supposedly relying on information protected by the privilege – i.e., the identity of the Source – in asserting their defenses, thus allegedly using the privilege as both a sword and a shield. The unequivocal answer is no, for two reasons.

First, for all the reasons previously stated, Defendants are not using the privilege as either a "sword" or a "shield" because none of their defenses turn on the Source's identity. Plaintiffs

---

organization and principal place of business." *Id.* at cmt (e). Those factors obviously point to New York, as does the fact that since the motion to dismiss in this case, the *Fridman* case has been filed in New York under New York law. Applying Florida law here would mean different laws would be applied to the same publication, which would undermine the goals of uniformity and consistency. Of course, as with the privilege issue, there may be no need to engage in a choice-of-law analysis unless an actual conflict regarding substantive defamation law exists as between Florida and New York. Nonetheless, the fact that whether the law of the forum will apply at all may reasonably be disputed is yet another "special reason" to apply the privilege law of the state with the most significant relationship to the privilege issue, which is clearly New York.

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

have simply invented that contention.  Second, even if Defendants were relying on the Source's identity (which they are not), in both Florida and New York the "sword and shield" doctrine does not effect a waiver of the reporter's privilege.  In fact, at least in Florida it does not effect a waiver of any privilege in the context of affirmative defenses.

In *TheStreet.com, Inc. v. Carroll*, 20 So. 3d 947, the Fourth District applied well-established Florida law that the sword-and-shield doctrine only applies to "claims or pleadings seeking affirmative relief", and does not apply where "the discovery in dispute related to an affirmative defense." *Id.* at 949.  Moreover, with respect to the reporter's privilege the Court further noted that even if a sword and shield problem were presented, "the proper remedy would be to dismiss or strike petitioners' defenses [to which the confidential source information is necessary] and not to compel production of the very information claimed to be privileged." *Id.*

New York law is no different.  The New York Court of Appeals has held that, while there might be other litigation consequences if a journalist relies on a confidential source in support of his or her defenses, divesting the journalist of the absolute protection provided by the Shield Law is not an option. *Oak Beach Inn Corp. v. Babylon Beacon*, 62 N.Y.2d 158, 166 (1984).  Moreover, New York courts applying those principles have held that no adverse consequences may be warranted at all as long as the journalist is not exclusively relying on a single confidential source. *See, e.g.*, *Sprewell*, 43 A.D.3d at 18-19; *Bement v. N.Y.P. Holdings, Inc.*, 307 A.D.2d 86, 91 (N.Y. App. Div. 2003) (granting defendant summary judgment on actual malice grounds based on information received from confidential source).

In short, there is no sword and shield issue presented here at all.  But even if there were, that doctrine would need to be, at most, raised in connection with motion practice directed at the substantive claims and defenses in this case, not as part of this discovery dispute.  Defendants therefore have not waived their right to invoke the reporter's privilege.

## CONCLUSION

Plaintiffs have not demonstrated a compelling need – or really any need – for the identity of the Source and have not made any efforts to obtain that information from a third party.  Under any test, therefore, they have not overcome the reporter's privilege.  This Court should, therefore, deny the motion to compel.

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

Date:  October 16, 2017

Respectfully submitted,

Davis Wright Tremaine, LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020

By: /s/ Katherine M. Bolger
        Katherine M. Bolger, Esq.
        Adam Lazier, Esq.
        Nathan Siegel, Esq.
        katebolger@dwt.com
        adamlazier@dwt.com
        nathansiegel@dwt.com

-and-

Black, Srebnick, Kornspan & Stumpf, P.A.
201 S. Biscayne Boulevard, Suite 1300
Miami, Florida 33131
Tel:     (305) 371-6421

By: /s/ Jared Lopez
        Roy Black, Esq.
        Florida Bar No. 126088
        Jared Lopez, Esq.
        Florida Bar No. 103616
        rblack@royblack.com
        jlopez@royblack.com
        civilpleadings@royblack.com

*Attorneys for Defendants*

21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:17-cv-60426-UU

ALEKSEJ GUBAREV, XBT HOLDING
S.A., AND WEBZILLA, INC.,

        Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

        Defendants.

_____/

## CERTIFICATE OF SERVICE

I CERTIFY that on October 16, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: /s/ Jared Lopez
Jared Lopez, Esq.

22