SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------- x
MIKHAIL FRIDMAN, PETR AVEN, AND
GERMAN KHAN,

                    Plaintiffs,

              -v-

BUZZFEED, INC., BEN SMITH, KEN
BENSINGER, MIRIAM ELDER, AND MARK
SCHOOFS

                    Defendants.
---------------------------------------------------------------- x

Index No. 154895/2017

## AMENDED ANSWER OF DEFENDANTS BUZZFEED, INC., BEN SMITH, KEN BENSINGER, MIRIAM ELDER, AND MARK SCHOOFS TO PLAINTIFFS' COMPLAINT

        Defendants BuzzFeed, Inc. ("BuzzFeed"), Ben Smith ("Smith"), Ken Bensinger ("Bensinger"), Miriam Elder ("Elder"), and Mark Schoofs ("Schoofs") (collectively, "Defendants"), answer the Complaint (the "Complaint") of Plaintiffs Mikhail Fridman, Petr Aven, and German Khan (collectively, "Plaintiffs") as follows, using the same headings and paragraph numbering employed by Plaintiffs:

### INTRODUCTION

        1.      Defendants admit that on January 10, 2017, BuzzFeed published an article with a byline crediting Bensinger, Elder and Schoofs entitled *These Reports Allege Trump Has Deep Ties to Russia* (the "Article"), accompanied by a 35-page page intelligence dossier (the "Dossier"). Defendants further admit that Smith, the Editor-in-Chief of BuzzFeed News, made the decision to publish the Article and Dossier. Defendants also admit that Plaintiffs assert certain claims arising out of the publication of the Article and the Dossier. Except as so admitted, Defendants deny each and every allegation in paragraph 1 of the Complaint.

1

4818-3435-0156v.5 0100812-000008

2. Defendants respectfully refer the Court to the Article and Dossier for their true content and meaning, admit that BuzzFeed did not contact Plaintiffs before publishing the Article and Dossier and, except as so referred and admitted, deny each and every allegation in paragraph 2 of the Complaint.

3. Defendants deny each and every allegation in paragraph 3 of the Complaint.

## THE PARTIES

4. Defendants lack sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 4 of the Complaint, and on that basis deny each and every allegation contained therein.

5. Defendants admit the allegations in paragraph 5 of the Complaint.

6. Defendants admit the allegations in paragraph 6 of the Complaint.

7. Defendants admit that Bensinger is an investigative reporter for BuzzFeed News based in Los Angeles, California and has a byline on the Article.

8. Defendants admit that Elder is the World Editor for BuzzFeed News, that Schoofs is the News Investigations Editor for BuzzFeed News, and that both have bylines on the Article.

9. Paragraph 9 calls for a legal conclusion for which no response is required, but, to the extent that any such response is required, Defendants admit that Smith, Bensinger, Elder and Schoofs are employed by BuzzFeed.

## FACTUAL ALLEGATIONS

10. Defendants admit that BuzzFeed published the Article and Dossier on January 10, 2017, respectfully refer the Court to the Article and Dossier for their true content and meaning,

and except as so referred and admitted, Defendants deny each and every allegation in paragraph 10 of the Complaint.

11.     Defendants respectfully refer the Court to the Article and Dossier for their true content and meaning, and except as so referred, Defendants deny each and every allegation in paragraph 11 of the Complaint.

12.     Defendants respectfully refer the Court to the Article and Dossier for their true content and meaning, and, except as so referred, Defendants deny each and every allegation in paragraph 12 of the Complaint.

13.     Defendants admit that the Article and Dossier were published on the website www.buzzfeed.com, and except as so admitted, Defendants deny each and every allegation in paragraph 13 of the Complaint.

14.     Defendants respectfully refer the Court to the Article for its true content and meaning, and except as so referred, Defendants deny each and every allegation in paragraph 14 of the Complaint.

15.     Defendants lack sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 15 of the Complaint, and on that basis deny each and every allegation contained therein.

16.     Defendants respectfully refer the Court to the Article and Dossier for their true content and meaning, and except as so referred, Defendants deny each and every allegation in paragraph 16 of the Complaint.

17.     Defendants deny each and every allegation in paragraph 17 of the Complaint.

18.     Defendants deny each and every allegation in paragraph 18 of the Complaint.

19. Defendants respectfully refer the Court to the Article and Dossier for their true content and meaning, and except as so referred, Defendants deny each and every allegation in paragraph 19 of the Complaint.

20. Defendants respectfully refer the Court to the Article and Dossier for their true content and meaning, and except as so referred, Defendants deny each and every allegation in paragraph 20 of the Complaint.

21. Defendants respectfully refer the Court to the Article and Dossier for their true content and meaning, and except as so referred, Defendants deny each and every allegation in paragraph 21 of the Complaint.

22. Defendants deny each and every allegation in paragraph 22 of the Complaint.

23. Defendants respectfully refer the Court to the Article and Dossier for their true content and meaning, and except as so referred, Defendants deny each and every allegation in paragraph 23 of the Complaint.

24. Defendants deny each and every allegation in paragraph 24 of the Complaint.

25. Defendants deny each and every allegation in paragraph 25 of the Complaint.

26. Defendants respectfully refer the Court to the Article and Dossier for their true content and meaning, and except as so referred, Defendants deny each and every allegation in paragraph 26 of the Complaint.

27. Defendants deny each and every allegation in paragraph 27 of the Complaint.

28. Defendants deny each and every allegation in paragraph 28 of the Complaint.

## FACTUAL ALLEGATIONS

29. Defendants repeat and reallege each and every admission, denial, and referral made in response to paragraphs 1 through 28 of the Complaint as if made in response to paragraph 29.

30. Defendants deny each and every allegation in paragraph 30 of the Complaint, and all of its subparts.

31. Defendants deny each and every allegation in paragraph 31 of the Complaint.

32. Defendants deny each and every allegation in paragraph 32 of the Complaint.

33. Defendants respectfully refer the Court to the Article and the Dossier for their true content and meaning, and except as so referred, Defendants deny each and every allegation in paragraph 33 of the Complaint.

34. Defendants deny each and every allegation in paragraph 34 of the Complaint.

To the extent a response to the Wherefore clause is required, Defendants deny each and every allegation contained therein.

## AFFIRMATIVE DEFENSES

### First Defense

Defendants' publication of the allegedly defamatory statements in the Dossier, within the context of the Article, is protected by a fair report privilege pursuant to New York Civil Rights Law § 74 and/or Article I, Section 8 of the New York State Constitution, because:

1. The Article reported on multiple ways in which the Dossier, which included the allegedly defamatory statements, was the subject of activity within the prescribed duties of public bodies and public officials, who were officially empowered to undertake the actions with respect to the Dossier referenced in the Article.

5

4818-3435-0156v.5 0100812-000008

2. The Article reported that a two-page synopsis of the Dossier was given to then-President Obama and President-elect Trump. The Article also contained a hyperlink to a CNN news report, which provided more details about those briefings. *See* Exhibit 1. The CNN report stated that the synopsis of the Dossier was appended to a report provided by US intelligence and law enforcement agencies to the President and President-elect. It reported that the briefings were presented "by four of the senior-most US intelligence chiefs -- Director of National Intelligence James Clapper, FBI Director James Comey, CIA Director John Brennan, and NSA Director Admiral Mike Rogers."

3. The Article, as well as the hyperlinked CNN report, was accurate. On or about January 6, 2017 the Dossier was the subject of separate briefings provided to President Obama and Vice-President Biden, and to then President-elect Trump. Those briefings were conducted by the Director of National Intelligence, James Clapper, the CIA Director, Michael Brennan, the FBI Director, James Comey, and/or the Director of the National Security Agency, Michael Rogers. A synopsis of the Dossier was also provided.

4. Vice-President Biden subsequently stated that he understood from the briefing that "the FBI thought they had to pursue [the Dossier]." Director Clapper also confirmed that the briefings were conducted pursuant to the Intelligence Community's "obligation [] to ensure that policymakers are provided with the fullest possible picture of any matters that might affect national security."

5. The briefings the Article reported about were activities within the prescribed duties of public bodies and public officials, who were officially empowered to undertake the actions they did.

6

4818-3435-0156v.5 0100812-000008

6. The Article also reported that Senator John McCain gave a full copy of the Dossier to FBI Director Comey, but that the FBI already had much of its contents. The hyperlinked report provided additional details, explaining that Senator McCain learned about the memos from a former British diplomat. The CNN report stated that "the FBI is investigating the credibility and accuracy of these allegations", but had not yet confirmed many of the "essential details." It also reported that the Dossier's author had provided copies directly to the FBI.

7. The Article also contained a hyperlink to an article published on October 31, 2016 by *Mother Jones*, which reported extensively about the Dossier. That article reported that in August 2016 the FBI requested the Dossier's author to provide it with the memos he had written to that date, and that subsequently the author continued to provide the FBI with information that he developed.

8. The Article, including the hyperlinked CNN and *Mother Jones* reports, was accurate. In November 2016, United States Senator John McCain attended a conference on international affairs in Canada, where he learned about the Dossier and subsequently received a copy.

9. On or about December 9, 2017, Senator McCain and/or his Senate staff delivered a copy of the Dossier to FBI Director Comey, including the portion containing the allegedly defamatory statements. Senator McCain explained to *Fox News* that he delivered the Dossier to the FBI because he considered the Dossier to have come from "a credible source" and that it would have been "a breach of my oath of office" to have not provided the document to the law enforcement agency.

10. Senator McCain's actions were within his capacity as a United States Senator.

11. At the time the Article was published, the Dossier was in fact the subject of an official investigation by the FBI. Upon information and belief, the allegations in the Dossier continued to be investigated by the FBI thereafter.

12. The FBI's actions in obtaining and investigating the allegations in the Dossier were within its prescribed duties as a federal law enforcement agency. The FBI was empowered to undertake the actions that it did with the Dossier

13. The Article also reported that former Democratic Senate Majority Leader Harry Reid had reviewed the Dossier before writing a letter to Director Comey about President Trump's ties to Russia. Both the CNN and *Mother Jones* reports that were hyperlinked also provided additional details about Reid's October, 2016 letter. Both reported that Reid wrote, in the letter that he had previously made public, that "[i]t has become clear that you possess explosive information about close ties and coordination between Donald Trump, his top advisors, and the Russian government -- a foreign interest openly hostile to the United States", and the letter called for Comey to make the "information", which included the Dossier, public.

14. The Article, as well as the hyperlinked reports, was accurate. Prior to October 30, 2016, then-Senate Majority Leader Harry Reid also learned about the contents of the Dossier. On or about October 30, 2016, Senator Reid wrote a letter to FBI Director Comey, stating that "In my communications with you and other top officials in the national security community, it has become clear that you possess explosive information about close ties and coordination between Donald Trump, his top advisors, and the Russian government", and he urged Director Comey to make that information public. Senator Reid was referring to the Dossier in his letter to Director Comey.

15. Senator Reid's actions were undertaken in his official capacity as a United States Senator. As the CNN report noted, other members of the Congressional leadership were also briefed on the Dossier's contents on or about January 6, 2017 by intelligence and law enforcement officials.

16. In each of the examples alleged in paragraphs 1-15 above of this First Affirmative Defense, the Article, along with the sources to which it hyperlinked, reported about activities within the prescribed duties of public bodies and public officials the focused on the Dossier, including but not limited to the White House, FBI, CIA, NSA, ODNI, the United States Senate and one or more of its committees, the United States House of Representatives and one or more of its committees, and James Comey, James Clapper, Michael Rogers, Michael Brennan, Senators John McCain and Harry Reid, former President Obama and Vice-President Biden, President-elect Trump, and numerous other government officials whose identities are currently unknown. All of those persons were officially empowered to undertake their activities concerning the Dossier. In each instance, the Article's report was substantially accurate.

17. The Dossier that was attached to the Article, including the allegedly defamatory statements, was republished *verbatim*. Buzzfeed's publication was a therefore a substantially accurate publication of the Dossier of the allegedly defamatory statements.

## Second Defense

Defendants' publication of the allegedly defamatory statements in the Dossier, within the context of the Article, is protected by a neutral report privilege pursuant to the common law, the First and Fourteenth Amendments to the Constitution of the United States, and/or Article I, Section 8 of the New York State Constitution.

1. Prior to October 30, 2016, then-Senate Majority Leader Harry Reid learned about the contents of the Dossier. On or about October 30, 2016, Senator Reid wrote a letter to FBI Director Comey, stating that "In my communications with you and other top officials in the national security community, it has become clear that you possess explosive information about close ties and coordination between Donald Trump, his top advisors, and the Russian government", and he urged Director Comey to make that information public. Senator Reid was referring to the Dossier in his letter to Director Comey, and wrote the letter in part because he deemed the Dossier to be sufficiently credible to warrant its public release.

2. On October 31, 2016, a well-regarded investigative reporter for *Mother Jones*, published a lengthy article revealing the existence and nature of the Dossier. The article quoted a senior government official who stated that the Dossier's author, identified in the report as "a former senior intelligence officer for a Western country who specialized in Russian counterintelligence" (and who has since been identified as Christopher Steele), "has been a credible source with a proven record of providing reliable, sensitive, and important information to the US government."

3. Steele told Corn that "he concluded that the information he had collected on Trump was "sufficiently serious" to share with the FBI." He also told Corn that in or around August 2016, the FBI asked him to provide it with all the reports in his possession, and to continue to do so as Steele developed new reports.

4. In November 2016, United States Senator John McCain attended a conference on international affairs in Canada. Senator McCain attended the conference in his capacity as a United States Senator. At that conference Sir Andrew Wood, a former ambassador to Moscow

from the United Kingdom, discussed the existence of Steele's research with Senator McCain. Subsequently, Senator McCain received a copy of the Dossier.

5. As the Article reported, on or about December 9, 2017, Senator McCain and/or his Senate staff delivered a copy of the Dossier to FBI Director Comey. Senator McCain explained to Fox News that he delivered the Dossier to the FBI because he considered the Dossier to have come from "a credible source" and that it would have been "a breach of my oath of office" to have not provided the document to the law enforcement agency.

6. On or about January 10, 2017, prior to Buzzfeed's publication of the Article and Dossier, *CNN* reported that then-President Obama, Vice President Biden, and then President-elect Trump were briefed on the contents of the Dossier, and were provided a two-page synopsis of its contents. CNN also reported that "US intelligence agencies have now checked out the former British intelligence operative and his vast network throughout Europe and find him and his sources to be credible enough to include some of the information in the presentations to the President and President-elect a few days ago."

7. Buzzfeed's publication of the Dossier, within the context of the Article, was accurate and disinterested, and the Article did not endorse the allegations within the Dossier, including the allegedly defamatory statements. The Article reported that the allegations the Dossier contained were unverified, and identified two factual errors.

8. The Article and Dossier concerned newsworthy controversies. Those included, but are not limited to, the nature of the Plaintiffs' relationship with the Russian government, their business conduct, potential Russian interference in the 2016 Presidential election campaign, and allegations that the Trump campaign had participated in that interference.

9. The allegations within the Dossier were made by a former British intelligence officer who multiple public officials deemed to be sufficiently credible and responsible to warrant further investigation. Buzzfeed published the Article and Dossier only after at least two United States Senators had deemed its contents to warrant delivery to and/or investigation by the FBI, and the FBI had in fact began to investigate it.

### Third Defense

Defendants' publication of the allegedly defamatory statements in the Dossier, within the context of the Article, is protected by the First and Fourteenth Amendments to the Constitution of the United States, and/or Article I, Section 8 of the New York State Constitution. Defendants incorporate by reference the allegations of the First, Second and Fourth Affirmative Defenses.

### Fourth Defense

While Defendants do not believe it is necessary to plead the following as an Affirmative Defense, in an abundance of caution Defendants repeat and hereby incorporate by reference paragraph 33 of their Answer and further state that Plaintiffs are public figures who cannot meet their burden to prove actual malice by clear and convincing evidence.

1. Plaintiffs were three key players in the economic transformation of Russia, and have retained their status as oligarchs wielding significant economic and political power in that country and elsewhere in the world economy.

2. Plaintiffs are, and have for several decades been, among the most well-known and notorious businessmen in the Western World.

3. Plaintiffs have taken numerous affirmative steps to attract public attention, including (but not limited to) attention and publicity concerning their business and political relations with the Government of Russia, including since Vladimir Putin became its President.

4. Plaintiffs are the principal owners of Alfa Group, Russia's largest business conglomerate which includes Alfa Bank, one of the country's largest banks.

5. Petr Aven served as one of the chief economic advisers to President Yeltsin as is one of the architects of the post-Soviet Russian economy. Plaintiffs all became enormously wealthy in that era.

6. Plaintiffs' business activities, and their business and political relationship with the Government of Russia, including Vladimir Putin, have long been the subject of intense public controversy. Plaintiffs have repeatedly participated in those controversies by way of both their activities and statements to the international news media.

7. Plaintiffs have been the subject of, discussed in, or quoted in thousands of media reports between 1996-2016, the time period relevant to the allegedly defamatory statements in the Dossier.

8. The United States District Court for the District of Columbia has already determined that Plaintiffs Fridman and Aven were public figures more than ten years ago, for purposes of another defamation case against a digital media organization. It held that "Fridman and Aven are recognized as two of the most powerful Russian oligarchs. They have maintained a close relationship to the highest reaches of the Russian government, and forged a series of friendships and alliances with Russian luminaries and politicians." *OAO Alpha Bank v. Center for Public Integrity*, 387 F.Supp.2d 20, 26 (D.D.C. 2005). The same facts apply to Plaintiff Khan as well.

9. Aven and Fridman have assumed an unforeseen level of prominence and influence in the economic and political affairs of their nation. Id. at 27. So has Plaintiff Khan.

10. Aven and Fridman have been dogged by allegations of corruption and illegal conduct for decades, and have repeatedly engaged with the media in try to defend their economic and political activities. Id. So has Plaintiff Khan.

11. For example, Fridman has acknowledged, that the "rules of business" in Russia "are quite different to western standards.... To say one can be completely clean and transparent is not realistic." Id.

12. Petr Aven, the first Minister for Foreign Economic Relations during Boris Yeltsin's Presidency, described aspects of their economic program as "pure stealing of Russian property."

13. The Plaintiffs' international business conduct, including their relationship to President Putin, has continued to attract intense public scrutiny to this date.

14. For example, in 2015, Plaintiffs Fridman and Khan engaged in a controversial sale of their oil assets to Russia's state-owned oil company, which *Forbes* called "another move by Vladimir Putin to centralize power?" The sale was covered by hundreds of reports in major international media, and was described by *Reuters* as "one of the biggest energy takeovers in history."

15. In 2015, the government of the United Kingdom ordered Fridman and Khan to sell all of their oil assets in that country, out of concern that their connections to the Russian government could invite sanctions. The controversy was covered by all major international media.

16. In a widely-publicized 2010 lecture entitled "How I Became an Oligarch", Plaintiff Fridman boasted that he is one of a small number of Russian businessmen who formed a group that is "the most influential public organization in the business sphere today." According

14

4818-3435-0156v.5 0100812-000008

to Fridman, "We really do try, as far as it is possible in our socio-political conditions, to influence the economic policy of government and the legislative policy of the State Duma, deputies and ministers." He boasted of the group's regular meetings with President Putin. Plaintiff Khan also participates in similar meetings with President Putin. As President of Alfa Bank, Plaintiff Aven also participates in meetings with Putin, such as a 2013 publicized meeting in which Putin pressured bankers to lower interest rates to help the Russian economy.

17. In 2016, Fridman told the *Financial Times* that a key to the Plaintiffs' success was that "We never wanted to challenge authority," he says. "We always followed this philosophy — always to be loyal and friendly [to the government] but never to be too close."

18. Fridman also told that *Financial Times* in 2016 that he teamed up with Plaintiff Aven in the mid-1990s because "We needed a channel for communication with the government . . . We didn't know anyone, and he was this very smart guy, young, energetic and liberal."

19. Mikhail Fridman is ranked 75th on the Forbes List of Global Billionaires, and ranked seventh richest individual in Russia, with an estimated current net worth over $15 Billion. Petr Aven is ranked 359th on the Forbes List of Global Billionaires, and ranked 24th richest individual in Russia, with an estimated current net worth over $4.5 Billion. Aven heads Alfa Bank to this day. German Khan is ranked 138th on the Forbes List of Global Billionaires, and ranked 11th richest individual in Russia, with an estimated net worth over $9 Billion. Khan was appointed the head of Alfa Group's wholesale trade business Alfa Eco where he was instrumental in involving the company in a lucrative export business and oil trade. When Alfa bought Tyumen Oil (TNK) in 1997, Khan joined the board of directors, where he played a significant role in forming a joint venture with British Petroleum (BP), in what was the biggest foreign investment in Russia to date. TNK-BP became Russia's third largest oil company, and

when the company was sold in 2013 for $56 billion, Khan joined Fridman and Aven in establishing LetterOne, an international investment firm.

20. Plaintiffs' friendships and alliances with Russian luminaries and politicians, including Vladimir Putin, have long been the subject of public scrutiny. In the early '90s, Aven worked with Vladimir Putin in the St. Petersburg government—and according to several accounts, including Karen Dawisha's history of the period, *Putin's Kleptocracy*, helped Putin wiggle out of accusations of corruption that might have derailed his ascent.

21. Plaintiffs have widespread access to the media and other channels of communications. In addition to numerous press interviews, Plaintiffs have spoken to numerous influential organizations in the United States, such as the Keenan Institute and the Carnegie Endowment for International Peace. The Alfa Group has also devoted millions to developing a public relations strategy that includes in-house press departments, an external public relations agency, a litany of press releases, and an English-language web site on which plaintiffs post their own articles as well as favorable press coverage.

22. In November 2016, Alfa Bank issued a statement on behalf of Fridman and Aven denying that they had any secret involvement with the Trump campaign: "Neither Alfa Bank nor its principals, including Mikhail Fridman and Petr Aven, have or have had any contact with Mr. Trump or his organizations. Fridman and Aven have never met Mr. Trump nor have they or Alfa Bank had any business dealings with him. Neither Alfa nor its officers have sent Mr. Trump or his organizations any emails, information or money. Alfa Bank does not have and has never had any special or exclusive internet connection with Mr. Trump or his entities."

23. In December 2016, Fridman praised the choice of Rex Tillerson as Secretary State to *Bloomberg News*, which reported that he said Tillerson would make a good choice from the Russian perspective because he has close ties to Putin and Igor Sechin.

24. In September 2016, Aven spoke to *Politico* to claim that rumors that Alfa Bank had paid for Carter Page, a reputed Trump advisor, to come to speak in Moscow were not true.

### Fifth Defense

Plaintiffs have failed to mitigate their alleged damages.

### Sixth Defense

Exemplary or punitive damages are not recoverable because Defendants did not act with either common-law malice or constitutional malice.

### Seventh Defense

Any claim for exemplary or punitive damages is barred by the First and Fourteenth Amendments to the Constitution of the United States and/or Article I, Section 8 of the New York State Constitution.

**WHEREFORE**, Defendants respectfully request that:

1. Judgment be entered in their favor, and the Complaint against them be dismissed with prejudice;

2. Defendants be awarded their costs, disbursements, and attorneys' fees; and

3. The Court grant Defendants such further and other relief as is just and proper.

Dated: New York, New York
October 5, 2017

                                  LEVINE SULLIVAN KOCH & SCHULZ, LLP

                                  By: *[signature]*
                                  Katherine M. Bolger
                                  Nathan Siegel
                                  Adam Lazier

                                  321 West 44th Street, Suite 1000
                                  New York, NY 10036
                                  Tel: (212) 850-6123
                                  Fax: (212) 850-6299

                                  *Counsel for Defendants*