UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 17-60426-CIVIL-UNGARO

ALEKSEY GUBAREV,                      Miami, Florida
XBT HOLDINGS, S.A., and
WEBZILLA, INC.,

                Plaintiffs,           September 28, 2017

        vs.                           10:00 a.m.

BUZZFEED, INC., and
BEN SMITH,

                Defendants.        Pages 1 to 103
_____

                    DISCOVERY HEARING
         BEFORE THE HONORABLE JOHN J. O'SULLIVAN,
              UNITED STATES MAGISTRATE JUDGE
         (TRANSCRIBED FROM THE DIGITAL AUDIO RECORDING)

APPEARANCES:


FOR THE PLAINTIFFS:      EVAN FRAY-WITZER, ESQ.
                         CIAMPA, FRAY-WITZER, LLP
                         20 Park Plaza
                         Suite 505
                         Boston, Massachusetts 02116


                         VALENTIN GURVITZ, ESQ.
                         BOSTON LAW GROUP, PC
                         825 Beacon Street
                         Suite 20
                         Newton Centre, Massachusetts 02459


                         BRADY COBB, ESQ.
                         TRIPP SCOTT
                         110 Southeast Sixth Street
                         Fifteenth Floor
                         Fort Lauderdale, Florida 33302

1    <u>APPEARANCES, CONT'D:</u>

2    FOR THE DEFENDANTS:        KATHERINE M. BOLGER, ESQ.
                                DAVIS WRIGHT TREMAINE, LLC
3                               1251 Avenue of the Americas
                                21st Floor
4                               New York, New York 10020

5
                                NATHAN SIEGEL, ESQ.
6                               DAVIS WRIGHT TREMAINE, LLC
                                1919 Pennsylvania Avenue, NW
7                               Suite 800
                                Washington, DC 20006

8

9                               JARED M. LOPEZ, ESQ.
                                BLACK, SREBNICK, KORNSPAN & STUMPF
10                              201 South Biscayne Boulevard
                                Suite 1300
11                              Miami, Florida 33131

12

     TRANSCRIBED BY:            LISA EDWARDS, RDR, CRR
13                              Reporterlisaedwards@gmail.com
                                (305) 439-7168

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  We're here today in the case of Aleksej --
 2   how do you say it? --
 3              MR. GUBAREV:  Mr. Gubarev.
 4              THE COURT:  -- Gubarev versus XBT Holdings, S.A., and
 5   Webzilla, Inc., versus -- I'm sorry -- and XBT Holdings and
 6   Webzilla versus Buzzfeed, Inc., and Ben Smith, Case No. --
 7   let's see -- 17-Civil-60426.  It's a Judge Ungaro case.  And
 8   we're here on two discovery issues.
 9              Could I have appearances, for the Plaintiff first.
10              MR. FRAY-WITZER:  Good morning, your Honor.  Evan
11   Fray-Witzer for the Plaintiffs.
12              THE COURT:  Thanks.
13              MR. GURVITS:  Good morning, your Honor.  Val Gurvits
14   for the Plaintiffs.
15              THE COURT:  Thanks.
16              MR. COBB:  And good morning, your Honor.  Brady Cobb
17   for Plaintiffs.
18              THE COURT:  Thanks.  Okay.
19              And for the Defendants?
20              MS. BOLGER:  Katherine Bolger on behalf of all
21   Defendants.
22              THE COURT:  Thanks.
23              MR. SIEGEL:  Good morning, your Honor.  Nathan Siegal
24   for all Defendants.
25              THE COURT:  Thanks.
```

4

1              MR. LOPEZ:  Good morning, your Honor.  Jared Lopez on

2    behalf of the Defendants.

3              THE COURT:  Okay.  Good.

4              You can be seated unless you're addressing the Court.

5              Let's address the Plaintiffs' issues first.

6              MR. FRAY-WITZER:  Thank you, your Honor.

7              Your Honor, just so that you understand, immediately

8    before the conference started, we spoke with defense counsel.

9    Apparently, they are going to produce responsive documents with

10   respect to the damages issue, which was the second of our two

11   issues noticed.

12             So the only one that I need to speak about from the

13   Plaintiffs' side will be the reporter's privilege.

14             THE COURT:  That's good.  Do you want me to give you

15   another five minutes?  Maybe you can work that out.

16             (Laughter.)

17             MR. FRAY-WITZER:  I tried, your Honor.

18             THE COURT:  See, now you have a good face-to-face and

19   you have to -- you know, you have to make these arguments with

20   a straight face.

21             All right.  Go ahead.

22             MR. FRAY-WITZER:  So, your Honor, with respect to the

23   reporter's privilege, first, you'll notice that the Defendants

24   have objected to almost every document request that we

25   submitted and a good number of the interrogatories that we

```
 1    submitted, asserting that they are entitled under a reporter's

 2    privilege not to produce the responsive documents and not to

 3    answer the interrogatories that were asked.

 4          There are a couple of questions that arise out of this

 5    preliminarily, but I'm not sure that they necessarily need to

 6    be decided at today's hearing.  One of them is which state's

 7    law is going to apply.  We obviously argue that it's Florida's

 8    law.  And if it's Florida's law, then it's Florida's reporter's

 9    statute, which is Section 90.5015.

10          We also argue that under Florida's statute, at least,

11    the way that the reporter's privilege is defined -- and it's

12    defined very specifically in Section 1-A -- Buzzfeed and Ben

13    Smith do not actually eventually qualify for the reporter's

14    privilege.

15          THE COURT:  Why is that?

16          MR. FRAY-WITZER:  Well, your Honor, the statute says

17    that to qualify for the privilege -- and there's a narrow

18    definition of who qualifies -- it is a newspaper, news journal,

19    news agency, press association, wire service, radio or

20    television station, network or news magazine, period.  And it

21    goes on to say --

22          THE COURT:  When was that statute written?

23          MR. FRAY-WITZER:  I --

24          THE COURT:  Before the invention of the Internet, I

25    suppose.
```

```
 1              MR. FRAY-WITZER:  I imagine that it did not, your

 2    Honor.  But again, it's up to the Legislature to fix that.

 3              THE COURT:  Is there a common-law reporter's privilege?

 4              MR. FRAY-WITZER:  And that is why I would say that it's

 5    probably not an issue that necessarily needs to get decided

 6    today.  Certainly the Defendants would argue that there's a

 7    common-law privilege.  The Defendants would argue that there's

 8    a federal common-law privilege, constitutional privilege.

 9              No matter which statute or privilege that you're

10    looking at, though, the one thing that they all have in common

11    is that they're not absolute privileges; they're a qualified

12    privilege.

13              And there are two steps to overcome the qualified

14    privilege.  The first is a showing that the information sought

15    is relevant and material to the -- to the actual case.  And the

16    second:  that the information sought cannot be obtained from

17    any other source.

18              So looking first just to the area that Buzzfeed at

19    least has an argument about -- and I'll get to all of the other

20    categories a little bit later, where they say, Well, we're not

21    going to give you financial information because of reporter's

22    privilege.  It makes no sense.

23              But with the categories that actually do make sense,

24    the primary one is:  Where did Buzzfeed get the dossier?

25              And so why is that relevant for the Plaintiffs?  Well,
```

```
 1    first of all, depending on whether or not the Plaintiffs are

 2    ultimately found to be private figures or public figures, we

 3    will have the burden of proving either negligence or actual

 4    malice, so knowledge of falsity or reckless disregard for the

 5    truth or falsity.

 6          What was Buzzfeed told when they were given the

 7    dossier?  Were they told that the information in it was

 8    unverified?  Were they told that there was information in it

 9    that was --

10          THE COURT:  Didn't they say that it was unverified in

11    the article?

12          MR. FRAY-WITZER:  They did say that it was unverified.

13    And they -- in fact, they also say in the article that there

14    are areas that they know are wrong, out-and-out wrong.

15          But the question is:  Were they handed the dossier and

16    did someone say to them, Look, before you print this thing, you

17    should run down whether or not the things in it are true?

18          Were they told, Before you print this thing, you should

19    redact out names because we're pretty sure that there's stuff

20    in here that isn't true?

21          Were they told -- and one suspicion, because it was a

22    limited number of parties that were actually given a copy of

23    the dossier -- were they given the dossier by another news

24    outlet that said to them, Look, we're not going to print this

25    thing because we can't verify the information in it; if you
```

1    want to do it, more power to you?

2           All of these things are going to go to the questions of

3    negligence and actual malice.

4           Were they given the dossier from a competitor of

5    Webzilla who saw an opportunity to hurt the company?  Again,

6    the questions as to who gave them the dossier, what they were

7    told when they were given the dossier, are clearly going to be

8    relevant, even if it's just to those questions.  But it's not

9    just to those questions.  The Defendants have asserted a fair

10   report privilege defense.  Well, the fair report privilege

11   defense applies only to reports of information received from

12   government officials or contained in official government

13   documents.

14          Did they receive the report from a government official?

15   There's no way we can know that unless we know who they

16   received the report from.

17          We do know --

18          THE COURT:  It's not an official document.  Right?

19          MR. FRAY-WITZER:  It's not an official government --

20          THE COURT:  Is [inaudible] admitting that?

21          MR. FRAY-WITZER:  Yeah.

22          We do know from Fusion GPS that the report didn't --

23          THE COURT:  What is that?  Fusion?

24          MR. FRAY-WITZER:  Fusion GPS -- and I'm sorry.  I

25   should have started with a little bit of the background.

1          But Fusion GPS is the opposition research firm in

2    Washington, DC, that was originally hired by someone to create

3    the Trump dossier.  They in turn turned to Orbis Business and

4    Christopher Steele of London, the former MI6 agent, who

5    gathered the information.

6          We have not yet been able to depose Fusion.  We're

7    making that attempt.  Fusion's fighting it.  But the one thing

8    that they have told us is Buzzfeed didn't get the dossier from

9    them.  Buzzfeed went to them and tried to get the dossier from

10   them and they refused to give it to Buzzfeed.

11          THE COURT:  The folks at Fusion GPS told you that?

12          MR. FRAY-WITZER:  That's what they -- that's what they

13   claim, yes, your Honor.

14          THE COURT:  Okay.  They just told you that informally

15   or you deposed them or they said that in some kind of filing

16   somewhere?

17          MR. FRAY-WITZER:  In response to our subpoenas and in

18   discussions about narrowing the categories, they've told it to

19   us.  It's not -- it's not in anything official yet and we

20   haven't been able to depose them because they have moved to

21   quash.

22          THE COURT:  And just to go back a little bit so I

23   understand, what do you contend that they did wrong as to your

24   client?

25          MR. FRAY-WITZER:  Okay.  Your Honor, on January 10th,

1    2017, Buzzfeed published what's become known as the Trump

2    dossier in its entirety without redacting any information as it

3    pertains to the Plaintiffs.  And the dossier included the

4    following.  And it's really one paragraph and it's very

5    targeted.  Although Buzzfeed wants to make it about the entire

6    dossier, it really isn't about the entire dossier.  And here's

7    what the dossier said:  "Blank" -- this is one thing that is

8    redacted -- "Blank reported that over the period March to

9    September 2016" --

10        THE COURT:  "Blank" being Steele, you think?

11        MR. FRAY-WITZER:  No.

12        THE COURT:  No?

13        MR. FRAY-WITZER:  It's whomever is Steele's source.

14        THE COURT:  Oh, I see.

15        MR. FRAY-WITZER:  And seeking that information from

16   Fusion is Steele.

17        THE COURT:  Right.

18        MR. FRAY-WITZER:  But the source reported that over the

19   period March to September 2016, a company called XBT/Webzilla

20   and its affiliates had been using botnets and porn traffic to

21   transmit viruses, plant bugs, steal data and conduct, quote,

22   "altering operations against the Democratic Party leadership.

23        "Entities linked to one Aleksey Gubarev were involved;

24   and he and another hacking expert, both recruited under duress

25   by the FSB, Sia Kapsguvich, were significant players in this

```
 1   operation."
 2         And then it goes on to talk a little bit about Michael
 3   Cohen, who is President Trump's personal lawyer.
 4         "In Prague, Cohen agreed to contingency plans for
 5   various scenarios to protect the operation, but in particular
 6   what was to be done in the event that Hillary Clinton won the
 7   presidency.  It was important in this event that all cash
 8   payments owed were made quickly and discreetly and that cyber
 9   and other operations were stood down/able to go effectively to
10   ground to cover their traces."
11         So as you might imagine --
12         THE COURT:  Gubarev owns Webzilla.  Is that correct?
13         MR. FRAY-WITZER:  I'm sorry, your Honor?
14         THE COURT:  Gubarev owns Webzilla?
15         MR. FRAY-WITZER:  Yes, your Honor.
16         THE COURT:  Okay.
17         MR. FRAY-WITZER:  And the XBT Companies is the umbrella
18   of Webzilla and a number of other companies that primarily
19   provide servers to businesses, over 40,000 clients.  They
20   provide server storage, among other things.
21         And as you might imagine, if you are an online storage
22   company, to have the accusation that you are an FSB agent,
23   former KGB, now FSB, that you are essentially coopted by the
24   FSB and you are launching hacking against the Democratic Party,
25   doesn't do wonders for your business.
```

1          THE COURT:  And what's Gubarev?  Is he a Russian or US

2     citizen or what is he?

3          MR. FRAY-WITZER:  He is --

4          THE COURT:  Is he a Russian --

5          MR. FRAY-WITZER:  Russian born, lives in Cyprus, your

6     Honor.

7          THE COURT:  Okay.  And he's a Russian national, then?

8          MR. FRAY-WITZER:  Yes, your Honor.

9          THE COURT:  Okay.

10          MR. FRAY-WITZER:  So getting back, then, to why the

11     information is relevant for our underlying case, in addition to

12     being relevant to the primary case in chief, it's also relevant

13     to the defenses that Buzzfeed has raised, their reporting

14     privilege, as I mentioned.

15          And I would argue that they can't have it both ways.

16     They can't maintain that they have a fair report privilege,

17     which, as I said, applies to information received from a

18     government official --

19          THE COURT:  Right.

20          MR. FRAY-WITZER:  -- and at the same time tell us, But

21     we're not going to tell you who we got the information from.

22     It's the sword and shield doctrine.

23          THE COURT:  Right.

24          MR. FRAY-WITZER:  You have it one way or the other.

25          The neutral reporting privilege only applies to

1    disinterested and neutral reports of official government

2    actions.  Again, you know, it's not an official government

3    action.

4              But again, what were they told and by whom?

5              If they were told by someone, Look, we'd like you to

6    publish this because we want to hurt Gubarev; if they were

7    told, We want you to publish this because we want to hurt

8    President Trump, that is not a disinterested or neutral report.

9    It is something that is pretty much the opposite of

10   disinterested and neutral.

11             They can't maintain the neutral reporter privilege

12   defense if they're going to tell us that they are not going to

13   tell us who they got the dossier from.  If they'd like to waive

14   both of those defenses, we can have a different discussion.

15   But they have not said that.

16             And then finally, your Honor, as I suggested at the

17   beginning, they've made wildly broad overassertions of this

18   privilege in response to inquiries that have nothing to do with

19   sources or anything of that source [sic].

20             And just a few of the categories:  Document Requests 5

21   through 9 ask about the amounts of traffic to the website that

22   resulted from the publication of the dossier.

23             This has nothing to do with sources.  It has nothing to

24   do with a reporter's privilege.

25             10 to 13:   Revenues resulting from publication.

 1              14:  Press reports about the publication.

 2              15:  IP addresses of reporters.

 3              16 through 17 -- and this is great:  We asked about

 4     communications that Buzzfeed or its reporters had with the

 5     Plaintiffs.  And they asserted a reporter's privilege.

 6              18 through 23:  Public statements by Ben Smith

 7     concerning the publication of the dossier.

 8              And No. 54:  A request for an audited profit/loss

 9     statement.

10              I'm at a loss to see how any of these could possibly,

11     possibly fall under a reporter's privilege, even if the

12     reporter's privilege applied, which we say it does not and we

13     say we've overcome in any event.

14              THE COURT:  Okay.  Let me hear from the defense.

15              MR. FRAY-WITZER:  Thank you, your Honor.

16              MS. BOLGER:  So, your Honor, I'll work backwards from

17     what Mr. Fray-Witzer just said.  In fact, he knows this,

18     because we've talked about it.

19              The only thing the Defendants have withheld at all on

20     the basis of the reporter's privilege is information tending to

21     reveal the identity of confidential sources, period.

22              THE COURT:  So would that include audited financial

23     statements or public statements by Ben Smith?

24              MS. BOLGER:  No.  All of that, your Honor, would be --

25     has been and will continue to be produced.  Right?

1          The only thing we've withheld are documents that -- or

2     we've redacted in most part -- information that would reveal

3     the identity of a confidential source.

4          THE COURT:  Okay.

5          MS. BOLGER:  So that's all that is at issue.

6          THE COURT:  Well, just so I understand, so we can

7     dispose of that, then, are you going to amend your answers to

8     those where you asserted -- I mean, I assume he -- that

9     originally the privilege -- or somewhere in there in your

10    response to that, there was -- that privilege was asserted?

11         MS. BOLGER:  Well, your Honor, I mean, the privilege

12    was asserted because, obviously, this is a privilege that's of

13    enormous significance to Buzzfeed.

14         I can amend the answers, if that's important.  But the

15    point, your Honor, is that there's nothing that has been

16    withheld.  So there is nothing that could be compelled --

17         THE COURT:  Okay.

18         MS. BOLGER:  -- on that basis.

19         THE COURT:  Well, let me just see what he --

20         Is that sufficient?  She says she has given you

21    everything in response to -- everything except for who the

22    source is, basically.

23         MR. FRAY-WITZER:  The only thing that we'd like is, as

24    your Honor suggested, that there be some writing that says:

25    With respect to those other categories that this objection is

```
 1    withdrawn.

 2           I'm not sure that we -- that the precise communication

 3    was that there's nothing withheld.  I think it was:  We're

 4    going to give you a privilege log, so you'll see what has and

 5    hasn't been withheld.

 6           THE COURT:  Okay.  So I'm going to require you to amend

 7    your responses to those areas outside of the source, identity

 8    of the source, and indicate that you're withdrawing the

 9    privilege.

10           MS. BOLGER:  Okay.  Again, your Honor, we didn't

11    withhold anything.

12           THE COURT:  Well, I know.  But it still gets -- I mean,

13    that's why you shouldn't assert privileges over stuff that you

14    don't have a privilege for, because then it becomes confusing.

15    Did you withhold something or didn't you?

16           MS. BOLGER:  Right.

17           THE COURT:  Because it says:  We're asserting the

18    privilege.  And so --

19           MS. BOLGER:  I think it's a little more -- there's a

20    little more to it than that, your Honor.  But we're happy to do

21    that and move on.

22           THE COURT:  All right.  That would just take care of

23    that.  And then we can get down to the real issue, which is:

24    Do you have to disclose your source?

25           MS. BOLGER:  Right.
```

1              Well, your Honor, Mr. Fray-Witzer said that there's no

2     privilege involved here that's not absolute.

3              And that's not true, your Honor.  There is an absolute

4     privilege.  And that's New York's privilege.

5              Your Honor, the right we're talking about is protected

6     by Florida common law, by Florida statute, by the United States

7     Constitution as interpreted by the Eleventh Circuit, by

8     New York State common law, by the New York State Constitution.

9     Right?

10             There's -- the right that is signal here in the United

11    States of America to protect these reporters' sources is

12    protected by a variety of sources, not just the Florida

13    statute.

14             And this is a privilege question.  And Rule 501 of the

15    Rules of Evidence tells us how to make a choice-of-law analysis

16    on a privilege question.  And it says:  You look to the law of

17    the state to determine the choice of law analysis.  So that

18    puts us --

19             THE COURT:  This is a diversity action.  Correct?

20             MS. BOLGER:  It is, your Honor.

21             THE COURT:  Okay.

22             MS. BOLGER:  So that --

23             THE COURT:  So why is New York the law -- the state

24    rather than Florida?

25             MS. BOLGER:  So the restatement -- Section 139, which

1    talks about privileged questions in diversity actions, says

2    that in assessing what law applies to the privilege, you look

3    to the law with the most significant relationship to the

4    document or testimony.  Right?  So it's the law of the state

5    with the most significant relationship.

6            Many times in other jurisdictions, Section 139 and the

7    reporter's privilege have met.  In the case, for example, of

8    *Mizella versus Philadelphia*, which was pending in New York, the

9    Plaintiff, a New York resident, sued a Philadelphia newspaper.

10   And the Court held that because the news gathering was done in

11   Philadelphia and the *Philadelphia Inquirer* is a Philadelphia

12   newspaper, that Philadelphia's state had the most significant

13   relationship to the document.

14           Similarly, in the case of *Compuware versus Moody's

15   Services*, which is an Eastern District of Michigan case, the

16   Court held exactly the same thing:  Section 139 requires me to

17   look at the significant relationship of the document and how

18   that because that people at issue wrote the document in

19   New York and transmitted the document in New York, New York

20   laws applied.

21           By sort of analogy, the closest I could get in Florida

22   was a case called *Annis versus Blecker*, which was actually

23   about a different privilege.  And the Florida court doing just

24   this analysis decided that Illinois law applied because it was

25   an Illinois insurance document, even though the case was

1    pending in Florida.

2         So there's significant precedent that we look to the

3    significant relationship of the document.  And here, that's

4    New York.

5         THE COURT:  Is New York the only place that has a

6    complete privilege?

7         MS. BOLGER:  No, your Honor.  Many places do.  The

8    District of Columbia does.  In certain contexts, California

9    does.

10        But New York's is --

11        THE COURT:  Is it different in a criminal fashion?

12   Well, I guess in a federal criminal action, you're applying

13   federal law.  Is that correct?

14        MS. BOLGER:  That's correct, your Honor.

15        In New York -- in fact, it was just affirmed by the

16   New York Court of Appeals in 2013 -- the absolute protection

17   applies in criminal or civil cases.  The New York courts have

18   said that they will not allow their residents to be even

19   subpoenaed in other jurisdictions that don't have the absolute

20   privilege.  And they have articulated that this is a

21   fundamental right that New York delivers to its citizens.

22        THE COURT:  Wasn't there a female reporter for the *New

23   York Times* who went to jail?

24        MS. BOLGER:  She wasn't in New York, your Honor.  She

25   was in federal court applying the federal law as interpreted by

```
 1    the DC Circuit, not down -- she was not in New York, your

 2    Honor.

 3            And this is a state law.  Right?  This is New York

 4    State law.

 5            In addition, your Honor, of course, the Eleventh

 6    Circuit has articulated that they believe, regardless of what

 7    happened to Judy Miller, that there is a journalist's privilege

 8    for journalists.  And that's not defined using the terms of the

 9    Florida statute; that's defined broadly.  It's similar in its

10    application, but the privilege is broad and grounded in the

11    First Amendment.

12            So here, your Honor, all of the journalists are based

13    in New York and California.  They have submitted affidavits

14    in --

15            THE COURT:  Well, where is Buzzfeed at?

16            MS. BOLGER:  Buzzfeed is in New York, your Honor.

17            THE COURT:  Do you have an office here in Miami -- I

18    mean, not in Miami, but in Florida?

19            MS. BOLGER:  Nothing, your Honor.  No connection to

20    Florida.

21            THE COURT:  Okay.

22            MS. BOLGER:  The -- all of the -- all of the

23    journalists involved in this story swore out affidavits in

24    support of our motion to dismiss the complaint for lack of

25    jurisdiction.
```

1           Ben Smith, the editor in chief, swore that he made the

2    decision to publish the article in New York.

3           Miriam Elder, one of the reporters involved, wrote --

4    swore under oath that she wrote the article accompanying the

5    dossier in New York.

6           And Mark Schoofs said he worked on the article and made

7    the decision to publish the article in New York.

8           By the way, your Honor, Mark Schoofs is a Pulitzer

9    Prize winner.  To even suggest that he's not a journalist is --

10   is kind of funny.

11          In any event, your Honor, all of the people involved in

12   this action have sworn that they'd made no efforts in Florida

13   to --

14          THE COURT:  Do any of them live down here or work down

15   here?

16          MS. BOLGER:  No, your Honor.

17          THE COURT:  No?

18          MS. BOLGER:  They all work in New York, or

19   Mr. Benzinger works in California.

20          THE COURT:  Okay.

21          MS. BOLGER:  So, your Honor, we would argue that the

22   significant -- the state with the most significant relationship

23   is New York.  And that is the -- really the end of the story.

24   In New York, it is an absolute privilege.  You cannot be

25   compelled to reveal your sources and you cannot be held in

1    contempt for failing to do so.  And that has just been

2    reaffirmed by our Court of Appeals.

3         If your Honor disagrees with me and decides that under

4    Florida -- that you want to apply Florida law, I still think we

5    win.  And there's a couple reasons.

6         The first is that I think -- I think Mr. Fray-Witzer

7    may have misspoke on the test.  The test is that the

8    information has to be relevant; it cannot be obtained from

9    alternative sources; and there has to be a compelling need for

10   the information.

11        THE COURT:  Just to back up a little bit, for instance,

12   the attorney-client privilege --

13        MS. BOLGER:  Yes, sir.

14        THE COURT:  -- is an absolute privilege.  Right?

15        MS. BOLGER:  I don't know in Florida, your Honor.

16        THE COURT:  Okay.  But if you're going to use that, if

17   you're going to say, "I relied on my attorney's advice," if

18   you're going to use that as a defense, it's not that the

19   privilege is absolute; it's that you're waiving the privilege

20   by relying on the privilege to present a defense in the case.

21        And I understand one of his arguments, at least, is

22   that under -- where you say that the document was given to you

23   by -- let me see.  I'm not that familiar with reporter's

24   privileges.  I don't know if I've ever addressed them before.

25   But fair reporting privilege and neutral reporting privilege,

```
 1    he says that you're using that as a defense.
 2           And if you use it as a defense, then you essentially --
 3    I think the case law, the federal case law, is -- which would
 4    apply, because it's whether or not he's asserting that defense
 5    or should be permitted to -- is the sword and shield.  You
 6    can't say, you know, "I'm relying on my attorney's advice" and
 7    then say, "But I'm not going to tell you what he told me."
 8           MS. BOLGER:  So there are two things about that, your
 9    Honor, actually.
10           Mr. Fray-Witzer's description of the governmental
11    privilege was just wrong.
12           The privilege isn't that you can only write in a
13    privileged matter about what the government does.  The
14    privilege is that you can write about what happens in a
15    government proceeding.
16           For example, if I were right now to stand up and
17    confess to you that I committed a mortal crime, you could print
18    it in a newspaper article tomorrow without fear of any
19    retribution.  That would be privileged because I was here in a
20    government proceeding.  Right?
21           So the government proceeding -- the fair and true
22    report of a government proceeding language isn't limited to
23    what the government does; it's limited to what the proceedings
24    are in a government.
25           And in particular, in New York, the privilege is broad
```

1     enough that if someone submits a piece of evidence that's under

2     investigation by the police, that's privileged by a fair and

3     true report proceeding.

4           So to assert the fair and true report proceeding, I

5     don't need to say what the government is doing; I need to say

6     what's part of the government investigation.  Right?

7           So I could -- I could talk freely and openly about a

8     government investigation without having to talk about what the

9     government is doing.  Otherwise, it wouldn't make any sense.

10    You would never be able to report on what lawyers said in a

11    courtroom, for example.

12          So Mr. --

13          THE COURT:  How does that apply here?

14          MS. BOLGER:  So, your Honor, we know from reading the

15    paper that this -- the FBI is investigating the dossier.  We

16    know from reading the newspaper that Congress is investigating

17    the dossier.  We know from reading the paper that the CIA is.

18          The Defendants have sought discovery from the

19    government in order to get confirmation that the investigation

20    exists and exists about the whole dossier.  We just moved to

21    compel that yesterday after many months of negotiation.

22          And hopefully --

23          THE COURT:  Is that in Washington, DC?

24          MS. BOLGER:  That is, your Honor.  We can give you

25    those papers, if you're interested.

1          THE COURT:  No.  It's going to stay there?

2          MS. BOLGER:  Yes.

3          THE COURT:  Oh, good.

4          (Laughter.)

5          MS. BOLGER:  Come on, your Honor.  It's really cool.

6          THE COURT:  Well, now, since they amended Rule 45, it's

7   every -- you know, I look at it and I go:  I'll just send it to

8   where it came from.  They're better off --

9          MS. BOLGER:  Right.  Well, that's -- Rule 45 gives me

10   belief that will stay there.

11          So, your Honor the fair and true reporting privilege is

12   not limited.  I don't have -- I don't have to say I got it from

13   a government source to invoke the fair and true reporting

14   privilege.  I can prove it's in the government to invoke the

15   fair and true reporting privilege.

16          And the other thing, your Honor, is this is kind of an

17   unusual defamation case.  And your Honor actually put your

18   finger on it earlier.

19          Generally, when someone seeks to compel the identity of

20   a source, the reporter relied on that source for the truth; and

21   the source who gave the information is known only to the

22   reporter.

23          That's not the case here.  The alleged defamatory

24   statement is that the Plaintiffs were -- had networks that were

25   involved in hacking the DNC.  We know who the source of that

1    information is.  It's Christopher Steele.  Christopher Steele

2    is the person who published that.

3            Buzzfeed said:  It's unverified.  We don't know the

4    name of the source.  Right?

5            So the person who knows is Christopher Steele, not us.

6            So in the usual circumstance, yes, your Honor, we would

7    be relying on the fact that a source gave us that information.

8            In this case, the source is Christopher Steele.  All

9    he's asking me is who gave me the document.

10           There's no compelling need to know who gave me the

11   document.  That's not -- that doesn't get you to the level of

12   compelling need.

13           But that's not why I think this is such an easy one.  I

14   think this is an easy one, your Honor, because there's a heck

15   of a lot of ways to get at this that don't involve Buzzfeed.

16   And remember, the test requires that there are no alternative

17   sources.  Right?

18           Your Honor, first of all, the Plaintiffs actually went

19   to the trouble of seeking a letter of request to depose

20   Christopher Steele.  They've had that signed by Judge Ungaro.

21   She did it like that.  And they've done nothing about it.

22   They've all but abandoned it.

23           THE COURT:  But Christopher Steele is not going to know

24   who gave you the document.  Presumably, somebody got it from

25   Christopher Steele, either legitimately or illegitimately.  And

```
 1    then may -- you know, who knows who they gave it to, they gave

 2    it to, who gave it to Buzzfeed.

 3              MS. BOLGER:  Well, that's --

 4              THE COURT:  I mean, maybe you know, but I don't.

 5              MS. BOLGER:  That's an assumption, your Honor.

 6              And the cases in Florida have been very clear that to

 7    make out the showing that there is an alternative source, first

 8    of all, you need to have a -- make a clear and convincing

 9    showing.  But you have to make a clear and convincing showing

10    that you tried.

11              They haven't even tried.  Plaintiff did indeed subpoena

12    Fusion GPS.  But, your Honor, if you read the hundreds or

13    thousands of articles that have been written on this matter of

14    enormous national importance, there's only -- and this was

15    Evan's words -- a limited number of parties who had the

16    dossier.  That's what Evan said -- sorry.  Mr. Fray-Witzer.  I

17    apologize.

18              I feel like we're there, Evan.

19              (Laughter.)

20              MS. BOLGER:  But --

21              THE COURT:  Are you already on a first-name basis?

22              MS. BOLGER:  But, your Honor, your Honor, there are

23    indeed a limited number of parties.  And Mr. Fray-Witzer has to

24    go get them before he comes to get me, even under the Florida

25    law, which, as I've said, your Honor, I don't think applies in
```

 1   these circumstances.

 2        THE COURT:  Who are the limited number of parties?

 3   Have they been identified or --

 4        MS. BOLGER:  I mean, from the newspaper, your Honor, we

 5   know Comey had it; McCain had it; Harry Reid had it.  We know

 6   that the *New York Times* had it.  We know that CNN had it.  We

 7   know bunches of people who had the dossier.  And I could name

 8   them off the top of my head, and I'm not even looking at a

 9   newspaper article, your Honor.

10        THE COURT:  They had it before you had it?

11        MS. BOLGER:  I -- I don't know, your Honor.

12        THE COURT:  Well, it would only be relevant to the

13   people who had it before you.  Correct?

14        MS. BOLGER:  Well, your Honor --

15        THE COURT:  You seem to -- everybody's got it now.

16        MS. BOLGER:  Harry Reid wrote a letter to Comey in

17   October -- or early -- it's October, October of 2016, saying:

18   Hey, Comey, why don't you investigate all those allegations

19   against Trump?

20        And everybody assumed that's about the dossier.  Right?

21        So, your Honor, there's a wide array of people who --

22        THE COURT:  Let me interrupt you.

23        Have you told them when you received the document?

24        MS. BOLGER:  No, your Honor.

25        THE COURT:  Why?  How does that disclose the source?

1          MS. BOLGER:  The article itself actually refers to the

2    fact that they've had it for some period of time.  So it's

3    actually published in the article.

4          THE COURT:  It says when they got it?

5          MS. BOLGER:  It doesn't say the specific time, but it

6    makes a reference to a number of weeks.

7          THE COURT:  Okay.  I mean, is that privileged, to tell

8    them when -- because if you told them when you got it, then

9    that would narrow who -- I mean, your thing is they've got to

10   go out and try to find the person independently who gave it to

11   you through some source.  And to have that information would be

12   helpful because --

13         MS. BOLGER:  Your Honor, we haven't withheld any

14   documents on that basis.  And, of course, there's testimony

15   coming up.  So, you know, I don't -- today I'm telling you that

16   what we withheld, what they have, what this motion is about, is

17   only information that would reveal the identity of the source.

18         THE COURT:  Well, does anybody know -- or do you know?

19   Have they told you when they received the information?

20         MR. FRAY-WITZER:  They didn't, your Honor.

21         But I'll let Ms. Bolger finish before I respond.

22         THE COURT:  Okay.

23         MR. FRAY-WITZER:  But essentially, she's asking us

24   to --

25         THE COURT:  If your response is just going to be to her

```
 1    argument, I'll wait to hear that.

 2         MS. BOLGER:  But I mean, your Honor, there's -- it was

 3    Mr. Fray-Witzer who admitted there's a limited number of people

 4    who have seen the dossier.

 5         There's one of the cases that I read last night where

 6    the Court was angry that the party seeking disclosure didn't

 7    depose 28 witnesses.  And there was another one where there

 8    were 117 people at issue and the Court said:  Gee, you should

 9    have tried to get it from them before you came for the

10    reporter.

11         And those are both Florida state court cases applying

12    either the shield law or the common-law privilege.  It was the

13    common-law privilege, which has largely been assumed.

14         So, your Honor, there -- Mr. Fray-Witzer's argument

15    about the compelling need for the document would be more

16    compelling and I suppose needful in a different kind of libel

17    case.  But in this kind of libel case, all we're talking about

18    is who handed us the document, not who was the source of the

19    defamatory information.  Right?  The person who handed Buzzfeed

20    the document is not the source of the allegedly defamatory

21    information.

22         And information about who gave us that document is not

23    probative of truth, of falsity, of actual malice, of damages.

24    It's not probative of any of the elements of a defamation

25    claim.
```

 1          THE COURT:  Well, I mean, it could be probative of

 2    negligence or, you know, actual malice.  Right?  Couldn't it?

 3    I mean, based on his explanation.  I mean, I realize that he's

 4    just making these explanations kind of out of thin air.  But --

 5          MS. BOLGER:  Well, your Honor, he can't --

 6          THE COURT:  For instance, if the Russian -- you know,

 7    the FSB gave it to you, that is --

 8          MS. BOLGER:  But the explanations out of thin air don't

 9    get you over the shield law.  And that's the point, your Honor:

10    You need to demonstrate a clear and convincing need for this

11    information.

12          So it can't just be Mr. Fray-Witzer speculating about

13    who or who didn't have the stuff.  Mr. Fritz -- sorry;

14    Mr. Fray-Witzer; see, I was better with Evan -- is -- needs to

15    do his homework before he gets to make those arguments.  And he

16    didn't do his homework.  There's no alternatives sources here.

17          Your Honor, obviously, these issues of are profound

18    importance to Buzzfeed and to reporters throughout the country.

19    If you have any interest -- if you want me to give you copies

20    of any of the cases I've mentioned today, I'd be happy to do

21    that.

22          THE COURT:  Okay.  What do you say?

23          MR. FRAY-WITZER:  Your Honor, what Ms. Bolger is

24    suggesting is -- and let me back up.

25          When I said that there are a limited number of parties,

1    Mr. Steele has said:  Well, I briefed the *New York Times* and I

2    briefed --

3             THE COURT:  Who did he say that to?

4             MR. FRAY-WITZER:  In a case pending in London.

5             THE COURT:  Okay.

6             MR. FRAY-WITZER:  He said:  I briefed the *New York*

7    *Times*; I have briefed CNN; a *Mother Jones* reporter; Yahoo!news

8    and a few other news outlets.

9             And it's clear that someone, probably Mr. Steele or

10   Fusion, gave a copy of the report to an associate of Senator

11   McCain, who was flown over to London to get a copy of the

12   report.

13            None of that says where the report went from there.

14            And what Ms. Bolger is suggesting is I should go to

15   New York and have -- make all of the *New York Times* tell me:

16   No, we didn't give it to Buzzfeed; no, we didn't give it to

17   Buzzfeed.  And I need to go to CNN in Atlanta and say:  No, we

18   didn't give it to Buzzfeed.  And I need to pick out every

19   journalist who might have been in any chain of possession from

20   where it originally spread before I can come and say, you know:

21   Who gave you the document?

22            There's one simple answer:  You know who handed you the

23   document.  And you alone know what they said to you when they

24   did it.

25            And you're right:  I am --

1          THE COURT:  Well, not them alone.  The source would

2     also know that.

3          MR. FRAY-WITZER:  Well, yes.  The source would know.

4     But the source could be anyone.  Anyone who had connection with

5     any of these reporters.  The reporters themselves could have

6     passed the document to any number of people.  The government

7     officials could have passed the document to any number of

8     people.

9          It is essentially telling us:  Go out into the world;

10    depose every news organization that you know of as a starting

11    place -- and I imagine they will all fight the same fight --

12    and then when the *New York Times* says, if they do:  Well, we

13    gave the copy of the document to these 30 people, then go to

14    each of those 30 people.

15         And when they say:  We gave it to -- you know, it's the

16    old commercial.  And they told two friends and they told two

17    friends.  It will go on forever.

18         Buzzfeed knows who they got the document from.  It's

19    very simple.  And they know what they were told when they got

20    the document.

21         And when Ms. Bolger says:  Well, it's not relevant to

22    any of the claims and it's not relevant to any of the defenses,

23    that's just not the case.  It is clearly relevant to the

24    questions of negligence or actual malice.

25         And your Honor's right:  Am I pulling these things,

1    speculation, out of thin air?  I am, because I have to, because

2    we have no idea who gave them the document.

3         There is only one way to know what the motivation was

4    in giving the document and what was said to Buzzfeed when they

5    received the document.  Did they know that someone was trying

6    to spread defamatory information about the Plaintiffs?  Did

7    they know that someone had an ulterior motive in giving them

8    the document?  Were they told:  We're not going to print this

9    because it's completely --

10        THE COURT:  Right.  You've already said this stuff to

11   me.

12        MR. FRAY-WITZER:  It is the only way that we can get at

13   what is clearly crucial information.  It goes to the heart of

14   every one of the defenses they've raised.  And if they'd like

15   to waive each of the defenses that they've raised, then that

16   would be wonderful.  And then we don't need to ask them about

17   the source of the document.

18        But unless they're going to waive those defenses, we

19   have a right to get this information.

20        THE COURT:  Okay.

21        MS. BOLGER:  Your Honor, maybe I -- very quickly, your

22   Honor, a response?

23        THE COURT:  Well, I mean, you guys are going to have to

24   brief this because, like I said, I'm not very familiar with

25   this doctrine.  So I'm hesitant to rule without, you know,

```
 1   getting briefed on it.  I mean, attorney-client privilege I'm

 2   pretty up on.  But this, I just -- I think maybe one time years

 3   ago I addressed it.  But I can't recall clearly.

 4          MS. BOLGER:  Nonetheless, may I take the opportunity to

 5   say three quick things?  I promise.

 6          THE COURT:  Okay.  Go ahead.

 7          MS. BOLGER:  The first is, the fact that

 8   Mr. Fray-Witzer has named all these individuals out there in

 9   the world that he could ask questions of, that's what

10   "alternative sources" means.  It's not me that says that; it's

11   the United States Constitution.

12          The second thing is, the idea that Mr. Fray-Witzer is

13   speculating cuts against him.  He needs clear and convincing

14   evidence.  That's what the statute says, not just me.

15          And the other thing I want to make clear about the fair

16   and true report privilege is the fair and true report privilege

17   is an objective thing.  It doesn't rely on who our source is.

18          If I found the dossier on a park bench and handed it to

19   Buzzfeed -- and by the way, I didn't -- that --

20          THE COURT:  So you've narrowed it down now.

21          (Laughter.)

22          MS. BOLGER:  Right.

23          THE COURT:  Once the park bench is out, you're --

24          MS. BOLGER:  It is still a fair and true report of a

25   governmental proceeding.  Right?
```

1          THE COURT:  Well, I want you to address that, actually,

2     because that's what I was thinking of with the waiver, because

3     there you're -- for the instance I gave, there you're relying

4     on what the lawyer told you in order to establish your defense.

5          MS. BOLGER:  But we're not.

6          THE COURT:  Here you're saying you're not relying on

7     what the source told you.

8          MS. BOLGER:  We're relying on the existence of the

9     government's investigation.

10         THE COURT:  Right.  So in other words, if you were

11    saying:  Well, the source told me this was true and that's why

12    we printed it and you didn't disclose who the source is, then

13    perhaps that would be a waiver, because you were going to rely

14    on the fact that the source told you something.

15         MS. BOLGER:  Exactly, your Honor.  But here, we're

16    saying it's a government -- in the fair and true report

17    context, this is a government investigation, which is an

18    objective fact.

19         THE COURT:  Okay.

20         MS. BOLGER:  Thank you.

21         THE COURT:  But anyway, because you're asserting the

22    privilege, you need to file a memorandum addressing why this

23    stuff is privileged because it's you -- it's you that has to

24    come first forward, first come forward.

25         MS. BOLGER:  Actually, your Honor, no.  The Plaintiff

```
1    bears the burden of overcoming the privilege.  The privilege is

2    the rule.  Overcoming it is the --

3              THE COURT:  Under what law is that?

4              MS. BOLGER:  Florida and New York.

5              THE COURT:  Well, it's not Florida law.  Florida law --

6              MS. BOLGER:  And Eleventh Circuit.

7              THE COURT:  The Eleventh Circuit says the person

8    asserting the privilege has to come forward and has the burden

9    to show that the privilege applies.  Then the burden shifts

10   to -- the way I understand it, then it shifts to the other side

11   to require them to rebut that.

12             MS. BOLGER:  Your Honor, that's not the case in the

13   context of the reporter's privilege.  In the reporter's

14   privilege, the burden --

15             THE COURT:  In what place?

16             MS. BOLGER:  Well, I mean, we'll go ahead and go first,

17   your Honor.  But the burden is --

18             THE COURT:  You don't have to waive -- you can convince

19   me now who has the burden.

20             MS. BOLGER:  Right.

21             THE COURT:  But my understanding is -- and like I said,

22   I don't know very much about reporter privileges -- that

23   generally the person asserting the privilege has to come

24   forward and say, for instance, with attorney-client privilege,

25   "We hired the attorney.  He was hired or she was hired for this
```

1    purpose.  We paid them some money and we asked them advice."

2    And that is privileged.

3            I don't -- and then once you establish that --

4            MS. BOLGER:  Right.

5            THE COURT:  -- then the other side comes forward and

6    says:  Well, yes, but they waived the privilege or there was

7    fraud involved or something.  And then --

8            MS. BOLGER:  Right.

9            THE COURT:  -- they show why the privilege doesn't

10   apply.

11           MS. BOLGER:  I'm sorry, your Honor.  I misunderstood

12   you.

13           I'm happy to make the motion and assert the privilege,

14   and then the Plaintiff has the obligation of overcoming it.

15   But I'm happy to waive the -- to make the motion.

16           THE COURT:  Okay.  Good.

17           MS. BOLGER:  What --

18           THE COURT:  So a few things I want to know is, one is,

19   what law applies.  It seems to me you would most likely --

20   New York to apply, because it's an absolute privilege there.

21   So you need to convince me of that, if that's the case, or, you

22   know, you made alternative arguments.  If you want to address

23   those as well, that if I find, you know, it's not New York,

24   that it's Florida or what have you.

25           MS. BOLGER:  Yes, sir.

```
 1          THE COURT:  And then I want you to also address the
 2   waiver issue that we just talked about, even though -- well,
 3   that's up to you if you want to do it.  If you want to wait to
 4   reply to them, you can reply to them.  Or if you want to just
 5   address it up front, that's -- that's up to you, because that's
 6   kind of them -- in their rebuttal, I assume they're going to
 7   raise that.
 8          So I guess that's it.  And have you provided a
 9   privilege log yet?
10          MS. BOLGER:  We have not, your Honor.
11          THE COURT:  Okay.  Are you going to do that?
12          MS. BOLGER:  Yes.  We can certainly do that.
13          THE COURT:  I mean, how many documents -- are there
14   documents that are on the privilege log?
15          MS. BOLGER:  It's not a very large amount of documents,
16   your Honor.
17          THE COURT:  Okay.  Good.
18          MS. BOLGER:  And I'll say again, it's mostly
19   redactions.  We redacted information that we produced.
20          THE COURT:  Oh, okay.  I mean, just so I understand,
21   what did you produce?  Do you have a memorandum that said, "We
22   received this stuff from so-and-so on such-and-such a date"
23   or --
24          MS. BOLGER:  No.  But reporters communicate with
25   sources over a variety of mediums.  Right, your Honor?  So
```

1    there could be an email where we redact the sender or a text

2    message where we redact the sender and perhaps if the source

3    says -- he or she says, "I'm in Y location," and we know that

4    could give something away, we redact it in that circumstance.

5          So, you know, there are images of text messages or

6    emails that have been redacted.

7          THE COURT:  I see.  Okay.  And do courts ever require

8    that the information be disclosed but not the source?

9          MS. BOLGER:  In --

10          THE COURT:  In other words, is that something --

11          MS. BOLGER:  Your Honor, because it's a balancing test,

12    of course it covers the gamut, the outcomes.

13          But we didn't redact information.  We only redacted

14    source.

15          THE COURT:  I mean, because he says:  Well, if the

16    source told you, you know, this is not true and -- but we're

17    hoping you're going to print it --

18          MS. BOLGER:  Your Honor, in that case he would never be

19    able to show a compelling need.  When we wrote the article, we

20    said it wasn't true.  Right?  I mean, that particular line of

21    questioning kind of goes nowhere in this case because the

22    article was published with -- the dossier was published with an

23    article that said, "These allegations are unverified and

24    unconfirmed."

25          THE COURT:  Yeah, but you didn't say they're not true.

1    It's different if you -- I mean, I think -- and you guys know a

2    lot more about that.  But if someone comes to you and tells

3    you, "This information's completely untrue, but I'd like you to

4    print it because I don't like this guy at Buzzfeed" -- I'm

5    sorry -- "at Webzilla," then you can't just print it and say,

6    "Well, we're not sure if this is true or not," because there

7    you have actual knowledge that it's not true.

8            MS. BOLGER:  Well, you could if it were privileged,

9    your Honor.  So there's that.

10           But also, in this case, the article says the

11   allegations are unverified.

12           THE COURT:  What do you mean, you could if it was

13   privileged?  I mean, just because it's privileged, that doesn't

14   exonerate you.

15           MS. BOLGER:  Your Honor, the fair and true report

16   privilege is an absolute privilege.  If the United States

17   government is investigating allegations, the press is free to

18   report on them, period.

19           THE COURT:  So the press is free to say things that

20   they know are wrong?

21           MS. BOLGER:  As long as they are a fair and true report

22   of a governmental investigation, your Honor.

23           THE COURT:  Well, how could it be fair and true if you

24   know that it's not correct?

25           MS. BOLGER:  If, for example, there was an

1    investigation into an individual in Florida and the DA's office

2    put out a press release that says the individual in Florida was

3    robbing a bank at 2:00 in the afternoon, you could always print

4    that, regardless of what you knew of its truth or falsity.

5         THE COURT:  Okay.  But that's not the case in this

6    case, is it?

7         MS. BOLGER:  Well, your Honor, we think it is.  The

8    Federal Government was investigating allegations in this

9    dossier, period.  The FBI, the president, the president of the

10    United States and the director of the FBI had a conversation

11    about the allegations in this dossier in which the president --

12    the FBI director warned the president of the United States

13    about how serious this was.

14         It was being investigated.

15         THE COURT:  Was that before or after you printed it?

16         MS. BOLGER:  That's before, your Honor.

17         THE COURT:  That was before.

18         MS. BOLGER:  That was before, your Honor.

19         THE COURT:  Oh, is that right?

20         MS. BOLGER:  In fact, CNN had done a story hours before

21    we published ours talking about the fact that allegations in

22    the dossier had been confirmed by law enforcement.

23         MR. FRAY-WITZER:  Your Honor, in fairness, according to

24    the testimony of James Comey, the only reason that he briefed

25    the president on it was because he knew it was about to be

```
 1    leaked in the media.  They can't create --

 2              MS. BOLGER:  That's not true, your Honor.

 3              MR. FRAY-WITZER:  Well, that was the testimony.

 4              MS. BOLGER:  No, it's not.

 5              MR. FRAY-WITZER:  They can't create the situation and

 6    then say, "Look, it's being investigated by the government."

 7              THE COURT:  All right.  Anyway, you can address that in

 8    your memorandum and then -- in other words, address why you

 9    believe it's -- you have that -- why you believe asserting that

10    privilege is not waiving your ability to protect the source.

11              MS. BOLGER:  Okay.  And, your Honor, a timeline?

12              THE COURT:  How much time do you want?  This case is

13    early on.  You don't even have a -- you're having a scheduling

14    conference tomorrow, right?

15              MS. BOLGER:  We are, your Honor.

16              THE COURT:  Yes.  Okay.

17              MS. BOLGER:  Can we have two weeks, your Honor?

18              THE COURT:  Yes.

19              How much time do you want to respond?

20              MR. FRAY-WITZER:  The same, your Honor.

21              THE COURT:  Okay.  So two weeks from today.  And then

22    if you're going to reply, you have a week to reply.

23              MS. BOLGER:  Your Honor, can we have two weeks from

24    Monday, just because we all have to travel like crazy for the

25    next several days?
```

1              THE COURT:  You know, I try to be nice, giving you what

2      you want, and then you --

3              MS. BOLGER:  Ask and ask and ask.

4              THE COURT:  All right.  So Monday is October 2nd.  So

5      by October 16th, the memorandum is to be filed.  October 30th,

6      the response.  And November -- I think November 6th might be --

7      I think that -- no, no.  Veterans Day is in the middle of the

8      week.  So November 6th, any reply, it necessary.

9              And I'm going to limit you each to 20 pages.  Don't

10     feel like you have to use it.

11             (Laughter.)

12             THE COURT:  The less, the better.

13             And ten pages for your reply.  Okay?  Which I think is

14     the general rule.

15             MS. BOLGER:  Thank you, your Honor.

16             THE COURT:  And in the meantime, I'll tell the

17     Plaintiff -- this isn't my ruling, but I would suggest that you

18     make some efforts, because this is very early on in this case.

19     You've had very little discovery for you to be able to come in

20     and say, "We can't get this from anywhere else."  You know, I

21     suggest that you make some efforts in that regard in the

22     meantime before I rule on this so you can advise me of that.

23     You don't have to if you feel comfortable the law is going to

24     support you that you don't need to.  But it's something you

25     might -- you might consider.

1            I mean, she says --

2            I'm sorry to call you "she."

3            Ms. --

4            MS. BOLGER:  Bolger.

5            THE COURT:  Bolger?

6            MS. BOLGER:  Yes.

7            THE COURT:  Are you related to the Bulgers in Boston?

8            MS. BOLGER:  I am not, your Honor.  They misspell it.

9            THE COURT:  They misspell?

10           MS. BOLGER:  It's B-O-L-G-E-R.  And if you're Irish,

11    you have say it Bulger.  So they spelled it with a U.

12           THE COURT:  Oh, is that right?

13           MS. BOLGER:  Yeah.  So just to be clear, not related to

14    any gangsters that I know of.

15           THE COURT:  Are you Irish?

16           MS. BOLGER:  I am, your Honor.

17           THE COURT:  That's a point in your favor.

18           MS. BOLGER:  Thank you.

19           THE COURT:  They're going to have to get an Irishman on

20    their side.

21           MR. FRAY-WITZER:  Right here.

22           (Laughter.)

23           THE COURT:  Now you're even.

24           MS. BOLGER:  I don't know.  I'm Katherine Mary

25    Patricia.

```
 1          THE COURT:  Yeah.  You would think, right?

 2          MS. BOLGER:  Yeah.

 3          THE COURT:  That's one of my daughter's middle names.

 4          Anyhow, so do the briefing.

 5          What do we need to discuss?  Anything else for the

 6     Plaintiff?  And then let's discuss what the Defendant has.

 7          MR. FRAY-WITZER:  No, your Honor.  Nothing else from

 8     the Plaintiff.

 9          MS. BOLGER:  Your Honor, I think my issues are a little

10     more straightforward.

11          So --

12          THE COURT:  Just so you know, in the future -- I'm not

13     sure how this -- if you got permission on this.  But because we

14     do these informal discovery conferences, I don't know if any of

15     them -- maybe Jared Lopez has appeared in front of me before,

16     but usually I resolve these issues at the hearing.  Because

17     this is complicated and something I'm not familiar with, I'm

18     not going to just rule, you know, from the hip.  But generally,

19     I'm going to rule based on what you're telling me.

20          So --

21          MS. BOLGER:  Your Honor, I think the next ones you can

22     rule from the hip on.

23          THE COURT:  Okay.  Just for the future, because I've

24     got an awful feeling that I may be seeing some more of you

25     folks.
```

```
 1              THE LAW CLERK:  Judge?

 2              THE COURT:  Yes.

 3              THE LAW CLERK:  Have (inaudible) title the filing a

 4    memorandum and not motion.

 5              THE COURT:  Yes.  When you file the memorandums I just

 6    ordered, don't file it as a motion, because it'll be stricken

 7    if it's filed as a motion.  You should just file it as a

 8    memorandum of law required by Magistrate Judge O'Sullivan

 9    regarding attorney -- I'm sorry -- reporter privilege or

10    whatever.  Okay?  Just make it clear.  Don't entitle it as a

11    motion.

12              The other thing is, when you file your notices, it

13    shouldn't have any argument in it.  You can include your

14    interrogatories, your requests for production or what have you.

15    But -- because I don't want one party having an advantage over

16    the other.  So just say I want better answers to these requests

17    for production or these interrogatories.

18              The third thing is, if, for instance, you call up and

19    you get a discovery time, usually it's a half an hour.  So if

20    you want more than that, you need to let us know at that time.

21              MR. FRAY-WITZER:  Okay.

22              MS. BOLGER:  Okay.

23              MR. FRAY-WITZER:  Also, because you said it doesn't

24    give them the right to then cross-notice it for them without

25    calling and saying, you know, I want some more time because I'm
```

1    going to notice --

2          THE COURT:  Unless you're cross-noticing the same exact

3    thing.  You know, if you're compelling and they're protecting,

4    there's really no need for a cross-notice, then.

5          MR. FRAY-WITZER:  Sure.

6          THE COURT:  But assuming it's not the exact same

7    subject, then you need to call and get additional time.

8    Hopefully, we can do it all at one time.

9          MR. COBB:  I think this last time we both just called

10   your JA jointly to try to let her know that it was all coming

11   at once.  We'll keep doing that in the future, if that's all

12   right.

13         THE COURT:  Yeah.  That's fine.  That's great.  But I

14   just want to make sure that we've got enough time for

15   everybody.

16         Okay.  Go ahead.

17         MS. BOLGER:  Okay.  Your Honor, I'm going to address

18   the first and last, 1 and 5, on our notice, because they both

19   relate to damages and reputation.  And I thought I could kind

20   of talk about them together --

21         THE COURT:  Okay.

22         MS. BOLGER:  -- to speed it along.

23         So, your Honor, a very unique thing about this case is

24   that Mr. Gubarev's representatives have been all over the media

25   talking about how badly damaged they were by this publication.

1          But they've produced absolutely no useful evidence to

2     us in assessing the scope of their damages.  And even at this

3     early stage of discovery, Rule 26 is clear that the Plaintiff

4     has to provide us with information to give us at least a

5     plausible basis to understand the scope of their damages.

6          So in particular, in the complaint, Paragraph 5,

7     Mr. Gubarev pled that his personal and professional reputation

8     was tattered and that he, like XBT and Webzilla, suffered

9     economic damages.

10          In Paragraph 46, the Plaintiff claimed he was injured

11     in his personal, social and business relationships.

12          In Paragraph 47, XBT and Webzilla argue that they are

13     suffering actual injury as a result of injury to their

14     corporate reputations.

15          In Paragraph 48, Mr. Gubarev says he suffered actual

16     injury as a result of injury to his personal reputation.

17          In Paragraph 49, the Plaintiffs argue that they've been

18     damaged in their business and trade.

19          In Paragraph 50, all Plaintiffs say they have suffered

20     and continue to suffer substantial damages.

21          Your Honor, nonetheless, they have been very reluctant

22     to produce any information.

23          So turning specifically to Plaintiff Gubarev, who is an

24     individual but who has claimed that his business reputation has

25     been damaged, we sought information related to his personal

 1    income, including his tax returns and his personal history.

 2         And the Plaintiff won't give them to us.

 3         We believe we're entitled to them for two reasons:  One

 4    is they obviously show damage or lack of damage.  If you make

 5    more money in one year and less money in the next year, maybe

 6    you've been damaged.  But if you make less money in one year

 7    and more money the next year, then you haven't.

 8         In addition --

 9         THE COURT:  What year is it you're asking for?

10         MS. BOLGER:  We asked from 2010 to the present, your

11    Honor.

12         THE COURT:  That's going back quite a bit, isn't it?

13         MS. BOLGER:  Well, I'd be happy to limit that to 2012

14    to the present, your Honor.

15         THE COURT:  That's still going back quite a bit.

16         MS. BOLGER:  Okay.

17         THE COURT:  Well, let me just ask you:  Give me the

18    date that the publication was.

19         MS. BOLGER:  January 10, 2017.

20         THE COURT:  Okay.  So you want to see -- you want to

21    compare his income before and after.  Is that correct?

22         MS. BOLGER:  That's exactly right, your Honor.  And we

23    want to know sources of income also, your Honor.  I mean, the

24    dossier does say, for example, that he was under duress from

25    the FSB or that he had certain connections to somebody.  If

```
 1    that information is disclosed in his personal information, that

 2    would also be relevant.

 3            It's also relevant, your Honor, to reputation.  I mean,

 4    if you're seeking injury [sic] for damage to your reputation,

 5    the fact that you make more money one year than you did the

 6    prior year would undercut any claim that you've had your

 7    business reputation damaged.

 8            So to us, these seem extremely straightforward.  They

 9    have to many other courts as well.

10            In the case of Tabalares versus Piro, perhaps one of

11    the most famous libel cases of all times, the Defendants did

12    exactly what the Plaintiffs here are doing.  They said:  We

13    didn't plead lost income.

14            And the Court said:  That's not acceptable.  You're

15    pleading damage to your reputation.  Turn over all information

16    about your salary, your income, your employment status and your

17    tax returns.

18            In the case of Curry versus HSBC, which is a Florida

19    case, in a defamation case, the Plaintiff wanted to withhold

20    her employment history and her tax returns.  And the Court

21    ordered them produced for the same reason.

22            Similarly, in a case called Pino in the Eastern

23    District of Pennsylvania, the judge ordered the Plaintiff to

24    turn over his personal tax returns and his business tax

25    returns.
```

1    So it seems really clear to us that we're entitled to

2    this information from the Plaintiff if he continues to seek

3    damage.

4    And I would just mention, your Honor, that damage is

5    actually the Plaintiff's burden to show.  So there's a

6    presumption of damage, but the quantum is determined by the

7    evidence the Plaintiff produces.  So this stuff, we think, is

8    clearly relevant and probative.

9    THE COURT:  Okay.  What does the Plaintiff say about

10   that?

11   You can stay there, because we're going to go.

12   MR. FRAY-WITZER:  Okay.

13   THE COURT:  Is that the only -- you're arguing some of

14   these other ones, too?

15   MS. BOLGER:  That was just the first one, your Honor.

16   That's No. 1 on my notice of hearing.

17   THE COURT:  Okay.  Well, I want to address them one at

18   a time, because it's easier than trying to --

19   MR. FRAY-WITZER:  Starting from the beginning of the

20   argument, as Ms. Bolger knows, we have said that we are indeed

21   going to be turning over extensive information about damages.

22   We think that that's coming within the next few days,

23   certainly within the next week.  There will be amended

24   interrogatory answers that address those as well.

25   Both sides have been a little bit less than as speedy

1    as they thought they were going to be.  We got the majority of

2    the documents from the Plaintiffs two days ago.  So we have

3    provided extensive discovery with the documents.

4           But for that issue, the amendments to the

5    interrogatories and the additional documents are indeed coming,

6    and they're coming very soon.

7           However, there are a few areas in which we objected.

8    We said that Mr. Gubarev's personal tax returns and personal

9    income information is not relevant.  And why did we say that?

10   Because we have informed the Plaintiff -- the Defendants that

11   we're not seeking any kind of lost wages.

12          THE COURT:  Hold on a second.

13          What does that say?

14          THE COURTROOM DEPUTY:  It's regarding the 11:00.  It's

15   someone that may not be able to make it.  Just so you know, the

16   11:00 (inaudible).

17          THE COURT:  Let me interrupt you for one second,

18   because we have another hearing.

19          Is somebody here for the 11:00?

20          MS. HOTSTETTER:  Yes, your Honor.  Jennifer Hotstetter

21   on behalf of the County Defendant.

22          THE COURT:  Okay.  I just got an email saying that the

23   counsel for Plaintiff called to advise she's stuck in state

24   court and may not be able to make it, and she has no objection

25   to the relief requested and would like the Court to start

1    without her.

2          I'm going to ask you all to sit down for a second,

3    because I think I can take care of this in about five minutes.

4          MS. BOLGER:  Thank you, your Honor.

5          (Pause in the proceedings.)

6          THE COURT:  We were talking about -- you were telling

7    me why you shouldn't have to turn over the individuals' income

8    tax returns.

9          MR. FRAY-WITZER:  Yes, your Honor.

10         As we've informed defense counsel, we are not seeking

11   and we will not be seeking any kind of damages for lost wages

12   for Mr. Gubarev.  It's not part of our claim.

13         We're not saying that he lost personal income as a

14   result of the defamation.

15         What we are saying is that the companies lost income

16   and they're going to get the companies' information.  But if I

17   work for Webzilla and Webzilla pays me a salary each year, my

18   salary is not going to necessarily change because Webzilla made

19   less money in one year or another year.

20         The information that they're seeking would be relevant

21   if we were making a claim for lost wages.

22         THE COURT:  So what's the measure of your damages for

23   the individual?

24         MR. FRAY-WITZER:  For Mr. Gubarev, I think it's going

25   to be damage to his business reputation, which includes the

1    fact that he has been unable to obtain personal loans that he

2    was previously able to obtain.  We're going to give the

3    documentation concerning that.

4            The only things that that we've said we're not going to give

5    over because they are not relevant to the claims are the

6    personal tax returns and information about his personal income.

7            And if I could just throw out there, the idea that

8    maybe on someone's tax return is the payment that they received

9    as a secret government agent of the FSB is a bit ludicrous.

10   Even if it was true -- and it is absolutely not true -- that

11   doesn't show up on someone's tax returns.

12           MS. BOLGER:  Your Honor --

13           THE COURT:  Yes.

14           MS. BOLGER:  -- the arguments Mr. Fray-Witzer are

15   making are the arguments that have been rejected time and time

16   and time again by defamation -- in defamation cases.

17           The Plaintiff has said his reputation is injured.  I'm

18   reading it:  "Plaintiffs' injury in their personal, social and

19   business relationships."  Right?

20           "Mr. Gubarev has found his personal and professional

21   reputation in tatters."

22           "Mr. Gubarev has suffered and will continue to suffer

23   actual injury as a result of the injury to his personal

24   reputation."

25           Your Honor, these are all things that courts time and

1    time again have said:  Well, you're entitled to look at the tax

2    returns as a measure -- and his employment; there's two --

3    there's two things -- as a measure of damages.

4         It's just strictly a damages case.  If he wants to get

5    damages, he's got to provide me -- he's got to provide me

6    evidence.

7         THE COURT:  Even if he says he's not going to argue

8    that this fellow lost any income?

9         MS. BOLGER:  That's what the Court in *Tabalares* has

10   said.  He said, I'm not going to argue --

11        THE COURT:  What court is that?

12        MS. BOLGER:  This was the District of Columbia, the

13   DDC.

14        THE COURT:  Yes.

15        MS. BOLGER:  Also, the EDPA, and there's a case in the

16   Middle District of Florida where the Plaintiff says, I'm not

17   going to argue that I've lost any income and the Court said you

18   have to turn over your tax returns.

19        You have to turn over your tax returns if you're going

20   to bring a defamation claim, your Honor.  That's the -- that's

21   the law.

22        THE COURT:  Okay.

23        MR. FRAY-WITZER:  He can suffer damages to his personal

24   reputation without suffering any loss of income.  And that's

25   what we're saying.

1    He's going to testify -- and I believe that possibly

2    his wife will testify -- that after the story broke, they

3    received numerous text messages and Facebook messages and were

4    held up to all kinds of ridicule and hatred in the community in

5    which they live because they were accused of being KGB spies

6    and having undermined the elections of the United States.

7    Did it cause him loss to his personal income?  We're

8    not arguing that.  That's not our case.  We're not going to

9    ever put on that case.

10    THE COURT:  Okay.

11    MS. BOLGER:  Your Honor, I don't have any of the

12    documents that the Plaintiff just referenced.  I have nothing.

13    I have none of these documents.  We sent them an interrogatory

14    asking them to identify the bank loans that the Plaintiffs --

15    THE COURT:  He says he's going to do that in the next

16    few days.

17    MS. BOLGER:  But I don't have them.  I mean --

18    THE COURT:  Well, he says he's going to give them to

19    you.  So I don't want to address stuff that he's already said

20    he's going to give you.

21    MS. BOLGER:  What I have is the --

22    THE COURT:  As far as the tax return, I'm not requiring

23    him to provide the tax return.  I find it's not relevant.  He's

24    indicated that he's not going to claim or assert that he lost

25    any income as a result of this -- of this alleged violation.

1    And so, contrary to the courts that you've cited, I find that

2    it's not relevant to the damages in this matter.

3        In addition, I find that -- first of all, if you got

4    his tax return, it would be the 2016.  So you have nothing to

5    compare it to right now anyway, because 2017 tax returns aren't

6    due until 2018, in April, and most people don't file them until

7    October next year.  So at this point in time, they'd have no

8    relevance because they're not going to show any loss of income,

9    because there's nothing to compare them to.

10       Now, employment history:  Why should you not be able to

11   provide -- why would you not provide employment history if

12   you're saying that there's damage to his business reputation?

13       MR. FRAY-WITZER:  Your Honor, none of the requests

14   identified in the notice of hearing ask anything about

15   employment history.

16       THE COURT:  Yeah, it does.  At the top of Page 2, it

17   says, "Refuses to provide any documents or responses to

18   interrogatories concerning his personal income tax returns and

19   employment history."

20       MR. FRAY-WITZER:  Yes.  And it references Document

21   Requests 58 to 59 and Interrogatory 4.  None of them talk about

22   employment history.

23       THE COURT:  Oh, okay.

24       Did you ask for employment history?

25       MS. BOLGER:  I -- your Honor, I thought -- I mean, I

```
 1    wouldn't have written it in -- can I look for a second, your
 2    Honor?
 3             THE COURT:  Go ahead.
 4             Do you have any problems providing his employment
 5    history?
 6             MR. FRAY-WITZER:  I don't see that we would, your
 7    Honor.
 8             THE COURT:  Okay.  So just provide it.  That way, we
 9    don't have to do another request for production, wait 30 days,
10    and you can get going.
11             MS. BOLGER:  And, your Honor, just to get back to
12    the -- Mr. Fray-Witzer's representation that he's going to
13    supplement his interrogatories, he made that representation to
14    me over a month ago.  But setting that aside, the information
15    that Mr. Gubarev provided in response to the request about what
16    loans he was denied -- and this is after his representatives
17    went on national media and said he denied loans -- the
18    actual -- this is the quote, is:  "I've had a lot of trouble
19    with banks."  Right?  That's the information we're getting,
20    your Honor.
21             We obviously need specific information about --
22             THE COURT:  Yes.  I agree with you.
23             So I assume you're going to provide the --
24             MR. FRAY-WITZER:  Yes, your Honor.
25             THE COURT:  -- specific loans or applications or
```

```
 1    whatever it is that he was --

 2            MR. FRAY-WITZER:  That's what we said.  Yes, your

 3    Honor.

 4            THE COURT:  Okay.

 5            MS. BOLGER:  Right.  So full interrogatory responses to

 6    the interrogatories I've identified in the -- in the notice of

 7    hearing.  Correct?

 8            THE COURT:  I don't know what that is.

 9            MS. BOLGER:  Well, it's -- but I mean, that's what I'm

10    asking for.  And that's what Mr. -- that's what Mr. Fray-Witzer

11    agreed to give me.

12            But it's interrogatories --

13            THE COURT:  Well, if he's agreed to give it to you,

14    then it's -- what interrogatory are you talking about?

15            MS. BOLGER:  It's Interrogatories 5 to 10 to

16    Mr. Gubarev.

17            THE COURT:  Where is that in here now?

18            MS. BOLGER:  It's 5, No. 5 in the notice of hearing.

19            THE COURT:  5 and 10, it says.

20            MS. BOLGER:  Yes.

21            Then --

22            THE COURT:  Well, let's slow down so we can make

23    sure --

24            Are you in agreement with that, No. 5 and 10?  To the

25    extent -- 5 is "to the extent not produced in response to the
```

1   foregoing, all documents related to any Trump investigation."

2        MS. BOLGER:  No.  Sorry.  "Interrogatories."

3        THE COURT:  I'm sorry.

4        MS. BOLGER:  I can read it, your Honor, if that's

5   helpful.

6        THE COURT:  I'll read it.

7        "Identify every bank or financial institution from

8   which you have sought a loan or other financing since January

9   1, 2015, whether such financing was granted, and the dates of

10  such applications and decisions."

11       MR. FRAY-WITZER:  Yes.  We agree to that, your Honor.

12       THE COURT:  Okay.  And No. 10?

13       MS. BOLGER:  No. 10.

14       THE COURT:  Each element -- "the damage that you claim

15  in this action, including, but not limited to, the injuries

16  claimed in Paragraphs 58 to 50 of the complaint.

17       "Identify separately and with specificity the complete

18  nature of your injury, the amount of damages and how you

19  calculated it and all facts related to and supporting the

20  allegation of injury."

21       MR. FRAY-WITZER:  Yeah.  And we agree to that as well.

22       THE COURT:  Okay.  Good.

23       MS. BOLGER:  And, your Honor, it was the same request

24  as to XBT Holding and Webzilla.  So it's the same request.

25       THE COURT:  Same numbers, too?

```
 1              MS. BOLGER:  5 and 10 for Webzilla -- sorry -- for XBT.

 2   And unfortunately, there's a typo.  It's 6 and 11 from

 3   Webzilla.

 4              THE COURT:  Okay.  Are you okay with that, too?

 5              MR. FRAY-WITZER:  Yes, your Honor.

 6              THE COURT:  Okay.  Good.

 7              What else?  Anything else we need to talk about?

 8              MS. BOLGER:  Yeah.

 9              THE COURT:  We're running out of time.

10              MS. BOLGER:  We have a couple more.

11              No. 2 is information related to the Plaintiffs'

12   reputation.

13              These document requests are sort of standard requests

14   in discovery in defamation actions of plaintiffs.  And they

15   request -- seek for documents related to government oversight

16   of the Plaintiff's business, all civil lawsuits filed against

17   the Plaintiff and all criminal investigations or complaints or

18   liens against the Plaintiff regardless of their outcome.

19              All of these, your Honor, relate to the reputation of

20   the Plaintiff in the community.  I'll give you an example.  We

21   know of some civil lawsuits against the Plaintiff, but we don't

22   know of all of them.  And we should get to know what the

23   Plaintiff's reputation is business-wise.

24              In particular, your Honor, also from the criminal point

25   of view, we should get to know if he's under investigation.
```

1      That also relates to truth, your Honor, as to the civil

2  complaints.  I mean, your Honor, as I'm sure you know, truth is

3  a complete defense to a defamation claim, although it's not

4  actually a defense.  It's part of the Plaintiff's case.

5      But the Defendants can prevail if they can show the

6  substantial truth of the investigation.

7      So if the Defendants are -- if the Plaintiffs are under

8  investigation for hacking, that's something I'm entitled to

9  argue to a jury, that this is substantially true.  We know from

10  civil lawsuits that pornography is carried on the Plaintiffs'

11  networks.  The dossier accuses them of having pornography

12  carried on the Plaintiffs' networks.

13      I'm entitled to make that showing to a jury.

14      Now, that doesn't -- isn't literal truth, but it

15  certainly gets me to substantial truth.

16      So, your Honor, these are related to reputation and

17  they're related to truth.  And they're kind of things that are

18  turned over all the time.  In the case called *Dolan versus*

19  *Riles*, there is a libel Plaintiff, and the Court refused to

20  turn over just these kinds of cases.  And the Court held that

21  because the Plaintiff asserts libel, defamation and loss of

22  goodwill associated with her, her acts, character, criminal

23  history and reputation are relevant evidence.

24      In a case called *Rivera Versus New York Post Holdings*,

25  which is in New York, in actually the appellate court, the

1   judge required the Plaintiff, a sitting judge, to turn over his

2   arrest record, his own testimony to a grand jury and

3   information about a private investigation into his behavior by

4   the Panel of Judicial Ethics.

5          So this is just boilerplate reputation evidence.

6   There's simply no reason we can't have it.  And we --

7          THE COURT:  Okay.  Got it.  Let me hear from the

8   Plaintiff.

9          MR. FRAY-WITZER:  As a starting point, your Honor,

10  we've already told them that there have been no criminal cases

11  brought against any of the Plaintiffs.  They're entitled to

12  know that and we've told them that it doesn't exist.

13         THE COURT:  Does that include criminal investigations?

14         MR. FRAY-WITZER:  Separately -- there was a separate

15  interrogatory about Trump investigations and we've told them

16  that there were no investigations.

17         What they have asked for now and were unsatisfied with

18  the answer, there have never been criminal cases brought

19  against any of them.  They say:  Well, we want to know if

20  there's ever been anyone charged with any kind of crime

21  whatsoever, ever.

22         How could that go to reputation if it's not something

23  that anyone in the public knows?  They're entitled to know if

24  there have ever been, you know, charges brought -- well, if

25  there have ever been cases brought against us.  And there

1      haven't been.

2           With respect to civil lawsuits, first of all, we said

3      that we've never been involved in any other defamation case,

4      which is something I think they're entitled to know.

5           And secondly, we've said that there has never been a

6      case brought against any of the Plaintiffs that have any of the

7      similarities to the things that were alleged in the dossier.

8           Now, there's a really incredibly crucial point in

9      something that Ms. Bolger said.  It's going to come up in her

10     next argument as well.  But I need to address it here.  What

11     she said to the Court was the dossier accuses the Plaintiffs of

12     carrying porn on their networks.  And that is absolutely

13     untrue.

14          The dossier says that Gubarev, that Webzilla, that XBT

15     were themselves engaged in sending out porn and spam bots and

16     viruses.  And the reason that this is crucial, your Honor, if

17     you could picture a case in which someone said that the

18     president of Verizon and Verizon were sending out porn and spam

19     bots and all of these things over their networks and they came

20     to you and said, We want to know what every customer of Verizon

21     is doing -- which is what they're saying:  We want to know what

22     every one of your 40,000 customers has on their portions of

23     your servers, which, by the way, we don't know anyway because

24     we're not entitled to know, which we couldn't possibly reveal

25     even if we did know because European privacy laws and I think

1    US privacy laws would prohibit it.

2            But much more importantly, it is completely and

3    absolutely irrelevant.  It is where they want to try and blur

4    the lines.  They want to say, Well --

5            THE COURT:  All right.  We need to go through these one

6    at a time.  And we need to get moving, because we're running --

7    we're almost out of time.

8            MS. BOLGER:  Your Honor, Rule 26 says "leads to the

9    discovery of admissible evidence."

10           THE COURT:  Yeah.  We're going to go through these one

11   at a time, because -- 49.  Is that the first one?  The numbers

12   you listed are 49 --

13           MS. BOLGER:  49, 76 --

14           THE COURT:  "All documents relating to regulation,

15   oversight, review by any federal, state, local, international

16   government since January 2000."

17           MS. BOLGER:  Your Honor, if they're being investigated

18   by the Federal government, I'm entitled to know that.

19           THE COURT:  That doesn't say that.  This says "All

20   documents relating to regulation or oversight by you."  It

21   doesn't say all documents relating to an investigation of you.

22   I mean, I assume if they're running, you know, servers that

23   they've got all sorts of regulations.

24           MS. BOLGER:  Well, right.  And I want to know if

25   they're complying with them.  So, your Honor, I'm entitled to

```
 1    ask that.
 2           THE COURT:  Well, I'll give you the opportunity to
 3    narrow it or I'll narrow it, because you're not getting every
 4    document relating to any regulator who's ever contacted them
 5    since 2000.
 6           MS. BOLGER:  Well, I'm --
 7           THE COURT:  If it relates to a criminal --
 8           MS. BOLGER:  I want to know if they're compliant.
 9           THE COURT:  Excuse me.
10           If it relates to a criminal investigation, you know, I
11    think so.  Maybe if it relates to compliance -- well, no.  I
12    still think that's too broad.
13           MS. BOLGER:  For 49, can I say compliance with
14    government regulators?  I mean, your Honor, look, Mr. --
15    Mr. Fray-Witzer is constraining the meaning of what I'm
16    entitled to prove.
17           I could prove, for example, that Mr. Gubarev has
18    networks that were used to hack the DNC and he didn't even look
19    to see if it was there.  And I could argue to a jury that
20    that's the same thing as doing it yourself, because you were
21    willfully blind.  I can argue a whole bunch of stuff, your
22    Honor.  I'm not stuck with what the Plaintiffs say the dossier
23    says.
24           THE COURT:  I realize that.
25           MS. BOLGER:  Right.  So --
```

1          THE COURT:  But you're also not getting every document

2     relating to regulation or oversight by them since January 2000.

3          MS. BOLGER:  How about -- can we say --

4          THE COURT:  That's ridiculously overbroad.

5          MS. BOLGER:  Can we say compliance?  Can we say

6     compliance in January 2015, compliance with government

7     regulators since January 2015?

8          MR. FRAY-WITZER:  What does that mean, your Honor?  As

9     you've said, they run a number of international companies.  Are

10    they subject to workers' comp laws?  Yeah.  Absolutely.

11    They're subject to workers' comp laws.

12         MS. BOLGER:  Well, that's fine.  We can relate --

13         MR. FRAY-WITZER:  Compliance with government

14    regulation.

15         MS. BOLGER:  We can do the subject matter, your Honor,

16    and say "related to government regulations since January 2015

17    related to their network-hosting operations," not their -- you

18    know, their HR issues or other things.

19         THE COURT:  Okay.  All right.  I'm going to require you

20    to provide all documents since January 1, 2015, that reflect a

21    lack of compliance relating to network --

22         What did you say?  Networking?

23         MS. BOLGER:  Their network operations, is what I said.

24         THE COURT:  Their network operations.

25         What's the next one?

```
 1              MS. BOLGER:  76 are all civil lawsuits, your Honor.

 2              THE COURT:  Dating back to when?

 3              MS. BOLGER:  Sorry, your Honor.  Off the top of my

 4      head, I don't know.

 5              THE COURT:  When would you like it for?  If you don't

 6      put a date in here -- I don't know if there's a date here

 7      somewhere in the beginning of your stuff.

 8              MS. BOLGER:  Your Honor, I mean, I would constrain

 9      that.  We could do 2012 to the present.

10              THE COURT:  All right.  They want all lawsuits, 2012 to

11      the present, that were filed against any of the Plaintiffs.

12              MR. FRAY-WITZER:  And that's against the Plaintiffs,

13      your Honor?

14              MS. BOLGER:  Involving the Plaintiffs.

15              MR. FRAY-WITZER:  See, because they also want --

16              MS. BOLGER:  Involving the Plaintiffs.

17              MR. FRAY-WITZER:  If we've sued someone for not paying

18      their bill, they want that.

19              MS. BOLGER:  Yes.

20              MR. FRAY-WITZER:  If someone has sued us for not paying

21      our -- our water bill for the bottled water, they want that.

22              MS. BOLGER:  Yes, your Honor.  They put their

23      reputation at issue.  I'm entitled to argue that they don't pay

24      their bills, jury, and therefore they have a bad reputation.

25      They have a reputation as people who don't pay their bills.  I
```

```
 1    have the right to argue about their reputation writ large.  It
 2    isn't confined by what the Plaintiff wants me to say.
 3            THE COURT:  I understand.
 4            What about suits that they bring against people for
 5    debt collection?  You don't really want that, do you?
 6            MS. BOLGER:  I do, your Honor, but I want it for one
 7    reason:  The Plaintiffs, you know, have networks; and things
 8    run on their networks.  And if they are willfully blind, then
 9    that is a thing I can argue to the jury, as tantamount to being
10    complicit in the hacking.  Right?  I'm allowed to argue that.
11            So yes.  I want to know what they're doing to police
12    their networks, what steps they're taking to protect their
13    network from malware or spam or hacking -- hacking bots.  I'm
14    entitled to ask what these guys are doing out there on the
15    marketplace.  Are they suing people who use their trademark?
16    What are they like?  Are they bullies?  I'm allowed to argue
17    that.
18            Do they bring cases on behalf of Russians, which is
19    what the dossier accuses them of, working for the XBT [sic]?
20    I'm entitled to ask those questions.
21            MR. FRAY-WITZER:  Yes, your Honor.
22            THE COURT:  What do you say about all that?
23            MR. FRAY-WITZER:  I don't think they're entitled to ask
24    those questions.  I think you run into things like the CDA and
25    Section 230 of it, which talks about how if you're operating a
```

1   network, you're not supposed to be subject to any of this kind

2   of liability.

3        The fact that Verizon has customers who are using the

4   telephone to commit criminal acts, using their Internet to

5   commit criminal acts, Verizon can't monitor that.

6        If you were to say that --

7        THE COURT:  I mean, you're talking apples and oranges

8   here.  She's asking for any lawsuits that were -- that you

9   either filed or were filed against you --

10       MS. BOLGER:  That's it.

11       THE COURT:  -- or criminal actions.

12       MS. BOLGER:  That's it, your Honor.

13       THE COURT:  That's what we're talking about right now.

14       MS. BOLGER:  Civil lawsuits filed against them or for

15  them since 2012, so I can establish their reputation and

16  perhaps their benign neglect, your Honor --

17       MR. FRAY-WITZER:  But what they're --

18       MS. BOLGER:  -- or their willful --

19       MR. FRAY-WITZER:  But what she just said was, if you

20  were sued for client activity.

21       So if someone sends a DMCA takedown notice saying one

22  of your clients has violated copyright, it's not our doing.

23       MS. BOLGER:  Your Honor, Mr. Fray-Witzer knows we

24  agreed --

25       MR. FRAY-WITZER:  It technically falls under --

```
 1              MS. BOLGER:  We agreed to --

 2              THE COURT:  Ma'am, you can only talk one at a time.

 3              MS. BOLGER:  I know, but that's not true.  We agreed we

 4     wouldn't seek DMCA requests.

 5              THE COURT:  All right.

 6              MS. BOLGER:  So -- and you know that.

 7              MR. FRAY-WITZER:  That's not what's being said here,

 8     though.

 9              THE COURT:  All right.  I'm going to require you to

10     provide -- to respond to No. 76 for 2012 to the present.  If in

11     your examination you find that there are thousands of lawsuits

12     where you sued someone for not paying you the $100 to use the

13     server, then you can categorize those in a summary fashion and

14     you can come back if you think that you need it.

15              But -- I mean, because I don't know what the burden is.

16     You know, if you guys are suing -- if you're like Verizon

17     where, you know, you file 100 lawsuits a week against someone

18     to collect -- because they didn't pay their phone bill, then I

19     can understand it.  But if you have two of those, then just

20     provide it.

21              So you're to provide it.  And you can provide it in

22     summary fashion as to items that you think are not directly

23     relevant to this suit.

24              MR. FRAY-WITZER:  Okay.

25              THE COURT:  And then you can come back to me if
```

```
 1    that's --

 2            MS. BOLGER:  But, your Honor, please don't say "not

 3    directly relevant to the suit," because then I'm -- I'm bound

 4    by the Plaintiffs' definition of relevance.

 5            THE COURT:  Well, that relate to monies owed to the

 6    company as a result of services provided.

 7            I mean, I don't know what you're going to find when you

 8    go there.  But what I want is for her to get basically the

 9    lawsuits that relate to -- that could be used or relate to your

10    reputation in the community.  And so if you're not paying

11    bills, then that has something to do with your reputation in

12    the community.  If people aren't paying you and there's

13    hundreds of those, then, as I said, you can summarize them.

14            MR. FRAY-WITZER:  Okay.

15            THE COURT:  So use your common sense and provide the

16    information.  You can do it in a summary fashion as to those

17    items in which there's numerous lawsuits that are of the same

18    standard.

19            MR. FRAY-WITZER:  Okay.

20            THE COURT:  And you can bring it -- you can try to

21    negotiate it.  If you can't, you can come back to me and say:

22    Hey, we need this because....

23            All right.  What's the next one?  We're way out of time

24    here.

25            MS. BOLGER:  81 to 83, your Honor, are criminal
```

1    investigations or criminal complaints or criminal liens.

2         And, your Honor, the Plaintiff is refusing to provide

3    any information about criminal investigations.

4         THE COURT:  Okay.

5         MS. BOLGER:  Your Honor, it's clearly relevant to

6    reputation.  It could also establish truth.  And we're clearly

7    entitled to that information.

8         THE COURT:  Which is what?  We're dealing with what

9    now?

10        MS. BOLGER:  81 through 83.

11        THE COURT:  81 is criminal investigations by --

12   investigation by a law enforcement agency.

13        82 is all documents relating to any criminal charges

14   brought anywhere against you, including search warrants, arrest

15   warrants, blah, blah, blah, 2000 to the present.

16        And 83 is all documents relating to any judgments or

17   liens filed against you.

18        What do you say about that?  It's basically criminal

19   investigations and liens.

20        MR. FRAY-WITZER:  Again, your Honor, our argument has

21   been that we've revealed to them that there were no criminal

22   cases brought against us; that asking about allegations is

23   beyond the scope of what any court really allows.  We've told

24   them, because it is relevant here, that we have not been

25   contacted or had any connection with any of the Trump

1    investigations.

2         But more than that, you know, we are really talking

3    about, did someone get alleged to have jaywalked and did

4    someone have a bar fight some years ago?  That's not the kind

5    of thing that's even remotely admissible in this case.

6         THE COURT:  Okay.  I find that it is relevant.  So I'm

7    going to require that you provide -- I'm going to use 2000 --

8         MS. BOLGER:  '12, your Honor?

9         THE COURT:  Yes.  2012 to the present, relating to --

10   in 81, you're to provide that.  I find that it's relevant to

11   your reputation.  I mean, it may not be admissible.  It may be

12   that you can argue, Hey, nobody knows about this, so how could

13   it be relevant to my reputation?  But without her knowing that

14   it exists, she can't investigate it to determine if it is.

15        82:  The same thing.  Any documents you have

16   relating -- you said there's no criminal charges.  So that

17   should be none.

18        MS. BOLGER:  Although our request is worldwide, your

19   Honor, and I don't think Mr. Fray-Witzer has said that.

20        THE COURT:  Okay.  Well, you're to respond to 82.  If

21   the answer is none, then just say none.

22        And 83 is relating to any judgments or liens against

23   you.  Same thing:  For 2012 to the present.

24        That seems kind of redundant on the lawsuits, probably,

25   but anyhow.

1              What else?  Anything else we need to talk about?

2              MS. BOLGER:  Yes, your Honor.  Mr. Siegal has the last

3      two of our requests.

4              THE COURT:  Mr. Siegal, you'd better hurry up.  I hope

5      you talk quick.  Are you from New York, too?

6              (Laughter.)

7              MR. SIEGEL:  I am not from New York.

8              MS. BOLGER:  I thought I was talking so slow.

9              MR. SIEGEL:  Your Honor, I actually grew up in

10     North Carolina, which probably disqualifies me from the fast

11     talker club.  But I live in Washington now, but I'll do my

12     best.

13             THE COURT:  Okay.

14             MR. SIEGEL:  I'm actually going to -- I'm going to ping

15     right off something that Mr. Witzer said.  And I think it might

16     be easier, actually, to go to the -- go to what is No. 4 on our

17     list, which is Request No. 32 --

18             THE COURT:  Yes.

19             MR. SIEGEL:  -- because Mr. Fray-Witzer just got up and

20     said that they're asking for all information about all 40,000

21     of our customers.

22             Frankly, your Honor, that's absurd.  It's not what

23     we're asking for.  Nothing close.

24             What we're done is narrow this request enormously.  He

25     says they have 40,000 customers.  That probably means -- I'm

1    not a technical expert, but they probably have millions of IP

2    addresses that are running on their servers.  We are asking for

3    information about 15 IP addresses and two blocks of smaller IP

4    addresses.

5           Actually, on that list, you can -- every number that

6    starts with 46 --

7           THE COURT:  Yes.

8           MR. SIEGEL:  -- you can eliminate it.  So we're only

9    asking for the ones that are above 46.  Okay?  We decided to

10   narrow it even further.

11          Why are we asking for those?  We are asking for those

12   because in -- every one of those IP addresses has been

13   identified in investigative reports either by the federal

14   government or by private cybersecurity agencies as what they

15   call indicators of compromise, IP addresses that are associated

16   primarily with Russian hacking of the DNC or other types of

17   similar botnet cybercrime that was occurring at the same time.

18          The first 13 on those lists are identified in what's

19   called the Grizzly Steppe Report, which was the joint report

20   issued by the Department of Homeland Security and the FBI in

21   late December.  This was the report where the government sort

22   of tried to definitively lay out its case for, "This is why we

23   believe that Russia was involved in hacking the election."

24          As an appendix to that report, they listed something

25   like 800 IP addresses that they said were indicators of

1    compromise that had some suspicious connection to potential

2    Russian hacking of the election.

3            13 of those IP addresses belong to Root, S.A., which is

4    a subsidiary of XBT.

5            So what we are asking for is, we would like to have the

6    log information -- and we're happy to do it in as protective a

7    way as possible.  We can do it under an attorney-eyes-only

8    protective order, et cetera.  But for the years 2014, '15, '16

9    up to the date of the lawsuit.  Why?  Because the hacking of

10   the DNC actually began in 2015, relatively earlier in 2015, and

11   they continued to siphon the information up through the

12   election.

13           So basically what we're saying is, let us go to a year

14   before up through the date that the lawsuit was filed.  And we

15   want the log information, essentially -- and they haven't even

16   told us what they have or what they don't have -- but

17   generally, Internet companies keep logs of activities that are

18   related to an IP address, so we can investigate what was

19   occurring at those particular addresses.

20           THE COURT:  And how is that relevant to this lawsuit?

21           MR. SIEGEL:  Because the underlying allegation -- they

22   are suing Defendants for defamation because they allege they

23   were falsely accused --

24           THE COURT:  Of hacking?

25           MR. SIEGEL:  Of hacking.

```
 1              THE COURT:  Right.

 2              MR. SIEGEL:  Right?

 3              Here, we have specific -- I mean, we're not just coming

 4    in here and saying:  Give us access to your whole network.

 5    Right?

 6              Here we're saying there is specific investigative

 7    reports that have identified these specific IP addresses on

 8    your network that have -- that, you know, the government or

 9    private cybersecurity companies -- primarily, the government --

10    have found have some suspicious connection to exactly what this

11    lawsuit is about.

12              And it's difficult for me to imagine a clearer fact

13    predicate for something that could lead to the discovery of

14    admissible evidence.

15              THE COURT:  Okay.  Let me hear from the Plaintiff.

16              MR. FRAY-WITZER:  And here's where we get to the

17    argument that we were just making, your Honor.

18              What we've said to them with respect to all of the IP

19    addresses that they've identified, even the other ones that

20    they're saying they're narrowing out, we have said, to the

21    extent that any of those IP addresses were used by Gubarev,

22    were used by Webzilla, were used by any XBT company, we will

23    give you what you are requesting.

24              The only thing that we were not doing -- and it's

25    important to know that if you look at Request No. 32, they talk
```

```
 1    about "and related entities."  They define related entities to

 2    be every one of our 40,000 customers.  We've said, if we use

 3    those IP addresses in any respect or completely, we will give

 4    you the information that you are requesting.

 5         To the extent that you are asking us for our customers'

 6    data, for what our customers were doing, that's not what was

 7    alleged in the dossier.  That is not relevant and we can't

 8    possibly be required to do that.

 9         That's where we drew the line was, again, with the

10    Verizon example.

11         THE COURT:  Okay.  I got it.

12         MR. FRAY-WITZER:  Yes.

13         THE COURT:  So he says he should give it to you --

14         (Interruption in digital audio recording.)

15         MR. SIEGEL:  I would submit that the more likely way

16    was that they would have been facilitating activity like that

17    occurring on their network.  Right?

18         And basically, they're saying:  No, no, no, no.  That

19    is completely shielded.  You don't -- they have decided up

20    front that if this activity was occurring on their network,

21    they're not even telling us whether they know who it was or it

22    wasn't.  But they have nothing to do with it.

23         Well, isn't that a fact that we get to discover?  I

24    mean, if this was, in fact -- if there was hacking of the DNC

25    that was occurring on their network, that's a pretty important
```

1    fact in this case.  Right?  First of all, in and of itself,

2    that's a relevant fact.  It goes to the credibility of the

3    dossier if in fact there was hacking emanating from their

4    network.

5         But number two, we would have to know whether that's

6    true in order to then be able to say:  Okay.  Did you know

7    about it?  Were you facilitating it?  Were you turning a blind

8    eye to it?

9         And this -- this -- this -- what they are trying to

10   say -- and they say it in their objection -- the actions or

11   omissions by any of Plaintiffs' customers or clients are not

12   attributable to Plaintiffs and are therefore irrelevant.

13        Well, that's the ultimate fact to be decided in the

14   case.  If their network was the source of hacking the

15   Democrats, then we have to be able to investigate whether they

16   knew about it, whether they facilitated it, whether they

17   encouraged it or not.

18        And maybe it won't be clear and maybe even those issues

19   will have to be presented for a jury to decide.  But this

20   absolute line that they're trying to say that -- that even if

21   this was happening on our network, it's irrelevant, because

22   we're telling you, your Honor, we're just representing to you

23   it has nothing to do with us, I mean, that's what the whole

24   case is about.  And that's what discovery is about.  And we

25   have to be entitled.

1          MR. FRAY-WITZER:  It is precisely, your Honor -- I

2     mean, the dossier does not say that it was taking place in

3     (inaudible).  The dossier says you, Plaintiffs, were doing

4     this.

5          THE COURT:  No.  It says entities linked to one Aleksey

6     Gubarev.

7          MR. FRAY-WITZER:  Yes.  All of his business entities.

8     And we have told them we will give them everything related to

9     every one of his business entities.  But it would be like

10    ordering --

11         THE COURT:  Well, the defense could be it was linked to

12    him because it was his company that ran their servers.  I find

13    that it is relevant.  It may not be admissible, but it's

14    relevant.  And I find that I'm going to require that the

15    information be provided for the -- all of the IP addresses

16    listed other than those that that begin with 46.

17         MR. SIEGEL:  And --

18         THE COURT:  You can agree to a -- hopefully, you can

19    come to a mutual agreement --

20         MR. SIEGEL:  We're happy to, yes.

21         THE COURT:  -- subject to a protective order that the

22    parties agree to.

23         MR. SIEGEL:  The last one --

24         THE COURT:  Really, I've got to get moving here.

25         MR. SIEGEL:  Yeah.  I know.  This to me should be very

1    easy.  And I don't understand why there's an objection.

2         "Documents identifying anti-malware, anti-spam and

3    other security tools utilized by XBT and related entities to

4    monitor its hosted content."

5         All we're saying is, we want to know what you, XBT --

6    I'm not asking for, you know, what antivirus program does every

7    one of your customers upload.  We're saying:  You, XBT, we

8    assume, have some sort of security tools like most Internet

9    companies to determine what's happening on -- whether there are

10   violations taking place on your system.  That would go to their

11   knowledge of what's on their system.

12        And all we're trying to find out is, tell us what they

13   are.  I mean, you know, tell us what tools you have, what

14   programs you have, what anti-malware.  That's all it is.  It

15   seems to me obviously relevant in a case about hacking to

16   understand the degree to which they are -- what kind of tools

17   they use to monitor whether is hacking occurring on their

18   networks.  It's not an intrusive request.

19        THE COURT:  What he's accused of is hacking someone

20   else's network, not hacking his own network.

21        MR. SIEGEL:  No, no, no, no, no.  I mean, in other

22   words, whether there is suspicious activity that is taking

23   place.  Whether people on their networks are violating their

24   terms and conditions by engaging in hacking by sending viruses

25   out.

1          In other words, an Internet company will often have

2     tools to try to determine whether there are bad actors on their

3     network, right, using their networks to send bad stuff out of

4     their networks.  That would be a violation of the terms and

5     conditions of their --

6          THE COURT:  When I think of malware, it's to protect

7     me.  But you're saying --

8          MR. SIEGEL:  Yeah.

9          THE COURT:  -- that these companies --

10         MR. SIEGEL:  This is maybe -- the best I can think

11    about it is preemptively.  Right?  If I'm Verizon, if I am

12    Verizon, I don't want people to be using my network to

13    cyberhack if I can tell that that's what they're doing.

14         That's all we are asking for.

15         THE COURT:  Okay.

16         MR. SIEGEL:  If the answer is "We don't have it," then

17    I guess it's "We don't have it."  But it seems very simple.

18         MR. FRAY-WITZER:  It is the same answer, your Honor,

19    which is:  We've told them that we will give them everything

20    that pertains to our use of the networks and that our clients'

21    use is not what the dossier is about.  It is not about --

22         THE COURT:  But that's what I'm hearing him saying, is

23    what do you use to monitor either your own traffic or your

24    customers' traffic?

25         MR. FRAY-WITZER:  We've said for our own traffic, we

1     are happy to give over that information.

2          THE COURT:  But what about the -- what about the

3     systems that you use to ensure that your clients are not

4     hacking?

5          MR. FRAY-WITZER:  Again, our problem with it is that

6     the request suggests that what our clients are doing or not

7     doing is relevant.  And it's just not relevant to the

8     allegations in the dossier.

9          What happened on the network is nowhere in the dossier

10    or the allegations.

11         The only allegation is Gubarev, Gubarev's businesses,

12    XBT and Webzilla, they were doing it.  That's what we think

13    they're entitled to.

14         MR. SIEGEL:  I don't think the dossier is that

15    suspicious -- is that specific.  Right?  If we could -- if we

16    could prove that they were knowingly facilitating Russian

17    hackers to use their networks to hack the DNC, I think that --

18    we would be entitled to certainly argue that that proves the

19    substantial truth of the dossier.

20         To say that that's --

21         THE COURT:  I'm going to require that it be provided.

22    I find that it is relevant to the issue of whether or not the

23    Plaintiffs were involved in hacking.

24         So you've got to produce it.

25         Anything else?

```
 1              MS. BOLGER:  Your Honor, one quick thing.

 2              THE COURT:  Yes.

 3              MS. BOLGER:  At the beginning of the session this

 4    morning, I -- Mr. Fray-Witzer and I reached agreement on the

 5    financial information, which caused him to withdraw the second

 6    thing.

 7              I forgot to tell Mr. Fray-Witzer that I'd like to do it

 8    attorneys' eyes only.

 9              Would it be okay with you if we just did it attorneys'

10    eyes only?

11              MR. FRAY-WITZER:  That's fine.

12              MS. BOLGER:  Okay.

13              THE COURT:  Have you all entered a protective order in

14    this case?

15              MR. FRAY-WITZER:  We have.

16              MS. BOLGER:  We have.

17              MR. SIEGEL:  Yes.

18              THE COURT:  Okay.  Good.

19              So I think on the Plaintiffs' motion, basically, I'm

20    just ordering you to brief that.

21              Was there any substantive ruling in that case?  I don't

22    think there was, right?

23              MS. BOLGER:  No.

24              THE COURT:  There was another issue.  No?

25              MS. BOLGER:  No.
```

```
 1          THE COURT:  The other issue I think you resolved.

 2          So I'm going to require that the Defendants prepare the

 3   order in this and get it to me.

 4          How much time do you need?  Hopefully, somebody over

 5   there is taking notes.

 6          MR. SIEGEL:  We'll get the transcript.

 7          THE COURT:  If you're getting that transcript, you

 8   probably need about a week, then, to get me --

 9          MS. BOLGER:  Can we have a week, your Honor?

10          THE COURT:  Yes.  Sure.

11          The order -- well, let's give you a date now for the

12   supplements that are required.  How much time do you need?

13   There was one thing where I told you to respond.

14          MS. BOLGER:  You told me to amend my answer, my

15   discovery request objections to strike the (inaudible) when not

16   relevant.  And I will do that, your Honor.

17          THE COURT:  Okay.  Got it.  So do that within a week.

18   Okay?

19          And can you do your stuff within a week?

20          MR. FRAY-WITZER:  Can we have two weeks, your Honor?

21          THE COURT:  Okay.  So two weeks from today, everything

22   that the Defendant is -- I'm sorry -- the Plaintiff is required

23   to produce is due.  The Defendants are to do their amendment

24   by --

25          MS. BOLGER:  Your Honor, just so it's all in one place,
```

1    for my -- for me, our motion on the reporter's privilege is due

2    on the 16th, opposition the 30th and reply the 6th.  Is that

3    right?

4              THE COURT:  It's two weeks from Monday.

5              MS. BOLGER:  Yeah.

6              THE COURT:  Yes.  The 16th.  And then 14 and then

7    seven.

8              All right.  Anything else I can help you all with?

9              MS. BOLGER:  No.  Thank you, your Honor.

10             MR. FRAY-WITZER:  Thank you, your Honor.

11             THE COURT:  Good seeing you.

12             MR. SIEGEL:  Thank you, your Honor.

13             THE COURT:  Are you meeting Judge Ungaro tomorrow?

14             MR. FRAY-WITZER:  Yes.  4:00 p.m.

15             THE COURT:  Good luck.

16             (Proceedings concluded.)

17

18

19

20

21

22

23

24

25

```
1                          C E R T I F I C A T E

2

3            I hereby certify that the foregoing is an

4     accurate transcription of the proceedings in the

5     above-entitled matter to the best of my ability.

6

7
                              /s/Lisa Edwards
8     _____          LISA EDWARDS, RDR, CRR
         DATE                Official Court Reporter
9                            United States District Court
                             400 North Miami Avenue, Twelfth Floor
10                           Miami, Florida 33128
                             (305) 523-5499
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

**$**

**$100** [1] - 72:12

**'**

**'12** [1] - 75:8
**'15** [1] - 78:8
**'16** [1] - 78:8

**/**

**/s/Lisa** [1] - 89:7

**0**

**02116** [1] - 1:17
**02459** [1] - 1:21

**1**

**1** [5] - 1:9, 48:18,
52:16, 61:9, 68:20
**1-A** [1] - 5:12
**10** [8] - 13:25, 50:19,
60:15, 60:19, 60:24,
61:12, 61:13, 62:1
**100** [1] - 72:17
**10020** [1] - 2:4
**10:00** [1] - 1:7
**10th** [1] - 9:25
**11** [1] - 62:2
**110** [1] - 1:23
**117** [1] - 30:8
**11:00** [3] - 53:14,
53:16, 53:19
**1251** [1] - 2:3
**13** [3] - 13:25, 77:18,
78:3
**1300** [1] - 2:10
**139** [3] - 17:25, 18:6,
18:16
**14** [2] - 14:1, 88:6
**15** [2] - 14:2, 77:3
**16** [1] - 14:3
**16th** [3] - 44:5, 88:2,
88:6
**17** [1] - 14:3
**17-60426-CIVIL-
UNGARO** [1] - 1:2
**17-Civil-60426** [1] -
3:7
**18** [1] - 14:6
**1919** [1] - 2:6

**2**

**2** [2] - 58:16, 62:11
**20** [3] - 1:16, 1:20,
44:9
**2000** [5] - 66:16,
67:5, 68:2, 74:15,
75:7
**20006** [1] - 2:7
**201** [1] - 2:10
**2010** [1] - 50:10
**2012** [7] - 50:13,
69:9, 69:10, 71:15,
72:10, 75:9, 75:23
**2013** [1] - 19:16
**2014** [1] - 78:8
**2015** [7] - 61:9, 68:6,
68:7, 68:16, 68:20,
78:10
**2016** [4] - 10:9,
10:19, 28:17, 58:4
**2017** [4] - 1:6, 10:1,
50:19, 58:5
**2018** [1] - 58:6
**21st** [1] - 2:3
**23** [1] - 14:6
**230** [1] - 70:25
**26** [2] - 49:3, 66:8
**28** [2] - 1:6, 30:7
**2:00** [1] - 42:3
**2nd** [1] - 44:4

**3**

**30** [3] - 33:13, 33:14,
59:9
**305** [2] - 2:13, 89:10
**30th** [2] - 44:5, 88:2
**32** [2] - 76:17, 79:25
**33128** [1] - 89:10
**33131** [1] - 2:11
**33302** [1] - 1:24

**4**

**4** [2] - 58:21, 76:16
**40,000** [5] - 11:19,
65:22, 76:20, 76:25,
80:2
**400** [1] - 89:9
**439-7168** [1] - 2:13
**45** [2] - 25:6, 25:9
**46** [4] - 49:10, 77:6,
77:9, 82:16
**47** [1] - 49:12
**48** [1] - 49:15
**49** [5] - 49:17, 66:11,

66:12, 66:13, 67:13
**4:00** [1] - 88:14

**5**

**5** [10] - 13:20, 48:18,
49:6, 60:15, 60:18,
60:19, 60:24, 60:25,
62:1
**50** [2] - 49:19, 61:16
**501** [1] - 17:14
**505** [1] - 1:17
**523-5499** [1] - 89:10
**54** [1] - 14:8
**58** [2] - 58:21, 61:16
**59** [1] - 58:21

**6**

**6** [1] - 62:2
**6th** [3] - 44:6, 44:8,
88:2

**7**

**76** [3] - 66:13, 69:1,
72:10

**8**

**800** [2] - 2:7, 77:25
**81** [4] - 73:25, 74:10,
74:11, 75:10
**82** [3] - 74:13, 75:15,
75:20
**825** [1] - 1:20
**83** [4] - 73:25, 74:10,
74:16, 75:22

**9**

**9** [1] - 13:21
**90.5015** [1] - 5:9

**A**

**a.m** [1] - 1:7
**abandoned** [1] -
26:22
**ability** [2] - 43:10,
89:5
**able** [11] - 9:6, 9:20,
24:10, 40:19, 44:19,
53:15, 53:24, 55:2,
58:10, 81:6, 81:15
**above-entitled** [1] -

89:5
**absolute** [11] - 6:11,
17:2, 17:3, 19:16,
19:19, 21:24, 22:14,
22:19, 38:20, 41:16,
81:20
**absolutely** [5] - 49:1,
55:10, 65:12, 66:3,
68:10
**absurd** [1] - 76:22
**acceptable** [1] -
51:14
**access** [1] - 79:4
**accompanying** [1] -
21:4
**according** [1] - 42:23
**accurate** [1] - 89:4
**accusation** [1] -
11:22
**accused** [1] - 57:5,
78:23, 83:19
**accuses** [3] - 63:11,
65:11, 70:19
**action** [5] - 13:3,
17:19, 19:12, 21:12,
61:15
**actions** [5] - 13:2,
18:1, 62:14, 71:11,
81:10
**activities** [1] - 78:17
**activity** [4] - 71:20,
80:16, 80:20, 83:22
**actors** [1] - 84:2
**acts** [3] - 63:22, 71:4,
71:5
**actual** [11] - 6:15,
7:3, 8:3, 30:23, 31:2,
33:24, 41:7, 49:13,
49:15, 55:23, 59:18
**addition** [4] - 12:11,
20:5, 50:8, 58:3
**additional** [2] - 48:7,
53:5
**address** [13] - 4:5,
36:1, 38:22, 39:1,
39:5, 43:7, 43:8,
48:17, 52:17, 52:24,
57:19, 65:10, 78:18
**addressed** [2] -
22:24, 35:3
**addresses** [14] -
14:2, 77:2, 77:3, 77:4,
77:12, 77:15, 77:25,
78:3, 78:19, 79:7,
79:19, 79:21, 80:3,
82:15
**addressing** [2] - 4:4,
36:22
**admissible** [5] -
66:9, 75:5, 75:11,

89:5
**admitted** [1] - 30:3
**admitting** [1] - 8:20
**advantage** [1] -
47:15
**advice** [3] - 22:17,
23:6, 38:1
**advise** [2] - 44:22,
53:23
**affidavits** [2] - 20:13,
20:23
**affiliates** [1] - 10:20
**affirmed** [1] - 19:15
**afternoon** [1] - 42:3
**agencies** [1] - 77:14
**agency** [2] - 5:19,
74:12
**agent** [2] - 9:4,
11:22, 55:9
**ago** [4] - 35:3, 53:2,
59:14, 75:4
**agree** [5] - 59:22,
61:11, 61:21, 82:18,
82:22
**agreed** [6] - 11:4,
60:11, 60:13, 71:24,
72:1, 72:3
**agreement** [3] -
60:24, 82:19, 86:4
**ahead** [4] - 4:21,
35:6, 37:16, 48:16,
59:3
**air** [3] - 31:4, 31:8,
34:1
**Aleksej** [1] - 3:1
**Aleksey** [2] - 10:23,
82:5
**ALEKSEY** [1] - 1:4
**allegation** [3] -
61:20, 78:21, 85:11
**allegations** [10] -
28:18, 40:23, 41:11,
41:17, 42:8, 42:11,
42:21, 74:22, 85:8,
85:10
**allege** [1] - 78:22
**alleged** [5] - 25:23,
57:25, 65:7, 75:3,
80:7
**allegedly** [1] - 30:20
**allow** [1] - 19:18
**allowed** [2] - 70:10,
70:16
**allows** [1] - 74:23
**almost** [2] - 4:24,
66:7
**alone** [2] - 32:23,
33:1
**altering** [1] - 10:22
**alternative** [5] - 22:9,

26:16, 27:7, 35:10, 38:22

**alternatives** [1] - 31:16

**amend** [4] - 15:7, 15:14, 16:6, 87:14

**amended** [2] - 25:6, 52:23

**amendment** [1] - 87:23

**Amendment** [1] - 20:11

**amendments** [1] - 53:4

**America** [1] - 17:11

**Americas** [1] - 2:3

**amount** [2] - 39:15, 61:18

**amounts** [1] - 13:21

**analogy** [1] - 18:21

**analysis** [3] - 17:15, 17:17, 18:24

**angry** [1] - 30:6

**Annis** [1] - 18:22

**answer** [7] - 5:3, 32:22, 64:18, 75:21, 84:16, 84:18, 87:14

**answers** [4] - 15:7, 15:14, 47:16, 52:24

**anti** [3] - 83:2, 83:14

**anti-malware** [2] - 83:2, 83:14

**anti-spam** [1] - 83:2

**antivirus** [1] - 83:6

**anyhow** [2] - 46:4, 75:25

**anyway** [4] - 36:21, 43:7, 58:5, 65:23

**apologize** [1] - 27:17

**Appeals** [2] - 19:16, 22:2

**appearances** [1] - 3:9

**APPEARANCES** [2] - 1:14, 2:1

**appeared** [1] - 46:15

**appellate** [1] - 63:25

**appendix** [1] - 77:24

**apples** [1] - 71:7

**application** [1] - 20:10

**applications** [2] - 59:25, 61:10

**applied** [3] - 14:12, 18:20, 18:24

**applies** [8] - 8:11, 12:17, 12:25, 18:2, 19:17, 27:25, 37:9, 38:19

**apply** [6] - 5:7, 22:4,

23:4, 24:13, 38:10, 38:20

**applying** [3] - 19:12, 19:25, 30:11

**April** [1] - 58:6

**area** [1] - 6:18

**areas** [3] - 7:14, 16:7, 53:7

**argue** [21] - 5:7, 5:10, 6:6, 6:7, 12:15, 21:21, 49:12, 49:17, 56:7, 56:10, 56:17, 63:9, 67:19, 67:21, 69:23, 70:1, 70:9, 70:10, 70:16, 75:12, 85:18

**arguing** [1] - 52:13, 57:8

**argument** [8] - 6:19, 30:1, 30:14, 47:13, 52:20, 65:10, 74:20, 79:17

**arguments** [6] - 4:19, 22:21, 31:15, 38:22, 55:14, 55:15

**arise** [1] - 5:4

**array** [1] - 28:21

**arrest** [2] - 64:2, 74:14

**article** [14] - 7:11, 7:13, 21:2, 21:4, 21:6, 21:7, 23:18, 28:9, 29:1, 29:3, 40:19, 40:22, 40:23, 41:10

**articles** [1] - 27:13

**articulated** [2] - 19:20, 20:6

**aside** [1] - 59:14

**assert** [4] - 16:13, 24:4, 38:13, 57:24

**asserted** [5] - 8:9, 14:5, 15:8, 15:10, 15:12

**asserting** [7] - 5:1, 16:17, 23:4, 36:21, 37:8, 37:23, 43:9

**asserts** [1] - 63:21

**assessing** [2] - 18:2, 49:2

**associate** [1] - 32:10

**associated** [2] - 63:22, 77:15

**association** [1] - 5:19

**assume** [5] - 15:8, 39:6, 59:23, 66:22, 83:8

**assumed** [2] - 28:20, 30:13

**assuming** [1] - 48:6

**assumption** [1] - 27:5

**Atlanta** [1] - 32:17

**attempt** [1] - 9:7

**attorney** [6] - 22:12, 35:1, 37:24, 37:25, 47:9, 78:7

**attorney's** [2] - 22:17, 23:6

**attorney-client** [3] - 22:12, 35:1, 37:24

**attorney-eyes-only** [1] - 78:7

**attorneys'** [2] - 86:8, 86:9

**attributable** [1] - 81:12

**audio** [1] - 80:14

**AUDIO** [1] - 1:13

**audited** [2] - 14:8, 14:22

**Avenue** [1] - 2:3, 2:6, 89:9

**awful** [1] - 46:24

## B

**B-O-L-G-E-R** [1] - 45:10

**background** [1] - 8:25

**backwards** [1] - 14:16

**bad** [3] - 69:24, 84:2, 84:3

**badly** [1] - 48:25

**balancing** [1] - 40:11

**bank** [3] - 42:3, 57:14, 61:7

**banks** [1] - 59:19

**bar** [1] - 75:4

**based** [3] - 20:12, 31:3, 46:19

**basis** [5] - 14:20, 15:18, 27:21, 29:14, 49:5

**Beacon** [1] - 1:20

**bears** [1] - 37:1

**because...** [1] - 73:22

**become** [1] - 10:1

**becomes** [1] - 16:14

**BEFORE** [1] - 1:12

**began** [1] - 78:10

**begin** [1] - 82:16

**beginning** [4] - 13:17, 52:19, 69:7, 86:3

**behalf** [4] - 3:20, 4:2,

53:21, 70:18

**behavior** [1] - 64:3

**belief** [1] - 25:10

**belong** [1] - 78:3

**BEN** [1] - 1:8

**Ben** [5] - 3:6, 5:12, 14:6, 14:23, 21:1

**bench** [2] - 35:18, 35:23

**benign** [1] - 71:16

**Benzinger** [1] - 21:19

**best** [2] - 76:12, 84:10, 89:5

**better** [5] - 25:8, 31:14, 44:12, 47:16, 76:4

**beyond** [1] - 74:23

**bill** [3] - 69:18, 69:21, 72:18

**bills** [3] - 69:24, 69:25, 73:11

**Biscayne** [1] - 2:10

**bit** [9] - 6:20, 8:25, 9:22, 11:2, 22:11, 50:12, 50:15, 52:25, 55:9

**BLACK** [1] - 2:9

**blah** [3] - 74:15

**blank** [3] - 10:7, 10:8, 10:10

**Blecker** [1] - 18:22

**blind** [3] - 67:21, 70:8, 81:7

**blocks** [1] - 77:3

**blur** [1] - 66:3

**boilerplate** [1] - 64:5

**Bolger** [9] - 3:20, 29:21, 31:23, 32:14, 33:21, 45:4, 45:5, 52:20, 65:9

**BOLGER** [181] - 2:2, 3:20, 14:16, 14:24, 15:5, 15:11, 15:18, 16:10, 16:16, 16:19, 16:25, 17:20, 17:22, 17:25, 19:7, 19:14, 19:24, 20:16, 20:19, 20:22, 21:16, 21:18, 21:21, 22:13, 22:15, 23:8, 24:14, 24:24, 25:2, 25:5, 25:9, 27:3, 27:5, 27:20, 27:22, 28:4, 28:11, 28:14, 28:16, 28:24, 29:1, 29:5, 29:13, 30:2, 31:5, 31:8, 34:21, 35:4, 35:7, 35:22, 35:24, 36:5, 36:8, 36:15, 36:20, 36:25,

37:4, 37:6, 37:12, 37:16, 37:20, 38:4, 38:8, 38:11, 38:17, 38:25, 39:10, 39:12, 39:15, 39:18, 39:24, 40:9, 40:11, 40:18, 41:8, 41:15, 41:21, 41:25, 42:7, 42:16, 42:18, 42:20, 43:2, 43:4, 43:11, 43:15, 43:17, 43:23, 44:3, 44:15, 45:4, 45:6, 45:8, 45:10, 45:13, 45:16, 45:18, 45:24, 46:2, 46:9, 46:21, 47:22, 48:17, 48:22, 50:10, 50:13, 50:16, 50:19, 50:22, 52:15, 54:4, 55:12, 55:14, 56:9, 56:12, 56:15, 57:11, 57:17, 57:21, 58:25, 59:11, 60:5, 60:9, 60:15, 60:18, 60:20, 61:2, 61:4, 61:13, 61:23, 62:1, 62:8, 62:10, 66:8, 66:13, 66:17, 66:24, 67:6, 67:8, 67:13, 67:25, 68:3, 68:5, 68:12, 68:15, 68:23, 69:1, 69:3, 69:8, 69:14, 69:16, 69:19, 69:22, 70:6, 71:10, 71:12, 71:14, 71:18, 71:23, 72:1, 72:3, 72:6, 73:2, 73:25, 74:5, 74:10, 75:8, 75:18, 76:2, 76:8, 86:1, 86:3, 86:12, 86:16, 86:23, 86:25, 87:9, 87:14, 87:25, 88:5, 88:9

**born** [1] - 12:5

**Boston** [2] - 1:17, 45:7

**BOSTON** [1] - 1:19

**botnet** [1] - 77:17

**botnets** [1] - 10:20

**bots** [3] - 65:15, 65:19, 70:13

**bottled** [1] - 69:21

**Boulevard** [1] - 2:10

**bound** [1] - 73:3

**Brady** [1] - 3:16

**BRADY** [1] - 1:22

**brief** [2] - 34:24, 86:20

**briefed** [6] - 32:1, 32:2, 32:6, 32:7, 35:1, 42:24

**briefing** [1] - 46:4
**bring** [4] - 56:20, 70:4, 70:18, 73:20
**broad** [4] - 13:17, 20:10, 23:25, 67:12
**broadly** [1] - 20:9
**broke** [1] - 57:2
**brought** [7] - 64:11, 64:18, 64:24, 64:25, 65:6, 74:14, 74:22
**bugs** [1] - 10:21
**Bulger** [1] - 45:11
**Bulgers** [1] - 45:7
**bullies** [1] - 70:16
**bunch** [1] - 67:21
**bunches** [1] - 28:7
**burden** [9] - 7:3, 37:1, 37:8, 37:9, 37:14, 37:17, 37:19, 52:5, 72:15
**business** [13] - 11:25, 49:11, 49:18, 49:24, 51:7, 51:24, 54:25, 55:19, 58:12, 62:16, 62:23, 82:7, 82:9
**Business** [1] - 9:3
**business-wise** [1] - 62:23
**businesses** [2] - 11:19, 85:11
**BUZZFEED** [1] - 1:8
**Buzzfeed** [27] - 3:6, 5:12, 6:18, 6:24, 7:6, 9:8, 9:9, 9:10, 10:1, 10:5, 12:13, 14:4, 15:13, 20:15, 20:16, 26:3, 26:15, 27:2, 30:19, 31:18, 32:16, 32:17, 32:18, 33:18, 34:4, 35:19, 41:4
**BY** [1] - 2:12

# C

**calculated** [1] - 61:19
**California** [3] - 19:8, 20:13, 21:19
**cannot** [4] - 6:16, 21:24, 21:25, 22:8
**care** [2] - 16:22, 54:3
**Carolina** [1] - 76:10
**carried** [2] - 63:10, 63:12
**carrying** [1] - 65:12
**case** [53] - 3:1, 3:7, 6:15, 12:11, 12:12, 18:7, 18:14, 18:15,

18:22, 18:25, 22:20, 23:3, 25:17, 25:23, 26:8, 30:17, 32:4, 33:23, 37:12, 38:21, 40:18, 40:21, 41:10, 42:5, 42:6, 43:12, 44:18, 48:23, 51:10, 51:18, 51:19, 51:22, 56:4, 56:15, 57:8, 57:9, 63:4, 63:18, 63:24, 65:3, 65:6, 65:17, 75:5, 77:22, 81:1, 81:14, 81:24, 83:15, 86:14, 86:21
**CASE** [1] - 1:2
**Case** [1] - 3:6
**cases** [19] - 19:17, 27:6, 30:5, 30:11, 31:20, 51:11, 55:16, 63:20, 64:10, 64:18, 64:25, 70:18, 74:22
**cash** [1] - 11:7
**categories** [5] - 6:20, 6:23, 9:18, 13:20, 15:25
**categorize** [1] - 72:13
**caused** [1] - 86:5
**CDA** [1] - 70:24
**Centre** [1] - 1:21
**certain** [2] - 19:8, 50:25
**certainly** [5] - 6:6, 39:12, 52:23, 63:15, 85:18
**certify** [1] - 89:3
**cetera** [1] - 78:8
**chain** [1] - 32:19
**change** [1] - 54:18
**character** [1] - 63:22
**charged** [1] - 64:20
**charges** [3] - 64:24, 74:13, 75:16
**chief** [2] - 12:12, 21:1
**choice** [2] - 17:15, 17:17
**choice-of-law** [1] - 17:15
**Christopher** [8] - 9:4, 26:1, 26:5, 26:8, 26:20, 26:23, 26:25
**CIA** [1] - 24:17
**CIAMPA** [1] - 1:16
**Circuit** [5] - 17:7, 20:1, 20:6, 37:6, 37:7
**circumstance** [2] - 26:6, 40:4
**circumstances** [1] - 28:1

**cited** [1] - 58:1
**citizen** [1] - 12:2
**citizens** [1] - 19:21
**civil** [8] - 19:17, 62:16, 62:21, 63:1, 63:10, 65:2, 69:1, 71:14
**claim** [9] - 9:13, 30:25, 51:6, 54:12, 54:21, 56:20, 57:24, 61:14, 63:3
**claimed** [3] - 49:10, 49:24, 61:16
**claims** [2] - 33:22, 55:5
**clear** [12] - 27:6, 27:8, 27:9, 31:10, 32:9, 35:13, 35:15, 45:13, 47:10, 49:3, 52:1, 81:18
**clearer** [1] - 79:12
**clearly** [7] - 8:7, 33:23, 34:13, 35:3, 52:8, 74:5, 74:6
**CLERK** [2] - 47:1, 47:3
**client** [5] - 9:24, 22:12, 35:1, 37:24, 71:20
**clients** [5] - 11:19, 71:22, 81:11, 85:3, 85:6
**clients'** [1] - 84:20
**Clinton** [1] - 11:6
**close** [1] - 76:23
**closest** [1] - 18:21
**club** [1] - 76:11
**CNN** [4] - 28:6, 32:7, 32:17, 42:20
**COBB** [3] - 1:22, 3:16, 48:9
**Cobb** [1] - 3:16
**Cohen** [1] - 11:3, 11:4
**collect** [1] - 72:18
**collection** [1] - 70:5
**Columbia** [2] - 19:8, 56:12
**Comey** [4] - 28:5, 28:16, 28:18, 42:24
**comfortable** [1] - 44:23
**coming** [6] - 29:15, 48:10, 52:22, 53:5, 53:6, 79:3
**commercial** [1] - 33:16
**commit** [2] - 71:4, 71:5
**committed** [1] -

23:17
**common** [9] - 6:3, 6:7, 6:8, 6:10, 17:6, 17:8, 30:12, 30:13, 73:15
**common-law** [5] - 6:3, 6:7, 6:8, 30:12, 30:13
**communicate** [1] - 39:24
**communication** [1] - 16:2
**communications** [1] - 14:4
**community** [4] - 57:4, 62:20, 73:10, 73:12
**comp** [2] - 68:10, 68:11
**Companies** [1] - 11:17
**companies** [7] - 11:18, 54:15, 68:9, 78:17, 79:9, 83:9, 84:9
**companies'** [1] - 54:16
**company** [7] - 8:5, 10:19, 11:22, 73:6, 79:22, 82:12, 84:1
**compare** [2] - 50:21, 58:5, 58:9
**compel** [2] - 24:21, 25:19
**compelled** [2] - 15:16, 21:25
**compelling** [7] - 22:9, 26:10, 26:12, 30:15, 30:16, 40:19, 48:3
**competitor** [1] - 8:4
**complaint** [3] - 20:24, 49:6, 61:16
**complaints** [3] - 62:17, 63:2, 74:1
**complete** [3] - 19:6, 61:17, 63:3
**completely** [5] - 34:9, 41:3, 66:2, 80:3, 80:19
**compliance** [7] - 67:11, 67:13, 68:5, 68:6, 68:13, 68:21
**compliant** [1] - 67:8
**complicated** [1] - 46:17
**complicit** [1] - 70:10
**complying** [1] - 66:25
**compromise** [2] -

77:15, 78:1
**Compuware** [1] - 18:14
**concerning** [3] - 14:7, 55:3, 58:18
**concluded** [1] - 88:16
**conditions** [2] - 83:24, 84:5
**conduct** [2] - 10:21
**conference** [2] - 4:8, 43:14
**conferences** [1] - 46:14
**confess** [1] - 23:17
**confidential** [2] - 14:21, 15:3
**confined** [1] - 70:2
**confirmation** [1] - 24:19
**confirmed** [1] - 42:22
**confusing** [1] - 16:14
**Congress** [1] - 24:16
**connection** [5] - 20:19, 33:4, 74:25, 78:1, 79:10
**connections** [1] - 50:25
**consider** [1] - 44:25
**Constitution** [3] - 17:7, 17:8, 35:11
**constitutional** [1] - 6:8
**constrain** [1] - 69:8
**constraining** [1] - 67:15
**CONT'D** [1] - 2:1
**contacted** [2] - 67:4, 74:25
**contained** [1] - 8:12
**contempt** [1] - 22:1
**contend** [1] - 9:23
**content** [1] - 83:4
**context** [2] - 36:17, 37:13
**contexts** [1] - 19:8
**contingency** [1] - 11:4
**continue** [3] - 14:25, 49:20, 55:22
**continued** [1] - 78:11
**continues** [1] - 52:2
**contrary** [1] - 58:1
**conversation** [1] - 42:10
**convince** [2] - 37:18, 38:21
**convincing** [4] - 27:8, 27:9, 31:10,

35:13
**cool** [1] - 25:5
**coopted** [1] - 11:23
**copies** [1] - 31:19
**copy** [4] - 7:22,
32:10, 32:11, 33:13
**copyright** [1] - 71:22
**corporate** [1] - 49:14
**correct** [8] - 11:12,
17:19, 19:13, 19:14,
28:13, 41:24, 50:21,
60:7
**counsel** [3] - 4:8,
53:23, 54:10
**country** [1] - 31:18
**County** [1] - 53:21
**couple** [3] - 5:4,
22:5, 62:10
**course** [2] - 20:5,
29:14, 40:12
**COURT** [263] - 1:1,
3:1, 3:4, 3:12, 3:15,
3:18, 3:22, 3:25, 4:3,
4:14, 4:18, 5:15, 5:22,
5:24, 6:3, 7:10, 8:18,
8:20, 8:23, 9:11, 9:14,
9:22, 10:10, 10:12,
10:14, 10:17, 11:12,
11:14, 11:16, 12:1,
12:4, 12:7, 12:9,
12:19, 12:23, 14:14,
14:22, 15:4, 15:6,
15:17, 15:19, 16:6,
16:12, 16:17, 16:22,
17:19, 17:21, 17:23,
19:5, 19:11, 19:22,
20:15, 20:17, 20:21,
21:14, 21:17, 21:20,
22:11, 22:14, 22:16,
24:13, 24:23, 25:1,
25:3, 25:6, 26:23,
27:4, 27:21, 28:2,
28:10, 28:12, 28:15,
28:22, 28:25, 29:4,
29:7, 29:18, 29:22,
29:25, 31:1, 31:6,
31:22, 32:3, 32:5,
33:1, 34:10, 34:20,
34:23, 35:6, 35:20,
35:23, 36:1, 36:6,
36:10, 36:19, 36:21,
37:3, 37:5, 37:7,
37:15, 37:18, 37:21,
38:5, 38:9, 38:16,
38:18, 39:1, 39:11,
39:13, 39:17, 39:20,
40:7, 40:10, 40:15,
40:25, 41:12, 41:19,
41:23, 42:5, 42:15,
42:17, 42:19, 43:7,

43:12, 43:16, 43:18,
43:21, 44:1, 44:4,
44:12, 44:16, 45:5,
45:7, 45:9, 45:12,
45:15, 45:17, 45:19,
45:23, 46:1, 46:3,
46:12, 46:23, 47:2,
47:5, 48:2, 48:6,
48:13, 48:21, 50:9,
50:12, 50:15, 50:17,
50:20, 52:9, 52:13,
52:17, 53:12, 53:17,
53:22, 54:6, 54:22,
55:13, 56:7, 56:11,
56:14, 56:22, 57:10,
57:15, 57:18, 57:22,
58:16, 58:23, 59:3,
59:8, 59:22, 59:25,
60:4, 60:8, 60:13,
60:17, 60:19, 60:22,
61:3, 61:6, 61:12,
61:14, 61:22, 61:25,
62:4, 62:6, 62:9, 64:7,
64:13, 66:5, 66:10,
66:14, 66:19, 67:2,
67:7, 67:9, 67:24,
68:1, 68:4, 68:19,
68:24, 69:2, 69:5,
69:10, 70:3, 70:22,
71:7, 71:11, 71:13,
72:2, 72:5, 72:9,
72:25, 73:5, 73:15,
73:20, 74:4, 74:8,
74:11, 75:6, 75:9,
75:20, 76:4, 76:13,
76:18, 77:7, 78:20,
78:24, 79:1, 79:5,
80:11, 80:13, 82:5,
82:11, 82:18, 82:21,
82:24, 83:19, 84:6,
84:9, 84:15, 84:22,
85:2, 85:21, 86:2,
86:13, 86:18, 86:24,
87:1, 87:7, 87:10,
87:17, 87:21, 88:4,
88:6, 88:11, 88:13,
88:15
**court** [7] - 18:23,
19:25, 30:11, 53:24,
56:11, 63:25, 74:23
**Court** [17] - 4:4,
18:10, 18:16, 19:16,
22:2, 30:6, 30:8,
51:14, 51:20, 53:25,
56:9, 56:17, 63:19,
63:20, 65:11, 89:8,
89:9
**courtroom** [1] -
24:11
**COURTROOM** [1] -
53:14

**courts** [5] - 19:17,
40:7, 51:9, 55:25,
58:1
**cover** [1] - 11:10
**covers** [1] - 40:12
**crazy** [1] - 43:24
**create** [3] - 9:2, 43:1,
43:5
**credibility** [1] - 81:2
**crime** [2] - 23:17,
64:20
**criminal** [23] - 19:11,
19:12, 19:17, 62:17,
62:24, 63:22, 64:10,
64:13, 64:18, 67:7,
67:10, 71:4, 71:5,
71:11, 73:25, 74:1,
74:3, 74:11, 74:13,
74:18, 74:21, 75:16
**cross** [3] - 47:24,
48:2, 48:4
**cross-notice** [2] -
47:24, 48:4
**cross-noticing** [1] -
48:2
**CRR** [2] - 2:12, 89:8
**crucial** [3] - 34:13,
65:8, 65:16
**Curry** [1] - 51:18
**customer** [1] - 65:20
**customers** [8] -
65:22, 71:3, 76:21,
76:25, 80:2, 80:6,
81:11, 83:7
**customers'** [2] -
80:5, 84:24
**cuts** [1] - 35:13
**cyber** [1] - 11:8
**cybercrime** [1] -
77:17
**cyberhack** [1] -
84:13
**cybersecurity** [2] -
77:14, 79:9
**Cyprus** [1] - 12:5

# D

**DA's** [1] - 42:1
**damage** [10] - 50:4,
51:4, 51:15, 52:3,
52:4, 52:6, 54:25,
58:12, 61:14
**damaged** [5] - 48:25,
49:18, 49:25, 50:6,
51:7
**damages** [16] - 4:10,
30:23, 48:19, 49:2,
49:5, 49:9, 49:20,

52:21, 54:11, 54:22,
56:3, 56:4, 56:5,
56:23, 58:2, 61:18
**data** [2] - 10:21, 80:6
**DATE** [1] - 89:8
**date** [7] - 39:22,
50:18, 69:6, 78:9,
78:14, 87:11
**dates** [1] - 61:9
**dating** [1] - 69:2
**daughter's** [1] - 46:3
**DAVIS** [2] - 2:2, 2:6
**days** [5] - 43:25,
52:22, 53:2, 57:16,
59:9
**DC** [4] - 2:7, 9:2,
20:1, 24:23
**DDC** [1] - 56:13
**dealing** [1] - 74:8
**debt** [1] - 70:5
**December** [1] -
77:21
**decide** [1] - 81:19
**decided** [6] - 5:6,
6:5, 18:24, 77:9,
80:19, 81:13
**decides** [1] - 22:3
**decision** [2] - 21:2,
21:7
**decisions** [1] - 61:10
**defamation** [12] -
25:17, 30:24, 51:19,
54:14, 55:16, 56:20,
62:14, 63:3, 63:21,
65:3, 78:22
**defamatory** [4] -
25:23, 30:19, 30:20,
34:6
**Defendant** [3] - 46:6,
53:21, 87:22
**DEFENDANTS** [1] -
2:2
**Defendants** [17] -
3:19, 3:21, 3:24, 4:2,
4:23, 6:6, 6:7, 8:9,
14:19, 24:18, 51:11,
53:10, 63:5, 63:7,
78:22, 87:2, 87:23
**defendants** [1] - 1:9
**defense** [15] - 4:8,
8:10, 8:11, 13:12,
14:14, 22:18, 22:20,
23:1, 23:2, 23:4, 36:4,
54:10, 63:3, 63:4,
82:11
**defenses** [6] - 12:13,
13:14, 33:22, 34:14,
34:15, 34:18
**define** [1] - 80:1
**defined** [4] - 5:11,

5:12, 20:8, 20:9
**definition** [2] - 5:18,
73:4
**definitively** [1] -
77:22
**degree** [1] - 83:16
**delivers** [1] - 19:21
**Democratic** [2] -
10:22, 11:24
**Democrats** [1] -
81:15
**demonstrate** [1] -
31:10
**denied** [2] - 59:16,
59:17
**Department** [1] -
77:20
**depose** [5] - 9:6,
9:20, 26:19, 30:7,
33:10
**deposed** [1] - 9:15
**DEPUTY** [1] - 53:14
**description** [1] -
23:10
**determine** [4] -
17:17, 75:14, 83:9,
84:2
**determined** [1] -
52:6
**different** [5] - 13:14,
18:23, 19:11, 30:16,
41:1
**difficult** [1] - 79:12
**DIGITAL** [1] - 1:13
**digital** [1] - 80:14
**directly** [2] - 72:22,
73:3
**director** [2] - 42:10,
42:12
**disagrees** [1] - 22:3
**disclose** [3] - 16:24,
28:25, 36:12
**disclosed** [2] - 40:8,
51:1
**disclosure** [1] - 30:6
**discover** [1] - 80:23
**discovery** [12] - 3:8,
24:18, 44:19, 46:14,
47:19, 49:3, 53:3,
62:14, 66:9, 79:13,
81:24, 87:15
**DISCOVERY** [1] -
1:11
**discreetly** [1] - 11:8
**discuss** [2] - 46:5,
46:6
**discussion** [1] -
13:14
**discussions** [1] -
9:18

**disinterested** [3] - 13:1, 13:8, 13:10
**dismiss** [1] - 20:24
**dispose** [1] - 15:7
**disqualifies** [1] - 76:10
**disregard** [1] - 7:4
**DISTRICT** [2] - 1:1, 1:1
**District** [6] - 18:15, 19:8, 51:23, 56:12, 56:16, 89:9
**diversity** [2] - 17:19, 18:1
**DIVISION** [1] - 1:2
**DMCA** [2] - 71:21, 72:4
**DNC** [6] - 25:25, 67:18, 77:16, 78:10, 80:24, 85:17
**doctrine** [2] - 12:22, 34:25
**Document** [1] - 58:20
**document** [34] - 4:24, 8:18, 13:20, 18:4, 18:13, 18:17, 18:18, 18:19, 18:25, 19:3, 22:22, 26:9, 26:11, 26:24, 28:23, 30:15, 30:18, 30:20, 30:22, 32:21, 32:23, 33:6, 33:7, 33:13, 33:18, 33:20, 34:2, 34:4, 34:5, 34:8, 34:17, 62:13, 67:4, 68:1
**documentation** [1] - 55:3
**documents** [24] - 4:9, 5:2, 8:13, 15:1, 29:14, 39:13, 39:14, 39:15, 53:2, 53:3, 53:5, 57:12, 57:13, 58:17, 61:1, 62:15, 66:14, 66:20, 66:21, 68:20, 74:13, 74:16, 75:15, 83:2
**Dolan** [1] - 63:18
**done** [5] - 11:6, 18:10, 26:21, 42:20, 76:24
**dossier** [48] - 6:24, 7:7, 7:15, 7:23, 8:4, 8:6, 8:7, 9:3, 9:8, 9:9, 10:2, 10:3, 10:6, 10:7, 13:13, 13:22, 14:7, 21:5, 24:15, 24:17, 24:20, 27:16, 28:7, 28:20, 30:4, 35:18,

40:22, 42:9, 42:11, 42:22, 50:24, 63:11, 65:7, 65:11, 65:14, 67:22, 70:19, 80:7, 81:3, 82:2, 82:3, 84:21, 85:8, 85:9, 85:14, 85:19
**down** [8] - 7:17, 16:23, 20:1, 21:14, 35:20, 54:2, 60:22
**down/able** [1] - 11:9
**drew** [1] - 80:9
**due** [3] - 58:6, 87:23, 88:1
**duress** [2] - 10:24, 50:24

---

**E**

**early** [4] - 28:17, 43:13, 44:18, 49:3
**easier** [2] - 52:18, 76:16
**Eastern** [2] - 18:15, 51:22
**easy** [3] - 26:13, 26:14, 83:1
**economic** [1] - 49:9
**editor** [1] - 21:1
**EDPA** [1] - 56:15
**EDWARDS** [2] - 2:12, 89:8
**Edwards** [1] - 89:7
**effectively** [1] - 11:9
**efforts** [3] - 21:12, 44:18, 44:21
**either** [6] - 7:3, 26:25, 30:12, 71:9, 77:13, 84:23
**Elder** [1] - 21:3
**election** [3] - 77:23, 78:2, 78:12
**elections** [1] - 57:6
**element** [1] - 61:14
**elements** [1] - 30:24
**Eleventh** [4] - 17:7, 20:5, 37:6, 37:7
**eliminate** [1] - 77:8
**email** [2] - 40:1, 53:22
**emails** [1] - 40:6
**emanating** [1] - 81:3
**employment** [10] - 51:16, 51:20, 56:2, 58:10, 58:11, 58:15, 58:19, 58:22, 58:24, 59:4
**encouraged** [1] - 81:17

end [1] - 21:23
**enforcement** [2] - 42:22, 74:12
**engaged** [1] - 65:15
**engaging** [1] - 83:24
**enormous** [2] - 15:13, 27:14
**enormously** [1] - 76:24
**ensure** [1] - 85:3
**entered** [1] - 86:13
**entire** [2] - 10:5, 10:6
**entirety** [1] - 10:2
**entities** [7] - 10:23, 80:1, 82:5, 82:7, 82:9, 83:3
**entitle** [1] - 47:10
**entitled** [22] - 5:1, 50:3, 52:1, 56:1, 63:8, 63:13, 64:11, 64:23, 65:4, 65:24, 66:18, 66:25, 67:16, 69:23, 70:14, 70:20, 70:23, 74:7, 81:25, 85:13, 85:18, 89:5
**ESQ** [6] - 1:15, 1:19, 1:22, 2:2, 2:5, 2:9
**essentially** [5] - 11:23, 23:2, 29:23, 33:9, 78:15
**establish** [4] - 36:4, 38:3, 71:15, 74:6
**et** [1] - 78:8
**Ethics** [1] - 64:4
**European** [1] - 65:25
**Evan** [3] - 3:10, 27:16, 27:18, 31:14
**EVAN** [1] - 1:15
**Evan's** [1] - 27:15
**event** [4] - 11:6, 11:7, 14:13, 21:11
**eventually** [1] - 5:13
**evidence** [9] - 24:1, 35:14, 49:1, 52:7, 56:6, 63:23, 64:5, 66:9, 79:14
**Evidence** [1] - 17:15
**exact** [2] - 48:2, 48:6
**exactly** [5] - 18:16, 36:15, 50:22, 51:12, 79:10
**examination** [1] - 72:11
**example** [8] - 18:7, 23:16, 24:11, 41:25, 50:24, 62:20, 67:17, 80:10
**except** [1] - 15:21
**excuse** [1] - 67:9
**exist** [1] - 64:12

**existence** [1] - 36:8
**exists** [3] - 24:20, 75:14
**exonerate** [1] - 41:14
**expert** [2] - 10:24, 77:1
**explanation** [1] - 31:3
**explanations** [2] - 31:4, 31:8
**extensive** [1] - 52:21, 53:3
**extent** [4] - 60:25, 79:21, 80:5
**extremely** [1] - 51:8
**eye** [1] - 81:8
**eyes** [3] - 78:7, 86:8, 86:10

---

**F**

**face** [3] - 4:18, 4:20
**face-to-face** [1] - 4:18
**Facebook** [1] - 57:3
**facilitated** [1] - 81:16
**facilitating** [3] - 80:16, 81:7, 85:16
**fact** [20] - 7:13, 14:17, 19:15, 26:7, 29:2, 35:7, 36:14, 36:18, 42:20, 42:21, 51:5, 55:1, 71:3, 79:12, 80:23, 80:24, 81:1, 81:2, 81:3, 81:13
**facts** [1] - 61:19
**failing** [1] - 22:1
**fair** [17] - 8:9, 8:10, 12:16, 22:25, 23:21, 24:2, 24:4, 25:11, 25:13, 25:15, 35:15, 35:16, 35:24, 36:16, 41:15, 41:21, 41:23
**fairness** [1] - 42:23
**fall** [1] - 14:11
**falls** [1] - 71:25
**falsely** [1] - 78:23
**falsity** [4] - 7:4, 7:5, 30:23, 42:4
**familiar** [3] - 22:23, 34:24, 46:17
**famous** [1] - 51:11
**far** [1] - 57:22
**fashion** [4] - 19:11, 72:13, 72:22, 73:16
**fast** [1] - 76:10
**favor** [1] - 45:17
**FBI** [5] - 24:15, 42:9,

42:10, 42:12, 77:20
**fear** [1] - 23:18
**federal** [8] - 6:8, 19:12, 19:13, 19:25, 23:3, 66:15, 77:13
**Federal** [2] - 42:8, 66:18
**fellow** [1] - 56:8
**female** [1] - 19:22
**few** [6] - 13:20, 32:8, 38:18, 52:22, 53:7, 57:16
**Fifteenth** [1] - 1:24
**fight** [3] - 33:11, 75:4
**fighting** [1] - 9:7
**figures** [2] - 7:2
**file** [7] - 36:22, 47:5, 47:6, 47:7, 47:12, 58:6, 72:17
**filed** [9] - 44:5, 47:7, 62:16, 69:11, 71:9, 71:14, 74:17, 78:14
**filing** [2] - 9:15, 47:3
**finally** [1] - 13:16
**financial** [4] - 6:21, 14:22, 61:7, 86:5
**financing** [2] - 61:8, 61:9
**fine** [3] - 48:13, 68:12, 86:11
**finger** [1] - 25:18
**finish** [1] - 29:21
**firm** [1] - 9:1
**First** [1] - 20:11
**first** [21] - 3:9, 4:5, 4:23, 6:14, 6:18, 7:1, 22:6, 26:18, 27:7, 27:21, 35:7, 36:24, 37:16, 48:18, 52:15, 58:3, 65:2, 66:11, 77:18, 81:1
**first-name** [1] - 27:21
**five** [2] - 4:15, 54:3
**fix** [1] - 6:2
**Floor** [3] - 1:24, 2:3, 89:9
**FLORIDA** [1] - 1:1
**Florida** [29] - 1:4, 1:24, 2:11, 17:6, 17:12, 17:24, 18:21, 18:23, 19:1, 20:9, 20:18, 20:20, 21:12, 22:4, 22:15, 27:6, 27:24, 30:11, 37:4, 37:5, 38:24, 42:1, 42:2, 51:18, 56:16, 89:10
**Florida's** [4] - 5:7, 5:8, 5:10

**flown** [1] - 32:11
**folks** [2] - 9:11, 46:25
**following** [1] - 10:4
**FOR** [2] - 1:15, 2:2
**foregoing** [2] - 61:1, 89:3
**forever** [1] - 33:17
**forgot** [1] - 86:7
**former** [2] - 9:4, 11:23
**Fort** [1] - 1:24
**forward** [5] - 36:24, 37:8, 37:24, 38:5
**frankly** [1] - 76:22
**fraud** [1] - 38:7
**Fray** [22] - 3:11, 14:17, 17:1, 22:6, 23:10, 27:16, 27:23, 30:3, 30:14, 31:12, 31:14, 35:8, 35:12, 55:14, 59:12, 60:10, 67:15, 71:23, 75:19, 76:19, 86:4, 86:7
**FRAY** [91] - 1:15, 1:16, 3:10, 4:6, 4:17, 4:22, 5:16, 5:23, 6:1, 6:4, 7:12, 8:19, 8:21, 8:24, 9:12, 9:17, 9:25, 10:11, 10:13, 10:15, 10:18, 11:13, 11:15, 11:17, 12:3, 12:5, 12:8, 12:10, 12:20, 12:24, 14:15, 15:23, 29:20, 29:23, 31:23, 32:4, 32:6, 33:3, 34:12, 42:23, 43:3, 43:5, 43:20, 45:21, 46:7, 47:21, 47:23, 48:5, 52:12, 52:19, 54:9, 54:24, 56:23, 58:13, 58:20, 59:6, 59:24, 60:2, 61:11, 61:21, 62:5, 64:9, 64:14, 68:8, 68:13, 69:12, 69:15, 69:17, 69:20, 70:21, 70:23, 71:17, 71:19, 71:25, 72:7, 72:24, 73:14, 73:19, 74:20, 79:16, 80:12, 82:1, 82:7, 84:18, 84:25, 85:5, 86:11, 86:15, 87:20, 88:10, 88:14
**Fray-Witzer** [19] - 3:11, 14:17, 17:1, 22:6, 27:16, 27:23, 30:3, 31:12, 31:14, 35:8, 35:12, 55:14, 60:10, 67:15, 71:23,

75:19, 76:19, 86:4, 86:7
**FRAY-WITZER** [91] - 1:15, 1:16, 3:10, 4:6, 4:17, 4:22, 5:16, 5:23, 6:1, 6:4, 7:12, 8:19, 8:21, 8:24, 9:12, 9:17, 9:25, 10:11, 10:13, 10:15, 10:18, 11:13, 11:15, 11:17, 12:3, 12:5, 12:8, 12:10, 12:20, 12:24, 14:15, 15:23, 29:20, 29:23, 31:23, 32:4, 32:6, 33:3, 34:12, 42:23, 43:3, 43:5, 43:20, 45:21, 46:7, 47:21, 47:23, 48:5, 52:12, 52:19, 54:9, 54:24, 56:23, 58:13, 58:20, 59:6, 59:24, 60:2, 61:11, 61:21, 62:5, 64:9, 64:14, 68:8, 68:13, 69:12, 69:15, 69:17, 69:20, 70:23, 71:17, 71:19, 71:25, 72:7, 72:24, 73:14, 73:19, 74:20, 79:16, 80:12, 82:1, 82:7, 84:18, 84:25, 85:5, 86:11, 86:15, 87:20, 88:10, 88:14
**Fray-Witzer's** [3] - 23:10, 30:14, 59:12
**free** [2] - 41:17, 41:19
**freely** [1] - 24:7
**friends** [2] - 33:16, 33:17
**Fritz** [1] - 31:13
**FROM** [1] - 1:13
**front** [2] - 39:5, 46:15, 80:20
**FSB** [7] - 10:25, 11:22, 11:23, 11:24, 31:7, 50:25, 55:9
**full** [1] - 60:5
**fundamental** [1] - 19:21
**funny** [1] - 21:10
**Fusion** [9] - 8:22, 8:23, 8:24, 9:1, 9:6, 9:11, 10:16, 27:12, 32:10
**Fusion's** [1] - 9:7
**future** [2] - 46:12, 46:23, 48:11

**G**

**gamut** [1] - 40:12
**gangsters** [1] - 45:14
**gathered** [1] - 9:5
**gathering** [1] - 18:10
**gee** [1] - 30:8
**general** [1] - 44:14
**generally** [4] - 25:19, 37:23, 46:18, 78:17
**given** [7] - 7:6, 7:22, 7:23, 8:4, 8:7, 15:20, 22:22
**goodwill** [1] - 63:22
**Government** [1] - 42:8
**government** [38] - 8:12, 8:14, 8:19, 12:18, 13:1, 13:2, 23:13, 23:15, 23:20, 23:21, 23:22, 23:23, 23:24, 24:5, 24:6, 24:8, 24:9, 24:19, 25:13, 25:14, 33:6, 36:16, 36:17, 41:17, 43:6, 55:9, 62:15, 66:16, 66:18, 67:14, 68:6, 68:13, 68:16, 77:14, 77:21, 79:8, 79:9
**government's** [1] - 36:9
**governmental** [3] - 23:10, 35:25, 41:22
**GPS** [5] - 8:22, 8:24, 9:1, 9:11, 27:12
**grand** [1] - 64:2
**granted** [1] - 61:9
**great** [2] - 14:3, 48:13
**grew** [1] - 76:9
**Grizzly** [1] - 77:19
**ground** [1] - 11:10
**grounded** [1] - 20:10
**GROUP** [1] - 1:19
**GUBAREV** [2] - 1:4, 3:3
**Gubarev** [21] - 3:3, 3:4, 10:23, 11:12, 11:14, 12:1, 13:6, 49:7, 49:15, 49:23, 54:12, 54:24, 55:20, 55:22, 59:15, 60:16, 65:14, 67:17, 79:21, 82:6, 85:11
**Gubarev's** [3] - 48:24, 53:8, 85:11
**guess** [3] - 19:12, 39:8, 84:17

**GURVITS** [1] - 3:13
**Gurvits** [1] - 3:13
**GURVITZ** [1] - 1:19
**guy** [1] - 41:4
**guys** [4] - 34:23, 41:1, 70:14, 72:16

**H**

**hack** [2] - 67:18, 85:17
**hackers** [1] - 85:17
**hacking** [23] - 10:24, 11:24, 25:25, 63:8, 70:10, 70:13, 77:16, 77:23, 78:2, 78:9, 78:24, 78:25, 80:24, 81:3, 81:14, 83:15, 83:17, 83:19, 83:20, 83:24, 85:4, 85:23
**half** [1] - 47:19
**handed** [5] - 7:15, 30:18, 30:19, 32:22, 35:18
**happy** [8] - 16:20, 31:20, 38:13, 38:15, 50:13, 78:6, 82:20, 85:1
**Harry** [2] - 28:5, 28:16
**hatred** [1] - 57:4
**head** [2] - 28:8, 69:4
**hear** [4] - 14:14, 30:1, 64:7, 79:15
**hearing** [5] - 5:6, 46:16, 52:16, 53:18, 58:14, 60:7, 60:18, 84:22
**HEARING** [1] - 1:11
**heart** [1] - 34:13
**heck** [1] - 26:14
**held** [5] - 18:10, 18:16, 21:25, 57:4, 63:20
**help** [1] - 88:8
**helpful** [2] - 29:12, 61:5
**hereby** [1] - 89:3
**hesitant** [1] - 34:25
**Hillary** [1] - 11:6
**hip** [2] - 46:18, 46:22
**hired** [2] - 9:2, 37:25
**history** [10] - 50:1, 51:20, 58:10, 58:11, 58:15, 58:19, 58:22, 58:24, 59:5, 63:23
**hold** [1] - 53:12
**Holding** [1] - 61:24
**Holdings** [3] - 3:4,

3:5, 63:24
**HOLDINGS** [1] - 1:4
**Homeland** [1] - 77:20
**homework** [2] - 31:15, 31:16
**Honor** [179] - 3:10, 3:13, 3:16, 3:23, 4:1, 4:6, 4:7, 4:17, 4:22, 5:16, 6:2, 9:13, 9:25, 11:13, 11:15, 12:6, 12:8, 13:16, 14:15, 14:16, 14:24, 15:11, 15:15, 15:24, 16:10, 16:20, 17:1, 17:3, 17:5, 17:20, 19:7, 19:14, 19:24, 20:2, 20:5, 20:12, 20:16, 20:19, 21:8, 21:11, 21:16, 21:21, 22:3, 22:15, 23:9, 24:14, 24:24, 25:5, 25:11, 25:16, 25:17, 26:6, 26:14, 26:18, 27:5, 27:12, 27:22, 27:25, 28:4, 28:9, 28:11, 28:14, 28:21, 28:24, 29:13, 29:20, 30:2, 30:14, 31:5, 31:9, 31:17, 31:23, 34:21, 34:22, 36:15, 36:25, 37:12, 37:17, 38:11, 39:10, 39:16, 39:25, 40:11, 40:18, 41:9, 41:15, 41:22, 42:7, 42:16, 42:18, 42:23, 43:2, 43:11, 43:15, 43:17, 43:20, 43:23, 44:15, 45:8, 45:16, 46:7, 46:9, 46:21, 48:17, 48:23, 49:21, 50:11, 50:14, 50:22, 50:23, 51:3, 52:4, 52:15, 53:20, 54:4, 54:9, 55:12, 55:25, 56:20, 57:11, 58:13, 58:25, 59:2, 59:7, 59:11, 59:20, 59:24, 60:3, 61:4, 61:11, 61:23, 62:5, 62:19, 62:24, 63:1, 63:2, 63:16, 64:9, 65:16, 66:8, 66:17, 66:25, 67:14, 67:22, 68:8, 68:15, 69:1, 69:3, 69:8, 69:13, 69:22, 70:6, 70:21, 71:12, 71:16, 71:23, 73:2, 73:25, 74:2, 74:5, 74:20, 75:8, 75:19, 76:2, 76:9, 76:22,

79:17, 81:22, 82:1,
84:18, 86:1, 87:9,
87:16, 87:20, 87:25,
88:9, 88:10, 88:12
**Honor's** [1] - 33:25
**HONORABLE** [1] -
1:12
**hope** [1] - 76:4
**hopefully** [4] - 24:22,
48:8, 82:18, 87:4
**hoping** [1] - 40:17
**hosted** [1] - 83:4
**hosting** [1] - 68:17
**Hotstetter** [1] - 53:20
**HOTSTETTER** [1] -
53:20
**hour** [1] - 47:19
**hours** [1] - 42:20
**HR** [1] - 68:18
**HSBC** [1] - 51:18
**hundreds** [2] -
27:12, 73:13
**hurry** [1] - 76:4
**hurt** [2] - 8:5, 13:6,
13:7

## I

**idea** [3] - 34:2, 35:12,
55:7
**identified** [7] - 28:3,
58:14, 60:6, 77:13,
77:18, 79:7, 79:19
**identify** [3] - 57:14,
61:7, 61:17
**identifying** [1] - 83:2
**identity** [5] - 14:21,
15:3, 16:7, 25:19,
29:17
**illegitimately** [1] -
26:25
**Illinois** [2] - 18:24,
18:25
**images** [1] - 40:5
**imagine** [5] - 6:1,
11:11, 11:21, 33:11,
79:12
**immediately** [1] - 4:7
**importance** [2] -
27:14, 31:18
**important** [4] - 11:7,
15:14, 79:25, 80:25
**importantly** [1] -
66:2
**inaudible** [3] - 8:20,
47:3, 87:15
**inaudible)** [2] -
53:16, 82:3
**Inc** [2] - 3:5, 3:6

**INC** [2] - 1:5, 1:8
**include** [3] - 14:22,
47:13, 64:13
**included** [1] - 10:3
**includes** [1] - 54:25
**including** [3] - 50:1,
61:15, 74:14
**income** [17] - 50:1,
50:21, 50:23, 51:13,
51:16, 53:9, 54:7,
54:13, 54:15, 55:6,
56:8, 56:17, 56:24,
57:7, 57:25, 58:8,
58:18
**incredibly** [1] - 65:8
**indeed** [4] - 27:11,
27:23, 52:20, 53:5
**independently** [1] -
29:10
**indicate** [1] - 16:8
**indicated** [1] - 57:24
**indicators** [2] -
77:15, 77:25
**individual** [4] - 42:1,
42:2, 49:24, 54:23
**individuals** [1] - 35:8
**individuals'** [1] -
54:7
**informal** [1] - 46:14
**informally** [1] - 9:14
**information** [62] -
6:14, 6:16, 6:21, 7:7,
7:8, 7:25, 8:11, 9:5,
10:2, 10:15, 12:11,
12:17, 12:21, 14:20,
15:2, 22:8, 22:10,
25:21, 26:1, 26:7,
29:11, 29:17, 29:19,
30:19, 30:21, 30:22,
31:11, 34:6, 34:13,
34:19, 39:19, 40:8,
40:13, 49:4, 49:22,
49:25, 51:1, 51:15,
52:2, 52:21, 53:9,
54:16, 54:20, 55:6,
59:14, 59:19, 59:21,
62:11, 64:3, 73:16,
74:3, 74:7, 76:20,
77:3, 78:6, 78:11,
78:15, 80:4, 82:15,
85:1, 86:5
**information's** [1] -
41:3
**informed** [2] - 53:10,
54:10
**injured** [2] - 49:10,
55:17
**injuries** [1] - 61:15
**injury** [10] - 49:13,
49:16, 51:4, 55:18,

55:23, 61:18, 61:20
**Inquirer** [1] - 18:11
**inquiries** [1] - 13:18
**instance** [5] - 22:11,
31:6, 36:3, 37:24,
47:18
**institution** [1] - 61:7
**insurance** [1] - 18:25
**interest** [1] - 31:19
**interested** [1] - 24:25
**international** [2] -
66:15, 68:9
**Internet** [5] - 5:24,
71:4, 78:17, 83:8,
84:1
**interpreted** [2] -
17:7, 19:25
**Interrogatories** [1] -
60:15
**interrogatories** [10] -
4:25, 5:3, 47:14,
47:17, 53:5, 58:18,
59:13, 60:6, 60:12,
61:2
**interrogatory** [5] -
52:24, 57:13, 60:5,
60:14, 64:15
**Interrogatory** [1] -
58:21
**interrupt** [1] - 28:22,
53:17
**interruption** [1] -
80:14
**intrusive** [1] - 83:18
**invention** [1] - 5:24
**investigate** [4] -
28:18, 75:14, 78:18,
81:15
**investigated** [3] -
42:14, 43:6, 66:17
**investigating** [4] -
24:15, 24:16, 41:17,
42:8
**investigation** [16] -
24:2, 24:6, 24:8,
24:19, 36:9, 36:17,
41:22, 42:1, 61:1,
62:25, 63:6, 63:8,
64:3, 66:21, 67:10,
74:12
**investigations** [9] -
62:17, 64:13, 64:15,
64:16, 74:1, 74:3,
74:11, 74:19, 75:1
**investigative** [2] -
77:13, 79:6
**invoke** [2] - 25:13,
25:14
**involve** [1] - 26:15
**involved** [10] - 10:23,

17:2, 20:23, 21:3,
21:11, 25:25, 38:7,
65:3, 77:23, 85:23
**involving** [2] - 69:14,
69:16
**IP** [14] - 14:2, 77:1,
77:3, 77:12, 77:15,
77:25, 78:3, 78:18,
79:7, 79:18, 79:21,
80:3, 82:15
**Irish** [2] - 45:10,
45:15
**Irishman** [1] - 45:19
**irrelevant** [3] - 66:3,
81:12, 81:21
**issue** [12] - 4:10, 6:5,
15:5, 16:23, 18:18,
30:8, 39:2, 53:4,
69:23, 85:22, 86:24,
87:1
**issued** [1] - 77:20
**issues** [8] - 3:8, 4:5,
4:11, 31:17, 46:9,
46:16, 68:18, 81:18
**it'll** [1] - 47:6
**items** [2] - 72:22,
73:17
**itself** [2] - 29:1, 81:1

## J

**JA** [1] - 48:10
**jail** [1] - 19:23
**James** [1] - 42:24
**January** [9] - 9:25,
50:19, 61:8, 66:16,
68:2, 68:6, 68:7,
68:16, 68:20
**JARED** [1] - 2:9
**Jared** [2] - 4:1, 46:15
**jaywalked** [1] - 75:3
**Jennifer** [1] - 53:20
**JOHN** [1] - 1:12
**joint** [1] - 77:19
**jointly** [1] - 48:10
**Jones** [1] - 32:7
**journal** [1] - 5:18
**journalist** [2] - 21:9,
32:19
**journalist's** [1] - 20:7
**journalists** [3] - 20:8,
20:12, 20:23
**Judge** [4] - 3:7,
26:20, 47:8, 86:13
**judge** [4] - 47:1,
51:23, 64:1
**JUDGE** [1] - 1:12
**judgments** [2] -
74:16, 75:22

**Judicial** [1] - 64:4
**Judy** [1] - 20:7
**jurisdiction** [1] -
20:25
**jurisdictions** [2] -
18:6, 19:19
**jury** [7] - 63:9, 63:13,
64:2, 67:19, 69:24,
70:9, 81:19

## K

**Kapsguvich** [1] -
10:25
**Katherine** [1] - 45:24
**KATHERINE** [1] - 2:2
**katherine** [1] - 3:20
**keep** [2] - 48:11,
78:17
**KGB** [2] - 11:23, 57:5
**kind** [17] - 9:15,
21:10, 25:16, 30:16,
30:17, 31:4, 39:6,
40:21, 48:19, 53:11,
54:11, 63:17, 64:20,
71:1, 75:4, 75:24,
83:16
**kinds** [2] - 57:4,
63:20
**knowing** [1] - 75:13
**knowingly** [1] -
85:16
**knowledge** [3] - 7:4,
41:7, 83:11
**known** [2] - 10:1,
25:21
**knows** [8] - 14:17,
26:5, 27:1, 33:18,
52:20, 64:23, 71:23,
75:12
**KORNSPAN** [1] - 2:9

## L

**lack** [3] - 20:24, 50:4,
68:21
**language** [1] - 23:22
**large** [2] - 39:15,
70:1
**largely** [1] - 30:13
**last** [5] - 30:5, 48:9,
48:18, 76:2, 82:23
**late** [1] - 77:21
**Lauderdale** [1] - 1:24
**laughter** [7] - 4:16,
25:4, 27:19, 35:21,
44:11, 45:22, 76:6
**launching** [1] - 11:24

**law** [37] - 5:7, 5:8, 6:3, 6:7, 6:8, 17:6, 17:8, 17:15, 17:16, 17:17, 17:23, 18:2, 18:3, 18:4, 18:24, 19:13, 19:25, 20:3, 20:4, 22:4, 23:3, 27:25, 30:12, 30:13, 31:9, 37:3, 37:5, 38:19, 42:22, 44:23, 47:8, 56:21, 74:12

**LAW** [3] - 1:19, 47:1, 47:3

**laws** [5] - 18:20, 65:25, 66:1, 68:10, 68:11

**lawsuit** [4] - 78:9, 78:14, 78:20, 79:11

**lawsuits** [13] - 62:16, 62:21, 63:10, 65:2, 69:1, 69:10, 71:8, 71:14, 72:11, 72:17, 73:9, 73:17, 75:24

**lawyer** [2] - 11:3, 36:4

**lawyers** [1] - 24:10

**lay** [1] - 77:22

**lead** [1] - 79:13

**leadership** [1] - 10:22

**leads** [1] - 66:8

**leaked** [1] - 43:1

**least** [4] - 5:10, 6:19, 22:21, 49:4

**Legislature** [1] - 6:2

**legitimately** [1] - 26:25

**less** [5] - 44:12, 50:5, 50:6, 52:25, 54:19

**letter** [2] - 26:19, 28:16

**level** [1] - 26:11

**liability** [1] - 71:2

**libel** [5] - 30:16, 30:17, 51:11, 63:19, 63:21

**liens** [5] - 62:18, 74:1, 74:17, 74:19, 75:22

**likely** [2] - 38:19, 80:15

**limit** [2] - 44:9, 50:13

**limited** [10] - 7:22, 23:22, 23:23, 25:12, 27:15, 27:23, 28:2, 30:3, 31:25, 61:15

**line** [3] - 40:20, 80:9, 81:20

**lines** [1] - 66:4

**linked** [3] - 10:23,

82:5, 82:11

**LISA** [2] - 2:12, 89:8

**list** [2] - 76:17, 77:5

**listed** [3] - 66:12, 77:24, 82:16

**lists** [1] - 77:18

**literal** [1] - 63:14

**live** [3] - 21:14, 57:5, 76:11

**lives** [1] - 12:5

**LLC** [2] - 2:2, 2:6

**LLP** [1] - 1:16

**loan** [1] - 61:8

**loans** [5] - 55:1, 57:14, 59:16, 59:17, 59:25

**local** [1] - 66:15

**location** [1] - 40:3

**log** [5] - 16:4, 39:9, 39:14, 78:6, 78:15

**logs** [1] - 78:17

**London** [3] - 9:4, 32:4, 32:11

**look** [1] - 17:16, 18:2, 18:17, 19:2, 25:7, 43:6, 56:1, 59:1, 67:14, 67:18, 79:25

**Look** [3] - 7:16, 7:24, 13:5

**looking** [3] - 6:10, 6:18, 28:8

**Lopez** [2] - 4:1, 46:15

**LOPEZ** [2] - 2:9, 4:1

**loss** [5] - 14:10, 56:24, 57:7, 58:8, 63:21

**lost** [9] - 51:13, 53:11, 54:11, 54:13, 54:15, 54:21, 56:8, 56:17, 57:24

**luck** [1] - 88:15

**ludicrous** [1] - 55:9

## M

**ma'am** [1] - 72:2

**magazine** [1] - 5:20

**Magistrate** [1] - 47:8

**MAGISTRATE** [1] - 1:12

**maintain** [2] - 12:16, 13:11

**majority** [1] - 53:1

**malice** [5] - 7:4, 8:3, 30:23, 31:2, 33:24

**malware** [4] - 70:13, 83:2, 83:14, 84:6

**March** [2] - 10:8,

10:19

**Mark** [2] - 21:6, 21:8

**marketplace** [1] - 70:15

**Mary** [1] - 45:24

**Massachusetts** [2] - 1:17, 1:21

**material** [1] - 6:15

**matter** [6] - 6:9, 23:13, 27:13, 58:2, 68:15, 89:5

**McCain** [2] - 28:5, 32:11

**mean** [43] - 15:8, 15:11, 16:12, 20:18, 27:4, 28:4, 29:7, 29:9, 30:2, 31:1, 31:3, 34:23, 35:1, 37:16, 39:13, 39:20, 40:15, 40:20, 41:1, 41:12, 41:13, 45:1, 50:23, 51:3, 57:17, 58:25, 60:9, 63:2, 66:22, 67:14, 68:8, 69:8, 71:7, 72:15, 73:7, 75:11, 79:3, 80:24, 81:23, 82:2, 83:13, 83:21

**meaning** [1] - 67:15

**means** [2] - 35:10, 76:25

**meantime** [2] - 44:16, 44:22

**measure** [3] - 54:22, 56:2, 56:3

**media** [3] - 43:1, 48:24, 59:17

**mediums** [1] - 39:25

**meeting** [1] - 88:13

**memorandum** [6] - 36:22, 39:21, 43:8, 44:5, 47:4, 47:8

**memorandums** [1] - 47:5

**mention** [1] - 52:4

**mentioned** [2] - 12:14, 31:20

**message** [1] - 40:2

**messages** [3] - 40:5, 57:3

**met** [1] - 18:7

**MI6** [1] - 9:4

**MIAMI** [1] - 1:2

**Miami** [6] - 1:4, 2:11, 20:17, 20:18, 89:9, 89:10

**Michael** [1] - 11:2

**Michigan** [1] - 18:15

**Middle** [1] - 56:16

**middle** [2] - 44:7,

46:3

**might** [7] - 11:11, 11:21, 32:19, 44:6, 44:25, 76:15

**Miller** [1] - 20:7

**millions** [1] - 77:1

**minutes** [2] - 4:15, 54:3

**Miriam** [1] - 21:3

**misspell** [2] - 45:8, 45:9

**misspoke** [1] - 22:7

**misunderstood** [1] - 38:11

**Mizella** [1] - 18:8

**Monday** [3] - 43:24, 44:4, 88:4

**money** [7] - 38:1, 50:5, 50:6, 50:7, 51:5, 54:19

**monies** [1] - 73:5

**monitor** [4] - 71:5, 83:4, 83:17, 84:23

**month** [1] - 59:14

**months** [1] - 24:21

**Moody's** [1] - 18:14

**morning** [6] - 3:10, 3:13, 3:16, 3:23, 4:1, 86:4

**mortal** [1] - 23:17

**most** [9] - 15:2, 18:3, 18:5, 18:12, 21:22, 38:19, 51:11, 58:6, 83:8

**mostly** [1] - 39:18

**Mother** [1] - 32:7

**motion** [10] - 20:24, 29:16, 38:13, 38:15, 47:4, 47:6, 47:7, 47:11, 86:19, 88:1

**motivation** [1] - 34:3

**motive** [1] - 34:7

**move** [1] - 16:21

**moved** [2] - 9:20, 24:20

**moving** [2] - 66:6, 82:24

**MR** [116] - 3:3, 3:10, 3:13, 3:16, 3:23, 4:1, 4:6, 4:17, 4:22, 5:16, 5:23, 6:1, 6:4, 7:12, 8:19, 8:21, 8:24, 9:12, 9:17, 9:25, 10:11, 10:13, 10:15, 10:18, 11:13, 11:15, 11:17, 12:3, 12:5, 12:8, 12:10, 12:20, 12:24, 14:15, 15:23, 29:20, 29:23, 31:23, 32:4, 32:6, 33:3, 34:12,

42:23, 43:3, 43:5, 43:20, 45:21, 46:7, 47:21, 47:23, 48:5, 48:9, 52:12, 52:19, 54:9, 54:24, 56:23, 58:13, 58:20, 59:6, 59:24, 60:2, 61:11, 61:21, 62:5, 64:9, 64:14, 68:8, 68:13, 69:12, 69:15, 69:17, 69:20, 70:21, 70:23, 71:17, 71:19, 71:25, 72:7, 72:24, 73:14, 73:19, 74:20, 76:7, 76:9, 76:14, 76:19, 77:8, 78:21, 78:25, 79:2, 79:16, 80:12, 80:15, 82:1, 82:7, 82:17, 82:20, 82:23, 82:25, 83:21, 84:8, 84:10, 84:16, 84:18, 84:25, 85:5, 85:14, 86:11, 86:15, 86:17, 87:6, 87:20, 88:10, 88:12, 88:14

**MS** [181] - 3:20, 14:16, 14:24, 15:5, 15:11, 15:18, 16:10, 16:16, 16:19, 16:25, 17:20, 17:22, 17:25, 19:7, 19:14, 19:24, 20:16, 20:19, 20:22, 21:16, 21:18, 21:21, 22:13, 22:15, 23:8, 24:14, 24:24, 25:2, 25:5, 25:9, 27:3, 27:5, 27:20, 27:22, 28:4, 28:11, 28:14, 28:16, 28:24, 29:1, 29:5, 29:13, 30:2, 31:5, 31:8, 34:21, 35:4, 35:7, 35:22, 35:24, 36:5, 36:8, 36:15, 36:20, 36:25, 37:4, 37:6, 37:12, 37:16, 37:20, 38:4, 38:8, 38:11, 38:17, 38:25, 39:10, 39:12, 39:15, 39:18, 39:24, 40:9, 40:11, 40:18, 41:8, 41:15, 41:21, 41:25, 42:7, 42:16, 42:18, 42:20, 43:2, 43:4, 43:11, 43:15, 43:17, 43:23, 44:3, 44:15, 45:4, 45:6, 45:8, 45:10, 45:13, 45:16, 45:18, 45:24, 46:2, 46:9, 46:21, 47:22, 48:17, 48:22, 50:10, 50:13, 50:16, 50:19,

50:22, 52:15, 53:20, 54:4, 55:12, 55:14, 56:9, 56:12, 56:15, 57:11, 57:17, 57:21, 58:25, 59:11, 60:5, 60:9, 60:15, 60:18, 60:20, 61:2, 61:4, 61:13, 61:23, 62:1, 62:8, 62:10, 66:8, 66:13, 66:17, 66:24, 67:6, 67:8, 67:13, 67:25, 68:3, 68:5, 68:12, 68:15, 68:23, 69:1, 69:3, 69:8, 69:14, 69:16, 69:19, 69:22, 70:6, 71:10, 71:12, 71:14, 71:18, 71:23, 72:1, 72:3, 72:6, 73:2, 73:25, 74:5, 74:10, 75:8, 75:18, 76:2, 76:8, 86:1, 86:3, 86:12, 86:16, 86:23, 86:25, 87:9, 87:14, 87:25, 88:5, 88:9

**mutual** [1] - 82:19

**N**

**name** [3] - 26:4, 27:21, 28:7
**named** [1] - 35:8
**names** [2] - 7:19, 46:3
**narrow** [6] - 5:17, 29:9, 67:3, 76:24, 77:10
**narrowed** [1] - 35:20
**narrowing** [2] - 9:18, 79:20
**Nathan** [1] - 3:23
**NATHAN** [1] - 2:5
**national** [3] - 12:7, 27:14, 59:17
**nature** [1] - 61:18
**necessarily** [3] - 5:5, 6:5, 54:18
**necessary** [1] - 44:8
**need** [33] - 4:12, 5:5, 22:9, 24:5, 26:10, 26:12, 27:8, 30:15, 31:10, 32:17, 32:18, 34:16, 36:22, 38:21, 40:19, 44:24, 46:5, 47:20, 48:4, 48:7, 59:21, 62:7, 65:10, 66:5, 66:6, 72:14, 73:22, 76:1, 87:4, 87:8, 87:12
**needful** [1] - 30:16

needs [3] - 6:5, 31:14, 35:13
**neglect** [1] - 71:16
**negligence** [4] - 7:3, 8:3, 31:2, 33:24
**negotiate** [1] - 73:21
**negotiation** [1] - 24:21
**network** [20] - 5:20, 68:17, 68:21, 68:23, 68:24, 70:13, 71:1, 79:4, 79:8, 80:17, 80:20, 80:25, 81:4, 81:14, 81:21, 83:20, 84:3, 84:12, 85:9
**network-hosting** [1] - 68:17
**networking** [1] - 68:22
**networks** [15] - 25:24, 63:11, 63:12, 65:12, 65:19, 67:18, 70:7, 70:8, 70:12, 83:18, 83:23, 84:3, 84:4, 84:20, 85:17
**neutral** [6] - 12:25, 13:1, 13:8, 13:10, 13:11, 22:25
**never** [5] - 24:10, 40:18, 64:18, 65:3, 65:5
**New** [44] - 2:4, 17:4, 17:8, 17:23, 18:8, 18:9, 18:19, 19:4, 19:5, 19:10, 19:15, 19:16, 19:17, 19:21, 19:22, 19:24, 20:1, 20:3, 20:13, 20:16, 21:2, 21:5, 21:7, 21:18, 21:23, 21:24, 23:25, 28:6, 32:1, 32:6, 32:15, 33:12, 37:4, 38:20, 38:23, 63:24, 63:25, 76:5, 76:7
**news** [7] - 5:18, 5:19, 5:20, 7:23, 18:10, 32:8, 33:10
**newspaper** [7] - 5:18, 18:9, 18:12, 23:18, 24:16, 28:4, 28:9
**Newton** [1] - 1:21
**next** [11] - 43:25, 46:21, 50:5, 50:7, 52:22, 52:23, 57:15, 58:7, 65:10, 68:25, 73:23
**nice** [1] - 44:1
**night** [1] - 30:5

**NO** [1] - 1:2
**nobody** [1] - 75:12
**none** [7] - 32:13, 57:13, 58:13, 58:21, 75:17, 75:21
**nonetheless** [2] - 35:4, 49:21
**North** [2] - 76:10, 89:9
**notes** [1] - 87:5
**nothing** [15] - 11:18, 13:23, 15:15, 15:16, 16:3, 20:19, 26:21, 46:7, 57:12, 58:4, 58:9, 76:23, 80:22, 81:23
**notice** [10] - 4:23, 47:24, 48:1, 48:4, 48:18, 52:16, 58:14, 60:6, 60:18, 71:21
**noticed** [1] - 4:11
**notices** [1] - 47:12
**noticing** [1] - 48:2
**November** [3] - 44:6, 44:8
**nowhere** [2] - 40:21, 85:9
**number** [14] - 4:25, 7:22, 11:18, 27:15, 27:23, 28:2, 29:6, 33:6, 33:6, 33:7, 68:9, 77:5, 81:5
**numbers** [2] - 61:25, 66:11
**numerous** [2] - 57:3, 73:17
**NW** [1] - 2:6

**O**

**O'SULLIVAN** [1] - 1:12
**O'Sullivan** [1] - 47:8
**oath** [1] - 21:4
**objected** [2] - 4:24, 53:7
**objection** [4] - 15:25, 53:24, 81:10, 83:1
**objections** [1] - 87:15
**objective** [2] - 35:17, 36:18
**obligation** [1] - 38:14
**obtain** [2] - 55:1, 55:2
**obtained** [2] - 6:16, 22:8
**obviously** [6] - 5:7, 15:12, 31:17, 50:4,

59:21, 83:15
**occurring** [6] - 77:17, 78:19, 80:17, 80:20, 80:25, 83:17
**October** [7] - 28:17, 44:4, 44:5, 58:7
**OF** [1] - 1:1
**office** [2] - 20:17, 42:1
**Official** [1] - 89:8
**official** [8] - 8:12, 8:14, 8:18, 8:19, 9:19, 12:18, 13:1, 13:2
**officials** [2] - 8:12, 33:7
**often** [1] - 84:1
**old** [1] - 33:16
**omissions** [1] - 81:11
**once** [3] - 35:23, 38:3, 48:11
**one** [51] - 4:12, 5:6, 6:10, 6:24, 7:2, 9:7, 10:4, 10:7, 10:23, 12:24, 21:3, 22:21, 26:13, 26:14, 30:5, 30:7, 32:22, 34:3, 34:14, 35:2, 38:18, 46:3, 47:15, 48:8, 50:3, 50:5, 50:6, 51:5, 51:10, 52:15, 52:17, 53:17, 54:19, 65:22, 66:5, 66:10, 66:11, 68:25, 70:6, 71:21, 72:2, 73:23, 77:12, 80:2, 82:5, 82:9, 82:23, 83:7, 86:1, 87:13, 87:25
**ones** [4] - 46:21, 52:14, 77:9, 79:19
**online** [1] - 11:21
**openly** [1] - 24:7
**operating** [1] - 70:25
**operation** [2] - 11:1, 11:5
**operations** [5] - 10:22, 11:9, 68:17, 68:23, 68:24
**opportunity** [3] - 8:5, 35:4, 67:2
**opposite** [1] - 13:9
**opposition** [2] - 9:1, 88:2
**oranges** [1] - 71:7
**Orbis** [1] - 9:3
**order** [8] - 24:19, 36:4, 78:8, 81:6, 82:21, 86:13, 87:3, 87:11
**ordered** [3] - 47:6,

51:21, 51:23
**ordering** [2] - 82:10, 86:20
**organization** [1] - 33:10
**originally** [3] - 9:2, 15:9, 32:20
**otherwise** [1] - 24:9
**out-and-out** [1] - 7:14
**outcome** [1] - 62:18
**outcomes** [1] - 40:12
**outlet** [1] - 7:24
**outlets** [1] - 32:8
**outside** [1] - 16:7
**overassertions** [1] - 13:17
**overbroad** [1] - 68:4
**overcome** [2] - 6:13, 14:13
**overcoming** [4] - 37:1, 37:2, 38:14
**oversight** [4] - 62:15, 66:15, 66:20, 68:2
**owed** [2] - 11:8, 73:5
**own** [4] - 64:2, 83:20, 84:23, 84:25
**owns** [2] - 11:12, 11:14

**P**

**p.m** [1] - 88:14
**Page** [1] - 58:16
**Pages** [1] - 1:9
**pages** [2] - 44:9, 44:13
**paid** [1] - 38:1
**Panel** [1] - 64:4
**paper** [2] - 24:15, 24:17
**papers** [1] - 24:25
**Paragraph** [6] - 49:6, 49:10, 49:12, 49:15, 49:17, 49:19
**paragraph** [1] - 10:4
**Paragraphs** [1] - 61:16
**park** [2] - 35:18, 35:23
**Park** [1] - 1:16
**part** [4] - 15:2, 24:6, 54:12, 63:4
**particular** [6] - 11:5, 23:25, 40:20, 49:6, 62:24, 78:19
**parties** [6] - 7:22, 27:15, 27:23, 28:2, 31:25, 82:22

**party** [2] - 30:6, 47:15
**Party** [2] - 10:22, 11:24
**passed** [2] - 33:6, 33:7
**Patricia** [1] - 45:25
**pause** [1] - 54:5
**pay** [3] - 69:23, 69:25, 72:18
**paying** [5] - 69:17, 69:20, 72:12, 73:10, 73:12
**payment** [1] - 55:8
**payments** [1] - 11:8
**pays** [1] - 54:17
**PC** [1] - 1:19
**pending** [3] - 18:8, 19:1, 32:4
**Pennsylvania** [2] - 2:6, 51:23
**people** [18] - 18:18, 21:11, 28:7, 28:13, 28:21, 30:3, 30:8, 33:6, 33:8, 33:13, 33:14, 58:6, 69:25, 70:4, 70:15, 73:12, 83:23, 84:12
**perhaps** [4] - 36:13, 40:2, 51:10, 71:16
**period** [7] - 5:20, 10:8, 10:19, 14:21, 29:2, 41:18, 42:9
**permission** [1] - 46:13
**permitted** [1] - 23:5
**person** [6] - 26:2, 26:5, 29:10, 30:19, 37:7, 37:23
**personal** [20] - 11:3, 49:7, 49:11, 49:16, 49:25, 50:1, 51:1, 51:24, 53:8, 54:13, 55:1, 55:6, 55:18, 55:20, 55:23, 56:23, 57:7, 58:18
**pertains** [2] - 10:3, 84:20
**Philadelphia** [5] - 18:8, 18:9, 18:11
**Philadelphia's** [1] - 18:12
**phone** [1] - 72:18
**pick** [1] - 32:18
**picture** [1] - 65:17
**piece** [1] - 24:1
**ping** [1] - 76:14
**Pino** [1] - 51:22
**Piro** [1] - 51:10
**place** [7] - 19:5,

33:11, 37:15, 82:2, 83:10, 83:23, 87:25
**places** [1] - 19:7
**Plaintiff** [34] - 3:9, 18:9, 27:11, 36:25, 38:14, 44:17, 46:6, 46:8, 49:3, 49:10, 49:23, 50:2, 51:19, 51:23, 52:2, 52:7, 52:9, 53:10, 53:23, 55:17, 56:16, 57:12, 62:17, 62:18, 62:20, 62:21, 63:19, 63:21, 64:1, 64:8, 70:2, 74:2, 79:15, 87:22
**Plaintiff's** [4] - 52:5, 62:16, 62:23, 63:4
**plaintiffs** [1] - 62:14
**Plaintiffs** [29] - 1:6, 3:11, 3:14, 3:17, 6:25, 7:1, 10:3, 14:5, 25:24, 26:18, 34:6, 49:17, 49:19, 51:12, 53:2, 57:14, 63:7, 64:11, 65:6, 65:11, 67:22, 69:11, 69:12, 69:14, 69:16, 70:7, 81:12, 82:3, 85:23
**PLAINTIFFS** [1] - 1:15
**Plaintiffs'** [9] - 4:5, 4:13, 55:18, 62:11, 63:10, 63:12, 73:4, 81:11, 86:19
**plans** [1] - 11:4
**plant** [1] - 10:21
**plausible** [1] - 49:5
**players** [1] - 10:25
**Plaza** [1] - 1:16
**plead** [1] - 51:13
**pleading** [1] - 51:15
**pled** [1] - 49:7
**point** [7] - 15:15, 31:9, 45:17, 58:7, 62:24, 64:9, 65:8
**police** [1] - 24:2, 70:11
**porn** [4] - 10:20, 65:12, 65:15, 65:18
**pornography** [2] - 63:10, 63:11
**portions** [1] - 65:22
**possession** [1] - 32:19
**possible** [1] - 78:7
**possibly** [4] - 14:10, 14:11, 57:1, 65:24, 80:8
**Post** [1] - 63:24
**potential** [1] - 78:1

**power** [1] - 8:1
**Prague** [1] - 11:4
**precedent** [1] - 19:2
**precise** [1] - 16:2
**precisely** [1] - 82:1
**predicate** [1] - 79:13
**preemptively** [1] - 84:11
**preliminarily** [1] - 5:5
**prepare** [1] - 87:2
**present** [9] - 22:20, 50:10, 50:14, 69:9, 69:11, 72:10, 74:15, 75:9, 75:23
**presented** [1] - 81:19
**presidency** [1] - 11:7
**president** [6] - 42:9, 42:11, 42:12, 42:25, 65:18
**President** [2] - 11:3, 13:8
**press** [5] - 5:19, 14:1, 41:17, 41:19, 42:2
**presumably** [1] - 26:24
**presumption** [1] - 52:6
**pretty** [4] - 7:19, 13:9, 35:2, 80:25
**prevail** [1] - 63:5
**previously** [1] - 55:2
**primarily** [3] - 11:18, 77:16, 79:9
**primary** [2] - 6:24, 12:12
**print** [9] - 7:16, 7:18, 7:24, 23:17, 34:8, 40:17, 41:4, 41:5, 42:3
**printed** [2] - 36:12, 42:15
**privacy** [2] - 65:25, 66:1
**private** [4] - 7:2, 64:3, 77:14, 79:9
**privilege** [86] - 4:13, 4:23, 5:2, 5:11, 5:14, 5:17, 6:3, 6:7, 6:8, 6:9, 6:12, 6:14, 6:22, 8:10, 12:14, 12:16, 12:25, 13:11, 13:18, 13:24, 14:5, 14:11, 14:12, 14:20, 15:9, 15:10, 15:11, 15:12, 16:4, 16:9, 16:14, 16:18, 17:2, 17:4, 17:14, 17:16, 18:2, 18:7, 18:23, 19:6,

19:20, 20:7, 20:10, 21:24, 22:12, 22:14, 22:19, 22:20, 22:25, 23:11, 23:12, 23:14, 23:25, 25:11, 25:14, 25:15, 30:12, 30:13, 35:1, 35:16, 36:22, 37:1, 37:8, 37:9, 37:13, 37:14, 37:23, 37:24, 38:6, 38:9, 38:13, 38:20, 39:9, 39:14, 41:16, 43:10, 47:9, 88:1
**privileged** [10] - 18:1, 23:13, 23:19, 24:2, 29:7, 36:23, 38:2, 41:8, 41:13
**privileges** [6] - 6:11, 16:13, 22:24, 37:22
**Prize** [1] - 21:9
**probative** [4] - 30:23, 30:24, 31:1, 52:8
**problem** [1] - 85:5
**problems** [1] - 59:4
**proceeding** [7] - 23:15, 23:20, 23:21, 23:22, 24:3, 24:4, 35:25
**proceedings** [4] - 23:23, 54:5, 88:16, 89:4
**produce** [6] - 4:9, 5:2, 39:21, 49:22, 85:24, 87:23
**produced** [5] - 14:25, 39:19, 49:1, 51:21, 60:25
**produces** [1] - 52:7
**production** [3] - 47:14, 47:17, 59:9
**professional** [2] - 49:7, 55:20
**profit/loss** [1] - 14:8
**profound** [1] - 31:17
**program** [1] - 83:6
**programs** [1] - 83:14
**prohibit** [1] - 66:1
**promise** [1] - 35:5
**protect** [5] - 11:5, 17:11, 43:10, 70:12, 84:6
**protected** [2] - 17:5, 17:12
**protecting** [1] - 48:3
**protection** [1] - 19:16
**protective** [4] - 78:6, 78:8, 82:21, 86:13
**prove** [4] - 25:14, 67:16, 67:17, 85:16

**proves** [1] - 85:18
**provide** [20] - 11:19, 11:20, 49:4, 56:5, 57:23, 58:11, 58:17, 59:8, 59:23, 68:20, 72:10, 72:20, 72:21, 73:15, 74:2, 75:7, 75:10
**provided** [6] - 39:8, 53:3, 59:15, 73:6, 82:15, 85:21
**providing** [1] - 59:4
**proving** [1] - 7:3
**public** [4] - 7:2, 14:6, 14:23, 64:23
**publication** [6] - 13:22, 13:25, 14:1, 14:7, 48:25, 50:18
**publish** [4] - 13:6, 13:7, 21:2, 21:7
**published** [6] - 10:1, 26:2, 29:3, 40:22, 42:21
**Pulitzer** [1] - 21:8
**pulling** [1] - 33:25
**purpose** [1] - 38:1
**put** [5] - 25:17, 42:2, 57:9, 69:6, 69:22
**puts** [1] - 17:18

**Q**

**qualified** [2] - 6:11, 6:13
**qualifies** [1] - 5:18
**qualify** [2] - 5:13, 5:17
**quantum** [1] - 52:6
**quash** [1] - 9:21
**questioning** [1] - 40:21
**questions** [10] - 5:4, 8:2, 8:6, 8:8, 8:9, 18:1, 33:24, 35:9, 70:20, 70:24
**quick** [3] - 35:5, 76:5, 86:1
**quickly** [2] - 11:8, 34:21
**quite** [2] - 50:12, 50:15
**quote** [2] - 10:21, 59:18

**R**

**radio** [1] - 5:19
**raise** [1] - 39:7
**raised** [3] - 12:13,

34:14, 34:15
**ran** [1] - 82:12
**rather** [1] - 17:24
**RDR** [2] - 2:12, 89:8
**reached** [1] - 86:4
**read** [4] - 27:12, 30:5, 61:4, 61:6
**reading** [4] - 24:14, 24:16, 24:17, 55:18
**reaffirmed** [1] - 22:2
**real** [1] - 16:23
**realize** [2] - 31:3, 67:24
**really** [11] - 10:4, 10:6, 21:23, 25:5, 48:4, 52:1, 65:8, 70:5, 74:23, 75:2, 82:24
**reason** [5] - 42:24, 51:21, 64:6, 65:16, 70:7
**reasons** [2] - 22:5, 50:3
**rebut** [1] - 37:11
**rebuttal** [1] - 39:6
**receive** [1] - 8:14
**received** [9] - 8:11, 8:16, 12:17, 28:23, 29:19, 34:5, 39:22, 55:8, 57:3
**reckless** [1] - 7:4
**record** [1] - 64:2
**RECORDING** [1] - 1:13
**recording** [1] - 80:14
**recruited** [1] - 10:24
**redact** [5] - 7:19, 40:1, 40:2, 40:4, 40:13
**redacted** [5] - 10:8, 15:2, 39:19, 40:6, 40:13
**redacting** [1] - 10:2
**redactions** [1] - 39:19
**redundant** [1] - 75:24
**reference** [1] - 29:6
**referenced** [1] - 57:12
**references** [1] - 58:20
**refers** [1] - 29:1
**reflect** [1] - 68:20
**refused** [2] - 9:10, 63:19
**refuses** [1] - 58:17
**refusing** [1] - 74:2
**regard** [1] - 44:21
**regarding** [2] - 47:9, 53:14

**regardless** [3] - 20:6, 42:4, 62:18
**regulation** [4] - 66:14, 66:20, 68:2, 68:14
**regulations** [2] - 66:23, 68:16
**regulator** [1] - 67:4
**regulators** [2] - 67:14, 68:7
**Reid** [2] - 28:5, 28:16
**rejected** [1] - 55:15
**relate** [4] - 48:19, 62:19, 68:12, 73:5, 73:9
**related** [16] - 45:7, 45:13, 49:25, 61:1, 61:19, 62:11, 62:15, 63:16, 63:17, 68:16, 68:17, 78:18, 80:1, 82:8, 83:3
**relates** [4] - 63:1, 67:7, 67:10, 67:11
**relating** [11] - 66:14, 66:20, 66:21, 67:4, 68:2, 68:21, 74:13, 74:16, 75:9, 75:16, 75:22
**relationship** [6] - 18:3, 18:5, 18:13, 18:17, 19:3, 21:22
**relationships** [2] - 49:11, 55:19
**relatively** [1] - 78:10
**release** [1] - 42:2
**relevance** [2] - 58:8, 73:4
**relevant** [37] - 6:15, 6:25, 8:8, 12:11, 12:12, 22:8, 28:12, 33:21, 33:22, 33:23, 51:2, 51:3, 52:8, 53:9, 54:20, 55:5, 57:23, 58:2, 63:23, 72:23, 73:3, 74:5, 74:24, 75:6, 75:10, 75:13, 78:20, 80:7, 81:2, 82:13, 82:14, 83:15, 85:7, 85:22, 87:16
**relied** [2] - 22:17, 25:20
**relief** [1] - 53:25
**reluctant** [1] - 49:21
**rely** [2] - 35:17, 36:13
**relying** [6] - 22:20, 23:6, 26:7, 36:3, 36:6, 36:8
**remember** [1] - 26:16
**remotely** [1] - 75:5
**reply** [7] - 39:4,

43:22, 44:8, 44:13, 88:2
**Report** [1] - 77:19
**report** [24] - 8:10, 8:14, 8:16, 8:22, 12:16, 13:8, 23:22, 24:3, 24:4, 24:10, 32:10, 32:12, 32:13, 35:16, 35:24, 36:16, 41:15, 41:18, 41:21, 77:19, 77:21, 77:24
**reported** [2] - 10:8, 10:18
**reporter** [8] - 13:11, 19:22, 25:20, 25:22, 30:10, 32:7, 37:22, 47:9
**Reporter** [1] - 89:8
**reporter's** [18] - 4:13, 4:23, 5:1, 5:8, 5:11, 5:13, 6:3, 6:21, 13:24, 14:5, 14:11, 14:12, 14:20, 18:7, 22:23, 37:13, 88:1
**Reporterlisaedwar ds@gmail.com** [1] - 2:13
**reporters** [7] - 14:2, 14:4, 21:3, 31:18, 33:5, 39:24
**reporters'** [1] - 17:11
**reporting** [7] - 12:13, 12:25, 22:25, 25:11, 25:13, 25:15
**reports** [5] - 8:11, 13:1, 14:1, 77:13, 79:7
**representation** [2] - 59:12, 59:13
**representatives** [2] - 48:24, 59:16
**representing** [1] - 81:22
**reputation** [31] - 48:19, 49:7, 49:16, 49:24, 51:3, 51:4, 51:7, 51:15, 54:25, 55:17, 55:21, 55:24, 56:24, 58:12, 62:12, 62:19, 62:23, 63:16, 63:23, 64:5, 64:22, 69:23, 69:24, 69:25, 70:1, 71:15, 73:10, 73:11, 74:6, 75:11, 75:13
**reputations** [1] - 49:14
**Request** [2] - 76:17, 79:25
**request** [13] - 4:24,

14:8, 26:19, 59:9, 59:15, 61:23, 61:24, 62:15, 75:18, 76:24, 83:18, 85:6, 87:15
**requested** [1] - 53:25
**requesting** [2] - 79:23, 80:4
**requests** [7] - 47:14, 47:16, 58:13, 62:13, 72:4, 76:3
**Requests** [2] - 13:20, 58:21
**require** [9] - 16:6, 37:11, 40:7, 68:19, 72:9, 75:7, 82:14, 85:21, 87:2
**required** [5] - 47:8, 64:1, 80:8, 87:12, 87:22
**requires** [2] - 18:16, 26:16
**requiring** [1] - 57:22
**research** [1] - 9:1
**resident** [1] - 18:9
**residents** [1] - 19:18
**resolve** [1] - 46:16
**resolved** [1] - 87:1
**respect** [4] - 4:10, 4:22, 15:25, 65:2, 79:18, 80:3
**respond** [5] - 29:21, 43:19, 72:10, 75:20, 87:13
**response** [9] - 9:17, 13:18, 15:10, 15:21, 29:25, 34:22, 44:6, 59:15, 60:25
**responses** [3] - 16:7, 58:17, 60:5
**responsive** [2] - 4:9, 5:2
**restatement** [1] - 17:25
**result** [6] - 49:13, 49:16, 54:14, 55:23, 57:25, 73:6
**resulted** [1] - 13:22
**resulting** [1] - 13:25
**retribution** [1] - 23:19
**return** [4] - 55:8, 57:22, 57:23, 58:4
**returns** [14] - 50:1, 51:17, 51:20, 51:24, 51:25, 53:8, 54:8, 55:6, 55:11, 56:2, 56:18, 56:19, 58:5, 58:18
**reveal** [5] - 14:21, 15:2, 21:25, 29:17,

65:24
**revealed** [1] - 74:21
**revenues** [1] - 13:25
**review** [1] - 66:15
**ridicule** [1] - 57:4
**ridiculously** [1] - 68:4
**Riles** [1] - 63:19
**Rivera** [1] - 63:24
**robbing** [1] - 42:3
**Root** [1] - 78:3
**Rule** [5] - 17:14, 25:6, 25:9, 49:3, 66:8
**rule** [7] - 34:25, 37:2, 44:14, 44:22, 46:18, 46:19, 46:22
**Rules** [1] - 17:15
**ruling** [2] - 44:17, 86:21
**run** [4] - 7:17, 68:9, 70:8, 70:24
**running** [4] - 62:9, 66:6, 66:22, 77:2
**Russia** [1] - 77:23
**Russian** [8] - 12:1, 12:4, 12:5, 12:7, 31:6, 77:16, 78:2, 85:16
**Russians** [1] - 70:18

**S**

**S.A** [3] - 1:4, 3:4, 78:3
**salary** [3] - 51:16, 54:17, 54:18
**saw** [1] - 8:5
**scenarios** [1] - 11:5
**scheduling** [1] - 43:13
**Schoofs** [2] - 21:6, 21:8
**scope** [3] - 49:2, 49:5, 74:23
**SCOTT** [1] - 1:23
**search** [1] - 74:14
**seated** [1] - 4:4
**second** [8] - 4:10, 6:16, 35:12, 53:12, 53:17, 54:2, 59:1, 86:5
**secondly** [1] - 65:5
**secret** [1] - 55:9
**Section** [6] - 5:9, 5:12, 17:25, 18:6, 18:16, 70:25
**Security** [1] - 77:20
**security** [2] - 83:3, 83:8
**see** [13] - 3:7, 4:18,

10:14, 14:10, 15:19, 16:4, 22:23, 31:14, 40:7, 50:20, 59:6, 67:19, 69:15
**seeing** [2] - 46:24, 88:11
**seek** [3] - 52:2, 62:15, 72:4
**seeking** [8] - 10:15, 26:19, 30:6, 51:4, 53:11, 54:10, 54:11, 54:20
**seeks** [1] - 25:19
**seem** [2] - 28:15, 51:8
**Senator** [1] - 32:10
**send** [2] - 25:7, 84:3
**sender** [2] - 40:1, 40:2
**sending** [3] - 65:15, 65:18, 83:24
**sends** [1] - 71:21
**sense** [4] - 6:22, 6:23, 24:9, 73:15
**sent** [1] - 57:13
**separate** [1] - 64:14
**separately** [2] - 61:17, 64:14
**September** [3] - 1:6, 10:9, 10:19
**serious** [1] - 42:13
**server** [2] - 11:20, 72:13
**servers** [5] - 11:19, 65:23, 66:22, 77:2, 82:12
**service** [1] - 5:19
**Services** [1] - 18:15
**services** [1] - 73:6
**session** [1] - 86:3
**setting** [1] - 59:14
**seven** [1] - 88:7
**several** [1] - 43:25
**shield** [4] - 12:22, 23:5, 30:12, 31:9
**shielded** [1] - 80:19
**shifts** [2] - 37:9, 37:10
**show** [8] - 37:9, 38:9, 40:19, 50:4, 52:5, 55:11, 58:8, 63:5
**showing** [5] - 6:14, 27:7, 27:9, 63:13
**Sia** [1] - 10:25
**sic** [2] - 51:4, 70:19
**sic]** [1] - 13:19
**side** [4] - 4:13, 37:10, 38:5, 45:20
**sides** [1] - 52:25
**Sigal** [3] - 3:23,

76:2, 76:4
**SIEGEL** [23] - 2:5, 3:23, 76:7, 76:9, 76:14, 76:19, 77:8, 78:21, 78:25, 79:2, 80:15, 82:17, 82:20, 82:23, 82:25, 83:21, 84:8, 84:10, 84:16, 85:14, 86:17, 87:6, 88:12
**signal** [1] - 17:10
**signed** [1] - 26:20
**significance** [1] - 15:13
**significant** [9] - 10:25, 18:3, 18:5, 18:12, 18:17, 19:2, 19:3, 21:22
**similar** [2] - 20:9, 77:17
**similarities** [1] - 65:7
**similarly** [2] - 18:14, 51:22
**simple** [3] - 32:22, 33:19, 84:17
**simply** [1] - 64:6
**siphon** [1] - 78:11
**sit** [1] - 54:2
**sitting** [1] - 64:1
**situation** [1] - 43:5
**Sixth** [1] - 1:23
**slow** [2] - 60:22, 76:8
**smaller** [1] - 77:3
**SMITH** [1] - 1:8
**Smith** [5] - 3:6, 5:13, 14:6, 14:23, 21:1
**so-and-so** [1] - 39:22
**social** [2] - 49:11, 55:18
**someone** [19] - 7:16, 9:2, 13:5, 24:1, 25:19, 32:9, 34:5, 34:7, 41:2, 53:15, 65:17, 69:17, 69:20, 71:21, 72:12, 72:17, 75:3, 75:4, 83:19
**somewhere** [3] - 9:16, 15:9, 69:7
**soon** [1] - 53:6
**sorry** [14] - 3:5, 8:24, 11:13, 27:16, 31:13, 38:11, 41:5, 45:2, 47:9, 61:2, 61:3, 62:1, 69:3, 87:22
**sort** [4] - 18:21, 62:13, 77:21, 83:8
**sorts** [1] - 66:23
**sought** [5] - 6:14, 6:16, 24:18, 49:25, 61:8

**source** [38] - 6:17, 10:13, 10:18, 13:19, 15:3, 15:22, 16:7, 16:8, 16:24, 25:13, 25:20, 25:21, 25:25, 26:4, 26:7, 26:8, 27:7, 28:25, 29:11, 29:17, 30:18, 30:20, 33:1, 33:3, 33:4, 34:17, 35:17, 36:7, 36:11, 36:12, 36:14, 40:2, 40:8, 40:14, 40:16, 43:10, 81:14
**sources** [12] - 13:19, 13:23, 14:21, 17:11, 17:12, 21:25, 22:9, 26:17, 31:16, 35:10, 39:25, 50:23
**South** [1] - 2:10
**Southeast** [1] - 1:23
**SOUTHERN** [1] - 1:1
**spam** [4] - 65:15, 65:18, 70:13, 83:2
**specific** [7] - 29:5, 59:21, 59:25, 79:3, 79:6, 79:7, 85:15
**specifically** [2] - 5:12, 49:23
**specificity** [1] - 61:17
**speculating** [2] - 31:12, 35:13
**speculation** [1] - 34:1
**speed** [1] - 48:22
**speedy** [1] - 52:25
**spelled** [1] - 45:11
**spies** [1] - 57:5
**spread** [2] - 32:20, 34:6
**SREBNICK** [1] - 2:9
**stage** [1] - 49:3
**stand** [1] - 23:16
**standard** [2] - 62:13, 73:18
**start** [1] - 53:25
**started** [2] - 4:8, 8:25
**starting** [3] - 33:10, 52:19, 64:9
**starts** [1] - 77:6
**State** [3] - 17:8, 20:4
**state** [9] - 17:17, 17:23, 18:4, 18:12, 20:3, 21:22, 30:11, 53:23, 66:15
**state's** [1] - 5:6
**statement** [2] - 14:9, 25:24
**statements** [3] - 14:6, 14:23

**STATES** [2] - 1:1, 1:12
**States** [8] - 17:6, 17:11, 35:11, 41:16, 42:10, 42:12, 57:6, 89:9
**station** [1] - 5:20
**status** [1] - 51:16
**statute** [5] - 5:9, 5:10, 5:16, 5:22, 6:9, 17:6, 17:13, 20:9, 35:14
**stay** [3] - 25:1, 25:10, 52:11
**steal** [1] - 10:21
**Steele** [12] - 9:4, 10:10, 10:16, 26:1, 26:5, 26:8, 26:20, 26:23, 26:25, 32:1, 32:9
**Steele's** [1] - 10:13
**Steppe** [1] - 77:19
**steps** [2] - 6:13, 70:12
**still** [5] - 16:12, 22:4, 35:24, 50:15, 67:12
**stood** [1] - 11:9
**storage** [2] - 11:20, 11:21
**story** [4] - 20:23, 21:23, 42:20, 57:2
**straight** [1] - 4:20
**straightforward** [2] - 46:10, 51:8
**Street** [2] - 1:20, 1:23
**stricken** [1] - 47:6
**strictly** [1] - 56:4
**strike** [1] - 87:15
**stuck** [2] - 53:23, 67:22
**stuff** [12] - 7:19, 16:13, 31:13, 34:10, 36:23, 39:22, 52:7, 57:19, 67:21, 69:7, 84:3, 87:19
**STUMPF** [1] - 2:9
**subject** [6] - 48:7, 68:10, 68:11, 68:15, 71:1, 82:21
**submit** [1] - 80:15
**submits** [1] - 24:1
**submitted** [3] - 4:25, 5:1, 20:13
**subpoena** [1] - 27:11
**subpoenaed** [1] - 19:19
**subpoenas** [1] - 9:17
**subsidiary** [1] - 78:4
**substantial** [4] - 49:20, 63:6, 63:15,

85:19
**substantially** [1] - 63:9
**substantive** [1] - 86:21
**such-and-such** [1] - 39:22
**sued** [5] - 18:9, 69:17, 69:20, 71:20, 72:12
**suffer** [3] - 49:20, 55:22, 56:23
**suffered** [4] - 49:8, 49:15, 49:19, 55:22
**suffering** [2] - 49:13, 56:24
**sufficient** [1] - 15:20
**suggest** [2] - 21:9, 44:17, 44:21
**suggested** [2] - 13:16, 15:24
**suggesting** [2] - 31:24, 32:14
**suggests** [1] - 85:6
**suing** [3] - 70:15, 72:16, 78:22
**suit** [2] - 72:23, 73:3
**Suite** [4] - 1:17, 1:20, 2:7, 2:10
**suits** [1] - 70:4
**summarize** [1] - 73:13
**summary** [3] - 72:13, 72:22, 73:16
**supplement** [1] - 59:13
**supplements** [1] - 87:12
**support** [2] - 20:24, 44:24
**supporting** [1] - 61:19
**suppose** [2] - 5:25, 30:16
**supposed** [1] - 71:1
**suspicion** [1] - 7:21
**suspicious** [4] - 78:1, 79:10, 83:22, 85:15
**sword** [1] - 12:22, 23:5
**swore** [3] - 20:23, 21:1, 21:4
**sworn** [1] - 21:12
**system** [2] - 83:10, 83:11
**systems** [1] - 85:3

## T

**Tabalares** [2] - 51:10, 56:9
**takedown** [1] - 71:21
**talker** [1] - 76:11
**talks** [2] - 18:1, 70:25
**tantamount** [1] - 70:9
**targeted** [1] - 10:5
**tattered** [1] - 49:8
**tatters** [1] - 55:21
**tax** [18] - 50:1, 51:17, 51:20, 51:24, 53:8, 54:8, 55:6, 55:8, 55:11, 56:1, 56:18, 56:19, 57:22, 57:23, 58:4, 58:5, 58:18
**technical** [1] - 77:1
**technically** [1] - 71:25
**telephone** [1] - 71:4
**television** [1] - 5:20
**ten** [1] - 44:13
**tending** [1] - 14:20
**terms** [3] - 20:8, 83:24, 84:4
**test** [4] - 22:7, 26:16, 40:11
**testify** [2] - 57:1, 57:2
**testimony** [5] - 18:4, 29:14, 42:24, 43:3, 64:2
**text** [3] - 40:1, 40:5, 57:3
**THE** [269] - 1:12, 1:13, 1:15, 2:2, 3:1, 3:4, 3:12, 3:15, 3:18, 3:22, 3:25, 4:3, 4:14, 4:18, 5:15, 5:22, 5:24, 6:3, 7:10, 8:18, 8:20, 8:23, 9:11, 9:14, 9:22, 10:10, 10:12, 10:14, 10:17, 11:12, 11:14, 11:16, 12:1, 12:4, 12:7, 12:9, 12:19, 12:23, 14:14, 14:22, 15:4, 15:6, 15:17, 15:19, 16:6, 16:12, 16:17, 16:22, 17:19, 17:21, 17:23, 19:5, 19:11, 19:22, 20:15, 20:17, 20:21, 21:14, 21:17, 21:20, 22:11, 22:14, 22:16, 24:13, 24:23, 25:1, 25:3, 25:6, 26:23, 27:4, 27:21, 28:2, 28:10,

28:12, 28:15, 28:22, 28:25, 29:4, 29:7, 29:18, 29:22, 29:25, 31:1, 31:6, 31:22, 32:3, 32:5, 33:1, 34:10, 34:20, 34:23, 35:6, 35:20, 35:23, 36:1, 36:6, 36:10, 36:19, 36:21, 37:3, 37:5, 37:7, 37:15, 37:18, 37:21, 38:5, 38:9, 38:16, 38:18, 39:1, 39:11, 39:13, 39:17, 39:20, 40:7, 40:10, 40:15, 40:25, 41:12, 41:19, 41:23, 42:5, 42:15, 42:17, 42:19, 43:7, 43:12, 43:16, 43:18, 43:21, 44:1, 44:4, 44:12, 44:16, 45:5, 45:7, 45:9, 45:12, 45:15, 45:17, 45:19, 45:23, 46:1, 46:3, 46:12, 46:23, 47:1, 47:2, 47:3, 47:5, 48:2, 48:6, 48:13, 48:21, 50:9, 50:12, 50:15, 50:17, 50:20, 52:9, 52:13, 52:17, 53:12, 53:14, 53:17, 53:22, 54:6, 54:22, 55:13, 56:7, 56:11, 56:14, 56:22, 57:10, 57:15, 57:18, 57:22, 58:16, 58:23, 59:3, 59:8, 59:22, 59:25, 60:4, 60:8, 60:13, 60:17, 60:19, 60:22, 61:3, 61:6, 61:12, 61:14, 61:22, 61:25, 62:4, 62:6, 62:9, 64:7, 64:13, 66:5, 66:10, 66:14, 66:19, 67:2, 67:7, 67:9, 67:24, 68:1, 68:4, 68:19, 68:24, 69:2, 69:5, 69:10, 70:3, 70:22, 71:7, 71:11, 71:13, 72:2, 72:5, 72:9, 72:25, 73:5, 73:15, 73:20, 74:4, 74:8, 74:11, 75:6, 75:9, 75:20, 76:4, 76:13, 76:18, 77:7, 78:20, 78:24, 79:1, 79:15, 80:11, 80:13, 82:5, 82:11, 82:18, 82:21, 82:24, 83:19, 84:6, 84:9, 84:15, 84:22, 85:2, 85:21, 86:2, 86:13,

86:18, 86:24, 87:1, 87:7, 87:10, 87:17, 87:21, 88:4, 88:6, 88:11, 88:13, 88:15
**themselves** [2] - 33:5, 65:15
**therefore** [2] - 69:24, 81:12
**they've** [13] - 9:18, 13:17, 26:20, 26:21, 26:22, 29:2, 29:9, 34:14, 34:15, 49:1, 49:17, 66:23, 79:19
**thin** [3] - 31:4, 31:8, 34:1
**thinking** [1] - 36:2
**third** [1] - 47:18
**thousands** [2] - 27:13, 72:11
**three** [1] - 35:5
**throughout** [1] - 31:18
**throw** [1] - 55:7
**timeline** [1] - 43:11
**title** [1] - 47:3
**today** [6] - 3:1, 6:6, 29:15, 31:20, 43:21, 87:21
**today's** [1] - 5:6
**together** [1] - 48:20
**tomorrow** [3] - 23:18, 43:14, 88:13
**tools** [5] - 83:3, 83:8, 83:13, 83:16, 84:2
**top** [3] - 28:8, 58:16, 69:3
**traces** [1] - 11:10
**trade** [1] - 49:18
**trademark** [1] - 70:15
**traffic** [5] - 10:20, 13:21, 84:23, 84:24, 84:25
**TRANSCRIBED** [2] - 1:13, 2:12
**transcript** [2] - 87:6, 87:7
**transcription** [1] - 89:4
**transmit** [1] - 10:21
**transmitted** [1] - 18:19
**travel** [1] - 43:24
**TREMAINE** [2] - 2:2, 2:6
**tried** [6] - 4:17, 9:9, 27:10, 27:11, 30:9, 77:22
**TRIPP** [1] - 1:23
**trouble** [2] - 26:19, 59:18

**true** [28] - 7:17, 7:20, 17:3, 23:21, 24:3, 24:4, 25:11, 25:13, 25:15, 35:16, 35:24, 36:11, 36:16, 40:16, 40:20, 40:25, 41:6, 41:7, 41:15, 41:21, 41:23, 43:2, 55:10, 63:9, 72:3, 81:6
**Trump** [7] - 9:3, 10:1, 13:8, 28:19, 61:1, 64:15, 74:25
**Trump's** [1] - 11:3
**truth** [12] - 7:5, 25:20, 30:23, 42:4, 63:1, 63:2, 63:6, 63:14, 63:15, 63:17, 74:6, 85:19
**try** [6] - 29:10, 44:1, 48:10, 66:3, 73:20, 84:2
**trying** [5] - 34:5, 52:18, 81:9, 81:20, 83:12
**turn** [8] - 9:3, 51:15, 51:24, 54:7, 56:18, 56:19, 63:20, 64:1
**turned** [2] - 9:3, 63:18
**turning** [3] - 49:23, 52:21, 81:7
**Twelfth** [1] - 89:9
**two** [20] - 3:8, 4:10, 6:13, 23:8, 33:16, 43:17, 43:21, 43:23, 50:3, 53:2, 56:2, 56:3, 72:19, 76:3, 77:3, 81:5, 87:20, 87:21, 88:4
**types** [1] - 77:16
**typo** [1] - 62:2

## U

**ulterior** [1] - 34:7
**ultimate** [1] - 81:13
**ultimately** [1] - 7:2
**umbrella** [1] - 11:17
**unable** [1] - 55:1
**unconfirmed** [1] - 40:24
**under** [15] - 5:1, 5:10, 10:24, 14:11, 21:4, 22:3, 22:22, 24:1, 27:24, 37:3, 50:24, 62:25, 63:7, 71:25, 78:7
**undercut** [1] - 51:6
**underlying** [2] -

12:11, 78:21
**undermined** [1] - 57:6
**unfortunately** [1] - 62:2
**Ungaro** [3] - 3:7, 26:20, 88:13
**unique** [1] - 48:23
**United** [8] - 17:6, 17:10, 35:11, 41:16, 42:10, 42:12, 57:6, 89:9
**UNITED** [2] - 1:1, 1:12
**unless** [4] - 4:4, 8:15, 34:18, 48:2
**unsatisfied** [1] - 64:17
**untrue** [2] - 41:3, 65:13
**unusual** [1] - 25:17
**unverified** [6] - 7:8, 7:10, 7:12, 26:3, 40:23, 41:11
**up** [20] - 6:2, 22:11, 23:16, 29:15, 31:24, 35:2, 39:3, 39:5, 47:18, 55:11, 57:4, 65:9, 76:4, 76:9, 76:19, 78:9, 78:11, 78:14, 80:19
**upload** [1] - 83:7
**US** [2] - 12:1, 66:1
**useful** [1] - 49:1
**usual** [1] - 26:6
**utilized** [1] - 83:3

## V

**Val** [1] - 3:13
**VALENTIN** [2] - 1:19
**variety** [2] - 17:12, 39:25
**various** [1] - 11:5
**verify** [1] - 7:25
**Verizon** [9] - 65:18, 65:20, 71:3, 71:5, 72:16, 80:10, 84:11, 84:12
**versus** [9] - 3:4, 3:5, 3:6, 18:8, 18:14, 18:22, 51:10, 51:18, 63:18
**Versus** [1] - 63:24
**Veterans** [1] - 44:7
**view** [1] - 62:25
**violated** [1] - 71:22
**violating** [1] - 83:23
**violation** [2] - 57:25,

84:4
  violations [1] - 83:10
  viruses [3] - 10:21,
65:16, 83:24
  vs [1] - 1:7

## W

  wages [3] - 53:11,
54:11, 54:21
  wait [3] - 30:1, 39:3,
59:9
  waive [5] - 13:13,
34:15, 34:18, 37:18,
38:15
  waived [1] - 38:6
  waiver [3] - 36:2,
36:13, 39:2
  waiving [2] - 22:19,
43:10
  wants [3] - 10:5,
56:4, 70:2
  warned [1] - 42:12
  warrants [2] - 74:14,
74:15
  Washington [4] -
2:7, 9:2, 24:23, 76:11
  water [2] - 69:21
  ways [2] - 12:15,
26:15
  website [1] - 13:21
  Webzilla [18] - 3:5,
3:6, 8:5, 11:12, 11:14,
11:18, 41:5, 49:8,
49:12, 54:17, 54:18,
61:24, 62:1, 62:3,
65:14, 79:22, 85:12
  WEBZILLA [1] - 1:5
  week [8] - 43:22,
44:8, 52:23, 72:17,
87:8, 87:9, 87:17,
87:19
  weeks [7] - 29:6,
43:17, 43:21, 43:23,
87:20, 87:21, 88:4
  whatsoever [1] -
64:21
  whole [4] - 24:20,
67:21, 79:4, 81:23
  wide [1] - 28:21
  wife [1] - 57:2
  wildly [1] - 13:17
  willful [1] - 71:18
  willfully [2] - 67:21,
70:8
  win [1] - 22:5
  winner [1] - 21:9
  wire [1] - 5:19
  wise [1] - 62:23

  withdraw [1] - 86:5
  withdrawing [1] -
16:8
  withdrawn [1] - 16:1
  withheld [7] - 14:19,
15:1, 15:16, 16:3,
16:5, 29:13, 29:16
  withhold [3] - 16:11,
16:15, 51:19
  witnesses [1] - 30:7
  witzer [1] - 76:15
  WITZER [91] - 1:15,
1:16, 3:10, 4:6, 4:17,
4:22, 5:16, 5:23, 6:1,
6:4, 7:12, 8:19, 8:21,
8:24, 9:12, 9:17, 9:25,
10:11, 10:13, 10:15,
10:18, 11:13, 11:15,
11:17, 12:3, 12:5,
12:8, 12:10, 12:20,
12:24, 14:15, 15:23,
29:20, 29:23, 31:23,
32:4, 32:6, 33:3,
34:12, 42:23, 43:3,
43:5, 43:20, 45:21,
46:7, 47:21, 47:23,
48:5, 52:12, 52:19,
54:9, 54:24, 56:23,
58:13, 58:20, 59:6,
59:24, 60:2, 61:11,
61:21, 62:5, 64:9,
64:14, 68:8, 68:13,
69:12, 69:15, 69:17,
69:20, 70:21, 70:23,
71:17, 71:19, 71:25,
72:7, 72:24, 73:14,
73:19, 74:20, 79:16,
80:12, 82:1, 82:7,
84:18, 84:25, 85:5,
86:11, 86:15, 87:20,
88:10, 88:14
  Witzer [19] - 3:11,
14:17, 17:1, 22:6,
27:16, 27:23, 30:3,
31:12, 31:14, 35:8,
35:12, 55:14, 60:10,
67:15, 71:23, 75:19,
76:19, 86:4, 86:7
  Witzer's [3] - 23:10,
30:14, 59:12
  won [1] - 11:6
  wonderful [1] - 34:16
  wonders [1] - 11:25
  words [6] - 27:15,
36:10, 40:10, 43:8,
83:22, 84:1
  workers' [2] - 68:10,
68:11
  works [1] - 21:19
  world [2] - 33:9, 35:9

  worldwide [1] -
75:18
  WRIGHT [2] - 2:2,
2:6
  writ [1] - 70:1
  write [2] - 23:12,
23:14
  writing [1] - 15:24
  written [3] - 5:22,
27:13, 59:1
  wrote [5] - 18:18,
21:3, 21:4, 28:16,
40:19

## X

  XBT [16] - 1:4, 3:4,
3:5, 11:17, 49:8,
49:12, 61:24, 62:1,
65:14, 70:19, 78:4,
79:22, 83:3, 83:5,
83:7, 85:12
  XBT/Webzilla [1] -
10:19

## Y

  Yahoo!news [1] -
32:7
  year [12] - 50:5, 50:6,
50:7, 50:9, 51:5, 51:6,
54:17, 54:19, 58:7,
78:13
  years [3] - 35:2, 75:4,
78:8
  yesterday [1] - 24:21
  York [42] - 2:4, 17:8,
17:23, 18:8, 18:9,
18:19, 19:4, 19:5,
19:15, 19:16, 19:17,
19:21, 19:23, 19:24,
20:1, 20:3, 20:13,
20:16, 21:2, 21:5,
21:7, 21:18, 21:23,
21:24, 23:25, 28:6,
32:1, 32:6, 32:15,
33:12, 37:4, 38:20,
38:23, 63:24, 63:25,
76:5, 76:7
  York's [2] - 17:4,
19:10
  yourself [1] - 67:20