UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| ALEKSEJ GUBAREV,<br>XBT HOLDINGS S.A., and<br>WEBZILLA, INC.<br>     Plaintiffs,<br><br>v.<br><br>BUZZFEED, INC. and<br>BEN SMITH<br>     Defendants. | Case No.<br><br>0:17-cv-60426-UU |

**PLAINTIFFS' MEMORANDUM OF LAW REGARDING THE REPORTERS'
PRIVILEGE, AS REQUESTED BY JUDGE O'SULLIVAN**

*"We are told that we cannot have our cake and eat it too. What this means in the privilege context is that a litigant cannot at one and the same time place privileged matters into issue and also assert that what has been placed into issue nonetheless remains privileged and not subject to full discovery and exploration."*
- *QBE Ins. Corp. v. Jorda Enters.*,
286 F.R.D. 661, 664 (S.D. Fla. 2012)

## Introduction

In late December of 2016, Defendant Buzzfeed obtained a copy of a compilation of unverified memos, prepared by a private opposition research firm. Although Buzzfeed claims to have spent weeks attempting to verify the information contained in that Dossier (except for information relating to Plaintiffs, which Buzzfeed admits it did not even attempt to verity), it admits that it was ultimately unable to verify anything contained therein. Undeterred, and seemingly unconcerned, Buzzfeed and its editor-in-chief, Ben Smith, chose to print the unsubstantiated Dossier, knowing full well that the information contained therein might prove to be completely false. And, with respect to the Plaintiffs herein, at least, the information was both false and defamatory.

As Buzzfeed itself has acknowledged, other news outlets also had the Dossier in their possession, but chose not to publish the documents believing that it was irresponsible to publish a compendium of unverified information. It is entirely possible that a reporter from one of these

more responsible news outlets provided Buzzfeed with the copy of the Dossier that Buzzfeed published, though Plaintiffs have no way of knowing this inasmuch as Buzzfeed has refused to produce any information concerning the identity of its source, citing to various "reporter's privileges."

While Defendants seek the protection of such privileges (depriving the Plaintiffs of information necessary to prove their case in chief), Defendants also seek to take advantage of affirmative defenses that hinge upon the withheld information. In doing so, Defendants seek to "have their cake and eat it too." This they cannot do. As the Court will see, Plaintiffs contend that Defendants are not entitled to the protections of the various reporter's privileges or that, if they are, the qualified privilege must give way to Plaintiffs' legitimate need for the information sought.

In the alternative, if Defendants are not required to produce the information concerning the identity of their source, they should be precluded from asserting certain defenses that are reliant on such source information and Plaintiffs should be relieved of the burden of presenting evidence as part of their case-in-chief that would require the disclosure of such information.

In further support, Plaintiffs state as follows.

## Relevant Facts

I.  The Dossier and the December Memo

In 2016, a private, Washington, D.C.-based opposition research firm, Fusion GPS, was first hired by a conservative news website to conduct opposition research on then-Presidential candidate Donald Trump. After President Trump secured the Republican nomination, that news website discontinued its engagement with Fusion GPS. Fusion GPS was subsequently retained to continue its research by a Washington D.C. law firm, Perkins Coie, which was working on behalf of the Democratic National Committee and the Hillary Clinton Presidential Campaign.

Fusion GPS, in turn, hired a private British-based investigatory firm, Orbis Business Intelligence, which was founded by a former British spy, Christopher Steele.

Mr. Steele was tasked with investigating ties between Russia and the Trump Presidential campaign. Mr. Steele used paid informants in Russia to gather raw intelligence data, which he compiled into a series of memorandum. The last of these memoranda was dated December 13, 2016 and titled "Company Intelligence Report 2016/166" (the "December Memo"). Taken together, the memoranda authored by Mr. Steele have been referred to as the "Dossier."

The December Memo contained various unsubstantiated allegations concerning, among other things, allegations of computer hacking of the Democratic Party allegedly carried out by persons or organizations with ties to Russia, the Russian Government, and/or the Federal Security Service of the Russian Federation ("FSB").[1]  Complaint, ¶ 25.  With respect to the Plaintiffs, the December memo included the following assertions of fact:

> *[redacted] reported that over the period March-September 2016 a company called XBT/Webzilla and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct "altering operations" against the Democratic Party leadership. Entities linked to one Alexei GUBAROV [sic] were involved and he and another hacking expert, both recruited under duress by the FSB, Seva KAPSUGOVICH, were significant players in this operation. In Prague, COHEN agreed contingency plans for various scenarios to protect the operations, but in particular what was to be done in the event that Hillary CLINTON won the presidency. It was important in this event that all cash payments owed were made quickly and discreetly and that cyber and that cyber and other operators were stood down / able to go effectively to ground to cover their traces.*

*Id.*, ¶ 26.

At some point in late December of 2016, Buzzfeed reporter Ken Bensinger, who lives and works in Los Angeles, obtained a copy of the Dossier.  Buzzfeed has refused to identify the source of its copy of the Dossier.  On January 10, Defendants published an online article entitled, "These Reports Allege Trump Has Deep Ties To Russia" (the "Defamatory Article"), along with the entire unverified Dossier.  Complaint, ¶ 23.

Mr. Steele has subsequently (in litigation brought in the United Kingdom) stated that he briefed reporters from the New York Times, Washington Post, Yahoo! News, the New Yorker, CNN, and Mother Jones on the contents of the Dossier, though he denied providing copies of the Dossier to any of the journalists briefed.  Mr. Steele stated also that he provided a copy of the Dossier to David Kramer, who was then employed by the McCain Institute for Human Rights.

Fusion GPS, Mr. Steele, and Senator McCain have each denied providing Buzzfeed with a copy of the Dossier.  *See*, Exhibit 1, p. 13; Exhibit 2, ¶ 30 and *passim*; Exhibit 3.

II.   Plaintiffs' Contacts with Florida

Plaintiff Webzilla, Inc. ("Webzilla"), a domestic for-profit corporation incorporated in Florida, has been continuously registered as such with Florida's Division of Corporations since

---

[1] The FSB is the main successor agency to the USSR's Committee of State Security ("KGB").

3

2009.  Declaration of Constantin Luchian ["Luchian Decl."], filed herewith, ¶ 5 and Exhibit 1 thereto; Exhibit 4.  Webzilla's website (Webzilla.com) indicates that the North America Corporate Contact address listed for Webzilla is in Fort Lauderdale, Florida.  Luchian Decl., ¶ 8 and Exhibit 2 thereto.

Webzilla's Financial Director, Constantin Luchian, has been a full-time resident of Florida since 2009 and he has performed all of his duties for Webzilla – including processing of payments to Webzilla; oversight of Webzilla's billing; and overseeing Webzilla's accounting – from Florida.  Luchian Decl., ¶¶ 2-7, 25.  Mr. Luchian is also an owner, employee, and director of Incorporate Now, Inc. – also located in Fort Lauderdale, Florida – which serves as Webzilla's Resident Agent in Florida.  Luchian Decl., ¶¶ 21-22 and Exhibit 1 thereto.  Additionally, Mr. Luchian is Webzilla's registered agent to receive notifications of claimed infringement, as registered with the United States Copyright Office.  Luchian Decl., ¶ 23 and Exhibit 5 thereto.

Webzilla has always maintained a physical presence in Florida.  Luchian Decl., ¶ 7; Declaration of Kostyantyn Bezruchenko ["Bezruchenko Decl."], filed herewith, ¶ 4.  At various times, that physical presence was at a separate office maintained by Webzilla (and sublet from executive office space providers such as Regus); sometimes it was as part of Incorporate Now's offices; and sometimes it maintained a presence in both locations.  Luchian Decl., ¶ 9.  Whenever Mr. Luchian was told that mail had arrived at one of Webzilla's Florida offices, he would personally go to the office to pick up the mail, or have it forwarded to him in Florida.  Luchian Decl., ¶ 11.  The United States telephone number listed on the Webzilla.com website is 954-237-3587.  Luchian Decl., ¶¶ 8, 12 and Exhibit 2 thereto.  The 954 exchange is a Broward County exchange.  Luchian Decl., ¶ 12.  The telephone company bills Mr. Luchian in Florida for the telephone number.  Luchian Decl., ¶ 13.  Calls to that telephone number go directly to Mr. Luchian who is, again, a full-time Florida resident.  Luchian Decl., ¶ 14.

Webzilla has previously employed other personnel based in Florida, including Konstantin Bolotin who was Webzilla's director of operations through 2013.  Luchian Decl., ¶ 15; Bezruchenko Decl., ¶ 5.  Webzilla files Florida tax returns in Florida.  Luchian Decl., ¶ 17. Since 2009, Webzilla has maintained a bank account in Florida with Bank of America.  Luchian Decl., ¶¶ 19-20.

Webzilla has been involved in a number of lawsuits in the courts in Florida. Webzilla was named as a defendant in the case *Depicto Commercial Ltd. v. Webzilla*

4

*LLC et al*, Case No. CACE 13-010329(2) in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida.  *See* Exhibit 5.  Webzilla and its sister company WZ Communications, Inc. (also a Florida corporation) were named as defendants in the case *AMA Multimedia, LLC v. ERA Technologies, Ltd. et al*, Case No. 1:15-cv-24289-FAM (S.D. Fla.).  *See* Exhibit 6.  They were also named as defendants in the case *Hydentra, L.P. HLP General Partner, Inc. v. ERA Technologies, Ltd. et al.,* Case No. 1:15-cv-24293-MGC (S.D. Fla.).  *See* Exhibit 7.  Webzilla's sister company and XBT subsidiary IP Transit, Inc. was named as a defendant in *Hydentra L.P. HLP General Partner, Inc. v. Siracusa Management S.A.*, Case No. 1:16-cv-20191-RNS (S.D. Fla.).  *See* Exhibit 8.  In each such instance, Webzilla and the other XBT companies admitted jurisdiction was proper in Florida, inasmuch as Webzilla is a Florida corporation.

Webzilla has clients in Florida, including, without limitation, ServerClub Inc/Fresh IT Solutions, with an address in Fort Lauderdale, Florida, and 1405 Martin Clary, with an address in Clearwater, Florida.  Luchian Decl., ¶ 28.  The Webzilla.com domain name registration lists Webzilla Inc as its registrant with an address in Florida.  *See* Exhibit 9.

The XBT family includes three other Florida incorporated companies, Dedicated Servers Inc., IP Transit Inc. and WZ Communications Inc., all three of which use Incorporate Now as their registered agent.  *See* Exhibit 10.  Dedicated Servers Inc. and IP Transit Inc. receive correspondence and bills to addresses in Florida.  Luchian Decl., ¶ 26.  Webzilla, IP Transit Inc. and other members of the XBT family use their Florida addresses for many contracts and relationships with vendors and business affiliates.[2]  XBT's website states that it has offices in Fort Lauderdale.  *See* Exhibit 11.  IP Transit Inc.'s website states that it has a Florida address and telephone number.  Luchian Decl., Exhibit 8.

Additionally, this Court has already found that Plaintiffs have established "that Plaintiff Webzilla maintains a physical presence in the State of Florida" on account of Webzilla's incorporation in Florida and on the basis that "Webzilla has maintained one or more physical locations in Florida, that Webzilla maintains a Florida-based telephone number, engages Florida-based personnel, and files tax returns in Florida."  Order, Docket No. 27, p. 9.  This Court has

---

[2] Plaintiffs have produced documents that substantiate this, however the documents have been designated as confidential.  Plaintiffs will provide such documents to the Court under seal, if the Court so desires.

5

also held that "Plaintiff Webzilla is located in Florida, and as such, Defendants have caused injury to a Florida resident through their acts that took place in this state." *Id.*, pp. 9-10.

III.  Defendants' Reporting on the Dossier

Although Buzzfeed attempts to portray all of its reporting concerning the Dossier as emanating from New York, the truth is much more nuanced and geographically diverse. Buzzfeed points to reporting done by Miriam Elder and Mark Schoofs, both of whom are located in New York and the decision to publish the Dossier, made by Ben Smith,[3] who is also located in New York. Discovery has already shown, however, that reporters in California (Ken Bensinger, Sheera Frenkel, and Jessica Garrison), Washington, DC (Aram Roston and Ali Watkins), and London (Stuart Millar) were also reporting on the Dossier for Buzzfeed.

Perhaps most crucially (for purposes of this memorandum), however, is that Ken Bensinger – who lives and works in Los Angeles, California and who reported on the Dossier from California – makes no claim that he received the Dossier from his source anywhere other than in California.[4]

IV.  Tort Committed in Florida

As this Court has already found:

> [T]here is no dispute that the Buzzfeed website and the Buzzfeed mobile application are accessible in Florida, the Article was accessible in Florida, and the Article was, in fact, accessed in Florida, it follows that Defendants have committed a tort in Florida for purposes of the jurisdictional analysis. In addition, Plaintiff Webzilla is located in Florida, and as such, Defendants have caused injury to a Florida resident through their acts that took place in this state.

Order, Docket No. 27, pp. 9-10.

---

[3] Mr. Smith acknowledges that he made this decision in consultation with others, including Mr. Bensinger, who happened to be in Florida at the time the decision to publish was made. Mr. Bensinger acknowledges that he participated in a number of phone calls concerning the publication of the Dossier from Florida.

[4] Although he makes no claim whatsoever that he did any of his reporting anywhere other than California, Mr. Bensinger states in his Declaration that "I consider myself a part of the New York-based BuzzFeed News team." Although the undersigned counsel "considers himself" part of "Patriots Nation," that has not (much to his regret) transformed him into Tom Brady.

V.  Discovery Undertaken

To date, Plaintiffs have initiated the following discovery (separate and apart from the written discovery propounded on the Defendants) in an attempt to utilize alternate means to determine the identity of the individual who provided Buzzfeed with the Dossier:

- Plaintiffs have obtained letters rogatory to depose Christopher Steele. Although the process was delayed slightly by the need to obtain an original copy of the Court's issuance of the letters rogatory, the original has been obtained and provided to British counsel, who is proceeding to present the letters to the British Courts for approval.

- Plaintiffs served a deposition subpoena on Fusion GPS. Fusion has moved to quash the subpoena and Plaintiffs have opposed that motion, which is currently pending before the District Court in the District of Columbia.

- Plaintiffs have served deposition subpoenas on: the New York Times; the Wall Street Journal; the New Yorker; Mother Jones Magazine; CNN; Yahoo! News; William F.B. O'Reilly as possible persons or entities who may have knowledge of the source of the Dossier to Buzzfeed.[5] The depositions are currently scheduled to occur throughout November. However, to date, both the Wall Street Journal and the New York Times have each indicated their intent to fight the deposition subpoenas, arguing that they, too, are protected by their own Reporter's Privileges. Ironically, the New York Times claims that the Plaintiffs cannot overcome the reporter's privilege because there is a much easier way to obtain the information sought, namely by asking Buzzfeed. See Exhibit 12.

**Argument**

I. The Court Should Apply Florida Law to Determine the Scope and Applicability of the Reporter's Privilege.

In determining which state's law to apply to the present case, the Court utilizes Florida's three-prong "significant relationship test," in which "the Court considers the location of the parties, where the conduct and injury occurred, and where the relationship between the parties is centered." *Klayman v. Judicial Watch, Inc.*, 22 F.Supp.3d 1240, 1246 (S.D. Fla. 2014) (*quoting*

---

[5] Plaintiffs have been attempting to serve David Kramer with a deposition subpoena for a number of weeks, though he has been seemingly avoiding service of the same. Plaintiffs continue to attempt to complete such service.

*Connell v. Riggins*, 944 So. 2d 1174, 1176-77 (Fla. 1st DCA 2006) and *Bishop v. Fla. Specialty Paint Co.,* 389 So. 2d 999, 1001 (Fla. 1980)) (internal quotation marks omitted)).

Indeed, in a case such as this one, where the Defamatory statement has been communicated in multiple states, the general rule is that the most weight is given to the place where the Plaintiff is located – as that is the place where the Plaintiff most feels the injury. The Plaintiff's location is:

> where the principal injury from a defamation will occur because it is where the victim works and lives and where (in the usual case) most of the people--family, friends, business associates, etc.--are found with whom he has personal or commercial transactions, which might be impaired by defamation.… And it is where, according to Learned Hand, he feels the sting of defamation. Hand said that "the gravamen of the wrong in defamation is not so much the injury to reputation, measured by the opinions of others, as the feelings, that is, the repulsion or the light esteem, which those opinions engender."

*Kamelgard v. Macura*, 585 F.3d 334, 342 (7th Cir. 2009) (*quoting Burton v. Crowell Publishing Co.*, 82 F.2d 154, 156 (2d Cir. 1936) (L. Hand, J.)) (citations omitted).

This is consistent with Florida choice of law precedent. As the Florida Supreme Court has held, "the state where the injury occurred would, under most circumstances, be the decisive consideration in determining the applicable choice of law." *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980). *See*, *also*, *Connell v. Riggins,* 944 So. 2d 1174, 1177 (Fla. Dist. Ct. App. 2006) ("[U]nder most circumstances, the state where the injury occurred will be 'the decisive consideration in determining the applicable choice of law.'").

The *Klayman* case is particularly instructive. There, the defamatory comments were initially made in California and then subsequently reported and posted to a website from California. Nevertheless, the Court applied Florida law, as the Plaintiff was a resident of Florida and suffered injury within the state:

> The initial publication by Ruffley and Taitz's republication occurred in California, but once published online, the allegedly defamatory statement was readily available worldwide. The parties have ties to Florida: Judicial Watch has an office in Miami, Florida and conducts business in Florida; and Klayman lives in Ocala, Florida, is licensed to practice law in Florida, and has a Florida driver's license and Florida concealed weapons permit… Klayman also argues the defamatory statement was directed at Florida readers since he planned to file a high profile lawsuit in Florida in 2012, and as a result, he suffered injury in Florida.… Florida law is appropriate as the statement published on Taitz's website constitutes an electronic communication into Florida where the online material is accessed by readers in


> Florida, and the content of the statement concerns a Florida resident. *See Internet Solutions Corp. v. Marshall*, 39 So. 3d 1201, 1214-16 (Fla. 2010) (holding a nonresident defendant commits a tortious act in Florida by virtue of posting defamatory statements about a Florida resident on a website accessed in Florida).

*Klayman*, 22 F.Supp.3d at 1246.

The same result should obtain here. Webzilla is, undisputedly, a Florida corporation which has long maintained a presence in Florida. And, although Defendants are residents of New York, as this Court has already held, they have substantial contacts with Florida.

In considering the place where the "conduct and injury" took place, this Court has also already found that Webzilla has suffered injury in Florida. Although Defendants claim that the wrongful conduct at issue took place in New York, this representation is only partially correct. Mr. Bensinger works and reported not from New York, but rather California. He has not claimed to have received the Dossier anywhere other than in California and other Buzzfeed reporters worked on the defamatory article from Washington, D.C., California, and London. And, although Defendants claim Mr. Bensinger was only in Florida on vacation at the time,[6] it is undisputed that he participated in a number of telephone calls from Florida concerning Buzzfeed's decision to publish the Dossier.

Finally, in the present case, the only "relationship" between the parties is that Buzzfeed caused injury to the Plaintiffs in, among other places, Florida.

In short, nothing about the facts of this case take it outside the general presumption employed under Florida law that the place of injury should, under most circumstances, be the decisive consideration in determining the applicable choice of law.

II.   Under Florida Law, The Information Sought Should Be Compelled.

Pursuant to the applicable Florida law, the Defendants should be required to reveal the name of their source (as well details concerning their acquisition of the Dossier) both because Defendants are not entitled to protection under the clear words of the statute and, more importantly, because the balancing test utilized favors disclosure.

---

[6] Mr. Bensinger's byline appears on numerous Buzzfeed news reports with connections to Florida. This is not to say that Mr. Bensinger necessarily conducted any reporting from Florida, but it is also not inconceivable that Mr. Bensinger's vacation to Florida was a working one. In any event, neither Mr. Bensinger nor Buzzfeed are strangers to the state.

9

A.   Neither Buzzfeed Nor Mr. Smith Are Entitled to Protection Under the Statute

Florida's Reporter's Privilege is codified at Florida Stat. 90.5015. Section 90.5015 provides a qualified right to protect a "professional journalist's" sources. The term "professional journalist" is specifically (and narrowly) defined as:

> a person regularly engaged in collecting, photographing, recording, writing, editing, reporting, or publishing news, for gain or livelihood, who obtained the information sought while working as a salaried employee of, or independent contractor for, a newspaper, news journal, news agency, press association, wire service, radio or television station, network, or news magazine. Book authors and others who are not professional journalists, as defined in this paragraph, are not included in the provisions of this section.

Florida Statute 90.5015(1)(a).

Buzzfeed is not a "newspaper, news journal, news agency, press association, wire service, radio or television station, network, or news magazine" and, as such it is not covered by the statute. And, of course, because Buzzfeed is not a covered entity, Mr. Smith is not an employee of a covered entity.

Buzzfeed has argued that it should be covered by the statute because it employs renowned reporters and editors, some of whom have won (or been nominated) for Pulitzer prizes. The Plaintiffs do not dispute that Buzzfeed employs many well-credentialed and very experienced individuals, including those that worked on the defamatory article at issue in this case (making Buzzfeed's conduct all the more shocking). That being said, Defendants could win the Nobel Prize for literature and still not qualify for protection under the Florida statute. Indeed, there are undoubtedly untold numbers of book authors who have won prestigious literary and reporting awards but whom would still not qualify for protection under the statute, which specifically exempts such individuals from coverage. The statutory privilege is just that – statutory – and as such, the Florida legislature was permitted to define its contours.[7]

---

[7] This Court (understandably) questioned whether the Florida statute predated the internet. It did not. The Florida statute was enacted in 1998, a point in time when internet news websites were not uncommon. *See REPORTER'S HANDBOOK – REPORTER'S QUALIFIED PRIVILEGE*, publication of the Florida Bar at https://www.floridabar.org/news/resources/rpt-hbk-10/, last accessed Nov. 1, 2017 and attached hereto as Exhibit 13 ("In 1998, the privilege was codified when the Florida Legislature enacted a journalist's privilege statute or 'shield law,' which, as noted above, is at Section 90.5015, Florida Statutes. Essentially, this statutory privilege provides that 'professional journalists,' as defined by the statute have a qualified privilege not to be a witness concerning and not to disclose information, including, but not limited to confidential

Buzzfeed's citations to *TheStreet.com Inc. v. Carroll*, 20 So. 3d 947 (4th Cir. DCA 2009), and *Carroll v. TheStreet.com, Inc.*, 2014 U.S. Dist. LEXIS 156514 (S.D. Fla. April 10, 2014), demonstrates little as the Courts there did not discuss the applicability of the Florida statute to internet websites. Indeed, commenters have expressed doubt that the law protects online publications. *See, e.g.* Harvard's Digital Media Law Project, *Florida Protections for Sources and Source Material*, at http://www.dmlp.org/legal-guide/florida-protections-sources-and-source-material, last accessed Nov. 1, 2017 and attached hereto as Exhibit 14 ("The [DMLP] is not aware of any Florida cases addressing whether an employee or independent contractor for an online news publication is covered by the statute, but the language of the statute makes such coverage doubtful.").

Buzzfeed may legitimately question the choices made by the Florida legislature; what it cannot do is ignore the plain words of the statute under which it seeks protection.

> B. Even if Defendants Are Entitled to the Protections of Florida's Statute, Under the Circumstances of the Case, the Reporter's Privilege Must Yield to the Plaintiffs' Need for the Information.

Under section 90.5015 of the Florida Statutes, "professional journalists," as defined by the statute, have a qualified privilege to protect the identities of their sources. "Derived from the Supreme Court's concurrence in *Branzburg v. Hayes*, 408 U.S. 665, 92 S. Ct. 2646, 33 L. Ed. 2d 626 (1972), section 90.5015 imposes a three-part test a party seeking to over the journalist's privilege must overcome: (1) Is the information relevant and material to unresolved issues in the case? (2) Can the information be obtained from alternative sources? And, (3) is there a compelling need for the information?" *Carroll v. TheStreet.com, Inc.,* 2014 U.S. Dist. LEXIS 156514, *22-23 (S.D. Fla. Apr. 10, 2014).

In the present case, the identity of the source of the Dossier is crucial both to Plaintiffs' case in chief and also to a number of affirmative defenses asserted by the Defendants. First, it is widely recognized in the context of defamation cases, that an essential factor in proving actual

---

sources, gathered in his or her professional journalistic capacity. The privilege is a qualified one, however, because one seeking the information can compel the journalist to testify by meeting the three-part test described above: relevance of the information, a compelling need for it, and no alternative sources."). And, of course, one can assume that the Florida legislature is aware of the internet, yet has chosen not to amend the definition of "professional journalists."

11

malice (or even lesser degrees of fault) is the identity of the source of the defamatory information:

> Proof of actual malice under *Sullivan* invariably depends on knowing the identity of the reporter's source, since a libel plaintiff needs to demonstrate that the reporter's source was unreliable or that the reporter failed to take sufficient steps to verify his or her story. …Without such information, however, inquiring into the reliability of these sources would be a futile exercise: reporters could volunteer information buttressing their defense, and then plead the privilege to prevent the disclosure of any detrimental facts. …Ultimately, juries would be forced to decide the question of malice based on the allegations of a plaintiff claiming libel and a defendant whose defense of reliable sources would be untested--a scenario which spells little hope of success for the plaintiff.

*Desai v. Hersh,* 954 F.2d 1408, 1412 (7th Cir. 1992). *See*, *also*, *Zerilli v. Smith*, 656 F.2d 705, 714 (D.D.C. 1981) ("A distinction can also be drawn between civil cases in which the reporter is a party, as in a libel action, and cases in which the reporter is not a party. When the journalist is a party, and successful assertion of the privilege will effectively shield him from liability, the equities weigh somewhat more heavily in favor of disclosure…. Proof of actual malice will frequently depend on knowing the identity of the newspaper's informant, since a plaintiff will have to demonstrate that the informant was unreliable and that the journalist failed to take adequate steps to verify his story.").

This Court has ruled similarly:

> The federal common-law of this circuit directs this result, too.… Of course, a plaintiff's interest in knowing the identity of the source is more compelling in libel actions involving a "public figure," where the plaintiff must prove "actual malice." … But, this does not preclude the Court from weighing the interests at stake under the balancing test and finding that the privilege does not apply in a libel action where, as here, the plaintiff is not a public figure. In particular, the Court finds that disclosure of the Source is necessary for Carroll to demonstrate that the Journalists did not use "reasonable care" in publishing the allegedly defamatory article.

*Carroll v. TheStreet.com, Inc.,* supra at *26-27.

Although Buzzfeed argues that the name of its source is irrelevant here – because the source did not (presumably) produce the Dossier – but rather simply passed it along, information concerning the source – and his or her motivations in passing on the Dossier – may still be crucial to a determination of actual malice or negligence. If, for example, the source was another news outlet that had declined to publish the Dossier because the information contained therein was unreliable and unverifiable, such evidence would be essential for demonstrating that the

Defendants acted with reckless disregard for the truth or falsity of the information published.[8] Additionally, as discussed in more detail below, the identity of the source of the Dossier is indeed crucial to a number of Defendants' defenses, including its defense of the Fair Reporting Privilege.

Additionally, as the above recitation of facts demonstrates, Plaintiffs have utilized reasonable efforts to attempt to secure the information sought from other sources, without success. Finally, as this Court held in *Carroll v. TheStreet.com, Inc.,* supra at *25-27 (collecting cases), in cases such as this one where the news outlet and the reporters are themselves the defendants in an action for libel, the compelling interests weigh in favor of disclosure.

III. Even if New York Law Applied, Defendants Should Be Required to Reveal the Source of the Dossier Because They Have Waived the Privilege by Disclosing the Information to Third Parties Outside of Buzzfeed.

Even if the Defendants were correct in their assertion that New York law should apply to the privilege question, disclosure of the identity of the source of the Dossier should be ordered because the Defendants have waived the privilege by voluntarily disclosing their source to persons outside of Buzzfeed.

According to privilege logs produced by Defendants, the identity of Buzzfeed's source (or information concerning the source's identity) was discussed with at least two individuals outside of the Buzzfeed organization: (1) Greg Bensinger,[9] who is, on information and belief, the brother of Buzzfeed reporter Ken Bensinger; and (2) William F.B. O'Reilly, a political consultant. *See* Exhibit 15 (privilege log of withheld documents); Exhibit 16 (privilege log of redacted documents); and Exhibit 17 (William F.B. O'Reilly bio).

Under New York's reporter's privilege, a journalist waives the protections of the privilege if he or she "voluntarily discloses or consents to disclosure of the specific information

---

[8] Defendants deride such hypothetical examples as "speculation." They are, of course, correct. Plaintiffs are forced to speculate as to what Buzzfeed's source may or may not have said and the source's motivations because Defendants refuse to provide information known to them about the same. Defendants cannot at one and the same time refuse to provide the Plaintiffs with the information necessary to ascertain the source's motivations and the facts surrounding Buzzfeed's receipt of the Dossier, yet claim that Plaintiffs need provide the Court with the very information they are shielding.

[9] Although Greg Bensinger is himself a reporter with the Wall Street Journal, he is a technology reporter for that paper and does not report on political events. There is no legitimate newsgathering purpose for Defendants to share source information with Greg Bensinger.

13

sought to be disclosed to any person not otherwise entitled to claim the exemptions provided by this section." New York Civil Rights Law, §79-h(g). *See, also, Guice-Mills v. Forbes*, 819 N.Y.S.2d 432, 436 (2006) (reporter who had previously revealed identity of source to plaintiff could not subsequently claim protection of privilege); *In re Dan*, 363 N.Y.S.2d 493, 497 (1975) (holding that reporter who voluntarily provided information to a special assistant attorney general and a commission investigating the Attica prison could not subsequently claim protections of the privilege because "the statute… cannot be used as a shield to protect that which has already been exposed to view"). Other courts have held similarly. *See, e.g.*, *In re Venezia*, 191 N.J. 259, 270 and 272 (2005) ("[A] waiver of the privilege may occur when a newsperson communicat[es] information or sources with friends and neighbors outside the course of newsgathering activities," noting that even the media defendants acknowledged that sharing information with friends and family constituted the most "egregious and cavalier disseminations on the part of a reporter.").

Because the Defendants have shared the confidential information that they now seek to protect with individuals outside the course of the newsgathering activities, they have waived the protections of New York's reporter's privilege and should be compelled to provide the information sought.

IV. If the Defendants are Not Required to Reveal the Source of Their Information, They Should Be Precluded from Raising Certain Defenses and Arguments at Trial.

Under both Florida and New York law, a Defendant who successfully asserts the reporter's privilege to protect source information cannot, at one and the same time, take advantage of the privilege and also reap the benefits of shielding the information sought.

In the present case, the Defendants have indicated that they are refusing to produce not only the name of the person who provided them with a copy of the Dossier, but *any* information concerning the provision of the Dossier to Buzzfeed including: whether the person who provided the Dossier was a member of the government or a member of the news media; when precisely the Dossier was provided to Buzzfeed; and what the source might have said to Buzzfeed about the Dossier. If the Defendants are permitted to shield this information, then they should be precluded from presenting certain evidence at trial or relying on certain defenses which could not be properly or fully rebutted if the Defendants are allowed to shield the identity of their source.

A. <u>Fair Reporting Privilege</u>

Despite Defendants' protestations to the contrary, under Florida law (and unlike the District of Columbia case cited by Defendants), one requirement of the Fair Reporting Privilege is that the document in question was received from a government official.[10] *See, e.g., Woodard v. Sunbeam Television Corp.*, 616 So. 2d 501, 502 (Fla. Dist. Ct. App. 1993) (discussing the fair reporting privilege: "The news media has been given a qualified privilege to accurately report on the information they receive from government officials"); *Stewart v. Sun Sentinel Co.,* 695 So. 2d 360, 362 (Fla. Dist. Ct. App. 1997) (same); *Rasmussen v. Collier County Publ'g Co.*, 946 So. 2d 567, 570-571 (Fla. Dist. Ct. App. 2006) ("The trial court also found that the fair report privilege applied to the articles. The Daily News has a qualified privilege to report accurately on information received from government officials.… The privilege extends to the publication of the contents of official documents…."); *Trujillo v. Banco Cent. Del Ecuador*, 17 F. Supp. 2d 1334, 1338 (S.D. Fla. 1998) ("The fair reporting privilege is extended to news media 'to accurately report on the information they receive from government officials,' protecting the reporting media if that information is inaccurate."); *Steven H. v. Duval County Sch. Bd.,* 1999 U.S. Dist. LEXIS 23349, *4 (Fla. Dist. Ct. App. 1999) ("Under Florida law, the fair reporting privilege gives the media a qualified privilege to republish statements of reports of government officials.").

In the present case, Defendants have made explicit their intent: "revealing information as whether the Source is or is not a 'government official' is precisely what Defendants are asserting they will *not* do by invoking the reporter's privilege." *Defendants' Memorandum*, p. 11 (emphasis in original). Thus, the Defendants are employing a classic "sword and shield," insisting that they will not reveal if they received the Dossier from a government official, while attempting to rely on a defense that requires them to have received the Dossier from a

---

[10] Some Florida cases alternately talk of the fair report privilege applying to publishing official publicly-available government documents, something which the Dossier – assembled by a private, opposition research firm – clearly was not. *See, e.g., Carson v. News-Journal Corp.,* 790 So. 2d 1120, 1121 (Fla. Dist. Ct. App. 2001) (" The articles at issue were based upon information contained in two public documents from Florida's Bureau of Unemployment Compensation (Bureau). The fair reports privilege requires that, in order to be privileged, a news report of a public document must contain the substance of the subject the document undertakes to present, or any separable part thereof.").

government official. This they cannot do. If the information sought is not to be compelled, then Defendants must be precluded from relying on Florida's fair reporting privilege.[11]

### B. Negligence/Actual Malice

Depending on whether the Plaintiffs are ultimately found to be private figures (as they contend) or public figures (as the Defendants contend), they would ordinarily be required to produce evidence that the Defendants acted either negligently or with actual malice. As is discussed in detail, above, it is widely recognized that, for this reason, the identity of the Defendants' source goes to the heart of the Plaintiffs' case. Accordingly, if Defendants are permitted to shield the identity of their source (and what that source may have told them about the Dossier), the Plaintiffs should be entitled to a presumption that the Defendants acted with actual malice. Such a result is the same under either Florida or New York law. *See, e.g., Oak Beach Inn, Corp. v. Babylon Beacon, Inc.*, 62 N.Y.2d 158, 476 N.Y.S.2d 269 (1984) (holding that defendant newspaper could not rely on material withheld as absolutely privileged under the Shield Law to establish lack of malice: "the statutory [exemption]… from contempt cannot be fairly read to include general exemption from the sanctions authorized by CPLR 3126, most of which function to prevent a party who has refused to disclose evidence from affirmatively exploiting or benefiting from the unavailability of the proof during the pending civil action") *cert denied*, 469 U.S. 1158 (1985); *Garcia v. Padilla*, 2016 U.S. Dist. LEXIS 29398 (M.D. Fla. Mar. 8, 2016) ("Behind the sword and shield doctrine is the premise that a party may not use privileged documents to prove a claim or defense, then hide behind the shield of privilege to prevent the opposing party from effectively challenging such evidence."); *Collins v. Troy*

---

[11] Although the Fair Reporting Privilege will also be unavailable to the Defendants under New York law, it is for different reasons not implicated by Defendants' reliance on the reporter's privilege. Under New York law, the fair reporting privilege is only available for reporting on public judicial, legislative, or other official proceedings, none of which are actually at issue here. *See, e.g., Hogan v. Herald Co.*, 446 N.Y.S.2d 836, 841 (N.Y. App. Div. 1982) ("Generally stated, the common-law rule of fair report permits the privileged publication of (1) the public proceedings of governmental bodies, (2) which are fairly and accurately reported, (3) in good faith and without malice or intent to harm, and (4) which report official activity…. In New York the privilege has been codified in section 74 of the Civil Rights Law which provides that publication of a fair and true report of any judicial, legislative or other official proceeding is absolutely privileged. The principal theory behind the rule of fair report is that the publisher acts as the agent of the public, reporting only that which others could hear for themselves were they to attend the proceedings.").

*Publishing, Co., Inc.*, 623 N.Y.S.2d 663, 665 (3d Dep't 1995) (defendant are precluded from "using as a sword the information which they are shielding from disclosure" by invoking the reporters privilege.).

  C. <u>Government Source</u>

  Defendants have specifically stated that they will not reveal if they received the Dossier from a government source. As such, they should be precluded from claiming at trial that they received the Dossier from such a source and, indeed, should be required to stipulate that they did *not* receive the Dossier from any government source, lest the jury be left to surmise to the contrary. It is reasonable to expect that a jury might give more weight or credence to a document procured from a government witness – or to take that factor into consideration in evaluating negligence or malice – and the Defendants should not be able to take advantage of such proclivities.

  D. <u>Authenticity/Completeness of the Dossier</u>

  If the Defendants are permitted to shield the identity of the source of the Dossier, they should be precluded from offering any testimony to suggest that the version of the Dossier that they published was complete or authentic or that they had any basis for believing that it was authentic or complete. By shielding their source, the Defendants will have deprived the Plaintiffs of the ability to verify the authenticity (or completeness) of the materials published by Buzzfeed and, as such, any evidence proffered by the Defendants would violate the sword and shield doctrine.

## Conclusion

  For the reasons outlined hereinabove, Defendants should be required to withdraw their objections to producing discovery based on the reporter's privilege and provide the information (and documents) requested. In the alternative, if Defendants are permitted to shield information concerning their source, they should be precluded from presenting certain evidence at trial or relying on certain defenses as detailed above.

Respectfully submitted,
Plaintiffs,
By their Attorneys,

/s/ Evan Fray-Witzer
Evan Fray-Witzer (*pro hac vice*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-0000
Facsimile: 617-423-4855
Evan@CFWLegal.com

/s/ Valentin Gurvits
Valentin D. Gurvits (*pro hac vice*)
Matthew Shayefar (Fla. Bar No. 0126465)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1804
Facsimile: 617-928-1802
vgurvits@bostonlawgroup.com
matt@bostonlawgroup.com

/s/ Brady J. Cobb
Brady J. Cobb (Fla. Bar No. 031018)
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com

Dated: November 1, 2017

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served electronically via the CM/ECF electronic filing system on all counsel or parties of record on the service list below this 1st day of November, 2017.

<div align="right">

/s/ Matthew Shayefar
Matthew Shayefar

</div>

## SERVICE LIST

Katherine M. Bolger
Adam Lazier
Nathan Siegel
Davis Wright Tremaine, LLC
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
katebolger@dwt.com
adamlazier@dwt.com
nathansiegel@dwt.com

Roy Eric Black
Jared M. Lopez
Black Srebnick Kornspan & Stumpf
201 S Biscayne Boulevard, Suite 1300
Miami, Florida 33131
rblack@royblack.com
jlopez@royblack.com