```
 1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2                       FORT LAUDERDALE
                   CASE NO. 17-CV-60426-UU
 3     _____

 4     ALEKSEJ GUBAREV, XBT HOLDINGS
       S.A., WEBZILLA INC,
 5                         Plaintiffs        January 10, 2018
                vs.
 6
       BUZZFEED, INC., BEN SMITH,
 7                         Defendants.

 8     _____

 9                     STATUS CONFERENCE

10           BEFORE THE HONORABLE URSULA UNGARO,

11         UNITED STATES DISTRICT COURT JUDGE

12     _____
                     A P P E A R A N C E S
13

14     FOR THE PLAINTIFF:    EVAN FRAY-WITZER, ESQ
       ALEKSEJ GUBAREV       Ciampa Fray-Witzer LLP
15                           20 Park Plaza, Suite 505
                             Boston, MA 02116
16                           (617) 426-0000
                             Evan@cfwlegal.com.
17
                             BRADY J. COBB, ESQ.
18                           Tripp Scott.
                             110 SE 6th Street, 15th FL.
19                           Fort Lauderdale, FL  33302.
                             (954) 527-4111.
20                           Bcobb@cobbeddy.com

21     FOR THE DEFENDANT:    NATHAN SIEGEL, ESQ
       BUZZFEED, INC.        KATHERINE M. BOLGER, ESQ  (via phone)
22                           Davis Wright Tremaine LLC
                             1919 Pennsylvania Avenue NW Suite 800
23                           Washington, DC 20006
                             (202) 973-4200
24                           Nathansiegel@dwt.com.
                             Katebolger@dwt.com
25
```

```
 1   FOR THE DEFENDANT:    ROY BLACK, ESQ.
     BUZZFEED, INC.        JARED M. LOPEZ, ESQ
 2                         Black Srebnick Kornspan & Stumpf
                           201 S. Biscayne, Suite 1300
 3                         Miami, FL 33131
                           (305) 371-6421
 4                         Rblack@royblack.com
                           Jlopez@royblack.com
 5

 6
     REPORTED BY:          GIZELLA BAAN-PROULX, RPR, FCRR
 7                         United States Court Reporter
                           400 North Miami Avenue, Suite 8S32
 8                         Miami  FL  33128
                           (305) 523-5294
 9                         gizella_baan-proulx@flsd.uscourts.gov

10

11

12                   P R O C E E D I N G S

13        (The following proceedings were held in open court.)

14           THE COURT:  Good afternoon.  So the case before the

04:04 15  Court is Gubarev, et al. versus BuzzFeed, et al., Case Number

16  17-60426.

17           Who is here for the plaintiffs?

18           MR. FRAY-WITZER:  Good afternoon, Your Honor, Evan

19  Fray-Witzer for the plaintiffs.

04:04 20          MR. COBB:  And good afternoon, Your Honor, Brady Cobb

21  for the plaintiffs.

22           THE COURT:  Okay, fine.  Good afternoon.  And who is

23  here for the defendants?

24           MR. SIEGEL:  Nathan Siegel for the defendants, Your

04:04 25  Honor.
```

1      **MR. BLACK:**  Roy Black and Jared Lopez.

2      **THE COURT:**  And is Ms. Bolger on the telephone?  Do we

3  need to get her?  We forgot about Ms. Bolger.  So while we're

4  waiting, is there anybody else on BuzzFeed today?

04:04  5      **MR. FRAY-WITZER:**  Today is still early, Your Honor,

6  it's hard to say.

7      **THE COURT:**  So how many lawsuits are there now arising

8  out of the dossier?

9      **MR. SIEGEL:**  There are three.

04:05 10      **THE COURT:**  Only three?

11      **MR. FRAY-WITZER:**  Well, three with respect to

12  BuzzFeed, I think there are a couple more with respect to

13  Fusion.

14      **MR. SIEGEL:**  Right, there are now two against Fusion

04:05 15  and one against --

16      **THE COURT:**  That's just here in the United States?

17      **MR. SIEGEL:**  No, the two against Fusion are here and

18  then the one in London.

19      (Thereupon, there was a brief discussion off the record.)

04:05 20      **THE COURT:**  Okay.  So Ms. Bolger, you want to state

21  your appearance?

22      **MS. BOLGER:**  Katherine Bolger from Davis, Wright,

23  Tremaine on behalf of the defendants.  Hello, everybody, and

24  thank you for letting me appear telephonically, Your Honor.

04:06 25      **THE COURT:**  You didn't want to come to Miami in

1  January?

2       **MS. BOLGER:**  Your Honor, my boy turned seven and that

3  seemed more important than even Miami in January.

4       **THE COURT:**  I'm sure that is true.

04:06  5       Okay.  Well, so I just thought we should get together

6  before I leave on vacation, which I'm about to do, so let's

7  just find out a few things and then we'll put you out of your

8  misery of being here.

9       So I don't quite understand what the plaintiffs are

04:06  10  doing in the way of discovery.  Are the plaintiffs doing

11  anything?  Yes?

12       **MR. FRAY-WITZER:**  Yes, Your Honor.  We have wrapped up

13  all of our paper discovery.

14       **THE COURT:**  Yes.

04:06  15       **MR. FRAY-WITZER:**  We --

16       **THE COURT:**  What did that consist of?

17       **MR. FRAY-WITZER:**  We served two rounds of

18  interrogatory requests, might have even been three.  There were

19  two rounds of document requests all to the defendants.  We,

04:07  20  last month, took the deposition of David Kramer.

21       **THE COURT:**  Who is he?

22       **MR. FRAY-WITZER:**  David Kramer, Your Honor, used to

23  work at the McCain Human Rights Institute, and although his

24  testimony at the moment is designated as classified and

04:07  25  attorneys' eyes only, I can say just from the public news

1  reports, it had been widely reported that he had gone to

2  London, met with Christopher Steele, received the memos that

3  comprised the dossier, and brought them back to the United

4  States.  So he is an important part of the story that we will

04:07  5  be --

6            **THE COURT:**  What is the McCain Human Rights Institute?

7            **MR. FRAY-WITZER:**  The McCain Human Rights Institute is

8  connected with -- it's a private organization.  It's connected

9  with the Arizona State University.  They are something --

04:08  10  pretty much as they sound.  They are a think tank that works on

11  human rights issues around the world.

12            **THE COURT:**  And why were they interested in meeting

13  with Mr. -- how do they even know Mr. Steele existed?

14            **MR. FRAY-WITZER:**  Well, it's an interesting story,

04:08  15  Your Honor.  And again, this -- I can talk about it, at least

16  things that have been widely and publically reported.

17            Mr. Kramer is, himself, something of a Russia expert.

18  Prior to being at the McCain Institute, he was with the State

19  Department.  He had done a lot of work on Russia.  He's also

04:08  20  part of the group that gets together in Canada each year, the

21  Halifax International Forum where leaders from around the world

22  get together to talk about security issues.

23            He was approached in Canada by Sir Andrew Wood who is

24  London's former ambassador to Russia and a confidant of

04:09  25  Mr. Steele's.  There were -- Mr. Wood conveyed information to

1  Mr. Kramer about what was going on and asked if Mr. Kramer

2  would loop Senator McCain into the conversation.

3          THE COURT:  All right.  Then I guess I've heard on the

4  news that Senator McCain at some point had possession of the

04:09  5  dossier --

6          MR. FRAY-WITZER:  Correct, Your Honor.

7          THE COURT:  -- early in the game.

8          MR. FRAY-WITZER:  I would say midway in the game, but

9  before the December memo that is at issue in this case, Senator

04:09  10  McCain had a copy of the other memos that comprised the

11  dossier.

12          THE COURT:  Okay.  So -- and what else have you done?

13  Anything?

14          MR. FRAY-WITZER:  So, in addition, we are continuing

04:10  15  to press ahead with a bit of a tussle with Fusion GPS in

16  Washington, D.C.  We had served them with a deposition

17  subpoena.  They filed a motion to quash.

18          The proceedings in D.C. have gotten complicated,

19  first, because the original judge who was assigned to our

04:10  20  motion to quash recused herself.

21          THE COURT:  Any idea why?

22          MR. FRAY-WITZER:  Again, it's somewhat speculation.

23          THE COURT:  There's no for-the-record reason?

24          MR. FRAY-WITZER:  There's no for-the-record reason.

04:10  25  She seems to have had some ties to some of the law firms that

1  are connected to Fusion GPS.  It got randomly reassigned to

2  another judge.  We have had that judge for about three weeks

3  and a few days ago Fusion GPS moved to have him recused because

4  he was a minor player in the transition team for President

04:11  5  Trump, among other reasons.

6      The judge had set a briefing schedule on the issue of

7  the recusal question which, honestly, surprised me that -- but

8  did, and so that has to happen before the deposition goes

9  forward.

04:11  10     Then if you want to jump across the pond, we filed the

11  request that you had endorsed for us with the courts in London.

12  The way that it works is it's filed first on an ex parte basis.

13  It was granted.  Then Mr. Steele was given notice of it.  He

14  and his solicitors have moved to set it aside.

04:11  15     The shortest version of that is that there is a

16  hearing that is scheduled for early February to see if the

17  British courts are going to modify the order or set it aside.

18  We suspect that they will allow it to go forward in some

19  fashion so we will be taking Mr. Steele's deposition.

04:12  20     **THE COURT**:  Are there privileges that you anticipate

21  that Mr. Steele would have and he would assert?

22     **MR. FRAY-WITZER**:  Mr. Steele has claimed, essentially,

23  two privileges, as I understand it.  One privilege that he is

24  asserting is he is claiming that his testimony would implicate

04:12  25  state secrets in London.

1          THE COURT:  Does he have standing to assert that?

2          MR. FRAY-WITZER:  Well, he's tried to bring in some of

3    his friends from the MI6 and the -- they have not --

4          THE COURT:  So he is asserting it or is the government

04:12   5    asserting it?

6          MR. FRAY-WITZER:  The government has not asserted it.

7    He's asserting that he can't speak about things.  We have

8    pointed out that he's spoken to anyone who is willing to

9    listen, every journalist around, the FBI, and in addition, we

04:12  10    are not going to be asking him for any of his source

11    information, which obviates any of the even potential state

12    secrets.

13          THE COURT:  So what is it that you're interested in,

14    how he and BuzzFeed came to --

04:13  15          MR. FRAY-WITZER:  It's partially that, Your Honor, and

16    it's partially our understanding and belief that any time that

17    Mr. Steele provided any information to any news outlet, he did

18    so with some particularly strong warnings not to publish, not

19    to reveal names, and not to put any of the information out

04:13  20    there that the news media did not independently verify because

21    a lot of materials contained in the memos were raw, unverified,

22    sometimes unsolicited information that was given to him by

23    sources.

24          So one of the things that we're certainly hoping to

04:13  25    get from him is his testimony that, you know, hey, any time

1   anyone got any of this information they were specifically told,

2   "The stuff is raw, the stuff is unverified.  We can't vouch for

3   it.  You need to do independent verification before you do

4   anything," and that obviates our contention that BuzzFeed did

04:14   5   not.

6           And then, finally, we have, just last week, agreed

7   with the defendants' counsel about some deposition dates for --

8           THE COURT:  So let me ask you something.  I never

9   thought about this and I'm no expert on the liable laws, but

04:14   10   let's just suppose for the sake of argument you're right.  But

11   then subsequent to BuzzFeed's publication, information that's

12   relevant to this lawsuit -- I have no idea whether this is true

13   or not -- was verified.  Does that affect the case against

14   BuzzFeed?

04:14   15           MR. FRAY-WITZER:  Well, it could potentially affect

16   the case against BuzzFeed in one scenario, Your Honor, and only

17   one.  If the information about the plaintiffs was verified,

18   sure, that would indeed affect our case because we have to show

19   that the information was false.

04:15   20           Information about the rest of the dossier, and this is

21   actually an issue that we expect to raise at some point before

22   a trial, really is irrelevant.  It doesn't matter.  It does not

23   matter if the allegations concerning President Trump are true

24   or not true.  It doesn't matter if the allegations concerning

04:15   25   anyone else named in the dossier is true or not true because

1   the only real issue is what was said about the plaintiff.

2        THE COURT:  Right.  And your position is that you

3   don't have to show actual malice?

4        MR. FRAY-WITZER:  We have two positions, Your Honor.

04:15   5   The first would obviously be we don't have to show actual

6   malice, we just have to show negligence.  And the second, even

7   if we had to show actual malice, we can.

8        And so just to finish up the answer to the question,

9   we have deposition dates scheduled for Ken Bensinger, who was

04:16  10   the --

11        THE COURT:  Who is he?

12        MR. FRAY-WITZER:  He was the main reporter from

13   BuzzFeed on the story.  Ben Smith, the editor of BuzzFeed, and

14   a 30(b)(6) for BuzzFeed generally.

04:16  15        THE COURT:  And when is that scheduled?

16        MR. FRAY-WITZER:  Those are scheduled for early

17   February.

18        THE COURT:  All right.  So, so far what have you

19   yielded that -- what has come out of all of this that's

04:16  20   reinforcing your belief that you're going to prevail in the

21   case?

22        MR. FRAY-WITZER:  I will start by saying that the

23   information that I would most like to share with the Court as

24   of this moment I can't share it because of David Kramer's

04:16  25   deposition.  His attorney has designated his entire deposition

1    as attorneys' eyes only, confidential.  We have informed

2    Mr. Kramer's attorney that under the protective order that we

3    don't think any of it is confidential.  None of it talks about

4    any kind of trade secrets, any kind of information that one

04:17    5    would normally think of as being protected.

6            He has indicated that he is going to file a formal

7    motion with the Court, I believe next week, Your Honor.  So we

8    believe that David Kramer's testimony has been very helpful in

9    supporting our case.

04:17   10            Everything that we have seen so --

11            THE COURT:  I'm not sure I understand.  He's going to

12    intervene for the purposes of enforcing the protective order?

13            MR. FRAY-WITZER:  The protective order itself gives

14    not only the parties, but any witness the right, first of all,

04:17   15    to designate something as confidential.

16            THE COURT:  But, of course, that doesn't control me.

17            MR. FRAY-WITZER:  Well, that is true, Your Honor,

18    although it was a protective order that the Court entered.

19            THE COURT:  Well, right.  But these orders never

04:17   20    extend to me.  Right?  And if the information is necessary for

21    the purpose of resolving the case, then obviously it cannot

22    remain confidential.

23            MR. FRAY-WITZER:  It is and it will be, and if Your

24    Honor wants to say -- there's no one else in the courtroom, if

04:18   25    Your Honor wants to tell me that the transcript from this would

1  be marked confidential or this portion so that I'm not

2  inadvertently violating the protective order as entered by the

3  Court, I can talk more about it.

4          I just know that every time we have appeared before

04:18  5  you, three days later I get a phone call from the reporter

6  saying, "Well, we got the transcript and I want to ask you

7  about it."

8          So I'm hesitant even here to reveal things --

9          **THE COURT:**  I think you're probably right.  The next

04:18 10  thing that will happen is some news agency will file a motion

11  to get the transcript if we try to seal it.  So I don't think

12  that's a good idea.

13          **MR. FRAY-WITZER:**  I will say also, Your Honor, that by

14  way of admission, BuzzFeed has stated that they did absolutely

04:18 15  nothing, nothing, to verify any of the information with respect

16  to any of the plaintiffs.  They didn't call them.  They didn't

17  try and contact them.  They didn't try and verify any of the

18  information.  They didn't visit the website of --

19          **THE COURT:**  But BuzzFeed's own publication said it was

04:19 20  not verified.

21          **MR. FRAY-WITZER:**  This is true, Your Honor, though

22  that does not itself insulate them from liability.  And, in

23  fact, one thing that we have talked about and, unfortunately,

24  was delayed but is now well underway, and I expect by mid next

04:19 25  week at the latest they will have a motion from us on the fair

1  report privilege and the neutral report privilege that BuzzFeed

2  and Mr. Smith have asserted.  It's our position that as a

3  matter of law, neither one of those is going to be applicable

4  here, and the law is really clear.

04:19  5      If you put aside those privileges that they're

6  asserting, that you can't simply say, "Hey, we don't know if is

7  true, we don't think it's true, maybe it is true, maybe it's

8  not true, now we're about to liable someone, here it goes."

9      And that's our position, that's precisely what

04:20 10  BuzzFeed did is they had information that they knew was

11  unverified, that they knew -- they claimed they had spent weeks

12  trying to verify unsuccessfully, although not with respect to

13  our clients, and that ultimately they threw up their hands and

14  they said, "What the heck, this is a great story, we're just

04:20 15  going to print whatever is in this dossier because it's going

16  to get us clicks."

17      THE COURT:  Okay.  Do you want to tell me anything

18  else?

19      MR. FRAY-WITZER:  If Your Honor has other questions,

04:20 20  I'm happy to answer them.

21      THE COURT:  Well, no.  It sounds like you've really

22  moved forward and you're getting yourself in a position to move

23  for Summary Judgment.

24      MR. FRAY-WITZER:  We are, Your Honor.  We'll first

04:20 25  have the motions that I mentioned next week on the privileges

1    that you had requested.  We expect that we'll have Summary

2    Judgment motions after that.

3          But from the beginning, quite honestly, for us, we

4    felt that it is, as interesting and as exciting as this case

04:21  5    can be, it's also sort of a simple liable case.  They published

6    things about our clients that were patently untrue that damaged

7    our clients that they had no reason to believe were true.  In

8    fact, harbored serious doubts about the veracity.

9          THE COURT:  Well, speaking of this, what damage has

04:21 10    your client incurred as a result of this?

11          MR. FRAY-WITZER:  There's a range, Your Honor, and we

12    have provided a lot of discovery on the damages so far.  First

13    of all, from the corporate side, as you might imagine, a

14    company that sort of makes its living as a place where

04:21 15    companies store their data, it doesn't do good things for you

16    to be accused of being the source of the hacking of the

17    Democratic National Committee, and all sorts of viruses and

18    spamware that is being used to hack.

19          There were numerous clients that contacted Webzilla

04:22 20    and XPT, and either didn't expand business or told them that

21    they weren't going to enter into business with Webzilla until

22    the cloud that has been hanging over the company is resolved in

23    court.

24          THE COURT:  But did they lose existing business?

04:22 25          MR. FRAY-WITZER:  I believe they did, Your Honor.  I

1  believe they lost existing business.  I believe there's also

2  some discovery that we have provided that shows sort of a

3  year-to-year normal growth, and then what happens when the --

4  when BuzzFeed publishes the dossier, the immediate drop-off.

04:22  5      And then for Mr. Gubarev himself, in addition to -- in

6  addition to, I guess, sort of the emotional distress of this,

7  he was contacted by tons of friends, tons of clients, they --

8  he and his wife received all sorts of harassing comments

9  through social media.  They have lost friends.  They've lost

04:23  10  standing in the community.  He's also lost business

11  opportunities and we have provided information about this.

12      Banks that had provided loans to Mr. Gubarev in the

13  past, when the dossier was published, either rejected giving

14  him future loans or put on hold loans that were already in the

04:23  15  process again, saying, "We need to see what's going on."

16      **THE COURT:**  Where do the Gubarevs live?

17      **MR. FRAY-WITZER:**  In Cypress.

18      **THE COURT:**  I forgot.  Okay.  Thanks.

19      If the defense could, more or less, do the same thing

04:24  20  for me, I would appreciate it.

21      **MR. SIEGEL:**  If it's okay with Your Honor, I was

22  hoping to start at the back end.  Your Honor asked

23  Mr. Fray-Witzer what has happened that leads you to think your

24  case has gotten better, I'd like start there and work

04:24  25  backwards.

1        **THE COURT:**  That's fine.

2        **MR. SIEGEL:**  So I would say there are two things.  In

3    the past year, it has become clear that this document that

4    BuzzFeed published has really been at the epicenter of the

04:24    5    biggest political controversy in the United States in some time

6    and, arguably, even in the world.

7        And Your Honor made reference to the fact it has also

8    become clear, or clearer, but part of our task, of course, is

9    to try to build an evidentiary building block which is part of

04:24   10    what I want to talk about, that this document was shared with

11    the FBI from the get-go.  It was taken very seriously by the

12    FBI.  It was part of the FBI's investigation of the

13    relationship between Russia and the 2016 election campaign.

14        You mentioned Senator McCain, that Senator McCain,

04:25   15    what Mr. Fray-Witzer has left out is that it has also become

16    increasingly clear that Mr. Steele was a very well-respected

17    person who had a long track record, he was the head of the MI6

18    Russia desk in Britain, trusted by the FBI, trusted by

19    legislators, trusted by -- and, you know, he himself brought

04:25   20    this to the FBI because he thought it was something that it was

21    important to look into.  And, frankly, the dossier has been at

22    the front and center of much of what has happened since.

23        I mean, in many ways Jim Comey was fired arguably, in

24    part, because of the tussle about the dossier and how it was

04:25   25    being handled, the special counsel, et cetera, et cetera.

1          So, the essential proposition of this case, and Your

2    Honor noted that there are three other cases being filed.

3    Right?  There are like 40 names in the dossier.  Right?  So the

4    central proposition of this case is that BuzzFeed, having

04:26 5    published a document which, arguably, is one of the most

6    important documents in, you know, contemporary political

7    debate, is subject to suit by all 40 of those people.  And it

8    has no legal privilege, nothing.  And that it's just a simple

9    liable case.

04:26 10         And that we submit, Your Honor, is a proposition that

11   is just not consistent with any fair notion of freedom of the

12   press under state law or under the First Amendment.

13         So everything that we have come to learn about, at

14   least publically, about the dossier ever since, frankly, to us

04:26 15   reinforces the point that, I mean, if BuzzFeed hadn't published

16   this on January 10th, somebody else surely would have sooner or

17   later because it would be impossible for the public to follow

18   much of what has happened ever since if that document hadn't

19   been published.

04:27 20         And so the -- you know, obviously, these ultimately

21   get reduced to legal arguments and legal defenses, but the

22   proposition that this is exactly the type of document that the

23   law renders legally privileged, we think that argument has

24   gotten much stronger over the past year.

04:27 25         The second point, and I want to --

1          THE COURT:  So what is the legal theory that you

2    attach to that?

3          MR. SIEGEL:  The primary legal theory is the fair

4    report privilege.  That it is clear -- I mean -- well, it is

04:27  5    clear in the sense that we all know it.  Right?  Because it's

6    all in the news.  The challenge, of course, is having it be

7    clear from an evidentiary perspective that this has been the

8    subject of numerous key core official actions in the context of

9    the whole Russia controversy, both before it was published and

04:28 10    after.

11          THE COURT:  So give me a brief description of the fair

12    report privilege.

13          MR. SIEGEL:  Well, the fair report privilege protects

14    the press, right, to publish documents that are the subject of

04:28 15    official activity.  And a classic example of it, probably the

16    easiest one is, you know, a document that is the subject of an

17    investigation.

18              So I'll just give you an example because this is a

19    case that I know, Delray, and it's been tussled back and forth

04:28 20    in the litigation, it was a case that I did, so I know a lot

21    about it.  It was a case called Fine versus ESPN in New York.

22    So that was a situation where ESPN, sort of like in this case,

23    obtained from a source -- not from the police or something like

24    that -- an audiotape of a phone conversation that seemed to

04:28 25    show that a basketball coach and his wife had been involved in

1   some abuse of -- sexual abuse of ball boys.  And, ultimately,

2   ESPN broke that story at the same time the tape was turned over

3   to the police, and they published the story about the tape

4   about ten days after it was turned over to the police, and the

04:29   5   tapes -- and the Court said, "Look, to the extent that ESPN is

6   simply reproducing aspects of that tape, that is privileged

7   because that tape has become the subject of a law enforcement

8   investigation."

9           THE COURT:  In other words, the tape is a fact.

04:29  10           MR. SIEGEL:  The tape is a fact.  That's right.  And

11   the contents of the tape obviously contained allegedly

12   defamatory statements, but the point of the privilege is that

13   all the time the press is in the position of reproducing

14   material that contains allegedly defamatory statements.

04:29  15           THE COURT:  So this was not a tape between the

16   individuals containing admissions, it was a tape discussing

17   that these individuals might have engaged in this improper

18   conduct?

19           MR. SIEGEL:  Well, it arguably did contain admissions

04:30  20   from the wife.  It was a tape between the alleged victim and

21   the wife of the coach, who the victim allegedly knew about the

22   abuse, and the point of the tape was that the wife seemed to

23   make statements in what she thought was a private conversation

24   that was actually secretly being taped by the victim that

04:30  25   seemed to confirm her knowledge that, in fact, there had been

1    abuse that had occurred.

2          But the point was that once the tape was turned over

3    to the police, even though ESPN didn't get it from the police,

4    it got it independently from that source, the tape is a piece

04:30    5    of evidence in that case in a law enforcement investigation of

6    sexual abuse and so it's privileged.

7          Something like the Watergate tapes, right, would fall

8    into the same category.  I mean, there are lots of defamatory

9    statements that people make about the people they're talking

04:30   10    about.

11          THE COURT:  Well, there are lots of, for instance,

12    arguably, defamatory statements that might appear in a police

13    report.

14          MR. SIEGEL:  That's true.  And a police report is

04:31   15    another example.  So the critical point here is this document,

16    you know, by the time it was published had become the subject

17    of official activity in a number of different ways.  We think

18    it had become part and parcel of the FBI investigation, it had

19    become the subject of a referral by Senator McCain.  It's now

04:31   20    believed that earlier versions of it was the subject of a

21    letter that Harry Reid wrote to Jim Comey saying, "You need to

22    release this."

23          There are actually -- again, I can't disclose some of

24    this for the reasons that have been said, but we're now aware

04:31   25    of other people in the government that it was forwarded to

1   before publication.

2          So, but it really goes to the central point that -- I

3   mean, if the press is going to be liable for publishing

4   something like this, that exposure is ruined because there's no

04:31  5   end to it.  Anybody who is mentioned in that document can

6   simply come in and say, "Hey, you didn't -- you know, what you

7   said about me wasn't true," including a lot of people in Russia

8   and that kind of thing, where, frankly, it's very difficult to

9   figure out whether it was true or not, and, you know, be

04:32  10  subject to 40 lawsuits, and that's exactly what the fair report

11  privilege is designed to protect against.

12         The second issue, and where I -- and we will

13  undoubtedly have a dispute about whether or not Mr. Gubarev is

14  a public figure and the Court will determine that, but if he is

04:32  15  a public figure, it is actually -- then, of course, he has to

16  prove actual malice.  Right?  And what actual malice means is

17  simply that the press has published something that they don't

18  affirmatively believe is false.  Right?  And that's what

19  BuzzFeed did.

04:32  20         It's fine for BuzzFeed to publish something saying,

21  "Look, we think you need to know about this, we are going to be

22  honest with you, and tell you that it's unverified, and we're

23  going to tell you there are a couple of spelling errors and

24  that kind of thing if you want to take that into

04:33  25  consideration," but that is not the same thing as saying, "We

published something affirmatively believing that it was false."

And that is what actual malice means, and if we get to the

point where, ultimately, the plaintiff is determined to be a

public figure, you know, there are four or five cases, and

04:33   we'll all brief this, but it's sort of called the agnostic

variance of actual malice.  Right?

The notion is, is that as a reporter you can publish

something saying, "Look, I think this is important to say.  I

don't know or necessarily believe it to be false, but I'm going

04:33   to be honest with you, I can't verify that it's true either,

and so I'm going to be transparent about that."  That is not

actual malice.  In fact, if it was actual malice that probably

describes an awful lot of the reporting that appears in every

newspaper.

04:33   **THE COURT:**  So are there facts other than the

appearance of Mr. Gubarev in the dossier that you would be able

to point to that would suggest that he's a public figure?

**MR. SIEGEL:**  Well, Mr. Gubarev actually commented on

the election controversy in an interview with Bloomberg News

04:34   about a month before the dossier was published.

**THE COURT:**  Why?  Why would anybody have even spoke to

Mr. Gubarev?

**MR. SIEGEL:**  Well, that's a good question and I think

the answer is that, you know, Mr. Gubarev, like many business

04:34   folks, has been fairly aggressive about promoting his companies

1  and that, in our view, is sufficient to make him to be a public

2  figure.

3      THE COURT:  Is Webzilla a big company?  What kind of

4  revenues does it is have?

04:34  5      MR. SIEGEL:  I think Webzilla has, I want to say,

6  something in the order -- well, XPT, which is the big holding

7  company, 50 million in revenue, something in that ballpark.

8      That's about what I want to say.

9      THE COURT:  Does XPT have businesses other than

04:34  10  Webzilla?

11      MR. SIEGEL:  Oh, yes, it's got, I want to say, 20-

12  something.  I mean, Webzilla is -- well, there are five

13  Webzillas, but the Webzilla, Inc. that is the plaintiff here is

14  one small little piece of the pie that's registered in Florida.

04:34  15  It has multiple companies in the United States, it has multiple

16  subsidiaries in the Netherlands, in Luxembourg, et cetera.

17      THE COURT:  And not all concerned with servers and --

18      MR. SIEGEL:  You know, I can't fully speak to that but

19  the short answer is they largely are.  They are largely all

04:35  20  involved in -- one way or another in the data hosting and

21  storage business.

22      THE COURT:  Okay.  All right.

23      MR. SIEGEL:  So, and the final point that I would make

24  is that I thought Mr. Fray-Witzer did a good job of testifying

04:35  25  for Mr. Steele as he hopes, obviously, that Mr. Steele will

1   testify, but, in fact, I think another thing that has become

2   clear is that, you know, there was a book published a couple of

3   weeks ago which appears to include interviews with Mr. Steele,

4   sort of the first ones he's given, and, of course, yesterday

04:35   5   there were 312 pages of testimony of Glenn Simpson from Fusion

6   GPS before the Senate that was finally released, and what's

7   really striking about both of them is that to this day they are

8   standing behind, they're not saying, "Oh, I don't vouch for any

9   of this," or, you know, et cetera.  To this day they appeared

04:36   10   to be standing behind the dossier.

11          Someone took it seriously and there's a reason we took

12   it seriously and that will, obviously, be part of our argument,

13   too, that we understood where this came from.  And so --

14          THE COURT:  And the book you referred to is Fire and

04:36   15   Fury or some other book?

16          MR. SIEGEL:  No, it's not Fire and Fury.  It's a book

17   by a Guardian reporter named Luke Harding and I forget what the

18   name of it is.

19          MR. FRAY-WITZER:  Collusion.

04:36   20          MR. SIEGEL:  Collusion.  That's it.  It's the attempt

21   to sort of -- I mean, the thesis is that there probably was

22   collusion, but it sort of -- that's the broader point of the

23   book, but the more interesting, I guess, newsworthy elements of

24   the book are what appear to be some of the first comments by

04:36   25   Mr. Steele directly since all of this happened.

1        THE COURT:  I'll have to read it while I'm on

2   vacation.

3        MR. SIEGEL:  So moving from the big picture to the

4   small picture, I guess.  Right?

04:37   5        THE COURT:  Right.

6        MR. SIEGEL:  Here is where we think we stand on

7   discovery, both party discovery and nonparty, and then I want

8   to briefly touch on an issue we think may come out of this

9   Motion for Judgment on the pleadings that we wanted to just

04:37   10  make the Court aware of.

11       So plaintiff is right, we have confirmed dates for

12  BuzzFeed witnesses in February.  We have asked plaintiff to

13  confirm dates for their depositions, witnesses in the same

14  month.  We haven't gotten that yet.

04:37   15       In our view --

16       THE COURT:  Why is that?

17       MR. FRAY-WITZER:  They asked last week, Your Honor.

18  We have been asking since, I believe, October.  We got the

19  answers last week.  They just asked us last week.  In fact, it

04:37   20  was a few days ago that they told us who they wanted to depose.

21  Our folks, obviously, are going to have to come primarily

22  from -- not primarily -- some of them are coming from Cypress,

23  so we just have to work out the dates, but they are going to

24  come and sit for their depositions.

04:38   25       MR. SIEGEL:  That's fine.  We have no reason to

1  believe that's not going to happen.

2      We are still waiting -- the two -- in terms of party

3  discovery, the two things we're still waiting for are we still

4  have yet to get any clear statement as to what they're alleging

04:38  5  their damages are.  I mean, we have gotten some sort of

6  scattered documents about loans and businesses, but, obviously,

7  we have interrogatory responses.  I mean, interrogatories have

8  been out for a long time.  Tell us what they are.  What are

9  they, how much, how do you calculate them, how do you apportion

04:38  10  them between each defendant.  We still haven't gotten that yet

11  and that, you know, obviously, there's probably some follow up

12  we're going to want to do once we get that, but that's

13  something we still have not gotten.

14      And the one other thing we have been waiting for

04:38  15  primarily are we had been promised back in September that they

16  were going to produce what are called abuse alerts.  In other

17  words, alerts that they get indicating that there might be

18  something problematic happening on their system.  They just

19  told us a week ago, there's like 16,000 pages of them, we're

04:39  20  going to get them.  So obviously, we'll want to go through

21  those once we do.

22      **THE COURT:**  I'm sorry, but what is the relevance of

23  that?

24      **MR. SIEGEL:**  I mean, it's true.  It's a question of

04:39  25  whether there was this activity occurring on their servers or

1  not.

2          THE COURT:  So the alerts would corroborate that?

3          MR. SIEGEL:  Right, potentially, or lead to clues

4  about what might be happening.  I mean, we just don't know.

04:39   5          So all of that is outstanding which does cause us some

6  concern because, although we have gone ahead and asked for

7  dates for plaintiffs' depositions, if we don't know what their

8  damages are, it's a little bit hard to, you know, examine them

9  effectively.

04:39  10          THE COURT:  So, Mr. Fray-Witzer, do you not have a

11  damages expert?

12          MR. FRAY-WITZER:  I think so far we have produced --

13  we have produced more than is represented, is my understanding.

14  Though we have not yet retained a damages expert, we expect

04:40  15  that to happen relatively shortly.

16          THE COURT:  Okay.  All right.

17          MR. SIEGEL:  But, I mean, that's obviously a concern

18  for us, but that's essentially just getting started.

19          The real, you know, wild card, at least in terms of

04:40  20  timing, is also in the nonparty and I'll just go down through

21  where I think we are in all of these.

22          As the Court knows, we have a motion to compel

23  government agencies which goes to the information about the

24  investigation.

04:40  25          THE COURT:  And that's really important from

1    BuzzFeed's perspective.

2              **MR. SIEGEL:**  Yes, there's no question about it.

3              **THE COURT:**  So what's going on with all of that?  How

4    many subpoenas are there out there and who are the agencies

04:40  5    that are resisting, and where does all of that stand?

6              **MR. SIEGEL:**  There has there been a lot of

7    negotiations back and forth, you know, on this.  The short

8    answer is what we have done is essentially what is outstanding

9    now is a 30(b)(6) deposition to the Department of Justice and,

04:41 10    if necessary, the CIA.  And we have reduced it to ten topics.

11    And what we tried to do is to say, look, obviously we'd love to

12    have the information, but we get that we are probably not going

13    to get, you know, the substance of these investigations, what

14    people have found, what they investigated, who their sources

04:41 15    were, et cetera.  So what we tried to do is to reduce it to

16    simply questions like, as of January 10th, did the FBI have the

17    dossier?  As of January 10th, was the dossier being used in the

18    context of any law enforcement investigation?  Very simple

19    questions that we think are, you know, minimal in terms of what

04:41 20    the government obviously is arguing intrudes on their

21    privileges, et cetera, but we think or hope will give us enough

22    to move for summary judgment on our defenses.

23              The government is -- the government's taking an

24    interesting tact.  It's asserting the law enforcement

04:42 25    privilege, as you might imagine.  So it's sort of this funny

1  thing where the government is saying we can neither confirm or

2  deny that there's an investigation, but we are asserting a

3  privilege that would require there to be an investigation.

4         And they've even argued -- and they're arguing that

04:42  5  it's not relevant, it's burdensome, et cetera, et cetera.  So

6  that's going to be heard before -- I mean, it's fully briefed,

7  it's been fully briefed, but, obviously, I guess the judge in

8  D.C. is interested, too, so he set a hearing for February 15th.

9         THE COURT:  This is Judge Mehte?

04:42 10        MR. SIEGEL:  Judge Mehte, that's right.

11        We also -- and this is important to us similarly with

12  the --

13        THE COURT:  It's GPS Fusion that moved to recuse him

14  or BuzzFeed recused him?

04:42 15        MR. SIEGEL:  No, they have a different judge.  These

16  are two different subpoenas that are before two different

17  judges.

18        THE COURT:  Oh, I see.

19        MR. SIEGEL:  You know, we also --

04:42 20        THE COURT:  I'm sorry.  The judge who's got the

21  subpoenas to the FBI and the CIA is who?

22        MR. SIEGEL:  Judge Mehta.

23        THE COURT:  Judge Mehta?

24        MR. SIEGEL:  Yes.

04:43 25        THE COURT:  And he's having a hearing when?

1         MR. SIEGEL:  February 15th.

2         THE COURT:  February 15th.  Okay.

3         MR. SIEGEL:  We also, as you know, Your Honor might

4    imagine in the context of trying to prove truth, we issued a

04:43   5    subpoena a couple of months ago to the DNC and, you know, some

6    others related, and in order to try to obtain, you know,

7    technical information about how they got hacked.

8         THE COURT:  So their own internal investigation?

9         MR. SIEGEL:  Yes, their own internal investigation.

04:43  10    We have had a lot of negotiation back and forth with them as

11    well, in which they said, "Well, maybe we think we can give you

12    something."

13         So the long and short of it is as of January 5th, they

14    said, "No, sorry, we're not giving you anything," so we need to

04:43  15    move --

16         THE COURT:  Are they moving for a protective order?

17         MR. SIEGEL:  Well, it's a document subpoena so they

18    simply asserted objections.  They served Rule 45 objections.

19    And so the onus is now on us to move to compel, which we plan

04:44  20    to do within a week or so.  So that's just going to get

21    started.

22         There is, in terms of -- oh.  Somewhat related to

23    these damages issues, we have been waiting to move this Court,

24    Mr. Gubarev apparently contends that he has not been able to

04:44  25    get a variety of financing as a result of the dossier, and we

1    have gone back and forth for several months about saying, "Give

2    us specifically what banks, where are they, who do we need to

3    subpoena?"  We are waiting.  We want to move to file a letter

4    of request before this Court to depose these banks in Cypress

04:44    5    and I think maybe one is in the Netherlands, and it has been

6    sort of pulling teeth, at least in our view, to get this

7    information out of them.

8            THE COURT:  So I'm not really -- like you said, you

9    don't really know what the damages are that are being

04:45   10    requested.  Is it clear that he's claiming that he has been cut

11    off from avenues to obtain financing?

12            MR. SIEGEL:  Oh, yes.  Yes, he says that.

13            THE COURT:  But is he maintaining that as an element

14    of damages, Mr. Fray-Witzer?

04:45   15            MR. FRAY-WITZER:  He is, Your Honor, and my

16    understanding, although I will admit that I have not been as

17    intimately involved with the production, but my understanding

18    is that the names and the details of the banks and the

19    individuals whom have denied Mr. Gubarev loans have all been

04:45   20    provided.  I think I saw something a few days ago that said we

21    need some more information about these folks, and we have been

22    endeavoring to get that information.  But yes, it is an element

23    of damages.

24            THE COURT:  Well, I hate to see them have to go

04:45   25    through a fishing expedition with other damages analysis of

1  some sort that establishes the parameters of what's being

2  sought here.

3          Isn't there some way that we can narrow this down or

4  at least identify what the elements of damage are and their

04:46  5  sources?

6          **MR. FRAY-WITZER:**  I believe we have done that, Your

7  Honor, though obviously having the damages expert produce a

8  report sooner rather than later would make sense.

9          **MR. SIEGEL:**  Yeah, I guess I would respectfully

04:46  10  disagree.  I mean, I think if you asked any of us how much of

11  Mr. Gubarev -- I mean, how much are the plaintiffs claiming in

12  damage and what does that consist of, the answer to that

13  question is a complete mystery.

14          **THE COURT:**  Well, I'm going to order you, by the end

04:46  15  of February, to provide a damage analysis that identifies the

16  element of damages and the source of the damage, and the

17  amounts.  Okay?

18          **MR. FRAY-WITZER:**  Yes.

19          **THE COURT:**  Okay.  Because, you know, I mean, I see

04:46  20  what's coming.  Letters rogatory to take discovery from banks

21  in Cypress and God knows where else, and endless foray into

22  international service of process and the enforcement of letters

23  rogatory all around the world.

24          And so I guess if Mr. Gubarev never wants to go to

04:47  25  trial, that is fine.

1        **MR. FRAY-WITZER:**  No, Mr. Gubarev --

2        **THE COURT:**  Well, then Mr. Gubarev needs to think this

3  through and you need to think it through.

4        **MR. FRAY-WITZER:**  And we'll provide the information as

04:47  5  soon as possible.

6        **THE COURT:**  Okay.  Fine.  Thank you.

7        Okay.  Go ahead.

8        **MR. SIEGEL:**  And just a couple of points.  Mr. Evan

9  covered in part the Steele deposition, but just to give you a

04:47 10  full sense of what's going on there.

11        **THE COURT:**  Right.

12        **MR. SIEGEL:**  I think it's fair to say --

13        **THE COURT:**  I take it you all are not the only people

14  who want to depose Mr. Steele?

04:47 15        **MR. FRAY-WITZER:**  Strangely enough, so far we are.  No

16  one else has sought to.

17        **MR. SIEGEL:**  I think that's one of Mr. Steele's

18  arguments.

19        **THE COURT:**  Are you representing the plaintiffs in all

04:48 20  the domestic cases, or only Mr. Gubarev?

21        **MR. FRAY-WITZER:**  We only have one case, Your Honor.

22        **THE COURT:**  Okay.  Fine.

23        **MR. FRAY-WITZER:**  This case.

24        **THE COURT:**  This case.  Okay.

04:48 25        **MR. SIEGEL:**  So I think it's fair to say that there

was sort of a tripartite dispute going on in the U.K. over this

deposition.  Mr. Steele, as Mr. Fray-Witzer discussed, has

moved to quash it essentially, and not to have it or to limit

it to 90 minutes or et cetera, et cetera.

04:48   The plaintiffs have taken the position, and this

actually goes to what Mr. Fray-Witzer was saying, that they

will narrow the scope of the questions that are on the letter

of request, only about those few sentences in the dossier.

Our view is that that's -- I mean, our defense -- what

04:48 was supposed to be published was the dossier.  It wasn't just

those few sentences.  Everything about BuzzFeed's state of mind

and about, you know, its thought process, about the legal

status of the document itself, relates to the whole document

and you can't segregate the case that way, and so we have also

04:49 hired lawyers in the U.K., big surprise, and are saying, "Wait

a minute, you know, the topics that are on the letter of

request is what they are."

**THE COURT:**  So just out of curiosity, does this get

assessed in relationship to the U.K.'s liable and defamation

04:49 laws or does it get assessed in the U.K. in accordance, as best

they can, with U.S. liable and defamation laws?

**MR. SIEGEL:**  Well, my understanding, and I would not

purport to be an expert on this, we have all hired U.K.

counsel, obviously, but my understanding is that it is more

04:49 U.S. law in the sense that, you know, the relevance of the

1   testimony to the American proceeding is what matters.

2          Now that's, of course -- again, I can't speak to this,

3   but I'm sure to the extent that there may be privileges or

4   things like that that can be asserted, those would be U.K. law,

04:50   5   but that -- our position is that, look, whatever the plaintiffs

6   want to do with respect to their own examination, they can't

7   unilaterally limit our right to cross-examine.  I mean, the

8   letters of request say -- or your letters of request, they're

9   not plaintiffs' really, they're not ours either -- they can't

04:50   10   limit our right to cross-examine about issues that are, you

11   know, essential to our defense, and I think we're both willing,

12   certainly, to represent that we won't ask Mr. Steele about his

13   sources or things of that nature.

14          But the notion that we can't ask him questions like,

04:50   15   when did you talk to the FBI?  I mean, those are really at the

16   heart of our defense, and our position, at least in the U.K.,

17   is it's not proper to sort of unilaterally reduce the scope of

18   the letter request in that way.  So that's going to be heard on

19   February 5th.

04:50   20          You know, how long that takes to unpack after that, I

21   don't think any of us have any idea.

22          MR. FRAY-WITZER:  No.  Although what I will say, Your

23   Honor, is, and the system in London, as I'm learning, is very

24   different from our system.

04:51   25          THE COURT:  Well, all of the liable laws are really

1  very different.  Right?

2        MR. FRAY-WITZER:  It's not even -- we're not even

3  getting to the liable laws, and I don't think we ever will.  I

4  think it's simply going to be Civil Procedure rules under which

04:51  5  the deposition gets conducted.

6        THE COURT:  Well, I don't know.  I have no idea what

7  the privileges would be in the U.K.

8        MR. FRAY-WITZER:  And in addition to the privileges,

9  even just the process of the deposition itself is very

04:51  10  different.  And, you know, just as my brother had said -- I am

11  sorry, I have to stop for a moment because I've done this

12  before in Florida.  I've referred to opposing counsel as my

13  brother, which we do up north, and I had a judge who stopped me

14  and said, "Are you actually related to" -- so I'll try to --

04:51  15        MR. SIEGEL:  I'm not offended.

16        THE COURT:  I got your point.  Right.

17        MR. FRAY-WITZER:  As you've heard, the defendants have

18  been having extensive conversations with the Department of

19  Justice about narrowing their subpoenas.  Those don't involve

04:52  20  us.  They don't need to involve us.  They're not supposed to

21  involve us.

22        Still, if a deposition occurs, we would want to go

23  about and ask questions, but in London the way it's been

24  explained to us is that the witness belongs to the person who

04:52  25  has initiated the process, who has paid -- and this is an

1  expensive process -- who has paid for the process to go forward

2  in London.  And even to an extent where the rules in London in

3  some respects favored us, to an extent that we said, "We're not

4  going to follow that."

04:52  5  We were apparently entitled to say, "Well, the seven

6  hours, we get six and you get one."  And we said, you know, we

7  told our British counsel, "That's just crazy, we wouldn't do

8  that to them, let's split it up more equitably," we were told,

9  yes, that can be done by agreement and we have done that.

04:53  10  But to the extent that the defendants would like to

11  ask Mr. Steele other questions -- there's an answer, and we

12  have said this for months to them as they've complained about

13  it, file your own letters of request.

14  **THE COURT:**  Yeah.  Right.  Why have you not done that?

04:53  15  **MR. SIEGEL:**  Well, if we need to do that we will

16  certainly be prepared to do that.  I guess our understanding is

17  a little bit different, which is that, ultimately, it's the

18  Court's letter of request.

19  I mean, remember, what happened here is the plaintiff

04:53  20  applied for this.  This was applied to motion practice.  They

21  delineated a series of topics.  We looked at it.  Those topics

22  comported, in our view, they were fine, maybe we even had some

23  negotiation, I don't remember.  We said we don't oppose it as,

24  you know, on that basis, fine, and the Court granted it.

04:53  25  If the plaintiffs had said, "Well, no, actually, once

1  we get over to England, we're going to drop 12 of these topics,

2  we're only going to do this," we would have opposed it, we

3  would have said in the alternative, grant this letter of

4  request.

04:54  5        So we think there's a procedural problem here and a

6  procedural problem in London.  Now, frankly, if we need to go

7  through this again, you know, we would be prepared to do that.

8        Our view is that that seems like a waste of time, you

9  know, to have to start getting this going from the get-go.

04:54  10       **THE COURT:**  Do you think that's where it's sorted out,

11  in the Court in London?

12       **MR. FRAY-WITZER:**  We think that that's where it should

13  be sorted out, and the only place that can it be.

14       **MR. SIEGEL:**  Well, there may be two issues.  One, yes,

04:54  15  it will get sorted out.

16       **THE COURT:**  The scope?

17       **MR. SIEGEL:**  The scope will get sorted out in the

18  Court in London, but, you know, we would certainly reserve the

19  right to say, "Hey, wait a minute, if we have been denied

04:54  20  ability to cross-examine on the subjects that we understood

21  when the motion was granted here were going to be the scope of

22  the deposition, then, you know, we reserve the right to object

23  obviously to the testimony, period."

24       So that's -- I think that's the way it plays out.

04:54  25       **THE COURT:**  Okay.  All right.  Go ahead.

1          **MR. SIEGEL:**  So I think that probably covers just

2    about everything.  I mean --

3          **THE COURT:**  I mean, I know you all want an extension

4    of the discovery cutoff, but I think -- so I'm going to be away

04:55    5    for quite a while.  When I get back I think we should get

6    together and see where everything is.

7          It sounds to me like you're not dragging your feet.  I

8    can certainly understand why you want to get the discovery from

9    the government agencies and, I guess, try to depose Mr. Comey.

04:55   10          **MR. SIEGEL:**  Well, we have asked to depose.  Yes.

11   What we have said, again, this is -- we subpoenaed Mr. Comey,

12   we said to DOJ, "Look, we think Mr. Comey is kind of the

13   obvious witness here, but if you can designate somebody else,

14   fine."

04:55   15          **THE COURT:**  What did you want to say?

16          **MR. COBB:**  Well, Your Honor, our position is we're

17   happy that BuzzFeed is now wanting to run down the veracity of

18   the dossier and what government agencies had it post

19   publication, but from our perspective, we will be filing

04:55   20   motions on this down the road, which is why I wanted to put it

21   on the Court's radar, this case is about the last memorandum of

22   the dossier.  Without revealing attorneys' eyes only

23   information at the deposition --

24          **THE COURT:**  Well, that's why I asked Mr. Fray-Witzer

04:56   25   earlier, okay, it wasn't verified when it was published, but

1  what if it's been verified since?  That's the end of the case.

2  Right?

3          MR. COBB:  Well, ultimately, our perspective is the

4  last memorandum, the December memorandum is the one at issue,

04:56  5  three lines in it.  This is not a case that's a referendum on

6  Donald Trump or Donald Trump's ties to Russia, so all of these

7  subpoenas and third party motion practice to the CIA, to every

8  government agency possible, the DNC, is all fishing for some

9  information about items that were contained in there that

04:56 10  relate to Trump and everything else.  None of that is directed

11  to Aleksej Gubarev.

12          THE COURT:  But, essentially, the claim against

13  Webzilla and the co-plaintiffs or the contention in the dossier

14  was that Webzilla facilitated the hacking of the DNC.

04:56 15          MR. COBB:  Correct.  That is one of the claims and

16  that is what's in the dossier, but the CIA's knowledge or the

17  DNC's knowledge or anyone else's knowledge on that point and

18  all of this third party motion practice that we're going

19  through, this case is not about the dossier in its entirety.

04:57 20  It is a collection of separate memorandums, and we believe that

21  this case needs to hinge on the memorandum that actually

22  references our client, not the 39 other individuals.

23          THE COURT:  Why wouldn't it be relevant to find out

24  what the CIA, what the FBI knows about whether or not Webzilla

04:57 25  facilitated the hacking of the DNC?

1       **MR. FRAY-WITZER:**  That's not what they're actually

2   looking for, Your Honor.  What they're looking for is a

3   verification that there was an investigation going on when they

4   published the memo because --

04:57   5       **THE COURT:**  An investigation of whether or not

6   Webzilla facilitated the hacking of the DNC.

7       **MR. FRAY-WITZER:**  Well, they're not even asking for

8   that, but even if they were, the reason that they're asking is

9   because they want to know -- they don't want to know what the

04:57  10   investigation said, they just want to know the existence of an

11   investigation because they believe that brings them within the

12   fair report privilege.

13       The problem for them is twofold.  One is the fact that

14   they're asking now kind of proves our point.  They had to know

04:58  15   when they published it and there are cases --

16       **THE COURT:**  That's what I just asked you.  Suppose

17   that they didn't know when they published, but later on the FBI

18   and the CIA investigated whether Webzilla had facilitated the

19   hacking and the FBI and the CIA came to believe that it had?

04:58  20       **MR. COBB:**  It's nothing like that.

21       **MR. FRAY-WITZER:**  Again, they are two separate issues,

22   what the investigation might show and was there an

23   investigation.  All they really care about right now is they're

24   asking was there an investigation.  Our point is to get the

04:58  25   benefit of the fair report privilege, one) you had to know at

```
     1  the time you printed it, and two) the article that you wrote
     2  had to say they're investigating this and it doesn't, and the
     3  Department of Justice itself has made this very argument in
     4  moving to quash the subpoena.  You'll see when we file our
04:58 5  motion with you we're going to reference that considerably.
     6         The Department of Justice says the stuff they're
     7  asking for doesn't even touch the privilege that they say they
     8  want it for.
     9         MR. SIEGEL:  Your Honor, in brief, I think that's --
04:59 10 we think that's just wrong.  It's just a wrong statement of the
    11  law.  We can be privileged --
    12         THE COURT:  I view this strictly as a preview.  I take
    13  no position.  I just view this as a preview.
    14         MR. SIEGEL:  Fair enough.  And actually, this sort of
04:59 15 segues.  So yes, it seems difficult for us to believe that the
    16  sum total of all this discovery is going to be done by March
    17  15th, which is why we have said --
    18         THE COURT:  Well, by the time I get back, it sounds
    19  like -- so when are you filing your motions and what are your
04:59 20 motions that you're filing?
    21         MR. FRAY-WITZER:  We will file a motion next week,
    22  Your Honor, and it's the -- it will be a motion that you had
    23  suggested at the last hearing.  It's essentially a --
    24         THE COURT:  Motion for Judgment on the pleadings.
04:59 25        MR. FRAY-WITZER:  Yes, exactly.  We have targeted just
```

 1  these two privileges that BuzzFeed is asserting in our argument

 2  as a matter of law they can't.

 3          THE COURT:  So you're filing that next week?

 4          MR. FRAY-WITZER:  Next week, Your Honor.

05:00  5          THE COURT:  And so it will be ripe about the time I

 6  get back, I suppose.

 7          What else are you filing?  Anything else?

 8          MR. FRAY-WITZER:  I think that's it.

 9          THE COURT:  That's it.

05:00 10          MR. SIEGEL:  There's one issue we'd like --

11          THE COURT:  Excuse me.  So if the Court were to rule

12  in the plaintiffs' favor -- I have no idea whether I would or

13  not -- that would substantially either narrow or kill off the

14  case.

05:00 15          MR. FRAY-WITZER:  And the other thing that it would

16  do, we believe, Your Honor --

17          THE COURT:  Which would it do?  Would it narrow the

18  case or would it nail BuzzFeed?

19          MR. FRAY-WITZER:  Well, our belief is that it would

05:00 20  eliminate 75 percent of their defenses.  But, in addition, the

21  thing that it would do is it would eliminate about 90 percent

22  of their third party discovery.  That would cut off the need

23  for the government discovery that they seem to be seeking, if

24  they can't take advantage of the fair reporting --

05:01 25          THE COURT:  Well, that's a very good excuse for me not

1    to address their discovery deadline extension request until I

2    get back.

3         **MR. SIEGEL:**  Okay.  And actually, this was the last

4    issue I wanted to get back to because it goes right to the

05:01  5    point of the timing in this motion.

6         There's one concern we have about this motion and I

7    just want to bring it to the Court's attention.  Obviously, we

8    haven't had an opportunity to see it yet, so it may or may not

9    be a concern when we do.

05:01  10        But -- and we hadn't raised this before because I

11   think it was three months ago when Your Honor first raised this

12   and so we think there's plenty of time to hash this out, but

13   now it's three months later, it's getting farther along.

14        We have always, frankly, liked the idea.  We think

05:01  15   it's -- and Your Honor might be just interested to know that,

16   literally, the exact same motion is being litigated in New York

17   now in one of the New York cases, and it's almost fully

18   briefed, I think it's going to be fully briefed as of next

19   week.

05:02  20        But the way it's being litigated there actually

21   pertains to this.  There's a little bit of a back story to the

22   pleadings here, which is that after we filed our answer

23   initially, the plaintiffs came to us and said, "Look, we think

24   there are some deficiencies in the way you pleaded your

05:02  25   affirmative defenses, including the fair report privilege."

1    Their principal objection was they said we didn't make it clear

2    which state's laws we're potentially purporting to invoke, and

3    so we plan to move to dismiss -- I mean, essentially, move to

4    dismiss them on that, and, but we're giving you an opportunity

05:02  5    to confer.

6         So anyway, the long of it is we met and conferred and

7    we agreed that we would amend our answer, and the result of

8    that was they agreed that, you know, they weren't going to file

9    a motion directed at the pleadings, and essentially that was

05:02  10   sufficient to take care of their concerns, obviously, not that

11   they were in any way representing that they think the defendant

12   has merit, but simply for purposes of pleading.

13        So after Your Honor raised this, we went to them and

14   said, "Look, you know, the fair report privilege is ultimately,

05:03  15   I think, we probably both think, a question of law, but it

16   involves applying law to facts.  Right?  So if you're talking

17   about a Motion for Judgment on the pleadings, it would be one

18   of the facts that we plead that we think we could show."

19        But we, essentially, had an agreement with them that

05:03  20   we didn't need to go through all of that for purposes of

21   pleading, and after Your Honor raised the suggestion we said,

22   "Well, look" -- and this is actually exactly what happened in

23   New York.  We said, "Look, we're all on board with the idea of

24   testing, you know, your argument is that no matter what the

05:03  25   facts are as a matter of law, your article won't support this

1   defense, fine.  But, you know, given we have this agreement we

2   think we ought to be able -- we ought to just amend the answer,

3   we will plead all of the facts and you can make your

4   arguments."

05:03   5           They said, "No, we won't agree to that."

6           And so our only --

7           THE COURT:  So what do the answers say right now?

8           MR. SIEGEL:  All the answer -- what the answer says

9   is -- I had it right here.  It says, "Defendant publications of

05:04  10  the allegedly defamatory statements in the dossier within the

11  context of the article is protected by the fair report

12  privilege pursuant to New York Civil Rights Law 74.  In the

13  alternative, it's protected by the fair report privilege

14  pursuant to Florida common law and the Florida constitution

05:04  15  and/or Texas law," and it cites the statute because Webzilla --

16          THE COURT:  But they never moved to strike it?

17          MR. SIEGEL:  That's right.

18          THE COURT:  So it's your affirmative defenses sitting

19  there -- as far as I'm concerned, then if they didn't move to

05:04  20  strike it, it's sitting there, it's in the pleading, and I

21  don't know, what is it that would be deficient about it?

22          MR. SIEGEL:  Well, it's not that we think it's

23  deficient, we agreed that it wasn't deficient.  Our only

24  concern, though, is that if we were -- for purposes of setting

05:04  25  up a Motion for Judgment of the pleading, we would normally

1   say, "And here is why it's privileged."  Right?  "We allege

2   this fact.  We allege this is what Senator McCain did.  This is

3   what the FBI did," et cetera.

4        So our only concern is that -- and this is why in all

05:05   5   the status reports we said, "Well, look, we reserve the right

6   to amend the answer," because what we don't want to happen is

7   having had an agreement that, you know, that it was fine, that

8   simply because we have all now agreed that it makes sense to

9   test this, that it can't fully be tested because -- you know,

05:05   10   because we didn't allege every one of these facts in the

11   pleading.

12        THE COURT:  Well, you didn't allege any facts.

13        MR. SIEGEL:  Right.

14        THE COURT:  So I don't see the problem.  But, I mean,

05:05   15   obviously, you can each argue your set of facts which is going

16   to create a problem in resolving a Motion for Judgment in the

17   pleadings because then it's going to turn into a Summary

18   Judgment or you can submit stipulated facts, and it doesn't

19   sound like you're going to be able to stipulate to the facts.

05:05   20        MR. SIEGEL:  I think that's right.  And the reason --

21   I mean, the reason it had originally unfolded this way, our

22   assumption was, once we had originally agreed that there wasn't

23   going to be a motion to strike or something like that, that we

24   would move for Summary Judgment and, of course, when we moved

05:06   25   for Summary Judgment we would have a statement of material

1  facts that, you know, that supported it, et cetera.

2         So, I mean, again it's -- I don't know what their

3  issue -- I don't know what their motion is going to say.

4         **THE COURT:**  Well, let's wait and see what the motion

05:06   5  is.  But, you know, it's very hard to apply law in isolation

6  without facts.  So we'll see how it shakes out.  I mean, the

7  facts may be just so contained, so fundamental, so obvious that

8  there's no dispute and then there's no problem.  But I don't

9  know.

05:06  10         **MR. SIEGEL:**  Right.

11         **MR. FRAY-WITZER:**  We don't think it's going to be a

12  problem.  We discussed this with them.  We don't think it's

13  going to actually be an issue.  We don't think that the way

14  this motion is going to be presented to the Court is going to

05:06  15  require any consideration of any fact that is either not

16  stipulated to, or at least something that the defendants would

17  say, "Well, there's no possible way that we could plead

18  something that would be contrary to this."

19         We don't think it's going to be an issue.

05:07  20         **THE COURT:**  Right.  Right.  Okay.  And maybe they're

21  right, maybe they're wrong.  I have no idea.  I guess we'll

22  wait and see what it looks like.

23         **MR. SIEGEL:**  And that was our original view.

24         **THE COURT:**  What's the case number in New York so I

05:07  25  can go scramble around in PACER and try to get an idea --

1      **MR. SIEGEL:**  That's a good question.

2      **THE COURT:**  -- what's going on?

3      **MR. SIEGEL:**  I don't know if I have that.  Kate, is

4  that something you can look up?

05:07  5      **MS. BOLGER:**  Give me one second, I will find it for

6  you.

7      **THE COURT:**  Who is the plaintiff in the case in New

8  York?

9      **MR. SIEGEL:**  There are three of them.  The plaintiffs

05:07 10  are three extremely wealthy Russian businessmen.

11      **THE COURT:**  More Russians.

12      **MR. SIEGEL:**  Yes, they're also Russians.

13      **MS. BOLGER:**  The current case that we are in active

14  litigation and is pending in New York County in the New York

05:08 15  Supreme, Your Honor, if you'd like me to send you the complaint

16  I'd be more than happy to do that.  It's difficult to manage

17  our electronic management system, but it's index number

18  154895/2017.

19      **THE COURT:**  So this is a New York State case?

05:08 20      **MR. SIEGEL:**  That's right.

21      **MS. BOLGER:**  Yes, ma'am.

22      **THE COURT:**  So we won't have access to the docket.

23      **MR. SIEGEL:**  No.  It's -- I think it's e-filing now.

24      **THE COURT:**  Maybe we will.  Or maybe we can find --

05:08 25      **MS. BOLGER:**  I can send you the complaint or the

1   pleadings, whatever you'd like, Your Honor.

2          THE COURT:  I'd like to see the briefing on the

3   privilege.

4          MS. BOLGER:  Certainly, Your Honor, I can send that

05:08   5   out.

6          THE COURT:  That's what I'd really like to see.  Okay.

7   Thank you.  If you want to send it electronically, you can send

8   it to --

9          THE COURTROOM DEPUTY:  Just wait and I'll give her

05:08  10   the --

11          THE COURT:  Just stay on the line the courtroom deputy

12   will give you an e-mail address.  Okay?

13          MS. BOLGER:  Yes.

14          THE COURT:  All right.  What else do you want to say?

05:09  15          MR. SIEGEL:  I think that's all we have.

16          THE COURT:  Okay.  Well, you said a lot.  You've been

17   here a long time for a status conference.  Okay.

18          So I'm going away and let's just get together again at

19   the end of February.  And we'll see where we are.

05:09  20          THE COURTROOM DEPUTY:  February 27th, four o'clock.

21          THE COURT:  Discovery cutoff is March 15th.  Right?

22   Is that right?

23          MR. SIEGEL:  Yes.

24          THE COURT:  Okay.  February 27th, at four o'clock.

05:09  25   Okay?  What kind of day is that?

1          **THE COURTROOM DEPUTY:**  It's a Tuesday, but it's after

2    the first week when you get back.  It's the second week.

3          **THE COURT:**  Okay.  Tuesday, February 27th.  Okay?  All

4    right.  Who knows what will happen between now and then?

05:09    5          All right.  Thank you very much.

6

7

8          (Thereupon, the above hearing was concluded.)

9

10                    *          *          *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      **C E R T I F I C A T E**

2

3          I hereby certify that the foregoing is an accurate

4     transcription of the proceedings in the above-entitled

5     matter.

6

8     01/12/2018              _____

9     DATE COMPLETED          GIZELLA BAAN-PROULX, RPR, FCRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## 0

**01/12/2018** [1] - 52:8

## 1

**10th** [3] - 17:16, 28:16, 28:17
**12** [1] - 38:1
**154895/2017** [1] - 49:18
**15th** [5] - 29:8, 30:1, 30:2, 42:17, 50:21
**16,000** [1] - 26:19

## 2

**20** [1] - 23:11
**2016** [1] - 16:13
**27th** [3] - 50:20, 50:24, 51:3

## 3

**30(b)(6** [2] - 10:14, 28:9
**312** [1] - 24:5
**39** [1] - 40:22

## 4

**40** [3] - 17:3, 17:7, 21:10
**45** [1] - 30:18

## 5

**50** [1] - 23:7
**5th** [2] - 30:13, 35:19

## 7

**74** [1] - 46:12
**75** [1] - 43:20

## 9

**90** [2] - 34:4, 43:21

## A

**ability** [1] - 38:20
**able** [4] - 22:16, 30:24, 46:2, 47:19
**above-entitled** [1] - 52:4
**absolutely** [1] - 12:14
**abuse** [6] - 19:1, 19:22, 20:1, 20:6, 26:16
**access** [1] - 49:22
**accordance** [1] - 34:20
**accurate** [1] - 52:3

**accused** [1] - 14:16
**actions** [1] - 18:8
**active** [1] - 49:13
**activity** [3] - 18:15, 20:17, 26:25
**actual** [9] - 10:3, 10:5, 10:7, 21:16, 22:2, 22:6, 22:12
**addition** [6] - 6:14, 8:9, 15:5, 15:6, 36:8, 43:20
**address** [2] - 44:1, 50:12
**admission** [1] - 12:14
**admissions** [2] - 19:16, 19:19
**admit** [1] - 31:16
**advantage** [1] - 43:24
**affect** [3] - 9:13, 9:15, 9:18
**affirmatively** [2] - 21:18, 22:1
**agencies** [3] - 27:23, 28:4, 39:9, 39:18
**agency** [2] - 12:10, 40:8
**aggressive** [1] - 22:25
**agnostic** [1] - 22:5
**ago** [7] - 7:3, 24:3, 25:20, 26:19, 30:5, 31:20, 44:11
**agree** [1] - 46:5
**agreed** [6] - 9:6, 45:7, 45:8, 46:23, 47:8, 47:22
**agreement** [4] - 37:9, 45:19, 46:1, 47:7
**ahead** [4] - 6:15, 27:6, 33:7, 38:25
**Aleksej** [1] - 40:11
**alerts** [3] - 26:16, 26:17, 27:2
**allegations** [2] - 9:23, 9:24
**allege** [4] - 47:1, 47:2, 47:10, 47:12
**alleged** [1] - 19:20
**allegedly** [4] - 19:11, 19:14, 19:21, 46:10
**alleging** [1] - 26:4
**allow** [1] - 7:18
**almost** [1] - 44:17
**alternative** [2] - 38:3, 46:13
**ambassador** [1] - 5:24
**amend** [3] - 45:7, 46:2, 47:6
**Amendment** [1] - 17:12
**American** [1] - 35:1
**amounts** [1] - 32:17
**analysis** [2] - 31:25, 32:15
**Andrew** [1] - 5:23
**answer** [13] - 10:8, 13:20, 22:24, 23:19, 28:8, 32:12, 37:11, 44:22, 45:7, 46:2, 46:8, 47:6
**answers** [2] - 25:19, 46:7
**anticipate** [1] - 7:20
**anyway** [1] - 45:6
**appear** [3] - 3:24, 20:12, 24:24
**appearance** [2] - 3:21, 22:16
**appeared** [2] - 12:4, 24:9
**applicable** [1] - 13:3
**applied** [2] - 37:20
**apply** [1] - 48:5
**applying** [1] - 45:16
**apportion** [1] - 26:9
**appreciate** [1] - 15:20

**approached** [1] - 5:23
**arguably** [5] - 16:6, 16:23, 17:5, 19:19, 20:12
**argue** [1] - 47:15
**argued** [1] - 29:4
**arguing** [2] - 28:20, 29:4
**argument** [6] - 9:10, 17:23, 24:12, 42:3, 43:1, 45:24
**arguments** [3] - 17:21, 33:18, 46:4
**arising** [1] - 3:7
**Arizona** [1] - ...
**article** [3] - 42:1, 45:25, 46:11
**aside** [3] - 7:14, 7:17, 13:5
**aspects** [1] - 19:6
**assert** [2] - 7:21, 8:1
**asserted** [4] - 8:6, 13:2, 30:18, 35:4
**asserting** [8] - 7:24, 8:4, 8:5, 8:7, 13:6, 28:24, 29:2, 43:1
**assessed** [2] - 34:19, 34:20
**assigned** [1] - 6:19
**assumption** [1] - 47:22
**attach** [1] - 18:2
**attempt** [1] - 24:20
**attention** [1] - 44:7
**attorney** [2] - 10:25, 11:2
**attorneys'** [4] - 4:25, 11:1, 39:22
**audiotape** [1] - 18:24
**avenues** [1] - 31:11
**aware** [2] - 20:24, 25:10
**awful** [1] - 22:13

## B

**BAAN** [1] - 52:9
**BAAN-PROULX** [1] - 52:9
**backwards** [1] - 15:25
**ball** [1] - 19:1
**ballpark** [1] - 23:7
**banks** [5] - 15:12, 31:2, 31:4, 31:18, 32:20
**basis** [2] - 7:12, 37:24
**basketball** [1] - 18:25
**become** [8] - 16:3, 16:8, 16:15, 19:7, 20:16, 20:18, 20:19, 24:1
**beginning** [1] - 14:3
**behalf** [1] - 3:23
**behind** [2] - 24:8, 24:10
**belief** [3] - 8:16, 10:20, 43:19
**belongs** [1] - 36:24
**Ben** [1] - 10:13
**benefit** [1] - 41:25
**Bensinger** [1] - 10:9
**best** [1] - 34:20
**better** [1] - 15:24
**between** [5] - 16:13, 19:15, 19:20, 26:10, 51:4
**big** [4] - 23:3, 23:6, 25:3, 34:15
**biggest** [1] - 16:5
**bit** [4] - 6:15, 27:8, 37:17, 44:21

**BLACK** [1] - 3:1
**Black** [1] - 3:1
**block** [1] - 16:9
**Bloomberg** [1] - 22:19
**board** [1] - 45:23
**Bolger** [4] - 3:2, 3:3, 3:20, 3:22
**BOLGER** [8] - 3:22, 4:2, 49:5, 49:13, 49:21, 49:25, 50:4, 50:13
**book** [6] - 24:2, 24:14, 24:15, 24:16, 24:23, 24:24
**boy** [1] - 4:2
**boys** [1] - 19:1
**brief** [4] - 3:19, 18:11, 22:5, 42:9
**briefed** [4] - 29:6, 29:7, 44:18
**briefing** [2] - 7:6, 50:2
**briefly** [1] - 25:8
**bring** [2] - 8:2, 44:7
**brings** [1] - 41:11
**Britain** [1] - 16:18
**British** [2] - 7:17, 37:7
**broader** [1] - 24:22
**broke** [1] - 19:2
**brother** [2] - 36:10, 36:13
**brought** [2] - 5:3, 16:19
**build** [1] - 16:9
**building** [1] - 16:9
**burdensome** [1] - 29:5
**business** [7] - 14:20, 14:21, 14:24, 15:1, 15:10, 22:24, 23:21
**businesses** [2] - 23:9, 26:6
**businessmen** [1] - 49:10
**BuzzFeed** [23] - 3:4, 3:12, 8:14, 9:4, 9:14, 9:16, 10:13, 10:14, 12:14, 13:1, 13:10, 15:4, 16:4, 17:4, 17:15, 21:19, 21:20, 25:12, 29:14, 39:17, 43:1, 43:18
**BuzzFeed's** [4] - 9:11, 12:19, 28:1, 34:11

## C

**calculate** [1] - 26:9
**campaign** [1] - 16:13
**Canada** [2] - 5:20, 5:23
**cannot** [1] - 11:21
**card** [1] - 27:19
**care** [2] - 41:23, 45:10
**case** [33] - 6:9, 9:13, 9:16, 9:18, 10:21, 11:9, 11:21, 14:4, 14:5, 15:24, 17:1, 17:4, 17:9, 18:19, 18:20, 18:21, 18:22, 20:5, 33:21, 33:23, 33:24, 34:14, 39:21, 40:1, 40:5, 40:19, 40:21, 43:14, 43:18, 48:24, 49:7, 49:13, 49:19
**cases** [5] - 17:2, 22:4, 33:20, 41:15, 44:17
**category** [1] - 20:8
**center** [1] - 16:22
**central** [2] - 17:4, 21:2
**certainly** [6] - 8:24, 35:12, 37:16, 38:18, 39:8, 50:4

**certify** [1] - 52:3
**cetera** [12] - 16:25, 23:16, 24:9, 28:15, 28:21, 29:5, 34:4, 47:3, 48:1
**challenge** [1] - 18:6
**Christopher** [1] - 5:2
**CIA** [6] - 28:10, 29:21, 40:7, 40:24, 41:18, 41:19
**CIA's** [1] - 40:16
**cites** [1] - 46:15
**Civil** [2] - 36:4, 46:12
**claim** [1] - 40:12
**claimed** [2] - 7:22, 13:11
**claiming** [3] - 7:24, 31:10, 32:11
**claims** [1] - 40:15
**classic** [1] - 18:15
**classified** [1] - 4:24
**clear** [11] - 13:4, 16:3, 16:8, 16:16, 18:4, 18:5, 18:7, 24:2, 26:4, 31:10, 45:1
**clearer** [1] - 16:8
**clicks** [1] - 13:16
**client** [2] - 14:10, 40:22
**clients** [5] - 13:13, 14:6, 14:7, 14:19, 15:7
**cloud** [1] - 14:22
**clues** [1] - 27:3
**co** [1] - 40:13
**co-plaintiffs** [1] - 40:13
**coach** [2] - 18:25, 19:21
**COBB** [4] - 39:16, 40:3, 40:15, 41:20
**collection** [1] - 40:20
**collusion** [3] - 24:19, 24:20, 24:22
**comey** [1] - 39:9
**Comey** [4] - 16:23, 20:21, 39:11, 39:12
**coming** [2] - 25:22, 32:20
**commented** [1] - 22:18
**comments** [2] - 15:8, 24:24
**Committee** [1] - 14:17
**common** [1] - 46:14
**community** [1] - 15:10
**companies** [3] - 14:15, 22:25, 23:15
**company** [4] - 14:14, 14:22, 23:3, 23:7
**compel** [2] - 27:22, 30:19
**complained** [1] - 37:12
**complaint** [2] - 49:15, 49:25
**complete** [1] - 32:13
**COMPLETED** [1] - 52:9
**complicated** [1] - 6:18
**comported** [1] - 37:22
**comprised** [2] - 5:3, 6:10
**concern** [6] - 27:6, 27:17, 44:6, 44:9, 46:24, 47:4
**concerned** [2] - 23:17, 46:19
**concerning** [2] - 9:23, 9:24
**concerns** [1] - 45:10
**concluded** [1] - 51:8
**conduct** [1] - 19:18
**conducted** [1] - 36:5
**confer** [1] - 45:5
**conference** [1] - 50:17

**conferred** [1] - 45:6
**confidant** [1] - 5:24
**confidential** [5] - 11:1, 11:3, 11:15, 11:22, 12:1
**confirm** [3] - 19:25, 25:13, 29:1
**confirmed** [1] - 25:11
**connected** [3] - 5:8, 7:1
**considerably** [1] - 42:5
**consideration** [2] - 21:25, 48:15
**consist** [2] - 4:16, 32:12
**consistent** [1] - 17:11
**constitution** [1] - 46:14
**contact** [1] - 12:17
**contacted** [2] - 14:19, 15:7
**contain** [1] - 19:19
**contained** [4] - 8:21, 19:11, 40:9, 48:7
**containing** [1] - 19:16
**contains** [1] - 19:14
**contemporary** [1] - 17:6
**contends** [1] - 30:24
**contention** [2] - 9:4, 40:13
**contents** [1] - 19:11
**context** [4] - 18:8, 28:18, 30:4, 46:11
**continuing** [1] - 6:14
**contrary** [1] - 48:18
**control** [1] - 11:16
**controversy** [3] - 16:5, 18:9, 22:19
**conversation** [3] - 6:2, 18:24, 19:23
**conversations** [1] - 36:18
**conveyed** [1] - 5:25
**copy** [1] - 6:10
**core** [1] - 18:8
**corporate** [1] - 14:13
**correct** [2] - 6:6, 40:15
**corroborate** [1] - 27:2
**counsel** [5] - 9:7, 16:25, 34:24, 36:12, 37:7
**County** [1] - 49:14
**couple** [5] - 3:12, 21:23, 24:2, 30:5, 33:8
**course** [7] - 11:16, 16:8, 18:6, 21:15, 24:4, 35:2, 47:24
**court** [1] - 14:23
**Court** [10] - 10:23, 11:7, 11:18, 12:3, 19:5, 21:14, 25:10, 27:22, 30:23, 31:4, 37:24, 38:11, 38:18, 43:11, 48:14
**COURT** [126] - 3:2, 3:7, 3:10, 3:16, 3:20, 3:25, 4:4, 4:14, 4:16, 4:21, 5:6, 5:12, 6:3, 6:7, 6:12, 6:21, 6:23, 7:20, 8:1, 8:4, 8:13, 9:8, 10:2, 10:11, 10:15, 10:18, 11:11, 11:16, 11:19, 12:9, 12:19, 13:17, 13:21, 14:9, 14:24, 15:16, 15:18, 16:1, 18:1, 18:11, 19:9, 19:15, 20:11, 22:15, 22:21, 23:3, 23:9, 23:17, 23:22, 24:14, 25:1, 25:5, 25:16, 26:22, 27:2, 27:10, 27:16, 27:25, 28:3, 29:9, 29:13, 29:18, 29:20, 29:23, 29:25, 30:2, 30:8, 30:16, 31:8, 31:13, 31:24, 32:14, 32:19, 33:2, 33:6, 33:11, 33:13, 33:19, 33:22,

33:24, 34:18, 35:25, 36:6, 36:16, 37:14, 38:10, 38:16, 38:25, 39:3, 39:15, 39:24, 40:12, 40:23, 41:5, 41:16, 42:12, 42:18, 42:24, 43:3, 43:5, 43:9, 43:11, 43:17, 43:25, 46:7, 46:16, 46:18, 47:12, 47:14, 48:4, 48:20, 48:24, 49:2, 49:7, 49:11, 49:19, 49:22, 49:24, 50:2, 50:6, 50:11, 50:14, 50:16, 50:21, 50:24, 51:3
  **Court's** [3] - 37:18, 39:21, 44:7
  **COURTROOM** [3] - 50:9, 50:20, 51:1
  **courtroom** [2] - 11:24, 50:11
  **courts** [2] - 7:11, 7:17
  **covered** [1] - 33:9
  **covers** [1] - 39:1
  **crazy** [1] - 37:7
  **create** [1] - 47:16
  **critical** [1] - 20:15
  **cross** [3] - 35:7, 35:10, 38:20
  **cross-examine** [3] - 35:7, 35:10, 38:20
  **curiosity** [1] - 34:18
  **current** [1] - 49:13
  **cut** [2] - 31:10, 43:22
  **cutoff** [2] - 39:4, 50:21
  **Cypress** [4] - 15:17, 25:22, 31:4, 32:21

### D

  **D.C** [3] - 6:16, 6:18, 29:8
  **damage** [5] - 14:9, 32:4, 32:12, 32:15, 32:16
  **damaged** [1] - 14:6
  **damages** [12] - 14:12, 26:5, 27:8, 27:11, 27:14, 30:23, 31:9, 31:14, 31:23, 31:25, 32:7, 32:16
  **data** [2] - 14:15, 23:20
  **DATE** [1] - 52:9
  **dates** [6] - 9:7, 10:9, 25:11, 25:13, 25:23, 27:7
  **David** [4] - 4:20, 4:22, 10:24, 11:8
  **Davis** [1] - 3:22
  **days** [5] - 7:3, 12:5, 19:4, 25:20, 31:20
  **deadline** [1] - 44:1
  **debate** [1] - 17:7
  **December** [2] - 6:9, 40:4
  **defamation** [2] - 34:19, 34:21
  **defamatory** [5] - 19:12, 19:14, 20:8, 20:12, 46:10
  **Defendant** [1] - 46:9
  **defendant** [2] - 26:10, 45:11
  **defendants** [5] - 3:23, 4:19, 36:17, 37:10, 48:16
  **defendants'** [1] - 9:7
  **defense** [5] - 15:19, 34:9, 35:11, 35:16, 46:1
  **defenses** [5] - 17:21, 28:22, 43:20, 44:25, 46:18
  **deficiencies** [1] - 44:24
  **deficient** [3] - 46:21, 46:23
  **delayed** [1] - 12:24

  **delineated** [1] - 37:21
  **Delray** [1] - 18:19
  **Democratic** [1] - 14:17
  **denied** [2] - 31:19, 38:19
  **deny** [1] - 29:2
  **Department** [5] - 5:19, 28:9, 36:18, 42:3, 42:6
  **depose** [5] - 25:20, 31:4, 33:14, 39:9, 39:10
  **deposition** [16] - 4:20, 6:16, 7:8, 7:19, 9:7, 10:9, 10:25, 28:9, 33:9, 34:2, 36:5, 36:9, 36:22, 38:22, 39:23
  **depositions** [3] - 25:13, 25:24, 27:7
  **DEPUTY** [3] - 50:9, 50:20, 51:1
  **deputy** [1] - 50:11
  **describes** [1] - 22:13
  **description** [1] - 18:11
  **designate** [2] - 11:15, 39:13
  **designated** [2] - 4:24, 10:25
  **designed** [1] - 21:11
  **desk** [1] - 16:18
  **details** [1] - 31:18
  **determine** [1] - 21:14
  **determined** [1] - 22:3
  **different** [8] - 20:17, 29:15, 29:16, 35:24, 36:1, 36:10, 37:17
  **difficult** [3] - 21:8, 42:15, 49:16
  **directed** [2] - 40:10, 45:9
  **directly** [1] - 24:25
  **disagree** [1] - 32:10
  **disclose** [1] - 20:23
  **discovery** [15] - 4:10, 4:13, 14:12, 15:2, 25:7, 26:3, 32:20, 39:4, 39:8, 42:16, 43:22, 43:23, 44:1, 50:21
  **discussed** [2] - 34:2, 48:12
  **discussing** [1] - 19:16
  **discussion** [1] - 3:19
  **dismiss** [2] - 45:3, 45:4
  **dispute** [3] - 21:13, 34:1, 48:8
  **distress** [1] - 15:6
  **DNC** [5] - 30:5, 40:8, 40:14, 40:25, 41:6
  **DNC's** [1] - 40:17
  **docket** [1] - 49:22
  **document** [12] - 4:19, 16:3, 16:10, 17:5, 17:18, 17:22, 18:16, 20:15, 21:5, 30:17, 34:13
  **documents** [3] - 17:6, 18:14, 26:6
  **DOJ** [1] - 39:12
  **domestic** [1] - 33:20
  **Donald** [2] - 40:6
  **done** [9] - 5:19, 6:12, 28:8, 32:6, 36:11, 37:9, 37:14, 42:16
  **dossier** [27] - 3:8, 5:3, 6:5, 6:11, 9:20, 9:25, 13:15, 15:4, 15:13, 16:21, 16:24, 17:3, 17:14, 22:16, 22:20, 24:10, 28:17, 30:25, 34:8, 34:10, 39:18, 39:22, 40:13, 40:16, 40:19, 46:10
  **doubts** [1] - 14:8

  **down** [4] - 27:20, 32:3, 39:17, 39:20
  **dragging** [1] - 39:7
  **drop** [2] - 15:4, 38:1
  **drop-off** [1] - 15:4

### E

  **e-filing** [1] - 49:23
  **e-mail** [1] - 50:12
  **early** [4] - 3:5, 6:7, 7:16, 10:16
  **easiest** [1] - 18:16
  **editor** [1] - 10:13
  **effectively** [1] - 27:9
  **either** [6] - 14:20, 15:13, 22:10, 35:9, 43:13, 48:15
  **election** [2] - 16:13, 22:19
  **electronic** [1] - 49:17
  **electronically** [1] - 50:7
  **element** [3] - 31:13, 31:22, 32:16
  **elements** [2] - 24:23, 32:4
  **eliminate** [2] - 43:20, 43:21
  **emotional** [1] - 15:6
  **end** [5] - 15:22, 21:5, 32:14, 40:1, 50:19
  **endeavoring** [1] - 31:22
  **endless** [1] - 32:21
  **endorsed** [1] - 7:11
  **enforcement** [5] - 19:7, 20:5, 28:18, 28:24, 32:22
  **enforcing** [1] - 11:12
  **engaged** [1] - 19:17
  **England** [1] - 38:1
  **enter** [1] - 14:21
  **entered** [2] - 11:18, 12:2
  **entire** [1] - 10:25
  **entirety** [1] - 40:19
  **entitled** [2] - 37:5, 52:4
  **epicenter** [1] - 16:4
  **equitably** [1] - 37:8
  **errors** [1] - 21:23
  **ESPN** [5] - 18:21, 18:22, 19:2, 19:5, 20:3
  **essential** [2] - 17:1, 35:11
  **essentially** [9] - 7:22, 27:18, 28:8, 34:3, 40:12, 42:23, 45:3, 45:9, 45:19
  **establishes** [1] - 32:1
  **et** [12] - 16:25, 23:16, 24:9, 28:15, 28:21, 29:5, 34:4, 47:3, 48:1
  **Evan** [1] - 33:8
  **evidence** [1] - 20:5
  **evidentiary** [2] - 16:9, 18:7
  **ex** [1] - 7:12
  **exact** [1] - 44:16
  **exactly** [4] - 17:22, 21:10, 42:25, 45:22
  **examination** [1] - 35:6
  **examine** [4] - 27:8, 35:7, 35:10, 38:20
  **example** [3] - 18:15, 18:18, 20:15
  **exciting** [1] - 14:4
  **excuse** [2] - 43:11, 43:25

**existed** [1] - 5:13
**existence** [1] - 41:10
**existing** [2] - 14:24, 15:1
**expand** [1] - 14:20
**expect** [4] - 9:21, 12:24, 14:1, 27:14
**expedition** [1] - 31:25
**expensive** [1] - 37:1
**expert** [6] - 5:17, 9:9, 27:11, 27:14, 32:7, 34:23
**explained** [1] - 36:24
**exposure** [1] - 21:4
**extend** [1] - 11:20
**extension** [2] - 39:3, 44:1
**extensive** [1] - 36:18
**extent** [5] - 19:5, 35:3, 37:2, 37:3, 37:10
**extremely** [1] - 49:10
**eyes** [3] - 4:25, 11:1, 39:22

### F

**facilitated** [4] - 40:14, 40:25, 41:6, 41:18
**fact** [12] - 12:23, 14:8, 16:7, 19:9, 19:10, 19:25, 22:12, 24:1, 25:19, 41:13, 47:2, 48:15
**facts** [13] - 22:15, 45:16, 45:18, 45:25, 46:3, 47:10, 47:12, 47:15, 47:18, 47:19, 48:1, 48:6, 48:7
**fair** [16] - 12:25, 17:11, 18:3, 18:11, 18:13, 21:10, 33:12, 33:25, 41:12, 41:25, 42:14, 43:24, 44:25, 45:14, 46:11, 46:13
**fairly** [1] - 22:25
**fall** [1] - 20:7
**false** [4] - 9:19, 21:18, 22:1, 22:9
**far** [5] - 10:18, 14:12, 27:12, 33:15, 46:19
**fashion** [1] - 7:19
**favor** [1] - 43:12
**favored** [1] - 37:3
**FBI** [13] - 8:9, 16:11, 16:12, 16:18, 16:20, 20:18, 28:16, 29:21, 35:15, 40:24, 41:17, 41:19, 47:3
**FBI's** [1] - 16:12
**FCRR** [1] - 52:9
**February** [12] - 7:16, 10:17, 25:12, 29:8, 30:1, 30:2, 32:15, 35:19, 50:19, 50:20, 50:24, 51:3
**feet** [1] - 39:7
**felt** [1] - 14:4
**few** [6] - 4:7, 7:3, 25:20, 31:20, 34:8, 34:11
**figure** [6] - 21:9, 21:14, 21:15, 22:4, 22:17, 23:2
**file** [7] - 11:6, 12:10, 31:3, 37:13, 42:4, 42:21, 45:8
**filed** [5] - 6:17, 7:10, 7:12, 17:2, 44:22
**filing** [6] - 39:19, 42:19, 42:20, 43:3,

43:7, 49:23
**final** [1] - 23:23
**finally** [2] - 9:6, 24:6
**financing** [2] - 30:25, 31:11
**fine** [11] - 16:1, 21:20, 25:25, 32:25, 33:6, 33:22, 37:22, 37:24, 39:14, 46:1, 47:7
**Fine** [1] - 18:21
**finish** [1] - 10:8
**Fire** [2] - 24:14, 24:16
**fired** [1] - 16:23
**firms** [1] - 6:25
**First** [1] - 17:12
**first** [10] - 6:19, 7:12, 10:5, 11:14, 13:24, 14:12, 24:4, 24:24, 44:11, 51:2
**fishing** [2] - 31:25, 40:8
**five** [2] - 22:4, 23:12
**Florida** [4] - 23:14, 36:12, 46:14
**folks** [3] - 22:25, 25:21, 31:21
**follow** [3] - 17:17, 26:11, 37:4
**for-the-record** [2] - 6:23, 6:24
**foray** [1] - 32:21
**foregoing** [1] - 52:3
**forget** [1] - 24:17
**forgot** [2] - 3:3, 15:18
**formal** [1] - 11:6
**former** [1] - 5:24
**forth** [4] - 18:19, 28:7, 30:10, 31:1
**Forum** [1] - 5:21
**forward** [4] - 7:9, 7:18, 13:22, 37:1
**forwarded** [1] - 20:25
**four** [2] - 22:4, 50:20, 50:24
**frankly** [5] - 16:21, 17:14, 21:8, 38:6, 44:14
**FRAY** [58] - 3:5, 3:11, 4:12, 4:15, 4:17, 4:22, 5:7, 5:14, 6:6, 6:8, 6:14, 6:22, 6:24, 7:22, 8:2, 8:6, 8:15, 9:15, 10:4, 10:12, 10:16, 10:22, 11:13, 11:17, 11:23, 12:13, 12:21, 13:19, 13:24, 14:11, 14:25, 15:17, 24:19, 25:17, 27:12, 31:15, 32:6, 32:18, 33:1, 33:4, 33:15, 33:21, 33:23, 35:22, 36:2, 36:8, 36:17, 38:12, 41:1, 41:7, 41:21, 42:21, 42:25, 43:4, 43:8, 43:15, 43:19, 48:11
**fray** [2] - 15:23, 27:10
**Fray** [6] - 16:15, 23:24, 31:14, 34:2, 34:6, 39:24
**FRAY-WITZER** [58] - 3:5, 3:11, 4:12, 4:15, 4:17, 4:22, 5:7, 5:14, 6:6, 6:8, 6:14, 6:22, 6:24, 7:22, 8:2, 8:6, 8:15, 9:15, 10:4, 10:12, 10:16, 10:22, 11:13, 11:17, 11:23, 12:13, 12:21, 13:19, 13:24, 14:11, 14:25, 15:17, 24:19, 25:17, 27:12, 31:15, 32:6, 32:18, 33:1, 33:4, 33:15, 33:21, 33:23, 35:22, 36:2, 36:8, 36:17, 38:12, 41:1, 41:7, 41:21, 42:21, 42:25, 43:4, 43:8, 43:15, 43:19, 48:11
**fray-Witzer** [2] - 15:23, 27:10
**Fray-Witzer** [6] - 16:15, 23:24, 31:14,

34:2, 34:6, 39:24
**freedom** [1] - 17:11
**friends** [3] - 8:3, 15:7, 15:9
**front** [1] - 16:22
**full** [1] - 33:10
**fully** [6] - 23:18, 29:6, 29:7, 44:17, 44:18, 47:9
**fundamental** [1] - 48:7
**funny** [1] - 28:25
**Fury** [2] - 24:15, 24:16
**Fusion** [8] - 3:13, 3:14, 3:17, 6:15, 7:1, 7:3, 24:5, 29:13
**future** [1] - 15:14

### G

**game** [2] - 6:7, 6:8
**generally** [1] - 10:14
**get-go** [2] - 16:11, 38:9
**given** [4] - 7:13, 8:22, 24:4, 46:1
**GIZELLA** [1] - 52:9
**Glenn** [1] - 24:5
**God** [1] - 32:21
**government** [11] - 8:4, 8:6, 20:25, 27:23, 28:20, 28:23, 29:1, 39:9, 39:18, 40:8, 43:23
**government's** [1] - 28:23
**GPS** [5] - 6:15, 7:1, 7:3, 24:6, 29:13
**grant** [1] - 38:3
**granted** [3] - 7:13, 37:24, 38:21
**great** [1] - 13:14
**group** [1] - 5:20
**growth** [1] - 15:3
**Guardian** [1] - 24:17
**Gubarev** [15] - 15:5, 15:12, 21:13, 22:16, 22:18, 22:22, 22:24, 30:24, 31:19, 32:11, 32:24, 33:1, 33:2, 33:20, 40:11
**Gubarevs** [1] - 15:16
**guess** [10] - 6:3, 15:6, 24:23, 25:4, 27:9, 32:9, 32:24, 37:16, 39:9, 48:21

### H

**hack** [1] - 14:18
**hacked** [1] - 30:7
**hacking** [5] - 14:16, 40:14, 40:25, 41:6, 41:19
**Halifax** [1] - 5:21
**handled** [1] - 16:25
**hands** [1] - 13:13
**hanging** [1] - 14:22
**happy** [3] - 13:20, 39:17, 49:16
**harassing** [1] - 15:8
**harbored** [1] - 14:8
**hard** [3] - 3:6, 27:8, 48:5
**Harding** [1] - 24:17
**Harry** [1] - 20:21

**hash** [1] - 44:12
**hate** [1] - 31:24
**head** [1] - 16:17
**heard** [4] - 6:3, 29:6, 35:18, 36:17
**hearing** [5] - 7:16, 29:8, 29:25, 42:23, 51:8
**heart** [1] - 35:16
**heck** [1] - 13:14
**hello** [1] - 3:23
**helpful** [1] - 11:8
**hereby** [1] - 52:3
**herself** [1] - 6:20
**hesitant** [1] - 12:8
**himself** [3] - 5:17, 15:5, 16:19
**hinge** [1] - 40:21
**hired** [2] - 34:15, 34:23
**hold** [1] - 15:14
**holding** [1] - 23:6
**honest** [2] - 21:22, 22:10
**honestly** [2] - 7:7, 14:3
**Honor** [44] - 3:5, 3:24, 4:2, 4:12, 4:22, 5:15, 6:6, 8:15, 9:16, 10:4, 11:7, 11:17, 11:24, 11:25, 12:13, 12:21, 13:19, 13:24, 14:11, 14:25, 15:21, 15:22, 16:7, 17:2, 17:10, 25:17, 30:3, 31:15, 32:7, 33:21, 35:23, 39:16, 41:2, 42:9, 42:22, 43:4, 43:16, 44:11, 44:15, 45:13, 45:21, 49:15, 50:1, 50:4
**hope** [1] - 28:21
**hopes** [1] - 23:25
**hoping** [2] - 8:24, 15:22
**hosting** [1] - 23:20
**hours** [1] - 37:6
**Human** [3] - 4:23, 5:6, 5:7
**human** [1] - 5:11

## I

**idea** [10] - 6:21, 9:12, 12:12, 35:21, 36:6, 43:12, 44:14, 45:23, 48:21, 48:25
**identifies** [1] - 32:15
**identify** [1] - 32:4
**imagine** [3] - 14:13, 28:25, 30:4
**immediate** [1] - 15:4
**implicate** [1] - 7:24
**important** [7] - 4:3, 5:4, 16:21, 17:6, 22:8, 27:25, 29:11
**impossible** [1] - 17:17
**improper** [1] - 19:17
**inadvertently** [1] - 12:2
**Inc** [1] - 23:13
**include** [1] - 24:3
**including** [2] - 21:7, 44:25
**increasingly** [1] - 16:16
**incurred** [1] - 14:10
**indeed** [1] - 9:18
**independent** [1] - 9:3
**independently** [2] - 8:20, 20:4
**index** [1] - 49:17

**indicated** [1] - 11:6
**indicating** [1] - 26:17
**individuals** [4] - 19:16, 19:17, 31:19, 40:22
**information** [26] - 5:25, 8:11, 8:17, 8:19, 8:22, 9:1, 9:11, 9:17, 9:19, 9:20, 10:23, 11:4, 11:20, 12:15, 12:18, 13:10, 15:11, 27:23, 28:12, 30:7, 31:7, 31:21, 31:22, 33:4, 39:23, 40:9
**informed** [1] - 11:1
**initiated** [1] - 36:25
**instance** [1] - 20:11
**Institute** [4] - 4:23, 5:6, 5:7, 5:18
**insulate** [1] - 12:22
**interested** [4] - 5:12, 8:13, 29:8, 44:15
**interesting** [4] - 5:14, 14:4, 24:23, 28:24
**internal** [2] - 30:8, 30:9
**international** [1] - 32:22
**International** [1] - 5:21
**interrogatories** [1] - 26:7
**interrogatory** [2] - 4:18, 26:7
**intervene** [1] - 11:12
**interview** [1] - 22:19
**interviews** [1] - 24:3
**intimately** [1] - 31:17
**intrudes** [1] - 28:20
**investigated** [2] - 28:14, 41:18
**investigating** [1] - 42:2
**investigation** [18] - 16:12, 18:17, 19:8, 20:5, 20:18, 27:24, 28:18, 29:2, 29:3, 30:8, 30:9, 41:3, 41:5, 41:10, 41:11, 41:22, 41:23, 41:24
**investigations** [1] - 28:13
**invoke** [1] - 45:2
**involve** [3] - 36:19, 36:20, 36:21
**involved** [3] - 18:25, 23:20, 31:17
**involves** [1] - 45:16
**irrelevant** [1] - 9:22
**isolation** [1] - 48:5
**issue** [12] - 6:9, 7:6, 9:21, 10:1, 21:12, 25:8, 40:4, 43:10, 44:4, 48:3, 48:13, 48:19
**issued** [1] - 30:4
**issues** [6] - 5:11, 5:22, 30:23, 35:10, 38:14, 41:21
**items** [1] - 40:9
**itself** [5] - 11:13, 12:22, 34:13, 36:9, 42:3

## J

**January** [6] - 4:1, 4:3, 17:16, 28:16, 28:17, 30:13
**Jared** [1] - 3:1
**Jim** [2] - 16:23, 20:21
**job** [1] - 23:24
**journalist** [1] - 8:9
**judge** [9] - 6:19, 7:2, 7:6, 29:7, 29:15,

29:20, 29:22, 36:13
**Judge** [3] - 29:9, 29:10, 29:23
**judges** [1] - 29:17
**Judgment** [10] - 13:23, 14:2, 25:9, 42:24, 45:17, 46:25, 47:16, 47:18, 47:24, 47:25
**judgment** [1] - 28:22
**jump** [1] - 7:10
**Justice** [4] - 28:9, 36:19, 42:3, 42:6

## K

**Kate** [1] - 49:3
**Katherine** [1] - 3:22
**Ken** [1] - 10:9
**key** [1] - 18:8
**kill** [1] - 43:13
**kind** [8] - 11:4, 21:8, 21:24, 23:3, 39:12, 41:14, 50:25
**knowledge** [4] - 19:25, 40:16, 40:17
**knows** [4] - 27:22, 32:21, 40:24, 51:4
**Kramer** [5] - 4:20, 4:22, 5:17, 6:1
**Kramer's** [3] - 10:24, 11:2, 11:8

## L

**largely** [2] - 23:19
**last** [9] - 4:20, 9:6, 25:17, 25:19, 39:21, 40:4, 42:23, 44:3
**latest** [1] - 12:25
**law** [19] - 6:25, 13:3, 13:4, 17:12, 17:23, 19:7, 20:5, 28:18, 28:24, 34:25, 35:4, 42:11, 43:2, 45:15, 45:16, 45:25, 46:14, 46:15, 48:5
**Law** [1] - 46:12
**laws** [6] - 9:9, 34:20, 34:21, 35:25, 36:3, 45:2
**lawsuit** [1] - 9:12
**lawsuits** [2] - 3:7, 21:10
**lawyers** [1] - 34:15
**lead** [1] - 27:3
**leaders** [1] - 5:21
**leads** [1] - 15:23
**learn** [1] - 17:13
**learning** [1] - 35:23
**least** [7] - 5:15, 17:14, 27:19, 31:6, 32:4, 35:16, 48:16
**leave** [1] - 4:6
**left** [1] - 16:15
**legal** [6] - 17:8, 17:21, 18:1, 18:3, 34:12
**legally** [1] - 17:23
**legislators** [1] - 16:19
**less** [1] - 15:19
**letter** [7] - 20:21, 31:3, 34:7, 34:16, 35:18, 37:18, 38:3
**letters** [3] - 32:20, 32:22, 35:8, 37:13
**letting** [1] - 3:24

liability [1] - 12:22
liable [9] - 9:9, 13:8, 14:5, 17:9, 21:3, 34:19, 34:21, 35:25, 36:3
limit [3] - 34:3, 35:7, 35:10
line [1] - 50:11
lines [1] - 40:5
listen [1] - 8:9
literally [1] - 44:16
litigated [2] - 44:16, 44:20
litigation [2] - 18:20, 49:14
live [1] - 15:16
living [1] - 14:14
loans [5] - 15:12, 15:14, 26:6, 31:19
London [11] - 3:18, 5:2, 7:11, 7:25, 35:23, 36:23, 37:2, 38:6, 38:11, 38:18
London's [1] - 5:24
look [6] - 16:21, 28:11, 35:5, 45:22, 47:5, 49:4
Look [7] - 19:5, 21:21, 22:8, 39:12, 44:23, 45:14, 45:23
looked [1] - 37:21
looking [2] - 41:2
looks [1] - 48:22
loop [1] - 6:2
Lopez [1] - 3:1
lose [1] - 14:24
lost [4] - 15:1, 15:9, 15:10
love [1] - 28:11
Luke [1] - 24:17
Luxembourg [1] - 23:16

## M

ma'am [1] - 49:21
mail [1] - 50:12
main [1] - 10:12
maintaining [1] - 31:13
malice [9] - 10:3, 10:6, 10:7, 21:16, 22:2, 22:6, 22:12
manage [1] - 49:16
management [1] - 49:17
March [2] - 42:16, 50:21
marked [1] - 12:1
material [2] - 19:14, 47:25
materials [1] - 8:21
matter [8] - 9:22, 9:23, 9:24, 13:3, 43:2, 45:24, 45:25, 52:5
matters [1] - 35:1
McCain [11] - 4:23, 5:6, 5:7, 5:18, 6:2, 6:4, 6:10, 16:14, 20:19, 47:2
mean [27] - 16:23, 17:15, 18:4, 20:8, 21:3, 23:12, 24:21, 26:5, 26:7, 26:24, 27:4, 27:17, 29:6, 32:10, 32:11, 32:19, 34:9, 35:7, 35:15, 37:19, 39:2, 39:3, 45:3, 47:14, 47:21, 48:2, 48:6
means [2] - 21:16, 22:2
media [2] - 8:20, 15:9
meeting [1] - 5:12
Mehta [2] - 29:22, 29:23

Mehte [2] - 29:9, 29:10
memo [2] - 6:9, 41:4
memorandum [4] - 39:21, 40:4, 40:21
memorandums [1] - 40:20
memos [3] - 5:2, 6:10, 8:21
mentioned [3] - 13:25, 16:14, 21:5
merit [1] - 45:12
met [2] - 5:2, 45:6
MI6 [2] - 8:3, 16:17
Miami [3] - 3:25, 4:3
mid [1] - 12:24
midway [1] - 6:8
might [10] - 4:18, 14:13, 19:17, 20:12, 26:17, 27:4, 28:25, 30:3, 41:22, 44:15
million [1] - 23:7
mind [1] - 34:11
minimal [1] - 28:19
minor [1] - 7:4
minute [2] - 34:16, 38:19
minutes [1] - 34:4
misery [1] - 4:8
modify [1] - 7:17
moment [3] - 4:24, 10:24, 36:11
month [3] - 4:20, 22:20, 25:14
months [5] - 30:5, 31:1, 37:12, 44:11, 44:13
most [2] - 10:23, 17:5
Motion [5] - 25:9, 42:24, 45:17, 46:25, 47:16
motion [21] - 6:17, 6:20, 11:7, 12:10, 12:25, 27:22, 37:20, 38:21, 40:7, 40:18, 42:5, 42:21, 42:22, 44:5, 44:6, 44:16, 45:9, 47:23, 48:3, 48:4, 48:14
motions [5] - 13:25, 14:2, 39:20, 42:19, 42:20
move [10] - 13:22, 28:22, 30:15, 30:19, 30:23, 31:3, 45:3, 46:19, 47:24
moved [7] - 7:3, 7:14, 13:22, 29:13, 34:3, 46:16, 47:24
moving [3] - 25:3, 30:16, 42:4
MR [130] - 3:1, 3:5, 3:9, 3:11, 3:14, 3:17, 4:12, 4:15, 4:17, 4:22, 5:7, 5:14, 6:6, 6:8, 6:14, 6:22, 6:24, 7:22, 8:2, 8:6, 8:15, 9:15, 10:4, 10:12, 10:16, 10:22, 11:13, 11:17, 11:23, 12:13, 12:21, 13:19, 13:24, 14:11, 14:25, 15:17, 15:21, 16:2, 18:3, 18:13, 19:10, 19:19, 20:14, 22:18, 22:23, 23:5, 23:11, 23:18, 23:23, 24:16, 24:19, 24:20, 25:3, 25:6, 25:17, 25:25, 26:24, 27:3, 27:12, 27:17, 28:2, 28:6, 29:10, 29:15, 29:19, 29:22, 29:24, 30:1, 30:3, 30:9, 30:17, 31:12, 31:15, 32:6, 32:9, 32:18, 33:1, 33:4, 33:8, 33:12, 33:15, 33:17, 33:21, 33:23, 33:25, 34:22, 35:22, 36:2, 36:8, 36:15, 36:17, 37:15, 38:12, 38:14, 38:17, 39:1, 39:10, 39:16, 40:3, 40:15, 41:1, 41:7, 41:20, 41:21, 42:9, 42:14, 42:21, 42:25, 43:4, 43:8, 43:10, 43:15, 43:19, 44:3, 46:8, 46:17, 46:22, 47:13, 47:20, 48:10,

48:11, 48:23, 49:1, 49:3, 49:9, 49:12, 49:20, 49:23, 50:15, 50:23
MS [8] - 3:22, 4:2, 49:5, 49:13, 49:21, 49:25, 50:4, 50:13
multiple [2] - 23:15
mystery [1] - 32:13

## N

nail [1] - 43:18
name [1] - 24:18
named [2] - 9:25, 24:17
names [3] - 8:19, 17:3, 31:18
narrow [4] - 32:3, 34:7, 43:13, 43:17
narrowing [1] - 36:19
National [1] - 14:17
nature [1] - 35:13
necessarily [1] - 22:9
necessary [2] - 11:20, 28:10
need [14] - 3:3, 9:3, 15:15, 20:21, 21:21, 30:14, 31:2, 31:21, 33:3, 36:20, 37:15, 38:6, 43:22, 45:20
needs [2] - 33:2, 40:21
negligence [1] - 10:6
negotiation [2] - 30:10, 37:23
negotiations [1] - 28:7
Netherlands [2] - 23:16, 31:5
neutral [1] - 13:1
never [4] - 9:8, 11:19, 32:24, 46:16
New [10] - 18:21, 44:16, 44:17, 45:23, 46:12, 48:24, 49:7, 49:14, 49:19
News [1] - 22:19
news [6] - 4:25, 6:4, 8:17, 8:20, 12:10, 18:6
newspaper [1] - 22:14
newsworthy [1] - 24:23
next [8] - 11:7, 12:9, 12:24, 13:25, 42:21, 43:3, 43:4, 44:18
none [2] - 11:3, 40:10
nonparty [2] - 25:7, 27:20
normal [1] - 15:3
normally [2] - 11:5, 46:25
north [1] - 36:13
noted [1] - 17:2
nothing [4] - 12:15, 17:8, 41:20
notice [1] - 7:13
notion [3] - 17:11, 22:7, 35:14
number [3] - 20:17, 48:24, 49:17
numerous [2] - 14:19, 18:8

## O

o'clock [2] - 50:20, 50:24
object [1] - 38:22
objection [1] - 45:1
objections [2] - 30:18
obtain [2] - 30:6, 31:11
obtained [1] - 18:23

**obviates** [2] - 8:11, 9:4
**obvious** [2] - 39:13, 48:7
**obviously** [20] - 10:5, 11:21, 17:20, 19:11, 23:25, 24:12, 25:21, 26:6, 26:11, 26:20, 27:17, 28:11, 28:20, 29:7, 32:7, 34:24, 38:23, 44:7, 45:10, 47:15
**occurred** [1] - 20:1
**occurring** [1] - 26:25
**occurs** [1] - 36:22
**October** [1] - 25:18
**offended** [1] - 36:15
**official** [3] - 18:8, 18:15, 20:17
**once** [5] - 20:2, 26:12, 26:21, 37:25, 47:22
**one** [31] - 3:15, 3:18, 7:23, 8:24, 9:16, 9:17, 11:4, 11:24, 12:23, 13:3, 17:5, 18:16, 23:14, 23:20, 26:14, 31:5, 33:16, 33:17, 33:21, 37:6, 38:14, 40:4, 40:15, 41:13, 41:25, 43:10, 44:6, 44:17, 45:17, 47:10, 49:5
**ones** [1] - 24:4
**onus** [1] - 30:19
**opportunities** [1] - 15:11
**opportunity** [2] - 44:8, 45:4
**oppose** [1] - 37:23
**opposed** [1] - 38:2
**opposing** [1] - 36:12
**order** [10] - 7:17, 11:2, 11:12, 11:13, 11:18, 12:2, 23:6, 30:6, 30:16, 32:14
**orders** [1] - 11:19
**organization** [1] - 5:8
**original** [2] - 6:19, 48:23
**originally** [2] - 47:21, 47:22
**ought** [2] - 46:2
**outlet** [1] - 8:17
**outstanding** [2] - 27:5, 28:8
**own** [5] - 12:19, 30:8, 30:9, 35:6, 37:13

## P

**PACER** [1] - 48:25
**pages** [2] - 24:5, 26:19
**paid** [2] - 36:25, 37:1
**paper** [1] - 4:13
**parameters** [1] - 32:1
**parcel** [1] - 20:18
**part** [9] - 5:4, 5:20, 16:8, 16:9, 16:12, 16:24, 20:18, 24:12, 33:9
**parte** [1] - 7:12
**partially** [2] - 8:15, 8:16
**particularly** [1] - 8:18
**parties** [1] - 11:14
**party** [5] - 25:7, 26:2, 40:7, 40:18, 43:22
**past** [3] - 15:13, 16:3, 17:24
**patently** [1] - 14:6
**pending** [1] - 49:14
**people** [7] - 17:7, 20:9, 20:25, 21:7, 28:14, 33:13

**percent** [2] - 43:20, 43:21
**period** [1] - 38:23
**person** [2] - 16:17, 36:24
**perspective** [4] - 18:7, 28:1, 39:19, 40:3
**pertains** [1] - 44:21
**phone** [2] - 12:5, 18:24
**picture** [2] - 25:3, 25:4
**pie** [1] - 23:14
**piece** [2] - 20:4, 23:14
**place** [2] - 14:14, 38:13
**plaintiff** [7] - 10:1, 22:3, 23:13, 25:11, 25:12, 37:19, 49:7
**plaintiffs** [12] - 4:9, 4:10, 9:17, 12:16, 32:11, 33:19, 34:5, 35:5, 37:25, 40:13, 44:23, 49:9
**plaintiffs'** [3] - 27:7, 35:9, 43:12
**plan** [2] - 30:19, 45:3
**player** [1] - 7:4
**plays** [1] - 38:24
**plead** [3] - 45:18, 46:3, 48:17
**pleaded** [1] - 44:24
**pleading** [5] - 45:12, 45:21, 46:20, 46:25, 47:11
**pleadings** [7] - 25:9, 42:24, 44:22, 45:9, 45:17, 47:17, 50:1
**plenty** [1] - 44:12
**point** [18] - 6:4, 9:21, 17:15, 17:25, 19:12, 19:22, 20:2, 20:15, 21:2, 22:3, 22:17, 23:23, 24:22, 36:16, 40:17, 41:14, 41:24, 44:5
**pointed** [1] - 8:8
**points** [1] - 33:8
**police** [7] - 18:23, 19:3, 19:4, 20:3, 20:12, 20:14
**political** [2] - 16:5, 17:6
**pond** [1] - 7:10
**portion** [1] - 12:1
**position** [10] - 10:2, 13:2, 13:9, 13:22, 19:13, 34:5, 35:5, 35:16, 39:16, 42:13
**positions** [1] - 10:4
**possession** [1] - 6:4
**possible** [3] - 33:5, 40:8, 48:17
**post** [1] - 39:18
**potential** [1] - 8:11
**potentially** [3] - 9:15, 27:3, 45:2
**practice** [3] - 37:20, 40:7, 40:18
**precisely** [1] - 13:9
**prepared** [2] - 37:16, 38:7
**presented** [1] - 48:14
**President** [2] - 7:4, 9:23
**press** [6] - 6:15, 17:12, 18:14, 19:13, 21:3, 21:17
**pretty** [1] - 5:10
**prevail** [1] - 10:20
**preview** [2] - 42:12, 42:13
**primarily** [3] - 25:21, 25:22, 26:15
**primary** [1] - 18:3
**principal** [1] - 45:1

**print** [1] - 13:15
**printed** [1] - 42:1
**private** [2] - 5:8, 19:23
**privilege** [19] - 7:23, 13:1, 17:8, 18:4, 18:12, 18:13, 19:12, 21:11, 28:25, 29:3, 41:12, 41:25, 42:7, 44:25, 45:14, 46:12, 46:13, 50:3
**privileged** [5] - 17:23, 19:6, 20:6, 42:11, 47:1
**privileges** [9] - 7:20, 7:23, 13:5, 13:25, 28:21, 35:3, 36:7, 36:8, 43:1
**problem** [7] - 38:5, 38:6, 41:13, 47:14, 47:16, 48:8, 48:12
**problematic** [1] - 26:18
**procedural** [2] - 38:5, 38:6
**Procedure** [1] - 36:4
**proceeding** [1] - 35:1
**proceedings** [2] - 6:18, 52:4
**process** [7] - 15:15, 32:22, 34:12, 36:9, 36:25, 37:1
**produce** [2] - 26:16, 32:7
**produced** [2] - 27:12, 27:13
**production** [1] - 31:17
**promised** [1] - 26:15
**promoting** [1] - 22:25
**proper** [1] - 35:17
**proposition** [4] - 17:1, 17:4, 17:10, 17:22
**protect** [1] - 21:11
**protected** [3] - 11:5, 46:11, 46:13
**protective** [6] - 11:2, 11:12, 11:13, 11:18, 12:2, 30:16
**protects** [1] - 18:13
**PROULX** [1] - 52:9
**prove** [2] - 21:16, 30:4
**proves** [1] - 41:14
**provide** [2] - 32:15, 33:4
**provided** [6] - 8:17, 14:12, 15:2, 15:11, 15:12, 31:20
**public** [7] - 4:25, 17:17, 21:14, 21:15, 22:4, 22:17, 23:1
**publically** [2] - 5:16, 17:14
**publication** [4] - 9:11, 12:19, 21:1, 39:19
**publications** [1] - 46:9
**publish** [4] - 8:18, 18:14, 21:20, 22:7
**published** [14] - 14:5, 15:13, 16:4, 17:5, 17:15, 17:19, 18:9, 19:3, 20:16, 21:17, 22:1, 22:20, 24:2, 34:10, 39:25, 41:4, 41:15, 41:17
**publishes** [1] - 15:4
**publishing** [1] - 21:3
**pulling** [1] - 31:6
**purport** [1] - 34:23
**purporting** [1] - 45:2
**purpose** [1] - 11:21
**purposes** [4] - 11:12, 45:12, 45:20, 46:24
**pursuant** [2] - 46:12, 46:14

**put** [5] - 4:7, 8:19, 13:5, 15:14, 39:20

# Q

**quash** [4] - 6:17, 6:20, 34:3, 42:4
**questions** [7] - 13:19, 28:16, 28:19, 34:7, 35:14, 36:23, 37:11
**quite** [3] - 4:9, 14:3, 39:5

# R

**radar** [1] - 39:21
**raise** [1] - 9:21
**raised** [4] - 44:10, 44:11, 45:13, 45:21
**randomly** [1] - 7:1
**range** [1] - 14:11
**rather** [1] - 32:8
**raw** [2] - 8:21, 9:2
**read** [1] - 25:1
**real** [2] - 10:1, 27:19
**really** [14] - 9:22, 13:4, 13:21, 16:4, 21:2, 24:7, 27:25, 31:8, 31:9, 35:9, 35:15, 35:25, 41:23, 50:6
**reason** [8] - 6:23, 6:24, 14:7, 24:11, 25:25, 41:8, 47:20, 47:21
**reasons** [2] - 7:5, 20:24
**reassigned** [1] - 7:1
**received** [2] - 5:2, 15:8
**record** [4] - 3:19, 6:23, 6:24, 16:17
**recusal** [1] - 7:7
**recuse** [1] - 29:13
**recused** [3] - 6:20, 7:3, 29:14
**reduce** [2] - 28:15, 35:17
**reduced** [2] - 17:21, 28:10
**reference** [2] - 16:7, 42:5
**references** [1] - 40:22
**referendum** [1] - 40:5
**referral** [1] - 20:19
**referred** [2] - 24:14, 36:12
**registered** [1] - 23:14
**Reid** [1] - 20:21
**reinforces** [1] - 17:15
**reinforcing** [1] - 10:20
**rejected** [1] - 15:13
**relate** [1] - 40:10
**related** [3] - 30:6, 30:22, 36:14
**relates** [1] - 34:13
**relationship** [2] - 16:13, 34:19
**relatively** [1] - 27:15
**release** [1] - 20:22
**released** [1] - 24:6
**relevance** [2] - 26:22, 34:25
**relevant** [3] - 9:12, 29:5, 40:23
**remain** [1] - 11:22
**remember** [2] - 37:19, 37:23
**renders** [1] - 17:23
**report** [15] - 13:1, 18:4, 18:12, 18:13, 20:13, 20:14, 21:10, 32:8, 41:12, 41:25,
44:25, 45:14, 46:11, 46:13
**reported** [2] - 5:1, 5:16
**reporter** [4] - 10:12, 12:5, 22:7, 24:17
**reporting** [2] - 22:13, 43:24
**reports** [2] - 5:1, 47:5
**represent** [1] - 35:12
**represented** [1] - 27:13
**representing** [2] - 33:19, 45:11
**reproducing** [2] - 19:6, 19:13
**request** [11] - 7:11, 31:4, 34:8, 34:17, 35:8, 35:18, 37:13, 37:18, 38:4, 44:1
**requested** [2] - 14:1, 31:10
**requests** [2] - 4:18, 4:19
**require** [2] - 29:3, 48:15
**reserve** [3] - 38:18, 38:22, 47:5
**resisting** [1] - 28:5
**resolved** [1] - 14:22
**resolving** [2] - 11:21, 47:16
**respect** [5] - 3:11, 3:12, 12:15, 13:12, 35:6
**respected** [1] - 16:16
**respectfully** [1] - 32:9
**respects** [1] - 37:3
**responses** [1] - 26:7
**rest** [1] - 9:20
**result** [3] - 14:10, 30:25, 45:7
**retained** [1] - 27:14
**reveal** [2] - 8:19, 12:8
**revealing** [1] - 39:22
**revenue** [1] - 23:7
**revenues** [1] - 23:4
**Rights** [4] - 4:23, 5:6, 5:7, 46:12
**rights** [1] - 5:11
**ripe** [1] - 43:5
**road** [1] - 39:20
**rogatory** [2] - 32:20, 32:23
**rounds** [2] - 4:17, 4:19
**Roy** [1] - 3:1
**RPR** [1] - 52:9
**ruined** [1] - 21:4
**Rule** [1] - 30:18
**rule** [1] - 43:11
**rules** [2] - 36:4, 37:2
**run** [1] - 39:17
**Russia** [5] - 5:17, 5:19, 5:24, 16:13, 16:18, 18:9, 21:7, 40:6
**Russian** [1] - 49:10
**Russians** [2] - 49:11, 49:12

# S

**sake** [1] - 9:10
**saw** [1] - 31:20
**scattered** [1] - 26:6
**scenario** [1] - 9:16
**schedule** [1] - 7:6
**scheduled** [4] - 7:16, 10:9, 10:15, 10:16
**scope** [5] - 34:7, 35:17, 38:16, 38:17,
38:21
**scramble** [1] - 48:25
**seal** [1] - 12:11
**second** [5] - 10:6, 17:25, 21:12, 49:5, 51:2
**secretly** [1] - 19:24
**secrets** [3] - 7:25, 8:12, 11:4
**security** [1] - 5:22
**see** [15] - 7:16, 15:15, 29:18, 31:24, 32:19, 39:6, 42:4, 44:8, 47:14, 48:4, 48:6, 48:22, 50:2, 50:6, 50:19
**seeking** [1] - 43:23
**seem** [1] - 43:23
**segregate** [1] - 34:14
**segues** [1] - 42:15
**Senate** [1] - 24:6
**Senator** [7] - 6:2, 6:4, 6:9, 16:14, 20:19, 47:2
**send** [5] - 49:15, 49:25, 50:4, 50:7
**sense** [5] - 18:5, 32:8, 33:10, 34:25, 47:8
**sentences** [2] - 34:8, 34:11
**separate** [2] - 40:20, 41:21
**September** [1] - 26:15
**series** [1] - 37:21
**serious** [1] - 14:8
**seriously** [3] - 16:11, 24:11, 24:12
**served** [3] - 4:17, 6:16, 30:18
**servers** [2] - 23:17, 26:25
**service** [1] - 32:22
**set** [5] - 7:6, 7:14, 7:17, 29:8, 47:15
**setting** [1] - 46:24
**seven** [2] - 4:2, 37:5
**several** [1] - 31:1
**sexual** [2] - 19:1, 20:6
**shakes** [1] - 48:6
**share** [2] - 10:23, 10:24
**shared** [1] - 16:10
**short** [3] - 23:19, 28:7, 30:13
**shortest** [1] - 7:15
**shortly** [1] - 27:15
**show** [8] - 9:18, 10:3, 10:5, 10:6, 10:7, 18:25, 41:22, 45:18
**shows** [1] - 15:2
**side** [1] - 14:13
**SIEGEL** [67] - 3:9, 3:14, 3:17, 15:21, 16:2, 18:3, 18:13, 19:10, 19:19, 20:14, 22:18, 22:23, 23:5, 23:11, 23:18, 23:23, 24:16, 24:20, 25:3, 25:6, 25:25, 26:24, 27:3, 27:17, 28:2, 28:6, 29:10, 29:15, 29:19, 29:22, 29:24, 30:1, 30:3, 30:9, 30:17, 31:12, 32:9, 33:8, 33:12, 33:17, 33:25, 34:22, 36:15, 37:15, 38:14, 38:17, 39:1, 39:10, 42:9, 42:14, 43:10, 44:3, 46:8, 46:17, 46:22, 47:13, 47:20, 48:10, 48:23, 49:1, 49:3, 49:9, 49:12, 49:20, 49:23, 50:15, 50:23
**similarly** [1] - 29:11
**simple** [3] - 14:5, 17:8, 28:18

**simply** [9] - 13:6, 19:6, 21:6, 21:17, 28:16, 30:18, 36:4, 45:12, 47:8
**Simpson** [1] - 24:5
**sit** [1] - 25:24
**sitting** [2] - 46:18, 46:20
**situation** [1] - 18:22
**six** [1] - 37:6
**small** [2] - 23:14, 25:4
**Smith** [2] - 10:13, 13:2
**social** [1] - 15:9
**solicitors** [1] - 7:14
**someone** [2] - 13:8, 24:11
**sometimes** [1] - 8:22
**somewhat** [2] - 6:22, 30:22
**soon** [1] - 33:5
**sooner** [2] - 17:16, 32:8
**sorry** [4] - 26:22, 29:20, 30:14, 36:11
**sort** [16] - 14:5, 14:14, 15:2, 15:6, 18:22, 22:5, 24:4, 24:21, 24:22, 26:5, 28:25, 31:6, 32:1, 34:1, 35:17, 42:14
**sorted** [4] - 38:10, 38:13, 38:15, 38:17
**sorts** [2] - 14:17, 15:8
**sought** [2] - 32:2, 33:16
**sound** [2] - 5:10, 47:19
**sounds** [3] - 13:21, 39:7, 42:18
**source** [5] - 8:10, 14:16, 18:23, 20:4, 32:16
**sources** [4] - 8:23, 28:14, 32:5, 35:13
**spamware** [1] - 14:18
**speaking** [1] - 14:9
**special** [1] - 16:25
**specifically** [2] - 9:1, 31:2
**speculation** [1] - 6:22
**spelling** [1] - 21:23
**spent** [1] - 13:11
**split** [1] - 37:8
**spoken** [1] - 8:8
**stand** [2] - 25:6, 28:5
**standing** [4] - 8:1, 15:10, 24:8, 24:10
**start** [4] - 10:22, 15:22, 15:24, 38:9
**started** [2] - 27:18, 30:21
**State** [3] - 5:9, 5:18, 49:19
**state** [5] - 3:20, 7:25, 8:11, 17:12, 34:11
**state's** [1] - 45:2
**statement** [3] - 26:4, 42:10, 47:25
**statements** [6] - 19:12, 19:14, 19:23, 20:9, 20:12, 46:10
**States** [4] - 3:16, 5:4, 16:5, 23:15
**status** [3] - 34:13, 47:5, 50:17
**statute** [1] - 46:15
**stay** [1] - 50:11
**Steele** [16] - 5:2, 5:13, 7:13, 7:21, 7:22, 8:17, 16:16, 23:25, 24:3, 24:25, 33:9, 33:14, 34:2, 35:12, 37:11
**steele's** [1] - 5:25
**Steele's** [2] - 7:19, 33:17
**still** [7] - 3:5, 26:2, 26:3, 26:10, 26:13, 36:22

**stipulate** [1] - 47:19
**stipulated** [2] - 47:18, 48:16
**stop** [1] - 36:11
**stopped** [1] - 36:13
**storage** [1] - 23:21
**store** [1] - 14:15
**story** [7] - 5:4, 5:14, 10:13, 13:14, 19:2, 19:3, 44:21
**strangely** [1] - 33:15
**strictly** [1] - 42:12
**strike** [3] - 46:16, 46:20, 47:23
**striking** [1] - 24:7
**strong** [1] - 8:18
**stronger** [1] - 17:24
**stuff** [3] - 9:2, 42:6
**subject** [9] - 17:7, 18:8, 18:14, 18:16, 19:7, 20:16, 20:19, 20:20, 21:10
**subjects** [1] - 38:20
**submit** [1] - 17:10, 47:18
**subpoena** [5] - 6:17, 30:5, 30:17, 31:3, 42:4
**subpoenaed** [1] - 39:11
**subpoenas** [5] - 28:4, 29:16, 29:21, 36:19, 40:7
**subsequent** [1] - 9:11
**subsidiaries** [1] - 23:16
**substance** [1] - 28:13
**substantially** [1] - 43:13
**sufficient** [2] - 23:1, 45:10
**suggest** [1] - 22:17
**suggested** [1] - 42:23
**suggestion** [1] - 45:21
**suit** [1] - 17:7
**sum** [1] - 42:16
**summary** [1] - 28:22
**Summary** [5] - 13:23, 14:1, 47:17, 47:24, 47:25
**support** [1] - 45:25
**supported** [1] - 48:1
**supporting** [1] - 11:9
**suppose** [2] - 9:10, 41:16, 43:6
**supposed** [2] - 34:10, 36:20
**Supreme** [1] - 49:15
**surely** [1] - 17:16
**surprise** [1] - 34:15
**surprised** [1] - 7:7
**suspect** [1] - 7:18
**system** [4] - 26:18, 35:23, 35:24, 49:17

---

## T

**tact** [1] - 28:24
**talks** [1] - 11:3
**tank** [1] - 5:10
**tape** [13] - 19:2, 19:3, 19:6, 19:7, 19:9, 19:10, 19:11, 19:15, 19:16, 19:20, 19:22, 20:2, 20:4
**taped** [1] - 19:24
**tapes** [2] - 19:5, 20:7

**targeted** [1] - 42:25
**task** [1] - 16:8
**team** [1] - 7:4
**technical** [1] - 30:7
**teeth** [1] - 31:6
**telephone** [1] - 3:2
**telephonically** [1] - 3:24
**ten** [2] - 19:4, 28:10
**terms** [4] - 26:2, 27:19, 28:19, 30:22
**test** [1] - 47:9
**tested** [1] - 47:9
**testify** [1] - 24:1
**testifying** [1] - 23:24
**testimony** [7] - 4:24, 7:24, 8:25, 11:8, 24:5, 35:1, 38:23
**testing** [1] - 45:24
**Texas** [1] - 46:15
**THE** [129] - 3:2, 3:7, 3:10, 3:16, 3:20, 3:25, 4:4, 4:14, 4:16, 4:21, 5:6, 5:12, 6:3, 6:7, 6:12, 6:21, 6:23, 7:20, 8:1, 8:4, 8:13, 9:8, 10:2, 10:11, 10:15, 10:18, 11:11, 11:16, 11:19, 12:9, 12:19, 13:17, 13:21, 14:9, 14:24, 15:16, 15:18, 16:1, 18:1, 18:11, 19:9, 19:15, 20:11, 22:15, 22:21, 23:3, 23:9, 23:17, 23:22, 24:14, 25:1, 25:5, 25:16, 26:22, 27:2, 27:10, 27:16, 27:25, 28:3, 29:9, 29:13, 29:18, 29:20, 29:23, 29:25, 30:2, 30:8, 30:16, 31:8, 31:13, 31:24, 32:14, 32:19, 33:2, 33:6, 33:11, 33:13, 33:19, 33:22, 33:24, 34:18, 35:25, 36:6, 36:16, 37:14, 38:10, 38:16, 38:25, 39:3, 39:15, 39:24, 40:12, 40:23, 41:5, 41:16, 42:12, 42:18, 42:24, 43:3, 43:5, 43:9, 43:11, 43:17, 43:25, 46:7, 46:16, 46:18, 47:12, 47:14, 48:4, 48:20, 48:24, 49:2, 49:7, 49:11, 49:19, 49:22, 49:24, 50:2, 50:6, 50:9, 50:11, 50:14, 50:16, 50:20, 50:21, 50:24, 51:1, 51:3
**theory** [2] - 18:1, 18:3
**Thereupon** [2] - 3:19, 51:8
**thesis** [1] - 24:21
**they've** [3] - 15:9, 29:4, 37:12
**third** [3] - 40:7, 40:18, 43:22
**three** [12] - 3:9, 3:10, 3:11, 4:18, 7:2, 12:5, 17:2, 40:5, 44:11, 44:13, 49:9, 49:10
**threw** [1] - 13:13
**ties** [2] - 6:25, 40:6
**timing** [2] - 27:20, 44:5
**today** [2] - 3:4, 3:5
**together** [5] - 4:5, 5:20, 5:22, 39:6, 50:18
**tons** [2] - 15:7
**took** [3] - 4:20, 24:11
**topics** [5] - 28:10, 34:16, 37:21, 38:1
**total** [1] - 42:16
**touch** [2] - 25:8, 42:7
**track** [1] - 16:17
**trade** [1] - 11:4

**transcript** [3] - 11:25, 12:6, 12:11
**transcription** [1] - 52:4
**transition** [1] - 7:4
**transparent** [1] - 22:11
**Tremaine** [1] - 3:23
**trial** [2] - 9:22, 32:25
**tried** [3] - 8:2, 28:11, 28:15
**tripartite** [1] - 34:1
**true** [18] - 4:4, 9:12, 9:23, 9:24, 9:25, 11:17, 12:21, 13:7, 13:8, 14:7, 20:14, 21:7, 21:9, 22:10, 26:24
**Trump** [4] - 7:5, 9:23, 40:6, 40:10
**Trump's** [1] - 40:6
**trusted** [3] - 16:18, 16:19
**truth** [1] - 30:4
**try** [8] - 12:11, 12:17, 16:9, 30:6, 36:14, 39:9, 48:25
**trying** [2] - 13:12, 30:4
**Tuesday** [2] - 51:1, 51:3
**turn** [1] - 47:17
**turned** [4] - 4:2, 19:2, 19:4, 20:2
**tussle** [2] - 6:15, 16:24
**tussled** [1] - 18:19
**two** [15] - 3:14, 3:17, 4:17, 4:19, 7:23, 10:4, 16:2, 26:2, 26:3, 29:16, 38:14, 41:21, 42:1, 43:1
**twofold** [1] - 41:13
**type** [1] - 17:22

## U

**U.K** [7] - 34:1, 34:15, 34:20, 34:23, 35:4, 35:16, 36:7
**U.K.'s** [1] - 34:19
**U.S** [2] - 34:21, 34:25
**ultimately** [7] - 13:13, 17:20, 19:1, 22:3, 37:17, 40:3, 45:14
**under** [4] - 11:2, 17:12, 36:4
**understood** [2] - 24:13, 38:20
**underway** [1] - 12:24
**undoubtedly** [1] - 21:13
**unfolded** [1] - 47:21
**unfortunately** [1] - 12:23
**unilaterally** [2] - 35:7, 35:17
**United** [4] - 3:16, 5:3, 16:5, 23:15
**University** [1] - 5:9
**unpack** [1] - 35:20
**unsolicited** [1] - 8:22
**unsuccessfully** [1] - 13:12
**untrue** [1] - 14:6
**unverified** [4] - 8:21, 9:2, 13:11, 21:22
**up** [8] - 4:12, 10:8, 13:13, 26:11, 36:13, 37:8, 46:25, 49:4

## V

**vacation** [2] - 4:6, 25:2
**variance** [1] - 22:6

**variety** [1] - 30:25
**veracity** [2] - 14:8, 39:17
**verification** [2] - 9:3, 41:3
**verified** [5] - 9:13, 9:17, 12:20, 39:25, 40:1
**verify** [5] - 8:20, 12:15, 12:17, 13:12, 22:10
**version** [1] - 7:15
**versions** [1] - 20:20
**versus** [1] - 18:21
**victim** [3] - 19:20, 19:21, 19:24
**view** [9] - 23:1, 25:15, 31:6, 34:9, 37:22, 38:8, 42:12, 42:13, 48:23
**violating** [1] - 12:2
**viruses** [1] - 14:17
**visit** [1] - 12:18
**vouch** [2] - 9:2, 24:8

## W

**Wait** [1] - 34:15
**wait** [4] - 38:19, 48:4, 48:22, 50:9
**waiting** [6] - 3:4, 26:2, 26:3, 26:14, 30:23, 31:3
**wants** [3] - 11:24, 11:25, 32:24
**warnings** [1] - 8:18
**Washington** [1] - 6:16
**waste** [1] - 38:8
**Watergate** [1] - 20:7
**ways** [2] - 16:23, 20:17
**wealthy** [1] - 49:10
**website** [1] - 12:18
**Webzilla** [13] - 14:19, 14:21, 23:3, 23:5, 23:10, 23:12, 23:13, 40:13, 40:14, 40:24, 41:6, 41:18, 46:15
**Webzillas** [1] - 23:13
**week** [15] - 9:6, 11:7, 12:25, 13:25, 25:17, 25:19, 26:19, 30:20, 42:21, 43:3, 43:4, 44:19, 51:2
**weeks** [3] - 7:2, 13:11, 24:3
**well-respected** [1] - 16:16
**whole** [2] - 18:9, 34:13
**widely** [2] - 5:1, 5:16
**wife** [5] - 15:8, 18:25, 19:20, 19:21, 19:22
**wild** [1] - 27:19
**willing** [2] - 8:8, 35:11
**witness** [3] - 11:14, 36:24, 39:13
**witnesses** [2] - 25:12, 25:13
**Witzer** [8] - 15:23, 16:15, 23:24, 27:10, 31:14, 34:2, 34:6, 39:24
**WITZER** [58] - 3:5, 3:11, 4:12, 4:15, 4:17, 4:22, 5:7, 5:14, 6:6, 6:8, 6:14, 6:22, 6:24, 7:22, 8:2, 8:6, 8:15, 9:15, 10:4, 10:12, 10:16, 10:22, 11:13, 11:17, 11:23, 12:13, 12:21, 13:19, 13:24, 14:11, 14:25, 15:17, 24:19, 25:17, 27:12, 31:15, 32:6, 32:18, 33:1, 33:4, 33:15, 33:21, 33:23, 35:22, 36:2, 36:8,

36:17, 38:12, 41:1, 41:7, 41:21, 42:21, 42:25, 43:4, 43:8, 43:15, 43:19, 48:11
**Wood** [1] - 5:23
**woods** [1] - 5:25
**words** [2] - 19:9, 26:17
**works** [2] - 5:10, 7:12
**world** [4] - 5:11, 5:21, 16:6, 32:23
**wrapped** [1] - 4:12
**Wright** [1] - 3:22
**wrote** [2] - 20:21, 42:1

## X

**XPT** [3] - 14:20, 23:6, 23:9

## Y

**year** [5] - 5:20, 15:3, 16:3, 17:24
**year-to-year** [1] - 15:3
**yesterday** [1] - 24:4
**yielded** [1] - 10:19
**York** [10] - 18:21, 44:16, 44:17, 45:23, 46:12, 48:24, 49:8, 49:14, 49:19
**yourself** [1] - 13:22