**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

ALEKSEJ GUBAREV,
XBT HOLDINGS S.A., and
WEBZILLA, INC.
    Plaintiffs,

v.

BUZZFEED, INC. and
BEN SMITH
    Defendants.

**Case No.**

**0:17-cv-60426-UU**

**PLAINTIFFS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS WITH**
**RESPECT TO DEFENDANTS' AFFIRMATIVE DEFENSES OF "FAIR AND TRUE**
**REPORTING PRIVILEGE" AND "NEUTRAL REPORTING PRIVILEGE"**

*"The 'report' in Buzzfeed's Article is not a government document, but a 'collection of memos'*
*allegedly compiled by 'a person who is understood to be a former British intelligence agent.'"*

*"Buzzfeed's characterization of the Article as a report on official government activity is at best a*
*post-hoc rationalization proffered to avoid liability in private litigation…."*

*"Buzzfeed believes that protections normally afforded actual reports of government proceedings*
*should shield it from liability for any defamatory statements in the so-called Dossier. [This is] a*
*gross mischaracterization of its Article…."*

-- The United States Department of Justice[1]

**Introduction**

    Abraham Lincoln once famously asked, "How many legs does a calf have if you call the

tail a leg?"  The answer?  "Four.  Calling a tail a leg doesn't make it a leg."[2]

    Here, in a bid to invoke the Fair Reporting Privilege and the Neutral Reporting Privilege,

---

[1] *See* Defendants' Opposition to Plaintiffs' Motion to Compel, Docket No. 8, *Buzzfeed, Inc. v.*
*U.S. Department of Justice et al.*, Case No. 1:17-mc-02429-APM (D.D.C. Nov. 13, 2017), pp. 1,
14, 19, attached hereto as <u>Exhibit 1</u> [hereinafter "DOJ Memorandum"].
[2] *Reminiscences of Abraham Lincoln by distinguished men of his time / collected and edited by*
*Allen Thorndike Rice* (1853-1889), New York: Harper & Brothers Publishers, 1909, p. 242.

Defendants attempt to portray a compilation of unverified memos prepared by a British private investigator (Christopher Steele) at the behest of a private opposition research firm (Fusion GPS) as an "official government document;" and their Article about the memos – which never once mentions or claims that there was a government investigation into the memos – as a report of "official government activity."  This is, as the Department of Justice has argued, a "post-hoc rationalization" and a "gross mischaracterization."  DOJ Memorandum, Exhibit 1 hereto, pp. 1, 14.

The calf still has but four legs.  And, because Defendants' privilege defenses hinge upon such mischaracterizations, their affirmative defenses fail as a matter of law and should be stricken.  In further support of this Motion, Plaintiffs state as follows.

## Facts[3]

In 2016, a private, Washington, D.C.-based opposition research firm, Fusion GPS, was first hired by a conservative news website to conduct opposition research on then-Presidential candidate Donald Trump.  After President Trump secured the Republican nomination, that news website discontinued its engagement with Fusion GPS.  Fusion GPS was subsequently retained to continue its research by a Washington D.C. law firm, Perkins Coie, which was working on behalf of the Democratic National Committee and the Hillary Clinton Presidential Campaign.

Fusion GPS, in turn, hired a private British-based investigatory firm, Orbis Business Intelligence, which was founded by a former British spy, Christopher Steele.

Mr. Steele was tasked with investigating ties between Russia and the Trump Presidential campaign.  Mr. Steele used informants in Russia to gather intelligence data, which he compiled into a series of memoranda.  The last of these memoranda was dated December 13, 2016 and titled "Company Intelligence Report 2016/166" (the "December Memo").  Taken together, the memoranda authored by Mr. Steele have been referred to as the "Dossier."  *See* Exhibit 3 to Complaint, Docket No. 1-2.

The December Memo contained various unsubstantiated allegations concerning, among other things, allegations of computer hacking of the Democratic Party allegedly carried out by

---

[3] Plaintiffs note that a small number of facts included herein for background do not include citations.  Plaintiffs do not believe that Defendants dispute any such facts nor do they believe that these widely-reported facts are in any way controversial. In any event, they are included solely for background and – to the extent that Defendants do dispute their accuracy – they are not essential to the resolution of this motion or any of Plaintiffs' arguments.

persons or organizations with ties to Russia, the Russian Government, and/or the Federal Security Service of the Russian Federation ("FSB").  Complaint, ¶ 25.  With respect to Plaintiffs, the December Memo included the following assertions of fact:

> *[redacted] reported that over the period March-September 2016 a company called XBT/Webzilla and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct "altering operations" against the Democratic Party leadership. Entities linked to one Alexei GUBAROV [sic] were involved and he and another hacking expert, both recruited under duress by the FSB, Seva KAPSUGOVICH, were significant players in this operation. In Prague, COHEN agreed contingency plans for various scenarios to protect the operations, but in particular what was to be done in the event that Hillary CLINTON won the presidency. It was important in this event that all cash payments owed were made quickly and discreetly and that cyber and that cyber and other operators were stood down / able to go effectively to ground to cover their traces.*

*Id.*, ¶ 26; Exhibit 3 to the Complaint.

In late December of 2016, Buzzfeed reporter Ken Bensinger obtained a copy of the memos.[4]  On January 10, Defendants published an online article entitled, "These Reports Allege Trump Has Deep Ties To Russia" (the "Article"), along with the entire unverified Dossier. Complaint, ¶ 23; Exhibit 2 to Complaint.

The Article itself, containing approximately 465 actual words, announces the existence of a series of memos "prepared for political opponents of Trump by a person who is understood to be a former British intelligence agent," noting that the memos were "unverified" and contained "some clear errors."  *See* Exhibit 2 to Complaint.  The Article also declares its purpose, stating that "BuzzFeed News is publishing the full document so that Americans can make up their own minds about allegations about the president-elect that have circulated at the highest levels of the US government."  *Id.*

The Article also states that the memos:

- had "been circulating among elected officials, intelligence agents, and journalists for weeks"

- were summarized into a two-page synopsis which was presented to President Obama and then President-elect Trump;

- had been seen by Senator Harry Reid; and

---

[4] *See* <u>Exhibit 2</u> hereto, pp. 58-65.

- were given to then FBI Director James Comey on December 9 by Senator John McCain, but that the FBI already had copies of many of the memos.[5]

Exhibit 2 to Complaint.

This is the sum total of any mention of government officials or government "action" in the Article.  The article says nothing about the memos being the subject of any investigation or official proceeding; makes no claim that such an investigation or official proceeding existed; and contains no reporting on any such investigation.  Moreover, the article makes no claims concerning the only relevant memo, the December Memo, which contained the defamatory content.  Indeed, even the report that the memos were given to the FBI could not be referring to the December Memo inasmuch as that memo had not been written as of December 9.

On January 11, 2017, Buzzfeed Editor Ben Smith was interviewed on *Meet the Press*.  In that interview, Mr. Smith admitted that he and Buzzfeed had "real solid reasons to distrust" the information contained in the Dossier at the time they published it.  Complaint, ¶ 26; Meet the Press Interview at http://www.msnbc.com/mtp-daily/watch/chuck-todd-goes-one-on-one-with-buzzfeed-editor-852858947658, last accessed January 16, 2018.

## ARGUMENT

### I.       The Rule 12(c) Standard.

A district court may enter a judgment on the pleadings upon motion of either party at the close of the pleadings.  Fed. R. Civ. P. 12(c).  "[J]udgment on the pleadings is proper when no issues of material fact exist, and the moving party is entitled to judgment as a matter of law." *Cunningham v. Dist. Atty's Office for Excambia Cty*, 592 F.3d 1237, 1255 (11th Cir. 2010). "When ruling on a 12(c) motion, courts look at the substance of the pleadings and any judicially-noticed facts."  *Carefree Lifestyles, Inc. v. Gov't Emples. Ins. Co.*, 2015 U.S. Dist. LEXIS 185056, *3-5 (S.D. Fla. 2015).

A motion for judgment on the pleadings is governed by the same standard as a motion to dismiss.  *See Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998). Accordingly, all well-pleaded allegations contained in the pleadings are accepted as true and the allegations are favorably construed to the non-moving party.  *Cunningham*, 592 F.3d at 1255;

---

[5] Senator McCain could not have provided the FBI with a copy containing the defamatory statements relevant to this proceeding inasmuch as the December Memo had not been authored by December 9.  The December Memo is dated December 13, 2016.

*Miami Herald Pub. Co. v. Ferre,* 636 F. Supp. 970, 974 (S.D. Fla. 1985).  While a court, at this stage of the litigation, must consider the allegations contained in the pleadings as true, this rule "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## II.     Plaintiffs are Entitled to Judgment on the Pleadings on Defendants' Assertion of the Fair and True Reporting Privilege Under Both Florida and New York Law.

Under both Florida and New York law, questions concerning the applicability of a privilege in a defamation action are questions of law to be decided by the Court.  *See, e.g.*, *Alan v. Wells Fargo Bank, N.A.*, 604 Fed. Appx. 863, 866 (11th Cir. 2015) ("[W]hether defamation is privileged is a question of law to be decided by the court."); *Rico v. Sch. Bd.*, 2009 U.S. Dist. LEXIS 91609, *7 (S.D.N.Y. 2009) ("[N]umerous cases in Florida have held that the issue with respect to whether an alleged defamatory statement is privileged is a question of law, properly decided on a motion to dismiss."); *Nodar v. Galbreath*, 462 So. 2d 803, 810 (Fla. 1984) ("Where the circumstances surrounding a defamatory communication are undisputed, or are so clear under the evidence as to be unquestionable, then the question of whether the occasion upon which they were spoken was privileged is a question of law to be decided by the court"); *Karedes v. Endicott*, 254 F. Supp. 2d 276, 289-290 (N.D.N.Y. 2003) ("Whether an allegedly defamatory passage is a fair and true report 'in the first instance is a question of law for the Court to determine.'" (quoting *Easton v. Public Citizens, Inc.*, 1991 U.S. Dist. LEXIS 18690 (S.D.N.Y. 1991))); *Karp v. Hill & Knowlton, Inc.*, 631 F. Supp. 360, 363 (S.D.N.Y. 1986) ("Where, as here, the essential judicial documents ... are before us, it is for the Court, in the first instance to determine whether a publication is protected under section 74 as a fair report of those documents."); *Schachter v. News Syndicate Co.*, 59 N.Y.S.2d 693, 694 (App. Div. 1946) ("Where, as here and as conceded by the parties, all of the essential facts appear in the pleadings and the only question is a question of law as to whether the publication is a fair report of court documents attached to the complaint, judgment on the pleadings is proper.").

And, although the question as to which state's law will apply to the present matter remains an open one, for purposes of the present motion, at least, the result is the same although the path to that result may be different.  Regardless of the path travelled, however, what remains clear is that the Plaintiffs are entitled to a finding as a matter of law that Defendants

cannot assert the "Fair and True Reporting Privilege"[6] in the present case. [7]

---

[6] Cases refer to the privilege interchangeably as the "Fair and True Reporting Privilege" and the "Fair Reporting Privilege" and are used interchangeably herein.

[7] To the extent the Court believes that application of one state's law would lead to a different result than the application of the other state's law, Plaintiffs assert that Florida law should control the present action.  In determining which state's law to apply to the present case, the Court utilizes Florida's three-prong "significant relationship test," in which "the Court considers the location of the parties, where the conduct and injury occurred, and where the relationship between the parties is centered."  *Klayman v. Judicial Watch, Inc*., 22 F.Supp.3d 1240, 1246 (S.D. Fla. 2014) (citing *Connell v. Riggins*, 944 So. 2d 1174, 1176-77 (Fla. 1st DCA 2006) and *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980)).

   Indeed, in a case such as this, where the defamatory statement has been communicated in multiple states, the general rule is that the most weight is given to the place where the plaintiff is located – as that is the place where the plaintiff most feels the injury.  The plaintiff's location is:

> where the principal injury from a defamation will occur because it is where the victim works and lives and where (in the usual case) most of the people--family, friends, business associates, etc.--are found with whom he has personal or commercial transactions, which might be impaired by defamation.…  And it is where, according to Learned Hand, he feels the sting of defamation.  Hand said that "the gravamen of the wrong in defamation is not so much the injury to reputation, measured by the opinions of others, as the feelings, that is, the repulsion or the light esteem, which those opinions engender."

*Kamelgard v. Macura*, 585 F.3d 334, 342 (7th Cir. 2009) (quoting *Burton v. Crowell Publishing Co.*, 82 F.2d 154, 156 (2d Cir. 1936) (L. Hand, J.)) (citations omitted).  This is consistent with Florida choice of law precedent.  As the Florida Supreme Court has held, "the state where the injury occurred would, under most circumstances, be the decisive consideration in determining the applicable choice of law."  *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980).  *See, also, Connell v. Riggins,* 944 So. 2d 1174, 1177 (Fla. Dist. Ct. App. 2006) ("[U]nder most circumstances, the state where the injury occurred will be 'the decisive consideration in determining the applicable choice of law.'").

   The *Klayman* case is particularly instructive.  There, the defamatory comments were initially made in California and then subsequently reported and posted to a website from California.  Nevertheless, the Court applied Florida law, as the Plaintiff was a resident of Florida and suffered injury within the state:

> The initial publication by Ruffley and Taitz's republication occurred in California, but once published online, the allegedly defamatory statement was readily available worldwide.  The parties have ties to Florida: Judicial Watch has an office in Miami, Florida and conducts business in Florida; and Klayman lives in Ocala, Florida, is licensed to practice law in Florida, and has a Florida driver's license and Florida concealed weapons permit…  Klayman also argues the defamatory statement was directed at Florida readers since he planned to file a high profile lawsuit in Florida in 2012, and as a result, he suffered injury in Florida.…  Florida law is appropriate as the statement published on Taitz's website constitutes an electronic

A.      The Florida Privilege

Although Florida has not legislatively adopted a Fair Reporting Privilege, its Courts have recognized the existence of such a privilege under the common law.  In Florida, the "news media has been given a qualified privilege to accurately report on the information they receive from government officials."  *Woodard v. Sunbeam Television Corp.*, 616 So. 2d 501, 502 (Fla. Dist. Ct. App. 1993).  *See*, *also*, *Stewart v. Sun Sentinel Co.,* 695 So. 2d 360, 362 (Fla. Dist. Ct. App. 1997) (same); *Rasmussen v. Collier County Publ'g Co.*, 946 So. 2d 567, 570-571 (Fla. Dist. Ct. App. 2006) ("The trial court also found that the fair report privilege applied to the articles.  The Daily News has a qualified privilege to report accurately on information received from government officials.…  The privilege extends to the publication of the contents of official documents.…"); *Trujillo v. Banco Cent. Del Ecuador*, 17 F. Supp. 2d 1334, 1338 (S.D. Fla. 1998) ("The fair reporting privilege is extended to news media 'to accurately report on the information they receive from government officials,' protecting the reporting media if that information is inaccurate."); *Steven H. v. Duval County Sch. Bd.,* 1999 U.S. Dist. LEXIS 23349, *4 (Fla. Dist. Ct. App. 1999) ("Under Florida law, the fair reporting privilege gives the media a qualified privilege to republish statements of reports of government officials.").

Alternately, some Florida cases discuss the fair report privilege as applying to the publication of official publicly-available government documents.  *See*, *e.g.*, *Carson v. News-*

_____

communication into Florida where the online material is accessed by readers in Florida, and the content of the statement concerns a Florida resident. *Klayman*, 22 F.Supp.3d at 1246.

The same result should obtain here.  Webzilla is, undisputedly, a Florida corporation that has long maintained a presence in Florida.  And, although Defendants are residents of New York, as this Court has already held, they have substantial contacts with Florida.  In considering the place where the "conduct and injury" took place, this Court has also already found that Webzilla has suffered injury in Florida.  Although Defendants claim that the wrongful conduct at issue took place in New York, this representation is only partially correct.  Mr. Bensinger works and reported not from New York, but rather California.  He has not claimed to have received the Dossier anywhere other than in California and other Buzzfeed reporters worked on the defamatory article from Washington, D.C., California, and London.  And, although Defendants claim Mr. Bensinger was only in Florida on vacation at the time, it is undisputed that he participated in a number of telephone calls from Florida concerning Buzzfeed's decision to publish the Dossier.  Finally, in the present case, the only "relationship" between the parties is that Buzzfeed caused injury to the Plaintiffs in, among other places, Florida.  In short, nothing about the facts of this case take it outside the general presumption employed under Florida law that the place of injury should, under most circumstances, be the decisive consideration in determining the applicable choice of law.

*Journal Corp.*, 790 So. 2d 1120, 1121 (Fla. Dist. Ct. App. 2001) ("The articles at issue were based upon information contained in two public documents from Florida's Bureau of Unemployment Compensation (Bureau).  The fair reports privilege requires that, in order to be privileged, a news report of a public document must contain the substance of the subject the document undertakes to present, or any separable part thereof.").  Finally, some Florida courts have also found that the fair report privilege extends to reporting "on matters brought out in public proceedings."  *Ortega v. Post-Newsweek Stations, Florida, Inc.*, 510 So. 2d 972, 975 (Fla. Ct. App. 3d Dist. 1987) (applying privilege to newspaper report of testimony made to a subcommittee of the Florida legislature).

It is clear that, as a matter of law, the Defendants cannot take advantage of the protections of Florida's fair report privilege.  First, it is undisputed that Buzzfeed did not receive the Dossier from a government official or any other government source.  Defendants make no claim in their Answer to have received the Dossier from such a source, nor could they make such a claim even if given an opportunity to amend their answer.[8]

Similarly, it is undisputed that the Dossier, which was compiled by a private individual (Mr. Steele) at the direction of an opposition research firm hired by private interests (the Democratic National Committee and the Hillary Clinton presidential campaign, acting through their attorney), is not a "publicly available government document," or a government document at all.  Indeed, the Department of Justice made precisely this point in its Opposition to Buzzfeed and Ben Smith's Motion to Compel the Production of documents:

> The "report" in Buzzfeed's Article is not a government document, but a "collection of memos" allegedly compiled by "a person who is understood to be a former British intelligence agent."

DOJ Memorandum, Exhibit 1, p. 19.  Fusion GPS, at whose direction the memos were prepared, stressed the same point in its Congressional testimony:

> Q. And can you just explain to us so that we understand the document, [the memo] has a heading "Company Intelligence Report." I'm just looking at the first page. That one says "Company Intelligence Report 2016/080." What would that have signified?
>
> A. Company Intelligence Report is just a way of saying it's not a government document. In the event that, you know, someone stole it or it leaked or there was

---

[8] *See* Exhibit 4 hereto.

some sort of breach, you know, they're not going to have their own name on it, but they want to make sure that no one mistakes it for a government document.

Transcript of Interview of Glenn Simpson, Exhibit 3 hereto, p. 140.

While the so-called Dossier may have been provided to or read by government officials, that does not turn the Dossier into a "publicly available government document" any more than the fact that many government officials likely read *Fifty Shades of Gray* transform the novel into a government document.  The Department of Justice made a similar (if less colorful) point in its Opposition to Buzzfeed's motion to compel a subpoena:

> to the extent that any government activity is discussed at all in the Article, it is the assertion that this private report [the Dossier] was "circulating among" unnamed government officials and that some such officials have "seen" the report.  The [Buzzfeed] Article never attributes its account of this purportedly official government activity to any official document or statement of any government official.

*Id.* at p. 19.

Nor can publication of a private series of memos created for an opposition research firm constitute reporting on "matters brought out in public proceedings."  Defendants have not alleged that the Dossier was presented in a "public proceeding," nor does the Article purport in any way to be reporting on such a proceeding.

This is game, set, and match for Defendants under the Florida fair report privilege.  The Dossier was not provided to Buzzfeed by a government official, it is not a publicly available government document, and it was not presented in a public proceeding – nor does the Article suggest that it was reporting on any such thing.  Accordingly, and as a matter of law, Plaintiffs are entitled to a judgment that Florida's fair reporting privilege is inapplicable to the case at bar.

B.     The New York Privilege

Under New York law, the Fair Report Privilege is codified at New York Civil Rights Law § 74, which provides that:

> A civil action cannot be maintained against any corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding, or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published.
> This section does not apply to libel contained in any other matter added by any person concerned in the publication; or in the report of anything said or done at the time and place of such a proceeding which was not a part thereof.

N.Y. Civ. Rights Law § 74 (McKinney 1992) (emphasis added).

"Generally stated, the common-law rule of fair report permits the privileged publication of (1) the public proceedings of governmental bodies, (2) which are fairly and accurately reported, (3) in good faith and without malice or intent to harm, and (4) which report official activity…. In New York the privilege has been codified in section 74 of the Civil Rights Law which provides that publication of a fair and true report of any judicial, legislative or other official proceeding is absolutely privileged.  The principal theory behind the rule of fair report is that the publisher acts as the agent of the public, reporting only that which others could hear for themselves were they to attend the proceedings."  *Hogan v. Herald Co*., 446 N.Y.S.2d 836, 841 (N.Y. App. Div. 1982).

As a starting point, it is undisputed that the Article is not a report of a judicial or legislative proceeding.  This leaves only Defendants' argument that the Article somehow constitutes reporting on some "other official proceeding."  Defendants fail here both because they cannot show the existence of an "official proceeding," and, even if they could, as a matter of law, the Article does not actually purport to report on such an official proceeding.

1.    *The Lack of an Official Proceeding/Reliance on an Official Proceeding*

Preliminarily, although it is true that some Courts in New York have found that an official government investigation qualifies as an "official proceeding" for the purposes of that state's fair reporting privilege, other Courts considering facts similar to those at issue have rejected the application of a fair reporting privilege as being inconsistent with the underlying goals of the privilege.  This was covered in depth in *Schiavone Constr. Co. v. Time, Inc.*:

> We are skeptical whether the unauthorized leak of a confidential FBI document qualifies as an 'official action or proceeding' under the Restatement as interpreted by New Jersey law….  In expressing our serious doubts whether Time is eligible for a fair report privilege, we recognize the value of investigative reporting to a democracy, and the danger of chilling such a valuable watchdog and source of information.    However, we believe that important countervailing policy considerations raise serious issues concerning the appropriate application of the privilege to confidential FBI investigation files.  The historical justification of the privilege, which operates as an exception to the general rule that one who republishes a defamation commits libel, is that the report is already in the public domain.  *See* W. Prosser & W. Keeton, *The Law of Torts*, § 115, at 836 (5th ed. 1984) ('the privilege rests upon the idea that any member of the public, if he were present, might see and hear for himself, so that the reporter is merely a substitute for the public eye'); R. Smolla, *Law of Defamation* § 8.10[1], at 8-34 (1986) ('The rationale for the privilege is of considerable vintage, but remains as relevant as ever: The reporter is a surrogate for the public, permitting it to observe through the

reporter's eyes how the business of government is being conducted.')… Under the facts of this case, the Webster memorandum was not in the public sphere until Smith unearthed it and Time published it.  By publishing such confidential documents about individual citizens, Time brought to light new and potentially defamatory information that the government had no intention of releasing -- at least not in the form edited by Time.  Such leaks could become powerful tools for injuring citizens with impunity.  It is for these reasons that we seriously doubt that the privilege is applicable here.

847 F.2d 1069, 1086 (3d Cir. 1998).  *See, also, Hogan v. Herald Co.*, 446 N.Y.S.2d 836, 841 (N.Y. App. Div. 1982) ("The principal theory behind the rule of fair report is that the publisher acts as the agent of the public, reporting only that which others could hear for themselves were they to attend the proceedings."); *Wynn v. Smith*, 117 Nev. 6, 14-16 (Nev. 2001) ("This court has not before addressed the question of whether a report generally unavailable to the public, like the Scotland Yard report in this case, is 'a report of an official action or proceeding' subject to the fair report privilege.…  We agree with the court's reasoning in *Schiavone* and hold that unauthorized or confidential investigatory reports do not qualify as an 'official action or proceeding' under the fair report privilege. The policies underlying the privilege are simply not served by the rule urged by Stuart and Barricade.  The privilege is an exception to the common law rule that attaches liability for libel to a party who publishes a defamatory statement.…  Here, the Scotland Yard report referenced in the statement at issue was not accessible to the public, nor did Scotland Yard itself ever recognize it as 'official.'…  Inclusion of such a report within the ambit of the fair report privilege would directly conflict with the protections provided by our libel laws, and would undermine the basis of the privilege itself.  We conclude that this privilege should not be extended to allow the spread of common innuendo that is not afforded the protection accorded to official or judicial proceedings.").

Even assuming, however, that a non-public investigation can constitute an "official proceeding," Defendants have never actually claimed: (1) that there was any investigation relating to Plaintiffs, or (2) that there was any investigation into the December Memo (containing the defamatory statements about Plaintiffs) as opposed to the Dossier as a whole.  And, indeed, Defendants do not claim that they knew of any actual "investigation" into the Dossier as a whole prior to their publication of the same, as opposed to their statements that certain government officials had read or obtained copies of the Dossier.  Each of these are fatal to Defendants' fair report privilege as a matter of law.

First, it is important to note that the "privilege applies only where ... the allegedly defamatory statement is connected to a ... proceeding." *Wenz v. Becker*, 948 F. Supp. 319, 322 (S.D.N.Y. 1996); *Cholowsky v. Civiletti*, 69 A.D.3d 110, 887 N.Y.S.2d 592, 596 (App. Div. 2009) ("An overlap between the subject matter of the report and the subject matter of a proceeding does not suffice…."). In other words, for the privilege to apply at all, Defendants would have to allege that they were aware of an investigation that existed at the time of publication that had some relation to the defamatory statements contained in the Dossier *about Plaintiffs*. This they cannot do.

Indeed, it is undisputed that the Defendants were not aware of *any* investigation at the time they published the Dossier, as opposed to knowledge that various government officials possessed or had discussed the Dossier as a whole.[9] This lack of knowledge of an actual investigation at the time of publication is similarly fatal to Defendants' fair reporting privilege

---

[9] *See* Defendant Ben Smith's Response to Plaintiffs' First Set of Interrogatories, Exhibit 5 hereto ("Subject to, and without waiving, the foregoing objections, Mr. Smith states that in December 2016 he learned from a source that there was a document containing allegations about Presidents Trump's ties to Russia that had been written by a knowledgeable former British intelligence agent, the document was being reviewed by government officials, including Senator McCain, and that correspondence written several months earlier by Senator Harry Reid to FBI Director James Comey referred to the document. In or around December 2016, Mr. Smith came to believe that the documents shared with, and requested by the FBI, as reported by Mother Jones on October 31, 2016 was the same document referred to by the source, which is now known as the Dossier. On the afternoon of January 10, 2017, Mr. Smith came to believe that President, President-elect Obama, and other members of Congress had been briefed about the Dossier and became aware of more details concerning the handling of the Dossier by the FBI and intelligence agencies as described in a CNN report published at that time. Since January 10, 2017 Mr. Smith has become aware of more details about investigations conducted by, among others, the FBI, intelligence agencies, committees of the United States House and Senate, and Special Counsel Robert Mueller, largely through numerous news reports over the ensuing year.").

Although the foregoing is within the four corners of the Complaint and Answer, the consideration of an undisputed document does not convert a Rule 12 motion into a Rule 56 motion. *See Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) ("[T]he court may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed"); *Colon v. Nationstar Mortg., LLC*, No. 1:15-cv-22961-UU, 2015 U.S. Dist. LEXIS 158874, at *3 (S.D. Fla. Nov. 17, 2015) ("[A] district court may consider an extrinsic document even on Rule 12(b)(6) review if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged.… In addition, a district court may take judicial notice of certain facts without converting a motion to dismiss into a motion for summary judgment." (internal citations omitted)).

defense.  *See, e.g., Bufalino v. Associated Press*, 692 F.2d 266, 271 (2d Cir. 1982) ("[T]he privilege cannot be divorced from its underlying policy of encouraging the broad dissemination of public records.  The rule applied by the District Court does not serve that policy because it does nothing to encourage the initial reporting of public records and proceedings.  Certainly §611 should not be interpreted to protect unattributed, defamatory statements supported after-the-fact through a frantic search of official records.  For where the media does not directly or indirectly rely upon official records, the policy underlying the privilege is inapplicable and the privilege itself should not be applied.  We thus conclude that AP is not entitled to summary judgment on the basis of records upon which it did not actually rely."); *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985) (fair report privilege is unavailable where it is not "apparent either from specific attribution or from the overall context that the article is quoting, paraphrasing, or otherwise drawing upon official documents or proceedings").

For all of these reasons, and as a matter of law, Defendants' reliance on the fair report privilege is misplaced and Plaintiffs' motion should be allowed.

2.     *The Article Does not <u>Report</u> on an Official Proceeding*

Evan assuming, *arguendo,* that the Court could (or wanted to) stretch the definition of an "official proceeding" to encompass the facts as they exist here, it is nonetheless indisputable that – on the face of the Article itself – Buzzfeed was not *reporting on* any such "official proceeding."  Indeed, the Article neither mentions an investigation nor does it even suggest the existence of such an investigation, much less purport to "report on" such an investigation.  Such is fatal to Defendants' claim of privilege.

The Article itself, containing approximately 465 actual words, announces the existence of a series of memos "prepared for political opponents of Trump by a person who is understood to be a former British intelligence agent," noting that the memos were "unverified" and contained "some clear errors."  Complaint, Exhibit 2.  The Article also declares its purpose, stating that "BuzzFeed News is publishing the full document so that Americans can make up their own minds about allegations about the president-elect that have circulated at the highest levels of the US government."  *Id.*

The Article also states that the memos:

- had "been circulating among elected officials, intelligence agents, and journalists for weeks"

- were summarized into a two-page synopsis which was presented to President Obama and then President-elect Trump;

- had been seen by Senator Harry Reid; and

- were given to then FBI Director James Comey on December 9 by Senator John McCain, but that the FBI already had copies of many of the memos.[10]

This is the sum total of any mention of government officials or government "action" in the Article.  The article says nothing about the memos being the subject of any investigation or official proceeding; makes no claim that such an investigation or official proceeding existed; and, of course, contains no *reporting on* any such investigation.  Moreover, the article makes no claims concerning the only relevant memo, the December Memo, which contained the defamatory content.  Indeed, even the report that the memos were given to the FBI could not be referring to the December Memo inasmuch as it had not been written as of December 9.

The lack of any actual reporting *about* an official proceeding is fatal to Defendants' claim of privilege as a matter of law.  *See*, *e.g.*, *Cholowsky v Civiletti*, 887 N.Y.S.2d 592, 596 (N.Y. 2009) ("[I]t is also incumbent on the party asserting the privilege to establish that the statements at issue reported on a [official proceeding]….  If the publication does not purport to comment on a judicial proceeding, Civil Rights Law § 74 is inapplicable.…  If the context in which the statements are made make it 'impossible for the ordinary viewer [listener or reader] to determine whether defendant was reporting' on a judicial proceeding, the absolute privilege does not apply...."); *Dameron v. Wash. Magazine*, 779 F.2d 736, 739 (1985) ("The privilege is similarly unavailable where the report is written in such a manner that the average reader would be unlikely to understand the article (or the pertinent section thereof) to be a report on or summary of an official document or proceeding."); *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 216 (N.D.N.Y. 2014) ("Section 74 applies only where the challenged report is 'of' a proceeding."); *Corp. Training Unlimited v. NBC*, 868 F. Supp. 501, 508-09 (E.D.N.Y. 1994) ("The statute, by its very terms, protects only reports of judicial proceedings.  The Broadcast does not even purport to be a report of the Icelandic trial."); *Wenz v. Becker*, 948 F. Supp. 319, 323 (S.D.N.Y. 1996) ("If the context in which the statements are made make[s] it impossible for the ordinary viewer to

---

[10] Senator McCain could not have provided the FBI with a copy containing the defamatory statements relevant to this proceeding inasmuch as the December Memo had not been authored by December 9.  The December Memo is dated December 13, 2016.

determine whether defendant was reporting [on a proceeding], the absolute statutory privilege does not attach."); *Shipkovitz v. Wash. Post Co.,* 408 F. App'x 376, 378 (D.C. Cir. 2010) ("The privilege, however, is 'only available to ... news reports [that] are presented in such a manner that the average reader would be likely to understand the communication to be a report on — or summary of – an official document or proceeding.'" (internal citations omitted)); *Dameron v. Wash. Magazine,* 250 U.S. App. D.C. 346, 779 F.2d 736, 739 (1985) ("The privilege is similarly unavailable where the report is written in such a manner that the average reader would be unlikely to understand the article (or the pertinent section thereof) to be a report on or summary of an official document or proceeding."); *Hughes v. Wash. Daily News Co.*, 193 F.2d 922, 923 (1952) ("We need not decide whether the privilege might extend to a report of such an 'announcement' as appellee now attributes to the Secretary of the Treasury.…  [The article] mentioned only 'Secret Service men' as authority for its statement that 'At least 15 were passed in Washington.' It did not mention the Secretary of the Treasury or intimate that he had made an announcement.  In order words it made no report of any announcement of the Secretary. Accordingly it is not entitled to the benefit of whatever privilege, if any, might have attached to a report of such an announcement.").

On this front, *Abakporo v. Sahara Reporters*, 2011 U.S. Dist. LEXIS 109056 (E.D.N.Y. Sept. 26, 2011), is particularly instructive.  There, the defendants had published articles that reported on a petition "by a group of Nigerian citizens, calling itself the Patriots and leveling allegations of corruption within the official ranks of the Permanent Mission of Nigeria to the United Nations." *Id.* at *1.  The Petition was addressed to Nigeria's Acting President, Goodluck Jonathan, and was copied to (1) the Chairman of Nigeria's Economic and Financial Crimes Commission, whose duties include "the examination and investigation of all reported cases of economic and financial crimes" and which most often accepted new cases by way of petition, and (2) the Chairman of Nigeria's Independent Corrupt Practices and Other Related Offenses Commission, which was created to "receive and investigate any report of 'the intended, attempted, or actual commission of'" a statute prohibiting governmental corruption. *Id.* at *6-10.  The Plaintiff, who was named in the Petition as having committed various offenses, sued Sahara Reporters for printing an article that included a description of the allegations made in the Petition. *Id., generally*.

The Court first acknowledged that the Petition "proposes to bring these instances of alleged misconduct to the attention of the relevant authorities, including Nigeria's President and a pair of commissions created to investigate financial crimes and corruption. The articles by Sahara Reporters, in turn, broadcast the Petition's contents to the entire Nigerian community and, indeed, to the world." *Id.* at *24. The Court also agreed that "a formal investigation into allegations of government corruption undertaken by the EFCC or ICPC would be an 'official proceeding' within the meaning of Section 74." *Id.* at *25. Nevertheless, the Court rejected the Defendant's argument that it was protected by New York's fair reportage privilege:

> The Conclusion that Section 74 shields reporting on the Petition itself, divorced from the investigation its authors request, does not follow.… Even assuming the Petition reached the relevant Nigerian authorities, however, this fact would not transform the Petition into part of an "official proceeding" under Section 74.
> …Construing the statutory privilege in the suggested manner would create a recipe for libel, as specious allegations could be broadcast with impunity once sent, even anonymously, to a government agency. Both Courts of Appeals in this state have long cautioned against expanding immunity from defamation liability in this way.
> …Indeed, this Court is unaware of a single prior decision holding that the mere request for an investigation by a private individual or association (either named or anonymous) summons the generous protection afforded by Section 74.

*Id*. at *26-30.

Similarly, even if an article makes a passing mention of an official proceeding, this is insufficient to invoke the privilege. *Fine v. ESPN, Inc.,* 11 F. Supp. 3d 209, 217 (N.D.N.Y. 2014) ("[A] report's mere mention of an official proceeding does not automatically extend the privilege to an entire publication."); *Dameron v. Wash. Magazine*, 779 F.2d 736, 739-40 (1985) ("The public's strong interest in keeping abreast of public affairs, however, is not served by reports that are so minimally related to governmental proceedings that the reader would not realize that any governmental report or proceeding was being described."); *Cholowsky v. Civiletti*, 69 A.D.3d 110, 887 N.Y.S.2d 592, 596 (App. Div. 2009) ("An overlap between the subject matter of the report and the subject matter of a proceeding does not suffice…").

On its face, then, Buzzfeed's publication of the memos comprising the Dossier fails to meet any of the requirements for protection under the Fair Report Privilege: Defendants cannot show that there was an investigation into Plaintiffs, the December Memo, or the Dossier at the time of publication; even if they could, they cannot show that they knew of – or relied on – any such investigation; and, perhaps most importantly, the Article they published did not report on

16

such an investigation. As such, their attempt to invoke a fair reporting privilege defense must fail as a matter of law.

       C.     <u>The Neutral Reporting Privilege</u>

      Defendants' "neutral reporting privilege" affirmative defense also fails as a matter of law. The neutral reporting privilege, first announced in *Edwards v. National Audubon Soc*., provides a qualified privilege for the news media to provide "accurate and disinterested reporting" on "serious charges against a public figure" made by "a responsible, prominent organization."  556 F.2d 113, 120 (2nd Cir. 1977).  The *Edwards* decision, however, was not well-received by other courts and has been rejected outright by numerous jurisdictions.  *See*, *e.g.*, Note: The Developing Privilege of Neutral Reportage, 69 Va. L. Rev. 853, 855 n.10 (June 1983) ("Most courts that have faced the privilege have either found it inapplicable or have rejected it outright.") and 863 ("Unfortunately, Judge Kaufman's conclusions [in *Edwards*] that the First Amendment protects 'neutral reportage' has little analytical support.  Perhaps because of this deficiency, courts have failed to respond to *Edwards* with the same enthusiasm commentators have shown.…  Since *Edwards*, few courts have extended the protections of its privilege.  Some courts – including some leading state courts – have explicitly refused to adopt the privilege.").

      Ironically (given Defendants' insistence that New York law should apply), New York is one of the jurisdictions to have explicitly *rejected* the neutral reporting privilege articulated in *Edwards*.  *See*, *e.g.*, *Hogan v. Herald Co.*, 446 N.Y.S.2d 836, 842 (N.Y. App. Div. 1982) ("The Supreme Court has not adopted *Edwards* (supra) and in our view it is not possible to reconcile it with that court's prior decision in *Gertz* (418 U.S. 323, supra).…  Presumably, all publications of the news media are newsworthy.  They are not privileged, however, unless the publisher is free of culpable conduct.…"); *Gross v. New York Times Co.*, 587 N.Y.S.2d 293, 296 (N.Y. App. Div. 1992) ("The Court of Appeals has rejected the adoption of a neutral reporting privilege which would allow  a newspaper to freely repeat statements made by third parties provided that the newspaper does not endorse the statements reported."); *Weiner v. Doubleday & Co.,* 74 N.Y.2d 586, 594 (1992) ("Indeed, in *Hogan v Herald Co.* … we rejected a claim that a 'neutral reporting' privilege should be extended to a newspaper that published an objective report of newsworthy charges with proper attribution to sources.").

      It is unclear whether Florida formally recognizes a neutral report privilege.  Although the Florida Courts and federal courts in Florida have, in rare instances, discussed the neutral report

privilege, they have done so in a context of explaining why such a privilege would not apply to the particular case in which it is discussed. *See*, *e.g.*, *Trujillo v. Banco Cent. Del Ecuador*, 17 F. Supp. 2d 1334, 1336 (S.D. Fla. 1998) (finding neutral reporting privilege immaterial given that defendant was not a member of the news media and the report was not fair or neutral); *Miami Herald Pub. Co. v. Ane,* 458 So. 2d 239, 241 (Fla. 1984) (discussing Florida's rejection of a neutral privilege with respect to private individuals, with no discussion of whether such a privilege is recognized in Florida for public individuals); *Ortega v. Post-Newsweek Stations, Fla., Inc.*, 510 So. 2d 972, 975 (Fla. Dist. Ct. App. 1987) (same).

It is clear, however, that, even if Florida recognizes a neutral report privilege, it is a qualified privilege whose application is limited to cases involving public figures, not private figures such as Plaintiffs. *See*, *e.g.*, *Miami Herald Pub. Co. v. Ane,* 458 So. 2d 239, 241 (Fla. 1984) ("This Court has not previously held that there is a qualified privilege for a newspaper or a private person to defame a private person merely because the defamatory communication is directed to a matter of public or general concern, and we decline to do so now."); *Ortega v. Post-Newsweek Stations, Florida, Inc.*, 510 So. 2d 972, 975 (Fla App. 1987) ("At the outset, it should be noted that in Florida the press has no qualified privilege to defame a private individual simply by virtue of the matter being of public concern."); *Saro Corp. v. Waterman Broadcasting Corp.*, 595 So. 2d 87, 89 (Fla. App. 1992) ("The press has no qualified privilege to defame a private individual."). As such, the privilege, even if recognized under Florida law, is inapplicable here where Plaintiffs are not public figures.

Even assuming that the neutral report privilege is recognized in Florida, and even if Plaintiffs were public figures, Defendants' defense would still fail as a matter of law. At the heart of the neutral report privilege is the requirement that the person providing the defamatory information be made by "a responsible, prominent organization." *Edwards*, 556 F.2d at 120; *Cianci v. New Times Pub. Co.,* 639 F.2d 54, 69-70 (2d Cir. 1980) ("Absent the qualifications set forth by Chief Judge Kaufman in *Edwards*, all elements of the media would have absolute immunity to espouse and concur in the most unwarranted attacks, at least upon any public official or figure, based on episodes long in the past and made by persons known to be of scant reliability"); *Martin v. Wilson Pub. Co.*, 497 A.2d 322, 330 (R.I. 1985) ("In *Edwards* the court emphasized the existence of a prominent responsible organization originating the charges.… With rumors, however, any such characteristics are wholly absent.… We believe that *Cianci*

18

supports a rule that republication of false defamatory statements about an individual may be printed only in the extremely limited situation in which the publication accurately attributes such statements to an identified and responsible source.  Assuming, without deciding, that *Edwards* as limited by *Cianci* is a correct statement of this aspect of the law of libel, we find this principle to be wholly inapplicable to rumors since a responsible source is lacking.  Moreover, we discern no public policy which would be served by immunizing the reporting of false or baseless rumors."); *Khawar v. Globe Internat.*, 19 Cal. 4th 254, 279 (1998) (discussing generally the requirement that the source of the defamatory information must be credible and reliable for a neutral reporting privilege to apply before concluding that, "Morrow's reputation for credibility within journalistic or academic circles, such as it may have been, provides no justification for Globe's failure to make any effort to verify the truth of the Morrow book's inherently incredible accusation against Khawar"); *Davis v. Keystone Printing Serv.*, 155 Ill. App. 3d 309, 323 (1987) ("That privilege is inapplicable here for two reasons. First, the charges must be against a public figure and plaintiff here is a private figure. Second, the charges must be made by a 'responsible prominent person.'").

Defendants will undoubtedly attempt to argue that the author of the memos, Christopher Steele, is credible and reliable given his background as an MI-6 agent.  This would be an interesting argument if Mr. Steele was himself the source of the defamatory materials. He was not.  Instead, the memorandum authored by Mr. Steele (and published by Buzzfeed) attributed the defamatory allegations concerning Plaintiffs to an unnamed source, whose identity was redacted from the Dossier.  Defendants could not have relied on the source of the defamatory materials being "credible" or "reliable" because they had and have no idea of the identity of the source of the defamatory allegations.

Moreover, Ben Smith admitted in a televised interview a day after Buzzfeed published the Article that Defendants had "solid reasons to distrust" the information contained in the Dossier.  In other words, Buzzfeed itself did not believe the source of the information in the Dossier to be "credible and reliable" at the time of publication.  As such, Defendants' neutral reporting privilege defense fails as a matter of law.

## Conclusion

For the reasons stated hereinabove, Defendants' affirmative defenses of Fair Report Privilege and Neutral Report Privilege fail as a matter of law and, as such, Plaintiffs are entitled to a Judgment on the Pleadings striking each of those defenses.

## Local Rule 7.1(a)(3) Certificate

Undersigned counsel hereby certify that counsel for Plaintiffs has conferred with counsel for Defendants in a good faith effort to resolve the issues raised in this motion and have been unable to resolve the issues.

Dated: January 18, 2018

**Respectfully Submitted:**

/s/ Evan Fray-Witzer
Evan Fray-Witzer (Mass. Bar No. 564349 – *pro hac vice*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505, Boston, Massachusetts 02116
Telephone: 617-426-0000
Facsimile: 617-423-4855
Evan@CFWLegal.com

/s/ Valentin Gurvits
Valentin D. Gurvits (Mass. Bar No. 643572 – *pro hac vice*)
Matthew Shayefar (Fla. Bar No. 0126465)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20, Newton Centre, Massachusetts 02459
Telephone: 617-928-1804
Facsimile: 617-928-1802
vgurvits@bostonlawgroup.com
matt@bostonlawgroup.com

/s/ Brady J. Cobb
Brady J. Cobb (Fla. Bar No. 031018)
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com

*Attorneys for Plaintiffs*

20

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served electronically via the CM/ECF electronic filing system on all counsel or parties of record on the service list below this 18th day of January, 2018.

/s/ Matthew Shayefar
Matthew Shayefar

## SERVICE LIST

Katherine M. Bolger
Adam Lazier
Davis Wright Tremaine, LLC
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
katebolger@dwt.com
adamlazier@dwt.com

Nathan Siegel
Alison Schary
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, Suite 800
Washington, DC 20006
nathansiegel@dwt.com
alisonschary@dwt.com

Roy Eric Black
Jared M. Lopez
Black Srebnick Kornspan & Stumpf
201 S Biscayne Boulevard, Suite 1300
Miami, Florida 33131
rblack@royblack.com
jlopez@royblack.com