FILED UNDER SEAL

# Exhibit
# 2

**Page 1**

```
1          IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF FLORIDA
2
                     Civil Action No. 17-cv-60426-UU
3
4
   ALEKSEJ GUBAREV, et al.,
5
            Plaintiffs,
6
   vs.
7
8  BUZZFEED, INC., et al.,
9            Defendants.
   _____X
10
11                44 West Flagler Street
12                14th Floor
                  Miami, Florida
13
14                Wednesday, December 13, 2017
                  9:59 a.m. - 1:32 p.m.
15
16
17             ATTORNEYS' EYES ONLY
18           VIDEOTAPED DEPOSITION OF
                    DAVID KRAMER
19
20
21
22  ESQUIRE DEPOSITION SOLUTIONS
    800 211-DEPO
23  www.esquiresolutions.com
24  REPORTED BY:  JEROME E. HARRIS
    JOB NO: J0781312
25
```

**Page 2**

```
1          A P P E A R A N C E S
2
   CIAMPA FRAY-WITZER, LLP
3  BY: EVAN FRAY-WITZER, ESQ.
   20 Park Plaza
4  Suite 505
   Boston, Massachusetts  02116
5  Appearing on behalf of the Plaintiffs
6
   COBB EDDY, PLLC
7  BY: BRADY COBB, ESQ.
8  642 Northeast 3rd Avenue
   Fort Lauderdale, Florida  33304
9  Appearing on behalf of the Plaintiffs
10
11
   DAVIS WRIGHT TREMAINE, LLP
12 BY:  KATHERINE M. BOLGER, ESQ.
   BY:  NATHAN SIEGEL, ESQ.
13 1251 Avenue of the Americas
   21st Floor
14 New York, New York  10020
   Appearing on behalf of the Defendants
15
16
17 MARCOS D. JIMENEZ, P.A.
   BY: MARCOS DANIEL JIMENEZ, ESQ.
18 255 Alhambra Circle
   Suite 800
19 Coral Gables, Florida  33134
   Appearing on behalf of the Deponent
20
21
22 ALSO PRESENT:
23      David Griffin, Videographer
24
25
```

**Page 3**

```
1               INDEX
2          INDEX TO TESTIMONY
3  WITNESS          DIRECT CROSS REDIRECT RECROSS
   DAVID KRAMER
4
   BY MR. FRAY-WITZER:
5                     5
6  BY MS. BOLGER:          75
7  BY MR. FRAY-WITZER:          127
8
9
            INDEX TO EXHIBITS
10
11 NO.       DESCRIPTION      PAGE    LINE
12
13 1    The Subpoena          9      5
14
   2    The Redacted Version  72     11
15
   3    The Unredacted Version 72    23
16
   4    The Highlighted       73     24
17        Document
18 5    The GOP National      78     16
        Document
19 6    The Article           79     22
20
21
   (Exhibits 1 through 6 are designated
22 Confidential/Sensitive Source/Attorneys' Eyes Only.)
23
24
25
```

**Page 4**

```
1        THE VIDEOGRAPHER:  We are now on the record.
2  This begins Disk number 1 in the videotaped
3  deposition of David Kramer, taken in the matter
4  of Aleksej Gubarev, et al, versus Buzzfeed, Inc.,
5  et al.
6        This deposition is being held at Esquire
7  Deposition Solutions, 44 West Flagler Street,
8  14th Floor, Miami, Florida.  Today is
9  December 13th, 2017, and the time is 9:59 a.m.
10       My name is David Griffin, I'm the
11 videographer, our court reporter is Jeri Harris,
12 both on behalf of Esquire.
13       Counsel please introduce themselves.
14       MR. FRAY-WITZER:  Good morning.  For the
15 Plaintiffs, I am Evan Fray-Witzer.
16       MS. BOLGER:  On behalf of the Defendants,
17 Katherine Bolger from Davis, Wright, Tremaine.
18       MR. JIMENEZ:  And Marcos Jimenez for
19 Mr. Kramer, the witness.
20       MR. SIEGEL:  And Nathan Siegel on behalf of
21 the Defendants.
22 THEREUPON,
23       DAVID KRAMER
24 was called as a witness by the Plaintiffs, and having
25 first been duly sworn, testified as follows:
```



DAVID KRAMER  Attorneys Eyes Only
GUBAREV vs BUZZFEED

December 13, 2017
5–8

Page 5

1    DIRECT EXAMINATION
2 BY MR. FRAY-WITZER:
3    Q.  Good morning, Mr. Kramer.
4    A.  Good morning.
5    Q.  Let me start by asking if you have ever been
6 deposed before?
7    A.  I have not.
8    Q.  Okay.  So I would just like to run through some
9 of the ground rules --
10    A.  Sure.
11    Q.  (Continuing.) -- for you.
12       I am going to ask you a series of questions
13 today.  I am going to wait for your answers.  If at any
14 point in time you find any of my questions to be
15 confusing, and I guarantee you at some point in time you
16 will find my questions to be confusing, please tell
17 me --
18    A.  Um-um.
19    Q.  (Continuing.) -- that you found my question
20 confusing.  If you answer a question, I am going to
21 assume that you understood the question.  Is that okay?
22    A.  Yes.
23    Q.  I should also mention that because you are being
24 recorded not just by video but by a stenographer, any
25 answer that you give needs to be a verbal answer.  So

Page 6

1 yes or no, but ah-ahs and head shakes unfortunately
2 don't make for a very good transcript.
3       Is that okay?
4    A.  Understood, yes.
5    Q.  If at any point during the deposition today you
6 would like to take a break, please just let me know; we
7 will be happy to take a break for you.
8    A.  Thanks.
9    Q.  The only exception to that that I'll ask is that
10 if a question is pending, I would ask that you first
11 answer the question that is out there and then ask to
12 take a break if that's okay.
13    A.  Yes.
14       MR. FRAY-WITZER:  I should backtrack for a
15    little bit of housekeeping for a moment.  We have
16    agreed to, at least what we in the North
17    understands is the Usual Stipulations.  So all
18    objections other than objections to the form of
19    the question will be preserved until the time of
20    trial.  All motions to strike are similarly
21    preserved for the time of trial.  I am fine with
22    the witness reading and signing and waiving the
23    need for a notary.  Is that okay with you , Kate?
24       MS. BOLGER:  Yes.
25       MR. GRAY-WITZER:  Okay.

Page 7

1 BY MR. FRAY-WITZER:
2    Q.  Mr. Kramer, can you please tell me where you
3 currently reside?
4    A.  I reside in Doral, Florida.  About 30-minute ride
5 from this location.
6    Q.  And what is your address in Doral?
7       MR. JIMENEZ:  Do you really need his personal
8    address?  If you want his personal address, then
9    that's going to have to be marked Attorneys' Eyes
10    Only.
11       MR. FRAY-WITZER:  Well, at the moment you
12    have marked the entire deposition as Attorneys'
13    Eyes Only.
14       MR. JIMENEZ:  It was only in an e-mail to
15    you.
16       MR. FRAY-WITZER:  Yeah.
17       MR. JIMENEZ:  I don't have a problem with him
18    answering background questions that are
19    Attorneys' Eyes Only.
20       MR. FRAY-WITZER:  Sure.
21       MR. JIMENEZ:  But if you are going to get
22    into personal information like his address, then
23    once we get to the actual substantive questions,
24    then I will instruct him not to answer unless the
25    answers are treated as Attorneys' Eyes Only.

Page 8

1       MR. FRAY-WITZER:  That's fine.
2       THE REPORTER:  So is the entire deposition
3    Attorneys' Eyes Only at this --
4       MR. JIMENEZ:  I'm fine with that, but it's up
5    to the rest of the lawyers here.
6       MS. BOLGER:  I'd rather do it on a
7    by-question basis, if that's amenable to you all
8    or at least by subject matter basis.
9       MR. FRAY-WITZER:  I think that's fine and we
10    can deal with it afterwards at that point.
11       MR. JIMENEZ:  Right, but I don't want -- his
12    address is not going to be, you know, given --
13       MR. FRAY-WITZER:  And --
14       MR. JIMENEZ:  (Continuing.) -- unless it's
15    protected.
16       MR. FRAY-WITZER:  I'm okay with that.  Given
17    that he is represented by counsel, we always know
18    where to find --
19       MR. JIMENEZ:  Yeah, you can find me.
20       MR. FRAY-WITZER:  (Continuing.) -- to find
21    you.
22 BY MR. FRAY-WITZER:
23    Q.  How long have you lived at that address?
24    A.  Since May of this year.
25    Q.  And do you currently intend to be living at that



Page 9
1 address for the foreseeable future?
2   A.  Yes.
3       MR. FRAY-WITZER:  I would like to mark the
4   first exhibit.
5       (Thereupon, The Subpoena was marked Kramer
6   Exhibit 1 for identification as of this date, and
7   is designated Confidential/Sensitive
8   Source/Attorneys' Eyes Only.)
9 BY MR. FRAY-WITZER:
10   Q.  You are looking at what has been marked as
11 Plaintiffs' Exhibit number 1, which is the Subpoena
12 asking you to testify today.  Have you seen that
13 document before?
14   A.  Yes, I have.
15   Q.  And am I correct that you are appearing pursuant
16 to that Subpoena?
17   A.  Yes, that's correct.
18   Q.  The Subpoena requests the production of certain
19 documents.  Have you brought any documents with you
20 today?
21   A.  I brought a copy of the so-called Dossier, the
22 document, and two versions.  One a redacted version that
23 was given to me, and the other that has been the one
24 posted.
25   Q.  Did you --

Page 10
1   A.  (Handing.)
2   Q.  (Continuing.) -- conduct a thorough search for
3 the documents that are listed in that Subpoena?
4   A.  Yes, so these are the only ones in my possession.
5 I don't have others.
6   Q.  Okay.  And just to clarify, there were no written
7 communications or e-mails that you found that were
8 responsive to the request?
9   A.  Correct.
10   Q.  I'd like to --
11       MR. JIMENEZ:  Let me clarify one thing, and I
12   haven't gone through each category.  The -- let
13   me just look at them for a second.
14       Okay.  And I think Mr. Kramer can confirm
15   this on the record if you want.  There are no
16   e-mail communications with any individuals
17   relating to this document that he has produced.
18   There are no other documents relating to the
19   categories in the Subpoena other than there is
20   one, I think, three-page document concerning that
21   reflects answers to questions that were
22   propounded to him confidentially by the Senate
23   Select Committee on Intelligence.  Do I have that
24   right?
25       THE WITNESS:  Yes.

Page 11
1       MR. JIMENEZ:  And he is not going to produce
2   that absent the Committee's agreement that that
3   be produced.  But I would tell you for what it's
4   worth, that the information that's contained in
5   -- I have read it, the information that's
6   contained in there is essentially the same that
7   he would testify about in regard to the meetings
8   and the document and the topics that you have got
9   here.
10       MR. FRAY-WITZER:  That's fine then.  Thank
11   you.
12       MR. JIMENEZ:  Sure.  But other than those two
13   documents, that's all that there exists.  Meaning
14   these that he has brought with him and that,
15   those answers to the Senate Select Committee on
16   Intelligence.
17       MR. FRAY-WITZER:  At a break, I think we
18   would like to take copies of the documents.
19       MR. JIMENEZ:  Sure.  Um-um.
20 BY MR. FRAY-WITZER:
21   Q.  I would like to briefly review your background
22 with you first.  So if you could tell me first what the
23 -- what your highest level of education completed was?
24   A.  I received a Master's from Harvard University in
25 Soviet Studies in 1988.

Page 12
1   Q.  And prior to that, where did you attend
2 undergraduate?
3   A.  Tufts University in Massachusetts.
4   Q.  And what degree did you receive from Tufts?
5   A.  Sorry, what degree?
6   Q.  What degree?
7   A.  A dual degree in Political Science and Soviet
8 Studies in 1986.
9   Q.  And after you received your graduate degree,
10 where did you first go to work?
11   A.  I stayed at Harvard affiliated with the Russian
12 Research Center as a teaching fellow, and did some
13 consulting work for Arthur D. Little, and -- which I
14 think no longer exists, and did some teaching at UMass
15 Boston, and then Clark University.
16   Q.  And that brings us to approximately when?
17   A.  1993, summer.
18   Q.  And after that, what was your next place of
19 employment?
20   A.  I moved to Washington and started at the Senate
21 Floor Strategic and International Studies, CSIS as it's
22 called.
23   Q.  And what does CSIS do?
24   A.  It's a think tank.  I worked in the Russia
25 Eurasia Program.



Page 13

1   Q. And how long were you there?
2   A. Just about a year.  And then I moved from there
3   to the Carnegie Endowment also in Washington in a
4   similar kind of position.
5   Q. And just briefly, what is the Carnegie Endowment?
6   A. It's also a think tank.
7   Q. When did you leave the Carnegie Endowment?
8   A. Sorry, when?
9   Q. When did you leave the Carnegie Endowment?
10  A. The end of 1999.
11  Q. And what was your next place of employment?
12  A. I was temporarily affiliated with another think
13  tank called The Project For New American Century, PNAC
14  it was called, for two to three months, and then I was
15  hired to be the executive director of the U.S. Advisory
16  Commission on Public Diplomacy.
17  Q. And how long did you hold those positions?
18  A. The PNAC one was just until I started at the
19  Advisory Commission, so that was two or three months in
20  -- beginning in 2000, and then I was hired in April 2000
21  at the U.S. Advisory Commission on Public Diplomacy.
22  Q. And how long did you hold that position?
23  A. A year until I was offered a position in the
24  State Department.
25  Q. And what was that position?

Page 14

1   A. I was the Senior Advisor for the Undersecretary
2   For Global Affairs for a little over two years, so from
3   roughly June 2001 until October 2003.
4   Q. How did it come about that you went to work at
5   the State Department?
6   A. Someone I had known, Paula Dobriansky,
7   D-O-B-R-I-A-N-S-K-Y, was nominated and confirmed to be
8   the Undersecretary For Global Affairs, I had known her
9   previously, and she offered me the job to be her Senior
10  Advisor.
11  Q. Okay.  And I'm sorry, I think you said you held
12  that position for two years?
13  A. A little over two years.
14  Q. And what was your next position?
15  A. I became a Professional Staff Member in the
16  Office of Policy Planning at the State Department, from
17  roughly October 2003 'til June, July 2005.
18  Q. And did you have a particular area of expertise
19  or portfolio as I guess they like to --
20  A. Yes, I had a responsibility for -- in that office
21  for Russia, Ukraine, Eurasia.
22  Q. And you held that position for how long?
23  A. A little less than two years.  October 2003 'til
24  I think it was July 2005.
25  Q. And your next position?

Page 15

1   A. I became the Deputy Assistant Secretary in the
2   State Department in the Europe, Eurasia Bureau
3   responsibile for Russia, Ukraine, Belarus, Moldova, as
4   well as Nonproliferation Affairs.
5   Q. And, again, how long did you hold that position?
6   A. From July 2005 until March 2008.
7   Q. And what was your next position after that?
8   A. I was nominated and confirmed to be the Assistant
9   Secretary for Democracy, Human Rights and Labor at the
10  State Department.  And I held that job until
11  January 20th, 2009.
12  Q. And after that position?
13  A. After that, I took a few months to figure out
14  what to do, and was hired to be a Senior Transatlantic
15  Fellow at the German Marshall Fund in Washington.  It's
16  a research think tank organization.
17  Q. Does the German Marshall Fund have any particular
18  political leaning in one direction or another?
19  A. I would say at that time it was pretty centrist.
20  Q. And how long did you stay in that position?
21  A. I was there from April 2009 until October 2010.
22  Q. And what was your next position after that?
23  A. I was the President of Freedom House for four
24  years.
25  Q. And what was Freedom House?

Page 16

1   A. Actually, let me just say I was hired initially
2   as Executive Director, that was the name of the title,
3   and the title was changed, has become president.
4       Freedom House is the oldest human rights
5   organization in the United States, and it does analysis
6   and advocacy programs.  To promote democracy and human
7   rights around the world.
8   Q. Does it have a specific geographical focus or
9   does it promote human rights sort of globally?
10  A. Globally.
11  Q. And you spent how long in that position?
12  A. October 2010 until November 2014.
13  Q. And what was your next position after that?
14  A. I went to the McCain Institute For International
15  Leadership, which is based in Washington, D.C. though
16  it's part of Arizona State University.  And I was a
17  Senior Director there for Human Rights and Democracy.
18  Q. How did you come to work at the McCain Institute?
19  A. The executive director of it was a colleague of
20  mine in the State Department, Kurt Volker, he and I
21  remained friends after working together, and he was
22  interested in having me join when I might have gotten
23  tired of Freedom House, which I did.
24  Q. And how long did you work at the McCain
25  Institute?



Page 17

1    A.  November 2014 until early May of this year, 2017.
2    Q.  And why did you leave the McCain Institute?
3    A.  Because I had decided, I had been thinking about
4  it for several years and decided to move down to Florida
5  for family personal reasons.  And had also been thinking
6  about a change anyway.  I had lived in D.C. for 24
7  years.
8    Q.  And are you currently employed?
9    A.  Yes.
10    Q.  And where are you currently employed?
11    A.  Florida International University, which is here
12  in Miami.
13    Q.  And what is your position there?
14    A.  I am a Senior Fellow in the Green School For
15  International and Public Affairs in the Vaclav Havel
16  Program for Human Rights -- Green School of
17  International and Public Affairs in the Vaclav Havel, so
18  it's V-A-C-L-A-V, Havel is H-A-V-E-L Program Human
19  Rights and Diplomacy.
20    Q.  Do you personally know Senator John McCain?
21    A.  Yes.
22    Q.  For how long have you known Senator McCain?
23    A.  I first got to know him, I would say, when I was
24  working at State Department, so I testified once or
25  twice before the Senate Foreign Relations Committee, and

Page 18

1  he was there, and I met him on a few occasions mostly in
2  -- well, not mostly, in an official capacity when I was
3  at the State Department.  That was the first engagement
4  with him.
5    Q.  And from that time forwards, can you describe
6  what your relationship with Senator McCain has been?
7    A.  I would see him at conferences.  He attends
8  Halifax International Security Forum, which I am a
9  member of the Board.  He has attended that since its
10  creation in 2009.  Not every year has he been there.
11      When I was at Freedom House, I met him a few
12  times representing Freedom House.  We gave him an award,
13  a leadership award, I think in 2013 if my memory serves
14  me correctly, for his support for the Magnitsky Act that
15  Congress past in 2012.
16      And then, when I joined the McCain Institute, or
17  even before I joined, there is something called a Sedona
18  Forum that the McCain Institute hosts, and he hosts a
19  cookout at his ranch in Sedona, and so I have been there
20  as well.
21      And so I have known him since I was in the State
22  Department.  I wouldn't say we have a close relationship
23  but we certainly know each other.
24    Q.  Do you know who Andrew Wood is?
25    A.  I do.

Page 19

1    Q.  And can you tell me who Andrew Wood is?
2    A.  Andrew Wood, Sir Andrew Wood, is a retired
3  British diplomat who was Ambassador to Russia in the
4  '90s, Ambassador to I think Yugoslavia.  I don't think
5  it was just Serbia.  I think it was Yugoslavia.  He has
6  been affiliated with Chatham House for a number of
7  years, and that's where I first got to know him.
8    Q.  And what is Chatham House?
9    A.  Chatham House is a think tank in London.
10    Q.  And you said it was through Chatham House that
11  you first got to know Sir Andrew Wood?
12    A.  Yes.
13    Q.  Can you tell me how that came about?
14    A.  He and I have a common friend, and so she
15  introduced us, and I have been to a few conferences at
16  Chatham House in London, was introduced to him there, so
17  I would say we have known each other maybe four, five or
18  six years.
19    Q.  And since first being introduced to Sir Andrew
20  Wood, what has your relationship with him been like?
21    A.  It's been mostly sharing stories, articles.  He
22  and this friend of mine co-wrote a book together, and so
23  it has been mostly exchanging impressions about what's
24  happening in Russia.  He is a Russian expert.
25    Q.  What was the book that he wrote?

Page 20

1    A.  It was with Lilia Shevtsova.  I don't remember
2  the name.
3      With Lilia Shevtsova, so it's L-I-L-I-A -- she --
4  I mean, frankly, she doesn't need to come into this.
5      So Shevtsova is S-H-E-V-T-S-O-V-A.  I don't
6  remember the name of the book.
7    Q.  And has Sir Andrew Wood appeared at the Halifax
8  International Security Forum as well?
9    A.  He was there last year and he was there again
10  this year.
11    Q.  With respect to his appearance last year, had you
12  invited him to the forum?
13    A.  Had I -- I don't do invitations to the forum.
14  Those are done by the forum in its Washington office.
15  Did I give them his name?  It's possible, I don't recall
16  exactly.  They may have gotten it independently of
17  anything I said.
18    Q.  If I am correct, he spoke on a panel that you
19  moderated at the 2016 forum; is that correct?
20    A.  Um.  I don't think so.  I'd have to go back and I
21  can easily check, but I don't recall that.  I don't know
22  that I moderated a panel.  I moderated a dinner at the
23  2016.
24      It's possible.  I honestly don't have a clear
25  recollection of it.



DAVID KRAMER  Attorneys Eyes Only
GUBAREV vs BUZZFEED

December 13, 2017
21–24

Page 21

1    Q.  With respect to the dinner, and maybe I am using
2    the wrong --
3    A.  Yeah, so maybe it was a dinner.
4    Q.  (Continuing.) -- terminology.
5        A dinner --
6    A.  Is off the record.
7    Q.  A dinner discussion; is that correct?
8    A.  Yes, every Saturday the forum had dinner
9    discussions.
10   Q.  And you hosted or moderated a dinner discussion
11   in 2016; correct?
12   A.  Yes.  I don't remember the subject but, yes, I
13   did because I have been to all of them and I don't keep
14   them  clear in my mind.
15   Q.  And Sir Andrew Wood was part of the panel for
16   that dinner discussion; is that correct?
17   A.  I -- it's possible.  I honestly don't remember.
18   It's a distinct possibility.
19   Q.  You said that you brought with you today two
20   documents.  One is a copy of what has been called a
21   Dossier that was given to you, and another is an
22   unredacted form; is that correct?
23       MR. JIMENEZ:  Let's go back to the beginning
24       of the question.  Let's mark that as Attorneys'
25       Eyes Only from now on to the extent you are going

Page 22

1    to start asking him about The Dossier, that
2    subject matter.
3        MS. BOLGER:  So sorry, can I have the
4    question again.
5        MR. FRAY-WITZER:  If you wouldn't mind
6    reading it back.
7        (Thereupon, the requested portion was read
8    back by the reporter as above recorded.)
9    A.  Yes.
10   BY MR. FRAY-WITZER:
11   Q.  When did you first learn about the existence of
12   The Memos that have been referred to as The Dossier?
13   A.  It was in the November 2016 Halifax International
14   Security Forum from Andrew Wood.
15   Q.  And to the best of your recollection, let's start
16   with where were you when Sir Andrew Wood informed you of
17   the existence of some memos?
18   A.  He, during a break in the conference, he pulled
19   me aside and said he was aware of information that he
20   thought I should be aware of and that Senator McCain
21   might be interested in.  So it was at the forum.  It was
22   the exact date was November 19th.
23   Q.  And --
24   A.  It was a Saturday.
25   Q.  I'm sorry.  And at the time that he pulled you

Page 23

1    aside, was anyone else present for that conversation?
2    A.  No.
3    Q.  And what was your response to Sir Andrew Wood?
4    A.  I listened to him and I said this seems serious
5    enough that you should raise this and mention it with
6    Senator McCain.
7    Q.  What specifically had he told you in that first
8    conversation that led you to feel that Senator McCain
9    should be brought in?
10   A.  He told me he himself had not seen the material
11   but that he was -- he had been told that some
12   information had been gathered that pointed to possible
13   collusion and that there may be compromising
14   election about President Elect Trump.  This was after
15   the election so it was President Elect Trump at that
16   point.
17   Q.  In that first conversation that you had, did he
18   tell you who had collected the information?
19   A.  Yes, not by name but, yes, he said it was a
20   former British Intelligence Officer, whom he knew.
21   Q.  Did you -- did you know Christopher Steele prior
22   to that date?
23   A.  I did not.
24   Q.  Did you know of Christopher Steele prior to that
25   date?

Page 24

1    A.  I did not.
2    Q.  So when Sir Andrew Wood told you that there was a
3    former British Intelligence Officer who had collected
4    information, you didn't know specifically who he was
5    referring to; is that right?
6    A.  Correct.
7    Q.  What was the next step after that first
8    discussion in pursuing or following up on your
9    suggestion that Senator McCain be brought into the
10   conversation?
11   A.  I approached Senator McCain and said I have been
12   told of this information and that I thought it would be
13   appropriate for him to hear it directly from Sir Andrew,
14   and the Senator agreed to that.
15   Q.  Do you know if Senator McCain knew of Sir Andrew
16   Wood prior to that conversation?
17   A.  I don't believe -- if he knew of Sir Andrew Wood?
18   I don't believe so, no.
19   Q.  Was a meeting with the three of you arranged at
20   that point?
21   A.  Yes, and with The Senator's top staffer.
22       MS. BOLGER: Can I just ask you to keep your
23       voice up
24   A.  I'm sorry, with The Senator's top staffer, Chris
25   -- Christopher Brose, B-R-O-S-E.



Page 25

1  BY MR. FRAY-WITZER:
2      Q.  Did that meeting eventually occur?
3      A.  Yes, it did.
4      Q.  When did that meeting occur?
5      A.  Later that afternoon, that Saturday,
6  November 19th.
7      Q.  Where did the meeting occur?
8      A.  In a small meeting room that the Halifax forum
9  has for various people if they need to have a private
10  conversation.
11      Q.  So other than yourself, Senator McCain, Sir
12  Andrew Wood, and The Senator's -- I'm sorry, was it a
13  name?
14      A.  Chris Brose, yeah.
15      Q.  (Continuing.) -- and Mr. Brose, was anyone else
16  present at that meeting?
17      A.  No.
18      Q.  And if you can tell us to the best of your
19  recollection what was said at that meeting?
20      A.  Sir Andrew basically said the same thing to
21  Senator McCain as he had said to me, which was he was
22  aware of this information that had been gathered that
23  raised the possibility of collusion and compromising
24  material on the President Elect.  And he explained that
25  he knew the person who gathered the information and felt

Page 26

1  that the person was of the utmost credibility.
2      Q.  Did he at that time mention Christopher Steele's
3  name?
4      A.  He may have.  I can't recall exactly.
5      Q.  To the best of your --
6      A.  I think he might have, yes.
7      Q.  To the best of your recollection, did he give any
8  additional detail about what was included in this
9  information that had been gathered?
10      A.  He mentioned that there was the possibility of a
11  video that might have shown the President Elect in a
12  compromising situation.
13      Q.  Was he more specific than that?
14      A.  He mentioned that it was, if it existed, that it
15  was from a hotel in Moscow when President Elect, before
16  he was President Elect, had been in Moscow.
17      Q.  What was --
18      A.  Of a sexual nature.
19      Q.  What was The Senator's reaction to this?
20      A.  Senator listened very carefully.  He didn't
21  really have much in the way of reaction.  Sir Andrew
22  said that the person who gathered this was in London and
23  would be willing to meet.  And so The Senator turned to
24  me and asked me if I would go to London to meet with
25  what turned out to be Mr. Steele.

Page 27

1      Q.  Were you surprised that The Senator had asked you
2  to do this?
3      A.  I don't recall being surprised one way or the
4  other, but I agreed to do it.  And I did it in a
5  personal capacity.  I flew there, using my own miles,
6  and paid the airport fee out of my own pocket.
7      Q.  Prior to your flying to London to meet with
8  Mr. Steele, were there additional discussions to
9  coordinate the logistics of your trip?
10      A.  Sorry, say -- prior to my going to meet
11  Mr. Steele, were there additional conversations about --
12      Q.  The logistics of your trip?
13      A.  The logistics.  Simply that I would be met.  Sir
14  Andrew told me that I would be met at the airport.
15      Q.  Did --
16      A.  And asked for my -- sorry, asked for my cellphone
17  number, which I took my cellphone with me.  That was the
18  way I was contacted upon arrival.
19      Q.  Did you have an understanding as to how the
20  meeting in London was going to progress?
21      A.  Before I left, no.
22      Q.  Had you ever seen Mr. Steele or a picture of
23  Mr. Steele at that point?
24      A.  No.
25      Q.  How did you intend to find Mr. Steele at the

Page 28

1  London airport?
2      A.  Sir Andrew told me I would be met at the airport,
3  and upon arrival, I received a text message from
4  Mr. Steele saying he was holding a Financial Times and
5  was in a blue coat.
6          Lot of people holding Financial Times in London,
7  but anyway.
8      Q.  Were you able to locate him based on that
9  description?
10      A.  Yes.
11      Q.  Are you aware of a book that was recently
12  published by a Guardian reporter, Luke Harding?
13      A.  Yes.
14      Q.  Did you speak to Mr. Harding in connection with
15  that book?
16      A.  No, I did not.  I ordered the book but I have not
17  yet read it.
18      Q.  Mr. Harding's account of your meeting Mr. Steele
19  at the airport is almost identical to your account of
20  it.  Do you know where Mr. Harding would have received
21  those details?
22      A.  The Guardian had published these details after
23  The Dossier had been posted.  So I assume from his
24  colleagues.  I knew Luke Harding from a 2010 trip to
25  Ukraine but I have not really been in touch with him in



Page 29

1  probably four or five, six years.
2     Q.  Had you provided any of the details of your trip
3  to London to any Guardian reporters?
4     A.  I did, and it was supposed to have been off the
5  record.
6     Q.  And those are the details that ended up in
7  Mr. Harding's book; is that accurate?
8     A.  I don't know because I haven't read his book, but
9  those were the details that wound up in the Guardian
10  report at the time in January.
11     Q.  So you arrived at -- am I correct, I'm sorry, was
12  it Heathrow Airport?
13     A.  Yes.
14     Q.  So you arrived at Heathrow Airport, you were able
15  to locate Mr. Steele.  What happened at that point?
16     A.  We went to his car, we drove to his home, I made
17  contact, he kindly let me take a shower there because I
18  had flown overnight.  And then we were in his family
19  room or living room, and he gave me some context about
20  what he had done.
21     Q.  What date was this?
22     A.  This was -- I have written these down.  This was
23  November 28th.
24     Q.  To the best of --
25     A.  Of 2016.  I'm sorry.

Page 30

1     Q.  Thank you.
2        To the best of your recollection, can you take us
3  through what Mr. Steele told you during that meeting?
4     A.  He said that he had been hired to look into
5  Donald Trump's dealings in Russia, and that in the
6  course of doing so, he came upon material that indicated
7  that there were close ties between the Trump Campaign
8  and various Russians, and the possibility of
9  compromising material on Mr. Trump.
10     Q.  Did he tell you who had hired him?
11     A.  He did not.
12     Q.  At any point, did he tell you who had hired him?
13     A.  No.  It later became clear to me that GPS -- I'm
14  sorry, Fusion GPS had a relationship with him because I
15  met them the next day, but it was not clear to me that
16  they had hired Mr. Steele at that point.
17     Q.  Were you familiar with Mr. Steele's business or
18  of his business intelligence?
19     A.  No, before, no.
20     Q.  Did you at that meeting learn about his company?
21     A.  Yes, in the sense that they do research per
22  client request.
23     Q.  Did he tell you anything else about the company?
24     A.  No.  Other than he stressed to me that for the
25  integrity of his work and his own reputation, they do

Page 31

1  not tailor the information they find for the client,
2  they provide what they find and don't sugarcoat it or
3  shape it one way or the other.  He said if they did
4  that, that would destroy his business.
5     Q.  Do you know if Sir Andrew Wood had any
6  connections with Orbis?
7     A.  To the best of my understanding, he may have been
8  an advisor, informally possibly.  I don't know that he
9  had a formal role with Orbis, but he knew Mr. Steele
10  from when Sir Andrew was in the British Foreign Service,
11  and Mr. Steele was working at MI6.
12     Q.  So in this first meeting, you are at Mr. Steele's
13  home, he has informed you generally as to what he has
14  been doing.  What happened next?
15     A.  He then said I should read the document, and he
16  gave me over -- probably over an hour to do so.
17     Q.  And when you say the document, what document are
18  we referring to?
19     A.  This was a compilation of memos that he had
20  produced based on the work that he and his firm had
21  done.
22     Q.  Do you know at that time how many memos he gave
23  you to review?
24     A.  It was not the last one at that point because
25  that one came in December.  So I would say it was

Page 32

1  probably 16 different memos because I believe if I
2  remember right there were 17 memos altogether.
3        I can't swear to that but I think that's correct.
4     Q.  And so you spent an hour reading The Memos.  What
5  was your reaction to The Memos when you first read them?
6     A.  I was not in a position to know whether it was
7  accurate.  But what I read was rather alarming, and so I
8  felt that if it was true or if parts of it were true
9  even, that that would be a very disturbing thing to
10  discover.
11     Q.  After Mr. Steele gave you a chance to sit and
12  read the 15, 16 memos, did he discuss The Memos with
13  you?
14     A.  He asked me if I had questions, and I believe I
15  did, and I honestly don't remember what the questions
16  were at the time.  But he explained again that the
17  information he gathered was what he found, not what he
18  thought the client might want.  He stressed that point
19  to me several times.
20     Q.  Did he give you any information about how he had
21  gathered the information?
22     A.  He said that based on contacts he had and through
23  people he had used in the past, that he was able to
24  gather this information.
25     Q.  Did he give you any specifics about his sources?



DAVID KRAMER  Attorneys Eyes Only
GUBAREV vs BUZZFEED

December 13, 2017
33–36

Page 33

1    A. Yes.
2    Q. And what did he tell you?
3    A. He explained to me how the document was produced
4    through the sources.
5    Q. Did he name the sources or did he describe them
6    to you?
7    A. He -- there was a piece of paper in which the
8    names were there.
9    Q. And did you see the piece of paper with the
10   names?
11   A. I did.
12   Q. Were any of the names people with whom you were
13   already familiar because of your background in Russia?
14   A. Yes.
15   Q. Did Mr. Steele tell you whether and to what
16   extent he had been able to verify the information he had
17   gathered?
18   A. He explained that what was produced was that
19   needed to be corroborated and verified, he himself did
20   not feel that he was in a position to vouch for
21   everything that was produced in this. But he felt that
22   based on the sources and based on his own company's
23   track record, he felt that at least he had the best
24   sources possible to provide information.
25   Q. Did he tell you whether or not any of the sources

Page 34

1    had been paid for information?
2    A. He did not mention any payment. My impression is
3    none of the sources was paid.
4    Q. Do you know if any of the direct sources used
5    subsources, so the sources themselves went to other
6    sources?
7    A. I do not know.
8    Q. Did Mr. Steele say anything about that?
9    A. No.
10   Q. Did Mr. Steele ever tell you that some or any of
11   the information in The Memos was raw intelligence? Did
12   he use those words?
13   A. Yes, I believe he did, and I think based on his
14   own experience that was not a new thing for him. His
15   experience having served in MI6.
16   Q. What did you understand raw intelligence to be?
17   A. Signal, human intelligence which has not been
18   corroborated or verified by other sources.
19   Q. And I'm sorry if I am -- tell me if I am
20   misrepresenting.
21   A. Sure.
22   Q. But he told you that he had not himself verified
23   the information contained in The Memos; is that correct?
24   A. Not all of the information. Some of it I believe
25   he felt was verified, but I don't know which parts.

Page 35

1    Q. Did you go through the individual memos and
2    discuss the information contained in those memos?
3    A. Not in detail. There wasn't much more that he
4    had to offer and say beyond what was produced in The
5    Memos.
6    Q. After the first hour that you spent reading The
7    Memos on your own, about how long did you spend
8    discussing The Memos with Mr. Steele?
9    A. 30 to 60 minutes, and then we went to have lunch
10   at a local pub. And we didn't talk about them there.
11   Q. After you had lunch, did you return to his house?
12   A. Briefly, and then he brought me to the airport
13   after that.
14   Q. To the best of your recollection, is there
15   anything else you can tell us about the discussions with
16   Mr. Steele that you haven't already told us?
17   A. He told me that he had been in touch with an FBI
18   person in Europe to share what he had found, and that he
19   was hopeful that the FBI would take a serious look at
20   this. And he explained to me that he thought having
21   Senator McCain weigh in would be hopeful in terms of
22   giving the FBI additional prod to take this seriously.
23   And that's the reason I believe that through Sir Andrew
24   Wood he reached out to me.
25   Q. Did you have an understanding at that time that

Page 36

1    Mr. Steele had been hired by private interests to look
2    into this information?
3    A. Had I had an understanding he had been hired by
4    private interests to look at this information? Yes.
5    Yes. And my understanding was that the payments for
6    that ended at a certain point but that he felt
7    sufficiently concerned by what he had uncovered that he
8    continued to explore. On an uncompensated basis.
9    Q. Did you have an understanding as to why he
10   continued to investigate this information?
11   A. He explained to me that as someone who worked in
12   the British Government for many years, view the United
13   States as the U.K.'s strongest ally, he was rather
14   alarmed by what he had found, and felt that it was,
15   while he was not an American citizen, felt it was his
16   duty to continue to pursue what he had uncovered.
17   Q. Did he give you a copy of The Memos at that time?
18   A. He did not.
19   Q. Did you take photographs of The Memos at that
20   time?
21   A. I did not.
22   Q. How did your discussion with Mr. Steele
23   concerning The Memos end?
24   A. He explained to me that he would arrange for
25   Glenn Simpson to get me a copy of the material upon my



DAVID KRAMER  Attorneys Eyes Only
GUBAREV vs BUZZFEED

December 13, 2017
37–40

Page 37

1  return to Washington.

2     Q.  And did he explain to you who Glenn Simpson was?

3     A.  That they had been working together on this

4  material.

5     Q.  Were you familiar with Glenn Simpson prior to

6  that conversation?

7     A.  I knew he had been a reporter at the Wall Street

8  Journal, I knew he had left the Journal and had set up

9  his own company.  I was not familiar with Fusion GPS at

10  that time, and Mr. Simpson and I had never met before.

11  We had spoken I think when I was at Carnegie Endowment

12  in the '90s and he was a reporter.  It's possible we

13  spoke when I was at the State, but we had never met

14  before.

15     Q.  Did you personally know anyone else at Fusion

16  GPS?

17     A.  No.

18     Q.  So I think you said that Mr. Steele drove you

19  back to the airport the same day?

20     A.  Correct.  Correct.

21     Q.  And you flew back to D.C. that day?

22     A.  Yes.  So I left D.C. Sunday night, got to London

23  Monday morning, flew back to D.C. Monday evening, on the

24  4:20 flight, I think United.

25     Q.  When you returned to D.C., what was the next

Page 38

1  thing that you did in connection with The Memos?

2     A.  Mr. Simpson contacted me, so the next day on the

3  29th I met with him in his office where he gave me a

4  copy of these two versions.

5     Q.  Now, again, November 29th when Mr. Simpson gave

6  you the documents, did they include what we have called

7  The December Memo?

8     A.  No.

9     Q.  Were you aware at that time that Mr. Steele was

10  collecting information for a final Memo?

11     A.  I was under the impression that he was continuing

12  to do work and research in this area.  I didn't have a

13  reason to think that there would be another Memo

14  necessarily.

15     Q.  Had he specifically told you about any

16  information that he had gathered to that point that was

17  not included in The Memos that you were being provided?

18     A.  I'm sorry, sorry, say that again.  I was spacing

19  for a second, sorry.

20        MR. FRAY-WITZER:  Maybe we can have it read

21     back.

22        (Thereupon, the requested portion was read

23        back by the reporter as above recorded.)

24     A.  No, other than he said he was continuing to do

25  research and do work in this area, but there was nothing

Page 39

1  specific that would indicate that there would be

2  follow-on memos.

3  BY MR. FRAY-WITZER:

4     Q.  When you met with Mr. Steele in London, did he

5  mention to you at any point in time the name, Alex

6  Gubarev?

7     A.  He did not.

8     Q.  Did he mention to you the name, Webzilla?

9     A.  He did not.

10     Q.  Did he mention to you the name, XBT Holdings?

11     A.  He did not.

12     Q.  When you met with Mr. Simpson, did he mention to

13  you the name, Alex Gubarev?

14     A.  He did not.

15     Q.  Did he mention to you the name, Webzilla?

16     A.  He did not.  And no on the last.

17     Q.  Where did you meet with Glenn Simpson?

18     A.  In his office in Dupont Circle.

19     Q.  And where --

20        How did you -- how did you come to learn where

21  Fusion GPS was located?

22     A.  He called me and gave me the address.

23     Q.  I'm sorry, I think you said this was

24  November 29th; is that correct?

25     A.  Correct, Tuesday, yeah.

Page 40

1     Q.  Approximately what time did you meet with him?

2     A.  About five p.m.

3     Q.  And how long did your meeting last?

4     A.  30 minutes maybe.

5     Q.  To the best of your recollection, if you could

6  tell us what happened at that meeting.

7     A.  There he did have a colleague with him and I

8  don't recall the person's name.

9     Q.  Was the person male or female?

10     A.  It was a male.

11        And he explained to me that he had been working

12  with Mr. Steele and that they had -- that they held

13  these documents.  He had mentioned that they had spoken

14  to the New York Times about the documents but that

15  nothing came of that conversation.  And he, to the best

16  of my recollection, I don't believe said anything about

17  the FBI.  I think it was only Mr. Steele that mentioned

18  contact with the FBI.

19     Q.  I think you said that at that meeting Mr. Simpson

20  gave you a copy of the documents; is that correct?

21     A.  Correct.

22     Q.  Did he give you both versions at that meeting?

23     A.  Yes, he did.

24     Q.  Did he explain to you why he was giving you two

25  versions of the documents?



Page 41

1    A. He said that one had more things blacked out than
2  the other.  It wasn't entirely clear to me why there
3  were two versions of this, so but I took both versions.
4    Q. Did Mr. Simpson ask or suggest what you might do
5  with The Memos?
6    A. Both he and Mr. Steele knew that I was going to
7  give this to Senator McCain.
8    Q. Did Mr. Simpson ask that you provide it to anyone
9  other than Senator McCain?
10    A. No.
11    Q. Did he ask or suggest that you might provide it
12  to any news outlets?
13    A. No.
14    Q. Did he ask or suggest that you not provide it to
15  anyone other than Senator McCain?
16    A. He indicated to me that it was a very sensitive
17  document and needed to be handled very carefully.
18    Q. And what did you understand him to mean when he
19  said that?
20    A. That it covered material that was politically
21  sensitive and in terms of the allegations in here, and
22  so it was not something to be bandied about.
23    Q. When he told you that he had I think you said
24  discussed the materials with the New York Times, did he
25  tell you whether or not he had provided a copy of The

Page 42

1  Memos to the New York Times?
2    A. He did not tell me.
3    Q. Did he mention any discussions with the
4  Washington Post?
5    A. He did not.
6    Q. Did he mention any discussions with Mother Jones
7  Magazine?
8    A. Not to my knowledge, or recollection rather, no.
9    Q. Did he mention any discussions with CNN?
10    A. No.
11    Q. Did he mention any discussions with The Yahoo
12  News?
13    A. I don't believe so, no.
14    Q. Do you remember him mentioning discussions with
15  any other media outlet?
16    A. Not to my recollection.
17    Q. Did Mr. Simpson tell you who Fusion GPS's client
18  was?
19    A. No.
20    Q. Did he give you any information as to what
21  Fusion's involvement with gathering the information was?
22    A. Not really, no.
23    Q. When you left the meeting with Mr. Simpson, what
24  was the next thing that you did in connection with The
25  Memos?

Page 43

1    A. I arranged for a meeting with Senator McCain the
2  next day, through Mr. Brose.
3    Q. And that meeting took place on November 30th; is
4  that correct?
5    A. November 30, correct, yes.
6    Q. And what time did that meeting take place?
7    A. End of the day.  Five p.m. probably.
8    Q. Who was present at that meeting?
9    A. The senator and Mr. Brose and I.
10    Q. And to the best of your recollection, what did
11  you tell The Senator?
12    A. I shared with him the document, and he took some
13  time to review it, he asked me what I thought he should
14  do, and I suggested that he provide a copy of it to the
15  Director of the FBI and the Director of the CIA.
16    Q. And do you know if he followed that advice?
17    A. He has publicly acknowledged giving a copy to the
18  Director of the FBI.  He did so on December 9th.
19    Q. Did Mr. Brose ask any questions during that
20  meeting?
21    A. Not that I recall.
22    Q. Did you communicate to The Senator that Mr.
23  Steele had represented that some of the information was
24  raw or unverified?
25    A. Yes.

Page 44

1    Q. Again, to the best of your recollection, what
2  were the words that you spoke and The Senator spoke with
3  connection to The Dossier?
4    A. I said that I was not in a position to verify
5  this.  I also informed him that I did not have a copy of
6  any video which had been mentioned by Sir Andrew when he
7  first raised this.  I indicated to him that Mr. Steele
8  indicated he did not have the video.  And I said I don't
9  think any of us is in a position to verify, to
10  corroborate or refute this, that's why people who have
11  the means to do so should.  Meaning the FBI and CIA.
12        And I said that Mr. Steele himself seemed to be
13  credible and believable, but that he himself had
14  acknowledged he was not in a position on his own to
15  verify everything in there.
16    Q. Had there been any discussions with Mr. Steele
17  about whether or not he was attempting to obtain the
18  video?
19    A. He was interested in getting it but did not know
20  how to.
21    Q. In your conversations with Senator McCain, did
22  you mention any of Alex Gubarev, Webzilla or XBT
23  Holdings?
24    A. No, I did not.
25    Q. How did your meeting with The Senator conclude?



Page 45

1    A. He had not read the whole thing but had read
2  parts of it and indicated that he would think about what
3  to do and would probably go see Director Comey.
4    Q. Did you have further discussions with Senator
5  McCain about The Memos?
6    A. With The Senator, no. With Mr. Brose I did, and
7  he was the one who informed me that The Senator gave it
8  to Director Comey.
9    Q. And when did he inform you of that?
10   A. It may have been the day it happened.
11  December 9th. 9th, yeah, which was a Friday. I think
12  it was that day.
13       He told me that The Senator went on his own
14  without any staff to meet with the Director.
15       And -- sorry, and he did not get any readout from
16  The Senator on the meeting, but just that it had
17  happened.
18   Q. Did you have any other discussions with
19  Mr. Brose concerning The Memos?
20   A. Just I was occasionally checking with him on
21  whether The Senator had been in touch with Director
22  Comey.
23   Q. After you learned that The Senator had spoken
24  with Director Comey, were there any conversations with
25  Mr. Brose after that point in time?

Page 46

1    A. There were a few that I had just checking on what
2  The Senator thought, and he didn't have much readout
3  because after The Senator met with Director Comey, it
4  was not long after that that the Senate went in recess,
5  so he was in Arizona most of the rest of the month.
6    Q. After The Senator provided The Memos to Director
7  Comey, did you have any additional conversations
8  directly with The Senator about The Memos?
9    A. No.
10   Q. Did you have additional conversations with either
11  Glenn Simpson or anyone at Fusion GPS?
12   A. Sorry, conversations after I met with him --
13   Q. Yes.
14   A. (Continuing.) -- that first time on
15  November 29th?
16   Q. Yes, correct.
17   A. Yes, I saw him maybe two, three other times, and
18  was in touch with him maybe once, two, three times a
19  week after that. And on, I don't know the exact date,
20  but he gave me the final Memo. It was through
21  Mr. Simpson that I obtained the last Memo. In-person in
22  Washington.
23   Q. Before you obtained the final Memo, can you tell
24  us about each of the discussions that you say you had
25  with Mr. Simpson? What was he telling you, what were

Page 47

1  you saying to him?
2    A. It was mostly just to inform him about whether or
3  not The Senator had transfer -- transmitted the document
4  to the FBI. Both he and Mr. Steele were -- I kept them
5  apprised of whether The Senator was -- where The Senator
6  was in terms of his contact with the FBI.
7    Q. Did you initiate those contacts with Mr. Simpson
8  or did he initiate the contacts with you?
9    A. It was probably a combination.
10   Q. Were you -- before you received the final memos,
11  were you given any information about continuing efforts
12  to gather information?
13   A. Well, Mr. Steele had told me that he continued to
14  do research when I met him. And so I was aware that he
15  continued to look into it. I was not aware of whether
16  or not Mr. Simpson was doing so.
17   Q. After your meeting in London with Mr. Steele, did
18  you have any further conversations with Mr. Steele?
19   A. Yes.
20   Q. What conversations were those?
21   A. They were in the beginning mostly about the
22  status of Senator McCain's contact with Director Comey.
23  He was very interested to know where that stood. And
24  then just to get a sense of if I was hearing anything in
25  Washington.

Page 48

1    Q. And you said in the beginning that was the nature
2  of the conversations?
3    A. Right.
4    Q. Did the conversations change at some point?
5    A. Well, after I told him that The Senator gave the
6  documents to Director Comey, there wasn't any further
7  questioning about where the status was. He did ask me
8  several times if I was aware of any further follow-up
9  from The Senator or anything further from the FBI with
10  The Senator, and I was not aware of anything further.
11   Q. Up until, let's say, December 10th when you
12  understood that The Senator had gone to Director Comey,
13  had you yourself had any communications with media
14  outlets about The Memos?
15   A. December 10th? I couldn't tell you exact dates,
16  but I was contacted by Mother Jones, and the Guardian,
17  and ABC News. And then the Washington Post, there was a
18  reporter whom I had known, who we had been talking to
19  throughout The Campaign before I knew the existence of
20  this, and became clear to me that he was aware of the
21  document as well.
22       I'm trying to think if there were any others.
23       I was not in touch with New York Times. And I
24  was in touch with McClatchy.
25       And also up until    December 10th I think those



DAVID KRAMER  Attorneys Eyes Only
GUBAREV vs BUZZFEED

December 13, 2017
49–52

Page 49

1  were the ones.  But most of the ones I mentioned
2  contacted me.  How they knew my role, I don't know.  But
3  I did not reach out to them.  But they were aware that I
4  had given it to Senator McCain.
5     Q.  You said most of those outlets contacted you.
6  Were there any other outlets that you contacted
7  yourself?
8     A.  The person at McClatchy was someone I had been
9  talking to throughout The Campaign and on Russia stuff
10  more broadly, and so it came up in the course of a
11  conversation.  Whether I initiated that conversation or
12  he did, I don't know, I don't recall.
13     Q.  Do you know with whom at Mother Jones you spoke?
14     A.  It was David Corn.  And I subsequently became
15  aware of an article he had written before the election
16  which I had not seen and did not know of before
17  receiving this.
18     Q.  And do you know approximately when David Korn
19  contacted you?
20     A.  It would have been early, mid-December.
21     Q.  And when David Korn reached out to you, what did
22  he say to you?
23     A.  He and Julian Borger came to meet me from the
24  Guardian, and they had been aware of the document.  I
25  don't know whether they had it in their possession or

Page 50

1  had read it, but they were certainly familiar with it.
2  And so they were mostly interested in Senator McCain and
3  his, whether he had given it to Director Comey or not.
4     Q.  And did you inform them that he had?
5     A.  I think the time I met them it was not clear yet
6  whether he had.  It was before December 9th, so I assume
7  the meeting with them must have been the beginning of
8  December before The Senator had given it to Director
9  Comey.
10     Q.  Was it just one meeting with Mother Jones or was
11  there a number of meetings?
12     A.  It was I believe just one meeting with them.  I
13  was in touch with him a few times after that.  And then,
14  Julian Borger from the Guardian came to see me the day
15  that the document was posted on January 10th.  Literally
16  as we were talking, CNN broke the story, and then
17  Buzzfeed did.
18     Q.  Was there anyone other than Julian Borger at the
19  Guardian that you spoke with?
20     A.  No.
21     Q.  Was there anyone other than David Korn of Mother
22  Jones?
23     A.  No.
24     Q.  With whom did you speak at ABC News?
25     A.  With Matt Mosk who is a producer there.

Page 51

1     Q.  And am I correct that he contacted you?
2     A.  Correct.  I did not know him before.  I had never
3  spoken to Korn or to Borger before any of this.
4     Q.  And what did Mr. Mosk ask you?
5     A.  M-O-S-K.  I don't think there is an E at the end.
6  I think M-O-S-K.
7        He must have contacted me before Senator McCain
8  gave it to Comey because he initially asked me about the
9  status with Senator McCain.
10     Q.  And was it one conversation with Mr. Mosk or a
11  number of conversations?
12     A.  No, there were a number of conversations with him
13  after.
14     Q.  What else did you discuss with Mr. Mosk?
15     A.  Just what I thought about the document, and if I
16  was aware of hearing anything else.
17     Q.  Were your conversations with him on the record or
18  off the record?
19     A.  Off the record.
20     Q.  Was the same true with Mother Jones and The
21  Guardian?
22     A.  Yes.
23     Q.  With whom did you speak at the Washington Post?
24     A.  With Tom Hamburger and Rosalind -- what's
25  Rosalind's last name?  Helderman.  And Tom was the one I

Page 52

1  had been in touch with just before all of this talking
2  about various things in The Campaign.
3     Q.  What were your conversations with The Washington
4  Post then?
5     A.  Just my impressions of this and they were also
6  interested in The Senator's handling of it.
7     Q.  Did you know if The Washington Post had a copy of
8  The Memos?
9     A.  I didn't know whether they had a hard copy.  It
10  seemed clear to me that they had read it.  I don't know
11  whether they had been given a copy.
12     Q.  And did you know if ABC News had a copy of The
13  Memos?
14     A.  My impression was that they did, and in fact I
15  was shown a copy of it by Brian Ross at ABC.  Or not a
16  whole copy but I saw a first page of it.
17     Q.  Did you know if The Guardian had copies of The
18  Memos?
19     A.  I don't know whether they did or not.  It seemed
20  to me that they had seen it.  I don't know if they had
21  copies.
22     Q.  And do you know if Mother Jones had a copy of The
23  Memos?
24     A.  Same thing.  It was clear to me they had seen it.
25  I don't know if they had a copy.



DAVID KRAMER  Attorneys Eyes Only                          December 13, 2017
GUBAREV vs BUZZFEED                                                    53–56

Page 53

1    Q.  And with whom did you speak at McClatchy?

2    A.  It was Peter Stone and Greg Gordon I believe was

3  the other person.  Peter was the one I had been talking

4  to regularly about The Campaign more broadly.

5    Q.  And do you know if they had a copy of The Memos?

6    A.  Until they saw me, they did not.

7    Q.  Did you provide them with a copy of The Memos?

8    A.  I did.

9    Q.  When did you do that?

10   A.  I believe it was before I released -- I received

11  the last Memo, so I believe the copy I gave them was

12  without that Memo.  So that would have been early

13  December, I would say.

14        I stressed to them that I was not in a position

15  to verify it.  They had heard about it, they did not

16  hear about it from me for the first time.  And I

17  stressed that I felt if they were going to look into it,

18  it needed to be either verified or refuted.

19        He subsequently, I would say in early January, he

20  being Peter Stone, asked if he could quote I think a

21  paragraph or two from it, and I said no.  And he did

22  not.

23   Q.  Did you provide a copy of The Memos to any other

24  media organization?

25   A.  I did.

Page 54

1    Q.  To whom did you provide a copy of The Memos?

2    A.  To a different person at the Washington Post.

3  Fred Hiatt who was the editor of the editorial page.  He

4  has been a friend of mine for a number of years.  I

5  provided it to him on the same basis, which was it had

6  to be handled very carefully.  I was not able to verify

7  it, and Fred understood that.

8        I mentioned Peter Stone.

9        I also provided a copy to Allan Cullison at The

10  Wall Street Journal whom I had known for many years.  On

11  the same basis.

12        And there were three others.  Two of whom

13  Mr. Steele asked me to meet with.  So maybe if you want,

14  I will deal with the last one first.

15        I gave a copy to Bob Little at NPR.  I believe

16  the day before it was all released.  And that was I felt

17  NPR I could trust.

18        Then, the other two were Buzzfeed and Carl

19  Bernstein.

20        Both of the meetings occurred at Mr. Steele's

21  request.

22        Carl, C-A-R-L, Bernstein.

23        I, you know, became aware that other journalists

24  either had seen it or had it.  I stressed to every

25  person I met the sensitivity of the document, the need

Page 55

1  to verify or refute it, and not to publish it.  Unless

2  or until that would be done.  And if it was refuted, it

3  was obviously no reason to publish it.

4    Q.  So I would like to sort of go through --

5    A.  Sure.

6    Q.  (Continuing.) -- the media outlets individually.

7    A.  Um-um.

8    Q.  Prior to providing a copy of The Memos to The

9  Washington Post, had you informed Fusion or Mr. Simpson

10  that you intended do so?

11   A.  They were aware that I was giving it to Mr. Hiatt

12  at The Post.

13   Q.  Had they asked you to do so?

14   A.  No, but I felt that Fred was a person I could

15  trust, and they seemed to approve that.

16   Q.  Did you let Mr. Simpson know that you were giving

17  caveats and warnings to the people to whom you were

18  providing copies of The Memos?

19   A.  Yes.  I did the same to Mr. Steele.

20   Q.  And did Mr. Steele know that you were going to be

21  providing a cop of The Memo to The Washington Post?

22   A.  Yes.  Keep in mind it's a different division from

23  the news division, the editorial division.

24        Sorry, the news part already either had it or had

25  seen it.  Not from me.

Page 56

1    Q.  When you provided a copy of The Memos to The Wall

2  Street Journal, was Fusion aware that you were going to

3  do that?

4    A.  I believe I mentioned to them that I was -- I

5  knew Allan and was going to talk to him about it.

6  Mr. Simpson, having been a reporter at The Journal, I

7  think knew Mr. Cullison and had mixed views on whether

8  it was good idea to contact him.

9    Q.  When you provided The Memos to Mr. Cullison, did

10  you do so with the same cautions and warnings that

11  you --

12   A.  Absolutely.

13   Q.  Prior to providing The Memo to NPR, did you

14  inform Fusion that you were going to provide The Memo to

15  NPR?

16   A.  No.

17   Q.  Did you inform Mr. Steele that you were going to

18  provide The Memo to NPR?

19   A.  No.

20   Q.  When you provided it to NPR, did you do so with

21  the same warnings and cautions that you have talked

22  about?

23   A.  Absolutely.

24   Q.  Why did you decide to provide a copy of The Memo

25  to NPR?



DAVID KRAMER  Attorneys Eyes Only
GUBAREV vs BUZZFEED

December 13, 2017
57—60

Page 57

1    A. I had been interviewed there the week before, and
2  Rachel Martin, who was one of the anchors in the
3  morning, had heard talk about it and asked me, and I
4  indicated to her that I was aware of it.  And so I
5  actually showed it to her first but I did not give her a
6  copy.  This was a few days after I did the interview.
7  And then she asked if Bob Little could meet with me, and
8  we did and I gave him a copy at that time.
9    Q. Was Fusion aware that you were going to provide a
10  copy of The Memos to Carl Bernstein?
11    A. Was Fusion aware?  No.  I don't believe so, no.
12    Q. And I believe you said that you provided a copy
13  to Carl Bernstein at Mr. Steele's request?
14    A. I met with Mr. Bernstein at Mr. Steele's request.
15  And I believe Mr. Bernstein had been in touch with
16  Mr. Steele and so Mr. Steele asked me if I would meet
17  with him and talk with him about it.  Since Bernstein
18  was in the U.S. and Steele was in London.
19    Q. And when did you meet with Mr. Bernstein?
20    A. I think the first meeting was January 3 or 4.
21  And I think that there was a follow-up meeting with him
22  a few days later.  The first one was in New York, the
23  second one was in Washington.
24    Q. Did you discuss the contents of The Memos with
25  Mr. Bernstein?

Page 58

1    A. In that first meeting, I explained to him how I
2  had gotten involved, and I said to him -- I said the
3  same thing to him that I had said to the others, which
4  was I myself was not in a position to verify or
5  corroborate any of the material in there, but that I
6  felt that it was serious enough that it needed to be
7  looked into in a professional way.
8    Q. You said that Mr. Steele asked that you meet with
9  someone at Buzzfeed; is that correct?
10    A. That is correct.
11    Q. Did he specify an individual at Buzzfeed?
12    A. He did.
13    Q. And who was that individual?
14    A. Ken Bensinger.
15    Q. And did you meet with Mr. Bensinger?
16    A. I did.
17    Q. Where did you meet Mr. Bensinger?
18    A. In Washington.
19    Q. And where --
20    MS. BOLGER:  Can I interrupt for just one
21  second?  Since this is a whole new line of
22  questioning, I could use a bathroom break.
23    THE WITNESS:  Yes, I am glad you said so
24  because I could too.
25    THE VIDEOGRAPHER:  Off the record, 11:22.

Page 59

1    (Thereupon, a brief recess was taken, after
2    which the following proceedings occurred.)
3    THE VIDEOGRAPHER:  This begins Disk 2.  We
4    are on the record, 11:31 a.m.
5  BY MR. FRAY-WITZER:
6    Q. So I believe you told us that Mr. Steele
7  suggested that you speak with Ken Bensinger at Buzzfeed;
8  is that correct?
9    A. That is correct.
10    Q. When did Mr. Steele make this suggestion to you?
11    A. It was either Christmas Day -- excuse me,
12  Christmas Day or right around there, right around that
13  holiday.
14    Q. Was this in a telephone conversation?
15    A. Yes.
16    Q. To the best of your recollection, what did
17  Mr. Steele say to you about contacting Ken Bensinger?
18    A. He indicated to me that Mr. Bensinger had been in
19  touch with him, had heard about the existence of the
20  document.  And he vouched for Mr. Bensinger saying that
21  he had worked with him and Buzzfeed in the FIFA
22  investigation which Mr. Steele had been involved in;
23  felt that Mr. Bensinger was very trustworthy and
24  professional and but that he wasn't in a position from
25  London to talk with him or meet with him.  So he asked

Page 60

1  me if I would -- if he, Mr. Steele, could give Mr.
2  Bensinger my phone number.
3    Q. And what did you say to Mr. Steele?
4    A. I said yes, that was fine.
5    Q. Did Mr. Steele ask you to provide Mr. Bensinger
6  with a copy of The Memos?
7    A. He didn't either way.
8    Q. So just so that I understand, he didn't ask you
9  to give him a copy, he didn't ask you not to give him a
10  copy?
11    A. Correct.
12    Q. Did Mr. Bensinger subsequently contact you?
13    A. Yes.
14    Q. And presumably that was by telephone?
15    A. Yes.
16    Q. Do you remember what date that was?
17    A. It may have been the next day, so possibly the
18  26th or the 27th.
19    Q. What did Mr. Bensinger say?
20    A. He asked if we could meet, and he was in LA I
21  believe at that time.  Said he was willing to fly to
22  Washington but wanted to see the document, and so we
23  agreed to meet.
24    Q. Prior to meeting with Mr. Bensinger, was Glenn
25  Simpson or Fusion aware that you intended to meet with



DAVID KRAMER  Attorneys Eyes Only
GUBAREV vs BUZZFEED

December 13, 2017
61—64

Page 61

1  Mr. Bensinger?

2      A.  Not from me.

3      Q.  On what date did you first meet Mr. Bensinger?

4      A.  The first and only meeting was December 20 -- I'm

5  sorry, December 29th.  Yes, December 29th.

6      Q.  And where did you meet?

7      A.  In the McCain Institute Office in Washington.

8      Q.  Was anyone else present at that meeting?

9      A.  No.  I believe the Institute was closed for the

10  holidays during that whole week, but I was there.

11      Q.  How long did the meeting last?

12      A.  The whole thing may have been 45 minutes to an

13  hour.

14      Q.  To the best of your recollection, I know it's

15  difficult, but can you tell me what Mr. Bensinger said

16  to you and what you said to him during that meeting?

17      A.  He reiterated what Mr. Steele had told me; that

18  he and Mr. Steele had been in touch during the FIFA

19  investigation; they got to know each other that way.  I

20  don't know whether if it was in-person or not.

21      He said that they were very interested in this,

22  that they had heard about it, they had not heard about

23  it from me initially, and were interested in looking at

24  it and doing some investigative reporting on it.

25      Q.  What did you tell him about The Dossier?

Page 62

1      A.  I explained to him how I became involved, just as

2  I have explained to you.  That through Sir Andrew Wood

3  and then to Senator McCain, and then there I was.

4      Q.  Did you review The Memos with him?

5      A.  I -- he said he wanted to read them, he asked me

6  if he could take photos of them on his -- I assume it

7  was an iPhone.  I asked him not to.  He said he was a

8  slow reader, he wanted to read it.  And so I said, you

9  know, I got a phone call to make, and I had to go to the

10  bathroom so I'll let you be because I don't read well

11  when people are looking at me breathing down my neck,

12  and so I left him to read for 20, 30 minutes.

13      Q.  Were you aware that he had taken pictures of The

14  Memos with his cellphone?

15      A.  Not until January 10th.

16      Q.  When he asked you if he could take pictures of

17  The Memos, why were you reluctant to allow him to do so?

18      A.  I said to him that even though I'm a bit of a

19  Luddite, I don't understand technology, I always worry

20  that things electronically like that could inadvertently

21  be spread around, and I said that that would not be

22  good.

23      Q.  Did Mr. Bensinger discuss with you the

24  possibility of publishing The Memos?

25      A.  No.

Page 63

1      Q.  When you were explaining to Mr. Bensinger how it

2  came to be that you were in possession of The Memos, did

3  you talk to him at all about the unverified nature of

4  the information in The Memos?

5      A.  Yes.  I said to him what I had said to the

6  others, which is I'm not in a position to verify or

7  refute this, but that it seemed to me to be serious

8  enough to be looked at in a professional way, and that

9  professional journalists were arguably in a position to

10  look into the matter.  And I stressed to him the

11  sensitivity of it; that it had to be handled very

12  carefully.  And he agreed.

13      Q.  Did he ask you if he could quote from any of The

14  Memos in his reporting?

15      A.  No.  Not that I recall, no.

16      Q.  Did you explain to Mr. Bensinger what Mr. Steele

17  had said to you, that some of the information was

18  unverified?

19      A.  I'm sorry, say it again.

20          MR. FRAY-WITZER:  Why don't we just --

21          (Thereupon, the requested portion was read

22          back by the reporter as above recorded.)

23      A.  Yes.

24  BY MR. FRAY-WITZER:

25      Q.  If you had known that Mr. Bensinger was going to

Page 64

1  take photographs of The Memos, would you have left him

2  alone with them?

3          MS. BOLGER:  Let me object a second.  It's a

4          hypothetical question.

5  BY MR. FRAY-WITZER:

6      Q.  You can answer.

7      A.  I can answer?

8      Q.  Yes.

9      A.  Probably not, no.

10      Q.  If you had known that Buzzfeed would publish The

11  Memos, would you have given Mr. Bensinger access to

12  them?

13          MS. BOLGER:  Same objection.

14  BY MR. FRAY-WITZER:

15      Q.  You can answer.

16      A.  No.

17      Q.  In your conversations with Mr. Bensinger, did you

18  discuss at all Alex Gubarev?

19      A.  No.

20      Q.  Did you discuss at all Webzilla?

21      A.  No.

22      Q.  Did you discuss at all XBT Holdings?

23      A.  No.

24      Q.  I believe you testified that the first time that

25  you understood that Mr. Bensinger had taken pictures of



DAVID KRAMER  Attorneys Eyes Only
GUBAREV vs BUZZFEED

December 13, 2017
65–68

Page 65

1 The Memos was when you learned that they were published
2 on Buzzfeed; is that correct?
3   A. Correct.
4       MS. BOLGER:  Objection.  Mischaracterizes the
5   testimony, but that's okay.  You can answer.
6   A. Sorry.  Actually, could you repeat it just so
7 that I make sure that I understood it correctly.
8       MR. FRAY-WITZER:  Sure.  Or if you could just
9   read it back.
10      (Thereupon, the requested portion was read
11   back by the reporter as above recorded.)
12  A. Yes.
13 BY MR. FRAY-WITZER:
14   Q. And I apologize, you testified earlier that you
15 were in a meeting with someone when CNN first reported
16 on The Memos; is that correct?
17   A. Um-um.  Correct.
18   Q. Who was that again?
19   A. It was Julian Borger, The Guardian reporter.
20   Q. How did you first come to learn that CNN had
21 reported on The Memos?
22   A. We were sitting in the lounge area, there was a
23 big TV with CNN on at the time.  And so as we were
24 talking, the story literally was breaking before us.
25   Q. What was your reaction when CNN broke the story?

Page 66

1   A. I believe my words were, "Holy shit."
2   Q. And did Mr. Borger have any reaction?
3   A. I think he may have echoed those words.
4   Q. Do you recall where you were when you first
5 learned that Buzzfeed had published The Memos?
6   A. I had gone back to my office and received a call
7 from Mr. Simpson who informed me that they had posted
8 it.
9   Q. To the best of your recollection, what did
10 Mr. Simpson say specifically?
11   A. There was a very short conversation that I
12 recall, and he simply said Buzzfeed has posted the
13 document.
14   Q. And what was your reaction to that?
15   A. I said I will call them and ask them to take it
16 down.
17   Q. Did you do so?
18   A. I called Mr. Bensinger, and my first words out of
19 my mouth were you are gonna get people killed.
20   Q. What did Mr. Bensinger say?
21   A. He said why?  How?  And I said by releasing this
22 -- I had not seen it at that point, but I said by
23 posting this, you will put people's lives in danger.  I
24 said please take it down, or he said they will try
25 to redact some of it.  I then called him back a second

Page 67

1 time and asked him to not disclose my name at all.  And
2 he said he would not do so.  These were very brief
3 conversations.
4   Q. Did you subsequently speak with anyone else at
5 Buzzfeed?
6   A. No.
7   Q. Up to the present day, have you spoken with
8 anyone at Buzzfeed other than Ken Bensinger?
9   A. No.
10   Q. Have you had additional conversations with
11 Mr. Simpson or anyone at Fusion concerning the
12 publication of The Memos?
13   A. Since his name and his firm's name were
14 publicized, he explained to me that it was causing
15 considerable problems for him.  And I certainly
16 understood that.
17   Q. After The Memos were published, did you have any
18 conversations with Mr. Steele?
19   A. Yes.
20   Q. What was the first of those conversations?
21   A. The first was that evening, because it happened
22 late in the day.  I think CNN's report was about five
23 o'clock, and I think the Buzzfeed posting followed
24 within an hour, if I remember right.
25      He called me.  And then after that the next day I

Page 68

1 learned The Wall Street Journal was going to publish his
2 name.  Mr. Steele's name.
3   Q. Um-um.
4   A. I contacted two editors there to ask them not to
5 do so.  They had already made up their mind, it was
6 clear to me, although I spent a good hour or two talking
7 to them, explaining to them why this was a terrible
8 decision on their part.  They went ahead and did so, and
9 then Mr. Steele went into hiding.
10   Q. When did you first speak to Mr. Steele after the
11 publication of The Memos?
12   A. Within an hour after they were published.
13   Q. And what did Mr. Steele say to you?
14   A. He was shocked.
15   Q. Do you recall his precise words?
16   A. Not exactly no.
17   Q. Do you recall what you said to him?
18   A. Yeah, he said this wasn't supposed to happen this
19 way.  I said the same thing to Mr. Simpson, which was
20 that this was only supposed to have been released or
21 posted and published if it had been verified.
22   Q. Did you explain to Mr. Steele how Mr. Bensinger
23 had come to have a copy of The Memos?
24   A. No.  He did ask me subsequently, and I denied it.
25   Q. To Mr. Steele?



Page 69

1    A. Correct.

2    Q. Have you up until today informed Mr. Steele how

3  Mr. Bensinger came to have a copy of The Memo?

4    A. No.

5    Q. Did Mr. Steele subsequently say anything to you

6  about the fact that he had suggested that Mr. Bensinger

7  was someone who could be trusted with the information?

8    A. I'm sorry, I spaced again.  Sorry, could you

9  repeat that, sorry.

10        (Thereupon, the requested portion was read

11        back by the reporter as above recorded.)

12    A. I don't believe we had a conversation along those

13  lines, no.

14  BY MR. FRAY-WITZER:

15    Q. Why did you deny to Mr. Steele how Mr. Bensinger

16  came to have a copy of The Memo?

17    A. Initially I panicked, and then I felt I could try

18  to do more good and by maintaining contact with

19  Mr. Steele which I thought might end if I had told him.

20    Q. Have you subsequently had more conversations with

21  Mr. Steele?

22    A. Not since the beginning of March.

23    Q. What were the last conversations that you had

24  with Mr. Steele?

25    A. It was at -- it was before it was largely just to

Page 70

1  get my sense of where this was going since I was based

2  in Washington.  Where I thought things were going, with

3  the Congress, with the FBI, and I had no further

4  insight than what I gathered in the Press.

5    Q. At any point in time up 'til today, did you ever

6  discuss with Mr. Steele Alex Gubarev?

7    A. No.  Including when he let me know that he had an

8  additional Memo to get to me through Mr. Simpson, it was

9  I don't recall any specific reference to Mr. Gubarev.

10    Q. And was there any reference to Webzilla or XBT

11  Holdings?

12    A. No.

13    Q. Up to this day --

14    A. Not that I recall, no.

15    Q. Up to this day, have you had any conversations

16  with Glenn Simpson about Alex Gubarev or Webzilla or XBT

17  Holdings?

18    A. No.

19    Q. Up 'til today, have you had any conversations

20  with anyone at Buzzfeed about Mr. Gubarev, Webzilla or

21  XBT Holdings?

22    A. No.

23    Q. And up 'til today, have you had any conversations

24  with anyone in the media concerning Mr. Gubarev,

25  Webzilla or XBT Holdings?

Page 71

1    A. No.

2    Q. Did you believe that the publication of The Memos

3  by Buzzfeed violated the spirit of the discussions that

4  you had with Mr. Bensinger?

5    A. Yes.

6    Q. Were you surprised by the publication of The

7  Memos?

8    A. I was shocked.

9    Q. Did you express that to Mr. Bensinger?

10    A. I think it was implicit when I said you are gonna

11  get people killed.  You know, what one infers is a

12  different matter.

13        MR. FRAY-WITZER:  Why don't we take a

14        five-minute break.  I don't think I have a whole

15        lot more, but I think I will probably mark The

16        Memos and then -- December Memo just so he can

17        identify them.  But might also take copies of the

18        versions you have brought so that we can mark

19        those.

20        MS. BOLGER:  You mean The Dossier?  Is that

21        what you are talking about?

22        MR. FRAY-WITZER:  Well, Memos.

23        MS. BOLGER:  Do you mean The Dossier?  Is

24        that the document you are talking about?  That is

25        The Dossier.

Page 72

1        MR. FRAY-WITZER:  I think the collection of

2        The Memos is referred to as The Dossier, yes.

3        MS. BOLGER:  Okay.

4        THE VIDEOGRAPHER:  Off the record, 11:53.

5        MR. FRAY-WITZER:  So why don't we go off the

6        record.

7        (Thereupon, a brief recess was taken, after

8        which the following proceedings occurred.)

9        THE VIDEOGRAPHER:  On the record at 12:10

10        p.m.

11        (Thereupon, The Redacted Version was marked

12        Kramer Exhibit 2 for identification as of this

13        date, and is designated Confidential/Sensitive

14        Source/Attorneys' Eyes Only.)

15  BY MR. FRAY-WITZER:

16    Q. Mr. Kramer, so what has been marked as

17  Plaintiffs' Exhibit number 2 has been put in front of

18  you.  This is one of the two documents that you have

19  provided to us today.  Can you identify that document

20  for me, please?

21    A. This is the redacted version that I was given by

22  Mr. Simpson on November 29th.

23        (Thereupon, The Unredacted Version was marked

24        Kramer Exhibit 3 for identification as of this

25        date, and is designated Confidential/Sensitive



Page 73

1     Source/Attorneys' Eyes Only.)
2  BY MR. FRAY-WITZER:
3     Q. And looking now at what has been marked as
4  Plaintiffs' Exhibit number 3, can you tell me what that
5  document is?
6     A. This is the unredacted version of the document
7  that was given to me in two tranches.  Everything up
8  until the last two pages was given to me on
9  November 29th, and then the last two pages was given to
10  me separately, but it's compiled into one.
11     Q. And is Exhibit number 3 a copy of the document
12  that was shown to Mr. Bensinger at your meeting?
13     A. No, that version had highlights in it that I had
14  done.
15     Q. Other than the omission of the highlights, is
16  this a same copy of the document?
17     A. I believe there are three places that Buzzfeed
18  subsequently redacted from this unredacted version.  But
19  otherwise, this is the same thing.
20     Q. And do you remember the date on which you met
21  with Ken Bensinger?
22     A. I think it was December 29th.  It was a Thursday.
23  I'm pretty sure.  It was between the holidays.
24        Thereupon, The Highlighted Document was
25     marked Kramer Exhibit 4 for identification as of

Page 74

1     this date, and is designated
2     Confidential/Sensitive Source/Attorneys' Eyes
3     Only.)
4  BY MR. FRAY-WITZER:
5     Q. You have been handed what has been marked as
6  Plaintiffs' Exhibit number 4.
7        MR. FRAY-WITZER:  And for the benefit of
8        counsel in the room, I will represent to everyone
9        that it is an identical copy to what has been
10        handed to the witness other than the fact that
11        the witness' copy, because it is in color, shows
12        the highlighting.  And we can obviously get from
13        the reporter color copies, but the yellow
14        highlighting that appears on the witness' copy
15        does not appear on our copies, but it is an
16        identical copy.
17  BY MR. FRAY-WITZER:
18     Q. Do you recognize the document that has been
19  provided to you?
20        MS. BOLGER:  Just for one second.  I would
21        like a copy of the version with highlighting.
22        MR. FRAY-WITZER:  Absolutely.
23        THE WITNESS:  I'm sorry?
24        MS. BOLGER: Just for the record, I would like
25        a copy with the version with the highlighting.

Page 75

1        THE WITNESS:  I see.
2     A. And your question was?
3  BY MR. FRAY-WITZER:
4     Q. Do you recognize this document?
5     A. Yes, I do.
6     Q. Is the yellow highlighting your highlighting?
7     A. Yes.
8     Q. And is that a copy of the document that was shown
9  to Mr. Bensinger?
10     A. Yes.
11        MR. FRAY-WITZER:  I have no further
12        questions.
13           CROSS-EXAMINATION
14  BY MS. BOLGER:
15     Q. Hi, Mr. Kramer.
16     A. Yes.
17     Q. So I'm Kate Bolger and I represent the defendants
18  in this action.
19        I was going to talk to you about your background
20  but Mr. Fray-Witzer did a fine job.  The takeaway is of
21  course that you are a Russia exert; right?
22     A. Yes.
23     Q. And you have been a Russia expert since 1986;
24  right?
25     A. Yeah.  To the extent anyone is an expert on

Page 76

1  Russia, but, yes.
2     Q. And in 1986, it was still The Soviet Union?
3     A. Yes.
4     Q. So you have been studying the country since 1986
5  when it was The Soviet Union?
6     A. Three decades.
7     Q. Through three decades, rise and falls of
8  Oligarchs and Putins and things like that; right?
9     A. Yes.
10     Q. And your professional, whole professional life
11  has largely been spent studying Russia; correct?
12     A. Yes, Russia and the region, yes.  And U.S.-Russia
13  relations.
14     Q. And you have written about it?
15     A. Extensively including a book that was published
16  in August by the McCain Institute.
17     Q. And in that book, you posit that Putin is
18  essentially the biggest threat to the Western World
19  currently; correct?
20     A. Correct.
21     Q. What is your basis for saying that?
22     A. First, Russia is a nuclear superpower, has the
23  ability to attack us with massive force.
24        Second, Putin views the United States and the
25  West as a threat and challenge to his system,

Page 77

1  authoritarian kleptocratic system.
2       Three, he has shown no respect for the human
3  rights of his own people.
4       Four, he has shown no respect for the sovereign
5  and the territorial integrity of his neighbors.
6       Five, he shows no compunction about interfering
7  in our election.
8       I could probably go on, but that's a start.
9    Q.  You once said that Putin was just in every
10  possible way a bad guy.  Would you agree?
11    A.  Yes.
12    Q.  You have also written about the hacking of the
13  Democratic National Committee by Russia; correct?
14    A.  Yes, not -- yes, including a letter that in July
15  of 2016 that I co-headed with other Republicans viewing
16  the hacking as a threat against the United States, not
17  against one party or the other, correct.
18    Q.  Can you explain that to me?  What did you say in
19  that letter?
20    A.  There were I think 25 of us who signed this open
21  letter to Members of Congress, who our view was that the
22  hacking was an attack against the U.S., not against the
23  Democratic Party, or it could be the Republican Party
24  another day.  And we called for Congressional
25  investigations because we felt it was an unprecedented

Page 78

1  attack and interference in the U.S.
2       MS. BOLGER:  I am going to ask the court
3       reporter to mark as Exhibit 5, a document which
4       has the headline GOP National Security Experts
5       Ask Congress To Investigate DNC Hack.
6       I was just going to continue in numerical
7       order and make it 5.
8       MR. FRAY-WITZER:  Yeah, I don't have a
9       problem.
10       MR. BOLGER:  I'd rather just call it Exhibit
11       5 and not designate Plaintiff or Defendant,
12       unless you object.
13       MR. FRAY-WITZER:  I don't object at all.
14       So you want me to just write 5 and we can
15       scratch it out afterwards.
16       (Thereupon, The GOP National Document was
17       marked Kramer Exhibit 5 for identification as of
18       this date, and is designated
19       Confidential/Sensitive Source/Attorneys' Eyes
20       Only.)
21  BY MS. BOLGER:
22    Q.  You certainly can take a minute to look,
23  Mr. Kramer, but I am going to direct your attention to
24  the second page.
25    A.  Okay.

Page 79

1    Q.  And is that the letter which there is a copy of a
2  letter and it's addressed to Speaker Ryan, Senator
3  McConnell, Senator Reid, and Representative Pelosi?
4    A.  Yes.
5    Q.  Is that the letter you are talking about?
6    A.  Yes.
7    Q.  And in this you say that "the foreign attack on
8  us was an assault on the integrity of the entire
9  American political process."  Correct?
10    A.  Correct.
11    Q.  You also have written extensively that you
12  understand the evidence makes it clear that the Russian
13  hack was designed specifically to help Donald Trump
14  become the president of the United States; correct?
15    A.  I believe I have written that it was designed to
16  help Mr. Trump, it was to hurt Mrs. Clinton, and it was
17  to discredit the U.S. democratic system overall.
18       MS. BOLGER:  I am going to ask -- I will mark
19       as Exhibit 6 and we will do later an article
20       entitled How Trump's Victory Could Give Russia
21       Another Win, from Politico Magazine.
22       (Thereupon, The Article was marked Kramer
23       Exhibit 6 for identification as of this date, and
24       is designated Confidential/Sensitive
25       Source/Attorneys' Eyes Only.)

Page 80

1  BY MS. BOLGER:
2    Q.  Mr. Kramer, if you take a look at this, this is
3  an article that you co-wrote with Eric Edelman?
4    A.  Correct.
5    Q.  On November 16th, 2016?
6    A.  Um-um.  Yes.
7    Q.  Right before you went to Halifax?
8    A.  Correct.
9    Q.  And in this article, you are, on the third page,
10  you see there is a paragraph that starts out "Trump also
11  repeatedly expressed admiration for Putin during that
12  campaign."  Do you see that?
13    A.  At the top, yes.
14    Q.  Okay.  Great.  And in the paragraph beneath that
15  you say, "Controversy about ties to Russia shadow Trump
16  throughout The Campaign."
17    A.  Um-um.
18    Q.  You see that?  This article is critical of
19  President Trump for his relationships with the Russians;
20  correct?
21    A.  Yes.
22    Q.  Can you explain your criticism?
23    A.  From this article?
24    Q.  No, generally.
25    A.  In general.  Well, I am one of the Republicans



Page 81

1 who signed two letters saying that Mr. Trump was unfit
2 to be president. That's public. That's not a secret.
3 I would offer commentary occasionally during The
4 Campaign that was also not praising Mrs. Clinton by any
5 means, I'm not a fan of hers. But Mr. Trump's comments
6 during The Campaign about Russia and about Mr. Putin
7 were odd to me. Certainly didn't fit with my perception
8 of Russia.
9       And let me rephrase it. Not Russia. Putin and
10 his regime is a threat.
11    Q. And that's because you believe Putin and his
12 regime are a serious threat to the American public?
13    A. I have used the term, existential threat.
14    Q. Sorry, so Putin and his regime are an existential
15 threat to the United States of America?
16    A. In my view, yes.
17    Q. And you perceive the hacking of the Democratic
18 National Committee not as a partisan attack but as a
19 part of the existential threat that Putin's regime
20 represents to the American public?
21    A. Correct. It could have been the Democrats in
22 2016, could be the Republicans down the road.
23    Q. And in your mind, the intervention of Putin's
24 regime in our core American processes is of central
25 public significance; correct?

Page 82

1       MR. FRAY-WITZER: Objection.
2    A. Absolutely. Sorry.
3       MR. FRAY-WITZER: No just objection.
4 BY MS. BOLGER:
5    Q. Sorry?
6    A. Yes, I do believe that.
7    Q. One of the most serious issues facing the country
8 right now?
9    A. The attack on our electrical system?
10    Q. Yes.
11    A. Yes, I think it needs to be taken with utmost
12 seriousness.
13    Q. And you think the President is failing to do
14 that?
15    A. Attorney General Sessions has indicated that the
16 Justice Department doesn't seem to be doing very much
17 about it. And the President has said things that
18 suggest he doesn't believe the intelligence committee.
19    Q. But you are not convinced by the President's
20 statements?
21    A. I am not, no.
22    Q. What is the Halifax Conference?
23    A. It started as part of the German Marshall Fund in
24 2009. For the first two years, the German Marshall Fund
25 hosted it, it then became a separate organization, a

Page 83

1 separate entity. I was asked to be a member of the
2 board, which I agreed to do in 2011.
3       It is an annual gathering in Halifax to bring
4 together security foreign policy analysts and officials
5 for about 300 people in a conference in Halifax. It has
6 a range of panels and discussions.
7    Q. And what is the German Marshall Fund, just for
8 the record?
9    A. The German Marshall Fund is a research think tank
10 based in Washington with offices in Europe.
11    Q. And the Halifax International Security Forum has
12 been called the Davos of international security law or
13 international security think heads -- thinkers; right?
14    A. I think people from Halifax would love to be
15 viewed as the Davos. Yes, I mean it's in November, it's
16 not the nicest time of the year to be in Halifax, but it
17 keeps people in the conference.
18    Q. And it is considered extremely prestigious;
19 correct?
20    A. I think so, yeah. I may be a little biased as
21 someone on the board, but, yes.
22    Q. Who comes to the Halifax International Security
23 Forum?
24    A. People in uniform, ministers of defense, foreign
25 affairs from various countries around the world.

Page 84

1 Experts, Members of Congress. In the past Secretary
2 Hagel, Secretary Defense Hagel was there. I think he is
3 the only Secretary of Defense.
4       So it's a fairly senior high-level gathering of
5 leading analysts officials. And the Canadian Government
6 is the host technically.
7    Q. And Sir Andrew Wood is one of those leading
8 experts; correct?
9    A. In my view, yes.
10    Q. Can you tell me about the reputation of Sir
11 Andrew Wood in the international security community?
12    A. I think he is viewed in very high regard. Since
13 he left the Foreign Service, he has written a number of
14 articles and contributed to reports by Chatham House,
15 which is a London-based think tank. And he and a few
16 others and I trade e-mails about Russia and what's
17 happening there, and I have -- I hold him in the highest
18 regard.
19    Q. And you respect his expertise when it comes to
20 Russia?
21    A. Absolutely.
22    Q. Sorry. I want to talk just briefly about your
23 conversation with Mr. Wood in Halifax.
24    A. Um-um.
25    Q. I don't think you answered this question but I



DAVID KRAMER Attorneys Eyes Only
GUBAREV vs BUZZFEED

December 13, 2017
85–88

Page 85

1 apologize if you did.

2    A. Sure.

3    Q. How long was that? How long was the meeting with

4 Sir Andrew Wood, Senator McCain and you? I am missing

5 someone.

6    A. And Mr. Brose.

7    Q. And Mr. Brose?

8    A. 15 minutes, maybe. It wasn't a long one.

9    Q. What is it in the nature of your relationship

10 with Senator McCain that made Mr. -- Sir Andrew Wood

11 think that you were a person to talk to if he wanted to

12 get to McCain, for lack of a better phrase?

13    A. Sure. He perhaps did not understand that even

14 though I worked at something called the McCain Institute

15 for International Leadership, that is separate from

16 Senator McCain's Office, that's part of Arizona State

17 University, though named after Senator McCain and his

18 family. I believe that he felt that I was the best

19 person he knew to act as a conduit to get to Senator

20 McCain.

21    Q. Do you know the basis -- do you know why he would

22 have thought that? Is your reputation in the community

23 that you have access to Senator McCain? What is the

24 basis for that?

25    A. I assume it's because I have worked at the McCain

Page 86

1 Institute that he concluded that.

2    Q. Okay. And indeed you do have pretty quick access

3 to Senator McCain; correct?

4    A. I did at the conference. I wouldn't say outside

5 of the conference I do, but I did at the conference

6 certainly.

7    Q. Well, I mean, you did testify you were able to

8 reach out with him and set a meeting immediately when

9 you came back from London; correct?

10    A. Yes, he knew I was going to be doing that based

11 on what we had discussed at Halifax. So in other words,

12 if I tried to seek a meeting on a regular basis

13 unrelated to this, I might get it, I might not be able

14 to.

15    Q. In --

16    A. Probably would.

17    Q. I'm sorry, say that again?

18    A. I probably would be able to but maybe not

19 immediately.

20    Q. Quicker than I could, for example?

21    A. I don't know how quickly you can.

22    Q. Not at all.

23       Did you -- sorry. At that meeting, did Senator

24 McCain say anything?

25    A. Yeah, as I mentioned, he turned to me and asked

Page 87

1 me to go to London; he thanked Sir Andrew Wood for

2 bringing the matter to his attention. He took it

3 seriously. He said obviously he is not in a position

4 based on what he heard to assess it one way or the

5 other, but he thought it warranted a closer look, and

6 that's why he asked me to go, to London.

7    Q. What was it in your conversation with Sir Andrew

8 Wood that made you take the matter seriously enough to

9 loop in Senator McCain?

10    A. Sir Andrew's reputation, my familiarity with him,

11 and he is an expert, I think a well-renowned expert in

12 the field, and he struck me -- has struck me as somebody

13 who would not make something up simply to get a meeting

14 with Senator McCain.

15    Q. And at the meeting in Halifax, The Senator had

16 the same reaction as you did to Sir Andrew Wood, which

17 is wow, I better take this seriously; correct?

18    A. Correct.

19    Q. Then you travelled to London; correct?

20    A. Yes. So the conference with Sir Andrew was on

21 November 19th, I traveled, I arrived in London

22 November 28th.

23    Q. So you were -- you get to London essentially

24 within ten days of first hearing about this existence;

25 correct?

Page 88

1    A. Correct. Yes.

2    Q. Did you learn anything about that in that interim

3 period?

4    A. About The Dossier?

5    Q. About The Dossier.

6    A. No.

7    Q. Did you have any more contact with Sir Andrew

8 Wood about The Dossier in that time?

9    A. Simply that I would be met at the airport, at

10 Heathrow.

11    Q. No substantive conversation?

12    A. No.

13    Q. Just logistics?

14    A. Correct.

15    Q. Okay. Great.

16       After the first meeting with Christopher Steele,

17 what was your impression of Christopher Steele?

18    A. A serious man who knew some people I knew, so we

19 had some people in common that way. Sir Andrew had

20 attested to his bona fides and I didn't come away

21 questioning that attestation. And we talked a lot about

22 sort of what was happening at Russia more broadly. I

23 was impressed with his knowledge and his analysis.

24 Separate from discussion of The Dossier. I also came

25 away thinking that he believed he was doing the right



DAVID KRAMER  Attorneys Eyes Only
GUBAREV vs BUZZFEED

December 13, 2017
89—92

Page 89

1  thing, and that he started this by from a paid
2  arrangement to explore and research what was going on
3  between the Trump Campaign and Russia.  And then I came
4  away impressed that he continued to do it even though
5  the compensation appeared to have stopped.
6    Q.  At the end of your interaction with Mr. Steele,
7  did you take the allegations contained in this Dossier
8  more seriously than you did when you were talking about
9  it nebulously with Sir Andrew Wood in Halifax?
10    A.  Yes.
11    Q.  You told Mr. Fray-Witzer that Mr. Steele -- and I
12  wrote this down -- explained to you how the document was
13  produced through sources.  That's a rough quote of what
14  you said.
15    A.  Um-um.
16    Q.  Do you remember that?
17    A.  Um-um.
18    Q.  I do not want to know the sources and no question
19  I ask should be perceived as asking for that.
20    A.  Appreciate it.
21    Q.  So that's my ground rule.  But I do want to know
22  what you mean by that.  What do you mean by you came to
23  understand how the document was produced through the
24  sources?
25    A.  He explained to me how information represented in

Page 90

1  The Dossier or the document was gathered, and he
2  explained that the person who provided it to him did the
3  best that that person could do to convey it as clearly
4  as possible and as accurately as possible.
5    Q.  Again, without telling me, do you know who the
6  person was who presented him with the information?
7    A.  The person who provided it directly?  I do not.
8  No, that name I do not know.
9    Q.  Is that one of his researchers?  Is that the
10  person?
11    A.  My understanding is that somebody he has worked
12  with in the past, but I don't know more than that.
13    Q.  Okay.  You also said that he had a piece of paper
14  on which the names were there.  What -- again, without
15  telling me the names --
16    A.  Yes.
17    Q.  (Continuing.) -- what did you mean by that?
18    A.  That there was identification of the sources.
19    Q.  On a piece of paper that was separate from The
20  Dossier?
21    A.  Correct.
22    Q.  And you knew some of the names; correct?
23    A.  I was familiar with -- I was certainly familiar
24  with one of the names and vaguely familiar with the
25  second.

Page 91

1    Q.  How many names were there?
2    A.  There were -- I believe there were five.
3    Q.  And the person whose name you knew, what was your
4  impression of that person as a source?
5    A.  If that person was a source, it was a serious
6  high-level source.
7    Q.  And the second individual who you said you knew
8  of rather than the person you knew?
9    A.  Just knew the name.  I didn't have much more of
10  an impression on that.
11    Q.  Did you have an impression of whether that was a
12  serious high-level source?
13    A.  I would say yes, and the other -- two of the
14  other names also seemed to be serious if they were in
15  fact the sources.
16    Q.  So when you saw this piece of paper with the
17  listing of sources, did it bolster your belief in the
18  credibility of what Mr. Steele was saying?
19    A.  It did, but it was being past onto me second,
20  third-hand since there was an intermediary between those
21  sources and Mr. Steele, so I was getting it -- I guess
22  that would make it fourth-hand even, possibly.  But yes.
23    Q.  What about your interaction with -- you testified
24  a minute ago that you took The Dossier more seriously
25  after meeting with Mr. Steele than you had in Halifax.

Page 92

1  What was it about your interaction with Mr. Steele that
2  work that change in the way you thought about The
3  Dossier?
4    A.  Sir Andrew presented a fairly vague picture of
5  what he had heard because he is not -- he had not seen
6  it himself.  He mentioned the possibility of a video
7  that Sir Andrew did.  And in broader terms, the
8  possibility of collusion between The Campaign and
9  Russia.
10      Since he did not have the actual document, I
11  wasn't sure what to make of what he was saying.  I
12  didn't think he was making something up.  Having seen
13  the actual Memos at the time and hearing from Mr. Steele
14  how it came about, that gave me more granularity.
15    Q.  I think you testified on direct-examination that
16  Steele did this, continued to investigate these
17  allegations in no small part because he thought that
18  they represented a real threat to America and Britain;
19  correct?
20    A.  Correct.
21    Q.  Did you join him in this -- in the thought that
22  these presented a real treat to the United States?
23    A.  I have always caveated my impression of them by
24  saying if they are true.  Because I'm not in a position
25  to vouch for them one way or the other, but I felt that



DAVID KRAMER  Attorneys Eyes Only
GUBAREV vs BUZZFEED

December 13, 2017
93—96

Page 93

1  they were serious enough that they needed to be looked
2  into in a serious professional way.
3     Q. In fact, you felt they needed to be looked into
4  by the Federal Government; right?
5     A. Yes.  Yes.  That's why I recommended that step to
6  Senator McCain to meet with Director Comey.  Which he
7  may have done on his own, by the way, but --
8     Q. I won't accuse you of trying to take credit.
9        When you talked to Mr. McCain about -- sorry,
10  Senator McCain, about your conversations with Mr.
11  Steele, did you convey to Senator McCain that you
12  believed that these were serious allegations that needed
13  to be investigated?
14     A. I said to him that this was serious enough that
15  it needed to be looked into in a serious way, and that
16  if they were true and we did nothing with it, then
17  history would not look kindly upon us.
18     Q. What did Senator McCain say in response to that?
19     A. He agreed, he said he wants to do what the right
20  thing is.  And he was struggling with what that was, but
21  he seemed to agree that going to the FBI was the right
22  thing to do.  I don't think in the least that he viewed
23  this in political terms.
24     Q. Nor did you; correct?
25     A. Absolutely.  Absolutely.

Page 94

1     Q. In fact, you have publicly said Russia is a
2  threat to the United States regardless of your political
3  party; correct?
4     A. Correct.
5     Q. At the end of your conversation with Mr. Steele,
6  did you want a copy of The Dossier?
7     A. If I was to go to Senator McCain with more detail
8  about this, I had to have a copy, in my view.
9     Q. Was there any resistance from Mr. Steele in
10  giving it to you?
11     A. He simply didn't want me to travel with it from
12  London back to Washington.  But he arranged for
13  Mr. Simpson to provide it to me upon my return.
14     Q. And am I correct that it was always Mr. Steele's
15  intention that you would take this document to Senator
16  McCain; correct?
17     A. Yes.
18     Q. That was the ask?  The ask was take this document
19  to the Federal Government; correct?
20     A. To bring it to Senator -- I'm not sure he -- I'm
21  not sure he knew what that next step was after bringing
22  it to Senator McCain.  I think he was going to rely on
23  Senator McCain's judgment to determine what was the best
24  next step.
25     Q. He wanted it to get to the FBI; correct?

Page 95

1     A. Yes, but he had also been in touch with the FBI
2  before, and I think he felt that Senator -- having
3  Senator McCain provide it to the FBI would give it a
4  little more oomph than it had had up until that point.
5     Q. With all due respect for Senator McCain's
6  illustrious career , and I meant that sincerely, is
7  there a particular reason that Senator McCain was the
8  person that they were focussing on, rather than say
9  Senator Schumer or Senator Corker or somebody, any one
10  particular person?
11     A. I think they felt a senior Republican was better
12  to be the recipient of this rather than a Democrat
13  because if it were a Democrat, I think that the view was
14  that it would have been dismissed as a political attack.
15     Q. So when you got back to the United States, you
16  met with Mr. Simpson; correct?
17     A. Yes.  The next day.
18     Q. The next day?
19     A. Right.
20     Q. Why so quickly?
21     A. The feeling was that there was no reason to
22  delay.  Senator McCain was interested in receiving a
23  copy as soon as possible, and so and Mr. Steele and
24  Mr. Simpson seemed in agreement with that.
25     Q. I keep knocking off my microphone in excitement.

Page 96

1  I apologize.
2        You said that in your -- in that initial
3  conversation with Mr. Simpson, he told you that you had
4  given -- sorry, he told you that he had given a copy of
5  the document to The New York Times?
6     A. Don't think -- if I said he had given a copy,
7  then I probably misspoke.  I think they had spoken to.
8  It's possible they gave a copy to The New York Times, I
9  can't swear to that he said that they gave a copy.  But
10  they -- he had told me that they had been in touch with
11  The New York Times and talked to them about it.
12     Q. Did he tell you why they had called The New York
13  Times to talk to them about it?
14     A. They felt it required investigation by a serious
15  news outlet, and they seemed to have chosen The Times at
16  that point.
17     Q. And what do you understand was the nature of
18  their conversations with The Times?  In other words, was
19  it a one-off or was that an ongoing relationship, do you
20  know?
21     A. I don't know.  I think it was beyond just a
22  one-off, but I couldn't accurately describe what kind of
23  relationship.  Or I'd be speculating.
24     Q. So Mr. Simpson made a decision to give the, or to
25  talk to a publication about The Dossier, but only for



Page 97

1   the purpose of having them investigate it; is that
2   correct?
3      A.  I think that's correct, yes.  I believe that is
4   how one could interpret what he had done.
5      Q.  You mentioned that at the initial meeting with
6   Mr. Simpson, he gave you both versions of the article,
7   and I think I just didn't understand.
8         Did he ever explain to you why he gave you both a
9   redacted and unredacted version of The Dossier?
10     A.  If he did, I don't recall what it was, but they
11  gave me the two versions.
12     Q.  Who did the redactions?
13     A.  I think -- I'd be speculating.  I think it was
14  Fusion GPS but I can't say that for sure.
15     Q.  Do you know why there were redactions?
16     A.  I don't know.  Perhaps to -- I don't know.  I
17  don't know.
18     Q.  Did you understand that Simpson had circulated
19  The Dossier to anyone?
20     A.  When I met him?
21        I think The New York Times was the only outlet
22  that he mentioned, and, again, I don't -- I can't say
23  whether he gave it to them or talked to them about it
24  and showed it to them.  At that time --
25     Q.  Do you know if the redactions were to circulate

Page 98

1   the document?
2      A.  It's possible.  I don't know.
3      Q.  Did your conversations with Mr. Simpson affect in
4   any way your belief in the credibility of The Dossier?
5      A.  No.  No.
6      Q.  You continued to take it seriously though after
7   your conversation?
8      A.  I did, correct.
9      Q.  Okay.
10     A.  Very seriously.
11     Q.  What's the distinction between seriously and very
12  seriously?
13     A.  I felt it raised concerns, serious concerns that
14  needed to be looked at.
15     Q.  I mean, you have to have had some belief in its
16  credibility to talk to people about it; correct?
17     A.  I said to people that based on Mr. Steele's bona
18  fides, based on my understanding of Russian behavior,
19  under the Putin regime and questions about comments made
20  during The Campaign, those three things together didn't
21  prove this but certainly led to further reason to look
22  at it seriously.
23     Q.  You said that it was you who suggested that
24  Senator McCain talk to either the FBI or the CIA, and
25  that you then had several conversations with Mr. Brose

Page 99

1   thereafter.  Did you initiate those calls with
2   Mr. Brose?
3      A.  I think probably in almost every case, yes.
4      Q.  Did you say they were daily or almost daily?
5      A.  I don't know that they were daily, but during
6   that intervening period from November 30 when I met with
7   Senator McCain and Mr. Brose and December 9th when he
8   delivered it, they were pretty regular.  Maybe every
9   other day.
10     Q.  Why call him every other day?
11     A.  I was curious if The Senator had provided it to
12  the FBI.  To the FBI Director, that is.
13     Q.  Because you were taking it seriously; correct?
14     A.  Correct, yes.
15     Q.  And what did Mr. Brose say in those conversations
16  about The Senator's?  Were they long conversations with
17  Mr. Brose?
18     A.  No, they were short.  They would be short.
19  Basically I would ask, you know, any update, any word,
20  and he would tell me one way or the other.
21     Q.  What did Mr. Brose think about it?
22     A.  I don't know.  I don't know.
23     Q.  Did you ever have any conversations in which
24  Mr. Brose commented on The Dossier?
25     A.  I mean, he would sit mostly quietly in the --

Page 100

1   certainly in the meeting with Sir Andrew, he said
2   nothing.  In the meeting in The Senator's office, I
3   don't recall if Mr. Brose said anything.
4         I have to give you a warning, I probably have to
5   run to the bathroom soon, but go ahead.
6      Q.  That's fine, I will let you do that.
7         Did Mr. Brose ever communicate to you what The
8   Senator was thinking in that intervening time period
9   between when you talked to Senator McCain about giving
10  it to the FBI and when he ultimately did give it to the
11  FBI?
12     A.  What The Senator was thinking?
13     Q.  Yes.
14     A.  No.  Just that he believed that The Senator was
15  going to do what he said he was going to do.
16     Q.  Is it unusual for a senator, a United States
17  Senator, to walk over to the FBI Director's office and
18  hand them a document and say a I think you should
19  investigate this?
20        MR. FRAY-WITZER:  Objection.
21     A.  I don't know, is the honest answer.  Having never
22  worked on The Hill, I don't know.
23  BY MS. BOLGER:
24     Q.  Have you ever heard of it in any other context?
25     A.  No.



DAVID KRAMER Attorneys Eyes Only
GUBAREV vs BUZZFEED

December 13, 2017
101–104

Page 101

1    Q. In your experience of interacting with Senator
2  McCain, is that an unusual thing for Senator McCain to
3  have done?
4    A. I have never had a conversation with him that
5  would have come close to this kind of conversation.
6        Will you permit me to run to the bathroom?
7    Q. I will, yes.
8    A. Thanks. I will be right back. I promise.
9        THE VIDEOGRAPHER: Off the record at 12:46.
10        (Thereupon, a brief recess was taken, after
11    which the following proceedings occurred.)
12        THE VIDEOGRAPHER: On the record at 12:50.
13  BY MS. BOLGER:
14    Q. Did you ever talk to anybody at the FBI about The
15  Dossier?
16    A. No.
17    Q. To your knowledge, did Mr. Brose ever talk to
18  anybody at the FBI about The Dossier?
19    A. Not to my knowledge.
20    Q. So after Senator McCain gave The Dossier to the
21  FBI, you testified that you saw Fusion two or three
22  other times and were in touch with them two or three
23  other times.
24        Why did you keep interacting with Fusion?
25    A. One time was to receive the final two-page Memo,

Page 102

1  which was after Senator McCain had provided the copy to
2  Director Comey. And then, there was just occasionally
3  touching base just to see what was going on, comparing
4  notes.
5    Q. Just to backtrack for one second.
6    A. Sure.
7    Q. Do you know substantively what Senator McCain
8  said to Director Comey?
9    A. No, and not to the best of my knowledge neither
10  does Mr. Brose. Mr. Brose told me that it was a
11  one-on-one meeting. Mr. Brose was not at that meeting.
12    Q. And he didn't?
13    A. He did not get a readout.
14    Q. For those of us who don't live or never lived in
15  The Beltway, what's a readout?
16    A. A brief of what was discussed and transpired
17  during the meeting.
18    Q. Have you heard from any other source what
19  happened in that meeting?
20    A. No.
21    Q. Have you ever asked Senator McCain that?
22    A. No, I have not.
23    Q. Okay. So you said that one of your interactions
24  with Fusion was to get the last two pages of The
25  Dossier, the last Memo?

Page 103

1    A. Correct.
2    Q. And how did that come to be?
3    A. Mr. Steele called me to say that there was an
4  additional Memo that I could receive through
5  Mr. Simpson.
6    Q. And what did he say about The Memo?
7    A. He didn't talk about it in detail. He simply
8  said that there is two more pages for you to receive.
9    Q. Did he tell you or ask you to do anything with
10  those two pages?
11    A. Not specifically.
12    Q. Did you understand that he wanted you to give
13  them to Senator McCain?
14    A. It occurred to me that that was a possibility,
15  and, in fact, he may have indicated that he hoped this
16  could also get to Senator McCain.
17    Q. So did you then reach out to Fusion to get the
18  last two pages or did Fusion reach out to you?
19    A. I honestly don't remember. I'm not sure who
20  contacted whom.
21    Q. And how did you actually get --
22    A. I think Mr. Simpson contacted me.
23    Q. How did you actually get The Memo?
24    A. We met in downtown Washington.
25    Q. Where did you meet?

Page 104

1    A. I think at Starbucks, near the Farragut North.
2  The Farragut North. It's an area in D.C.
3    Q. Was anybody carrying a copy of the Financial
4  Times?
5    A. I am sure people were but I wasn't on the lookout
6  for them.
7    Q. Did you -- did you sit down and read The Memo
8  with Mr. Simpson in that coffee shop?
9    A. Yes.
10    Q. And did you discuss it with Mr. Simpson?
11    A. Not really. I thanked him for giving it to me,
12  and added it to the compilation that I already had.
13    Q. What were your impressions of The Memo?
14    A. I didn't have major impressions one way or the
15  other. It didn't strike me as anything significantly
16  new from what I had read before.
17    Q. When you say from what you had read before, do
18  you mean --
19    A. From the --
20    Q. From The Dossier itself?
21    A. Earlier parts of The Dossier, correct.
22    Q. Just so we are clear, so what you are saying is
23  it did not strike you as anything different than what
24  you had read in the other parts of The Dossier; correct?
25    A. Correct.



DAVID KRAMER  Attorneys Eyes Only
GUBAREV vs BUZZFEED

December 13, 2017
105–108

Page 105

1    Q.  And you had the same reaction that it needed to
2  be taken seriously; correct?
3    A.  Yes, along with the rest of it.
4    Q.  Did Mr. Simpson -- did you ask Mr. Simpson any
5  questions about the document?
6    A.  I don't believe so.
7    Q.  Did he give you any information about it?
8    A.  I don't believe so.
9    Q.  Had you heard of Aleksej Gubarev before you saw
10  The Memo?
11    A.  No.
12    Q.  Or Webzilla?
13    A.  No.
14    Q.  Or XBT?
15    A.  No.
16    Q.  You described yourself as a Luddite; right?
17    A.  Yes.
18    Q.  So tech people aren't your usual area of
19  expertise; is that correct?
20    A.  That is very true.
21    Q.  How long was the coffee with Mr. Simpson?
22    A.  15 minutes maybe.
23    Q.  Did Mr. Simpson tell you why he was giving you
24  the last part of The Dossier?
25    A.  It was additional information that had been

Page 106

1  compiled I believe by Mr. Steele, and they felt that I
2  should have it.
3    Q.  You believed it to be compiled by Mr. Steele
4  himself?
5    A.  I -- yes, I believe it had been.
6    Q.  What is the basis for that belief?
7    A.  Mr. Steele told me that he had additional
8  information he was sending to Mr. Simpson, and it also
9  seemed consistent in its style, writing style, with the
10  rest of the document.
11    Q.  And did Mr. Simpson tell you that he wanted you
12  to give the document to Senator McCain?
13    A.  I don't recall if he did.  I don't believe so.
14    Q.  Did you understand he wanted you to give the
15  document to Senator McCain?
16    A.  Yes, I think they gave it to me in order to pass
17  along to Senator McCain, but The Senator, as I recall by
18  that point, was back in Arizona, the Senate was in
19  recess, so I was not in a position to do so.
20    Q.  Did Senator McCain know about the meeting, this
21  meeting, particular meeting with Mr. Simpson?
22    A.  No.
23    Q.  Throughout this time period where you were
24  interacting with Fusion and Steele about The Dossier,
25  were you updating Mr. Brose or The Senator?

Page 107

1    A.  Most -- I had not had following conversations
2  with The Senator.  My conversations were with
3  Mr. Brose, and it was mostly just to find out what the
4  status was with Senator McCain's outreach to the FBI.
5    Q.  You said mostly.  Were there other things
6  discussed?
7    A.  Just curious if he had heard anything on The Hill
8  about any of this, and for the most part he had not.
9    Q.  You said that when you saw the CNN story, you
10  said holy shit?
11    A.  Um-um.
12    Q.  Forgive me for cursing on the transcript, but
13  what did you mean by holy shit?
14    A.  I think you are just quoting me, so --
15    Q.  That's what I used to tell my mother.
16    A.  I felt from the beginning that any reporting or
17  coverage of this should have been based on
18  corroboration, verification, and part of what the CNN
19  story was not the release of the document but it was
20  that President Obama and President Elect Trump had been
21  briefed on it, on its existence, and so that seemed
22  significant to me.
23    Q.  In what way?
24    A.  That it had reached a point where the
25  intelligence community or the FBI Director I guess is

Page 108

1  the one who briefed President Elect Trump, had reached a
2  point where they felt they needed to alert him to its
3  existence.
4    Q.  So just so I understand --
5    A.  Sure.
6    Q.  So what you are saying is that it had been
7  corroborated or verified to the point that it needed to
8  get to The President, is that -- The President Elect?
9  Is that what you mean?
10        MR. FRAY-WITZER:  Objection.
11    A.  No.  No, because I wasn't in a position to know
12  whether it had been corroborated or verified, but that
13  it had apparently reached a level of attention that they
14  felt a need to alert both The President and The
15  President Elect.
16  BY MS. BOLGER:
17    Q.  Law enforcement?
18    A.  Yes, correct.  It's possible the initial CNN
19  report did not specify there was just Comey who had
20  briefed President Elect Trump.  They may have included
21  Clapper and Brennan in that, but I don't remember the
22  details.  But subsequent reports indicated it was just
23  Comey.
24    Q.  You said that you gave The Dossier or discussed
25  The Dossier with a number of news organizations.  Did



DAVID KRAMER  Attorneys Eyes Only
GUBAREV vs BUZZFEED

December 13, 2017
109–112

Page 109

1  the copy of The Dossier you gave to those news
2  organizations include the last two pages?
3    A.  Not to Fred Hiatt at The Post, not to Peter Stone
4  and McClatchy.
5      It did to Allan Cullison, it did to Ken
6  Bensinger, it did to Carl Bernstein, and it did to NPR.
7      So two out of the six did not.
8    Q.  You said that you had had a conversation with a
9  reporter at The Guardian --
10   A.  Um-um.
11   Q.  (Continuing.) -- in which you described your
12  meeting with Christopher Steele at Heathrow; correct?
13   A.  Yes.
14   Q.  Was that Borger?
15   A.  Borger.  Julian Borger.
16   Q.  Apologies.
17   A.  Yes.
18   Q.  And you also said that you were with Julian
19  Borger when the news came out on CNN; correct?
20   A.  Yes.
21   Q.  Were those the same conversations?
22   A.  No.  The first one had to have been early
23  December before Senator McCain met with Director Comey.
24  But Borger had been informed, I don't know by whom, that
25  I had played this role of giving it to Senator McCain.

Page 110

1  I had not spoken to Julian Borger before, I had not
2  spoken to David Korn before, and the two of them met me
3  together.  Korn was part of that meeting as well.
4    Q.  Sorry, that's the meeting when the CNN broadcast
5  came?
6    A.  No, no, sorry.  So early December meeting, my
7  meeting with Julian Borger and David Korn, and then
8  January 10th, Julian Borger just coincidentally just
9  happened to come see me when the news broke on CNN.
10   Q.  Were you talking about The Dossier at the time?
11   A.  Yes, we were talking to see if I had heard
12  anything more, and at that point I really hadn't.  But
13  then we all did.
14   Q.  During your conversation with Mr. Bensinger, did
15  you tell him that Senator McCain had given The Dossier
16  to the FBI?
17   A.  Yes.
18   Q.  Did you make a distinction between the last two
19  pages of the document and the rest of the document, or
20  did you tell him that The Dossier had been given by
21  McCain to the FBI?
22   A.  I did not distinguish between the last two pages
23  and the rest of it.
24   Q.  Did Mr. Bensinger know that already when you
25  talked to him?

Page 111

1    A.  Know what, I'm sorry?
2    Q.  Know that Senator McCain had given the document
3  to the FBI?
4    A.  Yes.  Yes.  And I think -- I told him certainly
5  and I think he knew possibly from Mr. Steele as well.
6      I can't swear to that, but I think --
7    Q.  What, if anything, did you tell Mr. Bensinger
8  about the seriousness with which you took the
9  allegations in The Dossier?
10   A.  I laid out the same three reasons to him as I
11  explained a little earlier, which is Mr. Steele's bona
12  fides, the behavior of the Russians, and the comments by
13  the Trump Campaign.  And I felt that it warranted a
14  serious investigation.
15   Q.  Did you believe that there was an investigation
16  going on at the time?
17   A.  The end of December did I believe there was
18  investigation going on?  I don't think I knew that there
19  was.
20   Q.  Did you think there was?
21   A.  I thought it was a possibility, but I was not --
22  since I had nobody I knew in the FBI, I had no contacts
23  there, I was not in a position to know for sure.
24   Q.  But you knew McCain had given it to the FBI?
25   A.  Correct.

Page 112

1    Q.  Do you know currently the status of anything
2  about the government's investigation into the
3  allegations made in The Dossier?
4    A.  Nothing other than what I read in the papers.
5    Q.  You have no personal knowledge other than what's
6  public?
7    A.  Correct.  I don't know anyone at the FBI so I
8  have no inside information.
9    Q.  You mentioned, by the way, that you had spoken to
10  Mr. Steele.  Do you know that Mr. Gubarev has sued
11  Mr. Steele in London?
12   A.  Yes, I am aware of that.
13   Q.  Did Mr. Steele tell you that?
14   A.  He did, and it had been in the Press.  I had see
15  it there.
16   Q.  What did he say about it?
17   A.  That, you know, he was being sued, and he wasn't
18  sure how it was going to play out.
19   Q.  On direct-examination, Mr. Fray-Witzer asked you
20  a series of questions about if you had ever spoken to
21  anyone about Mr. Gubarev or Webzilla or XBT, but he
22  didn't ask you about The Government.  Have you ever
23  spoken to anyone in The Government about Gubarev, XBT or
24  Webzilla?
25   A.  No.



DAVID KRAMER  Attorneys Eyes Only                    December 13, 2017
GUBAREV vs BUZZFEED                                          113–116

Page 113

1    Q.  Have you ever spoken to anyone in The Government
2  about The Dossier?
3    A.  Yes.
4    Q.  Can you tell me about that, please.
5    A.  I met with Celeste Wallander, who was the Senior
6  Director for Russian Affairs at the National Security
7  Council.  Someone I have known for many years, who I
8  consider her a friend.
9        W-A-L-L -- I don't remember if it's A-N-D-E-R or
10 E-N-D-E-R.
11       And so I did meet with her and asked her about
12 it.
13   Q.  When was that?
14   A.  That was soon after I got back from London.
15   Q.  So in early December 2016?
16   A.  Correct.  Yes.  Yes.
17   Q.  And what made you decide to do that?
18   A.  I also met with Victoria Newland who is the
19 Assistant Secretary for Europe and Eurasia Affairs.
20       Senator McCain asked me to meet with both of them
21 to see if this was being taken seriously in The
22 Government.
23   Q.  When was that?  Sorry, when did you meet with
24 Wallander?
25   A.  Wallander --

Page 114

1    Q.  Sorry, early December.
2    A.  Early December, and the same time frame for
3  Newland.
4    Q.  Okay.
5    A.  And after my return from London.
6    Q.  And Senator McCain asked you to meet with them?
7    A.  Yes, just to see if this was being taken
8  seriously.  I think he wanted to do -- this was his kind
9  of due diligence before he went to Director Comey.
10   Q.  So in which meeting with Senator McCain did he
11 ask you to speak to Wallander and Newland?
12   A.  That was I believe it was the meeting on the
13 30th.  November 30th when I went to his office.
14   Q.  And he said specifically go to these people and
15 ask them if it's being taken seriously?
16   A.  He mentioned Victoria Newland's name, and then I
17 also mentioned Celeste Wallander was someone I knew and
18 felt I could trust.
19   Q.  And what was your conversation with Victoria
20 Newland?
21   A.  It was simply she had been aware of it, and she
22 thought Steele was a serious person but she wasn't in a
23 position herself to judge the veracity of the document.
24   Q.  Did she tell you how she had become aware of it?
25   A.  No.

Page 115

1    Q.  And what else did she say about the fact that she
2  was aware of it?
3    A.  It was a fairly brief conversation.  You know,
4  but that she had heard about it, it was not clear to me
5  whether she had seen it, but that she was aware that the
6  document was out there.
7    Q.  And was being investigated or looked into in some
8  way by her?
9    A.  That she didn't know -- no, by her?
10   Q.  By her.  I was going to say I guess she was the
11 Secretary of State.
12   A.  In the State Department, but she wasn't in a
13 position to launch an investigation herself.
14   Q.  Right.  Was she aware that the document, for
15 example, was being reviewed within the State Department
16 or did you not get that level of familiarity?
17   A.  I did not get that level.
18   Q.  So she told you that she was aware that The
19 Dossier was circulating?
20   A.  Yes.  Yes.
21   Q.  And what else did she say?
22   A.  And that she vouched for Steele's bona fides,
23 Mr. Steele's bona fides.
24   Q.  To whom did she vouch?
25   A.  To me.

Page 116

1    Q.  Was that in response to a question as in do you
2  know anything about Steele or was she saying --
3    A.  Yes.  I asked.
4    Q.  What did she know about Steele?
5    A.  No, she said that his reputation is strong, and I
6  don't know that she said she knew him personally but
7  that she had heard that he had a good reputation.
8    Q.  Did you show her The Dossier?
9    A.  No.
10   Q.  Why not?
11   A.  She seemed familiar with it.
12   Q.  How could you tell she was familiar with it?
13   A.  Because we were talking about the same document.
14   Q.  And how about your conversation with
15 Ms. Wallander, what happened in that conversation?
16   A.  The same.  The same thing.  Just if she was aware
17 of this, she had not seen it, and I did show it to her.
18 And she also said that she had heard Steele had a good
19 reputation.  So it was a similar conversation.
20   Q.  Did either Mr. Newland or Ms. Wallander tell you
21 why they knew about Steele's reputation?
22   A.  Why they knew?
23   Q.  Or how?  I mean he is a -- Mr. Steele is a
24 retired MI6 agent from London, these are relatively
25 sophisticated American State people.  I'm curious if you



DAVID KRAMER  Attorneys Eyes Only
GUBAREV vs BUZZFEED

December 13, 2017
117–120

Page 117

1  know why they knew about some MI6 guy in London?
2    A.  I assumed that they knew who the author of these
3  Memos was, and that based on that they probably heard
4  from various people, and I don't know from whom, that he
5  had a good reputation.
6    Q.  So in other words, they were aware both of the
7  existence of The Dossier and the fact that Chris Steele
8  had written it; correct?
9    A.  Correct.
10    Q.  And they believed him to be credible; correct?
11    A.  Yes, correct.
12    Q.  And all of that happened in early December;
13  correct?
14    A.  Yes.  I had a subsequent conversation with
15  Ms. Wallander in which I gave her a copy of the
16  document.  That was probably around New Year's.
17    Q.  And I know you said she is a National Security
18  Counsel; is that correct?
19    A.  Correct, Senior Director.
20    Q.  What did she know about the circulation of The
21  Dossier in The Government, if anything?
22    A.  She had not seen it herself until I had shown it
23  to her.  She had heard about it.  And she didn't know
24  the status of it.
25    Q.  What else did you guys talk about relate --

Page 118

1  relevant to The Dossier in that conversation?
2    A.  I informed her that I had given it to Senator
3  McCain, and that Senator McCain had given it to Director
4  Comey.  That was -- it wasn't a whole lot more than
5  that.
6    Q.  Did she comment on that at all?
7    A.  On The Senator McCain part?
8    Q.  Yes.
9    A.  Not that I recall, but it's possible she did but
10  I don't recall.
11    Q.  So other than Ms. Wallander and Ms. Newland, have
12  you had any conversations with anyone in The Government
13  about The Dossier?
14    A.  No.
15    Q.  Did the copy you gave to Ms. Wallander include
16  the December Memo, the last two pages?
17    A.  Yes.
18    Q.  Did you -- did you intend to give the last two
19  pages of The Dossier to Senator McCain and he just was
20  away?
21    A.  Had he been in town, I might have, but I never
22  did.
23    Q.  Did you ever -- other than so we talked about
24  Ms. Wallander, Ms. Newland and a group of reporters.
25    Other than those people, did you ever share a

Page 119

1  copy of The Dossier with anyone else?
2    MR. FRAY-WITZER:  Objection.
3    MR. JIMENEZ:  Don't mention anything with
4    your lawyers or anybody.  That would be
5    privileged.
6    A.  Yes.
7  BY MS. BOLGER:
8    Q.  Obviously I don't want to ask you about your
9  lawyers.  Who cares about lawyers.
10    But other than lawyers, have you shared a copy of
11  The Dossier with anyone?
12    A.  I gave a copy to Congressman Adam Kinzinger from
13  Illinois.
14    Q.  And why did you give a copy to Congressman Adam
15  Kinzinger?
16    A.  I felt I could trust him, he -- I really got to
17  know him at the Halifax meeting, the same Halifax
18  meeting he attended, and he strikes me as a very serious
19  and honorable person, and I felt that someone on that
20  side of Congress should be aware.
21    Q.  And when did you do that?
22    A.  It would have been after the winter recess, so
23  early January.
24    Q.  And you said someone on that side of the
25  Congress.  And by that side I assume you mean --

Page 120

1    A.  The House.
2    Q.  (Continuing.) -- the House of Representatives;
3  correct?
4    A.  Yes.
5    Q.  And why did you think it was important for
6  someone in The House to know?
7    A.  I just felt that someone with what I took to be
8  his reputation of being serious and credible and
9  honorable person should be aware that this document
10  exists.
11    Q.  Because this is a serious document; correct?
12    A.  Yes.
13    Q.  And had he heard of The Dossier before you handed
14  him a copy?
15    A.  No.
16    Q.  What was his reaction?
17    A.  He read it, and, you know, he thought it raised
18  serious concerns, but like me he wasn't in a position to
19  vouch for it one way or the other.
20    Q.  Do you know what, if anything, he did with it?
21    A.  I think he put it in his safe or desk drawer and
22  kept it there.  I'm not aware that he did anything
23  further with it.
24    Q.  Did you ever have a conversation about it?
25    A.  Yeah, I stressed to him, I went through the same



DAVID KRAMER  Attorneys Eyes Only
GUBAREV vs BUZZFEED

December 13, 2017
121–124

Page 121

1  three reasons why I felt it needed to be taken
2  seriously.  The bona fides, the Russian behavior, the
3  commentary.  And said that it is also unverified and
4  needed to be corroborated and investigated.
5      Q.  And did he have any responses to that?
6      A.  No, he understood that and said he understood.
7      Q.  So other than the reporters and the three
8  Government officials we have talked about --
9      A.  Yes.
10     Q.  (Continuing.) -- is there any other person to
11  whom you have handed a copy of The Dossier?
12     A.  No.
13     Q.  Are there any other people to whom you have
14  discussed The Dossier -- with whom you have discussed
15  The Dossier?
16     A.  No.
17         Sorry.  I did discuss it with John Burks who is
18  the Chief of Staff -- or at that time, sorry, he was
19  Chief of Staff to Speaker Ryan.
20     Q.  And can you tell me what that conversation was?
21     A.  It was strictly I showed him the material, he
22  read it, and he didn't have a reaction one way or the
23  other.  He just said thank you.
24     Q.  And when was that?
25     A.  That would have been early January.

Page 122

1      Q.  So the Chief of Staff for the Speaker of the
2  House had no reaction to the material?
3      A.  I wasn't looking for one.  I just wanted him to
4  be aware.
5      Q.  Did the Kinzinger copy of The Dossier you gave
6  him include the last two pages?
7      A.  Yes.
8      Q.  Did the copy you showed to John Burks also
9  include the last two pages?
10     A.  I believe so.  I don't know if he read it all the
11  way through.
12     Q.  How come you weren't expecting him to have a
13  reaction?
14     A.  I don't know.  I don't know.
15     Q.  At the beginning of the deposition, Mr. Jimenez
16  mentioned that you had done a written submission for the
17  Senate Select Committee on Intelligence?
18     A.  Yes.
19     Q.  I understand you don't want to produce that to me
20  today, but can you tell me how that came to pass?
21     A.  They contact -- a staffer on the Committee
22  contacted Mr. Brose who asked if he could give them my
23  information, and I gave him another lawyer who is
24  representing me in Washington, his contact information
25  and they contacted him.

Page 123

1      Q.  And when was that?
2      A.  Early August, late July.  Mid July, late July.
3      Q.  So early August or late July of this year --
4      A.  Yes.
5      Q.  (Continuing.) -- the Senate Committee reached out
6  to Mr. Brose looking for your contact information?
7      A.  Correct.
8      Q.  And you directed him to another lawyer; correct?
9      A.  Correct.
10     Q.  Who is the lawyer?
11     A.  Larry Robbins.
12     Q.  And then, after that happened, what happened
13  next?
14     A.  Mr. Robbins explained to them that I was no
15  longer in Washington, and worked out an arrangement with
16  the Committee staff that they would send me questions
17  and I would reply.
18     Q.  How many questions did you get?
19     A.  Eight or ten.
20     Q.  I'm sorry, can you --
21     A.  Eight or ten.  I honestly don't quite remember.
22     Q.  What were the nature of the questions?
23     A.  Just very similar to what I have been asked here
24  this morning.  How I came into possession of The
25  Dossier, and my contact with Mr. Steele or Mr. Simpson,

Page 124

1  and those things.
2      Q.  Did you understand that the questions were being
3  asked of you in connection with an investigation?
4      A.  I mean, the Senate Select Committee has an
5  ongoing investigation so I assume -- in fact, I didn't
6  assume.  I believe they said in the letter that they
7  sent this was part of their investigation.
8      Q.  What is the investigation into?  Did they say?
9      A.  That they had an ongoing investigation shared by
10  Senator Burr and Vice-Chair Senator Warner.
11     Q.  And you have supplied answers to those questions?
12     A.  Yes.
13     Q.  Substantive answers?  Not what we lawyers would
14  call objections, right, substantive answers?
15     A.  Yes.
16     Q.  And has there been any further contact by the
17  Committee?
18     A.  No.
19     Q.  And they have asked you no follow-up questions?
20     A.  They did ask me one follow-up question, and that
21  was the names of two non -- any non-journalists to whom
22  I gave the document.
23     Q.  And who did you name?
24     A.  Ms. Wallander and Congressman Kinzinger.
25     Q.  Did they ask you in the --



DAVID KRAMER  Attorneys Eyes Only
GUBAREV vs BUZZFEED

December 13, 2017
125–128

Page 125

1       Did the initial questions ask you to whom you had
2   given The Dossier?
3       A.  Yes.
4       Q.  And in your response to that question, who did
5   you list?
6       A.  I did not.
7       Q.  Can you explain that to me.
8       A.  I explained to them that given the litigation
9   that I was aware of, and the possibility of getting
10  drawn into that, that I did not feel comfortable in
11  providing those names.
12      Q.  Have you told me everyone to whom you have
13  provided a copy of The Dossier?
14      A.  With my counsel's caveat, yes.
15      Q.  Your counsel's caveat not to mention counsel;
16  right?
17      A.  Yes.
18      Q.  And have you told me -- I just wanted to make
19  sure there wasn't other caveat I had missed.
20      A.  Right.
21      Q.  Have you told me every person with whom you have
22  spoken about The Dossier?
23      A.  Yes.  Yes.
24      Q.  You seem equivocal, Mr. Kramer.
25      A.  No, I am trying to remember if there was anyone

Page 126

1   else, but yes.
2       MS. BOLGER:  I would like to take just a
3   five-minute break if that's okay and then we all
4   can come back.
5       MR. JIMENEZ:  Are we almost done?
6       THE VIDEOGRAPHER:  Off the record at 1:21.
7       (Thereupon, a brief recess was taken, after
8   which the following proceedings occurred.)
9       THE VIDEOGRAPHER:  This begins Disk 3.  We
10  are on the record at 1:25 p.m.
11  BY MS. BOLGER:
12      Q.  Just quickly, did you understand -- when you saw
13  the CNN report and said holy shit, were you unhappy that
14  CNN had reported on the existence of The Dossier?
15      A.  I didn't know what the report was going to say,
16  so as my initial reaction that it was coming out this
17  way.  I had -- Mr. Steele had heard that CNN was
18  working on the story and asked me to look into it.  I
19  tried to contact Mr. Bernstein and I was unsuccessful.
20      Q.  And so were you unhappy when CNN published it?
21      A.  My reaction with the CNN report was more
22  surprised that it was coming out than happy or unhappy.
23      Q.  Okay.  Is your belief in the credibility of the
24  allegations in The Dossier higher now, stronger now,
25  than it was in January?

Page 127

1       A.  It seems to me that there are a number of
2   questions that were raised in The Dossier that are still
3   out there, some of which have been addressed and some of
4   which have not.  I think that there, you know, you have
5   three Congressional committees investigating, you have
6   the Special Counsel investigating.
7       I assume that they are not investigating solely
8   based on The Dossier, but that it factors into their
9   work.
10      Q.  And you have said you know that not through
11  sources in The Government but through reading what's in
12  the media; correct?
13      A.  Correct.
14      MS. BOLGER:  I have no further questions.
15      MR. FRAY-WITZER:  Just a few follow-up
16      questions.
17      RE-DIRECT EXAMINATION
18  BY MR. FRAY-WITZER:
19      Q.  Your initial conversations with Wallander and
20  Newland, you testified, were in early December; correct?
21      A.  The initial conversations?
22      Q.  Yes.
23      A.  Yes.
24      Q.  And so that was prior to your having received the
25  final Memo, the December Memo; is that correct?

Page 128

1       A.  Correct.
2       Q.  And you testified that you saw a list when you
3   were with Mr. Steele of five names of sources.  You were
4   asked about the seriousness of some of those sources.
5       You saw that list prior to the December Memo
6   being compiled; is that correct?
7       A.  Correct.
8       Q.  Do you have any way of knowing whether or not the
9   sources for the December Memo were the same or different
10  from those five sources?
11      A.  I don't know, and the last page where there is a
12  redaction at the very top, it's -- I'm sorry, in the
13  so-called Unredacted Version, if you will, Exhibit 3 I
14  think you said, so I'm pointing at paragraph 3 at the
15  top of the very last page.
16      Q.  Yes.
17      A.  That's how I received it, so I don't know what it
18  says here.
19      Q.  And do you have any information whatsoever on who
20  that source is or what is under that redaction?
21      A.  I do not know.
22      Q.  Have you in your experience and prior to your
23  dealings with Mr. Steele, have you had cause to see raw
24  intelligence reports?
25      A.  Since -- sorry, say that again, I'm sorry?



DAVID KRAMER  Attorneys Eyes Only
GUBAREV vs BUZZFEED

December 13, 2017
129–132

Page 129

1   Q.  Prior to your interactions with Mr. Steele --
2   A.  Yes.
3   Q.  (Continuing.) -- in your history with working for
4   The Government --
5   A.  Yes.
6   Q.  (Continuing.) -- have you had occasion to see raw
7   intelligence reports?
8   A.  I was read into very highly classified material
9   that included material that would be described not as
10  raw intelligence but as human intelligence or signal
11  intelligence or various kinds of intelligences.
12   Q.  In your experience as -- I don't think any of us
13  dispute this -- as a Russia expert, have you known human
14  intelligence to include disinformation?
15   A.  Yes, and the intelligence community does its best
16  to corroborate and weed out disinformation.
17   Q.  The questions that you were asked by the Senate
18  Select Committee and that you responded to, did any of
19  those questions have -- deal with Gubarev, Webzilla or
20  XBT?
21   A.  No.
22   Q.  You were asked by Attorney Bolger, I believe her
23  quote was "tech people are not your area of expertise."
24  Do you remember that?
25   A.  Yes.

Page 130

1   Q.  People connected to the Russian Government are
2   part of your expertise; is that correct?
3   A.  Yes.
4   Q.  And prior to receiving the December Memo, you had
5   never heard of Gubarev, Webzilla or XBT; is that
6   correct?
7   A.  Correct.
8       MR. FRAY-WITZER:  No further questions.
9       MR. JIMENEZ:  So we are going to designate
10      the whole thing pursuant to the parties'
11      agreement as Attorneys' Eyes Only subject to
12      whatever rights people have to challenge and I
13      will receive notice of any such challenge.
14      MR. FRAY-WITZER:  I believe we are agreeing
15      to waive the time limitations on any party
16      challenging the designations.
17      Is that correct.
18      MS. BOLGER:  Yes, that's correct.
19      MR. FRAY-WITZER:  And is that okay with you?
20      MR. JIMENEZ:  It's fine with me.
21      As long as I get notice if there is such a
22      challenge, yes.
23      MS. BOLGER:  Yes, certainly.
24      MR. FRAY-WITZER:  Yes.  Thank you.
25      THE VIDEOGRAPHER:  This concludes the

Page 131

1   deposition.  Off the video record at 1:32 p.m.
2       MS. BOLGER:  I am ordering a copy, yes.
3       (Thereupon, the deposition was concluded at
4   1:32 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 132

1                 CERTIFICATE OF OATH
2
3   STATE OF FLORIDA)
4   COUNTY OF MIAMI-DADE)
5
6       I, JEROME E. HARRIS, the undersigned
7   authority, hereby certify that the following-named
8   deponent personally appeared before me and was
9   thereupon duly sworn:
10
11                 DAVID KRAMER
12       WITNESS my hand and official seal this
13   13th day of December 2017.
14
15
16
17
18
19       _____
20            JEROME E. HARRIS
21        Notary Public - State of Florida
            Commission No. FF 139869
22          expires September 4, 2018
23
24
25



DAVID KRAMER  Attorneys Eyes Only
GUBAREV vs BUZZFEED

December 13, 2017
133—136

**Page 133**

1                    REPORTER'S DEPOSITION CERTIFICATE
2
   STATE OF FLORIDA)
3
   COUNTY OF MIAMI-DADE)
4
5          I, the undersigned authority, certify that I
6   was authorized to and did stenographically report the
7   foregoing deposition; and that the transcript is a true
8   record of the testimony given by the witness.
9
10         That the witness requested reading and
11  signing.
12
13         I further certify that I am not of counsel,
14  Am not related to nor employed by any attorney to this
15  suit and am not financially interested in the outcome
16  thereof.
17
18
19         Dated this 13th day of December 2017
20
21
22         *Jerome E. Harris*
23         _____
24              JEROME E. HARRIS
25

**Page 134**

1                    DEPOSITION ERRATA SHEET
2
3   Our Assignment No.:   J0781312
    Case Caption:        Gubarev v. Buzzfeed
4
            DECLARATION UNDER PENALTY OF PERJURY
5
6          I,              declare under penalty of
7   perjury that I have read the entire transcript of my
8   Deposition taken in the captioned matter or the same has
9   been read to me, and the same is true and accurate, save
10  and except for changes and/or corrections, if any, as
11  indicated by me on the DEPOSITION ERRATA SHEET hereof,
12  with the understanding that I offer these changes as if
13  still under oath.
14  EXECUTED this _____ day of _____,
15  20_____, at _____  _____
                        City          State
16
17
18         _____
                  DAVID KRAMER
19
20
21  Subscribed and sworn to before me
    This_____ day of_____,_____,
22
23
24  Notary Public in and for said
       County and State
25

**Page 135**

1                    DEPOSITION ERRATA SHEET
2   Page No.____Line No.____Change to_____
3   _____
4   Reason for change:_____
    Page No.____Line No.____Change to_____
5
6   _____
7   Reason for change:_____
    Page No.____Line No.____Change to_____
8
9   _____
10  Reason for change:_____
11  Page No.____Line No.____Change to_____
12  _____
13  Reason for change:_____
14  Page No.____Line No.____Change to_____
15  _____
16  Reason for change:_____
17  Page No.____Line No.____Change to_____
18  _____
19  Reason for change:_____
20  Page No.____Line No.____Change to_____
21  _____
22  Reason for change:_____
23
24  SIGNATURE:   _____DATE:_____
25                         J#: J0781312

**Page 136**

1                    DEPOSITION ERRATA SHEET
2   Page No.____Line No.____Change to_____
3   _____
4   Reason for change:_____
5   Page No.____Line No.____Change to_____
6   _____
7   Reason for change:_____
8   Page No.____Line No.____Change to_____
9   _____
10  Reason for change:_____
11  Page No.____Line No.____Change to_____
12  _____
13  Reason for change:_____
14  Page No.____Line No.____Change to_____
15  _____
16  Reason for change:_____
17  Page No.____Line No.____Change to_____
18  _____
19  Reason for change:_____
20  Page No.____Line No.____Change to_____
21  _____
22  Reason for change:_____
23
24  SIGNATURE:   _____DATE:_____
25                         J#: J0781312

