FILED UNDER SEAL PER COURT ORDER

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

Case No. 17-60426-CV-Ungaro/O'Sullivan

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.

    Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

    Defendants.
_____/

## NON-PARTY DAVID J. KRAMER'S SEALED MOTION FOR PROTECTIVE ORDER

Pursuant to the Court's Amended Confidentiality Stipulation and Protective Order, non-party David J. Kramer files this sealed motion to maintain the confidential designation of his deposition testimony.[1] In support, Mr. Kramer states the following:

### I. INTRODUCTION

The "good cause" standard for issuing a protective order is easily met here. The public release of Mr. Kramer's confidential deposition testimony would jeopardize his and his family's personal safety, as well as the integrity of ongoing investigations by the United States Senate Select Committee on Intelligence and the United States House Permanent Select Committee on Intelligence.

---

[1] The Court's Amended Protective Order sets out the requisite procedure. *See* Docket Entry ("D.E.") 97. In short, The Amended Protected Order allows material to be designated Confidential. *Id.* at ¶4. If a party challenges that designation, the party who designated the material Confidential has fifteen days to "seek an order from the court upholding the designation[.]" *Id.* at ¶13. By filing this motion, Mr. Kramer seeks to comply with the terms of the Amended Protective Order.

1

When these compelling reasons for the Amended Protective Order are compared with Plaintiffs' stated reasons for removing the confidentiality designation, it makes the correct and just result all the more apparent. Prior to the initial filing of this motion under seal, Plaintiffs claimed they needed Mr. Kramer's deposition for three reasons: (i) for use during the depositions of others in the instant case; (ii) to assist them with securing the deposition of the Trump Dossier's purported author, Christopher Steele; and (iii) to confirm aspects of Mr. Kramer's testimony with other third parties who received briefings or materials from Mr. Kramer. At the hearing held by this Court on January 26, 2018, Plaintiffs focused on the purported need to use Mr. Kramer's deposition testimony in order to secure Mr. Steele's deposition in London, as well as a separate case they have brought in Washington, D.C. against Fusion GPS.

With respect to (i), Plaintiffs are, of course, *already* permitted consistent with the terms of the Amended Protective Order to use Mr. Kramer's deposition in an appropriate manner, particularly since the parties have agreed with the Court's approval to treat the deposition as Confidential rather than Attorneys' Eyes Only. With respect to (ii), Plaintiffs have not adequately explained why the use of Mr. Kramer's deposition would help them secure Mr. Steele's deposition in London, and even if they could, Plaintiffs' interest in using the deposition hardly outweighs the concerns articulated above. And with respect to (iii), Plaintiffs can confirm Mr. Kramer's testimony with thirdparties in a way that maintains the confidentiality of his deposition.

Mr. Kramer believes that Plaintiffs simply want his deposition to placate their desire to publicly expose anyone who had anything to do with the Dossier's publication and to satisfy their and their counsel's desire for publicity. In sum, to de-designate Mr. Kramer's testimony would serve no purpose at this point other than to embarrass, harass, and unduly burden a non-party to this lawsuit. The Court should order that the deposition remain Confidential.

## II.  FACTS

A. **Background on the Dossier and its Ultimate Publication**

1. The "Dossier"

The so-called "Trump Dossier" is a series of separate memorandums prepared over a period of several months. *See* Complaint ("Compl.") at ¶3[2] & Ex. 3 to Compl.[3] The Dossier was compiled by Christopher Steele, a former British intelligence officer. Deposition Transcript ("Dep. Tr.") at 26:2-3; 31:9-11.[4] The Dossier sets out reports from unnamed sources covering a wide range of subjects, most of which relate to Russian involvement in United States political affairs. Ex. 3 to Compl.

One of the subjects was the alleged "Trump operation," purportedly "supported and directed by Russian President Vladimir PUTIN." Ex. 3 to Compl. at *22. The Dossier alleged that "Russian authorities had been cultivating and supporting US Republican presidential candidate Donald TRUMP for at least 5 years." *Id.* According to an alleged Dossier source, the "aim" of the operation was "to sow discord and disunity both within the US itself, but more especially within the Transatlantic alliance which was viewed inimical to Russian's interests." *Id.* at 22-23. The Dossier provided an example of how the Russian government was attempting to "support" Mr. Trump, alleging that the Russian government's intelligence branch, the Federal Security Service of the Russian Federation, had recruited "hacking experts" to "conduct 'altering operations' against the Democratic Party leadership" "over the period March-September 2016."

---

[2] For the Court's convenience, Mr. Kramer is attaching the Complaint as **Attachment A**.

[3] Mr. Kramer is attaching Ex. 3 to the Complaint as **Attachment B**.

[4] Mr. Kramer is attaching the deposition transcript as **Attachment C**.

Ex. 3 at *56. Compl. ¶25. Another topic of the Dossier included the Russian government's alleged acquisition of so-called "kompromat" (i.e., compromising material) on then presidential candidates Donald Trump and Hilary Clinton. Ex. 3 to Compl. at *22-23.

2. <u>Mr. Kramer Acquires the Dossier</u>

In November 2016, Mr. Kramer learned about the existence of the Dossier from Sir Andrew Wood, a retired British diplomat. Dep. Tr. at 22:11-14; 19:1-5. Mr. Wood suggested that Senator John McCain might be interested in the information in the Dossier. *Id.* at 22:10-21. That same day, Mr. Kramer, Mr. Wood, Senator McCain, and Senator McCain's aide met in person to discuss the Dossier. *Id.* at 25:2-14. When Mr. Wood told the others that Mr. Steele was in London and willing to meet to discuss the Dossier, Senator McCain asked Mr. Kramer to fly to London to meet Mr. Steele. *Id.* at 26:21-15. Mr. Kramer agreed to do so. *Id.* at 27:4.

Mr. Kramer met Mr. Steele in London. *Id.* at 28:8-10, Mr. Steele gave Mr. Kramer a copy of the Dossier to read and, after he read the Dossier, they generally discussed it. *Id.* at 31:15-16; 32-36. Mr. Steele told Mr. Kramer that he would arrange for him to get a copy of the Dossier upon his return to Washington D.C. *Id.* at 36:24-25; 37:1. When Mr. Kramer got back to Washington, he obtained a copy of the Dossier from Fusion GPS. *Id.* at 36-38.

3. <u>Mr. Kramer Shares the Dossier</u>

Mr. Kramer gave a copy of the Dossier to Senator McCain, who in turn provided it to former FBI Director Comey. *See id.* at 43:12-15; 45:4-8. Mr. Kramer subsequently met with representatives of the media, including persons associated with McClatchy, The Washington Post, The Wall Street Journal, and NPR. *Id.* at 53-56. He provided copies of the Dossier to representatives of those entities. *Id.* When doing so, Mr. Kramer consistently provided certain "warnings and cautions." *Id.* at 56:20-13. Specifically, Mr. Kramer stressed "the sensitivity of

the document, the need to verify or refute it, and not to publish it" "unless and until" it could be verified. *Id.* at 55. Indeed, at one point after being given the Dossier, a representative from McClatchy asked Mr. Kramer if he could quote "a paragraph or two" from the Dossier. *Id.* at 53:19-21. Mr. Kramer said "no." *Id.* at 53:21.

    4. <u>Mr. Kramer Permits BuzzFeed Reporter to Read Dossier</u>

Mr. Kramer, at Mr. Steele's request, met with Ken Bensinger from BuzzFeed. *Id.* at 58:8-16; 61:3-5. Mr. Bensinger stated that BuzzFeed was "very interested" in looking at the Dossier and asked if he could take photographs of it using his phone. *Id.* at 61:21; 62:5-7. Mr. Kramer asked Mr. Bensinger not to take photographs of the Dossier. *Id.* at 62:7. Mr. Kramer stressed that he was in no position to verify or refute the accuracy of the Dossier and noted that he felt that journalists needed to look into the matter. *Id.* at 63:5-7. After Mr. Bensinger told Mr. Kramer that he was a "slow reader," Mr. Kramer said that he would give him some space to review the Dossier and left him alone for approximately 20 to 30 minutes. *Id.* at 62:8-12. Unbeknownst to Mr. Kramer, during this time Mr. Bensinger took photographs of the Dossier. *Id.* at 62:13-14.

    4. <u>BuzzFeed Publishes the Dossier</u>

On January 10, 2017, BuzzFeed published the photographs of the Dossier on its website. Compl. ¶23-24. After learning of this fact, Mr. Kramer called Mr. Bensinger and asked him to take the Dossier off the website. Dep. Tr. at 66:18-19. He told Mr. Bensinger that he was going to "get people killed." *Id.* Mr. Kramer also asked Mr. Bensinger not to disclose his name in connection with the Dossier, which he agreed not to do. *Id.* at 66:15; 67:1-3.

**B.     Mr. Kramer's Deposition and the Fight over the Confidential Designation**

   1. <u>The Plaintiffs File this Lawsuit and Court Issues an Amended Protective Order</u>

On February 3, 2017, the Plaintiffs in this case, Aleksej Gubarev, XBT Holding S.A., and Webzilla, Inc., sued the Defendants here, BuzzFeed, Inc. and Ben Smith. D.E. 80-1. Mr. Gubarev is a Russian who lives in Cyprus and incorporated his holding company, Plaintiff XBT Holdings, in Luxembourg. XBT's subsidiary, Webzilla (also a Plaintiff), has been associated with internet piracy.[5]

Following the removal of the case to federal court, this Court entered the Amended Protective Order. D.E. 97.[6] Relevant for the purposes of this motion, this Order covered all depositions, including depositions of non-parties. *Id.* at ¶1. Under the terms of the order, both parties and non-parties could designate documents and information either Confidential or Attorneys' Eyes Only. *Id.* at ¶2, 4. With respect to "Confidential Information," it includes "any business, proprietary, or personal information contained in Discovery Material and any other non-public or sensitive information of the parties and their affiliates[.]" *Id.* at ¶4. Once information is marked "Confidential," it may only be shared with specific people and used for specific purposes. *Id.* at ¶6. By way of example, the parties may show such information to deponents and witnesses in this action. *Id.* at ¶6(d).

The Order also included a procedure for challenging a designation of Confidential. *Id.* at ¶13. In short, a party challenging such a designation must challenge such a designation "in writing,

---

[5] http://www.charlotteobserver.com/news/politics-government/article184786603.html ("It's not shocking that Webzilla was listed as a hub for questionable activity. Webzilla is on my radar weekly due to its client base facilitating online piracy on a massive scale," said Jason Tucker, president of Battleship Stance, a company that manages and investigates copyright infringement for film studios).

[6] This is attached as **Attachment D**.

stating with specificity" both the document challenged (e.g., deposition transcript) and "the reasons for such challenge." *Id.* At that point, the party that originally designated the material as Confidential must "seek an order from the court upholding" that designation. *Id.*

2. Mr. Kramer is Deposed and Deposition is Designated Attorneys' Eyes Only

Prior to Mr. Kramer's deposition, he advised counsel for the parties that he intended to designate the deposition as Attorneys' Eyes Only. No one objected or mentioned the need to use the deposition in London or anywhere else. At the deposition on December 13, 2017, Mr. Kramer designated the deposition as Attorneys' Eyes Only. Again, no one objected or mentioned London.

On December 26, 2017, the day after Christmas, Plaintiffs challenged this designation. *See* December 26, 2017 Email from Evan Fray-Witzer to Marcos D. Jimenez.[7] Among other things, the Plaintiffs argued that there was no basis under the Federal Rules of Civil Procedure or the existing Amended Protective Order to keep the deposition testimony private and identified various reasons for why they needed to de-designate the deposition, including a need to use it in foreign litigation. *Id.*

3. Plaintiffs mislead the Court at the hearing on January 26, 2018.

Although Mr. Kramer has not obtained a copy of the transcript, at the hearing on January 26, 2018, Plaintiffs misled the Court in three significant ways. First, they claimed that Mr. Kramer had already revealed facts from his deposition to a reporter from The Guardian, who published a book called "Collusion." That is not true. Mr. Kramer never spoke with the author of Collusion,

---

[7] Mr. Kramer attaches this email as **Attachment E**. Notably, given the timing of the Plaintiffs' challenge, Mr. Kramer technically had to seek an order from the Court maintaining the Attorneys' Eyes Only designation by January 10, 2017. *See* Amended Protective Order at ¶13 ("The designating party shall have fifteen (15) days from the receipt of [a notice challenging the designation] to seek an order from the court upholding the designation[.]"). The Plaintiffs, however, agreed to give Mr. Kramer a one week extension, with which he complied.

7

Luke Hardin, about the Dossier and expressly said so at his deposition. Dep. Tr. 28:11-25; 29:1. And although he did speak with another reporter at The Guardian, his conversation with that reporter was supposed to have been off the record. Dep. Tr. 29:2-5. However, that reporter, Julian Borger, violated the off-the-record agreement and published information about Mr. Kramer's meeting in London with Mr. Steele. Mr. Harding, in turn must have used that as the basis for his description in his book, as he never spoke to Mr. Kramer for the book. Dep. Tr. 29:6-10. Thus, under no circumstances should the Court believe that Mr. Kramer facilitated any account in that book. The published information does not cover any aspect of Mr. Kramer's meetings with Senator McCain or any member of the press following his meeting in London with Mr. Steele.

Second, Plaintiffs suggested that Mr. Kramer sought out meetings with representatives of the media about the Dossier, calling into question his safety concerns. In fact, Mr. Kramer made clear that, in most instances, the media representatives either approached him or he was asked to meet with them by Mr. Steele. Dep. Tr. 49:5-12. But more importantly, Mr. Kramer consistently warned and cautioned media representatives not to publish any part of the Dossier without first verifying or corroborating it through investigation. And at no time did he agree to be identified as the source of the Dossier or of any information provided to the media.

Third, the Plaintiffs denied that they have already violated the protective order. This has already been proven to be false. Because of a single filing submitted in this case by the Plaintiffs' attorneys, a member of the press has already reached out to Mr. Kramer's lawyer. *See* Email dated Jan. 5, 2018 from K. Polantz of CNN to M. Jimenez (stating "[a] court filing in the case today [by Plaintiffs' attorneys] indicated that Mr. Kramer was the only person [Plaintiffs' attorneys] interviewed before they said they learned who leaked the Dossier to BuzzFeed. It seems quite

obvious that they learned the original of the leak from his deposition.").[8] Plaintiffs also effectively conveyed aspects of Mr. Kramer's December 13, 2017 deposition testimony to the press. On December 21, 2017, just eight days after Mr. Kramer's deposition, counsel for Plaintiffs told the press that "We were able to get the information [about BuzzFeed's source that] we wanted[.]" Chuck Ross, BuzzFeed's Trump Dossier Source Gets Closer to Being Identified, Dec. 21, 2017, http://dailycaller.com/2017/12/21/BuzzFeeds-trump-dossier-source-gets-closer-to-being-identified/. This effectively implicated Mr. Kramer as having provided that information to BuzzFeed. Plaintiffs' filing and counsel's comments to the press violated the Amended Protective Order.

### III. DISCUSSION

The Court should order that Mr. Kramer's deposition remain Confidential. As developed further below, (A) at this stage of the litigation, there is neither a common law right of access to the deposition nor any constitutional right to share the deposition that cannot be overcome by a showing of good cause under Federal Rule of Civil Procedure 26(c) and (B) under Federal Rule of Civil Procedure 26(c), there is good cause to maintain the confidentiality of the deposition.

**A.     The Common-Law and Constitutional Right of Access**

A court must exercise its Rule 26(c) authority to issue a protective order in a manner consistent with both (1) the common-law right to inspect and copy judicial records; and (2) the First Amendment right of access to court records and documents. As a threshold matter, then, Mr. Kramer will address these issues.

---

[8] Mr. Kramer attaches this email as **Attachment F**.

1. <u>There is no Common-Law Right of Access to the Deposition</u>

As a general matter, the press and the public jointly have a common-law right "to inspect and copy judicial records." *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978); *United States v. Rosenthal*, 763 F.2d 1291, 1293 (11th Cir.1985). The Eleventh Circuit has offered two points of guidance regarding whether this common-law right of access extends to documents obtained during the discovery process.

First, the right of access does *not* extend to *unfiled* discovery, which, as the name suggests, is discovery that has *not* been filed with the court, because unfiled discovery does not qualify as "judicial records." *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1311 (11th Cir. 2001) (noting that "there is no common-law right of access" to "discovery material" "as these materials are neither public documents nor judicial records"); *In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 355 (11th Cir. 1987) ("[T]his court has observed that private "documents collected during discovery are not 'judicial records'"); *Bond v. Utreras*, 585 F.3d 1061 (7th Cir. 2009) ("Unfiled discovery is private, not public."). This stems from the purpose of discovery, which is "essentially a private process . . . the sole purpose [of which] is to assist trial preparation." *United States v. Anderson*, 799 F.2d 1438, 1441 (11th Cir. 1986).

Second, the right of access *may* extend to *filed* discovery, depending on the nature of the filing at issue. Specifically, the Eleventh Circuit has distinguished between two sorts of filings (i) substantive filings -- "material filed in connection with pretrial motions that require judicial resolution of the merits" (which the Eleventh Circuit considers "judicial records" that are "subject to the common-law right" of access") and (ii) discovery-related filings -- "material filed with discovery motions" (which the Eleventh Circuit does *not* consider "judicial records" that are "subject to the common-law right of access"). *Chicago Tribune Co.*, 263 F.3d at 1312.

Here, the Court should find that the common-law right of access to inspect and copy judicial records and public documents does *not* apply to the deposition at issue. Simply put, the deposition at issue is not a judicial record, as it constitutes *unfiled* civil discovery. *See In re Denture Cream Prod. Liab. Litig.*, No. 09-2051-MD, 2013 WL 214672, at *6 (S.D. Fla. Jan. 18, 2013). But even if the common-law fight of access did apply here, it could be overcome by a finding that good cause exists to keep the deposition Confidential. *Chicago Tribune Co.*, 263 F.3d at 1313 ("[T]he Press's common-law right to the Firestone documents filed in connection with the motion for summary judgment may be resolved by the Rule 26 good cause balancing test."). As developed in Part B below, good cause exists here.

2. The Constitutional Right of Access is Governed by the Rule 26(c) Standard

A party's First Amendment right to share material obtained during discovery is not absolute. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32, 104 S. Ct. 2199, 2207, 81 L. Ed. 2d 17 (1984) (noting that "[a]lthough litigants do not surrender their First Amendment rights at the courthouse door those rights may be subordinated to other interests that arise in this setting."). Among other things, a court may issue a protective order expressly precluding the dissemination of such discovery material outside of the litigation before the court. *See Chicago Tribune Co.*, 263 F.3d at 1310. When deciding whether to do so, the court applies a legal standard "identical to that of Rule 26(c) of the Federal Rules of Civil Procedure." *Id.* at 1310. In other words, the person seeking the protective order must demonstrate "good cause" for precluding the dissemination of the materials. *Id.*[9]

---

[9] This "good cause" standard stands in contrast to the heightened "compelling interest" standard of review, which "requires courts to close judicial records only when the denial is necessitated by a compelling governmental interest, and is narrowly tailored to that interest." *Wilson v. Am. Motors Corp.*, 759 F.2d 1568, 1571 (11th Cir. 1985) (internal citations omitted); *see also Chicago Tribune Co.*, 263 F.3d at 1310 (noting that "[m]aterials merely gathered as a result of the civil

B.     **Good Cause Exists for the Current Designation under the Amended Protective Order**

Under Federal Rule of Civil Procedure 26(c), a court may, "for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c); *see also Chevron Corp. v. Donziger*, No. 11 CIV. 0691 LAK, 2013 WL 646399, at *5 (S.D.N.Y. Feb. 21, 2013) (noting district courts may issue protective and sealing orders to protect a party or person from the concerns expressly set out in Rule 26(c) "not to mention even graver concerns"). Good cause "generally signifies a sound basis or legitimate need to take judicial action." *In re Alexander Grant*, 820 F.2d at 356. When analyzing whether good cause exists, a court should perform a "balancing of interests." *Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1547 (11th Cir. 1985). This balancing "requires the district court to balance the party's interest in obtaining access against the other party's interest in keeping the information confidential." *Chicago Tribune Co.*, 263 F.3d at 1313 (citing *Farnsworth*, 758 F.2d at 1548). Ultimately, the party seeking protection bears the burden of demonstrating good cause. *See id.*; *United States v. Garrett*, 571 F. 2d 1323, 1326 n.3 (5th Cir. 1978).

1. <u>The Sound and Legitimate Needs to Keep the Deposition Confidential</u>

The Court should order that Mr. Kramer's deposition testimony remain Confidential for at least two reasons: (a) dissemination could threaten Mr. Kramer's and his family's personal safety; and (b) dissemination could compromise ongoing Congressional investigations.

---

discovery process . . . do *not* fall within the scope of the constitutional right of access's compelling interest standard") (emphasis added)). *In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 355 (11th Cir. 1987) (noting that, so long as a protective order is "limited to pretrial civil discovery, it is not subjected to heightened scrutiny").

*a. Dissemination Could Threaten Mr. Kramer's Personal Safety*

Most importantly, if the Court allows the Plaintiffs to share the deposition outside of the instant litigation, it could threaten Mr. Kramer's and his family's safety for a number of reasons. If the deposition becomes public, people could certainly view Mr. Kramer as the cause-in-fact of the Dossier's publication. If persons or entities named in the Dossier were to discover the contents of the deposition, they or those associated with them may seek to exact revenge on Mr. Kramer. Obvious candidates include members of the Federal Security Service of the Russian Federation, the modern equivalent of the KGB. The Dossier reported that the Federal Security Service "uses coercion and blackmail to recruit most capable cyber operatives in Russia" and specifically reported that the Security Service recruited entities to "conduct 'altering operations' against the Democratic Party leadership." Ex. 3 to Compl. at *25, 56. Regardless of the truth of this report, which Mr. Kramer is in no position to confirm or deny, Mr. Kramer understandably fears that publication of the Dossier may have upset members of the Security Service and that they may attempt to retaliate against him or his family, however misguided such retaliation. *See* Decl. of David J. Kramer.[10] Moreover, if his deposition is made public, his stated knowledge of the sources of the dossier could lead persons to attempt to extract this knowledge from him.

This is not hyperbole. Mr. Kramer's fear is clearly well-founded. It is based Mr. Kramer's years of study of the actions of Russian intelligence operatives and agencies, as well as on the list of critics or suspected enemies of the Russian government who have been murdered, including a person suspected of being a source for the Dossier, Oleg Erovinkin. The following list is illustrative:

---

[10] Mr. Kramer attaches his declaration as **Attachment G**.

- In December 2016, Oleg Erovinkin, a senior associate of Igor Sechin, the head of Rosneft (the state-owned oil company), was found dead in the back of his car under mysterious circumstances; press reports speculated that he may have been a source for the dossier and thus killed for his suspected role. Robert Mendick & Robert Verkaik, Mystery Death of Ex-KGB Chief Linked to MI6 Spy's Dossier on Donald Trump, The Telegraph (Jan. 27, 2017), http:www.telegraph.co.uk/news/2017/01/27/mystery-death-ex-kgb-chief-linked-mi6-spys-dossier-donald-trump/; Andrew E. Kramer, Hacker Is a Villian to Russia and the United States for Different Reasons, New York Times (March 16, 2017), http.//www.nytimes.com/2017/03/16/world/europe/russian-hacker-fsb-agent-dimitry-dokuchaev.html);https://www.thedailybeast.com/was-this-russian-general-murdered-over-the-steele-dossier.

- Mikhail Lesin, former Russian minister for communications, died mysteriously in his Washington, D.C. hotel in November 2015 from blunt force injuries to his head and torso. Some reports suggested Lesin was cooperating with the FBI in a criminal investigation of his former Russian business colleagues and officials, and that such a role may have been a factor in his death. Jason Leopold et al., *"Everyone Thinks He Was Whacked,"* BuzzFeed (July 28, 2017), https://www.buzzfeed.com/jasonleopold/putins -media-czar-was-murdered-just-before-meeding-feds?utm_term=.fxPQG1ADb#.soMPVkovJ.

- Alexander Perepilichny, a Russian businessman turned whistleblower of the Putin regime, died under mysterious conditions near London in 2012. Subsequent lab results showed he died from ingesting a rare poison. Alan Cowel, *Putin 'Probably Approved' Litvinenko Poisoning, British Inquiry Says, New York Times* (Jan. 21, 2016), http://www.nytimes.com/2016/01/22/world/europe/alexander-litvinenko-poisoning-inquiry-britain.html?r_=).

- Alexander Litvinenko, a former agent of the Russian FSB (successor agency to the KGB), received asylum in London after becoming an outspoken critic of Russian President Putin. In 2006, he was poisoned to death by polonium in a London hotel by two suspected Russian agents; according to an official British inquiry, Putin "probably approved" the poisoning of Litvinenko. (https://www.nytimes.com/2016/01/22/world/europe/alexander-litvinenko-poisoning-inquiry-britain.html?_r=0).

Furthermore, Mr. Kramer has been the target of several recent hacking attempts -- one in the fall of 2016 and two more in the summer of 2017. *See* Decl. of David J. Kramer at ¶5. And, it should be stressed, Mr. Kramer does not just fear reprisals from members of the Russian intelligence community or those working at their direction. He also fears reprisals by persons sympathetic to the Putin regime who view the Dossier as reflecting negatively on that regime. This is of particular concern given that Mr. Kramer currently lives and works in the South Florida area,

which is home to many Russian emigres and other Russians who have purchased property and who vacation here. Notably, Mr. Kramer has consistently expressed his grave concerns over the publication of the Dossier and his association with that publication. Immediately after BuzzFeed published the deposition, Mr. Kramer informed Mr. Bensinger that he was going to "get people killed" and asked him to both remove the Dossier from BuzzFeed's website and to not disclose Mr. Kramer's name in connection with the Dossier. *Id.* at 66:15; 67:1-3. Similarly, Mr. Steele, the purported author of the Dossier, went into hiding following the Dossier's release to the general public.

Although Mr. Kramer's well-founded fear for his personal safety serves as an obvious justification for maintaining the confidentiality of the deposition, the case law serves to confirm it. *See, e.g., Planned Parenthood Arkansas & E. Oklahoma v. Jegley*, No. 4:15-CV-00784-KGB, 2016 WL 7487914, at *2 (E.D. Ark. Feb. 1, 2016) (issuing a protective order keeping the identities of doctors affiliated with "Planned Parenthood" confidential where there was "evidence in the record before the Court that physicians who provide abortions or associate with abortion providers are subject to personal and professional stigma and that they fear for their personal safety and that of their families"); *Doe No. 2 v. Kolko*, 242 F.R.D. 193, 199 (E.D.N.Y. 2006) (issuing a protective order precluding the disclosure of the identity of the plaintiff "other than for purposes of this litigation" where, among other things, plaintiff submitted an affidavit in which he claimed he would "suffer intimidation and retaliation by members of the Orthodox Jewish community, of which he is a member, if his identity is publicly disclosed").

### b. *Dissemination Could Compromise Congressional Investigations*

Second, if the Court allows the Plaintiffs to share the deposition publicly and/or outside the instant litigation, it could threaten the integrity of Congressional investigations on the same

subject matter. Mr. Kramer recently provided testimony to both houses of Congress, testifying in a "closed-door" session before the United States House Permanent Select Committee on Intelligence, and provided additional testimony to the United States Senate Select Committee on Intelligence. Mr. Kramer's testimony before those Committees is required to be treated as confidential.

Both the House and Senate Committees treat the testimony provided to them as confidential. For example, Rule 12(a)(4) of the Rules of Procedure for the Permanent Select Committee on Intelligence of the House of Representatives provides the following:

> (4) Records of Closed Proceedings. Any records or notes taken by any person memorializing material otherwise prohibited from disclosure by members of the Committee and Committee Staff under these rules, including information received in executive session and the substance of any hearing or briefing that was closed to the public, shall remain Committee material subject to these rules and may not be publicly discussed, disclosed, or caused to be publicly discussed or disclosed, unless authorized by the Committee consistent with these rules.

Similarly, the Rules of Procedure of the Select Committee on Intelligence of the Senate provide the following:

> 9.7. . . . [C]lassified and committee sensitive information may only be disclosed to persons outside the Committee (to include any congressional committee, Member of Congress, congressional staff, or specified non-governmental persons who support intelligence activities) with the prior approval of the Chairman and Vice Chairman of the Committee, or the Staff Director and Minority Staff Director acting on their behalf, consistent with the requirements that classified information may only be disclosed to persons with appropriate security clearances and a need-to-know such information for an official governmental purpose. Public disclosure of classified information in the possession of the Committee may only be authorized in accordance with Section 8 of S. Res. 400 of the 94th Congress.

Here, when asked during his deposition about the nature of the questions proposed by Congress, Mr. Kramer testified that the questions were "[j]ust very similar to what I have been asked here this morning. How I came into possession of The Dossier, and my contact with Mr. Steele or Mr. Simpson, and those things." Dep. Tr. at 123:22-124:1. Accordingly, if the Court

allows the Plaintiffs to share the deposition publicly and/or outside the context of this case, it could threaten Congressional investigations, as it will reveal the Congressional Committees' knowledge regarding the information provided by Mr. Kramer to the Committees. Moreover, the Select Committees of the House and Senate have not authorized public disclosure of this information. Indeed, the public disclosure of Mr. Kramer's testimony in this case undermines the very purpose of his confidential testimony before Congress.

    2. <u>The Balancing of Interests Favors Mr. Kramer</u>

The requisite balancing of interests only serves to underscore why the Court should keep Mr. Kramer's deposition confidential. As noted in the introduction, Plaintiffs have failed to articulate a true need to use Mr. Kramer's deposition outside the instant litigation.

First, they claim they "need to use Mr. Kramer's deposition in connection with the depositions" of others in the case. *See* December 26, 2017 Email from E. Fray-Witzer to M. Jimenez. This need is non-existent, as the Plaintiffs are already permitted under the Amended Protective Order to use Mr. Kramer's deposition in this way.[11]

Second, they claim that they "need" to use Mr. Kramer's deposition to secure Mr. Steele's deposition in London. *Id.* According to the Plaintiffs, Mr. Steele is fighting his deposition. *Id.* The Plaintiffs believe that filing Mr. Kramer's deposition in England will help them overcome Mr. Steele's resistance. *Id.* As for how, exactly, it will do so, Plaintiffs appear to suggest that the deposition will effectively impeach statements that Mr. Steele has made in resisting his deposition. *Id.* This argument is unpersuasive. The Plaintiffs have cited no law -- whether U.S. law, U.K.

---

[11] *See* Amended Protective Order at Paragraph 6(d) (permitting Confidential Information to be shown to "witnesses and deponents in this action who are shown Confidential Information while testifying").

law, or otherwise -- that suggests that impeaching statements made by a person fighting his or her deposition will somehow help secure that person's deposition. No one has confirmed that the British courts would find the existence of contradictory testimony material to its decision on Mr. Steele's deposition.

Third, Plaintiffs' claim that they "may also want to confirm other aspects of Mr. Kramer's testimony with other third parties who received briefings or materials from Mr. Kramer." *Id.* This too is unpersuasive. For one thing, Plaintiffs appropriately characterize this as a "want," not a need. For another, it appears that the Amended Protective Order also provides a mechanism for doing this. *See* Amended Protective Order at Paragraph 6(h) (permitting Confidential Information to be shown to "any other person whom the parties agree, in advance and in writing, may receive such protected information, provided such person has executed the Notification of Protective Order attached hereto as Ex. A").

On the other side of the scale is Mr. Kramer's significant interest in keeping his deposition Confidential, including to protect himself and his family.

## IV. CONCLUSION

For the foregoing reasons, Mr. Kramer asks this Court to order that Mr. Kramer's deposition remain Confidential under the existing Amended Protective Order for the remainder of this litigation and until further order of the Court.

Dated: January 29, 2018

Respectfully submitted,

*s/ Marcos Daniel Jiménez*
Marcos Daniel Jiménez
Florida Bar No. 441503
**Marcos D. Jiménez, P.A.**
255 Alhambra Circle, Suite 800
Coral Gables, Florida 33134
Telephone: 305.740.1975
Email: mdj@mdjlegal.com

## CERTIFICATE OF SERVICE

This motion was filed electronically on January 29, 2018 through CM/ECF and served on counsel for the parties, through that system.

<i>s/ Marcos D. Jimenez</i><br>
Marcos Daniel Jimenez