**FILED UNDER SEAL PURSUANT TO COURT ORDER**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| ALEKSEJ GUBAREV,<br>XBT HOLDING S.A., and<br>WEBZILLA, INC.<br>    Plaintiffs,<br><br>v.<br><br>BUZZFEED, INC. and<br>BEN SMITH<br>    Defendants. | **FILED UNDER SEAL**<br><br>Case No.<br><br>0:17-cv-60426-UU |

**PLAINTIFFS' OPPOSITION TO DAVID KRAMER'S
MOTION FOR PROTECTIVE ORDER**

**Introduction**

In a hearing before this Court, Mr. Kramer, through his counsel, contended that good cause existed to designate his deposition transcript as confidential.  Specifically, he asserted that the release of his transcript might (a) put his personal safety at risk, and (b) call into question the continuing viability of his confidentiality agreements with the United States Senate and House of Representatives.  With respect to the former, Mr. Kramer claimed that public disclosure of his testimony that he knew the identities of Christopher Steele's Russian sources might place him at risk.  With respect to the latter, Mr. Kramer claimed that his having testified as to the similarity between the questions answered at his deposition and the questions answered during his Congressional testimony might imperil his ability to continue to insist that his Congressional testimony remain confidential.  Neither argument holds up to even the mildest of scrutiny and the remaining arguments raised in Mr. Kramer's Motion fair no better.

1

In reality, it has already been widely reported that Mr. Kramer testified to Congress that he knew the identities of Christopher Steele's Russian sources and, in any event, Plaintiffs have stated that they are willing to keep confidential the portions of the transcript referring to Mr. Kramer's knowledge of the identities of these sources as well as those portions of testimony referencing the similarities between Mr. Kramer's deposition testimony and questions answered before Congress.

In his Motion, however, Mr. Kramer expands his "personal safety" argument to include the idea that any suggestion that he was connected to the release or publication of the Steele Dossier could be dangerous because it would put him publicly in the anti-Vladamir Putin camp. The kindest thing that can be said about this argument is that it is disingenuous. Mr. Kramer has authored numerous articles critical of the Putin regime; has spoken widely about his opposition to the Putin regime, and, recently authored a book, "Back to Containment: Dealing with Putin's Regime" in which he wrote:

> In dealing with Putin, it is important to distinguish between his regime and Russia as a whole. Our problems are not with Russia or Russians, notwithstanding their seeming preference for strong leaders. Our problems are with the Putin regime. We should stop seeing Putin as anything other than a paranoid, authoritarian leader who oversees one of the most corrupt regimes in the world.

See <u>Exhibit 1</u>, excerpts from Kramer, David, *Back to Containment: Dealing with Putin's Regime,* The McCain Institute for International Leadership (August 8, 2017). It would seem likely that any casual reader of Mr. Kramer's book would understand him to be in the anti-Putin camp.

Nor can Mr. Kramer legitimately claim that he behaved in a manner consistent with someone who believed that a connection with the Dossier would put him at risk: Mr. Kramer briefed no fewer than a dozen reporters at eight different news outlets about his having received the Dossier from Mr. Steele and his providing the same to Senator McCain.

Because Mr. Kramer cannot meet the "good cause" standard his motion for a protective order should be denied. In further opposition, Plaintiffs state as follows.

**Argument**

I. **Mr. Kramer Bears the Burden of Proving that Good Cause Exists to Designate His Deposition Testimony as Confidential.**

Fed. R. Civ. P. 26(c), on which the Parties' protective order is based, "permits a court upon motion of a party to make a protective order requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way." *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1313 (11th Cir. 2001). A party's designation of materials as confidential pursuant to a protective order does not overcome the presumption that documents filed with the Court should be public. *See*, *e.g.*, *Aldora Aluminum & Glass Prods. v. Poma Glass & Specialty Windows, Inc.*, 2016 U.S. Dist. LEXIS 192231, at *3 (M.D. Fla. June 13, 2016).

Indeed, the general presumption, however, "is that court filings are matters of public record." *Noveshen v. Bridgewater Assocs.*, 2016 U.S. Dist. LEXIS 54909 (S.D. Fla. Apr. 19, 2016). This is true because, as the Eleventh Circuit has held, "the operations of the courts and the judicial conduct of judges are matters of utmost public concern… [t]he common-law right of access to judicial proceedings, an essential component of our system of justice, is instrumental in securing the integrity of the process…. This right includes the right to inspect and copy public records and documents." *Romero v. Drummond Co.*, 480 F.3d 1234, 1245 (11th Cir. 2007) (internal quotation marks and citations omitted).

Although the rule favoring disclosure is not absolute, and does not generally apply to discovery not otherwise filed in conjunction with a motion or otherwise used in a Court

proceeding, "material filed in connection with any substantive pretrial motion, unrelated to discovery, is subject to the common law right of access." *Id.*

The prerequisite to overcoming the presumption in favor of disclosure "is a showing of 'good cause' made by the party seeking protection.... This standard requires the district court to balance the party's interest in obtaining access against the other party's interest in keeping the information confidential." *Chicago Tribune Co.*, 263 F.3d at 1313. The "mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records." *State Farm Mut. Auto. Ins. Co. v. Altamonte Springs Diagnostic Imaging, Inc.*, 2013 U.S. Dist. LEXIS 41321 (M.D. Fla. Mar. 25, 2013).

II. **Mr. Kramer's "Personal Safety" Claims are Based Entirely on Misrepresentation and Unfounded Speculation.**

A. **The Russian Sources**

Mr. Kramer first claims that release of his transcript could endanger his personal safety because it would reveal the fact that he knows the identities of some of Christopher Steele's Russian sources. The argument is not only disingenuous, but representative of the extent to which Mr. Kramer's counsel is willing to attempt to mislead the Court. First, as the Court may recall, Plaintiffs offered during the hearing to redact out that portion of the transcript that refers to Mr. Kramer's knowledge of the Russian sources. Plaintiffs again made the offer, in writing, not to publicly use that portion of the transcript that mentioned Mr. Kramer's knowledge of the sources, an offer which counsel rejected. *See* Exhibit 2 hereto.

More to the point, however, and as Mr. Kramer's counsel was certainly aware, ***it has already been widely reported in the media that Mr. Kramer testified before Congress that he knows the identities of the Russian sources***. *See*, *e.g.*, "Byron York: McCain Associate

4

Subpoenaed in Trump Dossier Probe," *The Washington Examiner* (January 26, 2018) ("In the session, Kramer told House investigators that he knew the identities of the Russian sources for the allegations in Steele's dossier."); "Devin Nunes Shouldn't Be Outing Russian Sources," *The Washington Monthly* (December 28, 2017) ("There's someone else who claims to know the sources, and that's a man named David Kramer who works as a senior fellow at the McCain Institute for International Leadership at Arizona State University."); "House Intel Committee Subpoenas McCain Associate Over Trump Dossier Sources, Committee Confirms," *Fox News* (December 27, 2017) ("A former State Department official with ties to Sen. John McCain, R-Ariz., was subpoenaed by the House Intelligence Committee Wednesday because of his reported firsthand knowledge of the sources behind the salacious dossier on President Trump, the committee confirmed to Fox News.  Chairman Devin Nunes issued the subpoena to David Kramer, a senior fellow at the McCain Institute for International Leadership, on Wednesday afternoon to obtain the names of sources behind the dossier, the contents of which are not yet confirmed."); "House Panel Subpoenas McCain Associate for Names of Steele's Dossier Sources," *The Daily Caller* (December 27, 2017) ("The House Intelligence Committee has issued a subpoena for an associate of Arizona Sen. John McCain's who revealed last week that he knows the names of the Russian sources used in former British spy Christopher Steele's infamous dossier"); "Byron York: Dossier Investigation Intensifies," *Daily Local News* (January 3, 2018) ("In the session, Kramer told House investigators that he knew the identities of the Russian sources for the allegations in Steele's dossier."); "McCain Associate Subpoenaed in Trump-Russia Probe, Could Reveal Controversial Dossier's Sources," *Independent Journal Review* (December 28, 2017) ("The House Intelligence Committee has issued a subpoena for an

5

associate of Sen. John McCain (R-AZ) who claims to know the Russian sources of the allegations made in the Russian dossier"). *See* Exhibits 3 – 8 attached hereto.

For Mr. Kramer's counsel to represent to the Court – as he has twice done now – that widely publicized information must be kept confidential (and that his client's safety depends on such confidentiality) is unconscionable.  The information that Mr. Kramer's counsel claims would endanger his client's safety has been in the public domain for weeks.  Far from demonstrating "good cause," Mr. Kramer's counsel has demonstrated only that the Court cannot rely on his representations.

B. **Opponent of the Putin Regime**

Mr. Kramer's Motion also claims that Mr. Kramer fears reprisal if his deposition testimony were made public because "critics or suspected enemies of the Russian government … have been murdered" and because he lives in South Florida, where there are "Russian emigres and other Russians who have purchased property and vacation here" who may be "sympathetic to the Putin regime."  In support of this contention, Mr. Kramer points to four individuals (two in London, one in Washington, D.C., and one in Russia) who died under suspicious circumstances over the last 12 years.

Putting aside the speculative nature of the stated concern, it might be hard to find a more publicly vocal critic of the Putin regime than Mr. Kramer.  In the introduction to ***his recently-published book***, "Back to Containment: Dealing with Putin's Regime" (which, presumably, Mr. Kramer hopes people will buy and read), he wrote:

> In dealing with Putin, it is important to distinguish between his regime and Russia as a whole.  Our problems are not with Russia or Russians, notwithstanding their seeming preference for strong leaders.  Our problems are with the Putin regime.  We should stop seeing Putin as anything other than a paranoid, authoritarian leader who oversees one of the most corrupt regimes in the world.

Exhibit 1.

As Mr. Kramer explained in his deposition, his book posits that "Putin is essentially the biggest threat to the Western World currently." Kramer Depo., pp. 76-77. Mr. Kramer acknowledged in his deposition that he had stated publicly that "Putin was just in every possible way a bad guy" and that Putin was an "existential threat" to the United States Kramer Depo., pp. 77, 81.

Similarly, in a recent article in *The American Interest,* Mr. Kramer wrote:

> Putin, in other words, is a wholly untrustworthy interlocutor. His regime is thoroughly corrupt and authoritarian and poses a threat to its own people, its neighbors, and the West.
>
> … How many more Russian liberal activists need to be killed or poisoned? How many more countries does Putin need to invade? How many more Ukrainians need to die? How many more civilians need to be killed in Syria? And how many more elections does he need to interfere in—before we understand the existential threat the Putin regime represents?

*See* "Why Talking to Putin Won't Work," by David Kramer, *The American Interest* (July 6, 2017), Exhibit 9.

Moreover, Mr. Kramer has written or been quoted in perhaps hundreds of articles in which he is critical of the Putin regime; given speeches in opposition to the Putin regime; and provided Congressional testimony warning against the Putin regime. *See*, *e.g.*, "Russia is now a threat. The U.S. Should Treat it like one," by David Kramer, *The Washington Post* (August 18, 2016); "There will be no 'win-win' deal with Putin," by David Kramer, *The Washington Post* (December 11, 2014); "Now, really crank up the heat on Russia" by David Kramer, *Politico* (December 30, 2016); "Russia's Hacking Is Only Putin's Latest Outrage" by David Kramer, *Foreign Policy* (July 28, 2016). *See* Exhibits 10-13.[1]

---

[1] As the Court might imagine, this is but a tiny sampling of articles written by Mr. Kramer critical of the Putin regime.

Mr. Kramer has been a vocal critic of the Putin regime for well over a decade; so much so that it is more than a little inconceivable that his counsel felt no compunction about coming before this Court and claiming that Mr. Kramer "fears reprisals by persons sympathetic to the Putin regime" if his anti-Putin stance is somehow made known.  Kramer Motion, p. 14.

C.  **Connection to the Dossier**

Mr. Kramer next suggests that release of his transcript will reveal his involvement with the Dossier which will, itself, endanger his safety.  Once again, however, this argument ignores the fact that Mr. Kramer's general involvement with the Dossier – that he flew to London, met with Mr. Steele, and provided the Dossier to Senator McCain is well-documents in newspapers, magazines, and books.  *See, e.g.*, "How Trump Walked Into Putin's Web," *The Guardian*[2] (November 15, 2017) ("The emissary was David Kramer, a former assistant secretary of state in the Bush administration.  He was sufficiently troubled to get on a flight to London.  Steele agreed to meet him at Heathrow airport.  The rendezvous involved some old-fashioned spycraft.  Kramer didn't know what Steele looked like.  He was told to look for a man with a copy of the Financial Times.  After meeting Kramer, Steele drove him to his home in Surrey.  They talked through the dossier: how Steele compiled it, what it said.  Less than 24 hours later, Kramer returned to Washington.");[3] "How Ex-Spy Christopher Steele Compiled His Explosive Trump-Russia Dossier," *Vanity Fair* (April 2017) ("... [Senator McCain and Kramer] came to realize they had to see [Steele's memos] with their own eyes.  Kramer, the good soldier, volunteered to retrieve them.  On an evening about a week later, using a ticket purchased with miles from his own account, Kramer flew out of Washington and landed early the next morning at Heathrow.

---

[2] According to Mr. Kramer, he was himself the source of the details used by *The Guardian* in its report.  Kramer Depo. pp. 27-29.
[3] This same paragraph appears also in Luke Harding's Book, *Collusion: Secret Meetings, Dirty Money, and How Russia Helped Donald Trump Win."*

Once on the ground, as per stern instructions, he operated on Moscow Rules.  Told to meet a man loitering outside baggage claim holding a copy of the Financial Times, Kramer engaged in an exchange of word code.  At last satisfied, Christopher Steele whisked him off in a Land Rover to the security of his house in Surrey.  They talked for hours.  And Steele passed him his report.  Was this the identical, somewhat sputtering 35-page memo that had already been making the rounds among reporters?  Or, as some intelligence analysts believe, was it a longer, more expertly crafted and sourced document, the final work product of a well-trained M.I.6 senior deskman?  Neither McCain nor Kramer would comment, but what is known is that Kramer flew back to Washington that same night, guarding his hard-won prize with his life."); "John McCain faces questions in Trump-Russia dossier case," *The Miami Herald* (July 11, 2017) ("The court document[4] confirms that Wood, Steele and former State Department official David Kramer decided together that new information gathered after the election should be shared with authorities in Britain and the United States.").  *See*, Exhibits 14-16.

In addition, Mr. Kramer's behavior, after receiving the Dossier, was in no way consistent with someone who believed that being tied to the Dossier might put his safety in danger.  He provided briefings (or copies) of the Dossier to reporters at *Mother Jones, The Guardian, ABC News, The Washington Post, McClatchy News, The Wall Street Journal, NPR,* and *BuzzFeed*.  *See* Kramer Depo., pp. 22-29, 35-40, 48-67.

And, although he claims in his Motion that he spoke to many (though not all) of these organizations after they contacted him, he also testified that many of the contacts came after Mr. Steele asked him if it was OK to provide his contact information to various reporters.

---

[4] The document reference was a filing made by Mr. Steele in the action pending against him in London.

Mr. Kramer was also willing to appear on television to discuss the Dossier (though not specifically his connection to it). In an on-camera interview with ABC News, Mr. Kramer said of the Dossier: "This makes some claims that need to be investigated, no question." *See* http://abcnews.go.com/US/fbi-investigating-unconfirmed-claims-trump-compromised-election/story?id=44693343, last accessed February 1, 2018.

Nor is Mr. Kramer's contention that he provided briefings (and copies of the dossier) to the media under promises of confidentiality persuasive. Mr. Kramer was under no obligation to speak with the media – he did so of his own volition. And he did so as someone who is regularly quoted by such media outlets as an expert in Russian affairs. Presumably, Mr. Kramer finds some personal or professional benefit in being recognized as such and maintaining his contacts with the various news outlets with which he had preexisting relationships. *See*, *e.g.*, Kramer Depo., pp. 56-57 ("Q: Why did you decide to provide a copy of The Memo to NPR? A. I had been interviewed there the week before, and Rachel Martin, who was one of the anchors in the morning, had heard talk about it and asked me, and I indicated to her that I was aware of it. And so I actually showed it to her first but I did not give her a copy. This was a few days after I did the interview. And then she asked if Bob Little could meet with me, and we did and I gave him a copy at that time.").

Had Mr. Kramer truly believed that his personal safety could have been compromised by any connection to the Dossier, he would have simply declined to speak with the press about the Dossier – whether those conversations were confidential or not. Instead, he made a conscious decision to provide briefings to a dozen journalists at eight different news outlets. Having done so – and knowing that the possibility existed that any of the dozen journalists with whom he spoke could have breached their "gentlemen's agreement" to keep the information provided

confidential – Mr. Kramer cannot rightly claim that he acted in a manner consistent with the "personal safety" argument he now makes to this Court.

### III.     Mr. Kramer's "Congressional Testimony" Argument is Baseless.

Mr. Kramer next argues that his agreement with Congress to keep his testimony confidential could be put in jeopardy if that portion of his deposition transcript in which he stated that he answered questions for Congress similar to those asked in the deposition was made public.  See Kramer Depo., pp. 123-124 ("Q: What were the nature of the questions?  A.· Just very similar to what I have been asked here this morning. How I came into possession of The Dossier, and my contact with Mr. Steele or Mr. Simpson, and those things.").

Preliminarily, Mr. Kramer's Motion does not provide a copy of the purported agreement he reached with Congress that he claims would be in jeopardy if this testimony were made public, nor does he provide an opinion from his Washington, D.C. counsel in support of this assertion.  Instead, Mr. Kramer seems to believe that he can meet the "good cause" standard simply by saying, "trust me."

Additionally, Mr. Kramer's deposition testimony contains few, if any, actual details of his Congressional testimony.  It can hardly come as a surprise that Mr. Kramer was asked about how he came into possession of the Dossier, and his contacts with Messrs. Steele and Simpson and, as such, his deposition testimony would reveal nothing more than that which anyone would surmise without seeing the testimony.

Finally, and perhaps most importantly, Plaintiffs have made clear both during the hearing and again in a subsequent proposal to Mr. Kramer's counsel, that they have no need to make public that portion of the testimony in which Mr. Kramer discusses his Congressional testimony. Accordingly, Mr. Kramer's argument on this point is unavailing.

IV.  **Although it is Not Plaintiffs' Burden, Plaintiffs Have Legitimate Needs to Use Mr. Kramer's Testimony.**

As the Court is aware, there are two ongoing proceedings involving third party witnesses for use in the present action: a proceeding in London to compel Mr. Steele to sit for his deposition pursuant to letters rogatory issued by this Court and a proceeding in Washington, D.C. in which Fusion GPS is resisting having its deposition taken. Mr. Kramer's deposition transcript is needed in both, not just for the proceedings required to compel these witnesses to testify, but for the eventual depositions themselves as well.

In the London proceeding, Mr. Steele has moved to set aside an order requiring him to sit for his deposition. In that proceeding, Mr. Steele has "raised as one of his arguments that he kept the dossier strictly confidential, providing it only to the FBI and Senator McCain." *See* Declaration of Steven Loble, Exhibit 17 hereto. There is no question but that Mr. Kramer's testimony, in which he testified about providing briefings and copies of the Dossier to the media at the request of Mr. Steele, would be useful in opposing Mr. Steele's motion. *Id.,* ¶ 4 ("It is clearly relevant to assist the English Court to make a decision based on all relevant evidence in relation to that application that any material to the effect that Mr. Steele directed David Kramer to brief news outlets on the contents of the dossier and to provide some of those news outlets with copies of the dossier should be available to the English Court.").

The presumption in the English Court is that all evidence presented to the Court is available to the public or the press, upon proper request. *Id.,* ¶ 5. The only exceptions to this rule are instances involving national security, intellectual property, or trade secrets. *Id.,* ¶ 6. Based on his knowledge of the case and the procedure employed in the English court, Mr. Loble concluded that he "cannot conceive of any reason why if Mr Kramer's testimony were to be

available to the English Court it would not be disclosed to anyone who applied to the Court for that material." *Id.*, ¶ 7.

And, of course, the larger point is that, once presented to the English Court, the Plaintiffs have no control over what that Court will and will not release to the public upon request.

Assuming that the English Court permits Mr. Steele's deposition to proceed, the Plaintiffs would also need to use Mr. Kramer's testimony in questioning Mr. Steele. And, although Mr. Kramer points to the provisions in the protective order that permit the Parties to share confidential materials with a witness who agrees to be bound the terms of the protective order, there is no reason to believe that Mr. Steele would be willing to agree to be so bound. Indeed, given that Mr. Steele is actively attempting to avoid being deposed, there is every reason to believe that – if informed that he could avoid answering at least some questions by refusing to sign the protective order – he would do precisely that.

The same holds true for the Washington, D.C. proceeding concerning Fusion GPS. Fusion GPS has also argued, *inter alia*, that it should be protected from sitting for its deposition on confidentiality grounds. Here, too, Fusion GPS's role in encouraging Mr. Kramer to speak with the media will be useful in the Plaintiff's opposition to Fusion GPS's motion to quash the subpoena. And, while it the Plaintiffs can apply to file Mr. Kramer's transcript under seal in the Washington, D.C. proceeding, the same problem remains when Fusion GPS sits for its deposition – it has no incentive (and indeed has a disincentive) to signing the protective order, something that Plaintiffs cannot control.

Finally, this not a situation in which the materials in question have not yet been used in Court as part of a non-discovery motion. At Judge Ungaro's suggestion, Plaintiffs have filed a Motion for Judgment on the Pleadings in connection with Defendants' affirmative defenses of

the fair report privilege and neutral reporting privilege. This is a substantive motion that goes to the heart of Defendants' defenses in this action (and not merely a discovery-related motion). Nor will this be an isolated incident.[5] Plaintiffs anticipate that summary judgment motions will be filed in the coming months and that Mr. Kramer's testimony will be crucial in connection with those motions as well.

In short, these materials are already of the type that the Eleventh Circuit has held subject to the "common-law right of access to judicial proceedings." Mr. Kramer has presented no legitimate reason for his transcript to remain confidential and, even if he had, the balance would tip in favor of releasing his transcript (with the two redactions previously offered).

## Conclusion

For the reasons outlined hereinabove, Mr. Kramer's Motion for a Protective Order should be denied.[6]

---

[5] Indeed, at the last hearing, Judge Ungaro inquired into the testimony provided by Mr. Kramer. Plaintiffs had to inform the Court that, until the present motion was ruled upon, they could not respond to the Judge's questions without violating the protective order unless the proceeding was sealed.

[6] In his Motion, Mr. Kramer's counsel (for the second time) levels the unsupported – and unsupportable – allegation that Attorney Gurvits somehow already violated the terms of the protective order by confirming that Plaintiffs knew how Buzzfeed obtained the dossier. Although Mr. Kramer's allegation is irrelevant to the present motion (and seemingly inserted simply to impugn counsel), Plaintiffs explain as follows. Following Mr. Kramer's deposition, the Parties reached an agreement that the Plaintiffs would withdraw their motion to compel Buzzfeed to reveal its source. And, indeed, just hours before this Court issued its ruling on that motion, the parties had agreed to jointly contact the Court to withdraw the motion as moot. *See* Exhibit 18. Before the Parties could reach the Court, however, the Court issued its ruling in which it (presciently) held, in essence, that Plaintiffs had not yet exhausted all alternative means available to identify Buzzfeed's source. Somewhat surprisingly, Buzzfeed began contacting media outlets to herald their "victory." One reporter who received Buzzfeed's release, Chuck Ross, contacted Plaintiffs for comment. Mr. Gurvits responded (without disclosing Mr. Kramer's identity) that he did not know why Buzzfeed was celebrating the ruling given that the parties had been in the process of withdrawing the motion since Plaintiffs had been able to identify Buzzfeed's source through alternate means. *See* Exhibit 19. The email from a different journalist cited by Mr. Kramer as "proof" of a violation of the protective order simply notes that a court filing (the Parties' Joint Status Report) noted that the only person to have been deposed thus far was Mr. Kramer, speculating that perhaps Plaintiffs had learned of Buzzfeed's source from Mr. Kramer. This is not a "violation of the protective order," but rather a journalist doing what journalists do – investigate and report. Indeed, the fact that some journalists have already begun to speculate that Mr. Kramer was Buzzfeed's source – not completely accurate since Mr. Kramer testified that Buzzfeed's reporter surreptitiously took pictures of the Dossier after being told not to – is simply an additional argument as to why the transcript should be made public.

**Respectfully Submitted:**

/s/ Evan Fray-Witzer
Evan Fray-Witzer (Mass. Bar No. 564349 – *pro hac vice*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505, Boston, Massachusetts 02116
Telephone: 617-426-0000
Facsimile: 617-423-4855
Evan@CFWLegal.com

/s/ Valentin Gurvits
Valentin D. Gurvits (Mass. Bar No. 643572 – *pro hac vice*)
Matthew Shayefar (Fla. Bar No. 0126465)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20, Newton Centre, Massachusetts 02459
Telephone: 617-928-1804
Facsimile: 617-928-1802
vgurvits@bostonlawgroup.com
matt@bostonlawgroup.com

/s/ Brady J. Cobb
Brady J. Cobb (Fla. Bar No. 031018)
COBB EDDY, PLLC
642 Northeast Third Avenue, Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com

*Attorneys for Plaintiffs*

Dated: February 2, 2018

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing will be served electronically via email on all counsel or parties of record on the service list below this 2nd day of February, 2018.

/s/ Matthew Shayefar
Matthew Shayefar

**SERVICE LIST**

Katherine M. Bolger
Adam Lazier
Davis Wright Tremaine, LLC
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
katebolger@dwt.com
adamlazier@dwt.com

Nathan Siegel
Alison Schary
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, Suite 800
Washington, DC 20006
nathansiegel@dwt.com
alisonschary@dwt.com

Roy Eric Black
Jared M. Lopez
Black Srebnick Kornspan & Stumpf
201 S Biscayne Boulevard, Suite 1300
Miami, Florida 33131
rblack@royblack.com
jlopez@royblack.com

Marcos Daniel Jiménez
Marcos D. Jiménez, P.A.
255 Alhambra Circle, Suite 800
Coral Gables, Florida 33134
mdj@mdjlegal.com