FILED UNDER SEAL PER COURT ORDER

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

Case No. 17-60426-CV-Ungaro/O'Sullivan

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.

    Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

    Defendants.
_____/

### NON-PARTY DAVID J. KRAMER'S REPLY TO THE PLAINTIFFS' OPPOSITION TO HIS MOTION FOR PROTECTIVE ORDER

    The Plaintiffs' opposition demonstrates that the danger posed by the release of Mr. Kramer's deposition testimony greatly outweighs any supposed benefit to the Plaintiffs, who are the only parties seeking to disclose the testimony. The danger here is apparent. The deposition establishes that Mr. Kramer was the unwitting cause-in-fact of the publication of the Dossier. The Dossier is not an academic's ivory tower criticism of the Putin regime. It is a former British intelligent officer's detailed accounting of the Putin regime's alleged attempts to illegally influence U.S. leaders and interfere with U.S. democratic institutions. As Mr. Kramer explained in his motion, if those in the Russian government or Russian sympathizers were to learn that Mr. Kramer was the cause-in-fact of the publication of these explosive allegations, they may look to exact revenge on him or his family, something which they have a track record of doing with respect to perceived opponents.

    Remarkably, the Plaintiffs do not address Mr. Kramer's argument at all in their brief. Instead, they choose to mischaracterize it, claiming that Mr. Kramer has voiced some vague worry

1

about being associated with the Dossier. That is not, nor has it ever been, Mr. Kramer's concern. The Plaintiffs also attempt to mislead this Court into thinking that the information relayed above, that Mr. Kramer was BuzzFeed's source, is already in the public domain. It is not. Short of BuzzFeed disclosing Mr. Kramer's identity as its source for the Dossier, which it has refused to do, only this Court's release of the deposition transcript or a violation of the Amended Protective Order will result in the dissemination of this information.

As for the Plaintiffs' stated needs for the de-designation of Mr. Kramer's deposition, the first has recently been rendered toothless and the second is non-existent.

First, the Plaintiffs claim that they need Mr. Kramer's deposition to help secure Mr. Steele's deposition in London. Specifically, they argue that Mr. Kramer's deposition will help contradict Mr. Steele's claim that he "kept the dossier strictly confidential, providing it only to the FBI and Senator McCain." As an initial matter, the Plaintiffs have yet to establish that an English court would actually consider Mr. Kramer's testimony in deciding whether Mr. Steele should be deposed. Their recent reliance on a vague declaration from a British solicitor only serves to underscore this fact. But more importantly, a recent factual development -- the declassification and release of the so-called "Nunes Memorandum" -- has eliminated the Plaintiffs' claimed need for Mr. Kramer's testimony. As discussed below, the Nunes Memorandum contains a treasure trove of material that contradicts Mr. Steele's claim of strict confidentiality.

Second, the Plaintiffs claim that they need to use Mr. Kramer's deposition when deposing third-party witnesses in this case. As Mr. Kramer has previously pointed out, the Amended Protective Order *already* allows the Plaintiffs to use Mr. Kramer's deposition for this purpose. And despite the Plaintiffs' claims to the contrary, the Plaintiffs do not need sign-off from third-

party witnesses in order to use Mr. Kramer's deposition when deposing such witnesses. In sum, this Court should find good cause for keeping the deposition confidential.

## I. DISCUSSION

This Court should find that good cause precludes the release of the deposition transcript. As Mr. Kramer argued in his opening brief, (A) dissemination will threaten Mr. Kramer's and his family's personal safety; (B) dissemination could compromise ongoing Congressional investigations; and (C) the balancing of the relevant interests weighs in favor of confidentiality.

**A.  Dissemination Will Threaten Mr. Kramer's Personal Safety**

If the Court allows the Plaintiffs to share the deposition outside of the instant litigation, it will threaten Mr. Kramer's and his family's safety. The reason is obvious. Persons named in the Dossier may look to exact revenge on Mr. Kramer for his role in the Dossier's publication. As Mr. Kramer noted in his initial filing, the Dossier levels explosive allegations against high-level Russian officials and institutions. It accuses Vladimir Putin and the Federal Security Service, among others, with compiling blackmail on U.S. political leaders and attempting to interfere with U.S. political institutions. Ex. 3 to Compl. at *22-23, 56. And these are not bare allegations. The Dossier purports to rely on high-level sources and gives granular detail on these subject matters, identifying Russian government officials by name and relaying the content of internal discussions. *See, e.g., id.* at *41.

Whether or not the allegations in the Dossier are true, the exposure of Mr. Kramer's role in the release of the Dossier clearly places him in danger. On the one hand, if the allegations in the Dossier are fictional, their publication would clearly upset the Russian individuals and institutions identified in the Dossier, not to mention those sympathetic to their interests. On the other hand, if certain allegations in the Dossier are true, there is even greater cause for concern.

3

By way of example, the Dossier itself discusses how those in the Russian government, including Putin himself, were greatly concerned that their efforts to influence the U.S. political process would be exposed. *Id.* at *43, 49. Indeed, according to the Dossier, one source had reported that Putin was "angry" about the failure to "cover" "Kremlin interference" with the United States political process and that, as a result, "[m]ore heads therefore were likely to roll." *Id.* at *49. The Dossier, of course, assiduously documents this very alleged interference. Consequently, Mr. Kramer's role in the Dossier's release, if made public, would clearly place his life in jeopardy.

Of all people, the Plaintiffs should understand why Mr. Kramer's fear of reprisal is well-founded. The Dossier's isolated reference to the Plaintiffs upset them so much that they filed this defamation action. And that reference pales in comparison to the Dossier's explosive allegations against Russian officials and institutions, allegations which U.S. Ambassador to the United Nations Nikki Haley has said would constitute an act of "warfare" against the United States. John Haltiwanger, Russia Committed Act of War with Election Interference, Nikki Haley Says, *Newsweek* (Oct. 19, 2017) (http://www.newsweek.com/russia-committed-act-war-election-interference-nikki-haley-says-688518 ("When a country can come interfere in another country's elections, that is warfare. It really is, because you're making sure that the democracy shifts from what the people want. This is [Russia's] weapon of choice and we have to make sure we get in front of it.").

As for the Plaintiffs' various counter points to Mr. Kramer's personal safety argument, they are, in addition to being tone-deaf, substantively unpersuasive.

First, the Plaintiffs mischaracterize Mr. Kramer's argument on personal safety. They claim that Mr. Kramer fears his mere "[c]onnection with the Dossier" and go on to note that his "involvement" with the Dossier has been "well-documents [sic]" by the media.

This, of course, has never been Mr. Kramer's argument. To be sure, Mr. Kramer has never publicly acknowledged *any* connection to the Dossier, and the release of his deposition testimony, which definitively confirms this connection, is something materially different than press speculation about such a connection. But what drives Mr. Kramer's concern here has nothing to do with simply being connected to the Dossier. It has to do being identified as the cause-in-fact of the Dossier's publication. This information is not public, and Mr. Kramer has consistently expressed his concern about it becoming so, immediately asking BuzzFeed, after it published the Dossier, to not identify him as its source. In short, the release of Mr. Kramer's deposition testimony will fundamentally alter what is publicly known about his connection to the Dossier and place his life at risk.

Second, the Plaintiffs mischaracterize Mr. Kramer as arguing that he fears for his safety because the release of the deposition will expose him as an "[o]pponent of the Putin [r]egime."

Once again, the Plaintiffs have erected and vanquished a straw man. Mr. Kramer has never said that he fears for his safety because he is a vocal critic of the Putin regime, although he clearly is. Rather, he explained how the unwitting role he played in the publication of the Dossier would place him in danger and noted that the Putin regime has an established track record of exacting revenge against perceived enemies. And to be sure, when you combine Mr. Kramer's past criticisms of the Putin regime with the role he played in the release of the Dossier, one can easily appreciate his concern about being a target for retribution.

Third, the Plaintiffs effectively call Mr. Kramer a liar, arguing that his actions are inconsistent with someone who is legitimately concerned about his personal safety. The actions the Plaintiffs are referring to here are Mr. Kramer's various meetings with members of the press

FILED UNDER SEAL PER COURT ORDER

about the Dossier. If Mr. Kramer truly feared for his personal safety, the Plaintiffs' argument goes, he never would have met with any press in the first place.

In addition to being offensive, the argument rests on a faulty premise: that Mr. Kramer's actions were inconsistent with a man who feared being connected with the Dossier. Because Mr. Kramer was concerned about that very thing, he met with members of the press in confidence. Based on his past experiences and relationships with members of the press, Mr. Kramer had faith that the press would keep their meetings confidential. And as this very dispute proves, Mr. Kramer's faith was rewarded. The Plaintiffs are desperate to have this Court de-designate the deposition because the various reporters with whom Mr. Kramer met about the Dossier have not disclosed his identity or conveyed the substance of their meetings with him. This extends to BuzzFeed, which has refused to publicly identify Mr. Kramer as its source for the Dossier. So it is altogether odd, and unpersuasive, for the Plaintiffs to seize on Mr. Kramer's meetings with the press as proof that his actions are inconsistent with his words.

Fourth, and finally, the Plaintiffs spend much of their brief attacking a secondary argument for confidentiality that Mr. Kramer advanced in his brief, namely, that the Court's de-designation of the transcript would put him in danger because it would reveal that he knows the names of Mr. Steele's sources. They argue that such an argument is "disingenuous" because the news media has already "widely reported" that Mr. Kramer "knows the identities of the Russian sources."

As an initial matter, despite the Plaintiffs' transparent attempt to make it so, this concern has never been Mr. Kramer's primary reason for fearing the release of the deposition. Rather, as discussed above, his primary concern comes with being identified as BuzzFeed's source for the Dossier. But more importantly, the Plaintiffs' argument is unpersuasive. Even if we were not operating in a world where the phrase "fake news" has surprising currency, the argument that there

6

is no material difference between newspapers alleging that Mr. Kramer knows the identity of Mr. Steele's sources and Mr. Kramer admitting the same in a sworn deposition does not pass the laugh test.  Of course there is a difference.  Through the release of the deposition, Mr. Kramer's knowledge of Mr. Steele's sources would be unequivocally confirmed.  Where one suspected source has already been murdered,[1] the Court need not speculate as to why the potential release of this information would endanger Mr. Kramer.

**B.    Dissemination Could Compromise Congressional Investigations**

At the time of his deposition, Mr. Kramer had already provided answers to the Senate Select Committee on Intelligence.  At the end of his deposition, Mr. Kramer testified, under oath, that the questions were "[j]ust very similar to what I have been asked here this morning. How I came into possession of The Dossier, and my contact with Mr. Steele or Mr. Simpson, and those things." Dep. Tr. at 123:22-124:1.

The Plaintiffs' primary argument on this point again devolves into a weak attack on Mr. Kramer's character.  They say that Mr. Kramer is asking the Court to "trust [him]" about his assertion of the overlap and the confidential nature of his Congressional testimony.  Such an argument lacks force when it comes from parties that have already signaled their belief in the veracity of Mr. Kramer's testimony, which is what the Plaintiffs have done in seeking to use Mr.

---

[1] As Mr. Kramer noted in his opening brief, in December 2016, Oleg Erovinkin, a senior associate of Igor Sechin, the head of Rosneft (the state-owned oil company), was found dead in the back of his car under mysterious circumstances; press reports speculated that he may have been a source for the dossier and thus killed for his suspected role. Robert Mendick & Robert Verkaik, Mystery Death of Ex-KGB Chief Linked to MI6 Spy's Dossier on Donald Trump, The Telegraph (Jan. 27, 2017), http:www.telegraph.co.uk/news/2017/01/27/mystery-death-ex-kgb-chief-linked-mi6-spys-dossier-donald-trump/; Andrew E. Kramer, Hacker Is a Villian to Russia and the United States for Different Reasons, New York Times (March 16, 2017), http.//www.nytimes.com/2017/03/16/world/europe/russian-hacker-fsb-agent-dimitry-dokuchaev.html);https://www.thedailybeast.com/was-this-russian-general-murdered-over-the-steele-dossier.

FILED UNDER SEAL PER COURT ORDER

Kramer's testimony to contradict Mr. Steele's representations to an English Court. In short, Mr. Kramer asks the Court to take his sworn deposition testimony on its face, as the Plaintiffs apparently have.

As for the Plaintiffs' other argument on this issue -- that "Mr. Kramer's deposition testimony contains few, if any, actual details of his Congressional testimony" -- it is directly controverted by Mr. Kramer's actual deposition testimony, where he said that his deposition testimony was "very similar" to his Congressional testimony. Dep. Tr. at 123:22-124:1.

C.   **The Balancing of Interests Favors Mr. Kramer**

As Mr. Kramer noted in his opening brief, when analyzing whether good cause exists, a court should perform a "balancing of interests." *Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1547 (11th Cir. 1985). This balancing "requires the district court to balance the party's interest in obtaining access against the other party's interest in keeping the information confidential." *Chicago Tribune Co.*, 263 F.3d at 1313 (citing *Farnsworth*, 758 F.2d at 1548). Here, the balancing of the respective interests makes clear that the Court should maintain the confidentiality designation.

It makes sense to start with the Plaintiffs' claimed interest in de-designation. From the moment they challenged the confidentiality designation, the Plaintiffs have claimed that they primarily need Mr. Kramer's deposition to help overcome Mr. Steele's resistance to his deposition in London. *See* December 26, 2017 Email from E. Fray-Witzer to M. Jimenez (identifying this as the Plaintiffs' first "need" for the deposition). By way of background, an English Court has apparently ordered Mr. Steele to sit for a deposition in connection with the instant litigation. In attempting to "set aside" this order, Mr. Steele has allegedly represented to the English Court that "he kept the dossier strictly confidential, providing it only to the FBI and Senator McCain." To

oppose Mr. Steele's efforts, the Plaintiffs claim that they need Mr. Kramer's deposition to contradict his representations to the English Court. The Plaintiffs believe that Mr. Kramer's deposition testimony contradicts Mr. Steele's representations because Mr. Kramer "testified about providing briefings and copies of the Dossier to the media at the request of Mr. Steele[.]" The Court should give no weight to the Plaintiffs' claimed need for Mr. Kramer's deposition testimony for two distinct reasons.

First, as a matter of substance, Plaintiffs continue to make an unpersuasive case for submitting Mr. Kramer's deposition testimony to the English Court. In their latest filing, they attach the declaration of Steven Frederick Loble, a "Solicitor of the Senior Courts of England and Wales." *See* Plaintiffs' Exhibit 17, at ¶2. Despite Mr. Loble's impressive credentials and 33 years of experience, he conspicuously says nothing about either (1) the standard the English Court will apply when deciding whether to "set aside" the court order requiring Mr. Steele to sit for a deposition or (2) whether an English Court considers material like Mr. Kramer's "contradiction" testimony relevant to such an issue. Instead, he summarily asserts that such testimony would be "clearly relevant to assist the English Court to make a decision based on all relevant evidence[.]" *Id.* at ¶4. Such circular logic, without any insight into the governing legal standards or rules, is unhelpful in assessing the Plaintiffs' need for Mr. Kramer's deposition.

Second, and more importantly, a recent factual development has eliminated the Plaintiffs' claimed need for Mr. Kramer's deposition. On February 2, 2018, with President Trump's authorization, the formerly "Top Secret" Nunes Memorandum was declassified and released. The Memorandum was prepared by the staff of the U.S. House of Representatives Permanent Select Committee on Intelligence. And critically, it serves to *directly* contradict Mr. Steele's representations to the English Court. The Memorandum notes that Mr. Steele "has admitted in

9

British court filings that he met with *Yahoo News*—and several other outlets—in September 2016 at the direction of Fusion GPS." Nunes Memorandum at *2.² The Memorandum further notes that Mr. Steele went so far as to disclose his status as an FBI source to a magazine, *Mother Jones*, which resulted in the FBI suspending and then terminating him as a source. *Id.* The Nunes Memorandum's documentation of Mr. Steele's "numerous encounters with the media," *id.* at *3, is far more powerful evidence than Mr. Kramer's deposition testimony about Mr. Steele's *indirect* engagement with the media. And as noted by the Nunes Memorandum, Mr. Steele has *already admitted* in British court filings to personally meeting with members of the media. *Id.* at *2.

As for the Plaintiffs' other claimed need for de-designation of Mr. Kramer's deposition -- the need to use it when deposing witnesses during the instant litigation -- it is fictional. The Amended Protective Order expressly permits the Plaintiffs to use Mr. Kramer's deposition when deposing witnesses or deponents. The provision provides:

> 6. Confidential Information shall not be delivered, disclosed, or disseminated except to the following persons:
>
> (d) witnesses and deponents in this action who are shown the Confidential Information while testifying[.]

*See* Amended Protective Order at ¶6(d).

Given their clear ability to use Mr. Kramer's deposition in this manner, Mr. Kramer continues to be perplexed by the Plaintiffs' argument that they would need putative deponents like Mr. Steele or employees of Fusion GPS to "sign the protective order" in order to use Mr. Kramer's deposition during their depositions. That is, obviously, not true. Of course, if any party were to show Mr. Kramer's deposition to a deponent in this action (e.g., Mr. Steele), Mr. Kramer will insist

---

² Mr. Kramer attaches this Memorandum as **Attachment H**.

that such portions of the deposition be treated as confidential by the parties.  And it goes without saying that the Plaintiffs could not use Mr. Kramer's deposition testimony during the litigation of some other, unrelated action (e.g., a separate lawsuit filed in London against Mr. Steele).

## II.  CONCLUSION

For the foregoing reasons, Mr. Kramer asks this Court to order that Mr. Kramer's deposition remain Confidential under the existing Amended Protective Order for the remainder of this litigation and until further order of the Court.

Dated:  February 6, 2018

Respectfully submitted,

*s/ Marcos Daniel Jiménez*
Marcos Daniel Jiménez
Florida Bar No. 441503
**Marcos D. Jiménez, P.A.**
255 Alhambra Circle, Suite 800
Coral Gables, Florida 33134
Telephone: 305.740.1975
Email:  mdj@mdjlegal.com

FILED UNDER SEAL PER COURT ORDER

## CERTIFICATE OF SERVICE

This motion was filed electronically on February 6, 2018 through CM/ECF and served on counsel for the parties, through that system.

*s/ Marcos D. Jimenez*
Marcos Daniel Jimenez