**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 17-cv-60426-UU**

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.,

    Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

    Defendants.

_____

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**

Katherine M. Bolger
Adam Lazier
Nathan Siegel
Alison Schary
Davis Wright Tremaine, LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
katebolger@dwt.com
adamlazier@dwt.com
nathansiegel@dwt.com
alisonschary@dwt.com

Roy Black
Jared Lopez
Black, Srebnick, Kornspan & Stumpf, P.A.
201 So. Biscayne Boulevard
Miami, Florida 33131
rblack@royblack.com
jlopez@royblack.com

*Attorneys for Defendants*

## INTRODUCTION

There is a lot more at stake in this case than bovine anatomy.  According to Lexis, since BuzzFeed published the Dossier more than 10,000 news reports have been published containing the words "Trump" and "dossier," or "Steele" and "dossier."  Many, if not most of them could not have been written without the ability to make reference to the Dossier's specific content.  Put another way, the Dossier has been "published," in whole or in part, hundreds of times since then by journalists around the world.  And that has happened because it has become even clearer that the Dossier lies at the core of the public controversy regarding Russian interference in the 2016 election.  Most of the key subsequent events at the heart of that controversy have been directly related to the Dossier; indeed the government's handling of it has become a fulcrum through which elected officials are now debating the entire controversy.

Nonetheless, Plaintiffs maintain the law demands that to this day, journalists should withhold the Dossier from the public unless they can independently "verify" each fact within it they publish.  If that were the law, the public would still be unable to meaningfully follow much of the Russia controversy.  But for good reason, that is not the law of Florida, New York or the First Amendment.  The Dossier's role in controversy over government conduct exemplifies why the law recognizes the fair report privilege, and BuzzFeed's emphasis that the Dossier was unverified was also protected, neutral reporting.

If nothing else, Plaintiffs' motion makes it obvious that the merit of these affirmative defenses cannot be resolved on the pleadings in this case, at least in their present form.  While the parties agree that the fair and neutral report privileges will ultimately present questions for the Court, both questions require the application of legal principles to a specific factual record.  But the legal arguments in Plaintiffs' motion are all premised on unsupported factual assertions and record materials, so the motion is really a premature one for partial summary judgment, filed while discovery is on-going.  It should be denied, or alternatively deferred, on that basis alone.

## PROCEDURAL BACKGROUND

This motion was filed because Plaintiffs represented to the Court that these privilege defenses presented pure questions of law, and so could be adjudicated before summary judgment motions are filed.  But their motion is plainly not a proper Rule 12(c) motion.  Courts "will not consider matters outside the pleadings when passing on a Rule 12(c) motion for judgment on the pleadings."  *Horsley v. Feldt*, 304 F.3d 1125, 1136 (11th Cir. 2002).  Yet Plaintiffs' legal arguments are based entirely on (1) materials generated during discovery like interrogatories, depositions and news interviews; (2) numerous "facts" they simply assert in their brief and

2

declare to be "undisputed"; and even (3) another party's legal brief.  No authority permits Plaintiffs to rely on *any* of that in a Rule 12 motion.[1]  For that reason alone, the Court should exercise its discretion to deny the motion and re-visit the issue on summary judgment.

Moreover, there are other reasons why this motion should be denied, or alternatively deferred.  Ordinarily when a party files a Rule 12(c) motion but relies on material outside the pleadings, the Court may either disregard the material and rule solely on the pleadings, or convert the motion to one for summary judgment, providing notice to the opposing party and an opportunity to supplement the motion with a complete record.  Fed. R. Civ. P. 12(d).  *See also Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 701 (11th Cir. 2016).

If the Court were to try to rule on the pleadings, it is doubtful the Court could disentangle Plaintiffs' legal arguments from the thicket of allegations outside the pleadings on which they are based.  But if somehow that were possible, then for the reasons set forth in the accompanying motion for leave to amend, Defendants' should first be permitted to amend the pleading of these affirmative defenses.  To consider a Rule 12(c) motion filed by a plaintiff to dismiss these privilege defenses, the Court must apply the governing legal standards to the particular factual allegations that *Defendants* could assert to support these defenses.  *Bass v. Hoagland*, 172 F.2d 205, 207 (5th Cir. 1949).  But as described in the accompanying motion, due to a prior agreement of the parties the Answer in its current form does not contain the factual allegations necessary for the Court to evaluate whether Defendants can plead viable privilege defenses.

Finally, if this Court were to convert the motion, then pursuant to Rule 56(d) it should be denied or deferred, because as set forth in the accompanying Declaration of Nathan Siegel, discovery relevant to Defendants' assertion of these privileges is still pending.  *Snook v. Trust Co. of Ga. Bank of Savannah*, 859 F.2d 865, 870 (11th Cir. 1988).  In the meantime, because the pleadings in their current form lack the factual allegations necessary for the Court to evaluate the facial merit of the fair and neutral report privilege defenses, this Opposition sets out below the facts Defendants could allege at this juncture to support them.  These facts are taken from the proposed Second Amended Answer ("SAA").[2]  The rest of the Opposition then demonstrates why, assuming these facts to be true, Defendants' have pled meritorious privilege defenses.

## STATEMENT OF FACTS

---

[1] Plaintiffs' position that cases like *Day v. Taylor*, 400 F.3d 1272 (11th Cir. 2005) permit this is frivolous.  *Day* holds that when filing a motion to dismiss, a party may attach documents that are integrally referenced in the *opponent's* pleadings.  *Id.* at 1276.  The only documents referenced in BuzzFeed's defenses are the Article and the Dossier.  No authority permits Plaintiffs to attach all materials and allegation outside the pleadings they contend will support *their* position.

[2] The proposed SAA is attached as Exhibit A to Defendants' Motion to Amend their Answer.

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

A. **The Parties**

Plaintiff Aleksej Gubarev lives in Cyprus.  Compl. ¶ 6.  Plaintiff XBT Holding S.A. ("XBT") is incorporated in Luxembourg with its principal place of business in Cyprus.  XBT has roughly 30 subsidiaries, six of which carry the brand name "Webzilla": Webzilla Ltd. (based in Cyprus), Webzilla BV (based in the Netherlands), Webzilla Apps, Inc. (incorporated in Delaware), Webzilla Dallas, Inc. (incorporated in Texas), Webzilla Singapore Pte Ltd. (in Singapore) and Plaintiff Webzilla, Inc.  Webzilla, Inc. is incorporated in Florida, but its principal place of business is in Texas.  Defendant BuzzFeed, Inc. is a Delaware corporation with its principal place of business in New York, New York.  Defendant Ben Smith resides in Brooklyn, New York.

B. **The Origin of the Dossier**

For years, Christopher Steele worked for MI6, the United Kingdom's equivalent of the CIA, as one of its leading Russia experts.  After Steele left government service he founded Orbis Business Intelligence Service.  Steele is a longtime U.S. government source with a record of providing credible information to the Federal Bureau of Investigation and the State Department. In 2016, Fusion GPS, a private research firm headed by former reporter Glenn Simpson, was retained to conduct opposition research on Donald Trump – first by a Republican-leaning client, and then by a law firm working for the Democratic National Committee.  Fusion retained Orbis to conduct some of that research.  However, Steele's investigation quickly turned into something more.  He began receiving information that Russia was interfering in the election to support Trump, that the Trump campaign was cooperating, and that Russia held compromising information on him.  *See* SAA at 9-10, 16.

C. **Steele Becomes an FBI Source and the Dossier Becomes the Subject of Multiple Official Actions by the Government**

1. **The FBI Begins Using Steele's Reports in an Investigation.**  Steele decided to share his research with the FBI in July 2016, and from that point Steele also was an FBI source as he researched the Dossier.  The FBI used Steele's reports in its investigation of Russian interference in the elections.  In the fall of 2016 the Justice Department used information from his reports, as well as other sources, to obtain a FISA warrant to conduct surveillance on Carter Page, a Trump advisor.  In October, Steele met with the FBI in Rome to discuss his research. Steele also met with a Justice Department prosecutor, Bruce Ohr, as did Glenn Simpson.  Steele also shared his reports with Jonathan Winer, who summarized them for Victoria Nuland, then Assistant Secretary of State for Europe and Eurasian Affairs.  *See* SAA at 10-12, 16-17.

4

**2.      Senator Harry Reid Calls for Release of Information From the Dossier.**

Steele's reports also became the subject of other official actions.  Prior to the November election then majority-leader Senator Harry Reid was briefed on their contents.  On October 30, 2016, Senator Reid wrote a public letter to then-FBI Director James Comey, stating that "In my communications with you and other top officials in the national security community, it has become clear that you possess explosive information about close ties and coordination between Donald Trump, his top advisors, and the Russian government," and he urged Director Comey to make that information public.  Reid's letter was referring to the memos. *See* SAA at 11-12, 17.

**3.      Senator John McCain Procures the Dossier and Provides it to Government Agencies.**   In November 2016 the Halifax International Security Forum, a global security conference, met in Canada.  Among the attendees was Sir Andrew Wood, a former British ambassador to Russia; David Kramer, a Russia expert and former State Department official who was then heading the McCain Institute for International Leadership at Arizona State University; and Senator John McCain.

Wood told McCain that he was aware of information collected by Steele, whom Wood considered credible, that suggested there was collusion as well as compromising information collected on Trump.  Senator McCain asked Kramer to go to London to meet Steele and get the document, and after returning Kramer delivered the Dossier to Senator McCain.  On December 9, Senator McCain personally delivered the Dossier to FBI Director Comey.  *See* SAA at 12, 18.

**4.      Steele Writes the December Report Which Goes to U.S. Officials.**   After the election Steele continued to collect information, without compensation.  Steele's last two pre-election reports focused on a meeting that Trump's personal lawyer, Michael Cohen, allegedly had in Prague to deal with the public reports of Russian pro-Trump activity.  On December 13, 2016, Steele wrote a final report which provided more details about the alleged Cohen meeting.  The December report said that "XBT/Webzilla and its affiliates" and "entities linked to one Aleksei GUBAROV" [*sic*] were involved in the DNC hacking that Cohen was allegedly trying to conceal.  Steele sent the December memo to Kramer, through Fusion, with the intent that it would also be delivered to Senator McCain.  And as with Steele's previous reports, other government agencies and officials also obtained the December report.  *See* SAA at 12-13.

**D.      Two United States Presidents are Briefed on the Dossier**

On January 6, 2017, the Director of National Intelligence and the Directors of the FBI, CIA, and  NSA briefed President Obama and President-elect Trump about the Dossier, and delivered a two-page synopsis of it.  Director of National Intelligence James Clapper later

confirmed those briefings were conducted pursuant to the Intelligence Community's "obligation [] to ensure that policymakers are provided with the fullest possible picture of any matters that might affect national security."  Top Congressional leaders, including chairpersons and ranking members of the House and Senate intelligence committees, also received a summary of the Dossier.  *See* SAA at 13, 18-19.

**E.**     **BuzzFeed Publishes the Dossier**

Reporter Ken Bensinger of BuzzFeed obtained the Dossier in late December 2016.  Bensinger had first learned of the Dossier's existence earlier that month, and was aware that Steele wrote it and the FBI had it.  BuzzFeed's editor-in-chief Ben Smith and Bensinger also learned about Senator McCain's actions with the Dossier, and Smith understood that the FBI was investigating it and that Senator Reid's earlier letter referred to the Dossier.  Once BuzzFeed obtained the Dossier, a number of BuzzFeed journalists investigated different allegations within it to try to verify or disprove them.

On January 10, 2017, CNN broke a story that summarized the Dossier's most dramatic allegations, reported about the briefings of the President and President-elect, and reported that the FBI was investigating its contents.  Ben Smith concluded that since official action with the Dossier had reached the highest levels of government, it should be published.  BuzzFeed published an article entitled *These Reports Allege Trump Has Deep Ties to Russia* (the "Article"), along with an embedded PDF of the 35-page Dossier itself.  The Article also referred, and contained hyperlinks to, the January 10 CNN story and an earlier story in *Mother Jones* that reported about Steele's research (without naming him) and his relationship with the FBI.

The Article reported that the Dossier had been "circulating among elected officials, intelligence agents, and journalists for weeks," and that "CNN reported Tuesday that a two-page synopsis of the report was given to President Obama and Trump."  The Article summarized what the Dossier was and how it had come to be written.  Both the Article, and the CNN and *Mother Jones* reports to which it provided hyperlinks, made clear that the Dossier was the subject of multiple, official actions undertaken by all three branches of Government.  Specifically:

- The Article reported that "CNN reported Tuesday that a two-page synopsis of the report was given to President Obama and Trump."  *Id*.
- The words "CNN reported" were a hyperlink to the CNN Article, which included the following statements:
  - "The allegations were presented to Obama and Trump in a two-page synopsis that was appended to a report on Russian interference in the 2016 election."
  - "The FBI is investigating the credibility and accuracy of these allegations, which are based primarily on information from Russian sources, but has not confirmed

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

many essential details in the memos about Mr. Trump." *Id.*

- o "The classified briefings last week were presented by four of the senior-most US intelligence chiefs – Director of National Intelligence James Clapper, FBI Director James Comey, CIA Director John Brennan, and NSA Director Admiral Mike Rogers."
- o "Sources tell CNN that these same allegations . . . prompted then-Senate Democratic Leader Harry Reid to send a letter to FBI Director Comey in October"
- o "US intelligence agencies have now checked out the former British intelligence operative . . . and find him and his sources to be credible enough to include some of the information in the presentations to the President and President-elect a few days ago."
- o "[T]he top four Congressional leaders, and chairmen and ranking members of the House and Senate intelligence committees – the so-called 'Gang of Eight' – were also provided a summary of the memos . . ."
- The Article also reported that "Harry Reid spokesman Adam Jentleson tweeted Tuesday that the former Senate Democratic leader had seen the documents before writing a public letter to FBI Director James Comey about Trump's ties to Russia."
- The Article reported that "CNN reported Tuesday that Arizona Republican John McCain gave a 'full copy' of the memos to Comey on Dec. 9, but that the FBI already had copies of many of the memos."

BuzzFeed's Article also made clear to readers that the allegations in the Dossier were, at that time, "unverified." Finally, the Article added statements denying the Dossier's claims from President Trump, his spokesperson Kellyanne Conway, and his personal lawyer Michael Cohen. SAA at 14-16.

## ARGUMENT
## I.   THE AMENDED PLEADINGS ESTABLISH THE FAIR REPORT PRIVILEGE

### A.   The Fair Report Privilege Protects Publishing Documents Obtained and Used By Government Officials

This case arises because BuzzFeed republished a document written by someone else, i.e., Christopher Steele. Ordinarily, defamation law provides that one who republishes a defamatory statement made by someone else can be liable as well – what is called the "republication rule." However, if applied without exception the republication rule "creates special problems for the press." *Medico v. Time, Inc.*, 643 F.2d 134, 137 (3d Cir. 1981).

Most importantly, the rule would make it practically impossible for the press to report on activities related to government. For example, a reporter could not report defamatory allegations made by witnesses that are contained in a police report, unless he or she could independently verify which witnesses were telling the truth – in effect, solving the underlying alleged crime. To avoid that scenario, the fair report privilege operates as an exception to the rule. *Id.* It grants

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

the press (and others) the right to republish allegedly defamatory statements by someone else, as long as they were made within the context of government activities. *Id.* at 137-38.

While the fair report privilege is often generically described as granting a right to republish defamatory statements made in "official proceedings," *id.* at 136; *see also* N.Y. Civ. Rights L. § 74 (protecting "the publication of a fair and true report of any . . . official proceeding"), it applies much more broadly than to "proceedings" in the narrow sense of formal meetings or adjudications. The *Restatement (Second) of Torts* provides that "[t]he privilege extends to "the report of any official proceeding, *or any action taken by any officers or agency of the government of the United States*, or of any State or of any of its subdivisions." *Restatement*, § 611 cmt. d (1977) (emphasis added).[3]

In the context of reporting on official activity, the privilege also protects the publication of government documents, *Holy Spirit Ass'n for Unification of Christianity v. N.Y. Times Co.*, 49 N.Y.2d 63, 67-68 (1979); *Rasmussen v. Collier Cty. Publ'g Co.*, 946 So. 2d 567, 570-71 (Fla. Dist. Ct. App. 2006), including documents that were compiled by a private citizen and then provided to the government. *See, e.g.*, *White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990) (applying privilege to letter written by a private attorney submitted to the mayor and then investigated); *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209 (N.D.N.Y. 2014) (privilege would apply to an audiotape recorded by a private citizen and later used in a law enforcement investigation). And in New York and Florida, the privilege also applies to written or oral information that the press receives from government sources. *Woodard v. Sunbeam Television Corp.*, 616 So. 2d 501, 502 (Fl. Dist. Ct. App. 1993) (privilege applies to what reporter "was told by the Attorney General's Office"); *Fields v. Cty. of Westchester*, 2017 WL 353501, at *4 (Sup. Ct. Westchester Cty. Jan. 23, 2017). Importantly, if a document is protected by the privilege, the press "has no duty to determine the accuracy of the information contained" in the document. *Woodard*, 616 So. 2d at 503.

Finally, and perhaps most relevant here, a minority of jurisdictions do not apply the privilege to documents or government actions that are not otherwise open to the public, *see, e.g.*, *Wynn v. Smith*, 117 Nev. 6, 14-16 (2001), or to oral statements by police or prosecutors that are

---

[3] *See also Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1111 (Fla. 2008) (noting that Florida recognizes a "qualified privilege for fair and accurate statements made in reporting on official government activities"); *Huszar v. Gross*, 468 So. 2d 512, 516 (Fla. Dist. Ct. App. 1985) (adopting Section 611 of the *Restatement*); *Freeze Right Refrigeration & Air Conditioning Servs., Inc. v. City of New York*, 101 A.D.2d 175, 182 (N.Y. App. Div. 1st Dep't 1984) (the New York privilege protects news reports that "concern[] activities which are within the prescribed duties of a public body. The test is whether the reports concern action taken by a person officially empowered to do so.").

not part of an official record or report.  *Jones v. Taibbi*, 512 N.E.2d 260, 267 (Mass. 1987). Both New York and Florida, however, are among the larger number of states that apply the privilege regardless of whether a document or proceeding is treated as confidential by the government, including material related to confidential government investigations.  *See, e.g.*, *Global Relief Found. v. N.Y. Times Co.*, 390 F.3d 973 (7th Cir. 2004) (FBI investigation of charity's alleged ties to financing terrorism); *Crane v. Arizona Republic*, 972 F.2d 1511 (9th Cir. 1992) (Congressional investigation that was closed to the public); *White*, 909 F.2d 512.

In New York, the courts have frequently had occasion to address this issue.[4]  Thus, New York courts have applied the privilege to reports about a wide variety of government investigations and/or non-public documents used in investigations.  Some examples include an audiotape provided to police as part of investigation into sexual abuse allegations, *Fine*, 11 F. Supp. 3d at 216-17; the FBI's execution of a search warrant, *Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*, 844 F.2d 955, 962 (2d Cir. 1988); and consumer protection investigations, *Freeze Right*, 101 A.D.2d at 182 and *Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*, 603 F. Supp. 2d 584, 588 (S.D.N.Y. 2009).

Florida courts have had much less occasion to address the privilege in the context of non-public information, but when they have they apply the same principles as New York.  The most specific example is *Ortega v. Post-Newsweek Stations, Florida, Inc.*, 510 So. 2d 972, 976 (Fla. Dist. Ct. App. 1987), which involved a report about a Florida Department of Law Enforcement investigation into suspected organized crime, including testimony delivered by an agent before a legislative committee.  Neither the public testimony nor the committee record identified the plaintiff as one of the suspects, because the agency does not publicly identify investigative suspects.  *Id.* at 976 n.2.  But, the defendant's news report identified the plaintiff, based on information provided to the reporter by FDLE sources from FDLE files.  *Id.* at 976.

The *Ortega* court held that reporting the plaintiff's name was nonetheless privileged, and it relied extensively on *Medico v. Time, Inc.*, 643 F.2d 134 (3d Cir. 1981), a case that has many parallels to this one.  *Ortega* explained that "in *Medico*, the Third Circuit held that fair and accurate reports of FBI materials not released to the public were privileged. The court determined that even though the materials were not public records, the report based on those

---

[4] *See, e.g.*, *Freeze Right*, 101 A.D.2d at 182 ("the activities of the agency need not be public for the statutory privilege to apply."); *Komarov v. Advance Magazine Publishers*, 180 Misc.2d 658, 660 (Sup. Ct. N.Y. Cty. 1999) (internal FBI report that "was not prepared for public consumption"); *Keogh v. N.Y. Herald Tribune, Inc.*, 51 Misc. 2d 888, 891 (Sup. Ct. N.Y. Cty. 1966) ("The absolute privilege shall apply . . . whether [proceedings] are public or nonpublic.").

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

materials constituted a report of official proceedings." 510 So. 2d at 976. Quoting words that speak directly to this case, *Ortega* explained that "[i]n light of the difficulty in obtaining independent corroboration of [information on alleged crime compiled by a governmental agency], *the press may often have to rely on materials the government acquires* if it is to report on organized crime at all." *Id* at 976-77, *quoting Medico*, 643 F.2d at 142 (emphasis added).

In several other cases, Florida courts have also rejected the more narrow privilege applied in some jurisdictions by holding that informal statements made by public employees to the press are protected – even though such statements may be neither public nor officially authorized. In *Steven H. v. Duval Co. School Board*, 1999 WL 1427666, at *1 (M.D. Fla. 1999), the court held that a newspaper article stating that a high school football coach told a reporter that one of his players had been disciplined for wearing an earring was privileged. And in *Woodard*, the privilege was applied to what a reporter "was told by the Attorney General's Office." 616 So. 2d at 502.

Applying the principles recognized in both New York and Florida to this case, BuzzFeed's publication of the Dossier was protected by the fair report privilege. Steele was functioning as an FBI source for almost the entire time he was writing the Dossier, and the FBI used it in its investigation of the 2016 election and vouched for Steele's credibility before the Foreign Intelligence Surveillance Court. Moreover, the Dossier was the subject of multiple other official actions, any one of which would suffice to establish the privilege. They range from briefings of the Congressional leadership, Senator Reid's public call to Director Comey to release some of its contents, Senator McCain's unusual action of obtaining the Dossier and then having it personally delivered to the FBI, and briefing the President and President-elect. If a privilege that "exists so that the public may be kept informed of the workings of government," *Ortega*, 510 So. 2d at 976, protects an article about a high school coach's casual complaints about a player's earring, then surely it also protects the publication of the document that has been at the heart of the most important political controversy of our time.

### B.    Courts Have Applied the Fair Report Privilege In Analogous Circumstances

And, indeed, multiple courts have applied the fair report privilege to circumstances where, like here, the news media published the contents of non-public documents that were obtained by the government in the course of an investigation or other official activity. In *Fine v. ESPN*, (Mot. at 14, 16), ESPN aired news reports about allegations that an assistant basketball coach at Syracuse University had sexually molested two ball boys, and that his wife was aware

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

of the abuse.   The ESPN reports featured excerpts from an audiotape made by one of the accusers, of a telephone conversation he had with the coach's wife.  *See Fine v. ESPN*, 2013 WL 528468, at *1 (N.D.N.Y. Feb. 11, 2013).  The accuser gave the tape to ESPN, and then *eight years later* also turned it over to law enforcement authorities, whereupon ESPN reported about it.

The court held that to the extent ESPN's reports "quote from or describe the tape," those portions of its reports would be privileged because they describe materials submitted to and considered by law enforcement in an investigation.   *Id.* at 218.   As the court explained, "[q]uotations from, and summaries of, documents or other material that the report indicates are part of a proceeding are indisputably statements 'of' that proceeding." *Id.* at 216-17.  Here too, BuzzFeed reported that multiple agencies had the Dossier and were using it in an investigation, as well as taking other official action with it like briefing the country's highest officials.  Similarly, in *White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990), the *Washington Post* reported about allegations in letters written by a private attorney for a police union to the mayor, who then passed them on to a committee to investigate.  The D.C. Circuit held that the newspaper's description of the content of the letters was privileged, because "it would be untenable to make a distinction between a report about an official proceeding and that which, for all purposes, is the subject matter of the proceeding."  *Id.* at 527.  The Dossier is even more clearly the subject matter of official activities because not only was it obtained and investigated by the FBI, Steele was as an FBI source as he was conducting "private research."

The facts here also resemble another case that considered the application of the fair report privilege to another dossier, albeit one that was compiled and forwarded to investigative authorities in Russia.  *See OAO Alfa Bank v. Center for Public Integrity,* 387 F. Supp. 2d 20, 40 (D.D.C. 2005).  That dossier was also a collection of anonymous allegations of criminal conduct on the part of Russia's largest bank and two of its wealthiest citizens.  The court found that the Russian dossier met all the requirements for the fair report privilege, except that in the District of Columbia the privilege does not apply to the official actions of *foreign* governments.  *Id.* at 41-42.   By contrast, this case involves essentially the same type of conduct regarding the transmission and use of the Dossier by U.S. government officials.

The Fourth Circuit applied similar reasoning to a document that, like the letters in *White*, was written by a non-governmental employee.  *Reuber v. Food Chem. News*, 925 F.2d 703 (4th Cir. 1991).  The plaintiff in *Reuber* was a scientist who worked at a private research firm under contract with a government agency.  His supervisor wrote a letter reprimanding him for speaking out against the agency's position on the risks of the pesticide malathion, and the letter was leaked

to the media.  The Court rejected the plaintiff's argument that "the reprimand letter constitutes the actions of private entities," and held that given its actual impact on a government agency, "the letter does qualify as official action *for the purposes of a fair report privilege*."  *Id.* at 713.

Finally, in *Medico v. Time, Inc.*, which as previously discussed was relied on extensively by *Ortega*, the Third Circuit explained why the privilege protected a report about non-public documents that had leaked from an FBI investigation of a Congressman:

> [A]ny general supervisory concern with respect to the FBI is heightened in the present case by the public's interest in examining the conduct of individuals it elects to positions of civic trust . . . If the citizenry is effectively and responsibly to discharge its obligation to monitor the conduct of its government, there can be no penalty for exposing to general view the possible wrongdoing of government officials.

643 F.2d at 140-42.  Here too, publishing the Dossier helped citizens understand what the government was doing with serious allegations concerning the President-elect.  Moreover, the focus of the FBI investigation in *Medico* was on an elected official (much like the Trump campaign here), and the plaintiff was a businessman that was allegedly involved in corrupt acts by that official (like Plaintiffs here).  But that made no difference for purposes of the privilege.

**C.    Plaintiffs' Arguments Misstate Both the Legal and Factual Basis of Defendants' Fair Report Privilege Defense**

At bottom, Plaintiffs maintain that a privilege that protects reports about official activity does not protect the publication of arguably the most important document that all branches of government have been wrestling with for more than a year.   To construct that argument, Plaintiffs assert facts that are nowhere in the pleadings or the record (or reality) and advance legal arguments that are flatly contradicted by case law, often by the very cases they cite.

1.    Plaintiffs Mischaracterize New York Law

*First*, Plaintiffs argue that none of the official actions detailed above, including an FBI investigation, qualifies as an "official proceeding" under the New York statute because they are non-public.  That is flatly wrong.  Even Plaintiffs concede that "some courts in New York have found that an official government investigation" qualifies regardless of whether it was open to the public, and the only authority they discuss are two cases from other jurisdictions which disagreed with New York.  Mot at 10-11, *citing Schiavone Constr. Co v. Time, Inc.*, 847 F.2d 1069, 1086 (3d Cir. 1988) (opining in *dicta* that New Jersey might not apply the privilege to confidential investigations); *Wynn v. Smith*, 117 Nev. 6, 14-16 (2001).

*Abakporo v. Sahara Reporters*, 2011 WL 4460547 (E.D.N.Y. Sept. 26, 2011), also cited by Plaintiffs (Mot. at 16), actually makes clear why BuzzFeed's publication is privileged.  That

case holds that "the mere request for an investigation by a private individual or association," without more, is not necessarily protected. *Id.* at *10. But *Abakporo* makes clear that once there are "actions taken by a person officially empowered to do so" in response to a private complaint, the privilege attaches. *Id.* at *9. That requirement is easily satisfied here. Steele was an FBI source, not just a "private individual," and multiple official actions were taken with the Steele Dossier.

*Second*, Plaintiffs also argue that even assuming that "the facts as they exist here" could qualify for the fair report privilege, they contend its Article never actually reported about the Dossier's relationship to any official actions. Mot. at 13-15. Put another way, they argue BuzzFeed is liable because it should have written the Article a little differently. This argument is largely copied from a Government brief, but it fares no better here. The plain text of the Article, as well as the sources to which it hyperlinks, refutes Plaintiffs' (and the Government's) claims.

Plaintiffs never clearly explain what legal requirement they contend the Article fails to satisfy, but the point they raise can best be understood by considering the following hypothetical. If BuzzFeed had simply posted the Dossier on its website without any explanation about what it was, then its mere posting might not be privileged, because readers would have no context for understanding that the document relates to any government activity. To address that concern, the law provides that the privilege will apply to "documents or other material that the report indicates are part of a proceeding . . . ." *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 216-17 (N.D.N.Y. 2014). But this is not a rigorous requirement. *See, e.g.*, *id.* at 217 ("in light of the broad construction of § 74 . . . reports that bear a more attenuated relationship to a proceeding have been deemed sufficiently connected."); *Wenz v. Becker*, 948 F. Supp. 319, 323 (S.D.N.Y. 1996) (cited at Mot. at 12) ("If the context in which the statements are made make[s] it impossible for the ordinary viewer to determine whether defendant was reporting [on a proceeding], the absolute statutory privilege does not attach"). To the contrary, "newspaper accounts . . . must be accorded some degree of liberality. When determining whether an article constitutes a 'fair and true' report, the language used therein should not be dissected and analyzed with a lexicographer's precision." *Holy Spirit Ass'n*, 49 N.Y.2d at 68.

Moreover, in the digital age providing hyperlinks to other news reports about official activities also suffices to report about them. *Adelson v. Harris*, 402 P.3d 665, 666 (Nev. 2017) ("a hyperlink to source material about a judicial proceeding may suffice as a report within the common law fair report privilege"). *See also Sandals Resorts Int'l Ltd. v. Google, Inc.*, 86 A.D.3d 32, 45 (1st Dep't 2011) ("the e-mail is supported by links to the writer's sources."). In

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

fact another case Plaintiffs cite, *Cholowsky v. Civiletti*, holds that one news organization may rely on reports by another in its reporting about official actions – much like BuzzFeed relied in part on the CNN and *Mother Jones* reports to which the Article linked.  69 A.D.3d 110, 115 (2d Dep't 2011).

Here, the Article and its hyperlinked sources plainly "indicate" that the Dossier is a "document" that was a "part of" at least a half-dozen different official actions undertaken by all three branches of government.  After reading the Article and its linked-to sources, it is far from "impossible" for readers to understand that the Dossier was the subject of government activity.

*Next*, Plaintiffs argue that even assuming the actions of the FBI, CIA, Senator McCain, etc. qualify as "official proceedings," none of them related to the specific allegations about the Plaintiffs.  Mot. at 12.  Nor, they assert, did the Article make any "claims" specifically about the December memo.  *Id.* at 14, 16.  Those arguments also fail, as a matter of both fact and law.

First, there *was* an investigation that "had some relation" to the defamatory statements about Plaintiffs.  *Id.*  The Plaintiffs were alleged to have been involved in hacking the DNC, a central focus of the investigations.  Moreover, the Article does contain "claims" about the December memo.  The principal focus of that memo was on then candidate Trump's personal lawyer Michael Cohen, and the Plaintiffs are mentioned as part of the operation Cohen allegedly tried to protect.  The Article includes a statement from Cohen strongly denying the allegations.

But even if the facts were otherwise, it would make no difference.  Plaintiffs point to no authority which suggests that, having provided readers with a basic explanation of a document's relation to official activity, a news article must also make "claims" about every single sentence within the document to qualify for the privilege.  That would be an absurd standard.  For example, recently Congressional committees released the testimony of Glenn Simpson, which totaled 496 pages.  Reporting legislative testimony is privileged, *see, e.g.*, *Holy Spirit*, *supra*; *Ortega, supra*, and many news reports attached a PDF of the transcripts.  But no article could also make "claims" about every person Simpson mentioned, and no legal principle requires that.

Moreover, neither the Article nor the linked-to CNN report purported to delineate, or even know, all the details of how the Dossier had been utilized within the government as of January 10.  Rather, the Article explained that the document had been "circulating among elected officials, intelligence agents, and journalists for weeks," and provided several examples of official activity.  The privilege can hardly be lost because it turns out the Dossier was even *more* integral to official activity than was known or could have been reported at the time.

14

And if Plaintiffs are implying that the Dossier with the December memo was never the subject of any official action, there too they are wrong.  Steele has stated in sworn court filings that he wrote the December memo specifically to send it to Senator McCain (as well as a government official in the U.K.).  He therefore sent it to Kramer, because he "believed that Senator McCain and Mr. Kramer were acting only in their official capacities."

Moreover, if Senator McCain had asked a member of his staff to handle the Dossier rather than a well-respected private expert who headed the McCain Institute, the staffer's conduct would clearly be "official action."  That he asked Kramer makes no difference.  Kramer functioned much like the individual defendants in *Reuber,* who were not actually government employees but, for purposes of the privilege, were held to be performing the functional equivalent of official actions.  Moreover, as set forth in Defendants' Rule 56(d) Declaration, discovery may yield even more examples of official activity with the Dossier.[5]

2.    Plaintiffs Mischaracterize Florida Law

The Florida Supreme Court has emphasized the "extensive protections" Florida law provides defamation defendants "to ensure the delicate balance between preventing tortious injury resulting from defamatory statements and protecting the constitutional right to free speech."  *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1112 (Fla. 2008).  Yet Plaintiffs' characterization of Florida law would make this state's fair report privilege perhaps the least protective of any jurisdiction nationwide.  Plaintiffs point to Florida cases in which a reporter supposedly "received [a document or information] from a government official or any other government source," or alternatively, published what Plaintiffs call "publicly available government documents."  Mot. at 7-8.  They contend this case presents neither scenario, and so there is no privilege.  Plaintiffs are mistaken, for two reasons.

First, while the fact patterns in the cases Plaintiffs cite are common examples of how the privilege applies, they do not define the limits of the Florida privilege.  For example, one of the earliest fair report privilege cases involved oral statements by a candidate running for Governor.  *Abram v. Odham*, 89 So. 2d 334 (Fla. 1956).  The candidate was not a "government official" or a "government source," nor were his speeches "publicly available government documents."

In any event, for purposes of the fair report privilege Christopher Steele was functioning as a "government source" for virtually the entire time he wrote the Dossier.  *See supra* at 3-4.

---

[5] Plaintiffs also cite *Bufalino v. Associated Press*, 692 F.2d 266 (2d Cir. 1982), and *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736 (D.C. Cir. 1985) (Mot. at 13), but those cases involved articles that did not mention any official activities. After lawsuits were filed, the defendants found that similar allegations could also be found in government sources.  Here, the Article identifies the Dossier's relationship to multiple official actions.

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

And since the FBI and other agencies obtained the Dossier for their own investigative purposes, it also functioned as a "government document" for purposes of the privilege. As the *Fine*, *White*, *OAO Alfa*, *Reuber*, and *Medico* cases discussed herein demonstrate, the fair report privilege looks at the function persons and documents play in government activity, and so the privilege can apply to investigative materials that the government obtains. Plaintiffs never define what they mean by a "government document," but notably the Dossier is clearly an "agency record" under the federal Freedom of Information Act. *Guidry v. Comey*, 692 F. App'x 975, 977 (11th Cir. 2017) ("A document qualifies as an 'agency record' . . . if . . . the document was created or obtained by the agency and was in the agency's possession through the legitimate conduct of the agency's official duties."). By contrast, a novel like *Fifty Shades of Gray* is not an agency record, and comparing that type of "document" to the Dossier is patently absurd. *See* Mot. at 9.[6]

Finally, Plaintiffs cite *Ortega* for the proposition that the Florida privilege is otherwise limited to "matters brought out in *public* proceedings." Mot. at 8. Along the same lines, they assert that the privilege only applies to "publicly available" documents. *Id.* But *Ortega* rejected those very propositions. *Ortega* agreed with the Third Circuit in *Medico* that the privilege extended to "materials not released to the public," and therefore applied the privilege to the identities of suspects who had not been named in any public proceedings or records. Plaintiffs would limit the press to reporting only statements and documents that the government chooses to release. As cases like *Medico* have recognized, that proposition is fundamentally inconsistent with the constitutionally-sanctioned role of the press "effectively and responsibly to discharge its obligation to monitor the conduct of its government." 643 F.2d at 141.

**D.      If a Choice Were Necessary, New York Law Should Be Applied**

In a diversity action, the Court must apply the choice-of law principles of Florida. *Michel*, 816 F.3d at 694. Florida applies the "most significant relationship" test, which determines the law applicable to an issue by considering the contacts listed in Section 145 of the Restatement (Second) of Conflict of Laws. *Id.*. Courts also consider these contacts in light of

---

[6] Plaintiffs point to a legal brief filed by counsel for the government agencies that have objected to providing any discovery from BuzzFeed about the Dossier. Mot. at 9. The brief argues that that the Dossier is not a "government document," which Plaintiffs cites as if it were a fact. Obviously, arguments by counsel seeking to quash a subpoena to their clients do not establish the parameters of the fair report privilege. Mot. at 9. Indeed, later in its brief the Government takes the patently inconsistent position that the law enforcement privilege applies to the Dossier. Dkt. 115-1 at 31-35. Similarly, Plaintiffs note that Glenn Simpson testified that the Dossier was not originally authored as a government document. Mot. at 8-9. But that is irrelevant to whether it became one for purposes of the fair report privilege.

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

the principles in Section 6 of the Restatement.  *Bishop v. Fla. Specialty Paint Co,*, 389 So. 2d 999, 1001 n.1 (Fla. 1980)*.*

Importantly, in Florida the "most significant relationship" test "does not require the court . . . to determine which state's local law should be applied to all issues in the *case* as a whole; rather, the contacts must be evaluated with respect to the particular *issue* under consideration." *Stallworth v. Hosp. Rentals, Inc.*, 515 So. 2d 413, 415 (Fla. Dist. Ct. App. 1987).  Accordingly, "the law of a foreign state may control one issue while the law of Florida controls another." *Judge v. Am. Motors Corp.*, 908 F.2d 1565, 1578 (11th Cir. 1990).  Thus, the only question potentially raised by this motion is which state law should apply to BuzzFeed's *affirmative defenses*.  The Court need not decide which law should define the elements of Plaintiff's defamation claim.

While the issue has not arisen in Florida, decisions on point from courts following the same *Restatement* test make it clear that New York law should apply to the two affirmative defenses at issue.  In *Wilkow v. Forbes, Inc.*, 2000 WL 631344 (N.D. Ill. May 15, 2000), *aff'd*, 241 F.3d 552 (7th Cir. 2001), an Illinois plaintiff sued a New York-based publisher for defamation over on a nationally published magazine article.  The court held that Illinois law applied to "the defamation issue," but the law of the defendants' domicile – New York – applied to the fair report privilege.  It noted that "[t]he issue of whether a statement is defamatory or invades the right to privacy is distinct [for choice of law analysis] from the issue of whether that statement is privileged," *id.* at *5.  The court explained that "[t]he fair reporting privilege is meant to protect speakers, not provide a remedy to plaintiffs," and the fact that the publishing decisions were made in New York gave that state "a more substantial relationship with the conduct at issue here."  *Id.* at *7.  *See also Global Relief Found. v. N.Y. Times Co*, 2002 WL 31045394, at *11 (N.D. Ill. Sept. 11, 2002) (Illinois law applied to the underlying defamation claim while "the law of California will apply to defenses to defamation").

Here, the factors favoring the application of New York privilege law are even stronger than in the Illinois cases cited above, for two reasons. First, several of the factors identified by Section 6 of the Restatement are especially implicated here.  Two other defamation lawsuits are pending in New York challenging BuzzFeed's publication of the Dossier.  The same privilege issues being litigated here are being litigated there, under New York law.  If there were a conflict between Florida and New York law, then applying the former here could lead to the absurd result that BuzzFeed's single decision to publish the Dossier would be wholly protected with respect to some plaintiffs, while subjecting it liability with respect to others.  *See Michel v. NYP Holdings,*

17

*Inc.*, 2015 WL 1285309, at *3 (S.D. Fla. Mar. 4, 2015) (noting that "applicability of New York defamation law to a New York publication encourages 'certainty, predictability and uniformity of result' and 'ease in the determination and application of the law to be applied'"), *aff'd in relevant part*, 816 F.3d 686 (11th Cir. 2016).[7]

The second reason the *Restatement* factors favor New York law is that even with respect to Plaintiffs' substantive defamation claim, their argument for applying Florida law is very weak. Florida's interests would therefore not be meaningfully threatened by applying New York's laws protecting publishers.  Plaintiffs rely entirely on the fact that just one plaintiff –Webzilla Inc. – is incorporated here, and claim Florida is the "place of injury" for it.  Mot. at 6 n.7.  That logic is fundamentally flawed.

First, even looking solely at Webzilla, the *Restatement* provides that when a publication is nationwide, a corporate plaintiff's place of injury is presumptively the state where it maintains its *principal place of business*, not its state of incorporation.  *See Restatement (Second) of Conflict of Laws* § 150 & cmt e (1971).  Webzilla's principal place of business is in Texas, whose law no one maintains has the most significant relationship to this case.  Moreover, the reference to "Webzilla" in the Dossier could refer to any of the six companies with the same trade name, five of which have no connection to Florida.

Second, there is no basis at all to apply Florida law to the claims of wholly foreign plaintiffs like XBT and Gubarev.  *See, e.g.*, *In re Takata Airbag Prod. Liab. Litig.*, 2016 WL 6072406, at *4–5 (S.D. Fla. Oct. 14, 2016) (conducting choice-of-law analysis specific to each individual plaintiff); *Tavoulareas v. Wash. Post*, 8 Media L. Rep. 2262, 2267 (D.D.C. 1982) (court applied New York law to the New York plaintiff and D.C. law to the London plaintiff in defamation case against D.C. publisher).  Rather, in defamation actions involving a multistate publication and multiple plaintiffs in various jurisdictions, courts have afforded the location of any single plaintiff little weight in determining choice of law and accorded far more weight to the location of the publisher and the locus of the publishing decisions.  In *Sarver v. Chartier*, 813 F.3d 891, 899 (9th Cir. 2016), the Ninth Circuit applied California law to suit brought by a putative New Jersey plaintiff against California filmmakers over a film that was distributed nationwide.  *Davis v. Costa-Gavras*, 580 F. Supp. 1082 (S.D.N.Y. 1984), applied New York law

---

[7] In rejecting Defendants' motion to transfer, the Court stated that "*Michel* did not involve the accessibility of a defamatory article that was posted on a website."  *Gubarev v. BuzzFeed, Inc.*, 253 F. Supp. 3d 1149, 1167 (S.D. Fla. 2017).  Respectfully, the article at issue in *Michel* was posted by the newspaper on the internet as well.  *See Michel*, 2015 WL 1285309, at *1.

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

to a suit brought by plaintiffs from different states against New York publishers over a book that described activities outside of the United States.  And *Ramsey v. Fox News Network, LLC*, 351 F. Supp. 2d 1145 (D. Colo. 2005), applied Colorado law to a claim brought by Georgia residents over a news story developed by Colorado-based journalists where "millions" of viewers saw the broadcast "throughout the United States and the world."  Here, Defendants are all based in New York, the decision to publish the Dossier was made in New York, and the Article was written and edited in New York.

## III.    THE PLEADINGS ALSO SUPPORT THE NEUTRAL REPORT PRIVILEGE

There are two sources of the neutral report privilege: the First Amendment and state law. Looking first at the latter, Plaintiffs maintain that it is "unclear" whether Florida recognizes the neutral report privilege.  Actually it is clear: the privilege protects "disinterested and neutral reporting" by the media about newsworthy matters.[8]  Here the Article's description of the Dossier was "neutral and disinterested."  It made clear that its allegations were unverified, and it was newsworthy.  The cases Plaintiffs cite for the proposition that it is "unclear" whether Florida recognizes this privilege were not addressing the neutral report privilege.  Rather, those cases addressed whether private figures must prove "actual malice" whenever statements relate to matters of public concern.  *See Miami Herald Publ'g Co. v. Ane*, 458 So. 2d 239, 241 (Fla. 1984); *Ortega*, 510 So. 2d at 975.  Moreover, even if Florida did limit the neutral report privilege to public figures, Defendants have specifically pled that Plaintiffs are public figures, which must, at this stage, be assumed to be true.  *See* Dkt. 32 at 10 (Sixth Defense).  The adjudication of Plaintiffs' status at the summary judgment phase may be more relevant if New York law applies, because New York has only "rejected the existence of a neutral reportage privilege *for private plaintiffs*."  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 105 n.11 (2d Cir. 2000) (emphasis added).  Whether New York would apply the privilege to public figures is unsettled.

Separate and apart from state law, the neutral report privilege under the First Amendment was first recognized by the Second Circuit in *Edwards v. National Audubon Society*, 556 F.2d 113 (2d Cir. 1977).  The First Amendment privilege applies where the defendant published "(1)

---

[8]*Huszar*, 468 So.2d at 516 (statement is "the type of disinterested and neutral reporting that the First Amendment privilege is designed to protect."); *Smith v. Taylor Cty. Publ'g Co.*, 443 So. 2d 1042, 1044 (Fla. Dist. Ct. App. 1983) ("[T]he 'news story' was protected by the neutral reporting privilege, because the article was a disinterested report of a newsworthy event"); *Ortega Trujillo v. Banco Central Del Ecuador*, 17 F. Supp. 2d 1334, 1336 (S.D. Fla. 1998) (the neutral reporting privilege is only extended to "disinterested and neutral reporting" by members of the media"); *Thomas v. Patton*, 2005 WL 3048033 at *3 (Fl. Cir. Ct. Duval Cty. 2005) ("The reports also fall within, and are protected by, the neutral reporting privilege, because the reports are disinterested accounts of newsworthy information about matters of public concern.").

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

'an accurate and disinterested report'; (2) regarding a newsworthy controversy; (3) in which the defamatory statement was made by a 'responsible, prominent organization'; and (4) provided that the statement is not endorsed by the publisher." *Coliniatis v. Dimas*, 965 F. Supp. 511, 519 (S.D.N.Y. 1997).  The Eleventh Circuit has never addressed the constitutional privilege.

*Edwards* recognized the privilege because "[t]he public interest in being fully informed about controversies that often rage around sensitive issues demands that the press be afforded the freedom to report such charges without assuming responsibility for them."  556 F.2d at 120. That reasoning applies squarely to this case, and all the elements of the constitutional privilege are satisfied here.  The alleged corruption of the President is a "newsworthy controversy." And BuzzFeed's presentation of the Dossier was neutral.  The Article emphasized that it had neither been "verified" nor "falsified" by BuzzFeed.  Finally, Christopher Steele was a responsible, prominent source with a worldwide reputation for expertise in gathering intelligence concerning Russia, and was used as a source by American law enforcement and intelligence agencies.

Plaintiffs argue that final element is not satisfied because Steele was not the "source" of the allegations, his sources were.  Mot. at 19.  But the privilege requires that "the defamatory statement" be made by a responsible entity; it does not bar responsible persons from consulting sources or conducting research to inform their reports.  For example, in *Edwards* the National Audubon Society published some of the defamatory statements, but they were actually written by a volunteer scientist.  556 F.2d at 115-18.  The point of the privilege is that responsible persons like Steele are more likely to have reliable sources for the information they disseminate.

## CONCLUSION

For the reasons stated herein, Plaintiffs' Motion should be denied or deferred.

Date:  February 9, 2018

Respectfully submitted,

| | |
|---|---|
| /s/ Katherine M. Bolger | /s/ Roy Black |
| Katherine M. Bolger | Roy Black |
| Adam Lazier | Jared Lopez |
| Nathan Siegel | Black, Srebnick, Kornspan & Stumpf, P.A. |
| Alison Schary | 201 So. Biscayne Boulevard |
| Davis Wright Tremaine, LLP | Miami, Florida 33131 |
| 1251 Avenue of the Americas, 21st Floor | rblack@royblack.com |
| New York, New York 10020 | jlopez@royblack.com |
| katebolger@dwt.com | |
| adamlazier@dwt.com | |
| nathansiegel@dwt.com | Attorneys for Defendants |
| alisonschary@dwt.com | |

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

## <u>CERTIFICATE OF SERVICE</u>

I CERTIFY that on February 9, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: /s/ Jared Lopez

Jared Lopez, Esq.

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com