## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No.: 17-cv-60426-UU

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.

    Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

    Defendants.

_____/

### RULE 56(D) DECLARATION OF NATHAN SIEGEL

Pursuant to 28 U.S.C. § 1746, I, **NATHAN SIEGEL**, declare as follows:

    1.    I am an attorney duly admitted to practice law *pro hac vice* before this United States District Court and a partner of the firm of Davis Wright Tremaine LLP, counsel for defendants BuzzFeed, Inc. and Ben Smith ("Defendants") in the above-captioned action. I submit this declaration pursuant to Rule 56(d) of the Federal Rules of Civil Procedure in opposition to Plaintiffs' Motion for Partial Judgment on the Pleadings and in support of Defendants' request for further discovery if this Court should convert Plaintiffs' motion to a motion for summary judgment. Everything contained in this declaration is based on the discovery in this case, as referenced by my citations, or my personal knowledge, except as otherwise indicated.

    2.    For the reasons set forth in Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Judgment on the Pleadings, filed herewith, Defendants believe that Plaintiffs' motion is improperly designated as a Rule 12(c) motion and, if converted to a Rule 56 motion, should be deferred or denied as premature. In the event that this Court considers

converting Plaintiffs' motion to one for summary judgment based on its reliance upon factual allegations outside the pleadings, Defendants submit this declaration to detail why such a motion would be premature given ongoing relevant discovery.  Accordingly, Defendants respectfully request pursuant to Rule 56(d) that the Court deny Plaintiffs' motion or defer consideration until Defendants are able to obtain the additional discovery described herein.

3.       Discovery in this case is still ongoing.  The current discovery deadline is March 15, 2018 (ECF No. 93); however, at the Court hearing on January 10, 2018, Defendants advised the Court that they would seek to extend that deadline in light of the status of discovery to date, including pending third-party discovery and discovery disputes related thereto, and the Court indicated that it would consider such a request at the upcoming court conference on February 27, 2018. *See* Transcript of January 10, 2018 Status Conference ("Conf. Tr.") at 39, 43-44.

4.       Plaintiffs argue in their motion that Defendants are not entitled to the protections of the fair-report privilege because the Dossier was not the subject of an "official proceeding." *See* Mot. at 10-11.  Widespread reporting, as well as public testimony by current and former government officials – and most recently, the release of a formerly classified memorandum by the House Permanent Select Committee on Intelligence – undercuts Plaintiffs' assertions.

5.       Defendants are currently in the process of obtaining discovery in a form admissible at the summary judgment stage from several sources to create the most complete record of facts establishing official activity involving the Dossier.  First, Defendants are currently seeking testimony from the FBI, DOJ, and ODNI, as well as former DNI James Clapper and former FBI Director James Comey (together, the "Government Parties"), to confirm for purposes of a summary judgment motion that they had the Dossier and that it was used in

government investigations prior to the date that BuzzFeed published the Dossier and the Article on January 10, 2017.

6.     Defendants have diligently sought this discovery from the Government Parties. Defendants served a third-party subpoena for documents and testimony upon the Government Parties on June 28, 2017. The Government Parties formally objected to Defendants' requests on August 18 and 25, 2017. Following receipt of those objections, Defendants conferred with the Government Parties on September 8, 2017, and proposed a narrowed set of topics for testimony. The Government Parties rejected Defendants' narrowed request by letter dated September 15, 2017, and Defendants moved to compel on September 27, 2017. The motion was fully briefed on December 18, 2017, and it is set for oral argument on February 15, 2018 in the U.S. District Court for the District of Columbia. *BuzzFeed, Inc. v. Dep't of Justice*, No. 1:17-mc-02429-APM (D.D.C.). Plaintiffs attached a copy of the Government Parties' brief opposing Defendants' motion to compel as Exhibit 1 to their Motion for Partial Judgment on the Pleadings; accordingly, for completeness, Defendants attach their briefing in support of the motion to compel as **Exhibit A** hereto.

7.     Second, the Court's Letter of Request seeking testimony from Christopher Steele, the Dossier's author, in the United Kingdom, remains the subject of litigation in that jurisdiction. Plaintiffs sought a Letter of Request from this Court, with Defendants' consent – preserving the right to cross-examine the witness – and that request was granted by the U.K. court in an order dated November 9, 2017. Mr. Steele has moved to set aside the order providing for his oral examination, and the parties are currently contesting that motion in the U.K. court. If Mr. Steele's deposition proceeds pursuant to the topics listed in the Letter of Request, it will include testimony concerning when and who he provided the Dossier to, including U.S. government

officials, which will be directly relevant to Defendants' fair-report privilege defense. His testimony may also provide evidence in support of the constitutional neutral reporting privilege's requirement that the allegations at issue were written by a "responsible, prominent" source.

8.      Third, Plaintiffs' Subpoena to Fusion GPS remains pending in the courts of the District of Columbia. Glenn Simpson, Fusion's founder, has knowledge regarding Fusion's communications with government officials about the Dossier that can provide further evidence of official activity with the Dossier. Fusion's motion to quash that subpoena remains pending.

9.      Finally, as discussed at the January 10 hearing, this is somewhat of an unusual case in that the Dossier is at the center of a major national story that is unfolding in real time. News is constantly breaking that sheds light on the factual allegations in the Dossier, as well as the scope of official investigations into its contents. The more information that emerges, the more it is clear that the Dossier was indeed being "circulated at the highest levels of the U.S. government," as the Article reported, and that it was the subject of investigation by U.S. law enforcement and intelligence agencies.

10.      For example, on February 2, 2018, Republican members of the U.S. House Permanent Select Committee on Intelligence (HPSCI), led by HPSCI Chairman Devin Nunes, released a memorandum stating that the Dossier was included in materials presented to the Foreign Intelligence Surveillance Court (FISC) to obtain a FISA warrant for Carter Page, a former Trump campaign advisor, on October 21, 2016, which was subsequently renewed at least three times. A true and correct copy of that memo (the "Nunes Memo"), which was declassified and approved for public release by President Trump, is attached as **Exhibit B**. The memo further states that the FBI was attempting to corroborate the contents of the Dossier at the time the warrant was first obtained; that its corroboration attempts continued thereafter; and that former

FBI Director James Comey briefed President Obama and incoming President-Elect Trump on a "summary of the Steele dossier." On February 5, 2018, the House Intelligence Committee voted to make public a rebuttal memo drafted by Democratic members of the committee, responding to the allegations in the Nunes Memo. The White House is currently considering whether to declassify the Democratic memo. That same day, Senator Charles Grassley released a letter to the Department of Justice referring Christopher Steele for possible criminal prosecution (the "Grassley Letter"), which also contains more information about Steele's relationship with the U.S. government authorities. A true and correct copy of the Grassley Letter is attached as **Exhibit C.**

11. In addition, Plaintiffs' motion for judgment on the pleadings argues that Florida law should apply to the privilege defenses that are the subject of this motion, and acknowledges that there is authority in Florida supporting the recognition of a neutral reporting privilege. However, Plaintiffs argue that any such privilege in Florida is limited to public figures, and assert that they are private figures. Mot. at 17-18.

12. Whether the Plaintiffs are public or private figures will be a question of law for the Court to resolve, but one that necessarily requires the application of the governing legal standards to the factual record about the Plaintiffs. *See, e.g., O'Boyle v. Sweetapple*, No. 9:14-CV-81250-KAM, 2015 WL 13574304, at *5 (S.D. Fla. June 4, 2015) (issue of whether plaintiff is a limited-purpose public figure "lends itself more readily to a motion for summary judgment rather than a motion to dismiss"); *OAO Alfa Bank v. Ctr. for Pub. Integrity*, No. CIV.A. 00-2208(JDB), 2006 WL 1313309, at *2 (D.D.C. May 12, 2006) ("The legal standards governing whether a person is a 'limited public figure' are dependent on the particular facts of the case."). Discovery regarding Plaintiffs' status as public or private figures is also ongoing.

13.     Defendants are currently serving a Request for Production of Documents that will include requests for magazines published by Defendant Gubarev, materials about conferences sponsored by Defendant Gubarev, and a variety of other public relations material that the course of discovery to date leads Defendants to believe exists.

14.     Defendants have also served a subpoena on KGlobal, a public relations firm that, according to documents produced by Plaintiffs, they previously retained in Washington, D.C. The subpoena seeks information about public relations activities conducted on behalf of Plaintiffs and is returnable on February 28. Once the firm produces responsive documents, Defendants will assess whether a deposition of the firm will also be required.

15.     Defendants have also not yet taken the depositions of any of the Plaintiffs, primarily because as was discussed at the last status conference, Plaintiffs have not yet produced any calculation of the nature and amount of their alleged damages. The Court ordered Plaintiffs to produce that damages information by the end of this month, and the depositions will take place after that production is complete. Defendants will require those depositions to examine the Plaintiffs about facts and documents that are relevant to their potential status as public figures.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 9, 2018.

Nathan Siegel

# EXHIBIT "A"

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

BUZZFEED, INC. and BEN SMITH,
  Plaintiffs,

v.

DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Washington DC 20530

FEDERAL BUREAU OF INVESTIGATION
Office of General Counsel
935 Pennsylvania Avenue, NW
Washington, DC 20535-0001

OFFICE OF THE DIRECTOR OF
NATIONAL INTELLIGENCE
Office of General Counsel
1500 Tysons McLean Drive
McLean, VA 22102

JAMES COMEY
c/o FEDERAL BUREAU OF
INVESTIGATION
Office of General Counsel
935 Pennsylvania Avenue, NW
Washington, DC 20535-0001

and

JAMES CLAPPER
c/o OFFICE OF THE DIRECTOR OF
NATIONAL INTELLIGENCE
Office of General Counsel
1500 Tysons McLean Drive
McLean, VA 22102

  Defendants.

Case: 1:17-mc-02429
Assigned To : Mehta, Amit P.
Assign. Date : 9/27/2017
Description: Misc.

**MOTION TO COMPEL AND
INCORPORATED MEMORANDUM OF
LAW**

4831-3301-6910v.8 0100812-000009

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................1

FACTUAL BACKGROUND ...................................................................2

    I.     THE DOSSIER AND THE FLORIDA LITIGATION ...............................2

           A.    The Dossier ......................................................................2

           B.    The Publication of Buzzfeed's Article with the Dossier .................3

           C.    The Official Briefings .......................................................4

           D.    Official Investigations of the Dossier and its Contents ..................7

           E.    The Florida Litigation .......................................................9

    II.    MOVANTS' EFFORTS TO DATE TO OBTAIN THE REQUESTED
          DISCOVERY FROM THE GOVERNMENT PARTIES ...........................10

           A.    The Subpoenas ...............................................................10

           B.    The Government's Response to the Subpoenas .............................10

           C.    Movants Efforts to Narrow the Subpoenas and Meet and Confer .....11

           D.    The Limited Scope Of The Deposition(s) Movants Seek To
               Compel In This Motion......................................................12

ARGUMENT....................................................................................13

           A.    The Subpoenas Seek Information Highly Relevant to BuzzFeed's Fair
               Report Privilege Defense and the Element of Falsity in the Florida
               Litigation......................................................................14

            B.    The Subpoenas do not Subject the Government Parties to an
               Undue Burden. ...............................................................18

            C.    The Limited Requested Testimony Does Not Implicate any
               Bona-Fide Classified Information...........................................21

CONCLUSION.................................................................................25

4831-3301-6910v.8 0100812-000009

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.C.L.U. v. C.I.A.,*
  710 F.3d 422 (D.D.C. 2013) .......................................................................................... 24

*Alexander v. FBI,*
  186 F.R.D. 21 (D.D.C. 1998) ........................................................................................ 13

*Biro v. Conde Nast,*
  883 F. Supp. 2d 441 (S.D.N.Y. 2012) ..................................................................... 14, 15

*Byers v. Burleson,*
  100 F.R.D. 436 (D.D.C. 1983) ...................................................................................... 22

*Chau v. Lewis,*
  771 F.3d 118 (2d Cir. 2014) .......................................................................................... 15

*In re Denture Cream Prods. Liability Litigation,*
  292 F.R.D. 120 (D.D.C. 2013) ........................................................................... 14, 19, 20

*District Title v. Warren,*
  2017 WL 2462489 (D.D.C. June 2, 2017) .................................................................... 22

*Fine v. ESPN,*
  11 F. Supp. 3d 209 (N.D.N.Y. 2014) ............................................................................ 17

*Freeze Right Refrigeration and Air Conditioning Services, Inc. v. City of New York,*
  101 A.D.2d 175 (1st Dept. 1984) .................................................................................. 15

*Global Relief Found. v. N.Y. Times Co.,*
  2002 WL 31045394 (N.D.Ill., Sept. 11, 2002) ............................................................ 16

*Global Relief Found. v. N.Y. Times Co.,*
  390 F.3d 973 (7th Cir. 2004) ............................................................................. 15, 16, 17

*Global Relief Found. v. O'Neill,*
  315 F.3d 748 (7th Cir. 2002) ........................................................................................ 16

*Goldstein v. F.D.I.C.,*
  494 B.R. 82 (D.D.C. 2013) ........................................................................................... 23

ii

*Guccione v. Hustler Magazine, Inc.*,
  800 F.2d 298 (2d Cir. 1986) ........................................................................................... 15

*Klayman v. Judicial Watch, Inc.*,
  22 F. Supp. 3d 1240 (S.D. Fla. 2014) ............................................................................ 15

*Marino v. Drug Enforcement Admin.*,
  685 F.3d 1076 (D.D.C. 2012) ......................................................................................... 24

*Montesa v. Schwartz*,
  2015 WL 13016354 (S.D.N.Y. Nov. 3, 2015) ................................................................ 21

*N.Y. Times v. D.O.J.*,
  756 F.3d 100 (2d Cir. 2014) ........................................................................................... 23

*OAO Alpha Bank v. Center for Public Integrity*,
  387 F.Supp.2d 20 (D.D.C. 2005) ....................................................................... 15, 17, 18

*Ortega v. Post-Newsweek Stations, Florida, Inc.*,
  510 So.2d 972 (Fla. Dist. Ct. App. 1987) ...................................................................... 15

*Smith v. C.I.A.*,
  2017 WL 1194166 (D.D.C. Mar. 30, 2017) .................................................................... 24

*Steven H. v. Duval County School Bd.*,
  1999 WL 1427666 (M.D. Fla. Sept. 3, 1999) ........................................................... 14, 15

*Tuite v. Henry*,
  98 F.3d 1411 (D.C. Cir. 1996) ........................................................................................ 25

*U.S. Dept of the Treasury v. Pension Benefit Guaranty Corp.*,
  301 F.R.D. 20 (D.D.C. 2014) .......................................................................................... 19

*U.S. v. AT&T, Inc.*,
  2011 WL 5347178 (D.D.C. Nov. 6, 2011) ................................................................ 19, 21

*Watts v. Sec. Exchange Comm.*,
  482 F.3d 501 (D.C. Cir. 2007) .................................................................................. 13, 18

*White v. Fraternal Order of Police*,
  909 F.2d 512 (D.C. Cir. 1990) ........................................................................................ 18

*Williams v. Schrader*,
  2012 WL 1060159 (S.D. Fla. Mar. 28, 2012) ................................................................ 15

*Wolf v. C.I.A.*,
  473 F.3d 370 (D.C. Cir. 2007) .................................................................................. 22, 23

iii

**Other Authorities**

Fed. R. Civ. P. § 26 ........................................................................................................... 1, 18

Fed. R. Civ. P. § 45 ........................................................................................................... 1, 18

*Restatement of Torts* § 611, cmt. f ........................................................................................ 15

4831-3301-6910v.8 0100812-000009

BuzzFeed, Inc. ("BuzzFeed") and Ben Smith ("Smith") (collectively, "Movants") submit this memorandum of law in support of their motion to compel the Department of Justice ("DOJ"), Federal Bureau of Investigation ("FBI"), James Comey ("Comey"), and if necessary the Office of the Director of National Security ("ODNI") and/or James Clapper ("Clapper") (collectively, the "Government Parties") to comply with those portions of the subpoenas issued to them pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, as substantially narrowed for purposes of bringing this motion.[1]

## PRELIMINARY STATEMENT

This is a case in which a news organization, its chief editor and several reporters are being sued for having published information that lies at the heart of one the most important political stories of our day: Russia's efforts to interfere with the 2016 United States presidential election. The underlying Complaint in this action, *Gubarev et al. v. BuzzFeed, Inc.*, No. 17-cv-60426-UU, pending in the Southern District of Florida (the "Florida Litigation"), asserts a claim for defamation based upon an article published by defendant BuzzFeed in January 2017 entitled "These Reports Allege Trump Has Deep Ties to Russia" (the "Article"). The Article includes an embedded document file containing a 35-page collection of memoranda that primarily discuss Russian efforts to influence the 2016 U.S. Presidential election, including alleged ties between Russia and the campaign of President Trump. The collection of reports has since been popularly dubbed "the Trump Dossier" (the "Dossier"). The Plaintiffs in the Florida Litigation assert that they were falsely identified in the penultimate paragraph of the Dossier as having been involved in Russian efforts to hack Democratic political operatives.

The Article reports, and provides hyperlinks to other news reports that further explain, that the Dossier is a document originally written by a British investigator. The Article describes how by January 10, 2017, the Dossier had become the subject of multiple forms of official government activity. Those official actions included, at the very least, briefings provided to

---

[1] The exhibits supporting this motion are annexed to the Declaration of Nathan Siegel, sworn to the 27th day of September 2017 (the "Siegel Declaration" or "Siegel Dec.").

President Obama, President-elect Trump and Congressional leadership by officials from multiple agencies; an investigation by the FBI and possibly other agencies; and actions by two United States Senators who reviewed and referred the Dossier to the FBI.

Beginning the day after Buzzfeed's publication and continuing to the present, the Government Parties and other government officials, including the President, have spoken frequently and publicly about their official conduct with the Dossier. One of Defendants' key defenses in the Florida Litigation is the legal privilege which defamation law recognizes for reporting about official government action, including documents that become the subject of official conduct. However, in order to establish this privilege, often called the "fair report" privilege, Movants need documents and/or testimony from the Government Parties confirming their official actions. The same information would also, at least under the laws of some states, demonstrate that the Article was accurate, and therefore Plaintiffs cannot meet their burden of proving any actionable, false statements.

In large part, this Motion merely seeks to compel the Government Parties to provide this information by providing very limited testimony under oath about the matters they have already publicly discussed. The testimony that Defendants seek is therefore very narrow, poses no substantial burden, there is no other means to obtain it in admissible form and the issues presented by this lawsuit are of unusual public importance. For these reasons, the Government Parties should be compelled to comply with the as-narrowed subpoenas served in connection with the Florida Litigation.

## FACTUAL BACKGROUND

## I.    THE DOSSIER AND THE FLORIDA LITIGATION

### A.    The Dossier

By way of background, the underlying Florida Litigation arises out of Buzzfeed's publication of the Article and embedded Dossier on January 10, 2017. See Siegel Dec., Ex. 1 ("Compl."). The Dossier consists of a series of memoranda written between June and December

2016 by a private British intelligence company founded by Christopher Steele, a former British government intelligence officer. Its contents primarily (though not exclusively) concern "Russian efforts to influence the U.S. Presidential election process and links between Russia and Donald Trump." Siegel Dec., Ex. 36 at ¶ 9. Multiple news reports and public statements, including by some of the Government Parties here, make clear that by the time the Article was published the Dossier had become the subject of substantial official activity.

For example, as the Article notes, during the 2016 election campaign then Senate Minority Leader Harry Reid publicly released two letters he wrote to then-FBI Director James Comey, which asked the FBI to make public information about alleged Russian collaboration with the Trump campaign. *Id.*, Exs. 11-12. Those letters apparently relied in part on Reid's review of the Dossier. *Id.*, Ex. 19. In November 2016, a former British diplomat made Senator John McCain aware of the Dossier. Senator McCain subsequently reviewed it and delivered it to the FBI. *Id.*, Ex. 18. According to multiple news reports, the FBI had obtained the Dossier much earlier directly from its authors, and continued to do so as it was updated. *Id.*, Ex. 13.

### B.     The Publication of Buzzfeed's Article with the Dossier

On January 10, 2017, CNN reported that a two-page synopsis of the document had been given to President Obama and President-elect Trump, and that both had been briefed on its general contents. Siegel Dec., Ex. 23. CNN also reported that the FBI was investigating the Dossier's allegations. *Id.* Shortly thereafter, BuzzFeed published the Article with the embedded Dossier. The Dossier was viewed by approximately 5.9 million people prior to the commencement of the Florida Litigation on Buzzfeed's website alone, and has since been republished elsewhere. *See, e.g., id.*, Ex. 15.

The Article explained that the memos in the Dossier had been "circulating among elected officials, intelligence agents, and journalists for weeks." Compl., Ex. 2 at 1-2. The Article summarized what had been reported (though not formally confirmed) about official use of the Dossier up to that point, including by hyperlinking to the CNN and *Mother Jones* reports:

3

the Dossier's use in briefing the President and President-elect, the actions by Senators Reid and McCain, and (in the hyperlinked reports) an FBI investigation into its content. *Id.* The Article made clear that the allegations in the Dossier were, at that point in time, "unverified," and it noted a couple of factual errors that Defendants noticed in the document. *Id.*

### C.   **The Official Briefings**

The day after Buzzfeed's publication, President-elect Trump and his Secretary gave a press conference which offered a detailed response to multiple allegations in the Dossier, and implied the intelligence agencies may have leaked it. Siegel Dec., Ex. 20.  In response, that same day the Office of the Director of National Intelligence released an official statement from then-Director James Clapper. *Id.*, Ex. 21.  The statement confirmed that Director Clapper and then-President-Elect Trump discussed "the private security company document . . . which was circulated in recent months among the media, members of Congress and congressional staff even before the [Intelligence Community] became aware of it." *Id.*  The statement explained that the intelligence community had not, at that point, formed a judgment about the document's reliability, but that "part of our obligation is to ensure that policymakers are provided with the fullest possible picture of any matters that might affect national security." *Id.*

On January 12, Vice-President Biden also publicly confirmed that he and then-President Obama had been briefed about the Dossier, and explained that he understood it was "something that obviously the agency [the FBI] thinks they have to track down." Siegel Dec., Ex. 22 at 2. Later, on June 7, Mr. Clapper elaborated on the briefing and stated that President Trump had asked him to publicly refute the Dossier, which Mr. Clapper "could not and would not do." *Id.*, Ex. 47 at 2.  Senator McCain also released a statement on January 11, confirming his actions with respect to the Dossier. *Id.*, Ex. 18.

In his highly publicized testimony before the Senate Intelligence Committee on June 8, Mr. Comey began by issuing a written statement that described in detail his briefing of President-elect Trump on the Dossier's contents. Siegel Dec., Ex. 48.  Notably, the Committee's

Chairman, Senator Richard Burr, had opened the hearing by asking the participants not to cover "any questions that might get into classified information", so it was clear that any ground covered in Mr. Comey's written or oral public testimony did not implicate any classified information. Siegel Dec., Ex. 49 at 2. Mr. Comey explained that he briefed the President-elect about the Dossier on January 6 as part of a larger briefing on the Intelligence Community's findings about Russian interference in the 2016 election. *Id.*, Ex. 48.

Specifically, Mr. Comey said that he met with "then-President-Elect Trump on Friday, January 6 in a conference room at Trump Tower in New York . . . to brief him and his new national security team on the findings of an [Intelligence Community] assessment concerning Russian efforts to interfere in the election." *Id.* at 1. Mr. Comey added that he then spoke alone "with the President-Elect to brief him on some personally sensitive aspects of the information assembled during the assessment," again referring to the allegations contained in the Dossier. *Id.* Mr. Comey explained that Mr. Clapper asked him to do "this portion of the briefing because I was staying in my position and because the material implicated the FBI's counter-intelligence responsibilities." *Id.* Director Comey also explained that the Intelligence Community "leadership thought it important, for a variety of reasons, to alert the incoming President to the existence of this material . . . [in part because] to the extent there was some effort to compromise an incoming President, we could blunt any such effort with a defensive briefing." *Id.*

Finally, in an interview with *The New York Times* on July 19, President Trump himself confirmed that Director Comey briefed him about the Dossier two weeks prior to his inauguration. He also accused Mr. Comey of doing that in order to signal to the President-elect that he had "leverage" over him, in an effort to keep his job as FBI Director:

> TRUMP: Well, I thought originally it might have had to do something with the payment by Russia of the D.N.C. Somewhere I heard that. Like, it was an illegal act done by the D.N.C., or the Democrats. That's what I had heard. Now, I don't know where I heard it, but I had heard that it had to do something with illegal acts with respect to the D.N.C. Now, you know, when you look at the kind of stuff that came out, that was, that was some pretty horrific things came out of that. But that's what I had heard. But I don't know what it means. All I know is this: When

5

somebody calls up and they say, "We have infor—" Look what they did to me with Russia, and it was totally phony stuff.

HABERMAN: Which, which one?

SCHMIDT: The dossier.

TRUMP: The dossier.

HABERMAN: The dossier. Oh, yes.

———————

TRUMP: Now, that was totally made-up stuff, and in fact, that guy's being sued by somebody. … And he's dying with the lawsuit. I know a lot about those guys, they're phony guys. They make up whatever they want. Just not my thing — plus, I have witnesses, because I went there with a group of people. You know, I went there with Phil Ruffin——

HABERMAN: Oh, I didn't know that.

———————

TRUMP: I had a group of bodyguards, including Keith [Schiller] —

HABERMAN: Keith was there, right?

TRUMP: Keith was there. He said, "What kind of crap is this?" I went there for one day for the Miss Universe contest, I turned around, I went back. It was so disgraceful. It was so disgraceful.

———————

TRUMP: When he [James B. Comey] brought it [the dossier] to me, I said this is really made-up junk. I didn't think about anything. I just thought about, man, this is such a phony deal.

HABERMAN: You said that to him?

TRUMP: Yeah, don't forget——

———————

TRUMP: I said, this is — honestly, it was so wrong, and they didn't know I was just there for a very short period of time. It was so wrong, and I was with groups of people. It was so wrong that I really didn't, I didn't think about motive. I didn't know what to think other than, this is really phony stuff.

SCHMIDT: Why do you think — why do you think he shared it?

6

TRUMP: I think he shared it so that I would — because the other three people left, and he showed it to me.

——————

TRUMP: So anyway, in my opinion, he shared it so that I would think he had it out there.

SCHMIDT: As leverage?

TRUMP: Yeah, I think so. In retrospect. In retrospect.

Siegel Decl. Ex 63 at 15-16.

Finally, White House spokespersons have also acknowledged the existence of the Dossier several times, largely in order to try to discredit it. For example:

SARAH HUCKABEE SANDERS: Often, we have a lot of media with Russia first, but today, there was public testimony that further discredited the phony dossier that's been the source of so much of the fake news and conspiracy theories, and we learned that the firm that produced it was also being paid by the Russians. Siegel Dec., Ex. 64 at 21.

SARAH HUCKABEE SANDERS: The Democrat-linked firm, Fusion GPS, actually took money from the Russian government while it created the phony dossier that's been the basis for all of the Russia scandal fake news. Siegel Dec., Ex. 65 at 4.

### D.    Official Investigations of the Dossier and its Contents

The January 10 CNN report, to which the Article hyperlinked, also reported that "[t]he FBI is investigating the credibility and accuracy of these allegations . . . but has not confirmed many essential details in the memos about Mr. Trump." Siegel Dec., Ex. 23. Subsequently, the Government Parties here have publicly acknowledged the existence of one or more official investigations into the Dossier's contents.

On May 23, 2017 former CIA Director Brennan testified before the House Intelligence Committee and directly confirmed his understanding that there was an FBI investigation:

REP. GOWDY: Director Brennan, do you know who commissioned the Steele dossier?

DIRECTOR BRENNAN: I don't.

7

GOWDY: Do you know if the FBI paid for any – portion of the Steele dossier?

BRENNAN: I don't know. I know that there are press reports related to that, but I – I don't know, I have no firsthand knowledge of that.

GOWDY: Do you know whether any of the underlying allegations made in the Steele dossier were ever tested, probed, examined, cross- examined, whether the sources were examined for reliability, credibility?

BRENNAN: I know that there were efforts made by the Bureau to try to understand whether or not any of the information in that was valid, but I just – I don't have any firsthand knowledge of it.

Siegel Decl. 45 at 32-33.  And on May 8, former Director Clapper testified before the Senate Judiciary Committee and implicitly confirmed that one or more law enforcement and/or intelligence agencies had made efforts to investigate the basis of the Dossier's allegations, prior to briefing President Obama and President-elect Trump on January 6 about the Intelligence Community's assessment of Russian interference in the 2016 election:

SENATOR GRAHAM:  Follow up on that, are you familiar with a dossier about Mr. Trump compiled with some guy in England?

DIRECTOR CLAPPER: I am.

GRAHAM: Did you find that to be a credible report?

CLAPPER: Well, we didn't make a judgment on that. And that's — that's one reason why we did not include it in the body of our intelligence community assessment.

GRAHAM: You didn't find it credible enough to be included?

CLAPPER: We couldn't corroborate the sourcing, particularly the second — third-order sources.

Siegel Decl. 41 at 10.

Finally, in his written statement provided to the Senate Intelligence Committee and released to the public on June 7, Director Comey explained at length why the Dossier would be the kind of document that could trigger a counter-intelligence investigation, but that he told President-elect Trump in his briefing that there was no such investigation directed at him personally.  Siegel Dec., Ex. 48 at 4.  Director Comey also related how President Trump

8

subsequently brought up the more salacious allegations of the Dossier with him on other occasions, and Comey continued to tell him that he was not personally the target of any investigation.  *Id.*

E.      **The Florida Litigation**

Plaintiffs in the Florida Litigation are Aleksej Gubarev, an alleged "venture capitalist and tech expert" as well as XBT Holdings, S.A. and Webzilla, Inc., companies founded by Mr. Gubarev that "specialize in internet hosting, data and web-development" (collectively, "Plaintiffs").  *See* Compl. ¶ 16.  Plaintiffs filed their Complaint on February 3, 2017 in the Circuit Court of the Seventeenth Judicial Circuit for Broward County, Florida, and it was subsequently removed to the Southern District of Florida.  *Id.*  Plaintiffs assert one claim for defamation, specifically alleging that the following allegations in the Dossier are false:

> [O]ver the period March-September 2016 a company called XBT/Webzilla and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct "altering operations" against the Democratic Party leadership.  Entities linked to one Aleksei GUBAROV were involved and he and another hacking expert, both recruited under duress by the FSB, Seva KAPSUGOVICH, were significant players in this operation. . . . It was important in this event that all cash payments owed were made quickly and discreetly and that cyber and other operators were stood down/able to go effectively to ground to cover their traces.

*See id.* ¶¶ 26-27 & Ex. C at 35.

In their Answer, Movants assert as their first Affirmative Defense that publication of the allegedly defamatory statements in the Dossier, within the context of the Article, is protected by the fair report privilege pursuant to state statutes, common law and/or the First and Fourteenth Amendments to the Constitution of the United States.  See Siegel Dec., Ex. 2.

4831-3301-6910v.8 0100812-000009

## II.   MOVANTS' EFFORTS TO DATE TO OBTAIN THE REQUESTED DISCOVERY FROM THE GOVERNMENT PARTIES

### A.   The Subpoenas

BuzzFeed issued seven subpoenas and accompanying *Touhy* affidavits to the Government Parties on June 28, 2017 (the "Subpoenas"), pursuant to the regulations of each of the subpoenaed agencies. Siegel Dec. ¶ 3 & Exs. 3-5. The Subpoenas sought documents and testimony from a designated representative of four agencies: The Department of Justice, FBI, CIA and the Office of the Director of National Intelligence. *Id.* ¶¶ 3-6 & Exs. 3-5. It also sought documents and testimony from three former officials of those agencies: former FBI Director James Comey, former CIA director John Brennan, and former DNI James Clapper. *Id.*

From the agencies, the Subpoenas did not seek all documents or testimony concerning the Dossier, but rather only sought information likely to be directly relevant to the Florida Litigation. In summary, the Subpoenas sought documents and testimony related to (1) when and in what form the agencies received the Dossier; (2) any use of the Dossier in judicial proceedings; (3) communications with Christopher Steele; (4) communications about the Dossier with members of Congress; (5) any synopsis provided to Presidents Obama and Trump; and (6) any investigation of the allegations against the Plaintiffs in the Florida Litigation. The Subpoenas also sought testimony focused on the public statements the individual Government Parties had already made about the Dossier. *See generally*, Siegel Dec., Exs. 3-5.

### B.   The Government's Response to the Subpoenas

All of the agencies accepted service, on their own behalves and for the individuals, on varying dates such that all service was accepted by July 20, 2017. *Id.* ¶ 3. On August 18, 2017, the ODNI and Mr. Clapper responded to their Subpoenas and declined to produce records or

provide any testimony. *See id.* ¶ 7 & Ex. 6.[2]  The DOJ, FBI and Mr. Comey responded on

August 25 and took the same position. *Id.* ¶ 8 & Ex. 8.

ODNI and Brennan stated that they would neither confirm nor deny the existence of

responsive information, but that, assuming it exists, compliance with their Subpoenas would

(1) pose an undue burden, (2) "could allow for the disclosure of privileged, confidential, or

classified information"; (3) "could potentially cause harm to the nation's security", and/or

(4) "may" violate the Privacy Act. Siegel Dec., Ex. 6.  With respect to the DOJ, FBI, and Mr.

Comey, they began their objections by asserting that "none of the Respondents has confirmed or

denied the existence of the alleged 'Dossier'", even though the document was at the heart of

much of Mr. Comey's public statement and testimony on June 8, 2017. *Id.*, Ex. 8.  Otherwise,

those Government Parties asserted that compliance would (1) pose an undue burden, (2) reveal

investigative details protected by the law enforcement privilege, (3) may implicate classified

information, and/or (4) might violate the Privacy Act. Siegel Dec., Exs. 6-8.

### C.     Movants Efforts to Narrow the Subpoenas and Meet and Confer

Counsel for the Movants met and conferred with counsel for the Government Parties in

person on September 8, 2017. *Id.* ¶ 9.  For purposes of attempting to reach agreement, Movants

offered to very substantially narrow the scope of what the Subpoenas sought.  Movants offered to

withdraw the Subpoenas to the CIA and Mr. Brennan entirely; to withdraw all of the requests for

documents in the remaining Subpoenas; and to seek very limited testimony from only one or two

witnesses designated by the agencies (most likely, but not necessarily Mr. Comey, and if

necessary Mr. Clapper) concerning roughly ten topics covering the public statements previously

made about briefings, the existence of an investigation, and merely confirming the receipt of

materials from Senator McCain. *Id.* ¶ 9 & Ex. 9.  Notably, the proposed narrowed requests

---

[2] The CIA and Mr. Brennan likewise responded on August 18 and declined to produce anything.
However, as explained in more detail below, as part of an effort to substantially narrow the
Subpoenas, Movants are not seeking to compel compliance with any aspect of those Subpoenas.
As a result, those responses are not discussed herein.

eliminated all of the examples the Government had specifically identified in its objections as potentially implicating privileged, classified, or Privacy-Act protected materials.

On September 15, the Government responded to Defendants' proposed narrowed subpoenas, and once again declined to comply with any of the narrowed requests for a limited deposition. Siegel Dec. ¶ 10 & Ex. 10. The Government again maintained that "Respondents have never confirmed or denied the existence of the so-called "Dossier" or any investigation or other activities related to it." *Id.* at 2. The Response then seemed to qualify that assertion to some degree, noting obliquely that "[s]tatements made by former government officials in their individual capacity after they are no longer serving as government officials do not constitute official government acknowledgements." *Id.* The Government declined to comply with the narrowed subpoenas primarily on the ground that the requested testimony would "implicate classified information and/or require the Respondents to confirm or deny the existence of classified information." *Id.* at 2.

D.   **The Limited Scope Of The Deposition(s) Movants Seek To Compel In This Motion**

In this Motion, Movants are seeking slightly narrower discovery than even what they proposed to the Government Parties after their objections were served. Specifically, Movants ask the Court to compel the Government Parties to produce a designated witness from the DOJ/FBI with knowledge of the following topics for a deposition, whose scope would be limited to questions within the listed topics. If no single witness from DOJ/FBI can speak to all of the listed topics, then Movants seek a designated witness from ODNI who could speak to the remaining topics. Movants seek to compel no more than two witnesses who could each address specific topics within their knowledge. The specific topics are:

1.   Whether the content of the Dossier was being investigated as of January 10.

2.   Whether the Dossier was the subject of a counter-intelligence investigation, or any other form of investigation, as of January 10.

3.   Whether DOJ had all the pages of the Dossier that BuzzFeed published as of January 10.

4.   That Mr. Comey confirm his written statement to the Senate about his January 6 briefing of President-elect Trump.

5.   Whether a summary of the Dossier's contents was included in material provided to President-elect Trump.

6.   Whether Mr. Comey participated in briefing President Obama about the Dossier on or about January 6 in his official capacity as the FBI Director.

7.   Whether DOJ/FBI received the Dossier from Senator McCain's office on December 9, and whether DOJ/FBI received anything else subsequently from Senator McCain's office or any other representative of Senator McCain.

8.   That Brennan, Clapper and Rogers also participated in briefing President Obama about the Dossier on January 6, in their official capacities and provided a written synopsis of the Dossier.

9.   That agencies of the US Government were attempting to verify the contents and sourcing of the Dossier prior to January 10, as referenced in Mr. Clapper's May 8 testimony before the Senate Judiciary Committee.

## ARGUMENT

As an initial matter, "[d]isputes over third-party subpoenas to agencies in civil litigation [] must commence in the district court under Rule 45." *Watts v. Sec. Exchange Comm.*, 482 F.3d 501, 503 (D.C. Cir. 2007). "Federal Rule of Civil Procedure 45 authorizes court-issued subpoenas to obtain discovery from third parties and Rule 26, which generally governs civil discovery, provides [that] [p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." *Id.* at 507. Rule 45 requires that the district court enforce subpoenas over agencies' objections so long as the subpoenas do not call for privileged matter or would cause an undue burden. *Id.* at 508. *See also Alexander v. FBI*, 186 F.R.D. 21, 43 (D.D.C. 1998) ("A motion to compel for failure to provide relevant information sought through discovery requires the court to determine if the materials or testimony sought are relevant to the action and whether all or part of the materials or testimony are covered by a privilege that prevents its disclosure.").

4831-3301-6910v.8 0100812-000009

As discussed in greater detail below, the Government Parties should be compelled to produce the witnesses(es) requested for the limited testimony sought because (1) it is relevant, and indeed critical to BuzzFeed's defense of the case; (2) the requests as narrowed are very limited in scope and would not be unduly burdensome; (3) the Florida Litigation presents issues of unusual public importance; and (4) the discovery sought is tailored to public statements made by the Government Parties, so any claim of classification and/or privilege is unlikely to have merit. In any event, all this Motion seeks is an order compelling the Government Parties to produce a witness, or if necessary two, to appear for a deposition limited to the specific topics. The Government would remain free to assert privilege to any particular question at a deposition, and any disputes regarding privilege could then be adjudicated on the basis of an actual record. Thus, the modest relief requested here easily meets the standards of Rule 45.

### A.    The Subpoenas Seek Information Highly Relevant to BuzzFeed's Fair Report Privilege Defense and the Element of Falsity in the Florida Litigation.

The limited information sought in the Subpoenas — seeking to confirm the existence of a government investigation into the contents of the Dossier and the Government Parties' use of the Dossier as a basis for briefing government officials — is clearly relevant within the meaning of the Federal Rules. "For purposes of discovery, relevance is liberally construed[,]" and "with respect to a Rule 45 subpoena, a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the claim or defense of any party." *In re Denture Cream Prods. Liability Litigation*, 292 F.R.D. 120, 123 (D.D.C. 2013).

In fact, the requested information here is highly relevant to BuzzFeed's ability to establish that the publication of the Article, including the Dossier, is a fair and accurate report of records that were a basis of official government actions and thus is protected by a fair report privilege pursuant to state statute, common law and/or the First and Fourteenth Amendments to the Constitution of the United States. *See, e.g., Biro v. Conde Nast*, 883 F. Supp. 2d 441, 477 (S.D.N.Y. 2012); *Steven H. v. Duval County School Bd.*, 1999 WL 1427666, at *1 (M.D. Fla. Sept. 3, 1999). The same information could also establish that the Article is not false, because it

14

accurately reports that the Dossier has been the subject of official government activity while making clear that the underlying allegations in the Dossier itself had not been verified when it was published. *Global Relief Found. v. N.Y. Times Co.*, 390 F.3d 973 (7th Cir. 2004). *See also, e.g., Chau v. Lewis*, 771 F.3d 118, 129 (2d Cir. 2014) ("[f]alsity of a statement is needed to make out a claim of libel."); *Williams v. Schrader*, 2012 WL 1060159, at *1 (S.D. Fla. Mar. 28, 2012). *See also, Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 301 (2d Cir. 1986) (citation omitted); *Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1253 (S.D. Fla. 2014). "Importantly, the whole point of the privilege is that journalists need to be able to report on official conduct without being placed in the position of independently verifying whether defamatory allegations that may arise in the course of official activity are accurate." *Restatement of Torts* § 611, cmt. f.

The parties in the Florida Litigation have a dispute regarding which state's law applies to the Plaintiffs' defamation claim, but the evidence sought here is important to their defenses under any potential choice of law. Generally, "[t]he privilege extends to "the report of any official proceeding, or any action taken by any officers or agency of the government of the United States, or of any State or of any of its subdivisions."" *OAO Alpha Bank v. Center for Public Integrity*, 387 F.Supp.2d 20, 40 (D.D.C. 2005), *quoting* Restatement (Second) of Torts § 611 cmt. d (1977). The fair report privilege thus protects news reports that "concern[] activities which are within the prescribed duties of a public body. The test is whether the report concerns action taken by a person officially empowered to do so." *Freeze Right Refrigeration and Air Conditioning Services, Inc. v. City of New York*, 101 A.D.2d 175, 182 (1st Dept. 1984). *See also Ortega v. Post-Newsweek Stations, Florida, Inc.*, 510 So.2d 972, 976-77 (Fla. Dist. Ct. App. 1987) ("[i]n light of the difficulty in obtaining independent corroboration of" non-public government activity, "the press may often have to rely on materials the government acquires if it is to report on [such investigations] at all.").

The privilege applies so long as the report of official conduct is "fair and accurate." *See Biro*, 883 F. Supp. 2d at 477; *Steven H.*, 1999 WL 1427666, at *1. BuzzFeed's Article

15

reports about several "activities that are within the prescribed duties of a public body": an agency investigation, briefings of the President and President-elect, and conduct by at least two United States Senators. Compl., Ex. 2 at 1-2. This motion merely seeks very limited testimony that BuzzFeed needs to verify that the official actions summarized by the Article actually took place.

Three cases that presented similar scenarios illustrate why the testimony Movants seek is highly relevant. In *Global Relief*, multiple news organizations published reports that federal law enforcement agencies were investigating certain charities for allegedly providing material support to terrorist organizations. The charities sued for defamation, and the news organizations' motion to dismiss was denied because at that point in the proceedings there was no record to establish that the investigation had in fact taken place. *Global Relief Found. v. N.Y. Times Co.*, 2002 WL 31045394, *8 (N.D.Ill., Sept. 11, 2002) ("At this point, however, the defendants have not established the truth of their statements [that the plaintiffs were being investigated].").

Subsequently, the defendant news organizations "produced affidavits from government sources confirming that the government was in fact investigating GRF for links to terrorist groups." *Global Relief*, 390 F.3d at 980. Specifically, the defendants produced affidavits from "FBI Special Agent Brent Potter and OFAC [the Treasury Department's Office of Foreign Asset Control] Director Richard Newcomb, demonstrating that the government was in fact investigating GRF for links to terrorism at the time these reports were issued." *Id.* at 983. The Seventh Circuit affirmed that summary judgment was properly entered at that point because that testimony established that the challenged news reports were substantially true.

In *Global Relief* the defendants did not need to subpoena any agencies, because they were able to utilize affidavits that had been filed by the government on the public docket of other litigation that was pending between the plaintiff charity and the government at the same time. *See Global Relief Found. v. O'Neill*, 315 F.3d 748 (7th Cir. 2002). Movants are not aware of any similarly specific, publicly-available testimony concerning the Dossier, and so they need the relief requested here to obtain it.

16

Similarly, in *Fine v. ESPN*, 11 F. Supp. 3d 209 (N.D.N.Y. 2014), ESPN aired several news reports about allegations that an assistant basketball coach at Syracuse University had sexually molested two ball boys, and that his wife was aware of the abuse. The ESPN reports featured excerpts from an audiotape made by one of the accusers of a conversation with the coach's wife. By the time ESPN reported the story, the audiotape had been provided by private parties to both local police and the FBI as part of their investigation of the abuse allegations.

*Fine* held that to the extent that ESPN's reports "quote from or describe the tape", those portions of its reports would likely be privileged because they describe materials submitted to and investigated by law enforcement. *Id.* at 218. Nonetheless, as in *Global Relief, Fine* held that is was premature to conclusively resolve the privilege issue on a motion for judgment on the pleadings, because the authenticity of both the audiotape and the related law enforcement records were disputed in the Complaint and had not yet been the subject of any discovery. Here, all of the defamatory statements alleged by the Plaintiffs are contained within the Dossier, which was published verbatim and in its entirety. But as in *Fine,* Movants seek discovery to establish record facts to support their privilege defense.

Finally, the facts here also closely resemble a case from this Court which considered the application of the fair report privilege to another dossier, albeit one that was compiled and forwarded to investigative authorities in Russia. *See OAO Alpha Bank* , 387 F.Supp.2d 20. That dossier was also a collection of anonymous allegations of criminal conduct by the plaintiffs, which in that case were Russia's largest bank and two of its wealthiest citizens. That dossier was sent to the Chairman of the Security Committee of the Russian Duma, who then forwarded it to Russian law enforcement authorities for investigation.[3]

---

[3] The Defendants in *OAO Alfa-Bank* began their motion for summary judgment by asserting that "[t]he challenged article is a fair and accurate report of an official action taken by Viktor Ilyukhin, Chairman of the Security Committee of the State Duma (the lower house of the Russian Federation Parliament); namely, a dossier that the Security Chairman was given . . ." Siegel Decl. Ex. 69 at 1. Most of the Plaintiffs in *OAO Alfa-Bank* are also discussed in the Dossier, and several have also sued the Defendants in a defamation case pending in state court in New York City. *See Fridman, et.al. v. BuzzFeed, et.al.,* Index No. 154895/2017 (Sup., N.Y. Cty.).

17

Judge Bates found that the document met all the requirements for the fair report privilege, except that the privilege does not apply to actions taken by officials of foreign governments. *Id.* at 41-42. By contrast, this case involves essentially the same type of official conduct regarding the transmission and use of the Dossier by U.S. government agencies and officials. The Florida Litigation therefore presents facts quite similar to *White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990), where this Circuit held the privilege applied to a report about letters written by a police union to the Mayor, who then passed them on to law enforcement which proceeded to investigate. *Id.* at 527 ("it would be untenable to make a distinction between a report about an official proceeding and that which, for all purposes, is the subject matter of the proceeding").

There is thus no question that the very narrow, limited-in-scope materials and testimony sought by Movants is highly relevant to potentially establishing their fair report defense, and rebutting the element of falsity, in the Florida Litigation.

**B.      The Subpoenas do not Subject the Government Parties to an Undue Burden.**

The Government Parties will not suffer an undue burden if ordered to comply with the Subpoenas, as heavily narrowed by the Movants. Movants recognize that "discovery under Rules 26 and 45 must properly accommodate the government's serious and legitimate concern that its employee resources not be commandeered into service by private litigants to the detriment of the smooth functioning of government operations." *Watts*, 482 F.3d at 509. In doing so, courts must weigh a number of factors relevant to the question of undue burden, including "whether the discovery is unreasonably cumulative or duplicative, whether the discovery sought is obtainable from some other source that is more convenient, less burdensome, or less expensive; and whether the burden or expense of the proposed disocvery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation and the importance of the proposed discovery in resolving the issues." *Id.* (internal marks omitted). Notably, it is the

"party opposing the motion to compel [who] carries a 'heavy' burden of persuasion." *U.S. v. AT&T, Inc.*, 2011 WL 5347178, at *5 (D.D.C. Nov. 6, 2011). Here, Movants seek very limited information — highly relevant to their defenses — that is not available from anyone other than the Government Parties. Accordingly, compliance with the as-narrowed Subpoenas does not impose an undue hardship.

        *First*, the Government Parties cannot credibly argue that the Subpoenas request duplicative or cumulative materials. Rather, Movants seek information that by its nature is uniquely within the government's possession, i.e. whether it has investigated and conducted briefings based on the same Dossier which Buzzfeed published. *Second*, Movants cannot obtain the requested materials from any alternative sources. In fact, Movants are aware of no other specific sources of publicly available, sworn testimony conclusively confirming the existence, timing, and scope of law enforcement and/or intelligence agency investigations into the Dossier. Nor is there another means by which to obtain this information from anyone other than the Government Parties. *Denture Cream*, 292 F.R.D. at 127 (finding that the requested discovery was unavailable from other sources where the subpoenaed entity was responsible for maintaining that information). Indeed, several news organizations, including BuzzFeed, have already filed Freedom of Information Act requests for similar documentary materials, all to no avail. *See* Siegel Dec., Exs. 28 & 43. *See also U.S. Dept of the Treasury v. Pension Benefit Guaranty Corp.*, 301 F.R.D. 20, 30 (D.D.C. 2014); *Denture Cream*, 292 F.R.D. at127 (finding requested materials not cumulative or duplicative because they could not be obtained from plaintiffs and were not already in movant's possession).

        Next, any burden imposed by the Subpoenas is minimal given that Movants have now eliminated any request for documents, and merely seek confirmation of some basic facts which can be covered in a short deposition of likely one, or at most two witnesses. *AT&T*, 2011 WL 5347178, at *7 (granting motion to compel where movant narrowed production requests to seek only those non-duplicative documents central to the case and to eliminate other requests from the scope of its subpoena). Moreover, as narrowed, the Subpoenas ask for little more than what the

19

Government Parties have already repeatedly discussed in public fora.  In any event, any burden is far outweighed by the importance of the discovery sought and its potential impact on the Florida Litigation.  As outlined above, the fair report privilege and substantial truth doctrines could be wholly dispositive of the defamation claims against Movants, and the discovery sought is highly relevant to potentially establishing the elements of those doctrines.  *See, e.g., Denture Cream*, 292 F.R.D. at 127.

Finally, "the importance of the issues at stake in the litigation" is far greater than in other civil lawsuits, which may only affect the parties' private interests.  Since Buzzfeed published the Dossier, it has become clear that the Dossier lies at the core of the public controversy regarding Russian interference in the Presidential election and alleged collusion with the Trump Campaign.  Most of the key subsequent events at the heart of that controversy — including the recusal of Attorney General Sessions from any Russia investigation, the firing of Director Comey, the appointment of Special Counsel Robert Mueller, allegations that President Trump may have obstructed justice, and the revelation of a June 2016 meeting between Trump campaign officials and several Russian nationals — have been directly related to the Dossier.  If Buzzfeed — or someone else — had not published the Dossier, it would have been impossible for the public to meaningfully follow, understand, and evaluate what is perhaps the seminal political controversy of our time.  A more detailed timeline of some of the key events that have transpired since Buzzfeed's publication of the Dossier on January 10 is attached as Appendix A.

Moreover, since the Dossier's publication, there have been literally hundreds of news reports published by other news organizations around the world that have explored in depth virtually every aspect of the Dossier, including the allegations at issue in the Florida Litigation.  Other journalists have investigated topics such as the Dossier's sourcing, suspicion that a recently-murdered ex-KGB chief may have been a source, the progress of investigations into the details of the Dossier, the Dossier's overall credibility, the background and credibility of Christopher Steele, particular individuals discussed in the Dossier such as Aras Agalarov, Alfa Bank, and Carter Page, and parallels between the allegations in the Dossier and the facts of the

20

June 2016 meeting with Donald Trump, Jr. and others in New York. A list of just a small sample of subsequent news reports, by news organizations other than Buzzfeed, is attached as Appendix B.

Thus, there can be be no serious question that there is an enormous public interest in both the contents and existence of the Dossier. Yet notwithstanding the critical role that the Dossier has played in both political debate and its coverage by journalists since its publication, the fundamental premises of the Florida Litigation are (1) that Buzzfeed should never have published the Dossier, or at least not any portion whose contents it had not independently verified; (2) that the public should therefore never have had access to it; and (3) that Defendants should be exposed to enormous liability for being the first news organization to provide the public with direct access to the Dossier. Those stark propositions present "issues at stake in this litigation" of unusual public importance. This Court is of course not the forum to ultimately resolve those issues. Rather, this Court need only recognize that the Florida Litigation presents issues of sufficient importance to warrant granting Defendants the opportunity to conduct the very limited discovery sought here that will enable them to present a complete defense, and thus ensure that the Florida court can adjudicate these important issues on the basis of a full evidentiary record that will be available to both sides.

## C. The Limited Requested Testimony Does Not Implicate any Bona-Fide Classified Information

In their September 15 response to the narrowed Subpoenas, the Government's primary objection was that no testimony of any sort could be provided, because all of the nine topics requested would "implicate" or "reveal" classified information, and/or harm national security by requiring the Government Parties to confirm or deny the existence of classified information. Importantly, it would be the Government's burden to establish that any privilege or other objection insulates them from having to comply with the Subpoenas at all. *See AT&T*, 2011 WL 5347178, at *5; *Montesa v. Schwartz*, 2015 WL 13016354, at *1 (S.D.N.Y. Nov. 3, 2015). Movants cannot anticipate all of the arguments the Government Parties might actually assert in

21

response to this Motion, and reserve the right to fully respond to any such claims in their Reply. For present purposes, Movants will simply point out why the Government is highly unlikely to be able to sustain its burden of justifying its classification objection in the circumstances presented here.

*First*, the Government's attempted "Glomar" response to the narrowed Subpoenas is simply misplaced. As a general matter, it is far from clear that Glomar responses may properly be interposed at all outside the context of requests for documents made under the Freedom of Information Act. *Wolf v. C.I.A.*, 473 F.3d 370, 374 (D.C. Cir. 2007) (explicitly stating that a Glomar response "is proper if the fact of the existence or nonexistence of agency records falls within *a FOIA exemption*") (emphasis added). But even if there might be circumstances where the Glomar doctrine might apply to discovery disputes under Rule 45, they are not presented here.

Movants do not seek to compel the production of any documents, nor indeed at this juncture to compel the Government to "confirm or deny" anything. All this motion seeks is an order compelling the Government Parties to produce witnesses to appear for depositions, at which Movants would be permitted to question them about the specified topics. Those topics were selected to minimize the likelihood that any questions posed would in fact seek any legitimately privileged or classified information, as discussed in more detail below.

Movants recognize that it may be difficult to foresee the resolution of all privilege or related issues with respect to every question and/or potential answer in advance of a deposition. But that is often the case when a deponent responds to a deposition subpoena by claiming a risk that privileged information might be disclosed. That is why the preferred means of resolving such issues under Rule 45 is for the deponent to appear at the deposition, and interpose their objections to specific questions so that any disputes may be resolved on the basis of a specific record. *See, e.g., Byers v. Burleson*, 100 F.R.D. 436, 439 (D.D.C. 1983) ("A party who asserts a privilege in response to a notice of deposition should attend the deposition and submit to the court for resolution any matters which allegedly violate the privilege."); *see also District Title v. Warren*, 2017 WL 2462489, at *5 (D.D.C. June 2, 2017) ("[N]o authority supports the

22

proposition that the threat by a witness to claim such privileges is a basis upon which to preclude the issuance of a subpoena. Rather, the applicable authorities require that claims of such privileges be made in response to a specific question or questions actually posed, or specific documents actually requested."); *Goldstein v. F.D.I.C.*, 494 B.R. 82, 90 (D.D.C. 2013) (finding that the possibility that a deponent will lodge privilege objections "is not a proper ground for quashing the subpoena *ad testificandum*, but rather a reason for objecting to certain questions on a case by case basis"). That is all the relief this Motion seeks.

*Second*, to say the least, neither Movants — nor anyone else — needs the Government Parties to "confirm or deny" the existence of the Dossier, given that BuzzFeed published the document, millions of people have viewed it, scores of news organizations have written about it, and it has been at the epicenter of both domestic and international political debate for the past nine months. In any event, the record makes clear that the Government has repeatedly "confirmed . . . the existence of the Dossier" as well as "any investigation or other activities related to it." Within days of its publication, ODNI and Vice-President Biden confirmed that the President and President-elect were briefed on the "private security document", and that the FBI was "track[ing] down" the subject. Since then, almost everyone who was a participant in the January 6 briefing that first drew attention to the Dossier — including President Trump and former Directors Comey, Clapper and Brennan — have all discussed in more detail both those events and the general existence of an investigation into the Dossier. So have dozens of United States Senators and Congressmen in the course of the multiple investigations into Russian interference in the election since January 2017. *See generally supra* at 4-10.

Even within the FOIA context, it is well-established that prior disclosure of records can defeat an agency's Glomar response and assertion of national security and/or privilege exemptions. *See, e.g., N.Y. Times v. D.O.J.*, 756 F.3d 100, 116-17 (2d Cir. 2014); *Wolf*, 473 F.3d at 378. Yet here the extent of official acknowledgment of the subject-matter of the requested testimony, as well as the degree to which the Dossier is obviously in the public domain, goes far beyond other circumstances in which courts have found disclosure was warranted even under the

23

more restrictive requirements of the FOIA. *A.C.L.U. v. C.I.A.*, 710 F.3d 422, 427-29 (D.D.C. 2013) (rejecting Glomar response where the President of the United States and other officials had acknowledged existence of requested information); *Marino v. Drug Enforcement Admin.*, 685 F.3d 1076, 1082-83 (D.D.C. 2012) (concluding that the public disclosure exception applied to request for case file where DEA had already publicly revealed information about its existence); *Smith v. C.I.A.*, 2017 WL 1194166, at *4 (D.D.C. Mar. 30, 2017) (finding it "neither logical nor plausible" that the CIA does not have the information requested about budget line items related to intelligence assistance for Israel in light of the President's public statements concerning such information). In fact, the testimony Movants seek largely tracks the public statements already made by the Government Parties.

Similarly, Movants have narrowed the Subpoenas to avoid seeking genuinely classified information. Movants recognize that while the Government Parties have not concealed the existence of briefings about and investigations into the Dossier, current and former officials have generally declined to disclose more specific details, such as their assessment of specific sources and/or any investigative findings. For example, former Director Comey's June 8 testimony before the Senate Intelligence Committee contained the following exchange:

> **SENATOR BURR:** In the public domain is this question of the "Steele Dossier," a document that has been around out in for over a year. I'm not sure when the FBI first took possession of it, but the media had it before you had it and we had it. At the time of your departure from the FBI, was the FBI able to confirm any criminal allegations contained in the steel document?
>
> **MR. COMEY:** Mr. Chairman, I don't think that's a question I can answer in an open setting because it goes into the details of the investigation.

Siegel Decl. Ex. 49. As a result, although the kind of information Senator Burr requested could also be highly relevant to the Florida Litigation, Movants have narrowed the Subpoenas to exclude questions about subjects like investigative results or conclusions, either formal or informal, of anything in the Dossier. In these circumstances, Movants' strong need for the limited information sought far outweighs the Government Parties' desire to avoid proceeding

24

with discovery at all. *See Tuite v. Henry*, 98 F.3d 1411, 1417 (D.C. Cir. 1996) (requiring

consideration of whether, on balance, the need for information outweighs any privilege).

## CONCLUSION

For all of the foregoing reasons, Movants respectfully request that this Court compel the

Government Parties to produce one, or if necessary at most two designated witnesses to appear

for a deposition whose questions will be limited to the topics listed herein.

Dated:  September 27, 2017

Respectfully submitted,

By: _Nathan Siegel_

Nathan Siegel
Katherine M. Bolger
Adam Lazier
Amy Wolf
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, D.C. 20006
(T): (202) 973-4200
(F): (202) 973-4499
nathansiegel@dwt.com
katebolger@dwt.com
adamlazier@dwt.com
amywolf@dwt.com

OF COUNSEL:
Allison Lucas
Nabiha Syed
BuzzFeed, Inc.
11 E. 18th Street, 13th Floor
New York, NY 10003

*Attorneys for Movants BuzzFeed, Inc. and Ben Smith*

25

## APPENDIX A

<u>January 2017</u>

- At the confirmation hearing of Attorney General Jeff Sessions, Senator Al Franken asks Sessions about the CNN reports of a document containing evidence of collusion between Russia and the Trump campaign. Siegel Dec., Ex. 29. Session responds by saying that he has never had any communications with the Russians. *Id.*

<u>February 2017</u>

- National Security Advisor Michael Flynn resigned after reports emerged that he had misled Vice President Pence about meetings with the Russian ambassador, Sergie Kislyak. Siegel Dec., Exs. 26-27, 34. As many news reports noted, Flynn made a trip to Russia in December 2015 and the Dossier alleged that he was one of the key officials Russia sought to cultivate by funding his trip. *Id.*, Ex. 26. Shortly before his resignation, Flynn reportedly recommended to President Trump that Montenegro be admitted to NATO, which some commentators opined seemed consistent with the Dossier's allegation that the Trump team had agreed to "raise US/NATO defense commitments in the Baltics and Eastern Europe to deflect attention away from Ukraine . . ." *Id.*, Ex. 15.

- CNN reported that U.S. law enforcement officials had corroborated that some of the communications between foreign nationals alleged to have taken place by the Dossier did in fact occur. *Id.*, Ex. 25.

<u>March 2017</u>

- News organizations report on March 1 that Attorney General Sessions' answer at his confirmation hearing in response to a question about the Dossier appears to be inaccurate. *Id.*, Ex. 29. The next day, Sessions recused himself from the Russia investigation. *Id*, Ex. 31.

- Senator Grassley publicly released a March 6 letter he sent to Director Comey, demanding that Comey provide the Senate Judiciary Committee with specific information about any relationship between the FBI and Christopher Steele, the Dossier's primary author. *Id.*, Ex. 32.

- Comey and Admiral Michael Rogers testified before the House Intelligence Committee on March 20. *Id.*, Ex. 33. Rep. Adam Schiff read from portions of the Dossier and urged for the formation of an investigative commission to probe the alleged Trump-Russia connections. *Id.* Rep. Schiff opined that "many claims within Steele's dossier are looking more and more likely." *Id.*

- Senator Grassley released a letter to Fusion GPS, who hired Steele, demanding documents about its relationship with Steele and any with the FBI. *Id.*, Ex. 35.

- Senator Grassley calls on the Justice Department to investigate Fusions GPS's ties to Russia. *Id.*

26

April 2017

- CNN reports that the FBI used the Dossier in the fall of 2016 to obtain a FISA warrant to monitor Carter Page, a Trump advisor who is mentioned several times in the Dossier. *Id.*, Ex. 37.

- Senators Feinstein and Grassley send a letter to Director Comey, questioning alleged inconsistencies in his account of the FBI's relationship with Steele and seeking additional information about that issue. *Id.*, Ex. 38.

May 2017

- Director Comey testifies before the Senate Judiciary Committee and is asked numerous questions about the Dossier, Steele, Carter Page and Flynn. *Id.*, Ex. 40.

- James Clapper testifies before the Senate Judiciary Committee on May 8 and said the Intelligence Community looked into the Dossier but was not able to corroborate the underlying sources. *Id.*, Ex. 41.

- President Trump fired Director Comey on May 9, with a letter noting that Comey had told him three times he was not under investigation. *Id.*, Ex. 42. Comey would later testify that those conversations were primarily related to allegations in the Dossier. *Id.*, Exs. 45-46.

- Deputy Attorney General Rod Rosenstein appoints Robert Mueller as Special Counsel for the Russia investigation. *Id.*, Ex. 44.

- Former CIA Director Brennan testified before the House Intelligence Committee, where he was asked several questions about the Dossier and confirmed his understanding that the FBI was investigating it. *Id.*, Ex. 45.

- On May 30 CNN reported that investigators found that Russian officials had been discussing derogatory information that allegedly could be used to influence Trump, and summarized similar allegations made in the Dossier. *Id.*, Ex. 46.

June 2017

- Former Director Clapper in a public speech on June 7 said that President Trump had "asked me to publicly refute the infamous dossier, which I could not and would not do." *Id.*, Ex. 47.

- Former Director Comey on June 7 releases his written statement to the Senate Intelligence Committee, which describes in detail his briefing of then President-elect Trump about the Dossier, his explanation of why the Dossier could trigger a counter-intelligence investigation, his subsequent meetings in which President Trump raised the Dossier and asked Comey to publicly confirm that he was not under investigation. *Id.*, Ex. 48.

- On June 8 former Director Comey testified in public and answered multiple follow-up questions about the Dossier-related issues discussed in his written statement. *Id.*, Ex. 49.

27

<u>July 2017</u>

- Multiple news reports reveal a meeting in June 2016 in New York with Donald Trump, Jr., other campaign officials and several Russians following a promise of damaging information about Hilary Clinton. *Id.*, Exs. 50-54. The meeting was arranged by Aras Agalarov, who is prominently described in the Dossier as the "Azeri business figure [who] had been closely involved with TRUMP in Russia and would know most of the details of what the Republican presidential candidate had got up to there." Compl., Ex. 1 at 27. Numerous media reports describe the relationship between the allegations in the Dossier and the facts concerning the meeting. *See, e.g., id.* at Exs. 55-63.

- In a July 19 interview with the *New York Times*, President Trump confirmed that Director Comey briefed him about the Dossier two weeks prior to his inauguration. *Id.*, Ex. 63. He accuses Comey of doing that in order to signal to the President-elect that he had "leverage" over him, in an effort to keep his job. *Id.*

- In a July 27 press conference, press secretary Sarah Huckabee Sanders discusses reports that Fusion GPS had done work for Russia, saying that this discredits the Dossier. *Id.*, Ex. 64.

<u>August 2017</u>

- News reports state that members of the House Intelligence Committee traveled to London to try to meet with Steele and that the Senate Intelligence Committee was also seeking information from Steele. *Id.*, Ex. 66.

- Glenn Simpson from Fusion GPS met with the Senate Judicary Committee on August 22. *Id.*, Exs. 67-68.

28

## APPENDIX B

Assessing the Merits of Allegations in the Dossier

- http://www.bbc.com/news/world-us-canada-38589427

- https://www.theguardian.com/commentisfree/2017/jan/12/donald-trump-russia-dossier-frighteningly-true

- http://www.cnn.com/2017/02/10/politics/russia-dossier-update/

- http://www.bbc.com/news/world-us-canada-39435786

- https://www.washingtonpost.com/amphtml/politics/trumps-business-sought-deal-on-a-trump-tower-in-moscow-while-he-ran-for-president/2017/08/27/d6e95114-8b65-11e7-91d5-ab4e4bb76a3a_story.html

Progress of Investigation into the Dossier

- http://www.nbcnews.com/news/us-news/fbi-s-comey-told-trump-about-russia-dossier-after-intel-n706416

- https://www.lawfareblog.com/why-are-trump-allegations-hanging-around-when-they-havent-been-substantiated

- https://www.theguardian.com/us-news/2017/jan/13/uk-british-former-moscow-ambassador-andrew-wood-trump-dossier

- http://www.cnn.com/2017/03/09/politics/fbi-investigation-continues-into-odd-computer-link-between-russian-bank-and-trump-organization/index.html

- http://www.cnn.com/2017/05/23/politics/john-brennan-trump-russia/index.html

- http://www.cnn.com/2017/06/07/politics/james-clapper-watergate-russia/index.html

- http://www.rollingstone.com/politics/features/what-we-learned-from-comeys-pre-hearing-statement-w486494

Sourcing of the Dossier

- http://www.telegraph.co.uk/news/2017/01/27/mystery-death-ex-kgb-chief-linked-mi6-spys-dossier-donald-trump/

- http://abcnews.go.com/Politics/us-russian-businessman-source-key-trump-dossier-claims/story?id=45019603

- http://washingtonmonthly.com/2017/07/18/trumps-buddy-aras-agalarov-in-the-steele-dossier/

- http://www.rawstory.com/2017/08/british-spy-christopher-steele-has-given-fbi-the-names-of-his-sources-for-trump-dossier-report/

29

Credibility of Christopher Steele

- http://www.independent.co.uk/news/world/americas/donald-trump-russia-dossier-file-investigation-hacking-christopher-steele-mi6-a7526901.html
- https://www.washingtonpost.com/politics/fbi-once-planned-to-pay-former-british-spy-who-authored-controversial-trump-dossier/2017/02/28/896ab470-facc-11e6-9845-576c69081518_story.html?utm_term=.b027bd1cfcda

Individuals Mentioned in the Dossier

- https://www.nytimes.com/2017/02/13/us/politics/donald-trump-national-security-adviser-michael-flynn.html?_r=1
- https://www.bloomberg.com/news/articles/2017-03-17/alfa-bank-of-russia-says-cyberattacks-falsely-tie-it-to-trump
- https://www.washingtonpost.com/world/national-security/fbi-obtained-fisa-warrant-to-monitor-former-trump-adviser-carter-page/2017/04/11/620192ea-1e0e-11e7-ad74-3a742a6e93a7_story.html?hpid=hp_hp-top-table-main_page710pm%3Ahomepage%2Fstory&utm_term=.c2043a001bd5
- http://www.cnn.com/2017/04/18/politics/fbi-dossier-carter-page-donald-trump-russia-investigation/index.html
- https://www.axios.com/russian-lobbyists-hourly-rate-has-soared-since-his-meeting-with-trump-jr-2481509231.html

Donald Trump, Jr. June 2016 Meeting's Relationship to the Dossier

- http://www.businessinsider.com/donald-trump-jr-email-leaked-buzzfeed-trump-russia-document-2017-7
- https://theintercept.com/2017/07/11/russian-oligarch-plotted-aid-trump-named-private-intelligence-dossier/
- http://dailycaller.com/2017/07/12/does-the-steele-dossier-describe-what-happened-in-trump-tower-meeting/
- https://www.washingtonpost.com/amphtml/politics/trump-dictated-sons-misleading-statement-on-meeting-with-russian-lawyer/2017/07/31/04c94f96-73ae-11e7-8f39-eeb7d3a2d304_story.html
- https://www.nytimes.com/2017/08/21/us/rinat-akhmetshin-russia-trump-meeting.html?auth=login-email

4831-3301-6910v.8 0100812-000009

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

BUZZFEED, INC. and BEN SMITH,
   Plaintiffs,

v.

DEPARTMENT OF JUSTICE, FEDERAL
BUREAU OF INVESTIGATION, OFFICE
OF THE DIRECTOR OF NATIONAL
INTELLIGENCE, JAMES COMEY, and
JAMES CLAPPER,
   Defendants.

Case No. 1:17-mc-02429-APM

## REPLY MEMORANDUM IN FURTHER SUPPORT
## OF PLAINTIFFS' MOTION TO COMPEL

Nathan Siegel
Katherine M. Bolger
Alison Schary
Adam Lazier
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, D.C. 20006
Tel.: (202) 973-4200
Fax: (202) 973-4499
nathansiegel@dwt.com
katebolger@dwt.com
alisonschary@dwt.com
adamlazier@dwt.com

*Counsel for Plaintiffs*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT .......................................................................................................................... 2

A.    THE DISCOVERY SOUGHT IS RELEVANT TO THE FLORIDA LITIGATION........ 2

    1.    The Government's Arguments Improperly Address the Merits of the
        Underlying Litigation.............................................................................................2

    2.    The Government Misstates How the Fair Report Privilege Applies to a
        Document Published By the News Media. .............................................................3

    3.    The Government's Other Arguments Going to the Merits of BuzzFeed's
        Defenses Are Equally Flawed................................................................................7

    4.    The Government Ignores the Separate Issue of Substantial Truth. .......................13

B.    THE LIMITED TESTIMONY SOUGHT IS NOT "UNDULY BURDENSOME" ........ 13

C.    THE LAW ENFORCEMENT PRIVILEGE DOES NOT SHIELD THE DISCOVERY
    SOUGHT ............................................................................................................................. 16

    1.    Defendants Have Not Made the Required Specific Showing to Assert the
        Law Enforcement Privilege. ................................................................................16

    2.    When Considered Against Plaintiffs' Need for this Testimony, Defendants
        Cannot Meet Their Burden. .................................................................................19

CONCLUSION........................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.N.S.W.E.R. Coal. v. Jewell*,
    292 F.R.D. 44 (D.D.C. 2013).................................................................................................20

*Abbas v. Foreign Policy Grp., LLC*,
    975 F. Supp. 2d 1 (D.D.C. 2013), *aff'd*, 783 F.3d 1328 (D.C. Cir. 2015) ................................8

*Adelson v. Harris*,
    402 P.3d 665 (Nev. 2017) ........................................................................................................8

*Adelson v. Harris*,
    973 F. Supp. 2d 467 (S.D.N.Y. 2013), *aff'd*, No. 13-4173-CV, 2017 WL
    5760256 (2d Cir. Nov. 29, 2017) ............................................................................................9

*Agora, Inc. v. Axxess, Inc.*,
    90 F. Supp. 2d 697 (D. Md. 2000), *aff'd*, 11 F. App'x 99 (4th Cir. 2001) ................................8

*Alexander v. FBI*,
    186 F.R.D. 154 (D.D.C. 1999).................................................................................................17

*Alexander v. FBI*,
    186 F.R.D. 12 (D.D.C. 1998)...................................................................................................16

*Bartko v. Dep't of Justice*,
    62 F. Supp. 3d 134 (D.D.C. 2014) ..........................................................................................21

*Boley v. Atl. Monthly Grp.*,
    950 F. Supp. 2d 249 (D.D.C. 2013) ..........................................................................................8

*Cholowsky v. Civiletti*,
    69 A.D.3d 110 (N.Y. 2009) .......................................................................................................9

*Coleman v. Cty. of Suffolk*,
    174 F. Supp. 3d 747 (E.D.N.Y. 2016), *aff'd*, 685 F. App'x 69 (2d Cir. 2017).......................18

*Commonwealth of Puerto Rico v. United States*,
    490 F.3d 50 (1st Cir. 2007)......................................................................................................25

*Conte v. County of Nassau*,
    No. CV 06-4746, 2009 WL 1362784 (E.D.N.Y. May 15, 2009) ............................................20

*Dameron v. Washington Magazine, Inc.*,
    779 F.2d 736 (D.C. Cir. 1985) ...................................................................................4, 7, 9, 15

*Davis Enterprises v. EPA,*
   877 F.2d 1181 (3d Cir. 1989)....................................................................................................15

*Fine v. ESPN, Inc.,*
   11 F. Supp. 3d 209 (N.D.N.Y. 2014) ...............................................................................4, 12, 13

*Fitzgibbon v. CIA,*
   911 F. 2d 755 (D.C. Cir. 1990) ...............................................................................................21

*Flanagan v. Wyndham Int'l Inc.,*
   231 F.R.D. 98 (D.D.C. 2005).....................................................................................................3

*Freeze Right Refrigeration & Air Conditioning Servs., Inc. v. City of New York,*
   101 A.D.2d 175 (N.Y. App. Div. 1984) ...................................................................................5

*Fridman et al. v. BuzzFeed, Inc. et al.,*
   Index No. 154895/2017 (Sup. Ct. N.Y. Cty.) .........................................................................14

*Friedman v. Bache Halsey Stuart Shields, Inc.,*
   738 F.2d 1336 (D.C. Cir. 1984) ...................................................................................17, 18, 20

*FTC v. Timeshare Mega Media & Mktg. Grp., Inc.,*
   No. 10-62000-CIV, 2011 WL 6102676 (S.D. Fla. Dec. 7, 2011)...........................................25

*Glob. Relief Found., Inc. v. New York Times Co.,*
   390 F.3d 973 (7th Cir. 2004) .............................................................................................12, 13

*Healthsmart Pac., Inc. v. Kabateck,*
   212 Cal. Rptr. 3d 589 (Cal. App. 2d Dist. 2016, *modified*, 2017) ...........................................10

*Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.,*
   49 N.Y.2d 63 (1979) ...............................................................................................................10

*Howell v. Enterprise Publ'g Co.,*
   920 N.E.2d 1 (Mass. 2010) .....................................................................................................11

*In re Denture Cream Prods. Liab. Litig.,*
   292 F.R.D. 120 (D.D.C. 2013)...........................................................................................3, 14

*In re Micron Tech., Inc. Sec. Litig.,*
   264 F.R.D. 7 (D.D.C. 2010).......................................................................................................2

*In re Sealed Case,*
   121 F.3d 729 (D.C. Cir. 1997) ................................................................................................20

*In re Sealed Case,*
   856 F.2d 268 (D.C. Cir. 1988) ...................................................................................17, 19, 20

*James Madison Project v. Dep't of Justice,*
    No. 1:17-cv-00144-APM (D.D.C. filed Nov. 13, 2017)..........................................23

*Jewish War Veterans of the U.S. of Am., Inc. v. Gates,*
    506 F. Supp. 2d 30 (D.D.C. 2007) .......................................................................3

*Kunstler v. City of New York,*
    No. 04 CIV 1145 RWSMHD, 2006 WL 1084375 (S.D.N.Y. Apr. 24, 2006).........17

*Lee v. TMZ Prods. Inc.,*
    --- F. App'x ---, No. 16-2736, 2017 WL 4675710 (3d Cir. 2017)...........................9

*Medico v. Time, Inc.,*
    643 F.2d 134 (3d Cir. 1981)................................................................................11

*Micillo v. Liddle & Robinson LLP,*
    No. 15-CV-6141 (JMF), 2016 WL 2997507 (S.D.N.Y. May 23, 2016) .................18

*Miller v. Mehltretter,*
    478 F. Supp. 2d 415 (W.D.N.Y. 2007) ...........................................................18, 25

*Moore v. Armour Pharm. Co.,*
    927 F.2d 1194 (11th Cir. 1991) .....................................................................14, 15

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964).............................................................................................16

*Northrop Corp. v. McDonnell Douglas Corp.,*
    751 F.2d 395 (D.C. Cir. 1984) ............................................................................15

*OAO Alpha Bank v. Center for Public Integrity,*
    387 F. Supp. 2d 20 (D.D.C. 2005) ........................................................................4

*Ortega v. Post-Newsweek Stations, Fla., Inc.,*
    510 So. 2d 972 (Fla. Dist. Ct. App. 1987) ...........................................................11

*Rakofsky v. Washington Post,*
    39 Misc. 3d 1226(A), 2013 WL 1975654 (Sup. Ct. N.Y. Cty. 2013) ......................8

*Reid v. Cumberland Cty.,*
    34 F. Supp. 3d 396 (D.N.J. 2013) .......................................................................20

*Sandals Resorts Int'l Ltd. v. Google, Inc.,*
    86 A.D.3d 32 (N.Y. App. Div. 2011) .....................................................................8

*Schiller v. City of New York,*
    No. 04 Civ. 7921 KMK JCF, 2007 WL 136149 (S.D.N.Y. Jan. 19, 2007).............18

*SEC v. Merkin*,
    No. 11-23585-CIV, 2012 WL 2568158 (S.D. Fla. June 29, 2012)..........................20

*SEC v. Shanahan*,
    No. 4:07CV270JCH, 2009 WL 1955747 (E.D. Mo. July 6, 2009) ...........................17

*Shah v. Dep't of Justice*,
    89 F. Supp. 3d 1074 (D. Nev. Feb. 2, 2015) ...........................................................25

*Simonson v. United Press Int'l, Inc.*,
    500 F. Supp. 1261 (D. Wisc. 1980), *aff'd on other grounds*, 654 F.2d 478 (7th
    Cir. 1981) ................................................................................................................9

*Tax Analysts v. IRS*,
    294 F.3d 71 (D.C. Cir. 2002) ................................................................................16

*Town of Sw. Ranches v. U.S. Dep't of Homeland Sec., Immigration & Customs
    Enf't*,
    No. 15-CV-21924, 2016 WL 4264049 (S.D. Fla. Aug. 12, 2016) ...........................15

*Tuite v. Henry*,
    181 F.R.D. 175 (D.D.C. 1998), *aff'd*, 203 F.3d 53 (D.C. Cir. 1999).................18, 20

*United Am. Fin. v. Potter*,
    667 F. Supp. 2d 49 (D.D.C. 2009) .........................................................................16

*United States v. U.S. Currency in Sum of Twenty One Thousand Nine Hundred
    Dollars*,
    No. 98 CV 6168 (SJ), 1999 WL 993721 (E.D.N.Y. Sept. 21, 1999)......................17

*Watts v. SEC*,
    482 F.3d 501 (D.C. Cir. 2007) .........................................................................13, 15

*White v. Fraternal Order of Police*,
    909 F.2d 512 (D.C. Cir. 1990) .................................................................4, 7, 11, 12

*Wolf v. CIA*,
    473 F.3d 370 (D.C. Cir. 2007) ..............................................................................21

**Other Authorities**

28 C.F.R. § 16.21 ...............................................................................................................23

32 C.F.R. § 1703.2 .............................................................................................................23

32 C.F.R. § 1905.2 .........................................................................................................5, 23

Fed R. Civ. P. 26 ................................................................................................................13

Fed R. Civ. P. 45 .................................................................................................... *passim*

*Restatement (Second) of Torts* § 611 ........................................................................ 4

U.S. Attorneys' Manual § 1.6111 ............................................................................. 23

## PRELIMINARY STATEMENT

The Government's Opposition ("Opp.") opens by arguing that BuzzFeed's publication of the Dossier was not a report about any government investigation, and ends by arguing that BuzzFeed's motion to compel should be denied because the Dossier is the subject of a government investigation. This effort to have it both ways speaks volumes about why the standards of Rule 45 that govern this dispute require that Plaintiffs' motion to compel be granted.

The Government begins its Opposition by standing in the shoes of the plaintiffs in the underlying Florida Litigation, to attack the ultimate merits of some of BuzzFeed's defenses in that case. That is not a proper basis for challenging a third-party subpoena, especially for a case pending elsewhere. In any event, the Government fundamentally misapprehends how that defense applies to BuzzFeed's publication of the Dossier. Further, the Government fails to dispute that the information BuzzFeed seeks is relevant to the independent issue of substantial truth in the Florida case.

Nor can the Government demonstrate that the testimony sought is unduly burdensome. The Government largely posits a parade of horribles, such as the disclosure of investigative sources and methods, which are wholly imagined because nothing in the very limited discovery BuzzFeed seeks requests such information. Moreover, the Government readily admits that the information sought by BuzzFeed is not available from any other source, a fact that weighs strongly in BuzzFeed's favor.

The Government's attempt to invoke the law enforcement privilege fails for similar reasons. Rather than engage in the detailed balancing analysis required by this Circuit, it again offers conclusory, boilerplate assertions of harm in response to imagined requests that are far broader than the actual topics of testimony at issue. The Government fails to identify any particularized law enforcement harm that would result from answering any of the narrow

1

questions at issue in this motion.  Moreover, its arguments largely rely on cases that address the

scope of FOIA exemptions, not the standards of Rule 45 or the law enforcement privilege.

Finally, the Government asks this Court to indulge in the Orwellian fiction that the

Government has never acknowledged that the "so-called Dossier" posted on BuzzFeed's website

actually exists, notwithstanding numerous public statements by, among others, former FBI

Director Comey, former Director of National Intelligence Clapper, former Vice President Biden,

and President Trump himself.  In sum, Plaintiffs have demonstrated that they seek only very

limited information that is highly relevant to the Florida Litigation.  The Government does not

and cannot identify any burden or law enforcement harm that would outweigh BuzzFeed's clear

need for this information, which the Government admits is unavailable from any other source.

The motion to compel should be granted.

## ARGUMENT

### A.    THE DISCOVERY SOUGHT IS RELEVANT TO THE FLORIDA LITIGATION

####     1.    <u>The Government's Arguments Improperly Address the Merits of the Underlying Litigation.</u>

Remarkably, the Government's Opposition leads with what is essentially a surrogate

plaintiffs' motion for partial summary judgment in the Florida case, urging this Court to rule that

BuzzFeed may not invoke the fair report and substantial truth doctrines.  This is an extraordinary

overreach, because the law is clear that "it is not for the Government to limit [a party's] case" by

opining as to what information they need in a Rule 45 subpoena.  *In re Micron Tech., Inc. Sec.*

*Litig.*, 264 F.R.D. 7, 9 (D.D.C. 2010).  Moreover:

> A court with jurisdiction over a discovery dispute for an action pending in a
> different district generally has limited exposure to and understanding of the
> primary action.  A court in such a situation should hence be cautious in
> determining relevance of evidence, and in case of doubt should err on the side of
> permissive discovery.

2

*Flanagan v. Wyndham Int'l Inc.*, 231 F.R.D. 98, 103 (D.D.C. 2005) (citations omitted). *See also Jewish War Veterans of the U.S. of Am., Inc. v. Gates*, 506 F. Supp. 2d 30, 42–43 (D.D.C. 2007) (the merits "is a task assigned to the district court in California. This Court's task, in contrast, is the limited one of determining relevance as that term is construed at the discovery stage.").

Accordingly, this court need not – and, indeed, should not – decide what defenses apply in the Florida Litigation.  This court should focus instead on determining whether there is "any possibility that the information sought may be relevant to the claim or defense of any party" in the underlying action. *In re Denture Cream Prods. Liab. Litig.*, 292 F.R.D. 120, 123 (D.D.C. 2013).  Here, the Government barely attempts to dispute that, if those doctrines may apply, the limited discovery BuzzFeed seeks is highly relevant.

### 2.    The Government Misstates How the Fair Report Privilege Applies to a Document Published By the News Media.

In any event, if the Court were to wade into the merits of the Florida Litigation, it should grant BuzzFeed's motion to compel.  Put simply, the Government's characterization of the fair report privilege is just plain wrong.  Its arguments are sometimes hard to follow because they often employ shifting semantics.  For example, sometimes the Government claims that the word "report" in the fair report privilege means that the Article is the "report" (e.g., Opp. at 14 ("BuzzFeed must establish that the Article is a report on an official government proceeding")), while other times its arguments flow from the premise that the Dossier is the "report" (e.g., *id.* at 19 ("the 'report' in BuzzFeed's Article is … a 'collection of memos'")).  Sometimes the Government recognizes that the privilege extends to reports of any government "action" or "activity" (e.g., *id.* at 13, 14, 22), while other times its arguments proceed from the premise that the privilege is limited to quoting "an official government source or report" (*id.* at 18) or even more narrowly, an "official document or statement by any government official" (*id.* at 18).

3

But the actual grounds for BuzzFeed's fair report defense are not so complicated.  To recap, the fair report privilege protects "[t]he publication of defamatory matter concerning another in a report of an official action or proceeding . . . ." *Restatement (Second) of Torts* § 611. *See also id.*, cmt. a (the privilege protects "the publication of reports of defamatory statements."). Here, all of the allegedly defamatory statements at issue appear only in the Dossier.  Thus, BuzzFeed asserts that its publication of *the Dossier* was privileged.

Where, as in this case, allegedly defamatory statements are contained in a document that was published (in whole or in part) by the news media, the privilege will apply to "documents or other material *that the report indicates are part of a proceeding . . .* ." *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 216-17 (N.D.N.Y. 2014) (emphasis added).  That is because where a report indicates that a document is part of a proceeding, the law treats the publication of the document (or excerpts from it) as "indisputably statements 'of' that proceeding." *Id. See also White v. Fraternal Order of Police,* 909 F.2d 512, 527 (D.C. Cir. 1990) ("it would be untenable to make a distinction between a report about an official proceeding and that which, for all purposes, is the subject matter of the proceeding"); *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985) (the privilege applies if a news report indicates that it was "quoting, paraphrasing, or otherwise drawing upon official documents or proceedings").

Thus, BuzzFeed's publication of the Dossier is privileged as long as its article indicated to readers that the Dossier was part of "an official action or proceeding."  This is not a rigorous test. *Fine*, 11 F. Supp. 3d at 217 ("in light of the broad construction of § 74 . . . reports that bear a more attenuated relationship to a proceeding have been deemed sufficiently connected.").  It is satisfied if the relationship of the Dossier to official actions is made apparent to the reader either "from specific attribution or from the overall context" of the Article. *OAO Alpha Bank v. Center for Public Integrity*, 387 F. Supp. 2d 20, 40 (D.D.C. 2005).  Moreover, the Government

4

acknowledges that the scope of what is an "official action or proceeding" for these purposes is

broad, and extends beyond formal proceedings to any "action taken by a person officially

empowered to do so." *Freeze Right Refrigeration & Air Conditioning Servs., Inc. v. City of New*

*York*, 101 A.D.2d 175, 182 (N.Y. App. Div. 1984).

Here, the text of BuzzFeed's Article and the sources to which it links clearly indicate to

readers that the Dossier was the subject of multiple government activities, including briefings to

the President, President-elect, and key members of Congressional intelligence committees, an

FBI investigation, and communications between Senators Reid and McCain and the FBI:

- The Article reports that "CNN reported Tuesday that a two-page synopsis of the report was given to President Obama and Trump."

- The words "CNN reported" were a hyperlink to an article (Siegel Decl. Ex. 23) that included the following statements:

  - "The allegations were presented [to Obama and Trump] in a two-page synopsis that was appended to a report on Russian interference in the 2016 election."

  - "The FBI is investigating the credibility and accuracy of these allegations, which are based primarily on information from Russian sources, but has not confirmed many essential details in the memos about Mr. Trump."

  - "The classified briefings last week were presented by four of the senior-most US intelligence chiefs – Director of National Intelligence James Clapper, FBI Director James Comey, CIA Director John Brennan, and NSA Director Admiral Mike Rogers.

  - "Sources tell CNN that these same allegations about communications between the Trump campaign and the Russians, mentioned in classified briefings for congressional leaders last year, prompted then-Senate Democratic Leader Harry Reid to send a letter to FBI Director Comey in October, in which he wrote, 'It has become clear that you possess explosive information about close ties and coordination between Donald Trump, his top advisors, and the Russian government – a foreign interest openly hostile to the United States.'"

  - "US intelligence agencies have now checked out the former British intelligence operative and his vast network throughout Europe and find

him and his sources to be credible enough to include some of the information in the presentations to the President and President-elect a few days ago."

- o "On the same day that the President-elect was briefed by the intelligence community, the top four Congressional leaders, and chairmen and ranking members of the House and Senate intelligence committees – the so-called 'Gang of Eight' – were also provided a summary of the memos regarding Mr. Trump, according to law enforcement, intelligence and administration sources."

- The Article's text also reported that "Harry Reid spokesman Adam Jentleson tweeted Tuesday that the former Senate Democratic leader had seen the documents before writing a public letter to FBI Director James Comey about Trump's ties to Russia."

- The Article further reported that "CNN reported Tuesday that Arizona Republican John McCain gave a 'full copy' of the memos to Comey on Dec. 9, but that the FBI already had copies of many of the memos."

Accordingly, because the Article indicates the Dossier's relationship to these official activities, any allegedly defamatory statements in the Dossier are protected by the fair report privilege.

All of the Government's arguments to the contrary proceed from mischaracterizing both the requirements of the fair report privilege and BuzzFeed's stated reasons for invoking it. The problem with the Government's position is evident in the first page of its brief, which asserts that "BuzzFeed now contends in its motion to compel that the Article is nothing more than a report on official government proceedings." Opp. at 1. Much of the rest of the Government's argument proceeds from the premise that the fair report privilege requires that the Article be some kind of blow-by-blow account of official proceedings. Opp. at 12, 14. Based on that premise, the Government cherry-picks words within the Article that are arguably not in and of themselves such accounts, and further speculates that those words demonstrate that BuzzFeed's subjective "intent" and "*raison d'etre*" was something other than reporting on official activities. On that basis, the Government asserts that "the Article" is not privileged. Opp. at 15-17.

The problem with the Government's argument is that BuzzFeed does not assert that "the

Article is nothing more than a report on official government proceedings," nor would it be necessary to do that. BuzzFeed merely asserts that the Article indicates to the reader that the Dossier is the subject of several official actions, which is all the privilege requires. Moreover, the requirement that the Article indicate to readers that a document is the subject of official activity is an objective one. The privilege does not (and should not) demand that courts try to psycho-analyze journalists' subjective "intent" or "*raison d'etre*" for reporting news, and none of the authority the Government cites suggests that it does.

In fact, the case law makes clear that the privilege may attach as long as an article is not so bereft of any information explaining how a document relates to official activity that "the reader would not realize that any governmental report or proceeding was being described" at all. *Dameron*, 779 F.2d at 740. For example, *Dameron* held that the privilege was not established because "[t]he challenged assertion is simply offered as historical fact without any indication of its source . . . the reader is left with the impression that the conclusion is that of the article's author based on his own research." *Id.* Similarly, *White* denied the privilege to an NBC report that presented allegations made in letters from a police union "as a matter of historical fact." without explaining in any manner that the letters were the subject of an official investigation. 909 F.2d at 528. By contrast, BuzzFeed's Article, including both its text and the sources to which it hyperlinks, is replete with specific references to official actions undertaken by all three branches of government. And the Article goes out of its way to make clear that the Dossier is not the product of BuzzFeed's research, and that readers should not assume that it reflects historical fact because it was unverified. That readily establishes the fair report privilege.

### 3. The Government's Other Arguments Going to the Merits of BuzzFeed's Defenses Are Equally Flawed.

The Government's mischaracterization of the privilege pervades the rest of its arguments

7

going to the merits of that defense.  The Government appears to make essentially five arguments.

*First*, the Government contends that BuzzFeed did not "report[] that the Dossier has been

the subject of official government activity" at all.  Opp. at 14; *see also id.* at 15-20.  But that

contention is plainly refuted by all of the quotes from the Article and its hyperlinked sources that

are set out above.  Crucially, the Government seems to implicitly concede that these descriptions

would be sufficient to establish the privilege.  So the crux of its argument is that most of these

attributions to official activity should be disregarded because only the text of the Article itself

counts – not the CNN and other reports to which the Article links.  The Government cites no

authority for that proposition, but instead maintains that BuzzFeed "points to no authority

suggesting that a publisher may defend against a defamation action by relying on the contents of

stories published by other organizations that its article merely references or links."  Opp. at 18.

In fact, there is a wealth of such authority.  *See, e.g., Adelson v. Harris*, 402 P.3d 665, 666 (Nev.

2017) (hyperlink to Associated Press story established privilege because "a hyperlink to source

material about a judicial proceeding may suffice as a report within the common law fair report

privilege"); *Abbas v. Foreign Policy Grp., LLC*, 975 F. Supp. 2d 1, 16-18 & n.7 (D.D.C. 2013)

(hyperlinks sufficient to disclose facts as basis for fair comment privilege), *aff'd*, 783 F.3d 1328

(D.C. Cir. 2015); *Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 262 (D.D.C. 2013)

(hyperlinking to earlier article sufficient to "incorporat[e] that article by reference and provid[e]

the necessary context for the allegedly defamatory remark"); *Agora, Inc. v. Axxess, Inc.*, 90 F.

Supp. 2d 697, 704-05 (D. Md. 2000) (dismissing defamation claim based on facts disclosed

through hyperlinks), *aff'd*, 11 F. App'x 99 (4th Cir. 2001); *Sandals Resorts Int'l Ltd. v. Google,

Inc.*, 86 A.D.3d 32, 45 (N.Y. App. Div. 2011) (hyperlinks constitute disclosure of facts

supporting opinion); *Rakofsky v. Washington Post*, 39 Misc. 3d 1226(A) (table), 2013 WL

1975654, at *4-5, *9 (Sup. Ct. N.Y. Cty. 2013) (blog posts that linked and referenced initial *Washington Post* articles reporting on judicial proceedings were privileged fair reports.)[1]  Indeed, "[t]he hyperlink is the twenty-first century equivalent of the footnote for purposes of attribution in defamation law, because it has become a well-recognized means for an author or the Internet to attribute a source." *Adelson v. Harris*, 973 F. Supp. 2d 467, 484 (S.D.N.Y. 2013), *aff'd*, No. 13-4173-CV, 2017 WL 5760256 (2d Cir. Nov. 29, 2017).

*Second*, in an effort to posit BuzzFeed's "intent," the Government points to different strands of text in the Article to bolster its argument that it was "intended to be about something else." Opp. at 16.  Apart from the fact that subjective intent is not the test, none of the words the Government highlights is inconsistent with the privilege, and indeed they reinforce why the privilege attaches.  For example, the Article first explains generally that the Dossier "has been circulating among elected officials, intelligence agents, and journalists for weeks" (Opp. at 17) – which signals to the reader that the Dossier relates to some official conduct – and then the Article proceeds to refer to specific examples of what officials actually did with the Dossier.  The Government also complains that the Article says that "Americans can make up their own minds about [the] allegations . . . ." Opp. at 15.  But that is one of the very purposes the fair report privilege serves. *Dameron*, 779 F.2d at 740 (purpose of referring to government actions is so that "the reader would know that he was simply being informed of the NTSB's view and could then evaluate the statement accordingly").  The Government likewise complains that the Article characterizes the Dossier as "making explosive – but unverified – allegations."  Similar characterizations are routinely used in privileged reports about strong allegations. *See, e.g., Lee*

---

[1] *See also Cholowsky v. Civiletti*, 69 A.D.3d 110, 114 (N.Y. 2009) (reliance on information reported in another newspaper established the privilege); *Simonson v. United Press Int'l, Inc.*, 500 F. Supp. 1261, 1264 (D. Wisc. 1980), *aff'd on other grounds*, 654 F.2d 478 (7th Cir. 1981).

9

*v. TMZ Prods. Inc.*, --- F. App'x ---, No. 16-2736, 2017 WL 4675710, at *2 (3d Cir. 2017)

(newspaper report that "[s]hocking Korean prostitution ring uncovered" is privileged);

*Healthsmart Pac., Inc. v. Kabateck*, 212 Cal. Rptr. 3d 589, 594 (Cal. App. 2d Dist. 2016,

*modified*, 2017) (same for statements that "[i]In this civil lawsuit, Mary Cavalieri . . . adds the

explosive allegation that knock-off devices were implanted in her spine.").

     Indeed, the New York Court of Appeals has warned against exactly the kind of linguistic

parsing of the Article that the Government's arguments rely on:

> When determining whether an article constitutes a "fair and true" report, the
> language used therein should not be dissected and analyzed with a lexicographer's
> precision.  This is so because a newspaper article is, by its very nature, a
> condensed report of events which must, of necessity, reflect to some degree the
> subjective viewpoint of its author.  Nor should a fair report which is not
> misleading, composed and phrased in good faith under the exigencies of a
> publication deadline, be thereafter parsed and dissected on the basis of precise
> denotative meanings which may literally, although not contextually, be ascribed
> to the words used.

*Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*, 49 N.Y.2d 63, 68

(1979).

     *Third*, the Government asserts that BuzzFeed's purpose in publishing the Dossier is

"manifestly at odds with '[t]he premise of the [fair report] privilege [, which] is the interest of the

public in obtaining information about what occurs in official proceedings.'"  Opp. at 15-16.  To

the contrary, as BuzzFeed noted in its Motion and the Government does not dispute, the Dossier

has been at the epicenter of numerous official proceedings and actions related to the 2016

election and its aftermath, and indeed Mr. Comey and Mr. Clapper have referred to it numerous

times in testimony and/or public statements.  Without access to the Dossier, to this day it would

have remained difficult for the public to follow this entire controversy, let alone be able to

assess the actions of the public officials involved.  The Third Circuit spoke directly to this point

in *Medico v. Time, Inc.*, 643 F.2d 134 (3d Cir. 1981), in holding that documents that had leaked

from an FBI investigation about a Congressman were privileged:

> [A]ny general supervisory concern with respect to the FBI is heightened in the
> present case by the public's interest in examining the conduct of individuals it
> elects to positions of civic trust. Elected officials derive their authority from, and
> are answerable to, the public. If the citizenry is effectively and responsibly to
> discharge its obligation to monitor the conduct of its government, there can be no
> penalty for exposing to general view the possible wrongdoing of government
> officials. Because the alleged defamation of Medico occurred in an article
> analyzing the conduct of former Congressman Flood, we believe it implicates this
> aspect of the supervisory rationale.

*Medico*, 643 F.2d at 140–42. Here, BuzzFeed published the Dossier so that the public could

examine serious allegations made about the President of the United States and the integrity of a

Presidential election that had become the subject of official briefings and investigations. That is

exactly what the privilege was designed to protect.

    *Fourth*, the Government offers a potpourri of arguments claiming there are "further

defect[s]" in BuzzFeed's defenses. Opp. at 18. First, the Government shifts its use of the word

"report" from the Article to the Dossier, and then maintains there is a "lack of attribution to an

official government source or report." *Id.* It then shifts it back again to the Article, and

maintains that the Article fails to cite "any official document or statement by any government

official." *Id.* Either way, the privilege is not limited to merely publishing quotations directly

from government reports or sources. *Howell v. Enterprise Publ'g Co.*, 920 N.E.2d 1, 18 (Mass.

2010) ("[T]he privilege extends to reports of official actions based on information provided by

nonofficial third-party sources."); *Ortega v. Post-Newsweek Stations, Fla., Inc.*, 510 So. 2d 972,

976 (Fla. Dist. Ct. App. 1987) ("[T]he fact that a reporter gathers information of an official

proceeding second-hand 'is immaterial provided his story is a fair and substantially accurate

portrayal of the events in question.'") (citation omitted). For example, in *White*, the allegedly

defamatory statements were contained in letters written by private attorneys, 909 F.2d at 515, while in *Fine* the audiotape at issue was recorded by a victim of alleged sexual abuse, who gave it to ESPN. 11 F. Supp. 3d at 213. Both cases suggest that when a document becomes the subject of official activity, it functions as an "official document" for purposes of the privilege. *See White*, 909 F.2d at 527.

*Finally*, the Government's remaining arguments highlight why the requested discovery is relevant. The Government argues that because the Article never reported on any government activity, it would be impossible to assess its "substantial accuracy." Opp. at 19. But as discussed above, the Article plainly *did* report about multiple official actions, and so BuzzFeed needs the requested discovery precisely to see "if the Government's testimony might supply official support for the account of the possession and/or 'circulation' of the so-called Dossier by government officials." Opp. at 19; *see also Glob. Relief Found., Inc. v. New York Times Co.*, 390 F.3d 973, 986-87 (7th Cir. 2004).[2]

Relatedly, the Government argues that even assuming the Article reports on government activity, it did not specifically say the allegedly defamatory statements were encompassed within that activity. Opp. at 20-22. But the Article, in combination with the news reports to which it linked, reported that the Dossier was the subject of actions by government officials, and embedded the entire document so that the public would have access to the same material the government had. Neither law nor logic suggests that BuzzFeed had to go back and repeat in the

---

[2] The Government tries to distinguish *Global Relief* by the fact that the media defendants were able to rely upon affidavits filed by government officials in a related case. *Global Relief* does not remotely stand for the proposition that the Government cannot be compelled to provide testimony unless it is publicly available elsewhere. That makes no sense, because if information is already publicly available there would be no need to subpoena, let alone compel the Government to provide it. *Global Relief* was not a discovery dispute; rather, Plaintiffs cited it because it establishes the *relevance* of the narrow testimony sought in this motion to the issue of substantial truth. *See* MTC at 15-17.

Article the contents of the Dossier to qualify for the protection of the fair report privilege.

Indeed that was the import of *Fine*, the very case the Government mistakenly cites as supporting its position on this point. *Fine* held that because the defendant news organization (ESPN) had reported that an audiotape was being investigated by the police, any portion of the tape that it chose to publish would be privileged. 11 F. Supp. 3d at 218. Had ESPN simply posted the entire audiotape rather than "summaries" or "quotations" from it, *id.*, it would have made no difference, and the same holds true here.

### 4.    The Government Ignores the Separate Issue of Substantial Truth.

Finally, the Government fails to offer any argument that the testimony sought is not relevant to the issue of substantial truth in the Florida Litigation. To the extent the relevant state law may apply that doctrine to this context, it may be established simply by showing that the government was, in fact, investigating the allegations of the Dossier as reported in the Article. *See Glob. Relief*, 390 F.3d at 986-87. There is no question that the information sought in this application is relevant to that issue within the meaning of Rule 45.

### B.    THE LIMITED TESTIMONY SOUGHT IS NOT "UNDULY BURDENSOME"

The Government fails to meet its burden to establish that the nine narrow deposition topics are "unduly burdensome" with respect to any of the factors set forth in Rule 26(b).

*First*, the information sought is not "unreasonably cumulative or duplicative," nor can it be "obtain[ed] from some other source that is more convenient, less burdensome, or less expensive." *Watts v. SEC*, 482 F.3d 501, 509 (D.C. Cir. 2007). The Government does not dispute that it is the sole source for the information that Plaintiffs seek. It concedes there is no "similarly specific, publicly-available testimony" that BuzzFeed could use in lieu of the testimony sought here (Opp. at 29), and takes the position that even former officials with personal knowledge of these topics cannot speak on the Government's behalf (*id.* at 27). The

13

fact that this testimony is not available from any other source weighs heavily in favor of Plaintiffs. *See In re Denture Cream Prods. Liab. Litig.*, 292 F.R.D. at 127.

*Second*, courts assess whether the "burden or expense" of the proposed discovery outweighs its "likely benefit" to the party seeking it, taking into account, *inter alia*, "the needs of the case" and the "importance of the proposed discovery in resolving the issues." With respect to benefit, need and importance, the Government puts all of its eggs in the basket of arguing the merits of the underlying case, and as discussed above, those arguments lack merit. Otherwise, the Government does not provide any estimation of "expense" or detail the specific "burden" on its resources that it would allegedly bear in responding to these narrow testimony requests, in order to weigh this against the benefit to Plaintiffs. Given the narrow scope of the requests, such burdens are plainly minimal. Plaintiffs are not asking the Government to search their records or to produce a single document. And the nine deposition topics are highly specific, and some may even be susceptible to "yes or no" responses.

Instead, the Government makes three other arguments to claim that the subpoena is unduly burdensome. *First*, it argues that the requests are "cumulative" because the Government "could be subjected to similar requests for testimony in the future." Opp. at 23-24. Yet despite claiming a "proliferation of lawsuits" concerning the broad topic of "Russia's efforts to interfere with the 2016 United States presidential election," the Government identifies only a single case concerning the Dossier – and does not point to *any cases* that will merely seek the same narrow confirmation of facts.[3] *Compare Moore v. Armour Pharm. Co.*, 927 F.2d 1194, 1196, 1198 n.3 (11th Cir. 1991) (recognizing "cumulative impact" of permitting testimony where there were

---

[3] Plaintiffs are aware of only one other case where the same information may be relevant: another pending case against Plaintiffs in New York by a separate set of Russian-national plaintiffs. *Fridman et al. v. BuzzFeed, Inc. et al.*, Index No. 154895/2017 (Sup. Ct. N.Y. Cty.).

"more than 200 cases" similar to the present case and the CDC had already received "more than fifty requests" for deposition testimony from its researchers). Moreover, that the Government may resist much broader requests for disclosures under FOIA by other parties is not a basis for the Government to refuse any narrowly-tailored disclosure whatsoever. *Id.* at 1198 (even where courts consider the "cumulative effect" of multiple requests to non-party government agencies, the government "cannot put a blanket ban on all requests for testimony."). The two cases cited by the Government, *Davis Enterprises v. EPA*, 877 F.2d 1181 (3d Cir. 1989) and *Town of Sw. Ranches v. U.S. Dep't of Homeland Sec., Immigration & Customs Enf't*, No. 15-CV-21924, 2016 WL 4264049 (S.D. Fla. Aug. 12, 2016), support Plaintiffs' position because in both cases the Government offered to provide testimony by way of affidavit as an alternative. Here, the Government rejected that option.[4]

*Second*, the Government contends that compliance "could reveal previously undisclosed details about an ongoing law enforcement investigation." Opp. at 26 n.11. That argument restates its asserted law enforcement privilege; mere assertion of a privilege does not constitute a burden. *See Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 403 (D.C. Cir. 1984).

*Third*, the Government contends there is no "public interest" at stake (Opp. at 30), but it appears to misconstrue BuzzFeed's argument. Here, the "important issue at stake" is the public policy embodied in the fair report privilege, which "springs from the recognition that in a democratic society, the public has both the right and the need to know what is being done and said in government – even if some of that is defamatory." *Dameron v*, 779 F.2d at 739. It is

---

[4] Moreover, affidavits were offered in those cases despite the fact that the agencies' decisions in those cases were ultimately reviewed under the far more deferential "arbitrary and capricious" standard of the Administrative Procedure Act, rather than the standards of Rule 45, as is required in this Circuit. *Watts*, 482 F.3d at 508.

therefore not accurate to characterize this case as nothing more than a "private defamation suit." Beginning with *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), the law has long recognized that the use of defamation suits to challenge reporting about official conduct has broad public significance. Indeed, it is troubling that in the guise of opposing a Rule 45 subpoena, the Government leads with arguments that promote the merits of a defamation suit concerning a report which the present Administration has denounced as "fake news." Thus, there is a strong public interest in affording BuzzFeed and the Florida court access to information that is highly relevant to determining whether the publication of a document central to official actions concerning Russian interference in the election is (or is not) protected speech.

## C.    THE LAW ENFORCEMENT PRIVILEGE DOES NOT SHIELD THE DISCOVERY SOUGHT

Lastly, after arguing that BuzzFeed did not report about official activity, the Government maintains that it cannot produce the requested information *because there is a pending official investigation*. Defendants base this argument on a declaration that they submitted to this Court *ex parte* for *in camera* review.[5] Based on the record available to Plaintiffs, however, the Government has not met its burden to successfully invoke the law enforcement privilege.

### 1.    Defendants Have Not Made the Required Specific Showing to Assert the Law Enforcement Privilege.

*First*, the Government has not properly invoked the privilege.[6] To assert the law

---

[5] Accordingly, Plaintiffs have moved to strike this declaration or, in the alternative, for the Court to order a redacted version be produced. (Dkt. 11). If Defendants submit a redacted version, Plaintiffs reserve the right to seek leave to file a supplemental response to its contents.

[6] The Government erroneously relies on several cases describing FOIA Exemption 7, not the law enforcement privilege. *See Tax Analysts v. IRS*, 294 F.3d 71, 76-77 (D.C. Cir. 2002); *United Am. Fin. v. Potter*, 667 F. Supp. 2d 49, 59 (D.D.C. 2009) (cited at Opp. at 33). These are not interchangeable standards; the FOIA exemption is "broader than the law enforcement privilege" and therefore more deferential to the government. *Alexander v. FBI*, 186 F.R.D. 12, 16 (D.D.C. 1998) (noting that this is an "important distinction").

enforcement privilege, the Government must comply with the following requirements: "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege." *In re Sealed Case*, 856 F.2d 268, 271 (D.C. Cir. 1988). The privilege "will not be considered unless presented in a deliberate, considered and reasonably specific manner." *Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1342 (D.C. Cir. 1984). Further, "across-the-board claims of law enforcement privilege supported only by conclusory statements will not suffice." *Alexander v. FBI*, 186 F.R.D. 154, 167 (D.D.C. 1999).

The Government's invocation of the privilege is not sufficiently specific to meet these stringent requirements. Its brief contains no claim of privilege based on "actual personal consideration," and it asserts a boilerplate, conclusory set of speculative concerns, claiming that:

> The compelled testimony could, *inter alia*, give targets and others intent on interfering with the investigation information necessary to conceal evidence or implement countermeasures; reveal potential witnesses or sources in a manner that risks compromising or influencing relevant testimony; and/or suggest a map of possible investigative activity yet to be taken by revealing the current focus and scope of the investigation, allowing persons of interest to plan for such activity.

Opp. at 34. Such "formulaic incantations of harm" are "patent[ly] inadequa[te]." *Kunstler v. City of New York*, No. 04 CIV 1145 RWSMHD, 2006 WL 1084375, at *2 (S.D.N.Y. Apr. 24, 2006).[7] Instead of merely listing the *types* of harms that the law enforcement privilege is

---

[7] *See also, e.g., SEC v. Shanahan*, No. 4:07CV270JCH, 2009 WL 1955747, at *2 (E.D. Mo. July 6, 2009) (rejecting "boilerplate and conclusory statements" of harm); *United States v. U.S. Currency in Sum of Twenty One Thousand Nine Hundred Dollars*, No. 98 CV 6168 (SJ), 1999 WL 993721, at *3 (E.D.N.Y. Sept. 21, 1999) (conclusory assertion that disclosure would "hinder[ ] law enforcement efforts and ... reveal law enforcement techniques, procedures, or strategies in this case and others" not sufficient to apply law enforcement privilege).

supposed to protect against, the Government must identify "particularized harm" that would result from disclosure of this specific testimony. *Tuite v. Henry*, 181 F.R.D. 175, 179 (D.D.C. 1998), *aff'd*, 203 F.3d 53 (D.C. Cir. 1999). *See also Coleman v. Cty. of Suffolk*, 174 F. Supp. 3d 747, 756-57 (E.D.N.Y. 2016) (privilege requires a "clear and specific evidentiary showing of the nature and extent of the harm," not a mere "restatement of the type of information the privilege is meant to protect"), *aff'd*, 685 F. App'x 69 (2d Cir. 2017); *Schiller v. City of New York*, No. 04 Civ. 7921 KMK JCF, 2007 WL 136149, at *7-8 (S.D.N.Y. Jan. 19, 2007) ("conclusory assertion that public disclosure of this document would 'undermine the NYPD's planning for future unique and uncommon large-scale events and demonstrations'" not sufficient to apply privilege).

Here, the Government does not and cannot explain how simply confirming that the Government had the Dossier prior to January 10, 2017, and was investigating its contents, could possibly implicate these wide-ranging concerns. *See Miller v. Mehltretter*, 478 F. Supp. 2d 415, 425 (W.D.N.Y. 2007). Moreover, the fact that the Government has made a "broad, undifferentiated assertion of privilege" over *all* testimony requested only "exacerbates the deficiency of its privilege claim." *Micillo v. Liddle & Robinson LLP*, No. 15-CV-6141 (JMF), 2016 WL 2997507, at *5 (S.D.N.Y. May 23, 2016). *See also Friedman*, 738 F.2d at 1341-42 (rejecting "generalized claim" of law enforcement privilege as to entirety of subpoenaed material). It is unclear, for example, how the law enforcement privilege is remotely implicated by a request to confirm statements in Mr. Comey's public, written submission to the Senate (Topic 4) or Mr. Clapper's public testimony before the Senate Judiciary Committee (Topic 9).

Further, the Government asserts these boilerplate objections in response to straw-man requests that are far broader than the *actual* nine narrow topics at issue. For example, the Government asserts that BuzzFeed is seeking testimony about the following issues, none of

which are actually implicated by the nine topics at issue:

- the "scope of presumed investigatory activities related to Russia" (Opp. at 33)

- "the status of and actions taken in [the] investigation" (*id.* at 34)

- "whether or not the Government is utilizing a particular investigative strategy or source in furtherance of an ongoing investigation" (*id.*)

- "the current focus and scope of the investigation" (*id.*)

- "what actions [the Government] have or have not taken based on [certain] material" (*id.* at 35).

These imagined requests do not meet the rigorous standards to invoke the privilege.

### 2. When Considered Against Plaintiffs' Need for this Testimony, Defendants Cannot Meet Their Burden.

Even if Defendants could establish that the law enforcement privilege applies to the information sought, the privilege is only a "qualified" one. "The public interest in nondisclosure must be balanced against the need of a particular litigant for access to the privileged information." *In re Sealed Case*, 856 F.2d at 272. The D.C. Circuit has identified ten factors to consider in balancing these interests:

> (1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information; (2) the impact upon persons who have given information of having their identities disclosed; (3) the degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure; (4) whether the information sought is factual data or evaluative summary; (5) whether the party seeking discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question; (6) whether the police investigation has been completed; (7) whether any interdepartmental disciplinary proceedings have arisen or may arise from the investigation; (8) whether the plaintiff's suit is non-frivolous and brought in good faith; (9) whether the information sought is available through other discovery or from other sources; (10) the importance of the information sought to the plaintiff's case.

*Id.* The balancing test is not satisfied by "exclusive reliance on one factor." *Tuite*, 98 F.3d at 1418.

Defendants erroneously claim that Plaintiffs "bear[] the burden of demonstrating a sufficient evidentiary need for the withheld information that outweighs the Government's interest in non-disclosure." Opp. at 36. In fact, it is the Government – as the proponent of the privilege – that bears that burden. *Friedman*, 738 F.2d at 1341-42 ("The party claiming privilege has the burden to establish its existence.") *See also Conte v. County of Nassau*, No. CV 06-4746, 2009 WL 1362784, at *7 (E.D.N.Y. May 15, 2009) (when balancing interests to determine whether law enforcement privilege applies, "the burden of persuasion resides with the party seeking to prevent disclosure"). Notably, "the D.C. Circuit has not recognized any strong presumption against disclosure" in weighing claims of law enforcement privilege; rather, courts in this circuit conduct the balancing test "with an eye toward disclosure." *A.N.S.W.E.R. Coal. v. Jewell*, 292 F.R.D. 44, 51 (D.D.C. 2013) (quoting *Tuite*, 181 F.R.D. at 177).[8]

The Government argues at length that the subpoena should be quashed because it seeks information they have "not previously disclosed," since they contend they have not previously issued specific "official statements" that track the language of the requested testimony. *See* Opp. at 26-30. But that argument is misdirected. The question of whether prior statements are "official acknowledgments," and whether the Government's narrow construction of that term is accurate, relate to whether an agency has waived an otherwise applicable exemption from disclosure under FOIA (i.e., the exemption for classified information). *See* Opp. at 26-27 (citing

---

[8] In support of their claim that BuzzFeed bears this burden, the Government cites *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) – but *In re Sealed Case* does not contain this holding, and the cited page discusses the deliberative process privilege, not the law enforcement privilege. *Reid v. Cumberland Cty.*, 34 F. Supp. 3d 396, 406 (D.N.J. 2013) and *SEC v. Merkin*, No. 11-23585-CIV, 2012 WL 2568158 (S.D. Fla. June 29, 2012), both of which are also cited in this section (Opp. at 36-37) similarly concern the deliberate process privilege.

20

*Fitzgibbon v. CIA*, 911 F. 2d 755, 765 (D.C. Cir. 1990) and *Bartko v. Dep't of Justice*, 62 F. Supp. 3d 134, 143-44 (D.D.C. 2014)). But in the Rule 45 context, this argument cuts in favor of *Plaintiffs*, since it reinforces that there is no alternative source for the information sought. The Government cites no authority for its novel position that a subpoena seeking information that does not precisely track prior official statements (as the Government wishes to define that term) is inherently burdensome under Rule 45 or subject to the law enforcement privilege.[9]

Rather, in this context it is relevant to the Court's balancing assessment that these basic facts have already been acknowledged by senior government officials, cutting against the Government's claim that disclosure in this content would interfere with law enforcement. *See* Plaintiffs' Motion to Compel and Incorporated Memorandum of Law ("MTC") at 4-8. The Government tries to downplay these public acknowledgements by claiming, first, that nearly all of them are "not binding on the Government Respondents" and second, that one cannot be sure that these statements are even about the same Dossier published by BuzzFeed. Opp. at 27-28. Those arguments lack merit as a matter of law and fact.

As a matter of law, as explained above, the question of what is "binding" speaks only to the issue of whether, in the FOIA context, the Government has waived an otherwise explicit FOIA exemption. Nor do the facts support the Government's fiction that it has never discussed the Dossier. The context of the public statements identified in Plaintiffs' moving brief make absolutely clear that the "dossier," the "private security document," and the "compromising allegations" against President Trump are all referring to the 35-page Dossier published by BuzzFeed on January 10, 2017. For example:

---

[9] The same "official acknowledgement" test applies to *Glomar* responses asserted by an agency in response to a FOIA request, in which the agency refuses to confirm or deny the existence of a document. Again, the Government provides no legal basis to interpose a *Glomar* response outside the FOIA context. *See Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007).

- Director Clapper's statement about the "private security company document" was released on January 11, 2017 the day after BuzzFeed published the Dossier, and explicitly in response to "recent media reports about our briefing last Friday," which was reported by CNN and referenced by BuzzFeed in the Article. Siegel Decl. Ex. 21.

- Also on January 11, Senator McCain released a statement "on recent news reports," in which he confirmed that he had received the Dossier ("sensitive information that has since been made public") in "late [2016]" and provided it to the FBI, as reported by CNN and referenced in the Article. Siegel Decl. Ex. 18.

- The next day, January 12, then-Vice President Biden confirmed to the Associated Press that Clapper had previously briefed him and President Obama on the Dossier, and that intelligence leaders advised that they would be briefing Trump as well. The AP story makes clear that the briefing concerned the uncorroborated dossier that was "released publicly this week by the media." Siegel Decl. Ex. 22.

- During Mr. Comey's June 8, 2017 public testimony before the Senate Judiciary Committee, Senator Burr asked him whether the FBI had been able to "confirm any criminal allegations" in "the Steele document," which was by that point "[i]n the public domain." Mr. Comey did not ask for clarification as to what document he might be referring to, nor did he deny the existence of such a document; instead, he said that he could not answer questions about the FBI's substantive assessments of the Dossier in an "open setting" "because it *goes into the details of the investigation.*" Siegel Decl. Ex. 49 (emphasis added). In his public written testimony submitted in advance of the same hearing, Mr. Comey stated that he briefed Trump on January 6 about "an IC assessment concerning Russian efforts to interfere in the election," including a private briefing about some "personally sensitive aspects of the information assembled during the assessment" that he "knew the media was about to publicly report." Siegel Decl. Ex. 48.

- President Trump confirmed in an interview with *The New York Times* that Comey briefed him privately on the Dossier prior to his inauguration, specifically challenging its allegations about his visit to Russia and noting that lawsuits had been filed over the Dossier's contents. MTC at 6-7; Siegel Decl. Ex. 63 at 15-16.

- Press Secretary Sarah Huckabee Sanders claimed that the "phony dossier" commissioned by "Fusion GPS" was "discredited" by "public testimony." Siegel Decl. Exs. 64, 65.

- Just last week, current FBI Director Wray repeatedly referred to the "dossier" in testifying before the House Judiciary Committee, but like Director Comey he declined to discussed investigative details, which are not being sought by Defendants' narrowed subpoena. *See, e.g.,* Exhibit A to the Declaration of Nathan Siegel dated Dec. 18, 2017 ("Siegel Reply Decl.") at 38-42, 66-67, 83.

Indeed, President Trump just recently publicly called upon the FBI and DOJ to release

documents and permit testimony by an FBI witness concerning whether the Dossier was used as

the basis for FISA warrants, exhorting the Defendants to "[g]ive this information NOW!"[10] There is no question that everyone was talking about the same document, and all of those statements were "official acknowledgements" even as the Government defines that term.

*Second*, in the Rule 45 context the Government cannot hide behind a fiction that public statements and testimony by former FBI Director Comey and former Director of National Intelligence Clapper concerning matters that took place during their tenure as government officials do not count as public acknowledgements that the Government had the Dossier. The FBI's Employment Agreement specifically states that all information acquired in the course of official duties "remain[s] the property of the United States of America"; that it cannot be revealed "without prior official written authorization by the FBI"; and that any proposed disclosures must be submitted to the FBI for official prepublication review. Siegel Reply Decl. Ex. D. And the agencies' respective *Tuohy* regulations consider both Comey and Clapper "employees" notwithstanding their former status, since the subpoena seeks information within the scope of their previous official service. *See* 32 C.F.R. § 1703.2 (ODNI); 32 C.F.R. § 1905.2 (CIA); 28 C.F.R. § 16.21 (DOJ, FBI); *see also* U.S. Attorneys' Manual § 1.6111.[11] The Government cannot have it both ways. It cannot bar Defendants from personally subpoenaing Mr. Comey or Mr. Clapper on the grounds that anything they learned while they were employees

---

[10] Siegel Reply Decl. Ex. B (Nov. 29, 2017 tweet by @realDonaldTrump). *See also* Siegel Reply Decl. Ex. C (Oct. 21, 2017 tweet by @realDonaldTrump stating that the "Justice Department and/or FBI should immediately release who paid for" the "now discredited 'Dossier'"). In another case pending before this Court, the Government has confirmed that these tweets constitute "official statements of the President of the United States." Defs. Supp. Submission, Dkt. 29, *James Madison Project v. Dep't of Justice*, No. 1:17-cv-00144-APM (D.D.C. filed Nov. 13, 2017), at 2, 4.

[11] For this reason, the respective government agencies accepted service of BuzzFeed's individual subpoenas to Messrs. Comey and Clapper and have responded on their behalf throughout this process, including in the instant motion. *See* Siegel Decl. Exs. 6-8.

is official information, and then claim that their post-employment testimony to Congress (and elsewhere) about the same subjects is not an official disclosure.

At this point, the horse has long left the barn regarding basic information concerning the Dossier, and the Government's blanket assertions of harm are simply ephemeral. BuzzFeed is not asking the Government to testify about its assessment of the veracity of any allegations in the Dossier or comment on the current status of its investigation. Nor is BuzzFeed asking the Government to pinpoint when or how it first received the Dossier, or identify every source from which it obtained it. Rather, BuzzFeed simply requests that the Government confirm it was considering the Dossier in its investigation prior to January 10, 2017, which would include the January 6 briefing that has been publicly acknowledged by Director Comey and Director Clapper (Topics 1, 2, 4, 5, 6, 8, 9), and that it confirm Senator McCain's already-public statement that he provided the Dossier to the FBI (Topic 7). Similarly, BuzzFeed is not asking the Government to go beyond the published Dossier and detail other, undisclosed materials; it is simply asking whether, or which, of the 35 pages published by BuzzFeed were in the Government's possession as of January 10 (Topic 3).

Applying these factors, it is clear that Defendants cannot sustain their burden of persuasion for asserting the law enforcement privilege. Given that BuzzFeed already has published the Dossier, and Christopher Steele has already admitted to being the Dossier's author and providing at least some of it to the FBI, as has Senator McCain, the testimony sought would not reveal the substance of information provided by a source or the identity of a source (Factors 1 & 2). The information sought is "purely factual," not evaluative (Factors 3 & 4). Plaintiffs are not party to any criminal action arising out of the Dossier (Factor 5), and they are not aware of any disciplinary actions related to the testimony sought (Factor 7). Moreover, this testimony is

highly relevant to Plaintiffs' potentially dispositive defenses, and (as the Government repeatedly emphasizes) it cannot be obtained from any other source (Factors 8-10).

With respect to the remaining factor (Factor 6), Plaintiffs take the Government at its word that the testimony relates to an "ongoing, rather than a completed investigation." Of course, this creates a circular argument: the Government insists they cannot be compelled to confirm the prior existence of an investigation because it relates to an ongoing investigation. In any event, the Plaintiffs are not seeking any information about the current status of the investigation; they simply seek to establish the historical fact that this investigation was underway prior to January 10, 2017. The law does not provide a basis to shield these narrow record facts – and the Government does not cite a single case with analogous facts to justify their refusal.  Rather, the cases they cite only underscore why disclosure of the narrow testimony sought is appropriate here, because they all involved discovery requests that were far broader than what Defendants' narrowed subpoena seeks.[12]  *Compare Miller*, 478 F. Supp. 2d at 424-25 (law enforcement privilege did not shield testimony concerning "when," "how," and "from whom" police files were received) (cited at Opp. at 33).

## CONCLUSION

For the reasons stated herein, Plaintiffs' motion to compel should be granted.

---

[12] *See, e.g., FTC v. Timeshare Mega Media & Mktg. Grp., Inc.*, No. 10-62000-CIV, 2011 WL 6102676, at *5 (S.D. Fla. Dec. 7, 2011) (seeking testimony concerning "(1) an ongoing criminal investigation, (2) confidential sources, and (3) law enforcement techniques and procedures"); *Shah v. Dep't of Justice*, 89 F. Supp. 3d 1074, 1080 (D. Nev. Feb. 2, 2015) (seeking polygraph examination materials that would reveal, *inter alia*, polygraph questions, sequencing, and equipment – details that could help future examinees prevail on a polygraph exam); *Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 66-67 (1st Cir. 2007) (seeking FBI operation details, including agent identities, operation reports, recordings from operation, and information regarding FBI protocols and operating procedures) (cited at Opp. at 33-35).  The latter two cases were also decided under the deferential Administrative Procedure Act standard, which does not apply to Rule 45 requests in this Circuit.

Dated: December 18, 2017                Respectfully submitted,

                                        /s/ Nathan Siegel

                                        Nathan Siegel
                                        Katherine M. Bolger
                                        Alison Schary
                                        Adam Lazier
                                        DAVIS WRIGHT TREMAINE LLP
                                        1919 Pennsylvania Avenue NW, Suite 800
                                        Washington, D.C. 20006
                                        Tel.: (202) 973-4200
                                        Fax: (202) 973-4499
                                        nathansiegel@dwt.com
                                        katebolger@dwt.com
                                        alisonschary@dwt.com
                                        adamlazier@dwt.com

                                        *Counsel for Plaintiffs*

# EXHIBIT "B"

# UNCLASSIFIED ~~TOP SECRET//NOFORN~~

January 18, 2018

Declassified by order of the President
February 2, 2018

To:         HPSCI Majority Members

From:       HPSCI Majority Staff

Subject:    Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the
            Federal Bureau of Investigation

## Purpose

    This memorandum provides Members an update on significant facts relating to the
Committee's ongoing investigation into the Department of Justice (DOJ) and Federal Bureau of
Investigation (FBI) and their use of the Foreign Intelligence Surveillance Act (FISA) during the
2016 presidential election cycle.  Our findings, which are detailed below, 1) raise concerns with
the legitimacy and legality of certain DOJ and FBI interactions with the Foreign Intelligence
Surveillance Court (FISC), and 2) represent a troubling breakdown of legal processes established
to protect the American people from abuses related to the FISA process.

## Investigation Update

    On October 21, 2016, DOJ and FBI sought and received a FISA probable cause order
(not under Title VII) authorizing electronic surveillance on Carter Page from the FISC.  Page is a
U.S. citizen who served as a volunteer advisor to the Trump presidential campaign.  Consistent
with requirements under FISA, the application had to be first certified by the Director or Deputy
Director of the FBI.  It then required the approval of the Attorney General, Deputy Attorney
General (DAG), or the Senate-confirmed Assistant Attorney General for the National Security
Division.

    The FBI and DOJ obtained one initial FISA warrant targeting Carter Page and three FISA
renewals from the FISC.  As required by statute (50 U.S.C. §1805(d)(1)), a FISA order on an
American citizen must be renewed by the FISC every 90 days and each renewal requires a
separate finding of probable cause.  Then-Director James Comey signed three FISA applications
in question on behalf of the FBI, and Deputy Director Andrew McCabe signed one. Then-DAG
Sally Yates, then-Acting DAG Dana Boente, and DAG Rod Rosenstein each signed one or more
FISA applications on behalf of DOJ.

    Due to the sensitive nature of foreign intelligence activity, FISA submissions (including
renewals) before the FISC are classified.  As such, the public's confidence in the integrity of the
FISA process depends on the court's ability to hold the government to the highest standard—
particularly as it relates to surveillance of American citizens.  However, the FISC's rigor in
protecting the rights of Americans, which is reinforced by 90-day renewals of surveillance
orders, is necessarily dependent on the government's production to the court of all material and
relevant facts.  This should include information potentially favorable to the target of the FISA

~~TOP SECRET//NOFORN~~

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET//NOFORN

application that is known by the government. In the case of Carter Page, the government had at least four independent opportunities before the FISC to accurately provide an accounting of the relevant facts. However, our findings indicate that, as described below, material and relevant information was omitted.

1) The "dossier" compiled by Christopher Steele (Steele dossier) on behalf of the Democratic National Committee (DNC) and the Hillary Clinton campaign formed an essential part of the Carter Page FISA application. Steele was a longtime FBI source who was paid over $160,000 by the DNC and Clinton campaign, via the law firm Perkins Coie and research firm Fusion GPS, to obtain derogatory information on Donald Trump's ties to Russia.

   a) Neither the initial application in October 2016, nor any of the renewals, disclose or reference the role of the DNC, Clinton campaign, or any party/campaign in funding Steele's efforts, even though the political origins of the Steele dossier were then known to senior DOJ and FBI officials.

   b) The initial FISA application notes Steele was working for a named U.S. person, but does not name Fusion GPS and principal Glenn Simpson, who was paid by a U.S. law firm (Perkins Coie) representing the DNC (even though it was known by DOJ at the time that political actors were involved with the Steele dossier). The application does not mention Steele was ultimately working on behalf of—and paid by—the DNC and Clinton campaign, or that the FBI had separately authorized payment to Steele for the same information.

2) The Carter Page FISA application also cited extensively a September 23, 2016, *Yahoo News* article by Michael Isikoff, which focuses on Page's July 2016 trip to Moscow. This article does not corroborate the Steele dossier because it is derived from information leaked by Steele himself to *Yahoo News*. The Page FISA application incorrectly assesses that Steele did not directly provide information to *Yahoo News*. Steele has admitted in British court filings that he met with *Yahoo News*—and several other outlets—in September 2016 at the direction of Fusion GPS. Perkins Coie was aware of Steele's initial media contacts because they hosted at least one meeting in Washington D.C. in 2016 with Steele and Fusion GPS where this matter was discussed.

   a) Steele was suspended and then terminated as an FBI source for what the FBI defines as the most serious of violations—an unauthorized disclosure to the media of his relationship with the FBI in an October 30, 2016, *Mother Jones* article by David Corn. Steele should have been terminated for his previous undisclosed contacts with Yahoo and other outlets **in September**—before the Page application was submitted to

**UNCLASSIFIED**

TOP SECRET//NOFORN

the FISC in October—but Steele improperly concealed from and lied to the FBI about those contacts.

b) Steele's numerous encounters with the media violated the cardinal rule of source handling—maintaining confidentiality—and demonstrated that Steele had become a less than reliable source for the FBI.

3) Before and after Steele was terminated as a source, he maintained contact with DOJ via then-Associate Deputy Attorney General Bruce Ohr, a senior DOJ official who worked closely with Deputy Attorneys General Yates and later Rosenstein. Shortly after the election, the FBI began interviewing Ohr, documenting his communications with Steele. For example, in September 2016, Steele admitted to Ohr his feelings against then-candidate Trump when Steele said he "**was desperate that Donald Trump not get elected and was passionate about him not being president.**" This clear evidence of Steele's bias was recorded by Ohr at the time and subsequently in official FBI files—but not reflected in any of the Page FISA applications.

a) During this same time period, Ohr's wife was employed by Fusion GPS to assist in the cultivation of opposition research on Trump. Ohr later provided the FBI with all of his wife's opposition research, paid for by the DNC and Clinton campaign via Fusion GPS. The Ohrs' relationship with Steele and Fusion GPS was inexplicably concealed from the FISC.

4) According to the head of the FBI's counterintelligence division, Assistant Director Bill Priestap, corroboration of the Steele dossier was in its "infancy" at the time of the initial Page FISA application. After Steele was terminated, a source validation report conducted by an independent unit within FBI assessed Steele's reporting as only minimally corroborated. Yet, in early January 2017, Director Comey briefed President-elect Trump on a summary of the Steele dossier, even though it was—according to his June 2017 testimony—"salacious and unverified." While the FISA application relied on Steele's past record of credible reporting on other unrelated matters, it ignored or concealed his anti-Trump financial and ideological motivations. Furthermore, Deputy Director McCabe testified before the Committee in December 2017 that no surveillance warrant would have been sought from the FISC without the Steele dossier information.

# UNCLASSIFIED

TOP SECRET//NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET//NOFORN

5) The Page FISA application also mentions information regarding fellow Trump campaign advisor George Papadopoulos, but there is no evidence of any cooperation or conspiracy between Page and Papadopoulos. The Papadopoulos information triggered the opening of an FBI counterintelligence investigation in late July 2016 by FBI agent Pete Strzok. Strzok was reassigned by the Special Counsel's Office to FBI Human Resources for improper text messages with his mistress, FBI Attorney Lisa Page (no known relation to Carter Page), where they both demonstrated a clear bias against Trump and in favor of Clinton, whom Strzok had also investigated. The Strzok/Lisa Page texts also reflect extensive discussions about the investigation, orchestrating leaks to the media, and include a meeting with Deputy Director McCabe to discuss an "insurance" policy against President Trump's election.

# UNCLASSIFIED

TOP SECRET//NOFORN

# EXHIBIT "C"



CHAIRMAN CHARLES E. GRASSLEY, IOWA

ORRIN G. HATCH, UTAH
LINDSEY O. GRAHAM, SOUTH CAROLINA
JOHN CORNYN, TEXAS
MICHAEL S. LEE, UTAH
TED CRUZ, TEXAS
BEN SASSE, NEBRASKA
JEFF FLAKE, ARIZONA
MIKE CRAPO, IDAHO
THOM TILLIS, NORTH CAROLINA
JOHN KENNEDY, LOUISIANA

DIANNE FEINSTEIN, CALIFORNIA
PATRICK J. LEAHY, VERMONT
RICHARD J. DURBIN, ILLINOIS
SHELDON WHITEHOUSE, RHODE ISLAND
AMY KLOBUCHAR, MINNESOTA
AL FRANKEN, MINNESOTA
CHRISTOPHER A. COONS, DELAWARE
RICHARD BLUMENTHAL, CONNECTICUT
MAZIE K. HIRONO, HAWAII

KOLAN DAVIS, Chief Counsel and Staff Director
JENNIFER DUCK, Democratic Staff Director

## United States Senate

COMMITTEE ON THE JUDICIARY

WASHINGTON, DC 20510-6275

January 4, 2018

**VIA ELECTRONIC TRANSMISSION**

The Honorable Rod J. Rosenstein
Deputy Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

The Honorable Christopher A. Wray
Director
Federal Bureau of Investigation
935 Pennsylvania Avenue, NW
Washington, DC 20535

Dear Deputy Attorney General Rosenstein and Director Wray:

Attached please find a classified memorandum related to certain communications between Christopher Steele and multiple U.S. news outlets regarding the so-called "Trump dossier" that Mr. Steele compiled on behalf of Fusion GPS for the Clinton Campaign and the Democratic National Committee and also provided to the FBI.

Based on the information contained therein, we are respectfully referring Mr. Steele to you for investigation of potential violations of 18 U.S.C. § 1001, for statements the Committee has reason to believe Mr. Steele made regarding his distribution of information contained in the dossier.

Thank you for your prompt attention to this important matter.  If you have any questions, please contact Patrick Davis or DeLisa Lay of Chairman Grassley's staff at (202) 224-5225.

Sincerely,

Charles E. Grassley
Chairman
Committee on the Judiciary

Lindsey O. Graham
Chairman
Subcommittee on Crime and Terrorism
Committee on the Judiciary

Enclosure: As stated.

Deputy Attorney General Rosenstein and Director Wray
January 4, 2018
Page 2 of 2

cc:    The Honorable Dianne Feinstein
Ranking Member
Committee on the Judiciary

The Honorable Richard Burr
Chairman
Senate Select Committee on Intelligence

The Honorable Mark Warner
Vice Chairman
Senate Select Committee on Intelligence

The Honorable Devin Nunes
Chairman
House Permanent Select Committee on Intelligence

The Honorable Adam Schiff
Ranking Member
House Permanent Select Committee on Intelligence

**MEMORANDUM**

(U)  FROM:  Charles E. Grassley, Chairman, U.S. Senate Committee on the Judiciary
Lindsey O. Graham, Chairman, Subcommittee on Crime and Terrorism,
U.S. Senate Committee on the Judiciary

TO:  The Honorable Rod J. Rosenstein, Deputy Attorney General, U.S.
Department of Justice

The Honorable Christopher A. Wray, Director, Federal Bureau of
Investigation

RE:  Referral of Christopher Steele for Potential Violation of 18 U.S.C. § 1001

(U) As you know, former British Intelligence Officer Christopher Steele was hired by the private firm Fusion GPS in June 2016 to gather information about "links between Russia and [then-presidential candidate] Donald Trump."[1]  Pursuant to that business arrangement, Mr. Steele prepared a series of documents styled as intelligence reports, some of which were later compiled into a "dossier" and published by *BuzzFeed* in January 2017.[2]  On the face of the dossier, it appears that Mr. Steele gathered much of his information from Russian government sources inside Russia.[3]  According to the law firm Perkins Coie, Mr. Steele's dossier-related efforts were funded through Fusion GPS by that law firm on behalf of the Democratic National Committee and the Clinton Campaign.[4]

(U) In response to reporting by the *Washington Post* about Mr. Steele's relationship with the FBI relating to this partisan dossier project, the Judiciary Committee began raising a series of questions to the FBI and the Justice Department about these matters as part of the Committee's constitutional oversight responsibilities.[5]

(U) The FBI has since provided the Committee access to classified documents relevant to the FBI's relationship with Mr. Steele and whether the FBI relied on his dossier work.  As explained in greater detail below, when information in those classified documents is evaluated in light of sworn statements by Mr. Steele in British litigation, it appears that either Mr. Steele lied to the FBI or the British court, or that the classified documents reviewed by the Committee contain materially false statements.

[1] (U) Defence, *Gubarev et. Al v. Orbis Business Intelligence Limited and Christopher Steele*, Claim No. HQ17D00413, Queen's Bench (Apr. 4, 2017), para. 9 [Hereinafter "Steele Statement 1"] [Attachment A].
[2] (U) *Id.* at para. 10; Ken Bensinger, Miriam Elder, and Mark Schoofs, *These Reports Allege Trump Has Deep Ties to Russia*, BUZZFEED (Jan. 10, 2017).
[3] (U) *Id.*
[4] (U) Adam Entous, Devlin Barrett and Rosalind S. Helderman, *Clinton Campaign, DNC Paid for Research that Led to Russia Dossier*, THE WASHINGTON POST (Oct. 24, 2017).
[5] (U) Tom Hamburger and Rosalind S. Helderman, *FBI Once Planned to Pay Former British Spy who Authored Controversial Trump Dossier*, THE WASHINGTON POST (Feb. 28, 2017).



(U) In response to the Committee's inquiries, the Chairman and Ranking Member received a briefing on March 15, 2017, from then-Director James B. Comey, Jr.

█████████ That briefing addressed the Russia investigation, the FBI's relationship with Mr. Steele, and the FBI's reliance on Mr. Steele's dossier in two applications it filed for surveillance under the Foreign Intelligence Surveillance Act (FISA). Then, on March 17, 2017, the Chairman and Ranking Member were provided copies of the two relevant FISA applications, which requested authority to conduct surveillance of Carter Page. Both relied heavily on Mr. Steele's dossier claims, and both applications were granted by the Foreign Intelligence Surveillance Court (FISC). In December of 2017, the Chairman, Ranking Member, and Subcommittee Chairman Graham were allowed to review a total of four FISA applications relying on the dossier to seek surveillance of Mr. Carter Page, as well as numerous other FBI documents relating to Mr. Steele.

█████████ In the March 2017 briefing with then-Director Comey, he stated that ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

(U) Similarly, in June 2017, former FBI Director Comey testified publicly before the Senate Select Committee on Intelligence that he had briefed President-Elect Trump on the dossier allegations in January 2017, which Mr. Comey described as "salacious" and "unverified."[6]

█████████ When asked at the March 2017 briefing why the FBI relied on the dossier in the FISA applications absent meaningful corroboration—and in light of the highly political motives surrounding its creation—then-Director Comey stated that the FBI included the dossier allegations about Carter Page in the FISA applications because Mr. Steele himself was considered reliable due to his past work with the Bureau.

█████████ Indeed, the documents we have reviewed show that the FBI took important investigative steps largely based on Mr. Steele's information—and relying heavily on his credibility. Specifically, on October 21, 2016, the FBI filed its first warrant application under FISA for Carter Page. ██████████████████ The bulk of the application consists of allegations against Page that were disclosed to the FBI by Mr. Steele and are also outlined in the Steele dossier. The application appears to contain no additional information corroborating the dossier allegations against Mr. Page, although it does cite to a news article that appears to be sourced to Mr. Steele's dossier as well.

---

[6] (U) Statement of James B. Comey, Jr., Hearing of the U.S. Sen. Select Comm. on Intelligence (June 8, 2017).

███████████████

███████ The FBI discussed the reliability of this unverified information provided by Mr. Steele in footnotes 8 and 18 of the FISA warrant application. First, the FBI noted to a vaguely limited extent the political origins of the dossier. In footnote 8 the FBI stated that the dossier information was compiled pursuant to the direction of a law firm who had hired an "identified U.S. person"—now known as Glenn Simpson of Fusion GPS—███████████████ ████████████████████████████████████ The application failed to disclose that the identities of Mr. Simpson's ultimate clients were the Clinton campaign and the DNC.

███████ The FBI stated to the FISC that "based on [Steele's] previous reporting history with the FBI, whereby [Steele] provided reliable information to the FBI, the FBI believes [Steele's] reporting to be credible." In short, it appears the FBI relied on admittedly uncorroborated information, funded by and obtained for Secretary Clinton's presidential campaign, in order to conduct surveillance of an associate of the opposing presidential candidate. It did so based on Mr. Steele's personal credibility and presumably having faith in his process of obtaining the information.

(U) But there is substantial evidence suggesting that Mr. Steele materially misled the FBI about a key aspect of his dossier efforts, one which bears on his credibility.



███████ Yet the FISA applications note the existence of a news article dated September 23, 2016, which in particular contained some of the same dossier information about Mr. Page compiled by Mr. Steele and on which the FBI relied in its application. While not explicitly stated, this is presumably the article by Michael Isikoff of *Yahoo News*, titled "U.S. Intel Officials Probe Ties Between Trump Adviser and Kremlin." ████████████████████████████████████, the application attempts to explain away the inconsistency between Mr. Steele's assertion to the FBI and the existence of the article, apparently to shield Mr. Steele's credibility on which it still relied for the renewal request. The application to the FISC said: "Given that the information contained in the September 23rd news article generally matches the information about Page that [Steele] discovered doing his/her research, ███████ █████ █████████████████

---

7 ██████ The FBI has failed to provide the Committee the 1023s documenting all of Mr. Steele's statements to the FBI, so the Committee is relying on the accuracy of the FBI's representation to the FISC regarding those statements.

██████

████████████████ ***The FBI does not believe*** that [Steele] directly provided this information to the press" (emphasis added).

███████ In footnote 9 of its January 2017 application to renew the FISA warrant for Mr. Page, the FBI again addressed Mr. Steele's credibility. At that time, the FBI noted that it had suspended its relationship with Mr. Steele in October 2016 because of Steele's "unauthorized disclosure of information to the press." The FBI relayed that Steele had been bothered by the FBI's notification to Congress in October 2016 about the reopening of the Clinton investigation, and as a result "[Steele] independently and against the prior admonishment from the FBI to speak only with the FBI on this matter, released the reporting discussed herein [dossier allegations against Page] to an identified news organization." However, the FBI continued to cite to Mr. Steele's past work as evidence of his reliability, and stated that "the incident that led to the FBI suspending its relationship with [Mr. Steele] occurred after [Mr. Steele] provided" the FBI with the dossier information described in the application. The FBI further asserted in footnote 19 that it did not believe that Steele directly gave information to *Yahoo News* that "published the September 23 News Article."

███████ So, as documented in the FISA renewals, the FBI still seemed to believed Mr. Steele's earlier claim that he had only provided the dossier information to the FBI and Fusion— and not to the media—prior to his October media contact that resulted in the FBI suspending the relationship. Accordingly, the FBI still deemed the information he provided prior to the October disclosure to be reliable. After all, the FBI already believed Mr. Steele was reliable, he had previously told the FBI he had not shared the information with the press – and lying to the FBI is a crime. In defending Mr. Steele's credibility to the FISC, the FBI had posited an innocuous explanation for the September 23 article, based on the assumption that Mr. Steele had told the FBI the truth about his press contacts. The FBI then vouched for him twice more, using the same rationale, in subsequent renewal applications filed with the Foreign Intelligence Surveillance Court in April and June 2017.

(U) However, public reports, court filings, and information obtained by the Committee during witness interviews in the course of its ongoing investigation indicate that Mr. Steele not only provided dossier information to the FBI, but also to numerous media organizations **prior to** the end of his relationship with the FBI in October 2016.[8]

(U) In Steele's sworn court filings in litigation in London, he admitted that he "gave off the record briefings to a small number of journalists about the pre-election memoranda [*i.e.*, the dossier] in late summer/autumn 2016."[9] In another sworn filing in that case, Mr. Steele further

---

[8] (U) *See* Steele Statement 1; Defendants' Response to Claimants' Request for Further Information Pursuant to CPR Part 18, *Gubarev et. Al v. Orbis Business Intelligence Limited and Christopher Steele*, Claim No. HQ17D00413, Queen's Bench (May 18, 2017), [Hereinafter "Steele Statement 2"] [Attachment B]; Tom Hamburger and Rosalind S. Helderman, *FBI Once Planned to Pay Former British Spy who Authored Controversial Trump Dossier*, THE WASHINGTON POST (Feb. 28, 2017); Simpson Transcript, on File with Sen. Comm. on the Judiciary.
[9] (U) Steele Statement 1 at para. 32.

stated that journalists from "the New York Times, the Washington Post, **Yahoo News**, the New Yorker, and CNN" were "briefed **at the end of September 2016** *by [Steele]* and Fusion at Fusion's instruction."[10] The filing further states that Mr. Steele "subsequently participated in further meetings at Fusion's instruction with Fusion and the New York Times, the Washington Post, and Yahoo News, which took place mid-October 2016."[11] According to these court filings, "[t]he briefings involved the disclosure of limited intelligence regarding indications of Russian interference in the US election process and the possible co-ordination of members of Trump's campaign team and Russian government officials."[12]  In his interview with the Committee, Glenn Simpson of Fusion GPS confirmed this account by Mr. Steele and his company as filed in the British court.[13]

▮▮▮▮▮ The first of these filings was publicly reported in the U.S. media in April of 2017, yet the FBI did not subsequently disclose to the FISC this evidence suggesting that Mr. Steele had lied to the FBI.  Instead the application still relied primarily on his credibility prior to the October media incident.

▮▮▮▮▮▮ The FBI received similar information from a Justice Department official, Bruce Ohr, who maintained contacts with Mr. Simpson and Mr. Steele about their dossier work, and whose wife also worked for Fusion GPS on the Russia project. ▮▮▮▮▮▮▮



He also noted in the same interview that Mr. Steele was "desperate" to see that Mr. Trump was not elected president.[16]  None of the information provided by Mr. Ohr in his interviews with the FBI was included in the FISA renewal applications, despite its relevance to whether Mr. Steele had lied to the FBI about his contacts with the media as well as its broader relevance to his credibility and his stated political motive.

---

[10] (U) Steele Statement 2 at para. 18. (emphasis added).
[11] ▮▮▮▮ *Id.* The filing also apparently described the media contact that resulted in the FBI's suspension of its relationship with Mr. Steele, stating: "In addition, and again at Fusion's instruction, in late October 2016 the Second Defendant briefed a journalist from Mother Jones by Skype."
[12] (U) *Id.*
[13] (U) Simpson Transcript, On File with the Sen. Comm. on the Judiciary at 205-07.
[14] ▮▮▮▮▮ Ohr FD-302 (Nov. 22, 2016).
[15] ▮▮▮▮▮ Ohr FD-302 (Dec. 12, 2016).
[16] ▮▮▮▮▮ Ohr FD-302 (Nov. 22, 2016).

██████████████████

████ Whether Mr. Steele lied to the FBI about his media contacts is relevant for at least two reasons. First, it is relevant to his credibility as a source, particularly given the lack of corroboration for his claims, at least at the time they were included in the FISA applications. Second, it is relevant to the reliability of his information-gathering efforts.

(U) Mr. Steele conducted his work for Fusion GPS compiling the "pre-election memoranda" "[b]etween June and early November 2016."[17] In the British litigation, Mr. Steele acknowledged briefing journalists about the dossier memoranda "in late summer/autumn 2016."[18] Unsurprisingly, during the summer of 2016, reports of at least some of the dossier allegations began circulating among reporters and people involved in Russian issues.[19] Mr. Steele also admitted in the British litigation to briefing journalists from the *Washington Post*, *Yahoo News*, the *New Yorker*, and *CNN* in September of 2016.[20] Simply put, the more people who contemporaneously knew that Mr. Steele was compiling his dossier, the more likely it was vulnerable to manipulation. In fact, in the British litigation, which involves a post-election dossier memorandum, Mr. Steele admitted that he received and included in it *unsolicited*—and unverified—allegations.[21] That filing implies that he similarly received unsolicited intelligence on these matters prior to the election as well, stating that Mr. Steele "*continued to receive unsolicited intelligence*" on the matters covered by the pre-election memoranda after the US Presidential election."[22]

████████████████████████████████████
█████████████████████████████████████
████████████████████████████████
██████████████████████

(U) One memorandum by Mr. Steele that was not published by *Buzzfeed* is dated October 19, 2016. The report alleges ██████████████████, as well as ████ ████. Mr. Steele's memorandum states that his company "received this report from ████ ████, US State Department," that the report was the second in a series, and that the report was information that came from a foreign sub-source who "is in touch with ████████, a contact of ████████, a friend of the Clintons, who passed it to ████." It is troubling enough that the Clinton Campaign funded Mr. Steele's work, but that these Clinton associates were contemporaneously feeding Mr. Steele allegations raises additional concerns about his credibility.

---

[17] (U) Steele Statement 1 at para. 9.
[18] (U) Steele Statement 1 at para. 32
[19] (U) Ahkmetshin Transcript, On File with the Sen. Comm. on the Judiciary (Mr. Ahkmetshin informed the Committee that he began hearing from journalists about the dossier before it was published, and thought it was the summer of 2016).
[20] (U) Steele Statement 2 at para. 18 (emphasis added).
[21] (U) Steele Statement 1 at para. 18 and 20c.
[22] (U) *Id*.; *see* Steele Statement 2 at 4 ("Such intelligence was not actively sought, it was merely received.")

████████████████

███████

███████

████ Simply put, Mr. Steele told the FBI he had not shared the Carter Page dossier information beyond his client and the FBI. The Department repeated that claim to the FISC. Yet Mr. Steele acknowledged in sworn filings that he did brief *Yahoo News* and other media organizations about the dossier around the time of the publication of the *Yahoo News* article that seems to be based on the dossier.

(U) On September 23, 2016, *Yahoo News* published its article entitled "U.S. Intel Officials Probe Ties Between Trump Adviser and Kremlin."[23] That article described claims about meetings between Carter Page and Russians, including Igor Sechin. Mr. Sechin is described in the article as "a longtime Putin associate and former Russian deputy prime minister" under sanction by the Treasury Department in response to Russia's actions in the Ukraine.[24] The article attributes the information to "a well-placed Western intelligence source," who reportedly said that "[a]t their alleged meeting, Sechin raised the issue of the lifting of sanctions with Page."[25] This information also appears in multiple "memoranda" that make up the dossier.[26]

(U) In sum, around the same time *Yahoo News* published its article containing dossier information about Carter Page, *Mr. Steele and* Fusion GPS had briefed *Yahoo News* and other news outlets about information contained in the dossier.

████ These facts appear to directly contradict the FBI's assertions in its initial application for the Page FISA warrant, as well as subsequent renewal applications. The FBI repeatedly represented to the court that Mr. Steele told the FBI he did *not* have unauthorized contacts with the press about the dossier prior to October 2016. The FISA applications make these claims specifically in the context of the September 2016 *Yahoo News* article. But Mr. Steele has admitted—publicly before a court of law—that he *did* have such contacts with the press at this time, and his former business partner Mr. Simpson has confirmed it to the Committee. Thus, the FISA applications are either materially false in claiming that Mr. Steele said he did not provide dossier information to the press prior to October 2016, or Mr. Steele made materially false statements to the FBI when he claimed he only provided the dossier information to his business partner and the FBI.

████ In this case, Mr. Steele's apparent deception seems to have posed significant, material consequences on the FBI's investigative decisions and representations to the court. Mr. Steele's information formed a significant portion of the FBI's warrant application, and the FISA application relied more heavily on Steele's credibility than on any independent verification or corroboration for his claims. Thus the basis for the warrant authorizing surveillance on a U.S. citizen rests largely on Mr. Steele's credibility. The Department of Justice has a responsibility to

[23] (U) Michael Isikoff, *U.S. Intel Officials Probe Ties Between Trump Adviser and Kremlin*, YAHOO NEWS (Sept. 23, 2016).
[24] (U) *Id.*
[25] (U) *Id.*
[26] (U) Bensinger *et. al*, BUZZFEED.

███████

7

██████████

determine whether Mr. Steele provided false information to the FBI and whether the FBI's representations to the court were in error.

(U) Accordingly, we are referring Christopher Steele to the Department of Justice for investigation of potential violation(s) of 18 U.S.C. § 1001.

██████████

8