# EXHIBIT "A"

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 17-cv-60426-UU**

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.

    Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

    Defendants.

_____/

## SECOND AMENDED ANSWER OF DEFENDANTS BUZZFEED, INC. AND BEN SMITH TO PLAINTIFFS' COMPLAINT FOR DAMAGES

    Defendants BuzzFeed, Inc. and Ben Smith ("Smith" and collectively, "Defendants"),

answer the Complaint for Damages (the "Complaint") of Plaintiffs Aleksej Gubarev

("Gubarev"), XBT Holding S.A. ("XBT"), and Webzilla, Inc. ("Webzilla," and collectively,

"Plaintiffs") as follows, using the same headings and paragraph numbering employed by

Plaintiffs:

### INTRODUCTORY STATEMENT

    1.    Defendants admit that on January 10, 2017, BuzzFeed published an article

entitled *These Reports Allege Trump Has Deep Ties to Russia* (the "Article"), accompanied by a

35-page page intelligence dossier (the "Dossier"). Defendants respectfully refer the Court to the

Article and Dossier (attached to the Complaint as Exhibits 2 and 3) for their true content and

meaning. Except as so referred and admitted, Defendants deny each and every allegation in

paragraph 1 of the Complaint.

1

2.     Defendants respectfully refer the Court to the Article and Dossier for their true content and meaning, and except as so referred, Defendants deny each and every allegation in paragraph 2 of the Complaint.

3.     Defendants respectfully refer the Court to the Article and the Dossier for their true content and meaning, admit that they did not contact Plaintiffs prior to publishing the Dossier, and except as so admitted deny each and every allegation in paragraph 3 of the Complaint.

4.     Defendants admit that the Article had nearly six million total non-unique page views as of February 3, 2017, and that BuzzFeed published additional articles about the Dossier containing links back to the Article and Dossier.  Except as so admitted, Defendants deny each and every allegation in paragraph 4 of the Complaint.

5.     Paragraph 5 of the Complaint contains legal conclusions that require no response, and factual allegations for which Defendants lack sufficient information to form a belief as to the truth or falsity thereof, and on that basis deny.

## PARTIES

6.     Defendants lack sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 6 of the Complaint, and on that basis deny each and every one of them.

7.     Defendants admit that XBT is incorporated in Luxembourg, deny that it has offices in Florida, and lack sufficient information to form a belief as to the truth or falsity of the remaining allegations in paragraph 7 of the Complaint, and on that basis deny each and every one of them.

8.     Defendants admit that Webzilla is incorporated in Florida, but, except as so admitted, deny each and every allegation in paragraph 8 of the Complaint.

9.     Defendants admit the allegations in paragraph 9 of the Complaint.

2

10.     Defendants admit that Smith resides in Brooklyn, New York, and is Editor-in-Chief of BuzzFeed News.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

11.     Paragraph 11 of the Complaint contains legal conclusions that require no response.  To the extent that any response is required, Defendants do not contest this Court's subject-matter jurisdiction.

12.     Paragraph 12 of the Complaint contains legal conclusions that require no response.  To the extent that any response is required, Defendants deny each and every allegation in paragraph 12, and specifically deny that this Court has personal jurisdiction over either of them.

13.     Paragraph 13 of the Complaint contains legal conclusions that require no response.  To the extent that any response is required, Defendants deny each and every allegation in paragraph 13, and specifically deny that this Court has personal jurisdiction over either of them, in whole or in part.

14.     Paragraph 14 of the Complaint contains legal conclusions that require no response.  To the extent that any response is required, Defendants deny each and every allegation in paragraph 14.

15.     Paragraph 15 of the Complaint contains legal conclusions that require no response.  To the extent that any response is required, Defendants admit that Plaintiffs sent the letter referred to in paragraph 15 and, except as so admitted, deny each and every allegation in paragraph 15.

## FACTUAL ALLEGATIONS

16.     Defendants lack sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 16 of the Complaint, and on that basis deny each and every one of them.

17.     Defendants lack sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 17 of the Complaint, and on that basis deny each and every one of them.

18.     Paragraph 18 of the Complaint contains legal conclusions that require no response, and factual allegations for which Defendants lack sufficient information to form a belief as to the truth or falsity thereof, and on that basis deny.

19.     Defendants admit that Webzilla is incorporated in Florida, deny that Webzilla has an office in Fort Lauderdale, Florida, and lack sufficient information to form a belief as to the truth or falsity of the remaining allegations in paragraph 19 of the Complaint, and on that basis deny each and every one of them.

20.     Defendants lack sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 20 of the Complaint, and on that basis deny each and every one of them.

21.     Defendants lack sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 21 of the Complaint, and on that basis deny each and every one of them.

22.     Defendants lack sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 22 of the Complaint, and on that basis deny each and every one of them.

4842-6865-4673v.6 0100812-000009

23.     Defendants admit that they published the Article on January 10, 2017, and respectfully refer the Court to the Article and the Dossier for their true content and meaning. Defendants also admit that the Article had more than 5.9 million total non-unique page views as of February 3, 2017.  Except as so admitted, Defendants deny each and every remaining allegation in paragraph 23 of the Complaint.

24.     Defendants admit that they published the Dossier along with the Article.  Except as so admitted, Defendants deny each and every remaining allegation in paragraph 24 of the Complaint.

25.     Defendants respectfully refer the Court to the Article and Dossier for their true content and meaning.  Except as so referred, Defendants deny each and every remaining allegation in paragraph 25 of the Complaint.

26.     Defendants admit that the Dossier included the words quoted in paragraph 26 of the Complaint.  Except as so admitted, Defendants deny each and every remaining allegation in paragraph 26.

27.     Defendants lack sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 27 of the Complaint, and on that basis deny each and every one of them.

28.     Defendants admit that they have not contacted Gubarev regarding the allegations in the Dossier.  Defendants lack sufficient information to form a belief as to the truth or falsity of the remaining allegations in paragraph 28 of the Complaint, and on that basis deny each and every one of them.

29.     Defendants admit that the Article contained the words quoted in paragraph 29 of the Complaint, respectfully refer the Court to the Article and the Dossier for their true content

5

and meaning.  Except as so admitted, Defendants deny each and every remaining allegation in paragraph 29.

30.     Defendants deny each and every allegation in paragraph 30 of the Complaint.

31.     Defendants admit that, in an interview with MSNBC's MTP Daily aired on or about January 11, 2017 (the "MSNBC Interview"), Mr. Smith stated "Once…it emerges, as it did last night, in the public conversation that there is this secret document floating around, full of dark allegations that we will not repeat to you.  That I feel like, in this era, you really have to show your readers what that is, in an appropriate context. And our original report, I mean, if you read what we wrote, it stressed that there were real solid reasons to distrust this.  It noted two specific errors," and respectfully refer the Court to that interview for its true content and meaning.  Except as so admitted, Defendants deny each and every remaining allegation in paragraph 31 of the Complaint.

32.     Defendants admit that they did not redact the words "XBT/Webzilla" OR "Aleksei GUBAROV" from the Dossier when they initially published it.  Except as so admitted, Defendants deny each and every remaining allegation in paragraph 32 of the Complaint.

33.     Defendants admit that BuzzFeed's publication of the Article and Dossier touched off debate about the appropriateness of publishing the Dossier, with journalists and journalism experts taking both sides of the debate.  Except as so admitted, Defendants deny each and every remaining allegation in paragraph 33 of the Complaint.

34.     Defendants admit that BuzzFeed has published a number of additional articles related to the Dossier and that some of those articles contain links to the Article and Dossier. Except as so admitted, Defendants deny each and every remaining allegation in paragraph 34 of the Complaint.

6

30. The paragraph immediately following paragraph 34 of the Complaint is misnumbered paragraph 30. Defendants admit that Mr. Smith published an article in the *New York Times* on January 23, 2017, entitled *Why BuzzFeed News Published the Dossier* (the "New York Times Article") and that he discussed BuzzFeed's decision to publish the Dossier in television interviews. Defendants respectfully refer the Court to the New York Times Article and the other unspecified interviews referred to in the misnumbered paragraph 30 for their true content and meaning. Except as so referred and admitted, Defendants deny each and every remaining allegation in this paragraph.

35. Defendants admit that in the New York Times Article, Mr. Smith wrote that "BuzzFeed News decided to publish the dossier, with appropriate context and caveats…only after we had spent weeks with reporters in the United States and Europe trying to confirm or disprove specific claims," and respectfully refer the Court to that article for its true content and meaning. Except as so referred and admitted, Defendants deny each and every remaining allegation in paragraph 35 of the Complaint.

36. Defendants admit that, in January 15, 2017 interview with CNN's Reliable Sources, Mr. Smith stated that "we, like you, I think like you, like certainly other outlets who we ran across in the reporting, we're staking out places where we thought we could get information in Europe. We're running it down every way we could." Defendants also admit that Mr. Smith stated in the MSNBC Interview that "we, like many other organizations, had had it for weeks. We had reporters in Europe and the United States trying to stand up or knock down specific details." Defendants respectfully refer the Court to both of those interviews for their true content and meaning, and, except as so referred and admitted, Defendants deny each and every remaining allegation in paragraph 36 of the Complaint.

7

37.     Defendants admit that Mr. Smith wrote an article published in the Columbia Journalism Review November 17, 2016 entitled *How tech and media can fight fake news*, and that the article included the words in the block quotation in paragraph 37 of the Complaint. Defendants respectfully refer the Court to that article for its true and content and meaning, and, except as so referred and admitted, Defendants deny each and every remaining allegation in paragraph 37 of the Complaint.

### COUNT I – DEFAMATION AND DEFAMATION PER SE

38.     Defendants repeat and reallege each and every admission, denial, and referral made in response to paragraphs 1 through 37 of the Complaint (including the misnumbered paragraph 30) as if made in response to paragraph 38 of the Complaint.

39.     Defendants deny each and every allegation in paragraph 39 of the Complaint.

40.     Defendants deny each and every allegation in paragraph 40 of the Complaint.

41.     Defendants deny each and every allegation in paragraph 41 of the Complaint.

42.     Paragraph 42 of the Complaint contains legal conclusions that require no response.  To the extent that any response is required, Defendants deny each and every allegation in paragraph 42.

43.     Defendants deny each and every allegation in paragraph 43 of the Complaint.

44.     Defendants deny each and every allegation in paragraph 44 of the Complaint.

45.     Defendants deny each and every allegation in paragraph 45 of the Complaint.

46.     Defendants deny each and every allegation in paragraph 46 of the Complaint.

47.     Defendants deny each and every allegation in paragraph 47 of the Complaint.

48.     Defendants deny each and every allegation in paragraph 48 of the Complaint.

49.     Defendants deny each and every allegation in paragraph 49 of the Complaint.

8

50.     Defendants deny each and every allegation in paragraph 50 of the Complaint.

51.     Defendants deny each and every allegation in paragraph 51 of the Complaint, deny that Plaintiffs are entitled to an award of punitive damages, and further deny that Florida law applies to this case.

Defendants deny each and every allegation in the Complaint not expressly admitted herein.

### AFFIRMATIVE DEFENSES

#### First Defense

This Court does not have personal jurisdiction over Defendants, in whole or in part.  By pleading and preserving this defense, Defendants are not in any way agreeing or conceding that they have the burden of proof or the burden of persuasion on it.

#### Second Defense

Defendants' publication of the allegedly defamatory statements in the Dossier, within the context of the Article, is protected by the fair report privilege pursuant to New York Civil Rights Law § 74  and/or the New York state constitution.  In the alternative, Defendants' publication of the allegedly defamatory statements is protected by the fair report privilege pursuant to Florida common law and/or the Florida constitution, or Texas law pursuant to Tex. Civ. Prac. & Rem. Code § 73.002(b)(1) and the Texas constitution.

1.     The Dossier was compiled by Christopher Steele, a former MI6 agent who had been one of that agency's leading Russia experts.  After Steele retired from government service he founded Orbis Business Intelligence Service, based in London.  Steele is also a longtime FBI source with a track record of providing credible information to the Bureau.  He has provided credible information used by the State Department.  In 2016 Fusion GPS, a private research firm

9

headed by former *Wall Street Journal* reporter Glenn Simpson, was retained to conduct opposition research on then-candidate Donald Trump – first by a Republican-leaning client, and then by a law firm working for the Democratic National Committee. Fusion retained Orbis to conduct some of that research. As part of his investigation, Steele began receiving information that the Russian government was engaging in cyber-crime to interfere in the 2016 Presidential election to support Donald Trump; that the Trump campaign was cooperating with those efforts; and that the Russian government held compromising information on Trump.

2.      Steele decided to share his research with the FBI, and became an FBI source as he researched and wrote the Dossier, which consisted of periodic, short memos. The FBI had opened an investigation on Russian interference in the U.S. elections, and used Steele's reports to assist with its investigation. Steele met with the FBI in person in or around July 2016, and again in October 2016. The FBI investigated the allegations set out in his reports over the second half of 2016, and continued to do so in 2017.

3.      In September 2016 Steele also met with Jonathan Winer, an official at the State Department, and shared with him the reports he had written up to that point. Winer wrote a summary of those reports and briefed other State Department officials about them, including Victoria Nuland, then Assistant Secretary of State for European and Eurasian Affairs. Previously, Steele had provided more than 100 reports reviewed by State Department Russia experts.[1]

4.      In October 2016, the Department of Justice and the FBI used information from Steele's reports, as well as other sources, to obtain a warrant from the Foreign Intelligence

---

[1] *See* Jonathan M. Winer, "Devin Nunes is investigating me. Here's the truth," Washington Post (Feb. 8, 2018), available at https://www.washingtonpost.com/opinions/devin-nunes-is-investigating-me-heres-the-truth/2018/02/08/cc621170-0cf4-11e8-8b0d-891602206fb7_story.html?utm_term=.207e66c323aa.

10

Surveillance Court (the "FISC") to conduct surveillance on Carter Page, a Trump advisor.[2]  The FBI told the FISC that "based on [Steele's] previous reporting history with the FBI, whereby [Steele] provided reliable information to the FBI, the FBI believes [Steele's] reporting to be credible."[3]  And the FBI again cited Steele's reliability in its January 2017 application to renew the FISA warrant for Page.[4]

5.       In the summer and fall of 2016, Steele was also in contact with the Department of Justice via then-Associate Attorney General Bruce Ohr, a senior Department official who worked closely with the Deputy Attorney General.[5]

6.       The actions of the Department of Justice and the FBI in obtaining, investigating, and using the allegations the Dossier and the allegations in it were within their prescribed law enforcement duties.  The same is true with respect to the actions of officials at the State Department.  They were empowered to undertake the actions that they did in connection with the Dossier

7.       The Dossier also became the subject of other official actions.  Prior to the November 2016 election, then-minority leader Senator Harry Reid was briefed on its contents.  On October 30, 2016 Senator Reid wrote a public letter to then-FBI Director James Comey, stating that "In my communications with you and other top officials in the national security community, it has become clear that you possess explosive information about close ties and coordination between Donald Trump, his top advisors, and the Russian government," and he

---

[2] *See* Exhibit 1 (Jan. 4, 2018 Memorandum from Sen. Charles E. Grassley and Sen. Lindsey O. Graham to Deputy Attorney Gen. Rod J. Rosenstein and FBI Director Christopher A. Wray [Declassified]), at 2; Exhibit 2 (Jan. 18, 2018 Memorandum from HPSCI Majority Staff to HPSCI Majority Members [Unclassified]), at 2.

[3] Ex. 1 at 3.

[4] Ex. 1 at 4.

[5] Ex. 1 at 5; Ex. 2 at 3.

11

urged Director Comey to make that information public.[6] Senator Reid's letter was referring to the Dossier. His actions were undertaken in his official capacity as a United States Senator.

8.      In November 2016, United States Senator John McCain attended a conference on international affairs in Canada. Senator McCain attended the conference in his capacity as a United States Senator. At that conference Sir Andrew Wood, a former ambassador to Russia from the United Kingdom, discussed the existence of Steele's research with Senator McCain. Senator McCain subsequently asked David Kramer, a former Assistant Secretary of State and Russia expert then serving as senior director of the McCain Institute at Arizona State University, to go to London to meet Steele, which he did and gave the Dossier to Senator McCain.[7]

9.      As the Article reported, on or about December 9, 2016, Senator McCain delivered a copy of the Dossier to FBI Director Comey.

10.      Senator McCain's actions were within the prescribed duties of a United States Senator, and he was officially empowered to undertake the actions that he did with the Dossier. David Kramer was also acting on Senator McCain's behalf in connection with the Dossier.

11.      Separately, Glenn Simpson met with Bruce Ohr to discuss the information in the Dossier.[8]

12.      On or around December 13, 2016 Steele wrote a final report (the "December Memo"). Steele sent the December Memo to Kramer through Fusion so that it would also be

---

[6] See Exhibit 3 (Oct. 30, 2016 Letter from Sen. Harry Reid to FBI Director James Comey).

[7] See, e.g., Luke Harding, "How Trump Walked Into Putin's Web," The Guardian (Nov. 15, 2017), available at https://www.theguardian.com/news/2017/nov/15/how-trump-walked-into-putins-web-luke; Howard Blum, "How Ex-Spy Christopher Steele Compiled His Explosive Trump-Russia Dossier," Vanity Fair (April 2017), available at https://www.vanityfair.com/news/2017/03/how-the-explosive-russian-dossier-was-compiled-christopher-steele.

[8] See Nov. 14, 2017 Testimony of Glenn Simpson before the U.S. House Permanent Select Committee on Intelligence [Unclassified], at 78 (available at http://docs.house.gov/meetings/IG/IG00/20180118/106796/HMTG-115-IG00-20180118-SD002.pdf).

delivered to Senator McCain. Steele sent the memo to Kramer because he understood that Kramer was acting for Senator McCain.[9]

13.    On January 6, 2017, James Comey (then Director of the FBI), John Brennan (then Director of the CIA), James Clapper (then Director of National Intelligence) and Michael Rogers (Director of the National Security Agency) briefed President Obama and Vice-President Biden about the Dossier, and delivered a two-page synopsis of it. Director Clapper later confirmed those briefings were conducted pursuant to the Intelligence Community's "obligation [] to ensure that policymakers are provided with the fullest possible picture of any matters that might affect national security."[10] Director Comey briefed President-elect Trump because the document "implicated the FBI's counter-intelligence responsibilities," and "to the extent there was some effort to compromise an incoming President, we could blunt any such effort with a defensive briefing."[11] Top Congressional leaders, including the chairpersons and ranking members of the House and Senate intelligence committees, were also given a summary of the Dossier.

14.    Each of these briefings was activities within the prescribed duties of public bodies and public officials, who were officially empowered to undertake the actions they did.

15.    As with Steele's previous reports, the December memo was also obtained by officials at the White House, members of Congress, and upon information and belief other government agencies including the Department of Justice.

---

[9] *See* Julian Borger, "UK was given details of alleged contacts between Trump campaign and Moscow," The Guardian (Apr. 28, 2017), available at https://www.theguardian.com/us-news/2017/apr/28/trump-russia-intelligence-uk-government-m16-kremlin.

[10] *See* DNI Clapper Statement on Conversation with President-Elect Trump (Jan. 11, 2017), available at https://www.dni.gov/index.php/newsroom/press-releases/item/1736-dni-clapper-statement-on-conversation-with-president-elect-trump.

[11] *See* Statement for the Record by James B. Comey before the Senate Select Committee on Intelligence (June 8, 2017), available at https://www.intelligence.senate.gov/sites/default/files/documents/os-jcomey-060817.pdf.

16.     Defendants obtained the Dossier in late December 2016.  Defendants had first learned of the Dossier's existence earlier that month and were aware that it was authored by Steele and in the possession of the FBI.

17.     Defendants also learned about Senator McCain's actions with respect to the Dossier.  Defendants understood that the FBI was investigating the Dossier and that Senator Reid's October 30 letter referred to the Dossier.

18.     Once BuzzFeed obtained the Dossier, a number of BuzzFeed journalists investigated different allegations within it to try to verify or disprove them.

19.     The Dossier was provided by a government source.

20.     On January 10, 2017 CNN broke a story that summarized the Dossier's most dramatic allegations, reported about the briefings of the President and President-elect, and reported that the FBI was investigating its contents.  Defendants concluded that since official action with the Dossier had reached the highest levels of government, it should be published.  Later that evening, BuzzFeed published the Article along with an embedded PDF of the 35-page Dossier.

21.     The Dossier that was embedded in the Article was republished verbatim, including the allegedly defamatory statements about the Plaintiffs.

22.     The Article reported on multiple ways in which the Dossier was the subject of activity within the prescribed duties of public bodies and public officials, who were officially empowered to undertake the actions with respect to the Dossier referenced in the Article, including activity that took place after the December Memorandum was included within the Dossier.

23.     The Article reported that a two-page synopsis of the Dossier was given to then-President Obama and President-elect Trump.  The Article also contained a hyperlink to the CNN news report, which provided more details about those briefings. [12] The CNN report stated that the synopsis of the Dossier was appended to a report provided by US intelligence and law enforcement agencies to the President and President-elect.  It reported that the briefings were presented "by four of the senior-most US intelligence chiefs – Director of National Intelligence James Clapper, FBI Director James Comey, CIA Director John Brennan, and NSA Director Admiral Mike Rogers."

24.     The Article also reported that Senator John McCain gave the Dossier to FBI Director Comey, but that the FBI already had much of its contents.  The hyperlinked CNN report provided additional details, explaining that Senator McCain learned about the memos from a former British diplomat.  The CNN report stated that "the FBI is investigating the credibility and accuracy of these allegations," but had not yet confirmed many of the "essential details."  It also reported that the Dossier's author had provided copies directly to the FBI.

25.     The Article also contained a hyperlink to an article published on October 31, 2016 by *Mother Jones*, which reported extensively about the Dossier.[13]  That article reported that in August 2016 the FBI requested the Dossier's author to provide it with the memos he had written to that date, and that subsequently the author continued to provide the FBI with information that he developed.

26.     In each of the examples alleged in paragraphs 1-25 above of this Affirmative Defense, the Article, along with the sources to which it hyperlinked, reported about activities

---

[12] *See* Exhibit 4 (Evan Perez, Jim Sciutto, Jake Tapper, and Carl Bernstein, "Intel chiefs presented Trump with claims of Russian efforts to compromise him," CNN (Jan. 10, 2017)).

[13] *See* Exhibit 5 (David Corn, "A Veteran Spy Has Given the FBI Information Alleging a Russian Operation to Cultivate Donald Trump," Mother Jones (Oct. 31, 2016)).

15

within the prescribed duties of public bodies and public officials that focused on the Dossier, including but not limited to the White House, FBI, CIA, NSA, ODNI, the United States Senate and one or more of its committees, the United States House of Representatives and one or more of its committees, and James Comey, James Clapper, Michael Rogers, Michael Brennan, Andrew McCabe, Senators John McCain and Harry Reid, former President Obama and Vice-President Biden, President-elect Trump, Bruce Ohr, Jonathan Winer, Victoria Nuland, and numerous other government officials whose identities are currently unknown. It also concerns the activities of David Kramer, while he was acting at the request of Senator McCain. All of those persons were officially empowered to undertake their activities concerning the Dossier. In each instance, the Article's report was substantially accurate.

### **Third Defense**

Defendants' publication of the allegedly defamatory statements in the Dossier, within the context of the Article, is protected by a neutral report privilege pursuant to the common law, the First and Fourteenth Amendments to the Constitution of the United States, and the New York (or, in the alternative), Florida, or Texas constitutions.

1.      The Dossier is the product of months of research conducted by Christopher Steele, a widely-respected former officer of MI6, the United Kingdom's foreign intelligence service. In more than 20 years at MI6, Steele came to be recognized as a leading expert on Russia, serving as head of that agency's Russia desk.

2.      Steele is a longtime source of the FBI and the State Department, with a track record of providing credible information. In or around July 2016, having concluded that his findings were "sufficiently serious," he shared his research on the Dossier with the FBI, and the FBI began to investigate the allegations in his research. From that point, Steele acted as an FBI

16

source on that issue as he researched and wrote the Dossier. In or around October 2016, Steele met with the FBI again to discuss his research. Steele also met with a Justice Department prosecutor, Bruce Ohr, to share his research.

3.       In October 2016, the Department of Justice and the FBI used information from Steele's reports, as well as other sources, to obtain a warrant from the FISC to conduct surveillance on Carter Page, a Trump advisor.[14] The FBI told the FISC that "based on [Steele's] previous reporting history with the FBI, whereby [Steele] provided reliable information to the FBI, the FBI believes [Steele's] reporting to be credible."[15] And the FBI again cited Steele's reliability in its January 2017 application to renew the FISA warrant for Page.[16]

4.       Prior to October 30, 2016, then-Senate Majority Leader Harry Reid learned about the contents of the Dossier. On or about October 30, 2016, Senator Reid wrote a letter to FBI Director Comey, stating that "In my communications with you and other top officials in the national security community, it has become clear that you possess explosive information about close ties and coordination between Donald Trump, his top advisors, and the Russian government," and he urged Director Comey to make that information public.[17] Senator Reid was referring to the Dossier in his letter to Director Comey, and wrote the letter in part because he deemed the Dossier to be sufficiently credible to warrant its public release.

5.       On October 31, 2016, a well-regarded investigative reporter for *Mother Jones* published a lengthy article revealing the existence and nature of the Dossier. The article quoted a senior government official who stated that the Dossier's author, identified in the report as "a

---

[14] Ex. 1 at 2; Ex. 2 at 2.

[15] Ex. 1 at 3.

[16] Ex. 1 at 4.

[17] Ex. 3.

17

former senior intelligence officer for a Western country who specialized in Russian counterintelligence" (and who has since been identified as Christopher Steele), "has been a credible source with a proven record of providing reliable, sensitive, and important information to the US government."[18]

6.   In November 2016, United States Senator John McCain attended a conference on international affairs in Canada.  Senator McCain attended the conference in his capacity as a United States Senator.  At that conference Sir Andrew Wood, a former ambassador to Russia from the United Kingdom, discussed the existence of Steele's research with Senator McCain.  Senator McCain subsequently asked David Kramer, a former Assistant Secretary of State and Russia expert then serving as senior director of the McCain Institute at Arizona State University, to go to London to meet Steele, which he did, and he then gave the Dossier to Senator McCain.[19]

7.   As the Article reported, on or about December 9, 2016, Senator McCain delivered a copy of the Dossier to FBI Director Comey.  Senator McCain deemed it to be an important part of his official duties to do so.  In fact, Senator McCain explained to Fox News that he delivered the Dossier to the FBI because he considered the Dossier to have come from "a credible source" and that it would have been "a breach of my oath of office" to have not provided the document to the law enforcement agency.[20]

8.   On or about January 10, 2017, prior to BuzzFeed's publication of the Article and Dossier, CNN reported that then-President Obama, Vice President Biden, and then President-elect Trump were briefed on the contents of the Dossier, and were provided a two-page synopsis

---

[18] Ex. 5.

[19] *See supra* n.7.

[20] *See* "'First 100 Days' Exclusive: Will McCain Support Tillerson Despite Russia Concerns?" (Interview with Sen. John McCain [video]), Fox News (Jan. 16, 2017), available at http://insider.foxnews.com/2017/01/16/john-mccain-trump-get-better-intelligence-russia-criticism-john-brennan-cia.

18

of its contents. CNN also reported that "US intelligence agencies have now checked out the former British intelligence operative and his vast network throughout Europe and find him and his sources to be credible enough to include some of the information in the presentations to the President and President-elect a few days ago."[21]

9.      The Article also contained a hyperlink to an article published on October 31, 2016 by *Mother Jones*, which reported extensively about the Dossier.[22] That article reported that in August 2016 the FBI requested the Dossier's author – described as a "former senior intelligence officer for a Western country who specialized in Russian counterintelligence" – provide it with the memos he had written to that date, and that subsequently the author continued to provide the FBI with information that he developed. Mother Jones reported that "a senior US government official not involved in this case but familiar with the former spy tells *Mother Jones* that he has been a credible source with a proven record of providing reliable, sensitive, and important information to the US government."

10.      BuzzFeed's publication of the Dossier, within the context of the Article, was accurate and disinterested, and the Article did not endorse the allegations within the Dossier, including the allegedly defamatory statements. The Article reported that the Dossier contained allegations that were "unverified, and potentially unverifiable" and identified two known factual errors in the Dossier. The Article further reported that BuzzFeed reporters "have been investigating various alleged facts in the dossier but have not verified or falsified them."

11.      The Article and Dossier concerned newsworthy controversies which were already the subject of public interest when BuzzFeed published the Article and Dossier. Those included, but are not limited to, potential Russian interference in the 2016 Presidential election campaign

---

[21] Ex. 4.

19

and allegations that the Trump campaign had participated in that interference, and with respect to the Plaintiffs their involvement in those activities.

12.      The allegations within the Dossier were collected and written by a former British intelligence officer who multiple public officials deemed to be sufficiently credible and responsible to warrant further investigation.  BuzzFeed published the Article and Dossier only after at least two United States Senators had deemed its contents to warrant delivery to and/or investigation by the FBI.  The FBI deemed Steele and the Dossier sufficiently credible to warrant investigation, and to justify relying on the allegations from the Dossier in seeking a warrant from the Foreign Intelligence Surveillance Court

13.      The Plaintiffs are public figures.

### Fourth Defense

Defendants' publication of the allegedly defamatory statements in the Dossier, within the context of the Article, is protected by the First and Fourteenth Amendments to the Constitution of the United States, the New York Constitution, and (in the alternative), the Florida and/or Texas constitutions.

### Fifth Defense

Plaintiffs are public figures and cannot meet their burden to prove actual malice by clear and convincing evidence.

### Sixth Defense

Plaintiffs have failed to mitigate their alleged damages.

---

[22] Ex. 5.

20

### Seventh Defense

Exemplary or punitive damages are not recoverable because Defendants did not act with either common-law malice or constitutional malice.

### Eighth Defense

Any claim for exemplary or punitive damages is barred by the First and Fourteenth Amendments to the Constitution of the United States, the New York, Florida and/or Texas constitutions, and New York, Florida and/or Texas law.

**WHEREFORE**, Defendants respectfully request that:

1. Judgment be entered in their favor, and the Complaint against them be dismissed with prejudice;

2. Defendants be awarded their costs, disbursements, and attorneys' fees; and

3. The Court grant Defendants such further and other relief as is just and proper.

Dated: February 9, 2018

Respectfully submitted,

DAVIS WRIGHT TREMAINE
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Tel: (212) 489-8230

By: /s/ Katherine M. Bolger
    Katherine M. Bolger, Esq.
    Nathan Siegel, Esq.
    Adam Lazier, Esq.
    katebolger@dwt.com
    adamlazier@dwt.com
    nathansiegel@dwt.com

- and –

BLACK, SREBNICK, KORNSPAN &
STUMPF, P.A.
201 S. Biscayne Boulevard, Suite 1300

21

Miami, Florida 33131

By: /s/ Jared Lopez
     Roy Black, Esq.
     Florida Bar No. 126088
     Jared Lopez, Esq.
     Florida Bar No. 103616
     rblack@royblack.com
     jlopez@royblack.com
     civilpleadings@royblack.com
     *Counsel for Defendants*

22

# EXHIBIT 1



**United States Senate**

COMMITTEE ON THE JUDICIARY

WASHINGTON, DC 20510-6275

January 4, 2018

**VIA ELECTRONIC TRANSMISSION**

The Honorable Rod J. Rosenstein          The Honorable Christopher A. Wray
Deputy Attorney General                  Director
U.S. Department of Justice               Federal Bureau of Investigation
950 Pennsylvania Avenue, NW              935 Pennsylvania Avenue, NW
Washington, DC 20530                     Washington, DC 20535

Dear Deputy Attorney General Rosenstein and Director Wray:

    Attached please find a classified memorandum related to certain communications between Christopher Steele and multiple U.S. news outlets regarding the so-called "Trump dossier" that Mr. Steele compiled on behalf of Fusion GPS for the Clinton Campaign and the Democratic National Committee and also provided to the FBI.

    Based on the information contained therein, we are respectfully referring Mr. Steele to you for investigation of potential violations of 18 U.S.C. § 1001, for statements the Committee has reason to believe Mr. Steele made regarding his distribution of information contained in the dossier.

    Thank you for your prompt attention to this important matter.  If you have any questions, please contact Patrick Davis or DeLisa Lay of Chairman Grassley's staff at (202) 224-5225.

    Sincerely,

Charles E. Grassley                      Lindsey O. Graham
Chairman                                 Chairman
Committee on the Judiciary               Subcommittee on Crime and Terrorism
                                         Committee on the Judiciary

Enclosure: As stated.

Deputy Attorney General Rosenstein and Director Wray
January 4, 2018
Page 2 of 2

cc:     The Honorable Dianne Feinstein
        Ranking Member
        Committee on the Judiciary

        The Honorable Richard Burr
        Chairman
        Senate Select Committee on Intelligence

        The Honorable Mark Warner
        Vice Chairman
        Senate Select Committee on Intelligence

        The Honorable Devin Nunes
        Chairman
        House Permanent Select Committee on Intelligence

        The Honorable Adam Schiff
        Ranking Member
        House Permanent Select Committee on Intelligence

███████████

## MEMORANDUM

(U)   **FROM:**     Charles E. Grassley, Chairman, U.S. Senate Committee on the Judiciary
Lindsey O. Graham, Chairman, Subcommittee on Crime and Terrorism, U.S. Senate Committee on the Judiciary

        **TO:**       The Honorable Rod J. Rosenstein, Deputy Attorney General, U.S. Department of Justice

                          The Honorable Christopher A. Wray, Director, Federal Bureau of Investigation

        **RE:**       Referral of Christopher Steele for Potential Violation of 18 U.S.C. § 1001

(U) As you know, former British Intelligence Officer Christopher Steele was hired by the private firm Fusion GPS in June 2016 to gather information about "links between Russia and [then-presidential candidate] Donald Trump."[1]  Pursuant to that business arrangement, Mr. Steele prepared a series of documents styled as intelligence reports, some of which were later compiled into a "dossier" and published by *BuzzFeed* in January 2017.[2]  On the face of the dossier, it appears that Mr. Steele gathered much of his information from Russian government sources inside Russia.[3]  According to the law firm Perkins Coie, Mr. Steele's dossier-related efforts were funded through Fusion GPS by that law firm on behalf of the Democratic National Committee and the Clinton Campaign.[4]

(U) In response to reporting by the *Washington Post* about Mr. Steele's relationship with the FBI relating to this partisan dossier project, the Judiciary Committee began raising a series of questions to the FBI and the Justice Department about these matters as part of the Committee's constitutional oversight responsibilities.[5]

(U) The FBI has since provided the Committee access to classified documents relevant to the FBI's relationship with Mr. Steele and whether the FBI relied on his dossier work.  As explained in greater detail below, when information in those classified documents is evaluated in light of sworn statements by Mr. Steele in British litigation, it appears that either Mr. Steele lied to the FBI or the British court, or that the classified documents reviewed by the Committee contain materially false statements.

---

[1] (U) Defence, *Gubarev et. Al v. Orbis Business Intelligence Limited and Christobpher Steele*, Claim No. HQ17D00413, Queen's Bench (Apr. 4, 2017), para. 9 [Hereinafter "Steele Statement 1"] [Attachment A].
[2] (U) *Id.* at para. 10; Ken Bensinger, Miriam Elder, and Mark Schoofs, *These Reports Allege Trump Has Deep Ties to Russia*, BUZZFEED (Jan. 10, 2017).
[3] (U) *Id.*
[4] (U) Adam Entous, Devlin Barrett and Rosalind S. Helderman, *Clinton Campaign, DNC Paid for Research that Led to Russia Dossier*, THE WASHINGTON POST (Oct. 24, 2017).
[5] (U) Tom Hamburger and Rosalind S. Helderman, *FBI Once Planned to Pay Former British Spy who Authored Controversial Trump Dossier*, THE WASHINGTON POST (Feb. 28, 2017).

███████████



(U) In response to the Committee's inquiries, the Chairman and Ranking Member received a briefing on March 15, 2017, from then-Director James B. Comey, Jr.

████████ That briefing addressed the Russia investigation, the FBI's relationship with Mr. Steele, and the FBI's reliance on Mr. Steele's dossier in two applications it filed for surveillance under the Foreign Intelligence Surveillance Act (FISA). Then, on March 17, 2017, the Chairman and Ranking Member were provided copies of the two relevant FISA applications, which requested authority to conduct surveillance of Carter Page. Both relied heavily on Mr. Steele's dossier claims, and both applications were granted by the Foreign Intelligence Surveillance Court (FISC). In December of 2017, the Chairman, Ranking Member, and Subcommittee Chairman Graham were allowed to review a total of four FISA applications relying on the dossier to seek surveillance of Mr. Carter Page, as well as numerous other FBI documents relating to Mr. Steele.

████████ In the March 2017 briefing with then-Director Comey, he stated that ████████
████████████████████████████████████████
████████████████████████████████████████

(U) Similarly, in June 2017, former FBI Director Comey testified publicly before the Senate Select Committee on Intelligence that he had briefed President-Elect Trump on the dossier allegations in January 2017, which Mr. Comey described as "salacious" and "unverified."[6]

████████ When asked at the March 2017 briefing why the FBI relied on the dossier in the FISA applications absent meaningful corroboration—and in light of the highly political motives surrounding its creation—then-Director Comey stated that the FBI included the dossier allegations about Carter Page in the FISA applications because Mr. Steele himself was considered reliable due to his past work with the Bureau.

████████ Indeed, the documents we have reviewed show that the FBI took important investigative steps largely based on Mr. Steele's information—and relying heavily on his credibility. Specifically, on October 21, 2016, the FBI filed its first warrant application under FISA for Carter Page. ████████████████████████████ The bulk of the application consists of allegations against Page that were disclosed to the FBI by Mr. Steele and are also outlined in the Steele dossier. The application appears to contain no additional information corroborating the dossier allegations against Mr. Page, although it does cite to a news article that appears to be sourced to Mr. Steele's dossier as well.

---

[6] (U) Statement of James B. Comey, Jr., Hearing of the U.S. Sen. Select Comm. on Intelligence (June 8, 2017).

████████

████████ The FBI discussed the reliability of this unverified information provided by Mr. Steele in footnotes 8 and 18 of the FISA warrant application. First, the FBI noted to a vaguely limited extent the political origins of the dossier. In footnote 8 the FBI stated that the dossier information was compiled pursuant to the direction of a law firm who had hired an "identified U.S. person"—now known as Glenn Simpson of Fusion GPS—████████████████████ ████████████████████████████████████████ The application failed to disclose that the identities of Mr. Simpson's ultimate clients were the Clinton campaign and the DNC.

████████ The FBI stated to the FISC that "based on [Steele's] previous reporting history with the FBI, whereby [Steele] provided reliable information to the FBI, the FBI believes [Steele's] reporting to be credible." In short, it appears the FBI relied on admittedly uncorroborated information, funded by and obtained for Secretary Clinton's presidential campaign, in order to conduct surveillance of an associate of the opposing presidential candidate. It did so based on Mr. Steele's personal credibility and presumably having faith in his process of obtaining the information.

(U) But there is substantial evidence suggesting that Mr. Steele materially misled the FBI about a key aspect of his dossier efforts, one which bears on his credibility.



████████ Yet the FISA applications note the existence of a news article dated September 23, 2016, which in particular contained some of the same dossier information about Mr. Page compiled by Mr. Steele and on which the FBI relied in its application. While not explicitly stated, this is presumably the article by Michael Isikoff of *Yahoo News*, titled "U.S. Intel Officials Probe Ties Between Trump Adviser and Kremlin." ████████████████████ ████████████████████████████████████████████, the application attempts to explain away the inconsistency between Mr. Steele's assertion to the FBI and the existence of the article, apparently to shield Mr. Steele's credibility on which it still relied for the renewal request. The application to the FISC said: "Given that the information contained in the September 23[rd] news article generally matches the information about Page that [Steele] discovered doing his/her research, ████████ ████████ ████████████████████

---

[7] ████ The FBI has failed to provide the Committee the 1023s documenting all of Mr. Steele's statements to the FBI, so the Committee is relying on the accuracy of the FBI's representation to the FISC regarding those statements.

████████████

██████████████

██████████████████ ***The FBI does not believe*** that [Steele] directly provided this information to the press" (emphasis added).

██████████ In footnote 9 of its January 2017 application to renew the FISA warrant for Mr. Page, the FBI again addressed Mr. Steele's credibility. At that time, the FBI noted that it had suspended its relationship with Mr. Steele in October 2016 because of Steele's "unauthorized disclosure of information to the press." The FBI relayed that Steele had been bothered by the FBI's notification to Congress in October 2016 about the reopening of the Clinton investigation, and as a result "[Steele] independently and against the prior admonishment from the FBI to speak only with the FBI on this matter, released the reporting discussed herein [dossier allegations against Page] to an identified news organization." However, the FBI continued to cite to Mr. Steele's past work as evidence of his reliability, and stated that "the incident that led to the FBI suspending its relationship with [Mr. Steele] occurred after [Mr. Steele] provided" the FBI with the dossier information described in the application. The FBI further asserted in footnote 19 that it did not believe that Steele directly gave information to *Yahoo News* that "published the September 23 News Article."

██████████ So, as documented in the FISA renewals, the FBI still seemed to believed Mr. Steele's earlier claim that he had only provided the dossier information to the FBI and Fusion—and not to the media—prior to his October media contact that resulted in the FBI suspending the relationship. Accordingly, the FBI still deemed the information he provided prior to the October disclosure to be reliable. After all, the FBI already believed Mr. Steele was reliable, he had previously told the FBI he had not shared the information with the press – and lying to the FBI is a crime. In defending Mr. Steele's credibility to the FISC, the FBI had posited an innocuous explanation for the September 23 article, based on the assumption that Mr. Steele had told the FBI the truth about his press contacts. The FBI then vouched for him twice more, using the same rationale, in subsequent renewal applications filed with the Foreign Intelligence Surveillance Court in April and June 2017.

(U) However, public reports, court filings, and information obtained by the Committee during witness interviews in the course of its ongoing investigation indicate that Mr. Steele not only provided dossier information to the FBI, but also to numerous media organizations **prior to** the end of his relationship with the FBI in October 2016.[8]

(U) In Steele's sworn court filings in litigation in London, he admitted that he "gave off the record briefings to a small number of journalists about the pre-election memoranda [*i.e.*, the dossier] in late summer/autumn 2016."[9] In another sworn filing in that case, Mr. Steele further

---

[8] (U) *See* Steele Statement 1; Defendants' Response to Claimants' Request for Further Information Pursuant to CPR Part 18, *Gubarev et. Al v. Orbis Business Intelligence Limited and Christopher Steele*, Claim No. HQ17D00413, Queen's Bench (May 18, 2017), [Hereinafter "Steele Statement 2"] [Attachment B]; Tom Hamburger and Rosalind S. Helderman, *FBI Once Planned to Pay Former British Spy who Authored Controversial Trump Dossier*, THE WASHINGTON POST (Feb. 28, 2017); Simpson Transcript, on File with Sen. Comm. on the Judiciary.
[9] (U) Steele Statement 1 at para. 32.

██████████████

████████████

stated that journalists from "the New York Times, the Washington Post, **Yahoo News**, the New Yorker, and CNN" were "briefed **at the end of September 2016** *by [Steele]* and Fusion at Fusion's instruction."[10]  The filing further states that Mr. Steele "subsequently participated in further meetings at Fusion's instruction with Fusion and the New York Times, the Washington Post, and Yahoo News, which took place mid-October 2016."[11] According to these court filings, "[t]he briefings involved the disclosure of limited intelligence regarding indications of Russian interference in the US election process and the possible co-ordination of members of Trump's campaign team and Russian government officials."[12]  In his interview with the Committee, Glenn Simpson of Fusion GPS confirmed this account by Mr. Steele and his company as filed in the British court.[13]

████████  The first of these filings was publicly reported in the U.S. media in April of 2017, yet the FBI did not subsequently disclose to the FISC this evidence suggesting that Mr. Steele had lied to the FBI.  Instead the application still relied primarily on his credibility prior to the October media incident.

████████  The FBI received similar information from a Justice Department official, Bruce Ohr, who maintained contacts with Mr. Simpson and Mr. Steele about their dossier work, and whose wife also worked for Fusion GPS on the Russia project. ████████



████████████████████████████  He also noted in the same interview that Mr. Steele was "desperate" to see that Mr. Trump was not elected president.[16]  None of the information provided by Mr. Ohr in his interviews with the FBI was included in the FISA renewal applications, despite its relevance to whether Mr. Steele had lied to the FBI about his contacts with the media as well as its broader relevance to his credibility and his stated political motive.

---

[10] (U) Steele Statement 2 at para. 18. (emphasis added).
[11] ████ *Id.* The filing also apparently described the media contact that resulted in the FBI's suspension of its relationship with Mr. Steele, stating: "In addition, and again at Fusion's instruction, in late October 2016 the Second Defendant briefed a journalist from Mother Jones by Skype."
[12] (U) *Id.*
[13] (U) Simpson Transcript, On File with the Sen. Comm. on the Judiciary at 205-07.
[14] ████████ Ohr FD-302 (Nov. 22, 2016).
[15] ████████ Ohr FD-302 (Dec. 12, 2016).
[16] ████████ Ohr FD-302 (Nov. 22, 2016).

███████

████ Whether Mr. Steele lied to the FBI about his media contacts is relevant for at least two reasons. First, it is relevant to his credibility as a source, particularly given the lack of corroboration for his claims, at least at the time they were included in the FISA applications. Second, it is relevant to the reliability of his information-gathering efforts.

(U) Mr. Steele conducted his work for Fusion GPS compiling the "pre-election memoranda" "[b]etween June and early November 2016."[17] In the British litigation, Mr. Steele acknowledged briefing journalists about the dossier memoranda "in late summer/autumn 2016."[18] Unsurprisingly, during the summer of 2016, reports of at least some of the dossier allegations began circulating among reporters and people involved in Russian issues.[19] Mr. Steele also admitted in the British litigation to briefing journalists from the *Washington Post, Yahoo News*, the *New Yorker*, and *CNN* in September of 2016.[20] Simply put, the more people who contemporaneously knew that Mr. Steele was compiling his dossier, the more likely it was vulnerable to manipulation. In fact, in the British litigation, which involves a post-election dossier memorandum, Mr. Steele admitted that he received and included in it ***unsolicited***—and unverified—allegations.[21] That filing implies that he similarly received unsolicited intelligence on these matters prior to the election as well, stating that Mr. Steele "***continued to receive unsolicited intelligence*** on the matters covered by the pre-election memoranda after the US Presidential election."[22]

███████████████████████████
███████████████████████████
███████████████████

(U) One memorandum by Mr. Steele that was not published by *Buzzfeed* is dated October 19, 2016. The report alleges ██████████████████, as well as ████. Mr. Steele's memorandum states that his company "received this report from ██ █ US State Department," that the report was the second in a series, and that the report was information that came from a foreign sub-source who "is in touch with ████████, a contact of ████████████, a friend of the Clintons, who passed it to ████." It is troubling enough that the Clinton Campaign funded Mr. Steele's work, but that these Clinton associates were contemporaneously feeding Mr. Steele allegations raises additional concerns about his credibility.

---

[17] (U) Steele Statement 1 at para. 9.
[18] (U) Steele Statement 1 at para. 32
[19] (U) Ahkmetshin Transcript, On File with the Sen. Comm. on the Judiciary (Mr. Ahkmetshin informed the Committee that he began hearing from journalists about the dossier before it was published, and thought it was the summer of 2016).
[20] (U) Steele Statement 2 at para. 18 (emphasis added).
[21] (U) Steele Statement 1 at para. 18 and 20c.
[22] (U) *Id*.; *see* Steele Statement 2 at 4 ("Such intelligence was not actively sought, it was merely received.")

███████

███████████████

███████████████████████████

███████ Simply put, Mr. Steele told the FBI he had not shared the Carter Page dossier information beyond his client and the FBI. The Department repeated that claim to the FISC. Yet Mr. Steele acknowledged in sworn filings that he did brief *Yahoo News* and other media organizations about the dossier around the time of the publication of the *Yahoo News* article that seems to be based on the dossier.

(U) On September 23, 2016, *Yahoo News* published its article entitled "U.S. Intel Officials Probe Ties Between Trump Adviser and Kremlin."[23] That article described claims about meetings between Carter Page and Russians, including Igor Sechin. Mr. Sechin is described in the article as "a longtime Putin associate and former Russian deputy prime minister" under sanction by the Treasury Department in response to Russia's actions in the Ukraine.[24] The article attributes the information to "a well-placed Western intelligence source," who reportedly said that "[a]t their alleged meeting, Sechin raised the issue of the lifting of sanctions with Page."[25] This information also appears in multiple "memoranda" that make up the dossier.[26]

(U) In sum, around the same time *Yahoo News* published its article containing dossier information about Carter Page, *Mr. Steele and* Fusion GPS had briefed *Yahoo News* and other news outlets about information contained in the dossier.

███████ These facts appear to directly contradict the FBI's assertions in its initial application for the Page FISA warrant, as well as subsequent renewal applications. The FBI repeatedly represented to the court that Mr. Steele told the FBI he did *not* have unauthorized contacts with the press about the dossier prior to October 2016. The FISA applications make these claims specifically in the context of the September 2016 *Yahoo News* article. But Mr. Steele has admitted—publicly before a court of law—that he *did* have such contacts with the press at this time, and his former business partner Mr. Simpson has confirmed it to the Committee. Thus, the FISA applications are either materially false in claiming that Mr. Steele said he did not provide dossier information to the press prior to October 2016, or Mr. Steele made materially false statements to the FBI when he claimed he only provided the dossier information to his business partner and the FBI.

███████ In this case, Mr. Steele's apparent deception seems to have posed significant, material consequences on the FBI's investigative decisions and representations to the court. Mr. Steele's information formed a significant portion of the FBI's warrant application, and the FISA application relied more heavily on Steele's credibility than on any independent verification or corroboration for his claims. Thus the basis for the warrant authorizing surveillance on a U.S. citizen rests largely on Mr. Steele's credibility. The Department of Justice has a responsibility to

---

[23] (U) Michael Isikoff, *U.S. Intel Officials Probe Ties Between Trump Adviser and Kremlin*, YAHOO NEWS (Sept. 23, 2016).
[24] (U) *Id.*
[25] (U) *Id.*
[26] (U) Bensinger *et. al*, BUZZFEED.

███████████

determine whether Mr. Steele provided false information to the FBI and whether the FBI's representations to the court were in error.

(U) Accordingly, we are referring Christopher Steele to the Department of Justice for investigation of potential violation(s) of 18 U.S.C. § 1001.

███████████

# EXHIBIT 2

**UNCLASSIFIED** ~~TOP SECRET//NOFORN~~

January 18, 2018

Declassified by order of the President
February 2, 2018

To:        HPSCI Majority Members

From:      HPSCI Majority Staff

Subject:   Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the
           Federal Bureau of Investigation

## Purpose

    This memorandum provides Members an update on significant facts relating to the
Committee's ongoing investigation into the Department of Justice (DOJ) and Federal Bureau of
Investigation (FBI) and their use of the Foreign Intelligence Surveillance Act (FISA) during the
2016 presidential election cycle.  Our findings, which are detailed below, 1) raise concerns with
the legitimacy and legality of certain DOJ and FBI interactions with the Foreign Intelligence
Surveillance Court (FISC), and 2) represent a troubling breakdown of legal processes established
to protect the American people from abuses related to the FISA process.

## Investigation Update

    On October 21, 2016, DOJ and FBI sought and received a FISA probable cause order
(not under Title VII) authorizing electronic surveillance on Carter Page from the FISC.  Page is a
U.S. citizen who served as a volunteer advisor to the Trump presidential campaign.  Consistent
with requirements under FISA, the application had to be first certified by the Director or Deputy
Director of the FBI.  It then required the approval of the Attorney General, Deputy Attorney
General (DAG), or the Senate-confirmed Assistant Attorney General for the National Security
Division.

    The FBI and DOJ obtained one initial FISA warrant targeting Carter Page and three FISA
renewals from the FISC.  As required by statute (50 U.S.C. §1805(d)(1)), a FISA order on an
American citizen must be renewed by the FISC every 90 days and each renewal requires a
separate finding of probable cause.  Then-Director James Comey signed three FISA applications
in question on behalf of the FBI, and Deputy Director Andrew McCabe signed one. Then-DAG
Sally Yates, then-Acting DAG Dana Boente, and DAG Rod Rosenstein each signed one or more
FISA applications on behalf of DOJ.

    Due to the sensitive nature of foreign intelligence activity, FISA submissions (including
renewals) before the FISC are classified.  As such, the public's confidence in the integrity of the
FISA process depends on the court's ability to hold the government to the highest standard—
particularly as it relates to surveillance of American citizens.  However, the FISC's rigor in
protecting the rights of Americans, which is reinforced by 90-day renewals of surveillance
orders, is necessarily dependent on the government's production to the court of all material and
relevant facts.  This should include information potentially favorable to the target of the FISA

~~TOP SECRET//NOFORN~~

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET//NOFORN

application that is known by the government. In the case of Carter Page, the government had at least four independent opportunities before the FISC to accurately provide an accounting of the relevant facts. However, our findings indicate that, as described below, material and relevant information was omitted.

1) The "dossier" compiled by Christopher Steele (Steele dossier) on behalf of the Democratic National Committee (DNC) and the Hillary Clinton campaign formed an essential part of the Carter Page FISA application. Steele was a longtime FBI source who was paid over $160,000 by the DNC and Clinton campaign, via the law firm Perkins Coie and research firm Fusion GPS, to obtain derogatory information on Donald Trump's ties to Russia.

   a) Neither the initial application in October 2016, nor any of the renewals, disclose or reference the role of the DNC, Clinton campaign, or any party/campaign in funding Steele's efforts, even though the political origins of the Steele dossier were then known to senior DOJ and FBI officials.

   b) The initial FISA application notes Steele was working for a named U.S. person, but does not name Fusion GPS and principal Glenn Simpson, who was paid by a U.S. law firm (Perkins Coie) representing the DNC (even though it was known by DOJ at the time that political actors were involved with the Steele dossier). The application does not mention Steele was ultimately working on behalf of—and paid by—the DNC and Clinton campaign, or that the FBI had separately authorized payment to Steele for the same information.

2) The Carter Page FISA application also cited extensively a September 23, 2016, *Yahoo News* article by Michael Isikoff, which focuses on Page's July 2016 trip to Moscow. This article does not corroborate the Steele dossier because it is derived from information leaked by Steele himself to *Yahoo News.* The Page FISA application incorrectly assesses that Steele did not directly provide information to *Yahoo News*. Steele has admitted in British court filings that he met with *Yahoo News*—and several other outlets—in September 2016 at the direction of Fusion GPS. Perkins Coie was aware of Steele's initial media contacts because they hosted at least one meeting in Washington D.C. in 2016 with Steele and Fusion GPS where this matter was discussed.

   a) Steele was suspended and then terminated as an FBI source for what the FBI defines as the most serious of violations—an unauthorized disclosure to the media of his relationship with the FBI in an October 30, 2016, *Mother Jones* article by David Corn. Steele should have been terminated for his previous undisclosed contacts with Yahoo and other outlets **in September**—before the Page application was submitted to

# UNCLASSIFIED

TOP SECRET//NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET//NOFORN

the FISC in October—but Steele improperly concealed from and lied to the FBI about those contacts.

  b) Steele's numerous encounters with the media violated the cardinal rule of source handling—maintaining confidentiality—and demonstrated that Steele had become a less than reliable source for the FBI.

3) Before and after Steele was terminated as a source, he maintained contact with DOJ via then-Associate Deputy Attorney General Bruce Ohr, a senior DOJ official who worked closely with Deputy Attorneys General Yates and later Rosenstein. Shortly after the election, the FBI began interviewing Ohr, documenting his communications with Steele. For example, in September 2016, Steele admitted to Ohr his feelings against then-candidate Trump when Steele said he **"was desperate that Donald Trump not get elected and was passionate about him not being president."** This clear evidence of Steele's bias was recorded by Ohr at the time and subsequently in official FBI files—but not reflected in any of the Page FISA applications.

  a) During this same time period, Ohr's wife was employed by Fusion GPS to assist in the cultivation of opposition research on Trump. Ohr later provided the FBI with all of his wife's opposition research, paid for by the DNC and Clinton campaign via Fusion GPS. The Ohrs' relationship with Steele and Fusion GPS was inexplicably concealed from the FISC.

4) According to the head of the FBI's counterintelligence division, Assistant Director Bill Priestap, corroboration of the Steele dossier was in its "infancy" at the time of the initial Page FISA application. After Steele was terminated, a source validation report conducted by an independent unit within FBI assessed Steele's reporting as only minimally corroborated. Yet, in early January 2017, Director Comey briefed President-elect Trump on a summary of the Steele dossier, even though it was—according to his June 2017 testimony—"salacious and unverified." While the FISA application relied on Steele's past record of credible reporting on other unrelated matters, it ignored or concealed his anti-Trump financial and ideological motivations. Furthermore, Deputy Director McCabe testified before the Committee in December 2017 that no surveillance warrant would have been sought from the FISC without the Steele dossier information.

# UNCLASSIFIED

TOP SECRET//NOFORN

~~TOP SECRET//NOFORN~~

5) The Page FISA application also mentions information regarding fellow Trump campaign advisor George Papadopoulos, but there is no evidence of any cooperation or conspiracy between Page and Papadopoulos. The Papadopoulos information triggered the opening of an FBI counterintelligence investigation in late July 2016 by FBI agent Pete Strzok. Strzok was reassigned by the Special Counsel's Office to FBI Human Resources for improper text messages with his mistress, FBI Attorney Lisa Page (no known relation to Carter Page), where they both demonstrated a clear bias against Trump and in favor of Clinton, whom Strzok had also investigated. The Strzok/Lisa Page texts also reflect extensive discussions about the investigation, orchestrating leaks to the media, and include a meeting with Deputy Director McCabe to discuss an "insurance" policy against President Trump's election.

# UNCLASSIFIED

~~TOP SECRET//NOFORN~~

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

# EXHIBIT 3

HARRY REID
NEVADA

DEMOCRATIC LEADER

# United States Senate

WASHINGTON, DC 20510-7012

October 30, 2016

The Honorable James Comey
Director of the Federal Bureau of Investigation
Federal Bureau of Investigation Headquarters
935 Pennsylvania Avenue, NW
Washington, D.C. 20535-0001

Dear Director Comey:

Your actions in recent months have demonstrated a disturbing double standard for the treatment of sensitive information, with what appears to be a clear intent to aid one political party over another. I am writing to inform you that my office has determined that these actions may violate the Hatch Act, which bars FBI officials from using their official authority to influence an election. Through your partisan actions, you may have broken the law.

The double standard established by your actions is clear.

In my communications with you and other top officials in the national security community, it has become clear that you possess explosive information about close ties and coordination between Donald Trump, his top advisors, and the Russian government - a foreign interest openly hostile to the United States, which Trump praises at every opportunity. The public has a right to know this information. I wrote to you months ago calling for this information to be released to the public. There is no danger to American interests from releasing it. And yet, you continue to resist calls to inform the public of this critical information.

By contrast, as soon as you came into possession of the slightest innuendo related to Secretary Clinton, you rushed to publicize it in the most negative light possible.

Moreover, in tarring Secretary Clinton with thin innuendo, you overruled longstanding tradition and the explicit guidance of your own Department. You rushed to take this step eleven days before a presidential election, despite the fact that for all you know, the information you possess could be entirely duplicative of the information you already examined which exonerated Secretary Clinton.

As you know, a memo authored by Deputy Attorney General Sally Yates on March 10, 2016, makes clear that all Justice Department employees, including you, are subject to the Hatch Act. The memo defines the political activity prohibited under the Hatch Act as "activity directed towards the success or failure of a political party, candidate for partisan political office, or partisan political group."

The clear double-standard established by your actions strongly suggests that your highly selective approach to publicizing information, along with your timing, was intended for the success or failure of a partisan candidate or political group.

Please keep in mind that I have been a supporter of yours in the past. When Republicans filibustered your nomination and delayed your confirmation longer than any previous nominee to your position, I led the fight to get you confirmed because I believed you to be a principled public servant.

With the deepest regret, I now see that I was wrong.

Sincerely,

HARRY REID
United States Senator

# EXHIBIT 4

# Intel chiefs presented Trump with claims of Russian efforts to compromise him

**By Evan Perez, Jim Sciutto and Jake Tapper and Carl Bernstein, CNN**

🕐 Updated 5:09 PM ET, Tue January 10, 2017

**(CNN)** — Classified documents presented last week to President Obama and President-elect Trump included allegations that Russian operatives claim to have compromising personal and financial information about Mr. Trump, multiple US officials with direct knowledge of the briefings tell CNN.

The allegations were presented in a two-page synopsis that was appended to a report on Russian interference in the 2016 election. The allegations came, in part, from memos compiled by a former British intelligence operative, whose past work US intelligence officials consider credible. The FBI is investigating the credibility and accuracy of these allegations, which are based primarily on information from Russian sources, but has not confirmed many essential details in the memos about Mr. Trump.

The classified briefings last week were presented by four of the senior-most US intelligence chiefs -- Director of National Intelligence James Clapper, FBI Director James Comey, CIA Director John Brennan, and NSA Director Admiral Mike Rogers.

One reason the nation's intelligence chiefs took the extraordinary step of including the synopsis in the briefing documents was to make the President-elect aware that such allegations involving him are circulating among intelligence agencies, senior members of Congress and other government officials in Washington, multiple sources tell CNN.

These senior intelligence officials also included the synopsis to demonstrate that Russia had compiled information potentially harmful to both political parties, but only released information damaging to Hillary Clinton and Democrats. This synopsis was not an official part of the report from the intelligence community case about Russian

hacks, but some officials said it augmented the evidence that Moscow intended to harm Clinton's candidacy and help Trump's, several officials with knowledge of the briefings tell CNN.

The two-page synopsis also included allegations that there was a continuing exchange of information during the campaign between Trump surrogates and intermediaries for the Russian government, according to two national security officials.

Sources tell CNN that these same allegations about communications between the Trump campaign and the Russians, mentioned in classified briefings for congressional leaders last year, prompted then-Senate Democratic Leader Harry Reid to send a letter to FBI Director Comey in October, in which he wrote, "It has become clear that you possess explosive information about close ties and coordination between Donald Trump, his top advisors, and the Russian government -- a foreign interest openly hostile to the United States."

CNN has confirmed that the synopsis was included in the documents that were presented to Mr. Trump but cannot confirm if it was discussed in his meeting with the intelligence chiefs.

The Trump transition team declined repeated requests for comment.

CNN has reviewed a 35-page compilation of the memos, from which the two-page synopsis was drawn. The memos originated as opposition research, first commissioned by anti-Trump Republicans, and later by Democrats. At this point, CNN is not reporting on details of the memos, as it has not independently corroborated the specific allegations. But, in preparing this story, CNN has spoken to multiple high ranking intelligence, administration, congressional and law enforcement officials, as well as foreign officials and others in the private sector with direct knowledge of the memos.

Some of the memos were circulating as far back as last summer. What has changed since then is that US intelligence agencies have now checked out the former British intelligence operative and his vast network throughout Europe and find him and his sources to be credible enough to include some of the information in the presentations to the President and President-elect a few days ago.

On the same day that the President-elect was briefed by the intelligence community, the top four Congressional leaders, and chairmen and ranking members of the House and Senate intelligence committees -- the so-called "Gang of Eight" -- were also provided a summary of the memos regarding Mr. Trump, according to law enforcement, intelligence and administration sources.

The two-page summary was written without the detailed specifics and information about sources and methods included in the memos by the former British intelligence official. That said, the synopsis was considered so sensitive it was not included in the classified report about Russian hacking that was more widely distributed, but rather in an annex only shared at the most senior levels of the government: President Obama, the President-elect, and the eight Congressional leaders.

CNN has also learned that on December 9, Senator John McCain gave a full copy of the memos -- dated from June through December, 2016 -- to FBI Director James Comey. McCain became aware of the memos from a former British diplomat who had been posted in Moscow. But the FBI had already been given a set of the memos compiled up to August 2016, when the former MI6 agent presented them to an FBI official in Rome, according to national security officials.

The raw memos on which the synopsis is based were prepared by the former MI6 agent, who was posted in Russia in the 1990s and now runs a private intelligence gathering firm. His investigations related to Mr. Trump were initially funded by groups and donors supporting Republican opponents of Mr. Trump during the GOP primaries, multiple sources confirmed to CNN. Those sources also said that once Mr. Trump became the nominee, further investigation was funded by groups and donors supporting Hillary Clinton.

Spokespeople for the FBI and the Director of National Intelligence declined to comment. Officials who spoke to CNN declined to do so on the record given the classified nature of the material.

Some of the allegations were first reported publicly in Mother Jones one week before the election.

One high level administration official told CNN, "I have a sense the outgoing administration and intelligence community is setting down the pieces so this must be investigated seriously and run down. I think [the] concern was to be sure that whatever information was out there is put into the system so it is evaluated as it should be and acted upon as necessary."

# EXHIBIT 5

# MotherJones

## A Veteran Spy Has Given the FBI Information Alleging a Russian Operation to Cultivate Donald Trump

Has the bureau investigated this material?

**DAVID CORN  OCT. 31, 2016 11:52 PM**



Mike McQuade

Looking for news you can trust?
Subscribe to our free newsletters.

**EMAIL**                                                                              **SIGN UP**

On Friday, FBI Director James Comey set off a political blast when he informed congressional leaders that the bureau had stumbled across emails that might be pertinent to its completed inquiry into Hillary Clinton's handling of emails when she was secretary of state. The Clinton campaign and others criticized Comey for intervening in a presidential campaign by

breaking with Justice Department tradition and revealing information about an investigation—information that was vague and perhaps ultimately irrelevant—so close to Election Day. On Sunday, Senate Minority Leader Harry Reid upped the ante. He sent Comey a fiery letter saying the FBI chief may have broken the law and pointed to a potentially greater controversy: "In my communications with you and other top officials in the national security community, it has become clear that you possess explosive information about close ties and coordination between Donald Trump, his top advisors, and the Russian government...The public has a right to know this information."

ADVERTISING

Reid's missive set off a burst of speculation on Twitter and elsewhere. What was he referring to regarding the Republican presidential nominee? At the end of August, Reid had written to Comey and demanded an investigation of the "connections between the Russian government and Donald Trump's presidential campaign," and in that letter he indirectly referred to Carter Page, an American businessman cited by Trump as one of his foreign policy advisers, who had financial ties to Russia and had recently visited Moscow. Last month, *Yahoo News* reported that US intelligence officials were probing the links between Page and senior Russian officials. (Page has called accusations against him "garbage.") On Monday, NBC News reported that the FBI has mounted a preliminary inquiry into the foreign business ties of Paul Manafort, Trump's former campaign chief. But Reid's recent note hinted at more than the Page or Manafort affairs. And a former senior intelligence officer for a Western country who specialized in Russian counterintelligence tells *Mother Jones* that in recent months he provided the bureau with memos, based on his recent interactions with Russian sources, contending the Russian government has for years tried to co-opt and assist Trump—and that the FBI requested more information from him.

*"This is something of huge significance, way above party politics," the former intelligence officer says. "I think [Trump's] own party should be aware of this stuff as well."*

Does this mean the FBI is investigating whether Russian intelligence has attempted to develop a secret relationship with Trump or cultivate him as an asset? Was the former intelligence officer and his material deemed credible or not? An FBI spokeswoman says, "Normally, we don't talk about whether we are investigating anything." But a senior US government official not involved in this case but familiar with the former spy tells *Mother Jones* that he has been a credible source with a proven record of providing reliable, sensitive, and important information to the US government.

In June, the former Western intelligence officer—who spent almost two decades on Russian intelligence matters and who now works with a US firm that gathers information on Russia for corporate clients—was assigned the task of researching Trump's dealings in Russia and elsewhere, according to the former spy and his associates in this American firm. This was for an opposition research project originally financed by a Republican client critical of the celebrity mogul. (Before the former spy

was retained, the project's financing switched to a client allied with Democrats.) "It started off as a fairly general inquiry," says the former spook, who asks not to be identified. But when he dug into Trump, he notes, he came across troubling information indicating connections between Trump and the Russian government. According to his sources, he says, "there was an established exchange of information between the Trump campaign and the Kremlin of mutual benefit."

This was, the former spy remarks, "an extraordinary situation." He regularly consults with US government agencies on Russian matters, and near the start of July on his own initiative—without the permission of the US company that hired him—he sent a report he had written for that firm to a contact at the FBI, according to the former intelligence officer and his American associates, who asked not to be identified. (He declines to identify the FBI contact.) The former spy says he concluded that the information he had collected on Trump was "sufficiently serious" to share with the FBI.

*Mother Jones* has reviewed that report and other memos this former spy wrote. The first memo, based on the former intelligence officer's conversations with Russian sources, noted, "Russian regime has been cultivating, supporting and assisting TRUMP for at least 5 years. Aim, endorsed by PUTIN, has been to encourage splits and divisions in western alliance." It maintained that Trump "and his inner circle have accepted a regular flow of intelligence from the Kremlin, including on his Democratic and other political rivals." It claimed that Russian intelligence had "compromised" Trump during his visits to Moscow and could "blackmail him." It also reported that Russian intelligence had compiled a dossier on Hillary Clinton based on "bugged conversations she had on various visits to Russia and intercepted phone calls."

The former intelligence officer says the response from the FBI was "shock and horror." The FBI, after receiving the first memo, did not immediately request additional material, according to the former intelligence officer and his American associates. Yet in August, they say, the FBI asked him for all information in his possession and for him to explain how the material had been gathered and to identify his sources. The former spy forwarded to the bureau several memos—some of which referred to members of Trump's inner circle. After that point, he continued to share information with the FBI. "It's quite clear there was or is a pretty substantial inquiry going on," he says.

"This is something of huge significance, way above party politics," the former intelligence officer comments. "I think [Trump's] own party should be aware of this stuff as well."

The Trump campaign did not respond to a request for comment regarding the memos. In the past, Trump has declared, "I have nothing to do with Russia."

The FBI is certainly investigating the hacks attributed to Russia that have hit American political targets, including the Democratic National Committee and John Podesta, the chairman of Clinton's presidential campaign. But there have been few public signs of whether that probe extends to examining possible contacts between the Russian government and Trump. (In recent weeks, reporters in Washington have pursued anonymous online reports that a computer server related to the Trump Organization engaged in a high level of activity with servers connected to Alfa Bank, the largest private bank in Russia. On Monday, a *Slate* investigation detailed the pattern of unusual server activity but concluded, "We don't yet know what this [Trump] server was for, but it deserves further explanation." In an email to *Mother Jones*, Hope Hicks, a Trump campaign spokeswoman, maintains, "The Trump Organization is not sending or receiving any communications from this email server. The Trump Organization has no communication or relationship with this entity or any Russian entity.")

According to several national security experts, there is widespread concern in the US intelligence community that Russian intelligence, via hacks, is aiming to undermine the presidential election—to embarrass the United States and delegitimize its democratic elections. And the hacks appear to have been designed to benefit Trump. In August, Democratic members of the House committee on oversight wrote Comey to ask the FBI to investigate "whether connections between Trump campaign officials and Russian interests may have contributed to these [cyber] attacks in order to interfere with the US. presidential election." In September, Sen. Dianne Feinstein and Rep. Adam Schiff, the senior Democrats on, respectively, the Senate and

House intelligence committees, issued a joint statement accusing Russia of underhanded meddling: "Based on briefings we have received, we have concluded that the Russian intelligence agencies are making a serious and concerted effort to influence the U.S. election. At the least, this effort is intended to sow doubt about the security of our election and may well be intended to influence the outcomes of the election." The Obama White House has declared Russia the culprit in the hacking capers, expressed outrage, and promised a "proportional" response.

There's no way to tell whether the FBI has confirmed or debunked any of the allegations contained in the former spy's memos. But a Russian intelligence attempt to co-opt or cultivate a presidential candidate would mark an even more serious operation than the hacking.

In the letter Reid sent to Comey on Sunday, he pointed out that months ago he had asked the FBI director to release information on Trump's possible Russia ties. Since then, according to a Reid spokesman, Reid has been briefed several times. The spokesman adds, "He is confident that he knows enough to be extremely alarmed."

**FACT:**

*Mother Jones* was founded as a nonprofit in 1976 because we knew corporations and the wealthy wouldn't fund the type of hard-hitting journalism we set out to do.

Today, reader support makes up about two-thirds of our budget, allows us to dig deep on stories that matter, and lets us keep our reporting free for everyone. If you value what you get from *Mother Jones*, **please join us with a tax-deductible donation** so we can keep on doing the type of journalism that 2018 demands.

**DONATE NOW**



**DAVID CORN** 🐦

David Corn is *Mother Jones'* Washington bureau chief. For more of his stories, click here. He's also on Twitter and Facebook.

# + VIEW COMMENTS

▷ ×



## Sick Clothes, Delivered

Fresh Looks The Ladies Will Love On You. First Month, $150 Worth of Clothes For Only $33 !

 Trendy Butler

**Mother Jones**

Copyright ©2018 Mother Jones and the Foundation for National Progress. All Rights Reserved.

Contact Us   Terms of Service   Privacy Policy