# Exhibit
# 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

LAURIE J. FINE,

                  Plaintiff,

         -against-

ESPN, Inc. a subsidiary of Walt Disney,
Inc.; MARK SCHWARZ, in his individual
capacity and as an employee of ESPN, and
ARTHUR BERKO, in his individual
capacity and as an employee of ESPN,

                  Defendants.

**COMPLAINT**

Civil Action No. ~~XX-XXXXX~~
5:12-CV-0836 (LEK/DEP)
JURY TRIAL DEMANDED

---

       COMES NOW Plaintiff, Laurie J. Fine, by and through her attorneys, Lawrence

H. Fisher and Kevin W. Tucker, Cohen and Willwerth, P.C., One Oxford Centre, 301

Grant Street, Suite 4300, Pittsburgh, PA 15219, (724) 986-9785, Facsimile: (412) 255-

3701, and states in her Complaint for Libel against Defendants, ESPN, Inc. ("ESPN"),

jointly owned by The Walt Disney Company and the Hearst Corporation, Mark Schwarz

("Schwarz"), and Arthur Berko ("Berko") as follows:

**PRELIMINARY STATEMENT**

       1.      This Complaint for Libel arises from Defendant ESPN's coverage of

Robert Davis' uncorroborated attack upon Plaintiff Laurie J. Fine. Through this coverage,

ESPN, acting by and through its agents and employees, including Defendants Mark

Schwarz and Arthur Berko, spitefully destroyed Laurie Fine's reputation in an attempt to

capitalize financially in the tragic wake of the Penn State Sex Abuse Scandal. Defendants

have ruined Laurie Fine's reputation by maliciously publishing false and defamatory

factual accusations. Defendants falsely accuse Laurie Fine of, among other things:

- Creating a space in which children could be sexually molested in secret;

- Witnessing her husband sexually molest children, but not doing anything to stop it;

- Knowingly permitting the sexual molestation of children in her home;

- Telling Robert Davis that she knew her husband was sexually molesting him;

- Having adulterous sex with Robert Davis while he was still in high school;

- Betraying Robert Davis' trust by not protecting him from sexual molestation;

- Having adulterous and dysfunctional sexual relationships with Syracuse basketball team players over the course of many years.

## THE PARTIES

2.      Plaintiff, Laurie J. Fine, is domiciled and resides in the State of New York.

3.      Laurie Fine married her husband, Bernie Fine, in 1985.

4.      Bernie Fine is a former Associate Basketball Coach at Syracuse University.

5.      The Fines have raised three children in the Syracuse, New York community.

6.      Defendant ESPN, Inc. ("ESPN") is a Delaware corporation with its principal place of business in Bristol, Connecticut.

7.      ESPN is owned by The Walt Disney Company and the Hearst Corporation.

8.      ESPN markets itself as "The Worldwide Leader in Sports." ESPN is a sports media conglomerate, owning various cable, radio, and Internet broadcasting

operations.

9.     ESPN's programming includes live and tape-delayed sporting events, sports news programming and talk shows, and original series and documentaries.

10.     Defendant Mark Schwarz is employed by ESPN and/or was employed by ESPN on November 27, 2011.

11.     Over many years, Schwarz has reported hundreds of sporting news stories for ESPN, and has provided viewers and listeners with commentary on current sports events.

12.     Defendant Arthur Berko is employed by ESPN and/or was employed by ESPN on November 27, 2011.

## JURISDICTION AND VENUE

13.     Laurie Fine is a citizen of the State of New York for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

14.     Schwarz is a citizen of the State of Maryland for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

15.     Berko is a citizen of the State of Maryland for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

16.     ESPN is a citizen of the States of Delaware and Connecticut for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

17.     This Honorable Court has original subject matter jurisdiction with respect to this action pursuant to 28 U.S.C. § 1332 as there exists complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000), exclusive of interests and costs.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a).

## FACTUAL BACKGROUND

19.     Laurie J. Fine ("Laurie" or "Plaintiff") married her husband, Bernie Fine ("Bernie") (collectively, the "Fines"), in 1985, at which time Bernie was an assistant coach for the Men's Basketball program at Syracuse University.

20.     Since 1985, the Syracuse Men's Basketball program has won nine Big East regular season championships, five Big East Tournament championships, and has made 28 appearances in the NCAA Tournament, where it played in the national championship game in 1987 and 1996. The program won the NCAA Tournament in 2003.

21.     As the wife of an assistant coach, Laurie became close with the Syracuse community in which the basketball program was revered.

22.     In light of her connection to the basketball program, charitable organizations often competed to employ Laurie in various capacities.

23.     In 2009, the Boys and Girls Club hired Laurie to conduct its fundraising.

24.     In 2011, Laurie left the Boys and Girls Club with the intention of becoming the Major Gifts Director at Save the Kids, another Syracuse nonprofit organization.

25.     Laurie was also involved in fundraising at the Ronald McDonald House for about ten years and at the Make-a-Wish Foundation for about twenty years.

26.     In 2011, Galaxy Communications, a private media company, hired Laurie to conduct a radio show discussing the Syracuse Men's Basketball program.

27.     The Fines raised three children in the greater Syracuse community and

now also have a granddaughter.

28.    In addition to raising three children, coaching the Syracuse Men's Basketball team, and devoting their otherwise available time to area nonprofits or employment, the Fines gave Robert Davis ("Davis") a home during a difficult period in his childhood.

29.    At the time, Davis was a ball boy for the Syracuse Men's Basketball team.

30.    Like some teenagers, Davis was constantly getting into trouble at school.

31.    The Fines believed Davis lacked the stability and positive influences necessary to turn around his troubled life.

32.    In an effort to provide that stability and those positive influences, the Fines welcomed Davis into their home, wherein they treated—and held him accountable—as if he were their own teenage son.

33.    For many years, the Fine's have provided a home and family-like setting and support to at-risk children in the area of Syracuse, New York.

34.    In November 2011, Defendant Schwarz told CNN that Davis felt an extraordinary attachment to Laurie, Bernie, and their children. During his teenage years, Davis spent more time with the Fines than he did with his own family.

35.    Over time, a parental relationship strengthened between the Fines and Davis. In fact, when Davis got in trouble at school, the school called the Fines, not his biological parents.

36.    The Fines mentored Davis when he got in trouble. Rather than humiliating him in front of Laurie or their other children, Bernie often came home from work, and sternly spoke to him, in private, as if he were his own teenage son.

37.     Davis was family, and when he messed up, the Fines made sure he learned from his poor decisions, even if that required occasional parental corporal punishment and reprimanding.

38.     In addition to providing Davis tough love, Bernie helped Davis get into colleges and on basketball teams throughout the United States and in Germany.

39.     Unfortunately, Davis became dependent upon the Fines' generosity.

40.     Davis began taking advantage of his familial relationship with the Fines.

41.     In addition to getting Davis into various colleges, Bernie regularly gave Davis money to help pay costs associated with transportation, employment, and housing.

42.     Eventually, Laurie told her husband they had to stop enabling Davis' debilitating reliance on their financial support.

43.     Davis responded poorly to being financially cut-off by the Fines.

44.     Davis regularly tricked the Fines into giving him money.

45.     On at least three occasions, Davis tricked Bernie into giving him money to pay off unpaid student loans. Bernie gave Davis at least $5,000 to pay off these loans. However, these loans did not exist.

46.     Bernie refused to accept his failure to turn around Davis' troubled youth.

47.     Davis fabricated countless stories in order to gain the Fines' sympathy and justify his requests for money.

48.     One particular story set Laurie off.

49.     One day, Davis called Laurie and told her that Bernie sexually abused him while living in the Fine's home during the mid-1980s.

50.     Laurie "went off" on Davis, because Davis finally crossed the line.

6

51.     Bernie assured Laurie that it was just another one of Davis' fabricated stories.

52.     Although they agreed that Davis crossed the line in privately and falsely accusing Bernie of sexual abuse, the Fines were still in denial about their inability to better help Davis.

53.     Therefore, the Fines agreed not to "go off" on Davis in the future, because Davis was still just a young man in serious need of mental help and support.

54.      Davis continued calling Laurie with various stories designed to win her family's sympathy and justify his habitual requests for money

55.     When Davis was desperate, he would bring up his false accusations against Bernie.

56.     However, in light of their agreement not to "go off" on Davis, Laurie would patiently suffer Davis' vilification of her husband with the hope that Davis would eventually outgrow the lies and his dependency upon her family for financial support.

57.     Laurie occasionally tested Davis' various stories by asking him specific questions—questions intended to see just how far Davis was willing to let his lies go.

58.     Laurie often resorted to sarcasm during these conversations, as it was the only way she could get through Davis' stories without "going off" on him.

59.     Eventually, Davis quit calling Laurie with his made-up stories.

60.     The Fines thought Davis finally outgrew his dependency on them for money and the bitterness he felt when they withheld their financial support. They were wrong.

61.     In 2002, Davis saw an ESPN report about coaches molesting young

athletes.

62.     In light of ESPN's report, Davis believed the media would quickly pick up his story and that he could get payback against the Fines for their financial abandonment, and perhaps profit in some way from the media attention.

63.     Davis contacted Mike McAndrew ("McAndrew") and Matt Michael ("Michael"), reporters at *The Post-Standard*, a newspaper based in Syracuse, New York.

64.     Davis told McAndrew the same fabricated story he had previously told Laurie, that Bernie Fine had molested him while he, Davis, was a child.

65.     *The Post-Standard* spent a year researching Davis' story before determining they lacked any evidence to overcome their serious doubts as to the story's truth.

66.     Davis gave *The Post Standard* the names of several men, including Davis' own stepbrother, Mike Lang ("Lang"), who Davis said would corroborate his story.

67.     Lang is five years older than his stepbrother, Davis.

68.     Lang was a ball boy for, or otherwise similarly related to, the Syracuse Men's Basketball team before Davis.

69.     In 2002, McAndrew contacted Lang by telephone to vet Davis' story.

70.     During this conversation, Lang said Bernie had "never done nothing to me—never. I would tell you."

71.     Lang told McAndrew that, as of 2002, "he had not talked to Fine in about 15 years. He had stopped socializing with the coach because Lang had started smoking cigarettes and knew Fine would not approve[.]" Lang confirmed that his smoking was "the only reason why [he stopped socializing with Bernie.]"

72.     Lang renewed his social relationship with Bernie sometime after 2002.

73.     Lang even attended Bernie's 60th birthday party in 2006, and as recently as 2010, used Bernie's personal tickets to attend Syracuse Men's Basketball home games.

74.     Lang asked Bernie in 2009 or 2010 to allow Lang's sons to serve as ball boys for the Syracuse Men's Basketball team, thereby allowing them to follow in their father's footsteps. Lang further asked Bernie to show his sons the locker room, introduce them to the players, and otherwise give them the same experience he, Lang, had as a child.

75.     At or around this time, it was public record that Lang had experienced severe financial hardship.

76.     None of the men identified by Davis in 2003, including Lang, corroborated his accusations against Bernie, or his wife, Laurie.

77.     In 2003, after *The Post-Standard* refused to publish his story, Davis contacted Defendant ESPN and was put in touch with Defendants Mark Schwarz and Arthur Berko.

78.     Davis told Schwarz and Berko the same story he had told Laurie and *The Post-Standard*.

79.     Davis also gave Defendants an admittedly doctored, substantially inaudible, and entirely speculative tape, which Davis purported to be a recoding of a telephone conversation between he and Laurie in 2002.

80.     Davis told Defendants he made the tape, without Laurie's knowledge, in 2002.

81.     Davis told Defendants that the tape proved Laurie's knowledge of, and

involvement in, Bernie's molestation of him, Davis, from the 1980s to 2000.

82.     This tape is largely inaudible.

83.     The portions of this tape that are audible, are entirely speculative in nature and are otherwise totally unsupportive of Defendants' eventual coverage of Davis' story.

84.     On May 17, 2012, ESPN published a 46 minute, 41 second recording that it, ESPN, purports to be the entire taped conversation between Davis and Plaintiff from 2002. From this recording, it is apparent that:

1. Plaintiff repeatedly confirms that Bernie never sexually molested Davis.

2. Plaintiff repeatedly cautions Davis from having contact with Bernie, in light of Davis' accusations; and

3. Plaintiff repeatedly looks out for Davis as a mother would.

85.     Regarding the statement in this recording that Plaintiff was "with" Davis because she wanted to be, it is apparent within the entire context of the tape that "with" simply refers to spending time with Davis, which Bernie seemingly resented. Moreover, Plaintiff mocks that idea that she had any improper relationship with Davis or anyone other than her husband, and Davis in no way indicates that his relationship with Plaintiff was untoward.

86.     ESPN knew this recording was inconsistent with Davis' accusations. This is readily apparent from the comments of Vince Doria, Vice President and Director of News for ESPN, in a November 28, 2011 article entitled "ESPN's Doria on Syracuse Coverage." In this article, Doria admits that the recording "was clearly a damning tape in terms of [Laurie's] characterization of her husband but much of it was her thinking and beliefs. [Laurie] never directly acknowledged to have witnessed any of [Davis'

accusations] first-hand."

87.     During this recording, Davis lied to Laurie and deceived her be telling her that he was not recording the conversation.

88.     From 2003 to 2011, Defendants refused to publish this admittedly unreliable tape because it was substantially inaudible, entirely speculative in nature, and otherwise lacked any corroborating support. Defendants were also aware of *The Post-Standard*'s refusal to publish the Davis' story, despite their possession of the same tape.

89.     As he did with *The Post-Standard*, Davis gave Defendants the names of various persons whom Davis promised would corroborate his accusations against the Fines.

90.     Not a single person corroborated Davis' story.

91.     Defendants contacted Davis' stepbrother, Lang, to corroborate Davis' story.

92.     Lang again denied ever being abused by Bernie, and assured Defendants that Bernie had never done anything inappropriate to him.

93.     Defendants did not publish Davis' story because Davis was the only source; Bernie was a well-respected coach and individual; Bernie had no track record whatsoever that would support Davis' accusations; none of the persons named by Davis corroborated his story, including Davis' stepbrother, Lang; and the tape produced by Davis was unauthenticated.

94.     During an interview with Richard Deitsch ("Deitsch") of Sports Illustrated on December 1, 2011, Defendant Schwarz explained: "It was not as if we were party to recording it, vetting it, knowing how it was made, who was on the other end of the phone

call. We had never met Laurie Fine. We didn't know her voice. And it was not a perfect recording, either. It was a little scratchy and you could hear it, but you had to strain to hear exactly what was said. We had to sweeten the audio quality to make sure we understood the words better."

95. Defendant Schwarz also stated that he and Berko interviewed Lang on several occasions in 2003, but that Lang said Bernie never once inappropriately touched him.

96. In light of the above, Defendants decided not to run Davis' story or publish the selective statements taken out of context from the admittedly doctored, substantially inaudible, and entirely speculative tape purporting to be of Laurie Fine in 2003, because they lacked evidence to overcome their serious doubts as to the story's truth.

97. Just as Laurie and *The Post-Standard* had done, Defendants vetted Davis' story and found absolutely no corroborating evidence to support its publication in 2003.

98. Having failed to convince *The Post-Standard* and Defendants in 2003, Davis emailed his story to Syracuse University Chancellor Nancy Cantor in 2005.

99. Syracuse University hired a law firm to investigate Davis' story. However, when its investigation was over, it too concluded that Davis' story was totally unfounded. By way of Davis, Defendants were aware of this investigation's unfounded conclusions when they subsequently defamed Plaintiff.

100. Schwarz regretted not breaking Davis' story in 2003.

101. Schwarz obsessed over Davis' story. His obsession is apparent during his December 1, 2011 interview with Deitsch: "I would have taken a run at [Davis' story]

every month of my career between 2003 and 2011 if I could have been pulled off other events and other coverage. If someone said you can either do this story, or you can do 100 NBA championship events or 17 World Series, which would you do, I would do this story and let other people cover the World Series."

102.　In 2003, Schwarz went so far as to spy on Plaintiff, shooting a hidden camera video of her without her knowledge. This video could have been used to authenticate Laurie's voice in 2003. Instead, Defendants did not bother to authenticate Laurie's voice until after the Penn State Sex Abuse Scandal in 2011.

103.　Schwarz kept in regular contact with Davis over the next decade.

104.　Schwarz knew about Davis' first marriage and divorce. Schwarz knew that Davis found God and was no longer pushing his story against the Fines. Schwarz knew Davis was remarried and had two kids and that everything in Davis' life was great.

105.　Although Davis had finally outgrown his story, Schwarz kept calling Davis, pressuring him until November 2011, at which time the Penn State Sex Abuse Scandal broke.

106.　The Penn State Sex Abuse Scandal involved accusations against a former assistant Pennsylvania State University football coach, Jerry Sandusky, who is alleged to have sexually abused several young boys while employed by the university.

107.　Just as he had after watching the 2002 ESPN report about coaches accused of sexually abusing young athletes, the Penn State Sex Abuse Scandal spurned Davis to recirculate his story to Defendants with the intent of punishing the Fines for their tough love and financial abandonment, and capitalizing financially from his "fifteen minutes of fame."

108.    This time Davis convinced his stepbrother, Lang, to back him up.

109.    Davis gave Lang Defendant Schwarz' cell phone number and instructed him to tell Schwarz that Bernie had molested him, Lang, just like Jerry Sandusky molested those kids at Penn State.

110.    Lang called Schwarz on November 11, 2011, and recanted the claim he steadfastly maintained during the prior decade, that "[t]he things that happened to [Davis], didn't happen to me."[1]

111.    Despite Lang's blatant non-credibility, which was most evident from his inconsistent and contradictory statements, inherently biased relationship to Davis, renewed relationship with Bernie Fine, including coming to Bernie's 60th birthday party, using Bernie's personal basketball tickets to attend Syracuse home games, and requesting that his sons serve as ball boys for Bernie and the Syracuse Basketball team, Defendants relied on Lang as a second-source to Davis' otherwise completely uncorroborated accusations.

112.    Nearly a decade after first investigating Davis' story, but only six days after receiving Lang's phone call, Defendants broke Davis' story on November 17, 2011.

113.    Defendants had serious doubts as to the truth of Davis' story in 2011, just as they had in 2003, because the story still lacked a credible second source or any corroborating evidence.

114.    Only two things changed between 2003, when Defendants first investigated Davis' story but refused to publish it, and November 17, 2011, when

---

[1] Lang's statement does not appear in the printed article, but may be heard in the audio recording that appears in the article and found at:
http://www.syracuse.com/news/index.ssf/2012/04/bernie_fine_supporters_questio.html

Defendants published Davis' accusations against Laurie and Bernie Fine.

> 1. In November 2011, the Penn State Sex Abuse Scandal received worldwide coverage.
>
> 2. In the immediate wake of the Penn State Sex Abuse Scandal, Mike Lang suddenly recanted decades-long testimony by telling Schwarz he was abused, just like the children at Penn State.

115. By 2011, Schwarz had lost his journalistic objectivity in Davis' story, in part, by maintaining personal communication with Davis for almost a decade.

116. These personal communications caused Schwarz and Berko to push Davis' story, despite having serious doubts as to its truth, because they had spitefully developed an irrational ill will toward the Fines since Davis first approached Defendants in 2003.

117. Defendants knew that Lang had consistently maintained that "[t]he things that happened to [Davis], didn't happen to me."

118. Defendants knew that Lang was Davis' stepbrother.

119. Defendants were aware of, or knowingly overlooked, countless reasons to seriously doubt Lang's credibility, including that Lang attended Bernie Fine's 60th birthday party in 2006, and as recently as 2010, used Bernie Fine's tickets to attend Syracuse Men's Basketball home games. If there were any credibility to Lang's corroborating statements, he surely would not have renewed such a close personal relationship with Bernie during this time.

120. Defendants were aware of, or knowingly overlooked, the fact that Lang asked Bernie in 2009 or 2010 to allow Lang's sons to serve as ball boys for the Syracuse

Men's Basketball team, thereby following in their father's footsteps. Lang further asked Bernie to show his sons the locker room, introduce them to the players, and otherwise give them the same experience he, Lang, had as a child. Had their been any credibility to Lang's eventual and inconsistent support of Davis' accusations, it clearly was undone by Lang's request to place his sons within Bernie's close personal supervision.

121.    At or around this time, Defendants knew that it was public record that Lang had experienced severe financial hardship. Lang's financial desperation should have compelled Defendants to further question Lang's non-credibility as a second-source to a story they had otherwise kept under wraps for almost a decade.

122.    Nevertheless, Schwarz and Berko pushed the story, despite having serious doubts at to its truth, because of the ill will they had irrationally developed toward the Fines since 2003.

123.    ESPN pushed the story, despite having serious doubts as to its truth, in order to capitalize financially in the wake of the Penn State Sexual Abuse Scandal.

124.    In doing so, Defendants ignored Lang's total lack credibility, which should have precluded Defendants from maliciously publishing the story.

125.    Vince Doria spoke about Defendants' over-eagerness to break Davis' story at the S.I. Newhouse School of Public Communications at Syracuse University on February 23, 2012.

126.    At the Newhouse symposium, Doria was asked, "Would you have broken the Syracuse story, the way you did, and at the time you did, had the Penn State Scandal not been broken?" In response, Doria explained, "I don't think that I could give you an *honest* answer. There is no doubt that ESPN, every news entity, the world at large, was

influenced by the Sandusky-Penn State story, and once that's in your head, and you are aware of it and you've seen how its played out, you see the impact that it's had, *it's awfully hard to make an objective judgment*."

127. Doria further explained that Defendants had doubts about Davis and Lang, as well as the facts otherwise known to Defendants, but published Davis' story anyway. "Would we have reported it [had the Penn State story not been broke]? I'd like to think the sourcing of it, and the facts that we had at the time would've compelled us to report it, but can I tell you that Penn State wasn't in my head? I can't tell you that."

128. On or around November 20, 2011, just days after Defendants gave life to Davis' story, Zach Tomaselli contacted ESPN and was put in touch with Schwarz.

129. Tomaselli told Schwarz that he had been abused by Bernie Fine.

130. Motivated by his ill will toward the Fines, and before Tomaselli had even spoken with police, Schwarz put Tomaselli in direct contact with Davis.

131. Schwarz acted maliciously, wantonly, and recklessly by putting Tomaselli directly in touch with Davis. This act willfully disregarded the Fines' rights.

132. Schwarz put Tomaselli in touch with Davis so that Davis could coach Tomaselli on what to say to the Syracuse police.

133. During a December 4, 2011 interview with Howard Kurtz of CNN's Reliable Sources, Vince Doria admitted that Schwarz's actions, putting a primary source to a story, Davis, in touch with a secondary source to the same story, Tomaselli, was grossly inappropriate. Specifically, Doria explained, "that is not how we typically operate. Putting two sources in touch with each other is something we would not normally do, and probably would not have done in this case if we had thought about it."

134.    In April 2012, Tomaselli admitted that Davis coached him on what to say to police over the course of multiple telephone conversations. Tomaselli also admitted to making up his accusations against Bernie Fine.[2]

135.    Davis knew Tomaselli was lying during these telephone conversations.

136.    During these telephone conversations, Tomaselli could not describe the Fines' home, the Syracuse basketball arena, or the players on the Syracuse basketball team at the time he was allegedly abused.

137.    Davis told Schwarz that Tomaselli's claim was a lie.

138.    Defendants repeatedly told Tomaselli that his story lacked credibility and fell short of Defendants' journalistic standards.

139.    Defendants nevertheless leaked Tomaselli's story to *The Post-Standard* in order to falsely boost the newsworthiness of Tomaselli's non-credible story.

140.    Despite knowing that Tomaselli was lying, Defendants published Tomaselli's allegations, without qualification, in order to bolster Davis' accusations against the Fines and to further justify Defendants' 2011 publication of selective statements taken out of context from the admittedly doctored, substantially inaudible, and entirely speculative tape made by Davis in 2002.

141.    On November 27, 2011, just a week after breaking the story and shortly after "casting" Tomaselli as the third accuser, Defendants published selective statements, taken out of context from the tape given to them by Davis in, and held by Defendants since, 2003—the recording that Davis claimed to be of a 2002 telephone conversation between he and Laurie.

---

[2] Tomaselli later claimed he was lying about lying about accusing Bernie Fine of sexual abuse.

142.    From 2003 to 2011, Defendants refused to publish any part of this admittedly unreliable tape because it was substantially inaudible, entirely speculative in nature, lacked any corroborating support, and otherwise failed to support Davis' claims when considered in the overall context of those limited portions of the tape that were somewhat audible.

143.    Despite its entirely speculative nature, Defendants doctored and otherwise highly edited this unreliable tape for publication in 2011.

144.    Defendants distorted the tape's sound quality and voices, and otherwise spliced and/or deleted portions of the recording that were inconsistent with and totally contradicted the storyline of their coverage.

145.    Although Defendants claim they confirmed in 2011 that the tape included Plaintiff's voice, Defendants have not made any other representations as to the tape's authenticity and doctored nature.

146.    After refusing to publish it for more than eight (8) years, Defendants published selective statements taken out of context from the admittedly doctored, substantially inaudible, and entirely speculative tape during an ESPN program entitled *Outside the Lines* on November 27, 2011.

147.    ESPN continues to publish selective statements taken out of context from the admittedly doctored, substantially inaudible, and entirely speculative tape on its website, where the recording has received predictably significant attention via social media.

148.    The selective statements taken out of context from the admittedly doctored, substantially inaudible, and entirely speculative tape has drawn over 4,000

comments on ESPN's website, has been recommended on Facebook over 4,000 times, and has been shared on Twitter almost 1,000 times.

149.    The selective statements taken out of context from the admittedly doctored, substantially inaudible, and entirely speculative tape has been countlessly republished via other forms of social networking, as well as by media broadcast companies around the world.

150.    The selective statements taken out of context from the admittedly doctored, substantially inaudible, and entirely speculative tape has been the subject of various stories and interviews subsequently published by Defendants.

151.    During the November 27, 2011 program on *Outside the Lines*, since available on ESPN's website, Defendants selectively published statements taken out of context from the admittedly doctored, substantially inaudible, and entirely speculative tape.[3]

152.    The gist of Defendants' defamatory publications is that Laurie knowingly created an environment within her home where young boys could be molested in secret.

153.    Defendants had actual notice that the gist of the publication was false.

154.    Defendants had serious doubts as to the publication's truth.

155.    Defendants had actual notice that several statements made by Schwarz in the program, or otherwise published by Defendants, were false.

156.    Defendants had serious doubts as to whether several statements made by Schwarz in the program, or otherwise published by Defendants, were true.

_____

[3] Defendants claim the selected statements were taken from a tape purported to be about 47 minutes in length. Defendants published a 46 minute, 41 second tape on May 17, 2012.

157.    Defendants had actual notice that several portions of the admittedly doctored, substantially inaudible, and entirely speculative tape were published outside their original context, and/or misleadingly represented as supportive of the publication's false gist.

158.    Defendants had serious doubts as to whether selective statements taken out of context from the admittedly doctored, substantially inaudible, and entirely speculative tape were published outside their original context, so as to make the gist of the publication untrue.

159.    Davis was not the first at-risk child the Fines welcomed into their home.

160.    For years, the Fines provided a home to at-risk children, including a 14-year old boy, named Floyd VanHooser ("VanHooser").

161.    VanHooser moved in with Bernie Fine after VanHooser's parents died.

162.    On or around December 15, 2011, VanHooser told The Associate Press during a prison interview that he too was abused by Bernie.

163.    VanHooser is serving a 16-year to life sentence at Clinton state prison for his involvement in several burglaries of Syracuse-area homes.

164.    Shortly after VanHooser accused Bernie of sexual abuse, Onondaga County District Attorney William Fitzpatrick made clear that VanHooser's claims were not credible.

165.    A month later, on or around January 15, 2012, VanHooser recanted his accusation and admitted that he was never molested by Bernie.

166.    Plaintiff and her husband have put their house up for sale in order to escape the predictable aftermath of Defendants' continued malicious publication of

certain false and defamatory statements.

## CAUSE OF ACTION FOR LIBEL AGAINST ALL DEFENDANTS

167.    Plaintiff, Laurie J. Fine, hereby incorporates, adopts, and re-alleges Paragraphs 1 through 166 of this Complaint as if fully set forth herein.

168.    The gist of Defendants' publication is that Plaintiff is a despicable person worthy of public contempt. Defendants created this gist by falsely stating that Plaintiff engaged in a number of unsavory and disreputable acts, including, but not limited to, knowing that her husband was sexually molesting Davis but not doing anything to stop it; having adulterous sex with Davis while he was still in high school; witnessing her husband sexually molest Davis, but not doing anything to stop it; and having adulterous sex with numerous members of the Syracuse men's basketball team.

169.    Plaintiff did not engage in any of the unsavory and disreputable acts for which she stands accused by Defendants in their coverage of Davis' accusations.

170.    The gist of Defendants' publication is false and defamatory and constitutes libel per se and/or libel by implication in that it imputes to Plaintiff numerous unsavory and disreputable acts that injure her personal and professional reputations.

171.    Defendants published the libelous statements without any privilege.

172.    Major newspapers, television and radio programs around the country, and Internet websites republished Defendants' libelous statements.

173.    Defendants' libelous statements are still available, as of the date of the filing of this Complaint, on Defendant ESPN's Internet website.

### *Libelous Statement 1: Laurie Fine knew her husband was sexually molesting Davis*

174.    Plaintiff hereby incorporates, adopts, and re-alleges Paragraphs 1 through

173 of this Complaint as if fully set forth herein.

175.    On November 27, 2011, Defendants published false and defamatory statements in an article entitled, *Bernie Fine's wife had abuse concerns*.

176.    This article's title is a false and defamatory statement, because it conveys the totally untrue contention that Plaintiff knew her husband, Bernie Fine, was sexually molesting Robert Davis in their home, while Davis was a child, but did not do anything to stop it.

177.    Defendants also published the following false and defamatory statements, thereby conveying again that Plaintiff knew her husband was sexually molesting Davis in their home, while Davis was a child, but did not do anything to stop it.

> In a tape-recorded 2002 telephone conversation, the wife of Syracuse associate head coach Bernie Fine admitted she had concerns that her husband had sexually molested a team ball boy in their home, but said she felt powerless to stop the alleged abuse.
>
> ...
>
> "I know everything that went on, you know," Laurie Fine said on the call, obtained by *Outside the Lines* from Davis. "I know everything that went on with him...Bernie has issues, maybe that's not aware of, but he has issues...And you trusted somebody you shouldn't have trusted..."
>
> She continued: "Bernie is also in denial. I think that he did the things he did, but he's somehow through his own mental telepathy has erased them out of his mind."
>
> ...
>
> "Laurie was a person I talked to a lot about this situation as I got older," Davis said in an interview with ESPN. "And she was there a lot of the times, and had seen a lot of the things that were going on when Bernie would come down to the basement in his house at night."
>
> On the tape, Davis repeatedly asked Laurie Fine about what she knew of the alleged molestation.

"Do you think I'm the only one that he's ever done that to?" Davis asked,

"No...I think there might have been others but it was geared to...there was something about you," Laurie Fine said.

"Yeah, that's what I'm wondering." Davis said. "Like I'm wondering why I was like the worst one."

"I don't know," Fine said.

...

On the call, Laurie Fine told Davis she'd already warned her husband that one day his alleged molestation of Davis might become public.

"I said to him, '[Davis] and I talked, and I know some things about you that if you keep pushing are going to be let out.'"

Davis continued: "He doesn't think he can be touched..."

Laurie Fine: "No...he thinks he's above the law."

(*Bernie Fine's wife had abuse concerns*, November 27, 2011).

178.    In this same article, Defendants also published by video the following false and defamatory statements, thereby conveying that Plaintiff knew her husband, Bernie Fine, was sexually molesting Davis in their home, while Davis was a child.

Schwarz: "Bobby Davis says he knew of one person who could validate that he was being sexually abused by Bernie Fine. That person was Fine's wife, Laurie Fine."

...

Schwarz: "Davis says that in October of 2002, he recorded a phone conversation with Laurie Fine, without her knowledge—a legal act, based on the location of both parties. During the call, Fine, seen here in hidden camera video from 2003, discussed the alleged sexual molestation of Davis by her husband, Syracuse associate head basketball coach, Bernie Fine."

...

Schwarz: "After bringing his allegations against Bernie Fine to a Syracuse police detective in 2002, and getting no where, Davis says he was determined to confirm his story. He says he hoped Laurie Fine would disclose on tape the details of her own knowledge of the abuse he says started when he was twelve, and continued for more than a decade."

...

Davis: "Laurie was a person I talked to a lot about the situation as I got older, um, and she was there a lot of the times, and seen a lot of the things that were going on, ya know, when, ya know, Bernie would come down to the basement, uh, in his house, uh, at night, and when I was laying down there, and ya know, she had to see him every night to do that. Laurie was the only one else that knew about what was going on, ya know, and saw things that were happening with her own eyes, and that we talked about it."

...

Schwarz: "Davis, who periodically stayed here, at the Fine's former home, beginning in the seventh grade, and at one point had his own room in their basement, says Laurie Fine told him that she was aware that her husband was sexually abusing him."

...

Schwarz: "Danielle Roach, who has been friends with Davis since the second grade, says that as a teenager, she served as the Fine's babysitter for about three years. Recently, Roach listened to the conversation again. Davis first played the call for her after recording it in 2002.

Roach: "The tape tells me that Laurie knew and watched it go on, knowing that it was going on in her home for a long time."

Schwarz: "Roach, who is now a mother herself, says she cannot imagine how any mother could know sexual abuse was happening in her home and not act."

Roach: "It's amazing she can say some of the things she says to Bobby, but couldn't pick up a phone and say maybe this isn't the place for your kid. Maybe he shouldn't be here."

(*Bernie Fine's wife had abuse concerns*, November 27, 2011).

179.    In addition to the above statements, Defendants published the following false and defamatory statements in a separate article, thereby conveying again that Plaintiff knew her husband was molesting children in their home:

> Bernie Fine was fired Sunday by Syracuse University after a 10-year-old voice recording of his wife emerged in which she acknowledges alleged sexual abuse...

(*Bernie Fine fired amid abuse concerns*, November 27, 2011, updated November 28, 2011).

180.    The above statements are herein referenced as Libelous Statement 1.

181.    Libelous Statement 1 is false because Plaintiff's husband never sexually abused Davis, nor has he been charged with any crime in connection with any accusation made pursuant to Defendants' coverage of Davis' story.

182.    Libelous Statement 1 is false because Plaintiff did not have, nor does she presently have, concerns that her husband sexually abused Davis.

183.    Libelous Statement 1 is false because Plaintiff did not know, and does not now know or believe that her husband ever sexually molested Davis.

184.    Libelous Statement 1 is false because Plaintiff never acknowledged that her husband sexually abused Davis in the selective statements taken out of context from the admittedly doctored, substantially inaudible, and entirely speculative tape from 2002.

185.    Libelous Statement 1 is false because Plaintiff never witnessed sexual molestation in her home.

186.    Libelous Statement 1 is false because Plaintiff never says in the selective statements taken out of context from the admittedly doctored, substantially inaudible, and entirely speculative tape from 2002 that she witnessed her husband molest Davis.

187.     Libelous Statement 1 is false because Plaintiff was not acknowledging that Davis had ben sexually molested in the above statements, which were selectively published by Defendants from a 47-minute unauthenticated tape-recording and published in such a way to fit Davis' story. The entirety of the tape-recording demonstrates that Plaintiff was, in fact, repeatedly confirming that Davis had not been sexually molested by her husband.

188.     Libelous Statement 1 is false because Plaintiff was not acknowledging that Davis had been sexually molested in the misleadingly quoted statements above, but rather her husband's enabling of Davis' dependence upon the Fines for money, against Plaintiff's will; the Fine's overwhelming expectations for Davis to turn his life around, and Davis' inability to do so; her husband's occasional use of corporal punishment and reprimanding when Davis refused to repay the Fines for past loans; and finally, Davis' threats to mislead NCAA investigations into the fictional misconduct of the Syracuse Men's Basketball program. The entirety of the tape-recording demonstrates that Plaintiff was, in fact, repeatedly confirming that Davis had not been sexually molested by her husband.

189.     Libelous Statement 1 is false because Danielle Roach never served as the Fine's babysitter.

190.     Upon information and belief, Danielle Roach is Davis' ex-girlfriend.

191.     Libelous Statement 1 is libel per se and defamatory because, among other things, it conveys to the average, right-thinking reader the totally untrue contention that Plaintiff was passively and/or otherwise involved in the serious sexual misconduct of a young child.

192.    Libelous Statement 1 is libel per se and otherwise defamatory because it imputes unchastity to Plaintiff.

193.    Libelous Statement 1 is libel per se and otherwise defamatory because, among other things, it tends to injure Plaintiff's professional reputation as a nonprofit fundraiser, particularly in the area of children's organizations, where her experience is almost exclusively focused.

### *Libelous Statement 2: Laurie Fine had a Sexual Relationship with Davis*

194.    Plaintiff hereby incorporates, adopts, and re-alleges Paragraphs 1 through 193 of this Complaint as if fully set forth herein.

195.    On November 27, 2011, Defendants published the following false and defamatory statements in an article entitled, *Bernie Fine's wife had abuse concerns*, thereby conveying that Laurie Fine had a sexual relationship with Davis.

> Later, Laurie Fine admitted to having a relationship with Davis. In the interview with ESPN, Davis said that occurred when he was 18 and a senior in high school. Davis said he told Bernie Fine about it, but Fine seemed unaffected. "I thought he was gonna kill me, but I had to tell him," Davis said in the interview with ESPN. "I felt so bad. I told him about it—what was going on with me and Laurie—and it didn't faze him one bit honestly."

(*Bernie Fine's wife had abuse concerns*, November 27, 2011).

196.    On November 27, 2011, Defendants also published by video the following false and defamatory statements in an article entitled, *Bernie Fine's wife had abuse concerns*, thereby conveying the totally untrue contention that Plaintiff had a sexual relationship with Davis.

> Schwarz: "Davis says, he and Laurie Fine had a sexual relationship that she initiated when he says, he was 18 and a senior in high school."

Schwarz: "Were you ever with her sexually?"

Davis: "Yes."

Schwarz: "Slept with her?"

Davis: "Yes."

Schwarz: "Had intercourse with her?"

Davis: "Yes."

(*Bernie Fine's wife had abuse concerns*, November 27, 2011).

197.    The above statements are herein referred to as Libelous Statement 2.

198.    Libelous Statement 2 is false because Plaintiff never had a sexual relationship with Davis. This is apparent within the entire context of the tape-recording where Plaintiff mocks the idea that she had any improper relationship with Davis or anyone, and Davis in no way indicates that his relationship with Plaintiff was untoward.

199.    Libelous Statement 2 is false because Plaintiff never admitted to having a sexual relationship with Davis. This is apparent within the entire context of the tape-recording where Plaintiff mocks the idea that she had any improper relationship with Davis or anyone, and Davis in no way indicates that his relationship with Plaintiff was untoward.

200.    Libelous Statement 2 is libel per se and otherwise defamatory because, among other things, it conveys to the average, right-thinking reader the totally untrue contention that Plaintiff was passively and/or otherwise involved in the serious sexual misconduct of a child and young man. By stating that Plaintiff had sex with Davis when Davis was a senior in high school, the average, right-thinking reader reasonably concludes that Plaintiff was more likely involved or complicit in Davis' other accusations

of sexual molestation.

201.    Libelous Statement 2 is libel per se and otherwise defamatory because it imputes unchastity to Plaintiff.

202.    Libelous Statement 2 is libel per se and otherwise defamatory because, among other things, it tends to injure Plaintiff's professional reputation as a nonprofit fundraiser, particularly in the area of children's organizations, where her experience is almost exclusively focused.

### Libelous Statement 3: Laurie Fine witnessed her husband molest Davis in her home, but did nothing to stop it

203.    Plaintiff hereby incorporates, adopts, and re-alleges Paragraphs 1 through 102 of this Complaint as if fully set forth herein.

204.    On November 27, 2011, Defendants published the following statements about Plaintiff in an article entitled, *Bernie Fine's wife had abuse concerns*, thereby conveying that Plaintiff witnessed her husband sexually molest Davis in secret, but did nothing to stop it.

> "Laurie was a person I talked to a lot about this situation as I got older," Davis said in an interview with ESPN. "And she was there a lot of the times, and had seen a lot of the things that were going on when Bernie would come down to the basement in his house at night."

(*Bernie Fine's wife had abuse concerns*, November 27, 2011)

205.    The above statements are herein referred to as Libelous Statement 3

206.    Libelous Statement 3 is false because Plaintiff's husband never sexually abused Davis, nor has he been charged with any crime in connection with any accusation made pursuant to Defendants' coverage of Davis' story.

207.    Libelous Statement 3 is false because Plaintiff never witnessed sexual

abuse in her home. The entirety of the tape-recording demonstrates that Plaintiff was, in fact, repeatedly confirming that Davis had not been sexually molested by her husband.

208.    Libelous Statement 3 is false because Plaintiff never says or admits in the selective statements taken out of context from the admittedly doctored, substantially inaudible, and entirely speculative tape-recording from 2002 that she was aware of or witnessed her husband sexually molest Davis. The entirety of the tape-recording demonstrates that Plaintiff was, in fact, repeatedly confirming that Davis had not been sexually molested by her husband.

209.    Libelous Statement 3 is libel per se and defamatory because, among other things, it conveys to the average, right-thinking reader the totally untrue contention that Plaintiff was passively and/or otherwise involved in the serious sexual misconduct of a child.

210.    Libelous Statement 3 is libel per se and otherwise defamatory because, among other things, it tends to injure Plaintiff's professional reputation as a nonprofit fundraiser, particularly in the area of children's organizations, where her experience is almost exclusively focused.

### Libelous Statement 4: Laurie Fine created a space in her home where children could be sexually molested in secret

211.    Plaintiff hereby incorporates, adopts, and re-alleges Paragraphs 1 through 210 of this Complaint as if fully set forth herein.

212.    On November 27, 2011, Defendants published by video the following false and defamatory statements in an article entitled, *Bernie Fine's wife had abuse concerns*, thereby conveying that Plaintiff created a space in her home in which children could be sexually molested in secret.

31

Danielle Roach: "This is about a kid who was abused and adults who didn't help, who didn't step in, who in fact sort of allowed it, created a space for it to go on."

(*Bernie Fine's wife had abuse concerns*, November 27, 2011).

213.   The above statements are herein referred to as Libelous Statement 4.

214.   Libelous Statement 4 is false because Plaintiff's husband never sexually abused Davis, nor has he been charged with any crime in connection with any accusation made pursuant to Defendants' coverage of Davis' story.

215.   Libelous Statement 4 is false because Plaintiff did not create a space in which her husband could sexually molest Davis in secret.

216.   Libelous Statement 4 is false because Plaintiff did not know, and does not now know or believe that her husband ever sexually molested Davis. The entirety of the tape-recording demonstrates that Plaintiff was, in fact, repeatedly confirming that Davis had not been sexually molested by her husband.

217.   Libelous Statement 4 is false because Plaintiff never witnessed her husband abusing Davis in an inappropriate manner. The entirety of the tape-recording demonstrates that Plaintiff was, in fact, repeatedly confirming that Davis had not been sexually molested by her husband.

218.   Libelous Statement 4 is false because Plaintiff never says or admits in the selective statements taken out of context from the admittedly doctored, substantially inaudible, and entirely speculative tape from 2002 that she was aware of or witnessed her husband sexually abuse Davis. The entirety of the tape-recording demonstrates that Plaintiff was, in fact, repeatedly confirming that Davis had not been sexually molested by her husband.

219.    Libelous Statement 4 is false because Danielle Roach never served as the Fines' babysitter.

220.    Upon information and belief, Danielle Roach is Davis' ex-girlfriend.

221.    Libelous Statement 4 is libel per se and defamatory because, among other things, it conveys to the average, right-thinking reader the totally untrue contention that Plaintiff was passively and/or otherwise involved in the serious sexual misconduct of a young child.

222.    Libelous Statement 4 is libel per se and defamatory because, among other things, it tends to injure Plaintiff's professional reputation as a nonprofit fundraiser, particularly in the area of children's organizations, where her experience is almost exclusively focused.

***Libelous Statement 5: Laurie Fine slept with Syracuse basketball players***

223.    Plaintiff hereby incorporates, adopts, and re-alleges Paragraphs 1 through 222 of this Complaint as if fully set forth herein.

224.    On February 12, 2012 Defendants published the following false and defamatory statements in an article entitled, *Affidavit: Fine's wife slept with players*, thereby conveying that Plaintiff had multiple adulterous sexual relationships with Syracuse basketball players:

> In the affidavit, Bobby Davis, a former ball boy with the men's team, says he was present on several occasions with basketball players when he heard them speaking of having sex with Laurie Fine. Davis said players joked about it and it seemed to be an openly known fact that Laurie Fine has sex with basketball players.

 (*Affidavit: Fine's wife slept with players*, January 31, 2012, updated February 2, 2012).

33

225.    In addition to the above statements, Defendants published the following false and defamatory statements in a separate article, entitled *Judge: Laurie Fine claims not relevant*, thereby conveying again that Plaintiff had several dysfunctional relationships with Syracuse Men's Basketball players:

> Salacious claims about the wife of an assistant Syracuse University basketball coach who was fired after claims that he molested boys have no bearing in a slander lawsuit two of the men brought against the team's coach, a judge ruled Friday.
>
> ...
>
> Before the ruling, a lawyer for the men, Mariann Wang, argued that Laurie Fine's alleged affairs point to an atmosphere of "dysfunctional" sexual relationships surrounding the Fines...
>
> ...
>
> The former ball boys sought addresses for all Syracuse basketball team members from 1992 to 1997, the names of anyone who may have had a sexual relationship with either Bernie or Laurie Fine and information on what the university or [head coach Jim] Boeheim knew about her alleged affairs with players and ball boys, among other information.
>
> ...
>
> 'What is the relationship between the alleged conduct of Mrs. Fine and basketball players and the statements made by Boeheim?' Judge Singh asked.
>
> 'This was an element of the severe dysfunctional relationship that, apparently, Laurie and Bernie Fine had with one another,' and others, Wang responded. 'It goes directly to Boeheim's knowledge. When he made the statements that our clients are liars and money-grubbers, effectively, what did he know?'

(*Judge: Laurie Fine claims not relevant*, February 12, 2012).

226.    The above statements are herein referred to as Libelous Statement 5.

227.    Libelous Statement 5 is false because Plaintiff never had a sexual

relationship of any kind with any player on the Syracuse basketball team. No current or former player has stepped forward, or been produced by Defendants, claiming otherwise. Defendants knew there were no such players before maliciously publishing Davis' story, and, in fact, the entirety of the tape-recording either mocks the idea that Plaintiff had a sexual relationship of any kind with any player on the Syracuse basketball team or is completely devoid of any indication of a sexual relationship of any kind between Plaintiff and any player on the Syracuse basketball team.

228.    Libelous Statement 5 is libel per se because, among other things, it conveys to the average, right-thinking reader the totally untrue contention that Plaintiff was passively and/or otherwise involved in the serious sexual misconduct of Davis while he was a young child. By stating that Plaintiff had sex with members of the Syracuse basketball team, the average, right-thinking reader reasonably concludes that Plaintiff was more likely to be involved or complicit in Davis' other accusations of sexual abuse.

229.    Libelous Statement 5 is libel per se and otherwise defamatory because it imputes unchastity to Plaintiff.

230.    Libelous Statement 5 is libel per se and defamatory because it imputes serious sexual misconduct to Plaintiff. At times, college athletic teams have minors on their roster. By indiscriminately stating that Plaintiff had sex with players on the Syracuse basketball team, Defendants suggest that Plaintiff may have had sex with minors. By suggesting that Plaintiff had sex with minors, Defendants impute to Plaintiff serious sexual misconduct.

231.    Libelous Statement 5 is libel per se and otherwise defamatory because, among other things, it tends to injure Plaintiff's professional reputation as a nonprofit

fundraiser, particularly in the area of children's organizations, where her experience is almost exclusively focused.

### *Libelous Statement 6: Laurie Fine betrayed Davis' trust*

232.     Plaintiff hereby incorporates, adopts, and re-alleges Paragraphs 1 through 231 of this Complaint as if fully set forth herein.

233.     On November 27, 2011, Defendants published by video the following false and defamatory statement in an article entitled, *Bernie Fine's wife had abuse concerns*, thereby conveying that Plaintiff betrayed Davis' trust by having sex with Davis and otherwise permitting her husband to sexually molest Davis:

> Schwarz: "At one point, Laurie Fine seems to say that her husband was not the only adult in the Fine household who betrayed Davis' trust."

(*Bernie Fine's wife had abuse concerns*, November 27, 2011).

234.     In misleading support of the above false and libelous statement, Defendants selectively published the following excerpt of the unauthenticated 2002 tape-recording made and produced to them by Davis:

> Laurie Fine: "The issue at hand is that he has no business doing what he did to you."
>
> Davis: "In retrospect, I, I..."
>
> Laurie Fine: "You know what, and neither did I, because I really helped screw you up a little more too..."

(*Bernie Fine's wife had abuse concerns*, November 27, 2011).

235.     The above statements are herein referred to as Libelous Statement 6.

236.     Libelous Statement 6 is false because Plaintiff's husband never sexually abused Davis, nor has he been charged with any crime in connection with any accusation made pursuant to Defendants' coverage of Davis' story.

237.    Libelous Statement 6 is false because Plaintiff never had a sexual relationship with Davis. This is apparent from the entire context of the tape-recording where Plaintiff mocks the idea that she had any improper relationship with Davis or anyone, and Davis in no way indicates that his relationship with Plaintiff was untoward.

238.    Libelous Statement 6 is false because Plaintiff was not acknowledging that Davis had been sexually molested, which Defendants otherwise imply from the surrounding context of the November 27, 2011 publication, but rather how her husband habitually enabled Davis' financial dependency on the Fines; her and her husband's overwhelming expectations for Davis to turn his life around, and Davis' inability to do so; and her husband's occasional use of corporal punishment and reprimanding when Davis refused to repay the Fines for past loans. Plaintiff felt responsible for not stepping in to prevent Davis' unhealthy dependency on Bernie's financial generosity, and her family's potentially overwhelming expectations of Davis. The entirety of the tape-recording demonstrates that Plaintiff was, in fact, repeatedly confirming that Davis had not been sexually molested by her husband.

239.    Libelous Statement 6 is libel per se and defamatory because, among other things, it conveys to the average, right-thinking reader the totally untrue contention that Plaintiff was passively and/or otherwise involved in the serious sexual misconduct of a young child.

240.    Libelous Statement 6 is libel per se and defamatory because it imputes unchastity to Plaintiff.

241.    Libelous Statement 6 is libel per se and defamatory because, among other things, it tends to injure Plaintiff's professional reputation as a nonprofit fundraiser,

particularly in the area of children's organizations, where her experience is almost exclusively focused.

### *Publication with Actual Malice*

242.    Defendants published Libelous Statements 1 through 6 with actual malice.

243.    Defendants possessed actual knowledge of the falsity of certain of their libelous statements against Plaintiff and acted with reckless disregard for the truth in maliciously publishing all of the false and defamatory statements against Plaintiff.

244.    Defendants published Libelous Statements 1 through 6 with actual malice by failing to procure any credible corroboration whatsoever before their publication.

245.    Rather than procuring independent and credible corroboration for Davis' accusations, Defendants relied exclusively on Davis, the accuser in this supposed scandal, as well as selective statements taken out of context from an admittedly doctored, substantially inaudible, and entirely speculative tape made by him and originally produced to Defendants in 2003, as well as the compromised and patently non-credible corroboration of two unreliable sources.

246.    Defendants did not publish Davis' tape in 2003 because they had serious doubts as to the truth of Davis' accusations and the tape's speculative implications.

247.    From 2003 to 2011, Defendants refused to publish any part of this admittedly unreliable tape because it was substantially inaudible, entirely speculative in nature, and otherwise lacked any corroborating support.

248.    Despite its entirely speculative nature, Defendants doctored and otherwise highly edited this unreliable tape for publication in 2011.

249.    Defendants distorted the tape's sound quality and voices, and otherwise

spliced and/or deleted portions of the recording that were inconsistent with the storyline of their coverage.

250.    Although Defendants claim they confirmed in 2011 that the tape included Plaintiff's voice, Defendants have not made any other representations as to the tape's authenticity and highly doctored nature.

251.    After refusing to publish it for almost a decade, Defendants published selective statements taken out of context from the admittedly doctored, substantially inaudible, and entirely speculative tape during an ESPN program entitled *Outside the Lines* on November 27, 2011.

252.    Defendants had clear and acknowledged reasons to doubt the veracity of Mike Lang and Zach Tomaselli as "secondary sources," who Defendants allegedly relied on to corroborate Davis' accusations.

253.    Upon their publication of Libelous Statements 1 through 6, Defendants knew Lang was related to Davis and would potentially lie to help his stepbrother.

254.    Upon their publication of Libelous Statements 1 through 6, Defendants knew that in 2003, Lang swore that Plaintiff's husband had never done anything inappropriate to him while he, Lang, was a ball boy for the Syracuse basketball team.

255.    Upon their publication of Libelous Statements 1 through 6, Defendants knew that in 2003, Lang lacked knowledge of Plaintiff's husband ever inappropriately touching anyone else, including his stepbrother, Davis.

256.    Upon their publication of Libelous Statements 1 through 6, Defendants were aware of, or knowingly overlooked, countless reasons to seriously doubt Lang's credibility, including that Lang attended Bernie Fine's 60th birthday party in 2006, and as

recently as 2010, used Bernie Fine's tickets to attend Syracuse Men's Basketball home games. If there were any credibility to Lang's corroborating statements, he surely would not have renewed such a close personal relationship with Bernie during this time.

257.    Upon their publication of Libelous Statements 1 through 6, Defendants were aware of, or knowingly overlooked, the fact that Lang asked Bernie in 2009 or 2010 to allow Lang's sons to serve as ball boys for the Syracuse Men's Basketball team, thereby following in their father's footsteps. Lang further asked Bernie to show his sons the locker room, introduce them to the players, and otherwise give them the same experience he, Lang, had as a child. Had their been any credibility to Lang's eventual and inconsistent support of Davis' accusations, it clearly was undone by Lang's request to place his sons within Bernie's close personal supervision.

258.    Upon their publication of Libelous Statements 1 through 6, Defendants were aware of, or knowingly overlooked, the fact that it was public record that Lang had experienced severe financial hardship. Lang's financial desperation should have compelled Defendants to further question Lang's non-credibility as a second-source to a story they had otherwise kept under wraps for almost a decade.

259.    Upon their publication of Libelous Statements 1 through 6, Defendants knew Tomaselli was not a credible source.

260.    Defendants put Davis in touch with Tomaselli before their publication of Libelous Statements 1 through 6 and instructed Davis to coach Tomaselli on his story. In doing so, Defendants quashed Tomselli's ability to independently corroborate Davis' story, and thereby justify Defendants' publication of Libelous Statements 1 through 6. During a December 4, 2011 interview with Howard Kurtz of CNN's Reliable Sources,

Vince Doria admitted that Schwarz's actions, putting a primary source to a story, Davis, in touch with a secondary source to the same story, Tomaselli, was grossly inappropriate. Specifically, Doria explained, "that is not how we typically operate. Putting two sources in touch with each other is something we would not normally do, and probably would not have done in this case if we had thought about it."

261. To make matters worse, Davis even told Defendants that Tomaselli lacked credibility. Nevertheless, Defendants relied on Tomaselli as an additional source to justify their publication of Libelous Statements 1 through 6.

262. Defendants published Libelous Statements 1 through 6 with actual malice, as evident from the fact Libelous Statements 1 through 6 are so highly implausible, and their foreseeable impact on Plaintiff so devastating, that to publish these statements without credible and independent corroboration from reliable sources, and with actual knowledge of their falsity, absolutely constituted publication with reckless disregard for the truth.

263. Defendants published Libelous Statements 1 through 6 with actual malice, as evident from the fact Libelous Statements 1 through 6 are therefore based only on Davis' unverified and uncorroborated accusations, and selective statements taken out of context from the admittedly doctored, substantially inaudible, and entirely speculative tape-recording.

264. Defendants published Libelous Statements 1 through 6 with actual malice by relying on deliberately slipshod and sketchy investigative techniques even though they had almost a decade to properly vet and research Davis' accusations.

265. Defendants published Libelous Statements 1 through 6 with actual malice

because, in reality, the only thing that changed between 2003, when Defendants had serious doubts as to the truth of Davis' accusations against Plaintiff, and 2011, when Defendants published Libelous Statements 1 through 6, was the "worldwide" coverage of the Penn State Sex Abuse Scandal. Defendant Schwarz's malicious and spiteful obsession to expose Plaintiff for her supposed role in the serious sexual misconduct of Davis is evident from a 2011 interview with Richard Deitsch, of Sports Illustrated, wherein Schwarz explained, "I would have taken a run at [Davis' story] every month of my career between 2003 and 2011 if I could have been pulled off other events and other coverage. If someone said you can either do this story, or you can do 100 NBA championship events or 17 World Series, which would you do, I would do this story and let other people cover the World Series."

266.    Defendants intentionally published Libelous Statements 1 through 6 in a calculated effort to gain a competitive and financial advantage in the media frenzy surrounding the Penn State Sex Abuse Scandal. At the Newhouse symposium, Doria was asked, "Would you have broken the Syracuse story, the way you did, and at the time you did, had the Penn State Scandal not been broken?" In response, Doria explained, "I don't think that I could give you an *honest* answer. There is no doubt that ESPN, every news entity, the world at large, was influenced by the Sandusky-Penn State story, and once that's in your head, and you are aware of it and you've seen how its played out, you see the impact that it's had, *it's awfully hard to make an objective judgment*."

### *Publication with Common Law Malice*

267.    Defendants published Libelous Statements 1 through 6 with common law malice, that is, maliciously, wantonly, recklessly, and/or in willful disregard to Plaintiff's

rights.

268. Defendants maliciously, wantonly, recklessly, and/or in willful disregard to Plaintiff's rights, published Libelous Statements 1 through 6 in order to gain a competitive and financial advantage in the media frenzy surrounding the Penn State Sex Abuse Scandal.

269. "Worldwide" coverage of the Penn State Sex Abuse Scandal was the only new development in Davis' story between 2003 and 2011. This scandal in no way justified publication given Defendants' serious doubts as to the truth of Davis' story. Defendants still had serious doubts as to the truth of Davis' story when they published Libelous Statements 1 through 6 in 2011 and 2012. At the Newhouse symposium, Doria was asked, "Would you have broken the Syracuse story, the way you did, and at the time you did, had the Penn State Scandal not been broken?" In response, Doria explained, "I don't think that I could give you an *honest* answer. There is no doubt that ESPN, every news entity, the world at large, was influenced by the Sandusky-Penn State story, and once that's in your head, and you are aware of it and you've seen how its played out, you see the impact that it's had, *it's awfully hard to make an objective judgment*."

270. Defendants maliciously, wantonly, recklessly, and/or in willful disregard to Plaintiff's rights, published Libelous Statements 1 through 6 in order to ruin Plaintiff's reputation, whom Defendant Schwarz sought to vilify through his vigilant reporting and who Schwarz presumed and prejudged to be guilty of the disreputable acts described to him by Davis a decade earlier.

271. The maliciousness, wantonness, and/or recklessness of Defendants' publication of Libelous Statements 1 through 6, and/or willful disregard for Plaintiff's

rights in maliciously publishing the same, is evident from Defendant Schwarz's ill will toward Plaintiff and spiteful coverage of Davis' story.

272.    Defendant Schwarz kept in regular contact with Davis from 2003 to 2011. Schwarz regularly called Davis, pressuring him until November 2011, at which time the Penn State Sex Abuse Scandal broke.

273.    Defendant Schwarz's malicious and spiteful obsession to expose Plaintiff for her supposed role in the serious sexual misconduct of Davis is evident from a 2011 interview with Richard Deitsch, of Sports Illustrated, wherein Schwarz explained, "I would have taken a run at [Davis' story] every month of my career between 2003 and 2011 if I could have been pulled off other events and other coverage. If someone said you can either do this story, or you can do 100 NBA championship events or 17 World Series, which would you do, I would do this story and let other people cover the World Series."

274.    In 2003, Schwarz even shot a hidden camera video of Plaintiff without Plaintiff's knowledge.

275.    Defendant Schwarz's malicious and spiteful obsession to expose Plaintiff for her supposed role in the serious sexual misconduct of Davis is evident from Schwarz's decision to put Davis in direct contact with Tomaselli.

276.    Defendant Schwarz put Davis in direct contact with Tomaselli before Defendants' subsequent publication of Libelous Statements 1 through 6. During a December 4, 2011 interview with Howard Kurtz of CNN's Reliable Sources, Vince Doria admitted that Schwarz's actions, putting a primary source to a story, Davis, in touch with a secondary source to the same story, Tomaselli, was grossly inappropriate. Specifically, Doria explained, "that is not how we typically operate. Putting two sources in touch with

44

each other is something we would not normally do, and probably would not have done in this case if we had thought about it."

277.     In order to bolster the investigation into Plaintiff and her husband, and support Defendants' subsequent publication of Libelous Statements 1 through 6, Schwarz instructed Davis to coach Tomaselli on what to say to the police.

278.     Pursuant to Defendant Schwarz's instructions, Davis called Tomaselli multiple times before Tomaselli was interviewed by the police. Davis gave Tomaselli personal details about the Fines. With these details, Tomaselli told the police a story with just enough detail to support a search warrant for the Fine's home.

### *Respondeat Superior and Joint and Several Liability*

279.     Defendant ESPN was complicit in the publication of Libelous Statements 1 through 6, in that ESPN authorized, participated in, and/or ratified its publication.

280.     Defendant Schwarz was acting within the scope of his employment with, and as an agent for, ESPN upon maliciously publishing Libelous Statements 1 through 6.

281.     Defendant Berko was acting within the scope of his employment with, and as an agent for, ESPN upon maliciously publishing Libelous Statements 1 through 6.

282.     The individual Defendants' acts and omissions are imputed to ESPN as a matter of law.

283.     The individual Defendants' state of mind with respect to the publication of Libelous Statements 1 through 6, including their knowledge or lack of knowledge regarding the truth or falsity of those statements, is imputed to ESPN as a matter of law.

284.     Defendant ESPN is therefore vicariously and/or joint and severally liable under the theory of Respondeat Superior for the individual Defendants' publication of

Libelous Statements 1 through 6.

### *Damages*

285. As a direct and proximate result of the libelous statements published by Defendants, Plaintiff's reputation has been permanently damaged.

286. As a direct and proximate result of the libelous statements published by Defendants, Plaintiff has suffered adverse physical consequences from stress, emotional distress, and mental pain and suffering.

287. As a direct and proximate result of the libelous statements published by Defendants, Plaintiff has suffered "worldwide" hatred, contempt, and ridicule.

288. As a direct and proximate result of the libelous statements published by Defendants, Plaintiff has suffered permanent impairment to her ability to obtain or maintain gainful employment, including employment as a nonprofit fundraiser.

289. The false and defamatory statements published by Defendants were libelous per se in that they impute an unsavory, salacious, and disreputable character to Plaintiff, injurious to both her personal and professional reputation.

290. The false and defamatory statements published by Defendants were libelous per se in that they impute that Plaintiff was passively and/or otherwise involved in the serious sexual misconduct of a child and young man, thereby entitling Plaintiff to presumed damages.

291. The false and defamatory statements published by Defendants were libelous per se in that they impute unchastity to Plaintiff, thereby entitling Plaintiff to presumed damages.

292. The conduct of Defendants demonstrates willful misconduct and that

entire want of care that raises a presumption of conscious indifference to consequences.

293. The false and defamatory statements of Defendants were published with both actual malice and common law malice.

294. Plaintiff is entitled to an award of punitive damages from Defendants in order to punish Defendants and deter them from repeating their unlawful conduct.

WHEREFORE, Plaintiff, Laurie J. Fine, demands:

(a) That judgment be entered against Defendant Mark Schwarz, Defendant Arthur Berko, and Defendant ESPN, jointly and severally, for compensatory damages in an amount to be determined by a jury from this jurisdiction;

(b) That judgment be entered against Defendant Mark Schwarz, Defendant Arthur Berko, and Defendant ESPN, jointly and severally, for punitive damages in an amount to be determined by a jury and in excess of the threshold requirements for diversity jurisdiction so as to punish Defendants and to deter Defendants from repeating their unlawful conduct;

(c) That all costs of this action be assessed against Defendant Mark Schwarz, Defendant Arthur Berko, and Defendant ESPN.

(d) That this Honorable Court award such other relief as it deems equitable, just, and proper.

***Trial Jury Demanded***

Respectfully submitted,

BY: /s/ Lawrence H. Fisher
Lawrence H. Fisher, Esquire
Counsel for Plaintiff
NDNY Bar No. 517521
COHEN & WILLWERTH, P.C.
One Oxford Centre

301 Grant St., Suite 4300
Pittsburgh, PA 15219
t. 724.986.9785
f. 412.255.3701

/s/ Kevin W. Tucker
Kevin W. Tucker, Esquire
Counsel for Plaintiff
NDNY Bar No. 517520
COHEN & WILLWERTH, P.C.
One Oxford Centre
301 Grant St., Suite 4300
Pittsburgh, PA 15219
t. 412.894.8741
f. 412.255.3701

DATED: May 21, 2012