IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


BUZZFEED, INC., ET AL.,              )
                                     )      MC No. 17-2429-APM
          Plaintiffs,                )
                                     )      Washington, D.C.
      vs.                            )      February 15, 2018
                                     )      2:00 p.m.
DEPARTMENT OF JUSTICE, ET AL.,       )
                                     )
                                     )
          Defendants.                )
_____)


TRANSCRIPT OF ORAL ARGUMENT HEARING
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:              Alison Schary
                                Nathan E. Siegel
                                Katherine M. Bolger
                                DAVIS WRIGHT TREMAINE, LLP
                                1919 Pennsylvania Avenue, NW
                                Suite 800
                                Washington, D.C. 20006
                                (202) 973-4248
                                alisonschary@dwt.com
                                nathansiegel@dwt.com

                                Nabiha Syed
                                Assistant General Counsel
                                111 East 18th Street
                                New York, NY 10003
                                (212) 431-7464
                                nabiha.syed@buzzfeed.com

APPEARANCES CONTINUED

For the Defendants:          Anjali Motgi
                             Jacqueline Coleman Snead
                             U.S. DEPARTMENT OF JUSTICE
                             Federal Programs Branch,
                             Civil Division
                             20 Massachusetts Avenue, NW
                             Washington, D.C. 20530
                             (202) 305-0879
                             anjali.motgi@usdoj.gov


Court Reporter:              William P. Zaremba
                             Registered Merit Reporter
                             Certified Realtime Reporter
                             Official Court Reporter
                             U.S. Courthouse
                             333 Constitution Avenue, NW
                             Room 6511
                             Washington, D.C. 20001
                             (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

3

                    P R O C E E D I N G S

1          THE COURT:  Good afternoon.  Please be seated.

2          DEPUTY CLERK:  Miscellaneous Action 17-2429,

3  BuzzFeed, Incorporated, et al., versus Department of

4  Justice, et al.

5          For the plaintiffs, Alison Schary, Nathan Siegel,

6  Katherine Bolger, and Nabiha Syed.

7          For the defense, Anjali Motgi and

8  Jacqueline Snead.

9          THE COURT:  All right.  Good afternoon, Counsel.

10  Nice to have you all here.

11          Okay.  We're here for argument on the movant's

12  motion to quash -- or, excuse me, motion to compel.  So I'll

13  hear first from BuzzFeed.

14          MR. SIEGEL:  Should I come to the lectern?

15          Thank you, Your Honor.

16          We are here on a Rule 45 motion.  And we all know

17  that the sort of three big prongs of Rule 45 is relevance,

18  burden, and privilege, or absence of privilege.

19          If it is okay with Your Honor, I was actually

20  going to go in reverse order, because I thought that that

21  might get both a little bit more directly to the most -- the

22  key issues here, and also would go directly to Your Honor's

23  request that we address your decision in the *James Madison*

24  case, because I think that relates most to our record.

4

1          THE COURT:  To be clear, I wasn't -- well, it

2   wasn't sort of meant to suggest that the case was directly

3   relevant to the issues here.

4          MR. SIEGEL:  No.  I understand.

5          THE COURT:  It was more that you all should have

6   been aware of it, because I've got now some familiarity with

7   the Dossier in its many permutations.

8          MR. SIEGEL:  No doubt.

9          Well, briefly, in a way, I think that some of the

10  issues that animated the *James Madison* argument or have

11  animated the government -- certainly, the government's

12  opposition here -- and the main point we wanted to make is

13  simply that neither the law that was at issue in

14  *James Madison*, the Official Acknowledgment Doctrine as it

15  applies to FOIA exemptions, nor the facts, including the

16  changes in the facts that have happened since this

17  decision --

18          THE COURT:  Right.

19          MR. SIEGEL:  -- apply here simply because the FOIA

20  *Glomar* analysis doesn't apply to Rule 45.

21          The Rule 45 privilege is quite different from FOIA

22  and Exemption 7, and there are a couple of basic reasons for

23  that.

24          I mean, FOIA is set up so that anyone can ask for

25  a record; you, therefore, have categorical exemptions,

1    essentially, they either apply or they don't.

2            And so the only question becomes, did the

3    government waive?  And that is where the Official

4    Acknowledgment Doctrine comes in.

5            Rule 45 and the Law Enforcement Privilege is quite

6    different.  You know, by definition, people can't just come

7    in and seek a Rule 45 subpoena.  You have to pass some

8    hurdles to do that:  Relevance, burden, et cetera.  But once

9    you do do that, then the response is not a categorical

10   exemption, it's a privilege; and in the case of the Law

11   Enforcement Privilege, most importantly, it's a qualified

12   privilege, and there's a balancing test.

13           THE COURT:  So can I -- I'm sorry.

14           MR. SIEGEL:  Yes.

15           THE COURT:  Can I interrupt you and can I say, as

16   a factual matter, your Fair Reporting Privilege and what you

17   need to establish it?

18           MR. SIEGEL:  Yes.

19           THE COURT:  The first question I have has to do

20   with the date.

21           Is it your belief that you need to establish

22   official proceedings with respect to the Dossier as of

23   December 13th, 2016, and thereafter?

24           In other words, let me say it differently, which

25   is that, is it relevant that there may have been government

1    proceedings prior to December 13th, 2016, which is the date

2    of the memo that was written about Mr. -- in which

3    Mr. Gubarev has referenced?

4            MR. SIEGEL:  The answer to that -- I think the

5    answer to that question, if I understand it, is no.

6            We think that the relevant time frame would begin

7    with the beginning of the Dossier, because BuzzFeed

8    published the Dossier as a whole, as a document, and it had

9    a history.  And even the generation of the December memo had

10   a history, it was subsequent to the Dossier having been

11   given to Senator McCain.  The memo was written, in large

12   part, to give it to or try to give it to Senator McCain, and

13   so the proceedings with respect to the whole document --

14           THE COURT:  I'm sorry, what was given to, in large

15   part, to give to Senator McCain?

16           MR. SIEGEL:  The December 13th memo.  Mr. Steele

17   has testified or --

18           THE COURT:  Okay.  Fine.

19           MR. SIEGEL:  -- filed papers that was the

20   significant purpose.

21           He really wrote that for two people; one was

22   Senator McCain and one was officials of the U.K.

23           THE COURT:  Okay.

24           MR. SIEGEL:  And so the relevant time frame would

25   be, essentially, up until January 10th, the date of

1    publication.

2         THE COURT:  Right.

3         MR. SIEGEL:  The most relevant time frame would be

4    any time basically beginning, what we now believe to be the

5    case, which is that government activity, in connection with

6    the Dossier, began as early as July of 2017.

7         THE COURT:  So then the question becomes -- that's

8    an interesting fact; I wasn't aware of that.

9         So then why does anything that happens prior to

10   December 13th matter?  And the reason I ask is this:  I

11   mean, it's fair to now draw the conclusion -- I suppose it

12   would have been fair to draw it before -- but BuzzFeed

13   obviously received the Dossier, or whatever it published --

14        MR. SIEGEL:  Right.

15        THE COURT:  -- those 35 pages, sometime between

16   December 13th and January 10th, right?

17        MR. SIEGEL:  Right.

18        THE COURT:  So isn't then what matters, at least

19   in terms of its publication, that there was some ongoing --

20   that it understood that there was ongoing proceedings

21   relating to the pages it received as of -- between

22   December 13th and January 10th?

23        MR. SIEGEL:  No, because the entire Dossier was

24   what the government was considering.

25        I would analogize it to, for example, the -- we

1    cited a case called *Fine versus ESPN*, which involved an

2    audiotape.  I think the import of that case is, the

3    audiotape itself is involved in an official investigation

4    made anything that you quoted from the audiotape privileged.

5            It wouldn't have mattered in that case if they had

6    quoted from something that didn't pertain to the plaintiff

7    or pertain to some other plaintiff or something like that.

8    It would simply be privileged.

9            And particularly with the dossier, I mean, what we

10   know to some degree is that there's a continuum,

11   essentially, of proceedings that starts back in July of

12   2016, and it, again, is the publication of the whole

13   document; you can't just segregate the December 13th memo

14   out.

15           THE COURT:  Okay.

16           So then let me get to the heart of what I've been

17   pondering, which is:  Why do you need this discovery?  And

18   here's why I ask.  I think when you all filed this back in

19   September of 2017, the facts are very different than they

20   find themselves today.

21           And as you go through the nine topics that you

22   have requested evidence concerning, it seems to me the

23   majority of them -- and I'd like to talk about them

24   specifically -- you now have evidence, admissible evidence

25   that answers the very question that you're asking.

9

1          So, for example, you know, the first topic is

2  whether the content of the Dossier was being investigated as

3  of January the 10th.  We now know it was, right?

4          MR. SIEGEL:  Well --

5          THE COURT:  We know that -- I mean, that's

6  probably page --

7          MR. SIEGEL:  Here's what I think the issue is.

8  And I've made a list of those topics because I anticipated

9  Your Honor would ask the question.

10          THE COURT:  Yeah.

11          MR. SIEGEL:  We certainly think that we have

12  admissible evidence for some of them as a result of the

13  Nunes memo.

14          Whether our -- but as your Court may know, the

15  admissibility of congressional reports is something that can

16  be disputed.  Whether our opponents will and will not

17  dispute the admissibility, we don't know.

18          THE COURT:  So I guess if that's one of the

19  issues --

20          MR. SIEGEL:  Right.

21          THE COURT:  -- then shouldn't you come forward

22  with me now -- and maybe this will require some more

23  briefing, maybe it won't -- to convince me that that, in

24  fact, the Nunes memo isn't going to be admissible as the

25  Eleventh Circuit interprets the public-records exception,

1     right?

2            I mean, I read the public-records exception

3     803(8), and *the* Nunes memo and the Grassley memo, at least

4     in terms of the facts that are asserted there that are --

5     and it can't be any clearer than that.

6            You now have not only the declassification of

7     those memos, the documents, I sent you the document this

8     morning, which is, you now have a public acknowledgment by

9     the Department of Justice.

10            MR. SIEGEL:  Right.

11            THE COURT:  So even if you had an argument that

12     well, you know, this wasn't an Executive Branch

13     acknowledgment, you now have an Executive Branch

14     acknowledgment.

15            And I'm hard-pressed to believe that the

16     combination or any one of those things would be deemed

17     inadmissible by your Trial Judge.

18            MR. SIEGEL:  Well, I disagree with that.  I wish I

19     could be as certain as Your Honor is.

20            One suggestion might be for us to go back to

21     our -- I mean, the Trial Judge, obviously, is well-aware

22     that we have this litigation.

23            THE COURT:  Right.

24            By the way, is your discovery deadline passed?

25     I don't know the answer to that.

```
 1              MR. SIEGEL:  No.  It's now March 15th.  There was
 2    discussion about whether it may be extended or not.
 3              In fact, we have a status conference on
 4    February 27th.
 5              We could go back and talk to our opponents and
 6    say, look, we think that there's some basic facts here that
 7    are sort of clearly disputable at this point.
 8              THE COURT:  Right.
 9              MR. SIEGEL:  Can we obviously just agree that it's
10    admissible or stipulate to some of the facts --
11              THE COURT:  So...
12              MR. SIEGEL:  -- assuming the Courts agree.
13              THE COURT:  Say that happens with that --
14              MR. SIEGEL:  Okay.
15              THE COURT:  -- wouldn't that obviate the need in
16    your mind to seek the testimony you're seeking?
17              MR. SIEGEL:  Not entirely.
18              I think -- here's what --
19              THE COURT:  As to all topics or just some topics?
20              MR. SIEGEL:  Some topics.
21              THE COURT:  Okay.
22              MR. SIEGEL:  I think it probably would obviate,
23    with respect to No. 1, which Your Honor talked about --
24              THE COURT:  Yep.
25              MR. SIEGEL:  -- I think it would obviate it with
```

```
 1   respect to No. 2.
 2              I don't think it would obviate it with respect to
 3   No. 3.
 4              THE COURT:  Okay.  Let's go through the list,
 5   because I have questions about 3.
 6              MR. SIEGEL:  Okay.
 7              And --
 8              THE COURT:  4, obviously, is a separate issue.
 9              MR. SIEGEL:  Yes.
10              There actually is an issue with 3, which I'll
11   raise.
12              THE COURT:  Yeah, let's talk about that in a
13   moment.
14              MR. SIEGEL:  Okay.
15              THE COURT:  Because I agree with you that the
16   public disclosures have nothing to do with No. 4.
17              MR. SIEGEL:  I think it would obviate it with
18   respect to No. 4.
19              And No. 5.
20              I don't think it would obviate it with respect to
21   No. 6, but I think we could probably live without it.
22              THE COURT:  And is that because the public
23   disclosures refer to briefings of the President-Elect, as
24   opposed to the President?
25              MR. SIEGEL:  Yes.
```

```
 1              THE COURT:  Okay.  Is that a material fact that's
 2   important to your defense ultimately?
 3              MR. SIEGEL:  I said I think we could live without
 4   it.
 5              THE COURT:  Okay.
 6              MR. SIEGEL:  I think what is more material there
 7   is probably No. 8, which I don't think has yet been
 8   officially disclosed.
 9              THE COURT:  Okay.  But what about 7?
10              7, you -- that's --
11              MR. SIEGEL:  Now, here's the issue with 7.
12              I think the answer from 7 is, no, we don't have
13   any formal confirmation of that yet.
14              I can tell you, however, that we have been --
15   we've been in contact with Senator McCain's office about
16   this.
17              THE COURT:  Right.
18              MR. SIEGEL:  As the Court may know, subpoenaing a
19   sitting United States Senator is, frankly, a lot more
20   difficult than subpoenaing a -- you have to get a resolution
21   of the Senate, et cetera.
22              What we are trying to do there is work out -- if
23   our opponents will accept a stipulation about those basic
24   facts, that would obviate the need for this.  We actually
25   have sent them.  We sent them that about a week ago; we have
```

 1    not heard back yet.

 2              THE COURT:  Okay.

 3              MR. SIEGEL:  So that one -- we don't have that

 4    clear -- what we don't have is the actual, "Yes, Senator

 5    McCain went to the FBI, and the FBI received it."

 6              THE COURT:  Although his --

 7              MR. SIEGEL:  We know that Senator McCain got the

 8    document.  Without Senator McCain or Mr. Comey --

 9              THE COURT:  Doesn't his -- I mean, do you not

10    think that his -- say you can't get the stipulation, but

11    don't you think his press release, Senator McCain's press

12    release pretty much acknowledges that he received the

13    Dossier and turned it over to the director at the time?

14              He doesn't call it "the Dossier," because I don't

15    think it was called "the Dossier" at the time.

16              MR. SIEGEL:  Yes, that's right.

17              One of the things -- I'll just give you an

18    example, because, as you know, this is where you could

19    really get into the nitty-gritty, right?

20              One of the things we're asking -- we're proposing

21    in the stipulation is just simply confirming that the

22    document that Senator McCain received is the same document

23    that he actually gave to Comey; in other words -- so there's

24    no ambiguity about what that document is.

25              THE COURT:  Right.

```
 1              MR. SIEGEL:  No. 8, I don't believe that we have.

 2         And No. 9, I think that we do.

 3              THE COURT:  Okay.

 4         So then now we're down to two of these, 3 and 8,

 5    right?

 6              MR. SIEGEL:  3, 8, with an asterisk on 7.

 7              THE COURT:  Right.  I'll just put an asterisk on

 8    7.

 9         So let's start with 8 and let's just go backwards.

10    You're asking for some confirmation that Mr. Brennan,

11    Clapper, and Rogers participated in briefing President Obama

12    about the Dossier on January the 6th.

13         I guess the question is:  Why isn't Mr. Clapper's

14    statement sufficient?  Is that again because only it

15    references the President-Elect?

16              MR. SIEGEL:  Yeah.  It only references

17    President Trump.  It doesn't reference President Obama at

18    all.

19              THE COURT:  All right.  So if that's the issue,

20    then it's in sort of the same basket as 6, right?

21              MR. SIEGEL:  I think that's right.

22         And the reason I said I don't think we need

23    both -- in other words, we would want some confirmation that

24    President Obama was briefed on the Dossier on January 6th,

25    which, obviously, has some significance; it's four days
```

```
 1    before BuzzFeed's publication.

 2              THE COURT:  Right.

 3              MR. SIEGEL:  That's what that is about.

 4              But that's why I said I think we could live

 5    without 6, 6 or 8, even.

 6              THE COURT:  So you can live without 6 or 8.

 7              So that leaves us to 3.  We're making good

 8    progress.

 9              All right.  So 3.  So what -- I mean, is the

10    bottom line here that you want to know that when the FBI

11    received or when the Executive Branch received page 35?

12              MR. SIEGEL:  Correct.

13              THE COURT:  That's it, right?

14              MR. SIEGEL:  Page 34 and 35, yes.

15              THE COURT:  Why is that important?

16              MR. SIEGEL:  Well, we would ultimately argue that

17    we're entitled to the Fair Report Privilege anyway.

18              But we know that our -- in fact, the government's

19    made the same argument here, right?  They are arguing and

20    they will argue that it is material; that if the government

21    didn't have that particular document until later, that that

22    viciates the privilege.  We don't think that that's right,

23    but that clearly is an argument that is going to be made.

24              I mean, that falls into the category of --

25              THE COURT:  So -- I'm sorry to interrupt you.
```

```
 1              MR. SIEGEL:  Yes.

 2              THE COURT:  You anticipate that to be an issue

 3     that will be raised by Mr. Gubarev --

 4              MR. SIEGEL:  Yes.

 5              THE COURT:  -- and his counsel that there's no

 6     evidence that as of January 10th, pages 33 and 34 were in

 7     the possession of the FBI?

 8              MR. SIEGEL:  Right.  That's right.

 9              THE COURT:  Okay.

10              MR. SIEGEL:  So that's why that --

11              And, obviously --

12              THE COURT:  I know you don't think that's so.

13              MR. SIEGEL:  We don't think so --

14              THE COURT:  Right.

15              MR. SIEGEL:  -- but the Judge is going to have to

16     decide whether that's a material fact or not, and we can't

17     possibly predict what that decision is going to be.  So we'd

18     like to have the evidence that will then become the

19     predicate for her resolving a legal question, essentially.

20              THE COURT:  And say I want to grant some sort of

21     limited response, would an affidavit do?

22              MR. SIEGEL:  Yes.

23              And I was actually going to talk about that,

24     because I think it is even more clear than it was when we

25     first served these subpoenas, that both sides in the Florida
```

1    case essentially agree that the privilege issues will need

2    to be decided as a matter of law prior to trial; in other

3    words, whether the facts establish the privilege will be an

4    issue for the Judge to decide, and I think both parties

5    agree on that.  So for that reason, we would be fine with an

6    affidavit.

7              THE COURT:  I guess the question is:  Would your

8    opponent object to evidence by affidavit as not admissible?

9              MR. SIEGEL:  I don't think our opponent -- for

10   purposes of summary judgment, I think it is clear that it is

11   admissible.

12             THE COURT:  Right.

13             MR. SIEGEL:  And it seems clear to us that this

14   is -- at this point, that this is an issue that's going to

15   be resolved on summary judgment.  So that in other words, if

16   we lose, the case goes to trial, there's going to be no

17   privilege argument made to the jury.

18             THE COURT:  Right.

19             MR. SIEGEL:  If we win -- let me -- candidly,

20   would we, perhaps, like to have videotape of a government

21   official testifying about this if the case goes to trial?

22   Sure.  But that's not the core of what we're seeking here.

23             THE COURT:  Okay.

24             MR. SIEGEL:  And so we would be -- we've offered

25   from the beginning to the government to discuss an

```
1    affidavit.

2              THE COURT:  Okay.

3              Let me talk to the government here real quick --

4              MR. SIEGEL:  Okay.

5              THE COURT:  -- because I think we're at a point

6    where we are at one request of nine, it seems to me and

7    whether you can get evidence as to that one issue.  Am I

8    right about that?

9              MR. SIEGEL:  I think that's the most important

10   one.

11             THE COURT:  Right.

12             MR. SIEGEL:  I think -- the only thing I would say

13   is that the briefing is important, because that -- I think

14   it's somewhat apparent from the face of the article but even

15   more so from the development of the facts in the case.  The

16   report of that briefing was what prompted BuzzFeed to

17   publish the Dossier.

18             THE COURT:  Right.

19             MR. SIEGEL:  So establishing that that briefing

20   took place, which was not just a briefing of

21   President Trump, it was a briefing of President Obama that

22   involved multiple agencies is important for us.

23             So that's why the other one has some significance.

24   It's particularly tied to what prompted BuzzFeed's

25   publication.
```

```
 1              THE COURT:  Okay.

 2              All right.  Thank you.

 3              So, Ms. Motgi, let's talk about what the issue

 4    would be here.  Let's start with 3.

 5              And so let's say the government is ordered to

 6    produce a single-page, two-line affidavit that says, the FBI

 7    had the memo that is dated December 12th, I think --

 8    December 13th.  We had it as of X date.  Why is that a

 9    problem?

10              MS. MOTGE:  Well, first, Your Honor, it's a

11    problem because it's not relevant for the underlying

12    litigation.

13              So I think opposing counsel has the formulation

14    backwards.  It's true that if DOJ didn't possess the

15    document on January 10th, it would viciate the privilege.

16              But even if DOJ did have the document on

17    January 10th, it still wouldn't allow BuzzFeed to assert the

18    Fair Report Privilege because they didn't report that DOJ

19    possessed the document on that day.

20              THE COURT:  Maybe.

21              But I guess the problem I'm having with that whole

22    line of argument is, I mean, you're essentially asking me to

23    make a legal judgment on the applicability of a defense in

24    the context of a Rule 45 subpoena that could potentially

25    have issue-preclusive effects in a litigation elsewhere.
```

1           MS. MOTGE:  I don't think it would, Your Honor.

2           THE COURT:  It wouldn't?  Why not?

3           I mean, if I ruled as you want me to that the

4   requests here are not relevant to that defense, why wouldn't

5   Mr. Gubarev run down to Florida and say, "Hey, look, this

6   Federal Judge just ruled that they don't really have this

7   defense available to them"?

8           MS. MOTGE:  Well, first of all, Your Honor,

9   Mr. Gubarev has already said that.

10          The plaintiffs in the BuzzFeed litigation have

11  moved for judgment on the pleadings as to two of BuzzFeed's

12  defenses, including the Fair Report Privilege, and the

13  briefing on that will be complete tomorrow.  So they don't

14  believe that any evidence is required in order for the

15  Florida Court to determine that this defense is not

16  available to them.

17          THE COURT:  That may be, but they would now have

18  the additional argument of issue preclusion, which they

19  presently don't have.

20          MS. MOTGE:  I think Your Honor's ruling would be

21  that BuzzFeed has failed to carry their Rule 26 burden to

22  establish that this testimony is actually relevant; in other

23  words, there's no authority for the proposition that you

24  need to take for granted that -- or the Court needs to take

25  for granted that a claim or defense for which testimony is

1   sought is viable.

2          And, in fact, Rule 26 contains the contrary

3   instruction.  So the movant bears the burden in the first

4   instance of establishing that testimony sought is relevant.

5   And that means that a court, in assessing whether that

6   burden has been met, has to determine, is the claim

7   frivolous, is the subpoena a fishing expedition, and is the

8   testimony requested necessary for the underlying litigation.

9          THE COURT:  So why is it frivolous?

10          MS. MOTGE:  We're arguing, Your Honor, that the

11   testimony sought here in court --

12          THE COURT:  You mentioned three things:

13   "Frivolous," "fishing expedition," and, I think, "sought

14   for."

15          MS. MOTGE:  Necessary for the underlying

16   litigation.

17          So here's my --

18          THE COURT:  So which one of those are you hanging

19   your hat on as to why this is not meeting the threshold

20   requirement of relevance?

21          MS. MOTGE:  Well, I think they overlap,

22   Your Honor.

23          And as to No. 3, the third item on the top is of

24   testimony requested, I think it's all three.

25          The article that BuzzFeed published doesn't report

```
1    that DOJ possessed all the pages of their 35-page embedded
2    document on January 10th.  And even if it did, mere
3    possession of a document doesn't constitute an official
4    government action or proceeding within the meaning of the
5    Fair Report Privilege in any jurisdiction.
6              So their attempts to use --
7              THE COURT:  But I don't -- I mean, aren't you
8    looking at this way too narrowly?
9              I mean, this isn't just about whether the
10   government possessed the Dossier.  And, in fact, the article
11   itself doesn't refer to just mere possession.  The article
12   refers to a distillation of the Dossier into a couple of
13   pages that was presented to President Obama.  It talks about
14   the Dossier being circulated amongst media, law enforcement,
15   and others.
16             And it's not an article that just says, "Hey, the
17   government has this, take a look at it."  I mean, that's not
18   what the article says.  It says more than that.
19             MS. MOTGE:  Your Honor, respectfully, it says that
20   CNN reported that those things were occurring.
21             But even, of course -- and, of course, the
22   government doesn't believe that the national corporation
23   could --
24             THE COURT:  You can't tell me that that deprives
25   them of the privilege.
```

1          And it happens all the time.  The Press has -- if

2     anything, it's an attribution to another source, which is

3     precisely what they should be doing.

4          MS. MOTGE:  But, Your Honor, the nexus between the

5     allegedly defamatory statement here, which appears in the

6     penultimate paragraph of the 35-page embedded document, and

7     the briefing, the alleged briefing of the President,

8     President-Elect based on a two-page synopsis is simply

9     non-existent.

10         In other words, as Your Honor is well-aware,

11    there's a qualitative difference between a synopsis of a

12    document and the document being summarized, and government

13    action around one can't be equated to government action

14    around another.

15         And there's simply nothing in either --

16         THE COURT:  You can stand there and say that now

17    in light of the President's declassification of FISA

18    applications and other law enforcement activity around this

19    memo?  I mean, can the Department of Justice really say that

20    now?

21         MS. MOTGE:  Your Honor, the government respondents

22    subpoenaed here never confirmed the veracity of the contents

23    of the Nunes memo, other than to confirm in the filing to

24    which Your Honor mentioned in the Minute Order, that the

25    existence of the Page FISA applications in Orders identified

1   in the Nunes memo.

2          THE COURT:  Hang on.

3          Are you now telling me now that the Department of

4   Justice is at odds with the President of the United States

5   about the factual accuracy of the Nunes memo?  Because

6   that's what I thought I heard you say.

7          MS. MOTGE:  No, Your Honor.

8          I'm saying that the cover memo from White House

9   Counsel released with the Nunes memo explains that the memo

10  contains the judgments and the statements of its

11  congressional authors.

12         My argument is simply that the government

13  respondents have never themselves offered any information

14  confirming from these government respondents these sources.

15         THE COURT:  You have confirmed now that the

16  Department of Justice, through the FBI, in October of 2016,

17  applied for a FISA warrant in this courthouse using the

18  Dossier.  The Department of Justice has now confirmed that

19  in the other case.

20         MS. MOTGE:  I don't think so, Your Honor.

21         What it exactly says is:  "The existence of the

22  Page FISA applications and orders identified in the Nunes

23  memo."  It doesn't say anything further.

24         And I would argue that the Executive Branch's

25  confirmation is limited to that exact language.

```
1              THE COURT:  Right.

2              But that's a fact that supports their position

3    that there is an official proceeding, there's an ongoing

4    proceeding involving the Dossier.

5              MS. MOTGE:  Your Honor, the Page FISA applications

6    and orders don't appear anywhere in either the CNN article

7    or the BuzzFeed article.

8              THE COURT:  But they don't have to.

9              MS. MOTGE:  Well, Your Honor --

10             THE COURT:  Send me a case that says, for example,

11   that the document in this case, the Dossier, that the

12   particular defamatory statement itself has to be subject of

13   the article.

14             MS. MOTGE:  Fine versus ESPN, Your Honor.

15             There, they say, "If the challenged portion of the

16   publication focuses exclusively on the underlying events

17   rather than the official proceedings related to those

18   events, that portion is insufficiently connected to the

19   proceeding to constitute a report on that proceeding

20   eligible for the Fair Report Privilege."

21             Here, there's no suggestion that either the

22   two-page synopsis of these unverified memos reported on in

23   either of the two articles here or anything else reported on

24   in the CNN article or the BuzzFeed article talks about

25   Gubarev.
```

1          THE COURT:  So does that mean that the

2     availability of the privilege depends upon who's asserting

3     the defamation?  That's what I hear you saying.

4          In other words, because Mr. Gubarev happens to

5     have a passing reference in here, the publication of the

6     entire document means that Mr. Gubarev can essentially avoid

7     the Fair Report Privilege in a case like this.

8          MS. MOTGE:  Your Honor, the Fair Report Privilege

9     extends only to defamatory statements made within an

10    official proceeding.

11         So all of the cases explain that, first of all,

12    that you can't assert the privilege on the basis of records

13    and information gleaned after the fact; in other words, any

14    subsequent development or disclosure by the government or

15    anyone else, including the Nunes memo or anything else after

16    the publication of the article doesn't bear on the relevance

17    question here; it doesn't bear on the Fair Report question.

18         But, Your Honor, all of the cases explain that --

19         THE COURT:  What if you're wrong about that?

20         MS. MOTGE:  I'm sorry, what do you mean,

21    Your Honor?

22         THE COURT:  What if you're wrong?

23         I don't think that's a settled issue.  And so what

24    if the Judge down in Florida takes a different view of that

25    issue?

1            MS. MOTGE:  Well, I think, Your Honor, that the

2     judge down in Florida would be free to do whatever she

3     wanted to do.

4            THE COURT:  Right.

5            MS. MOTGE:  Simply that they wanted be able to

6     use --

7            THE COURT:  Then they're out of luck, because I've

8     said you can't have that evidence.

9            MS. MOTGE:  I don't agree with that, Your Honor.

10           I think your ruling would be limited to whether

11    BuzzFeed has carried their Rule 26 burden here.

12           But Your Honor could deny this motion to compel

13    for either of the two other separate and independent reasons

14    the government has offered, both the burden and the

15    privilege.

16           Mr. Siegel explained that unlike in the FOIA

17    context, there's no statutory right of access here; rather,

18    the movant needs to establish that all three of those are --

19           THE COURT:  So answer plainly:  What is the burden

20    on the United States Department of Justice to produce a

21    two-paragraph affidavit that says, "This is when we got the

22    December memo"?

23           MS. MOTGE:  Well, first, Your Honor, confirming

24    previously unconfirmed facts about that

25    law-enforcement-sensitive information will always --

1           THE COURT:  Let me tell you something:  That's

2    going to be hard to sell, given what the President has done.

3           He has now agreed to declassify an entire national

4    security investigation, right?  Or at least the initiation

5    of that investigation, correct?

6           MS. MOTGE:  Your Honor --

7           THE COURT:  And he's further contemplating the

8    declassification of additional facts, at least that one, the

9    Democratic memo, right?

10          MS. MOTGE:  I can't speak to what the President is

11   contemplating at this time, Your Honor.  But I can say that

12   that is not the only burden on the respondents here.

13          THE COURT:  So what's the other burden?

14          MS. MOTGE:  Well, for one, Your Honor, this is not

15   the only case -- this is not the only defamation action

16   against BuzzFeed, nor is it the only defamation action

17   arising out of the publication of a document, a so-called

18   Dossier, in this District.

19          So all the case law instructs that even when only

20   a single deposition or a single affidavit is being

21   requested, the Court should consider whether there's a

22   future burden on the government; in other words, if

23   Your Honor were to rule here that it's simple for the

24   government to write a short affidavit pertaining to the

25   so-called Dossier, or the alleged Dossier, then in any other

1    litigation where the so-called Dossier is at issue, parties,

2    private litigants can look to the government to participate

3    in their litigation, and that's not what the Circuit has

4    explained is appropriate for Rule 45 context.

5              THE COURT:  It's interesting that on one hand, you

6    say my relevance determination would be limited; but, on the

7    other hand, if I went forward and said you've got to produce

8    some evidence, that that would be taken as some sort of

9    precedent that would bind all future cases.

10             Look.  I mean, the question of burden here is not

11   a substantial one if all you're being asked to produce is a

12   single page, particularly in light of what's presently

13   happening on this very topic --

14             MS. MOTGE:  But, Your Honor, that's --

15             THE COURT:  -- it seems to me.

16             MS. MOTGE:  I'm sorry, Your Honor.

17             But the Rule 26 and Rule 45 inquiry isn't about

18   the public interest broadly in a document known as the

19   Dossier.  It's about the public interest in this particular

20   underlying litigation; that is, the Florida defamation

21   action.  There's no public interest in a private company

22   avoiding defamation liability for the publication of two

23   sentences.

24             THE COURT:  Don't you think there's a public

25   interest, at least on behalf of the media companies, that

```
1    this privilege be recognized in the current circumstances?
2             MS. MOTGE:  I don't agree with BuzzFeed's implied
3    argument.
4             I think what Your Honor is suggesting is that
5    every assertion of the Fair Report Privilege satisfies the
6    public-interest inquiry in the civil discovery context, not
7    when they're countervailing impacts on law enforcement
8    investigations, not where the assertion of that privilege is
9    very tenuous.
10            THE COURT:  What would the counterunveiling impact
11   be on the law enforcement investigation if the FBI were to
12   disclose when it got the December memo?  How would it affect
13   a law enforcement investigation?
14            MS. MOTGE:  Your Honor, the specific details of
15   that are enumerated in the government's declaration with
16   respect to the privilege.
17            THE COURT:  They're not that specific.
18            So articulate a specific manner in which that
19   limited factual disclosure would impact an ongoing law
20   enforcement investigation.
21            MS. MOTGE:  Your Honor, BuzzFeed concedes that
22   ongoing investigations could be impacted through the
23   disclosure of any of their testimony.
24            THE COURT:  I'm asking you.  I'm not asking what
25   BuzzFeed is conceding or not.
```

1          Tell me in plain English:  How would learning that

2     the FBI received the December memo on December 27th, how

3     would that impact a law enforcement investigation?

4          MS. MOTGE:  I mean, Your Honor, that is a

5     previously undisclosed, unconfirmed fact pertaining to an

6     ongoing investigation that would be disclosed to aid a

7     private litigant in their private defense in a lawsuit which

8     the United States Government has nothing to do with.

9     So it would be impacted in a very real way.

10          And if Your Honor feels that additional details

11     are required to articulate with greater specificity what

12     that impact is, the government would be happy to submit a

13     supplemental declaration explaining what the very real

14     impact would be even in light of government disclosures that

15     post-date the government's filing from November.

16          In other words, Your Honor, this is a context in

17     which courts typically defer to an agency's determination

18     that the disclosure of information could have an impact on

19     that.

20          THE COURT:  And you know what?  You're right.

21          But this isn't the ordinary case.  I don't know of

22     any time that a President has declassified the fact of a

23     counterintelligence investigation and acknowledged that the

24     FBI applied for a FISA warrant.  I mean, this is a new

25     frontier in that regard and has an effect on the law.

1            And I would agree with you that had we sat here

2      back in the fall when this memo was filed, that is, the

3      motion to compel was filed, the facts on the ground were

4      very different than they appear to be today.

5            MS. MOTGE:  Well, Your Honor, the Law Enforcement

6      Privilege protects information the disclosure of which would

7      have a negative effect on law enforcement investigations,

8      and that harm is not eliminated simply because some facts

9      about an investigation are revealed from a different source,

10     whether government or otherwise.

11           But if Your Honor would -- believes that the facts

12     on the ground have changed, respectfully, the government

13     would ask for the opportunity to articulate how those

14     changed facts don't change the potential negative

15     implications at issue here.

16           THE COURT:  I don't need that.

17           I would, however, if you think that there is

18     something more precise to be said about the revelation of

19     the actual date on which the December 13th memo, the one

20     that counsel said was prepared specifically for

21     Senator McCain, how that would materially affect a law

22     enforcement investigation, I would be interested to hear

23     that.

24           And you don't have to do it now in public, but you

25     can submit something that explains, with a degree of

```
 1    particularity, certainly more particularity than the current

 2    ex parte affidavit does, how the impact -- what the impact

 3    will be.

 4           MS. MOTGE:  We would be happy to do so,

 5    Your Honor.

 6           But, again, I mean, just -- I would just return to

 7    the fact that the government respondents that are subpoenaed

 8    here haven't confirmed some of the underlying assumptions in

 9    Your Honor's order just now, and we can articulate with

10    greater specificity what we mean by that.

11           THE COURT:  What haven't you confirmed?  What

12    hasn't been confirmed?

13           MS. MOTGE:  Any of the topics of testimony that

14    are enumerated here from these subpoenaed government

15    respondents.

16           THE COURT:  So No. 1, the content of the Dossier

17    was being investigated as of January the 10th.  That hasn't

18    been confirmed?

19           MS. MOTGE:  Not by these government respondents,

20    Your Honor.

21           THE COURT:  How about by the President of the

22    United States?

23           The President of the United States has the

24    authority to declassify, right?  The President of the

25    United States has the authority and does officially
```

1   acknowledge for purposes of FOIA.

2           You mean to tell me the Department of Justice,

3   because it has not precisely said, "Yes, we applied for a

4   FISA warrant on last October for Carter Page," that somehow

5   you can stand here and tell me that that has no longer

6   been -- that that question still remains in doubt?

7           MS. MOTGE:  Your Honor, respectfully,

8   I don't think the imprimatur of the President as to the

9   veracity of all of the contents of the memo is as --

10          THE COURT:  You may want to be careful about what

11  you're going to say.

12          MS. MOTGE:  What I mean to say is that the

13  White House indicated that the memo is a document authored

14  by members of Congress, not authored by government

15  respondents.

16          THE COURT:  Do you think the White House would

17  have let a factually inaccurate memo go out to public?

18          MS. MOTGE:  I can't speculate as to what the

19  White House would do.

20          THE COURT:  Shouldn't I presume that the

21  White House would not allow a memo to go out that is

22  factually inaccurate about a law enforcement and

23  counterintelligence investigation?  Wouldn't that be a fair

24  presumption and a presumption-in-fact that the Courts

25  routinely make?

1          MS. MOTGE:  Your Honor, I think we're far afield

2     from the motion to compel at issue before us today.  This is

3     -- before you, Your Honor.

4          This is a question of whether a private litigant

5     in a private defamation action can compel testimony from

6     senior government officials about previously undisclosed

7     information, highly sensitive information and potentially

8     privileged information, we believe privileged information,

9     in order to aid in a defense, premised on what we think is

10    an inaccurate characterization of their article.

11         And Your Honor doesn't need to reach the question

12    of subsequent government disclosures and what import they

13    might have on sort of the truth in the world.  This is not

14    the FOIA context, Your Honor, where every -- a statement

15    from -- an official statement or official acknowledgment has

16    a potential impact on the right of access, the statutory

17    right of access.

18         The burden is on the movement to establish that

19    they are entitled to this testimony, Your Honor.  And there

20    are a number of factors that need to be weighed here.

21         And a disclosure, even if Your Honor believes that

22    those disclosures have some impact on the inquiry here, they

23    don't obviate the need for this Court to determine that this

24    is a viable defense and that this testimony is actually

25    needed, including, I think as Your Honor, hopefully, did, by

1    looking at whether there are other places for BuzzFeed to

2    get particular information that they claim to need.

3              I think a helpful case for this Court, Your Honor,

4    is *Jewish War Veterans*, which BuzzFeed has cited in their

5    reply, in which Judge Bates engages in a very detailed and

6    searching longer than ten-page analysis of the Establishment

7    Clause Theory on which the plaintiffs' claim was based, for

8    which they had served a third-party subpoena on the

9    defendants in that miscellaneous motion to compel,

10   Your Honor.

11             This Court has an independent obligation separate

12   and apart from the Florida Court to determine whether there

13   is a colorable claim here, and the government continues to

14   believe that there isn't.

15             And even if there is, that's a factor that the

16   need for this testimony with respect to the overall

17   litigation is a factor that the Court can consider in

18   weighing the other potential burden analyses.

19             You know, the two defenses that BuzzFeed has

20   articulated in their motion to compel here require this

21   testimony are two of eight defenses that they've included in

22   their answer in the Florida litigation.

23             So the idea that this information is critical for

24   these defenses, which are, at best, extremely tenuous and

25   are not the only defenses in this litigation; and, moreover,

1      the testimony by BuzzFeed's own admission is largely

2      available from other sources.

3              I mean, this is, it would be extraordinary,

4      we believe, for a party to be able -- not only to use sort

5      of the shield of other reporting to protect this particular

6      allegedly defamatory statement which has no nexus to what

7      has been reported in the CNN article, even if we believe

8      that that's a report on government action, which the

9      government doesn't concede that it is.

10             THE COURT:  You don't concede that in light of the

11     string citation in the reply brief?

12             MS. MOTGE:  I'm sorry?

13             THE COURT:  You don't concede that the CNN

14     reporting to which the BuzzFeed article is linked is not

15     relevant, in light of the string citation that they supplied

16     in their reply brief?

17             MS. MOTGE:  Yeah, I think the six cases that they

18     cite in their reply all involve hyperlinks that provided

19     factual support for the allegedly defamatory statements,

20     which were then deemed non-defamatory because they drew from

21     those facts or commented on them.

22             Only one of them even plausibly addresses the

23     potential relationship between a hyperlinked report of an

24     official proceeding and an assertion of the Fair Report

25     Privilege.

1          In that case, *Adelson v. Harris*, actually

2    demonstrates precisely why it's not available here.

3          In that case, the Nevada State Supreme Court held

4    that under Nevada common law, a hyperlinked report of a

5    judicial proceeding could extend the privilege to an

6    allegedly defamatory statement drawn from that proceeding.

7          So there, the hyperlinked article was a report on

8    a lawsuit, and the allegedly -- and the article reported on

9    documents filed in that lawsuit, including a sworn

10   declaration.

11         And the hyperlinked article -- I'm sorry, the

12   allegedly defamatory statement came from that deposition in

13   the judicial proceeding.

14         Here, Your Honor, not only do we not agree that

15   the CNN article necessarily reports on the kind of

16   government action that is protected typically under the Fair

17   Report Privilege.

18         But it's not attributed to any government sources

19   and reports the way, for instance, in *Adelson*, the report is

20   attributed to judicial sources and reports.

21         And, most importantly, even if this Court did

22   believe that the CNN article could be incorporated and did a

23   report on official government action, there's no nexus

24   between anything reported on in the CNN article and the

25   allegedly defamatory statements at issue here.

```
 1              And all of the case law in the Fair Report
 2   Privilege explains that there needs to be at those close
 3   nexus.  In other words, a passing reference to the five
 4   cases as well, as is the Bufalino from the Second Circuit,
 5   "A passing reference to or some overlapping" --
 6              THE COURT:  All right.  I hear you.
 7              MS. MOTGE:  Sorry, Your Honor.
 8              THE COURT:  You're starting to retrod ground that
 9   we've heard already.
10              MS. MOTGE:  I apologize, Your Honor.
11              THE COURT:  And I want you to take a breath,
12   because that's important when you argue.
13              Is there anything else you wanted to add?
14              MS. MOTGE:  No, Your Honor.
15              But we would -- the government would appreciate
16   and does appreciate the opportunity to supplement the
17   record.
18              THE COURT:  All right.
19              MS. MOTGE:  Thank you.
20              THE COURT:  Mr. Siegel, let's figure out where we
21   go from here.
22              You've told me that of the nine subjects you
23   either believe that you now have publicly available and what
24   we at least agree is likely to be admissible evidence and
25   almost certainly admissible at the summary judgment stage
```

```
 1   that answers the questions, and that's certainly true for 1,
 2   2, 4, 5, and, I think, 9.
 3             You've suggested that there is a potential
 4   stipulation in the offering as to --
 5             MR. SIEGEL:  The McCain one.
 6             THE COURT:  -- the McCain one --
 7             MR. SIEGEL:  Which is No. 7.
 8             THE COURT:  -- which is No. 7.
 9             And then where are we at with 6 and 8?  And where
10   do we stand on that?  You said you can probably do without
11   answers to those.
12             MR. SIEGEL:  I think we could do without 6.  We
13   have 8.
14             THE COURT:  So we're down to three.
15             MR. SIEGEL:  Right.
16             THE COURT:  I guess the question is:  Is there any
17   prospect -- well, I guess they really can't stipulate to
18   this.
19             Let me ask you the following.
20             How can I ask this without having you reveal
21   anything?
22             In your mind, have you exhausted all possible
23   witnesses to the totality of the Dossier as it was delivered
24   to Senator McCain?
25             MR. SIEGEL:  Yes, we have exhausted -- we have
```

1    exhausted, and are not asking for, information about the

2    delivery of the Dossier to Senator McCain.

3           What we don't have is a formal evidentiary

4    confirmation of what Senator McCain did with it.

5           THE COURT:  Okay.

6           And what's the -- you said you would -- you were

7    going down the road of trying to obtain some evidence from

8    Senator McCain's office, did I understand that correctly, a

9    potential stipulation?

10          Was that a stipulation or what?

11          MR. SIEGEL:  The facts of what Senator McCain did,

12   I mean, are known, they're fairly disputed.  So Mr. McCain

13   has been quite open about it.  So we're simply trying to

14   dispute those in some simple evidentiary form.

15          However, to actually subpoena Senator McCain to

16   provide that information is not something that is so easily

17   done.  So what we are trying to do is see if our parties

18   will agree to stipulation, saying something like, if

19   Senator McCain were to be called, he would testify to the

20   following language.

21          THE COURT:  I think me question is a little

22   different, which is:  Are you discussing with

23   Senator McCain's office any factual stipulation by him that

24   would --

25          MR. SIEGEL:  No.

 1            THE COURT:  -- confirm that he delivered that

 2    December memo to Director Comey?

 3            MR. SIEGEL:  No.

 4            Me -- and the discussions that I've had are with

 5    the Office of Senate Counsel --

 6            THE COURT:  Right.

 7            MR. SIEGEL:  -- not his office.

 8            But, no, because my understanding is that under

 9    the Senate rules, even a declaration, affidavit, whatever it

10    may be, would be considered testimony, and so you have to go

11    through the whole process, where the whole Senate has to

12    pass a resolution authorizing that.

13            What we're trying to do is see if the parties can

14    simply agree to that -- agree to what would be said, because

15    if we agree to it, right, it doesn't matter whether he

16    formally signs off on it or not.

17            THE COURT:  Of course.

18            MR. SIEGEL:  So that's what we're trying to

19    explore.

20            THE COURT:  No.  I'm just trying to get at what

21    the alternatives are here to confirming that pages 34 and 35

22    were in the possession of the FBI or --

23            MR. SIEGEL:  Right.

24            THE COURT:  -- of the Executive Branch as of the

25    date of the publication of the BuzzFeed article, okay?

1          MR. SIEGEL:  I guess if I could just offer one

2    observation on that, we -- you know, when we first --

3    everybody, I mean, the Carter Page FISA warrant was

4    reported, right; I mean, it's been out there.  So I think

5    when we served these subpoenas initially, we included it.

6    When we whittled this down to these nine topics, we dropped

7    it.

8          THE COURT:  You dropped what?

9          MR. SIEGEL:  The request for confirmation that the

10   Dossier was used to secure a FISA warrant.

11         THE COURT:  Oh, okay.

12         MR. SIEGEL:  Why did we drop it?  Because I'd

13   never believed for a moment we would ever get it, because it

14   seemed so obviously classified.

15         THE COURT:  You're not the only one.

16         MR. SIEGEL:  So my point simply being that I think

17   it's fair to say that the information we were asking for at

18   this point is so much more generic, non-specific, and has so

19   much less of any arguable impact on law enforcement

20   interests than the information that has not only been

21   disclosed but we didn't even think we could ask for that in

22   assessing the balancing analysis.

23         THE COURT:  Can I ask you this following question,

24   which is:  Is there any way to suss out from your Judge this

25   narrow question of whether the possession of pages 34 and 35

1    is dispositive as to your ability to assert this privilege?

2            I mean, because that's sort of what we're all

3    talking about right now.  It seems to me that's our brass

4    tacks here, which is:  Do I compel the government to answer

5    the question?

6            On the other hand, if you've got a Federal Judge

7    that says, look, it doesn't matter, under this privilege,

8    whether they had the whole document or not, so long as

9    BuzzFeed had a good-faith belief -- I suspect that's what

10   you're going to argue -- so long as BuzzFeed had a

11   good-faith belief that this Dossier was the same Dossier,

12   was the same one that was in the possession of the

13   United States Government and the one that was synthesized

14   and presented to the President, is there a way we can get to

15   the bottom of that sooner rather than later?

16           MR. SIEGEL:  We could raise it with the Court in a

17   couple of weeks.

18           I mean, the present status, and Ms. Motgi alluded

19   to it, they filed for a motion of judgment on the pleadings.

20   We, of course, have pled all that.  And we filed, in

21   addition to an opposition, a Rule 56(d) declaration that

22   said discovery is incomplete; that what they really filed is

23   a partial motion for a summary judgment.  It includes

24   interrogatories and things like that.

25           But I will say this:  We know something about the

1    December memorandum; whether what we know is sufficient or

2    not, I don't -- whether the Judge would consider it

3    sufficient or not, I don't know the answer.

4              THE COURT:  As to when it was delivered, you mean?

5              MR. SIEGEL:  Not to any of the parties here.

6              THE COURT:  Right.  Understood.

7              MR. SIEGEL:  So we could raise that with the

8    Court.

9              I mean, I suppose it would be possible, in

10   principle, to brief the issue on the basis of uncertainty

11   about that and see if the Court thinks that the facts that

12   we do know sort of vitiate that.

13             I don't know what she would say, obviously.

14             THE COURT:  Yeah.  Sure.

15             Look, I don't want her to rule on something just

16   to make me life easier.  I think it's a "her," so "her."

17             MR. SIEGEL:  Right.

18             THE COURT:  That wouldn't be fair.

19             All right.  Let me ponder this a little bit in how

20   I think might be the best way to approach this.

21             So let me just be clear then:  Am I hearing that

22   you are withdrawing your request for evidence as to

23   everything other than 3 at this point?

24             MR. SIEGEL:  No.  I don't think we would withdraw

25   it as with respect to both 7 and 8.

1    What I was going to suggest about the other 6 is
2    if there was a way that we could -- well, would be to
3    withdraw them without prejudice.  So just in case, down the
4    road, it turns out that there is some unexpected, really
5    sticky evidentiary ruling, we have never forever and forever
6    waived the right to come back and say, look, we thought the
7    Nunes memo was --
8    And, of course, as I think was alluded to in the
9    response that DOJ filed in the other case, there may be more
10   coming in the next month or two.  So by the time we get to
11   summary judgment, it's a little hard to --
12   THE COURT:  You may know what date they got that
13   last memo if we wait long enough.
14   Okay.  So if we hold those six in limbo, what
15   do you propose we do with 7 and 8?  Do you want to get back
16   to me at a certain date as to --
17   MR. SIEGEL:  Yes.
18   I mean, at a minimum, I can certainly go to our
19   opposing counsel and say, look, we all know this is true.
20   THE COURT:  Right.
21   MR. SIEGEL:  So we can either put the government
22   through the ropes of giving us two lines saying, yes, or we
23   can just agree with it.
24   THE COURT:  Okay.
25   How long did you think you need to get back to me

48

1  on that issue?

2            MR. SIEGEL:  No.  We're talking about 7 and 8.

3            THE COURT:  I'm sorry?

4            MR. SIEGEL:  No.  We talked to the defendants

5  about whether they will agree that that simply is true.

6            THE COURT:  I'm sorry.  That's actually -- 6 and 8

7  are what we are sort of -- that's the *Obama versus*

8  *President-Elect Trump* disclosure on 6, 7 and 8.

9            MR. SIEGEL:  Yes, 6, 7, and 8.

10            As I said, you know, in many ways, 8 is more

11  useful, I think, than 6.

12            And I'm actually not 100 percent sure, Your Honor,

13  that 6 is accurate, because what we now know is that

14  Mr. Comey briefed President-Elect Trump, we think, on the

15  same day.  If that happened, it's not clear whether he was

16  in the briefing of President Obama or not.  He did it by

17  himself.  I mean, that all has come out later.

18            THE COURT:  Right.

19            MR. SIEGEL:  So I don't even know absolutely for

20  certain whether 6 is accurate.

21            THE COURT:  At least in terms of the date, you

22  mean?

23            MR. SIEGEL:  Correct.

24            THE COURT:  Okay.

25            MR. SIEGEL:  So we're really talking about 3, 7,

```
 1   and 8.
 2              And we could get back to you on 7 and 8 as to
 3   whether those are facts that we could essentially stipulate
 4   to.
 5              I don't think we're going to be able to get a
 6   stipulation on No. 3, for obvious reasons.
 7              THE COURT:  Right.  I can see that.
 8              Okay.  Well, how long do you think you need to get
 9   back to me on 7 and 8?
10              MR. SIEGEL:  We can just say ten days.
11              THE COURT:  All right.  So ten days.
12              All right.  So I'll ask --
13              MR. SIEGEL:  Actually, I have a suggestion,
14   because we're going before the Florida Court on February
15   27th.  It's always possible, of course, that the Florida
16   Court might have something to say about this, if we raise
17   these issues.
18              So what I would suggest maybe is we get back to
19   you maybe a couple days after that.
20              THE COURT:  Sure.  That's fine.
21              MR. SIEGEL:  Is that fine?  Okay.
22              THE COURT:  I don't have my calendar.
23              MR. SIEGEL:  It should be, what, March 1st?
24              THE COURT:  March 1st is fine.  Is that during the
25   week?
```

50

1          All right.  So let's say by March 1st, why don't

2    you get back to me.

3          I'll set that as the same date for the government

4    to supplement its affidavit about the law enforcement

5    implications of disclosing --

6          And it doesn't -- the more I think about it, it

7    doesn't have to be the date on which it received the memo.

8    It can just simply be, we had the memo; that is, not the

9    whole Dossier, but just that last two pages, pages 34 and

10   35.  We had that as of January 10th.

11         So you don't even have to go far as to say, "We

12   got it on December 28th."  It would just be, "Yes, we had it

13   as of January the 10th," and that's all it would have to

14   say, right --

15              MR. SIEGEL:  Right.  Yes.

16              THE COURT:  -- to satisfy you?

17              MR. SIEGEL:  Yes.

18              THE COURT:  All right.

19         So if you'll address why that would affect law

20   enforcement interests, that would be good.

21              MS. MOTGE:  Yes, Your Honor.

22              THE COURT:  All right.

23         Okay.  Interesting stuff, folks.

24         Anything else?

25              MR. SIEGEL:  Nope.

1          THE COURT:  All right.  Thank you, everyone.

2          (Proceedings concluded at 3:07 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

   I, William P. Zaremba, RMR, CRR, certify that
the foregoing is a correct transcript from the record of
proceedings in the above-titled matter.


Date: February 19, 2018_____  /S/__William P. Zaremba_____

            William P. Zaremba, RMR, CRR