# Exhibit
# 1



Neutral Citation Number: [2018] EWHC 512 (QB)

Case No: CR 2017 - 664

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 21/03/2018

**Before** :

**SENIOR MASTER FONTAINE**
- - - - - - - - - - - - - - - - - - - - -
**Between:**

| | |
|---|---:|
| **Aleksej Gubarev (1)** | **Plaintiffs** |
| **XBT Holdings SA (2)** | |
| **Webzilla Inc (3)** | |
| **- and -** | |
| **Buzzfeed Inc (1)** | **Defendants** |
| **Ben Smith (2)** | |
| | |
| **-and-** | |
| | |
| **Christopher Steele** | |
| | **Applicant** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Mr Gavin Millar QC and Mr Edward Craven** (instructed by **RPC**) for the **Applicant**
**Miss Hannah Brown QC** (instructed by **W Legal**) for the **Plaintiffs**
**Mr Alex Bailin QC and Mr Ben Silverstone** (instructed by **Taylor Wessing**) for the **Defendants**
**Mr Julian Blake** (instructed by **the Government Legal Department** for the **Foreign and Commonwealth Office intervening**)

Hearing dates: 5 February and 16 March 2018
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

**Senior Master Fontaine:**


1.      The applications before me relate to a Letter of Request dated 8th August 2017, ("the Request") from the United States District Court for the Southern District of Florida (Miami Division) ("the Florida court"), pursuant to section 2 of the Evidence (Proceedings in other Jurisdictions) Act 1975.  Pursuant to the Request, and the application of the US Plaintiffs' dated 3rd November 2018, made without notice, I made an order dated 9th November 2017 ("the November 2017 order") without a hearing, for evidence to be taken by way of oral examination of the Applicant ("Mr Steele") under CPR 34.18. By way of an application notice dated 1st December 2017 Mr Steele applies to set aside or vary that order.

2.      There is also before me an application by the US Defendants dated 9th January 2018, to vary the November 2017 order, if that order is not set aside.  Finally, there is an application dated 4th December 2017 on behalf of the Foreign and Commonwealth Office ("the FCO"), who have intervened as a party with an interest in the proceedings. The FCO do not seek their application to be dealt with until I have determined the applications of both Mr Steele and the US Defendants.

3.      The following witness statements were before the court:

        For the Applicant Mr Steele:

        Witness statement of Nicola Cain dated 1st December 2017;

        Witness statement of Edward Lucas dated 30th November 2017.

For the US Plaintiffs

        First witness statement of Steven Frederick Loble dated 3rd November 2017 Second witness statement of Steven Frederick Loble dated 16th January 2018.

For the US Defendants

        Witness statement of Katherine M Bolger dated 20th December 2017

For the FCO

        First witness statement of Lewis Neal dated 30th November 2017

        Second witness statement of Lewis Neal dated 1st February 2018

4.      In this judgment I refer to documents referred to in the evidence by the bundle reference, as follows: **[bundle number/tab number/page number].**

**Background to the applications – summary of information in the evidence**

5.      The November 2017 order was made on the application of the three US Plaintiffs in defamation proceedings which are currently pending before the Florida court ("the Florida proceedings").  The US Plaintiffs in those proceedings are an individual, Mr

Aleksej Gubarev, and two companies owned by or associated with him, XBT Holdings SA and Webzilla Inc. The US Defendants are the US publishing company BuzzFeed Inc and its editor Mr Ben Smith. In the Florida proceedings the US Plaintiffs complain of allegedly defamatory statements in documents published by the US Defendants on 10 January 2017 "(the dossier)".    The dossier consists of a number of memoranda produced by Mr Steele and/or his company, Orbis Business Intelligence Ltd ("Orbis").

6.      Mr Steele and Orbis are defendants in defamation proceedings in the Queen's Bench Division brought by the US Plaintiffs, as claimants (save that Webzilla Inc is not a claimant, and the second and third claimants are Webzilla BV and Webzilla Limited), issued on 3rd February 2017 under Claim No. HQ17D00413 ("the QB proceedings"). The QB proceedings have reached the stage of service of the claim form and particulars of claim, and service of the defence and a reply.  The QB proceedings are brought in respect of the same publication of the dossier by the US Defendants.

7.      Mr Steele was a Crown Servant between 1987-2009, rising to the position of Counsellor in the Foreign and Commonwealth Office.   During that time he acquired expertise in the affairs of Russia/Commonwealth of Independent States.  He is bound by contractual and Official Secrets Act obligations.

8.      After he left the FCO, Mr Steele founded Orbis in partnership with Mr Christopher Burrows, another retired Senior FCO Crown Servant.  Orbis is a corporate intelligence consultancy, which specialises in providing strategic insight and advice, intelligence and investigative services to a range of clients.  Mr Steele is a Director of Orbis.

9.      Between June and early November 2016, Orbis was engaged by Fusion GPS ("Fusion"), a consultancy based in Washington DC, providing research, strategic intelligence and due diligence services to clients.   Mr Steele and Orbis had developed a prior working relationship with Fusion over a number of years.  Fusion engaged Orbis to prepare a series of confidential memoranda based on intelligence concerning alleged Russian efforts to influence the United States Presidential election, and possible links between Russia and the then Presidential candidate, and later President, Donald Trump. The parties describe these memoranda as the "pre-election memoranda", being those prepared before the 2016 US Presidential election, and "the December memorandum", a further memorandum dated 13th December 2016 prepared by Mr Steele of his own initiative, after the US Presidential election.   The pre-election memoranda and the December memorandum, sixteen documents in total, constitute the dossier, as referred to in the Florida proceedings.   The dossier was supplied to Fusion on terms that it was subject to an obligation not to disclose it or any of it to third parties without the agreement of Orbis and/or Mr Steele.

10.     Mr Steele, concluding that the intelligence reported on in the December Memorandum was of considerable importance to the national security of the US and the UK, and therefore needed to be analysed further, investigated and verified, provided a copy of the same to a senior UK government national security official acting in his official capacity; and a copy to Fusion by enciphered email, with an instruction to Fusion to provide a hard copy to Senator John McCain of the United States, via Mr David Kramer, a former US State Department civil servant and an associate of Senator McCain.

11.     On 10th January 2017 the US Defendants published an online article entitled "These Reports Allege Trump has Deep Ties to Russia" ("the Article"), accompanied by a link

to the dossier. It is not known who provided the dossier to the US Defendants. Mr Steele's evidence is that he was "horrified and remains horrified that the US Defendants published the dossier at all, let alone without substantial redactions." He considers that this may have compromised the sources of his intelligence, putting their lives, their families and their livelihoods at risk. He says that for former Crown Servants with the experience and background of the Directors of Orbis, such publication of such raw intelligence reports in this way is simply unthinkable   (Cain Paragraph 44) **[1/3/10]**.

12. The US Plaintiffs' claim in the Florida proceedings concerns the publication of paragraph 3 of the December memorandum (described as Company Intelligence Report 2016/166), which states as follows:

> "[Redacted] reported that over the period March-September 2016 a company called XBT/Webzilla and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct "alerting operations" against the Democratic Party leadership. Entities linked to one Aleksei GUBAROV were involved and he and another hacking expert, both recruited under duress by the FSB, Seva KAPSUGOVICH, were significant players in this operation. In Prague, COHEN agreed contingency plans for various scenarios to protect the operation, but in particular what was to be done in the event that Hillary CLINTON won the presidency. It was important in this event that all cash payments owed were made quickly and discreetly and that cyber and other operators were stood down/able to go effectively to ground to cover their traces. *[additional sentence in parenthesis not relied upon]*" **[2/11/127]**

13. The complaint by the US Plaintiffs was filed on 2nd March 2017, following a letter before action dated 28th January 2017. The US Defendants' defence was filed on 29th June 2017. The US Plaintiffs applied to the Florida court by motion for the issue of a Letter of Request pursuant to the Hague Convention of 18th March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters ("the Hague Evidence Convention") in relation to oral evidence sought from Mr Steele in this jurisdiction for use at trial. The Request **[2/12/230 – 240]** was issued in identical terms to the motion by the US Plaintiffs, and the draft order and November 2017 order are in the same terms.

14. On 10th August 2017 Mr Steele filed a non-party motion of intervention in the Florida proceedings objecting to the Letter of Request on grounds that:

> "The deposition sought is impermissible and unlawful on multiple grounds, not the least of which is that the self-same Plaintiffs have a direct defamation action pending against Mr Steele in the United Kingdom in which the requested deposition is strictly prohibited. Plaintiffs thus are seeking to employ this Court in an end-run around their limitations in their parallel UK action". **[2/13/242 – 243]**

15. The motion was refused by order of the Florida court dated 15th August 2017 **[2/13/245 – 247]**. Her Hon. District Judge Ursula Ungaro stated in the said order:

"Mr Steele seeks to intervene on the grounds that his deposition is prohibited by British law. This Court presumes, however, that the Senior Master of the Court of Judicature, Queen's Bench Division, will limit the scope of the Request pursuant to British law …… The Court, therefore, denies Mr Steele's request to intervene, trusting that his rights under British law will be protected by the British Court." **[2/13/246]**

## Chronology of the application by the US Plaintiffs under CPR 34.17

16.  In correspondence between W Legal and RPC, the solicitors acting for, respectively, the US Plaintiffs and Mr Steele, RPC requested that the application for an order pursuant to the Request be dealt with at a hearing on notice. However, that course, obviously a sensible one where there is a dispute between the party who seeks the examination and the witness, as to whether or not the application should be granted and/or in what terms it should be granted, was not followed by the US Plaintiffs. Rather, W Legal lodged the application to be dealt with on a without notice basis, and without a hearing. Consequently, the order was made in the terms sought, there being no obvious grounds before the court at that time on which to refuse the application in the terms sought.

17.  On 14th November 2017, the Government Legal Department ("GLD") acting on behalf of the FCO, wrote to Mr Steele's solicitors RPC indicating that it was considering seeking a certificate under section 3(3) of the 1975 Act. Section 3(3) of the 1975 Act gives protection against compulsion to give evidence prejudicial to the security of the United Kingdom.

18.  On 20th November 2017 RPC wrote to the Plaintiffs' solicitors, W Legal pointing out a number of concerns about the terms of the November 2017 order, and in particular the width of Schedule A to that order, which sets out the topics and ambit of the oral examination. The US Plaintiffs' solicitors were notified of Mr Steele's intended application to set aside the November 2017 order. Following a telephone discussion on 22nd November 2017, W Legal sent to RPC a draft of an alternative Schedule A to see whether Mr Steele would agree to be examined on that alternative formulation. That proposal could not be agreed.

## The Law

19.  The court's jurisdiction is derived from the Evidence (Proceedings in Other Jurisdictions) Act 1975 ("the 1975 Act").

20.  All parties referred the court to a number of authorities, as follows:

*In re State of Norway* [1987] QB 433

*Rio Tinto Zinc Corporation –v- Westinghouse Electric* [1978] AC 547

*CH (Ireland) Inc –v- Credit Suisse Canada* [2004] EWHC 626 (QB) at [14] and [17]

*First American Corp –v- Al Nahyan* [1999] 1 WLR 1154

*United States of America v Philip Morris Inc* [2003] EWHC 3028 (Comm)

*United States of America v Philip Morris Inc* [2004] 1CLC 811

*State of Minnesota –v- Phillip Morris Inc* [1998] I.L.Pr 170

*Gredd –v- Busson* [2003] EWHC 3001

*Genira Trade –v- Refco* [2011] EWCA Civ 1733, [2002] C.P. Rep. 15

*Microtechnologies LLC v Autonomy Inc and Hussain* [2016] EWHC 3268 (QB)

*Dombo Beheer B.V. The Netherlands* (1994) 18 EHRR 213

*Sanoma v the Netherlands [2011] EMLR 4*

*Land Rover North America Inc –v- Windh* [2005] EWHC 432 (QB)

*Rio Tinto Zinc plc v Vale SA* [2015] EWHC 1865 (QB*)*

*Secretary of State for Trade and Industry v Crane* [2001] 1 BCLC 222

## Mr Steele's Application – Summary of Submissions on his behalf

21.     The application to set aside the November 2017 order is made on both jurisdictional and discretionary grounds.  Mr Millar QC for Mr Steele drew the court's attention to the width of the topics of the proposed examination in the original Schedule A to the November 2017 order.

22.     Paragraph 1 seeks evidence on Mr Steele's educational background, employment history, professional qualifications, personal preparation for the deposition, despite the fact that he will be a witness of fact and not an expert witness.  Paragraphs 2-14 list topics of examination in relation to the entire dossier, although only one paragraph of the December Memorandum is complained of in the Florida proceedings.  Paragraph 4 seeks evidence from Mr Steele of steps he took to obtain information for the dossier, which would inevitably be a substantial and wide-ranging investigation, given the extent of the material in the dossier.  Paragraph 7 seeks Mr Steele's sources of information for the dossier, even though it must have been apparent that the answers would involve a wide-ranging examination and could put potential intelligence sources at great risk.  Paragraphs 12-13 relate to provision of the dossier by Mr Steele to others, even though his defence in the QB proceedings, signed by a statement of truth, provides this information.   Further the November 2017 order provides for a seven hour examination, with six hours being allotted to the Plaintiffs' US trial counsel and one hour to the US Defendants' trial counsel, which it is said demonstrates the extent of the questioning sought, despite the narrow limits of the allegations in the US proceedings.

High Court Unapproved Judgment:
No permission is granted to copy or use in court

Double-click to enter the short title

## Jurisdictional Grounds

Evidence sought for an impermissible purpose

23. Mr Millar relies on the judgments in a number of authorities to support the position that investigatory examinations and fishing expeditions will not be permitted by the English Court, on either jurisdictional grounds because they do not come within the 1975 Act or on discretionary grounds because they are oppressive, namely:

 *In re State of Norway* [1987] QB 433 at 481F, 482 E – F, 483G, 491F

 *First American Corp –v- Al Nahyan* [1999] 1 WLR 1154 at 1165 D – E, 1165H – 1166A

 *Gredd –v- Busson* [2003] EWHC 3001 at §27 (3) (9)

 *Rio Tinto plc v Vale S.A.* [2015] EWHC 1865 (QB)

 *Rio Tinto Zinc Corporation –v- Westinghouse Electric* 1978 AC 547 at §37 - 38

24. It is submitted that the court is able to infer from the wide-ranging evidence sought in the Request, far beyond what is required for the purposes of the Florida proceedings, that the US Plaintiffs' intention is not primarily to obtain evidence for trial, but to conduct a wide ranging investigation in order to attack the credibility of Mr Steele and his sources. There has been no attempt in the Florida proceedings to analyse how the evidence sought is relevant to the issues between the parties in the Florida proceedings. The inference that can be drawn is that the US Plaintiffs want a public platform to attempt to discredit the dossier as valueless. This would increase the pressure on Mr Steele not to defend the QB proceedings and could put the well-being of his sources in jeopardy. The court should therefore infer that the application is brought for an impermissible purpose and that the court therefore has no jurisdiction.

25. The defence of the US Defendants' in the Florida proceedings relies on the following grounds –

 i) no personal jurisdiction;

 ii) publication is protected by fair report privilege;

 iii) publication is protected by neutral report privilege;

 iv) publication is protected by the First and Fourteenth Amendments to the US Constitution (Free Speech Defence);

 v) the Plaintiffs are public figures and cannot meet their burden to prove actual malice by clear and convincing evidence;

 vi) [the remaining defences relate to damages].  **[2/11/193-194].**

26. There is no basis for Mr Steele being able to give evidence as to the US Defendants' state of mind or to any of the other defences.

27.     Further, although the US Plaintiffs have now made concessions and will agree to a more limited form of order, and have agreed to give various assurances, the description of the topics for examination as redrafted are so far different from the topics requested to be ordered for examination by the US Court that this court has no jurisdiction to make an order amended in that form unless an amended Letter of Request is sought.

Breach of Article 6 Rights

28.     It is submitted that the result of the November 2017 order is to violate Mr Steele's fair trial rights in the QB proceedings under Article 6 of the European Convention on Human Rights, as set out in the Human Rights Act 1998. It is accepted that it is a matter of fact and degree whether matters of procedure can affect Article 6 rights.   However, it is submitted that on the basis of the principles outlined in the case of *Dombo Beheer B.V. –v- The Netherlands* (1994) 18 EHRR 213, that the November 2017 order has the effect of violating Mr Steele's right to a fair trial because it results in an inequality of arms.   Under the CPR both parties exchange their witness statements at the same time, after disclosure and inspection of documents, so that neither party can tailor their evidence in the light of having seen the other party's evidence first.   If the order remains as drafted the US Plaintiffs will have the advantage in the QB proceedings of hearing Mr Steele being examined, cross-examined and re-examined on issues that arise in the QB proceedings.

29.     Further, if the court rules in favour of the Claimants in the QB proceedings, awarding them damages for the publication of the words complained of in the December Memorandum, Mr Steele and Orbis are very likely to issue proceedings for a contribution against the US Defendants under the Civil Liability (Contribution) Act 1978.   There has been correspondence with the US Defendants about the possibility of pursuing such a claim as an additional claim in the current QB proceedings, although this has not yet happened.   The US Defendants are, therefore, aware of the possibility of future litigation between Mr Steele and themselves in respect of the publication of the December Memorandum. Thus, the US Defendants also would have the advantage in such contribution proceedings of having had Mr Steele's evidence on examination, cross-examination and re-examination ahead of such proceedings.

30.     Mr Steele faces losing the "level playing field" protection given by the CPR where the trial is the first opportunity for the opposing party to cross-examine.   It is submitted that the US Plaintiffs' reliance on the case of *Secretary of State for Trade and Industry –v-Crane* [2001] 1 BCLC 222 is not comparable either on the facts in respect of the ruling. This was not a case under the 1975 Act, but rather whether civil proceedings under s. 6 of the Company Directors Disqualification Act 1986 should be stayed pending the outcome of criminal proceedings against the directors.   In that case the right of silence in criminal proceedings was a factor in the determination, whereas there is no parallel right in civil proceedings.   In any event, there is no application in the QB proceedings for a stay as there was in that case.

31.     Mr Millar QC for Mr Steele relies on similar cases in related context where judges have emphasised "the desirability of avoiding a dress rehearsal of the cross-examination", where a Court is invited to order the pre-trial examination of a person who may be subsequently cross-examined at a trial in the case.  (For example, in re *Castle –v- New Homes Ltd* 1979 1 WLR 1075 per Slade J at 10/83, and in *Re: Frank's Ex Parte Gittins* 1892 1 QB 646 per Gordon Williams J at 647-648).   This reflects the inherent

oppressiveness of requiring one party, but not the other, to submit to detailed cross-examination many months before the trial.

32.     It is submitted that the court could not fairly dismiss Mr Steele's legitimate concerns on the basis of unsubstantiated speculation by the US Plaintiffs about the evidence Mr Steele would or would not give at the examination.

**Discretionary Grounds**

33.     If the court considers that it does have jurisdiction to make the order on behalf of Mr Steele it is submitted that the court should refuse to exercise its discretion so to do on the following grounds.

<u>Oppression – evidence on issues included in the QB proceedings</u>

34.     It is submitted that the case pleaded by the US Plaintiffs as Claimants in the QB proceedings puts in issue a wide range of factual matters, which are also likely to be the subject of the examination, cross-examination and re-examination in the US proceedings.   For example:

i)      the extent to which the information in the memoranda comprising the dossier as published was based on intelligence, the terms on which any such intelligence was supplied to Mr Steele/Orbis and the steps the US Defendants took to check any such intelligence;

ii)     the history and nature of the relationship between Mr Steele and Orbis, on the one hand, and Fusion, on the other;

iii)    the identity of and motives of Fusion's client, on whose behalf it instructed Orbis to prepare the pre-election memoranda;

iv)     the circumstances in, and the terms on, which Mr Steele and Orbis prepared the pre-election memoranda for Fusion, including the extent of the US Defendant's knowledge of the matters referred to at (iii) above;

v)      the extent to which Mr Steele and Orbis treated the pre-election memoranda and the December memorandum as confidential;

vi)     provision by the Defendants of the pre-election memoranda to the FBI;

vii)    the extent to which, and the purposes for which, Fusion and its client and Mr Steele engaged with the media in relation to the contents of the memoranda;

viii)   the circumstances in which Mr Steele and Orbis prepared the December memorandum;

ix)     the basis and terms on which Mr Steele transmitted a copy of the December memorandum to Fusion/Senator McCain in December 2016;

x)      whether Senator McCain or his representative, David Kramer, was responsible for the dissemination of the December memorandum to the media; and

xi)      the identity  of the source of the allegations  made against  the US Plaintiffs  in the
December  memorandum.

35.    It is submitted  that the court's findings  in respect  of these contested  issues  will  be
central  to its determination  of liability  in the QB proceedings.   It should  be noted  that
in the Florida  proceedings,  the publication  of exactly  the same paragraph  in the
December  memorandum  is complained  of.

36.    Various  authorities  have emphasised  "*the desirability of avoiding a dress rehearsal of
the cross examination*": see *In re Castle New Homes Ltd* per Slade J. at 1083 and *In re
Franks, ex p Gittins* per Vaughan  Williams  J. at 647-648 (see above Paragraph  31).
This  reflects  the inherent  oppressiveness  of requiring  one party,  but not the other,  to
submit  to detailed  cross examination  many months  before  the trial  of a claim.

Oppression – the Request  constitutes  a fishing  expedition

37.    It is submitted  that the Request  was not subject  to any form of judicial  scrutiny,  it is
formulaic  in content  and says nothing  about the legal  issues  in respect  of which  it is
said the evidence  sought  is relevant  witness  evidence.   There is no analysis  of the topics
listed  in Schedule  A to explain  what evidence  Mr Steele  can give  in respect  of each
topic  relevant  to the issues  in the US proceedings.

38.    In Mr Loble's  Second  Witness  Statement  at paragraph  34 it is stated  that "the key
evidence"  sought  is:

> "the extent  to which,  if at all,  Mr Steele  verified  the allegations
> against  the Plaintiffs".  **[1/10/70]**

Mr Steele's  evidence  in relation  to that issue  will  not assist  the US Plaintiffs  as whatever
steps were taken  will  not demonstrate  the truth  or falsity  of the allegations,  and will  be
completely  irrelevant  to the decision  by the US Defendants  to publish  the dossier.

39.    It is further  not explained  how the evidence  sought  which  goes beyond  that "key
evidence"  is relevant  to the Florida  proceedings.   The original  drafting  of Schedule  A
to the Request  makes  it clear  that what the US Plaintiffs  are seeking  is an impermissible
fishing  exercise  ranging  well  beyond  what is relevant  to the issues  in the Florida
proceedings.   The order  cannot  be saved  by the recent  proposed  amendments  in draft
Amended  Schedule  A, because  the areas  of questioning  still  go too far beyond  what is
required,  and also constitute  a wholesale  rewriting  of the Letter  of Request  which  is not
permitted.

40.    It is submitted  that the rapid  concessions  made by the US Plaintiffs  in November  2017
tacitly  acknowledge  that their application  far exceeded  what is permitted  under  the 1975
Act,  and it is noteworthy  that they have made no attempt  to justify  the breadth  of the
topics  in Schedule  A to the November  2017 order.

41.    The US Plaintiffs'  representatives  have stated  that the key factual  issues  in the Florida
proceedings  are:

i)       whether  the publication  of the allegations  by the US Defendants  was made
"negligently,  without  reasonable  care as to their truth  or falsity:  with knowledge

of their falsity; and/or with reckless disregard for the truth or falsity of the allegations";

ii) whether the allegations made in relation to the Plaintiffs in the December 2016 Memorandum are true.

(Second Witness Statement of Steven Loble, Paragraph 10 **[1/10/61]**.

42. The matters upon which Mr Steele will be required to testify under the November 2017 order go well beyond those issues. As to (i), Mr Steele will be unable to testify as to the state of mind of the US Defendants, with whom he had no contact about the publication in question. As to (ii), it is clear that the significant majority of the 14 subject matters listed in Schedule A to the November 2017 order have little or no bearing upon the truth or falsity of the allegations about the US Plaintiffs. It is of relevance that Mr Steele has chosen in the QB proceedings not to plead a defence of truth, as this indicates that he cannot advance a case based on admissible evidence as to the conduct of the US Plaintiffs/Claimants, to the effect that the allegations against them in the relevant passage of the December memorandum are true.

43. Questions 11 to 14 of the original Schedule A seek to question Mr Steele about his provision of the dossier to officials with responsibility for US and UK national security. It is unclear how this will elicit any relevant probative evidence concerning the truth of the allegations about the US Plaintiffs, or the state of mind of the US Defendants. Mr Loble asserts at paragraph 26(iv) (3) of his second witness statement that:

> "The circumstances of the provision of the dossier to various parties identified in topics 6-9 *[of draft amended Schedule A, originally topics 11 to 13 and an additional question not included in the Request]* including whether cautions were given to such parties about the unverified nature of the allegations in the dossier and warnings not to publish the same without independent verification. This evidence will go to the lack of care exhibited by Buzzfeed." **[1/10/66]**

44. It is submitted that this is a classic example of a speculative fishing expedition as:

i) There is no pleaded allegation in the Florida proceedings that Mr Steele did not provide any "caution" when transmitting the December memorandum; and

ii) Whether or not he provided such caution is irrelevant to the truth of the allegations or to the US Defendants' state of mind and conduct in its decision to publish the December memorandum.

45. Even if the order made is not in contravention of Mr Steele's Article 6 rights it is submitted that it is oppressive because:

i) For all the reasons above the wide-ranging nature of the topics advanced, most of which have no relevance to what the US Plaintiffs state to be the key issues in the Florida proceedings, indicate that the examination is intended to be a speculative fishing expedition designed to discredit Mr Steele; and

ii)     It gives the Claimants a "dry run" at cross-examination of Mr Steele prior to
exchanging the parties' witness statements in the QB proceedings. Although,
the Plaintiffs say that they could elicit the same information by serving a Request
for Further Information in the QB proceedings, the Plaintiffs have already
served a Request and this has been answered. It is not necessarily the case that
the court would order Mr Steele to provide further information in response to a
further Request under Part 18. In any event, information elicited by a Request
for Further Information is not comparable to a three-hour examination, a three-
hour cross-examination and a one-hour re-examination (which is now sought).

iii)    There is a risk to the confidentiality of Mr Steele/Orbis' sources for the
intelligence in the dossier.

iv)     Contractual confidentiality and national security reasons.

Oppression - Risk to Sources

46.     Ms Cain at Paragraphs 40-44 of her Statement **[1/3/16]** gives evidence that the reports
prepared by Mr Steele which comprise the dossier were not intended for public
consumption and they were written accordingly. It is critical to Orbis and its directors
that there is no possibility whatsoever of anyone ever identifying its sources. The
dossier was sent to Fusion by encrypted email under obligations of confidentiality. The
distribution to Senator McCain was sent by the same method but by Fusion and via Mr
Kramer. It is therefore imperative that the court does not sanction any course of action
which would further increase the already significant risks of harm that the individuals
face by virtue of unauthorised publication of the dossier by the US Defendants.

47.     Mr Millar QC relies on the witness statement of Mr Lucas, a leading expert on the
Russian Federation, and the interplay between security intelligence, corruption and
abuse of power. At paragraph 26 of that statement he states that he:

"...is in no doubt that the Russian authorities wish to establish
the sources of the Orbis dossier through the defamation
litigation, arising out the publication of the dossier by Buzzfeed"
**[1/3A/20F]**.

48.     At Paragraph 27 Mr Lucas states his view that the sources of information contained in
the dossier would face a grave risk of sanctions "from long jail sentences in harsh
conditions, to beatings and murder" **[1/3A/20F]**. He substantiates this by reference to
a number of specific examples of the harsh and violent treatment meted out to those
who have been perceived to have colluded with Russia's enemies (paragraphs 10-24
**[1/3A/20C -20F]**).

49.     Although the US Plaintiffs and the US Defendants have now confirmed in open court
that they are not seeking to identify Mr Steele's sources of information it is submitted
that this is a bad point because:

i)      The inclusion of paragraph 7 (Mr Steele's sources of information) in Schedule
A to the November 2017 order reflects a clear wish on the part of the US
Plaintiffs to identify Mr Steele's sources, notwithstanding the obvious risks to
them. The belated offer to remove paragraph 7 does not change this obvious

fact.   It is also telling that the proposed revised draft of Schedule A does not contain any provision that prohibits questions from being asked which are likely or indeed intended to result in the identification of confidential sources.

ii)   The continued existence of the desire to identify Mr Steele's confidential sources is explicitly reflected in the Claimants' Reply in the QB proceedings which states that:

"…..it may be necessary for the Defendants *[sic Claimants]* to make an application for disclosure of the identity of any source of the Allegations made against the Claimants in the December memorandum" (Reply Paragraph 39 **[2/11/162]**).

iii)   Even if paragraph 7 is removed from Schedule A, it is self evident that Mr Steele's answers to questions concerning the remaining subject matters covered by Schedule A, for example, his "preparation of the dossier", his "solicitation of information for the dossier", and his "work to verify allegations of the dossier", might reveal identification of sources even if the answers do not involve him in naming any individuals.   Evidence about these issues is likely to provide information that would increase the already significant risk of identification of the sources.   In the context of protection of journalistic sources, and interference with Article 10 rights, the threshold considered by the ECHR recognises the risks of "jigsaw identification" as a result of compelled answers/disclosure.   The court should ask whether the information sought is <u>capable</u> of identifying sources in the same way as a direct question would be: *Sanoma –v- Netherlands* [2011] EMLR 4 at [65] and [72].

50.   The High Court has previously held that questioning that seeks disclosure of the identities of confidential sources in an examination under section 2 of the 1975 Act would be:

"disproportionate and unfair … bearing in mind the very real risks that could arise for the sources themselves and … the impact that such enforced disclosure might have on the Respondents' business and business reputations" (*Rio Tinto Plc –v- Vale SA* [2015] EWHC 1865 (QB) per Andrews J at [47]).

51.   This is consistent with the court's positive obligations under Articles 2 and 3 of the ECHR to protect the lives and bodily integrity of individuals who are known to be at risk of serious harm at the hands of third parties, and its positive obligations under Article 8 of the ECHR to ensure respect for private and family life.   It is submitted that the risk to Mr Steele's confidential sources can only be eliminated by setting aside the order.

<u>Oppression - Confidentiality and National Security</u>

52.   In addition to the factors above there is a significant chance that Mr Steele's examination could trespass into sensitive areas of national security and/or require Mr Steele to provide information which he is not at liberty to divulge without the explicit consent of the FCO.   In this regard, the GLD has indicated that it will consider seeking a certificate under Section 3(3) of the 1975 Act.   It is notable that the US Plaintiffs in

the Florida proceedings have not expressly disavowed any interest in inquiring into any disclosure to a competent official or body for the legitimate purpose of national security:   see Paragraph 21(a) of the Defence **[2/11/130]** and Paragraph 19.1 of the Reply in the QB Proceedings **[2/11/154]**.

## Mr Steele's Alternative Application to Vary the Order

53.     In the alternative it is submitted that if the court does not set aside the order it must be varied to ensure that:-

i)     The scope of the examination is limited to:

     a)     the steps that Mr Steele took to verify the allegations about the US Plaintiffs contained in the words complained or pleaded in the US Complaints; and

     b)     Buzzfeed's acquisition of the December memorandum;

ii)     Mr Steele will not be compelled to disclose any confidential information; and

iii)     Mr Steele's right to a fair trial in the QB proceedings is properly respected.

54.     If the scope of the examination is limited as in (i) (a) above this would limit the scope of irrelevant questioning and would reflect the US Plaintiffs' position that:

> "The thrust of the [intended] questioning is whether or not the contents of the relevant paragraph of the dossier, which is attached to the Schedule, were verified or not." **[2/11/221]**.

55.     The order, if not set aside, must as an absolute minimum be varied so that the terms of Schedule A to the November 2017 order are modified so as include the new provisions identified in the draft order to Mr Steele's application namely:

i)     The duration of the examination permitted is substantially reduced to a total of no more than 3 hours, so as to reduce the scope for a roving inquisition;

ii)     There is an express provision that prevents any questions from being asked which would require the disclosure of any confidential information including (but not limited to) information that would in the ordinary course:-

     a)     require the consent of Mr Steele's former Crown employer before disclosure;

     b)     increase the existing risk of confidential intelligence sources being identified; or

     c)     risk disclosure of information concerning processes of intelligence gathering known to Crown servants.

iii)     There is an express provision that prevents any question from being asked that would require the disclosure of any legally privileged information; and

iv)  Mr Steele's legal representatives be permitted to attend the examination in order to advise Mr Steele and object to the asking of any questions that are not permitted by the order.

## In relation to the application of the US Defendants

56.  It is submitted that with regard to the US Defendants' application, the Court has no duty to assist the US parties, and its only duty is to the Florida Court in its response to the Request issued at the request of the US Plaintiffs. If the US Defendants want to achieve a different form of order they would need to apply to apply for their own Letter of Request. Their intervention is an opportunistic attempt at fishing and the Court has no jurisdiction to make the order that they seek.

## Summary of the US Plaintiffs' Submissions

57.  The key factual issues in the US proceedings are:

i)  whether the publication of the defamatory allegations by the US Defendants was made "negligently without reasonable care as to their truth or falsity; without knowledge of their falsity; and/or with reckless disregard for the truth or falsity of the allegations";

ii)  whether the allegations made in relation to the US Plaintiffs are true

(US complaint **[2/11/170-174]**).

58.  In the QB proceedings the key issue is whether Mr Steele/Orbis were responsible for the publication of the defamatory statement. Thus, the factual enquiry in the English proceedings will not focus on the truth or falsity of the defamatory allegation which is presumed to be false, and the QB Defendants have not contended otherwise. (This is contrary to the position in the Florida proceedings where the US Plaintiffs have the burden of proving that the allegations are false).

59.  Following the service of the order there was correspondence between the US Plaintiffs' solicitors and Mr Steele's solicitors as a result of which the US Plaintiffs agreed to the following: -

i)  they would not seek to identify Mr Steele's sources;

ii)  to restrict the subject matter of the examination, excluding from the list of topics at Schedule A the identity of Mr Steele's sources, and to limit the questions relating to all topics except the first (Mr Steele's background) to the specific paragraph in the December Memorandum which contains the defamatory statement;

iii)  to amend the order to reflect the above agreement.

Despite Mr Steele not agreeing to the amended order the US Plaintiffs remain content that the court should amend the November 2017 order to reflect that proposal.

Relevance

60.     The court had jurisdiction to make the order under the 1975 Act.

61.     The court's starting point should be that it will ordinarily give effect to a request for assistance from a foreign court in obtaining evidence so far as it is proper and practicable and to the extent permissible under English law, to reflect judicial and international comity: CPR 34.21.2; *Rio Tinto Zinc v Westinghouse* per Lord Denning at 560H.

62.     The Request confirms that:

> "the Court considers that the evidence sought is directly relevant to the issues in dispute, and it is not discovery within the meaning of Article 23 of the Hague Evidence Convention, that is, discovery intending to lead to relevant evidence for trial." **[2/12/230]**

> and

> "For the reasons set forth above, the United States District Court … believes that the witnesses … will be able to provide evidence directly relevant to the main issues between the parties, and without which the ends of justice could not properly be met. The United States District Court … believes that this information is not available from any other source". **[2/12/238]**

63.     The trial in the Florida proceedings is now likely to start in August 2018.

64.     In the ordinary way and in the absence of evidence to the contrary the court should be prepared to accept the statement of the Florida court in the Request that the evidence is required for the purposes of the Florida proceedings and that the evidence is directly relevant to the issues at trial: CPR 34.21.2; *Rio Tinto Zinc v Westinghouse* per Lord Diplock at 634A and following and Lord Keith at 654G; *First American* per Sir Richard Scott at 1165B - C, 1166F.

65.     It is clear that Mr Steele has knowledge of the matters in issue at the trial and he does not suggest otherwise, and indeed is the person who has most knowledge of the majority of relevant matters.

66.     The evidence that Mr Steele is being asked to give is directly relevant to the issues in dispute in the Florida proceedings and the list of topics in the US Plaintiffs' draft amended Schedule A. The Florida court has confirmed in the Request that without Mr Steele's evidence the ends of justice cannot properly be met.

67.     Mr Steele's defence in the QB proceedings does not address the key issues in the Florida proceedings, namely the lack of verification of the information contained in the dossier, and in any event would be likely to be inadmissible as hearsay (Loble 2 paragraph 26(ii)) **[1/10/66].**

68.     It is submitted that the court should not go behind the statement of the Florida court with regard to the relevance of the evidence sought, and that the criticisms of the Florida

court made on behalf of Mr Steele are wrong because the truth of the defamation statements in the US proceedings are in issue, and the US Plaintiffs have the burden of proving the falsity of those statements. The Florida court was persuaded that Mr Steele has relevant evidence to the issues in the case. The US Defendants did not contest the US Plaintiffs' application for the Request **[1/5/23,** Paragraph 8] which is unsurprising because they also consider Mr Steele's evidence to be relevant.

69.    The reasons why the US Plaintiffs were prepared to compromise and vary the topics for examination in Schedule A was not because they did not consider they were relevant, but for reasons of pragmatism. It should be noted that the Florida court had already determined the issue of relevance and so dismissed Mr Steele's motion to dismiss the Letter of Request. In addition, on Mr Steele's behalf it was said that the examination would be prohibited by English law which is untrue. The Florida court simply held that the English court would protect Mr Steele against any questioning which is contrary to the law in the United Kingdom. There is no evidence to suggest that the Florida court is wrong.

70.    It is submitted that the submissions on behalf of Mr Steele ignore the fact that in the Florida proceedings the truth of the publication is in issue, so it is necessary to understand the circumstances in which the allegations came to be made. It is clear from the US Plaintiffs' complaint in the Florida proceedings that they consider the information included in the dossier was "unverified" and as the US Plaintiffs are seeking to prove a negative i.e., that the allegations and the publication are untrue, it is important to have evidence from the person who wrote the dossier. The US Plaintiffs will have to seek to undermine the creditability of the allegations in that part of the dossier. The dissemination of the dossier, and when Mr Steele first published the December Memorandum to third parties, are also matters relevant to the issue of culpability of the US Defendants and their state of mind when they published.

71.    The US Plaintiffs submit that the topics for examination as in the proposed redrafted order and draft amended Schedule A are not unfair to Mr Steele. In paragraph 1 of Schedule A Mr Steele's background is relevant to the likelihood of his evidence being true or false. Paragraphs 2-5 are applicable to a limited period of time between about October and December 2016, and are limited to paragraph 3 of the December Memorandum. They are not topics that are vague or uncertain and do not suggest a roving enquiry. On the contrary they are clear and discrete topics. With regards to paragraphs 6 to 9, these all relate to the provision of documents to third parties, relevant to the issues of publication by the US Defendants. In summary, the Plaintiffs have acted reasonably in response to requests by Mr Steele as to his concerns about protecting his sources and national security issues.

Protection of Sources

72.    The US Plaintiffs have already and prior to the issue of Mr Steele's application confirmed that the examination will not seek to identify Mr Steele's sources of information and have removed this paragraph from the topics in the draft Amended Schedule A. The US Plaintiffs are content that this express confirmation be recorded in the court's order on Mr Steele's application.

73.    In any event, it in fact appears to be the case of much of the damage (in terms of risk to sources) has already been done by reason of the preparation of the dossier and its publication.

National Security

74.    Neither Mr Steele nor the FCO have provided any information as to what issues of national security would be engaged by the proposed questioning, and the FCO have not yet sought a section 3(3) Certificate under the 1975 Act.   The US Plaintiffs' representatives have asked the FCO to identify which of the topics were of concern to the FCO in the hope of finding accommodation for those concerns, but no substantive response was received, save for confirmation that the FCO intends to consider whether to issue a section 3(3) Certificate "in the event that it becomes necessary to do so following the determination of Mr Steele's application".   [2/14/323]. Thus the US Plaintiffs have had no assistance on this point.

75.    In any event, the topics which are listed in the draft Amended Schedule A have already been the subject of extensive publicity in the context of the entire dossier, both from information ultimately coming from Mr Steele and more recently in the publication of Mr Simpson's evidence to Congress.

76.    Mr Steele has been content to talk to journalists about the dossier; by way of example:-

    i)    articles in Mother Jones dated 31st October 2016 **[2/14/313],** and 13th January 2017 **[2/14/315, 316, 317];** from those articles it is apparent that pre-election memos have been provided to a journalist at Mother Jones, David Corn **[2/14/312-314** and **315-317];**

    ii)    article in the Guardian dated 12th May 2017 **[2/14/268-271];**

    iii)    extract from "Collusion – Secret Meetings, Dirty Money and how Russia helped Donald Trump win" by Luke Harding **[2/14/309-311].** Information was given by Mr Steele to Mr Luke Harding, a Guardian journalist, for this book. The book traces Mr Steele's career as an 'MI6 Officer' and records the off the record meetings which Mr Steele had with a number of American journalists from the New York Times, The Washington Post, Yahoo! News, the New Yorker and CNN.

    iv)    extracts from evidence provided by Mr Glenn Simpson to the Senate Judiciary Committee of the US Senate, Washington DC on 22nd August 2017. **[2/15/415, 418, 476, 533, 539, 559 and 601].**

    Thus, a substantial amount of information was given by Mr Steele to journalists to create interest so that the press would put pressure on the FBI to investigate, so a considerable amount of the material has been put into the public domain.

Abuse of Process

77.    The allegation in Ms Cain's witness statement at paragraph 52(a) **[1/3/18]** that the US Plaintiffs' motive is to pressurise Mr Steele/Orbis and their sources by gaining access to highly confidential information, leaving those involved in putting the dossier

together exposed to attack outside the courtroom, is without foundation and should be withdrawn. The Florida court has confirmed, and it is obvious the evidence sought is directly relevant to the issues in the Florida proceedings and that is the motive for the US Plaintiffs wishing to examine Mr Steele.

78. In any event, the purpose of the instruction of Fusion, which hired Orbis, was to obtain information to undermine the Trump Presidential campaign (see Washington Post Article **[2/14/1259]**) so the specific purpose for which Orbis/Mr Steele was hired was to collect information to be used publicly: see Loble 2 Paragraph 27(ii), (i), (3) and (4) **[1/10/67-68]** and extracts from Mr Simpson's evidence at **[2/15/533, 539, 599].**

Article 6 ECHR

79. It is submitted that an assertion that the order amounts to a breach of Mr Steele's ECHR Article 6 rights, because he may be examined prior to disclosure, exchange of witness statements and cross-examination in the QB proceedings is misconceived because: -

    i)      the order has been obtained because Mr Steele's evidence is directly relevant in the Florida proceedings and cannot be obtained in any other way;

    ii)      the key evidence (as to whether the allegations were verified) is of no or marginal relevance to the English proceedings;

    iii)      the remainder of the topics relate to the provision of the dossier to third parties which will be potentially relevant in the QB proceedings, but there is no breach of Mr Steele's Article 6 rights in being required to be examined on the same topics pursuant to the order. Mr Steele has no right to silence in the English proceedings. On the contrary, he will be required to state the evidence he wishes to give ahead of trial in a witness statement. Moreover, he could be required to provide further information on the relevant issues prior to the date for exchange of witness statements should an application for further information be made, particularly as the issues are peculiarly within his or Orbis' knowledge and not that of the Claimants in the QB proceedings. The suggestion that to require Mr Steele to answer questions on the topics in the draft Amended Schedule A will give the Claimants in the QB proceedings "an unwarranted advantage" and create an "inequality of arms" in the English proceedings is misconceived. See *Secretary of State v Crane* and *Rio Tinto Zinc v Westinghouse*, Lord Wilberforce at 611G-H.

80. No further variation to the order is therefore necessary or appropriate. The Examiner will ensure that the examination is conducted fairly and in accordance with the order and the CPR. In the event that Mr Steele objects to answering any questions the provisions of paragraph 4.5 of CPR 34 APD.4.5 will apply or CPR 34.20 if an objection is based on privilege.

81. With regard to Mr Steele's alternative argument that the time limit for the examination should be three hours, Mr Loble's evidence is that the attorneys for the US Plaintiffs do not expect the examination to take the six hours allowed for, but given the costs associated with obtaining the order and attending the examination it would be unwise to impose an artificially limited time in which to conduct the examination. The revised timetable has been agreed between the US Plaintiffs and the US Defendants, so that

they have equal time between them for questions.   Finally, the US Plaintiffs are content for the order to recite that Mr Steele should be permitted to have legal representation at the examination for the purpose solely of taking any proper objection that might be taken to questions put to him in the course of examination should he wish to do.

## Oppression

82.    The fact that Mr Steele will be giving evidence at an earlier time in relation to matters which will be canvassed in the QB proceedings does not matter if it is relevant to the US proceedings.    This much is clear from the authorities, see *Rio Tinto Zinc v Westinghouse* in the judgment of Wilberforce LJ at page 611G and *Micro Technologies* at Paragraphs 52, 54.   The clear area of distinction is where fraud is alleged, and this is not a fraud case.

83.    Mr Steele's evidence is likely to be exculpatory of him and it is likely to reflect that which he has already said in his Statements of Case in the QB proceedings.    In any event, the English approach to litigation is "cards on the table", and the information will be in his witness statement in the QB proceedings in due course in any event.

## Generally

84.    As the US trial is now in August 2018 and in the QB proceedings a CMC has not yet been held, the US proceedings will proceed more quickly and Mr Steele may be assisted by hearing Mr Gubarev's evidence in the Florida proceedings.   Again, if there are to be contribution proceedings against the US Defendants Mr Steele may be helped by the evidence in the US trial, and in any event, such proceedings would not be dealt with until after the QB proceedings have been determined.

## In relation to the US Defendants' application

85.    It is submitted that the US Defendants' application demonstrates internal inconsistency because on the one hand: -

    i)    it is neutral on Mr Steele's application to set aside the order;

    ii)    it seeks an order that the US Defendants' English counsel and solicitors be permitted to attend the examination to advise the US Defendants and object to the asking of any questions not permitted by the order.

86.    On the other hand, the US Defendants seeks to vary the Amended Schedule A as proposed by the US Plaintiffs but to re-expand the ambit of topics 5-9 to relate to the entire dossier, not just the relevant paragraph within the December Memorandum.

87.    Otherwise the US Plaintiffs are neutral on the US Defendants' application.

## Summary of the US Defendants' submissions on Mr Steele's application and their own application

88.    The US Defendants are neutral in respect of Mr Steele's application to set aside the November 2017 order.

89.    If that order is not set aside the US Defendants seek to vary the order as follows:

    i)      to permit them to ask questions relating to the dossier as a whole, (as is sought in the Request) and not merely paragraph 3 of the December Memorandum;

    ii)     to clarify that the US Defendants will not ask questions which would require the disclosure of any confidential source or method of information gathering by Mr Steele;

    iii)    to ensure that the questioning time of Mr Steele is equally divided between US Plaintiffs and the US Defendants and not unduly time restricted overall; and to permit the Defendants' English legal team to attend the examination of Mr Steele.

90.    The US Defendants submit that although both the US Plaintiffs and Mr Steele have raised issues in correspondence as to the US Defendants' entitlement to be heard in relation to the order of November 2017, no formal objection has been raised to the US Defendants' participation since their application has been issued. In any event, such an objection would be untenable because:

    i)      the right of a party to the foreign proceedings to challenge an order made under the 1975 Act is established: see White Book paragraph 34.21.18; *Land Rover North America Inc –v- Windh* [2005] EWHC 432 (QB);

    ii)     further the November 2017 order expressly provides that: "the parties and the witness are at liberty to apply to the Senior Master or in her absence another Master" **[1/9/56].**

    iii)    the order confers on the US Defendants a right to question Mr Steele in accordance with the right to cross-examine provided for in the Request to which the November 2017 order gives the effect. The US Defendants are entitled are to be heard before any order is made by which those rights are modified or curtailed. In circumstances where the examination procedure is intended to replicate the giving of evidence at the trial in the Florida proceedings, any suggestion that the US Defendants can have no say in the conduct of the examination would be misguided.

91.    The proposed amendments to the November 2017 order and Schedule A as submitted by the US Plaintiffs are more extensive than the US Defendants accept is appropriate. Their primary submission in relation to both the proposed variations to the order by the US Plaintiffs and by Mr Steele is that neither accords with the principle that, in exercising its powers under the 1975 Act, the English court should give effect to the request of the foreign court so far as possible and proper. See *Rio Tinto Zinc Corporation –v- Westinghouse Electric* at pages 611H-612A, 618D-E, 634A-C and 654C. Both sets of proposals represent an unjustified departure from the terms of the Request. The US Defendants' application is brought with the aim of ensuring that proper effect is given to the Request and that modifications are made only in so far as is necessary.

92.    The English court should be extremely slow to depart from the views of the US Court as to the relevant issues and appropriate topics for questioning. There must be a proper evidential basis before the English court can begin to consider going behind the finding of the requesting court as to the reasons which justify the making of the Request (see

*Rio Tinto* at page 634B). The English court ought not to embark on any exercise which restructures or recasts the original Request so that it becomes different in substance from the original Request. (See *White Book Commentary* at 34.2.1.2 - General Principles for complying with foreign request for evidence).

93. In any event, it is plain that the issues in the Florida proceedings justify questioning on a broader scope of subjects than that proposed by Mr Steele, those issues include the following: -

    i)      whether the alleged defamatory allegations about the US Plaintiffs contained in the dossier published by the US Defendants are true;

    ii)     whether the dossier is a fair and true report of an official proceeding;

    iii)    whether the US Defendants acted with malice, irresponsibly or negligently in publishing the dossier;

    iv)     whether the publication of the dossier as a whole is protected as neutral reportage.

94. The conduct of both the US Defendants and Mr Steele in relation to the whole of the dossier is therefore clearly an issue in the Florida proceedings. Subject to issues of source protection and confidentiality, the parties are entitled to question Mr Steele on his employment background at least in general terms, and on his verification of allegations in the dossier and on the steps he took in providing it to others.

95. The revised Schedule A proposed by Mr Steele would mean that the relevant issues concerning the US Defendants' and Mr Steele's conduct vís a vís the dossier would not be fairly explored. It would be unduly restrictive to permit questioning of Mr Steele solely about his verification and distribution of paragraph 3 of the December Memorandum in circumstances where the US court would be required to assess the propriety of the US Defendants' decision to publish the dossier as a whole, in the light of the public interest reasons which favoured the publication of the dossier and the steps taken by Mr Steele to verify its contents and disseminate it to other third parties. To allow questioning on a single paragraph of the dossier notwithstanding that the steps taken by the US Defendants were informed by the contents of the dossier as whole, would be artificial and insufficient.

96. However, the US Defendants are content to agree to variations to the November 2017 order that seek to clarify that Mr Steele will not be asked about his confidential sources or information, and/or to avoid duplication in the list of subjects. The US Defendants do take issue with the proposed narrowing of paragraphs 5-9 of Schedule A so that they only refer to Paragraph 3 of the December Memorandum of the dossier. It is submitted that questions relating to the verification of the dossier as a whole and the steps taken by Mr Steele to disseminate it are relevant to the Florida proceedings, and the parties should be permitted to pose such questions to Mr Steele. The US Plaintiffs seems to have accepted this position in part: see Loble 2 Paragraphs 26(3) [1/10/66] and Paragraph 34(iii), (v) **[1/10/71].**

97. The US Defendants' proposed variations to the draft order seek to balance Mr Steele's concerns to protect confidential sources and methods of information gathering with the

need to give effect to the Request and ensure that the relevant issues are addressed in the examination. The US Defendants suggest a general restriction of any questions which would require the disclosure of confidential information, and a focusing of the subject in Schedule A. Paragraphs 5-9 of the Schedule A in the US Defendants' draft order preserves the right of the parties to question Mr Steele on certain matters relating to the dossier as a whole, not simply on the single paragraph which refers to the US Plaintiffs.

98.     The following variations are agreed by the US Plaintiffs in relation to the conduct of the examination but not by Mr Steele. The duration of the examination is intended as far as possible to replicate the procedure of giving of evidence in the US proceedings. The US Defendants propose that the US Plaintiffs should be entitled to examine in chief and the US Defendants permitted to cross-examine Mr Steele for up to three hours each, and the US Plaintiffs permitted to re-examine Mr Steele for up to one hour. Adequate time will need to be set aside to ensure that Mr Steele's evidence is properly explored. There should also be parity between the US Plaintiffs and the US Defendants as to the duration of their questioning, and it is submitted that Mr Steele's proposal of just 30 minutes for cross-examination is inadequate. The US Defendants also seek permission for their English counsel and solicitors to attend the examination as the procedure is required to be conducted in accordance with English law and practice.

## DISCUSSION

### Jurisdiction

99.     The starting point is the well known quotation by Lord Denning in *Westinghouse* at 560H:

> "It is our duty and our pleasure to do all we can to assist that Court, just as we would expect the United States to help us in like circumstances. "Do unto others as you would be done by".

100.    See also Simon J (as he then was) in *Credit Suisse* at §14, where he quoted Kerr LJ's judgment in *State of Norway* at page 470B:

> "The Court should strive to give effect to the request of the Foreign Court unless it is driven to the clear conclusion that it cannot properly do so".

101.    The authorities make it clear that the English court should try to give effect to a letter of request from a foreign court, for reasons of judicial and international comity (*Rio Tinto v Westinghouse* at 560H; *Genira Trade v Refco* at §28).

102.    The court's jurisdiction to make an order pursuant to a letter of request from a country or territory outside the United Kingdom is granted by the 1975 Act. With regard to a request for oral evidence by way of examination the only restrictions imposed on the court's jurisdiction are under:

i)      Section 2(3) - no requirement for any particular steps to be taken unless they are steps that can be required to be taken by way of obtaining evidence for the purposes of civil proceedings inn this court;

  ii)  Sections 3 (1) and (2) in respect of privileged evidence; and

  iii)  where a certificate is issued under section 3(3).

103. Thus, under section 2(3) a witness cannot be compelled to give evidence if the court is satisfied that the evidence sought is not primarily for the purposes of trial (see *Credit Suisse*, Simon J. §14 and the authorities referred to). Mr Steele relies on this section of the 1975 Act, contending that the court has no jurisdiction to make the order because it can infer an impermissible purpose from the width of the topics upon which the US Plaintiffs have sought to examine Mr Steele, namely that the US Plaintiffs want to conduct a wide ranging investigation to attack the creditability of Mr Steele and his sources and to discredit the dossier as a whole.

Relevant Evidence

104. I must first consider whether the intended witness can reasonably be expected to have relevant evidence to give on the topics mentioned in the Schedule, described in *First American*, at 1165D, by the Vice-Chancellor as the first question for consideration. I note also that Simon J. in *Credit Suisse* at §14, in what he described as the fourth guiding proposition to be gleaned from the authorities, stated:

> "If the letter of request states that a particular person is a necessary witness then the English court should not itself embark upon an investigation as to whether the requesting court is correct for the purpose of determining in advance whether the evidence is relevant and admissible."

105. In my judgment it is obvious that the author of the paragraph complained of in the Florida proceedings would be a relevant witness in defamation proceedings which are entirely based on the allegations in that paragraph, in a jurisdiction where the Plaintiffs have to prove that the allegations are false. I accept Mr Millar's submissions that the evidence as to what, if any, verification was carried out in respect of the information contained in that paragraph, will not necessarily answer the question of whether that information is true or false, but it may very well inform and assist the Florida court, and the parties, in relation to that issue. It is evidence relevant to that issue. It is invidious for this court to attempt to assess the relevance of Mr Steele's evidence in respect of defences relied upon by the US Defendants which are not available in English law defamation proceedings, and as I have concluded that Mr Steele is a relevant witness on the issues that the US Plaintiffs seek to prove to the Florida Court, I do not have to do so, save that if I decide that the order should not be set aside but varied, which I deal with later in this judgment.

106. I further conclude that the evidence is required for trial, and not for 'oral discovery' (as described in Simon J.'s 'fifth proposition' in *Credit Suisse* at §14). See *Gredd v Busson* at §27(4):

> "Particularly pertinent will be the stage at which the order is sought and the extent to which the party seeking the order is able to demonstrate that the information sought is relevant to the issues in the foreign proceedings in the sense of being capable of being adduced at trial in support of those issues."

And at §27(9):

> "The fact that the evidence sought is described in wide or general terms is not inconsistent with its being sought for the trial."

The evidence shows that the trial was originally fixed for 19 March 2018 but I am informed that it is now listed for August 2018. See by analogy *Land Rover v Windh* at §23(ii).

107.   It is clear from the authorities that it is impermissible to use the Act "for the purpose of wide-ranging and unfocused enquiries in the hope that something will turn up": *Credit Suisse* Simon J. at §14, or the "roving inquiry" described by Lord Justice Kerr in *State of Norway* at 482F. See also Sir Richard Scott's comments in *First American* at 1165D and 1166D.

108.   It is indeed unfortunate that such a wide-ranging Request was sought, combined with the fact that in none of the documents in the Florida proceedings is there any analysis of how each topic for examination relates to and is relevant to the issues in the trial. That causes a particular problem for this court, given the clear guidance in the authorities that relevance is primarily within the remit of the foreign court, for obvious reasons.  (See *Westinghouse,* Lord Keith page 654F-G; *Asbestos Insurance Coverage Cases* [1985] 1WLR 331 Lord Fraser page 339; and *Credit Suisse,* Simon J. §14).

109.   This problem was addressed by Simon J. in *Credit Suisse* at §14, when he quoted Sir Richard Scott's observations in *First American* at 1165D-E:

> "In summary, in considering the letters of request in this case the court should, in my opinion, ask first whether the intended witnesses can reasonably be expected to have relevant evidence to give on the topics mentioned in the amended schedule of requested testimony, and second whether the intention underlying the formulation of those topics is an intention to obtain evidence for use at the trial or is some other investigatory, and therefore, impermissible intention".

And went on to say at §15:

> "It seems to me, however, that Mr Howard QC, Counsel for the Claimant, is correct in his submission that the approach of the court will depend on whether the requesting court has itself considered questions of relevance.  If it has, then it is hardly in the interests of comity that the court to whom the request is made should embark on a close consideration of questions of relevance on what is likely to be more limited material and a less clear understanding of the issues than the requesting court.  If, on the other hand, the requesting court has plainly not considered the question of relevance or it is clear, even on a broad examination, that the evidence is not relevant then the Vice-Chancellor's first question must be addressed."

110.   I note also the comments of Stanley Burnton J. (as he then was) in *Gredd v Busson* at §27(7) and (8):

> "(7) This court will take into account anything in the evidence before it that indicates that the party that obtained the order for the letter of request appreciated and took into account the differences between United States and English procedural rules.
>
> (8) Similarly, the court will take into account evidence that the US judge appreciated and took into account those differences. In this connection, this court appreciates that orders for letters of request are normally made by the US judge without any real scrutiny. The order is normally made in the terms sought by the applicant without any (or any significant) amendment and without the judge being informed of the significant differences between US federal procedure and of these courts."

111.   I have been taken in some detail to the statements of case in the Florida proceedings and in my judgment it is apparent, despite the assertion in the Request that the Florida court considers the evidence of Mr Steele as sought to be relevant to the issues in the case, that the requesting court has not in fact considered the question of the relevance of the individual topics for examination to the issues between the parties independently, but has accepted the list of topics requested by the US Plaintiffs without question. I reach this conclusion because there is no evidence in those court documents that it has done so, and neither of the parties to the Florida proceedings sought to suggest otherwise. Further, it appears that much of the evidence sought in the topics for examination is not in fact relevant to the issues in the US proceedings. That much is clear from the US Plaintiffs' ready concession to delete many of the topics for examination in Schedule A to the November 2017 order, and to further limit that order and Schedule A beyond what was requested by the Florida court (although I note that the US Plaintiffs state that this was done by reason of pragmatism, and make no concession that the topics for examination are not all relevant). Save for primarily one issue, (whether certain of the topics should be restricted to paragraph 3 of the December Memorandum or left as stated in the Request, in respect of the entirety of the dossier), the US Defendants also accept such deletions and limitations.

112.   Finally, the Florida court itself appears to accept that this court may impose limitations on the ambit of the evidence sought, by the words in the Order of 15 August 2017, dismissing Mr Steele's motion to intervene to oppose the Request:

> "Mr Steele seeks to intervene on the grounds that his deposition is prohibited by British law. This Court presumes, however, that the Senior Master of the Court of Judicature, Queen's Bench Division, will limit the scope of the Request pursuant to British law …… The Court, therefore, denies Mr Steele's request to intervene, trusting that his rights under British law will be protected by the British Court." **[2/13/246]**

113.   As I have concluded that Mr Steele does have relevant evidence to give and that the evidence is sought for use at trial, I do not consider that the width of the examination sought in the Request, reflected in the November 2017 order, necessarily deprives the

court of jurisdiction, although this also is a matter for consideration in the exercise of the court's discretion; see the observations of Sir Richard Scott in *First American* at page 1163H -1164:

> "If oral evidence is being sought for the purpose of use at trial and if there is good reason to believe that the intended witness has knowledge of matters in issue at the trial so as to be likely to be able to give evidence relevant to those issues, I do not understand how an application to have the intended witness orally examined can be described as "fishing". It cannot be necessary that it be known in advance what answers to the questions the witness can give. Nor can it be necessary that the answers will be determinative of one or other of the issues in the action. Section 2(2) of the Act of 1975 bars the court from making an order for oral testimony to be taken pursuant to a letter of request unless the order is of a type that could have been made for the purpose of obtaining oral testimony for domestic litigation. In the case of a witness who there is reason to believe has relevant evidence to give, a subpoena served on the witness in order to obtain his evidence for trial could not be set aside on the ground that it was "fishing". In a comparable case, a court would not be deprived by section 2(2) of power to accede to a letter of request. The question whether, as a matter of discretion, the court would be prepared to make an order pursuant to the letter of request, and if so what order, would be another matter. But there would be no jurisdictional reason why the court should not make the order sought."

## Mr Steele's Rights under Article 6 ECHR

114. In *Micro Technologies* Morris J. at §120 stated:

> "…the question whether an order for examination would infringe Mr Hussain's rights under Article 6 ECHR is a question of law and not one for the discretion of the Court as to whether to give effect to a letter of request under the 1975 Act."

115. The case of *Dombo Beheer* establishes the general principle that a party's Article 6 rights to a fair trial may be breached if national authorities do not ensure that the requirements of a "fair hearing" are met, and that "the requirement of 'equality of arms' in a sense of a 'fair balance' between the parties" applies both in civil and criminal proceedings. At paragraph 1(b) of the summary it is stated:

> "It implies that each party must be afforded a reasonable opportunity to present his case including his evidence under conditions that do not place him at a substantial disadvantage vis-à-vis his opponent."

116. The issue of whether a fair balance is preserved when making an order for examination of a witness who is also a party to English proceedings covering the same issues has

been considered in authorities namely:   *Westinghouse* in the judgment of Lord Wilberforce  at 611G-H:

> "Unless  a case of bad faith  is made against  Westinghouse  (which is expressly disclaimed)  it is impossible  to deny that the letters rogatory  were issued for the purposes  of obtaining  evidence  in the Richmond  proceedings.   The fact, if it be so, that evidence so obtained  may be used in other proceedings  and indeed may be central  in those proceedings  is no reason for refusing  to allow it to be requested:   all evidence,  once brought  out in court, is in the public  domain,  and to accept the argument  would largely stultify  the letters rogatory  procedure".

117.    In *First American*  Sir Richard  Scott stated at page 1168F-G:

> "I would not refuse  to give effect  to these letters  of request  on the ground  that the main purpose  underlying  them was not to obtain evidence  for the existing  action but was to obtain evidence for a contemplated  action against  Price Waterhouse,"

118.    I accept the submissions  of the US Plaintiffs  that it is clear from the authorities  that any requirement  for Mr Steele to give evidence  in foreign  proceedings  prior to, and on the same issues  as he would be giving  in the QB proceedings  does not, without  more, breach his Article  6 rights.

## Discretion

## Oppression

119.    Although  this ground  relies partly  on the same matters  as the jurisdictional  arguments, setting  aside on this ground  is a matter  of discretion  rather than of jurisdiction.

120.    I reach the conclusion  that the requirement  to give evidence  at an earlier stage than in the QB proceedings  is not of itself  oppressive,  absent issues of allegations  of fraudulent conduct.

121.    It is clear from the authorities  that the mere fact that Mr Steele  will be required  to give evidence  which he might  also give in the QB proceedings,  and at an earlier stage, does not of itself, unless  fraud is alleged,  make the request  oppressive  (see *First American* at 1168F-G and *Micro Technologies*  at §154).

122.    In *First American*  the issue of oppression  was considered  and in the headnote  at page 1154 it is stated:

> "as a matter of discretion  a request  for oral testimony  should only be acceded  to where there was sufficient  ground  for believing that an intended  witness  might  have relevant  evidence  to give on topics which were relevant  to the issues  in the action;  that in all but the clearest  cases the decision  as to whether  particular answers,  or answers  on particular  topics,  would constitute relevant  admissible  evidence  was primarily  a matter  for the

**High Court Unapproved Judgment:**
**No permission is granted to copy or use in court**
Double-click to enter the short title

> foreign court and as a general rule English courts should, therefore, accede to letters of request issued by foreign courts if they could properly do so; but that it would not be proper to do so where the burden imposed on the intended witness was oppressive."

123.   Sir Richard Scott at page 1167F-G cited Lord Woolf 's judgment in *State of Minnesota at §18.*

> "because of the need to hold the balance between the requesting court and the witnesses who are to be examined, if the request is given effect, the court will not allow uncertain, vague or other objectionable requests to be implemented. A witness is entitled to know within reasonable limits the matters about which he or she is to be examined".

124.   In *Gredd –v- Busson* Stanley Burnton J. said at §27(9):

> "The fact that the evidence sought is described in wide or general terms is not inconsistent with its being sought for the trial. There will be occasions where the subject matter of the testimony sought is so extensive as to preclude specification. However, where that is the case, the court in the exercise of its discretion may refuse to make an order on the basis that it would be oppressive to the witness to require him to prepare himself to give evidence and to require him to give evidence without sufficient identification of the matters to be addressed. See *State of Minnesota –v- Philip Morris Incorporated & Ors.,* a decision of the Court of Appeal of 30th July 1997."

125.   The topics for questioning are not vague and uncertain but they are, in my judgment, wide and far-ranging far beyond what appears to be required by the limited ambit of the Florida proceedings, for all the reasons advanced on behalf of Mr Steele, and to that extent, in the particular circumstances of this case, (to which I refer in more detail below) I have concluded that, as originally drafted, they are so wide as to constitute a fishing expedition. I reach that conclusion by reference to all the evidence and all the circumstances of this case.

<u>General Considerations in relation to Oppression</u>

126.   This is an unusual, and probably unique, case, where the witness is in many respects in the same position as a whistle-blower, because of the actions taken by him after the 2016 Presidential election, in sending the December memorandum to Senator McCain and to a senior government national security official, and in briefing sections of the US media.

127.   I consider that the comments of Mrs Justice Andrews in *Rio Tinto v Vale* at §37 to 38, although made in the different context of the confidentiality of journalists' sources, and the protection of whistle blowers, are apposite in this case:

"37. Nevertheless, it seems to me that in this rather different context, the court may take judicial cognizance of the truism that even in a democratic society such as this jurisdiction or the United States, whistle-blowers may be castigated for speaking out and suffer prejudice to themselves or their families, whether or not they act within the four corners of the law and whether or not they are exposing wrongdoing. Human nature is such that those who engage in corruption, particularly if they are in positions of power, do not take kindly to their wrongdoing being exposed. There are many corners of the globe where journalists are targeted and even imprisoned for fair and impartial reporting, or accused of being spies. This jurisdiction expressly recognizes the importance of keeping confidential the identity of journalists' sources (indeed there is legislation to protect them) and I accept Mr George's submissions that there is a degree of public policy overlap between that situation and this, especially in the light of the evidence that some of the sources concerned are sources of information provided to journalists, who may themselves be Associates of Livingstone.

"38. There is no reason to suppose that any of the sources in this case have acted unlawfully, but that does not mean that they have nothing to fear if their identities come to light. I am persuaded that much of what is said by Mr Huband and Ms O'Connor rings true, although some of the sources may face more serious risks than others. It is in the public interest that they should not be discouraged from speaking out or from providing intelligence of this nature."

128.   See also comments made in *Sanoma* at §65 and §71, relating to breach of Article 10 in the context of confidentiality of journalists' sources, again by analogy.

129.   As a result of the information provided to the media, Mr Simpson's evidence to Congress and the US Defendants' publication of the dossier, much of the information in the dossier is likely now be in the public domain (not least perhaps by an event that occurred following the hearing, namely the investigation launched by US Justice Department Special Counsel Robert Mueller, involving a number of indictments against Russian businesses and individuals). A search of Mr Steele's name on the internet reveals the extent of media interest in the issues the subject of the dossier, and one can readily understand why a view might be taken that the purpose of the Request might be for a wide ranging inquiry rather than simply for evidence in defamation proceedings relating to one paragraph in one memorandum of the dossier. No explanation has been advanced by the US Plaintiffs as to why they sought the topics for examination to extend so far beyond what would generally be expected for such proceedings, and they have not sought to explain why there was no attempt to demonstrate the relevance of each area of questioning in the Request, and the original formulation of Schedule A, to the issues in the case. The US Defendants, although they did not apply for the Request, and say they are neutral as to whether it be set aside or not, still seek to maintain part of the examination extending to the entirety of the dossier, in circumstances where there

is no suggestion that Mr Steele had anything to do with their decision to publish the same.

Confidentiality and National Security

130.   Those issues of confidentiality which can be protected can be dealt with by pre-conditions in an amended order, if I conclude that is permissible.   I note that the US Plaintiffs have agreed to limit questions in relation to Mr Steele's former employment with the FCO.   In so far as national security concerns are in issue, I have no details of these and if, as a result of the order I make on this application the FCO decide that a section 3(3) Certificate should be issued they will no doubt list their application.

Confidentiality of Sources

131.   Again, provided the pre-conditions and the deletion of inappropriate questions can be dealt with in the order, this is a concern which can be addressed, and in so far as it is not addressed, a section 3(3) Certificate can be issued.

132.   In the circumstances peculiar to this case, which I am permitted to consider in the exercise of the court's discretion, I do conclude that the November 2017 order is oppressive, and unless I conclude that it can be limited in a way which is permissible by law, so as to render it not oppressive, it will be set aside on such ground.   However, if the order is capable of being narrowed appropriately, within the limits of what is permissible, so that its oppressive elements are removed, then the issue of oppression would not constitute a ground for setting aside the November 2017 order.   I consider this in Paragraphs 133 onwards below.

**Whether the Order of 17th November 2017 should be varied**

**Discussion**

133.   For ease of reference Schedule A to the November 2017 order is included as an Annex to this judgment.

134.   The basis of on which I can consider amending the topics for examination requested by the requesting court are either:-

   i)     The amendments are agreed by the parties and the witness, or;

   ii)    where the court considers that deletions or restrictions to those topics are appropriate because the topics for examination would otherwise contravene section 2(3) of the 1975 Act, namely the burden imposed on the intended witness would be oppressive and/or the Request would constitute impermissible fishing: see *State of Norway* at 484E-F, 491F; *State of Minnesota* at §18; *US v Philip Morris* at §76; *Refco Companies* at §32; *Gredd –v- Busson* at §27(3) and (4) and (10).

135.   I have concluded that the form of the Request in its original format as set out in the order of November 2017:

   i)     goes beyond what is required for the US proceedings; and

ii)  in its breadth appears to be a fishing exercise; and

iii)  is oppressive.

136.  The question is whether, notwithstanding such conclusions, this court is able assist the US court by restricting the topics requested for examination, and introducing safeguards for Mr Steele in the order. The authorities are clear that there cannot be a wholesale rewriting of the order to rescue it. See authorities referred to above. I take into account particularly the words in the judgment of Lord Woolf in *State of Minnesota* at §18, also cited in *Refco* LJ Waller's at §32:

> "Because of the general approach, to which I have drawn attention, when the court has to choose between either giving effect to a Letter of Request or refusing to do so, it will take into account any limitations, corrections or conditions which the party seeking the order is willing for the court to take into account. It will, if appropriate, be prepared to give the request an amended effect."

137.  My comments and conclusions on the proposed amendments of Mr Steele and the parties to Schedule A and the order are as follows.

Schedule A

138.  **Topic 1**

**Mr Steele's educational background, employment history, professional qualifications, personal preparation for the deposition (to include any contacts the witness may have had with the parties, their lawyers, insurers or representatives, but excluding any privileged content of such communications):**

i)  The US Plaintiffs and the US Defendants propose to add the words "(in general terms)" to emphasise that this is intended only to be an introductory area of questioning to inform the Florida court. Mr Steele seeks to delete from the words "employment history" and "(to include any contacts the witness may have had with the parties, their lawyers, insurers or representatives, but excluding any privilege content of such communications)."

ii)  I do not consider that it is appropriate delete the words suggested by Mr Steele, because I cannot conclude that the questions on the proposed deleted matters are for an impermissible purpose or oppressive. The paragraph is intended to be a general introductory paragraph as is normal in witness statements so the court will have the context in which the evidence is given. I note the comments in *First American* at page 1164F:

> "In framing questions to ask a witness from whom no proof has been taken, the questioner can be expected to ask a number of preliminary questions in order to feel his way in."

iii)  Any attempts by the parties' legal representatives to question Mr Steele on issues relating to his employment history which would breach the conditions

which could be imposed in the order will be protected by intervention by Mr Steele's legal representatives.   Although I have no evidence on the matter, I assume that evidence as to any contact Mr Steele has had with the parties, their lawyers, insurers or representatives excluding privilege communications would be limited in time and scope and would not be oppressive or for an impermissible purpose being again general introductory material.

iv)     I propose to introduce conditions which will offer further protection to Mr Steele.

v)      I consider that the words proposed to be inserted by the US Plaintiffs and US Defendants are acceptable, provide further reassurance to Mr Steele, and do not involve redrafting to an impermissible extent.

139.   **Topics 2-7**

**2. The instructions given to Mr Steele and his company to prepare the dossier and the reasons for the preparation of the dossier.**

**3. The payments made to Mr Steele and his company for the dossier.**

**4. The steps Mr Steele took to obtain information for the dossier.**

**5. Mr Steele's preparation of the dossier.**

**6. Mr Steele's solicitation of information for the dossier.**

**7. Mr Steele's sources of information for the dossier.**

i)      All parties agreed to the deletion of Topics 2, 3 and 7.  Mr Steele proposes that all Topics 2-7 are deleted.   The US Plaintiffs and the US Defendants wish to retain Topics 4, 5 and 6.  The US Plaintiffs agree to limit the examination in those Topics to paragraph 3 of the December Memorandum (described as paragraph 3 of Company Report 2016/166 of the dossier for precision), and the US Defendants do not oppose such restriction.

ii)     I consider that topics 4, 5 and 6 should be deleted.  The US Plaintiffs have focused on the issue of Mr Steele's verification of the allegedly defamatory statements in Paragraph 3 of the December Memorandum, which is the subject of Paragraph 8, and the US Defendants on the reasons and justification for publication. There has been no satisfactory explanation as to why these topics are relevant to the issues identified.  These areas of questioning for Topics 4, 5 and 6 would, in my judgment, be areas of questioning that would be likely to risk identification of sources through the 'jigsaw effect' identified by Mr Millar in his submissions.  Although the order can include a prohibition on questions that will risk identity of the sources, there is likely to be considerable difference of opinion between the parties' representatives as to whether any particular question would fall into that category in questioning on these topics, and it would be unfair and oppressive to Mr Steele to be put in that position.

140.   **Topic 8 - Mr Steele's efforts (or lack of efforts) to verify allegations in the dossier**

i)      Mr Millar for Mr Steele proposes that it be amended to read "the steps taken by Mr Steele to verify the information regarding the Plaintiffs contained in paragraph 3 of Company Report 2016/166, a copy of which is attached".

ii)     The US Plaintiffs have agreed to amend the paragraph to "Mr Steele's efforts to verify the allegations in paragraph 3 of Company Report 2016/166 of the dossier (excluding the final sentence)".

iii)    The US Defendants oppose the restriction of Topic 8 to paragraph 3 of the December Memorandum, but agree to delete the words "(or lack of efforts)".

iv)    I consider that the US Plaintiffs formulation is appropriate and does not involve substantial redrafting, merely a limitation of the ambit of questioning. Mr Millar's formulation does involve redrafting, and although it may be better drafting, I do not consider that I am able to simply redraft in that way.

v)     There is in my judgment no good reason why this area of questioning should extend beyond the paragraph complained of in the Florida proceedings, given the evidence of the US Plaintiffs as to the key issues for which the evidence is required. With regard to the relevance of Mr Steele's evidence to the defences of the US Defendants, it may well be that were informed by the whole of the dossier in their decision to publish, but there has been no suggestion that any actions Mr Steele took in relation to the whole dossier informed that decision. Neither is Mr Steele's evidence relevant to the US Defendants' state of mind when it decided to publish. The Florida court will have the ability to have before it a copy of the contents of the dossier as a whole, so will be able to see paragraph 3 of the December memorandum in its context. I consider that questioning on this topic in relation to the dossier as a whole would be oppressive because it would involve a wide-ranging examination of Mr Steele over the entirety of the dossier, only a small part of which is complained of in the Florida proceedings.

141.   **Topic 9 - Mr Steele's work to verify allegations in the dossier.**

       **Topic 10 - Mr Steele's clients with respect to the dossier.**

       All parties have agreed to delete Topics 9 and 10.

142.   **Topic 11 - The provision of the dossier to Fusion GPS.**

       **Topic 12 - The provision of the dossier to media outlets.**

       **Topic 13 - The provision of the dossier to other third parties.**

i)      Mr Steele seeks to amend Topic 11 to read: "The provision of Company Report 2016/166 to Fusion GPS". That is agreed by the US Plaintiffs.

ii)     Mr Steele seeks to delete Topics 12-13. That is not agreed, but the US Plaintiffs agree to restrict these topics to "Company Report 2016/166" and again insert the words "the version of".

   iii)    The US Defendants do not agree and also consider that the original wording should remain, save that they also propose that the wording should be amended to: "The provision of the version of the dossier to …".

   iv)    I consider that these topics should be limited as proposed by the US Plaintiffs. I do not consider that in that form they are oppressive to Mr Steele. This information is partly given by Mr Steele in his defence in the QB proceedings, (at paragraph 21) **[2/11/130].** In that regard I note the evidence of Mr Loble that the parties are unable to rely on the QB statements of case in the Florida proceedings. The topics concern evidence which appears to be in the public domain so far as media outlets are concerned, and the examination on these topics is likely to be very limited in scope. The topics are clear, limited and easily identifiable, and the issues as to distribution of the December memorandum are relevant to the issues pleaded in the defence in the Florida proceedings.

143.   **Topic 14 - Mr Steele's communications with others concerning the dossier and the allegations contained therein**

   i)    All parties agree to delete Topic 14. The US plaintiffs seek to add an alternative Topic 14, namely "Payments made (or offered) to media outlets to publish Company Report 2016/166 of the dossier to write about it." They submit that this is just an explanatory topic within the ambit of Topics 11-13.

   ii)    The new iteration as drafted by the US Plaintiffs cannot be included. It was not in the Request and this court cannot add to or redraft the subject matters for examination unless all parties wish the court to do so.

144.   Schedule A will accordingly be amended as indicated.

Amendments to the November 2017 Order

145.   The parties and Mr Steele have agreed certain additional provisions in the amended order, namely:

   i)    No questions are to be asked which go to the identity of Mr Steele's sources;

   ii)    Mr Steele is to be permitted to have legal representation at the examination for the purpose of taking proper objection to questions that might be put to him in the course of examination should he so wish.

I approve these additions.

146.   With regard to the body of the Order, apart from Schedule A, I consider that the following additional provisions should be added to provide further protection to Mr Steele:

   i)    No questions may be asked that would require the disclosure of any information that would in the ordinary course:

        a)    require the consent of Mr Steele's former Crown employer before disclosure;

    b)    increase the existing risk of confidential intelligence sources being identified;

    c)    risk disclosure of information concerning processes of intelligence gathering known to Crown servants;

ii)    A list of questions for each topic in Schedule A is to be provided to Mr Steele's solicitors a reasonable period of time before the examination. This will not be prescriptive. It will obviously be permitted that if the answers to any questions lead to other questions exploring that line of questioning these will be permitted (subject to any appropriate objections from Mr Steele's legal representatives or ruling by the Examiner). The parties' US and English legal representatives would have to prepare this in any event, as part of the preparation for the examination, and Mr Steele's legal representatives should have an opportunity to consider the lines of questioning to be addressed in each topic, so they can prepare and give appropriate advice. It is likely to be of benefit to the US Plaintiffs and the US Defendants if Mr Steele is able to improve his recollection of the areas of questioning before the examination by reference to particular questions.

147. With regard to the length of time to be included for the examination, I consider that the seven hours agreed between the US Plaintiffs and US Defendants is an appropriate time for the examination and is not oppressive. I agree to this not because I consider that the questioning on the now very limited topics is likely to last that length of time, and I would hope that it should not, but I recognise the point made by each of the US parties' counsel that lawyers will be attending from the United States for the examination at some cost, so it would not be appropriate to restrict the time available further. This time leaves a reasonable margin for any objections to be made, submissions on the same, and opinions by the Examiner, if needed (see CPR PD 34A paragraph 4.5). This is a standard time for examination in many Letters of Request. A limit for the examination to one day is a reasonable period of time to avoid considerable disruption to a person's professional and/or personal life. Mr Steele will have the protection of his own legal advisors to ensure that the hearing should involve questioning only on the topics permitted.

148. Both the US Plaintiffs and the US Defendants seek an order that their respective English counsel and solicitors be permitted to attend the examination to advise the parties' US attorneys and make any submissions to the examiner in respect of disagreement between the parties on the scope of questioning permitted or on issues of English procedure.

149. It is the general rule in examinations ordered pursuant to letters of request outside the EU Evidence Regulation, that where proceedings are to be conducted according to English rules of procedure (which is the norm, unless a special procedure is requested and acceded to) that if foreign lawyers are permitted to attend and carry out the questioning, that English lawyers instructed by those parties are permitted also to be present at the examination. The reason is so that they can advise the foreign lawyers on any disputed issues of English law and procedure that may arise, and make appropriate submissions to the examiner where the examiner is asked to give an opinion. I see no reason to depart from that general rule in this case. It would be unfortunate if there were to be an objection raised by Mr Steele's English legal

representatives and the parties' US attorneys were not in a position to take advice and make informed submissions in response. There are also issues of rights of audience in relation to questioning being conducted by US attorneys if English representatives were not also present, which might have implications for the validity of the examination, if challenged (see *Cockerill: The Law and Practice of Compelled Evidence in Civil Proceedings* 2011 at §8.21).

150.    I note that confirmation has been given by Leading Counsel for the US Plaintiffs that their English legal representatives present at the examination will not include any of those who are involved in the QB proceedings.

151.    The US Plaintiffs and the US Defendants seek to include a provision in the Order that notice of documents, and copies of the same, that they intend to refer to Mr Steele during questioning, be provided 21 days before the examination. I consider that this is appropriate and will assist the parties. Rule 34.9(1) provides that the examination must be conducted in the same way as if the witness were giving evidence at trial. That would include the witness being referred to relevant documents to assist them in giving their evidence. This would not involve any extension of the scope of the examination, as this will be limited by the provisions of the Order, including the topics for questioning in Schedule A.

152.    I consider that it will be helpful for both Mr Steele and his legal representatives to know in advance which documents he is likely to be referred to, and it is apparent from the nature of the Florida proceedings that there would not be the same expectation of large numbers of documents as there would be in a commercial dispute. A list of and copies of documents, combined with a list of questions, may assist them in considering any risk that questioning may go beyond what is permitted by the amended order.

Generally

153.    In considering this court's jurisdiction and its powers to exercise discretion in this area of the law, it would have been of considerable assistance to this court if the US Plaintiffs had identified the relevance of each of the topics sought for examination to the issues in the Florida proceedings. The fact that has not been done, and that this court's primary position is that it seeks to accept without investigation the foreign court's confirmation of relevance in a letter of request, put this court in a difficult position. I refer to the pertinent comments of Mrs Justice Andrews in *Vale* at paragraphs 37-38 cited in Paragraph 127 above. This case, it seems to me involves a similar complex balancing exercise. I have done my best to balance the interests of Mr Steele with the requirements of the Florida court, against the background of very unusual circumstances.

**Conclusion on the applications of Mr Steele and the US Defendants**

154.    Having come to the conclusion that Mr Steele does have relevant evidence to give for trial in the US proceeding, and that the topics in Schedule A are capable of being amended in such a way that does not constitute redrafting of the Letter of Request, and appropriate protections for Mr Steele included in the order, I do not conclude that the November 2017 order should be set aside in its entirety, but that it should be varied as set out above. Accordingly Mr Steele's application to set aside the November 2017 order is dismissed. His application to vary the order is granted in part. The US

**High Court Unapproved Judgment:**
**No permission is granted to copy or use in court**                    Double-click to enter the short title

Defendants' application to vary the order if not set aside, is granted in part and dismissed in part.

## ANNEX TO JUDGMENT

## SCHEDULE A

*In this Schedule, references to "the dossier" are to the dossier mentioned in paragraph 7 of the letter of request:-*

1.  Mr Steele's educational background, employment history, professional qualifications, personal preparation for the deposition (to include any contacts the witness may have had with the parties, their lawyers, insurers or representatives, but excluding any privileged content of such communications).

2.  The instructions given to Mr Steele and his company to prepare the dossier and the reasons for the preparation of the dossier.

3.  The payments made to Mr Steele and his company for the dossier.

4.  The steps Mr Steele took to obtain information for the dossier.

5.  Mr Steele's preparation of the dossier.

6.  Mr Steele's solicitation of information for the dossier.

7.  Mr Steele's sources of information for the dossier.

8.  Mr Steele's efforts (or lack of efforts) to verify allegations in the dossier.

9.  Mr Steele's work to verify allegations in the dossier.

10. Mr Steele's clients with respect to the dossier.

11. The provision of the dossier to Fusion GPS.

12. The provision of the dossier to media outlets.

13. The provision of the dossier to other third parties.

14. Mr Steele's communications with others concerning the dossier and the allegations contained therein.