

Neutral Citation Number: [2018] EWHC 1201 (QB)

Case No: QB/2018/0074

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 18/05/2018

**Before**:

**MR JUSTICE JAY**

- - - - - - - - - - - - - - - - - - - - -

**Between:**

| | |
|---|---|
| **BUZZFEED INC and another** | **Appellant** |
| - and – | |
| **ALEKSEJ GUBAREV and others** | **First Respondents** |
| - and – | |
| **CHRISTOPHER STEELE** | **Second Respondents** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Alex Bailin QC** and **Ben Silverstone** (instructed by **Taylor Wessing**) for the **Appellants**
**Hannah Brown QC** (instructed by **W Legal**) for the **First Respondents**
**Gavin Millar QC** and **Edward Craven** (instructed by **RPC**) for the **Second Respondent**
**Julian Blake** (instructed by **GLD**) for the **FCO (as intervenor)**

Hearing date: 14th May 2018

- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

.............................

**MR JUSTICE JAY:**

### Introduction

1. The parties to this appeal and application for permission to appeal are:

   (1) BuzzFeed Inc and Ben Smith, who are the defendants in proceedings for defamation brought in the United States District Court for the Southern District of Florida (Miami Division) ("the Florida Court"). Although they are the Appellants/Applicants in the proceedings before me, I will describe them as "the US Defendants".

   (2) Aleksej Gubarev, XBT Holdings SA and Webzilla Inc, who are the plaintiffs in the defamation proceedings and the First Respondents to this appeal/application. They take a neutral position before me. I will describe them as "the US Plaintiffs".

   (3) Christopher Steele, who is the subject of a Letter of Request from the Florida Court issued on 10th August 2018 at the instance of the US Plaintiffs and formally directed to the Senior Master of the Queen's Bench Division. It is said that he can give relevant evidence by way of oral examination in this jurisdiction pursuant to section 2 of the Evidence (Proceedings in Other Jurisdictions) Act 1975. He is the Second Respondent to this appeal and has actively opposed it. I will describe him as "Mr Steele".

2. The appeal and application relate to parts of the Order of the Senior Master given on 16th March 2018 following the handing down of her detailed and lengthy judgment ([2018] EWHC 512 (QB)) in this case.

3. The background is lengthy and complex, and has been comprehensively set out in the Senior Master's judgment. It is unnecessary for me to repeat all of this. I will provide a much shorter narrative, concentrating on certain key features of the evidence as highlighted by the parties. The Senior Master's judgment is available online and repays careful reading.

4. The appeal has been expedited by Warby J to accommodate the timetable set down by the Florida Court leading to trial in November. Mr Steele's oral examination will take place on 18th June but, pending the outcome of this appeal, the ground-rules remain in a state of flux. I had intended to deliver an extempore judgment in this case, but the quality and interest of the oral arguments delivered by Mr Alex Bailin QC for the US Defendants and Mr Gavin Millar QC for Mr Steele has forced me to adopt this present course. For similar reasons, I have decided to grant the US Defendants permission to appeal on Grounds 1 and 2.

### Essential Factual Background

5. Mr Steele, a former civil servant with expertise in Russian affairs, set up Orbis Business Intelligence Ltd after he left the FCO. Between June and November 2016 Orbis was

        engaged by Fusion GPS, a consultancy based in Washington DC, to prepare a series of confidential memoranda based on intelligence concerning alleged Russian efforts to influence the US Presidential election, including possible links between the Russians and the Republican candidate, Mr Donald Trump. 16 such memoranda were prepared. They were provided by Orbis to Fusion on a confidential basis, on terms that there should be no disclosure to third parties without the agreement of Orbis and/or Mr Steele.

6. After Mr Trump's election in November 2016, Mr Steele continued to receive intelligence on the same topic. His Defence in defamation proceedings brought by certain of the US Plaintiffs in this jurisdiction is that this intelligence was "unsolicited" by him. Mr Millar placed emphasis on this adjective but I am not convinced that much turns on it. A reasonable inference is that Mr Steele's source or sources continued to provide him with information on the not unreasonable assumption that he had not lost interest in the topic.

7. On or about 13th December 2016 Mr Steele prepared a memorandum or report which he labelled "Company Report 2016/166". I will call this "the December memorandum". All 17 memoranda have been called "the dossier". This is a convenient moniker but its use should not obscure the practical difference between the pre-election and the post-election phase. The December memorandum was prepared by Mr Steele on his own initiative and outside the scope of Orbis' contract with Fusion.

8. Meanwhile, in late November 2016 Mr Steele, through an intermediary, agreed to provide the pre-election memoranda to Senator John McCain on a confidential basis. The intermediary asked that Senator McCain be supplied with any further intelligence. After 13th December (the precise date is unclear and matters not), Mr Steele provided the December memorandum to a senior UK government national security official, as well as a copy to Fusion via encrypted email, with an instruction to Fusion to provide a hard copy to Senator McCain through the offices of the intermediary. The same conditions of confidentiality applied.

9. Mr Steele's pleaded case is that he did not provide copies of the dossier to anyone else. He accepts that he conducted some "off the record" briefings of journalists. He also accepts that the FBI has received the dossier.

10. The US Defendants do not accept Mr Steele's case on this issue. The Senior Master was shown various media reporting which indicates that the dossier has found its way into the hands of third parties, including media outlets. David Corn, writing in "Mother Jones" on 13th January 2017, has said that he spoke with "the former spy" and "I was also able to review the memos the spy has written". However, Mr Corn does not state in terms that Mr Steele showed him the dossier, and it is obvious that their entry into the semi-public domain before the US Defendants decided to publish them online could have resulted from a leak from a number of sources. Even so, the possibility that Mr Steele was the cause of the leak cannot be excluded.

11. Mr Corn further explains that he did not "post the memos, as BuzzFeed did this week, because the documents contained information about the former spy's sources that could place people at risk". This issue has been expounded in the witness statement of Mr Edward Lucas.

12. Thus, the US Defendants were not the sole recipients of the dossier. On 10th January 2017 they published online an article, "These Reports Allege Trump has Deep Ties to Russia", accompanied by a hyperlink to the entire dossier with some redactions. The Florida proceedings relate only to paragraph 3 of the December memorandum, the terms of which have been set out in the Senior Master's judgment [12].

13. The article claims that the dossier "has been circulating among elected officials, intelligence agents, and journalists for weeks". Later in the same piece it is asserted that "the documents have circulated for months". The article states in terms that the allegations are unverified although they have not been falsified. The stated reason for publication was:

> "Now BuzzFeed News is publishing the full document [hyperlinked] so that Americans can make up their own minds about allegations about the president-elect that have circulated at the highest levels of government."

14. Mr Steele's evidence is that he was horrified by what the US Defendants have done. The dossier comprises raw intelligence reports and sources could be compromised.

15. The US proceedings were commenced on 3rd February 2017. Mr Steele is not named as a defendant and does not feature in the pleaded cases of the parties.

16. The case of the US Plaintiffs is that paragraph 3 of the December memorandum contains defamatory statements which were made negligently or recklessly, either with knowledge of their falsity or without reasonable care as to their truth or falsity.

17. The case of the US Defendants is that they "lack sufficient information to form a belief as to the truth or falsity of the allegations". They therefore deny that the allegations are false and contend that the US Plaintiffs must prove their falsity at trial. This is common ground between the parties in Florida. Further or alternatively, the US Defendants plead "fair report privilege" and "neutral report privilege".

18. By a motion filed on 9th August 2017 the US Plaintiffs sought the issue of a request for international assistance to the Senior Master of the Queen's Bench Division, requiring Mr Steele to give evidence by oral examination on 14 specified topics for the purposes of the Florida proceedings. The motion included a draft of the Request sought. The US Defendants indicated to the Florida Court that they did not object to the relief sought, but if the Letter of Request were granted they reserved their right to cross-examine Mr Steele. In my view, it was clear that the US Defendants more or less accepted that Mr Steele could give relevant evidence, at least in principle. However, I take Mr Millar's point that there was no cross-motion, and that the Florida Court was considering the issue solely within the context and parameters of the US Plaintiffs' motion.

19. On 10th August Judge Ungaro issued the Letter of Request in the precise terms of the draft. I have examined the terms of the Request. It is clear that Judge Ungaro satisfied herself that Mr Steele could give relevant evidence but, given that there were no submissions to the contrary or maybe in any event, did not focus on the detail of the 14 topics. In particular, she did not explain how and why Mr Steele could give relevant evidence on each of these topics; her consideration was more general. I imagine that

        this is standard practice in this sort of case, particularly where the opposing party adopts a neutral position.

20. The Senior Master concluded that "the requesting court has not in fact considered the question of the relevance of the individual topics for examination to the issues between the parties independently, but has accepted the list of topics requested by the US Plaintiffs without question" [111]. Mr Millar submitted that the US Defendants have not put that finding in issue. Although Mr Bailin did seek to assail it in oral argument, I consider that the Senior Master was entitled to conclude as she did. I will need to return to this point when examining Mr Bailin's submissions.

21. On 10th August 2017 Mr Steele filed a non-party motion of intervention in the Florida proceedings objecting to the issue of the Letter of Request. Multiple grounds were relied on, including the co-existence of libel proceedings in this jurisdiction. Many of these have now fallen away. On 15th August Judge Ungaro refused Mr Steele's motion, stating that she "presumed" that the Senior Master would limit the scope of the Request pursuant to domestic law, if so advised.

22. On 4th November 2017 the US Plaintiffs issued a without notice application in this Division for an order that Mr Steele's evidence be taken for use in the Florida proceedings in accordance with the Letter of Request. On 9th November the Senior Master made an order on the basis sought, directed to the same 14 topics.

23. By email dated 22nd November 2017 Mr Loble on behalf of the US Plaintiffs proposed to Mr Steele's representatives a narrower list of 9 topics for his questioning at the examination. As the Senior Master noted, this was stated to be for pragmatic reasons. Mr Steele did not accept the proposal. On 1st December 2017 he applied to set aside, alternatively to vary, the without notice order. The bases of the application were multifarious, but focusing on what is relevant for present purposes Mr Steele contended that the Letter of Request sought irrelevant evidence, was oppressive, amounted to a fishing expedition, and would compromise his source or sources. Alternatively, Mr Steele argued that the topics for questioning should be limited to the steps taken to verify paragraph 3 of the December memorandum, and the US Defendants' acquisition of that document; and that protections should be emplaced to safeguard the confidentiality of his source or sources.

24. Mr Steele's application was supported by the witness statements of Nicola Cain, a barrister employed as a legal director in RPC, and Edward Lucas, a respected journalist and expert in Russian affairs. Ms Cain's evidence does not in my view take matters any further. Insofar as it contains matters of legal argument, she should in my view have left those for written skeleton submissions. She is not qualified to address matters of Florida law and does not purport to do so.

25. On 9th January 2018 the US Defendants issued an application notice by which they sought their own variations to the without notice order in the event that they failed to have it set aside in its entirety. I will come to the detail in due course.

26. The Senior Master also had evidence in the form of a second witness statement from Mr Loble which explained from the perspective of the US Plaintiffs how and why Mr Steele could give relevant evidence. According to paragraph 26(iv)(2) of his witness statement, the saliency of Mr Steele's evidence covered:

> "How [Mr Steele] came to make the allegations in the December memorandum/whether the allegations were verified. This evidence will go to whether the allegations are true [items 4-6 and 8 of the Schedule on the original numbering]"

and, according to paragraph 26(iv)(3):

> "the circumstances of the provision of the dossier to various parties identified in [items 11-13] including whether cautions were given to such parties about the unverified nature of the allegations in the dossier and warnings were given not to publish the same without independent verification. This evidence will go to the lack of care exhibited by BuzzFeed."

27. Mr Millar sought to make something of the point that Mr Loble's evidence was solely directed to the issue of saliency from the point of view of the US Plaintiffs; it did not advance the case of the US Defendants. In my judgment, this point leads nowhere. If Mr Steele's evidence could assist the case of the US Plaintiffs in discharging the burden of proof which was on them to establish falsity, and it was also relevant to any enhancement of the culpability of the publishers, the US Defendants would obviously seek to neutralise that evidence if they could; and, perhaps, to build a positive case – that the December memorandum was true - on the back of what Mr Steele had to say. On the other hand, items 11-13 in the Schedule as originally numbered went to the issue of BuzzFeed's culpability, if any, rather than the truth or otherwise of the intelligence in the December memorandum. I think that it is obvious from all the surrounding circumstances, as the US Defendants well appreciated, that the December memorandum contained intelligence, not evidence, and that – putting the matter at its lowest – it had not been independently verified. The article under scrutiny states in two places that the allegations are unverified.

28. The US Defendants rely on the witness statement of Ms Katherine Bolger who is a partner in a New York law firm. Ms Bolger makes clear that her clients have no intention of exposing or jeopardising Mr Steele's sources. Paragraph 34 of her witness statement has been carefully examined by Counsel, and I therefore set out relevant parts:

> "Further, the Defendants are entitled, in the Florida proceedings, to defend themselves based on their decision to publish the whole dossier as opposed solely to paragraph 3 of [the December memorandum]. Although the parties dispute whether New York or Florida substantive law applies to the Florida proceedings, under either body of the law relevant issues will include: (a) whether the publication of the dossier is a fair and true report of an official proceeding, see [relevant authority] …; (b) whether the Defendants acted with "actual malice", gross irresponsibility, or negligence in publishing the dossier, see [relevant authority] …; and (c) whether the publication of the dossier as a whole is protected by neutral reportage, see [relevant authority]"

29. I was taken to a selection of the relevant jurisprudence by Mr Bailin. If I may say so, *Ortega v Post-Newsweek Stations, Florida, Inc*. 510 So.2d 972 and *Konikoff v*

*Prudential Ins. Co. of Am.*, 234 F.3d 92 provide thin support for the defences relied on in these particular circumstances. However, I have had to remind myself that I am not qualified to opine on questions of US law; and Mr Millar did not seek to persuade me that I should. His measured, and well-aimed, submission was that paragraph 34 of Ms Bulger's witness statement does not explain how and why Mr Steele could give relevant evidence on these defences. To the extent that he could give relevant evidence in relation to her point (b), this issue clearly overlaps with that identified by Mr Loble.

### The Judgment of the Senior Master

30. In my judgment, the Senior Master has delivered a clear, comprehensive and impressive judgment. I agree with Mr Millar that it is necessary to identify her general approach before examining her narrower analysis of the specific matters in dispute.

31. At [105], the Senior Master held that Mr Steele could give relevant evidence "in a jurisdiction where the Plaintiffs have to prove that the allegations are false". She recognised that it would be invidious for her to attempt to assess the relevance of Mr Steele's evidence to the pleaded defences of the US Defendants, and she therefore refrained from doing so, "save that if I decide that the order should not be set aside but varied".

32. At [108], the Senior Master stated: "[i]t is indeed unfortunate that such a wide-ranging request was sought, combined with the fact that in none of the documents in the Florida proceedings is there any analysis of how each topic for examination relates to and is relevant to the issues in the trial". In my judgment, this is entirely correct. I have already commented on the lack of analysis in paragraph 34 of Ms Bolger's witness statement. The Senior Master had examined the documents in the Florida proceedings which enabled her to reach the conclusion she did.

33. Furthermore, at [111] the Senior Master held that the requesting court had not independently addressed the question of the relevance of the individual topics for examination of Mr Steele in connection with the pleaded issues (or, I would add, at all). By implication, the Senior Master directed herself on the basis that she should apply the test laid down by Simon J in *CH (Ireland) Inc v Credit Suisse Canada* [2004] EWHC 626 (QB) at [14] and [17].

34. At [112], the Senior Master placed some weight on the terms of Judge Ungaro's Order dated 15th August 2017. I think that she was wrong to do so, because Judge Ungaro was probably referring to free-standing issues under domestic law such as any arising under Article 6 of the Convention; but nothing turns on that.

35. At [125] the Senior Master concluded that the topics for questioning as originally drafted "are so wide as to constitute a fishing-expedition": in other words, the request was oppressive. Mr Millar submitted that the US Defendants have not sought to assail this conclusion. On my understanding of his submissions, Mr Bailin did not attack [125]. He made the overarching submission, in the context of the pared down Schedule, that the receiving court should strive to uphold the request for assistance sought by the Florida Court.

36. [129] contains an important holding:

    "No explanation has been advanced by the US Plaintiffs as to why they sought the topics for examination to extend so far beyond what would generally be expected for such proceedings, and they have not sought to explain why there was no attempt to demonstrate the relevance of each area of questioning in the Request, and the original formulation of Schedule A, to the issues in the case. The US Defendants, although they did not apply for the Request, and say they are neutral as to whether it be set aside or not, still seek to maintain part of the examination extending to the entirety of the dossier, in circumstances where there is no suggestion that Mr Steele had anything to do with their decision to publish the same."

    The US Defendants have not pleaded in the Florida proceedings that they relied on anything Mr Steele told them.

37. At [135], the Senior Master set out a summary of her conclusions that the request in its original format went beyond what was required in the US proceedings, amounted to a fishing expedition, and was oppressive. She then went on to consider whether she was able nonetheless to assist her American counterparts by restricting the topics for examination and introducing appropriate safeguards. I do not understand Mr Bailin to be objecting to this approach, at least in principle. If he were to have done, that objection would have proved too much.

38. The Senior Master then proceeded to address the 14 topics individually on the basis of the submissions advanced to her. In this regard it is important not to lose sight of the respective cases of the US Plaintiffs, the US Defendants and Mr Steele. I will disregard the topics which are no longer at issue.

Topics 4, 5 and 6

39. These were, respectively, "the steps Mr Steele took to obtain information for the dossier" [4], "Mr Steele's preparation for the dossier" [5] and "Mr Steele's solicitation of information for the dossier" [6]. Mr Steele's position before the Senior Master was that these topics should be deleted; the position of the parties to the litigation was that these should be retained albeit limited to the December memorandum.

40. The Senior Master acceded to Mr Steele's submissions in these terms [139(ii)]:

    "I consider that topics 4, 5 and 6 should be deleted. The US Plaintiffs have focused on the issue of Mr Steele's verification of the allegedly defamatory statements in paragraph 3 of the December memorandum, which is the subject of paragraph 8, and the US Defendants on the reasons and justification for publication. There has been no satisfactory explanation as to why these topics are relevant to the issues identified. These areas of questioning … would … be likely to risk identification of

> sources through the 'jigsaw effect' identified by Mr Millar in his submissions. Although the order can include a prohibition on questions that will risk identity of the sources, there is likely to be considerable difference of opinion between the parties' representatives as to whether any particular question would fall into that category … and it would be unfair and oppressive for Mr Steele to be put into that position."

41. Topic 8 is not the subject-matter of this appeal, but I have noted the Senior Master's reasons for disallowing questioning on the issue of verification beyond the ambit of the December memorandum. She held that there is no suggestion that any actions Mr Steele took in relation to the whole dossier informed the US Defendants' decision to publish, and that wide-ranging questioning on the entire dossier would be oppressive [140(v)].

Topics 11, 12 and 13

42. These were, respectively, "the provision of the dossier to Fusion GPS" [11], "the provision of the dossier to media outlets" [12] and "the provision of the dossier to third parties" [13]. Mr Steele accepted the validity of only topic 11, subject to the subject-matter being limited to the December memorandum. The US Plaintiffs agreed to restrict the subject-matter of all three topics to the December memorandum. The US Defendants submitted that the original wording (i.e. the wording I have set out and which was in the Letter or Request) should be retained.

43. The Senior Master accepted the submissions of the US Plaintiffs in these terms [142(iv)]:

> "I consider that these topics should be limited as proposed by the US Plaintiffs, I do not consider that in that form they are oppressive to Mr Steele. This information is partly given by Mr Steele in his defence in the QB proceedings. In that regard I note the evidence of Mr Loble that the parties are unable to rely on the QB statements of case in the Florida proceedings. The topics concern evidence which appears to be in the public domain so far as media outlets are concerned, and the examination on these topics is likely to be very limited in scope. The topics are clear, limited and easily identifiable, and the issues as to distribution of the December memorandum are relevant to the issues pleaded in the defence in the Florida proceedings."

44. The Senior Master imposed various conditions and safeguards in relation to Mr Steele's examination, some with the agreement of the parties, so as "to provide further protection to Mr Steele" in relation to his source or sources. She also ordered that he be given advance notice of the questions to be asked, and that he be permitted to have legal representation at the examination for the purpose of taking proper objection to any questions posed.

Case 0:17-cv-60426-UU   Document 167-1   Entered on FLSD Docket 05/18/2018   Page 10 of 15

[2018] EWHC 1201 (QB) BuzzFeed Inc and another v Gubarev
and another/Steele
**Approved Judgment**

### The Appeal

45. By their appeal the US Defendants seek to reinstate topics 4, 5 and 6 (limited to paragraph 3 of the December memorandum), and the original wording of topics 11-13. There are three Grounds of Appeal, the first two covering topics 4, 5 and 6, and the last topics 11-13. Ground 1 is that the Senior Master erred on the issue of relevance; Ground 2 is that she did so on the issue of oppression. Ground 3 is that the Senior Master erred on the issue of relevance, although in oral argument submissions were advanced on the issue of oppression. She granted permission to appeal on Ground 3 because she considered that there was a reasonable prospect of success on the argument that "all of the reasons [the Senior Master] advanced in support of the conclusion that questions about the provision of the December memorandum to Fusion GPS [etc.] also applied to questions about the provision of the dossier to those parties".

46. As I have said, I have decided to grant permission to appeal on Grounds 1 and 2. Logically, these Grounds do not all stand or fall together, but the issues arising are very similar.

### The Submissions for the US Defendants

47. Mr Bailin advanced two submissions on Ground 1. The first was that the Senior Master failed to follow the well-established principles as to how the court should approach questions of relevance under section 2 of the 1975 Act. It is complained that either she should have deferred to the Order of the Florida Court, which predicated that the request sought was relevant to the US proceedings, or she should have applied a low threshold in line with the judicial guidance laid down by Simon J in *Credit Suisse*. Mr Bailin's second submission was that there is an internal inconsistency or illogicality in the Senior Master's reasoning. Whereas the steps that Mr Steele took to verify the information contained in the December memorandum were relevant on her analysis, any steps taken at the anterior stage relating to information obtaining and gathering were apparently not. It is complained that there is no real distinction between these two stages, and an absence of reasoning from the Senior Master on this issue.

48. As for Ground 2, Mr Bailin's submission was that the Senior Master overlooked the safeguards in her Order which would afford the very protection necessary to avoid the vice she had identified. Mr Steele would be given advance notice of the questions to be asked, and his legal representative could object on the day. Further, questioning relating to the issue of verification also carried with it the same risk, if it was a risk, as regards source identification.

49. Mr Bailin advanced three submissions in developing Ground 3. His first was that the Senior Master asked herself the wrong question: rather than considering whether questioning on the topics as originally formulated was oppressive, she focused on whether questioning on a narrower formulation would be. However, the very issue to be decided was the former not the latter. Secondly, and I have already referred to this point at paragraph 45 above, the Senior Master's reasons for absence of oppression in relation to the narrower formulation were equally applicable to the wider. Thirdly, Mr Bailin submitted that there was uncontested evidence from Ms Bulger to the effect that dissemination of the entire dossier was relevant to the pleaded defences of the US

Defendants. The final sentence of the Senior Master's reasons on this topic should apply not just to the December memorandum. The BuzzFeed article itself made clear that the publishers took into account the fact that the whole dossier had been circulating widely in certain quarters.

**Discussion and Conclusions**

50. Given that I broadly accept the submissions advanced by Mr Millar, albeit not in their entirety, it is unnecessary for me to set these out.

51. In *MicroTechnologies LLC v Autonomy Inc* [2016] EWHC 3268 (QB) Morris J emphasised the limited scope for an appellate court to interfere with the Senior Master's exercise of discretion in respect of orders made under the 1975 Act [63]:

> "It is not a *de novo* rehearing of the matters placed before her. In this regard, before interfering with the Senior Master's decision, it must be shown that she had either erred in principle in her approach or has left out of account or has taken into account some feature that she should, or should not, have considered or that her decision was wholly wrong because the court is forced to come to the conclusion that she has not balanced the various factors fairly in the scale …"

These considerations carry much greater weight in relation to Mr Bailin's submissions grouped under the rubric of oppression than to his submissions under the banner of relevance. The former raise discretionary considerations; as for the latter, points of principle may well arise, although the Senior Master in my view should be accorded an appropriate margin of appreciation as regards matters of evaluative judgment.

52. The starting-point of this court in relation to Letters of Request issued by a foreign state to which the 1975 Act applies is that they should be given effect to so far as is possible: see *Rio Tinto Zinc Corporation v British Westinghouse Electric Corporation* [1978] AC 547. In *In re State of Norway's Application* [1987] 1 QB 433 Kerr LJ held that "[t]he court should strive to give effect to the request of the foreign court unless it is driven to the clear conclusion that it cannot properly do so" [page 470B].

53. Consistent with this approach, the House of Lords has warned against the domestic court second-guessing issues of relevance arising under the law of the requesting state. In *In re Asbestos Insurance Coverage Cases* [1985] 1 WLR 331, Lord Fraser stated:

> "It would be quite inappropriate, even if it were possible, for this House or any English court to determine in advance the matters relevant to the issues before the Californian courts on which each of these witnesses is in a position to give evidence." [page 1165B-C]

54. No possible issue arises if it is clear that the requesting court has given some consideration to the issue of relevancy in terms of the generality and specificities of the request. As I have already said (see paragraph 33 above), the Senior Master held that

the requesting court did not examine the relevancy of the individual topics for examination. Her reasons for this conclusion were:

> "… because there is no evidence in those court documents that she has done so, and neither of the parties to the Florida proceedings sought to suggest otherwise. Further, it appears that much of the evidence sought in the topics for examination is not in fact relevant to the issues in the US proceedings …" [111]

55. The Senior Master clearly took into account the view of Stanley Burnton J in *Gredd v Busson* [2003] EWHC 3001 (QB) that:

> "… orders for letters of request are normally made by the US judge without any real scrutiny. The order is normally made in the terms sought by the applicant without any (or any significant) amendment and without the judge being informed of the significant differences between US federal procedure and of these courts."

I apprehend that this conclusion was based on Stanley Burnton J's considerable experience in this area of the law.

56. In my judgment, the Senior Master was entitled to reach the conclusion she did at [111] of her judgment. It follows that what Mr Bailin characterised as the "strict approach", based on judicial comity and deference to the assessment by a foreign court of the ends of justice, should be tempered. The issue arises as to what extent.

57. That issue was addressed by Simon J in *Credit Suisse*. In that case the question arose of whether a dictum of Sir Richard Scott V.-C in *First American Corporation v Zayed* [1999] 1 WLR 1154 could be reconciled with the line of high authority I have summarised. The Vice-Chancellor had said that the first issue was "whether the intended witnesses can reasonably be expected to have relevant evidence to give on the topics mentioned in the amended schedule". Simon J's neat solution to the apparent contradiction was as follows:

> "It seems to me, however, that [Counsel] is correct in his submission that the approach of the court will depend on whether the requesting court has itself considered questions of relevance. If it has, then it is hardly in the interests of comity that the court to whom the request is made should embark on a close consideration of questions of relevance on what is likely to be limited material and a less clear understanding of the issues than the requesting court. If, on the other hand, the requesting court has plainly not considered the question of relevance or it is clear, even on a broad examination, that the evidence is not relevant then the Vice-Chancellor's first question must be addressed." [15]

58. If the position is that the requesting court plainly has not considered the question of relevance, it must fall on the receiving court to undertake that exercise. In Simon J's view, the test to be applied in such circumstances is the Vice-Chancellor's. Mr Bailin

described that test as importing a low threshold, and I agree. However, an issue arises as to exactly what the test – can the intended witnesses reasonably be expected to have relevant evidence to give on the specified topics? – amounts to or requires. Often, questions of relevance can be answered by applying a straightforward logic to the issues in the case. Sometimes, however, questions of relevance engage matters of foreign law. In the present case, it may be said that pleaded defences of the US Defendants raise questions which may be superficially familiar to an English lawyer but are strictly speaking outside his experience and qualifications. In circumstances where the court has evidence from a lawyer with experience and qualifications in the requesting state, and that evidence stands uncontradicted, considerable deference must be given to it. I do not think that it follows that the evidence of the foreign lawyer must be accepted, and difficult questions could arise if both parties have submitted competing evidence, but in circumstances such as these appropriate caution must be shown.

59. In my judgment, Mr Bailin's submission that the Senior Master did not apply a "strict approach" to topics 4, 5 and 6, and should have done, is unsound. By the time the Senior Master had reached [139] of her judgment, she had already decided that the requesting court had not given independent consideration to the merits of the US Plaintiffs' application and that the request in its original form contained irrelevant matters, was overly wide-ranging and was oppressive. Thus, the general principles enunciated in *Rio Tinto Zinc Corporation* and other cases were of little relevance. At best from the perspective of the US Defendants, the issue was whether Mr Steele could reasonably be expected to give relevant evidence on topics 4, 5 and 6. This was a matter for the Senior Master to decide, deferring where appropriate to the witness statement of Ms Bolger.

60. Furthermore, it was the agreed position of the parties to the US litigation that these topics should be limited to the December memorandum.

61. Viewing the underlying litigation from the perspective of the US Plaintiffs, they need to prove that paragraph 3 of the December memorandum is untrue. Whether the US Defendants took reasonable care would no doubt be relevant to the amount of damages. Viewing the underlying litigation from the perspective of the US Defendants, in the event that falsity was established, there were two pleaded defences to consider.

62. The Senior Master concluded that "there has been no satisfactory explanation as to why these topics are relevant to the issues identified", i.e. the issues I have just encapsulated. Clearly, what she meant by that was that no proper explanation had been given as to why the steps Mr Steele took, and by implication his evidence about those steps, were relevant to the parties' pleaded cases. I have little or no difficulty with this in relation to the pleaded defences of the US Defendants, and would reiterate that Ms Bolger has failed to explain how and why Mr Steele's evidence under the rubrics of these topics could assist in connection with those defences. The position is slightly more complex on the issue of falsity. The US Plaintiffs may have focused on the issue of verification (topic 8), but this issue has two sides, and the US Defendants could seek to deploy Mr Steele's evidence in support of their case that paragraph 3 of the December memorandum was in fact true. I do not perceive any inherent contradiction in the US Defendants' case which was (i) the request should be wholly set aside, but (ii) if (i) did not happen, then in the alternative individual topics should be allowed, with amendments (restricting the scope) if necessary.

63. Even if there may be some force in the contention that the Senior Master did not examine the obverse of the US Plaintiffs' coin, I would hold that her decision on the issue of relevance cannot be impugned on this appeal. The Senior Master was entitled to take a merits-based approach. The fact remains that Mr Steele has pleaded in his defence in the QB action, backed by a Statement of Truth, that the intelligence for the December memorandum was unsolicited. The Senior Master heard Mr Millar's submission about that, and was entitled to take it into account, giving it some weight. Moreover, it is obvious to anyone with experience in this area that intelligence is just that: it is not evidence; seen in isolation, it is unverified; it needs to be handled with care. Mr Steele knew that as did the US Defendants. The steps he took to obtain information and prepare the memorandum could throw no light on the truth or otherwise of the intelligence. The steps he took to verify that intelligence could be regarded as at least capable of throwing some light on this issue.

64. It follows that I must reject Mr Bailin's first Ground of Appeal.

65. As for the second ground, this to my mind raises a point of discretion not of principle. The Senior Master could not have overlooked the fact that she was about to impose various conditions and constraints on the examination process. However, she remained concerned that issues could arise through the "jigsaw effect" which Mr Steele might find it difficult to deal with on the day, particularly I would add in the context of possible follow-up questions, and she was also troubled by the possibility of the forensic contests which might ensue before the examiner. Moreover, although she may not have mentioned these specifically in this context, I believe that she must have taken account of Mr Millar's submissions that (i) a witness in Mr Steele's position would be very concerned about the risk to his sources, and that concern would place him under stress, (ii) his position was tantamount to that of a whistle-blower, and (iii) the risk to the source or sources was great if anything went wrong (see Mr Lucas' evidence).

66. I cannot accept the argument that the issue of source identification was as great in the context of verification as it was at the anterior stages. This would be true if it were suggested that Mr Steele should have asked his source or sources for confirmation that the intelligence was true. However, "verification" in this context really means, "independent verification".

67. I cannot suppress the observation that the notion that Mr Steele should be probed about the steps he took to assess the reliability of his source or sources has an Alice in Wonderland feel to it, and offends reality and common sense. Mr Steele has made clear at all material times that this was intelligence. The US Defendants have never said that they asked Mr Steele any questions about it.

68. Mr Bailin has failed to demonstrate that the Senior Master's exercise of discretion in relation to the issue of oppression was wrong, and I have no hesitation in rejecting Ground 2.

69. As for the Ground 3, there is superficial force in Mr Bailin's submission that if [142(iv)] of the Senior Master's ruling is examined for what it says and nothing more, she has not specifically asked and answered the question of whether topics 11-13 in their original formulation would be oppressive. It seems that the Senior Master may have been concerned about that when she decided to grant permission to appeal. However,

in my judgment such concerns would have been unfounded, and Mr Bailin's point is not well made.

70. I accept Mr Millar's submission that it is implicit in the Senior Master's judgment read as a whole that questioning ranging over the entirety of the dossier would be oppressive. Indeed, she makes that point explicitly in the final sentence of [129] of her judgment, and it also emerges strongly from [140(v)]. The Senior Master's reasons for supporting the narrowing down of these topics to the December memorandum, including the reference to the questioning being "likely to be very limited in scope" do not apply to the dossier as a whole. Further, the Senior Master was entitled to attach some weight to the modest ambitions of the US Plaintiffs, as revised, in the context of these topics. This may have been generated by pragmatism, but by the time of the hearing the issues were back in contest. In my judgment, the Senior Master's conclusion on the issue of oppression in relation to topics 11-13 is entirely supportable.

71. The Senior Master did not address the issue of whether topics 11-13 as originally formulated could have yielded relevant evidence from Mr Steele. Strictly speaking this issue does not arise, at least in the context of what the Senior Master expressly decided. However, I would add that if the scope of my inquiry, as opposed to appellate function, could properly extend to the issue of the provision of the entire dossier to Fusion GPS and others, I would have needed some persuading on the logically prior issue of relevance. The final sentence of [142(iv)] relates only to the December memorandum.

**Conclusion**

72. Despite Mr Bailin's attractive oral argument, I have reached the clear and firm conclusion that this appeal should be dismissed on all Grounds.

73. The parties should agree the form of Order in the light of my judgment.

74. The FCO's intervention may need to be addressed in the light of my judgment, but I release this aspect to the Senior Master.