## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 1:17-cv-60426-UU

ALEKSEJ GUBAREV, *et al.*,

      Plaintiffs,

v.

BUZZFEED, INC., *et al.*,

      Defendants.

_____/

## **ORDER**

THIS CAUSE comes before the Court upon Plaintiff's Motion for Partial Judgment on the Pleadings with Respect to Defendants' Affirmative Defenses of "Fair Report Privilege" and "Neutral Reporting Privilege" (D.E. 115).

THE COURT has considered the motion, the pertinent portions of the record and is otherwise fully advised in the premises.

## **BACKGROUND**

These facts come from the complaint (D.E. 1) and the amended answer (D.E. 38). The standard for a motion for judgment on the pleadings significantly constrains the Court's consideration of extrinsic facts. (*see* Legal Standard, *infra*).

### I.      The Parties

Plaintiff Aleksej Gubarev is a resident of the Republic of Cyprus. D.E. 1 ¶ 6. He is the chairman and CEO of Plaintiff XBT Holdings S.A. *Id.* XBT Holdings S.A., is a Luxembourg company with offices in Florida, among other places. *Id.* ¶ 7. It owns Plaintiff Webzilla, Inc., which is a Florida corporation with offices in Fort Lauderdale. *Id.* ¶¶ 6-7.

Defendant BuzzFeed, Inc. ("BuzzFeed") is a Delaware corporation with offices in eighteen cities around the world, including New York. *Id*. ¶ 9, D.E. 38 ¶ 9. Defendant Ben Smith is BuzzFeed's editor-in-chief, and he resides in Brooklyn, New York. *Id*. ¶ 10, D.E. 38 ¶ 10.

## II.   **The Facts**

On January 10, 2017, BuzzFeed published an online article entitled *These Reports Allege Trump Has Deep Ties to Russia* (the "Article"), which included a 35-page dossier (the "Dossier"). D.E. 1-3, ¶ 1; D.E. 38 ¶ 1; D.E. 1-2 p. 19–21. In the Article, BuzzFeed described the Dossier as a compilation of memoranda assembled "for political opponents of Trump by a person who is understood to be a former British Intelligence agent." D.E. 1-2 p. 20. One memorandum, dated December 13, 2016, allegedly contains statements about Plaintiffs. As published by BuzzFeed, the pertinent portion of that memorandum appeared as follows:

> ▆▆▆▆▆▆▆▆▆▆▆ reported that over the period March-September 2016 a company called ▆▆▆▆▆▆[1] and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data, and conduct "altering operations" against the Democratic Party leadership. Entities linked to one ▆▆▆▆▆▆▆[2] were involved and he and another hacking expert, both recruited under duress by the FSB, ▆▆▆▆▆ were significant players in this operation. In Prague, COHEN[3] agreed [sic] contingency plans for various scenarios to protect the operation, but in particular what was to be done in the event that Hillary CLINTON won the presidency. It was important in this event that all cash payments owed were made quickly and discreetly and that cyber and other operators were stood down/able to go effectively to ground to cover their traces. (We reported earlier that the involvement of political operatives Paul MANAFORT and Carter PAGE in the secret TRUMP-Kremlin liaison had been exposed in the media in the run-up to Prague and that damage limitation of these also was discussed by COHEN with the Kremlin representatives).

*Id*. ¶ 26, D.E. 1-2 p. 19–21.

The Article included the following disclaimers:

---

[1] Plaintiffs allege that the name redacted here is XBT/Webzilla. D.E. 1-3 ¶ 26.
[2] Plaintiffs allege that the name redacted here is Aleksej Gubarev. D.E. 1-3 ¶ 26.
[3] "COHEN" refers to Michal Cohen, then-candidate Donald Trump's lawyer. D.E. 1-2, p. 18.

> The dossier, which is a collection of memos written over a period of months, includes specific, unverified, and potentially unverifiable allegations . . . . BuzzFeed News reporters in the US and Europe have been investigating various alleged facts in the dossier but have not verified or falsified them . . . [The Dossier] is not just unconfirmed: It includes some clear errors.

*Id.* ¶ 3, D.E. 1-2, p. 20.

The Article stated that the Dossier had "circulated at the highest levels of the US Government." *Id.* It explained that a summary of the Dossier was shown to President Obama and President-elect Trump. *Id.* Additionally, it asserted that Senators Harry Reid and John McCain saw the Dossier and informed the FBI about it, although the FBI had copies of some of the documents within Dossier before being contacted by the Senators. *Id.*

The Article cited and included a hyperlink to a CNN article: Evan Perez, *et al.*, *Intel chiefs presented Trump with claims of Russian efforts to compromise him*, CNN (Jan. 10, 2017), https://www.cnn.com/2017/01/10/politics/donald-trump-intelligence-report-russia/index.html. That article reported that four U.S. intelligence directors—Director of National Intelligence James Clapper, FBI Director James Comey, CIA Director John Brennan, and NSA Director Admiral Mike Rogers—presented a two-page synopsis of the Dossier to President Obama and then President-elect Trump to brief them on the allegations in the Dossier. It also reported that the FBI was investigating the credibility and accuracy of the allegations. Finally, it stated that US intelligence agencies "checked out" the former British intelligence operative who compiled the Dossier and "[found] him and his sources to be credible enough to include some of the information in the presentations to the President and President-elect." *Id.*

Plaintiffs allege that the Dossier's statements about them are false. D.E. 1-3 ¶ 27. Plaintiffs also allege that although BuzzFeed tasked its reporters with investigating the allegations, Defendants never contacted Plaintiffs to determine whether the allegations that they

hacked the Democratic Party had merit.  *Id*. ¶ 28, D.E. 38 ¶ 28.  Plaintiffs assert that because

Defendants could not verify the Dossier and knew that it contained "some clear errors,"

Defendants published it without reasonable care for, or with reckless disregard as to the truth.

*Id*. ¶ 43.  And, despite the redaction of Plaintiffs' identities, Plaintiffs allege that Defendants'

decision to publish the Dossier defamed them.  *Id*. ¶ 51.  According to Plaintiffs, this defamation

has caused them to lose business and credit, and has otherwise damaged their reputations.  *Id*. ¶¶

5, 47–48.

Defendants assert, among other defenses, that their publication of the Dossier is protected

by the fair report privilege and the neutral report privilege.  D.E. 38, p. 9.

## PROCEDURAL HISTORY

Plaintiffs filed the complaint on February 28, 2017.  D.E. 1.  Defendants filed the

operative amended answer on June 29, 2017.  D.E. 38.  Discovery is underway and is proceeding

slowly.  The Court has held several status conferences to monitor the pace of discovery and to

address various issues as they arise.  During one such conference on September 29, 2017, the

Court encouraged the parties to move for partial judgement on the pleadings with respect to

Defendants' asserted privileges.  D.E. 78, p. 21:13–17.  On January 18, 2018, Plaintiffs obliged

the Court and filed the present motion.  D.E. 115.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(c), "after the pleadings are closed—but early

enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P.

12(c).  A judgment on the pleadings is a decision on the merits, appropriate where "there are no

material facts in dispute and the moving party is entitled to judgment as a matter of law."  *Scott*

*v. Taylor*, 405 F.3d 1251, 1253 (11th Cir. 2005) (citing *Cannon v. City of W. Palm Beach*, 250

F.3d 1299, 1301 (11th Cir. 2001)).  In reviewing a motion for judgment on the pleadings, the factual allegations of the non-moving party are assumed to be true and all reasonable inferences are drawn in that party's favor.  *Hawthorne v. MAC Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998).

## ANALYSIS

Plaintiffs move for partial judgment on the pleadings with respect to two of Defendants' affirmative defenses: the fair report privilege, and the neutral report privilege.  *See* D.E. 38 p. 9. The threshold question before the Court is whether these affirmative defenses are governed by New York or Florida law.  Each side argues that it prevails regardless of which law applies, but Defendants argue that the Court should apply New York law.

### A.  Choice of Law

The Court is required to conduct a choice-of-law analysis where there is a true conflict between the laws of the states with an interest in the case.  A true conflict exists when "two or more states have a legitimate interest in a particular set of facts in litigation and the laws of those states differ or would produce a different result."  *Pycsa Panama, S.A. v. Tensar Earth Techs., Inc.*, 625 F. Supp. 2d 1198, 1219 (S.D. Fla. 2008), aff'd, 329 F. App'x 257 (11th Cir. 2009).  A false conflict, by contrast, exists "'when the potentially applicable laws do not differ.'"  *Fioretti v. Massachusetts Gen. Life Ins. Co.*, 53 F.3d 1228, 1234 n. 20 (11th Cir. 1995) (quoting Restatement (Second) of Conflict of Laws § 1 cmt. b (1971)).

The Court has reviewed the laws of Florida and New York and finds that they conflict. As to the fair report privilege, Florida follows the common law, and New York has codified it. *Compare Woodard v. Sunbeam Television Corp.*, 616 So. 2d 501, 502 (Fla. Dist. Ct. App. 1993), *with* N.Y. Civ. Rights Law § 74.   The common law generally protects only reports of

proceedings "open to the public," and although there is one case suggesting that Florida courts might extend the privilege to cover non-public information in some circumstances, it is not clear that confidential or classified materials are protected.  *See* Restatement (Second) of Torts § 611 (1977); *Ortega v. Post-Newsweek Stations, Florida, Inc.*, 510 So. 2d 972 (Fla. Dist. Ct. App. 1987).   In New York, by contrast, the law is well established that the privilege applies to confidential and even privileged materials.  *See* Fair Report Privilege, *infra*.  Finally, in Florida, the privilege is qualified; in New York, it is absolute.  *Compare Woodard*, 616 So. 2d at 502, *with Cholowsky v. Civiletti*, 69 A.D.3d 110, 114 (N.Y. App. 2009).   As to the neutral report privilege, at least one Florida court recognizes it; New York courts do not.  *Compare   Thomas v. Patton*, No. 162005CA003777XXXXMA, 2005 WL 3048033, at *3 (Fla. Cir. Ct. Oct. 21, 2005), *with Hogan v. Herald Co.*, 84 A.D.2d 470, 446, aff'd, 58 N.Y.2d 630 (N.Y.S.2d 1982).   Accordingly, the Court must conduct a choice-of-law analysis.

A federal court sitting in diversity must apply the conflict-of-laws rules of the forum state.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  As a preliminary matter, the court must characterize the legal issue before it and determine whether it sounds in tort, contract, property law, etc.  *Acme Circus Operating Co., Inc. v. Kuperstock*, 711 F.2d 1538, 1540 (11th Cir.1983).  Once it has done so, the court determines the choice of law rule that the forum state applies to that type of issue.  *Id*.

Here, the issues before the court are the applicability of two affirmative defenses to defamation; these issues, therefore, arise in tort.  With respect to issues in tort, Florida applies the "most significant relationship" test outlined in the Restatement (Second) of Conflict of Laws section 145.  *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007) (citing *Bishop v. Florida Specialty Paint Co.*, 389 So.2d 999, 1001 (Fla. 1980)).

This test is applied "not to the collective sum of issues in dispute, but to each individual issue which arises in the case." *Judge v. Am. Motors Corp.*, 908 F.2d 1565, 1578 (11th Cir. 1990). "Thus the law of a foreign state may control one issue while the law of Florida controls another." *Id*. Section 145 provides:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>> (a) the place where the injury occurred,
>> (b) the place where the conduct causing the injury occurred,
>> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
>> (d) the place where the relationship, if any, between the parties is centered.
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflict of Laws § 145 (1971).  The contacts identified in section 145(2) are non-exhaustive and are intended to assist the court in "applying the principles of § 6."

Section 6 provides:

> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
> (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
>> (a) the needs of the interstate and international systems,
>> (b) the relevant policies of the forum,
>> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>> (d) the protection of justified expectations,
>> (e) the basic policies underlying the particular field of law,
>> (f) certainty, predictability and uniformity of result, and
>> (g) ease in the determination and application of the law to be applied.

*Id*. § 6.  Florida has no statutory directive.  Accordingly, the Court begins its analysis with the Section 145(2) contacts and will turn to the Section 6(2) factors if the Section 145(2) contacts result in a standoff.  *See Grupo Televisa*, 485 F.3d at 1242.

### 1.   The Place Where The Injury Occurred

Although Webzilla and XBT Holdings S.A., have offices in Florida, Plaintiffs' injury allegations are not limited to this state.   Mr. Gubarev, a resident of Cyprus, alleges that his personal and professional reputation has been damaged.  D.E. 1 ¶ 5.  XBT Holdings S.A., which does business "across the globe" claims it has lost clients, suffered damage to its reputation, and lost business relationships with at least one lender.  *Id.* ¶¶ 7, 47.  Additionally, there is "little reason in logic or persuasiveness to say that one state rather than another is the place of injury . . . in the case of multistate defamation."  Restatement (Second) of Conflicts of Laws § 145 cmt. 3 (1971).   Here, the Dossier was published online and therefore was accessible anywhere in the world.  *See* D.E. 1 ¶ 23.  Accordingly, this factor weighs only weakly in favor of applying Florida law.

### 2.   The Place Where the Conduct Occurred

As with the previous factor, the place where the conduct occurred is of "less significance" in cases of multistate defamation.  Restatement § 145 cmt. e.  Here, the Dossier was published online and therefore was viewable anywhere.  Nevertheless, this factor weighs somewhat in favor of applying New York law because the decision to publish the Dossier was made in New York.

### 3.   The Location of the Parties

This factor weighs slightly in favor of applying New York law.  Although Plaintiffs XBT Holdings, S.A. and Webzilla have offices in Florida, neither is alleged to be headquartered here. Defendants, however, are based in or reside in New York.  Their connection to New York,

therefore, is stronger than Plaintiffs' connection to Florida.  *See id.* ("a corporation's principal place of business is a more important contact than the place of incorporation, and this is particularly true in situations where the corporation does little, or no, business in the latter place.").

    4.   <u>The Place Where the Parties' Relationship is Centered</u>

This factor carries no weight.  The parties do not allege any relationship to one another besides the alleged defamation.

On balance, the Section 145(2) factors weigh slightly in favor of applying New York law to the two affirmative defenses at issue here.  Given that these factors do not weigh conclusively in favor of applying New York law, the Court turns to the Section 6 factors.

    5.   <u>The Section 6 Factors</u>

Not all of the Section 6 factors are applicable here, but three are: (1) the interest of other states in the determination of the particular issue, (2) the basic policies underlying the particular field of law, and (3) certainty, predictability and uniformity of result.  *Id*. § 6.  As to the first and second, the Court finds persuasive the reasoning of a similar case from the Northern District of Illinois.  *See Wilkow v. Forbes, Inc.*, No. 99 C 3477, 2000 WL 631344 (N.D. Ill. May 15, 2000), aff'd, 241 F.3d 552 (7th Cir. 2001).  That case also arose in the context of an article published nationally and where the decision to publish was made in New York.  *Id*. at *1.  The court reasoned that "[t]he issue of whether a statement is defamatory or invades the right to privacy is distinct from the issue of whether that statement is privileged . . . . the fair reporting privilege is meant to protect speakers, not provide a remedy to plaintiffs."  *Id*. at *5, 7.  Because the policy behind the privilege is to protect speakers, and because the decision to publish the article was

made in New York "where the New York legislature has spoken regarding the breadth of its privilege," the court held that New York law should apply to the affirmative defense. *Id.* So too here; the affirmative defenses asserted by Defendants exist to protect speakers, not to provide Plaintiffs a remedy. Furthermore, the decision to publish the Dossier was made in New York, and accordingly, New York has a strong interest determining the applicability of the affirmative defenses. D.E. 1-3 ¶ 10; D.E. 1-2, p. 21. The first two of the relevant Section 6 factors, therefore, weigh in favor of applying New York law.

The third also weighs in favor of applying New York law, but not as forcefully. Two related defamation suits are pending against Defendants in New York.[4] Defendants have asserted the same privileges there that are at issue here. Applying New York law to those privileges, therefore, tends to promote predictability and uniformity of result.

Defendants go a step further and argue that it is "absurd" that their decision to publish the Dossier could be protected in one jurisdiction and unprotected in another. D.E. 133, p. 17. Hardly—that is the nature of our federalist system. *See Murphy v. F.D.I.C.*, 208 F.3d 959, 965 (11th Cir. 2000) ("'Our system contemplates differences between different states' laws'") (quoting *In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1175 (D.C. Cir. 1987), aff'd sub nom. *Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 109 (1989)). Still, applying New York law to Defendants' privileges would tend to foster predictability and uniformity of result, and therefore, this factor weighs somewhat in favor of applying New York law.

---

[4] The Court may take judicial notice of the existence and nature of other lawsuits. *See generally United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir.1994); *Universal Express, Inc. v. S.E.C.*, 177 Fed. Appx 52, 53 (11th Cir. 2006).

In sum, the Restatement factors weigh in favor of applying New York law, and so the Court will apply New York law to determine whether BuzzFeed can rely on the fair report and the neutral report privileges in this case.[5]

### B.  Fair Report Privilege

#### 1.  Overview

The fair report privilege is codified in New York Civil Rights Law section 74, which reads:

> A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published.

> This section does not apply to a libel contained in any other matter added by any person concerned in the publication; or in the report of anything said or done at the time and place of such a proceeding which was not a part thereof.

The purpose of this statute is to protect reports of proceedings which are "made in the public interest." *Williams v. Williams*, 23 N.Y.2d 592, 599 (N.Y. 1969).  The press acts as the agent of the public, gathering and compiling diffuse information in the public domain.  The press also provides the public with the information it needs to exercise oversight of the government, and with information concerning the public welfare.  The fair report privilege exists to protect the press as it carries out these functions.  *See, e.g.*, *Reuber v. Food Chem. News, Inc.*, 925 F.2d

---

[5] At this time, the Court does not decide what law governs the elements of Plaintiffs' defamation claim.

703, 714 (4th Cir. 1991) (holding that the privilege exists so that the press is not punished for serving its basic function).

Section 74 differs slightly from the traditional common law iteration of the fair report privilege, which protects only proceedings that are open to the public. *See, e.g.*, Restatement (Second) of Torts § 611 (1977) ("As in the case of the report of official proceedings, the purpose of the privilege is to protect those who make available to the public information concerning public events that concern or affect the public interest and that any member of the public could have acquired for himself by attending them."); *Hogan*, 84 A.D.2d at 446 ("Generally stated, the common-law rule of fair report permits the privileged publication of (1) the *public proceedings* of governmental bodies . . . .") (emphasis added).

New York courts have extended the term "official proceeding" to cover any official investigation even if it is not open to the public. *See, e.g.*, *Freeze Right Refrigeration & Air Conditioning Servs., Inc. v. City of New York*, 101 A.D.2d 175, 475 N.Y.S.2d 383 (1984) (New York City Department of Consumer Affairs investigation); *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209 (N.D.N.Y. 2014) ("New York courts have broadly interpreted the meaning of an official proceeding as used in Section 74") (collecting cases; internal quotations omitted); *Test Masters*, 603 F.Supp.2d 584 (New York Consumer Protection Board investigation); *Easton v. Public Citizens, Inc.*, No. 91 Civ. 1639, 1991 WL 280688, at *1 (S.D.N.Y. Dec. 26, 1991) (New York State Commission on Quality of Care for the Mentally Disabled investigation), aff'd, 969 F.2d 1043 (2d Cir.1992); *Muscarella v. Berkshire Hathaway, Inc.*, 278 A.D.2d 854, 721 N.Y.S.2d 432, 433 (2000) (federal agency audit); *Baumann v. Newspaper Enters.*, 270 A.D. 825, 60 N.Y.S.2d 185 (1946) (District Attorney investigation); *Ibrahim v. Fox Television Stations, Inc.*, 32 Misc.3d 1223(A), No. 109370, 2011 WL 3198879, at *2 (N.Y.Sup.Ct. July 21, 2011) (UN

investigation into allegations of employee misconduct); *Farrell v. N.Y. Evening Post, Inc.*, 167 Misc. 412, 3 N.Y.S.2d 1018 (Sup.Ct.1938) (internal governmental investigation of the Civil Works Administration).  The test is whether the "report concerns actions taken by a person officially empowered to do so." *Freeze Right*, 101 A.D.2d at 182 (internal quotation marks omitted) ("The report is protected as long as it concerns activities which are within the prescribed duties of a public body.").

There are, however, two important limitations on this privilege.  First, there must be more than a mere "overlap" between the subject matter of the report and the subject matter of the proceeding; "the ordinary viewer or reader must be able to determine from the publication itself that the publication is reporting on a proceeding."  *Fine*, 11 F. Supp. 3d at 216; *see also Wenz v. Becker*, 948 F. Supp. 319, 323 (S.D.N.Y. 1996) ("If the context in which the statements are made make[s] it impossible for the ordinary viewer to determine whether defendant was reporting [on a proceeding], the absolute statutory privilege does not attach.") (internal quotations omitted); *Corp. Training Unlimited, Inc. v. Nat'l Broad. Co.*, 868 F. Supp. 501, 509 (E.D.N.Y. 1994) (ruling that the privilege did not apply where "[t]he ordinary viewer . . . would not have been under the impression that he was being presented with the report of the . . . proceedings."); *Cholowsky v. Civiletti*, 69 A.D.3d 110, 114, 887 N.Y.S.2d 592, 596 (2009) ("If the publication does not purport to comment on a judicial proceeding, Civil Rights Law § 74 is inapplicable."). This is to insure that the reader can ascertain that what is reported as true is that there is an official proceeding underway or official action being taken regarding the allegedly defamatory matter—not that the allegedly defamatory statements are true.  *El Greco Leather Prod. Co. v. Shoe World, Inc.*, 623 F. Supp. 1038, 1043–44 (E.D.N.Y. 1985), aff'd, 806 F.2d 392 (2d Cir. 1986) (applying the privilege to protect allegedly defamatory summary of pleadings in a pending

lawsuit even though the allegations within those pleadings were unproved and contested); *Mills v. Raycom Media, Inc.*, 34 A.D.3d 1352, 1352, 824 N.Y.S.2d 845, 845 (2006) (same).

And second, a formal proceeding must be underway at the time of publication. *See, e.g.*, *Abakporo v. Sahara Reporters*, No. 10 CV 3256 RJD VVP, 2011 WL 4460547 (E.D.N.Y. Sept. 26, 2011) (refusing to apply the privilege to a complaint sent to law enforcement where the complaint was not itself government action and did not initiate an investigation); *Komarov v. Advance Magazine Publishers, Inc.*, 180 Misc. 2d 658, 660 (N.Y. Sup. Ct. 1999) (holding that the privilege applies "to any pleading made within the course of the proceeding" and "to affidavits submitted in the proceeding.").

Where, as here, the parties have submitted the allegedly defamatory materials to the Court, the Court "may determine as a matter of law whether allegedly defamatory publications are 'fair and true' reports of official proceedings.'" *Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 457 (E.D.N.Y. 2013) (quoting *Fine v. ESPN, Inc.*, No. 12–CV–0836, 2013 WL 528468, at *3 (N.D.N.Y. Feb. 11, 2013)).  And in making this determination, "the language used [in the report] should not be dissected and analyzed with a lexicographer's precision." *Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*, 49 N.Y.2d 63, 68 (1979).

### 2. **Relationship to Official Proceeding**

Without editorializing, the Article accurately reproduces the Dossier, albeit with some names, including Plaintiffs' redacted.  The issues, thus, are whether an official proceeding concerning the Dossier was underway when BuzzFeed published it, and whether the Court can conclude as a matter of law that an ordinary reader would have understood that the Dossier was the subject of official action. *See Aguirre*, 961 F. Supp. 2d at 457; *Fine*, 2013 WL 528468, at *3.

14

As an initial matter, it is of no moment that the Article and Dossier are not, strictly speaking, reports about an official proceeding such as a report of a judicial proceeding or summary of a law enforcement investigation.  The privilege applies if the Dossier was part of or subject to an official proceeding.  *See, e.g.*, *Fine*, 11 F. Supp. 3d 209 (applying privilege to audio recording by a private citizen later used in a law-enforcement investigation); *Komarov* 180 Misc. 2d at 660 (holding that the privilege applies to "affidavits submitted in the proceeding."); *Branca v. Mayesh*, 101 A.D.2d 872, 873 aff'd, 63 N.Y.2d 994 (N.Y. App. 1984) (holding that the privilege applies to "any pleading made within the course of the proceeding.") (citing *Campbell v. New York Evening Post*, 245 N.Y. 320, 320 (N.Y. 1927)).

Plaintiffs take a narrow view of "official proceeding," arguing that that term encompasses only an "actual investigation." D.E. 115, p. 11.  And because the Article does not state in its text that the Dossier was the subject of an investigation, the privilege does not apply.  *Id*.  Defendants respond that "official proceeding" is broadly defined, citing several cases holding that the term encompasses any "'actions taken by a person officially empowered to do so.'"  D.E. 133, p. 13 (quoting *Abakporo*, 2011 WL 4460547, at *10 (quoting *Freeze Right*, 101 A.D.2d at 182)). Defendants argue that this broad standard is satisfied for several reasons.  First, the Article states that the Dossier circulated at the highest levels of the government, that the President and President-elect were briefed about the allegations therein, and that two senators received it and sent it to the FBI.  And second, the Article links to a CNN article that stated that four U.S. intelligence directors gave confidential briefings about the allegations to the President and President-elect, and, most importantly, that the FBI was investigating the truth of the allegations.

The Court agrees with Defendants that the term "official proceeding" should be broadly interpreted to apply to any official action.  *See, e.g.*, *Freeze Right*, 101 A.D.2d at 182.  A

confidential briefing to the President and the President-elect by the four most senior intelligence directors in the country is official action taken by those empowered to do so.  So too is an FBI investigation into the truth of the Dossier's allegations.  *See, e.g.*, *Test Masters*, 603 F.Supp. 2d at 588.

Applying the privilege to classified intelligence briefings accords with both the purpose of the privilege and New York case law.  *See Williams*, 23 N.Y.2d at 599 (holding that the purpose is to protect reports about proceedings in the public interest); *Medico v. Time, Inc.*, 643 F.2d 134, 141 (3d Cir. 1981) (explaining that the policy behind the privilege supported extending it to privileged and confidential FBI investigatory documents because "[i]f the citizenry is effectively and responsibly to discharge its obligation to monitor the conduct of its government, there can be no penalty for exposing to general view the possible wrongdoing of government officials."); *see also Test Masters*, 603 F.Supp. 2d at 588–89 (collecting cases showing that the privilege applies to a wide range of investigatory proceedings).

Regardless of the broad scope of the privilege, its protection is available only if an ordinary reader of the Article would have concluded that there was a classified briefing or an FBI investigation concerning the truth of the Dossier's allegations.  *See Fine*, 2013 WL 528468, at *3; *Schwartz v. Bartle*, 51 Misc. 2d 215, 216, 272 N.Y.S.2d 805, 806 (Sup. Ct. 1966) (holding that the privilege applied only if the allegedly libelous statements arose during a judicial proceeding, which was a question for the court); *cf Corp. Training Unlimited, Inc. v. Nat'l Broad. Co.*, 868 F. Supp. 501, 509 (E.D.N.Y. 1994) (ruling that the privilege did not apply where "[t]he ordinary viewer . . . would not have been under the impression that he was being presented with the report of the . . . proceedings").  The Article itself does not permit an ordinary reader to understand that the Dossier was the subject of classified briefings or an FBI investigation.

16

Rather, it is the hyperlinked CNN article that describes the confidential briefings and asserts that the FBI is investigating the truth of the Dossier's allegations.  The question then is: would an ordinary reader of the Article conclude that the Dossier was subject to these official actions when these official actions are mentioned only in the hyperlinked CNN article?

The Supreme Court of Nevada is the only court to confront this question.  In *Adelson v. Harris*, the Second Circuit certified the question to the Nevada Supreme Court, which held that a hyperlink renders a report privileged provided the hyperlink is conspicuous.  402 P.3d 665 (Nev. 2017).  The court reasoned that "the hyperlink is the twenty-first century equivalent of the footnote for purposes of attribution in defamation law, because it has become a well-recognized means for an author or the Internet to attribute a source and the hyperlink instantaneously permits the reader to verify an electronic article's claims."  *Id*. at 669 (internal quotations omitted) (citing *Adelson v. Harris*, 973 F. Supp. 2d 467, 484 (S.D.N.Y. 2013), aff'd, 876 F.3d 413 (2d Cir. 2017)).

*Adelson* is aligned with modern journalistic principles and the way information is consumed in the digital age.  *See, e.g.*, Michael Schudson*, et al*., *Link Think: News organizations and their hyperlinking choices*, Columbia Journalism Review, March/April 2012, https://archives.cjr.org/the_research_report/link_think.php ("Publishing such heavily linked features holds reporters accountable by requiring them to show the sources of their work.  It also helps readers find more information or deepen their research, if they want to."); Daniel Luzer, *Linked Out: One day, one story, one million hyperlinks*, Columbia Journalism Review, December 3, 2008, https://archives.cjr.org/overload/linked_out.php ("[T]he hyperlink is the building block of this democratization of information."); Mark Sableman, *Link Law Revisited: Internet Linking Law at Five Years*, 16 Berkeley Tech. L.J. 1273, 1276 (2001) ("Hypertext links

are the signature characteristic of the World Wide Web. . . . Both creation and use of hyperlinks are relatively simple tasks . . . ."); Porismita Borah, *The Hyperlinked World: A Look at How the Interactions of New Frames and Hyperlinks Influence News Credibility and Willingness to Seek Information*, 19 J. of Computer–Mediated Comm. 576, 579 (2014) ("On an individual level, hyperlinks can help readers understand an issue in depth; can provide an element of interactivity for the reader and can also increase the user's ability to control the information-seeking process.") (internal quotations and citations omitted).  Accordingly, the Court follows *Adelson* and rules that BuzzFeed can satisfy the fair report privilege by conspicuously hyperlinking to the CNN article.

The hyperlink here is conspicuous.  It appears in the body of the Article, within the words "CNN reported," which are written in blue.  *See* D.E. 1-2, p. 20.  Thus, when BuzzFeed published the Dossier, it explained (via the hyperlink) that the Dossier was the subject of official actions in the form of classified briefings by four intelligence directors to the President and President-elect, and an FBI investigation.

Plaintiffs next argue that even if there was official action, the Article does not state that there was any official action about the specific allegations in the Dossier relating to them.  This is incorrect.  The Dossier alleges that Plaintiffs were part of a cyber-operations scheme coordinated, at least in part, by Michael Cohen and the FSB.  The Article includes a statement from Michael Cohen denying all of the allegations in the Dossier.  Meanwhile, the hyperlinked CNN article reports that the classified briefings concerned allegations about communications between the Trump campaign and the Russians.  Thus, the official action as described would appear to include the allegations about Plaintiffs.  Regardless, it would undermine the privilege to require that one who reports on official action tie every specific allegation in the report to a

specific instance of official action.  *See, e.g.*, *Reuber*, 925 F.2d at 712 ("In return for frequent and timely reports on governmental activity, defamation law has traditionally stopped short of imposing extensive investigatory requirements on a news organization reporting on a governmental activity or document."); *see also Holy Spirit Ass'n,* 49 N.Y.2d at 68 (holding that the court should not dissect a report with "a lexicographer's precision.").

For these reasons, the Court cannot conclude as a matter of law that the Article is other than a fair and true report of an official proceeding.  *See Aguirre* 961 F. Supp. 2d at 457.  This does not dispose of the case, however, because application of the privilege turns on whether facts essential to its application are undisputed.  At this stage, the Court takes as true that the official actions described in the CNN article (the classified briefings and FBI investigation) actually occurred.  If discovery reveals that they did not, then there was, in fact, no official action.  *See Abakporo*, 2011 WL 4460547; *Test Masters Educ. Servs., Inc.*, 603 F. Supp. 2d 584 at 588; *Bloom v. Fox News of Los Angeles*, 528 F. Supp. 2d 69, 76 (E.D.N.Y. 2007).  It would, after all, be contrary to the purpose of the privilege to allow the press to falsely report that official action was underway in order to publish otherwise defamatory statements.  *See generally Williams v. Williams*, 23 N.Y.2d 592, 599, 298 N.Y.S.2d 473, 246 N.E.2d 333 (1969) ("[I]t was never the intention of the Legislature in enacting section 74 to allow 'any person' to maliciously institute a judicial proceeding alleging false and defamatory charges, and to then circulate a press release or other communication based thereon and escape liability by invoking the statute.")).

C.  **Neutral Report Privilege Under New York Law**

The neutral report privilege was first announced by the Second Circuit Court of Appeals in *Edwards v. National Audubon Society, Inc*.  556 F.2d 113 (2d Cir. 1977).  The court crafted the neutral report privilege as an expansion of the fair report privilege.  It applies when the press:

(1) publishes an accurate and disinterested report, (2) of serious charges against a public figure, (3) by a responsible, prominent organization, and (4) does not espouse or endorse the organization's statement.  *Id*. at 120.

New York law does not recognize this privilege.  Indeed, New York courts have roundly rejected *Edwards* as contrary to the policy underpinning the fair report privilege and contrary to Supreme Court precedent.  *See, e.g.*, *Hogan*, 84 A.D.2d at 478–79 ("We now hold that the rule of *Edwards v. National Audubon Society* does not apply in this department."), aff'd, 58 N.Y.2d 630; *Weiner v. Doubleday & Co.*, 74 N.Y.2d 586, 594, (N.Y. 1989) ("Indeed, in *Hogan . . .* we rejected a claim that a "neutral reporting" privilege should be extended to a newspaper that published an objective report of newsworthy charges with proper attribution to source.).

In rejecting *Edwards* the court in *Hogan* explained,

> The Supreme Court has not adopted *Edwards . . .* and in our view it is not possible to reconcile it with that court's prior decision in [*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)]. The unequivocal holding of *Gertz* is that a publisher's immunity is based upon the status of the plaintiff, not the subject matter of the publication. Presumably, all publications of the news media are newsworthy. They are not privileged, however, unless the publisher is free of culpable conduct under the standards stated in *New York Times v Sullivan* [376 U.S. 254 (1964)], *Gertz v. Robert Welch, Inc.* and, in *New York, Chapadeau v Utica Observer-Dispatch* [38 NY2d 196 (N.Y. Ct. App. 1975)].

84 A.D.2d at 479.  Additionally, the court explained, "[t]he privilege was extended and given constitutional status solely because the court perceived informational value to the public in the publication of the charges; they were newsworthy."  *Id*. at 478.

Because the Court agrees with Defendants that New York law applies to their asserted privileges, and because New York law does not recognize the neutral report privilege, Defendants may not claim its protection under New York law.

**B.  Neutral Report Privilege Under the United States' Constitution**

*Edwards* described the neutral report privilege as a constitutional privilege under the First Amendment.  556 F.2d at 120.  Therefore, notwithstanding the New York courts' rejection of the neutral report privilege, the Court must decide whether it agrees with and will follow *Edwards* as a constitutional matter.  For the reasons discussed below, the Court declines to follow *Edwards*.

First, the Supreme Court has not considered *Edwards* or the neutral report privilege. Neither has the Eleventh Circuit.  Of the other Circuit Courts, only the Eighth has followed *Edwards*.  *See Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1434 (8th Cir. 1989).  The Third has rejected *Edwards* outright.  *See Dickey v. CBS Inc.*, 583 F.2d 1221, 1226 (3d Cir.1978).  The Fourth, Seventh, Ninth, and Tenth Circuits have considered the privilege, but have not adopted it.  *See Lee v. Dong-A-Ilbo*, 849 F.2d 876, 878 (4th Cir.1988); *Woods v. Evansville Press Co., Inc.*, 791 F.2d 480, 489 (7th Cir.1986); *Weaver v. Oregonian Pub. Co.*, 878 F.2d 388 (9th Cir. 1989); *Dixson v. Newsweek, Inc.*, 562 F.2d 626, 631 (10th Cir.1977).

Second, the Court agrees with *Edwards*'s critics.  *Edwards* stands for the proposition that the press is free to publish defamatory statements provided the statements are newsworthy and originate from a source which is—in some amorphous sense—"trustworthy."  This cannot be reconciled with *Gertz* and *St. Amant v. Thompson*, 390 U.S. 727 (1968), which make liability for defamation dependent upon the public or private status of the plaintiff, and the defendant's knowledge as to the falsity of the statement.  Under *Edwards*, these considerations become irrelevant when the subject of the statement is newsworthy and provided to the press by a reliable source.  *See Dickey*, 583 F.2d 1226 n.5 (3d Cir. 1978) ("it appears that what triggers the existence of the constitutional privilege of neutral reportage, according to *Edwards*, is not whether the plaintiff is a public or private figure, but whether the statement published by the defendant is "newsworthy." . . . [in *Gertz*] the Court held that the application of the Sullivan

Standard[6] must be determined by reference to the public or private status of the plaintiff . . . instead of the content of the defamatory statement."). For these reasons, the Court declines to follow *Edwards*, and declines to recognize the neutral report privilege under the First Amendment.

**<u>CONCLUSION</u>**

For the reasons set forth above, it is hereby

ORDERED AND ADJUDGED that Plaintiff's Motion for Partial Judgment on the Pleadings (D.E. 115) is DENIED IN PART AND GRANTED IN PART. It is denied as to the fair report privilege and granted as to the neutral report privilege, which the Court hereby strikes from Defendants' amended answer.

DONE AND ORDERED in Chambers, Miami, Florida, this 2d_ day of June, 2018.

_____
URSULA UNGARO
UNITED STATES DISTRICT JUDGE

cc: counsel of record via cm/ecf

---

[6] *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).