2017 WL 1836801
Bloomberg Government
Copy (c) 2017 Provided under license from Bloomberg Government

Verbatim Transcript
May 08, 2017

Senate
Committee on the Judiciary, Subcommittee on Crime and Terrorism
Committee Hearing

Senate Committee on the Judiciary, Subcommittee on Crime and Terrorism
Hearing on Russian Interference in the 2016 United States Election

SENATE COMMITTEE ON THE JUDICIARY, SUBCOMMITTEE ON CRIME
AND TERRORISM HEARING ON RUSSIAN INTERFERENCE IN THE 2016
UNITED STATES ELECTION

MAY 8, 2017

SPEAKERS:
SEN. LINDSEY GRAHAM, R-S.C.
CHAIRMAN
SEN. JOHN CORNYN, R-TEXAS
SEN. TED CRUZ, R-TEXAS
SEN. BEN SASSE, R-NEB.
SEN. JOHN KENNEDY, R-LA.
SEN. CHARLES E. GRASSLEY, R-IOWA
EX OFFICIO

SEN. SHELDON WHITEHOUSE, D-R.I.
RANKING MEMBER
SEN. AMY KLOBUCHAR, D-MINN.
SEN. RICHARD J. DURBIN, D-ILL.
SEN. CHRIS COONS, D-DEL.
SEN. DIANNE FEINSTEIN, D-CALIF.
EX OFFICIO

SEN. PATRICK J. LEAHY, D-VT.
SEN. AL FRANKEN, D-MINN.
SEN. RICHARD BLUMENTHAL, D-CONN.
SEN. MAZIE K. HIRONO, D-HAWAII

WITNESSES:
SALLY Q. YATES,
FORMER ACTING ATTORNEY GENERAL

JAMES R. CLAPPER JR.,

FORMER DIRECTOR OF NATIONAL INTELLIGENCE

GRAHAM: The hearing will come to order, thank you all for
coming. Here's sort of the order of the day. I'll give a brief
opening statement along with Senator Whitehouse, then we'll have
Senator Grassley and Feinstein follow some questioning and it'll be
seven minute rounds initially and we'll try to do a second round of
five minutes. To both of the witnesses, thank you for coming.

I'll try to make this as reasonably short as possible and if you
need a break, please let us know. So people wonder what are we doing
and what are we trying to accomplish? In January, the intelligence
community unanimously said that the Russians through their
intelligence services tried to interfere in the 2016 American
presidential election, that it was the Russians who hacked Podesta's
e-mails.

It was the Russians who broke into the Democratic National
Committee and it was Russians who helped empower WikiLeaks. No
evidence that the Russians changed voting tallies, how people were
influenced by what happened only they know and God knows but I think
every American should be concerned about what the Russians did. From
my point of view, there's no doubt in my mind it was the Russians
involved in all the things I just described, not some 400 pound guy
sitting on a bed or any other country.

Russia is up to no good when it comes to democracies all over the
world. Dismembering the Ukraine, the Baltics are always under siege
by Russian interference, so why? We want to learn what the Russians
did, we want to find a way to stop them because they're apparently not
going to stop until somebody makes them. The hearing that was held
last week with Director Comey asked a question, is it fair to say that
Russian government still involved in American politics and he said
yes.
So I want House members and Senators to know it was the
presidential campaign in 2016, it could be our campaigns next. I
don't know what happened in France but somebody hacked into Mr.
Macron's account and we'll see who that may have been but this is sort
of what Russia does to try to undermine democracy. So what are we
trying to accomplish here?

GRAHAM: To validate the findings of the intelligence committee
as much as possible and to come up with a course of action as a nation
bipartisan in nature because it was the Democratic Party of 2016 were
the victims, could be the Republican Party of the future. When one
party's attacked, all of us should feel an attack. It should be an
Article 5 agreement between both major parties -- all major parties,
that when a foreign power interferes in our election, it doesn't
matter who they targeted, we're all in the same boat.

Secondly, the unmasking the 702 program. Quite frankly, when I
got involved in this investigation, I didn't know much about it.
Director Comey said the 702 program, which allows warrants for
intelligence gathering and a vital intelligence tool, I've learned to
bid about unmasking and what I've learned is disturbing.

So I don't know exactly all the details, what goes into unmasking
an American citizen, being incidentally surveilled when they involved
with a foreign agent. I'd like to know more and I want to make sure
that that unmasking can never be used as a political weapon in our
democracy, so I am all for hitting the enemy before they hit us,
intelligence gatherings essential.

But I do believe we need to take a look at the procedures
involved in 702, particularly how unmasking is requested, who can
request it and what can -- what -- what limitations exist, if any, on
how the information can be used. So that's why we're here.

We're here to find out all things Russia and the witnesses are
determined by the evidence and nothing else. And the 702
reauthorization will come before the Congress fairly soon and I, for
one, have a lot of questions I didn't have before.

I've enjoyed doing this with Senator Whitehouse, Senator
Feinstein and Grassley have been terrific. Let it be said that the
chairman and ranking member of this subcommittee have allowed us to do
our job, have empowered us and have been hands-on and it's much
appreciated.

And with that, I'll recognize Senator Whitehouse.

WHITEHOUSE: Thank you, Chairman Graham, for the important work
this subcommittee is doing understood your leadership investigating
the threat of Russian interference in our elections.

In January, America's intelligence community disclosed that the
Russian government on the orders of Vladimir Putin engaged in an
influence campaign throughout 2016. In March, FBI Director Comey
confirmed that, and I quote him here, "The FBI as part of its counter-
intelligence mission, is investigating the Russian government's
efforts to interfere in the 2016 election and that includes
investigating the nature of any links between individuals associated
with the Trump campaign and the Russian government and whether there
was any coordination between the campaign and Russia's efforts."

The FBI and the intelligence community's work is appropriately
taking place outside the public eye. Our inquiry serves broader aims.
To give a thorough public accounting of the known facts, to pose the

questions that still need answers and to help us determine how best to
protect the integrity and proper functioning of our government.

At the subcommittee's first hearing on March 15th, we heard from
expert witnesses about the Russian toolbox for interfering in the
politics of other countries. Now, we can ask which of these tools
were used against us, by the Russians, in 2016.

Here's a checklist, propaganda, fake news, trolls and bots. As
Clint Watts told the Senate Select Committee on Intelligence in March,
Russian state-sponsored media outlets, RT and Sputnik in the lead up
to the election, quote, "Turned out manipulated truths, false news
stories and conspiracies," end quote, providing a weaponized fake news
effort openly supporting Donald Trump's candidacy, quoting again,
"While consistently offering negative coverage of Secretary Clinton."

This was to again, quote, "Watch a deliberate, well organized,
well resourced, well funded, wide ranging effort," end quote, by
Russia, using trolls and bots to amplify its messages particularly
across social media. These facts are not disputed by any serious
person, so this is a yes on the checklist.

Hacking and theft of political information. Throughout 2015 and
2016, Russian intelligence services and state-sponsored hackers
conducted cyber operations against U.S. political targets, including
state and local election boards, penetrating networks probing for
vulnerabilities and stealing private information and e-mails.

Attribution of these crimes to Russian actors was confirmed in
our last hearing and by many other sources. So this is another yes.
Timed leaks of damaging material. Russian intelligence fronts,
cutouts and sympathetic organizations like Guccifer 2.0, dcleaks.com
and WikiLeaks, then time the release of stolen victim data to maximize
its political effect, manipulate public opinion and thereby, influence
the outcome of an election.

WHITEHOUSE: Long time Trump associate Roger Stone admits to
having interacted with Guccifer 2.0 and he foreshadowed released of
stolen data on Twitter in August and October 2016. Timing can matter.
On October 7th, just hours after the damaging Access Hollywood tapes
of Donald Trump were made public, WikiLeaks began publishing e-mails
stolen from Clinton campaign manager, John Podesta.

So yes, again. Assassination and political violence. Last
October, Russian military intelligence reportedly conspired to
assassinate the then prime minister of Montenegro as part of a coup
attempt.

In 2004, former Ukrainian prime minister, Viktor Yushchenko was

disfigured when he was poisoned in a suspected assassination attempt
by Russian agents. Russian opposition figures are routinely the
targets of state directed political violence.

Volodymyr [****] has survived two recent poisonings while
Boris Nemtsov was brazenly murdered near the Kremlin in 2015.
Thankfully we have no evidence of that happening here. Investment
control and key economic sectors.

We learned from Heather Connolly's testimony in our last hearing
that the Kremlin playbook is to manipulate other countries through
economic penetration. Heavily investing in critical sectors of the
target country's economic to create political leverage.

Putin's petro politics uses Russia's control of natural gas to
create political pressure. But no, as to that tactic here so far.
Shady business and financial ties. Russia exploits the dark shadows
of economic and political systems.

FBI Director Comey testified last week that the United States is
becoming the last big haven for Shell corporations where the opacity
of the corporate form allows the concealment of criminal funds and can
allow foreign money to directly and indirectly influence our political
system.

Since the citizens united decisions, we've seen unprecedented
dark money flow in our elections from 501(c)(4) organizations. We
don't know who's behind that dark money, or what they're demanding in
return.

Using Shell corporations and other devices, Russia establishes
elicit financial relationships to develop leverage against prominent
figures through the carrot (ph) of continued bribery or the stick of
threatened disclosure.

How about here? Well we know that President Trump has long
pursued business deals in Russia. He's reported to have done or
sought to do business there since the mid 1990s.

As he chased deals in Russia throughout the 2000s he deputized a
colorful character named Felix Sater to develop real estate projects
there under the Trump name. Sater's family has links to Russian
organized crime. And Felix himself has had difficulties with the law.

Sater said in a 2008 deposition that he would pitch business
ideas directly to Trump and his team on a constant basis. As recently
as 2010, Trump had a organization business card and an office in Trump
Tower.

Donald Trump Jr. said in September 2008 that he'd made half a
dozen trips in the preceding 18 months, noting that Russian investors
were heavily involved in Trump's New York real estate projects. We
see a lot of money pouring in from Russia, he said.

One Trump property in midtown Manhattan had become, within a few
years of opening, a prominent depository of Russian money, according
to a report in Bloomberg Business Week. So here, there are still big
questions.

Of course President Trump could clarify these questions by
releasing his business and personal tax returns.

Corrupting and compromising politicians. In testimony before the
judiciary committee last Wednesday, Director Comey acknowledged that
financial leverage has been exploited by Russian intelligence over
many decades.

Back to the days of -- day of Joseph Alsop, they used compromat
(ph) or compromising material to pressure and manipulate targeted
individuals with the prospect of damaging disclosures.

Has Russia compromised, corrupted, cultivated, or exerted
improper influence on individuals associated with President Trump, his
administration, his transition team, his campaign, or his businesses?
Another big question mark.

We know that President Trump has had in his orbit a number of
very Russia friendly figures. In August 2015, Trump first met
informally with Michael Flynn who as Director of the Defense
Intelligence Agency, had developed strong professional relationships
with Russian military intelligence.

In December of that year, Flynn traveled to Moscow for a paid
speaking appearance at an anniversary gala for RT (ph) where he was
briefly seated next to Vladimir Putin. Quite a seat for a retired
American General.

Two months after that trip, Flynn was reportedly serving as an
informal national security advisor to Trump. Trump identified a
little know energy investor named Carter Page as one of his foreign
policy advisors.

In late March 2016, Page told Bloomberg Politics that friends and
associates had been hurt by U.S. sanctions against Russia. And that
there's a lot of excitement in terms of the possibilities for creating
a better situation, end quote.

On April 27, 2016 Trump and several of his advisors, including

Jeff Sessions, met Sergey Kislyak, Russia's ambassador to United
States before a campaign speech. The speech which was hosted by the
Center for the National Interest had been arranged by Trump's son in
law, Jared Kushner. Kislyak attended the Trump Republican convention
and he told the Washington Post that he had multiple contacts with the
Trump campaign both before and after the election.

In the days after the November election, Russia's deputy foreign
minister confirmed that his government had communicated with the Trump
team during the campaign. And we know Michael Flynn spoke with
Ambassador Kislyak on December 29, the same day President Obama
announced punitive sanctions against Russia for its interference in
the 2016 election.

Trump transition and administration officials thereafter made
false statements to the media and the public about the content of
Flynn's conversations with Kislyak apparently as a result of Flynn
having misled them. This eventually led President Trump to ask for
Flynn's resignation, something I'm hoping Ms. Yates can shed some
light on in her testimony today.

The president and his administration have yet to take
responsibility for or explain these and other troubling Russia links,
dismissing facts as fake news and downplaying the significance of
individuals involved. More than 100 days into the Trump
administration and nearly two years since he declared his candidacy
for president, only one person has been held accountable for improper
contacts with Russia; Michael Flynn.

Even then, the Trump administration has maintained that Flynn's
communications with the ambassador were not in fact improper. He
simply lost the confidence of the president. We need a more thorough
accounting of the facts. Many years ago, an 18 minute gap transfixed
the country and got everybody's attention in another investigation.
In this case, we have an 18 day gap between the notification of the
White House that a senior official had potentially been compromised
and action taken against that senior official's role.

At best the Trump administration has displayed serious errors of
judgment, at worst these irregularities may reflect efforts at
compromise or corruption at the hands of Russian intelligence. My
sincere hope is that this hearing and those to come will help us find
out. Thank you, Chairman.

GRAHAM: Our two witnesses are well known and will be sworn in
but Mr. Clapper, the former director of national intelligence has
served his country for decades in uniform and out and dedicated his
life to intelligence gathering and we appreciate that. Ms. Yates was
the former deputy attorney general, is well respected by people in the

legal profession. Thank you both for coming.

If you'll please rise. Raise your right hand, please. Do you
affirm that testimony you're about to give this subcommittee is the
truth, the whole truth, and nothing but the truth so help you God?

YATES: (OFF MIKE)

GRAHAM: Mr. Clapper.

CLAPPER: (OFF MIKE). Chairman Graham, Ranking Member Whitehouse
and members of the subcommittee, certainly didn't expect to be before
this committee or any other committee of the Congress again so soon
since I thought I was all done with this when I left the government.
And this is only my first of two hearings this week. But
understandably, concern about the egregious Russian interference in
our election process is so critically serious as to merit focus,
hopefully bipartisan focus by the Congress and the American people.

Last year, the intelligence community conducted an exhaustive
review of Russian interference into our presidential election process
resulting in a special intelligence community assessment or ICA as we
call it. I'm here today to provide whatever information I can now as
a private citizen on how the intelligence community conducted its
analysis, came up with its findings, and communicated them to the
Obama administration, to the Trump transition team, to the Congress
and in unclassified form to the American public.

Additionally, I'll briefly address four related topics that have
emerged since the ICA was produced. Because of both classification
and some executive privilege strictures (ph) requested by the White
House, there are limits to what I can discuss. And of course my
direct official knowledge of any of this stopped on 20 January when my
term of office was happily over.

As you know, the I.C. was a coordinated product from three
agencies; CIA, NSA, and the FBI not all 17 components of the
intelligence community. Those three under the aegis of my former
office. Following an extensive intelligence reporting about many
Russian efforts to collect on and influence the outcome of the
presidential election, President Obama asked us to do this in early
December and have it completed before the end of his term.

The two dozen or so analysts for this task were hand-picked,
seasoned experts from each of the contributing agencies. They were
given complete, unfettered mutual access to all sensitive raw
intelligence data, and importantly, complete independence to reach
their findings. They found that the Russian government pursued a
multifaceted influence campaign in the run-up to the election,

including aggressive use of cyber capabilities.

The Russians used cyber operations against both political
parties, including hacking into servers used by the Democratic
National Committee and releasing stolen data to WikiLeaks and other
media outlets. Russia also collected on certain Republican Party-
affiliated targets, but did not release any Republican-related data.
The Intelligence Community Assessment concluded first that
President Putin directed and influenced campaign to erode the faith
and confidence of the American people in our presidential election
process. Second, that he did so to demean Secretary Clinton, and
third, that he sought to advantage Mr. Trump. These conclusions were
reached based on the richness of the information gathered and analyzed
and were thoroughly vetted and then approved by the directors of the
three agencies and me.

These Russian activities and the result and (ph) assessment were
briefed first to President Obama on the 5th of January, then to
President-elect Trump at Trump Tower on the 6th and to the Congress
via a series of five briefings from the 6th through the 13th of
January. The classified version was profusely annotated, with
footnotes drawn from thousands of pages of supporting material. The
key judgments in the unclassified version published on the 6th of
January were identical to the classified version.

While it's been over four months since the issuance of this
assessment, as Directors Comey and Rodgers testified before the House
Intelligence Committee on the 20th of March, the conclusions and
confidence levels reached at the time still stand. I think that's a
statement to the quality and professional of the -- of the
intelligence community people who produced such a compelling
intelligence report during a tumultuous, controversial time, under
intense scrutiny and with a very tight deadline.

Throughout the public dialogue about the issue over the past few
months, four related topics have been raised that could use some
clarification. I'd like to take a few moments to provide - attempt to
provide that clarification.

First, I want to address the meaning of quote, "unmasking," which
is an unofficial term that's appeared frequently in the media in
recent months and was often I think misused and misunderstand. So it
frequently happens that in the course of conducting lawfully
authorized electronic surveillance on validated foreign intelligence
targets, the collecting agency picks up communications involving U.S.
persons, either their direct interface with a validated foreign
intelligence target or where there is discussion about those U.S.
persons by validated foreign intelligence targets. Under intelligence
community minimization procedures, the identities of these U.S.

persons are typically masked in reports that go out to intelligence
consumers and they're referred to each report at a time as U.S. person
one, U.S. person two, et cetera.

However, there are cases when, to fully understand the context of
the communication that has been obtained or the threat that is posed,
the consumer of that collected intelligence may ask the identity of
the U.S. person be revealed. Such requests explain why the unmasking
is necessary and that explanation is conveyed back to the agency that
collected the information. It is then up to that agency whether to
approve the request and to provide the identity. And if the U.S.
person's identity is revealed, that identity is provided only to the
person who properly requested it, not to a broader audience.
This process is subject to oversight and reporting, and in the
interest of transparency, my former office publishes a report on the
statistics of how many U.S. persons' identities are unmasked based on
collection that occurred under section 702 of the FISA Amendment Act,
which I'll speak to in a moment. And in 2016, that number was 1,934.
On several occasions during my six and a half years as DNI, I
requested the identity of U.S. persons to be revealed. In each such
instance, I made these requests so I could fully understand the
context of the communication and the potential threat being posed.

At no time did I ever submit a request for personal or political
purposes or to voyeuristically look at raw intelligence nor am I aware
of any instance of such abuse by anyone else.

Second is the issue of leaks. Leaks have been conflated with
unmaskings in some of the public discourse, but they are two very
different things. An unmasking is a legitimate process that consists
of a request and approval by proper authorities, as I've just briefly
described. A leak is an unauthorized disclosure of classified or
sensitive information that is improper under any circumstance.

I've long maintained during my 50-plus year career in
intelligence that leaks endanger national security, they compromise
sources, methods and tradecraft and they can put assets' lives at
risk. And for the record, in my long career, I've never knowingly
exposed classified information in an inappropriate manner.

Third is the issue of counterintelligence investigations
conducted by the Federal Bureau of Investigation. While I can't and
won't comment in this setting on any particular counterintelligence
investigation, it's important to understand how such investigations
fit into and relate to the intelligence community and at least the
general practice I followed during my time as DNI with respect to FBI
counterintelligence investigations.

When the intelligence community obtains information suggesting

that a U.S. person is acting on behalf of a foreign power, the standard procedure is to share that information with the lead investigatory body, which of course is the FBI. The bureau then decides whether to look into that information and handles any ensuing investigation if there is one. Given its sensitivity, even the existence of a counterintelligence investigation's closely held, including at the highest levels.

During my tenure as DNI, it was my practice to defer to the FBI director, both Director Mueller and then subsequently Director Comey, on whether, when and to what extent they would inform me about such investigations. This stems from the unique position of the FBI, which straddles both intelligence and law enforcement. And as a consequence, I was not aware of the counterintelligence investigation Director Comey first referred to during his testimony before the House Permanent Select Committee for Intelligence on the 20th of March, and that comports with my public statements.

Finally I'd like to comment on Section 702 of the Foreign Intelligence Surveillance Act Amendment Acts, as it's called, what it governs and why it's vital. This provision authorizes the Foreign Intelligence Surveillance Court to approve electronic surveillance of non-U.S. person, let me repeat that, non-U.S. person, foreign intelligence targets outside the United States. Section 702 has been a tremendously effective tool in identifying terrorists and other threats to us, while at the same time protecting the privacy and civil liberties of U.S. persons.

And as the - as Chairman Graham indicated, Section 702 is due for reauthorization by Congress this year. It was renewed in 2012 for five years and it expires on 31 December of this year. With so many misconceptions flying around, it would be tragic for Section 702 to become a casualty of misinformation and for us to lose a tool that is so vital to the safety of this nation.

In conclusion, Russia's influence activities in the run-up to the 2016 election constituted the high water mark of their long running efforts since the 1960s to disrupt and influence our elections. They must be congratulating themselves for having exceeded their wildest expectations with a minimal expenditure of resource. And I believe they are now emboldened to continue such activities in the future both here and around the world, and to do so even more intensely. If there has ever been a clarion call for vigilance and action against a threat to the very foundation of our democratic political system, this episode is it.

I hope the American people recognize the severity of this threat and that we collectively counter it before it further erodes the fabric of our democracy.

I'll now turn to my former colleague, Acting Attorney General
Sally Yates, for any remarks that she has to make.

YATES: Thank you. Chairman Graham, Ranking Member Whitehouse
and distinguished members of the subcommittee, I'm pleased to appear
before you this afternoon on this critically important topic of
Russian interference in our last presidential election and the related
topics that this subcommittee is investigating.

For 27 years, I was honored to represent the people of the United
States with the Department of Justice. I began as an assistant United
States attorney in Atlanta in the fall of 1989, and like all
prosecutors, I investigated and tried cases and worked hard to try to
ensure the safety of our communities and that those who violated our
laws were held accountable. Over time, through five Republican and
Democratic administrations, I assumed greater leadership positions
within the department.

In the U.S. Attorney's Office in Atlanta, I served as chief of
the fraud and public corruption section as first assistant United
States attorney and then was appointed United States attorney. And
then, I had the privilege of serving as deputy attorney general for a
little over two years, and finally, the current administration asked
me to stay on as acting attorney general.

Throughout my time at the department, I was incredibly fortunate
to be able to work with the talented career men and women at the
Department of Justice, who followed the facts and applied the law with
tremendous care and dedication and who are, in fact, the backbone of
the Department of Justice.

And at every step, in every position, from AUSA to acting
attorney general, I always try to carry out my responsibility to seek
justice in a way that would engender the trust and the confidence of
the people whom I served. I want to thank this subcommittee for
conducting an impartial and thorough investigation of this vitally
important topic.

The efforts by a foreign adversary to interfere and undermine our
Democratic processes and -- and those of our allies pose a serious
threat to all Americans. This hearing and others this subcommittee
has conducted and will be conducting in the future are an important
bipartisan step in understanding the threat and the best ways to
confront it going forward.

As the intelligence community assessed in its January of 2017
report, Russia will continue to develop capabilities to use against
the United States and we need to be ready to meet those threats. I

sincerely appreciate the opportunity to take part in today's
discussion.

Now, I want to note that in my answers today, I intend to be as
fulsome and as comprehensive as possible, while respecting my legal
and ethical boundaries. As the subcommittee understands, many of the
topics of interest today concern classified information that I cannot
address in this public setting.

My duty to protect classified information applies just as much as
a former official, as it did when I led the department. In addition,
I'm obviously no longer with the Department of Justice and I am not
authorized to generally discuss deliberations within DOJ or more
broadly, within the executive branch, particularly on matters that may
be the subject of ongoing investigations.

I take those obligations very seriously. And I appreciate the
subcommittee's shared interest in protecting classified information
and preserving the integrity of any investigations that the Department
of Justice may now be conducting.

I look forward to answering your questions. Thank you.

GRAHAM: Senator Grassley, would you like to make a statement?

GRASSLEY: [****]

GRAHAM: OK.

GRASSLEY: I don't want to.

GRAHAM: OK.

GRASSLEY: I've got questions.

GRAHAM: All right, you'll get to ask them.
Senator Feinstein?

FEINSTEIN: Thank you very much, Mr. Chairman and I'll be very
brief. We have prepared for the committee and I'd like to ask the
staff to distribute it, a background and time line on Lieutenant
General Michael Flynn and some of the key dates involved, which may be
of help to the subcommittee.

And I would just like to take this opportunity to thank the
subcommittee, Chairman Graham and -- and the Ranking Member
Whitehouse, I think you've done a good job and your whole subcommittee
has. And so thank you very, very much.

I'd just like to make a few comments, if I might, and put all the remarks in the record. I think it is a foregone conclusion about Russia's involvement and we see it replicated even in the French election, perhaps not to the extent or in the way, but certainly replicated.

On February 9th, 2017, the Washington Post reported that either Flynn had misled the vice president or that Pence had misspoken. Lieutenant General Flynn resigned his post on February 13th, four days after the Post broke this story. There are still many unanswered questions about General Flynn, including who know what -- who knew what and when.

For example, the press is now reporting that in addition to the warning from Sally Yates, concerns were raised by former President Obama directly to then President-elect Trump, 95 days before Flynn resigned. So the question, what role did Flynn play in communications with the Russians, both after the first warning by President Obama and then after the warning by Sally Yates? And I hope to ask that today. What role did Flynn play in high-level national security decisions, again both during the 95 days and the 18 days when the White House was on notice?

So, I look forward to hearing more about this from you, acting Attorney General Yates. You have stated that you warned the White House on January 26, nearly three weeks before Flynn resigned that he had not been truthful and might be vulnerable to Russian blackmail.

And finally, there are other troubling questions regarding Russia's relationships and connections with Trump advisors and associates. And there are questions about whether anyone was the target of Russian intelligence, either to be exploited or cultivated.

So, I will put my whole remarks in the record, Mr. Chairman. And I hope to ask some questions around these few comments. Thank you very much for this opportunity.

GRAHAM: Yes, ma'am, without objections.

WHITEHOUSE: Mr. Chairman, may I also put into the record a letter dated November 18, 2016 from the ranking member on the House Committee on Oversight Government Reform, Representative Elijah Cummings, giving then Vice President-elect Pence notice about certain -- what he called apparent conflicts of interest regarding General Flynn?

GRAHAM: Without objection. General Clapper, on March 5, 2017, you said the following to a question. Here's the question.

Does intelligence exist that can definitely answer the following
question, whether there were improper contacts between the Trump
campaign and Russian officials? You said we did not include any
evidence in our report.

And I say our, that's the NSA, the FBI, the CIA, with my office,
the Director of National Intelligence, that had anything -- that had
any reflection of collusion between members of the Trump campaign and
the Russians. There was no evidence of that included in our report.

Chuck Todd (ph) then asked, I understand that, but does it exist?
You say no, not to my knowledge. Is that still accurate?

CLAPPER: It is.

GRAHAM: Ms. Yates, do you have any evidence -- are you aware of
any evidence that would suggest that in the 2016 campaign anybody in
the Trump campaign colluded -- colluded with the Russian government
intelligence services in improper fashion?

YATES: And Senator, my answer to that question would require me
to reveal classified information. And so, I -- I can't answer that.

GRAHAM: Well, I don't get that because he just said he issued
the report. And he said he doesn't know of any. So, what would you
know that's not in the report?

(CROSSTALK)

CLAPPER: Are you asking me, or...

GRAHAM: No, her.

CLAPPER: Oh.

YATES: Well, I think that Director Clapper also said that he was
unaware of the FBI counter intelligence investigations.

GRAHAM: Would it be fair to say that the counter-intelligence
investigation was not mature enough to come to his -- to get in the
report. Is that fair, Mr. -- Mr. Clapper?

CLAPPER: I -- that's an -- that's a possibility.

GRAHAM: What I don't get is how the FBI can have a counter-
intelligence investigation suggesting collusion, and you, as director
of National Intelligence not know about it, and the FBI sign on to a
report that basically said there was no collusion.

CLAPPER: I can only speculate why that's so. There wasn't --
the evidence, if there was any, didn't reach the evidentiary bar in
terms of the level of confidence that we were striving for in that
intelligence community assessment.

GRAHAM: OK, that makes perfect sense to me. Follow up on that,
are you familiar with a dossier about Mr. Trump compiled with some guy
in England?

CLAPPER: I am.

GRAHAM: Did you find that to be a credible report?

CLAPPER: Well, we didn't make a judgment on that. And that's --
that's one reason why we did not include it in the body of our
intelligence community assessment.

GRAHAM: You didn't find it credible enough to be included?

CLAPPER: We couldn't corroborate the sourcing, particularly the
second -- third-order sources.

GRAHAM: Ms. Yates, are you familiar with the dossier?

YATES: (OFF-MIKE)

CLAPPER: Microphone.

GRAHAM: Microphone.

YATES: If I could try to clarify one answer before as well,
because I think, Senator Graham, you may have misunderstood me. You
asked me whether I was aware of any evidence of collusion, and I
declined to answer because answering would reveal classified
information.

I believe that that's the same answer that Director Comey gave to
this committee when he was asked this question as well. And he made
clear, and I'd like to make clear, that just because I say I can't
answer it, you should not draw from that an assumption that that means
that the answer is yes.

GRAHAM: OK, fair enough.

CLAPPER: I also think, if I may, sir, that this illustrates what
I was trying to get at in my statement about the unique position that
FBI straddles between intelligence and law enforcement.

GRAHAM: I just want the country to know that whatever they're

doing on the counterintelligence side, Mr. Clapper didn't know about
it, didn't make it in the report and we'll see what comes from it.
Ms. Yates, what did you tell the White House about Mr. Flynn?

YATES: I had two in-person meetings and one phone call with the
White House Counsel about Mr. Flynn. The first meeting occurred on
January 26, called Don McGahn first thing that morning and told him
that I had a very sensitive matter that I needed to discuss with him,
that I couldn't talk about it on the phone and that I needed to come
see him. And he agreed to meet with me later that afternoon.

I took a senior member of the national security division who was
overseeing this matter with me to meet with Mr. McGahn. We met in his
office at the White House which is a skiff (ph) so we could discuss
classified information in his office. We began our meeting telling
him that there had been press accounts of statements from the vice
president and others that related conduct that Mr. Flynn had been
involved in that we knew not to be the truth.

And as I - as I tell you what happened here, again I'm going to
be very careful not to reveal classified information.

GRAHAM: Well the reason you knew it wasn't true was because you
had collected some intelligence from an incidental collection system,
is that fair to say?

YATES: And I can't answer that because that again would call me
- for me to reveal classified information.

GRAHAM: Let me ask you this, did anybody ever make a request to
unmask the conversation between the Russian ambassador and Mr. Flynn?

YATES: And again, Senator, I can't answer a question like that,
it would call for classified information...

GRAHAM: ...Mr. Clapper, do you know if that was the case?

CLAPPER: I don't.

GRAHAM: Is there a way to find that out?

CLAPPER: Well, in another setting it could be discussed.

GRAHAM: But there is a record somewhere of who would make a
request to unmask the conversation with General Flynn and the Russian
ambassador?

CLAPPER: Well, I'm...

2017 WL 7538609, 2017 WL 8368941 (2017)

GRAHAM: ...If one was made, there'd be a record of it?

CLAPPER: I can't speak to this specific case but I can generally comment that in the case of 702 requests, yes, those are all documented.

GRAHAM: OK and I don't mean to interrupt you but this is important to me. How did the conversation between the Russian ambassador and Mr. Flynn make it to the "Washington Post?"

YATES: Which one of us are you asking?

GRAHAM: Ms. Yates.

CLAPPER: That's a great question.

GRAHAM: I thought so...

CLAPPER: ...All of us would like to know that and I don't know the answer to that.

YATES: Yeah. Nor do I know the answer to that.

GRAHAM: Is it fair to say that if somebody did make an unmasking request, we would know who they were and we could find out from them who they shared the information with? Is that fair to say, the system would allow us to do what I just described?

YATES: Well, unmasking requests are not made to the Department of Justice.

GRAHAM: No but to the agency who does the collection.

YATES: That's my understanding is that yes...

GRAHAM: ...So there should be a record somewhere in our system whether or not an unmasking request was made for the conversation between Mr. Flynn and the Russian ambassador. We should be ale to determine if it did - if it was made, who made it. Then we can ask, what did they do with the information? Is that a fair statement, Mr. Clapper?

CLAPPER: Yes.

GRAHAM: OK. Now what did you finish? What did you tell the White House?

YATES: So I told them again that there were a number of press accounts of statements that had been made by the vice president and

other high-ranking White House officials about General Flynn's conduct
that we knew to be untrue. And we told them how we knew that this -
how we had this information, how we had acquired it, and how we knew
that it was untrue.

And we walked the White House Counsel who also had an associate
there with him through General Flynn's underlying conduct, the
contents of which I obviously cannot go through with you today because
it's classified. But we took him through in a fair amount of detail
of the underlying conduct, what General Flynn had done, and then we
walked through the various press accounts and how it had been falsely
reported.

We also told the White House Counsel that General Flynn had been
interviewed by the FBI on February 24. Mr. McGahn asked me how he did
and I declined to give him an answer to that. And we then walked
through with Mr. McGahn essentially why we were telling them about
this and the first thing we did was to explain to Mr. McGahn that the
underlying conduct that General Flynn had engaged in was problematic
in and of itself.

Secondly, we told him we felt like the vice president and others
were entitled to know that the information that they were conveying to
the American people wasn't true. And we wanted to make it really
clear right out of the gate that we were not accusing Vice President
Pence of knowingly providing false information to the American people.

And, in fact, Mr. McGahn responded back to me to let me know that
anything that General Flynn would've said would have been based --
excuse me -- anything that Vice President Pence would have said would
have been based on what General Flynn had told him.

We told him the third reason was -- is because we were concerned
that the American people had been misled about the underlying conduct
and what General Flynn had done, and additionally, that we weren't the
only ones that knew all of this, that the Russians also knew about
what General Flynn had done.

And the Russians also knew that General Flynn had misled the vice
president and others, because in the media accounts, it was clear from
the vice president and others that they were repeating what General
Flynn had told them, and that this was a problem because not only did
we believe that the Russians knew this, but that they likely had proof
of this information.

And that created a compromise situation, a situation where the
national security adviser essentially could be blackmailed by the
Russians. Finally, we told them that we were giving them all of this
information so that they could take action, the action that they

deemed appropriate.

I remember that Mr. McGahn asked me whether or not General Flynn
should be fired, and I told him that that really wasn't our call, that
was up to them, but that we were giving them this information so that
they could take action, and that was the first meeting.

GRAHAM: Thank you, and I'll go to Senator Whitehouse -- one very
quick question. Was...

YATES: Yeah.

GRAHAM: ... are you either one of you aware of incidental
collection by our intelligence community -- of any presidential
candidate, staff or campaign during the 2016 election cycle?

CLAPPER: Say that again, sir. I'm sorry (ph).

GRAHAM: Was there any incidental collection, where our
intelligence community collects information, involving a presidential
candidate on either side of the aisle during 2015 or 2016?

CLAPPER: No, not to my knowledge.

YATES: I believe Director Comey was also asked this question and
declined to answer it, so I'm -- I need to follow the same lines the
DOJ has drawn. Again, you should not draw from that that my answer is
yes, but rather, that the answer would require me to reveal classified
information.

GRAHAM: Thank you.

Senator Whitehouse.

CLAPPER: My -- my response is all within the context of
intelligence -- foreign intelligence, not the domestic consideration.

YATES: (OFF-MIKE)

GRAHAM: Exactly.

WHITEHOUSE: Following the Comey line, the director testified a
few days ago in the full committee that the FBI had interviewed Mr.
Flynn a day before, or two days before, your meeting at the White
House, and you've just testified that you had told the White House
counsel that the FBI had interviewed Flynn and he'd asked -- McGahn
had asked, how'd he do?

YATES: Right.

WHITEHOUSE: Did you have the 302 with you when you were in the White House? Did you show it to White House counsel? And had you seen it at the time you went up to the White House?

YATES: No. The FBI had conducted the interview on the 24th. We got a readout from the FBI on the 25th, a detailed readout specifically from the agents that had conducted the interview.

But we didn't want to wait for the 302, because we felt that it was important to get this information to the White House as quickly as possible, so we had folks from the national security division who spent a lot of time with the agents, not only finding out exactly how the interview went but how this impacted their investigation.

WHITEHOUSE: So did you take that summary with you? Do you have any document with you that described the FBI interview of General Flynn?

YATES: At the time that I was there, I had notes that described that interview, as well as the individual that was with me -- the senior career official from the national security division -- had been part of all of those discussions with the FBI.

WHITEHOUSE: Did you discuss criminal prosecution of Mr. Flynn -- General Flynn?

YATES: My recollection is that did not really come up much in the first meeting. It did come up in the second meeting, when Mr. McGahn called me back the next morning and asked the -- the morning after -- this is the morning of the 27th, now -- and asked me if I could come back to his office.

And so I went back with the NSD official, and there were essentially four topics that he wanted to discuss there, and one of those topics was precisely that. He asked about the applicability of certain statutes, certain criminal statutes and, more specifically, about...

WHITEHOUSE: This was (ph) the second meeting at the White House Council's Office in his office again?

YATES: In his office again.

WHITEHOUSE: With the same two individuals?

YATES: Exactly.

WHITEHOUSE: On the following day?

YATES: Right.

WHITEHOUSE: And you went back pursuant to a phone call request
or a -- was...

YATES: Yes, the morning of the 27th after our meeting had
occurred on the afternoon of the 26th, the morning of the 27th, Mr.
McGann called me and asked if I could come back to the White House to
discuss this further. And we set up a time and I went over there that
afternoon, bringing again the same career official with me from the
national security division, who was overseeing this investigation.

He had the same associate from the White House Council's Office
and we talked through four to five more issues.

WHITEHOUSE: You could perhaps have waited until you actually had
seen the agents 302 from the interview of General Flynn. Why go ahead
of that? Why not wait?

YATES: Well, because this was a matter of some urgency, we...

WHITEHOUSE: Describe.

YATES: In making the determination about notification here, we
had to balance a variety of interest. For the reasons that I just
described a few minutes ago, we felt like it was critical that we get
this information to the White House, because in part because the vice
president was unknowingly making false statements to the public and
because we believed that General Flynn was compromised with respect to
the Russians.

We were balancing this though, against the FBI's investigation,
as you would always do, and take into account the investigating
agency's desires and concerns about how a notification might impact
that ongoing investigation. But once General Flynn was interviewed,
there was no longer a concern about an impact on an investigation.

WHITEHOUSE: Do you know where that interview took place or under
what circumstances?

YATES: I believe it took place at the White House.

WHITEHOUSE: The Flynn interview?

YATES: Yes.

WHITEHOUSE: OK. Do you know if Flynn was represented by council
at the time?

YATES: I don't believe he was.

WHITEHOUSE: OK. And the scenario that you were concerned about was that you were seeing all these statements coming from the White House that were inconsistent with what you knew, you presumed that the White House was being truthful which meant that Flynn was misleading them.

YATES: Right.

WHITEHOUSE: Which meant that he was vulnerable to manipulation by the Russians, who knowing what had actually taken place could call up the national security advisor to the president and say, you got to do this for us or we're going to out you with all your folks and your career is done.

YATES: That's right, because one of the questions that Mr. McGann asked me when I went back over the second day was essentially, why does it matter to DOJ if one White House official lies to another White House official?

And so we explained to him, it was a whole lot more than that and went back over the same concerns that we had raised with them the prior day, that the concern first about the underlying conduct itself, that he had lied to the vice president and others, the American public had been misled.

And then importantly, that every time this lie was repeated and the misrepresentations were getting more and more specific, as -- as they were coming out. Every time that happened, it increased the compromise and to state the obvious, you don't want your national security advisor compromised with the Russians.

WHITEHOUSE: Were there any takeaways from the first meeting or action items that you left with?

YATES: Well, there was an action item in the second meeting because I got -- we talked about several issues but...

WHITEHOUSE: To get the order right, you said earlier that there were two meetings and a phone call.

YATES: Right.

WHITEHOUSE: Was the phone call the phone call that set up the second meeting or was there a third...

YATES: There was a third substantive phone call. There was a...

WHITEHOUSE: Go ahead, I can...

YATES: Sorry about that. One of the -- one of the issues that
Mr. McGann raised with me in this second meeting that again was on the
27th, the day after the first meeting, was his concern because we had
told him before that we were giving him this information so that they
could take action.

And he said that they were concerned that taking action might
interfere with the
FBI investigation. And we told him, both the senior career official
and I, that he should not be concerned with it, that General Flynn had
been interviewed, that their action would not interfere with any
investigation and in fact, I remember specifically saying, you know it
wouldn't really be fair of us to tell you this and then expect you to
sit on your hands.
WHITEHOUSE: Was the interview of General Flynn accelerated once
you became aware of this information and felt you needed to get his
statement quickly?

YATES: Well, we had wanted to tell the White House as quickly as
possible and we're working with the FBI and in the course of the
investigation but certainly, we did...

(CROSSTALK)

WHITEHOUSE: And the first thing you know is that you have
information that one thing was said and the White House is saying
something different. And you know that that information irrespective
of who is involved needs to get up to the White House quickly. And so
at that point, the decision was made to do the interview so that that
was locked down before you went up to White House counsel?

YATES: Right, so that that would not have a negative impact on
the FBI investigation at that point.

And there was a request made by Mr. McGahn, in the second meeting
as to whether or not they would be able to look at the underlying
evidence that we had that we had described for him of General Flynn's
conduct. And we told him that we were inclined to allow them to look
at that underlying evidence, that we wanted to go back to DOJ and be
able to make the logistical arrangements for that. This second
meeting on the 27th occurred late in the afternoon, this is Friday the
27th. So we told him that we would work with the FBI over the
weekend on this issue and get back with him on Monday morning. And I
called him first thing Monday morning to let him know that we would
allow them to come over and to review the underlying evidence.

WHITEHOUSE: And was that the phone call or is there a separate phone call?

YATES: There was the phone call initially to let him know I needed to come see him.

WHITEHOUSE: Yeah?

YATES: Two meetings and then a phone call at the end to let him know...

WHITEHOUSE: That the material was available if he wanted to see it.

YATES: ... that the material was available. He had to call me back. He was not available then and I did not hear back from him until that afternoon of Monday the 30th.

WHITEHOUSE: And that was the end of this episode, nobody came over to look at the material?

YATES: I don't know what happened after that because that was my last day with DOJ.

WHITEHOUSE: Got it. OK.

(LAUGHTER)

GRAHAM: Senator Grassley.

GRASSLEY: Mr. Clapper, you said that you've never exposed classified information in an inappropriate manner. I asked Director Comey these questions last week, so for both of you, yes or no. As far as you know, has any classified information relating to Mr. Trump or his associates been declassified and shared with the media?

CLAPPER: Not to my knowledge.

GRASSLEY: Ms. Yates?

YATES: Not to my knowledge either.

GRASSLEY: OK. Next question; have either of you ever been an anonymous source in a news report about matters relating to Mr. Trump, his associates or Russia's attempt to meddle in the election?

CLAPPER: No.

YATES: Absolutely not.

GRASSLEY: OK. Third question; did either of you ever authorize someone else at your respective organizations to be an anonymous source in a news report about Mr. Trump or his associates?

CLAPPER: No.

YATES: No.

GRASSLEY: OK. As far as either of you know, have any government agencies referred any of the leaks over the past several months to the Justice Department for potential criminal investigation?

CLAPPER: I don't know. As you know, Senator, there is a process for that -- for doing that. I don't know if that -- that's happened.

GRASSLEY: Ms. Yates?

YATES: I'm not at DOJ anymore, so I don't know what's been referred.

GRASSLEY: So then I guess to kind of sum up, neither one of you know whether the department authorized a criminal investigation of the leaks?

CLAPPER: I do not, sir.
YATES: No, sir.

GRASSLEY: OK. Have any of you been questioned by the FBI about any leaks?

CLAPPER: I have not been.

YATES: No.

GRASSLEY: OK. I want to discuss unmasking.

Mr. Clapper and Ms. Yates, did either of you ever request the unmasking of Mr. Trump, his associates or any member of Congress?

CLAPPER: Yes, in one case I did that I can specifically recall, but I can't discuss it any further than that.

GRASSLEY: You can't, so if I ask you for details, you said you can't discuss that, is that what you said?

CLAPPER: Not -- not here.

GRASSLEY: OK.

Ms. Yates, can you answer that question? Did you ever request unmasking of Mr. Trump, his associates or any member of Congress?

YATES: No.

GRASSLEY: Question two. Did either of you ever review classified documents in which Mr. Trump, his associates or members of Congress had been unmasked?

CLAPPER: Yes.

GRASSLEY: You have? Can you give us details here in this...

CLAPPER: No, I can't.

GRASSLEY: Ms. Yates, have you?

YATES: Yes, I have and no, I can't give you details.

GRASSLEY: OK. Did either of you ever share information about unmasked (ph) Trump associates or members of Congress with anyone else?

CLAPPER: Well, I'm thinking back over six and a half years, I could have discussed it with either my deputy or my general counsel.

GRASSLEY: Ms. Yates?

YATES: In the course of the Flynn matter, I had discussions with other members of the intel community. I'm not sure if that's responsive to your question.

GRASSLEY: And in both cases, you can't give details here.

YATES: No.

CLAPPER: No.

GRASSLEY: The FBI notified the Democratic National Committee of the Russian's intrusion into their systems in August of 2015, but the DNC turned down the FBI's offer to get the Russians out and refused the FBI access to their servers. Instead, it evidently eventually hired a private firm in the spring of 2016. WikiLeaks began releasing the hacked DNC e-mails last July. It took roughly 27,000 of the 27,500 DNC e-mails it released were e-mails sent after the FBI notified the DNC of the breach.

Mr. Clapper, would you agree that one of the lessons of this
episode is that people should cooperate with the FBI when notified of
foreign hacks instead of stone walling?

CLAPPER: Yes, sir. I generally think that's a very good idea.

GRASSLEY: Mr. Clapper, you sent the Russians -- you said the
Russians did not release any negative information on Republican
candidates. I believe that that's not quite right. On June the 15th,
2016, Guccifer 2.0 released to Gawker and The Smoking Gun more than
200 pages of the DNC's opposition research on Mr. Trump's -- hundreds
of pages of what I would call dirt. This happened just two days after
The Wall Street Journal published a plan for Republican Convention
delegates to revolt to prevent Mr. Trump from securing the nomination.

Why wasn't - why wasn't the Russian release of harmful
information about Mr. Trump addressed in the Russia report? And was
this even evaluated during the review?

CLAPPER: I would have to consult with the analysts that were
involved in the report to definitively answer that. I don't know
personally whether they considered that or not.

GRASSLEY: Can you submit that as an answer in writing?

CLAPPER: Well, I'm a private citizen now, sir. I don't know
what -- what the rules are on my...

GRASSLEY: Well, give me the name...

CLAPPER: ... obtaining classified -- potentially classified
information, so I will look in to it.

GRASSLEY: OK. Mr. Clapper, you testified that the intelligence
community conducted an exhaustive review of Russian interference and
the analysts involved had complete, unfettered access to all sensitive
raw intelligence data. Do you have any reason to believe that any
agency withheld any relevant information?

CLAPPER: I don't believe so, with one potential caveat, which is
that there is the possibility, again acknowledging this role that the
FBI plays in straddling both intelligence and law enforcement, that
for whatever reason they may have chosen to withhold investigatory
sensitive information from the report. I don't know that to be a
fact. I was not apprised of that, I'm just suggesting that as a
possibility.

GRASSLEY: My time's up, Mr. Chairman. Thank you.

GRAHAM: Thank you.

Senator Feinstein.

FEINSTEIN: Thanks very much, Mr. Chairman.

Ms. Yates, I'm not going to ask you anything that deserves a
confidential or secure answer, but after your second in-person meeting
with Mr. McGahn, you said there were four topics he wanted to
discuss. Would you list those four topics?

YATES: Sure. The first topic in the second meeting was
essentially why does it matter to DOJ if one White House official lies
to another. The second topic related to the applicability of criminal
statutes and the likelihood that the Department of Justice would
pursue a criminal case. The third topic was his concern that their
taking action might interfere with an investigation of Mr. Flynn. And
the fourth topic was his request to see the underlying evidence.

FEINSTEIN: Were all those topics satisfied with respect to your
impression after the second meeting?

YATES: Yes. The only thing that was really left open there
would (ph) -- was the logistics, for us to be able to make
arrangements for them to look at the underlying evidence.

FEINSTEIN: And you did make those arrangements?

YATES: We did make those arrangements, but again, I don't know
whether that ever happened, whether they ever looked at...

FEINSTEIN: OK.

YATES: ... that evidence or not.

FEINSTEIN: Fair enough.

Apparently, Lieutenant General Flynn remained national security
adviser for 18 days after you raised the Justice Department's concern.
In your view, during those 18 days, did the risk that Flynn had been
or could be compromised diminish at all?

YATES: You know, I don't know that I'm in a position to really
have an answer for that. I know that we were really concerned about
the compromise here, and that was the reason why we were encouraging
them to act. I don't know what steps they may have taken, if any,
during that 18 days to minimize any risk.

FEINSTEIN: Well, did you discuss this with other DOJ career

professionals?

YATES: Certainly, leading up to our notification on the 26th.
It was a topic of a whole lot of discussion, in DOJ and with other
members of the intel community, and we discussed it at great length.
But after the 30th, again, I wasn't at DOJ anymore, so I didn't have
any further discussions after that point about what was being done
with respect to that.
FEINSTEIN: Did you consult with other career prosecutors?

YATES: Absolutely. We had, really, the experts within the
national security division. As we were navigating this situation,
they were working with the FBI on the investigation, and we were
trying to make a determination about how best to make this
notification so that we could get the information to the White House
that they needed to be able to act.

FEINSTEIN: So what's the point that you were trying to make --
yes or no will be fine -- that General Flynn had seriously compromised
the security of the United States, and possibly the government, by
what he had done, whatever that was?

YATES: Well, our point was -- is that logic would tell you that
you don't want the national security adviser to be in a position where
the Russians have leverage over him. Now, in terms of what impact
that may have or could have had, I can't speak to that, but we knew
that was not a good situation, which is why we wanted to let the White
House know about it.

FEINSTEIN: The Guardian has reported that Britain's intelligence
service first became aware in late 2015 of suspicious interactions
between Trump advisers and Russian intelligence agents. This
information was passed on to U.S. intelligence agencies.

Over the spring of 2016, multiple European allies passed on
additional information to the United States about contacts between the
Trump campaign and Russians. Is this accurate?

YATES: I -- I can't answer that.

FEINSTEIN: General Clapper, is that accurate?

CLAPPER: Yes, it is and it's also quite sensitive.

FEINSTEIN: OK. Let me ask you this.

CLAPPER: The specifics are -- are --- are quite sensitive.

FEINSTEIN: When did components of the intelligence community

open investigations into the interactions between trump advisers and Russians?

What was the question again, ma'am, I'm sorry?

FEINSTEIN: When did components of the intelligence community open investigations into the interactions between Trump advisers and Russians?

CLAPPER: What was the question, again, Ma'am? I'm sorry.

FEINSTEIN: When did components of the intelligence community open investigations into the interactions between Trump advisers and Russians?
CLAPPER: Well, I can -- I refer to Director Comey's statement before the House Intelligence Committee on the 20th of March -- is when he advised that they'd open an investigation in July of '16.

FEINSTEIN: And what was the reaction when you advised that the investigation be opened as early as July 15th?

CLAPPER: I'm sorry?

FEINSTEIN: I -- I thought you said that you advised on July...

CLAPPER: No, Director Comey did, before the House Intelligence Committee...

FEINSTEIN: The director (ph) -- I see.

CLAPPER: ... announced that the FBI had initiated investigation in July of 2016.

FEINSTEIN: Well, what did the intelligence agencies do with the findings that I just spoke about that The Guardian wrote about?

CLAPPER: Well, I'm not sure about the accuracy of that article, so clearly over actually going back to 2015, there was evidence of Soviet, excuse me, Freudian slip, Russian activity. Mainly, in an information gathering or recon ordering mode, where they were investigating voter registration rolls and the like.

And that activity started early, and so, we were monitoring this as it progressed, and certainly as it picked up, accelerated in spring, summer and fall of 2016.

FEINSTEIN: OK.

So let me go back to you, Miss Yates, I take it you were very

concerned. What was your prime worry during all of this?
Now, you were worried that General Flynn would be compromised?
What did you think would happen, if he were, and how do you believe he
would have been compromised?

YATES: Well, we had two concerns, compromise was certainly the
number one concern and the Russians can use compromised material,
information, in a variety of ways, sometimes overtly and sometimes
subtly. And again, our concern was, is that you have a very sensitive
position, like the National Security advisor and you don't want that
person to be in a position, where again, the Russians have leverage
over him.

But, I will also say, another motivating factor is that we felt
like the Vice President was entitled to know that the information he
had been given, and that he was relaying to the American public,
wasn't true.

FEINSTEIN: So, what's you're saying is that General Flynn lied
to the Vice President?
YATES: That's certainly how it appeared, yes, because the Vice
President went out and made statements about General Flynn's conduct,
that he said were based on what General Flynn had told him, and we
knew that that just flat wasn't true.

FEINSTEIN: Well, as the days went on, what was your view of the
situation? Because there were, I guess two weeks before, or was it 18
days before Director Flynn was dismissed?

YATES: Well, again, I was no longer with DOJ after the 30th,
and so I wasn't having interaction or any involvement in this issue
after that day.

FEINSTEIN: Thank you, Mr. Chairman.

GRAHAM: Senator Cornyn.

CORNYN: Thank you, Chairman Graham.

And Senator Whitehouse, for today's hearing.

This is important, the American people have every right to know
as much as possible about Russian interference in our elections. But,
as I think, as the Director has told us before many times, this is not
anything new.

Although, perhaps, the level and intensity, and the
sophistication, of both Russian overt and covert operations is really
unprecedented, and I thank the intelligence community for their

assessment.

I do regret that, while these two witnesses are certainly
welcomed and we're glad to have them here, that former National
Security Advisor Susan Rice, has refused to testify in front of the
Committee. It seems to me, there are a lot of questions that she
needs to answer.

I would point out, though, Mr. Chairman, that both Senator
Feinstein and I, are fortunate enough to be on the Senate Intelligence
Committee, which is also conducting a bipartisan investigation under
the leadership of Chairman Burr and Vice Chairman Warner.

One of the benefits of that additional investigation, is that we
have been given access to the raw intelligence collected by the
intelligence community, which I think, completes what understandably
is an incomplete picture. When you can only talk in a public setting
about part of the evidence, but it is important for the American
people to understand what's happening.

I think this subcommittee hearing is playing an important role in
that.

I want to ask Director Clapper, because, I think, unfortunately
some of the discussion about unmasking is casting suspicion on the
intelligence community in a way that I think is, frankly, concerning.
Particularly when we're looking at reauthorizing Section 702 of the
Patriot Act by the end of next year.

because as many have said, I can't recall your specific words,
but I know Director Comey has called that the crown jewels of the
intelligence community, and I'm very concerned that some of the
information that's been discussed about unmasking, for example, might
cause some people to worry about their legitimate privacy concerns.

CORNYN: So when it comes to incidental collection on an American
person, and that is unmasked at the request of some appropriate
authority, can you describe, briefly, the paper trail and the series
-- and the approval process that is required in order to allow that to
happen? That's not a trivial matter, is it?

CLAPPER: The -- and the -- the process is that, first of all,
the judgment as to whether or not to unmask or reveal the identity is
rendered by the original collection agency so normally that's going to
be, in the case of 702 -- going to be NSA.

And I know, for my part, because, as I indicated in my statement,
over my six and a half years of DNI, I occasionally ask for identities
to be unmasked to understand the context.

What I was concerned about, and those of us in the intelligence
community are concerned about, is the behavior of the -- the validated
foreign intelligence target. Is that target trying to co-opt,
recruit, bribe, penetrate or what?

And it's very difficult to understand that context by the labels
"U.S. person one," "U.S. person two." And as well, I should point
out, doing that on an anecdotal basis, one SIGINT report at a time, in
which you need to look at is there a -- is there a pattern here, and
so I tried on my part to be very, very judicious about that.

It's a very sensitive thing. But I did feel an obligation, as
DNI, that I should attempt to understand the context and who this
person was, because that had a huge bearing on how important or
critical it was, and what threat might be posed by virtue of the --
again, the behavior of the validated foreign intelligence target.

So our focus was on the target, not -- not as much as the U.S.
person -- only to understand the context.

CORNYN: Well, the fact that some appropriate authority might
request and receive the unmasking of the name of the U.S. person does
not then authorize the release of that information -- that classified
information -- into the public domain? that remains a crime, does it
not?

CLAPPER: Yes. Again, that's why I attempted to make -- to
clarify, in my statement...

(CROSSTALK)

CORNYN (?): Push the button.

CLAPPER: That's why, in my statement, I attempted to make that
distinction between unmasking, an authorized, legitimate process with
approval by the appropriate authorities, and leaking, which is an
unauthorized process under any circumstance.

CORNYN: Mr. Chairman, I think it's really important that, in
order to determine who actually requested the unmasking, and in order
to establish whether appropriate procedures were undertaken under both
legislative oversight and judicial oversight, that we determine what
that paper trail is and follow it...

CLAPPER: Senator Cornyn, if I may, I just -- and I have to be
very careful here about how I phrase this, but I would just repeat to
you the definition of what 702 is used for...

CORNYN: Foreign intelligence (ph).

CLAPPER: ... which is collection against a non-U.S. person overseas.

CORNYN: I don't think you can say that enough, Director Clapper. It's important, because people need to understand that...

CLAPPER: Happy to say it again.

CORNYN: ... we are both getting necessary foreign intelligence...

(CROSSTALK)

CORNYN: ... to keep the American people safe, but also respecting the privacy rights and the constitutional rights of American citizens.

CLAPPER: Absolutely.

CORNYN: Ms. Yates, this is the first time that you've appeared before Congress since you left the Department of Justice, and I just wanted to ask you a question about the -- your decision to refuse to defend the president's executive order.

In the letter that you sent to Congress, you point out that the executive order itself was drafted in consultation with the Office of Legal Counsel, and you point out that the Office of Legal Counsel reviewed it to determine whether, in its view, the proposed executive order was lawful on its face and properly drafted.

Is it true that the Office of Legal Counsel did conclude it was lawful on its face and properly drafted?

YATES: Yes, they did. The office of...

CORNYN: And you overruled them?

YATES: ... I did. The office of legal...

CORNYN: Did you (ph) -- what -- what is your authority to -- to overrule the Office of Legal Counsel when it comes to a legal determination?

YATES: The Office of Legal Counsel has a narrow function, and that is to look at the face of an executive order and to determine purely on its face whether there is some set of circumstances under which at least some part of the executive order may be lawful. And

importantly, they do not look beyond the face of the executive order, for example, statement that are made contemporaneously or prior to the execution of the E.O. that may bear on its intent and purpose.

That office does not look at those factors, and in determining the constitutionality of this executive order, that was an important analysis to engage in and one that I did.

CORNYN: Well, Ms. Yates, I thought the Department of Justice had a long standing tradition of defending a presidential action in court if there are reasonable arguments in its favor, regardless whether those arguments might prove to be ultimately persuasive, which of course is up to the courts to decide and not you, correct?

YATES: It is correct that often times, but not always, the civil division of the Department of Justice will defend an action of the president or an action of Congress if there is a reasonable argument to be made. But in this instance, all - all arguments have to be based on truth because we're the Department of Justice. We're not just a law firm, we're the Department of Justice and the...

(CROSSTALK)

CORNYN: You distinguish the truth from lawful?

YATES: Yes, because in this instance, in looking at what the intent was of the executive order, which was derived in part from an analysis of facts outside the face of the order, that is part of what led to our conclusion that it was not lawful, yes.

CORNYN: Well, Ms. Yates, you had a distinguished career for 27 years at the Department of Justice and I voted for your confirmation because I believed that you had a distinguished career. But I have to tell you that I find it enormously disappointing that you somehow vetoed the decision of the Office of Legal Counsel with regard to the lawfulness of the president's order and decided instead that you would counter man (ph) the executive order of the president of the United States because you happen to disagree with it as a policy matter.

YATES: Well, it was...

CORNYN: I just have to say that.

YATES: I appreciate that, Senator, and let me make one thing clear. It is not purely as a policy matter. In fact, I'll remember my confirmation hearing. In an exchange that I had with you and others of your colleagues where you specifically asked me in that hearing that if the president asked me to do something that was unlawful or unconstitutional and one of your colleagues said or even

just that would reflect poorly on the Department of Justice, would I say no? And I looked at this, I made a determination that I believed that it was unlawful. I also thought that it was inconsistent with principles of the Department of Justice and I said no. And that's what I promised you I would do and that's what I did.

CORNYN: I don't know how you can say that it was lawful and say that it was within your prerogative to refuse to defend it in a court of law and leave it to the court to decide.

YATES: Senator, I did not say it was lawful. I said it was unlawful.

GRAHAM: Senator Durbin is next, but I have one quick, if you don't mind Senator Durbin, about how 702 works. You said something, General Clapper, I don't quite understand. Is it unlawful to surveil with a FISA warrant a foreign agent in the United States?

CLAPPER: No, it's not. But that's another provision. I was - I was saying...

GRAHAM: OK.

CLAPPER: I was saying what 702 does.

GRAHAM: I just want to make sure there is a procedure to do that.

CLAPPTER: There is.

GRAHAM: OK.

Senator Durbin?

(UNKNOWN): Just to your point, you said the word overseas. Ambassador Kislyak was not overseas on December 29th, was he?

CLAPPER: That's correct.

(UNKNOWN): Thank you.

DURBIN: Thank you, Mr. Chairman.

Let me say at the outset in response to Senator Cornyn, in your conclusion about the unlawful nature of the Muslim travel ban was, of course, a position which was supported by three different federal courts that stopped the enforcement of that ban and ultimately led to the president withdrawing that particular travel ban. Is that not true?

YATES: That's correct.

DURBIN: Thank you.

I want to mention at the outset here that this is a critically
important hearing and I want to thank Senator Graham and Senator
Whitehouse for the bipartisan nature and the cooperation in this
hearing. I think the testimony we've received from these witnesses
and the presence of so many other of my colleagues is an indication of
how we view the severity and gravity of the issue before us.

I'm troubled that this great committee with its great chairman
and all its members does not have professional staff assigned to this
investigation. It's the ordinary staff of the subcommittee who are
working it. I think that what we have seen with this situation calls
for the appointment of an independent commission, presidential
commission or congressional commission, one that is clearly
independent, transparent and can get to the bottom of the Russian
involvement in our last election process and the threat that faces --
we face in the future because of it.

Short of that, we'll continue to do our best on a committee level
with meager resources in both the Intelligence Committee and here.
And this is, I think, an issue that begs for so much more. I might
also say that I'm starting to hear from the Republican side of the
table some real concerns about Section 702, which Senator Lee,
Republican member of the committee and myself, have been calling for
reform on for several years. Unfortunately, we didn't have the
support from the other side of the table when we did. I hope that we
can get it now when we talk about real reform to (ph) the 702 and
protecting the rights of individuals in America.

Ms. Yates, let me ask you about this meeting on January the 26th
with White House Counsel Don McGahn. You shared the Justice
Department's concern about his communications with Russia, his
apparent dishonesty about those communications and his vulnerability
to blackmail. Is that correct?

YATES: That's right.

DURBIN: Was there anything else about the relationship of
General Flynn and the Russians other than his representations that he
had no conversation that you warned Don McGahn about?

YATES: No.

DURBIN: So it didn't go back to his trip to Moscow, money
received and so forth?

YATES: No, it did not.

DURBIN: It was strictly on that question?

YATES: Yes.

DURBIN: And then you had a second meeting the next day.

YATES: That's right.

DURBIN: Is that correct, on January 27th?

YATES: At his request, yes.

DURBIN: At Mr. McGahn's request. And at that second meeting, did Mr. McGahn say anything about whether he had taken the information you'd given him the previous day to the president?
YATES: No, he didn't tell us.

DURBIN: Are you aware of the fact that Mr. Spicer, the White House press secretary, on February 14th said, and I quote, "Immediately after the Department of Justice notified the White House counsel of the situation, the White House counsel briefed the president and a small group of senior advisors?"

YATES: I've seen media reports to that effect, but that's all I know is from the media.

DURBIN: So there was no statement by Mr. McGahn that he had either spoken to the president about your concerns with his national security advisor or with any other members of the White House?

YATES: No, he didn't advise us in the second meeting anyone he may have discussed this with the prior evening.

DURBIN: I guess I want to also go to the question which keeps gnawing at me here that Mr. McGahn asked of you. Is there anything wrong with one White House official lying to another White House official?

YATES: Well, to be fair to Mr. McGahn here, I wouldn't say that he said is there anything wrong. His question was more essentially what's it to the Justice Department if one White House official is lying to another? In other words, why is this something that DOJ would be concerned about? And that's why went back through the list of issues and reasons why this was troubling to us.

DURBIN: Did you think there was a legal reason to be concerned

if one White House official lied to another White House official?

YATES: We didn't go into that. And to the extent you may be
talking about like 1001 violation, that was not something that we were
alluding to or discussing with Mr. McGahn. I think his point when he
made that point to me was that he wasn't sure why the Department of
Justice would care about one lying to another, not to be discussing
whether that was in fact a crime.

DURBIN: And the reason you told him was what?

YATES: Was that, again, it was a whole lot more than one White
House official lying to another. First of all, it was the vice
president of the United States and the vice president had then gone
out and provided that information to the American people who had then
been misled and the Russians knew all of this, making Mike Flynn
compromised now.

DURBIN: You said earlier, I believe, that Mr. McGahn asked you
if you thought they should fire General Flynn at that point.

YATES: Right.

DURBIN: And what was your response?
YATES: Told him that it was not our call as to whether General
Flynn was fired, that we were giving them this information so that
they could take action, the action that they believed was appropriate.

DURBIN: On February 14th, after General Flynn resigned, Sean
Spicer said, and I quote, "There was nothing in what General Flynn did
in terms of conducting himself that was an issue." Do you have any
idea what he meant by those words?

YATES: No. I'm not -- all I can say is he didn't reach that
conclusion from his conversation with us. I can't speak to how he
arrived at that.

DURBIN: Let me ask you, there was a period of time, 18 days,
that we've referred to [****] and during that period of 18 days,
a number of things occurred; General Glynn continued to serve as the
national security advisor for 18 days after you had briefed the White
House about the counterintelligence risk that he posed. And during
those 18 days, General Flynn continued to hire key senior staff on the
National Security Council, announced new sanctions on Iran's ballistic
missile program, met with Japanese Prime Minister Shinzo Abe along
with President Trump at Mar-a-Lago and participated in discussions
about responding to a North Korean missile launch and spoke repeatedly
to the press about his communications with Russian Ambassador Kisliak.

DURBIN: Ms. Yates, in -- in your view, were there national security concerns in these decisions being made after the information you shared with the White House?

YATES: I was no long with DOJ after January 30th, so I wasn't aware of any actions that the General Flynn was taking. So I -- I couldn't really opine on that.

DURBIN: General Clapper? Would you comment? If you had the warning from the White House -- pardon me, from the Department of Justice to the White House about General Flynn possibly being compromised here, and then these important national security decisions had followed, would you have concern about that?

CLAPPER: Well, I would. Hypothetically, yes. I mean, again, I was gone from the government as well when all this happened.

DURBIN: But -- but you've had quite a career in intelligence and national security. And here, you have a man that's been told -- the White House has been told his -- he could be compromised and blackmailed by the Russians -- continuing to make the highest level decisions of our government.

CLAPPER: Well, that's -- that's -- it is certainly a potential vulnerability, there's no question about it.

DURBIN: I would say so. Thank you very much.

Thanks, Mr. Chairman.

GRAHAM: (OFF-MIKE)
CRUZ: Thank you, Mr. Chairman. Thank you to the witnesses for being here today.

Mr. Clapper, you -- you testified as to the harms that come from leaks -- the harms that come to our national security -- and you also testified about the importance of protecting classified information and keeping it classified.

During your many years in intelligence, and at the DNI, have you ever knowingly forwarded classified information to a non-government employee on a non-government computer who did not have authorization to receive that information?

CLAPPER: Not to my -- not to my recollection, no, sir.

CRUZ: And, Director Clapper, what would you do, at the DNI, if you discovered that an employee of yours had forwarded hundreds or even thousands of e-mails to a non-government individual, their

spouse, on a non-government computer?

CLAPPER: Well, you know, I'm not a investigatory or prosecutorial element. But if I were aware of it, I would certainly make known to the appropriate officials that that was going on.

CRUZ: Would that strike you as anything ordinary?

CLAPPER: Hopefully not.

CRUZ: What -- what concerns would that raise for you?

CLAPPER: Well, it raises all kinds of potential security concerns. Again, depending on -- on the -- the content of the e-mail, what the intent was, there's a whole bunch of variables here that would have to be considered. But, you know, potentially, and again, this is a hypothetical scenario, it could be quite concerning.

CRUZ: What would you expect to happen if you made a referral of an individual who had forwarded hundreds or even thousands of classified information...

CLAPPER: Well...

CRUZ: ... to a non-government employee...

CLAPPER: ... whether (ph)...

CRUZ: ... on a non-government computer?

CLAPPER: ... whatever the transgression -- potential transgression was, if there were sufficient evidence of a compromise, we would file a crimes report. That's standard procedure that we use when there's the potential for investigating and prosecuting someone.

CRUZ: Last week, I asked similar questions to FBI Director Comey, and -- and he said an individual who did that would be subject to, quote, "significant administrative discipline," but that he was highly confident they wouldn't be prosecuted. Do you share that assessment?

CLAPPER: Well, I don't -- I -- I don't know. I think the -- the track record is that the prior administration, I think, prosecuted more people for leaking than anyone in any -- in any other administration in the past.

So it's difficult to do that. And there are many cases we could not prosecute or even seek a crimes report because the potential audience of people that could have been the perpetrator of -- of -- of

these insecurities could not be identified.

CRUZ: It is true that other individuals who were not the direct employee of the Democratic nominee for president were prosecuted for that conduct. Let me -- let me shift to a different topic.

Director Clapper, you -- you also testified that you're not aware of any intercepted communications of any presidential candidates or campaigns, other than the Trump campaign that's been discussed here. Is -- is that correct?

CLAPPER: Yes. But that's to my knowledge. But, you know, prior administrations, prior campaigns -- they wouldn't have been visible to me. So I -- I can't -- I can't say...

CRUZ: But -- but in 2016, you're not aware any other campaigns or candidates?

CLAPPER: ... no.

CRUZ: And, Ms. Yates, same question to you.

YATES: I'm not aware of any interceptions of the Trump campaign.

CRUZ: And are you aware of any intercepted communications of any other candidates or campaigns?

YATES: No.

CRUZ: Okay. Because earlier, when Chairman Graham had asked you that, I -- I thought you'd declined to answer. So perhaps I misunderstood that.

YATES: And I may have misunderstood the question. I thought the question I declined to answer was a different one than that. So I'm -- I'm glad I got a chance to clear it up.

CRUZ: OK. So you have no information of any interceptions of the Bernie Sanders campaign, Hillary Clinton campaign...

YATES: No.

CRUZ: ... or any other candidate...

YATES: No.

CRUZ: ... in 2016, or campaigns?
YATES: No.

CRUZ: OK. Let' revisit the topic, Ms. Yates, that -- that you
and Senator Cornyn were talking about.

YATES: OK.

CRUZ: It is correct that the constitution vests the executive
authority in the president?

YATES: Yes.

CRUZ: And if an attorney general disagrees with a policy
decision of the president -- a policy decision that is lawful -- does
the attorney general have the authority to direct the Department of
Justice to defy the president's order?

YATES: I don't know whether the attorney general has the
authority to do that or not. But I don't think it would be a good
idea. And that's not what I did in this case.

CRUZ: Well, are you familiar with 8 USC Section 1182?

YATES: Not off the top of my head, no.

CRUZ: Well, it -- it -- it is the binding statutory authority
for the executive order that you refused to implement, and that led to
your termination. So it -- it certainly is a relevant and not a
terribly obscure statute.

By the express text of the statute, it says, quote, "whenever the
president finds that entry of any alien or of any class of aliens into
the United States would be detrimental to the interest of the United
States, he may by proclamation, and for such period as he shall deem
necessary, suspend the entry of all aliens or any class of aliens as
immigrants or non-immigrants, or impose on the entry of aliens any
restrictions he may deem appropriate."

Would you agree that is broad statutory authorization?

YATES: I would, and I am familiar with that. And I'm also
familiar with an additional provision of the INA that says no person
shall receive preference or be discriminated against an issuance of a
visa because of race, nationality or place of birth, that I believe
was promulgated after the statute that you just quoted.

And that's been part of the discussion with the courts, with
respect to the INA, is whether this more specific statute trumps the
first one that you just described.

(CROSSTALK)

YATES: But my concern was not an INA concern here. It, rather, was a constitutional concern, whether or not this -- the executive order here violated the Constitution, specifically with the establishment clause and equal protection and due process.

CRUZ: There is no doubt the arguments you laid out are arguments that we could expect litigants to bring, partisan litigants who disagree with the policy decision of the president.

I would note, on January 27th, 2017, the Department of Justice issued an official legal decision, a determination by the Office of Legal Counsel, that the executive order -- and I'll quote from the opinion -- "the proposed order is approved with respect to form and legality."

That's a determination from OLC on January 27th that it was legal. Three days later, you determined, using your own words, that although OLC had -- had opined on legality, it had not addressed whether it was, quote, "wise or just."

YATES: And I also, in that same directive, Senator, said that I was not convinced it was lawful. I also made the point that the office of -- OLC looks purely at the face of the document and, again, makes a determination as to whether there is some set of circumstances under which some portion of that E.O. would be enforceable, would be lawful.

They, importantly, do not look outside the face of the document. And in this particular instance, particularly where we were talking about a fundamental issue of religious freedom -- not the interpretation of some arcane statute, but religious freedom -- it was appropriate for us to look at the intent behind the president's actions, and the intent is laid in and out his statements.

CRUZ: A final, very -- very brief question. In the over 200 years of the Department of Justice history, are you aware of any instance in which the Department of Justice has formally approved the legality of a policy, and three days later, the attorney general has directed the department not to follow that policy, and to defy that policy?

YATES: I'm not. But I'm also not aware of a situation where the Office of Legal Counsel was advised not to tell the attorney general about it until after it was over.

CRUZ: Thank you, Ms. Yates. I -- I -- I would note, that might be the case, if there's reason to suspect partisanship.

GRAHAM: Senator Klobuchar.

KLOBUCHAR: Thank you.

I want to thank you very much for your service Ms. Yates. From
beginning to end your distinguished career as a prosecutor and I just
was putting this time table together and I realize that you're second
meeting, when you went over to the white house to warn them of General
Flynn's line, and his connections with Russia was the same day that
this Refugee order came out and it was the same day that you had to
leave the justice department. So you -- when did you meet with the
White House council on that day?

YATES: I met with White House Council as best as I can recall
about 3:00 in the afternoon on the 30th.

KLOBUCHAR: And during that meeting did they mention -- anyone
mention that this refugee order was about to come out?

YATES: No.

KLOBUCHAR: Did the acting Attorney General of the United States?

YATES: No and that was one thing that was of concern to us, is
that not only was department leadership not consulted here and beyond
department leadership, really the subject matter experts, the national
security experts, not only was the department not consulted, we
weren't even told about it. I learned about this from media reports.

KLOBUCHAR: So you learned about it after the meeting at the
White house Council from the media.

YATES: Right.

KLOBUCHAR: And then it's true that during your hearing, then
Senator Sessions, now the Attorney General actually asked you if the
views the President wants to execute are unlawful, should the Attorney
General or Deputy Attorney General say no? And what did you say?

YATES: And I said yes, the Attorney General should.

KLOBUCHAR: And then moving forward here, as was mentioned by
Senator Durbin, this order was [****] after a lawsuit from the
State of Washington and Minnesota, the court basically challenged --
the constitutionality of the order. The order is now taken effect,
but what I want to get to right now is the fact that the
administration then withdrew its request for an appeal of the court
ruling blocking implementation of the same order and then they changed
the order that you would not implement.

YATES: Right. And there were a number of important distinctions between travel ban one and travel ban two. At the time I had to make my decision for example, the executive order still applied to green card holders, lawful permanent residents and those who had visas.

There were a number of other distinctions as well. And look, let me say ...

KLOBUCHAR: Thank you.

YATES: Oh, OK sorry.

KLOBUCHAR: I want to get on to -- but go ahead very quickly.

YATES: Look I understand that, you know people of good will and -- who are good folks can make different decisions about this. I understand that. But all I can say is that I did my job the best way I knew how. I looked at this E.O., I looked at the law, I talked with the folks at the Department of Justice, gathered them all to get their views and their input and I did my job.

KLOBUCHAR: OK. I appreciate that. Let's go to Russia. December 29th, this is the date that actually Senator Graham and I were with Senator McCain hearing about Russian interference, meeting with leaders in the Baltic's, Georgia and Ukraine. This is the date that the President expanded the sanctions against Russia and this is the date that Michael Flynn reportedly talked to the Russians, perhaps several times about sanctions.

He then went on to not tell the truth to the Vice President. And one of the White House officials has described the notification that you provided warning them of this as a heads up. How would you describe a heads-up?

YATES: Well at the risk of trying to characterize. I mean we were there to tell the White House about something we were very concerned about and emphasized to them repeatedly. It was so they could take action.

KLOBUCHAR: So it was much more formal than just a simple hey this is happening. Michael Flynn did not resign his position as national security advisor until February 13th. That is 18 days after you went over there with a formal warning. And in particular after they knew about this on January 28th Flynn was allowed to join President Trump on an hour long telephone call with Russian President Vladimir Putin. Do you have any doubt that the information that you conveyed to the White House on January 26th should have been made clear that Flynn had been potentially compromised by Russia? That this information was clear?

YATES: Well the purpose in our telling them again was so that they could act and so that they could convey that information. So I would hope that they did.

KLOBUCHAR: If a high ranking national security official is caught on tape with a foreign official saying on thing in private and then caught in public saying another thing to the Vice President, is that material for blackmail?

YATES: Certainly.

KLOBUCHAR: Do you want to add anything to that Director Clapper?

CLAPPER: No [****].

KLOBUCHAR: OK. I think it's pretty clear. And I think it's pretty clear why we had this hearing today. I wanted to ask you, Director Clapper, a few things about just in general this Russian influence.

When Director Comey was here last week, he said, "I think that one of the lessons that the Russians may have drawn from this," he's talking about the election influence, "is that this works."

Those were Comey's words, do you agree?

CLAPPER: Absolutely. And as I said in my statement, the Russians have to be celebrating the success of what -- for what they set out do with rather minimal resource expenditure.

And the first objective was to sow discord and dissension, which they certainly did.

KLOBUCHAR: And when you look at this, in addition to the hacking into the DNC and Podesta's e-mails, all of those things, we also had the fake news propaganda, which is referenced in the report.

I believe it's $200 million, is that all they spent in the scheme of things? Something like that?

CLAPPER: If that, which doesn't include government support to -- subsidies to RT.

KLOBUCHAR: And how does RT work, when you look at this?

CLAPPER: Well, RT is essentially a propaganda mouthpiece for the government, since the predominance of its funding comes from the government and the management is close to Putin. So it's, as I say, I think a governmental -- Russian governmental mouthpiece.

KLOBUCHAR: Ms. Yates, I'm asking you in your capacity as a
former attorney general and deputy attorney general, I would ask this
of Director Comey, about the use of shell corporations.

Now something like 50 percent real estate deals over $5 million
are now done with shell corporations. We're trying to push so that
the Treasury Department puts more transparency. This is something
that European countries are working on right now.

And I'm very concerned that this is another vehicle where money
is laundered. I'm concerned about loopholes in our campaign finance
laws as well. But could you address this just from your experience as
a criminal prosecutor?

YATES: Sure. And those are all valid concerns. We're actually
lagging behind other countries in the world. And we don't want to
become a haven then where you can have shell corporations that can be
used for all sorts of nefarious purposes. They can have national
security implications as well as criminal implications.

KLOBUCHAR: Director Clapper, did you want to add anything to
that? And, again, this is why I believe an independent commission --
in addition to the great work that's being done by this subcommittee
and the Senate Intelligence Committee, which is so important, as well
as the investigation, an independent commission would allow a panel of
experts to go into the next election, go into 2020, where Director
Comey had said "I expect to see them back in 2018 and especially
2020."

Those are his words. Do you agree with that, Director?

CLAPPER: Absolutely.

KLOBUCHAR: And that is why an independent commission would allow
us to come up with some ideas and how we can stop this from
happening again, whether it is how the media handled these things, how campaigns
handled these things, how intelligence agencies, when they find out,
handle these things, because we cannot allow foreign countries to
influence our democracies.

Do you agree, Director Clapper?

CLAPPER: I certainly do. And I understand how critical leaks
are and unmasking and all these ancillary issues. But to me, the
transcendent issue here is the Russian interference in our election
process, and what that means to the erosion of the fundamental fabric
of our democracy.

And that to me is a huge deal. And they're going to continue to

do it. And why not? It proved successful.

KLOBUCHAR: Thank you.

GRAHAM: Until they pay a price, I hope which they will soon pay.

Senator Sasse?
SASSE: Thank you, Mr. Chairman.

Thank you, both, for being here.

Director Clapper, how likely do you think it is that foreign intelligence services are trying to compromise congressional IT systems?

CLAPPER: Well, I think that's -- congressional IT systems are a target, and have been. And certainly I saw examples of that during my time as DNI and then the -- this is one case where we expeditiously informed the Congress when we saw evidence of that.

And, again, that's not just Russians, there are others out there doing the same thing.

SASSE: And what intel value would it provide to them?

CLAPPER: Well, depending on the nature of the material that they've purloined, it could be quite sensitive. That -- hard to make a general statement about it. But just as a general rule, it could be quite damaging.

SASSE: And could you talk a little bit about the relationship between that particular intel gathering on legislators and the interface with propaganda campaigns such as you say Russia? I've heard you testify in other places about Russia's activity among their near neighbors.

What is the relationship between propaganda and director intel gathering?

CLAPPER: You mean, on the part of the Russians?

SASSE: Yes, on their neighbors.

CLAPPER: Well, they would certainly use that, as they have and examples of that in places like Georgia and the Baltics where they will turn evidence that or -- or what they've gathered and use that as -- as leverage or if they can, to use kompromat (ph), the -- the Russian acronym for compromise of material or the real tribes (ph) so there's all kinds of nefarious things they can potentially do if -- if

they gather information like that.

SASSE: One of -- one of the unhelpful ways that we talked about this issue in the present context in D.C.'s polarized context, is it's almost always retrospective about our election in 2016. And so it devolves into a shirts and skins exercise about what candidate you allegedly supported.

Director Comey last week said he expects as Senator Klobuchar just quoted him, he expects the Russians to be back in 2018 and back with a vengeance in 2020. I think it would be helpful for the American people to understand what Russia does among its near neighbors now. So could you unpack a little bit more of how that works?

CLAPPER: Well, they're -- if anything, in many ways, particularly those countries that were in the former soviet orbit which they still feel, shall I say, paternal about. And so places like Moldova, or the Baltics, Georgia, they are very aggressive in using all the multitude of tools that were on Senator Whitehouse's checklist, wherever they can, however they can, to influence the outcome of elections towards candidates of for whatever office whom they think will be more pliant with them.

And -- and of course, what's new and different here is that -- that aggressiveness is -- is spreading into Western Europe. As we've seen I believe in France and will in Germany. And -- and their relatives, in their minds success at doing this is simply going to reinforce.

So all the tools available to them, active propaganda, financing, candidates sympathetic to -- to their cause, trolls, hacking, revelations of -- of confidential e-mails, whatever it is, they'll -- they'll use that fairly well (ph).

SASSE: And could you give us some sense of the -- without revealing classified information, the order of magnitude of their financial investment in these kind of efforts? If you're a near neighbor of Russia and you've got your Army, Navy, Air Force, Marines then you might have a little bit of an Intel community and a little bit of a -- of a sort of Intel ops, info ops campaign going. How does -- what is the Russian investment?

CLAPPER: Well, I can't -- I can't give you a figure. I will say though that in -- in comparison to a classical military expenditures, its -- it's a bargain for them. And of course, what they're looking for particularly in Europe is so dissension, split unity, and of course end sanctions.

And if they can drive wedges between and among the European

nations by and particularly by their manipulating and influencing
elections, they're going to do it.

SASSE: Director, do you stand by the IC's January assessment
that WikiLeaks is a known propaganda platform for Russia?

CLAPPER: Absolutely, and I am in agreement with Director
Pompeo's characterization of WikiLeaks as a non-nation state
intelligence service.

SASSE: Unpack that a little bit more, if that's the case, then
you're saying that Julian Assange is not a journalist.

CLAPPER: You're asking the wrong guy a question like that,
absolutely not.

SASSE: I mean, reasonable people in the American debate are
worried when they hear people in the IC talk about something that
sounds like its just information. I'm obviously highly skeptical of
Mr. Assange and I've been pushing the Justice Department to ask why we
have not been taking steps to prosecute him for particular crimes that
have endangered American intelligence assets.

But across the continuum of journalists who are legitimate
journalists who are trying to get information to help the American
people under our First Amendment to be fully informed about the
operations of our government, there are people in the journalistic
community who will lean on IC resources to say, we want to know all
that you're able to tell us.

And the burden of -- the burden is on the intelligence official
not to leak classified information. The burden is not on the
journalists to not ask hard questions.

CLAPPER: That is correct, that's absolutely correct.

SASSE: And so it's useful for the American people to hear you
explain, why is Assange something other than just an American
journalist asking hard questions?

CLAPPER: Well, I think and there's -- there's obviously
judgment, here. And when a journalist does -- does harm to the
country, harms our national security, compromises sensitive sources
and methods and trade craft and puts the company -- the -- the country
-- deliberately puts the country in jeopardy, I think that -- that's
-- the line is -- is -- that's a red line, to use a -- use a phrase,
that I think is -- is unacceptable.

SASSE: Have any unauthorized disclosures from Assange and

WikiLeaks directly endangered Americans and American interests?

CLAPPER: In the -- yes, absolutely.

SASSE: Thank you.

Ms. Yates, I wanted to ask you a couple of questions. But I'm almost at my time, so I'll -- I'll limit it to one. Could you please explain the bureaucratic process in which concerning information about political appointees would be brought to the attention of the attorney general? Just give us a few steps in how that process would happen.

YATES: When you say concerning information, what do you mean? If (ph)...

SASSE: I'm trying to elicit an answer from that you doesn't require you to say that, related to Flynn particularly, you can't disclose how this happened. I think it would be useful for the public to understand, more generally, how information about a political appointee would be brought to the attorney general from the FBI and other...

YATES: I understand.

SASSE: ... aspects of the intelligence community.

YATES: Generally, if we discovered information -- let's say an investigative agency like FBI discovered information about a political appointee, they would first get in contact with the relevant division of the Department of Justice that would have jurisdiction over it, whether it's the criminal division, the national security division -- whatever it might be.

They would report that information there, and then, depending on the seriousness of that information, it would probably make its way to me, when I was deputy attorney general, or, then, acting attorney general.

SASSE: Thank you.

GRAHAM: (OFF-MIKE)

COONS: Thank you, Senator Graham.

I want to thank both of you for your decades of dedicated service in intelligence and law enforcement, and for your testimony here today.

The question before us is one of really grave consequence, as you

suggested in your opening statements. Really an existential threat to
our democracy, which, if not faced appropriately, will simply
encourage increased aggressive actions.

The reality is that a foreign adversary intentionally influenced
our 2016 presidential election, and our president may not want to
confront this, but it is a reality, and one that our U.S. intelligence
community agreed about with very high confidence.

I greatly appreciate Senators Graham and Whitehouse in convening
this hearing, and in treating this very real threat to our democracy
with the seriousness that it deserves.

Former Director Clapper, in your opening statement, you suggested
that the Russians should be celebrating, and that they are likely
emboldened, because they succeeded beyond their wildest dreams and at
minimal cost, and they are likely to continue.

In the French national elections, which concluded yesterday,
there was a -- a stunning dump of hacked e-mails at the last moment in
an attempt -- I, at least, believe -- to influence the outcome of that
election in a way designed to help advance a candidate favored by the
Kremlin.

And in that instance, there was a significant amount of fake
news, of manufactured articles, mixed in with, seemingly, actual e-
mails that had been hacked, and there are allegations that there was
coordination between alt-right news sites trying to forward this
information and to get it out around France and around the world.

Is that your understanding of what's just happened in France?
And, more importantly, was there any evidence that you saw of
comparable coordination between alt-right news sites and released
information in the attempts to influence the 2016 American
presidential election?

CLAPPER: Senator Coons, I -- I honestly -- all I know is what
I'm reading in the media, and so I -- I don't have access to any
intelligence information that would help me cast any light -- could
authoritatively answer your question. All I know is -- is what's --
what's in the media.

COONS: But, during the period when you did have regular access
to intelligence, did you see any evidence to suggest that the
longstanding Russian practice of spreading misinformation and fake
news was being amplified by news sites in the United States, and any
reason to believe that might have been coordinated or intentional?

CLAPPER: Well, I don't know about the latter. But I -- and I

think some news outlets were -- were probably unwitting of that. It
certainly went on. But I can't say to what extent that was
coordinated intentionally with -- with certain news outlets.

COONS: And you...

CLAPPER: Again, that's a -- kind of in the domestic realm.

COONS: ... you said that the Russians will continue this
behavior until we impose some significant costs. Could you speak
briefly to what sort of actions you think we might take that would
deter them...

(CROSSTALK)

COONS: ... this action (ph)?

CLAPPER: ... that's a little over my labor grade as an
intelligence guy. I thought the sanctions that we did impose on the
-- on the -- as -- and I was part of that, as part of the former --
the former administration -- were a great first step. And
[****].

COONS: Well, I'll simply say that I agree with you, and a
bipartisan bill led by my colleague, Senator Graham, and co-sponsored
by 20 senators, Republican and Democrat, would be a terrific next
step.

Ms. Yates, we established, in the course of these questions,
that, on December 27th and 29th, former national security adviser
General Flynn discussed sanctions with the Russian ambassador. So
when the Trump transition team told the Washington Post on January
13th that sanctions were not discussed, was that false?

YATES: I understand that there have been news reports to that
account. But I can't confirm whether in fact those conversations
regarding sanctions occurred, because that would require me to reveal
classified information.

COONS: Understood. So I have a whole series of questions about
things that would have been untrue were that the case. You're not
going to be able to answer any of those.

YATES: Not to the extent that it goes to General Flynn's
underlying conduct. I can't address that.
COONS: Well, then let me move to that, if I might.

YATES: Sure.

COONS: On January 24th, you just testified that National
Security Adviser Flynn was interviewed by the FBI about his underlying
conduct, and that that underlying conduct was problematic because it
led to the conclusion the vice president was relying on falsehoods.

What was that underlying conduct? And are you convinced that the
former national security adviser was truthful in his testimony to the
FBI on January 24?

YATES: Again, I -- I hate to frustrate you again, but I think
I'm going to have to, because my knowledge of his underlying conduct
is based on classified information. And so I can't reveal what that
underlying conduct is.

That's why I had to do sort of an artificial description, here,
of events, without revealing that conduct.

COONS: I understand that.

On January 27th you just testified that you discussed with White
-- White House Counsel McGahn four different topics, and one of them
included the possibility of criminal prosecution of the former
national security adviser, and what would the applicable statutes be.

What applicable statutes did you discuss, and in your conclusion,
should the national security adviser face criminal prosecution?

YATES: Senator Coons, I'm going to strike out here, because, if
I identified the statute, then that would be insight into what the
conduct was. And, look, I'm not trying to be hyper-technical here.
I'm trying to be really careful that I observe my responsibilities to
protect classified information. And so I -- I can't identify the
statute.

COONS: OK. Do you believe the administration took your warnings
seriously when you made this extraordinary effort to go to the White
House and, in person, brief the White House counsel on the 26th and
27th? Do you think they took appropriate steps with regards to
General Flynn as the national security adviser, given that he remained
a frequent participant in very high level national security matters
for two weeks?

YATES: Well, certainly, in the course of the meetings, both on
the 26th and 27th, Mr. McGahn certainly demonstrated that he
understood that this was serious. So he did seem to be taking it
seriously.

I -- you know, I don't have any way of knowing what, if anything,
they did. If nothing was done, then certainly, that would be

concerning.

COONS: So you don't know whether they took any steps to restrict
his access to classified information, to investigate him further, up
and until the -- the Washington Post published information that made
it clear that he had been lying to the vice president?

YATES: No, again, I was gone after the 30th. And so it's -- I
wouldn't know if -- if any steps had been communicated to the
Department of Justice, but I was not aware of any, no.

COONS: Had you not been summarily fired, would you have
recommended to the White House counsel that they begin further
investigations into the national security adviser, or that they
restrict his access to sensitive and classified information?

YATES: Well, it's -- it's a bit of a hypothetical. Had I
remained at the Department of Justice, and if I were under the
impression that nothing had been done, then, yes, I would have raised
it again with the White House.

COONS: Thank you. Ms. Yates. Thank you, Mr. Graham (ph).

GRAHAM: (OFF-MIKE)

KENNEDY: Ms. Yates, Dr. Clapper, thank you both for your years
of service to the American people.

Ms. Yates, I want to start with you. You declined to support --
to defend President Trump's executive order because you thought it was
unconstitutional. Is that correct?

YATES: That's correct. Yes.

KENNEDY: And you believe there was no -- you believe that no
reasonable argument could be made in its defense, is that correct?

YATES: I don't know that I would put it in that -- in that way,
Senator. I -- this was the analysis that we went through.

KENNEDY: Let me -- let me -- let me stop you, because I've got a
whole bunch of questions.

YATES: Okay.

KENNEDY: I just want to understand your thinking from my
perspective.

YATES: Sure.

KENNEDY: Did you believe, then, that there were reasonable arguments that could be made in its defense?

YATES: I believed that any argument that we would have to make in its defense would not be grounded in the truth, because, to make an argument in its defense, we would have to argue that the executive order had nothing to do with religion, that it was not done with an intent to discriminate against Muslims. And based on a variety of factors...

KENNEDY: And you were looking at intent?

YATES: Yes, and I believe that that's the appropriate analysis. And in fact, that's been borne out in several court decisions since that time, that that's the appropriate analysis when you're doing a constitutional analysis is to look to see what are you trying to accomplish here?

KENNEDY: OK. Suppose instead of an executive order, this had been an act of Congress. Would you have refused to defend it?

YATES: If it were the same act, yes. And in fact, the Department of Justice has done that in the past. For example, with DOMA, the Defense of Marriage Act, when the Department of Justice refused to defend DOMA.

KENNEDY: But that was a political decision, was it not?

YATES: Well, I wasn't at main justice at that time, so I can't speak to that. But that was another example of when DOJ did not defend the constitutionality of a statute in that sense.

KENNEDY: OK. But in your opinion, the executive order is unconstitutional.

YATES: I certainly was not convinced that it was constitutional, and given that I wasn't in the import of this, I couldn't in good conscience send Department of Justice lawyers in to defend it.

KENNEDY: Well, I want to be sure I understand. Do you believe it's constitutional or unconstitutional?

YATES: I believed -- I was not convinced that it was constitutional. I believed that it was unconstitutional in the sense that there was no way in the world I could send folks in there to argue something that we didn't believe to be the truth.

KENNEDY: So you believe it's unconstitutional?

YATES: Yes.

KENNEDY: OK. I don't mean to wax two (ph)...

YATES: And if I can say, I can understand why might be a little frustrated with the language here...

KENNEDY: I'm not frustrated. I'm happy as a clown.

YATES: And here's - here's the reason. Let me give you a little idea of the timing of this.

KENNEDY: Let me stop you because I don't have much time. I've got a lot of ground to cover.

YATES: OK.

KENNEDY: I don't mean to wax too (ph) metaphysical here, but at what point does an act of Congress or an executive order become unconstitutional?

YATES: Well, it all depends on what the act does.

KENNEDY: No, but I mean, at what point -- is it become -- I can look at a statute and say I think that's unconstitutional. Does that make it unconstitutional?

YATES: I think the issue that we faced at the Department of Justice is to defend this executive order would require lawyers to go in and argue that this has nothing to do with religion, something that...

KENNEDY: But at what point does a statute or an executive order become unconstitutional? Is it some apriori (ph) determination? It become -- let me - telling you what you I'm getting at and I don't mean you any disrespect. Who appointed you to the United States Supreme Court?

YATES: I was appointed...

KENNEDY: That determined -- isn't it a court of (ph) final jurisdiction decides what's constitutional and not? In fact, aren't most acts of Congress presumed to be constitutional?

YATES: They are presumed but they're not always constitutional, and of course, I was not on the Supreme Court. And I can tell you, Senator, look, we really wrestled over this decision. I personally wrestled over this decision and it was not one that I took lightly at

all. But it was because I took my responsibilities seriously...

(CROSSTALK)

KENNEDY: I believe you believe what you're saying.

YATES: Yes, I do.

KENNEDY: I just find it - understand, this is likely to come up
in the future.

YATES: Well...

KENNEDY: At what point does an executive order or statute become
unconstitutional? When I think it's unconstitutional or you think
it's unconstitutional or a court of final jurisdiction says it's
unconstitutional?

YATES: I believe that it is the responsibility of the attorney
general if the president asks him or her to do something that he or
she believes is unlawful or unconstitutional to say no, and that's
what I did.

KENNEDY: OK, I get it.

All right. Let me ask you both a couple questions. Can we
agree, Director and Counselor, that the Russians attempted to
influence the outcome of the election?
CLAPPER: Yes, sir, absolutely.

YATES: Yes.

KENNEDY: Do you believe that the Russians did in fact influence
the outcome of the election?

Director?

CLAPPTER: In our intelligence community assessment, we made the
point that we could not make that call. The intelligence community
has neither the authority, the expertise or the resources to make that
judgment. The only thing we said was we saw no evidence of
influencing voter tallies at any of the 50 states. But we were not in
a position to judge whether -- what actual outcome on the election.

KENNEDY: How about you, Ms. Yates?

YATES: I don't know the answer to that and I think that's part
of the problem, is we'll never know.

KENNEDY: OK. Have you ever -- the Russians have been doing this for years, have they not? I'm not minimizing what they did. I think they did try to influence the election.

CLAPPER: It's absolutely true. As I pointed -- as I mentioned in my opening statement, sir, the -- they've been doing this since at least the '60s.

KENNEDY: OK.

CLAPPER: The difference, however, was this is unprecedented in terms of its aggressiveness and the multifaceted campaign that they mounted. That's new.

KENNEDY: Isn't it a fact that in 1968, the Kremlin -- actually Service A, which was part of the AGB (ph), attempted to subsidize the campaign of Hubert Humphrey?

CLAPPER: I don't know the specifics of that. I'd want to research that, but again, that certainly comports with what Russian tactics would be.

KENNEDY: OK. Isn't it a fact that in 1984, the Kremlin tried to stop Ronald Reagan from being re-elected?

CLAPPER: Again, I'd have to do some research to verify that. But again, it certainly comports with what, if they chose a candidate for whatever reason they had an aversion to, they would do that.

KENNEDY: OK. General Clapper, have you ever leaked information, classified or unclassified, to a member of the press?

CLAPPER: Not wittingly or knowingly, as I said in my statement.

KENNEDY: Classified or unclassified?
CLAPPER: Well, unclassified is not leaking.

(LAUGHTER)

Unclassified -- that's -- that's somewhat of a [****].

KENNEDY: And have you ever given information to a reporter that you didn't want to have your name connected with, but you wanted to see it in the paper?

CLAPPER: I have not. I've had many encounters with media over my career.

KENNEDY: I'm sorry about that.

(LAUGHTER)

How you about, Ms. Yates?

YATES: Other than situations where the Department of Justice
would arrange, for example, for me to talk on background with
reporters about a particular issue to educate them about that, no. I
certainly never provided classified information and that would be the
only kind of background information...

(CROSSTALK)

KENNEDY: Do you know...

CLAPPER: I might have done the same thing, but certainly not --
that doesn't include sharing classified information.

KENNEDY: Do you know anybody else at Justice who has ever leaked
classified or unclassified information to the press?

YATES: No.

KENNEDY: Ms. Yates?

YATES: No.

KENNEDY: OK.

Thank you, Mr. Chairman. I went over. I apologize.

(CROSSTALK)

GRAHAM: Senator Leahy?

LEAHY: Thank you, Mr. Chairman.

General Clapper, Ms. Yates, good to see you again. Good to have
you back here.

I -- Ms. Yates, I remember so well your confirmation hearing. I
remember one senator just bearing in on you, intensely bearing in on
you saying, "Would stand up to the president of the United States if
you thought he was asking you to do something unlawful? He's
demanding under oath for you to say yes, you would stand up?" And you
told then Senator Jeff Sessions of Alabama that's what you would do
and appears to me that you kept your word. Apparently, it's OK to
keep your word depending upon who the administration is.

But I'm proud of you for keeping your word when the president tried to set a religious test for entrance into this country, something [****] it was unconstitutional. You said you aren't going to uphold it. I wish that Mr. Sessions and others had kept as consistent in this administration as they did in the last. That's my editorial judgments.

Now, you wrote to the Justice Department, "I am responsible for ensuring that the positions we take in court remain consistent with this institution's solemn obligation to always seek justice and stand for what is right. At present, I'm not convinced that the [****] executive order's consistent with these responsibilities, nor am I convinced the executive order is lawful." Is that an accurate statement of what you said?

YATES: Yes, it is, Senator.

LEAHY: And do you still feel that way today?

YATES: Yes, I do.

LEAHY: The White House claimed that you betrayed the Department of Justice? Do you feel you betrayed the Department of Justice?

YATES: No, Senator, I feel to have done anything else would have been a betrayal of my solemn obligation to represent the people and to uphold the law and the Constitution.

LEAHY: Was the White House trying to tell the Justice Department how to carry out that executive order?

YATES: Well, I didn't have a lot of discussion with the White House about this executive order. They -- I'm sorry. I don't entirely understand the question.

LEAHY: No, but I mean, did anybody from the White House try to direct the Justice Department how they should respond on that executive order?

YATES: Well, certainly there was discussion with the White House about litigation strategy, but that occurred, to my knowledge, over the weekend. But, after the 30th, when I issued my directive, I was gone then that evening around 9:00, so I don't know what other discussions occurred after that.

LEAHY: Well, one, I applaud you for keeping your word to then Senator Sessions, who apparently has a different standard as Attorney General.

FBI Director Comey testified before this committee, he has told
why he appointed a special counsel to investigate the law plainly,
back in 2003, he was Deputy Attorney General, Attorney General
Ashcroft has refused, himself. Some of the senior officials and Trump
campaign administration are connected to this Russian investigation,
and Attorney General was forced to recuse himself.

I do think this is the kind of situation where we should do what,
then Deputy Attorney General Comey as acting Attorney General did in
the flame (ph) investigation, and appoint a special counsel.

YATES: Well, Senator, I think that my successor, Rod Rosenstein
has a big job ahead of him. And, I don't think I'm going to be giving
him any advice from the cheap seats about how he needs to do it.

LEAHY: Well, let me ask you this, we know about General Putin's
vulnerability to Russian blackmail, Attorney General Sessions misled
this committee about his contacts, and then he had to change his
testimony.

The President's son-in-law and senior adviser, also reported he
failed to disclose contacts on his security clearance forms.

Do you have or did you have, or did you have, any concerns about
the Attorney General, about Mr. Kushner
or other trump officials, vulnerability to blackmail?

YATES: All this information came to light after I was no longer
with DOJ.

LEAHY: Did you have concerns, though, while you were at DOJ,
that General Flynn might be vulnerable to blackmail?

YATES: Yes, I did, and expressed those to the White House.

LEAHY: You say why you feel he may have been vulnerable to
blackmail, and if somebody else fell into that same category, might
they be vulnerable to blackmail?

YATES: Well, certainly any time the Russians have compromising
information on you, then you are certainly vulnerable to blackmail.

LEAHY: Let me ask General Clapper this. You've looked at a lot
of these, the other cases of the senior government officials. If they
have hidden financial information, things that normally disclose when
you take a senior official position, is that an area where they could
be blackmailed, if it's discovered?

CLAPPER: Yes, it is, of course.

LEAHY: And, is it your experience that Russians search for that kind of thing?

CLAPPER: Absolutely, they do.

LEAHY: January, the intelligence community, the FBI, CIA, NSA, concluded high conference (ph) that Russia interfered in the 2016 election, to denigrate Secretary Clinton, help elect Donald Trump. Last week, President Trump contradicted that consensus, he said while it could have been China, it could have been a lot of different groups. Do you feel Russia was responsible?

CLAPPER: Absolutely. And regrettably, certainly he, although the conclusions that we rendered were the same as in the highly classified report, as the unclassified, unfortunately a lot of the substantiation for that could not be put in the unclassified report because of the sensitivity of it.

To me, the evidence was overwhelming, and very compelling, that the Russians did this.

LEAHY: Does it serve any purpose for high officials, like the President, to say, "Well it could have been somebody else, it could have been china"? I mean does that really, does that help us, or does that help Russia?

CLAPPER: Well, yes, I guess it could be -- you could rationalize that it helps the Russians by obfuscating who was actually responsible.

LEAHY: Thank you, thank you very much, General.

Thank you, Miss Yates.

It's good to have you, both, here.

GRAHAM: Senator Franken.

FRANKEN: Thank you, Mr. Chairman.

I want to thank both you and the ranking member for -- for this hearing and these hearings.

And I want to thank General Clapper and -- and Attorney General Yates for -- for appearing today. We have -- the intelligence communities have concluded all 17 of them that Russia interfered with this election. And we all know how that's right.

CLAPPER: Senator, as I pointed out in my statement Senator
Franken, it was there were only three agencies that directly involved
in this assessment plus my office...

FRANKEN: But all 17 signed on to that?

CLAPPER: Well, we didn't go through that -- that process, this
was a special situation because of the time limits and my -- what I
knew to be to who could really contribute to this and the sensitivity
of the situation, we decided it was a constant judgment (ph) to
restrict it to those three. I'm not aware of anyone who dissented or
-- or disagreed when it came out.

FRANKEN: OK. And I think anyone whose looked at even the
unclassified border's pretty convinced that this is what happened.
And one of the questions is, why do they favor Donald Trump? There
are a number of contacts and communications that between Trump
campaign officials and associates and members of the Trump
administration, Jeff Sessions as Senator Leahy mentioned.

Carter Page, a former campaign advisor, Paul Manafort who was a
former campaign manager and chief strategist, Rex Tillerson, secretary
of state, friend of Russia war (ph) Roger Stone, and of course, Jared
Kushner, White House senior advisor, Simon Law (ph) and Michael Flynn.
All -- that's a lot, in -- in my mind.

Now, going to Flynn, he appeared during the campaign on Russia
Today. Russia Today is the propaganda arm, one of the propagandas
arms. And now you, General, since you've retired have you appeared on
Russia today?

(LAUGHTER)

CLAPPER: No, no, not willingly, you know.

FRANKEN: OK. And -- and General Flynn received $37,000 for
sitting next to Putin at the 10th anniversary of Russia today. It
seems -- all this seems very odd to me and raised a lot of questions.

I was struck that Mr. McGahn did not ask you in the second
meeting why DOJ, General Yates, would have concerns that the -- that
the national security advisor had lied to the vice president. In the
first meeting, did you mention that? That that was -- that he might
be compromised?

YATES: Certainly, we went through all of our concerns in the
first meeting. And it was in the second meeting that he just raised
the question of essentially, why is this an issue for the Department
of Justice if one White House official lies to another.

FRANKEN: OK I don't understand why he didn't understand that.

YATES: I'm not sure I can help you with that, Senator.

FRANKEN: This is -- General Flynn after that, for 18 days stayed
there and was in one classified thing after another. There are
policies that deal with who gets clearance, security clearance and
not.

The executive order 12968 outlines the rules for security
clearances and says that when there is a credible allegation that
raises concern about someone's fitness to access classified
information, that person's clearance should be suspended, pending
investigations, is that right?

The executive order also states that clearance holders must
always demonstrate, quote, "trustworthiness, honesty, reliability,
discretion and sound judgment, as well as freedom from allegiances and
potential for coercion." Is that right?

And yet, the White House Council did not understand why the
Department of Justice was concerned.
YATES: Well, to be fair to Mr. McGahn, I think the issue that he
raised, he wasn't clear on was why we cared that Michael Flynn had
lied to the vice president and others, why that was a matter of ...

(CROSSTALK)

FRANKEN: I think that's clear.

YATES: Within DOJ jurisdiction.

FRANKEN: I think that's so clear, I can't...

YATES: Yes.

FRANKEN: And the president had told -- President Obama had told
the incoming president-elect two days after the election, don't hire
this guy.

YATES: I don't know anything about that.

FRANKEN: Well, that's what we've heard.

(LAUGHTER)

FRANKEN: And we have McGahn doesn't understand what's wrong with
this? And then we have Spicer, the press secretary, saying the

2017 WL 7536669, 2017 WL 83689 (2017)

president was told about this. The president was told about this in
late January, according to the press secretary.

So now he's got a guy who has been, the former president said,
don't hire this guy. He's clearly compromised. He's lied to the vice
president. And he keeps him on, and he lets him be in all these
classified phone -- lets him talk with Putin. President of the
United States and the national security adviser sit in the oval office
and discuss this with Putin.

Is it possible that the reason that he didn't fire him then was
that, well, if I fire him for talking to the Russians about sanctions,
and if I fire -- what about all the other people on my team, who
coordinated? I mean, isn't it possible that the reason -- because you
ask yourself, why wouldn't you fire a guy who did this? And all I can
think of is that he would say, well, we've got all these other people
in the administration who have had contacts. We have all these other
people in the administration who coordinated, who are talking. Maybe
that. I'm just trying to -- we're trying to put a puzzle together
here, everybody.

And maybe, just maybe, he didn't get rid of a guy who lied to the
vice president, who got paid by the Russians, who went on Russia
Today, because there are other people in his administration who met
secretly with the Russians and didn't reveal it until later, until
they were caught. That may be why it took him 18 days, until it
became public, to get rid of Mike Flynn, who is a danger to this
republic.

Care to comment?
(LAUGHTER)

YATES: I don't think I'm going to touch that, senator. Thank
you.

GRAHAM: Senator Blumenthal.

BLUMENTHAL: Thank you, Mr. Chairman. And I want to thank you,
Senator Graham, and Senator Whitehouse for conducting this hearing in
a bipartisan way and for prioritizing this issue, which is of such
gravity to our Democracy.

I want to thank each of you not only for your long and
distinguished service, but also for the conscience and conviction that
you have brought to your jobs. Whether we agree or disagree with you.
I hope that there are young prosecutors around the country and young
members of our intelligence committee who will watch this hearing and
say, that's the kind of professional I want to be. Not just expert,
but people of deep conviction and conscience.

And I agree with my colleagues that there ought to be an
independent commission that can have public hearings, produce
recommendations and a report.

But I also believe that there has to be a special prosecutor.
Because what I hear from people in Connecticut and from my colleagues
in their town halls and meetings is that people want the truth
uncovered about how the Russians sought to interfere and undermine our
democracy and electoral system. And they also want accountability.

They want not only the Russians to pay a price, they want anybody
who colluded with the Russians or aided and abetted them to pay a
price as well. And there are criminal statutes that prohibit that
kind of collusion, and impose serious criminal fines and imprisonment
for people who might have done that.

And we know that the FBI is now investigating the potential
collusion of Trump associates and Trump campaign and administration
officials with the Russians, as Director Comey has told us and made
public. So, there's no classified information there.

The meeting that the FBI conducted on January 24th preceded by
one day, approximately, your first meeting with Donald McGahn. Isn't
it a fact that Michael Flynn lied to the FBI?

YATES: And I can't reveal the internal FBI investigation,
Senator, even though it's not -- even though part would not be
technically classified, it's on ongoing investigation and I can't
reveal that.

BLUMENTHAL: Did you tell Donald McGahn that then-National
Security Adviser Flynn told the truth to the FBI?

YATES: No, he asked me how he had done in the interview, and I
specifically declined to answer that.

BLUMENTHAL: Because it was part of an investigation?

YATES: That's right.

BLUMENTHAL: Was that intended to indicate to him that Michael
Flynn had a problem in that interview?

YATES: No, I was intending to let him know that Michael Flynn
had a problem on a lot of levels, but it wasn't necessarily with
respect to how he performed in the interview. I was intentionally not
letting him know how the interview had gone.

BLUMENTHAL: And lying to the FBI is a crime, correct?

YATES: It is, yes.

BLUMENTHAL: Violation of 18 United States Code 1001?

YATES: That's right.

BLUMENTHAL: And it's punishable by five years in prison?

YATES: Yes, it is.

BLUMENTHAL: So, if Michael Flynn lied to the FBI, he had a ton of legal trouble facing him?

YATES: He could face criminal prosecution if he lied to the FBI, yes.

BLUMENTHAL: And if he became a foreign agent for another country, for Turkey, which he was a foreign agent for, without getting permission from the Department of Defense, he faced criminal penalties for that and still faces them, correct?

YATES: Yes. It's certainly FARA violations can be criminally prosecuted, yes.

BLUMENTHAL: In fact, it's a violation of 18 United States Code 219, and that's punishable by two years in prison, correct?

YATES: Mm-hmm.

BLUMENTHAL: And his failure to disclose payments from foreign sources which also he had done before you went to Donald McGahn is also criminally punishable, is it not?

YATES: That was not a topic I discussed with Mr. McGahn and so it's not something I can discuss here today.

BLUMENTHAL: But it is in fact, from your knowledge a violation of criminal law, is it not?

YATES: To not disclose payments for it, yes, but I'm not speaking to his specific conduct, just generally that it is, yes.

BLUMENTHAL: If Michael Flynn is prosecuted for any of these crimes, isn't it possible that the vice president of the United States might be a witness?

YATES: I guess it would depend on the crime.

BLUMENTHAL: If it were a false statement to the FBI about his conversations with the Russians, wouldn't the vice president potentially be called as a witness to corroborate that false statement?

YATES: You know, I would be -- certainly that's possible, but I would be speculating how such criminal prosecution would come together.

BLUMENTHAL: So where I'm going is, the need for a special prosecutor is because officials at the highest level who are responsible for appointing the deputy attorney general, the United States attorney general are all potentially witnesses and they are even targets, correct?

YATES: Potentially.

BLUMENTHAL: And so a special counsel, in order to hold those government officials or others responsible, really has to be independent, correct?

YATES: Well, Department of Justice lawyers pride themselves on being able to be independent regardless of whether they're appointed as a special counsel.

BLUMENTHAL: But the ultimate decision whether or not to prosecute, for the sake of appearance as well as in reality, should be made by someone who is unquestionably independent, objective, and impartial?

YATES: Senator, I absolutely understand your concerns here. But the fact of the matter is, is that particularly as someone who just departed from the Department of Justice, I'm just not going to wade into whether or not they should have a special counsel or an independent counsel in this matter. I don't really think they need the formers telling them how to do their jobs.

BLUMENTHAL: Well, I'm going to be very unfair to you and just ask you, as a private citizen, wouldn't you like to see a special counsel appointed under these circumstances?

(LAUGHTER)

YATES: Not going to go there either, Senator.

BLUMENTHAL: As an expert witness...

(LAUGHTER)

... for our committee, I'll qualify you as an expert if Judge
Graham allows me to do it. Let me...

GRAHAM: You'll have to pay her.
(LAUGHTER)

BLUMENTHAL: Let me just close by asking you, my colleague,
Senator Franken, made reference to warnings given to the -- given by
President Obama to then-President-elect Trump about hiring Michael
Flynn.

That is a public report from The New York Times, in fact, of
today, which I ask to be entered into the record. And I also ask to
be entered into the record, the February 9th report from The
Washington Post, I believe there has been a reference to it.

Without that published report, and without the free press telling
us a lot of what went on, Michael Flynn might still be sitting in the
White House as national security adviser, because by January 30th, you
were forced to resign, correct? You were fired.

YATES: Yes, I was fired.

BLUMENTHAL: So nobody was around to tell the White House, as you
said, that our national security was in danger.

YATES: Well, there were still the career officials in the
National Security Division who had been working with me on this matter
that were there and were certainly conversant in the facts.

BLUMENTHAL: But the ultimate decision to go to the White House
was yours?

YATES: Yes, it was.

BLUMENTHAL: Thank you, Mr. Chairman.

GRAHAM: Senator Hirono.

HIRONO: Thank you, Mr. Chairman.

In spite of the Trump administration's ongoing efforts to
convince all of us that there is nothing to see here with regard to
Russian interference with our 2016 election, the Trump team's
connections to these efforts, we need to get to the bottom of this.

And so I thank Chair Graham and Ranking Member Whitehouse for
these hearings. And in fact I just had a number of town hall meetings

in Hawaii this past weekend. And hundreds of people came, and believe
me, they care that we get to the bottom of this.

The Trump administration blames President Obama for failing to
suspend General Flynn's clearance. And in fact in a press conference
today, Sean Spicer said: "Everyone in the government goes through the
same process."

And he also said: "There's no difference of a security clearance
once it's issued. And basically as far as this administration is
concerned, nothing more needed to be done" by them regarding General
Flynn's clearance.
Director Clapper, isn't it true that the CIA has a separate
vetting process for National Security Council appointees? And in fact
the press is reporting today that General Flynn never completed that
process. Can you enlighten us?

CLAPPER: I can't speak to specifics of how it was done with
General Flynn. I know what I went through as a political appointee
twice in two -- in a Republican and a Democratic administration.

And the vetting process for either a political appointee or
someone working in the White House is far, far more invasive and far,
far more thorough than a standard TS/SCI clearance process.

But I don't know what process was used in General Flynn's case.
And nor did I have access to his complete investigatory file, so it's
very difficult for me to speculate on what was in it and what action,
if any, was taken by the White House.

HIRONO: Well, according to Sean Spicer, that he had a clearance
from the Obama administration, and that was it. And this
administration had no further responsibilities.

So let me go on. Others of my colleagues have mentioned, and you
yourself, Mr. Clapper, said that RT is a Russian mouthpiece to spread
propaganda. And, of course, we know that General Flynn attended a
gala hosted by -- or a 10th anniversary gala for RT in December, 2015,
where he sat next President Putin and got paid over $33,000 for that.

Mr. Clapper, given the conversation that Ms. Yates provided to
the White House regarding -- and this is during the January 26th and
27th timeframe -- regarding General Flynn, should he have sat in on
the following discussions?

On January 28th, he participated in an hour-long call, along with
President Trump, to President Putin. And on February 11th, he
participated in a discussion with Prime Minister Abe and the president
at Mar-a-Lago to discuss North Korea's missile tests.

Should he -- given the -- the information that had already been
provided by Ms. Yates, should he have participated in these two very
specific instances?

CLAPPER: Well, I -- you know, I can't, it's difficult for me to
answer, Because I'm not -- I -- I was out at that...

HIRONO: Well, let's say you were in.

CLAPPER: ... point. I -- I don't -- as just a standard comment,
a -- a general comment, I -- I don't think it -- it was a -- I don't
think it was a good practice. Put it that way.

HIRONO: So I think this comports with some of the concerns that
have been raised about the appropriateness or adequacy of the Trump
administration's vetting process with regard to various disclosures by
other members of his administration, and, as I mentioned, the
administration's continuing efforts to downplay Russia's interference
in our elections.

After General Flynn resigned on February 13th, on February 15th,
President Trump tweeted that Flynn is a, quote, "wonderful man," and,
quote, "it's very, very unfair what's happened to General Flynn,"
unquote.

So, Mr. Clapper, is this the kind of statement that would be made
by a president aware of serious security concerns about his former
national security adviser?

CLAPPER: Well, I -- I'm loath to comment on the tweets. I --
you know, that's -- that was, I -- I suppose, an honest expression of
how he felt.

HIRONO: Well, does this sound like somebody who knew that there
were serious security concerns about it, that he would say it was
very, very unfair, and that -- that Mr. Flynn is a wonderful man?
Maybe I should just...

(CROSSTALK)

CLAPPER: Well, I don't...

HIRONO: ... and people can draw their own conclusions.

CLAPPER: ... I -- I don't know what information was conveyed to
the president. I -- I have no insight there. So I don't know to --
the extent to which he had an understanding of what the former
attorney -- acting attorney general...

HIRONO: Yes.

CLAPPER: ... conveyed. I don't know how much of that made its
way to the president.

HIRONO: Yes, precisely that -- that is a concern that I would
have, that it sounds like perhaps the president was not aware.

And in fact, going on, in March, the president tweeted that Flynn
should be given immunity -- Flynn resigned on February 13 -- and that
the FBI's investigation is, quote, "a witch hunt."

So, I'd like to ask both of you, should these tweets -- these
kinds of tweets and other similar assertions by the president have any
influence at all on the FBI's ongoing investigation into Russian
interference in our elections and team Trump's connections to these
efforts?

CLAPPER: Well, it shouldn't, and I'm confident it won't.

HIRONO: I hope so.

I have a question about the Foreign Agents Registration Act
violations -- FARA. A number of Trump administration officials are
belatedly disclosing and registering their work on behalf of foreign
governments under the Foreign Agents Registration Act, some of which
raised serious counter-intelligence concerns.

I asked Director Comey about these concerns last week. Ms.
Yates, what are the consequences for White House staffers who fail to
disclose their foreign contacts on their security clearance forms?

YATES: Well, there can be a variety of ramifications. You can
lose your security clearance. You can lose your job, or, in certain
circumstances, you can be criminally prosecuted.

HIRONO: Is it up to the Department of Justice or the FBI to
pursue these kinds of allegations against staffers who do not disclose
appropriately?

YATES: Again, it would all depend on the circumstances of the
non-disclosure, whether it was willful, and what the circumstances
were of the conduct underlying that. So it would really -- it's going
to be very fact-specific.

HIRONO: I agree that it should be fact-specific, but considering
the allegations, though, I -- I hope that either the FBI or the
Department of Justice is pursuing an investigation into these matters.

Again, under what circumstances would the Department of Justice
decide to bring charges against someone for violating FARA? So you --
you said, Ms. Yates, it would depend on the facts...

YATES: Right (ph).

HIRONO: ... of the -- of the situation.

If the president or someone close to him knew that a White House
official failed to disclose work on behalf of a foreign government,
and chose to cover that up. Again, can you reiterate again the
possible repercussions to this person?

YATES: To the individual?

HIRONO: To the individual. Let's say that the allegations are
proven true.

YATES: That they fail to disclose their activity and that the
President covered it up, or the individual did?

HIRONO: Let's say the person knew or the administration knew and
then the individual also covered it up?

YATES: Well cover ups are bad. They [****] usually as
evidence of intent and so that's something that we look at in making
determinations about whether it's something that should be criminally
prosecuted. But again, you know it's going to be very fact specific.
It's hard to give you a hard fast answer.

HIRONO: And if the administration -- either knew or should have
known --I'm sorry.

GRAHAM: Senator.
HIRONO: Thank you very much, you've been very ...

GRAHAM: We're going to do a second round, but we're going to do
it quickly and we're going to do four minute rounds and there's light
at the end of the tunnel. We got a vote at 5:30, so I promise you
you're going to get out of here pretty quick. But I know Senators
have questions, starting with me and I'm going to enforce the four
minutes to myself.

General Clapper, during your investigation of all things Russia,
did you ever find a situation where a trump business interest in
Russia gave you concern?

CLAPPER: Not in the course of the preparation of the

intelligence communities assessment.

GRAHAM: Since?

CLAPPER: I'm sorry?

GRAHAM: At all, any time?

CLAPPER: Senator Graham I can't comment on that because that impacts an investigation.

GRAHAM: It wasn't enough to put into the report.

CLAPPER: That's correct.

GRAHAM: OK. Ms. Yates the rule of law, you cannot allow people to leak classified information because they want a particular outcome, that's not the rule of law, is that correct?

CLAPPER: Absolutely.

GRAHAM: Then I think you both agree with that concept. Did Mr. McCan(ph), in your view Ms. Yates, ask reasonable questions about your concerns?

YATES: I didn't really have a judgment about whether they were reasonable or unreasonable. But I do think that Mr. McCan (ph) was trying to get to the bottom, in our discussion of what had happened with General ...

GRAHAM: And he wanted to actually see the information that you were talking about?

YATES: He indicated he did. Again, I don't have any way of knowing what happened after that.

GRAHAM: But he said he wanted to and you tried to set that up.

YATES: That's right.

GRAHAM: OK. Now about surveillance, this is very important, an American citizen cannot be surveilled in the United States for colluding with a foreign government unless you have a warrant. Is that a true statement of the law?

YATES: That's right.

GRAHAM: Is it fair to say that incidental collection occurs, even in the united States?

YATES: That's correct as well, yes.

GRAHAM: OK. So there's two situations that we would have found out what General Flynn said to the Russian bastard. If there was a FISA warrant focused on him, was there?

YATES: You asking?

GRAHAM: Yes, either one of you.

YATES: Again I think you know I'm not going to answer whether there was a FISA warrant. Nor am I even going to talk about whether General Flynn was talking to the Russians.

GRAHAM: OK.

CLAPPER: Oh I have to obviously going to go along with ...

YATES: Well if he wasn't talking to the Russians, we've had a hearing for no good reason. So clearly he's talking to the Russians and we know about it. So if there is no FISA warrant, and I'm going to find out about this by the way. The other way that we knew what he was talking about, the Russia [****] was incidentally surveilled. So those were the two options. Do we know who unmasked the conversation between the Russian ambassador and General Flynn? Was there unmasking in this situation?

CLAPPER: Are you looking at me?

GRAHAM: Yes sir.

CLAPPER: I don't know.

GRAHAM: Do you Ms. Yates?

YATES: I can't speak to this specific situation. But can I try to clarify one point on this unmasking thing?

GRAHAM: Very quickly.

YATES: OK I'll try to do it quickly. As a consumer of intelligence I would -- for example, I would receive intelligence reports from various agencies.

GRAHAM: I get that, no.

YATES: Now often times the names are already unmasked by the intelligence agencies ...

GRAHAM: The bottom line here is I want to know how it got to the Washington Post. Somebody had to have access to the information and they gave it to the Washington Post, is that a fair statement?

YATES: That's right. That's what it looks like to me.

GRAHAM: Is that right General Clapper?

CLAPPER: Yes.

GRAHAM: And it was -- neither one of you did it?

YATES: That's right.

CLAPPER: That's right.

GRAHAM: How many people can request unmasking of American citizen in our government, General Clapper, how many?

CLAPPER: I don't have an exact number. It's I think fairly limited, because it's a -- normally fairly high level officials.

GRAHAM: How did you know that General Flynn was talking to the Russian's who told you?

YATES: And I can't reveal that in an open setting. But what I was trying to say was, is that often times we receive intelligence reports where the name of the American citizen is already unmasked, and it's unmasked by the intel agency because, not based on anybody's request, but because the name of that citizen is essential.

GRAHAM: Is that the situation here?

YATES: I can't -- Senator, I cannot...

(CROSSTALK)

GRAHAM: Thank you. My four minutes is up. Thank you both. But I want to know the answer to these questions.

Senator Whitehouse?

WHITEHOUSE: Thanks, again, Chairman.

Two things. One, there are multiple levels of security clearances, and they're issued by different agencies, correct? So having one from DoD doesn't necessarily make you good for all positions and places.

CLAPPER: It does not.

WHITEHOUSE: And in DoD operates clearances at multiple levels, correct?

CLAPPER: Right. But I think the key point here is that, as I indicated earlier, the requirements for a TS/SCI versus the requirements for occupying a sensitive position in the White House as a part of the National Security Council or...

(CROSSTALK)

WHITEHOUSE: Way higher than for a retired general?

CLAPPER: Well, exactly. And as I can attest, much more invasive and aggressive than a standard TS/SCI.

WHITEHOUSE: Now in terms of compromise tradecraft, if you have somebody, and you have them compromised, it's pretty standard compromise tradecraft to ask them to do some little thing for you under the threat of having the compromising information disclosed.

And if you succeed, you now have two things on them. And you work it that way to get somebody more and more enmeshed in compromise until they're more or less owned by the intelligence agency. Is that a fair description of how you can develop compromise through regular tradecraft?

CLAPPER: Yes, yes, yes.

WHITEHOUSE: OK. Just want to make that sure, because we're talking a lot about it here.

Last thing, my list. So, I went through the list, it looked like propaganda, fake news, trolls, and bots. We can all agree from the IC report that those were in fact used in the 2016 election.

Hacking and theft of political information, the hack into the DNC, into the Podesta e-mails, I think we can all agree that that's a yes.

Timed leaks of damaging material. That appears very strongly to be a yes, because of the timing of the release, smack after the "Access Hollywood" release.

I believe that the answers were correct, no, as to in-country assassination and political violence by the Russians here in the United States. Would you both agree with that?

CLAPPER: I don't think we turned up any evidence of that.

WHITEHOUSE: OK. And controlling investment in key economic sectors for leverage, it seems that our economy is probably a little too big for that and there was no evidence of that in the IC report either, correct?

CLAPPER: That's correct.

WHITEHOUSE: So, the question of shady business and financial ties that not only start out as bribery, perhaps, or as highly favorable deals, secret deals with Russians, but that in turn can then turn into compromise?

CLAPPER: It could.

WHITEHOUSE: And it's not just the carrot of I'm continuing to bribe you, at some point you have a stick over the individual of, I'm going to out the deal that we have unless you do this, correct?

CLAPPER: That's classic kompromat.

WHITEHOUSE: And we do not yet know the extent to which that has played a role in the 2016 Russian election hack, correct?

CLAPPER: I don't.

WHITEHOUSE: And in terms of corrupting and compromising politicians, same, we don't know the full extent of whether or not politicians have been corrupted and compromised?

CLAPPER: I certainly don't -- I did not and don't.

WHITEHOUSE: So, if we were to go down this, yes, yes, yes, no, no, question mark, question mark, would be our tally at the end. Are we agreed on that?

CLAPPER: Yes.

WHITEHOUSE: OK.

Anything else, Ms. Yates?

YATES: Not from me, sir.

WHITEHOUSE: Terrific. Thank you.

I yield back my nine seconds.

(LAUGHTER)

GRAHAM: You're a trend-setter.

Senator Grassley?

GRASSLEY: Mr. Clapper, you said yes when I asked you if you ever unmasked a Trump associate or a member of Congress. But I forgot to ask, which was it? Was it a Trump associate, a member of Congress, or both?

CLAPPER: Over my time as DNI, I think the answer was on rare occasion, both. And, again, Senator, just to make the point here, my focus was on the foreign target and at the foreign target's behavior in relation to the U.S. person.

GRASSLEY: OK. How many instances were there, or was there just one?

CLAPPER: I can only recall one.

GRASSLEY: Could you provide...

CLAPPER: It could have been more. And the best accounting of this would be in accordance with the procedure, the collecting agency, and that would be a better source of records than the top of my head.

GRASSLEY: OK.

Could you provide us more details in a classified setting?

CLAPPER: I could.

GRASSLEY: OK.

Miss Yates, the same question -- you said, I don't know what you said to answer my question about if you were involved in any unmasking, were you involved?

YATES: No, I've never asked for anyone to be unmasked.

GRASSLEY: OK.

Senator Graham, both you and I, and maybe other people, have been said that we need a classified setting to get some answers here. I assume you're going to pursue that?

GRAHAM: Yes, sir.

GRASSLEY: OK.

Let's see, I got time for a couple more questions, I believe.

Regardless of any disagreements that we have about allegations of collusion, the fact that Russia tried to meddle in our democracy is obviously a front to all Americans. We have to punish Russia, and we have to deter all nations from these shenanigans.

Do you two believe that the government's response, so far, has been enough to deter future attacks of this kind? And if not, what else would you think we should be doing?

Miss Yates, would you start out, please?

YATES: I think they're coming back, and we have to do a whole lot more, both to harden our election systems, our state election systems, to ensure that folks out there know when they're looking at news feeds, that it may not be real news that they're reading.

I think that we have to do more to deter the Russians, and it wouldn't hurt to prosecute a few folks, but I don't think we should kid ourselves, that we'll be able to prosecute our way out of this problem.

GRASSLEY: OK, Mr. Clapper.

CLAPPER: Well, as much as I love Congressional Hearings, I think there is a useful purpose served. Because I think the most important thing that needs to be done here, is educate the electorate as to what the Russians' objective is, and the tactics and techniques, and procedures that they've employed and will continue to employ, and I predict it will be against all the parties.

And so, I think education of the public is the most important thing we can do in this hearing, grudgingly though, I admit it, serves that purpose to the extent that this can be shared openly.

GRASSLEY: So, your . . .

CLAPPER: I do think as well, there needs to be more done in the way of sanctions to the Russians, or any other government, that attempts to interfere in our election process.

GRASSLEY: I'm done.

GRAHAM: thank you very much.

Senator Klobuchar?

KLOBUCHAR: Thank you.

And we thank you, both, for being here again.

I think Senator Graham asked if you would want to come back, then Director Clapper, and we're very glad that you're here.
So, when I asked my questions before, I asked about this general fact, if a high-ranking national security official is caught on tape, with a foreign official, saying one thing in private, and then says something in public that's different, and if that's material for blackmail. And you, both, said that it was.

Can you give me an examples, just from your experience, Director Clapper, of when Russians have used, for one of better words, sex, lies, and videotape against people as blackmail?

CLAPPER: Well, I don't have a lot of direct knowledge external to Russia, this is a classical technique going back to Soviet era, that they would use to co-opt, compromise political opponents. And of course, you know, the current administration in Russia is even more aggressive than that, where they just blot out people for being opposition.

So, there are examples of that, I don't have them off the top of my head, but I have read, and seen it, particularly during the Soviet era, internal to the Soviet Union, that this was a common practice.

KLOBUCHAR: What about our election infrastructure, as we move forward? As you said, one major thing we need to do, is to educate the public.

And I'm very concerned, while we have different states, have different election equipment on the ranking on rules, and we're working on a Bill on this. How important is that to protect the integrity of our election equipment?

CLAPPER: It's quite important and speaking now as a private citizen, not my former capacity, I do think that our election apparatus should be considered critical infrastructure, and should have the protections that are tended to that. A lot of states pushed back when Jeh Johnson, secretary of Homeland Security, engaged with state election officials about having that designation and having the federal government interfere in -- in their election process. But as a citizen, I'd be concerned with doing all we can to secure that apparatus part of the -- attendant (ph) to the intelligence community assessment that we put out. DHS put out a paper on best practices for -- as an advisory on how to secure election apparatuses in -- at the

state and local level.

KLOBUCHAR: Very good. Do you think we're doing a good enough job now, back to the propaganda issue, in educating our citizens about this?

CLAPPER: No, we're not. And the other thing we don't do well enough is the counter messaging.

KLOBUCHAR: And how would you suggest we could improve that?

CLAPPER: I would be for -- I have been an advocate for a USIA (ph) on steroids. I felt that way in terms of countering the message from ISIS, who is very sophisticated at conveying messages and proselytizing and recruiting people. Our efforts to counter message are too fragmented in my -- in my own opinion. That's all I'm saying here. I -- I would seriously consider the notion of a, as I say, a USIA (ph) on steroids not only for the...

KLOBUCHAR: What would that mean exactly?

CLAPPER: I'm sorry?

KLOBUCHAR: Well, someone that we could -- we could message or counter message, and our efforts to counter violent extremist ideology, particularly that from ISIS, who are very skilled at this and we -- I don't think we do, as a nation, we do a good enough job. I think counter messaging the Russians, giving them some of their own medicine much more aggressively than we've done now. And I would hasten to add that is -- should not be tagged onto the intelligence community. It needs to be a separate entity from the intelligence community, something the I.C. would support, but should be separate from that.

KLOBUCHAR: Mr. Chair, just one last question. Ms. Yates, you brought a lawyer with you, a career lawyer, to the meeting at the White House. Is that right?

YATES: Yes, that's right.

KLOBUCHAR: About when you were giving these warnings about the knowledge you had on General Flynn. Is that normal practice? Why did you do that?

YATES: Well, this was a person who was the career lawyer who was supervising this matter and we thought that it was important. First of all, she had been the one who was most intimately familiar with it, but secondly, we knew that my tenure was going to be short and wanted to make sure that there was continuity there and that...

(CROSSTALK)

KLOBUCHAR: You just didn't know it was going to be that short.

YATES: I didn't.

KLOBUCHAR: OK. Thank you.

(LAUGHTER)

GRAHAM: I think the vote is on, so I hate to change, but let's do three minutes.

KENNEDY: I can be very quick.

GRAHAM: Yes, sir.

KENNEDY: Mr. Clapper, does Mr. Putin have any assets in the United States?

CLAPPER: I don't know the answer to the question.

KENNEDY: Who would know that?

CLAPPER: Well, some component in the intelligence community might know it or the FBI, but I don't know.

KENNEDY: Do you know if any of Mr. Putin's friends might have assets in the United States that are being held for Mr. Putin?

CLAPPER: That's a possibility, yes.

KENNEDY: Who would know that? Same person?

CLAPPER: I'm sorry?

KENNEDY: Who would know that? Same person?

CLAPPER: I would guess the FBI.
KENNEDY: OK. If the intelligence community and the attorney general knew all this information about Mr. Flynn, how did he get a security clearance?

CLAPPER: Knew what about Mr. Flynn?

KENNEDY: Well, that he had had a conversation with the Russian ambassador about sanctions.

CLAPPER: Well, that was late -- that was the 29th of December or so, whenever that -- whenever that -- as reported in the media when that took place.

KENNEDY: January 19th, I think, the president was sworn in, 17th, something like that. How did he get a security clearance?

CLAPPER: Well, he was a security clearance -- had one for a long time. He's a career military intelligence officer. I don't know the specifics of when his -- when his fell due. The system is every five years -- the current system, every five years, you're supposed to get a periodic reinvestigation. I don't know the details of that. It would probably be done by his old agency, the Defense Intelligence Agency, but...

KENNEDY: But don't you have to get some additional double secret security clearance to serve in the White House?

CLAPPER: Well, yes, you do. And as I indicated before...

KENNEDY: Can i ask you how he got one...

CLAPPER: ... the process is done -- I don't know how it's done in this administration.

KENNEDY: OK.

CLAPPER: But my own knowledge of how it was done when I served in the Bush administration and again in the Obama administration, there's an extensive vetting process by the FBI.

KENNEDY: OK. Let me stop you because I've only got 50 seconds.

Ms. Yates, are there any reasonable arguments that can be made in defense of President Trump's executive order?

YATES: I don't believe that there are reasonable legal arguments that are grounded in truth that can be made in defense of his argument that the travel ban was not intended to have an impact, a religious impact, and to disfavor Muslims.

KENNEDY: So you believe that the arguments made by the lawyers who are now defending the executive order are unreasonable?

YATES: I believe that the Department of Justice has a responsibility to uphold the law and to always speak the truth, particularly when it's about something as fundamental as this executive order was, that deals with religious freedom.

But let me say this. I have tremendous respect for the career
men and women of the Department of Justice, including the lawyers in
the civil division who are handling this. But their obligation was
different than mine. They must make an argument if they can make a
reasonable legal argument. As acting attorney general, my
responsibility was broader than that and I had to look beyond the
confines of the face of the E.O. to look at the president's statements
and to look at other factors to determine what was the actual intent
here, and that was the basis for my decision.

KENNEDY: And for the record, different travel ban.

GRAHAM: Yeah, there's a -- the first order was withdrawn.
There's a second one out there.

Senator Blumenthal.

BLUMENTHAL: Thanks, Mr. Chairman.

Ms. Yates, so far, the concerns you expressed about the
constitutionality of these executive orders have been upheld by the
courts, correct?

YATES: That's right.

BLUMENTHAL: Second, Director Clapper, on the issue of possible
use of the far right websites by the Russians, you were asked earlier
whether you have any knowledge about that potential cooperation or
involvement. Do you have independent knowledge of the use of those
far right websites?

CLAPPER: I don't. I don't have, at least off the top of my
head, specific knowledge or insight into that connection. Could have
been, I just don't know that directly.

BLUMENTHAL: But you made reference to published reports. You
said, I think, you knew about it from what you read about in the
newspapers.

CLAPPER: Well, that's a specific reference to what happened in
-- occurred in France.

BLUMENTHAL: Correct. And the same tactics that were used most
recently in France were also used or at least reportedly used in this
country?

CLAPPER: Correct.

BLUMENTHAL: And I'd like to put in the record one public report,

there are probably others, a McClatchy report of March 20th, which
begins with the lead, "federal investigators are examining whether far
right news sites played any role last years in the Russian cyber
operation that dramatically widened the reach of news stories, some
fictional, that favored Donald Trump's presidential bid." It quotes
tow people familiar with the inquiry and it goes on to mention, "Among
those sites, Breitbart News and Infowars."

Mr. Chairman, if this report could be entered into the record.

GRAHAM: (OFF-MIKE)

BLUMENTHAL: Do you have knowledge, Ms. Yates, of that federal
investigation?

YATES: I don't, and if I did, I couldn't tell you about it.

BLUMENTHAL: I thought that might be your answer.

Finally, you said, Ms. Yates, that we're not going to prosecute
our way out of the Russian continued attack on this country. But
putting Americans in prison if they cooperate, collude, aid and abet
or otherwise assist in that illegality might send a very strong
deterrent message, correct?

YATES: I expect that it would, yes.

BLUMENTHAL: And there are indeed criminal penalties existing on
the books, we don't need new laws, which involve criminality and
potential criminal prosecution for those acts, correct?

YATES: Yes, that's right.

BLUMENTHAL: Thank you very much, Mr. Chairman.

GRAHAMN: Thank you all. We're at the end of the day and you've
been great. I think the public is better educated, at least I hope,
about what Russia did. Seems to be bipartisan consensus that Russia
tried to interfere with our election. We have some differences in
other places.

But just some housekeeping here, you will provide to the
committee if you could, Mr. Clapper -- I know you're a private citizen
now, but if you could help us to determine the pool of people that can
request unmasking, we'd appreciate it some later date. When it comes
to [****] collection on 2016 campaigns, I'm a little confused,
but I think we found at least one occasion where that did happen. You
made a request for unmasking on a Trump associate and maybe a member
of Congress? Is that right, Mr. Clapper?

CLAPPER: Yes.

GRAHAM: OK. Do we know any others off the top of your head of
any other candidate on either side of the aisle?

CLAPPER: Well, I don't -- there could have been other requests
-- unmasking requests that I...

GRAHAM: But there's a way to find that out.

CLAPPER: Yes.

GRAHAM: OK, good.
CLAPPER: And the best way to do it would be to the original
collection agency...

(CROSSTALK)

GRAHAM: Right, to find out who requested what.

Finally, the current deputy attorney general, do you know him,
Ms. Yates?

YATES: (OFF-MIKE)

GRAHAM: Do you have confidence in him?

YATES: Yes, I do.

GRAHAM: Thank you all.

WHITEHOUSE: Final comment?

GRAHAM: Absolutely.

WHITEHOUSE: During the last hearing, we had the author of the
Kremlin playbook as one of our witnesses and we had the very well-
regarded Kenneth Weinstein as one of our witnesses, and they both
agreed that the United States is leaving itself vulnerable to this
kind of influence if we continue to allow shell corporations to
proliferate without a way for law enforcement to figure out who the
beneficial owners are.

So I mention that because Chairman Grassley and I are working on
a piece of legislation to help solve that, but I think it's very
important in this area and I just wanted to flag it and express to
Chairman Grassley my appreciation for his bipartisan cooperation on
that front, and of course, my appreciation to Chairman Graham for his

work to make this hearing a success and so interesting and meaningful.

Thank you.

GRAHAM: Thank you both. The hearing is adjourned.

END

    SEN. LINDSEY GRAHAM
    Chairman
    Washington, D.C.

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.