2017 WL 2255977
Bloomberg Government
Copy (c) 2017 Provided under license from Bloomberg Government

Verbatim Transcript
May 23, 2017

H Intel
Committee Hearing

H Intel Hearing on Russia Investigation


H Intel Hearing on Russia Investigation


MAY 23, 2017

SPEAKERS:
REP. DEVIN NUNES, R-CALIF.
CHAIRMAN
REP. K. MICHAEL CONAWAY, R-TEXAS
REP. PETER T. KING, R-N.Y.
REP. FRANK A. LOBIONDO, R-N.J.
REP. TOM ROONEY, R-FLA.
REP. ILEANA ROS-LEHTINEN, R-FLA.
REP. CHRIS STEWART, R-UTAH
REP. MICHAEL R. TURNER, R-OHIO
REP. BRAD WENSTRUP, R-OHIO
REP. RICK CRAWFORD, R-ARK.
REP. TREY GOWDY, R-S.C.
REP. WILL HURD, R-TEXAS
REP. ELISE STEFANIK, R-N.Y.
REP. PAUL D. RYAN, R-WIS.
EX OFFICIO

REP. ADAM B. SCHIFF, D-CALIF.
RANKING MEMBER
REP. JIM HIMES, D-CONN.
REP. TERRI A. SEWELL, D-ALA.
REP. ANDRE CARSON, D-IND.
REP. MIKE QUIGLEY, D-ILL.
REP. JACKIE SPEIER, D-CALIF.
REP. ERIC SWALWELL, D-CALIF.
REP. JOAQUIN CASTRO, D-TEXAS
REP. DENNY HECK, D-WASH.
REP. NANCY PELOSI, D-CALIF.
EX OFFICIO

WITNESS:

FORMER CIA DIRECTOR JOHN O. BRENNAN

CONAWAY: (OFF-MIKE) morning as we try to find the truth, try to find answers that our American public wants and we ask for your guidance and wisdom. These things in your -- your son's name, Jesus, amen.

Well, good morning. The committee will come to order. I'd like to welcome our witness, the former director of the Central Intelligence Agency, John -- agency, John Brennan. Thank you Mr. Brennan for agreeing to visit with us this morning. We appreciate that.

As you're aware, this -- I guess mentioned in our prayer, a horrific attack last night in Manchester Arena in the U.K. I'd liked -- we obviously offer all of our prayers and sympathy to the families of the deceased and injured. And while there are many unanswered questions, last night's unspeakable tragedy reminds us of our crucial role our intelligence agencies play in protecting our homeland.

I'm confident that I.C. agencies are doing all they can to assist our U.K. partners at this time. I'd now like to remind our members and the witnesses, this [****] portion is an open hearing. There will be a close session in the Intelligence Committee spaces immediately following today's open hearing to allow members and the witness to discuss classified information.

To our guests in the audience, welcome. We appreciate that the public and the media's interest in the committee's reported work. We expected proper decorum will be observed at all times and disruptions during today's proceedings will not be tolerated.

At this time, I'd like our witness to stand and raise your right hand please. I do solemnly swear and affirm that the testimony you will give this committee will be the truth, the whole truth, and nothing but the truth, so help you God? Thank you, Mr. Brennan. Again, I appreciate it. I now recognize myself for 5 minutes.

As you know, the committee has an incredible responsibility to the American public. We are charged with getting to the bottom of the facts regarding Russians involvement in the 2016 election, and what if any steps were taken by the United States government to prevent such interference in our election. It's my hope that your testimony today will assist both ours and the American public's understanding of the facts surrounding Russian active measures during our last presidential campaign.

As a former director of the CIA, you have a vital knowledge of the events and activities of last year and were a key player in the

preparation of the intelligence community assessment regarding Russian
activities and intentions in recent U.S. elections published in
January 2017. You wrote up a handful of former U.S. government
employees that can assist this committee with understand the events
that took place in the judgments rendered by the intelligence
committee regarding -- community regarding those matters.

In particular, I'm hopeful you will discuss your understanding of
the ongoing Russia threat and the actions that were taken by the Obama
administration to counter it. This committee was focused on the
Russian aggression long before the 2016 election, so it is -- it is
disheartening to wonder why more action was not taken sooner. I hope
you will have some insight in this important matter. Every day the
American public is bombarded with news about the Russian interference
in our elections.

Many of these reports are false and/or misleading. Today is an
opportunity to focus on the truth and the truth can be only found
through a full and fair investigation of all the facts. The committee
has a vital duty to the American public to conduct a comprehensive
bipartisan oversight of the intelligence community and to follow the
facts wherever they lead. To that end, your testimony today will
greatly help us meet this solemn obligation.

And with that -- with that, I'd recognize the Ranking Member Mr.
Schiff for five minutes for any opening comments that he would like to
make. Adam?

SCHIFF: Thank you, Chairman.

Good morning Dr. Brennan and welcome. We thank you for coming
before our committee and for your lifetime of service to the country.
We awoke today to the terrible news from Manchester that a suicide
bomber killed and wounded scores of young people, including children
enjoying music at a concert. It's difficult to describe the depravity
of that act, let alone view the images of the carnage which has now
been claimed by ISIS.

We know that your colleagues and the intelligence community are
doing everything they can to share information with the British and
working day and night to prevent such attacks from again plaguing our
own country. We thank them and the brave servicemen and women
fighting this scourge of terror in places like Iraq, Syria and
Afghanistan.
Two months ago, our committee held its first open hearing with
then FBI Director Comey and NSA Director Rogers, because Mr. Comey was
responsible for investigating whether U.S. persons were involved in
the Russia hacking of our election. Many of our questions at that
hearing went to the issue of collusion.

It was at that hearing that Director Comey first revealed that the FBI had opened a foreign counterintelligence investigation, people associated with the Trump campaign in July of last year and that this investigation was ongoing. Director Comey and Rogers also repudiated the president's contention that he was the subject of an illegal wiretapping operation orchestrated by his predecessor.

Today, we'll hear the testimony of Former CIA Director John Brennan, who had the responsibility to determine Russia's plans and intentions in the United States and around the world. Those plans involve an unprecedented attack on our Democratic institutions and those intentions included a desire to tear down our democracy and more than that, a wish to undermine the candidacy of Hillary Clinton and advance the prospects that Donald Trump would become President of the United States.

The audacity of the Russian intervention in our election took most Americans by surprise. And today, we will look to Director Brennan to inform us when the CIA first learned that the Russians intended to do more than gather foreign intelligence and were intent on weaponizing the data by publishing it at critical times during the campaign. What accounts for the Russian willingness to interfere in such a brazen way? What were they hoping to accomplish and why were they willing to run the risk of getting caught?

Did the Russians believe that the U.S. government response would be so muted that they could get away with it and pay little price? Since the decision to intervene in our election came from the very top levels of the Kremlin, was Putin himself encouraged by then Candidate Trump's call for the Russians to hack Hillary Clinton's e-mails and his promise that they would be richly rewarded for doing so?

While the CIA's mission is to gather foreign intelligence, we will also want to explore with Director Brennan what the agency may have learned about the issue of U.S. person involvement in the Russian operation and can share an open session about how the Russians may have identified or targeted U.S. persons to secure their systems or co-op them and what mechanism was established, if any, for the sharing of information between elements of the intelligence community and the FBI.

Our agencies have concluded that the Russian attack on our democracy was not a one off and they will do so again. In fact, the Russians are already employing many of the same tactics in Europe. We will want to know the director's views of the broader Russian aims and what we can do to stop them. Finally, the disruption of our democracy that the Russians sought to provoke continues to reverberate throughout our government.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Over the course of the last two weeks, several matters have been
alleged that are great concern to our committee and the public that
have a direct bearing on our investigation and the relationship
between the president and intelligence community. It is alleged that
the president shared sensitive and classified information with the
Russians that was provided by one of our intelligence partners.

It is alleged that the president urged Director Comey to lay off
the investigation of Michael Flynn and asked the director to pledge
his loyalty. Most recently, it is alleged that the president weighed
in with the Directors Rogers and Coats and urged them to rebut the
issue of collusion and that his staff asked personnel at those
agencies to lobby Director Comey to drop the Flynn case. And
significantly, it was admitted by the president himself that the
Russia probe was the primary motivation behind his firing of Mr.
Comey.

If accurate, these events would have taken place shortly after
you left the CIA but as I imagine you must have maintained many
relationships with the incredible workforce at the CIA and elsewhere
where you served for many decades. We will be interested to learn
whether members of the intelligence community have shared information
with you that corroborates any of these allegations and how you assess
the conduct of the administration may be impacting the ability of our
agencies to gather critical information from our partners and the
ability of the FBI to carry out its investigation free from
interference.

And last I want to say a word about the appointment of Mr.
Mueller as special counsel. Many of us have known Director Mueller
for many years and have the utmost respect for him but I take sharp
issue with those who have suggested that his appointment, as important
as it was to ensure public confidence in the conduct of the DOJ
investigation, somehow obviates the need for our own congressional
probe.

Our investigation and Mr. Mueller's have two very different, but
equally important objects. His will ultimately determine whether any
U.S. laws were broken and who should be brought to justice if they
were. And ours will be to determine the whole scope of Russian
intervention in which U.S. person involvement is but one part, whether
our response was adequate, what steps need to be taken to protect us
in the future, and importantly to make many of our public -- our
hearings and findings public since a well-informed electorate is our
only sure defense.

I thank the chairman and I yield back.

CONAWAY: Gentleman yields back.

Mr. Brennan, do you have an opening statement?

BRENNAN: Yes sir, I do.

CONAWAY: You're recognized.

BRENNAN: Thank you.
Representative Conaway, Representative Schiff, and members of the
committee, I appreciate the opportunity to appear before you today.
As you know, I served as director of the Central Intelligence Agency
from March 2013 to January of this year, as assistant to President
Obama for homeland security and counterterrorism from 2009 to 2013,
and as a CIA officer from 1980 to 2005.

I am currently serving as a part-time senior advisor at Kissinger
Associates. I would like to express my deepest condolences like you
to the British people and to the families of those killed and injured
in yesterday's heinous attack against innocents in Manchester. I am
confident that intelligence, security, and law enforcement officers
from the United Kingdom, United States, and other countries, are
actively working to find those responsible and prevent further
attacks. And I wish them Godspeed.

Congress and the American people have already heard from former
and current U.S. officials intimately involved in uncovering Russian
attempts to interfere in the 2016 presidential election, notably from
Former Director of National Intelligence James Clapper, Former
Director of the FBI James Comey, Former Acting Attorney General Sally
Yates and NSA Director, Admiral Mike Rogers.

Rather than repeating details contained in their testimonies, I
will use this opportunity to make three main points before I take your
questions. First, I'm exceptionally proud of the work done by the
women and men of the CIA who along with their talented colleagues from
the FBI, NSA, and the office of the DNI, tracked and exposed Russian
active measures against our presidential election.

When it became clear to me last summer that Russia was engaged in
a very aggressive and wide-ranging effort to interfere in one of the
key pillars of our democracy, we pulled together experts from CIA,
NSA, and FBI in late July to focus on the issue, drawing in multiple
perspectives and subject matter experts with broad expertise to assess
Russian attempts to interfere in the U.S. presidential election.

BRENNAN: The purpose was to ensure that experts in key agencies
had access to information and intelligence relevant to Russian actions
so that we could have as full an appreciation as possible on the

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

scope, nature, and intentions of this Russian activity.

The experts provided regular updates and assessments through the summer and fall, which we used to inform senior U.S. officials, including President Obama. The work also was leveraged for the intelligence community assessments that was completed in early January, under the aegis of the director of national intelligence.

Second, it should be clear to everyone that Russia brazenly interfered in our 2016 present election process and that they undertook these activities, despite our strong protests and expose a warning that they not do so.

Along these lines on 4, August of last year, I spoke to Alexander Bortnikov, the head of Russia's Federal security Bureau, the FSB, Russia's internal security and intelligence service. The bulk of the schedule call focused on Syria, as Bortnikov was my principal Russian interlocutor on tourism matters.

In consultation with the White House, I took the opportunity to raise two additional issues with him. I first told Mr. Bortnikov, as I had several times previously that the continued mistreatment and harassment of U.S. diplomats in Moscow was irresponsible, reckless, intolerable and needed to stop. Over the years it has been Mr. Bortnikov's FSB that has been most responsible for this outrageous behavior.

I next raised the published media reports of Russian attempts to interfere in our upcoming presidential election. I told Mr. Bortnikov that if Russia had such campaign underway, it would be certain to backfire. I said that all Americans regardless of political affiliation or whom they might support in the election cherish their ability to elect their own leaders without outside interference or disruption. I said American voters would be outraged by any Russian attempt to interfere in election.

Finally, I warned Mr. Bortnikov that if Russia pursued this course, it would destroy any near-term prospect for improvement in relations between Washington and Moscow and would undermine constructive engagement even on matters of mutual interest.

As I expected, Mr. Bortnikov denied that Russia was doing anything to influence our presidential election, claiming that Moscow is a traditional target of blame by Washington for such activities. He said that Russia was prepared to work with whichever candidate wins the election. When I repeated my warning, he again denied the charge, but said that he would inform President Putin of my comments. I believe I was the first U.S. official to brace the Russians on this matter.

Third, to the so-called Gang of Eight process, we kept Congress
apprised of these issues as we identify them. Again in consultation
with the White House, I personally briefed the full details of our
understanding of Russian attempts to interfere in election to
congressional leadership, specifically Senators Harry Reid, Mitch
McConnell, Dianne Feinstein and Richard Burr; and to Representatives
Paul Ryan, Nancy Pelosi, Devon Nunes and Adam Schiff between 11,
August and 6, September.

I provided the same briefing to each of the gang of eight
members. Given the highly sensitive nature of what was an active
counterintelligence case involving an ongoing Russian effort to
interfere in our presidential election, the full details of what we
knew at the time were shared only with those members of Congress, each
of whom was accompanied by one senior staff member.

The substance of those briefings was entirely consistent with the
main judgments contained in the January classified and unclassified
assessments, namely that Russia's goals were to undermine public faith
in U.S. democratic process, denigrate Secretary Clinton and harm her
electability and potential presidency, and to help President Trump's
election chances.

Let me conclude by saying that was a very special privilege to
serve as a CIA officer for the first 25 years of my public service and
it was the highest honor of my professional career and always will be
to have served another four years as director of CIA. CIA officers of
all disciplines past, present and future serve this country and their
fellow citizens with tremendous dedication, talent, and courage.

They recognize that this country's national security rests
heavily on their continued outstanding work on the sacrifices they and
their families make every day on behalf of their fellow citizens. We
all owe a great debt of gratitude to all CIA officers and their
families for what they have done and continue to do to protect this
country. And I will now be pleased to take your questions.

CONAWAY: Well, again Mr. Brennan, thank you very much for your
long service, distinguished and for agreeing to come this morning.

I'm joined on our task force by two able prosecutors who I'd like
to yield my five minutes to -- to Tom Rooney, Tom?

ROONEY: Thank you, Mr. Chairman.

Mr. Director, if you could just take a quick minute before I
start with my line of questioning, with regard to what happened last
night in Manchester to do whatever you can the best you can from your

expert -- expert opinion to try to reassure the American people that
what we do in this country and what we're trying to do would help
thwart and stop any kind of similar activity here in the -- in the
future. If you could help try to put American minds at ease briefly,
I would appreciate any words that you might have of advice.

BRENNAN: Well, I would say that ISIS and Al Qaida and their
terrorist -- terrorist affiliates continue to try to carry out these
outrageous attacks in Europe, as well as the United States. But I can
say with great confidence that this country has the absolute best
counter-terrorism community that knits together the experts from
intelligence, law enforcement, homeland security and does a great job
of making sure that our federal structure is interoperating as best it
can with state and local officials and local law enforcement.

And so I have seen a tremendous, tremendous growth of capability,
as well as an -- an enhanced national architecture since 9/11, in
terms of the ability to share counter-terrorism information quickly,
terrorist threat information so that when it's collected overseas or
wherever, it gets to those individuals who have to take action on it.
So I can assure the American people that I know today, my former
colleagues are working even harder than they ever have before to
prevent attacks.

ROONEY: Thank you, sir. And to the matter at hand, we heard the
ranking member speak in his opening, as well as we've heard in -- in
the press numerous times with regard to and in your opening statement,
the Russian investigation what -- what the Russians were trying to do
with regard to our election.

The Russians interfering with our election, whether it be through
the RT or propaganda or whatever, we know that that has now
unfortunately become the new norm and it's something that we're all
going to have to deal with. And our charge on this committee isn't so
much necessarily to try to seek out and root out criminal behavior,
especially now in light of the new Special Counsel Robert Mueller, who
would be looking into those type of things.

But for us on the intelligence committees, whether it be here or
in the Senate, to try to improve the intelligence community's ability
to do our jobs and to make a report, a recommendation to you and the
-- the new administration as to how we better defend ourselves against
what Russia and/or others may be trying to do with regard to affecting
our Republican, our democracy. And in doing so, if we do find any
kind of criminal behavior, I think that -- that the minority would
agree that those type of -- that type of information would be referred
to the Justice Department, which is the -- the proper jurisdiction.

But with regard to the -- the -- the main question at hand in

your experience with the Russian trying to involve themselves in our election. Did you ever find any evidence as the ranking member spoke of collusion while you were the director, did you find direct evidence of collusion between the Trump campaign and Putin in Moscow while you were there?

BRENNAN: Mr. Rooney, I never was an FBI agent I never was a prosecutor so I really don't do evidence; I do intelligence throughout the course of my career. As an intelligence professional, what we try to do is to make sure that we provide all relevant information to the bureau if there is an investigation underway that they're looking into criminal activity.

As I mentioned in my opening statement, I was convinced in the summer that the Russians were trying to interfere in the election. And they were very aggressive, they had -- it was a multifaceted effort and I wanted to make sure that we were able to expose as much of that as possible.

ROONEY: But was there intelligence that said that the Trump campaign was colluding with Moscow during their campaign to assist...

BRENNAN: There was intelligence that the Russian intelligence services were actively involved in this effort and having been involved in many counterintelligence cases in the past, I know what the Russians try to do. They try to suborn individuals and they try to get individuals, including U.S. persons, to act on their behalf either wittingly or unwittingly.

And I was worried by a number of the contacts that the Russians had with U.S. persons and so therefore, by the time I left office on January 20, I had unresolved questions in my mind as to whether or not the Russians had been successful in getting U.S. persons involved in the campaign or not to work on their behalf, again, either in a witting or unwitting fashion. And so therefore I felt as though the FBI investigation was certainly well-founded and needed to look into those issues.

ROONEY: When you talk about -- and I'm running out of time, but hopefully I'll be able to circle back. Can you describe their capabilities beyond just propaganda and actual infiltrating whether or not there was -- you had intelligence to infiltrate the campaign with capabilities beyond just propaganda and beyond just reaching out or trying to influence the news or the campaign and how long have we known about these type of capabilities?

BRENNAN: There's a lot of intelligence that's been built up over the years about Russia's M.O. in terms of trying to gain influence in Western democracies. How they've been able to use individuals,

they've been able to use politicians, political parties, they've been able to use elements within the media to try to make sure that their objectives are realized.

And so again, knowing what the Russian M.O. is and has been including elections in Europe, I certainly was concerned that they were practicing the same types of activities here in the United States. And that's why, as I said, we set up a group in late July that included the FBI and NSA.

I wanted to make sure that every information and bit of intelligence that we had was shared with the bureau so that they could take it. It was well beyond my mandate as director of CIA to follow on any of those leads that involved U.S. persons. But I made sure that anything that was involving U.S. persons, including anything involving the individuals involved in the Trump campaign was shared with the bureau.

ROONEY: Thank you, Mr. Chairman.

NUNES: Gentleman's time expired.

Mr. Schiff, five minutes.

SCHIFF: Thank you, Mr. Chairman.

I wanted to follow up on a comment that I made in the opening statement and that is, with respect to a number of the allegations that have been made recently that the president or his aides may have sought to enlist the help of members of the IC or Director Comey himself to drop the Flynn investigation? Have any members of the IC shared with you their concerns that the president was attempting to enlist the help of people within the intelligence community to drop the Flynn investigation?

BRENNAN: No, sir.

SCHIFF: Are you aware of any efforts the president has made to enlist the support of intelligence community personnel to push back on a narrative involving the collusion issue that Mr. Rooney was asking about?

BRENNAN: I am unaware of it.

SCHIFF: I want to ask you about the allegations concerning the president's meetings in the White House, in the Oval Office with the Russians.

First, what concerns you might have if the allegations are

accurate about sharing information that we may have obtained from an intelligence partner. What impact you think that might have on -- not only that partner, but other intelligence partner's willingness to share intelligence with United States. But more than that, if you can also shed your insights on -- on one other thing, and that is the Russians reaction to that meeting was -- was at least twofold. One was Vladimir Putin's offer to validate what happened in the Oval Office, to provide his own transcript of that meeting, but also the Russian publication of photographs from that meeting.

The Russians had to understand the publication of those photos would be harmful to the president or the president would've invited American press into that meeting. What do you think motivated the Russians to publish those photos, what you think motivated Putin to make a claim he knew would never be accepted to provide their own transcript of that meeting? Is this just further efforts to weaken the president, to disrupt our political process? How do you explain those events?

BRENNAN: A lot of questions there, Mr. Schiff. The first one I'd like to make is that I shared classified information with the Russians while I was director at the CIA. CIA, on a routine basis, shares classified information with Russians on tourism matters. It doesn't mean that it becomes unclassified; it means that it retains the classification, but is releasable then to Russia or to other partners, so that in itself is not unprecedented.

And I don't know what was shared or said in the Oval Office, but if the reports in the press are true that Mr. Trump decided to spontaneously share some intelligence with the Russians, I think he would have basically violated two protocols. And those two protocols are one, is that such intelligence -- classified intelligence is not shared with visiting foreign ministers or local ambassadors. It's shared through intelligence channels because it needs to be handled the right way and it needs to make sure that it is not exposed. He didn't do that, again, if they get the press charges are accurate.

Secondly, before sharing any classifies intelligence with foreign partners, it needs to go back to the originating agency to make sure that the language in it is not -- even just providing a substance going to reveal source of methods and compromise the future collection capability. So it appears as though, at least from the press reports, that neither did it go in the proper channels nor did the originating agency have the opportunity to clear language for it, so that is a problem.

What I was very concerned about though is the subsequent releases of -- what appears to be classified information reporting to appoint to the originator of the information, liaison partners. These

continue to be very, very damaging leaks and I find them appalling and they need to be tracked down. So that was where the damage came from; I think that it was released in the press.

Now the Russians are watching very carefully what's going on in Washington right now and they will try to exploit it for their own purposes and to see whether not they can further, I think, seed partisan animosity here in Washington and try to roil the waters -- the political waters here. and so even though the election is over, I think Mr. Putin and Russian intelligence services are trying to actively exploit a what is going on now in Washington to their benefit and to our detriment.

SCHIFF: [****] again, on Mr. Rooney's questions, when you have these concerns raised about the Russian efforts and their potential effort to suborn U.S. persons to their cause and the hacking operation, did you take steps to set up an organizational structure to analyze the Russian campaign so that members of the of the FBI, CIA, NSA and other agencies would look at these allegations in a cohesive fashion.

BRENNAN: Yes and I also recognize that this was an exceptionally, exceptionally sensitive issue, an active counterintelligence case, trying to stop and uncover what the Russian intelligence activities were in the midst of a hotly debated presidential campaign. That included information that may have involved U.S. persons' contacts with Russia, whether they benign or not.

And so therefore, one of the key pieces of any type of counter intelligence effort is to compartment that effort so that your operators, your investigators, your collectors, can continue to uncover what the Russians were doing.
We set up a group within CIA, I spoke to Jim Comey, I spoke to Mike Rogers, to make sure that they were able to send over their experts so that they could share information among them, even the most sensitive information that was not disseminated within the community. I wanted to make sure that learning the lessons of 9/11, that there were not going to be any stovepipes and -- and barriers to sharing information from the intelligence and law enforcement communities.

SCHIFF: Thank you Mr. Chairman, I yield back.

CONAWAY: Gentleman's time expired. Mr. Gowdy, five minutes.

GOWDY: Thank you, Mr. Chairman.

Director, thank you for your service to our country. Let's go back to where we were a couple minutes ago, you mentioned or you

testify that you had a conversation in August of 2016 with your
Russian counterpart, you testified that you briefed at least eight
members of Congress throughout [****] of your investigation.

When you learned of Russian efforts -- and we'll get to that in a
minute because my understanding from your unclassified report is,
Russia has historically attempted to interfere with our electoral
process. And they did so without coordination, collusion or
conspiring with any of the candidates, so they have a history of doing
it. We'll lay that aside for a minute, 2016 electoral process. When
you learned of Russian efforts, did you have evidence of a connection
between the Trump campaign and Russian state actors?

BRENNAN: As I said Mr. Gowdy, I don't do evidence...

GOWDY: Well, I...

BRENNAN: ... and we were uncovering information intelligence
about interactions and contacts between U.S. persons and the Russians.
And as we came upon that, we would share it with the bureau.

GOWDY: I appreciate that you don't do evidence, Director
Brennan. Unfortunately, that's what I do. That's the word we use,
you use the word assessment, you use the word tradecraft. I use the
word evidence. And the good news for me is lots of my colleagues on
the other side of the aisle use the word evidence, too. One of my
colleagues said there is more than circumstantial evidence of
collusion between the Russians and the Trump campaign.

Now, there are only two types of evidence; there's circumstantial
and direct. So if it's more than circumstantial, by necessity, it has
to be direct. Those aren't my words; those are the words of one of my
colleagues on the other side of this very committee. Another Democrat
colleague on the other side of this committee also used the word
evidence, that he has seen evidence of collusion between the Trump
campaign and the Russians and yet a third California Democrat, said
she had seen no evidence of collusion.

So that's three different members of Congress from the same
state, using the same word, which is evidence. And that's the word
that my fellow citizens understand, evidence. Assessment is -- is
your vernacular. Tradecraft is your vernacular. You and I both know
worth the word evidence makes. And we're not getting into whether or
not you corroborated, contradicted, examined, cross-examined. We're
not getting into how you tested and probed the reliability of that
evidence; it's a really simple question.

Did evidence exist of collusion, coordination, conspiracy,
between the Trump campaign and Russian state actors at the time you

learned of 2016 efforts?

BRENNAN: I encountered and am aware of information and intelligence that revealed contacts and interactions between Russian officials and U.S. persons involved in the Trump campaign that I was concerned about because of known Russian efforts to suborn such individuals and it raised questions in my mind, again, whether or not the Russians were able to gain the cooperation of those individuals.

I don't know whether or not such collusion -- and that's your term, such collusion existed. I don't know. But I know that there was a sufficient basis of information and intelligence that required further investigation by the bureau to determine whether or not U.S. persons were actively conspiring, colluding with Russian officials.

GOWDY: Do you know the basis of that information that you shared with the bureau? What was -- the nature of the evidence?

BRENNAN: I think, Mr. Gowdy, this committee has now been provided information that relates to that issue in terms of information that the agency shared with the bureau and that is something that is appropriately classified.

GOWDY: All right, and you learned that when? When in this chronology did you learn of the contacts between these official members of the Trump campaign or -- because there's kind of a tripartite hierarchy. There's Trump himself, there are official members of the campaign, and then there are folks who represented themselves as being connected with him.

BRENNAN: I'm not going to try to identify individuals nor try to parse it.

GOWDY: I don't want you to parse it, I just want you to identify the individuals. I don't want you to parse it.

BRENNAN: I'm not going to identify the individuals because this is information that, again, is based on classified sources and intelligence. And I think this committee has access to it...

GOWDY: Were they official members of the campaign?

BRENNAN: I'm going to defer to current agency officials to be able to further provide to you information related to that. But my understanding is that this committee has access to the documents that we would have provided to the bureau.

GOWDY: All right. Last question because I'm out of time, we can use the word onus, we both know what the other one's talking about.

How did you test, probe, examine, cross-examine, otherwise test the reliability or believability, credibility, of that evidence you uncovered?

BRENNAN: I made sure that the components within CIA that have responsible for counterintelligence, cyber, and Russia, were actively working to understand as much as possible about the reliability, accuracy of the information that they already collected and information that was available that needed further corroboration.

GOWDY: We'll come back to it next round.

CONAWAY: Gentleman time's expired, Mr. Himes, five minutes.

HIMES: Thank you, Mr. Chairman and thank you, Director Brennan, for being here. It's good to see you again.

I want to use my five minutes to try to paint a more specific picture around the methods and mechanisms that the Russians used to suborn, which is the word that you used and that we've used here today, our democracy and our electoral process and I want to start with a quote by a report I know you're familiar with, CSIS' report, the Kremlin playbook in which they say that Russia, quote, "Seeks to corrode democracy from within by deepening political divides," unquote.

The Russians stir the pot, heighten anxieties and know that when they trigger chaos, even if it ends up negatively affecting them, that they are serving the purpose of weakening us. I want to talk about people because you made reference to people and I don't want to do it specifically, I want to put it in the abstract. The Kremlin playbook that I just referred to says further that Russia looks to corrode democracy by, quote, "Investing in rising politicians, cultivating relationships with prominent businessmen, or helping to ensure that its business affiliates become well-positioned in government."

Mr. Brennan, assuming that you agree with that, how specifically has the Kremlin gone about cultivating relationships with key Americans in an effort to it to influence our policy?

BRENNAN: It is traditional intelligence collection tradecraft in terms of you meant, which is to identify individuals that you think are either very influential or rising stars, and you will try to develop a relationship with them. And the Russians frequently will do that through cutouts or through false flag operations. They won't identify themselves as Russians or as members of Russian government. They will try to develop a personal relationship and then over time they will try to get individuals to do things on their behalf.

And that's why again, having been involved in a lot of
counterintelligence cases over the years and seeing this pattern over
and over again, my radar goes up when I see that the Russians are
actively involved in a particular intelligence operational campaign
and that U.S. persons are being contacted by a Russian officials.

HIMES: So is it -- is it fair to assume you -- the phrase you
used previously was that you were worried by contacts that there
might've been efforts to suborn. Is it fair to say that those
contacts have [****], you might -- might have been consistent
with that age-old Russian recruitment methodology?

BRENNAN: Sure and these are contacts that might've been totally,
totally innocent and benign as well as those that might have succumbed
somehow to those Russian efforts.

HIMES: Great. Let me -- let me just focus from Americans to --
to Russians. We -- we hear a lot about Russian oligarchs -- and I'm
not asking you a question about specific Russian oligarchs, we may do
that in -- in closed session; but can you tell us a little bit about
what the role of Russian oligarchs is in Putin's plan? What levers of
influence do they use and -- and -- and why do some Americans fall for
contacts with Russian oligarchs and business people.

BRENNAN: Well, Mr. Putin's political standing in Russia is
certainly well supported by key oligarchs who control billion-dollar
industries and -- and parts of the Russian economy, and he -- I think
reliant on them for support -- and they are reliant on him for
support.

And so they honestly have a lot of international connections, a
lot of business connections that they will use to advance their
business interests; but also we see that's Russian intelligence
agencies do not hesitate at all to use private companies and Russian
persons who are unaffiliated with the Russian government to support
their objectives.

HIMES: And so we talked about Americans and Russians, now these
couple of minutes, do Americans who are suborn in such a way -- and
Russian oligarchs that are recruited or suborn, do they necessarily
need to know that they are doing Russia's bidding?

BRENNAN: No, many times they do not. They do not even know that
the person that they're acting --interacting with is a Russian. Many
times they -- they know that individuals may be Russian officials, but
they don't know that there is an intelligence connection or
intelligence motive for behind it.

HIMES: Thank you, thank you. I'm -- I'm running low on time so

I'll just close with this thought. There's hardly anyone left today who doubts that Russia attacked us, but we have to realize the true thrust of the Russian attack is what they have triggered in us, the partisanship. Every time we refuse to face facts, every time we attack the messenger rather than confront the actions that happened, every time we undercut our allies in our alliances and our values, I think we're playing precisely in the Russians' fondest hopes.

We're doing something about that in my opinion, the gray, cold warriors, be it Ronald Reagan or Harry Truman would never have allowed. So I thank for your testimony. I yield back to balance of my time.

CONAWAY: Chairman Himes' time has expired. Mr. King, five minutes.
KING: Thank you, Mr. Chairman.

Mr. Brennan, before I yield to Mr. Gowdy, I have one question to ask you. And I realize we're in an open session, so I'm going to word it a certain way, but I think you'll understand what I'm saying.

In the preparation of the report on the 2016 election, which concluded that Russia favored the election of Donald Trump, who would've made the decision to include or exclude any evidence or indications of Russian intentions that were contrary to that conclusion?

BRENNAN: Myself, Jim Comey, Mike Rodgers and Jim Clapper relied on the experts who pulled this draft together in the intelligence community's assessment and it was a process where the representatives from those entities wrestled with the language to make sure that they had as much accuracy and precision and consensus as possible.

So any adjustments that were made were made during the process. I met with some of my officers who were involved in it. I asked them questions, I wanted to make sure that they were comfortable with sort of the language that was being used. But it would've been that internal, interagency process that then resulted in the intelligence community assessment. That is the traditional way that these assessments are drafted, are coordinated, and are published.

KING: And again, without even getting to the final conclusion, if there were other evidence, though, that indicated contrary, should that have been listed or not?

BRENNAN: You're dealing with a lot of information when you put together an intelligence assessment. And it comes down to a distillation process. And as you know, there were two products that were produced, an unclassified version and a highly classified

version. And the attempt was to try to include in that highly classified version all of the relevant and pertinent information that needed to be in there in order to undergird the judgments contained.

And so it was (ph) 100 percent of all of the information available, put into that highly classified one? No, but it was taken into account. And so, therefore, again, some decisions have to be made about it. But I am unaware that anything was intentionally excluded, because of -- intelligence, that is -- that was for some reason -- one of the agencies didn't want in there for a reason that was not a very legitimate intelligence reason.

KING: I think we can discuss that in the executive session.

Mr. Gowdy, I yield the balance of my time to you.

GOWDY: Thank you, my friend from New York.

Director Brennan, last time, we were talking about at the inception of your investigation, 2016 -- I want the next question to include the inception, the pendency, up until your very last day at the CIA.

Did you see evidence of collusion, coordination, conspiracy between Donald Trump and Russian state actors?

BRENNAN: I saw information and intelligence that was worthy of investigation by the Bureau to determine whether or not such cooperation or conclusion (sic) was taking place.

GOWDY: That doesn't help us a lot. What was the nature of the information?

BRENNAN: As I said, Mr. Gowdy, I think this committee now has access to the type of information that I'm alluding to here. It's classified and I'm happy to talk about it in classified session.

GOWDY: And that would've been directly between the candidate and Russian state actors?

BRENNAN: That's not what I said. I'm not going to talk to any individuals...

(CROSSTALK)

GOWDY: But -- but that was -- but that was my question, and -- and -- and you answered it. You didn't answer it that way.

BRENNAN: I -- no, I responded to your query. I'm not going to

respond to particular elements of your question because I think it would be inappropriate for me to do so here.

GOWDY: So the answer...

(CROSSTALK)

BRENNAN: So I can only repeat what I said, which is that I was aware of intelligence and information about contacts between Russian officials and U.S. persons that raised concerns in my mind about whether or not those individuals were cooperating with the Russians, either in a witting or unwitting fashion, and it served as the basis for the FBI investigation to determine whether such collusion -- cooperation occurred.

GOWDY: All right, well, there are a bunch of words that start with C floating around. I asked you about collusion, coordination and conspiracy, and you used the word "contact." And I think in a previous answer you did a really good job of establishing that contact could be benign or not benign. So was it contact that you saw? Was it something more than contact? What is the nature of what you saw?

BRENNAN: I saw interaction and -- aware of interaction that, again, raised questions in my mind about what was the true nature of it. But I don't know. I don't have sufficient information to make a determination whether or not such cooperation or complicity or collusion was taking place. But I know that there was a basis to have individuals pull those threads.

GOWDY: I don't want to put words in your mouth, but you saw something that led you to refer it to law enforcement, and in your judgment, it is up to law enforcement to test, probe, corroborate, contradict, otherwise investigate the full nature of that information you passed on. Is that a fair way to put it?

BRENNAN: Yes, it is because it's not CIA's job to make a determination about whether a U.S. person is cooperating, colluding, or whatever in some type of criminal or legal matter. It is our responsibility to give the Bureau everything that they need in order to follow that path and make such a determination and recommendation if they want to press charges.

GOWDY: All right. We'll pick it up next time.

CONAWAY: Ms. Sewell, five minutes.

SEWELL: Welcome, Director Brennan.

Building on the questions that my colleague Mr. Himes talked with

you about, I'd like to ask you some more specifics about Russia attacking us and how their attacks specifically cause us to doubt our own credibility as Americans. I'd like to talk about truth and what it means to be truthful to your country if you are in a position of power.

Director Brennan, was Putin, first within Russia and then against us, working to undermine truth? And how exactly has he done that?

BRENNAN: Mr. Putin and Russian intelligence services are determined to do what they can to influence, in a very inappropriate and illegal way, activities within Western democracies to undermine the Western-led liberal democratic order.

They do that on a regular basis. They see that as -- Western democracies as a threat to them. And so that's why the cyber domain right now is a growing playground for Russian activities. And they will use that and exploit it whatever way they can.

So they've been involved in elections for many years, including trying to influence the ones here in the United States with propaganda, whatever. But this cyber environment now provides new opportunities to collect, to collect and release, to influence, and they are increasingly adept at it.

SEWELL: So you said that they're going to do it again. We -- the I.C. unclassified assessment said that. And has there been any blowback or consequences to Russia for their interference in our election? And most importantly, what would you do to try to prevent that from happening in future elections?

BRENNAN: Well, first of all, I think exposure is very, very important. Make sure that we're able to confront the Russians, and make sure that partners and allies in other countries around the globe are aware of this type of Russian capability. And it also is important, I think, to have the Russians incur costs, not just in terms of reputational damage, but also actions that I think this government and other governments should take against the Russians when they're caught in those types of activities.

It is anathema to our democratic values and it's something that I think we need to be able to, again, push back hard against.

SEWELL: Have you seen the Trump administration do anything to push back, as you said? Have you seen or witnessed -- I know that you're no longer in the -- you know, no longer a director, but have you seen any indication that we're trying to punish or stop the Russians from doing this again?

BRENNAN: I'm not a position to evaluate, because there could be
things going on behind the scenes. We were doing things behind the
scenes to -- to try to counter Russian activities. We took actions in
January, in the last days of the administration, in terms of PNG-ing a
number of Russian officials here and -- and trying to clamp down on
their intelligence activities. Maybe that the current administration
is doing the same thing, I don't know.

SEWELL: So, Director Brennan, can you talk about -- more about
Russia's disinformation campaign and what tools the Russians use to do
that?

BRENNAN: They use all sorts of tools. As I've said, they have
been able to control various media outlets. Obviously they use RTTV
here in the United States, which has a fairly significant audience.
They use individuals who have -- who are writers or publishers,
editorialists.

Again, some of this is -- is very obvious to those who are
involved because they're on the payrolls. I'm talking globally now --
they're on the payrolls of Russian intelligence, and so they place
pieces that advance Russia's interests.

SEWELL: So, I just wanted to, really, kind of go back to what I
was trying to say before, which is about truth -- getting to the
truth. And I can't emphasize enough how damaging this disinformation
campaign is.

And it troubles me so much that there those in this country that
-- who are practicing similar tactics, I think -- attacking truth,
calling disagreeable facts "fake news" and attacking the messenger,
rather than confronting the message that the Russians are trying to
get us to believe.

It's divert, its dissemble, it's deny, and these are Putin's
tactics that are -- that we're seeing and embracing in America. In
other words, truth is being replaced by trust. People trust this
person or this new source, even if it isn't objectively true. So we
can't all agree on a common set of facts and that's a big problem, I
believe, that really is leading to the divide that we see in this
country.

Our national security has never been as partisan as it is now,
and I think that the -- the truth is that they interfered in our
elections. And the truth is the American people want to get to the
bottom of it. And the truth is we as an elected officials and on this
committee should be doing all we can to make sure that we find out how
they did it, we make sure we know who helped them do it and that we
also get to the bottom of making sure that it doesn't happen again.

So my last question to you is, do you believe that -- one of the
things you talked about was exploit -- you said that -- that even
though the election is over, Putin is still -- and Russians are still
exploiting us. What did you mean by that?

BRENNAN: I -- I mean, that's -- again, this has been a pattern
of Russian intelligence services to try to take advantage of the
openness of Western societies, free press and other things and
political parties and systems to find opportunities and
vulnerabilities that they can use to advance their interests.

They will continue to do this. I think they're probably taking
some lessons from this past experience. I don't believe that this is
going to make them at all recoil and not engage in these types of
things in the past (sic). I think that that what they will do is to
further refine their tactics so that they can be as successful as
possible in the future.

SEWELL: Thank you.

CONAWAY: Mr. LoBiondo, five minutes.

LOBIONDO: Thanks, Mr. Chairman.

Director Brennan, thank you for being here today, thank you for
your service.

And I have a number of questions I know, in an open setting, you
won't be able to answer, so I'm looking forward to the closed setting.
But missile (ph) -- as to the extent you can answer in this setting
what the elements of Russian active measures in the campaign and the
election were?

So are these -- you -- can you be any more specific than your
answer with her about what they were doing, what you saw?

BRENNAN: I think they're all chronicled in the unclassified
intelligence community assessment, in terms of -- it's very clear that
the GRU was responsible for hacking into the -- the networks of the
DNC, DCCC, and were responsible, through a cutout, releasing it
through places like Guccifer 2.0, WikiLeaks and -- and others.

And so they were taking advantage of information that they had
collected, that they determined, if it was publicly released, was
going to advance their objectives that I had enumerated before.

In addition, they amplified a lot of fake new stories that tried
to denigrate Secretary Clinton. So it was a mixture of propaganda, it
was cyber collection and it was the release of information that was,

again, seen as damaging to -- to one of the candidates that they were trying to -- to harm.

LOBIONDO: So you said a moment ago that you don't believe they'll be deterred from engaging in activity like this in the future. Do you -- do you think they would attempt to influence the 2018 midterm elections?

BRENNAN: I -- I have, unfortunately, grudging respect for Russian intelligence capabilities and their aggressiveness, their pervasiveness and their determination to do what they can to undermine this country's democracy and democratic institutions, as well as those, certainly, in Europe and other areas. So I believe that's they will try to exploit elections, but they will not wait only until elections.

We know that they, again, are aggressively collecting and trying to evaluate individuals who may be influential, who currently are in government, or are not. The Russian intelligence threat is a serious one, and this is just one manifestation of the nature of that threat.

LOBIONDO: During your tenure as CIA director, did you have the resources and authorities necessary to conduct what you needed to with -- as it pertained to the Russians?

BRENNAN: I -- I had resources and authorities that allowed us to do things, but I think this is something that, maybe, in a classified setting, we can talk more about.

LOBIONDO: And if we need to go to classified setting, I understand. But were there additional suggestions that you would give to this intelligence committee of what we should be doing proactively to enable not just the CIA, but the FBI and the NSA for -- to -- to thwart future meddling?

BRENNAN: Sure.

LOBIONDO: OK. Based on what happened here, do you think there are ways that we can assist our allies in thwarting what the Russians are doing? Is it simply sharing information, or are there additional measures that can be taken? Because I think, if one of us is successful, then more of us can be successful.

BRENNAN: I think it's a combination of things, and I have to be careful here, again, in an open setting, but certainly sharing information and making sure that they're aware of the techniques, the tactics, the procedures, as well as the practitioners that the Russians use. That is something that's very important.

We also need to be able to work some joint operations together so
that we can expose Russian actors in a variety of places. And I know
that my former colleagues who currently are still in the intelligence
community are working very closely with a lot of sister services to do
exactly that, and to catch the Russians in their efforts to undermine
democratic institutions. We need to continue to do that. We need to
continue to do even more of it.

LOBIONDO: I'm not sure if you can answer in this setting, but,
while we're focusing on Russia, do you have indications that there was
any collusion with the Russians with other state actors -- the
Iranians, the North Koreans -- to meddle against us?

BRENNAN: I -- I do not believe that they were partnered with
other countries in this most recent effort to undermine last year's
election.

LOBIONDO: Do you believe that other countries were involved in
attempting to influence us?

BRENNAN: I'd have to think about that, and I'd want to talk to
you about that in closed session.

LOBIONDO: OK.

Thank you, Mr. Chairman.

CONAWAY: Gentleman's time has expired.

Mr. Carson, five minutes.

CARSON: Thank you, Mr. Chairman, and thank you, Director, for
your service to our country.

We've talked about Putin's desire to weaken our democracy from
the inside out. I want to turn to how our democracy has been
undermined by attacks on our military, diplomatic and intelligence
professionals. In our 240 years, America has spent a lot of blood and
treasure to make the world safe for democracy. We work to ensure this
at home and we work to ensure it abroad.

Our diplomatic, intelligence, and military professionals have
been at the forefront of that effort. They're the reason we've
succeeded. They've worked tirelessly to promote democratic values
because we value democracy in itself, but also because it helps us to
prevent war. Now, those professionals have helped advance the cause
of freedom, and they've helped enable economic opportunities.

Director Brennan, in your mind, does Putin want us to be

successful? And secondly, does he want to see democracy thrive around the world? I would imagine he doesn't.

BRENNAN: No and no.

CARSON: Director Brennan, how do our intelligence professionals in particular support America's mission to protect the world from war and to maintain global stability?

BRENNAN: We are this nation's forward-deployed radar. We are the ones that need to make sure that we understand what is going on, but also what is underway in the future. We need to make sure that we're able to assess capabilities and intentions of foreign actors if they try to do us harm, as well as to support our diplomatic efforts, our warfighters, our homeland security specialists and others.

The foreign intelligence -- I.C. -- community has an enormous task: to cover the globe, do it 24/7, frequently in places where they are in harm's way, but also in other areas where the threat to U.S. national security is much less obvious, much more insidious and sometimes much more threatening. And so therefore our nation's intelligence professionals really have a lot on their shoulders as far as keeping this country safe and secure.

CARSON: Yes, sir.

And lastly, Director Brennan, do you believe, sir, that Putin and the Kremlin would like to see us hampered and shrink our intelligence and diplomatic capabilities?

BRENNAN: Sure. They know that we -- we are their principal nemesis. We are the reasons why they have not been successful in so many areas, and we've been able to undercut and undermine them. So, although they are capable, I wouldn't suggest for one moment that the U.S. intelligence community has not been very successful in preventing and thwarting Russian activities.

CARSON: That's so important, sir. You know, Secretary of Defense Jim Mattis -- I think he knows the diplomats are the tip of the spear. He said himself, in 2013, and I quote, "if you don't fully fund the State Department, then I need to buy more ammunition," end quote.

So I'm concerned, as we all are, sir, when we see proposed cuts of a third to the State Department, a third to entire budget -- their entire budget and the announcement that we, the United States of America, no longer champion human rights around the world, we are concerned with efforts to undercut our intelligence professionals, comparing them at times to Nazis -- comments by our own leaders.

We can't let Vladimir Putin continue to undermine us by doing
exactly what he wants us to do. Generations of intelligence,
diplomatic and military professionals have fought for our independence
and for the march of democracy around the world, and I don't think,
sir -- and neither do the rest of us -- that we can -- we can't let
their important work prove to be nothing.

I thank you for your commitment and service to our great nation.

I yield back, Mr. Chairman.

CONAWAY: The gentleman (ph) yields back.

I inadvertently skipped Mr. Rooney for his own five minutes. So,
Mr. Rooney, five minutes.

ROONEY: Thank you, Mr. Chairman.

Mr. Director, I -- I -- I want to say that I have been up to the
agency to review those documents that you had referred to before, and
I look forward to talking about the information therein in our closed
session.

I also want to mention something that we had talked with Admiral
Rogers and Mr. Comey for in our last -- or two open sessions ago, from
the intelligence -- House Intelligence Committee. It's one that sort
of got a lot of hoopla on TV, with regard to our side of the aisle
here trying to make a diversionary tactic when we talk about the
importance of what leaks do with our intelligence community.

And I just want to ask you if you agree with Admiral Rogers that,
when high-level intelligence community officials -- I -- I think some
news reports had almost 20 people leaking classified information to
the press -- if you agree with Admiral Rogers that that kind of
leaking with our -- with our ability to have to reauthorize things
like 702, so we can gather intelligence on bad guys for political
purposes -- if you agree that that kind of activity actually hurts our
national security.

BRENNAN: I think the unauthorized disclosure of classified
information at all times hurts our national security, compromises our
intelligence capabilities and needs to be investigated, needs to -- to
stop. Absolutely.

ROONEY: Thank -- thank you.

With regard to more specific questions, with regard to hacking,
when did you learn of the Russian hacking in the last election cycle?

BRENNAN: In the...

ROONEY: Roughly?

BRENNAN: ... in the summer.

ROONEY: And did you, at that time, notify the -- both campaigns that you -- or did somebody at the agency -- or are you aware that both campaigns were notified at that time that there was an effort by the Russians to hack and try to influence the -- the political campaign of -- of last year?

BRENNAN: I was aware that both campaigns were being contacted and notified about it, yes.

ROONEY: You said, I -- I believe, to Mr. Gowdy, that you -- you believed that there was information of contact between people in the Trump universe and Moscow. Whether or not that was collusion or not remains to be seen. You said you didn't know if it was actual collusion. I think that your words were, "I don't know."

Can you tell us whether or not, from the information that you've looked at, it looks like the intelligence shows that Moscow is actually rooting for Donald Trump, or were they rooting against Hillary Clinton? And why?

BRENNAN: I -- I think -- my assessment is, it was both. I think that's -- that they -- at different times in the campaign, they felt that the fortunes of one candidate or the other was going up or down, and I think that they, most of the time, believed that Secretary Clinton was going to win the election, and so their efforts to denigrate her were not just to try to diminish her chances of winning, but also to hurt her and -- for her eventual presidency.

But also it's my assessment that they clearly had a more favorable view toward Mr. Trump, and actions they were taking were trying to increase his prospects, even though I think that they probably felt as though they were not all that great.

ROONEY: Why? Why did they -- why did they want her -- why did they want him and not her?

BRENNAN: I think it's a variety of reasons. One is that there was a -- had been a traditional, I think (ph), animus, certainly, between Mr. Putin and Secretary Clinton, as well as that there has not been a good relationship between the Putins and -- between Putin and the Clintons over the years. Felt that Secretary Clinton, with some of her actions while she was secretary of state, led to some of the

domestic disturbances inside of Russia. And I think he was more
concerned that she was going to be more rigid on certain issues,
particularly on human rights and other issues.

ROONEY: But what -- what was Donald Trump going to do for them,
then? Or was it just that they didn't like Hillary?

BRENNAN: No, I think they -- they felt that Mr. Trump, being a
bit of an outsider -- that they have in the past had -- had some good
relations with businessmen who happened to elevate into positions of
government authority, and so felt as though, from a negotiating
standpoint, that he might be more amenable (ph) to...

(CROSSTALK)

ROONEY: So -- so, good relations -- what -- if that's true, one
of the questions that I have, and this might be more appropriate for
closed session -- but, if that's true, was there, in your -- in your
review of the evidence, was there more damaging evidence of Secretary
Clinton that was not revealed? And if it wasn't revealed, what does
that say about their -- the Russian ability to be actually rooting for
her to win?

BRENNAN: Well, yeah, we can talk about it in closed, but, as I
said, I think that they anticipated that Secretary Clinton was going
to win the election. And so they -- I believe that they tried to
damage and bloody her before the election.

But also, I would have anticipated that, had she been elected,
that their efforts to denigrate her and hurt her would have continued
during her presidency. So if they did collect more information about
her that they did not release, I think they were probably husbanding
it for a -- another day.

CONAWAY: Gentleman yields back.

Ms. Speier, five minutes.

SPEIER: Thank you, Mr. Chairman.

Thank you, Director Brennan, for your service.

I'd like to spend some time talking about the outsized role that
the Russian oligarchy plays in terms of supporting the Russian
government. It's been said that there -- when the Russians want to
cultivate a U.S. person, they will do it over a long period of time.
Is that your experience?

BRENNAN: I guess (ph) a lot depends on the U.S. person and their

willingness to work with the Russians.

SPEIER: Were you aware that they were attempting to cultivate then-real estate developer Donald Trump for almost eight years?

BRENNAN: I'm not going to talk about any individuals.

SPEIER: Are Russian oligarchs encouraged to invest in the United States?

BRENNAN: By whom?

SPEIER: By Putin.

BRENNAN: There are some tremendous investment opportunities here in the United States, and certainly I think that Mr. Putin would like to see more Russian involvement in investment here in the United States, so yes.

SPEIER: And with that Russian investment, is there an expectation that they're going to provide information to President Putin about what's going on in the United States?

BRENNAN: I would fully anticipate that some of the key Russian oligarchs and their business interests are, you know, tapped on a regular basis by Russian intelligence for information, yes.

SPEIER: So were any of the oligarchs investing in U.S. properties owned by then-real estate developer Trump?

BRENNAN: I don't know the answer to that question.

SPEIER: Are you aware that, in 2015 alone, there were 106 visas granted to Russians for investing in the United States in amounts of money of $500,000 or more? They're called EB-5 visas.

BRENNAN: I'm unaware of that.

SPEIER: So, as a general rule within the CIA, you did not investigate those who were granted EB-5 visas?

BRENNAN: It may have come across our screen. We may have intelligence on it. I'm just not personally aware of a lot of the information that the CIA had collected on it (ph).

SPEIER: So, in 2014, the United States, the European Union and Canada imposed sanctions on Russia in response to their invasion of Ukraine and Crimea. These sanctions greatly restricted the flow of private money to the Russian government and business leaders. How

much pain do you think those sanctions have caused Russia?

BRENNAN: I think it has been increasingly painful, and I believe that one of Mr. Putin's priorities has been, especially over the last year, to try to get those sanctions reduced. And his strategy is getting European countries to separate from the U.S.-led sanction effort. And that's why I think, as part of this effort, they were trying to drive a wedge between Europe and -- and Washington.

And some of the unfavorable characterizations of Secretary Clinton indicated that she was an unreliable leader and that there were going to be problems for Europe. So I think that's part of a broader Russian strategy. Again, I think that Mr. Putin wants sanctions removed sooner rather than later.

SPEIER: So that's -- you would say that's one of his top, if not very top, policy objectives in dealing with the United States?
BRENNAN: It's certainly -- it's a key one, but it's more dealing with us indirectly by trying to wean the European nations off of the -- of the sanctions wagon.

SPEIER: So Igor Rosneft -- Igor Sechin, who was the CEO of Rosneft, and then Rex Tillerson, the CEO of ExxonMobil, were doing a deal in Russia that was about $1 billion, I believe. The sanctions that were imposed in 2014 shut that down. Is that correct?

BRENNAN: I believe so. I'm not sure.

SPEIER: So, again, it would make the case that the impacts on Russia are grave in terms of the sanctions.

Let me ask you another question. There have been reports in newspapers that British and Dutch intelligence had provided information about meetings in European cities between Russian officials associated with President Putin and associates of the Trump campaign.

Is that how you first found out about those meetings?

BRENNAN: I am not going to talk about anything that any of our international partners might have shared with us.

SPEIER: All right.

Thank you, Mr. Chairman, I yield back.

CONAWAY: Gentlelady yields back.

Ms. Ros-Lehtinen, five minutes.

ROS-LEHTINEN: Thank you so much, Mr. Chairman.

Thank you, Mr. Brennan, for being here.

Because of your long history with the -- with the agency, I think
that you're the perfect expert to give us some historical perspective
on how long Russia has been at this active measure campaign. How long
would you say that Russia and the Soviet Union sought to undermine the
process of our democratic framework here in the West?

BRENNAN: For many, many decades.

ROS-LEHTINEN: For decades. And did Russia attempt to collect
intelligence on specific U.S. presidential candidates or target
political parties or organizations in the U.S. before 2016, or was it
more of a general campaign?

BRENNAN: Well, I would defer to the Bureau, which would have the
investigative leads in terms of what might be happening here on U.S.
soil. But I know that, again, the Russians try to cultivate
relationships with -- with individuals. But, again, I would defer to
the Bureau.

ROS-LEHTINEN: Thank you. Can you provide any examples of past
Russian or Soviet active measures, as they're called?

BRENNAN: Well, it runs the gamut from targeted assassinations of
dissidents, of members of the media, of the -- inside of Russia, as
well as outside of Russia -- to getting people on their payroll in
foreign governments to carry out their -- their actions, to the --
their efforts in Ukraine, as not just the military takeover of Crimea,
but their basic intervention into eastern Ukraine with their
intelligence and paramilitary services, to the active propagation of
propaganda and disinformation as they try to besmirch and tarnish
individuals, as well as the use of blackmail, Kompromat, that they
would be able to then leverage for their own purposes.

So it -- it really does run the gamut from the -- the most
heinous and -- and violent to that which is much more subtle and
insidious.

ROS-LEHTINEN: Yes, the scope is -- is alarming. How does the
Kremlin's attempt to influence this -- this previous election compare
to Soviet active measures during the Cold War? What has changed in
their stagecraft (ph)?

BRENNAN: Well I think, when we talk about U.S. presidential
elections -- and we know that the Russians were trying to influence

outcomes as well as perceptions of -- back to the 1960s, I believe.
But, again, the -- this cyber environment, now, really provides so
much more opportunity for a variety of troublemaking, and the Russians
take advantage of it.

So the ability to go in and to collect and to use different types
of techniques -- spear phishing, whatever else -- so that they can
then gain access to people's e-mails, computer systems and networks --
it is something that the Russians are quite adept at.

And what we've seen recently is the collaboration between Russian
intelligence services and organized criminals. I think it was in
March that the Department of Justice indicted four individuals -- two
members of the FSB and two well-known organized criminals, hackers --
because of the -- the pillaging of the Yahoo servers.

And that collaboration between Russian intelligence and Russian
organized crime, I think, is more and more of a concern so that they
can promote their respective interests. So this is something that I
think the Russians are looking for new opportunities to partner with
whomever they can in order to do what they want to do.

ROS-LEHTINEN: And as a young analyst, you probably had a lot of
dealings with Andropov, the head of the KGB, in the early 80's, and he
was very focused on -- on this active measure campaign.

BRENNAN: Well yes, I -- as a young analyst, I wouldn't have had
direct interaction with Andropov, but I have studied Russian
intelligence activities over the years, and have seen it -- again,
manifest in many different of our counterintelligence cases, and --
and how they have been able to get people, including inside of CIA, to
become treasonous.

And frequently, individuals who go along that treasonous path do
not even realize they're along that path until it gets to be a bit too
late.

And that's why, again, my -- my radar goes up early when I see
certain things that -- I know what the Russians are trying to do, and
I don't know whether or not the targets of their efforts are as
mindful of the Russian intentions as they need to be.

ROS-LEHTINEN: Thank you for your service.

Thank you, Mr. Chairman.

CONAWAY: Gentlelady yields back. Mr. Quigley, five minutes.

QUIGLEY: Thank you, Mr. Chairman.

Thank you, Director, for your service.

Sir, you said you became aware of U.S. persons' interactions with
the Russians, and you've mentioned your radar going up. Is part of
that who the Russians were, that were meeting?

BRENNAN: I'm sorry?

QUIGLEY: Was part of your concern not just the fact that there
were interactions, but who the particular Russians were?

BRENNAN: Yes. It was on both sides, yeah, the -- not just the
-- the nature of the contacts and the communicants, or the
[****].

QUIGLEY: Yeah, and it's not just the fact that they met?

BRENNAN: Right.

QUIGLEY: You said -- and I want to make sure I had your words
correctly -- you knew that meant there was a basis to pull these
threads. Can you elaborate on what that means generally?

BRENNAN: Well, frequently, and even totally divorced from the
presidential election issue, if there are Russian -- known or
suspected Russian intelligence officers who seem to be cultivating
contacts with U.S. persons, and there are reasons for CIA or others to
be concerned about what's happening there, we would make sure that the
Bureau is aware of it.

We wouldn't know what those follow-up investigative steps were,
taken by the Bureau, because of appropriate privacy rights and civil
liberties of U.S. persons. But the Bureau has the primary
responsibility on U.S. soil to follow its counterintelligence leads
wherever they may go.

CIA has very unique counterintelligence authorities as well, and
we have a unique collection of authorities that make us the -- I
think, the closest partner with the Bureau in this matter, because we
have the intelligence liaison relationships with our foreign service
-- sister services.

We have covert action responsibilities, we have clandestine
collection responsibilities and authorities, we have all sorts of
analytic capabilities -- the best analysts in the U.S. government, bar
none.
And so that combination of talent and capabilities is able to
give the Bureau what they need. And that's why any type of suspicion

that we have that something may be afoot here, that the Russians are
trying to get -- and it's not just the Russians, it's other foreign
service as well.

We make sure the bureau is fully apprised of that. And that's
why we have FBI agents who are serving inside of CIA's
counterintelligence elements.

QUIGLEY: Thank you.

Switching topics here, Ms. Speier mentioned the sanctions and
they -- how they're impacting the Russians. You talked about how the
Russians are attempting to get -- avoid these sanctions, or getting
aid from others. But they also use money laundering, correct?

BRENNAN: Yes, they do.

QUIGLEY: And can you elaborate just how extensive that is, and
where they're doing it, primarily?

BRENNAN: I would -- I would defer to some of the experts in CIA,
as well as Department of Treasury and others. But money laundering is
a long-practiced effort on the part of Russian businesses, Russian
government officials and others, as well as Russian intelligence
services, in order to cover their tracks and be able to carry out
their illegal, illicit, and even immoral activities.

QUIGLEY: Avoid taxes, sanctions?

BRENNAN: I'm sorry?

QUIGLEY: Avoiding taxes, sanctions?

BRENNAN: Avoiding any number of problems for them -- and they've
become very adept over the years at money laundering.

QUIGLEY: Are you familiar with which particular country or
countries that they're principally involved with money laundering?

BRENNAN: I'm aware of some, but, again, I would defer to the
agency at this time to identify the priority ones.

QUIGLEY: Cyprus?

BRENNAN: They -- they use banking institutions in a number of
countries. A lot of times what they're doing with some of the
financial elements in countries is unbeknownst to the governments.
And so there are a number of financial centers around the world that
the Russians have become quite active in.

QUIGLEY: And I agree that the -- the home country may not be aware, and probably isn't aware of all that's taking place. But you would certainly be aware and concerned if there were U.S. persons involved with those financial institutions, correct?

BRENNAN: Anything that we might uncover related to that, we would make sure that the Bureau, Department of Treasury and others are aware of it. They're the ones that need to follow up in terms of whether or not there's any criminal activity.

QUIGLEY: And were there areas concerned, in Cyprus, involving this with U.S. persons and financial institutions there?

BRENNAN: Well, I think it's a well-known fact that there is a large Russian presence -- a large business interest, a large financial interest, a part of Russia -- in Cyprus. And so, again, any type of involvement of U.S. persons or companies, it would be the responsibility of the FBI and other U.S. agencies, not CIA, to follow up on that.

QUIGLEY: Finally, if a U.S. president asked any intel official not to pursue an investigation, would you construe that as obstruction?

BRENNAN: I do not have the -- a legal basis to determine what constitutes obstruction of justice.

QUIGLEY: Well, how would you react if a president asked you not to pursue an investigation?

BRENNAN: I have never been asked that, and if I was, I certainly would not -- I would not follow such a directive.

QUIGLEY: Thank you.

I yield back.

CONAWAY: Gentleman yields back.

Mr. Turner, five minutes.

TURNER: Thank you, Mr. Chairman.

Mr. Brennan, turning back to the exchange that you had with Mr. Gowdy, you stated -- and, by the way, I want to also thank you, as others have, for the specificity that you provide to us.

These are difficult issues and concepts, different standards, intelligence assessments, evidence -- we've got the FBI, the CIA, each

of you do different jobs. And your expertise is certainly helpful to
us, to unwind, as we're dealing with elements of this, what -- what
we're looking at and what this means as we try to move forward with an
investigation.

So you indicated that you saw -- when asked about whether or not
you'd seen evidence of collusion or collaboration, you said that you
saw intelligence that indicated that there had been contacts with
individuals -- with -- with Russians -- that were of a nature that
bore investigation.

You said that those contacts might have been benign, might not
have been. But they rose to the level of indicating that they need to
be reviewed for their nature, and looking into an investigation.

Did I characterize that correctly?

BRENNAN: Yes, but I don't want to take this out of context. You
know, we see contacts and interactions between Russian officials and
U.S. persons all the time.

It is when it's in the context that there is something else going
on -- and so we knew, at the time, that the Russians were involved in
this effort to try to interfere in our election.

So with that backdrop, and increasing indications that they were
involved in that, seeing these types of contacts and interactions
during the same period of time raised my -- my concern.

TURNER: Excellent. I appreciate that -- that qualification.
But if someone left this hearing today and said that you had indicated
that those contacts were evidence of collusion or collaboration, they
would be misrepresenting your statements, correct?

BRENNAN: They would have misheard my response to the very good
questions that were asked of me. I'm trying to be as clear as
possible in terms of what I know, what I assess, and what I can say.

TURNER: So you would say that's a misrepresentation of your
statement, yes?

BRENNAN: I would say that it was not an accurate portrayal of my
statement.

TURNER: Excellent (ph).

BRENNAN: Absolutely, it was inconsistent with my remarks.

TURNER: So (ph) let me go to the next step. If someone saw what

you saw, and only what you saw, with respect to those contacts -- if they looked at the intelligence that you saw, where you said it might have been benign, might not have been benign, and then they characterize what they saw has been -- as having been evidence of collusion or collaboration, they'd be misrepresenting the intelligence, would they not?

BRENNAN: I don't know what else they have seen that could corroborate...

(CROSSTALK)

TURNER: Only what you saw. They would be misrepresenting the intelligence, correct?

BRENNAN: I -- I presume they would be misrepresenting what it is that I saw. Again, I don't know...

TURNER: Thank you. I appreciate that, because I do believe that there are members of this committee that deserve that counsel, because your specificity gives us an understanding of what we're reviewing. And I do believe that there are those who reviewed some of the information that you have -- have seen and represent it to the public absolutely incorrectly, and misrepresent it.

And I'd like to yield the remainder my time to Mr. Gowdy.

GOWDY: Sorry. I was colluding with my friend from Florida.

And I want to pick up where -- well, I want to do this. The last time you and I talked, you had referred information to the Bureau, am I right? You -- what you had seen, you referred to the Bureau?

BRENNAN: OK. I don't know if that (ph) was the last thing that we talked about, but I'll grant you that we...

GOWDY: One of them.

BRENNAN: ... talked (ph) about that, yes.

GOWDY: One of the last.

BRENNAN: Yes.

GOWDY: It wasn't a trick question. One of the last things -- you referred to the Bureau what you saw. Is that fair?

BRENNAN: Yes.

GOWDY: Did you also refer to Director Clapper?

BRENNAN: Not everything that was shared with the Bureau was shared with Director Clapper.

GOWDY: And why would that be?

BRENNAN: Because, on counterintelligence matters dealing with U.S. person information of a very sensitive nature, the Office of the DNI and the DNI does not have that type of operational responsibility. And what we try to do is to make sure that there is as little exposure of that information as possible.

I would keep General Clapper informed about the nature of my engagements, but the materials that were shared with the Bureau would not have been shared with the -- the DNI.

GOWDY: Do you know if the Bureau opened a (ph) matter? Well, first of all, when was that? With as much specificity as you can give us, when did you refer that information to the Bureau?

BRENNAN: Would you accept last year as the answer? It was during the summertime, and the...

GOWDY: OK.

BRENNAN: ... but even previously, there are ongoing -- ongoing sharing of information with the -- the Bureau, and so it was over the course of the -- of the year.

GOWDY: All right. In conclusion, because I'm out of time, sometime in the summer, you shared the information with Director Comey at the Bureau?

BRENNAN: Sometime this summer, there was information that the CIA had that was shared with the Bureau. But it wasn't the only period of time where such information was shared with the Bureau.

GOWDY: Good enough. Thanks.

CONAWAY: The gentleman yields back (ph).

Mr. Swalwell, five minutes.

SWALWELL: Thank you, Chair.

Thank you, Director.

Since you passed that information to the FBI director, have you

reviewed the FBI's development of that evidence or any other evidence?

BRENNAN: I am unaware of what the Bureau has done with that information, and I have no knowledge of anything, even, that the Agency has done since January 20th.

SWALWELL: Are you aware of what the Bureau has briefed this committee, with respect to evidence of collusion?

BRENNAN: I watched Jim Comey's hearing and his comments, and I've gone through his transcript, so I'm aware of it, yes.

SWALWELL: Are you aware of what the FBI has briefed this committee in a classified setting, with respect to evidence of collusion?

BRENNAN: No, I'm not. I'm totally not.

SWALWELL: Director, May 10th of this year produced an unsettling image inside the Oval Office. President Trump, standing and laughing with Russia's Ambassador Kislyak and Foreign Minister Lavrov.

It's been further reported that President Trump shared highly sensitive codeword information with Russia, putting at risk U.S. lives and jeopardizing sources and methods. Director, are the Russians worthy of receiving such information in the manner alleged?

BRENNAN: I believe it's important for U.S. intelligence to provide to any of our foreign partners any information related to terrorist threats to foreign countries or their citizens. And that's why I authorized the provision of classified information numerous times to the Russians that I believe saved Russian lives.

As I mentioned, there is an appropriate manner and procedure for doing that. They need to be followed scrupulously so that there's not going to be a undermining of those collection capabilities and systems.

SWALWELL: Director, you warned Bortnikov that there would be consequences if they meddled in our elections. When you look at that picture and the manner in which, allegedly, classified information was conveyed to the Russians, do you see consequences for their actions?

BRENNAN: Again, I don't know the totality of the actions that have been taken against the Russians. I know that, again, the Obama administration, in January, took actions against them.

So I -- I believe that, depending on how this investigation proceeds, by the -- by the FBI and the special counsel, as well as by

the work of the committees -- and I agree that the appointment of a
special counsel should not, in any way, stop these committees --
intelligence committees in the Senate and the House -- from doing its
work, because you're supposed to be looking at what are -- what do we
need to do to strengthen our system so that we're better prepared to
-- so I believe that consequences need to be levied on the Russians
for it, but I would defer to policy makers in Congress to decide that.

SWALWELL: Director, with respect to the contacts between Russia
and Trump campaign persons that you referenced earlier, and whether
they were innocent or benign contacts, when you see a multiplicity of
contacts between one country and one campaign, when does it -- in your
mind, when you're deciding whether to refer it to the FBI -- when does
it move from mere coincidences to a pattern? And in this case, when
did it?

BRENNAN: I guess -- it's all sort of varies to be generous (ph),
as far as the instances are concerned. But as I said, there was a
backdrop there of known Russian efforts to interfere in our election.
And there were a variety of activities taking place that -- wondered
whether or not they were part of that campaign and strategy.

We don't have a totality of insight into all the things the
Russians were doing. And I left it up to the professionals -- the
counterintelligence and Russian experts -- to make sure that whatever
information that they deemed appropriate to share with the Bureau
because it could be relevant to their investigation -- they did that.

So I wasn't the one to make decisions, you know, share this with
the Bureau, share this with -- it was based on long-held practices on
the part of the CIA to make sure that we're not holding back from our
Bureau colleagues.

SWALWELL: Director, there is what is referred to as
consciousness of guilt evidence. That's when somebody lies about a
material fact, and that fact -- the fact of them lying -- can be used
against that person because it would be, in essence, an effort to
cover up what happened. Meaning, if, you know, you were telling the
truth, you wouldn't have anything to cover up.

With respect to some of the contacts that you've referred to
between Russia and Trump campaign officials, are you aware of any of
those U.S. persons who had contacts with Russia either making false
statements about those contacts or failing to disclose those contacts?
BRENNAN: I think that's something that you can -- we can pursue
in a closed session.

SWALWELL: And -- and, Director, with respect to the contacts
that you have seen, have you ever seen, in your history working as an

intelligence official, this number of contacts between a foreign
adversary and a presidential campaign?

BRENNAN: I think our collection systems have increased over the
years and so I don't know whether or not it's a result of better
collection or because there were more contacts this time and I -- I
just do not have a basis to make a determination about that.

SWALWELL: Thank you.

Yield back.

CONAWAY: Gentleman yields back.

Dr. Wenstrup.

WENSTRUP: Thank you, Mr. Chairman.

Thank you, Mr. Brennan, for being here today and your candor in
this conversation.

Have you ever been asked to give your opinion to the FBI about
whether intelligence you gathered should lead to an investigation? Do
they engage you in that way? You said there's FBI engaged in the CIA,
so I didn't know if they have an opinion or ask your opinion on that.

BRENNAN: Well, we would -- we would make a referral to the
Department of Justice, in many instances, when we saw classified
information appear in the public in an unauthorized fashion. And so
that referral is made to the Department of Justice, to determine
whether or not there should be a follow-up investigation. And it's
the FBI that then takes a look at the circumstances and makes the
decision. So that would be the referral we make.

WENSTRUP: OK. And we've pretty much established that Russia and
the Soviet Union -- they've tried to meddle with our elections for
years. Now, you came in as director after the last election, and --
which leads me to something Mr. Himes was talking about.

He says, you know, the rules -- the Russian playbook or whatever,
they go -- they try to build relationships, especially with
influential Americans, and you would agree with that. That's one of
the things that you're kind of looking out for, these relationships.
At least I believe that's what you've said.

So I'm just trying to understand process here a little bit. What
sets up a red flag? What type of conversation do you hear that says,
maybe we need to take a little bit further look into this, or refer it
on?

And I can't help but think back to the previous election, when we see on videotape, President Obama says, "this is my last election. After my election, I have more flexibility." And President Medvedev, who he's speaking to, says, "I understand. I'll transmit this information to Vladimir, and I stand with you."

Now, you talk about the playbook -- it sounds like, "I stand with you," that's a pretty strong relationship. This is certainly an influential American, and we're talking openly about elections.

So again, I'm just -- I'm not trying to launch another investigation here, but I am concerned about the process. So you weren't sitting as a director at that time, but, you know, as Mr. Swalwell used the term, that's a pretty disturbing image, I think, to a lot of Americans, is -- what kind of relationship.

So would you question this interaction, where that type of conversation's taking place? And again, I'm just trying to understand process of how it moves from CIA to FBI to DOJ.

BRENNAN: That was direct conversation between the heads of government and state between two countries. I'm -- I'm not going to respond to your...

(CROSSTALK)

WENSTRUP: OK, but I think that's what we're -- I'm just, again, trying to get some understanding of what sets off a red flag, you know, and when do you refer to law enforcement.

I know you weren't the director at that time, but boy, that just hits all the things you were talking about in the playbook: elections, influential American, and building a relationship. "I stand by you."

So just, again, trying to get to the -- the substance there. But -- that's interesting you can't respond to a personal conversation, but this is what we're talking about. Anyway, with that, I yield back.

BRENNAN: I try to...

(CROSSTALK)

WENSTRUP: ... Go ahead.

BRENNAN: I try to avoid getting involved in political issues, partisan issues. And so, with respect to Mr. Wenstrup, I just will

not recognize that question.

WENSTRUP: Thank you.

And with that, I yield the remainder of my time to Mr. Gowdy.

GOWDY: Thank you, Dr. Wenstrup.

Congressman Rooney and you were discussing, generally, the motive and I think it is -- let's just assume it's a given that the Russians did not like Secretary Clinton -- did not like President Obama, for that matter -- and desired negative things for her.

But they also thought she was going to win. Was it your testimony that all of the information stolen was not publicly disseminated?

BRENNAN: No. I said, if they had collected additional information, as I think was implied, that the -- effort to try to further hurt her if she became president -- that information -- any type of derogatory information about her could have been husbanded for post-election period.

GOWDY: All right. But do you know if negative information was husbanded, to use your word, and not disseminated?

BRENNAN: Again, I -- I -- I think that would be inappropriate to talk about in an -- in an open session like this.

GOWDY: Is it inappropriate to both -- I get not asking you about the nature of it. Is it inappropriate to answer yes or no, whether or not that information was husbanded but not disseminated?

BRENNAN: My -- my request would be that we could talk about that in closed session.

GOWDY: OK. I'll honor your request, and we'll talk about that in a little bit.

CONAWAY: The gentleman yields back.

Mr. Castro.

CASTRO: Thank you, Chairman.

Thank you, Director Brennan, for your testimony here today.

Over the course the last several months, the intelligence agencies have been berated by the president for the possibility of

leaks. Have you -- are you aware of his tweets and other criticisms
he's made about leaking in the intelligence agencies?

BRENNAN: I know that there have been a number of allegations
made publicly about intelligence officials being responsible for those
leaks; yes, I'm aware of them (ph).

CASTRO: Are you aware of a story that came out yesterday that
said, quote, "three White House staffers have been identified for
leaking classified info. POTUS will fire, quote, 'multiple people,'
when he returns to D.C."?

BRENNAN: I am unaware of that story or the facts, if any,
underneath it.

CASTRO: If the story is true, and we don't know whether it is or
not, but if it's true that there may have been people who leaked
classified info at the White House, first, could you tell us, would --
it seems like an obvious question, should be an obvious answer -- are
there people at the White House that would have classified information
that they could leak to journalists?

BRENNAN: White House officials -- if they have the appropriate
security clearances based on their position, they would have access to
classified information, yes.

CASTRO: OK. And then the second part of that is, if the White
House has determined that leaks are coming from within their
operation, could you tell us how they would go about determining that?
How would they figure out that they have leakers in the White House?

BRENNAN: If there is a sense that there are unauthorized
disclosures of classified information from within the White House, I
think it's imperative that the -- the FBI be brought into the matter
so that there can be an appropriate investigation to determine whether
or not that conduct was criminal or not.

And there shouldn't be just a -- an independent investigation
that takes place. They can -- they can do some efforts to try to
contain any hemorrhaging information, but it really is the
responsibility of law enforcement and the Bureau to investigate
criminal leaks of classified information.

CASTRO: Thank you.

Now, I have -- I have some questions about the I.C. assessment
itself, and the declassified report, because there has been a lot of
disinformation and confusion about the intelligence assessment, and
it's been attacked also.

So, Mr. Brennan, when did the I.C. start warning about the
Russian threat, and how was the assessment produced? Do you believe
that the people working on it had the requisite skills and expertise
to write such an important assessment?

BRENNAN: Well, the intelligence community assessment that was
produced in early January was initiated by President Obama in early
December to ensure that there was going to be a -- a full accounting
of Russian activities, and directed that there be a classified and
unclassified version of that.

The effort to uncover the Russian activities took place prior to
that, and in both instances, I believe that the right people with the
requisites -- array of skills were involved in the initial collection
effort and assessment effort about Russian activities, up to and even
in the aftermath of the election in November.

And then, there were additional individuals who were added to
that, to a group that could draft that assessment so that it could be
produced in early January.

CASTRO: And, let me ask you, how and why did all three agencies
come to such a high degree of confidence about their assessment?

BRENNAN: I think that they rigorously interrogated the data, had
very careful and deep discussions about what the data told them about
their assessments. And so, therefore, there was a unanimous consensus
among the three agencies in the ODNI about the judgments.

There was one variation as far as the NSA's confidence level, in
terms of the Russian advocacy for Mr. Trump. But with that lone
exception, it was a consensus assessment.

CASTRO: And the report also talked extensively about the role of
WikiLeaks in working with Russia on this covert action campaign. Can
you talk a bit more about how they fit in?

BRENNAN: Well, I think, as the assessment says, that the
Russians used a cutout for the WikiLeaks exposure. And when you look
at the WikiLeaks releases over time, you can see that sometimes they
are timed to coincide with certain events. And they, I think, are
always intended to undermine U.S. national security.

And Russian protests that they are not working with WikiLeaks and
WikiLeaks' protests they're not working with the Russians, I think, on
both parts, are disingenuous.

CASTRO: And then let me ask my final question because I'm

running out of time, back to the leaking at the White House, a potential leaking. What surveillance methods would the president of the White House have authorization to engage in on its own staffers that would be legal? And where might they cross the line?

BRENNAN: I am not a lawyer and you would have to go to the Department of Justice and the FBI in terms of what statutory authorities they might have, which I -- I just -- I am not aware, I don't know.

CASTRO: Thank you, Director.

CONAWAY: Gentleman's time has expired.

Mr. Stewart, five minutes?

STEWART: Thank you, Chairman.

And thank you Mr. Director for again, your many years of service. I'm going to go very quickly because I want to reserve as much time as I can for our task force and the attorneys. I want to go through and make one point; it's a point worth making. But before I do, I'm just going to add that I've reviewed the raw intelligence of the CIA regarding the analysis of whether they preferred Mr. Trump.

I don't agree with the conclusion, particularly that it's such a high level of confidence. I just think there should've been allowances made for some of the ambiguity in that and especially for those who didn't also share in the conclusion that it was a high degree of confidence. But having said that, I do think we can agree that Russia wants a weakened U.S. president, would you agree with that?

BRENNAN: Yes.

STEWART: Yes, certainly. And in regards to Secretary Clinton, you have said that their primary goal seemed to be to -- to weaken her candidacy so that she would be a weakened U.S. president. My question to you is would the same thing be true now? Would Russia want a weakened U.S. President, Mr. Trump?

BRENNAN: Well, I think they -- they want to be able to weaken the U.S. policies, especially on the international stage. I -- I do think that there is an interest in the part of the Russians to improve relations with the United States. And I do think it's important that relations between Washington and Moscow be improved, because...

STEWART: Yes, but -- but even if they want improved relationships relationships they would want that on their terms as

much as able and that would be better accomplished by having a
weakened U.S. president, regardless of who it is, wouldn't you say
that's true?

BRENNAN: One can argue the point or that a stronger president is
able to make -- have an accommodation with Russia out of strength as
opposed to out of weakness.

STEWART: OK. I -- I would agree with you that there are some
circumstances but I think in general they -- a weakened U.S., a
weakened Western influence in the world and a weakened U.S. president
is in their interests. And I'll just conclude with this. These
active measures, the propaganda, the false news reports, et cetera,
they don't end with the U.S. election.

And I think it's appropriate that we would warn the American
people that these active measures, again, propaganda, fake news
stories, et cetera, would be applicable today as well and that they
would be trying to weaken our U.S. president and trying to weaken
foreign leaders as well as we look at upcoming elections. Would you
agree with that?

BRENNAN: Yes, generally speaking, yes.

STEWART: Thank you. And with that, I yield the remainder over
to, I believe, Mr. Gowdy.

GOWDY: I thank the representative from Utah (ph). Director
Brennan, why is it important to protect the identity of U.S. persons
as part of our surveillance programs?

BRENNAN: Because there is, I think, a right of all Americans to
privacy and that sometimes information is collected about U.S. persons
who may or may not be involved in any manner of criminal activity.
And therefore, respecting that privacy of U.S. citizens, the
intelligence community goes to great lengths to cover the identities
of U.S. persons if they happen to be included in intelligence
collection.

GOWDY: For all those reasons and others -- and we're not talking
about leaks. We're talking about masking within the intelligence
community, right? We're not talking about reading it on the front
page of the newspapers. We're talking about prohibitions that you
place on yourself with respect to identifying U.S. persons as part of
our surveillance programs, right?

BRENNAN: That's correct, yes.

GOWDY: All right. And you just cited some of the very important

reasons that we do that and I would assume that there is a process, a
protocol under which the intelligence community goes through if they
seek to unmask a U.S. person's name.

BRENNAN: That's correct.

GOWDY: Have you ever requested that a U.S. person's name be
unmasked?

BRENNAN: Yes I have.

GOWDY: Have you also either approved or denied requests of
others that a U.S. person's name be unmasked?

BRENNAN: I don't recall in my tenure at CIA any decision on
unmasking for someone else coming up to my level. It would have been
-- that decision would have been made at a lower level within the
agency.

GOWDY: Are you aware of any request within the community that
were denied?

BRENNAN: I -- I do not -- I didn't have visibility into requests
that were being made across the government so I don't -- I don't
recall one that I was denied.

GOWDY: Do you recall any U.S. ambassadors asking that names be
unmasked?

BRENNAN: I don't -- I don't know. Maybe it's ringing a vague
bell but I'm not -- I could not answer with any confidence.

GOWDY: Do you remember what your last day on the job was at the
CIA? What was the date?

BRENNAN: It was noon on January 20 when I gave up my
responsibility as director of CIA.

GOWDY: On either January 19 or up till noon on January 20, did
you make any unmasking requests?

BRENNAN: I do not believe I did.

GOWDY: So you did not make any requests on the last day that you
were employed?

BRENNAN: No, I was not in the agency on the last day I was
employed. I definitely know that on the last day I was employed I
definitely

did not make such a request.

GOWDY: Thank you, director.

CONAWAY: The gentleman's time has expired. Mr. Crawford for five minutes. I'm sorry, Mr. Heck. Mr. Heck?

HECK: Thank you (ph) Mr. Chairman.

CONAWAY: I just want to make sure you're awake down there, Mr. Heck.

HECK: All over it thank you sir. Director Brennan thanks for being here. I -- I want to freely confess to you that there's an element of this Russian investigation with which I've struggled, and it is this. How I explained why this should matter and why people should care? What words do I use to explain this to folks who have a lot of things on their mind? Things like their kids, like keeping their job, like managing their debt, like caring for an elderly parent? Why should people care that the Russians hacked into our computers and then selectively disclosed that information with the express purpose of swaying an election? Why should they care that the Russians are doing this in other Western democracies and will continue to do so -- by the way it minimal investment.

That's the precise question that I actually put to then-Director Comey and Admiral Rogers when they were with us in March. I now pose it to you, sir. So not for my sake, but for America's sake. As someone who has devoted your entire life to public service in your own words, please tell my constituents, my neighbors why they should care not -- just here in Washington DC but in Washington state and Texas and Connecticut and points in between. Why should they care? Why do you care, sir?

BRENNAN: Because for the last 241 years this -- this nation and its citizens have cherished the freedom and liberty that this country was founded upon. Many, many Americans -- brave Americans over the years have lost their lives to be able to protect that freedom and liberty. They've lost their lives also to protect the freedom and liberties of other countries and other peoples around the world.

Our ability to choose our elected leaders as we see fit is, I believe in inalienable right that we must protect with all of our resources and all of our authority and power. And the fact that the Russians try to influence that election so that the will of the American people was not going be realized by that election, I find outrageous and something that we need to, with every last ounce of devotion to this country, resist and to try to act -- to prevent further instances of that. And so therefore I believe that this is

something that's critical important to every American.

It certainly -- I -- it's very important to me for my children
and grandchildren to make sure that never again will a foreign country
try to influence and interfere in the foundation stone of this country
which is electing our Democratic leaders.

HECK: In other words, sir, because you love your country.

BRENNAN: That's the -- the cliff note version of it, yes.

HECK: Well, I believe much is at stake here, including the
following, whether American -- whether America will have elections
that we can trust, that our continuing measures of self-determination
free from foreign interference, whether we will smartly arm ourselves
against any future such digital invasion, whether we are strong enough
to make good on the promise to be a nation of rule by law, whether we
will hold those accountable who seek to abrade our cherished
institutions, whether we will stand up for democracy or enable this
insidious autocracy and kleptocracy (ph), much is at stake.

No one should be misled, however, because this isn't just about
Russia. This is about us and our metal (ph). The famous American
diplomat George Kennan said at the outset of the Cold War, much
depends on the health and vigor of our own society, and indeed it
does. We're being tested, we're divided.

We've gone to our respective corners and claimed our own set of
facts. Anger has become the currency of our civic discourse. Reason
has been replaced with decibel level. But you know what? People also
yearn for a reaffirmation of the value of narrative of America, which
is the very thing that makes us great.

That's what I hear when I'm home, whether I'm playing cards with
my buddies or out to a movie with my wife Paula or having coffee in
the narthex of church. And do you know why? Do you know why
Americans yearn for this? It's because it's what makes us -- makes it
possible, for us to be for something bigger than ourselves.

And that is precisely what America is hoping, if not counting on
us, on this dais, to do to be for something bigger for ourselves and
to put our country above party. And I pray that that's what we'll do.
Thank you sir, for your decades of service and for your presence here
today.

CONAWAY: Gentleman's time has expired.

Mr. Crawford, five minutes?

CRAWFORD: Thank you, Mr. Chairman, I will yield to the gentleman from South Carolina, you may ask.

Mr. Gowdy?

GOWDY: I thank my friend from Arkansas.

Director Brennan, do you know who commissioned the steel dossier?

BRENNAN: I don't.

GOWDY: Do you know if the FBI paid for any -- portion of the steel dossier?

BRENNAN: I don't know. I know that there are press reports related to that, but I -- I don't know, I have no firsthand knowledge of that.

GOWDY: Do you know whether any of the underlying allegations made in the steel dossier were other ever tested, probed, examined, cross-examined, whether the sources were examined for reliability, credibility?

BRENNAN: I know that there were efforts made by the Bureau to try to understand whether or not any of the information in that was valid, but I just -- I don't have any firsthand knowledge of it.
GOWDY: Do you know if the Bureau ever relied on the steel dossier as any -- as part of any court filings, applications, petitions, pleadings?

BRENNAN: I have no awareness.

GOWDY: Did the CIA rely on it?

BRENNAN: No.

GOWDY: Why not?

BRENNAN: Because we -- we didn't, it wasn't part of the corpus of intelligence information that we had. It was not in any way used as a basis for the intelligence community assessment that was done. It was -- it was not.

GOWDY: All right, this is my last line of questioning and I hope I have waited sufficiently long enough to ask you about leaks to not inflame the anger of our friends in the media who think Republicans are hyper focused on it. So we'll just do it last.

Some of your colleagues have testified that our surveillance

programs are critical, vital, indispensable to our national security.
Do you agree with their assessment?

BRENNAN Speaking generally, yes, some of those programs are
absolutely essential and vital to our national security.

GOWDY: Do you agree that there is at least a tacit agreement
between the American people and their government that they will allow
us certain power, certain freedoms, in exchange for safeguarding the
privacy of the information collected?

BRENNAN: I think there is certainly an expectation that there
would be a protection of privacy as the government carries out its --
its responsibility, yes.

GOWDY: And you and I discussed some of those privacy
protections, even within the intelligence community as it relates to
U.S. persons and you've been very clear this morning. In fact, I've
-- I've noted the times you've said U.S. persons. You could've
inserted a name, but you did not. You had the discipline to say U.S.
person. And that discipline is practiced throughout the intelligence
community unless and until there is a request to unmask that U.S
person's name, correct?

BRENNAN: I would like to think that discipline is still
exercised even if a request to unmask a name is made.

GOWDY: All right. So we protect U.S. persons even within those
like yourself and Director Pompeo and Admiral Rogers and Director
Comey and the people that we trust with awesome powers, we still
impose some restrictions on them in that they have to request an
unmasking, there has to be, I assume, a justification. You can't just
wake up in the morning and say hey, I feel like knowing who
participated in X, Y, and Z.

There has to be justification, right?

BRENNAN: Yes.

GOWDY: So how do we get from that to names being on the front
pages of certain major U.S. newspapers?

BRENNAN: It's an excellent question.

GOWDY: What would be an equally excellent answer?

BRENNAN: That somebody violated their oath to protect classified
information and violated that oath and shared that information in an
unauthorized fashion with members of the media.

GOWDY: Well, my friend from Washington -- and he is my friend, I was impressed not only with his eloquence but the conviction with which he just spoke. But I've got other colleagues not from Washington that tend to minimize the nature of leaks as if there is somehow a weighing and a balancing that needs to take place between how interesting we may find the underlying information, how interesting we may find the underlying names.

I have seen attempts unfortunately by members of this very body to mitigate and explain away and minimize what it does to the surveillance programs to have leaks of classified information. So I will finish with this. I believe there's some surveillance programs that are up for reauthorization. What would you say to the American people as names are unmasked on the last day that people are in office and classified information appears on the front pages of major U.S. newspapers?

How would you tell your constituents, let's reauthorize this program again despite the fact that we have abuses? How -- help us make that argument when we go home.

BRENNAN: Mr. Gowdy, you and your colleagues here are going to have to make that argument based on the merits of the program and the importance of it to our national security as well as trying to send a reassuring message to them that if there had been any abuses of the accesses to that information either because of the number of people involved or those who were in fact violating their oath of office that you and your colleagues will do everything possible to make sure you work with the executive branch to minimize and mitigate that danger and that prospect.

CONAWAY: Gentleman's time has expired. Ms. Stefanik.

STEFANIK: Thank you, Mr. Chairman, and thank you, Director Brennan, for your service. My questions will be focused on the process and development of the intelligence community assessment. As you know, the previous administration directed the intelligence community to produce a comprehensive intelligence report assessing Russian activities and intentions on December 9. The unclassified version of that report incorporated information as of December 29. In your experience as an analyst and as the director, what is the average time that it typically takes to produce an I.C. assessment?

BRENNAN: It can range from days to months to years, in fact, depending on the complexity of the matter as well as the urgency of getting something out but it really does vary widely.

STEFANIK: So you noted that the complexity can have an impact on the timeliness to produce

a comprehensive report. This report was produced in just 20 days in December. Was there anything about this interagency process that differed the timeline, the approval process, the editing or the staffing?

BRENNAN: I think it followed the general model of how you want to do something like this with some notable exceptions. It only involved the FBI, NSA and CIA as well as The Office of Director of National Intelligence; it wasn't a full interagency community assessment that was coordinated among the 17 agencies and for good reason, because of the nature the sensitivity of the information trying to, once again keep the tightly compartmented. But in terms of the -- the rigor on the -- the [****] tradecraft as well as the sourcing and as you think know, in the classified version there, it's extensively sourced.

It tried to adhere to the -- general standards.

STEFANIK: So at no point, there was never an individual with any administration outside of the CIA, the FBI, NSA or the DNI that reviewed, edited or was part of the staffing process?

BRENNAN: Not to my knowledge, but I wasn't overseeing the production process and the review process.

STEFANIK: The DNI was overseeing the production process?

BRENNAN: Yes, it was a -- a DNI produced assessments.

STEFANIK: So it's unclear whether anyone else on the NSC the White House was part of the approval or review process from your--- from the knowledge that you have?

BRENNAN: They naturally would not have been part of a -- you know, any type of review or editing process, no.

STEFANIK: What happened between December 29, the date of the last information listed in the ICA, and January 6, when the report was published? Were there any additional edits or approval process outside of the norm?

BRENNAN: I think it was those last few days. We're used to -- further refined people worked over the holiday period, but again it was trying to make sure that the products could be provided to the former president and the current president in their first week of January.

STEFANIK: As we know from your testimony, the Russian role in hacking of U.S. political entities was first reported in July 2016 and was publicly acknowledged by the IC in October 2016. Why wasn't the intelligence community wide assessment of these activities ordered until December?

BRENNAN: There were ongoing assessments that were done. And as I mentioned in my opening testimony, it was used to brief the senior-most the government officials, as well as to ensure that the FBI and DHS could do with they needed to do to protect the -- the -- the government institutions that were affected. And so again they were periodic assessments as we were learning more through the process. It was additional detail.

It also allowed us to note that we weren't seeing certain things that we were concerned about and so the intelligence community assessment that was done in December, published in January was the culmination of the -- the work, the assessment, the collection that had taken place in the months before.

STEFANIK: For the record, it's of concern to me that and there was a two-month lag for the administration to direct the DNI to produce a comprehensive report when this was publicly acknowledged as an issue months earlier during the year.

I want to touch upon the previous administration's actions on December 29 in response to the Russian government's harassment U.S. officials and -- and cyber operations which declared persona non grata 35 Russian intelligence operatives and the closure of two Russian compounds in the U.S. Did you recommend any action to the -- to the administration prior to December 29 or prior to the November election?

BRENNAN: I wasn't recommending. We had discussed what different options might be before...

STEFANIK: So let me ask, did you suggest or present

different options prior to the election or prior to December 29th to the administration?

BRENNAN: That's something that could be discussed in a closed setting.

STEFANIK: Thank you. My time is expired, or it's about to, and I yield back.

CONAWAY: The gentlelady yields back.

Mr. Hurd, five minutes?

HURD: Thank you, Mr. Chairman.

And Director Brennan, I would like to join my colleagues in
thanking you for your years of service, some of which we overlapped in
the CIA and I hope you are enjoying not getting late calls at night.
And that look -- we looked -- we look fresh.

My -- my first question and -- and I apologize in advance for
asking some questions about what did you know when, at certain times.
I have difficulty remembering what happened this morning, but
nonetheless, on the continuum. In 2016, was collecting intelligence
on foreign entities attempts to influence our -- our election a
collection priority?

BRENNAN: And when was that?

HURD: Last year, in 2016.

BRENNAN: It was a collection priority, yes.

HURD: It was? So does that fall under the broader
counterintelligence collection priorities of the -- of the CIA?

BRENNAN: Yes counter intelligence, as well as Russia collection
efforts.

HURD: What is Ops Intel?

BRENNAN: It's operational intelligence that is not maybe
formally disseminated as intelligence community, but it is something
of operational value to for example an investigation.

HURD: So prior to the -- the full accounting that happened in
December 2016 of we're going to do a complete intelligence assessment,
was there any Ops Intel that was used or changed into intelligence
actually disseminated to the broader community during that assessment?

BRENNAN: There was an effort to make sure that all relevant
intelligence that needed to be tapped for the drafting of this
intelligence assessment was made available to the appropriate
individuals, yes.

HURD: So is it your understanding that there was information
that was in operational channels that wasn't available to the entire
analytical community. That was included in that December, ultimately,
the -- the report that was dated January 6th?

BRENNAN: I think as the -- and again, I would defer to the folks at the agency that classified intelligence report is exceptionally well documented and sourced. And just because something is produced as an intelligence report, it doesn't mean that it goes to everybody in the community.

It is the recipient lists for that and depending on the sensitivity of the information; it is either broadly disseminated or very narrowly disseminated.

HURD: One of the issues that this committee is focused on is figuring out what was the U.S. government's response to these Russian active measures? And what do we need to do to protect ourselves and our allies in the future? And one of my concerns is did we escalate soon enough, quickly enough?
Did we notify those that were being targeted soon enough? And did we recognize the intelligence or the information that we had access to, at the time that it was actually collected? And so my question is, knowing what you know now, would you have directed the CIA to do things differently?

BRENNAN: You know, I've asked myself the question. I feel as though we tried to do everything that we could to fulfill our responsibility which was to learn as much as we could about the Russian efforts because we didn't know, again, the extent of it. And so we had to be very careful about what we did so that we would protect certain capabilities and the community as a whole as well as to try to assess what was happening. Kept the executive branch seniors informed, national security council informed, the Gang of Eight informed.

And so 20/20 hindsight is always, you know, I think a lot maybe clearer to some folks. That's what I think this committee and the other committee in the Senate is going to take a look at. Was it perfect? I don't think anything in this world is perfect but I think we try to do the best job that we could.

HURD: So are we -- is the intelligence community prepared or ready to counter covert action directed against us or direct measures as the Russians like to call it? How do we develop a strategy to counter covert action against us? And I only have seven seconds so I know that's difficult for you to answer.

BRENNAN: And that's why it's easy for me to say it's referred to closed session as well as to current agency and other officials.

HURD: Good copy (ph). I yield back, Chairman.

BRENNAN: I do want to take this opportunity to say that I

2017 WL 2259577, 2017 WL 2259577 (2017)

misspoke earlier in response to Mr. Gowdy. I was at CIA headquarters
on the morning of January 20. I went there to collect some final
personal materials as well as to pay my last respects to a memorial
wall. But I was there for a brief period of time and just to take
care of some final -- final things that were important to me.

GOWDY: Yes sir, thank you.

CONAWAY: Well, Mr. Brennan, thank you very much. This is right
at the end of our open hearing. Our committee is charged with
answering some really important questions. As some of my colleagues
have said, our -- the success -- the ultimate success of the Russians'
disinformation campaign and/or active measures lies with the American
citizens and whether or not they're successful or not is up to us --
up to us as citizens to not let that happen.

Part of that is how well we inform them of what happened and
where, when, and what, all those kind of good things. And so thank
you for being a part of that exercise this morning. We intend to have
a closed session that will start in about 30 minutes downstairs in the
spaces. We've got sandwiches available for you if you'd like. With
that, we are recessed until we get to closed sessions downstairs.
Thank you very much.

END

    REP. DEVIN NUNES
    Chairman
    H Intel
    Washington, D.C.

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.