S. Hrg. 115–99

# OPEN HEARING WITH FORMER FBI DIRECTOR JAMES COMEY

# HEARING

BEFORE THE

## SELECT COMMITTEE ON INTELLIGENCE

OF THE

## UNITED STATES SENATE

ONE HUNDRED FIFTEENTH CONGRESS

FIRST SESSION

THURSDAY, JUNE 8, 2017

Printed for the use of the Select Committee on Intelligence



Available via the World Wide Web: http://www.fdsys.gov

U.S. GOVERNMENT PUBLISHING OFFICE

25–890 PDF WASHINGTON : 2017

For sale by the Superintendent of Documents, U.S. Government Publishing Office
Internet: bookstore.gpo.gov  Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104  Mail: Stop IDCC, Washington, DC 20402–0001

## SELECT COMMITTEE ON INTELLIGENCE

[Established by S. Res. 400, 94th Cong., 2d Sess.]

RICHARD BURR, North Carolina, *Chairman*
MARK R. WARNER, Virginia, *Vice Chairman*

JAMES E. RISCH, Idaho
MARCO RUBIO, Florida
SUSAN COLLINS, Maine
ROY BLUNT, Missouri
JAMES LANKFORD, Oklahoma
TOM COTTON, Arkansas
JOHN CORNYN, Texas

DIANNE FEINSTEIN, California
RON WYDEN, Oregon
MARTIN HEINRICH, New Mexico
ANGUS KING, Maine
JOE MANCHIN III, West Virginia
KAMALA HARRIS, California

MITCH McCONNELL, Kentucky, *Ex Officio*
CHARLES SCHUMER, New York, *Ex Officio*
JOHN McCAIN, Arizona, *Ex Officio*
JACK REED, Rhode Island, *Ex Officio*

———————

CHRIS JOYNER, *Staff Director*
MICHAEL CASEY, *Minority Staff Director*
KELSEY STROUD BAILEY, *Chief Clerk*

(II)

# CONTENTS

———————

**JUNE 8, 2017**

OPENING STATEMENTS

Burr, Hon. Richard, Chairman, a U.S. Senator from North Carolina ................ 1
Warner, Hon. Mark R., Vice Chairman, a U.S. Senator from Virginia .............. 3

WITNESS

James Comey, Former Director, Federal Bureau of Investigation ...................... 5

# OPEN HEARING WITH FORMER FBI DIRECTOR JAMES COMEY

———

## THURSDAY, JUNE 8, 2017

U.S. SENATE,
SELECT COMMITTEE ON INTELLIGENCE,
*Washington, DC.*

The Committee met, pursuant to notice, at 10:04 a.m. in Room SH–216, Hart Senate Office Building, Hon. Richard Burr (Chairman of the Committee) presiding.

Committee Members Present: Senators Burr, Warner, Risch, Rubio, Collins, Blunt, Lankford, Cotton, Cornyn, McCain, Feinstein, Wyden, Heinrich, King, Manchin, Harris, and Reed.

## OPENING STATEMENT OF HON. RICHARD BURR, CHAIRMAN, A U.S. SENATOR FROM NORTH CAROLINA

Chairman BURR. I'd like to call this hearing to order.

Director Comey, I appreciate your willingness to appear before the committee today and, more importantly, I thank you for your dedicated service and leadership to the Federal Bureau of Investigation. Your appearance today speaks to the trust we have built over the years, and I'm looking forward to a very open and candid discussion today.

I'd like to remind my colleagues that we will reconvene in closed session at 1:00 p.m. today and I ask that you reserve for that venue any questions that might get into classified information. The Director has been very gracious with his time, but the Vice Chairman and I have worked out a very specific timeline for his commitment to be on the Hill, so we will do everything we can to meet that agreement.

The Senate Select Committee on Intelligence exists to certify for the other 85 members of the United States Senate and the American people that the intelligence community is operating lawfully and has the necessary authorities and tools to accomplish its mission and keep America safe. Part of our mission, beyond the oversight we continue to provide to the intelligence community and its activities, is to investigate Russian interference in the 2016 U.S. elections. The committee's work continues. This hearing represents part of that effort.

Jim, allegations have been swirling in the press for the last several weeks and today's your opportunity to set the record straight. Yesterday, I read with interest your statement for the record. And I think it provides some helpful details surrounding your interactions with the President.

It clearly lays out your understanding of those discussions, actions you took following each conversation, and your state of mind. I very much appreciate your candor and I think it's helpful as we work through to determine the ultimate truth behind possible Russian interference in the 2016 elections.

Your statement also provides texture and context to your interactions with the President from your vantage point and outlines a strained relationship. The American people need to hear your side of the story just as they need to hear the President's descriptions of events.

These interactions also highlight the importance of the committee's ongoing investigation. Our experienced staff is interviewing all relevant parties and some of the most sensitive intelligence in our country's possession. We will establish the facts, separate from rampant speculation, and lay them out for the American people to make their own judgment. Only then will we as a Nation be able to move forward and to put this episode to rest.

There are several outstanding issues not addressed in your statement that I hope you'll clear up for the American people today. Did the President's request for loyalty, your impression that the one-on-one dinner of January 27th was, and I quote, "at least in part an effort to create some sort of patronage relationship," or his March 30th phone call asking what you could do to lift the cloud of Russia investigation in any way, alter your approach to the FBI's investigation into General Flynn or the broader investigation into Russia and possible links to the campaign?

In your opinion, did potential Russian efforts to establish links with individuals in the Trump orbit rise to the level we could define as collusion or was it a counterintelligence concern?

There's been significant public speculation about your decision-making related to the Clinton e-mail investigation. Why did you decide to publicly announce FBI's recommendations that the Department of Justice not pursue criminal charges? You have described it as a choice between a bad decision and a worse decision. The American people need to understand the facts behind your action.

This committee is uniquely suited to investigate Russia's interference in the 2016 elections. We also have a unified, bipartisan approach to what is a highly charged partisan issue. Russian activities during the 2016 election may have been aimed at one party's candidate, but, as my colleague Senator Rubio says frequently, in 2018 and 2020 it could be aimed at anyone, at home or abroad.

My colleague Senator Warner and I have worked to stay in lock-step on this investigation. We've had our differences on approach at times, but I've constantly stressed that we need to be a team. And I think Senator Warner agrees with me.

We must keep these questions above politics and partisanship. It's too important to be tainted by anyone trying to score political points.

With that, again I welcome you, Director, and I turn to the Vice Chairman for any comments he might have.

## OPENING STATEMENT OF HON. MARK R. WARNER, A U.S. SENATOR FROM VIRGINIA

Vice Chairman WARNER. Well, thank you, Mr. Chairman. And let me start by again actually thanking all the members of the committee for the seriousness in which they've taken on this task.

Mr. Comey, thank you for agreeing to come testify as part of this committee's investigation into Russia.

I realize that this hearing has been, obviously, the focus of a lot of Washington in the last few days. But the truth is many Americans who may be tuning in today probably haven't focused on every twist and turn of the investigation. So I'd like to briefly describe, at least from this Senator's standpoint, what we already know and what we're still investigating.

To be clear, this whole investigation is not about relitigating the election. It's not about who won or lost. And it sure as heck is not about Democrats versus Republicans. We're here because a foreign adversary attacked us right here at home, plain and simple, not by guns or missiles, but by foreign operatives seeking to hijack our most important democratic process—our presidential election. Russian spies engaged in a series of online cyber raids and a broad campaign of disinformation, all ultimately aimed at sowing chaos to us to undermine public faith in our process, in our leadership, and ultimately in ourselves.

And that's not just this Senator's opinion. It is the unanimous determination of the entire U.S. intelligence community. So we must find out the full story, what the Russians did, and, candidly, as some other colleagues have mentioned, why they were so successful. And more importantly, we must determine the necessary steps to take to protect our democracy and ensure they can't do it again.

The Chairman mentioned elections in 2018 and 2020. In my home State of Virginia, we have elections this year, in 2017. Simply put, we cannot let anything or anyone prevent us from getting to the bottom of this.

Now, Mr. Comey, let me say at the outset we haven't always agreed on every issue. In fact, I've occasionally questioned some of the actions you've taken. But I've never had any reason to question your integrity, your expertise, or your intelligence. You've been a straight shooter with this committee and have been willing to speak truth to power, even at the risk of your own career, which makes the way in which you were fired by the President ultimately shocking.

Recall we began this entire process with the President and his staff first denying that the Russians were ever involved and then falsely claiming that no one from his team was ever in touch with any Russians. We know that's just not the truth. Numerous Trump associates had undisclosed contacts with Russians before and after the election, including the President's Attorney General, his former national security adviser and his current senior adviser, Mr. Kushner.

That doesn't even begin to count the host of additional campaign associates and advisers who've also been caught up in this massive web. We saw Mr. Trump's campaign manager, Mr. Manafort, forced to step down over ties to Russian-backed entities. The national se-

curity adviser, General Flynn, had to resign over his lies about engagements with the Russians. And we saw the candidate himself express an odd and unexplained affection for the Russian dictator, while calling for the hacking of his opponent.

There's a lot to investigate. Enough, in fact that then-Director Comey publicly acknowledged that he was leading an investigation into those links between Mr. Trump's campaign and the Russian government. As the Director of the FBI, Mr. Comey was ultimately responsible for conducting that investigation, which might explain why you're sitting now as a private citizen.

What we didn't know was at the same time that this investigation was proceeding the President himself appears to have been engaged in an effort to influence, or at least co-opt, the Director of the FBI.

The testimony that Mr. Comey has submitted for today's hearing is very disturbing. For example, on January 27th, after summoning Director Comey to dinner, the President appears to have threatened the Director's job while telling him, quote, "I need loyalty. I expect loyalty."

At a later meeting on February 14th, the President asked the Attorney General to leave the Oval Office so that he could privately ask Director Comey, again quote, "to see a way clear to letting Flynn go." That is a statement that Director Comey interpreted as a request that he drop the investigation connected to General Flynn's false statements. Think about it: the President of the United States asking the FBI Director to drop an ongoing investigation.

And after that, the President called the FBI Director on two additional occasions, March 30th and April 11th, and asked him again, quote, "to lift the cloud" on the Russian investigation.

Now, Director Comey denied each of these improper requests: the loyalty pledge, the admonition to drop the Flynn investigation, the request to lift the cloud of the Russia investigation. Of course, after his refusals Director Comey was fired.

The initial explanation for the firing didn't pass any smell test. So now Director Comey was fired because he didn't treat Hillary Clinton appropriately. Of course, that explanation lasted about a day, because the President himself then made very clear that he was thinking about Russia when he decided to fire Director Comey.

Shockingly, reports suggest that the President admitted as much in an Oval Office meeting with the Russians the day after Director Comey was fired. Disparaging our country's top law enforcement official as a, quote/unquote, "nut job." The President allegedly suggested that his firing relieved great pressure on his feelings about Russia.

This is not happening in isolation. At the same time the President was engaged in these efforts with Director Comey, he was also, at least allegedly, asking senior leaders of the intelligence community to downplay the Russian investigation or to intervene with the Director.

Yesterday, we had DNI Director Coats and NSA Director Admiral Rogers, who were offered a number of opportunities to flatly deny those press reports. They expressed their opinions, but they did not take that opportunity to deny those reports. They did not

take advantage of that opportunity. In my belief, that's not how the President of the United States should behave.

Regardless of the outcome of our investigation into the Russia links, Director Comey's firing and his testimony raise separate and troubling questions that we must get to the bottom of.

Again, as I said at the outset, I've seen firsthand how seriously every member of this committee is taking his work. I'm proud of the committee's efforts so far. Let me be clear: This is not a witch hunt. This is not fake news. It is an effort to protect our country from a new threat that, quite honestly, will not go away any time soon.

So, Mr. Comey, your testimony here today will help us move towards that goal. I look forward to that testimony.

Thank you, Mr. Chairman.

Chairman BURR. Thank you, Vice Chairman.

Director, as discussed when you agreed to appear before the committee, it would be under oath. I'd ask you to please stand. Raise your right hand. Do you solemnly swear to tell the truth, the whole truth, and nothing but the truth, so help you God?

Director COMEY. I do.

Chairman BURR. Please be seated.

## TESTIMONY OF JAMES COMEY, FORMER DIRECTOR, FEDERAL BUREAU OF INVESTIGATION

Chairman BURR. Director Comey, you're now under oath.

And I would just note to members, you will be recognized by seniority for a period up to seven minutes. And again, it is the intent to move to a closed session no later than 1:00 p.m.

With that, Director Comey, you are recognized. You have the floor for as long as you might need.

Director COMEY. Thank you. Mr. Chairman, Ranking Member Warner, members of the committee: Thank you for inviting me here to testify today. I've submitted my statement for the record and I'm not going to repeat it here this morning. I thought I would just offer some very brief introductory remarks and then I would welcome your questions.

When I was appointed FBI Director in 2013, I understood that I served at the pleasure of the President. Even though I was appointed to a 10-year term, which Congress created in order to underscore the importance of the FBI being outside of politics and independent, I understood that I could be fired by a President for any reason or for no reason at all.

And on May the 9th, when I learned that I had been fired, for that reason I immediately came home as a private citizen. But then the explanations, the shifting explanations, confused me and increasingly concerned me. They confused me because the President and I had had multiple conversations about my job, both before and after he took office, and he had repeatedly told me I was doing a great job and he hoped I would stay. And I had repeatedly assured him that I did intend to stay and serve out the remaining six years of my term.

He told me repeatedly that he had talked to lots of people about me, including our current Attorney General, and had learned that

I was doing a great job and that I was extremely well-liked by the FBI workforce.

So it confused me when I saw on television the President saying that he actually fired me because of the Russia investigation and learned, again from the media, that he was telling privately other parties that my firing had relieved great pressure on the Russia investigation.

I was also confused by the initial explanation that was offered publicly, that I was fired because of the decisions I had made during the election year. That didn't make sense to me for a whole bunch of reasons, including the time and all the water that had gone under the bridge since those hard decisions that had to be made. That didn't make any sense to me.

And although the law required no reason at all to fire an FBI Director, the Administration then chose to defame me and, more importantly, the FBI by saying that the organization was in disarray, that it was poorly led, that the workforce had lost confidence in its leader.

Those were lies, plain and simple, and I am so sorry that the FBI workforce had to hear them and I'm so sorry that the American people were told them. I worked every day at the FBI to help make that great organization better. And I say "help" because I did nothing alone at the FBI. There are no indispensable people at the FBI. The organization's great strength is that its values and abilities run deep and wide. The FBI will be fine without me. The FBI's mission will be relentlessly pursued by its people and that mission is to protect the American people and uphold the Constitution of the United States.

I will deeply miss being part of that mission, but this organization and its mission will go on long beyond me and long beyond any particular administration.

I have a message before I close for my former colleagues at the FBI. But first I want the American people to know this truth: The FBI is honest. The FBI is strong. And the FBI is and always will be independent.

And now to my former colleagues, if I may. I am so sorry that I didn't get the chance to say goodbye to you properly. It was the honor of my life to serve beside you, to be part of the FBI family. And I will miss it for the rest of my life. Thank you for standing watch. Thank you for doing so much good for this country. Do that good as long as ever you can.

And, Senators, I look forward to your questions.

Chairman BURR. Director, thank you for that testimony, both oral and the written testimony that you provided to the committee yesterday and made public to the American people.

The Chair would recognize himself first for 12 minutes, Vice Chair for 12 minutes, based upon the agreement we have.

Director, did the Special Counsel's Office review and/or edit your written testimony?

Director COMEY. No.

Chairman BURR. Do you have any doubt that Russia attempted to interfere in the 2016 elections?

Director COMEY. None.

Chairman BURR. Do you have any doubt that the Russian government was behind the intrusions in the DNC and the DCCC systems and the subsequent leaks of that information?

Director COMEY. No, no doubt.

Chairman BURR. Do you have any doubt that the Russian government was behind the cyber intrusion in the State voter files?

Director COMEY. No.

Chairman BURR. Do you have any doubt that officials of the Russian government were fully aware of these activities?

Director COMEY. No doubt.

Chairman BURR. Are you confident that no votes cast in the 2016 Presidential election were altered?

Director COMEY. I'm confident. By the time—when I left as Director, I had seen no indication of that whatsoever.

Chairman BURR. Director Comey, did the President at any time ask you to stop the FBI investigation into Russian involvement in the 2016 U.S. elections?

Director COMEY. Not to my understanding, no.

Chairman BURR. Did any individual working for this Administration, including the Justice Department, ask you to stop the Russian investigation?

Director COMEY. No.

Chairman BURR. Director, when the President requested that you, and I quote, "let Flynn go," General Flynn had an unreported contact with the Russians, which is an offense. And if press accounts are right, there might have been discrepancies between facts and his FBI testimony. In your estimation, was General Flynn at that time in serious legal jeopardy? And in addition to that, do you sense that the President was trying to obstruct justice or just seek for a way for Mike Flynn to save face, given he had already been fired?

Director COMEY. General Flynn at that point in time was in legal jeopardy. There was an open FBI criminal investigation of his statements in connection with the Russian contacts and the contacts themselves. And so that was my assessment at the time.

I don't think it's for me to say whether the conversation I had with the President was an effort to obstruct. I took it as a very disturbing thing, very concerning, but that's a conclusion I'm sure the special counsel will work towards, to try and understand what the intention was there and whether that's an offense.

Chairman BURR. Director, is it possible that as part of this FBI investigation the FBI could find evidence of criminality that is not tied to the 2016 elections, possible collusion, or coordination with Russians?

Director COMEY. Sure.

Chairman BURR. So there could be something that just fits a criminal aspect to this that doesn't have anything to do with the 2016 election cycle?

Director COMEY. Correct. In any complex investigation, when you start turning over rocks, sometimes you find things that are unrelated to the primary investigation that are criminal in nature.

Chairman BURR. Director Comey, you have been criticized publicly for the decision to present your findings on the e-mail investigation directly to the American people. Have you learned any-

thing since that time that would've changed what you said, or how you chose to inform the American people?

Director COMEY. Honestly, no. I mean, it caused a whole lot of personal pain for me, but as I look back, given what I knew at the time and even what I've learned since, I think it was the best way to try and protect the justice institution, including the FBI.

Chairman BURR. In the public domain is this question of the Steele dossier, a document that has been around now for over a year. I'm not sure when the FBI first took possession of it, but the media had it before you had it and we had it.

At the time of your departure from the FBI, was the FBI able to confirm any criminal allegations contained in the Steele document?

Director COMEY. Mr. Chairman, I don't think that's a question I can answer in an open setting because it goes into the details of the investigation.

Chairman BURR. Director, the term we hear most often is "collusion." When people are describing possible links between Americans and Russian government entities related to the interference in our election, would you say that it's normal for foreign governments to reach out to the members of an incoming administration?

Director COMEY. Yes.

Chairman BURR. At what point does the normal contact cross the line into an attempt to recruit agents or influence or spies?

Director COMEY. Difficult to say in the abstract. It depends upon the context, whether there's an effort to keep it covert, what the nature of the requests made of the American by the foreign government are. It's a judgment call based on a whole lot of facts.

Chairman BURR. At what point would that recruitment become a counterintelligence threat to our country?

Director COMEY. Again, difficult to answer in the abstract. But when a foreign power is using especially coercion or some sort of pressure to try and co-opt an American, especially a government official, to act on its behalf, that's a serious concern to the FBI and at the heart of the FBI's counterintelligence mission.

Chairman BURR. So if you've got a 36-page document of specific claims that are out there, the FBI would have to, for counterintelligence reasons, try to verify anything that might be claimed in there. One, and probably first and foremost, is the counterintelligence concerns that we have about blackmail. Would that be an accurate statement?

Director COMEY. Yes. If the FBI receives a credible allegation that there is some effort to co-opt, coerce, direct, employ covertly an American on behalf of the foreign power, that's the basis on which a counterintelligence investigation is opened.

Chairman BURR. And when you read the dossier, what was your reaction, given that it was 100 percent directed at the President-elect?

Director COMEY. Not a question I can answer in an open setting, Mr. Chairman.

Chairman BURR. Okay. When did you become aware of the cyber intrusion?

Director COMEY. The first cyber—it was all kinds of cyber intrusions going on all the time. The first Russia-connected cyber intrusion I became aware of in the late summer of 2015.

Chairman BURR. And in that timeframe, there were more than the DNC and the DCCC that were targets?

Director COMEY. Correct. It was a massive effort to target government and nongovernmental—near-governmental agencies like nonprofits.

Chairman BURR. What would be the estimate of how many entities out there the Russians specifically targeted in that timeframe?

Director COMEY. It's hundreds. I suppose it could be more than a thousand, but it's at least hundreds.

Chairman BURR. When did you become aware that data had been exfiltrated?

Director COMEY. I'm not sure, exactly. I think either late 2015 or early 2016.

Chairman BURR. And did you, the Director of the FBI, have conversations with the last Administration about the risk that this posed?

Director COMEY. Yes.

Chairman BURR. And share with us, if you will, what actions they took.

Director COMEY. Well, the FBI had already undertaken an effort to notify all the victims, and that's what we consider the entities that were attacked as part of this massive spear phishing campaign. And so we notified them in an effort to disrupt what might be ongoing.

Then there was a series of continuing interactions with entities through the rest of 2015 into 2016, and then throughout 2016 the Administration was trying to decide how to respond to the intrusion activity that it saw.

Chairman BURR. And the FBI in this case, unlike other cases that you might investigate, did you ever have access to the actual hardware that was hacked? Or did you have to rely on a third party to provide you the data that they had collected?

Director COMEY. In the case of the DNC, and I believe the DCCC, but I'm sure the DNC, we did not have access to the devices themselves. We got relevant forensic information from a private party, a high-class entity, that had done the work. But we didn't get direct access.

Chairman BURR. But no content?

Director COMEY. Correct.

Chairman BURR. Isn't content an important part of the forensics from a counterintelligence standpoint?

Director COMEY. It is, although what was briefed to me by my folks, the people who were my folks at the time, is that they had gotten the information from the private party that they needed to understand the intrusion by the spring of 2016.

Chairman BURR. Let me go back, if I can, very briefly, to the decision to publicly go out with your results on the e-mail. Was your decision influenced by the Attorney General's tarmac meeting with the former President, Bill Clinton?

Director COMEY. Yes, in an ultimately conclusive way. That was the thing that capped it for me that I had to do something sepa-

rately to protect the credibility of the investigation, which meant both the FBI and the Justice Department.

Chairman BURR. Were there other things that contributed to that that you can describe in an open session?

Director COMEY. There were other things that contributed to that. One significant item I can't, I know the committee's been briefed on. There's been some public accounts of it, which are nonsense, but I understand the committee's been briefed on the classified facts.

Probably the only other consideration that I guess I can talk about in an open setting is at one point the Attorney General had directed me not to call it an "investigation," but instead to call it a "matter," which confused me and concerned me. But that was one of the bricks in the load that led me to conclude I have to step away from the Department if we're to close this case credibly.

Chairman BURR. Director, my last question: You're not only a seasoned prosecutor, you've led the FBI for years. You understand the investigative process. You've worked with this committee closely, and we're grateful to you because I think we've mutually built trust in what your organization does and what we do.

Is there any doubt in your mind that this committee can carry out its oversight role in the 2016 Russian involvement in the elections in parallel with the now special counsel that's been set up?

Director COMEY. No, no doubt. It can be done. It requires lots of conversations, but Bob Mueller is one of this country's great, great pros. And I'm sure you all will be able to work it out with him to run it in parallel.

Chairman BURR. I want to thank you once again, and I want to turn to the Vice Chairman.

Vice Chairman WARNER. Thank you, Mr. Chairman.

And again, Director Comey, thank you for your service. Your comments to your FBI family I know were heartfelt. Know that, even though there are some in the Administration who've tried to smear your reputation, you had Acting Director McCabe in public testimony a few weeks back and in public testimony yesterday reaffirm that the vast majority of the FBI community had great trust in your leadership and, obviously, trust in your integrity.

I want to go through a number of the meetings that you referenced in your testimony. And let's start with the January 6th meeting in Trump Tower, where you went up with a series of officials to brief the President-elect on the Russia investigation. My understanding is you remained afterwards to brief him on, again, quote, "some personally sensitive aspects" of the information you relayed.

Now, you said after that briefing you felt compelled to document that conversation, that you actually started documenting it soon as you got into the car. Now, you've had extensive experience at the Department of Justice and at the FBI. You've worked under Presidents of both parties. What was it about that meeting that led you to determine that you needed to start putting down a written record?

Director COMEY. A combination of things, I think: the circumstances, the subject matter, and the person I was interacting

with. Circumstances first: I was alone with the President of the United States—or the President-elect, soon to be President.

The subject matter: I was talking about matters that touch on the FBI's core responsibility and that relate to the President—President-elect personally.

And then the nature of the person: I was honestly concerned that he might lie about the nature of our meeting, and so I thought it really important to document.

That combination of things I'd never experienced before, but it led me to believe I've got to write it down, and I've got to write it down in a very detailed way.

Vice Chairman WARNER. I think that's a very important statement you just made. And my understanding is that then, again unlike your dealings with Presidents of either parties in your past experience, in every subsequent meeting or conversation with this President you created a written record.

Did you feel that you needed to create this written record or these memos because they might need to be relied on at some future date?

Director COMEY. Sure. I created records after conversations, and I think I did it after each of our nine conversations. If I didn't, I did it for nearly all of them, especially the ones that were substantive.

I knew that there might come a day when I would need a record of what had happened, not just to defend myself, but to defend the FBI and our integrity as an institution and the independence of our investigative function. That's what made this so difficult, is it was a combination of circumstances, subject matter, and the particular person.

Vice Chairman WARNER. And so, in all your experience this was the only President that you felt like in every meeting you needed to document, because at some point, using your words, he might put out a non-truthful representation of that meeting?

Director COMEY. That's right, Senator. And as I said in my written testimony, as FBI Director I interacted with President Obama. I spoke only twice alone in three years, and didn't document it. When I was Deputy Attorney General, I had one one-on-one meeting with President Bush about a very important and difficult national security matter. I didn't write a memo documenting that conversation either—sent a quick e-mail to my staff to let them know there was something going on, but I didn't feel with President Bush the need to document it in that way, again because the combination of those factors just wasn't present with either President Bush or President Obama.

Vice Chairman WARNER. I think that is very significant. I think others will probably question that.

Now, the Chairman and I have requested those memos. It is our hope that the FBI will get this committee access to those memos so that, again, we can read that contemporaneous rendition so that we've got your side of the story.

Now, I know members have said and press has said that if you were—a great deal's been made of whether the President—you were asked to, in effect, indicate whether the President was the subject of any investigation.

And my understanding is prior to your meeting on January 6th you discussed with your leadership team whether or not you should be prepared to assure then President-elect Trump that the FBI was not investigating him personally. Now, my understanding is your leadership team agreed with that. But was that a unanimous decision? Was there any debate about that?

Director COMEY. Was it unanimous? One of the members of the leadership team had a view that, although it was technically true we did not have a counterintelligence file case open on then-President-elect Trump, his concern was because we're looking at the potential—again, that's the subject of the investigation—coordination between the campaign and Russia, because it was President Trump, President-elect Trump's campaign, this person's view was inevitably his behavior, his conduct, will fall within the scope of that work, and so he was reluctant to make the statement that I made.

I disagreed. I thought it was fair to say what was literally true: There is not a counterintelligence investigation of Mr. Trump. And I decided in the moment to say it, given the nature of our conversation.

Vice Chairman WARNER. At that moment in time. Did you ever revisit that in these subsequent sessions?

Director COMEY. With the FBI leadership team?

Vice Chairman WARNER. With the team—with your team.

Director COMEY. Sure, and the leader who had that view, it didn't change. His view was still that it was probably—although literally true, his concern was it could be misleading because the nature of the investigation was such that it might well touch—obviously, it would touch the campaign, and the person at the head of the campaign would be the candidate. And so that was his view throughout.

Vice Chairman WARNER. Let me move to the January 27th dinner, where you said, quote, "The President began by asking me whether I wanted to stay on as FBI Director." He also indicated that lots of people"—again, your words—"wanted the job."

You go on to say that the dinner itself was seemingly an effort to quote, "have you ask him for your job," and create some sort of, quote-unquote, "patronage relationship."

The President seems, from my reading of your memo, to be holding your job or your possibility of continuing in your job over your head in a fairly direct way. What was your impression and what did you mean by this notion of a patronage relationship?

Director COMEY. Well, my impression—and, again, it's my impression. I could always be wrong. But my common sense told me that what was going on is either he had concluded or someone had told him that you didn't—you've already asked Comey to stay and you didn't get anything for it; and that the dinner was an effort to build a relationship—in fact, he asked specifically—of loyalty in the context of asking me to stay.

And as I said, what was odd about that is we'd already talked twice about it by that point and he'd said, I very much hope you'll stay, I hope you'll stay.

In fact, I just remembered sitting here a third one. When—you've seen the picture of me walking across the Blue Room. And what

the President whispered in my ear was, "I really look forward to working with you." So, after those encounters——

Vice Chairman WARNER. And that was just a few days before you were fired?

Director COMEY. Yeah, that was on the 20—the Sunday after the Inauguration.

The next Friday, I have dinner and the President begins by wanting to talk about my job. And so I'm sitting there thinking: Wait a minute, three times we've already—you've already asked me to stay or talked about me staying. And my common sense—again, I could be wrong, but my common sense told me what's going on here is that he's looking to get something in exchange for granting my request to stay in the job.

Vice Chairman WARNER. And again, we all understand. I was a governor, I had people work for me. But this constant requests and, again quoting you, him saying that, despite you explaining your independence, he kept coming back to "I need loyalty." "I expect loyalty."

Had you ever had any of those kind of requests before, from anyone else you'd worked for in the government?

Director COMEY. No, and what made me uneasy was I'm at that point the Director of the FBI. The reason that Congress created a ten-year term is so that the Director is not feeling as if they're serving with political loyalty owed to any particular person. The statue of Justice has a blindfold on because you're not supposed to be peeking out to see whether your patron is pleased or not with what you're doing.

It should be about the facts and the law. That's why I became FBI Director, to be in that kind of position. So that's why I was so uneasy.

Vice Chairman WARNER. Well, let me—let me move on. My time's running out. February 14th—again, it seems a bit strange. You were in a meeting. And your direct superior, the Attorney General, was in that meeting, as well.

Yet the President asked everyone to leave, including the Attorney General to leave, before he brought up the matter of General Flynn. What was your impression of that type of action? Had you ever seen anything like that before?

Director COMEY. No. My impression was, something big is about to happen. I need to remember every single word that is spoken. And again, I could be wrong, but I'm 56 years old. I've seen a few things. My sense was the Attorney General knew he shouldn't be leaving, which is why he was lingering. And I don't know Mr. Kushner well, but I think he picked up on the same thing. And so I knew something was about to happen that I needed to pay very close attention to.

Vice Chairman WARNER. And I found it very interesting that, in the memo that you wrote after this February 14th pull-aside, you made clear that you wrote that memo in a way that was unclassified. If you affirmatively made the decision to write a memo that was unclassified, was that because you felt at some point the facts of that meeting would have to come clean and come clear and actually be able to be cleared in a way that could be shared with the American people?

Director COMEY. Well, I remember thinking, this is a very disturbing development, really important to our work, I need to document it and preserve it in a way—and this committee gets this, but sometimes when things are classified, it tangles them up. It's hard——

Vice Chairman WARNER. Amen.

Director COMEY [continuing]. To share it within an investigative team. You have to be very careful about how you handle it, for good reason. So my thinking was, if I write it in such a way that I don't include anything that would trigger a classification, that'll make it easier for us to discuss within the FBI and the government, and to hold on to it in a way that makes it accessible to us.

Vice Chairman WARNER. Well, again, it's our hope, particularly since you're a pretty knowledgeable guy and you wrote this in a way that was unclassified, that this committee will get access to that unclassified document. I think it'll be very important to our investigation.

Let me just ask this in closing: How many ongoing investigations at any time does the FBI have going on?

Director COMEY. Tens of thousands.

Vice Chairman WARNER. Tens of thousands. Did the President ever ask about any other ongoing investigation?

Director COMEY. No.

Vice Chairman WARNER. Did he ever ask about you trying to interfere on any other investigation?

Director COMEY. No.

Vice Chairman WARNER. I think again this speaks volumes. This doesn't even get to the questions around the phone calls about lifting the cloud. I know other members will get to that, but I really appreciate your testimony and appreciate your service to our Nation.

Director COMEY. Thank you, Senator Warner.

You know, just I'm sitting here, going through my contacts with him. I had one conversation with the President that was classified, where he asked about an ongoing intelligence investigation. It was brief and entirely professional.

Vice Chairman WARNER. But he didn't ask you to take any specific action on that?

Director COMEY. No, no.

Vice Chairman WARNER. Unlike what he had done vis-á-vis Mr. Flynn and the overall Russia investigation?

Director COMEY. Correct.

Vice Chairman WARNER. Thank you, sir.

Chairman BURR. Senator Risch.

Senator RISCH. Thank you very much.

Mr. Comey, thank you for your service. America needs more like you, and we really appreciate it.

Yesterday I got and everybody got the seven pages of your direct testimony that's now a part of the record here. And the first—I read it, then I read it again, and all I could think was, number one, how much I hated the class of legal writing when I was in law school. And you were the guy that probably got the A, after reading this. So I find it clear, I find it concise, and, having been a prosecutor for a number of years and handling hundreds, maybe thou-

sands, of cases and read police reports, investigative reports, this is as good as it gets.

And I really appreciate that, not only the conciseness and the clearness of it, but also the fact that you have things that were written down contemporaneously when they happened and you actually put them in quotes, so we know exactly what happened and we're not getting some rendition of it that in your mind.

Director COMEY. Thank you, Senator.

Senator RISCH. So you're to be complimented for that.

Director COMEY. I had great parents and great teachers who beat that into me.

Senator RISCH. That's obvious, sir.

The Chairman walked you through a number of things that the American people need to know and want to know. Number one, obviously we all know about the active measures that the Russians have taken. I think a lot of people were surprised at this. Those of us that work in the intelligence community, it didn't come as a surprise. But now the American people know this, and it's good they know this because this is serious and it's a problem.

I think, secondly, I gather from all this that you're willing to say now that while you were Director the President of the United States was not under investigation. Is that a fair statement?

Director COMEY. That's correct.

Senator RISCH. All right. So that's a fact that we can rely on.

Director COMEY. Yes, sir.

Senator RISCH. Okay.

I remember you talked with us shortly after February 14th, when the New York Times wrote an article that suggested that the Trump campaign was colluding with the Russians. You remember reading that article when it first came out?

Director COMEY. I do. It was about allegedly extensive electronic surveillance——

Senator RISCH. Correct.

Director COMEY [continuing]. Of communications, yes.

Senator RISCH. And that upset you to the point where you actually went out and surveyed the intelligence community to see whether you were missing something in that. Is that correct?

Director COMEY. That's correct. I want to be careful in an open setting, but——

Senator RISCH. I'm not going to go any further than that with it, so thank you.

Director COMEY. Okay.

Senator RISCH. In addition to that, after that you sought out both Republican and Democrat Senators to tell them that, hey, I don't know where this is coming from, but this is not the case, this is not factual. Do you recall that?

Director COMEY. Yes.

Senator RISCH. Okay. So again, so the American people can understand this, that report by the New York Times was not true. Is that a fair statement?

Director COMEY. In the main, it was not true. And again, all of you know this and maybe the American people don't. The challenge—and I'm not picking on reporters—about writing stories about classified information is that people talking about it often

don't really know what's going on, and those of us who actually know what's going on are not talking about it. And we don't call the press to say, hey, you got that thing wrong about this sensitive topic. We just have to leave it there.

I mentioned to the Chairman the nonsense around what influenced me to make the July 5th statement. Nonsense, but I can't go explaining how it's nonsense.

Senator RISCH. Thank you. All right. So those three things we now know regarding the active measures, whether the President's under investigation, and the collusion between the Russians—the Trump campaign and the Russians.

I want to drill right down, as my time is limited, to the most recent dust-up regarding allegations that the President of the United States obstructed justice. And, boy, you nailed this down on page 5, paragraph 3. You put this in quotes. Words matter. You wrote down the words so we can all have the words in front of us now. There's 28 words there that are in quotes, and it says, quote, "I hope"—this is the President speaking—"I hope you can see your way clear to letting this go, to letting Flynn go. He is a good guy. I hope you can let this go."

Now those are his exact words, is that correct?

Director COMEY. Correct.

Senator RISCH. And you wrote them here and you put them in quotes?

Director COMEY. Correct.

Senator RISCH. Okay. Thank you for that. He did not direct you to let it go?

Director COMEY. Not in his words, no.

Senator RISCH. He did not order you to let it go?

Director COMEY. Again, those words are not an order.

Senator RISCH. No. He said, "I hope." Now, like me, you probably did hundreds of cases, maybe thousands of cases, charging people with criminal offenses. And of course you have knowledge of the thousands of cases out there where people have been charged. Do you know of any case where a person has been charged for obstruction of justice or, for that matter, any other criminal offense, where they said or thought they hoped for an outcome?

Director COMEY. I don't know well enough to answer. And the reason I keep saying his words is I took it as a direction.

Senator RISCH. Right.

Director COMEY. I mean, this is the President of the United States with me alone, saying, "I hope" this. I took it as this is what he wants me to do. I didn't obey that, but that's the way I took it.

Senator RISCH. You may have taken it as a direction, but that's not what he said.

Director COMEY. Correct. That's why——

Senator RISCH. He said "I hope."

Director COMEY. Those are exact words, correct.

Senator RISCH. You don't know of anyone that's ever been charged for hoping something. Is that a fair statement?

Director COMEY. I don't as I sit here.

Senator RISCH. Thank you.

Thank you, Mr. Chairman.

Chairman BURR. Senator Feinstein.

Senator FEINSTEIN. Thanks very much, Mr. Chairman.

Mr. Comey, I just want you to know that I have great respect for you. Senator Cornyn and I sit on the Judiciary Committee, so we have occasion to have you before us. And I know that you're a man of strength and integrity, and I really regret the situation that we all find ourselves in. I just want to say that.

Let me begin with one overarching question. Why do you believe you were fired?

Director COMEY. Guess I don't know for sure. I believe the—I take the President at his word, that I was fired because of the Russia investigation. Something about the way I was conducting it the President felt created pressure on him that he wanted to relieve. Again, I didn't know that at the time, but I watched his interview, I've read the press accounts of his conversations. So I take him at his word there.

Now, look, I could be wrong. Maybe he's saying something that's not true. But I take him at his word, at least based on what I know now.

Senator FEINSTEIN. Talk for a moment about his request that you pledge loyalty and your response to that and what impact you believe that had.

Director COMEY. I don't know for sure, because I don't know the President well enough to read him well. I think it was—because our relationship didn't get off to a great start, given the conversation I had to have on January 6th, this was not—this didn't improve the relationship, because it was very, very awkward.

He was asking for something and I was refusing to give it. But again, I don't know him well enough to know how he reacted to that exactly.

Senator FEINSTEIN. Do you believe the Russia investigation played a role?

Director COMEY. In why I was fired?

Senator FEINSTEIN. Yes.

Director COMEY. Yes, because I've seen the President say so.

Senator FEINSTEIN. Okay. Let's go to the Flynn issue. Senator Risch outlined "I hope you could see your way to letting Flynn go. He's a good guy. I hope you can let this go." But you also said in your written remarks, and I quote, that you had "understood the President to be requesting that we drop any investigation of Flynn in connection with false statements about his conversations with the Russian ambassador in December," end quote.

Please go into that with more detail.

Director COMEY. Well, the context and the President's words are what led me to that conclusion. As I said in my statement, I could be wrong, but Flynn had been forced to resign the day before and the controversy around General Flynn at that point in time was centered on whether he had lied to the Vice President about the nature of his conversations with the Russians, whether he had been candid with others in the course of that.

And so that happens on the day before. On the 14th, the President makes specific reference to that. And so that's why I understood him to be saying that what he wanted me to do was drop any investigation connected to Flynn's account of his conversations with the Russians.

Senator FEINSTEIN. Now, here's the question: You're big. You're strong. I know the Oval Office and I know what happens to people when they walk in. There is a certain amount of intimidation. But why didn't you stop and say, "Mr. President, this is wrong. I cannot discuss this with you"?

Director COMEY. It's a great question. Maybe if I were stronger I would have. I was so stunned by the conversation that I just took it in. And the only thing I could think to say, because I was playing in my mind, because I could remember every word he said—I was playing in my mind, what should my response be? And that's why I very carefully chose the words.

And, look, I've seen the tweet about tapes. Lordy, I hope there are tapes. I remember saying, "I agree he's a good guy," as a way of saying, "I'm not agreeing with what you just asked me to do."

Again, maybe other people would be stronger in that circumstance but that was—that's how I conducted myself. I hope I'll never have another opportunity. Maybe if I did it again I would do it better.

Senator FEINSTEIN. You described two phone calls that you received from President Trump, one on March 30 and one on April 11, where he, quote, "described the Russia investigation as a cloud that was impairing his ability," end quote, as President and asked you, quote, "to lift the cloud," end quote.

How did you interpret that? And what did you believe he wanted you to do?

Director COMEY. I interpreted that as he was frustrated that the Russia investigation was taking up so much time and energy, I think he meant of the Executive Branch, but in the public square in general, and it was making it difficult for him to focus on other priorities of his. But what he asked me was actually narrower than that.

So I think what he meant by the cloud, and again I could be wrong, but what I think he meant by the cloud was the entire investigation is taking up oxygen and making it hard for me to focus on the things I want to focus on.

The ask was to get it out that I, the President, am not personally under investigation.

Senator FEINSTEIN. After April 11th, did he ask you more, ever, about the Russia investigation? Did he ask you any questions?

Director COMEY. We never spoke again after April 11th.

Senator FEINSTEIN. You told the President, "I would see what we could do." What did you mean?

Director COMEY. Well, it was kind of a slightly cowardly way of trying to avoid telling him, we're not going to do that; that I would see what we could do. It was a way of kind of getting off the phone, frankly. And then I turned and handed it to the acting Deputy Attorney General, Mr. Boente.

Senator FEINSTEIN. So I wanted to go into that. Who did you talk with about that, lifting the cloud, stopping the investigation, back at the FBI, and what was their response?

Director COMEY. Well, the FBI—during one of the two conversations—I'm not remembering exactly; I think the first—my chief of staff was actually sitting in front of me and heard my end of the conversation because the President's call was a surprise. And I dis-

cussed the lifting the cloud and the request with the senior leadership team, who typically and I think in all these circumstances, was the deputy director, my chief of staff, the general counsel, the deputy director's chief counsel, and I think in a number of circumstances the number three in the FBI, and a few of the conversations included the head of the National Security Branch, so that group of us that lead the FBI when it comes to national security.

Senator FEINSTEIN. Okay. You have the President of the United States asking you to stop an investigation that's an important investigation. What was the response of your colleagues?

Director COMEY. I think they were as shocked and troubled by it as I was. Some said things that led me to believe that. I don't remember exactly, but the reaction was similar to mine. They're all experienced people who had never experienced such a thing. So they were very concerned.

And then the conversation turned to about, so what should we do with this information? And that was a struggle for us, because we are the leaders of the FBI. So it's been reported to us in that I heard it and now I've shared it with the leaders of the FBI. Our conversation was, should we share this with any senior officials at the Justice Department?

Our absolute primary concern was, we can't infect the investigative team. We don't want the agents and analysts working on this to know the President of the United States has asked—and when it comes from the President, I took it as a direction—to get rid of this investigation, because we're not going to follow that, that request.

And so we decided we gotta keep it away from our troops. But is there anybody else we ought to tell at the Justice Department? And, as I laid out in my statement, we considered whether to tell the Attorney General, decided that didn't make sense because we believed, rightly, that he was shortly going to recuse. There were no other Senate-confirmed leaders in the Justice Department at that point. The Deputy Attorney General was Mr. Boente, who was acting and going to be shortly in that seat.

And we decided the best move would be to hold it, keep it in a box, document it, as we'd already done, and then this investigation's going to go on, figure out what to do with it down the road. Is there a way to corroborate this? Our view at the time was, look, it's your word against the President's. There's no way to corroborate this. That view of that changed when the prospect of tapes was raised, but that's how we thought about it then.

Senator FEINSTEIN. Thank you.

Thank you, Mr. Chairman.

Chairman BURR. Senator Rubio.

Senator RUBIO. Thank you.

Director Comey, the meeting in the Oval Office where he made the request about Mike Flynn, was that the only time he asked you to hopefully let it go?

Director COMEY. Yes.

Senator RUBIO. And in that meeting, as you understood it, that was—he was asking not about the general Russia investigation; he

was asking very specifically about the jeopardy that Flynn was in himself?

Director COMEY. That's how I understood it, yes, sir.

Senator RUBIO. And as you perceived it, while it was a request that he hoped you did away with it, you perceived it as an order, given his position, the setting and the like, and some of the circumstances?

Director COMEY. Yes.

Senator RUBIO. At the time, did you say anything to the President about that is not an appropriate request, or did you tell the White House counsel, that is not an appropriate request, someone needs to go tell the President that he can't do these things?

Director COMEY. I didn't, no.

Senator RUBIO. Okay. Why?

Director COMEY. I don't know. I think, as I said earlier, I think the circumstances were such that it was—I was a bit stunned and didn't have the presence of mind. And I don't know—you know, I don't want to make you sound like I'm Captain Courageous. I don't know whether, even if I had the presence of mind, I would have said to the President, "Sir, that's wrong." I don't know whether I would have.

Senator RUBIO. Okay.

Director COMEY. But in the moment, it didn't come to my mind. What came to my mind is, be careful what you say. And so I said, "I agree Flynn is a good guy."

Senator RUBIO. So, on the cloud—we keep talking about this cloud—you perceived the cloud to be the Russian investigation in general, correct?

Director COMEY. Yes, sir.

Senator RUBIO. But the specific ask was that you would tell the American people what you had already told him, what you had already told the leaders of Congress, both Democrats and Republicans: that he was not personally under investigation.

Director COMEY. Yes, sir, that's how I——

Senator RUBIO. In fact, he was asking you to do what you have done here today.

Director COMEY. Correct. Yes, sir.

Senator RUBIO. Okay. And again, at that setting did you say to the President that it would be inappropriate for you to do so and then talk to the White House counsel or anybody so hopefully they would talk to him and tell him that he couldn't do this?

Director COMEY. The first time I said, "I'll see what we can do." Second time, I explained how it should work, that the White House counsel should contact the Deputy Attorney General.

Senator RUBIO. You told him that?

Director COMEY. The President said: Okay, I think that's what I'll do.

Senator RUBIO. And just to be clear, for you to make a public statement that he was not under investigation would not have been illegal, but you felt it made no sense because it could potentially create a duty to correct if circumstances changed?

Director COMEY. Yes, sir. We wrestled with it before my testimony where I confirmed that there was an investigation and there were two primary concerns. One was it creates a duty to correct,

which I've lived before and you want to be very careful about doing that. And second, it's a slippery slope, because if we say the President and the Vice President aren't under investigation, what's the principled basis for stopping?

Senator RUBIO. Okay.

Director COMEY. And so the leadership at Justice, Acting Attorney General Boente, said, "You're not going to do that."

Senator RUBIO. Now, on March 30th during the phone call about General Flynn you said he abruptly shifted and brought up something that you call, quote, unquote, "the McCabe thing." Specifically, the McCabe thing as you understood it was that McCabe's wife had received campaign money from what I assume means Terry McAuliffe?

Director COMEY. Yes, sir.

Senator RUBIO. Who was very close to the Clintons. And so why did you—had the President at any point in time expressed to you concern, opposition, potential opposition to McCabe? "I don't like this guy because he got money from someone this close to Clinton?"

Director COMEY. He had asked me during previous conversations about Andy McCabe and said, in essence, "How's he going to be with me as President? I was pretty rough on them on the campaign trail." And——

Senator RUBIO. He was rough on McCabe?

Director COMEY. He was rough—by his own account, he said he was rough on McCabe and Mrs. McCabe on the campaign trail. How's he going to be? And I assured the President, Andy is a total pro, no issue at all; you got to know the people of the FBI, they are not——

Senator RUBIO. So when the President turns to you and says, "Remember, I never brought up the McCabe thing because you said he was a good guy," did you perceive that to be a statement that I took care of you, I didn't do something because you told me he was a good guy, so now, you know, I'm asking you potentially for something in return? Is that how you perceived it?

Director COMEY. I wasn't sure what to make of it, honestly. That's possible, but it was so out of context that I didn't have a clear view of what it was.

Senator RUBIO. Now, on a number of occasions here you bring up—let's talk now about the general Russia investigation, okay? On page 6 of your testimony, you say—the first thing you say is, he asked what we could do to, quote/unquote, "lift the cloud," the general Russia investigation.

And you responded that we were investigating the matter as quickly as we could and that there would be great benefit, if we didn't find anything, to having done the work well. And he agreed. He reemphasized the problems it was causing him, but he agreed.

So in essence the President agreed with your statement that it would be great if we could have an investigation, all the facts came out, and we found nothing. So he agreed that that would be ideal, but this cloud is still messing up my ability to do the rest of my agenda. Is that an accurate assessment?

Director COMEY. Yes, sir. He actually went farther than that. He said, "And if some of my satellites did something wrong, it'd be good to find that out."

Senator RUBIO. Well, that's the second part, and that is the satellites. He said, "If one of my satellites"—I imagine by that he meant some of the other people surrounding his campaign—"did something wrong, it would be great to know that, as well"?

Director COMEY. Yes, sir. That's what he said.

Senator RUBIO. So are those the other—are those the only two instances in which that sort of back-and-forth happened, where the President was basically saying, and I'm paraphrasing here, it's okay, do the Russia investigation, I hope it all comes out, I have nothing to do with anything Russia, it'd be great if it all came out, if people around me were doing things that were wrong?

Director COMEY. Yes. As I recorded it accurately there, that was the sentiment he was expressing. Yes, sir.

Senator RUBIO. So what it basically comes down to is the President has asked three things of you. He asked for your loyalty, and you said you would be loyally honest.

Director COMEY. Honestly loyal.

Senator RUBIO. Honestly loyal. He asked you on one occasion to let the Mike Flynn thing go because he was a good guy. You're aware that he said the exact same thing in the press the next day, "He's a good guy," "He's been treated unfairly," et cetera, et cetera. So I imagine your FBI agents read that.

Director COMEY. I'm sure they did.

Senator RUBIO. The President's wishes were known to them certainly by the next day, when he had a press conference with the Prime Minister.

But going back, the three requests were: number one, be loyal; number two, let the Mike Flynn thing go, he's a good guy, he's been treated unfairly; and, number three, can you please tell the American people what these leaders in Congress already know, what you already know, what you've told me three times, that I'm not under, personally under investigation?

Director COMEY. Those are the three things he asked. Yes, sir.

Senator RUBIO. You know, this investigation is full of leaks, left and right. I mean, we've learned more from the newspapers sometimes than we do from our open hearings, for sure. Do you ever wonder why, of all the things in this investigation, the only thing that's never been leaked is the fact that the President was not personally under investigation, despite the fact that both Democrats and Republicans in the leadership of Congress knew that and have known that for weeks?

Director COMEY. I don't know. I find matters that are briefed to the Gang of Eight are pretty tightly held in my experience.

Senator RUBIO. Finally, who are those senior leaders at the FBI that you shared these conversations with?

Director COMEY. As I said in response to Senator Feinstein's question, deputy director, my chief of staff, general counsel, the deputy director's chief counsel, and then more often than not the number three person at the FBI, who is the associate deputy Director, and then quite often the head of the National Security Branch.

Chairman BURR. Senator Wyden.

Senator WYDEN. Thank you, Mr. Chairman.

Mr. Comey, welcome. You and I have had significant policy differences over the years, particularly protecting Americans' access to

secure encryption. But I believe the timing of your firing stinks. And yesterday you put on the record testimony that demonstrates why the odor of presidential abuse of power is so strong.

Now, to my questions. In talking to Senator Warner about this dinner that you had with President, I believe January 27th, all in one dinner the President raised your job prospects, he asked for your loyalty, and denied allegations against him. All took place over one supper.

Now, you told Senator Warner that the President was looking to, quote, "get something." Looking back, did that dinner suggest that your job might be contingent on how you handled the investigation?

Director COMEY. I don't know that I'd go that far. I got the sense my job would be contingent upon how he felt I—excuse me—how he felt I conducted myself and whether I demonstrated loyalty. But I don't know whether I'd go so far as to connect it to the investigation.

Senator WYDEN. You said the President was trying to create some sort of patronage relationship. In a patronage relationship isn't the underling expected to behave in a manner consistent with the wishes of the boss?

Director COMEY. Yes.

Senator WYDEN. Okay.

Director COMEY. Or at least consider how what you're doing will affect the boss as a significant consideration.

Senator WYDEN. Let me turn to the Attorney General. In your statement, you said that you and the FBI leadership team decided not to discuss the President's actions with Attorney General Sessions, even though he had not recused himself. What was it about the Attorney General's own interactions with the Russians or his behavior with regard to the investigation that would have led the entire leadership of the FBI to make this decision?

Director COMEY. Our judgment, as I recall, was that he was very close to and inevitably going to recuse himself for a variety of reasons. We also were aware of facts that I can't discuss in an open setting that would make his continued engagement in a Russia-related investigation problematic.

And so we were convinced—and, in fact, I think we had already heard that the career people were recommending that he recuse himself—that he was not going to be in contact with Russia-related matters much longer, and that turned out to be the case.

Senator WYDEN. How would you characterize Attorney General Sessions' adherence to his recusal, in particular with regard to his involvement in your firing, which the President has acknowledged was because of the Russian investigation?

Director COMEY. That's a question I can't answer. I think it's a reasonable question. If, as the President said, I was fired because of the Russia investigation, why was the Attorney General involved in that chain? I don't know, and so I don't have an answer for the question.

Senator WYDEN. Your testimony was that the President's request about Flynn could infect the investigation. Had the President got what he wanted and what he asked of you, what would have been the effect on the investigation?

Director COMEY. Well, we would have closed any investigation of General Flynn in connection with his statements and encounter—statements about and encounters with Russians in the late part of December.

Senator WYDEN. Well——

Director COMEY. So we would have dropped an open criminal investigation.

Senator WYDEN. So, in effect, when you talk about infecting the enterprise, you would have dropped something major that would have spoken to the overall ability of the American people to get the facts?

Director COMEY. Correct. And, as good as our people are, our judgment was we don't want them hearing that the President of the United States wants this to go away, because it might have an effect of their ability to be fair and impartial and aggressive.

Senator WYDEN. Now, the Acting Attorney General Yates found out that Michael Flynn could be blackmailed by the Russians and she went immediately to warn the White House. Flynn is gone, but other individuals with contacts with the Russians are still in extremely important positions of power. Should the American people have the same sense of urgency now, with respect to them?

Director COMEY. I think all I can say, Senator, is the special counsel's investigation is very important. Understanding what efforts there were or are by the Russian government to influence our government is a critical part of the FBI's mission, so—and you've got the right person in Bob Mueller to lead it. So it's a very important piece of work.

Senator WYDEN. Vice President Pence was the head of the transition. To your knowledge, was he aware of the concerns about Michael Flynn prior to or during General Flynn's tenure as national security adviser?

Director COMEY. I don't—you're asking including up to the time when Flynn was forced to resign? My understanding is that he was, and I'm trying to remember where I get that understanding from. I think from Acting Attorney General Yates.

Senator WYDEN. So former Acting Attorney General Yates testified that concerns about General Flynn were discussed with the intelligence community. Would that have included anyone at the CIA or Dan Coats's office, the DNI?

Director COMEY. I would assume yes.

Senator WYDEN. Michael Flynn resigned four days after Attorney General Sessions was sworn in. Do you know if the Attorney General was aware of the concerns about Michael Flynn during that period?

Director COMEY. I don't as I sit here. I don't recall that he was. I could be wrong, but I don't remember that he was.

Senator WYDEN. And finally, let's see if you can give us some sense of who recommended your firing. Besides the letters from the Attorney General, the Deputy Attorney General, do you have any information on who may have recommended or have been involved in your firing?

Director COMEY. I don't. I don't.

Senator WYDEN. Okay.

Thank you, Mr. Chairman.

Chairman BURR. Senator Collins.

Senator COLLINS. Thank you, Mr. Chairman.

Mr. Comey, let me begin by thanking you for your voluntary compliance with our request to appear before this committee and assist us in this very important investigation.

I want first to ask you about your conversations with the President, the three conversations in which you told him that he was not under investigation. The first was during your January 6th meeting, according to your testimony, in which it appears that you actually volunteered that assurance. Is that correct?

Director COMEY. That's correct.

Senator COLLINS. Did you limit that statement to counterintelligence investigations or were you talking about any kind of FBI investigation?

Director COMEY. I didn't use the term "counterintelligence." I was speaking to him and briefing him about some salacious and unverified material. It was in the context of that that he had a strong and defensive reaction about that not being true. And my reading of it was it was important for me to assure him we were not personally investigating him. And so the context then was actually narrower, focused on what I had just talked to him about.

It was very important because it was, first, true. And second, I was worried very much about being in kind of a—kind of a J. Edgar Hoover-type situation. I didn't want him thinking that I was briefing him on this to sort of hang it over him in some way. I was briefing him on it because we had been told by the media it was about to launch. We didn't want to be keeping that from him. And he needed to know this was being said.

But I was very keen not to leave him with an impression that the Bureau was trying to do something to him. And so that's the context in which I said, "Sir, we're not personally investigating you."

Senator COLLINS. And then, that's why you volunteered the information——

Director COMEY. Yes, ma'am.

Senator COLLINS [continuing]. Correct?

Then, on the January 27th dinner you told the President that he should be careful about asking you to investigate because, quote, "You might create a narrative that we are investigating him personally, which we weren't." Again, were you limiting that statement to counterintelligence investigations or more broadly, such as a criminal investigation?

Director COMEY. The context was very similar. I didn't modify the word "investigation." It was again he was reacting strongly again to that unverified material, saying, "I'm tempted to order you to investigate it." And in the context of that I said, "Sir, you want to be careful about that, because it might create a narrative we're investigating you personally."

Senator COLLINS. And then there was the March 30th phone call with the President, in which you reminded him that Congressional leaders have been briefed that we were not personally, the FBI was not personally investigating President Trump. And again, was that statement to Congressional leaders and to the President limited to counterintelligence investigations? Or was it a broader statement?

I'm trying to understand whether there was any kind of investigation of the President under way.

Director COMEY. No. I'm sorry, and if I misunderstood I apologize. We briefed the Congressional leadership about what Americans we had opened counterintelligence investigation cases on and we specifically said the President is not one of those Americans. But there was no other investigation of the President that we were not mentioning at that time. The context was counterintelligence, but I wasn't trying to hide some criminal investigation of the President.

Senator COLLINS. And was the President under investigation at the time of your dismissal on May 9th?

Director COMEY. No.

Senator COLLINS. I'd like to now turn to the conversations with the President about Michael Flynn, which have been discussed at great length. And first let me make very clear that the President never should have cleared the room, and he never should have asked you, as you reported, to let it go, to let the investigation go.

But I remain puzzled by your response. Your response was, "I agree that Michael Flynn is a good guy." You could have said, "Mr. President, this meeting is inappropriate. This response could compromise the investigation. You should not be making such a request. It's fundamental to the operation of our government that the FBI be insulated from this kind of political pressure."

And you've talked a bit today about that you were stunned by the President making the request. But my question to you is, later on, upon reflection, did you go to anyone at the Department of Justice and ask them to call the White House counsel's office and explain that the President had to have a far better understanding and appreciation of his role vis-á-vis the FBI?

Director COMEY. In general, I did. I spoke to the Attorney General and I spoke to the new Deputy Attorney General, Mr. Rosenstein, when he took office and explained my serious concern about the way in which the President is interacting, especially with the FBI. And I specifically, as I said my testimony, asked the—told the Attorney General, it can't happen that you get kicked out of the room and the President talks to me.

Look, in the room—but why didn't we raise the specific? It was of investigative interest to us to try and figure out, so what just happened with the President's request? So I would not have wanted to alert the White House that it had happened until we figured out, what are we going to do with this investigatively?

Senator COLLINS. Your testimony was that you went to Attorney General Sessions and said, "Don't ever leave me alone with him again." Are you saying that you also told him that he had made a request that you let it go with regard to part of the investigation of Michael Flynn?

Director COMEY. No, I specifically did not. I did not.

Senator COLLINS. You mentioned that from your very first meeting with the President you decided to write a memo memorializing the conversation. What was it about that very first meeting that made you write a memo, when you had not done that with two previous Presidents?

Director COMEY. As I said, a combination of things. A gut feeling is an important overlay on it, but the circumstances, that I was alone, the subject matter, and the nature of the person that I was interacting with and my read of that person. And really, just a gut feel laying on top of all of that, that this—it's going to be important to protect this organization that I make records of this.

Senator COLLINS. And finally, did you show copies of your memos to anyone outside of the Department of Justice?

Director COMEY. Yes.

Senator COLLINS. And to whom did you show copies?

Director COMEY. I asked—the President tweeted on Friday after I got fired that I better hope there's not tapes. I woke up in the middle of the night on Monday night, because it didn't dawn on me originally that there might be corroboration for our conversation, there might be a tape. And my judgment was I needed to get that out into the public square. And so I asked a friend of mine to share the content of the memo with a reporter. Didn't do it myself, for a variety of reasons. But I asked him to, because I thought that might prompt the appointment of a special counsel. And so I asked a close friend of mine to do it.

Senator COLLINS. And was that Mr. Wittes?

Director COMEY. No, no.

Senator COLLINS. Who was that?

Director COMEY. A good friend of mine who's a professor at Columbia Law School.

Senator COLLINS. Thank you.

Chairman BURR. Senator Heinrich.

Senator HEINRICH. Mr. Comey, prior to January 27th of this year, have you ever had a one-on-one meeting or a private dinner with a President of the United States?

Director COMEY. No. I met—dinner, no. I had two one-on-ones with President Obama that I laid out in my testimony: once, to talk about law enforcement issues, law enforcement and race, which was an important topic throughout for me and for the President; and then once, very briefly, for him to say goodbye.

Senator HEINRICH. Were those brief interactions?

Director COMEY. No. The one about law enforcement and race in policing, we spoke for probably over an hour, just the two of us.

Senator HEINRICH. How unusual is it to have a one-on-one dinner with the President? Did that strike you as odd?

Director COMEY. Yes, so much so that I assumed there would be others, that he couldn't possibly be having dinner with me alone.

Senator HEINRICH. Do you have an impression that, if you had found—if you had behaved differently in that dinner—and I am quite pleased that you did not—but if you had found a way to express some sort of expression of loyalty or given some suggestion that the Flynn criminal investigation might be pursued less vigorously, do you think you would've still been fired?

Director COMEY. I don't know. It's impossible to say, looking back. I don't know.

Senator HEINRICH. But you felt like those two things were directly relevant to the kind of relationship that the President was seeking to establish with you?

Director COMEY. Sure, yes.

Senator HEINRICH. The President has repeatedly talked about the Russian investigation into the U.S.—or the Russian—Russia's involvement in the U.S. election cycle as a hoax and as fake news. Can you talk a little bit about what you saw as FBI Director, and obviously only the parts that you can share in this setting, that demonstrate how serious this action actually was, and why there was an investigation in the first place?

Director COMEY. Yes, sir.

There should be no fuzz on this whatsoever. The Russians interfered in our election during the 2016 cycle. They did it with purpose. They did it with sophistication. They did it with overwhelming technical efforts. And it was an active measures campaign driven from the top of that government. There is no fuzz on that.

It is a high-confidence judgment of the entire intelligence community, and the members of this committee have seen the intelligence. It's not a close call. That happened. That's about as unfake as you can possibly get, and is very, very serious, which is why it's so refreshing to see a bipartisan focus on that, because this is about America, not about any particular party.

Senator HEINRICH. So that was a hostile act by the Russian government against this country?

Director COMEY. Yes, sir.

Senator HEINRICH. Did the President in any of those interactions that you've shared with us today ask you what you should be doing or what our government should be doing or the intelligence community to protect America against Russian interference in our election system?

Director COMEY. I don't recall a conversation like that.

Senator HEINRICH. Never?

Director COMEY. No.

Senator HEINRICH. Do you find it odd——

Director COMEY. Not with President Trump.

Senator HEINRICH. Right.

Director COMEY. I attended a fair number of meetings on that with President Obama.

Senator HEINRICH. Do you find it odd that the President seemed unconcerned by Russia's actions in our election?

Director COMEY. I can't answer that because I don't know what other conversations he had with other advisers or other intelligence community leaders. So I just don't know sitting here.

Senator HEINRICH. Did you have any interactions with the President that suggested he was taking that hostile action seriously?

Director COMEY. I don't remember any interactions with the President, other than the initial briefing on January the 6th. I don't remember—could be wrong, but I don't remember any conversations with him at all about that.

Senator HEINRICH. As you're very aware, it was only the two of you in the room for that dinner. You've told us the President asked you to back off the Flynn investigation. The President told a reporter——

Director COMEY. Not in that dinner.

Senator HEINRICH. Fair enough—told a reporter he never did that. You've testified that the President asked for your loyalty in

that dinner. The White House denies that. A lot of this comes down to who should we believe? Do you want to say anything as to why we should believe you?

Director COMEY. My mother raised me not to say things like this about myself, so not I'm going to. I think people should look at the whole body of my testimony, because, as I used to say to juries, and when I talked about a witness, you can't cherry-pick it. You can't say, "I like these things he said, but on this, he's a dirty, rotten liar." You've got to take it all together. And I've tried to be open and fair and transparent and accurate.

A really significant fact to me is, so why did he kick everybody out of the Oval Office? Why would you kick the Attorney General, the Vice President, the chief of staff out, to talk to me, if it was about something else? And so that to me as an investigator is a very significant fact.

Senator HEINRICH. And as we look at testimony or communication from both of you, we should probably be looking for consistency.

Director COMEY. Well, in looking at any witness you look at consistency, track record, demeanor, record over time, that sort of thing.

Senator HEINRICH. Thank you.

So there are reports that the incoming Trump administration, either during the transition and/or after the inauguration, attempted to set up a sort of back-door communication channel with the Russian government using their infrastructure, their devices or facilities. What would be the risks, particularly for a transition, someone not actually in the office of the President yet, to setting up unauthorized channels with a hostile foreign government, especially if they were to evade our own American intelligence services?

Director COMEY. I'm not going to comment on whether that happened in an open setting. But the risk is—the primary risk is obvious: you spare the Russians the cost and effort of having to break into our communications channels by using theirs. And so you make it a whole lot easier for them to capture all of your conversations and then to use those to the benefit of Russia against the United States.

Senator HEINRICH. The memos that you wrote, did you write all nine of them in a way that was designed to prevent them from needing classification?

Director COMEY. No. And on a few of the occasions I wrote, I sent e-mails to my chief of staff or others on some of the brief phone conversations that I recall. The first one was a classified briefing. Although it wasn't in a SCIF, it was in a conference room at Trump Tower. It was a classified briefing and so I wrote that on a classified device. The one I started typing in the car, that was a classified laptop that I started working on.

Senator HEINRICH. Any reason in a classified environment, in a SCIF, that this committee would—it would not be appropriate to see those communications,—at least from your perspective as the author?

Director COMEY. No.

Senator HEINRICH. Thank you, Mr. Chairman.

Chairman BURR. Senator Blunt.

Senator BLUNT. Thank you, Mr. Chairman.

Mr. Comey, when you were terminated at the FBI, I said, and still continue to feel, that you have provided years of great service to the country. I also said that I'd had significant questions over the last year about some of the decisions you made. If the President hadn't terminated your service, would you still be in your opinion the Director of the FBI today?

Director COMEY. Yes, sir.

Senator BLUNT. So you took as a direction from the President something that you thought was serious and troublesome, but continued to show up for work the next day?

Director COMEY. Yes, sir.

Senator BLUNT. And, six weeks later we're still telling the President on March the 30th that he was not personally the target of any investigation?

Director COMEY. Correct. On March the 30th, and I think again on—I think on April 11th as well, I told him we're not investigating him personally. That was true.

Senator BLUNT. Well, the point to me, the concern to me there, is that all these things are going on. You now in retrospect—or at least you now to this committee—that these were—you had serious concerns about what the President had, you believed, directed you to do, and had taken no action, hadn't even reported up the chain of command, assuming you believe there is an "up the chain of command," that these things had happened.

Do you have a sense of that, looking back, that that was a mistake?

Director COMEY. No. In fact, I think no action was the most important thing I could do to make sure there was no interference with the investigation.

Senator BLUNT. And on the Flynn issue specifically, I believe you said earlier that you believed the President was suggesting you drop any investigation of Flynn's account of his conversation with the Russian ambassador, which was essentially misleading the Vice President and others?

Director COMEY. Correct, and—and I'm not going into the details, but whether there were false statements made to government investigators as well.

Senator BLUNT. Any suggestion that General Flynn had violated the Logan Act I always find pretty incredible. The Logan Act's been on the books for over 200 years. Nobody's ever been prosecuted for violating the Logan Act. My sense would be that the discussion not the problem; misleading investigators or the Vice President might have been.

Director COMEY. That's fair. Yes, sir.

Senator BLUNT. Had you previously on February the 14th discussed with the President in the previous meeting anything your investigators had learned or their impressions from talking to Flynn?

Director COMEY. No, sir.

Senator BLUNT. So he said, "He's a good guy." You said, "He's a good guy." And that was—no further action taken on that?

Director COMEY. Well, he said more than that. But there was no—the action was I wrote it up, briefed our senior team, tried to

figure out what to do with it, and just made a decision, we're going to hold this and then see what we make of it down the road. Yes, sir.

Senator BLUNT. Was it your view that not briefing up meant you really had no responsibility to report that to the Justice Department in some way?

Director COMEY. I think at some point—and I don't know what Director Mueller is going to do with it, but at some point I was sure we were going to brief it to the team in charge of the case. But our judgment was in the short term it doesn't make sense to— no fuzz on the fact that I reported to the Attorney General. That's why I stressed he shouldn't be kicked out of the room. But it didn't make sense to report to him now.

Senator BLUNT. You know, you said to the Attorney General, said, "I don't want to be in the room with him alone again," but you continued to talk to him on the phone. What is the difference in being in the room alone with him and talking to him on the phone alone?

Director COMEY. Yes, I think that what I stressed to the Attorney General was a little broader than just the room. I said "You, I report to you. It's very important you be between me and the White House, between"——

Senator BLUNT. After that discussion with the Attorney General, did you take phone calls from the President?

Director COMEY. Yes, sir.

Senator BLUNT. So why did you just say you need to talk to— why didn't you say, "I'm not taking that call; you need to talk to the Attorney General"?

Director COMEY. Well, I did on the April 11th call, and I reported the calls, the March 30th call and the April 11th call, to my superior, who was the acting Deputy Attorney General.

Senator BLUNT. I don't want to run out of time here. Let me make one other point. In reading your testimony, January the 3rd, January the 27th, and March the 30th, it appears to me that on all three of those occasions you, unsolicited by the President, made the point to him that he was not a target of the—of an investigation.

Director COMEY. Correct. Yes, sir.

Senator BLUNT. One, I thought the March 30th very interesting. You said, well, even though you don't want—you may not want us—that was the 27th, where he said, "Why don't you look into that dossier thing more?" You said, "Well, you may not want that, because then we couldn't tell you—couldn't say with—we couldn't answer the question about you being a target of the investigation."

But you didn't seem to be answering that question anyhow. As Senator Rubio pointed out, the one unanswered, unleaked question seems to have been that, in this whole period of time.

But you said something earlier I don't want to fail to follow up on. You said, after you were dismissed, you gave information to a friend so that friend could get that information into the public media.

Director COMEY. Correct.

Senator BLUNT. What kind of information was that? Wasn't that—what kind of information did you give to a friend?

Director COMEY. That the President—the Flynn conversation, that the President had asked me to let the Flynn—I'm forgetting my exact own words, but the conversation in the Oval Office.

Senator BLUNT. So you didn't consider your memo or your sense of that conversation to be a government document? You consider it to be somehow your own personal document that you could share with the media as you wanted to?

Director COMEY. Correct——

Senator BLUNT. Through a friend?

Director COMEY. I understood this to be my recollection recorded of my conversation with the President. As a private citizen, I felt free to share that. I thought it very important to get it out.

Senator BLUNT. So were all of your memos that you've recorded on classified or other documents memos that might be yours as a private citizen?

Director COMEY. I'm sorry, I'm not following the question.

Senator BLUNT. Well, I think you said you'd used classified a classified——

Director COMEY. Oh, yes, not the classified documents. Unclassified, I don't have any of them anymore. I gave them to the special counsel. But, yeah, my view was that the content of those unclassified—the memorialization of those conversations was my recollection recorded.

Senator BLUNT. So why didn't you give those to somebody yourself, rather than give them through a third party?

Director COMEY. Because I was worried the media was camping at the end of my driveway at that point, and I was actually going out of town with my wife to hide, and I worried it would be like feeding seagulls at the beach if it was I who gave it to the media. So I asked my friend, "Make sure this gets out."

Senator BLUNT. It does seem to me that what you do there is create a source close to the former Director of the FBI, as opposed to just taking responsibility yourself for saying, "Here are these records."

And, like everybody else, I have other things I'd like to get into, but I'm out of time.

Director COMEY. Okay.

Chairman BURR. Senator King.

Senator KING. Thank you.

First I'd like to acknowledge Senator Blumenthal and earlier Senator Nelson. I think the one principal thing you'll learn today, Senator, is that the chairs there are less comfortable than the chairs here. But I welcome you to the hearing.

Mr. Comey, a broad question. Was the Russian activity in the 2016 election a one-off proposition? Or is this part of a long-term strategy? Will they be back?

Director COMEY. Oh, it's a long-term practice of theirs. It stepped up a notch in a significant way in 2016. They'll be back.

Senator KING. I think that's very important for the American people to understand, that this is very much a forward-looking investigation in terms of how do we understand what they did and how do we prevent it. Would you agree that that's a big part of our role here?

Director COMEY. Yes, sir, and it's not a Republican thing or Democratic thing. It really is an American thing. They're going to come for whatever party they choose to try and work on behalf of. And they're not devoted to either, in my experience. They're just about their own advantage. And they will be back.

Senator KING. That's my observation. I don't think Putin is a Republican or a Democrat. He's an opportunist.

Director COMEY. I think that's a fair statement.

Senator KING. With regard to several of these conversations, in his interview with Lester Holt on NBC the President said, "I had dinner with him. He wanted to have dinner because he wanted to stay on." Is this an accurate statement?

Director COMEY. No, sir.

Senator KING. Did you in any way initiate that dinner?

Director COMEY. No. He called me at my desk at lunchtime, and asked me was I free for dinner that night. He called himself and said, "Can you come over for dinner tonight?"

And I said, "Yes, sir."

He said, "Will 6:00 work?" I think he said 6 first. And then he said, "I was going to invite your whole family, but we'll do that next time. I wanted you to come over. And is that a good time?"

I said, "Sir, whatever works for you."

And he then said, "How about 6:30?"

And I said, "Whatever works for you, sir." And then I hung up and then I had to call my wife and break a date with her. I was supposed to take her out to dinner that night, and——

Senator KING. That's one of the all-time great excuses for breaking a date.

[Laughter.]

Director COMEY. In retrospect, I would have—I love spending time with my wife. I wish I'd been there that night.

[Laughter.]

Senator KING. That's one question I'm not going follow up, Mr. Comey.

But, in that same interview the President said, "In one case I called him and in one case he called me." Is that an accurate statement?

Director COMEY. No.

Senator KING. Did you ever call the President?

Director COMEY. No. I might—the only reason I'm hesitating is I think there was at least one conversation where I was asked to call the White House switchboard to be connected to him, but I never initiated a communication with the President.

Senator KING. And in his press conference on May 18th, the President was asked whether he had urged you to shut down the investigation into Michael Flynn. The President responded, quote, "No, no. Next question." Is that an accurate statement?

Director COMEY. I don't believe it is.

Senator KING. Thank you.

With regard to the question of him being under personal—personally under investigation, does that mean that the dossier is not being reviewed or investigated or followed up on in any way?

Director COMEY. I obviously can't—I can't comment either way. I can't talk in an open setting about the investigation as it was

when I was the head of the FBI. And obviously it's Director Mueller's, Bob Mueller's responsibility now, so I just—I don't know.

Senator KING. So clearly your statements to the President back in these various times when you assured him he wasn't under investigation were as of that moment. That's correct, is it not?

Director COMEY. Correct, correct.

Senator KING. Now, on the Flynn investigation, is it not true that Mr. Flynn was and is a central figure in this entire investigation of the relationship between the Trump campaign and the Russians?

Director COMEY. I can't answer that in an open setting, sir.

Senator KING. And certainly Mr. Flynn was part of the so-called Russian investigation. Can you answer that question?

Director COMEY. I have to give you the same answer.

Senator KING. All right. We'll be having a closed session shortly, so we will follow up on that.

In terms of his comments to you about—I think in response to Mr. Risch, to Senator Risch, you said he said, "I hope you will hold back on that." But when you get a—when a President of the United States in the Oval Office says something like "I hope" or "I suggest" or "would you," do you take that as a directive?

Director COMEY. Yes. Yes, it rings in my ear as kind of, "Will no one rid me of this meddlesome priest?"

Senator KING. I was just going to quote that. In 1170, December 29, Henry II said, "Who will rid me of this meddlesome priest?" And then, the next day he was killed, Thomas a Becket. That's exactly the same situation. We're thinking along the same lines.

Several other questions and these are a little bit more detailed. What do you know about the Russian bank VEB?

Director COMEY. Nothing that I can talk about in an open setting. I mean, I know it——

Senator KING. Well, that takes care of my next three questions.

Director COMEY. I know it exists. Yes, sir.

Senator KING. You know it exists.

What is the relationship of Ambassador—the ambassador from Russia to the United States, to the Russian intelligence infrastructure?

Director COMEY. Well, he's a diplomat who is the chief of mission at the Russian embassy, which employs a robust cohort of intelligence officers. And so surely he's witting of their very, very aggressive intelligence operations, at least some of it in the United States. I don't consider him to be an intelligence officer himself. He's a diplomat.

Senator KING. Did you ever—did the FBI ever brief the Trump administration about the advisability of interacting directly with Ambassador Kislyak?

Director COMEY. I think all I can say sitting here is there were a variety of defensive briefings given to the incoming Administration about the counterintelligence risk.

Senator KING. Back to Mr. Flynn, would closing out the Flynn investigation have impeded the overall Russian investigation?

Director COMEY. No. Well, unlikely, except to the extent—there's always a possibility, if you have a criminal case against someone and you bring them and squeeze them, you flip them, and they give

you information about something else. But I saw the two as touching each other, but separate.

Senator KING. With regard to your memos, isn't it true that in a court case when you're weighing evidence, contemporaneous memos and contemporaneous statements to third parties are considered probative in terms of the validity of testimony?

Director COMEY. Yes.

Senator KING. Thank you.

Thank you, Mr. Chairman.

Chairman BURR. Senator Cotton. No, excuse me. Senator Lankford.

Senator LANKFORD. Director Comey, good to see you again.

Director COMEY. You, too.

Senator LANKFORD. We've had multiple opportunities to be able to visit, as everyone on this dais has. And I appreciate you and your service and what you have done for the Nation for a long time, what you continue to do. I've told you before in the heat of last year, when we had an opportunity to visit personally, that I pray for you and for your family, because you do carry a tremendous amount of stress. And that is still true today.

Director COMEY. Thank you.

Senator LANKFORD. Let me walk through a couple things with you. Your notes are obviously exceptionally important, because they give a very rapid account of what you wrote down and what you perceived to happen in those different meetings. Have you had the opportunity to be able to reference those notes when you were preparing the written statement that you put forth today?

Director COMEY. Yes, yes. I think nearly all of my written recordings of my conversations, I had a chance to review them before filing my statement.

Senator LANKFORD. Do you have a copy of any of those notes, personally?

Director COMEY. I don't. I turned them over to Bob Mueller's investigators.

Senator LANKFORD. The individual that you told about your memos, that then were sent on to the New York Times, do they have a copy of those memos or were they told orally of those memos?

Director COMEY. Had a copy, had a copy at the time.

Senator LANKFORD. Do they still have a copy of those memos?

Director COMEY. That's a good question. I think so. I guess I can't say for sure sitting here, but I—I guess I don't know, but I think so.

Senator LANKFORD. So the question is, could you ask them to hand that copy right back to you, so you could hand them over to this committee?

Director COMEY. Potentially.

Senator LANKFORD. I would like to move that from "potential" to "see if we can ask that question," so we can have a copy of those. Obviously those notes are exceptionally important to us to be able to go through the process so we can continue to get to the facts as we see it. As you know, the written documents are exceptionally important.

Director COMEY. Yes.

Senator LANKFORD. Are there other documents that we need to be aware of that you used in your preparation for your written statement that we should also have, that would assist us in helping with this?

Director COMEY. Not that I'm aware of, no.

Senator LANKFORD. Past the February the 14th meeting, which is a very important meeting obviously, as we discuss the conversations here about Michael Flynn, when the President asked you about he hopes that you would let this go, and the conversation back and forth about him being a good guy. After that time, did the President ever bring up anything about Michael Flynn again to you? You had multiple other conversations you have documented with the President.

Director COMEY. No, I don't remember him ever bringing it up again.

Senator LANKFORD. Did any member of the White House staff ever come to you and talk to you about letting go of the Michael Flynn case or dropping it or anything referring to that?

Director COMEY. No, nope.

Senator LANKFORD. Did the director of national intelligence come to you and talk to you about that?

Director COMEY. No.

Senator LANKFORD. Did anyone from the Attorney General's office, the Department of Justice, ask you about that?

Director COMEY. No.

Senator LANKFORD. Did the head of NSA talk to you about that?

Director COMEY. No.

Senator LANKFORD. The key aspect here is if this seems to be something the President's trying to get you to drop it, this seems like a pretty light touch to drop it, to bring it up at that moment the day after he had just fired Flynn, to come back in and say, I hope we can let this go. But then it never reappears again.

Did it slow down your investigation or any investigation that may or may not be occurring with Michael Flynn?

Director COMEY. No, although I don't know there were any manifestations, outward manifestations of the investigation, between February 14th and when I was fired. So I don't know that the President had any way of knowing whether it was effective or not.

Senator LANKFORD. Okay, that's fair enough. If the President wanted to stop an investigation, how would he do that? Knowing it's an ongoing criminal investigation or a counterintelligence investigation, would that be a matter of trying to go to you, you perceive, and to say, you make it stop, because he doesn't have the authority to stop? Or how would the President make an ongoing investigation stop?

Director COMEY. Again, I'm not a legal scholar. So smarter people answer this better, but I think as a legal matter, the President is the head of the Executive Branch and could direct, in theory—but we have important norms against this—but direct that anybody be investigated or anybody not be investigated. I think he has the legal authority because all of us ultimately report in the Executive Branch up to the President.

Senator LANKFORD. Okay. Would that be to you? Would that be the Attorney General? Would that be to who that would do that?

Director COMEY. I Suppose he could do it to—if he wanted to issue a direct order, he could do it in any way. He could do it through the Attorney General or issue it directly to me.

Senator LANKFORD. Well, is there any question that the President is not real fond of this investigation? I can think of multiple 140-word-character expressions that he's done publicly to express he's not fond of the investigation.

I've heard you share before in this conversation that you're trying to keep the agents that are working on it away from any comment the President might have made. Quite frankly, the President has informed around 6 billion people that he's not real fond of this investigation.

Do you think there's a difference in that?

Director COMEY. Yes.

Senator LANKFORD. Okay. What would that be?

Director COMEY. I think there's a big difference in kicking superior officers out of the Oval Office, looking the FBI Director in the eye, and saying, "I hope you'll let this go." I think if our—if the agents, as good as they are, heard the President of the United States did that there's a real risk of a chilling effect on their work. That's why we kept it so tight.

Senator LANKFORD. Okay. You had mentioned before about some news stories and news accounts, but, without having to go into all the names and the specific times and to be able dip into all that, have there been news accounts about the Russia investigation, about collusion, about this whole event or accusations that as you read the story you were stunned about how wrong they got the facts?

Director COMEY. Yes. There have been many, many stories purportedly based on classified information about—well, about lots of stuff, but especially about Russia, that are just dead wrong.

Senator LANKFORD. I was interested in your comment that you made as well, that the President said to you, if there were some satellite associates of his that did something wrong it would be good to find that out. That the President seemed to talk to you specifically on March the 30th and say, I'm frustrated that the word is not getting out that I'm not under investigation, but if there are people that are in my circle that are, let's finish the investigation. Is that how you took it, as well?

Director COMEY. Yes, sir. Yes.

Senator LANKFORD. And then you made a comment earlier about the Attorney General, previous Attorney General, asking you about the investigation on the Clinton e-mails, saying that you'd been asked not to call it an "investigation" anymore, but to call it a "matter." And you had said that confused you. Can you give us additional details on that?

Director COMEY. Well, it concerned me because we were at the point where we had refused to confirm the existence, as we typically do, of an investigation for months, and it was getting to a place where that looked silly, because the campaigns were talking about interacting with the FBI in the course of our work.

The Clinton campaign at the time was using all kind of euphemisms—security review, matters, things like that—for what was going on. We were getting to a place where the Attorney General

and I were both going to have to testify and talk publicly about. And I wanted to know, was she going to authorize us to confirm we had an investigation?

And she said "Yes," but don't call it that, call it a "matter." And I said, why would I do that? And she said, just call it a "matter."

And, again, you look back in hindsight, you think should I have resisted harder? I just said, all right, it isn't worth—this isn't a hill worth dying on and so I just said, okay, the press is going to completely ignore it. And that's what happened. When I said, we have opened a matter, they all reported the FBI has an investigation open.

And so that concerned me because that language tracked the way the campaign was talking about the FBI's work and that's concerning.

Senator LANKFORD. It gave the impression that the campaign was somehow using the same language as the FBI, because you were handed the campaign language and told to be able to use the campaign language.

Director COMEY. And again, I don't know whether it was intentional or not, but it gave the impression that the Attorney General was looking to align the way we talked about our work with the way a political campaign was describing the same activity, which was inaccurate.

We had a criminal investigation open with, as I said before, the Federal Bureau of Investigation. We had an investigation open at the time, and so that gave me a queasy feeling.

Senator LANKFORD. Thank you.

Chairman BURR. Senator Manchin.

Senator MANCHIN. Thank you Mr. Chairman.

Thank you, Mr. Comey. I appreciate very much your being here.

West Virginia is very interested in this hearing that we're having today. I've had over 600 requests for questions to ask you from my fellow West Virginians and most of them have been asked. And there's quite a few of them that were quite detailed that I'll ask in our classified hearing.

I want to thank you, first of all, for coming and agreeing to be here, volunteering, but also volunteering to stay into the classified hearing.

I don't know if you had a chance to watch our hearing yesterday.

Director COMEY. I watched part of it, yes, sir.

Senator MANCHIN. And it was quite troubling. My colleagues here had some very pointed questions they wanted answers to. They weren't classified. They could have answered in this open setting. They refused to do so. So that even makes us much more appreciative of your cooperation.

Sir, the seriousness of the Russian aggressions in our past elections and knowing that it'll be ongoing, as Senator King had alluded to, what's your concerns there? I mean, what should the American public understand? People said, "Well, this is a—why are we worried about this? Why make such a big deal out of this Russian investigation?" Can you tell me what your thoughts are?

Director COMEY. Yes, sir.

Senator MANCHIN. And then the final thing is on this same topic. Did the President ever show any concern or interest or curiosity about what the Russians were doing?

Director COMEY. Thank you, Senator.

As I said earlier, I don't remember any conversations with the President about the Russia election interference.

Senator MANCHIN. Did he ever ask you any questions concerning this?

Director COMEY. Well, there was an initial briefing of our findings and I think there was conversation there—I don't remember it exactly—where he asked questions about what we had found and what our sources were and what our confidence level was. But after that, I don't remember anything.

The reason this is such a big deal is we have this big, messy, wonderful country where we fight with each other all the time, but nobody tells us what to think, what to fight about, what to vote for, except other Americans, and that's wonderful and often painful. But we're talking about a foreign government that, using technical intrusion, lots of other methods, tried to shape the way we think, we vote, we act. That is a big deal and people need to recognize it.

It's not about Republicans or Democrats. They're coming after America, which I hope we all love equally. They want to undermine our credibility in the face of the world. They think that this great experiment of ours is a threat to them, and so they're going to try to run it down and dirty it up as much as possible.

That's what this is about. And they will be back, because we remain, as difficult as we can be with each other, we remain that shining city on the hill, and they don't like it.

Senator MANCHIN. This is extremely important. It's extremely dangerous, what we're dealing with, and it's needed, is what you're saying.

Director COMEY. Yes, sir.

Senator MANCHIN. Do you believe there were any tapes or recordings of your conversations with the President?

Director COMEY. It never occurred to me until the President's tweet. I'm not being facetious. I hope there are and I'll consent to the release of them.

Senator MANCHIN. Both of you are in the same findings here. You both hope there's tapes and recordings.

Director COMEY. Well, I mean, all I can do is hope. The President surely knows whether he taped me, and if he did my feelings aren't hurt. Release the entire—release all the tapes. I'm good with it.

Senator MANCHIN. Got you. Got you.

Sir, do you believe that Robert Mueller, our new special investigator on Russia, will be thorough and complete, without political intervention? And would you be confident on his findings and recommendations?

Director COMEY. Yes. Bob Mueller is one of the finest people and public servants this country's ever produced. He will do it well. He is a dogged, tough person, and you can have high confidence that when it's done he's turned over all the rocks.

Senator MANCHIN. You've been asked a wide variety of questions today and we're going to be hearing more, I'm sure, in our classi-

fied hearing. Something I'll often ask folks when they come here: what details of this saga should we be focusing on and what would you recommend us do differently, or to adjust our perspective on this?

Director COMEY. I don't know. One of the reasons that I'm pleased to be here is I think this committee has shown the American people, although we have two parties and we disagree about important things, we can work together when it involves the core interests of the country. So I would hope you'll just keep doing what you're doing. It's good in and of itself, but it's also a model, especially for kids, that we are a functioning, adult democracy.

Senator MANCHIN. And you also mentioned you had, I think, what, six meetings—three times in person, six on the phone, nine times in conversation with the President. Did he ever at that time allude that you were not performing adequately, ever indicate that at all?

Director COMEY. Oh, no. In fact, the contrary, quite often. Yeah, he called me one day. I was about to get on a helicopter, the head of the DEA was waiting in the helicopter for me, and he just called to check in and tell me I was doing an awesome job, and wanted to see how I was doing. And I said, "I'm doing fine, sir." And then I finished the call and got on the helicopter.

Senator MANCHIN. Mr. Comey, do you believe you would have been fired if Hillary Clinton had become President?

Director COMEY. That's a great question. I don't know. I don't know.

Senator MANCHIN. Do you have any thoughts about it?

Director COMEY. I might have been. I don't know. Look, I've said before that was an extraordinarily difficult and painful time. I think I did what I had to do. I knew it was going to be very bad for me personally, and the consequences of that might have been if Hillary Clinton was elected I might have been terminated. I don't know. I really don't.

Senator MANCHIN. My final question will be, after the February 14th meeting in the Oval Office, you mentioned that you asked Attorney General Sessions to ensure that you were never left alone with the President. Did you ever consider why Attorney General Sessions was not asked to stay in the room?

Director COMEY. Oh, sure, I did and have. And, in that moment, I——

Senator MANCHIN. Did you ever talk to him about it?

Director COMEY. No.

Senator MANCHIN. You never had a discussion with Jeff Sessions on this?

Director COMEY. No, not at all.

Senator MANCHIN. On any of your meetings?

Director COMEY. No. I think——

Senator MANCHIN. Did he inquire? Did he show any inquiry whatsoever, what was that meeting about?

Director COMEY. No. You're right, I did say to him—I'd forgotten this—when I talked to him and said, "You have to be between me and the President, and that's incredibly important," and I forget my exact words, I passed along the President's message about the importance of aggressively pursuing leaks of classified information,

which is a goal I share. And I passed that along to the Attorney General, I think it was the next morning, in a meeting. But I did not tell him about the Flynn part.

Senator MANCHIN. Do you believe this will rise to obstruction of justice?

Director COMEY. I don't know. That's Bob Mueller's job to sort that out.

Senator MANCHIN. Thank you, sir.

Mr. Chairman.

Chairman BURR. Senator Cotton.

Senator COTTON. Mr. Comey, you encouraged the President to release the tapes. Will you encourage the Department of Justice or your friend at Columbia or Mr. Mueller to release your memos?

Director COMEY. Sure.

Senator COTTON. You said that you did not record your conversations with President Obama or President Bush in memos. Did you do so with Attorney General Sessions or any other senior member of the Trump Department of Justice?

Director COMEY. No.

Senator COTTON. Did you——

Director COMEY. I think it—I'm sorry.

Senator COTTON. Did you record conversations in memos with Attorney General Lynch or any other senior member of the Obama Department of Justice?

Director COMEY. No, not that I recall.

Senator COTTON. In your statement for the record, you cite nine private conversations with the President, three meetings and two phone calls. There are four phone calls that are not discussed in your statement for the record. What happened in those phone calls?

Director COMEY. The President called me, I believe, shortly before he was inaugurated, as a follow-up to our conversation, private conversation on January the 6th. He just wanted to reiterate his rejection of the allegation and talk about he'd thought about it more and why he thought it wasn't true, the unverified and salacious parts. And during that call he asked me again, "Hope you're going to stay, you're doing a great job." And I told him that I intended to.

There was another phone call that I mentioned, I think it was—could have the date wrong—March the 1st, where he called just to check in with me as I was about to get on the helicopter.

There was a secure call we had about an operational matter that was not related to any of this, about something the FBI was working on. He wanted to make sure that I understood how important he thought it was—a totally appropriate call.

And then the fourth call—I'm probably forgetting. May have been the—I may have meant the call when he called to invite me to dinner. I'll think about as I'm answering other questions, but I think I got that right.

Senator COTTON. Let's turn our attention to the underlying activity at issue here: Russia's hacking into those e-mails and releasing them and the allegations of collusion. Do you believe Donald Trump colluded with Russia?

Director COMEY. That's a question I don't think I should answer in an open setting. As I said, when I left we did not have an inves-

tigation focused on President Trump. But that's a question that'll be answered by the investigation, I think.

Senator COTTON. Let me turn to a couple of statements by one of my colleagues, Senator Feinstein. She was the ranking member on this committee until January, which means she had access to information that only she and Chairman Burr did. She's now the senior Democrat on the Judiciary Committee, meaning she has access to the FBI that most of us don't.

On May 3rd, on CNN's Wolf Blitzer's show she was asked, "Do you believe, do you have evidence that there was in fact collusion between Trump associates and Russia during the campaign?"

She answered, "Not at this time."

On May 18th, at the same show, Mr. Blitzer said, "The last time we spoke, Senator, I asked if you had actually seen any evidence of collusion between the Trump campaign and the Russians, and you said to me, and I'm quoting you now—you said, 'Not at this time.' Has anything changed since we last spoke?"

Senator Feinstein said, "Well, no. No, it hasn't."

Do you have any reason to doubt those statements?

Director COMEY. I don't doubt that Senator Feinstein was saying what she understood. I just don't want to go down that path, first of all because I'm not in the government anymore; and answering in the negative I just worry leads me deeper and deeper into talking about the investigation in an open setting. I don't—I want to be—I'm always trying to be fair. I don't want to be unfair to President Trump. I'm not trying to suggest by my answer something nefarious, but I don't want to get into the business of saying not as to this person, not as to that person.

Senator COTTON. On February 14th, the New York Times published a story the headline of which was, "Trump Campaign Aides Had Repeated Contacts With Russian Intelligence."

You were asked earlier if that was an inaccurate story, and you said "in the main." Would it be fair to characterize that story as almost entirely wrong?

Director COMEY. Yes.

Senator COTTON. Did you have at the time that story was published any indication of any contact between Trump people and Russians, intelligence officers, other government officials, or close associates of the Russian government?

Director COMEY. That's one I can't answer sitting here.

Senator COTTON. We can discuss that in a classified setting, then.

I want to turn attention now to Mr. Flynn and the allegations of his underlying conduct, to be specific his alleged interactions with the Russian ambassador on the telephone, and then what he said to senior Trump administration officials and Department of Justice officials. I understand there are other issues with Mr. Flynn related to his receipt of foreign monies or disclosure of potential advocacy activity on behalf of foreign governments. Those are serious and credible allegations that I'm sure will be pursued, but I want to speak specifically about his interactions with the Russian ambassador.

There was a story on January 23rd in the Washington Post that says—entitled, "FBI reviewed Flynn's calls with Russian ambassador, but found nothing illicit." Is the story accurate?

Director COMEY. I don't want to comment on that, Senator, because I'm pretty sure the bureau has not confirmed any interception of communications. And so I don't want to talk about that in an open setting.

Senator COTTON. Would it be improper for an incoming national security adviser to have a conversation with a foreign ambassador?

Director COMEY. In my experience, no.

Senator COTTON. But you can't confirm or deny that the conversation happened, and we would need to know the contents of that conversation to know if it was in fact improper?

Director COMEY. Yeah, I don't think I can talk about that in an open setting. And again, I've been out of government now a month, so I also don't want to talk about things when it's now somebody else's responsibility. But maybe in the classified setting we can talk more about that.

Senator COTTON. You stated earlier that there was an open investigation of Mr. Flynn in the FBI. Did you or any FBI agent ever sense that Mr. Flynn attempted to deceive you or made false statements to an FBI agent?

Director COMEY. I don't want to go too far. That was the subject of the criminal inquiry.

Senator COTTON. Did you ever come close to closing the investigation on Mr. Flynn?

Director COMEY. I don't think I can talk about that in an open setting, either.

Senator COTTON. We can discuss these more in a closed setting, then.

Mr. Comey, in 2004 you were a part of a well-publicized event about an intelligence program that had been recertified several times, and you were acting Attorney General when Attorney General John Ashcroft was incapacitated due to illness. There was a dramatic showdown at the hospital here. The next day, you've said that you wrote a letter of resignation and signed it before you went to meet with President Bush to explain why he refused to certify it. Is that accurate?

Director COMEY. Yes, I think so.

Senator COTTON. At any time in the three and half months you were the FBI Director during the Trump administration, did you ever write and sign a letter of recommendation and leave it on your desk?

Director COMEY. A letter of resignation? No, sir.

Senator COTTON. Letter of resignation.

Director COMEY. No, sir.

Senator COTTON. So despite all of the things that you've testified to here today, you didn't feel this rose to the level of an honest but serious difference of legal opinion between accomplished and skilled lawyers in that 2004 episode?

Director COMEY. I wouldn't characterize the circumstances in 2004 that way. But to answer, no, I didn't find—encounter any circumstance that led me to intend to resign, consider to resign. No, sir.

Senator COTTON. Thank you.

Chairman BURR. Senator Harris.

Senator HARRIS. Director Comey, I want to thank you. You are now a private citizen and you are enduring a Senate Intelligence Committee hearing, and each of us get seven minutes instead of five, as yesterday, to ask you questions. So thank you.

Director COMEY. I'm between opportunities now, so——

Senator HARRIS. Well, you are——

[Laughter.]

I'm sure you'll have future opportunities.

You know, you and I are both former prosecutors. I'm not going to require you to answer. I just want to make a statement that in my experience of prosecuting cases, when a robber held a gun to somebody's head, and said, "I hope you will give me your wallet," the word "hope" was not the most operative word at that moment. But you don't have to respond to that point.

I have a series of questions to ask you, and they're going to start with, are you aware of any meetings between the Trump administration officials and Russian officials during the campaign that have not been acknowledged by those officials in the White House?

Director COMEY. That's not a—even if I remembered clearly, that's a not a question I can answer in an open setting.

Senator HARRIS. Are you aware of any efforts by Trump campaign officials or associates of the campaign to hide their communications with Russian officials through encrypted communications or other means?

Director COMEY. I have to give you same answer, Senator.

Senator HARRIS. Sure.

In the course of the FBI's investigation, did you ever come across anything that suggested that communications, records, documents or other evidence had been destroyed?

Director COMEY. I think I've got to give you the same answer, because it would touch on investigative matters.

Senator HARRIS. And are you aware of any efforts or potential efforts to conceal communications between campaign officials and Russian officials?

Director COMEY. I think I have to give you the same answer, Senator.

Senator HARRIS. Thank you.

As a former Attorney General, I have a series of questions about your connection with the Attorney General during the course of your tenure as Director. What is your understanding of the parameters of General Sessions' recusal from the Russia investigation?

Director COMEY. I think it's described in a written release or statement from DOJ, which I don't remember sitting here. But the gist was he would be recused from all matters relating to Russia and the campaign, or activities of Russia and the 2016 election, I think, something like that.

Senator HARRIS. So is your knowledge of the extent of his recusal based on the public statements he's made?

Director COMEY. Correct.

Senator HARRIS. Okay. So was there any kind of memorandum issued from the Attorney General or the Department of Justice to the FBI outlining the parameters of his recusal?

Director COMEY. Not that I'm aware of.

Senator HARRIS. And do you know if he reviewed any FBI or DOJ documents pertaining to the investigation before he was recused?

Director COMEY. I don't. I don't know.

Senator HARRIS. And after he was recused, I'm assuming it's the same answer.

Director COMEY. Same answer.

Senator HARRIS. And aside from any notice or memorandum that was not sent or was, what mechanism or processes were in place to ensure that the Attorney General would not have any connection with the investigation, to your knowledge?

Director COMEY. I don't know for sure. I know that he had consulted with career ethics officials that know how to run a recusal at DOJ, but I don't know what mechanism they set up.

Senator HARRIS. And the Attorney General recused himself from the investigation, but do you believe it was appropriate for him to be involved in the firing of the chief investigator of that case, of that Russia interference?

Director COMEY. That's something I can't answer, sitting here. It's a reasonable question, but that would depend on a lot of things I don't know, like what did he know, what was he told, did he realize that the President was doing it because of the Russia investigation, things like that. I just don't know the answer.

Senator HARRIS. You've mentioned in your written testimony and here that the President essentially asked you for a loyalty pledge. Are you aware of him making the same request of any other members of the Cabinet?

Director COMEY. I am not.

Senator HARRIS. Do you know one way or another what he——

Director COMEY. I don't know one way or another. I never heard anything about it.

Senator HARRIS. And you mentioned that you had the conversation where he hoped that you would let the Flynn matter go on February 14th or thereabouts. It's my understanding that Mr. Sessions was recused from any involvement in the investigation about a full two weeks later.

To your knowledge, was the Attorney General—did he have access to information about the investigation in those interim two weeks?

Director COMEY. I don't—in theory, sure, because he's the Attorney General. I don't know whether he had any contact with any materials related to that.

Senator HARRIS. To your knowledge, was there any directive that he should not have any contact with any information about the Russia investigation between the February 14th date and the day he was ultimately recused—or recused himself, on March 2nd?

Director COMEY. Not to my knowledge. I don't know one way or another.

Senator HARRIS. And did you speak to the Attorney General about the Russia investigation before his recusal?

Director COMEY. I don't think so, no.

Senator HARRIS. Do you know if anyone in the Department, in the FBI, forwarded any documents or information or memos of any sort to the attention of the Attorney General before his recusal?

Director COMEY. I don't know of any, remember any, sitting here. It's possible, but I don't remember any.

Senator HARRIS. Do you know if the Attorney General was involved, in fact involved, in any aspect of the Russia investigation after his recusal on the 2nd of March?

Director COMEY. I don't. I would assume not, but I don't—let me say it this way. I don't know of any information that would lead me to believe he did something to touch the Russia investigation after the recusal.

Senator HARRIS. In your written testimony, you indicate that you, after you were left alone with the President, you mentioned that it was inappropriate and should never happen again to the Attorney General. And, apparently he did not reply, and you write that he did not reply.

What did he do, if anything? Did he just look at you? Was there a pause for a moment? What happened?

Director COMEY. I don't remember real clearly. I have a recollection of him just kind of looking at me. And there's a danger here I'm projecting onto him, so this may be a faulty memory, but I kind of got—his body language gave me the sense like, what am I going to do?

Senator HARRIS. Did he shrug?

Director COMEY. I don't remember clearly. I think the reason I have that impression is I have some recollection of almost an imperceptible, like, what am I going to do? But I don't have a clear recollection of that. He didn't say anything.

Senator HARRIS. And on that same February 14th meeting, you said you understood the President to be requesting that you drop the investigation. After that meeting, however, you received two calls from the President, March 30th and April 11th, where the President talked about a cloud over his presidency.

Has anything you've learned in the months since your February 14th meeting changed your understanding of the President's request? I guess it would be what he has said in public documents or public interviews?

Director COMEY. Correct.

Senator HARRIS. And is there anything about this investigation that you believe is in any way biased or is not being informed by a process of seeking the truth?

Director COMEY. No. The appointment of a special counsel should offer great, especially given who that person is, great comfort to Americans, no matter what your political affiliation is, that this will be done independently, competently, and honestly.

Senator HARRIS. And do you believe that he should have full authority, Mr. Mueller, to be able to pursue that investigation?

Director COMEY. Yes, and, knowing him well over the years, if there's something that he thinks he needs, he will speak up about it.

Senator HARRIS. Do you believe he should have full independence?

Director COMEY. Oh, yeah. And he wouldn't be part of it if he wasn't going to get full independence.

Senator HARRIS. Thank you.

Chairman BURR. Senator Cornyn.

Senator CORNYN. Thank you, Mr. Chairman.

Mr. Comey, I'll repeat what I've said at previous hearings, that I believe you're a good and decent man who has been dealt a very difficult hand, starting back with the Clinton e-mail investigation. And I appreciate your willingness to appear here today voluntarily and answer our questions and cooperate with our investigation.

As a general matter, if an FBI agent has reason to believe that a crime has been committed, do they have a duty to report it?

Director COMEY. That's a good question. I don't know that there's a legal duty to report it. They certainly have a cultural, ethical duty to report it.

Senator CORNYN. You're unsure whether they would have a legal duty?

Director COMEY. It's a good question. I've not thought about it before. I don't know where the legal—there's a statute that prohibits misprision of a felony, knowing of a felony and taking steps to conceal it. But this is a different question.

And so, look, let me be clear. I would expect any FBI agent who has reason—information about a crime being committed to report it.

Senator CORNYN. Me, too.

Director COMEY. But where you rest that obligation, I don't know. It exists.

Senator CORNYN. And let me ask you as a general proposition, if you're trying to make an investigation go away, is firing an FBI director a good way to make that happen? By that, I mean——

Director COMEY. Yeah, it doesn't make a lot of sense to me, but I'm obviously hopelessly biased, given that I was the one fired.

[Laughter.]

Senator CORNYN. I understand it's personal.

Director COMEY. No; given the nature of the FBI, I meant what I said. There's no indispensable people in the world, including at the FBI. There's lots of bad things about me not being at the FBI. Most of them are for me. But the work's going to go on as before.

Senator CORNYN. So nothing that's happened that you've testified to here today has impeded the investigation of the FBI or Director Mueller's commitment to get to the bottom of this from the standpoint of the FBI and the Department of Justice. Would you agree with that?

Director COMEY. Correct. Especially the appointment of former Director Mueller is a critical part of that equation.

Senator CORNYN. Let me take you back to the Clinton e-mail investigation. I think you've been cast as a hero or a villain, depending on whose political ox is being gored, at many different times during the course of the Clinton e-mail investigation, and even now perhaps.

But you clearly were troubled by the conduct of the sitting Attorney General, Loretta Lynch, when it came to the Clinton e-mail investigation. You mentioned the characterization that you'd been

asked to accept that this was a "matter" and not a criminal investigation, which you've said it was.

There was the matter of President Clinton's meeting on the tarmac with the sitting Attorney General at a time when his wife was subject to a criminal investigation. And you've suggested that perhaps there are other matters that you may be able to share with us later on in a classified setting.

But it seems to me that you clearly believe that Loretta Lynch, the Attorney General, had an appearance of a conflict of interest on the Clinton e-mail investigation. Is that correct?

Director COMEY. I think that's fair. I didn't believe she could credibly decline that investigation, at least not without grievous damage to the Department of Justice and to the FBI.

Senator CORNYN. And under Department of Justice and FBI norms, wouldn't it have been appropriate for the Attorney General, or, if she had recused herself—which she did not do—for the Deputy Attorney General to appoint a special counsel?

That's essentially what's happened now with Director Mueller. Would that have been an appropriate step in the Clinton e-mail investigation in your opinion?

Director COMEY. Certainly a possible step, yes, sir.

Senator CORNYN. And were you aware that Ms. Lynch had been requested numerous times to appoint a special counsel and had refused?

Director COMEY. Yes, from—I think Congress had, members of Congress had repeatedly asked. Yes, sir.

Senator CORNYN. Yours truly did on multiple occasions.

And that heightened your concerns about the appearance of a conflict of interest with the Department of Justice, which caused you to make what you have described as an incredibly painful decision to basically take the matter up yourself and led to that July press conference.

Director COMEY. Yes, sir. After President Clinton, former President Clinton, met on the plane with the Attorney General, I considered whether I should call for the appointment of a special counsel and had decided that that would be an unfair thing to do, because I knew there was no case there. We had investigated it very, very thoroughly. I know this is a subject of passionate disagreement, but I knew there was no case there. And calling for the appointment of a special counsel would be brutally unfair because it would send the message, aha, there's something here. That was my judgment. Again, lots of people have different views of it. But that's how I thought about it.

Senator CORNYN. Well, if the special counsel had been appointed, they could've made that determination that there was nothing there and declined to pursue it, right?

Director COMEY. Sure, but it would've been many months later or a year later.

Senator CORNYN. Let me just ask you to—given the experience of the Clinton e-mail investigation and what happened there, do you think it's unreasonable for anyone, any President who has been assured on multiple occasions that he's not the subject of an FBI investigation, do you think it's unreasonable for them to want the

FBI Director to publicly announce that so that this cloud over his Administration would be removed?

Director COMEY. I think that's a reasonable point of view. The concern would be, obviously, because if that boomerang comes back, it's going to be a very big deal, because there will be a duty to correct.

Senator CORNYN. Well, we saw that in the Clinton e-mail investigation, of course.

Director COMEY. Yes, I recall that.

Senator CORNYN. I know you do.

So let me ask you, finally, in the minute that we have left—there was this conversation back and forth about loyalty, and I think we all appreciate the fact that an FBI Director is a unique public official in the sense that he's a political appointee in one sense, but he has a duty of independence to pursue the law pursuant to the Constitution and laws of the United States.

And so when the President asked you about loyalty, you got in this back-and-forth about, well, I'll pledge you my honesty. And then it looks like, from what I've read, you agreed upon honest loyalty or something like that. Is that the characterization?

Director COMEY. Yes.

Senator CORNYN. Thank you very much.

Director COMEY. Thank you, sir.

Chairman BURR. Senator Reed.

Senator REED. Thank you, Mr. Chairman.

Thank you, Director Comey.

There have been press reports that the President, in addition to asking you to drop the Flynn investigation, has asked other senior intelligence officials to take steps which would tend to undermine the investigation into Russia. There have been reports that he's asked DNI Coats and Admiral Rogers to make public statements exonerating him or taking the pressure off him, and also reports about Admiral Rogers and Director Pompeo, to intervene and reach out to the FBI and ask them.

Are you aware of any of these or do you have any information with respect to any of these allegations?

Director COMEY. I don't. I'm aware of the public reporting, but I had no contact, no conversation with any of those leaders about that subject.

Senator REED. Thank you.

You have testified that you interpret the discussion with the President about Flynn as a direction to stop the investigation. Is that correct?

Director COMEY. Yes.

Senator REED. You've testified that the President asked you to lift the cloud by essentially making public statement that exonerated him and perhaps others. You refused, correct?

Director COMEY. I didn't do it. I didn't refuse the President. I told him we would see what we could do, and then the second time he called, I told him in substance, that's something your lawyer will have to take up with the Justice Department.

Senator REED. And part of the underlying logic that we've discussed many times throughout this morning is the duty to correct. That is one of—a theoretical issue, but also a very practical issue.

Was your feeling that the direction of the investigation could in fact include the President?

Director COMEY. Well, in theory. I mean, as I explained, the concern of one of my senior leader colleagues was if you're looking at potential coordination between the campaign and Russia, the person at the head of the campaign is the candidate. So logically, this person argued, the candidate's knowledge, understanding, will logically become a part of your inquiry if it proceeds.

And so I understood that argument. My view was that what I said to the President was accurate and fair, and fair to him. I resisted the idea of publicly saying it, although if the Justice Department had wanted to I would have done it, because of the duty to correct and the slippery slope problem.

Senator REED. And again, also you've testified that the President asked you repeatedly to be loyal to him, and you responded you would be honestly loyal, which is I think your way of saying, "I'll be honest, and I'll be the head of the FBI and independent." Is that fair?

Director COMEY. Correct. I tried "honest" first. And also—I mean, you see it in my testimony—also tried to explain to him why it's in his interest and every President's interest for the FBI to be apart in a way, because its credibility is important to a President and to the country.

And so I tried to hold the line, hold the line. It got very awkward, and I then said, "You'll always have honesty from me." He said, "honest loyalty," and then I acceded to that as a way to end this awkwardness.

Senator REED. At the culmination of all these events, you're summarily fired, without any explanation or anything else?

Director COMEY. Well, there was an explanation. I just don't buy it.

Senator REED. Well, yes. So you're fired. So do you believe that you were fired because you refused to take the President's direction? Is that the ultimate reason?

Director COMEY. I don't know for sure. I know I was fired. Again, I take the President's words. I know I was fired because something about the way I was conducting the Russia investigation was in some way putting pressure on him, in some way irritating him, and he decided to fire me because of that.

Senator REED. Now——

Director COMEY. I can't go farther than that.

Senator REED. The Russian investigation, as you have pointed out, and as all my colleagues have reflected, is one of the most serious hostile acts against this country in our history. Undermining the very core of our democracy and our elections is not a discrete event. It will likely occur—it's probably being prepared now for 2018 and 2020 and beyond. And yet the President of the United States fires you because, in your own words, some relation to this investigation.

And then he shows up in the Oval Office with the Russian foreign minister. First, after classifying you as crazy and a real nut job, which I think you've effectively disproved this morning, he said, "I faced great pressure because of Russia. That's taken off." Your conclusion would be that the President, I would think, is

downplaying the seriousness of this threat, in fact took specific steps to stop a thorough investigation of the Russian influence; and also, from what you've said or what has been said this morning, doesn't seem particularly interested in these hostile threats by the Russians? Is that fair?

Director COMEY. I don't know that I can agree to that level of detail. There's no doubt that it's a fair judgment, it's my judgment, that I was fired because of the Russia investigation. I was fired in some way to change—or the endeavor was to change the way the Russia investigation was being conducted.

That is a very big deal, and not just because it involves me. The nature of the FBI and the nature of its work requires that it not be the subject of political consideration. And on top of that you have the Russia investigation itself is vital because of the threat. And I know I should have said this earlier, but it's obvious: If any Americans were part of helping the Russians do that to us, that is a very big deal. And I'm confident that if that is the case, Director Mueller will find that evidence.

Senator REED. Finally, the President tweeted that "James Comey better hope that there are no tapes of our conversation before he starts leaking to the press." Was that a rather unsubtle attempt to intimidate you from testifying and intimidate anyone else who seriously crosses his path, of not doing it?

Director COMEY. I'm not going to sit here and try and interpret the President's tweets. To me, its major impact was, as I said, it occurred to me in the middle of the night, holy cow, there might be tapes. And if there are tapes, it's not just my word against his on the direction to get rid of the Flynn investigation.

Senator REED. Thank you very much.

Chairman BURR. Senator McCain.

Senator McCAIN. In the case of Hillary Clinton, you made the statement that there wasn't sufficient evidence to bring a suit against her, although it had been very careless in their behavior. But you did reach a conclusion in that case that it was not necessary to further pursue her. Yet, at the same time, in the case of Mr. Comey you said that there was not enough information to make a conclusion.

Tell me the difference between your conclusion as far as former Secretary Clinton is concerned and Mr. Trump?

Director COMEY. The Clinton investigation was a completed investigation that the FBI had been deeply involved in, and so I had an opportunity to understand all the facts and apply those facts against the law as I understood them. This investigation was underway, still going when I was fired. So it's nowhere near in the same place. At least, it wasn't when I was——

Senator McCAIN. But it's still ongoing?

Director COMEY. Correct, so far as I know. It was when I left.

Senator McCAIN. That investigation was going on. This investigation is going on. You reached separate conclusions.

Director COMEY. No, that one was done. The——

Senator McCAIN. That investigation of any involvement of Secretary Clinton or any of her associates is completed?

Director COMEY. Yes, as of July the 5th the FBI completed its investigative work, and that's what I was announcing, what we had done and what we had found.

Senator MCCAIN. Well, at least in the minds of this member, there's a whole lot of questions remaining about what went on, particularly considering the fact that, as you mention, it's a, quote, "big deal" as to what went on during the campaign.

So I'm glad you concluded that part of the investigation, but I think that the American people have a whole lot of questions out there, particularly since you just emphasized the role that Russia played. And obviously, she was a candidate for President at the time, so she was clearly involved in this whole situation where fake news, as you've just described it, "big deal," took place.

You're going to have to help me out here. In other words, we're complete, the investigation of anything that former Secretary Clinton had to do with the campaign is over and we don't have to worry about it anymore?

Director COMEY. With respect to Secretary—I'm not—I'm a little confused, Senator. With respect to Secretary Clinton——

Senator MCCAIN. Yeah.

Director COMEY [continuing]. We investigated a criminal investigation in connection with her use of a personal e-mail server——

Senator MCCAIN. I understand.

Director COMEY [continuing]. And that's the investigation I announced the conclusion of on July 5th.

Senator MCCAIN. So—but, at the same time you made the announcement there would be no charges brought against then-Secretary Clinton for any activities involved in the Russia involvement in our, engagement in our election. I don't quite understand how you could be done with that, but not completely done with the whole investigation of their attempt to affect the outcome of our election.

Director COMEY. No. I'm sorry. We're not—at least when I left, when I was fired on May the 9th, there was still an open, active investigation to understand the Russian efforts and whether any Americans worked with them.

Senator MCCAIN. But you reached the conclusion that there was no reason to bring charges again Secretary Clinton. So you reached a conclusion.

In the case of Mr. Comey, you—President Comey——

Director COMEY. No, sir.

Senator MCCAIN [continuing]. I mean, excuse me—in the case of President Trump, you have an ongoing investigation. So you got one candidate who you're done with and another candidate that you have a long way to go. Is that correct?

Director COMEY. I don't know how far the FBI has to go, but yes, the Clinton e-mail investigation was completed. The investigation of Russia's efforts in connection with the election and whether there was any coordination and, if so, with whom, between Russia and the campaign——

Senator MCCAIN. You just made it—you just made it——

Director COMEY [continuing]. Was ongoing when I left.

Senator MCCAIN. You just made it clear in what you said this is a, quote, "big deal," unquote.

I think that it's hard to reconcile. In one case you reach a complete conclusion and on the other side you have not, and you—in fact, obviously, there's a lot more there, as we know, as you called it a, quote, "big deal." She's one of the candidates. But in her case you say there will be no charges, and in the case of President Trump the investigation continues.

What has been brought out in this hearing is more and more emphasis on the Russian engagement and involvement in this campaign. How serious do you think this was?

Director COMEY. Very serious. But I want to say something to be clear. We have not announced, and there was no predication to announce, an investigation of whether the Russians may have coordinated with Secretary Clinton's campaign. Secretary Clinton's campaign——

Senator MCCAIN. No, but they may not have been involved with her campaign. They were involved with the entire presidential campaign, obviously.

Director COMEY. Of course. Yes, sir. And that is an investigation that began last summer and so far as I'm aware continues.

Senator MCCAIN. So both President Trump and former candidate Clinton are both involved in the investigation. Yet one of them you said there's going to be no charges, and the other one, the investigation continues. Well, I think there's a double standard there, to tell you the truth.

Then when the President said to you—you talked about the April 11th phone call and he said, quote, "Because I've been very loyal to you, very loyal. We had that thing, you know." Did that arouse your curiosity as what, quote, "that thing" was?

Director COMEY. Yes.

Senator MCCAIN. Why didn't you ask him?

Director COMEY. It didn't seem to me to be important for the conversation we were having to understand it. I took it to be some—an effort to communicate to me that there is a relationship between us where, I've been good to you, you should be good to me.

Senator MCCAIN. Yeah, but I think it would intensely arouse my curiosity if the President of the United States said "We had that thing, you know." I'd like to know what the hell that thing is, particularly if I'm the Director of the FBI.

Director COMEY. Yeah, I get that, Senator. Honestly, I'll tell you what. This is speculation, but what I concluded at the time is in his memory he was searching back to our encounter at the dinner and was preparing himself to say, "I offered loyalty to you, you promised loyalty to me." And all of a sudden his memory showed him that did not happen, and I think he pulled up short. That's just a guess, but I've had a lot of conversations with humans over the years——

Senator MCCAIN. I think I would have had some curiosity if it had been about me, to be honest with you.

So are you aware of anything that would believe you to believe that the President or the members of the Administration or members of the campaign could potentially be used to coerce or blackmail the Administration?

Director COMEY. That's a subject for investigations, not something I can comment on sitting here.

Senator MCCAIN. But you've reached that conclusion as far as Secretary Clinton was concerned. But you're not reaching a conclusion as far as this Administration is concerned. Are you aware of anything that would lead you to believe that information exists that could coerce members of the Administration or blackmail the Administration?

Director COMEY. That's not a question I can answer, Senator.

Chairman BURR. The Senator's time has expired.

Senator MCCAIN. Thank you.

Chairman BURR. All time has expired for the hearing. Can I say for members, we'll reconvene promptly at 1:00 p.m. in the hearing room. We have a vote scheduled for 1:45. I would suggest that all members promptly be there at 1:00 o'clock. We have about three minutes——

I'd like to have order. Photographers—photographers, return to where you were, please. This hearing's not adjourned yet. Either that, or we'll remove you.

To members, we have about three minutes of updates that we would love to cover as soon as we get into the closed session, before we have an opportunity to spend some time with Director Comey. Based on our agreement, it would be my intentions to adjourn that closed hearing between 2:00 and 2:10 so that members can go vote, and I would urge you to eat at that time.

Jim, several of us on this committee have had the opportunity to work with you since you walked in the door. I want to say personally, on behalf of all the committee members, we're grateful to you for your service to your country, not just in the capacity as FBI Director, but as prosecutor and, more importantly, being somebody that loves this country enough to tell it like it is.

I want to say to your workforce that we're grateful to them with the level of cooperation that they have shown us, with the trust we've built between both organizations, the Congress and the bureau. We couldn't do our job if it wasn't for their willingness to share candidly with us the work that we need to see.

This hearing's the ninth public hearing this committee has had this year. That is twice the historical year-long average of this committee. I think the Vice Chairman and my's biggest challenge when this investigation has concluded is to return our hearings to the secrecy of a closed hearing, to encourage our members not to freely talk about intelligence matters publicly and to respect the fact that we have a huge job. And that's to represent the entire body of the United States Senate and the American people, to make sure that we work with the intelligence community to provide you the tools to keep America safe, and that you do it within the legal limit, or those limits that are set by the Executive Branch.

We could not do it if it wasn't for a trusted partnership that you have been able to lead and others before you. So as we depart from this, this is a pivotal hearing in our investigation. We're grateful to you for the professionalism you've shown, and your willingness.

I will turn to the Vice Chairman.

Vice Chairman WARNER. I simply want to echo, one, again the thanks for your appearance. And there clearly still remain a number of questions. And the one thing I want to commit to you and, more importantly, I think the Chairman and I want to commit to

all those who are still potentially watching and following, there are still a lot of unanswered questions and we're going to get to the bottom of this. We're going to get the facts out. The American people deserve to know.

There's the questions around implications of Trump officials and the Russians, but there's also the macro issue of what the Russians did and continue to do. And I think it is very important that all Americans realize that threat is real, it is continuous. It is not just towards our Nation. It is towards all Western democracies. And we have to come to a solution set.

Thank you, Mr. Chairman.

Chairman BURR. Director Comey, thank you once again on behalf of the committee.

This hearing's adjourned.

[Whereupon, at 12:12 p.m., the hearing was adjourned.]

○