Glenn Simpson                                          August 22, 2017

Washington, DC

1                SENATE JUDICIARY COMMITTEE

2                        U.S. SENATE

3                      WASHINGTON, D.C.

4

5

6

7           INTERVIEW OF:   GLENN SIMPSON

8

9

10

11               TUESDAY, AUGUST 22, 2017

12                      WASHINGTON, D.C.

13

14

15

16

17       The interview in this matter was held at the

18   Hart Senate Office Building, commencing at 9:34 a.m.

19

20

21

22

23

24

25

Alderson Court Reporting

Glenn Simpson                                                    August 22, 2017
Washington, DC

```
                                                        Page 2
 1    APPEARANCES:

 2    SENATE JUDICIARY COMMITTEE:

 3    Patrick Davis, Deputy Chief Investigative Counsel,

 4       Chairman Grassley

 5    Jason Foster, Chief Investigative Counsel,

 6       Chairman Grassley

 7    Samantha Brennan, Investigative Counsel,

 8       Chairman Grassley

 9    Daniel Parker, Investigative Assistant,

10       Chairman Grassley

11    Joshua Flynn-Brown, Investigative Counsel,

12       Chairman Grassley

13    Scott Graber, Legislative Assistant/Counsel,

14       Senator Graham

15    Heather Sawyer, Chief Oversight Counsel,

16       Senator Feinstein

17    Jennifer Duck, Staff Director,

18       Senator Feinstein

19    Molly Claflin, Counsel,

20       Senator Feinstein

21    Lara Quint, Chief Counsel,

22       Senator Whitehouse

23

24

25
```

Glenn Simpson                                             August 22, 2017
                        Washington, DC

Page 3

1    APPEARANCES:  (Cont'd)

2    FOR THE WITNESS:

3    Joshua Levy, Cunningham Levy Muse

4    Robert Muse, Cunningham Levy Muse

5    Rachel Clattenburg, Cunningham Levy Muse

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Glenn Simpson                                                    August 22, 2017
Washington, DC

```
                                                       Page 4
 1                    I N D E X

 2                   EXAMINATION

 3                                        PAGE

 4       By Mr. Davis                     11

 5       By Ms. Sawyer                    52

 6       By Mr. Davis                     95

 7       By Ms. Sawyer                    138

 8       By Mr. Davis                     180

 9       By Ms. Sawyer                    227

10       By Mr. Davis                     260

11       By Ms. Sawyer                    290

12                    EXHIBITS

13    EXHIBIT                             PAGE

14    Exhibit 1                           11
         8/3/17 letter agreement
15
      Exhibit 2                           30
16       Privilege log

17    Exhibit 3                           138
         BuzzFeed memos
18
      Exhibit 4                           196
19       Filing in UK litigation

20    Exhibit 5                           205
         (Not described)
21
      Exhibit 6                           261
22       Meeting notes

23

24

25
```

Alderson Court Reporting

Glenn Simpson                                                      August 22, 2017
Washington, DC

1          MR. DAVIS:  Good morning.  This is the

2     transcribed interview of Glenn Simpson.  Chairman

3     Grassley and Ranking Member Feinstein requested

4     this interview as part of the Senate Judiciary

5     Committee's investigation of Fusion GPS's

6     activities related to the dossier compiled by

7     Christopher Steele, the Prevezon case, and the

8     Magnitsky Act.

9          Would the witness please state your name for

10    the record.

11         MR. SIMPSON:  Glenn Simpson.

12         MR. DAVIS:  On behalf of the Chairman I want

13    to thank Mr. Simpson for appearing here today.  My

14    name is Patrick Davis.  I'm the Deputy Chief

15    Investigative Counsel with the committee's majority

16    staff.

17         I'll ask everyone else from the committee who

18    is here to introduce themselves as well.

19         MR. FOSTER:  Jason Foster, I'm the Chief

20    Investigative Counsel for Chairman Grassley.

21         MS. BRENNAN:  Samantha Brennan, Investigative

22    Counsel, Chairman Grassley.

23         MR. GRABER:  Scott Graber, Senator Graham.

24         MR. PARKER:  Daniel Parker, Investigative

25    Assistant for Senator Grassley.

Glenn Simpson                                             August 22, 2017
                        Washington, DC

Page 6

1       MR. BROWN:  Joshua Flynn-Brown, Investigative

2  Counsel for Senator Grassley.

3       MS. DUCK:  Jennifer Duck, Staff Director for

4  Senator Feinstein.

5       MS. QUINT:  Lara Quint, Chief Counsel,

6  Senator Whitehouse.

7       MS. SAWYER:  Heather Sawyer, Chief Oversight

8  Counsel, Senator Feinstein.

9       MS. CLAFLIN:  Molly Claflin, Counsel, Senator

10  Feinstein.

11       MR. DAVIS:  The Federal Rules of Civil

12  Procedure do not apply to any of the committee's

13  investigative activities, including transcribed

14  interviews.  There are some guidelines we follow,

15  and I'll go over those now.

16       Our questioning will proceed in rounds.  The

17  majority staff will ask questions first for one

18  hour, then the minority staff will have an

19  opportunity to ask questions for an equal amount of

20  time.  We will go back and forth until there are no

21  more questions and the interview is over.

22       We typically take a short break at the end of

23  each hour, but should you need a break at any other

24  time, please just let us know.  And we can discuss

25  taking a break for lunch whenever you're ready to

Glenn Simpson                                        August 22, 2017

Washington, DC

Page 7

1   do so.

2        We have an official reporter taking down

3   everything we say to make a written record.  So we

4   ask that you give verbal responses to all

5   questions.  Do you understand?

6        MR. SIMPSON:  Yes.

7        MR. DAVIS:  So that the court reporter can

8   take down a clear record, we'll do our best to

9   limit the number of people directing questions at

10  you during any given hour to those whose turn it

11  is.  It's also important that we don't talk over

12  one another or interrupt each other to the extent

13  we can help it.  That goes for everybody present at

14  today's interview.

15       We encourage witnesses who appear before the

16  committee to freely consult with counsel if they

17  should choose.  You are appearing here today with

18  counsel.  Counsel, could you please state your name

19  for the record.

20       MR. LEVY:  Josh levy.

21       MR. MUSE:  I'm Bob Muse and I represent Glenn

22  Simpson.

23       MS. CLATTENBURG:  I'm Rachel Clattenburg.

24       MR. DAVIS:  We want you to answer our

25  questions in the most complete and truthful manner

Glenn Simpson                                              August 22, 2017

Washington, DC

Page 8

1    possible.  So we will take our time.  If you have

2    any questions or if you don't understand any of our

3    questions, please let us know.  If you honestly

4    don't know the answer to a question or don't

5    remember, it's best not to guess.  Just give us

6    your best recollection.

7         It's okay to tell us if you learned

8    information from somewhere else if you indicate how

9    you came to know the information.  If there are

10   things that you don't know or can't remember, we

11   ask that you inform us to the best of your

12   knowledge who might be able to provide a more

13   complete answer to the question.

14        This interview is unclassified.  So if any

15   question calls for information that you know to be

16   classified, please state that for the record as

17   well as the reason for the classification.  Then

18   once you've clarified that to the extent possible,

19   please respond with as much unclassified

20   information as you can.  If we need to have a

21   classified session later, that can be arranged.

22        It is this committee's practice to honor

23   valid common law privilege claims as an

24   accommodation to a witness or party when those

25   claims are made in good faith and accompanied by

Glenn Simpson                                          August 22, 2017
Washington, DC

```
 1   sufficient explanation so that the committee can
 2   evaluate the claim.  When deciding whether to honor
 3   a privilege the committee weighs its need for the
 4   information against any legitimate basis for
 5   withholding it.  The committee typically does not
 6   honor contractual confidentiality agreements.
 7        The committee and Mr. Simpson have agreed
 8   that this interview is occurring without prejudice
 9   to any future discussions with the committee and we
10   reserve the right to request Mr. Simpson's
11   participation in future interviews or to compel his
12   testimony.  The committee and Mr. Simpson have also
13   agreed that participation in this interview does
14   not constitute a waiver of his ability to assert
15   any privileges in response to future appearances
16   before this committee.
17        Mr. Simpson, you should understand that
18   although the interview is not under oath, by law
19   you are required to answer questions from Congress
20   truthfully.  Do you understand that?
21        MR. SIMPSON:  Yes.
22        MR. DAVIS:  Specifically 18 U.S.C. Section
23   1001 makes it a crime to make any materially false,
24   fictitious, or fraudulent statement or
25   representation in the course of a congressional
```

Alderson Court Reporting

Glenn Simpson                                              August 22, 2017

Washington, DC

Page 10

1    investigation.  That statute applies to your

2    statements in this interview.  Do you understand

3    that?

4         MR. SIMPSON:  Yes, I do.

5         MR. DAVIS:  Witnesses who knowingly provide

6    false statements could be subject to criminal

7    prosecution and imprisonment for up to five years.

8    Do you understand this?

9         MR. SIMPSON:  Yes, I do.

10         MR. DAVIS:  Is there any reason you're unable

11    to provide truthful answers to today's questions?

12         MR. SIMPSON:  No.

13         MR. DAVIS:  Finally, we ask that you not

14    speak about what we discuss in this interview with

15    anyone else outside of who's here in the room today

16    in order to preserve the integrity of our

17    investigation.  We also ask that you not remove any

18    exhibits or other committee documents from the

19    interview.

20         Once again, the Chairman and Ranking Member

21    withdrew their subpoena of you due to your

22    willingness to provide information in this

23    voluntary interview and document production.

24    However, the extent to which the committee deems

25    further compulsory process necessary will likely

Glenn Simpson                                        August 22, 2017

Washington, DC

Page 11

1    depend on your level of cooperation and candor.

2        Is there anything else that my colleagues

3    from the minority would like to add?

4        MS. SAWYER:  Thank you.  We appreciate it.

5    And we appreciate you being here as part of the

6    investigation into the Russian interference into

7    the 2016 election.

8        I did want to, with agreement of my

9    colleagues, just enter into the record the letter

10   agreement regarding the interview that was sent to

11   your counsel on August 3, 2017.  I think my

12   colleague has gone over a number of the parameters

13   that we agreed to, but I think it would be helpful

14   to have this in the record.  So we'll go ahead and

15   mark it as Interview Exhibit No. 1 just for

16   identification purposes.

17                    (Interview Exhibit 1 was

18                     marked for identification.)

19       MS. SAWYER:  With that, again, thank you for

20   being here.

21       MR. DAVIS:  The time is now 9:40 and we will

22   get started with the first hour of questions.

23                    EXAMINATION

24   BY MR. DAVIS:

25       Q. Mr. Simpson, what is your professional

Alderson Court Reporting

Glenn Simpson                                           August 22, 2017

Washington, DC

1    background?

2         A. I have a degree in journalism from George

3    Washington University and I've spent most of my

4    working adult life as a journalist, much of it as

5    an investigative reporter for the Wall Street

6    Journal.  Prior to that I worked as an

7    investigative reporter at Roll Call Newspaper

8    writing about political corruption, financial

9    crime, terrorism, tax evasion, stock fraud,

10   financial scandals, congressional investigations,

11   government prosecutions, money laundering,

12   organized crime.

13        Q. And when did you leave the Wall Street

14   Journal?

15        A. In 2009.

16        Q. And did you found SNS Global after leaving

17   the Wall Street Journal?

18        A. That's right.

19        Q. And how many employees and associates did

20   SNS Global have?

21        A. There were two partners and in the first

22   part of the time I think we had one employee.  No,

23   I'm sorry.  We had two employees.

24        Q. And who were they?

25        A. We had a research assistant named Margot

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 13

1   Williams, M-A-R-G-O-T Williams, and another

2   administrative assistant whose name I don't recall

3   right now.

4          Q. And who was the other partner?

5          A. Susan Schmidt was my other partner, former

6   colleague from the Wall Street Journal, and prior

7   to that was an investigative reporter at the

8   Washington Post.

9          Q. And what was the nature of SNS Global's

10  business?

11         A. Research, business intelligence.

12         Q. And what types of clients did SNS Global

13  have?

14         A. It's a while ago, so it's not fresh in my

15  mind.  Other consulting firms, lawyers.  I don't

16  specifically remember a lot of them.

17         Q. And is SNS Global still in business?

18         A. No.

19         Q. When did it cease operations?

20         A. I believe at the end of 2010.

21         Q. And why did it -- why did SNS Global cease

22  operations?

23         A. Basically my partner and I had different

24  ambitions for what we wanted to do.  I wanted to

25  have a brick and mortar office with more resources

Glenn Simpson                                                     August 22, 2017

Washington, DC

1    and staff.  Basically I concluded that the work

2    that we were doing required more infrastructure and

3    resources.  Basically in modern research you need

4    to have access to a lot of different databases and

5    there's a lot of aspects of the work that are

6    administrative in nature that require things that I

7    wasn't able to do.  I prefer to spend my time doing

8    the research.  So I wanted to have more of an

9    infrastructure where I could focus on that.

10          Q. What is Bean, LLC?

11          A. That's the LLC that is my current

12   company.

13          Q. And what is your role in Bean, LLC?

14          A. I'm the majority owner.  I guess, you

15   know, we don't have official titles, but I'm

16   generally referred to as the CEO.

17          Q. Bean, LLC registered Fusion GPS as a trade

18   name in the District of Columbia; is that correct?

19          A. Yes, it's a DBA.

20          Q. Why did you choose to use a trade name for

21   Bean, LLC rather than directly name the company

22   Fusion GPS?

23          A. Because at the time that I was deciding

24   what I wanted to do I was recruiting a new partner

25   and I just needed to set up a holding company while

Glenn Simpson                                                August 22, 2017

Washington, DC

Page 15

1    I organized my new business.  So I just picked a

2    name.  You know, a bean is a seed, a new thing.  So

3    I picked that name to begin the process of

4    organizing a new business and didn't want to select

5    an actual DBA, you know, a brand name until I

6    consulted with my new partner.  We wanted to

7    mutually -- I actually had two partners in the

8    beginning, so there were three of us, and I wanted

9    to make it a group decision.

10        Q. Is Bean, LLC currently registered in D.C.

11   to conduct business under the trade name Fusion

12   GPS?

13        A. To my knowledge it is.  It should be.

14        Q. Have any other LLC's or business entities

15   conducted business as Fusion GPS?

16        A. I don't think so.

17        Q. Have any other LLC's or business entities

18   received payments for work conducted by Fusion GPS,

19   its employees, or its associates?

20        MR. LEVY:  Are you asking to include

21   subcontractors or are you --

22        MR. DAVIS:  Sure.

23        MR. LEVY:  Does Fusion GPS have

24   subcontractors?

25        MR. DAVIS:  Right.  I think that would be

Glenn Simpson                                                    August 22, 2017

Washington, DC

1    part of it, but the other part is: are there other

2    LLC's associated with Bean direct- -- with Bean or

3    Fusion directly, not just subcontractors?

4    BY THE WITNESS:

5         A. Yes.  I mean, the one I think that has

6    come up in some of the correspondence or somewhere,

7    I can't remember where, is another one called

8    Kernel, K-E-R-N-E-L, and that was an LLC that was

9    set up for a book project that never -- we never

10   finished -- we never did the book.  So it's

11   inactive with the current time.  Then there's

12   another one that one of my partners manages that's

13   for different types of work, technology, policy,

14   and that type of thing.

15        Q. What's the name of that one?

16        A. I think it's Caudex, C-A-U-D-E-X.

17        Q. And are any other LLC's or types of

18   business entities otherwise associated with Fusion

19   GPS?

20        A. Those are the only ones I can think of.

21        Q. And have you been a registered agent,

22   owner, or beneficial owner of any other LLC's or

23   business entities?

24        A. I own an LLC in Maryland that holds some

25   property that I own.

Glenn Simpson                                                   August 22, 2017

Washington, DC

1        Q. And what's the name of that LLC?

2        A. As we sit here, I wasn't prepared for this

3    question, I don't remember the name of it.  It was

4    registered fairly recently.  Obviously we can get

5    that to you.

6        Q. So is it correct that Fusion has at times

7    worked with different LLC's based on by project?

8        A. For most of the history of the company

9    Bean, LLC was the primary entity through which we

10   did business.  I'm not sure I totally understand

11   your question.  There's this other LLC I mentioned

12   that's fairly recent and there may be other

13   entities, but nothing that I, myself set up, at

14   least not that I can think of.

15       Q. Anything that your partners would have set

16   up?

17       A. Not that I can think of.

18       Q. Does Fusion GPS, Bean, LLC, Kernel, LLC,

19   or any of these other related business entities

20   have any bank accounts outside of the United

21   States?

22       A. No.

23       Q. Domestically does Bean, LLC have an

24   account at ███████?

25       A. Yes.

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 18

1         MR. LEVY:  I don't know that we need to get

2    into bank accounts.

3         MR. DAVIS:  Are you offering a basis for that

4    objection?

5         MR. LEVY:  It's outside the scope of the

6    interview.

7         MR. DAVIS:  Part of the questions we've asked

8    are actions Fusion has taken -- interactions Fusion

9    has had and we're trying to define the scope of

10   what Fusion is as a predicate to understanding

11   those answers.

12        MR. LEVY:  Yeah, and he's answering those

13   questions.

14        MR. FOSTER:  He answered yes to the question.

15   BY MR. DAVIS:

16        Q. Where is Fusion GPS's physical office, if

17   any?

18        A. DuPont Circle.

19        Q. Is it, if I recall correctly, 1700

20   Connecticut Avenue, Northwest?

21        A. That's the address, yes.

22        Q. Is it Suite 400?

23        A. It is.

24        Q. How many employees and associates does

25   Fusion GPS currently have?

Glenn Simpson                                          August 22, 2017
                        Washington, DC

Page 19

1          A. Roughly a dozen.

2          Q. Who are they?

3          A. Do you want their names?

4          Q. Yes, their names.

5          A. ████████████    is a partner in the

6     business; █████████████████  is a partner in the

7     business; ██████████ , ████████ , is a partner in

8     the business.  ████████████████████

9     ██████████████████████████████

10    ███████████████████████████

11    ████████████████    Another one of our managers is

12    ████████ , and he is a ██████████████████████

13    ████████ l.  We have several analysts whose

14    names are ████████████████████████ ;

15    ████████████████████ ; ████████████████

16    whose previous position I don't recall; ████████

17    ████████████ whose former position I don't recall;

18    ████████████ who previously was with I think

19    ████████ ; ████████████ who's our administrative

20    person.  There may be one or two others whose names

21    I don't recall.

22          Q. Is anyone who was an employee or associate

23    of Fusion GPS in 2015 or 2016 no longer with the

24    company?  And if so, who?

25          A. Not that I can think of.

Glenn Simpson                                                    August 22, 2017

Washington, DC

1          Q. In general, what is Fusion GPS's business?

2          A. We primarily are a research, strategy,

3     consulting firm.

4          Q. And what types of clients has Fusion GPS

5     had?

6          A. It runs the gamut from corporations to law

7     firms, various investment funds, people involved in

8     litigation.

9          Q. And roughly how many active clients --

10          MR. LEVY:  Did you finish?  I don't know if

11     he finished.

12          MR. DAVIS:  I'm sorry.

13     BY THE WITNESS:

14          A. It's hard to categorize them all.  Those

15     are some of the main types of clients we have.

16          Q. And roughly how many active clients did

17     Fusion GPS have in 2016?

18          A. That's difficult for me to answer.  You

19     know, over ten I would say, but it's hard for me --

20     beyond that I would be guessing.

21          Q. Does part of Fusion GPS's business involve

22     attempting to have media outlets publish articles

23     that further the interests of your clients?

24          A. Yeah, you could -- I mean, generally

25     speaking, we are -- generally we tend to respond to

Glenn Simpson                                            August 22, 2017

Washington, DC

1    inquiries more than try to push things, but, you

2    know, we work with the press frequently.

3         Q. And has Fusion GPS ever provided

4    information to journalists in order to encourage

5    them to publish articles or air stories that

6    further your client's interests?

7         A. Yes.

8         Q. And has Fusion GPS provided information to

9    journalists or editors in order to discourage them

10   from publishing or airing stories that are contrary

11   to your client's interests?

12        A. Well, what we -- we're a research company.

13   So generally what we do is provide people with

14   factual information.  Our specialty is public

15   record information.  So if we get an inquiry about

16   a story and some of the information that a

17   reporter's presuming is incorrect and we give them

18   correct information, that may cause them to not

19   write the story.

20        Q. Has Fusion GPS ever had arrangements with

21   clients in which the amount of Fusion's

22   compensation was dependent on getting articles

23   published or stories aired?

24        A. Not that I can recall.

25        Q. Has Fusion GPS ever had arrangements with

Alderson Court Reporting

Glenn Simpson                                            August 22, 2017

Washington, DC

Page 22

1    clients in which the amount of Fusion's

2    compensation was dependent upon preventing articles

3    from being published or stories from being aired?

4           A. No, I don't think so, not to my

5    recollection.

6           Q. To the best of your knowledge, has anyone

7    associated with Fusion GPS ever told clients or

8    prospective clients that the company could find and

9    distribute information or take other actions in

10   order to encourage government agencies to initiate

11   an investigation?

12          A. Could you restate that?

13          Q. To the best of your knowledge, has anyone

14   associated with Fusion GPS ever told clients or

15   prospective clients that the company could find and

16   distribute information or take other actions in

17   order to encourage government agencies to initiate

18   an investigation?

19          MR. LEVY:  Within the scope of this

20   interview?

21          MR. DAVIS:  In general.  I'm not asking about

22   any particular case.

23          MR. LEVY:  Hold on.  Let's -- let me just

24   talk to my client about that and get back to you on

25   that.  I just want to understand the facts so we

Glenn Simpson                                        August 22, 2017

Washington, DC

Page 23

```
 1   can evaluate whether it's appropriate to discuss

 2   that here if such a predicate for the answer

 3   exists.

 4        MR. FOSTER:  Do you want to take a break?

 5        MR. LEVY:  Sure.

 6        MR. FOSTER:  Let's go off the record.  It's

 7   9:55.

 8                  (A short break was had.)

 9        MR. DAVIS:  We'll go back on the record.

10   It's 10:02.

11   BY MR. DAVIS:

12        Q. After conferring with your counsel, are

13   you able to answer the question?

14        A. Yes.  Could you just state it one more

15   time.

16        Q. Sure.  To the best of your knowledge, has

17   anyone associated with Fusion GPS ever told clients

18   or prospective clients that the company could find

19   and distribute information or take other actions in

20   order to encourage government agencies to initiate

21   an investigation?

22        A. The word "associated" is really vague.

23   I'm not sure I know what you mean by that.  I can

24   speak to my own practices and the practices of the

25   people who work at my company.
```

Alderson Court Reporting

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 24

 1        Generally speaking, when we do a research

 2    project for a new client and they ask us -- you

 3    know, they explain, you know, what situation

 4    they're involved in, if it's a lawsuit, for

 5    example, or some other dispute, a lot of what we do

 6    is related to disputes, they say -- you know, we

 7    say we will conduct an open-ended inquiry that's

 8    not goal directed and the results of the research

 9    will guide whatever decision you want to make about

10    how to use it.

11        So the range of possibilities with, you know,

12    research are you could file a lawsuit, you could

13    put it in a court filing, you could take it to a

14    government agency, you could give it to Congress,

15    you could give it to the press, but you don't

16    really prejudge, you know, how you're going to use

17    information until you know what you've got.

18        So we generally don't let our clients dictate

19    sort of the -- you know, the end result of things

20    because we don't think that's an intelligent way of

21    trying to do research and, you know, a lot of what

22    we do is decision support.  Your clients are

23    frequently trying to make a decision about how they

24    want to proceed, whether they want to -- you know,

25    if someone thinks they've been defrauded, you can

Glenn Simpson                                              August 22, 2017

Washington, DC

1   file a lawsuit, you can go to the police.  You

2   would decide that based on what you find out about

3   the, you know, evidence of a fraud.  So that's

4   generally the way we do it.

5        Q. To the best of your knowledge, has Fusion

6   GPS ever had an arrangement with a client in which

7   the company was specifically tasked with getting

8   government agencies to initiate an investigation?

9        A. I would -- to the best of my recollection,

10  we don't have any agreements like that we would put

11  into writing generally for the reasons I stated in

12  answer to the previous question.  In the course of,

13  you know, dealing with a client we might talk about

14  whether, you know, something was worthy of a

15  government investigation and talk about how that

16  could be done.  There's any number of scenarios

17  there that might come under discussion, but, as I

18  say, that's generally not how we frame a project.

19       Q. Has Fusion GPS ever had arrangements with

20  clients in which the amount of Fusion's

21  compensation was dependent on government agencies

22  initiating an investigation?

23       A. We've been in business since 2010, so

24  seven years is a fairly long time, but as I say,

25  not to my recollection.  I just can't be

Glenn Simpson                                           August 22, 2017

Washington, DC

Page 26

1    categorical because we've done a lot of work over

2    the last seven years.

3         Q. So I'm going to move on now to some

4    questions about Prevezon Holdings and the Magnitsky

5    Act.  I want to sort of generally make it clear

6    when I refer to you or to Fusion, I mean not just

7    you personally, but all employees and associates of

8    Fusion GPS and its component LLC's and legal

9    entities as well as any contractors or

10   subcontractors.  If it's not clear to you who I'm

11   referring to in the question, please just ask and

12   I'll clarify.

13        Similarly, I'm going to refer to Prevezon and

14   Magnitsky, M-A-G-N-I-T-S-K-Y.  When I refer to

15   those together, I mean all matters related to the

16   Justice Department's lawsuit against Prevezon

17   Holdings Limited, as well as all matters related to

18   efforts with the media, government officials, and

19   campaigns to overturn the Magnitsky Act, prevent

20   the passage of the global Magnitsky Act, remove the

21   word Magnitsky from either law, the Russian ban on

22   U.S. adoptions of Russian children, research on Mr.

23   Magnitsky himself or Mr. Browder, Hermitage Capital

24   Management and its affiliated companies.  So I'm

25   generally putting those under that umbrella.  If

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 27

1    you need me to clarify for any specific question,

2    just ask.

3         MR. LEVY:  You obviously said a lot there.

4         MR. DAVIS:  I did.

5         MR. LEVY:  And so on a question-by-question

6    basis out of fairness to the witness, I just want

7    to make sure that he has the ability to ask

8    clarification, of course, as questions arise.

9         MR. DAVIS:  Right.  That's what I would be

10   asking you to do.

11        MR. LEVY:  Even now, quite frankly, I'm not

12   sure I can recall everything that you baked into

13   the term that you're going to use.

14        MR. DAVIS:  Feel free to raise questions

15   about any particular question we ask.

16        MR. LEVY:  Okay.

17   BY MR. DAVIS:

18        Q. Mr. Simpson, what was Fusion GPS's role in

19   the Justice Departments's litigation against

20   Prevezon Holdings?

21        A. We were retained by Baker Hostetler in the

22   spring of 2014 to do litigation support, and under

23   the heading of litigation support was things

24   related to discovery, locating witnesses, answer

25   questions from the press, gathering documents,

Glenn Simpson                                              August 22, 2017
Washington, DC

1    pretty much, you know, a conventional understanding

2    of litigation support.

3        Q. And to whom did Fusion GPS report in the

4    course of this work?

5        A. Baker Hostetler.  The partner in charge

6    was Mark Cymrot, C-Y-M-R-O-T, who's a partner in

7    the Washington office and former Justice Department

8    prosecutor.

9        Q. Did Mr. Cymrot provide instructions to

10   Fusion GPS during the course of the work?

11       A. Mr. Cymrot regularly instructed us in how

12   we were to go about doing discovery and various

13   other tasks, yes.

14       Q. And for a portion of that case at least

15   Mr. Cymrot was the attorney of record for Prevezon

16   Holdings; is that correct?

17       A. For the entirety of the time that I worked

18   on the case he was -- I believe he was the attorney

19   of record.

20       Q. And did you understand the instructions

21   you received from him to be originating from his

22   client, from Prevezon Holdings?

23       A. The ultimate direction, of course, would

24   have been from the ultimate client, but the client

25   was outside the United States for most of its time.

Glenn Simpson                                              August 22, 2017

Washington, DC

1    So, you know, a lot of instruction came from him

2    and he was the person who formulated the legal

3    strategy, undertook all of the legal efforts to

4    work the case.

5        Q. And when did Fusion GPS cease working on

6    the Prevezon Holdings case?

7        A. I can't say exactly.  It was mid to late

8    2016.

9        Q. Which of Fusion's associates and employees

10   have worked on the Prevezon or Magnitsky issues?

11       A. For the most part it was myself and one of

12   my analysts, ████████████.  There may have -- from

13   time to time issues may have come up about trying

14   to find records or other issues where I conferred

15   with or enlisted someone else in the office, but I

16   don't specifically recall.

17       MR. FOSTER:  To follow up on the previous

18   answer, you said mid to late 2016 is when the

19   investigation ended, generally speaking.  Do you

20   have any records that could refresh your

21   recollection about the exact date at a later time?

22       MR. SIMPSON:  I'm sure we do, yes.  I am --

23   we have a division of labor and I don't do a lot of

24   things like invoicing.  So this is not going to be

25   my strong suit.

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 30

 1        MR. FOSTER:  But you could figure it out

 2    later for us?

 3        MR. SIMPSON:  We maintain books and records.

 4        MR. FOSTER:  Could you maybe just describe

 5    quickly what kind of record would constitute the

 6    end of the engagement?

 7        MR. SIMPSON:  That's a good question.  You

 8    know, in some cases there's no specific termination

 9    letter.  So I don't know whether there's a

10    termination agreement or termination letter in this

11    case.  I mean, generally speaking, you know, when

12    we stop billing the case is over.

13                     (Exhibit 2 was marked for

14                      identification.)

15    BY MR. DAVIS:

16        Q. I'd like to introduce an exhibit.  It's

17    one of two privilege logs that your attorneys

18    provided us.  This will be Exhibit 2.

19        Mr. Simpson, on the third page of this

20    document, the last two entries appear to be e-mails

21    sent on October 27, 2016 from Peter Fritsch to Mark

22    Cymrot CC'g you.  To the best of your recollection,

23    was Fusion GPS still working for Mr. Cymrot on --

24    still working for Baker Hostetler on the Prevezon

25    case as of the date of this e-mail?

Glenn Simpson                                    August 22, 2017

Washington, DC

Page 31

1        A. I don't know.

2        Q. The privilege asserted was attorney work

3    product.  Do you know what the basis of that was?

4        A. Well, it was a legal --

5        MR. LEVY:   This is a judgment that his

6    lawyers made and any knowledge he would have about

7    whether it was attorney work product or not likely

8    would come from communications with counsel, which

9    obviously are privileged.

10   BY MR. DAVIS:

11       Q. Did Fusion ever work with subcontractors

12   on its Prevezon or Magnitsky efforts?

13       A. Yes.

14       Q. Who were they?

15       MR. LEVY:  Just to clarify that, your

16   question was -- can you repeat the question,

17   please?

18       MR. DAVIS:  Sure.  Did Fusion ever work with

19   subcontractors on its Prevezon or Magnitsky

20   efforts?

21       MR. LEVY:  What do you mean by "Magnitsky

22   efforts"?

23       MR. DAVIS:  I mean all matters related to the

24   efforts with the media, government officials, and

25   campaigns -- or campaigns to overturn the Magnitsky

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 32

1    Act, prevent the passage of the global Magnitsky

2    Act, remove the word Magnitsky from the law -- from

3    either law, as well as the Russian ban on U.S.

4    adoptions of Russian children.

5         MR. LEVY:  And you were also asking about

6    subcontractors for Prevezon as well?

7         MR. DAVIS:  I'm asking whether Fusion ever

8    worked with subcontractors on those issues.

9    BY THE WITNESS:

10        A. Well, I object to the question the way the

11   question is framed.  You've sort of built into the

12   question the sort of inference that we were doing

13   something other than working on a legal case, and

14   there's extensive public record, documentation in

15   Pacer of the work that we did and it was a legal

16   case.  So I don't -- it's going to be difficult

17   because it's really hard for me to answer questions

18   where you lump in all these things that other

19   people were doing and impute them to me.

20        Q. Let's break them down by category.

21        A. Let's do that.

22        Q. Did Fusion ever work with

23   subcontractors -- did Fusion ever hire

24   subcontractors as part of its legal work on the

25   Prevezon case?

Glenn Simpson                                        August 22, 2017

Washington, DC

Page 33

1        A. Yes.

2        Q. And whom did you hire?

3        A. I think the primary, possibly only one was

4    a guy named Edward Baumgartner.  There may have

5    been others.  I just don't recall.

6        Q. And what type of work did Mr. Baumgartner

7    undertake for Fusion?

8        A. Discovery mostly, helping locate

9    witnesses.  He speaks Russian.  So he would work

10   with the lawyers on gathering Russian language

11   documents, gathering Russian language media

12   reports, talking to witnesses who speak Russian,

13   that sort of thing.  He may have dealt with the

14   press.  I just don't remember.

15       MR. FOSTER:  What is his professional

16   background?

17       MR. SIMPSON:  He has a degree in Russian.

18       MR. FOSTER:  So his primary role was as a

19   Russian speaker?  Is he a private investigator?

20   What does he do?

21       MR. SIMPSON:  He runs a consulting firm like

22   me and deals with issues more in Ukraine than

23   Russia, but in both.  Yeah, he was doing Russian

24   language things.  The case revolved around,

25   centered on events in Russia.  So a lot of what we

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 34

1    needed to find out were things that were in Russia

2    or there were documents in the Russian language.  I

3    don't speak Russian, I've never been to Russia.  So

4    it would be ordinary course of business for me to

5    identify a specialist who could supply me with that

6    kind of specialized expertise.

7    BY MR. DAVIS:

8        Q. And how did you come to hire him for this

9    engagement?

10       A. I met him on a previous engagement and I

11   was impressed by his knowledge of the region and

12   his general abilities.

13       MR. FOSTER:  What was the previous

14   engagement?

15       MR. LEVY:  We're not going to get into prior

16   engagements.  It's outside the scope.

17       MR. FOSTER:  Generally speaking, what was it?

18       MR. SIMPSON:  It was something involving

19   Russia.

20       MR. FOSTER:  A little more specifically

21   speaking.

22       MR. SIMPSON:  It's my understanding that I

23   was not required to talk about my other cases at

24   this interview.

25       MR. DAVIS:  Again, it's a voluntary interview

Glenn Simpson                                                    August 22, 2017

Washington, DC

1    and you are not under compulsion to answer any

2    questions, but, again, the extent to which you

3    cooperate will help the committee members evaluate

4    whether further compulsory process is necessary.

5         MR. LEVY:  He's been answering questions and

6    we're here all day for you.

7         MR. SIMPSON:  I'm here to cooperate.

8    BY MR. DAVIS:

9         Q. Did anyone from Fusion ever work with

10   other subcontractors hired by Baker Hostetler for

11   the Prevezon case?

12        A. That would have been ordinary.  I don't

13   specifically remember doing that, but it wouldn't

14   have been out of the ordinary.  It's not

15   particularly noteworthy.  I've worked with Baker

16   Hostetler since 2009 on a number of legal cases.

17   This is the only one that involved Russia.  And in

18   the course of any legal case, you know, various

19   people are retained by a law firm to perform

20   various services.  So you would meet other

21   subcontractors in the course of doing legal work.

22   That's common.

23        Q. What types of services would they tend to

24   be providing?

25        A. Translators would be common, in this case

Glenn Simpson                                    August 22, 2017

Washington, DC

Page 36

1    particularly.  Forensic people, accountants, PR

2    people, all those services are facets of modern

3    litigation.

4        Q. And to the best of your knowledge, did

5    Fusion ever work with any other contractors hired

6    by Prevezon Holdings?

7        A. I'm sorry.  Could you repeat that?

8        Q. Sure.  I asked if Fusion had hired any

9    subcontractors that you worked with on the Prevezon

10   matter, whether Baker hired anyone that you worked

11   with.  Now I'm wondering did you work with anyone

12   hired directly through Prevezon on this as opposed

13   to Baker Hostetler?

14       A. It's difficult to give a yes or no answer

15   to that.  I would have to say I think so, but when

16   you're a subcontractor to a law firm, you know,

17   you're sort of in a lane and, you know, my lane was

18   research, discovery, William Browder's business

19   practices, his activities in Russia, his history of

20   avoiding taxes.

21       So people -- other people, you know, in a big

22   case come and go and it's not really my position to

23   ask, you know, who hired them and why.  Generally

24   if I'm introduced to somebody they'll explain, you

25   know, why there were other lawyers who worked for

Glenn Simpson                                      August 22, 2017

Washington, DC

1    Prevezon who were part of the case.  Other people

2    were brought in -- you know, were brought in either

3    by Prevezon or by the lawyers and I didn't always

4    try to pin that down.

5         Q. In general would the decision whether you

6    would share Fusion's information with them be

7    dependent then upon the attorneys introducing you

8    to them?

9         A. It would be dependent on the direction of

10   the attorneys.  I basically -- you know, in all

11   these cases for reasons of privilege and simply

12   just professionalism you work at the direction of

13   the lawyers and you do what they instruct you to

14   do.

15        Q. Did anyone from Fusion ever help arrange

16   for other entities to be hired by Prevezon or Baker

17   Hostetler for the Prevezon case?

18        A. I don't think you could say we arranged

19   for others to be hired.  If you're asking me if we

20   made referrals, we would refer -- you know, we made

21   quite extensive -- fairly extensive efforts to get

22   a PR firm hired for the trial that we were

23   expecting and we made a number of referrals in that

24   case, in that matter.

25        Q. What was the name of that PR firm?

Glenn Simpson                                              August 22, 2017

Washington, DC

Page 38

1        A. There were several.  We actually, you

2    know, had a series of screening sessions.  I think

3    Weber Shandwick was the one we ended up with.

4        Q. You mentioned that Fusion was conducting

5    litigation support in regard to the Prevezon case.

6    Could you expand a little more about what type of

7    litigation support activities you undertook?

8        MR. LEVY:  Beyond what he's already told you?

9        MR. DAVIS:  With a little more detail.

10   BY THE WITNESS:

11       A. Yes.  In the original period of the case

12   the question -- the client's explanation for or

13   response to the government's allegations was that

14   they originated with an organized crime figure in

15   Russia who had been extorting them and who they had

16   reported to the police and who had been jailed and

17   convicted for blackmailing them, and they claimed

18   that that was where these allegations originated,

19   which, you know, seemed remarkable because it was

20   in a Justice Department complaint.

21       So the first thing, you know, in any case

22   really is to sort of try and figure out whether

23   your own client's story can be supported or whether

24   it's not true, and the lawyers -- you know, we work

25   with a lot of prominent law firms and in many cases

Glenn Simpson                                                      August 22, 2017

Washington, DC

Page 39

1    the first thing the lawyers need to know is whether

2    their client's story is real, whether it can be

3    supported, you know, because in any new case you

4    don't know whether your own client is telling you

5    the truth.

6         So originally one of the first things we were

7    hired to do was to check out whether this was, in

8    fact, the case.  So they claimed that the

9    allegations originated with a mobster named Demetri

10   Baranovsky, B-A-R-A-N-O-V-S-K-Y, who was, in fact,

11   jailed for running a shake-down operation in which

12   he posed as an anticorruption campaigner for the

13   purpose of extorting money from people by

14   threatening to accuse them of some kind of corrupt

15   activities.  As you know, Russia is rife with

16   corruption and there's a lot of anger over

17   corruption.

18        We were able to ascertain that Mr. Baranovsky

19   was, in fact, associated with Russia's biggest

20   organized crime family, the Solntsevo Brotherhood,

21   S-O-L-N-T-S-E-V-O brotherhood, which is the major

22   dominant mafia clan in Moscow.  So as far as it

23   went, the client seemed to be telling the truth.

24   You know, there was extensive record of these

25   events and we found some indications from western

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 40

1    law enforcement that western law enforcement did

2    consider Baranovsky to be a lieutenant in this

3    organized crime family.  So we did that for a

4    while.  Edward Baumgartner helped a lot with that

5    because of his Russian language skills and his

6    ability to interface with the court system in

7    Russia.

8         And, you know, around the -- similarly, there

9    was a deposition of a customs agent by one of the

10   lawyers who -- you know, in this initial effort to

11   trace the origin of these allegations, where they

12   came from, how they could have ended up with the

13   Justice Department, the first thing we did was

14   interview the client, got their story, and

15   interviewed the agent who worked on the case for

16   the DOJ and that agent said he got all his

17   information from William Browder.

18        So at that point I was asked to help see if

19   we could get an interview with William Browder.

20   They wrote a letter to Browder and asked him to

21   answer questions and he refused.  Then the lawyers

22   wanted to know, you know, whether he could be

23   subpoenaed.  So a lot of what I did in 2014 was

24   help them figure out whether he could be subpoenaed

25   in the United States to give a deposition, and the

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 41

```
 1   first thing that we did was we researched the
 2   ownership and registration of his hedge fund, which
 3   was registered in Delaware and filed documents with
 4   the Securities and Exchange Commission.
 5        So we subpoenaed his hedge fund.  A lot of
 6   the early work I did was just documenting that his
 7   hedge fund had presence in the United States.  So
 8   we subpoenaed his hedge fund.  He then changed the
 9   hedge fund registration, took his name off, said it
10   was on there by accident, it was a mistake, and
11   said that he had no presence in the United States
12   and that, you know -- as you may know, he
13   surrendered his citizenship in 1998 and moved
14   outside the United States.  That was around the
15   time he started making all the money in Russia.  So
16   he's never had to pay U.S. taxes on his profits
17   from his time in Russia, which became important in
18   the case later.
19        In any case, he said he never came to the
20   United States, didn't own any property here, didn't
21   do any business here, and therefore he was not
22   required to participate in the U.S. court system
23   even though he admitted that he brought the case to
24   the U.S. Justice Department.  So we found this to
25   be a frustrating and somewhat curious situation.
```

Page 42

1   He was willing to, you know, hand stuff off to the

2   DOJ anonymously in the beginning and cause them to

3   launch a court case against somebody, but he wasn't

4   interesting in speaking under oath about, you know,

5   why he did that, his own activities in Russia.

6          So looking at the public record we determined

7   that he did come to the United States frequently,

8   and I discovered through public records that he

9   seemed to own a house in Aspen, Colorado, a very

10  expensive mansion, over $10 million, which he had

11  registered in the name of a shell company in a

12  clear attempt to disguise the ownership of the

13  property.  We were able to ascertain that he does

14  use that property because he registered cars to

15  that property with the Colorado DMV in the name of

16  William Browder.

17         So we began looking for public information

18  about when he might be in Aspen, Colorado, and I

19  found a listing on the Aspen Institute Website

20  about an appearance he was going to make there in

21  the summer of 2014.  So we -- I served him a

22  subpoena in the parking lot of the Aspen Institute

23  in the summer of 2014 using two people -- two

24  subcontractors.  Actually, those other

25  subcontractors were -- their names escape me, but I

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 43

1    forgot about those.  We can get you that.  This is

2    all in the Pacer court record, the public court

3    record.

4         In any event, the three of us served -- there

5    was another subcontractor working for the law firm

6    whose name I also forget.  I did not retain him,

7    but I was asked to work with him on this.  He is a

8    private investigator and we can get you his name.

9    In any event, we served him the subpoena and he ran

10   away.  He dropped it on the ground and he ran away.

11   He jumped in his car and went back to his mansion.

12        At that point he tried to suppress -- tried

13   to quash the subpoena on the grounds it hadn't been

14   properly served.  We didn't get a video, but there

15   are sworn affidavits from my servers in the court

16   record about the service.  But he objected to it on

17   a number of grounds.  A, he continued to insist he

18   had nothing to do with the United States and didn't

19   come here very often even, though we caught him

20   here, clearly has cars in Colorado.  He also said

21   that you can't serve a subpoena for a case in

22   New York in the state of Colorado, it's outside the

23   primary jurisdiction.  He also began to raise

24   questions about whether Baker Hostetler had a

25   conflict of interest because of some previous work

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 44

1    he did with one of the Baker lawyers.

2         This led to a long, drawn-out discovery

3    battle that I was in the center of because I served

4    the subpoenas and I helped find the information for

5    the first set of subpoenas that lasted, you know,

6    through 2014.  This was, you know, a lot of what I

7    did.  This was -- the main focus was on trying to

8    get William Browder to testify under oath about his

9    role in this case and his activities in Russia.

10        All of this -- his determined effort to avoid

11   testifying under oath, including running away from

12   subpoenas and changing -- frequently changing

13   lawyers and making lurid allegations against us,

14   including that, you know, he thought we were KGB

15   assassins in the parking lot of Aspen, Colorado

16   when we served the subpoena, all raised questions

17   in my mind about why he was so determined to not

18   have to answer questions under oath about things

19   that happened in Russia.

20        I'll add that, you know, I've done a lot of

21   Russia reporting over the years.  I originally met

22   William Browder back when I was a journalist at the

23   Wall Street Journal when I was doing stories about

24   corruption in Russia.  I think the first time I met

25   him he lectured me about -- I was working on a

Glenn Simpson                                    August 22, 2017

Washington, DC

Page 45

1    story about Vladimir Putin corruption and he

2    lectured me about how have Vladimir Putin was not

3    corrupt and how he was the best thing that ever

4    happened to Russia.  There are numerous documents

5    that he published himself, interviews he gave

6    singing the praises of Vladimir Putin.  At that

7    time I was already investigating corruption in

8    Putin's Russia.

9         So this made me more curious about the

10   history of his activities in Russia and what that

11   might tell me about corruption in Russia, and as

12   part of the case we became curious about whether

13   there was something that he was hiding about his

14   activities in Russia.  So through this period while

15   we were attempting to get him under oath we were

16   also investigating his business practices in Russia

17   and that research -- and I should add when I say

18   "we," I mean the lawyers were doing a lot of this

19   work and it wasn't -- I can't take responsibility

20   or pride of place on having done all this work.  We

21   were doing it all together.  It was a -- you know,

22   there were a number of lawyers involved, other

23   people.

24        In the course of doing this research into

25   what he might not want to be asked about from his

Glenn Simpson                                    August 22, 2017

Washington, DC

1   history in Russia we began to learn about the

2   history of his tax avoidance in Russia and we began

3   to deconstruct the way that his hedge fund

4   structured its investments in Russia and, you know,

5   we gradually accumulated through public records,

6   not all from Russia, that he set up dozens of shell

7   companies in Cyprus and other tax havens around the

8   world to funnel money into Russia and to hold

9   Russian securities.

10       He also set up shell companies inside of

11   Russia in order to avoid paying taxes in Russia and

12   he set up shell companies in a remote republic

13   called Kalmykia, K-A-L-M-Y-K-I-A, which is next to

14   Mongolia.  It's the only Buddhist republic in

15   Russia and there's nothing much there, but if you

16   put your companies there you can lower your taxes.

17   They were putting their companies in Kalmykia that

18   were holding investments from western investors and

19   they were staffing these companies -- they were

20   using Afghan war veterans because there's a tax

21   preference for Afghan war veterans, and what we

22   learned is that they got in trouble for this

23   eventually because one of Putin's primary rules for

24   business was you can do a lot of things, but you've

25   got to pay your taxes.

Glenn Simpson                                          August 22, 2017

Washington, DC

1         In fact, William Browder famously said in

2    2005 at Davos everybody knows under Putin you have

3    to pay your taxes, which is ironic because at the

4    time he was being investigated for not paying

5    taxes.  Ultimately they were caught, some of these

6    companies were prosecuted, and he was forced to

7    make an enormous tax payment to the government of

8    Russia in 2006.

9         I will add that Sergei Magnitsky was working

10   for him at this time and all of this happened prior

11   to the events that you are interested in involving

12   the Russian treasury fraud and his jailing.  This

13   precedes all that.

14        But returning to the detailed discussion of

15   my work, we investigated William Browder's business

16   practices in Russia, we began to understand maybe

17   what it was he didn't want to talk about, and as we

18   looked at that we then began to look at his

19   decision to surrender his American citizenship in

20   1998.  At that point somewhere in there the Panama

21   papers came out and we discovered that he had

22   incorporated shell companies offshore in the mid

23   1990s, in 1995 I believe it was in the British

24   Virgin Islands, and that at some point his hedge

25   fund's shares had been transferred to this offshore

Glenn Simpson                                      August 22, 2017

Washington, DC

Page 48

1    company.

2          This offshore company was managed -- several

3    of his offshore companies were managed by the

4    Panamanian law firm called Mossack Fonseca,

5    M-O-S-S-A-C-K, Fonseca, F-O-N-S-E-C-A, which is

6    known now for setting up offshore companies for

7    drug kingpins, narcos, kleptos, you name it.  They

8    were servicing every bad guy around.  And I'm

9    familiar with them from other money laundering and

10   corruption and tax evasion investigations that I've

11   done.

12         I'll note parenthetically that William

13   Browder talks a lot about the Panama papers and the

14   Russians who are in the Panama papers without ever

15   mentioning that he's in the Panama papers.  This

16   is, again, a public fact that you can check

17   on-line.

18         So that's an overview of the sort of work I

19   was doing on this case.  In the course of that I

20   also began reaching back, I read his book Red

21   Notice to understand his story and the story of his

22   activities in Russia.  I'll add also that I was

23   extremely sympathetic for what happened to Sergei

24   Magnitsky and I told him that myself and I tried to

25   help him.  It was only later from this other case

Glenn Simpson                                              August 22, 2017

Washington, DC

1    that I began to be curious and skeptical about

2    William Browder's activities and history in Russia.

3         MR. FOSTER:  Can I ask you a follow-up

4    question.  I appreciate the narrative answer, but

5    at the very beginning of the narrative you talked

6    about beginning this journey by interviewing --

7    conducting an interview of the case agent who said

8    he'd gotten all of his information -- the case

9    agent or the attorney, the primary person at the

10   DOJ, you said they got all their information from

11   Bill Browder.  Can you tell us who that was and who

12   conducted the interview?

13        MR. LEVY:  Mr. Simpson should definitely

14   answer that question.  I just want to make sure for

15   the record that he hadn't finished his answer.  He

16   can talk more extensively about the litigation

17   support that he provided for Baker --

18        MR. FOSTER:  We're happy to get into that if

19   he wants to do that.  We're just coming up at the

20   end of our hour.

21        MR. LEVY:  No problem.

22        MR. FOSTER:  and I wanted to get that

23   follow-up in before --

24        MR. LEVY:  No problem.  No problem at all.

25   BY THE WITNESS:

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 50

```
 1        A. I'll just finish with one last thing and
 2    I'm happy to answer that question.
 3        So in the course of this, you know -- I mean,
 4    one of my interests or even obsessions over the
 5    last decade has been corruption in Russia and
 6    Russian kleptocracy and the police state that was
 7    there.  I was stationed in Europe from 2005 to 2007
 8    or '8.  So I was there when Putin was consolidating
 9    power and all this wave of power was coming.  So
10    it's been a subject that I've read very widely on
11    and I'm very interested in the history of Putin's
12    rise.
13        You know, in the course of all this I'll tell
14    you I became personally interested in where Bill
15    Browder came from, how he made so much money under
16    Vladimir Putin without getting involved in anything
17    illicit.  So I read his book and I began doing
18    other research and I found filings at the SEC
19    linking him quite directly and his company, Salomon
20    Brothers at the time, to a company in Russia called
21    Peter Star, and I had, as it happens, vetted Peter
22    Star and I knew that Peter Star was, you know, at
23    the center of a corruption case that I covered as a
24    reporter at the Wall Street Journal.  When I went
25    back into the history of Peter Star I realized that
```

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 51

```
 1   Bill Browder did business with the mayor's office
 2   in Saint Petersburg when Vladimir Putin was the
 3   deputy mayor and was responsible for dealing with
 4   western businessmen and corporations.
 5        I then went and looked in Red Notice, this
 6   was a large deal, it was the biggest deal ever for
 7   Salomon at that time, they sold $98 million worth
 8   of stock on NASDAQ.  There's no mention of William
 9   Browder's deal with Peter Star in Red Notice.  I
10   can't tell you why, but I can tell you that Peter
11   Star later became the subject of a massive
12   corruption investigation, Pan-European, that I
13   exposed a lot of and that led to the resignation of
14   Putin's telecoms minister.  So I assume he might
15   not have -- this is kind of a pattern with Browder,
16   which is he tends to omit things that aren't
17   helpful to him, and I think we've seen a good bit
18   of that lately in his allegations against me, which
19   I'm sure you're going to ask me about.
20        So your question about the ICE agent, he was
21   deposed by John Moscow of the New York office of
22   Baker Hostetler.  John is an old associate of mine
23   from my days as a journalist.  John's an expert on
24   tax evasion and money laundering.  He was the head
25   of the rackets bureau for the district attorney's
```

Glenn Simpson                                              August 22, 2017

Washington, DC

1    office in New York.

2         MR. FOSTER:  You're talking about a formal

3    deposition in the litigation?

4         MR. SIMPSON:  Yeah.

5         MR. FOSTER:  I just wanted to clarify that.

6         MR. SIMPSON:  Again, it's in the court

7    record.  One of the frustrating things about this

8    whole issue for me is everything I'm talking about

9    or most of it is in the court record.  You know, I

10   don't take a lot of credit for my work.  So you

11   won't see my name scattered through the court

12   record, but a lot of this is what I did.

13        MR. DAVIS:  I think that's concludes our

14   first hour.  Let's take a short break before we

15   begin a new one.

16        MR. FOSTER:  Let's go off the record.

17        MR. DAVIS:  We'll go off the record at

18   10:45.

19                   (A short break was had.)

20        MS. SAWYER:  It's about 10:55.

21                   EXAMINATION

22   BY MS. SAWYER:

23        Q. Mr. Simpson, again, I'm Heather Sawyer, I

24   work as counsel for Senator Feinstein, and I have

25   with me two of my colleagues.  I will primarily be

Glenn Simpson                                             August 22, 2017
Washington, DC

Page 53

1    asking the questions.  They may have some

2    follow-up.

3         We want to make sure we're clear.  So

4    certainly if I ask you a question, anything that's

5    unclear, let me know and I will clarify it.  Again,

6    we appreciate you being here today to answer our

7    questions.

8         You had talked with my colleagues a bit about

9    the work that Fusion GPS does in general and I

10   wanted to ask you some follow-up on that.  What

11   would you describe as kind of the key expertise of

12   your firm, Fusion GPS?

13        A. Public information is our specialty.  We

14   generally are all ex-journalists and specific type

15   of journalists, investigative reporters, and, you

16   know, being a journalist is all about finding

17   public information.  At least, you know, the kind

18   of journalism I practiced was based on documents.

19   I'm a document hound and so are my colleagues.

20        So essentially we gather up large quantities

21   of public information and we process that.  We've

22   sort of more recently branched into data science

23   and, you know, digital data, obtaining databases

24   through FOIA.  We do a lot of Freedom of

25   Information Act work.  We work with court records

Glenn Simpson                                                    August 22, 2017

Washington, DC

1    a lot, corporate records a lot.  Some of my

2    employees do a lot of financial crime and money

3    laundering and fraud investigations, tax evasion,

4    that sort of thing.  Those are my specialties.

5         I was also a political reporter and covered

6    campaigns and elections.  I know a lot about how

7    campaigns work and how, you know, Washington works

8    generally.  So we do things like policy disputes,

9    one industry versus another, one company versus

10   another.  We don't do a lot of campaign consulting,

11   but every four years for the last couple of cycles

12   we've done some presidential work.

13        Generally speaking, the way our business is

14   structured most campaigns don't have the budget for

15   the kind of services that we provide.  So we only

16   would do things where people have the resources to

17   pay for a serious piece of research.  So we do

18   things like a California initiative or

19   presidential.

20        Q. And how would you describe like how would

21   you pitch and why would a client need your

22   services?

23        A. Generally speaking, people tend to get

24   referred to us when they have a sort of undefined

25   need, like they feel like they don't know what

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 55

1    happened or they don't know what happened, they

2    don't know what's going on.  So I think that's what

3    I referred to earlier as the decision support part

4    of our work.

5         You know, a client will come to us and

6    they'll say I'm being sued and they're accusing me

7    of X and, you know, not only did I not do it, but I

8    don't even understand why they're suing me.  I

9    mean, that's a kind of typical thing.  Also another

10   example would be I think I've been defrauded, but I

11   can't figure out how or why.  Or I keep -- you

12   know, I run the best company in my industry and,

13   you know, we make the best widgets and we keep

14   losing out on the Pentagon contract to this other

15   guy and we think something fishy's going on and we

16   want you to help us figure it out.

17        Q. So in some ways it's fact gathering and

18   due diligence for clients?

19        A. Well, it is certainly fact gathering and I

20   certainly am around the due diligence industry and

21   I am essentially part of it, but we don't really do

22   a lot of classic due diligence, which has become a

23   commoditized product in the business intelligence

24   field that is conducted, you know, at a fairly sort

25   of low level.  it's become sort of a mass product

Glenn Simpson                                           August 22, 2017

Washington, DC

Page 56

1    like a McDonald's cheeseburger.

2         Q. I think when you were speaking with my

3    colleagues you described your work as open ended

4    and not results directed.  Can you explain a little

5    more what you mean by that?

6         A. Sure.  Another thing we say about our work

7    is it's custom information, it's a customized

8    product.  You tell us what your problem is and we

9    customize a research solution.  In general when

10   people come to us and they tell us what their

11   challenge is, we stipulate that they retain us for

12   30 days, they agree to pay our fee, they don't tell

13   us what to do, they don't tell us, you know, what

14   result to get.  I like to call it a holistic

15   methodology.

16        The reason we do it that way, you know, A, we

17   are professionals and we feel like it's not helpful

18   to have someone dictating how you do things, but,

19   B, if you predetermine the result that you're

20   looking for you tend to miss things.  So it's

21   better -- you know, it's pure versus applied

22   science, right?  You're looking to understand how

23   things work before you understand what you might

24   need to address a particular problem.

25        What happens after you've done open-ended

Glenn Simpson                                        August 22, 2017

Washington, DC

Page 57

```
 1   research is then, of course, you try to apply it to
 2   the specific issues at hand.  So if you're not able
 3   to get a government contract and you think the
 4   other guy is up to something and we find out, you
 5   know, indeed he's been making, you know, payments
 6   to somebody, you know, then we would, you know,
 7   advise them on how to address that.
 8        Q. So the way it's structured you are
 9   certainly free to follow the facts wherever they
10   may lead you in the course of research?
11        A. That's right.  You know, it's a little
12   different in litigation where you're working for an
13   attorney and he's got specific things he needs,
14   like serving a witness or something like that, but
15   on the research side of it it's -- I have the
16   professional -- basically I reserve for myself the
17   professional freedom to find out the answers.
18        Q. A January 11, 2017 New York Times article
19   described your firm, Fusion GPS, as a firm that
20   "Most often works for business clients, but in
21   presidential elections the firm is sometimes hired
22   by candidates, party organizations, or donors to do
23   political oppo work, short for opposition research
24   on the side."
25        Is that an accurate description of the firm?
```

Alderson Court Reporting

Glenn Simpson                                    August 22, 2017

Washington, DC

Page 58

1        A. In a shorthand way, yeah.  I mean, it's

2   consistent with the description I think I gave you.

3   We don't do a lot of campaign work, but, you know,

4   every few years we do.  And most of our clients are

5   not trying to win an election.  They're trying to

6   win a lawsuit or, you know, find out who ripped

7   them off.

8        Q. With regard to the political or campaign

9   work that you do, the same principles you've talked

10  about in terms of how the relationship is

11  structured, how the research is done, do those same

12  principles apply to that political or campaign

13  research as well?

14       A. Yes.  There's a limited number of examples

15  because we don't do a lot of it, but, again, my

16  specialty is really sort of financial

17  investigations and business practices.  In the

18  last -- you know, in a current example we have a

19  businessman who had a far-flung business empire all

20  around the world.  So, you know, that was a natural

21  subject for me.  So we do, we investigate

22  multinational enterprises on a frequent basis.

23       Q. Just to be clear, when you say "in the

24  current example," what are you referring to?

25       A. 2016 presidential election.

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 59

```
 1        Q. And then, by extension, when you're
 2   talking about an international businessman, I
 3   presume you're talking about then candidate now
 4   President Trump?
 5        A. Yes.
 6        Q. I do want to ask you more about that, but
 7   before we get to that, in general, when you do the
 8   political or campaign work you're equally free to
 9   follow the facts wherever they lead you and the
10   firm Fusion GPS?
11        A. Yes, that's right.
12        Q. Now, certainly it sounds like you handle
13   business for multiple clients, not just one client
14   at one time.  How do you handle the fact that you
15   have work for more than one client in terms of
16   protecting confidentiality in general and
17   ensuring -- well, first of all, I presume that you
18   take steps so that work for one client is not
19   shared with another client?
20        MR. LEVY:  What's the question?
21        MS. SAWYER:  Do you take steps to ensure that
22   work that you're doing for one client is not shared
23   with another client?
24   BY THE WITNESS:
25        A. Yes.  My partners and I don't talk
```

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 60

1    about -- it's like a lawyer wouldn't talk about one

2    client to another client.  You know, there's some

3    exceptions when things become public.  If we're

4    working on a public matter and someone else asks us

5    about it, I mean, obviously if it's public it's not

6    -- it doesn't need to be protected.  But we have

7    systems to segregate our cases and clients and, you

8    know, we deal with them individually and we operate

9    in that sense, you know, like a lawyer would.

10        As the business has grown, you know, we've

11   taken on more and more matters.  So I don't -- you

12   know, I generally do about a half a dozen cases at

13   a time on all range of subjects in all parts of the

14   world, and the same is true of my partners and we

15   divide them up.  So sometimes we work together, but

16   frequently each of them will be doing three, four,

17   five cases at a time.

18        Q. With regard to subcontractors who work

19   with the firm, do you have a policy that is shared

20   with them about how they are to treat the

21   information that they're doing on behalf of one of

22   your clients vis-a-vis some of your other clients?

23        A. Well, our subcontractors are governed by

24   NDA's to start with.  In most cases that I can

25   think of we don't have one subcontractor working on

Glenn Simpson                                                    August 22, 2017

Washington, DC

1    more than one matter, but to the extent that would

2    happen, we don't really -- when you're dealing with

3    subcontractors you're giving them generally very

4    specific assignments, find out what you can about

5    this company or this businessman or this court

6    case, whatever, and a lot of that you never get

7    into who the client is.  It's irrelevant.

8         I'd say more often than not the

9    subcontractors don't know who the client is.  We

10   would not volunteer that information to them unless

11   they were what we would call a super sub, which is

12   someone who, you know, has worked with us for a

13   long time and has enough trust and confidence to be

14   involved.  Again, it would also be on a kind of

15   need-to-know basis.  There's no need for a

16   subcontractor to know who a client is unless it's

17   for, you know, KYC, know your customer kind of due

18   diligence purposes.  Sometimes we identify clients

19   to prevent conflicts.  So unless there's a reason

20   like that or because they need to meet with the

21   client, you know, we generally wouldn't tell them

22   who the client is.

23        Q. So you had mentioned a few minutes ago

24   that you had done some political or campaign

25   research in the course of the 2016 presidential

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 62

1    election and you clarified that that was work

2    related to then Candidate and now President Trump.

3    What can you tell us about that work?  Can you just

4    describe it first generally and then I'll ask you

5    some follow-up.

6         A. It was, broadly speaking, a kind of

7    holistic examination of Donald Trump's business

8    record and his associations, his bankruptcies, his

9    suppliers, you know, offshore or third-world

10   suppliers of products that he was selling.  You

11   know, it evolved somewhat quickly into issues of

12   his relationships to organized crime figures but,

13   you know, really the gamut of Donald Trump.

14        What we generally do at the beginning of a

15   case if it's possible is to order all the books

16   about the subject from Amazon so we're not

17   reinventing the wheel and we know what's been

18   written and said before.  So this was typical.  We

19   ordered every Donald Trump book and, to my

20   surprise, that's a lot of books.  I was never very

21   interested in Donald Trump.  He was not a serious

22   political figure that I'd ever had any exposure to.

23   He's a New York figure really.

24        So anyway, we read everything we could read

25   about Donald Trump.  Those books cover his

Glenn Simpson                                                August 22, 2017

Washington, DC

1   divorces, his casinos, his early years dealings

2   with labor unions and mafia figures.  I'm trying to

3   think what else.  His taxes certainly have always

4   been a big issue.  Again, it was sort of an

5   unlimited look at his -- you know, his business and

6   finances and that sort of thing.

7        Q. And when did this work begin?

8        A. It was either September or October of

9   2015.  I recall being in London on other business

10  and hearing somebody wanted for us to take a look

11  at it.

12       Q. And what can you tell us about who engaged

13  you initially to do that work?

14       MR. LEVY:  The answer to that question might

15  implicate privilege.

16  BY MS. SAWYER:

17       Q. So it has been publicly reported that the

18  initial engagement of September to October 2015 was

19  by someone with ties -- with Republican ties.  Can

20  you confirm whether that is accurate or not?

21       MR. LEVY:  We're not going to talk about the

22  identity of clients.

23  BY MS. SAWYER:

24       Q. So with regard to this engagement in

25  September -- that began initially in September or

Glenn Simpson                                              August 22, 2017

Washington, DC

1   October 2015, what were you asked specifically to

2   do by the client?

3        A. I don't have specific recollection of

4   there being a specific tasking.  I believe it was

5   why don't you take a look at Donald Trump, it looks

6   like he may, you know, be more successful than

7   people think, something -- there was some level of

8   insight that he had a better shot than people were

9   giving him at the time, but it was on open-ended

10  request like most of the things that we get.

11       Q. And, again, on that one was the work

12  directed at all by the client?  Did they ask you to

13  look at any particular aspects of Candidate Trump's

14  background?

15       A. I don't -- I know there was --

16       MR. LEVY:  We're not going to get into client

17  communications.  It's privileged.

18  BY MS. SAWYER:

19       Q. Were you in any way limited in the

20  research that you did or the facts that you wanted

21  to pursue?

22       A. Can I talk generally about my practices

23  and the history?

24       Q. Sure.

25       A. I mean, in general it's very rare for

Glenn Simpson                                          August 22, 2017

Washington, DC

1    someone to tell me look here, don't look there.

2    For the most part we are looking at -- you know,

3    we're trying to understand something big.  So it's

4    really counterproductive for somebody to tell you

5    look here, don't look there, I'm interested in X

6    but not Y.  So we generally sort of push back when

7    that happens, but I have to say we sort of set the

8    rules at the beginning and people, you know,

9    accepted those terms.  So generally that's what we

10   explain to people in the beginning of our

11   engagements, you know, let us do our jobs and

12   that's the way it works best.

13        Q. And did that -- can you tell us whether

14   that general practice and rule applied to the

15   engagement that you took on in September or October

16   2015 with regard to Candidate Trump?

17        MR. LEVY:  You can answer that without

18   getting into client communications.

19   BY THE WITNESS:

20        A. I mean, we were -- it was regular order.

21   As, you know, various people will tell you, I'm --

22   you know, it would be like herding a cat, right?

23   We're going to do what we do.  So it was regular

24   order.

25        Q. And then when you spoke with my colleagues

Glenn Simpson                                           August 22, 2017

Washington, DC

Page 66

1    earlier you had indicated that sometimes when facts

2    are gathered you present options to a client and

3    you articulated kind of four options, a potential

4    lawsuit, take it to a government agency, give it to

5    Congress, give it to the press.  Did you -- were

6    those the general options on the table with regard

7    to this engagement as well?

8         MR. LEVY:  If you can discuss it without

9    talking about client communications.  If you can't,

10   you can't.

11   BY THE WITNESS:

12        A. I'm just trying to -- because it evolved

13   it's a little bit hard to -- I mean, in the

14   beginning of this case like pretty much every case

15   there was no -- there was no range of options --

16   there weren't -- it was a request to see what we

17   could find out about Donald Trump and the, you

18   know, goal or sort of reason, there wasn't really

19   one.  It was tell me what we need to know about

20   this guy.  So later on, you know, we started

21   getting press inquiries and at that point, you

22   know, the sort of press element enters the

23   equation, but I can't really get into what they

24   told me or didn't tell me to do.

25        Q. And are you free today to talk to us about

Glenn Simpson                                            August 22, 2017

Washington, DC

 1    any of the actual findings from that research and

 2    that engagement?

 3         A. Yes.

 4         Q. Okay.  So with regard to that initial

 5    engagement because you had talked a bit about some

 6    of the research you had done -- I think you said it

 7    was holistic, financials, potential ties to

 8    organized crime.  With regard to this initial

 9    engagement that started in October, September, can

10    you just explain for us what your findings were.

11         A. I guess I'll just give you the caveat

12    that, you know, it's a group effort.  So I can tell

13    you, you know, as the person that was, you know,

14    running the project, you know, I had my fingers in

15    various things, but there were also the things that

16    I was directly focused on.

17         In the early -- the very first weekend that I

18    started boning up on Donald Trump, you know, I

19    found various references to him having connections

20    to Italian organized crime and later to a Russian

21    organized crime figure named Felix Sater,

22    S-A-T-E-R.  It wasn't hard to find, it wasn't any

23    great achievement, it was in the New York Times,

24    but as someone who has done a lot of Russian

25    organized crime investigations as a journalist

Glenn Simpson                                         August 22, 2017

Washington, DC

Page 68

1   originally that caught my attention and became

2   something that, you know, I focused on while other

3   people looked at other things.

4        So from the very beginning of this organized

5   crime was -- Russian organized crime was a focus of

6   interest.  I guess I should just repeat, you know,

7   this is a subject that I covered extensively at the

8   Wall Street Journal.  I wrote a series of front-

9   page articles about various corrupt politicians

10  from Russia, oligarchs, and one of the things that

11  I wrote about was the connections between western

12  politicians and Russian business figures.  So, you

13  know, I was sort of an amateur student of the

14  subject and I had written about some of these same

15  Russian crime figures, you know, years earlier in

16  the U.S. and various frauds and things they were

17  involved in.

18       As it happens, Felix Sater was, you know,

19  connected to the same Russian crime family that was

20  at issue in the Prevezon case, which is the

21  dominant Russian crime family in Russia and has a

22  robust U.S. presence and is involved in a lot of

23  crime and criminal activity in the United States

24  and for many years was the -- the leader of this

25  family was on the FBI most wanted list and lives

Glenn Simpson                                                    August 22, 2017

Washington, DC

1    openly in Moscow as a fugitive from U.S. law for a

2    very elaborate stock fraud.

3        Q. Who is that individual and family?

4        A. The first name is Semyon, S-E-M-Y-O-N, the

5    last name is Mogilevich, M-O-G-I-L-E-V-I-C-H.

6    Mogilevich is sometimes referred to as the brainy

7    Don because he runs very sophisticated schemes

8    including, according to the FBI, involving natural

9    gas pipelines in Europe, and he's wanted in

10   connection with an elaborate stock fraud called YBM

11   Magnex that was took place in the Philadelphia

12   area.

13       You know, Russian organized crime is very

14   different from Italian organized crime.  It's much

15   more sort of a hybrid kind of thing where they're

16   involved in politics and banking and there's even a

17   lot of connections between the mafia and the KGB or

18   the FSB and cyber crime, things that the Italians

19   sort of never figured out.  Stock fraud in

20   particular was the big thing in the U.S.  In any

21   event, all of that entered into my thinking when I

22   saw that Donald Trump was in business with Felix

23   Sater in the Trump Soho project and a number of

24   other controversial condo projects.

25       Q. And what, if anything, did you conclude

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 70

1    about the connection between and in the business

2    dealings that then Candidate Trump had had with

3    Mr. Sater?

4         A. Well, somewhat analogous to the Browder

5    situation I found it notable this was something he

6    didn't want to talk about and testified under oath

7    he wouldn't know Felix if he ran into him in the

8    street.  That was not true.  He knew him well and,

9    in fact, continued to associate with him long after

10   he learned of Felix's organized crime ties.  So,

11   you know, that tells you something about somebody.

12   So I concluded that he was okay with that and that

13   was a troubling thing.  I also, you know, began

14   to -- I keep saying I, but we as a company began to

15   look at where his money came from and, you know,

16   that raised a lot of questions.  We saw indications

17   that some of the money came from Kazakhstan, among

18   other places, and that some of it you just couldn't

19   account for.

20        You know, we also conducted a much broader

21   sort of look at his entire career and his overseas

22   investments in places like Europe and Latin

23   America.  You know, it wasn't really a Russia

24   focused investigation for the first half of it.

25   That was just one component of a broader look at

Glenn Simpson                                        August 22, 2017
Washington, DC

Page 71

 1    his business career, his finances.  We spent a lot

 2    of time trying to figure out whether he's really as

 3    rich as he says he is because that was the subject

 4    of a libel case that he filed against a journalist

 5    named Tim O'Brien for which there was quite a lot

 6    of discovery and litigation filings detailing

 7    O'Brien's allegation that he was worth, you know,

 8    maybe a fifth to a third of what he claims and

 9    Trump's angry retort that he was worth far more

10    than that.

11         So we did things like we looked at the golf

12    courses and whether they actually ever made any

13    money and how much debt they had.  We looked at the

14    bankruptcies, how could somebody go through so many

15    bankruptcies, you know, and still have a billion

16    dollars in personal assets.  So those are the kinds

17    of things.  We looked at a lot of things like his

18    tax bills.  Tax bills are useful because you can

19    figure out how much money someone is making or how

20    much they're worth or how much their properties are

21    worth based on how much they have to pay in taxes.

22         One of the things we found out was that, you

23    know, when it comes to paying taxes, Donald Trump

24    claims to not have much stuff.  At least the Trump

25    organization.  So they would make filings with

Glenn Simpson                                                    August 22, 2017

Washington, DC

                                                                    Page 72

1    various state and local authorities saying that

2    their buildings weren't worth much.

3         Q. And this information that you gathered,

4    was it shared with the client that you had for that

5    September, October engagement?

6         A. I can't answer that.

7         MS. QUINT:  When you said you looked at the

8    golf courses and bankruptcies, just to clarify,

9    everything you're talking about was for that 2015

10   engagement?  When you say it wasn't Russia focused

11   at first, I'm unclear of the time.

12        MS. SAWYER:  Yeah.  Can you tell us when that

13   engagement ended?

14        MR. LEVY:  Which question is pending?  Can

15   you repeat the question?

16        MS. QUINT:  I think they're related.  I lost

17   track when you said you looked at golf courses,

18   bankruptcies, tax bills and it was not initially

19   Russia centric.  I'm wondering the time frame to

20   make sure we're all on the same page.

21        MR. SIMPSON:  It's difficult to specifically

22   recall when we did exactly what.  For example, the

23   specific issue of the golf courses I think did come

24   up later, much later, but these things run in

25   stages.  For instance, in the early stage of an

Glenn Simpson                                                    August 22, 2017

Washington, DC

1    investigation, you know, particularly of Donald

2    Trump you want to get every lawsuit the guy's ever

3    been in.  So, you know, we collected lawsuits from

4    around the country and the world.  And I do

5    remember one of the earlier things we did was we

6    collected a lot of documents from Scotland because

7    he'd been in a big controversy there about land

8    use.  There had been another one in Ireland.  There

9    was a lot of Freedom of Information Act requests

10   and that sort of thing.

11        So in the early phases of something you're

12   collecting lots of paper on every subject

13   imaginable.  So in the course of reading that

14   litigation we would follow up on things that were

15   interesting, such as a libel case against a

16   journalist that he settled, which, in other words,

17   he didn't prevail in his attempts to prove that he

18   was a billionaire.

19   BY MS. SAWYER:

20        Q. So one way to help clarify this is just

21   to -- you know, we had been talking about an

22   engagement that began in September or October of

23   2015.  Can you tell us when that particular

24   engagement ended?

25        A. I can only estimate it.

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 74

```
 1        Q. And in general when do you think that
 2   ended?
 3        A. Spring of 2016.
 4        MR. LEVY:  Don't guess.
 5        MR. SIMPSON:  I'm sorry.
 6   BY MS. SAWYER:
 7        Q. Okay.  But that engagement did come to an
 8   end and it came to an end before November 8th, the
 9   election, November 8, 2016?
10        A. It did end before the election, yes.
11        Q. And then did you continue doing opposition
12   work on Candidate Trump -- then Candidate Trump,
13   now President Trump for a different client?
14        A. Yes.
15        Q. And can you tell us generally when that
16   engagement began?
17        A. It was in the first half of 2016.
18        Q. And what, if anything, can you tell us
19   about that client?
20        A. Nothing.
21        MR. LEVY:  Not nothing as a factual matter,
22   but he's going to decline to answer that question.
23        MS. SAWYER:  And the basis again for
24   declining that question?
25        MR. LEVY:  Privilege.
```

Glenn Simpson                                            August 22, 2017
Washington, DC

1          MS. SAWYER:  Okay.

2          MR. LEVY:  And other obligations of

3      confidentiality.

4          MS. SAWYER:  Just to be clear for the record,

5      specifically what privilege?

6          MR. LEVY:  The privileges that we previously

7      asserted with the committee.  They're in our

8      April 7 and June 23 letters.

9          MS. SAWYER:  Okay.

10     BY MS. SAWYER:

11         Q. With regard to the engagements, both of

12     these engagements to do opposition research on

13     Candidate Trump, were you paid directly by each of

14     the clients or was there an intermediary paying

15     you?

16         A. I think I'd like to confer with my lawyer

17     about this.

18         MR. LEVY:  Sure.

19                     (Whereupon a discussion was had

20                      sotto voce.)

21         MR. SIMPSON:  I'm going to decline to answer

22     that question.

23         MS. SAWYER:  And, again, the grounds for

24     declining?

25         MR. LEVY:  It's a voluntary interview and it

Glenn Simpson                                      August 22, 2017

Washington, DC

Page 76

1   would implicate privileges and obligations that

2   we've set forth with the committee potentially.

3        MS. SAWYER:   Sure.

4   BY MS. SAWYER:

5        Q. At a news briefing on August 1, 2017 White

6   House Press Secretary Sarah Huckabee Sanders

7   described Fusion GPS as a democratic linked firm.

8   Is that an accurate description?

9        A. I would not agree with that description.

10  I was a journalist for most of my adult life and a

11  professional at not taking sides, and I'm happy and

12  proud to say I have lots of Republican clients and

13  friends and I have lots of Democratic clients and

14  friends.  I've lived in this city for 30 years or

15  so and I know a lot of people on both sides and we

16  have a long proud history of not being partisan.

17  And the same is true for my colleagues.  We

18  intentionally don't hire people who have strong

19  partisan affiliations.  We prefer journalists who

20  don't see things through ideological prisms and

21  ideological prisms are not helpful for doing

22  research.

23        Q. So it has been widely reported that you

24  engaged Christopher Steele to do part of the

25  research, the opposition research on Candidate

Glenn Simpson                                                    August 22, 2017

Washington, DC

1    Trump.  Is that accurate?

2         A. Yes.

3         Q. And he was working in that capacity as a

4    subcontractor for you?  And when I say "you" here I

5    mean Fusion GPS.

6         A. Yes.

7         Q. And when did you engage Mr. Steele to

8    conduct opposition research on Candidate Trump?

9         A. I don't specifically recall, but it would

10   have been in the -- it would have been May or June

11   of 2016.

12        Q. And why did you engage Mr. Steele in May

13   or June of 2016?

14        A. That calls for a somewhat long answer.  We

15   had done an enormous amount of work on Donald Trump

16   generally at this point in the project and we began

17   to drill down on specific areas.  He was not the

18   only subcontractor that we engaged.  Other parts of

19   the world required other people.  For example, we

20   were interested in the fact that the Trump family

21   was selling merchandise under the Trump brand in

22   the United States that was made in sweat shops in

23   Asia and South America -- or Latin America.  So we

24   needed someone else for that.  So there were other

25   things.  We were not totally focused on Russia at

Glenn Simpson                                                    August 22, 2017

Washington, DC

1    that time, but we were at a point where we were --

2    you know, we'd done a lot of reading and research

3    and we were drilling down on specific areas.

4    Scotland was another one.

5         So that's the answer.  What happens when you

6    get to this point in an investigation when you've

7    gathered all of the public record information and

8    you've begun to exhaust your open source, you know,

9    resources is that you tend to find specialists who

10   can take you further into a subject and I had known

11   Chris since I left the Wall Street Journal.  He was

12   the lead Russianist at MI6 prior to leaving the

13   government and an extremely well-regarded

14   investigator, researcher, and, as I say, we're

15   friends and share interest in Russian kleptocracy

16   and organized crime issues.  I would say that's

17   broadly why I asked him to see what he could find

18   out about Donald Trump's business activities in

19   Russia.

20        Q. So in May or June 2016 you hired

21   Christopher Steele to, as you've just indicated,

22   find out what he could about Donald Trump's

23   business activities in Russia.  Did something in

24   particular trigger that assignment?

25        A. No, I don't think I could point to

Alderson Court Reporting

Glenn Simpson                                                      August 22, 2017

Washington, DC

1   something in particular as a trigger.  I mean, the

2   basis for the request was he had made a number of

3   trips to Russia and talked about doing a number of

4   business deals but never did one, and that struck

5   me as a little bit odd and calling for an

6   explanation.

7        You know, in the background of all

8   international business is questions about

9   corruption.  The Trump organization had branched

10  out all over the world in like the four to eight

11  years prior to 2016.  So in any kind of

12  investigation you would naturally want to know

13  whether there was some issue with improper business

14  relationships.

15       I'll just stress that we weren't looking

16  for -- at least it wasn't at the forefront of my

17  mind there was going to be anything involving the

18  Russian government per se, at least not that I

19  recall.

20       Q. So at the time you first hired him had it

21  been publicly reported that there had been a cyber

22  intrusion into the Democratic National Convention

23  computer system?

24       A. I don't specifically remember.  What I

25  know was that there was chatter around Washington

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 80

1    about hacking of the Democrats and Democratic think

2    tanks and other things like that and there was a

3    site that had sprung up called D.C. Leaks that

4    seemed to suggest that somebody was up to

5    something.  I don't think at the time at least that

6    we were particularly focused on -- well, I don't

7    specifically remember.

8         Q. So you hired Mr. Steele.  Had you worked

9    with him before?

10        A. Yes.

11        Q. And can you generally describe what he had

12   done in the capacity of working with you and your

13   firm, what kind of projects?

14        A. Generally speaking, like me, Chris tends

15   to work for lawyers who are attempting to assist

16   clients in litigation or an asset recovery-type

17   situation.  And so, you know, the former Soviet

18   Union throws off an enormous number of disputes

19   about who owns what because of the history of state

20   ownership of everything and the transfers of

21   property into private hands following the collapse

22   of the Soviet Union was a murky process.  So

23   particularly in Europe there's a lot of disputes

24   over who really owns what.

25        And so we would collaborate on those kinds of

Glenn Simpson                                            August 22, 2017

Washington, DC

1   investigations.  Sometimes a controversy would

2   spill over into the United States and, you know, I

3   would be asked to see if I could find a company

4   here or there or run director searches on

5   individuals who might be associated with people we

6   were interested in, that sort of thing.  It's

7   interesting work, but it's kind of plain vanilla

8   business intelligence, litigation support stuff.

9        Q. And roughly how many years -- over how

10   many years, like when do you first recall working

11   with him?

12        A. I believe we met in 2009.  We've worked

13   together since 2009.

14        Q. And how did you find the quality of his

15   work over that period of time?

16        A. Quality is a really important issue in the

17   business intelligence industry.  There's a lot of

18   poor quality work and a lot of people make a lot of

19   promises about what they can do and who they know

20   and what they can find out and then there's just a

21   lot of people who operate in sort of improper

22   questionable ways.  Chris was, you know, a person

23   who delivered quality work in very appropriate

24   ways.

25        So -- I mean, I hope you won't be insulted,

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 82

```
 1   but he's basically a Boy Scout.  You know, he

 2   worked for the government for a very long time.  He

 3   lives a very modest, quiet life, and, you know,

 4   this is his specialty.  We got along very well

 5   because my speciality is public information.  So he

 6   was comfortable working with me and I was

 7   comfortable working with him and, you know, we've

 8   both been around a lot of criminal investigations

 9   and national security stuff.

10        When I was at the Journal I spent many years

11   investigating the financing of Al-Qaeda.  So I did

12   get introduced to sort of national security law and

13   national security operations and wrote a lot about

14   that and was dragged into court over that a few

15   times for things I wrote about people suspected of

16   funding terrorism.  So we had a lot of common

17   interests and background.

18        Q. And specific to the engagement with regard

19   to the research on Candidate Trump, why did you

20   specifically ask Mr. Steele to do that work?

21        A. The way our firm runs we pursue things,

22   you know, somewhat out of curiosity.  So we didn't

23   know -- it was opaque what Donald Trump had been

24   doing on these business trips to Russia.  We didn't

25   know what he was doing there.  So I gave Chris --
```

Glenn Simpson                                    August 22, 2017

Washington, DC

1   we gave Chris a sort of assignment that would be

2   typical for us which was pretty open ended.  We

3   said see if you can find out what Donald Trump's

4   been doing on these trips to Russia.  Since Chris

5   and I worked together over the years there's a lot

6   that didn't need to be said.  That would include

7   who is he doing business with, which hotels does he

8   like to stay at, you know, did anyone ever offer

9   him anything, you know, the standard sort of things

10  you would look at.  I don't think I gave him any

11  specific instructions beyond the general find out

12  what he was up to.

13        Q. And was anyone else -- did you engage

14  anyone else to do that particular research?

15        A. In Russia?

16        Q. Yes.

17        A. So we had other people like Ed Baumgartner

18  who, you know, by this time -- I guess Prevezon was

19  still winding down, but who would do Russian

20  language research which didn't involve going to

21  Russia.  It just involves reading Russian newspaper

22  accounts and that sort of thing.

23        Q. So was Mr. Baumgartner also working on

24  opposition research for Candidate Trump?

25        A. At some point, I think probably after the

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 84

1    end of the Prevezon case we asked him to help with

2    I think -- my specific recollection is he worked on

3    specific issues involving Paul Manafort and

4    Ukraine.

5         Q. With regard to the presidential election

6    of 2016?

7         A. Yes.

8         Q. We had talked about work for multiple

9    clients.  What steps were taken, if any, to make

10   sure that the work that Mr. Baumgartner was doing

11   for Prevezon was not shared across to the clients

12   you were working for with regard to the

13   presidential election?

14        A. He didn't deal with them.  He didn't deal

15   with the clients.  There wouldn't have been any

16   reason to -- he operates under the same rules that

17   I do.

18        Q. And with regard to Mr. Steele, did he ever

19   do any work for Fusion GPS on the Prevezon

20   litigation matter?

21        A. No.

22        Q. It's my understanding that Mr. Steele

23   works with a company called Orbis & Associates.

24   Did anyone else at Orbis, to the best of your

25   knowledge, work with Mr. Steele on the engagement

Glenn Simpson                                                    August 22, 2017

Washington, DC

1    that you had with him related to Candidate Trump?

2          A. I mean, I don't know their names.

3          Q. So do you know whether anyone else worked

4    with him?

5          A. Yes.  I mean, do you mean as

6    subcontractors or within his company?

7          Q. First within his company.

8          MR. LEVY:  If you know.

9    BY THE WITNESS:

10         A. I mean, I just don't remember their names.

11   I remember meeting somebody in London who I think

12   worked on it, but I just don't remember.

13         Q. Somebody else associated with Orbis?

14         A. Yes.

15         Q. With regard to the assignment that you

16   gave to Mr. Steele to do Russia-related research

17   for Candidate Trump, is that an accurate way to

18   describe it?  I said Russia-related research with

19   regard to Candidate Trump.  Would that be a fair

20   way to describe the assignment?

21         A. Yes.

22         Q. Did you have any input into the actual

23   work that he did?  Did you give him directions as

24   to what to research specifically?

25         A. I don't recall giving him specific

Glenn Simpson                                                    August 22, 2017

Washington, DC

1    instructions.  We spoke on the phone about various

2    areas of interest.  For example, when Paul Manafort

3    was elevated to running the campaign, we talked

4    about Paul Manafort and his long history of

5    dealings with Russian oligarchs.  So it's more of a

6    collaboration than, you know, sort of manager-

7    employee kind of relationship.  You know, we would

8    talk about things that were interesting to us and

9    that seemed to be -- you know, needed to be

10   (indecipherable).

11        Q. So is it fair to describe it as you would

12   collaboratively discuss potential topics to

13   explore?

14        A. Yes, I think that's fair.

15        Q. And did you conduct any of the actual

16   research yourself?

17        A. Well, I think it's important to understand

18   we were doing in my company, you know, all kinds of

19   research, including lots of Russia research, and

20   part of what you do when you get information from

21   someone outside the company who's specifically

22   looking at a discrete set of questions or issues is

23   you add it to the stuff you've already gathered.

24   So we did all kinds of stuff on public information

25   about Donald Trump's business trips to Russia and

Glenn Simpson                                      August 22, 2017

Washington, DC

Page 87

1  business dealings with Russians.  I mean, Chris's

2  role was specifically to do the thing that we

3  couldn't do, which was to arrange to talk to

4  people.  Generally speaking, we don't do a lot of

5  interviewing.  Our research is very document

6  focused.

7        Q. So to the extent you can describe, when

8  you say he was doing something you could not do and

9  that was he was arranging to talk to people, can

10  you describe who it was he was reaching out to,

11  what you knew about that?

12        A. I don't think for security reasons, among

13  other things, it's an area I'm not going to be able

14  to go into in terms of sources and things like

15  that.  I think speaking broadly, you know, there's

16  a large diaspora of Russians around the world and

17  people in Moscow that, you know, are talking to

18  each other all the time.  The thing that people

19  forget about what was going on in June of 2016 was

20  that no one was really focused on sort of this

21  question of whether Donald Trump had a relationship

22  with the Kremlin.

23        So, you know, when Chris started asking

24  around in Moscow about this the information was

25  sitting there.  It wasn't a giant secret.  People

Alderson Court Reporting

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 88

1   were talking about it freely.  It was only, you

2   know, later that it became a subject of great

3   controversy and people clammed up, and at that time

4   the whole issue of the hacking was also, you know,

5   not really focused on Russia.  So these things

6   eventually converged into, you know, a major issue,

7   but at the time it wasn't one.

8        Q. I have five or so more minutes and I know

9   that I have a lot more questions just about some of

10  that work, but I do want to just pin down a couple

11  things about the engagement in particular before we

12  end this hour.

13       So with regard to selecting Mr. Steele

14  specifically to do the Russia -- to do work on

15  Candidate Trump's ties to Russia, do you believe

16  based on his experience and background that

17  Mr. Steele would have been aware of the potential

18  in his discussions with these people that he could

19  be fed this information?

20       A. When Chris -- I don't believe it, I know

21  it.  When Chris briefs in a sort of more formal

22  setting, which I've seen, you know, when he

23  introduces himself -- you know, he was the lead

24  Russianist for MI6.  So the first sort of beginning

25  of that is he says, you know, I've worked on this

Glenn Simpson                                                August 22, 2017

Washington, DC

1    issue all my life and when you're trained in

2    Russian intelligence matters the fundamental

3    problem of your profession is disinformation.  It's

4    the number one issue.

5          In any collection of field -- you know,

6    information from the field you should assume that

7    there will be possibly some disinformation and

8    that, you know, as a professional who has dedicated

9    my life to this, you know, I am trained to spot

10   possible or likely disinformation.  So it's front

11   and center when you gather information in Russia.

12         Q. And when you hired him to do the work, did

13   the client -- were you still working for -- at any

14   time did you work for two clients on this

15   opposition research?  Did they overlap, the two

16   clients?

17         A. I just don't know.  I can just tell you

18   that it was -- I mean, things follow the political

19   cycle.  So there was a point at which the

20   Republican primaries were fundamentally over and

21   the Democrats hadn't really begun yet.  So there

22   was some transition period.  That's all I can say.

23   I don't keep the books at my place.  So I would

24   feel -- I'm afraid to give you a wrong answer that.

25   I just don't know.

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 90

```
 1          Q. Did either client know that you had hired
 2   Mr. Steele specifically?
 3          A. I don't think I can answer that.
 4          Q. And on what basis can you not answer that?
 5          MR. LEVY:  The answer to that question
 6   would -- could require the disclosure of client
 7   communications which might implicate privileges and
 8   obligations that we've previously set forth to the
 9   committee.
10   BY MS. SAWYER:
11          Q. Okay.  Maybe you can answer this question,
12   then.  Did either client ever direct Mr. Steele
13   themselves, directly engage and have conversations
14   with Mr. Steele?
15          A. I don't think I can answer that.
16          MR. LEVY:  Do you want to take a break?
17          MR. SIMPSON:  Sure.
18          MR. LEVY:  Let's take a break and confer.
19          MR. SIMPSON:  That's fine.
20          MS. SAWYER:  Sure.  We'll go off the record
21   for a few minutes.
22          MR. FOSTER:  It's 11:51.
23                    (A short break was had.)
24          MR. FOSTER:  It's 11:53.
25          MS. SAWYER:  I think the question pending was
```

Glenn Simpson                                                    August 22, 2017
Washington, DC

Page 91

1    just whether or not the clients specifically spoke

2    with or directed Mr. Steele's work?

3         MR. LEVY:  So he can't talk about client

4    communications, directions to the client --

5    directions to Mr. Steele as those communications

6    might implicate privilege or obligations, but if

7    you want to ask him whether the clients directed

8    Mr. Steele to go to the FBI, that's a question he

9    can answer.  That's in the scope of the interview

10   today.

11   BY MS. SAWYER:

12        Q. All right.  So we'll get to that.  We'll

13   talk about that a little bit later.  Let me just

14   follow up on a couple other things that came up and

15   then we'll conclude for our hour and turn it back

16   to our colleagues.

17        So one of the things that came up in the

18   course of our conversation and when I had asked you

19   specifically about work being done for one client

20   and rules and procedures in place to ensure that

21   that work is not shared with another, can you just

22   specifically describe those rules.  I think at one

23   point you indicated that you and Mr. Baumgartner

24   had operated under the same rules?

25        A. Right.  We're both professionals and we

Glenn Simpson                                    August 22, 2017

Washington, DC

Page 92

1    both deal with multiple clients.  So we don't talk

2    about a case with one client with another client.

3        I think since you raised this I should be

4    clear, Mr. Baumgartner did not know about

5    Mr. Steele, the work I was doing with Mr. Steele

6    or, you know, the memos he was writing.

7        MR. FOSTER:  Can you speak up a little bit.

8    BY THE WITNESS:

9        A. Mr. Baumgartner did not know about the

10   work that we were doing with Mr. Steele.  One of

11   the ways that we avoid bleeding between one case

12   and another is compartmentalization.  We don't tell

13   people -- we don't tell one subcontractor what

14   we're doing with another subcontractor.  We don't

15   even tell them, you know, that they exist.

16       Q. What about Mr. Steele, what rules was he

17   operating under when he was doing the work on

18   Candidate Trump?

19       A. Every subcontractor signs an NDA at the

20   beginning of the discussion before even there's an

21   engagement.  So he was operating under an NDA.

22       Q. And in general what does that NDA provide?

23   And by NDA I assume you mean nondisclosure

24   agreement?

25       A. Right.  Again, the paperwork side of the

Glenn Simpson                                    August 22, 2017

Washington, DC

Page 93

```
 1  business is not my strong suit, but it's a general
 2  strict prohibition on sharing information about the
 3  nature of the work you're doing, your findings with
 4  anyone outside of, you know -- we're the client in
 5  this case.  So they're not allowed to share
 6  information with anyone outside the case.
 7        Q. And you had talked a bit about prior work
 8  and Mr. Steele's performance in prior work and
 9  being satisfied by that work.  Did you do anything
10  to kind of test and make sure that information he
11  was giving you was accurate?
12        A. So in the sort of -- I know I'm repeating
13  myself, but generally we do public records work.
14  So we deal in documents and things that are very
15  hard and that are useful in court or, you know,
16  other kinds of proceedings.
17        Chris deals in a very different kind of
18  information, which is human intelligence, human
19  information.  So by its very nature the question of
20  whether something is accurate isn't really asked.
21  The question that is asked generally is whether
22  it's credible.  Human intelligence isn't good for,
23  you know, filing lawsuits.  It's good for making
24  decisions and trying to understand what's going on
25  and that's a really valuable thing, but it's not
```

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 94

1    the same thing.

2         So when you evaluate human intelligence,

3    human reporting, field reporting, source reporting,

4    you know, it's sort of like when you're a

5    journalist and you're trying to figure out who's

6    telling the truth, right.  You don't really decide

7    who's telling the truth.  You decide whether the

8    person is credible, right, whether they know what

9    they're talking about, whether there's other

10   reasons to believe what they're saying, whether

11   anything they've said factually matches up with

12   something in the public record.

13        So, you know, we would evaluate his memos

14   based on whether he told us something we didn't

15   know from somewhere else that we were then able to

16   run down.  So, you know, for example, he, you know,

17   wrote a memo about a Trump campaign advisor named

18   Carter Page and his mysterious trip to Moscow.

19        Q. I'm just going to stop you for a moment

20   because I hadn't yet gotten to the specific stuff

21   of the Trump assignment.  I was just trying to get

22   a sense of the specific ways in which you assessed

23   his performance in determining to hire him.

24        A. That's how we did it.  We would assess it

25   based on the content and the credibility of -- we'd

Glenn Simpson                                          August 22, 2017
Washington, DC

Page 95

1   try to determine the credibility of what we were

2   reading.

3         MR. MUSE:  His reference was to give you an

4   example.  I think that's where he was going.

5         MR. SIMPSON:  Yeah.

6         MS. SAWYER:  I understand and I appreciate

7   that and we'll get to that.  I just didn't want

8   to -- in light of the time I didn't want to get you

9   started down that road.  If I could just have a

10  second because I want to make sure we finish our

11  questions on this topic and we'll resume our next

12  hour with some of the others.

13        MR. SIMPSON:  Okay.

14        MS. SAWYER:  So we'll go off the record.

15  It's high noon, 12:00.  So let's go off the record.

16                    (A short break was had.)

17        MR. DAVIS:  We're back on the record.  It's

18  12:06 p.m.

19                    EXAMINATION

20  BY MR. DAVIS:

21        Q. All right.  Mr. Simpson, I'm going to

22  return to the topic of Prevezon.  Let me know if

23  I'm accurately summarizing the scope of work you're

24  describing.  I think you've described three main

25  areas so far.  First is that you were investigating

Glenn Simpson                                           August 22, 2017

Washington, DC

1    Prevezon's side of the story to see if it was

2    credible; the second is you were investigating Bill

3    Browder's ties to the U.S. and related subpoena

4    issues; and the third is that you were

5    investigating Bill Browder's Russian businesses.

6    Is that correct?

7         MR. LEVY:  I think he said a lot more than

8    that, but go ahead.

9         MR. DAVIS:  I listed the main topics.  That's

10   where we left off.

11        MR. LEVY:  I don't think that's the main

12   topics either, but go ahead.

13   BY THE WITNESS:

14        A. Is that a yes-or-no question?  I think

15   those are three things I covered, but I covered a

16   lot of stuff.

17        Q. With the information that you gathered in

18   those and related efforts, what did you do with the

19   information once you obtained it?

20        A. Well, the first thing you do is you give

21   it to the lawyers and, you know, when appropriate

22   you give it to reporters, you know, put it in court

23   filings.

24        Q. So is it correct, then, people associated

25   with Fusion did communicate with journalists about

Glenn Simpson                                          August 22, 2017

Washington, DC

1    the Prevezon case and the information you found out

2    about Mr. Browder?

3         A. Yes.

4         Q. And did Fusion engage in these

5    communications with the media on its own accord or

6    were you directed or authorized to do so?

7         A. In litigation support, you know, basically

8    the cases that we work on frequently get some media

9    attention.  So it's always part of a litigation

10   engagement that if you're the guy that does the

11   research, you're going to end up talking to

12   reporters because they're going to ask questions

13   about, you know, information from the case.

14        MR. LEVY:  Just make sure you answer his

15   question.  Was it done?

16   BY THE WITNESS:

17        A. That's part of what the lawyers hire you

18   to do and that's what they instruct you to do.  The

19   way it generally happens is the lawyer gets a call

20   from a reporter who wants to write a story about

21   the case and he answers the questions or gives them

22   a quote and then he instructs me to give him

23   background information.

24        Q. So then was it typically done on a

25   case-by-case basis or did you have blanket

Alderson Court Reporting

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 98

1    authorization regardless of specific interactions

2    with the attorneys?

3         A. These things evolved over time.  So in the

4    beginning of the case when you're new to a subject

5    you're generally fielding -- you generally get

6    requests from the lawyers to answer a specific

7    question that a reporter has.  So the reporter will

8    call and they'll want to know whatever, where the

9    house was in Colorado, and he'll say somewhere in

10   Aspen, ask Glenn.  Then he'll send him to me or

11   he'll send me to them.  Later on when you get where

12   you've gathered a mass of information that covers a

13   whole wide range of topics and, you know, if

14   there's more coverage, you know, they will direct

15   you to answer questions for the reporters covering

16   the case.  They won't tell you on an individual

17   basis talk to so-and-so.  It's a little of both.

18        Q. Was Fusion then paid for these

19   communications with the media?

20        A. We were compensated for our litigation

21   support and as part of that we were directed to

22   talk to the media.  So in the fundamental sense

23   yes, we were.  Specifically paid for individual

24   conversations, I don't think so.

25        MR. FOSTER:  Do you bill hourly?

Glenn Simpson                                              August 22, 2017

Washington, DC

Page 99

1         MR. SIMPSON:  It depends on the case.

2         MR. FOSTER:  On this case?

3         MR. SIMPSON:  I think we did on this case.

4         MR. FOSTER:  So did you bill for

5    conversations with the press on this case?

6         MR. SIMPSON:  I'm sorry to say I don't know.

7    I probably did not.  Generally speaking, what I

8    would bill for would be to attend events where

9    there would be press.  So if I was at a court

10   hearing -- most of the press was around court

11   hearings.  So I would go to a court hearing with

12   the lawyers and there would be reporters there.  So

13   part of what I was billing for was answering their

14   questions.

15   BY MR. DAVIS:

16        Q. And with which news organizations did

17   Fusion communicate in relation to the Prevezon

18   case?

19        A. I will try to remember them.  It was the

20   major news organizations that were covering the

21   litigation.  Usually it was their courthouse or

22   legal reporters.  So it was Bloomberg, New York

23   Times, Wall Street Journal, probably Reuters, Legal

24   360.  I'm sure there were a handful of others.

25        Q. Was the Financial Times possibly one of

Glenn Simpson                                              August 22, 2017

Washington, DC

Page 100

1   them?

2         A. Yes.

3         Q. Politico?

4         A. They approached us with -- they had been

5   getting information from Bill Browder.  He had

6   alleged to them that we were part of a big campaign

7   on Capitol Hill and that we were engaged in

8   lobbying and that it was all designed to affect

9   legislation or smear him or Sergei Magnitsky.  So

10  eventually we did end up dealing with that, but I

11  don't remember whether we dealt with them prior to

12  that.  I don't think they covered the case prior to

13  that.

14        Q. What about NBC?

15        A. We would have -- I'm sorry.  Yes.

16        Q. And the New Republic?

17        A. I think so.

18        Q. And do you recall what information you

19  provided to each or is that too into the weeds?

20        A. I don't know if it's in the weeds, but

21  generally speaking, the work -- we provided

22  information about the work that I had done about

23  William Browder's credibility.  The whole case

24  ended up -- when I said when he declined to appear

25  voluntarily as I am here and explain things, you

Glenn Simpson                                               August 22, 2017

Washington, DC

Page 101

1   know, it ended up being an issue of why he didn't

2   want to talk.  So a lot of it was about his

3   credibility, about his account of his activities in

4   Russia, about his history of tax avoidance, all

5   these things.

6        Q. Did Fusion provide the media information

7   alleging that Browder had illicitly engineered the

8   purchase of 133 million shares of Gazprom?

9        A. I don't know for sure, but we certainly

10  did research on that issue.

11       Q. And you described investigating these

12  series of issues.  How did you acquire the

13  information in the course of this investigate?

14       A. We used the methods that I've described

15  here today.  We pulled court records, we pulled

16  corporate records, we, you know, pulled real estate

17  records, SEC securities filings, that sort of

18  thing.

19       Q. And was any of the information you

20  provided to the media information that wasn't the

21  result of your own research but that had been

22  passed along to you by Baker Hostetler or Prevezon?

23       A. I think the answer to that is yes, but I'm

24  struggling to think of a specific example.  As I

25  was saying earlier, the lawyers did a lot of the

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 102

1    research too.  So there was obviously a sharing of

2    research where, you know, we were feeding research

3    to them and they were housing a central repository

4    of research and then the research would become

5    memoranda and given in court filings.  In a lot of

6    these cases we were giving people court filings.

7    So the information was mixed together from various

8    sources.

9         Q. Did Fusion independently verify the

10   information provided by Baker Hostetler or Prevezon

11   or in this circumstance was it assumed to be

12   reliable given your work with them?

13        A. We certainly did not independently verify

14   everything that the lawyers generated in the case.

15   That would have been an enormous task and it would

16   have made no sense.

17        I just want to stress that I've worked with

18   Baker Hostetler for -- you know, since 2009, so I

19   guess going on over eight years, and they're very

20   good lawyers and very conservative.  So if they

21   provided me with information that they had

22   gathered, I would have been confident -- I was

23   confident in the quality of their work.

24        Q. And did Prevezon or Baker Hostetler ever

25   direct Fusion to relay to the media information

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 103

1    that they had provided to Fusion?

2         A. I'm sorry.  Can you say that again.

3         Q. Did Baker Hostetler or Prevezon direct

4    Fusion to relay to the media information that they

5    had provided to you?

6         A. I don't specifically recall an example of

7    that, but I think as a general sort of operating

8    principle we were working at their direction and

9    they were providing us with, you know, case

10   information.  So I think so, but I just don't have

11   an idea.

12        Q. And did anyone at Fusion or perhaps

13   Mr. Baumgartner review Russian documents related to

14   the Prevezon matter?

15        A. Yes.

16        Q. Do any --

17        A. Most of them were Russian court

18   documents.

19        Q. Do any Fusion employees or associates

20   speak Russian?

21        A. No.  I'll qualify that.  Depends on how

22   you define associate.  Edward isn't an employee of

23   the company, but he speaks Russian.  He's a

24   subcontractor.

25        Q. Aside from Mr. Baumgartner, do you have

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 104

1    any other support from Russian-speaking individuals

2    in reviewing the Russian documents?

3         A. Not in my company, at least not that I can

4    recall.  There was other Russian speakers I think

5    that were engaged by Baker Hostetler in various

6    situations, like translators, Russian bilingual

7    lawyers, that sort of thing.

8         Q. Do you remember the names of any of those

9    people?

10        A. Anatoli, whose last name I can't really

11   pronounce, was a New York-based English-Russian

12   court translator.  He was mostly a courtroom

13   translator.  So I don't know whether he -- I really

14   don't know the extent of their other involvement

15   with other people in these things.

16        MR. FOSTER:  Can I just back up before we get

17   too far afield of this.  I want to follow up on an

18   answer that you gave earlier.  You described your

19   interactions with the press as primarily being

20   directed to answer questions, in other words, the

21   contact as being initiated by the press.  That's my

22   understanding of how you described it.

23        MR. LEVY:  I don't think that's a complete

24   summary of what he said.

25        MR. FOSTER:  Feel free to correct me if I'm

Glenn Simpson                                      August 22, 2017

Washington, DC

Page 105

1   wrong.  My question is were there instances where

2   you were initiating contact with the press or

3   pitching stories to the press?

4        MR. SIMPSON:  Sure.  I mean, the range of

5   things that you would do, you know, again, it would

6   evolve.  In the beginning you were going to a lot

7   of hearings and a lot of legal reporters are

8   showing up and you're mostly answering their

9   questions.  Depending on the setting, you know, you

10  might get a question for the lawyers like is anyone

11  from Reuters going to be there and you would reach

12  out to Reuters and say are you guys sending someone

13  to this hearing.  So there was definitely some

14  reach out like that.  Then we would also talk to

15  reporters, you know, generally covering issues of

16  corruption or law or Russia or whatever and say,

17  you know, we're involved in a really weird court

18  case, you might be interested in this.

19       MR. FOSTER:  So is it fair to say that part

20  of your job, then, was to locate reporters who

21  would write about these matters from a point of

22  view that was advantageous to your client?

23       MR. SIMPSON:  Yes, but I think we should note

24  here that William Browder is an especially

25  aggressive media self-promoter and promoter of his

Glenn Simpson                                                           August 22, 2017

Washington, DC

1    story.  So for much of this case it was reactive

2    and we were constantly besieged with reporters

3    pursuing negative stories about Prevezon, the

4    events of the Prevezon case that had been given to

5    them by William Browder.  So, you know, unhappily,

6    I would say, you know, a lot of what we were doing

7    was simply responding to his wild allegations,

8    unsupported wild allegations.

9        There were certainly moments, particularly

10   concerning his unwillingness to appear for a

11   deposition, where we said to some reporters, hey,

12   guy, you know, he's just dodged his third subpoena,

13   you might want to write about this, it's pretty

14   funny.  In fact, you know, the third one he ran

15   down a street in Manhattan in the middle of a

16   blizzard to get away from our process servers, but

17   that one we actually had them film it.

18       So, you know, did we want to get that

19   covered, did we think it was important that people

20   know that this guy was unwilling to appear in court

21   in public under oath to talk about the story that

22   he'd been selling for years about his activities in

23   Russia?  Yeah, we wanted people to know that.

24   BY MR. DAVIS:

25       Q.  Other than the media and Baker Hostetler,

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 107

```
 1   did Fusion provide any information regarding the
 2   Prevezon matter to any other third parties?
 3        A. I don't have a specific recollection of
 4   doing so.  If there's a specific incident that
 5   you'd like to ask about I'd be happy to try and
 6   answer that.  I don't remember.
 7        Q. We'll get into that a little bit more.
 8        Also to go back to the translator you
 9   mentioned, you said Anatoli and that you didn't
10   know how to pronounce --
11        A. Samochornov I think is his --
12        Q. Okay.
13        A. I'm massacring it.  Again, it's something
14   that's in the public record.
15        Q. Do you know Rinat Akhmetshin?
16        A. Yes, I do.
17        MR. MUSE:  Spell it.
18        MR. DAVIS:  Sure.  R-I-N-A-T,
19   A-K-H-M-E-T-S-H-I-N.
20   BY MR. DAVIS:
21        Q. When did you first meet Mr. Akhmetshin?
22        A. When I was a reporter at the Wall Street
23   Journal.
24        Q. And as far as you know, what is his
25   business?
```

Alderson Court Reporting

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 108

1        A. Some kind of PR consulting lobbyist.  I

2    think he's a registered lobbyist.

3        Q. Have you ever worked with Mr. Akhmetshin?

4        A. I've been -- in the Prevezon case I

5    interacted with him.  I think -- again, this has

6    unhelpfully been distorted by William Browder into

7    some sort of economic relationship or conspiracy or

8    something.  I don't have any economic relations

9    with him.  You know, I've bumped into him over the

10   years around town.  So, you know, the only thing

11   that I specifically recall having done with him was

12   interacting for a brief period on the Prevezon

13   case.

14       Q. You don't recall working with him for any

15   other clients or cases?

16       A. Let's be clear, I'm sure we did not do

17   business together, but I do work on areas of the

18   world where he's from, Central Asia, former Soviet

19   Union, and he is, as I'm sure you've seen, a guy

20   around town who knows lots of people who cover this

21   stuff.  I met him in connection with some stories I

22   was doing on Kazakhstan at the Wall Street Journal.

23   That's the kind of context I've bumped into him

24   over the years.  He's told me various things and I

25   think I even met one of his clients at one point,

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 109

1    but it wasn't a business thing.  I don't think I

2    was doing any work.  I was just networking.

3         Q. You said he told you various things.  Do

4    you mean he would pass along information to you?

5         A. The information that I remember was about

6    his Kyrgyzstan stuff.  There was a congressional

7    investigation into Kyrgyzstan that he claimed

8    credit for having started and he told me about it

9    for some reason, but it wasn't because we were

10   doing business together.  It was coffee or

11   something.

12        Q. You said he claimed credit for having

13   started the congressional investigation?

14        A. That's my recollection, but this was some

15   years ago.

16        Q. And you said you met one of his clients.

17   Do you remember which client?

18        A. A former Kazakh politician whose name

19   escapes me.

20        Q. Do you remember when you met that client?

21        A. Years ago in London.

22        Q. Has Mr. Akhmetshin ever been paid by

23   Fusion GPS?

24        A. Not to my knowledge.

25        Q. Has he ever provided information to Fusion

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 110

1    GPS for use in your work?

2         A. I don't have a specific recollection of

3    him having done so.  I would hesitate to say so

4    categorically because I've been running this

5    business now for a number of years and I would have

6    interacted with him at various times and ways that

7    I probably don't remember, but not that I

8    specifically recall.

9         Q. Has Mr. Akhmetshin ever paid Fusion GPS

10   for work?

11        A. Not to my knowledge.

12        Q. You mentioned interacting with him in the

13   Prevezon matter.  What did you understand his role

14   to be in the Prevezon work?

15        A. I did not have a clear understanding of

16   his role initially.  He started attending meetings

17   sometime in 2016, just a handful of things, and

18   it's -- you know what?  I don't recall anyone ever

19   saying to me you're not doing X, Y, or Z.  They may

20   have.  I just don't recall.  The lane that I was in

21   was the court case and this fight over whether

22   Browder would have to testify, which morphed then

23   into this fight over whether -- you know, his

24   allegations that John Moscow had a conflict of

25   interest.  So I was very focused on that.  These

Glenn Simpson                                      August 22, 2017

Washington, DC

Page 111

1    other issues came up two plus years into the case

2    and he was clearly dealing with them, but I don't

3    recall anyone sort of giving me a specific

4    explanation, you know, of what he was doing.

5            MR. FOSTER:  What other issues?

6            MR. SIMPSON:  The issues of the -- what do

7    you call it, HRAGI, the foundation and the

8    congressional stuff.

9    BY MR. DAVIS:

10           Q. You mentioned he started showing up at

11   meetings in 2016.  Who else attended these

12   meetings?

13           A. I don't specifically remember.  I mean, Ed

14   Lieberman I think was at a meeting.  Again, I don't

15   think it was -- it wasn't a lot of meetings, just

16   one or two, but it was at Baker Hostetler.

17           MR. FOSTER:  Can you explain briefly who Ed

18   Lieberman is.

19           MR. SIMPSON:  Ed Lieberman is a lawyer in

20   Washington who has a specialty in international tax

21   who worked for Baker Hostetler on some of the

22   analysis of the alleged tax evasion by Hermitage

23   Capital and William Browder.  And then subsequently

24   also he knows Rinat from I guess, I don't know,

25   college or something and subsequently the two of

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 112

1    them were working on the -- I don't know what to

2    call it, the congressional stuff.

3         MR. FOSTER:   Lobbying Congress?

4         MR. SIMPSON:   I believe they registered to

5    lobby Congress.

6    BY MR. DAVIS:

7         Q. Did Fusion provide any of its research to

8    Mr. Akhmetshin whether directly or through an

9    intermediary such as Baker Hostetler?

10        A. Yes.   We were directed to do so by Baker

11   Hostetler.

12        Q. And do you know or have reason to believe

13   whether Mr. Akhmetshin used that information when

14   he spoke with people on the Hill?

15        A. I have reason to believe that.   I don't

16   have specific knowledge of his discussions with

17   people on the Hill.   I don't remember.   He may have

18   told me what he did.   As I say, it was not the

19   focus of my work.

20        Q. Has Mr. Akhmetshin ever said anything to

21   you indicating or implying that he had worked with

22   the Russian government?

23        A. Well, I knew he had been a soldier, I knew

24   he had been in the Soviet military, and I also knew

25   that he went to Moscow a fair bit because he said

Glenn Simpson                                    August 22, 2017

Washington, DC

Page 113

1   on several occasions I'm in Moscow or I'm going to

2   Moscow.  He may have -- I don't recall whether he

3   mentioned having worked with the Russian

4   government.

5        Q. Has he ever said anything to you

6   indicating or implying that he had worked for

7   Russian intelligence more specifically?

8        A. Well, as I said, I'm sure that he had

9   mentioned to me maybe back in, you know, the time

10  when I was at the Wall Street Journal that he was

11  in the Soviet military and he had some kind of

12  low-level intelligence position, but I don't

13  remember anything beyond that.  He certainly didn't

14  say anything in recent years about having any

15  current connections with Russian intelligence.

16       Q. Has he ever said anything to you

17  indicating or implying that he has contacts or

18  connections with Russian government officials?

19       A. Not that I specifically recall.

20       Q. Do you have reason to believe that he has

21  ties to the Russian government?

22       A. I have reason to wonder whether he has

23  ties to the Russian government, but, you know, in

24  the course of my work for Baker Hostetler the

25  question of whether he had some connection to the

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 114

1  Russian government wasn't germane really.  It just

2  didn't come up.  Obviously with the news of this

3  meeting at Trump Tower and the allegations in the

4  media that there's some relationship there I share

5  everyone's interest in the answer to that

6  question.

7          Q. Do you know Natalia Veselnitskaya?

8          A. Yes.

9          Q. When did you first interact with

10  Ms. Veselnitskaya?

11          A. I believe it was sometime in 2014.

12          Q. Has Fusion ever worked with

13  Ms. Veselnitskaya?

14          A. Didn't I just answer that?  Yes.  I mean,

15  she was the lawyer, the Russian lawyer who retained

16  Baker Hostetler who retained us.  So when you say

17  "worked with," I don't know that as a technical

18  meaning, but we interacted with her as part of the

19  Prevezon litigation.

20          Q. Has Fusion ever been paid by her?

21          A. Well, she arranged -- as the lawyer for

22  Prevezon she would have arranged for Prevezon to

23  pay Baker Hostetler which paid us.  So if that's

24  what your question is, then the answer is yes, but

25  I mean, I don't think the money came from her.  It

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 115

1    came from Prevezon.

2         Q. Were there any direct payments that didn't

3    go through Baker Hostetler?

4         A. No.

5         Q. So what did you understand her role to be

6    in the litigation?  You said she was the attorney

7    for Prevezon.  Was she managing the case for

8    Prevezon?

9         A. I was not introduced to her originally.

10   The original way that she was -- it came up in my

11   conversations with Mark Cymrot and other Baker

12   lawyers was as the person who had hired them who

13   had the information about the extortion case

14   against Demetri Baranovsky.  It was represented to

15   me by Mark Cymrot that she handled that matter and

16   was familiar with the prosecution of Demetri

17   Baranovsky and very well versed in the events of

18   the extortion.  So, you know, that's how I learned

19   of her and I think that's probably -- our first

20   interactions were probably about that subject.

21        Q. Did she provide Fusion with the

22   information about that extortion case?

23        A. Well, I certainly discussed it with her at

24   some point, but it was all in Russian.  You know,

25   the bulk of the Russian-English translating just

Glenn Simpson                                                   August 22, 2017

Washington, DC

Page 116

```
 1   for, you know, chain of evidence reasons went from
 2   her to Baker Hostetler.  They would have materials
 3   analyzed and translated and then they would -- I
 4   don't read a word of Russian.  So I would get the
 5   certified translations of stuff from Baker.
 6         Q. And beyond your interactions with her
 7   about the extortion issue, what type of interaction
 8   did you have with her in the course of the Prevezon
 9   work?
10         A. In the early period it was I believe
11   largely about this extortion case.  Later on when
12   we would appear in court it would -- you know, she
13   would come to some of the Court hearings and the
14   issue of Browder's efforts to avoid having to
15   testify were front and center, sort of the main
16   issue for quite a while.  So I don't remember
17   specific conversations with her about that, but
18   that's what we would have discussed.
19         Q. Have you met in person with her on other
20   occasions besides court hearings?
21         A. I attended a couple client dinners and I
22   think that's about it.
23         Q. Do you recall when and where those would
24   have been?
25         A. I recall some of the when and the where.
```

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 117

1    There were a couple of dinners in New York and a

2    couple of dinners in D.C.  I don't remember when

3    they started.  I think probably 2015.  And there

4    was some in 2016 in both cities.

5         Q. Were any in June 2016?

6         A. Yes.  Two.

7         Q. Were those in New York or in D.C.?

8         A. I believe that one was in New York and one

9    was in D.C.

10        Q. Do you recall the specific date of either?

11        A. I didn't until we tried to piece these

12   things together, but June 8th I think was the

13   dinner in New York and I think the 10th was the

14   dinner in D.C., something like that.

15        Q. And what were the purposes of these

16   dinners?

17        A. Well, the first one was just an obligatory

18   client dinner which, you know, when you work on a

19   legal case you get invited to dinner with the

20   clients.  The one in D.C. was more of a social

21   thing.  It wasn't -- she was at it, but it wasn't

22   really about the case.  It was just a bunch of Mark

23   Cymrot's friends.  You know, the editor of the

24   Washington Post book section was there and his wife

25   who's a well-known author were also there.  I can't

Glenn Simpson                                    August 22, 2017

Washington, DC

Page 118

1    remember who else was there.  But anyway, she sat

2    at the other end of the table from me and, you

3    know, as I said, she doesn't really speak English

4    and I don't speak Russian.  So not a lot of

5    chit-chat.

6         Q. Was it your understanding that the

7    research you provided to Baker Hostetler would then

8    be passed on to Ms. Veselnitskaya?

9         A. To the extent that it was useful and

10   interesting to her I'm sure they did, yes.

11        Q. Has she ever said anything to you,

12   presumably via a translator, indicating or implying

13   she had worked with the Russian government?

14        A. No, but Mark Cymrot told me when he told

15   me of her existence that she was a former

16   prosecutor.

17        Q. And has she ever said anything to you more

18   specifically indicating or implying that she had

19   worked for Russian intelligence?

20        A. No.

21        Q. Do you have any reasons to believe that

22   Ms. Veselnitskaya has ties to the Russian

23   government?

24        A. I know what I've read in the newspaper.

25        Q. Beyond that?

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 119

```
 1        A. Beyond that my impression of her was of
 2   someone who, you know, was a very smart and
 3   ambitious lawyer, but not like a big political
 4   player in the Kremlin.  Of course given to wonder
 5   given all the recent events and disclosures that I
 6   was unaware of whether my assessment of her was
 7   right or wrong.  As we sit here today, the jury's
 8   kind of out.  I honestly can tell you all I knew is
 9   she didn't seem to be a heavy hitter in the Kremlin
10   world.
11        Q. This might be a little repetitive, but
12   when did you first meet Ed Lieberman?
13        A. I don't remember specifically, but it was
14   years ago.
15        Q. I believe you described his business.
16   Have you ever worked with Mr. Lieberman?
17        A. I don't think so.
18        Q. Or Fusion more broadly?
19        A. Not that I can recall.
20        Q. Have you ever paid him or been paid by
21   him?
22        A. No.
23        Q. And what exactly did you understand his
24   role to be in the Prevezon issue?
25        A. Well, the initial issue that we worked on
```

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 120

1  together was the issues about alleged tax evasion

2  by Hermitage Capital in Russia and William

3  Browder's decision to surrender his citizenship

4  shortly before the tax rules on surrendering your

5  citizenship changed, which tended to make us

6  suspect that it was motivated by tax

7  considerations.  At that time we didn't know about

8  the offshore companies in BVI.

9      Q. And what type of interactions did you have

10  with Mr. Lieberman in the course of the Prevezon

11  work?

12      A. Collegial, I guess professional I would

13  say.  Ed's, you know, got a background in tax.  So

14  we talked about tax stuff.  Later on, much later on

15  after a couple years had gone by, you know, he and

16  Rinat embarked on this other project, but I don't

17  have a specific recollection of whether I dealt

18  with him directly on any of that.

19      Q. Did Fusion provide its research to

20  Mr. Lieberman either directly or through an

21  intermediary such as Baker Hostetler?

22      A. Not that I recall, but if the lawyers

23  asked me to send them something, I would send them

24  something.

25      Q. Do you have any reason to believe that

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 121

1      Mr. Lieberman has ties to the Russian government?

2           A. No.

3           Q. Do you know Mr. Robert Arakelian,

4      A-R-A-K-E-L-I-A-N?

5           A. There was a guy at a lunch or dinner or

6      something named Robert and he was introduced to me

7      as Robert.  Again, when you're going to like these

8      client meals or things like that, you know, we

9      didn't get into a lot of details of who he was.  I

10     just remember he was introduced as a friend Denis

11     Katsyv, K-A-T-S-Y-V.  That's my recollection.  It

12     may be that he's a friend of Rinat's.  I don't

13     really know.

14          Q. As far as you know, what is Mr. -- what is

15     Robert's business?

16          A. I don't know.

17          Q. So presumably, then, has Fusion ever

18     worked with him?

19          A. Not to my knowledge.

20          Q. What did you understand Mr. Arakelian's

21     role to be in the Prevezon work?

22          A. I didn't know he had a role.  If someone

23     told me I've forgotten, but, again, I was pretty

24     narrowly focused on a few things and he wasn't

25     involved in those things.

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 122

1        Q. Were you aware that he was a registered

2    lobbyist for HRAGI?

3        A. No.

4        Q. Other than meeting him at that dinner, did

5    you have any other interactions with him in the

6    course of the Prevezon work?

7        A. Not that I can recall.

8        Q. Did Fusion provide any research to him

9    directly or through an intermediary such as Baker

10   Hostetler?

11       A. I don't know.  I mean, if Baker Hostetler

12   gave him information from my research or my

13   company's research, they didn't tell me.

14       Q. Do you have any reason to believe he has

15   ties to the Russian government?

16       A. No.

17       Q. But you said he is friends with the

18   Katsyvs?

19       A. I shouldn't speculate.  I recall he was

20   introduced to me as a friend of someone and I don't

21   remember whether it was Rinat or Denis Katsyv, but

22   it was one or the other.

23       Q. Do you know Howard Schweitzer?

24       A. I don't, not that I can recall.

25       Q. So you've never done any business with

Glenn Simpson                                             August 22, 2017

Washington, DC

Page 123

1    him; is that correct?

2         A. I don't think so.

3         Q. Do you know if he had any role in the

4    Prevezon work?

5         A. I've read that his firm was involved in

6    the lobbying, but it's just something I read.  I

7    don't believe I had any personal interactions.

8         Q. Do you know who Denis Katsyv is?

9         A. He's the owner of Prevezon.

10        Q. Did you have any interactions with him?

11        A. Again, I sat in a few meetings, a couple

12   of client meals, but it was limited by his limited

13   English and my limited Russian.

14        Q. In your interactions with

15   Ms. Veselnitskaya did she claim to be acting as the

16   attorney for Prevezon Holdings and the Katsyv

17   family or just for Prevezon Holdings?

18        A. She was introduced to me as the lawyer for

19   Prevezon.  I never --

20        MR. LEVY:  When you say "the Katsyv family,"

21   Denis Katsyv is the only person named in the

22   lawsuit.  I'm just wondering what you mean by that.

23        MR. DAVIS:  Denis or Pyotr.

24        MR. SIMPSON:  As I said, she was introduced

25   to me as the lawyer for Prevezon.  So -- and I

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 124

1    think the lawyer for Denis.  So beyond that I

2    don't know.

3    BY MR. DAVIS:

4         Q. Do you know who Pyotr Katsyv is?

5         A. I do now.  I mean, I knew a little bit

6    about him at the time, but now that it's become an

7    issue, at least in the mind of William Browder,

8    obviously I know who he is.

9         Q. Did you have any interactions with him?

10        A. No.

11        Q. Do you know Chris Cooper?

12        A. Yes.

13        Q. How long have you known Mr. Cooper?

14        A. Probably ten years, maybe longer.

15        Q. As far as you know, what is his

16   business?

17        A. Public relations.

18        Q. Is he associated with the Potomac Square

19   Group?

20        A. I believe he is the Potomac Square Group.

21        Q. Has Fusion ever worked with Mr. Cooper or

22   the Potomac Square Group?

23        A. Yes.

24        Q. Have you paid him or been paid by him?

25        A. I believe we've paid him.  I don't know if

Glenn Simpson                                          August 22, 2017

Washington, DC

1    he's paid us.

2         Q. What did you understand his role to be in

3    the Prevezon work?

4         A. He worked on his movie doing --

5    essentially as I understand it and recall it, he

6    was asked to help find a place where they could

7    show this movie.  William Browder likes to use the

8    press, but he doesn't like anyone talking freely

9    about him or raising questions about the story of

10   his activities in Russia.  So when this movie came

11   together they were going to screen it in Europe and

12   he hired the meanest libel firm in London which has

13   previously sued me on behalf of Saudi billionaires

14   and -- unsuccessfully I might add, and he

15   threatened to file libel cases against the people

16   who were daring to offer to host a showing of this

17   film.

18        So, as you know, they don't have the First

19   Amendment in Europe.  So he was able to

20   successfully suppress the showings of this film

21   which questioned his credibility and whether -- the

22   truth of his story and his activities in Russia.

23   So Chris came up with the idea of showing it at the

24   Newseum which is dedicated to the First Amendment

25   and where they don't have much time for libel

Glenn Simpson                                                      August 22, 2017

Washington, DC

Page 126

1    lawyers and people trying to suppress free speech

2        Q. And was the showing arranged for Prevezon,

3    for HRAGI?  Who was arranging this?

4        A. I don't know.

5        Q. Did Fusion have any role in that showing?

6        A. We supplied some names of people.  They

7    wanted to round up people who would be interested

8    in coming, journalists, friends, people interested

9    in Russia, and we supplied names for them.

10       Q. Did Fusion contact any journalists to

11   inform them about the film or the showing or to

12   encourage them to write about it?

13       A. I believe that I mentioned it to some

14   journalists in terms of showing up.  I don't

15   believe I -- I just don't remember whether I tried

16   to get anyone to write anything about it, but if I

17   did I would have had good reason to because it was

18   all about William Browder's credibility which was

19   the subject that we were hotly litigating in

20   New York and I had been on this -- you know, we had

21   been on this, you know, multi-year effort to get

22   him to answer questions about his activities in

23   Russia.  So it was the central issue in the

24   Prevezon case.

25       Q. So you mentioned Mr. Cooper was involved

Glenn Simpson                                              August 22, 2017

Washington, DC

Page 127

1    in establishing this screening.  Do you know how he

2    came to be hired by Prevezon or HRAGI or whoever?

3         A. I know a little.  As I was saying earlier,

4    I've known Chris from Wall Street Journal days and

5    I refer business to him.  I know this doesn't fit

6    with the Browder theory of the case, but I don't do

7    a lot of public relations work and I refer, you

8    know, public relations jobs to other people,

9    friends.

10        So when the trial was approaching in the

11   Prevezon case I kept telling the lawyers you guys

12   have to hire a PR guy, I'm not going to do this,

13   it's just too much work.  So we were trying to find

14   PR people and he was one of the people that I

15   recommended as a trial PR guy.  From there I don't

16   have a clear sense of how he ended up working on

17   the movie, but it wouldn't be surprising if they

18   had his name from the previous referral.

19        Q. Do you know who came up with the idea of

20   creating HRAGI?

21        A. I would be guessing.  I just don't

22   remember.  Someone may have told me.  I don't

23   remember.

24        Q. What kind of interaction did Fusion have

25   directly or indirectly with HRAGI?

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 128

1        A. I remember hearing about it.  I remember

2    Rinat talking about it and maybe others.  We were

3    very peripheral to this stuff and I don't remember

4    if I had any specific interactions with it.  I

5    don't know if they had an office, I don't know if

6    they had a bank account.  I just don't know.  I do

7    know they registered to lobby.

8        Q. Do you know Lanny Wiles, L-A-N-N-Y,

9    W-I-L-E-S?

10       A. I know him a little bit.  I met him

11   originally when I was a journalist.  He was

12   introduced to me as a well-connected Republican

13   consultant type and I bumped into him once or twice

14   over the years.

15       Q. Has Fusion ever worked with him?

16       A. I don't think so, no.

17       Q. What did you understand his role to be in

18   the Prevezon-HRAGI work?

19       A. Again, my understanding of people's

20   roles on -- he was involved in the lobbying.  He's

21   a lobbyist.  He was involved in the lobbying.

22   Beyond that I really couldn't say.

23       Q. Did you have any involvement with him in

24   the course of your work on the Prevezon?

25       A. I think we had lunch once.

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 129

1        Q. Do you have any reason to believe that

2    Mr. Wiles has ties to the Russian government?

3        A. No.

4        Q. So as you mentioned, in 2016 people

5    associated with HRAGI met and attempted to meet

6    with people in a number of congressional offices.

7    Were you aware of any of these meetings?

8        A. The meeting that I was aware of that I

9    remember hearing about was a meeting that actually

10   didn't happen which was some meeting that Mark

11   Cymrot was supposed to have.  It's possible that he

12   was going to meet some Congressman.  It's possible

13   that I was told about other meetings by some of

14   these people that we're discussing, but I don't

15   specifically remember hearing about other meetings.

16   I was generally aware that there was stuff going on

17   on the Hill.

18       Q. If I could refer back to Exhibit 2, the

19   partial privilege log.  The first page of that

20   document lists a 5/13/16 e-mail from Rinat

21   Akhmetshin to Mark Cymrot with the subject/

22   description "Appointment with Cong. Hill."  Do you

23   believe that to be a reference Congressman French

24   Hill?

25       A. I don't know.  I believe it was a

Glenn Simpson                                      August 22, 2017

Washington, DC

Page 130

1    Congressman named Hill.  I don't know if it was a

2    Congressman named French Hill.

3         Q. And do you recall any other mentions of

4    meetings with any particular congressional offices

5    or committees?

6         A. I'm sure -- I'm sorry.  I believe I recall

7    Rinat telling me that he was talking to Paul

8    Behrends, B-E-H-R-E-N-D-S.  It was either Rinat or

9    Mark Cymrot or maybe both about some of these

10   issues, but, again, I don't have a great

11   recollection for the specifics.

12        Q. Did Fusion have any role in these

13   meetings?

14        A. I mean, I think we were asked for

15   information, and to the extent that the lawyers

16   wanted me to give somebody information I would hand

17   it over to them.  It's their information.

18        Q. To the best of your knowledge, was that

19   information referenced in the meetings with

20   congressional staff members?

21        A. I don't know.

22        Q. You mentioned you had dinner with

23   Ms. Veselnitskaya on June 8th and 10th of 2016.

24   Were you generally aware of her trip to the United

25   States in June?

Glenn Simpson                                              August 22, 2017

Washington, DC

                                                              Page 131

1        A. I was.  She had trouble getting a visa and

2    the lawyers -- there was some drama over whether

3    she could get a visa.  This would have been a

4    recurring issue in the case.  You know, our lawyers

5    believed that the Justice Department was

6    interfering with her visas because they wanted to

7    inhibit her from collaborating with us on the case,

8    but I don't have any independent knowledge of her

9    visa issues.  I just remember that was an issue.

10       I remember that at the last minute she got a

11   visa to come to this Appellate Court hearing on

12   June 9th in New York, and that was the way that she

13   persuaded them to give her a visa was that she

14   needed to attend a hearing which was on an appeal

15   of a District Court ruling related to the

16   disqualification motion that had been filed by

17   William Browder against Baker Hostetler after he

18   was ordered to give testimony.

19       So that's the history of that court hearing,

20   which was after the Court said he couldn't get out

21   of the subpoena and he had to give testimony, he

22   then triggered a new delay in his testimony by

23   filing a disqualification motion.

24       Q. And that hearing was on June 8th; is that

25   correct?

Glenn Simpson                                                        August 22, 2017

Washington, DC

Page 132

1          A. I believe it was June 9th.

2          Q. Did you have any other information about

3     Ms. Veselnitskaya's itinerary or intended

4     activities on this trip?

5          A. No.  I mean, I can tell you what I knew.

6     I knew she was coming in I guess on the 8th.  I

7     don't have a clear recollection of the dinner, but

8     I know -- I believe we had a dinner.  The problem

9     is I had more than one.  So I don't have a clear

10    recollection of it.

11          Anyway, I saw her the next day in court at

12    this hearing and I'm sure we exchanged greetings,

13    but, as I say, she speaks Russian and I speak

14    English.  I think she was with Anatoli and she left

15    afterwards.  I know she didn't tell me any other

16    plans she had.

17          Q. So you had dinner the 8th, saw her in

18    court on the 9th; is that correct?

19          A. Yes.

20          Q. And dinner again on the 10th?

21          A. In D.C.

22          Q. Did you see her any other time?

23          A. Not that I recall.

24          Q. Did Fusion play any role assisting

25    Ms. Veselnitskaya during that trip?

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 133

1          A. Not that I recall.

2          Q. It has widely been reported

3   Ms. Veselnitskaya and Mr. Akhmetshin and others met

4   with Donald Trump, Junior, Paul Manafort, and Jared

5   Kushner on June 9th, 2016.  Were you aware of this

6   meeting beforehand?

7          A. No.

8          Q. It didn't come up at the dinner the night

9   before?

10         A. No.

11         Q. When did you first become aware of the

12  meeting?

13         A. Around the time it broke in the New York

14  Times.  I was stunned.

15         Q. Is it correct that that means it wasn't

16  discussed at the dinner on the 10th?

17         A. No, but, again, you know, the dinner on

18  the 10th was I was at one end of the table talking

19  to a woman about her biography on Simon Bolivar and

20  she was at the other end with Rinat and she doesn't

21  really speak much English.  So, you know,

22  fortunately I was not going to do a lot of

23  entertaining.

24         Q. I should clarify, discussed with you.

25         A. Yeah.  So if she discussed with somebody

Glenn Simpson                                          August 22, 2017

Washington, DC

1   else, I wouldn't --

2        Q. Right.

3        Do you have any knowledge of the purpose of

4   the meeting other than what you read in the media?

5        A. No.  No.  Well, I mean, I read she wanted

6   to give them some information and I wondered

7   whether it was information from the Prevezon case

8   and I've seen speculation to that effect, but I

9   don't have any knowledge.

10       Q. If we had the specifics of the

11  information, would you be able to clarify whether

12  it had come from Fusion?

13       A. I think so.  If it's, you know, stuff I

14  worked on I obviously will recognize it, yes.

15       Q. As far as you know, how was this meeting

16  arranged or do you have any information beyond

17  what's in the public --

18       A. I don't.

19       Q. Other than recent media reports, do you

20  have any reason to believe that the meeting was an

21  attempt by the Russian government to make contact

22  with the Trump campaign?

23       A. I mean, that's kind of an analytical

24  question.  I don't have any factual reason to

25  believe that.  I don't have possession of any

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 135

1    information about this that would allow me to say

2    one way or the other.  You know, as a sort of

3    question of counterintelligence and just general

4    investigation of Russian methods and that sort of

5    thing, I think that's a reasonable interpretation.

6         Q. Have you had any communications about the

7    meeting at any time with Rinat Akhmetshin?

8         A. No.  No.

9         Q. Have you had any communications about the

10   meeting, again, at any time with Ms. Veselnitskaya?

11        A. No.

12        Q. Have you had any communications about the

13   meeting with anyone you worked with on the Prevezon

14   matter?

15        A. Probably.  I think we all exchanged mutual

16   expressions of surprise.  I think I talked to Paul

17   Levine, a lawyer at Baker Hostetler.  I'm sure I

18   discussed it with Ed Baumgartner, Mark Cymrot.  You

19   know, if anyone knew about it they certainly didn't

20   confess it to me.

21        Q. Do you know -- I'm going to butcher this

22   name -- Irakle Kaveladze?

23        A. I know who he is.

24        Q. I'll spell it.  I-R-A-K-L-E, last name

25   K-A-V-E-L-A-D-Z-E.

Glenn Simpson                                             August 22, 2017

Washington, DC

Page 136

1          A. No, I don't know.

2          Q. Has Fusion ever worked with him?

3          A. No, not to my knowledge.

4          Q. To the best of your knowledge, did he have

5     any role in the Prevezon or Magnitsky work?

6          A. My knowledge is primarily of the Prevezon

7     case and, to my knowledge, he was not involved in

8     the Prevezon case in any way.

9          Q. Do you have any reason to believe beyond

10    public reporting that he has ties to the Russian

11    government?

12         A. I've been told by a source that --

13    actually, I was told by a source that there was

14    some reason to believe he had ties to the Russian

15    government, and he directed me to a newspaper

16    article which said that he had connections to a guy

17    on the West Coast named Boris Goldstein who has

18    been linked historically to Soviet Russian

19    intelligence.  Beyond that I don't have any -- I

20    don't have any information.

21         Q. And who was the source that told you that?

22         A. I'm not going to talk about my source.

23         Q. I think you've already addressed this a

24    little bit, but do you know Anatoli Samochornov?

25    A-N-A-T-O-L-I, S-A-M-O-C-H-O-R-N-O-V.

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 137

1        A. I met him in connection with this case.

2   We've never had any kind of social or other

3   relations beyond chatting in courthouses and that

4   sort of thing, sitting in restaurants waiting for a

5   hearing to start.

6        Q. Has Fusion ever worked with him other than

7   on the Prevezon case?

8        A. No.

9        Q. And to the best of your knowledge, what

10  was his role in the Prevezon case?

11       A. As I understood it, he was recruited off

12  the rack basically as a certified -- a translator

13  who had courtroom experience in New York who was

14  qualified to do sort of technical-legal type

15  translation work.  He, to my knowledge, didn't have

16  a pre-existing relationship with Ms. Veselnitskaya

17  or Prevezon.  That's my understanding to this day.

18       MR. DAVIS:  I think that's the end of our

19  hour.  It is 1:04.  Let's go off the record.

20                    (Whereupon, at 1:05 p.m., the

21                     interview was recessed, to

22                     reconvene at 1:45 p.m., this

23                     same day.)

24                    AFTERNOON SESSION

25       MS. SAWYER:  We'll go back on the record.

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 138

1    It's 1:55.

2                        EXAMINATION

3    BY MS. SAWYER:

4         Q. I'm going to return you back to discussing

5    the work at Fusion that Christopher Steele had done

6    during the Presidential election of 2016.  It has

7    been widely reported and Mr. Steele has

8    acknowledged that he created 16 memos before the

9    election between the time period of June of 2016

10   and October of 2016.  Is that accurate?

11        A. To the best of my knowledge, that's

12   accurate.

13        Q. And then he also has acknowledged --

14   Mr. Steele also has acknowledged and it's been

15   reported that there was one additional memo that

16   came after the election in December of 2016.  Is

17   that also accurate?

18        A. I think what he has said is that -- yeah,

19   that's basically accurate.  What he said was that

20   the series of memos that were published by

21   BuzzFeed, that's the package that you're talking

22   about.

23                      (Exhibit 3 was marked for

24                       identification.)

25   BY MS. SAWYER:

Glenn Simpson                                    August 22, 2017

Washington, DC

Page 139

1      Q. And so I'm going to show you what we will

2  just mark as Exhibit 3 for identification purposes.

3  So Exhibit 3 that I've just given you is a document

4  that was produced to the committee by your lawyers,

5  and they had explained to us that this was a

6  document originally posted by BuzzFeed in January

7  of 2017 and it has Bates numbers down in the

8  right-hand corner.  The first one is

9  CLMS-JC-00041391 and then the last one is number

10 41425.  If you could just take a look at that.  Is

11 that what we were just discussing as the series of

12 memos posted by BuzzFeed and created by Mr. Steele?

13     A. Yes, it is.

14     Q. Can you explain for us just what -- does

15 this represent the 16 memos that would have

16 occurred between June and October of 2016 that

17 Mr. Steele created?

18     A. These are the memos that he created under

19 the engagement and then this extra one that is

20 appended.  I never actually numbered -- totaled

21 them up, but these are the ones I'm familiar

22 with.

23     Q. And does this represent the entire

24 universe of memos that Mr. Steele created as part

25 of this particular engagement for you?

Glenn Simpson                                                          August 22, 2017

Washington, DC

1        A. To the best of the my knowledge as part of

2    this engagement, this is it.

3        Q. And can you just explain to us so that we

4    understand the document, it has a heading "Company

5    Intelligence Report."  I'm just looking at the

6    first page.  That one says "Company Intelligence

7    Report 2016/080."  What would that have signified?

8        A. Company Intelligence Report is just a way

9    of saying it's not a government document.  In the

10   event that, you know, someone stole it or it leaked

11   or there was some sort of breach, you know, they're

12   not going to have their own name on it, but they

13   want to make sure that no one mistakes it for a

14   government document.  That's my understanding.

15       080 is their internal numbering system for,

16   you know, their production of memoranda, and the

17   reason it jumps from 80 to 86 is -- I never

18   actually asked him, but there aren't five memos in

19   between this.  So the interpretation is that it's

20   an internal numbering system for maybe Russia stuff

21   or maybe it's just -- I'm sorry.  I don't know what

22   the internal numbering system is, but there isn't

23   five memos in this project between these two.

24       Q. So the company referenced in Company

25   Intelligence Report, your understanding is that

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 141

1   would be Orbis, not Fusion GPS?

2        A. I can't answer that.  I think it's, as I

3   said, meant to denote that it's not a government

4   report.

5        Q. Were they producing -- as you noted, the

6   next apparent report 086 would be five, presumably,

7   reports later.  Were those other five reports

8   reports that were being generated for Fusion GPS

9   or --

10       A. No.

11       MR. LEVY:  I don't think he said that.  Go

12  ahead.

13  BY THE WITNESS:

14       A. I mean, there aren't five reports that he

15  did for us between these two.  This is the first

16  and second.

17       Q. So, again, when we look at that first one

18  that we discussed briefly, 2016/080, it appears to

19  be a three-page memorandum and it's dated 20 June

20  2016 and that shows up on the last page.  Would you

21  have received it around that time that it's dated,

22  June 20, 2016?

23       A. Within a couple days, yeah.  Yes.

24       Q. And not every single discrete memo has a

25  date, but a number of them do.  To the extent they

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 142

1    had dates, would you have been receiving them

2    around the time they were dated?

3        A. Yeah.  I believe so, yes.  There might be

4    some lag, transition lag.

5        Q. And what was -- what use did you make of

6    these memos?

7        A. These memos -- I mean, I guess I'd like to

8    back up a little bit and explain, you know, what

9    led to the memos, which was -- as I said, I mean,

10   you know, we started looking at -- first we started

11   looking at Trump's business affairs generally with

12   some of the emphasis on associations with organized

13   crime and in particular Russian organized crime.

14   As the project progressed towards the end of 2015

15   and into 2016 we became interested in his overseas

16   business dealings particularly because they were so

17   opaque and seemed to involve, you know, to say the

18   least, colorful characters.

19       So as we got into 2016 we were looking

20   broadly at -- one of the things we were looking at,

21   broadly speaking, was Donald Trump's international

22   business dealings and, you know, through the spring

23   of 2016, as I mentioned, we were -- you know, we

24   looked in various places, Latin America.  He has

25   worked on projects all over the world, but in

Alderson Court Reporting

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 143

1  particular, you know, several in the former Soviet

2  Union, Georgia, Azerbaijan, both former Soviet

3  republics.  So over the course of the spring I'd

4  say -- and Russia -- we gradually began to exhaust

5  the public record, the open source about these

6  topics in various places.  As you, you know, sort

7  of run short on public record or open source

8  information, you know, you need to get -- if you

9  still want to go deeper you need to get human

10  source.

11        So the purpose of this was to see if we could

12  learn more, generally speaking, about his business

13  dealings in Russia.  What came back was something,

14  you know, very different and obviously more

15  alarming, which had to do with -- you know, which

16  outlined a political conspiracy and a much broader

17  set of issues than the ones that we basically went

18  looking for.  You know, initially we didn't know

19  what do with this.

20        The main thing we did with it, the use we

21  made of it was as intelligence, which is to

22  understand what's happening.  So when this arrived

23  the first indicators were starting to float around

24  that there was something bigger going on, the

25  government of Russia or someone was doing some

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 144

1    hacking.  I don't really remember the precise

2    details.  I just remember there were rumblings at

3    that time about whether there had been lot of

4    hacking and there was going to be -- political

5    digital espionage was going to be a component of

6    the campaign.

7          So when this arrived it was also right around

8    the time I think -- Trump had said weird things

9    about the Russians and Putin and things that are

10   very atypical for a Republican and that people

11   found to be odd.  So when this arrived, you know,

12   we made no immediate use of it at all in terms of,

13   you know, giving it to anybody.  It was essentially

14   used to inform our other researcher, but because it

15   was -- and because it was human source intelligence

16   and some of it was of a personal nature, it was not

17   particularly useful for the kind of things that

18   are, you know, useful in politics, which are things

19   that you can prove, things that you can say, things

20   that people will believe.

21         So we used it as intelligence to try and

22   understand what was going on and, you know,

23   obviously, as we talked about earlier, we tried to

24   analyze this to see if it was credible.  You know,

25   I did -- you know, in the initial round of this

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 145

1    that was the big question, was this credible.

2         Q. Okay.  So let me stop you there for a

3    second before we get too far because you've

4    referred a number of times to "this" and you have a

5    35-page document in front of you.  So I want to

6    clarify when you said "this," in the context of

7    answering that I assumed you were talking about the

8    first --

9         A. The first memo.

10         Q. That's the report 2016/080?

11         A. Correct.

12         Q. And that's the one that has the date of 20

13    June 2016?

14         A. Correct.  To be totally clear, you know,

15    what people call the dossier is not really a

16    dossier.  It's a collection of field memoranda, of

17    field interviews, a collection that accumulates

18    over a period of months.  You know, they came in

19    intermittently, there was no schedule.  You know,

20    he'd reach a point in the reporting where he had

21    enough to send a new memo; so he'd send one.  So

22    you won't find any real rhythm or chronological

23    sort of system to the way they came in.

24         MR. MUSE:  Just for clarification of "this,"

25    there are bates numbers I think that could be

Glenn Simpson                                                    August 22, 2017

Washington, DC

1    identified here.

2         MS. SAWYER:  Right.  So that first document,

3    the one that we've just been talking about, has

4    Bates Nos. 49391 to 41393.  Do we need to go off

5    the record for a moment?  Let's go off the record

6    for a moment.

7                    (A short break was had.)

8    BY MS. SAWYER:

9         Q. With regard to this document, you

10   characterized this document as representing field

11   interviews, I think you talked about it as human

12   source information.  So was Mr. Steele's kind of

13   role with regard to the project primarily

14   conducting these types of interviews, gathering

15   this type of what I think you referred to as human

16   intelligence for Fusion?

17        A. Yes.  I mean, in other cases we did other

18   things.

19        MR. LEVY:  Don't get into other cases.

20   BY THE WITNESS:

21        A. I can't remember specifically what I had

22   in mind to get from him.  This form of reporting

23   was, in fact, the form that the rest of the project

24   took, which was, you know -- I've done other kinds

25   of research in Russia, but something this sensitive

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 147

```
 1   I don't think I've ever been involved in.  So in an
 2   ordinary case you would try to gather public
 3   records and you would conduct yourself in a much
 4   more open fashion.
 5        You know, Russia is a dangerous place, it's a
 6   kleptocracy and a police state, but it's also a
 7   giant bureaucracy and in some ways it's a much more
 8   open society, much more open than the Soviet Union
 9   ever was.  You can pull records for companies and
10   that sort of thing.
11        Anyway, so this was unusual in what we were
12   doing here and it's not what I had in mind when I
13   asked him to begin collecting information on this.
14   My expectation was of something a lot less
15   interesting than this, more along the lines of a
16   typical corruption investigation.
17        Q. You had indicated that when you received
18   it you found it unusual, it was sensitive
19   information.  Did you take steps to verify any of
20   the information?
21        A. We assessed it for credibility, whether it
22   was credible.  The question of the credibility of
23   the information is obviously a big question here,
24   can this be believed.  There's other secondary
25   questions that would follow on from that, can it
```

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 148

1   somehow be used, does it have any use and that sort

2   of thing, but the threshold question is is it

3   credible information.

4        You know, there were two background factors

5   to that.  One was who is it coming from.  It's

6   coming from Chris Steele who's a guy that I've

7   worked with for, you know, about eight or nine

8   years and Chris, as I say, has a Sterling

9   reputation as a person who doesn't exaggerate,

10  doesn't make things up, doesn't sell baloney.  In

11  my business, I mean, there are a lot of people who

12  make stuff up and sell baloney.  So the one thing

13  that you get good at if you do this for a while is

14  finding reliable sources, finding reliable people

15  who have a record of giving it to you straight and

16  not making stuff up and not making mistakes.  So

17  from that perspective, you know, this was alarming

18  because Chris is a credible person, he's well

19  respected in his field, and, as I say, everyone I

20  know who's ever dealt with him thinks he's quite

21  good.  That would include people from the U.S.

22  government.

23       So the issue is where is it coming from and

24  then the other issue is does it make sense or are

25  there events in there that can be externally, you

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 149

1    know, reviewed or backed up.  On the question of

2    whether it makes sense -- well, let me stay on the

3    question of some of the events that are described.

4    We were aware of some of these trips and we were

5    obviously aware of the hostility toward Hillary

6    Clinton and, you know, there was a lot of general

7    knowledge that we had that fit with this just in

8    terms of dates and places and roles of people in

9    the Kremlin.  So on a surface level, you know, it

10   was credible too, but the thing that, you know,

11   most concerned me at this point was my own

12   familiarity with foreign meddling in American

13   elections, which is a subject that I've dealt with

14   for a long time.

15        In the 1990s I was working at the Wall Street

16   Journal and I wrote some of the very first stories

17   about the Chinese government's interference in the

18   1996 presidential election which triggered a

19   massive national security investigation, numerous

20   prosecutions, lots of business for Bob Muse, and a

21   lot of congressional hearings, congressional

22   inquiries.  And in that episode it was eventually

23   dug out by congressional investigations that the

24   fundraisers, the Asian fundraisers were Chinese

25   intelligence assets.  So there's ample recent

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 150

1   historical precedent for a foreign government to

2   interfere in American elections in a really big way

3   and for it to be an intelligence operation.  So I

4   knew all of that while reading this and digesting

5   it for the first time.

6        I also knew because I've done a lot of

7   reporting on Russia about the Kremlin's interest in

8   American politics, European politics, disrupting

9   the politics of other countries, and, in fact, one

10  of the last things I did when I was a reporter at

11  the Wall Street Journal was report on several

12  stories of government investigations, FBI

13  investigations into American politicians who had

14  been corrupted allegedly by the Russians.

15       Sort of my departure point from journalism

16  was a series of stories and conferences I attended

17  where a lot of American and European intelligence

18  officials were expressing great alarm at the

19  resurfacing of Russian intelligence operations in

20  western capitals and the new twist on it which

21  seemed to be that these guys seemed to be getting

22  involved in politics in ways that they hadn't

23  previously.  So I knew all that when I read this.

24       Q. Okay.  So if I can stop you there.  It

25  sounds like the components -- you can tell me if

Glenn Simpson                                                August 22, 2017

Washington, DC

Page 151

1    there were more -- that you considered in assessing

2    the credibility of this was Mr. Steele, his

3    background, his reputation, overall the fact that

4    you had information and knowledge of Russia

5    meddling in other countries' elections, and then

6    the broader work of Russia to disrupt political

7    systems of other countries?

8          A. I covered that.  I also would add that the

9    China case was for me in my journalistic career a

10   formative event that took -- you know, consumed

11   years of my reporting and was about, you know, a

12   Chinese intelligence operation to swing the '96

13   election to the Democrats.

14         The only other thing I'd add to all that is,

15   again, in the mid 2000s one of the stories I

16   wrote -- actually, I wrote a couple different

17   stories about a Russian oligarch having a meeting

18   with Senator John McCain shortly before the 2008

19   presidential election and another story or set of

20   stories about Paul Manafort and his involvement

21   with some Russian and Ukrainian oligarchs who were

22   considered to be suspicious or corrupt.

23         So I also knew -- or I formed an opinion or

24   impression that the Russians were interested in

25   making friends with the Republicans and that Paul

Alderson Court Reporting

Glenn Simpson                                                      August 22, 2017

Washington, DC

1    Manafort, you know, there was this previous episode

2    involving Paul Manafort, John McCain.  So all of

3    that was in my head when this came in which, as I

4    say, tended to support the credibility -- the

5    possibility that this information was credible.

6         Q. You mentioned a Russian oligarch who had

7    met with Senator McCain.  Who specifically was

8    that?

9         A. Oleg Deripaska, O-L-E-G,

10   D-E-R-I-P-A-S-K-A.  He's not able to travel to the

11   United States because he's banned for suspicion of

12   ties to organized crime.  He's extremely close to

13   the Kremlin, or at least he was, and is -- I broke

14   the story of him being banned from the United

15   States which caused him a lot of embarrassment and

16   trouble with his business and led to him hiring a

17   lobbyist and trying to get involved with getting a

18   visa to the U.S.

19        Q. And you had also mentioned your background

20   knowledge of Paul Manafort and his involvement with

21   Russian oligarchs.  Can you identify who those

22   individuals were and the basis of that knowledge?

23        A. The issue I specifically wrote about I

24   believe was his work for the Party of Regions and

25   Victor Yanukovych, Y-A-N-U-K-O-V-Y-C-H, I think,

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 153

1    and that's the Pro-Russia party or was the

2    Pro-Russia party in Ukraine, and all that work sort

3    of grew out of work I had done about the Kremlin

4    working with the Russian mafia to siphon money off

5    the gas trade between Russia and Ukraine.

6          Q. Was that work you had done while still a

7    reporter with the Wall Street Journal?

8          A. Yes.

9          Q. So any conclusions you had reached from

10   that, would that be material that we would be able

11   to obtain and may already have in your public

12   reporting?

13         MR. LEVY:  We'd have to talk to the Wall

14   Street Journal about that probably.

15   BY THE WITNESS:

16         A. My articles about this are available on

17   the Internet.

18         MR. LEVY:  Some of them we've produced to you

19   already because it was responsive to your request.

20         MS. SAWYER:  Understood.

21   BY MS. SAWYER:

22         Q. And there's potentially additional work

23   product related to the work that you had done on

24   Mr. Manafort?

25         A. For the Wall Street Journal or later?

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 154

1        Q. Let's start with the Wall Street

2    Journal?

3        A. I collected lots of information on

4    Mr. Manafort during my years at the Journal.

5        Q. And then we'll get into the work on

6    Mr. Manafort more recently.

7        So this particular memo that we've been

8    talking about, this first one doesn't specifically

9    mention, as far as I can see, any efforts to

10    interfere by Russia.  It does talk about

11    potential -- as it's called in here, a dossier of

12    compromising material on Hillary Clinton.  Did you

13    take any steps to verify whether that dossier of

14    compromising material existed on Hillary Clinton?

15        A. I will answer that, but can I just back

16    you up a little bit.  I think your observation it

17    doesn't mention anything about interfering I

18    wouldn't agree with.

19        Q. Okay.

20        A. I mean, one of the key lines here in the

21    second paragraph says "However, he and his inner

22    circle have accepted a regular flow of intelligence

23    from the Kremlin, including on his democratic and

24    other political rivals."

25        So the issue with the Trump Tower meeting, as

Glenn Simpson                                                                    August 22, 2017

Washington, DC

Page 155

1    I understand it, is that the Trump people were

2    eager to accept intelligence from a foreign

3    government about their political rivals and that

4    is, you know, I would say, a form of interference.

5    If you're getting help from a foreign government

6    and your help is intelligence, then the foreign

7    government's interfering.  I mean, you know, I

8    think that also -- of course, in retrospect we now

9    know this was pretty right on target in terms on

10   what it says.  So anyway --

11        Q. In reference to you think that particular

12   sentence?

13        A. I mean, it clearly refers to, you know,

14   them being interested in and willing to -- it

15   depicts them as accepting information.  What we

16   have seen to date with the disclosures this year is

17   they were at a minimum super interested in getting

18   information.

19        Q. And when you're referencing the

20   "disclosures this year," could you just be specific

21   about that.

22        A. The Trump Tower meeting.

23        Q. So with reference to the June 9th Trump

24   Tower meeting?

25        A. Yes.  Yes.

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 156

1          Q. Okay.

2          A. I will go back to your question, but,

3      again, it says "Source B asserted the Trump

4      operating was both supported and directed by Putin

5      aimed to sew discord within the U.S.," and, you

6      know, basically -- you know, there's a number of

7      different ways that it seems they're trying to

8      intervene in our politics in this memo.

9          What was your question?

10         Q. I appreciate that clarification.  You were

11     actually clarifying a statement I made, which I

12     appreciate.

13         So you had testified a little earlier that at

14     the point in time in which you received this first

15     memo you used it a little more as background to

16     inform your thinking on it, but you didn't take

17     discrete steps.  Had you -- were you involved in

18     editing this memo in any way?

19         A. No.

20         Q. Did you give Mr. Steele any specific

21     direction on, you know, next steps based on this

22     memo?

23         A. Not that I can recall, no.

24         Q. So at this point in time was he still

25     operating with the understanding that he was just

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 157

1    to engage in an open-ended research project?

2         A. Actually it wasn't really an open-ended

3    research project -- well, it was open-ended in

4    scope, it wasn't open-ended in time.  It was take a

5    few weeks, see if there's anything there that's

6    interesting, notable, important, and if we think

7    there's reason to go on we'll make that decision at

8    that time.  So it was a short-term engagement in

9    the beginning.

10        Q. And to the best you can explain to us, did

11   the client that you were working for know that he

12   was engaged in this particular research or what his

13   findings were at that point in time?

14        MR. LEVY:  The answer to that question might

15   implicate privilege or obligations.

16   BY MS. SAWYER:

17        Q. Did you interfere in any way with

18   Mr. Steele's research, tell him not to pursue any

19   particular avenues?

20        A. No.

21        Q. To the best of your knowledge, did anyone

22   else give him that direction, either directly or

23   through you, and tell him not to --

24        A. No.

25        Q. If I could just finish.

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 158

1       A. I'm sorry.

2       Q. -- and tell him not to pursue any

3  particular avenues of research?

4       A. No.

5       Q. Do you know -- if we could just move on to

6  kind of the next memo, which begins with Bates

7  No. 41394 and it ends with 41396.  It appears to

8  be -- it's three pages and it has a date of 26 July

9  2015 and it has "Company Intelligence Report

10  2016/086."  To the best of your recollection, was

11  this the second memo you had received from

12  Mr. Steele?

13       A. To the best of my recollection, this is

14  the second memo.

15       Q. And how did you kind of use this

16  information?

17       A. Well, I think the context of external

18  events is important here.  I believe -- it's my

19  recollection that what prompted this memo was, in

20  fact, the beginning of public reporting on the

21  hack.  I think -- what is the date again?  Yeah,

22  it's 26 July.  So by this time Debbie Wasserman

23  Schultz has been the subject of a very aggressive

24  hacking campaign, weaponized hack, the likes of

25  which, you know, have never really been seen.

Glenn Simpson                                              August 22, 2017

Washington, DC

Page 159

1    We've seen hacking in politics before, but this

2    kind of, you know, mass theft of e-mail and then to

3    dump it all into, you know, the public sphere was

4    extraordinary and it was criminal.

5         So the question by now of whether this was

6    Russia and whether this might have something to do

7    with the other information that we'd received was,

8    you know, the immediate question, and I think this

9    is also -- by the time this memo was written Chris

10   had already met with the FBI about the first memo.

11   So he's -- if I can interpret a little bit here.

12   In his mind this is already a criminal matter,

13   there's already a potential national security

14   matter here.

15        I mean, this is basically about a month later

16   and there's a lot of events that occurred in

17   between.  You know, after the first memo, you know,

18   Chris said he was very concerned about whether this

19   represented a national security threat and said he

20   wanted to -- he said he thought we were obligated

21   to tell someone in government, in our government

22   about this information.  He thought from his

23   perspective there was an issue -- a security issue

24   about whether a presidential candidate was being

25   blackmailed.  From my perspective there was a law

Glenn Simpson                                              August 22, 2017

Washington, DC

Page 160

1    enforcement issue about whether there was an

2    illegal conspiracy to violate the campaign laws,

3    and then somewhere in this time the whole issue of

4    hacking has also surfaced.

5         So he proposed to -- he said we should tell

6    the FBI, it's a national security issue.  I didn't

7    originally agree or disagree, I just put it off and

8    said I needed to think about it.  Then he raised it

9    again with me.  I don't remember the exact sequence

10   of these events, but my recollection is that I

11   questioned how we would do that because I don't

12   know anyone there that I could report something

13   like this to and be believed and I didn't really

14   think it was necessarily appropriate for me to do

15   that.  In any event, he said don't worry about

16   that, I know the perfect person, I have a contact

17   there, they'll listen to me, they know who I am,

18   I'll take care of it.  I said okay.  You know, I

19   agreed, it's potentially a crime in progress.  So,

20   you know, if we can do that in the most appropriate

21   way, I said it was okay for him to do that.

22        Q. Okay.  So let me just stop you there and

23   let's just make sure we get the sequencing

24   accurate.

25        A. Sure.

Glenn Simpson                                              August 22, 2017

Washington, DC

Page 161

1          Q. So after Mr. Steele had found out the

2     information that he put in the very first of these

3     memos, the one dated June 20, 2016, he approached

4     you about taking this information to specifically

5     the FBI, the Federal Bureau of Investigation?

6          A. That's my recollection.

7          Q. So to the best of your recollection, that

8     request or idea came directly from Mr. Steele, not

9     anyone else?

10         A. That's right.

11         Q. And who was involved in discussions about

12    whether it was appropriate to take either the memo

13    or the information in the memo to the FBI?

14         A. It was Chris and me.  I mean, that's the

15    only ones I remember, the two of us.  The only ones

16    I know of.

17         Q. You said you had asked for some time to

18    think it over.  What in particular did he

19    articulate to you was of significant national

20    security concern to indicate that it should be

21    taken to the FBI?

22         A. His concern, which is something that

23    counterintelligence people deal with a lot, is

24    whether or not there was blackmail going on,

25    whether a political candidate was being blackmailed

Glenn Simpson                                                      August 22, 2017

Washington, DC

Page 162

1    or had been compromised.  And the whole problem of

2    compromise of western businessmen and politicians

3    by the Russians is an essential part of -- it's

4    like disinformation, it's something they worry

5    about a lot and deal with a lot and are trained to

6    respond to.  So, you know, a trained intelligence

7    officer can spot disinformation that you or I might

8    not recognize, certainly that was Chris's skill,

9    and he honed in on this issue of blackmail as being

10   a significant national security issue.

11          Chris is the professional and I'm not.  So I

12   didn't agree with that -- it wasn't that I

13   disagreed with it.  It was that I didn't feel

14   qualified to be the arbitrar of whether this is a

15   national security expert.  He's the pro and I'm the

16   ex-journalist.

17          Q. In that regard when you say he's a

18   professional and you're not, I take that to mean

19   that he was the intelligence expert?

20          A. He was -- yes, he was the national

21   security guy.  I know a lot about politics, I know

22   a good bit about financial crime, but, you know, my

23   specialty was journalism and his was security.

24          Q. And with specific regard to the issue of

25   blackmail, what was the -- what were the facts that

Glenn Simpson                                                                    August 22, 2017

Washington, DC

1    he had gathered that made him concerned about the

2    possibility of blackmail and who did he think was

3    going to be blackmailed?

4         A. Well, the facts are -- beyond what's here

5    I don't have any additional facts.  The alleged

6    incident that's described here is the one that he

7    was referring to.  As I say, I don't have really

8    any additional information beyond this except

9    that -- I mean, it's probably in here somewhere

10   actually, but it's well known in intelligence

11   circles that the Russians have cameras in all the

12   luxury hotel rooms and there are memoirs written

13   about this by former Russian intelligence agents I

14   could quote you.  So the problem of kompromat and

15   kompromating is just endemic to east-west

16   intelligence work.  So that's what I'm referring

17   to.  That's what he's referring to.

18        Q. Got it.  So that would be in the summary

19   the kind of third dash point down where it

20   mentions --

21        A. Yes, that's right.

22        Q. -- that FSB -- what is your understanding

23   of who or what FSB is?

24        A. It's a successor to the KGB.  I mean,

25   nominally it's the domestic intelligence agency on

Glenn Simpson                                              August 22, 2017

Washington, DC

Page 164

1    the domestic side of what was the KGB.  In practice

2    it's sort of the preeminent intelligence organ of

3    the Russian state, government.

4         Q. And do you recall when you -- when you and

5    Mr. Steele decided kind of that he could or should

6    take this to the FBI, approximately the time frame

7    of that?

8         A. I believe it was sometime around the turn

9    of the month.  It would have been in late June or

10   at latest early July.  That's my recollection.

11        Q. And Mr. Steele was the one who was then

12   responsible for doing the initial outreach to them

13   and making that contact?

14        A. Yes.  Well, I mean, let's be clear, this

15   was not considered by me to be part of the work

16   that we were doing.  This was -- to me this was

17   like, you know, you're driving to work and you see

18   something happen and you call 911, right.  It

19   wasn't part of the -- it wasn't like we were trying

20   to figure out who should do it.  He said he was

21   professionally obligated to do it.  Like if you're

22   a lawyer and, you know, you find out about a crime,

23   in a lot of countries you must report that.  So it

24   was like that.  So I just said if that's your

25   obligation, then you should fulfill your

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 165

1   obligation.

2        Q. And were you a part of those conversations

3   with -- that Mr. Steele had with whoever his

4   contact was at the FBI?

5        A. No.

6        Q. Do you have any knowledge of when that

7   first conversation actually then took place?

8        A. Over the last several months that this has

9   become a public controversy I've learned the

10  general date and I believe it was if first week of

11  July, but I don't believe he told me -- if he told

12  me the time, I don't remember when he told me.

13       Q. And that information about that time, that

14  first week of July, where does that come from?

15       A. It comes from news accounts of these

16  events and conversations between Chris and I and

17  some of my -- presumably my business partners too.

18  Generally speaking, we have, as you know, not been

19  eager to discuss any of this in public and there's

20  been a lot of speculation and guessing and stories,

21  many of which are wrong.  So when an incorrect

22  story comes out we would, you know, talk about it.

23  So, you know, in the course of those kinds of

24  things I generally obtained a sense of when things

25  occurred that I might otherwise not be able to

Glenn Simpson                                              August 22, 2017

Washington, DC

Page 166

1    provide you.

2        Q. And do you know who it is that Mr. Steele

3    contacted and talked with at the FBI?

4        A. I did not know at the time.  I believe I

5    know now, but I don't have authoritative

6    information on that.  I didn't -- yeah.  I didn't

7    know who it was in July.

8        Q. And do you now know who that was?

9        A. I think I know, but Chris never told me.

10   I figured it out eventually based on other sources

11   and other information, but that was not until

12   December or November.

13       Q. December of -- November or December 2016?

14       A. November, December 2016.  It was after the

15   election.

16       Q. And what is your understanding from what

17   you've been able to put together of who that would

18   have been?

19       A. My understanding of?

20       Q. Of who Mr. Steele would have talked to at

21   the FBI.

22       A. I believe it was a ████████████████████

     ████   ████████████████████████████, an official named

24   ████████████████████████.

25       Q. And we had talked about that discussion

Glenn Simpson                                                    August 22, 2017
Washington, DC

Page 167

1    that you had with Mr. Steele about potentially

2    going to the FBI.  You had indicated that it was

3    just the two of you having those conversations and

4    coming to that decision.  Once the decision was

5    made, did you share that decision with anyone, that

6    he was going to go to the FBI with this

7    information?

8          A. I think we're not able to answer that.

9          MR. LEVY:  He's going to decline to answer

10   that question.

11   BY MS. SAWYER:

12         Q. Did you seek anyone else's approval for

13   him to go to the FBI?

14         A. No.

15         Q. Did anyone ever encourage you to ask him

16   on to go to the FBI?

17         A. No.

18         Q. Did anyone discourage you from having him

19   go to the FBI?

20         A. No.

21         Q. Do you know whether Mr. Steele when he had

22   that first meeting, which you said occurred in the

23   first week of July, do you know whether Mr. Steele

24   actually gave the FBI this document that we've been

25   talking about, the intelligence report 2016/080?

Glenn Simpson                                              August 22, 2017

Washington, DC

Page 168

```
 1        A. I don't know.

 2        Q. With regard to providing -- what was the

 3   goal -- as you understood it, what was the purpose

 4   of the kind of goal in taking this to the FBI from

 5   Mr. Steele's perspective?

 6        MR. LEVY:  Beyond what he's said already?

 7        MS. SAWYER:  Yes.

 8   BY THE WITNESS:

 9        A. I mean, for him it was professional

10   obligations.  I mean, for both of us it was

11   citizenship.  You know, people report crimes all

12   the time.

13        Q. So beyond reporting -- certainly if I'm

14   mischaracterizing please let me know, but beyond

15   reporting what he believed was an issue of national

16   security and a potential crime, I think you had

17   said kind of a potential crime in progress, do you

18   know whether he requested that the FBI open an

19   investigation?

20        A. I don't know that.  I mean, all he told me

21   in the immediate aftermath was that he filled him

22   in.  I can talk generally about the FBI and what

23   happens when you give them information because I

24   know that from years of experience, but generally,

25   you know, you don't ask them to do it.  There's no
```

Glenn Simpson                                               August 22, 2017

Washington, DC

Page 169

1    ask.

2         Q. But you don't know what concrete steps

3    they may have taken once they got the information

4    from him?

5         A. I do not.  Of course we know now that

6    shortly thereafter they got a vice award on one of

7    the people who's dealt with in here.  He's not

8    dealt with in this memo, but he's dealt with in the

9    later memos.  I don't know there's any connection

10   between these events.  I do know in Director

11   Comey's testimony he said -- I'm sorry.  Maybe I'm

12   skipping ahead.  As far as I know, they didn't -- I

13   don't know what they did.

14        Q. So then with regard to Mr. Steele's

15   ongoing work, I presume that his work then

16   continued after you got this first memo because we

17   have additional memos between June?

18        A. Yes.

19        Q. Was there a discussion about whether and

20   when he would take information to the FBI?

21        A. Not that I recall.  After the initial memo

22   he told me that he had briefed him.  I don't

23   remember anything specific about the issue arising

24   again other than to say generally that as the

25   summer progressed the situation with the hacking of

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 170

1    the Democrats and the efforts by the Russians to

2    influence the election and the possibility that the

3    Trump organization was, in fact, doing things to

4    curry favor with the Russians became more and more

5    serious as external developments occurred.

6         So, for instance, they changed the Republican

7    platform, which is addressed in here.  Carter Page

8    shows up in Moscow and gives a speech.  He's a

9    campaign advisor and he gives a speech about

10   dropping sanctions.  Trump continues to say

11   mysterious things about what a great guy Putin is.

12   So I vaguely recall that these external events

13   prompted us to say I wonder what the FBI did,

14   whoops, haven't heard from them.  So that was

15   basically the state of things through September

16        Q. So do you know whether or not Mr. Steele

17   did have any subsequent conversations with the FBI

18   after that initial conversation in the first week

19   of July 2016?

20        A. Yes, I do.  He did.

21        Q. So can you explain the next incident where

22   you know that Mr. Steele met with the FBI?

23        A. Yes.  I guess what I'd like to explain is

24   what I knew at the time and what I know now.  It

25   was September and obviously the controversy was

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 171

1    really front and center now in the election.  I

2    can't remember whether the intelligence community

3    had come out with their statement, but, you know,

4    there was a lot of concern in Washington and in the

5    U.S. about whether there was a Kremlin operation to

6    interfere with our election and there was a lot of

7    debate throughout this period about whether they

8    were trying to help Trump or just trying to cause

9    trouble.  But there wasn't much debate that they

10   were up to something.

11        So, you know, I'm dealing with Chris on the

12   underlying reporting and by this time my concern,

13   you know, was -- I was very concerned because Chris

14   had delivered a lot of information and by this time

15   we had, you know, stood up a good bit of it.

16   Various things he had written about in his memos

17   corresponded quite closely with other events and I

18   began, you know, to view his reporting in this case

19   as, you know, really serious and really credible.

20        So anyway, we were working on all of that and

21   then he said, hey, I heard back from the FBI and

22   they want me to come talk to them and they said

23   they want everything I have, to which I said okay.

24   He said he had to go to Rome, I said okay.  He went

25   to Rome.  Then afterwards he came back and said,

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 172

1    you know, I gave them a full briefing.

2         I'll add because I didn't consider this to

3    be -- you know, there was no objective here

4    politically because you can't -- in an ordinary

5    election I know from my decades of dealing with

6    U.S. elections that you can't expect the government

7    or the FBI to be of any use in a campaign because

8    the DOJ has rules against law enforcement getting

9    involved in investigations in the middle of a

10   campaign and this was obviously -- you know, this

11   obviously became a huge issue.

12        Anyway, because it wasn't really part of the

13   project in my mind I didn't really ask a lot of

14   questions about these meetings.  I didn't ask who

15   he met with, I didn't ask, you know, much of

16   anything, but he did tell me that he gave --

17        Q. Before we get to that, which I do want to

18   hear, I just want to get a sense of the chronology.

19        A. Sure.

20        Q. So when did that -- you had said the FBI

21   then came back and contacted Mr. Steele?

22        A. That's my understanding.

23        Q. When did that, to the best of your

24   knowledge, take place?

25        A. Mid to late September.

Glenn Simpson                                                                    August 22, 2017

Washington, DC

Page 173

1          Q. So in that intervening time period

2     Mr. Steele continues his research, he also

3     continues to provide you with memos?

4          A. Yes.

5          Q. And at no point in that time between

6     July -- the first week of July when he first met

7     with the FBI and then mid to late September did you

8     suggest to him that he should go back to the FBI?

9          A. Not that I recall.  What I would -- what I

10    believe I may have said was have you heard anything

11    from the FBI because by then it was obvious there

12    was a crime in progress.  So I just was curious

13    whether he'd heard back.

14         Q. And when you say it was obvious that there

15    was a crime in progress, what specifically are you

16    referencing?

17         A. Espionage.  They were hacking into the

18    computers of Democrats and think tanks.  That's a

19    computer crime.

20         Q. So the thing that was apparent was Russia

21    or somebody had engaged in cyber intrusion and

22    computer crimes?

23         A. Yes.

24         Q. So do you know whether or not Mr. Steele

25    was directed -- you said you did not direct him or

Alderson Court Reporting

Glenn Simpson                                              August 22, 2017

Washington, DC

Page 174

1    ask him to go back to the FBI -- whether anyone

2    else either directly or indirectly asked him to go

3    to the FBI after his July 5th --

4         A. To my knowledge, no one else told him to

5    report this.  He may have conferred with his

6    business associates, but I don't know.

7         Q. And you said that meeting with the FBI,

8    you said Mr. Steele said he had to go to Rome for

9    this meeting.  Do you otherwise know who he met

10   with?

11        A. This gets into the chronology of what I

12   learned when.  At some point I learned that he was

13   meeting with the lead FBI guy from Rome.  I don't

14   remember when he told me that.

15        Q. And did you have a name associated with

16   who that was?

17        A. Not at that time.

18        Q. You said that he told you of the meeting

19   with the FBI in Rome in mid or late September, that

20   he "gave them a full briefing"?

21        A. A debrief I think is what he probably

22   said, they had debriefed him.  I don't remember him

23   articulating the specifics of that.  You know, my

24   understanding was that they would have gotten into

25   who his sources were, how he knew certain things,

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 175

1    and, you know, other details based on their own

2    intelligence.  Essentially what he told me was they

3    had other intelligence about this matter from an

4    internal Trump campaign source and that -- that

5    they -- my understanding was that they believed

6    Chris at this point -- that they believed Chris's

7    information might be credible because they had

8    other intelligence that indicated the same thing

9    and one of those pieces of intelligence was a human

10   source from inside the Trump organization.

11        Q. And did you have any understanding then or

12   now as to who that human intelligence source from

13   inside the Trump campaign might have been?

14        MR. LEVY:  He's going to decline to answer

15   that question.

16        MS. SAWYER:  On what basis?

17        MR. SIMPSON:  Security.

18        MR. LEVY:  Security.

19   BY THE WITNESS:

20        A. We had been really careful -- I was really

21   careful throughout this process to not ask a lot of

22   specific sourcing questions.  There are some things

23   I know that I just don't feel comfortable sharing

24   because obviously it's been in the news a lot

25   lately that people who get in the way of the

Glenn Simpson                                               August 22, 2017

Washington, DC

Page 176

1    Russians tend to get hurt.

2         MR. LEVY:  And I would just add that there

3    are privileges and obligations that might be

4    implicated in the disclosure of any source related

5    to this matter.

6    BY MS. SAWYER:

7         Q. Was this individual also a person who had

8    been a source for Mr. Steele, without identifying

9    who that was?

10        A. No.

11        Q. So this was someone independent of

12   Mr. Steele's sources who potentially had

13   information also on the same topics?

14        A. Yes.  I mean, I don't think this

15   implicates any of the issues to say I think it was

16   a voluntary source, someone who was concerned about

17   the same concerns we had.

18        MR. DAVIS:  I'm having a hard time hearing

19   you.  Please speak up.

20   BY THE WITNESS:

21        A. It was someone like us who decided to pick

22   up the phone and report something.

23        Q. And your understanding of this, does that

24   come from Mr. Steele or from a different source?

25        A. That comes from Chris, yes.

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 177

1      Q. And when did he share that information

2   with you?

3      A. I don't remember exactly.

4      Q. Do you think it was around the same time

5   that he had met with the FBI, so mid to late

6   September of 2016?

7      A. I think more likely early October.

8      Q. Do you know whether when Mr. Steele met

9   with the FBI he provided them with the memos that

10  he would have had at that point in time, which

11  would have been mid to late September of 2016?

12     A. I don't know that.  He didn't tell me

13  that.  He did say they asked him for -- they wanted

14  to know everything he had, but whether that would

15  include getting paper I don't know.

16     Q. And did he indicate that he had cooperated

17  fully and given them whatever information he had

18  available?

19     A. Yes.  In the course of these, you know,

20  discussions, you know, he indicated to me this was

21  someone he had worked with previously who knew him

22  and that they had a -- they worked together.

23     Q. By that person you're referring to

24  █████████  in Rome?

25     A. Yes.

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 178

1        Q. Now, with regard to -- just to finish up

2    on the interactions with FBI, do you know were

3    there any additional interactions between

4    Mr. Steele and the FBI?

5        A. There was some sort of interaction, I

6    think it was probably telephonic that occurred

7    after Director Comey sent his letter to Congress

8    reopening the investigation into Hillary Clinton's

9    e-mails.  That episode, you know, obviously created

10   some concern that the FBI was intervening in a

11   political campaign in contravention of

12   long-standing Justice Department regulation.

13       So it made a lot of people, including us,

14   concerned about what the heck was going on at the

15   FBI.  So, you know, we began getting questions from

16   the press about, you know, whether they were also

17   investigating Trump and, you know, we encouraged

18   them to ask the FBI that question.  You know, I

19   think -- I'm not sure we've covered this fully,

20   but, you know, we just encouraged them to ask the

21   FBI that question.

22       On October 31st the New York Times posed a

23   story saying that the FBI is investigating Trump

24   and found no connections to Russia and, you know,

25   it was a real Halloween special.

Glenn Simpson                                                    August 22, 2017

Washington, DC

                                                                   Page 179

1          Sometime thereafter the FBI -- I understand

2    Chris severed his relationship with the FBI out of

3    concern that he didn't know what was happening

4    inside the FBI and there was a concern that the FBI

5    was being manipulated for political ends by the

6    Trump people and that we didn't really understand

7    what was going on.  So he stopped dealing with

8    them.

9          Q. Okay.  So I do want to get to the timing

10   on that.  I know that I'm getting close to the end

11   of my hour.  Can I just ask you a general question

12   on the memos that we were talking about.  I had

13   asked you specifically about the first one, if you

14   had in any way -- first of all, with regard to the

15   packet on whole, did you have any input or

16   involvement in the drafting of these or input for

17   the research?

18         A. No.

19         Q. And did you edit any of them in any way?

20         A. No.

21         Q. So these were documents that you were just

22   receiving from Mr. Steele?

23         A. Yes.  I mean, the only qualifier I'd add

24   is I'm sure I said things like Paul Manafort was

25   just named campaign manager, what do you know about

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 180

1    him, that kind of thing.

2        Q. I do want to get into some more specifics

3    about kind of what steps and what items you may

4    also clarify, but I do want to make sure, if I

5    could have your indulgence, just that we -- well,

6    we can finish up the FBI part on our next hour

7    because it sounds like there's a little more to

8    finishing that. So our hour is up. If you'll just

9    give me a moment.

10       Okay. So we'll go ahead and go off the

11   record. It is 2:58.

12                       (A short break was had.)

13       MR. DAVIS: We'll go back on the record.

14   It's now 3:09.

15                       EXAMINATION

16   BY MR. DAVIS:

17       Q. Mr. Simpson, do you know Emin Agalarov,

18   E-M-I-N, A-G-A-L-A-R-O-V?

19       MR. LEVY: Personally or just does he know

20   about him?

21       MR. DAVIS: Personally.

22   BY THE WITNESS:

23       A. No.

24       Q. Do you know Aras, A-R-A-S, Agalarov?

25       A. No.

Glenn Simpson                                                           August 22, 2017

Washington, DC

Page 181

1        Q. Has Fusion ever worked with either of

2    them?

3        A. No.

4        Q. To the best of your knowledge, have

5    either of them had any role in the Prevezon work?

6        A. Not to my knowledge.

7        Q. Do you know Rob Goldstone?

8        A. No.

9        Q. Has Fusion ever worked with him?

10       A. No.

11       Q. Paid him or been paid by him?

12       A. No.

13       Q. To the best of your knowledge, has

14   Mr. Goldstone had any work in the Prevezon or

15   Magnitsky work?

16       A. Not to my knowledge.

17       Q. When you had these dinners in June of 2006

18   with Ms. Veselnitskaya, who else attended those

19   dinners?

20       MR. FOSTER:  2016.

21       MR. DAVIS:  2016.  Excuse me.

22   BY THE WITNESS:

23       A. The Baker lawyers would have attended, did

24   attend.

25       Q. Was Rinat Akhmetshin there?

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 182

1        A. I specifically remember he was at the

2    second dinner on I think it was the 10th.  I don't

3    specifically remember if he was at the other

4    dinner.  I don't have many memory of the other

5    dinner.

6        Q. Do you recall if he was at the court

7    hearing on the 9th?

8        A. I believe he was.  I'm not certain of it.

9    The other person would have been a translator at

10   some of these dinners.  I can't remember which

11   ones.

12       Q. Were there any other individuals there

13   involved with HRAGI or Prevezon work beyond the

14   people you've mentioned?

15       MR. LEVY:  When you say "there," you're

16   talking about now?

17       MR. DAVIS:  You're right.  At the hearing.

18   BY THE WITNESS:

19       A. The hearing.  Before you were asking about

20   the dinners, right?

21       Q. I was.

22       A. Now you're asking about the hearing.  I

23   just want to be clear.  Well, it was a crowded

24   hearing and there may have been other people

25   involved.  I mean, I remember specifically pretty

Glenn Simpson                                                August 22, 2017

Washington, DC

Page 183

1    much most of the Baker legal team was there,

2    Natalia was there, I believe she -- I believe

3    Anatoli was her translator for that.  There was

4    some other people who I think were also from Baker

5    Hostetler who were there.  Former Attorney General

6    Mukasey was arguing for Prevezon.  So I just

7    remember that there were lawyers -- people who I

8    believed were lawyers who were there to watch the

9    argument and maybe had some connection to the case.

10   There was another associate I think from New York

11   who was there, usually came to some of the Court

12   hearings.  That's all I remember.

13        Q. And the first dinner on the 8th were there

14   any other attendees?

15        A. I don't remember.  I think John Moscow

16   might have been there.

17        Q. And the second dinner on the 10th, were

18   there any other attendees beyond the ones you've

19   already described?

20        A. I don't recall.  My wife.

21        Q. You mentioned that information Fusion had

22   gathered may have been passed on to the HRAGI

23   people via Baker Hostetler or if they instructed

24   you to that you would have.  Did you have any

25   expectation that that would reasonably result in

Glenn Simpson                                            August 22, 2017

Washington, DC

Page 184

1    them influencing U.S. policy?

2         A. I can't say that I would have specifically

3    expected anything from that.  I was acting --

4    lawyers hire me to do research for them, the

5    research is their property or their client's

6    property, it's not mine.  So if they want me to

7    provide it to somebody else, it's their

8    information.  So I would -- it's a fairly

9    ministerial thing.  I'm not sure I would have an

10   expectation of any sort of specific result from

11   that.

12        Q. But you did understand HRAGI to be

13   lobbying on the Hill?

14        A. They were registered to lobby on the Hill.

15   So I believe that's what they were doing, yeah.

16        Q. And did you understand that your actions

17   on behalf of Prevezon or Baker Hostetler would

18   principally benefit the Russian government?  Who

19   did you believe the principal beneficiary to be?

20        MR. LEVY:  I'd like to note for the record

21   that Patrick is smiling as he's asking the

22   question.  You can answer.

23        MR. MUSE:  He's trying to contain his

24   laughter.

25   BY THE WITNESS:

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 185

1      A. We did not believe that was being done on

2  behalf of the Russian government.

3      Q. What do you understand Prevezon's

4  relationship, if any, to be with the Russian

5  government?

6      A. Prevezon was introduced to me as the

7  client and Denis Katsyv was the owner of Prevezon.

8  Generally speaking, when we take on a new case, you

9  know, from a respected law firm part of the, you

10  know, discussion is who's the client, and, you

11  know, Mark Cymrot said they've checked out Denis

12  Katsyv and he has -- he's a legitimate businessman.

13  He's got a real estate company, it's a successful

14  company, and he has an explanation for how he makes

15  his money and appears to be legit.  To some extent

16  whenever you enter a new case that's part of what

17  you're being hired to determine is whether that

18  initial due diligence stands up, but in any event,

19  he was presented to me as a successful real estate

20  investor.

21      As I say, I worked with Baker Hostetler for a

22  number of years and it's a conservative midwestern

23  law firm with a lot of respected people in it, and

24  part of the obligations of lawyers in this country

25  and now in a lot of other countries is to determine

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 186

1    where their money comes from and who their clients

2    are and whether their clients are involved in

3    criminal activity.  I don't remember the exact

4    specifics of our discussions of these matters, but

5    one of the issues was whether he's a legitimate

6    businessman.

7         Q. Did you ever receive a letter of inquiry

8    from the Department of Justice regarding the

9    applicability of the Foreign Agent Registration Act

10   to your work on the Prevezon case or Magnitsky

11   matter?

12        A. No, I have not.

13        Q. Did you charge any fees to any other

14   entities or people besides Baker Hostetler for work

15   on the Prevezon or Magnitsky matters?

16        A. I don't think so, no.  I specifically can

17   tell you I wasn't compensated by this foundation or

18   anybody else involved in any of the lobbying.

19        Q. At the time of this June -- early June

20   trip to New York had you already engaged Mr. Steele

21   to do work on Mr. Trump's involvement with Russia?

22        A. I don't specifically remember.  As I

23   mentioned, the actual agreements are handled by

24   other people on my staff.

25        Q. Which employees and associates of Fusion

Glenn Simpson                                                              August 22, 2017

Washington, DC

1    worked on the project investigating then candidate

2    Donald Trump?

3         MR. LEVY:  We can give you that information

4    at the end of the interview.

5         MR. DAVIS:  Why at the end of the interview?

6         MR. LEVY:  I just want to make sure that

7    employees involved in this matter are protected.

8    We've had death threats come to the company.  We'll

9    be happy to cooperate with the committee and give

10   the names of those people.  I just want to do it

11   outside of this transcript, unless you're going to

12   assure me the transcript is going to be kept

13   confidential.

14        MR. FOSTER:  Let's go back to the previous

15   question.  What was the previous question?

16        MR. DAVIS:  Whether he'd already started

17   working with Mr. Steele during the time of the --

18        MR. FOSTER:  During the time of the meetings

19   in early June, right?  And your answer was?

20        MR. SIMPSON:  I don't know.

21        MR. FOSTER:  Do you have -- you said you

22   don't handle those issues at the company.

23        MR. SIMPSON:  That's right.

24        MR. FOSTER:  So your company does have

25   records that would establish that fact?

Glenn Simpson                                      August 22, 2017

Washington, DC

Page 188

```
 1        MR. SIMPSON:  We keep books and records.  We
 2   should have records of agreements and things, yeah.
 3        MR. FOSTER:  So did you not review any of
 4   those in preparation for today?
 5        MR. LEVY:  What he reviewed is privileged.
 6        MR. FOSTER:  Have you reviewed them -- I'm
 7   not asking if you reviewed them with counsel.  Have
 8   you reviewed them recently?
 9        MR. LEVY:  If he reviewed anything to prepare
10   for this interview it would have been at the
11   direction of counsel and attorney work product.
12        MR. FOSTER:  So you do or don't know whether
13   you have such records that would identify the
14   date -- the precise dates of the engagements?
15        MR. LEVY:  We will --
16        MR. FOSTER:  I'm just asking what he knows.
17        MR. LEVY:  I think he's told you.  Go ahead.
18        MR. SIMPSON:  I'll just restate that we run
19   a -- it's a reasonably well-run company, we keep
20   books and records.  So, you know, those kinds of
21   things are kept in our corporate files.
22   BY MR. DAVIS:
23        Q. Did Baker Hostetler or Prevezon pay for
24   your travel to New York for the meetings in June of
25   2016?
```

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 189

```
 1        MR. LEVY:  The meetings?

 2        MR. DAVIS:  The dinner after the hearing.

 3   BY THE WITNESS:

 4        A. The purpose of the trip was the hearing.

 5   It was routine for me to attend hearings.  So I

 6   would bill them -- my office would bill them for my

 7   train trips and hotels depending on whether there

 8   was -- whether it was specifically for the Prevezon

 9   case.  I don't know if -- I don't know for a fact

10   that we billed them.

11        Q. Did you travel with any other members of

12   the Prevezon team either to or from New York?

13        A. I don't think so.

14        Q. So I think you've already stated that Ed

15   Baumgartner worked on both projects, on the

16   Prevezon project and another Trump investigation.

17   To the best of your knowledge, does Mr. Baumgartner

18   know Rinat Akhmetshin?

19        A. I don't know.  I'd just like to clarify,

20   you know, my recollection is that Ed worked -- the

21   Prevezon thing wound down and I don't think I

22   brought Ed on until it was either ending or had

23   already ended.

24        Q. Can you clarify the time frame for when it

25   was winding down?
```

Glenn Simpson                                                August 22, 2017

Washington, DC

Page 190

1        MR. LEVY:  Talk about what the "it" was when

2   you say "it."

3   BY THE WITNESS:

4        A. The hearing was on June 9th, I guess we

5   said, and that was the culmination of a long

6   controversy over whether Browder was going to have

7   to testify and whether, you know, we had to be

8   disqualified and, you know, there was a whole

9   series of media attacks on us during that period

10  from Browder.  Then nothing happened after that and

11  that was, you know, sort of the peak of that.  It

12  was after that that a lot of the issues involving

13  Russia and the campaign started to heat up.

14       Q. Was there any overlap between the

15  employees from Fusion who were working on the Trump

16  investigation and the Prevezon case?

17       A. I think the primary employees did not

18  overlap, but I can't tell you that there was a

19  Chinese wall of separation.  Various people

20  specialize in certain things and can contribute

21  ad hoc to something.

22       Q. And you worked on both, correct?

23       A. Yes, I did.

24       Q. You previously mentioned that Fusion had

25  hired subcontractors beyond Mr. Steele to work on

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 191

1   the Trump project.  Was there any overlap of other

2   subcontractors between the Trump investigation and

3   the Prevezon work?

4        A. Not to my recollection.

5        Q. And had Fusion worked with Mr. Steele

6   prior to this project regarding Mr. Trump?

7        A. Yes.

8        Q. And had you previously paid him or Orbis?

9        A. I believe so, yeah.

10        Q. And had Fusion been paid by him or Orbis

11   as well?

12        A. Yes, I believe so.

13        Q. And are you aware of any interactions

14   Mr. Steele had with the FBI prior to his work on

15   the investigation of Mr. Trump and his associates?

16        MR. MUSE:  Could you repeat that?

17        MR. DAVIS:  Are you aware of any interactions

18   with Mr. Steele with the FBI prior to his work on

19   the investigation of Mr. Trump and his association?

20   BY THE WITNESS:

21        A. I was not at the time, but I am now.

22        Q. Did you have reason to believe that in his

23   prior position within British intelligence he would

24   have interacted with the FBI?

25        A. Yes, he's told me that.

Glenn Simpson                                                August 22, 2017

Washington, DC

Page 192

1        Q. Do you believe that the FBI generally

2   considers sources more credible if they have

3   previously provided reliable information?

4        A. That's my understanding.

5        Q. Was Mr. Steele's reportedly successful

6   history in working with the FBI a factor in

7   deciding to hire Orbis for the Trump project?

8        A. No.

9        Q. Do you know Christopher Burrows?

10       A. Yes.

11       Q. Do you know if he worked on the Trump-

12   Russia project with Orbis?

13       A. I do not.

14       Q. Do you know Sir Andrew Wood?

15       A. No.

16       Q. Are you aware he's an associate of Orbis

17   Business Intelligence?

18       A. I am aware of that as of now.  I didn't

19   know it -- I don't know when I learned of it, but I

20   didn't know it last year, much of last year.

21       Q. Did Fusion ask Orbis to undertake other

22   actions beyond preparing the memoranda containing

23   the allegations regarding Mr. Trump and his

24   associates?

25       A. Not that I specifically -- I'm sorry.  In

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 193

1    connection with that engagement?

2         Q. In connection with that engagement.

3         A. Not that I specifically recall.

4         Q. Did you communicate with Mr. Steele other

5    than through these memos?  Did you have phone calls

6    and e-mails with him?

7         A. Mostly we spoke by phone.

8         MR. FOSTER:  You did also e-mail with him?

9         MR. SIMPSON:  Nothing -- I don't believe I

10   had anything substantive.  E-mail security is a

11   major problem.  So, generally speaking, we would

12   try to communicate telephonically on an encrypted

13   line.

14        MR. FOSTER:  Did you have another method of

15   communicating with him via text.

16        MR. SIMPSON:  I mean, we used encrypted

17   methods of communicating.  Part of the security

18   concern we have involve there's been a lot of

19   attempts to break into our systems.  So I prefer

20   not to get into a lot of that, but suffice to say

21   we use secured encrypted systems.

22        MR. FOSTER:  Regardless of the details of how

23   you did, do you retain copies of written

24   communications that you may have engaged with him

25   through some other secure method?

Glenn Simpson                                            August 22, 2017

Washington, DC

Page 194

 1        MR. SIMPSON:  Generally not.

 2        MR. FOSTER:  You have not retained?

 3        MR. SIMPSON:  Generally we use things that

 4   can't be stolen because they no longer exist.

 5        MR. FOSTER:  Disappearing messages, auto

 6   deleting messages?  Is that correct?

 7        MR. SIMPSON:  That sort of thing, yes, that's

 8   correct.

 9        MR. FOSTER:  I just needed a verbal answer.

10        MR. SIMPSON:  Yeah.  Sorry.

11   BY MR. DAVIS:

12        Q. You previously mentioned the relationship

13   with Mr. Steele was more collaborative than a

14   manager-employee and I think you referenced

15   mentioning as an example Paul Manafort's been named

16   campaign chairman, what do you know about him.  Did

17   you collaborate with Mr. Steele on the content of

18   the memos even if he did the drafting?

19        A. No, generally speaking.  I was managing a

20   much bigger project and he's a reliable provider.

21   So I did very little tasking.

22        Q. You mentioned other subcontractors were

23   focusing on other regions in which the Trump

24   organization has business.  Were those other

25   subcontractors retained until the election or how

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 195

1    long did their engagements last?

2         A. It was ad hoc.  So as things came we said

3    can we find someone in Latin America, give them an

4    assignment, they'd complete the assignment.  If

5    there's no more to do, stop.  So it's hard to

6    generalize.

7         Q. One point I'd like to clarify from

8    Ms. Sawyer's questioning.  I believe you said that

9    Mr. Steele had told you that the FBI had a source

10   from inside the Trump organization and I believe

11   she referred to a source from inside the Trump

12   campaign.  Do you know which is the accurate --

13        MR. LEVY:  He's not going to get into the

14   details of that source.

15        MR. DAVIS:  I'm not asking for any particular

16   details.  It was characterized differently by you

17   and by counsel.  I just wanted to make sure.

18   BY THE WITNESS:

19        A. I don't know.

20        MR. FOSTER:  So you don't know whether it was

21   the organization or the campaign, in other words?

22        MR. SIMPSON:  That's correct.

23        MR. FOSTER:  Meaning the business versus the

24   campaign.

25   BY MR. DAVIS:

Glenn Simpson                                                August 22, 2017
Washington, DC

Page 196

```
 1        Q. And did Mr. Steele tell you that the FBI

 2   had relayed this information to him?

 3        A. He didn't specifically say that.

 4        Q. I'm going to have you take a look at one

 5   of the filings --

 6        MR. FOSTER:  I thought you said earlier that

 7   he did say the FBI told him.

 8        MR. SIMPSON:  I think I was saying we did not

 9   have the detailed conversations where he would

10   debrief me on his discussions with the FBI.  He

11   would say very generic things like I saw them, they

12   asked me a lot of questions, sounds like they have

13   another source or they have another source.  He

14   wouldn't put words in their mouth.

15                      (Exhibit 4 was marked for

16                       identification.)

17   BY MR. DAVIS:

18        Q. I'm going to have you take a look at one

19   of the filings by Mr. Steele's attorneys in the

20   lawsuit against him and Orbis in the United

21   Kingdom.  This will be Exhibit 4.  If you could

22   please turn to page 2 and read paragraph No. 8.

23   That paragraph states "At all material times Fusion

24   was subject to an obligation not to disclose to

25   third parties confidential intelligence material
```

Glenn Simpson                                                                    August 22, 2017

Washington, DC

Page 197

1    provided to it by the Defendants in the course of

2    that working relationship without the agreement of

3    the Defendants."  Is that a correct description of

4    your understanding of how the material was to be

5    treated?

6          MR. MUSE:  There's also a context to that who

7    the Defendants are in other such matters.

8          MR. DAVIS:  Sure.  The Defendants are Orbis

9    Business Intelligence Limited and Christopher

10   Steele.

11   BY THE WITNESS:

12         A. What's the question?

13         Q. Is that an accurate description of what

14   you understood the obligations to be with that

15   material?

16         A. I mean, that's hard for me to answer.

17   There's a mutual expectation of confidentiality,

18   and if that's what you read that as saying, then

19   yes, there's a mutual expectation of

20   confidentiality.

21         Q. Was that expectation established by

22   contract?

23         MR. LEVY:  We're not going to talk about

24   contracts with clients.

25   BY MR. DAVIS:

Glenn Simpson                                                                    August 22, 2017

Washington, DC

Page 198

1          Q. Was it established by practice?

2          A. I guess I'll just reiterate we do

3     confidential work together and we treat all matters

4     as confidential.  He's pretty good at sticking to

5     that and so am I.

6          Q. Was any of the information included in the

7     memoranda Orbis prepared during the Trump

8     investigation not considered "confidential

9     intelligence" under this understanding such that

10    Fusion was not required to obtain Orbis's

11    permission in order to disclose it?

12         A. I don't really understand the question.

13         Q. I'm saying if the understanding is that

14    you weren't to disclose confidential intelligence

15    material, were the memos confidential intelligence

16    material, the dossier memos?

17         A. They're confidential, yes.

18         MR. MUSE:  Hold on one second.  Here's the

19    mischief that's created by that.  Someone else is

20    sending this and you're asking what they mean.

21    There may be direct answers to those questions if

22    you ask direct questions, but to do it in the frame

23    of reference of someone else putting forth a piece

24    of evidence, which this is, it inevitably creates

25    confusion.  The reference to the document adds

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 199

1   nothing to his knowledge.  It's just simply a point

2   of reference by you, but it doesn't add anything to

3   what he might be saying.  So I think the better way

4   to get at it is simply to ask direct questions.

5        MR. DAVIS:  There are two parties to this, at

6   least, and we've got one's description.  I'd like

7   to know if he agrees with that description.

8        MR. MUSE:  But even within what do they mean

9   by this is the question.  I mean, what do they mean

10  by this sort of paragraph.  You're asking him for

11  an interpretation.  He can answer questions about

12  the relationship.

13       MR. DAVIS:  I'm asking him to give an

14  interpretation of their agreement in terms of what

15  he did.

16       MR. MUSE:  And therein lies the problem.

17       MR. DAVIS:  But if it's an agreement to which

18  he's a party, there's a basis for that

19  understanding.

20       MR. MUSE:  I don't think that's the way the

21  rule works.

22       MR. FOSTER:  Well, I think the bigger

23  mischief from my point of view is the fact that

24  we're trying to get an understanding of what the

25  contractual relationship was.  You're telling us

Glenn Simpson                                                  August 22, 2017

Washington, DC

Page 200

 1    you're not going to provide us with details about

 2    that contractual relationship, you're not going to

 3    provide us with copies of any nondisclosure

 4    agreements, contracts we've asked for and we don't

 5    have.  So we're asking him for his understanding of

 6    what obligations he had.

 7         MR. LEVY:  And that's outside the scope of

 8    this interview.  Go ahead.

 9         MS. SAWYER:  Can I in general ask that you

10    guys all speak up a little bit because we're right

11    under the blower.

12         MR. LEVY:  Will do.

13         MR. FOSTER:  The record will reflect we are

14    not raising our voices.

15         To be clear, you're instructing him not to

16    answer that question because you think it's outside

17    the scope of what he agreed to come here to talk

18    about voluntarily?

19         MR. LEVY:  That's not what I said.  You had

20    made a comment about contracts, and I just wanted

21    to make sure that obviously the Chair and the

22    Ranking Member have agreed those questions are not

23    part of the scope of this interview.  That said,

24    I've now forgotten what the pending question was.

25    So if Patrick wants to restate it he can and we can

Glenn Simpson                                    August 22, 2017

Washington, DC

Page 201

1  evaluate it.

2      MR. DAVIS:  Sure.  In general we're asking

3  questions about distribution of the material within

4  the dossier which was the scope of the agreement.

5  If you look at page 4 of that same exhibit,

6  paragraph 30, Steele's attorneys state "The

7  Defendants" -- and again, that's Orbis Business

8  Intelligence and Christopher Steele -- "did not

9  however provide any of the pre-election memoranda

10 to any of the media or journalists, nor did they

11 authorize anyone to do so, nor did they provide the

12 confidential December memorandum to media

13 organizations or journalists, nor did they

14 authorize anyone to do so."

15     To the best of your knowledge, did Orbis ever

16 authorize Fusion to make any disclosures of the

17 memoranda to the media?

18     MR. LEVY:  Just before we get into this

19 question, this paragraph began with a sentence you

20 did not read and it says "In the first sentence of

21 subparagraph 8.2.5 as noted."  I don't know what

22 they're referring to.  Maybe you do.  Can you show

23 us that?

24     MR. DAVIS:  I don't have that with me at the

25 moment, but I'll see if we can find it. Regardless,

Glenn Simpson                                    August 22, 2017

Washington, DC

1    did Orbis ever authorize you to share the memoranda

2    with the media?

3    BY THE WITNESS:

4         A. I'm not sure I can answer this in -- I'm

5    not sure I know the answer to this.

6         MR. LEVY:  If you don't know, then...

7         MR. SIMPSON:  It's a little confusing.

8         MR. FOSTER:  You don't know whether or not

9    Orbis or Mr. Steele authorized you to distribute

10   the memos to the media?

11        MR. SIMPSON:  I think what I would like to

12   say is that we had discussions about, you know,

13   information as opposed to memos and, you know, at

14   various times in talking to reporters about the

15   Trump-Russia connection, you know, things -- those

16   discussions would be informed by what's in the

17   memos.

18        MR. FOSTER:  So are you saying that you may

19   have provided information from the memos to the

20   media without discussing whether or not -- without

21   getting permission specifically From Mr. Steele or

22   Orbis?

23        MR. SIMPSON:  What I'm saying is we discussed

24   that.  No.  I'm saying we discussed generally the

25   wisdom of answering questions from reporters about

Glenn Simpson                                              August 22, 2017

Washington, DC

1  different matters, what we could say and what we

2  couldn't say.

3      MR. FOSTER:  And in those discussions did he

4  ever authorize you to discuss the information

5  contained in the memoranda with the media?

6      MR. SIMPSON:  As I've stated before, this is

7  not a master-servant relationship.  We worked

8  together.  Sometimes he's working for my clients,

9  sometimes I'm working for his.  So we might jointly

10  make a decision, but it's not a sort of can I do

11  this, yes you can do that kind of relationship.  So

12  if they -- so I hope that's responsive.

13      MR. FOSTER:  So did you ever share either the

14  memos or the content of the memos with the media

15  independently of him without having discussed it

16  with him?

17      MR. SIMPSON:  I think what I said was I had

18  spoken with reporters over the course of the summer

19  and through the fall about the investigations by

20  the government and the controversy over connections

21  between -- alleged connections between the Trump

22  campaign and the Russians.  Some of what we

23  discussed was informed by Chris's reporting.  So

24  whether that was -- I don't think there's any sense

25  that that was an unauthorized thing to do.

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 204

```
1         MR. DAVIS:  On page 5 --

2         MR. FOSTER:  Is it something that you

3   discussed with him that you were doing?

4         MR. SIMPSON:  We would discuss inquiries that

5   we had received from reporters, yes.

6         MR. FOSTER:  And that you were answering?

7         MR. SIMPSON:  To the best of our ability.  I

8   mean, we obviously didn't tell people about the

9   existence of these things for a long time.

10  BY MR. DAVIS:

11        Q.  On page 5 of that same exhibit, paragraph

12  32 there's a portion of the sentence -- and I'll

13  just read this for background before we move on to

14  another segment.  I think this is relevant for

15  context.  There's a portion here in which Steele's

16  attorneys state that he gave -- that the Defendants

17  gave "Off-the-record briefings to a small number of

18  journalists about the pre-election memoranda in

19  late summer/autumn 2016."  I'd like to provide

20  Exhibit 5 which is the second filing by

21  Mr. Steele's attorneys.

22        MS. SAWYER:  Patrick, you've represented this

23  one as the second filing.  Are we sure these are --

24        MR. DAVIS:  Second for the purpose of this

25  interview, second one we're referencing.
```

Alderson Court Reporting

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 205

1         MS. SAWYER:  Were these documents that were

2    requested or obtained from a third party in the

3    course of the investigation?

4         MR. DAVIS:  These were documents that were

5    published in the media.  I believe the second one

6    was published by McClatchy.

7         MS. SAWYER:  And what about the first?

8         MR. DAVIS:  That was the one published by the

9    Washington Times.

10                        (Exhibit 5 was marked for

11                         identification.)

12   BY MR. DAVIS:

13        Q. So with the second one on page 8 of

14   Exhibit 5, under the response to 18 Steele's

15   attorneys state "The journalists initially briefed

16   at the end of September 2016 by the second

17   Defendant and Fusion at Fusion's instruction were

18   from the New York Times, the Washington Post, Yahoo

19   News, the New Yorker, and CNN.  The second

20   Defendant" -- that would be Mr. Steele --

21   "subsequently participated in further meetings at

22   Fusion's instruction with Fusion and the New York

23   Times, the Washington Post, and Yahoo News which

24   took place in mid-October 2016.  In each of those

25   cases the briefing was conducted verbally in

Glenn Simpson                                                August 22, 2017

Washington, DC

1   person.  In addition, and again at Fusion's

2   instruction, in late October 2016 the second

3   Defendant briefed the journalist from Mother Jones

4   by Skype.  No copies of the pre-election memoranda

5   were ever shown or provided to any journalist by or

6   with the authorization of the Defendants.  The

7   briefings involved the disclosure of limited

8   intelligence regarding indications of Russian

9   interference in the U.S. election process and the

10   possible coordination of members of Trump's

11   campaign team and Russian government officials."

12        To the best of your knowledge, is that a full

13   and accurate account of all the news organizations

14   with which Fusion and Mr. Steele shared information

15   from the memoranda.

16        A. I'd say it's largely right.

17        Q. Are there any that have been omitted?

18        A. Maybe, yeah.

19        MR. LEVY:  Just say what you know or recall.

20   BY THE WITNESS:

21        A. Yeah.  I think there's at least one thing

22   misidentified.  There might have been another.  I

23   can't specifically think of it, but I think this is

24   incomplete, that maybe one of the broadcast

25   networks is misidentified.  I just don't have a

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 207

1    tally of this.  It's mostly right.

2          Q. By broadcast network I assume you mean CNN

3    is incorrect, it was a different network?

4          A. I think so.

5          Q. Do you recall which network it was?

6          A. I think it was ABC.

7          Q. Did you attend these meetings with

8    Mr. Steele?

9          A. Yeah.  Yes.

10          Q. Did any other Fusion associates attend?

11          A. Possibly, yes.

12          Q. Can you identify them?

13          MR. LEVY:  We can give that to you

14    afterwards.

15    BY MR. DAVIS:

16          Q. Do you recall the specific dates of these

17    meetings?

18          A. No.

19          Q. I believe the filing says end of September

20    2016.  Does that comport with your recollection?

21          A. Yes.

22          Q. Was this, as far as you know, before or

23    after Mr. Steele had had his second meeting with

24    the FBI?

25          A. I don't remember.  Sorry.

Glenn Simpson                                        August 22, 2017

Washington, DC

Page 208

```
 1        Q. Did Mr. Steele ever indicate to you

 2   whether the FBI had asked him not to speak with the

 3   media?

 4        A. I remember Chris saying at some point that

 5   they were upset with media coverage of some of the

 6   issues that he had discussed with him.

 7        Q. Sorry.  I didn't hear.

 8        A. He never said they told him he couldn't

 9   talk to them.

10        Q. Do you recall which journalists you spoke

11   to at each of these organizations and what

12   information from the memoranda was revealed to

13   each?

14        A. I remember some of them and I remember

15   some of the names, yeah, some of the people I

16   talked to and some of these discussions.

17        Q. Can you tell us what those were?

18        MR. LEVY:  The answer to that question goes

19   to confidential conversations that's been declined

20   to answer.

21        MR. FOSTER:  Sorry.  Confidential what?

22        MR. LEVY:  The answer to that question might

23   implicate privilege and other obligations we've

24   already set forth and he's not going to answer the

25   question.
```

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 209

```
 1          MR. FOSTER:  What's the privilege?

 2          MR. LEVY:  First amendment, confidentiality.

 3          MR. FOSTER:  Confidentiality agreement,

 4     contractual obligation, is that what you're talking

 5     about?

 6          MR. LEVY:  No.  Just talking to confidential

 7     sources, First Amendment issue.  We can discuss it

 8     later after the interview.

 9     BY MR. DAVIS:

10          Q. Mr. Steele's filing indicates that these

11     meetings occurred at Fusion's instruction.  Is that

12     correct, did you initiate these meetings and

13     instruct Mr. Steele to participate in them?

14          A. I'd just reiterate the nature of our

15     relationship was that we would -- I might propose

16     something and he might agree to do it, but it was

17     not a -- it was not a military style relationship

18     where I gave the orders and he carried them out.

19          Q. Was part of the purpose of your

20     investigation to share information with

21     journalists?

22          A. I think that's a fair statement.  To the

23     extent -- I mean, I'm sorry.  Could you be clear.

24     You mean the project overall?

25          Q. Yes, investigating Mr. Trump and his
```

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 210

1    associates.

2          A. As I said earlier, in any project, and

3    that would include this one, the objective is to

4    gather relevant information, and some of that

5    information was gathered for other purposes and

6    some of it was gathered for the possibility that it

7    might be useful to the press.

8          Q. Did your client instruct you to have these

9    meetings?

10         MR. LEVY:  The answer to that question might

11   implicate privilege or obligations that we've set

12   forth.

13   BY MR. DAVIS:

14         Q. Do you have any reason to believe that

15   Mr. Steele passed any information on to journalists

16   without Fusion?

17         A. Without me -- you mean without me

18   participating, without me authorizing it?  Can you

19   be more specific?

20         Q. Sure.  Let's start without you

21   participating.  The filing references meetings that

22   both you and Fusion jointly had with journalists.

23   Do you believe he had any meetings with journalists

24   without you present?

25         MR. LEVY:  Without Mr. Simpson physically

Glenn Simpson                                                                    August 22, 2017

Washington, DC

Page 211

1    present?

2         MR. DAVIS:  For physical meetings or via

3    Skype, without him aware of them contemporaneously.

4    BY THE WITNESS:

5         A. That's a difficult question to answer

6    because I don't know what I don't know, but I don't

7    have any reason to believe that he did anything

8    that I didn't authorize or approve.

9         Q. Jason may have already touched on this,

10   but did Fusion disclose hard copies of the

11   memoranda to any journalists?

12        MR. LEVY:  The answer to that question might

13   implicate privilege or obligations.  So he's going

14   to decline to answer that question.

15        MR. FOSTER:  Doesn't the filing say that they

16   did not?

17        MR. LEVY:  While our letter to the committee

18   has said that neither Mr. Simpson nor Fusion GPS

19   provided the dossier to BuzzFeed, Mr. Simpson's

20   going to decline to answer your question

21   respectfully.  He's given you a lot of information

22   today.  He's not going to answer that question.

23   BY MR. DAVIS:

24        Q. Still with Exhibit 5 on page 2, the

25   responses to 4 and 6.  Here the attorneys for Orbis

Alderson Court Reporting

Glenn Simpson                                                August 22, 2017

Washington, DC

1   and Mr. Steele --

2        MR. LEVY:  Where are you again?

3   BY MR. DAVIS:

4        Q. Page 2, the response to 4 and to 6.  Here

5   the attorneys for Orbis and Mr. Steele state "The

6   duty not to disclose intelligence to third parties

7   without the prior agreement of the Defendants" --

8   again, that's Orbis and Mr. Steele -- "do not

9   extend to disclosure by Fusion to its clients,

10  although the Defendants understand that copies of

11  the memoranda were not disclosed by Fusion."

12       A. Where are you?  You're on page 2 -- okay.

13  I see it now.

14       Q. -- "do not extend to disclosure by Fusion

15  to its clients, although the Defendants understand

16  that copies of the memoranda were not disclosed by

17  Fusion to its clients."

18       Further down on that same page in response to

19  a question about whether Fusion's clients, insofar

20  as disclosure to them, was permitted, could

21  themselves disclose the intelligence from Orbis,

22  the filing responds "Defendants understood that the

23  arrangement between Fusion and its clients was that

24  intelligence would not be disclosed."

25       Is that a correct statement of the

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 213

1   relationship between you and the client, did Fusion

2   not disclose the memoranda or information contained

3   there in to its clients?

4        MR. LEVY:  He's not going to get into

5   discussion with the client because of privileges

6   and obligations that might be implicated by the

7   answer to that question.

8   BY MR. DAVIS:

9        Q. Do you believe this filing is accurate in

10  those paragraphs?

11       MR. LEVY:  Again, to comment on that he would

12  have to talk about client communications that are

13  privileged and might implicate privilege or

14  obligation were he to answer your question.

15  BY MR. DAVIS:

16       Q. Mr. Simpson, do you believe that any

17  confidentiality obligations regarding the memos did

18  not extend to law enforcement and intelligence

19  services?

20       A. Yes.  I mean, I -- well, in general I

21  think that in the course of any sort of

22  confidential business lawyers or other

23  professionals engage in if they come across

24  information about a possible terrorist attack or a

25  mafia operation they should report it, yes, and

Alderson Court Reporting

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 214

1   that that is, in fact, not covered by ordinary

2   confidentiality.

3        Q. Was Fusion aware of the reports that the

4   FBI considered -- let me rephrase.  Was Fusion

5   aware that the FBI considered paying Mr. Steele to

6   investigate Mr. Trump and his associates?

7        A. When?

8        Q. At any time.

9        MR. LEVY:  When you say "paying," what do you

10  mean by that?

11       MR. DAVIS:  Providing money.

12       MR. LEVY:  For a fee?  Are you talking about

13  reimbursements?

14       MR. DAVIS:  Fees or reimbursements in this

15  context.

16  BY THE WITNESS:

17       A. We've learned that.  We know that now.  In

18  fact, it was --

19       MR. LEVY:  Learned what?

20  BY THE WITNESS:

21       A. Well, we learned -- sometime after the

22  election we learned that Chris had discussed

23  working for the FBI on these matters after the

24  election and that that didn't happen.

25       Q. Did Mr. Steele discuss that with you at

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 215

1     the time?

2          A. He didn't discuss it -- I don't remember

3     exactly when he mentioned this to me, but he

4     mentioned to me at some point I think after the

5     election that he had discussed this with them.

6          MR. FOSTER:  So prior to news reports to that

7     effect?  In other words, you learned it from him

8     not from the news; is that right?

9          MR. LEVY:  Wait.  You asked two different

10    questions.  I'm trying to figure out which one you

11    want him to answer.

12         MR. FOSTER:  The last one.

13         MR. LEVY:  What was the last one?

14         MR. FOSTER:  You learned it from the news and

15    not from him?  Are you saying you learned it from

16    him?

17         MR. LEVY:  Learned what from him?

18         MR. FOSTER:  That he discussed with the FBI

19    having the FBI pay Mr. Steele.

20         MR. SIMPSON:  I don't remember.

21         MR. LEVY:  The witness is yawning.  Let's

22    take a break.

23         MR. MUSE:  We will attribute that to fatigue

24    as opposed to the questions.

25         MR. FOSTER:  Let's go off the record.  It is

Glenn Simpson                                             August 22, 2017

Washington, DC

1    3:55.

2                    (A short break was had.)

3         MR. DAVIS:  We'll go back on the record.

4    It's now 4:05.  We'll continue with the questions.

5    BY MR. DAVIS:

6         Q. Mr. Simpson, did anyone from Fusion ever

7    communicate with the FBI regarding information in

8    the memoranda or other allegations regarding

9    Mr. Trump and his associates?

10        A. From Fusion, did anyone from Fusion

11   communicate with the FBI?  No, no one from Fusion

12   ever spoke with the FBI, to the best of my

13   knowledge.

14        Q. Did you ever exchange any e-mails with

15   them?

16        A. We did not communicate with them by e-mail

17   either.

18        Q. Do you know any current or former FBI

19   personnel?

20        MR. LEVY:  As a general matter?

21        MR. DAVIS:  Yeah, as a general matter.

22   BY THE WITNESS:

23        A. As a general matter I'm sure I do.  I know

24   current and former law enforcement officials.  I go

25   to a lot of crime conferences and things like

Glenn Simpson                                        August 22, 2017

Washington, DC

Page 217

1    that.

2         Q. Were any of them consulted as part of this

3    investigation?

4         A. Not to my recollection.

5         Q. Was the amount of Fusion's compensation in

6    the Trump investigation dependent on the FBI

7    initiating an investigation of Mr. Trump or his

8    associates?

9         A. No.

10        Q. Was the amount of Orbis's compensation

11   dependent on the FBI initiating an investigation of

12   Mr. Trump and his associates?

13        A. No.

14        Q. Other than Senator McCain, who we'll

15   discuss later, did Fusion or Orbis disclose any of

16   the memoranda information contained therein or

17   related information from Mr. Steele with any

18   elected officials or staff in Congress?

19        A. I don't recall having done so, no.

20        Q. If we could turn briefly back to Exhibits

21   4 and 5.  I just want to reference two things.

22        MR. LEVY:  I also want to clarify in the

23   premise of that question there were factual

24   assertions made that may or may not be true to

25   which the witness did not respond.

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 218

1        MR. DAVIS:  Sure.  Understood.  To be clear,

2   we obviously were not referencing any disclosures

3   to this committee as part of the committee's

4   inquiry.

5   BY MR. DAVIS:

6        Q. So on Exhibit 4, page 3, paragraph 21A,

7   Mr. Steele's attorneys state that the post-election

8   dossier memoranda was provided to a senior United

9   Kingdom government national security official

10  acting in his official capacity.  In Exhibit 5 on

11  page 2 -- I'm sorry -- page 5, the response to 13

12  similarly references disclosing that memoranda to

13  the UK national security official.

14       Mr. Simpson, to the best of your knowledge,

15  were the memoranda or information contained therein

16  disclosed to foreign governments?

17       A. I have no knowledge of this beyond what

18  you're showing me.  I can tell you about, you know,

19  what I know about Chris's encounter with David

20  Kramer and how all that came about.  If Chris

21  specifically said something to me about showing

22  this to one of his government officials I don't

23  remember it.  So...

24       MR. LEVY:  Why don't you walk them through.

25  BY THE WITNESS:

Glenn Simpson                                               August 22, 2017

Washington, DC

Page 219

```
 1        A. If you want to know the rest of the story,
 2   I'm happy to walk you through it.
 3        Q. Sure, we can do that.
 4        A. So after the election obviously we were as
 5   surprised as everyone else and Chris and I were
 6   mutually concerned about whether the United States
 7   had just elected someone who was compromised by a
 8   hostile foreign power, more in my case whether the
 9   election had been tainted by an intervention by the
10   Russian intelligence services, and we were, you
11   know, unsure what to do.  Initially we didn't do
12   anything other than to discuss our concerns, but we
13   were gravely concerned.
14        At some point a few weeks after the election
15   Chris called me and said that he had received an
16   inquiry from David Kramer, who was a long-time
17   advisor to Senator McCain, and that according to --
18   Kramer told Chris that he had run into Sir Andrew
19   Wood at a security conference in Halifax,
20   Nova Scotia and that Kramer was accompanying
21   Senator McCain to this conference and that the
22   three of them had had an unscheduled or unplanned
23   encounter where the issue of this research was
24   discussed and the essence of it, I guess, was
25   conveyed to Senator McCain and to David Kramer from
```

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 220

1    Andrew Wood.  I don't remember whether Andrew

2    Wood's name was specifically given to me by

3    Christopher Steele at that time.  It was later

4    given to me.  It later became an accepted fact that

5    Chris had mentioned him to me.  I believe he

6    probably mentioned it.

7         But anyway, he did say someone that he worked

8    with in the past who was a former UK government

9    official with experience in Russia had had this

10   conversation with David Kramer and John McCain and

11   that Senator McCain had followed up on it as to

12   what more there was to know about these

13   allegations, this information.

14        So Chris asked me do you know David Kramer,

15   and I said yes, I've known David Kramer for a long

16   time.  David Kramer is part of a small group of

17   people that I'm sort of loosely affiliated with.

18   We've all worked on Russia and are very concerned

19   about kleptocracy and human rights and the police

20   state that Russia has become, in particular the

21   efforts of the Russians to corrupt and mess with

22   our political system.  So we shared this concern

23   going back to when I was at the Wall Street Journal

24   and that's how I met David.  He was working at the

25   State Department as assistant secretary for human

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 221

1    rights, and I was reporting on human rights and

2    corruption in Russia.

3         So I told Chris he's legit.  David is someone

4    I've known for a long time and he knows a lot about

5    these issues and he's very concerned about Putin

6    and the Kremlin and the rise of the new Russia and

7    criminality and kleptocracy.  So he said, well, can

8    we trust him?  And I said yes, I think we can trust

9    him.  He says he wants information to give to

10   Senator McCain so that Senator McCain can ask

11   questions about it at the FBI, with the leadership

12   of the FBI.  That was essentially -- all we sort of

13   wanted was for the government to do its job and we

14   were concerned about whether the information that

15   we provided previously had ever, you know, risen to

16   the leadership level of the FBI.  We simply just

17   didn't know.  It was our belief that Director Comey

18   if he was aware -- if he was made aware of this

19   information would treat it seriously.

20        Again, at this time, you know, while we

21   believed that we had very credible reporting here,

22   you know, what we really -- we just wanted people

23   in official positions to ascertain whether it was

24   accurate or not.  You know, we just felt that was

25   our obligation.  So I said to Chris I think we can

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 222

1    trust him, and he said okay.  Well, he was here, I

2    met with him, and I told him what happened.  Now

3    he's back in Washington and, you know, I'm going to

4    hand him to you.

5         I don't remember whether I called David or

6    David called me, I just don't remember, but we got

7    in touch and he, you know, asked me -- we met.

8         Q. And after you met how did he -- did you

9    provide the memoranda to --

10        MR. LEVY:  Sorry.  Finish your question.

11   BY MR. DAVIS:

12        Q. -- did you provide the memoranda to him?

13        MR. LEVY:  The answer to that question might

14   implicate privilege and other obligations.  So he's

15   going to decline to answer the question.

16   BY MR. DAVIS:

17        Q. Did Mr. Steele represent to you that Orbis

18   or Mr. Wood had initiated this contact with

19   Mr. Kramer and Mr. McCain to share the dossier

20   information?

21        A. Well, that has two parts on that question.

22   I think I can answer the first part which I think

23   answers the second.  Anyway, he did not describe

24   this as having been initiated by Orbis.  He

25   described this as a chance encounter at a security

Glenn Simpson                                                     August 22, 2017

Washington, DC

Page 223

1    conference where, you know, someone who had some

2    knowledge of these matters shared it with Senator

3    McCain and David Kramer and that caused David

4    Kramer to follow up with Chris and that it was

5    passive.  In other words, it was initiated by

6    Mr. Kramer.

7         Q. Did Mr. Steele describe anyone else being

8    involved at the Halifax international security

9    conference in this discussion?

10        A. Not that I can recall.

11        Q. According to the official attendee list

12   for that conference, Mr. Akhmetshin was also there.

13   To the best of your knowledge, was he involved in

14   any capacity in the effort to discuss the dossier

15   information with Mr. Kramer and Mr. McCain?

16        A. That's the first time I've received that

17   information.  So I don't have any knowledge.

18        Q. And you haven't spoken with Mr. Akhmetshin

19   about that, I assume?

20        A. No.

21        Q. In addition to the disclosures we have

22   already discussed, to whom did Fusion GPS provide

23   the memoranda, information contained therein, or

24   related information from Orbis?

25        MR. LEVY:  Beyond what you've discussed?

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 224

1         MR. DAVIS:  Anyone we've left out.

2         MR. LEVY:  The answer to that might implicate

3    privilege or other obligations.  So he's going to

4    decline to answer the question.

5    BY MR. DAVIS:

6         Q. To the extent there's any portion of the

7    answer to that question that would not implicate

8    those privileges, I would ask that you reveal

9    those.

10        A. I'm not sure I see how I could answer that

11   question without getting into privileged areas.

12        MR. FOSTER:  Again, what privilege?

13        MR. LEVY:  We can discuss it at the end.

14   It's a voluntary interview.  He's declining to

15   answer that.

16   BY MR. DAVIS:

17        Q. Did any Fusion employees communicate with

18   any foreign governments or foreign intelligence

19   agencies about the memoranda or the information

20   contained therein?

21        A. I don't believe so, certainly not

22   knowingly.

23        Q. Did you and Mr. Steele ever discuss any

24   communications he had with foreign government

25   officials about the information in the memoranda?

Glenn Simpson                                              August 22, 2017

Washington, DC

1          A. It would be difficult -- nothing specific

2    that I recall.  There are parts of the memos that

3    talk about information that foreign government

4    officials provided in the course of their research,

5    but beyond what's in the memos I don't really have

6    any recollection.

7          Q. Do you know who paid for Mr. Steele's trip

8    to Rome to meet with the FBI?

9          A. I have read recently that -- I think in a

10   letter from Senator Grassley that the FBI

11   reimbursed the expense, but to be clear, I mean,

12   that's it.  He was, to my knowledge, not been

13   compensated for that work or any other work during

14   this time.

15         MR. FOSTER:  I'm sorry.  You're saying that

16   Fusion did not pay for the trip?

17         MR. LEVY:  Go ahead and answer the question.

18         MR. SIMPSON:  I don't think we did.  I have

19   no information that we paid for it.  Again, this

20   sort of emphasizes, you know, the point I was

21   making earlier which was this was something that I

22   considered to be something that Chris took on on

23   his own based on his professional obligations and

24   not something that was part of my project.  So it

25   makes sense to me that he was reimbursed by them,

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 226

1    not us.

2    BY MR. DAVIS:

3         Q. To clarify, you were saying his

4    interactions with the FBI were not part of your

5    project?

6         A. They obviously grew out of the project,

7    but as he explained it to me, you know, when you

8    learn things in your daily life that raise national

9    security considerations you're obligated to report

10   them.  So that wouldn't have anything to do with my

11   client's goals or project.

12        Q. But in your briefings with journalists you

13   did reference his interactions -- Mr. Steele's

14   interactions with the FBI, correct?

15        A. At some point that occurred, but I don't

16   believe it occurred until very late in the

17   process.

18        Q. Can you estimate when in the process?

19        A. It was probably the last few days before

20   the election or immediately thereafter.

21        Q. So the meetings in September that you

22   referenced, you didn't reveal Mr. Steele passing on

23   information to the FBI?

24        MR. LEVY:  Can you repeat the question.

25   Sorry.

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 227

```
 1        MR. DAVIS:  So in your meetings with

 2   journalists in September you didn't reference

 3   Mr. Steele's interactions with the FBI or passing

 4   on of information to them?

 5   BY THE WITNESS:

 6        A. I don't recall.

 7        MR. DAVIS:  I think my hour is up.

 8        MR. FOSTER:  Off the record at 4:21.

 9             (A short break was had.)

10        MS. SAWYER:  We'll go back on the record.

11   It's 4:30.

12                  EXAMINATION

13   BY MS. SAWYER:

14        Q. I wanted to return to our conversation

15   about interactions that Mr. Steele had with the

16   FBI.  We had been talking about a second time he

17   met in Rome.  Besides that meeting and the first

18   meeting in early July, are you aware of any other

19   meetings or conversations that Mr. Steele had with

20   the FBI?

21        A. I think I was just recounting that he

22   vaguely said that he had broken off with them over

23   this concern that we didn't really know what was

24   going on.  I'm sorry to be vague, but we just

25   didn't understand what was going on and he said he
```

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 228

1    had broken off with them.

2         Q. When you say "we" did not understand what

3    was going on, who are you referring to as the "we"?

4         A. Chris and I, mostly just the two of us.

5    There was a lot of public controversy over the

6    conduct of the FBI.  I remember discussing it with

7    many people, but this conversation was between the

8    two of us.

9         Q. And what was the time frame of when Steele

10   said he had broken off with the FBI?

11        A. I can -- I don't know exactly, but it

12   would have been between October 31st and election

13   day.

14        MS. QUINT:  October 31st was when you said

15   there was an article --

16        MR. SIMPSON:  In the New York Times.  There

17   was an article in the New York Times on

18   October 31st that created concern about what was

19   going on at the FBI.

20        MS. QUINT:  Because it wasn't consistent with

21   your understanding of the investigation?

22        MR. SIMPSON:  Exactly.

23   BY MS. SAWYER:

24        Q. And I think, just to be clear, this was an

25   article you had talked about that both revealed

Glenn Simpson

August 22, 2017

Washington, DC

Page 229

1   that Director Comey had alerted Congress to

2   something about the Clinton e-mail investigation?

3       A. No.  That happened a few days previous.  I

4   don't know the exact date that he sent the letter

5   to Congress, but this was an article specifically

6   about -- it was disclosing the existence of an FBI

7   investigation of Trump's ties to Russia, which, to

8   my recollection, was the first time that anyone

9   reported that the FBI was looking at whether the

10  Trump campaign had ties to the Kremlin but at the

11  same time saying that they had investigated this

12  and not found anything, which threw cold water on

13  the whole question through the election.

14      Q. And was that -- just to tie it together

15  when you were talking previously, was that in

16  connection with your conversation with journalists

17  where you directed them to ask the FBI as to

18  whether there was an investigation going on?

19      A. I'm not going to get into specific news

20  organizations or reporters or stories, but I would

21  restate that this was during the period when we

22  were encouraging the media to ask questions about

23  whether the FBI was, in fact, investigating these

24  matters.

25          I'll add that, you know, a lot of what we

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 230

1    were talking to the media about were things in the

2    public record, specifically Carter Page, Paul

3    Manafort had resigned over allegations of illicit

4    relationships with Russian oligarchs and Ukrainian

5    oligarchs.  So there was, you know, a lot of open

6    source public information pointing towards the

7    possibility that the Russians had infiltrated the

8    Trump campaign.  So we spoke broadly to reporters

9    and encouraged them to look into this.

10       Q. And did you ever come to find out who the

11   journalists had spoken with at the FBI about the

12   existence of an investigation into Russian

13   interference and possible ties to the Trump

14   campaign?

15       A. No.

16       Q. So you had indicated that Mr. Steele said

17   he had -- I think your phrase was "broken off" with

18   the FBI.  What did you understand that to mean?

19       A. That Chris was confused and somewhat

20   disturbed and didn't think he understood the

21   landscape and I think both of us felt like things

22   were happening that we didn't understand and that

23   we must not know everything about, and therefore,

24   you know, in a situation like that the smart thing

25   to do is stand down.

Glenn Simpson                                            August 22, 2017

Washington, DC

Page 231

1          Q. And had he been reaching out affirmatively

2    to the FBI and providing them with information or

3    were they reaching out to him and he was simply

4    responding to their requests?

5          A. The first contact was initiated by Chris

6    to someone that he said he knew.

7          Q. And now you're just going back to the July

8    contact?

9          A. Yes.  The September briefing or debriefing

10   in Rome I believe I understood -- to this day I

11   understand that to have been initiated by the FBI.

12   Subsequent contacts during this period I just don't

13   know.

14         Q. Do you know if there were any contacts

15   after that second meeting in Rome between then and

16   the point in time which occurred sometime between

17   October 31st and the election day when he stopped

18   communicating with the FBI, do you know if there

19   actually were any conversations or meetings between

20   Mr. Steele and the FBI?

21         A. He didn't literally tell me about specific

22   contacts.  I just recall that there was -- that he

23   broke off, which implies that he told him he didn't

24   want to have anything more to do with them.  I

25   believe he also mentioned that they didn't like

Glenn Simpson                                              August 22, 2017

Washington, DC

Page 232

1   media coverage, that there was media coverage of,

2   you know, FBI interest in Donald Trump.  I don't

3   know what it was that they didn't like.

4        Q. And I think you've already answered this

5   question, but to the best of your knowledge, did

6   Mr. Steele ever obtain payment from the FBI for

7   actual research that he was doing on Russian

8   interference or on possible ties between the Trump

9   campaign and Russia?

10       A. He told me he did not, and I have no

11  independent information other than what he told me.

12  I don't believe he ever received compensation for

13  working on anything related to Trump and Russia.

14       Q. I'm going to direct your attention back to

15  what we marked as Exhibit 3, which is the series of

16  memos that you had received from Mr. Steele in the

17  course of his work.  We talked about the first memo

18  and we also talked about the second memo to some

19  degree.  You were explaining to me why you believed

20  the second memo, which starts at page 41394, came

21  about, why he had generated that report or done

22  that research, and you had indicated that there was

23  much more public reporting on the hacking.  I think

24  you had mentioned -- that's when you mentioned

25  Debbie Wasserman Schultz.

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 233

1        So with regard to that memo, were there any

2    particular things that you independently verified?

3        A. I just need to review it here for a

4    second.

5        Q. Sure.

6                    (Reviewing document.)

7    BY THE WITNESS:

8        A. Most of this I did not seek to

9    independently verify and was relatively new

10   information.  I was aware at the time of

11   connections between Russian intelligence and cyber

12   criminals, and I was aware at the time that the

13   Russian mafia and Russian cyber crime was a

14   subcontractor to the Russian intelligence services.

15   So this comported with my general knowledge of

16   these matters, but a lot of the specifics was new

17   information to me.

18        The only things in here that I specifically

19   recognize from other work or from other research

20   was that the -- the allegation that the telegram

21   encrypted messaging system, which is an app, had

22   been compromised by Russian intelligence and that

23   someone else in the business of cyber security had

24   told me that too who was in a position to know.  I

25   don't remember who that was, but I was told that by

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 234

1    an American.  And issues of Russian criminal

2    operations with names like Booktrap and Maddel

3    (phonetic) rings a bell to me or did ring a bell to

4    me at the time.  There's been a great deal -- there

5    had been a great deal at this time even of U.S. law

6    enforcement activity against organized Russian

7    cyber crime operations.

8         Q. And this memo which is dated 26 July -- it

9    actually bears the date 2015.

10        A. I noticed that.

11        Q. Is that just, as far as you understand it,

12   a typo or mistake?  Was it actually 2016?

13        A. Yes.

14        Q. Then similarly with what I have -- and I'm

15   just doing it in the order that it was Bates-

16   stamped and appeared on BuzzFeed -- there's a

17   two-page report and it bears the Bates Nos. 41397

18   and 41398 and it has a company report number

19   2016/095.  This one has the title "Russia/U.S.

20   Presidential Election, Further Indications of

21   Extensive Conspiracy Between Trump's Campaign Team

22   and the Kremlin."

23        Did you do any independent verification of

24   these facts?

25        A. I did some work on aspects of this.  We

Glenn Simpson                                                         August 22, 2017

Washington, DC

Page 235

1   were separately -- you know, my team and myself

2   were separately investigating various things in

3   here.  So I can't talk about this as a

4   verification, but I was analyzing this.

5         MR. FOSTER:  Speak up, please.

6   BY THE WITNESS:

7         A. I analyzed this information in the same

8   manner I analyzed the other stuff.

9         Q. So based on the work that you were doing,

10  did any of that independent work that you did alter

11  the content of this?

12        A. No.

13        Q. So it was in addition to whatever was

14  provided in this memo, this two-page memo?

15        A. Yes, that's right.

16        Q. And to the best that you can recall, can

17  you tell us what you were learning at the same time

18  about the topics covered in this memo?

19        A. Yes.  Could I just clarify something?  I

20  assume this is exactly how it was published and

21  someone mixed up the sequence of the memos.  So the

22  next memo's numbered 94 and is dated July 19th and

23  this one is 95 and is not dated, I don't believe.

24  Maybe that's why they got mixed up.

25        But in any event, what I would loosely call

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 236

1    the Carter Page memo came before this conspiracy

2    memo.  So with that caveat I can say we were

3    investigating just based on open sources and, you

4    know, other methods, more public information Carter

5    Page's trip to Russia.  We watched tapes of it, we

6    did background work on Carter Page, I did research

7    on his business dealings, and in the course of

8    trying to analyze -- you know, this is some new

9    detail here about how the operation is working in

10   the Kremlin and how they are trying to use

11   influence and it comports with my knowledge and

12   Chris's knowledge of how the Kremlin does this,

13   which is they offer people business deals as a way

14   to compromise them.  And, in fact, you know, to my

15   knowledge, this is a much bigger issue than

16   personal indiscretions when it comes to the way the

17   Kremlin operates and is something I know a fair bit

18   about.

19        So we looked into Carter Page and we also

20   looked into Igor Sechin and whether Sergei Ivanov

21   was in a position to be managing the election

22   operation, which is what 94 talks about, and we

23   determined that he was.  I, you know, independently

24   verified he does have a deputy who's very obscure

25   named Igor Divyekin.  It's spelled two different

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 237

1    ways here.  I believe the correct spelling is

2    D-I-V-Y-E-K-I-N.

3         MR. MUSE:  Can you give the Bates number of

4    the document you're looking at.

5         MR. SIMPSON:  This one is 41399.

6    BY MS. SAWYER:

7         Q. And just for the record, it's a two-page

8    document, 41399 to 41400, and it has the date, I

9    think you indicated before, 19 July 2016.  Is this

10   the memo that you said you referred to as the

11   Carter Page memo?

12        A. Yes.

13        Q. And you were explaining that in the

14   sequencing this one came before the document that

15   actually in terms of Bates numbers --

16        A. Right.

17        Q. -- comes before it which we had talked

18   about which had the company report No. 095.  So 94

19   came to you before 095 -- report No. 095; is that

20   correct?

21        A. That's my recollection.

22        Q. So with regard to the research you were

23   also doing, is it also just true that whatever

24   independent research you were doing did not then

25   get incorporated into document company report

Glenn Simpson                                                   August 22, 2017

Washington, DC

1    2016/94, the Carter Page memo?

2        A. That's correct.  We essentially segregated

3    this reporting from other things we were doing for

4    reasons we discussed earlier.  A lot of this is

5    human intelligence, it's not the kind of thing that

6    you would share with almost anyone basically.  A

7    lot of the work that we do is public record

8    research.  Generally speaking, most of this

9    information is useful for making decisions and

10   trying to understand what's going on, but it's

11   not -- doesn't have much use beyond that unless you

12   can independently verify it.  So our reports are

13   full of footnotes and appendices and court records

14   and that sort of thing.

15       Q. So is it fair to characterize the research

16   that you were doing as kind of a separate track of

17   research on the same topic sometimes?

18       A. I think so.  I wouldn't say it was

19   completely separate because, for instance, on some

20   subjects I knew more than Chris.  So when it comes

21   to Paul Manafort, he's a long-time U.S. political

22   figure about whom I know a lot.  But his

23   reporting -- you know, so there may have been some

24   bleed between things I told him about someone like

25   Manafort, but most of these characters neither of

Glenn Simpson                                            August 22, 2017

Washington, DC

Page 239

1    us know much about and it's really just he's

2    faithfully reporting information to him that's

3    being reported to him by his network.

4         In British intelligence the methodology's a

5    little different from American intelligence.

6    There's a practice of being faithful to what people

7    are saying.  So these are relatively

8    straightforward recitations of things that people

9    have said.  Obviously as we talked about before,

10   you know, disinformation is an issue that Chris

11   wrestles with, has wrestled with his entire life.

12   So if he believed any of this was disinformation,

13   he would have told us.

14        Q. And did he ever tell you that information

15   in any of these memos, that he had concerns that

16   any of it was disinformation?

17        A. No.  What he said was disinformation is an

18   issue in my profession, that is a central concern

19   and that we are trained to spot disinformation, and

20   if I believed this was disinformation or I had

21   concerns about that I would tell you that and I'm

22   not telling you that.  I'm telling you that I don't

23   believe this is disinformation.

24        Q. And then on the memo, the Carter Page

25   memo, which is company report 2016/94, you said

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 240

1   that you had done -- you, Fusion -- you, Glenn

2   Simpson had done some research into Carter Page,

3   including Mr. Page's business dealings?

4          A. Yes.

5          Q. Is that information that you still have?

6          A. I don't know.  I haven't looked for it.  I

7   don't know.

8          Q. You also specifically mentioned Igor

9   Sechin and maybe work that you had done research

10  into Sechin.  Is that work that you would also

11  still have?

12         A. I don't know if I have anything specific

13  on Sechin.  Sechin is a well-known character.  I

14  collect, you know, research on various people who

15  are oligarchs or mafia figures.  I don't think I

16  have any specific reports on Sechin, but I know a

17  lot about him.  He's, you know, sort of Putin's

18  No. 1 compadre in the kleptocracy.

19         Q. And with regard to Carter Page, did you

20  reach any findings, conclusions about his business

21  dealings, about him, about his connections in

22  particular to, you know, Russia?

23         A. Yes.

24         Q. And can you share what those were?

25         A. Carter Page seemed to us to be a typical

Glenn Simpson                                    August 22, 2017

Washington, DC

Page 241

1   person who the Russians would attempt to co-opt or

2   compromise or manipulate.  He was on the younger

3   side, a little bit -- considered to be a striver

4   who was ambitious and not terribly savvy, and those

5   are the kind of people that the Russians tend to

6   compromise.  That was the general sense we had.  He

7   was also, you know, from early on described as

8   somewhat eccentric.

9        There was a -- I remember quite clearly there

10  was a bit of a -- when we were talking to reporters

11  about him because he was all over the news for this

12  trip to Russia and we had done -- there was a fair

13  amount of open source on his consulting firm, his

14  complaint that he'd lost money on Russian

15  investments and he owned stock in Gazprom and he

16  was really mad about the sanctions and he went over

17  there in this hastily-arranged trip to speak to

18  this school and that was all pretty unusual, but

19  there's a lot of skepticism in the press about

20  whether he could be linked between the Kremlin and

21  the Trump campaign because he seemed like a zero, a

22  lightweight.

23       I remember sort of not being able to kind of

24  explain to people that's exactly why he would end

25  up as someone who they would try to co-opt.  Of

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 242

1   course, you know, when we talk about things in the

2   dossier that are confirmed, this is one of the

3   things that I think really stands out as notable,

4   which is that Chris identified Carter Page as

5   someone who had -- seemed to be in the middle of

6   the campaign, between the Trump campaign and the

7   Kremlin, and he later turned out to be an espionage

8   suspect who was, in fact, someone that the FBI had

9   been investigating for years.

10       Q. So beyond what is in the dossier, did you

11   kind of find any evidence that he had actually been

12   compromised?  Now I'm speaking of Carter Page.

13       A. Well, the definition of compromised is

14   someone who has been influenced sometimes without

15   even their knowledge.  We had reason to believe

16   that he had, in fact, been offered business deals

17   that were -- that would tend to influence him,

18   business arrangements.

19       Q. And do you have the records of those

20   business deals that you had collected?

21       A. Yeah.  I don't think so.  Most of that

22   was, in fact, reporting that we did with other

23   people who knew him from the business world.

24       Q. And then just the next memo that we had

25   touched on, 2016/95, it has Bates numbers 41397 to

Glenn Simpson                                              August 22, 2017

Washington, DC

Page 243

1    398, it does not bear a date on it.  Do you recall

2    roughly when you received this particular report?

3         A. Sometime in midsummer.

4         Q. The next report, which is 2016/097 which

5    is two pages, has the date of 30 July 2016.  Just

6    by the numbers it would appear to maybe have come

7    between those two.  Does it seem logical that it

8    came sometime between July 19th and July 30th?

9         A. That seems logical.

10        Q. And then just in general, with regard to

11   this particular memo did you do any research to

12   verify this information that was in this memo?

13        MR. LEVY:  Beyond what he said as a general

14   matter?

15        MR. MUSE:  I'm sorry.  You were going back

16   and forth.  Which one in particular?

17        MS. SAWYER:  This is memo No. -- it has

18   Company Intelligence Report 2016/095, it's Bates

19   numbers 41397 and 41398.

20        MR. MUSE:  Thank you.

21   BY MS. SAWYER:

22        Q. Was there particular information in this

23   memo that you did verify?

24        A. One of the things I did, which is pretty

25   typical of how I would sort of analyze things, was

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 244

```
 1   I looked at the Russian pension system to determine
 2   if, in fact, the Russian government was
 3   distributing lots of pension payments to Russian
 4   immigrants in the United States, and I found some
 5   reports from the Social Security Administration and
 6   other places describing this system.
 7          Basically because everyone in Russia, you
 8   know, more or less works for the government,
 9   there's a lot of -- there's a large number of
10   Russian emigres in the United States who receive
11   pension payments that are paid through the
12   embassies and various people, Russian lawyers and
13   others who we became interested in in the course of
14   this investigation seem to be involved in that
15   process.  I'm not saying they did anything illegal.
16   I'm just saying, you know, we looked at this
17   system, and as someone who does a lot of money
18   laundering work this was an interesting thing that
19   I hadn't heard about.
20          There's all this money flowing in the United
21   States from Russia, it probably flows in under some
22   sort of diplomatic status.  So if there's sanctions
23   on Russia and the Russians can't move money in the
24   United States for most things, this would, in fact,
25   be an ideal mechanism for moving money into the
```

Glenn Simpson                                               August 22, 2017

Washington, DC

Page 245

1    United States for whatever purpose, for some kind

2    of illicit purpose.  I think that's a pretty good

3    example of the kind of general work I would do to

4    determine whether there's some base level of

5    credibility to the things we're getting.

6          Q. And in answering that you said that some

7    of the officials that you had identified as

8    involved in this effort seemed to come up with

9    regard to the pension disbursements.  Who

10   specifically are you referring to?

11         A. We identified a lawyer in Sunny Isles

12   Beach, Florida who said she previously worked for

13   Gazprom and just had on her professional Website or

14   someplace that she was -- she had some kind of

15   relationship with the Russian embassy in dealing

16   with these pension issues.

17         Q. And do you recall that lawyer's name?

18         A. I don't.

19         Q. Anyone else besides that individual?

20         A. If I could look at this for a second.

21         Q. Sure.

22              (Reviewing document.)

23   BY THE WITNESS:

24         A. I don't have a clear recollection of this.

25   I'm sorry.  I thought there was another name in

Alderson Court Reporting

Glenn Simpson                                           August 22, 2017

Washington, DC

Page 246

1    here that we had looked at, but I don't see it in

2    this memo.

3        Q. To the extent you have records about this

4    and the individual in Sunny Isles, would you at

5    least look for them and let us know whether you

6    would be willing to provide them to the committee?

7        MR. LEVY:  Counsel has the request.

8    BY MS. SAWYER:

9        Q. Just moving on to the next memo, which is

10   Company Intelligence Report 2016/097, it bears the

11   Bates Nos. 401 and 41402, it's a two-page memo

12   dated 30 July 2016.  Again, when you take a look at

13   that, was there anything that you independently

14   verified that comes out of this memo?

15                  (Reviewing document.)

16   BY THE WITNESS:

17       A. I don't think so.

18       Q. Okay.  Then Company Intelligence Report

19   2016/100, was there any information there that you

20   either independently verified or had independent

21   research on any of the individuals mentioned in

22   there?  It mentions Sergei Ivanov, Dmitry Peskov.

23       MR. MUSE:  If I may, some clarification.

24   When you say is there anything that you

25   independently verified that comes out of the memo,

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 247

1    are you talking -- it's a little confusing because

2    the memo comes in, he already knows some

3    information, but I think he's generally said that

4    he's not doing a draft of the memo beforehand and

5    yet your question seems to permit that possibility.

6         MS. SAWYER:  No.  I appreciate the

7    clarification.

8    BY MS. SAWYER:

9         Q. Just to be clear, I'm not trying to --

10   what we're trying to determine is is there

11   information that either you had in your possession

12   that corroborated and verified this or even went

13   beyond what was in this and amplified information

14   on any of these individuals relevant to Russia's

15   interference or possible ties with the Trump

16   campaign?

17        A. Yes.  I'm trying to be as helpful as I

18   can.  The thing that we worked on with regard to

19   Sergei Ivanov, who was the head of what's called

20   the head of administration which we confirmed from

21   open sources is kind of an internal Kremlin

22   intelligence operation, and that Ivanov according

23   to experts on Russia, the Russian military, Russian

24   intelligence, does, in fact, run this internal

25   Kremlin intelligence operation that sort of sits

Glenn Simpson                                           August 22, 2017

Washington, DC

1    atop the FSB and the SVR, the GRU, which are the

2    other agencies specifically tasked with areas of

3    intelligence, military for the GRU, foreign for the

4    SVR, domestic for the FSB.

5         Before I got this memo I didn't know about

6    this internal Kremlin structure.  It was either

7    this one or the previous one.  So in the course of

8    saying who is this Ivanov guy, you know, we looked

9    at Ivanov and found journal articles and other

10   public information about his long history of

11   intelligence.  He's a veteran of the FSB, his long

12   history with Vladimir Putin, and his role atop this

13   internal operation.

14        In particular I remember reading a paper by a

15   superb academic expert whose name is Mark Galeotti,

16   G-A-L-E-O-T-T-I, who's done a lot of work on the

17   Kremlin's black operations and written quite widely

18   on the subject and is very learned.  So that would

19   have given me comfort that whoever Chris is talking

20   to they know what they're talking about.

21        Q. With regard to that just in general, I did

22   want to ask you not to identify based on the

23   particular sources, but did Mr. Steele ever share

24   with you who his sources were?

25        MR. LEVY:  That conversation, if it occurred,

Glenn Simpson                                        August 22, 2017

Washington, DC

Page 249

```
 1   would implicate obligations and he's going to

 2   decline to answer that question.

 3        MS. SAWYER:  And is that based just on the --

 4   can you just articulate the obligations so we can

 5   understand them.

 6        MR. LEVY:  It's a very sensitive security

 7   issue and I just don't -- in a transcript where

 8   there's no assurance of confidentiality it's not a

 9   discussion we want to have here.

10   BY MS. SAWYER:

11        Q. And do you know whether he shared his

12   sources with the FBI?

13        A. I don't.  I don't know.

14        MR. FOSTER:  What was the answer?

15        MR. SIMPSON:  Sorry.  I don't know whether he

16   shared his sourcing with the FBI.

17        MS. SAWYER:  Can we just take a minute.  We

18   can go off the record for a minute.

19                    (A short break was had.)

20        MS. SAWYER:  Just with sensitivity toward the

21   lateness of the day and in the interest of time it

22   would just be helpful -- and I'll give you as much

23   time as you need to take a few minutes and, if you

24   could, look through the remaining memos and let us

25   know if anything kind of stood out to you, if there
```

Glenn Simpson                                                    August 22, 2017
Washington, DC

Page 250

```
 1   were things that either did not ring true at the
 2   time and that you were concerned about or things in
 3   particular that in addition to what's in here you
 4   had independent research about that you could share
 5   with the committee in the context of our
 6   investigation.  Is that a clear request?
 7        MR. MUSE:  Heather, may I make a suggestion?
 8        MS. SAWYER:  Sure.
 9        MR. MUSE:  Why don't we break for a few
10   minutes so he can look at it, but here's a bigger
11   problem and I don't mean this as criticism
12   particularly with regard to the sensitivity as to
13   time.  The difficulty is in summary questions
14   there's sometimes the problem that is created when
15   you try to sort of do a wholesale commentary,
16   particularly after it's been sort of more
17   focused --
18        MS. SAWYER:  I understand where you're going.
19   So yeah.  I don't want to put us in a position
20   where --
21        MR. LEVY:  Let's just take some time for the
22   witness to review the document.
23        MS. SAWYER:  Why don't you take a little bit
24   of time.
25        MR. MUSE:  In that spirit maybe you could
```

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 251

1    look in case you have a more focused inquiry too.

2        MS. SAWYER:  We can certainly do that.  Why

3    don't we take a five-minute break and I'll ask

4    whatever remaining questions we have on the

5    dossier.

6        MR. FOSTER:  We'll go off the record at 5:11.

7                    (A short break was had.)

8        MS. SAWYER:  We're back on the record at

9    5:20.

10   BY MS. SAWYER:

11       Q. We appreciate you are walking through some

12   of these and we understand your general practice

13   and I want to make sure I'm characterizing this

14   accurately.  When you would get the memos you

15   would -- from Mr. Steele you would review them, you

16   would see if they resonated with information that

17   you already knew and other research you may already

18   have done.  I think you already told me that you

19   don't recall at the time anything jumping out at

20   you as patently inaccurate; is that fair to say?

21       A. Yes, that's fair to say.

22       Q. And I had just asked you to review and I

23   appreciate you taking the time to review the

24   additional memos which would just run from Bates

25   No. 41405 to 41425 to just try to determine for the

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 252

1    committee if research that you had been doing on

2    the separate track on some of these topics in

3    particular amplified the work in the dossier.

4         MR. LEVY:  When you say "amplified the work

5    in the dossier," what do you mean?

6         MS. SAWYER:  Both kind of verified and maybe

7    gave you some additional information and insights

8    on either the factual allegations in them or

9    whether or not the key players identified had also

10   engaged in either similar or related behavior on

11   Russian -- you know, related to Russian

12   interference.

13   BY THE WITNESS:

14        A. I'd say that's generally right.  I read a

15   lot of books and studies on Russia and organized

16   crime.  So over the years I just have a lot of

17   residual knowledge of some of the people and

18   subjects that are covered in the memos.

19        Q. Okay.  So nothing certainly jumped out at

20   you and then as --

21        A. Nothing jumped out at me --

22        Q. -- as inconsistent with information that

23   you had gained from other sources?

24        A. That's correct.

25        Q. And did you have any reason to believe

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 253

1    either then or now that Mr. Steele would have kind

2    of fabricated any of the information that he

3    included in any of these memos?

4        A. No.

5        Q. I do want to return to a few of the topics

6    and a few of the specifics, but I think I'll hold

7    that until the next round because I have a few

8    other just follow-up questions for you.

9        It had come up in the last round that there

10   was a meeting and some information was provided to

11   Mr. Kramer.  Were you still -- at the time that

12   occurred were you, Fusion GPS, still working on

13   behalf of a client who had engaged you to do

14   research as part of the presidential election

15   campaign or did that occur after that engagement

16   ended?

17       A. It occurred after the engagement had

18   ended.

19       Q. And besides Mr. Steele, did you discuss

20   sharing information with Mr. Kramer with anyone

21   else?

22       A. Not that I recall.

23       Q. My colleagues had also asked you about

24   meetings and particularly that occurred between

25   June 8th and June 10th of 2016 and some of the

Glenn Simpson                                                    August 22, 2017

Washington, DC

1   individuals involved in those meetings.  As a

2   general matter, did you discuss the work you were

3   doing related to the presidential election campaign

4   with -- did you ever discuss that with Natalia

5   Veselnitskaya?

6           A. I don't believe I ever discussed it with

7   her.  I'd just add that she doesn't speak much

8   English.  So the possibilities are almost none.  I

9   didn't discuss it with her.

10          Q. Do you have any reason to believe that she

11  knew that you were doing work -- opposition

12  research work on then Candidate Trump?

13          A. No.

14          Q. Do you have any reason to believe that she

15  knew that Christopher Steele was doing work for you

16  as part of that project, the opposition research on

17  Candidate Trump?

18          A. No.

19          Q. What about Rinat Akhmetshin, did you ever

20  talk with Rinat Akhmetshin about the fact that you

21  were doing opposition research on Candidate Trump?

22          A. Not that I recall, no.

23          Q. Do you have any reason to believe that

24  Christopher Steele ever spoke with Rinat Akhmetshin

25  about the fact that Christopher Steele had been

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 255

1    engaged by you to do work -- related to the

2    opposition work on then Candidate Trump?

3          A. Do I have any reason to believe that he

4    spoke?  No, I have no reason to believe he did.

5          Q. Do you know if he did or not?

6          A. It's never -- we've never discussed it,

7    but I have no reason to think he would have.

8          Q. And if he had discussed it, would that

9    have been consistent with the nondisclosure

10   agreement that you indicated you would have had

11   with Mr. Steele?

12         A. That would -- if he discussed it with

13   someone like that without my knowledge, it would

14   not have been consistent with our agreement.

15         Q. And then given that, would it surprise you

16   if Mr. Steele had talked with Rinat Akhmetshin

17   about the work he was doing related to then

18   Candidate Trump?

19         A. Yes, that would surprise me.

20         Q. Did you discuss the fact that you were

21   doing opposition research on Candidate Trump with

22   anyone at Prevezon Holdings?

23         A. Not that I recall, no.

24         Q. And if you had done so, would that have

25   been consistent with your confidentiality

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 256

1    obligations to that client?

2         A. No, it wouldn't have been consistent.

3         Q. Did you speak with anyone at Baker

4    Hostetler about the work that you had been engaged

5    to do on then Candidate Trump?

6         A. Not that I recall.

7         Q. So the point in time at which you were in

8    meetings that included -- the meetings that you had

9    related to the Court hearing at Prevezon that

10   you've already discussed, the dinner, the Court

11   hearing, and then a subsequent dinner, they occur

12   right around the same time that Natalia

13   Veselnitskaya and Rinat Akhmetshin and the

14   individual you described as a translator, Anatoli

15   Samochornov, met -- or it has been reported met

16   with individuals in the Trump campaign.  Did that

17   topic just never come up during those three days?

18        A. It never came up.  I don't know what else

19   to say.  It never came up.

20        Q. So you at the time had no idea that they

21   were meeting with or met -- and actually, in fact,

22   met with members of the Trump campaign?

23        A. I didn't have any idea about that meeting

24   until quite recently.

25        Q. So in an August 1, 2017 news briefing

Glenn Simpson                                              August 22, 2017

Washington, DC

Page 257

1    White House Press Secretary Sarah Huckabee Sanders

2    said "The Democrat linked firm Fusion GPS actually

3    took money from the Russian government while it

4    created the phoney dossier that's been the basis

5    for all of the Russia scandal fake news."  What is

6    your response to that statement?

7            A. It's not true?

8            Q. And what in particular is not true about

9    it?

10           A. Well, it's a false allegation leveled by

11   William Browder before this committee and in other

12   places for the purpose of his advantage.  She's

13   repeating an allegation that was aired before this

14   committee and in other places that we were working

15   for the Russian government and it's not true.

16           Most importantly the allegation that we were

17   working for the Russian government then or ever is

18   simply not true.  I don't know what to say.  It's

19   political rhetoric to call the dossier phoney.  The

20   memos are field reports of real interviews that

21   Chris's network conducted and there's nothing

22   phoney about it.  We can argue about what's prudent

23   and what's not, but it's not a fabrication.

24           Q. And I think you've already answered you

25   contend that you were not taking money from the

Glenn Simpson                                    August 22, 2017

Washington, DC

Page 258

1   Russian government and that was in relation to the

2   litigation work you had done with Baker Hostetler,

3   correct?

4        A. Yes.  They are a well-regarded law firm

5   that has obligations to determine the sources of

6   funds when they take a client and, to my knowledge,

7   they did so and the money was not coming from the

8   Russian government.

9        Q. So that was for the Prevezon work for

10  Baker Hostetler.  Did you take money in any way,

11  shape, or form that could be attributed to the

12  Russian government for the work that you were

13  doing -- the opposition research work that you were

14  doing on then Candidate Trump?

15       A. No.

16       Q. Did, to the best of your knowledge,

17  Mr. Steele take money in any way, shape, or form

18  that could be attributed to the Russian government

19  for the work that he did on the memos as part of

20  the opposition research on Candidate Trump?

21       A. No.

22       I'll add one more thing to the response to

23  Sarah Huckabee Sanders, which is her assertion that

24  we are a Democrat linked opposition research firm.

25  I think I addressed this earlier, but to be clear,

Alderson Court Reporting

Glenn Simpson                                                August 22, 2017
Washington, DC

Page 259

1   we don't have a business of -- we're not an

2   appendage to the Democratic party.  We run a

3   commercial business, we're all ex-journalists.  We

4   take clients from both sides of the aisle.  We have

5   a long history of that, I'm proud of that.  I'm

6   happy to say I have lots of Republican clients and

7   friends.

8        Q. To the extent there have been allegations

9   or indications that the work that Mr. Steele did,

10  his research into Russian interference in the 2016

11  election, or your work could have been influenced

12  by Rinat Akhmetshin, do you believe that is true

13  and if -- do you believe it's true?

14       A. No.

15       Q. Do you believe that the work that

16  Mr. Steele did on Russian interference and possible

17  ties to the Trump campaign or your work could have

18  been influenced by Natalia Veselnitskaya?

19       A. No.

20       MS. SAWYER:  I think my time is up for this

21  round.  So I appreciate your patience and we'll

22  take a break.

23       MR. FOSTER:  It's 5:34.

24                  (A short break was had.)

25       MR. DAVIS:  We'll go back on the record.

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 260

1    It's 5:43 p.m.

2                         EXAMINATION

3    BY MR. DAVIS:

4         Q. Mr. Simpson, could you walk us through

5    your itinerary to the best you remember it from

6    June 8th through 10th of 2016, especially any

7    interactions you had with Prevezon team members

8    during those three days?

9         MR. LEVY:  Beyond what he's discussed today?

10        MR. DAVIS:  Yes.

11   BY THE WITNESS:

12        A. I took the train to New York.  I don't

13   recall, but I may have had other business.  I don't

14   remember.  I think there was a dinner.  I went back

15   to my hotel, went to bed.  Got up the next morning.

16   I don't remember the sequence, but I remember

17   meeting with Weber Shandwick, the PR firm, about

18   preparations for -- I think we expected there was

19   going to be a trial.  I think that's what it was

20   about.  It might have been about the press coverage

21   of the hearing.  I just don't remember.  I went to

22   the hearing and I think -- if I remember the

23   sequence correctly, I went to the hearing, then I

24   had the meeting with those guys, the Weber

25   Shandwick guys, and then I hightailed it home.  My

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 261

1    son's junior prom was that night or senior prom and

2    I was under some pressure to go home and be a dad.

3          Q. And then on the 10th, that first day back

4    in D.C.?

5          A. I don't think that was my first day back.

6    I was back the evening of the 9th.

7          Q. Sorry.  The first full day.

8          A. I think it was a weekend.  So I don't know

9    what I was doing.  Probably just relaxing.  I went

10   to the dinner, it was at a restaurant called

11   Barcelona up on Wisconsin Avenue, it was a social

12   occasion.  I brought my wife, other people brought

13   their wives.  We talked about books and other other

14   nongermane topics.  It was just a social

15   occasion.

16                    (Exhibit 6 was marked for

17                     identification.)

18   BY MR. DAVIS:

19          Q. I'm going to show you an exhibit.  I think

20   we're on 6.  We understand these are meeting notes.

21   Do these phrases about -- including Mr. Browder

22   mean anything to you or relate to any of the

23   research that you conducted or otherwise aware of

24   regarding Mr. Browder?

25          MR. LEVY:  When say "meetings notes," meeting

Glenn Simpson                                                   August 22, 2017

Washington, DC

Page 262

1  notes about what meeting?

2       MR. DAVIS:  These are the meeting notes from

3  the June 9th meeting at Trump Tower.  These are

4  Mr. Manafort's notes or they're contemporaneous.

5  BY THE WITNESS:

6       A. I could tell -- obviously you know who

7  Bill Browder is.  Cyprus Offshore, Bill Browder's

8  structure, you know, investment -- Hermitage

9  Capital, his hedge fund, set up numerous companies

10  in Cyprus to engage in inward investment into

11  Russia, which is a common structure, both partially

12  for tax reasons but also to have entities outside

13  of Russia, you know, managing specific investments.

14  I can only tell you I assume that's what that

15  references.  I don't know what the 133 million --

16       MR. FOSTER:  Can I interrupt?  And you know

17  that from research that you did and provided to --

18       MR. SIMPSON:  Yes.

19       MR. LEVY:  Let him finish.

20       MR. FOSTER:  -- research that you did and

21  provided to Baker Hostetler and their client?

22       MR. SIMPSON:  Yes.  There was a -- I can

23  elaborate a little bit.  As part of the research

24  into how Hermitage Capital worked we looked at

25  various things, their banking relationships, the

Glenn Simpson                                                    August 22, 2017

Washington, DC

1   way they structured their investments in Russia.  I

2   don't remember how many, but there was a large

3   number of shell companies in Cyprus that were used

4   to hold the investments of individual clients of

5   Hermitage.  So one of the things we discovered from

6   that was the likely identities of some of

7   Hermitage's clients.

8   BY MR. DAVIS:

9        Q. Do any of the other entries in here mean

10  anything to you in light of the research you've

11  conducted or what you otherwise know about

12  Mr. Browder?

13       A. I'm going to -- I can only speculate about

14  some of these things.  I mean, sometimes --

15       MR. LEVY:  Don't speculate.

16  BY THE WITNESS:

17       A. Just would be guesses.

18       Q. Okay.

19       A. I can skip down a couple.  So "Value in

20  Cyprus as inter," I don't know what that means.

21  "Illici," I don't know what that means.  "Active

22  sponsors of RNC," I don't know what that means.

23  "Browder hired Joanna Glover" is a mistaken

24  reference to Juliana Glover, who was Dick Cheney's

25  press secretary during the Iraq war and associated

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 264

1    with another foreign policy controversy.  "Russian

2    adoptions by American families" I assume is a

3    reference to the adoption issue.

4         Q. And by "adoption issue" do you mean Russia

5    prohibiting U.S. families from adopting Russian

6    babies as a measure in response to the Magnitsky

7    act?

8         A. I assume so.

9         Q. The information here, is this generally

10   consistent with the type of information you or

11   Baker Hostetler were providing about Mr. Browder

12   and his activities?

13        MR. LEVY:  Can you repeat that question.

14        MR. DAVIS:  Is the information here, to the

15   best you can decipher it, consistent with the

16   information that you and Baker Hostetler and HRAGI

17   were relaying to other parties about Mr. Browder's

18   activities?

19        MR. LEVY:  He's just told you that a lot of

20   what's here he doesn't know what it means, he

21   doesn't have knowledge or recollection as to these

22   terms.

23        MR. DAVIS:  The parts you do recognize.

24   BY THE WITNESS:

25        A. Couple of the items touch on things that I

Glenn Simpson                                              August 22, 2017

Washington, DC

Page 265

1    worked on, Cyprus, Bill Browder.

2         Q. I'm going to jump back to the Russia

3    investigation.  You'd mentioned before you've had

4    some subcontractors that you've worked with long

5    enough that you call them super subs; is that

6    correct?

7         A. Yes.

8         Q. Orbis or Mr. Steele, is that one such

9    super sub in your opinion?

10        A. It's a loose term.  We don't have a list

11   of super subs.

12        MR. FOSTER:  Is he one of them?

13        MR. SIMPSON:  There is no list.  So I can't

14   tell you if he's one of them.  He's a reliable

15   subcontractor who's worked with us in the past and

16   we've been very satisfied with the quality of his

17   work.

18        MR. LEVY:  Just to reiterate, I think as you

19   described these super subs earlier loosely, even

20   with some of these super subs Mr. Simpson said that

21   he would talk about clients only on a need-to-know

22   basis even with the super subs, so-called.

23   BY MR. DAVIS:

24        Q. Beyond the memoranda prepared by

25   Mr. Steele, did Fusion create any other work

Glenn Simpson                                                        August 22, 2017

Washington, DC

Page 266

1    product relating to this investigation?

2         MR. LEVY:  Which investigation?

3         MR. DAVIS:  The investigation into Mr. Trump

4    and his associates.

5         MR. LEVY:  In addition to what?

6         MR. DAVIS:  Sorry.  The investigation into

7    Mr. Trump and his associates.

8         MR. LEVY:  I'm sorry.  Just repeat the whole

9    question.

10        MR. DAVIS:  Sure.  In addition to the

11   memoranda compiled by Mr. Steele, did Fusion itself

12   create any other work product as part of this

13   investigation?

14        MR. LEVY:  I just want to make sure there's

15   no confusion.  It wasn't Fusion that created the

16   memoranda.

17        MR. DAVIS:  Right, but it was a subcontractor

18   giving it back to Fusion.

19        MR. LEVY:  That's correct.

20   BY MR. DAVIS:

21        Q. With that understanding, did Fusion create

22   any work product of its own?

23        A. Yes.

24        Q. And can you describe what type of work

25   product that was?

Glenn Simpson                                    August 22, 2017

Washington, DC

Page 267

```
 1        A. I believe I described it before.  We do a

 2   lot of public records research, things that are in

 3   the news, things that are in court documents.  We

 4   summarize those things and try to document, you

 5   know, and attach them to the underlying source

 6   material.

 7        Q. So you create sort of summary memoranda of

 8   those documents?

 9        A. Yes.

10        Q. Okay.  And to whom is that distributed?

11        MR. LEVY:  As a general matter?

12        MR. DAVIS:  Well, within the course of this

13   investigation.

14        MR. LEVY:  Inasmuch as that answer calls for

15   client communications the answer might be

16   privileged, might touch on obligations Mr. Simpson

17   has.  So he's not going to answer that question.

18        MR. FOSTER:  Did you provide work product to

19   your client?

20        MR. LEVY:  Again, the answer to that question

21   might implicate privilege or his obligations.

22   BY MR. DAVIS:

23        Q. Is the version of the Steele memoranda

24   that was published by BuzzFeed identical to the

25   version that Orbis provided Fusion?
```

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 268

1        A. To my knowledge, yes.

2        Q. The version published by BuzzFeed contains

3    several redactions, not merely the ones by

4    Mr. Gubarev, G-U-B-A-R-E-V, that were later added.

5    Were those redactions in the versions Mr. Steele

6    provided to you?

7        MR. LEVY:  So wait.  You're asking about the

8    version in Exhibit 3?

9        MR. DAVIS:  Right.

10       MR. LEVY:  And you're asking if the

11   redactions that appear here were delivered to

12   Fusion?

13       MR. DAVIS:  Right.

14   BY THE WITNESS:

15       A. No.

16       Q. Do you know who added those redactions?

17       A. No.

18       Q. Did any version of the memoranda list

19   source and subsource names rather than referring to

20   sources anonymously?

21       A. I'm not sure I understand the question.

22       Q. In the version that we have as an exhibit

23   obviously it doesn't give identifying information

24   for sources, it says source A, subsources, things

25   like that.  Was there ever a version that listed

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 269

1    the actual source names rather than substituting

2    them?

3          A. These are the versions that we received.

4          Q. They're what?

5          A. These are the memos that we received.

6          Q. Those are the memos you received.  Okay.

7          MR. FOSTER:  But he's asking if you received

8    any other memos that listed the sources?

9          MR. LEVY:  He did not -- what I think he said

10   is that he did not receive any versions of these

11   memos that listed the sources.

12         MR. FOSTER:  Okay.  Did you receive any other

13   documentation from Mr. Steele that listed the

14   sources?

15         MR. SIMPSON:  I don't want to get into source

16   information.

17   BY MR. DAVIS:

18         Q. Again, I don't want to repeat questions

19   that have been asked, but I don't want to

20   unintentionally omit anything.  Did the version

21   provided to the FBI include all source names?

22         A. I don't know that there was a version

23   provided to the FBI.

24         Q. When Mr. Steele first met with the FBI in

25   the summer of 2016 do you know if he provided the

Glenn Simpson                                             August 22, 2017

Washington, DC

Page 270

1    first memoranda that he created?

2         MR. LEVY:  He's already answered that

3    question.

4    BY THE WITNESS:

5         A. No, I don't know.

6         Q. Do you know if he provided any other

7    memoranda to the FBI on a rolling basis at all at

8    any point?

9         MR. LEVY:  He's answered that question too.

10   BY THE WITNESS:

11        A. I don't know.

12        Q. So I'd like to go back to Exhibit 4, I

13   believe.  On page 3, paragraph 18 Mr. Steele's

14   attorneys are describing the December memoranda and

15   they state "The Defendants" -- again, that's

16   Mr. Steele and Orbis -- "continued to receive

17   unsolicited intelligence on the matters covered by

18   the pre-election memoranda after the U.S.

19   presidential election and the conclusion of the

20   assignment for Fusion."

21        They reiterate this point on Exhibit 5 on

22   page 4.  Request 11 asks "Please state whether such

23   intelligence was actively sought by the

24   Defendant" --

25        A. Where are you at?

Glenn Simpson                                        August 22, 2017

Washington, DC

Page 271

```
 1        Q. Page 4, request 11.  It states "Please
 2   state whether such intelligence was actively sought
 3   by the second Defendant or merely received as
 4   presently pleaded."  The response they say is "Such
 5   intelligence was not actively sought, it was merely
 6   received."
 7        Did anyone -- are you aware of who sent this
 8   unsolicited intelligence to Mr. Steele?
 9        A. No.
10        Q. Could you describe his methods of
11   compiling the dossier a little more?  I think
12   before you described field interviews.  He seems to
13   be talking about unsolicited information coming to
14   him rather than information he sought out?
15        A. I can try.  When you're doing field
16   information gathering you have a network of people,
17   sources.  It's not like a light switch that you
18   turn on and off, these are people you work with.
19   So they call you and tell you stuff.  You know, you
20   don't close the window and stop answering phone
21   calls, you know, when the engagement ends.  So I
22   assume this is stuff that came in straggle,
23   whatever you call it.
24        Q. To the best of your knowledge, did
25   Mr. Steele pay any of his sources or subsources in
```

Glenn Simpson                                        August 22, 2017

Washington, DC

Page 272

1    the memoranda for information?

2          A. I don't know.  I think there's been a

3    little bit of confusion I would like to clear up.

4    Some people were saying that he was paying people

5    for information.  I don't know whether he does or

6    not, but that's not basically how I understand

7    field operations to work.  You commission people to

8    gather information for you rather than sort of

9    paying someone for a document or to sit for an

10   interview or something like that.  That's not how I

11   understand it works.

12         Q. To make sure I understand, are you saying

13   you don't pay for particular information, you would

14   have an established financial arrangement with

15   someone?

16         A. If he did at all, but I did not ask and he

17   did not share that information.  He did not invoice

18   me for any such.

19         Q. Did Mr. Steele ever discuss his opinion of

20   Mr. Trump with you?

21         A. We didn't discuss our political views of

22   Mr. Trump, I don't think, at least not that I

23   specifically remember, if that's what you mean.

24         Q. That is.

25         If I recall correctly, you said earlier that

Glenn Simpson                                    August 22, 2017
Washington, DC

Page 273

1  once Fusion had exhausted public documentary

2  sources you turned to Mr. Steele and some other

3  subcontractors for human intelligence; is that

4  correct?

5       A. Yeah, field intelligence.

6       Q. Would your engagement with your client

7  have ended had you not turned to human

8  intelligence?

9       A. I have no idea.  I mean, I can't

10  speculate.

11      Q. Well, to clarify, when say you had

12  exhausted the public documentation, are you saying

13  you reached the end of your work or was there still

14  more?

15      A. No.  It's a broad project, there's lots of

16  things going on.  We're pulling legal filings and

17  bankruptcies and all sorts of other stuff on all

18  kinds of issues.  I was talking about specific

19  lines of inquiry.

20      Q. To the best of your knowledge, do Rinat

21  Akhmetshin and Christopher Steele know each

22  other?

23      A. I don't know.

24      Q. To the best of your knowledge, has

25  Mr. Akhmetshin ever worked with Orbis?

Alderson Court Reporting

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 274

1        A. Not to my knowledge.

2        MR. FOSTER:  If Mr. Akhmetshin were one of

3   the sources in the dossier, would you know that?

4        MR. SIMPSON:  I believe he would have told me

5   that by now given the public controversy over this

6   matter, but he hasn't.

7   BY MR. DAVIS:

8        Q. I'm sorry.  Is the "he" --

9        A. Chris Steele.

10        Q. How often would you say you interacted

11   with Mr. Akhmetshin during the 2016 elections

12   season?

13        A. Infrequently, intermittently.

14        Q. When was the last time you spoke with him?

15        A. I don't remember, but I don't think it

16   was -- I just don't remember.

17        Q. To the best of your knowledge, was Ed

18   Lieberman aware of your Trump research project?

19        A. Not to the best of my knowledge.

20        MR. FOSTER:  Could you just tell us generally

21   who else other than your client was aware of the

22   Trump research project as it was going on.  So

23   excluding your client and excluding your

24   subcontractors, who else knew that you were doing

25   it?

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 275

1          MR. SIMPSON:  Journalists.

2          MR. FOSTER:  In the summer of 2016?

3          MR. SIMPSON:  Yes.

4          MR. FOSTER:  And they knew that because you

5     were telling them about it?

6          MR. SIMPSON:  We get calls from journalists

7     who are working on stories about all kinds of

8     subjects and some things we can answer questions on

9     and others we don't.  I'm a former journalist, as I

10    think you know, and we do lots of different kinds

11    of research and people who are working on a story

12    will call us and say what do you know about, you

13    know, Carter Page and we'll say, well, here's the

14    things that we know.

15         MR. FOSTER:  And they're aware you're being

16    paid to do that research for a client?

17         MR. SIMPSON:  I don't know.  Generally that's

18    not an issue.

19         MR. FOSTER:  So my question was who knew that

20    you were doing the research, the Trump-Russia

21    research at the time?

22         MR. LEVY:  He answered the question.  He told

23    you he spoke with journalists and told them what he

24    had found.

25         MR. FOSTER:  Right.  I was trying to clarify.

Glenn Simpson                                                      August 22, 2017

Washington, DC

Page 276

1    My question was whether or not they knew you were

2    being paid to do that research.

3         MR. LEVY:  He answered that question too and

4    he said he did not explain that to the journalists.

5         MR. SIMPSON:  It's hard to generalize.  I run

6    a business, it's a research business.  Reporters

7    know we have clients who pay us to do research.

8    So, you know, I don't remember any specific queries

9    about whether we were being paid or not, but I

10   think most journalists would assume that someone

11   had paid us to do research.

12        MR. FOSTER:  They knew you were doing a Trump

13   oppo research project as opposed to a Hillary

14   Clinton oppo research project?

15        MR. LEVY:  From 2015 through the end of the

16   election?

17        MR. FOSTER:  Can you let the witness answer,

18   please.

19        MR. SIMPSON:  The word "they" is extremely

20   broad.  Journalists would call and ask questions

21   about specific things and from that they might

22   conclude that we were doing a Trump oppo project.

23        It's just worth pointing out that in a

24   political season all kinds of people are doing

25   research on all kinds of things.  Some people are

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 277

1    interested in trade, other people are interested in

2    guns.  So you wouldn't necessarily intuit exactly

3    what we were doing.  Most people are interested in,

4    you know -- they're interested in the story they're

5    working on.  So some people will say, hey, I'm

6    interested in whether Donald Trump gets his ties

7    from third-world countries and they wouldn't ask

8    about anything else.

9    BY MR. DAVIS:

10        Q. You mentioned before, if I recall

11   correctly, that Fusion was having issues with

12   persons attempting to hack it?

13        A. That's a current concern, yes.

14        Q. When did that concern -- when did you

15   first become aware of that concern?

16        A. Relatively recently.

17        Q. So after the election?

18        A. Yes.

19        MR. FOSTER:  Did you tell journalists that

20   you had engaged Mr. Steele in the summer of 2016?

21        MR. SIMPSON:  I don't specifically remember

22   doing that until the fall.

23        MR. FOSTER:  After the election or before?

24        MR. SIMPSON:  Before the election.

25        MR. FOSTER:  Can you remember the context in

Alderson Court Reporting

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 278

1    which you told them that?

2         MR. SIMPSON:  Yes.

3         MR. FOSTER:  Can you describe it for us,

4    please.

5         MR. SIMPSON:  Sure.  Essentially there was --

6    at some point the controversy over the Trump

7    campaign's possible relationship with the Kremlin

8    became, you know, one of the main -- major issues

9    in the campaign and there were things that Chris

10   knew and understood to be the case that only he

11   could really explain in a credible way, and I

12   thought that -- we thought that he should be the

13   one that explains them, you know.  So we sat down

14   with a small group of reporters who were involved

15   in investigative journalism of national security

16   issues and we thought were in a position to make

17   use of him as a resource.

18        MR. FOSTER:  Do you recall whether that was

19   before or after he ended his relationship with the

20   FBI?

21        MR. SIMPSON:  Before.

22   BY MR. DAVIS:

23        Q. Do you recall what the first published

24   article -- when the first published article came

25   out that referenced material from the memoranda?

Glenn Simpson                                                      August 22, 2017

Washington, DC

Page 279

1        A. Not specifically.

2        MR. FOSTER:  Earlier you talked about

3    evaluating the credibility of the information in

4    the memoranda that you were being provided by

5    Mr. Steele and, by way of summary, you talked about

6    your belief that he was credible and that you had

7    worked with him before and the information he had

8    provided you had been reliable in the past.  Did

9    you take any steps to try to assess the credibility

10   of his sources, his unnamed sources in the material

11   that he was providing to you?

12       MR. SIMPSON:  Yes, but I'm not going to get

13   into sourcing information.

14       MR. FOSTER:  So without getting into naming

15   the sources or anything like that, what steps did

16   you take to try to verify their credibility?

17       MR. SIMPSON:  I'm going to decline to answer

18   that.

19       MR. FOSTER:  Why?

20       MR. LEVY:  It's a voluntary interview, and in

21   addition to that he wants to be very careful to

22   protect his sources.  Somebody's already been

23   killed as a result of the publication of this

24   dossier and no harm should come to anybody related

25   to this honest work.

Glenn Simpson                                                          August 22, 2017

Washington, DC

Page 280

1        MR. FOSTER:  I'm not asking him to identify

2    the sources.  I'm just asking what steps he took to

3    try to verify or validate the information.

4        MR. LEVY:  He's given you --

5        MR. FOSTER:  If he can answer generally

6    without identifying the sources, I'd ask him to

7    answer.

8        MR. LEVY:  He's given you over nine hours of

9    information and he's going to decline to answer

10   this one question.

11       MR. FOSTER:  And several others.

12       MR. LEVY:  Not many.

13   BY MR. DAVIS:

14       Q. I think you mentioned that you were in

15   London when you first heard that someone was

16   interested in hiring Fusion to work on the Trump

17   research; is that correct?

18       MR. LEVY:  Repeat the question.

19       MR. DAVIS:  If I recall correctly,

20   Mr. Simpson said that he was in London when he

21   first heard that somebody was interested in hiring

22   Fusion to do Trump research?

23   BY THE WITNESS:

24       A. That's my recollection.

25       Q. Were either of the clients on this project

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 281

1    not American citizens?

2          A. Were either of the clients on this --

3          MR. LEVY:  Clients on which project?

4    BY MR. DAVIS:

5          Q. Were any clients on the Trump research not

6    American citizens?

7          A. I don't mind answering that if that's

8    okay.  They're domestic clients.

9          MR. FOSTER:  You said earlier that the

10   information that you gather in your work is owned

11   by the client, it's not owned by you, and so

12   therefore you also referenced your nondisclosure

13   agreements and that you felt like if you had

14   information that related to national security or

15   law enforcement that the nondisclosure agreement

16   did not prevent you from disclosing that

17   information to third parties.  Is that a fair

18   summary?

19         MR. LEVY:  Wait.  You said a lot there.

20   Which third parties are you talking about?

21         MR. FOSTER:  Well, to law enforcement.

22         MR. LEVY:  I think he's answered this

23   already.  You're asking him whether it was

24   permittable under his contractual obligations to

25   report a crime to the national security community,

Glenn Simpson                                              August 22, 2017

Washington, DC

Page 282

1    and he said yes, it's fine for him to do that.

2         MR. FOSTER:  Right.  I'm trying to summarize

3    the previous answer as a premise to my next

4    question.  Is that an accurate summary of what you

5    said before?

6         MR. LEVY:  Summarizing testimony is dangerous

7    after he's given nine hours of it.  If you want to

8    ask him a question, ask him a question.

9         MR. FOSTER:  Is there a specific provision in

10   your NDA that provides an exception for disclosure

11   to law enforcement or intelligence agencies?

12        MR. LEVY:  I think he earlier didn't talk

13   about the contract, but if you want to talk about

14   it as a matter of practice what your understanding

15   is, go ahead.

16        MR. SIMPSON:  I don't know.

17        MR. FOSTER:  My colleague Ms. Sawyer asked

18   you earlier about public reports that the initial

19   client on the Trump work was a Republican and that

20   it's also been publicly reported that later there

21   was another client who was a supporter of Hillary

22   Clinton.  Are you the source for any of those

23   public reports?

24        MR. LEVY:  A hundred percent of what you were

25   saying was referring to news articles, right.

Glenn Simpson                                        August 22, 2017

Washington, DC

Page 283

```
 1        MR. SIMPSON:  I've been asked about this by

 2   various journals as to what I've heard, whether

 3   they can report things that they've heard

 4   elsewhere, and I have not -- I don't know if you'd

 5   classify that as being a source, but I've been

 6   asked those questions and I've avoiding getting

 7   into specifics.  But I have -- if people have

 8   accurate information of a general nature like that,

 9   I generally would not -- I would confirm things.

10        MR. FOSTER:  Sorry.  I didn't understand your

11   answer.

12        MR. MUSE:  It's quite clear.

13        MR. SIMPSON:  Depends on what you say a

14   source is.  If someone calls me and say I hear

15   client No. 1 was a Republican, then I'd say I don't

16   have any problem with you writing that.  That's not

17   quite the same thing.

18        MR. FOSTER:  So you confirm the accuracy of

19   information?

20        MR. LEVY:  He didn't say that.

21        MR. SIMPSON:  There are certain things that

22   I've chosen not to deny.  You know, generally

23   speaking, I deal with a lot of journalists.  I'm

24   not going to mislead people.

25   BY MR. DAVIS:
```

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 284

1        Q. To the extent you can clarify, is it that

2    there were two sets of clients, one of whom was

3    Republican and one of which was a Clinton

4    supporter, or was it one person's whose views

5    changed?

6        MR. LEVY:  We're not going to get into the

7    identity of clients.  As you know, we've agreed to

8    an interview about questions 5 through 13 of the

9    March 24 request.  Questions 1 through 4 talk about

10   the identities of the clients.  The Chair and the

11   Ranking Member agreed with counsel for Mr. Simpson

12   about the scope of this interview and that question

13   is outside of it.  In addition, the answer to that

14   question would implicate privilege and obligations.

15   He's talked to you for nine hours, he's given you a

16   lot of information, and he's not going to answer

17   questions about identities of clients.

18       MR. DAVIS:  You've asserted attorney-client

19   work product privilege --

20       MR. LEVY:  There is no such privilege.  I've

21   asserted the attorney work product privilege, we've

22   asserted privileges under the First Amendment,

23   we've asserted the attorney-client privilege, and

24   we've asserted privileges of confidentiality.  It's

25   a voluntary interview and he's declining to answer

Glenn Simpson                                        August 22, 2017

Washington, DC

1    the question.

2         MR. DAVIS:  I understand that.

3    BY MR. DAVIS:

4         Q. So with the Prevezon matter, then, is it

5    correct the law firm involved was Baker Hostetler

6    and the ultimate client was Prevezon, is that

7    right, while you were working there?

8         A. Yes.

9         Q. So any attorney-client privileges within

10   the context of that information would be -- the

11   holder of that privilege is Prevezon; is that

12   correct?

13        MR. LEVY:  That's a legal conclusion that

14   he's not qualified to draw.

15        MR. DAVIS:  You don't feel that you can speak

16   to it without their permission?

17        MR. LEVY:  Speak to what?

18        MR. DAVIS:  To questions that would be

19   covered by attorney-client privilege.

20        MR. LEVY:  I'm not sure he's qualified to

21   answer that question.

22   BY MR. DAVIS:

23        Q. Did you work with any law firms in

24   relation to the Trump investigation?

25        MR. LEVY:  Again, we're not getting into the

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 286

1    identity of any clients --

2          MR. DAVIS:  I didn't say client.

3          MR. LEVY:  I understand.  Or their lawyers.

4          MR. FOSTER:  I think the issue we're trying

5    to deal with is in order to assess your claims of

6    privilege the committee needs to understand at

7    least as much about the context of the dossier work

8    as it does about the Prevezon work in terms of who

9    was involved.  So if there's a law firm involved or

10   if he was reporting to a law firm or acting under

11   the direction of a law firm, then we need to be

12   able to assess whether or not that was in

13   anticipation of litigation, whether he was doing it

14   by the direction of a law firm in order to assess

15   your assertions of privilege.

16         MR. LEVY:  I understand.  We've identified

17   our position.  We've been talking -- Mr. Simpson

18   has been answering your questions since 9:30 this

19   morning, it's now 6:15.  He's been fully

20   cooperative and he's here because the Chair and the

21   Ranking Member agreed to a limited scope.  The

22   questions you're asking are outside of that scope

23   and this is part of why appearing at a hearing was

24   going to be impossible.  Through this agreement

25   we're here.  He's given you a ton of information.

Glenn Simpson                                        August 22, 2017

Washington, DC

Page 287

1    If you want to discuss the privilege with counsel

2    after the interview, you may do so.  He's answered

3    a ton of questions today and he's going to decline

4    to answer this last one.

5          MR. FOSTER:  The last one was did you work

6    with a law firm on the Trump matter?

7          MR. LEVY:  He's declining to answer.

8          MR. FOSTER:  There were several points in the

9    interview where you made a point of saying your

10   firm is not a Democratic linked firm in reference

11   to the Sarah Huckabee Sanders quote.  It's been

12   publicly reported that you did opposition research

13   for a client targeting Mr. Romney in the 2012

14   election.  Obviously we've been talking about the

15   Trump opposition research.  Have you ever done

16   opposition research regarding Mr. Obama?

17         MR. LEVY:  We're not going to get into

18   specific client matters that are outside the scope

19   of this interview.  He's told you he's represented

20   clients on the right and left, but he's not going

21   to get into other matters beyond Prevezon and what

22   he did in the 2016 election.

23         MR. SIMPSON:  I did investigate Senator

24   Obama's campaign in 2008 when I was working for the

25   Wall Street Journal and wrote an article that

Glenn Simpson                                                    August 22, 2017

Washington, DC

1    caused his campaign chair to resign.  The record is

2    replete -- or the public report of my work is

3    replete with examples of investigations I've done

4    of Democrats that resulted in them losing their

5    elections and being prosecuted.

6          MR. LEVY:  At the Wall Street Journal?

7          MR. SIMPSON:  Yes.

8    BY MR. DAVIS:

9          Q. Are you party to a joint defense agreement

10   related to your Prevezon work?

11         MR. LEVY:  He's not going to talk about

12   privileged discussions or agreements, and he's

13   probably not qualified to answer anyway.

14   BY MR. DAVIS:

15         Q. Is Fusion GPS paying Cunningham Levy for

16   the firm's representation of you or as a third

17   party?

18         MR. LEVY:  That's privileged also.  He's not

19   getting into payments to his lawyers and it's

20   beyond the scope of this interview which has now

21   gone on for almost nine hours.

22   BY MR. DAVIS:

23         Q. Has Fusion GPS ever offered directly or

24   indirectly to pay journalists to publish

25   information?

Glenn Simpson                                              August 22, 2017

Washington, DC

1          A. No.

2          Q. Are you aware of any Fusion clients

3    offering directly or indirectly to pay journalists

4    to publish information from Fusion?

5          MR. LEVY:  While working for Fusion on a

6    Fusion matter or as a general matter?

7          MR. FOSTER:  Can you let the witness answer.

8          MR. LEVY:  Well, if the question's clear he

9    can answer any question --

10          MR. FOSTER:  I think the question was clear.

11          MR. LEVY:  -- within the scope of the

12    interview --

13          MR. DAVIS:  Are there any of Fusion's

14    clients offering --

15          THE REPORTER:  Guys.

16    BY MR. DAVIS:

17          Q. I'll repeat the question.  Are you aware

18    of any of Fusion's clients offering directly or

19    indirectly to pay journalists to publish

20    information from Fusion?

21          A. Not to my knowledge or recollection, no.

22          MR. FOSTER:  What was the end date of the

23    Trump engagement?

24          MR. LEVY:  He told you he didn't recall

25    exactly.

Glenn Simpson                                        August 22, 2017

Washington, DC

Page 290

         1       MR. SIMPSON:  That's not correct.  The

         2  election was the end date.  I assume you're asking

         3  about the general election?  The election date

         4  would have been the end.

         5       MR. FOSTER:  So you didn't do any work on the

         6  Trump matter after the election date, that was the

         7  end of your work?

         8       MR. SIMPSON:  I had no client after the

         9  election.

        10       MR. FOSTER:  It's 6:21.  Let's go off the

        11  record for a minute.

        12                  (A short break was had.)

        13       MS. SAWYER:  We'll go back on the record.

        14  It's 6:30.

        15                  EXAMINATION

        16  BY MS. SAWYER:

        17       Q. We appreciate your time today, your

        18  patience in answering our questions.

        19       You've been asked a number of questions just

        20  about -- well, strike that.

        21       Were any of the particular factual findings

        22  or conclusions that you reached with regard to the

        23  research that was being done related to Russian

        24  interference in the 2016 election including

        25  possible ties to the Trump campaign, were any of

Glenn Simpson

August 22, 2017

Washington, DC

Page 291

1  the factual findings or conclusions influenced in

2  any way by the identity of the client for whom you

3  were doing that work?

4       A. All the questions you've asked I guess

5  this one I've not given a lot of thought to.

6  Offhand, not that I can think of.

7       Q. So you weren't trying to reach a

8  particular conclusion based on the identity had

9  they asked you to find -- well, strike that.

10       I think what I'm trying to get some sense of

11  comfort around is to the extent there might be

12  concerns that the work being done was driven in a

13  direction designed to reach a particular conclusion

14  for a client or because of the client's identity

15  was that the case?

16       A. I think it's safe to say that, you know,

17  at some point probably early in 2016 I had reached

18  a conclusion about Donald Trump as a businessman

19  and his character and I was opposed to Donald

20  Trump.  I'm not going to pretend that that wouldn't

21  have entered into my thinking.  You know, again, I

22  was a journalist my whole life.  So we were, you

23  know, trained not to take sides and practiced in

24  not taking sides.

25       So most of what I do as a research person is

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 292

1    we try to avoid getting into situations where one's

2    etiology or political views would cloud your work

3    because it's a known hazard, but, you know, I

4    reached an opinion about Donald Trump and his

5    suitability to be president of the United States

6    and I was concerned about whether he was the best

7    person for the job.

8         Q. And given that you had been trained not to

9    allow etiology to cloud your work, it sounds like

10   you reached a conclusion and had concerns about

11   Candidate Trump.  What steps did you take to then

12   ensure that your conclusion didn't cloud the work

13   that was being done?

14        A. Well, to be clear, my concerns were in the

15   category of character and competence rather than --

16   I didn't have any specific concerns for much of the

17   time about his views, which I don't share, but that

18   wasn't really the issue.  Most of what we do has to

19   do with do people have integrity and whether

20   they've been involved in illicit activity.  So

21   those were the things I focused on.

22        Q. So the conclusion that you reached, was it

23   informed by the research that you were -- your

24   personal conclusion, was it informed by the

25   research that you were conducting?

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 293

```
 1        A. Yes.  We deal in factual information and
 2   over the course of this project we gathered lots of
 3   facts about Donald Trump.
 4        Q. You mentioned that earlier and I think you
 5   made clear a number of times in the course of the
 6   day that the specific work on Russian interference
 7   and possible ties to the campaign that Mr. Steele
 8   was doing was one part of that bigger picture, and
 9   I did want to ask you about some of that bigger
10   picture of the work and get a sense from you, if I
11   could, you know, some of the background and
12   findings.  In particular one of the things you had
13   mentioned -- well, you just mentioned right now as
14   we were speaking the term "illicit activity."
15   What, if any, research did you conduct that gave
16   you any concerns about then Candidate Trump and
17   potential illicit activity?
18        A. I think the thing I cited to you was his
19   relationship with organized crime figures, and that
20   was a concern.
21        Q. And what can you share with us about the
22   findings, your findings?
23        A. Well, I've tried to share as much as I
24   could think of over the course of today.  As I say,
25   there were various allegations of fraudulent
```

Glenn Simpson                                              August 22, 2017
Washington, DC

Page 294

1    business practices or dishonest business practices

2    or connections with organized crime figures.  In

3    fact, you know, there was numerous others that I

4    can't remember the names of.  It was a long history

5    of associations with people accused of involvement

6    in criminal activity.

7         You know, just to reiterate, the facts of

8    these investigations are the facts and we don't try

9    to drive an investigation to any particular

10   conclusion, certainly not based on our political

11   views.  So I think it would be, you know, not

12   believable for me to tell you I didn't reach, you

13   know, views about Donald Trump's integrity, but,

14   you know, those were -- those didn't influence the

15   research in terms of the findings.  Those were the

16   findings.

17        Q. You mentioned specifically and I think

18   with regard to organized crime particularly ties to

19   Felix Sater is one.  You indicated a connection to

20   Yudkovich Mogilebich, I think it is.

21        A. Mogilebich.

22        Q. Mogilebich, which we can spell for you.

23   Tell me if I have this correct.

24   M-O-G-I-L-E-B-I-C-H.

25        A. Yes.

Glenn Simpson                                                     August 22, 2017

Washington, DC

```
 1        THE REPORTER:  What's the first name?
 2        MR. SIMPSON:  Semyon, S-E-M-Y-O-N.
 3  BY MS. SAWYER:
 4        Q. Yudkovich, did I get that --
 5        A. I believe I was probably talking fast and
 6  I think I might have made a reference to
 7  Yanukovych, which is the former president of the
 8  Ukraine.
 9        Q. With regard to any of that work, did you
10  create work product based on that work?
11        A. I don't specifically recall what we would
12  have created.
13        Q. And with regard to that work, did you
14  share any of that information with law enforcement
15  agencies?
16        A. No.  I mean, just to reiterate, the only
17  contact that, you know, occurred during this
18  engagement was -- at least to my knowledge, was
19  Chris's dealing with the FBI.  Other than that, I
20  don't remember having any dealings with the FBI.
21        Q. You had also mentioned earlier in the day
22  work -- that there was an investigation about money
23  from Kazakhstan?
24        A. Yes.
25        Q. And could you tell me about that and what
```

Glenn Simpson                                            August 22, 2017

Washington, DC

Page 296

1    you investigated and what you learned.

2         A. There was some parallel litigation in

3    New York involving attempts by the government of

4    Kazakhstan to recover money that had been allegedly

5    stolen from Kazakhstan, billions of dollars in a

6    colossal bank failure.  The name of the bank was

7    BTA Bank.  It's been well established in various

8    courts that the government's allegations are

9    basically true, which is that large amounts of

10   money were illicitly removed from this bank,

11   laundered across Europe and into the United States

12   apparently.  Allegedly.

13        So there was a civil case, at least one civil

14   case in New York involving -- filed by the city of

15   Almaty, A-L-M-A-T-Y, against some alleged Kazakh

16   money launderers.  I don't remember exactly how,

17   but we learned that -- it wasn't from Chris.  We

18   learned that Felix Sater had some connections with

19   these people, and it's been more recently in the

20   media that he's helping the government of

21   Kazakhstan to recover this money.  There's been

22   media reports that the money went into the Trump

23   Soho or it went into the company that built the

24   Trump Soho.  I can't remember the name.

25        Q. So the connection in that instance was to

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 297

1   Felix Sater and through Felix Sater to --

2   potentially to Donald Trump?

3        A. Yes.  It was a company that Felix Sater

4   and Donald Trump were involved in together.

5        Q. And the research you did on that project,

6   was that public source research?  Did you have any

7   other -- did you have human intelligence sources on

8   that project?

9        A. I think I probably did have some human

10  sources.  That's my answer.

11       Q. And did you use subcontractors at all on

12  that work?

13       A. I can't say specifically whether it was --

14  I remember commissioning some public record-type

15  research on Felix Sater and his history in

16  New York.

17       Q. Did you feel in the course of that that

18  you had uncovered evidence of any criminal activity

19  by Donald Trump?

20       A. In the course of that I don't think so.  I

21  think my concern was the associations with known

22  organized crime figures.

23       Q. And that included Felix Sater?

24       A. Yes.

25       Q. Anyone else in particular?

Glenn Simpson                                            August 22, 2017

Washington, DC

Page 298

1      A. There were others.

2      MR. LEVY:  Beyond what we've discussed today?

3      MS. SAWYER:  Yes, beyond what we've already

4  discussed.

5  BY THE WITNESS:

6      A. Another figure involved in the Trump Soho

7  project was a central Asian person named Arif,

8  A-R-I-F, is the last name.  The first name is

9  generally spelled Tevfik, it's T-E-V-F-I-K.  If you

10  search under a different transiteration of that

11  name you can find open source reporting alleging

12  that he's an organized crime figure from Central

13  Asia and he had an arrest for involvement in child

14  prostitution.

15      Q. You mentioned as well that you had

16  reviewed tax bills.  Were these specifically Donald

17  Trump's tax bills?

18      A. They were Trump properties and I believe

19  we may have reviewed some public information about

20  estate taxes and things like that.  We didn't have

21  access to his tax returns.

22      Q. Did you reach any conclusions based on

23  your review of his tax bills?  I think you

24  mentioned that in connection with trying to assess

25  either financial connections or his financial

Glenn Simpson                                      August 22, 2017

Washington, DC

Page 299

1    standing.  Did you reach any conclusions with

2    regard to either of those?

3          A. Yes.  I concluded -- we concluded that his

4    statements about what individual properties were

5    worth were greatly exaggerated and at odds with the

6    information that he'd supplied, you know, in legal

7    filings with tax authorities and other records,

8    corporate records.

9          Q. Did any of that indicate anything that

10   showed a connection to Russia or the Russian

11   government or Russian officials or Russian

12   oligarchs?

13         A. Not that I can recall.

14         Q. You mentioned as well, you brought up

15   Trump golf courses.  What in particular were you

16   looking into with regard to Donald Trump's golf

17   courses?

18         A. The original inquiry was into the value of

19   the courses, whether he had to borrow money to buy

20   them, whether they were encumbered with debt, how

21   much money they brought in, what valuations he put

22   on them, and property tax filings.

23         Q. And in general can you share what findings

24   and conclusions you reached?

25         MR. LEVY:  With regard to?

Glenn Simpson                                                    August 22, 2017
Washington, DC

Page 300

1        MS. SAWYER:  To the work on the golf

2   properties.

3   BY THE WITNESS:

4        A. A number of them don't make any money.

5   His valuations of the properties are questionable.

6   I guess those would be the main findings.

7        Q. You just mentioned broadly but didn't

8   describe it, you mentioned research on Scotland.  I

9   don't know if it was particular properties or

10  something with regard to Scotland.  Can you just

11  describe what that research was.

12       A. Sure.  He has golf courses in Scotland and

13  Ireland and one of the facets of UK or anglo

14  company law is that private companies have to file

15  financial statements, public financial statements.

16  So when you're looking at a guy like Donald Trump

17  who doesn't like to share information about his

18  company, it's useful to find a jurisdiction where

19  he's required to share that information with the

20  local government.

21       So we went and ordered the records -- the

22  financial statements of the golf courses.  There's

23  also a long-running land use controversy -- I think

24  there's multiple long-running land use

25  controversies over those properties.  We haven't

Glenn Simpson                                                    August 22, 2017

Washington, DC

1   really touched on this at all, but there were also

2   environmental issues that were part of the

3   research.

4        Q. With regard to the public financial

5   statements, did you reach any conclusions based on

6   that?

7        A. That they were not profitable entities.  I

8   don't specifically recall.  I just remember that

9   these were not doing very well and that he'd sunk a

10  lot of money into them and he hadn't gotten a lot

11  of money back yet.

12       MS. QUINT:  You mentioned a couple of times,

13  Mr. Simpson, that you had particular familiarity

14  with Mr. Manafort and even that you were more

15  familiar with him in particular than Chris Steele

16  was.  In general and it might not be easy to be

17  general about it, but what was your focus when you

18  had looked into Manafort?  What main areas were you

19  familiar with?

20       MR. SIMPSON:  Over the years, originally at

21  the Wall Street Journal we learned of his

22  relationship with Ukrainian and Russian oligarchs.

23  So it was generally continued in that vein.  He was

24  subject of some litigation over his business

25  dealings in New York.  There was a lawsuit filed by

Glenn Simpson                                              August 22, 2017

Washington, DC

Page 302

1    the opposition politician from Ukraine accusing him

2    of involvement in corruption in Ukraine.  So as

3    just a -- not for any particular client, but just

4    because these matters are something I follow I had

5    collected those documents.  I think there's

6    probably some other litigation that I collected

7    that was in a similar vein.

8         MS. QUINT:  And it was all documentary or did

9    you have human sources for your Manafort research?

10         MR. SIMPSON:  I don't think -- for the most

11    part it was just what you call gathering string,

12    just accumulating files on people or subjects that

13    are of interest.

14    BY MS. SAWYER:

15         Q. The committee, certain members of the

16    committee, the Chairman and Ranking Member along

17    with Senators Graham and Whitehouse had sent a

18    request for documents and information on July 19.

19    I understand your efforts to identify that

20    information are ongoing and I know that in response

21    to one of my questions about Mr. Page your attorney

22    has already said that the request for information

23    is pending and being reviewed.  I just wanted to

24    ask you a couple of questions about some of the

25    other individuals that we had identified in that

Glenn Simpson                                          August 22, 2017
Washington, DC

Page 303

1    letter and in particular in request No. 6?

2         MR. LEVY:  Do you have an exhibit or should I

3    just get my copy out?

4         MS. SAWYER:  I'm happy to enter it as an

5    exhibit or I can just read the names.  I don't

6    think there's any reason we need to --

7         MR. LEVY:  Just read the names to move it

8    along, that's fine.

9         MS. SAWYER:  I don't think there's any

10   reason -- there's nothing in this letter to inform

11   your answer otherwise.

12   BY MS. SAWYER:

13        Q. So with regard to Alpha Group, sometimes

14   I've heard Alpha Group, sometimes I've heard Alpha

15   Bank.  I don't know if they're two distinct

16   entities.  Do you know anything about Alpha Bank or

17   Alpha Group with regard to Russian interference in

18   the 2016 election?

19        A. Alpha Group is not a corporate person,

20   it's not an entity.  It's just a collective name.

21   Alpha Bank is a bank.  I know a limited amount.  I

22   know, you know, journalists were working on some

23   issues related to this and they asked us about it,

24   but the information didn't come from us.

25        Q. So you were asked by journalists about it,

Glenn Simpson                                                August 22, 2017

Washington, DC

```
 1    but you're saying whatever information you had was

 2    not generated by Fusion GPS?

 3         A. That's right.  I know they're a big player

 4    and they have long, deep ties to Vladimir Putin.

 5    One of the founders, Pyotr Aven, P-Y-O-T-R, second

 6    word Aven, A-V-E-N, was an associate of Vladimir

 7    Putin when he was in the mayor's office in Saint

 8    Petersburg around the time same that Bill Browder

 9    was doing business with the mayor's office.

10    They're very powerful politically and economically

11    in Russia and they have -- in the tens of billions

12    are the assets of the founders and they have all

13    sorts of interests.  They have epic disputes with

14    western corporations, including BP.  So people in

15    my business tend to just have a lot of

16    institutional knowledge about them and, you know, I

17    shared my institutional knowledge about them.

18         Q. You mentioned other founders.  Are those

19    other founders Mikhail Fridman and German Khan?

20         A. Yes.

21         Q. Do you have any information there have

22    been reports about potential communications between

23    a server at Alpha Bank and potentially servers that

24    belong to the Trump organization or Trump -- some

25    entity associated with Donald Trump?  Do you have
```

Glenn Simpson                                              August 22, 2017

Washington, DC

Page 305

1    any information about those particular reports?

2        A. That's kind of an open-ended question.  I

3    think what I said is we were asked about that and

4    it wasn't -- that information wasn't generated by

5    us and I'm happy to say it's beyond our competence

6    to have generated, but in the course of being asked

7    about it, you know, people gave us information.  I

8    don't know what else to say.

9        Q. And what information were you given?

10       A. A bunch of data.  I mean, we were shown

11   like do you know what this would mean, does this

12   mean, and it's beyond -- it's really -- it's

13   certainly beyond my competence.

14       Q. So the data that you were shown, you could

15   not draw any conclusions from it?

16       A. I did not draw any conclusions from the

17   data.

18       Q. Another individual that there's been a lot

19   of press reporting on is Sergei Millian.  Other

20   than what -- what, if anything, can you tell us

21   about did you conduct any research into

22   Mr. Millian?  And, if so, what conclusions did you

23   reach with regard to Russian interference in the

24   2016 election?

25       A. We learned from sources that he had

Glenn Simpson                                         August 22, 2017

Washington, DC

1    connections to the Trump organization and we did an

2    open source investigation of him.  We found a

3    picture of him with Donald Trump and another real

4    estate investor in Florida.  We've discovered

5    that's not his real name or at least not the name

6    he came to the United States with and that before

7    he became a real estate broker he was a linguist

8    and translator.  Speaking generally, people with

9    advanced training in linguistics are oftentimes

10   involved in intelligence matters, but I don't know

11   whether he is or isn't.  Various reporters became

12   interested in him because he was boasting about his

13   connections to the Trump organization in the Trump

14   campaign.  So we got lots of inquiries about who

15   was he, was he a spy, you know, that sort of thing.

16        Q. And did you make a determination whether

17   or not he had actual ties to the Trump campaign?

18        A. Well, some of the -- yes.  I mean, he

19   was -- I think he's Facebook friends with Michael

20   Cohen.  I'm sorry.  It was some social media

21   connection.  It was either Twitter friends or

22   Facebook friends.  It was public information.  We

23   took it from that that they did know each other.  I

24   guess we gradually learned of Michael Cohen's role

25   in the Trump campaign as opposed to in the Trump

Glenn Simpson                                                    August 22, 2017

Washington, DC

1    organization.

2        Q. And what did you learn about Mr. Cohen's

3    role in the Trump campaign?

4        A. We learned that his job included dealing

5    with inquiries about Russia and he seemed to get

6    all of the serious inquiries, investigative

7    inquiries about Russia.  He seemed to know a lot

8    about that.  We learned that he was a very

9    intimidating person who had a history of

10   threatening reporters with libel suits.  We learned

11   that he's married to -- his father-in-law is a

12   Ukrainian emigre, that he had some Ukrainian

13   clients and connections to the taxi industry in

14   New York which is heavily populated with Russian

15   emigres, and we learned that he was involved in

16   some of Trump's projects where there was a lot of

17   Russian buyers.  The only other thing I can think

18   of is that he was also the person who dealt with

19   allegations against Mr. Trump from the tabloids.

20       Q. And with regard to Trump projects with

21   Russian buyers, what specific projects had a number

22   of Russian buyers?

23       A. I don't specifically remember.  Florida

24   maybe.  I think it was Florida.  Sorry.

25       MS. SAWYER:  Just give us a minute.

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 308

1          I think that's really all of our questions.

2     I don't know if there's follow-up that you all had.

3          MR. FOSTER:  Just very quickly.  I can do it

4     from right here.

5          So I asked you -- or you were asked earlier

6     about representations that you're not -- you don't

7     see your firm as being Democrat linked and in my

8     previous question I asserted that there had been

9     public reports that you had done work, opposition

10    research during the 2012 election aimed at

11    Mr. Romney, but I didn't ask you to confirm that.

12    Is that correct?

13         MR. LEVY:  Work for clients outside the scope

14    of the interview is not within the scope of the

15    interview.

16         MR. FOSTER:  It's relevant to his claim that

17    he's not a Democrat linked firm.

18         MR. LEVY:  He's answered that question.  He's

19    given you multiple answers to that question and

20    significant information in support of his answer to

21    that question, and that small fact which may or may

22    not be pertinent is that he's going to decline to

23    answer because it's outside the scope of this

24    interview.

25         MR. SIMPSON:  I decline to answer.

Glenn Simpson                                    August 22, 2017

Washington, DC

Page 309

 1          MR. FOSTER:  In some of the questioning in

 2    the last round there was some talk of your -- you

 3    didn't have a particular aim in your research, you

 4    were following the facts wherever they lead.  Is it

 5    fair to say -- is it a fair description to say that

 6    your job was opposition research aimed at

 7    Mr. Trump?  That's been widely reported and

 8    characterized that way.  Do you think that's a fair

 9    characterization of what your job was?

10          MR. LEVY:  He's been talking for nine and a

11    half hours, a lot of which was describing his work.

12    To simplify it in any particular way at this point

13    I think is unfair to the witness.

14          MR. FOSTER:  You weren't hired to find

15    positive information about Mr. Trump, were you?

16          MR. SIMPSON:  To the contrary.  I think when

17    you're doing research on any subject you're trying

18    to figure out what the truth is.  So if Donald

19    Trump's got a good business record and he's really

20    worth billions of dollars, that's important

21    information.  In fact, you shouldn't be feeding

22    reporters stories about how Donald Trump is not

23    worth billions of dollars if he's worth billions of

24    dollars.  So, you know, I think the connotation of

25    negativity, I get, you know, where you're coming

Glenn Simpson                                          August 22, 2017

Washington, DC

Page 310

1   from, but, in fact, you're just trying to figure

2   out what's true.

3        It's like with the Prevezon case, we were

4   trying to figure out who's telling the truth, is it

5   our guys or is it Browder.  I do my job well and I

6   get rehired when I give them the right information,

7   when I give them accurate information.  So if

8   Donald Trump turned out to be a great businessman,

9   that's what I would have to tell people.

10       MR. FOSTER:  Nothing further from me.

11       MR. LEVY:  Before we go off the record, will

12  we be entitled to a copy of the transcript?

13       MR. FOSTER:  You'll be able to review the

14  transcript and request corrections, make an

15  errata.

16       MR. LEVY:  Will it be kept confidential?

17  We'd like to make a request that it be kept

18  confidential given the sensitivity of the matters

19  discussed today.

20       MR. FOSTER:  Your request is noted.

21       MR. LEVY:  Noted, but no decision on it?

22       MR. FOSTER:  No decision.

23       MR. LEVY:  And upon reviewing the transcript,

24  when will we have that opportunity?

25       MR. FOSTER:  We can arrange that off the

Glenn Simpson                                                    August 22, 2017

Washington, DC

Page 311

1   record.

2          MR. LEVY:  When we do we just reserve the

3   right obviously to correct the record or supplement

4   it.

5          MR. FOSTER:  That's why we'd allow you to

6   review it.

7          MR. LEVY:  Thank you very much.

8          MR. DAVIS:  Nothing further.  We're going off

9   the record at 7:04.

10                      (Whereupon the interview was

11                       concluded at 7:04 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Glenn Simpson                                                           August 22, 2017

Washington, DC

```
                                                              Page 312

 1     CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

 2            I, TINA M. ALFARO, Certified Shorthand

 3     Reporter No. 084-004220, Certified Realtime

 4     Reporter, and Notary Public in and for the State of

 5     Illinois, do hereby certify:

 6            That GLENN SIMPSON, whose interview is

 7     hereinbefore set forth, was duly sworn by me and

 8     that said deposition is a true record of the

 9     testimony given by such witness.

10            I further certify that I am not counsel

11     for nor in any way related to any of the parties to

12     this suit, nor am I in any way interested in the

13     outcome thereof.

14            In witness, whereof, I have hereunto set

15     my hand this ____ day of _____,2017.

16

17

18

19                    _____

20                    Tina M. Alfaro, CSR, CRR

21

22

23

24

25
```