UNITED STATES SENATE — NEWS RELEASE

For Immediate Release
February 9, 2018

# Analysis Refutes Criminal Referral of Christopher Steele

*Washington*—Senate Judiciary Committee Ranking Member Dianne Feinstein (D-Calif.) today released a minority view analysis on behalf of all Judiciary Committee Democrats of the Christopher Steele criminal referral sent last month by Senators Chuck Grassley (R-Iowa) and Lindsey Graham (R-S.C.). A classified memo that accompanied the criminal referral was declassified this week.

**"The criminal referral of Christopher Steele has nothing to do with accountability,"** Feinstein said. **"Clearly its goals included undermining the FBI and Special Counsel Mueller's investigation, attacking Christopher Steele and deflecting attention from collusion and obstruction of justice investigations."**

**"Not a single revelation in the Steele dossier has been refuted. Unfortunately, the claims in the criminal referral rely on classified information, so it's difficult to fully repudiate them here. However, as much as possible using unclassified information, the following points lay out the flaws in the criminal referral."**

The following analysis rebuts a series of claims in the Grassley-Graham criminal referral:

1. **The criminal referral is not based on any allegation that Steele lied or misrepresented facts about Carter Page or what is included in the Steele dossier.** In fact, neither provide any evidence that any of the information in Steele's dossier is wrong. Instead, *the referral is limited to a single baseless allegation: that Steele lied about his contacts with the press*.

2. **The criminal referral omits key facts.** The Department of Justice has provided documents regarding its interactions with Mr. Steele to the Judiciary Committee both before *and after* the criminal referral was made. Despite this, the Majority did not modify the criminal referral and pressed forward with its original claims, which do not take into account the additional information provided after the initial January 4 referral.

   Instead of providing a comprehensive analysis, the criminal referral selectively focuses on some facts while omitting others.

For example, the criminal referral includes incomplete and misleading allegations regarding an October 19, 2016, report that Mr. Steele received from a "friend of the Clintons."[1]

The criminal referral alleges that Mr. Steele was using this additional reporting from "the Clinton friend" as the basis for his own work – implying there was no independent investigative work done by Steele. <u>The criminal referral fails to address the fact that 14 of the 17 memos in the Steele dossier published by Buzzfeed were created by Mr. Steele before this October 19 report.</u> It would have been impossible for Mr. Steele to include information that he received in an October 19 report from "a friend of the Clintons" in his 14 earlier reports, which date back to June 20, 2016.

3. **The criminal referral fails to make a case that Christopher Steele lied to the FBI.** The referral states that "it appears that either Mr. Steele lied to the FBI or the British court, or that the classified documents reviewed by the Committee contain materially false statements."[2] These allegations are made regarding Mr. Steele's interactions *with the press* and whether he lied about those interactions to the FBI.

18 U.S.C. § 1001, the legal authority cited by the criminal referral, provides that: "[W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully makes any materially false, fictitious, or fraudulent statement or representation" shall be punished accordingly.

- <u>Importantly, the criminal referral fails to identify when, if ever, Mr. Steele was asked about and provided a materially false statement about his press contacts</u>.

- Tellingly, <u>it also fails to explain any circumstances which would have required Mr. Steele to seek the FBI's permission to speak to the press or to disclose if he had done so</u>.

Rather, the criminal referral cites occasions where Mr. Steele spoke to the press at the end of September 2016. Specifically, it focuses on a *Yahoo News* article written by Michael Isikoff.

If Mr. Steele had been asked by the FBI about his contacts with Mr. Isikoff for this September article, and if he had spoken with this reporter, then he should have disclosed that fact.[3] <u>But the criminal referral provides no evidence that Steele was ever asked about the Isikoff article, or if asked that he lied.</u>

---

[1] Memorandum from Hon. Charles E. Grassley and Hon. Lindsey O. Graham to Hon. Rod J. Rosenstein, Deputy Attorney General, U.S. Department of Justice, Jan. 4, 2018, at 6 (hereinafter "Grassley/Graham Memo").
[2] Grassley/Graham Memo, at 1.
[3] *United States v. Worthington,* 822 F.2d 315, 310 (2d Cir.), *cert. denied,* 484 U.S. 944 (1987) (A false or fictitious statement or representation is an assertion that is untrue when made or when used, and that is known by the person making it to be untrue); *see also United States v. Anderson*, 579 F.2d 455 (8th Cir.), *cert. denied*, 439 U.S. 980 (1978); *United States v. Race*, 632 F.2d 1114 (4th Cir. 1980) (If a defendant's statement, or the government's question requiring an

It is also important to note, that in October 2016, the FBI learned that Mr. Steele had disclosed "his relationship with the FBI" to a reporter, David Corn.[4] Because of this, the FBI then suspended its relationship with Mr. Steele and informed the FISA court of these developments in its renewal requests.[5]

- <u>The FBI made clear, however, that it still considered Steele's reporting to be reliable regardless of his contacts with the press.</u>[6]

- <u>The FISA court granted three renewals after having been informed of Steele's contacts with the press.</u>[7]

4. **Christopher Steele is a respected and reliable expert on Russia.** He served more than 20 years as an intelligence officer with the British intelligence service MI6, and worked in Moscow under diplomatic cover from 1990 to 1993.[8] Mr. Steele has a history of providing useful information that has assisted law enforcement in criminal investigations.

    For example, in 2010, Mr. Steele gave information to the FBI that led to indictments of several officials from the International Federation of Association Football (FIFA) and the termination of the organization's president, Sepp Blatter.[9] Citing U.S. officials, <u>Reuters noted that Steele's work on the FIFA matter "lent credence to his reporting on Trump's entanglements in Russia."</u>[10]

    Reports also indicate that between 2013 and 2016, Steele collaborated successfully with the FBI's Eurasian Joint Organized Crime Squad on Russia- and Ukraine-related matters.[11] According to the Washington Post, <u>"Steele was known for the quality of his past work and for the knowledge he had developed over nearly 20 years working on Russia-related issues for British intelligence.</u>"[12]

5. **Mr. Steele came forward voluntarily out of concern for U.S. national security.** In early July 2016, Mr. Steele shared with the FBI what he viewed as alarming information about Russian interference in the 2016 election and a potentially compromised candidate. [13]

---

answer, is ambiguous, it is incumbent on the government to negate any reasonable interpretation that could make the defendant's statement factually correct).

[4] Memorandum from HPSCI Majority Staff to HPSCI Majority Members, "Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation," Jan. 18, 2018, at 2 (hereinafter "Nunes Memo").

[5] Nunes Memo, Jan. 18, 2018, at 2-3; Grassley/Graham Memo, at 4.

[6] Grassley/Graham Memo, at 4.

[7] Grassley/Graham Memo, at 4; Nunes Memo, Jan. 18, 2018, at 1.

[8] Vanity Fair, "How Ex-Spy Christopher Steele Compiled His Explosive Trump-Russia Dossier," Apr. 2017; see also The Guardian, "How Trump walked into Putin's web," Nov. 15, 2017.

[9] Washington Post, "The British spy behind the Trump dossier helped the FBI bust FIFA," Jan. 13, 2017.

[10] Reuters, "Former MI6 spy known to U.S. agencies is author of reports on Trump in Russia," Jan. 12, 2017.

[11] Business Insider, "Congressional and FBI investigators are homing in on the Trump-Russia dossier," Oct. 5, 2017.

[12] Washington Post, "FBI once planned to pay former British spy who authored controversial Trump dossier," Feb. 28, 2017.

[13] Senate Judiciary Committee Interview of Glenn Simpson, Aug. 22, 2017, at 159, 164-65, 167.

Specifically, Mr. Simpson testified under oath to the House Permanent Select Committee on Intelligence that Mr. Steele said, "*I'm a former intelligence officer, and we're your closest ally. You know, I have obligations, professional obligations. If there's a national security emergency or possible national security issue, I should report it.*" … "*And I [Simpson] said: 'So you're telling me that you think this is serious enough that it needs to be reported to law enforcement, and that you're confident enough in your sources, it's your professional judgment and your professional obligation, that you should report this to the FBI?' And he [Steele] said, 'Yes.'*"[14]

6. **The criminal referral contains no new information**. All the information in the criminal referral was already available to the FBI and the Department of Justice.

    - In fact, <u>the referral relies on publicly available information and information that was provided to Congress from DOJ and the FBI</u>.

7. **The facts about Carter Page are not disputed.** As has been widely reported, the FBI was aware of Page's extensive connections to Russia several years before he joined the Trump campaign. In fact, the FBI determined in 2013 that Russian intelligence operatives had been attempting to recruit him and warned Mr. Page about this.[15] That same year, Mr. Page reportedly described himself as an "informal advisor to the staff of the Kremlin."[16] Page continued to cultivate Russian investments and business[17] – something that the FBI believed could be used by Russia to cultivate him as a source.[18]

    On March 21, 2016, then-candidate Donald Trump named Page to his foreign policy team.[19] In July 2016, and with the approval of Campaign Manager Corey Lewandowski, Mr. Page traveled to Moscow to speak at the New Economic School.[20] During his trip, Mr. Page emailed the Trump campaign about "some incredible insights and outreach I've received from a few Russian legislators and senior members of the Presidential Administration here."[21]

    That same month, Mr. Steele reported that Russia and the Trump campaign "had a mutual interest in defeating Democratic presidential candidate HILLARY CLINTON, whom President PUTIN apparently both hated and feared." Mr. Steele reported that Trump campaign chairman Paul Manafort was using "foreign policy advisor, Carter PAGE, and others as intermediaries" between the campaign and Russia and that Mr.

---

[14] HPSCI Interview of Glenn Simpson, Nov. 14, 2017, at 60-61.
[15] New York Times, "Russian Spies Tried to Recruit Carter Page Before He Advised Trump," Apr. 4, 2017.
[16] Time, "Carter Page Touted Kremlin Contacts in 2013 Letter," Feb. 4, 2018.
[17] Bloomberg, "Trump's New Russia Adviser Has Deep Ties to Kremlin's Gazprom," Mar. 30, 2016.
[18] Complaint at 13, U.S. v. Evgeny Buryakov, CA No. 15-cr-00073 (filed Jan. 23, 2015).
[19] Washington Post, "A transcript of Donald Trump's meeting with the Washington Post editorial board," Mar. 21, 2016.
[20] HPSCI Interview of Carter Page, Nov. 2, 2017, at 19; see also Politico, "Trump campaign approved adviser's trip to Moscow," Mar. 7, 2017.
[21] HPSCI Interview of Carter Page, Nov. 2, 2017, at 40.

Page had meetings with Rosneft CEO Igor Sechin and Presidential Administration official Igor Divyekin.[22]

During his testimony before the House Intelligence Committee, Mr. Page denied meeting with Mr. Sechin or Mr. Divyekin. He did admit, however, that he met with Russia's Deputy Prime Minister, Arkady Dvorkovich.[23] He also admitted meeting with Andrey Baranov – a close associate of Mr. Sechin.[24] And, in December 2016, after the election, Mr. Page went back to Moscow and again met with high-ranking Russian officials, including Deputy Prime Minister Arkady Dvorkovich and Rosneft executive Andrey Baranov.[25]

None of these facts are disputed in the Grassley-Graham criminal referral.

**CONCLUSION**

In June 2016, Mr. Steele began uncovering information indicating that Russia was interfering in the U.S. presidential election, and that the Trump campaign might be assisting Russia in its efforts.[26] Under any circumstances, the right thing to do would be to go to law enforcement and turn over this information. And that is exactly what Mr. Steele did.

Steele's reporting was deemed reliable by the FBI. The FISA court granted three renewals of the FISA warrant on Carter Page after learning of Mr. Steele's contacts with the press, a fact that did not cause the FBI to question the reliability of his underlying reporting.

The President's decision to declassify and release the Nunes memo has confirmed that the Russia investigation started because of another Trump campaign foreign policy advisor – George Papadopoulos – who was told in April that Russia had "dirt" on Clinton in the form of thousands of emails.[27] Unlike Mr. Steele, Mr. Papadopoulos did not affirmatively share what he had learned with the FBI.

This Committee should dedicate its resources and attention to getting to the bottom of exactly what Russia did during the 2016 election and who was involved – not attacking voluntary sources and the nation's leading law enforcement agencies.

###

---

[22] Company Intelligence Reports, 2016/094 and 2016/095, July 2016; Senate Judiciary Committee Interview of Glenn Simpson, at 235-36.
[23] HPSCI Interview of Carter Page, Nov. 2, 2017, at 12.
[24] *Id*. at 105.
[25] *Id.* at 119.
[26] Company Intelligence Reports, June 20, 2016 through Dec. 13, 2016.
[27] Nunes Memo, Jan. 18, 2018, at 4.