# (U) Chapter 7 - Conclusions and Recommendations

### Russian Influence Campaigns in Europe

(U) For at least the last decade, Russia has aggressively engaged in an information war against the West. The Kremlin takes advantage of the openness, freedom of expression, and respect for legal norms enjoyed in Western democracies by conducting targeted, multi-faceted influence operations against its adversaries. Each influence campaign is unique to the populace, media environment, and internal dynamic of the country being targeted.

(U) The factors that make Russian operations effective also make them difficult to counter. Nonetheless, countries throughout the West are taking a variety of actions to impede, counter, and where possible, eliminate Russian influence operations.

(U) The vast majority of Russian tactics share a common denominator: proliferation through mass media. Therefore, this chapter's recommendations primarily focus on ways to degrade the impact of nefarious media activities and make them more difficult to conduct.

(U) Recommendation #1: European governments, non-governmental organizations, businesses, think tanks, and academia should strengthen legal and regulatory environments, promote media pluralism, build professional media associations, and improve the financial sustainability of legitimate news outlets.

(U) Russia exploits free media spaces and open democracies through a network of Russian state-owned news outlets and media platforms. Those platforms amplify pro-Russian views in Russian-funded and local media, provoke doubt and disagreement, and propagate false news stories. In many Eastern European and Baltic countries, local, independent media outlets often operate with extremely limited resources, limiting their ability to acquire and produce high-quality content. In contrast, the high production value of Russia-owned content presents an attractive alternative. Russian intelligence services or their agents of influence also purchase, invest in, or partner with existing TV and radio channels, providing editorialized content for redistribution. Furthermore, Russian propaganda is occasionally re-broadcast by legitimate news outlets.

(U) Strengthening legal and regulatory environments, promoting media pluralism, building professional media associations, and improving the financial sustainability of legitimate news outlets will help to: increase access to legitimate news reporting, improve production quality and financial sustainability of local media, and professionalize journalists.

(U) Countries that contain sizable Russian-speaking populations are more vulnerable to the effects of media-enabled Russian information operations. As described

TOP SECRET// ███████ NOFORN

above, for many of these populations, Russian media saturates local markets, providing few alternatives for news and entertainment and non-Russian editorial viewpoints

(U) For countries with large Russian-speaking populations, strengthening legitimate Russian-language broadcasters and independent media outlets that disseminate fact-based content would provide both balance to the media space and more viewing options for residents of those countries.

(U) Recommendation #2: European governments, non-governmental organizations, businesses, think tanks, and academia should implement and encourage multi-pronged, country-wide efforts by both public and private entities to combat Russian propaganda, technical, and cyber operations.

(U) Russia utilizes a whole-of-government approach in its information operations, mobilizing a variety of tools to achieve its goals. From hacking of government networks, think tanks, and universities to spreading propaganda via social media, Russia's tentacles are many and far reaching.

(U) It is therefore imperative that Western nations implement country-wide efforts to educate its populations and inoculate their governments, media outlets, and other organizations from Russian influence campaigns. To do this, Western nations should encourage increased partnership between public and private entities in order to combat Russian information, technical, and cyber operations.

(U) Recommendation #3: European governments, non-governmental organizations, businesses, think tanks, and academia should implement more stringent cyber security practices, such as multifactor authentication and encryption of sensitive data, as well as educating workforces on basic cyber security topics and best practices.

(U) In the last decade, Russian cyber operations have targeted governments, militaries, industrial control systems, businesses, think tanks, and universities worldwide. While Russian intelligence services can employ extremely sophisticated means for gaining access to sensitive data, often simple tactics such as spear phishing can prove just as effective.

(U) Given that cyber operations are relatively low risk/high reward, difficult to attribute, and even harder to consistently combat, it is likely that Russia will continue to utilize this tactic in its influence campaigns. Network defenses have to be right 100% of the time; a cyber intruder only has to be right once. Therefore, it is imperative that governments, NGOs, businesses, think tanks, and academia invest more resources in cyber security defenses, implement more stringent cyber security practices, and conduct regular workforce education and training on these topics.

(U) Recommendation #4: European govern-

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET//                                    //NOFORN

ments should look to long-term solutions to lessen economic dependence on Russia.

(U) Russia utilizes economic ties to its advantage. Economic vulnerability – such as reliance on Russia for trade or energy – can be leveraged to change behavior, send a message of displeasure, or inflict punishment. This is especially true for smaller countries within Russia's periphery, such as Moldova, where Russia is among their largest trading partners. Yet even large, economically secure countries like Germany depend on Russia for a large percentage of its energy needs.

(U) The United States should look for opportunities to lessen European countries' economic dependence on Russia. Exploring alternative sources of energy and diversifying trade relationships would diminish one of Russia's tools for imposing influence on its neighbors.

## Russia Attacks the United States & America Reacts

(U) The Committee's findings concerning the Russian government's malign influence campaign during the 2016 U.S. presidential election are largely consistent with the facts outlined in the ICA. The Russian effort was multifaceted, persistent, and effective in sowing division. The effort included cyber operations (hacking), the use of social media, the creation of automated accounts and fake cyber personas, the use of third party intermediaries, and state-run media.



(U) Evidence reviewed by the Committee also shows that the Russian government and its proxies used social media to advance Russia's malign interests. While

TOP SECRET//                                    //NOFORN

these efforts were limited – some even came after Election Day – they were effective at sowing divisions within American society and promoting false information.

(U) America's reaction to the Russian active measures campaign consisted of a whole of government response, with various activities conducted by the IC, law enforcement, and policy makers. Despite arguably the best of intentions in addressing the Russian cyber menace before and during the 2016 election cycle, the Executive Branch's response fell short of deterring the Russians from conducting such activity in the future.

(U) After analyzing the Executive Branch's responses to the active measure campaign, the Committee identified various gaps in current law and policy that must be addressed in order to help protect U.S. election systems and increase the efficacy of victim notifications in the future. In addition, the Executive Branch must diligently inform U.S. presidential campaigns in the future of counterintelligence threats, to the extent consistent with national security and law enforcement equities.

(U) Recommendation #5: Congress should identify options available to the private sector and federal government that would address the social media vulnerabilities exploited by the Russian government.

(U) The exploitation of social media platforms by the Russian government for malign purposes demonstrated a significant

vulnerability. The response of social media platforms to this threat should be examined closely and evaluated against ongoing threats. Furthermore, social media platforms should consider implementing methods to help counter malign foreign activity.

(U) Recommendation #6: Congress should consider updating the Foreign Intelligence Surveillance Act to cover malicious international cyber actors.

(U) As part of the Committee's initial FISA Amendments Act reauthorization discussions in 2017, the Committee sought to address the changing threat environment as it relates to malicious cyber activity threating the U.S. national security. Given the difficulty in attributing a specific cyber actor, the lines between independent hacker and government cyber operator are often blurred. U.S. adversaries are consistently attempting to obfuscate their identity and location in order to evade detection. Unfortunately, current national security authorities are inadequate to counter the growing cyber threat.



TOP SECRET//                                    NOFORN

(U) Unfortunately, the proposed addition to the FISA "foreign power" definition did not make it into the final version of the FISA Amendments Act of 2017 given concerns that such a designation would dilute the key distinction between two different legal purposes: intelligence collection and law enforcement. This concern, while understandable, fails to take into account the changing threat environment, as evidenced by Russian cyber actors, such as the Internet Research Agency, that attempted to meddle in the 2016 U.S. presidential elections.

(U) The Committee renews its call for Congress to update the definition of "foreign power" and "agent of foreign power" in FISA to account for entities engaged in international malicious cyber activity that threatens the national defense or security of the United States. Adding this new entity to the definition of "foreign power" would permit the IC to target international cyber groups without having to connect that group to a foreign government or terrorist organization, so long as the cyber entity is threating U.S. national security or defense. Such an addition provides the IC with much

needed flexibility and will help keep the United States ahead of its adversaries.

(U) Recommendation #7: The Federal Bureau of Investigation should improve cyberattack victim notification.

(U) When a state-sponsored cyberattack is directed against U.S. critical infrastructure or systems related to national elections, it is essential for the appropriate federal officials to work quickly to both understand the nature of the threat and aid the victim's defense.



(U) Although the FBI maintained an ongoing dialogue with the DNC related to the Russian intrusions, the engagement remained at the working level. These interactions continued for months, despite no signs of effective mediation to the problem. In



Director Comey testified that, had he known at the time the seriousness of the problem, he would have "walked over

TOP SECRET//                                    NOFORN

there" himself.



{U} On the other side of the notification process, the Committee found that cyberattack victim organizations did not always grasp the information conveyed by the FBI, even when that information was reasonably clear. As a result of both government- and private-sector failures, Russian intelligence agencies were afforded critical time on breached systems. During this time, extensive amounts of data were stolen for later use as part of Russia's malign influence campaign.

{U} While the DNC failed to handle the intrusions with the level of seriousness it deserved—given the severity and national security implications of the particular intrusion sets—the FBI should have engaged more vigorously at the senior management level. The FBI cannot, and should not, force a victim of a malicious cyber event to take specific remedial measures. However, the FBI should update its internal processes to make it clear that if a victim is neither willing nor able to take remedial measures in the event of a significant national security cyber event, FBI leadership should contact the victim and engage at the leadership lev-

el.

{U} One way to implement these procedures is to provide specific guidance to FBI agents conducting victim notifications as to the circumstances under which the agent should elevate the situation. Additionally, if the cyber intrusion is attributed to a foreign government entity and the victim is a political party or campaign, FBI senior management should be responsible for victim engagement immediately.

{U} The Committee therefore recommends that notifications associated with state-sponsored cyberattacks should be conducted as soon as possible, and at the highest levels of the victim organization. If intelligence sources and methods are threatened by dissemination of information, the IC should work with the Department of Homeland Security {DHS} to provide specific recommendations on what actions can be taken by system owners to defend their networks from the state-actor. The DHS and IC should designate personnel and resources to carry out this task and should establish a triage system to prioritize tasking during periods of high demand.

(U) Recommendation #8: Threats identified by the Intelligence Community to state and local elections infrastructure should be immediately briefed to appropriate state and local officials. When threats are identified, the federal government should conduct an expedited declassification review to ensure that the threat information can reach all

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

necessary state and local officials in a timely manner.

(U) The Committee found insufficient information sharing between the federal government and state election officials in 2016 regarding cybersecurity threats to federal elections. The Committee has attempted to address this deficiency in the FY 2018 Intelligence Authorization Act (IAA).

(U) Section 502 of the House-passed IAA would require the Director of National Intelligence (DNI), in coordination with the Undersecretary of Homeland Security for Intelligence and Analysis and the FBI Director, to post on the internet an advisory report on foreign counterintelligence and cybersecurity threats to election campaigns for federal offices.

(U) The provision also allows the FBI and DHS to make available additional information to appropriate representatives of any campaign for federal office if those agencies determine that such campaign is subject to a heightened foreign counterintelligence or cybersecurity threat.

(U) The Committee has seen some recent improvement in this area on a general level. In February 2018, the Office of the Director of National Intelligence, FBI, and DHS held a classified briefing for election officials of all 50 states.

(U) Recommendation #9: The Secretary of Homeland Security should provide certain designated state and local election officials appropriate security clearances to enable

those officials to respond to election-related threats.

(U) Even if all parties recognize the interest in sharing information, the classification—or even the knowledge of the existence—of a threat may impair timely sharing with state and local election officials. Consistent with the need to protect sources and methods, the Secretary of Homeland Security should provide certain state and local election officials with necessary security clearances in order to share information.

(U) The Senate Select Committee on Intelligence-passed FY 2018 IAA also attempted to address this issue. Specifically, Section 402 of the IAA would require the DNI to support the Under Secretary of Homeland Security for Intelligence and Analysis and any other DHS official in sponsoring a security clearance up to the top secret level for each eligible chief election official of a state. In addition, the DNI may issue interim clearances to a chief election official for the purposes of receiving appropriate classified information regarding cybersecurity threats to election systems.

(U) Recommendation #10: Significant threats to U.S. elections identified by the Intelligence Community, including cyberattacks directed at political organizations, should be immediately reported to the congressional intelligence committees.

(U) The House and Senate Intelligence Committees should be informed whenever the IC determines with medium confidence

that a significant cyber intrusion or active measures campaign by foreign actors is intended to influence an upcoming election for any federal office. Accordingly, the Committee recommends that the FBI Director, the DNI, and the Secretary of Homeland Security jointly provide a briefing to the Congressional intelligence committees no later than 14 days after a determination of a significant cyber intrusion.

(U) Recommendation #11: Congress should encourage the adoption of National Institute of Standards and Technology cyber security standards, such as those adopted by the Elections Assistance Commission, by providing federal resources to state and local governments to facilitate such adoption. Funds should be tied to the adoption and certification of elections systems to appropriate standards.

(U) Election systems are owned and operated by state and local governments. Their acquisition and installation is costly and recapitalization is infrequent.

(U) The federal government largely operates within the limits of establishing voluntary standards through NIST, providing technical assistance and sharing threat information.

(U) NIST is working with state and local election officials to develop further enhancements to election agencies' system security.

(U) The adoption of new standards may involve system replacement, particularly for

aging systems. To encourage adoption and in recognition of the federal government's responsibility to protect the nation against foreign threats, the Congress should consider providing significantly more resources to state and local governments. These investments could be tied to appropriate enhancements in election system security.

(U) Recommendation #12: Congress should consider additional funding for the National Institute of Standards and Technology to enable better outreach to state and local governments.

(U) With additional resources, NIST could host more frequent engagements around the United States to promote the adoption of new standards and to provide more technical support to state and local officials. Furthermore, separately identifying the budget for this activity within the NIST would further convey the importance of this effort and allow Congress to more closely track progress.

(U) Recommendation #13: Congress should consider a one-time grant to state and local election agencies to conduct a risk assessment of those agencies' computer systems.

(U) Because voting is administered at the state and local level, even for federal candidate elections, there is a patchwork of electronic voting systems. In addition, those varied systems are not subject to consistent maintenance and replacement regimes.

(U) Congress should consider allocating





funds to be transferred to state and local election agencies to conduct a risk assessment of their systems. Doing this would, the Committee believes, further demonstrate the need for the implementation of the NIST cyber security standards for election agencies.

(U) Recommendation #14: Congress should consider strengthening the Help America Vote Act of 2002 to ensure that both statewide voter registration and tabulation systems are better protected from foreign cyber threats.

(U) As noted above, DHS Secretary Jeh Johnson designated U.S. election systems as critical infrastructure on January 6, 2017, which was one day after the release of the classified ICA and the same day as the release of the unclassified version. By labeling election systems as critical infrastructure, DHS can "prioritize cybersecurity assistance" for those who request it, as well as provide election systems the same international legal protections afforded to other critical infrastructure. Implementation of such a designation takes time. As of September 1, 2017, the U.S. Election Assistance Commission reported that the election critical infrastructure subsector plans were progressing, in hopes of finalization in time for the 2018 elections. The Committee applauds this designation because it helps address the threats to the nation's voting infrastructure.

(U) However, as articulated in recent news reports, even with election systems designated as critical infrastructure, the DHS "risk and vulnerability" assessments take time and resources, and there appears to be a lengthy wait list. Therefore, in preparing for the 2018 midterm elections, DHS should continue to work with the states on prioritizing these assessments for election systems – and other stakeholders must do more.

(U) Recommendation #15: The Department

122

TOP SECRET// NOFORN

of Homeland Security should provide the owner or operator of any electronic election infrastructure affected by any significant foreign cyber intrusion with a briefing and include steps that may be taken to mitigate such intrusions.

(U) The Committee found that commercial providers of electronic election infrastructure were not informed of foreign cyber intrusions to their systems. While the IC and federal government may be aware of malicious cyber activity targeting election systems, the information is of little value if appropriate threat information cannot be shared with the owners and operators of affected systems. Accordingly, the Committee recommends that DHS provide a briefing and mitigation steps to the owner or operator of election infrastructure systems targeting by a foreign cyber intrusion.

(U) In addition, DHS has offered state and local governments a network monitoring tool that alerts election system operators about known foreign threats using information obtained by the IC. Not all states have adopted this tool.

(U) Recommendation #16: State and local governments should be encouraged to establish redundancies that are not dependent on current elections infrastructure, such as a mechanism that retains individual vote records, ensuring the integrity of the vote in the event of a compromise of voting infrastructure due to a foreign cyberattack. An example of such a redun-

dancy is a contemporaneously created paper record reflecting the voter's selections.

(U) The vulnerability of state and local election infrastructure has been well documented. These systems, which are not frequently updated or replaced, are not developed to defend against state-sponsored cyber threats. The fact that voting machines themselves, as well as tabulation systems, are not directly connected to the internet does not offer adequate security. Rather, it can create a false sense of security.

(U) To help protect the integrity of the process, state and local election authorities should consider building in additional redundancies to ensure an audit trail in the event of a compromise of the electronic voting systems. An example of this is a contemporaneously printed record of votes that is securely stored at the polling place and transported to the relevant election office at the end of Election Day. The Committee is mindful of the reason most jurisdictions replaced the paper ballot, but building in a redundancy using a paper record of a vote will help guard against the potential for manipulation of voting results in the event of a breach of the electronic voting machines.

(U) Recommendation #17: While it is important to implement lessons learned from the Executive Branch's response, Congress should not hamper the Executive Branch's ability to use discretion in responding to a

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

particular foreign threat.

(U) The Executive Branch's response to the 2016 Russian active measures campaign was neither timely nor effective. As discussed above, the Executive Branch did not publicly attribute Russian attempts to hack into various political institutions or compromise emails of U.S. people until October 7, 2016—roughly one month before the 2016 U.S. presidential election. The Executive Branch also waited to issue sanctions against Russia, expel Russian diplomats, and close Russian diplomatic facilities until December 29, 2016. Further, DHS did not designate U.S. election systems as critical infrastructure until January 6, 2017, which was two months after the 2016 U.S. presidential election. While the previous administration made attempts in diplomatic channels to dissuade Russia from its ongoing activities, such attempts apparently fell on deaf ears.

(U) However, despite the fact that the Executive Branch's remedial actions were arguably too little too late, any efforts by Congress to introduce certain legislative "solutions" are misguided. The President is the primary recipient of the intelligence produced by the IC, as well as the individual constitutionally empowered to command the armed forces of the United States. As such, if a foreign government conducts active measures targeting U.S. elections in the future, the Executive Branch should have the ability to craft a response based on the intelligence known at the time of the interference and, if necessary, the readiness of

U.S. military forces. These are variables that the Congress cannot possibly anticipate in drafting potential legislation. Therefore, despite potential calls from both Democrats and Republicans to legislate the threshold necessary to trigger attribution or reaction by the President in the wake of foreign hostilities, the Committee urges Congress not to hamper the Executive Branch's role in responding to foreign threats.

(U) Recommendation #18: Congress should consider repealing the Logan Act.

(U) Congress passed the Logan Act and President Adams signed it into law on January 30, 1799. Broadly stated, the Logan Act prohibits U.S. citizens to influence any foreign government vis-à-vis any disputes that government may have with the United States. It provides a punishment of a fine and three years' imprisonment.

(U) Over the course of the Act's more-than-200-year history, there has never been a conviction for its violation, and there have only been a handful of indictments that never reached trial.

(U) Despite its demonstrated disuse, the law has gained occasional congressional interest. In 1978, Senator Ted Kennedy unsuccessfully sought to remove the Logan Act. In 1980, Congressman and former House Intelligence Committee Chairman, Anthony Beilenson, introduced legislation to repeal the Logan Act, stating that the primary use of the Logan Act was to provide for "periodic calls for prosecution motivated by

opposition to the cause being expressed instead of actual concern about treason." In 1994, Congress updated the Logan Act by changing the $5,000 fine to "shall be fined under this title."

(U) Due to the lack of prosecutions under the Logan Act and despite the various apparent violations since its passage, Congress should evaluate the law's utility and consider repealing it.

(U) Recommendation #19: All U.S. presidential campaigns should receive unclassified counterintelligence briefings at an appropriate time prior to a nomination convention.

(U) During the 2016 U.S. presidential election campaign, candidate Trump and candidate Clinton did not receive a classified intelligence briefing until after their respective nomination conventions. Since 1952, the sitting President typically offers the U.S. presidential candidates classified briefings as a matter of courtesy, but only after the nomination conventions. However, the Committee's investigation found that a counterintelligence briefing before the nomination convention, even at the unclassified level, would be a significant benefit to the candidates and enhance the integrity of the campaign.

(U) U.S. presidential campaigns are a significant target of interest to America's foreign adversaries. It should be expected that various foreign intelligence services will conduct offensive operations to penetrate

such campaigns in the hopes of influencing U.S. policy and discourse. Therefore, it is critical that the IC educate presidential campaigns on counterintelligence issues as an important protection measure for campaign operations.

(U) For example, at an appropriate time, the IC could host unclassified counterintelligence training sessions for each campaign. Such training would assist the candidates and campaign leadership in understanding the severity of this issue, and should cover a range of topics, including:

- (U) The intelligence collection process;

- (U) Reasons why foreign intelligence services, generally, would want to penetrate a U.S. presidential campaign;

- (U) How to better secure campaign communications and practice good cyber operational security; and

- (U) Hypothetical examples of suspicious behavior that may warrant questioning or the dismissal of campaign staff.

(U) Recommendation #20: When consistent with national security, the Intelligence Community should immediately inform U.S. presidential candidates when it discovers a legitimate counterintelligence threat to the campaign, and promptly notify Congress.

(U) The Committee is not aware of any

notification to candidate Trump that the U.S. government conducted counterintelligence investigations of people associated directly or indirectly with the campaign. While the Committee understands and appreciates the IC's reasons for not disclosing such information to protect classified sources and methods, the FBI should have provided candidate Trump some sort of notification, even if it is general and at the unclassified level, that the IC is concerned that a potential counterintelligence threat exists to the campaign.

{U} The DNI should issue an ICD to provide guidance on how and when the IC should notify a U.S. presidential campaign of a legitimate counterintelligence threat. Similar to victim notifications in the cyber context, when the IC has an individual under an active counterintelligence investigation and the IC becomes aware of that individual's affiliation with a U.S. presidential campaign, the IC should have a responsibility to notify the candidate, when consistent with national security. There may be instances where such notifications are not consistent with national security, such as if the candidate himself or herself is under a counterintelligence investigation.

{U} Further, given the sensitivities associated with counterintelligence investigations, if the IC decides that campaign notification is required, the IC should promptly notify Congress of the campaign notification, including the classified details underpinning the counterintelligence threat. De-

pending on the sensitivity, such notifications can be made to the leadership of the House and Senate, as well as the chair and ranking Members of the House and Senate intelligence committees – known as the Gang of 8.

(U) Recommendation #21: Both houses of Congress should consider requiring all staff to receive an annual counterintelligence awareness briefing.

(U) As with presidential campaigns, congressional staff members are targets for foreign intelligence collection. The IC should coordinate, and Congress should consider requiring, an annual counterintelligence briefing for staff.

{U} The briefing should be unclassified, cover both physical and cyber threat awareness, and should emphasize that all staff are targets for foreign intelligence services. The Committee's investigation of the 2016 election demonstrated that many campaign staff members were unaware of their status as a potential target for foreign intelligence services. Congressional staff may also be unaware of the counterintelligence risks associated with their positions. Increasing the awareness of staff—even in an unclassified setting—that they are potential targets would enable them to take precautionary measures and be better prepared to counter the threat.

Campaign Links to Russia

(U) Recommendation #22: Political campaigns and law enforcement should ensure

that their counterintelligence defenses appropriately account for the role of cut-outs and intermediaries.

(U) Russian attempts to influence the American political process, including via intermediaries and cut-outs, did not end on Election Day. The universe of pre- and post-election contacts between Russian intermediaries and Trump associates described in Chapter 4 suggest a sophisticated effort to target unwitting Americans by leveraging existing relationships, interests, and opportunities.[3] Therefore, both U.S. government entities and campaigns in particular must strengthen their defenses against such subversive tactics, beginning with expanding counterintelligence education and training.

(U) The IC should work to provide as much information to campaigns and law enforcement agencies about foreign intelligence agencies' efforts to target them. The Committee is mindful that sensitive counterintelligence issues often involve some of the most highly classified secrets the U.S. government has, but the IC should work to provide some basic training at the unclassified level about foreign adversaries' use of intermediaries.

(U) Recommendation #23: Congress should consider amending current campaign finance laws to further increase transparency regarding services provided by foreign persons or entities.

(U) The Committee is concerned that current campaign finance reporting is in-

sufficiently transparent. For example, the DNC and Hillary for America used Perkins Coie, which they billed as "legal services" or "legal and compliance consulting," to finance opposition research by Fusion GPS, which in turn utilized Christopher Steele, a foreign person, to compile the dossier that he created for use against candidate Trump.[4]

(U) Under current federal election law, foreigners are prohibited from making contributions or donations in connection with any campaign in the United States.[5] However, it is not illegal to contract with a foreign person or foreign entity for services, including conducting opposition research on a U.S. campaign, so long as the service was paid for at the market rate.

(U) In light of the use of foreign people and foreign companies for services by the 2016 U.S. presidential election campaigns, the Committee encourages Congress, in consultation with the Federal Election Commission (FEC), to consider whether Congress should amend campaign finance laws to require greater transparency when U.S. campaigns obtain services from foreign persons or entities. Congress should consider whether U.S. campaigns that contract with a foreign person or entity for services should immediately disclose to the FEC a contract with a foreign person or foreign entity, as well as a lengthy summary of the types of services provided by the foreign person or entity.

TOP SECRET// NOFORN

## Intelligence Community Assessment Leaks

{U) Based on the extraordinary number of leaks of classified information over the past year, it is apparent that government officials are not afraid of the criminal penalties for such unauthorized and illegal conduct.

{U) This leaves the Committee with an impression that criminal statutes related to leaks of classified information are not strong enough to deter potential criminal acts of leaking classified information.

{U) Recommendation #24: Each component of the Intelligence Community should update its guidance regarding media contacts to ensure the guidance applies to every employee, including senior officials.

{U) The Committee found significant leaks of classified information around the time of the ICA. The Committee believes many of those leaks were likely from senior officials within the IC. This recommendation is similar to a provision of the FY 2013 Intelligence Authorization Act that expired in early 2014. That provision required a notification to the congressional intelligence committees in the event of an authorized disclosure of classified information to the media or anybody else who had the intent to make the information public.[6] The purpose of the law was to ensure that congressional intelligence committees were informed on a timely basis when there was a disclosure of classified information to the media, and the statute specifically carved

out disclosures made under the Freedom of Information Act, in litigation or administrative proceedings, under executive orders, or to any federal employee with an active security clearance and a need to know.

(U) Recommendation #25: Congress should consider legislation to increase the penalties for unauthorized disclosures of classified information.

(U) To date, based on publicly available information, there have not been any prosecutions of leaks pertaining to the Russian active measures campaign. As evidenced by the lack of leak prosecutions, difficulties often arise in finding a culprit behind leaks of classified information. However, when the Executive Branch is successful in identifying an alleged leaker, there should be no bar to prosecuting that individual. While prosecutors may utilize multiple criminal statutes to prosecute individuals who leak or mishandle national defense information, the construct of the Espionage Act does not lend itself in favor of prosecution and as a sufficient deterrent from individuals breaking the law for their own political purposes. Therefore, Congress should consider legislation to clearly articulate stronger penalties for those individuals who make unauthorized disclosures of classified information to the media.

(U) For example, enactment of Congressman Chris Stewart's bill -- H.R. 3448, the Classified Information Protection Act -- would strengthen the Espionage Act. Unlike

TOP SECRET// NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

current unauthorized disclosure statutes which, by virtue of their complexity, create difficulties in building cases, H.R. 3448 clearly prohibits any current or former individual who had lawful access to classified information from knowingly providing such information to a person who is not authorized to access the information. If someone is found guilty under this proposal, the leaker will be fined, imprisoned for up to three years, or both. This legislation originally passed both chambers of Congress in 2000, but President Clinton vetoed the bill. Given the proliferation of leaks, it is essential for Congress to examine amending the Espionage Act to strengthen our laws needed to protect classified information.

(U) Furthermore, given the significant number of leaks and instances of mishandling classified information coming from within the IC in the past several years, Congress should consider ways to strengthen the protection of classified information. This legislation could include requiring the head of a federal agency to suspend the security clearance of an individual who intentionally or recklessly fails to comply with security procedures for handling classified information. The legislation could also provide for the ability of an agency's Inspector General to make recommendations to the President related to potential violations of security procedures by senior agency officials. Finally, the legislation should consider mandating annual training for all individuals with access to classified information on security procedures for handling classified information.

(U) Recommendation #26: The Executive Branch should consider instituting mandatory polygraphs for all non-confirmed political appointees that have top secret clearances.

(U) Despite employees in the Executive Branch having extraordinary access to a significant amount of highly classified information, there are very few processes in place to ensure that these individuals handle such information appropriately.

(U) The DNI is responsible for policies and procedures governing "eligibility for access to classified information or eligibility to hold a sensitive position made by any agency." However, pursuant to ICD 704, the DNI delegated the authority to grant access to an IC element's Sensitive Compartmented Information (SCI) and other controlled access program information to the heads of such element. As it relates to the administration of polygraphs during personnel security vetting, the DNI issued Intelligence Community Policy Guidance (ICPG) 704.6.

(U) ICPG 704.6 provides basic instruction as to the types of polygraphs and circumstances by which polygraphs should be administered. While IC elements should have discretion in terms of the timing and circumstances by which to conduct SIPs, every employee not subject to Senate-confirmation that is granted access to TOP SECRET classified information should be

subject to at least a counterintelligence
scope polygraph (CSP).  As a result, the DNI
should revise ICD 704 and ICPG 704.6 to
specifically reflect this requirement.

---

1.   50 U.S.C. § 1804.

2.   50 U.S.C. § 1801.

3.   HPSCI, "Russian Active Measures During the 2016 Election Campaign," May 23, 2017, pp. 31-32.

4.   Campaign Legal Center and Catherine Hinckley Kelley v. Democratic National Committee and Hillary for America,
     "Complaint," Federal Election Commission, www.campaignlegalcenter.org/document/fec-complaint-hillary-america-dnc-
     failure-disclose, Oct. 25, 2017.

5.   52 U.S.C. § 30121; 11 CFR 110.20.

6.   Pub. L. No. 112-277, § 504 (2013).

# (U) Appendix A - Scope and Methodology

(U) On January 25, 2017, Chairman Nunes and Ranking Member Schiff released a joint statement detailing the Committee's inquiry into the Russian active measures campaign targeting the 2016 U.S. presidential election.[1] The final parameters of the Russia investigation were agreed to by Chairman Nunes and Ranking Member Schiff on March 1, 2017.[2] The review's key questions were: (1) what Russian cyber activity and other active measures were directed against the United States and its allies; (2) did the Russian active measures include links between Russia and individuals associated with political campaigns or any other U.S. persons; (3) what was the U.S. government response to these Russian active measures and what do we need to do to protect ourselves and our allies in the future; and (4) what possible leaks of classified information took place related to the Intelligence Community's assessment of these matters? The Committee remained focused on investigating the answers to these four questions and designed the investigation's methodology around them.

(U) The Committee interviewed and/or transcribed testimony from 73 witnesses, conducted 9 open and closed hearings and briefings, and issued 20 subpoenas. The Committee identified witnesses to interview by reviewing open source material, including news reports; official U.S. government documents, including classified Intelligence IC source material; IC agency briefings; and

following up on leads acquired from formal transcribed interviews with current and former administration officials, as well as volunteers who offered pertinent testimony or documents to the Committee. In some instances, prospective witnesses were unresponsive or unwilling to be interviewed. When appropriate, Congressman K. Michael Conaway, in consultation with the Ranking Member, made a recommendation to the Committee Chairman Devin Nunes in accordance with *Rules of Procedure for the Permanent Select Committee on Intelligence* to issue a subpoena.[3] Subpoenas were used to compel witnesses to appear as well as to compel the production of pertinent documents in compliance with the Committee's lawful authority. Six of the witnesses the Committee requested to interview invoked their 5th amendment protections from self-incrimination, which resulted in the Committee not being able to obtain pertinent information from those particular individuals.

(U) During the interviews, the Committee Members and staff questioned the witnesses about activities that generally took place between April 2015 and January 2017. If the Committee discovered anything that arose before April 2015 or after January 2017, the Committee made a determination of its relevancy. If it was identified to have an impact on the campaign or election, the Committee defined it as relevant and included it within the scope. However, none of

the witnesses interviewed indicated potential collusion that would have led the Committee to adapt a broader scope. The Committee also collected over 307,900 documents and 230 hours of witness testimony.

**(U) What Russian cyber activity and other active measures were directed against the United States and its allies?**

(C//NF) ~~(U)~~ The Committee collected and analyzed IC products on Russian influence operations and activities from the period beginning with the summer of 2015 and ending in January 2017.[4] The Committee did not examine the motivation of the Russian actors, but instead focused on what it found about the Russian's activities. The Committee also spent approximately 1,200 hours reviewing the classified *Intelligence Community Assessment on Russian Activities and Intentions in Recent Elections* (ICA), ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ In addition, the Committee interviewed the Chief of the CIA Director's fusion cell, which was an interagency analytic group run by the CIA that was stood up▮▮ ▮▮▮▮ to produce products focused on Russian cyber and other influence activities targeting the United States. The Committee also interviewed the FBI's Section Chief for the Bureau's Counterintelligence Analysis Section. In addition, the Committee traveled to Bulgaria, Cypress, Estonia, Germany, Moldova, Ukraine, and the United Kingdom to interview these nation's foreign intelligence services about the Russian active measures against their governments.

**(U) Did the Russian active measures include links between Russia and individuals associated with political campaigns or any other U.S. persons?**

(U) The Committee investigated facts related to the FBI's investigation through May 2017, until the appointment of Special Counsel Robert Mueller. The Committee avoided examining events thereafter to avoid interfering with the Special Counsel's investigation. The Committee also examined allegations of collusion by investigating the interaction between the political campaigns and Russian agents of influence during the 2016 election cycle. The election cycle was defined as April 12, 2015, when Hillary Clinton launched her campaign for President through November 8, 2016, or election day. To answer this question, the Committee met with the head of Counterintelligence for the DOJ to understand the context and events surrounding the investigation into the Trump campaign. The Committee also interviewed several officials from the FBI and DOJ to collect official testimony about the investigation. In addition, the Committee collected and reviewed pertinent FBI and DOJ documents about the counterintelligence investigation. The Committee also coordinated closely with the Office of Special Counsel. For example, the Committee shared the list of witnesses that the Committee interviewed and kept the Special Counsel's office apprised of any changes or developments on a monthly ba-

sis.

(U) What was the U.S. government response to these Russian active measures and what do we need to do to protect ourselves and our allies in the future?

The Committee interviewed current and former officials at the NSA, FBI, and CIA. The Committee interviewed these witnesses about Russia's active measures, the impact these active measures had on U.S. intelligence relationships and alliances, as well as the agencies' response to these attacks. In addition, the Committee traveled to seven countries in Europe and met with IC, Department of State, and foreign intelligence service representatives to obtain other nations' perspectives about the Russian active measures, the potential impacts of these measures, and the U.S. government and its allies' response.

(U) What possible leaks of classified information took place related to the Intel-

ligence Community's assessment of these matters?

(U) The Committee collected, reviewed, and analyzed open source articles containing leaks that occurred between the IC's establishment of the CIA Director's fusion cell ███████████ and the publication of the classified and declassified version of the ICA in January 2017. In addition, the Committee collected and analyzed laws and policies pertaining to the release or publication of classified information. Finally, the Committee also compared the leaks found in the identified articles to the classified and unclassified Intelligence Community Assessment to determine any similarities.

1. HPSCI, "Joint Statement on Progress of Bipartisan HPSCI Inquiry into Russian Active Measures," Press Releases, intelligence.house.gov, Jan. 25, 2017.

2. HPSCI, "Intelligence Committee Chairman, Ranking Member Establish Parameters for Russia Investigation," intelligence.house.gov, Mar. 1, 2017.

3. HPSCI, Rules of Procedure for the Permanent Select Committee on Intelligence, United States House of Representatives, 115th Congress.

4. The IC comprises 17 different organizations, or IC elements, to include the Office of the Director of National Intelligence, the Central Intelligence Agency, the Federal Bureau of Investigation, the Office of Intelligence and Counterintelligence at the Department of Energy, the Office of National Security Intelligence at the Department of Justice's Drug Enforcement Administration, the Office of Intelligence and Analysis at the Department of Homeland Security, the Bureau of Intelligence and Research at the Department of State, the Office of Intelligence and Analysis at the Department of Treasury, Air Force Intelligence, Army Intelligence, Coast Guard Intelligence, Defense Intelligence Agency, Marine Corps Intelligence, National Geospatial-Intelligence Agency, National Reconnaissance Office, National Security Agency, and Navy Intelligence. For the purposes of this review, the Committee reviewed intelligence products from the Central Intelligence Agency, Federal Bureau of Investigation, and National Security Agency because these agencies were the IC partners for community-wide assessment of Russian active measures.

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

## (U) Appendix B - Russia Investigation Parameters

### HPSCI INQUIRIES AND INVESTIGATIONS

### SCOPE OF INVESTIGATION

### BI-PARTISAN INQUIRY INTO RUSSIAN ACTIVE MEASURES

**TOPIC**

An examination into Russian cyber activity and other active measures directed at the 2016 U.S. election.

**PURPOSE**

*What problem are you trying to solve?*

One of HPSCI's highest priorities is oversight of the Intelligence Community's activities to counter Russian aggression, including the cyber-attacks directed against the United States in the last year. As part of this oversight responsibility, the Committee is undertaking a bi-partisan investigation into these activities directed at the 2016 election and the underlying intelligence used to draft the Intelligence Community Assessment, "Russian Activities and Intentions in Recent US Elections." The investigation will help us better understand Russian active measures against the United States and our allies and inform efforts to prevent similar episodes in the future, both here and abroad.

*Who is your intended audience?*

The intended audience is the Members of HPSCI and—to the extent permitted by classification and security rules—the broader House of Representatives and the American people.

*What are the key questions you seek to answer?*

- What Russian cyber activity and other active measures were directed against the United States and its allies?
- What counterintelligence concerns exist related to Russia and the 2016 U.S. elections, including any intelligence regarding links between Russia and individuals associated with political campaigns?
- What was the USG response to these Russian active measures and what impact, if any, did the Russian activity have on intelligence relationships and traditional alliances?
- What possible leaks of classified information took place related to the Intelligence Community's assessment of these matters?

*What is your intended outcome product(s)?*

The Committee intends to complete a report at the highest classification necessary to answer the key questions and, where possible, report(s) at lower classification levels releasable to the House of Representatives and the public, as appropriate.

1

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

*What intended impact will there be for budget, legislation, or press?*
The inquiry and report may uncover vulnerabilities within the Intelligence Community and/or USG agencies or institutions. If so, the Committee may identify avenues of improvement that would be reflected in IAA provisions, stand-alone legislation, IC budget adjustments, and/or further areas to focus HPSCI's oversight efforts.

The Committee also expects that there will be significant interest from the press, given the delicate political issues surrounding the topic. Staff will remain bi-partisan and focus solely on the facts uncovered in our investigation.

*What intended effect do you want those products to have? How does that fit into the Committee's oversight plan?*
The objective is to better understand Russian active measures directed at the 2016 U.S. election, and to better position the IC and the broader USG to respond to and defend against the threat.

### SCOPE

*What are the boundaries of your review? Please consider time, substance, agency, and range of activities.*

Time:
The Committee will focus primarily on Russian active measures deployed during the 2015-2017 timeframe, but may pursue activities germane to the investigation that took place outside this window.

Substance:
- *What:* The Committee will investigate Russian activities aimed at USG agencies, political parties, NGOs, individuals, and private industry, as appropriate.

  The investigation will also assess whether there is any intelligence that identifies insider threat or CI concerns, including whether Russian activity involved any USPs, including those on or associated with campaigns.
  - The investigation will also consider what USG officials believe to be the impact to U.S. intelligence of both Russian active measures related to the election and the associated recent disclosures.
- *How:* The Committee will investigate the methods by which Russia targeted the aforementioned groups.
- *Why:* The investigation will consider Russian leadership plans and intentions, including whether and in what ways Russia intended to influence U.S. policy or undermine U.S. political systems and democratic institutions.
- *USG response:* The Committee will examine how the U.S. government responded to Russian active measures.
  It will also include an assessment of the process used to generate the IC's report and any deviations from standard practices in the IC's report.

2

███████ ██████████████                    ████████████ ████████

████████

████████████ and an accounting of whether a person or persons in the IC or the White House leaked information on the report prior to its dissemination to the Gang of Eight, Congress, or the public.

- o  The report will also assess whether intelligence relating to U.S. persons was collected and disseminated in accordance with applicable laws and policies.
- *Recommendations:* Several recommendations are likely to come out of this investigation.

Agencies:

- The Committee expects to be in contact with CIA, NSA, DHS, FBI, DIA, and ODNI. However, The Committee will pursue all avenues of inquiry, which may include agencies not listed here.
- The Committee will also engage current and former IC and USG personnel, private industry, and any other parties with knowledge relevant to the investigation.
- The Committee will examine the process by which the Intelligence Community Assessment, "Russian Activities and Intentions in Recent US Elections." was created and the intelligence underlying the assessment to determine whether the IC comported with all relevant Intelligence Community Directives and security precautions when researching, writing, analyzing, and releasing their product, and whether the assessments meet a reasonable standard of credibility as determined by the investigatory team. The Committee will focus on evaluating the IC's work on the Assessment with regard to IC rules and procedures, but not create a new or separate assessment of Russian activities.

*Given the above, and competing priorities, when do you expect to complete the project?*
The Committee expects the investigation to take several months, at least, and the drafting of a report and any declassification review to take additional time thereafter.  Above all, the investigation will prioritize comprehensiveness over completion by a particular date, while still seeking to move as quickly as possible to ensure the report is timely and useful.

*What if/any political or jurisdictional issues exist?*
The inquiry's subject matter carries political sensitivities. Nevertheless, staff will proceed in a bi-partisan and objective manner, both in conducting the inquiry and in drafting the report.

- The Committee's investigation will not interfere with any ongoing criminal or counterintelligence investigations. Staff will, however, seek relevant law enforcement or counterintelligence information consistent with the Committee's oversight jurisdiction and investigative responsibilities. The objective of seeking such information will be to assess whether any collusion occurred between Russians and USPs, and the leaks of classified information.
- The investigation could implicate the work of the agencies within the jurisdiction of Homeland Security, Judiciary, Oversight, and Foreign Affairs Committees.  However, because the investigation will focus on an active measures campaign by a foreign adversary, the investigation clearly lies within the jurisdiction of HPSCI.  Additionally, House Rule 10 provides that HPSCI shall study the sources and methods of the IC on an "exclusive basis."

3

████████ ████████

*What if/any compartmentation issues exist?*

Staff and Members conducting the investigation will need access to Gang of Eight material. This necessitates a small, nimble group, and will require special arrangements for proper storage of compartmented information at HPSCI.

## METHODOLOGY

*Will it be bipartisan? Who will be involved?*

This investigation is bi-partisan. Gang of Eight access will be required for the investigatory team.

- Lead: ████████ (Majority); ████████ (Minority)
- Counsel: ████████ (Majority); ████████ (Minority)
- Investigators: ████████ and ████████ (Majority)
- Advisor: ████████ (Minority)
- Technical Advisor: ████████ (Bi-partisan Fellow)

*What information do you anticipate will be necessary to achieve your purpose?*

- Access to and custody of all underlying intelligence used to create the Intelligence Community Assessment, "Russian Activities and Intentions in Recent US Elections." This includes reporting currently only available to the Gang of Eight and their Staff Directors.
- Access to and custody of other relevant reporting on Russian active measures as it relates to the timeframe and topics described in the Scope of Investigation, as needed.
- Interviews with USG and non-USG individuals with knowledge of Russian active measures, including those in the Intelligence Community, private industry, NGOs, political parties, and/or other groups. ████████

  ████████. The Committee may also wish to engage cyber experts from our National Labs, both resident at HPSCI and outside the committee.

- ████████ ████████.

- Access to documents and information regarding law enforcement and counterintelligence investigations, consistent with the Committee's oversight jurisdiction and investigative responsibilities, as further described above.

*What roles will Members play? At what points will they be brought in to provide feedback or guide the project? What Committee events may be necessary?*

- The investigation is of highest interest to HPSCI Members. They will need to be updated on the status of the investigation at regular intervals, likely through bi-partisan investigatory team memos and Majority- and Minority-specific channels, as necessary.
- Members may also be interested in joining interviews if they are of high interest.
- As needed, the Committee will hold hearings, both open and closed, on elements of the investigation.

4

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

*How will you gather information (what types of document requests do you plan to submit; who do you plan to interview; where do you intend to travel)?*

- The Committee has already requested from the ODNI access to and custody of all intelligence reporting included in the Intelligence Community assessment, "Russian Activities and Intentions in Recent US Elections."
- The Committee will submit further requests for documents, and for interviews, as the inquiry proceeds.
- The Committee will interview current and former USG personnel, industry personnel, those who work or worked in NGOs and/or political parties, and others as the Committee deems appropriate.
- The Committee will also seek existing IC information on Russian activity against U.S. allies during their elections.

*How will you file, organize, and retain all of the information received? Have you factored in sufficient time for declassification review, if necessary? How will that occur?*

- The Committee will need to accommodate document review and storage at HPSCI— particularly as it relates to compartmented information. The Committee will also need to factor in the time it may take agencies to respond to document access requests, declassification reviews, and/or making available individuals for interviews with the investigatory team or HPSCI Members.
- The Committee staff have already set-up digital folders on the HPSCI classified system, to hold all relevant non-Gang of Eight planning and scoping documents, with the proper permissions based on responsibilities and Majority/Minority status.

## TIMELINE

*Provide specific intended deadlines for each phase of your review (data gathering, analysis, writing, coordination/editing, publishing...)*

The Committee will pursue a phased, building-blocks approach to the investigation, while prioritizing comprehensiveness above completion by a fixed end date. The structuring of the investigation into Phases, and the consequent prioritization of specifically identified investigative activities or research, will not be construed to limit staff's ability to gather or analyze relevant information.

The Committee expects each phase will take weeks to months to complete.

- Phase 1 will focus on initial, general knowledge acquisition about the Russia active measures campaign, the U.S. response, counterintelligence concerns, and the other key questions identified above.
    - □ Phase 1 will include reading and analyzing intelligence reporting relevant to the Russia cyber threat, including all underlying intelligence used to produce the Intelligence Community Assessment, "Russian Activities and Intentions in Recent US Elections."
    - ○ Phase 1 also will include meetings with USG and industry personnel generally knowledgeable about the threat; meetings with USG personnel knowledgeable about the IC's analytic process; and meetings with former USG experts

5

knowledgeable about USG posture against the Russia target, to include counterintelligence.
o  Phase 1 also will include witness testimony, following investigative leads, and document production relative to the IC Assessment, counterintelligence concerns, the USG response, and leak allegations.
o  Throughout Phase 1, the Committee will pursue document acquisition and schedule interviews necessary to conduct Phase 2.

• Phase 2 will build on the baseline knowledge acquired in Phase 1 through a focused and specific investigation.
   o  Phase 2 will include a detailed analysis of the intelligence production process and conclusions in the Intelligence Community Assessment, "Russian Activities and Intentions in Recent US Elections" to assess whether the IC comported with all relevant Intelligence Community Directives and security precautions when researching, writing, analyzing, and releasing their assessment.
   o  Phase 2 will include interviews with specific USG and industry personnel knowledgeable about the specific topics discussed in the IC's report and the process used to compile, review, and disseminate the IC's report.
   o  Phase 2 may include detailed interviews and analysis regarding the Russian active measures campaign; the U.S. response; counterintelligence concerns; the impact of Russian active measures on U.S. allies; and whether the IC or the White House leaked information on the report prior to its dissemination to the Gang of Eight, Congress, or the public.

• Phase 3 will focus on writing, coordinating, editing, transmitting for declassification review (if necessary), and releasing the Committee's reports at appropriate classification levels.

• Throughout all three phases, the Committee will engage Members for any feedback and incorporate that feedback into our process.

* * * *

Pursuant to Rule 9 of the Committee's Rules of Procedure, 115th Congress, we hereby jointly agree to the scope of investigation described above.

Devin Nunes
Chairman

Adam Schiff
Ranking Member

Date: February 27, 2017

6

139

# (U) Appendix C - Russia's Media Propaganda Apparatus

## (U) *Rossiya Segodnya*

(U) Created by Putin in 2013, Rossiya Segodnya is Russia's overarching state media company. Rossiya Sogodnya acts as an umbrella for outlets like RT and Sputnik. "Rossiya Segodnya" is translated as "Russia Today," but it is different from the television channel with the same name. According to Russian press reporting, in September 2014, Moscow tripled Rossiya Segodnya's budget to 6.48 billion rubles and increased RT's 2015 budget by 41 percent to 15.38 billion rubles, which is equivalent to roughly $600 million.

## (U) *Russia Today (RT)*

(U) This 24-hour worldwide television (TV) and online network was created in 2005 to promote Russia's image abroad and to show foreigners world events from a Russian perspective. Nominally independent but Kremlin-controlled and funded, Russia

To deemphasize its Russian origin, Russia Today was rebranded RT in 2008.

(U) RT employs 2,000 staff to provide coverage in Russian, English, Arabic, French, German, and Spanish in 100 countries and on the Internet from its studios in Moscow and Washington DC. RT's central slogan, "Question More," is indicative of its overarching goal to urge viewers to doubt every-

thing they see in Western media and from its leaders.

## (U) *Sputnik*

(U) A Russian state-owned network of media platforms producing radio, social media, and news content, Sputnik was created in 2014 to act as Russia's multimedia hub. Sputnik is based in 28 countries and operates in 33 different languages, broadcasting pro-Russian messaging and disinformation. A recent GAO study found that Sputnik promotes anti-West narratives and undermines support for democracy.

## (U) *Russia Beyond the Headlines*

(U) Less ideologically hostile than RT and Sputnik, Russia Beyond the Headlines (RBTH) pays for printed inserts in many leading European newspapers and targets Bulgaria, Croatia, France, Germany, Greece, Italy, Macedonia, Portugal, Serbia, Spain, and the UK. Comparatively less anti-American in tone, RBTH provides another avenue for Russian propaganda to reach wide audiences in these European countries.



~~TOP SECRET/~~ ████████████ ~~/NOFORN/~~ █

1. ████████████████████████████████████
2. GAO, *Russia: U.S. Government Takes a Country-Specific Approach to Addressing Disinformation Overseas*, May 2017.
3. ████████████████████████████████████████
4. ████████████████████████████████████████

~~TOP SECRET/~~ ████████████ ~~/NOFORN~~ █

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

# (U) Appendix E - HPSCI Majority Memo about FISA Abuses

## UNCLASSIFIED

January 18, 2018

| | |
|---|---|
| To: | HPSCI Majority Members |
| From: | HPSCI Majority Staff |
| Subject: | Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation |

### Purpose

This memorandum provides Members an update on significant facts relating to the Committee's ongoing investigation into the Department of Justice (DOJ) and Federal Bureau of Investigation (FBI) and their use of the Foreign Intelligence Surveillance Act (FISA) during the 2016 presidential election cycle. Our findings, which are detailed below, 1) raise concerns with the legitimacy and legality of certain DOJ and FBI interactions with the Foreign Intelligence Surveillance Court (FISC), and 2) represent a troubling breakdown of legal processes established to protect the American people from abuses related to the FISA process.

### Investigation Update

On October 21, 2016, DOJ and FBI sought and received a FISA probable cause order (not under Title VII) authorizing electronic surveillance on Carter Page from the FISC. Page is a U.S. citizen who served as a volunteer advisor to the Trump presidential campaign. Consistent with requirements under FISA, the application had to be first certified by the Director or Deputy Director of the FBI. It then required the approval of the Attorney General, Deputy Attorney General (DAG), or the Senate-confirmed Assistant Attorney General for the National Security Division.

The FBI and DOJ obtained one initial FISA warrant targeting Carter Page and three FISA renewals from the FISC. As required by statute (50 U.S.C. §1805(d)(1)), a FISA order on an American citizen must be renewed by the FISC every 90 days and each renewal requires a separate finding of probable cause. Then-Director James Comey signed three FISA applications in question on behalf of the FBI, and Deputy Director Andrew McCabe signed one. Then-DAG Sally Yates, then-Acting DAG Dana Boente, and DAG Rod Rosenstein each signed one or more FISA applications on behalf of DOJ.

Due to the sensitive nature of foreign intelligence activity, FISA submissions (including renewals) before the FISC are classified. As such, the public's confidence in the integrity of the FISA process depends on the court's ability to hold the government to the highest standard - particularly as it relates to surveillance of American citizens. However, the FISC's rigor in protecting the rights of Americans, which is reinforced by 90-day renewals of surveillance orders, is necessarily dependent on the government's production to the court of all material and relevant facts. This should include information potentially favorable to the target of the FISA

## UNCLASSIFIED

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

**UNCLASSIFIED**

application that is known by the government. In the case of Carter Page, the government had at least four independent opportunities before the FISC to accurately provide an accounting of the relevant facts. However, our findings indicate that, as described below, material and relevant information was omitted.

1) The "dossier" compiled by Christopher Steele (Steele dossier) on behalf of the Democratic National Committee (DNC) and the Hillary Clinton campaign formed an essential part of the Carter Page FISA application. Steele was a longtime FBI source who was paid over $160,000 by the DNC and Clinton campaign, via the law firm Perkins Coie and research firm Fusion GPS, to obtain derogatory information on Donald Trump's ties to Russia.

   a) Neither the initial application in October 2016, nor any of the renewals, disclose or reference the role of the DNC, Clinton campaign, or any party/campaign in funding Steele's efforts, even though the political origins of the Steele dossier were then known to senior DOJ and FBI officials.

   b) The initial FISA application notes Steele was working for a named U.S. person, but does not name Fusion GPS and principal Glenn Simpson, who was paid by a U.S. law firm (Perkins Coie) representing the DNC (even though it was known by DOJ at the time that political actors were involved with the Steele dossier). The application does not mention Steele was ultimately working on behalf of—and paid by—the DNC and Clinton campaign, or that the FBI had separately authorized payment to Steele for the same information.

2) The Carter Page FISA application also cited extensively a September 23, 2016, *Yahoo News* article by Michael Isikoff, which focuses on Page's July 2016 trip to Moscow. This article does not corroborate the Steele dossier because it is derived from information leaked by Steele himself to *Yahoo News*. The Page FISA application incorrectly assesses that Steele did not directly provide information to *Yahoo News*. Steele has admitted in British court filings that he met with *Yahoo News*—and several other outlets—in September 2016 at the direction of Fusion GPS. Perkins Coie was aware of Steele's initial media contacts because they hosted at least one meeting in Washington D.C. in 2016 with Steele and Fusion GPS where this matter was discussed.

   a) Steele was suspended and then terminated as an FBI source for what the FBI defines as the most serious of violations—an unauthorized disclosure to the media of his relationship with the FBI in an October 30, 2016, *Mother Jones* article by David Corn. Steele should have been terminated for his previous undisclosed contacts with Yahoo and other outlets **in September**—before the Page application was submitted to

**UNCLASSIFIED**

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

UNCLASSIFIED

the FISC in October—but Steele improperly concealed from and lied to the FBI about those contacts.

  b) Steele's numerous encounters with the media violated the cardinal rule of source handling—maintaining confidentiality—and demonstrated that Steele had become a less than reliable source for the FBI.

3) Before and after Steele was terminated as a source, he maintained contact with DOJ via then-Associate Deputy Attorney General Bruce Ohr, a senior DOJ official who worked closely with Deputy Attorneys General Yates and later Rosenstein. Shortly after the election, the FBI began interviewing Ohr, documenting his communications with Steele. For example, in September 2016, Steele admitted to Ohr his feelings against then-candidate Trump when Steele said he **"was desperate that Donald Trump not get elected and was passionate about him not being president."** This clear evidence of Steele's bias was recorded by Ohr at the time and subsequently in official FBI files—but not reflected in any of the Page FISA applications.

  a) During this same time period, Ohr's wife was employed by Fusion GPS to assist in the cultivation of opposition research on Trump. Ohr later provided the FBI with all of his wife's opposition research, paid for by the DNC and Clinton campaign via Fusion GPS. The Ohrs' relationship with Steele and Fusion GPS was inexplicably concealed from the FISC.

4) According to the head of the FBI's counterintelligence division, Assistant Director Bill Priestap, corroboration of the Steele dossier was in its "infancy" at the time of the initial Page FISA application. After Steele was terminated, a source validation report conducted by an independent unit within FBI assessed Steele's reporting as only minimally corroborated. Yet, in early January 2017, Director Comey briefed President-elect Trump on a summary of the Steele dossier, even though it was—according to his June 2017 testimony—"salacious and unverified." While the FISA application relied on Steele's past record of credible reporting on other unrelated matters, it ignored or concealed his anti-Trump financial and ideological motivations. Furthermore, Deputy Director McCabe testified before the Committee in December 2017 that no surveillance warrant would have been sought from the FISC without the Steele dossier information.

UNCLASSIFIED

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// NOFORN

## UNCLASSIFIED

5) The Page FISA application also mentions information regarding fellow Trump campaign advisor George Papadopoulos, but there is no evidence of any cooperation or conspiracy between Page and Papadopoulos. The Papadopoulos information triggered the opening of an FBI counterintelligence investigation in late July 2016 by FBI agent Pete Strzok. Strzok was reassigned by the Special Counsel's Office to FBI Human Resources for improper text messages with his mistress, FBI Attorney Lisa Page (no known relation to Carter Page), where they both demonstrated a clear bias against Trump and in favor of Clinton, whom Strzok had also investigated. The Strzok/Lisa Page texts also reflect extensive discussions about the investigation, orchestrating leaks to the media, and include a meeting with Deputy Director McCabe to discuss an "insurance" policy against President Trump's election.

## UNCLASSIFIED

TOP SECRET// NOFORN

TOP SECRET// NOFORN

# (U) Appendix F - HPSCI Minority Memo about FISA Abuses

Redactions match previously released version--no additional redactions taken

TO: All Members of the House of Representatives
FROM: HPSCI Minority
DATE: January 29, 2018
RE: Correcting the Record – The Russia Investigations

The HPSCI Majority's move to release to the House of Representatives its allegations against the Federal Bureau of Investigation (FBI) and the Department of Justice (DOJ) is a transparent effort to undermine those agencies, the Special Counsel, and Congress' investigations. It also risks public exposure of sensitive sources and methods for no legitimate purpose.

FBI and DOJ officials did not "abuse" the Foreign Intelligence Surveillance Act (FISA) process, omit material information, or subvert this vital tool to spy on the Trump campaign.

In fact, DOJ and the FBI would have been remiss in their duty to protect the country had they not sought a FISA warrant and repeated renewals to conduct temporary surveillance of Carter Page, someone the FBI assessed to be an agent of the Russian government. DOJ met the rigor, transparency, and evidentiary basis needed to meet FISA's probable cause requirement, by demonstrating:

- o contemporaneous evidence of Russia's election interference;
- o concerning Russian links and outreach to Trump campaign officials;
- o Page's history with Russian intelligence; and
- o ▇▇▇▇▇▇▇▇▇▇▇ Page's suspicious activities in 2016, including in Moscow.

The Committee's Minority has therefore prepared this memorandum to correct the record:

- • **Christopher Steele's raw intelligence reporting did not inform the FBI's decision to initiate its counterintelligence investigation in late July 2016.** In fact, the FBI's closely-held investigative team only received Steele's reporting in mid-September – more than seven weeks later. The FBI – and, subsequently, the Special Counsel's – investigation into links between the Russian government and Trump campaign associates has been based on troubling law enforcement and intelligence information unrelated to the "dossier."

- • **DOJ's October 21, 2016 FISA application and three subsequent renewals carefully outlined for the Court a multi-pronged rationale for surveilling Page, who, at the time of the first application, was no longer with the Trump campaign.** DOJ detailed Page's past relationships with Russian spies and interaction with Russian officials during the 2016 campaign ▇▇▇▇▇▇▇. DOJ cited multiple sources to support the case for surveilling Page — but made only narrow use of information from Steele's sources about Page's specific activities in 2016, chiefly his suspected July 2016 meetings in Moscow with Russian officials. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. In fact, the FBI interviewed Page in March 2016 about his contact with Russian intelligence, the very month candidate Donald Trump named him a foreign policy advisor.

As DOJ informed the Court in subsequent renewals, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Steele's reporting about Page's Moscow meetings ▇▇▇▇▇▇▇▇▇▇▇▇▇. DOJ's applications did not otherwise rely on Steele's reporting, including any "salacious" allegations

1

about Trump, and the FBI never paid Steele for this reporting. While explaining why the FBI viewed Steele's reporting and sources as reliable and credible, DOJ also disclosed:

- □ Steele's prior relationship with the FBI;
- ○ the fact of and reason for his termination as a source; and
- ○ the assessed political motivation of those who hired him.

● The Committee Majority's memorandum, which draws selectively on highly sensitive classified information, includes other distortions and misrepresentations that are contradicted by the underlying classified documents, which the vast majority of Members of the Committee and the House have not had the opportunity to review – and which Chairman Nunes chose not to read himself.[1]

## Background

On January 18, 2018, the Committee Majority, during an unrelated business meeting, forced a surprise vote to release to the full House a profoundly misleading memorandum alleging serious abuses by the FBI and DOJ. Majority staff drafted the document in secret on behalf of Chairman Devin Nunes (and reportedly with guidance and input from Rep. Trey Gowdy), and then rushed a party-line vote without prior notice.

This was by design. The overwhelming majority of Committee Members never received DOJ authorization to access the underlying classified information, and therefore could not judge the veracity of Chairman Nunes' claims. Due to sensitive sources and methods, DOJ provided access only to the Committee's Chair and Ranking Member (or respective designees), and limited staff, to facilitate the Committee's investigation into Russia's covert campaign to influence the 2016 U.S. elections.[2] As DOJ has confirmed publicly, it did not authorize the broader release of this information within Congress or to the public, and Chairman Nunes refused to allow DOJ and the FBI to review his document until he permitted the FBI Director to see it for the first time in HPSCI's secure spaces late on Sunday, January 28 – 10 days after disclosure to the House.[3]

## FBI's Counterintelligence Investigation

In its October 2016 FISA application and subsequent renewals, DOJ accurately informed the Court that the FBI initiated its counterintelligence investigation on July 31, 2016, after receiving information ████████████████. George Papadopoulos revealed ███████ ██████ ████ that individuals linked to Russia, who took interest in Papadopoulos as a Trump campaign foreign policy adviser, informed him in late April 2016 that Russia ████████ ███ █ █████████████████████████████████████.[4] Papadopoulos's disclosure, moreover, occurred against the backdrop of Russia's aggressive covert campaign to influence our elections, which the FBI was already monitoring. We would later learn in Papadopoulos's plea that that the information the Russians could assist by anonymously releasing were thousands of Hillary Clinton's emails.[5]

DOJ told the Court the truth. Its representation was consistent with the FBI's underlying investigative record, which current and former senior officials later corroborated in extensive

2

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

147

Committee testimony. Christopher Steele's reporting, which he began to share with an FBI agent ▓▓▓▓▓▓▓ through the end of October 2016, played no role in launching the FBI's counterintelligence investigation into Russian interference and links to the Trump campaign. In fact, Steele's reporting did not reach the counterintelligence team investigating Russia at FBI headquarters until mid-September 2016, more than seven weeks after the FBI opened its investigation, because the probe's existence was so closely held within the FBI.[6] By then, the FBI had already opened sub-inquiries into ▓▓ individuals linked to the Trump campaign ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, and former campaign foreign policy advisor Carter Page.

As Committee testimony bears out, the FBI would have continued its investigation, including against ▓▓▓▓ individuals, even if it had never received information from Steele, never applied for a FISA warrant against Page, or if the FISC had rejected the application.[7]

## DOJ's FISA Application and Renewals

The initial warrant application and subsequent renewals received independent scrutiny and approval by four different federal judges, three of whom were appointed by President George W. Bush and one by President Ronald Reagan. DOJ first applied to the FISC on October 21, 2016 for a warrant to permit the FBI to initiate electronic surveillance and physical search of Page for 90 days, consistent with FISA requirements. The Court approved three renewals – in early January 2017, early April 2017, and late June 2017 – which authorized the FBI to maintain surveillance on Page until late September 2017. Senior DOJ and FBI officials appointed by the Obama and Trump Administrations, including acting Attorney General Dana Boente and Deputy Attorney General Rod Rosenstein, certified the applications with the Court.

FISA was not used to spy on Trump or his campaign. As the Trump campaign and Page have acknowledged, Page ended his formal affiliation with the campaign months before DOJ applied for a warrant. DOJ, moreover, submitted the initial application less than three weeks before the election, even though the FBI's investigation had been ongoing since the end of July 2016.

DOJ's warrant request was based on compelling evidence and probable cause to believe Page was knowingly assisting clandestine Russian intelligence activities in the U.S.:

• **Page's Connections to Russian Government and Intelligence Officials:** The FBI had an independent basis for investigating Page's motivations and actions during the campaign, transition, and following the inauguration. As DOJ described in detail to the Court, Page had an extensive record as ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓[8] prior to joining the Trump campaign. He resided in Moscow from 2004-2007 and pursued business deals with Russia's state-owned energy company Gazprom—

As early as ▓▓▓, a Russian intelligence officer ▓▓▓▓▓ targeted Page for recruitment. Page showed ▓▓▓▓▓▓▓▓.

3

TOP SECRET//

Redactions match previously released version—no additional redactions taken

Page remained on the radar of Russian intelligence and the FBI. In 2013, prosecutors indicted three other Russian spies, two of whom targeted Page for recruitment. The FBI also interviewed Page multiple times about his Russian intelligence contacts, including in March 2016.[13] The FBI's concern about and knowledge of Page's activities therefore long predate the FBI's receipt of Steele's information.

- Page's Suspicious Activity During the 2016 Campaign: The FISA applications also detail Page's suspicious activity after joining the Trump campaign in March 2016.
  Page traveled to Moscow in July 2016, during which he gave a university commencement address – an honor usually reserved for well-known luminaries.

  o It is in this specific sub-section of the applications that DOJ refers to Steele's reporting on Page and his alleged coordination with Russian officials. Steele's information about Page was consistent with the FBI's assessment of Russian intelligence efforts to recruit him and his connections to Russian persons of interest.

  o In particular, Steele's sources reported that Page met separately while in Russia with Igor Sechin, a close associate of Vladimir Putin and executive chairman of Rosneft, Russia's state-owned oil company, and Igor Divyekin, a senior Kremlin official. Sechin allegedly discussed the prospect of future U.S.-Russia energy cooperation and "an associated move to lift Ukraine-related western sanctions against Russia." Divyekin allegedly disclosed to Page that the Kremlin possessed compromising information on Clinton ("kompromat") and noted "the possibility of its being released to Candidate #1's campaign."[14] [Note: "Candidate #3" refers to candidate Trump.] This closely tracks what other Russian contacts were informing another Trump foreign policy advisor, George Papadopoulos.

- In subsequent FISA renewals, DOJ provided additional information obtained through multiple independent sources that corroborated Steele's reporting.



  o
  o
  o Page's                                                    in Moscow with
    senior Russian officials –
                          – as well as meetings with Russian officials
                                                                      15

This information contradicts Page's November 2, 2017 testimony to the Committee, in which he initially denied any such meetings and then was forced to admit speaking with

4

THE U.S. HOUSE OF REPRESENTATIVES

Dvorkovich and meeting with Rosneft's Sechin-tied investor relations chief, Andrey Baranov.

● The Court-approved surveillance of Page allowed FBI to collect valuable intelligence. The FISA renewals demonstrate that the FBI collected important investigative information and leads by conducting Court-approved surveillance. For instance

DOJ also documented evidence that Page                                    anticipated
                              and repeatedly contacted
            in an effort to present himself as                        [14]
                                                                              [15]
Page's efforts to                                                also contradict his
sworn testimony to our Committee.



### DOJ's Transparency about Christopher Steele

Far from "omitting" material facts about Steele, as the Majority claims,[16] DOJ repeatedly informed the Court about Steele's background, credibility, and potential bias. DOJ explained in detail Steele's prior relationship with and compensation from the FBI; his credibility, reporting history, and source network; the fact of and reason for his termination as a source in late October 2016; and the likely political motivations of those who hired Steele.

● DOJ was transparent with Court about Steele's sourcing: The Committee Majority, which had earlier accused Obama Administration officials of improper "unmasking," faults DOJ for not revealing the names of specific U.S. persons and entities in the FISA application and subsequent renewals. In fact, DOJ appropriately upheld its longstanding practice of protecting U.S. citizen information by purposefully not "unmasking" U.S. person and entity names, unless they were themselves the subject of a counterintelligence investigation. DOJ instead used generic identifiers that provided the Court with more than sufficient information to understand the political context of Steele's research. In an extensive explanation to the Court, DOJ discloses that Steele

> "was approached by an identified U.S. Person,[21] who indicated to Source #1[Steele][22] that a U.S.-based law firm[23] had hired the identified U.S. Person to conduct research regarding Candidate #1's[24] ties to Russia. (The identified U.S. Person and Source #1 have a long-standing business relationship.) The identified U.S. person hired Source #1 to conduct this research. The identified U.S. Person never advised Source #1 as to the motivation behind the research into Candidate #1's ties to Russia. The FBI speculates that the identified U.S. Person was likely looking for information that could be used to discredit Candidate #1's campaign."[25]

Contrary to the Majority's assertion that DOJ fails to mention that Steele's research was commissioned by "political actors" to "obtain derogatory information on Donald Trump's ties to Russia,"[26] DOJ in fact informed the Court accurately that Steele was hired by

5

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES



politically-motivated U.S. persons and entities and that his research appeared intended for use "to discredit" Trump's campaign.

• DOJ explained the FBI's reasonable basis for finding Steele credible: The applications correctly described Steele as ███████████. The applications also reviewed Steele's multi-year history of credible reporting on Russia and other matters, including information DOJ used in criminal proceedings.[27] Senior FBI and DOJ officials have repeatedly affirmed to the Committee the reliability and credibility of Steele's reporting, an assessment also reflected in the FBI's underlying source documents.[28] The FBI has undertaken a rigorous process to vet allegations from Steele's reporting, including with regard to Page.[31]

• The FBI properly notified the FISC after it terminated Steele as a source for making unauthorized disclosures to the media. The Majority cites no evidence that the FBI, prior to filing its initial October 21, 2016 application, actually knew or should have known of any allegedly inappropriate media contacts by Steele. Nor do they cite evidence that Steele disclosed to Yahoo! details included in the FISA warrant, since the British Court filings to which they refer do not address what Steele may have said to Yahoo!.

DOJ informed the Court in its renewals that the FBI acted promptly to terminate Steele after learning from him (after DOJ filed the first warrant application) that he had discussed his work with a media outlet in late October. The January 2018 renewal further explained to the Court that Steele told the FBI that he made his unauthorized media disclosure because of his frustration at Director Comey's public announcement shortly before the election that the FBI reopened its investigation into candidate Clinton's email use.

• DOJ never paid Steele for the "dossier": The Majority asserts that the FBI had "separately authorized payment" to Steele for his research on Trump but neglects to mention that payment was cancelled and never made. As the FBI's records and Committee testimony confirms, although the FBI initially considered compensation ███████████ ███████████ Steele ultimately never received payment from the FBI for any "dossier"-related information.[32] DOJ accurately informed the Court that Steele had been an FBI confidential human source since ███, for which he was "compensated ███████████ by the FBI" – payment for previously-shared information of value unrelated to the FBI's Russia investigation.[33]

### Additional Omissions, Errors, and Distortions in the Majority's Memorandum

• DOJ appropriately provided the Court with a comprehensive explanation of Russia's election interference, including evidence that Russia courted another Trump campaign advisor, Papadopoulos, and that Russian agents previewed their hack and dissemination of stolen emails. In claiming that there is "no evidence of any cooperation or conspiracy between Page and Papadopoulos,"[34] the Majority misstates the reason why DOJ specifically explained Russia's courting of Papadopoulos. Papadopoulos's interaction with Russian agents, coupled with real-time evidence of Russian election interference, provided the Court with a broader context in which to evaluate Russia's clandestine activities and Page's history and alleged contact with Russian officials. Moreover, since only Page

6

TOP SECRET//                                                                          //NOFORN

, no evidence of a separate conspiracy between him and Papadopoulos was required. DOJ would have been negligent in omitting vital information about Papadopoulos and Russia's concerted efforts.

- In its Court filings, DOJ made proper use of news coverage. The Majority falsely claims that the FISA materials "relied heavily" on a September 23, 2016 *Yahoo! News* article by Michael Isikoff and that this article "does not corroborate the Steele Dossier because it is derived from information leaked by Steele himself."[35] In fact, DOJ referenced Isikoff's article, alongside another article the Majority fails to mention, not to provide separate corroboration for Steele's reporting, but instead to inform the Court of Page's public denial of his suspected meetings in Moscow, which Page also echoed in a September 25, 2016 letter to FBI Director Comey.[36]

- The Majority's reference to Bruce Ohr is misleading. The Majority mischaracterizes Bruce Ohr's role, overstates the significance of his interactions with Steele, and misleads about the timeframe of Ohr's communication with the FBI. In late November 2016, Ohr informed the FBI of his prior professional relationship with Steele and information that Steele shared with him (including Steele's concern about Trump being compromised by Russia). He also described his wife's contract work with Fusion GPS, the firm that hired Steele separately. This occurred weeks *after* the election and more than a month *after* the Court approved the initial FISA application. The Majority describes Bruce Ohr as a senior DOJ official who "worked closely with the Deputy Attorney General, Yates and later Rosenstein," in order to imply that Ohr was somehow involved in the FISA process, but there is no indication this is the case.

  Bruce Ohr is a well-respected career professional whose portfolio is drugs and organized crime, not counterintelligence. There is no evidence that he would have known about the Page FISA applications and their contents. The Majority's assertions, moreover, are irrelevant in determining the veracity of Steele's reporting. By the time Ohr debriefs with the FBI, it had already terminated Steele as a source and was independently corroborating Steele's reporting about Page's activities. Bruce Ohr took the initiative to inform the FBI of what he knew, and the Majority does him a grave disservice by suggesting he is part of some malign conspiracy.

- Finally, Peter Strzok and Lisa Page's text messages are irrelevant to the FISA application. The Majority gratuitously includes reference to Strzok and Page at the end of their memorandum, in an effort to imply that political bias infected the FBI's investigation and DOJ's FISA applications. In fact, neither Strzok nor Page served as affiants on the applications, which were the product of extensive and senior DOJ and FBI review.[37] In demonizing both career professionals, the Majority accuses them of "orchestrating leaks to the media" – a serious charge; omits inconvenient text messages, in which they critiqued a wide range of other officials and candidates from both parties; does not disclose that FBI Deputy Director McCabe testified to the Committee that he had no idea what Page and Strzok were referring to in their "insurance policy" texts;[38] and ignores Strzok's acknowledged role in preparing a public declaration, by then Director Comey, about former Secretary Clinton's "extreme carelessness" in handling classified information—which greatly damaged Clinton's public reputation in the days just prior to the presidential election.

7

TOP SECRET//                                                                          //NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

~~TOP SECRET/~~ ███████████ ~~/NOFORN~~ ████

████████████████

---

[1] Letter to HPSCI Chairman Devin Nunes, Assistant Attorney General Stephen Boyd, Department of Justice, January 24, 2018.

[2] Letter to HPSCI Chairman Devin Nunes, Assistant Attorney General Stephen Boyd, Department of Justice, January 24, 2018. DOJ also confirmed in writing to Minority Staff DOJ and FBI's terms of review:

> the Department has accommodated HPSCI's oversight request by allowing repeated [in camera reviews of the material in an appropriate secure facility under the general stipulations that (1) the Chair (or his delegate) and the Ranking Member (or his delegate) and two staff each, with appropriate security clearances, be allowed to review on behalf of the Committee, (2) that the review take place in a reading room set up at the Department, and (3) that the documents not leave the physical control of the Department, and (5) that the review opportunities be bipartisan in nature. Though we originally requested that no notes be taken, in acknowledgment of a request by the Committee, and recognizing that the volume of documents had increased with time, the Department eventually allowed notes to be taken to facilitate HPSCI's review. Also, initial reviews of the material include [sic] short briefings by Department officials to put the material in context and to provide some additional information.

Email from Stephen Boyd to HPSCI Minority Staff, January 18, 2018 (emphasis supplied).

[3] Letter to HPSCI Chairman Devin Nunes, Assistant Attorney General Stephen Boyd, Department of Justice, January 24, 2018.



[5] Papadopoulos's October 5, 2017 guilty plea adds further texture to this initial tip, by clarifying that a Russian agent told Papadopoulos that "They [the Russians] have dirt on her"; "the Russians had emails of Clinton"; "they have thousands of emails." *U.S. v. George Papadopoulos* (1:17-cr-182, District of Columbia), p. 7.



[7] Under the Special Counsel's direction, Flynn and Papadopoulos have both pleaded guilty to lying to federal investigators and are cooperating with the Special Counsel's investigation, while Manafort and his long-time aide, former Trump deputy campaign manager Rick Gates, have been indicted on multiple counts and are awaiting trial. See *U.S. v. Michael T. Flynn* (1:17-cr-232, District of Columbia); *U.S. v. Paul J. Manafort, Jr., and Richard W. Gates III* (1:17-cr-201, District of Columbia); *U.S. v. George Papadopoulos* (1:17-cr-182, District of Columbia).



███████████████████. See also, *U.S. v. Evgeny Buryakov, a/k/a "Zhenya," Igor Sporyshev, and Victor Podolnyy*, U.S. Southern District of New York, January 23, 2015.

[12] Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, p.18. Repeated in subsequent renewal applications

[13] Department of Justice, Foreign Intelligence Surveillance Court Application, June 29, 2017, pp. 20-21.

8

~~TOP SECRET/~~ ████████████ ~~/NOFORN~~ ████

TOP SECRET//                                          //NOFORN//

<sup>17</sup> _____ the FBI and broader Intelligence Community's high confidence assessment that the Russian government was engaged in a covert interference campaign to influence the 2016 election, including that Russian intelligence actors "compromised the DNC" and WikiLeaks subsequently leaked in July 2016 "a trove" of DNC emails. Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, pp. 6-7. Repeated and updated with new information in subsequent renewal applications. Department of Justice, Foreign Intelligence Surveillance Court Application, June 29, 2017, pp. 20-21.

<sup>18</sup> Department of Justice, Foreign Intelligence Surveillance Court Application, June 29, 2017, pp. 36, 46, 48.

<sup>19</sup> Department of Justice, Foreign Intelligence Surveillance Court Application, June 29, 2017, p. 56.

<sup>20</sup> HPSCI Majority Memorandum, *Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation*, January 18, 2018, pp. 2-3 (enumerating "omissions" of fact regarding Steele and his activities, from the Page FISA applications).

<sup>21</sup> Glenn Simpson.

<sup>22</sup> Christopher Steele.

<sup>23</sup> Perkins Coie LLP.

<sup>24</sup> Donald Trump.

<sup>25</sup> Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, pp. 15-16, n. 8. Repeated in subsequent renewal applications.

<sup>26</sup> HPSCI Majority Memorandum, *Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation*, January 18, 2018, p. 2.

<sup>27</sup> Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, p. 15, footnote 8. Repeated in subsequent renewal applications.

<sup>28</sup> Interview of Andrew McCabe (FBI Deputy Director), House Permanent Select Committee on Intelligence, December 19, 2017, p. 46, 100; Interview of Sally Yates (former Deputy Attorney General), House Permanent Select Committee on Intelligence, November 3, 2017, p. 16; Interview with John Carlin (former Assistant Attorney General for National Security), House Permanent Select Committee on Intelligence, July, 2017, p. 35.
<sup>29</sup> Interview of Andrew McCabe (FBI Deputy Director), House Permanent Select Committee on Intelligence, December 19, 2017, p. 100-101, 115.

<sup>32</sup> Interview of FBI Agent, House Permanent Select Committee on Intelligence, December 20, 2017, p. 112.

<sup>33</sup> Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, pp. 15-16, n. 8. Repeated in subsequent renewal applications.

<sup>34</sup> HPSCI Majority Memorandum, *Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation*, January 18, 2018, p. 4 ("The Page FISA application also mentions information regarding fellow Trump campaign advisor George Papadopoulos, but there is no evidence of any cooperation or conspiracy between Page and Papadopoulos.")

<sup>35</sup> HPSCI Majority Memorandum, *Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation*, January 18, 2018, p. 2. Neither Isikoff nor Yahoo! are specifically identified in the FISA Materials, in keeping with the FBI's general practice of not identifying U.S. persons.

<sup>36</sup> Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, p. 25; Department of Justice, Foreign Intelligence Surveillance Court Application, January 12, 2017, p. 31; Carter Page, Letter to FBI Director James Comey, September 25, 2016.

9

TOP SECRET//                                          //NOFORN//

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET//                                    /NOFORN



[17] _____

[38] Interview of Andrew McCabe (FBI Deputy Director), House Permanent Select Committee on Intelligence, December 19, 2017, p. 157.

10



~~TOP SECRET//~~ ████████████████ ~~//NOFORN~~ ██████

# (U) Appendix G - Senate Judiciary Memo about Steele Referral

TOP SECRET//NOFORN
(UNCLASSIFIED when separated from attachment)



United States Senate

January 4, 2018

**VIA ELECTRONIC TRANSMISSION**

The Honorable Rod J. Rosenstein
Deputy Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

The Honorable Christopher A. Wray
Director
Federal Bureau of Investigation
935 Pennsylvania Avenue, NW
Washington, DC 20535

Dear Deputy Attorney General Rosenstein and Director Wray:

Attached please find a classified memorandum related to certain communications between Christopher Steele and multiple U.S. news outlets regarding the so-called "Trump dossier" that Mr. Steele compiled on behalf of Fusion GPS for the Clinton Campaign and the Democratic National Committee and also provided to the FBI

Based on the information contained therein, we are respectfully referring Mr. Steele to you for investigation of potential violations of 18 U.S.C. § 1001, for statements the Committee has reason to believe Mr. Steele made regarding his distribution of information contained in the dossier.

Thank you for your prompt attention to this important matter. If you have any questions, please contact Patrick Davis or DeLisa Lay of Chairman Grassley's staff at (202) 224-5225.

Sincerely,

Charles E. Grassley
Chairman
Committee on the Judiciary

Lindsey O. Graham
Chairman
Subcommittee on Crime and Terrorism
Committee on the Judiciary

Enclosure: As stated.

TOP SECRET//NOFORN
(UNCLASSIFIED when separated from attachment)

~~TOP SECRET//~~ ████████████████ ~~//NOFORN~~ █

156

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET//████████████████ //NOFORN █████

Deputy Attorney General Rosenstein and Director Wray
January 4, 2018
Page 2 of 2

cc:    The Honorable Dianne Feinstein
       Ranking Member
       Committee on the Judiciary

       The Honorable Richard Burr
       Chairman
       Senate Select Committee on Intelligence

       The Honorable Mark Warner
       Vice Chairman
       Senate Select Committee on Intelligence

       The Honorable Devin Nunes
       Chairman
       House Permanent Select Committee on Intelligence

       The Honorable Adam Schiff
       Ranking Member
       House Permanent Select Committee on Intelligence

TOP SECRET//████████████████ //NOFORN █████

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET//HCS-O-P/SI-G//ORCON/NOFORN/NOCONTRACT//FISA

**MEMORANDUM**

(U)   FROM:   Charles E. Grassley, Chairman, U.S. Senate Committee on the Judiciary
              Lindsey O. Graham, Chairman, Subcommittee on Crime and Terrorism,
              U.S. Senate Committee on the Judiciary

      TO:     The Honorable Rod J. Rosenstein, Deputy Attorney General, U.S.
              Department of Justice

              The Honorable Christopher A. Wray, Director, Federal Bureau of
              Investigation

      RE:     Referral of Christopher Steele for Potential Violation of 18 U.S.C. § 1001

(U) As you know, former British Intelligence Officer Christopher Steele was hired by the private firm Fusion GPS in June 2016 to gather information about "links between Russia and [then-presidential candidate] Donald Trump."[1] Pursuant to that business arrangement, Mr. Steele prepared a series of documents styled as intelligence reports, some of which were later compiled into a "dossier" and published by *BuzzFeed* in January 2017.[2] On the face of the dossier, it appears that Mr. Steele gathered much of his information from Russian government sources inside Russia.[3] According to the law firm Perkins Coie, Mr. Steele's dossier-related efforts were funded through Fusion GPS by that law firm on behalf of the Democratic National Committee and the Clinton Campaign.[4]

(U) In response to reporting by the *Washington Post* about Mr. Steele's relationship with the FBI relating to this partisan dossier project, the Judiciary Committee began raising a series of questions to the FBI and the Justice Department about these matters as part of the Committee's constitutional oversight responsibilities.[5]

(U) The FBI has since provided the Committee access to classified documents relevant to the FBI's relationship with Mr. Steele and whether the FBI relied on his dossier work. As explained in greater detail below, when information in those classified documents is evaluated in light of sworn statements by Mr. Steele in British litigation, it appears that either Mr. Steele lied to the FBI or the British court, or that the classified documents reviewed by the Committee contain materially false statements.

---

[1] (U) Defence, *Gubarev v. Al v. Orbis Business Intelligence Limited and Christopher Steele*, Claim No. HQ17D00413, Queen's Bench (Apr. 4, 2017), para. 9 [Hereinafter "Steele Statement 1"] [Attachment A].
[2] (U) *Id.* at para. 10; Ken Bensinger, Miriam Elder, and Mark Schoofs, *These Reports Allege Trump Has Deep Ties to Russia*, BUZZFEED (Jan. 10, 2017).
[3] (U) *Id.*
[4] (U) Adam Entous, Devlin Barrett and Rosalind S. Helderman, *Clinton Campaign, DNC Paid for Research that Led to Russia Dossier*, THE WASHINGTON POST (Oct. 24, 2017).
[5] (U) Tom Hamburger and Rosalind S. Helderman, *FBI Once Planned to Pay Former British Spy who Authored Controversial Trump Dossier*, THE WASHINGTON POST (Feb. 28, 2017).

1

TOP SECRET//                                                    //NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

(U) In response to the Committee's inquiries, the Chairman and Ranking Member received a briefing on March 15, 2017, from then-Director James B. Comey, Jr.

That briefing addressed the Russia investigation, the FBI's relationship with Mr. Steele, and the FBI's reliance on Mr. Steele's dossier in two applications it filed for surveillance under the Foreign Intelligence Surveillance Act (FISA). Then, on March 17, 2017, the Chairman and Ranking Member were provided copies of the two relevant FISA applications, which requested authority to conduct surveillance of Carter Page. Both relied heavily on Mr. Steele's dossier claims, and both applications were granted by the Foreign Intelligence Surveillance Court (FISC). In December of 2017, the Chairman, Ranking Member, and Subcommittee Chairman Graham were allowed to review a total of four FISA applications relying on the dossier to seek surveillance of Mr. Carter Page, as well as numerous other FBI documents relating to Mr. Steele.



In the March 2017 briefing with then-Director Comey, he stated that

(U) Similarly, in June 2017, former FBI Director Comey testified publicly before the Senate Select Committee on Intelligence that he had briefed President-Elect Trump on the dossier allegations in January 2017, which Mr. Comey described as "salacious" and "unverified."[6]

When asked at the March 2017 briefing why the FBI relied on the dossier in the FISA applications absent meaningful corroboration—and in light of the highly political motives surrounding its creation—then-Director Comey stated that the FBI included the dossier allegations about Carter Page in the FISA applications because Mr. Steele himself was considered reliable due to his past work with the Bureau.

Indeed, the documents we have reviewed show that the FBI took important investigative steps largely based on Mr. Steele's information—and relying heavily on his credibility. Specifically, on October 21, 2016, the FBI filed its first warrant application under FISA for Carter Page. This initial application relies in part on alleged past Russian attempts to recruit Page years ago. That portion is less than five pages. The bulk of the application consists of allegations against Page that were disclosed to the FBI by Mr. Steele and are also outlined in the Steele dossier. The application appears to contain no additional information corroborating the dossier allegations against Mr. Page, although it does cite to a news article that appears to be sourced to Mr. Steele's dossier as well.

---

[6] (U) Statement of James B. Comey, Jr., Hearing of the U.S. Sen. Select Comm. on Intelligence (June 8, 2017).

2

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

**TOP SECRET/**　　　　　　　　　　　　　　　　**/NOFORN**

The FBI discussed the reliability of this unverified information provided by Mr. Steele in footnotes 8 and 18 of the FISA warrant application. First, the FBI noted to a vaguely limited extent the political origins of the dossier. In footnote 8 the FBI stated that the dossier information was compiled pursuant to the direction of a law firm who had hired an "identified U.S. person"—now known as Glenn Simpson of Fusion GPS—"to conduct research regarding [Trump's] ties to Russia." The FBI further "speculate[d]" that Mr. Simpson "was likely looking for information that could be used to discredit [Trump's] campaign." The application failed to disclose that the identities of Mr. Simpson's ultimate clients were the Clinton campaign and the DNC.

he FBI stated to the FISC that "based on [Steele's] previous reporting history with the FBI, whereby [Steele] provided reliable information to the FBI, the FBI believes [Steele's] reporting to be credible." In short, it appears the FBI relied on admittedly uncorroborated information, funded by and obtained for Secretary Clinton's presidential campaign, in order to conduct surveillance of an associate of the opposing presidential candidate. It did so based on Mr. Steele's personal credibility and presumably having faith in his process of obtaining the information.

(U) But there is substantial evidence suggesting that Mr. Steele materially misled the FBI about a key aspect of his dossier efforts, one which bears on his credibility.

In the October 2016 FISA application, and in each of the three renewals, after relaying Steele's dossier allegations against Carter Page, the FBI states: **"[Steele] told the FBI that he/she only provided this information to the business associate [Fusion GPS] and the FBI."[7]** (emphasis added). Indeed, the FISA renewal application in January 2017 notes that Steele had received ·

Yet the FISA applications note the existence of a news article dated September 23, 2016, which in particular contained some of the same dossier information about Mr. Page compiled by Mr. Steele and on which the FBI relied in its application. While not explicitly stated, this is presumably the article by Michael Isikoff of *Yahoo News*, titled "U.S. Intel Officials Probe Ties Between Trump Adviser and Kremlin." After noting that Mr. Steele had claimed to the FBI he had only provided this information to the FBI and Mr. Simpson, the application attempts to explain away the inconsistency between Mr. Steele's assertion to the FBI and the existence of the article, apparently to shield Mr. Steele's credibility on which it still relied for the renewal request. The application to the FISC said: "Given that the information contained in the September 23rd news article generally matches the information about Page that [Steele] discovered doing his/her research,

The FBI has failed to provide the Committee the 1023s documenting all of Mr. Steele's statements to the FBI, so the Committee is relying on the accuracy of the FBI's representation to the FISC regarding those statements.

3

_The FBI does not believe_ that [Steele] directly provided this information to the press" (emphasis added).

n footnote 9 of its January 2017 application to renew the FISA warrant for Mr. Page, the FBI again addressed Mr. Steele's credibility. At that time, the FBI noted that it had suspended its relationship with Mr. Steele in October 2016 because of Steele's "unauthorized disclosure of information to the press." The FBI relayed that Steele had been bothered by the FBI's notification to Congress in October 2016 about the reopening of the Clinton investigation, and as a result "[Steele] independently and against the prior admonishment from the FBI to speak only with the FBI on this matter, released the reporting discussed herein [dossier allegations against Page] to an identified news organization." However, the FBI continued to cite to Mr. Steele's past work as evidence of his reliability, and stated that "the incident that led to the FBI suspending its relationship with [Mr. Steele] occurred after [Mr. Steele] provided" the FBI with the dossier information described in the application. The FBI further asserted in footnote 19 that it did not believe that Steele directly gave information to _Yahoo News_ that "published the September 23 News Article."

So, as documented in the FISA renewals, the FBI still seemed to believed Mr. Steele's earlier claim that he had only provided the dossier information to the FBI and Fusion— and not to the media—prior to his October media contact that resulted in the FBI suspending the relationship. Accordingly, the FBI still deemed the information he provided prior to the October disclosure to be reliable. After all, the FBI already believed Mr. Steele was reliable, he had previously told the FBI he had not shared the information with the press – and lying to the FBI is a crime. In defending Mr. Steele's credibility to the FISC, the FBI had posited an innocuous explanation for the September 23 article, based on the assumption that Mr. Steele had told the FBI the truth about his press contacts. The FBI then vouched for him twice more, using the same rationale, in subsequent renewal applications filed with the Foreign Intelligence Surveillance Court in April and June 2017.

(U) However, public reports, court filings, and information obtained by the Committee during witness interviews in the course of its ongoing investigation indicate that Mr. Steele not only provided dossier information to the FBI, but also to numerous media organizations **prior to the end of his relationship with the FBI in October 2016.**[5]

(U) In Steele's sworn court filings in litigation in London, he admitted that he "gave off the record briefings to a small number of journalists about the pre-election memoranda [i.e., the dossier] in late summer/autumn 2016."[9] In another sworn filing in that case, Mr. Steele further

---

[5] (U) _See_ Steele Statement 3; Defendants' Response to Claimants' Request for Further Information Pursuant to CPR Part 18, _Gubarev et. Al v. Orbis Business Intelligence Limited and Christopher Steele_, Claim No. HQ17D00413, Queen's Bench (May 18, 2017), [Hereinafter "Steele Statement 2"] [Attachment B]; Tom Hamburger and Rosalind S. Helderman, _FBI Once Planned to Pay Former British Spy who Authored Controversial Trump Dossier_, THE WASHINGTON POST (Feb. 28, 2017); Simpson Transcript, on File with Sen. Comm. on the Judiciary.
[9] (U) Steele Statement 1 at para. 32.

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// ████                                    //NOFORN ██████

stated that journalists from "the New York Times, the Washington Post, Yahoo News, the New Yorker, and CNN" were "briefed at the end of September 2016 *by [Steele]* and Fusion at Fusion's instruction."[10] The filing further states that Mr. Steele "subsequently participated in further meetings at Fusion's instruction with Fusion and the New York Times, the Washington Post, and Yahoo News, which took place mid-October 2016."[11] According to these court filings, "[t]he briefings involved the disclosure of limited intelligence regarding indications of Russian interference in the US election process and the possible co-ordination of members of Trump's campaign team and Russian government officials."[12] In his interview with the Committee, Glenn Simpson of Fusion GPS confirmed this account by Mr. Steele and his company as filed in the British court.[12]

████████ he first of these filings was publicly reported in the U.S. media in April of 2017, yet the FBI did not subsequently disclose to the FISC this evidence suggesting that Mr. Steele had lied to the FBI. Instead the application still relied primarily on his credibility prior to the October media incident.

████████ The FBI received similar information from a Justice Department official, Bruce Ohr, who maintained contacts with Mr. Simpson and Mr. Steele about their dossier work, and whose wife also worked for Fusion GPS on the Russia project. In an interview with the FBI on November 22, 2016, Mr. Ohr stated that Mr. Simpson gave the



He also noted in the same interview that Mr. Steele was "desperate" to see that Mr. Trump was not elected president.[14] None of the information provided by Mr. Ohr in his interviews with the FBI was included in the FISA renewal applications, despite its relevance to whether Mr. Steele had lied to the FBI about his contacts with the media as well as its broader relevance to his credibility and his stated political motive.

---

[10] (U) Steele Statement 2 at para. 18. (emphasis added).
████ d. The filing also apparently described the media contact that resulted in the FBI's suspension of its relationship with Mr. Steele, stating: "In addition, and again at Fusion's instruction, in late October 2016 the Second Defendant briefed a journalist from Mother Jones by Skype."
[12] (U) *Id.*
[13] (U) Simpson Transcript, On File with the Sen. Comm. on the Judiciary at 205-07.
████████ Ohr FD-302 (Nov. 22, 2016).
████████ Ohr FD-302 (Dec. 12, 2016).
████████ Ohr FD-302 (Nov. 22, 2016).

TOP SECRET// ████████                              //NOFORN ████████

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

Whether Mr. Steele lied to the FBI about his media contacts is relevant for at least two reasons. First, it is relevant to his credibility as a source, particularly given the lack of corroboration for his claims, at least at the time they were included in the FISA applications. Second, it is relevant to the reliability of his information-gathering efforts.

(U) Mr. Steele conducted his work for Fusion GPS compiling the "pre-election memoranda" "[b]etween June and early November 2016."[17] In the British litigation, Mr. Steele acknowledged briefing journalists about the dossier memoranda "in late summer/autumn 2016."[18] Unsurprisingly, during the summer of 2016, reports of at least some of the dossier allegations began circulating among reporters and people involved in Russian issues.[19] Mr. Steele also admitted in the British litigation to briefing journalists from the *Washington Post*, *Yahoo News*, the *New Yorker*, and *CNN* in September of 2016.[20] Simply put, the more people who contemporaneously knew that Mr. Steele was compiling his dossier, the more likely it was vulnerable to manipulation. In fact, in the British litigation, which involves a post-election dossier memorandum, Mr. Steele admitted that he received and included in it *unsolicited*—and unverified—allegations.[21] That filing implies that he similarly received unsolicited intelligence on these matters prior to the election as well, stating that Mr. Steele "*continued to receive unsolicited intelligence* on the matters covered by the pre-election memoranda after the US Presidential election."[22]

(U) One memorandum by Mr. Steele that was not published by *Buzzfeed* is dated October 19, 2016. The report alleges a ▮▮▮▮ as well as ▮▮▮▮ ▮▮▮▮ Mr. Steele's memorandum states that his company "received this report from Jon US State Department," that the report was the second in a series, and that the report was information that came from a foreign sub-source who "is in touch with ▮▮▮▮ a contact of ▮▮▮▮ a friend of the Clintons, who passed it to ▮▮▮▮ It is troubling enough that the Clinton Campaign funded Mr. Steele's work, but that these Clinton associates were contemporaneously feeding Mr. Steele allegations raises additional concerns about his credibility.

---

[17] (U) Steele Statement 1 at para. 9.

[18] (U) Steele Statement 1 at para. 32

[19] (U) Ahkmetshin Transcript, On File with the Sen. Comm. on the Judiciary (Mr. Ahkmetshin informed the Committee that he began hearing from journalists about the dossier before it was published, and though it was the summer of 2016).

[20] (U) Steele Statement 2 at para. 18 (emphasis added).

[21] (U) Steele Statement 1 at para. 18 and 20c.

[22] (U) *Id*; *see* Steele Statement 2 at 4 ("Such intelligence was not actively sought, it was merely received.")

6

TOP SECRET// ███████████████                    ██NOFORN█

█████████ ██████████

█████████ fr. Steele then apparently passed this report to the FBI.

█████████ Simply put, Mr. Steele told the FBI he had not shared the Carter Page dossier information beyond his client and the FBI. The Department repeated that claim to the FISC. Yet Mr. Steele acknowledged in sworn filings that he did brief *Yahoo News* and other media organizations about the dossier around the time of the publication of the *Yahoo News* article that seems to be based on the dossier.

(U) On September 23, 2016, *Yahoo News* published its article entitled "U.S. Intel Officials Probe Ties Between Trump Adviser and Kremlin."[23] That article described claims about meetings between Carter Page and Russians, including Igor Sechin. Mr. Sechin is described in the article as "a longtime Putin associate and former Russian deputy prime minister" under sanction by the Treasury Department in response to Russia's actions in the Ukraine.[24] The article attributes the information to "a well-placed Western intelligence source," who reportedly said that "[a]t their alleged meeting, Sechin raised the issue of the lifting of sanctions with Page."[25] This information also appears in multiple "memoranda" that make up the dossier.[26]

(U) In sum, around the same time *Yahoo News* published its article containing dossier information about Carter Page, *Mr. Steele and* Fusion GPS had briefed *Yahoo News* and other news outlets about information contained in the dossier.

█████████ These facts appear to directly contradict the FBI's assertions in its initial application for the Page FISA warrant, as well as subsequent renewal applications. The FBI repeatedly represented to the court that Mr. Steele told the FBI he did *not* have unauthorized contacts with the press about the dossier prior to October 2016. The FISA applications make these claims specifically in the context of the September 2016 *Yahoo News* article. But Mr. Steele has admitted—publicly before a court of law—that he *did* have such contacts with the press at this time, and his former business partner Mr. Simpson has confirmed it to the Committee. Thus, the FISA applications are either materially false in claiming that Mr. Steele said he did not provide dossier information to the press prior to October 2016, or Mr. Steele made materially false statements to the FBI when he claimed he only provided the dossier information to his business partner and the FBI.

█████████ In this case, Mr. Steele's apparent deception seems to have posed significant, material consequences on the FBI's investigative decisions and representations to the court. Mr. Steele's information formed a significant portion of the FBI's warrant application, and the FISA application relied more heavily on Steele's credibility than on any independent verification or corroboration for his claims. Thus the basis for the warrant authorizing surveillance on a U.S. citizen rests largely on Mr. Steele's credibility. The Department of Justice has a responsibility to

---

[23] (U) Michael Isikoff, *U.S. Intel Officials Probe Ties Between Trump Adviser and Kremlin*, YAHOO NEWS (Sept. 23, 2016).
[24] (U) *Id.*
[25] (U) *Id.*
[26] (U) Bensinger et. al, BUZZFEED.

████████████████

7

TOP SECRET// ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ N//NOFORN ▓▓▓▓

determine whether Mr. Steele provided false information to the FBI and whether the FBI's representations to the court were in error.

(U) Accordingly, we are referring Christopher Steele to the Department of Justice for investigation of potential violation(s) of 18 U.S.C. § 1001.

8

TOP SECRET// ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ //NOFORN ▓▓▓▓

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// █████████████████████████ //NOFORN████

UNCLASSIFIED ATTACHMENT A

TOP SECRET// █████████████████████████ //NOFORN████

166

TOP SECRET// ███████████████ /NOFORN █████

IN THE HIGH COURT OF JUSTICE                          Claim No. HQ17000413
QUEEN'S BENCH DIVISION
                                                       – 4 APR 2017
BETWEEN:-
                        (1) ALEKSEJ GUBAREV
                        (2) WEBZILLA B.V.
                        (3) WEBZILLA LIMITED
                        (4) XBT HOLDINGS S.A.
                                                              Claimants

                              -and-

                (1) ORBIS BUSINESS INTELLIGENCE LIMITED
                    (2) CHRISTOPHER STEELE
                                                              Defendants


                              _____

                              **DEFENCE**
                              _____


References in this Defence are to paragraphs in the Particulars of Claim unless otherwise
stated.


Introduction

1. Save that it is admitted that the Second and Third Claimants are hosting
   infrastructure companies based in the Netherlands and Cyprus respectively, no
   admissions are made as to paragraphs 1 and 2.

2. Paragraphs 3-5 are admitted.

3. Orbis was founded in 2009 by the Second Defendant and Christopher Burrows.

4. The Second Defendant and Christopher Burrows were formerly senior and
   experienced Crown servants in the Foreign and Commonwealth Office.

5. Sir Andrew Wood GCMG was the British Ambassador to Moscow between 1995 and
   2000. He is an Associate Fellow of the Russia and Eurasia Programme at the Royal
   Institute for International Affairs at Chatham House. He is also an Associate of Orbis.


                              1


TOP SECRET// ███████████████ /NOFORN █████
PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// NOFORN

6. Fusion GPS ("Fusion") is a consultancy based in Washington DC providing research, strategic intelligence and due diligence services to clients.

7. Prior to the events in issue in this case the Defendants had developed a working relationship with Fusion over a number of years.

8. At all material times Fusion was subject to an obligation not to disclose to third parties confidential intelligence material provided to it by the Defendants in the course of that working relationship without the agreement of the Defendants.

The pre-election memoranda

9. Between June and early November 2016 Orbis was engaged by Fusion to prepare a series of confidential memoranda based on intelligence concerning Russian efforts to influence the US Presidential election process and links between Russia and Donald Trump.

10. The Defendants produced sixteen such memoranda. These will be referred to for convenience as "the pre-election memoranda", having been prepared before the 2016 US Presidential election. The last one was produced in the latter part of October 2016. None were produced in November 2016. None of the pre-election memoranda contained any reference to, or intelligence about, the Claimants.

11. As an Associate of Orbis, Sir Andrew Wood was aware of the Second Defendant's intelligence gathering for the pre-election memoranda.

Senator John McCain

12. Senator John McCain is the Chair of the US Senate Armed Services Committee and a member of the US Senate Committee on Homeland Security and Governmental Affairs.

13. David Kramer is a former US State Department civil servant and was US Assistant Secretary of State for Democracy, Human Rights, and Labor from 2008 to 2009. He is the Senior Director for Human Rights and Human Freedoms at Senator McCain's Institute for International Leadership.

14. After the election of Donald Trump as the 45th President of the United States on 8 November 2016, Sir Andrew Wood met Mr Kramer and Senator McCain. As a result of their discussions Sir Andrew arranged for the Second Defendant to meet Mr Kramer, as the representative of Senator McCain, in order to show him the pre-election memoranda on a confidential basis.

2

TOP SECRET// NOFORN

TOP SECRET// ███████████ //NOFORN ███

15. The meeting between the Second Defendant and Mr Kramer took place on 28 November 2016 in Surrey. Mr Kramer told the Second Defendant that the intelligence he had gathered raised issues of potential national security importance.

16. An arrangement was then made upon Mr Kramer's return to Washington for Fusion to provide Sen. McCain with hard copies of the pre-election memoranda on a confidential basis via Mr Kramer.

17. On behalf of Sen McCain, Mr Kramer requested to be provided with any further intelligence gathered by the Defendants about alleged Russian interference in the US Presidential election.

The confidential December memorandum

18. The Defendants continued to receive unsolicited intelligence on the matters covered by the pre-election memoranda after the US Presidential election and the conclusion of the assignment for Fusion.

19. After receiving some such intelligence the Second Defendant prepared the confidential December memorandum, referred to at paragraph 8.1, on his own initiative on or around 13 December 2016.

20. The Defendants considered, correctly, that the raw intelligence in the December memorandum:

    a. was of considerable importance in relation to alleged Russian interference in the US Presidential election;

    b. had implications for the national security of the US and the UK; and

    c. needed to be analysed and further investigated/verified.

21. Accordingly the Second Defendant provided a copy of the December memorandum to:

    a. A senior UK government national security official acting in his official capacity, on a confidential basis in hard copy form; and

    b. Fusion, by enciphered email with an instruction to Fusion to provide a hard copy to Sen. McCain via Mr Kramer.

Liability for the publication complained of

22. Save that it is admitted that the words complained of and set out therein were contained in the confidential December memorandum, paragraph 8 is denied.

3

TOP SECRET// ███████████ //NOFORN ███

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// NOFORN

23. It is denied that in their natural and ordinary meaning, in their proper context, the words complained of bore or were capable of bearing the meaning pleaded at paragraph 7.

24. Read in context the natural and ordinary meaning of the words complained of was that there were grounds to investigate whether the Claimants had been coerced by Russia into hacking the computers used by the US Democratic Party leadership, transmitting viruses, planting bugs, stealing data and conducting altering operations.

25. Save insofar as it is admitted above paragraph 8.1 is denied.

26. The first sentence of paragraph 8.2 is noted. This is understandable. The contents of the December memorandum were highly sensitive and the Defendants only disseminated copies of it in strict confidence as aforesaid.

27. The remainder of paragraph 8.2 is, in the premises, denied in its entirety.

28. Sub-paragraphs 8.2.1, 8.2.2 and 8.2.4 are admitted.

29. As to sub-paragraph 8.2.3:

    a. In so far as this sub-paragraph refers to the pre-election memoranda:

        i. The first sentence is too vague for the Defendants to plead to in any meaningful way;

        ii. The second sentence is denied;

    b. In so far as it refers to the confidential December memorandum:

        i. The first sentence is again too vague for the Defendants to plead to in any meaningful way. The December memorandum was provided to the recipients identified above so that that the information in it was known to the United States and United Kingdom governments at a high level by persons with responsibility for national security;

        ii. The second sentence is denied.

30. The first sentence of sub-paragraph 8.2.5 is noted. The Defendants did not, however, provide any of the pre-election memoranda to media organizations or journalists. Nor did they authorize anyone to do so. Nor did they provide the confidential December memorandum to media organizations or journalists. Nor did they authorize anyone to do so.

31. The second sentence of sub-paragraph 8.2.5 is denied.

4

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

32. Save that it is admitted that the Second Defendant gave off the record briefings to a small number of journalists about the pre-election memoranda in late summer/autumn 2016, sub-paragraph 8.2.6 is denied.

33. Paragraph 8.3 is admitted but liability for such publication resides with BuzzFeed.

34. No admissions are made as to paragraph 8.4.

35. Paragraph 8.5 is denied. The Defendants are not liable for publication by BuzzFeed.

## Qualified privilege

36. Further or in the alternative, the confidential December memorandum was published by the Defendants, as pleaded at paragraph 21 above, in good faith, on an occasion of qualified privilege.

37. In the circumstances set out above the Defendants were under a duty to pass the information in the December memorandum to the senior UK government national security official and Sen. McCain so that it was known to the United Kingdom and United States governments at a high level by persons with responsibility for national security. These recipients had a corresponding duty or interest to receive it in their capacities as senior representatives of those governments with such responsibilities.

38. The incidental publications to Fusion and Mr Kramer were reasonable as a means of bringing this sensitive document securely to the attention of Sen. McCain.

39. The Defendants did not publish the December memorandum to any of the said recipients with the intention it should be republished to the world at large nor did they ask any of them to republish the December memorandum to others. If any of the recipients did so with the result that it was published to the world at large the Defendants, in the circumstances, retain the protection of qualified privilege.

## Harm

40. In relation to paragraph 9, it is admitted that publication of the words complained of by BuzzFeed (or any subsequent internet republication of those words by third parties) was likely to cause serious harm to the reputation of the First Claimant. Save as aforesaid, paragraph 9 is not admitted. In particular, it is not admitted that the publication of the words complained of by BuzzFeed (or any such subsequent republication) has caused serious financial loss to any of the Claimants or that it is likely to do so in future. The Claimants are required to prove the existence and extent of any past financial loss and/or any likely future financial loss caused by the publication of the words complained of.

5

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

41. Paragraph 10 is noted. It is not admitted that the law of each of the jurisdictions in the European Union in which the words complained of were published was and is, so far as material, the same as the law of England and Wales.

42. In relation to paragraph 11:

    a. Paragraphs 23 and 24 above are repeated and sub-paragraph 11.1 is denied;

    b. Sub-paragraph 11.2 is admitted but it is denied that the Defendants published or caused the publication of the words complained of extremely widely;

    c. Sub-paragraph 11 3 is not admitted;

43. The first sentence of paragraph 12 is not admitted.

44. In relation to the second sentence of paragraph 12, it is denied that the Claimants are entitled to claim damages, whether aggravated or otherwise, against the Defendants as opposed to BuzzFeed.

45. In relation to paragraphs 12.1 and 12.2, it is admitted that the Defendants did not contact the Claimants prior to the publication of the words complained of by BuzzFeed. In light of the matters pleaded above the Defendants had no reason to contact the Claimants in relation to the publication of the December memorandum by BuzzFeed.

46. Paragraph 12.3 is denied. The First, Second and Third Claimants sent a letter before action to the Defendants on 23 January 2017. The Defendants acknowledged receipt of the letter before action through a letter from their former solicitors, Schillings, on 30 January 2017. The Defendants then provided a detailed response to the letter before action four days later on 3 February 2017. The Defendants pointed out that the Claimants' letter before action did not meet the requirements contained in the Pre-Action Protocol for Defamation. In particular the letter before action:

    a. stated that McDermott Will & Emery were instructed by "affiliates" of the Second and Third Defendants, but did not provide the names or any details of those "affiliates". Nor did it state whether McDermott Will & Emery were instructed by the Fourth Claimant;

    b. did not identify the particular publication(s) that were the subject of the prospective claim, contrary to paragraph 3.2 of the Pre-Action Protocol for Defamation;

    c. did not identify the meaning that the First to Third Claimants attributed to the words complained of, contrary to paragraph 3.3 of the Pre-Action Protocol for Defamation.

The Defendants therefore requested the Claimants to provide the necessary information in order to enable the Defendants to provide a full response to the

6

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

proposed claim  Notwithstanding the fact that the Defendants provided a detailed response to the Claimants' letter before action within 11 days of that letter being sent, and notwithstanding the numerous deficiencies in the letter before action, on 3 February 2017 the Claimants issued and served proceedings on the Defendants. In the circumstances, the Claimants' decision to issue proceedings less than two weeks after the letter before action was precipitous, incompatible with the overriding objective in the Civil Procedure Rules, and breached the requirements of the Pre-action Protocol for Defamation.

47. It is denied that the Claimants are entitled to an injunction against the Defendants as pleaded in paragraph 13 of the Particulars of Claim or at all.

**GAVIN MILLAR Q.C.**

**EDWARD CRAVEN**

### STATEMENT OF TRUTH

The Defendants believe that the facts set out in these Particulars of Claim are true.

Signed:

Christopher Steele

Position:   Director, Orbis Business Intelligence Ltd

Date:       03 April 2017

7

THH23475964 v1

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// /NOFORN

UNCLASSIFIED ATTACHMENT B

~~TOP SECRET/~~      ~~/NOFORN~~

IN THE HIGH COURT OF JUSTICE      Claim no. HQ17D00413
QUEEN'S BENCH DIVISION

BETWEEN

(1) ALEKSEJ GUBAREV
(2) WEBZILLA B.V.
(3) WEBZILLA LIMITED
(4) XBT HOLDING S.A

Claimants

and

(1) ORBIS BUSINESS INTELLIGENCE LIMITED
(2) CHRISTOPHER STEELE

Defendants

## DEFENDANTS' RESPONSE TO CLAIMANTS' REQUEST FOR FURTHER
## INFORMATION PURSUANT TO CPR PART 18

### Under paragraphs 7 and 8

Of: "At all material times Fusion was subject to an obligation not to disclose to third parties confidential intelligence material provided to it by the Defendants in the course of that working relationship without the agreement of the Defendants."

### REQUESTS

1. Whether the alleged duty of confidentiality is said to arise by contract or in equity.

2. If by contract, state whether the duty arose under (a) a general contract or retainer, or (b) specific contracts relating to the specific work.

3. In either event state whether any contract(s) relied on were written or oral; if oral, stating when and between whom they were made.

### RESPONSE

The duty arose both by contract and in equity. A written non-disclosure agreement was concluded between the First Defendant and a representative of Fusion in January 2010 in relation to work conducted by Fusion for the First Defendant. Furthermore, Fusion was aware of the confidentiality of intelligence reports through the course of business with the Defendants and, in relation to the disclosure of the memoranda to Mr Kramer, the Second Defendant and Fusion had had specific discussions in which the confidentiality of the memoranda had been emphasised and Fusion was instructed to inform Mr Kramer of their confidentiality.

### REQUEST

- 1 -      RPC

~~TOP SECRET/~~      ~~/NOFORN~~

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

4. State whether the alleged duty not to disclose such intelligence to third parties without the prior agreement of the Defendants in the course of the working relationship extended to disclosure by Fusion to their own clients (ie the clients who had commissioned the intelligence material: see paragraph 5 of the Defence).

**RESPONSE**

In relation to the pre-election memoranda the duty not to disclose intelligence to third parties without the prior agreement of the Defendants did not extend to disclosure by Fusion to its client(s), although the Defendants understand that copies of the memoranda were not disclosed by Fusion to its client(s).

In relation to the December memorandum, this was not prepared pursuant to any contract as stated at paragraph 18 of the Defence. The duty not to disclose this intelligence report to third parties without the prior agreement of the Defendants therefore did extend to disclosure by Fusion to its client(s).

**REQUEST**

5. State whether the Defendants owed any reciprocal duty of confidence to Fusion and/or Fusion's clients in relation to the intelligence they provided.

**RESPONSE**

Since it was not produced pursuant to the engagement with Fusion described at paragraph 9 of the Defence, the Defendants did not owe any obligation of confidence to Fusion and/or Fusion's client(s) in relation to the intelligence contained in the December memorandum.

**REQUEST**

6. State whether Fusion's clients, insofar as disclosure to them was permitted (see Request 4), were under any duty to the Defendants and/or Fusion not to (a) use and/or (b) disclose the intelligence, and, if so, give like particulars as to how that duty is alleged to arise.

**RESPONSE**

The response to question 4 above is repeated. The Defendants understood that the arrangement between Fusion and its client(s) was that intelligence would not be disclosed. As explained above, the December memorandum was not produced pursuant to the engagement referred to at paragraph 9 of the Defence and therefore disclosure of the December memorandum to their client(s) was not permitted.

**Under paragraphs 9 and 10**

Of "*Between June and early November 2016 Orbis was engaged by Fusion to prepare a series of confidential memoranda based on intelligence concerning Russian efforts to influence the US Presidential election process and links between Russia and Donald Trump*".

**REQUEST**

- 2 -                                                    RPC

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// ███████████████████ /NOFORN ███

7. Please identify (see paragraph 6 of the Defence) Fusion's client(s) in relation to this particular engagement.

### RESPONSE

This request is neither reasonably necessary nor proportionate to enable the Claimants to prepare their own case nor to understand the case they have to meet.

Of *"The Defendants produced sixteen such memoranda. These will be referred to for convenience as 'the pre-election memoranda', having been prepared before the 2016 US Presidential election. The last one was produced in the latter part of October 2016. None were produced in November 2016. None of the pre-election memoranda contained any reference to, or intelligence about, the Claimants".*

### REQUEST

8. In view of the assertion that no memoranda were produced in November 2016, please state the nature of the engagement in early November 2016 as referred to in paragraph 9, and whether this engagement was performed and what intelligence it related to.

### RESPONSE

The nature of the Defendants' engagement by Fusion did not change during the period between the preparation of the last pre-election memorandum on 20 October 2016 and the date of the US Presidential election. However since the Defendants did not receive any relevant intelligence concerning Russian efforts to influence the US Presidential election process and links between Russia and Donald Trump during this period, no memoranda were produced pursuant to the engagement after 20 October 2016.

### Under paragraphs 12 and 13

Of *"Senator John McCain is the Chair of the US Senate Armed Services Committee and a member of the Us Senate Committee on Homeland Security and Governmental Affairs"* and *"David Kramer is a former US State Department civil servant and was US Assistant Secretary of State for Democracy, Human Rights, and Labor from 2008 to 2009. He is the Senior Director for Human Rights and Human Freedoms at Senator McCain's Institute for International Leadership".*

### REQUEST

9. Please confirm (as paragraph 29b(i) of the Defence suggests) that Senator McCain and Mr Kramer are alleged (a) to have been acting in those official capacities; and (b) only in relation to those capacities in the course of the matters pleaded in paragraphs 14 to 17 and 21b; and, if not, identify any other capacity in which they were acting and when and for what purpose(s).

### RESPONSE

· 3 ·                                                              RPC

The Defendants believed that Senator McCain and Mr Kramer were acting only in their official capacities and were not informed of any other capacity or purpose in which they were acting. There were no grounds that led the Defendants to suspect that Senator McCain and Mr Kramer were not acting in their official capacities at any time up to and including the publication of the December memorandum to Mr Kramer.

### Under paragraph 14

Of *"As a result of these discussions Sir Andrew arranged for the Second Defendant to meet Mr Kramer, as the representative of Senator McCain, in order to show him the pre-election memoranda on a confidential basis"*.

### REQUEST

10. State what is meant by 'on a confidential basis', indicating precisely what use or uses Senator McCain was/were permitted to make of the pre-election memoranda and whether these uses were specified to Senator McCain and Mr Kramer.

### RESPONSE

The Defendants understood that the contents of the memoranda would be treated in the strictest confidence and would only be used by Senator McCain in his official capacity for the sole purpose of analysing, investigating and verifying their contents to enable such action to be taken as necessary for the purposes of protecting US national security. The Second Defendant expressly informed Mr Kramer that the pre-election memoranda were only to be used for this exclusive purpose before he showed Mr Kramer any of the memoranda. Mr Kramer was not at this time provided with copies of the memoranda that had been prepared as at that date, but was shown copies.

### Under paragraph 18

Of *"The Defendants continued to receive unsolicited intelligence on the matters covered by the pre-election memoranda after the US Presidential election and the conclusion of the assignment for Fusion"*.

### REQUEST

11. Please state whether such intelligence was actively sought by the Second Defendant or merely received (as presently pleaded).

### RESPONSE

Such intelligence was not actively sought; it was merely received.

### Under paragraph 19

- 8 -                                                                          RPC

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

178

Of 'After receiving some such intelligence the Second Defendant prepared the confidential December memorandum, referred to at paragraph 8.1, on his own initiative on or around 13 December 2016'.

### REQUEST

12. Please state whether the words 'on his own initiative' mean that the December memorandum was not (a) created; or (b) provided to Fusion pursuant to any contract. If not, please specify the contract in question.

### RESPONSE

The December memorandum was not created or provided to Fusion pursuant to any contract.

### Under paragraph 20

Of "The Defendants considered, correctly, that the raw intelligence in the December memorandum: a. was of considerable importance in relation to alleged Russian interference in the US Presidential election; b. had implications for the national security of the US and the UK; and c. needed to be analysed and further investigated/verified".

### REQUEST

13. Please state whether the Second Defendant only reached this conclusion on behalf of the First Defendant or whether Christopher Burrows and/or Sir Andrew were party to his assessment.

### RESPONSE

The Defendants' assessment that the pre-election memoranda and any subsequent related intelligence which they received should be disclosed to the individuals referred to at paragraph 21 of the Defence was reached following separate discussions between the Second Defendant and (i) Christopher Burrows of the First Defendant; (ii) Sir Andrew Wood (who had spoken with Senator McCain); (iii) David Kramer (who was acting on behalf of Senator McCain) and (iv) the UK national security official referred to at paragraph 21(b) of the Defence. Mr Burrows shared the Second Defendant's assessment at the relevant time. The Defendants considered that the issues were self-evidently relevant to the national security of the US, UK and their allies and that subsequent intelligence relating to these issues ought to be disclosed to the individuals referred to at paragraph 21 of the Defence. Each of the individuals with whom the Second Defendant discussed the issue shared this view at the time and, to the Second Defendant's knowledge and belief, continue to hold that view.

- 5 -

RFC

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

179

TOP SECRET// ███████████████ /NOFORN ███████

Under paragraph 20c and 21

REQUEST

14. Please state whether the December memorandum was provided to (a) the UK national security official; and/or (b) Fusion; and/or (c) Mr Kramer and Senator McCain with the source of the allegations against the Claimants redacted or not.

RESPONSE

Information pertaining to the status of the source(s) of the intelligence contained within the December memorandum was not redacted when it was provided to either the UK national security official and/or Fusion and/or Mr Kramer and Senator McCain. The information contained within the intelligence reports pertaining to the status of the source(s) was consistent with the Defendants' conscious efforts to protect the identity of the source(s).

REQUEST

15. Please state whether the instruction to Fusion contained any express reference to confidentiality (contrast paragraph 21a which expressly refers to 'on a confidential basis').

RESPONSE

In the Second Defendant's communications with Fusion surrounding the provision of the instruction by enciphered email, it was explicitly stated that the memoranda were only to be provided to Mr Kramer for the purpose of passing them on to Senator McCain. Substantive conversations between the Second Defendant and Fusion relating to this matter were conducted using secure telephone communications. During those secure communications, the Second Defendant expressly emphasised that the December memorandum was subject to the same strict restrictions on disclosure to third parties as were contained in the written agreement described in the response to requests 1 to 3 above.

Under paragraph 21a and b

Of "Accordingly the Second Defendant provided a copy of the December memorandum to: a. a senior UK government national security official acting in his official capacity, on a confidential basis in hard copy form; and b. Fusion, by enciphered email with an instruction to Fusion to provide a hard copy to Sen. McCain via Mr Kramer".

REQUEST

16. Please state whether intelligence provided by the Defendants to Fusion was generally provided in enciphered form.

- 8 -                                                    FPC

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

180

TOP SECRET/ NOFORN

**RESPONSE**

Intelligence provided by the Defendants to Fusion was provided securely and where provided electronically it was provided in enciphered form.

**Under paragraphs 23 and 24**

Of *"It is denied that in their natural and ordinary meaning, in their proper context, the words complained of bore or were capable of bearing the meaning pleaded at paragraph 7"* and *"Read in context the natural and ordinary meaning of the words complained of was that there were grounds to investigate whether the Claimants had been coerced by Russia into hacking the computers used by the US Democratic Party leadership, transmitting viruses, planting bugs, stealing data and conducting altering operations".*

**REQUEST**

17. Please identify the context relied on and the reader(s) to whom it was allegedly known.

**RESPONSE**

The readers referred to are the readers of the December memorandum who accessed and read the words complained of via the article that was published on the BuzzFeed website on 10 January 2017.

The December memorandum was a raw intelligence report which contained information gathered from a confidential source(s) about various national security issues that warranted further investigation.

Further, the words complained of were published by BuzzFeed as part of an article which stressed that the contents of the dossier (which included the December memorandum) were "unverified", "unconfirmed" and contained "unverified, and potentially unverifiable allegations". The article added that, "BuzzFeed News reporters in the US and Europe have been investigating the alleged facts in the dossier but have not verified or falsified them." The article reported that the President-elect's attorney, Michael Cohen, had said that allegations in the dossier "were absolutely false".

In these circumstances, readers of the words complained of were therefore aware that (i) the contents of the December memorandum did not represent (and did not purport to represent) verified facts, but were raw intelligence which had identified a range of allegations that warranted investigation given their potential national security implications; (ii) persons mentioned in the December memorandum were unlikely to have been approached for comment, and therefore many of those persons were likely to deny the allegations contained in the raw intelligence; and (iii) while the December memorandum was prepared in good faith, its content must be critically viewed in light of the purpose for and circumstances in which the information was collected.

- 7 -    RPC

**Under paragraph 32**

Of "Save that it is admitted that the Second Defendant gave off the record briefings to a small number of journalists about the pre-election memoranda in late summer/autumn 2016, sub-paragraph 8.2.6 is denied".

## REQUEST

18. Please identify the journalists briefed by the Second Defendant and state when and how the briefing was done in each case and the gist of what was conveyed.

## RESPONSE

The journalists initially briefed at the end of September 2016 by the Second Defendant and Fusion at Fusion's instruction were from the New York Times, the Washington Post, Yahoo News, the New Yorker and CNN. The Second Defendant subsequently participated in further meetings at Fusion's instruction with Fusion and the New York Times, the Washington Post and Yahoo News, which took place in mid-October 2016. In each of those cases the briefing was conducted verbally in person. In addition, and again at Fusion's instruction, in late October 2016 the Second Defendant briefed a journalist from Mother Jones by Skype. No copies of the pre-election memoranda were ever shown or provided to any journalists by, or with the authorisation of, the Defendants. The briefings involved the disclosure of limited intelligence regarding indications of Russian interference in the US election process and the possible co-ordination of members of Trump's campaign team and Russian government officials.

## REQUEST

19. Please state what is meant by 'off the record' and, in particular whether it means:

(a) The information provided was not to be published (but might be used);

(b) The information might be published but not attributed to the Defendants in any way;

(c) As (b), but the Defendants could be generically described, but not by name.

## RESPONSE

The Second Defendant understood that the information provided might be used for the purpose of further research, but would not be published or attributed. The Defendants repeat that no off the record briefing ever took place concerning the December memorandum, and no copies of any of the pre-election memoranda or the December memorandum were ever provided to journalists by, or with the authorisation of, the Defendants.

## REQUEST

20. Please state whether these terms were agreed to by the journalists concerned.

- 8 -                                                                              RPC

TOP SECRET//            /NOFORN

### RESPONSE

The Second Defendant was told by Fusion that the terms had been explained to the relevant journalists in advance by them and the Second Defendant reinforced the basis on which he was speaking to each of the journalists he met in person. None of the journalists raised any objection.

Under paragraphs 38 to 39

### REQUEST

21. Please state whether the defence of qualified privilege is relied on by the Defendants if they are held to be liable for publication to the world at large as distinct from the admitted publication to the individuals identified by the Defendants in the Defence.

### RESPONSE

Yes.

### STATEMENT OF TRUTH

The Defendants believe that the facts stated in this Response are true.

Signed:

Nicola Cain

Position:     Legal Director, RPC; Defendants' legal representative

Date:       18 May 2017

- 9 -

RPC

TOP SECRET//           /NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

~~TOP SECRET//~~ ~~/NOFORN~~

Claim No. HQ17D00413

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION

BETWEEN

(1) ALEKSEJ GUBAREV

(2) WEBZILLA B.V.

(3) WEBZILLA LIMITED

(4) XBT HOLDING S.A.

Claimants

and

(1) ORBIS BUSINESS INTELLIGENCE
LIMITED

(2) CHRISTOPHER STEELE

Defendants

---

## DEFENDANTS' RESPONSE TO PART 18 REQUEST

---

RPC
Tower Bridge House
St Katharine's Way
London
E1W 1AA
T: 020 3060 6000

Reference. ORB4.1

Solicitors for the Defendants

TRI·5372270·v1

~~TOP SECRET//~~ ~~/NOFORN~~

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET/ ████████████████████ /NOFORN ████

# (U) Appendix H - Committee Correspondence about FISA Abuses

## Appendix H Table of Contents

| | |
|---|---|
| (U) Letter to Acting Deputy Attorney General Dana Boente (March 8, 2017) | 187 |
| (U) Letter from Acting Assistant Attorney General Samuel R. Ramer (March 17, 2017) | 188 |
| (U) Letter to FBI Director James Comey et al. (March 15, 2017) | 189 |
| (U) Letter from FBI Assistant Director Gregory A. Brower (April 4, 2017) | 191 |
| (U) Letter to Attorney General Jeff Sessions (May 9, 2017) | 192 |
| (U) Letter to Acting Attorney General Mary McCord (May 9, 2017) | 194 |
| (U) Letter from Acting Assistant Attorney General Samuel R. Ramer (July 7, 2017) | 196 |
| (U) Letter to FBI Acting Director Andrew McCabe (May 16, 2017) | 197 |
| (U) Letter from Acting Assistant Attorney General Samuel R. Ramer (July 27, 2017) | 199 |
| (U) Letter to Special Counsel Mueller and FBI Acting Director McCabe (May 17, 2017) | 200 |
| (U) Letter from FBI Acting Director Gregory A. Brower (July 26, 2017) | 202 |
| (U) Letter to Attorney General Jeff Sessions (Sept. 1, 2017) | 204 |
| (U) Letter to FBI Director Christopher Wray (Sept. 1, 2017) | 206 |
| (U) Letter to Attorney General Jeff Sessions (Sept. 5, 2017) | 208 |
| (U) Letter to FBI Director Christopher Wray (Sept. 5, 2017) | 209 |
| (U) Letter to Attorney General Sessions and FBI Director Wray (Sept. 15, 2017) | 210 |
| (U) Letter from Deputy Attorney General Rod J. Rosenstein (Sept. 22, 2017) | 212 |
| (U) Letter to Deputy Attorney General Rod Rosenstein (Sept. 26, 2017) | 213 |
| (U) Letter to Deputy Attorney General Rod Rosenstein (Nov. 2, 2017) | 215 |
| (U) Letter to Deputy Attorney General Rod Rosenstein (Dec. 28, 2017) | 216 |
| (U) Letter to Deputy Attorney General Rod Rosenstein (Jan. 4, 2018) | 218 |
| (U) Letter to Former FBI Director James Comey (Nov. 8, 2017) | 220 |
| (U) Letter from Former FBI Director James Comey (Feb. 1, 2018) | 222 |
| (U) Letter to Deputy Attorney General Rod Rosenstein (Dec. 6, 2017) | 223 |

## (U) Appendix H (Cont.)

| | |
|---|---|
| (U) Letter from Assistant Attorney General Stephen E. Boyd (March 14, 2018) | 225 |
| (U) Letter to Deputy Attorney General Rod Rosenstein (Dec. 12, 2017) | 227 |
| (U) Letter from Assistant Attorney General Stephen E. Boyd (Dec. 12, 2017) | 228 |
| (U) Letter from Assistant Attorney General Stephen E. Boyd (Jan. 19, 2018) | 230 |
| (U) Letter to Deputy Attorney General Rosenstein and FBI Director Wray (Jan. 25, 2018) | 233 |
| (U) Letter from FBI Assistant Director Gregory A. Brower (Feb. 2, 2018) | 235 |
| (U) Letter to Assistant Attorney General Stephen E. Boyd (Feb. 16, 2018) | 236 |
| (U) Letter from Assistant Attorney General Stephen E. Boyd (March 7, 2018) | 237 |
| (U) Letter to Former FBI Director James Comey (Feb. 20, 2018) | 238 |
| (U) Letter to FBI Deputy Director Andrew McCabe (Feb. 20, 2018) | 240 |
| (U) Letter to Attorney General Jeff Sessions (March 1, 2018) | 242 |

TOP SECRET// ██████████████ //NOFORN

UNCLASSIFIED

# U.S. HOUSE OF REPRESENTATIVES
PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

March 8, 2017

The Honorable Dana Boente
Acting Deputy Attorney General
United States Department of Justice
950 Pennsylvania Ave, NW
Washington, D.C. 20530

Dear Acting Deputy Attorney General Boente,

The House Permanent Select Committee on Intelligence (the Committee) is aware of recent media reports indicating the possible existence of Foreign Intelligence Surveillance Act (FISA) applications submitted by the Department of Justice (DoJ) in 2016, and/or Foreign Intelligence Surveillance Court (FISC) orders or criminal warrants pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968 that may have authorized the collection of communications and/or information regarding Presidential candidate Donald J. Trump or his associates in 2016.

For the purposes of this letter, "associates" includes any Trump campaign surrogates, advisors, or employees; any Trump Organization surrogates, advisors, or employees; and family, friends, and business associates of Mr. Trump.

Accordingly, the Committee requests the following information, if it exists:

1. Any and all copies of any FISA applications submitted to the FISC by the DoJ in 2016 regarding then Presidential candidate Donald J. Trump or his associates.

2. Any and all copies of any orders issued by the FISC in 2016 regarding then Presidential candidate Donald J. Trump or his associates.

3. Any and all copies of any warrant issued by a Federal Judge or Magistrate pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968 in 2016 regarding then Presidential candidate Donald J. Trump or his associates.

We seek copies of the foregoing documents, if they exist, no later than March 13, 2017.

Sincerely,

Devin Nunes
Chairman

Adam Schiff
Ranking Member

Copy to: The Honorable James Comey, Director, Federal Bureau of Investigation

UNCLASSIFIED

TOP SECRET// ██████████████ //NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES



U.S. Department of Justice

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

March 17, 2017

The Honorable Devin Nunes
Chairman
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC  20515

The Honorable Adam B. Schiff
Ranking Member
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC  20515

Dear Chairman Nunes and Congressman Schiff:

Enclosed please find classified documents responsive to your request, which we are
providing for review only by each of you and for return to us today.  In addition, pursuant to our
agreement, one staff member for each of you, who has the requisite clearances, also may review
the materials. In the event that either of you is not available today to review these materials, you
may designate one staff member with the requisite clearances to review them in your stead.  An
attorney from this office will remain with the documents at all times and return with them to the
Department today.

We hope that this information is helpful.  Please do not hesitate to contact this office if
we may provide additional assistance regarding this or any other matter.

Sincerely,

Samuel R. Ramer
Acting Assistant Attorney General

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET//

John Comes, California Chairman

K. Michael Conaway, Texas
Peter T. King, New York
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Ileana Ros-Lehtinen, Florida
Michael R. Turner, Ohio
Brad R. Wenstrup, Ohio
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Adam B. Schiff, California,
Ranking Member

James A. Himes, Connecticut
Terri A. Sewell, Alabama
André Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

Paul D. Ryan, Speaker of the House
Nancy Pelosi, Democratic Leader

UNCLASSIFIED

# U.S. HOUSE OF REPRESENTATIVES
PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

Damon Nelson
Staff Director

Michael Bahar
Minority Staff Director

March 15, 2017

The Honorable Admiral Michael Rogers
Director, National Security Agency
Fort Meade, MD 20755

The Honorable James Comey
Director, Federal Bureau of Investigation
Washington, D.C. 20535

The Honorable Mike Pompeo
Director, Central Intelligence Agency
Washington, D.C. 20505

Dear Directors Rogers, Comey, and Pompeo:

As you know, the Committee has been very concerned regarding the purported unauthorized disclosures of classified information, particularly when they pertain to intelligence collection on, or related to, U.S. persons (USP). To take a prominent example, a January 12, 2017 article in a major newspaper was the first to claim that "Retired Lt. Gen. Michael T. Flynn, [then President-Elect] Trump's choice for national security adviser . . . . phoned Russian Ambassador Sergey Kislyak several times on Dec. 29."

Such stories would appear to contain the unauthorized disclosure of USP identities. This potential misuse is a key reason why the Intelligence Community (IC) has developed robust "minimization procedures" for the protection of USP information, including requiring the "masking" of USP identities in most circumstances.

However, as recent news stories seem to illustrate, individuals talking to the media would appear to have wantonly disregarded these procedures. The Committee is concerned that USP identifiable information may have been mishandled in violation of approved minimization and dissemination procedures pursuant to statute and/or Executive Order 12333, as amended. Therefore, no later than **Friday, March 17, 2017,** each of your agencies should provide the Committee with the following:

UNCLASSIFIED

TOP SECRET//

TOP SECRET// ███████████████ //NOFORN

UNCLASSIFIED

1. All specific policies and/or procedures each agency employs to make a determination to unmask and disseminate the identity of a USP; specifically, the Committee requests the approval process required to authorize such a dissemination within and outside the agency, including the number of individuals who can approve an unmasking in each agency;

2. The total number of disseminations of any unmasked USP identities between June 2016 and January 2017, if they exist;

3. If they exist, the names of any unmasked USPs whose identities were disseminated in response to requests from IC agencies, law enforcement, or senior Executive Branch officials between June 2016 and January 2017, and that relate to Presidential candidates Donald J. Trump and Hillary Rodham Clinton and their associates in 2016;[1]

4. If they exist, the names of any IC agencies, law enforcement agencies, and/or senior Executive Branch officials that requested and/or authorized the unmasking and dissemination of USP information relating to the specific individuals and entities specified in request #3 above, as well as the titles of all specific recipients of that unmasked USP information; and

5. If it exists, the stated reason, pursuant to the relevant minimization procedures, for unmasking each USP identity relating to request #3 above.

We appreciate your prompt attention to this request. If you have any questions regarding the foregoing, please contact the Committee at (202) 225-4121.

Sincerely,

Devin Nunes
Chairman

Adam B. Schiff
Ranking Member

Copy to:
The Honorable Michael Dempsey, Acting Director of National Intelligence

---

[1] For the purposes of this letter, "associates" include any campaign surrogates, advisors, or employees; any Trump Organization or Clinton Foundation surrogates, advisors, or employees; and family, friends, and business associates of Mr. Trump and Mrs. Clinton.

UNCLASSIFIED

TOP SECRET// ███████████████ //NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES





**U.S. Department of Justice**

Federal Bureau of Investigation

*Washington, D.C. 20535-0001*

April 4, 2017

Honorable Devin Nunes
Chairman
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

Honorable Adam B. Schiff
Ranking Member
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Chairman and Ranking Member:

This responds to your letter dated March 15, 2017 to Admiral Rogers, National Security Agency; Director Pompeo, Central Intelligence Agency; and Director Comey, Federal Bureau of Investigation (FBI), requesting information concerning each agency's policies and procedures relating to the dissemination of U.S. person information.

As we have discussed with your staffs on several occasions, we welcome an opportunity to brief the Committee concerning the FBI's policies and procedures in order to identify information held by the FBI that is of interest to the Committee.

We appreciate your continued support for the FBI and its mission. Please contact this office is we can be of further assistance.

Sincerely,

Gregory A. Brower
Assistant Director
Office of Congressional Affairs

Devin Nunes, California, Chairman

K. Michael Conaway, Texas
Peter T. King, New York
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Ileana Ros-Lehtinen, Florida
Michael R. Turner, Ohio
Brad R. Wenstrup, Ohio
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Adam B. Schiff, California,
Ranking Member

Jim Himes, Connecticut
Terri A. Sewell, Alabama
André Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

Paul D. Ryan, Speaker of the House
Nancy Pelosi, Democratic Leader

UNCLASSIFIED//COMMITTEE SENSITIVE

## U.S. HOUSE OF REPRESENTATIVES
PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

Damon Nelson
Staff Director

Michael Bahar
Minority Staff Director

May 9, 2017

### VIA CERTIFIED U.S. AND ELECTRONIC MAIL

The Honorable Jeff Sessions
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue N.W.
Washington, D.C. 20530

Dear General Sessions:

As part of its bipartisan investigation into Russian active measures directed at the 2016 U.S.
election, the House Permanent Select Committee on Intelligence requests that you produce
certain documents and other materials to the Committee and arrange for your participation in a
voluntary, transcribed interview at the Committee's offices.

First we respectfully ask that you produce to the Committee, by no later than the close of
business on May 22, the following:

> Any documents, records, electronically stored information including e-mail,
> communication, recordings, data and tangible things (including, but not limited to,
> graphs, charts, photographs, images and other documents) regardless of form, other than
> those widely available (e.g., newspaper articles) that reasonably could lead to the
> discovery of any facts within the investigation's publicly-announced parameters.

In complying with this request, we ask that you furnish to the Committee, in unredacted form,
any and all responsive material in your actual or constructive possession, custody, or control or
otherwise available to you, including responsive material possessed by any third party to be
transferred to your possession and shared with the Committee. This request is also made on an
ongoing basis: if after making an initial production to the Committee you find additional
responsive material, you should produce that material to the Committee.

To the extent not encompassed by the above request, this letter also requests preservation of all
documents, records, electronically stored information, recordings, data and tangible things
(including, but not limited to, graphs, charts, photographs, images and other documents)
regardless of form, other than those widely available (e.g., newspaper articles), related to the
Committee's investigation, your interview, and any ancillary matters.

TOP SECRET//  //NOFORN

UNCLASSIFIED//COMMITTEE SENSITIVE

**Should it become necessary to do so, the Committee may supplement the document request contained in this letter at any time.**

Committee staff will work with you to arrange your interview, at a time and date subsequent to your production of documents to the Committee. The interview may cover any topic within the publicly-announced parameters of the Committee's investigation, including Russian cyber activities directed against the 2016 U.S. election, potential links between Russia and individuals associated with political campaigns, the U.S. government's response to these Russian active measures, and related leaks of classified information.

Should you have any questions at any time, please contact Committee staff at (202) 225-4121. If you are represented by an attorney, please forward this letter to your attorney, and have him or her contact the Committee on your behalf.

Sincerely,

K. Michael Conaway
Member of Congress

Adam Schiff
Ranking Member

Attachment: Parameters for Russia Investigation

2

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

193

TOP SECRET// NOFORN

Devin Nunes, California, Chairman

K. Michael Conaway, Texas
Peter T. King, New York
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Ileana Ros-Lehtinen, Florida
Michael R. Turner, Ohio
Brad R. Wenstrup, Ohio
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Adam B. Schiff, California,
Ranking Member

James A. Himes, Connecticut
Terri A. Sewell, Alabama
André Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

Paul D. Ryan, Speaker of the House
Nancy Pelosi, Democratic Leader

UNCLASSIFIED//COMMITTEE SENSITIVE

## U.S. HOUSE OF REPRESENTATIVES
PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC-304, The Capitol
Washington, DC 20515
(202) 225-4121

Damon Nelson
Staff Director

Michael Bahar
Minority Staff Director

May 9, 2017

### VIA CERTIFIED U.S. AND ELECTRONIC MAIL

Ms. Mary McCord
Acting Assistant Attorney General
U.S. Department of Justice
National Security Division
950 Pennsylvania Avenue N.W.
Washington, D.C. 20530

Dear Ms. McCord:

As part of its bipartisan investigation into Russian active measures directed at the 2016 U.S. election, the House Permanent Select Committee on Intelligence requests that you produce certain documents and other materials to the Committee and participate in a voluntary, transcribed interview at the Committee's offices.

First we respectfully ask that you produce to the Committee, by no later than the close of business on May 22, the following:

Any documents, records, electronically stored information including e-mail, communication, recordings, data and tangible things (including, but not limited to, graphs, charts, photographs, images and other documents) regardless of form, other than those widely available (e.g., newspaper articles) that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters.

In complying with this request, we ask that you furnish to the Committee, in unredacted form, any and all responsive material in your actual or constructive possession, custody, or control or otherwise available to you, including responsive material possessed by any third party to be transferred to your possession and shared with the Committee. This request is also made on an ongoing basis: if after making an initial production to the Committee you find additional responsive material, you should produce that material to the Committee.

To the extent not encompassed by the above request, this letter also requests preservation of all documents, records, electronically stored information, recordings, data and tangible things (including, but not limited to, graphs, charts, photographs, images and other documents)

TOP SECRET// NOFORN

TOP SECRET// ██████████████████ //NOFORN

UNCLASSIFIED//COMMITTEE SENSITIVE

regardless of form, other than those widely available (e.g., newspaper articles), related to the Committee's investigation, your interview, and any ancillary matters.

**Should it become necessary to do so, the Committee may supplement the document request contained in this letter at any time.**

Committee staff will work with you to arrange your interview, at a time and date subsequent to your production of documents to the Committee. The interview may cover any topic within the publicly-announced parameters of the Committee's investigation, including Russian cyber activities directed against the 2016 U.S. election, potential links between Russia and individuals associated with political campaigns, the U.S. government's response to these Russian active measures, and related leaks of classified information.

Should you have any questions at any time, please contact Committee staff at (202) 225-4121. If you are represented by an attorney, please forward this letter to your attorney, and have him or her contact the Committee on your behalf.

Sincerely,

K. Michael Conaway
Member of Congress

Adam Schiff
Ranking Member

Attachment: Parameters for Russia Investigation

2

TOP SECRET// ██████████████████ //NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// ▇▇▇▇▇▇▇▇▇▇▇▇▇ /NOFORN/ ▇▇▇▇▇▇



U.S. Department of Justice

Office of Legislative Affairs

Office of the Assistant Attorney General          *Washington, D.C. 20530*

**JUL 0 7 2017**

The Honorable K. Michael Conaway
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

The Honorable Adam Schiff
Ranking Member
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

Dear Congressman Conaway and Congressman Schiff:

This responds to your letters to the Attorney General and to then-Acting Assistant Attorney General Mary McCord of the National Security Division, both dated May 9, 2017, which requested documents in connection with the Committee's investigation into Russian active measures directed at the 2016 U.S. election.

As you know, on May 17, 2017, the Department of Justice (Department) announced the appointment of Robert S. Mueller III to serve as Special Counsel to oversee the previously-confirmed FBI investigation of Russian government efforts to influence the 2016 presidential election and related matters. We are advised that the Special Counsel has begun to take steps to fulfill these responsibilities. Under these circumstances and consistent with the Department's long-standing policy regarding the confidentiality and sensitivity of information relating to pending matters, the Department is not prepared to respond further to your requests at this time.

We appreciate the Committee's interests in this matter and hope that this information is helpful. Please do not hesitate to contact this office if we may provide additional assistance about any other matter.

Sincerely,

Samuel R. Ramer
Acting Assistant Attorney General

TOP SECRET// ▇▇▇▇▇▇▇▇▇▇ /NOFORN/ ▇▇▇▇▇▇

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ /NOFORN

UNCLASSIFIED//COMMITTEE SENSITIVE

# U.S. HOUSE OF REPRESENTATIVES

PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

May 16, 2017

## VIA CERTIFIED U.S. AND ELECTRONIC MAIL

Acting Director Andrew McCabe
FBI Headquarters
935 Pennsylvania Avenue, NW
Washington, D.C. 20535-0001

Dear Acting Director McCabe:

As part of its bipartisan investigation into Russian active measures directed at the 2016 U.S. election, the House Permanent Select Committee on Intelligence requests that you produce certain documents and other materials to the Committee and arrange for your participation in a voluntary, transcribed interview at the Committee's offices.

First we respectfully ask that you produce to the Committee, by no later than the close of business on May 23, the following:

> Any documents, records, electronically stored information including e-mail, communication, recordings, data and tangible things (including, but not limited to, graphs, charts, photographs, images and other documents) regardless of form, other than those widely available (e.g., newspaper articles) that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters.

In complying with this request, we ask that you furnish to the Committee, in unredacted form, any and all responsive material in your actual or constructive possession, custody, or control or otherwise available to you, including responsive material possessed by any third party to be transferred to your possession and shared with the Committee. This request is also made on an ongoing basis: if after making an initial production to the Committee you find additional responsive material, you should produce that material to the Committee.

To the extent not encompassed by the above request, this letter also requests preservation of all documents, records, electronically stored information, recordings, data and tangible things (including, but not limited to, graphs, charts, photographs, images and other documents) regardless of form, other than those widely available (e.g., newspaper articles), related to the Committee's investigation, your interview, and any ancillary matters.

UNCLASSIFIED//COMMITTEE SENSITIVE

Should it become necessary to do so, the Committee may supplement the document request contained in this letter at any time.

Committee staff will work with you to arrange your interview, at a time and date subsequent to your production of documents to the Committee. The interview may cover any topic within the publicly-announced parameters of the Committee's investigation, including Russian cyber activities directed against the 2016 U.S. election, potential links between Russia and individuals associated with political campaigns, the U.S. government's response to these Russian active measures, and related leaks of classified information.

Should you have any questions at any time, please contact Committee staff at (202) 225-4121. If you are represented by an attorney, please forward this letter to your attorney, and have him or her contact the Committee on your behalf.

Sincerely,

K. Michael Conaway
Member of Congress

Adam Schiff
Ranking Member

Attachment: Parameters for Russia Investigation

2

TOP SECRET/                                                         /NOFORN



**U.S. Department of Justice**

Office of Legislative Affairs

---

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

**JUL 2 7 2017**

The Honorable K. Michael Conaway
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

The Honorable Adam Schiff
Ranking Member
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

Dear Congressman Conaway and Congressman Schiff:

This responds to your letter to Federal Bureau of Investigation (FBI) Acting Director Andrew McCabe, dated May 16, 2017, which requested documents in connection with the Committee's investigation into Russian active measures directed at the 2016 U.S. election.

As you know, on May 17, 2017 the Department of Justice (Department) announced the appointment of Robert S. Mueller III to serve as Special Counsel to oversee the previously-confirmed FBI investigation of Russian government efforts to influence the 2016 presidential election and related matters. We are advised that the Special Counsel has begun to take steps to fulfill these responsibilities. Under these circumstances and consistent with the Department's long-standing policy regarding the confidentiality and sensitivity of information relating to pending matters, the Department is not prepared to respond further to your request at this time.

We appreciate the Committee's interests in this matter and hope that this information is helpful. Please do not hesitate to contact this office if we may provide additional assistance about any other matter.

Sincerely,

Samuel R. Ramer
Acting Assistant Attorney General

TOP SECRET/                                                         /NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

199

TOP SECRET// /NOFORN/

DEVIN NUNES, CALIFORNIA CHAIRMAN

K. MICHAEL CONAWAY, Texas
PETER T. KING, New York
FRANK A. LoBIONDO, New Jersey
THOMAS J. ROONEY, Florida
ILEANA ROS-LEHTINEN, Florida
MICHAEL R. TURNER, Ohio
BRAD R. WENSTRUP, Ohio
CHRIS STEWART, Utah
RICK CRAWFORD, Arkansas
TREY GOWDY, South Carolina
ELISE M. STEFANIK, New York
WILL HURD, Texas

ADAM B. SCHIFF, California
Ranking Member

JAMES A. HIMES, Connecticut
TERRI A. SEWELL, Alabama
ANDRE CARSON, Indiana
JACKIE SPEIER, California
MIKE QUIGLEY, Illinois
ERIC SWALWELL, California
JOAQUIN CASTRO, Texas
DENNY HECK, Washington

PAUL D. RYAN, SPEAKER OF THE HOUSE
NANCY PELOSI, DEMOCRATIC LEADER

## U.S. HOUSE OF REPRESENTATIVES
PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

DAMON NELSON
STAFF DIRECTOR

MICHAEL BAHAR
MINORITY STAFF DIRECTOR

May 17, 2017

Mr. Robert Mueller
Special Counsel
U.S. Department of Justice
Washington, D.C. 20530

Mr. Andrew McCabe
Acting Director
Federal Bureau of Investigation
Washington, D.C. 20535

Dear Mr. Mueller and Acting Director McCabe:

Mr. Mueller's appointment as Special Counsel is a necessary and positive development in the Department of Justice's investigation regarding Russia. As part of its own, bipartisan inquiry into Russian active measures, to include counterintelligence concerns, the Committee will be conducting rigorous oversight to ensure that the Department of Justice's work, to include the ongoing counterintelligence investigation regarding Russia by the Federal Bureau of Investigation, is not impeded or interfered with in any way.

Accordingly the Committee requests that the Department of Justice, including the Federal Bureau of Investigation, preserve and produce to the Committee:

(1) copies of all documents, records, electronically stored information including e-mail, communication, recordings, data and tangible things, regardless of form, other than those widely available (e.g., newspaper articles) that reference Mr. Comey's dismissal as FBI Director, and that are potentially relevant to the Bureau's counterintelligence investigation.

(2) all documents memorializing conversations between the President and Mr. Comey regarding his activities as Director, to include all memoranda, notes, or other documents regarding such conversations, that are potentially relevant to the Bureau's counterintelligence investigation.

TOP SECRET// /NOFORN/

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// ████████ //NOFORN

We would appreciate your written reply, and the fulfillment of this request, by no later than the close of business on <u>May 23</u>.

Should you have any questions at any time, please contact Committee staff at (202) 225-4121.

Sincerely,

K. Michael Conaway
Member of Congress

Adam Schiff
Ranking Member

2

TOP SECRET// ████████ //NOFORN

TOP SECRET/                                                              /NOFORN



**U.S. Department of Justice**

Federal Bureau of Investigation

*Washington, D.C. 20535-0001*

July 26, 2017

Honorable K. Michael Conaway
Member of Congress
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

Honorable Adam Schiff
Ranking Member
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

Dear Congressman Conaway and Ranking Member Schiff:

  This is in response to your letter to Acting Director McCabe and Special Counsel Robert Mueller dated May 17, 2017, seeking all documents, records, and data that reference "Mr. Comey's dismissal as FBI Director" that are "potentially relevant to the FBI's counterintelligence investigation" of Russian interference in the 2016 Presidential election.

  As you know, Acting Attorney General Rosenstein announced the appointment of a Special Counsel "to conduct the investigation confirmed by then-FBI Director James B. Comey in testimony before the House Permanent Select Committee on Intelligence on March 20, 2017, including: (i) any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump; and (ii) any matters that arose or may arise directly from the investigation; and (iii) any other matters within the scope of 28 C.F.R. § 600.4(a)." As a result, your request seeks investigative materials related to an ongoing investigation, and, consistent with longstanding Department of Justice policy, we would decline to produce those materials at this time.

  In addition, you requested all documents memorializing communications between the President and then FBI Director Comey. We are advised that the Special Counsel's Office and the Department of Justice have provided the Committee with access to the memoranda and documents of former FBI Director Comey. In light of that accommodation, we believe this request has been addressed.

TOP SECRET/                                                              /NOFORN

TOP SECRET/ ████████████████████████ NOFORN ████

Honorable K. Michael Conaway and Honorable Adam Schiff

Please contact this office if we can be of assistance concerning other matters. We appreciate your continued support for the FBI and its mission.

Sincerely,

Gregory A. Brower
Assistant Director
Office of Congressional Affairs

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET/███████████████████████████/NOFORN

Devin Nunes, California, Chairman

K. Michael Conaway, Texas
Peter T. King, New York
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Dennis M. [illegible], Florida
Michael R. Turner, Ohio
Brad R. Wenstrup, Ohio
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Adam B. Schiff, California,
Ranking Member

Jim Himes, Connecticut
Terri A. Sewell, Alabama
André Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

Paul D. Ryan, Speaker of the House
Nancy Pelosi, Democratic Leader

## U.S. HOUSE OF REPRESENTATIVES
### PERMANENT SELECT COMMITTEE
### ON INTELLIGENCE

HVC-304, The CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

Damon Nelson
Staff Director

Thomas D. Bossert
Minority Staff Director

September 1, 2017

The Honorable Jeff Sessions
Attorney General
United States Department of Justice
950 Pennsylvania Ave, N.W.
Washington, D.C. 20530

Dear Attorney General Sessions:

On August 24, 2017, the House Permanent Select Committee on Intelligence ("Committee") served subpoenas on the Attorney General, in his capacity as head of the Department of Justice ("DOJ"), and the Director of the Federal Bureau of Investigation ("FBI") for production of documents relevant to the Committee's ongoing investigation of Russian interference in the 2016 U.S. presidential election, including allegations of collusion between the Trump campaign and the Russians.

The subpoenas directed DOJ and FBI to produce any and all documents relating to the agencies' relationship with former British Secret Intelligence Service officer Christopher Steele and/or the so-called "Trump Dossier," including those memorializing FBI's relationship with Mr. Steele, any payments made to Mr. Steele, and efforts to corroborate information provided by Mr. Steele and his sub-sources—whether directly or via Fusion GPS. The subpoenas also directed DOJ and FBI to provide copies of any Foreign Intelligence Surveillance Act (FISA) applications submitted to the Foreign Intelligence Surveillance Court (FISC)—whether or not approved by the FISC—incorporating information provided by Mr. Steele, his sub-sources, and/or Fusion GPS.

Resort to compulsory process was necessary because of DOJ's and FBI's insufficient responsiveness to the Committee's numerous Russia-investigation related requests over the past several months. On multiple occasions, through written requests and direct engagements, the Committee has sought but failed to receive responsive testimony or documents from DOJ and FBI. For example, to date the Committee has not received a meaningful response to its May 9, 2017, request to Attorney General Sessions. Additionally, on May 16, 2017, the Committee sent a letter asking then-Acting Director Andrew McCabe to participate in a voluntary interview, and produce relevant documents. The Committee received no reply until May 27—more than two months later—when DOJ declined the interview request and indicated that "the Department is not prepared to respond further to your request at this time."

TOP SECRET/███████████████████████████/NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

Previously, on March 8, the Committee sought from DOJ certain documents, including relevant FISA applications and FISC orders, and on March 17 was allotted two billets to review responsive documents on a read-and-return basis. The Committee was not provided a copy of these documents, and the Committee's request to review them again was denied.

The subpoenas issued on August 24 required production no later than 12:00pm on September 1, 2017. Neither DOJ nor FBI provided any documents by the deadline. On the afternoon of August 31, less than 24 hours before the due date, the Committee received an initial response from the DOJ Office of Legislative Affairs requesting—on behalf of both DOJ and FBI—additional time to comply with the subpoenas.

The Committee requires timely production of the subpoenaed documents in order to execute its oversight responsibilities on behalf of the American public and fully evaluate the actions of both DOJ and the FBI. There is no legitimate basis for DOJ's failure to meaningfully engage the Committee until the eve of the deadline or begin production as a show of good faith.

Moreover, there is no legitimate basis for DOJ's request for additional time to comply, because DOJ and the FBI are well aware of the identity of the requested documents. Indeed, as noted above, at least some of them have already been compiled and made temporarily available for the Committee's review, and the remaining requested documents are readily identifiable.

Notwithstanding these concerns, the Committee hereby grants an additional thirteen (13) days for full compliance and production, to occur no later than 9:00 a.m. on September 14, 2017, at the local specified in the original subpoena. This revised deadline will not be extended.

In the alternative, if all responsive documents are not produced by the revised deadline, the Attorney General and the Director of the FBI shall appear before the Committee at 9:00 am on September 14, 2017, in Room HVC-210 of the U.S. Capitol during an open hearing, to explain under oath DOJ's and FBI's unwillingness or inability to comply in full with the subpoenas issued on August 24.

Please be advised that, in the event that DOJ or FBI fails to provide the documents in full or testimony described above, the Committee expressly reserves its right to proceed with any and all available legal options—including reporting to the full House of Representatives a resolution to hold the Attorney General and Director of the FBI in contempt of Congress, pursuant to 2 U.S.C. §§ 192, 194.

Sincerely,

Devin Nunes

Devin Nunes
Chairman

TOP SECRET//        /NOFORN

Devin Nunes, California, Chairman

K. Michael Conaway, Texas
Peter T. King, New York
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Lynn Westmoreland, Georgia
Michael R. Turner, Ohio
Brad R. Wenstrup, Ohio
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Adam B. Schiff, California,
Ranking Member

James A. Himes, Connecticut
Terri A. Sewell, Alabama
André Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

Paul D. Ryan, Speaker of the House
Nancy Pelosi, Democratic Leader

HVC-304, The Capitol
Washington, DC 20515
(202) 225-4121

Damon Nelson
Staff Director

Timothy S. Bergreen
Minority Staff Director

## U.S. HOUSE OF REPRESENTATIVES
### PERMANENT SELECT COMMITTEE
### ON INTELLIGENCE

September 1, 2017

The Honorable Christopher Wray
Director
Federal Bureau of Investigation
935 Pennsylvania Ave, N.W.
Washington, D.C. 20530

Dear Director Wray:

On August 24, 2017, the House Permanent Select Committee on Intelligence ("Committee") served subpoenas on the Attorney General, in his capacity as head of the Department of Justice ("DOJ"), and the Director of the Federal Bureau of Investigation ("FBI") for production of documents relevant to the Committee's ongoing investigation of Russian interference in the 2016 U.S. presidential election, including allegations of collusion between the Trump campaign and the Russians.

The subpoenas directed DOJ and FBI to produce any and all documents relating to the agencies' relationship with former British Secret Intelligence Service officer Christopher Steele and/or the so-called "Trump Dossier," including those memorializing FBI's relationship with Mr. Steele, any payments made to Mr. Steele, and efforts to corroborate information provided by Mr. Steele and his sub-sources—whether directly or via Fusion GPS. The subpoenas also directed DOJ and FBI to provide copies of any Foreign Intelligence Surveillance Act (FISA) applications submitted to the Foreign Intelligence Surveillance Court (FISC)—whether or not approved by the FISC—incorporating information provided by Mr. Steele, his sub-sources, and/or Fusion GPS.

Resort to compulsory process was necessary because of DOJ's and FBI's insufficient responsiveness to the Committee's numerous Russia-investigation related requests over the past several months. On multiple occasions, through written requests and direct engagements, the Committee has sought but failed to receive responsive testimony or documents from DOJ and FBI. For example, to date the Committee has not received a meaningful response to its May 9, 2017, request to Attorney General Sessions. Additionally, on May 16, 2017, the Committee sent a letter asking then-Acting Director Andrew McCabe to participate in a voluntary interview, and produce relevant documents. The Committee received no reply until May 27—more than two months later—when DOJ declined the interview request and indicated that "the Department is not prepared to respond further to your request at this time."

TOP SECRET//        /NOFORN

TOP SECRET// ███████████████████████ NOFORN

Previously, on March 8, the Committee sought from DOJ certain documents, including relevant FISA applications and FISC orders, and on March 17 was allotted two billets to review responsive documents on a read-and-return basis. The Committee was not provided a copy of these documents, and the Committee's request to review them again was denied.

The subpoenas issued on August 24 required production no later than 12:00pm on September 1, 2017. Neither DOJ nor FBI provided any documents by the deadline. On the afternoon of August 31, less than 24 hours before the due date, the Committee received an initial response from the DOJ Office of Legislative Affairs requesting—on behalf of both DOJ and FBI—additional time to comply with the subpoenas.

The Committee requires timely production of the subpoenaed documents in order to execute its oversight responsibilities on behalf of the American public and fully evaluate the actions of both DOJ and the FBI. There is no legitimate basis for FBI's failure to meaningfully engage the Committee until the eve of the deadline or begin production as a show of good faith.

Moreover, there is no legitimate basis for FBI's request for additional time to comply, because DOJ and the FBI are well aware of the identity of the requested documents. Indeed, as noted above, at least some of them have already been compiled and made temporarily available for the Committee's review, and the remaining requested documents are readily identifiable.

Notwithstanding these concerns, the Committee hereby grants an additional thirteen (13) days for full compliance and production, to occur no later than 9:00 a.m. on September 14, 2017, at the local specified in the original subpoena. This revised deadline will not be extended.

In the alternative, if all responsive documents are not produced by the revised deadline, the Attorney General and the Director of the FBI shall appear before the Committee at 9:00 am on September 14, 2017, in Room HVC-210 of the U.S. Capitol during an open hearing, to explain under oath DOJ's and FBI's unwillingness or inability to comply in full with the subpoenas issued on August 24.

Please be advised that, in the event that DOJ or FBI fails to provide the documents in full or testimony described above, the Committee expressly reserves its right to proceed with any and all available legal options—including reporting to the full House of Representatives a resolution to hold the Attorney General and Director of the FBI in contempt of Congress, pursuant to 2 U.S.C. §§ 192, 194.

Sincerely,

Devin Nunes

Devin Nunes
Chairman

TOP SECRET// ███████████████████████ NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET//

Grith Ruben, California, Chairman

K. Michael Conaway, Texas
Peter T. King, New York
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Ileana Ros-Lehtinen, Florida
Michael R. Turner, Ohio
Brad R. Wenstrup, Ohio
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Adam B. Schiff, California,
Ranking Member

James A. Himes, Connecticut
Terri A. Sewell, Alabama
Andre Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

Paul D. Ryan, Speaker of the House
Nancy Pelosi, Democratic Leader

### U.S. HOUSE OF REPRESENTATIVES
PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

Damon Nelson
Staff Director

Timothy S. Bergreen
Minority Staff Director

September 5, 2017

The Honorable Jeff Sessions
Attorney General
United States Department of Justice
950 Pennsylvania Ave, N.W.
Washington, D.C. 20530

Dear Attorney General Sessions:

As explained in my letter of [September 1, 2017], if the Department of Justice fails to comply in full with the subpoena for production of documents issued by the House Permanent Select Committee on Intelligence (Committee) on August 24, 2017, the Committee requires that Attorney General Jeff Sessions appear before the Committee on September 14, 2017 to explain that failure. The accompanying subpoena, issued today, is intended to ensure compliance with that requirement. Should the Department of Justice comply in full and in a timely manner with the Committee's subpoena of August 24, 2017, then the Attorney General's appearance will not be necessary, and the appearance subpoena dated September 5, 2017, will be withdrawn.

Sincerely,

Devin Nunes
Chairman

TOP SECRET//

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

208



Devin Nunes, California, Chairman

K. Michael Conaway, Texas
Peter T. King, New York
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Ileana Ros-Lehtinen, Florida
Michael R. Turner, Ohio
Brad R. Wenstrup, Ohio
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Adam B. Schiff, California
Ranking Minority Member

James A. Himes, Connecticut
Terri A. Sewell, Alabama
André Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

Paul D. Ryan, Speaker of the House
Nancy Pelosi, Democratic Leader

## U.S. HOUSE OF REPRESENTATIVES
### PERMANENT SELECT COMMITTEE
### ON INTELLIGENCE

HVC-304, The Capitol
Washington, DC 20515
(202) 225-4121

Damon Nelson
Staff Director

Timothy S. Somma
Minority Staff Director

September 5, 2017

The Honorable Christopher Wray
Director
Federal Bureau of Investigation
935 Pennsylvania Ave, N.W.
Washington, D.C. 20530

Dear Director Wray;

As explained in my letter of [September 1, 2017], if the Federal Bureau of Investigation fails to comply in full with the subpoena for production of documents issued by the House Permanent Select Committee on Intelligence (Committee) on August 24, 2017, the Committee requires that Director Christopher Wray appear before the Committee on September 14, 2017 to explain that failure. The accompanying subpoena, issued today, is intended to ensure compliance with that requirement. Should the Federal Bureau of Investigation comply in full and in a timely manner with the Committee's subpoena of August 24, 2017, then the Director's appearance will not be necessary, and the appearance subpoena dated September 5, 2017, will be withdrawn.

Sincerely,

Devin Nunes
Chairman

TOP SECRET/ /NOFORN

DEVIN NUNES, CALIFORNIA, CHAIRMAN

K. MICHAEL CONAWAY, TEXAS
PETER T. KING, NEW YORK
FRANK A. LOBIONDO, NEW JERSEY
THOMAS J. ROONEY, FLORIDA
ILEANA ROS-LEHTINEN, FLORIDA
MICHAEL R. TURNER, OHIO
BRAD R. WENSTRUP, OHIO
CHRIS STEWART, UTAH
RICK CRAWFORD, ARKANSAS
TREY GOWDY, SOUTH CAROLINA
ELISE M. STEFANIK, NEW YORK
WILL HURD, TEXAS

ADAM B. SCHIFF, CALIFORNIA,
RANKING MEMBER

ANDRE A. HITCH, DEPUTY STAFF
JANET A. STOUT, ALABAMA
ANNE E. VINCENT, INDIANA
RICK A. ROWAN, CALIFORNIA
MIKE GALAPO, ILLINOIS
ERIC SWALWELL, CALIFORNIA
JACKIE SPEIER, TEXAS
TERRI SEWELL, VIRGINIA

## U.S. HOUSE OF REPRESENTATIVES
### PERMANENT SELECT COMMITTEE
### ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

DAMON NELSON
STAFF DIRECTOR

TIMOTHY S. BERGREEN
MINORITY STAFF DIRECTOR

PAUL D. RYAN, SPEAKER OF THE HOUSE
NANCY PELOSI, DEMOCRATIC LEADER

September 15, 2017

The Honorable Jeff Sessions
Attorney General
United States Department of Justice
950 Pennsylvania Ave, N.W.
Washington, D.C. 20530

The Honorable Christopher Wray
Director
Federal Bureau of Investigation
935 Pennsylvania Ave, N.W.
Washington, D.C. 20530

Dear Attorney General Sessions and Director Wray:

On September 14, 2017, representatives from the Department of Justice ("DOJ") and Federal Bureau of Investigation ("FBI") informed the Committee that they were not prepared to produce *any* documents responsive to the subpoenas issued on August 24—despite a 13-day extension of the original September 1 deadline that was granted at DOJ's request. I was particularly concerned to learn that, in the past three weeks, efforts to assemble such documents had not advanced beyond a preliminary stage.

As noted in my letter of September 1, the Committee continues to seek any documents regarding the extent of your agencies' relationship with former British Secret Intelligence Service officer Christopher Steele and/or the so-called "Trump Dossier" relevant to the Committee's ongoing investigation of Russian interference in the 2016 U.S. presidential election—including allegations of collusion between the Trump campaign and the Russians. The Committee has also sought any Foreign Intelligence Court Surveillance Act (FISA) applications submitted to the Foreign Intelligence Surveillance Court (FISC) – whether or not approved by the FISC – that may have incorporated any information provided by Mr. Steele and/or Fusion GPS. To date, no documents have been provided.

Unfortunately, DOJ's and FBI's last-minute engagement with the Committee regarding subpoena compliance and failure to produce *any* documents—including those previously made available—fits into a continuing pattern of insufficient responsiveness to written Committee requests dating back over 5 months, including for documents and testimony from Attorney

TOP SECRET/ /NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// NOFORN

General Sessions, FBI Deputy Director Andrew McCabe, and former Acting Assistant Attorney General Mary McCord.

The Committee remains committed to exercising its constitutional oversight responsibilities, and will continue seeking your cooperation with these efforts. DOJ and FBI are therefore granted an extraordinary extension of an additional seven (7) days for production that satisfies the August 24 subpoena, to occur no later than 9:00 a.m. on September 22, 2017. In the alternative, and pursuant to the testimonial subpoenas issued on September 5, the Attorney General and the Director of the FBI shall appear for an open hearing at 9:00 am on September 28, 2017, in Room HVC-210 of the U.S. Capitol, to testify under oath.

In the event of continued noncompliance, the Committee reserves its right to proceed with any and all available legal options—including reporting to the full House of Representatives a resolution to hold the Attorney General and Director of the FBI in contempt of Congress, pursuant to 2 U.S.C. §§ 192, 194.

Sincerely,

Devin Nunes
Chairman

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// ███████ /NOFORN ███



Office of the Deputy Attorney General
Washington, D.C. 20530

September 22, 2017

The Honorable Devin Nunes
Chairman
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

Dear Chairman Nunes:

Our Legislative Affairs Office has been consulting with your staff in an effort to arrange for me to meet with you to discuss the Committee's inquiries. I understand that you have been on foreign travel this week. I will be on foreign travel for the next five days. I therefore request that you extend the deadline stated in your September 15 letter to the Attorney General and the FBI Director, so that we can arrange to address your requests without unduly damaging national security and disrupting any ongoing criminal investigation.

I appreciated our brief telephone conversation last week. I know that you understand that the executive branch's obligation to safeguard intelligence sources and methods and protect the integrity of investigations sometimes warrants accommodation.

This is not a novel issue, and it is not a partisan issue. Law enforcement and national security matters are kept confidential for good reasons.

Wise legislative and executive branch officials have worked together for many decades to defend our nation's long-term interests by protecting the confidentiality of Department of Justice investigations and preserving the Department's independence from the political arena.

I hope that longstanding tradition will continue on our watch.

Thank you for your continuing courtesies.

Sincerely,

Rod J. Rosenstein
Deputy Attorney General

TOP SECRET// ███████ /NOFORN ███

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// [REDACTED] NOFORN [REDACTED]

## U.S. HOUSE OF REPRESENTATIVES
### PERMANENT SELECT COMMITTEE
### ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

September 26, 2017

The Honorable Rod Rosenstein
Deputy Attorney General
United States Department of Justice
950 Pennsylvania Ave, NW
Washington, D.C. 20530-0001

Dear Deputy Attorney General Rosenstein:

Thank you for your letter of September 22, 2017. As you are well aware, the House Permanent Select Committee on Intelligence (the Committee) is uniquely equipped to safeguard intelligence sources and methods. Other executive branch agencies have provided the Committee with the documents necessary to conduct its ongoing investigation into the 2016 presidential election, including highly-classified information of extraordinary sensitivity. The Committee has gone to great lengths to avoid interfering with any ongoing executive branch investigations, and we stand ready to work with you in this regard. I also take this opportunity to underscore that our requests for information are likely to be fewer in number and smaller in scope than the typical questions judges and attorneys would ask in criminal probes.

Furthermore, just as the Department of Justice (DOJ) and Federal Bureau of Investigation (FBI) have constitutional obligations, so too does Congress, which is responsible for overseeing both DOJ and FBI. While the Committee has been very patient over these last six months, that patience is not without limit. To date, meaningful compliance with the Committee's numerous requests has been minimal, and the Committee has not received any documents pursuant to subpoenas issued a month ago for which the deadline has been twice extended. The fact that certain information may be embarrassing or cast DOJ or FBI in a light you prefer to avoid is not sufficient grounds to deny the Committee access to materials relevant to its oversight responsibilities. Nor are there any lawful justifications for such a denial to Congress. This absence of responsiveness from the world's premier law enforcement agency is unacceptable.

For example, on March 17, the Committee was allotted two billets to review documents responsive to a request for Foreign Intelligence Surveillance Act (FISA) applications and Foreign Intelligence Surveillance Court (FISC) orders. The documents were provided on a read-and-return basis, and the Committee's request to review them again was denied. I am particularly frustrated by DOJ's lack of cooperation in providing documents to which the



Committee has already been given access, and additionally have reason to believe that responsive documents were improperly withheld from the March 17 production.

With respect to the pending subpoenas, the repeated last-minute responses by DOJ and FBI to generous deadlines have been wholly inadequate. Given the Congress's obligations to the American people, Congress needs answers. Therefore, I look forward to discussing these matters in person with you on Thursday.

Sincerely,

Devin Nunes
Chairman

Copies to: The Honorable Jeff Sessions, Attorney General
The Honorable Christopher Wray, Director, Federal Bureau of Investigation



COMMITTEE MEMBERS

[member roster — illegible]

## U.S. HOUSE OF REPRESENTATIVES
### PERMANENT SELECT COMMITTEE
### ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

November 2, 2017

Deputy Director Rod Rosenstein
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Deputy Director Rod Rosenstein,

I hereby designate Congressman Trey Gowdy as my proxy for an in camera review of documents made available per the subpoenas issued to Attorney General Sessions and FBI Director Wray dated August 24, 2017. This designation is without prejudice to, and shall not limit or waive the authority of all Members of the House Permanent Select Committee on Intelligence from reviewing the documents at a later date upon request.

It is my request that this review occur by close of business on November 2, 2017.

Best Regards,

Devin Nunes
Chairman

TOP SECRET//███████████████████████/NOFORN████

## U.S. HOUSE OF REPRESENTATIVES
PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

December 28, 2017

The Honorable Rod Rosenstein
Deputy Attorney General
U.S. Department of Justice
1201 Pennsylvania Ave, NW
Washington, D.C. 20004

Dear Mr. Rosenstein:

The House Permanent Select Committee on Intelligence (the Committee) writes in response to the Department of Justice's (DOJ) and the Federal Bureau of Investigation's (FBI) failure to fully produce responsive documents and provide the requested witnesses in compliance with the subpoenas issued over *four months ago*, on August 24, 2017.

Several weeks ago, DOJ informed the Committee that the basic investigatory documents demanded by the subpoenas, FBI Form FD-302 interview summaries, did not exist. However, shortly before my meeting with you in early December, DOJ subsequently located and produced numerous FD-302s pertaining to the Steele dossier, thereby rendering the initial response disingenuous at best. As it turns out, not only did documents exist that were directly responsive to the Committee's subpoenas, but they involved senior DOJ and FBI officials who were swiftly reassigned when their roles in matters under the Committee's investigation were brought to light. Given the content and impact of these supposedly newly-discovered FD-302s, the Committee is no longer able to accept your purported basis for DOJ's blanket refusal to provide responsive FBI Form FD-1023s—documenting meetings between FBI officials and FBI confidential human sources—or anything less than full and complete compliance with its subpoenas.

As a result of the numerous delays and discrepancies that have hampered the process of subpoena compliance, the Committee no longer credits the representations made by DOJ and/or the FBI regarding these matters. Accordingly, DOJ and the FBI are instructed to promptly produce to the Committee—no later than January 3, 2018—ALL outstanding records identified as responsive to the August 24 subpoenas, including but not limited to:

TOP SECRET//███████████████████████/NOFORN████

TOP SECRET// /NOFORN

- All responsive FD-1023s, including all reports that summarize meetings between FBI confidential human sources and FBI officials pertaining to the Steele dossier;
- All responsive FD-302s not previously provided to the Committee; and
- In addition to the FD-302s and FD-1023s, certain responsive analytical and reference documents that were specifically identified and requested by the Committee, and supposedly subject to imminent production, as of December 15.

Should DOJ decide to withhold any responsive records, or portions thereof, from the Committee, it must, consistent with the subpoena instructions, provide a written response, under your signature, detailing the legal justification for failing to comply with valid congressional subpoenas.

Additionally, by the same deadline, please provide—in writing—available dates in January 2018 for interviews with the following officials:

- Former DOJ Associate Deputy Attorney General Bruce Ohr;
- FBI Supervisory Special Agent Peter (SSA) Strzok;
- FBI Attorney James Baker;
- FBI Attorney Lisa Page;
- FBI Attorney Sally Moyer; and
- FBI Assistant Director for Congressional Affairs Greg Brower.

The Committee further reminds you of these other outstanding requests for information:

- Details concerning an apparent April 2017 meeting with the media involving DOJ/FBI personnel, including DOJ Attorney Andrew Weissman (due December 13) and
- The remaining text messages between SSA Strzok and Ms. Page (due December 15).

Unfortunately, DOJ/FBI's intransigence with respect to the August 24 subpoenas is part of a broader pattern of behavior that can no longer be tolerated. As I said in a public statement several weeks ago, when the reason for SSA Strzok's removal from the Special Counsel investigation was leaked to the *Washington Post* before that reason was provided to this Committee, at this point it seems the DOJ and FBI need to be investigating themselves.

I look forward to your timely written response.

Sincerely,

Devin Nunes
Chairman

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES



# U.S. HOUSE OF REPRESENTATIVES
PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

January 4, 2018

The Honorable Rod Rosenstein
Deputy Attorney General
U.S. Department of Justice
1201 Pennsylvania Ave, NW
Washington, D.C. 20004

Dear Mr. Rosenstein:

Pursuant to our phone call yesterday evening, I write to memorialize the agreement we reached regarding compliance with the subpoenas issued by the House Permanent Select Committee on Intelligence (the Committee) on August 24, 2017, to the Department of Justice (DOJ) and Federal Bureau of Investigation (FBI), as well as several other outstanding requests by the Committee for information and interviews. It is my hope that this agreement will provide the Committee with all outstanding documents and witnesses necessary to complete its investigations into matters involving DOJ and FBI.

As agreed, designated Committee investigators and staff will be provided access to all remaining investigative documents, in unredacted form, for review at DOJ on Friday, January 5, 2018. The documents to be reviewed will include all FBI Form FD-1023s and all remaining FBI Form FD-302s responsive to the Committee's August 24, 2017 subpoenas. The only agreed-upon exception pertains to a single FD-302, which, due to national security interests, will be shown separately by Director Wray to myself and my senior investigators during the week of January 8, 2018.

You further confirmed that there are no other extant investigative documents that relate to the Committee's investigations into (a) Russian involvement in the 2016 Presidential election or (b) DOJ/FBI's related actions during this time period. This includes FD-302s, FD-1023s, and any other investigatory documents germane to the Committee's investigations, regardless of form and/or title. If, somehow, "new" or "other" responsive documents are discovered, as discussed, you will notify me immediately and allow my senior investigators to review them shortly thereafter.

With respect to the witness interviews requested by the Committee, you have agreed that all such witnesses – namely, former DOJ Associate Deputy Attorney General Bruce Ohr; FBI Supervisory Special Agent Peter Strzok; former FBI General Counsel James Baker; FBI Attorney Lisa Page; FBI Attorney Sally Moyer; FBI Assistant Director Greg Brower; FBI Assistant Director Bill Priestap; and FBI Special Agent James Rybicki – will be made available for interviews to be conducted in January.

Lastly, as to the remaining approximately 9,500 text messages between FBI Supervisory Special Agent Peter Strzok and his mistress, FBI Attorney Lisa Page, it is my understanding based on your representations that another search is being conducted and all relevant messages will be provided. Accordingly, the Committee requests production of these messages by no later than close of business, Thursday, January 11, 2018. Similarly, I understand that your office is researching records related to the details of an April 2017 meeting between DOJ Attorney Andrew Weissman (now the senior attorney for Special Counsel Robert Mueller) and the media, which will also be provided to this Committee by close of business on Thursday, January 11, 2018.

It was further agreed that all documents made available to the Committee will also be available for review by the minority Ranking Member and designated staff.

The materials we are requesting are vital to the Committee's investigation of potential abuses into intelligence and law enforcement agencies' handling of the Christopher Steele dossier. The Committee is extremely concerned by indications that top U.S. Government officials who were investigating a presidential campaign relied on unverified information that was funded by the opposing political campaign and was based on Russian sources. Going forward, it's crucial that we memorialize our conversations on this issue, and that we're as transparent as possible with the American people, who deserve answers to the questions the Committee is investigating.

The subpoenas issued August 24, 2017, remain in effect.

Sincerely,

Devin Nunes
Chairman

Copies to:
    The Honorable Jeff Sessions, Attorney General
    The Honorable Christopher Wray, Director, Federal Bureau of Investigation

▮▮▮▮▮▮▮▮▮▮▮▮ NOFORN

DEVIN NUNES, CALIFORNIA, CHAIRMAN

K. MICHAEL CONAWAY, TEXAS
PETER T. KING, NEW YORK
FRANK A. LoBIONDO, NEW JERSEY
THOMAS J. ROONEY, FLORIDA
ILEANA ROS-LEHTINEN, FLORIDA
MICHAEL R. TURNER, OHIO
BRADT, WENSTRUP, OHIO
CHRIS STEWART, UTAH
RICK CRAWFORD, ARKANSAS
TREY GOWDY, SOUTH CAROLINA
ELISE M. STEFANIK, NEW YORK
WILL HURD, TEXAS

ADAM B. SCHIFF, CALIFORNIA,
RANKING MEMBER

JAMES A. HIMES, CONNECTICUT
TERRI A. SEWELL, ALABAMA
ANDRE CARSON, INDIANA
JACKIE SPEIER, CALIFORNIA
MIKE QUIGLEY, ILLINOIS
ERIC SWALWELL, CALIFORNIA
JOAQUIN CASTRO, TEXAS
DENNY HECK, WASHINGTON

PAUL D. RYAN, SPEAKER OF THE HOUSE
NANCY PELOSI, DEMOCRATIC LEADER

## U.S. HOUSE OF REPRESENTATIVES
### PERMANENT SELECT COMMITTEE
### ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

DAMON NELSON
STAFF DIRECTOR

TIMOTHY S. BERGREEN
MINORITY STAFF DIRECTOR

November 8, 2017

**VIA U.S. MAIL**

The Honorable James B. Comey

▮▮▮▮▮▮▮▮

Dear Mr. Comey:

Thank you for your testimony before the House Permanent Select Committee on Intelligence on March 20, 2017 and May 4, 2017 in the Committee's bipartisan investigation into Russian active measures directed at the 2016 U.S. election. In light of additional facts learned during the investigation, the Committee requests that you participate in a voluntary, transcribed interview at the Committee's offices.

Committee staff will work with you to arrange your interview for either the week of December 4 or December 11. The interview may cover any topic within the publicly-announced parameters of the Committee's investigation (see attached), including Russian cyber activities directed against the 2016 U.S. election, potential links between Russia and individuals associated with political campaigns, the U.S. government's response to these Russian active measures, and related leaks of classified information.

We respectfully ask that you produce to the Committee, by no later than the close of business on November 24, your availability for the interview during the time identified above.

This letter also requests preservation and production of all documents, records, electronically stored information, recordings, data and tangible things (including, but not limited to, graphs, charts, photographs, images and other documents) regardless of form, other than those widely available (e.g., newspaper articles), related to the Committee's investigation, your interview, and any ancillary matters.

Should you have any questions at any time, please contact Committee staff at (202) 225-4121. If you are represented by an attorney, please forward this letter to your attorney, and have him or her contact the Committee on your behalf.



Sincerely,

K. Michael Conaway
Member of Congress

Adam Schiff
Ranking Member

Attachment: Parameters for Russia Investigation

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES



TOP SECRET//&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608; //NOFORN

February 1, 2018

United States House of Representatives
Permanent Select Committee on Intelligence
ATTN: Nick Ciarlante
HVC-304, U.S. Capitol
Washington, D.C. 20515

Dear Mr. Ciarlante:

I received your January 24, 2018 letter, forwarding a November 8, 2017 letter that was sent to an old mailing address of mine.

I respectfully decline the invitation to a voluntary interview. I am confident you can obtain the best information from current FBI employees. Please give my best to Messrs. Conaway and Schiff. I have fond recollections of our past interactions.

Sincerely yours,

James B. Comey

TOP SECRET//~~NOFORN~~

**U.S. HOUSE OF REPRESENTATIVES**
PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

December 6, 2017

The Honorable Rod Rosenstein
Deputy Attorney General
United States Department of Justice
1201 Pennsylvania Ave, NW
Washington, D.C. 20004

Dear Mr. Rosenstein:

I am writing you as a follow-up to our recent conversation about the persistent problem of unauthorized leaks of information to the media from executive branch agencies.

In February 2017, I wrote a letter to then-Federal Bureau of Investigation (FBI) Director James Comey expressing my concern regarding the "epidemic of unauthorized disclosures to the press", many of which purported to contain classified information, particularly the alleged leak of Lt. Gen. Michael Flynn's name regarding a conversation that he reportedly had with former Russian Ambassador Sergei Kislyak. In May 2017, I wrote another letter to the Intelligence Community Inspector General and you expressing a grave concern about a pending article based on an improper leak. Unfortunately, it is still not clear to the House Permanent Select Committee on Intelligence (HPSCI) whether the Department of Justice (DOJ) is investigating these matters.

In the past several months, numerous additional leaks, some comprising purportedly classified information, have appeared in the press in connection to the ongoing investigation of Russian interaction with the Trump campaign.

I am particularly concerned about the potential role of DOJ personnel in facilitating such leaks. HPSCI has learned that on or about April 11, 2017, at the behest of a current attorney assigned to Special Counsel Robert Mueller III, Andrew Weissmann, then head of DOJ's Criminal Division's Fraud Section, met, along with FBI agents, with a group of reporters from a major media organization to discuss the ongoing Russia investigation. In light of this information, I request that you provide HPSCI with answers to the following questions:

- Did this meeting between DOJ and/or FBI officials and reporters occur?
- If this meeting occurred:

TOP SECRET//~~NOFORN~~

223



- Why was it not briefed to HPSCI or other relevant oversight committees?
- Who from the DOJ and/or FBI approved this meeting?
- Which reporters and representatives from DOJ and/or FBI attended the meeting?
- Did the arranging and conduct of the meeting follow all relevant DOJ and/or FBI protocols?
- At the meeting, did any DOJ and/or FBI officials provide any information to the reporters about the FBI investigation or confirm any information provided by the reporters?
- Did anyone from DOJ and/or FBI file a complaint about this meeting?
- Did any DOJ and/or FBI representatives take notes during the meeting?
- Is this meeting the subject of a IG investigation?

Please provide answers to the Committee no later than 5:00 p.m. on December 13, 2017.

Sincerely,

Devin Nunes
Chairman

Copy to: The Honorable Michael E. Horowitz, Inspector General, U.S. Department of Justice

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES



U.S. Department of Justice

Office of Legislative Affairs

Office of the Assistant Attorney General          Washington, D.C. 20530

MAR 1 4 2018

The Honorable Devin Nunes
Chairman
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

Dear Chairman Nunes:

This responds to your letter to the Deputy Attorney General dated December 6, 2017. Your letter expresses concern about unauthorized disclosures of classified information to the media from executive branch agencies, and notes your particular concern about the potential role of Department of Justice (Department) personnel in facilitating such disclosures. Department policy does not permit confirmation of the existence of ongoing investigations, including investigations of unauthorized disclosures of classified information. However, the Department shares your concerns about unauthorized disclosures of classified information, investigates such disclosures, and prosecutes offenders when appropriate. It certainly would be helpful to any investigation that the Department may be conducting for you to share any information you have about the identity of any individuals in any branch of government who have disclosed classified information to the media or to anyone without a need to know the information. The Department will work with you to receive any such information confidentially at your convenience.

You have also asked whether a meeting occurred among Department personnel and reporters on April 11, 2017 to "discuss the ongoing Russia investigation." The Department is aware of no such meeting at which this was the topic of discussion. On that date, Department officials did meet with reporters from the Associated Press (AP) at the reporters' request. The Department officials included Andrew Weissmann, Chief of the Fraud Section of the Criminal Division; three FBI agents; a Department trial attorney; and an Assistant U.S. Attorney from the Eastern District of Virginia. Four AP reporters attended. An AP reporter contacted Mr. Weissmann to arrange the meeting, and Mr. Weissmann did so.

During the meeting, the AP reporters provided information to the Department that they had learned as a result of their investigation of Paul Manafort. They described activities unrelated to any role Mr. Manafort may have had with the campaign of President Donald J. Trump and focused primarily on his business practices, financial activities, and relationships with foreign individuals or entities. The AP reporters asked questions of the Department officials, who declined to comment on the questions. The Department understands that notes were taken during the meeting. Based on the Department's current understanding, it does not appear that Department officials improperly disclosed any confidential information.

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

The Honorable Devin Nunes
Page Two

The Department has referred to the Inspector General your questions as to whether anyone filed a complaint about the meeting and whether the meeting is the subject of an Inspector General investigation.

Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

*Prima Escalona / for*

Stephen E. Boyd
Assistant Attorney General

cc:     The Honorable Adam B. Schiff
        Ranking Member

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET//~~~~~~~ ~NOFORN~

DEVIN NUNES, CALIFORNIA, CHAIRMAN

K. MICHAEL CONAWAY, TEXAS
PETER T. KING, NEW YORK
FRANK A. LOBIONDO, NEW JERSEY
THOMAS J. ROONEY, FLORIDA
ILEANA ROS-LEHTINEN, FLORIDA
MICHAEL R. TURNER, OHIO
MIKE R. WENSTRUP, OHIO
CHRIS STEWART, UTAH
RICK CRAWFORD, ARKANSAS
TREY GOWDY, SOUTH CAROLINA
ELISE M. STEFANIK, NEW YORK
WILL HURD, TEXAS

ADAM B. SCHIFF, CALIFORNIA
RANKING MEMBER

JAMES A. HIMES, CONNECTICUT
TERRI A. SEWELL, ALABAMA
ANDRE CARSON, INDIANA
JACKIE SPEIER, CALIFORNIA
MIKE QUIGLEY, ILLINOIS
ERIC SWALWELL, CALIFORNIA
JOAQUIN CASTRO, TEXAS
DENNY HECK, WASHINGTON

PAUL D. RYAN, SPEAKER OF THE HOUSE
NANCY PELOSI, DEMOCRATIC LEADER

## U.S. HOUSE OF REPRESENTATIVES

PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

CHIEF OF STAFF
DAMON NELSON

TREVOR S. SHERER
MINORITY STAFF DIRECTOR

December 12, 2017

The Honorable Rod Rosenstein
Deputy Attorney General
U.S. Department of Justice
1201 Pennsylvania Ave, NW
Washington, D.C. 20004

Dear Mr. Rosenstein:

This letter shall serve as the Committee's formal request to the Department of Justice (DOJ) and the Federal Bureau of Investigation (FBI) for copies of all communications (to include text messages, emails, and any other captured communications) between FBI Agent Peter Strzok and FBI Attorney Lisa Page. SSA Strzok and Ms. Page have been identified in media reporting as two senior-level FBI employees who both participated in the FBI's counterintelligence investigations concerning the Hillary Clinton e-mails and the 2016 presidential election.

SSA Strzok was the Deputy Director of the FBI's Counterintelligence Division which oversaw both investigations. Ms. Page is a FBI Office of General Counsel attorney, who at the time, was assigned to Deputy Director Andrew McCabe's office and provided legal support to both investigations. Both SSA Strzok and Ms. Page also worked for Special Counsel Robert Mueller earlier this year before being quietly dismissed upon the discovery of their extramarital affair and the exchange of numerous politically charged messages during the course of both investigations that were allegedly anti-Trump and pro-Clinton.

The Committee previously made a written request for these communications on December 2, 2017, and again on December 6, 2017. I also made a request for the communications during my meeting with you on December 6, 2017. The Committee expects to receive un-redacted copies of all requested communications, and will resort to compulsory process if all such documents are not delivered to the Committee before 9:00 AM, December 15, 2017.

Sincerely,

Devin Nunes
Chairman

TOP SECRET//~~~~~~~ ~N/NOFORN~

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

227



U.S. Department of Justice

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

**DEC 1 2 2017**

The Honorable Devin Nunes
Chairman
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

Dear Chairman Nunes,

This responds to the Committee's request that the Department of Justice (Department) provide the Committee with copies of text message communications between Federal Bureau of Investigation (FBI) employees Peter Strzok and Lisa Page. We are sending letters and identical enclosures to a number of Congressional Committees that have made similar requests.

As you may know, on January 12, 2016, the Department of Justice's Office of Inspector General (OIG) publicly announced that the OIG would review "allegations that Department or FBI policies or procedures were not followed in connection with, or in actions leading up to or related to, the FBI Director's public announcement on July 5, 2016,[1] and the Director's letters to Congress on October 28 and November 6, 2016, and that certain underlying investigative decisions were based on improper considerations.[2]" As part of that review, the OIG obtained, among other things, text messages between Mr. Strzok and Ms. Page.

The Department expected the documents provided herein to be provided as part of a completed OIG report. However, public reporting about the existence of the text messages prompted Congressional Committee requests for the text messages. Please find enclosed an initial disclosure of approximately 375 text message communications, dated August 16, 2015 to December 1, 2016, that have been identified as pertinent to the OIG review referenced above. The enclosed documents contain minimal redactions that protect the privacy interests of third parties and sensitive law enforcement information, and remove irrelevant information. The Department continues to review documents and will provide pertinent documents as they become available.

---

[1] On that date, then-FBI Director James B. Comey announced that the FBI was recommending to the Department of Justice that no charges should be filed relating to former Secretary of State Hillary Clinton's use of a private email server.

[2] DOJ OIG Announces Initiation of Review, January 12, 2017, available at https://oig.justice.gov/press/2017/2017-01-12.pdf

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// /NOFORN/

The Honorable Devin Nunes
Page Two

As has been publicly reported, Mr. Strzok previously served on the investigative team led by Special Counsel Robert Mueller. The OIG informed the Special Counsel of the existence of the enclosed text messages on or about July 27, 2017. Mr. Mueller immediately concluded that Mr. Strzok could no longer participate in the investigation, and he was removed from the team.

This extraordinary accommodation of providing the enclosed documents is unique to the facts and circumstances of this particular matter. The Department appreciates the work of the OIG on this matter, looks forward to the findings and recommendations arising from that review, and will take appropriate action as warranted.

Sincerely,

Stephen E. Boyd
Assistant Attorney General

cc: The Honorable Adam Schiff
Ranking Member

Enclosures

TOP SECRET// /NOFORN/

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET/ NOFORN

Rec: 22 JAN 18



U.S. Department of Justice

Office of Legislative Affairs

---

Office of the Assistant Attorney General          *Washington, D.C. 20530*

The Honorable Devin Nunes
Chairman
Permanent Selection Committee on Intelligence          **JAN 19 2018**
U.S. House of Representatives
Washington, DC 20515

Dear Chairman Nunes:

This responds to your request to the Department of Justice (Department) to provide the Committee with copies of text message communications between Federal Bureau of Investigation (FBI) employees Peter Strzok and Lisa Page.

As you may know, on January 12, 2016, the Department's Office of Inspector General (OIG) publicly announced that the OIG would review "allegations that Department or FBI policies or procedures were not followed in connection with, or in actions leading up to or related to, the FBI Director's public announcement on July 5, 2016,[1] and the Director's letters to Congress on October 28 and November 6, 2016, and that certain underlying investigative decisions were based on improper considerations.[2]" As part of that review, the OIG obtained, among other things, text messages between Mr. Strzok and Ms. Page.

In December 2017, we provided you with an initial production of approximately 375 text message communications, dated August 16, 2015 to December 1, 2016. In response to the requests for the texts messages, the Department collected all text messages between Mr. Strzok and Ms. Page available from the FBI for the period July 1, 2015 to July 28, 2017,[3] which was the same period requested by the OIG. The Department began reviewing those documents in an effort to provide you those messages that were either work-related or that provided any insight into the political views of the participants.

---

[1] On that date, then-FBI Director James B. Comey announced that the FBI was recommending to the Department of Justice that no charges should be filed relating to former Secretary of State Hillary Clinton's use of a private email server.

[2] DOJ OIG Announces Initiation of Review, January 12, 2017, available at: https://oig.justice.gov/press/2017/2017-01-12.pdf

[3] Although the request included texts through July 28, 2017, there were no text messages between Mr. Strzok and Ms. Page after July 1, 2017, and the messages after June 25, 2017, were personal in nature.

TOP SECRET/ NOFORN

The Honorable Devin Nunes
Page Two

The Department is not providing text messages that were purely personal in nature. Furthermore, the Department has redacted from some work-related text messages portions that were purely personal. The Department's aim in withholding purely personal text messages and redacting personal portions of work-related text messages was primarily to facilitate the Committee's access to potentially relevant text messages without having to cull through large quantities of material unrelated to either the investigation of former Secretary of State Hillary Clinton's use of a personal email server or the investigation into Russian efforts to interfere with the 2016 Presidential election. Also, the withholding of personal information in some instances avoids unnecessary embarrassment or harassment to third parties that could result from public release of such information. The Department redacted the names of employees who are not SES-level employees, and in some instances, redacted SES employees' names to avoid unwarranted attention to those individuals when comments were gratuitous and did not provide relevant information to ongoing Congressional inquiries.

In a few instances, the Department has redacted portions of work-related texts that concern other investigations. Finally, the Department consulted with the Special Counsel's Office (SCO) and made some redactions related to the structure, operation, and substance of the SCO investigation because it is ongoing.

To avoid any concern that the Department has withheld relevant information, if a Committee has specific questions about why a particular text was partially redacted or about the nature of personal text messages withheld, the Department will work with that Committee to either further describe or disclose redacted information in a closed setting. Although the original spreadsheet contained only what the Department believed to be work-related text messages, subsequent reviews identified some additional personal text messages within that document. Therefore, the document produced today contains a small number of fully redacted messages that were determined to be personal messages subsequent to their initial inclusion in the previously provided spreadsheet. The enclosed document also excludes columns of information that contained only technical information such as phone numbers or email addresses in an effort to provide a more readily reviewable set of documents. In the attached, the "Inbox" documents are from Mr. Strzok to Ms. Page, and the "Outbox" documents are from Ms. Page to Mr. Strzok.

. The Department wants to bring to your attention that the FBI's technical system for retaining text messages sent and received on FBI mobile devices failed to preserve text messages for Mr. Strzok and Ms. Page from December 14, 2016 to approximately to May 17, 2017. The FBI has informed us that many FBI-provided Samsung 5 mobile devices did not capture or store text messages due to misconfiguration issues related to rollouts, provisioning, and software upgrades that conflicted with the FBI's collection capabilities. The result was that data that should have been automatically collected and retained for long-term storage and retrieval was not collected. This problem should have been corrected with the rollout of the Samsung 7s in 2017.

TOP SECRET// ▮▮▮▮▮▮▮▮ //NOFORN

The Honorable Devin Nunes
Page Three

Mr. Strzok's Samsung 5 phone last connected to the storage system on June 18, 2016. He received his new Samsung 7 phone on or about July 5, 2017. Ms. Page's Samsung 5 phone last connected to the storage system on December 13, 2016. She received her new Samsung 7 phone on or about May 22, 2017.[4]

The Office of Inspector General pieced together the text messages between Mr. Strzok and Ms. Page from June 18, 2016, to December 13, 2016, using the data from Ms. Page's phone until the connection to the storage system stopped on December 13, 2016. On May 17, 2017, Ms. Page's data collection re-initiated when she received her new phone.

Please let this office know if you have any questions regarding this production.

Very truly yours,

Stephen E. Boyd
Assistant Attorney General

cc: The Honorable Adam Schiff
    Ranking Member

---

[4] Although FBI identified May 22, 2017 as the issued date for Ms. Page's phone, collection resumed on May 13, 2017. The FBI has not yet been able to account for this discrepancy.

TOP SECRET// ▮▮▮▮▮▮▮▮ //NOFORN

/NOFORN

## U.S. HOUSE OF REPRESENTATIVES
### PERMANENT SELECT COMMITTEE
### ON INTELLIGENCE

HVC-304, The Capitol
WASHINGTON, DC 20515
(202) 225-4121

January 25, 2018

### VIA ELECTRONIC MAIL

The Honorable Rod J. Rosenstein
Deputy Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

The Honorable Christopher Wray
Director
Federal Bureau of Investigation
935 Pennsylvania Avenue, NW
Washington, D.C. 20535

Dear Messrs. Rosenstein and Wray:

For months, the House Permanent Select Committee on Intelligence has been concerned about the Department's and the Federal Bureau of Investigation's actions in a number of cases. Last weekend's revelations that the Department and the FBI failed to preserve – and today's media reporting that the Department's Inspector General has forensically recovered – approximately five months of text message exchanges between Special Agent Peter Strzok and FBI attorney Lisa Page have only amplified those concerns.

To ensure that any Committee inquiry is as thorough and complete as possible, we respectfully request that the Department and the FBI ensure documents and information related to the following issues are preserved for potential production to the Committee:

- Any communications devices issued to Agent Strzok and Ms. Page;
- Any efforts to retrieve information from Agent Strzok's and Ms. Page's government-issued devices;
- Any data on the Samsung 5 phone issued to Agent Strzok until on or about July 5, 2017;
- Any data on the Samsung 5 phone issued to Ms. Page until on or about May 17, 2017;

UNCLASSIFIED

- Any information about the alleged "misconfiguration issues related to rollouts, provisioning, and software upgrades that conflicted with the FBI's collection capabilities" that caused "many FBI-provided Samsung 5 mobile devices" not to "capture or store text messages"; and[*]

- Any investigation by the Department or the FBI into the circumstances related to the failure to preserve the text messages.

The Department and FBI should interpret "preservation" in the broadest possible manner, including ensuring the discontinuation of any auto-delete or similar functions that erase materials after a certain period of time. This preservation request covers all documents, records, electronically stored information, recordings, data, and tangible things (including, but not limited to, graphs, charts, photographs, images and other documents), regardless of form and medium of storage, from January 1, 2016 – present.

The Committee also requests that you:

1. Exercise reasonable efforts to identify and notify former employees and contractors, subcontractors and consultants wo may have access to such electronic records that they are to be preserved;

2. Exercise reasonable efforts to identify, recover, and preserve any electronic records which have been deleted or marked for deletion but are still recoverable; and

3. If it is the routine practice of any agency employee or contractor to destroy or otherwise alter such electronic records, either halt such practices or arrange for the preservation of complete and accurate duplicates or copies of such records, suitable for production, if requested.

We would appreciate your confirming that all relevant documents and information are being preserved no later than the close of business on **January 29, 2018**.

Should you have any questions at any time, please contact Kash Patel at (202) 225-4121.

Sincerely,

Devin Nunes
Chairman

cc:   Michael Horowitz, Inspector General, U.S. Department of Justice

[*] Letter from Stephen E. Boyd, Assistant Att'y Gen., Office of Legislative to Rep. Devin Nunes, Chairman, U.S. House Permanent Select Committee on Intelligence, Jan. 19, 2018.

UNCLASSIFIED
PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET /NOFORN

U.S. Department of Justice

Federal Bureau of Investigation

Washington, D.C. 20535-0001

February 2, 2018

The Honorable Devin Nunes
Chairman
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

I write in response to your letter dated January 25, 2018, regarding FBI retention and preservation obligations. Your request has been forwarded to the FBI's Office of the General Counsel for appropriate action. Please note, however, that preservation requests related to the FBI-issued mobile devices assigned to Ms. Page and Ms. Strzok during the relevant periods should be directed to the DOJ Office of the Inspector General, as those devices are not in the physical custody of the FBI.

Thank you for your continued support of the FBI.

Sincerely,

Gregory A. Brower
Assistant Director
Office of Congressional Affairs

1 - The Honorable Adam Schiff
Ranking Member
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

TOP SECRET /NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

235

TOP SECRET//    NOFORN

DEVIN NUNES, CALIFORNIA, CHAIRMAN

K. MICHAEL CONAWAY, TEXAS
PETER T. KING, NEW YORK
FRANK A. LoBIONDO, NEW JERSEY
THOMAS J. ROONEY, FLORIDA
ILEANA ROS-LEHTINEN, FLORIDA
MICHAEL R. TURNER, OHIO
BRAD R. WENSTRUP, OHIO
CHRIS STEWART, UTAH
RICK CRAWFORD, ARKANSAS
TREY GOWDY, SOUTH CAROLINA
ELISE M. STEFANIK, NEW YORK
WILL HURD, TEXAS

ADAM B. SCHIFF, CALIFORNIA
RANKING MEMBER

JAMES A. HIMES, CONNECTICUT
TERRI A. SEWELL, ALABAMA
ANDRE CARSON, INDIANA
JACKIE SPEIER, CALIFORNIA
MIKE QUIGLEY, ILLINOIS
ERIC SWALWELL, CALIFORNIA
JOAQUIN CASTRO, TEXAS
DENNY HECK, WASHINGTON

PAUL D. RYAN, SPEAKER OF THE HOUSE
NANCY PELOSI, DEMOCRATIC LEADER

## U.S. HOUSE OF REPRESENTATIVES
### PERMANENT SELECT COMMITTEE
### ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

DAMON NELSON
STAFF DIRECTOR

TIMOTHY S. BERGREEN
MINORITY STAFF DIRECTOR

February 16, 2018

Stephen E. Boyd
Assistant Attorney General
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, D.C. 20530

Dear Mr. Boyd:

On February 7, 2018, I wrote to the Honorable Rosemary M. Collyer, Presiding Judge of the United States Foreign Intelligence Surveillance Court (FISC), requesting that the Court produce transcripts of any relevant FISC hearings associated with the initial FISA application or subsequent renewals related to the electronic surveillance of Carter Page.

In her response to the Committee Judge Collyer wrote, "...you may note that the Department of Justice possesses (or can easily obtain) the same responsive information the Court might possess, and...is better positioned than the Court to respond quickly."

Therefore, in an effort to inform the Committee's ongoing investigation, the Committee seeks the transcripts of any relevant FISC hearings associated with the initial FISA application or subsequent renewals related to electronic surveillance of Carter Page. The Committee respectfully requests that, no later than February 26, 2018, DOJ inform the Committee whether such transcripts exist, and, if so, please provide them.

If you have any questions, please contact Committee staff at (202) 225-4121.

Sincerely,

Devin Nunes
Chairman

Enclosure (1)

lower

TOP SECRET // NOFORN



U.S. Department of Justice

Office of Legislative Affairs

*Office of the Assistant Attorney General*　　　　*Washington, D.C. 20530*

MAR 0 7 2018

The Honorable Devin Nunes
Chairman
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

This responds to your letter dated February 16, 2018, requesting transcripts of any relevant hearings of the Foreign Intelligence Surveillance Court (FISC) associated with the initial FISA application or subsequent renewals related to the electronic surveillance of Carter Page. As is typical in the consideration of warrant applications generally, including applications to the FISC, the FISC considered the applications based upon the written submission, and held no hearings. Accordingly, no responsive transcripts exist. For your reference, we have attached a letter dated July 29, 2013 from FISC Presiding Judge Reggie B. Walton to the Senate Committee on the Judiciary then-Chairman Patrick J. Leahy that outlines the FISC practice when considering FISA applications, which includes consideration of circumstances in which a hearing may be required.

We hope this information is helpful. Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Stephen E. Boyd
Assistant Attorney General

Enclosure

TOP SECRET // NOFORN

TOP SECRET// /NOFORN

Devin Nunes, Executive Counsel

K. Michael Conaway, Texas
Peter T. King, New York
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Ileana Ros-Lehtinen, Florida
Michael R. Turner, Ohio
Brad R. Wenstrup, Ohio
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Mike K. Rene, California
Ranking Member

James A. Himes, Connecticut
Terri A. Sewell, Alabama
André Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

Ted S. Hyatt, Republican Staff Director
Michael Bahar, Democratic Staff Director

## U.S. HOUSE OF REPRESENTATIVES
### PERMANENT SELECT COMMITTEE
### ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

Damon Nelson
Staff Director
Timothy S. Bergreen
Minority Staff Director

February 20, 2018

The Honorable James Comey

Dear Director Comey:

Enclosed please find a series of questions regarding the information contained in the Steele dossier, which was funded by the Democratic National Committee (DNC) and Hillary for America (Clinton campaign) and used in a Foreign Intelligence Surveillance Act (FISA) application targeting Carter Page.

Please provide complete written responses as soon as possible, and no later than Friday, March 2, 2018, to the attention of the Committee's chief clerk, Nick Ciarlante. If you do not provide timely answers on a voluntary basis, the Committee will initiate compulsory process.

Thank you for your prompt attention this matter. If you have any questions, please contact Committee staff at 202-225-4121.

Sincerely,

Devin Nunes
Chairman

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

238

N/NUFORN

1. When and how did you first become aware of any of the information contained in the Steele dossier?

2. In what form(s) was the information in the Steele dossier presented to you? By whom? (Please describe each instance)

3. Who did you share this information with? When? In what form? (Please describe each instance)

4. What official actions did you take as a result of receiving the information contained in the Steele dossier?

5. Did you convene any meetings with the intelligence community and/or law enforcement communities as a result of the information contained in the Steele dossier?

6. When did you first learn or come to believe that the Steele dossier was funded by a Democrat-aligned entity?

7. When did you first learn or come to believe that the Steele dossier was funded by the Democratic National Committee (DNC) and/or Hillary for America (Clinton campaign)?

8. When did you first become aware that the Steele dossier was used to obtain a FISA order on Carter Page?

9. Was President Obama briefed on any information contained in the dossier prior to January 5, 2017?

10. Did you discuss the information contained in the Steele dossier with any reporters or other representatives of the media? If so, who and when?

TOP SECRET //H... //NUFORN

Devin Nunes, California, Chairman

K. Michael Conaway, Texas
Peter T. King, New York
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Ileana Ros-Lehtinen, Florida
Michael R. Turner, Ohio
Brad R. Wenstrup, Ohio
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Adam B. Schiff, California,
Ranking Member

James A. Himes, Connecticut
Terri A. Sewell, Alabama
André Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

Paul D. Ryan, Speaker of the House
Nancy Pelosi, Democratic Leader

## U.S. HOUSE OF REPRESENTATIVES

### PERMANENT SELECT COMMITTEE
### ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

Damon Nelson
Staff Director

Thomas E. Eiserhart
Minority Staff Director

February 20, 2018

Mr. Andrew McCabe
Federal Bureau of Investigation
935 Pennsylvania Ave, NW
Washington, D.C. 20535

Dear Mr. McCabe:

Enclosed please find a series of questions regarding the information contained in the Steele dossier, which was funded by the Democratic National Committee (DNC) and Hillary for America (Clinton campaign) and used in a Foreign Intelligence Surveillance Act (FISA) application targeting Carter Page.

Please provide complete written responses as soon as possible, and no later than Friday, March 2, 2018, to the attention of the Committee's chief clerk, Nick Ciarlante. If you do not provide timely answers on a voluntary basis, the Committee will initiate compulsory process.

Thank you for your prompt attention this matter. If you have any questions, please contact Committee staff at 202-225-4121.

Sincerely,

Devin Nunes
Chairman

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

240

/NOFORN

1. When and how did you first become aware of any of the information contained in the Steele dossier?

2. In what form(s) was the information in the Steele dossier presented to you? By whom? (Please describe each instance)

3. Who did you share this information with? When? In what form? (Please describe each instance)

4. What official actions did you take as a result of receiving the information contained in the Steele dossier?

5. Did you convene any meetings with the intelligence community and/or law enforcement communities as a result of the information contained in the Steele dossier?

6. When did you first learn or come to believe that the Steele dossier was funded by a Democrat-aligned entity?

7. When did you first learn or come to believe that the Steele dossier was funded by the Democratic National Committee (DNC) and/or Hillary for America (Clinton campaign)?

8. When did you first become aware that the Steele dossier was used to obtain a FISA order on Carter Page?

9. Was President Obama briefed on any information contained in the dossier prior to January 5, 2017?

10. Did you discuss the information contained in the Steele dossier with any reporters or other representatives of the media? If so, who and when?

CHRIS MURPH, CALIFORNIA, CHAIRMAN

K. Michael Conaway, Texas
Peter T. King, New York
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Devin Nunes, California
Michael R. Turner, Ohio
Brad R. Wenstrup, Ohio
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Adam B. Schiff, California
Ranking Member

James A. Himes, Connecticut
Terri A. Sewell, Alabama
André Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

Fred W. Fleitz, Staff Director
Michael Bahar, Democratic Director

**U.S. HOUSE OF REPRESENTATIVES**

PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC-304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225-4121

March 1, 2018

The Honorable Jeff Sessions
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Dear Mr. Attorney General:

The Federal Bureau of Investigation (FBI) is charged with protecting the American people and enforcing our laws in accordance with the U.S. Constitution. To carry out this essential mission, the FBI has a strict set of internal rules and procedures embodied in the Domestic Investigations and Operations Guide (DIOG). The DIOG was created by the Bureau itself and approved by the Department of Justice (DOJ).

The latest unredacted version of the DIOG available to the Committee (dated October 15, 2011) delineates procedures the FBI must follow when submitting applications to the Foreign Intelligence Surveillance Court (FISC) for orders to conduct surveillance through the Foreign Intelligence Surveillance Act (FISA). According to the DOIG:

- FISA surveillance is a very intrusive means of acquiring information that must balance the need to obtain sensitive national security information against civil liberties.
- When striking this balance, a verification process must be conducted for all FISA applications.
  - Under the subsection "FISA Verification of Accuracy Procedures," the FBI itself acknowledges this importance: "The accuracy of information contained within FISA applications is of utmost importance.... Only documented and verified information may be used to support FBI applications [FISA] to the court [FISC]."
- The DIOG provides detailed instructions for the FBI to follow to ensure that information appearing in a FISA application that is presented to the FISC has been thoroughly vetted and confirmed.

Former and current DOJ and FBI leadership have confirmed to the Committee that unverified information from the Steele dossier comprised an essential part of the FISA applications related to Carter Page. These details are outlined in a declassified memorandum released by the Committee on February 2, 2018, a copy of which is attached for your review.

TOP SECRET/

In light of what appears to be a clear violation of FBI protocols, the Committee directs that DOJ shall, no later than March 8, 2018, provide answers to the following questions:

- Were these protocols changed after the 2011 version to allow for the use of unverified information to support FBI FISA applications to the FISC?
- If not, what steps has the DOJ and/or the FBI taken to hold accountable those officials who violated these protocols?

I will remind you that aside from the violation of these protocols, the presentation of false and/or unverified information to the FISC in connection with the Carter Page warrant applications could entail violations of the following criminal statutes:

- 18 USC 242
- 50 USC 1809
- Conspiracy
- Obstruction of justice
- Contempt of Court

The FBI DIOG provides internal oversight and controls over authorized FBI activities so the American public can be assured the Bureau is conducting its vital mission in accordance with law and established guidelines. However, in this instance, it's clear that basic operating guidance was violated.

Congressional oversight is designed to hold agencies accountable. I trust that you share this view, and will assist the Committee's investigation into violations of DIOG procedures related to the use of the Steele dossier in FISA applications.

Sincerely,

Devin Nunes
Chairman

Enclosure

cc: Michael Horowitz, Inspector General of the Department of Justice
    The Honorable Christopher Wray, Director, Federal Bureau of Investigation

/NOFORN/

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES