# MINORITY VIEWS

The Minority Members of the House Permanent Select Committee on Intelligence on March 26, 2018 submit the following Minority Views to the Majority-produced "Report on Russian Active Measures, March 22, 2018."

Devin Nunes, California, CHAIRMAN

K. Michael Conaway, Texas
Peter T. King, New York
Frank A. LoBiondo, New Jersey
Thomas J. Rooney, Florida
Ileana Ros-Lehtinen, Florida
Michael R. Turner, Ohio
Brad R. Wenstrup, Ohio
Chris Stewart, Utah
Rick Crawford, Arkansas
Trey Gowdy, South Carolina
Elise M. Stefanik, New York
Will Hurd, Texas

Adam B. Schiff, California,
RANKING MEMBER

James A. Himes, Connecticut
Terri A. Sewell, Alabama
André Carson, Indiana
Jackie Speier, California
Mike Quigley, Illinois
Eric Swalwell, California
Joaquin Castro, Texas
Denny Heck, Washington

Paul D. Ryan, SPEAKER OF THE HOUSE
Nancy Pelosi, DEMOCRATIC LEADER

UNCLASSIFIED
# U.S. HOUSE OF REPRESENTATIVES
PERMANENT SELECT COMMITTEE
ON INTELLIGENCE

HVC–304, THE CAPITOL
WASHINGTON, DC 20515
(202) 225–4121

DAMON NELSON
STAFF DIRECTOR

TIMOTHY S. BERGREEN
MINORITY STAFF DIRECTOR

March 26, 2018

## MINORITY VIEWS

On March 1, 2017, the House Permanent Select Committee on Intelligence (HPSCI) approved a bipartisan "Scope of Investigation" to guide the Committee's inquiry into Russia's interference in the 2016 U.S. election.[1] In announcing these parameters for the House of Representatives' only authorized investigation into Russia's meddling, the Committee's leadership pledged to undertake a thorough, bipartisan, and independent probe.

The Committee explained at the time that it would "conduct interviews, take witness testimony, and review all reporting underlying" the January 6, 2017 Intelligence Community Assessment (ICA) on Russia's covert campaign.[2] Importantly, Chairman Devin Nunes and Ranking Member Adam Schiff promised the American public that the Committee would "seek to ensure […] that allegations of Russian collusion with any U.S. Persons and the leaks of classified information are fully investigated." Chairman Nunes vowed that "on a bipartisan basis, we will fully investigate all the evidence we collect and follow that evidence wherever it leads," a promise echoed by Ranking Member Schiff, who said that the Committee "must follow the facts wherever they may lead, leaving no stone unturned, and that must also include both the Russian hacking and dumping of documents as well as any potential collusion between Russia and U.S. citizens."[3]

One year later, the Committee's Majority has shattered its commitment by rushing to end its investigation prematurely, even as it continues to investigate President Donald Trump's political opponents, our intelligence agencies, law enforcement, and diplomatic corps, and former members of the Administration of President Barack Obama.

In so doing, the Majority has not only failed to meet the mandate given to the HPSCI by the Speaker of the House and the Minority Leader, but they have engaged in a systematic effort to muddy the waters, and to deflect attention away from the President, most recklessly in their assault on the central pillars of the rule of law. Their report, as with their overall conduct of the investigation, is unworthy of this Committee, the House of Representatives, and most importantly, the American people, who are now left to try to discern what is true and what is not.

UNCLASSIFIED

The Majority's report reflects a lack of seriousness and interest in pursuing the truth. By refusing to call in key witnesses, by refusing to request pertinent documents, and by refusing to compel and enforce witness cooperation and answers to key questions, the Majority hobbled the Committee's ability to conduct a credible investigation that could inspire public confidence. The Majority's conduct has also undermined Congress' independent investigative authority. Their repeated deferrals to the White House allowed witnesses to refuse cooperation, and permitted the Administration to dictate the terms of their interaction with Congress, or evade congressional oversight altogether, setting a damaging precedent for future non-cooperation by this President and, possibly, by his successors.

These Views memorialize the Minority's profound disappointment with and objections to the manner in which the Majority subverted this investigation, and highlight for the public some of the most glaring misrepresentations, distortions, and inaccuracies in the Majority's report.

A majority of the report's findings are misleading and unsupported by the facts and the investigative record. They have been crafted to advance a political narrative that exonerates the President, downplays Russia's preference and support for then-candidate Trump, explains away repeated contacts by Trump associates with Russia-aligned actors, and seeks to shift suspicion towards President Trump's political opponents and the prior administration.

One can find no better example of the Majority's willingness to contort facts to support its politicized narrative than the report's *Finding #35*. The Majority argues that evidence that Trump associates sought after the election to establish secret back channels to communicate with the Russians without the U.S. government finding out – and then lied about it – actually proves there was no collusion with Russia. The sophistry of this kind of analysis, and the report as a whole, wither under scrutiny. Even before its public release, the report suffered in the face of public revelations that bear directly on the investigation and contradicted the Majority's conclusions.

Tragically, for a country in need of the truth and an election system in need of greater security, the Majority diverted the investigation in the service of President Trump by launching parallel probes to promote baseless allegations of wrongdoing by the Obama Administration and our law enforcement agencies. The Majority's efforts have cultivated doubt about what occurred during the 2016 elections; cast suspicion on the Federal Bureau of Investigation (FBI) and Department of Justice (DOJ), including the FBI's basis for and handling of its counterintelligence investigation into links between Russia and the Trump campaign; and sought to undercut Special Counsel Robert Mueller's ongoing investigation, including by attempting to tarnish the credibility of numerous current and former officials with knowledge pertinent to the Special Counsel's probe.

Despite these setbacks and the constraints of being in the Minority, the Committee's Democratic Members remain committed to continuing the investigation. We have significantly advanced our understanding of key aspects of the investigation, including Russia's covert activities and the

2
UNCLASSIFIED

issues of collusion and obstruction of justice. We have assembled to date a significant body of evidence from witness interviews, hearings, classified intelligence, and materials produced to the Committee, which has in turn identified new leads, persons, and entities of interest.

Our charge remains clear and unchanged: ensure a full accounting of Russia's meddling, including the involvement by any U.S. persons; inoculate the public against future foreign influence campaigns; and provide a roadmap for securing future elections. These Minority Views are not a substitute for a comprehensive report, which the Minority will present to the American public after completing the necessary investigatory work. Instead, the Minority Views will highlight a small portion of the evidence that has come to our attention, the many important leads which the Majority made a deliberate decision not to pursue, and the reasons to reject the Majority's attempt to explain away conduct by the Trump campaign that was clearly deceptive and unethical, and may very well have violated U.S. laws.

We have drafted our analysis in these Views in unclassified form for the public, which means we have not included crucial, but classified, intelligence reporting, including post-election collection, that has informed our analysis and advanced our understanding of Russia's active measures and links with U.S. persons. Our ultimate report will draw on and weave together this rich corpus of classified and unclassified information.

The Minority has also incorporated into the body of these Views the transcripts of all 64 transcribed interviews conducted by the Committee during the investigation, as well as the Committee's March 22, 2018 business meeting to adopt the Majority's report. Chairman Nunes and Representative Mike Conaway committed to the Minority, and stated publicly on repeated occasions, that the Committee would release all interview transcripts once the Majority issued its report. In the absence of a bipartisan report, and recognizing that the Minority still needs to investigate substantial areas of inquiry before issuing a comprehensive account, publication of these transcripts, pursuant to appropriate declassification review, is a necessary step. Doing so affords the American public the opportunity to evaluate for themselves the Majority's assertions with the benefit of a core component of the underlying investigative record: testimony by key witnesses who have thus far appeared before the Committee. And importantly, the transcripts also make clear how perfunctory an effort the Majority made to get to the truth.

UNCLASSIFIED

## TABLE OF CONTENTS

**I. THE COMMITTEE'S INVESTIGATION AND COUNTER-INVESTIGATION** ............ **7**

    **Investigative Process** ............................................................................................ **8**

    **Progress and Outstanding Lines of Inquiry** ...................................................... **12**

**II. THE MAJORITY'S RUSSIA REPORT FINDINGS** ............................................ **14**

    **Putin's Preference for Trump** ............................................................................ **14**

        January 2017 Intelligence Community Assessment ....................................... 14

        Russia's Social Media Campaign ................................................................. 15

**III. COLLUSION** ........................................................................................................ **19**

    **What We Know** .................................................................................................... **19**

        April 2016 – George Papadopoulos Email Hack Revelations ....................... 19

        May 2016 – National Rifle Association (NRA) Connections ....................... 21

        Cultivation of the Agalarov-Trump Relationship ........................................ 23

        June 9, 2016 – Trump Tower Meeting ........................................................ 24

        Public Disclosure of June 9, 2016 Meeting ................................................. 31

        Weaponization of Hacked Information ......................................................... 32

        July 2016 – Carter Page Travel to Moscow ................................................ 41

        December 2016/January 2017 – Backchannel Meetings with Russia ........... 44

        December 2016 – Attempts to Undermine U.S. Sanctions ........................... 47

        Russian Financial Leverage ......................................................................... 49

    **Investigative Next steps** ..................................................................................... **52**

**IV. THE MAJORITY REPORT'S RECOMMENDATIONS** ................................... **56**

**V. ADDITIONAL MATTERS** ................................................................................... **59**

    **The Obama Administration's Response** ............................................................ **59**

    **Former Director of National Intelligence James Clapper's Testimony** ............ **60**

    **Abuse of Power and Obstruction of Justice** ..................................................... **62**

**VI. TRANSCRIPTS** ................................................................................................... **80**

UNCLASSIFIED

## **APPENDICES**

**Note**: The appendices follow Chapter VI of the Minority Views (Transcripts)


**Appendix A**: "Status of the Russia Investigation," HPSCI Minority, March 13, 2018.

**Appendix B**: Letter to Representative Conaway from Ranking Member Schiff, November 7, 2017.

**Appendix C**: Additional Witnesses Requested by HPSCI Minority During Investigation

**Appendix D**: Ranking Member Schiff Opening Statement, HPSCI Open Hearing on Russia Investigation, March 20, 2017.

**Appendix E:** Ranking Member Schiff Opening Statement, HPSCI Business Meeting on "Adoption of the Committee's Investigative Report into Russian Active Measures During the 2016 Presidential Election," March 22, 2018.

**Appendix F:** HPSCI Minority Memorandum, "Correcting the Record – The Russia Investigations," January 29, 2018. Released publicly on February 24, 2018.

**Appendix G:** HPSCI Exchange of Letters with the White House regarding Memorialization of Communications between President Trump and former FBI Director Comey, June 2017.

**Signatures**                                    **Date:**

Rep. Adam Schiff
Ranking Member

Rep. Eric Swalwell

Rep. Jim Himes

Rep. Joaquin Castro

Rep. Terri Sewell

Rep. Denny Heck

Rep. Andre Carson

Rep. Jackie Speier

Rep. Mike Quigley

UNCLASSIFIED

## I. THE COMMITTEE'S INVESTIGATION AND COUNTER-INVESTIGATION

On March 12, 2018, the Committee Majority announced publicly that it had finished its Russia investigation and previewed several conclusions reached by the Republican Members.[4] The Majority's announcement was made without advance notice to, or consultation with, the Minority, which learned about the decision from press reports. The Majority subsequently scheduled for March 22, 2018 a vote to adopt a report that it drafted unilaterally and in secret. The Minority received a copy of the Majority's report for the first time on March 13, 2018, only to learn that the Majority would continue to make substantive modifications and revisions to its report up until the eve of the vote.

In the ten days between its announcement and the Committee vote on adoption of the report, the Majority faced considerable public criticism after previewing that, contrary to both classified and unclassified evidence, its report would (1) dispute the Intelligence Community's assessment that Russian President Vladimir Putin aspired to help candidate Trump and (2) conclude that the Committee's Republicans have found no evidence of collusion.[5]

In public appearances announcing their results, Majority Members contradicted themselves in trying to explain away evidence of Russia's support for Donald Trump's candidacy and justify how Russian efforts to hurt the Clinton campaign did not simultaneously help Trump. As explained in Chapter II, the Majority revised this core finding prior to the vote to make it less explicit in the body of the report. President Trump nonetheless quickly endorsed the Committee Majority's exculpatory conclusion in tweets on March 12 and March 17, 2018.[6] On March 23, 2018, the day after the Majority's March 22, 2018 vote to adopt the report, the President touted their findings again:

> *"House Intelligence Committee votes to release final report. FINDINGS: (1) No evidence provided of Collusion between Trump Campaign & Russia. (2) The Obama Administrations Post election response was insufficient. (3) Clapper provided inconsistent testimony on media contacts."[7]*

The Kremlin's propaganda channels, RT and Sputnik, also favorably reported the Majority's conclusions.[8]

At the same time the Majority announced that its Russia probe had gone on too long and would be shut down, the Chairman also stated that its side or counter-investigations would be "still ongoing" and would likely expand after the ostensible end of its Russia investigation.[9] Since the inception of the Committee's Russia investigation in March 2017, the Majority has initiated unilateral counter-investigations into fringe and debunked allegations of: improper "unmasking" by Obama Administration officials; Foreign Intelligence Surveillance Act (FISA) "abuses" by the FBI and DOJ in the course of their counterintelligence investigation of Russia and links to Trump campaign associates; a Hillary Clinton-tied conspiracy to procure and disseminate the "dossier" compiled by Christopher Steele; and improprieties related to Clinton during the

UNCLASSIFIED

Committee on Foreign Investment in the United States' (CFIUS) 2010 review of uranium mining company Uranium One's sale to a subsidiary of Rosatom, Russia's Atomic Energy Agency. The Majority has recently indicated that it is also investigating the State Department for links to Steele.

### Investigative Process

The rushed manner in which the Majority has sought to end its investigation of Russia's actions, and adopt, along party lines, its flawed and partisan report, is a fitting capstone to the Majority's conduct during the Russia investigation.

As the Committee's Majority, the Republican Members, led by Chairman Nunes, held the power to dictate the pace and terms for our investigation, including which witnesses to call in and when; which documents to request; whether to issue subpoenas; and, when necessary, whether to enforce Congress' power to compel testimony and production of documents. Regrettably, following a brief spell of bipartisanship after the Chairman announced on April 6, 2017 that other Majority Members would "temporarily take charge of the Committee's Russia investigation" due to a House Ethics Committee investigation into his actions, the Majority wielded their power to stymie the investigation.[10]

The Majority circumscribed severely, and at times affirmatively blocked, important aspects of our work. Most distressing, they exhibited a fundamental disinterest in pursuing core lines of inquiry authorized by the Committee's Scope of Investigation. Their report reflects this lack of investigative vigor.

On March 13, 2018, the Committee Minority released an update – "Status of the Russian Investigation" – to inform the American public of the Committee's outstanding areas of inquiry (see Appendix A).[11] This status update provides a snapshot of the investigative leads and steps left unaddressed as the Majority moved to shutter the investigation. These include more than 30 key witnesses yet to be interviewed (selected from a more extensive witness list, which is attached at Appendix C); more than 20 entities from which documents have yet to be requested; and more than 15 subpoenas that the Majority never issued or enforced. This followed a November 7, 2017 letter from Ranking Member Schiff to Representative Conaway, attached at Appendix B, in which the Minority outlined over 60 individuals and entities from which the Committee should request or compel cooperation. The Committee subsequently interviewed fewer than half the individuals on the list, many of whom provided incomplete or potentially misleading testimony, and did not request the specified documents.

As the Minority's investigative updates demonstrate, the Majority consistently short-circuited investigative best practices and refused to hear relevant testimony and seek pertinent records. Beginning in the summer of 2017, and accelerating in the fall, the Majority placed increasingly counterproductive restrictions on the investigation:

UNCLASSIFIED

- **Witnesses:** The Majority refused to seek testimony from dozens of witnesses proposed by the Minority, as described above. The Majority also failed to call in a significant number of current and former U.S. government officials, as well as outside experts, who could have shed light on Russia's active measures campaign, the U.S. government's response under the Obama and Trump administrations, and policy and legislative recommendations to protect the United States and our elections infrastructure moving forward. This includes numerous Intelligence Community personnel with unique insight who were or are currently in sensitive positions and are engaged in pertinent operational activity, such as the FBI's new Foreign Influence Task Force.

The Majority also made no effort to engage the Special Counsel about interviewing central witnesses in this probe: Michael Flynn, Paul Manafort, Rick Gates, George Papadopoulos, and George Nader. To ensure a credible investigation, particularly on the issues of collusion, financial leverage and money laundering, and obstruction of justice, the Committee must interview these individuals. All but Manafort have entered into cooperation agreements with the Special Counsel, and the Committee should have engaged with his office to determine when interviews could proceed without impairing his work. The Minority made a motion to do so at the time the Majority sought adoption of its report, but the Majority voted against pursuing interviews of these key witnesses. The transcript of the March 22, 2018 Committee business meeting is incorporated in Chapter VI.

The Majority's refusal to seek testimony from George Papadopoulos exemplifies its efforts to impair the investigation. Without interviewing Papadopoulos and seeking relevant records to determine whom on the campaign he would have reported this overture to and assess whether any follow-up occurred, the Committee was unable to examine the precise facts regarding Russia's approach to Papadopoulos, during which they informed him they possessed stolen Clinton-related emails and, crucially, previewed their later dissemination of this information. Only weeks later, the President's son, Donald Trump, Jr., would take a meeting in Trump Tower with other Russian emissaries offering dirt on Clinton. This yawning gap in the investigative record, and many others, fundamentally undermines the credibility of the Majority's findings.

The Majority often rushed to conduct other interviews – particularly with witnesses associated with the Trump campaign or the White House – before the Committee had adequately processed relevant documents, or even received them. Interviews were scheduled with little regard for investigative strategy. For instance, witnesses of particular interest, like Jared Kushner and Michael Cohen, were brought in before the Committee could hear from other foundational witnesses with relevant testimony, prior to receiving important document production, and without sufficient time to conduct a forensic assessment of material in the Committee's possession. The Majority has since rebuffed the Minority's requests to bring these witnesses back, despite commitments that they would do so if necessary.

UNCLASSIFIED

Key witnesses, moreover, were scheduled during overlapping timeframes, impairing the ability of Minority Members to attend certain interviews and straining the ability of staff to prepare Members, who were juggling two or even three interviews in a single day. In their haste to finish interviews, the Majority unilaterally conceded to conducting some in other cities or by video-teleconference, rather than in the Committee's spaces, and on days Members had votes and could not easily attend, or could not attend at all. Interviews were conducted in New York with two witnesses who expressed readiness to come to the Committee to be interviewed instead. The interview of Alexander Nix was conducted by video-teleconference, even though he informed the Committee during the interview that he traveled to the United States almost every month and would have been willing to come in — if he had been asked.

As the attached interview transcripts show, the interviews themselves revealed the stark difference in questioning and preparation between the Majority and Minority. Too often, the few Majority Members present asked limited questions, anchored by a superficial inquiry about whether self-interested witnesses were aware of any "collusion, coordination, or cooperation" between the Trump campaign and Russia. The Majority systematically denied Minority requests to compel production of records—electronic, phone, and other material— to assess the veracity of these responses. Taken as a whole, the testimonial record demonstrates the profound disinterest the Majority has exhibited throughout the Russia investigation. Even Mr. Nix, caught on camera in a British undercover news investigation, would ridicule this lack of seriousness of the Majority's abbreviated questioning.[12]

- **Open Hearings:** The Majority held only four open hearings during the course of the investigation. Though limited in number, these hearings served an important educational function. The public heard directly about key aspects of Russia's active measures campaign from FBI Director James Comey on March 20, 2017 (during which he revealed the existence of the FBI counterintelligence investigation), former CIA Director John Brennan on May 23, 2017, former DHS Secretary Jeh Johnson on June 21, 2017, and senior executives from Facebook, Twitter, and Google on November 1, 2017. Unfortunately, the Majority cancelled the hearing with Sally Yates and Director of National Intelligence James Clapper, and refused additional hearings, including about election security. Such a hearing could have served as an opportunity to clarify for the public the extent of Russia's intrusion into our election systems, highlight vulnerabilities in our elections infrastructure, and identify  technical and other solutions necessary to protect our country.

- **Document Production:** At the outset of the investigation, the Majority agreed to request documents from key persons and entities, including the Trump Organization, Trump campaign, and presidential transition. In practice, it imposed unnecessarily narrow criteria for cooperation, limiting requests to only particular search terms and to material dating back only to 2015. Despite repeated entreaties, the Majority refused follow-up document requests informed by new information and leads.  For instance, the Committee has not received from the Trump campaign and transition all correspondence to and from George Papadopoulos,

UNCLASSIFIED

UNCLASSIFIED

Carter Page, and other key persons of interest, thereby making it impossible to determine whether the Committee has reviewed the complete universe of relevant correspondence. Similarly, the Majority refused to seek documents from over 20 entities, despite repeated Minority requests. During the business meeting in which the Majority sought to release its report, the Minority moved to issue subpoenas to relevant organizations, telecommunications providers, banks and other entities, but the Majority refused on a party line basis (see Chapter VI for transcript of March 22, 2017 business meeting).

- **Compulsory Process:** The Majority's systematic refusal to use the Committee's subpoena power to advance the Russia investigation has weakened Congress' independent investigative powers. Combined with the Trump Administration's disregard for congressional authority and disdain for the investigation, this sets a dangerous precedent for future relations between the White House and Congress.

Contrary to the assertion in the Majority report, Chairman Nunes authorized the majority of the Committee's subpoenas in service of his unilateral counter-investigations into "unmasking," against the FBI and DOJ, and to compel witnesses who the Majority believed had information they could exploit to tar Christopher Steele and his research.  By contrast, the Majority opposed more than 15 subpoena requests by the Minority, some of which were necessary to compel testimony in the face of non-existent, overly broad, or farcical claims of executive and attorney-client privilege.

Steve Bannon was the only witness the Majority was willing to subpoena in the face of White House-directed defiance, and even there, the Majority ultimately backed down. Committee Republicans refused to consider a contempt recommendation for Bannon after the White House continued to bar Bannon from key testimony, save for answering "no" to 25 questions furnished by the White House that were meant to cover the entire period from the transition through Bannon's tenure at the White House.

During Bannon's February 15, 2018 follow-up interview, with the subpoena still in effect, Bannon refused to answer questions beyond those authorized by the White House. In response to a question from Ranking Member Schiff as to whether Bannon ever discussed the Russia investigation with either Speaker Paul Ryan or Chairman Nunes, Bannon denied communicating with Speaker Ryan, but claimed he was unauthorized by the White House to answer the question about the Chairman. Under subsequent questioning about his contacts since leaving the White House, Bannon had no choice but to acknowledge communicating with Chairman Nunes, but did not answer questions about the frequency, means, and subject matter of their communications.[13] Bannon's refusal to answer demonstrates how the White House, in confining pertinent witnesses to carefully-worded questions, sought to mislead the Committee. Although Bannon remained under subpoena, the Majority refused during the interview to order Bannon to answer questions beyond those authorized by the White House. A motion to hold Steve Bannon in contempt was also defeated on a party-line vote (see Chapter VI for transcript of March 22, 2017 business meeting).

UNCLASSIFIED

UNCLASSIFIED

Through January and February 2018, the Majority scheduled only five remaining witness interviews (two of those interviewed, Steve Bannon and Corey Lewandowski, would appear twice) and signaled that they would not invite additional witnesses to testify.  The Majority also opposed repeated Minority efforts to hold a Committee-wide Members meeting to discuss the status of the investigation, seek common ground, and develop a joint plan to work towards a bipartisan report. Instead, the Majority consumed the Committee's time and resources by initiating a never-before used parliamentary process to release to the public a profoundly misleading, now-debunked classified memorandum alleging serious FISA-related abuses by DOJ and FBI in the course of the FBI's counterintelligence investigation. In response, the Minority wrote a rebuttal memorandum (see Appendix F), which the Majority and the White House delayed releasing for weeks.[14]

***Progress and Outstanding Lines of Inquiry***

The Majority's actions have, at this stage, deprived the Committee and country of a credible and thorough investigation. Even under these constraints, however, the Minority has been able to make significant progress in understanding what occurred during the 2016 U.S. elections and identifying new leads as well as persons and entities of interest. The Minority has amassed significant material that helps clarify, among other investigative threads:

- The intelligence information, sources and methods, and analysis underlying the January 6, 2017 Intelligence Community Assessment;

- Russia's covert cyber efforts preceding and during the elections, including its hacking and dissemination operation aimed at weaponizing stolen information for political gain;

- Russia's intelligence operations during the election, in which it used intermediaries and cutouts to probe, establish contact, and possibly glean valuable information from a diverse set of actors associated with President Trump and his campaign; and

- Russia's sophisticated and well-funded online and social media operation, which exploited platforms such as Facebook, Twitter, and Google, but appears to have also taken advantage of other mediums, such as Reddit, Tumblr, Snapchat, and Imgur.

As the Minority's March 13 Status Update makes clear (see Appendix A), however, significant questions remain that require greater investigation. Although important evidence has been found on the issues of collusion and obstruction, much work remains on these and other vital lines of inquiry and key unanswered questions:

UNCLASSIFIED

UNCLASSIFIED

- Whether and to what extent certain U.S. persons, including individuals associated with then-candidate Trump, his companies, and his campaign, knew of, abetted, or were otherwise involved in Russia's active measures, including its anonymous dissemination efforts;

- The precise circumstances of and reasons for contact by Trump associates with Russian actors and intermediaries in the lead up to, during, and immediately following the election, including communications that may have occurred surrounding and during these encounters and why President Trump and associates have sought to deny, cover up, and deceive Congress and the public about these contacts;

- Whether and to what extent Russia – directly or through proxies, financial institutions, or other state or non-state actors – exploited financial transactions or other dealings to launder funds, gain financial leverage, or otherwise influence and benefit Trump or his associates, including close advisors such as Jared Kushner;

- Contact and coordination between Trump transition officials and Russia after the election, including in response to the Obama Administration's decision to impose new sanctions to punish Russia for its election interference, and the Administration's false statements about these contacts, including the precise circumstances that led Vice President Mike Pence to misrepresent Flynn's activities;

- Efforts by President Trump and his associates to interfere with, obstruct or discredit the FBI and then the Special Counsel's investigation, including through pressure on senior law enforcement officials to drop investigations or make exonerating public representations; by firing FBI Director Comey and issuing instructions to fire Special Counsel Mueller; and crafting and disseminating statements intended to mislead investigators and the public, and possibly suppressing evidence that would contradict revelations about contact with Russian actors;

- The full extent of Russia's infiltration of state-based voter systems, identification of vulnerabilities that Russia exploited in 2016, and persistent vulnerabilities that require effective remedial measures, and practical safeguards to harden our elections infrastructure.

Congress has an obligation to find out the truth and inform the American people. The Committee's Minority therefore remains fully committed to conducting this investigation as originally envisioned, leaving no stone unturned in determining the facts of Russia's interference in the 2016 U.S. elections and the steps we must take to ensure the future integrity of our democratic process. To the best of our ability, we will continue to do so, until such time as the full Congress once again lives up to its oversight responsibilities.

UNCLASSIFIED

## II. THE MAJORITY'S RUSSIA REPORT FINDINGS

The Majority's report lists 44 key findings across five chapters: *Russian Campaigns in Europe*; *Russia Attacks the United States*; *America Reacts*; *Campaign Links to Russia*; and *Intelligence Community Assessment Leaks*. Many of the findings are misleading, at odds with the investigative record, and crafted to advance a political narrative beneficial to President Trump. The report's underlying analysis, moreover, is rife with significant inaccuracies, mischaracterizations, vital omissions of fact and context, and often risible attempts to explain away inconvenient truths discovered in the course of the Committee's investigation.

Rather than strain to debunk and fact-check every misleading assertion in the Majority report, these Minority Views instead address two of the report's most unsupported and controversial claims:

- That the Intelligence Community erred in its core judgment that Russian President Vladimir Putin aspired to help candidate Donald Trump; and

- That the Committee found no evidence of Trump campaign collusion with Russia.

### *Putin's Preference for Trump*

#### January 2017 Intelligence Community Assessment

Despite the Majority's inclusion of a significant body of Intelligence Community reporting on Russian interference in Europe, and its claim to have supported the conclusions of the January 6, 2017 declassified Intelligence Community Assessment (ICA) on Russian interference in the U.S. election,[15] the report concludes, without offering evidence, that analytic "tradecraft failures" provide reason to doubt a key assessment in the ICA – that Russia "aspired to help [Trump's] election chances when possible by discrediting Secretary Clinton and publicly contrasting her unfavorably to him."[16] The Majority previewed this conclusion in a one-page description of its report, which it released publicly on March 12, 2018 to severe criticism. The press release stated that Committee Republicans concurred with "the Intelligence Community Assessment's judgments, except with respect to Putin's supposed preference for candidate Trump."

Over the course of substantively revising its report in the days prior to the March 22, 2018 business meeting, the Majority modified this finding and dropped an explicit reference to the ICA's judgment about Putin's preference for Trump. In the first draft provided to the Minority on March 13, 2018, the Majority argued that the ICA's "judgements on Putin's strategic intentions raise tradecraft concerns." In the March 21, 2018 draft provided on the eve of the business meeting, this finding was changed to state that the ICA's "judgements on Putin's strategic intentions *did not employ proper analytic tradecraft*" (emphasis added). Moreover, the March 21, 2018 version specifically omits a previously included quote from the ICA that made clear that the Majority took issue with the ICA's judgment that Putin aspired to help candidate

14
UNCLASSIFIED

UNCLASSIFIED

Trump. Instead, the revised section only refers vaguely to "a key assessment on Putin's strategic intentions."[17]

Neither the report, nor the press release, provide any evidence or analysis as to why the Majority came to this conclusion—a finding at odds with the Intelligence Community, the House Intelligence Committee Minority, the Majority and Minority leaders of the Senate Intelligence Committee, and the Special Counsel.[18]

Upon a thorough review of the underlying source material that informed the ICA's findings, briefings with the analysts and senior leaders who authored and reviewed the report, and classified and unclassified hearings with directors of the agencies responsible—CIA, NSA, and FBI—the Minority has found no evidence that calls into question the quality and reliability of the ICA's underlying reporting and key judgments, including the assessment about President Putin's desire to help candidate Trump. The Minority likewise has found no reason to doubt the subject matter expertise and analytic rigor of the ICA's authors, nor the review standards and process leading to the assessment's production and release.

Revelations since the release of the ICA in January 2017 have only strengthened our agreement with its assessment of Putin's motives. Most recently, the Special Counsel Office's February 16, 2018 indictment of the St. Petersburg-based and Kremlin-linked Internet Research Agency (IRA) and 12 of its associates makes clear that, "by early to mid-2016, Defendants' operations included supporting the presidential campaign of then-candidate Donald J. Trump ("Trump campaign") and disparaging Hillary Clinton."[19]

The Majority notes in its Russia report that a more detailed accounting of its finding disagreeing with the ICA will be forthcoming later in 2018. We will carefully review the Majority's secondary report, which it failed to share with the Minority prior to adoption of its primary report, once received. However, having reviewed the same body of intelligence as the Majority and coming to no such disagreement with the IC, we are left to presume that the Majority has sought release of this finding publicly, while withholding from the Minority and the public the underlying analysis it claims informs its conclusion, in an attempt to sow doubt about the IC's credibility and reliability on this matter and perhaps to appeal to President Trump.

*Russia's Social Media Campaign*

Consistent with its attempt to undermine the ICA assessment on Putin's support of Trump, the Majority's analysis reflects a consistent blind spot about Russia's social media campaign— and its clear preference for Donald Trump. For instance, it acknowledges RT's (formerly Russia Today) role as a propaganda vehicle for the Russian government, and its effort to weaken Clinton. However, the Majority persistently ignores Russian-directed activity in support of Trump, as this report excerpt demonstrates:

UNCLASSIFIED

> *"RT was critical of presidential candidates from both major parties but was consistently critical of candidate Clinton through the election. RT's attacks against candidate Clinton were wide-ranging, including the insinuation that the Clinton family were criminals. RT also used advertising to promote material leaked by Russian intelligence, which targeted candidate Clinton and the Democratic Party."[20]*

As Facebook and Twitter material released to the public by the Committee illustrates, Russia pumped material into the online ecosystem that promoted Trump over Clinton. The Special Counsel's indictment of the Russia-based IRA outlines the same finding: "Defendants posted derogatory information about a number of candidates, and by early to mid-2016, Defendants' operations included supporting the presidential campaign of then-candidate Donald J. Trump ("Trump Campaign") and disparaging Hillary Clinton."[21]

Also absent from the Majority's social media findings are updates provided by the companies themselves since the Committee's November 1, 2017 open hearing. For example, Twitter informed Congress on January 19, 2018 that it had "identified an additional 1,062 accounts that appear to be IRA-linked," bringing the total to 3,814 handles—not the 2,752 number listed in the Majority report.[22] That update also revealed that Russian-linked automated accounts retweeted the @realDonaldTrump Twitter handle nearly ten times as much as the @HillaryClinton handle from the period of September 1, 2016 to November 15, 2016—another data point that underscores Russian intent to boost the viability of candidate Trump's campaign.[23]

The Majority also seeks to downplay the scope and impact of Russia's malign activities against Clinton on Facebook. The report paints Russia's online messaging as generally divisive and implies broadly equal criticism of both presidential candidates. This cursory analysis of activity on Twitter, Facebook, and Google fails to mention the trove of online activity that the Committee has received from the companies that highlight how Russian online operatives explicitly sought to damage Clinton and boost Trump, consistent with the ICA assessment and the Special Counsel's indictment. For instance, the Minority has highlighted Facebook and Instagram ads that promoted pro-Trump rallies in Florida before the election, which aligns squarely with the Special Counsel's own findings.[24]

Other ads in production received by the Committee reinforce the pro-Trump tenor of the overall Russian IRA online campaign: one fake "Being Patriotic" page described Clinton as the "main hardliner against cops" and said that "[a]mong all the candidates Donald Trump is the one and only who can defend the police from terrorists."[25]

Moreover, the Majority fails to appreciate that many of the Facebook pages and ads that appeared at first to be unrelated to specific candidates or focused on socio-political issues or discrete populations (such as African- or Muslim-Americans), at times used language, images, and graphics intended to purposefully associate candidate Clinton with particular groups in an effort to reinforce assumptions and prejudices among potential voters who harbored suspicions and concerns about her.[26] [27]

UNCLASSIFIED

UNCLASSIFIED

Russian exploitation of other social media platforms, such as Reddit, Tumblr, Imgur, or Snapchat, remain unexplored by the Majority, despite classified and unclassified intelligence indicating the need for further inquiry. As recently as March 23, 2018 – a day after the Majority voted to end its investigation – Tumblr publicly acknowledged it had "uncovered 84 Tumblr accounts linked to the Russian government through the Internet Research Agency, or IRA."[28] The platform has published a list of these accounts and has committed to add to that registry if it discovers more Russian foreign influence-linked users moving forward.[29] This is but one example of how the Majority neglected to pursue other valid leads about the activities of Russian operatives online, to the clear detriment of compiling a comprehensive accounting of the scope and depth of Kremlin-directed activities on social media platforms.

In a final effort to obscure Russia's social media operation in support of Trump, the Majority report argues that "Russian malign influence activities on Facebook were significant but they were not well-funded or large-scale operations relative to the overall scope of election-related activity on these platforms."[30] In its February 16, 2018 indictment, the Special Counsel revealed that the IRA's operation was in fact well-funded and organized. The Committee, moreover, was unable to fully investigate and determine the financial backing, scope, and reach of Russia's covert effort. This is an area that will require greater investigation.

As detailed below, Russia's hacking of Democratic National Committee (DNC) and Clinton-related emails, and the weaponization of this information through anonymous dissemination, served the very objective identified in the ICA: to help Trump and hurt Clinton.

Moreover, even as the Majority shutters its own investigation into Russia's meddling, new developments have emerged related to Cambridge Analytica, which ran the Trump campaign's digital media operation. On March 17, 2018, news organizations in the United States and United Kingdom began publishing a series of reports detailing the role of Cambridge Analytica in the 2016 U.S. election and the misappropriation of Facebook data of more than 50 million users. This data reportedly provided the basis for the algorithms underlying Cambridge Analytica's election support to U.S. political candidates, thereby allowing it to exploit the private social media activity of a large swath of the American electorate and develop techniques that potentially underpinned its work on President Trump's campaign.[31]

These revelations are in stark contrast to the testimony of Cambridge Analytica CEO Alexander Nix.

> *QUESTION: Has Cambridge Analytica acquired bulk data through Facebook?*
>
> *MR. NIX: No, it has not.[32]*
>
> *QUESTION: Did Cambridge Analytica use any other third-party data that was not purchased?*

UNCLASSIFIED

UNCLASSIFIED

*MR. NIX: As far as I'm aware, it did not.*[33]

In addition to Nix's questionable testimony, the new reports raise questions about potential Russian access to and use of this data. Cambridge Analytica may have sought business in Russia and with sanctioned Russian entities, such as Lukoil, and the researcher the company worked through to access the Facebook data appears to have research links at a Russian state university.[34] This is an area that the Minority will focus on intensively in the next phase of its investigation.

UNCLASSIFIED

UNCLASSIFIED

## III. COLLUSION

### *What We Know*

One year into the Russia investigation, the Minority has obtained a body of classified and unclassified evidence pointing to an unprecedented effort by the Russian government – consistent with Russian intelligence tradecraft – to gain entrée to and influence with individuals associated with the Trump campaign, including the candidate himself. Also unprecedented was the willingness by Trump campaign officials to accept those overtures.

The Committee has identified numerous meetings and contacts between Trump officials – from the campaign, transition, and administration – and representatives of the Russian government dispatched by the Kremlin.  These meetings included repeated offers of assistance, a willingness by the campaign to accept that assistance, and even a conspiracy to undermine Obama Administration sanctions responding to Russia's election interference. The pattern of deception surrounding these meetings – first denying they took place; then, when discovered, denying their content; and then denying their significance – suggests a consciousness of wrongfulness, if not illegality.

The following unclassified overview addresses only some of these contacts and does not incorporate important classified information, including sensitive intelligence, that has otherwise informed the Minority's analysis.

### *April 2016 – George Papadopoulos Email Hack Revelations*

Early in the Presidential race, Russia made one of its initial approaches to the Trump campaign through one of candidate Trump's five original foreign policy advisors, George Papadopoulos, who Trump had described publicly as an "excellent guy."  In their approach to Papadopoulos, the Russians used common tradecraft and employed a cutout—a Maltese professor named Joseph Mifsud. In late April 2016, Mifsud informed Papadopoulos that the Kremlin had "dirt" on Hillary Clinton in the form of "thousands of emails," and, crucially, previewed the Russians' release of this information. The early timing of this approach is significant; in April of 2016, not even the DNC or Clinton campaign appears to have been aware that the Russians were in possession of private emails.

The Russians followed up this initial approach with additional meetings and overtures.  On or about April 18, 2016, Mifsud introduced Papadopoulos to a Russian individual connected to the Ministry of Foreign Affairs (MFA). Papadopoulos and the MFA contact engaged in multiple conversations by Skype and email over the next several weeks, attempting to link Trump campaign officials and Russian officials. In early May, the person connected to the Russian MFA informed Papadopoulos that MFA officials were open for cooperation, and suggested a meeting between Papadopoulos and the Russian government's North American Desk in Moscow.

UNCLASSIFIED

Papadopoulos reported this communication to a "High-Ranking" campaign official to seek guidance on how the Trump campaign wished to proceed. The next day, Papadopoulos spoke by phone with the "Campaign Supervisor," and, following that call, forwarded the email from the MFA connection to the Campaign Supervisor – adding to the top of the email "Russia updates."[35]

From mid-June through mid-August 2016, Papadopoulos pursued an "off the record" meeting between Trump campaign officials and officials from President Putin's office as well as the Russian MFA. On about June 19, 2016, Papadopoulos emailed the "High-Ranking" campaign official with the subject line "New message from Russia": "The Russian ministry of foreign affairs messaged and said that if Mr. Trump is unable to make it to Russia, if a campaign rep (me or someone else) can make it for meetings? I am willing to make the trip off the record if it's in the interest of Mr. [T]rump and the campaign to meet specific people."[36] After several weeks of additional communications discussing a potential "off the record" meeting with Russian officials, in mid-August 2016, the "Campaign Supervisor" informed Papadopoulos, "I would encourage you" and another campaign foreign policy advisor to "make the trip[], if it is feasible."[37]

The Majority portrays Papadopoulos as an inconsequential campaign volunteer – a "coffee boy," according to campaign officials – who made only minor contributions to the campaign, and downplays the significance of Papadopoulos's contacts with Kremlin-linked Mifsud and a connection to Russia's Ministry of Foreign Affairs. This characterization of Papadopoulos contradicts public reports, testimony, and documents produced to the Committee, which indicate that he was involved in coordinating meetings between candidate Trump and foreign leaders during the campaign and the transition, and communicated with high-level Trump associates throughout.

For example, during the 2016 Republican National Convention in Cleveland, Papadopoulos spoke at a foreign policy panel hosted by the American Jewish Committee. Other program panelists included Senator Bob Corker and Representatives Tom Marino and Ted Yoho.[38] Similarly, a foreign policy advisor on the Trump campaign testified that Papadopoulos was directly involved in arranging a meeting between then-candidate Trump and Egyptian President Sisi in September 2016.[39] This witness also indicated that Papadopoulos was directed by the campaign to engage in outreach to "Orthodox Christian" constituencies across the U.S. as part of the campaign's get out of the vote effort prior to election day.[40]

The Majority claims that no witness "shed light on the provenance of the emails" offered by the Kremlin-linked actor.[41] In the same section, the Majority claims that no witness "clarif[ied] that [Kremlin-affiliated] Mifsud was referring to emails actually stolen by the Russians (as opposed to, for example, emails missing from Clinton's private server)." The Majority also states that it found no evidence that Papadopoulos told anyone affiliated with the Trump campaign about Mifsud's claims that the Russians had 'dirt' on candidate Clinton."[42]

UNCLASSIFIED

The Majority, in fact, has refused to engage the Special Counsel's office to seek Papadopoulos' testimony before the Committee. It opposed pursuing his production of documents, and turned down requests to interview campaign officials that Papadopoulos interacted with and may have communicated with about the Russian overture. The Majority also refused to interview other individuals who may be knowledgeable about Papadopoulos's receipt of information on the stolen emails, including his wife, Simona Magiante. By failing to take these natural investigative steps, the Majority has made clear that it is not interested in determining "the provenance of the emails," with whom on the campaign Papadopoulos shared this information, or any other information that might implicate the Trump campaign in collusion with the Russians. You cannot find what you do not seek.

The Majority's suggestion that the emails to which Mifsud referred might be those connected to Hillary Clinton's private server, instead of those stolen from the DNC, is equally disingenuous. The FBI determined in 2016 that there is no evidence to indicate that Clinton's private email server was ever successfully hacked.[43] More significant, only weeks after Papadopoulos learned that the Russians had stolen emails and previewed their dissemination, the Russian government, through WikiLeaks and other intermediaries, began their anonymous release of these materials.

Papadopoulos's foreknowledge of the Russian dissemination of the stolen emails raises questions about the extent to which specific individuals within the campaign sought to or did collude, conspire, or coordinate with Russia in the campaign against the 2016 U.S. elections. The Committee has an obligation to determine what precisely the Russians relayed to Papadopoulos, how they relayed it, and, most important, with whom on the campaign Papadopoulos shared this information. The Majority failed to do so, and made no effort to interview Papadopoulos after he agreed to cooperate with authorities.

Not long after establishing a communication channel with Papadopoulos, the Kremlin reached out to the highest levels of the Trump campaign. Once again, using standard Russian tradecraft, the Kremlin approached the candidate through an intermediary – a Russian oligarch close to Putin, Aras Agalarov – to facilitate a meeting in Trump Tower with the promise of "dirt" on Hillary Clinton. A Russian attorney would be dispatched from Moscow for the meeting  with the President's son, Donald Trump Jr., son-in-law, Jared Kushner, and campaign manager, Paul Manafort, at a critical moment in the campaign, when their time was at an absolute premium. Whether Trump Jr.'s eagerness for the meeting, his acceptance of the offer of Russian government help ("love it"), and disappointment that better "dirt" was not produced at the meeting, was informed by the information George Papadopoulos obtained that the Russians did indeed have "dirt" to offer, or other signals, remains a matter still under investigation by the Minority.

### *May 2016 – National Rifle Association (NRA) Connections*

Just weeks after an intermediary for the Russian government told Papadopoulos that the Russians had "dirt" on Hillary Clinton in the form of "thousands of emails," a senior Russian official

UNCLASSIFIED

approached the Trump campaign through the National Rifle Association (NRA) to try and arrange a meeting between candidate Trump and President Putin. The Kremlin-linked individual appears to have used the group to befriend and establish a backchannel to senior Trump campaign associates through their mutual affinity for firearms – a strategy consistent with Russian tradecraft.

Alexander Torshin, the deputy governor of the Central Bank of Russia, with the assistance of his deputy, Maria Butina, have used their affiliation with the NRA to cultivate relationships with Russia-friendly politicians in the United States. In 2015, a delegation from the NRA traveled to Russia at the invitation of Torshin and Butina's organization, the Right to Bear Arms. An intermediary to the Trump campaign and longtime NRA member, Rick Erickson, was part of that delegation, and reportedly maintains close ties with Torshin and Butina.

On May 10, 2016, Erickson reached out to Rick Dearborn, a longtime senior advisor to Jeff Sessions and a senior campaign official:

> *"Switching hats! I'm now writing to you and Sen. Sessions in your roles as Trump foreign policy experts / advisors. [...] Happenstance and the (sometimes) international reach of the NRA placed me in a position a couple of years ago to slowly begin cultivating a back-channel to President Putin's Kremlin. Russia is quietly but actively seeking a dialogue with the U.S. that isn't forthcoming under the current administration. And for reasons that we can discuss in person or on the phone, the Kremlin believes that the only possibility of a true re-set in this relationship would be with a new Republican White House."[44]*

The email goes on to say that Russia planned to use the NRA's annual convention to make "first contact" with the Trump campaign and that "Putin is deadly serious about building a good relationship with Mr. Trump. He wants to extend an invitation to Mr. Trump to visit him in the Kremlin before the election."[45]

Dearborn communicated this request on May 17, 2016 to the highest levels of the Trump campaign, including Paul Manafort, Rick Gates, and Jared Kushner. The effort to establish a back-channel between Russia and the Trump campaign included a private meeting between Torshin and "someone of high rank in the Trump Campaign."[46] The private meeting would take place just prior to then-candidate Trump's speech to the NRA. As explained in Dearborn's email, such a meeting would provide Torshin an opportunity "to discuss an offer he claims to be carrying from President Putin to meet with DJT. They would also like DJT to visit Russia for a world summit on the persecution of Christians at which Putin and Trump would meet."[47]

Despite numerous questions raised by Committee testimony and document production regarding Russia's potential use of the NRA as part of its larger influence operations, the Majority report focuses exclusively on the attendance of Trump Jr. at the annual convention in Kentucky in May 2016. The Majority's finding on this topic affirms that Trump Jr. met with a Russian government

UNCLASSIFIED

UNCLASSIFIED

official, Alexander Torshin, at the event, but conveniently concludes that "the Committee found no evidence that the two discussed the presidential election."[48] As with many findings in the report, this relies solely on the voluntary and self-interested testimony of the individual in question, in this case Trump Jr. The Majority refused multiple requests by the Minority to interview witnesses central to this line of inquiry, including Torshin, Butina, Erickson, and others.

The Majority report outlines conversations between Trump campaign personnel and associates in planning the meeting but makes no judgments about the questionable circumstances under which NRA associates wished to help the Trump campaign set up a "back-channel to President Putin's Kremlin"[49] through Torshin and Butina. It also ignores significant outstanding questions about individuals who sought to set up this backchannel, including why Torshin and Butina were interested in connecting the Trump campaign to Putin, what they sought to get out of that connection, why they enlisted the support of NRA colleagues, and whether others in the campaign were communicating with Russia through the NRA.

According to press reports that emerged after the Majority announced the end of its investigation, the Federal Election Commission has launched a preliminary investigation into whether the NRA accepted illegal contributions from Russians in support of the Trump Campaign.[50] The NRA reportedly spent a record $21 million to support Trump's campaign and another $14 million to attack Hillary Clinton. Despite this open question, the Majority refused to investigate whether Russian-linked intermediaries used the NRA to illegally funnel money to the Trump Campaign, to open lines of communication with or approaches to Trump or his associates, and how those approaches may have informed Russia's active measures campaign as it unfolded throughout 2016.

### _Cultivation of the Agalarov-Trump Relationship_

By June 2016, Donald Trump Jr. and other senior Trump campaign officials signaled openness to the type of support Russia had previewed to George Papadopoulos several weeks earlier. In early June, the Russians capitalized on then-candidate Trump's friendship with Russian oligarch Aras Agalarov, who arranged for a Russian delegation offering "dirt" on Trump's opponent to meet with Trump Jr. at Trump Tower.

Agalarov had cultivated a friendship with Trump since their joint venture to hold the 2013 Miss Universe pageant in Moscow.  The immediate fruit from the Miss Universe pageant for Mr. Trump was the prospect of finally building a Trump Tower in Moscow.  While the business opportunity failed to materialize, the Agalarovs continued to nurture and cultivate a personal and professional relationship with the Trumps.

The trust between the Trump family and the Agalarov family appears to have deepened over the years. Evidence obtained by the Committee suggests a particularly close familiarity between Trump Jr and Aras' son, Emin Agalarov, which appears to have transcended professional

UNCLASSIFIED

UNCLASSIFIED

bounds.[51] This documentary evidence contrasts with Trump Jr.'s testimony in which he attempts to minimize the relationship.[52]

Aras and Emin Agalarov expressed strong support for Trump's candidacy throughout the election – starting the day Trump announced his candidacy[53] – and offered to serve as an intermediary with President Putin.

At key campaign milestones, the Agalarovs sent notes wishing good luck, conveying congratulations, and offering gifts to Donald Trump. These communications generally occurred through Rob Goldstone, Emin Agalorov's business partner, who then emailed them to Rhona Graff, candidate Trump's trusted personal assistant. On each occasion, Graff made sure that Mr. Trump saw these communications, and made it clear that doing so was "*important*." Mr. Trump replied more than once to these gestures with hand-written notes of his own.[54] For example, on July 24, 2015, Goldstone emailed Graff asking if then-candidate Trump would be tempted to come to Moscow (for Aras Agalarov's 60th birthday) for a "meeting with President Putin which Emin would set up."[55] Later, on the eve of Super Tuesday in late February 2016, Agalarov congratulated then-candidate Trump and offered *"*his support and that of many of his important Russian friends and colleagues – especially with reference to U.S./Russian relations."[56]

Soon after election night – at 3:00 am on November 10, 2016 – Emin Agalarov texted Trump Jr.:

> *"Don!!! Amazing run and a glorious victory!!!!! Congratulations to you and your dad, we are proud and happy for you !!!!!! Always at your disposal here in Russia [] Emin and Aras Agalarov@*."[57]

*June 9, 2016 – Trump Tower Meeting*

The Agalarovs appear to have seized on Trump's potential presidency as a means of pursuing one of Putin's top priorities: lifting U.S. sanctions on Russia imposed by the Magnitsky Act. The June 9, 2016 meeting at Trump Tower proved to be one entrée in this regard.

On June 9, 2016, Trump Jr., Jared Kushner, and Trump campaign chairman Paul Manafort participated in a meeting in Trump Tower in New York, with a Russian government attorney and others to receive "official documents" from the Russian government that was represented to be part of the Russian government's support for Donald Trump.

The initial email offer was sent to Trump Jr. by Rob Goldstone at 10:36 a.m. on June 3:

> *"The Crown prosecutor of Russia [Yuri Chaika, Russian Prosecutor General] met with his father Aras [Agalarov] this morning and in their meeting offered to provide the Trump campaign with some official documents and information that would incriminate Hillary and her dealings with Russia and would be very useful to your father. This is obviously*

UNCLASSIFIED

*very high level and sensitive information but is part of Russia and its government's support for Mr. Trump—helped along by Aras and Emin [Agalarov]."*  Goldstone also offered to "send this info to your father via Rhona, but it is ultra sensitive so wanted to send to you first."[58]

As explained to Trump Jr., the clear purpose of this meeting was to provide information from the Russian government that was damaging to then-candidate Trump's opponent, explicitly as part of the Russian "government's support for Mr. Trump." Trump Jr. acknowledged as much in his testimony before the Committee:

> *MR. SCHIFF: But she [Veselnitskaya] started off the meeting discussing this [donors of Hillary Clinton]. This was the first topic that she raised.*

> *MR. TRUMP JR.: That's my recollection, yes.*

> *MR. SCHIFF: Which would indicate that she understood the purpose – ostensible purpose of the meeting as you did, which was to provide derogatory information about Clinton.*

> *MR. TRUMP JR.: To my understanding, yes.[59]*

Less than 20 minutes after receiving Goldstone's email about the offer of dirt on Clinton from the Russian government, Trump Jr replied, "*if it's what you say I love it especially later in the summer*" [emphasis added].  Trump Jr was "on the road" and suggested a call with Emin Agalarov directly.[60] Trump Jr's response to this offer indicates an eagerness to obtain the information.

Three days later, on June 6, 2016, Trump Jr. and Goldstone exchanged a flurry of back and forth messages to arrange for a call between Trump Jr. and Emin Agalarov.

- At 12:40 pm, Goldstone emailed Trump Jr.: "Let me know when you are free to talk with Emin by phone about this Hillary info – you had mentioned early this week so wanted to try to schedule a time and day. Best to you and family."

- At 3:03 pm, Trump Jr. emailed Goldstone, "Rob could we speak now?"

- Approximately thirty minutes later, Goldstone emailed Trump Jr.: "Let me track him down in Moscow[.] What number [can he] call?"

- One minute later, Trump Jr. replied to Goldstone and provided his cellphone number.

- At 3:43 pm, Goldstone emailed Trump Jr.: "Ok he's on stage in Moscow but should be off within 20 minutes so I am sure can call."[61]

Trump Jr.'s phone records show two calls to and from the same Russian number on June 6, 2016.[62] The first call occurred at 4:04 pm on June 6, 2916 – just 21 minutes after Goldstone emailed Trump Jr. to say that Emin Agalarov was "*on stage in Moscow but should be off within 20 minutes so I am sure can call. [emphasis added]*"[63] At 4:38 pm, Trump Jr emailed Goldstone, "Rob, thanks for the help."[64]

This documentary evidence indicates that a call likely took place between Trump Jr. and Emin Agalarov. During his interview, Trump Jr. confirmed that the Russian phone number belonged to Agalarov, though he claimed to not recall whether he actually spoke with him. Rather, despite one of the two calls reflecting a two-minute connection, Trump Jr. suggested that Agalarov may have left voice messages.[65]

The phone records also show a "blocked" number at 4:27 pm, between the two calls to and from Emin Agalarov. Trump Jr. claimed he did not know who was associated with the blocked number.[66] While the Committee has not pursued leads to determine who called Trump Jr. at this crucial time from a blocked number, Corey Lewandowski told the Committee that Mr. Trump's "primary residence has a blocked [phone] line."[67] Despite the Minority's repeated efforts to obtain home or cell phone records for then-candidate Trump to determine whether the blocked call was Trump Jr.'s father, the Majority was unwilling to pursue the matter.

The following day, on June 7, 2016, Trump Jr. and Goldstone arranged for the meeting to take place at 3:00 pm on June 9. Within an hour of confirming the meeting, Trump Jr. emailed Goldstone, "will likely be Paul Manafort (campaign boss) my brother in law and me."[68] The following day, on June 8, 2016, Goldstone asked Trump Jr. if they could shift the meeting back an hour, to 4:00 pm instead of 3:00 pm. Trump Jr. then forwarded the entire email exchange to Jared Kushner and Paul Manafort with the message "meeting got moved to 4 tomorrow at my offices." Manafort confirmed his attendance within the hour.[69]

Also on June 7, just as Trump Jr. and Goldstone confirmed the Friday meeting, candidate Trump secured the Republican nomination. In public remarks after the final Republican primaries, Trump previewed his intention to give a speech about the Clintons the following week: "I am going to give a major speech on probably Monday of next week and we're going to be discussing all of the things that have taken place with the Clintons. I think you're going to find it very informative and very, very interesting."[70]

Two days later, candidate Trump's eldest son, son-in-law, and campaign manager would meet with the delegation, led by a Russian attorney with close ties to Russian officials, who had promised damaging information on his opponent. The same day, candidate Trump tweeted about Hillary Clinton's alleged "missing" emails - only the second time he had done so by this point: "How long did it take your staff of 823 people to think that up—and where are your 33,000 emails that you deleted?"[71]

UNCLASSIFIED

The delegation to Trump Tower included:

- *Natalia Veselnitskaya:* The Russian government attorney dispatched from Moscow for the meeting is reportedly a close associate of Russia's chief prosecutor, Yuri Chaika. Chaika and Veselnitskaya have campaigned extensively in recent years to overturn the Magnitsky Act, a top Putin foreign policy objective. While many outstanding questions remain as to Veselnitskaya's involvement in the June 9 meeting, the Majority has repeatedly denied requests by the Minority to bring her in for an interview, despite her publicly-acknowledged willingness to speak to U.S. congressional investigators.[72]

- *Rinat Akhmetshin:* A Russian-American and former Soviet intelligence officer, Akhmetshin is a registered lobbyist and has conducted lobbying activities on behalf of Veselnitskaya's organization.

- *Irakly ("Ike") Kaveladze:* Kaveladze is the vice president of Aras Agalarov's company Crocus Group International. Kaveladze has worked for Agalarov for more than 30 years. He attended the meeting as Aras Agalarov's representative.

- *Rob Goldstone:* A publicist who represented Emin Agalarov, Goldstone is a close associate of the Agalarov family, and appears to have acted as Aras Agalarov's intermediary with Donald Trump, via Trump's assistant Rhona Graff and Trump Jr.

- *Anatoli Samochornov:* Samochornov is a Russian-American who worked for many years as an interpreter for a wide range of organizations, including the U.S. State Department. He served as Veselnitskaya's interpreter during the meeting.

By most accounts, the meeting lasted approximately 20 minutes. While accounts of the meeting varied among the attendees with whom the Committee spoke, most acknowledged that the Magnitsky Act was raised.

> *MR. SCHIFF: During the course of your meeting in Trump Tower, were the sanctions imposed [by] the Magnitsky Act discussed?*
>
> *MR. TRUMP JR.: I believe they were. Generally speaking, as part of the Magnitsky Act, this sounds reasonably familiar, so –*
>
> *MR. SCHIFF: And what do you recall what was discussed about sanctions?*
>
> *MR. TRUMP JR.: I don't recall much, only that the sanctions, I guess, were what prompted Russia shutting down the adoption program for the U.S.*

UNCLASSIFIED

> *MR. SCHIFF: And did Ms. Veselnitskaya make it clear that the Russians were hoping that if Mr. Trump were successful, he would eliminate those sanctions?*

> *MR. TRUMP JR.: I don't know if she said that, but it was apparent that she was lobbying for the removal of sanctions.[73]*

The Committee spoke with two of the three Trump campaign officials who attended the meeting – Jared Kushner and Donald Trump Jr. Both expressed dissatisfaction with the meeting, in apparent disappointment at not having received the derogatory information on Clinton that had been promised. Trump Jr. described the meeting as a "bait-and-switch":[74]

> *MR. SCHIFF: Right. How much of the time was spent discussing that [the Magnitsky Act], and how much of the time was spent discussing dirt on Secretary Clinton?*

> *MR. TRUMP JR.: Again, the majority was really split up between – really started off as Russian adoption, which was sort of the, you know, what I perceive to be sort of the feel-good segue to probably lobbying for something as it related to that Act. So, you know, I'd say we spent less than, you know, 5 minutes of the 20 minutes, again, speaking through a translator about the quote/unquote "dirt", and the rest was a quick segue, bait-and-switch, whatever you want to call it, to speak about Russian adoption and the Magnitsky Act.[75]*

Most attendees acknowledged the meeting was a waste of time. Trump Jr. likely would not have taken the meeting had he not hoped to get dirt on Hillary Clinton:

> *MR. SCHIFF: Well, you said it was essentially a bait-and-switch and a waste of time, did you not?*

> *MR. TRUMP JR.: I did.[76]*

One member of the delegation recalled Trump Jr. asking whether Veselnitskaya had incriminating information on Hillary Clinton:

> *MR. SCHIFF: And do you recall Don Jr. asking whether Veselnitskaya had anything on Hillary Clinton?*

> *MR. KAVELADZE: Yes.[77]*

Trump Jr. also indicated that he likely would not have invited Manafort and Kushner had he known what the Russian lawyer had actually planned to discuss:

> *MR. SCHIFF: But it's fair to say you were hoping for something more useful than what you got?*

> *MR. TRUMP JR.: That's fair.*
>
> *MR. SCHIFF: And is it fair to say you wouldn't have invited the campaign chairman to the meeting if all you knew you were going to get was what they provided in terms of derogatory information?*
>
> *MR. TRUMP JR.: In hindsight, that's probably accurate, but I don't know.*
>
> *MR. SCHIFF: And in hindsight, you wouldn't have invited Mr. Kushner if you weren't going to get anything more useful than that?*
>
> *MR. TRUMP JR.: I may not have. I don't know.*
>
> *MR. SCHIFF: And it's also fair to say that you were hoping that the derogatory information you were going to get was going to be useful to your campaign?*
>
> *MR. TRUMP JR.: I imagine so.*[78]

Immediately after the meeting, the delegation proceeded to the bar in Trump Tower to discuss the meeting. According to Kaveladze, Veselnitskaya "expressed her dissatisfaction," though "she said it's good that he [Trump Jr.] suggested that they might return to the topic again, you know, if – if they win the election." Kaveladze left the bar after a few minutes to take a call from Agalarov to discuss the meeting.[79]

The very next day, on June 10, 2016, Aras Agalarov delivered to candidate Trump an expensive painting for the candidate's birthday.[80]

Candidate Trump sent Agalarov a thank you note on June 17, 2016:

> "*There are few things better than receiving a sensational gift from someone you admire – and that's what I've received from you. You made my birthday a truly special event by your thoughtfulness – not to mention your remarkable talent. I'm rarely at a loss for words, but right now I can only say how much I appreciate your friendship and to thank you for this fantastic gift. This is one birthday that I will always remember.*"[81]

When news broke five days after this meeting that Russians were behind the hacked DNC emails, Rob Goldstone sent a news article to Emin Agalarov and Ike Kaveladze, "*Top story right now – seems eerily weird based on our Trump meeting last week with the Russian lawyers etc*".[82]

While the Majority opted not to investigate the underlying facts surrounding the June 9, 2016 meeting, the preliminary record speaks volumes about the Russians' approach to convey

UNCLASSIFIED

damaging information on Clinton, as well as the Trump campaign's eagerness to receive that information.

The Majority's report admits that Trump Jr. was "open to discussing derogatory information from Russian government sources that could be useful to candidate Trump."[83] Not only did Trump Jr. believe that the meeting was about such information, but a separate attendee at the meeting testified that he, the attendee, contacted an associate who informed him that the purpose of the meeting would be to provide negative information on Clinton.[84] That third-party associate – Roman Beniaminov, a friend and business associate of Emin Agalarov who had prior knowledge of the Trump Tower meeting and its purpose – was never called to testify before the Committee despite repeated requests by the Minority.

Despite these significant gaps in the record, the Majority attempts to explain away this offer of damaging information on candidate Trump's opponent, and the campaign's enthusiastic desire to receive it, claiming that witnesses questioned about the meeting testified that "there was no mention of derogatory or incriminating information directly relating to Hillary Clinton" during the meeting.[85] Instead, the report notes that witnesses testified that the meeting centered on adoptions and the Magnitsky Act.[86]

This argument ignores two key points: first, that the Trump campaign officials themselves wished to receive a thing of value from a foreign government, namely damaging information on their opponent. Second, that the meeting was also about what the Trump campaign could do for Russia in return – help lift Magnitsky Act sanctions against the country, a top priority for Putin.[87] Since the campaign was likely already on notice, via George Papadopoulos' contact with Russian agents, that Russia in fact had damaging information on Trump's opponent, the June 9 meeting may have been an effort by Russian intelligence to gain insight into the Trump campaign's receptivity to receiving their assistance and how Trump and his associates might respond once Russia began anonymously releasing such information – or "dirt" – on Hillary Clinton.

Significantly, within days of Trump's election, the Russians reached out to the Trump family again, seeking a follow up meeting on the Magnitsky Act. In an email dated November 28, 2016, Goldstone emailed Graff, explaining that "Aras Agalarov has asked me to pass on this document in the hope it can be passed on to the appropriate team." Later that day, Graff forwarded to Steve Bannon the email with Agalarov's document regarding the Magnitsky Act as an attachment, explaining, "The PE [President Elect] knows Aras well.  Rob is his rep in the US and sent this on. Not sure how to proceed, if at all. R."[88]

Two weeks later, on December 13, 2016, Emin Agalarov texted Donald Trump Jr. about a business venture:

> *"Hi Don! Hope all is well, quick question for you. I've been in discussion with the Trump furniture producers from Turkey to open a store and a distribution Chanel in Moscow. Just wanted to check with you if you are ok with us partnering up with them and*

*launching the project. Wanted to check with you before committing [] thank you, Emin (Moscow)@.* [89]

## Public Disclosure of June 9, 2016 Meeting

On July 8, 2017, the *New York Times* reported on the fact of the June 9, 2016 meeting at Trump Tower.

The Committee is in receipt of extensive documentary evidence – including text messages, voice messages, and email correspondence – outlining extensive efforts by the Trump campaign meeting participants, at least one Trump organization lawyer, and the Agalarovs, to control the public narrative surrounding the meeting. Despite the extensive documentary record, which the Minority will outline in detail as part of its final report, the Majority has denied requests to interview all of the parties involved in this effort.

In response to press revelations, Trump Jr. posted online an email chain of his communications setting up the meeting, saying, "In order to be totally transparent, I am releasing the entire email chain of my emails with Rob Goldstone about the meeting on June 9, 2016."

In assessing how to respond, Trump Jr. acknowledged that Hope Hicks presented him with options:

> *MR. SCHIFF: And what was Hope Hicks' suggestion vis-à-vis the emails?*
>
> *MR. TRUMP JR: I believe we had presented multiple statements, a longer-form version and a shorter-form version. And I believe she preferred, in speaking with people, whoever they were, to go with a shorter form version of the statements that we had started preparing with counsel.* [90]
>
> *---*
>
> *MR. SCHIFF: So if you would, getting back to your text exchange with Hope Hicks, I asked if it concerned the scope of the emails that would be released or the scope of the statement that would be released. I think you said neither.*
>
> *MR. TRUMP JR: It was only about the statement.*
>
> *MR. SCHIFF: In your text communications with Hope Hicks, did you discuss whether to release emails?*
>
> *MR. TRUMP JR: I don't believe I did.*

UNCLASSIFIED

> *MR. SCHIFF: And in terms of the statement, did you draft a statement yourself and send to her, did she draft one and send to you? What was the nature of the communication?*
>
> *MR. TRUMP: I worked with counsel on the statement, and counsel may have sent to Hope.*[91]

Mr. Trump Jr. acknowledged having had at least one conversation with his father about the public release of his email and his public statements on the issue. However, Trump Jr. asserted attorney-client privilege to avoid testifying about the substance of those communications, despite that neither he nor his father are attorneys. Rather, Trump Jr. claimed a privilege existed by the mere presence of attorneys. These conversations pertain to important matters under investigation. As the Minority made clear following Trump Jr.'s interview, this assertion of privilege, invoked based on Trump and Trump Jr. having attorneys present for at least one phone call, is meritless and merely an effort to shield non-privileged direct communications between father and son on matters unrelated to seeking, obtaining, or providing legal assistance from counsel.

## *Weaponization of Hacked Information*

It was only days after the Trump Tower meeting that WikiLeaks and Julian Assange would first announce receipt of stolen DNC and Clinton-related emails.

On June 14, 2016, the *Washington Post reported* that Russian government hackers penetrated the computer network of the Democratic National Committee.[92] Crowdstrike, a cybersecurity firm hired by the DNC to address the breach, identified through digital footprints two Russia-linked hacker groups responsible for the hack, Cozy Bear and Fancy Bear.

Hours after *the Post* publicly attributed the hack to Russia-linked groups, the persona Guccifer 2.0 started a WordPress blog disputing CrowdStrike's attribution and claiming exclusive credit for the theft. It was an apparent effort on the part of the Russian Federation to cast public doubt about its involvement. However, the DNC and Crowdstrike were confident in their attribution. Recent reporting indicates that Guccifer 2.0 is not merely a Russian cutout, but appears in fact to be controlled by Russia's military intelligence directorate, the GRU.[93]

This stolen data would then be systematically released through Guccifer 2.0 and the Russian cutouts DC Leaks and WikiLeaks, throughout the summer of 2016.

Just days before the Democratic National Convention would kick off, on July 22, 2016, WikiLeaks released nearly 20,000 emails hacked from the Democratic National Committee (DNC). The release was clearly designed to sow discord within the Democratic Party just as the convention approached.

UNCLASSIFIED

UNCLASSIFIED

Candidate Trump's Public Statements

The dissemination of stolen Clinton campaign information tracked closely with public comments from Trump officials, including Trump Jr., Roger Stone, and candidate Trump throughout the summer of 2016. As the Russians anonymously pushed out stolen information through its intermediaries, Trump and his campaign publicly touted the hacked emails on a daily basis, and attempted to cast doubt on Russian attribution.

On Monday, July 25, 2016, the FBI confirmed that it had opened an investigation into the hacking of the DNC computer network, which sources and experts had already attributed to hackers in Russia. That same day, then-candidate Trump tweeted, "The new joke in town is that Russia leaked the disastrous DNC e-mails, which should never have been written (stupid), because Putin likes me."[94]

On July 27, two days after the start of the Democratic National Convention, candidate Trump called on Russia to hack Clinton again, telling a crowd: "Russia if you're listening, I hope you're able to find the 30,000 [Clinton] emails that are missing."[95] Earlier in the day, Trump had tweeted: "Funny how the failing @nytimes is pushing Dems narrative that Russia is working for me because Putin said 'Trump is a genius.' America 1st!"[96]

On September 26, 2016, at the first presidential debate of the general election, candidate Trump publicly doubted the attribution: "I don't know if we know it was Russia who broke into the DNC. She's saying Russia, Russia, Russia. Maybe it was. It could also be China, it could be someone sitting on their bed that weighs 400 pounds."[97]

Over the last few months of the campaign, then-candidate Trump tweeted more than 100 times, praising WikiLeaks and casting doubt on claims that Russia was behind the hacked emails and broader misinformation campaign. Such a willingness by a U.S. presidential candidate to accept and encourage assistance from a hostile foreign adversary is unprecedented.

Donald Trump Jr. and WikiLeaks

During the course of the campaign, Trump Jr. openly tweeted about WikiLeaks and expressed a clear willingness to obtain any helpful information from the group.

On September 21, 2016, Trump Jr. emailed several senior campaign officials, including Kellyanne Conway, Steve Bannon, Jared Kushner, David Bossie, and Brad Parscale:

> *"Guys I got a weird Twitter DM from [W]ikileaks. See below. I tried the password and it works and the about section they reference contains the next pic in terms of who is behind it. Not sure if this is anything but it seems like it's really wikileaks asking me as I follow them and it is a DM. Do you know the people mentioned and what the conspiracy they are looking for could be? These are just screen shots but it's a bully built out page claiming to be a PAC let me know your thoughts and if we want to look into it."[98]*

UNCLASSIFIED

Trump Jr. claimed he did not respond to this message though he "believe[d] Brad Parscale responded."[99]

On October 3, 2016, Wikileaks sent Trump Jr. a private direct message, asking that "you guys" comment on or "push" a story Wikileaks' twitter page had promoted earlier that day. Wikileaks' tweet, linking to a page on "truepundit.com" said: "Hillary Clinton on Assange 'Can't we just drone this guy'"[100] Trump Jr. replied to WikiLeaks, "Already did that earlier today. It's amazing what she can get away with. What's behind this Wednesday leak I keep reading about?"[101]

As election day grew near, Trump Jr's interaction with Russian cutouts increased. For example, on October 5, Trump Jr. retweeted Wikileaks: "RT @wikileaks: NEW: Guccifer 2.0 archive of 860Mb of various "Clinton campaign" related documents. Use "7zip" to unpack."

Two days later, on October 7, Trump Jr. retweeted Wikileaks: "RT @wikileaks: RELEASE: the first 2050 of well over 50000 emails from Clinton Campaign Chairman John Podesta." Also on October 7, Trump Jr. retweeted the following:
- o "RT @wikileaks: Secret paid Clinton speech: "You need to have a public position and a private position on policy" #PodestaEmails https://t.c…
- o "RT @CNNPolitics: WikiLeaks posts emails hacked from Clinton campaign chairman John Podesta"
- o "RT @wikileaks: RELEASE: Hillary Clinton Goldman Sachs paid speech transcript excerpts 2013 & 2014 #PodestaEmails"
- o "RT @FoxNews: .@wikileaks appears to release transcripts of @HillaryClinton's paid speeches"
- o "RT @TwitchyTeam: OCTOBER SURPRISE? WikiLeaks just dropped the first batch of 'well over 50,000' emails allegedly from John Podesta"

Roger Stone, WikiLeaks, and Guccifer 2.0

Roger Stone, candidate Trump's longtime associate and surrogate throughout the campaign, suggested during the campaign he was in communications with WikiLeaks and Julian Assange. He also sought to viciously attack Hillary Clinton and wrote at least one article raising the likelihood that the election was rigged.

On August 5, 2016, Stone wrote a column for Breitbart entitled, "Dear Hillary: DNC Hack Solved, So Now Stop Blaming Russia."  In that article, Stone stated, "It doesn't seem to be the Russians that hacked the DNC, but instead a hacker who goes by the name Guccifer 2.0."

Later in August, Stone engaged in a series of tweets with or about Guccifer 2.0.

- On August 13, 2016, Stone replied to a tweet from @WikiLeaks about Twitter suspending @Guccifer_2, writing "Outrageous ! Clintonistas now nned [sic] to censor their critics to rig the upcoming election."
- On August 14, 2016, Stone tweeted: "First #Milo, now Guccifer 2.0 - why are those exposing the truth banned? @RealAlexJones @infowars #FreeMilo."
- Once @Guccifer_2's account had been reinstated, Stone then sent that account a private message: "Delighted you are reinstated. Fuck the State and their MSM lackeys."
- @Guccifer_2 responded to Stone's message with a private response, on August 15: "wow thank u for writing back and thank you for an article about me!!! do u find anything interesting in the docs i posted?"[102]

The following day Stone wrote an op-ed for TheHill.com entitled, "Can the 2016 election be rigged? You bet."[103] That same day, Stone privately messaged @Guccifer_2 on Twitter, referencing his Hill column and asking Guccifer to retweet: "PLZ RT," with a hyperlink to the article. Guccifer_2 replied with two private messages: "done"; and "i read u'd been hacked."

On August 17, 2016, Guccifer 2.0 sent Stone a Direct Message, "please let me know if I can help you in any way it would be a great pleasure to me."

On September 9, 2016, @Guccifer_2 privately messages Stone with a link to a blog post from "HelloFLA.com" about Democratic voter turnout, particularly among marginal voters who are persuadable, writing:

> *hi, what do u think of the info on the turnout model for the democrats entire presidential campaign? Basically how it works is there are people who will vote party line no matter what and there are folks who will actually make a decision. The basic premise of winning an election is turnout your base (marked turnout) and target the marginal folks with persuadable advertising (marked persuadable). They spend millions calculating who is persuadable or what we call a 'soft democrat' and who is a 'hard democrat.'*

Stone replied to Guccifer, via Twitter private message thread, that such efforts were *"pretty standard."*

On October 1, Stone Tweeted, "Wednesday @HillaryClinton is done #WikiLeaks." Two days later, Stone Tweets, "I have total confidence that @Wikileaks and my hero Julian Assange will educate the American people soon #lockherup." On election night, November 9, 2016, Guccifer 2.0 sent Stone a Direct Message, "Happy? We are now more free to communicate."[104]

Throughout the campaign, Stone regularly represented that he was either in communication with Assange or communication through an intermediary with Assange. Despite these public proclamations during the election, Stone claimed during his interview that he had never met with or spoken with Assange.

UNCLASSIFIED

*MR. QUIGLEY:  You never met with Julian Assange.*

*MR. STONE:  Correct.*

*MR: QUIGLEY: You never communicated directly with him.*

*MR. STONE: Correct.*

*MR. QUIGLEY:  You've never spoken to him on the phone.*

*MR. STONE:  I never communicated directly with him during the election, correct.*

*MR. QUIGLEY:  Did you ever communicate with him outside of that timeframe?*

*MR. STONE:  We had some, I think, direct message responses in April of this year.*

*MR. QUIGLEY:  You and Julian Assange?*

*MR. STONE:  Correct.*

*MR. QUIGLEY:  Can you make those available to the committee?*

*MR. STONE:  Yes, we can.*

*MR. QUIGLEY:  Okay.  Had you ever communicated with him before the campaign?*

*MR. STONE:  No.*

*MR. QUIGLEY:  So, back on this other streak, you've never emailed with him?*

*MR. STONE:  Correct*

*MR. QUIGLEY:  Have you ever sent or received texts/SMS to and from Mr. Assange?*

*MR. STONE:  No.*

*MR. QUIGLEY:  Have you ever communicated with Mr. Assange over any other social media platform or encrypted application –*

*MR. STONE:  No[105].*

36
UNCLASSIFIED

UNCLASSIFIED

Seeking to explain his public statements about communications with Assange, Stone claimed during his testimony that his knowledge had been obtained through an intermediary.

> MR. QUIGLEY:  And so, just to reiterate, in an August 12th, 2016, interview with Alex Jones on Infowars, you reiterated your contact with Julian Assange, quote, "in communication with Assange," adding, quote, "I am not at liberty to discuss what I have."  That was correct too?
>
> MR. STONE:  That is correct.
>
> MR. QUIGLEY:  But you were referencing the same thing you pointed to before?
>
> MR. STONE:  Again, I have sometimes referred to this journalist as a go-between, as an intermediary, as a mutual friend.  It was someone I knew had interviewed Assange.  And I merely wanted confirmation of what he had tweeted on the 21st.  And that's what I refer to.
>
> MR. QUIGLEY:  -- like Twitter, LinkedIn, anything?
>
> MR. STONE:  No.
>
> MR. QUIGLEY:  Have any of your employees, associates, or individuals acting on your behest or encouragement been in any type of contact with Julian Assange?
>
> MR. STONE:  No.
>
> MR. QUGLEY:  Have you ever been in direct contact with a member of Wikileaks, whether by phone, email, text, Twitter, encrypted message platforms, other social media platforms, or other means of communication?
>
> MR. STONE:  I'm not certain, but I don't think so.[106]

Mr. Stone refused in the interview to disclose his intermediary's name.

> MR. SCHIFF:  Mr. Stone, I wanted to ask you, on October 12th [2016], you gave an interview to NBC News where you said that:  We have a mutual friend who's traveled to London several times, and everything I know is through that channel of communication.
>
> MR. STONE: Yes.
>
> MR. SCHIFF:  Referring to a friend of Assange.
>
> MR. STONE: Yes.

MR. SCHIFF: And you said something similar in another interview on October – to CBS Miami.  Did the intermediary tell you how often he traveled to London to meet with Mr. Assange?

MR. STONE: No.  I just knew he had been there a couple times.[107]

---

MR. SCHIFF: So throughout the many months in which you represented you were either in communication with Assange or communication through an intermediary with Assange, you were only referring to a single fact that you had confirmed with the intermediary –

MR. STONE:  That –

MR. SCHIFF:  -- was the length and the breadth of what you were referring to?

MR. STONE:  That is correct, even though it was repeated to me on numerous separate occasions. [108]

---

MR. SWALWELL: If we were to send you a request asking for any direct messages with respect to the 2016 campaign, particularly around Guccifer 2.0 and Wikileaks, you would be cooperative and turn that over to us?

MR. STONE: Well, I attached the exchange with Guccifer as an exhibit, and you're welcome to look at it.  Beyond that, we'd have to go review the material.  I don't know what's there.[109].

---

MR. CASTRO:  You have now just told us that the intermediary told you in August that the emails would be released in October.  Is that prior knowledge?

MR. STONE:  I guess you could consider it prior knowledge.  I would have to go back and look.  I think that Assange himself had said October on Twitter.  I was seeking a confirmation of what he'd already said.

MR. CASTRO: Mr. Stone, you've said multiple times here today that you had no prior knowledge. You've just now admitted that you had prior knowledge that these emails would be released.

MR. STONE: I believe that was a – I think that was publicly known, in all honesty.[110]

Stone also attempted to explain away his tweets about John Podesta's emails by claiming he was referring to a business deal that Stone had expected Assange to publish.[111]

Podesta's personal email account was the subject of a phishing email in or around May 2016. Mr. Podesta, however, was unaware at the time that his emails had been stolen. On August 21, 2016, Stone tweeted: "Trust me, it will soon be Podesta's time in the barrel. #CrookedHillary." WikiLeaks would not begin publishing Clinton campaign chairman John Podesta's emails until October 7, 2016. Stone's tweet prompted Podesta to suspect his account might have been hacked.[112]

The systematic release and weaponization of stolen emails over the course of the 2016 campaign was designed to inflict maximum harm on one candidate – Hillary Clinton – and boost her opponent, Donald Trump. As Mr. Podesta explained:

> MR. SCHIFF: I'm sorry, campaign chair, what do you think the effect of the continual dumping of the emails was on your campaign? And can you quantify it for us in any terms? Let me start with that.
>
> MR. PODESTA: Well, look, I think the manner in which it was done, constant release, day by day, from October 7 through the election, was intended to inflict damage on the campaign by keeping the press focused on whatever tidbits of campaign gossip they might find in those emails, and to distract from the ability to be talking about the real issues in the campaign. I think the timing of the first release is relevant. I think the timing of the first release is also relevant. In the wake of – on the same day, the letter from Jey Johnson and Jim Clapper noting that the intelligence Community had included that the Russians were involved in active measures, as it were – not quoting from the letter, but you remember that letter on October 7 – followed by the release of the Access Hollywood tape. And within a half an hour of that release, the emails started to get dumped. So I think that was –"[113]

Peter Smith Operation

The Majority concludes in their report that no Trump campaign associates were "involved in the theft or publication of Clinton-campaign related emails," but that Trump associates nevertheless had some "'ill-advised' contacts with WikiLeaks." Lines of inquiry the Majority refused to pursue, or pursued only tepidly, leave this finding open to doubt.

An example involves efforts by Peter W. Smith, a Republican activist with ties to the Trump Campaign.  During the 2016 U.S. election cycle, Smith sought to find and authenticate emails which, according to a contact of Smith's from the "Dark Web," had been harvested from Hillary

Clinton's private server. For this project, Smith in September sought the technical assistance of a leading cybersecurity expert, Matthew Tait.

Smith made clear to Tait that he was well acquainted with Flynn and his son. Additionally, on September 7, Smith sent Tait a document describing his overall political efforts, as well as the role Smith proposed for Tait.  That document, among other things:

> [D]etailed a company Smith and his colleagues had set up as a vehicle to conduct the research: "KLS Research", set up as a Delaware LLC "to avoid campaign reporting," and listing four groups who were involved in one way or another."

> The first group, entitled "Trump Campaign (in coordination to the extent permitted as an independent expenditure)" listed a number of senior campaign officials: Steve Bannon, Kellyanne Conway, Sam Clovis, Lt. Gen. Flynn and Lisa Nelson.[114]

For his part, Tait suspected that Smith could have "been contacted by a Russian intelligence front with intent to use Smith as part of their scheme by laundering real or forged documents," and thus explained to Smith that "if someone had contacted him via the 'Dark Web' with Clinton's personal emails, he should take very seriously the possibility that this may have been part of a wider Russian campaign against the United States."  Smith, however, "didn't seem to care."[115]

Tait never confirmed the identity of Smith's dark web contact. And Smith died in May, after speaking about his experience.[116]  After interviewing Tait and one additional witness, Jonathan Safron (by phone), the Majority refused to pursue further inquiries into Smith's activities.

Rigged Election Messaging

As the hacking and dissemination of emails unfolded, then-candidate Trump regularly drummed the idea that the election was rigged. In parallel, WikiLeaks had suggested to Donald Trump Jr. that the campaign should challenge the election results should Mr. Trump lose. On October 21, 2016, WikiLeaks sent Donald Trump Jr. a Twitter direct message: "Hi Don, if your father 'loses' we think it is much more interesting if he DOES NOT concede and spends time CHALLENGING the media and other types of rigging that occurred – as he has implied that he might do."

Majority Report

The Majority report states that communication between WikiLeaks and campaign personnel such as Donald Trump Jr. and Roger Stone, as well as attempts by Cambridge Analytica CEO Alexander Nix to acquire Clinton campaign emails from WikiLeaks founder Julian Assange, were "imprudent in light of WikiLeaks' role in disseminating stolen emails in line with Russian interests."[117] In fact, these surreptitious contacts between WikiLeaks and Trump campaign

associates are further evidence of an active effort to obtain Russian stolen Clinton emails either directly from the Russians or from their intermediaries.

The Majority concludes in their report that "the Committee did not find that multiple Trump associates went beyond mere praise and established lines of communication with WikiLeaks during the campaign."[118] The Committee, however, did not seek to validate claims by campaign personnel that this was the case, relying instead on witness testimony about their own communications.

For example, the Majority report notes that, "Trump Jr. testified that he did not reply to any of these messages [from WikiLeaks], nor did he have any communications with WikiLeaks before September 20 or after October 3, 2016. He testified that the direct message exchanges discussed above 'is a complete record of any communications [he] had with WikiLeaks."[119] The Committee has no way of determining the veracity of this statement because the Majority refused numerous requests by the Minority to subpoena Twitter to determine whether the communications publicly revealed and later provided to the Committee by Trump Jr. comprised the full record of communication between WikiLeaks and the witness.

Similarly, Committee Republicans refused to subpoena the company for records related to communication between WikiLeaks, its founder Julian Assange, or Russian cutouts responsible for disseminating hacked emails—such as Guccifer 2.0 and DC Leaks—and Trump campaign personnel, including Roger Stone and Cambridge Analytica. As such, any conclusions reached about witness interaction between the Trump campaign and WikiLeaks or other Russian cutouts is based on an incomplete investigative record. The Majority also has refused to require a reappearance of several witnesses, such as Stone, despite public reporting inconsistent with their testimony, including reports indicating that Stone may have been in direct contact with Assange during the 2016 campaign.[120]

Significant questions still remain, including: whether the Trump campaign received advanced knowledge of or access to the anonymously leaked, stolen information; whether the stolen emails informed campaign activity, including voter persuasion and targeting through its online operation—including through its sub-contractor Cambridge Analytica; and whether anyone directly or indirectly affiliated with the Trump campaign was in the chain of custody of the hacked and disseminated emails beyond sharing what was made publicly available in 2016.

_July 2016 – Carter Page Travel to Moscow_

As the summer progressed, the Russians reached out to an additional Trump campaign official, Carter Page.  Like Papadopoulos, Page was one of the initial group of five publicly-announced foreign policy advisors to the Trump campaign.  He was invited to travel to Moscow to give a speech at a prominent university, notwithstanding his lack of stature or requisite expertise. In Moscow, Page met with high-level Russian government and Putin-aligned business associates.[121]

UNCLASSIFIED

As with Papadopoulos, Russia's interest in Page had little to do with his experience in the energy sector and everything to do with his affiliation with the Trump campaign.

Page is the type of susceptible and ambitious individual with impressionable views broadly aligned with the Russian government's worldview who would be a prime target of the Russian intelligence services.  He resided in Moscow from 2004 to 2007, where he pursued a variety of business deals, including with Russia's state-owned energy company Gazprom. The Russians had actually tried to recruit Page in the past. In 2013, prosecutors indicted three Russian spies, two of whom targeted Page for recruitment. Indeed, the FBI had interviewed Page multiple times about his Russian intelligence contacts, including in March 2016 – the very month then-candidate Trump announced Page as one of his five initial foreign policy advisors.[122]

Prior to his testimony, Page made numerous and false public statements about his trip, denying that he met with Russian government officials and claiming to have only sought the input of the "man on the street." He also claimed to have visited Moscow in purely a personal capacity. But during his testimony, he was forced to acknowledge having had contact with senior members of the Russian government - including Deputy Prime Minister Arkady Dvorkovich – and reporting back to the campaign using the campaign's reporting mechanism.

On July 8, 2016, he emailed campaign foreign policy advisors Tera Dahl and JD Gordon to preview a readout of his visit:

> *"[...] On a related front, I'll send you guys a readout soon regarding some incredible insights and outreach I've received from a few Russian legislators and senior members of the Presidential Administration here. Suffice to say that after watching their national economy and relationships with Europe get derailed by Washington mismanagement with disastrous consequences over recent years, Russians from the highest levels of government to the average man on the street have a new optimism and hope for the future based on Mr. Trump's common sense statements about his foreign policy approaches over the past year."*[123]

In the follow-up readout, also sent on July 8, 2016, Page wrote:

> *"On Thursday and Friday (July 7 & 8, 2016), campaign advisor Carter Page presented before gatherings at the New Economic School (NES) in Moscow including their 2016 Commencement Ceremony. Russian Deputy Prime Minister and NES Board Member Arkady Dvorkovich also spoke before the event. In a private conversation, Dvorkovich expressed strong support for Mr. Trump and a desire to work together toward devising better solutions in response to the vast range of current international problems. Based on feedback from a diverse array of other sources close to the Russian Presidential Administration, it was readily apparent that this sentiment is widely held at all levels of the government."*[124]

UNCLASSIFIED

UNCLASSIFIED

Page also testified that, in advance of this trip, he alerted several members of the campaign to ensure he obtained the appropriate approvals.  In one email, Page suggested the then-candidate Trump travel to Moscow to give the speech.

Trump officials have sought to minimize Page's role in the campaign, calling him "low level," one of the "hangers-on," and someone with little influence.  Yet, in his testimony to this Committee and in documents produced to the Committee, we have learned that Mr. Page had regular communications with senior campaign officials and met with high-ranking foreign officials.

The Majority admits in its report that Carter Page's testimony and document production, as cited in his publicly-released transcript, show that Page informed Trump campaign officials several times before traveling to Moscow to speak at the university; that he was given permission by campaign chairman Corey Lewandowski to take the trip; and that he provided to senior campaign personnel an official read-out of his visit while still in Moscow, in which he detailed the senior Presidential Administration, Rosneft, and Gazprom employees with whom he met. The Majority writes off these activities, claiming that Page did not travel on behalf of the Trump campaign.[125]  Yet, this blanket dismissal ignores the reality that Page was invited to Moscow precisely because he had been named a foreign policy advisor to candidate Trump.

Furthermore, in September 2016, Mr. Page traveled to Budapest, Hungary, where he again presented himself as a member of then-candidate Trump's foreign policy team.  There, he held a 45-minute meeting with Jeno Megyesy, a close adviser to Hungarian Prime Minister Viktor Orban who focuses on relations with the United States.  The meeting was held at Megyesy's office in Budapest.  Page held a second meeting at a hotel in Budapest with Hungary's then-Ambassador to the United States Reka Szemerkenyi.  Page initially met Szemerkenyi at the Republican National Convention in Cleveland. The two reportedly met a third time in October at an embassy function in Washington.

This section of the Majority's report is internally illogical and inconsistent. First, the finding claims that the Majority is "concerned about his seemingly incomplete accounts of his activity in Moscow."[126] But, the Majority then cites the fact that Page has "repeatedly and consistently denied meeting"[127] Russians of interest. It is unclear whether the Majority believes that Page's "consistent" denials or his "inconsistent accounts" are sufficient to answer serious questions about his travel and activities during the campaign.  The FBI's FISA application and its renewals to conduct surveillance on Page shed light on these important questions. This material is conveniently omitted from the Majority report.

The Majority repeats spurious claims from its widely-criticized "FISA Abuse memorandum," which alleged FBI and DOJ abuses in seeking authorization to surveil Page. As the Minority's publicly-released memorandum of January 29, 2018 made clear,

43
UNCLASSIFIED

"DOJ's October 21, 2016 FISA application and three subsequent renewals carefully outlined for the Court a multi-pronged rationale for surveilling Page, who at the time of the first application, was no longer with the Trump campaign. DOJ detailed Page's past relationship with Russian spies and interaction with Russian officials during the 2016 campaign [REDACTED]. DOJ cited multiple sources to support the case for surveilling Page—but made only narrow use of information from Steele's sources about Page's specific activities in 2016, chiefly his suspected July 2016 meetings in Moscow with Russian officials."[128] (See Appendix F.)

The FBI's January 31, 2018 statement about Chairman Nunes' memorandum, in which it expressed "grave concerns about material omissions of fact that fundamentally impact the memorandum's accuracy,"[129] could apply equally to the Majority's recycled assertions in this report.

The Majority report also notes in this section that it is concerned about whether Russian disinformation found its way into the Steele dossier without providing evidence. Steele was a well-regarded FBI contact whose reporting and source network had been found credible over several years.

Moreover, as the Minority's January 29, 2018 memorandum points out, in the course of investigating Page's activities in Moscow in 2016, the DOJ obtained information through "multiple independent sources that corroborated Steele's reporting,"[130] lending credibility to Steele's claims about Page's activity in Moscow in July 2016.

*December 2016/January 2017 – Backchannel Meetings with Russia*

Once election day had passed and Donald Trump was declared the winner, the preponderance of the evidence indicates that the Trump campaign-turned-transition set about to establish additional secret backchannels to the Russians.

On December 1, 2016, Jared Kushner and Michael Flynn held a secret meeting with then-Russian Ambassador Sergey Kislyak at Trump Tower in New York, in which they reportedly discussed using Russian diplomatic facilities in the United States for secure communications between the Trump transition and the Kremlin.[131] The meeting followed numerous contacts between Trump campaign officials and Ambassador Kislyak throughout the election season, which would only come to light after they were revealed in press reporting and following attempts by campaign officials to deny the meetings and approaches. Likewise, the White House affirmed the existence of the December 1, 2016 meeting only in March 2017, following its public revelation. The Committee has yet to fully investigate for what purpose and from whom Flynn and Kushner wished to hide their communications, and what necessitated secret communications through Russian intermediaries and using Russian infrastructure.

UNCLASSIFIED

Later that month, on December 13, at the request of Ambassador Kislyak, Kushner took another secret meeting at Trump Tower,[132] this time with Sergey Gorkov, the head of Vnesheconombank, or VEB, a state-run financial entity under U.S. sanctions since 2014 and alleged to have ties to Russian intelligence services.[133]

Accounts differ regarding the purpose of the meeting. Then-White House spokeswoman Hope Hicks stated on May 29, 2017 that "Mr. Kushner was acting in his capacity as a transition official," and the meeting was unrelated to business.[134] In his July 2017 statement to congressional committees, Kushner claimed that, "[Gorkov] told me a little about his bank and made some statements about the Russian economy. He said that he was friendly with President Putin."[135] During Committee testimony, Kushner noted that he took the meeting in part so that Gorkov could "provide insight into what Putin's thoughts were on a potential new relationship."[136]

When the meeting was first revealed publicly in March 2017, however, Gorkov and the bank claimed that it was part of an effort to meet with representatives of "business circles of the U.S., including with the head of Kushner Companies, Jared Kushner."[137] Whether the meeting was to establish Gorkov as an intermediary for Putin, consider a business deal between soon-to-be White House official Kushner and Gorkov, or—most troubling—a mixture of both, remains unanswered. Public flight logs indicate that VEB's private jet flew from Moscow to Newark airport on December 13, 2016 – the day of Gorkov's meeting with Kushner - departing the afternoon of December 14 to Japan, where President Putin was visiting on December 15 and 16. Press reporting indicates Gorkov met Putin there.[138]

In mid-December, shortly after the Kushner-Gorkov meeting, the transition held yet another meeting at Trump Tower, this time with an official delegation from the United Arab Emirates, which the Trump transition and the UAE hid from Obama Administration officials.[139] The meeting, attended by Kushner, Flynn, and Steve Bannon—and, according to March 2018 press reports, UAE advisor George Nader[140]—preceded yet another secret meeting in January 2017 in the Seychelles between Trump associate Erik Prince and a Russian close to Putin, facilitated by the same UAE officials. Committee testimony by two of the attendees at the December Trump Tower meeting—Kushner and Bannon—has shed little light on the purpose of the meeting and why, as with others throughout December, it was originally shielded from discovery.

On January 11, 2017, shortly after the UAE meeting in Trump Tower and only days before Donald Trump's inauguration as President, Erik Prince, a Trump supporter and brother of Education Secretary Betsy DeVos, traveled to a resort island off the African coast during which he met with senior UAE officials and held a private meeting with a Russian close to Putin: Kirill Dmitriev, the head of Russia's sovereign wealth fund, the Russian Direct Investment Fund, which, like VEB, is subject to U.S. sanctions.

During his November 30, 2017 testimony before the Committee, Prince noted that he spoke with Bannon about the December transition team-UAE meeting before he traveled to the Seychelles,

UNCLASSIFIED

UNCLASSIFIED

but claimed that the December meeting was unrelated to his own trip to see UAE officials and Dmitriev.[141] When asked whether he was testifying that it was a coincidence that Dmitriev was in the same hotel as Prince and meeting with the same UAE officials in the Seychelles on January 11, Prince claimed that the UAE had "good relationships with a lot of other countries, so it's not a surprise that other leaders, other people from other countries would've been waiting to see or having met with any of that leadership."[142] Prince, however, refused to answer numerous questions about the meeting or its genesis.

The Majority argues perplexingly that these numerous contacts were themselves evidence against a broader campaign conspiracy. According to the Majority's report, "potential Russian efforts to set up a 'back channel' after the election suggest the absence of collusion during the campaign, since the communications associated with collusion would have rendered such a 'backchannel' unnecessary."[143] The logical fallacy so clearly on display in this finding ignores the obvious possibility that the Trump transition may have been seeking (1) to create new lines of communication or expand existing communication channels with the Russians, (2) to deliver on any secret arrangements considered or made during the campaign, and/or (3) hoped to undermine existing and bipartisan U.S. policies towards Russia and its interference in our election.

To support this assertion, the Majority again relies merely on the self-interested testimony of Kushner and Prince. After a brief section explaining the allegations against the two, which references only the December Gorkov meeting and the January Seychelles meeting, the Majority concludes, again without explanation, that the Committee found no evidence that either Kushner or Prince "did anything inappropriate during or following their meetings with [Russian oligarchs Sergey] Gorkov and [Kirill] Dmitriev."[144]

In reaching this assessment, the report spends one paragraph noting that Kushner attended the meeting with Gorkov at the request of Ambassador Kislyak. [145] The Majority quotes Kushner's testimony that Gorkov primarily spoke about VEB, offering no suggestions or assessments as to what the significance of that meeting could be, what specifically may have been discussed about VEB's business, or "Putin's thoughts…on a potential new relationship."

The Majority likewise seeks to exonerate Prince. After quoting Prince's Committee testimony that his meeting with Dmitriev focused on "trade matters" but not sanctions, the Majority concludes with no further information that the Committee "did not find evidence that…Prince did anything inappropriate" during or following the meeting with Dmitriev. The Majority, however, did not seek to validate Prince's claims about the meeting, did not require that he produce relevant material to the Committee on his travel, nor did it seek to interview anyone else who may have knowledge about the meeting.

March 2018 press reporting indicates that George Nader, a Lebanese-American businessman and advisor to Abu Dhabi's leadership, was present for Prince's meetings with the UAE delegation as well as Prince's subsequent meeting with Dmitriev.[146] In his testimony, Prince did not

46
UNCLASSIFIED

acknowledge the presence of others, such as Nader, during his encounters in the Seychelles. Similarly, Kushner did not acknowledge Nader's presence in the Trump Tower meeting with the UAE delegation.

Despite reports, the Majority has refused to interview Nader or anyone else with potential knowledge about the Seychelles meeting to confirm whether Prince's testimony is accurate. The Majority voted down on a party-line basis our request to bring Nader before our Committee and compel Prince's full cooperation.[147] Without corroboration, the Majority cannot credibly reach any definitive conclusion about whether Prince's meeting represented a secret Trump transition backchannel to Russia, nor whether Prince "did anything inappropriate" with respect to his meeting with Dmitriev.

*December 2016 – Attempts to Undermine U.S. Sanctions*

Once the Obama Administration imposed sanctions and expelled Russian personnel in December 2016, the president-elect's designated White House national security adviser, Michael Flynn — with the knowledge of other high-ranking Trump transition officials—conspired secretly with Russian Ambassador Kislyak to undermine the effect of the sanctions. From Flynn's December 1, 2017 guilty plea, and documents in the Committee's possession, we know that Flynn communicated by phone with Ambassador Kislyak contemporaneously with the imposition of sanctions.

According to Flynn's Statement of the Offense:

> *"On or about December 28, 2016, the Russian Ambassador contacted FLYNN. On or about December 29, 2016, FLYNN called a senior official of the Presidential Transition Team (PTT official) who was with other senior members of the Presidential Transition Team at the Mar-a-Lago resort in Palm Beach, Florida, to discuss what, if anything, to communicate to the Russian Ambassador about the U.S. sanctions. On that call, FLYNN and the PTT official discussed the U.S. sanctions, including the potential impact of those sanctions on the incoming administration's foreign policy goals. The PTT official and FLYNN also discussed that the members of the Presidential Transition Team at Mar-a-Lago did not want Russia to escalate the situation. Immediately after his conversation with the PTT official, FLYNN called the Russian Ambassador and requested that Russia not escalate the situation and only respond to the U.S. sanctions in a reciprocal manner. Shortly after his call with the Russian Ambassador, FLYNN spoke with the PTT official to report on the substance of his call with the Russian Ambassador, including their discussion of the U.S. sanctions."[148]*

Despite the clear knowledge of Flynn's discussion with Kislyak by at least one senior transition official and potentially others (including Steve Bannon, who was in Mar-a-Lago with Trump and others on December 29, according to press reports), Trump transition official and former press secretary Sean Spicer claimed publicly on January 13, 2017 that Flynn's discussion with Kislyak

was focused only on the "logistics" surrounding a Trump-Putin phone call.[149] The statement followed press reporting the day before that Flynn had held the calls.[150]

On January 14, according to Vice President-elect Mike Pence, Flynn told him that the call did not include the discussion of sanctions. On January 15, Pence appeared on *Meet the Press*, claiming that Flynn did not discuss sanctions with Ambassador Kislyak during his call. Despite Trump transition officials' knowledge that what Pence was telling the American people was untrue, no one sought to clarify the public or private record. For that, then-Acting Attorney General Sally Yates would have to travel to the White House on January 26 to inform White House Counsel Donald McGahn that Flynn had lied to FBI investigators about his conversations with Ambassador Kislyak and, it appeared, to Vice President Pence.[151] The next day, McGahn asked to see the underlying evidence regarding Flynn's conversation, which he relayed to President Trump. That night, Trump would invite FBI Director Comey to a private one-on-one dinner at the White House in which the President asked Comey whether he wished to keep his job and told Comey that he needed and expected loyalty.[152] On December 2, 2017, Trump would himself tweet that he was aware in late-January 2017 that Flynn was under FBI investigation.[153]

Instead of investigating these facts, the Majority seeks to exonerate Flynn. The purpose is evident – to cast doubt about one of the most damning revelations in the Russia investigation to date: that after months of direct and indirect contact with Russian operatives through numerous Trump campaign and transition officials and associates, and only weeks before Trump's inauguration, Trump's own National Security Advisor-designate —with the full knowledge or explicit support of at least one other transition official—sought to undermine official U.S. policy meant to punish Russia for its unprecedented attack on the United States. That the attack supported the candidate whose own transition officials were now seeking to help Russia in return is an inescapable fact which the Majority's report goes to great lengths to ignore.

In its finding on Flynn, the Majority argues that "the FBI agents did not detect any deception" when they interviewed Flynn about these very calls. This conclusion ignores both that Flynn himself admitted in his plea to deceiving FBI agents, and that by the time of his interview with the FBI on January 24, 2017, at least one other official was aware that Vice President-elect Pence had told the same lie on television.

Later, without explanation, the Majority recommends that Congress repeal the Logan Act, a law Flynn likely broke in his communications with Ambassador Kislyak. Not only is this a transparent effort to bolster Flynn by ignoring critical facts regarding his actions and deceit, but it ignored the fact that Flynn was trying to undermine the bipartisan policy of the United States that Russia should be punished for its interference in our election. Is the Majority recommendation to repeal the Logan Act an endorsement of the idea that we should have more than one government at a time, that we should condone lying to the public about secret contacts with an adversary, or that an incoming Administration should seek to undermine the policy of the outgoing Administration without repercussion?

UNCLASSIFIED

*Russian Financial Leverage*

One of the starkest examples of the Majority's failure to conduct a complete investigation into the Russian active measures campaign and its ties to the Trump campaign is its decision not to investigate whether the Russian government may hold financial leverage over Donald Trump, his businesses, or his family. Trump's business history with Russia, dating back at least to 1987, is a tale of failed attempts to secure funding and licenses to build a luxury skyscraper in Moscow— three decades of attempts which continued at least through the early part of 2016, just as the presidential campaign was heating up.

As the Soviet Union was on the verge of collapse in the late 1980s, Trump saw an opportunity. He and his first wife, Ivana, traveled to Moscow in 1987 to look at potential building sites for Trump-owned real estate. No deals materialized, and a decade later, in 1996, Trump announced that he would build a $250 million luxury residential center in Moscow.[154] Yet again, the opportunity dissolved.

Around the same time, Trump began a relationship with Deutsche Bank, the financial institution that U.S. and U.K. regulators hit with fines of approximately $630 million in January 2017 for a $10 billion money laundering scheme that enabled Russian clients to move large amounts of funds improperly to overseas accounts.[155] In 1998, as Deutsche Bank was beginning its real estate business, Trump could not secure funding from major financial firms due to previous failed real estate endeavors.[156] Deutsche Bank would prove to be a lender of last resort for Trump for years; Trump's 2016 financial disclosures shows he owed the bank at least $130 million that year.[157]

As Trump's fortunes improved, thanks to real estate licensing deals and his television show, *The Apprentice*, Trump again sought to find his way into the Russian real estate market. In 2005, he signed an exclusive deal to build Trump Tower Moscow with Bayrock Group—owned and managed by Tevfik Arif and Felix Sater, both of whom have ties to Russia. Sater brought Trump's children, Ivanka and Don Jr., to Moscow in 2006 to scope out potential building sites. Sater testified to the Committee about arrangements he made for Ivanka to sit in President Putin's chair during a tour of the Kremlin and Red Square.[158] Ivanka Trump has said publicly that this "may have" happened.[159] As with Trump's other Russia deals, it never materialized.

A year later, Bayrock Group partnered with the Trump Organization on Trump SoHo, a real estate project subject to numerous lawsuits alleging that the development received questionable funding from Russia and Kazakhstan, and that the Trump Organization defrauded buyers by inflating claims about purchases of the luxury condominiums. Ivanka Trump and Donald Trump Jr. settled, avoiding possible criminal fraud charges.[160]

The following year, in 2008, Don Jr. attended the Moscow real estate summit, where he is quoted as saying: "And in terms of high-end product influx into the U.S., Russians make up a pretty disproportionate cross-section of a lot of our assets; say in Dubai, and certainly with our project

UNCLASSIFIED

in SoHo and anywhere in New York…We see a lot of money pouring in from Russia."[161] The comment certainly appeared to be true with respect to Donald Trump, who the same year sold a Palm Beach, Florida property to Russian oligarch Dmitry Rybolovlev for a record $95 million— reportedly the most expensive home in America at the time at more than double its purchase price from 2004, and at a time when the financial crisis was about to shake the country and the world.[162] Rybolovlev would be one of numerous individuals and entities tied directly or indirectly to Russia who would buy up Trump-branded properties in New York, Florida, and elsewhere.[163]

The full scope of Russia-linked investment in Trump properties, and the use of these transactions to facilitate money laundering schemes, requires additional investigation, since a significant number of Trump property sales and resales over the years have involved shell corporations with opaque ownership structures and origin, many based in foreign jurisdictions with secretive bank laws, that paid in cash.[164]

Despite the influx of cash, and the loans from financial institutions with questionable ties to Russia, the Trump Moscow project seemed to elude Trump. As described above, in 2013, he brought the Miss Universe pageant to Moscow, one of the only times the event was not held in a sunny vacation locale. On November 11, 2013 Trump signed a deal with Aras Agalarov's Crocus Group to build a Trump Tower in Moscow. As detailed above, Agalarov cultivated a relationship with Trump and, in Moscow, introduced Trump to the head of one of Russia's largest lenders, Sberbank; Herman Gref was reported to have joined the pageant group's dinner at Nobu during the event. Despite the meetings and fanfare, the deal, as others, never came together, but the relationship between Agalarov and Trump continued.

Instead, in what is believed to be the most recent attempt to secure funding and licenses for a Trump property in Moscow, the Trump Organization, through Felix Sater in 2015, again initiated negotiations to build Trump Tower Moscow. This time, funding would be sought from VTB Bank, Russia's second largest bank and a U.S. sanctioned entity.

In an October 12, 2015 email from Sater to Trump Organization attorney Michael Cohen, titled "Andrey L. Kostin – CEO VTB Bank," Stater said:

> *"Kostin who is Putins top finance guy and CEO of 2nd largest bank in Russia is on board and has indicated he would finance Trump Moscow. This is major for us, not only the financing aspect by Kostins position in Russia, extremely powerful and respected. Now all we need is Putin on board and we are golden, meeting with Putin and top deputy is tentatively set for the 14th. See buddy I can not only get Ivanka to spin in Putin's Kremlin office chair on 30 minutes notice, I can also get a full meeting. I will call you later today to discuss getting the LOI signed."[165]*

In a November 3, 2015 email from Sater to Cohen acknowledging receipt of the Trump-signed Letter of Intent (LOI) to build Trump Tower Moscow – a copy of which the Committee

UNCLASSIFIED

UNCLASSIFIED

possesses – Sater wrote, "Buddy our boy can become President of the USA and we can engineer it. I will get all of Putin's team to buy in on this."[166] When the deal slowed in early 2016, Cohen took matters into his own hands, attempting on January 14, 2016 to contact Kremlin spokesman Dmitry Peskov via email to move the project forward. However, like so many others, the deal did not materialize.

The Majority, however, addresses few of Trump's attempted Moscow business deals, questionable funding sources, and ongoing business relationships with Russian oligarchs close to President Putin. Instead, it offers a perfunctory reference to the 2013 Miss Universe Pageant, claiming simply that the Committee "found no evidence that President Trump's pre-campaign business dealings formed the basis for collusion during the campaign."[167]

As with so many of the Majority's findings, the Majority did not uncover evidence because it refused look for any. The Majority expended little effort in investigating whether Trump's business deals may have been part of Moscow's effort to entangle business and political leaders in corrupt activity, and they actively blocked Minority requests to follow this thread. The Majority rejected numerous appeals by the Minority to request or subpoena Trump financial records from Deutsche Bank, interview pertinent witnesses from the financial entity, and seek testimony or production from other individuals and entities with knowledge of Trump's business projects in Moscow. The question of whether Trump's financial vulnerability, reliance on lenders of last resort with illicit ties to Russia, or decades-long desire to secure a real estate deal in Moscow led Russia to hold of leverage against him remains an unexplored but critical investigatory question.

The report also does not deal in any serious way with the actions of campaign chairman Paul Manafort and his deputy Rick Gates, who have been the subject of the Special Counsel investigation and have been indicted or pled guilty to money-laundering and conspiracy charges.[168] In its report, the Majority attempted to explain away inconvenient facts related to his ties to Russia-friendly entities. For example, a finding on the Trump campaign chairman argues that, "Special Counsel Robert Mueller indicted Paul Manafort on several charges, none of which relate to allegations of collusion, coordination, or conspiracy between the Trump campaign and the Russian government."[169]

However, the Special Counsel's investigation into Manafort is ongoing, and the Committee has no visibility into the status of that investigation, nor what the Special Counsel has found that has not yet been made public. It is possible that new or superseding indictments of Manafort will uncover activities related to the 2016 election.

On February 23, 2018, a federal grand jury in the District of Columbia returned a superseding indictment against Manafort for conspiracy to launder money, among other counts, including related to past work done for Putin-friendly Ukrainian Prime Minister Victor Yanukovich, who is now in exile in Moscow.[170] While those charges, and a separate indictment against Manafort in the Eastern District of Virginia,[171] do not explicitly associate this activity with his role on the

UNCLASSIFIED

UNCLASSIFIED

Trump campaign, it remains an open question whether Manafort sought to use his role as Trump campaign chairman to curry favor with prior illicit contacts. Production proffered to the Committee indicates that Manafort indeed sought to use his position on the Trump campaign to inflate his standing with his pro-Russian contacts and possibly obtain additional money or "get whole" for his work on behalf of pro-Russian interests.

For instance, on April 11, 2016, Manafort reached out to Konstantin Kilimnik, a Russian national who previously worked for Manafort in Ukraine. In a December 2017 court filing, the Special Counsel assessed that a long-time Russian colleague and ongoing contact of Manafort's has "ties to a Russian intelligence service." [172]  Public reports indicate that this person is Kilimnik.[173] Manafort inquires whether Kilimnik has "shown our friends my media coverage." Kilimnik responds: "Absolutely. Every article." Manafort then asks Kilimnik: "How do we use to get whole. Has Ovd operation seen?"

"Ovd" (or "OVD") refers to Oleg Vladimirovich Deripaska, the Russian oligarch to whom Manafort owed a significant amount of money.  Kilimnik confirms in a subsequent email that Deripaska was tracking Manafort's activities: "Yes, I have been sending everything to Victor, who has been forwarding the coverage directly to OVD. Frankly the coverage has been much better than Trump's. In any case it will hugely enhance your reputation no matter what happens."[174] Documents produced to the Committee also confirm that Manafort's deputy, Rick Gates, remained in email contact with Kilimnik through the summer and fall of 2016.[175]

Because the Majority failed to subpoena Manafort to require him to produce the full range of communications with Kilimnik and others, and the Majority refused to engage the Special Counsel about arranging testimony from Manafort, the Committee has an incomplete record about Manafort's communications prior to, during, and after his tenure on the campaign. As a result, we are unable yet to determine the extent of Manafort's engagement with his Russian contacts and associates of Deripaska, among others, and whether Manafort used his Russian contacts to help the campaign. The Minority will continue to investigate this line of inquiry.

### *Investigative Next steps*

When the Majority officially closed down their work on the Russia investigation on March 22, 2018, and voted to release their report, they chose to do so outside of the public eye. Although the debate was unclassified, the Majority wished to hide the ignominious end to their efforts behind closed doors. At the meeting, the Minority put forward a series of motions to undertake some of the investigative steps that the Majority refused to authorize throughout the investigation. These measures are necessary to compel important testimony and the production of documents to pursue promising leads, overcome improper assertions of privilege, ensure a complete record about key communications and events, and determine the veracity of statements made by key witnesses. Additionally, the Committee should have engaged the Special Counsel to arrange testimony from George Papadopoulos, Michael Flynn, Rick Gates and, Paul Manafort, George Nader, and potentially others under investigation or who are cooperating with the Special

52

UNCLASSIFIED

UNCLASSIFIED

Counsel. A transcript of the March 22, 2019 Committee business meeting is incorporated in Chapter VI.

As outlined in the March 13, 2018 status update, among an array of other steps, the Minority believes it necessary to:

- Refer to the House a contempt citation for Steve Bannon, in order to challenge and overcome the White House's direction to Bannon not to testify to matters pertaining to the presidential transition, his tenure at the White House, and his communications with the President since leaving government. A follow-up interview with Bannon would also result in testimony about Bannon's involvement with Cambridge Analytica, his involvement in the company's unauthorized procurement of Facebook data on tens of millions of Americans, and his knowledge of its possible business with Russia-linked entities and persons.

- Issue Committee subpoenas for third-party documents, including, among others, to ensure complete production from the Trump organization, the Trump campaign, and the Trump transition, as well as from Deutsche Bank for financial records related to the Trump Organization and Twitter for direct messages from identified Russian cutouts, such as Guccifer 2.0; proxies, such as WikiLeaks; and persons of interest, Roger Stone, who have sought contact with these Russia-aligned actors.

- Issue Committee subpoenas to the following individuals, many of whom, as explained in the Minority's March 13, 2017 status update (Appendix A), have provided inconsistent or incomplete testimony, or, in the case of Randy Credico, have refused to testify:

    o Former White House Communications Director Hope Hicks, to compel her to testify about her tenure at the White House, as well as specific communications during the presidential transition period – timeframes the White House largely barred her from discussing during her interview (see Chapter VI for Hicks' February 27, 2018 interview transcript);

    o Donald Trump Jr., to compel his testimony regarding communications with his father in July 2017, when he and his father coordinated his public posture in response to press reports about his June 9, 2016 meeting with a Russian delegation, as well as production of records regarding his communications surrounding the June 9, 2016 meeting as well as his foreign travel and engagements during the campaign, including his October 2016 visit to Paris at the paid invitation of a Russia-aligned organization (see Chapter VI for Trump Jr's December 6, 2017 interview transcript);

    o Attorney General Jeff Sessions, to compel his testimony regarding specific communications with the President, after he refused in his interview to answer questions regarding whether President Trump ever instructed him to take any action to hinder the FBI's Russia investigation  and whether President Trump ever discussed

UNCLASSIFIED

UNCLASSIFIED

with him the need to investigate and prosecute individuals suspected of sharing information with the press (see Chapter VI for Attorney General Sessions' November 30, 2017 interview transcript);[176]

o  Jared Kushner, for another interview and additional document production regarding specific communications and involvement in certain meetings, including a meeting with officials from the United Arab Emirates on December 15, 2016, which press reports indicate George Nader attended – an important development, if accurate, that Kushner omitted in his Committee testimony (see Chapter VI for Kushner's July 25, 2017 interview transcript);

o  Erik Prince, to compel testimony and production of documents regarding his January 2017 meetings in the Seychelles, in light of reports sine his interview that contradict his testimony about the presence of George Nader at his meeting with UAE officials and possibly during his encounter with Kirill Dmitriev, the head of the Russian Direct Investment Fund (see Chapter VI for Prince's November 30, 2017 interview transcript);

o  Cambridge Analytica CEO Alexander Nix, for a follow-up interview and more extensive production of personal and corporate documents in light of press reports exposing Nix and Cambridge Analytica's role in misappropriating Facebook data on more than 50 million users, possible communications with Russian entities, and involvement in the Trump campaign's digital operation (see Chapter VI for Nix' December 14, 2017 interview transcript);

o  Corey Lewandowski, to compel his testimony about specific matters he refused to answer during his March 8, 2018 interview, including his conversations with President Trump about the June 9, 2016 Trump Tower meeting, the President's firing of former FBI Director Comey, and efforts by the President to fire Special Counsel Mueller (see Chapter VI for Lewandowski's January 17 and March 8, 2018 transcripts);

o  Keith Schiller, to reappear in light of testimony by other witnesses, as well as recent public reporting that is inconsistent with his account of the 2013 Miss Universe event in Moscow, that call into Schiller's responses to the Committee (see Chapter VI for Schiller's November 7, 2017 interview transcript);[177]

o  Roger Stone, to testify again and produce documents to address inconsistent testimony in light of recent public reports that Stone bragged in the spring of 2016 that WikiLeaks' Julian Assange gave him advance notice about the email leaks related to John Podesta and the Democratic National Committee (see Chapter VI for Stone's  September 26, 2017 interview transcript).

UNCLASSIFIED

At the March 22, 2018 business meeting, the Minority also emphasized the need to require Randy Credico to appear in person. Roger Stone identified Credico to the Committee as his intermediary with Assange, but Credico refused to testify and informed the Committee that he intended to invoke the Fifth Amendment after being subpoenaed on December 12, 2017. The Majority opposed a motion during the business meeting to discuss with the Special Counsel whether any prosecutorial equities would prevent the Committee from entertaining a grant of immunity to secure Credico's testimony, which could provide greater insight into Stone's communications with Assange as well as WikiLeaks' activities during the 2016 elections.

UNCLASSIFIED

## IV. THE MAJORITY REPORT'S RECOMMENDATIONS

Since many of the Majority's findings are incomplete, slanted, or otherwise flawed, the Minority likewise expresses similar concerns about many of the resulting recommendations. One of the goals of the Committee's investigation should be to develop unique recommendations that genuinely advance future policy discussions or to consider unconventional or newfound legislative approaches to protecting our democratic processes moving forward – not merely recycle prior congressional work.

Some recommendations, notably those directed at our European allies, are relevant, but lack in substantive follow-on. If our Committee had interviewed more regional experts about Russian influence operations targeted across the Atlantic, the Minority feels this subset of recommendations could have been strengthened with concrete steps or courses of action instead of thin, superficial recommendations. For instance, the recommendations are narrowly scoped to focus on Russian-linked mass media, but do not speak to other possible actions, such as encouraging European countries to review and shore up anti-money laundering initiatives to combat Russian illicit financing.

Likewise, recommendations pertaining to the U.S. government reaction to Russia's active measures campaign and election interference are similarly superficial. For instance, our Committee held an open hearing with social media companies last year, learning in great detail how Russian operatives exploited these platforms. Yet, *Recommendation #5*, which purportedly addresses social media vulnerabilities, fails to offer any meaningful proposals, only that the companies "should consider implementing methods to counter malign foreign activity." The recommendation overlooks the need to have all technology and social media companies whose tools and platforms were weaponized by Russian-linked actors pool resources, knowledge, and data so that their experts might collaborate on a comprehensive, public accounting of what transpired online during the 2016 election season.

Other recommendations in this report merely cite legislative provisions that have already been introduced in – or indeed have already passed – either the House or the Senate, and again do not demonstrate a rigorous effort to conceive of new approaches to defending our election systems from outside interference. Some of these provisions were included in the House or Senate versions of the Intelligence Authorization Act (IAA) for Fiscal Year 2018, as the Majority itself notes and were previously proposed by the Ranking Member himself; other elements appear captured in H.R. 5011, the "Election Security Act," which was introduced in February 2018 and cosponsored solely by Democrats to date.

The core of the Majority's *Recommendation #15* was previously proposed by Ranking Member Adam Schiff for the conference version of the IAA for Fiscal Year 2018, and while we appreciate the Majority's adoption of this recommendation, it is not a substitute for a comprehensive response. While the Minority supports any and all efforts to bolster the security of our electoral processes, the fact that the Majority has relied on existing public proposals rather

56
UNCLASSIFIED

than offering original ones reflects its disproportionate lack of focus on election security issues during our investigation. Had the Committee taken the opportunity to interview more witnesses and experts in this field, it would have been better positioned to inform genuinely new recommendations for the Committee report.

The Minority also takes issue with unfair characterizations leveled against the DNC in *Recommendation #7*. Communication and information sharing from the FBI to the DNC was indeed deficient, and the Minority agrees that cyberattack victim notification processes require enhancements to ensure that as complete a picture as possible about the threat reaches senior leadership of the targeted organization, particularly when that organization is involved in an election campaign. However, the Majority needlessly attacks the DNC for "fail[ing] to handle the intrusions with the level of seriousness it deserved,"[178] ignoring the inherent, and daunting challenge that one of the world's most sophisticated state-sponsored actors—the Russian intelligence services—poses to any non-government entity. Such victim-blaming is needless and deflects attention away from otherwise sound suggestions about involving the Department of Homeland Security and the timely informing victims of foreign attacks on their systems.

As noted earlier, the inclusion of the repeal of the Logan Act as a report recommendation is baffling, as it is uncertain how this law has any bearing either on a retroactive review of Russian election meddling or on preparations for future foreign covert influence campaigns. However, if the Majority is advocating enshrining a better articulated principle of "one government at a time" in law, then the Minority would be open to such a recommendation. Instead, this recommendation appears to be a veiled attempt to retroactively exonerate Michael Flynn for attempts to undermine U.S. policy in December 2016.

The Minority has strong objections to the report recommendations pertaining to campaign links and Intelligence Community Assessment leaks. In particular, *Recommendation #23*, under the guise of improving the transparency of campaign finance reporting, is nothing more than a continuation of Majority attempts to paint the Clinton presidential campaign as having material connections to Russia.  At the same time, the report makes no mention of Cambridge Analytica, the British firm retained by the Trump campaign to support its digital operations – a firm now implicated in a major data breach scandal and mired in questions about compliance with Federal Election Commission regulations.

Meanwhile, neither of the Majority's recommendations that ostensibly relate to "campaign links to Russia" sufficiently address the many publicly known attempts by Trump campaign officials to engage with Russians during the 2016 election. Improving campaign staffs' awareness about foreign counterintelligence threats is crucial, but this does not adequately resolve unanswered questions about why so many individuals in the Trump orbit appeared so eager to work with a hostile foreign power in order to harm the Clinton campaign.

Finally, the Minority reaffirms that leaks of classified information constitute real harm to national security, and unauthorized leakers should face criminal prosecution and appropriate

UNCLASSIFIED

legal repercussions for doing so. But once again, the Majority bases its recommendations on the unsubstantiated findings, including that "senior officials within the IC" were responsible for leaks surrounding the ICA's publication, as well as on the faulty proposition that leaks were the result of individuals who were "breaking the law for their own political purposes."[179] Increasing the legal penalties in statute for leaking or the unauthorized dissemination of classified information is one avenue. But as with other recommendations, the Committee did not undertake a serious review of this fourth prong of the investigation, meaning that these recommendations could have been improved had the investigation been allowed to continue on its trajectory before being prematurely shut down by the Majority.

UNCLASSIFIED

UNCLASSIFIED

## V. ADDITIONAL MATTERS

Upon public release of the Majority's findings and recommendations, President Trump, Committee Republicans, and others also focused on several other politically-driven allegations in the report. Although these Views do not address all of the flawed assertions and arguments in the report, the following deserved immediate rebuttal.

### *The Obama Administration's Response*

*Finding # 14* of the Majority report accuses the United States Government of an insufficient response to the Russian attack after the election. Several Obama administration witnesses told the Committee that the President and the small circle of officials who were becoming increasingly aware of Russia's activities agonized through the summer of 2016 as to how to respond to the attacks and whether to make public attribution. Officials detailed their fear of "putting a thumb on the scale" of the election, which could have fueled charges of bias and favoritism, as a key element in the White House's reluctance to more forcefully respond earlier in the election cycle. At this time, candidate Trump was loudly proclaiming that the election was "rigged" against him, further complicating the political environment and making it more challenging for President Obama to act publicly without being perceived as intervening for political purposes, even as he and his aides confronted Russia privately.

In late December 2016, President Obama acted to expel 35 Russian officials in the United States, ordered the closing of two Russian compounds, and imposed a narrow set of sanctions. This response was never intended to be the United States' last word. Instead, as detailed above, Trump transition officials, with direct involvement by National Security Advisor-designate Michael Flynn and possibly at the direction of President Trump, coordinated with Russia to undermine the U.S. government's response.

The Ranking Member has expressed his concern since these events were ongoing, that the Obama Administration should have made earlier attribution of Russia as behind the hacking of our democratic institutions and begun discussions on sanctions while that attack was unfolding. But this does not absolve the current Administration of its lethargic response, let alone its efforts to undermine the sanctions the prior administration did impose.

Since coming to office, Trump has failed to take steps to harden our electoral infrastructure, defied congressional direction to impose sanctions against a range of Russian actors, and so far refrained from directing the executive branch, including the intelligence and law enforcement agencies, to make countering and deterring Russian active measures a top priority. In February 13, 2018 testimony before the Senate Select Committee on Intelligence, FBI Director Wray, along with National Security Agency Director Admiral Mike Rogers, Director of National Intelligence Dan Coats, and CIA Director Mike Pompeo, were unable to point to specific direction from President Trump to "blunt" and "disrupt" Russian meddling in future elections.[180]

UNCLASSIFIED

In February 27, 2018 testimony before the Senate Armed Services Committee, National Security Agency (NSA) Director Admiral Rogers confirmed more specifically that the President had not directed, through the Secretary of Defense, that NSA and Cyber Command seek to disrupt malicious cyber activity by Russia at the origin of these attacks. [181] Rogers also raised alarm that Russia has not suffered a sufficient cost to deter future action:

> *I believe that President Putin has clearly come to the conclusion, 'There's little price to play here [...] and that, therefore, I can continue this activity.' [...] Everything, both as a director of NSA and what I see on the Cyber Command side, leads me to believe that, if we don't change the dynamic here, this is going to continue, and 2016 won't be viewed as something isolated. This is something -- will be sustained over time. So, I think the challenge for all of us is, So what are the tools available to us? And, as the strategy says -- diplomatic, economic, some cyber things -- there are tools available to us. And again, I think, in fairness, you can't say nothing's been done. But, my point would be, it hasn't been enough. [...] Clearly what we've done hasn't been enough.[182]*

### Former Director of National Intelligence James Clapper's Testimony

The fifth chapter of the Majority's report is ostensibly concerned with the question of "[w]hat possible leaks of classified information took place related to the Intelligence Community's assessment of these matters."[183]

*Finding #44* claims that former Director of National Intelligence James Clapper "provided inconsistent testimony" to the Committee about his contacts with the media, including CNN. The report also observes that, in January 2017, CNN's Jake Tapper published a story about the Intelligence Community Assessment and Christopher Steele's "dossier"—which in turn, the report argues, was the proximate cause of another media outlet's decision publish the "dossier."[184]

*Finding #44* is written with the intent to smear Clapper, a decorated military and intelligence professional who served under Republican and Democratic Presidents, and promote a public narrative that former Obama Administration officials, such as Clapper, leaked classified or sensitive information to the media.

Despite this dark insinuation, the report neither cites evidence, nor even alleges, that Clapper disclosed information – classified or unclassified – illegally or improperly. Nor does the report acknowledge that, as Director of National Intelligence, Clapper was authorized to engage with media. Instead the Report seizes on alleged "inconsisten[cy]" in Clapper's testimony:

> *When initially asked about leaks related to the ICA in July 2017, Clapper flatly denied "discuss[ing] the dossier [compiled by Christopher Steele] or any other intelligence related to Russia hacking of the 2016 election with journalists." Clapper subsequently*

> *acknowledged discussing the "dossier with CNN journalist Jake Tapper," and admitted that he might have spoken with other journalists about the same topic. Clapper's discussion with Tapper took place in early January 2017, around the time IC leaders briefed President Obama and President-elect Trump, on "the Christopher Steele information," a two-page summary of which was "enclosed in" the highly-classified version of the ICA.[185]*

Clapper did not "admi[t]" to any criminal or inappropriate conduct regarding media contacts. Clapper explained the following during his interview: [186]

> *MR. ROONEY: Did you personally discuss the dossier or any of the other intelligence related to Russian hacking? You already said that you didn't leak it to the journalists, so I assume that's a no, correct?*
>
> *MR. CLAPPER: I'm sorry?*
>
> *MR. ROONEY: Did you discuss the dossier or any other intelligence related to Russia hacking of the 2016 election with journalists?*
>
> *MR. CLAPPER: No.*
>
> *MR. ROONEY: Did you confirm or corroborate the contents of the dossier with CNN journalist Jake Tapper?*
>
> *MR. CLAPPER: Well, by the time of that, they already knew about it. By the time it was -- it was after -- I don't know exactly the sequence there, but it was pretty close to when we briefed it and when it was out all over the place. The media had it by the way. We were kind of behind the power curve, because the media, many media outlets that I understood had that, had the dossier for some time, as did people on the Hill.*
>
> *MR. ROONEY: Do you have any idea how they had it, how they got it?*
>
> *MR. CLAPPER: The media?*
>
> *MR. ROONEY: Yes.*
>
> *MR. CLAPPER: 1 do not.*

Later during the interview, and consistent with his earlier answer, Clapper acknowledged to Majority staff that he and Tapper may have discussed the dossier once it was in the public domain. The dossier, moreover, is not a classified product, does not contain U.S.-derived intelligence information, and did not inform the Intelligence Community's assessment of Russia's activities:[187]

*Q: [W]as it your testimony earlier that you did, in fact, discuss the so-called dossier with CNN journalist Jake Tapper?*

*MR. CLAPPER: Well, after it was out, yeah.*

*Q: And by out, what do you mean by that?*

*MR. CLAPPER: Well, once it was public. It wasn't -- you know, it wasn't like this is an Intelligence Community document or anything. This was out in the media.*

*Q: And what were the nature of those conversations?*

*MR. CLAPPER: I don't remember specifically.*

*Q: Did you discuss the dossier with any other --*

*MR. CLAPPER: I may -- I probably said much of what I said here, that it was not a part of our report, and the reason was because we could not corroborate the second-, third-order assets that were used, apparently, to put the dossier together.*

*Q: Did you discuss --*

*MR. CLAPPER: Our primary purpose -- I do remember this -- was that we felt obliged to alert then President-elect Trump that it was out there.*

*Q: Did you discuss the dossier with any other journalists besides Mr. Tapper?*

*MR. CLAPPER: I could have. I don't remember specifically talking about the dossier.*

Evaluated in context, Clapper denied leaking classified information, while acknowledging that, as DNI, he engaged in legitimate discussion of unclassified, non-intelligence information with Tapper. There was nothing inappropriate with his doing so, and it is hard to escape the conclusion that the Majority simply wishes to impugn the integrity of a man with a lifetime of service who is now deeply critical of the President.

### Abuse of Power and Obstruction of Justice

In the course of the investigation, the Committee found important evidence on the question of whether President Trump and other Administration officials obstructed justice or otherwise abused the power of office.

UNCLASSIFIED

The Majority nonetheless sought to limit the Minority's ability to pursue this important line of inquiry by asserting that looking into actions by President Trump and his associates to interfere with congressional and law enforcement investigations into Russia's meddling – to include our own – fell outside the scope of the Committee's investigative parameters. With critical witnesses involved in or with direct knowledge of events under scrutiny, such as the President's role in crafting a misleading statement about the June 9, 2016 meeting or directions he may have provided to senior officials to intervene with the FBI and the Special Counsel, the Majority repeatedly refused to issue or enforce subpoenas to compel testimony or the production of documents that could clarify specific facts about the President's actions and intent.

Although constrained due to the lack of subpoena power, the Minority will continue to gather additional facts on this prong of the investigation. At this stage, however, it is important for the American public to review some of what we know. The portrait that emerges is troubling.

Since President Trump's inauguration, we have witnessed a systematic campaign by the President and his allies to discredit professionally and in the court of public opinion witnesses to possible presidential abuse of power and obstruction of justice. The most prominent – former FBI Director Comey, former FBI Deputy Director Andrew McCabe, former FBI General Counsel James Baker, and Comey's former Chief of Staff James Rybicki – have faced sustained attacks on their credibility and character. Comey and McCabe have been fired. Baker and Rybicki were moved out of their positions, with Rybicki ultimately leaving the Bureau.

This is no accident. And, regrettably, the Committee's Majority contributed to this effort, using the Committee's tools to investigate DOJ and the FBI and undermine public confidence in these institutions and the Special Counsel's ongoing investigation.

Comey memorialized his interactions with the President and ensured that FBI's core leadership was aware of the President's actions in real time. Besides Comey, the fact witnesses with greatest knowledge and visibility on the issue of possible obstruction have faced the brunt of the attacks: McCabe, Baker, and Rybicki. These officials, moreover, were involved to varying degrees in the FBI's Russia counterintelligence investigation, before the Special Counsel took it over. They are uniquely positioned to explain and defend the FBI's investigative decisions.

After his firing by the President, Comey testified publicly to the Senate Select Committee on Intelligence (SSCI) on June 8, 2017 about efforts by President Trump to exert inappropriate pressure on him as FBI Director. President Trump, during a private dinner, told Comey that he expected "loyalty," in what Comey interpreted to be an effort by the President to establish a sort of patronage relationship with him. During another one-on-one meeting, Trump, referencing recently terminated National Security Advisor Michael Flynn, asked Comey to "let this go," which Comey took to be a request for the FBI to drop any investigation or prosecution of Flynn.[188]

UNCLASSIFIED

Since firing Comey on May 10, 2017 the President has disparaged Comey via Twitter some thirty-six times, mostly by portraying him as a liar or leaker of classified information.[189]  In particular, the President suggested that Comey could face unspecified reprisal: "James Comey better hope there are no 'tapes' of our conversations before he leaks to the press!"[190] And the President also has denied ever asking "Comey to stop investigating Flynn.[191]

It has been the same pattern with McCabe—whose December 20, 2017 testimony to the Committee corroborated and strongly amplified Comey's testimony to the SSCI.  Prior to that appearance, the President already had begun to smear McCabe publicly, starting with his July 25 tweet falsely charging that McCabe received "$700,000 from H[ilary Clinton] for [his] wife!"[192] A day later the President tweeted again, in two parts. "Why didn't A.G. Sessions replace Acting FBI Director Andrew McCabe, a Comey friend who was in charge of the Clinton e-mail investigation but got…big dollars ($700,000) for his wife's political run from Hillary Clinton and her representatives. Drain the Swamp!"[193]

McCabe testified to the Committee that Comey told him about the fact and contents of Comey's private talks with President Trump. His testimony also established that Rybicki and Baker also heard Comey's side of phone conversations with the President, in real time, or were debriefed by Comey, along with McCabe, shortly after telephone discussions or in-person meetings took place.[194]

Most importantly, McCabe corroborated, and indeed substantially amplified Comey's account to the SSCI. Questioning Deputy Director McCabe about these, Ranking Member Schiff referred to, and read from, former Director Comey's written statement for the record, before the SSCI: [195]

_The "Patronage Relationship" and Request for Loyalty_

> MR. SCHIFF:  Now, Director Comey also testified about a January 27th meeting. He stated, quote,

>> [T]he President and I had dinner on Friday, January 27 and 6:30 p.m. in the green room at the White House.  He called me at lunch time that day, invited me to dinner that night, saying he was going to invite my whole family, but decided to just have me this time, with the whole family coming the next time.  It was unclear from the conversation who else would be at the dinner, although I assumed there would be others.

>> …

>> The Director also testified, he stated that lots of people wanted my job, and given the abuse I had taken during the previous year he would understand if I wanted to walk away.  My instincts told me that the one-on-one setting and the pretense that

UNCLASSIFIED

*this was our first discussion about my position meant the dinner, was at least in part, an effort to have me ask for my job and create some sort of patronage relationship. That concerned me greatly given the FBI's traditionally independent status in the executive branch. A few moments later the President said, I need loyalty. I expect loyalty. I didn't move, speak, or change my facial expression in any way during the awkward silence that followed. We simply looked at each other in silence. The conversation then moved on, but he returned to the subject near the end of our dinner.*

*Near the end of our dinner, the President returned to the subject of my job, saying that he was very glad that I wanted to stay, adding that he had heard great things about me from Jim Mattis, Jeff Sessions, and many others. He then said, I need loyalty. I replied you will always get honest loyalty from me. He paused and then said, that's what I meant, honest loyalty. I paused and then said, you will get that from me. As I wrote in the memo I created immediately after the dinner, it is possible he understood the phrase honest loyalty differently, but I decided it wouldn't be productive to push it further.*

*Is that account something he related to you after the dinner?*

*MR. MCCABE: Yes.*

*MR. SCHIFF: And did he also on this occasion call you after this meeting with the President to relay what happened?*

*MR. MCCABE: He did.*

*MR. SCHIFF: And what can you tell us that he related to you during that conversation?*

*MR. MCCABE: Essentially – is that his testimony or the memo that you just read, I'm sorry?*

*MR. SCHIFF: That is his testimony.*

*MR. MCCABE: His testimony. So it tracks the memo very closely, as did our conversation. He was very surprised and concerned by the interaction, specifically about the references to the request for loyalty.*

*MR. SCHIFF: And in his view what did he think the President was asking for?*

*MR. MCCABE: It was my impression from our discussion that he believed that the President was asking him to be loyal to the President.*

*MR. SCHIFF: And was it the Director's impression that what the President had in mind was loyalty when it came to his handling of the Russia investigation?*

*MR. MCCABE:  I think that he felt like it was a broad and troubling concept, that the Director of the FBI should be loyal only to the Constitution of the United States.*

*...*

*MR. SCHIFF:  Anything further you can recall of that conversation with the Director on January 27th?*

*MR. MCCABE:  No.  I mean just that we were both really surprised.  As I said, he was concerned going into the interaction kind of because he was concerned about, as I said, his – he believed that it was not a good idea for the Director of the FBI to have these kind of one on one meetings with the President.  And then lo and behold, they had an exchange that concerned him and me greatly.[196]*

### *The Request Regarding Flynn: "I Hope You Can Let This Go."*

In his December 19, 2017 testimony before the Committee, McCabe corroborated key elements of Comey's testimony, including that President Trump asked Comey to "end an investigative matter." In the exchange below, Ranking Member Schiff reviewed with McCabe pertinent sections of Comey's June 8, 2017 SSCI testimony: [197]

*MR. SCHIFF: [...] According to Director Comey, the President told him on February 14th that Flynn hadn't done anything wrong in speaking with the Russians, but that he had to let him go because he had misled the Vice President. [...] Were those facts, though, that the Director related in his testimony, as to what the President said to him, consistent with what he told you after the meeting?*

*MR. MCCABE: Yes.*

*MR. SCHIFF: Director Comey also testified he added that he had other concerns about Flynn which he did not then specify. The President then returned to the topic of Flyunn, saying he is a good guy and has been through a lot. He repeated that Flynn hadn't done antying on his calls with the Russians, but had misled the Vice Preisdent. He then said, I hope you can see your way clear to letting this go, to letting Flynn go. He is a good guy. I hope you can let this go. Is that also consistent with what the Director told you contemporaneous with the events?*

*MR. MCCABE: Yes, that is consistent. That's what he told me.*

UNCLASSIFIED

*Quoting Comey's testimony before SSCI again:*

*MR. SCHIFF: "I replied only that he is a good guy. In fact, I had positive experience dealing with Mike Flynn when he was a colleague as Director of the Defense Intelligence Agency at the beginning of my term at FBI. I did not say I would let this go. I immediately prepared an unclassified memo of the conversation about Flynn and discussed the matter with senior – with FBI senior leadership. I take it he is referring to you among others?*

*MR. MCCABE: Yes.*

*MR. SCHIFF: And who were the others that he would have been referring to there?*

*MR. MCCABE: I am sorry, read me the statement again?*

*MR. SCHIFF: I immediately prepared an unclassified memo of the conversation about Flynn and discussed the matter with the FBI senior leadership.*

*MR. MCCABE: So that would have been myself, Mr. Baker, likely Jim Rybicki, his chief of staff, possibly Bill Priestap, who is the AD [Assistant Director] of counterintelligence, possibly others.*

*MR. SCHIFF: He continues, I had understood the President to be requesting that we drop any investigation of Flynn in connection with false statements about his conversations with the Russian Ambassador in December. I did not understand the President to be talking about the broader investigation into Russia or possible links to his campaign. I could be wrong, but I took him to be focusing on what had just happened with Flynn's departure and the controversy around his account of his phone calls. Regardless, it was very concerning given the FBI's role as an independent investigative agency.*

*What can you tell us about your conversations with Director Comey after his meeting on the same day as to those facts, as to his impression that the President was asking him to drop the matter?*

*MR. MCCABE: His impression, as he communicated it to me, was that the President was asking him to end an investigative matter, which was greatly concerning to the Director and to me. We were shocked.*

*MR. SCHIFF: Did you and the Director discuss at that time whether this might constitute obstruction of justice?*

UNCLASSIFIED

UNCLASSIFIED

*MR. MCCABE: I don't remember that specifically. It's possible that we did. I just don't remember that from that time.*

*MR. SCHIFF: Did the President's request that the Director let this go, meaning the Flynn matter, have any impact on the Bureau's handling of the investigation concerning Mike Flynn?*

*MR. MCCABE: Of course not.*

*MR. SCHIFF: On December 2nd, 2017, President Trump tweeted, I had to fire General Flynn because he lied to the Vice President and the FBI. The President in that tweet – and I know the lawyer has taken the credit or blame for that tweet – appears to acknowledge that he knew at the time that Flynn was fired that he had lied to the FBI.*

*Prior to the appointment of the Special Counsel -and you may have answered that in large part already but – was the FBI able to confirm whether the President was aware that Flynn had lied to the FBI?*

*MR. MCCABE: No, sir.*

*MR. SCHIFF: The Director continued, the FBI leadership agreed with me that it was important not to infect the investigative time with the President's request, which we did not intend to abide. We also concluded that given that it was a one-way conversation, there was nothing available to corroborate in that account. We concluded that it made little sense to report it to Attorney General Sessions, who we expected would likely recuse himself from involvement in Russian-related investigations.*

*Why was it expected that at that time that the Attorney General would recuse himself?*

*MR. MCCABE: I think his recusal was already under consideration by the Department of Justice. I assume that that's where that would end up.*

*MR. SCHIFF: Was there any other basis on which the Director believed that the Attorney General might be forced to recuse himself?*

*MR. MCCABE: The recusal issue is – I think we knew of the general facts that had raised the recusal issue. I can't speak specifically to what Director Comey was thinking on that. But we certain knew that the issue would come to the fore as a result of the Attorney General's interactions with Russians and his involvement in the campaign.*

*MR. SCHIFF: Mr. Chairman, I yield back.*

UNCLASSIFIED

<u>*Veiled Threats: References to Deputy Director McCabe's Wife and 'That Thing'*</u>

McCabe told the Committee that he and Comey shared concern that the President had mentioned McCabe's wife's political activities and other matters during private discussions between the President and Comey in order to make veiled threats against McCabe and Comey: [198]

> MR. SCHIFF:  Did – well, let me continue then.  I will ask you about other parts of it.
>
> The Director goes on to say:
>
>> *In an abrupt shift, he turned the conversation to FBI Deputy Director Andrew McCabe saying that he hadn't brought up, quote, "the McCabe thing" beause I had said McCabe is honorable, though McAuliffe was close to the Clintons and had given him (I think he meant Deputy Director McCabe's wife) campaign money, although I didn't' understand why the President was bringing this up.  I repeated that Mr. McCabe was an honorable person.*
>
> *When you discussed this, did the director mention this in his conversation with you as well?*
>
> MR. MCCABE:    He did.  It was not the first time the President had raised me with the Director.
>
> MR. SCHIFF:  And did the Director have any understanding of why he thought the President was bringing this up?
>
> MR. MCCABE:  Understanding is probably not the right characterization.  Our concern was that he was bringing it up as some sort of an almost a veiled threat.
>
> MR. SCHIFF:  That if the Director didn't lift the cloud of the Russian investigation, that he would take action against you?
>
> MR. MCCABE:  That's correct.  That was my concern, and as I understand it, that was Director Comey's concern as well.
>
> MR.  SCHIFF:  Director Comey continued saying:
>
>> *He finished by stressing the cloud that was interfering with his ability to make deals for the country, and said he hoped I could find a way to get out that he wasn't being investigated.  I told him I would see what we could do and that we would do our investigative work well and as quickly as we could.*
>>
>> *Immediately after that conversation I called Acting Deputy Attorney General Dana Boente, AG Sessions had by then recused himself on all Russia-related matters, to*

69
UNCLASSIFIED

*report the substance of the call from the President and said I would await his guidance. I did not hear back from him before the President called me again, 2 weeks later.*

*Is that consistent with what he related to you contemporaneous with the meeting or soon thereafter?*

*MR. MCCABE: Yes, with the phone call. It was a phone call between he and the President; not a meeting.*

*MR. SCHIFF: And did Director Comey tell you what he thought the President meant by "lift the cloud?"*

*MR. MCCABE: Yeah, I mean, I think Director Comey's impression was that the President was still quite frustrated with the fact that we were continuing our investigative efforts into the --- into the campaign and Russia issues.*

*MR. SCHIFF: And did the Director communicate that the President essentially wanted him to absolve him publicly?*

*MR. MCCABE: Yes. The President was interested in the Director making some sort of a public statement that the President was not under investigation.*

McCabe further testified that both he and Comey likewise took a different remark by the President, during an April 11 phone call between the President and Comey, to constitute a separate threat of reprisal directed at Comey: [199]

*MR. SCHIFF: Another conversation took place on April 11, 2017. Director Comey testified:*

> *"On the morning of April 11 the President called me and asked what I had done about his request that I get out that he is not personally under investigation. I replied that I'd passed this request to the Acting Deputy Attorney General, but I had not heard back. He replied that the cloud was getting in the way of his ability to do his job. He said that perhaps he would have his people reach out to the Acting Deputy Attorney General. I said that was the way his request should be handled. I said the White House counsel should contact the leadership of DOJ to make the request, which was the traditional channel. He said he would do that and added, quote 'because I have been very loyal to you, very loyal. We had that thing, you know.' I did not reply or ask him what meant by that thing.*

> *I said that the way to handle it was to have the White House counsel call the Acting Deputy Attorney General.  He said that was what he would do and the call ended. That was the last time I spoke with President Trump."*

*So did the Director also share this conversation with you?*

MR. MCCABE:  He did.

MR. SCHIFF:  And what was his, as you can recall from your conversation rather than his testimony, what did he have to say in terms of the President's comments that "I have been very loyal to you, very loyal.  We had that thing, you know."  What did the Director tell you he took from that?

MR. MCCABE:  He was concerned.  He was concerned that the President was still focused on and frustrated by our investigative efforts; the President was really insisting that the Director make some sort of a public statement that, of course, the Director was not comfortable making; and the reference to "that thing," we weren't 100 percent sure what that was.  But Director Comey was, you know, interpreted it the same way that we had interpreted the prior comments about me and my wife.  That it was some sort of – it could be some sort of, a, you know, a veiled threat.

MR. SCHIFF: And in this case the veiled threat would be against Director Comey?

MR. MCCABE:  That's correct.

MR. SCHIFF:  Along the lines of, I the President have been very loyal to you.  I want you to lift the cloud.  Otherwise I might be less loyal to you.  Is that the---

MR. MCCABE:   That's correct.

MR. SCHIFF:  That was the impression of Director Comey?

MR. MCCABE:   It was his and my impression.


<u>*The Majority's Attempt to Minimize McCabe's Testimony*</u>

In response to Ranking Schiff's exchange with McCabe, Representative Gowdy, on behalf of the Majority, did not directly challenge McCabe's credibility as a witness, but sought to minimize the significance of his testimony with respect to abuse of power and obstruction. Also citing to Comey's Senate testimony, Representative Gowdy's line of questioning suggested that Comey (and thus McCabe) may have misunderstood the President's intended meaning.

UNCLASSIFIED

For example, in one exchange, Representative Gowdy read from Comey's public statement regarding Flynn and possible violations of the Logan Act: [200]

> MR. GOWDY: "The President began by saying Flynn hadn't done anything wrong in speaking with the Russians." Are you aware of any criminal code section that would have been implicated by Flynn talking to the Russian Ambassador during the transition period?
>
> MR. MCCABE: Other than the Logan Act, no.
>
> MR. GOWDY: I'm laughing only because we spent most of the day discussing two statutes that have never been enforced – so the gross negligence standard, and the classified email, and the Logan Act. Has there been a prosecution under either one of these?
>
> MR. MCCABE: Not that I'm aware of.
>
> MR. GOWDY: All right. So, absent wanting to make new law, you can't think of a criminal code section other than the Logan Act that could have been implicated by Flynn talking to the Russians in the transition period?
>
> MR. MCCABE: I haven't done a legal analysis on any possible criminal code implications of his contact with his conversation with Ambassador Kislyak, but of course, that was not the subject of our investigation[.]

In another exchange, Representative Gowdy asks McCabe whether the President's statements to Comey amount to obstruction of justice:[201]

> MR. GOWDY: Third paragraph. "The President then returned to the topic of Mike Flynn saying: "He is a good guy and he has been through a lot." Is that obstruction?
>
> MR. MCCABE: I'm not going to – you're asking me to give you legal interpretation of that statement kind of in the abstract sense, and I don't think I can do that.
>
> MR. GOWDY: Well let me ask you this: How long have you been in law enforcement?
>
> MR MCCABE: Twenty-one years.
>
> MR. GOWDY: Have you ever had anyone approach you on behalf of a defendant that is about to be sentenced or someone that you're investigating and putting in a good word for them?
>
> MR. MCCABE: I can't think of an instance off the top of my head, but it's certainly possible.

72
UNCLASSIFIED

UNCLASSIFIED

*MR. GOWDY: You must have been out of a field office for a while. You must have been at headquarters for a long time because it's not unusual for someone to say, hey, I hope this person doesn't get the book thrown at them. They are not a bad person. It happens at every courtroom across America all day long.*

*MR. MCCABE: It sure does, sir.*

*MR. GOWDY: Well, is there anything eye-catching to you in the President telling the former Director, "He is a good guy and has been through a lot"?*

*MR. MCCABE: I think the fact that they are discussing the ongoing FBI investigation is troubling to me.*

*MR. GOWDY: Troubling because of – troubling in what way? The President is the head of the executive branch, right?*

*MR. MCCABE: Yes, he is.*

*MR. GOWDY: Does the President have pardon powers?*

*MR. MCCABE: He does.*

*MR. GOWDY: Are they plenary?*

*MR. MCCABE: Certainly.*

*MR. GOWDY: Can he pardon someone even before you get a conviction?*

*MR. MCCABE: That's my understanding.*

*MR. GOWDY: So the head of the executive branch who has the full ability to pardon anyone even before a conviction, and you were troubled that he said he's a good guy whose [sic] been through a lot.*

*MR. MCCABE: Yes, troubled because it is not, in my experience, it's not common the President of the United States to weigh in on a specific criminal matter despite the fact that he has pardon power.*

*MR. GOWDY: Were you equally troubled – did you watch the Super Bowl a couple of years ago? Did you some [sic] President Obama's interview with Bill O'Reilly.*

*MR. MCCABE: I don't remember that.*

UNCLASSIFIED

*MR. GOWDY: Were you equally troubled when he said there was not an [sic] smidgeon of corruption during the pendency of an IRS investigation?*

*MR. MCCABE: I don't remember that comment, sir.*

*MR. GOWDY: You don't remember it.*

*MR. MCCABE: I don't.*

*MR. GOWDY: It got a lot of play. The President of the United States –*

*MR. MCCABE: Uh-huh.*

*MR. GOWDY: -- In the middle of an ongoing probe, said there's not a smidgeon of corruption. What about when he commented on Secretary Clinton while you all were in the middle of investigating the email server? How did you take that?*

*MR. MCCABE: It was concerning to us.*

*MR. GOWDY: Not concerning enough to put it in a memo. Did you bring it to anybody's attention, take it to the AG's attention?*

*MR. MCCABE: I'm not aware that President Obama expressed that to the Director of the FBI. So I think the situation was a little bit different.*

*MR. GOWDY: How? How is it different to say to the entire country as opposed to saying it to the head of the FBI?*

*MR. MCCABE: Because they think of the circumstances of a private one-on-one meeting with the President of the United States and the Director of the FBI is kind of a unique and rare occurrence. I don't think Director Comey had any such interactions with President Obama. Not that I'm aware of. And certainly, not about that statement. I would have heard that.*

*MR. GOWDY: Did he take his concerns to anyone at the Department of Justice?*

*MR. MCCABE: Ultimately, he talked to the acting Deputy Attorney General.*

*MR. GOWDY: Who was that?*

*MR. MCCABE: Acting, Dana Boente.*

*MR. GOWDY: About this, about feeling the pressure?*

74

UNCLASSIFIED

UNCLASSIFIED

*MR. MCCABE: I mean, I know that he had a conversation with Mr. Boente after the first phone call in March to discuss his discomfort with these – with the conversations that he had been having with the President, and also to let DOJ know to try to stay within the requirements of the contacts policy.*

*MR. GOWDY: "I understood the President to be requesting that we drop any investigation of Flynn in connection with false statements about his conversation with the Russian Ambassador in December. I did not understand the President to be talking about the broader investigation into Russia or possible links to his campaign. I could be wrong, but I took him to be focusing on what just happened with Flynn's departure and the controversy around his account of his phone calls. Regardless, it was very concerning given the FBI's role as an independent investigative agency."*

*I agree. There are [sic] an independent investigative agency. I would invite your attention to not just this portion of the memo that is including his opening statement, but all eight of them because I have read them twice. Have you read them, all eight?*

*MR. MCCABE: Yes.*

*MR. GOWDY: Did you read the section where he said it wasn't proper for you to be having this conversation with me. It should be done from you to the Department of Justice and then down to me.*

*MR. MCCABE: I remember that.*

*MR. GOWDY: All right. So we are quarrelling about the method by which a message is communicated? He had no problem if the conversation had gone from himself to the Department of Justice, down to the head of the FBI. So was it the conversation that was improper, or was it who he was having it with?*

*MR. MCCABE: I don't know that you can separate those two things.*

*MR. GOWDY: But he did. Because he laid out the path by which that could be communicated. Agreed?*

*MR. MCCABE: Yeah. That's the path that's required by the White House contacts policy. I'm sorry.*

*MR. GOWDY: March 31st, page 6. Middle. He described the Russian investigation as quote "a cloud" that was impairing his ability to act on behalf of the country. He said he had nothing to do with Russia, had not been involved with hookers in Russia, and had always assumed that he was being recorded. So then we have this phrase, "cloud," and*

75

UNCLASSIFIED

UNCLASSIFIED

*then one sentence removed from the salacious allegations of sexual misconduct. You don't think there is any way the cloud could have been a personal familial cloud, and –*

*MR. MCCABE: Well. I'm just reading the document. He said he described the Russia investigation as a cloud. So I assume that's what he's referring to.*

*MR. GOWDY: Yeah, but part of the Russia investigation involved a dossier that had some very salacious allegations in it, didn't it? I mean, I know you have not covered it before. I would invite you to go back and reflect on those eight memos again. I've read them. I'm not defending what the President asked and the manner in which he did it. I don't think it is unreasonable for a husband and a father who is not the target of an ongoing probe to ask: Can you let other people know that? I think there's one memo where he makes specific reference to questions he was getting from his wife and his kids. Do you remember that one?*

*MR. MCCABE: Generally.*

Minority Follow-Up Questions

In response to Representative Gowdy's questioning, Ranking Member Schiff returned to Comey's Senate testimony:[202]

*MR. SCHIFF: Just returning to some of the areas that my colleague covered, in the written testimony of the Director's – concerning the February 14th Oval Office meeting, he stated: "The President began by saying Flynn hadn't done anything wrong in speaking with the Russians."*

*In Mike Flynn's statement of the offence, he acknowledges informing high- and senior-transition officials of his contacts with the Russian Ambassador. Do you know, or did you find out prior to the appointment of the Special Counsel whether the President was saying that Flynn hadn't done anything wrong in speaking with the Russians because the President was aware from the transition team that Flynn had, in fact, done that, or it was done with his acquiescence. Do you know whether either of those were the case?*

*MR. MCCABE: I don't know that.*

*MR. SCHIFF: The Director testified about his reservations in terms of making a public statement about the President's status. And as I understand it from your testimony, it sounds like there were two concerns. One is that his campaign was under investigation.*

UNCLASSIFIED

MR. MCCABE: That's correct. It would also have put us in the awkward position of then going out and having to change the statement that we had made earlier and it seemed to be – that would be a concerning place for us to be.

MR. SCHIFF: Now, my colleague asked you about whether it would violate any laws to be secretly communicating with the Russian Ambassador and the Logan Act was brought up. And I want to ask you about that because there's been a lot of diminishing significance of the Logan Act because it hasn't been utilized before.

MR. MCCABE: Uh-huh.

MR. SCHIFF: If someone violates a U.S. law, does the FBI generally view it as worthy of investigation regardless of whether that particular statute has been used or used recently?

MR. MCCABE: Of course. That's not a factor in our decision to initiate an investigation.

MR. SCHIFF: It would be the Justice Department's decision whether to seek to prosecute someone under a statute that hadn't been used before?

MR. MCCABE: Of course.

MR. SCHIFF: But if you have credible evidence that someone is violating a current U.S. law, it is not something to be ignored?

MR. MCCABE: That's right.

MR. SCHIFF: And to your understanding, was the Logan Act designed to legislate effectively that you only have one government at a time, and that private parties were not to undermine the existing government, if you know?

MR. MCCABE: Yeah, I don't know. I'm not an expert on the Logan Act, so I shouldn't opine.

MR. SCHIFF: Would you agree there's a distinction between a friend or a loved one, and a courtroom somewhere in the country vouching for a defendant before sentencing as being a good guy, and the President of the United States in a private meeting with the head of the FBI asking him to let a case go?

MR. MCCABE: That seems different to me.

MR. SCHIFF: And the fact that the President has the power of pardon doesn't change that, does it?

UNCLASSIFIED

UNCLASSIFIED

*MR. MCCABE: No, it does not.*

*MR. SCHIFF: The fact that Nixon had the power to pardon the burglars of the Watergate Hotel wouldn't make him any more – wouldn't make it any more appropriate for him to have a conversation with the then FBI Director about letting the burglars go?*

*MR. MCCABE: I don't want to speculate on historical matters, but I can tell you that it's – the fact of the President's pardon power didn't really impact how we perceived the conversation between the President and the Director.*

*MR. SCHIFF: Now, I do agree with my colleague, frankly, my colleague, that I don't think it would be particularly appropriate for the President to be intervening with the Department of Justice or the FBI when it comes to an investigation that involves his own campaign, but there is nonetheless an explicit policy against the President of the United States directly communicating with the head of the FBI over a pending criminal matter. Is there not?*

*MR. MCCABE: Yes, there is.*

*MR. SCHIFF: And by engaging in that conversation about Mike Flynn, the President was violating that policy?*

*MR. MCCABE: That would be my understanding of the policy. That's right.*

*MR. SCHIFF: We have the added fact in this circumstance that the President, after Director Comey testified, essentially said that he was lying about his interactions with the President on the subject of Mike Flynn. Did he not?*

*MR. MCCABE: I'm generally familiar with those comments, yes.*

*MR. SCHIFF: So the President disputes what the Director testified to and what the Director related to you contemporaneous with those meetings?*

*MR. MCCABE: Apparently.*

***

This testimony supplies critical context for President's ensuing tirade against McCabe, and public comments about former FBI General Counsel James Baker.

Only three days after McCabe's testimony before the Committee, for which then-FBI General Counsel James Baker was present and during which the Majority indicated that they might also

UNCLASSIFIED

call him in as a witness, the President tweeted: "Wow, 'FBI lawyer James Baker reassigned,' according to @FoxNews".[203]   Trump turned his sights on McCabe later the same afternoon. "FBI Deputy Director Andrew McCabe is racing the clock to retire with full benefits. 90 days to go?!!!"[204]

This second tweet was followed quickly by a third: "How can FBI Deputy Director Andrew McCabe, the man in charge, along with leakin' James Comey, of the Phony Hillary Clinton investigation (including her 33,000 illegally deleted emails) be given $700,000 for wife's campaign by Clinton Puppets during investigation?"[205] A fourth fusillade, the following day, appeared to paraphrase reporting from Fox News. "@FoxNews 'FBI's Andrew McCabe, 'in addition to his wife getting all of this money from M (Clinton Puppet), he was using, allegedly, his FBI Official Email Account to promote her campaign. You obviously cannot do this. These were the people who were investigating Hillary Clinton.'"[206]

Keeping up campaign to undermine McCabe, the President reveled in McCabe's March 16, 2018 firing by the Attorney General, calling the termination a "great day for the hard working men and women of the FBI [and for] Democracy."[207]

The President added: "Sanctimonious James Comey was his boss and made McCabe look like a choirboy. He knew all about the lies and corruption going on at the highest levels of the FBI![208]

Responding to press reports that McCabe, like Comey, was so disturbed by the President's comments to him during his tenure at the FBI that McCabe made detailed memos of their conversations, the President tweeted that he never saw McCabe taking notes during their few meetings. This tweet also speculated that McCabe only wrote his memos later "to help his own agenda. Same with lying James Comey. Can we call them Fake Memos?"[209]

UNCLASSIFIED

## VI. TRANSCRIPTS

Witness interviews are an essential element of any investigation and they have served an important role in our work on the Russia investigation. In their rush to shut down the investigation, however, the Majority scheduled witnesses without regard to timing and sequence, and without obtaining related document productions prior to interviews. Most Majority Members did not attend the interviews, nor were they conducted with the rigor befitting the historic nature of this inquiry. At certain points, moreover, Majority Members inserted themselves into the proceedings as apparent advocates for witnesses close to the President.

During Jared Kushner's July 25, 2017 interview, Representative Trey Gowdy helpfully reminded the witness that "it is between you and your counsel how many questions" he might be willing to answer.[210] A review of the already-released transcripts of Carter Page and Erik Prince also exemplify the overall lack of preparation and disinterest of the Majority during the interviews.

At several points throughout the investigation, the Majority pledged to release the transcripts at its conclusion. Representative Conaway affirmed the Majority's position as recently on March 5, 2018, a week before the Majority announced that it would shut down its investigation.[211]

The Minority publishes them here as a separate chapter of the Minority Views, both in the interest of transparency and so that the American people may judge for themselves whether the Majority's report properly characterizes witness testimony. The public should also see for themselves the full measure of the Majority's handling of this most important national security investigation.

### *Unclassified Hearings and Interviews*

Transcript 1: Full Committee Open Hearing on Russian Active Measures Investigation with FBI Director James Comey and NSA Director Mike Rogers, March 20, 2017, pp. 1-222.

Transcript 2: Full Committee Open Hearing with former CIA Director John Brennan, May 23, 2017, pp. 1-94.

Transcript 3: HPSCI, Executive Session Interview of Director of National Intelligence Dan Coats, June 22, 2017, pp. 1-32.

Transcript 4: HPSCI, Executive Session Interview of Evelyn Farkas, June 26, 2017, pp. 1-72.

Transcript 5: HPSCI, Executive Session Interview of John Podesta, June 27, 2017, pp. 1-56.

Transcript 6: HPSCI, Executive Session Interview of Michael Caputo, July 14, 2017, pp. 1-110.

Transcript 7: HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017, pp. 1-128.

Transcript 8: HPSCI, Executive Session Interview of JD Gordon, July 26, 2017, pp. 1-136.

Transcript 9: HPSCI, Executive Session Interview of Andrew Brown, August 30, 2017, pp. 1-57.

Transcript 10: HPSCI, Executive Session Interview of Yared Tamene, August 30, 2017, pp. 1-53.

Transcript 11: HPSCI, Executive Session Interview of Roger Stone, September 26, 2017, pp. 1-121.

Transcript 12: HPSCI, Executive Session Interview of Boris Epshteyn, September 28, 2017, pp. 1-97.

Transcript 13: HPSCI, Executive Session Interview of Matt Tait, October 6, 2017, pp. 1-81.

Transcript 14: HPSCI, Executive Session Interview of Jonathon Safron (via telephone), October 12, 2017, pp. 1-27.

Transcript 15: HPSCI, Executive Session Interview of Peter Fritsch, October 18, 2017, pp. 1-16.

Transcript 16: HPSCI, Executive Session Interview of Thomas Catan, October 18, 2017, pp. 1-13.

Transcript 17: HPSCI, Executive Session Interview of Brad Parscale, October 24, 2017, pp. 1-145.

Transcript 18: HPSCI, Executive Session Interview of Michael Cohen, October 24, 2017, pp. 1-186.

Transcript 19: HPSCI, Executive Session Interview of Carter Page (Redacted for Release), November 2, 2017, pp. 1- 243.

Transcript 20: HPSCI, Executive Session Interview of Irakly Kaveladze, November 2, 2017, pp. 1-119.

Transcript 21: HPSCI, Executive Session Interview of Keith Schiller, November 7, 2017, pp. 1-165.

Transcript 22: HPSCI, Executive Session Interview of Glenn Simpson, November 8, 2017, pp. 1-19.

Transcript 23: HPSCI, Executive Session Interview of Rinat Akhmetshin, November 13, 2017, pp. 1-166.

Transcript 24: HPSCI, Executive Session Interview of Glenn Simpson, November 14, 2017, pp. 1-165.

Transcript 25: HPSCI, Executive Session Interview of Anatoli Samochornov, November 28, 2017, pp. 1-77.

Transcript 26: HPSCI, Executive Session Interview of Erik Prince (Redacted for Release), November 30, 2017, pp. 1-105.

Transcript 27: HPSCI, Executive Session Interview of Jeff Sessions, November 30, 2017, pp. 1-120.

Transcript 28: HPSCI, Executive Session Interview of John Podesta, December 4, 2017, pp. 1-61.

Transcript 29: HPSCI, Executive Session Interview of Diane Denman, December 5, 2017, pp. 1-72.

Transcript 30: HPSCI, Executive Session Interview of Shawn Henry, December 5, 2017, pp. 1-80.

Transcript 31: HPSCI, Executive Session Interview of Donald Trump Jr., December 6, 2017, pp. 1-238.

Transcript 32: HPSCI, Executive Session Interview of Walid Phares, December 8, 2017, pp. 1-114.

Transcript 33: HPSCI, Executive Session Interview of Michael Goldfarb, December 12, 2017, pp. 1-48.

Transcript 34: HPSCI, Executive Session Interview of Sam Clovis, December 12, 2017, pp. 1-147.

Transcript 35: HPSCI, Executive Session Interview of Marc Elias, December 13, 2017, pp. 1-103.

Transcript 36: HPSCI, Interview of Alexander Nix (via video-teleconference), December 14, 2017, pp. 1-98.

Transcript 37: HPSCI, Executive Session Interview of Debbie Wasserman-Schultz, December 18, 2017, pp. 1-56.

Transcript 38: HPSCI, Executive Session Interview of Michael Sussman, December 18, 2017, pp. 1-93.

Transcript 39: HPSCI, Executive Session Interview of Rob Goldstone, December 18, 2017, pp. 1-175.

Transcript 40: HPSCI, Executive Session Interview of David Kramer, December 19, 2017, pp. 1-101.

Transcript 41: HPSCI, Executive Session Interview of Felix Sater, December 20, 2017, pp. 1-142.

Transcript 42: HPSCI, Executive Session Interview of Dana Rohrabacher, December 21, 2017, pp. 1-186.

Transcript 43: HPSCI, Executive Session Interview of Jake Sullivan, December 21, 2017, pp. 1-71.

Transcript 44: HPSCI, Executive Session Interview of Rhona Graff, December 22, 2017, pp. 1-143.

Transcript 45: HPSCI, Executive Session Interview of David Kramer, January 10, 2018, pp. 1-24.

Transcript 46: HPSCI, Executive Session Interview of Steve Bannon, January 16, 2018, pp. 1-261.

Transcript 47: HPSCI, Executive Session Interview of Rick Dearborn, January 17, 2018, pp. 1-150.

Transcript 48: HPSCI, Executive Session Interview of Corey Lewandowski, January 17, 2018, pp. 1-175.

Transcript 49: HPSCI, Executive Session Interview of Steve Bannon, February 15, 2018, pp. 1-57.

Transcript 50: HPSCI, Executive Session Interview of Hope Hicks, February 27, 2018, pp. 1-208.

UNCLASSIFIED

Transcript 51: HPSCI, Executive Session Interview of Corey Lewandowski, March 8, 2018, pp. 1-112.

### Classified Hearings and Interviews

Transcript 1: Full Committee Closed Hearing on FBI Counterintelligence Investigations with FBI Director James Comey, March 2, 2017, pp. 1-121.

Transcript 2: Full Committee Closed Hearing on Russia Investigation with FBI Director Comey and NSA Director Mike Rogers, May 4, 2017, pp. 1-82.

Transcript 3: Full Committee Closed Hearing with former CIA Director John Brennan, May 23, 2017, pp. 1-53.

Transcript 4: HPSCI, Executive Session Interview of James Clapper, July 17, 2017, pp. 1-106.

Transcript 5: HPSCI, Executive Session Interview of John Carlin, July 27, 2017, pp. 1-72.

Transcript 6: HPSCI, Executive Session Interview of Susan Rice, September 8, 2017, pp. 1-110.

Transcript 7: HPSCI, Executive Session Interview of Samantha Power, October 13, 2017, pp. 1-115.

Transcript 8: HPSCI, Executive Session Interview of Loretta Lynch, October 20, 2017, pp. 1-97.

Transcript 9: HPSCI, Executive Session Interview of Ben Rhodes, October 25, 2017, pp. 1-75.

Transcript 10: HPSCI, Executive Session Interview of Mary McCord, November 1, 2017, pp. 1-81.

Transcript 11: HPSCI, Executive Session Interview of Sally Yates, November 3, 2017, pp. 1-96.

Transcript 12: HPSCI, Executive Session Interview of Andrew McCabe, December 19, 2017, pp. 1-215.

Transcript 13: HPSCI, Executive Session Interview of Special Agent Michael Gaeta, December 20, 2017, pp. 1-113.

Transcript 14: HPSCI, Committee Business Meeting to consider "Adoption of the Committee's Investigative Report into Russian Active Measures During the 2016 Presidential Election," March 22, 2018, pp. 1-89.

UNCLASSIFIED

UNCLASSIFIED

UNCLASSIFIED

## ENDNOTES

[1] House Permanent Select Committee on Intelligence (HPSCI), Scope of Investigation, March 1, 2017.

[2] Press Release, "Intelligence Committee Chairman, Ranking Member Establish Parameters for Russia Investigation," March 1, 2017. [https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=767]

[3] Press Release, "Intelligence Committee Chairman, Ranking Member Establish Parameters for Russia Investigation," March 1, 2017. [https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=767]

[4] Statement on Russia Investigation, Chairman Devin Nunes, March 12, 2018. [https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=873]

[5] For instance, see: Kyle Cheney, "Republicans fear they botched Russia report rollout," *Politico*, March 15, 2018 [https://www.politico.com/story/2018/03/15/house-intelligence-republicans-russia-probe-465805]; Nicholas Fandos, "Republican Leading House's Russia Inquiry Softens a Key Finding," *New York Times*, March 13, 2018 [https://www.nytimes.com/2018/03/13/us/politics/house-intelligence-trump-russia-conaway.html].

[6] President Donald Trump, Twitter, March 12, 2018: "THE HOUSE INTELLIGENCE COMMITTEE HAS, AFTER A 14 MONTH LONG IN-DEPTH INVESTIGATION, FOUND NO EVIDENCE OF COLLUSION OR COORDINATION BETWEEN THE TRUMP CAMPAIGN AND RUSSIA TO INFLUENCE THE 2016 PRESIDENTIAL ELECTION." [https://twitter.com/realdonaldtrump/status/973360355790479361]

President Donald Trump, Twitter, March 17, 2018: "As the House Intelligence Committee has concluded, there was no collusion between Russia and the Trump Campaign. As many are now finding out, however, there was tremendous leaking, lying and corruption at the highest levels of the FBI, Justice & State. #DrainTheSwamp" [https://twitter.com/realdonaldtrump/status/975057131136274432]

[7] President Donald Trump, Twitter, March 23, 2018. [https://twitter.com/realDonaldTrump/status/977124622285066240]

[8] Sputnik, "US Has Not Found Evidence of Trump Campaign's Collusion with Russia," March 22, 2018 [https://sputniknews.com/us/201803221062803332-us-house-committee-russi-probe]; RT, "'No collusion': House Intel Committee votes to end Russia probe," March 22, 2018. [https://www.rt.com/usa/422050-house-intel-russia-probe]

[9] Interview with Chairman Devin Nunes, "Hannity," Fox News, March 19, 2018. [http://www.foxnews.com/transcript/2018/03/19/devin-nunes-on-mccabe-firing-upcoming-ig-report.html]; Interview with Representative Peter King, "Rep. King on widening probe into the Trump dossier," Fox News, March 12, 2018. [http://video.foxnews.com/v/5749792245001/?#sp=show-clips]

[10] Chairman Devin Nunes, "Nunes Statement on Russia Investigation," April 6, 2017. [https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=775]

[11] HPSCI Minority, "Status of the Russia Investigation," March 13, 2017. Attached as Appendix A.

[12] Channel 4 (United Kingdom), "Data, Democracy, and Dirty Tricks – Part three: The Trump campaign," March 20, 2018. [https://www.channel4.com/news/data-democracy-and-dirty-tricks-cambridge-analytica-uncovered-investigation-expose] Speaking to an undercover reporter, Cambridge Analytica CEO Alexander Nix describes his December 14, 2017 testimony before the Committee, which occurred via video-teleconference:

> "Nix: "I *went to speak to them and the Republicans asked three questions, five minutes – minutes done. Democrats asked 2 hours of questions.*""

UNCLASSIFIED

UNCLASSIFIED

Undercover Reporter: "*And you had to answer everything?*"

Nix: "*No it's voluntary but I did because I'm trying to help them. We have no secrets. They're politicians, they're not technical. They don't understand how it works. They don't understand because the candidate never, is never involved. He's told what to do by the campaign team.*"

[13] HPSCI, Executive Session Interview of Steve Bannon, February 15, 2018, pp. 29-30. Relevant exchange with Representative Eric Swalwell:

MR. SWALWELL: *I'm just asking if a communication existed post your time at the White House with Chairman Nunes.*

*[Discussion off the record.]*

MR. BANNON: *Yes.*
MR. SWALWELL: *Okay. What was the nature of the communication? What was discussed?*

*[Discussion off the record.]*

MR. BANNON: *Yeah, I cannot answer anything about my – related to my time at the White House.*

MR. SWALWELL: *No. I'm asking, post your leaving the White House, any communication you had with non-White House-employee Devin Nunes, what was discussed?*

MR. BANNON: *I can only answer questions not related to my time at the White House.*

MR. SWALWELL: *How many times did you speak with Chairman Nunes once leaving the White House? And I'm talking about in person, over phone, by email, by any text message communication.*

*[Discussion off the record.]*

MR. BANNON: *I don't know.*

MR. SWALWELL: *More than once?*

MR. BANNON: *Probably.*

MR. SWALWELL: *Okay. Fewer than 10 times?*

MR. BANNON: *I don't – don't remember.*

MR. SWALWELL: *Every involve the Russia investigation?*

*[Discussion off the record.]*

MR. BANNON: *That would involve my time at the White House, and I'm not authorized to answer the question.*

[14] HPSCI Minority, "Correcting the Record – The Russia Investigations," January 29, 2018. Released to the public in unclassified form on February 24, 2018. Attached at Appendix A.

[15] Intelligence Community Assessment: *Background to "Assessing Russian Activities and Intentions in Recent US Elections": The Analytic Process and Cyber Incident Attribution*, January 6, 2017.

UNCLASSIFIED

UNCLASSIFIED

---

[16] Intelligence Community Assessment, "Assessing Russian Activities and Intentions in Recent US Elections," January 6, 2017, p. ii. [https://www.dni.gov/files/documents/ICA_2017_01.pdf]..

[17] HPSCI Majority Russia Report, March 21, 2018 version, p. 46-47. Compare with HPSCI Majority Russia Report, March 13, 2018 version, p. 40-41.

[18] Senate Intelligence Committee Chairman and Vice Chairman press conference, October 4, 2017. According to Chairman Richard Burr: "There is consensus among members and staff that we trust the conclusions of the ICA."

[19] *U.S. v. Internet Research Agency LLC* (1:18-cr-00032-DLF, District of Columbia), p.4.

[20] HPSCI Majority Russia Report, March 21, 2018 version, p. 32.

[21] *U.S. v. Internet Research Agency, et al* (1:18-cr-32, District of Columbia), p. 4. The Special Counsel also finds, for instance, that **"**From at least April 2016 through November 2016, Defendants and their co-conspirators, while concealing their Russian identities and ORGANIZATION affiliation through false personas, began to produce, purchase, and post advertisements on U.S. social media and other online sites expressly advocating for the election of then-candidate Trump or expressly opposing Clinton. Defendants and their co-conspirators did not report their expenditures to the Federal Election Commission, or register as foreign agents with the U.S. Department of Justice" (p. 19).

[22] Twitter, Inc., "Update on Results of Retrospective Review of Russian-Related Election Activity," United States Senate Committee on the Judiciary, Subcommittee on Crime and Terrorism, January 19, 2018. [https://www.judiciary.senate.gov/imo/media/doc/Edgett%20Appendix%20to%20Responses.pdf]

[23] Twitter, Inc., "Update on Results of Retrospective Review of Russian-Related Election Activity," United States Senate Committee on the Judiciary, Subcommittee on Crime and Terrorism, January 19, 2018. [https://www.judiciary.senate.gov/imo/media/doc/Edgett%20Appendix%20to%20Responses.pdf]

[24] HPSCI Minority Website, "Instagram Exhibit" [https://democrats-intelligence.house.gov/uploadedfiles/6052269196035.pdf]; associated metadata [https://democrats-intelligence.house.gov/uploadedfiles/6052269196035_metadata.pdf]

[25] HPSCI Minority Website, Facebook Exhibit [https://democrats-intelligence.house.gov/uploadedfiles/police_anti_blm_ad_metadata.pdf]

[26] HPSCI Minority Website, Facebook Exhibit, "United Muslims of America." [https://democrats-intelligence.house.gov/uploadedfiles/uma_banner__6039056709663.pdf]

[27] HPSCI Minority Website, Facebook Exhibit, "Save American Muslims." [https://democrats-intelligence.house.gov/uploadedfiles/uma_paid_event_ad.pdf]

[28] Tumblr, "We're taking steps to protect against future interference in our political conversation by state-sponsored propaganda campaigns," March 23, 2018. [https://staff.tumblr.com/post/172170432865/were-taking-steps-to-protect-against-future]

[29] Tumblr, "Public record of usernames linked to state-sponsored disinformation campaigns," March 23, 2018. [https://tumblr.zendesk.com/hc/en-us/articles/360002280214]

[30] HPSCI Majority Russia Report, March 21, 2018 version, p. 32.

[31] The New York Times, "How Trump Consultants Exploited the Facebook Data of Millions," March 17, 2018. [https://www.nytimes.com/2018/03/17/us/politics/cambridge-analytica-trump-campaign.html]

[32] House Permanent Select Committee on Intelligence, Interview of Alexander Nix, December 14, 2017, p. 59.

UNCLASSIFIED

UNCLASSIFIED

[33] House Permanent Select Committee on Intelligence, Interview of Alexander Nix, December 14, 2017, p. 67.

[34] The New York Times, "How Trump Consultants Exploited the Facebook Data of Millions," March 17, 2018. [https://www.nytimes.com/2018/03/17/us/politics/cambridge-analytica-trump-campaign.html]

[35] *United States v. George Papadopoulos*, Statement of the Offense, p.8.

[36] *United States v. George Papadopoulos*, Statement of the Offense, p. 9.

[37] *United States v. George Papadopoulos*, Statement of the Offense, p.9.

[38] CNN.com, November 10, 2017, full transcript: https://www.cnn.com/2017/11/09/politics/papadopoulos-meetings-coffee-boy/index.html

[39] House Permanent Select Committee on Intelligence, Interview of Walid Phares, December 8, 2017, p.79.

[40] House Permanent Select Committee on Intelligence, Interview of Walid Phares, December 8, 2017, p.79.

[41] HPSCI Majority Russia Report, March 21, 2018 version, p. 72.

[42] HPSCI Majority Russia Report, March 21, 2018 version, p. 72.

[43] FBI Director James Comey press conference on Clinton investigation, July 5, 2016. See transcript: https://www.washingtonpost.com/news/post-nation/wp/2016/07/05/fbi-director-comeys-full-remarks-on-clinton-email-probe/?utm_term=.20e40587ec5c

[44] HPSCI, Attorney General Jeff Session Document Production. Email from Paul Erickson to Rick Dearborn, May 10, 2016.

[45] *Id*.

[46] HPSCI, Rick Dearborn Document Production. [Bates# RD000009 to 16]

[47] HPSCI, Rick Dearborn Document Production. [Bates# RD000009 to 16]

[48] HPSCI Majority Russia Report, March 21, 2018 version, p. 83.

[49] HPSCI, Rick Dearborn Document Production. Email from Paul Erickson to Rick Dearborn, Subject: Kremlin Connection, May 10, 2016 [Bates# RD 000078].

[50] Josh Meyer, "FEC probes whether NRA got illegal Russian donations," Politico, March 16, 2018. [https://www.politico.com/story/2018/03/16/nra-russia-election-donations-fec-investigation-468661]

[51] Text Messages from Emin Agalarov to Donald Trump Jr., November 10, 2016, Donald Trump Jr. production, DJTFP00866; Phone Records of Donald Trump Jr., Billing Cycle June 1, 2016 through June 30, 2016, Donald Trump Jr. production, DJTJR00851-855all records, goldstone testimony.

[52] HPSCI, Executive Session Interview with Donald Trump Jr., December 6, 2017, p. 9.

[53] HPSCI, Rob Goldstone Document Production. Email from Rob Goldstone to Rhona Graff, "Subject: Please pass on mine and Emin's best wishes and congratulations to Mr. Trump – wonderful news," June 16, 2015/

[54] See, e.g., Email from Katherine Murphy to [redacted], Subject: From the office of Donald J. Trump, March 18, 2016, Donald Trump Jr. production, DJTJR00407 to 409 ("As per Mr. Trump's request, please see the attached note for Mr. Agalarov." The attachment is the congratulatory letter that Mr. Agalarov sent to Mr. Trump on the eve of

UNCLASSIFIED

Super Tuesday with a handwritten note from Mr. Trump, "*Araz you have done such a great job – you are an amazing man with a great family – keep in touch and say hello to Emin.*")

[55] HPSCI, Donald Trump Jr. Document Production. Email from Rob Goldstone to Donald Trump Jr., "Subject: Emin, July 24, 2015," [Bates# DJTJR00893].

[56] HPSCI, Donald Trump Jr. Document Production. "Email from Rob Goldstone to Rhona Graff, Subject: Congratulatory letter to Mr. Trump from Araz Agalarov," February 29, 2016. [ Bates# DJTJR00442 to 43]

[57] HPSCI, Donald Trump Jr. Document Production. Text Message from Emin Agalarov to Donald Trump Jr., November 10, 2016 [ Bates# DJTFP00866].

[58] HPSCI, Donald Trump Jr. Document Production. Email from Rob Goldstone to Donald Trump Jr., Subject: Russia – Clinton – private and confidential, June 3, 2016 [Bates# DJTJR00487].

[59] House Permanent Select Committee on Intelligence, Interview of Donald Trump Jr., December 6, 2017, pp.58-59.

[60] HPSCI, Donald Trump Jr. Document Production. Email from Donald Trump Jr. to Rob Goldstone, Subject: Russia – Clinton – private and confidential, June 3, 2016 [Bates# DJTJR00487].

[61] HPSCI, Donald Trump Jr. Document Production. Email from Donald Trump Jr. to Rob Goldstone, Subject: Russia – Clinton – private and confidential, June 6, 2016 [Bates # DJTJR00487].

[62] HPSCI, Donald Trump Jr. Document Production. Phone Records of Donald Trump Jr., Billing Cycle June 1, 2016 through June 30, 2016 [Bates #DJTJR00851-855].

[63] HPSCI, Donald Trump Jr. Production, Email from Donald Trump Jr. to Rob Goldstone, Subject: Russia – Clinton – private and confidential, June 6, 2016. [Bates #DJTJR00486]

[64] HPSCI, Donald Trump Jr. Production. Email from Donald Trump Jr. to Rob Goldstone, Subject: Russia – Clinton – private and confidential, June 6, 2016. [Bates #DJTJR00486]

[65] HPSCI, Executive Session Interview with Donald Trump Jr., December 6, 2017, pp.28-29.

[66] HPSCI, Donald Trump Jr. Production. Phone Records of Donald Trump Jr., Billing Cycle June 1, 2016 through June 30, 2016 [Bates # DJTJR00851-855].

[67] HPSCI, Executive Session Interview with Corey Lewandowski, January 17, 2018, pp. 161-162.

[68] HPSCI, Donald Trump Jr. Production. Email from Donald Trump Jr. to Paul Manafort and Jared Kushner, Subject: Russia – Clinton – private and confidential, June 8, 2016, Donald Trump Jr. production [Bates# DJTJR00485].

[69] HPSCI, Donald Trump Jr. Production. Email from Donald Trump Jr. to Rob Goldstone, Subject: Russia – Clinton – private and confidential, June 6, 2016 [Bates# DJTJR00486].

[70] Philip Bump, "What happened and when: The timeline leading up to Donald Trump Jr.'s fateful meeting," *The Washington Post,* July 11, 2017. [https://www.washingtonpost.com/news/politics/wp/2017/07/11/what-happened-and-when-the-timeline-leading-up-to-donald-trump-jr-s-fateful-meeting/?utm_term=.d27ea5db41ec]

[71] Donald Trump, Twitter, June 9, 2016. [https://twitter.com/realDonaldTrump/status/741007091947556864]

[72] In testimony before the Committee, Congressman Rohrabacher acknowledged that he met Veselnitskaya and Akhmetshin on previous occasions, but that in April 2016, he was traveling as part of a Congressional delegation and encountered them by chance at the hotel lobby of the Ritz Carlton in St. Petersburg. He acknowledged that they

UNCLASSIFIED

---

were probably spies and probably knew the Congressman would be there. HPSCI Executive Session Interview with Dana Rohrabacher, December 21, 2017, p.167.

[73] HPSCI, Executive Session Interview with Donald Trump Jr., December 6, 2017, p. 73.

[74] HPSCI, Executive Session Interview with Donald Trump Jr., December 6, 2017, pp. 59-60.

[75] HPSCI, Executive Session Interview with Donald Trump Jr., December 6, 2017, p. 56.

[76] HPSCI, Executive Session Interview with Donald Trump Jr., December 6, 2017, p. 59.

[77] HPSCI, Executive Session Interview with Ike Kaveladze, November 2, 2017, p.95.

[78] HPSCI, Executive Session Interview with Donald Trump Jr., December 6, 2017, p. 59-60.

[79] HPSCI, Executive Session Interview with Ike Kaveladze, November 2, 2017, p.98.

[80] Email from Rob Goldstone to Rhona Graff, Subject: Birthday gift for Mr. Trump, June 10, 2016, Rob Goldstone production, RG0000082.

[81] Email from Meredith McIver to Jessica Macchia, Subject: Emin gift.doc, June 17, 2016, Donald Trump Jr. production, DJTJR00404-05.

[82] Email from Rob Goldstone to Emin Agalarov and Ike Kaveladze, Subject: Breaking News, June 14, 2016, Ike Kaveladze production, HIC-KAV-00001 to 00002

[83] HPSCI Majority Russia Report, March 21, 2018 version, p. 81.

[84] HPSCI, Executive Session Interview with Ike Kaveladze, November 2, 2017, p. 89.

[85] HPSCI Majority Russia Report, March 21, 2018 version, p. 81.

[86] HPSCI Majority Russia Report, March 21, 2018 version, p. 82.

[87] S. 284 – Global Magnitsky Human Rights Accountability Act, 114th Congress. [https://www.congress.gov/bill/114th-congress/senate-bill/284/text]

[88] HPSCI, Donald Trump Jr. Production. Email from Rob Goldstone to Rhona Graff, Subject: For Mr. Trump, November 28, 2016. [Bates# DJTJR00245 to 246].

[89] HPSCI, Donald Trump Jr. Production. Text Messages from Emin Agalarov to Donald Trump Jr., November 10, 2016 [Bates# DJTFP00867].

[90] HPSCI Executive Session Interview of Donald Trump Jr., December 6, 2017, p. 94.

[91] HPSCI Executive Session Interview of Donald Trump Jr., December 6, 2017, p. 97.

[92] Washington Post, "Russian government hackers penetrated DNC, stole opposition research on Trump," June 14, 2016. [https://www.washingtonpost.com/world/national-security/russian-government-hackers-penetrated-dnc-stole-opposition-research-on-trump/2016/06/14/cf006cb4-316e-11e6-8ff77b6c1998b7a0_story.html?utm_term=.e2cff209578a

[93] Business Insider, DNC hacker "Guccifer 2.0" was reportedly confirmed as a Russian agent after forgetting to conceal his identity online,"March 22, 2018. [http://www.businessinsider.com/dnc-hacker-guccifer-confirmed-as-russian-agent-after-forgetting-to-conceal-identity-2018-3

UNCLASSIFIED

UNCLASSIFIED

---

[94] President Donald Trump, Twitter, July 25, 2016.

[95] Ashley Parker and David E. Sanger, "Donald Trump Calls on Russia to Find Hillary Clinton's Missing Emails," *New York Times*, July 27, 2016. [https://www.nytimes.com/2016/07/28/us/politics/donald-trump-russia-clinton-emails.html]

[96] President Donald Trump, Twitter, July 27, 2016. [https://twitter.com/realdonaldtrump/status/758236300554174465]

[97] President Donald Trump, Twitter, September 26, 2016.

[98] Email from Donald Trump Jr. to Kellyanne Conway, Steve Bannon, Jared Kushner, David Bossie, and Brad Parscale, Subject: WikiLeaks, September 21, 2016, Donald Trump Jr. production DJTFP00023909.

[99] HPSCI Executive Session Interview of Donald Trump Jr., December 6, 2017, p.131.

[100] Twitter Direct Message from WikiLeaks to Donald Trump Jr., October 3, 2016, Donald Trump Jr. production, DJTJR01265.

[101] Twitter Direct Message from Donald Trump Jr. to WikiLeaks, October 3, 2016, Donald Trump Jr. production, DJTJR01266.

[102] See Twitter handle @RogerJStoneJr.

[103] Roger Stone, "Can the 2016 election be rigged?" The Hill, August 16, 2016. [http://thehill.com/blogs/pundits-blog/presidential-campaign/291534-can-the-2016-election-be-rigged-you-bet]

[104] See Twitter handle @RogerJStoneJr.

[105] HPSCI Executive Session Interview of Roger Stone, September 26, 2017, pp.41-41.

[106] HPSCI Executive Session Interview of Roger Stone, September 26, 2017, pp.41-43.

[107] HPSCI Executive Session Interview of Roger Stone, September 26, 2017, pp.100-101.

[108] HPSCI Executive Session Interview of Roger Stone, September 26, 2017, p. 102.

[109] HPSCI Executive Session Interview of Roger Stone, September 26, 2017, p.28.

[110] HPSCI Executive Session Interview of Roger Stone, September 26, 2017, 120-121.

[111] HPSCI Executive Session Interview of Roger Stone, September 26, 2017, 10-11.

[112] HPSCI Executive Session Interview of John Podesta, June 27, 2017, p.8.

[113] HPSCI Executive Session Interview of John Podesta, June 27, 2017, p. 17-18.

[114] HPSCI, Matt Tait Document Production [Bates# TAIT000012-14].

[115] Matt Tait, "The Time I Got Recruited to Collude with the Russians," *Lawfare Blog*, June 30, 2017. [https://lawfareblog.com/time-i-got-recruited-collude-russians]

[116] Shane Harris, "GOP Activist Who Sought Clinton Emails Cited Trump Campaign Officials," *The Wall Street Journal,* July 1, 2017.

UNCLASSIFIED

UNCLASSIFIED

117 HPSCI Majority Russia Report, March 19 version, p. 73.

118 HPSCI Majority Russia Report, March 19 version, p. 73.

119 HPSCI Majority Russia Report, March 19 version, p. 75.

120 Washington Post, "Roger Stone claimed contact with WikiLeaks founder, Julian Assange in 2016, according to two associates," March 13, 2018. [https://www.washingtonpost.com/politics/roger-stone-claimed-contact-with-wikileaks-founder-julian-assange-in-2016-according-to-two-associates/2018/03/13/a263f842-2604-11e8-b79d-f3d931db7f68_story.html?utm_term=.16c6fc270330]

121 HPSCI, Executive Session Interview of Carter Page, November 2, 2018. The Committee released the transcript publicly pursuant to an arrangement between the Majority and Page. It can also be found in Chapter VI (Transcripts).

122 HPSCI Minority, *Correcting the Record – The Russia Investigations*, January 29, 2018, pp. 3-4. Attached at Appendix F.

123 Trump Campaign Document Production, Email from Carter Page to Tera Dahl and JD Gordon, July 8, 2016 [Bates #DJTFP00004021].

124 Trump Campaign Document Production, Email Attachment from Carter Page to Tera Dahl, JD Gordon, and Walid Phares, July 8, 2016 [Bates # DJTFP00004024].

125 HPSCI Majority Russia Report, March 21, 2018 version, p. 76.

126 HPSCI Majority Russia Report, March 21, 2018 version, p. 76.

127 HPSCI Majority Russia Report, March 21, 2018 version, p. 77.

128 HPSCI Minority, *Correcting the Record – The Russia Investigations*, January 29, 2018, pp. 1-2. See Appendix F.

129 FBI Statement on HPSCI Memo, January 31, 2018, https://www.fbi.gov/news/pressrel/press-releases/fbi-statement-on-hpsci-memo.

130 HPSCI Minority, *Correcting the Record – The Russia Investigations*, January 29, 2018, p. 4.

131 Elen Nakashima, Adam Entous, and Greg Miller, "Russian ambassador told Moscow that Kushner wanted secret communications channel with Kremlin," *The Washington Post*, May 26, 2017. [https://www.washingtonpost.com/world/national-security/russian-ambassador-told-moscow-that-kushner-wanted-secret-communications-channel-with-kremlin/2017/05/26/520a14b4-422d-11e7-9869-bac8b446820a_story.html]

132 Jared Kushner, "Statement of Jared C. Kushner to Congressional Committees," July 24, 2017. Produced by Jared Kushner to HPSCI. [Also available at: https://www.cnn.com/2017/07/24/politics/jared-kushner-statement-russia-2016-election/index.html]

133 Peter Hobson, "How Putin's Bank Became Russia's $20 Billion Problem," *The Moscow Times*, March 3, 2016. [https://themoscowtimes.com/articles/how-putins-bank-became-russias-20-billion-problem-52049]

134 Matthew Rosenberg, Mark Mazzetti, and Maggie Haberman, "Investigation Turns to Kushner's Motives in Meeting With a Putin Ally," *New York Times*, May 29, 2017. [https://www.nytimes.com/2017/05/29/us/politics/jared-kushner-russia-investigation.html]

UNCLASSIFIED

[135] Jared Kushner, "Statement of Jared C. Kushner to Congressional Committees," July 24, 2017. Produced by Jared Kushner to HPSCI. [Also available at: https://www.cnn.com/2017/07/24/politics/jared-kushner-statement-russia-2016-election/index.html]

[136] HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017, p. 30.

[137] Jo Becker, Matthew Rosenberg, and Maggie Haberman, "Senate Committee to Question Jared Kushner Over Meetings With Russians," New York Times, March 27, 2017. [https://www.nytimes.com/2017/03/27/us/politics/senate-jared-kushner-russia.html]

[138] David Filipov, Amy Brittain, Rosalind S. Helderman, and Tom Hamburger, "Explanations for Kushner's meeting with head of Kremlin-linked bank don't match up," The Washington Post, June 1, 2017. [https://www.washingtonpost.com/politics/explanations-for-kushners-meeting-with-head-of-kremlin-linked-bank-dont-match-up/2017/06/01/dd1bdbb0-460a-11e7-bcde-624ad94170ab_story.html]

[139] HPSCI, Executive Session Interview of Susan Rice, September 8, 2017.

[140] Sari Horwitz and Devlin Barrett, "Mueller gathers evidence that 2017 Seychelles meeting was effort to establish back channel to Kremlin," The Washington Post, March 7, 2018. [https://www.washingtonpost.com/world/national-security/mueller-gathers-evidence-that-2016-seychelles-meeting-was-effort-to-establish-back-channel-to-kremlin/2018/03/07/b6a5fb8c-224b-11e8-94da-ebf9d112159c_story.html]

[141] HPSCI, Executive Session Interview of Erik Prince (Redacted), November 30, 2017, pp. 14-15.

[142] HPSCI, Executive Session Interview of Erik Prince (Redacted), November 30, 2017, p. 29.

[143] HPSCI Majority Russia Report, March 21, 2018 version, p. 86.

[144] HPSCI Majority Russia Report, March 21, 2018 version, p. 86.

[145] HPSCI Majority Russia Report, March 21, 2018 version, p. 87.

[146] Mark Mazzetti, David D. Kirkpatrick, and Maggie Haberman, "Mueller's Focus on Adviser to Emirates Suggests Broader Investigation," New York Times, March 3, 2018. [https://www.nytimes.com/2018/03/03/us/politics/george-nader-mueller-investigation-united-arab-emirates.html]

[147] HPSCI, Business Meeting on "Adoption of the Committee's Investigative Report into Russian Active Measures During the 2016 Presidential Election," March 22, 2018. See Chapter VI for transcript.

[148] U.S. v. Michael T. Flynn (1:17-cr-232, District of Columbia), December 1, 2017.

[149] Greg Miller, Adam Entous, and Ellen Nakashima, "National security adviser Flynn discussed sanctions with Russian ambassador, despite denials, officials say," February 9, 2017. [https://www.washingtonpost.com/world/national-security/national-security-adviser-flynn-discussed-sanctions-with-russian-ambassador-despite-denials-officials-say/2017/02/09/f85b29d6-ee11-11e6-b4ff-ac2cf509efe5_story.html]

[150] David Ignatius, "Why did Obama dawdle on Russia's hacking?", The Washington Post, January 12, 2017. [https://www.washingtonpost.com/opinions/why-did-obama-dawdle-on-russias-hacking/2017/01/12/75f878a0-d90c-11e6-9a36-1d296534b31e_story.html?utm_term=.227acd88e819]

[151] Sally Quillian Yates, "Statement for the Record," Senate Judiciary Subcommittee on Crime and Terrorism, May 8, 2017. [https://www.judiciary.senate.gov/imo/media/doc/05-08-17%20Yates%20Testimony.pdf]

[152] James B. Comey, "Statement for the Record," Senate Select Committee on Intelligence, June 8, 2017. [https://www.intelligence.senate.gov/sites/default/files/documents/os-jcomey-060817.pdf]

UNCLASSIFIED

153 President Donald Trump, Twitter, December 2, 2017.
[https://twitter.com/realdonaldtrump/status/937007006526959618]

154 Jeff Grocott, "Trump Lays Bet on New Moscow Skyline" *The Moscow Times*, November 12, 1996.
[http://old.themoscowtimes.com/news/article/tmt/316249.html]

155 The New York Department of Financial Services fined Deutsche Bank $425 million on January 30, 2017. "DFS Fines Deutsche Bank $425 million for Russian Mirror-Trading Scheme," New York Department of Financial Services, January 30, 2017. [https://www.dfs.ny.gov/about/press/pr1701301.htm]. UK regulators fined Deutsche Bank approximately $204 million. United Kingdom Financial Conduct Authority, "FCA fines Deutsche Bank £163 million for serious anti-money laundering controls failings," January 31, 2017. [https://www.fca.org.uk/news/press-releases/fca-fines-deutsche-bank-163-million-anti-money-laundering-controls-failure]

156 Keri Geiger, Greg Farrell, and Sarah Mulholland, "Trump May Have a $300 Million Conflict of Interest With Deutsche Bank," Bloomberg News, December 22, 2016. [https://www.bloomberg.com/news/articles/2016-12-22/deutsche-bank-s-reworking-a-big-trump-loan-as-inauguration-nears]

157 Donald J. Trump, "Executive Branch personnel Public Financial Disclosure Report," May 16, 2016.
[https://www.documentcloud.org/documents/2838696-Trump-2016-Financial-Disclosure.html]

158 HPSCI, Executive Session Interview of Felix Sater, December 20, 2017, pp. 21-23 (see Chapter VI for transcript).

159 Damien Sharkov, "Did Ivanka Trump Take Putin's Seat in Moscow?", Newsweek, August 30, 2017.
[http://www.newsweek.com/ivanka-trump-did-not-take-putins-private-seat-says-kremlin-657023]

160 Mike McIntire, "Donald Trump Settled a Real Estate Lawsuit, and a Criminal Case Was Closed," N*ew York Times*, April 5, 2016. [https://www.nytimes.com/2016/04/06/us/politics/donald-trump-soho-settlement.html]

161 Hazel Heyer, "Executive Talk: Donald Trump Jr. bullish on Russia and few emerging markets," eTurboNews, September 15, 2008. [https://www.eturbonews.com/9788/executive-talk-donald-trump-jr-bullish-russia-and-few-emerging-ma]

162 Glenn Garvin, "Donald Trump and the mansion that no one wanted. Then came a Russian fertilizer king," Miami Herald, February 27, 2017. Updated July 21, 2017.
[http://www.miamiherald.com/news/business/article135187364.html]

163 Thomas Frank, "Secret Money: How Trump Made Millions Selling Condos To Unknown Buyers," BuzzFeed News, January 12, 2018. [https://www.buzzfeed.com/thomasfrank/secret-money-how-trump-made-millions-selling-condos-to?utm_term=.kxlbRe2vM#.rk4YRnPDy]

164 Thomas Frank, "Secret Money: How Trump Made Millions Selling Condos To Unknown Buyers," *BuzzFeed News*, January 12, 2018. [https://www.buzzfeed.com/thomasfrank/secret-money-how-trump-made-millions-selling-condos-to?utm_term=.kxlbRe2vM#.rk4YRnPDy] Craig Unger, "Trump's Russian Laundromat," *The New Republic*, July 13, 2017. [https://newrepublic.com/article/143586/trumps-russian-laundromat-trump-tower-luxury-high-rises-dirty-money-international-crime-syndicate]

165 HPSCI, Felix Sater Document Production, Email from Felix Sater to Michael Cohen, "Andrey L. Kostin – CEO VTB Bank," October 12, 2015. [Bates #FSHR00001]

166 HPSCI, Michael Cohen Document Production, Email from Felix Sater to Michael Cohem, November 3, 2015.
[Bates #MDC-H-000451]

167 HPSCI Majority Russia Report, March 21, 2018 version, *Finding #26*.

UNCLASSIFIED

[168] *U.S. v. Richard W. Gates III* (1:17-cr-201, District of Columbia); *U.S. v. Paul J. Manafort, Jr.* (1:17-cr-201, District of Columbia).

[169] HPSCI Majority Russia Report, March 21, 2018 version, p. 53.

[170] *U.S. v. Paul J. Manafort, Jr.* (1:17-cr-201, District of Columbia)

[171] *U.S. v. Paul J. Manafort, Jr., and Richard W. Gates III* (1:18-cr-83, Eastern District of Virginia).

[172] *United States of America v. Paul J. Manafort, Jr.* (Crim. No. 17-201-1(ABJ)), Document 73, Filed on December 4, 2017 in the U.S. District Court for the District of Columbia.

[173] Kenneth P. Vogel, "Manafort Associate Has Russian Intelligence Ties, Court Document Says," *New York Times*, December 4, 2018. [https://www.nytimes.com/2017/12/04/us/politics/manafort-russia-special-counsel-investigation.html]

[174] HPSCI Document Production, Email from Paul Manafort to Rick Gates, forwarding email exchange between Paul Manafort and Konstantin Kilimnik, April 11, 2016.

[175] HPSCI, Rick Gates Document Production. Received August 18, 2017.

[176] HPSCI, Executive Session Interview with Attorney General Jeffrey Beauregard Sessions III, November 30, 2017, pp. 75, 102.

[177] Michael Isikoff and David Corn, "What Happened in Moscow: The Inside Story of How Trump's Obsession With Putin Began," *Mother Jones*, March 8, 2018. [https://www.motherjones.com/politics/2018/03/russian-connection-what-happened-moscow-inside-story-trump-obsession-putin-david-corn-michael-isikoff/]

[178] HPSCI Majority Report, March 22 version, p. 119.

[179] HPSCI Majority Report, March 22 version, p. 128.

[180] World White Threats Hearing, Senate Select Committee on Intelligence, February 13, 2018. [https://www.intelligence.senate.gov/hearings/open-hearing-worldwide-threats-hearing-1]

[181] National Security Agency Director Admiral Rogers, Testimony before the Armed Services Committee, February 27, 2018, pp. 19-20. [https://www.armed-services.senate.gov/imo/media/doc/18-17_02-27-18.pdf]

[182] National Security Agency Director Admiral Rogers, Testimony before the Armed Services Committee, February 27, 2018, pp. 91-92. [https://www.armed-services.senate.gov/imo/media/doc/18-17_02-27-18.pdf]

[183] HPSCI Majority Report, p. 99 ("Chapter 5 - Intelligence Community Assessment Leaks. Key Question #4: What possible leaks of classified information took place related to the Intelligence Community's assessment of these matters?")

[184] HPSCI Majority Russia Report, March 21, 2018 version, p.108.

[185] HPSCI Majority Russia Report, March 21, 2018 version, p. 107 (internal citation and quotations omitted).

[186] HPSCI, Executive Session Interview of James Clapper, July 17, 2017, p. 34-35.

[187] HPSCI, Executive Session Interview of James Clapper, July 17, 2017, pp. 85-86.

UNCLASSIFIED

---

[188] James Comey, Hearing before the Select Committee on Intelligence of the United States Senate, June 8, 2017. [Transcript: https://www.intelligence.senate.gov/hearings/open-hearing-former-fbi-director-james-comey#]

[189] *See, e.g.,* President Donald Trump, Twitter, June 9, 2017 [https://twitter.com/realdonaldtrump/status/873120139222306817] ("Despite so many false statements and lies, total and complete vindication...and WOW, Comey is a leaker!"); June 11, 2017 [https://twitter.com/realdonaldtrump/status/873879934040780801] ("I believe the James Comey leaks will be far more prevalent than anyone ever thought possible. Totally illegal? Very 'cowardly!'"); July 10, 2017 [https://twitter.com/realdonaldtrump/status/884361623514656769 ] ("James Comey leaked CLASSIFIED INFORMATION to the media. That is so illegal!"); October 18, 2017 [https://twitter.com/realdonaldtrump/status/920604520572424193] ("As it has turned out, James Comey lied and leaked and totally protected Hillary Clinton. He was the best thing that ever happened to her!"); December 3, 2017 [https://twitter.com/realdonaldtrump/status/937279001684598784] ("I never asked Comey to stop investigating Flynn. Just more Fake News covering another Comey lie!"); March 18. 2018 [https://twitter.com/realdonaldtrump/status/975341676297445377] ("Wow, watch Comey lie under oath to Senator G when asked "have you ever been an anonymous source...or known someone else to be an anonymous source...?" He said strongly "never, no." He lied as shown clearly on @foxandfriends.")

[190] President Donald Trump, Twitter, May 12, 2017 [https://twitter.com/realdonaldtrump/status/863007411132649473] ("James Comey better hope that there are no "tapes" of our conversations before he starts leaking to the press!")

[191] President Donald Trump, Twitter, December 3, 2017 [https://twitter.com/realdonaldtrump/status/937279001684598784]

[192] President Donald Trump, Twitter, July 25, 2017 [https://twitter.com/realdonaldtrump/status/889792764363276288]

[193] President Donald Trump, Twitter, July 26, 2017 [https://twitter.com/realdonaldtrump/status/890207082926022656] and [https://twitter.com/realdonaldtrump/status/890208319566229504]

[194] *See, e.g.,* HPSCI, Executive Session Interview of Andrew McCabe, December 19, 2017, p. 58-59; and at pp. 88-89 (McCabe recalling his discussion, with Comey, of a March 30 phone call with the President, and further recalling, with respect to "one of the phone calls[,] [that] the Director's chief of staff, Jim Rybicki was in the room while the Director was on the phone call.").

> *MR. SCHIFF:  ...Did you also have a meeting or discussion on the phone with Director Comey after the March 30th meeting [between Comey and the President] where he discussed what took place during the meeting?*

> *MR. MCCABE:  Yes, sir.*

> *MR. SCHIFF:  Was that a phone conversation as well?*

> *MR. MCCABE:  The best of my recollection is we probably discussed it in person.  I think Director Comey was in his office for that phone call.*

> *MR. SCHIFF:  Were you present during the call?*

> *MR. MCCABE:  No, sir.*

> *MR. SCHIFF:  Do you know whether other agents were in the room with him and could at least listen to his half of the conversation?*

UNCLASSIFIED

> *MR. MCCABE:   I know that for one of the phone calls the Director's chief of staff, Jim Rybicki was in the room while the Director was on the phone call.  I'm not sure if it was that call.  I know there was one other phone call.  I'm confused as to which one that happened.*

[195] James B. Comey, Statement for the Record, Senate Select Committee on Intelligence, June 8, 2017. [https://www.intelligence.senate.gov/sites/default/files/documents/os-jcomey-060817.pdf]

[196] HPSCI, Executive Session Interview of Andrew McCabe, December 19, 2017, pp. 51-55.

[197] HPSCI, Executive Session Interview of Andrew McCabe, December 19, 2017, pp. 57-61.

[198] HPSCI, Executive Session Interview of Andrew McCabe, December 19, 2017, pp. 89-91 (emphasis added).

[199] HPSCI, Executive Session Interview of Andrew McCabe, December 19, 2017, pp. 91-93

[200]  HPSCI, Executive Session Interview of Andrew McCabe, December 19, 2017, pp. 145-46.

[201] HPSCI, Executive Session Interview of Andrew McCabe, December 19, 2017, pp. 146-151.

[202] HPSCI, Executive Session Interview of Andrew McCabe, December 19, 2017, pp. 153-156.

[203] President Donald Trump, Twitter, December 23, 2017 [https://twitter.com/realdonaldtrump/status/944667102312566784]

[204] President Donald Trump, Twitter, December 23, 2017 [https://twitter.com/realdonaldtrump/status/944666448185692166]

[205] President Donald Trump, Twitter, December 23, 2017 [https://twitter.com/realdonaldtrump/status/944665687292817415]

[206] President Donald Trump, Twitter, December 24, 2017 [https://twitter.com/realdonaldtrump/status/944906847970119680]

[207] President Donald Trump, Twitter, March 18, 2018 [https://twitter.com/realdonaldtrump/status/974859881827258369]

[208] President Donald Trump, Twitter, March 18, 2018 [https://twitter.com/realdonaldtrump/status/974859881827258369]

[209] President Donald Trump, Twitter, March 18, 2018 [https://twitter.com/realdonaldtrump/status/975346628113596417]

[210] HPSCI, Executive Session Interview with Jared Kushner, July 26, 2017, p.101.

[211] When asked by press whether he still planned to release the transcripts at the end of the investigation, Conaway replied: "Absolutely." Billy House, "House Russia Probe Dissolves Into a Fight Over Transcripts," *Bloomberg*, March 14, 2018. [https://www.bloomberg.com/news/articles/2018-03-14/house-russia-probe-dissolves-into-fight-over-public-transcripts]