# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

|  |  |
|---|---|
| ALEKSEJ GUBAREV,<br>XBT HOLDING S.A., and<br>WEBZILLA, INC.<br>    Plaintiffs,<br><br>v.<br><br>BUZZFEED, INC. and<br>BEN SMITH<br>    Defendants. | **Case No.**<br><br>**0:17-cv-60426-UU**<br><br>**PUBLIC REDACTED VERSION** |

**MOTION AND MEMORANDUM OF LAW OF PLAINTIFFS FOR SUMMARY JUDGMENT ON DEFENDANTS' "PUBLIC FIGURE" AFFIRMATIVE DEFENSE**

## *"Who on God's green earth is Aleksej Gubarev?"[1]*

### MOTION

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs Aleksej Gubarev, XBT Holding S.A. ("XBT"), and Webzilla Inc. ("Webzilla") hereby move for summary judgment on Defendants Buzzfeed, Inc.'s ("Buzzfeed") and Ben Smith's Fifth Affirmative Defense, asserting that Plaintiffs are public figures.  Because there exists no genuine issue of material fact and because, as a matter of law, Plaintiffs are neither general nor limited public figures, Plaintiffs are entitled to judgment on this affirmative defense as a matter of law.

---

[1] Robert Garson, *In Libel Suit by Aleksej Gubarev, BuzzFeed and Ben Smith Face a Tough Road*, Observer (Feb. 7, 2017), https://observer.com/2017/02/ben-smith-buzzfeed-aleksej-gubarev-lawsuit-trump-russia-dossier/, <u>Exhibit 1</u> to Declaration of Matthew Shayefar ["Shayefar Decl."], filed herewith.  *See, also*, John Miller, *Who the heck is Aleksej Gubarev, and why is he serving John McCain's friends?*, The Free Peach (Nov. 3, 2017), https://freezepeach.net/2017/11/03/who-the-heck-is-aleksej-gubarev-and-why-is-he-serving-john-mccains-friends/, <u>Exhibit 2</u> to Shayefar Decl. ("So who is Aleksej Gubarev?  Aleksej Gubarev is not the famous Soviet Cosmonaut.  May that gentleman rest in peace.  Aleksej Gubarev is a tech industry bigshot Russian ex-patriot who lives in Cyprus, to the best of my knowledge.  His hobbies include being rich and not buttoning his shirt up, he has a business that makes a lot of money in the U.S., he wasn't really on anybody's radar as a Putinbot, and his other hobby WAS being non-political.").

## **Introduction**

Aleksej Gubarev is not Sting, Madonna, or Oprah.[2]  XBT and Webzilla are not Microsoft, Google, or Facebook.  None of the Plaintiffs in this action are household names or celebrities "whose ideas and actions the public in fact follows with great interest."  *Waldbaum v. Fairchild Publications Inc.*, 627 F.2d 1287, 1292 (D.C. Cir. 1980).  To the contrary, prior to Buzzfeed's publication of the December 13, 2016 memo, the last of a collection of memos commonly referred to as the "Dossier," Plaintiffs were hardly known outside of small technology circles, despite some (largely unsuccessful) efforts made to publicize the companies' technological offerings and Mr. Gubarev's experience as a successful technology entrepreneur.

Nor were any of the Plaintiffs steeped in the debate concerning Russia's efforts to influence the 2016 United States presidential election.  To the contrary, prior to the publication of the Dossier, Mr. Gubarev had commented publicly only once on any topic even remotely connected to Donald Trump: in response to a Bloomberg reporter who solicited his assistance to "sort out technical details" for a story he was writing about whether an Alfa Bank computer server had been communicating with a computer server in the Trump organization.  In response to that solicitation, Mr. Gubarev noted that it would be impossible to know precisely what was going on without access to the logs from both computers, which was not something that was publicly available.  This technical and non-political statement was attributed to Mr. Gubarev in one sentence of the article eventually published by Bloomberg.  Aside from this single publication, there is not another relevant piece of evidence for Defendants to put in front of this Court.

Unwilling to let a wholesale lack of *relevant* evidence or supportive case law stand in their way, however, Defendants telegraphed to Plaintiffs and the Court their two-pronged plan of attack: attempt to slime Plaintiffs with irrelevant attacks and bury the Court with paper, assuming that the Court will mistake quantity for quality.[3]

---

[2] Counsel acknowledge that they are dating themselves.  For the benefit of the Court's law clerks: Aleksej Gubarev is not Drake, Selena Gomez, or Kylie Jenner.

[3] *See* June 11, 2018 Hearing Transcript, D.E. 184-1, p. 23 ("[W]e have testimony in this case Mr. Gubarev and his companies sought tons of publicity ███████████████████ ████████████████  I think we have tons of evidence, Your Honor.  You know, it doesn't matter whether you succeed in hitting PR.  It matters that you try.").

2

More specifically, Defendants have gleefully signaled their intent to say ▮▮▮▮▮▮ as many times as possible in the course of their briefing ▮▮▮▮▮▮▮▮



The Court might rightly wonder what any of this has to do with the determination of whether Plaintiffs are either general or limited-purpose public figures.  Plaintiffs wonder that themselves.  The materials are wholly irrelevant to the question at hand, but Defendants have promised them nonetheless.

Defendants have also signaled their intent to provide the court with "tons" of evidence of Plaintiffs' (largely) unsuccessful attempts to get the media to write more about *their product and service offerings*, none of which is relevant to the actual legal question at issue here.

Nevertheless, Defendants insisted not only that they would stick by their assertion of what has proven to be a completely frivolous affirmative defense, but that a separate motion for summary judgment was required for them to do so.  As the Court will see, below, Defendants'



position is wholly without factual or legal support and the Court should grant Plaintiffs' Motion, dismissing Defendants' affirmative defense and finding that, as a matter of law, Plaintiffs are private figures for the purposes of this case.

**Facts**

Aleksej Gubarev was born in Russia. *See* Statement of Material Facts ["SMF"], filed herewith, ¶ 1.  Mr. Gubarev, while he was a University student in Russia, dropped out of school to support his then-pregnant girlfriend (now his wife). *Id.*  In 2001, Mr. Gubarev's family were the victims of a violent home invasion in which his parents and grandmother were beaten and robbed. *Id.* at ¶ 2.  Soon thereafter, in 2002, because they no longer felt safe in Russia and because they had difficulty affording an apartment in Russia, Mr. Gubarev and his girlfriend moved from Russia to Cyprus. *Id.*

In 2005, Mr. Gubarev used his personal savings to start a small server company called Webazilla (later renamed Webzilla). *Id.*, at ¶ 3.  Over the next decade, by dint of hard work, entrepreneurial skills, and popular product offerings, Mr. Gubarev grew Webzilla and started other server companies, including Servers.com, all of which currently operate under the umbrella of XBT. *Id.*, at 4.

Despite operating a number of successful companies, Mr. Gubarev is largely unknown outside of small circles of technology executives and Cypriot entrepreneurs. *Id.*, at ¶ 6-7.  Over the years, Mr. Gubarev has spoken at a handful of small industry conferences, primarily to groups of fewer than 50 people. *Id.*, at ¶ 24.  From time to time, his companies have been recognized with small business-related awards. *Id.*, at ¶ 25.  ██████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████ █ ███████████

Mr. Gubarev has never been involved in, nor publicly commented on, any political matters, be they Russian politics, Cypriot politics, or United States politics. *Id.*, at ¶ 8.

In September of 2015, for the first time, an XBT company, Servers.com, decided that it would experiment with hiring an outside public relations firm in an attempt to gain some

---

█ ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████

publicity and recognition for its server products. *Id.*, at ¶ 9. Specifically, XBT's subsidiary Servers.com retained Cutler PR for the purpose of promoting the brand of Servers.com. *Id.*

Servers.com did not put significant effort into selecting a public relations firm, and instead selected the only company it considered. *Id.*, at ¶ 10. Servers.com paid no more than $7,500 per month to Cutler PR. *Id.* Prior to engaging Cutler PR, XBT had no one handling public relations at all.[8] *Id.*, at ¶ 11. To the extent that XBT's executives were themselves promoted, it was solely for the purpose of creating brand recognition for Servers.com, as suggested by Cutler PR. *Id.*, at ¶¶ 12, 14. Servers.com's sole intent was to promote its brand in markets where it thought it might be able to increase sales. *Id.*

Over the next few months, Cutler PR was largely unsuccessful in its efforts, producing only very limited exposure for Servers.com, including publications in Network World, missioncriticalmagazine.com, and "Cloud Strategy" ("an extremely unpopular website"); mentions in a Forbes and a Inc.com list; and an opinion commentary written by Servers.com's at then-time Chief Operating Officer Nikolay Dvas published on CNBC.com. *Id.*, at ¶ 15. Cutler PR was never able to get Servers.com referenced in the high-level technology media that Servers.com had hoped might write about the company. *Id.* By March of 2016, Servers.com had obtained so little from Cutler PR's work that it suspended its services. *Id.*, at ¶ 16.

Nevertheless, because Servers.com was still interested in growing revenue, it began to reach out to other PR firms and eventually hired the PR firm KGlobal. *Id.*, at ¶ 17. KGlobal was engaged by Servers.com in or about July of 2016. *Id.* As with Cutler PR, KGlobal was hired for the sole purpose of promoting Servers.com to increase its sales. *Id.*

Contrary to Defendants' direct representations to this Court, at no time did the Plaintiffs seek "public commentary on Russian servers, on hacking…." June 11, 2018 Hearing Transcript, D.E. 184-1, p. 23.[9] Instead, as part of its efforts to promote the Servers.com brand, KGlobal

---

[8] Servers.com and XBT were so inexperienced at public relation efforts that Servers.com's Chief Operating Officer did not even have a professional headshot and instead used a picture from a family photo shoot. SMF, ¶ 13.

[9] The full quote reads: "For the 18 months preceding the publication of the dossier, they aggressively sought public commentary on Russian servers, on hacking, so much so that Mr. Gubarev was actually asked to speak to a Bloomberg reporter about the hack of the Democratic National Committee." Contrary to counsel's representation, and as detailed below, Plaintiffs were not seeking to comment on "Russian servers" or "hacking" and the Bloomberg reporter did

pitched Mr. Gubarev to numerous publications (as a Servers.com executive) as a good resource for "stories about the Russian tech, startup and business scene ... and general startup/business/ entrepreneur tips and advice" or simply as the CEO of Servers.com for more information about the company's capabilities and upcoming products.  SMF, ¶ 19.  Mr. Gubarev did not see even these emails until they were shown to him as part of this litigation.  *Id.*  KGlobal's efforts, too, were largely unsuccessful.  Mr. Gubarev was interviewed for a handful of media publications, most of which were very small and in niche technology markets.  *Id.*, at ¶ 20.  Some of Mr. Gubarev's interviews did not even result in him being referenced by the publications.  *Id.*

KGlobal also coordinated a series of press releases strictly concerning the company's business offerings, almost all of which do not appear to have been picked up by any new organizations.  *Id.*, at ¶ 21.  Servers.com found that the press releases were largely ineffective. *Id.*  Only one press release – related to the very successful phone app, Prisma,[10] which was hosted by Servers.com – picked up any form of significant coverage.  *Id.*

Indeed, KGlobal's efforts were so unsuccessful in driving attention to the company that, on December 15, 2016, Servers.com terminated KGlobal's services, after only three months.[11] *Id.*, at ¶ 22.

 On October 31, 2016, the online magazine *Slate* published an article asking if a Trump organization server was communicating with a server maintained by Alfa Bank (and, if so, what that connection might mean).  *See* Franklin Foer, *Was a Trump Server Communicating With Russia?*, Slate (Oct. 31, 2016), http://www.slate.com/articles/news_and_politics/cover_story/ 2016/10/was_a_server_registered_to_the_trump_organization_communicating_with_russia.html, Exhibit 10 to Shayefar Decl.  In response to that article, on November 1, 2016, *Bloomberg View*

---

not ask about the hack of the DNC at all, but rather about the *technological* aspects of allegations of a link between Alfa Bank servers and Trump servers.  The Democratic National Committee is not mentioned even once in the article.  *See* Leonid Bershidsky, *Clinton Plugs Another Weak Story About Trump's Ties to Putin*, Bloomberg (Nov. 1, 2016), https://www.bloomberg.com/ view/articles/2016-11-01/clinton-plugs-another-weak-story-about-trump-s-ties-to-putin, Exhibit 6 to Shayefar Decl.

[10] Prisma is a phone app that allows users to employ filters to make their photographs look like paintings.

[11] After Buzzfeed published the defamatory materials at issue, Plaintiffs hired KGlobal to perform crisis communications.

published an article written by one of its columnists, Leonid Bershidsky, entitled "Clinton Pugs Another Weak Story About Trump's Ties to Putin."  *See* <u>Exhibit 6</u> to Shayefar Decl.

In researching his article, Mr. Bershidsky contacted Mr. Gubarev via email "out of the blue" to ask for Mr. Gubarev's technical opinion as to the technical allegations contained in the *Slate* article.  SMF, ¶ 29.  This contact was initiated by Mr. Bershidsky and not Mr. Gubarev.  *Id.* Prior to this contact, Mr. Gubarev had not commented publicly on any topic even remotely connected to Donald Trump or any alleged connections between Mr. Trump (or the Trump Organization) and Russia (or Alfa Bank).  *Id.*  Indeed, Mr. Gubarev did not consider even this request to be political in nature, rather, he believed it to be – as Mr. Bershidsky specified – a technical question posed to him by a journalist who knew that he headed Servers.com.  *Id.*, ¶¶ 28, 30 ("Could you help me sort out technical details of what is described here?").

Mr. Bershidsky confirms that he contacted Mr. Gubarev not because Mr. Gubarev had any involvement in the story (or in politics at all for that matter), but rather because Mr. Bershidsky knew Mr. Gubarev to have technological knowledge concerning servers.  *Id.*, at ¶ 32. *See*, *generally*, Declaration of Leonid Bershidsky, filed herewith.  Mr. Gubarev provided Mr. Bershidsky with some limited technical information in response to specific questions posed by Mr. Bershidsky.  SMF, ¶ 31.

Ultimately, Mr. Gubarev was mentioned (and not directly quoted) in a single sentence in the *Bloomberg* article:

> Alexey Gubarev, chief executive officer of Luxembourg-registered XBT Holding, which owns the infrastructure-as-a-service-provider Servers.com, told me there was no legitimate way to get access to the full logs of a server that you do not control.

SMF, ¶ 33; <u>Exhibit 6</u> to Shayefar Decl.

The article does not quote or reference Mr. Gubarev as opining on President Trump, Alfa Bank, or the alleged connection between the two.  The article does not make any reference whatsoever to the Democratic National Committee or the hacking of the same.  Instead, the article contains the single sentence quoted above in which Mr. Gubarev simply provides a

technical opinion concerning server logs, which Mr. Bershidsky used to question whether the *Slate* article could properly reach the conclusions it had reached.[12]

Other than this single mention in the *Bloomberg* article, there is no evidence that Mr. Gubarev, XBT, or Webzilla ever commented publicly on any topic that could be considered even remotely political or connected in any way to President Trump or Alfa Bank.

The Dossier as a whole (including the December memo and the portion of the December memo that discusses the Plaintiffs) makes no mention of a Trump Organization server communicating with an Alfa Bank server.  *See* <u>Exhibits 11 and 45</u> to Shayefar Decl.

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

### <u>Argument</u>

**I.    The Court's Choice of Law Will Not Affect the Outcome of This Motion.**

As this Court has recently noted, a choice of law analysis is not necessarily applied to "the collective sum of issues in dispute," but rather "to each individual issue which arises in the case." *Nix v. ESPN, Inc.*, 2018 U.S. Dist. LEXIS 149345, at *9 (S.D. Fla. Aug. 30, 2018) (citing *Judge v. Am. Motors Corp.*, 908 F.2d 1565, 1578 (11th Cir. 1990)). "Thus the law of a foreign state may control one issue while the law of Florida controls another."  *Judge*, 908 F.2d at 1578. Accordingly, this Court's determination that New York law should control the question of fair report privilege would not necessarily control the applicable choice of law for the public figure determination.  Nevertheless, the Court is only "required to conduct a choice-of-law analysis where there is a true conflict between the laws of the states with an interest in the case." *Nix*,

---

[12] Interestingly, on November 2, 2016, *Slate* published a follow-up article in which it acknowledged the widespread criticism of its original article, including specific criticism about whether *Slate*'s sources had been looking at incomplete server logs.  *See* Franklin Foer, *Trump's Server, Revisited*, Slate (Nov. 2, 2016), http://www.slate.com/articles/news_and_politics/ politics/2016/11/the_trump_server_evaluating_new_evidence_and_countertheories.html, <u>Exhibit 10</u> to Shayefar Decl. ("The Intercept also looked into this story and decided not to pursue it.  One reason was that it doubted my source possessed an unabridged set of DNS logs....  As I noted in my piece, there's no foolproof way to verify that these logs are complete and unedited....  Not every nexus between the candidate and Russia is nefarious.  This one might well be entirely innocent or even accidental.").

*supra* at *7.  "A true conflict exists when two or more states have a legitimate interest in a particular set of facts in litigation and the laws of those states differ or would produce a different result."  *Id.* (quoting *Pycsa Panama, S.A. v. Tensar Earth Techs., Inc.*, 625 F. Supp. 2d 1198, 1219 (S.D. Fla. 2008), aff'd, 329 Fed. Appx. 257 (11th Cir. 2009)).  In the present case, although the Florida and New York courts sometimes utilize different phraseology to describe the proper tests to be applied to determine if a plaintiff is a private or public individual, the actual analysis is the same and the results under either state's law would be identical.  As such, the Court need not engage in a choice of law analysis for the purposes of this motion.

## II.      The Determination of Whether Plaintiffs Are Public Figures is a Question of Law for the Court to Decide, Placing the Burden of Proof on Defendants.

For their Fifth Affirmative Defense, Defendants asserted that "Plaintiffs are public figures and cannot meet their burden to prove actual malice by clear and convincing evidence." D.E. 38, p. 10.  Under both Florida and New York law, the question of whether a plaintiff is a public or private figure is generally a question of law for the Court to decide.  *See, e.g.*, *Saro Corp. v. Waterman Broad. Corp.*, 595 So. 2d 87, 89 (Fla. 2d DCA 1992) ("The 'public figure status' of a claimant is a question of law to be determined by the court." (citing *Rosenblatt v. Baer*, 383 U.S. 75 (1966))); *Mitre Sports Int'l Ltd. v. HBO, Inc.*, 22 F. Supp. 3d 240, 249 (S.D.N.Y. 2014) ("Whether a plaintiff is a public figure is a question of law for the court." (citing *Celle v. Filipino Reporter*, 209 F.3d 163, 176 (2d Cir. 2000) and *Hotchner v. Castillo-Puche*, 404 F. Supp. 1041, 1045 (S.D.N.Y. 1975))); *Cantrill v. Herald Co.*, 1992 U.S. Dist. LEXIS 7620, at *48 (N.D.N.Y. May 22, 1992) (the law places "upon the court the responsibility of deciding the question as a matter of law"); *Krauss v. Globe Int'l, Inc.*, 251 A.D.2d 191, 192, (N.Y. App. Div. 1st Dept. 1998) ("Since the facts concerning this issue are not in dispute and are sufficiently set forth in the papers, the public-figure determination should properly be made by the court....").

And, although it should be clear simply by virtue of the fact that Defendants have plead "public figure status" as an affirmative defense, the question of whether a plaintiff is a public figure is, indeed, an affirmative defense for which the Defendants bear the burden of proof. *See, e.g.*, *Krauss*, 251 A.D.2d at 192 ("[T]he public-figure determination should properly be made by the court ... placing the burden of proof on the defendant...."); *Cantrill*, *supra* at *48 ("Generally, the defendant must show that the plaintiff has in some way made voluntary efforts

to affect and influence the resolution of a public controversy....").  And, although the Florida cases appear to be silent on this specific affirmative defense, it would follow that Defendants bear the burden on this issue in Florida, as they would with any other affirmative defense.  *See*, *e.g.*, *Donawa v. United States AG*, 735 F.3d 1275, 1282 (11th Cir. 2013) ("'[T]he defendant bears the burden of proving an affirmative defense.'" (quoting Black's Law Dictionary 482 (9th ed.2009))); *Jones v. City of Lakeland*, 318 F. App'x 730, 736 (11th Cir. 2008) ("As an affirmative defense, the defendant bears the burden of establishing both of these elements."); *Nurse "BE" v. Columbia Palms W. Hosp. Ltd. P'ship*, 490 F.3d 1302, 1309 (11th Cir. 2007) ("As an affirmative defense, the defendant bears the burden of establishing both of these elements.").[13]

Accordingly, Defendants bear the burden of proving their affirmative defense that Plaintiffs are public figures.

### III.   Plaintiffs are Not Public Figures.

A.   Plaintiffs are Not General Public Figures

As a starting point, in *Gertz v. Robert Welch*, 418 U.S. 323 (1974), the United States Supreme Court articulated the two types of "public figures" for defamation cases: individuals who are public figures for all purposes and those who are public figures for more limited purposes.  *Id.* at 351.  With respect to the former, the Supreme Court held that:

---

[13] Courts in other jurisdictions have similarly found the "public figure" question to be an affirmative defense, for which the defendant bears the burden of proof.  *See*, *e.g.*, *Schultz v. Reader's Digest Ass'n*, 1977 U.S. Dist. LEXIS 12563, at *6 (E.D. Mich. Dec. 5, 1977) ("The defense that a plaintiff is a 'public figure' is an affirmative defense in a case of this sort.  As such, the burden is on the defendant to plead and prove the elements of this defense."); *Quigley v. Rosenthal*, 43 F. Supp. 2d 1163, 1176 (D. Colo. 1999) (outlining criteria to be proven by defendant to "establish that a defamation or libel plaintiff is a limited-purpose public figure"); *Clyburn v. News World Commc'ns, Inc.*, 705 F. Supp. 635, 639 (D.D.C. 1989) ("To show that plaintiff is a limited purpose public figure, defendants must satisfy three criteria."); *Addison v. City of Baker City*, 258 F. Supp. 3d 1207, 1240 (D. Or. 2017) ("Defendants' Tenth Affirmative Defense asserts that Addison is a public figure, thereby providing heightened First Amendment protection, and triggering a higher standard of culpability that must be pleaded and proven for Addison's defamation claim than if Addison were not a public figure."); *Weingarten v. Block*, 102 Cal. App. 3d 129, 134 (1980) ("The answers alleged as an affirmative defense that Weingarten was a 'public figure.'"); *Helena Chem. Co. v. Uribe*, 293 P.3d 888, 892-93 (N.M.C.A. 2012) (finding that the question of  "public figure is an affirmative defense that must be raised before trial"); *Reesman v. Highfill*, 965 P.2d 1030, 1034 (1998) ("[P]laintiff filed a cross-motion for partial summary judgment on defendants' public figure affirmative defense.").

> For the most part those who attain this status have assumed roles of special prominence in the affairs of society.  Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes.

*Id.*

It is exceedingly rare for individuals to be all-purpose public figures and the test is "strict:"

> This test is a strict one. The [*Gertz*] Court stated flatly that "(a)bsent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life." ...  The Court in Gertz acknowledged freely that under this definition the general public figure is a rare creature....  From analyzing *Gertz* and more recent defamation cases, we believe that a person can be a general public figure only if he is a "celebrity" his name a "household word" whose ideas and actions the public in fact follows with great interest.

*Waldbaum v. Fairchild Publ'ns*, 627 F.2d 1287, 1292 (D.C. Cir. 1980).

With respect to corporate plaintiffs, the Courts have rejected the notion that even large, well-known, publicly-traded companies are transformed into all-purpose public figures simply by reason of their prominence in the marketplace.  *See, e.g.*, *Mitre Sports Int'l Ltd. v. HBO, Inc.*, 22 F. Supp. 3d 240 (S.D.N.Y. 2014).  In *Mitre*, the Court rejected HBO's argument that, "Mitre, simply by virtue of being one of the largest sporting goods companies in the world and one of the leading soccer ball brands in the United States .... is a public figure" despite the fact that Mitre touted itself as being "synonymous with soccer," and the "number one manufacturer of [soccer balls] in the world" and was described in the media as being "the leading maker of soccer shoes and balls in the U.S." and one of "two giants in the soccer industry."  *Id.*, at 249-50.

In rejecting these arguments, the *Mitre* Court held that "even well-known corporations that sell and advertise common products are not general purpose public figures."  *Id.* at 250 (citing *Computer Aid, Inc. v. Hewlett-Packard Co*., 56 F. Supp. 2d 526, 535-36 (E.D. Pa. 1999) for contention that "'we do not believe that Hewlett-Packard has such pervasive fame or notoriety to be deemed a general purpose public figure,' despite its status as 'one of the largest and most influential corporations in the world with one of the most actively traded stocks on the New York Stock Exchange'").  *See, also*, *Long v. Cooper*, 848 F.2d 1202, 1204-05 (11th Cir. 1988) (finding that plaintiff was not even a *limited* public figure despite it being undisputed "that Long's Electronics was one of the leading discount sellers of satellite television equipment in America.").

Nor do efforts at publicizing a company's products (successful or otherwise) transform that company (or its executives) into general purpose public figures. *Long*, 848 F.2d at 1204 (even high volumes of direct advertising did not result in plaintiff being even a limited public figure); *Rety v. Green*, 546 So. 2d 410, 425 (Fla. 3d DCA 1989) ("Rety was a private businessman who owned and operated an exclusive French restaurant in Bay Harbor Islands. He advertised his restaurant as do many other private businessmen, but he was in no sense a public personality."); *Mitre*, 22 F. Supp. 3d at 250 ("Mitre's sale and advertising of sports equipment is insufficient to make it a general purpose public figure. Courts have held that even well-known corporations that sell and advertise common products are not general purpose public figures." (collecting New York cases that "have repeatedly rejected the notion that advertising alone makes a business a public figure")).

There has never been a single bit of evidence to suggest that any of Plaintiffs have approached the level of public recognition necessary to qualify them as general-purpose public figures and, as a matter of law, they are not. Accordingly, the Court should find that Plaintiffs are not general-purpose public figures and dismiss Defendants' Fifth Affirmative Defense.

B. <u>Plaintiffs are Not Limited Public Figures in any Relevant Respect.</u>

The Court's inquiry, of course, does not end there. Instead, the Court must determine whether any of the Plaintiffs are limited-purpose public figures. Unlike the general-purpose public figure who "occupy positions of such persuasive power and influence that they are deemed public figures for all purposes," limited-purpose public figures are those individuals (or corporate entities" that "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz v. Robert Welch*, 418 U.S. 323, 345 (1974).

The test to determine if a party has "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved," is the three-prong test first set forth by the D.C. Circuit Court of Appeals in *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir.1980) and subsequently adopted by the Eleventh Circuit in *Silvester v. American Broadcasting Companies, Inc.*, 839 F.2d 1491 (11th Cir.1988).[14]

---

[14] Defendants acknowledged that the Court should apply the *Silvester* test in the last hearing before this Court. *See* June 11, 2018 Hearing Transcript, D.E. 184-1, p. 26 ("MS. BOLGER:

12

As the Eleventh Circuit explained:

In *Silvester*, we adopted the three-part analysis for establishing limited public figure status set forth in *Waldbaum*....  As we stated in *Silvester*, "[u]nder the *Waldbaum* analysis, the court must (1) isolate the public controversy, (2) examine the plaintiffs' involvement in the controversy, and (3) determine whether 'the alleged defamation [was] germane to the plaintiffs' participation in the controversy.'" 839 F.2d at 1494, *quoting Waldbaum*, 627 F.2d at 1297.

*Long v. Cooper*, 848 F.2d 1202, 1204 (11th Cir. 1988).[15]

### 1.     *Public Controversy*

Unsurprisingly, Defendants would like to define the "public controversy" as broadly as possible, claiming that the Court should define the public controversy to be "the meddling of the Russian Government in the election in the United States of America."  June 11, 2018 Hearing Transcript, D.E. 184-1, p. 24.  And, although Plaintiffs would argue that the public controversy should be defined more narrowly given the defamatory statements concerning Plaintiffs (that they allegedly participated in the hacking of the Democratic National Committee at the direction of the FSB), it does not matter which of the two formulations the Court adopts given that Plaintiffs are not even remotely limited-purpose public figures in connection with either.[16]

### 2.     *Plaintiff's Involvement in the Controversy*

In the second prong of the *Silvester* test, the Court looks to the question of the extent to which Plaintiffs have "thrust itself into a public controversy" in an "attempt to influence the outcome of the alleged controversy."  *Long*, 848 F.2d at 1204-05; *White v. Tarbell*, 284 A.D.2d 888, 889 (N.Y. App. Div. 2001) ("[O]ne may become a limited purpose public figure by 'purposeful activity amounting to a thrusting of his personality into the "vortex" of an important public controversy.'" (quoting *Curtis Publ. Co. v. Butts*, 388 U.S. 130, 155 (1967))).

---

Your Honor, the test is the Sylvester [sic] case in the Eleventh Circuit.... [T]he Sylvester case in the Eleventh Circuit sets forth the three prongs and says it's a matter of law.  So that's where to look, Your Honor.").

[15] *See*, *also*, *Mitre*, 22 F. Supp. 3d at 250-51 ("As articulated by the Second Circuit, a limited purpose public figure is someone who has: (i) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of the litigation, (ii) voluntarily injected himself into a public controversy related to the subject of the litigation; (iii) assumed a position of prominence in the public controversy; and (iv) maintained regular and continuing access to the media.").

[16] Plaintiffs do not dispute the existence of a public controversy predating Buzzfeed's publication of the Dossier.

As the Court held in *Waldbaum*:

> Once the court has defined the controversy, it must analyze the plaintiff's role in it. Trivial or tangential participation is not enough. The language of *Gertz* is clear that plaintiffs must have "thrust themselves to the forefront" of the controversies so as to become factors in their ultimate resolution.... They must have achieved a "special prominence" in the debate.... The plaintiff either must have been purposely trying to influence the outcome or could realistically have been expected, because of his position in the controversy, to have an impact on its resolution. In undertaking this analysis, a court can look to the plaintiff's past conduct, the extent of press coverage, and the public reaction to his conduct and statements.

627 F.2d at 1297-98 (citations omitted).

Often, by necessity, the court's analysis involves discussing those activities or actions that are *insufficient* to satisfy the second *Silvester* prong. Given that Defendants intend to rely almost entirely on actions rejected by other courts as being insufficient to meet the second prong of *Silvester*, such a discussion is appropriate here.

For example, courts have repeatedly held that simply engaging in normal publicity efforts does not transform a plaintiff into even a limited purpose public figure. *Mitre*, 22 F. Supp. 3d at 250 ("New York courts have repeatedly rejected the notion that advertising alone makes a business a public figure."); *Lee v. City of Rochester*, 663 N.Y.S.2d 738, 745-46 (N.Y. Sup. Ct. 1997) ("If that was the only criterion, any business that advertised would, merely by the fact of advertising, become a public figure, a proposition rejected in the cases."); *Behr v. Weber*, 1990 N.Y. Misc. LEXIS 712, 1990 WL 270993, at *2 (N.Y. Sup. Ct. Jan. 5, 1990) ("[A] business does not thrust itself into a public controversy by merely advertising its services" (internal quotation marks omitted)); *El Meson Espanol v. NYM Corp.*, 389 F. Supp. 357, 359 (S.D.N.Y. 1974) ("[A] corporation ... holding itself out to the public as operating a safe and proper place to go, is not a public figure.").

This is all the more true when the publicity and advertising efforts are unrelated to the relevant public controversy. For instance, the 11th Circuit in *Long* decided this issue as follows:

> This case can be decided on the narrow ground that Long's Electronics did not thrust itself into a public controversy.... It is not disputed that Long's Electronics was one of the leading discount sellers of satellite television equipment in America. It also is not disputed that much of Long's Electronics' advertising involved comparisons of its prices to "list" prices, that it did a high volume of direct mail advertising, and that it touted itself as "The Nation's Largest TVRO Dealer." There is no evidence in the record, however, that Long's Electronics – either through its advertisements or otherwise – ever commented upon or in any way addressed the

14

controversy over the relative virtues of discount wholesalers vis-a-vis specialty retailers of satellite television equipment.  Nor is there any evidence that Long's Electronics made direct, specific comparisons of its prices to those of identified specialty dealers.

> We can assume *arguendo* that a company and its principal could create advertisements that might thrust them into a controversy such as the one in this case.  However, the advertising used by Long's Electronics does not come close to rising to such levels; indeed the form and flavor of Long's Electronics' advertisements are well within the mainstream of normal advertising practices.  Moreover, Long's Electronics in no way attempted to influence the outcome of the alleged controversy.

848 F.2d at 1204-05.  *See*, *also*, *White*, 284 A.D.2d at 890 ("The fact that one of the plaintiffs here had previously run for public office is also insufficient in and of itself to his status as a limited purpose public figure, for there is no evidence of any relationship between his prior candidacies and the particular public controversy that was the subject of defendant's allegedly defamatory statements....").

Despite Defendants' specific representations to this Court to the contrary,[17] unsuccessful efforts to obtain publicity are irrelevant to the inquiry.  *See*, *e.g.*, *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 288 (S.D.N.Y. 2016) ("The Second Circuit has adopted a four-part test to determine whether a plaintiff is a limited-purpose public figure.  To qualify, a plaintiff must have: '(1) ***successfully*** invited public attention to [its] views in an effort to influence others prior to the incident that is the subject of litigation....'" (emphasis added)); *Calvin Klein Trademark Trust v. Wachner*, 129 F. Supp. 2d 248, 251-52 (S.D.N.Y. 2001) ("[A] claimant is to be considered a 'limited purpose' public figure if he (or she or it) has ... successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of the litigation....").

Likewise, simply speaking to small industry groups and writing articles for small niche industry publications is insufficient to transform a plaintiff into a limited public figure where the talks and writings were not aimed at influencing the outcome of a particular controversy.  *See*, *e.g.*, *Sovik v. Healing Network*, 244 A.D.2d 985, 988 (N.Y. App. Div. 1997) ("Further, through his teaching on behalf of the Institute and Himalayan International and his articles on yoga intended principally for members of Himalayan International, plaintiff has not 'voluntarily

---

[17] June 11, 2018 Hearing Transcript, D.E. 184-1, p. 23 ("You know, it doesn't matter whether you succeed in hitting PR.  It matters that you try.").

injected [himself] into the vortex of [the] particular public controversy [at issue] in order to influence its outcome' ... and thus is not a 'limited issue' public figure...." (citations omitted)); *Madsen v. Buie*, 454 So. 2d 727, 730 (Fla. 1st DCA 1984) (discussing *Hutchinson v. Proxmire*, 443 U.S. 111 (1979), and noting that, in that case, "Hutchinson, a research behavioral scientist who had received federal funds to conduct research and who had published writings which reached a relatively small category of professionals concerned with research in human behavior was found not to be a public figure for even limited purposes. The court found that neither Hutchinson's applications for federal grants nor his publications in professional journals could be said to have invited that degree of public attention and comment on his receipt of federal grants essential to place him within 'public figure' status.").

Merely achieving a degree of public recognition in a particular field is also insufficient to make a plaintiff even a limited public figure, where the plaintiff has not employed that recognition in an attempt to influence the outcome of the controversy. In the *Gertz* case before the United States Supreme Court, the plaintiff was not deemed a general or limited public figure despite the fact that he "has long been active in community and professional affairs. He has served as an officer of local civic groups and of various professional organizations, and he has published several books and articles on legal subjects. Although petitioner was consequently well known in some circles, he had achieved no general fame or notoriety in the community.... He plainly did not thrust himself into the vortex of this public issue, nor did he engage the public's attention in an attempt to influence its outcome." 418 U.S. at 351-52. *See*, *also*, *Madsen v. Buie,* 454 So. 2d 727, 729 (Fla. 1st DCA 1984) (reversing trial court's finding that plaintiff was a limited public figure despite finding that plaintiff "is an outstanding authority in the field of psychology and has authored a number of books and articles...."); *Long*, 848 F.2d at 1205-06 ("Although Long is well known in the satellite television industry, it has done nothing to thrust itself into the alleged controversy.... [T]he mere fact that Long's Electronics is successful and a leader in its field is insufficient to convert it into a limited public figure."); *Lee*, 663 N.Y.S.2d at 742-45 (evidence of plaintiff's "high profile effort to promote his business" did not make him a public figure where there was "no public controversy attend[ing] plaintiff's self-promotion efforts"); *Computer Aid, Inc. v. Hewlett-Packard Co.*, 56 F. Supp. 2d 526, 536 (E.D. Pa. 1999).

Even "being an executive within a prominent and influential company does not by itself make one a public figure." *Waldbaum*, 627 F.2d at 1299.

16

The fact that the media give a plaintiff the opportunity to respond to defamatory statements does not mean that a plaintiff has the kind of regular access to the media that might contribute to a plaintiff being deemed a limited public figure. *Hutchinson v. Proxmire*, 443 U.S. 111, 134-36 (1979) ("[W]e cannot agree that Hutchinson had such access to the media that he should be classified as a public figure. Hutchinson's access was limited to responding to the announcement of the Golden Fleece Award. He did not have the regular and continuing access to the media that is one of the accouterments of having become a public figure."). Indeed, the *Hutchinson* Court specifically noted that consideration of the Plaintiff's access to media *in response to* the defamatory publication would be improper. "Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Id.*, at 135. *See, also*, *Silvester*, 839 F.2d at 1496 ("[T]he plaintiff must have been a public figure prior to the publication of the particular defamatory speech which is the issue of the litigation."); *Rety*, 546 So. 2d at 425 ("[O]bviously a defendant in a defamation action cannot by his defamation make the plaintiff a limited public figure for First Amendment purposes; the said plaintiff, unlike this case, must be a limited public figure prior to the alleged defamation.").

And, even where a plaintiff takes certain actions that bring him within the public limelight, the Court must consider whether the plaintiff played a major or minor role in the overall controversy.[18] *See, e.g.*, *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 166-67 (1979) ("It is clear that petitioner played only a minor role in whatever public controversy there may have been concerning the investigation of Soviet espionage. We decline to hold that his mere citation for contempt rendered him a public figure for purposes of comment on the investigation of Soviet espionage."). As the United States Supreme Court in *Wolston* held:

---

[18] Amusingly, a plaintiff's own inflated view of their importance to the controversy is irrelevant. *Cantrill v. Herald Co.*, 1992 U.S. Dist. LEXIS 7620, at *57-58 (N.D.N.Y. May 22, 1992) ("Finally, defendants point to Cantrill's admissions that he has a national reputation and has influenced the outcome of the debate recruiting issue. Despite Cantrill's personal beliefs, the applicable legal authority suggests an objective analysis of whether plaintiff has attained limited public stature and does not permit the court to consider such subjective considerations as personal belief or desire.... Hence, defendants' reference to Cantrill's admissions has no bearing on the court's determination of Cantrill's status. The court finds that defendants fail to carry their burden of demonstrating that plaintiff Cantrill is a limited issue public figure on the issue of debate recruiting, and therefore the court concludes that plaintiff Cantrill is a private figure plaintiff for purposes of this lawsuit.").

> A private individual is not automatically transformed into a public figure just by
> becoming involved in or associated with a matter that attracts public attention....
> Nor do we think that petitioner engaged the attention of the public in an attempt to
> influence the resolution of the issues involved.  Petitioner assumed no "special
> prominence in the resolution of public questions."

*Wolston* at 167-68.  *See, also, Waldbaum*, 627 F.2d at 1300 ("Not everyone who participates in

activities that affect the public becomes a public figure.  Nevertheless, when one assumes a

position of great influence within a specific area and uses that influence to advocate and practice

controversial policies that substantially affect others, he becomes a public figure for that

debate."); *Saro Corp. v. Waterman Broad. Corp.,* 595 So. 2d 87, 89 (Fla. 2d DCA 1992)("[T]he

court must determine whether the individual played a central role in the controversy."); *Mitre*, 22

F. Supp. 3d at 252 ("Mitre's purported role in the international effort to eliminate child labor in

the manufacture of soccer balls similarly lack the level of involvement required by *Gertz*, *James*,

and their progeny.  Specifically, the role of Mitre's corporate parent in sponsoring a conference

that brought together representatives from the soccer ball industry in Pakistan in 1996, the

creation of a hotline for American consumers to learn which brands had committed to the Atlanta

Agreement, Mitre's corporate policy denouncing child labor on its website and press releases

indicating that Mitre had committed to the Atlanta Agreement do not show that Mitre itself took

an affirmative stance on child labor in a manner that aimed to influence the public's views on the

controversy.").

Turning to the present case, then, there is a complete absence of any evidence to suggest

that Mr. Gubarev, XBT, or Webzilla voluntarily injected themselves into any public controversy

in an attempt to influence the outcome of that controversy, no matter how the Court defines that

controversy.  Under either formulation of the controversy, Plaintiffs' efforts to obtain publicity

for new products and services would have been irrelevant even had they been successful, but,

given that they were not, are particularly immaterial to the Court's inquiry.

If the Court utilizes Defendants' formulation of the public controversy, namely "the

meddling of the Russian Government in the election in the United States of America," it would

have to conclude, as a matter of law, that even Mr. Gubarev's one, isolated comment concerning

the technical feasibility of a server from Alfa Bank communicating with a server from the Trump

organization, did not amount to his playing a "central role" in the controversy that constituted a

"thrusting of his personality into the 'vortex' of an important public controversy."  Nor can it be

said that Mr. Gubarev achieved a "special prominence" in the debate as opposed to "trivial or tangential participation." In short, even utilizing Defendants' definition of the controversy, Mr. Gubarev's "role" in that controversy falls far short even of the level of participation that Courts have consistently found insufficient to transform a party into a limited public figure.

And, of course, it should go without saying that, if the Court were to define the public controversy more narrowly as the hacking of the Democratic National Committee, then the evidence that Plaintiffs attempted to insert themselves into the controversy at all (much less for the purposes of influencing its outcome) is wholly nonexistent.

In either case, though, the Court should conclude as a matter of law that Plaintiffs' "involvement" in the controversy was insufficient to establish them as limited-purpose public figures.

3.    *The Connection Between the Defamation and Plaintiffs' Alleged Role in the Controversy.*

Although the Court can (and should) easily decide the present motion based on Defendants' wholesale inability to prove the second prong of *Silverster*, the final nail in the public-figure coffin is Defendants' inability to connect Plaintiffs' (non-existent) involvement in the public controversy to the alleged defamatory statements. *See*, *Saro Corp.*, 595 So. 2d at 89 (the court "must determine whether the alleged defamation was germane to the individual's role in the controversy"); *Waldbaum*, 627 F.2d at 1298 ("Finally, the alleged defamation must have been germane to the plaintiff's participation in the controversy.").

As discussed throughout this Memorandum, Plaintiffs' alleged "role" in the controversy is limited to providing comments to a Bloomberg columnist concerning the technical feasibility that *Slate* magazine was able to properly link a server from Alfa Bank to a server within the Trump organization. In contrast, the alleged defamatory statements at issue in this case are that:

> [Redacted] reported that over the period March-September 2016 a company called XBT/Webzilla and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct "altering operations" against the Democratic Party leadership. Entities linked to one Aleksei GUBAROV [sic] were involved and he and another hacking expert, both recruited under duress by the FSB, Seva KAPSUGOVICH, were significant players in this operation.

*See* <u>Exhibit 11</u> to Shayefar Decl., p. 35.

The two are wholly unconnected. Not only is the defamatory statement unrelated to any alleged connection between an Alfa Bank server and a Trump organization server, but the

19

Dossier as a whole fails to make any mention of any such alleged connection.  As such, even if Mr. Gubarev could be said to have somehow connected himself to the public controversy by virtue of his comments to Bloomberg, the defamatory statements were not germane to his "involvement" in the public controversy.  Accordingly, the present motion should be allowed, Plaintiffs should be granted Summary Judgment on Defendants' Fifth Affirmative Defense, and the Court should hold that Plaintiffs are private figures for the purposes of this action.

**Conclusion**

For the reasons stated hereinabove, Plaintiffs' Motion for Summary Judgment should be allowed and the Court should hold that Plaintiffs are private figures for the purposes of this action.

**Request for Hearing**

Plaintiffs respectfully request that the Court schedule a hearing on the present motion given the complex nature of the motion.  Plaintiffs estimate that the parties will require one hour for arguments.

Dated: September 17, 2018

**Respectfully Submitted:**

/s/ Evan Fray-Witzer
Evan Fray-Witzer (*pro hac vice*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-0000
Facsimile: 617-423-4855
Evan@CFWLegal.com

/s/ Valentin Gurvits
Valentin D. Gurvits (*pro hac vice*)
Matthew Shayefar (Fla. Bar No. 0126465)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1804
Facsimile: 617-928-1802
vgurvits@bostonlawgroup.com
matt@bostonlawgroup.com

/s/ Brady J. Cobb
Brady J. Cobb (Fla. Bar No. 031018)
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

**I hereby certify** that a true and correct copy of the foregoing was served electronically via the CM/ECF electronic filing system on all counsel or parties of record on the service list below on September 17, 2018.

/s/ Matthew Shayefar
Matthew Shayefar

## SERVICE LIST

Katherine M. Bolger
Adam Lazier
Davis Wright Tremaine, LLC
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
katebolger@dwt.com
adamlazier@dwt.com

Nathan Siegel
Alison Schary
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, Suite 800
Washington, DC 20006
nathansiegel@dwt.com
alisonschary@dwt.com

Roy Eric Black
Jared M. Lopez
Black Srebnick Kornspan & Stumpf
201 S Biscayne Boulevard, Suite 1300
Miami, Florida 33131
rblack@royblack.com
jlopez@royblack.com