ATTORNEYS' EYES ONLY

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 17-cv-60426-UU**

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.

   Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

  Defendants.

_____/

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**
**ON THE ISSUE OF PLAINTIFFS' STATUS AS PUBLIC FIGURES**

DAVIS WRIGHT TREMAINE LLP
Katherine M. Bolger
Nathan Siegel
Adam Lazier
Alison Schary
1251 Avenue of the Americas, 21st Floor
New York, New York 10020

BLACK, SREBNICK, KORNSPAN &
STUMPF, P.A.
Roy Black
Jared Lopez
201 So. Biscayne Boulevard
Miami, Florida 33131

*Of Counsel*:
Nabiha Syed
BuzzFeed, Inc.
11 E. 18th Street, 13th Floor
New York, NY 10003

*Attorneys for Defendants*

ATTORNEYS' EYES ONLY

## INTRODUCTION

The statements at issue in this case allege that Plaintiffs "had been using botnets and porn traffic" as part of Russian efforts to influence the 2016 U.S. Presidential election. As the record makes clear, Plaintiffs have a long history of aggressively injecting themselves into public debate regarding porn traffic, botnets and cybersecurity, especially in relation to Russia. As merely one example of that activity, Plaintiffs also publicly debunked an allegation of Trump-Russia cyber-collusion just before the election, and to this day Plaintiffs maintain they were included in the Dossier due to those comments. Given their access to the media and their preexisting involvement in the very topics discussed in the Dossier, Plaintiffs are limited public figures.

Plaintiffs have now filed their own motion for summary judgment, which largely tries to flee from those facts by asserting that much of their conduct for years either did not work or does not matter. Not so. For the most part, Defendants will address Plaintiffs' specific claims in our opposition to that motion. What is most important to note here is that Plaintiffs' motion is plainly an effort to file a pre-emptive opposition to this one. To try to do that, Plaintiffs took different fragments from a three-month old transcript of an informal colloquy during a status conference to construct what they claim constitutes "Defendants' position" on the public figure issue, consisting of a supposed "two pronged attack." Dkt. 208 at 2-3. Their entire motion then purports to rebut that "position" of their own invention. But as this Motion makes clear, the reasons Plaintiffs are limited public figures bear little resemblance to the imaginary, self-serving arguments that Plaintiffs hypothesize.

## STATEMENT OF FACTS

## I.   PLAINTIFFS' LEADING ROLE IN PROMOTING THE ONLINE PORNOGRAPHY INDUSTRY OPERATED BY RUSSIAN NATIVES

After moving to Cyprus in 2002, Gubarev became an outspoken, international advocate for the online pornography industry, especially for Russian-speakers who operate adult websites.

### A.   Gubarev Launches the AWMOpen Conferences

In 2003, Gubarev launched an international conference, called the "AWMOpen Conference," billed as a forum for Russian-speakers involved in the online pornography industry. Defs. Statement of Undisputed Material Facts ("SUMF") ¶ 4. Starting in Moscow, the conferences were hosted annually in different cities throughout the world, including Prague, Amsterdam, Pattaya (Thailand) and Malta, until at least 2015. *Id.* The AWMOpen Conferences

created the "Master X Award" and "GFY Award", which were awarded to adult webmasters at each conference. SUMF ¶ 5. After Gubarev founded the first Webzilla companies in 2005, the brand sponsored the AWMOpen conferences. SUMF ¶ 6. In conference brochures, Webzilla promoted itself as offering "high reliability, a wide channel, and liberal rules." *Id.* As recently as 2015 Gubarev and other top XBT executives attended the conferences. SUMF ¶ 7.

**B.      Gubarev Publishes the *AWMOpen Magazine***

In 2006 Gubarev, through a company he founded, started *AWMOpen Magazine*, billed as "the leading magazine for Adult Webmastering." SUMF ¶ 8. The magazine's stated "main goal" was "media support of online industries" by enhancing their legitimacy. *Id.* The magazine was described as "the first full-color, glossy, informative and entertaining magazine in the Russian language segment" and "a step to improve the status of the Russian language segment in [the] international online business." SUMF ¶ 10.[1] Within a year the magazine was publishing both Russian and English editions. *See* Declaration of Nathan Siegel, Ex. 16.[2]

**C.      The Controversial Nature of Many AWMOpen Sponsors and Participants**

Whether unwittingly or not, Gubarev's AWMOpen ventures also helped promote some notorious cyber-criminals who were subjects of widespread publicity. For example, a principal "informational sponsor" of multiple conferences was "Redeye" and his website *crutop.nu*; "Redeye" was the alias used by a Pavel Vrublesky. SUMF ¶¶ 11-13. *Forbes* described Crutop as an online "forum . . . where representatives of the semi-legal Runet areas meet." SUMF ¶ 13. Brian Krebs, an influential investigative journalist on the topic of cyber-security, reported that

---

[1] For his porn-related activities Gubarev used a pseudonym, "Alex XE", as illustrated by the picture below from the 2008 AWOpen Conference in Thailand. The staff for the Magazine and Conferences often put out materials under that pseudonym. SUMF ¶ 9.



[2] Unless otherwise noted, all exhibits are attached to the Declaration of Nathan Siegel filed herewith.

"the business of spam, fake antivirus and rogue Internet pharmacies, shadow economies . . . were aided immensely by . . . Vrublesky himself.  Ex. 19; SUMF ¶ 13.  In 2009, the FTC alleged that "*Crutop.nu* is a Russian language website that features a variety of discussion forums that focus on making money from spam."  SUMF ¶ 13; *see also* Exs. 26, 27.  In 2013 Vrublesky was imprisoned in Russia for allegedly launching a bot attack.  SUMF ¶ 14.

Krebs reported in *Slate* that McColo, another Conference sponsor, was:

a minor celebrity in the cybercriminal underground . . . a place where cybercrooks could reliably set up shop with little worry that their online investments and schemes would be discovered or jeopardized by foreign law-enforcement investigators.

Ex. 22; *see also* SUMF ¶¶ 15-16.  In 2008, Krebs wrote in *The Washington Post* that McColo was closed following a report that it "was responsible for facilitating more than 75 percent of the junk e-mail blasted out each day globally."  SUMF ¶ 16.  Another AWMOpen sponsor, 3fn.net, was shut down by the FTC in 2009 for operating as a "rogue Internet service provider" facilitating illegal bots and pornography.  SUMF ¶¶ 17, 18.

## II.   PLAINTIFFS HOLD THEMSELVES OUT TO THE MEDIA AS MAJOR PLAYERS IN THE INTERNET WORLD

By 2013, Plaintiffs were winding down their direct involvement in promoting the adult web industry.  Around the same time, XBT and Webzilla began to aggressively circulate press releases promoting the message that the companies had become major international players in the broader internet world.  The companies used the service "Marketwired," a London-based company that circulates press releases to the press worldwide.  SUMF ¶ 19.  For example, in a 2014 release entitled "Webzilla is Now in the Company of Giants," the company stated that "Webzilla has transitioned itself to stand among the ranks of exclusive peers such as Netflix, Google, and Akamai, quietly taking its rightful place among the giants."  SUMF ¶ 20.[3]

Another theme that XBT and Webzilla's press releases began to emphasize was the companies' stated commitment to protecting its servers from malicious cyber-activity.  In a 2015 press release, XBT's CFO Rajesh Mishra stated that:

---

[3] *See also* Ex. 30 (2014 Press release announcing stating "Webzilla is a world leader in enterprise holding and cloud services" and "XBT is now one of the fastest-growing companies in the Internet infrastructure industry."); Ex. 31 (2014 press release lauding "the corporate ascension of XBT to the ranks of the world's top providers of internet infrastructure.")

> Ever since it gained popularity and became a household presence, the Internet has been elevating questions regarding the exposure of personal and business data. The creation of SecureVPN was to introduce a unique version of online safety and help with internet protection. The company focuses on safeguarding users who are conscious of their sensitive data and patterns online.

Ex. 33; SUMF ¶ 21.  Another release claimed that "[t]he acquisition of DDoS.com combined with the expertise developed by all the companies under the XBT umbrella in dealing with threats to security, including DDoS attacks, guarantees a service that will make the online world a safer place."  SUMF ¶ 22.  Mishra explained that XBT's purpose for DDoS.com was to "create a forum so that we can educate the people" about online safety.  SUMF ¶ 23.  Plaintiffs' executives also began granting interviews to trade publications covering the internet hosting industry.[4]  SUMF ¶ 24.

### III. PLAINTIFFS ACTIVELY SEEK COVERAGE IN THE AMERICAN MEDIA BY PROMOTING THEMSELVES AS TECHNOLOGY "THOUGHT LEADERS"

In 2015, Plaintiffs decided to more aggressively inject themselves into media discussions about web-related technology, especially in U.S.-based media and particularly about topics relating to the Russian cyber-world.  Plaintiffs hired an American public relations ("PR") firm, Cutler PR.  Cutler was charged with soliciting journalists to write articles about the company and its executives, particularly a new brand that XBT was launching, Servers.com.  SUMF ¶ 25; Ex. 38 at 45:21-48:14.  The PR strategy Plaintiffs pursued involved much more than standard press releases announcing the company's products, finances, or internal news.  Rather, Cutler aimed to establish the company and its executives more broadly as "Thought Leaders" about issues related to technology.  SUMF ¶ 26.

Cutler thus undertook to "pitch top list, feature, trend and op-ed stories" to the media, targeting both major general business media like *CNN Money*, *Bloomberg, Forbes* and *Reuters* and leading publications focusing on technology like *VentureBeat*, *CNET* and *Gizmodo*.  SUMF ¶ 27.  XBT also aimed to "raise key executives profiles with bylined articles" that Cutler pitched to news editors to publish.  SUMF ¶ 28.  Those articles were "not product specific, and they are not generally profile stories of the company."  Rather, Plaintiffs' goal was to establish

---

[4] *See, e.g.*, Ex. 36 ("Webzilla has years of experience working with leaders in the FX industry . . ."); Ex. 37 ("In 2013, XBT Holding S.A. began the creation of Servers.com . . . Nick Dvas, Project Manager for Servers.com, recently spoke with Linux.com about the company . . .").

"credibility" with journalists so that "the press will seek commentary on timely topics." SUMF ¶ 29.

Cutler pitched multiple publications like *Forbes* and persuaded editors to publish several op-ed articles under the byline of one of the company's executives, Nikolai Dvas, such as an article published by *CNBC.com* on why Luxembourg (where XBT had a headquarters) is an attractive place to do business.  SUMF ¶ 30.  Luxembourg's Prime Minister re-posted the article on the government's Twitter feed, which Dvas thought was "good publicity."  *Id.*  Cutler also persuaded *Inc.*, another prestigious business publication, to list Servers.com as one of "18 Tech Companies to Get Excited About", noting that it "boasts super-secure" servers.  SUMF ¶ 31.

## IV.   PLAINTIFFS PROMOTE THEIR ENTRY INTO RUSSIA TO FACILITATE COMPLIANCE WITH CONTROVERSIAL RUSSIAN DATA PRIVACY LAWS

In 2015 Plaintiffs began to expand their business to Russia itself.  Russia had just enacted a highly controversial data privacy law requiring that the data of all Russian citizens be stored within Russia.  SUMF ¶ 32.  Critics saw it as an effort by Putin's government to assert control over information flowing in and out of Russia.  SUMF ¶ 33.  However, Plaintiffs viewed the new law as a business opportunity.  SUMF ¶ 34.

XBT purchased an existing Russian company ("Edinaya Set") to establish data center presence in Russia.  SUMF ¶ 32.  XBT issued press releases emphasizing how the new law relates to its services, and its executives spoke to the press about the Russian law and XBT's entry into Russia.  SUMF ¶¶ 35, 36; Ex. 47 ("the move enables XBT to deploy its solutions to the local market in observance of the legal standards of the Russian Federation"); Ex. 52 (XBT "provides the platform for businesses who maintain presence in Russia, as such entities are legally required to store personal data within Russia's physical borders."); Ex. 54 (XBT "launch[ed] local versions of XBT services in compliance with Russian legislation.").  Gubarev even publicly defended the controversial law:  "It is worth noting that the law on personal data in Russia is not unique, such provisions exist in other countries."  Ex. 53.

Plaintiffs also generated publicity about their launch in Russia in a variety of other ways.  They asked Cutler to "[p]itch info about opening of Russia office to U.S. media who might be able to cover it."  Ex. 56; SUMF ¶ 37.  Plaintiffs held a press conference in Moscow, which generated coverage in the Russian media.  SUMF ¶ 38; Ex. 57 ("Aleksej Gubarev launches Servers.ru hosing in Russia")."  Gubarev claimed the company offered "the fastest network in

Russia" and "the most powerful hardware in Russia."  SUMF ¶ 40.  Dvas even invited German Klimenko, President Putin's advisor on internet matters, to attend.  SUMF ¶ 39.

Plaintiffs continued to generate press in Russia throughout 2016.  SUMF ¶¶ 36, 38, 41.  In interviews, Gubarev asserted that Plaintiffs' entry into Russia was a transformative development in the internet industry there.  SUMF ¶ 41; Ex. 53 ("The main event of the year [is] our entry into the Russian market, as well as the launch and incredible success of our partner Prisma AI.");  Ex. 54 (Gubarev said the launch of his companies "will become the foundation for the development of international potential [in] the Russian market.").  Gubarev also commented on the importance of security safeguards against botnets.  SUMF ¶ 42; Ex. 53 ("It is interesting, if earlier botnets infected home computers, now the same thing happens more often with cloud servers.  According to our data . . . control and security are key factors in making decisions on choosing a host.").

In 2016, Gubarev also spoke at the Russian Internet Forum about "trend[s] in the infrastructure of the global and Russian internet."  SUMF ¶ 43.  The Forum is the "biggest Russian internet event" and was attended by key Russian officials including Klimenko, whom Gubarev met there.  SUMF ¶ 44; Ex. 61.  Servers.ru (the company's brand name in Russia) was a sponsor of the event.  SUMF ¶ 45.  Subsequently, XBT's marketing director lobbied Klimenko to secure Gubarev an opportunity to speak about "cyber-security" at the 2016 St. Petersburg International Economic Forum ("SPIEC").  SUMF ¶ 46.  The SPIEC is organized by Putin as "a leading global platform for members of the business community to meet and discuss the key economic issues facing Russia, emerging markets, and the world as a whole."  SUMF ¶ 47.

## V.    PLAINTIFFS ACCELERATE THEIR EFFORTS TO OBTAIN MEDIA COVERAGE AS EXPERTS ON RUSSIA-RELATED TECHNOLOGY ISSUES

Although Plaintiffs had been featured in high-profile publications like *CNBC.com* and *Inc.*, Plaintiffs thought that Cutler was not being aggressive in generating coverage in media that was sufficiently "popular."  SUMF ¶ 48.  So they looked for a replacement that could "maintain persistent citation level across business media with company news or experts' comments."  SUMF ¶ 48.  The company retained KGlobal, a PR firm based in Washington, D.C.  SUMF ¶ 49.

In July 2016, a KGlobal team conducted a "full-day media training" for Gubarev and other executives, focused on "how to talk to a journalist."  SUMF ¶ 50.  KGlobal focused heavily on pitching Gubarev to journalists as an industry "thought leader" and "expert," especially on

matters related to Russian and technology.  SUMF ¶¶ 51, 54.  As KGlobal explained, "Pitching Alex as a thought leader means longevity . . . introducing Alex is very important and crucial in building rapport with editors, bringing awareness to Servers.com and establishing Alex as credible and a great resource that can be called upon for his expertise."  Ex. 67 at 3; *see also* Ex. 68.  And Gubarev specifically requested that "my name will be in publication as well."  Ex. 139; SUMF ¶ 52.

KGlobal reached out to news organizations like *Bloomberg*, *Associated Press*, *Gizmodo*, *TechCrunch* and many others to solicit interviews with Gubarev.  SUMF ¶ 53.  It quickly secured interviews with *Bloomberg*, *Business Insider*, and *Tech Insider*, which resulted in articles published in *Business Insider* and *VentureBeat*.  SUMF ¶ 55.  To attract interviews, KGlobal also publicized Plaintiffs' role in the development of Prisma, a Moscow-based photo-processing application which was downloaded by 70 million customers.  *See, e.g.,* Ex. 76.

To pitch Gubarev as a "thought leader," KGlobal told reporters that:

> We want to introduce a successful young Russian entrepreneur whose global company is based in the European Union.  Aleskey Gubarev, CEO of XBT Holding and CEO of the unique company servers.com . . . He is also a great resource for stories about the Russian tech, startup, and entrepreneur scene . . . and general startup/business/entrepreneur tips and advice.

Ex. 69; SUMF ¶ 54.  KGlobal made this pitch to *The Wall Street Journal*, *Forbes*, *PC Magazine*, *TechCrunch, CNN, San Francisco Chronicle, Milwaukee Journal Sentinel, Fortune* and many others, and noted that "Aleksej was named a finalist by Ernst Young's Russia's Entrepreneur of the Year."  SUMF ¶ 54.  The pitch even came with a photo:



Are you interested in speaking with Aleksej about new and upcoming news in the tech space?



Ex. 71.

As a result, Gubarev was interviewed by *Forbes* and by *Bloomberg* once again, had

interviews scheduled with the *Wall Street Journal*, and sat for a 20-minute podcast focused on his personal story as a sort of Russian Horatio Alger titled "Biggest Lesson of Growing a Company with Aleksej Gubarev."  SUMF ¶ 55.  KGlobal described that podcast series as "the #1 mobile app podcast" at the time.  *Id.*

## VI.   PLAINTIFFS COMMENT ON THE 2016 U.S. PRESIDENTIAL ELECTION

Plaintiffs' efforts to promote Gubarev as a go-to expert on Russian tech also resulted in him commenting on the 2016 election.  On October 31, 2016, *Slate* published a story about cyber-contacts between Russia's Alfa Bank and the Trump campaign.  SUMF ¶ 56.  Shortly thereafter, a *Bloomberg* reporter who knew Gubarev from a previous interview KGlobal had arranged reached out to him to ask:

> I don't know if you came across [the *Slate* article]. It is a great scandal under American election campaign programme  – ostensibly the server was registered on Donald Trump's company, it was involved in some secret communications with servers of Russian Alpha [sic] Bank. Could you help to me to sort out technical details of what is described here?

Ex. 88; SUMF ¶ 57; Ex. 86.  Gubarev directed an employee of one of the Webzilla companies to analyze the technical claims in the *Slate* story.  SUMF ¶ 58.  Gubarev then e-mailed the reporter an "expert opinion" that was an annotated, paragraph-by-paragraph commentary as to "whether this is true or not."  *Id.*  Plaintiffs' "opinion about the article," challenged the reliability of the conclusions in the *Slate* article.  SUMF ¶ 59.  Gubarev also made clear he wanted Plaintiffs to be identified in the article ("will we be referenced in the article?") and told the reporter "if anything [else] comes up, you can write to us."  Ex. 86 at 34:10-23; SUMF ¶ 60.

The resulting *Bloomberg* article, titled "Clinton Plugs Another Weak Story About Trump's Ties to Putin," called the accusations of collusion "a trumped-up story" that "is easily debunked."  SUMF ¶ 61. The article explained that:

> Another troubling aspect of the Foer article . . . Alexey Gubarev, chief executive officer of Luxembourg-registered XBT Holding, which owns the infrastructure-as-a-service provider Servers.com, told me there was no legitimate way to get access to the full logs of a server that you do not control.

Ex. 81.

## VII.   METHBOT:  PLAINTIFFS CONTINUE TO INJECT THEMSELVES INTO CONTROVERSY OVER RUSSIAN CYBER-CRIME

Even though Plaintiffs had generated publicity in publications like *Bloomberg*, *Business*

*Insider*, *Yahoo Finance* and *VentureBeat* and landed interviews with *Forbes* and *The Wall Street Journal*, they still thought KGlobal was "not succeeding in getting as much publicity as [they] would have liked."  SUMF ¶ 62.  So they terminated KGlobal, but then a few days later re-hired it to help them "get in front of" a major story about a Russian-based, criminal botnet operation allegedly emanating in significant part from Plaintiffs' servers.  Ex. 90; SUMF ¶¶ 62, 63.

In December 2016 a cybersecurity firm called "White Ops" published a report detailing a massive fraud by Russian cybercriminals, dubbed "Methbot."  SUMF ¶ 64.  It reported "Russian cybercriminals are siphoning millions of advertising dollars per day away from U.S. media companies and the biggest U.S. brand name advertisers in the single most profitable bot operation discovered to date."  *Id.*  The news generated widespread international media coverage, including in *Forbes*, *Fortune*, *The New York Times*, and *CNN*.  SUMF ¶ 65.  When Dvas read the data published by White Ops, he realized that a lot of the bot activity was being conducted through IP addresses used by one of Plaintiffs' largest customers.  SUMF ¶ 66.  In November 2016 that customer had provided *7.5%* of XBT's total monthly revenues[5], and had personally come to Cyprus several times to meet Plaintiffs.  SUMF ¶¶ 66, 67.  In 2016, XBT (through its subsidiaries) earned nearly $2.2 million from the Methbot customer, which represented 4.4% of XBT's consolidated revenues for that year.  SUMF ¶ 68.

Gubarev and Dvas realized that "some curious journalist might eventually find out that the servers were ours," and if so the news would pose a public relations disaster.  Ex. 90.  So they asked KGlobal to help "minimize the bad publicity we could get from having this customer" by "establish[ing] control on the media field in this aspect."  SUMF ¶ 69.  KGlobal advised that "[g]iven the recent controversy over Russian hacking in the U.S. election," it was important to "get in front of the story."  *Id.*  So Plaintiffs instructed KGlobal to reach out proactively to White Ops and influential cybersecurity journalist Brian Krebs, who had written about the Methbot report.  SUMF ¶ 70.

Specifically, they instructed KGlobal to emphasize that Plaintiffs were also supposedly "victims" of the scam.[6]  *Id.*  Second, they instructed KGlobal to only reveal that the perpetrator

---

[5] XBT's consolidated monthly revenue for November 2016 was $5.3 million; the Methbot customer paid almost $400,000 that month.  SUMF ¶ 67.

[6] Plaintiffs' claimed to be "victims" because they terminated the customer once exposed, and they had to continue to pay for the servers he used.  Ex. 100; *see also* Ex. 101.  However,

was a Webzilla customer, and to avoid (unless asked) any connection to their newer brand, Servers.com.  SUMF ¶ 71.  That was because "Webzilla had some ambivalent episodes in its history and has had some customers with doubtful reputation."  *Id.*  As a result, Plaintiffs "want[ed] the damage to be limited to Webzilla" to try to protect the newer brand from being tarnished.  *Id.*  KGlobal reached out to Mr. Krebs.  SUMF ¶ 72.

## VIII.   PLAINTIFFS USE THEIR MEDIA ACCESS TO RESPOND TO THE DOSSIER

When the Dossier was published on January 10, 2017, Plaintiffs responded the same way they had to the Methbot news a few weeks earlier – they asked KGlobal to plan a press strategy. SUMF ¶ 73.  Moreover, on January 11 a leading Dutch newspaper, *de Volkskrant*, reported extensively about Plaintiffs' connection to the Dossier, focusing on Webzilla's history in the Netherlands.  SUMF ¶ 74.  So Webzilla B.V. retained the Amsterdam office of one of the world's largest PR firms – Hill & Knowlton Strategies ("HK") – to assist with media relations in Europe.  SUMF ¶ 75.

Both of Plaintiffs' PR firms monitored the press, spoke with journalists, arranged interviews for Gubarev and suggested talking points for him.  SUMF ¶ 76.  *See, e.g.*, Ex. 108 at P-P000014-15 (Gubarev texts a *Washington Post* reporter that he will "ask my PR team to set up a call"); Ex. 111 (KGlobal sends reporter a glossy photo of Gubarev); Ex. 110 (KGlobal offers interview with Gubarev to Tucker Carlson of Fox News); Exs. 112, 113, 116 (Plaintiffs work with HK to have reporters travel to Cyprus to interview Gubarev and edit draft article).  Gubarev gave interviews to major media worldwide.  *See, e.g.,* Ex. 137; Ex. 118; Ex. 119.  Plaintiffs tried to negotiate pre-conditions for an interview of Gubarev by *de Volkskrant*, including their right to review the resulting article before it was published.  SUMF ¶ 77.

In those interviews and now in testimony, Gubarev maintains that Plaintiffs were named in the Dossier as a direct response to the comments in *Bloomberg* helping to debunk the story about alleged Russia-Trump collusion.  SUMF ¶ 78; *see, e.g.*, Ex. 117 (Gubarev tells KGlobal, "It is 100% because I made report for Bloomberg about fake news that Trump servers have connections to Alfa bank servers"); Ex. 118 (*McClatchy* article reporting, "Gubarev suspected he might have been named in the report because of comments to Bloomberg's Russia business columnist Leonid Bershidsky"); Ex. 119 (*Wall Street Journal* article reporting, "Gubarev said his

---

Plaintiffs had already earned $2.2 million from the perpetrator in 2016 – 4.4% of XBT's revenues for that year.  SUMF ¶ 68.  Plaintiffs did not ask KGlobal to reveal those facts.

name ended up in the report after he was quoted in a news report as an expert voicing doubt about allegations that surfaced during the 2016 presidential campaign that Mr. Trump maintained a secret server that may have been in communication with a Russian bank"); Ex. 120 (Dutch newspaper reporting, "Gubarev thinks that he appears in the report because he got involved in political affairs").

## ARGUMENT

## I.    The First Amendment's Public Figure Doctrine

The public figure doctrine was created to give the press crucial "breathing space" to be able to report about newsworthy persons and controversies without fear of liability for mistaken facts. *Tavoulareas v. Piro*, 817 F.2d 762, 771 (D.C. Cir. 1987).  "Determining whether an individual is a public figure – and thus subject to the actual malice analysis – is a question of law for the court to decide." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016).

This Circuit's law emphasizes two "fundamental differences between public and private figures." *Silvester v. Am. Broad. Cos.*, 839 F.2d 1491, 1494 (11th Cir. 1988).  First, public figures "usually have greater access to the media . . . ." *Id.* (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344 (1974)).  *See also Turner v. Wells*, 879 F.3d 1254, 1272 (11th Cir. 2018) ("[T]he level of media access enjoyed by a particular claimant should be considered as part of the public figure calculus.") (citation omitted).  Second, public figures have "voluntarily placed themselves in a position and acted in a manner which invited public scrutiny and comment." *Silvester*, 839 F.2d at 1494.

The doctrine is thus predicated on a "voluntary assumption of risk" rationale.  *Brewer v. Memphis Publ'g Co.*, 626 F.2d 1238, 1254 (5th Cir. 1980).  By electing to speak out in the press and other public fora about topics that impact the lives of others, public figures "accept the risk that the press, in fulfilling its role of reporting, analyzing, and commenting on well-known persons and public controversies, will focus on them and, perhaps, cast them in an unfavorable light." *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1292 (D.C. Cir. 1980).  At the same time, public figures' access to the media gives them "a more realistic opportunity to counteract false statements than private individuals normally enjoy." *Gertz*, 418 U.S. at 344.

Contrary to what Plaintiffs maintain, Dkt. 208 at 12, this Circuit's public figure analysis begins with a broader, two-step inquiry.  First, the Court must consider whether Plaintiffs satisfy the two basic criteria for all public figures: whether prior to the publication at issue they had (1)

access to the media and (2) "voluntarily placed themselves in a position and acted in a manner which invited public scrutiny and comment." *Silvester*, 839 F.2d at 1494.  *See also Turner*, 879 F.3d at 1272 (key criteria is whether a plaintiff "chose to put himself in the public arena").  After assessing those general factors, the second step in the public figure analysis is for the Court to determine which category of public figures may fit the plaintiffs.  *Id.*

As Plaintiffs correctly explain, the doctrine further differentiates between "general purpose" public figures (*i.e.*, celebrities), and the far more common category, limited public figures, who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz*, 418 U.S. at 345.  Plaintiffs are obviously not general public figures.  Plaintiffs' Motion obscures, however, the critical point that limited public figures need *not* be well known.  Indeed, numerous plaintiffs who never sought nor achieved anything close to the media attention that Plaintiffs enjoyed prior to the Dossier's publication have been deemed limited public figures.[7]  To determine whether Plaintiffs are limited-purpose public figures, "the court must (1) isolate the public controversy, (2) examine the plaintiffs' involvement in the controversy, and (3) determine whether 'the alleged defamation [was] germane to the plaintiffs' participation in the controversy.'" *Silvester*, 839 F.2d at 1494 (quoting *Waldbaum,* 627 F.2d at 1297).

**II.**     **Plaintiffs are Limited-Purpose Public Figures**

The record here presents a textbook example of what it means to be a limited public figure.  First, Plaintiffs clearly satisfy the two basic *Gertz* criteria.  Plaintiffs actually published media promoting online pornography, and they hired PR professionals with access to the media to invite and receive attention from prestigious media well before the Dossier was published.

Second, Plaintiffs also satisfy the applicable three-part test.  Although in this context that alone would be enough, Plaintiffs Motion is mistaken in presuming that their public figure status in this case need turn solely on election commentary.  Rather, well before that, Plaintiffs chose to seek public attention to improve the "status" of online pornography, as "thought leaders" on

---

[7] *See, e.g.*, *Little v. Breland*, 93 F.3d 755 (11th Cir. 1996) (president of non-profit to attract conventions to Mobile, Alabama); *Orr v. Argus-Press Co.*, 586 F.2d 1108 (6th Cir. 1978) (developer of shopping mall in Owosso, Michigan); *Bourne v. Arruda*, No. 10-cv-393, 2013 WL 93637, at *2 (D.N.H. Jan. 8, 2013) (individual who sent letter to local newspaper for publication); *James v. Gannett Co.*, 40 N.Y.2d 415 (1976) (nightclub belly dancer in Rochester, New York).

matters generally related to cybersecurity and Russia, as supposed "victims" of Russian botnets, as well as expert commentators on alleged Russia-Trump cyber-collusion – all of which are highly controversial topics.  The Dossier then alleged that Plaintiffs were actually involved in the very types of Russian-directed, malicious cyber activities they spoke out about.  In response, Plaintiffs used their professional public relations team's pre-existing access to the media to vigorously respond.  That dynamic defines what it means to be a limited public figure.  *See, e.g.*, *Hatfill v. N.Y. Times Co.*, 532 F.3d 312, 323 (4th Cir. 2008) ("where an expert in a field claims defamation when a news publication later suggests he might have committed a crime relevant to that field," the expert was a limited public figure).

### A.     Plaintiffs Satisfy the Two Basic *Gertz* Criteria

First, the record establishes Plaintiffs' access to the media prior to the Dossier's publication.  Plaintiffs, either directly or through their PR team, were in regular contact with multiple publications, like *Bloomberg*, *Forbes*, *The Wall Street Journal*, *Business Insider*, *CNBC* and *CNN* to name a few.  Indeed, Plaintiffs' international media reach was far more extensive than the handful of local newspaper articles and television reports related to the public figure plaintiff in *Little*.  Moreover, like the plaintiff football coach in *Turner*, Plaintiffs actually "took advantage of [their] familiarity with the media" to respond to the Dossier.  *Turner*, 879 F.3d at 1272.  In fact, just before the Dossier was published they also used their media access to pre-emptively try to "control" the media's narrative about Methbot.

Likewise, Plaintiffs voluntarily "acted in a manner which invited public scrutiny and comment."  *Silvester*, 839 F.2d at 1494.  Plaintiffs launched general media PR campaigns, reaching out to scores of journalists to solicit op-ed articles and interviews as "thought leaders" and self-described experts on "Russia tech."  Plaintiffs further invited media profiles of Gubarev as a Russian émigré with a Horatio Alger-like success story.  Courts have consistently held that engaging in similar public relations efforts qualifies businesses and their executives as limited public figures.[8]

---

[8] *See, e.g.*, *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 17 (1st Cir. 2011) (plaintiffs who "enjoyed access to the press" and "orchestrat[ed] a PR blitz" were limited public figures); *Patrick v. Cleveland Scene Publ'g*, 582 F. Supp. 2d 939, 951 (N.D. Ohio 2008) (plaintiff who "retained a public relations firm to represent his interests in the controversy"), *aff'd*, 360 F. App'x 592 (6th Cir. 2009); *Carr v. Forbes, Inc.*, 121 F. Supp. 2d 485, 492 (D.S.C. 2000) (plaintiff whose "group paid a lobbyist/public relations firm"), *aff'd*, 259 F.3d 273 (4th Cir.

## B.     This Case Involves Several Pre-Existing Public Controversies

Turning to the three-part test, a "public controversy" is "a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." *Waldbaum*, 627 F.2d at 1296; *see also Silvester*, 839 F.2d at 1495.  Prior media reports are persuasive proof of a public controversy.  *Little*, 93 F.3d at 758.  And there may be – and frequently is – more than one controversy pertinent to the allegedly defamatory statements. *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 586 (D.C. Cir. 2016), *cert. denied*, 137 S. Ct. 1434 (2017) ("a court may find that there are multiple potential controversies"); *Little*, 93 F.3d at 757-58 (finding two controversies); *Waldbaum*, 627 F.2d at 1297 n.27 (the same article can implicate "broad" and "narrow" controversies).  Indeed, "courts often define the public controversy in expansive terms."  *Jankovic*, 822 F.3d at 586.[9]

The allegations against Plaintiffs were in the last of Steele's 17 memos.  It is clear, however, that with rare exception each memo was neither written nor intended to be read in isolation.  Each assumes knowledge of information from prior memos, even at times by cross-referencing them.  For example, the last memo (No. 166) explains that it is merely adding details to the two memos that preceded it (Nos. 135/36).  Those memos in turn assume knowledge of prior memos, and so on.  *See, e.g.*, No. 135 (containing "*further* confirmation" of reasons for Ivanov's departure previously discussed in No. 111, as well as more information about "the exposure of [Carter] Page's" meeting in Moscow, previously discussed in Nos. 94, 101 & 134); No. 111 (noting "the so-called veterans' pensions ruse (reported previously)")."  BuzzFeed, of course, published all of the memos together.

Steele's second memo, written before he reported anything about alleged hacking of Democrats, focused entirely on explaining the broader phenomena of "Russia Cyber/Crime,"

---

2001); *FoodScience Corp. v. McGraw-Hill, Inc.*, 592 F. Supp. 362, 365-66 (D. Vt. 1984) (company that hired "public relations representative" in order "to influence and counter the adverse impact of the unfavorable publicity").

[9] *See, e.g.*, *Silvester*, 839 F.2d at 1495 (public controversy over "corruption in the jai alai industry"); *Dubai World Corp. v. Jaubert*, No. 09-14314-CIV, 2011 WL 579213, at *15 (S.D. Fla. Feb. 9, 2011) (public controversies over "corporate fraud" and "whether or not foreigners are safe in Dubai"); *Jankovic*, 822 F.3d at 586 (defining public controversy as "the progress of political and economic reform in Serbia and the integration of Serbia into international institutions" post-Milosevic) (citation omitted); *OAO Alfa Bank v. Center for Pub. Integrity*, 387 F. Supp. 2d 20, 43 (D.D.C. 2006) (public controversy regarding rise of oligarchs and decline of Russian economy into a "criminal-syndicalist state").

including both its "extensive program of state-sponsored offensive cyber operations" and how "non-state sponsored cybercrime was becoming an increasing problem inside Russia."  No. 86. Steele explained that "the FSB often uses coercion and blackmail" to recruit cyber-operatives, and that the FSB makes particularly "heavy use also, both wittingly and unwittingly, of CIS emigres working in western corporations."  *Id.* When in subsequent memos Steele reports specifically about efforts to hack Democrats' e-mails, he notes the use of this FSB *modus operandi.  See, e.g.*, No. 95 (noting the importance of "Russian émigré and associated offensive cyber operators based in the U.S."); No. 134 (explaining that "Michael Cohen's wife is of Russian descent and her father a leading property developer in Moscow").  Likewise, in his last memo Steele reports that Gubarev – who is a CIS émigré working in a Western corporation with operations in the U.S. – was "recruited under duress by the FSB," and that XBT/Webzilla "had been using botnets and porn traffic" to launch cyber-attacks on Democrats.

Like many cases, this one involves several, often "overlapping" public controversies. At the broadest level, cybersecurity and cybercrime have been constant topics in public discourse for years, as attacks on businesses, political institutions and individuals around the globe using "botnets," "porn traffic" and other means have become common.[10]  More narrowly, malicious cyber-activity emanating from Russian state and non-state actors has also long been the subject of public attention.[11]  And most narrowly, there was plainly a controversy concerning Russian interference in the 2016 election.[12]  Each of these issues fits easily within the definition of a "public controversy."  They are not "essentially private concern[s]," such as a divorce (*e.g.*, *Time v. Firestone*, 424 U.S. 448, 454-55 (1976)); rather they are issues of global significance whose resolution affects both the security of nations and everyone who uses a computer.

---

[10] SUMF ¶ 79; Exs. 18, 121, 122, 123, 124, 125, 126, 127, 128, 140.

[11] SUMF ¶ 79; Ex. 18 (2006 *Forbes* article describing "adult webmasters (AWM), in other words, sellers of pornography on the internet" as "a global network [that] has no borders and knows no distances so that the business that began in Moscow can be continued in other hemisphere[s]…"); Ex. 121 (2007 *New Yorker* article reporting that "many of the world's most prodigious and talented spammers are hidden in Eastern Europe and Russia"); Ex. 122 (2009 *Network World* report that "Russia is the top country of origin for phishing e-mails" and "gambling and pornography sites sometimes seem to have malicious links placed systematically them"); Ex. 140 (2001 AP article reporting that "Russian police often complain about the legal chaos that has turned Russia into an international center of child pornography production").

[12] SUMF ¶ 79; Exs. 124, 125, 126, 127, 128.

### C.    Plaintiffs Voluntarily Involved Themselves In these Public Controversies

The second prong of the test requires the court to "examine the plaintiffs' involvement in the controvers[ies]," *Silvester*, 839 F.2d at 1494, with a particular eye towards whether Plaintiffs "voluntarily involved [themselves]."  *Schiller v. Viacom, Inc.*, No. 1:15-cv-22129-UU, 2016 WL 9280239, at *6 (S.D. Fla. Apr. 4, 2016).   This Circuit has emphasized two ways to become involved in controversies.  One is to affirmatively seek attention in the media and other public fora.  *Silvester*, 839 F.2d at 1497.  Another is to "voluntarily engage[] in a course [of conduct] that was bound to invite attention and comments."  *Silvester*, 839 F.2d at 1496, *quoting Rosanova v. Playboy Enters.*, 411 F. Supp. 440, 444-45 (S.D. Ga. 1976), *aff'd*, 580 F.2d 859.  For example, "voluntarily entering into a strictly regulated, high profile industry" can suffice to "invite[d] public scrutiny, discussions and criticism" even if media attention was not sought by the plaintiff.  *Id.  See also Green Group Holdings LLC v. Schaefer*, No. 16-00145-CG-N, 2016 WL 6023841, at *16 (S.D. Ala. Oct. 13, 2016).  Likewise, the fact that a plaintiff had publicly associated himself with figures in organized crime made him a limited public figure with respect to an article describing him as a "mobster."  *Rosanova*, 411 F. Supp. at 444-45.

 Here, Plaintiffs have involved themselves in public controversies both by engaging with the media and by their conduct.  They spent years aggressively soliciting, and receiving, media attention as one of the supposed "giants" in the internet world and as forward-looking "thought leaders" in the cyber-technology sector, including specifically as self-described experts for journalists covering cybersecurity in general and the Russian internet sector in particular.  They have repeatedly touted "the expertise developed by all the companies under the XBT umbrella in dealing with threats to security" and claimed to offer customers "a service that will make the online world a safer place."  *Supra* at 4.  And notwithstanding the controversial nature of cyber-activity in Russia, Plaintiffs aggressively promoted themselves in press conferences and interviews as "the foundation of the development of the Russian market's international potential" and as a means to comply with Russia's controversial data privacy laws.  *Supra* at 6.

Gubarev also sought prominent speaking roles at international conferences attended and sponsored by Russian officials.  When Plaintiffs were linked to a major "botnet" scandal perpetrated by a Russian customer, they pro-actively tried to "control . . . the media field."  *Supra* at 9.  And while those facts alone would be sufficient to render Plaintiffs public figures, here they even also publicly weighed in on the narrowest relevant controversy:  Russia's role in

the 2016 election.  Moreover, it was no accident that an Internet executive from Cyprus was asked by a reporter for one of the world's largest business media to comment on that topic, as that reporter's (Mr. Bershidsky) affidavit makes clear.  Dkt. 208-3.  Rather, that reporter only thought to contact Gubarev because *Bloomberg* had previously interviewed him as a direct result of Plaintiffs' aggressive efforts to offer themselves to journalists.  *See supra* at 4, 7-8.

Plaintiffs' conduct also invited scrutiny.  With respect to the use of "porn traffic" for malicious purposes, Gubarev helped create both media and public fora dedicated to enhancing the "status" of adult webmasters based in or originating from Russia.  *See Waldbaum*, 627 F.2d at 1299 (president of supermarket cooperative who was a "leading advocate of certain precedent-breaking policies" within his industry and was personally involved in monthly publication of company's newspaper was a limited public figure).  And the AWMOpen ventures featured some of the most notorious Russia-linked cyber-criminals.  *See supra* at 2-3.  Indeed, the Dossier was not the first time that Plaintiffs' relationship to questionable "porn traffic" was the subject of press scrutiny.  In 2008, the Dutch publication *Het Parool* published an expose examining 40 websites that were blacklisted for containing child pornography, and concluded that "almost all of the sites involved are openly hosted at two Dutch providers, Leaseweb and Webazilla …"  Ex. 129.  Another article focused on four sites identified by Dutch police, also hosted by "Webazilla from Utrecht and Leaseweb from Haarlem."  Ex. 130.  The allegations received more coverage after the Dutch Council for Journalism, an independent body that self-regulates Dutch media, rebuffed a complaint that the original article was flawed.  Ex. 131.  And in 2009, a citizen journalist writing on CNN's *iReport* reported that a German child protection organization, CareChild, publicly accused Webazilla of failing to act to take down child porn websites.  Ex. 132.  In fact, Christopher Steele read that article in conducting open source research on Plaintiffs.  Ex. 133 at 47:11-18.  Pornography is also a prime target for copyright thieves, and Webzilla has been the subject of multiple public reports to U.S. government authorities on that subject.[13]

Plaintiffs also chose to enter the Russian internet market by linking their business to its controversial data privacy laws and positioning themselves as transformative players in that market.  Indeed, after the Dossier was published journalists noted the connection between the

---

[13] *See, e.g.*, Ex. 134 at 6 (2015 Motion Picture Association of America report to U.S. Copyright Office stating that Webzilla hosted more than half the "cyberlocker" sites in the U.S. used by copyright thieves); Ex. 135, App'x C at 12 (2015 Joint Comments to U.S. Copyright Office of 18 music-related association's noting Webzilla's practices).

Plaintiffs' prior conduct and Steele's allegations:

> One reason XBT and Gubarev may have drawn suspicion is that their success in the open United States and European markets led to an expansion into Russia last year.  The XBT subsidiary Servers.com opened its Russian operation initially with 500 servers in Moscow, where the Internet is tightly controlled by the Kremlin's intelligence and military services. Since 2016, Russia has required that Internet providers there store data on servers there, giving Russia both a grip on information and the ability to thwart investigations elsewhere.

Ex. 136.  Moreover, Plaintiffs themselves have consistently maintained that they were included in the Dossier because they drew attention to themselves by  publicly casting doubt on the *Slate* story.  SUMF ¶ 78.  Thus, Plaintiffs have also "voluntarily engage[] in a course [of conduct] that was bound to invite attention and comments."  *Silvester*, 839 F.2d at 1496 [citation omitted].

The case law addressing the public figure status of corporations and/or their executives reinforces why Plaintiffs are limited public figures.  Plaintiffs spend most of their Motion citing cases holding that garden-variety, commercial advertisements do not necessarily configure public figure status.  True enough, but this case has nothing to do with that.  Rather, the law is clear that corporate plaintiffs who voluntarily engage with the press or with public issues have consistently held to be limited public figures – whether through advertisements or, like Plaintiffs, by soliciting journalists to write about them and/or entering controversial business sectors.  *Long v. Cooper*, 848 F.2d 1202, 1205 (11th Cir. 1988) (advertisements may result in public figure status, but not where their content "[n]ever commented upon or in any way addressed" any controversial topics); *Mile Marker, Inc. v. Petersen Publ'g, L.L.C.*, 811 So. 2d 841, 846 (4th DCA 2002) ("courts should examine the nature and extent of the advertising and publicity campaigns previously undertaken by the claimant, paying particular attention to the pursuit of a marketing strategy that emphasizes the controversy").  For example, in *Waldbaum*, the plaintiff was the president of a supermarket cooperative who, like Gubarev, "did not become merely a boardroom president whose vision was limited to the balance sheet," but one who also sought to vigorously publicize himself and his companies as innovators in the industry.  627 F.2d at 1300. The D.C. Circuit noted that, having "stepp[ed] into the public spotlight . . . he must take the good with the bad."  *Id.* at 1294-95.  In *Silvester*, the plaintiffs were owners of jai alai frontons who were limited public figures because, like Plaintiffs here, they promoted their role in a controversial industry.  In *Trotter v. Jack Anderson Enterprises, Inc.*, 818 F.2d 431 (5th Cir.

18

1987), the president of a Guatemalan soft drink bottling company was deemed a limited public figure for purposes of a controversy over labor conflict, even though, unlike Plaintiffs here, the plaintiff had "limit[ed] public comment" and "maintain[ed] a low public profile." *Id.* at 436.[14]

Here, too, Plaintiffs did not merely circulate advertisements claiming that their servers were well-built or attractively priced. *See, e.g.*, *Long*, 848 F.2d at 1204.  Rather, they undertook a systematic effort to "maintain persistent citation level across business media with . . . experts' comments" about controversial, cyber-related topics. *Supra* at 6.  They were even professionally trained on "how to talk to a journalist." *Id.*  And while Plaintiffs in their Motion repeatedly claim their motive for seeking press was to make money, the same could likely be said for all business plaintiffs and makes no difference. *Silvester v. Am. Broad. Cos.*, 650 F. Supp. 766, 776 (S.D. Fla. 1986), *aff'd*, 839 F.2d 1491 (11th Cir. 1988) (it is irrelevant that plaintiffs' motive for seeking attention may have been to "promote[] their business ventures in the hearty spirit of capitalism").  Accordingly, the record reflects that Plaintiffs affirmatively thrust themselves into the "vortex" of public controversies concerning cybersecurity, technology, and the Russian tech sector. *Dacey v. Fla. Bar, Inc.*, 427 F.2d 1292, 1295 (5th Cir. 1970).

### D.      The Dossier is Germane to Plaintiffs' Participation in the Controversies

The third factor considers whether the defamatory statements relate to Plaintiffs' participation in those public controversies.  To avoid second-guessing editorial decisions, this factor may be satisfied as long as the statements are not "wholly unrelated" to the controversies. *Waldbaum*, 627 F.2d at 1298.  Here, the Dossier's contents are plainly germane to Plaintiffs' participation in controversies regarding cybersecurity in general, Russian tech in particular, and the 2016 election.  While Plaintiffs promoted the online pornography industry as worthy of respectable "status," the Dossier alleged that they used "porn traffic" for illicit ends.  Indeed,

---

[14] *See also Maverick Boat Co. v. American Marine Holdings, Inc.*, Nos. 02-14102-CIV, 02-14283-CIV, 2004 WL 1093035, at *13 (S.D. Fla. Feb. 10, 2004) (boat manufacturers were limited public figures where they engaged in "extensive" advertising and "took affirmative steps to influence the public's perception of their product"), *aff'd*, 418 F.3d 1186 (11th Cir. 2005); *OAO Alfa Bank*, 387 F. Supp. 2d at 45-46 (plaintiff bank and its owners were limited public figures where they had "written articles in Russian newspapers, given interviews to newspapers and other media outlets . . . spoken on economic reform issues to international audiences, and developed a well-coordinated and sophisticated public relations strategy").

journalists reporting about the Dossier repeatedly noted that connection.[15]

Plaintiffs also invited attention as "thought leaders" and "experts" on cybersecurity and Russian tech who were dedicated to "making the online world a safer place," and touted their importance in the Russian internet space in light of Russia's data privacy policies.  They also claimed to be "victims" of a major botnet fraud emanating from Russia.  By contrast, the Dossier alleged that they were actually émigré cyber-criminals under the control of the FSB.  Plaintiffs also understood that the Dossier implicitly called into question their efforts to portray Gubarev as an exemplar of a Russian émigré success story.  An internal memo advised that Plaintiffs' media response to the Dossier should aim to "protect not only XBT/Webzilla brands, but personal brand of Alex, which happens to be our most valuable asset in terms of branding right now."  Ex. 103.

And last, but certainly not least, the Dossier is relevant to Plaintiffs decision to weigh in on the public controversy regarding alleged Russia-Trump election collusion.  Plaintiffs themselves assert that the *Bloomberg* article caused them to be included in the Dossier.   SUMF ¶ 78.  The very dynamic Gubarev claims occurred here is exactly what the limited public figure doctrine envisions:  a person and/or business  voluntarily speaks out on controversial issues, that triggers a response making defamatory charges, and the plaintiff then uses its access to the media to respond in kind.  Accordingly, Plaintiffs are limited public figures.

## CONCLUSION

For the reasons set forth above, this Court should grant partial summary judgment finding that Plaintiffs are limited-purpose public figures.

---

[15] *See, e.g.*, Ex. 118 (McClatchy News article noting that "XBT has been on a buying spree in recent years . . . [including] a site used heavily to host pornography, fozzy.com."); Ex. 138 (draft of Dutch newspaper article asking, "[w]hy do a substantial segment of the company's [Webzilla's] clients offer "adult content?"); Ex. 105 at 92:25-97:8; Ex. 136 (McClatchy News article reporting that "[p]irated pornography is often baited with malware that can affect users' computers in various ways . . .   A search of domain names shows many porn sites are hosted by Webzilla.").

Dated:  September 21, 2018          Respectfully submitted,

*Of Counsel*:                       /s/ *Katherine M. Bolger*
Nabiha Syed                         Katherine M. Bolger
BuzzFeed, Inc.                      Nathan Siegel
11 E. 18th Street, 13th Floor       Adam Lazier
New York, NY 10003                  Alison Schary
                                    Davis Wright Tremaine, LLP
                                    1251 Avenue of the Americas, 21st Floor
                                    New York, New York 10020
                                    katebolger@dwt.com
                                    nathansiegel@dwt.com
                                    adamlazier@dwt.com
                                    alisonschary@dwt.com

                                    /s/ *Roy Black*
                                    Roy Black
                                    Jared Lopez
                                    Black, Srebnick, Kornspan & Stumpf, P.A.
                                    201 So. Biscayne Boulevard
                                    Miami, Florida 33131
                                    rblack@royblack.com
                                    jlopez@royblack.com

                                    *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing, together with its exhibits, will be served electronically by email on all counsel or parties of record on the service list below this 21st day of September, 2018.

By: /s/ *Jared Lopez*
Jared Lopez, Esq.

## SERVICE LIST

Matthew Shayefar
Valentin D. Gurvits
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1806
Facsimile: 617-928-1802
matt@bostonlawgroup.com
vgurvits@bostonlawgroup.com

Evan Fray-Witzer
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-000
Facsimile: 617-423-4855
Evan@CFWLegal.com

Brady J. Cobb
Dylan Fulop
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com
dfulop@cobbeddy.com