Exhibit 20

DAVID SHONKA
Acting General Counsel

Ethan Arenson, DC # 473296
Carl Settlemyer, DC # 454272
Philip Tumminio, DC # 985624
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
(202) 326-2204 (Arenson)
(202) 326-2019 (Settlemyer)
(202) 326-2204 (Tumminio)
(202) 326-3395 *facsimile*
earenson@ftc.gov
csettlemyer@ftc.gov
ptumminio@ftc.gov

Attorneys for Plaintiff Federal Trade Commission

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
#### San Jose Division

| | |
|---|---|
| **Federal Trade Commission,**<br><br>**Plaintiff,**<br><br>v.<br><br>**Pricewert LLC d/b/a 3FN.net, Triple Fiber Network, APS Telecom and APX Telecom, APS Communications, and APS Communication,**<br><br>**Defendant.** | Case No. _____<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR AN *EX PARTE* TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE** |

**TABLE OF CONTENTS**

I.   SUMMARY ............................................................... 1

II.  THE PARTIES ........................................................... 2
     A.   Plaintiff ........................................................ 2
     B.   Defendant ....................................................... 2

III. THE DEFENDANT'S BUSINESS PRACTICES ............................... 3
     A.   Special Agent Sean Zadig, NASA Office of Inspector General, Computer Crime
          Division ........................................................ 3
          1.   The Discovery of the ICQ Logs ............................. 4
          2.   Botnet and Click Fraud Basics ............................. 5
          3.   The Translated ICQ Logs ................................... 6
          4.   Zadig's Analysis of the Content Hosted by 3FN ............. 8
          5.   Attacks on NASA Originating From 3FN ...................... 9
     B.   Gary Warner, Director of Research in Computer Forensics, University of
          Alabama at Birmingham ........................................... 9
          1.   The Illegal, Harmful and Malicious Content Hosted by 3FN .. 10
               a.   Malicious Botnet Software ........................... 10
               b.   Child Pornography ................................... 10
               c.   Fake Anti-Virus Products ............................ 11
               d.   Illegal Online Pharmacies ........................... 11
               e.   Pirated Music and Software .......................... 11
          2.   3FN Actively Recruits Criminals .......................... 12
     C.   Sarah Ohlsen, Supervisor, Exploited Children Division, The National Center for
          Missing and Exploited Children ................................. 12
     D.   Steve Linford, Founder, The Spamhaus Project ................... 13
     E.   Andre' DiMino, Co-Founder and Director, The Shadowserver Foundation .... 15
     F.   Dean Turner, Director of the Global Intelligence Network, Symantec
          Corporation ................................................... 16
     G.   Sheryl Drexler, Investigator, Federal Trade Commission ......... 17
          1.   Aliases Used by Pricewert ................................ 17
          2.   Pricewert's Extensive Overseas Ties ...................... 17
          3.   Pricewert's Marketing Efforts ............................ 18
          4.   Consumer Complaints Regarding 3FN ........................ 18
          5.   Malicious Activity Originating from 3FN's Servers ........ 18

IV.  ARGUMENT
     A.   The FTC Act Authorizes the Requested Relief .................... 19
     B.   The Commission Has Established a Likelihood of Succeeding on the Merits of its
          Section 5 Claims that Pricewert Has Engaged in Unfair Acts or Practices ..... 10
          1.   Defendant's Conduct Causes or is Likely to Cause Substantial Injury to
               Consumers ............................................... 22
          2.   The Harm Pricewert Inflicts Upon Consumers Is Not Outweighed by any
               Countervailing Benefits ................................. 23
          3.   The Harm Inflicted Upon Consumers Is Not Reasonably Avoidable ... 23
          4.   Pricewert's Unfair Conduct Is Not Protected By Section 230 of the
               Communications Decency Act .............................. 24
     C.   The Balance of Equities Tips Decidedly In the Commission's Favor and Supports
          Awarding the Requested Injunctive Relief ...................... 24

V.   AN *EX PARTE* TEMPORARY RESTRAINING ORDER DISCONNECTING

Memorandum in Support of FTC
TRO/Restraining Order Motion                        i

DEFENDANT'S SERVERS FROM THE INTERNET, FREEZING ASSETS AND
ORDERING THE TURNOVER OF DOCUMENTS, AN ACCOUNTING, AND THE
PRESERVATION OF RECORDS SHOULD BE GRANTED . . . . . . . . . . . . . . . . . . . 26

VI.    CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**TABLE OF AUTHORITIES**

**Federal Statutes**

15 U.S.C. § 45(a) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 20

15 U.S.C. § 45(n) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

15 U.S.C. § 53(b) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

15 U.S.C. §§ 41-58 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1030 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

47 U.S.C. § 230 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**State Statutes**

Cal. Penal Code § 502 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**Cases**

*Doe v. United States*, 487 U.S. 201 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Fair Housing Council of San Fernando Valley v. Roommates.com LLC*, 521 F.3d 1157 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*FSLIC v. Sahni*, 868 F.2d 1096 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*FTC v. Accusearch, Inc.*, 2007 U.S. Dist. LEXIS 74905 (D. Wyo. 2007) . . . . . . . . . . . . . . 21, 22

*FTC v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*FTC v. American National Cellular, Inc.*, 810 F.2d 1511 (9th Cir. 1987) . . . . . . . . . . . . . . . . 19

*FTC v. Amy Travel Serv., Inc.*, 875 F.2d 654 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . 19

*FTC v. Crescent Publ'g Group, Inc.*, 129 F. Supp. 2d 311 (S.D.N.Y. 1991) . . . . . . . . . . . . . . 21

*FTC v. Dugger*, Civ. No. CV-06-0078-PHX-ROS (D. Ariz., Jan. 10, 2006) . . . . . . . . . 19, 22, 26

*FTC v. Enternet Media*, CV-05-7777 CAS-AJWx (C.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . 20

*FTC v. ERG Ventures, LLC*, CV-06-00578 LRH-VCP (D. Nev. 2006) . . . . . . . . . . . . . . . . . . 20

*FTC v. Gem Merchandising Corp.*, 87 F.3d 466 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . 27

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . 19, 27

*FTC v. Innovative Marketing*, Civ. No. RDB-08-CV-3233 (D. Md. Dec. 2, 2008) . . . . . . . . . . 11

1   *FTC v. J.K. Pubs. Inc.*, 99 F. Supp. 2d 1176 (C.D. Cal. 2000) . . . . . . . . . . . . . . . . . . . . 21, 23, 27

2   *FTC v. MaxTheater, Inc.*, No. 05-CV-0069 (E.D. Wa. Dec. 6, 2005) . . . . . . . . . . . . . . . . . . 11

3   *FTC v. National Vending Consultants, Inc.*, CV-S-05-0160-RCJ-PAL (D. Nev. 2005) . . . . . . . 20

4   *FTC v. Neovi*, Inc., 598 F. Supp. 2d 1104 (S.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . 20, 22

5   *FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

6   *FTC v. Sage Seminars, Inc.*, 1995 U.S. Dist. LEXIS 21043 (N.D. Cal. 1995) . . . . . . . . . . . 20, 25

7   *FTC v. Seismic Entertainment Productions*, No. 04-377-JD (D.N.H. Oct. 12, 2004) . . . . . . 11, 21

8   *FTC v. Silueta Distributors, Inc.*, 1994 U.S. Dist. LEXIS 10095 (N.D. Cal. 1994) . . . . . . . 20, 25

9   *FTC v. Trustsoft, Inc.*, No. H-05-1905 (S.D. Tex. Nov. 30, 2005) . . . . . . . . . . . . . . . . . . . . . 11

10  *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431 (11th Cir. 1984) . . . . . . . . . . . . . . . . . . . 19, 26, 27

11  *FTC v. Windward Marketing, Ltd.*, 1997 U.S. Dist. LEXIS 17114, at \*32 (N.D. Ga., Sept. 30
12  1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 23

13  *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989) . . . . . . . . . . . . . . . . . 19, 24, 27

14  *HUD v. Cost Control Mktg. & Sales Mgmt. of Va.*, 64 F.3d 920 (4th Cir. 1995) . . . . . . . . . . . 31

15  *In re Vuitton et Fils*, 606 F.2d 1 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

16  *Kemp v. Peterson*, 940 F.2d 110 (4th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

17  *Nat'l Org. for Reform of Marijuana Laws v. Mullen*, 828 F.2d 536 (9th Cir. 1987) . . . . . . . . 28

18  *Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354 (11th Cir. 1988) . . . . . . . . . . . . . . . . . 23

19  *SEC v. International Swiss Inv. Corp.*, 895 F.2d 1272 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . 27

20  *SEC v. R.J. Allen & Assoc., Inc.*, 386 F. Supp. 866 (S.D. Fla. 1974) . . . . . . . . . . . . . . . . . . 25

21  *U.S. v. First Nat'l City Bank*, 379 U.S. 378 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

22  *United States v. Diapulse Corp. of Am.*, 457 F.2d 25 (2d Cir. 1972) . . . . . . . . . . . . . . . . . . 25

**Other Authority**

Brian Krebs, *Host of Internet Spam Groups Is Cut Off*, available online at
http://www.washingtonpost.com/wp-dyn/content/
article/2008/11/12/AR2008111200658.html (last visited May 28, 2009) . . . . . . . . . . . . . . . . . . 4

CERT Coordination Center, *Botnets as a Vehicle for Online Crime*,
http://www.certorg/archive/pdf/Botnets.pdf (last visited May 28, 2009) . . . . . . . . . . . . . . . . 5, 6

Memorandum in Support of FTC
TRO/Restraining Order Motion                    iv

Fed. R. Civ. P. 65(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

Fed. R. Civ. P. 65(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fed. R. Civ. Pro. 65(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

http://samspade.org/d/ipdns.html (last visited May 29, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ICQ Company, http://www.icq.com/products/whatisicq.html (last visited May 28, 2009) . . . . . . 4

Letter from the FTC to Hon. Wendell Ford and Hon. John Danforth, Committee on Commerce,
Science, and Transportation, United States Senate, Commission Statement of Policy on the
Scope of Consumer Unfairness Jurisdiction, appended to *International Harvester Co.*, 104
F.T.C. 949, 1064 (1984) ("Unfairness Statement") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

Marshall8e6, *Are Bots About to Bring Down Your Business?*,
http://www.marshal8e6.com/documents/pdfs/
white_papers/business/WP_BotsBringDownBusiness.pdf (last visited May 28, 2009) . . . . . . . . 6

Stefanie Olsen, Exposing Click Fraud, available online at
http://news.cnet.com/Exposing-click-fraud/
2100-1024_3-5273078.html (last visited May 29, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Tim Ferguson, *Security Experts: Botnets Biggest Threat on Net*, ZDNet UK, Apr. 11, 2008,
http://news.zdnet.co.uk/security/0,1000000189,39384066,00.htm (last visited on May 28, 2009)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Wikipedia, http://en.wikipedia.org/wiki/ICQ (last visited May 28, 2009) . . . . . . . . . . . . . . . . . 4

Wikipedia, http://en.wikipedia.org/wiki/Click_fraud (last visited May 29, 2009) . . . . . . . . . . . 6

Memorandum in Support of FTC
TRO/Restraining Order Motion                          v

1 | **I.     SUMMARY**

2 |     Plaintiff Federal Trade Commission ("FTC" or "Commission") seeks an *ex parte*

3 | temporary restraining order ("TRO") to stop a rogue Internet Service Provider controlled by

4 | overseas criminals from continuing to harm U.S. consumers.  As described in depth below,

5 | defendant Pricewert LLC ("Defendant," "Pricewert," or "3FN") operates Triple Fiber Network,

6 | an Internet hosting provider that recruits, knowingly hosts, and actively participates in the

7 | distribution of, illegal, malicious, and harmful electronic content, including child pornography,

8 | malicious software, and the servers used to control networks of compromised computers known

9 | as botnets.

10 |     Because the Defendant has gone to considerable lengths to hide from law enforcement,

11 | and is engaged in outright criminal activity that is causing massive consumer injury, the

12 | Commission seeks an *ex parte* temporary restraining order that would, *inter alia*, immediately

13 | disconnect the Defendant's servers from the Internet, impose an asset freeze, and order the

14 | preservation of evidence.  Defendant's history of criminal conduct,[1] extensive efforts to hide

15 | from law enforcement, and refusal to cease its injurious activity despite calls from consumers

16 | and the Internet security community, demonstrates its propensity to violate the law and to

17 | disregard any order to refrain from dissipating or concealing assets or destroying documents if

18 | given advance notice of this lawsuit.  Moreover, advance notice to the Defendant prior to the

19 | disconnection of its servers would likely result in the Defendant and its criminal clientele

20 | transferring their illegal, malicious and harmful electronic content to other Internet providers,

21 | which would render much of the relief requested in the Temporary Restraining Order moot and

22 | would cause significant harm to consumers.  Accordingly, immediate, *ex parte* relief is critical to

23 |

24 |     [1]It is the Commission's understanding that a parallel criminal investigation of the Defendant is underway.  Although the Commission is not privy to the details of that

25 | investigation, the Commission is informed that a search warrant will be executed at the Defendant's data center on or about Wednesday, June 3, 2009.  The Commission respectfully

26 | requests that this Court rule on the Commission's *Ex Parte* Motion for Temporary Restraining Order prior to June 3, 2009, so that – if the Commission's Motion is granted – service of the

27 | TRO can be effected at the same time the search warrant is executed.

28 |

Memorandum in Support of FTC
TRO/Restraining Order Motion          Page 1 of 29

1  bringing a halt to Defendant's conduct, and to protect Defendant's assets for possible consumer

2  redress or disgorgement pending final resolution of this matter.

3  **II.    THE PARTIES**

4      **A.    Plaintiff**

5      Plaintiff, FTC, is an independent agency of the United States government created by the

6  FTC Act, 15 U.S.C. §§ 41-58 (2006).  The FTC is charged with, among other things,

7  enforcement of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or

8  deceptive acts or practices in or affecting commerce.  The FTC is authorized to initiate federal

9  district court proceedings, by its own attorneys, to enjoin violations of the FTC Act, and to

10 secure such equitable relief as may be appropriate in each case, including restitution and

11 disgorgement.  15 U.S.C. § 53(b) (2006).

12     **B.    Defendant**

13     Defendant Pricewert is a shell company created by the overseas criminals that operate the

14 Internet Service Provider known as "Triple Fiber Network" or "3FN."  Pricewert is an Oregon

15 limited liability company, which reports its principal place of business as 35 Barrack Road,

16 Belize City, Belize, in corporate filings with the State of Oregon.  Drexler Decl., Ex. 7, ¶ 23.  In

17 its filings, Pricewert states that its only members are two Belizean companies, both of which

18 share the same Barrack Road address in Belize as Pricewert.  *Id.*  No individuals, other than an

19 employee of "Registered Agents Ltd.," appear in Pricewert's filings.  *Id.*

20     Pricewert is the owner and registrant of the 3FN.net domain name.  Drexler Decl., Ex. 7,

21 ¶ 5.  Visitors to pricewert.com, moreover, are redirected to the 3FN.net website.  Drexler Decl.,

22 Ex. 7, ¶ 12.  Pricewert also operates under a series of aliases, including Triple Fiber Network,

23 APS Telecom, APX Telecom, APS Communications, and APS Communication, all of which

24 have been linked to Pricewert by the FTC.  *See* Drexler Decl., Ex. 7, ¶¶ 3-20, 23-25; *See also*

25 Linford Decl., Ex. 4, ¶¶ 7-12.

26     A significant number of Pricewert's computer servers are located at Data Pipe, a third-

27 party data center located in San Jose.  Zadig Decl., Ex. 1, ¶ 9.  In addition, Pricewert lists a series

28

Memorandum in Support of FTC
TRO/Restraining Order Motion          Page 2 of 29

1   of addresses in the San Jose area in its registration information for its various websites and

2   Internet Protocol ("IP") ranges.[2]   *See* Drexler Decl., Ex. 7, ¶¶ 5, 7, 8, 9, 11, 13-14, 17, and 24.

3   Pricewert also lists a San Jose area code (408) as the phone number on its website, and boasts on

4   its webpage that its servers are located in the "heart of the Silicon Valley." Drexler Decl., Ex. 7,

5   ¶¶ 24, 25.

6   **III.      THE DEFENDANT'S BUSINESS PRACTICES**

7          Pricewert recruits and colludes with criminals seeking to distribute illegal, malicious and

8   harmful electronic content via the Internet. Pricewert offers these criminals a full service

9   Internet hosting facility that welcomes content no legitimate Internet Service Provider would

10  ever willingly host. This content includes a witches' brew of child pornography, botnet

11  command and control servers, spyware, viruses, trojans, phishing-related sites, and pornography

12  featuring violence, bestiality, and incest. In addition to recruiting and willingly distributing this

13  illegal, malicious and harmful content, Pricewert actively colludes with its criminal clientele in

14  several areas, including the maintenance and deployment of networks of compromised

15  computers known as botnets.

16         In order to provide this Court with a full picture of Pricewert's harmful activities, the

17  FTC has recruited a distinguished panel of Internet security experts, who have submitted

18  declarations in support of the FTC's suit. The evidence assembled by these experts, combined

19  with evidence collected during the FTC's investigation of Pricewert, provides overwhelming

20  proof that Pricewert is engaged in conduct that violates Section 5 of the FTC Act.

21  **A.      Special Agent Sean Zadig, NASA Office of Inspector General, Computer
           Crime Division**

22

23         Special Agent Sean Zadig works in the Computer Crime Division of the National

    Aeronautics and Space Administration's ("NASA") Office of Inspector General. Zadig Decl.,
24

25

26         [2]An IP address is a unique, 32 bit number assigned to every computer connected to the
    Internet, and expressed as four eight bit numbers, written in decimal and separated by periods.
27  For example 151.196.75.10. *See* http://samspade.org/d/ipdns.html (last visited May 29, 2009) A
    IP range or block is a collection of many IP addresses. *Id.*
28

    Memorandum in Support of FTC
    TRO/Restraining Order Motion            Page 3 of 29

1    Ex. 1, ¶ 1. Zadig first encountered 3FN as part of an investigation into a series of computer

2    intrusions at NASA. Zadig Decl., Ex. 1, ¶ 5. Zadig traced those intrusions to a number of

3    computer servers hosted by a now defunct ISP by the name of McColo. *Id.* McColo was a

4    notorious haven for criminal activity that was shut down after its upstream Internet providers

5    were approached by a Washington Post reporter and provided with evidence of the volume of

6    malicious content McColo was hosting. *Id. See also* Brian Krebs, *Host of Internet Spam Groups*

7    *Is Cut Off*, Wash. Post, http://www.washingtonpost.com/wp-dyn/content/article/2008/11/12/

8    AR2008111200658.html (last visited May 28, 2009).

9            1.       The Discovery of the ICQ Logs

10           Pursuant to a federal search warrant, Zadig copied the contents of several McColo servers

11   connected to the computer intrusions at NASA, and proceeded to analyze the data recovered.

12   Zadig Decl., Ex. 1, ¶¶ 5-6. In analyzing the data, Zadig discovered a series of connections

13   between McColo and 3FN, including malicious software located on McColo servers

14   communicating with 3FN servers. Zadig Decl., Ex. 1, ¶ 8.

15           One of the McColo servers Zadig analyzed contained a number of ICQ instant message

16   logs -- transcripts of instant message conversations between various parties that were relayed

17   through the McColo server. Zadig Decl., Ex. 1, ¶ 6. These logs contain, *inter alia*, the unique

18   ICQ number of each participant in the chat, the time and date of each message, and the content

19   of the messages. Zadig Decl., Ex. 1, ¶¶ 6, 10. Although the messages were in Russian, Zadig

20   was able to connect two of the chat participants to 3FN through their unique ICQ identifiers. *Id.*

21           Each user of ICQ is assigned a unique identifier or "handle" upon first registering to use

22   the program.[3] Zadig connected two of the ICQ handles that appeared in the chat logs to 3FN:

23   331226 and 126254. Zadig Decl., Ex. 1, ¶ 10. Zadig learned from 3FN's website that 331226 is

24   the unique ICQ handle assigned to 3FN's "Head of Programming Department." *Id.* On its

25   website, 3FN advertises "24h[our] ICQ Support" and encourages users to contact its Head of

26   _____

27           [3] *See* ICQ Company, http://www.icq.com/products/whatisicq.html (last visited May 28,
     2009); ICQ, available online at http://en.wikipedia.org/wiki/ICQ (last visited May 28, 2009).
28
     Memorandum in Support of FTC
     TRO/Restraining Order Motion            Page 4 of 29

Programming Department using ICQ identifier 331226. Zadig Decl., Ex. 1, ¶ 10, Drexler Decl.,
Ex. 7, ¶ 21. Zadig also queried the official website of the ICQ network for information about the
user assigned the ICQ identifier 331226. Zadig Decl., Ex. 1, ¶ 10. This query returned a profile
describing the user as "TAiNT, Ukraine, 35yo male." *Id.*

Zadig also connected a second ICQ identifier found in the chats, 126254, to 3FN. Zadig
Decl., Ex. 1, ¶ 10. This identifier was used by an individual promoting 3FN's services in an
online spam forum[4] located at the website *crutop.nu*. *Id.* This individual identified himself as
3FN's "Senior Project Manager" and utilized the ICQ identifier 126254. Zadig Decl., Ex. 1, ¶¶
6-7, 10.

Although the chats found by Zadig appeared to be in Russian, Zadig was able to use a
free translation service offered by Google to get a rough idea of the contents of the messages.
Zadig Decl., Ex. 1, ¶ 6. Although the translation was imperfect, Zadig was able to discern that
the logs contained a series of discussions between the above-referenced 3FN employees and
individuals seeking 3FN's assistance in configuring and deploying networks of compromised
computers, known as botnets. Zadig Decl., Ex. 1, ¶¶ 6-7, 10.

2.      Botnet and Click Fraud Basics

A botnet is a network of computers, which have been compromised with malicious code
and enslaved by the originator of the botnet, known as the bot herder. Zadig Decl., Ex. 1, ¶ 7;
CERT Coordination Center, *Botnets as a Vehicle for Online Crime*, at 11,
http://www.cert.org/archive/pdf/Botnets.pdf (last visited May 28, 2009). Typically, users whose
computers have been conscripted into a botnet are unaware that their computers have been
compromised. Zadig Decl., Ex. 1, ¶ 7.

In order to command his army of compromised computers, the bot herder utilizes a
computer server known as a "command and control" server or "C&C." *Id.* Upon being
compromised by malicious code, infected computers are instructed to communicate with the

---

[4] *See* Warner Decl., Ex. 2 ¶ 11 (discussing spam section of crutop.nu); see also Drexler
Decl., Ex. 7, ¶ 30.

1   command and control server and follow whatever instructions are received. *Id.*; Turner Decl.,

2   Ex. 6, ¶ 25.   By relaying commands through the C&C, the bot herder is able to remotely control

3   a vast network of compromised computers, and use those computers for a variety of nefarious

4   purposes, including the sending of spam, the distribution of malicious software, click fraud, and

5   denial of service attacks. *Id.*; CERT Coordination Center, *Botnets as a Vehicle for Online*

6   *Crime*, at 7-16, http://www.cert.org/archive/pdf/Botnets.pdf (last visited May 28, 2009)

7          The rise of botnets has been recognized as the most serious security threat facing the

8   Internet. *See, e.g.*, Tim Ferguson, *Security Experts: Botnets Biggest Threat on Net*, ZDNet UK,

9   Apr. 11, 2008, http://news.zdnet.co.uk/security/0,1000000189,39384066,00.htm (last visited on

10  May 28, 2009).   Among other harms, experts estimate that botnets are responsible for

11  approximately 85% of spam sent worldwide. *See, e.g.*, Marshall8e6, *Are Bots About to Bring*

12  *Down Your Business?* at 2,  http://www.marshal8e6.com/documents/pdfs/

13  white_papers/business/WP_BotsBringDownBusiness.pdf (last visited May 28, 2009).   Operating

14  a botnet is illegal, and in many cases, punishable as felony. *See* 18 U.S.C. § 1030 (2006).

15         Click fraud, one of the many uses for a botnet, is a type of Internet crime that occurs in

16  connection with pay per click online advertising when an automated script or computer program

17  imitates a legitimate user of a web browser clicking on an ad, for the sole purpose of generating

18  a charge per click without having actual interest in the target of the ad's link. *See, e.g.*, Stefanie

19  Olsen, *Exposing Click Fraud*, CNET News, http://news.cnet.com/Exposing-click-fraud

20  /2100-1024_3-5273078.html (last visited May 29, 2009); "Click Fraud," Wikipedia,

21  http://en.wikipedia.org/wiki/Click_fraud (last visited May 29, 2009).   Click fraud is a crime in

22  many jurisdictions, including California, where it is a felony. *See* Cal. Penal Code § 502 (2008).

23         3.      The Translated ICQ Logs

24         The ICQ logs located by Agent Zadig were provided to the FTC and submitted to a

25  translator, who translated the logs from Russian to English. Zadig Decl., Ex. 1, ¶¶ 10-11,

26  Drexler Decl., Ex. 7, ¶ 27.   The translated ICQ logs contain a series of admissions by 3FN's

27  senior staff that definitively link 3FN to illegal and injurious botnet and click fraud activity.

28

Memorandum in Support of FTC
TRO/Restraining Order Motion              Page 6 of 29

1    In one of the ICQ chats dated July 15, 2008, 3FN's Head of Programming engages in a

2  conversation with a customer regarding the number of compromised computers the customer

3  controls. Drexler Decl., Ex 7 at p. 361-362.  The customer informs 3FN that he controls a total

4  of 200,000 compromised computers, with 20,000 online and available for use at the time of the

5  chat.  Id.  The customer then offers this massive network of bots to 3FN.  The head of 3FN's

6  Programming Department agrees to work with the customer, but complains upon learning of the

7  size of the botnet that it will require a lot of effort.  Id. at p. 361.  The substance of the chat

8  between 3FN and its customer is reproduced below:

| FROM | TO | |
|---|---|---|
| Head of 3FN Programming Department | Customer | Bro, I am on my way home<br>Shall we put off till tomorrow? |
| Customer | Head of 3FN Programming Department | lets do tomorrow, we have not configured it today yet |
| Head of 3FN Programming Department | Customer | I see<br>Do you have big botnet? |
| Customer | Head of 3FN Programming Department | can reach 20k online<br>sometimes even more |
| Head of 3FN Programming Department | Customer | what about geography? |
| Customer | Head of 3FN Programming Department | will tell you for sure<br>200k bots reached today,  15% of them are USA - Europe-Australia |
| Head of 3FN Programming Department | Customer | I got it, that's somewhere normal |
| Customer | Head of 3FN Programming Department | yep, bots are waiting for you ) |
| Head of 3FN Programming Department | Customer | It's a lot of fucking work |

26    In another chat, dated June 17, 2008, a Senior Project Manager for 3FN is approached by

27  a customer seeking to work with 3FN on "botnet and clicker" – the use of a botnet to commit

Memorandum in Support of FTC
TRO/Restraining Order Motion          Page 7 of 29

1    click fraud. Drexler Decl., Ex. 7 at pg. 365-366. 3FN's Senior Project Manager inquires about

2    the size of the botnet and asks if 3FN will need to write the software to control it. Id. at p. 366.

3    Upon learning these details, 3FN's Senior Project Manager reassures the customer that "we can

4    manage it" and then proceeds to explain to the customer that 20,000 active bots are needed in

5    order to generate $500/day through click fraud. The substance of the chat is reproduced below:

| FROM | TO | |
|---|---|---|
| Customer | 3FN's Senior Project Manager | Do you want to work with me at clicker [software]? ) |
| 3FN's Senior Project Manager | Customer | If you have something to offer me . . . |
| Customer | 3FN's Senior Project Manager | botnet and clicker |
| 3FN's Senior Project Manager | Customer | what is the size of botnet? do we have to write software from the beginning? |
| Customer | 3FN's Senior Project Manager | Software remains version for beginning of this year botnet is approx. 20 000 clicks now and keeps on growing |
| 3FN's Senior Project Manager | Customer | Well, we can manage it To earn 500 USD per day you need to have 20 000 clicks approx. |

     4.      Zadig's Analysis of the Content Hosted by 3FN

       In an effort to quantify the scope of illegal, malicious, and harmful content currently and

historically hosted by 3FN, Agent Zadig prepared an analysis of the websites and other content

hosted at the various Internet Protocol ranges assigned to 3FN. Zadig Decl., Ex. 1, ¶¶ 12-19.

Agent Zadig conducted his analysis by entering each IP address controlled by 3FN into several

databases, as well as a network mapping tool, and the Google search engine. Zadig Decl., Ex. 1,

¶¶ 12-13. Agent Zadig then recorded any reports of illegal, malicious or harmful content into a

spreadsheet. Zadig Decl., Ex. 1, ¶ 13. The completed spreadsheet, which is attached to Zadig's

declaration as Exhibit 1, establishes that 3FN hosts a massive amount of content that harms

consumers. Among other harmful content, Zadig found: botnet command and control servers,

1   websites engaged in the hijacking of users' web browsers; websites engaged in search engine

2   optimization (SEO) ploys (spamming and other techniques used to artificially inflate the ranking

3   of a website); illegal online pharmacies; malware distribution sites; intellectual property theft

4   (MP3 and movie filesharing and downloads); sites featuring investment and currency trading

5   scams; hacking-related sites; rogue anti-virus products; and sites distributing trojan horses.

6   Zadig Decl., Ex. 1, at Att. A.

7          Indeed, 3FN's network is so full of malicious content that, while mapping the content

8   that 3FN hosts, Zadig's own computer was repeatedly infected with malicious software

9   originating from sites hosted by 3FN.  Zadig Decl., Ex. 1, ¶ 16.  One of the resulting infections

10  forced Zadig to completely rebuild his computer.  *Id.*

11         5.       Attacks on NASA Originating From 3FN

12         In another effort to quantify the harm originating from 3FN, Agent Zadig searched

13  NASA's agency-wide database of incidents of computer intrusions and infections impacting

14  NASA computers.  Zadig Decl., Ex. 1, ¶¶ 20-22.  Zadig searched the database for any incidents

15  traceable to IP addresses controlled by 3FN.  Zadig Decl., Ex. 1, ¶ 20.  The query found 22

16  separate attacks on NASA computers originating from IP addresses controlled by 3FN, including

17  five attacks in 2009, one as recently as April of 2009.  Zadig Decl., Ex. 1, ¶¶ 20-21.  Several of

18  these attacks involved efforts to conscript NASA computers into a botnet.  Zadig Decl., Ex. 1, ¶

19  21.  Zadig estimates that NASA has spent more than $14,000 to repair the damage to NASA's

20  systems that originated from servers hosted by 3FN.  Zadig Decl., Ex. 1, ¶ 22.

21         **B.      Gary Warner, Director of Research in Computer Forensics, University of
                    Alabama at Birmingham**

22
           Gary Warner is the Director of Research in Computer Forensics at the University of
23
    Alabama at Birmingham.  Warner Decl., Ex. 2, ¶ 1.  Warner has substantial expertise in the
24
    fields of computer forensics, computer security, and cybercrime, and is the recipient of
25
    numerous awards and other recognitions for his work, including his designation as a Microsoft
26
    MVP in Enterprise Security – one of only 57 individuals in the world to be so designated.  *Id.*
27

28

Memorandum in Support of FTC
TRO/Restraining Order Motion          Page 9 of 29

1    As part of his job responsibilities at the University of Alabama, Warner and his staff of

2    researchers track and analyze spam for evidence of criminal activity. Warner Decl., Ex. 2, ¶ 2.

3    Based on this work, Warner has become familiar with a number of Internet Service Providers

4    ("ISPs") that host unusually high concentrations of criminal activity. *Id.* Two of these ISPs –

5    McColo and InterCage – were shut down after their upstream providers learned of the amount of

6    criminal activity they were hosting. *Id.* In the wake of these shutdowns, Warner believes that

7    3FN (known to him as APS Telecom) is now the worst ISP located in the United States in terms

8    of hosting malicious content. *Id.*

9        1.    The Illegal, Harmful and Malicious Content Hosted by 3FN

10   To support his conclusion that 3FN is the worst domestic ISP in terms of hosting criminal

11   activity, Warner analyzed the various websites and other content 3FN hosts. *Id.* As described in

12   great depth in his declaration, and summarized below, Warner located a remarkably wide range

13   of illegal, harmful and malicious content hosted by 3FN.

14       a.    Malicious Botnet Software

15   As part of his spam analysis work, Warner tracked a cluster of spam messages that

16   invited users to visit a series of webpages offering pornographic content. Warner Decl., Ex. 2, ¶

17   3. Warner determined that users who visited these pages were instructed to download a video

18   player, which was actually malicious software hosted by 3FN. *Id.* Users who agreed to

19   download the software unwittingly exposed their computers to malicious code that compromised

20   their computers and conscripted them into a botnet. *Id.*

21   By studying this malicious code, Warner was able to determine how to access the 3FN-

22   hosted website associated with the code, and view the tracking statistics maintained by the

23   criminals controlling the botnet. *Id.* These statistics showed that thousands of computers had

24   been compromised by the malicious code located by Warner. *Id.*

25       b.    Child Pornography

26   Warner located more than 40 websites hosted by 3FN that are possible hosts of child

27   pornography, including several with domain names designed to appeal to those seeking such

28

Memorandum in Support of FTC
TRO/Restraining Order Motion          Page 10 of 29

1   content, including: *young-girl-sex.net, little-beauty.com, little-lady.info, little-incest.com, littles-*

2   *raped.com,* and *DrIncest.com.* Warner Decl., Ex. 2, ¶ 4. Although Warner did not visit these

3   sites due to their content, he did perform traffic analysis on several of the sites, and viewed one

4   of the sites with a text-only browser. Warner Decl., Ex. 2, ¶¶ 5-7. This analysis revealed a

5   strong correlation between visits to "*little-lady.info*" and the search term "nude little preteen

6   angels." Warner Decl., Ex. 2, ¶¶ 5-6. Moreover, by viewing *little-incest.com* with a text-based

7   browser, Warner was able to confirm that the 3FN-hosted site contains the following text

8   "ILLEGAL PHOTOS OF LITTLE GIRLS - just 3 steps," "VERY LITTLE SCHOOLGIRLS

9   RAPED," and "more than 10 free samples of tiny schoolgirls being forced...". Warner Decl., Ex.

10   2, ¶ 7.

11         c.    Fake Anti-Virus Products

12         Warner uncovered several 3FN-hosted websites engaged in the selling of fake or "rogue"

13   antivirus:  software that falsely informs consumers that their computers are infected with

14   malicious software and urges them to purchase the rogue anti-virus product in order to eliminate

15   the infection. Warner Decl., Ex. 2, ¶ 8. The FTC is currently litigating a suit against one of the

16   major purveyors of such software, and has a long history with this type of deceptive software.

17   *See, e.g., FTC v. Innovative Marketing*, Civ. No. RDB-08-CV-3233 (D. Md. Dec. 2, 2008); *FTC*

18   *v. MaxTheater, Inc.*, No. 05-CV-0069 (E.D. Wa. Dec. 6, 2005); *FTC v. Trustsoft, Inc.*, No. H-05-

19   1905 (S.D. Tex. Nov. 30, 2005); *FTC v. Seismic Entertainment Productions*, No. 04-377-JD

20   (D.N.H. Oct. 12, 2004).

21         d.    Illegal Online Pharmacies

22         Warned discovered numerous online pharmacies hosted at 3FN, all of which appear to be

23   illegal, including *BuyCialisWithoutAPrescription.net, BuyValiumNoRX.com*, and

24   *BuyDrugsOnlineNoPrescriptionNecessary.net.* Warner Decl., Ex. 2, ¶ 13.

25         e.    Pirated Music and Software

26         Warner lists in his declaration a variety of sites hosted by 3FN that are distributing

27   pirated software and music. Warner Decl., Ex. 2, ¶¶ 10, 12. These sites include *mp3-mass.com,*

28

Memorandum in Support of FTC
TRO/Restraining Order Motion       Page 11 of 29

1   which sells current music by popular artists such as Kanye West, Britney Spears, and Fergie for

2   20 cents per song, and $3 per album – far below what legitimate websites charge. Warner Decl.,

3   Ex. 2, ¶ 10. Similarly, software sites like 3FN-hosted *cheapoemstore.com* sell popular software,

4   including products from Adobe and Microsoft, at 10 to 20 percent of their retail value. Warner

5   Decl., Ex. 2, ¶ 12.

6       2.    3FN Actively Recruits Criminals

7       In an effort to understand how so much illegal content could exist at one ISP, Warner

8   began visiting websites where criminals share techniques and strategies with one another.

9   Warner Decl., Ex. 2, ¶ 11. One of the websites Warner visited is *crutop.nu*, which is itself

10  hosted by 3FN. *Id.* *Crutop.nu* is a Russian language website that features a variety of discussion

11  forums that focus on making money from spam. *Id.*

12      Warner discovered that representatives of 3FN are active participants in the *crutop.nu*

13  forums, and that 3FN advertises its services in banner ads placed on *crutop.nu*. *Id.* An

14  individual who identifies himself as 3FN's "Senior Project Manager" has posted 3,440 messages

15  in the crutop forums. *Id.* In one exchange between 3FN's Senior Project Manager and a user

16  identified as "Rett," Rett asks if he can host "Rape and Incest sites on 3FN." The response from

17  3FN: "Yes of course." *Id.*

18      **C.    Sarah Ohlsen, Supervisor, Exploited Children Division,
        The National Center for Missing and Exploited Children**

19

20      Sarah Ohlsen is a Supervisor in the Exploited Children Division of the The National

21  Center for Missing and Exploited Children ("NCMEC"). Ohlsen Decl., Ex. 3, ¶ 1. NCMEC

    servess as a clearinghouse for reports of child exploitation, including reports of child
22
    pornography. Through its "CyberTipline" and "CyberTipline II" – which Ohlsen supervises –
23
    NCMEC enables members of the public, electronic service providers, and law enforcement to
24
    report, *inter alia*, images containing child pornography found online. Ohlsen Decl., Ex. 3, ¶¶ 2 -
25
    4.
26

27

28
    Memorandum in Support of FTC
    TRO/Restraining Order Motion          Page 12 of 29

1    All reports to NCMEC's CyberTiplines are assigned to a NCMEC analyst, who reviews

2    the material alleged to be child pornography and makes a determination whether the specified

3    image is indeed "apparent child pornography." Ohlsen Decl., Ex. 3, ¶¶ 3 - 5. Although NCMEC

4    is not a law enforcement organization, NCMEC's reports are routinely shared with criminal law

5    enforcement, and NCMEC is often called upon by criminal law enforcement to analyze images

6    of suspected child pornography. Ohlsen Decl., Ex. 3, ¶¶ 2 - 3

7    At the FTC's request, NCMEC searched its database for CyberTipline reports associated

8    with IP ranges controlled by 3FN and a series of websites hosted by 3FN. Ohlsen Decl., Ex. 3, ¶

9    6. In those cases where NCMEC located a CyberTipline report, NCMEC consulted the

10   associated NCMEC analyst report to determine if the NCMEC analyst was able to confirm the

11   report. Ohlsen Decl., Ex. 3, ¶¶ 6 - 7.

12   Ohlsen's declaration paints a highly disturbing picture. In response to the FTC's query,

13   Ohlsen found that NCMEC's CyberTiplines received more than 700 reports of child

14   pornography hosted at 3FN. Ohlsen Decl., Ex. 3, ¶ 7. In more than 500 different cases,

15   NCMEC's analysts were able to confirm that the reported website did indeed contain apparent

16   child pornography. Id.

17   Morever, a review of the reports attached to Ohlsen's declaration shows that 3FN has

18   consistently hosted child pornography over a long period of time. The earliest CyberTipline

19   reports concerning 3FN's hosting of child pornography date back to 2004; the most recent to

20   May 21, 2009. Ohlsen Decl., Ex. 3, ¶ 7 and Appendix B to Ohlsen Decl. at line "# 1" (Ex. pg.

21   183) and line "# 329" (Ex. 3 pg. 201).

22   **D.    Steve Linford, Founder, The Spamhaus Project**

23   Steve Linford is the founder of the Spamhaus Project, one of the world's preeminent anti-

24   spam organizations. Linford Decl., Ex. 4, ¶¶ 2-3. Spamhaus fights spam by tracking spam

25   activity via its own network of sensors and data sources and then compiling lists of Internet

26   Protocol addresses associated with spam activity. Linford Decl., Ex. 4, ¶ 4. These IP addresses

27   are added to the Spamhaus Blocklist ("SBL"), which is widely used by ISPs around the world.

28

Memorandum in Support of FTC
TRO/Restraining Order Motion          Page 13 of 29

1    Linford Decl., Ex. 4, ¶¶ 4-5. ISPs use the SBL, along with other data, to determine which IP

2    ranges to block from their network. Linford Decl., Ex. 4, ¶ 4.

3       At the time an IP address is added to the SBL, Spamhaus generates and transmits an

4    abuse complaint to the network responsible for the cited IP. Linford Decl., Ex. 4, ¶ 6. If the

5    network responsible for the IP address takes action to remove the offending content hosted at the

6    cited IP, Spamhaus will remove the IP address from the SBL. *Id.* In virtually every case, ISPs

7    respond to Spamhaus abuse complaints and take action to remove the spam-related content from

8    their network. *Id.*

9       Spamhaus has a long history with 3FN, and has sent 3FN more than 70 abuse reports

10    since 2005. Linford Decl., Ex. 4, ¶ 7. Spamhaus's abuse complaints to 3FN have been answered

11    by two individuals since 2007: "Sergey Dubenco" and "Nick Tooms." Linford Decl., Ex. 4, ¶ 8.

12    Both of these individuals appear to be located outside of the United States, possibly in Ukraine

13    or Estonia. Linford Decl., Ex. 4, ¶¶ 9-12.

14       Based on Spamhaus's interactions with 3FN, it is Linford's view that 3FN is actively

15    collaborating with and protecting its clients who are engaged in spam and botnet-related activity.

16    Linford Decl., Ex. 4, ¶¶ 13-20. Linford bases this conclusion on 3FN's interactions with

17    Spamhaus since 2007. Linford Decl., Ex. 4, ¶ 14. During that period, 3FN has demonstrated a

18    consistent "push a pawn" strategy, whereby 3FN feigns cooperation with Spamhaus by

19    temporarily removing offending websites and servers, only to reinstate them shortly after

20    Spamhaus has withdrawn the IP address from the SBL. *Id.* In several cases, 3FN has moved

21    offending websites to other IP addresses controlled by 3FN, in what Linford believes to be an

22    effort to evade detection by Spamhaus. *Id.*

23       Linford includes several examples of 3FN's suspect behavior in his declaration,

24    including an incident involving botnet command and control servers hosted by 3FN. Linford

25    Decl., Ex. 4, ¶¶ 15-19. Between November 2008 and March 2009, Spamhaus reported 17

26    different IP addresses controlled by 3FN that were home to botnet command and control servers.

27    Linford Decl., Ex. 4, ¶ 19. In Linford's view, this is a huge number of command and control

28

Memorandum in Support of FTC
TRO/Restraining Order Motion       Page 14 of 29

1    servers to be located on any one network in the same time frame, and puts 3FN in the same

2    category as McColo and Atrivo/Intercage – two notorious rogue ISPs that were taken offline by

3    their upstream providers. *Id.*

4         In response to Spamhaus's abuse complaints regarding the botnet command and control

5    servers, 3FN assured Spamhaus that the command and control servers located by Spamhaus had

6    been taken down. Linford Decl., Ex. 4, ¶¶ 17-18, 20. This assertion proved to be false. Data

7    collected by Andre' DiMino (discussed below) establishes that at least five of the command and

8    control servers reported by Spamhaus – and purportedly taken down by 3FN – were not in fact

9    removed.

10        **E.    Andre' DiMino, Co-Founder and Director, The Shadowserver Foundation**

11        Andre' DiMino is the Co-Founder and Director of The Shadowserver Foundation, a

12    group of security researchers that gather information on malicious software, botnet activity, and

13    compromised servers. DiMino Decl., Ex. 5, ¶ 2. As described in depth in DiMino's declaration,

14    Shadowserver employs a comprehensive and regularly validated method of capturing and

15    logging information related to Internet-based malicious activity. DiMino Decl., Ex. 5, ¶¶ 3-10.

16        At the FTC's request, DiMino queried the Shadowserver database for reports of

17    malicious activity originating from IP addresses controlled by 3FN. DiMino Decl., Ex. 5, ¶¶ 11-

18    12. DiMino's query covered the time period January 1, 2008 through May 7, 2009. DiMino

19    Decl., Ex. 5, ¶ 13. During that period, DiMino found 311 unique IP addresses controlled by 3FN

20    that were found to be participating in, or facilitating, malicious activity. DiMino Decl., Ex. 5,

21    ¶¶ 14-15.

22        DiMino's database search also revealed 4,576 unique malicious software programs

23    ("malware") that use 3FN's servers as a botnet command and control server. DiMino Decl., Ex.

24    5, ¶ 21. DiMino's analysis of this malware found a range of malicious behavior, including

25    programs capable of keystroke logging, password stealing, data stealing, programs with hidden

26    backdoor remote control activity, and programs involved in spam distribution. DiMino Decl.,

27    Ex. 5, ¶ 22.

28

Memorandum in Support of FTC
TRO/Restraining Order Motion          Page 15 of 29

1    At the FTC's request, DiMino searched the Shadowserver database for evidence of

2    botnet command and control servers at a series of IP addresses provided by the FTC.  DiMino

3    Decl., Ex. 5, ¶¶ 24-25.  The FTC obtained these IP addresses from Spamhaus, which connected

4    them to botnet command and control activity, and reported them to 3FN in late 2008 and, in one

5    case, early 2009.  As detailed in Steve Linford's declaration, 3FN responded to Spamhaus's

6    complaint and reported that these command and control servers were taken offline.  DiMino's

7    data confirms that 3FN's representations to Spamhaus were false.  In fact, the botnet command

8    and control servers purportedly taken down by 3FN continued to operate after the date 3FN told

9    Spamhaus they had been taken offline.  DiMino Decl., Ex. 5, ¶¶ 26-30; Linford Decl., Ex. 4, ¶

10   19.

11           **F.     Dean Turner, Director of the Global Intelligence Network, Symantec
                      Corporation**

12           Dean Turner is the Director of the Symantec Corporation's Global Intelligence Network.

13   Turner Decl., Ex. 6, ¶ 2.  Among other responsibilities, Turner manages and co-authors

14   Symantec's annual Internet Threat Report, coordinates the research and analysis conducted on

15   attack data gathered from Symantec's network of Internet sensors, and manages Symantec's

16   Deepsight Analyst teams, which study cyber attacks and the vulnerability of systems to cyber

17   attacks.  Turner Decl., Ex. 6, ¶¶ 2, 4.

18           Symantec's Global Intelligence Network database consists of information gathered by

19   Symantec's network of "infield sensors" – software and hardware managed by Symantec that

20   report Internet threat data back to Symantec as well as sensors in the control of third parties (for

21   example, users of Symantec's anti-virus software who have agreed to share data with Symantec.)

22   Turner Decl., Ex. 6, ¶ 2.  At the FTC's request, Turner queried the Global Intelligence Network

23   databases by searching for cyber intrusions or attacks originating from IP addresses belonging to

24   3FN[5] in the past six months.  Turner Decl., Ex. 6, ¶ 9.

25

26   _____

27          [5]  A comparison of the IP ranges analyzed by Mr. Turner (*See* Turner Decl., Ex. 6, ¶ 9
     (listing IP ranges)) with the IP ranges linked by FTC Investigator Drexler (*See* Drexler Decl., Ex.

28

1       Turner's query found more than 600 IP addresses controlled by 3FN launching a variety

2  of attacks, including a number of attacks capable of taking control of a user's computer. Turner

3  Decl., Ex. 6, ¶ 11 and Ex A to Turner Decl. Turner's query also revealed phishing[6] and spam

4  activity originating from 3FN IP addresses (Turner Decl., Ex. 6, ¶¶ 29-32 and Exs. D and E. to

5  Turner Decl.), and 17 different 3FN IP addresses that housed botnet command and control

6  servers. Turner Decl., Ex. 6, ¶ 27 and Ex. C to Turner Decl.

7      **G.**     **Sheryl Drexler, Investigator, Federal Trade Commission**

8       Sheryl Drexler is an investigator for the Federal Trade Commission. Drexler has more

9  than six years of experience investigating unfair and deceptive practices involving the Internet.

10  Drexler ¶ 1.

11      1.     Aliases Used by Pricewert

12       By reviewing the defendant's domain and IP registration information, visting the

13  defendant's websites, and reviewing the defendant's corporate filings with the state of Oregon,

14  Drexler was able to link defendant's various aliases, including Triple Fiber Network, 3FN, APS

15  Telecom, APS Communication(s), and APX Telecom. Drexler Decl., Ex. 7, ¶¶ 3-20, 23-25.

16      2.     Pricewert's Extensive Overseas Ties

17       Drexler was also able to confirm that although the defendant claims to be based in the

18  United States, it has extensive ties to eastern Europe, principally the Ukraine. The text on 3FN's

19  website contains awkward phrasing and frequent grammatical errors, which strongly suggests

20  that it was drafted by a non-native English speaker. Drexler Decl., Ex. 7, ¶ 8. Of the employees

21  the FTC has been able to track to a location, all are located in the Ukraine or Estonia. Drexler

22  Decl., Ex. 7, ¶¶ 22 and 26. Moreover, two telephone phone numbers listed on 3FN's website are

23

24     ————————————

25  7, ¶ 15 and Attachment A to Drexler Dec. (listing IP ranges)) shows that Mr. Turner's analysis
was performed on IP ranges controlled by the Defendant.

26      [6]Phishing is the use of email, Internet web sites, or other means, to mimic or copy the

27  appearance of a trustworthy entity for the purpose of duping consumers into disclosing personal
information, such as account numbers and passwords.

28

1  answered by individuals with Russian accents, and 3FN advertises in Russian-language forums

2  with ads in Russian. Drexler Decl., Ex. 7, ¶¶ 21-22, 30.

3        3.     Pricewert's Marketing Efforts

4        Drexler located a number of 3FN banner advertisements on the website *crutop.nu*, a

5  Russian language site that includes forums for webmasters, including forums devoted to "Casino

6  Money," "Spam" and "Pharmacy." Drexler Decl., Ex. 7, ¶ 30. 3FN's ads appeared along side

7  those of other advertisers of dubious legality, including "IncestMoney.com." Drexler Decl., Ex.

8  7, ¶ 30.

9        4.     Consumer Complaints Regarding 3FN

10       Drexler found a number of consumer complaints about 3FN posted in various online

11  forums and websites. Drexler Decl., Ex. 7, ¶ 31. Among other complaints, consumers accused

12  3FN of hosting spam, bots, child pornography, and rogue anti-virus products. *Id.* Moreover,

13  Drexler located a number of complaints about users being redirected to sites on 3FN's servers

14  without their consent, including a report that Oxford University's Department of Education

15  website was hacked to redirect users to graphic images of child pornography hosted by 3FN.

16  Drexler Decl., Ex. 7, ¶ 32.

17        5.     Malicious Activity Originating from 3FN's Servers

18       In order to experience first hand the type of malicious activity hosted at 3FN, Drexler

19  visited a series of 3FN-hosted websites that purportedly contained malicious code according to

20  published reports. Drexler Decl., Ex. 7, ¶ 33. In eight different cases, Drexler's computer was

21  attacked by malicious code hosted by 3FN. *Id.* These attacks ranged from programs designed to

22  hijack users to malicious web sites, to a trojan designated as "InfoStealer.Banker.C" – a program

23  created to steal usernames and passwords for online bank accounts and other websites. Drexler

24  Decl., Ex. 7, ¶¶ 33-34.

25

26

27

28

Memorandum in Support of FTC
TRO/Restraining Order Motion        Page 18 of 29

## IV.    ARGUMENT

### A.    The FTC Act Authorizes the Requested Relief

"Section 13(b) [of the FTC Act] gives the Commission the authority to seek, and gives the district court the authority to grant, permanent injunctions," and "[i]t is clear that, because the district court has the power to issue a permanent injunction to enjoin acts of practices that violate the law enforced by the Commission, it also has authority to grant whatever preliminary injunctions are justified by the usual equitable standards." *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1111-13 (9th Cir. 1982). This "unqualified grant of statutory authority . . . carries with it the full range of equitable remedies . . . ." *Id. Accord FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431 (11th Cir. 1984) (per curiam); *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 654, 571-72 (7th Cir. 1989). The power of the Court pursuant to Section 13(b) is not limited to injunctive relief; rather, it includes the authority to grant any ancillary relief necessary to accomplish complete justice and preserve assets for rescission and restitution. *Singer*, 668 F.2d at 1112-14. This ancillary relief can include appointment of a receiver, asset freezes, and expedited discovery. *Id. Accord FTC v. American National Cellular, Inc.*, 810 F.2d 1511, 1514 (9th Cir. 1987).

In determining whether to grant a preliminary injunction under Section 13(b), a court "is required to (i) weigh the equities; and (ii) to consider the FTC's likelihood of ultimate success before entering a permanent injunction." *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 346 (9th Cir. 1989). Unlike private litigants, the Commission need not prove irreparable injury in order to obtain injunctive relief, because "harm to the public interest is presumed." *Id.*[7] Other courts in this district and in other districts within the Ninth Circuit have granted similar preliminary relief to the FTC.[8]

---

[7]No security is required for issuance of a temporary restraining order or preliminary injunction in this case because the FTC is an agency of the United States. *See* Fed. R. Civ. P. 65(c).

[8]*See, e.g., FTC v. Dugger*, Civ. No. CV-06-0078-PHX-ROS (D. Ariz., Jan. 10, 2006) (granting *ex parte* TRO requiring hosts to disconnect defendants' computer equipment from Internet, imposing an asset freeze, requiring records preservation, granting immediate access to

Memorandum in Support of FTC
TRO/Restraining Order Motion            Page 19 of 29

1       In its two-count complaint, the FTC has alleged that Pricewert has engaged and continues

2 to engage in unfair acts or practices that violate Section 5 of the FTC Act. *See* "Complaint for

3 Permanent Injunction, and Other Equitable Relief," filed concurrently. As set forth below, in

4 this memorandum and its two attached volume of exhibits, the Commission presents ample

5 evidence that it will ultimately succeed on the merits of its Section 5 claims and that the balance

6 of equities favors the requested injunctive relief.

7      **B.**     **The Commission Has Established a Likelihood of Succeeding on the Merits of its Section 5 Claims that Pricewert Has Engaged in Unfair Acts or**
8              **Practices**

9       Counts One and Two of the FTC's complaint allege that Pricewert has engaged in unfair

10 acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a). An act or practice

11 is unfair under Section 5 if: (1) it causes or is likely to cause substantial injury to consumers;

12 (2) the harm to consumers is not outweighed by any countervailing benefits; and (3) the harm is

13 not reasonably avoidable by consumers. 15 U.S.C. § 45(n).[9] *See, e.g., FTC v. Neovi,* Inc., 598 F.

14 Supp. 2d 1104 (S.D. Cal. 2008) (defendant's creation and delivery of checks without a

15 reasonable level of verification that the customers had authority to draw checks on the specified

16

17

18 business premises, and requiring foreign asset repatriation) (copies of the complaint, TRO

19 memo, and TRO are included as Exhibits 8,9, and 10, respectively, in the Commission's

20 accompanying two volumes of exhibits in support of the instant TRO motion); *See also FTC v. ERG Ventures, LLC,* CV-06-00578 LRH-VCP (D. Nev. 2006) (granting *ex parte* TRO, asset

21 freeze, financial accounting, preservation of and expedited access to business records); *FTC v. National Vending Consultants, Inc.,* CV-S-05-0160-RCJ-PAL (D. Nev. 2005) (granting *ex parte*

22 TRO, immediate access, asset freeze, and receiver); *FTC v. Enternet Media,* CV-05-7777 CAS-

23 AJWx (C.D. Cal. 2005)(granting *ex parte* TRO, immediate access, asset freeze, and financial accounting; *see also FTC v. Sage Seminars, Inc.,* 1995 U.S. Dist. LEXIS 21043 (N.D. Cal.

24 1995) (granting preliminary injunction and asset freeze); *FTC v. Silueta Distributors, Inc.,* 1994

25 U.S. Dist. LEXIS 10095, *1 (N.D. Cal. 1994) (granting preliminary injunction).

26      [9]*See also* Letter from the FTC to Hon. Wendell Ford and Hon. John Danforth, Committee on Commerce, Science, and Transportation, United States Senate, Commission Statement of

27 Policy on the Scope of Consumer Unfairness Jurisdiction, appended to *International Harvester Co.,* 104 F.T.C. 949, 1064 (1984) ("Unfairness Statement").

28

Memorandum in Support of FTC
TRO/Restraining Order Motion      Page 20 of 29

1   bank accounts held unfair), *reh'g denied*, 2009 U.S. Dist. LEXIS 649 (2009), *appeal docketed*,

2   No. 09-55093 (9th Cir. Jan. 16, 2009).[10]

3          In satisfying the "substantial injury" prong of the unfairness test, it is well-settled in the

4   Ninth Circuit that "consumer injury is substantial when it is the aggregate of many small

5   individual injuries." *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994). *Accord FTC*

6   *v. J.K. Pubs. Inc.*, 99 F. Supp. 2d 1176, 1201 (C.D. Cal. 2000) (holding that "[i]njury may be

7   sufficiently substantial if it causes a small harm to a large class of people. *See also FTC v.*

8   *Crescent Publ'g Group, Inc.*, 129 F. Supp. 2d 311, 322 (S.D.N.Y. 1991) (finding that "injury to

9   consumers was substantial in the aggregate"). In addition, the "substantial injury prong can be

10  satisfied if the FTC establishes that consumers were injured by a practice for which they did not

11  bargain." *J.K. Pubs.*, 99 F. Supp. 2d at 1201. The injury suffered by consumers need not be

12  monetary in nature. *See, e.g., Accusearch*, 2007 U.S. Dist. LEXIS 74905 at *22-23 (resources

13  expended changing phone carriers and upgrading account security held cognizable injury.)

14         Here, the FTC's Complaint alleges that Pricewert has violated Section 5 of the FTC Act

15  by: (1) unfairly recruiting and willingly hosting electronic code or content that inflicts harm

16  upon consumers, including but not limited to, child pornography, botnet command and control

17  servers, spyware, viruses, trojans, and phishing-related sites; and (2) colluding with bot herders

18  to configure, deploy, or operate botnets comprised of thousands of compromised computers. As

19

20

21         [10]*See also FTC v. Accusearch, Inc.*, 2007 U.S. Dist. LEXIS 74905 (D. Wyo. 2007)

22  (obtaining and selling of confidential customer phone records without the affected customers'
    authorization held unfair), *appeal docketed*, No. 08-8003 (10th Cir. Jan. 9, 2008); *FTC v.*

23  *Seismic Entm't Prods.*, 2004 U.S. Dist. LEXIS 22788 (D. N.H. 2004) (installation of software on
    computers through web browser exploits without consumers' knowledge held unfair); *FTC v.*

24  *Windward Marketing Ltd.*, 1997 U.S. Dist. LEXIS 17114 (N.D. Ga. 1997) (unauthorized bank
    drafts on consumers' accounts held unfair; company facilitated and provided substantial

25  assistance to co-defendants' deceptive scheme by depositing unauthorized bank drafts on
    consumers' accounts into bank accounts opened in the names of fictitious magazines; company

26  knew drafts were not authorized or was on notice of high probability of fraud and consciously

27  avoided learning the truth).

28
    Memorandum in Support of FTC
    TRO/Restraining Order Motion          Page 21 of 29

1    established below, this conduct satisfies all of the elements required in order to establish

2    unfairness under Section 5 of the FTC Act.

3        1.    Defendant's Conduct Causes or is Likely to Cause Substantial Injury to
              Consumers

4        As detailed in the factual recitation above, Pricewert causes massive harm to consumers

5    through the content it recruits and distributes.  These harms run the gamut from direct consumer

6    injury – including Pricewert's active participation in botnets that enslave consumers' computers

7    and put them to work for criminal ends, and its distribution of malicious software – to those

8    injuries less easy to quantify, but undoubtedly significant, such as Pricewert's hosting of child

9    pornography, pirated software and music, and participation in click fraud.

10        While the injury suffered by a given consumer as a result of Pricewert's conduct may

11   vary, the aggregate injury resulting from Pricewert's conduct is undoubtedly large.  For example,

12   in the two ICQ chats discussed above, Pricewert agrees to manage and configure massive bot

13   networks of hundreds of thousands of enslaved computers.  The aggregate injury to the hundreds

14   of thousands of consumers whose computers have been illegally conscripted into these botnets –

15   not to mention the public at large which will be targeted by these botnets – is immense.[11]  *Cf.*

16   *FTC v. Dugger*, Civ. No. CV-06-0078-PHX-ROS (D. Ariz., Jan. 10, 2006) (granting FTC *ex*

17   *parte* TRO against individual charged with, *inter alia*, using networks of compromised

18   computers to distribute spam).  *See also* Unfairness Statement, appended to *International*

19

20   _____

21       [11]It is important to note that the Commission seeks to hold Pricewert liable for its *own*
     unfair acts and practices, not those of third parties who use its services.  Many Internet service

22   providers may, unknowingly, host unlawful content or provide services to third-parties who
     cause consumers harm.  Those ISPs do not significantly facilitate, provide substantial assistance

23   to, or materially contribute to the harmful activity.  Pricewert, by contrast, does.  Courts have
     held other types of businesses liable under Section 5 when those businesses' own conduct, that

24   significantly facilitated, assisted, or contributed to third party fraudulent activity, met the

25   standard for unfairness under 15 U.S.C. § 45(n).  *See, e.g., Neovi*, 598 F. Supp. 2d at *18-24
     (rejecting defendants' claim that they "merely offered a 'morally neutral' software program" and

26   that third-party fraudsters manipulated their services to cause consumer harm; discussing similar
     holdings in *Accusearch* and *Windward Marketing* cases), *reh'g denied*, 2009 U.S. Dist. LEXIS

27   649, *10-12 (same).

28
     Memorandum in Support of FTC
     TRO/Restraining Order Motion            Page 22 of 29

1    *Harvester Co.*, 104 F.T.C. 949, 1064 at 4-5 (recognizing that conduct that violates the law is

2    often harmful to consumers and therefore also unfair under the FTC Act.)

3          2.      The Harm Pricewert Inflicts Upon Consumers Is Not Outweighed by any
                 Countervailing Benefits

4          The second prong of the unfairness test need not detain the Court long.  There is simply

5    no countervailing benefit to either consumers or competition that results from Pricewert's

6    actions.  Indeed, the only ones to benefit from Pricewert's activities are the Defendant itself –

7    who is paid by the criminals it caters to and collaborates with – and its criminal clientele, who

8    profit by harming consumers through stealing their account credentials, compromising their

9    computers, and blasting them with huge volumes of spam.  *See J.K. Pubs*, 99 F. Supp. 2d at

10    1201; *FTC v. Windward Marketing, Ltd.*, 1997 U.S. Dist. LEXIS 17114, at *32 (N.D. Ga., Sept.

11    30 1997)(countervailing benefits prong of the unfairness test is easily satisfied when a practice

12    disadvantages consumers without an offsetting benefit to consumers or competition.).

13          3.      The Harm Inflicted Upon Consumers Is Not Reasonably Avoidable

14          The third prong of the unfairness test requires the Court to consider if the harm caused by

15    the Defendant is reasonably avoidable by consumers.  If consumers do not have a "free and

16    informed choice that would have enabled them to avoid the unfair practice, the injury was not

17    reasonably avoidable." *J.K. Pubs*, 99 F. Supp. 2d at 1201 (*quoting FTC v. Windward Mktg.,*

18    *Ltd.*, 1997 U.S. Dist. LEXIS 17114, at *32 (N.D. Ga. Sept. 30, 1997) *and citing Orkin*

19    *Exterminating Co., Inc. v. FTC*, 849 F.2d 1354, 1365 (11th Cir. 1988)).

20          In this case, consumers not only lack a "free and informed choice" to avoid Pricewert's

21    unfair practices, they have no choice at all.  In some cases, consumers are tricked into visiting

22    websites that distribute malicious code hosted by 3FN.  Warner Decl., Ex. 2, ¶ 3 .  In other cases,

23    consumers are redirected without their consent from legitimate websites to the harmful content

24    hosted by 3FN.  Drexler Decl., Ex. 7, ¶ 32 .  In still other cases, consumers' computers are

25    conscripted into a 3FN-controlled botnet, which occurs without their knowledge or consent.

26    Zadig Decl., Ex. 1, ¶¶ 7, 21; Drexler Decl., Ex. 7, Att. F at 361.  And, consumers that are duped

27

28

Memorandum in Support of FTC
TRO/Restraining Order Motion       Page 23 of 29

1   into providing their account information to phishing websites that masquerade as the website of

2   their financial institution do not make a free and informed choice when divulging their personal

3   information. Turner Decl., Ex. 6, ¶¶ 31-32. Moreover, the harm that Pricewert inflicts upon

4   society generally – by, for example, hosting child pornography – cannot be reasonably avoided.

5   No consumer, if given a free choice, would willingly submit to any of these harms.

6   Accordingly, the wide swath of injury caused by Pricewert's unfair conduct is not reasonably

7   avoidable.

8           4.     Pricewert's Unfair Conduct Is Not Protected By Section 230 of the
                      Communications Decency Act

9

10          Section 230 of the Communications Decency Act provides, in relevant part, that "no

11   provider or user of an interactive computer service shall be treated as the publisher or speaker of

12   any information provided by another information content provider." 47 U.S.C. § 230 (2006).

13   This language has been interpreted by courts to protect a number of legitimate ISPs from a range

    of lawsuits seeking to impose liability for the actions of their customers.

14

15          However, the protections provided by Section 230 are not limitless, as the Ninth Circuit

16   has made clear. In *Fair Housing Council of San Fernando Valley v. Roomates.com LLC*, 521

17   F.3d 1157 (9th Cir. 2008) (en banc), the Ninth Circuit held that participation by a defendant in

18   the harmful conduct alleged in the complaint vitiates any immunity that Section 230 may

19   otherwise provide. *See Roomates.com*, 521 F.3d at 1167-68. This ruling puts to rest any Section

20   230 defense that Pricewert could otherwise assert. The evidence clearly demonstrates that

21   Pricewert has recruited and actively participated in the harmful code and content it hosts,

22   including its direct role in the operation illegal botnets. As a result, Pricewert cannot hide

    behind the shield of Section 230.

23

24   **C.**   **The Balance of Equities Tips Decidedly In the Commission's Favor and
           Supports Awarding the Requested Injunctive Relief**

25          The balance of the equities tips decidedly in the Commission's favor. Where, as here,

26   public and private equities are at issue, public equities far outweigh private equities. *FTC v.*

27   *World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989). Pricewert's past misconduct

28

Memorandum in Support of FTC's
TRO/Show Cause Motion         Page 24 of 29

1    "gives rise to the inference that there is a reasonable likelihood of future violations." *SEC v. R.J.*

2    *Allen & Assoc., Inc.*, 386 F. Supp. 866, 877 (S.D. Fla. 1974) (citations omitted).  Moreover,

3    Pricewert "can have no vested interest in a business activity found to be illegal." *United States*

4    *v. Diapulse Corp. of Am.*, 457 F.2d 25, 29 (2d Cir. 1972) (internal quotations and citations

5    omitted).  This is especially true when a defendant's alleged unlawful activities are not "isolated

6    or sporadic," but constitute a "clear pattern of practices which [are] central to [its] business."

7    *FTC v. Silueta Distributors, Inc.*, 1994 U.S. Dist. LEXIS 10095, *1 (N.D. Cal. 1994).[12]

8        Here, without the entry of the requested preliminary injunctive relief set forth in the

9    FTC's proposed TRO filed concurrently, Pricewert will continue to engage in its unfair practices

10   and injure the public during the pendency of the litigation.  Pricewert has been in business for

11   several years, and has ignored calls from the Internet security community and affected

12   consumers to halt its harmful practices.  Linford Decl., Ex. 4, ¶¶ 13-20.  In addition, as

13   described above, in Sections II.B and III.G, Pricewert has engaged in substantial efforts to hide

14   from law enforcement.

15       In summary, Pricewert's rampant use of unfair practices, particularly in the face of

16   complaints, as well as its efforts to mask its identity, create the inference that Pricewert will

17   continue to engage in its wrongful activities unless a temporary restraining order is issued

18   against it.  Pricewert's unfair practices should be halted immediately to prevent substantial

19   further injury to the public.

20

21

22

23

24       [12]*See also id.* at *2 ("Although a preliminary injunction may disrupt defendants' business
  activities, this court is under no obligation to recognize this equity in the continued operation of

25   the business because the business is permeated with deception designed to harm the public.");
  *FTC v. Sage Seminars, Inc.*, 1995 U.S. Dist. LEXIS 21043, *22-23 (N.D. Cal. 1995) (potential

26   hardship to defendants' business "insignificant" in light of evidence that business was "rooted in
  violations of the law"; court of equity under no duty to protect illegitimate profits or advance

27   business which is conducted illegally) (internal quotations and citations omitted).

28

  Memorandum in Support of FTC's
  TRO/Show Cause Motion       Page 25 of 29

## V. AN *EX PARTE* TEMPORARY RESTRAINING ORDER DISCONNECTING DEFENDANT'S SERVERS FROM THE INTERNET, FREEZING ASSETS AND ORDERING THE TURNOVER OF DOCUMENTS, AN ACCOUNTING, AND THE PRESERVATION OF RECORDS SHOULD BE GRANTED

In light of the scope of its criminal activity, its efforts to hide from law enforcement, and its extensive connections to individuals overseas, Defendant is likely to dissipate assets and destroy records if given notice of the relief sought in this suit. The FTC Act authorizes a district court to use its inherent equitable authority to "grant any ancillary relief necessary to accomplish complete justice." *U.S. Oil & Gas*, 748 F.2d 1431, 1434 (11th Cir. 1984). The Commission asks that the Court employ that authority here to issue an *ex parte* TRO that requires Defendant's third party data centers and upstream Internet providers to disconnect Defendant's servers from the Internet, freezes the Defendant's assets, requires Defendant to turn over business records to the FTC, orders the Defendant to provide the Commission with a financial accounting, and orders Defendant's assets repatriated to the United States. Courts in this district and throughout the Ninth Circuit have repeatedly issued TROs *ex parte* that contain similar relief. <u>See</u> cases cited in footnote 8, *supra*.

An *ex parte* TRO is warranted when the facts show that irreparable injury, loss, or damage will result before the defendants can be heard in opposition. *See In re Vuitton et Fils*, 606 F.2d 1, 4-5 (2d Cir. 1979); Fed. R. Civ. P. 65(b). Here, the Commission seeks to halt outright criminal activity by the Defendant that is causing massive consumer harm, and to disgorge Defendant's ill-gotten gains for possible consumer redress. The TRO requested by the Commission would immediately put a stop to Defendant's unlawful conduct by ordering its third-party data centers and upstream Internet providers to disconnect its servers from the Internet.[13] The TRO would also impose an asset freeze and require asset repatriation in order to prevent the Defendant from dissipating the proceeds of its unlawful activities before this Court

---

[13] The U.S. District Court for the District of Arizona granted similar relief in *FTC v. Dugger*. *See* Ex. 10, at 10-11 (granting *ex parte* TRO that, *inter alia*, required hosts of defendants' computer equipment to disconnect it from the Internet, deny defendants and others access to the equipment, and prevent removal of the equipment).

1  has the opportunity to rule on the merits of this case. Given the scope of the Defendant's illegal

2  and harmful conduct, its efforts to hide for law enforcement, and its extensive ties to individuals

3  in eastern Europe, it is likely that advance notice of this suit would cause the Defendant to

4  secrete assets and destroy evidence of their unlawful acts.

5  The FTC's concerns about the destruction of evidence and dissipation of assets absent *ex*

6  *parte* relief are informed by the Agency's experience with others engaged in similar unlawful

7  schemes. As described in depth in the attached Fed. R. Civ. P. 65(b) declaration, *ex parte* relief

8  has proven essential in preserving assets and preventing the destruction of evidence in similar

9  cases. <u>See</u> Certification and Declaration Plaintiff's Counsel of Ethan Arenson in Support of

10  Plaintiff's ex Parte Motions For: (1) Temporary Restraining Order and Order to Show Cause; (2)

11  Order Temporarily Sealing Entire File; and (3) Leave to Exceed Page Limit, filed herewith.

12  The asset freeze and asset repatriation requested by the FTC are well within this Court's

13  authority. These provisions are necessary here to preserve the status quo and to preserve the

14  possibility of effective final relief in the form of disgorgement of profits and other consumer

15  redress. A district court's authority to enter orders preserving defendants' assets is ancillary to its

16  equitable authority to order consumer redress. *World Wide Factors*, 882 F.2d at 347; *H.N.*

17  *Singer*, 668 F.2d at 1113; *FTC v. Gem Merchandising Corp.*, 87 F.3d 466, 469 (11th Cir. 1996).

18  Moreover, a court may impose an asset freeze based on the mere possibility of dissipation of

19  assets. *See FSLIC v. Sahni*, 868 F.2d 1096, 1097 (9th Cir. 1989). That possibility certainly

20  is present where, as here, the defendant is engaged in pervasive criminal activity. *See, e.g., J.K.*

21  *Pubs*, 99 F. Supp. 2d at 1176; *H.N. Singer*, 668 F.2d at 1113; *U.S. Oil & Gas*, 748 F.2d 1431.

22  The fact that Defendant's assets may be located overseas is not a bar to the relief sought by the

23  FTC. *See U.S. v. First Nat'l City Bank*, 379 U.S. 378, 384 (1965) ("Once personal jurisdiction

24  of a party is obtained, the District Court has authority to order it to 'freeze' property under its

25  control, whether the property be within or without the United States."); *SEC v. International*

26  *Swiss Inv. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990) (upholding district court's injunction

27  freezing and ordering an accounting of foreign assets); *FTC v. Affordable Media, LLC*, 179 F.3d

28

Memorandum in Support of FTC's
TRO/Show Cause Motion                    Page 27 of 29

1228, 1232, 1238-44 (9th Cir. 1999) (affirming finding of civil contempt for defendants' failure

to repatriate assets held for their benefit outside the United States in accordance with TRO and

preliminary injunction).

Additionally, in order to assist the Commission in locating and securing assets, and to

preserve the possibility of consumer redress for victimized consumers and/or the possibility of

disgorgement, the FTC requests that the Court order the Defendant to make a full financial

accounting.[14] Attached to the proposed Order are copies of proposed financial statements to be

completed by the Defendant.[15] Courts have upheld the use of these devices, recognizing that

they assist the district court's purpose of monitoring compliance with an asset freeze order and in

turn ensure effective final relief. *See Kemp v. Peterson*, 940 F.2d 110, 113 (4th Cir. 1991)

(affirming district court's order requiring monthly accounting and financial disclosure

statements); *HUD v. Cost Control Mktg. & Sales Mgmt. of Va.*, 64 F.3d 920, 927 (4th Cir. 1995);

*Nat'l Org. for Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 544 (9th Cir. 1987)

(approving the appointment of a Special Master to monitor compliance with a preliminary

injunction).[16]

## VI.    CONCLUSION

Defendant recruits, knowingly hosts, and actively participates in the distribution of,

illegal, malicious, and harmful electronic content, including child pornography, malicious

---

[14]The TRO also includes a provision that restrains Defendant from taking any action that may result in the encumbrance or dissipation of foreign assets, including taking any action that would invoke a duress clause. This provision is important since Defendant may have created asset protection trusts that could frustrate the Court's ability to provide consumer redress. *See FTC v. Affordable Media*, 179 F.3d 1228, 1239-44 (9th Cir. 1999).

[15]The TRO also includes a Consent to Release Financial Records form, which allows the FTC to access records of accounts or assets held by foreign financial institutions. *See Doe v. United States*, 487 U.S. 201, 215 (1988).

[16]The provision in the proposed TRO requiring Defendant's third-party data centers and upstream providers to disconnect its servers from the Internet is also well within this Court's authority pursuant to Fed. R. Civ. Pro. 65(d)(2).

Memorandum in Support of FTC's
TRO/Show Cause Motion                    Page 28 of 29

1   software, and the servers used to control botnets.  These practices are unfair and cause

2   substantial, unavoidable injuries to massive numbers of consumers throughout the United States

3   who use their computers to access the Internet.  In order to put an end to these unlawful

4   practices, the Commission respectfully requests that this Court grant the Commission's motion

5   for an *ex parte* TRO and ancillary equitable relief.

6

7   Dated: June 1, 2009

8                                                   Respectfully submitted:

9                                                   DAVID SHONKA
                                                    Acting General Counsel
10

11                                                  Ethan Arenson, DC # 473296
                                                    Carl Settlemyer, DC # 454272
12                                                  Philip Tumminio, DC # 985624
                                                    Federal Trade Commission
13                                                  600 Pennsylvania Avenue, N.W.
                                                    Washington, DC 20580
14                                                  (202) 326-2204 (Arenson)
                                                    (202) 326-2019 (Settlemyer)
15                                                  (202) 326-2004 (Tumminio)
                                                    (202) 326-3395 *facsimile*
16                                                  earenson@ftc.gov
                                                    csettlemyer@ftc.gov
17                                                  ptumminio@ftc.gov

18                                                  Attorneys for Plaintiff

19

20

21

22

23

24

25

26

27

28
     Memorandum in Support of FTC's                 Page 29 of 29
     TRO/Show Cause Motion