Exhibit 86

1              IN THE UNITED STATES DISTRICT COURT

2                 SOUTHERN DISTRICT OF FLORIDA

3      _____
                                               )
4      ALEKSEJ GUBAREV, XBT HOLDING S.A.,   )
       and WEBZILLA, INC.,                   )
5                                            )
                        Plaintiffs,          )
6      vs.                                   ) Case No.:
                                             ) 17-CV-60426-UU
7      BUZZFEED, INC., and BEN SMITH,        )
                                             )
8                       Defendants.          )
       _____)

9

10

11                    ** CONFIDENTIAL **

12          ** PURSUANT TO A PROTECTIVE ORDER **

13

14

15                  VIDEOTAPED DEPOSITION OF

16                     ALEKSEJ GUBAREV

17                    LIMASSOL, CYPRUS

18                 WEDNESDAY, MAY 16, 2018

19                       9:46 A.M.

20

21

22

23

24

25     REPORTED BY:  BRENDA MATZOV, CA CSR 9243

```
 1              Videotaped deposition of ALEKSEJ GUBAREV,

 2    taken in the above-entitled cause pending in the

 3    United States District Court, Southern District of

 4    Florida, pursuant to notice, before BRENDA MATZOV,

 5    CA CSR 9243, at Elias Neocleous & Co., Neocleous

 6    House, 195 Makarious III Avenue, Floor -1, Limassol,

 7    Cyprus, on Wednesday, the 16th day of May, 2018,

 8    at 9:46 a.m.

 9

10

11    APPEARANCES:

12    FOR PLAINTIFFS:

13              BOSTON LAW GROUP, PC
                By:  VAL GURVITS, ESQ.
14              825 Beacon Street
                Suite 20
15              Newton Centre, Massachusetts 02459
                (617) 928-1800 / Fax (617) 928-1802
16              vgurvits@bostonlawgroup.com

17

18    FOR DEFENDANT BUZZFEED, INC.:

19              DAVIS WRIGHT TREMAINE, LLP
                By:  NATHAN SIEGEL, ESQ.
20                   ALISON SCHARY, ESQ.
                1919 Pennsylvania Avenue NW
21              Suite 800
                Washington, DC 20006-3401
22              (202) 973-4200 / Fax (202) 973-4499
                nathansiegel@dwt.com
23              alisonschary@dwt.com

24

25
```

```
1    APPEARANCES (Continued):

2    FOR DEFENDANT BUZZFEED, INC.:

3              DAVIS WRIGHT TREMAINE, LLP
               By:  KATHERINE M. BOLGER, ESQ.
4              1251 Avenue of the Americas
               21st Floor
5              New York, New York 10020-1104
               (212) 489-8230 / Fax (212) 489-8340
6              katebolger@dwt.com

7

8    ALSO PRESENT:

9              ALON MATZOV, Videographer

10             BEN-ZION DIMERSKY, Russian Interpreter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2   WITNESS

 3   Aleksej Gubarev

 4

 5   EXAMINATION                              PAGE

 6   By Mr. Siegel                              8

 7

 8

 9                  E X H I B I T S

10   NUMBER          DESCRIPTION              MARKED

11   Exhibit 1       E-mail from Leonid Bershidsky
                     to "alex@servers.com," Dated
12                   November 1, 2016, Subject:
                     "[BULK] Re:  [BULK] Re:  [BULK]
13                   Re:  (Russian)" and Related
                     E-mail Chain
14                   (Bates P-H000093 to P-H000101)    8

15   Exhibit 2       English Translation of Exhibit 1
                     (Bates P-H000093 to P-H0000103)   8
16
     Exhibit 3       E-mail from Leonid Bershidsky
17                   to "alex@servers.com," Dated
                     November 1, 2016, Subject:
18                   "Re:  (Russian)" and Related
                     E-mail Chain
19                   (Bates P-H000076 to P-H000078)    8

20   Exhibit 4       English Translation of Exhibit 5
                     (Bates P-H0000103 to P-H0000104)  38
21
     Exhibit 5       E-mail from Leonid Bershidsky
22                   to "alex@servers.com," Dated
                     November 1, 2016, Subject:
23                   "[BULK] Re:  [BULK] Re:  [BULK]
                     Re:  [BULK] Re:  (Russian)" and
24                   Related E-mail Chain
                     (Bates P-H000103 to P-H000104)    38
25
```

```
 1              E X H I B I T S

 2    NUMBER          DESCRIPTION              MARKED

 3    Exhibit 6       Website Article Entitled "Was
                      a Trump Server Communicating
 4                    with Russia?" Dated October 31,
                      2016
 5                    (No Bates Number)              18

 6    Exhibit 7       Russian E-mail from Alexey
                      Gubarev to "kevit@webzilla.com,"
 7                    Dated November 1, 2016,
                      Subject:  "Jabber"
 8                    (Bates P-H000124)              20

 9    Exhibit 8       E-mail from "kevit@webzilla.com"
                      to Alexey Gubarev, Dated
10                    November 1, 2016, Subject:
                      "Re:  Jabber" and Related
11                    E-mail Chain
                      (Bates P-H000122 to P-H000123)    20
12
      Exhibit 9       Website Article from
13                    "www.bloomberg.com" Entitled
                      "Clinton Plugs Another Weak
14                    Story About Trump's Ties to
                      Putin," Dated November 1, 2016
15                    (Bates P-F000009 to P-F000012)    47

16    Exhibit 10      E-mail from Alexey Gubarev to
                      Charles Dolan, Dated November 3,
17                    2016, Subject:  "Alfa Bank and
                      Trump" and Related E-mail Chain
18                    (Bates P-P001509 to P-P001510)    47

19    Exhibit 11      E-mail from Alexey Gubarev to
                      Charles Dolan, Dated November 4,
20                    2016, Subject:  "Re:  WSJ" and
                      Related E-mail Chain
21                    (Bates P-P001511 to P-P001512)    47

22    Exhibit 12      English and Russian Text
                      Messages, Various Dates
23                    (Bates P-I000237 to P-I000260)    54

24

25
```

```
            1        LIMASSOL, CYPRUS; WEDNESDAY, MAY 16, 2018

            2                    9:46 A.M.

            3

09:46:11    4            THE VIDEOGRAPHER:  This is the beginning

09:46:12    5    of DVD No. 1 in the videotape deposition of Aleksej

09:46:19    6    Gubarev, being taken on May 16th, 2018, at 9:46

09:46:28    7    a.m., at Elias Neocleous & Co., Limassol, Cyprus,

09:46:34    8    in the matter of Aleksej Gubarev, et al. versus

09:46:39    9    Buzzfeed, Inc., et al., being heard before the

09:46:44   10    United States District Court, Southern District

09:46:46   11    of Florida, case number 17-CV-60426-UU.

09:46:58   12            I am Alon Matzov.  And the court

09:47:00   13    reporter is Brenda Matzov.

09:47:04   14            Would counsel please state their

09:47:06   15    appearances.

09:47:08   16            MR. SIEGEL:  Nathan Siegel, for the

09:47:10   17    defendants.

09:47:14   18            MS. SCHARY:  Alison Schary, for the

09:47:15   19    defendants.

09:47:16   20            MS. BOLGER:  And Kate Bolger, for the

09:47:18   21    defendants.

09:47:18   22            MR. GURVITS:  Val Gurvits, for the

09:47:22   23    plaintiffs.

09:47:23   24            THE VIDEOGRAPHER:  Would the court

09:47:24   25    reporter please swear in or affirm the interpreter
```

```
09:47:26   1    and the witness.

09:47:47   2

09:47:47   3                  BEN-ZION DIMERSKY,

09:29:21   4        the interpreter, was duly affirmed to translate

09:29:21   5        from English to Russian and from Russian to

09:29:21   6        English.

09:29:21   7

09:29:21   8                  ALEKSEJ GUBAREV,

09:29:21   9        called as a witness, being first duly sworn,

09:29:21   10       was examined and testified as hereinafter

09:29:21   11       set forth.

09:29:21   12

09:29:21   13           (The following proceedings were conducted

09:29:21   14       only in English, unless otherwise indicated.)

09:29:21   15

09:47:47   16             MR. SIEGEL:  Okay.  And just for the

09:47:49   17    record, Val, I just want to put on the record

09:47:50   18    that we stipulated that it's fine for the court

09:47:54   19    reporter to swear the witness in?

09:47:56   20             MR. GURVITS:  Yes.

09:47:56   21             MR. SIEGEL:  Okay.

09:47:56   22             MR. GURVITS:  It's so stipulated.

09:47:57   23             MS. BOLGER:  And can we make that

09:47:58   24    stipulation for all the depositions?

09:48:01   25             MR. GURVITS:  Yes.  It's an ongoing
```

| | | |
|---|---|---|
| 09:48:03 | 1 | stipulation. |
| 09:48:03 | 2 | MR. SIEGEL:  Great. |
| 09:48:03 | 3 | |
| 09:48:03 | 4 | EXAMINATION |
| 09:48:04 | 5 | BY MR. SIEGEL: |
| 09:48:04 | 6 | Q.   Good morning. |
| 09:48:04 | 7 | A.   Morning.  Nice to see you again. |
| 09:48:09 | 8 | Q.   Likewise.  So we're just going to go |
| 09:48:12 | 9 | through a few additional e-mails this morning. |
| 09:48:15 | 10 | And just to try to make everything clear, some |
| 09:48:19 | 11 | of the e-mails, as you know, go back and forth |
| 09:48:22 | 12 | between Russian and English.  We had a translator |
| 09:48:26 | 13 | do the translations in the United States.  And |
| 09:48:31 | 14 | we also have an interpreter here today. |
| 09:48:33 | 15 | I think that there are a few places |
| 09:48:35 | 16 | where the translations that we had in the United |
| 09:48:37 | 17 | States probably don't really make a lot of sense. |
| 09:48:40 | 18 | So we'll ask the interpreter.  And assuming that -- |
| 09:48:42 | 19 | if you agree with what the interpreter says, we'll |
| 09:48:45 | 20 | do it -- we'll go through that, just to clarify |
| 09:48:48 | 21 | that we all agree that the Russian -- |
| 09:48:49 | 22 | A.   Okay. |
| 09:48:49 | 23 | Q.   -- says what it says in English.  Okay? |
| 09:48:52 | 24 | (Exhibit 1, Exhibit 2, and Exhibit 3 |
| 09:48:52 | 25 | marked.) |

| | | |
|---|---|---|
| 09:48:52 | 1 | Q.   BY MR. SIEGEL:  So if you could take |
| 09:48:54 | 2 | a look at Exhibit 1 and turn to page 99 -- P-H |
| 09:49:02 | 3 | 99, which is the back of this e-mail chain.  And |
| 09:49:17 | 4 | turn to page -- turn to Exhibit 2, which is the |
| 09:49:21 | 5 | translation. |
| 09:49:22 | 6 | You have Exhibit 2? |
| 09:49:25 | 7 | A.   Aah, this here.  Sorry. |
| 09:49:27 | 8 | Q.   Yes. |
| 09:49:27 | 9 | A.   Yes. |
| 09:49:27 | 10 | Q.   Keep that open. |
| 09:49:28 | 11 | A.   Before is -- |
| 09:49:28 | 12 | Q.   Exhibit 2 is the translation. |
| 09:49:30 | 13 | A.   -- was different -- |
| 09:49:30 | 14 | Q.   And turn to -- on Exhibit 2 it's page |
| 09:49:33 | 15 | 100 is where the translation of that e-mail on |
| 09:49:36 | 16 | the back starts. |
| 09:49:40 | 17 | And I'll -- I'll just state for the |
| 09:49:42 | 18 | record that Exhibit 3 is the same chain of e-mails |
| 09:49:45 | 19 | almost in its entirety.  It's just printed out in |
| 09:49:49 | 20 | a simpler way.  So if you want to -- if you want |
| 09:49:51 | 21 | to go to the back of Exhibit 3 and use that because |
| 09:49:53 | 22 | you find it easier to read, you see it doesn't have |
| 09:49:56 | 23 | the -- it doesn't have the long columns at the end. |
| 09:50:03 | 24 | A.   Yes. |
| 09:50:03 | 25 | Q.   Okay.  So Exhibit 1, starting on page |

| | | |
|---|---|---|
| 09:50:09 | 1 | 99, in Russian, it appears to be an e-mail from |
| 09:50:15 | 2 | a Leonid Bershidsky at Bloomberg -- |
| 09:50:18 | 3 | A.   Yes. |
| 09:50:19 | 4 | Q.   -- is that right? |
| 09:50:21 | 5 | Prior to receiving this e-mail, had |
| 09:50:25 | 6 | Mr. Bershidsky contacted you in any other way, |
| 09:50:29 | 7 | by phone or text or anything like that? |
| 09:50:34 | 8 | A.   I don't remember.  I don't think so. |
| 09:50:36 | 9 | Q.   Okay.  So you -- you don't remember |
| 09:50:40 | 10 | whether this -- this e-mail just sort of came |
| 09:50:43 | 11 | out of the blue and was the first communication |
| 09:50:46 | 12 | to you about this particular matter or whether -- |
| 09:50:46 | 13 | A.   For this particular round, yes. |
| 09:50:46 | 14 | (Court reporter clarification.) |
| 09:50:46 | 15 | THE WITNESS:  Sorry.  Please continue. |
| 09:50:54 | 16 | Q.   BY MR. SIEGEL:  Was this the first |
| 09:50:56 | 17 | communication to you about the article in Slate |
| 09:51:03 | 18 | magazine that he's asking you about? |
| 09:51:05 | 19 | A.   I don't remember.  I think that maybe |
| 09:51:07 | 20 | this is the first one.  I don't remember that |
| 09:51:09 | 21 | I spoke with him over the phone. |
| 09:51:11 | 22 | Q.   Okay.  Do you -- did you know who |
| 09:51:15 | 23 | Leonid Bershidsky was -- |
| 09:51:17 | 24 | A.   Yes. |
| 09:51:17 | 25 | Q.   -- before? |

| | | |
|---|---|---|
| 09:51:18 | 1 | How did you know? |
| 09:51:19 | 2 | A.   We had one-time communication about |
| 09:51:22 | 3 | my investment in Prisma application.  And I was |
| 09:51:27 | 4 | giving comments for some article about Prisma. |
| 09:51:31 | 5 | Q.   Okay.  And I -- I take it that was |
| 09:51:34 | 6 | before November 1st? |
| 09:51:34 | 7 | A.   Much. |
| 09:51:34 | 8 | Q.   That was before? |
| 09:51:35 | 9 | A.   Much. |
| 09:51:36 | 10 | Q.   Okay. |
| 09:51:36 | 11 | A.   I think it was summer.  I don't remember |
| 09:51:39 | 12 | exactly. |
| 09:51:39 | 13 | Q.   Okay. |
| 09:51:39 | 14 | A.   But I think summer. |
| 09:51:41 | 15 | Q.   I am going to -- this first e-mail, |
| 09:51:43 | 16 | which is -- says 9:42 a.m. on November 1st, |
| 09:51:47 | 17 | I'm just going to read the English and make |
| 09:51:51 | 18 | sure that we -- that everyone agrees that it's |
| 09:51:55 | 19 | accurate.  I think this one seems to be fine. |
| 09:51:58 | 20 | In English, it's translated as: |
| 09:52:01 | 21 | "Aleksey.  Hello.  I have a question |
| 09:52:02 | 22 | for you as a specialist.  I don't know if you |
| 09:52:04 | 23 | came across this article.  This is a great |
| 09:52:08 | 24 | scandal in the context of the American election |
| 09:52:11 | 25 | campaign.  The server is ostensibly registered |

| | | |
|---|---|---|
| 09:52:14 | 1 | to Donald Trump's company.  It was operated in |
| 09:52:16 | 2 | some sort of secret communications with servers |
| 09:52:19 | 3 | of the Russian Alpha [sic] Bank.  Could you help |
| 09:52:22 | 4 | me sort out the technical details of what was |
| 09:52:25 | 5 | described here?" |
| 09:52:27 | 6 | Is that accurate? |
| 09:52:32 | 7 | A.   More or less. |
| 09:52:33 | 8 | Q.   Okay. |
| 09:52:33 | 9 | (Court reporter clarification.) |
| 09:52:33 | 10 | THE WITNESS:  More or less.  I don't -- |
| 09:52:34 | 11 | can't say it word to word. |
| 09:52:36 | 12 | Q.   BY MR. SIEGEL:  Okay.  But the gist |
| 09:52:38 | 13 | of it is -- |
| 09:52:38 | 14 | A.   Yes. |
| 09:52:38 | 15 | Q.   -- correct? |
| 09:52:38 | 16 | A.   Logic is -- |
| 09:52:40 | 17 | Q.   Okay.  And then you respond, if you |
| 09:52:45 | 18 | go to page 98. |
| 09:52:48 | 19 | A.   Which? |
| 09:52:49 | 20 | Q.   Exhibit 1, page 98, and then Exhibit 2, |
| 09:52:53 | 21 | page 99.  We have it translated as: |
| 09:53:05 | 22 | "I found the data.  I write to you an |
| 09:53:08 | 23 | expert conclusion with my colleagues." |
| 09:53:11 | 24 | I'm guessing that that's a little -- |
| 09:53:13 | 25 | maybe a little inaccurate. |

| | | |
|---|---|---|
| 09:53:15 | 1 | Is -- is an "expert opinion" a more |
| 09:53:18 | 2 | accurate translation of the Russian? |
| 09:53:21 | 3 | A.   Well, if -- like, I can tell you what |
| 09:53:23 | 4 | this mean. |
| 09:53:24 | 5 | Q.   Uh-huh. |
| 09:53:27 | 6 | A.   I answer that we found data.  Because |
| 09:53:30 | 7 | he sent initially some information.  Right? |
| 09:53:32 | 8 | If you check the initial e-mail, he |
| 09:53:33 | 9 | sent us information about this article.  We |
| 09:53:37 | 10 | found some extra data which was available.  And, |
| 09:53:39 | 11 | actually, not even me who found.  Like, I appoint |
| 09:53:43 | 12 | some person who is a technical specialist in the |
| 09:53:46 | 13 | company and asked him to prepare report for us. |
| 09:53:49 | 14 | Or not for us, actually.  For Bloomberg. |
| 09:53:50 | 15 | Q.   Right. |
| 09:53:51 | 16 | A.   And they prepare report and we send |
| 09:53:54 | 17 | it. |
| 09:53:54 | 18 | Q.   Okay.  And just -- |
| 09:53:55 | 19 | MR. SIEGEL:  I'll ask the interpreter, |
| 09:53:56 | 20 | was it -- this says: |
| 09:53:58 | 21 | "I write to you an expert conclusion |
| 09:53:59 | 22 | with my colleagues." |
| 09:54:01 | 23 | Do you think that's the -- |
| 09:54:01 | 24 | THE INTERPRETER:  Yes. |
| 09:54:01 | 25 | MR. SIEGEL:  -- most accurate? |

```
09:54:03   1              THE INTERPRETER:  No, I don't think

09:54:04   2    so.  I think that "opinion" is a more correct

09:54:09   3    term.

09:54:10   4              THE WITNESS:  Yes.

09:54:10   5              (Court reporter clarification.)

09:54:10   6              THE WITNESS:  "Expert opinion."

09:54:10   7              MR. SIEGEL:  Your --

09:54:10   8              THE INTERPRETER:  "Opinion."

09:54:10   9              MR. SIEGEL:  -- expert opinion.

09:54:10  10              THE INTERPRETER:  "Opinion" is more

09:54:10  11    correct term.

09:54:10  12              MR. SIEGEL:  That makes sense to me.

09:54:10  13    Okay.

09:54:10  14              THE WITNESS:  "Expert opinion by my

09:54:12  15    employees" is correct one.

09:54:13  16         Q.  BY MR. SIEGEL:  Okay.  So what did --

09:54:15  17    do -- who was the technical person?

09:54:20  18         A.  Sergei Karatkevich.

09:54:22  19         Q.  And we have some e-mails with a

09:54:25  20    k-e-v-i-t I'll show you later.

09:54:27  21              But that -- is that the Kevit --

09:54:27  22         A.  K-e-v -- yes.

09:54:29  23         Q.  -- "kevit@webzilla.com"?

09:54:30  24         A.  Yes.

09:54:30  25         Q.  Okay.  And who -- who is he?
```

```
09:54:32   1        A.   He's a person in the company.  He
09:54:35   2   don't work now in the company.  He work before,
09:54:37   3   many years.  I think he work with us eight years
09:54:42   4   something.  And he was on different positions.
09:54:46   5   And even one -- I think one or two years he was --
09:54:50   6   manage a office in Singapore as well.  But then,
09:54:53   7   because of his girlfriend, he have to move to
09:54:56   8   Germany.  And he left the company.
09:54:58   9        Q.   Okay.  So was he in Singapore at the
09:55:01  10   time that you communicated with him?
09:55:03  11        A.   I don't think so.  I think he was in
09:55:05  12   Cyprus.
09:55:05  13        Q.   Okay.  And why did you ask him?  Why
09:55:10  14   was he the person that you sent this to?
09:55:14  15        A.   He's a good specialist and a very
09:55:17  16   proper -- I mean, he is doing everything, like,
09:55:19  17   really in details.
09:55:21  18        Q.   Okay.  And what did you understand
09:55:24  19   Mr. Bershidsky to be asking you for?
09:55:30  20        A.   Well, he asked us our opinion about
09:55:32  21   the article and what -- whether this is true
09:55:36  22   or not or what can be done.  And this --
09:55:37  23   that's it.  This is what I remember.
09:55:40  24        Q.   Okay.  I'm just curious.  Because,
09:55:42  25   as I read his e-mail, he's saying:  Can you
```

```
09:55:44   1   help me sort out the technical details?
09:55:47   2           You respond by saying:  We'll give
09:55:48   3   you an expert opinion.
09:55:49   4           Did you understand that that's what
09:55:51   5   he was asking for?
09:55:52   6       A.   Well, I don't understand details
09:55:54   7   myself.  I'm not so high specialist.  That's
09:55:58   8   why I give to somebody who's in the company
09:55:58   9   who is much more specialist than me to give
09:56:02  10   opinion about that.  Because I cannot give
09:56:04  11   opinion on such technical things.
09:56:05  12       Q.   Okay.  Why -- why did you decide
09:56:16  13   to give him an expert opinion?
09:56:19  14       A.   He asked.  Nothing can --
09:56:25  15           (Court reporter clarification.)
09:56:25  16           THE WITNESS:  Nothing can -- I mean,
09:56:25  17   we don't think about anything.  We just give
09:56:28  18   an expert opinion.
09:56:29  19       Q.   BY MR. SIEGEL:  Okay.  So let's
09:56:33  20   go through this e-mail chain.  It looks like
09:56:37  21   Mr. Bershidsky responds 11:17 on November 1st,
09:56:40  22   saying:
09:56:43  23           "Thanks."
09:56:43  24       A.   Where?  Where?  Which page?
09:56:45  25       Q.   Look in page 98 in the Russian, page
```

| | | |
|---|---|---|
| 09:56:48 | 1 | 98 of Exhibit 1 and page 99 of Exhibit 2. |
| 09:56:51 | 2 | A.   Yes.  Correct. |
| 09:56:52 | 3 | Q.   (Reading.) |
| 09:56:52 | 4 | "Thanks." |
| 09:56:54 | 5 | Just out of curiosity, how do you |
| 09:56:57 | 6 | say that -- |
| 09:56:57 | 7 | A.   "Spasibo." |
| 09:57:09 | 8 | Q.   -- in Russian? |
| 09:57:09 | 9 | A.   "Spasibo." |
| 09:57:09 | 10 | Q.   "Spasibo."  Okay. |
| 09:57:10 | 11 | Then there is a longer e-mail chain -- |
| 09:57:19 | 12 | or a much longer e-mail that starts on page 95. |
| 09:57:27 | 13 | Do you see that? |
| 09:57:32 | 14 | A.   On 95? |
| 09:57:34 | 15 | Q.   Yes. |
| 09:57:35 | 16 | A.   Beginning of the page? |
| 09:57:36 | 17 | Q.   Bottom of the page. |
| 09:57:37 | 18 | A.   Bottom of the page.  Yes. |
| 09:57:38 | 19 | Q.   And then also in the English -- there's |
| 09:57:43 | 20 | only one little bit of Russian here.  But in the |
| 09:57:45 | 21 | English on Exhibit 2, it's also 95. |
| 09:57:50 | 22 | A.   Be interesting how you translate this. |
| 09:57:55 | 23 | (Court reporter clarification.) |
| 09:57:55 | 24 | THE WITNESS:  Yes. |
| 09:57:55 | 25 | Q.   BY MR. SIEGEL:  Okay.  So I want to |

| | | |
|---|---|---|
| 09:57:59 | 1 | try to understand what this e-mail is.  So most |
| 09:58:10 | 2 | of the e-mail that's in the bold English print -- |
| 09:58:12 | 3 | do you see that? -- appears to be excerpts, |
| 09:58:16 | 4 | portions taken from the Slate article? |
| 09:58:21 | 5 | A.   Yes. |
| 09:58:21 | 6 | MR. SIEGEL:  And why don't we go ahead |
| 09:58:27 | 7 | and give him exhibit, let's see, Exhibit 5 -- or |
| 09:58:30 | 8 | 6.  I realize this is out of order.  But we will |
| 09:58:34 | 9 | give you Exhibit 6, which is the Slate article, |
| 09:58:36 | 10 | just to have this in the record.  Give it to Val. |
| 09:58:42 | 11 | (Exhibit 6 marked.) |
| 09:58:43 | 12 | Q.   BY MR. SIEGEL:  And then after the |
| 09:58:50 | 13 | paragraphs that are in bold, there are questions |
| 09:58:59 | 14 | and comments. |
| 09:59:02 | 15 | Can -- can -- do you know who was |
| 09:59:03 | 16 | writing what?  For example -- |
| 09:59:05 | 17 | A.   I mean -- |
| 09:59:06 | 18 | Q.   Go ahead. |
| 09:59:08 | 19 | A.   Just to be specific, you're speaking |
| 09:59:10 | 20 | about which?  95 starting -- |
| 09:59:11 | 21 | Q.   That -- that -- that's fair enough. |
| 09:59:12 | 22 | So let's go -- you see at ninety -- |
| 09:59:14 | 23 | on 95, there's a paragraph that starts: |
| 09:59:17 | 24 | "Some of the most trusted" -- |
| 09:59:18 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 09:59:18 | 1 | Q.   (Reading.) |
| 09:59:18 | 2 | -- "DNS specialists." |
| 09:59:18 | 3 | Now go over to 96.  And that ends in: |
| 09:59:22 | 4 | "Since they work for firms trusted |
| 09:59:24 | 5 | by corporations and law enforcement to analyze |
| 09:59:28 | 6 | sensitive data." |
| 09:59:30 | 7 | Do you see that? |
| 09:59:34 | 8 | A.   Yes. |
| 09:59:34 | 9 | Q.   Okay.  And then it says: |
| 09:59:36 | 10 | "Is it means that somebody had full |
| 09:59:39 | 11 | access to bypassing traffic to the 'Trump' |
| 09:59:44 | 12 | servers?" |
| 09:59:44 | 13 | A.   Yes. |
| 09:59:45 | 14 | Q.   Who is writing that? |
| 09:59:47 | 15 | A.   Sergei. |
| 09:59:48 | 16 | Q.   So -- okay.  So that's -- who was |
| 09:59:50 | 17 | that question to? |
| 09:59:56 | 18 | A.   We -- oh, maybe -- this communication |
| 10:00:03 | 19 | with Bloomberg only.  We asked him as I understand. |
| 10:00:11 | 20 | Q.   So I -- who -- |
| 10:00:11 | 21 | A.   But just a second. |
| 10:00:11 | 22 | Like, is this Russian one has English |
| 10:00:11 | 23 | one? |
| 10:00:14 | 24 | Q.   Yes.  But the -- this part of it was |
| 10:00:16 | 25 | all in English. |

| | | |
|---|---|---|
| 10:00:17 | 1 | A.   Yes -- no, but everything in English, |
| 10:00:19 | 2 | I think you -- like, do you have e-mails from |
| 10:00:22 | 3 | Sergei Karatkevich?  You have them.  Could you |
| 10:00:24 | 4 | check if this was a communication there? |
| 10:00:26 | 5 | Q.   Okay.  Fair enough. |
| 10:00:28 | 6 | MR. SIEGEL:  Let's go off the record |
| 10:00:29 | 7 | for a second. |
| 10:00:30 | 8 | THE WITNESS:  Because I don't remember. |
| 10:00:31 | 9 | THE VIDEOGRAPHER:  Going off the record |
| 10:00:32 | 10 | at 10:00 a.m. |
| 10:00:36 | 11 | (Brief discussion held off the record.) |
| 10:01:29 | 12 | THE VIDEOGRAPHER:  Back on the record |
| 10:01:29 | 13 | at 10:01. |
| 10:01:29 | 14 | (Exhibit 7 and Exhibit 8 marked.) |
| 10:01:33 | 15 | Q.   BY MR. SIEGEL:  So I've given you |
| 10:01:37 | 16 | Exhibit 7 and Exhibit 8.  Those appear to be |
| 10:01:40 | 17 | e-mails between you and -- |
| 10:01:43 | 18 | A.   Sergei Karatkevich. |
| 10:01:45 | 19 | Q.   Okay.  So looking at Exhibit 7 [sic], |
| 10:01:47 | 20 | who -- who wrote the question "is it means that |
| 10:01:54 | 21 | somebody had full access to bypassing traffic"? |
| 10:01:58 | 22 | A.   We are speaking about 8 or 7? |
| 10:02:00 | 23 | Q.   Seven. |
| 10:02:01 | 24 | A.   But in 7 is nothing. |
| 10:02:03 | 25 | Q.   Oh.  Is -- 8 is the longer one.  I'm |

| | | |
|---|---|---|
| 10:02:05 | 1 | sorry.  My fault. |
| 10:02:06 | 2 | Let's look at 8. |
| 10:02:07 | 3 | A.   Eight.  Okay. |
| 10:02:08 | 4 | Q.   "Is it means," that's his question? |
| 10:02:12 | 5 | A.   Yes. |
| 10:02:13 | 6 | Q.   So he's asking you a question? |
| 10:02:15 | 7 | A.   He ask -- he -- he forward -- he give |
| 10:02:17 | 8 | me these questions that I forward to Bloomberg. |
| 10:02:19 | 9 | That's it. |
| 10:02:20 | 10 | Q.   I see.  Okay. |
| 10:02:26 | 11 | Do you understand what that question |
| 10:02:27 | 12 | means? |
| 10:02:28 | 13 | A.   No idea. |
| 10:02:30 | 14 | Q.   Okay.  So as you understand it, these |
| 10:02:34 | 15 | are questions that Sergei is asking Bloomberg? |
| 10:02:39 | 16 | A.   Well, that's -- well, from what I see |
| 10:02:44 | 17 | here -- |
| 10:02:44 | 18 | Q.   Uh-huh. |
| 10:02:45 | 19 | A.   -- it was a article.  And from -- |
| 10:02:50 | 20 | Q.   Yes. |
| 10:02:50 | 21 | A.   Some question was arise during this |
| 10:02:50 | 22 | article. |
| 10:02:51 | 23 | Q.   Right. |
| 10:02:51 | 24 | A.   And they asked our opinion about this |
| 10:02:53 | 25 | one. |

| | | |
|---|---|---|
| 10:02:53 | 1 | Q.   Okay. |
| 10:02:53 | 2 | A.   And this what Sergei Karatkevich reply |
| 10:02:58 | 3 | on this article in his comment.  And he said the |
| 10:03:03 | 4 | thing what's happening. |
| 10:03:04 | 5 | Q.   He's -- I'm sorry.  I didn't hear that. |
| 10:03:04 | 6 | A.   His understanding what was write in |
| 10:03:07 | 7 | this article and which question was arise from |
| 10:03:07 | 8 | this article.  That's it. |
| 10:03:11 | 9 | Q.   Okay.  Let's look at Exhibit 7 -- |
| 10:03:22 | 10 | A.   Yes. |
| 10:03:23 | 11 | Q.   -- which is in Russian. |
| 10:03:24 | 12 | MR. SIEGEL:  And I'll just say for |
| 10:03:25 | 13 | the record this was produced to us last night. |
| 10:03:29 | 14 | So we didn't get a -- get a translation. |
| 10:03:31 | 15 | Could you just translate it? |
| 10:03:34 | 16 | THE INTERPRETER:  Which one? |
| 10:03:35 | 17 | MR. SIEGEL:  The very short one, which |
| 10:03:37 | 18 | is 124. |
| 10:03:41 | 19 | THE WITNESS:  This.  (Indicating.) |
| 10:03:42 | 20 | THE INTERPRETER:  (Reading/translating.) |
| 10:03:42 | 21 | "Please look at that, Jabber." |
| 10:03:47 | 22 | MR. SIEGEL:  So "please look at that," |
| 10:03:49 | 23 | that's the whole thing? |
| 10:03:50 | 24 | THE INTERPRETER:  "Please look at that." |
| 10:03:52 | 25 | Q.   BY MR. SIEGEL:  What is Jabber? |

| | | |
|---|---|---|
| 10:03:53 | 1 | A.   Jabber is a communication server, |
| 10:03:55 | 2 | which was in use in the company for communication |
| 10:03:58 | 3 | between employees. |
| 10:04:00 | 4 | Q.   Okay.  So does this mean that you're |
| 10:04:04 | 5 | e-mailing and you're saying switch to Jabber? |
| 10:04:07 | 6 | We'll talk on Jabber? |
| 10:04:08 | 7 | A.   No.  I asked him:  Have a look on |
| 10:04:11 | 8 | Jabber.  Because I just copy e-mail of Bloomberg |
| 10:04:15 | 9 | to Jabber.  And that's it. |
| 10:04:16 | 10 | Q.   Okay.  Do you still use Jabber? |
| 10:04:19 | 11 | A.   No.  We switched to HipChat in November |
| 10:04:26 | 12 | 2016.  HipChat. |
| 10:04:27 | 13 | Q.   Oh, okay.  And what happened to all of |
| 10:04:31 | 14 | the Jabber messages when you switched? |
| 10:04:34 | 15 | A.   No idea.  When we switched to HipChat, |
| 10:04:34 | 16 | I just deleted, because we don't use in the company. |
| 10:04:38 | 17 | Q.   Okay.  So you use the -- what is it called |
| 10:04:40 | 18 | now? |
| 10:04:41 | 19 | A.   HipChat. |
| 10:04:43 | 20 | Q.   HipChat you use now? |
| 10:04:45 | 21 | Do you have a record -- do you have |
| 10:04:46 | 22 | a history of HipChat messages?  In other words, |
| 10:04:48 | 23 | when you're communicating with people like e-mail, |
| 10:04:52 | 24 | you keep the -- the e-mails that you send stay |
| 10:04:56 | 25 | in your Outlook or whatever box it is. |

| | | |
|---|---|---|
| 10:05:00 | 1 | Right? |
| 10:05:00 | 2 | Is -- do HipChat messages -- are they |
| 10:05:07 | 3 | retained in the same way that e-mails are? |
| 10:05:10 | 4 | A.   I don't know.  I'm not a technical |
| 10:05:11 | 5 | specialist. |
| 10:05:12 | 6 | Q.   Well, what I mean is just on a simple |
| 10:05:15 | 7 | level; right? |
| 10:05:17 | 8 | You have -- you have a phone; right? |
| 10:05:18 | 9 | You have a smartphone? |
| 10:05:21 | 10 | A.   Right. |
| 10:05:21 | 11 | Q.   You text people on your smartphone; |
| 10:05:22 | 12 | right? |
| 10:05:23 | 13 | A.   (Witness nods head in the affirmative.) |
| 10:05:24 | 14 | Q.   Your smartphone saves your texts unless |
| 10:05:28 | 15 | you delete them; right? |
| 10:05:30 | 16 | So if I was texting you, I could go |
| 10:05:33 | 17 | back to my smartphone.  And it will usually |
| 10:05:35 | 18 | have the -- the chain of texts that we've sent |
| 10:05:37 | 19 | over the last few months -- right? -- unless |
| 10:05:38 | 20 | I delete them. |
| 10:05:40 | 21 | You understand what I'm saying? |
| 10:05:41 | 22 | A.   Depends how you set up your phone. |
| 10:05:43 | 23 | Because, like, you can set up -- like, actually, |
| 10:05:47 | 24 | is a standard procedure even in any phone, you |
| 10:05:49 | 25 | can put that, for example, delete all messages |

| | | |
|---|---|---|
| 10:05:53 | 1 | automatically from the -- |
| 10:05:53 | 2 | Q.   You can do that -- right -- if you -- |
| 10:05:54 | 3 | A.   Yes. |
| 10:05:54 | 4 | Q.   -- do that. |
| 10:05:55 | 5 | So that's what I'm questioning. |
| 10:05:57 | 6 | Were -- in the HipChat, are the messages |
| 10:05:59 | 7 | immediately deleted, or are they saved in some |
| 10:06:04 | 8 | way? |
| 10:06:04 | 9 | A.   I don't know. |
| 10:06:05 | 10 | Q.   Do you know in -- you use HipChat, |
| 10:06:07 | 11 | I assume; right? |
| 10:06:09 | 12 | A.   Almost never. |
| 10:06:11 | 13 | Q.   Almost never? |
| 10:06:12 | 14 | A.   I don't like it. |
| 10:06:12 | 15 | Q.   Okay.  So do you know if you could |
| 10:06:13 | 16 | go back -- for example, if you sent somebody |
| 10:06:15 | 17 | a HipChat message last month, do you have that? |
| 10:06:19 | 18 | A.   I don't open HipChat maybe for more |
| 10:06:22 | 19 | than six or eight months.  I don't remember. |
| 10:06:24 | 20 | Q.   Okay.  Who would know the answer to |
| 10:06:26 | 21 | that question? |
| 10:06:28 | 22 | A.   You can ask Konstantin Bezruchenko. |
| 10:06:28 | 23 | Q.   Who? |
| 10:06:28 | 24 | (Court reporter clarification.) |
| 10:06:28 | 25 | THE WITNESS:  Konstantin Bezruchenko. |

| | | |
|---|---|---|
| 10:06:31 | 1 | Q. BY MR. SIEGEL: Okay. Okay. Let's |
| 10:06:38 | 2 | go back to Exhibit 1. |
| 10:06:43 | 3 | A. This one; yes? |
| 10:06:44 | 4 | Q. Yes. |
| 10:06:46 | 5 | A. Excuse me. We finish with 7, 8? |
| 10:06:48 | 6 | Q. Yes. |
| 10:06:49 | 7 | A. Okay. |
| 10:06:57 | 8 | Q. All right. So go back to page 95 of |
| 10:07:00 | 9 | Exhibit 1 and page 95 of Exhibit 2. |
| 10:07:12 | 10 | So in the middle of the page on Exhibit 1 |
| 10:07:19 | 11 | on page 95, November 1st at 12:04, Mr. Bershidsky |
| 10:07:25 | 12 | writes to you in Russian. The translation on |
| 10:07:27 | 13 | Exhibit 2 is: |
| 10:07:29 | 14 | "Thanks." That's "the main question, |
| 10:07:30 | 15 | if I correctly understood - how did they gain |
| 10:07:34 | 16 | access to the logs?" (As read.) |
| 10:07:35 | 17 | Does that seem right? |
| 10:07:36 | 18 | A. Sorry. Could you please point me |
| 10:07:42 | 19 | exactly where you're reading? |
| 10:07:45 | 20 | Q. You see we're on page -- on Exhibit 1 |
| 10:07:45 | 21 | at 95; right? |
| 10:07:46 | 22 | A. 95. Sorry. |
| 10:07:48 | 23 | Q. Yes. |
| 10:07:49 | 24 | A. Yes. |
| 10:07:50 | 25 | Q. In the middle of that page, Mr. Bershidsky |

| | | |
|---|---|---|
| 10:07:53 | 1 | writes an e-mail in Russian on November 21st [sic] |
| 10:07:54 | 2 | at 12:04 p.m. |
| 10:07:58 | 3 | Do you see that? |
| 10:07:58 | 4 | A.   Yes. |
| 10:07:59 | 5 | Q.   Okay.  Now look at Exhibit 2 on 95, also |
| 10:08:02 | 6 | in the middle of the page.  The English translation |
| 10:08:08 | 7 | that we have is: |
| 10:08:09 | 8 | "Thanks."  That's "the main question, |
| 10:08:10 | 9 | if I correctly understood - how did they gain |
| 10:08:13 | 10 | access to the logs?"  (As read.) |
| 10:08:14 | 11 | Does that seem to be right?  Does |
| 10:08:17 | 12 | everybody agree? |
| 10:08:21 | 13 | THE INTERPRETER:  Yeah. |
| 10:08:21 | 14 | THE WITNESS:  Yes. |
| 10:08:21 | 15 | Q.   BY MR. SIEGEL:  Yes.  Okay.  And then |
| 10:08:26 | 16 | you respond starting on page 94. |
| 10:08:41 | 17 | Now, here is where I'm -- I'm -- who |
| 10:08:44 | 18 | is writing which portions of this e-mail?  There's |
| 10:08:47 | 19 | a -- there's a Russian, it starts, that says three |
| 10:08:51 | 20 | possibilities in total -- is that right? -- three |
| 10:08:54 | 21 | variations in total? |
| 10:08:55 | 22 | A.   Yes. |
| 10:08:57 | 23 | Q.   Okay.  Then it says in English, in |
| 10:08:59 | 24 | regular font: |
| 10:09:00 | 25 | There's "at least three possibilities |

| | | |
|---|---|---|
| 10:09:02 | 1 | to get log of" DS -- "DNS queries."  (As read.) |
| 10:09:07 | 2 | Is that Sergei or is that you? |
| 10:09:07 | 3 | A.   No.  Sergei. |
| 10:09:08 | 4 | Q.   Sergei.  Okay. |
| 10:09:11 | 5 | Then I think there's a quote from the |
| 10:09:13 | 6 | article.  And then the rest of that is Sergei? |
| 10:09:19 | 7 | A.   Should be, yes. |
| 10:09:21 | 8 | Q.   Okay. |
| 10:09:21 | 9 | A.   Because he was writing whole |
| 10:09:22 | 10 | communication. |
| 10:09:22 | 11 | Q.   Okay.  And then there is another |
| 10:09:30 | 12 | couple of sentences in Russian. |
| 10:09:33 | 13 | Who is writing that? |
| 10:09:40 | 14 | A.   I don't remember. |
| 10:09:43 | 15 | Q.   Does that appear to be you? |
| 10:09:44 | 16 | A.   I don't remember.  I think Sergei |
| 10:09:46 | 17 | write this. |
| 10:09:48 | 18 | Q.   You think Sergei wrote it in Russian? |
| 10:09:51 | 19 | A.   Because -- no.  He was copying this. |
| 10:10:00 | 20 | Q.   Well, the -- I'll read the translation |
| 10:10:02 | 21 | we have. |
| 10:10:02 | 22 | "This is important - if they had access |
| 10:10:04 | 23 | to logs right on the server, how much can you |
| 10:10:07 | 24 | trust the logs in general?" |
| 10:10:09 | 25 | Does that seem right? |

```
10:10:09    1        A.    Correct.

10:10:10    2        Q.    (Reading.)

10:10:11    3             We've "already written that" it's

10:10:13    4   "very simple for them to fake or even simulate

10:10:17    5   a DNS attack," if it's enough -- it's "enough

10:10:19    6   to find a screwed up server built into the

10:10:21    7   Alpha [sic] Bank."  (As read.)

10:10:22    8             Is that accurate?

10:10:23    9        A.    It's correct.

10:10:25   10             THE INTERPRETER:  Yes.

10:10:27   11        Q.    BY MR. SIEGEL:  So you believe that's

10:10:29   12   Sergei who wrote that in Russian?

10:10:31   13        A.    I think so.  Because I cannot write

10:10:31   14   this.  I don't have experience about that.

10:10:33   15        Q.    Okay.  The -- the sentence we have

10:10:36   16   already written that it's very simple for them

10:10:39   17   to fake or even simulate a DNS attack, do you

10:10:42   18   know what he's referring to?  What's already

10:10:45   19   been written?

10:10:58   20        A.    No.

10:10:58   21        Q.    Okay.  All right.  Let's continue.

10:11:10   22             Go to page 94 on Exhibit 1 and 94

10:11:15   23   on Exhibit 2.

10:11:21   24             In the middle of -- so Mr. Bershidsky

10:11:24   25   responds in Russian on November 21st [sic] at
```

| 10:11:30 | 1  | 12:09.  And the translation we have is: |
| 10:11:35 | 2  | "All three do not appear to be quite |
| 10:11:39 | 3  | legal, have you noticed this?" |
| 10:11:42 | 4  | Is that right? |
| 10:11:42 | 5  | A.  Yes. |
| 10:11:44 | 6  | Q.  Okay.  I don't -- if you go back to |
| 10:11:49 | 7  | the e-mail exchange we just talked about on the |
| 10:11:52 | 8  | bottom of 94. |
| 10:11:55 | 9  | A.  Yes. |
| 10:11:56 | 10 | Q.  Are you copying and pasting from |
| 10:12:00 | 11 | some separate e-mail communication or Jabber |
| 10:12:04 | 12 | communication between you and Sergei? |
| 10:12:07 | 13 | A.  Yes.  It looks like. |
| 10:12:07 | 14 | MR. SIEGEL:  Okay.  I don't think we |
| 10:12:08 | 15 | have that one.  So I'd ask you to look for all |
| 10:12:12 | 16 | of those, any other communications between him |
| 10:12:14 | 17 | and Sergei. |
| 10:12:18 | 18 | Q.  BY MR. SIEGEL:  So now let's go to the |
| 10:12:23 | 19 | top of that -- of page 94, both Exhibit 1 or 2. |
| 10:12:28 | 20 | You write in Russian -- or is this -- |
| 10:12:30 | 21 | is -- are you writing the Russian, or is he |
| 10:12:36 | 22 | writing the Russian as far as you can tell: |
| 10:12:39 | 23 | "That's the point." |
| 10:12:41 | 24 | A.  I don't think I write here any comments. |
| 10:12:44 | 25 | As far as I remember of this communication, I -- |

| | | |
|---|---|---|
| 10:12:46 | 1 | we was -- like, he was replying me some questions. |
| 10:12:51 | 2 | I forward to Sergei.  He replied to me, to give |
| 10:12:54 | 3 | me answer.  Because, as I told you, I'm not so |
| 10:12:57 | 4 | technical specialist to give the -- any comments |
| 10:12:59 | 5 | on such specific topics. |
| 10:13:03 | 6 | Q.   In -- in the e-mail that's at the top |
| 10:13:04 | 7 | of page 94, there are three Russian words: |
| 10:13:07 | 8 | "That's the point." |
| 10:13:09 | 9 | Is that accurate? |
| 10:13:11 | 10 | A.   No.  It's not 100 percent accurate. |
| 10:13:14 | 11 | It's more or less okay.  Yes. |
| 10:13:16 | 12 | MR. SIEGEL:  How would you translate |
| 10:13:17 | 13 | it? |
| 10:13:18 | 14 | THE INTERPRETER:  (Reading/translating.) |
| 10:13:19 | 15 | "And all three of them do not look legal." |
| 10:13:19 | 16 | MR. SIEGEL:  No, the -- |
| 10:13:19 | 17 | MR. GURVITS:  No. |
| 10:13:19 | 18 | MR. SIEGEL:  -- the top one. |
| 10:13:19 | 19 | THE INTERPRETER:  Sorry. |
| 10:13:19 | 20 | MR. GURVITS:  It's this one. |
| 10:13:25 | 21 | THE WITNESS:  On the top. |
| 10:13:25 | 22 | THE INTERPRETER:  (Reading/translating.) |
| 10:13:25 | 23 | "This is the -- the truth of the matter." |
| 10:13:28 | 24 | MR. SIEGEL:  Okay. |
| 10:13:29 | 25 | MR. GURVITS:  I would say: |

| | | |
|---|---|---|
| 10:13:30 | 1 | "It's the crux of the matter." |
| 10:13:32 | 2 | THE INTERPRETER:  The "crux" is better. |
| 10:13:32 | 3 | Yeah, sure. |
| 10:13:34 | 4 | MR. SIEGEL:  I'll go with that.  "It's |
| 10:13:35 | 5 | the crux of the matter." |
| 10:13:36 | 6 | And then there are two lines in Russian |
| 10:13:38 | 7 | at the bottom of that e-mail.  I'd like to ask you |
| 10:13:46 | 8 | to translate that because the translation we have |
| 10:13:48 | 9 | I'm not sure. |
| 10:13:49 | 10 | THE INTERPRETER:  Just one moment. |
| 10:13:51 | 11 | MR. GURVITS:  Which one are we looking |
| 10:13:52 | 12 | at? |
| 10:13:52 | 13 | THE INTERPRETER:  Which one? |
| 10:13:54 | 14 | MR. SIEGEL:  Page -- page 94 -- |
| 10:13:55 | 15 | THE INTERPRETER:  94. |
| 10:13:55 | 16 | MR. SIEGEL:  -- you see there the -- |
| 10:13:55 | 17 | the e-mail at the top that says: |
| 10:13:56 | 18 | "From:  Alexey Gubarev." |
| 10:13:58 | 19 | November 1, 6:14. |
| 10:14:01 | 20 | THE INTERPRETER:  Okay.  Yeah. |
| 10:14:03 | 21 | MR. SIEGEL:  The two Russian lines -- |
| 10:14:04 | 22 | THE INTERPRETER:  Yeah. |
| 10:14:04 | 23 | MR. SIEGEL:  -- that are at the bottom -- |
| 10:14:05 | 24 | THE INTERPRETER:  We -- |
| 10:14:05 | 25 | MR. SIEGEL:  -- of that e-mail. |

| | | |
|---|---|---|
| 10:14:05 | 1 | THE INTERPRETER:  (Reading/translating.) |
| 10:14:06 | 2 | "We trust them" -- |
| 10:14:07 | 3 | "We trust them to such extent that |
| 10:14:12 | 4 | they are allowed to do anything." |
| 10:14:14 | 5 | Maybe.  That's difficult to translate |
| 10:14:16 | 6 | without the context. |
| 10:14:19 | 7 | "There are no names mentioned in the |
| 10:14:21 | 8 | article who trusted whom." |
| 10:14:25 | 9 | Q.  BY MR. SIEGEL:  Okay.  So did you write |
| 10:14:29 | 10 | that, or did Sergei write that? |
| 10:14:31 | 11 | A.  I don't remember exactly.  But I think |
| 10:14:34 | 12 | that Sergei write this. |
| 10:14:36 | 13 | Q.  Is it possible that you're sort of |
| 10:14:39 | 14 | summarizing or making a larger point? |
| 10:14:46 | 15 | A.  I don't remember. |
| 10:14:46 | 16 | Q.  You can't remember.  Okay. |
| 10:14:48 | 17 | MR. SIEGEL:  Well, again, if there's |
| 10:14:50 | 18 | some communication back and forth between him |
| 10:14:52 | 19 | and Sergei, we'd ask that you produce that |
| 10:14:55 | 20 | because we don't have that either. |
| 10:14:57 | 21 | Q.  BY MR. SIEGEL:  Then go to 93. |
| 10:15:01 | 22 | A.  Yes. |
| 10:15:01 | 23 | Q.  First page of Exhibit 1 and Exhibit 2, |
| 10:15:04 | 24 | Mr. Bershidsky says: |
| 10:15:08 | 25 | "Thanks." |

| | | |
|---|---|---|
| 10:15:11 | 1 | Right? |
| 10:15:11 | 2 | A.   Where is that?  Sorry. |
| 10:15:13 | 3 | Q.   Bottom -- bottom e-mail, November 1st, |
| 10:15:14 | 4 | 2016 -- |
| 10:15:17 | 5 | A.   Okay. |
| 10:15:17 | 6 | Q.   -- at 12 -- |
| 10:15:17 | 7 | "Okay, thanks." |
| 10:15:18 | 8 | A.   Yes. |
| 10:15:20 | 9 | Q.   Then you respond at 6:19. |
| 10:15:26 | 10 | MR. SIEGEL:  And, again, I'll ask you |
| 10:15:27 | 11 | to interpret that because I think the translation |
| 10:15:31 | 12 | we have is maybe not entirely accurate or clear. |
| 10:15:34 | 13 | THE INTERPRETER:  (Reading/translating.) |
| 10:15:36 | 14 | "Write" -- |
| 10:15:36 | 15 | "Write if something comes up."  "If |
| 10:15:40 | 16 | anything comes up." |
| 10:15:41 | 17 | MR. SIEGEL:  Okay.  Is that meaning -- |
| 10:15:41 | 18 | does that mean "if anything comes up, you can |
| 10:15:44 | 19 | write to" -- |
| 10:15:44 | 20 | THE INTERPRETER:  (Reading/translating.) |
| 10:15:44 | 21 | "You can write to us." |
| 10:15:45 | 22 | "If anything comes up, you can write |
| 10:15:47 | 23 | to us."  "Will we be referenced in the article?" |
| 10:15:50 | 24 | Q.   BY MR. SIEGEL:  Okay.  Why are you |
| 10:15:53 | 25 | asking him if you'll be referenced in the article? |

| | | |
|---|---|---|
| 10:15:58 | 1 | MR. GURVITS:  Objection. |
| 10:16:01 | 2 | THE WITNESS:  I don't remember. |
| 10:16:02 | 3 | MR. SIEGEL:  Okay.  Let's go to the |
| 10:16:08 | 4 | next e-mail in the chain, November 21st [sic] |
| 10:16:10 | 5 | at 12:21.  Mr. Bershidsky replies. |
| 10:16:17 | 6 | Could you translate that? |
| 10:16:20 | 7 | MR. GURVITS:  Where are we? |
| 10:16:21 | 8 | MR. SIEGEL:  November 21 [sic] at 12:21. |
| 10:16:24 | 9 | THE INTERPRETER:  (Reading/translating.) |
| 10:16:24 | 10 | "Yes, if I use your quotations -- I |
| 10:16:28 | 11 | still haven't written it -- I don't know how |
| 10:16:31 | 12 | this article will come out." |
| 10:16:33 | 13 | "How it will come out." |
| 10:16:37 | 14 | Sorry. |
| 10:16:37 | 15 | "How it will come out." |
| 10:16:37 | 16 | MR. SIEGEL:  Okay.  And then you -- |
| 10:16:40 | 17 | Mr. Gubarev, you respond at 6:22:40. |
| 10:16:44 | 18 | Could you translate that sentence? |
| 10:16:46 | 19 | THE INTERPRETER:  (Reading/translating.) |
| 10:16:47 | 20 | "Excellent.  We are launch -- launching |
| 10:16:49 | 21 | a foundation or a fund together with Yuri Gursky |
| 10:16:54 | 22 | if the material is interesting." |
| 10:16:57 | 23 | Q.  BY MR. SIEGEL:  What is that talking |
| 10:16:58 | 24 | about? |
| 10:16:59 | 25 | A.  It's public information.  I -- I launch |

| | | |
|---|---|---|
| 10:17:02 | 1 | a venture capital fund with the name Haxus.com |
| 10:17:06 | 2 | and together with my partner Yuri Gursky. |
| 10:17:10 | 3 | Q.   And what does that have to do with the -- |
| 10:17:12 | 4 | what you're discussing with Mr. Bershidsky? |
| 10:17:17 | 5 | A.   Well, we launch a fund.  And we have |
| 10:17:23 | 6 | some companies within the fund who is looking -- |
| 10:17:27 | 7 | (Court reporter clarification.) |
| 10:17:27 | 8 | THE WITNESS:  We have some companies |
| 10:17:27 | 9 | where we invest, like Prisma, which get the |
| 10:17:32 | 10 | attention of the media.  Like Prisma was very |
| 10:17:36 | 11 | big success.  Okay.  We ashame they don't publish |
| 10:17:43 | 12 | almost nothing about us in this story.  But we |
| 10:17:46 | 13 | have some other interesting project where we |
| 10:17:46 | 14 | invest. |
| 10:17:47 | 15 | Q.   BY MR. SIEGEL:  Okay.  So are -- |
| 10:17:47 | 16 | are you saying that -- you're saying that if -- |
| 10:17:53 | 17 | if we get our name in the media this way, that |
| 10:17:56 | 18 | might interest investors in my venture capital |
| 10:18:01 | 19 | fund? |
| 10:18:01 | 20 | Is that what you mean? |
| 10:18:01 | 21 | A.   Could you please -- |
| 10:18:02 | 22 | Q.   Sure. |
| 10:18:02 | 23 | A.   -- rephrase? |
| 10:18:03 | 24 | Q.   Are you -- are you saying that you -- you |
| 10:18:05 | 25 | were commenting that if you are quoted -- right? -- |

| | | |
|---|---|---|
| 10:18:09 | 1 | in this article, that might make investors in your |
| 10:18:18 | 2 | new fund or potential investors more interested |
| 10:18:20 | 3 | in investing? |
| 10:18:21 | 4 | Is that what you're saying? |
| 10:18:23 | 5 | MR. GURVITS:  Objection. |
| 10:18:23 | 6 | THE WITNESS:  It's completely opposite, |
| 10:18:24 | 7 | actually. |
| 10:18:26 | 8 | Q.   BY MR. SIEGEL:  What? |
| 10:18:26 | 9 | A.   It's completely opposite. |
| 10:18:28 | 10 | Q.   All right.  Go ahead. |
| 10:18:29 | 11 | A.   Actually, he are writing that, if they |
| 10:18:31 | 12 | want to write separate material, completely about |
| 10:18:35 | 13 | different topic, about venture fund, and he would |
| 10:18:38 | 14 | be interested to write about that. |
| 10:18:40 | 15 | Q.   Okay.  Okay.  So you're asking him if |
| 10:18:41 | 16 | he might be interested in writing about that as |
| 10:18:45 | 17 | a separate topic? |
| 10:18:46 | 18 | A.   Completely separate. |
| 10:18:50 | 19 | Q.   Okay.  So then he responds at the top -- |
| 10:18:55 | 20 | the first e-mail at the top of the page in Russian. |
| 10:19:02 | 21 | THE INTERPRETER:  (Reading/translating.) |
| 10:19:02 | 22 | "It will be interesting when you invest |
| 10:19:04 | 23 | in some interesting projects.  By the way, how |
| 10:19:08 | 24 | should I describe Servers.com if I'm going to |
| 10:19:12 | 25 | quote?  Is it a company that does what?  And |

| | | |
|---|---|---|
| 10:19:15 | 1 | where is it registered?" |
| 10:19:18 | 2 | MR. SIEGEL:  Okay.  Let's go to exhibit -- |
| 10:19:23 | 3 | I'm going to show you what's Exhibit 4 and 5. |
| 10:19:50 | 4 | Let's go off the record for one sec. |
| 10:19:53 | 5 | THE VIDEOGRAPHER:  Going off the record |
| 10:19:54 | 6 | at 10:19. |
| 10:20:14 | 7 | (Recess from 10:19 a.m. to 10:22 a.m.) |
| 10:22:28 | 8 | THE VIDEOGRAPHER:  Back on the record |
| 10:22:29 | 9 | at 10:22. |
| 10:22:29 | 10 | (Exhibit 4 and Exhibit 5 marked.) |
| 10:22:32 | 11 | Q.   BY MR. SIEGEL:  Okay.  I've shown you |
| 10:22:34 | 12 | Exhibit 4 and 5, which appears to be maybe the |
| 10:22:37 | 13 | last part of this e-mail chain.  But it was |
| 10:22:40 | 14 | produced to us as part of a different group |
| 10:22:44 | 15 | of documents. |
| 10:22:45 | 16 | So if you look at the bottom of -- |
| 10:22:51 | 17 | A.   We finish with 1, 2, 3?  Excuse me. |
| 10:22:58 | 18 | Q.   Say that again. |
| 10:22:59 | 19 | A.   Do we finish with 1, 2, 3? |
| 10:23:01 | 20 | MR. GURVITS:  The exhibits, are we done |
| 10:23:03 | 21 | with Exhibits 1, 2, 3? |
| 10:23:05 | 22 | MR. SIEGEL:  You know what?  Let's go |
| 10:23:06 | 23 | off the record a sec again. |
| 10:23:08 | 24 | THE VIDEOGRAPHER:  Going off the record |
| 10:23:08 | 25 | at 10:22. |

| | | |
|---|---|---|
| 10:23:10 | 1 | (Recess from 10:22 a.m. to 10:24 a.m.) |
| 10:24:19 | 2 | THE VIDEOGRAPHER:  Back on the record |
| 10:24:19 | 3 | at 10:24. |
| 10:24:30 | 4 | Q.  BY MR. SIEGEL:  Okay.  Exhibit 4 and |
| 10:24:32 | 5 | then the translation, Exhibit 5, appear to be |
| 10:24:36 | 6 | some of the last strands of this e-mail chain. |
| 10:24:40 | 7 | So let's look at page 103.  And in |
| 10:24:48 | 8 | the middle of the page, it says: |
| 10:24:52 | 9 | "Alexey Gubarev." |
| 10:24:52 | 10 | "From:  Alexey Gubarev." |
| 10:24:54 | 11 | On November 1st at 6:26. |
| 10:24:56 | 12 | Do you see that? |
| 10:24:56 | 13 | A.  (Examining.)  06:26.  Yes. |
| 10:25:02 | 14 | Q.  Okay.  And this is, again, where you've |
| 10:25:05 | 15 | already translated before.  Mr. Bershidsky says: |
| 10:25:08 | 16 | It may be interesting once you're investing in |
| 10:25:10 | 17 | some interesting projects. |
| 10:25:13 | 18 | And then you respond it looks like; |
| 10:25:17 | 19 | right? |
| 10:25:17 | 20 | A.  Yes. |
| 10:25:18 | 21 | Q.  We have -- the translation we have is: |
| 10:25:20 | 22 | We've "already invested in several; |
| 10:25:21 | 23 | I handed my shares" in "Prisma there through |
| 10:25:26 | 24 | Haxus ..."  (As read.) |
| 10:25:26 | 25 | Is that an accurate translation? |

```
10:25:29    1        A.   No.

10:25:30    2        Q.   What is the translation there?

10:25:33    3             THE INTERPRETER:  I would say:

10:25:33    4             (Reading/translating.)

10:25:33    5             "We already invested in several.  I

10:25:37    6   transferred my Prisma shares there Haxus" --

10:25:42    7             THE WITNESS:  "To Haxus."

10:25:45    8             THE INTERPRETER:  (Reading/translating.)

10:25:45    9             -- ".com" -- "to -- to Haxus.com.  Take

10:25:45   10   a look.  I can tell you the details later when

10:25:49   11   we have time."

10:25:51   12        Q.   BY MR. SIEGEL:  What is Haxus.com?

10:25:53   13        A.   I told you before.

10:25:55   14        Q.   That's the name of the fund?

10:25:56   15        A.   Yes.

10:25:56   16        Q.   Okay.  So you actually trans -- you

10:26:00   17   transferred your Prisma shares to that fund

10:26:02   18   at that point?  It was holding those shares?

10:26:03   19        A.   It was my part of the deal with Yuri

10:26:04   20   Gursky.

10:26:07   21        Q.   Okay.  Who --

10:26:07   22             (Court reporter clarification.)

10:26:07   23             THE WITNESS:  Part of the deal with

10:26:08   24   my partner Yuri Gursky.

10:26:10   25        Q.   BY MR. SIEGEL:  Who's Yuri Gursky?
```

```
10:26:14   1         A.   He's a venture capital [sic].

10:26:16   2         Q.   Where is he based?

10:26:17   3         A.   In Cyprus.

10:26:17   4         Q.   In Cyprus.

10:26:17   5              Do you have any other business projects

10:26:19   6    with him?

10:26:20   7         A.   Only venture fund.

10:26:21   8         Q.   Do you still have that venture fund?

10:26:23   9         A.   Yes.

10:26:27  10         Q.   And the projects that it invests in,

10:26:30  11    where are they?  Are they located any particular

10:26:34  12    place?

10:26:34  13         A.   We investing in artificial intelligence

10:26:41  14    and (unintelligible) for -- to computer visions.

10:26:43  15              THE COURT REPORTER:  You'll have to say

10:26:43  16    it again.

10:26:43  17              THE WITNESS:  Artificial intelligence

10:26:43  18    and computer visions.  I can tell you several

10:26:46  19    project where we invest if you're interested.

10:26:48  20         Q.   BY MR. SIEGEL:  Sure.

10:26:48  21         A.   One of them is a -- Prisma, which

10:26:56  22    I mentioned before.  It was a --

10:27:00  23              (Court reporter clarification.)

10:27:00  24              THE WITNESS:  Prisma, which I mentioned

10:27:00  25    before, is a photo application which use neural
```

| | | |
|---|---|---|
| 10:27:02 | 1 | networks to produce pictures.  "Neural."  Okay. |
| 10:27:13 | 2 | I will spell it for you later.  Okay? |
| 10:27:13 | 3 | Neural networks to produce pictures. |
| 10:27:13 | 4 | Another our investment is Flo.  Flo |
| 10:27:18 | 5 | is a period calendar for womens [sic]. |
| 10:27:31 | 6 | (Court reporter clarification.) |
| 10:27:31 | 7 | THE WITNESS:  Period calendar. |
| 10:27:31 | 8 | "Period."  You know, periods calendar |
| 10:27:31 | 9 | for womens [sic].  And it's very successful project, |
| 10:27:34 | 10 | is number one in the United States by audience |
| 10:27:35 | 11 | in this particular market.  We are doing really |
| 10:27:41 | 12 | amazing things there. |
| 10:27:43 | 13 | Another project is -- now is name |
| 10:27:46 | 14 | Voir, as a computer -- is application which -- |
| 10:27:52 | 15 | which give a new step to the digital cosmetic |
| 10:27:58 | 16 | for womens [sic]. |
| 10:28:02 | 17 | We also have one company WannaBy. |
| 10:28:06 | 18 | WannaBy is a company we invest for computer |
| 10:28:11 | 19 | vision.  The idea is -- we do an application |
| 10:28:14 | 20 | for womens [sic] to -- that if you need to |
| 10:28:16 | 21 | change nails colors or something like that, |
| 10:28:19 | 22 | you use this application.  You download. |
| 10:28:20 | 23 | And you could choose, on the fly, which |
| 10:28:23 | 24 | nails colors looks great for you. |
| 10:28:27 | 25 | Another investment is company Soil. |

```
10:28:31   1   I don't remember correct, like, the company
10:28:34   2   name.  The idea of this company, we help to
10:28:38   3   farmers.  Like, we use -- we download satellite
10:28:45   4   images.  And we know, for example, in this year
10:28:48   5   on this specific field, if you consider this
10:28:49   6   field, you will have very good results in this
10:28:53   7   area and very bad results in that area.
10:28:55   8          And we advise him for maybe to change
10:28:57   9   what he's growing in this particular area.  And,
10:28:59  10   thus, we create a program for his tractors, which
10:29:04  11   he use for -- put extra hemix (phonetic) in the --
10:29:07  12          THE COURT REPORTER:  Extra what?
10:29:11  13          THE WITNESS:  Extra hemix (phonetic).
10:29:11  14   I forgot what -- when you produce something,
10:29:11  15   you putting some things here to kill -- to
10:29:12  16   kill something or some extra minerals.
10:29:39  17          THE COURT REPORTER:  I'm sorry.
10:29:39  18   I'm really having trouble understanding you.
10:29:39  19          THE WITNESS:  Okay.  Let's repeat
10:29:39  20   some about that.
10:29:39  21          THE COURT REPORTER:  Just about
10:29:39  22   the program for which you put extra something.
10:29:39  23          THE WITNESS:  It's a program for
10:29:39  24   tractors --
10:29:39  25          MS. BOLGER:  "Tractors."
```

| | | |
|---|---|---|
| 10:29:39 | 1 | THE WITNESS:  "Tractors." |
| 10:29:39 | 2 | MS. BOLGER:  "Tractors." |
| 10:29:39 | 3 | MR. SIEGEL:  "Tractors." |
| 10:29:39 | 4 | THE COURT REPORTER:  "Tractors"? |
| 10:29:39 | 5 | THE WITNESS:  Yes. |
| 10:29:39 | 6 | -- which go on the fields and put |
| 10:29:39 | 7 | extra minerals. |
| 10:29:40 | 8 | MS. BOLGER:  "Minerals." |
| 10:29:40 | 9 | THE WITNESS:  Yes. |
| 10:29:40 | 10 | And we give them program where -- which |
| 10:29:41 | 11 | amount of the -- which minerals they have to do -- |
| 10:29:44 | 12 | put to get best results for their plots where |
| 10:29:49 | 13 | they grow the fields. |
| 10:29:53 | 14 | What else?  Aah, we have another company |
| 10:29:55 | 15 | which we just starting now.  It's a company named |
| 10:30:01 | 16 | Viv.  Here idea we want to -- I'm very interesting |
| 10:30:04 | 17 | [sic] myself in the anti-aging, what is happening |
| 10:30:08 | 18 | in the world.  And we investing in now application, |
| 10:30:13 | 19 | which will be -- teach you how you can make your |
| 10:30:18 | 20 | life longer and better right now without waiting |
| 10:30:22 | 21 | a -- new medicals which is coming in the future. |
| 10:30:25 | 22 | Q.  BY MR. SIEGEL:  Are -- are any of |
| 10:30:29 | 23 | the other investors -- the principal investors |
| 10:30:32 | 24 | in X -- shareholders in XBT partners or |
| 10:30:35 | 25 | shareholders in that -- in Haxus? |

| | | |
|---|---|---|
| 10:30:37 | 1 | A.   No.   It's only me and Yuri. |
| 10:30:40 | 2 | Q.   Where did you get the capital to -- |
| 10:30:41 | 3 | where does the capital of that company come |
| 10:30:44 | 4 | from? |
| 10:30:45 | 5 | A.   From my money which I make. |
| 10:30:48 | 6 | Q.   Okay. |
| 10:30:48 | 7 | A.   And Yuri, well, from his money which |
| 10:30:51 | 8 | he made. |
| 10:30:55 | 9 | Q.   And has the company been successful |
| 10:30:58 | 10 | so far in your opinion? |
| 10:31:00 | 11 | A.   It always can be better.  But we have |
| 10:31:02 | 12 | some good invest -- we don't have much exits. |
| 10:31:07 | 13 | I mean when we sold the company.  We only sold |
| 10:31:11 | 14 | one company till now.  But we hope in the future |
| 10:31:15 | 15 | will be much better. |
| 10:31:15 | 16 | Q.   Okay.  Meaning that one of -- only one |
| 10:31:17 | 17 | of the companies you've invested in has been sold |
| 10:31:20 | 18 | so far? |
| 10:31:20 | 19 | A.   (Witness nods head in the affirmative.) |
| 10:31:21 | 20 | Q.   Okay.  When did it start? |
| 10:31:24 | 21 | A.   It start middle of 2016, I think. |
| 10:31:33 | 22 | Q.   Okay.  I think the rest of these e-mails |
| 10:31:41 | 23 | are -- are -- the rest of this is self-explanatory. |
| 10:31:46 | 24 | So why did you decide to offer an opinion |
| 10:31:48 | 25 | on an issue related to the U.S. election? |

| | | |
|---|---|---|
| 10:31:53 | 1 | MR. GURVITS:  Objection. |
| 10:31:54 | 2 | You may answer if you can. |
| 10:31:57 | 3 | THE WITNESS:  Believe me, not even |
| 10:31:59 | 4 | think about that.  And if it ever -- anybody |
| 10:32:01 | 5 | ask me again in my life, I will never do. |
| 10:32:04 | 6 | Q.   BY MR. SIEGEL:  And why is that? |
| 10:32:06 | 7 | A.   Because this story is so big stress |
| 10:32:09 | 8 | for me, for my company, for my family.  I don't |
| 10:32:12 | 9 | want to have any connection to this in my life. |
| 10:32:15 | 10 | Q.   Okay.  But what does that -- what does |
| 10:32:19 | 11 | your -- in your understanding at least or your |
| 10:32:23 | 12 | opinion, your -- the opinion that you offered |
| 10:32:25 | 13 | here to the Bloomberg reporter have to do with |
| 10:32:30 | 14 | the -- the stress that you say you are experiencing |
| 10:32:33 | 15 | today? |
| 10:32:33 | 16 | A.   I'm speaking about the results of you -- |
| 10:32:33 | 17 | of publication of your client, which make me choose |
| 10:32:40 | 18 | that I will never want to go or comment anything |
| 10:32:43 | 19 | related to politic [sic] or even come close to |
| 10:32:47 | 20 | anybody in politic [sic]. |
| 10:32:49 | 21 | Q.   Okay.  Let's look at the last two |
| 10:32:59 | 22 | exhibits. |
| 10:33:06 | 23 | A.   Excuse me.  You finish with 4, 5? |
| 10:33:09 | 24 | MR. SIEGEL:  Yes.  10 and -- let's |
| 10:33:10 | 25 | give him 9, which is the -- here.  Let me show |

```
10:33:14   1   you Exhibit 9.  And let's give him 10 and 11
10:33:20   2   just so we're -- he has them all.  Here we go.
10:33:23   3              (Exhibit 9, Exhibit 10, and Exhibit 11
10:33:23   4         marked.)
10:33:23   5              MS. SCHARY:  This is 9, 10, 11.
10:33:54   6              MR. GURVITS:  This is 9, 10, 11?  Thank
10:33:55   7   you.
10:34:12   8         Q.   BY MR. SIEGEL:  I'll show you Exhibit 9,
10:34:12   9   which is the Bloomberg article by Mr. Bershidsky.
10:34:18  10              If you turn to page 10, the second page
10:34:21  11   of that exhibit.
10:34:22  12         A.   (Examining.)  Yes.
10:34:24  13         Q.   You see in the -- about two thirds
10:34:27  14   of the way down, there's a paragraph that
10:34:30  15   starts with:
10:34:31  16              "Another troubling aspect of the
10:34:33  17   Foer article."
10:34:35  18         A.   Yes.
10:34:35  19         Q.   And it says:
10:34:37  20              "Alexey Gubarev, chief executive
10:34:39  21   officer of Luxembourg-registered XBT Holding,
10:34:41  22   which owns the infrastructure-as-a-service
10:34:44  23   provider Servers.com, told me there was no
10:34:46  24   legitimate way to get access to the full
10:34:49  25   logs of a server that you do not control."
```

| | | |
|---|---|---|
| 10:34:54 | 1 | And you were asked this at your last |
| 10:34:57 | 2 | deposition.  And I just want to ask you again. |
| 10:34:59 | 3 | Having -- having reviewed the -- all |
| 10:35:00 | 4 | of the e-mails now, is -- do you understand |
| 10:35:03 | 5 | that to be a comment that he is taking from the |
| 10:35:06 | 6 | e-mail exchange?  Or did you have a subsequent |
| 10:35:10 | 7 | conversation with him? |
| 10:35:16 | 8 | A.   As I told you, I don't remember if |
| 10:35:17 | 9 | we have a phone conversation with him.  But |
| 10:35:20 | 10 | I think he took from my mail.  And I don't |
| 10:35:22 | 11 | create this specific article.  He create. |
| 10:35:25 | 12 | Q.   Right.  He's summarizing or he's |
| 10:35:27 | 13 | paraphrasing? |
| 10:35:28 | 14 | A.   Yes.  I don't give him this. |
| 10:35:30 | 15 | Q.   Okay.  If you look at the last two |
| 10:35:36 | 16 | exhibits, 10 and 11. |
| 10:35:51 | 17 | A.   Yes. |
| 10:35:51 | 18 | Q.   These are e-mails between you and |
| 10:35:54 | 19 | Mr. Dolan -- right -- |
| 10:35:56 | 20 | A.   Right. |
| 10:35:56 | 21 | Q.   -- in which it appears that you've |
| 10:35:58 | 22 | forwarded the exchange with Sergei? |
| 10:36:02 | 23 | A.   Correct. |
| 10:36:04 | 24 | Q.   Why did you forward that to him? |
| 10:36:09 | 25 | A.   Maybe we speak on the phone at that |

| | | |
|---|---|---|
| 10:36:11 | 1 | date or similar dates and he asked me:  Could |
| 10:36:14 | 2 | you forward just I have it?  That's it. |
| 10:36:16 | 3 | Q.   Okay.  For what purpose? |
| 10:36:23 | 4 | A.   I don't remember.  Maybe, like, if |
| 10:36:26 | 5 | you write here -- like, he write that, if you |
| 10:36:29 | 6 | won't send me -- your answer to me, then I |
| 10:36:32 | 7 | can't edit this for a major audience.  But |
| 10:36:34 | 8 | maybe that's the reason. |
| 10:36:36 | 9 | Q.   Right.  And then you respond: |
| 10:36:39 | 10 | "Ok.  I will." |
| 10:36:40 | 11 | A.   Yes. |
| 10:36:40 | 12 | Q.   And is there any other -- was there |
| 10:36:42 | 13 | any further communication about this? |
| 10:36:47 | 14 | A.   I don't know. |
| 10:36:47 | 15 | Q.   The subject of the -- line of the last |
| 10:36:53 | 16 | e-mail says:  Re:  Wall Street Journal. |
| 10:36:57 | 17 | Were you talking to him about possibly |
| 10:37:01 | 18 | providing information to the Wall Street Journal |
| 10:37:04 | 19 | about this topic? |
| 10:37:05 | 20 | A.   No idea. |
| 10:37:10 | 21 | Q.   Okay. |
| 10:37:17 | 22 | MR. GURVITS:  Can I see the exhibit |
| 10:37:18 | 23 | for a second just to make sure that I'm looking |
| 10:37:21 | 24 | at the same document?  I don't have this. |
| 10:37:27 | 25 | MS. SCHARY:  Which one don't you have? |

| | | |
|---|---|---|
| 10:37:27 | 1 | MR. GURVITS:  I don't have 11. |
| 10:37:29 | 2 | MS. SCHARY:  I have 11. |
| 10:37:30 | 3 | THE WITNESS:  And 10. |
| 10:37:34 | 4 | MR. GURVITS:  Yeah, I have 11. |
| 10:37:35 | 5 | I'm sorry.  I do have 11.  Aah, I have |
| 10:37:36 | 6 | them.  Apologies.  Okay.  I found them.  Thank |
| 10:37:38 | 7 | you. |
| 10:37:39 | 8 | MS. SCHARY:  Thank you. |
| 10:37:42 | 9 | THE WITNESS:  This is my one as well? |
| 10:37:45 | 10 | THE INTERPRETER:  Yeah. |
| 10:37:46 | 11 | Q.   BY MR. SIEGEL:  When you asked |
| 10:37:47 | 12 | Mr. Bershidsky in these e-mails whether you |
| 10:37:50 | 13 | were going to be quoted in the article, why |
| 10:37:53 | 14 | did you want to know that? |
| 10:37:58 | 15 | A.   Just asked. |
| 10:38:01 | 16 | Q.   Why did you want to be quoted in the |
| 10:38:03 | 17 | article? |
| 10:38:07 | 18 | You said something about the venture |
| 10:38:08 | 19 | capital fund too.  But why -- why were you |
| 10:38:11 | 20 | interested in being quoted in that article? |
| 10:38:13 | 21 | A.   Especially this article? |
| 10:38:15 | 22 | Q.   Yes. |
| 10:38:16 | 23 | A.   I was not think about that. |
| 10:38:19 | 24 | Q.   What do you mean you weren't thinking |
| 10:38:19 | 25 | about it? |

| | | |
|---|---|---|
| 10:38:20 | 1 | A.  I repeat you once again.  If I know |
| 10:38:22 | 2 | that your client will ever publish me in connection |
| 10:38:26 | 3 | to this story, I will never give comments to nobody. |
| 10:38:29 | 4 | And I tell you, when I was giving this opinion, I |
| 10:38:32 | 5 | never think that something like that will appear |
| 10:38:35 | 6 | in my life. |
| 10:38:36 | 7 | Q.  So what was your purpose for doing it? |
| 10:38:38 | 8 | What -- at the time that you gave that comment, |
| 10:38:39 | 9 | what were you thinking about? |
| 10:38:42 | 10 | A.  They asked.  I give it.  I was not |
| 10:38:44 | 11 | thinking about that. |
| 10:38:45 | 12 | Q.  And -- and why were you interested |
| 10:38:51 | 13 | in providing him information about what exactly |
| 10:38:54 | 14 | Servers.com was? |
| 10:38:56 | 15 | A.  He asked.  I answered. |
| 10:38:57 | 16 | Q.  Okay.  Why did you want to be in -- |
| 10:39:00 | 17 | in other words, why were you answering a reporter's |
| 10:39:02 | 18 | question from Bloomberg?  Why -- why did you not |
| 10:39:07 | 19 | say "no comment"? |
| 10:39:09 | 20 | A.  I repeat you once again.  He asked me. |
| 10:39:12 | 21 | And we have with him previous communication about |
| 10:39:17 | 22 | Prisma.  And he asked me opinion.  I asked if |
| 10:39:20 | 23 | we can give this opinion within the company. |
| 10:39:22 | 24 | We give it.  We send it to him.  And that's it. |
| 10:39:25 | 25 | I tell you again, if I will know that |

| | | |
|---|---|---|
| 10:39:27 | 1 | your client Buzzfeed publish this story about |
| 10:39:31 | 2 | me, I will never do even one small step to go |
| 10:39:35 | 3 | to this direction in my life. |
| 10:39:37 | 4 | Q.   Okay.  Why do you think that the |
| 10:39:39 | 5 | Buzzfeed story is connected to this comment? |
| 10:39:42 | 6 | A.   Because it's only one time in my |
| 10:39:44 | 7 | life when I was somehow even more close than |
| 10:39:51 | 8 | one kilometer to politic [sic].  I am not |
| 10:39:53 | 9 | politic person.  I'm not in this politic. |
| 10:39:54 | 10 | I'm never invest or give money to politic |
| 10:39:58 | 11 | parties.  It is not in my interest.  I'm |
| 10:40:01 | 12 | businessman.  [sic] |
| 10:40:02 | 13 | Q.   Okay.  And what was the reason for |
| 10:40:07 | 14 | your -- not just about this, but about Prisma |
| 10:40:12 | 15 | or other topics -- right? -- communicating with |
| 10:40:16 | 16 | reporters at Bloomberg and other publications |
| 10:40:18 | 17 | in 2016? |
| 10:40:19 | 18 | A.   No, it was not so many publication. |
| 10:40:23 | 19 | I think one or two times only was communication. |
| 10:40:26 | 20 | Q.   Well, the record will speak for itself. |
| 10:40:29 | 21 | But you hired a public relations firm; |
| 10:40:33 | 22 | right? |
| 10:40:33 | 23 | A.   Correct.  And I fired them because they |
| 10:40:34 | 24 | was not successful. |
| 10:40:35 | 25 | Q.   Right.  And then you hired them back |

10:40:37  1    again a week later; right?

10:40:38  2         A.   When -- yes, we hired them back when

10:40:41  3    you -- Buzzfeed --

10:40:41  4         Q.   No, you hired them back when the article

10:40:43  5    about the advertising fraud came out?

10:40:47  6         A.   Correct.  But then we extend -- it was

10:40:49  7    one-time fee, retaining fee for that only.  And

10:40:52  8    then we hired them permanently for an -- for one

10:40:55  9    and a half year --

10:40:56  10        Q.   Okay.

10:40:56  11        A.   -- just to handle all the mess with --

10:40:58  12   which create Buzzfeed.

10:41:02  13        Q.   And the reason that you hired them

10:41:03  14   in the first place?

10:41:06  15        A.   We was want to get some publicity for

10:41:09  16   Servers.com as a new project which we started.

10:41:13  17        Q.   And at -- at the time, not -- again,

10:41:14  18   not looking back at it in hindsight, would it

10:41:18  19   be fair to say that at the time that you gave

10:41:20  20   this comment to Bloomberg about the Trump/Alfa

10:41:25  21   issue, that that was part of your trying to get

10:41:29  22   publicity for Servers.com?

10:41:32  23        A.   Not.  Because you'll not get clients

10:41:36  24   from this publication.

10:41:37  25        Q.   From Bloomberg?

| | | |
|---|---|---|
| 10:41:39 | 1 | A.   No. |
| 10:41:39 | 2 | Q.   If you were identified as somebody who |
| 10:41:41 | 3 | is an expert and head of Servers.com? |
| 10:41:45 | 4 | A.   Well, it's very political article. |
| 10:41:48 | 5 | And I don't believe technical specialists who |
| 10:41:51 | 6 | is potential [sic] our clients reading this |
| 10:41:53 | 7 | publications. |
| 10:41:54 | 8 | MR. SIEGEL:  Okay.  Let's just go off |
| 10:42:01 | 9 | the record for a second.  We may -- we may be |
| 10:42:02 | 10 | done. |
| 10:42:03 | 11 | THE VIDEOGRAPHER:  Going off the record |
| 10:42:03 | 12 | at 10:41. |
| 10:42:06 | 13 | (Recess from 10:41 a.m. to 11:02 a.m.) |
| 11:02:01 | 14 | THE VIDEOGRAPHER:  Back on the record. |
| 11:02:02 | 15 | MR. SIEGEL:  Okay.  Well, I'm actually |
| 11:02:02 | 16 | not going to read from here.  So let's just make |
| 11:02:03 | 17 | this one exhibit, Exhibit 12. |
| 11:02:08 | 18 | (Exhibit 12 marked.) |
| 11:02:08 | 19 | Q.   BY MR. SIEGEL:  Can you just explain |
| 11:02:09 | 20 | what -- what these -- these are texts, I assume, |
| 11:02:11 | 21 | that you're exchanging with people; right? |
| 11:02:13 | 22 | A.   (Examining.) |
| 11:02:14 | 23 | Q.   Is that right? |
| 11:02:14 | 24 | A.   Yes.  Some exchange from the different |
| 11:02:18 | 25 | communications which I found out during the |

| | | |
|---|---|---|
| 11:02:23 | 1 | discovery.  And my lawyers ask me to produce |
| 11:02:25 | 2 | this. |
| 11:02:26 | 3 | MR. GURVITS:  Objection. |
| 11:02:26 | 4 | Do not talk about -- |
| 11:02:28 | 5 | MR. SIEGEL:  Right. |
| 11:02:28 | 6 | MR. GURVITS:  -- communications -- |
| 11:02:28 | 7 | THE WITNESS:  Aah, sorry. |
| 11:02:28 | 8 | MR. GURVITS:  -- with your lawyers. |
| 11:02:31 | 9 | MS. BOLGER:  For the record, Val, you |
| 11:02:32 | 10 | just objected to the witness' answer. |
| 11:02:36 | 11 | MR. GURVITS:  It's a knee-jerk reaction. |
| 11:02:39 | 12 | Q.  BY MR. SIEGEL:  What -- what -- is this |
| 11:02:43 | 13 | from your phone, these texts? |
| 11:02:46 | 14 | A.  Yes.  Some of them from phone.  One from |
| 11:02:50 | 15 | Facebook. |
| 11:02:51 | 16 | Q.  Okay.  So it looks to me like the -- the |
| 11:02:55 | 17 | first -- these communications start after Buzzfeed's |
| 11:03:00 | 18 | article came out? |
| 11:03:02 | 19 | A.  Correct. |
| 11:03:03 | 20 | Q.  How come there are no communications |
| 11:03:05 | 21 | that you've provided to us -- no texts before |
| 11:03:08 | 22 | the article came out? |
| 11:03:10 | 23 | A.  What do you mean? |
| 11:03:11 | 24 | Q.  Well, the -- you have not provided us |
| 11:03:13 | 25 | with any texts that you exchanged with anybody |

| | | |
|---|---|---|
| 11:03:19 | 1 | before January 10th, 2017. |
| 11:03:22 | 2 | How come? |
| 11:03:23 | 3 | A.   About what? |
| 11:03:24 | 4 | There was no any communication about |
| 11:03:26 | 5 | Buzzfeed before. |
| 11:03:26 | 6 | Q.   Well, but there are many communications |
| 11:03:28 | 7 | about your business.  Maybe I'll -- I'll -- I'll -- |
| 11:03:31 | 8 | I'll phrase it a different way. |
| 11:03:34 | 9 | Has anyone asked you to provide any |
| 11:03:38 | 10 | communications from your phone, any texts, that |
| 11:03:41 | 11 | occurred before the article was published? |
| 11:03:43 | 12 | MR. GURVITS:  Objection. |
| 11:03:44 | 13 | To the extent that your answer calls |
| 11:03:46 | 14 | for communication with your attorneys, I'll |
| 11:03:48 | 15 | instruct you not to answer.  Otherwise, you |
| 11:03:50 | 16 | can. |
| 11:03:51 | 17 | THE WITNESS:  I don't understand the |
| 11:03:52 | 18 | question. |
| 11:03:53 | 19 | Q.   BY MR. SIEGEL:  All right.  Well, okay. |
| 11:03:54 | 20 | You're texting with people and you're |
| 11:03:56 | 21 | texting with them -- in these particular texts, |
| 11:03:59 | 22 | it looks like they start a few days after the |
| 11:04:02 | 23 | article comes out; right? |
| 11:04:03 | 24 | A.   Correct. |
| 11:04:04 | 25 | Q.   Okay.  I take it you have exchanged |

| | | |
|---|---|---|
| 11:04:06 | 1 | texts in your life before January 10th, 2017 -- |
| 11:04:11 | 2 | A.   Of course. |
| 11:04:11 | 3 | Q.   -- correct? |
| 11:04:12 | 4 | Okay.  And so you communicate with |
| 11:04:20 | 5 | people from time to time by text; right? |
| 11:04:22 | 6 | A.   It's not my favorite way of communication. |
| 11:04:26 | 7 | I prefer call.  But yes, I communicate. |
| 11:04:29 | 8 | Q.   Okay.  Have you -- why are there no texts |
| 11:04:35 | 9 | that have been provided for us about anything about |
| 11:04:40 | 10 | your business or any of the other subjects that |
| 11:04:44 | 11 | we've covered in discovery? |
| 11:04:48 | 12 | A.   I don't understand the question. |
| 11:04:49 | 13 | Q.   Well, I take it -- would it be fair |
| 11:04:51 | 14 | to say you've never searched your phone to try |
| 11:04:54 | 15 | to find if there are any texts that you exchanged |
| 11:04:57 | 16 | with anyone before January 10th to provide in |
| 11:05:02 | 17 | discovery in this case? |
| 11:05:02 | 18 | A.   I was asking [sic] to search in my |
| 11:05:04 | 19 | e-mails everything related to the Buzzfeed -- |
| 11:05:06 | 20 | Buzzfeed publication.  It's correct? |
| 11:05:09 | 21 | Q.   Okay.  That's what you were asked? |
| 11:05:11 | 22 | Okay. |
| 11:05:12 | 23 | A.   Related to Buzzfeed publication, to -- |
| 11:05:13 | 24 | to any hacking activities like -- |
| 11:05:15 | 25 | Q.   Okay. |

| | | |
|---|---|---|
| 11:05:15 | 1 | A.   -- which was published in publication, |
| 11:05:17 | 2 | or anything else.  I found -- |
| 11:05:20 | 3 | Q.   What do you mean -- |
| 11:05:21 | 4 | A.   -- whatever is -- |
| 11:05:21 | 5 | Q.   -- by "anything else"? |
| 11:05:22 | 6 | A.   Huh? |
| 11:05:24 | 7 | Q.   What do you mean by "anything else"? |
| 11:05:24 | 8 | A.   Okay.  Just a word. |
| 11:05:26 | 9 | Q.   What? |
| 11:05:26 | 10 | A.   Just a word.  I mean, I was looking |
| 11:05:28 | 11 | for anything related to your -- to criminal |
| 11:05:32 | 12 | charges which Buzzfeed put on me -- |
| 11:05:34 | 13 | Q.   Okay. |
| 11:05:35 | 14 | A.   -- related to that and also to |
| 11:05:37 | 15 | publication of Buzzfeed. |
| 11:05:39 | 16 | Q.   Okay.  And not to any other subjects? |
| 11:05:41 | 17 | Okay. |
| 11:05:43 | 18 | A.   No. |
| 11:05:45 | 19 | Q.   That's fine. |
| 11:05:46 | 20 | What -- what text -- what text app or |
| 11:05:48 | 21 | service do you use or are these exchanged on? |
| 11:05:52 | 22 | A.   It was with different ones.  WhatsApp. |
| 11:05:56 | 23 | One is Telegram.  And one is Facebook.  That's |
| 11:06:01 | 24 | it. |
| 11:06:02 | 25 | Q.   Facebook. |

| | | |
|---|---|---|
| 11:06:06 | 1 | MS. SCHARY:  What was the second one? |
| 11:06:06 | 2 | MR. GURVITS:  Telegram. |
| 11:06:07 | 3 | MR. SIEGEL:  Telegram. |
| 11:06:08 | 4 | THE WITNESS:  Yes. |
| 11:06:15 | 5 | Q.   BY MR. SIEGEL:  When did you search -- |
| 11:06:15 | 6 | when did you search your phone for these texts? |
| 11:06:21 | 7 | A.   It's take very long time because is |
| 11:06:24 | 8 | no any good search engine to found -- to search |
| 11:06:28 | 9 | the messages.  I tell you, like, Facebook is |
| 11:06:31 | 10 | the worse for that ever.  And everybody else |
| 11:06:34 | 11 | is same.  Actually, you have to go almost one |
| 11:06:38 | 12 | by one to find out whatever it was relate to |
| 11:06:41 | 13 | this case.  It take much longer to produce it. |
| 11:06:44 | 14 | And also it was a lot of different |
| 11:06:46 | 15 | questions during discovery which you asked me, |
| 11:06:49 | 16 | like -- which we need to prepare as well. |
| 11:06:53 | 17 | Q.   I take it now you never took your phone |
| 11:06:57 | 18 | to be copied, in other words, to have the whole |
| 11:07:00 | 19 | phone copied? |
| 11:07:02 | 20 | A.   I don't understand the question. |
| 11:07:02 | 21 | Q.   You -- do you understand what it |
| 11:07:04 | 22 | means to image a phone or image a computer |
| 11:07:06 | 23 | is the technical word that's usually used? |
| 11:07:11 | 24 | A.   Yes.  But I usually -- when I get |
| 11:07:13 | 25 | new phone, I start from scratch. |

```
11:07:17   1        Q.   When was the last time you got a
11:07:19   2   new phone?
11:07:21   3        A.   Very recently.  I don't remember.
11:07:24   4            MS. BOLGER:  Did you say "very
11:07:24   5   recently" or "not very recently"?
11:07:28   6            THE WITNESS:  I don't remember exactly.
11:07:29   7        Q.   BY MR. SIEGEL:  The text that you have
11:07:31   8   that are here, is that the phone that you still
11:07:36   9   have today?  In other words, are they still on
11:07:40  10   your phone today, do you think?
11:07:42  11        A.   I think so.  Yes.
11:07:43  12        Q.   Okay.  Did you -- so I'll -- I'll
11:07:57  13   ask you again.  I think I understand the answer.
11:08:00  14            Your phone has never been physically
11:08:04  15   imaged -- right? -- for this case?  In other
11:08:07  16   words, nobody took your phone and made a copy
11:08:10  17   of the entire phone in order to search what
11:08:13  18   is on the phone; right?
11:08:14  19        A.   No.
11:08:17  20        Q.   Okay.  Meaning I'm correct -- right? --
11:08:20  21   your phone has never been imaged for this case?
11:08:24  22        A.   Yes.
11:08:30  23        Q.   Did you get a new phone since the
11:08:33  24   Buzzfeed article came out?
11:08:53  25        A.   I don't remember.
```

| | | |
|---|---|---|
| 11:08:56 | 1 | Q.   Okay.  You do remember that a few weeks |
| 11:09:01 | 2 | before the Buzzfeed article came out -- right? -- |
| 11:09:04 | 3 | there was a report about a Russian advertising |
| 11:09:10 | 4 | fraud bot; right?  "Methbot" it was called? |
| 11:09:13 | 5 | A.   Correct. |
| 11:09:14 | 6 | Q.   Right?  You remember that? |
| 11:09:16 | 7 | Do you have any texts related to |
| 11:09:18 | 8 | methbot? |
| 11:09:19 | 9 | A.   No. |
| 11:09:20 | 10 | Q.   How do you know? |
| 11:09:22 | 11 | A.   We communicated by mail or by phone |
| 11:09:26 | 12 | with the customer. |
| 11:09:27 | 13 | Q.   Okay.  How about with colleagues or |
| 11:09:32 | 14 | friends or anything like that? |
| 11:09:35 | 15 | A.   My colleagues is sitting in office |
| 11:09:37 | 16 | next to me. |
| 11:09:38 | 17 | Q.   Okay. |
| 11:09:39 | 18 | A.   I mean, why is there reason to |
| 11:09:41 | 19 | communicate with them -- like, you just go -- |
| 11:09:44 | 20 | he's a three meters' walk -- and you communicate. |
| 11:09:49 | 21 | Q.   What about did you communicate by |
| 11:09:51 | 22 | Jabber? |
| 11:09:51 | 23 | A.   It was no Jabber in the company at |
| 11:09:53 | 24 | that -- |
| 11:09:53 | 25 | Q.   HipChat is -- am I saying it right? |

| | | |
|---|---|---|
| 11:09:55 | 1 | A.   HipChat.  Yes. |
| 11:09:57 | 2 | Q.   Did you communicate by HipChat? |
| 11:09:59 | 3 | A.   I don't believe.  I get access much |
| 11:10:02 | 4 | later.  I'm not using internal communication |
| 11:10:05 | 5 | systems. |
| 11:10:05 | 6 | Q.   Okay.  Mr. Bershidsky at the time |
| 11:10:07 | 7 | was in Dallas; right? |
| 11:10:09 | 8 | A.   I don't know. |
| 11:10:09 | 9 | Q.   Okay.  Is it possible that you |
| 11:10:12 | 10 | communicated with him by text -- |
| 11:10:14 | 11 | A.   I don't know. |
| 11:10:14 | 12 | Q.   -- about methbot? |
| 11:10:16 | 13 | A.   I don't know. |
| 11:10:16 | 14 | Q.   Okay.  Let's go to the -- what -- what |
| 11:10:24 | 15 | I'm going to ask you to do is not to go through |
| 11:10:26 | 16 | each of these texts. |
| 11:10:28 | 17 | But I ask the general question first. |
| 11:10:32 | 18 | The people who you are texting with -- |
| 11:10:34 | 19 | A.   Yes. |
| 11:10:35 | 20 | Q.   -- in these texts, have you asked |
| 11:10:37 | 21 | any of them to be witnesses in this case? |
| 11:10:40 | 22 | A.   No.  Aah, just a second. |
| 11:10:43 | 23 | (Examining.)  No. |
| 11:10:56 | 24 | Q.   Do you anticipate asking any of them? |
| 11:11:00 | 25 | A.   It is not my decision. |

| | | |
|---|---|---|
| 11:11:01 | 1 | Q.   Okay.  Do you know if your lawyers |
| 11:11:03 | 2 | have asked any of these people to be witnesses? |
| 11:11:06 | 3 | A.   I don't know. |
| 11:11:07 | 4 | Q.   Just tell me who these people are. |
| 11:11:09 | 5 | One -- just go through one by one.  Just tell |
| 11:11:12 | 6 | me who they are. |
| 11:11:13 | 7 | A.   One is Andrey Romanenko.  Andrey |
| 11:11:13 | 8 | Romanenko is my friend.  Second is my sister. |
| 11:11:22 | 9 | Q.   Is that the -- Andrey is his first |
| 11:11:22 | 10 | name? |
| 11:11:25 | 11 | A.   Andrey, yes.  Romanenko. |
| 11:11:27 | 12 | Q.   How long have you known him? |
| 11:11:29 | 13 | A.   Maybe five years. |
| 11:11:31 | 14 | Q.   Okay. |
| 11:11:32 | 15 | A.   He's -- he did a public company in |
| 11:11:42 | 16 | United States, Kiwi. |
| 11:11:43 | 17 | (Court reporter clarification.) |
| 11:11:43 | 18 | MR. SIEGEL:  Okay. |
| 11:11:43 | 19 | THE WITNESS:  He did a public company |
| 11:11:43 | 20 | in United States, Kiwi. |
| 11:11:44 | 21 | Next one is my sister Natalia.  She's |
| 11:11:48 | 22 | living now in Canada.  She got a baby just two |
| 11:11:52 | 23 | weeks ago or three. |
| 11:11:53 | 24 | Q.   BY MR. SIEGEL:  Okay.  Hold on one sec. |
| 11:11:54 | 25 | The -- the -- just with Andrey and -- |

```
11:11:56    1   is it Natalia or Natasha?  Natalia --
11:12:01    2        A.   Natalia is my sister.
11:12:02    3        Q.   Okay.  The -- are the green texts
11:12:09    4   your text or the light text your texts?
11:12:13    5        A.   Green is -- belongs to me --
11:12:14    6        Q.   Okay.
11:12:19    7        A.   -- in this particular one.
11:12:21    8        Q.   Okay.
11:12:23    9        A.   George Krypto is a company who is doing
11:12:26   10   security for my office, for my house, and for
11:12:29   11   anything, like, related.
11:12:32   12        Q.   Okay.
11:12:32   13        A.   Dmitry -- this communication -- this
11:12:38   14   is a guy Dmitry Zeleznov is -- was a real estate
11:12:44   15   agent for my property in Moscow.
11:12:47   16        Q.   Okay.  So he lives in Moscow I take it?
11:12:50   17        A.   Yes.  Aleksejs Sjarki is one my friend
11:12:58   18   who was have some difficulty after publication.
11:13:00   19   But we managed to restore our relationships.
11:13:05   20        Q.   When you say "difficulty," what do
11:13:06   21   you mean?
11:13:06   22        A.   Well, he was have a birthday, and he
11:13:08   23   asked me "don't come" after publication.
11:13:10   24        Q.   He -- he asked you what?
11:13:11   25        A.   "Don't come" after publication.
```

| | | |
|---|---|---|
| 11:13:14 | 1 | Q.   Don't come? |
| 11:13:15 | 2 | A.   Yes.  Because it was -- he afraid that |
| 11:13:18 | 3 | at that moment was too many journalists who's |
| 11:13:22 | 4 | trying to follow me.  And he don't want that |
| 11:13:25 | 5 | I come on his birthday and, like, people be |
| 11:13:25 | 6 | scared about that and everything. |
| 11:13:27 | 7 | Q.   Oh, okay. |
| 11:13:28 | 8 | But then you say you worked it out? |
| 11:13:30 | 9 | A.   Huh? |
| 11:13:32 | 10 | Q.   You worked it out? |
| 11:13:33 | 11 | A.   Yes. |
| 11:13:33 | 12 | Q.   He lives in Cyprus, I take it, then? |
| 11:13:36 | 13 | A.   No. |
| 11:13:36 | 14 | Q.   No? |
| 11:13:36 | 15 | A.   No.  He live in Riga, Latvia. |
| 11:13:39 | 16 | Q.   Where? |
| 11:13:39 | 17 | A.   Riga, Latvia. |
| 11:13:39 | 18 | Q.   So were you intending to go visit him |
| 11:13:43 | 19 | at some point? |
| 11:13:44 | 20 | A.   Well, I -- I mean to visit him?  He |
| 11:13:48 | 21 | coming to Cyprus now and then.  I meet him last |
| 11:13:50 | 22 | time -- I don't know -- maybe six months ago. |
| 11:13:53 | 23 | Q.   So when you said he told you not to |
| 11:13:56 | 24 | come, come where? |
| 11:13:56 | 25 | A.   He have a birthday party in Riga, Latvia. |

```
11:13:59   1        Q.   He has a what?

11:14:02   2        A.   Birthday party.

11:14:03   3        Q.   Oh, okay.

11:14:03   4        A.   And I don't come there.

11:14:05   5             Okay.  Sergei Dmitry Zeleznov.

11:14:05   6             Alexander Chekan is a guy who work in

11:14:05   7   Haxus fund.  He's one the advising -- advising

11:14:11   8   board.

11:14:13   9             Igor is one sales guy who working

11:14:17  10   for us in Russia.

11:14:20  11        Q.   Okay.

11:14:20  12        A.   And this --

11:14:20  13        Q.   Is he an employee of your company?

11:14:23  14        A.   Yes.  And then Prisma Chat is some

11:14:28  15   communication between the shareholder and people

11:14:31  16   who work within the Prisma application where we

11:14:35  17   discuss what's this publication.

11:14:38  18        Q.   Okay.  So the -- it says seven members.

11:14:41  19             Those are people who work on Prisma?

11:14:43  20        A.   Yes.

11:14:43  21        Q.   Okay.

11:14:44  22        A.   And then "AK" is one of the guy who

11:14:49  23   also invested in Prisma.  He's -- what's his

11:14:52  24   name?  What's his name?  I can't tell you.

11:15:10  25   I don't remember.  I need to check.
```

| | | |
|---|---|---|
| 11:15:15 | 1 | Q.   This is "AK"? |
| 11:15:16 | 2 | A.   Yes.  Yes. |
| 11:15:18 | 3 | And it was one of the messages.  I |
| 11:15:22 | 4 | don't found any other.  So I -- somebody send |
| 11:15:25 | 5 | me, like, some time ago on Facebook.  I don't |
| 11:15:28 | 6 | know this person.  He just send me.  I don't |
| 11:15:32 | 7 | reply. |
| 11:15:33 | 8 | Q.   Okay.  Your sister lives in Canada |
| 11:15:39 | 9 | now, you said? |
| 11:15:40 | 10 | A.   My sister was living in Australia. |
| 11:15:42 | 11 | She living in United States for two, three |
| 11:15:45 | 12 | years.  Then she moved to Australia to finish |
| 11:15:50 | 13 | her study in Sidney.  She living seven years |
| 11:15:52 | 14 | there.  And then she moved to Canada.  She |
| 11:15:53 | 15 | work in Sony Enterprise for productions of |
| 11:15:57 | 16 | movies. |
| 11:15:59 | 17 | MR. SIEGEL:  I guess the only thing |
| 11:15:59 | 18 | I'd say for the record is -- I mean, she hasn't |
| 11:16:01 | 19 | been listed on your Interrogatory Responses. |
| 11:16:03 | 20 | We have no interest in deposing her.  But if |
| 11:16:07 | 21 | you weren't listing her as a witness, we would |
| 11:16:08 | 22 | reserve our right to do so. |
| 11:16:13 | 23 | MR. GURVITS:  Understood.  But we have |
| 11:16:14 | 24 | no -- |
| 11:16:14 | 25 | MR. SIEGEL:  Okay. |

| | | |
|---|---|---|
| 11:16:14 | 1 | THE WITNESS:  Okay.  We're finished? |
| 11:16:14 | 2 | MR. GURVITS:  -- plans to call her |
| 11:16:14 | 3 | as a witness. |
| 11:16:14 | 4 | MR. SIEGEL:  That's it. |
| 11:16:14 | 5 | THE WITNESS:  Thank you. |
| 11:16:15 | 6 | THE VIDEOGRAPHER:  This is the end |
| 11:16:17 | 7 | of the -- of the deposition of Aleksej Gubarev. |
| 11:16:18 | 8 | Going off the record at 11:16. |
| | 9 | (The deposition concluded at 11:16 a.m.) |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

```
 1              CERTIFICATE OF WITNESS

 2

 3           I, ALEKSEJ GUBAREV, witness herein,

 4    do hereby certify and declare the within and

 5    foregoing transcription to be my examination

 6    under oath in said action taken on May 16,

 7    2018, with the exception of the changes

 8    listed on the errata sheet, if any;

 9             That I have read, corrected, and

10    do hereby affix my signature under penalty

11    of perjury to said examination under oath.

12

13

14

15

16    _____  _____
         ALEKSEJ GUBAREV, Witness        Date
17

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE OF REPORTER

 2

 3            I, BRENDA MATZOV, CA CSR 9243, do hereby

 4    certify:

 5            That, prior to being examined, the witness

 6    named in the foregoing deposition was duly sworn

 7    by me to testify the truth, the whole truth, and

 8    nothing but the truth;

 9            That the foregoing deposition was taken

10    before me at the time and place herein set forth,

11    at which time the aforesaid proceedings were

12    stenographically recorded by me and thereafter

13    transcribed by me;

14            That the foregoing transcript, as

15    typed, is a true record of the said proceedings;

16            And I further certify that I am not

17    interested in the action.

18

19            Dated this 16th day of May, 2018.

20

21            _____

22            BRENDA MATZOV, CA CSR 9243

23

24

25
```

```
 1                        ERRATA SHEET

 2   Case:      ALEKSEJ GUBAREV, ET AL. vs. BUZZFEED,

 3              INC., ET AL.

 4   Date:      MAY 16, 2018

 5   Witness:  ALEKSEJ GUBAREV

 6

 7   Page _____ Line _____ Change _____

 8   Reason _____

 9   Page _____ Line _____ Change _____

10   Reason _____

11   Page _____ Line _____ Change _____

12   Reason _____

13   Page _____ Line _____ Change _____

14   Reason _____

15   Page _____ Line _____ Change _____

16   Reason _____

17   Page _____ Line _____ Change _____

18   Reason _____

19   Page _____ Line _____ Change _____

20   Reason _____

21   Page _____ Line _____ Change _____

22   Reason _____

23

24   _____   _____
         ALEKSEJ GUBAREV, Witness            Date
25
```