SUBJECT TO PROTECTIVE ORDER ENTERED AUGUST 24, 2018
ATTORNEYS' EYES ONLY

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 17-cv-60426-UU

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.

   Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

   Defendants.
_____/

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

DAVIS WRIGHT TREMAINE LLP
Katherine M. Bolger
Nathan Siegel
Adam Lazier
Alison Schary
1251 Avenue of the Americas, 21st Floor
New York, New York 10020

BLACK, SREBNICK, KORNSPAN & STUMPF, P.A.
Roy Black
Jared Lopez
201 So. Biscayne Boulevard
Miami, Florida 33131

*Of Counsel*:
Nabiha Syed
BuzzFeed, Inc.
11 E. 18th Street, 13th Floor
New York, NY 10003

*Attorneys for Defendants*

SUBJECT TO PROTECTIVE ORDER ENTERED AUGUST 24, 2018
ATTORNEYS' EYES ONLY

Pursuant to Local Rule 56.1, Defendants submit the following statement of undisputed material facts in support of their motion for summary judgment:

1. Plaintiff Aleksej Gubarev lives in Cyprus, where he moved from Russia in 2002. Declaration of Katherine M. Bolger.[1]  Ex. 1 [Compl.] ¶ 6; Ex. 9 [Gub. Dep.] at 20:21-21:11.

2. Plaintiff XBT Holding, S.A. ("XBT") is incorporated in Luxembourg with its principal place of business in Luxembourg.  Ex. 18.  XBT is the parent holding company for Gubarev's internet hosting business.  Ex. 10 [Mishra Dep.] at 30:15-21.

3. When the article at issue was published, Webzilla, Inc. was incorporated in Florida and had its principal place of business in Texas.  Exs. 19-20.  Webzilla, Inc. has only one Florida employee, who divides his time between Webzilla and his own company, and a "virtual address" in Florida in a Regus building.  Ex. 12 [Luchian Dep.] at 6:19-21, 7:7-15, 21:11-13.

4. "Webzilla" is a brand name, Ex. 10 [Mishra Dep.] at 28:2-29:6, which is used by six "Webzilla" companies incorporated around the world, including Plaintiff Webzilla, Inc.  Ex. 41 at 24.  Plaintiffs have publicly described Webzilla as a European company, including in their public relations responses to the Dossier.  *See, e.g.*, Exs. 21, 22.  Documents produced by Plaintiffs supposedly supporting their damage concern "Webzilla" entities in Europe.  *See* Ex. 23 at Resp. 6, Exs. 24-26.  Plaintiffs lease data centers throughout the world; none are in Florida.  Ex. 11 [Bezruchenko Dep.] at 29:9-30:21.

5. BuzzFeed is a digital media and news company.  Ex. 6 [Declaration of Roy Cysner] ¶ 2.  It is incorporated in Delaware and headquartered in New York City.  *Id.* ¶ 3. Defendant Smith is BuzzFeed's editor-in-chief.  Ex. 1 [Compl.] ¶ 1.

6. Christopher Steele worked for the U.K.'s Foreign and Commonwealth Office and then MI6, the U.K.'s equivalent of the CIA, as one of its leading Russia experts.  Ex. 16 [Steele Dep.] at 31:11-20, 32:22-33:11; Ex.17 [Fusion Dep.] at 42:7-43:5.  Steele then founded Orbis Business Intelligence Limited ("Orbis").  Ex. 16 [Steele Depo.] at 18:11-19:22.

7. Beginning in the fall of 2015, Fusion GPS, a private research firm headed by former *Wall Street Journal* reporter Glenn Simpson, was retained to conduct research on Donald Trump – first by a Republican client, and then by a law firm working for the Democratic National Committee.  Ex. 17 [Fusion Dep.] at 23:10-25:4, 33:2-36:6, 38:20-40:18, 242:3-243:2.

---

[1] Unless otherwise noted, all exhibits are attached to the Declaration of Katherine M. Bolger filed herewith.

Fusion retained Orbis as a contractor to investigate business ties between Trump and Russian interests. *Id.* at 46:9-48:19, 54:17-57:1

8.  Steele received information that Russia was interfering in the election to support Trump, and that Russia held compromising information on the candidate. Ex. 1 [Compl.] Ex. 3; Ex. 17 [Fusion Dep.] at 49:15-53:3, 64:3-68:7, 74:18-77:19.

9.  Steele chose to include in the 17 reports he wrote only the information he "regarded as credible, and it [was] produced to the best of our knowledge and ability to be accurate and true." Ex. 16 [Steele Dep.] at 91:17-92:11. In making that determination, Steele took into account that some sources might try to provide false disinformation. *Id*. at 66:17-67:6. Any information included in his reports was "subject[ed] to scrutiny in respect of this risk" by Steele. *Id*. at 93:9-12, 98:12-101:16; Ex. 17 [Fusion Dep.] at 80:2-81:1.

10. Steele is "a longtime FBI source," with a "multi-year history of credible reporting on Russia and other matters, including information DOJ used in criminal proceedings." Ex. 27 [Nunes Memo] at 4; Ex. 28 [Schiff Memo] at 6.

11. Steele told Fusion that he believed "the information he had collected was of urgent national security importance." Ex. 17 [Fusion Dep.] at 63:1-68:7. In July 2016 Steele shared his initial research with FBI agent Michael Gaeta, who Steele had previously assisted in the FBI's investigation of FIFA, the world's governing soccer body. Ex. 17 [Fusion Dep.] at 68:8-70:18; Ex. 28 [Schiff Memo] at 3.

12. Steele was also an FBI source as he researched the Dossier, until at least the end of October 2016. Ex. 28 [Schiff Memo] at 3; Ex. 17 [Fusion Dep.] at 83:12-85:4; Ex. 31.

13. In July 2016, the FBI opened an investigation into alleged collusion between the Trump campaign and Russia, and that investigative team attempted to corroborate and assess the credibility of Steele's reports. Ex. 28 [Schiff Memo] at 2-3; Ex. 27 [Nunes Memo] at 4-6; Ex. 29 [March 20, 2017 Comey testimony] at 12.

14. Steele also shared his research with Associate Deputy Attorney General Bruce Ohr and the State Department. Ex. 27 [Nunes Memo] at 4-6; Ex. 28 [Schiff Memo] at 7.

15. In October 2016, the Justice Department ("DOJ") used information from Steele's reports to help obtain a FISA warrant to conduct surveillance on Carter Page, a Trump advisor. Ex. 27 [Nunes Memo] at 4; Ex. 30 at 15-17. In its FISA application, DOJ stated that previously Steele's "reporting has been corroborated and used in criminal proceedings and the FBI assesses

2

SUBJECT TO PROTECTIVE ORDER ENTERED AUGUST 24, 2018
ATTORNEYS' EYES ONLY

[Steele] to be reliable." Ex. 30 at 15 n.8.

16. In October 2016, Steele met again with the FBI in Rome, at the agency's invitation, to discuss his research. Ex. 17 [Fusion Dep.] at 83:13-84:19.

17. Around November 1, 2016, the FBI "suspended" its relationship with Steele because Steele had spoken to journalists. Ex. 31 at 1; Ex. 27 [Nunes Memo] at 4-5; Ex. 32 at 17 n.9.

18. Steele shared information after the 2016 election with Mr. Ohr, including providing all 16 pre-election memoranda to him in late November. Ex. 27 [Nunes Memo] at 5; Ex. 17 [Fusion Dep.] at 85:19-87:19.

19. The FBI also continued to conduct a "source validation report" to assess Steele's Dossier reports. Ex. 27 [Nunes Memo] at 5.

20. Sir Andrew Wood, the former U.K. ambassador to Russia and an informal adviser to Orbis, attended the Halifax International Security Forum in November 2016. Ex. 16 [Steele Dep.] at 23:22-24:6; Ex. 13 [Kramer Dep.] at 18:24-19:24, 84:7-21.

21. So did David Kramer, a Russia expert who had served as the Deputy Assistant Secretary of State responsible for Russia, Ukraine, Belarus, and Moldova. Ex. 13 [Kramer Dep.] at 11:21-15:11, 75:17-77:11. Kramer was a Senior Director at the McCain Institute for International Leadership at Arizona State University. *Id*. at 16:14-17:1.

22. Senator John McCain also attended the Forum, along with his Chief of Staff Christopher Brose. *Id* at 17:20-18:13, 24:19-25:6.

23. During the Forum, Wood told Kramer, Senator McCain, and Brose that he was aware of information collected by Steele, that suggested there was collusion as well as compromising information collected on President-elect Trump. *Id.* at 22:11-26:18.

24. Senator McCain asked Kramer to go to London to meet with Steele, which he did on November 28. *Id.* at 26:19-27:6, 86:23-87:18.

25. Kramer read the 16 memos Steele had written, Steele explained his methods, and Kramer saw a list of Steele's sources. *Id.* at 27:7-33:14. Kramer "was impressed with his [Steele's] knowledge and analysis" and recognized some of Steele's sources, whom he considered to be "serious." *Id.* at 88:16-89:10, 89:11-92:14.

26. Steele said some information in the memos was verified, while some needed to be further corroborated and verified. *Id.* at 33:15-34:25; Ex. 16 [Steele Dep.] at 101:5-102:8.

SUBJECT TO PROTECTIVE ORDER ENTERED AUGUST 24, 2018
ATTORNEYS' EYES ONLY

27. Steele asked Kramer to give the memos to Senator McCain in the hopes of giving the FBI an "additional prod to take this seriously." Ex. 13 [Kramer Dep.] at 35:14-24, 94:5-95:4; Ex. 17 [Fusion Dep.] at 127:15-131:12.

28. Kramer obtained the sixteen existing memos from Glenn Simpson. Ex. 17 [Fusion Dep.] at 132:10-21. On November 30, 2016, Kramer met with Senator McCain and Brose, and the Senator reviewed Steele's reports. Ex. 13 [Kramer Dep.] at 42:23-43:9.

29. Kramer told them "Mr. Steele himself seemed to be credible and believable" and that if the reports "were true and we did nothing with it history would not look kindly on us." He advised the Senator to share the memos with the FBI and CIA. *Id.* at 43:16-46:9, 93:9-25.

30. Kramer met with Victoria Nuland, the Assistant Secretary of State for Europe and Eurasia Affairs, to see if the Dossier "was being taken seriously" *Id.* at 113:1-114:18. Kramer also met with Celeste Wallender, then the Senior Director for Russian Affairs at the National Security Council. *Id.* Each was aware of the Dossier and attested to Steele's strong reputation. *Id.* at 114:19-117:11.

31. On December 9, Senator McCain met with Director Comey, and the FBI received from the Senator the first 33 pages of the Dossier that BuzzFeed later published. Ex. 8 [FBI Decl.] ¶ 6(b); Ex. 13 [Kramer Dep.] at 43:16-18, 45:4-14, 100:7-102:22. Steele continued to receive more information about Trump's connections to Russia after the election, Ex. 13 [Kramer Dep.] at 38:5-14, and on December 13, 2016, wrote a final report (Report No. 166) which provided more details about the alleged meeting between Michael Cohen and representatives of the Russian government, which had been described in previous memos dated October 18 and 19. Ex. 16 [Steele Dep.] at 40:7-25; Ex. 17 [Fusion Dep.] at 143:20-144:18; Ex. 1 [Compl.] Ex. 3 at 30-35.

32. Steele applied the same standards to assess the credibility of Report No. 166 as he did with everything else he included in the Dossier. Ex. 1 [Compl.] Ex. 3 at 35; Ex. 16 [Steele Dep.] at 66:17-67:6, 91:17-92:11, 98:12-101:16.

33. Steele did not write Report No. 166 for any client. Ex. 17 [Fusion Dep.] at 41:19-42:6; 147:20-150:18. Steele wrote it to give to Senator McCain to pass on to the FBI because he "judged it had national security implications for the United States and the West as a whole" and he believed Senator McCain was in a position to provide it to Director Comey. Ex. 16 [Steele Dep.] at 98:23-99:4, 133:12-136:13; Ex. 17 [Fusion Dep.] at 178:15-179:2.

4

SUBJECT TO PROTECTIVE ORDER ENTERED AUGUST 24, 2018
ATTORNEYS' EYES ONLY

34. Steele understood Kramer to be "the nominated intermediary of Senator McCain," Ex. 16 [Steele Dep.] at 138:18-139:5, and so he called Kramer and sent Report No. 166 to him, again via Fusion, to deliver to Senator McCain. Ex. 13 [Kramer Dep.] at 102:23-105:3, 116:11-19; Ex. 17 [Fusion Dep.] at 159:13-160:14.

35. Fusion provided it Kramer because it "understood him to be acting as a personal representative of Senator McCain for the purpose of delivering these memoranda to Senator McCain and on to James Comey of the FBI." Ex. 17 [Fusion Dep.] at 258:12-19.

36. Steele also provided a copy of Report No. 166 to "a senior British national security official." Ex. 16 [Steele Dep.] at 83:9-16.

37. Kramer met with Ms. Wallender at the National Security Council and gave her a full copy of the Dossier, including Report No. 166. Ex. 13 [Kramer Dep.] at 117:12-118:17.

38. Kramer also shared the Dossier with Rep. Adam Kinzinger (R-Ill.) to brief him and give him the full 35 pages. *Id.* at 118:23-121:6, 122:5-7.

39. Kramer also met with House Speaker Paul Ryan's Chief of Staff, John Burks, and showed him the full Dossier. *Id.* at 121:13-122:11.

40. The FBI received the full Dossier (including Report No. 166) before it was published by BuzzFeed. Ex. 8 [FBI Decl.] ¶ 6.

41. On December 6, 2016 President Obama ordered an inter-agency assessment of Russian interference in the U.S. election, which included the CIA, FBI and NSA. Ex. 36 [Gistaro Decl.] ¶¶ 8-10; Ex. 33 [HPSCI Report] at 38-39.

42. On January 5, 2017 a classified version of the Intelligence Community Assessment ("ICA") was shared with President Obama. Ex. 36 [Gistaro Decl.] ¶ 10. Attached was a two-page synopsis of "allegations derived from a 35 page Dossier". *Id*. ¶¶ 11-14, 17; Ex. 33 [HPSCI Report] at 110 n.47. A public version was released on January 6, 2017. Ex. 37.

43. NSA Chief Michael Rogers also considered the two-page summary as "part of the overall ICA review/approval Process." Ex. 33 [HSCPI Report] at 110 n.47.

44. On January 5, 2017, Clapper and/or the Directors of the FBI, CIA, and NSA briefed President Obama about allegations in the Dossier. Ex. 8 [FBI Decl.] ¶ 6(c); Ex. 33 [HPSCI Report] at 107.

45. On January 6, Director Comey briefed President-Elect Trump on "a summary of the Steele Dossier", and provided him with the two-page synopsis. Ex. 33 [HPSCI Report] at

5

SUBJECT TO PROTECTIVE ORDER ENTERED AUGUST 24, 2018
ATTORNEYS' EYES ONLY

54-55, 104; Ex. 27 [Nunes Memo] at 5-6; Ex. 36 [Gistaro Decl.] ¶¶ 11-14, 17; Ex. 38 [Comey Congressional Statement] at 1-2.

46.   In early January 2017, the FBI applied to renew the FISA warrant regarding Carter Page and stated that it continued to find Steele reliable, "notwithstanding the suspension of its relationship" with him.  Ex. 32 at 17 [FISA Warrant Renewal Application]; Ex. 28 [Schiff Memo] at 3.

47.   In early December 2016, BuzzFeed reporter Ken Bensinger heard from sources about reports by Christopher Steele about President-elect Trump and Russia.  Ex. 3 [Bensinger Decl.] ¶ 10.  Bensinger was familiar with Steele and thought he was a source of highly credible information.  *Id.* ¶ 11.  Ben Smith learned that David Kramer may have a copy.  *Id.* ¶ 14; Ex. 2 [Smith Decl.] ¶ 9; Ex. 4 [Schoofs Decl.] ¶¶ 6-7.

48.   On December 29, Bensinger met with Kramer at the McCain Institute.  Kramer reviewed what he knew about the Dossier.  Ex. 13 [Kramer Dep.] at 61:3-63:23; Ex. 3 [Bensinger Decl.] ¶ 15.  Kramer told Bensinger that he took the allegations "seriously" due to "Mr. Steele's bona fides, based on my understanding of Russian behavior under the Putin regime, and questions about comments made by [Trump] during the campaign . . ."  Ex. 13 [Kramer Dep.] at 98:3-22, 111:7-14.  Bensinger found Kramer to be a serious and credible Russia expert.  Ex. 3 [Bensinger Decl.] ¶ 17.

49.   Kramer let Bensinger have a copy of all 17 memos, including Report No. 166.  Ex. 13 [Kramer Dep.] 61:3-63:23, 73:3-75:10; Ex. 14 [Kramer Dep. Ex. 3]; Ex. 15 [Kramer Dep. Ex. 4]; Ex. 7 [Kramer Decl.] ¶ 3.

50.   Kramer told Bensinger that the document was "sensitive" and that "some of the information was unverified."  Ex. 13 [Kramer Dep.] at 63:1-23.

51.   Kramer also provided copies of the Dossier to other journalists.  *Id*. at 48:11-55:3.

52.   Bensinger then contacted Mark Schoofs, BuzzFeed's senior editor in charge of investigative reporting.  Ex. 4 [Schoofs Decl.] ¶ 7.  Schoofs concluded that BuzzFeed should investigate a few of the specific allegations in the Dossier that he thought might be possible to verify, including those about Michael Cohen's alleged trip to Prague and the allegations about pension payments to Russian emigres.  *Id*. ¶¶ 9-10.

53.   More than a half-dozen journalists were involved to varying degrees in the investigation, including one who traveled to Prague to try to see if any hotel might have a record

6

SUBJECT TO PROTECTIVE ORDER ENTERED AUGUST 24, 2018
ATTORNEYS' EYES ONLY

of Michael Cohen staying there. *Id.* ¶ 10.

54. At that time, BuzzFeed had no plans to publish the Dossier, in whole or in part, while it continued investigating. Ex. 2 [Smith Decl.] ¶ 14.

55. On January 10, 2017, CNN published a story reporting about the Dossier, the two-page synopsis, the Presidential briefings, and that the FBI investigated it. *Id.* ¶ 15 & Ex. 1.

56. After consulting with several BuzzFeed senior editors and Bensinger, Smith decided to publish the Dossier at that point after the CNN report was published, within the context of the article BuzzFeed published. *Id.* ¶¶ 16-17.

57. When they made that decision, none of the BuzzFeed journalists involved knew or had any degree of awareness – let alone a "high degree" – that the allegations about Plaintiffs on the Dossier's last page were false, or harbored "serious doubts" about that. *Id.* ¶ 22; Ex. 3 [Bensinger Decl.] ¶ 27; Ex. 4 [Schoofs Decl.] ¶ 14; Ex. 5 [Elder Decl.] ¶ 9.

58. The reasons they believed the allegations against Plaintiffs were credible included:

   a. Those allegations provided more details about a key allegation in the Dossier – that Russia was behind the hack of the Democratic Party leadership – which had been confirmed by credible public statements by the U.S. government, and which Steele had managed to learn about months before it became public. Ex. 2 [Smith Decl.] ¶ 19; Ex. 3 [Bensinger Decl.] ¶¶ 22-24; Ex. 4 [Schoofs Decl.] ¶¶ 9, 13; Ex. 5 [Elder Decl.] ¶ 5.

   b. Donald Trump had spent months publicly praising Putin and the Russian government. Ex. 4 [Schoofs Decl.] ¶ 13; Ex. 5 [Elder Decl.] ¶ 5; Ex. 13 [Kramer Dep.] 111:10-12.

   c. The allegations against Plaintiffs related to Michael Cohen's alleged actions in the Dossier, including setting up payments for persons involved, which was consistent with the "fixer" role he had long performed for Donald Trump. Ex. 2 [Smith Decl.] ¶ 22; Ex. 3 [Bensinger Decl.] ¶ 27; Ex. 4 [Schoofs Decl.] ¶ 14.

   d. The Dossier was written by Christopher Steele, a former British intelligence agent who they understood to have an excellent reputation and "the types of sources who could provide him with credible information" along with "the expertise to evaluate it." Ex. 3 [Bensinger Decl.] ¶ 11; *see also* Ex. 2 [Smith Decl.] ¶ 19; Ex. 4 [Schoofs Decl.] ¶ 13.

7

SUBJECT TO PROTECTIVE ORDER ENTERED AUGUST 24, 2018
ATTORNEYS' EYES ONLY

e. Kramer found Steele "a credible and serious person" who believed that, while portions of the Dossier were unverified, "the allegations it contained should be taken very seriously." Ex. 3 [Bensinger Decl.] ¶¶ 15-16; *see also* Ex. 2 [Smith Decl.] ¶ 19); Ex. 4 [Schoofs Decl.] ¶ 13; Ex. 13 [Kramer Dep.] at 111:10-12.

f. Senator McCain had taken the Dossier to Director Comey, which indicated he took the Dossier seriously as well. Ex. 2 [Smith Decl.] ¶ 19; Ex. 3 [Bensinger Decl.] ¶¶ 5, 21; Ex. 4 [Schoofs Decl.] ¶ 13.

g. The FBI was investigating the allegations in the Dossier. Ex. 3 [Bensinger Decl.] ¶ 21.

h. Senator Harry Reid was likely referring to the Dossier in an October 30, 2016 letter to Director Comey. Ex. 3 [Bensinger Decl.] ¶ 25; *see also* Ex. 39 [Reid letter].

i. The Russian intelligence services regularly engage in surveillance of prominent foreign visitors, as described in the Dossier, Ex. 5 [Elder Decl.] ¶ 5, and frequently collect compromising information, or *kompromat*, in order to gain leverage over potential sources, as described in the Dossier. *Id.* ¶ 5.

j. Sergei Invanov was replaced as head of the Russian Presidential Administration in the summer of 2016, shortly after the Dossier reported that he was "angry" about Russian interference in the U.S. election. Ex. 4 [Schoofs Decl.] ¶ 13; Ex. 5 [Elder Decl.] ¶ 5.

k. Mikhail Kalugin, a Russian diplomat who the Dossier claims was at risk of being exposed for participating in the election interference, was recalled to Russia. Ex. 4 [Schoofs Decl.] ¶ 13.

l. The Dossier's allegations about Trump advisor Carter Page were consistent with reports about his trip to Moscow. Ex. 2 [Smith Decl.] ¶ 19; Ex. 3 [Bensinger Decl.] ¶ 19; Ex. 4 [Schoofs Decl.] ¶¶ 9, 13; Ex. 5 [Elder Decl.] ¶ 5.

59. Notwithstanding his personal views as to the Dossier's truth, however, Smith recognized that those allegations of collusion and compromise were unproven, which could lead some readers to reasonably doubt their veracity. Ex. 2 [Smith Decl.] ¶¶ 20-21.

60. BuzzFeed published an article entitled *These Reports Allege Trump Has Deep Ties to Russia* (the "Article"), together with the embedded Dossier, at approximately 6:20 pm Eastern time on January 10. Ex. 1 [Compl.] Ex. 2-3; Ex. 40.

61. The Article stated that "CNN reported Tuesday that a two-page synopsis of the

8

SUBJECT TO PROTECTIVE ORDER ENTERED AUGUST 24, 2018
ATTORNEYS' EYES ONLY

report was given to President Obama and Trump" and included a hyperlink to the CNN story. It also stated that CNN reported that Senator McCain had given a copy of the memos to the FBI on December 9. Ex. 1 [Compl.] Exs. 2-3; Ex. 40.

62. At approximately 9:09 p.m. Eastern time on January 10, BuzzFeed revised the Article by adding statements from President-elect Trump, Kellyanne Conway, and Michael Cohen denying the Dossier's claims. Ex. 1 [Compl.] at Ex. 2.

63. Fusion and David Kramer were unhappy that BuzzFeed had published the Dossier, because they were concerned for the safety of Steele's sources. Ex. 13 [Kramer Dep.] at 66:17-67:3; Ex. 17 [Fusion Dep.] at 180:15-181:3. Shortly after publication, BuzzFeed redacted information pertaining to one source. Ex. 4 [Schoofs Decl.] ¶ 16. When Simpson and Fusion co-founder Peter Fritsch complained to Bensinger and then Smith that publishing the Dossier could endanger sources, Smith explained to them why he thought that "it was a clear matter of public and national interest" to publish "given that it been briefed to the President and President-elect." Ex. 17 [Fusion Dep.] at 181:4-183:6. Fritsch thought "as the former national security editor of the *Wall Street Journal*, [Smith's] not wrong about that. We would – I would have made the exact same argument." *Id.* at 182:3-183:6.

64. Scores of other news organizations also immediately began to report on it. *See, e.g.*, Exs. 42-48. Many included hyperlinks to the entire document on BuzzFeed's website, *see, e.g.*, Exs. 44, 48, 52, 57, and new reports analyzing in depth various portions of the document continue to be published to this date. *See, e.g.*, Exs. 47-49, 41-43. Since January 10, 2017, the Dossier has also been the subject of extensive Congressional testimony, endless political debate, several published books, and remains central to the controversy over Russia and President Trump. *See, e.g.*, Exs. 27-29, 36, 42-58.

Dated:  September 21, 2018         Respectfully submitted,

*Of Counsel*:                      /s/ Katherine M. Bolger
Nabiha Syed                        Katherine M. Bolger
BuzzFeed, Inc.                     Nathan Siegel
11 E. 18th Street, 13th Floor      Adam Lazier
New York, NY 10003                 Alison Schary
                                   DAVIS WRIGHT TREMAINE, LLP
                                   1251 Avenue of the Americas, 21st Floor
                                   New York, New York 10020

9

SUBJECT TO PROTECTIVE ORDER ENTERED AUGUST 24, 2018
ATTORNEYS' EYES ONLY

kateblger@dwt.com
nathansiegel@dwt.com
adamlazier@dwt.com
alisonschary@dwt.com

/s/ Roy Black
Roy Black
Jared Lopez
BLACK, SREBNICK, KORNSPAN & STUMPF, P.A.
201 So. Biscayne Boulevard
Miami, Florida 33131
rblack@royblack.com
jlopez@royblack.com

*Attorneys for Defendants*