# Exhibit 16

# In The Matter Of:

*ALEKSEJ GUBAREV, XBT HOLDING SA and WEBZILLA, INC v.*
*BUZZFEED, INC and BEN SMITH*

---

*Mr Christopher Steele*
*June 18, 2018*

---



*Original File C Steele Deposition.txt*
*Min-U-Script® with Word Index*

1      Mr Christopher Steele

2      CONFIDENTIAL - ATTORNEYS' EYES ONLY
       IN THE UNITED STATES DISTRICT COURT
3          SOUTHERN DISTRICT OF FLORIDA
   _____ :
4                                   :
   ALEKSEJ GUBAREV, XBT HOLDING  : Case No:
5  SA and WEBZILLA, INC          : 17-cv-60426-UU
                                  :
6          Plaintiffs            :
                                  :
7            -v-                  :
                                  :
8  BUZZFEED, INC and BEN SMITH   :
                                  :
9          Defendants            :
   _____ :
10

11             Videotaped deposition

12                    of

13             Mr Christopher Steele

14

15          On Monday, June 18th 2018

16

17          Commencing at 9.35 am

18

19                Taken at:

20              15 Old Bailey

21                 London

22               EC4M 7EF

23             United Kingdom

24

25  Reported by: Miss Pamela Henley

1                  Mr Christopher Steele

2          Q.     Do you understand that some of the

3   materials that you will be shown today have been

4   designated as confidential pursuant to that

5   confidentiality stipulation?

6          A.     I do.

7          Q.     Thank you.

8                 MR BAILIN:  Could voices be a

9   little higher, please.  Thank you.

10  BY MR FRAY-WITZER:

11         Q.     Mr Steele, are you currently

12  employed?

13         A.     I am employed.

14         Q.     And can you tell us, please, by

15  whom you are employed?

16         A.     I am employed by Orbis Business

17  Intelligence Limited.

18         Q.     And what is Orbis Business

19  Intelligence Limited?

20         A.     Orbis Business Intelligence Limited

21  is an investigative firm and a business

22  intelligence firm based in London, England.

23         Q.     And, just generally, what kind of

24  work do you perform?

25         A.     As it says on our website, we

1           Mr Christopher Steele
2    conduct investigations for clients.  We provide
3    intelligence for clients, and we provide strategic
4    advice for clients.
5           Q.    Is Orbis business Intelligence
6    Limited connected in any way to any government
7    entity?
8           A.    No, it is not.
9           Q.    It is a private company?
10          A.    It is a private company.  Privately
11   owned and listed company.
12          Q.    When did you first form Orbis?
13          A.    Orbis Business Intelligence was
14   incorporated on 16th March, 2009.
15          Q.    Do you have any partners in Orbis
16   Business Intelligence?
17          A.    I do, my partner in Orbis Business
18   Intelligence is Christopher Parker Burrows.
19          Q.    Would you say that Orbis Business
20   Intelligence has been a successful enterprise for
21   you?
22          A.    I would indeed.
23                MS EIKHOFF:  Object to form.  You
24   can answer.
25          A.    I would indeed, on the basis that

1                    Mr Christopher Steele

2    stenographer please read back the question?

3           (Preceding question read back)

4                    THE EXAMINER:  US plaintiffs'

5    submission.

6                    MR FRAY-WITZER:  It is simply a

7    follow up question to the witness's statement that

8    they utilize independent contractors for

9    intelligence gathering.

10                    THE EXAMINER:  Defendants.

11                    MR BLACK:   We do not object.  We

12   join in with the plaintiffs.  We think it is an

13   entirely legitimate question, and one of the

14   important matters that is under litigation in this

15   case to understand how information was gathered

16   and put into the memorandums.

17                    THE EXAMINER:  My opinion is it is

18   not within the topic.

19                    Witness, you can choose what to do.

20        A.    I choose not to answer.

21   BY MR FRAY-WITZER:

22        Q.    Is Sir Andrew Wood an independent

23   contractor for Orbis Business Intelligence

24   Limited?

25        A.    No, he is not.

1                Mr Christopher Steele

2        Q.    Does he serve as a consultant or

3  adviser to Orbis Business Intelligence Limited?

4        A.    I would say he was an informal

5  adviser, not a formal one, and not employed as

6  such.

7        Q.    On average can you tell us what

8  your annual take home pay and other benefits from

9  Orbis are?

10        MS EIKHOFF:  Object to form.

11        MR MILLAR:  We object to that on

12  the ground it is not within topic 1.  That is

13  detail about his earnings.

14        The only thing it could be covered

15  by is employment history (in general terms).  The

16  only thing it could be covered by in topic 1 is

17  employment history (in general terms).  But it is

18  neither historical, it is current, and it is not

19  in general terms.  It is a specific question about

20  earnings.

21        THE EXAMINER:  My opinion is it is

22  within the employment history for what that may be

23  worth.

24        You can choose whether to answer.

25        A.    Choose whether to answer? What I

1                    Mr Christopher Steele

2    BY MR FRAY-WITZER:

3         Q.     Can you tell us, please, what the

4    highest level of education is that you have

5    achieved?

6         A.     I have a master of arts degree from

7    Cambridge University in social and political

8    science.

9         Q.     And do you hold any other degrees?

10        A.     I hold no other degrees.

11        Q.     Would you please, in general terms,

12   outline for us your employment history from the

13   time that you earned your masters degree to the

14   time that you formed Orbis?

15        A.     Certainly.  I joined the Foreign

16   and Commonwealth Office in April 1987. I served as

17   Second Secretary in Moscow from 1990 to 1993.  I

18   then served as First Secretary in Paris from 1998

19   to 2002. And I retired from the Foreign &

20   Commonwealth Office in September 2009.

21        Q.     And, again, just in general terms

22   if you could explain to me what a Second Secretary

23   does, again just very generally, what that

24   position entailed?

25                    MR MILLAR:  We object to that

1          Mr Christopher Steele

2    question.  There is provision in the order for the

3    witness not to -- this is in paragraph 4 of the

4    Senior Master's order, the witness not to have to

5    answer any question that would require the consent

6    of Mr Steele former Crown employer before

7    answering the question.  And I take instructions

8    from my client that is a question that requires

9    consent.

10          MR BLAKE:  On behalf of the

11    Foreign & Commonwealth Office that question would

12    require consent of Mr Steele's former Crown

13    employer.  It is something that would have come to

14    his notice as a Crown servant or relating to

15    something that would require consent.

16          THE EXAMINER:  I will hear the US

17    plaintiffs and US defendants, but --

18          MR FRAY-WITZER:  We will withdraw

19    the question.

20          THE EXAMINER:  Thank you.

21    BY MR FRAY-WITZER:

22          Q.    Is it accurate to say that from

23    1990 to 1993, you were in country in Russia?

24          A.    Indeed, as I just explained to you,

25    that is the case.

1                    Mr Christopher Steele

2          Q.     You detailed for us your employment

3    history 1990 to 1993, and I believe 1998 to 2002,

4    are you able to tell us between 1993 and 1998 what

5    position you held?

6          A.     I am not.

7          Q.     Are you able to tell us between

8    2002 and September of 2009, what positions you

9    held?

10         A.     I am not, for the same reason, it

11   would require Crown consent which I have not got.

12         Q.     Have you returned to Russia since

13   1993?

14              MR MILLAR:  We object to that

15   question. It is not a question that falls within

16   the scope of topic 1.  And the answer to the

17   question would require Crown consent.

18              MR BLAKE:  Again, on behalf of the

19   Foreign & Commonwealth Office insofar as it

20   relates to Mr Steele's employment with the Foreign

21   & Commonwealth Office that would require the

22   consent of the Foreign & Commonwealth Office.

23              (Reporter clarification)

24              THE EXAMINER:  US plaintiffs, do

25   you wish to withdraw or reformulate your question?

1                     Mr Christopher Steele

2              A.     I did not.

3           (Exhibit 4 marked for identification)

4              Q.     Did you discuss your deposition

5      today with the FCO?

6              A.     I did not.

7              Q.     You are being shown what has been

8      marked as Exhibit Number 4 to your deposition, can

9      you tell me if you recognize this document.

10             A.     I do.

11             Q.     And can you tell us what this

12     document is?

13             A.     It is what it says it is, which is

14     an intelligence memorandum concerning Russia's

15     interference in the 2016 American presidential

16     election.

17             Q.     If I refer to this document as the

18     December memo, would that be acceptable?

19             A.     Yes.

20             Q.     When did you create this document?

21             A.     I believe it was created on the

22     given date, which is 13th December 2016.

23             Q.     I am sorry, I got ahead of myself,

24     let me just ask, did you create this document?

25             A.     I did create this document.

1          Mr Christopher Steele

2          THE VIDEOGRAPHER:  Back on the

3  record at 10.43.

4  BY MR FRAY-WITZER:

5          Q.    Mr Steele, did you travel to Russia

6  to verify any of the allegations contained in the

7  December memo?

8          A.    No.

9          Q.    Have you traveled to Russia at any

10  time since leaving the FCO?

11          A.    Not since 2009.

12          Q.    You describe the information

13  contained in the December memo as raw

14  intelligence, is that correct?

15          A.    Yes.

16          Q.    Tell us, please, what it means for

17  something to be raw intelligence?

18          A.    I would define it as information

19  that is passed to you directly from a source.

20  That source could be human.  Could be technical in

21  its original form, and which, therefore, is

22  pre-analysis, so it has not been analyzed as such.

23  Does not mean it has not been looked at in terms

24  of verification, but has not been fully analyzed.

25      (Exhibit 6 marked for identification)

```
 1                    Mr Christopher Steele
 2          Q.      Mr Simpson says, and, again,
 3   supposedly paraphrasing you:
 4                    "It is HUMIT, right?  It is human
 5   source information...  and humans sometimes lie,
 6   and more frequently they just get it wrong."
 7                    Did you say words to that effect to
 8   Mr Simpson?
 9                    MR MILLAR:  The objection is the
10   same, it is not within topic 2.
11                    MR FRAY-WITZER:  The response is
12   the same.
13                    THE EXAMINER:  My opinion is the
14   same.  The witness can --
15          A.      I am choosing not to answer again.
16   BY MR FRAY-WITZER:
17          Q.      In making efforts to verify the
18   allegations about the plaintiffs contained in the
19   December memo did you take into account the fact
20   that raw intelligence might later prove to be
21   incorrect or untrue?
22                    MS EIKHOFF:  Object to form.
23          A.      Yes.
24   BY MR FRAY-WITZER:
25          Q.      In making your efforts to verify
```

1                    Mr Christopher Steele

2    the information contained in the December memo

3    about the plaintiffs did you take into account the

4    fact that raw intelligence might include

5    deliberately false information?

6          A.     Yes.

7          Q.       In attempting to verify the

8    information contained in the December memo

9    concerning the plaintiffs did you take into

10   account the possibility that a Russian business

11   competitor might give false information in order

12   to harm a competitor?

13                 MS EIKHOFF:  Object to form.

14                 MR MILLAR:  I am going to object to

15   that on the basis that we are straying very near

16   to increasing the existing risk of confidential

17   intelligence sources being identified.

18                 If the question could be rephrased

19   in a way that does not require the witness to

20   positively aver the status of his source that

21   might avoid the problem.

22                 THE EXAMINER:  US plaintiffs, do

23   you want to reformulate?

24                 MR FRAY-WITZER:  I am certainly

25   happy to try.

1                    Mr Christopher Steele

2    BY MR FRAY-WITZER:

3           Q.    Did you authorize BuzzFeed to

4    publish the December memo?

5           A.    No.

6           Q.    Did you provide copies of the

7    December memo to BuzzFeed?

8           A.    I did not.

9           Q.    To whom did you provide copies of

10   the December memo?

11          A.    As we have stated in our English

12   proceedings, I provided copies of the December

13   memo to Fusion GPS for onward passage to David

14   Kramer at the request of Senator John McCain, and

15   also to a senior British national security

16   official.

17          Q.    When you provided a copy of the

18   December memo to Fusion GPS did you intend for the

19   December memo to be published to the world at

20   large?

21          A.    No.

22          Q.    Did you authorize Fusion GPS to

23   publish the memo to the world at large?

24          A.    I did not.

25          Q.    You have described the December

1                Mr Christopher Steele

2  do you know if the December memo was provided to

3  the Penn Quarter Group?

4        A.     Not to my understanding, no.

5             THE EXAMINER:  It is actually

6  nearly 10 to 12, and I have just been informed the

7  tape is running low, could we take a 5-minute

8  break for the sake of both recordings.

9             THE VIDEOGRAPHER:  This is the end

10  of media 1 in the deposition of Christopher

11  Steele. Going off the record at 11.39.

12                (Recess taken)

13             THE VIDEOGRAPHER:  This is the

14  beginning of media 2 in the deposition of

15  Christopher Steele.  Going on the record at 11.48.

16  BY MR FRAY-WITZER:

17        Q.     In providing the December memo to

18  Fusion GPS did you give Fusion GPS any cautions or

19  warnings concerning the nature of the information

20  contained in the December memo?

21             MS EIKHOFF:  Objection.

22        A.     I cannot remember precisely, but

23  the memo would have been covered by the same

24  caveats that all memos were covered by in the

25  provision of them to Fusion.

1               Mr Christopher Steele

2   BY MR FRAY-WITZER:

3         Q.     And what prior caveats had you

4   given to Fusion that would apply to the December

5   memo?

6         A.     I cannot remember exact wording,

7   but the standard wording is along the lines of

8   this is material from human source or sources

9   regarded as credible, and it is produced to the

10  best of our knowledge and ability to be accurate

11  and true.

12        Q.     When you provided the December memo

13  to Mr Simpson did you caution him that a central

14  problem when you are a Russian intelligence expert

15  is disinformation and the Russians have a long

16  history and advanced capability in disinformation?

17               MS EIKHOFF:  Object to form.

18               MR MILLAR:  This is not covered by

19  topics 3, 4 and 5.

20               THE EXAMINER:  US plaintiffs.

21               MR FRAY-WITZER:  This is about what

22  was said during the provision of the memo to

23  Fusion GPS.  It is precisely within the topics.

24               THE EXAMINER:  My opinion is that

25  it is outside the topics which are provision, and

1            Mr Christopher Steele

2   not what is said on provision. There may be a way

3   of reformulating.

4            The witness can choose to answer.

5       A.    You said there may be a way of

6   reformulating so perhaps you would like to try and

7   reformulate the question.

8   BY MR FRAY-WITZER:

9       Q.    In providing the December memo to

10  Fusion GPS did you provide cautions against the

11  possibility that there might be Russian

12  disinformation contained therein?

13           MS EIKHOFF:  Object to form.

14           MR MILLAR:  Well, it is the same

15  objection.  It is not about the provision of the

16  report, it is about what he said to Fusion.  Did

17  not say to Fusion.

18           We could open up an entire line of

19  questioning about what he did and did not say to

20  Fusion, but that is not encompassed within the

21  topic.

22           MS BROWN:  Well, I would suggest

23  that at the time of the hearing before the Master

24  it was acknowledged that the very purpose of the

25  line of questioning related to provision of the

1                    Mr Christopher Steele

2                    THE EXAMINER:  Well, I cannot see

3    that there is a question within a question, do you

4    object to this, Mr Millar?

5                    MR MILLAR:  Well, I will withdraw

6    the objection to this question.  I will listen for

7    the next one.

8                    MS EIKHOFF:  I do object to form.

9                    THE EXAMINER:  Mr Steele, you can

10   choose whether to answer, but the objection has

11   been withdrawn.

12        A.    Well, I will answer then.  2 points

13   really, one, is that a general understanding

14   existed between us and Fusion during this topic --

15   during this project, that all material contained

16   this risk, but that any information that was

17   actually provided would have been subject to

18   scrutiny in respect of this risk, and a warning,

19   specific warning would have been issued had we

20   believed that, as we would say, I think, the

21   source was intending to influence as well as

22   inform.  I think that covers the point.

23                    The other point is that this memo

24   was not for the consumption of Fusion or for their

25   former client, it was for the consumption of

1                    Mr Christopher Steele

2   Senator McCain, and, therefore, we would not

3   specifically have caveated this memo in that way,

4   other than to Mr Kramer or Senator McCain.

5          Q.    Do you know if it was caveated in

6   that way to Senator McCain or David Kramer?

7          A.    I do not know whether specifically

8   this had been, but, obviously, the issue had come

9   up in previous conversation with Mr Kramer.

10         Q.    What caveats and warnings did you

11  provide to Mr Kramer?

12         A.    At our meeting in Surrey in

13  November 2016, I gave him the caveats and warnings

14  that I have indicated to you that we would apply

15  to any such report.

16         Q.    If you would turn, please, to

17  page 33 of the Kramer deposition, at line 15

18  Mr Kramer is asked:

19               "Did Mr Steele tell you whether and

20  to what extent he had been able to verify the

21  information he had gathered?"

22               "Answer:  He explained that what

23  was produced was -- that what was produced was

24  that needed to be corroborated and verified, he

25  himself did not feel that he was in a position to

1           Mr Christopher Steele

2    vouch for everything that was produced in this."

3               Was that one of the cautions and

4    caveats that you have just referred to him?

5               MR MILLAR:  This topic is about --

6    I am objecting to that question.  It may be

7    possible to reformulate it.  This topic is about

8    the provision of simply the December memorandum,

9    and as I understand it that the evidence tabled

10   from Mr Kramer was not limited in that way.

11              So if there is a question of that

12   sort that is specific to Document 166 and the

13   provision to Mr Kramer of that via the consultants

14   then that would not be objectionable.

15              THE EXAMINER:  Would you like to

16   reformulate.

17              MR FRAY-WITZER:  Well, I believe

18   that the witness testified that in the provision

19   of the December memo he believed that the caveats

20   that he gave Mr Kramer carried over from the

21   original meeting to the December memo, and so the

22   only way to ask about the December memo is to ask

23   about caveats that the witness himself says

24   carried over.

25              MR MILLAR:  Yes, well, do not ask

1                  Mr Christopher Steele

2  him about this deposition. Ask him the direct

3  question.  It is perfectly straightforward.

4  BY MR FRAY-WITZER:

5          Q.    Did you -- was one of the caveats

6  and cautions that you provided to Mr Kramer the

7  fact that the information needed to be

8  corroborated and verified?

9          A.    I would say further corroborated

10  and verified.

11          Q.    Was one of the caveats and cautions

12  that you gave to Mr Kramer that you did not feel

13  that you were in a position to vouch for

14  everything that was produced in the memos?

15          A.    Yes, with the emphasis on,

16  "everything".

17          Q.    Was one of the cautions that you

18  gave to Mr Kramer that you were dealing with raw

19  intelligence?

20          A.    It is difficult to answer that with

21  a "yes" or "no". In general, yes. But, obviously,

22  not always single source, and, therefore, it is

23  more complicated than is assumed by the question.

24          Q.    Was one the caveats and cautions

25  that you gave to Mr Kramer that you were dealing

1                    Mr Christopher Steele

2    with human intelligence?

3            A.      Yes.

4            Q.      Why did you give that caution?

5            A.      Because human intelligence is not a

6    science. It is a complicated set of principles and

7    information which have to be analyzed in an

8    equally complicated and thorough way.

9            Q.      When you provided the December memo

10   to Fusion did you have any conversations with them

11   concerning the truth or falsity of the allegations

12   concerning the plaintiffs contained in that memo?

13           A.      Not to my memory.

14           Q.      When you provided the December memo

15   to Fusion GPS did you have any conversations about

16   XBT?

17           A.      Not specifically that I recall.

18           Q.      When you provided the December memo

19   to Fusion GPS did you specifically have any

20   conversations with them concerning Webzilla?

21           A.      Not that I can recall.

22           Q.      And when you provided the December

23   memo to Fusion GPS did you have any specific

24   conversations with them concerning Aleksej

25   Gubarev?

1          Mr Christopher Steele

2    occur on one single occasion.  And the question

3    that can be asked is about the discrete provision

4    of Dossier 166 which happened later in December

5    after the election.

6                    THE EXAMINER:  I follow the

7    objection.  Are the defendants prepared to break

8    the question down so that it becomes apparent that

9    their question concerns this document, whether or

10   not it includes other documents.

11   BY MR BLACK:

12        Q.    Did you seek to share company

13   report 166 with Senator John McCain?

14        A.    I did.

15        Q.    Why?

16        A.    Because I judged it had national

17   security implications for the United States and

18   the West as a whole.

19        Q.    Did you do -- let me withdrew that.

20              Did you seek to send it to Senator

21   McCain through David Kramer?

22        A.    Yes, Senator McCain had requested

23   that I did so through David Kramer.

24        Q.    Did you share it with Senator

25   McCain because you knew he was the chair of the

1          Mr Christopher Steele

2    United States Senate Armed Services Committee?

3          A.    Yes.

4          Q.    Did you share it with him because

5    you knew he was also a member of the United States

6    Senate Committee on Homeland Security and

7    Governmental Affairs?

8          A.    Yes.

9          Q.    Did you use David Kramer as an

10   intermediary because he was a former United States

11   State Department civil servant?

12         A.    Senator McCain nominated him as the

13   intermediary.  I did not choose him as the

14   intermediary.

15         Q.    Did you know that he was a former

16   civil servant in the United States Department of

17   State?

18         A.    I did.

19         Q.    Did you know that he, in fact, was

20   the United States Assistant Secretary of State for

21   Democracy, Human Rights and Labour from 2008 to

22   2009?

23         A.    I did.

24         Q.    Did you also know that he was the

25   Senior Director For Human Rights and Human

1              Mr Christopher Steele
2  Freedoms at Senator McCain's Institute for
3  International Leadership?
4              MR FRAY-WITZER:  Objection to form.
5         A.    I did. Objection?
6              THE EXAMINER:  Objection to form.
7  Could you expand on that?
8              MR FRAY-WITZER:  If you would like
9  I would be happy to.  It is an objection to form
10  for the US proceedings.
11              THE EXAMINER:  Only for the US
12  proceedings.
13         A.    I answered the question, I believe.
14              MR BLACK:   Yes, you did.
15         Q.    What was your understanding as to
16  what Senator McCain would do with the memorandum
17  166 once he received it?
18              MR FRAY-WITZER:  Objection.
19              THE EXAMINER:  Objection to form,
20  you can continue.
21         A.    Okay.  Could you say objection to
22  form, please, and I can understand whether I need
23  to halt or not.
24              MR FRAY-WITZER:  I will tell you
25  that any objection that comes from me will be an

1          Mr Christopher Steele

2  objection to form.

3          THE WITNESS:  Okay. Because

4  sometimes I cannot hear you saying it up there so

5  perhaps you could.  Thank you. Sorry, the question

6  again was?

7  BY MR BLACK:

8      Q.     What was it that you hoped Senator

9  McCain would do once you gave him the company

10  report 166?

11         MR FRAY-WITZER:  Objection to form.

12     A.     Raise it with the competent US

13  investigative authorities.

14     Q.     For what purpose?

15     A.     Investigation and for validation.

16     Q.     How important -- how much

17  importance did you put on the information that you

18  were giving to Senator McCain?

19         MR MILLAR:  I do not think that is

20  a question that is covered by a topic.

21         THE EXAMINER:  Are you objecting?

22         MR MILLAR:  Yes, I am objecting,

23  yes. I mean, he has been asked what the purpose of

24  provision of the document to Senator McCain was.

25  He has given answers to that. Clearly he can be

1                    Mr Christopher Steele

2    affected the national security of the United

3    States?

4                    MR FRAY-WITZER:  Objection to form.

5         A.    Yes.

6                    MR BLACK:   Thank you very much.  I

7    have no further questions.

8                    THE EXAMINER:  US plaintiffs want

9    to reexamine?

10                   MR GURVITS:  Yes, we will take a

11   5-minute break.

12                   THE VIDEOGRAPHER:  Going off the

13   record at 1.41 pm.

14                        (Recess taken)

15                   THE VIDEOGRAPHER:  Back on the

16   record at 1.45.

17   BY MR FRAY-WITZER:

18        Q.    You were just asked a series of

19   questions concerning your having provided the

20   December memo to Senator McCain, correct?

21        A.    Correct.

22        Q.    You did not actually provide the

23   December memo to Senator McCain, did you?

24        A.    No, I provided it to the nominated

25   intermediary of Senator McCain.

1                    Mr Christopher Steele

2          Q.     You did not have direct

3    conversations with Senator McCain concerning the

4    provision of the December memo, is that correct?

5          A.     Not direct ones, no.

6                    MR FRAY-WITZER:  No further

7    questions.

8                    THE EXAMINER:  Thank you.

9                    MS EIKHOFF:  On behalf of the

10   witness as in producing parties we would like to

11   designate the entirety of his testimony today as

12   "attorneys' eyes only" information, pursuant to

13   the amended confidentiality stipulation of the

14   protective order that has been entered in this

15   case in the Southern District of Florida.

16                    THE EXAMINER:  US parties, is that

17   agreed?

18                    MR FRAY-WITZER:  That is the right

19   of any party and any individual providing

20   testimony, so that is certainly their right.

21                    THE EXAMINER:  Is it necessary to

22   have any order for English proceedings ancillary

23   to that as far as those present are concerned?

24                    MR MILLAR:  No, not as far as we

25   are concerned.  The exchange is on the record.  So