# Exhibit 17

**In the Matter Of:**

ALEKSEJ GUBAREV -v- BUZZFEED INC.

0 18-mc-60528-UU, 0 17-cv-60426-UU

---

**FUSION GPS**

*August 30, 2018*

---

*30(b)(6), Attorneys Eyes Only*



800.211.DEPO (3376)
EsquireSolutions.com

1   BY MR. FRAY-WITZER:

2        Q.   Sure.

3             Outside of conversations at which your

4   counsel was present --

5        A.   Right.

6        Q.   -- were there any conversations as to who

7   would be the best witness to appear today as Fusion

8   GPS 30 (b)(6)'s witness?

9        A.   No, there were not.

10       Q.   Can you tell me generally what Fusion GPS

11  is?

12       A.   Sure.  I'm happy to.  Fusion GPS is a

13  premium research firm.  We are a collection of former

14  journalists.  Mr. Simpson and myself worked for

15  roughly 15, 20 years for the Wall Street Journal.

16  Thomas Catan worked for the Wall Street Journal and

17  the Financial Times.

18            Mr. Felch worked for the Los Angeles Times.

19            And then we have a number of other research

20  staff who have various specialized skills such as

21  computer coding, we have people who are trained



1   archivists, people who are experts in open source

2   research and collection.

3           So what we do primarily is collect

4   information, as I said, available in the open source,

5   open source meaning publicly available records,

6   filings, that sort of information.  Our typical client

7   base are large law firms engaged in complicated

8   disputes, companies -- large companies looking for

9   deeper situation -- situational awareness of a matter.

10          We work with large hedge funds, ambassadors

11  of private equity firms, those sorts of people.

12      Q.   Does the firm conduct what is typically

13  referred to as opposition research for a political

14  candidate?

15      A.   Yeah, I hear that term used a lot,

16  "opposition research."  It has a certain connotation

17  that I don't really think is very helpful in

18  understanding our methodology.

19          That said, I'll explain that we rarely are

20  involved in political -- what you would describe or

21  what anyone would describe as a political matter.



1          We did so in 2012 and we did so in 2016.

2    And, again, in both those instances what we were asked

3    to do was collect, review, digest and articulate the

4    meaning of public records.

5          Q.   And if I understand it, I think -- and

6    please correct me if I'm wrong -- I think your

7    hesitation to use the phrase "opposition research" is

8    that Fusion GPS sees itself as collecting more than

9    just opposition as opposed to collecting, sort of, all

10   information about a subject.  Is that accurate?

11         MR. LEVY:  Objection, form.

12         But go ahead.

13         THE WITNESS:  I think the -- the intention

14   of my answer is -- resides more in -- in what is

15   typically known as opposition research, which is

16   campaign driven, which is typically a collection of

17   what you call votes and quotes that are then distilled

18   for purposes of a campaign; whether it's the cutting

19   of ads or whether it's talking points for a candidate

20   in a debate, that sort of thing.

21         What we are -- what we specialize in and our



1   BY MR. FRAY-WITZER:

2       Q.    At some point in time, was Fusion engaged by

3   a client to do research into candidate Trump?

4       A.    Yes, we were.

5       Q.    When were you engaged to do that?

6             MR. LEVY:  Objection to form.

7             Go ahead and answer.

8             THE WITNESS:  We were first engaged by a

9   client to research Donald Trump, not Trump and Russia

10  in, I believe it was September, 2015.

11  BY MR. FRAY-WITZER:

12      Q.    And who was the original client that engaged

13  Fusion GPS to conduct that research?

14      A.    It was the Washington Free Beacon.

15      Q.    How did that engagement come about?

16            MR. LEVY:  I'm going to instruct the witness

17  not to answer that question at this time inasmuch as

18  it is outside the scope -- more specifically limited

19  by the Court's July 28th, 2018, order allowing

20  Plaintiff to question the 30 (b)(6) non-party witness

21  about any clients who may have been behind the



1  December memo, and any client who is involved in the

2  creation of the dossier as it is referred to in the

3  subpoena.

4            And beyond that, the Court's order

5  documentary 50 states that questions by other clients

6  are outside the scope of this deposition.

7            MR. FRAY-WITZER:  I'm not sure that I agree

8  with all of what you said but we'll move on for the

9  moment, and when it becomes an issue it'll become an

10  issue.

11  BY MR. FRAY-WITZER:

12      Q.   At some point in time, did Fusion's

13  engagement with the Washington Free Beacon end?

14      A.   Yes, it did.

15      Q.   And when was that?

16      A.   I can't recall specifically, but I believe

17  it was around May of 2016, maybe April.  You should

18  understand that sometimes our engagements kind of die

19  a natural death and we don't have formal bookends or

20  we don't memorialize the end of an engagement.

21            In this particular case the client's



1    interests had dissipated with the de facto nomination

2    of Mr. Trump as the republican candidate for

3    president.

4         Q.   Subsequent to the engagement with the

5    Washington Free Beacon ending, did Fusion GPS acquire

6    a -- another client who was interested in your

7    continuing research on candidate Trump?

8              MR. LEVY:  Objection to form.

9              THE WITNESS:  Yes, we did.

10   BY MR. FRAY-WITZER:

11        Q.   When was that?

12        A.    In that same timeframe.  I think we -- I

13   can't remember precisely when we signed the contract.

14   It might have been April or May of 2016.

15        Q.   And who was the new client?

16        A.   Perkins Coie.

17        Q.   And --

18        A.   C-O-I-E.

19        Q.   Perkins Coie is a law firm.  Is that

20   correct?

21        A.   That's right.  They're a law firm.  I think



1  their headquarters is in Seattle.

2       Q.   And on whose behalf did Perkins Coie engage

3  Fusion GPS?

4       A.   We were not told explicitly at the time.

5  However it's pretty obvious that it was the DNC and

6  the Hillary for America campaign.

7       Q.   What specifically was the scope of

8  engagement from Perkins Coie?

9       A.   Very broad.  This gets back to what I was

10 trying to explain to you earlier, that what we sell --

11 and frankly, what we insist our clients buy is a very

12 holistic and broad inquiry that can take in any number

13 of subject matters.

14          So to fill that out a little bit, if you'd

15 like me to?

16      Q.   Go ahead.

17      A.   An organization like a national campaign or

18 major political party will have its own inhouse

19 researchers to conduct a lot of that, kind of more

20 sort of -- how would I call it without making it sound

21 insulting?  Mundane collection, devote some quotes,



1   sort of book I was describing earlier, it's a more

2   specialized skill to pull things like bankruptcy

3   records, to collect those and to process them and

4   digest them and make them understandable by common

5   persons.

6       Q.   I guess with respect to this particular

7   engagement, to the best that you recall what was the

8   scope of the engagement?  What was -- what was the

9   scope of the engagement?

10           MR. LEVY:  I'm going to instruct the witness

11  not to answer this question inasmuch as it would

12  implicate the attorney-client privilege, the attorney

13  work product doctrine.

14           If you want to talk about how these matters

15  worked in a general manner, you can.

16           MR. FRAY-WITZER:  I believe that the Court

17  did require answers to this kind of category of

18  questions with respect to what they were hired to do.

19           MR. LEVY:  And I also believe that the Court

20  in the same order preserved the opportunity for

21  counsel to invoke attorney work product doctrine where



1   applicable, while allowing the witness to answer

2   questions that did not implicate privilege.

3            Rule 30 (c)(2) is consistent with that

4   order, of course.

5            MR. FRAY-WITZER:  And just so I understand,

6   which attorneys are you referring to for attorney work

7   client privilege?

8            MR. LEVY:  For any lawyer at Perkins Coie

9   directing and communicating with Fusion GPS during the

10  course of the engagement.

11           MR. FRAY-WITZER:  And on what basis are you

12  asserting Perkins Coie's attorney-client privilege?

13           MR. LEVY:  The law firm has maintained both

14  privileges with Fusion GPS.  It has not authorized

15  Fusion GPS to waive those privileges.  It has only

16  released Fusion GPS to disclose the name of Perkins

17  Coie and its underlying clients.  There's a letter in

18  the public record to that effect.

19  BY MR. FRAY-WITZER:

20     Q.   What efforts did Fusion GPS initially

21  undertake in connection with the assignment from



1   Perkins Coie?

2        A.    I'm sorry.  I don't -- I'm not sure I

3   understand what you mean by efforts.

4        Q.    What did you actually do when you were hired

5   by the Democratic National Committee, Hillary for

6   American campaign through Perkins Coie?

7        A.    That I understood.

8              Again, it's an iteration of what I described

9   earlier.  I would boil it down as Donald Trump

10  discussed.  We were given a very broad mandate to

11  follow our instincts and our leads where they led.

12             Obviously we are a more specialized kind of

13  research firm, we used to work at the Wall Street

14  Journal, Candidate Trump had gone through four

15  bankruptcies.  That's a pile of paper.  And so we were

16  obviously looking at that.

17             We were looking at his business trajectory

18  and footprint, not just in the United States or New

19  York but globally.

20             So, is that helpful?

21       Q.    Yes.



1              I want to jump forward for a moment and

2       we'll come back.  But at some point in time, did

3       Fusion GPS's engagement with Perkins Coie on this

4       matter end?

5              A.   Yes, it did.

6              Q.   When was that?

7              A.   It ended on election day, 2016, early

8       November.  I think it was November 8th, 2016.

9              Q.   Was Fusion GPS subsequently hired to

10      continue the Trump research that you had been

11      conducting?

12             A.   I'm not sure I understand.  Hired by Perkins

13      Coie?

14             Q.   No.  Hired by anyone else?

15             A.   Yes.

16             Q.   When was Fusion GPS subsequently hired to

17      continue research?

18             A.   I believe February or March of 2017.

19             MR. LEVY:  And beyond that, I'm going to

20      instruct the witness not to discuss that matter

21      because it's limited by the Court's July 28th, 2018,



1    order.

2    BY MR. FRAY-WITZER:

3        Q.   And your counsel has anticipated my next

4    question, so let me ask it anyway and then you can

5    give the instruction.

6            It has been reported that Fusion GPS was

7    retained by the Penn Quarter Group to continue

8    research into President Trump.

9            Is that the engagement that you're referring

10   to?

11           MR. LEVY:  I'm going to instruct the witness

12   not to discuss any client matters outside of what

13   you've already discussed --

14   BY MR. FRAY-WITZER:

15       Q.   At --

16           MR. LEVY:  -- consistent with the Court's

17   order.

18   BY MR. FRAY-WITZER:

19       Q.   At the time that the -- what we have

20   referred to as the December memo from Christopher

21   Steele, a memo dated December 13th, 2017 --



1          A.    '16.

2          Q.    '16.  Thank you.

3                At the time the December memo was created,

4    did Fusion GPS have a client that was paying for

5    research into President Trump?

6          A.    No, we did not.

7          Q.    Can you tell me, if you know, who

8    Christopher Steele is?

9          A.    I can and I do.

10         Q.    And who is Mr. Steele?

11         A.    Christopher Steele is a former employee of

12   the British government working for MI6 which is the

13   intelligence, the equivalent of our CIA in the United

14   Kingdom.

15               He worked there for most of his career until

16   2009, I believe, when he and a fellow colleague

17   started a company in London -- based in London called

18   Orbis, O-R-B-I-S, Consulting.

19               Christopher Steele when he left Her

20   Majesty's service, was not just a Russia officer at

21   MI6, but he was the Russia officer at MI6. He was the



1   boss of that desk.

2          So he was, at the time of his retirement

3   from government, one of the premiere intelligence

4   analysts watching Russia and the former Soviet Union

5   in the NATO alliance.

6      Q.   And I'm sorry, when you just said at the

7   time, did you mean when he retired from the service in

8   2009?

9      A.   That's correct.

10     Q.   How did you Fusion become aware of Mr.

11  Steele?

12     A.   We were introduced to Mr. Steele in 2009, I

13  believe -- it might have been 2010 -- by mutual

14  friends in London who shared an interest in topics

15  related to Russia, money laundering, transnational

16  crime and political corruption.

17     Q.   To whom at Fusion was the introduction made?

18     A.    It was -- I believe it was first made to

19  Glenn, I -- Glenn Simpson.  I met Chris soon

20  thereafter, I want to say in the 2011 timeframe.

21     Q.   Between 2009 and 2011 when you were first



1  public record research on behalf of one of their

2  clients.

3  BY MR. FRAY-WITZER:

4      Q.   And had Fusion hired Orbis prior to the

5  Trump investigation?

6      A.   I honestly don't recall.  We may have.  If

7  we had, it would have been a small, limited

8  engagement.  But I don't recall.

9      Q.   How did Fusion come to engage Mr. Steele

10  and/or Orbis in connection with the Trump

11  investigation?

12      A.   Sure.

13          As I testified earlier, we had been looking

14  at Mr. Trump and his business record for the better

15  part of eight or nine months, during which time we had

16  come to a couple of decisions.  One was that we were

17  exhausting some of the public record material,

18  especially as they related to Donald Trump's

19  engagement with Russia.  Public records aren't --

20  aren't easily accessed in Russia or the former Soviet

21  Union.



1          We decided that that was a major area of

2    inquiry in which we could add value.

3          So Mr. Simpson and myself decided that we

4    would like to supplement our research with some more

5    human inquiries.

6          We considered a number of contractors who do

7    that kind of work and we decided after much discussion

8    that Mr. Steele was the most highly qualified and

9    reliable contractor we could hire, and so we did so.

10          You have to understand, too, that in that

11   line of work and especially when you're dealing with

12   Russia and the former Soviet Union, there's a large

13   amount of bad information and disinformation that can

14   flow through to someone like a research company like

15   ours.  We trusted Chris to identify, sort out, sift,

16   disqualify that sort of information.  That is what he

17   spent a career at MI6 learning how to do and we knew

18   him to have the most robust and experienced source

19   network in those countries.

20   Q.   When you say you knew him to have the most

21   robust source network in those countries, how did you



1  know that?

2          MR. LEVY:  I'm going to instruct the witness

3  to not discuss sources, their identities pursuant to

4  the Court's limitation in its order of July 28, 2018.

5          Beyond that you can answer the question.

6          THE WITNESS:  We had met with Chris many

7  times and we knew the quality of his information and

8  his knowledge and depth of his knowledge to be

9  outstanding.

10         As I mentioned, he was the former head of

11 the Russia desk at MI6.  I don't know another

12 comparable source working in the private sector today.

13 BY MR. FRAY-WITZER:

14     Q.   When did -- when did you engage Mr. Simpson

15 and/or Orbis?

16         MR. LEVY:  Mr. Simpson?

17 BY MR. FRAY-WITZER:

18     Q.   Mr. Steele and/or Orbis?  Thank you.

19     A.   I believe it was in May, late May of 2016.

20     Q.   So in late May of 2016, Mr. Steele had been

21 gone from MI6 for seven years.  Do you know if he had



1  been back to Russia during that time period?

2          MR. LEVY:  Objection.

3          Rephrase the question.

4  BY MR. FRAY-WITZER:

5      Q.  Do you know if Mr. Steele had traveled to

6  Russia between 2009 and the time that you hired him in

7  2016?

8      A.  I can't speak specifically of that timeframe

9  that you mentioned.  At some point, and I can't recall

10 when, Christopher Steele's name was published online

11 by a rogue or a disgruntled MI6 or UK government

12 employee, I can't recall which.

13         And so he was not able to go back to the

14 country for fear of his life.

15     Q.  If Mr. Steele wasn't able to return to

16 Russia, how did you know that in 2016 he had a robust

17 source network?

18         MR. LEVY:  Objection, asked and answered.

19         Beyond what you've answered already, go

20 ahead.

21         THE WITNESS:  I mean, as I mentioned, you



1   know, we understood that from our conversations with

2   Mr. Steele.

3   BY MR. FRAY-WITZER:

4       Q.   Tell me about those conversations.  What did

5   he tell you that made you believe that he had a robust

6   source network?

7            MR. LEVY:  Again, I'm going to instruct the

8   witness not to discuss the identity of sources or

9   anything that would identify the sources pursuant to

10  the Court's limitations in its July 28th order.

11           Beyond that you can answer the question.

12           THE WITNESS:  Our understanding of his

13  source network is that he was able to communicate with

14  people who had access to people in extremely high

15  places.

16  BY MR. FRAY-WITZER:

17      Q.   In hopes of limiting the need for the

18  objection, let me say that all of the questions that

19  I'm going to ask on this topic, I don't want identity

20  of the sources nor do I want you to tell me anything

21  that would lead to the identity of sources.  So that



1 | is always a limitation to these questions.

2 |        What specifically did Mr. Steele say to

3 | Fusion that led you to understand that he had

4 | connections to people who still have connections to

5 | people, as you put it?

6 |        MR. LEVY:  I'm going to repeat the

7 | instruction not to discuss details about sources,

8 | source network, anything that would identify them.

9 |        The witness on behalf of the company has

10 | already testified that the company had extensive

11 | communications with Mr. Steele about his sources and

12 | were confident in where they were placed and the

13 | credibility of them.

14 |        The details of those conversations may risk

15 | the disclosure of information about the sources that

16 | could put them in harms way, which is precisely why

17 | the Court limited this inquiry and I'm going to

18 | instruct the witness not to answer that question.

19 | BY MR. FRAY-WITZER:

20 |    Q.   Did Mr. Steele specifically say to you, I

21 | have a source network that still exists?



1        A.   Yes.  I don't -- to amend that.  I don't

2    know that he specifically used those words "I have a

3    source network that still exists," but we understood

4    him to have access to people with highly credible and

5    reliable information.

6        Q.   And did that understanding come from

7    anywhere other than Mr. Steele himself?

8             MR. LEVY:  Object, vague.

9             As of what point in time?

10   BY MR. FRAY-WITZER:

11       Q.   The time that you were retaining Mr. Steele

12   in connection with the Trump investigation, was there

13   any other source of your understanding that Mr. Steele

14   continued to maintain a network other than Mr. Steele

15   himself?

16            MR. LEVY:  Objection, vague.

17            Do you want to rephrase the question?

18            MR. FRAY-WITZER:  No.

19            THE WITNESS:  At what time?

20   BY MR. FRAY-WITZER:

21       Q.   In 2016, May of 2016 as you've identified.



1     A.   Yes.

2          No, other than his -- his colleagues at

3   Orbis.

4     Q.   What other colleagues at Orbis did you speak

5   with or did Fusion speak with other than Mr. Steele

6   himself?

7     A.   Christopher Burrows, B-U-R-R-O-W-S.

8          MR. LEVY:  We've been going on for about an

9   hour.  Can we take a break?

10         MR. FRAY-WITZER:  Yes.

11         THE VIDEOGRAPHER:  Going off the record at

12  11:08.

13         (Whereupon, a recess ensued.)

14         THE VIDEOGRAPHER:  Back on the record at

15  11:21.

16  BY MR. FRAY-WITZER:

17    Q.   So, I believe we were talking about Fusion

18  GPS's decision to engage Christopher Steele in

19  connection with the Trump investigation.  And I think

20  you told us some of the reasons why Fusion GPS decided

21  to engage Mr. Steele.



1          Once the decision was made, what was the

2    next step?  Who communicated with Mr. Steele?

3          MR. LEVY:  Which question do you want him to

4    answer?

5          MR. FRAY-WITZER:  There's only one there.

6    BY MR. FRAY-WITZER:

7        Q.   Who communicated with Mr. Steele?

8        A.   Myself and Mr. Simpson.

9        Q.   And was this in person?

10       A.   Sometimes.

11       Q.   The first contact in which you were talking

12   to Mr. Steele about possibly engaging him, was that in

13   person or how was that communication made?

14       A.   I don't recall.  We spoke on the phone many

15   times but I think Glenn may have also met with him at

16   the beginning of the engagement in London.

17       Q.   So as best you recall, what was said to Mr.

18   Steele in the first conversation that you had with him

19   about possibly engaging him to work on the Trump

20   investigation?

21          MR. LEVY:  Objection, asked and answered.



1          Beyond what you've already answered, you can

2   answer the question.

3          THE WITNESS:  Well, as with any contractor,

4   you discuss, you know, his availability and his firm's

5   availability to do the work, what it would cost.  And

6   can you execute the work?  Do you have the ability to

7   execute the work.

8          Our -- his response in all of those

9   instances, other than the cost one is affirmative --

10  was affirmative.  Yes, they were able to take on the

11  work.  Yes, he did have the ability to fulfill the

12  requests.  And we came to an agreement on cost.

13      Q.   What was the agreement on cost?

14      A.   I believe in the first instance, we expected

15  that this was going to be a one month, the typical

16  one month sort of engagement.  And I believe -- are

17  you asking me for the amount?

18      Q.   Yes.

19      A.   I believe it was for 20,000 probably pounds,

20  but I can't recall now.

21      Q.   In those initial conversations, what did you



1    tell Mr. Steele the assignment would be?

2         A.   Sure.

3              We gave him a very broad mandate.  We had in

4    the course of our previous research determined that or

5    learned that Mr. Trump and his family members had made

6    numerous trips to Russia and the former Soviet Union

7    in search of -- with the goal of consummating business

8    deals of some kind, hotel deals, whatever.

9              And we wanted to know why A, he was never

10   able to consummate any kind of deal.  And then B,

11   having never consummated a deal, why he kept going

12   back.

13        Q.   Do you recall anything else about the

14   conversations, the initial conversations with Mr.

15   Steele?

16        A.   No, beyond the general observation that I

17   just described to you, that it seems that there was a

18   preponderance of Russians and Russian interests on the

19   part of the Trump organization in the period after his

20   emergence from bankruptcies and his time on The

21   Apprentice and selling Trump Steaks and that sort of



1    thing.

2        Q.    Did you inform Mr. Steele who Fusion's

3    client was for this engagement?

4        A.    No, we did not.

5        Q.    And let me just break that down.

6              Not just Perkins Coie, but did you inform

7    Mr. Steele that Fusion had been engaged ultimately for

8    the DNC or the Hillary for America campaign?

9              MR. LEVY:  Objection.

10             MR. SIEGEL:  Objection.

11             MR. LEVY:  Vague.  At what point in time?

12             MR. FRAY-WITZER:  During the original

13   conversation?

14             THE WITNESS:  No, we did not.

15             MR. SIEGEL:  Objection.

16             THE WITNESS:  Sorry.

17             MR. SIEGEL:  Objection.

18   BY MR. FRAY-WITZER:

19        Q.    You said that Mr. Simpson may have met with

20   Mr. Steele in London.  When would that have taken

21   place?



1    BY MR. FRAY-WITZER:

2         Q.   Did Mr. Steele come to the United States and

3    meet with anyone from Fusion between May of 2016 and

4    November of 2016?

5         A.   Yes, he did.

6         Q.   During those meetings, was the Trump

7    investigation discussed?

8         A.   You mean our Trump investigation or his?

9         Q.   Yes.

10        A.   Absolutely, yes.

11        Q.   So how many meetings occurred during that

12   time period?

13        A.   We recall two, but there may have been one

14   other.

15        Q.   When did those two meetings occur?

16        A.   In the summer of 2016.

17        Q.   Who was present at each of those meetings?

18        A.   From our company?

19        Q.   No.  Who was present in its entirety of

20   these meetings?

21        A.   Myself and Mr. Simpson.



1      Q.    Anyone else?

2      A.    At one meeting, the client was present.

3      Q.    To the best of your recollection what was

4   the content of the conversation as it related to your

5   Trump investigation?

6            MR. LEVY:  I'm going to instruct the witness

7   not to discuss communications with the client inasmuch

8   as those conversations implicate attorney-client

9   privilege and attorney work product doctrine.

10           Beyond that, you can discuss what was

11  discussed.

12           THE WITNESS:  We discussed Chris's research

13  and some of the findings memorialized in now what is

14  called the dossier, which I should clarify, was not

15  compiled as a dossier.  These are contemporaneous

16  reports that were sent to us on or about the date in

17  which they're marked.

18           We further discussed Chris's understanding

19  that the information he had collected was of urgent

20  national security importance.  It implied peril for

21  the United States and its allies, specially Western



 1 | Europe.

 2 |          We discussed the extent to which he Felch it

 3 | was important to alert authorities to those beliefs.

 4 |          And by authorities, I mean government; the

 5 | United States and the British government.

 6 | BY MR. FRAY-WITZER:

 7 |    Q.   Specifically what did Mr. Steele say about

 8 | the extent to which he Felch it was important to alert

 9 | authorities?

10 |          MR. LEVY:  Asked and answered, objection.

11 |          Go ahead beyond what -- beyond what you've

12 | answered go ahead and answer the question.

13 |          THE WITNESS:  I'm sorry.  Can you repeat it

14 | so I can understand?

15 |          MR. FRAY-WITZER:  Mind reading it back?

16 |          (The requested portion of the record was

17 | read.)

18 |          THE WITNESS:  He said that based on his

19 | experience as a senior British intelligence officer,

20 | that this was among the most dangerous and troubling

21 | set of reporting and findings that he has ever had



1    assembled or collected in his 30 years of experience.

2              He said that this information was too

3    important to not share with the relevant authorities.

4    At this point in time, Donald Trump had become or was

5    about to become -- I forget what the convention was --

6    the republican candidate for president of the United

7    States.

8              His reporting that a candidate for that

9    office had been compromised by a hostile foreign power

10   that is our adversary on everything and by our, I mean

11   the Transatlantic Alliance, on everything from Syria

12   to Iran to North Korea to you name it was a national

13   emergency.

14        Q.   And did Mr. Steele propose anything specific

15   that he intended to do with that information?

16        A.   Yes.

17             MR. LEVY:  At what point in time?

18             MR. FRAY-WITZER:  During the discussion.

19             THE WITNESS:  Well, the first discussion

20   that we recall immediately followed production of his

21   first memorandum, which I believe is dated June 20th



1    of 2016.

2            Soon thereafter he informed us that he

3    thought it was his duty to discuss those findings with

4    the FBI and his own government.

5    BY MR. FRAY-WITZER:

6        Q.   And what did you or Mr. Simpson say in

7    response to that?

8        A.   We both said in the first instance we'd like

9    a day to think about that, to which he said don't take

10   too long to think about it.  But it was also very

11   clear to us that we were in a force majeure sort of

12   situation that when a former intelligence officer of a

13   government says that these are people who swear their

14   lives to serving their country and serving their

15   allies as well, especially in the UK, when that person

16   concludes that he needs to report something that's in

17   that national interests, he's going to do it.

18            And so he was quite determined to do that

19   and we as former journalists did not feel either

20   qualified or well placed to contradict him.

21            It's really important for people to



1   understand that we only know what Chris shares with

2   us.  He knows much more than he shares with us.  He

3   has years of experience that is highly classified that

4   he will never share with or would share with anybody.

5           So in that context, when someone of that

6   experience and quality and caliber and -- says to you

7   that this is important, you do not disagree.

8       Q.   Do you know if Mr. Steele went to the FBI at

9   that point in time?

10      A.   Yes, I do.

11      Q.   And did he do so?

12      A.   He represented to us that he did do that in

13  I believe early July, around the July 4th weekend or

14  week whatever it was in 2016.

15      Q.   Do you know with whom he met at the FBI?

16      A.   Yes, I do.

17      Q.   Who is that?

18      A.   I believe it's an agent by the name of

19  Michael Gaeta.

20          (The reporter requested clarification.)

21          THE WITNESS:  I believe it's spelled

1   G-A-E-T-A.

2   BY MR. FRAY-WITZER:

3       Q.   Do you know the content of what Mr. Steele

4   discussed with Mr. Gaeta?

5       A.   Yes.

6       Q.   And what is that?

7       A.   First let me back up and explain that

8   relationship.

9            Chris had worked previously with Mr. Gaeta,

10  as I -- as we understand it, on a matter related to

11  corruption in the governing body of world soccer

12  called FIFA, which by the way, resulted in a major

13  indictment in the Eastern District of New York.

14           Chris was super helpful in that, is my

15  understanding.  So he had a preexisting relationship

16  with Mr. Gaeta who is an agent in the, I believe the

17  transnational crime task force.

18           So a reliable, in Chris's view,

19  interlocutor.

20           We learned that later.  He told us that he

21  had the ability to do that, and we took him at his



1   word and let him do that.

2        Q.   What was the content of the conversation

3   between Mr. Steele and Mr. Gaeta?

4        A.   I know only in the most -- or we know, I

5   should say, in the most general terms.  Because Mr.

6   Gaeta as a law enforcement official, Chris would have

7   been able to share information with him that he could

8   not have shared with us, I believe.

9             But generally speaking, our understanding is

10  they discussed the findings as outlined in the first

11  memorandum dated June 20th, 2016.

12            I don't know at what level of specificity

13  that was imparted.

14       Q.   Do you know if Mr. Steele gave Mr. Gaeta a

15  copy of the first memorandum at that time?

16       A.   I don't believe he did but I don't know.  My

17  recollection is or our recollection is, I should say,

18  that he showed it to him.

19       Q.   When we started this a little while ago, you

20  told me that there were two meetings in person during

21  the summer of 2016 with Mr. Steele.  And I believe you



1    Q.   What is your understanding of what Mr.

2   Steele did to gather the information that you were

3   seeking in connection with this investigation?

4        MR. LEVY:  Objection, he's answered this

5   question.

6        Secondly, I'm going to instruct the witness

7   not to discuss, testify about sources, their

8   identities, methods subject to the Court's limitation

9   in his July 28th order.

10  BY MR. FRAY-WITZER:

11   Q.   Subject to that objection, do you have an

12  answer?

13       MR. LEVY:  I'm instructing you not to

14  discuss sources or their identities.

15       THE WITNESS:  Sorry.  You're going to have

16  to repeat the question.

17  BY MR. FRAY-WITZER:

18   Q.   What did you understand Mr. Steele did to

19  gather the information that you were seeking in

20  connection with the Trump investigation?

21       MR. LEVY:  Same instruction.



1          THE WITNESS:  I apologize.  I'm a little

2     confused by this.

3          Am I able to answer?

4          MR. LEVY:  Without identifying sources,

5     without saying anything that would indicate who they

6     are, what they are.

7          THE WITNESS:  Chris described in general

8     terms the nature of the ultimate sources, where these

9     people were placed or situated, I should say.  Beyond

10    that, his trade craft is to not discuss sources,

11    methods so that even his clients cannot learn their

12    identity.

13    BY MR. FRAY-WITZER:

14       Q.  At a high level, is it fair to say that Mr.

15    Steele activated a source network?

16          MR. LEVY:  Objection, vague.

17          What do you mean by activated?

18    BY MR. FRAY-WITZER:

19       Q.  Mr. Simpson has testified in front of the

20    Senate and in front of the House that Mr. Steele

21    reached out to a source network, and I'm looking for



 1    your understanding of that.

 2              MR. LEVY:  Objection, asked and answered.

 3              THE WITNESS:  My understanding is that, yes,

 4    he did, but whether he quote/end quote activated it or

 5    whether it is a -- something of a more permanent

 6    structure that he and his company use on a regular

 7    basis, I don't know.  We don't know, I should say.

 8    BY MR. FRAY-WITZER:

 9        Q.    Do you know if Mr. Steele made any payment

10    in connection with source information?

11        A.    I know that he did not.

12        Q.    And just because I want to make sure we're

13    speaking the same language, I'm not simply talking

14    about ultimate sources but rather the intermediate

15    source network that seems to have existed.

16              Do you know if he made any payment to anyone

17    in connection with gathering information for this

18    investigation?

19              MR. LEVY:  I'm going to instruct the witness

20    not to discuss sources pursuant to the Court's

21    limitation.



1            MR. FRAY-WITZER:  I'm not asking for

2    identity or anything that would lead to their

3    identities.

4            THE WITNESS:  We don't know what Chris's

5    arrangements are with what you're calling

6    intermediaries.

7    BY MR. FRAY-WITZER:

8        Q.   Is there a term that you would use for those

9    people?

10       A.   No.

11       Q.   And just to make sure I understand, it's not

12   that you're saying that he did make payments or he

13   didn't make payments, your testimony is that you --

14   you don't know what his arrangements are.  Is that

15   correct?

16           MR. LEVY:  Objection, asked and answered.

17           THE WITNESS:  We don't know what his

18   arrangements are with people that may or may not be

19   intermediaries.

20   BY MR. FRAY-WITZER:

21       Q.   You testified earlier that there were some



1   It's just the document.

2       Q.   When Fusion first engaged Mr. Steele for

3   this assignment, did Fusion have any conversations

4   with Mr. Steele concerning the limits of human

5   intelligence?

6       A.   I don't specifically recall, but we didn't

7   have to have that conversation because we had had it

8   many times previously.  Obviously humans are human and

9   they have flawed memories.  So --

10      Q.   Did you have discussions about the risks of

11  intentional disinformation?

12          MR. LEVY:  Objection, asked and answered.

13          THE WITNESS:  Yes, we did.

14  BY MR. FRAY-WITZER:

15      Q.   What was the content of those discussions?

16          MR. LEVY:  Objection, asked and answered.

17          THE WITNESS:  We had extensive conversations

18  and had had extensive over -- conversations with Chris

19  over the years about some risks, particularly in

20  Russia and the FSU.

21          Russia as you know is run by a former KGB



1    officer.

2         Q.   The memos that were produced between May of

3    2016 and November of 2016 have sometimes been referred

4    to as the pre-election memos.

5              Are you familiar with that term?

6         A.   I don't know that I'm familiar with it but I

7    don't dispute it.

8         Q.   How many pre-election memos did Mr. Steele

9    produce?

10        A.   I'd have to -- I'd have to review them to

11   recall exactly.

12        Q.   Did you review the memos in preparation for

13   today?

14        A.   I reviewed them carefully.  I didn't count

15   them.

16             MR. LEVY:  If you want to put them in front

17   of the witness, feel free.

18             MR. FRAY-WITZER:  I will at some point.

19   BY MR. FRAY-WITZER:

20        Q.   When Mr. Steele transmitted a memo to

21   Fusion, would you typically then have a conversation



1  about the content of that memo?

2       A.   Yes.

3       Q.   So let me start with the sort of big

4  picture.

5            To the extent that you recall for the

6  pre-election memos --

7       A.   Yes.

8       Q.   -- tell me about those conversations that

9  Fusion had with Mr. Steele about the content of the

10  memo?

11       A.   Sure.

12            We would discuss and I would characterize

13  these conversations as extensive, ongoing and daily.

14            We would discuss the quality of the sourcing

15  behind them.

16            We would discuss Chris's competence and his

17  team's competence and their credibility.

18            We would discuss the potential for

19  disinformation, as you mentioned earlier.  And then of

20  course, we would discuss any follow up activity that

21  Orbis would need to conduct in terms of ongoing



1  reporting.

2          We would also discuss, I should say, our own

3  efforts to verify information in the memorandum.

4      Q.   With respect --

5      A.   Sorry.  Last --

6      Q.   Go ahead.

7      A.   No, my fault.

8          Last but not least in short order we

9  discussed, as I mentioned earlier, Chris's belief that

10 this information was the equivalent of a crime in

11 progress and needed to be reported.

12     Q.   Let's take that last part first.

13          You told us about an initial meeting that

14 Mr. Steele had with Mr. Gaeta in which he described

15 the first of the pre-election memos.

16          Are you aware of additional conversations

17 Mr. Steele had with the FBI concerning pre-election

18 memos?

19     A.   Yes, I am.

20     Q.   What can you tell us about those

21 conversations?



1      A.    After a period of time -- I can't recall

2   specifically how much time had lapsed -- but Mr.

3   Steele was asked by the FBI to brief him further.

4      Q.    Who at the FBI asked Mr. Steele do that?

5      A.    Again, I believe that to be Mr. Gaeta and

6   there may have been others.  I -- we don't know.

7      Q.    Do you know how many conversations Mr.

8   Steele had with Mr. Gaeta concerning pre-election

9   memos?

10      A.    We do not.

11      Q.    Do you know if Mr. Steele provided Mr. Gaeta

12   with copies of the pre-election memos?

13      A.    We do not.  That said, it may have been

14   publically reported elsewhere, however we did not have

15   that specific knowledge or discuss it.

16           Just so we're clear, when Chris is reporting

17   or -- to a law enforcement or government official,

18   that's not a conversation to which we are privy or

19   made privy to other than the fact of its existence.

20      Q.    Which was actually my next question, so

21   thank you.



1           Do you have an understanding of how many

2     times Mr. Steele spoke with Mr. Gaeta concerning

3     pre-election memos?

4           A.    We do not.

5           Q.    Putting aside Mr. Steele for a second, did

6     anyone at Fusion have communications with the FBI

7     concerning the pre-election memos?

8           A.    We did not.

9           Q.    Did anyone at Fusion have conversations with

10    Congress concerning the pre-election memos?

11           MR. LEVY:  During the election campaign?

12           Exhibit 6 is a lengthy conversation about

13    the pre-election memos with Congress.

14    BY MR. FRAY-WITZER:

15          Q.    Prior to Mr. Simpson's testimony in front of

16    Congress, did Fusion have any communications with

17    anyone in Congress concerning the pre-election memos?

18          A.    No, we did not.

19          Q.    Did anyone at Fusion have communications

20    with the Department of Justice concerning the

21    pre-election memos?



1           MR. LEVY:  At what time?

2    BY MR. FRAY-WITZER:

3        Q.   At any time.

4        A.   At any time?

5        Q.   At any time.

6        A.   Yes.

7        Q.   What conversations did Fusion have with the

8    Department of Justice concerning the pre-election

9    memos?

10       A.   We recall a meeting between Glenn Simpson

11   and Bruce Ohr, that's O-H-R, which took place at Mr.

12   Steele's request for the purpose of transmitting to

13   Mr. Ohr a copy of these pre-election memoranda.

14           That would have taken place after the

15   election.

16       Q.   On what date?

17       A.   I don't recall the specific date.  I think

18   it was late November.

19       Q.   And did Mr. Simpson provide Mr. Ohr with a

20   copy of the pre-election memo?

21       A.   Yes.  Again, at Mr. Steele's request and for



1   the purpose of reporting what Mr. Steele believed to

2   be a crime to a law enforcement official, one in

3   progress I should say.

4       Q.   You said that the provision of the

5   pre-election memos to Bruce Ohr was at Mr. Steele's

6   request.  What specifically did Mr. Steele say in

7   connection with that request?

8       A.   Could you please arrange to meet with Bruce

9   Ohr and give him a copy of the pre-election

10  memorandum.

11      Q.   Did he say anything else?

12      A.   No.  Other than -- and I don't know if this

13  was in this conversation or another -- Mr. Steele had

14  a longstanding relationship with Mr. Ohr.  Mr. Ohr, I

15  think is currently or most recently attached to

16  counter-narcotics efforts.

17           But for many years he was involved in Russia

18  matters and transnational crime.

19           So he was known to Mr. Steele.

20      Q.   I believe you testified -- and, again,

21  correct me if I'm wrong, that one of the topics of



1       Q.   Do you know if McCain Institute is a

2   government entity?

3       A.   I don't believe it is.

4       Q.   You said at the time Mr. Kramer made this

5   trip he was not employed by the government.  Is that

6   correct?

7           MR. SIEGEL:  Objection.

8           THE WITNESS:  That's my understanding.  I do

9   believe that Senator McCain, however, was a United

10  States senator.

11  BY MR. FRAY-WITZER:

12      Q.   Where do you come to your understanding of

13  the fact of the meeting in Halifax?

14      A.   Mr. Steele told us about it.

15      Q.   What did Mr. Steele tell you about having --

16  what did Mr. Steele tell you about Mr. Kramer?

17      A.   So, he recounted to us in large part what I

18  just told you.

19          He agreed, based on Sir Andrew Wood's

20  recommendation to meet with Mr. Kramer in London,

21  which he did do.  Mr. Steele then asked us -- called



1  us and asked us if we knew Mr. Kramer to be a reliable

2  interlocutor for purposes of reporting information to

3  Senator McCain and the U.S. government.  The U.S.

4  government in this case being James Comey for the

5  ultimate purpose of handing information to Mr. Kramer

6  which we'll get to, I presume, in a moment.

7          So thereafter -- if you'd like me to

8  continue I will -- Mr. Kramer returned to the United

9  States and arranged to meet with us for the expressed

10 purpose of delivering a copy of the memoranda, less

11 the December 13th memo to Mr. Kramer for the purpose

12 of giving it to Senator McCain with the expressed

13 purpose of delivering that information to James Comey

14 of the FBI.

15    Q.   So as a starting point do you know why Mr.

16 Steele didn't simply give Mr. Kramer a copy of the

17 existing memos when the two met in London?

18    A.   Yes, I do.  Chris was concerned about the

19 sensitive nature of the information and did not want

20 to have Mr. Kramer travel overseas with it.

21          He also as I just mentioned to you was still



1  doing, conducting some of his own due diligence on Mr.

2  Kramer and wanted to complete that process before

3  agreeing to give him a copy of the memorandum.

4          He wanted -- Chris wanted to be sure that

5  Mr. Kramer and Senator McCain were truly interested in

6  taking the information to James Comey and had the

7  wherewithal to do it.

8          We concluded, he concluded, that Senator

9  McCain did in fact have the ability to reach James

10  Comey.

11      Q.   When Mr. Kramer returned to the United

12  States, did he make contact with Fusion or did Fusion

13  make contact with him?

14      A.   We don't recall.

15      Q.   And what was said in the initial

16  conversation?

17      A.   It was a very ministerial conversation to

18  arrange an in-person meeting.

19      Q.   Did that in-person meeting take place?

20      A.   It did.

21      Q.   On what date did it take place?



1      A.    I want to say late November, early December

2    timeframe.  We don't specifically recall the date.

3      Q.    Who was present at this in-person meeting?

4      A.    Mr. Kramer, Mr. Simpson and Mr. Berkowitz

5    who I referenced earlier.

6      Q.    You were not yourself present in that

7    meeting?

8      A.    I was not.

9      Q.    What was discussed at that meeting?

10     A.    It was a -- our recollection is that it was

11   a relatively brief meeting, maybe a half hour.  We

12   told him that we'd like -- you know, we've agreed to

13   give you a copy of this -- of these memoranda.  We

14   told him that the material is obviously -- we deemed

15   it to be very sensitive, so did Mr. Steele.  That this

16   memoranda's expressed purpose was for the delivery to

17   Senator McCain so that he could share it with James

18   Comey.

19     Q.    Was there any discussion about the need to

20   verify information contained in the report?

21     A.    Our recollection is there may have been but



1   that was understood because the expressed purpose of

2   delivering the -- making sure that James Comey had the

3   memoranda is to make sure that they would be

4   investigated by competent authorities with the

5   wherewithal to do it.

6           Earlier we talked about Exhibit 7, and our

7   feeling at that time was that the FBI is a big

8   bureaucracy and one part of the FBI might not know

9   what the other is doing.

10          So we wanted to make sure that the boss

11  understood how grave Mr. Steele thought the situation

12  was.

13      Q.   And I appreciate your saying that it was

14  understood the information contained in the memos

15  needed to be verified, but what I'd really like to

16  know is did anyone say to David Kramer the stuff in

17  here, the information in here needs to be verified?

18      A.   We don't recall those words being spoken.

19      Q.   Was he told that the information contained

20  in the memos was raw information?

21      A.   What he was told by Mr. Steele as best as we



1  understand it is that these reports were highly

2  credible, that they relied on reporting from the

3  network we've been talking about.  That network was

4  extremely well placed and had been reliable in the

5  past.

6       Q.   Do you know if Mr. Steele told Mr. Kramer

7  that some of the information contained in the memos

8  was unverified?

9       A.   No, I don't.

10       Q.   Do you know if anyone from Fusion told Mr.

11  Kramer some of the information from the memos was

12  unverified?

13           MR. SIEGEL:  Objection.

14           THE WITNESS:  What we recall is that, once

15  again, we described the information as highly

16  credible.  There's a difference between verified by

17  and highly credible.  There was a lot of information

18  in these reports that we were able to corroborate

19  through the open source and that others since have

20  been able to corroborate from the open source.

21           And Mr. Kramer understood that.



```
 1              MR. SIEGEL:  Objection.

 2              THE WITNESS:  No, we don't.

 3   BY MR. FRAY-WITZER:

 4       Q.  Did Fusion inform any of those listed media

 5   outlets of Mr. Kramer's involvement?

 6       A.   We did not.

 7       Q.   Did Mr. Steele inform any of the media

 8   outlets about Mr. Kramer's involvement?

 9              MR. LEVY:  Objection.

10              THE WITNESS:  We don't know.

11              MR. LEVY:  Are you moving an exhibit?  Can I

12   just take a quick break?

13              MR. FRAY-WITZER:  Yeah.

14              THE VIDEOGRAPHER:  Going off the record at

15   1423.

16              (Whereupon, a recess ensued.)

17              THE VIDEOGRAPHER:  Back on the record at

18   1426.

19   BY MR. FRAY-WITZER:

20       Q.   So we've talked a bit about the pre-election

21   memos and I want to turn now to the -- what we've
```



1  referred to as the December memo.  It's the memo of

2  December 13th, 2016.

3          And let me ask you first, when did you first

4  learn -- and in this context I mean Fusion.  When did

5  Fusion first learn that there was an additional memo

6  that Mr. Steele had created?

7          MR. LEVY:  Objection, vague.  When you say

8  additional memo, additional to what?

9  BY MR. FRAY-WITZER:

10     Q.   Other than the -- what we've referred to as

11  the December memo, were there any other post election

12  memos prior to January 10th, 2017?

13          MR. LEVY:  Objection.  Memos from whom?

14          MR. FRAY-WITZER:  From Mr. Steele.

15          MR. LEVY:  About what?

16          MR. FRAY-WITZER:  About the Russia

17  investigation, about the Trump investigation.

18          THE WITNESS:  I don't believe so.

19  BY MR. FRAY-WITZER:

20     Q.   So post election but before January 10th,

21  2017, there's only one additional memo, correct?



 1   receiving the December memo, what did Mr. Steele tell

 2   you, if anything, about the contents of that memo?

 3        A.   We don't recall that he said anything

 4   specific other than that there's an additional memo

 5   coming to you.

 6        Q.   I think you've testified that in December of

 7   2016, Fusion no longer had a client for this work, for

 8   the investigation that you were conducting, correct?

 9             MR. LEVY:  Objection.  I just want to be

10   really precise here.  I'm objecting to form.  Can you

11   repeat the question, please, if there's a question?

12             MR. FRAY-WITZER:  I think there was.

13             Could you read it back, please?

14             (Requested portion of record read.)

15   BY MR. FRAY-WITZER:

16        Q.   The question is, is that correct?

17             MR. LEVY:  And I'm going to object because

18   it's vague.

19   BY MR. FRAY-WITZER:

20        Q.   In December of 2016 did Fusion GPS have a

21   client for whom it was working and conducting



1  additional research into Donald Trump?

2          MR. LEVY:  Objection, asked and answered.

3          THE WITNESS:  No, we did not.

4  BY MR. FRAY-WITZER:

5     Q.   Given that you did not have a client at that

6  time, was Fusion surprised to learn that there was an

7  additional memo coming?

8     A.   A little bit.  However, let me fill that in

9  for you if I may.

10          The context, again, is our abiding belief at

11  this time that the United States had elected someone

12  who had been compromised by the Russian government and

13  was colluding in some way with the Russian government

14  and that Russia was interfering with our electoral

15  process to elect this specific individual who had won.

16          So there comes a point when this is not

17  about clients and money and dollars and cents, it's

18  about your national security.  That's where our head

19  was, that's where Chris Steele's head was.

20          So if there's more information that can shed

21  light on that emergency or the crime in progress I've



1  described, we were going to go get it and we were

2  going to deliver it.

3       Q.   You were going to deliver it to whom?

4       A.   In this case, James Comey.

5       Q.   And how were you going to deliver this memo

6  to James Comey?

7       A.   Through Mr. Kramer.  There were

8  subsequent -- after receipt of this memo, the December

9  13th memo, we contacted or he contacted us or Mr.

10 Steele contacted Mr. Kramer.  We don't -- we're not

11 clear on what the -- or we don't recollect, I should

12 say, what the sequence was, and arranged to give him a

13 copy of this memo.  Again, for the purpose of

14 delivering it to Senator McCain so that he could

15 deliver it to James Comey.

16      Q.   I'm going to -- I'm going to back up for

17 just a moment.

18           Did Mr. Steele tell Fusion why he was giving

19 this additional information to Fusion?

20      A.   Not that we specifically recall other than

21 in his professional opinion and in his estimation,



1   this was credible reporting that was relevant to the,

2   by then, well established fact that the Russian

3   government had hacked our election.

4        Q.   And I want to get a little specific with

5   you --

6        A.   Sure.

7        Q.   -- because I believe your testimony was that

8   those things were your understanding.  And what I want

9   to know is did Christopher Steele say words to that

10  effect to you as the reason he is providing Fusion

11  with this additional memo?

12           MR. LEVY:  Objection, asked and answered.

13           THE WITNESS:  Yes.  That's my understanding.

14  That is our best recollection.

15  BY MR. FRAY-WITZER:

16       Q.   Do you recall Mr. Steele saying words to

17  that effect to you personally?

18       A.   I do.

19       Q.   So it's your recollection as you sit here

20  today that you had a conversation with Mr. Steele

21  prior to him giving Fusion the December memo in which



1   with the December memo after he provided it to you?

2        A.   Again, as I think I testified or I hope I

3   testified, his goal in sending us this memorandum was

4   to supplement our understanding of the work.  But more

5   importantly to make a report or to have this

6   information shared with relevant, competent government

7   investigative authorities.

8        Q.   Did Mr. Steele ask Fusion to provide the

9   December memo to David Kramer so that he might provide

10  it to Senator McCain?

11       A.   Yes.

12       Q.   Did Mr. Steele ask Fusion to provide the

13  December memo to anyone other than David Kramer?

14       A.   Our recollection is that we may have also

15  given it to Mr. Ohr.

16       Q.   Do you know when Fusion might have given the

17  memo to Mr. Ohr?

18       A.   I don't recall that.

19       Q.   Do you know for certain whether or not

20  Fusion did or did not give the memo to Mr. Ohr?

21       A.   I'm trying to remember and I just don't



1   recall.  I believe we did.

2       Q.   Was there a meeting with Mr. Ohr subsequent

3   to the meeting that you had described earlier today?

4       A.   There may have been but we don't recall one.

5       Q.   How would Fusion have provided the memo to

6   Mr. Ohr if there was no meeting?

7       A.   I don't think we would have.

8       Q.   The meeting that you described earlier was

9   before December 13th, 2016.  Is that correct?

10      A.   That's correct.

11      Q.   And so I guess I'm confused.  If the only

12  way that you would have provided the document to Mr.

13  Ohr if you did was in a meeting and there was no

14  meeting after the first meeting, how would you have

15  provided the document to Mr. Ohr?

16      A.   I'm sorry.  I'm just -- we're not able to

17  recall a subsequent meeting.  There may have been.

18      Q.   So Fusion -- and this is fine, but Fusion

19  doesn't know one way or another whether or not there

20  was a meeting and whether or not the document was

21  provided to Mr. Ohr?



1          MR. SIEGEL:  Objection.

2          MR. LEVY:  Asked and answered, object --

3    objection.

4          THE WITNESS:  Right.

5    BY MR. FRAY-WITZER:

6      Q.   Did --

7      A.   I don't dispute that if it would have been

8    we would have done that.

9      Q.   But you don't know if you did?

10     A.   I don't recall.

11     Q.   Did Fusion provide the December memo either

12   on its own or as part of the dossier to any media

13   outlets?

14     A.   The December 13th memo?

15     Q.   Yes.

16         MR. LEVY:  Before publication of the

17   dossier?

18         MR. FRAY-WITZER:  Before January 10th, 2017.

19         THE WITNESS:  No. We don't believe so.

20   BY MR. FRAY-WITZER:

21     Q.   Did Fusion ask Mr. Kramer to provide copies



1  of the December memo or the dossier as a whole to

2  media outlets prior to January 10th, 2017?

3      A.    Just to be clear, you're talking about the

4  December 13th memorandum?

5      Q.    Either on its own or as part of the

6  collection of memos?

7      A.    No, we did not.

8      Q.    Other than Mr. Kramer and possibly Mr. Ohr,

9  but we don't know for sure, did Fusion GPS provide a

10  copy of the December memo to anyone else prior to

11  January 10th, 2017?

12      A.    No.

13      Q.    How did Fusion GPS provide the December memo

14  to Mr. Kramer?

15      A.    To the best of our recollection, there was a

16  meeting in a coffee shop, I believe, in Farragut

17  Square area and it was given to him at that time.

18      Q.    Who was present at that meeting?

19      A.    Mr. Simpson and Mr. Kramer.

20      Q.    What did Mr. Simpson say to Mr. Kramer when

21  he gave him the memo?



1      A.   This is an additional memo.

2      Q.   Did he specifically --

3      A.   From Mr. Steele.  Sorry.

4      Q.   Did he specifically ask Mr. Kramer to give

5  the memo to Senator McCain?

6      A.   The understanding was that it would go to

7  Senator McCain with the purpose of sharing it with Mr.

8  Comey.

9         I should also say that as your exhibit, your

10  deposition of Mr. Kramer seems to indicate, Mr. Kramer

11  had his own contacts with Mr. Steele.  Which is only

12  to say that limits the amount of things that needed to

13  be said between Mr. Simpson and Mr. Kramer if I'm

14  making sense.

15      Q.   You are.  But I want to actually be

16  specific --

17      A.   Sure.

18      Q.   -- to understand whether or not.

19      A.   Yep.

20      Q.   I understand what your testimony is.  You

21  testified that it was understood that Mr. Kramer was



1     Q.   Do you see where it says Statement of Truth:

2   "The defendants believe the facts set out in the

3   particulars of the claim are true."

4          Do you see that?

5     A.   Yes, I do.

6     Q.   Do you recognize Mr. Steele's signature

7   under that?

8     A.   No, I don't.

9     Q.   Do you have any reason to believe that that

10  is not Mr. Steele's signature?

11    A.   I don't.

12    Q.   If you would turn to Page 3, please.

13    A.   (Witness complies.)

14    Q.   Paragraph 18, under a heading:  The

15  Confidential December Memorandum.  "Defendants

16  continued to receive unsolicited intelligence on the

17  matters covered by the pre-election memorandum after

18  the U.S. presidential election and the conclusion of

19  the assignment to Fusion."

20          Did Mr. Simpson inform Fusion that the

21  information that he had received was unsolicited?



1           MR. LEVY:  Mr. Simpson?

2           THE WITNESS:  I think you mean Mr. Steele.

3    BY MR. FRAY-WITZER:

4        Q.   Did Mr. Steele inform Fusion that the

5    information received was unsolicited?

6        A.   Not that we recall.

7        Q.   Prior to the first time that you saw Mr.

8    Steele's defense in London, were you aware that the

9    information received was unsolicited?

10          MR. LEVY:  Objection, asked and answered.

11          MR. FRAY-WITZER:  Different timeframe.

12          THE WITNESS:  We were not aware of it.  As I

13   said earlier, I inelegantly used a metaphor from my

14   previous life.  Again, sometimes when you ask

15   questions, they're answered without them being

16   solicited or after an engagement has ended.

17   BY MR. FRAY-WITZER:

18       Q.   Paragraph 20, "The defendants considered

19   correctly that the raw intelligence in the December

20   memo -- memorandum, A, was of considerable importance

21   in relation to alleged Russian interference in the



1      Q.   Did Mr. Simpson specifically and explicitly,

2   as he says, state that it was only to be provided to

3   Mr. Kramer for the purpose of passing it to Senator

4   McCain?

5             MR. LEVY:  Objection.

6             MR. SIEGEL:  Objection.

7             MR. LEVY:  Evan, you've got seven hours

8   under the rules.

9             MR. FRAY-WITZER:  Then please let the

10   witness answer the question and we can get past it.

11             MR. LEVY:  It's been answered.

12             THE WITNESS:  The question was -- repeat it

13   for me.  Sorry.  I'm just getting a little tired.

14   BY MR. FRAY-WITZER:

15      Q.   Mr. Steele says that he explicitly stated

16   that the December -- that the memoranda were only to

17   be provided to Mr. Kramer for the purpose of passing

18   them onto Senator McCain.  And I just want to know if

19   Fusion has a recollection of that explicit

20   instruction?

21             MR. LEVY:  Objection, asked and answered.



1          THE WITNESS:  We don't have a specific

2    recollection.  However, we share this understanding.

3    BY MR. FRAY-WITZER:

4        Q.   If you would turn to Page 8, please.

5             Mr. Simpson's -- Mr. Steele's response to

6    request 18.

7        A.   (Witness complies.)

8        Q.   Mr. Steele says that the journalists that

9    were briefed in September of 2016 were briefed at

10   Fusion's instruction.

11            Did Fusion instruct Mr. Steele to brief the

12   journalists on the pre-election memo?

13       A.   We don't recall a specific instruction.  But

14   we all agreed to do that, that that would be

15   worthwhile, again, for the purpose of letting the

16   national security reporters represented by these

17   outlets know that a senior former intelligence

18   official of an allied country thought there was a

19   national emergency afoot in the event that Mr. Trump

20   were to be elected president.

21       Q.   On January 10th, 2017, did Fusion become



1   aware that the memos written by Orbis and Christopher

2   Steele had been published by BuzzFeed?

3        A.   Yes, we did.

4        Q.   How did Fusion first become aware of the

5   publication?

6        A.   I can't specifically recall.

7        Q.   Do you recall how you first became aware of

8   the publication?

9        A.   Vaguely.

10       Q.   And how is that?

11       A.   In the internet age and the age of Twitter

12  things don't stay quiet for very long.  So someone in

13  the office -- I don't know if it was Glenn or another

14  colleague said these memos had been published.

15       Q.   To the best of your recollection, what was

16  Mr. Simpson's reaction to the publication of the memo?

17       A.   We shared the same reaction, which was

18  disappointment, extreme disappointment.  Because

19  publication of these memoranda in an un-redacted

20  fashion could have jeopardized sources and methods

21  that could jeopardize, in turn, the ultimate sources



1  of the information and their physical safety.  That

2  was our primary concern, and overarching concern I

3  would say.

4       Q.   What, if anything, did Fusion do on

5  January 10th of 2017 when it learned that the memos

6  had been published by BuzzFeed?

7       A.   We called, in the first instance, Ken

8  Bensinger.  It was myself and Mr. Simpson as we recall

9  it.  And we -- we called him because his name was on

10  the accompanying story and we knew him.  And we asked

11  him to immediately see if he could take those down

12  because we told him about our concerns about the

13  safety of sources and methods.

14       Q.   As specifically as you can recall, what did

15  Fusion say to Mr. Bensinger?

16       A.   You need to take those memos down right now.

17       Q.   What do you recall Mr. Bensinger saying in

18  response?

19       A.   I recall that he had no power to do that and

20  that we needed to speak to his superiors.

21       Q.   And did you -- by you in this instance I



1  mean Fusion, did Fusion subsequently speak to, as you

2  put it, Mr. Bensinger's superiors at BuzzFeed?

3      A.   We did.  As we recall we put in a phone call

4  to Ben Smith, who is the editor in chief or executive

5  editor of BuzzFeed with whom we were acquainted, and

6  we reiterated that same concern to him.

7      Q.   And what was Mr. Smith's response?

8      A.   He responded not unreasonably in my view and

9  in retrospect, that these memoranda -- at this point

10 it had been reported that these memoranda had been

11 summarized to the tune of two pages for the sitting

12 president of the United States and briefed to the

13 president elect by James Comey.  So he argued that it

14 was a clear matter of public and national interest.

15 And I should say as the former national security

16 editor of the Wall Street Journal, he's not wrong

17 about that.  We would -- I would have made the exact

18 same argument.

19         The narrow thing we were concerned about was

20 that issue of the security, physical security of

21 sources and method.  And we were concerned that there



1  were indicia of numbers of sources, of their placement

2  in Russia and outside of Russia that could have

3  jeopardized their safety.

4          That's all we were thinking about.  We

5  agreed that it was a matter, a vital matter of

6  national and public interest.

7      Q.   Does Fusion know what information was

8  contained in the supposed two-page summary?

9      A.   No, we do not.  However, I can tell you

10 again, I'm relying on my own experience as -- for what

11 that's worth of being the national security editor for

12 the Wall Street Journal, that a two-paged memorandum

13 does not reach the desk of the president of the United

14 States without multi-agency review, a thorough vetting

15 and thorough corroboration on some level.  It just

16 doesn't happen.

17     Q.   Do you have any information whatsoever in

18 this specific instance as to what steps were taken to

19 create that two-paged memo and what it contained?

20         MR. LEVY:  Objection, asked and answered.

21         THE WITNESS:  I do not have that specific



1        A.    Good afternoon.

2        Q.    I just have a few questions for you.

3              What is the -- just because the jury is

4   unlikely to be familiar with it, what is the

5   Washington Free Beacon?  What is it?

6        A.    It's a conservative leaning publication

7   based in Washington, D.C.

8        Q.    Okay.  And would it be fair to characterize

9   it as republican leaning?

10       A.    Yes, it would.

11       Q.    So, would it be accurate to say that between

12  roughly September of 2015 and the spring of 2016,

13  Fusion was retained to conduct research on Donald

14  Trump by a republican leaning organization and that it

15  subsequently was retained to conduct research by the

16  democratic party indirectly.  Is that accurate?

17       A.    That's correct.

18       Q.    I mean, you -- you did research for both

19  sides on this one.  Is that fair -- in a sense?  Not

20  -- I don't mean for both sides but you were retained

21  by both sides at different times to conduct research?



1           MR. FRAY-WITZER:  Objection.

2           THE WITNESS:  That's correct.

3    BY MR. SIEGEL:

4      Q.   You testified that as you received the

5    memoranda from Mr. Steele, that Fusion undertook its

6    own efforts to try to independently assess the

7    credibility of the information.  And I believe you

8    testified about Carter Page, you testified about Paul

9    Manafort, you testified about Alexsei Gubarev and XBT.

10          Are there any other examples that you can

11   recall of people or topics within the dossier that

12   Fusion undertook to look at the credibility of those

13   -- of those allegations on its own?

14     A.   Sure.

15          I would say that the most prominent example

16   I probably overlooked is Michael Cohen who is Donald

17   Trump's -- or was Donald Trump's attorney, personal

18   attorney, and I believe worked with the Trump

19   Organization for many years.

20          Mr. Cohen who I believe has now pled guilty

21   to eight felonies is accused or it is written in --



1    the dossier represents that he has made deniable cash

2    payments to individuals.  I believe that's

3    substantially what Mr. Cohen has pled guilty to.

4         Q.   And did you -- at the time these memos came

5    -- were coming in, did you make any efforts to look at

6    Michael Cohen?

7         A.   We made substantial efforts to look at

8    Michael Cohen.

9         Q.   And can you describe those?

10        A.   Sure.

11             We looked as his history, we looked at his

12   taxi business, we looked at his family background.

13   His taxi business it would appear was financed and

14   supported in part by Russians, Russian-Americans.

15             He himself is married to someone who is

16   Russian.

17             We looked at his background and his

18   relationships to people like Felix Sater with whom --

19   they were connected on social media.  And those were

20   just a few examples of many things we looked at

21   regarding Mr. Cohen.



1       Q.   Did those enhance your confidence in the

2   credibility of the statements in the dossier about Mr.

3   Cohen?

4       A.   Substantially so.

5       Q.   Do you know who Mr. Agalarov is?

6       A.   I do.

7       Q.   Did you undertake any efforts to investigate

8   the statements related to Mr. Agalarov?

9       A.   Yes, we did.

10      Q.   What did you do?

11      A.   We researched his history with Mr. Trump and

12  his support for the Miss Universe pageant.  We also

13  looked at -- just to be clear you're talking about

14  pre-publication?

15      Q.   Pre-publication, yes, as the memos are

16  coming in?

17      A.   We looked at his background.  We found

18  evidence of a substantial relationship between the

19  Agalarov family and Mr. Trump including a music video

20  cut by Aras Agalarov's son Emin in which Mr. Trump

21  appears.



1   Q.   And did the research you conducted about Mr.

2   Agalarov enhance your confidence level about the

3   credibility of the statements made to him -- or

4   connected, related to him?

5   A.   Yes, it did.

6   Q.   Do you know who Sergei Ivanov is?

7   A.   I do.

8   Q.   Did you undertake any efforts to assess

9   statements related to Sergei Ivanov in the dossier?

10  A.   Yes, we did.

11  Q.   What did you do?

12  A.   We read substantially about Mr. Ivanov who's

13  known to us.  He is the head of the presidential

14  administration or was.

15       The dossier recounts in large, in many

16  instances, a story of tension between various

17  individuals in the Kremlin, inside the Kremlin,

18  specifically between a camp related to Mr. Peskov, who

19  is the spokesman for the Kremlin and Mr. Ivanov.  It

20  talks about how those tensions are coming to a head.

21  Subsequently we learned that Mr. Ivanov did in fact --



1    was in fact let go by Mr. Putin, which was a

2    surprising development to us because of their long

3    history together going back to Saint Petersburg.

4        Q.   And did you look at all into whether there

5    was a pension payment system that involved Russian --

6        A.   We did.

7        Q.   What did you find?

8        A.   And there is such a system and we -- in fact

9    as recently as the other day, it was reported that

10   Sergey Kislyak the former ambassador to the United

11   States undertook such cash payments to people.  Mr.

12   Kislyak obviously is someone who had met with Michael

13   Flynn who is awaiting a plea agreement under -- with

14   Mr. Mueller and with -- Mr. Kislyak also met with

15   various other people in the Trump orbit including

16   Carter Page, including Jeff Sessions.

17       Q.   You testified that one of the things that

18   you discussed with Mr. Steele was generally whether

19   there was a risk of disinformation when you undertake

20   intelligence in Russia.  What was the nature of what

21   Mr. Steele told you about that in relation to the



1  dossier?

2        A.   Mr. Steele -- and this is an ongoing

3  conversation that would happen with the delivery of

4  each memorandum -- and frankly, it goes back to our

5  sort of first meeting Mr. Steele in that 2009, '10,

6  '11 period.  He told us that Orbis has made its best

7  efforts to ensure that the memorandum -- memoranda

8  collected as the dossier is free of that sort of

9  disinformation.

10         It's -- he represented that he -- that is

11  one of the primary things that an MI6 officer working

12  in the FSB does.

13       Q.   Mr. Fray-Witzer showed you today a number of

14  statements from other people that in one way or the

15  other used the word "verified", "further verified",

16  "unverified."  I'm not going to ask you what that

17  means to other people.

18         What did you understand the reference to

19  verification meant in connection with the statements

20  in the dossier?

21         MR. FRAY-WITZER:  Objection.  What context?



1  has issued a similar report that goes further and says

2  that specific elements of the dossier have been

3  corroborated and verified.  To me verified means

4  proven.

5      Q.   Mr. Fray-Witzer showed you also, I think a

6  statement in one of Mr. Steele's pleadings saying that

7  the information -- that information in the December

8  memo was not actively sought, it was unsolicited.  And

9  you testified about your understanding of what that

10  means.

11          Does that -- does the fact that information

12  is unsolicited mean that it is less accurate?

13     A.   Not at all.  In this instance, Mr. Steele,

14  just to reiterate, is a professional.  With a

15  reputation and a track record of faithful service to

16  his country and its allies.  He would not have

17  forwarded to us for the purposes of putting

18  information before James Comey, the director of the

19  Federal Bureau of Investigation unless he thought that

20  information was reliable, credible and important.

21     Q.   In connection with the way the reports on



1    he was or wasn't an employee of the State of Arizona?

2              MR. FRAY-WITZER:  In 2016?

3    BY MR. SIEGEL:

4        Q.   Yes.  In 2016?

5        A.   Of the State of Arizona?

6        Q.   Yes.

7        A.   I do not.

8        Q.   You don't know one way or the other.  Is

9    that fair?

10       A.   That's right.  I don't know one way or the

11   other.

12       Q.   Did you understand Kramer to be asking as an

13   informal representative of Senator McCain for purposes

14   of his activities with the dossier?

15             MR. FRAY-WITZER:  Objection.

16             THE WITNESS:  We understood him to be acting

17   as a personal representative of Senator McCain for the

18   purpose of delivering these memoranda to Senator

19   McCain and onto James Comey of the FBI.

20             MR. SIEGEL:  Give me a minute.

21             THE VIDEOGRAPHER:  Going off the record at

