# Exhibit 33 - Part I

~~TOP SECRET/~~ ███████████████ ~~/NOFORN~~ ███



House Permanent Select Committee on Intelligence

# Report on Russian Active Measures

**March 22, 2018**

~~Classified by: 5000041~~
~~Derived from: Multiple Sources~~
~~Declassify on  20431231~~

~~TOP SECRET/~~ ███████████████ ~~/NOFORN~~ ███

# Table of Contents

(U) Abbreviations ii

(U) Referenced Persons iii

(U) Preface viii

(U) Introduction and Overview 1

(U) Summary Table of Findings 4

(U) Summary Table of Recommendations 8

(U) Chapter 1 – Russian Influence Campaigns in Europe 11

(U) Chapter 2 – Russia Attacks the United States 22

(U) Chapter 3 – America Reacts 38

(U) Chapter 4 – Campaign Links to Russia 60

(U) Chapter 5 – Intelligence Community Assessment Leaks 99

(U) Chapter 6 – Summary of Related Committee Oversight Efforts 111

(U) Chapter 7 – Conclusions and Recommendations 114

(U) Appendices 131

- (U) Appendix A: Scope and Methodology
- (U) Appendix B: Russia Investigation Parameters
- (U) Appendix C: Russia's Media Propaganda Apparatus
- (U) Appendix D: Intelligence Community Policy Guidance 107.1
- (U) Appendix E: HPSCI Majority Memo About FISA Abuses
- (U) Appendix F: HPSCI Minority Memo About FISA Abuses
- (U) Appendix G: Senate Judiciary Memo About Christopher Steele Referral
- (U) Appendix H: Committee Correspondence with DOJ and FBI

TOP SECRET/ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ //NOFORN

# Abbreviations

| | | | | |
|---|---|---|---|---|
| AP | Associated Press | NASS | National Association of Secretaries of State |
| APT | Advanced Persistent Threat | | |
| CIA | Central Intelligence Agency | NATO | North Atlantic Treaty Organization |
| CSP | Counterintelligence Scope Polygraph | NCCIC | National Cybersecurity and Communications Integration Center |
| DAG | Deputy Attorney General | | |
| DCCC | Democratic Congressional Campaign Committee | NGO | Non-governmental Organization |
| | | NIST | National Institute for Standards and Technology |
| DHS | Department of Homeland Security | | |
| DIA | Defense Intelligence Agency | NSA | National Security Agency |
| DNC | Democratic National Committee | NSAC | Candidate Trump's National Security Advisory Committee |
| DNI | Director of National Intelligence | | |
| DOJ | Department of Justice | NSC | National Security Council |
| EAC | U.S. Election Assistance Commission | ODNI | Office of the Director of National Intelligence |
| EU | European Union | | |
| FARA | Foreign Agents Registration Act | PTT | Presidential Transition Team |
| FBI | Federal Bureau of Investigation | RNC | Republican National Committee |
| FEC | Federal Election Commission | RT | Formerly known as Russia Today |
| FISA | Foreign Intelligence Surveillance Act | SCI | Sensitive Compartmented Information |
| FISC | Foreign Intelligence Surveillance Court | | |
| | | SIGINT | Signals Intelligence |
| FSB | Russian Federal Security Bureau | SIS | Moldovan Intelligence Service |
| FY | Fiscal Year | SSA | Supervisory Special Agent |
| GRU | Russian General Staff Main Intelligence Directorate | SVR | Russian Foreign Intelligence Service |
| | | UK | United Kingdom |
| HPSCI | House Permanent Select Committee on Intelligence (the Committee) | VOIP | Voice Over Internet Protocol |
| | | VPN | Virtual Private Network |
| HUMINT | Human Intelligence | | |
| IAA | Intelligence Authorization Act | | |
| IC | Intelligence Community | | |
| ICA | Intelligence Community Assessment | | |
| ICD | Intelligence Community Directive | | |
| ICPG | Intelligence Community Policy Guidance | | |
| IRA | Internet Research Agency | | |

TOP SECRET/ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ //NOFORN



# (U) Referenced Persons

| | | |
|---|---|---|
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| Assange | Julian | Founder of WikiLeaks |
| Bannon | Steve | Former Senior Counselor to the President and White House Chief Strategist (January-August 2017); former Chief Executive Officer of Donald Trump's 2016 presidential campaign; former Executive Chairman of Breitbart News |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| Brennan | John | Former Director of the Central Intelligence Agency (2013-2017) |
| Cameron | David | Former Prime Minister of the United Kingdom (2010-2016) |
| Chaika | Yuri | Prosecutor General of the Russian Federation (2006-present) |
| Clapper | James | Former Director of National Intelligence (2010-2017) |
| Clinton | Hillary | Nominated as the Democratic candidate for President in 2016; former Secretary of State (2009-2013); former First Lady of the United States |
| Clovis | Sam | Senior White House Advisor to the United States Department of Agriculture (2017-present); National Co-chair of Donald Trump's 2016 presidential campaign |
| Cohen | Michael | Executive Vice President of the Trump Organization and Special Counsel to Donald Trump |
| Comey | James | Former Director of the Federal Bureau of Investigation (2013-2017) |
| Conway | Kellyanne | Counselor to the President (2017-present); Campaign Manager of Donald Trump's 2016 presidential campaign (August 17, 2016-November 8, 2016) |
| Dearborn | Rick | White House Deputy Chief of Staff for Legislative, Intergovernmental Affairs (2017-present); Executive Director of the 2016 Presidential Transition Team |
| [redacted] | [redacted] | [redacted] |
| Diveykin | Igor | Deputy Chief for Internal Policy of the Russian Federation |
| Djukanovic | Milo | Former President of Montenegro from 1998-2002; former Prime Minister from 2003-2006, 2008-2010, and 2012-2016 |
| Dmitriev | Kirill | Chief Executive Officer of the Russian Direct Investment Fund |
| Downer | Alexander | Australian High Commissioner to the United Kingdom |
| Dvorkovich | Arkady | Chairman of the Board of Directors of Russian Railways |
| [redacted] | [redacted] | [redacted] |
| Fatah el-Sisi | Abdel | President of Egypt (2014-present) |



# (U) Referenced Persons (cont)

| | | |
|---|---|---|
| Flynn | Michael | National Security Advisor (January 2017-February 2017) |
| | | |
| Gates | Rick | Deputy to Paul Manafort (June-August 2016) |
| | | |
| | | |
| Gordon | J.D. | Director of National Security of Donald Trump's 2016 presidential campaign |
| Graham | Lindsay | United States Senator from South Carolina (2003-present); former member of the United States House of Representatives from South Carolina (1993-2003) |
| Grassley | Chuck | United States Senator from Iowa (1981-present); former member of the United States House of Representatives from Iowa (1973-1981) |
| Hicks | Hope | White House Director of Communications (2017-present); former White House Director of Strategic Communications (January 2017-September 2017); National Press Secretary of the Presidential Transition Team; Communications Director of Donald Trump's 2016 presidential campaign; former employee of the Trump Organization |
| Johnson | Jeh | Former Secretary of Homeland Security (2013-2017) |
| | | |
| Kellogg | Keith | Executive Secretary and Chief of Staff of the National Security Council (February 2017-present); Acting National Security Advisor (February 2017); foreign policy advisor of Donald Trump's 2016 presidential campaign |
| Kemp | Brian | Secretary of State of the State of Georgia (2010-present) |
| | | |
| | | |
| Kushner | Jared | Senior Advisor to the President; son-in-law of the President (married Ivanka Trump in 2009); real-estate developer |
| Lavrov | Sergey | Minister of Foreign Affairs of the Russian Federation (2004-present) |
| | | |
| Lynch | Loretta | Former Attorney General of the United States (2015-2017) |
| Macron | Emmanuel | President of France (2017-present) |
| | | r |
| Manafort | Paul | Chairman of Donald Trump's 2016 presidential campaign (June-August 2016) |
| Mashburn | John | Co-led, with Senator Sessions, the foreign policy advisory panel of Donald Trump's 2016 presidential campaign |
| McCabe | Andrew | Former Deputy Director of the Federal Bureau of Investigation (2016-2018) |

TOP SECRET// ███████ /NOFORN

## (U) Referenced Persons (cont)

| McConnell | Mitch | Senate Majority Leader (2015-present); United States Senator from Kentucky (1985-present) |
|---|---|---|
| McCord | Mary | Former Acting Assistant Attorney General of the United States (2016-2017); former Principal Deputy Assistant Attorney General for National Security (2014-2016) |
| McGahn | Don | White House Counsel (January 2017-present); General Counsel of the Presidential Transition Team (November 2016-January 2017); Counsel to the Trump campaign during Donald Trump's 2016 presidential campaign |
| Merkel | Angela | Chancellor of Germany (2005-present) |
|  |  |  |
| Mueller | Robert | Special Counsel for the United States Department of Justice (May 2017-present); former Director of the Federal Bureau of Investigation (2001-2013) |
| Obama | Barack | Former President of the United States (2009-2017) |
|  |  |  |
| Papadopoulos | George | Former member of the foreign policy advisory panel to Donald Trump's 2016 presidential campaign |
|  |  |  |
| Pelosi | Nancy | Minority Leader of the United States House of Representatives (2011-present); former Speaker of the United States House of Representatives (2007-2011); member of the United States House of Representatives from California (1987-present) |
| Pence | Mike | Vice President of the United States (2017-present); former Governor of Indiana (2013-2017); former member of the United States House of Representatives from Indiana (2001-2013) |
|  |  |  |
|  |  |  |
| Podesta | John | Chairman of Hillary Clinton's 2016 presidential campaign; former White House Chief of Staff; former Counselor to the President |
|  |  |  |
| Pompeo | Mike | Secretary of State nominee (March 2018); Director of the Central Intelligence Agency (January 2017-present); former member of the United States House of Representatives from Kansas (2011-2017) |



## (U) Referenced Persons (cont)

| | | |
|---|---|---|
| [redacted] | [redacted] | [redacted] |
| Putin | Vladimir | President of the Russian Federation (2012-present) |
| Reid | Harry | Former Minority Leader of the United States Senate (2015-2017); former United States Senator from Nevada (1987-2017) |
| Rice | Susan | Former National Security Advisor (2013-2017); former United States Ambassador to the United Nations (2009-2013) |
| Romney | Mitt | Former Republican nominee for President (2012); former Governor of Massachusetts (2003-2007) |
| Ryan | Paul | Speaker of the United States House of Representatives (2015-present); member of the United States House of Representatives from Wisconsin (1999-present) |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| Schiller | Keith | Former Deputy Assistant to the President and Director of Oval Office Operations (January 2017-September 2017); former Director of Security for the Trump Organization (2004-2017) |
| Schmitz | Joe | Former foreign policy advisor to Donald Trump; former Inspector General of the United States Department of Defense (2002-2005) |
| [redacted] | [redacted] | [redacted] |
| Sessions | Jeff | Attorney General of the United States (2017-present); member of the 2016 Presidential Transition Team and Donald Trump's 2016 presidential campaign; former United States Senator from Alabama (1997-2017) |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| Steele | Christopher | Founder of British research firm Orbis Business Intelligence; former British intelligence professional |
| Stone | Roger | Former advisor of Donald Trump's 2016 presidential campaign |
| Sullivan | Jake | Senior Policy Advisor of Hillary Clinton's 2016 presidential campaign; former National Security Advisor to the Vice President (2013-2014) |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| Trump | Donald J. | President of the United States (2017-present); career real estate developer and television host and producer |
| Trump, Jr. | Donald | President Trump's son; Trump Organization executive |



## (U) Referenced Persons (cont)

| [redacted] | [redacted] | [redacted] |
|---|---|---|
| Yanukovich | Viktor | Former President of Ukraine (2010-2014) |
| Yates | Sally | Former Acting Attorney General of the United States (Jan 2017); former Deputy Attorney General of the United States (2015-2017) |

TOP SECRET███████████████████//NOFORN████

# (U) Preface

(U) In 2015, Russia began engaging in a covert influence campaign aimed at the U.S. presidential election. The Russian government, at the direction of President Vladimir Putin, sought to sow discord in American society and undermine our faith in the democratic process. Now, more than a year after the election, the American people rightfully want to know what the Russians did; how they did it; with whose support, if anyone's; and what can be done to counter any election tampering by foreign adversaries in the future.

(U) With this charge, the House Permanent Select Committee on Intelligence (the Committee) initiated an investigation in January 2017 with the mandate to examine (1) what Russian cyber activity and other active measures (covert influence activities run by the Russian intelligence services) were directed against the United States and its allies; (2) whether the Russian active measures include links between Russia and individuals associated with presidential campaigns; (3) what was the U.S. government response to these Russian active measures and what do we need to do to protect ourselves and our allies in the future; and (4) what possible leaks of classified information took place related to the Intelligence Community's assessment of these matters. Our goal was to provide, to the greatest extent practicable, a full accounting of what happened, how it happened, and recommendations for protecting

our democratic processes and institutions in the future.

(U) From the investigation's inception, we were determined to follow the facts wherever they might lead within the agreed-upon scope and refer any criminality (if found) to the appropriate authorities. During the investigation we identified numerous shortcomings, including counterintelligence concerns, classified leaks, puzzling legal processes, and inappropriate or questionable behavior. All of these are enumerated in this report through findings, recommendations, and conclusions.

(U) We reviewed every piece of relevant evidence provided to us and interviewed every witness we assessed would substantively contribute to the agreed-upon bipartisan scope of the investigation. We acknowledge that investigations by other committees, the Special Counsel, the media, or interest groups will continue and may find facts that were not readily accessible to the Committee or outside the scope of our investigation. We will ensure any new discoveries are considered in the due course of the Committee's continuing oversight responsibilities.

(U) We would like to recognize the tireless work of the Committee's staff, which remained professional and dedicated throughout this inquiry. They deserve our nation's gratitude. We would also like to thank the thousands of men and women who serve in the IC. They will wake up to-

TOP SECRET███████████████████//NOFORN████

morrow and continue their watch to protect the American people against further threats from Russia and other adversaries.

**(U)** Nevertheless, the Committee remains concerned that Russia will continue to undermine western democracies by stoking social strife, political unrest, and division. As a country, it is time for us to reflect, understand what happened, fix the discovered problems, and unify around the common purpose of countering any future influence campaigns by Russia or any other nation.

TOP SECRET/ ███████████████ /NOFORN

## (U) **Introduction and Overview**

(U) Russia's interference in the 2016 U.S. presidential election was nothing novel for the Kremlin. The Kremlin aspires to sow chaos and discord and advance its agenda in targeted nations, particularly in Europe and former Soviet republics such as the Baltics and Ukraine. To do this, Russia effectively combines decades of experience in propaganda and psychological warfare techniques with its vast media apparatus, a strata of well-educated and proficient technicians, and a robust intelligence and security corps.

(U) In the United States, Russian cyberattacks related to the 2016 elections starkly highlighted technical vulnerabilities in U.S. digital infrastructure and bureaucratic shortcomings that were exploited by the Kremlin. Russia's active measures campaign achieved its primary goal of inciting division and discord among Americans. For more than a year, U.S. politics have been consumed by bitter recriminations, charges, and counter-charges about the attacks. The reliability of the democratic vote—the bedrock of the U.S. republic—was widely and repeatedly questioned.

(U) At the time of the 2016 U.S. presidential election cycle, the Committee was already concerned with Russian malfeasance and aggression in levels that had not been seen since the Cold War. In fact, the IAA for fiscal years 2016 and 2017 included multiple provisions to improve the United States' ability to counter Russian aggression. However, the Kremlin's malicious activities

during the 2016 U.S. presidential election triggered the Committee to announce a specific inquiry into Russia's campaign (see Appendix B). The bipartisan parameters focused the investigation and this report—this Committee examined: (1) Russian cyber activity and other active measures that were directed against the United States and its allies; (2) whether the Russian active measures include links between Russia and individuals associated with presidential campaigns; (3) the U.S. government response to these Russian active measures and what we need to do to protect ourselves and our allies in the future; and (4) what possible leaks of classified information took place related to the Intelligence Community's assessment of these matters.[1] The Committee interviewed 73 witnesses, conducted 9 hearings and briefings, reviewed approximately 307,900 documents, and issued 20 subpoenas. This allowed the Committee to find answers crucial for identifying and addressing institutional weaknesses to assist the United States with identifying and responding to inevitable hostile acts in the future.

(U) While the 2016 U.S. presidential election helped focus American attention on Russian cyber and information operations, the Russian government has conducted active measure campaigns in Europe for years. Believing it is engaged in an information war with the West, Russia's influence activities employ an array of tactics—usually tailored

TOP SECRET/ ███████████████ /NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

to the target country's population and environment—in an effort to accomplish the Kremlin's goals. These goals generally include influencing an opponent's leadership and population, advancing a narrative, or inducing a behavior change. The factors that make these campaigns successful also make them hard to counter. However, governments, non-governmental organizations, and media organizations in Europe have begun taking actions to address and mitigate the threat that Russian influence campaigns pose.

**(U)** The Russian active measures campaign against the United States was multifaceted. It leveraged cyberattacks, covert platforms, social media, third-party intermediaries, and state-run media. Hacked material was disseminated through this myriad network of actors with the objective of undermining the effectiveness of the future administration. This dissemination worked in conjunction with derisive messages posted on social media to undermine confidence in the election and sow fear and division in American society.

**(U)** The U.S. government's subsequent response to the Russian active measures campaign during the 2016 election was slow and inconsistent. [redacted] As that picture evolved, the FBI's notification to victims and oversight committees was inconsistent in timeliness and quality, which contributed to the victims' failure to both recognize the threat and defend their systems. State and local governments were slow to grasp the seriousness of the threat and when notified of breaches continued to resist any action that implied federal direction or control. Some states opted not to cooperate with important defensive measures offered by the DHS. While no tabulation systems, or systems that count votes, were impacted, the overall security posture of the U.S. federal, state, and local governments was demonstrated to be inadequate and vulnerable.

**(U)** The Committee's investigation also reviewed the opening, in summer 2016, of a FBI enterprise counterintelligence investigation into [redacted] Trump campaign associates: [redacted] Carter Page, [redacted] Because of "the sensitivity of the matter," the FBI did not notify congressional leadership about this investigation during the FBI's regular counterintelligence briefings.[2] Three of [redacted] original subjects of the FBI investigation have been charged with crimes and the Committee's review of these cases covers the period prior to the appointment of Special Counsel in May 2017.

**(U)** While the Committee found no evidence that the Trump campaign colluded, coordinated, or conspired with the Russian government, the investigation did find poor judgment and ill-considered actions by the Trump and Clinton campaigns. For example, the June 2016 meeting at Trump Tower between members of the Trump campaign

TOP SECRET// ~~██████~~ /NOFORN//~~██~~

and a Russian lawyer who falsely purported to have damaging information on the Clinton campaign demonstrated poor judgement. The Committee also found the Trump campaign's periodic praise for and communications with Wikileaks—a hostile foreign organization—to be highly objectionable and inconsistent with U.S. national security interests. The Committee also found that the Clinton campaign and the DNC, using a series of cutouts and intermediaries to obscure their roles, paid for opposition research on Trump obtained from Russian sources, including a litany of claims by high-ranking current and former Russian government officials. Some of this opposition research was used to produce sixteen memos, which comprise what has become known as the Steele dossier.

**(U)** The effectiveness and relatively low cost of information operations, such as the dissemination of propaganda, make it an attractive tool for foreign adversaries. Unless the cost-benefit equation of such operations changes significantly, the Putin regime and other hostile governments will continue to pursue these attacks against the United States and its allies. Based on the investigation, the Committee recommends several solutions to help safeguard U.S. and allies' political processes from nefarious actors, such as the Russians.

---

1.  HPSCI Press Release, *Intelligence Committee Chairman, Ranking Member Establish Parameters for Russia Investigation*, Mar. 1, 2017.
2.  HPSCI, "Russian Active Measures Investigation Open Hearing," Mar. 20, 2017.

TOP SECRET// ~~██████~~ /NOFORN//~~██~~

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// ███████████████ //NOFORN//

## (U) <u>Summary Table of Findings</u>

| CHAPTER 1: RUSSIAN CAMPAIGNS IN EUROPE |
|---|
| (U) Finding #1: The Kremlin exploits free or independent media spaces and open democracies to conduct active measures in Europe. |
| (U) Finding #2: Russia supports fringe political parties and non-governmental organizations in Europe to further the Kremlin's agenda while also disparaging or discrediting politicians and groups seen as hostile to Moscow. |
| (U) Finding #3: Russia conducts increasingly aggressive cyber operations against European governments; a tactic that will continue to present a profound threat. |
| (U) Finding #4: Russia targets disaffected European populations and exploits social, political, and racial divisions in an effort to sow discord, encourage unrest, and incite protests. |
| (U) Finding #5: Russia leverages business and economic ties in Europe to achieve the Kremlin's goals, message displeasure, or inflict punishment. |
| (U) Finding #6: European governments and media outlets are conducting a variety of activities to combat Russian influence campaigns. |
| **CHAPTER 2: RUSSIA ATTACKS THE UNITED STATES** |
| (U) Finding #7: Russia conducted cyberattacks on U.S. political institutions in 2015-2016. |
| (U) Finding #8: Russian-state actors and third-party intermediaries were responsible for the dissemination of documents and communications stolen from U.S. political organizations. |
| (U) Finding #9: The Russian government used RT to advance its malign influence campaign during the 2016 U.S. presidential election. |
| (U) Finding #10: Russian intelligence leveraged social media in an attempt to sow social discord and to undermine the U.S. electoral process. |
| **CHAPTER 3: AMERICA REACTS** |
| (U) Finding #11: The Federal Bureau of Investigation's notification to numerous Russian hacking victims was largely inadequate. |
| (U) Finding #12: Communication between the Department of Homeland Security and state election officials was impeded by state officials' mistrust of federal government overreach coupled with a unprecedented level of Russian cyber intrusions. |

TOP SECRET// ███████████████ //NOFORN//

TOP SECRET/ ██████████████ /NOFORN

## (U) Summary Table of Findings (cont)

| CHAPTER 3: AMERICA REACTS (CONT) |
|---|
| (U) Finding #13: The joint Office of the Director of National Intelligence and Department of Homeland Security public statement attributing election interference to Russia was ineffective. |
| (U) Finding #14: The Executive Branch's post-election response was insufficient. |
| (U) Finding #15: The majority of the Intelligence Community Assessment judgments on Russia's election activities employed proper analytic tradecraft. |
| (U) Finding #16: The Intelligence Community Assessment judgments on Putin's strategic intentions did not employ proper analytic tradecraft. |
| (U) Finding #17: The Federal Bureau of Investigation opened an enterprise counterintelligence investigation into the Trump campaign after receiving information related to Trump campaign foreign policy advisor George Papadopoulos. |
| (U) Finding #18: As part of the enterprise counterintelligence investigation into the Trump campaign, the Federal Bureau of Investigation opened an individual counterintelligence investigation into Carter Page. |
| (U) Finding #19: The dossier compiled by Christopher Steele formed an essential part of an application to the Foreign Intelligence Surveillance Court to obtain electronic surveillance on Carter Page. |
| (U) Finding #20: Special Counsel Robert Mueller indicted Paul Manafort on several charges, none of which relate to allegations of collusion, coordination, or conspiracy between the Trump campaign and the Russian government. |
| ██████████████████████████████████████████ |
| (U) Finding #22: General Flynn pleaded guilty to making a false statement to the Federal Bureau of Investigation regarding his December 2016 conversations with Ambassador Kislyak, even though the Federal Bureau of Investigation agents did not detect any deception during Flynn's interview. |
| (U) Finding #23: Executive Branch officials did not notify the Trump campaign that members of the campaign were assessed to be potential counterintelligence concerns. |
| (U) Finding #24: The February 2018 indictment of the Internet Research Agency and Russian nationals exposes Russian actors and their intent to spread distrust towards the candidates and the political system in general. |

TOP SECRET ██████████████ /NOFORN

TOP SECRET/ ████████████ /NOFORN ████

## (U) Summary Table of Findings (cont.)

| CHAPTER 4: CAMPAIGN LINKS WITH RUSSIA |
|---|
| (U) Finding #25: When asked directly, none of the interviewed witnesses provided evidence of collusion, coordination, or conspiracy between the Trump campaign and the Russian government. |
| (U) Finding #26: The Committee found no evidence that President Trump's pre-campaign business dealings formed the basis for collusion during the campaign. |
| (U) Finding #27: The Republican national security establishment's opposition to candidate Trump created opportunities for two less-experienced individuals with pro-Russia views to serve as campaign advisors: George Papadopoulos and Carter Page. |
| (U) Finding #28: The change in the Republican Party platform regarding Ukraine resulted in a stronger position against Russia, not a weaker one, and there is no evidence that Paul Manafort was involved. |
| (U) Finding #29: There is no evidence that Trump associates were involved in the theft or publication of Clinton campaign-related emails, although Trump associates had numerous ill-advised contacts with WikiLeaks. |
| (U) Finding #30: Carter Page did not travel to Moscow in July 2016 on behalf of the Trump campaign, but the Committee is concerned about his seemingly incomplete accounts of his activity in Moscow. |
| (U) Finding #31: George Papadopoulos' attempts to leverage his Russian contacts to facilitate meetings between the Trump campaign and Russians was unsuccessful. |
| (U) Finding #32: Donald Trump Jr., Jared Kushner, and Paul Manafort attended a June 9, 2016, meeting at Trump Tower where they expected to receive—but did not ultimately obtain—derogatory information on candidate Clinton from Russian sources. |
| (U) Finding #33: Donald Trump Jr. briefly met with a Russian government official at the 2016 National Rifle Association annual meeting, but the Committee found no evidence that the two discussed the U.S. presidential election. |
| (U) Finding #34: The Committee found no evidence that meetings between Trump associates—including Jeff Sessions—and official representatives of the Russian government—including Ambassador Kislyak—reflected collusion, coordination, or conspiracy with the Russian government. |

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// ███████████████████████ //NOFORN

## (U) Summary Table of Findings (cont.)

| CHAPTER 4: CAMPAIGN LINKS WITH RUSSIA (CONT.) |
|---|
| (U) Finding #35: Possible Russian efforts to set up a "back channel" with Trump associates after the election suggest the absence of collusion during the campaign, since the communication associated with collusion would have rendered such a "back channel" unnecessary. |
| (U) Finding #36: Prior to conducting opposition research targeting candidate Trump's business dealings, Fusion GPS conducted research benefitting Russian interests. |
| (U) Finding #37: The law firm Perkins Coie hired Fusion GPS on behalf of the Clinton campaign and the Democratic National Committee to research candidate Trump's Russia ties. |
| (U) Finding #38: Christopher Steele claims to have obtained his dossier information second- and third-hand from purported high-placed Russian sources, such as government officials with links to the Kremlin and intelligence services. |
| (U) Finding #39: Christopher Steele's information from Russian sources was provided directly to Fusion GPS and Perkins Coie and indirectly to the Clinton campaign. |
| CHAPTER 5: INTELLIGENCE COMMUNITY ASSESSMENT LEAKS |
| (U) Finding #40: Leaks of classified information regarding Russian intentions to sow discord in the U.S. presidential election began prior to the election day—November 8, 2016. |
| (U) Finding #41: Leaks of classified information alleging Russian intentions to help elect candidate Trump increased dramatically after the election day—November 8, 2016. |
| (U) Finding #42: The leaks prior to the classified Intelligence Community Assessment's publication, particularly leaks occurring after the U.S. presidential election, correlate to specific language found in the Intelligence Community Assessment. |
| (U) Finding #43: Continued leaks of classified information have damaged national security and potentially endangered lives. |
| (U) Finding #44: Former Director of National Intelligence James Clapper, now a CNN national security analyst, provided inconsistent testimony to the Committee about his contacts with the media, including CNN. |

TOP SECRET/ ██████████████ /NOFORN ███

## (U) Summary Table of Recommendations

| CHAPTER 1: RUSSIAN CAMPAIGNS IN EUROPE |
|---|
| (U) Recommendation #1: European governments, non-governmental organizations, businesses, think tanks, and academia should strengthen legal and regulatory environments, promote media pluralism, build professional media associations, and improve the financial sustainability of legitimate news outlets. |
| (U) Recommendation #2: European governments, non-governmental organizations, businesses, think tanks, and academia should implement and encourage multi-pronged, country-wide efforts by both public and private entities to combat Russian propaganda, technical, and cyber operations. |
| (U) Recommendation #3: European governments, non-governmental organizations, businesses, think tanks, and academia should implement more stringent cyber security practices, such as multifactor authentication and encryption of sensitive data, as well as educating workforces on basic cyber security topics and best practices. |
| (U) Recommendation #4: European governments should look to long-term solutions to lessen economic dependence on Russia. |

| CHAPTER 2 & 3: RUSSIA ATTACKS THE UNITED STATES AND AMERICA REACTS |
|---|
| (U) Recommendation #5: Congress should identify options available to the private sector and federal government that would address the social media vulnerabilities exploited by the Russian government. |
| (U) Recommendation #6: Congress should consider updating the Foreign Intelligence Surveillance Act to cover malicious international cyber actors. |
| (U) Recommendation #7: The Federal Bureau of Investigation should improve cyberattack victim notification. |
| (U) Recommendation #8: Threats identified by the Intelligence Community to state and local elections infrastructure should be immediately briefed to appropriate state and local officials. When threats are identified, the federal government should conduct an expedited declassification review to ensure that the threat information can reach all necessary state and local officials in a timely manner. |
| (U) Recommendation #9: The Secretary of Homeland Security should provide certain designated state and local election officials appropriate security clearances to enable those officials to respond to election-related threats. |

TOP SECRET/ ██████████████ /NOFORN ███

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET █████████████ //NOFORN█████

## (U) Summary Table of Recommendations (cont.)

| CHAPTER 2 & 3: RUSSIA ATTACKS THE UNITED STATES AND AMERICA REACTS (CONT.) |
| --- |
| (U) Recommendation #10: Significant threats to U.S. elections identified by the Intelligence Community, including cyberattacks directed at political organizations, should be immediately reported to the Congressional intelligence committees. |
| (U) Recommendation #11: Congress should encourage the adoption of National Institute of Standards and Technology cyber security standards, such as those adopted by the Elections Assistance Commission, by providing federal resources to state and local governments to facilitate such adoption. Funds should be tied to the adoption and certification of elections systems to appropriate standards. |
| (U) Recommendation #12: Congress should consider additional funding for the National Institute of Standards and Technology to enable better outreach to state and local governments. |
| (U) Recommendation #13: Congress should consider a one-time grant to state and local election agencies to conduct a risk assessment of those agencies' computer systems. |
| (U) Recommendation #14: Congress should consider strengthening the Help America Vote Act of 2002 to ensure that both statewide voter registration and tabulation systems are better protected from foreign cyber threats. |
| (U) Recommendation #15: The Department of Homeland Security should provide the owner or operator of any electronic election infrastructure affected by any significant foreign cyber intrusion with a briefing and include steps that may be taken to mitigate such intrusions. |
| (U) Recommendation #16: State and local governments should be encouraged to establish redundancies that are not dependent on current elections infrastructure, such as a mechanism that retains individual vote records, ensuring the integrity of the vote in the event of a compromise of voting infrastructure due to a foreign cyberattack. An example of such a redundancy is a contemporaneously created paper record reflecting the voter's selections. |
| (U) Recommendation #17: While it is important to implement lessons learned from the Executive Branch's response, Congress should not hamper the Executive Branch's ability to use discretion in responding to a particular foreign threat. |
| (U) Recommendation #18: Congress should consider repealing the Logan Act. |

TOP SECRET/ █████████████ //NOFORN█████

## (U) Summary Table of Recommendations (cont.)

| CHAPTER 2 & 3: RUSSIA ATTACKS THE UNITED STATES AND AMERICA REACTS (CONT.) |
|---|
| (U) Recommendation #19: All U.S. presidential campaigns should receive unclassified counterintelligence briefings at an appropriate time prior to a nomination convention. |
| (U) Recommendation #20: When consistent with national security, the Intelligence Community should immediately inform U.S. presidential candidates when it discovers a legitimate counterintelligence threat to the campaign, and promptly notify Congress. |
| (U) Recommendation #21: Both houses of Congress should consider requiring all staff to receive an annual counterintelligence awareness briefing. |
| **CHAPTER 4: CAMPAIGN LINKS TO RUSSIA** |
| (U) Recommendation #22: Political campaigns and law enforcement should ensure that their counterintelligence defenses appropriately account for the role of cut-outs and intermediaries. |
| (U) Recommendation #23: Congress should consider amending current campaign finance laws to further increase transparency regarding services provided by foreign persons or entities. |
| **CHAPTER 5: INTELLIGENCE COMMUNITY ASSESSMENT LEAKS** |
| (U) Recommendation #24: Each component of the Intelligence Community should update its guidance regarding media contacts to ensure the guidance applies to every employee, including senior officials. |
| (U) Recommendation #25: Congress should consider legislation to increase the penalties for unauthorized disclosures of classified information. |
| (U) Recommendation #26: The Executive Branch should consider instituting mandatory polygraphs for all non-confirmed political appointees that have top secret clearances. |



## (U) Chapter 1—Russian Influence Campaigns in Europe

***Key Question #1: What Russian cyber activity and other active measures were directed against the United States and <u>its allies</u>?***

(U) While Americans became acutely aware of Russian cyber and information operations after the 2016 U.S. presidential election, these activities were not new to Europe.

UNCLASSIFIED

**SOVIET PROPAGANDA TARGETING THE WEST AFTER WORLD WAR II**

Translation: America Helps. Who helps whom?
Source: Marshall Plan Foundation

UNCLASSIFIED

(U) Russia conducts information warfare in an effort to manipulate the populace and leadership of the nations it targets. To these ends, Russia employs an array of tactics for its influence activities in an effort to advance the Russian government's interests. When successful, these activities can influence an opponent's leadership and population to advance a narrative and induce a behavior change, concurrently serving multiple Russian objectives.

(U) Russia's goals for these campaigns include: to advance the Kremlin's interests; discredit the West; confuse or distort events that threaten Russia's image; break Western political cohesion; and defend Russia's role as a vital global power. More specific and country-tailored goals also include to: weaken, divide, and halt further expansion of consensus-driven institutions like NATO and the EU; sow confusion and amplify divisions among segments of Western populations; challenge establishment politics; damage U.S. foreign policy goals; advance Russia's version of world events; distract from controversial Russian policies and activities; reverse perceived anti-Russian policies; improve bilateral relations; and strengthen economic ties.

TOP SECRET// ███████████████ //NOFORN ███

(U) Aiding in Russia's influence activities, the modern world's widespread use of the internet and social media for news and communications has allowed Russia to: quickly and easily weaponize data stolen in cyber breaches; disseminate propaganda, misinformation, and disinformation; and aggravate social, racial, and political divisions.



(U) Finding #1: The Kremlin exploits free or independent media spaces and open democracies to conduct active measures in Europe.



(U) Russia also exploits free media

spaces and open democracies through a network of Russian state-owned news outlets and media platforms, such as Sputnik and RT, which promote Russia's image abroad and show foreigners world events from a Russian perspective (see Appendix C).

(U) The Kremlin's active measures, or information warfare, strategy includes several tactics:



- (U) After alleged Russian interference in the Brexit vote, in October 2013, the U.K. Electoral Commission announced a probe into this activity. According to open source reporting, Russian-based Twitter accounts posted more than 45,000 messages about Brexit in 48 hours during the 2016 referendum vote.[7]

- (U) ████████████████

████████████// ████████████ //████████ ███

- (U)

(U) *Plant and propagate false news stories*: Russia uses "troll" armies to set up fake social media accounts and blogs, including through an organization known as the Internet Research Agency (IRA).[11] A study by the European Endowment for Democracy described large numbers of paid Russian "trolls" on social media.[12]

(U) **Finding #2: Russia supports fringe political parties and non-governmental organizations in Europe to further the Kremlin's agenda while also disparaging or discrediting politicians and groups seen as hostile to Moscow.**

UNCLASSIFIED

HEADQUARTERS OF RUSSIA'S INTERNET RESEARCH AGENCY

Source: Independent

UNCLASSIFIED

(U) In a tactic dating back to the Soviet era, Moscow also denigrates and discredits people and groups seen as hostile to its interests

(U) Kremlin-linked journalists and media outlets also will engage in misinformation: weaving truth and falsehoods together to create misleading reports intended to impugn the target's character or reputation.

UNCLASSIFIED

ANTI-MERKEL PROTESTS FOLLOWING A RUSSIAN INFLUENCE CAMPAIGN

Source: The Guardian

UNCLASSIFIED

(U) In another example during the recent French Presidential elections, Russian-controlled media highlighted defamatory stories about the private life and campaign funding of the more Russia-skeptic candidate Emmanuel Macron. Two days before the final presidential election, data hacked from Macron's En Marche party was posted on a data sharing website. Cybersecurity researchers attributed the hack to the same GRU group that hacked the DNC.[27]

**(U) Finding #3: Russia conducts increasingly aggressive cyber operations against European governments; a tactic that will continue to present a profound threat.**



(U) Finding #4:  Russia targets disaffected European populations and exploits social, political, and racial divisions in an effort to sow discord, encourage unrest, and incite protests.



**(U) Finding #5: Russia leverages business and economic ties in Europe to achieve the Kremlin's goals, message displeasure, or inflict punishment.**

(U) Russia is adept at utilizing economic ties to its advantage. Moscow aims to deepen business ties with individuals that

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

16

can be used as agents of influence, and countries whose dependence on trade with Russia create vulnerabilities to Russian influence. Economic vulnerability—such as reliance on Russia for trade or energy—can be leveraged to change behavior, message displeasure, or inflict punishment. For example, Germany imports about 40 percent of its natural gas from Russia. Because of this, many business leaders are lobbying for the removal of sanctions against Russia.[37]

**(U) Finding #6: European governments and media outlets are conducting a variety of activities to combat Russian influence campaigns.**

(U) According to a 2016 study by the RAND Corporation, Russia's various tactics for conducting information operations, combined with its lack of a consistent, ideological goal, make countering these activities difficult. This study found that the factors that make Russian disinformation effective—the high volume of stories, its rapid, continuous nature, and lack of consistency—are the same factors that make it difficult to counter.[42]

UNCLASSIFIED

**2017 EUROPEAN SEMINAR ON BOLSTERING RESILIENCE TO ACTIVE MEASURES CAMPAIGNS**

Source: HybridCoE

UNCLASSIFIED

(U) Many European governments are taking proactive steps to counter Russian propaganda and disinformation efforts. NATO has prioritized efforts to counter "hybrid threats" by developing a strategy that includes strengthened coordination with the European Union, as well as training and exercises through its new Intelligence Division. The Strategic Communications Center of Excellence in Riga, Latvia and the Cooperative Cyber Defense Center of Excellence in Tallinn, Estonia also contribute to these efforts. In addition, several NATO al-



9/11."[56]

1. 
2. 
3. 
4. 
5. 
6. 
7. Alexi Mostrous, Mark Bridge, Katie Gibbons, "Russia Used Twitter Bots and Trolls "To Disrupt" Brexit Vote," *The Times UK*, Nov. 15, 2017.
8. 
9. 
10. 
11. Sonam Sheth, *"Our Task Was to Set Americans Against Their Own Government": New Details Emerge About Russia's Trolling Operation*, Business Insider, Oct. 17, 2017.
12. European Endowment for Democracy, *Bringing Plurality and Balance to the Russian Language Media Space*, June 25, 2015.
13. 
14. HPSCI, HPSCI Staff Delegation to Tallinn, Estonia, Sept. 15, 2017.
15. HPSCI, HPSCI Staff Delegation to Tallinn, Estonia, Sept. 15, 2017; XE Currency Converter, *EUR to USD*, www.xe.com/currencyconverter/convert/?Amount=1&From=EUR&To=USD.
16. HPSCI, HPSCI Staff Delegation to Berlin, Germany, Sept. 16, 2017.
17. 
18. 
19. 
20. 
21. 
22. TrendMicro, "From Espionage to Cyber Propaganda: Pawn Storm's Activities over the Past Two Years," Apr. 25, 2017.
23. 
24. 
25. 
26. 
27. HPSCI, HPSCI Staff Delegation to Berlin, Germany, Sept. 16, 2017; LexisNexis, Discovery Services Fact Sheet: "How Many Pages in a Gigabyte?," Dec. 23, 2017.
28. 
29. 
30. 
31. 
32. 
33. 
34. HPSCI, HPSCI Staff Delegation to Chisinau, Moldova, Sept. 19, 2017.
35. 
36. 
37. HPSCI, HPSCI Staff Delegation to Berlin, Germany, Sept. 16, 2017.
38. 
39. 
40.



41. ████.
42. ████
43. NATO, "NATO Welcomes Opening of European Centre for Countering Hybrid Threats," Apr. 11, 2017.
44. ████
45. ████
46. ████
47. ████
48. ████.
49. HPSCI, HPSCI Staff Delegation to Tallinn, Estonia, Sept. 15, 2017.
50. HPSCI, HPSCI Staff Delegation to Kiev, Ukraine, Sept. 21, 2017.
51. European Parliament, "European Parliament resolution of 23 November 2016 on EU strategic communications to counteract propaganda against it by third parties," Nov. 23, 2016.
52. ████
53. ████
54. GAO, *Russia: U.S. Government Takes a Country-Specific Approach to Addressing Disinformation Overseas*, May 2017.
55. ████
56. Bridget Johnson, "Chairman: Biggest Post 9/11 Intelligence Failure was Misreading Putin," *PJ Media*, Apr. 13, 2016; Saagar Enjeti, "US Response to Rusian Spying is 'Biggest Intelligence Failure Since 9/11," Sept. 15, 2016; Susan Jones, "Rep. Devin Nunes: We've Been Warning Administration About Russian Hacking 'And They Did Nothing,'" CNS News, Jan. 9, 2017.

# (U) Chapter 2 - Russia Attacks the United States

***Key Question #1: What Russian cyber activity and other active measures were directed against the United States and its allies?***

**(U)** The Russian government's multifaceted malign influence campaign was the subject of extensive public reporting in the months before the January 5, 2017, publication of the classified ICA titled *Assessing Russian Activities and Intentions in Recent US Elections.* While many of the facts concerning the attack have been widely disseminated, there are important elements of the Russian campaign that remain classified.

**(U)** The purpose of the Committee's review of the Russian information operations was to establish the facts, as well as the federal government's understanding of those facts. This chapter specifically examines (1) the cyberattacks that targeted U.S. political organizations (including the method of the attack and its attribution); (2) the dissemination of hacked material; and (3) the role of Russian state media and social media in Russia's malign influence campaign.

**(U) Finding #7: Russia conducted cyberattacks on U.S. political institutions in 2015-2016.**

**(U)** The Committee agrees with this statement and finds the ICA assessment of Russian responsibility to be based on compelling facts and well-reasoned analysis.



TOP SECRET/ /NOFORN

(U)

d[6]

UNCLASSIFIED

**SPEAR PHISHING** is a cyberattack that uses email to lure a victim into opening attachments, following links or disclosing their credentials. These messages are highly specific and seem authentic to the recipient.

**CREDENTIAL HARVESTING** is the process of identifying the usernames, passwords, and hashes of targets which can then be used to gain unauthorized access to a user's system.

TOP SECRET/ /NOFORN
PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES
23





[redacted]

[redacted]

[redacted]
PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES
25



(U)

## (U) Attribution is a Bear

(U)

TOP SECRET/[redacted]/NOFORN/[redacted]

TOP SECRET/[redacted]/NOFORN/[redacted]

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES



[redacted]

[redacted]

[redacted]

(U) While the intelligence case for attribution to Russia is significant, alternative scenarios have been examined to include an insider threat or another cyber actor. No credible evidence was found supporting either alternative, including a review of information contained in classified intelligence reports.

**(U) Finding #8: Russian-state actors and third-party intermediaries were responsible for the dissemination of documents and communications stolen from U.S. political organizations.**

(U) Russian-state actors and third party intermediaries were responsible for the selective dissemination of information from hacked U.S. political systems. This represents a "significant escalation in directness, level of activity, and scope of effort" in Russia's "longstanding desire to undermine the US-led liberal democratic order." It is therefore likely that high-level Russian government approval was required in both planning and execution of the operation.[16]

**(U) Russian-state Actors**

**(U) Guccifer 2.0 and DC Leaks**

[redacted]

**UNCLASSIFIED**

**GUCCIFER 2.0 TAKES CREDIT FOR DNC HACK ON WORDPRESS.COM**

Source: Wordpress.com (guccifer2.wordpress.com)

**UNCLASSIFIED**

[redacted]

(U) From their first appearances, both Guccifer 2.0 and DC Leaks sought to conceal their identities. During a media interview on June 21, 2017, Guccifer 2.0 identified himself as a Romanian "hacker, manager, philosopher, women lover," and a "freedom fighter." He further explained in broken English his desire to follow in Marcel Lazar's (the original Guccifer) footsteps to "fight for freedom of minds and for a world without illuminati."[19]

(U) Meanwhile, DC Leaks identified itself as a group of American hacktivists engaged in "a new level project aimed to analyze and publish a large amount of emails from top-ranking officials and their influence agents all over the world." The self-described premise of the DC Leaks effort was that "politicians have forgotten that in a democracy the people are the highest form of political authority."[20]

- (U) Both Guccifer 2.0 and DC Leaks worked to conceal their true identities, physical locations, and motivations;
- 
- [redacted]
- (U) Guccifer 2.0's first appearance online and claim of responsibility for the DNC hack occurred within 24 hours of the public announcement by [redacted] that the DNC had been hacked by actors affiliated with the Russian government;[22]
- 

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES


[redacted]

- (U) Multiple cybersecurity firms have evaluated Guccifer 2.0's activity and have published evidence that the online persona used a Russian-based VPN service to transmit files and communicate. Additionally, posted documents were processed on a computer using Russian language settings;[24]
- (U) During interactions with the media, Guccifer 2.0 denied any relationship with the Russian government and claimed to be Romanian. However, when pressed to explain how he hacked into the DNC in his native Romanian language, he failed to demonstrate fluency. Guccifer 2.0 terminated the interview when challenged on this point;[25]
- (U) [redacted]

**(U) WikiLeaks**

(U) WikiLeaks played a key role in Russia's malign influence campaign and served as a third party intermediary for Russian intelligence during the period leading up to the 2016 U.S. presidential election.

(U) The global reach of WikiLeaks and its established ties to the media makes it an attractive outlet for the dissemination of stolen documents intended to undermine the United States and its electoral process. In addition, WikiLeaks' historic actions, which have undermined U.S. interests and been beneficial to Russia, make the organization an ideal intermediary for Russian intelligence.[27]

**UNCLASSIFIED**

**GUCCIFER 2.0 & WIKILEAKS**

Source: Twitter

**UNCLASSIFIED**

(~~U~~) WikiLeaks relies on hackers, leakers, and other criminal agents to acquire personal, confidential, and classified material for publication. [redacted] As part of that dissemination, WikiLeaks sent 118 tweets promoting the hacked material. WikiLeaks messaging was then magnified by 426,000 other users' tweets. According to Twitter, as much as 25% of these tweets could have

been the result of automated activity associated with Russia's malign influence campaign.[28]

[redacted]

[redacted]

UNCLASSIFIED

**WIKILEAKS DISSEMINATES HACKED MATERIAL**

Source: WikiLeaks website

UNCLASSIFIED

**Finding #9: The Russian government used RT to advance its malign influence campaign during the 2016 U.S. presidential election.**

(U) The Committee finds ample evidence that RT is not only a state-enterprise, but is subject to the editorial control of the Russian government. This control allowed the Kremlin to use RT to advance its malign influence efforts during the 2016 U.S. presidential election.

(U) RT, formerly Russia Today, became an international news channel in 2005. It is available in more than 100 countries and has its largest viewer base in Europe. RT's stated goal is to "create news with an edge for viewers who want to question more" and produces content which appeals to skeptics of both the mainstream media and the establishment.[30]

(U) RT is subject to the control of the Russian government. The State Department describes it as a "State-owned international satellite news network broadcasting in multiple languages," which "spreads Russian propaganda tailored to international markets." The IC has identified RT as "the Kremlin's principal international propaganda outlet."[31]

[redacted]

[redacted]

(U) During the 2016 U.S. presidential elections, RT ran stories consistent with its past editorial bias against the West and suggested that the U.S. electoral process had been corrupted. RT was critical of presidential candidates from both major parties but was consistently critical of candidate Clinton through the election.

(U) RT's attacks against candidate Clinton were wide-ranging, including the insinuation that the Clinton family were criminals. RT also used advertising to promote material leaked by Russian intelligence, which targeted candidate Clinton and the Democratic Party.[32]

**(U) Finding #10: Russian intelligence leveraged social media in an attempt to sow social discord and to undermine the U.S. electoral process.**

[redacted]

(U) The Internet Research Agency (IRA), a Russia-based "troll farm" with ties to the Kremlin, was responsible for placing ads and maintaining both human operated and automated social media accounts for the malign influence campaign.[34]

(U) Twitter

UNCLASSIFIED

**RT SPONSORED TWEETS**

RT
5 times when the Clintons escaped federal charges
RT
#Podesta33: WikiLeaks releases latest batch of emails from Clinton campaign chair

Source: Twitter

UNCLASSIFIED

(U) The 2016 Russian Twitter operation was coordinated with the use of other social media platforms to undermine the U.S. political process and divide Americans. Both presidential candidates (@HillaryClinton and @realDonaldTrump) were directly engaged through "retweets" and "likes," as were various politically active and divisive

factions of American society.

(U) In total, Twitter identified 36,746 automated Russian accounts which were responsible for producing 1.4 million unique tweets. In addition, Twitter identified 2,752 human-operated accounts. Some of these accounts masqueraded as the news media, activists, and political organizations. One Russian account, @TEN_GOP, successfully impersonated the Tennessee Republican Party and grew to have significantly more followers than the legitimate Twitter account. After tweeting "We Love You, Mr. President" to Donald Trump, @TEN_GOP received a thank you from the presidential candidate.[35]

(U) @TEN_GOP and other Russian-linked accounts incited racial divisions, anti-Muslim, and anti-immigrant messages. They also promoted the dissemination of material stolen from U.S. political organizations by the GRU. The Russian cyber personas DC Leaks and Guccifer 2.0 used Twitter to promote stolen material, as did WikiLeaks.

UNCLASSIFIED

**RUSSIAN TWEETS USING @HillaryClinton and @realDonaldTrump**

32,254 Tweets & 111,326 Likes
416,632 Tweets & 480,346 Likes
Russian Twitter Accounts
Targeting @HillaryClinton followers
Targeting @realDonaldTrump followers

Source: Twitter

### (U) Facebook

(U) Russian operators also used Facebook Pages and advertising to advance their malign influence campaign. The company's internal review found the creation and promotion of 120 unique Facebook Pages by the IRA. These pages generated approximately 80,000 posts over the two year period preceding the election. These posts appeared in 29 million users' Facebook "News Feeds." When Facebook calculated the cumulative impact of "Shares" "Likes" and "Follows," the company estimated that 129 million people may have been served Russia's malign influence content.[36]

(U) According to Facebook, much of the Russian activity was designed to promote divisive social and political messages across the ideological spectrum and that advertising was intended to drive followership of divisive Pages. Four of the top impression-generating (or number of times an ad was on screen) advertisements were from fictitious personas claiming to represent organizations including "Back the Badge," "Blacktivist," "Being Patriotic," and "Woke Blacks."[37]

(U) Russian malign influence activities on Facebook were significant but they were not well-funded or large-scale operations relative to the overall scope of election-related activity on these platforms:

- Prior to the election, Russian operators used paid advertising on Facebook to reach 5 million Americans



**UNCLASSIFIED**

**RUSSIAN ADS ON FACEBOOK**

Source: Facebook

**UNCLASSIFIED**

TOP SECRET/ ███████████                    /NOFORN ███████

(based on impressions). At the same time, 33 trillion stories were served on Facebook Pages and users averaged 220 per day;

- 56% of the 11.4 million impressions associated with Russian Facebook advertising occurred after the election;

- 99% of Russian Facebook ads were funded with less than $1,000 and 25% were never seen.

(U) Google

(U) Google also was used as a media platform for Russia's malign influence campaign. The company's investigation revealed that $4,700 was spent promoting 18 channels and 1,100 YouTube videos (43 hours of content).

(U) Google describes this as a limited investment compared to overall election-related spending on Google. In total, 0.0002 percent of 2016 U.S. election advertising was found to be associated with Russian malign actors. In addition, Google noted that this Russian-funded media had very low view counts with only 3% reaching views of 5,000 or more.

(U) However, it should be noted that Google and its services have been and continue to be used by Russia for the dissemination of propaganda through RT. This is partly evidenced by RT's 2.2 million subscribers on YouTube, but also by the fact that RT propaganda is served to Americans by Google in the same manner as legitimate news sources.

(U) The Committee's investigation found that Twitter, Facebook, Google, and other social media platforms face significant challenges in their effort to identify and act on malign influence campaigns. Some of those challenges include:

- Sophisticated actors adapt to automated defenses;

- Social media does not require true name usage;

- Users can easily conceal their physical location with virtual private network connections;

- Social media seeks authentic exchanges and does not want to censor speech; and

- Social media platforms do not have access to intelligence reporting.

TOP SECRET/ ███████████                    NOFORN ███████

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES





13. HPSCI, Full Committee Briefing on Russia Cyber Activity (Closed Session), Sept. 6, 2016; HPSCI, Full Committee Briefing on Russia Cyber Activity (Closed Session), Jan. 10, 2016; HPSCI, Full Committee Briefing on Russia Cyber Activity (Closed Session), Dec. 5, 2016; [redacted], *Draft Incident Investigation Report for the Democratic National Committee*, Aug. 24, 2016; [redacted], *Draft Incident Investigation Report for the Democratic Congressional Campaign Committee*, Aug. 8, 2016.

14. [redacted] *Draft Incident Investigation Report for the Democratic National Committee*, Aug. 24, 2016; [redacted] *Draft Incident Investigation Report for the Democratic Congressional Campaign Committee*, Aug. 8, 2016.

15. [redacted] *Draft Incident Investigation Report for the Democratic National Committee*, Aug. 24, 2016; [redacted] *Draft Incident Investigation Report for the Democratic Congressional Campaign Committee*, Aug. 8, 2016; LexisNexis, *Discovery Services Fact Sheet: "How Many Pages in a Gigabyte?"* Dec. 23, 2017.

16. ODNI, *Intelligence Community Assessment: Assessing Russian Activities and Intentions in Recent US Elections*, Jan. 5, 2017; HPSCI, Full Committee Briefing on Russian Cyber Activities (Closed Session), Dec. 5, 2016; HPSCI, Full Committee Briefing on Russia Cyber Activity (Closed), Jan. 10, 2016; [redacted]; ODNI, *Intelligence Community Assessment: Cyber Threats to the 2016 US Presidential Election (ICA 2016-37HC)*, Sept. 12, 2016.
17. [redacted].
18. HPSCI, Full Committee Briefing on Russian Cyber Activities (Closed), Dec. 5, 2016; HPSCI, Full Committee Briefing on Russia Cyber Activity (Closed Session), Jan. 10, 2016; [redacted], *"The definitive Trump-Russia Timeline of Events," Politico*, Dec. 1, 2017; [redacted], "Hacking Democracy: The Post's new findings in Russia's bold campaign to influence the U.S. election," *Washington Post*, July 11, 2017; [redacted] ODNI, *Growing Risk of Strategic Surprise in Cyberspace Operations (NICM 2017-06)*, Jan. 30, 2017.
19. [redacted], *"Interview with Guccifer 2.0," VICE*, June 21, 2017.
20. Twitter, @DCLeaks_
21. [redacted],
22. [redacted] *"Bears in the Midst: Intrusion into the Democratic National Committee,"* CrowdStrike Blog, June 15, 2016; [redacted], *Inside Story: How Russians Hacked the Democrats' Emails, Associated Press*, Nov. 4, 2017; [redacted] "All *Signs Point to Russia Being Behind the DNC Hack," VICE*, July 25, 2016; [redacted] *"Interview with Guccifer 2.0," VICE*, June 21, 2017.
23. [redacted]; [redacted]
24. [redacted] "Two Years of Pawn Storm," *Trend Micro*, Apr. 25, 2017; ThreatConnect, *"Guccifer 2.0: All Roads Lead Back to Russia,"* July 26, 2016; [redacted]
25. [redacted], "Interview with Guccifer 2.0," *VICE*, June 21, 2017.
26. ThreatConnect, "Does a BEAR Leak in the Woods? ThreatConnect Identifies DCLeaks as Another Russian-Backed Influence Outlet," Aug. 12, 2016
27. [redacted] Joe Becker, Steven Erlanger, and Eric Schmitt, "How Russia Often Benefits When Julian Assange Reveals the West's Secrets," *The New York Times*, Aug. 31, 2016.
28. WikiLeaks.org, *About WikiLeaks (www.wikileaks.org)*, Dec. 22, 2017; Feike Hacquebord, "Two Years of Pawn Storm," *Trend Micro*, Apr. 25, 2017; ThreatConnect, "Guccifer 2.0: All Roads Lead Back to Russia," July 26, 2016; [redacted]; HPSCI, Full Committee Briefing on Russia Cyber Activity (Closed Session), Jan. 10, 2016.
29. HPSCI, Full Committee Briefing on Russian Cyber Activity (Closed Session), Dec. 5, 2016; HPSCI, Full Committee Briefing on Russia Cyber Activity (Closed Session), Jan. 10, 2016; Matthew Nussbaum, "The definitive Trump-Russia Timeline of Events," *Politico*, Dec. 1, 2017; [redacted], "Hacking Democracy: The Post's new findings in Russia's bold campaign to influence the U.S. election," *Washington Post*, July 11, 2017; [redacted]
30. RT.com, About, Dec. 23, 2017; [redacted]
31. U.S. Department of State, *Media organizations controlled and funded by the Government of the Russia Federation (Report 002580)*, Nov. 7, 2017.
32. [redacted].
33. [redacted]
34. Written testimony of [redacted] Acting General Counsel of Twitter, Inc., Nov. 1, 2017; HPSCI, "Russia Investigation Task Force Hearing on Social Media," Nov. 1, 2017.
35. Written testimony of [redacted], Acting General Counsel of Twitter, Inc., Nov. 1, 2017.
36. Written testimony of [redacted], General Counsel, Facebook, Nov. 1, 2017.
37. HPSCI, "Russia Investigation Task Force Hearing on Social Media," Nov. 1, 2017.

## (U) Chapter 3 - America Reacts

***Key Question #3: What was the U.S. government response to these Russian active measures and what do we need to do to protect ourselves and our allies in the future?***

(U) As discussed in Chapter 2, the IC was at the tip of the spear of the U.S. government's response to Russia's nefarious cyber activities. While the NSA focused on detection and attribution, the FBI took the lead on victim notification, and the DHS was the primary agency responsible for providing assistance to victims and coordinating with state and local election officials.

(U) The federal government's ability to effectively respond to cyber threats depends on the IC's ability to pass information efficiently to the FBI at the lowest classification level possible. It is also dependent on the sufficiency of the interactions between the federal government and victim, whether that victim is a private organization such as the DNC, or a state or local government entity. Given the response to Russia's malign influence campaign, the Committee believes that FBI and DHS need to improve the processes used to engage with victims and stakeholders, who independently control their respective systems.

(U) The Executive Branch's policy response to Russia's active measures campaign included extensive deliberation, but not significant pre-election action. This is explained by two factors. First, the Executive Branch was justifiably concerned about raising an alarm so close to the election. Second, elections are not run by the federal government. State and local governments are under no obligation to cooperate with federal officials, nor are political organizations that operate their own networks. In short, the developing intelligence on Russian active measures throughout 2016, the complexity of the political situation, and the lack of federal authority to act limited the options for aggressive pre-election actions. The Executive Branch took some actions, to include a joint DHS and ODNI public statement issued on October 7, 2016.

(U [redacted], the CIA created a fusion cell on Russian election interference, which was comprised of analysts from the CIA, FBI, and NSA. This fusion cell produced a series of papers for the White House, directors of each of the three agencies, and the DNI. The cell operated through the election, standing down in mid-November.

(U) On December 6, 2016, President Obama directed CIA Director John Brennan to conduct a review of all intelligence relating to Russian involvement in the 2016 elections, and produce a single, comprehensive assessment. The result, an ICA titled *Assessing Russian Activities and Intentions in Recent US Elections*, was drafted by [redacted] CIA analysts [redacted] and was coordinated with the NSA and the FBI. While most of the analysis contained in the ICA held up to scrutiny, the Committee investigation found that ICA judgments on Putin's strategic ob-

TOP SECRET// █████████████████ /NOFORN ███

jectives failed to meet most of the analytic standards set forth in the primary guiding document for IC analysis, Intelligence Community Directive (ICD) 203, *Analytic Standards*.

(U) Another component of the Executive Branch's response to the Russian government's efforts to interfere in the 2016 presidential campaign was FBI's opening of a counterintelligence investigation into "the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts."[1] ████████

████████████████████
████████████████████

(U) The Committee collected facts related to the FBI's investigation through May 2017, until the appointment of Special Counsel Robert Mueller. The Committee did not examine events that occurred thereafter in order to avoid interfering with Special Counsel Mueller's ongoing investigation. While this chapter addresses the FBI's investigation, facts identified by the Committee relating to Russia contacts with Trump campaign associates, including the individuals under FBI investigation, are addressed in Chapter 4.

(U) Finding #11: The Federal Bureau of Investigation's notification to numerous Russian hacking victims was largely inadequate.



(U) The Committee is also concerned that many, perhaps even a majority, of Russia's known victims were never contacted by the FBI. In November 2017, the Associated Press (AP) reported that it contacted approximately 80 people out of a list of approximately 500 victims. Only two who were contacted by the AP "learned of the hacking attempts of their personal Gmail accounts from the FBI."[8] Although the Com-



TOP SECRET/ /NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES



mittee cannot verify the accuracy of the AP's reporting, Clinton campaign senior policy advisor Jake Sullivan testified to the Committee that, consistent with the AP's analysis, his personal Gmail account was the subject of numerous hacking attempts, but that he never received any sort of notification from FBI.[9]

(U) Interaction with the DNC illustrated that even when the FBI expeditiously made contact with a victim, and conveyed relatively detailed information, the engagement failed to elicit the desired response—namely, the DNC's swift and serious attention. Director Comey testified that, in retrospect, "[w]e would have sent up a much larger flare. Yeah, we would have just kept banging and banging on the door, knowing what I know now. We made extensive efforts to notify. I might have walked over there myself, knowing what I know now."[10] Similarly, former DHS Secretary Jeh Johnson reflected that, "You know, in retrospect, it would be easy for me to say that I should have brought a sleeping bag and camped out in front of the DNC in late summer, with the benefit of hindsight."[11]

**(U) Finding #12: Communication between the Department of Homeland Security and state election officials was impeded by state officials' mistrust of federal government overreach coupled with an unprecedented level of Russian cyber intrusions.**

(U) DHS was the first agency to raise awareness to state election officials and the general public regarding cybersecurity concerns with the 2016 election infrastructure. In August 2016, Secretary Johnson hosted a conference call with the National Association of Secretaries of State (NASS) and other Chief Election Officials. This call was followed in September and October 2016 by four statements encouraging state and local elections officials to request DHS's cybersecurity assistance.[12]

(U) During the August 2016 phone call, Secretary Johnson offered assistance to state officials in managing risks to voting systems in each state's jurisdiction. He also encouraged state officials to implement recommendations from the Department of Commerce's NIST and the U.S. EAC on securing election infrastructure. At that time, DHS was "not aware of any specific or credible cybersecurity threats relating to the upcoming general election systems," and, on the call with state officials, "Secretary Johnson reiterated that DHS, the Election Assistance Commission, NIST, and DOJ are available to offer support and assistance in protecting against cyber attacks."[13]

(U) On August 18, 2016, the FBI Cyber Division, in an effort to aid cyber security professionals and system administrators to guard against the persistent malicious actions of cyber criminals, issued an alert to states entitled, "Targeting Activity Against State Board of Election Systems."[14] The bulletin warned that in late June 2016, an "unknown actor scanned a state's Board of Election website for vulnerabilities."[15] The FBI recommended that all states search activity logs for any escalation attempts and suggested three recommendations as pre-

cautionary measures.[16]

**UNCLASSIFIED**

**FBI WARNS STATES OF MALICIOUS CYBER ATTEMPTS**

Source: Yahoo

**UNCLASSIFIED**

(U) In a September 16, 2016 statement, Secretary Johnson announced "we have seen cyber intrusions involving political institutions and personal communications. We have also seen some efforts at cyber intrusions of voter registration data maintained in state election systems."[17] Secretary Johnson encouraged election officials to reach out to DHS and also offered a variety of cybersecurity services to state and election officials, including:

- Scans on internet-facing systems, including reporting of vulnerabilities and mitigation recommendations;
- Risk and vulnerability assessments;
- Support from the National Cybersecurity and Communications Integration Center (NCCIC) to provide on-site assistance in identifying and remediating a cyber incident;
- Information sharing of relevant cyber incidents, threats, and vulnerability information;
- Best practices for securing voter registration databases and addressing potential threats; and
- Field-based cybersecurity advisors to assist with planning and incident management.[18]

(U) Also on September 28, 2016, Speaker Ryan and Leaders McConnell, Pelosi, and Reid sent a letter to the National Association of State Election Directors, "urg[ing] states to take full advantage of the robust public and private sector resources available to them..." and informing them that "[i]n addition, the Department of Homeland Security stands ready to provide cybersecurity assistance to those states that choose to request it."[19]

(U) On October 1, 2016, Secretary Johnson expressed gratitude for the letter from congressional leadership, and noted that there were a few cases in which malicious actors gained access to state voting-related systems. He also encouraged state and local election officials to seek DHS' cybersecurity assistance. "So far, 21 states have contacted us about our services. We hope to see more," Johnson said at the time.[20]

(U) DHS and ODNI released a joint public statement on October 7, 2016. DHS continued to urge state and local election officials to remain vigilant and seek its assistance with cybersecurity.[21] On October 10, 2016, Secretary Johnson provided an update on DHS election cybersecurity services

that "to date, 33 states . . . election agencies have approached the Department of Homeland Security about our Cybersecurity services." Johnson stressed that time was an important factor, with only 29 days until election; it could take up to two weeks for DHS to run scans and identify vulnerabilities, and an additional week for election officials to mitigate any vulnerabilities. This was the Secretary's final public attempt to encourage state and local election officials to reach out to DHS for assistance.[22]

UNCLASSIFIED

Congress of the United States
Washington, DC 20515

[illegible]

[illegible]

UNCLASSIFIED

(U) Challenges encountered by DHS included the unprecedented size and scope of Russian active measures, lack of public attention, and mistrust from state and local election officials—many of whom lacked access to classified information. Ultimately, 36 states took advantage of DHS's assistance, but many election officials were resistant to the idea of designating election infrastructure as critical infrastructure.[23] As former Secretary Johnson explained to the Committee, "one thing I discovered in this conversation, State election officials are very sensitive about what they perceived to be Federal intrusion into their process. I heard that firsthand over and over: This is our process. It's our sovereign responsibility. We're not interested in the Federal takeover."[24] A clear example of mistrust was a letter sent from Georgia's Secretary of State Brian Kemp to Secretary Johnson on December 8, 2016, which accused DHS of attempting to breach the Georgia Secretary of State's firewall. "I am writing to ask you whether DHS was aware of this attempt and, if so, why DHS was attempting to breach our firewall," Mr. Kemp stated.[25] Nevertheless, on January 6, 2017, DHS designated election infrastructure as a subsector of the existing Government Facilities critical infrastructure sector.[26]

**(U) Finding #13: The joint Office of the Director of National Intelligence and Department of Homeland Security public statement attributing election interference to Russia was ineffective.**

(U) No major public actions were taken

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

between October 7, 2016 and election day. It is unclear exactly when policymakers began focusing on Russian efforts to influence the election. As further discussed below, Attorney General Loretta Lynch recalls being briefed by FBI senior leadership ███████ ██████████████████████████ that the Counterintelligence Division had essentially uncovered some information or received information involving Russian intelligence operatives."[27]

(U) On May 18, 2016, speaking at the Bipartisan Policy Center in Washington, D.C., DNI Clapper stated, "we've [the IC] already had some indications of that [attempts of cyberattacks on presidential campaign websites] and the combination of DHS and FBI are doing what they can to educate both campaigns against potential cyber threats."[28]

(U) By summer 2016, CIA Director Brennan had become aware of information about "specific Russian efforts to influence the election,"[79] and the National Security Council (NSC) Principals Committee began discussing actions to take in response to what the Russians had been doing.[30] As Director Brennan continued to brief the Principals Committee on Russia, the CIA—as discussed previously in this report—"pulled together experts from the Central Intelligence Agency (CIA), NSA, and FBI ███ to focus on the issue, drawing in multiple perspectives and subject matter experts with broad expertise to assess Russian attempts to interfere in the U.S. Presidential election."[31]

████████████████████████████
████████████████████████████
████████████████████████████

While DHS was providing assistance to states to conduct cyber reviews of their electoral mechanisms, the Principals Committee was awaiting "with urgency whatever the Intelligence Community could provide" that "would illuminate [their] understanding of [Russian interest in the election]."[33]

## UNCLASSIFIED

## IC CONFIDENT OF RUSSIAN PRE-ELECTION HACKING

Joint Statement from the Department Of Homeland Security and Office of the Director of National Intelligence on Election Security



For immediate Release
D H S Press Office
Contact: 202 282 8010

The U.S. Intelligence Community (USIC) is confident that the Russian Government directed the recent compromises of e-mails from US persons and institutions, including from US political organizations. The recent disclosures of alleged hacked e-mails on sites like DCLeaks.com and WikiLeaks and by the Guccifer 2.0 online persona are consistent with the methods and motivations of Russian-directed efforts. These thefts and disclosures are intended to interfere with the US election process. Such activity is not new to Moscow—the Russians have used similar tactics and techniques across Europe and Eurasia, for example, to influence public opinion there. We believe, based on the scope and sensitivity of these efforts, that only Russia's senior-most officials could have authorized these activities.

Source: DHS

## UNCLASSIFIED

(U) On August 4, 2016, Director Brennan, in a scheduled call with Alexander Bortnikov, the head of Russia's Federal Security Bureau (FSB), became the first U.S. official to raise the issue of Moscow's meddling.[34] Brennan told Bortnikov that a campaign against the United States would certainly "backfire" and that all Americans "cherished their ability to elect their own leaders without outside interference or disruption."[35] Additionally, former Attorney General

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES
44

Loretta Lynch testified that the decision was made to have "the President of the United States speak directly to President Putin, confront him with knowledge that we were aware of his efforts on a variety of fronts and that it was unacceptable, and that that discussion took place during a pull-aside . . . at one of the G- either 7 or 20 meetings in the early fall."[36] Former National Security Advisor Susan Rice corroborated in testimony before the Committee that President Obama and President Putin discussed Russian meddling in the 2016 election at the end of bilateral discussions during the G20 Summit in China in early September 2016.[37]

(U) The most significant pre-election public action was the October 7, 2016, joint DHS and ODNI statement, indicating in part that the IC "is confident that the Russian Government directed the recent compromises of e-mails from US persons and institutions, including from the US political organizations."[38] The IC assessed that the disclosures of alleged hacks on websites such as DCLeaks.com, WikiLeaks, and by Guccifer 2.0 were consistent with Russian methods and motivations. According to Secretary Johnson, the statement "did not get the public attention that it should have, frankly, because the same day the press was focused on the release of the 'Access Hollywood' video. That's what made our news below-the-fold news that day."[39] Additionally, the public dissemination of Podesta's emails commenced on October 7.[40]

(U) In considering a public response, the Executive Branch was in a unique position—it was dealing with extremely sensitive intelligence and had to consider the impacts of jeopardizing sources and methods when declassifying intelligence.[41] Furthermore, in the midst of an ongoing campaign, it had to carefully consider any public statements or actions, as it did not want to be perceived as taking sides and politicizing the election—or, according to former Secretary Johnson fueling claims that the election was "rigged."[42]

**(U) Finding #14: The Executive Branch's post-election response was insufficient.**

(U) In the weeks following candidate Trump's victory over candidate Clinton in the 2016 U.S. presidential election, Executive Branch officials began brainstorming options for punitive actions against Russian activities. On December 6, 2016, President Obama ordered Director Brennan to conduct a review of all intelligence relating to Russia and the 2016 elections, including a comprehensive assessment that would eventually be made public.[43]

(U) On December 29, 2016, among other measures, President Obama announced the expulsion of 35 Russian intelligence operatives under diplomatic cover, the closure of Russian compounds in Maryland and New York, sanctions against nine entities and individuals associated with Russian intelligence services, and the Treasury Department's designation of two Russian individuals for "using cyber-enabled means to cause misappropriation of funds and personal identifying information."[44] Also on December 29, the FBI and DHS released a Joint

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// ███████ //NOFORN ████

Analysis Report of declassified technical information on Russian cyber activity to help network defenders identify and disrupt Russian malicious cyber activity.

(U) On January 6, 2017, DHS designated election infrastructure as a subsector of the existing government facilities critical infrastructure sector.[45] The same day, a declassified version of the ICA was released to the public.[46]

(U) **Finding #15: The majority of the Intelligence Community Assessment judgments on Russia's election activities employed proper analytic tradecraft.**

(U) The IC produced three versions of the ICA: (1) a highly compartmented document, which included all sources and references to the underlying intelligence, (2) a Top Secret version that omitted details from compartmented reports, and (3) an unclassified version. The full ICA was briefed to President Obama on January 5, 2017 and President-elect Trump on January 6, 2017. The unclassified version of the ICA was also released to the public on January 6, 2017. While the level of detail varies greatly among the three versions, the final conclusions and key judgments of each are the same.

(U) The Committee determined that the majority of the ICA judgments on Russia's election activities employed proper analytic tradecraft. These were mostly well reasoned, consistent with observed Russian actions, properly documented, and—particularly on the cyber intrusion sec-

tions—employed appropriate caveats on sources and identified assumptions. Some of the key ICA judgments that the Committee found credible because they were based on proper analytic tradecraft are summarized below:

- (U) Russian efforts to influence the 2016 U.S. presidential election represent the most recent expression of Moscow's longstanding desire to undermine the U.S.-led liberal democratic order.

- (U) Russian intelligence services, acting on the orders of Russian President Vladimir Putin, launched cyber and conventional influence operations—notably by leaking politically sensitive emails obtained from computer intrusions—during the 2016 election.

- 

(U) **Finding #16: The Intelligence Community Assessment judgments on Putin's strategic intentions did not employ proper analytic tradecraft.**

(U) While the Committee found that most ICA analysis held-up to scrutiny, the investigation also identified significant intelligence tradecraft failings that undermine confidence in the ICA judgments regarding Russian President Vladimir Putin's strategic objectives for disrupting the U.S. election. Those judgments failed to meet longstand-

TOP SECRET// ███████ //NOFORN ████

ing standards set forth in the primary guiding document for IC analysis, ICD 203, *Analytic Standards* including:

- (U) "Properly describe quality and credibility of underlying sources."
- (U) "Properly express and explain uncertainties associated with major analytic judgments."
- (U) "Incorporate analysis of alternatives ... [particularly] when major judgments must contend with significant uncertainties or ... high-impact results."
- (U) Base confidence assessments on "the quantity and quality of source material."
- (U) "Be informed by all relevant information available."
- (U) "Be independent of political considerations."[47]

(U) The Committee emphasizes that the tradecraft failures identified in this investigation should not be broadly ascribed to CIA, NSA or FBI analysis, as the shortcomings were confined to select judgments—specifically, a key assessment on Putin's strategic intentions—and not to the entire ICA product. Moreover, the ICA was written [redacted] CIA analysts and their draft was subjected to an unusually constrained review and coordination process, which deviated from established CIA practice. The Committee is not aware of these problems being prevalent in other CIA, FBI, or NSA products.

(C/NF)

~~(U)~~ The Committee's findings on ICA tradecraft focused on the use of sensitive, [redacted] intelligence [redacted] cited by the ICA. This presented a significant challenge for classification downgrade. The Committee worked with intelligence officers from the agencies who own the raw reporting cited in the ICA to downgrade the classification of compartmented findings [redacted]

(U) The Committee is planning additional action regarding this information in early spring 2018.

**(U) Finding #17: The Federal Bureau of Investigation opened an enterprise counterintelligence investigation into the Trump campaign after receiving information related to Trump campaign foreign policy advisor George Papadopoulos.**

(U) In addition to the other Executive Branch responses described above, in late July 2016, the FBI opened an enterprise CI investigation into the Trump campaign following the receipt of derogatory information about foreign policy advisor George Papadopoulos. The purpose of an enterprise CI investigation is to obtain information of intelligence value, "most times . . . not with any kind of intent or objective of reaching a criminal charge."[48] FBI's enterprise CI investigation into the Trump campaign was led by a small team at FBI headquarters.[49] The timeline of this investigation can be found on the next page.

(U) The derogatory information resulted from the relationship between Papadopoulos and [redacted] was anonymized in Papadopoulos' charging document as "the Professor").[50] Based on the charging documents, the two first met in Italy on or about March 14, 2016, and "Papadopoulos was interested in [redacted] because . . . [he] claimed to have substantial connections with Russian government officials, which Papadopoulos thought could increase his importance as a policy advisor . . ."[51] [redacted] was interested in Papadopoulos because of his role in the Trump campaign.[52] The first meeting with [redacted] occurred approximately one week prior to candidate Trump publicly naming Papadopoulos as a foreign policy advisor.[53]

(U) In late March, Papadopoulos had a follow-on meeting with [redacted] London, where [redacted] introduced Papadopoulos to a woman who claimed to be a relative of President Putin "with connections to senior Russian government officials."[54] Papadopoulos informed the campaign about this meeting, with a campaign supervisor proclaiming that Papadopoulos conducted "great work."[55] Papadopoulos continued to correspond with [redacted] who connected Papadopoulos with an individual [redacted] claiming to have connections with the Russian Ministry of Foreign Affairs.[56] Papadopoulos communicated with this Russian contact throughout the summer of 2016, attempting to arrange meetings between the Russian government and campaign officials.[57]

(U) On April 26, 2016, over breakfast at a London hotel, [redacted] told Papadopoulos "that he had just returned from a trip to Moscow where he had met with high-level Russian government officials."[58] [redacted] further indicated he had learned that the Russians had obtained 'dirt' on candidate Clinton. Specifically that "'the Russians had emails of Clinton,' 'they have thousands of emails.'"[59] However, the Committee was unable to discern if the referenced emails were the missing emails from candidate Clinton's server while she was Secretary of State or the emails that were stolen from the DNC.

[redacted]



PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES



[redacted]

(U) Finding #18: As part of the enterprise counterintelligence investigation into the Trump campaign, the Federal Bureau of Investigation opened an individual counterintelligence investigation into Carter Page.

(U) By the time Page was announced as a Trump campaign foreign policy advisor on March 21, 2016, he was already a subject of interest for the FBI. Page previously lived and worked in Russia and maintained contact with known Russian intelligence officers, including [redacted]—who was described in a 2015 court filing as an SVR officer posted to the Russian Mission to the United Nations. Page previously worked with the FBI in the prosecution of [redacted] and other Russian intelligence officials.[68]

[redacted]

[REDACTED]

**(U) Finding #19: The dossier compiled by Christopher Steele formed an essential part of an application to the Foreign Intelligence Surveillance Court to obtain electronic surveillance on Carter Page.**

(U) In late October 2016, DOJ sought from the Foreign Intelligence Surveillance Court (FISC) an order authorizing [REDACTED] -and the Committee did not find—any evidence of any cooperation or conspiracy between Page and Papadopoulos. Additionally, the so-called "dossier" compiled by Christopher Steele formed a substantial and essential [REDACTED] (For additional information about the Steele dossier, see Chapter 4.)

(U) 

**(U) Finding #20: Special Counsel Robert Mueller indicted Paul Manafort on several charges, none of which relate to allegations of collusion, coordination, or conspiracy between the Trump campaign and the Russian government.**

(U) Paul Manafort joined the Trump campaign on March 29, 2016, and was elevated to campaign chairman on May 19, 2016. Manafort became campaign manager after the campaign removed [REDACTED] on June 20, 2016. The Committee agreed to avoid, to the greatest extent practical, any potential interference with Special Counsel Mueller's investigation. Given the ongoing litigation concerns associated with Manafort, the Committee will only discuss information in this report that has been publicly disseminated by the Special Counsel's office. Although the Committee would have appreciated the opportunity to interview Manafort regarding his role on the Trump campaign, the Committee is limited in this regard due to Special Counsel Mueller's investigation and indictments.

(U) On October 27, 2017, a grand jury indicted Manafort and his associate, fellow lobbyist and deputy Trump campaign manager Rick Gates, for various financial crimes, as well as making false statements.[74] All of the financial crimes took place prior to Manafort serving as Trump campaign manager, and nothing in the indictment relates to any potential collusion, conspiracy, or conspiracy between the Trump campaign and the Russian government.

(U) On February 22, 2017, a grand jury issued a superseding indictment for Manafort and Rick Gates, which included additional allegations of financial crimes, includ-

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET/ ~~████~~ /NOFORN ~~████~~

ing bank fraud. Similar to the October 27, 2017, indictment, the superseding indictment does not include any reference to the Trump campaign, including no mention of collusion, coordination, or conspiracy between the Trump campaign and the Russian government.

(U) While the Committee will not go into further detail on the charges against Manafort due to ongoing litigation concerns, Special Counsel Mueller's indictment of Manafort illustrates the necessity for U.S. presidential campaigns to better investigate individuals who serve in senior positions within the campaign. If the accusations against Manafort are true, he should have never served as a senior official with a campaign for the U.S. presidency, much less campaign chairman or manager.



(U) General Flynn began advising the Trump campaign on or before February 2016 and subsequently became a central figure on the campaign trail. He was the former Director of DIA and was one of candidate Trump's closest advisors on national security issues. Following the election, and during the transition period, he was designated as the future National Security Advisor to the President. General Flynn served as President Trump's National Security Advisor for less than a month, resigning on February 13, 2017. According to FBI Director

Comey, General Flynn's resignation occurred after it came to light that he had misled Vice President-Elect Pence about his contacts with Russian Ambassador Sergey Kislyak during the transition period.[78]



(U) Prior to his trip to Moscow, General Flynn and his son met with Russian Ambassador Kislyak at the ambassador's private residence in Washington, D.C. on December 2, 2015. The meeting was later described by General's Flynn's son in an email to the Russian embassy as "very productive."[79] The email indicates that the meeting was arranged at the request of General Flynn or his son.[80] The Committee was unable to interview General Flynn and his son because of their written intent to assert their Fifth Amendment rights against self-incrimination.



PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

**(U) Finding #22: General Flynn pleaded guilty to making a false statement to the Federal Bureau of Investigation regarding his December 2016 conversations with Ambassador Kislyak, even though the Federal Bureau of Investigation agents did not detect any deception during Flynn's interview.**

(U) According to the charging documents, on or about December 22, 2016, "a very senior member of the Presidential Transition Team" (PTT) directed General Flynn to contact representatives of foreign governments.[84] This request concerned a resolution about Israeli settlements submitted by Egypt to the U.N. Security Council around December 21, 2016.[85] Later, on December 22, General Flynn contacted Ambassador Kislyak and "requested that Russia vote against or delay the resolution."[86] The next day, Ambassador Kislyak informed General Flynn that Russia would not comply with the request.[87]

(U) On December 29, 2016, President Obama "authorized a number of actions"—including new sanctions—"in response to the Russian government's aggressive harassment of U.S. officials and cyber operations aimed at the U.S. election in 2016."[88] Following this announcement, the charging documents state that General Flynn discussed "what, if anything, to communicate to the Russian Ambassador about the U.S. sanctions," with a senior PTT official.[89]

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES



**(U) Finding #23: Executive Branch officials did not notify the Trump campaign that members of the campaign were assessed to be potential counterintelligence concerns.**

(U) The Committee found that the Trump campaign was not notified that members of the campaign were potential counterintelligence concerns. This lack of notification meant that the campaign was unable to address the problems with each campaign member and was ignorant about the potential national security concerns. AG Lynch recalled that, during her first meeting with Director Comey and McCabe about Page, "one of the possibilities the three of us discussed was whether or not to provide what is called a defensive briefing to the campaign, wherein there would be a meeting with a senior person with the Trump campaign to alert them to the fact that . . . there may be efforts to compromise someone with their campaign."[102]

(U) Such a defensive briefing would not have been unusual. According to Lynch, "[i]t is not an uncommon thing to do . . . in intelligence matters."[103] However, the FBI did not provide any such warning about Page, although it was again discussed by the administration's most senior policymakers after Director Comey briefed the National Security Council Principals about the Page information in "late spring" 2016.[104]

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// ███████████████████ ██NOFORN██

(U) The Trump campaign did not receive a general counterintelligence briefing until August 2016, and even then, it was never specifically notified about Papadopoulos, Page, Manafort, or General Flynn's Russia ties.[105] Further, the counterintelligence briefing provided to Trump and his top advisors did not identify any individuals by name, but rather focused on the general threat posed by adversaries, including Russia and China.

(U) **Finding #24: The February 2018 indictment of the Internet Research Agency and Russian nationals exposes Russian actors and their intent to spread distrust towards the candidates and the political system in general.**

(U) In mid-February 2018, the Department of Justice charged 12 Russians and the Russia-based Internet Research Agency LLC with interference operations targeting the United States political and electoral processes. The indictment claims that the stated goal of the Russian actors was to "spread distrust towards the candidates and the political system in general" and provides insight into the methods used by the IRA, such as the use of stolen identities, travel to the U.S. for the purpose of collecting intelligence, and the procurement of computer infrastructure to hide the Russian origin of activities.[106] The indictment by Special Counsel Mueller contains assertions that are consistent with information examined by the Committee during its investigation. Specifically, according to an accompanying DOJ announcement, "There is no allegation in

the indictment that any American was a knowing participant in the alleged unlawful activity. There is no allegation in the indictment that the charged conduct altered the outcome of the 2016 election."[107]

TOP SECRET// ███████████████████████ //NOFORN██

TOP SECRET//████████████████████████████                    █NOFORN█████████

1. HPSCI, "Russian Active Measures Investigation", Mar. 20, 2017.
2. HPSCI, "Russian Active Measures Investigation", Mar. 20, 2017.
3.
4.
5.
6.

7.
8.

9. HPSCI, Executive Session Interview of Jake Sullivan, Dec. 21, 2017.
10. HPSCI, "Russian Active Measures Investigation", Mar. 20, 2017.
11. HPSCI, "Russia Investigative Task Force Hearing with Former Secretary of Homeland Security Jeh Johnson," June 21, 2017.
12. HPSCI, "Russia Investigative Task Force Hearing with Former Secretary of Homeland Security Jeh Johnson," June 21, 2017.
13. DHS, *Readout of Secretary Johnson's Call With State Election Officials About Cybersecurity*, https://www.dhs.gov/news/2016/08/15/readout-secretary-johnsons-call-state-election-officials-cybersecurity, Aug. 15, 2016.
14. FBI, *FBI Flash: Targeting Activity Against State Board of Election Systems*, Aug. 18, 2016.
15. FBI, *FBI Flash: Targeting Activity Against State Board of Election Systems*, Aug. 18, 2016.
16. FBI, *FBI Flash: Targeting Activity Against State Board of Election Systems*, Aug. 18, 2016.
17. DHS, *Statement by Secretary Johnson Concerning the Cybersecurity of the Nation's Election Systems*, http://www.dhs.gov/news/2016/09/16/statement-secretary-johnson-concerning-cybersecurity-nation's-election-systems, Sept. 16, 2016.
18. DHS, *Statement by Secretary Johnson Concerning the Cybersecurity of the Nation's Election Systems*, http://www.dhs.gov/news/2016/09/16/statement-secretary-johnson-concerning-cybersecurity-nation's-election-systems, Sept. 16, 2016.
19. Paul D. Ryan, Nancy Pelosi, Mitch McConnell, Harry Reid, *Letter to Todd Valentine*, Sept. 28, 2016.
20. DHS, *Statement by Secretary Johnson About Election Systems' Cybersecurity*, http://www.dhs.gov/news/2016/10/01/statement-secretary-johnson-about-election-systems-cybersecurity, Oct. 1, 2016.
21. DHS, *Joint Statement from the Department of Homeland Security and Office of the Director of National Intelligence on Election Security*, https://www.dhs.gov/news/2016/10/07/joint-statement-department-homeland-security-and-office-director-national, Oct. 7, 2016.
22. DHS, *Update by Secretary Johnson On DHS Election Cybersecurity Services*, https://www.dhs.gov/news/2016/10/10/update-secretary-johnson-dhs-election-cybersecurity-services, Oct. 10, 2016.
23. HPSCI, "Russia Investigative Task Force Hearing with Former Secretary of Homeland Security Jeh Johnson," June 21, 2017.
24. HPSCI, "Russia Investigative Task Force Hearing with Former Secretary of Homeland Security Jeh Johnson," June 21, 2017.
25. The Office of Secretary of State of Georgia, Letter to Secretary Jeh Johnson, Dec. 8, 2016.
26. DHS, Statement by Secretary Jeh Johnson on the Designation of Election Infrastructure as a Critical Infrastructure Subsector, https://www.dhs.gov/news/2017/01/06/statement-secretary-johnson-designation-election-infrastructure-critical, Jan. 6, 2017.
27. HPSCI, Executive Session Interview of Loretta Lynch, Oct. 20, 2017.
28. "The Global Digital Challenge Initiative – Keynote Address," Bipartisan Policy Center video, 38:29, http://bcove.me/zff9r4pq, May 18, 2016.
29. HPSCI, Executive Session Interview of Loretta Lynch, Oct. 20, 2017.
30. HPSCI, Executive Session Interview of Loretta Lynch, Oct. 20, 2017; The Principals Committee, convened and chaired by the National Security Advisor, is a Cabinet-level interagency forum for considering policy issues that affect the national security interests of the United States. Regular attendees of the Principals Committee include: the Secretary of State, the Secretary of the Treasury, the Secretary of Defense, the Attorney General, the Secretary of Energy, the Chief of Staff to the President, the Director of National Intelligence, the Chairman of the Joint Chiefs of Staff, the Director of the Central Intelligence Agency, the National Security Advisor, the Homeland Security Advisor, and the Representative of the United States to the United Nations.
31. HPSCI, "Russian Active Measures During the 2016 Election Campaign," May 23, 2017.
32. The Gang of 8 is comprised of the Speaker of the House of Representatives, the Minority Leader of the House of Representatives, the Chairman and Ranking Member of the Permanent Select Committee on Intelligence of the House of Rep-

TOP SECRET//████████████████████████             N/NOFORN█████████

resentatives, the Majority and Minority Leaders of the U.S. Senate, and the Chairman and Vice Chairman of the Select Committee on Intelligence of the U.S. Senate.

33. HPSCI, Executive Session Interview of Susan Rice, Sep. 8, 2017.
34. HPSCI, "Russian Active Measures During the 2016 Election Campaign," May 23, 2017.
35. HPSCI, "Russian Active Measures During the 2016 Election Campaign," May 23, 2017.
36. HPSCI, Executive Session Interview of Loretta Lynch, Oct. 20, 2017.
37. HPSCI, Executive Session Interview of Susan Rice, Sep. 8, 2017.
38. DHS, *Joint Statement from the Department of Homeland Security and Office of the Director of National Intelligence on Election Security*, https://www.dhs.gov/news/2016/10/07/joint-statement-department-homeland-security-and-office-director-national, Oct. 7, 2016.
39. HPSCI, "Russia Investigative Task Force Hearing with Former Secretary of Homeland Security Jeh Johnson," June 21, 2017.
40. HPSCI, Executive Session Interview of John Podesta, June 27, 2017.
41. HPSCI, "Russia Investigative Task Force Hearing with Former Secretary of Homeland Security Jeh Johnson," June 21, 2017.
42. HPSCI, "Russia Investigative Task Force Hearing with Former Secretary of Homeland Security Jeh Johnson," June 21, 2017.
43. [redacted] in September 2016 [redacted] shared similar information in a one-on-one meeting with FBI General Counsel James Baker. HPSCI, Executive Session of [redacted], Dec. 18, 2017. Around the same time as his meeting with FBI, [redacted] shared the information with journalists, including [redacted] of Slate, who published an article at the end of October. HPSCI, Executive Session of [redacted] Dec. 18, 2017; [redacted] "Was a Trump Service Communicating With Russia?," Slate, Oct. 31, 2016. Candidate Clinton promoted the [redacted] article to her social media followers the same day it was published. Twitter, @HillaryClinton, Oct. 31, 2016, 4:32 PM.
44. White House, *Statement by the President on Actions in Response to Russian Malicious Cyber Activity and Harassment*, Dec. 29, 2016.
45. DHS, *Statement by Secretary Jeh Johnson on the Designation of Election Infrastructure as a Critical Infrastructure Subsector*, https://www.dhs.gov/news/2017/01/06/statement-secretary-johnson-designation-election-infrastructure-critical, Jan. 6, 2017.
46. ODNI, *Assessing Russian Activities and Intentions in Recent US Elections*, Jan. 6, 2017.
47. ODNI, *Intelligence Community Directive 203: Analytic Standards*, Jan. 2, 2015.
48. HPSCI, Executive Session Interview of Mary McCord, Nov. 1, 2017.
49. HPSCI, Executive Session Interview of Andrew McCabe, Dec. 19, 2017.
50. U.S. v. George Papadopoulos (1:17-cr-182, District of Columbia).
51. U.S. v. George Papadopoulos (1:17-cr-182, District of Columbia).
52. U.S. v. George Papadopoulos (1:17-cr-182, District of Columbia).
53. Post Opinions Staff, "A transcript of Donald Trump's meeting with The Washington Post editorial board," *Washington Post*, Mar. 21, 2016.
54. U.S. v. George Papadopoulos (1:17-cr-182, District of Columbia).
55. U.S. v. George Papadopoulos (1:17-cr-182, District of Columbia); Email from George Papadopoulos to [redacted]. "Re: Meeting with Russian leadership—including Putin," Mar. 24, 2016 (DJTFP00010111).
56. U.S. v. George Papadopoulos (1:17-cr-182, District of Columbia); Email from George Papadopoulos to [redacted] Fwd: (Russian Outreach)," May 4, 2016 (DJTFP00011405).
57. U.S. v. George Papadopoulos (1:17-cr-182, District of Columbia).
58. U.S. v. George Papadopoulos (1:17-cr-182, District of Columbia).
59. U.S. v. George Papadopoulos (1:17-cr-182, District of Columbia).
60. [redacted]
61.
62.
63.



64. [redacted]
65. [redacted]
66. [redacted]
67. [redacted]
68. U.S. v. Evgeny Buryakov, a/k/a "Zhenya," [redacted], and [redacted] U.S. Southern District of New York, January 23, 2015; [redacted] "Russian Spies Tried to Recruit Carter Page Before He Advised Trump," *The New York Times*, Apr. 4, 2017; DOJ, Foreign Intelligence Surveillance Court Application, Oct. 21, 2016, which was made available for review by HPSCI members and staff on March 17, October 31, November 2, December 14, December 15, and December 18, 2017.
69. [redacted]
70. [redacted]
71. [redacted]
72. [redacted]
73. [redacted]
74. U.S. v. Paul J. Manafort, Jr. and Richard W. Gates III (1:17-cr-201, District of Columbia).
75. HPSCI, "FBI Counterintelligence Investigations," Mar. 2, 2017.
76. [redacted]
77. [redacted]
78. [redacted]
79. Michael G. Flynn, Email messages to Russian Embassy in United States, Flynn Intel Group Production, FLYNN_HPSCI_00000500, 00007542.
80. Michael G. Flynn, Email message to Russian Embassy in United States, Flynn Intel Group Production, FLYNN_HPSCI_00000500, 00007542.
81. [redacted]
82. [redacted]
83. [redacted]
84. U.S. v. Michael T. Flynn (1:17-cr-232, District of Columbia).
85. U.S. v. Michael T. Flynn (1:17-cr-232, District of Columbia).
86. U.S. v. Michael T. Flynn (1:17-cr-232, District of Columbia).
87. U.S. v. Michael T. Flynn (1:17-cr-232, District of Columbia).
88. Barack Obama, "FACT SHEET: Actions in Response to Russian Malicious Cyber Activity and Harassment," *The White House*, Dec. 29, 2016.
89. U.S. v. Michael T. Flynn (1:17-cr-232, District of Columbia).
90. [redacted]
91. [redacted]
92. [redacted]
93. [redacted]
94. [redacted]
95. [redacted]



96.
97.
98.
99.
100.
101.
102. HPSCI, Executive Session Interview of Loretta Lynch, Oct. 20, 2017.
103. HPSCI, Executive Session Interview of Loretta Lynch, Oct. 20, 2017.
104. HPSCI, Executive Session Interview of Loretta Lynch, Oct. 20, 2017.
105. HPSCI, Staff meeting with Bill Priestap, FBI Assistant Director, Head of the Counterintelligence Division, Oct 31, 2017.
106. U.S. v. Internet Research Agency, et al. (1:18-cr-32, District of Columbia).
107. DOJ, "Grand Jury Indicts Thirteen Russian Individuals and Three Russian Companies for Scheme to Interfere in the United States Political System," Feb. 16, 2018.

TOP SECRET// ███████████████ //NOFORN████

# (U) Chapter 4 - Campaign Links to Russia

*Key Question #2: Did the Russian active measures include links between Russia and individuals associated with political campaigns or any other U.S. persons?*

(U) A key focus of the Committee's investigation was whether Russian active measures directed at the 2016 U.S. election (see Chapter 3) "include[d] links between Russia and individuals associated with political campaigns or any other U.S. persons."[1] The first part of this chapter reflects the Committee's answer to that question with respect to the Trump campaign. The second part of this chapter addresses the Clinton campaign.

(U) The "links" between individuals associated with the campaigns and Russia have often been publicly described as inquiries into whether there was "collusion" between individuals associated with either candidate Trump or Clinton and the Russian government. One challenge with describing potential "links" with the Russian government as "collusion" is that the term "collusion" may mean different things to different people, as exemplified in witness testimony before the Committee. Particularly in light of Special Counsel Robert Mueller's continuing criminal investigation—which has a different focus and the Committee agreed not to impede—it is important to note that the term "collusion" does not, by itself, describe a criminal offense. Unlike the closely-related concept of "conspiracy," there is no applicable statute that sets out the elements of "collusion." "Collusion" is

therefore an ambiguous term, not a precise legal one.

## Trump Campaign

(U) The Committee cast a wide net, generally asking each witnesses whether they had evidence of any "collusion," "coordination," or "conspiracy" between Russia and candidate Trump or any of his associates. The Committee also investigated potential Trump campaign links with Russia, focusing on credible allegations within the scope of the agreed-upon parameters. Matters investigated by the Committee include allegations pertaining to:

- candidate Trump's business dealings;

- the campaign's policy positions and personnel;

- involvement in or knowledge about the publication of stolen emails; and

- meetings with Russians.

(U) In the course of witness interviews, reviews of document productions, and investigative efforts extending well over a year, the Committee did not find any evidence of collusion, conspiracy, or coordination between the Trump campaign and the Russians. While the Committee found that several of the contacts between Trump associates and Russians—or their proxies, including WikiLeaks—were ill-

TOP SECRET// ███████████████ //NOFORN████

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

advised, the Committee did not determine that Trump or anyone associated with him assisted Russia's active measures campaign.

## DIRECT EVIDENCE OF COLLUSION, CONSPIRACY, OR COORDINATION

**(U) Finding #25: When asked directly, none of the interviewed witnesses provided evidence of collusion, coordination, or conspiracy between the Trump campaign and the Russian government.**

(U) The Committee interviewed high-ranking current and former government officials, along with numerous Trump campaign members, Trump administration officials, and other Trump associates. None of the witnesses testified they had evidence of collusion between the campaign and anyone affiliated with the Russian government. In most of the Committee's witness interviews, the witness was asked directly for any evidence of "collusion, coordination or conspiracy" with any element of the Russian government to influence the outcome of the 2016 U.S. presidential election. This question was asked with respect to the witness' own actions; the actions of candidate Trump; the actions of anyone officially affiliated with the campaign; or the actions of anyone unofficially affiliated with the campaign, defined as including "wannabes,"[2] "hangers-on,"[3] and "people who represented themselves as being part of the campaign."[4] Each witness was given wide latitude in answering these questions, but none produced any evidence. For example, Trump's son-in-law and senior advisor Jared Kushner stated categorically that the Trump campaign "did not collude, cooperate, whatever other 'C' words you used, with any foreign governments."[5]

(U) Several former government officials testified that, even though there was no evidence of collusion between Trump campaign associates and the Russian government, they were aware of contacts and interactions of potential concern. For example, former CIA Director John Brennan stated in open session, "I encountered and am aware of information and intelligence that revealed contacts and interactions between Russian officials and U.S. persons involved in the Trump campaign that I was concerned about because of known Russian efforts to suborn such individuals, and it raised questions in my mind. . . whether or not the Russians were able to gain the cooperation of those individuals."[6] Brennan continued, however, "I don't know whether or not such collusion . . . existed."[7]

(U) Similarly, former DNI James Clapper stated that he was aware of the same information to which Brennan referred, "that my dashboard warning lights were on just because of that."[8] However, reaffirming his prior public statements, he told the Committee that, "I didn't have any evidence—I don't care how you want to caveat it—of collusion."[9]

## BUSINESS DEALINGS

**(U) Finding #26: The Committee found no evidence that President Trump's pre-campaign business dealings formed the**

basis for collusion during the campaign.

(U) As a political outsider who had never run for office, Donald Trump did not have a political record to analyze, criticize, or rely upon during the 2016 campaign. Therefore, his long and varied business career garnered significant attention from supporters, opponents, and opposition researchers alike. Eventually, as described in the second half of this chapter, candidate Trump's pre-campaign business dealings with Russians became a subject of significant opposition research.

(U) As noted above, the Committee's investigation was focused on the time period of the 2016 election. Trump's pre-campaign dealings were within scope only to the extent they formed the basis for, or were otherwise linked to, improper conduct during the elections. As one of the Committee Members said during an interview, the key question was if any business "relationships, whether directly or indirectly or just by some other means, had the effect that there was a preexisting relationship with Russia, and that that preexisting relationship may have in some way inspired the Trump campaign to have a contact with the Russian Government to coordinate, collude, or conspire to help them win the election over Hillary Clinton."[10]

(U) The Committee focused only on any potential financial improprieties relating to the election. In particular, the Committee examined the Miss Universe pageant in Moscow in 2013; the Trump Organization's unsuccessful efforts to build a Trump Tower in Moscow in late 2015 and early 2016; and other assorted claims of Russian financial ties to the Trump family. The Committee did not uncover any evidence that any of those matters formed the basis for collusion, coordination, or conspiracy between Trump or his associates and the Russian government during the 2016 U.S. presidential election.

(U) **Miss Universe 2013:** Before he was a political candidate, Trump owned the Miss Universe Organization. The decision to hold the 2013 Miss Universe annual pageant in Moscow was a unanimous one made by representatives of the Trump Organization and NBC—the event's broadcaster—with approval of the president of the Miss Universe organization.[11] Michael Cohen, an attorney and former Executive Vice President of the Trump Organization, told the Committee 50 percent of the fees earned for the pageant went to NBC.[12] "[O]f the $12.2 million in foreign income that [the Miss Universe pageant] earned [in 2013], a substantial portion of it was attributable to the Moscow event."[13]

(U) The 2013 pageant's hosts were Aras and Emin Agalarov, father and son of a wealthy Azerbaijani-Russian family in Moscow. The Agalarovs' company, Crocus Group, owned the venue where the pageant was held.[14] The Agalarovs and Crocus Group wanted to host the event in Moscow because they wanted to have the pageant in their company's building, Crocus City Hall, and it was a way to promote Emin's music

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

career, who performed at the pageant.[15] The Agalarovs have connections with senior individuals and elements of the Russian government,[16] and Aras received the Order of Honor from Vladimir Putin.[17] The decision to hold the pageant in Moscow originated from an "off-the-cuff" discussion between Emin Agalarov, his manager, and a representative from the Miss Universe pageant.[18]

UNCLASSIFIED

**EMIN AGALAROV AT THE 2013 MISS UNIVERSE PAGEANT IN MOSCOW**

Source: The Atlantic

UNCLASSIFIED

(U) The Agalarovs first met Trump in person in 2013 in connection with the Miss USA pageant in Las Vegas.[19] The Agalarovs and Trump signed the contract to hold the pageant in Moscow during the weekend of the Miss USA pageant in January 2013.[20] At the conclusion of the 2013 Miss USA pageant, Trump and the Agalarovs announced on stage that the Miss Universe pageant that year would be held in Moscow.[21] In a June 18, 2013 tweet, Trump publicly asked, "Do you think Putin will be going to The Miss Universe Pageant in November in Moscow – if so, will he become my new best friend?"[22]

(U) Leading up to the Miss Universe pageant, the issue of President Putin possibly attending came "up a number of times" among those planning the pageant.[23] Emin's manager Robert Goldstone and the head of the pageant organization had "casual" conversations with one another, but every time Goldstone asked Emin about it, Emin replied the pageant would have had to go through "official channels" to make the request, indicating that the event was not officially related to the Russian government.[24] At the time, according to Goldstone, Emin cast doubt on whether President Putin would attend, stating "if this was in America, would Barack Obama attend? Probably not. It's a beauty pageant. But there is a chance, maybe, of some kind of meeting."[25] Before the pageant, however, President Putin's press secretary called and told Trump and others that President Putin would not attend the pageant, and he did not.[26]

(U) While in Moscow, Trump, along with his head of security, attended the pageant and several pageant-related events.[27] For example, Trump attended an event hosted by the Agalarovs at a well-known restaurant with local businessmen.[28]

(U) Although there were allegations in the Steele dossier that Trump engaged in illicit activities with prostitutes in the presidential suite at the Ritz-Carlton hotel, the Committee found no evidence to support these allegations. Trump's former head of security, [redacted], testified that

although somebody during a meeting in Moscow [redacted] did not know who—"mentioned sending women to [Trump's] room," [redacted] responded "absolutely not, we don't do that."[29] [redacted] told the Committee he advised Trump of the comment, and they both laughed about it. [redacted] also testified he walked Trump to his room that night, remained for a few minutes, and did not observe anybody enter the room.[30]

(U) **Trump Tower Moscow:** While in Russia for the Miss Universe pageant, Trump met with the Agalarovs and discussed a possible joint real estate development in Moscow.[31] The proposed project was a Trump Tower in Moscow adjacent to the Agalarov-owned Crocus City Hall; according to Donald Trump Jr., "it fizzled out" after a few months.[32]

(U) Trump Organization lawyer Michael Cohen was not involved in those original discussions regarding Trump Tower Moscow. In approximately September 2015, he received a separate proposal for Trump Tower Moscow from a businessman named [redacted].[33] According to Cohen, the concept of the project was that "[t]he Trump Organization would lend its name and management skills, but it was not going to borrow any money and it would not have any resulting debt for the purchase of the land and the building of the facility."[34] Cohen worked on this idea with [redacted] and his company, the Bayrock Group, a real estate consultancy that had previously worked with the Trump Organization. [redacted] has a unique and colorful background, and described for the Committee his path from Wall Street banker to white-collar criminal to government informant.[35]

(U) After signing a letter of intent with a local developer in October 2015,[36] Cohen and [redacted] exchanged a number of emails and text messages in late 2015 detailing their attempts to move the project forward. For instance, in December 2015, [redacted] tried to get Cohen and candidate Trump to travel to Russia to work on the project.[37]

(U) Several of [redacted] communications with Cohen involved an attempt to broker a meeting or other ties between candidate Trump and President Putin, and purported to convey Russian government interest in the project.[38] Perhaps most notably, [redacted] told Cohen in a November 3, 2015, email, "[b]uddy our boy can become President of the USA and we can engineer it."[39] [redacted] continued that if "Putin gets on stage with Donald for a ribbon cutting for Trump Moscow, . . . Donald owns the republican nomination."[40] This assertion apparently arose from [redacted] rather grandiose theory that cementing a deal with a hostile U.S. adversary would increase candidate Trump's foreign policy bona fides.[41]

(U) [redacted] testified that his communications with Cohen regarding President Putin were "mere puffery," designed to elicit a response from the Trump Organization to move the project along.[42] [redacted] explained that "[u]ntil the bank writes the check, it's all salesmanship and promotion to try to get many, many,

many parties towards the center to try to get the deal done."[43] Cohen similarly characterized [redacted] as "a salesman" who "uses very colorful language."[44]

(U) When the project started proceeding too slowly for the Trump Organization,[45] Cohen and [redacted] began to exchange acrimonious text messages.[46] As part of those text messages [redacted] told Cohen that President Putin's people were backing the deal, including "this is thru Putins [sic] administration, and nothing gets done there without approval from the top," as well as meetings in Russia with "Ministers" and "Putins [sic] top administration people."[47] [redacted] also mentioned Dmitry Peskov (President Putin's spokesman) would "most likely" be included.[48]

(U) Cohen thus attempted to reach out to members of the Russian government in an attempt to make the project proceed, but apparently did not have any direct points of contact. For example, Cohen sent an email to a general press mailbox at the Kremlin in an effort to reach Peskov.[49] Cohen's message notes that he has been working with a local partner to build a Trump Tower in Moscow and that communications have stalled with the local partner.[50] The email further seeks contact with Peskov so they may "discuss the specifics as well as arrang[e] meetings with the appropriate individuals."[51] Based on the documents produced to the Committee, it does not appear Cohen ever received a response from anyone affiliated with the Russian government.

(U) [redacted] testimony likewise made clear that neither President Putin nor any element of the Russian government was actually directly involved in the project. For instance, in one exchange, [redacted] testified he was offering the Trump Organization access to one of [redacted] acquaintances. This acquaintance was an acquaintance of someone else who is "partners on a real estate development with a friend of Putin's."[52] [redacted] testified that he was unaware of "any direct meetings with any [Russian] government officials" in connection with the Trump Tower Moscow project.[53] In addition, neither candidate Trump nor Cohen traveled to Russia in support of the deal.[54]

(U) [redacted] was unequivocal in his testimony that none of the Russians affiliated with the Trump Tower Moscow project had any communications with him "in which [he] w[as] asked to do something on behalf of the Russian government that [he] knew was on behalf of the Russian Government" with respect to the U.S. election.[55] None of those communications "were intended for [redacted] to take action to have a communication with or take some action to influence the 2016 Presidential election."[56] The Committee therefore assesses that [redacted] was attempting to leverage political contacts for business purposes, rather than the other way around.

(U) It appears the Trump Tower Moscow project failed in January 2016.[57]

Trump Jr. testified that, as of early June 2016, he believed the Trump Tower Moscow project was dormant.[58] The project failed because "[t]he due diligence did not come through" and the Trump Organization's representative "lost confidence in the licensee, and [he] abandoned the project."[59] In fact, the Trump Organization did not have a confirmed site, so the deal never reached the point where the company was discussing financing arrangements for the project.[60] The Committee determined that the Trump Tower Moscow project did not progress beyond an early developmental phase, and that this potential licensing deal was not related to the Trump campaign.[61]

(U) **Other Alleged Financial Dealings:** In addition to the Miss Universe and Trump Tower Moscow projects, a number of witnesses were asked about Trump family financial dealings, sometimes stretching back decades.[62] For example, Trump Jr. was asked about Russians: buying units in Trump Tower in 1984 (when he was seven years old);[63] buying properties in southern Florida for which the Trump brand was a licensor;[64] being involved in the Trump International Hotel in Toronto for which the Trump Organization was the brand and not the developer;[65] and having unspecified involvement in a licensing project for the Trump Ocean Club in Panama.[66] The Committee does not have any evidence that there is a nexus between these activities and the 2016 campaign, or information that contradicts representations made in a March 8, 2017 letter from Trump's lawyers regarding his Russia-related financial dealings over the previous ten years.[67]

**POLICY POSITIONS**

(U) During the campaign, candidate Trump and several of his campaign advisors expressed policy views towards Russia quite different than those espoused by much of the Republican foreign policy establishment, including previous Republican nominee Mitt Romney, who labeled Russia "our number one geopolitical foe" during the 2012 election. In fact, a significant number of Republican foreign policy experts made statements during the campaign that they would not work for the Trump campaign. As a result, the campaign relied on many lesser-known—or in some cases unknown—advisors on foreign policy issues.

(U) Additionally, a plank of the 2016 Republican platform pertaining to the Ukraine has been the subject of substantial controversy. The question for the Committee was whether candidate Trump's policy positions—and the campaign's involvement in the debate over the Ukraine platform plank—reflected legitimate policy positions, or something more nefarious. The Committee found no evidence that the policy positions of the Trump campaign were the result of collusion, coordination, or conspiracy with the Russians. In the words of [REDACTED] Trump campaign policy official involved in the platform issue, "[t]here was no coordination or thought for coordination. The idea to have better relations with Russia was a Mr. Trump idea

TOP SECRET// ███████████ /NOFORN

that I thought was reasonable to support."[68]

{U} Finding #27: The Republican national security establishment's opposition to candidate Trump created opportunities for two less-experienced individuals with pro-Russia views to serve as campaign advisors: George Papadopoulos and Carter Page.

(U) The Republican foreign policy establishment was critical of candidate Trump, who had to turn elsewhere for support. On March 2, 2016, 122 self-described "GOP National Security Leaders" signed an "Open Letter to Donald Trump" refusing to support then-candidate Trump.[69] The next day, Trump announced Senator Jeff Sessions as chairman of his National Security Advisory Committee (NSAC). A few weeks later, following continuing media criticism of his failure to publicly name a foreign policy team,[70] candidate Trump named five foreign policy advisors in a March 21, 2016 meeting with *The Washington Post* editorial board: Walid Phares, Carter Page, George Papadopoulos, Joe Schmitz, and Keith Kellogg.[71]

(U) The opposition to Trump's candidacy by the vast majority of the conservative national security establishment paved the way for lesser-known individuals, such as the then 28-year-old Papadopoulos, to join the Trump campaign. Page was another unknown brought into the periphery of the Trump campaign to fill the vacuum left by more experienced national security specialists who were unwilling to advise candidate

Trump. There is no evidence that anyone on the Trump campaign was aware of Page's past ties to Russian intelligence services—or Papadopoulos' more recent contacts with a Russian-connected professor—when these two individuals were included among the advisors that were publicly announced on March 21. In fact, as Kushner candidly put it, "we put together that list because we were getting a lot of pressure from the media to put out a list of foreign policy advisers."[72]

## UNCLASSIFIED

## GOP National Security Leaders Open Letter to Donald Trump

STATEMENT BY FORMER NATIONAL SECURITY OFFICIALS

The undersigned individuals have all served in senior national security and/or foreign policy positions in Republican Administrations, from Richard Nixon to George W. Bush. We have worked directly on national security issues with these Republican Presidents and/or their principal advisers during wartime and other periods of crisis, through successes and failures. We know the personal qualities required of a President of the United States.

None of us will vote for Donald Trump.

Source: The New York Times

## UNCLASSIFIED

(U) These five advisors were subsequently incorporated into the NSAC, which was part of the campaign's D.C.-based policy shop.[73] The NSAC was chaired by Senator Sessions and directed by J.D. Gordon, a retired Navy officer and former Department of Defense spokesman.[74] Some members of the NSAC met with candidate Trump in Washington, D.C. on March 31, 2016. Page did not attend. Each advisor in attendance, including Papadopoulos, briefed the group on a topic of their choice. Papadopoulos spoke about Russia.

TOP SECRET// ███████████ /NOFORN

However, in the opinion of one advisor, Walid Phares, the primary purpose of the meeting was about optics rather than substance: "the meeting was about the picture and to send the message that: I have a foreign policy team."[75]

**UNCLASSIFIED**
**NSAC MEETING WITH CANDIATE TRUMP**

Source: Twitter

**UNCLASSIFIED**

(U) Page was, according to NSAC director Gordon, "very loosely affiliated with the campaign and had really no roles or responsibilities."[76] The Committee assesses that Page played no major role in the campaign, and had no meaningful access to senior leadership.

(U) Page did not attend the March 31, 2016, NSAC meeting with then-candidate Trump, and has never met him.[77] Although members of the NSAC occasionally gathered for meals in the Washington, D.C. area, they never again met as a group with candidate Trump.[78] Kushner provided a blunt assessment of the role, or lack thereof, played by the individuals on the initial list of publicly-announced foreign policy advisors: "[T]he amount of interaction they had with the actual campaign or influence they had on anything that happened in the campaign was virtually nonexistent."[79] Gordon testified to the Committee that he agreed with the assertion that the NSAC was minimally influential in the context of the broader campaign.[80]

**(U) Finding #28: The change in the Republican Party platform regarding Ukraine resulted in a stronger position against Russia, not a weaker one, and there is no evidence that Paul Manafort was involved.**

(U) It has been widely reported that the 2016 Republican Party platform was weakened with respect to Ukraine, perhaps as a favor to Russia or some other nefarious reason. After reviewing the Republican Party platform amendment process, interviewing those involved, and reviewing document productions, the Committee determined that the original plank was strengthened, rather than weakened—and there is no evidence that language advocating for the provisions of "lethal defensive weapons" was improperly removed.

(U) On July 11, 2016, the Republican National Committee Platform Committee met to discuss and debate amendments to the platform. As drafted, the platform referenced "a resurgent Russia occupying parts of Ukraine," but included no language about support to Kiev (see inset). [redacted] [redacted] of Texas, a member of the National Security/Military Platform Subcommittee, offered an amendment that would "support

maintaining (and, if warranted, increasing) sanctions against Russia until Ukraine's sovereignty and territory integrity are fully restored."[81] [redacted] proposed amendment further called on the United States to provide "lethal defensive weapons to Ukraine's armed forces and greater coordination with NATO [North Atlantic Treaty Organization] on defense planning."[82]

**UNCLASSIFIED**

**Original RNC Plank**

(U) In the international arena, weakness invites aggression. The results of the [Obama] Administration's unilateral approach to disarmament are already clear: An emboldened China in the South China Sea, a resurgent Russia occupying parts of Ukraine and threatening neighbors from the Baltic to the Caucasus, an aggressive Islamist terrorist network in Middle East. All our adversaries heard the message in the [Obama] Administration's cutbacks: America is weaker and retreating.

**UNCLASSIFIED**

(U) Much of [redacted] amendment was adopted, but—following debate among the delegates—the final version called for the United States to provide "appropriate assistance" rather than "lethal defensive weapons."[83] The Committee assesses that "appropriate assistance" provided flexibility, and could encompass lethal defensive weapons as well as humanitarian aid, medical supplies, and meals-ready-to eat. In any event, even without the words "lethal defensive weapons," the final draft of the platform "was tougher against Russia" than the original after incorporating all but three words of [redacted] amendment.[84]

**UNCLASSIFIED**

**Final RNC Plank**

(U) We support maintaining and, if warranted, increasing sanctions, together with our allies, against Russia unless and until Ukraine's sovereignty and territorial integrity are fully restored. We also support providing appropriate assistance to the armed forces of Ukraine and greater coordination with NATO defense planning.

**UNCLASSIFIED**

(U) The Committee also investigated what role, if any, Paul Manafort played in the Trump campaign's response to Denman's amendment. Manafort, a veteran of numerous Republican campaigns,[85] had long represented the government of Ukraine, the pro-Russian former president of Ukraine Viktor Yanukovich, and Yanukovich's Party of Regions.[86] In late March 2016, candidate Trump hired Manafort to lead "delegate-corralling efforts at the Republican National Convention."[87] Then-campaign manager [redacted] testified that, when Manafort was hired, [redacted] made no attempt to vet him and was entirely unaware of Manafort's past work in Ukraine.[88] In May 2016, Manafort was promoted to campaign chairman and, after [redacted] was fired the next month, "evolve[d]" into the role of de facto campaign manager.[89]

(U) Manafort left the campaign in August 2016 following news reports that he

~~TOP SECRET//~~ ███████████ ~~/NOFORN~~ ███

had received $12.7 million in secret payments for his work on behalf of Yanukovich's Party of Regions; news reporting also alleged that Manafort and his aide Rick Gates had "directly orchestrated a covert Washington lobbying operation" on behalf of the party—while failing to register as foreign agents.[90] Campaign press secretary Hope Hicks recalled that, after receiving press inquiries about Manafort's "professional history," a major story broke on the evening of August 14, 2016.[91] According to Hicks, "Trump had made a decision to make a change in leadership on the campaign outside of Paul's issues that were being publicly reported," but those issues "certainly contributed to expediting and intensifying the way in which his role changed, and then ultimately he was fired at the end of that week."[92] Trump directed his son-in-law Jared Kushner to ensure Manafort departed the campaign on August 19, which he did.[93] As Kushner put it, "[t] here was a lot of news that was out there, and the decision was that it was time for

**UNCLASSIFIED**
**PAUL MANAFORT RESIGNS**
**FROM TRUMP CAMPAIGN**



The departure of Trump campaign chairman comes two days after the campaign added top to Pennsylvania.

[unreadable caption line]

Reuter Photos

**UNCLASSIFIED**

him to resign."[94]

(U) Given Manafort's past work in Ukraine, if the Ukraine plank change was made as a favor to the Russian government, it seems likely that then-campaign chairman Manafort would have known about it. However, campaign records produced to the Committee show that Manafort had no role in, or contemporaneous knowledge of, the platform change. On July 30, 2016, Manafort sent an email, copying Gates, to Rick Dearborn, then a senior campaign policy official and Sessions' chief of staff: "I gather that there was a change in the platform that removed arming Ukraine. I don't know anything about this change. Who pushed for it and why was it done?"[95]

(U) In response, Dearborn generated a memorandum, dated August 1, 2016, outlining a detailed sequence of events that occurred between July 10 and 12, 2016.[96] As part of that memo, J.D. Gordon created a timeline that noted candidate Trump's policy statements—including at a March 31, 2016, national security meeting—served as the basis for the modification of Denman's amendment.[97] Gordon's timeline made it clear that the change was initiated by campaign staffers at the convention—not by Manafort or senior officials. Although Page expressed support after the fact, the Committee did not find any evidence that he actively participated in the modification of Denman's "red line amendment providing lethal assistance to Ukraine."[98]

**PUBLICATION OF STOLEN EMAILS**

~~TOP SECRET//~~ ███████████ ~~/NOFORN~~ ███

TOP SECRET// ███████████████ /NOFORN████

(U) Finding #29: There is no evidence that Trump associates were involved in the theft or publication of Clinton campaign-related emails, although Trump associates had numerous ill-advised contacts with WikiLeaks.

(U) There is no evidence that Trump or anyone associated with him played a role in the hacking of emails from the DNC and Clinton campaign chairman John Podesta, among other entities and individuals, detailed in Chapter 2. As also discussed in Chapter 2, the Committee concurs with the IC's assessment that WikiLeaks was one of the vehicles for the public dissemination of emails stolen by Russians. As noted in Chapter 3, on October 7, 2016, the Department of Homeland Security and Office of the Director of National Intelligence released a public statement that "[t]he U.S. Intelligence Community is confident that the Russian Government directed the recent compromises of e-mails from US persons and institutions, including US political organizations."[99] The statement also specifically tied WikiLeaks to the Russian-directed disclosures.

(U) Trump campaign communications made ample use of the publicly available emails, which were reported by virtually all major media outlets. Regarding WikiLeaks, Trump Jr. testified that "[a]t the time, I looked at them as essentially a media outlet" and an "opportunistic organization" that would have also put out negative information on Trump if it had it.[100] For Senator Sessions, reference to WikiLeaks

material in campaign statements was the product of deliberation: "And so, I remember making a decision that it [a trove of hacked emails] was in the public domain, and it would be silly not to use it. So I used it, although I could understand somebody else not wanting to."[101] For campaign press secretary Hope Hicks, use of emails published by WikiLeaks was uncontroversial because such information was available in the public domain.[102]

### UNCLASSIFIED
### WIKILEAKS RELEASES CLINTON EMAILS



Source: Twitter

### UNCLASSIFIED

(U) Similarly, candidate Trump stated at a rally on October 10, 2016—three days after the release of Podesta's emails began and the IC publicly tied WikiLeaks' dissemination to "Russia's senior-most officials"—that "I love WikiLeaks."[103] Trump had earlier encouraged the Russians to "find the 30,000 emails that are missing" from Hillary Clinton's private server.[104] (These emails, which were the frequent subject of campaign talking points, should not be

TOP SECRET/ ███████████████ /NOFORN████

TOP SECRET// ████████████████ /NOFORN████

conflated with the DNC emails. The Committee did not receive evidence that the emails from Clinton's private server were stolen by the Russians—or anyone else.)[105]

(U) Particularly in light of candidate Trump's expressed enthusiasm for WikiLeaks, the Committee examined the relationship between his associates and the stolen emails. The Committee did not find any evidence that Trump associates were involved in the publication of emails by WikiLeaks and other outlets—or had access to such emails or other stolen information prior to their becoming publicly available.[106]

(U) The Committee did find that multiple Trump associates went beyond mere praise and established lines of communication with WikiLeaks during the campaign. Such contacts were imprudent in light of WikiLeaks' role in disseminating stolen emails in line with Russian interests—and CIA Director Mike Pompeo's post-election characterization of WikiLeaks as a hostile non-state intelligence service that "overwhelmingly focuses on the United States, while seeking support from anti-democratic countries and organizations" such as the Russian military intelligence service (GRU).[107]

(U) George Papadopoulos: Foreign policy advisor Papadopoulos was told by Russian-linked academic Joseph Mifsud in April 2016 that the Russians had "dirt" on Clinton in the form of "emails of Clinton."[108] However, the Committee found no evidence that Papadopoulos obtained these emails or that the Trump campaign had a role in facilitating the Russian government's dissemination of

stolen data. Nor did any witness shed light on the provenance of the emails, or clarify that Mifsud was referring to emails actually stolen by the Russians (as opposed to, for example, emails missing from Clinton's private server.) The Committee also found no evidence that Papadopoulos told anyone affiliated with the Trump campaign about Mifsud's claims that the Russians had "dirt" on candidate Clinton.

(U) Michael Flynn: On July 15, 2016, retired Lieutenant General and Trump national security advisor Michael Flynn forwarded an email to communications advisor ████████████ in an attempt to connect a friend from the military with the campaign's social media operation. Flynn included the following editorial comment: "There are a number of things happening (and will happen) this election via cyber operations (by both hacktivists, nation-states and the DNC)."[109] This statement does not necessarily indicate non-public knowledge, and could have instead reflected commentary on then-current public events—including the mid-June attribution of the DNC hack to Russia by the security firm CrowdStrike, and the subsequent claim of credit by the then-unknown persona "Guccifer 2.0." (See Chapter 2.)

(U) Donald Trump Jr.: During the course of the Committee's interview with Trump Jr., a news report from CNN appeared online claiming he was given a pre-release notification of a WikiLeaks release of Podesta emails.[110] The article appeared at 1:01 p.m., while Trump Jr. was still being interviewed by the Committee behind closed doors, which concluded at 5:51 p.m.[111] CNN's initial report

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

claimed Trump Jr. received an email on September 4, 2016, alerting him to an upcoming release of hacked emails.

**(U)** The email in question was from an individual named [redacted], who sent a lengthy email to a number of individuals associated with the Trump Organization, including Trump Jr., providing access to hacked DNC emails.[112] The email was actually dated September 14, 2016, the day after WikiLeaks published a tranche of Podesta emails, and thus did not substantiate allegations of prior knowledge of the release.[113] CNN subsequently issued a correction, noting the error.[114]

**(U)** When asked about the email by the Committee, Trump Jr. testified that he did not have any recollection of the email, stating that he "get[s] stuff from people that – you know, people put my email address online every few months, and I get a bunch of people that do the same thing and then they start bombarding you with stuff."[115] Trump Jr. went further to state that while he may have met a [redacted] at some point in time, he was not sure of the identity of this individual.[116]

**(U)** At the outset, Trump Jr. told the Committee that, although he was not aware of any coordination "between the Trump campaign and WikiLeaks to disseminate information acquired from the Podesta email or the DNC server,"[117] he did exchange Twitter direct messages with WikiLeaks beginning on September 20, 2016, and October 3, 2016.[118] WikiLeaks initiated both exchanges.[119] Trump Jr. testified that he was not aware of the reasons why WikiLeaks decided to reach out to him directly, but hypothesized that such direct messaging was likely due to the fact that he "was retweeting a bunch of their stuff. . ." and that he has "a relatively formidable social media platform."[120]

**(U)** In the first exchange, on September 20, 2016, WikiLeaks sent a direct message to Trump Jr. to alert him to a "PAC run anti-Trump site" that was about to launch. WikiLeaks "guessed the password" and sent it to Trump Jr. and asked for comments.[121] Trump Jr. responded the next day, "[o]ff the record I don't know who that is but I'll ask around."[122] Trump Jr. subsequently logged into the site using the WikiLeaks-supplied password, which had also been made publicly available.[123]

**(U)** Following that exchange, Trump Jr. emailed some Trump campaign officials, to include Kellyanne Conway, Steve Bannon, and Jared Kushner to advise them of the contact and seek their advice.[124] In a follow -up email, Trump Jr. noted the WikiLeaks message intimated "some connection we [the Trump campaign] should be aware of."[125] The Committee did not receive any documents or information that reflected a response to Trump Jr.'s email, although Hope Hicks recalled that—after being forwarded the email by Kushner—she "might have expressed concern to somebody about putting passwords in unknown websites, just as a general practice, not specific to WikiLeaks."[126]

**(U)** On October 3, WikiLeaks passed

TOP SECRET// ██████████████ //NOFORN ████████

along a story reporting Clinton's comments about Julian Assange and noted "[i]t'd be great if you guys could comment on/push this story."[127] Trump Jr. responded about 90 minutes later: "Already did that earlier today. It's amazing what she can get away with."[128] Trump Jr. then wrote: "What's behind this Wednesday leak I keep reading about?"[129] Trump Jr. was seeking information on what was purported to be, another future leak of Podesta-related emails.[130] There was no response.

(U) After October 3, 2016, Trump Jr. received numerous messages from WikiLeaks that:

- suggest a website link to use if the campaign refers to WikiLeaks in a tweet and suggests having supporters search through the leaked Podesta emails, noting WikiLeaks "just released" "Part 4" of those emails;[131]

- seek then-candidate Trump's tax returns and suggests leaking them to "improve the perception of [WikiLeaks'] impartiality";[132]

- suggest challenging the results should Trump lose the election;[133]

- describe an election-night message of "[w]ow" and noting Obama administration will delete records as they leave;[134]

- suggest the President-elect push Australia to make Julian Assange that country's ambassador to the United States;[135]

- forward what appears to be a video with the caption "Fake News";[136] and

- on the date the news of the June 9, 2016, Trump Tower meeting broke, seek copies of Trump Jr.'s emails.[137] With respect to the latter, Trump Jr. published those emails himself on his Twitter account.

(U) Trump Jr. testified that he did not reply to any of these messages, nor did he have any communications with WikiLeaks before September 20 or after October 3, 2016.[138] He testified that the direct message exchanges discussed above "is a complete record of any communications [he] had with WikiLeaks."[139]

(U) **Cambridge Analytica:** In addition to Trump Jr.'s communications with WikiLeaks, Cambridge Analytica, a British firm the Trump campaign used for data analytics, reached out to Julian Assange in an effort to confirm whether WikiLeaks possessed the "missing" emails deleted from Clinton's private server.[140] That contact occurred in approximately June 2016,[141] between an employee of Cambridge Analytica and the speaker's bureau (a separate third party) representing Assange.[142] WikiLeaks replied through the bureau that "they did not wish to take a telephone call or otherwise engage with us [Cambridge Analytica]."[143]

(U) Trump campaign digital director ██████████ testified that he did not participate in, nor was he aware of, Cambridge Analytica's attempted outreach to Assange.[144] The Chief Executive Officer

TOP SECRET// ████████████ //NOFORN ██

(CEO) of Cambridge Analytica confirmed in his testimony that he "did not share this with anyone on the Trump campaign."[145] In fact, the CEO testified that the outreach occurred before the company was even retained by the Trump campaign.[146]

(U) Roger Stone: Roger Stone has had a series of business relationships with Donald Trump dating back to at least 1981, and served as a paid campaign advisor for several months in 2015.[147] During testimony to the Committee, Stone addressed three public statements suggesting he might have important information about, and potentially advance knowledge of, disclosures during the 2016 campaign: (1) an August 2016 Twitter message regarding Clinton campaign chairman John Podesta, (2) an August 2016 public speech about purported contacts with Julian Assange, and (3) the March 2017 acknowledgement of pre-election direct communications with Guccifer 2.0.

(U) Stone denied that he "knew in advance about and predicted the hacking of . . . Podesta's email," notwithstanding his cryptic statement in an August 21, 2016, Twitter message—"Trust me, it will soon be Podesta's time in the barrel"—that predated by several weeks the initial public release of Podesta's hacked emails.[148] Stone noted that his Tweet "makes no mention whatsoever of Mr. Podesta's email."[149] Furthermore, it was posted "at a time that my boyhood friend and colleague, Paul Manafort, had just resigned from the Trump campaign over allegations regarding

his business activities in Ukraine. I thought it manifestly unfair that John Podesta not be held to the same standard" regarding his alleged business activities.[150] In October 2017, John Podesta's brother Tony resigned from the lobbying firm the brothers co-founded amid revelations about the Podesta Group's role in pro-Ukraine lobbying efforts that also involved Manafort and his associate Rick Gates.[151]

(U) Stone also addressed his August 2016 public statement that "I've actually communicated with Julian Assange. I believe the next tranche of his documents pertain to the Clinton Foundation, but there's no telling what the October surprise may be."[152] In his testimony to the Committee, Stone sought to "clarify that by saying the communication I refer to is through a journalist who I ask [sic] to confirm what Assange has tweeted, himself, on July 21st, that he has the Clinton emails and that he will publish them."[153] He subsequently identified the intermediary, but denied any access to non-public information.[154] Stone further disputed, under oath, that he "had advance knowledge of the source or actual content of the WikiLeaks disclosures."[155]

(U) In his testimony, Stone described a series of direct messages exchanged with Guccifer 2.0 in August and September 2016—which he first publicly disclosed in March 2017—as "innocuous," and denied taking action in response to Guccifer 2.0's messages.[156] He subsequently provided additional messages with WikiLeaks

TOP SECRET// ████████████ //NOFORN ██

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

75

extending from October 2016 to August 2017.[157]

(U) Despite these multiple contacts, the Committee did not find any evidence contradicting Stone's claim that "[a]ny information . . . disseminated via social media regarding the timing of the release of the DNC data or others was from publicly available sources" and "he in no way conspired, colluded, or coordinated with any agent of the Russian state."[158]

### MEETINGS WITH RUSSIANS

(U) The Committee examined meetings between Trump campaign associates and Russians, to include both official and unofficial representatives. The Russians found willing interlocutors in foreign policy advisors [redacted] and Papadopoulos. These advisors, however, were peripheral figures, and neither was in a position to influence Trump or his campaign. The Russians engaged Trump associates via official channels and—more notably—used apparent cut-outs and intermediaries to make contact with senior officials. However, questionable contacts like the Trump Tower meeting resulted in collusion, conspiracy, or coordination with the Russian government.

**(U) Finding #30: [redacted] did not travel to Moscow in July 2016 on behalf of the Trump campaign, but the Committee is concerned about his seemingly incomplete accounts of his activity in Moscow.**

(U) [redacted] traveled to Moscow in early July 2016 to deliver a commencement speech at the New Economic School—the first American to do so since then-President Barack Obama in 2009. At the time, [redacted] served as a foreign policy advisor for the Trump campaign. The Trump campaign made it clear to [redacted] that the trip was not on behalf of the Trump campaign, a point [redacted] acknowledged in his testimony to the Committee.[159] J.D. Gordon, the NSAC director, strongly advised against the trip, calling it "a bad idea."[160] However, Trump campaign manager [redacted] authorized [redacted] to make the trip "out side of [his] role with the DJT [Donald J. Trump] for President campaign."[161] [redacted] mentioned the upcoming trip to Sessions at one of the occasional NSAC meals,[162] although Sessions did not recall the interaction.[163]

(U) On July 9, 2016, while in Russia, [redacted] sent an "executive summary" of "Feedback From Russia" that stated in part "Russian Deputy Prime Minister and NES [New Economic School] Board Member Arkady Dvorkovich also spoke before the event. In a private conversation, Dvorkovich expressed strong support for Mr. Trump and a desire to work together toward devising better solutions in response to the vast range of current international problems. Based on feedback from a diverse array of other sources close to the Russian Presidential Administration, it was readily apparent that this sentiment is widely held at all levels of government."[164] [redacted] admitted to briefly greeting Dvorkovich before or after one of their

speeches, but minimized the interaction in testimony before the Committee.[165]

(U) Ultimately, ██ failed to clearly explain whom he meant when he referred to sources close to Russian government in his executive summary. He denied having any private meetings with any senior Russian officials during his July 2016 trip, and stated that he mostly met with "scholars."[166] The Steele dossier, a document compiled by former British intelligence officer Christopher Steele, alleges that while in Moscow in July 2016, Page secretly met with Igor Sechin, CEO of Russian state oil company Rosneft, and Igor Diveykin, a senior Russian intelligence official.[167] Further, the Steele dossier claims that Sechin offered Page a brokerage fee in connection with the sale of 19 percent of Rosneft in exchange for the lifting of sanctions.[168]

UNCLASSIFIED

**CHRISTOPHER STEELE, THE MAN BEHIND THE TRUMP DOSSIER**

Source: The New Yorker

UNCLASSIFIED

(U) Since the allegation of meeting with Sechin and Diveykin was first widely reported in September 2016, ██ has repeatedly and consistently denied meeting either Sechin or Diveykin, including under oath in testimony to the Committee.[169] The Committee has no information that confirms the Steele dossier's assertions regarding the purported meetings in Moscow, much less an offer by Sechin to ██ for such a role in a potentially lucrative transaction. After returning from Moscow, ██ took a "leave of absence" from the Trump campaign, and played no role in the transition or administration.[170]

**(U) Finding #31: George Papadopoulos' attempts to leverage his Russian contacts to facilitate meetings between the Trump campaign and Russians was unsuccessful.**

(U) Papadopoulos made minor contributions to the Trump campaign as a foreign policy advisor. He briefly served as a Trump campaign surrogate, a role cut short in May 2016 when he publicly insulted UK Prime Minister David Cameron.[171] He also—in an apparent effort to increase his standing within the Trump campaign—tried to insert himself into any number of international engagements. As described below, his particular focus was trying to broker meetings with foreign officials, but he often acted on his own without the official backing of the Trump campaign.

(U) On March 24, 2016, Papadopoulos sent an email to several members of the policy team pitching a "[m]eeting with Russian leadership—including Putin"—and also volunteered to travel to meet the "next prime minister of Vietnam" alongside Mifsud (whom he had first met just ten days

before but nonetheless described as a "good friend of mine").[172] Campaign co-chair and chief policy advisor [redacted] responded that "we probably should not go forward with any meetings with the Russians until we have had occasion to sit with our NATO allies, especially France, Germany and Great Britain."[173] In the same exchange, Papadopoulos then immediately switched gears, indicating that "[i]f we need any assistance with setting up meetings here in London or Paris, I have some good contacts that can open doors immediately to the leadership."[174]

(U) During the NSAC meeting with Trump on March 31, 2016—the only time Papadopoulos is known to have engaged directly with the candidate—Senator Sessions told the team that they were not authorized to speak for the campaign.[175] In his words "[t]his committee was not . . . a group of people authorized to speak for [candidate] Trump, and they absolutely weren't authorized to go around the world pretending to represent him."[176] That sentiment was, according to Sessions, "a good statement to make quite clear."[177]

(U) When Papadopoulos offered that he could engage, and possibly travel to, Russia on behalf of the campaign, his suggestion was swiftly rebuffed by Sessions, who testified that "I felt like—and I'm the chairman of this group—I should not do anything that indicated to Mr. Papadopoulos that he was authorized to go to Russia or anyplace else to represent the Trump campaign and do some sort of negotiations. So I pushed back pretty sharply on that."[178] Sessions' account of his response has been corroborated by another attendee, [redacted].[179] [redacted] also attended and similarly recalled that when Papadopoulos raised the issue of obtaining contacts with the Russian government on behalf of the campaign, Senator Sessions interrupted and began "talking about the Logan Act," which criminalizes unauthorized negotiations with foreign governments.[180]

(U) Although the Committee has no information to indicate that Papadopoulos was successful in setting up any meetings between the Trump campaign and the Russian government, he worked with campaign chief executive Steve Bannon to broker a September 2016 meeting between candidate Trump and Egyptian president Abdel Fatah el-Sisi.[181] Trump was apparently pleased with the meeting, which he described in an interview as "very productive," describing el-Sisi as "a fantastic guy."[182]

(U) While on a trip to Athens, Greece in May 2016, Papadopoulos sent an email to Manafort stating that he expected to soon receive "an official invitation for Mr. Trump to visit Greece sometime this summer should his schedule allow."[183] In the same email to Manafort, Papadopoulos also forwarded a meeting invitation from Ivan Timofeev, Director or Programs for the Russian International Affairs Council, and claimed that "Russia has been eager to meet Mr. Trump for quite sometime and have been reaching out to me to discuss. I

thought it would be prudent to send to you."[184]

(U) As of May 2016, Manafort had not yet been elevated to campaign chairman, but had a long track record of work abroad. Manafort forwarded Papadopoulos' email to his business and campaign deputy [REDACTED] noting that "[w]e need someone to communicate that D[onald] T[rump] is not doing these trips."[185] Manafort and [REDACTED] agreed to assign a response of a "general letter" to "our correspondence coordinator," the person responsible for "responding to all mail of non-importance."[186]

(U) In June 2016, Papadopoulos sought a paid position and reimbursement for expenses from [REDACTED]—a Sessions aide, who along with [REDACTED], ran the Trump campaign's D.C. policy shop—for an upcoming trip "to DC for a high level meeting [with] the director of the Israel National Security Council" and past trips to "the UK, Israel and Greece over the past month engaging in some senior level meetings . . . ."[187] [REDACTED] forwarded the message to Gordon and [REDACTED] Mashburn then replied as follows: "He cost us a lot more in having to deal with what he said about [then-UK prime minister David] Cameron 2 months ago. . . he got no approval for the travel and did it on his own in[i]tiative . . . . Let him eat the cost and maybe he will learn to play nice with the team, not go off on his own. [REDACTED] would never have approved his going off on world travels at campaign expense without asking permission first."[188] [REDACTED] replied to [REDACTED] with one word: "agreed."[189]

(U) [REDACTED] responded to Papadopoulos that he could take the meeting, but he "should do that as a private citizen."[190] Making the point explicit, [REDACTED] wrote: "You're not authorized to meet with him by [sic] the campaign, nor can you reflect the views of the campaign on security issues in that meeting."[191]

**(U) Finding #32: Donald Trump Jr., Jared Kushner, and Paul Manafort attended a June 9, 2016, meeting at Trump Tower where they expected to receive—but did not ultimately obtain—derogatory information on candidate Clinton from Russian sources.**

(U) In July 2017, the Committee became aware of a June 9, 2016, meeting in Trump Tower, which became a key focus of the investigation. The Committee's findings were informed by interviews with six of the eight participants in the meeting.

(U) Although they did not attend the meeting, the Agalarovs were the driving force to arrange it. As previously noted, the Agalarovs and Goldstone had gotten to know businessman Donald Trump when the Agalarovs worked with Trump to host the Miss Universe pageant at the Agalarovs' building, the Crocus City Hall, in Moscow in 2013.[192] The Agalarovs also had discussions with Donald Trump in 2013 to facilitate the possible development of a Trump Tower in Moscow.[193] The 2013 Miss Universe

TOP SECRET// ██████████ //NOFORN ██████

# UNCLASSIFIED

# PARTICIPANTS OF THE JUNE 9, 2016 MEETING AT TRUMP TOWER



**Paul Manafort**

Longtime Republican campaign advisor and international lobbyist, Manafort served as director of the Trump campaign.



**Donald J. Trump, Jr.**

Son of candidate Donald Trump, Trump, Jr. served as a senior advisor to the campaign running day-to-day operations from New York.



**Jared Kushner**

Son-in-law to candidate Donald Trump, Kushner served as a senior advisor to the campaign



**Rob Goldstone**

London-based promoter who managed pop star Emin [Agalarov], the Vice President of the Crocus Group.



**Natalia Veselnitskaya**

Russian lawyer, who represented the Prevezon in a civil forfeiture case in the federal court in New York.



**Ike Kaveladze**

California-based manager of the Crocus Group.



**Rinat Akhmetshin**

Russian-American lobbyist.



**Anatoli Samorchornov**

Former employee at the U.S. Department of State, Samorchornov translated for Vesalnitskaya at the June 9th meeting.

# UNCLASSIFIED

pageant formed the basis of a casual friendship between the Trumps and the Agalarovs.[194] Trump appeared in one of Emin Agalarov's music videos with the 2013 pageant winner,[195] and Trump maintained a friendly correspondence with Aras Agalarov—including during the busy 2016 campaign.[196]

(U) Events leading to the meeting were set in motion by a June 3, 2016, email from Goldstone to Trump Jr., stating: "Emin just called and asked me to contact you with something very interesting. The Crown prosecutor of Russia [possibly referring to Russian Prosecutor General Yuri Chaika] met with his father Aras this morning and in their meeting offered to provide the Trump

TOP SECRET// ██████████ //NOFORN ██████

campaign with some official documents and information that would incriminate Hillary and her dealings with Russia and would be very useful to your father. This is obviously very high level and sensitive information but is part of Russia and its government's support for Mr. Trump – helped along by Aras and Emin."[197] Trump Jr. replied to Goldstone's June 3 request by indicating "if it's what you say I love it especially in the summer."[198]

(U) This exchange indicates that Trump Jr. was open to discussing derogatory, information from Russian government sources that could be useful to candidate Trump. Goldstone proposed to deliver information concerning Hillary Clinton via a Russian government attorney.[199] Trump Jr. indicated that he had invited Kushner and Manafort,[200] underscoring his belief in the importance of the information.[redacted] with connections to the Agalarov family, was one of the individuals who attended the June 9 meeting at Trump Tower. The Committee discovered that the participants of the June 9 meeting did not all have the same understanding as to the reasons for the meeting, with [redacted] testifying that he thought it was odd that all three senior Trump campaign officials would be taking a meeting on the Magnitsky Act, a U.S. human rights law that imposes certain sanctions on Russian interests. Accordingly, [redacted] called [redacted], a close associate of Emin Agalarov based in the United States, to inquire about the purpose of the meeting. [redacted] explained that he believed the scheduled meeting at Trump Tower was about providing negative information on candidate Clinton to the Trump campaign.[201]

(U) Based on Trump Jr.'s testimony and the documentary evidence received by the Committee, there is no evidence to support that there were any prior communications between the Trump campaign and the other attendees: [redacted]; Russian lawyer Natalia Veselnitskaya; Russian-American lobbyist and former Soviet intelligence officer [redacted]; or Russian-American [redacted] who served as a Russian interpreter. Furthermore, the Committee found no evidence that Trump Jr. knew the identities of these individuals before the meeting,[202] or that he discussed it with candidate Trump beforehand.[203]

(U) The Committee interviewed all attendees other than Manafort, due to the Special Counsel's ongoing investigation, and Veselnitskaya, who is a Russian national located overseas without a valid visa to enter the United States. Despite the pretext for the meeting, every person with direct knowledge of what occurred confirmed that there was no mention of derogatory or incriminating information directly relating to Hillary Clinton during the June 9 meeting. Goldstone testified that he had no evidence that the Russian government supported or favored Donald Trump, and admitted to embellishing the contents of the email solely for the purpose of gaining a response from Trump Jr., namely by using inaccurate

information.[204]

(U) Veselnitskaya, Samochornov, Kaveladze, and Akhmetshin met for lunch before the Trump Tower meeting.[205] During lunch, there was a discussion regarding the Trump Tower meeting. Veselnitskaya shared an approximately 10-page document in Russian to provide the lunch attendees with a synopsis of what would be discussed at the meeting, a summary that contained much of the same information as a similar document reportedly shared with Russian prosecutor general Yuri Chaika.[206] Based on this discussion, the lunch attendees believed the Trump Tower meeting was about the Magnitsky Act.[207] The lunch attendees then met Goldstone at Trump Tower shortly before the meeting.[208] They proceeded to the 25th Floor where they met Trump Jr., and he led the group to a conference room.[209]

(U) The June 9 meeting lasted as little as 20 minutes.[210] Kaveladze testified that he believed Trump Jr. started the meeting and then turned it over to Veselnitskaya.[211] Interviewed meeting attendees agreed that Veselnitskaya presented information concerning the Magnitsky Act and the Ziff Brothers, including their alleged role in evading taxes in Russia and political contributions to the DNC and/or Clinton campaign.[212] Several attendees also recalled discussion of Russian adoptions, which the Russian government suspended in retaliation for the Magnitsky Act.[213]

(U) Goldstone further testified that Kushner, Manafort, and Trump Jr. seemed visibly uninterested in the Magnitsky Act briefing provided by Veselnitskaya.[214] Manafort, according to Goldstone, "never looked up from his cell phone from the moment we began the meeting until the moment we ended."[215] Manafort and Kushner complained to one another via text message during the meeting that the meeting was a "waste of time."[216] Kushner asked his assistants to call and give him and excuse to leave, which one of them did shortly after the text.[217] At the end of the meeting, Goldstone apologized to Trump Jr. for the "bait-and-switch talk about something which we knew nothing about, which was, again, Russian adoption and the Magnitsky Act."[218]

(U) Kaveladze testified that he received two calls from Aras Agalarov after the meeting. During the second call, Kaveladze explained that the meeting was a "complete loss of time and about nothing."[219] Aras Agalarov and Kaveladze did not discuss the "dirt" on Hillary Clinton.[220] Kaveladze also sent an email to his daughter after the meeting indicating that the "meeting was boring. The Russians did not have any bad info [o]n Hillary"[221]—a reference back to his conversation with Beniaminov, which he had apparently relayed to his daughter. The Committee received no testimony or documentary evidence indicating that the purpose of the meeting was to discuss WikiLeaks, Julian Assange, the hacking of DNC servers, and/or the John Podesta emails.[222]

(U) No witness, including the attendees,

testified that candidate Trump was aware of the meeting prior to its public exposure in June 2017. Steve Bannon, who had been previously quoted as saying "[t]he chances that Don Jr. did not walk [the meeting participants] up to his father's office is zero," conceded under oath that he had no evidence to support that claim.[223] The Committee also investigated a public statement made by candidate Trump during a speech after the final Republican primary contests on June 7, 2016, the same day as Trump Jr. exchanged emails with Goldstone regarding meeting attendees and logistics.[224] According to campaign press secretary Hope Hicks, Trump's publicly stated intent "to give a major speech . . . next week . . . discussing all of the things that have taken place with the Clintons" did not reflect knowledge about the upcoming meeting; instead, it referred to a planned speech "that was an outline of the book *Clinton Cash*," and was ultimately delivered approximately two weeks later after being delayed by a domestic terrorist attack.[225]

**(U) Finding #33: Donald Trump Jr. briefly met with a Russian government official at the 2016 National Rifle Association annual meeting, but the Committee found no evidence that the two discussed the U.S. presidential election.**

(U) In the weeks leading up to the National Rifle Association's (NRA) 2016 annual meeting, there were a series of emails sent to a member of the campaign discussing Russian interest in the campaign as it related to the NRA meeting. Despite the emails' rhetoric about setting up a "back channel" between the United States and Russian governments, the relevant testimony obtained in the Committee's interviews showed these email inquiries resulted in a brief meeting between Trump Jr. and a Russian government official that centered on shooting and hunting. It did not focus on the U.S. presidential election.

(U) From May 19-22, 2016, the NRA held its annual meeting and exhibits in Louisville, Kentucky.[226] In an interview with the Committee, Trump Jr. testified he received an invitation from "[v]arious people at the NRA" to attend the 2016 meeting.[227] In addition to Trump Jr.'s invitation, there were several emails sent to [redacted] seeking to establish a connection at the NRA meeting between an emissary of the Russian government and candidate Trump.

(U) In the first email, dated May 16, 2016, a business executive emailed [redacted] with the possibility of candidate Trump meeting with Alexander Torshin, the Deputy Governor of the Bank of Russia, the country's central bank.[228] The email mentions an "overture to Mr. Trump from President Putin."[229] [redacted] responds he will be "[w]orking on this first thing in the am."[230]

(U) [redacted] forwarded the email to Manafort, Gates, and Kushner, noting the "interesting request."[231] [redacted] email highlighted the entrepreneur's request that Torshin "meet with a high level official in our campaign" during the NRA meeting to discuss "an offer he [Torshin] claims to be

carrying from President Putin to meet with DJT." In response to that email, Kushner wrote: "Pass on this. A lot of people come claiming to carry messages. Very few we are able to verify. For now I think we decline such meetings," as well as "[b]e careful."[232] [redacted] replied to the executive seeking the meeting: "I've asked about a mtg but we are not able to accommodate it at that event in KY."[233]

(U) In addition to the emails discussing a possible meeting with Torshin, on May 10, 2016, [redacted], who had previously approached [redacted] about advising a prospective Trump transition,[234] sent [redacted] an email about meeting with Russians at the NRA event.[235] The email discusses [redacted] purported "back-channel to President Putin's Kremlin," that "Russia is quietly but actively seeking a dialogue with the U.S. that isn't forthcoming under the current administration," and that "the Kremlin believes that the only possibility of a true re-set in this relationship would be with a new Republican White House."[236]

(U) The email goes on to note that "President Putin's emissary" will be at the NRA convention and hopes to make contact with candidate Trump and present Mrs. Trump with a gift.[237] The email discussed Putin's desire to build a relationship with candidate Trump, to include extending an invitation to the Kremlin. The email also asked [redacted] to "talk through what has transpired and Sen. Sessions' advice on how to proceed."[238] When asked about this email in his interview before the Committee, Attorney General Sessions testified he was not aware of this email.[239] [redacted] testified that he may have met [redacted] once, and did not remember replying to his email.[240]

(U) Although the campaign declined to hold a meeting, Trump Jr. was introduced to Torshin, at the request of an acquaintance, at a restaurant where they were dining separately.[241] During their brief introduction, they spoke about "stuff as it related to shooting and hunting . . . exchanged casual hellos" but did not exchange contact information.[242] In his brief exchange with Torshin and a subsequent exchange with Torshin's assistant, Maria Batina, Trump Jr. testified he did not recall any discussion of the upcoming U.S. presidential election.[243] No other witness provided a contrary recollection to the Committee.

(U) The Committee reviewed several emails discussing a meeting with Russians at the NRA meeting, an attempt to establish a back channel of communication between the U.S. and Russian governments, and a possible meeting between candidate Trump and President Putin. However, the Committee found that all of those email exchanges resulted in just one, brief meeting between Mr. Torshin and the candidate's son that did not include any discussion related to the U.S. election.[244]

**(U) Finding #34: The Committee found no evidence that meetings between Trump associates—including Jeff Sessions—and**

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

**official representatives of the Russian government—including Ambassador Kislyak—reflected collusion, coordination, or conspiracy with the Russian government.**

**(U)** Meetings between U.S. senators and foreign government officials are considered a routine part of the job. However, there have been multiple media articles raising concerns about contacts with former Russian Ambassador to the United States Sergey Kislyak, particularly those involving then-Senator Sessions.

**(U) Mayflower Hotel Speech:** In April 2016, Senator Sessions, an early endorser of Trump and later a key figure during the transition, attended a foreign policy speech by Trump at the Mayflower Hotel in Washington, D.C.[245] Kushner also attended and recalled meeting 20 to 25 guests, including Ambassador Kislyak for the first time.[246] Kushner stated that the conversation between him and Ambassador Kislyak mainly consisted of pleasantries, and concluded with an offer for Kushner to visit the Russian Embassy for lunch, which Kushner never attended.[247]

**(U)** Attorney General Sessions similarly described a pre-speech reception of maybe 24 people; immediately following the speech, he went to a media stakeout to answer questions about the speech.[248] Attorney General Sessions recalled "no . . . discussions with the [Russian] Ambassador or any other representative from the Russian Government or their surrogate" at the Mayflower.[249]

**(U) Republican National Convention:** In July 2016, then-Senator Sessions attended the Republican National Convention in Cleveland, Ohio. Because he used his campaign funds to pay for his travel and lodging while in Ohio, his schedule focused primarily on his Senate campaign-related events.[250] For the five days that Sessions was in Cleveland, he attended numerous Trump campaign-related events.[251]

**(U)** Over 50 ambassadors to the United States also attended a reception associated with the 2016 Republican Convention.[252] Sessions addressed this group of ambassadors, as the keynote speaker, at the Heritage Foundation's Embassy Row Ambassador's Buffett Lunch.[253] According to Sessions, his interaction with Ambassador Kislyak following that speech was brief, unexpected, and occurred in the presence of several other people.[254]

**(U)** J.D. Gordon testified about briefly encountering Kislyak twice at convention events in July 2016, including a brief conversation that occurred during a networking event that was also attended by [redacted].[255] [redacted] recalled seeing Gordon and chatting casually with Kislyak at the same event.[256] The Committee found no evidence that these brief public interactions related to the hacking of emails or collusion, coordination, or conspiracy between the Trump campaign and Russia.

**(U) Senate Office Meeting:** On September 8, 2016, Senator Sessions met

Ambassador Kislyak in his Senate office.[257] As a Senator, such meetings in his Capitol Hill office are common. Notes of the meeting taken by Sessions' staff, and provided to the Committee, verified that the approximately 30-minute meeting was official in nature and not related to any role that Senator Sessions held with the Trump campaign.[258] Sessions testified that the conversation mainly revolved around Ukraine, and the two "had a little testy conversation" about Ukraine given Sessions' support for the Ukrainian cause.[259] The Committee's investigation did not uncover anything improper about Senator Sessions' meetings with the Russian ambassador.

**Finding #35: Possible Russian efforts to set up a "back channel" with Trump associates after the election suggest the absence of collusion during the campaign, since the communication associated with collusion would have rendered such a "back channel" unnecessary.**

(U) The Committee investigated meetings during the post-election transition period between Trump associates and Russians—with a focus on individuals who may have been acting as unofficial representatives of Moscow. In December 2016, Kushner met with the head of Russian bank VEB, Sergei Gorkov, at the urging of Russian Ambassador Sergei Kislyak, with whom Kushner and Flynn had met earlier in the month.[260] Kushner took the meeting partly because he had been told Gorkov could provide "insight into what Putin's thoughts were on a potential new relationship" between Russia and the United States.[261] Kushner testified that the meeting primarily entailed Gorkov telling Kushner about VEB, with which Kushner was entirely unfamiliar, and "that was really the extent of it."[262] Gorkov gave Kushner two gifts, which Kushner registered with the transition.[263]

(U) In January 2017, businessman and former Navy officer [redacted] was introduced through Emirati associates to Russian investor Kirill Dmitriev in the Seychelles.[264] [redacted] had no official or unofficial role in the transition, but had met twice with Bannon at Trump Tower.[265] [redacted] testified that his meeting with Dmitriev lasted 20-30 minutes and focused on "trade matters," and "how the United States and Russia should be working together to defeat Islamic terrorism."[266] [redacted] stated that he and Dmitriev did not discuss sanctions, the Russian government's "desire to have a relationship with the Trump administration," or "any channel of communications between the United States and Russia."[267] [redacted] further stated that he had had "no communications or dealings with [Dmitriev] or any of his colleagues before or after that encounter last January."[268]

(U) The Committee did not find evidence that Kushner or [redacted] did anything inappropriate during or following their meetings with Gorkov and Dmitriev. To the extent that one or both meetings reflected an unsuccessful attempt by intermediaries of the Russian government

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

to set up a "back channel" to the incoming Trump administration, that purpose was not shared with or accepted by Kushner or [redacted]—and potentially reflected an absence of such channels during the campaign.[269] Kushner, who was connected to Gorkov by Kislyak, asserted that "the fact that we [we]re going through the normal channels during the transition hopefully serves to show that there were no existing channels through the campaign." Similarly, [redacted] noted his meeting with Dmitriev "didn't happen until . . . more than 2 months after the election. So if there was all this collusion [before the election], why would there even need to be any other followup meetings?"[270]

**Clinton Campaign**

**(U)** Using a series of intermediaries, the Democratic National Committee (DNC) and Hillary for America (Clinton campaign) paid a research firm to conduct opposition research on candidate Trump and his ties with Russia. As part of this effort, research from numerous purported Russian sources was obtained and provided to the Clinton campaign, thereby constituting indirect, but substantial, links "between Russia and individuals associated with political campaigns" relevant to the 2016 U.S. election.

**(U)** Fusion GPS (Fusion) is the trade name of a Washington, D.C.-based company, Bean LLC, that conducts research primarily on behalf of corporate clients.[271] According to longtime Wall Street Journal reporter and Fusion co-founder [redacted] Fusion "specialize[s] in finding records and reading things and digesting large volumes of information."[272] Fusion's general practice is to "do engagements on a 30-day basis, and at the end of the 30 days we write a report about what we found. . . . And if you think what we told you was interesting and you want more, we can sign up again."[273] Founded and led by former journalists,[274] Fusion maintains relationships with numerous reporters, and provides information to news outlets on behalf of clients that include law firms, media organizations, and lobbying organizations.[275]

**(U)** As described below, Fusion was hired in spring 2016 by [redacted] [redacted], who represented the DNC and the Clinton campaign. Fusion was paid to conduct opposition research on candidate Trump. Fusion subsequently hired Christopher Steele as a sub-contractor to obtain information from sources purported to be current and former Russian government officials. The information Steele collected was reported back to the Clinton campaign via Fusion and [redacted][276]

**(U) Finding #36: Prior to conducting opposition research targeting candidate Trump's business dealings, Fusion GPS conducted research benefitting Russian interests.**

**(U)** Prior to conducting opposition research targeting candidate Trump's

business dealings, Fusion conducted research benefitting Russian interests.[277] Specifically, in 2013, Fusion was retained by a law firm to assist with representation of a Russian defendant in a civil forfeiture case arising out of alleged money laundering activities uncovered by the late Sergei Magnitsky (whose name was subsequently given to the U.S. human rights law, the Magnitsky Act).[278] [redacted] acknowledged that the Kremlin's interests in the case were aligned with his client and against the U.S. government.[279]

(U) Russian lawyer Natalia Veselnitskaya hired the law firm for which Simpson was working, and that firm retained the services of Russian-American lobbyist Rinat Akhmetshin, both of whom attended a meeting at Trump Tower on June 9, 2016, described in the first part of this chapter.[280] During the litigation, Veselnitskaya received, via the law firm, memoranda summarizing [redacted] research.[281] Certain topics—including the Ziff Brothers (a venture capital firm specializing in capital investment)—were the subject of both (1) memoranda Veselnitskaya received from [redacted] and (2) the presentation Veselnitskaya made to Trump campaign officials.[282] [redacted] acknowledged being with Veselnitskaya at a court hearing in New York on the morning of June 9, 2016, prior to her meeting at Trump Tower.[283] He further recalled having drinks and dinner with her and others, including Akhmetshin, in Washington, D.C. a day or two later.[284] However, he denied discussing the Trump Tower meeting with her before or after it occurred, and claimed not to have learned about it until 2017.[285]

**(U) Finding #37: The [redacted] hired Fusion GPS on behalf of the Clinton campaign and the Democratic National Committee to research candidate Trump's Russia ties.**

(U) [redacted], is longtime counsel to the DNC.[286] [redacted] also represented the Clinton campaign, from which it received $5.6 million in 2015 and 2016.[287] Pursuant to that representation, during the 2016 campaign, "[t]here was an expectation that [redacted] would hire the consultants, including research consultants, necessary to enable us to provide services to the campaign."[288]

(U) In approximately March or April 2016,[289] Fusion principals [redacted] and [redacted] approached [redacted] "and indicated that they might be a good fit for doing work to support the legal efforts" of [redacted] clients.[290] [redacted] testified that Fusion "had been retained . . . by a wealthy Republican . . . to do research on then candidate Trump . . . and thought that if I was going to be looking to hire a consultant to help me advise the campaign on issues relating to Trump, that they would be a good fit."[291] [redacted] was looking for a consultant to, among other things, sort through the multitude of public records pertaining to Trump's business dealings.[292] Although he had not previously worked with Fusion, he chose to

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

hire the company based on its familiarity with Trump's dealings, including "his business holdings, his financial holdings, and the kinds of litigation he had been involved in."[293] [redacted] further testified that "[t]hey were recommended . . . [and] thought highly of in the community."[294]

**(U)** The Committee determined the "wealthy Republican" who funded Fusion's initial Trump Research was [redacted]. In September 2015, the *Beacon* retained Fusion to conduct opposition research on Trump.[295] [redacted] leadership have publicly stated they "had no knowledge of or connection to the Steele dossier, did not pay for the dossier, and never had contact with, knowledge of, or provided payment for any work performed by Steele."[296] [redacted] testified that—based on a careful review of the relevant documents—he had identified "zero overlap in the work product" between the dossier and what Fusion provided [redacted].[297]

**(U)** [redacted] sought and received "budget approval to be able to spend money in order for me to retain consultants," from Clinton campaign manager [redacted] but did not specifically identify Fusion to [redacted].[298] Fusion's Simpson was "definitely aware that [redacted] represented the DNC and that they were the client in this matter" based on a general understanding that [redacted] represents the DNC.[299] Fusion's expenses, including the hiring of Christopher Steele as a sub-contractor, were passed on to [redacted],[300] and ultimately to the Clinton campaign and DNC.[301] In total, Fusion paid Steele (and charged [redacted]) approximately $160,000; Steele's efforts were part of a larger opposition research project for which [redacted] paid Fusion over $1 million.[302]

**(U)** [redacted] testified that Fusion began its opposition research work by "review[ing] what we had learned over the previous months," presumably including "information about candidate Trump's business ties in Russia," although [redacted] had not been aware of Russia-specific research at the time he engaged Fusion.[303] Fusion "began to develop more specific lines of inquiry," and eventually hired Steele, whom [redacted] had known since approximately 2009.[304] [redacted], signed off on the decision to hire Steele as a sub-contractor in June 2016—around the same time he learned that Fusion was beginning to focus its opposition research on Trump's ties to Russia—but was not aware of Steele's identity until July 2016.[305]

**(U) Finding #38: Christopher Steele claims to have obtained his dossier information second- and third-hand from purported high-placed Russian sources, such as government officials with links to the Kremlin and intelligence services.**

**(U)** Between June and November 2016, Steele produced sixteen reports for Fusion, which comprise what has become known as the Steele dossier, "concerning Russian efforts to influence the US Presidential

election and links between Russia and Donald Trump."[306] Steele did not travel to Russia to compile these reports.[307] Instead, Simpson stated that "[Steele] hire[d] people who can travel and talk to people and find out what's going on."[308]

(U) Of the separate claims the Committee identified within the dossier, almost all are attributable to Russian or Russia-based sources, such as: a "senior Russian government figure," a "senior Russian leadership figure," an "official close to [the] Russian Presidential Administration," a "Kremlin insider," a "former top Russian officer," a "senior Russian financial official," a "senior Russian Foreign Ministry figure," a "Kremlin official involved in U.S. relations," and a "former top level Russian intelligence officer still active inside the Kremlin."[309]

(U) The Committee is concerned with the degree to which the Kremlin may have sought to influence information that was ultimately provided to Steele—through the potential provision of disinformation or otherwise—consistent with its ongoing efforts "to undermine public faith in the US democratic process . . . ."[310] In addition, the vast majority of witnesses the Committee interviewed, including [redacted], did not know the identity of Steele's sources.[311] Steele declined to testify before the Committee, and the two witnesses who claimed to know some of Steele's sources—Simpson and [redacted], a former U.S. Department of State official—declined to identify them.[312]

**(U) Finding #39: Christopher Steele's information from Russian sources was provided directly to Fusion GPS and [redacted] and indirectly to the Clinton campaign.**

(U) Fusion began receiving written reports from Steele in June 2016.[313] At the same time, Fusion provided updates—approximately weekly and usually orally—to [redacted].[314] [redacted] recalled receiving some of the information later included in the dossier "maybe late June, early July."[315] [redacted] exchanges with Fusion were not one-way communications: he specifically recalled directing follow-up work on information gathered by Steele.[316] Elias recalled personally being briefed by Steele on his findings during a late September or early October meeting at [redacted] office and formed the impression that "the Fusion folks thought it was important that Mr. Steele hear from me directly that I was aware of his work and was appreciative."[317] The Committee requested [redacted] records related to this meeting, but the firm was not able to locate any.[318]

(U) [redacted] led regular briefings that contained Steele's information for senior Clinton campaign staff, which included Clinton campaign manager [redacted] and campaign chairman John Podesta.[319] [redacted] also began "relaying . . . information received from Fusion GPS to the DNC . . . around . . . convention time."[320]

1. HPSCI, "Intelligence Committee Chairman, Ranking Member Establish Parameters for Russia Investigation," https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=767, Mar. 11, 2017.
2. HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
3. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017; HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
4. HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
5. HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017.
6. HPSCI, "Russian Active Measures During the 2016 Election Campaign," May 23, 2017.
7. HPSCI, "Russian Active Measures During the 2016 Election Campaign," May 23, 2017.
8. HPSCI, Executive Session Interview of James Clapper, July 17, 2017.
9. HPSCI, Executive Session Interview of James Clapper, July 17, 2017.
10. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
11. HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
12. HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
13. Morgan, Lewis & Bockius LLP, Letter from Sheri A. Dillon and William F. Nelson to President Donald J. Trump, Mar. 8, 2017.
14. HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
15. HPSCI, Executive Session Interview of Ike Kaveladze, Nov. 2, 2017.
16. HPSCI, Executive Session Interview of Ike Kaveladze, Nov. 2, 2017.
17. HPSCI, Executive Session Interview of Rob Goldstone Dec. 18, 2017.
18. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.
19. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017; HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
20. HPSCI, Executive Session Interview of Ike Kaveladze, Nov. 2, 2017.
21. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.
22. Twitter, @realDonaldTrump, June 18, 2013, 8:17 PM.
23. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.
24. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.
25. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.
26. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.
27. HPSCI, Executive Session Interview of Keith Schiller, Nov. 7, 2017; HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.
28. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.
29. HPSCI, Executive Session Interview of Keith Schiller, Nov. 7, 2017.
30. HPSCI, Executive Session Interview of Keith Schiller, Nov. 7, 2017.
31. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.
32. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
33. HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
34. HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
35. HPSCI, Executive Session Interview of [REDACTED], Dec. 20, 2017.
36. HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
37. HPSCI, Executive Session Interview of Felix Sater, Dec. 20, 2017.
38. Text Message Exchange Between Michael Cohen and Felix Sater, Dec. 29-31, 2015. [FSHR00112-30]
39. Email from Felix Sater to Michael Cohen, "Re:Putin/Trump," Nov. 3, 2015. [MDC-H-000692]
40. Email from Felix Sater to Michael Cohen, "Re:Putin/Trump," Nov. 3, 2015. [MDC-H-000692]
41. HPSCI, Executive Session Interview of [REDACTED] Dec. 20, 2017.
42. HPSCI, Executive Session Interview of [REDACTED] Dec. 20, 2017.
43. HPSCI, Executive Session Interview of [REDACTED], Dec. 20, 2017.
44. HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
45. HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017 .
46. Text Message Exchange Between Michael Cohen and Felix Sater, Dec. 30-31, 2015. [FSHR00112-30] HPSCI, Executive Session Interview of Felix Sater, Dec. 20, 2017.
47. Text Message from Felix Sater to Michael Cohen, Dec. 30, 2015. [FSHR00124-25]
48. Text Message from Felix Sater to Michael Cohen, Dec. 30, 2015. [FSHR00125]
49. Email from Michael Cohen to info@prpress.gov.ru, "Trump Tower-Moscow," Jan. 14, 2016. [MDC-H-000690]
50. Email from Michael Cohen to info@prpress.gov.ru, "Trump Tower-Moscow," Jan. 14, 2016. [MDC-H-000690]
51. Email from Michael Cohen to info@prpress.gov.ru, "Trump Tower-Moscow," Jan. 14, 2016. [MDC-H-000690]
52. HPSCI, Executive Session Interview of Felix Sater, Dec. 20, 2017.

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

53. HPSCI, Executive Session Interview of Felix Sater, Dec. 20, 2017; HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
54. HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
55. HPSCI, Executive Session Interview of Felix Sater, Dec. 20, 2017.
56. HPSCI, Executive Session Interview of Felix Sater, Dec. 20, 2017.
57. HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
58. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
59. HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
60. HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
61. HPSCI, Executive Session Interview of Michael Cohen, Oct. 24, 2017.
62. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
63. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
64. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
65. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
66. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
67. Morgan, Lewis & Bockius LLP, Letter from Sheri A. Dillon and William F. Nelson to President Donald J. Trump, Mar. 8, 2017.
68. HPSCI, Executive Session Interview of Jeffrey Gordon, July 26, 2017.
69. Eliot Cohen, Bryan McGrath, et al., "Open Letter On Donald Trump from GOP National Security Leaders," *War on the Rocks*, Mar. 2, 2016.
70. Daniel W. Drezner, "Why can't Donald Trump close the deal with any foreign policy advisers?," *Washington Post*, Mar. 9, 2016.
71. Missy Ryan and Steven Mufson, "One of Trump's foreign policy advisers is a 2009 college grad who lists Model UN as a credential," *Washington Post*, Mar. 22, 2016.
72. HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017.
73. HPSCI, Executive Session Interview of Jeffrey Gordon, July 26, 2017.
74. HPSCI, Executive Session Interview of Jeffrey Gordon, July 26, 2017.
75. HPSCI, Executive Session Interview of Walid Phares, Dec. 8, 2017.
76. HPSCI, Executive Session Interview of Jeffrey Gordon, July 26, 2017.
77. HPSCI, Testimony of Carter Page, Nov. 2, 2017.
78. HPSCI, Testimony of Carter Page, Nov. 2, 2017.
79. HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017.
80. HPSCI, Executive Session Interview of Jeffrey Gordon, July 26, 2017.
81. HPSCI, Executive Session Interview of [REDACTED], Dec. 5, 2017; [REDACTED] – RNC National Security/Military Platform Sub Committee Proposed Plank on the Ukraine, Undated. [DENMAN 000012]
82. [REDACTED] – RNC National Security/Military Platform Sub Committee Proposed Plank on the Ukraine, Undated. [[REDACTED] 000012]
83. HPSCI, Executive Session Interview of Jeffrey Gordon, July 26, 2017.
84. HPSCI, Executive Session Interview of Jeffrey Gordon, July 26, 2017.
85. HPSCI, Executive Session Interview of [REDACTED], Jan. 17, 2018.
86. U.S. v. Paul J. Manafort, Jr., and Richard W. Gates III, "Superseding Indictment" (1:18-cr-83, Eastern District of Virginia), Feb. 22, 2018.
87. HPSCI, Executive Session Interview of [REDACTED], Jan. 17, 2018; Alexander Burns and Maggie Haberman, "Donald Trump Hires Paul Manafort to Lead Delegate Effort," *The New York Times*, Mar. 28, 2016.
88. HPSCI, Executive Session Interview of [REDACTED], Jan. 17, 2018.
89. HPSCI, Executive Session Interview of [REDACTED], Jan. 17, 2018; HPSCI, Executive Session Interview of Hope Hicks, Feb. 27, 2018.
90. Andrew E. Kramer, Mike McIntire, and Barry Meier, "Secret Ledger in Ukraine Lists Cash for Donald Trump's Campaign Chief," *The New York Times*, Aug. 14, 2016; Jeff Horowitz and Chad Day, "Trump advisers waged covert influence campaign," *Associated Press*, Aug. 19, 2016.
91. HPSCI, Executive Session Interview of Hope Hicks, Feb. 27, 2018.
92. HPSCI, Executive Session Interview of Hope Hicks, Feb. 27, 2018.
93. HPSCI, Executive Session Interview of Hope Hicks, Feb. 27, 2018.
94. HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017.
95. Email from Paul Manafort to [REDACTED], "Arming Ukraine," July 30, 2016. [Sessions production: 2016-07-30—Arming Ukraine]
96. Email from [REDACTED] to Brian Jack, "Fwd: ukraine," Aug. 1, 2016. [Sessions production: 2016-08--01—Fwd: ukraine]; Memorandum from [REDACTED], "GOP Platform: National Security, Ukraine Amendment—Sequence of Events," Aug.

1, 2016. [Sessions production: 2016-08--01—Fwd: Ukraine—ATTACHMENT MEMO—Ukraine Amendment (1).pdf]

97. Memo from J.D. Gordon, "GOP Platform: National Security, Ukraine Amendment—Sequence of Events," Aug. 1, 2016. [DJTFP00004693] Email from John Hemenway to Jeffrey D. Gordon, "Ukraine—Revised Format," Aug. 1, 2016. [DJTFP00004692-93]
98. HPSCI, Testimony of Carter Page, Nov. 2, 2017.
99. DHS and ODNI, *Joint Statement from the Department of Homeland Security and Office of the Director of National Intelligence on Election Security*, https://www.dhs.gov/news/2016/10/07/joint-statement-department-homeland-security-and-office-director-national, Oct. 7, 2016.
100. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
101. HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
102. HPSCI, Executive Session Interview of Hope Hicks, Feb. 27, 2018.
103. Mark Hench, "Trump: 'I love WikiLeaks,'" *The Hill*, Oct. 10, 2016.
104. Ashley Parker and David E. Sanger, "Donald Trump Calls on Russia to Find Hillary Clinton's Missing Emails," *The New York Times*, July 27, 2016.
105. HPSCI, Executive Session Interview of Matthew F. Tait, Oct. 6, 2017.
106. HPSCI, Executive Session Interview of Hope Hicks, Feb. 27, 2018; HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017; HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
107. CIA, "Director Pompeo Delivers Remarks at CSIS," http://www.cia.gov/news-information/speeches-testimony/2017-speeches-testimony/pompeo-delivers-remarks-at-csis/html, Apr. 13, 2017.
108. U.S. v. George Papadopoulos, "Statement of the Offense" (1:17-cr-182, District of Columbia), Oct. 5, 2017.
109. Email from Michael Flynn to [REDACTED], July 15, 2016. [FLYNN HPSCI 00002980-81].
110. Manu Raju and Jeremy Herb, "Email pointed Trump campaign to WikiLeaks documents," CNN, Dec. 8, 2017.
111. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
112. Email from [REDACTED] to Donald J. Trump, et al., "Trump: Another WikiLeaks DNC Upload," Sept. 14, 2016. [TRUMP_ORG_13_00001]
113. Email from [REDACTED] to Donald J. Trump, et al., "Trump: Another WikiLeaks DNC Upload," Sept. 14, 2016. [TRUMP_ORG_13_00001]
114. Oliver Darcy, "CNN corrects story on email to Trumps about WikiLeaks," CNN, Dec. 8, 2017.
115. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
116. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
117. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
118. Direct Message from WikiLeaks to Donald Trump Jr., Sept. 20, 2016, 11:59 PM; Direct Message from Donald Trump Jr. to WikiLeaks, Sept. 21, 2016, 11:50 AM; Direct Message from WikiLeaks to Donald Trump Jr., Oct. 3, 2016, 1:25 PM; Direct Message from Donald Trump Jr. to WikiLeaks, Oct. 3, 2016, 3:01 PM.; Direct Message from Donald Trump Jr. to WikiLeaks, Oct. 3, 2016, 3:03 PM. [DJTJR01265-66]
119. Direct Message from WikiLeaks to Donald Trump Jr., Sept. 20, 2016, 11:59 PM; Direct Message from WikiLeaks to Donald Trump Jr., Oct. 3, 2016, 1:25 PM.
120. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017, p. 107.
121. Direct Message from WikiLeaks to Donald Trump Jr., Sept. 20, 2016, 11:59 PM. [DJTJR01265]
122. Direct Message from Donald Trump Jr. to WikiLeaks, Sept. 21, 2016, 11:50 AM. [DJTJR01265]
123. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
124. Email from Donald Trump Jr. to Kellyanne Conway, et al., "Wikileaks," Sept. 21, 2016. [TRUMPORG_11_0000007]
125. Email from Donald Trump Jr. to Kellyanne Conway, et al., "Wikileaks," Sept. 21, 2016. [TRUMPORG_11_0000007]
126. HPSCI, Executive Session Interview of Hope Hicks, Feb. 27, 2018.
127. Direct Message from WikiLeaks to Donald Trump Jr., Oct. 3, 2016, 1:25 PM. [DJTJR 01265-66]
128. Direct Message from Donald Trump Jr. to WikiLeaks, Oct. 3, 2016, 3:01 PM. [DJTJR01266]
129. Direct Message from Donald Trump Jr. to WikiLeaks, Oct. 3, 2016, 3:03 PM. [DJTJR01266]
130. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
131. Direct Message from WikiLeaks to Donald Trump Jr., Oct. 12, 2016, 8:31 AM. [DJTJR01267]
132. Direct Message from WikiLeaks to Donald Trump Jr., Oct. 21, 2016, 9:46-9:54 AM. [DJTJR01267-69]
133. Direct Message from WikiLeaks to Donald Trump Jr., Nov. 8, 2016, 6:35 PM. [DJTJR01269-70]
134. Direct Message from WikiLeaks to Donald Trump Jr., Nov. 9, 2016, 12:49-12:51 AM. [DJTJR01270]
135. Direct Message from WikiLeaks to Donald Trump Jr., Dec. 16, 2016, 12:38 PM. [DJTJR01271]
136. Direct Message from WikiLeaks to Donald Trump Jr., Apr. 26, 2017, 12:01 AM. [DJTJR01272]
137. Direct Message from WikiLeaks to Donald Trump Jr., July 11, 2017, 9:29 AM. [DJTJR01273-74]
138. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
139. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
140. HPSCI, Executive Session Interview of Alexander Nix, Dec. 14, 2017.

141. Email from Alexander Nix to Peter Schweizer, et al., "Re: Remember me? I have an idea to win," Aug. 26, 2016. [CA0000077]
142. HPSCI, Executive Session Interview of Alexander Nix, Dec. 14, 2017.
143. HPSCI, Executive Session Interview of Alexander Nix, Dec. 14, 2017.
144. HPSCI, Executive Session Interview of [redacted] Oct. 24, 2017.
145. HPSCI, Executive Session Interview of Alexander Nix, Dec. 14, 2017.
146. HPSCI, Executive Session Interview of Alexander Nix, Dec. 14, 2017.
147. HPSCI, Executive Session Interview of Roger Stone, Sept. 26, 2017.
148. HPSCI, Executive Session Interview of Roger Stone, Sept. 26, 2017.
149. HPSCI, Executive Session Interview of Roger Stone, Sept. 26, 2017.
150. HPSCI, Executive Session Interview of Roger Stone, Sept. 26, 2017.
151. Kenneth P. Vogel, "Under Mueller Scrutiny, Democratic Donor Tony Podesta Resigns From Lobbying Firm," *The New York Times*, Oct. 30, 2017; HPSCI, Executive Sessions Interview of John Podesta, June 27, 2017; U.S. v. Paul J. Manafort, Jr., and Richard W. Gates III, "Indictment" (1:17-cr-201, District of Columbia), Oct. 30, 2017 (describing role of "Company A" and "Company B").
152. HPSCI, Executive Session Interview of Roger Stone, Sept. 26, 2017.
153. HPSCI, Executive Session Interview of Roger Stone, Sept. 26, 2017.
154. Letter from Robert C. Buschel to The Honorable K. Michael Conaway, "Re: Follow Up to Appearance of Roger Stone on September 26, 2017, and Supplement to May 9, 2017 Request to Produce Documents" Oct. 13, 2017.
155. HPSCI, Executive Session Interview of Roger Stone, Sept. 26, 2017.
156. Andrew Blake, "Roger Stone, Trump confidant, acknowledges 'innocuous' Twitter conversation with DNC hackers," *Washington Times*, Mar. 10, 2017; HPSCI, Executive Session Interview of Roger Stone, Sept. 26, 2017.
157. Letter from Robert C. Buschel to The Honorable K. Michael Conaway "Re: Follow Up to Appearance of Roger Stone on September 26, 2017, and Supplement to May 9, 2017 Request to Produce Documents" Oct. 13, 2017.
158. Letter from Robert C. Buschel to The Honorable K. Michael Conaway "Re: Follow Up to Appearance of Roger Stone on September 26, 2017, and Supplement to May 9, 2017 Request to Produce Documents" Oct. 13, 2017.
159. HPSCI, Testimony of [redacted] Nov. 2, 2017.
160. HPSCI, Executive Session Interview of Jeffrey Gordon, July 26, 2017.
161. Email from Carter Page to Jeffery D. Gordon et al., "Re: Commencement Address, Class of 2016, New Economic School (NES), July 7, 2016. [DJTFP00003892] HPSCI, Executive Session Interview of Jeffrey Gordon, July 26, 2017.
162. HPSCI, Testimony of [redacted] Nov. 2, 2017.
163. HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
164. Email from Carter Page to Jeffrey D. Gordon, Tera Dahl, and Walid Phares, "Feedback from Russia – Executive Summary," July 8, 2016. [DJTFP00004023-24]
165. HPSCI, Testimony of Carter Page, Nov. 2, 2017; Josh Rogin, "Trump's Russia adviser speaks out, calls accusations 'complete garbage,'" *Washington Post*, Sept. 26, 2016.
166. HPSCI, Testimony of Carter Page, Nov. 2, 2017.
167. HPSCI, Russia Active Measures Investigation, Mar. 20, 2017; HPSCI, Testimony of Carter Page, Nov. 2, 2017.
168. HPSCI, "Russia Active Measures Investigation," Mar. 20, 2017.
169. HPSCI, Testimony of Carter Page, Nov. 2, 2017; Josh Rogin, "Trump's Russia adviser speaks out, calls accusations 'complete garbage,'" *Washington Post*, Sep. 26, 2016.
170. HPSCI, Testimony of Carter Page, Nov. 2, 2017.
171. Sharon LaFraniere, Mark Mazzetti, and Matt Apuzzo, "How the Russia Inquiry Began: A Campaign Aide, Drinks and Talk of Political Dirt," *Washington Post*, Dec. 30, 2017; Email from John Mashburn to Rick Dearborn and Jeffrey D. Gordon, "Re: Travel reimbursement (received email from Michael Glassner)," June 24, 2016. [DJTFP00022914]
172. Email from George Papadopoulos to [redacted] et al., "Re: Meeting with Russian leadership—including Putin," Mar. 24, 2016. [DJTFP00010111-12]
173. Email from [redacted] to George Papadopoulos et al., "Re: Meeting with Russian leadership—including Putin," Mar. 24, 2016. [DJTFP00010111]
174. Email from George Papadopoulos to [redacted] et al., "Re: Meeting with Russian leadership—including Putin," Mar. 24, 2016. [DJTFP00010111]
175. HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
176. HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
177. HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
178. HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
179. HPSCI, Executive Session Interview of [redacted] Dec. 8, 2017.
180. HPSCI, Executive Session Interview of [redacted] Jr., Dec. 12, 2017.
181. Sharon LaFraniere, Mark Mazzetti, and Matt Apuzzo, "How the Russia Inquiry Began: A Campaign Aide, Drinks and Talk of

Political Dirt," *Washington Post*, Dec. 30, 2017; HPSCI, Executive Session Interview of [REDACTED] Dec. 8, 2017, pp. 79-80; Email from George Papadopoulos to [REDACTED] "Transition," Nov. 11, 2016 ("I made the introduction between Mr Trump [a]nd president Sisi based primarily on the trust the region has on my work etc.") [DJTFP00024754]

182. Lou Dobbs, Interview with Donald Trump, *Fox Business*, Sept. 22, 2016.
183. Email from George Papadopoulos to Paul Manafort, "Fwd," May. 21, 2016. [GAT-HPSCI-00000258]
184. Email from George Papadopoulos to Paul Manafort, "Fwd," May. 21, 2016. [GAT-HPSCI-00000258-59]
185. Email from Paul Manafort to [REDACTED] "Fwd," May. 21, 2016. [GAT-HPSCI-00000258]
186. Email from Paul Manafort to [REDACTED] "Re:" May. 21, 2016. [GAT-HPSCI-00000258]
187. Email from George Papadopoulos to Rick Dearborn, "Travel reimbursement (received email from Michael Glassner)," June 24, 2016 [DJTFP00022915-16]
188. Email from [REDACTED] and Jeffrey D. Gordon, "FWD: Travel reimbursement (received email from Michael Glassner)," June 24, 2016. [DJTFP00022915]
189. Email from [REDACTED] and Jeffrey D. Gordon, "Re: Travel reimbursement (received email from Michael Glassner)," June 24, 2016. [DJTFP00022915]
190. Email from [REDACTED] to George Papadopoulos, "Re: Travel reimbursement (received email from Michael Glassner)," June 24, 2016. [DJTFP00022918]
191. Email from [REDACTED] to George Papadopoulos, "Re: Travel reimbursement (received email from Michael Glassner)," June 24, 2016. [DJTFP00022918]
192. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017; Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017; Email from [REDACTED] to Rob Goldstone, "FW-Message-from '26-Copier-Exec,'" Apr. 25, 2016 (passing along handwritten response from candidate Trump to email from Aras Agalarov) [RG000033]
193. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.
194. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
195. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.
196. Email from [REDACTED] to [REDACTED], "From the office of Donald J. Trump,'" Mar. 18, 2016 (passing along hand-written response from candidate Trump to typewritten note from Aras Agalarov) [DJTJR00408-09]; Email from Rhona Graff to Rob Goldstone, "FW-Message-from '26-Copier-Exec,'" Apr. 25, 2016 (passing along handwritten response from candidate Trump to email from Aras Agalarov) [RG000033]
197. Email from Rob Goldstone to Donald Trump Jr., "Re: Re: Russia – Clinton – private and confidential," June 3, 2016. [DJTJR00464]
198. Email from Donald Trump Jr to Rob Goldstone, "Re: Russia – Clinton – private and confidential," June 3, 2016. [DJTJR00464]
199. Email from Rob Goldstone to Donald Trump Jr., "Re: Russia – Clinton – private and confidential," June 7, 2016. [DJTJR00467]
200. Email from Donald Trump Jr to Rob Goldstone, "Re: Russia – Clinton – private and confidential," June 7, 2016. [DJTJR00469]
201. HPSCI, Executive Session Interview of Ike Kaveladze, Nov. 2, 2017.
202. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
203. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
204. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.
205. HPSCI, Executive Session Interview of Rinat Akhmetshin, Nov. 13, 2017; HPSCI Executive Session Interview of Anatoli Samochornov, Nov. 28, 2017.
206. HPSCI, Executive Session Interview of Ike Kaveladze, Nov. 2, 2017; Sharon La Franiere and Andrew E. Kramer, "Talking Points Brought to Trump Tower Meeting Were Shared With Kremlin," *The New York Times*, Oct. 27, 2017. Based on public reporting, Veselnitskaya previously shared a version of the memo or talking points with Yuri Chaika.
207. HPSCI, Executive Session Interview of Ike Kaveladze, Nov. 2, 2017; HPSCI, Executive Session Interview of Rinat Akhmetshin, Nov. 13, 2017; HPSCI, Executive Session Interview of Anatoli Samochornov, Nov. 28, 2017.
208. HPSCI, Executive Session Interview of Ike Kaveladze, Nov. 2, 2017.
209. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
210. HPSCI, Executive Session Interview of Anatoli Samochornov, Nov. 28, 2017.
211. HPSCI, Executive Session Interview of Ike Kaveladze, Nov. 2, 2017.
212. HPSCI, Executive Session Interview of Ike Kaveladze, Nov. 2, 2017; HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017; HPSCI, Executive Session Interview of Anatoli Samochornov, Nov. 28, 2017; HPSCI, Executive Session Interview of Rinat Akhmetshin, Nov. 13, 2017; HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.
213. HPSCI, Executive Session Interview of Ike Kaveladze, Nov. 2, 2017; HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017; HPSCI, Executive Session Interview of Anatoli Samochornov, Nov. 28, 2017; HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017.
214. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.

215. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.
216. Text Message Exchange Between Jared Kushner and Paul Manafort, June 9, 2016. [NHPSCI00000145]
217. HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017.
218. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
219. HPSCI, Executive Session Interview of Ike Kaveladze, Nov. 2, 2017.
220. HPSCI, Executive Session Interview of Ike Kaveladze, Nov. 2, 2017.
221. Email from Ike Kaveladze to A. Kaveladze, "Re: how are you," June 14, 2016. [HIC-KAV_00020]
222. HPSCI, Executive Session Interview of Rob Goldstone, Dec. 18, 2017.
223. HPSCI, Executive Session Interview of Stephen Bannon, Jan. 16, 2018.
224. Ryan Teague Beckwith, "Read Donald Trump's Subdued Victory Speech After Winning New Jersey," *TIME*, June 8, 2017; Email from Donald Trump Jr to Rob.Goldstone, "Re: Russia – Clinton – private and confidential," June 7, 2016. [DJTJR00469].
225. HPSCI, Executive Session Interview of Hope Hicks, Feb. 27, 2018; "Full transcript: Donald Trump NYC speech on stakes of the election," *POLITICO*, June 22, 2018.
226. NRA, "2016 NRA Annual Meetings & Exhibits Full Event Schedule," https://www.nraam.org/media/1641/daily-event-schedule.pdf, undated.
227. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
228. Email from [redacted] to [redacted] "Russian backdoor overture and dinner invite," May 16, 2016.[Sessions production: 2016-05-16--Re Russian backdoor overture and dinner invite (36)]
229. Email from [redacted] to [redacted] "Russian backdoor overture and dinner invite," May 16, 2016. [Sessions production: 2016-05-16--Re Russian backdoor overture and dinner invite (36)]
230. Email from [redacted] to [redacted] "Russian backdoor overture and dinner invite," May 16, 2016. [Sessions production: 2016-05-16--Re Russian backdoor overture and dinner invite (36)]
231. Email from [redacted] to Paul Manafort, et al., "Fwd: Russian backdoor overture and dinner invite," May 17, 2016. [Sessions production: 2016-05-17--Fwd Russian backdoor overture and dinner invite (28)]
232. Email from Jared Kushner to [redacted] "Re: Russian backdoor overture and dinner invite," May 17, 2016. [RD000001]
233. Email from [redacted] to [redacted] "Re: KY Request," May 18, 2016. [Sessions Production: 2016-05-18--Re KY Request]
234. HPSCI, Executive Session Interview of [redacted] Jan. 17, 2018.
235. Email from [redacted] to [redacted] "Kremlin Connection," May 10, 2016. [RD 000078]
236. Email from [redacted] to [redacted] "Kremlin Connection," May 10, 2016. [RD 000078]
237. Email from [redacted] to [redacted] "Kremlin Connection," May 10, 2016. [RD 000078]
238. Email from [redacted] to [redacted] "Kremlin Connection," May 10, 2016. [RD 000078]
239. HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
240. HPSCI, Executive Session Interview of [redacted] Jan. 17, 2018.
241. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
242. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
243. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
244. HPSCI, Executive Session Interview of Donald Trump, Jr., Dec. 6, 2017.
245. HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
246. HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017.
247. HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017.
248. HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
249. HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
250. Federal Election Commission, "Hillary for America Disbursements to [redacted] from 2015-2016, www.fec.gov; "JBS Schedule," July 16, 2016. [2016-07-16--Untitled (15)--ATTACHMENT JBS Convention Schedule with Drop By (Sessions Production)]
251. "JBS Schedule," July 16, 2016. [Sessions Production: 2016-07-16--Untitled (15)--ATTACHMENT JBS Convention Schedule with Drop By]
252. HPSCI, Executive Session Interview of Jeffrey Gordon, July 26, 2017; Courtney Ottrix, "U.S. Senator Bob Corker Speaks at Global Cleveland's Global Partners in Diplomacy Event," Globalcleveland.org, Jan. 31, 2017.
253. "JBS Schedule," July 16, 2016. [Sessions Production: 2016-07-16--Untitled (15)--ATTACHMENT JBS Convention Schedule with Drop By]
254. HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017, p. 86 ("I met with him, as I recall, twice. There was an encounter after I made a speech at the Republican Convention. I didn't—didn't know he was going to be there. I spoke to a number of ambassadors and other people and was standing in front of the podium and he and I chatted a bit.").

255. HPSCI, Executive Session Interview of Jeffrey Gordon, July 26, 2017.
256. HPSCI, Testimony of [redacted] Nov. 2, 2017.
257. "JBS Schedule," July 16, 2016. [Sessions Production: 2016-07-16—Untitled (15)—ATTACHMENT JBS Convention Schedule with Drop By]; Calendar invite, "Meeting with Russian Ambassador Kislyak," Sept. 8, 2016. [2016-09-08—Meeting with Russian Ambassador Kislyak]
258. Senator Sessions' Staff Notes, "Russian Ambassador," Sept. 8, 2016 [Sessions Supplemental Production]; Calendar invite, "Meeting with Russian Ambassador Kislyak," Sept. 8, 2016. [Sessions production: 2016-09-08—Meeting with Russian Ambassador Kislyak].
259. HPSCI, Executive Session Interview of Jefferson B. Sessions, Nov. 30, 2017.
260. HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017.
261. HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017.
262. HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017.
263. HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017.
264. HPSCI, Executive Session Interview of [redacted] Nov. 30, 2017.
265. HPSCI, Executive Session Interview of [redacted] Nov. 30, 2017.
266. HPSCI, Executive Session Interview of [redacted] Nov. 30, 2017.
267. HPSCI, Executive Session Interview of [redacted] Nov. 30, 2017.
268. HPSCI, Executive Session Interview of [redacted] Nov. 30, 2017.
269. HPSCI, Executive Session Interview of Jared Kushner, July 25, 2017.
270. HPSCI, Testimony of Erik Prince, Nov. 30, 2017.
271. HPSCI, Executive Session Interview of [redacted] Nov. 14, 2017.
272. HPSCI, Executive Session Interview of [redacted] Nov. 14, 2017.
273. HPSCI, Executive Session Interview of [redacted] Nov. 14, 2017.
274. HPSCI, Executive Session Interview of [redacted] Nov. 14, 2017.
275. HPSCI, Executive Session Interview of [redacted] Nov. 14, 2017.
276. HPSCI, Executive Session Interview of Jake Sullivan, Dec. 21, 2017 [redacted] central role in the dossier was first revealed in a press article. Adam Entous, Devlin Barrett, and Rosalind S. Helderman, "Clinton campaign, DNC paid for research that led to Russia dossier," *Washington Post*, Oct. 24, 2017. Prior to its publication, Elias elected to represent three witnesses—including former Clinton campaign chairman John Podesta—before the Committee in connection with this investigation. HPSCI, Executive Session Interview of John Podesta, June 27, 2017; HPSCI, Executive Session Interview of [redacted] Aug. 30, 2017; HPSCI, Executive Session Interview of Yared Tamene Wolde-Yohannes, Aug. 30, 2017. That decision was questionable, since Elias was himself in possession of facts relevant to the Committee's investigation. HPSCI, Executive Session Interview of Marc Elias, Dec. 13, 2017.
277. HPSCI, Executive Session Interview of [redacted] Nov. 14, 2017.
278. HPSCI, Executive Session Interview of [redacted] Nov. 14, 2017; HPSCI, Executive Session Interview of Rinat Akmetshin, Nov. 13; Joel Schectman and Nathan Layne. "U.S. settles Russian money laundering case," *Reuters*, May 13, 2017.
279. HPSCI, Executive Session Interview of [redacted] Nov. 14, 2017.
280. HPSCI, Executive Session Interview of [redacted] Nov. 14, 2017; HPSCI, Executive Session Interview of Rinat Akmetshin, Nov. 13, 2017.
281. HPSCI, Executive Session Interview of [redacted] Nov. 14, 2017.
282. HPSCI, Executive Session Interview of [redacted] Nov. 14, 2017; HPSCI, Executive Session Interview of Rinat Akhmetshin, Nov. 13, 2017; HPSCI, Executive Session Interview of Ike Kaveladze, Nov. 2, 2017.
283. HPSCI, Executive Session Interview of [redacted] Nov. 14, 2017.
284. HPSCI, Executive Session Interview of [redacted] Nov. 14, 2017.
285. HPSCI, Executive Session Interview of [redacted] Nov. 14, 2017.
286. HPSCI, Executive Session Interview of [redacted] Nov. 14, 2017.
287. Federal Election Commission, "Hillary for America Disbursements to Perkins Coie from 2015 to 2016", www.fec.gov; HPSCI, Executive Session Interview of [redacted] Dec. 13, 2017.
288. HPSCI, Executive Session Interview of [redacted] Dec. 13, 2017.
289. HPSCI, Executive Session Interview of [redacted] Dec. 13, 2017.
290. HPSCI, Executive Session Interview of [redacted] Dec. 13, 2017.
291. HPSCI, Executive Session Interview of [redacted] Dec. 13, 2017.
292. HPSCI, Executive Session Interview of [redacted] Dec. 13, 2017.
293. HPSCI, Executive Session Interview of [redacted] Dec. 13, 2017.
294. HPSCI, Executive Session Interview of [redacted] Dec. 13, 2017.
295. HPSCI, Executive Session Interview of [redacted] Dec. 12, 2017.
296. Matthew Continetti and Michael Goldfarb, "Fusion GPS and the Washington Free Beacon," *Washington Free Beacon*, Oct. 27, 2017.

297. HPSCI, Executive Session Interview of [redacted] Dec. 12, 2017.
298. HPSCI, Executive Session Interview of [redacted] Dec. 13, 2017.
299. HPSCI, Executive Session Interview of [redacted] Nov. 14, 2017.
300. HPSCI, Executive Session Interview of [redacted] Nov. 14, 2017.
301. HPSCI, Executive Session Interview of [redacted] Dec. 13, 2017.
302. HPSCI, Executive Session Interview of [redacted] Nov. 14, 2017; Mark Hosenball, "Ex-British spy $168,000 for Trump dossier, U.S. firm discloses," *Reuters*, Nov. 1, 2017.
303. HPSCI, Executive Session Interview of [redacted] Nov. 14, 2017.
304. HPSCI, Executive Session Interview of [redacted] Nov. 14, 2017.
305. HPSCI, Executive Session Interview of [redacted] Dec. 13, 2017.
306. Gubarev et al. v. Orbis et al., Defense, (Claim No. HQ17D0413, Queen's Bench Division), Apr. 3, 2017.
307. HPSCI, Executive Session Interview of [redacted] Nov. 14, 2017 (stating that, as a known "former undercover British Intelligence officer who worked in Moscow," Steele would not have been able to travel to Russia safely).
308. HPSCI, Executive Session Interview of [redacted] Nov. 14, 2017.
309. Ken Bensinger, Miriam Elder, Mark Schoofs, "These Reports Allege Trump Has Deep Ties To Russia," *BuzzFeed News*, Jan. 10, 2017; HPSCI, Executive Session Interview of David J. Kramer," Dec. 19, 2017.
310. ODNI, *Assessing Russian Activities in Recent U.S. Elections*, Jan. 6, 2017.
311. HPSCI, Executive Session Interview of [redacted] Dec. 13, 2017.
312. Letter from Robert M. Weinberg to K. Michael Conaway and Adam Schiff, Aug. 21, 2017; HPSCI, Executive Session Interview of Glenn Simpson, Nov. 14, 2017; HPSCI, Executive Session Interview of David J. Kramer, Dec. 19, 2017. The Committee issued a subpoena to Kramer, but Kramer still refused to identify Steele's sources. HPSCI, Executive Session Interview of David J. Kramer, Jan. 10, 2018; Letter from Lawrence S. Robbins to Representative Devin Nunes and Representative Adam Schiff, "Re: December 27, 2017, Subpoena Issued to David Kramer," Jan. 10, 2018.
313. HPSCI, Executive Session Interview of Glenn Simpson," Nov. 14, 2017.
314. HPSCI, Executive Session Interview of Marc Elias, Dec. 13, 2017.
315. HPSCI, Executive Session Interview of Marc Elias, Dec. 13, 2017.
316. HPSCI, Executive Session Interview of Marc Elias, Dec. 13, 2017.
317. HPSCI, Executive Session Interview of Marc Elias, Dec. 13, 2017.
318. Email for Katherine Ruemmler to HPSCI Staff, "RE: Production," Jan. 24, 2018.
319. HPSCI, Executive Session Interview of Jake Sullivan, Dec. 21, 2017.
320. HPSCI, Executive Session Interview of Marc Elias, Dec. 13, 2017; HPSCI, Executive Session Interview of Jake Sullivan, Dec. 21, 2017; Jennifer Palmieri, "The Clinton campaign warned you about Russia. But nobody listened to us," *Washington Post*, Mar. 24, 2017.

TOP SECRET// ██████████████████ /NOFORN ████

## (U) Chapter 5 - Intelligence Community Assessment Leaks

*Key Question #4: What possible leaks of classified information took place related to the Intelligence Community's assessment of these matters?*

(U) Leaks of classified information are criminal acts, and have the potential to damage U.S. national security interests, at home and abroad.[1] Even more concerning is that the lives of IC employees or assets may be placed in danger due to unauthorized disclosures of classified information. Finally, when leaks of classified information come from congressional sources, such leaks jeopardize the effective oversight role Congress plays over the IC. Therefore, as part of the Committee's investigation, the Committee reviewed leaks related to the classified ICA on the Russian active measures campaign targeting the 2016 U.S. presidential election, focusing primarily on leaks that occurred between the IC's establishment of the CIA Director's fusion cell ██ ██████████ and the publication of the ICA in January 2017.

(U) On January 6, 2017, the DNI released the unclassified ICA. The ICA states that Russia conducted its active measures campaign for the dual purposes of (1) sowing discord in and undermining the U.S. presidential election process, and (2) helping elect Donald J. Trump by denigrating Secretary Hillary Clinton.[2] Unfortunately, the public release of the unclassified version of the ICA was not the first time that the public had seen the IC's various assessments related to the Russian active measures campaign. Although outside the scope of this

chapter, leaks related to the Russian active measures were already happening in 2015 and 2016. For example, there were press reports regarding the hack of the DNC, as well as the potential hacks of pro-Trump and Republican groups.[3] During this time, the Committee carried out a healthy dialogue, which included briefings, with the IC related to these matters as part of its oversight responsibilities.[4]

(U) In addition, this chapter covers leaks of information about IC assessments that were likely classified at the time this information found its way into the press, especially in light of the fact that the leaks reportedly came from government sources. This chapter does not make any determination as to the accuracy or analytic integrity of the information leaked to the press and subsequently produced in the ICA.

(U) Finding #40: Leaks of classified information regarding Russian intentions to sow discord in the U.S. presidential election began prior to the election day—November 8, 2016.

(U) The leaks related to Russian intentions to sow discord in the U.S. presidential election took place prior to the November 8, 2016 election, and notably, after the IC's establishment of the fusion cell ██████████ ████████████████████████████████ ████████████████████████████████

TOP SECRET// ██████████████████ /NOFORN ████

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES



Almost a week later on October 7, 2016, the U.S. government formally accused Russia of hacking political institutions, but did not attribute a specific hack to the Russians.[11]

(U) At the time of these leaks, the information contained within them was still classified. These leaks of classified information endangered U.S. national security by revealing key information about U.S. intelligence capabilities to its adversaries, including assessments on adversary intentions. The Committee finds the timing of these leaks particularly concerning. These leaks happened during the early stages of the IC's ongoing assessment of Russian active measures, thus permitting adversaries to not only potentially discover U.S. intelligence capabilities, but also provided adver-

saries, including the Russians, the opportunity to thwart or manipulate the IC's ongoing assessment.

**(U) Finding #41: Leaks of classified information alleging Russian intentions to help elect candidate Trump increased dramatically after the election day—November 8, 2016.**

(TS/NF) ~~(U)~~ Further, as of December 5, 2016, the administration had not acknowledged any attempt by Moscow to influence the election in favor of candidate Trump.

(TS/NF) ~~(U)~~ However, four days later on December 9, Adam Entous, Ellen Nakashima, and Greg Miller of *The Washington Post* reported that the CIA concluded a new assessment that Russia intervened in the 2016 U.S. presidential election to help candidate Trump win the presidency, rather than for the sole purpose of undermining confidence in the U.S. electoral system.[16]

TOP SECRET// [redacted] //NOFORN/ [redacted]

UNCLASSIFIED

SECRET CIA ASSESSMENT SAYS RUSSIA WAS TRYING TO HELP TRUMP WIN WHITE HOUSE

Source: The Washington Post

UNCLASSIFIED

(C/NF) (U) In addition, on December 10, 2016, John Walcott of *Reuters* reported that a U.S. official familiar with the IC's findings stated that as the 2016 U.S. presidential campaign progressed, Russian government officials devoted increasing attention to assisting candidate Trump's efforts to win the election.[21]

TOP SECRET// [redacted] //NOFORN/ [redacted]

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

102



TOP SECRET// /NOFORN

TOP SECRET// /NOFORN
PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES
103

TOP SECRET// ▓▓▓▓▓▓▓▓▓▓▓ /NOFORN

(U) It is important to note that Evan Perez, Jim Sciutto, Jake Tapper, and Carl Bernstein of CNN reported on January 12, 2016, that President-elect Trump was briefed on classified information indicating that the Russians have compromising personal or financial information that the Russians could use against President-elect Trump.[39] The Committee's investigation revealed that President-elect Trump was indeed briefed on the contents of the Steele dossier and when questioned by the Committee, former Director of National Intelligence James Clapper admitted that he confirmed the existence of the dossier to the media.[40]

(TS/NF)   (U) In reviewing the various leaks both before and after November 8, 2016, a trend becomes evident—prior to the election, leaks of potentially classified information focused on Russia's attempts to sow discord with the U.S. presidential election. ▓▓▓▓



(U) Finding #42: The leaks prior to the classified Intelligence Community Assessment's publication, particularly leaks occurring after the U.S. presidential election, correlate to specific language found in the

Intelligence Community Assessment.

(U) During this review, the Committee found that leaks of potentially classified information permeated throughout the media both before and after the November 8, 2016, U.S. presidential election. ▓▓▓▓



TOP SECRET// ▓▓▓▓▓▓▓▓▓▓▓ /NOFORN

| Pre-Publication Leaks Associated with the ICA | | |
|---|---|---|
| **Article** | **Quotes in Article that Mirror ICA** | **Final ICA Findings** |
| "Secret CIA assessment says Russia was trying to help Trump win White House"<br>• Date: December 9, 2016<br>• Outlet: *The Washington Post* | "The CIA has concluded in a secret assessment that Russia intervened in the 2016 election ***to help Donald Trump win the presidency***, rather than just to undermine confidence in the U.S. electoral system, according to officials briefed on the matter." | Page 1: "We further assess Putin and the Russian Government ***developed a clear preference for President-Elect Trump.***" |
| | "'It is the assessment of the intelligence community that Russia's goal here ***was to favor one candidate over the other, to help Trump get elected,***' said a senior U.S. official briefed on an intelligence presentation made to U.S. senators. 'That's the consensus view.'" | Page 1: "Nonetheless, Putin publicly indicated a ***preference for President-elect Trump's stated policy to work with Russia***, and pro-Kremlin figures spoke highly about what they saw as his Russia-friendly positions on Syria and Ukraine. Putin publicly ***contrasted the President-elect's approach*** to Russia ***with Secretary Clinton's 'aggressive rhetoric.'***" |
| "Russian Hackers Acted to Aid Trump in Election, U.S. Says"<br>• Date: December 9, 2016<br>• Outlet: *The New York Times* | "'We now have high confidence that they hacked the D.N.C. and ***the R.N.C., and conspicuously released no documents' from the Republican organization***, one senior administration official said, referring to the Russians." | Page 3: "Russia collected on some Republican-affiliated targets but ***did not conduct a comparable disclosure campaign.***" |
| | [redacted] [redacted] or 'A.P.T. 28,' is believed to have created two outlets on the internet, Guccifer 2.0 and DCLeaks, to make Democratic documents public. Many of the documents were also provided to WikiLeaks, which released them over many weeks before the Nov. 8 election." | Page 2: "We assess with high confidence that the [redacted] [redacted] ***DCLeaks.com, and WikiLeaks to release US victim data*** obtained in cyber operations publicly and in exclusives to media outlets." |

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

| Pre-Publication Leaks Associated with the ICA (cont'd) | | |
|---|---|---|
| **Article** | **Quotes in Article that Mirror ICA** | **Final ICA Findings** |
| "U.S. Officials: Putin Personally Involved in U.S. Election Hack"<br>• Date: December 15, 2016<br>• Outlet: *NBC News* | "Two senior officials with direct access to the information say ***new intelligence shows that Putin personally directed*** how hacked material from Democrats was leaked and otherwise used. The intelligence came from diplomatic sources and spies working for U.S. allies, the officials said." | Page 1: "We assess with high confidence that ***Russian President Vladimir Putin ordered*** an influence campaign in 2016 aimed at the US presidential election..." |
| | "Putin's objectives were multifaceted, a high-level intelligence source told NBC News. What ***began as a 'vendetta' against Hillary Clinton morphed*** into an effort to ***show corruption in American politics*** and to 'split off key American allies by creating the image that [other countries] couldn't depend on the U.S. to be a credible global leader anymore,' the official said." | Page 1: "Putin most likely wanted to discredit Secretary Clinton because ***he has publicly blamed her*** since 2011 for inciting mass protests against his regime in late 2011 and early 2012, and because ***he holds a grudge*** for comments ***he almost certainly saw as disparaging him.***"<br><br>Page 1: "In trying to influence the US election, we assess the Kremlin sought to advance its longstanding desire to ***undermine the US-led liberal democratic order***, the promotion of which Putin and other senior Russian leaders view as a threat to Russia and Putin's regime." |
| "Intel analysis shows Putin approved election hacking"<br>• Date: December 15, 2016<br>• Outlet: CNN | "'The intelligence community has assessed that in order for this operation to have been executed, it could not have been done without the ***highest levels of the government, including the President*** himself.'" | Page 2: "We assess that influence campaigns are ***approved at the highest levels of the Russian Government***—particularly those that would be politically sensitive." |
| "Report: Putin, Russia Tried to Help Trump By 'Discrediting' Clinton"<br>• Date: January 6, 2017<br>• Outlet: *NBC News* | "The unclassified report does not identify who transmitted the information or how. A senior official with direct knowledge, however, told NBC News Thursday that the U.S. ***has identified the Russian actors*** who turned over stolen Democratic material ***to WikiLeaks.***" | Page 3: "We assess with high confidence that [redacted] ***relayed material*** it acquired from the DNC and senior Democratic officials ***to WikiLeaks.***" |

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES



(U) Finding #43: Continued leaks of classified information have damaged national security and potentially endangered lives.

(TS//NF)

(U) Finding #44: Former Director of National Intelligence James Clapper, now a CNN national security analyst, provided inconsistent testimony to the Committee about his contacts with the media, including CNN.

(U) When initially asked about leaks related to the ICA in July 2017, former DNI Clapper flatly denied "discuss[ing] the dossier [compiled by Steele] or any other intelligence related to Russia hacking of the 2016 election with journalists."[45] Clapper subsequently acknowledged discussing the "dossier with CNN journalist Jake Tapper," and admitted that he might have spoken with other journalists about the same topic.[46] Clapper's discussion with Tapper took place in early January 2017, around the time IC leaders briefed President Obama and President-elect Trump, on "the Christopher Steele information," a two-page summary of which was "enclosed in" the highly-classified version of the ICA."[47]

(U) On January 10, 2017, CNN published an article by Tapper and others, which

claimed that "classified documents presented last week to President Obama and President-elect Trump included allegations . . . about Mr. Trump" that were (1) "presented in a two-page synopsis . . . appended to a report on Russian interference in the 2016 election" and (2) derived from "memos compiled by a former British intelligence operative."[48] Those claims were sourced to "multiple U.S. officials with direct knowledge of the briefings."[49] The next day, Clapper issued a statement describing a call with President-elect Trump in which Clapper "expressed my profound dismay at the leaks that have been appearing the in press" and "emphasized . . . that I do not believe the leaks came from within the IC."[50]

(U) The Committee assesses that leaks to CNN about the dossier were especially significant, since CNN's report "that a two-page synopsis of the report was given to President Obama and Trump" was the proximate cause of *BuzzFeed News*' decision to publish the dossier for the first time just a few hours later.[51] Until that point, the dossier had been "circulating among elected official, intelligence agents, and journalists," but remained unpublished.[52] As the accompanying article explained, "[n]ow BuzzFeed News is publishing the full document so that Americans can make up their own minds about allegations about the president-elect that have circulated at the highest levels of government."[53]

(U) In approximately early August 2017, shortly after his testimony to the Committee, Clapper joined CNN as a national security analyst.[54]



1.  Espionage Act of 1917 (codified as amended at 18 U.S.C. §§ 793-798).
2.  ODNI, *Assessing Russian Activities and Intentions in Recent US Elections*, Jan. 6, 2017.
3.  Ellen Nakashima, "Russian Government Hackers Penetrated DNC, Stole Opposition Research on Trump," *Washington Post*, June 14, 2016; Joseph Menn, Mark Hosenball, and John Walcott, "Hackers Targeted Trump Campaign, Republican Party Groups: Sources," *Reuters*, Aug. 19, 2016.
4.  HPSCI, Staff Briefing on Cyber Targeting of Political Parties, June 14, 2016; HPSCI, Staff Briefing on WikiLeaks and Hacking of Campaign Systems, Aug. 3, 2016; HPSCI, Member Briefing on Russian Cyber Activities, Sept. 6, 2016; Gang of 8 Briefing, "Russian Cyber Activities," Sept. 8, 2016.
5.
6.
7.
8.
9.
10.



11. DHS and ODNI, "Joint Statement from the Department of Homeland Security and Office of the Director of National Intelligence on Election Security," Oct. 7, 2016.
12.
13.
14.
15.
16. Adam Entous, Ellen Nakashima, and Greg Miller, "Secret CIA Assessment Says Russia Was Trying to Help Trump Win White House," *Washington Post*, Dec. 9, 2016.
17.
18.
19.
20.
21. John Walcott, "Russia intervened to help Trump win election: intelligence officials," *Reuters*, Dec. 10, 2016.
22.
23.



24.
25.
26.
27.
28.
29.
30.
31.



32.
33.
34.
35.
36.
37.
38.
39. Evan Perez, Jim Sciutto, Jake Tapper, and Carl Bernstein, "Intel chiefs presented Trump with claims of Russian efforts to compromise him," *CNN News*, Jan. 12, 2016.
40. HPSCI, Executive Session Interview of James Clapper, July 17, 2017.
41.
42.
43.
44.
45. HPSCI, Executive Session Interview of James Clapper, July 17, 2017.
46. HPSCI, Executive Session Interview of James Clapper, July 17, 2017. Regarding his communication with Tapper about the dossier, Clapper stated: "I don't know exactly the sequence there, but it was pretty close to when we briefed it and when it was out all over the place. The media had it by the way. We were kind of behind the power curve, because the media, many media outlets that I understood had that, had the dossier for some time, as did people on the Hill."
47. HPSCI, Executive Session Interview of James Clapper, July 17, 2017. Former CIA Director Brennan testified publicly that the dossier was "not in any way used as a basis for the Intelligence Community Assessment." HPSCI, Russian Active Measures During the 2016 Election Campaign, May 23, 2017. However, NSA Director Rogers clarified that, in late December 2016, a two-page summary of the Steele dossier was "added" as an "Appendix to the ICA draft," and that his consideration of the Appendix was "part of the overall ICA review/approval Process." Letter from Michael S. Rogers to the Honorable Devin Nunes, Mar. 5, 2018. *See also* Evan Perez, "Biden confirms Obama, VP were briefed on unsubstantiated claims against Trump," CNN, Jan. 12, 2018.
48. Evan Perez, Jim Sciutto, Jake Tapper, and Carl Bernstein, "Intel chiefs presented Trump with claims of Russian efforts to compromise him," CNN, Jan. 12, 2017; Twitter, @cnnbrk, Jan. 10, 2017, 2:13 PM (reflecting the story's initial publication time).
49. Evan Perez, Jim Sciutto, Jake Tapper, and Carl Bernstein, "Intel chiefs presented Trump with claims of Russian efforts to compromise him," CNN, Jan. 12, 2017.
50. ODNI, "DNI Clapper Statement on Conversation with President-elect Trump," Jan. 11, 2017.
51. Ken Bensinger, Miriam Elder, Mark Schoofs, "These Reports Allege Trump Has Deep Ties To Russia," *BuzzFeed News*, Jan. 10, 2017.
52. Miriam Elder, Mark Schoofs, "These Reports Allege Trump Has Deep Ties To Russia," *BuzzFeed News*, Jan. 10, 2017 ("originally posted . . . at 6:20 p.m.).
53. Ken Bensinger, Miriam Elder, Mark Schoofs, "These Reports Allege Trump Has Deep Ties To Russia," *BuzzFeed News*, Jan. 10, 2017.
54. Transcript, "President Trump Takes Working Vacation; Analysts Examine President's Recent Poll Numbers," CNN, Aug. 7, 2017 ("Joining us now to talk more about this is CNN's new national security analyst, James Clapper.") .



# (U) Chapter 6 - Summary of Related Committee Oversight Efforts

(U) During the course of the Committee's investigation into Russian active measures targeting the 2016 U.S. presidential election, the Committee identified several issues within its jurisdiction that required additional attention and oversight outside of the broader investigation.

**Sufficiency of "Unmasking" Procedures**

(U) In March 2017, the Committee became aware of senior Obama Administration officials' requests for U.S. person identities related to President-elect Trump's transition team. These U.S. person identities were previously redacted in IC reporting. The Committee initiated its investigation of the process for requesting identities, colloquially referred to as "unmasking," to determine the sufficiency of existing policies and procedures related to the release of U.S. person identities. As a result, the Committee recognized gaps in the "unmasking" processes, including the lack of IC-wide standards related to the justification for requesting U.S. person identity information. Therefore, the Committee's findings related to these processes necessitated an immediate change in policy.

(U) The Committee believed that the IC should use specific procedures related to the "unmasking" of U.S. person identities in IC reporting, including additional review requirements for "unmasking" presidential transition team officials during a presidential transition.[1] The Committee felt that a change in policy was necessary for the IC to protect U.S. person privacy and the sanctity of the peaceful transition of presidential administrations, all while resulting in no operational impact. As part of negotiations of the FISA Amendments Act of 2017, DNI Coats and the White House agreed to develop a new IC-wide policy for handling "unmasking" requests. Therefore, on January 11, 2018, DNI Coats signed Intelligence Community Policy Guidance 107.1 (see Appendix D), which includes requirements for:

- IC element heads or designee approval for requests for U.S. person identity information;
- Documentation for names or titles of individuals who will receive the U.S. person identify information;
- A fact-based justification for each U.S. person identity request; and
- IC element General Counsel concurrence for U.S. person identity requests that relate to Presidential transition team members prior to those identities being approved for release.

[redacted]

(U) Using a series of intermediaries, the DNC and Hillary for America (Clinton campaign) paid a research firm to conduct opposition research on candidate Trump and his ties with Russia. Fusion GPS (Fusion) is the trade name of a Washington, D.C.-based company that conducts research primarily

on behalf of corporate clients.[2] Marc Elias, chair of Perkins Coie's election law practice who represented the DNC and the Clinton campaign, hired Fusion in spring 2016 and paid Fusion $1 million to conduct opposition research on candidate Trump. Fusion subsequently hired former British Secret Intelligence Service officer Christopher Steele for $160,000 to obtain information on candidate Trump via a Russia-based primary subsource and numerous sub-sub-sources network who were purported to be current and former Russian government officials. The information Steele collected was reported back through a series of memos to Fusion and Perkins Coie. Steele produced sixteen memos, which comprise what has become known as the Steele dossier.[3]

(U) By the end of September 2016—in addition to Fusion and Perkins Coie—Steele provided the information in the Steele dossier to the DOJ, Department of State, numerous press outlets, and the FBI.

(U) After uncovering this information, the Committee voted to publicly release two memos, one written by the Majority on January 18, 2018 (see Appendix E) and another written by the Minority on January 29, 2018 (see Appendix F). In addition to the Committee's oversight of this matter, the Senate Judiciary Committee identified the same issues in a criminal referral sent by Chairman Grassley and Senator Graham to the DOJ on January 4, 2018, describing Christopher Steele's exploits in detail (see Appendix G).

(U) Ongoing lines of effort include (1) continued oversight of DOJ and FBI (see Appendix H for relevant correspondence); (2) inquiries into the State Department's handling of information from Steele, including the dossier;[4] and (3) post-election anti-Trump research by Steele and/or Fusion GPS.[5]

1. H.R. 4478, § 207, 115th Cong.
2. HPSCI, "Executive Session Interview of Glenn Simpson," Nov. 14, 2017.
3. The dossier, however, has no fixed composition. The version published by *BuzzFeed* does not necessarily entirely correspond with documents provided to other parties.

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

4. Former State Department official [redacted] has stated publicly that, over a period of approximately two years, he provided over "100 of Steele's reports with the Russia experts at the State Department," including Assistant Secretary of State Victoria Nuland. In September 2016, Winer was personally briefed by Steele on the dossier, and shared a two-page summary with Nuland, who ensured that Secretary of State John Kerry was made aware of Steele's information. Additionally, [redacted] received from Clinton associate [redacted] information collected by an individual named [redacted] Shearer which "alleged the Russians had compromising information on Trump of a sexual and financial nature." Winer shared with [redacted] r information with Steele, who provided it to the FBI. [redacted], "Devin Nunes is investigating me. Here's the truth.," *Washington Post*, Feb. 8, 2018; Susan B. Glasser, "Victoria Nuland: The Full Transcript," *POLITICO*, Feb. 5, 2018; Appendix G. The Committee believes that additional State Department officials were aware of Steele's efforts in 2016.

5. [redacted] who currently leads "a research and investigatory advisory" called the Penn Quarter Group (PQG), is a former employee of The Daschle Group, U.S. Senate Select Committee on Intelligence (SSCI), and FBI; while at SSCI, he served as the "chief author" of "The Committee Study of the Central Intelligence Agency's Detention and Interrogation Program." The Penn Quarter Group, "Our Leadership," thepqg.com/team/leadership; LinkedIn, [redacted] https://www.linkedin.com/in/danieljjones. In late March 2017, Jones met with FBI regarding PQG, which he described as "exposing foreign influence in Western elections." [redacted] told FBI that PQG was being funded by 7 to 10 wealthy donors located primarily in New York and California, who provided approximately $50 million. [redacted] further stated that PQG had secured the services of Steele, his associate [redacted], and Fusion GPS to continue exposing Russian interference in the 2016 U.S. Presidential election. [redacted] planned to share the information he obtained with policymakers on Capitol Hill and with the press, and also offered to provide PQG's entire holdings to the FBI. FBI, [redacted] FD-302, Mar. 28, 2017.

# (U) Chapter 7 - Conclusions and Recommendations

**Russian Influence Campaigns in Europe**

(U) For at least the last decade, Russia has aggressively engaged in an information war against the West. The Kremlin takes advantage of the openness, freedom of expression, and respect for legal norms enjoyed in Western democracies by conducting targeted, multi-faceted influence operations against its adversaries. Each influence campaign is unique to the populace, media environment, and internal dynamic of the country being targeted.

(U) The factors that make Russian operations effective also make them difficult to counter. Nonetheless, countries throughout the West are taking a variety of actions to impede, counter, and where possible, eliminate Russian influence operations.

(U) The vast majority of Russian tactics share a common denominator: proliferation through mass media. Therefore, this chapter's recommendations primarily focus on ways to degrade the impact of nefarious media activities and make them more difficult to conduct.

**(U) Recommendation #1: European governments, non-governmental organizations, businesses, think tanks, and academia should strengthen legal and regulatory environments, promote media pluralism, build professional media associations, and improve the financial sustainability of legitimate news outlets.**

(U) Russia exploits free media spaces and open democracies through a network of Russian state-owned news outlets and media platforms. Those platforms amplify pro-Russian views in Russian-funded and local media, provoke doubt and disagreement, and propagate false news stories. In many Eastern European and Baltic countries, local, independent media outlets often operate with extremely limited resources, limiting their ability to acquire and produce high-quality content. In contrast, the high production value of Russia-owned content presents an attractive alternative. Russian intelligence services or their agents of influence also purchase, invest in, or partner with existing TV and radio channels, providing editorialized content for redistribution. Furthermore, Russian propaganda is occasionally re-broadcast by legitimate news outlets.

(U) Strengthening legal and regulatory environments, promoting media pluralism, building professional media associations, and improving the financial sustainability of legitimate news outlets will help to: increase access to legitimate news reporting, improve production quality and financial sustainability of local media, and professionalize journalists.

(U) Countries that contain sizable Russian-speaking populations are more vulnerable to the effects of media-enabled Russian information operations. As described

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

above, for many of these populations, Russian media saturates local markets, providing few alternatives for news and entertainment and non-Russian editorial viewpoints

(U) For countries with large Russian-speaking populations, strengthening legitimate Russian-language broadcasters and independent media outlets that disseminate fact-based content would provide both balance to the media space and more viewing options for residents of those countries.

**(U) Recommendation #2: European governments, non-governmental organizations, businesses, think tanks, and academia should implement and encourage multi-pronged, country-wide efforts by both public and private entities to combat Russian propaganda, technical, and cyber operations.**

(U) Russia utilizes a whole-of-government approach in its information operations, mobilizing a variety of tools to achieve its goals. From hacking of government networks, think tanks, and universities to spreading propaganda via social media, Russia's tentacles are many and far reaching.

(U) It is therefore imperative that Western nations implement country-wide efforts to educate its populations and inoculate their governments, media outlets, and other organizations from Russian influence campaigns. To do this, Western nations should encourage increased partnership between public and private entities in order to combat Russian information, technical, and cyber operations.

**(U) Recommendation #3: European governments, non-governmental organizations, businesses, think tanks, and academia should implement more stringent cyber security practices, such as multifactor authentication and encryption of sensitive data, as well as educating workforces on basic cyber security topics and best practices.**

(U) In the last decade, Russian cyber operations have targeted governments, militaries, industrial control systems, businesses, think tanks, and universities worldwide. While Russian intelligence services can employ extremely sophisticated means for gaining access to sensitive data, often simple tactics such as spear phishing can prove just as effective.

(U) Given that cyber operations are relatively low risk/high reward, difficult to attribute, and even harder to consistently combat, it is likely that Russia will continue to utilize this tactic in its influence campaigns. Network defenses have to be right 100% of the time; a cyber intruder only has to be right once. Therefore, it is imperative that governments, NGOs, businesses, think tanks, and academia invest more resources in cyber security defenses, implement more stringent cyber security practices, and conduct regular workforce education and training on these topics.

**(U) Recommendation #4: European govern-**

ments should look to long-term solutions to lessen economic dependence on Russia.

(U) Russia utilizes economic ties to its advantage. Economic vulnerability – such as reliance on Russia for trade or energy – can be leveraged to change behavior, send a message of displeasure, or inflict punishment. This is especially true for smaller countries within Russia's periphery, such as Moldova, where Russia is among their largest trading partners. Yet even large, economically secure countries like Germany depend on Russia for a large percentage of its energy needs.

(U) The United States should look for opportunities to lessen European countries' economic dependence on Russia. Exploring alternative sources of energy and diversifying trade relationships would diminish one of Russia's tools for imposing influence on its neighbors.

**Russia Attacks the United States & America Reacts**

(U) The Committee's findings concerning the Russian government's malign influence campaign during the 2016 U.S. presidential election are largely consistent with the facts outlined in the ICA. The Russian effort was multifaceted, persistent, and effective in sowing division. The effort included cyber operations (hacking), the use of social media, the creation of automated accounts and fake cyber personas, the use of third party intermediaries, and state-run media.

(U) Evidence reviewed by the Committee also shows that the Russian government and its proxies used social media to advance Russia's malign interests. While

these efforts were limited – some even came after Election Day – they were effective at sowing divisions within American society and promoting false information.

(U) America's reaction to the Russian active measures campaign consisted of a whole of government response, with various activities conducted by the IC, law enforcement, and policy makers. Despite arguably the best of intentions in addressing the Russian cyber menace before and during the 2016 election cycle, the Executive Branch's response fell short of deterring the Russians from conducting such activity in the future.

(U) After analyzing the Executive Branch's responses to the active measure campaign, the Committee identified various gaps in current law and policy that must be addressed in order to help protect U.S. election systems and increase the efficacy of victim notifications in the future. In addition, the Executive Branch must diligently inform U.S. presidential campaigns in the future of counterintelligence threats, to the extent consistent with national security and law enforcement equities.

**(U) Recommendation #5: Congress should identify options available to the private sector and federal government that would address the social media vulnerabilities exploited by the Russian government.**

(U) The exploitation of social media platforms by the Russian government for malign purposes demonstrated a significant vulnerability. The response of social media platforms to this threat should be examined closely and evaluated against ongoing threats. Furthermore, social media platforms should consider implementing methods to help counter malign foreign activity.

**(U) Recommendation #6: Congress should consider updating the Foreign Intelligence Surveillance Act to cover malicious international cyber actors.**

(U) As part of the Committee's initial FISA Amendments Act reauthorization discussions in 2017, the Committee sought to address the changing threat environment as it relates to malicious cyber activity threating the U.S. national security. Given the difficulty in attributing a specific cyber actor, the lines between independent hacker and government cyber operator are often blurred. U.S. adversaries are consistently attempting to obfuscate their identity and location in order to evade detection. Unfortunately, current national security authorities are inadequate to counter the growing cyber threat.



(U) Unfortunately, the proposed addition to the FISA "foreign power" definition did not make it into the final version of the FISA Amendments Act of 2017 given concerns that such a designation would dilute the key distinction between two different legal purposes: intelligence collection and law enforcement. This concern, while understandable, fails to take into account the changing threat environment, as evidenced by Russian cyber actors, such as the Internet Research Agency, that attempted to meddle in the 2016 U.S. presidential elections.

(U) The Committee renews its call for Congress to update the definition of "foreign power" and "agent of foreign power" in FISA to account for entities engaged in international malicious cyber activity that threatens the national defense or security of the United States. Adding this new entity to the definition of "foreign power" would permit the IC to target international cyber groups without having to connect that group to a foreign government or terrorist organization, so long as the cyber entity is threating U.S. national security or defense. Such an addition provides the IC with much needed flexibility and will help keep the United States ahead of its adversaries.

**(U) Recommendation #7: The Federal Bureau of Investigation should improve cyberattack victim notification.**

(U) When a state-sponsored cyberattack is directed against U.S. critical infrastructure or systems related to national elections, it is essential for the appropriate federal officials to work quickly to both understand the nature of the threat and aid the victim's defense.

(U) Although the FBI maintained an ongoing dialogue with the DNC related to the Russian intrusions, the engagement remained at the working level. These interactions continued for months, despite no signs of effective mediation to the problem. In

Director Comey testified that, had he known at the time the seriousness of the problem, he would have "walked over

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

there" himself.

(U) On the other side of the notification process, the Committee found that cyberattack victim organizations did not always grasp the information conveyed by the FBI, even when that information was reasonably clear. As a result of both government- and private-sector failures, Russian intelligence agencies were afforded critical time on breached systems. During this time, extensive amounts of data were stolen for later use as part of Russia's malign influence campaign.

(U) While the DNC failed to handle the intrusions with the level of seriousness it deserved—given the severity and national security implications of the particular intrusion sets—the FBI should have engaged more vigorously at the senior management level. The FBI cannot, and should not, force a victim of a malicious cyber event to take specific remedial measures. However, the FBI should update its internal processes to make it clear that if a victim is neither willing nor able to take remedial measures in the event of a significant national security cyber event, FBI leadership should contact the victim and engage at the leadership level.

(U) One way to implement these procedures is to provide specific guidance to FBI agents conducting victim notifications as to the circumstances under which the agent should elevate the situation. Additionally, if the cyber intrusion is attributed to a foreign government entity and the victim is a political party or campaign, FBI senior management should be responsible for victim engagement immediately.

(U) The Committee therefore recommends that notifications associated with state-sponsored cyberattacks should be conducted as soon as possible, and at the highest levels of the victim organization. If intelligence sources and methods are threatened by dissemination of information, the IC should work with the Department of Homeland Security (DHS) to provide specific recommendations on what actions can be taken by system owners to defend their networks from the state-actor. The DHS and IC should designate personnel and resources to carry out this task and should establish a triage system to prioritize tasking during periods of high demand.

**(U) Recommendation #8: Threats identified by the Intelligence Community to state and local elections infrastructure should be immediately briefed to appropriate state and local officials. When threats are identified, the federal government should conduct an expedited declassification review to ensure that the threat information can reach all**

necessary state and local officials in a timely manner.

(U) The Committee found insufficient information sharing between the federal government and state election officials in 2016 regarding cybersecurity threats to federal elections. The Committee has attempted to address this deficiency in the FY 2018 Intelligence Authorization Act (IAA).

(U) Section 502 of the House-passed IAA would require the Director of National Intelligence (DNI), in coordination with the Undersecretary of Homeland Security for Intelligence and Analysis and the FBI Director, to post on the internet an advisory report on foreign counterintelligence and cybersecurity threats to election campaigns for federal offices.

(U) The provision also allows the FBI and DHS to make available additional information to appropriate representatives of any campaign for federal office if those agencies determine that such campaign is subject to a heightened foreign counterintelligence or cybersecurity threat.

(U) The Committee has seen some recent improvement in this area on a general level. In February 2018, the Office of the Director of National Intelligence, FBI, and DHS held a classified briefing for election officials of all 50 states.

**(U) Recommendation #9: The Secretary of Homeland Security should provide certain designated state and local election officials appropriate security clearances to enable those officials to respond to election-related threats.**

(U) Even if all parties recognize the interest in sharing information, the classification—or even the knowledge of the existence—of a threat may impair timely sharing with state and local election officials. Consistent with the need to protect sources and methods, the Secretary of Homeland Security should provide certain state and local election officials with necessary security clearances in order to share information.

(U) The Senate Select Committee on Intelligence-passed FY 2018 IAA also attempted to address this issue. Specifically, Section 402 of the IAA would require the DNI to support the Under Secretary of Homeland Security for Intelligence and Analysis and any other DHS official in sponsoring a security clearance up to the top secret level for each eligible chief election official of a state. In addition, the DNI may issue interim clearances to a chief election official for the purposes of receiving appropriate classified information regarding cybersecurity threats to election systems.

**(U) Recommendation #10: Significant threats to U.S. elections identified by the Intelligence Community, including cyberattacks directed at political organizations, should be immediately reported to the congressional intelligence committees.**

(U) The House and Senate Intelligence Committees should be informed whenever the IC determines with medium confidence

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

that a significant cyber intrusion or active measures campaign by foreign actors is intended to influence an upcoming election for any federal office. Accordingly, the Committee recommends that the FBI Director, the DNI, and the Secretary of Homeland Security jointly provide a briefing to the Congressional intelligence committees no later than 14 days after a determination of a significant cyber intrusion.

**(U) Recommendation #11: Congress should encourage the adoption of National Institute of Standards and Technology cyber security standards, such as those adopted by the Elections Assistance Commission, by providing federal resources to state and local governments to facilitate such adoption. Funds should be tied to the adoption and certification of elections systems to appropriate standards.**

(U) Election systems are owned and operated by state and local governments. Their acquisition and installation is costly and recapitalization is infrequent.

(U) The federal government largely operates within the limits of establishing voluntary standards through NIST, providing technical assistance and sharing threat information.

(U) NIST is working with state and local election officials to develop further enhancements to election agencies' system security.

(U) The adoption of new standards may involve system replacement, particularly for aging systems. To encourage adoption and in recognition of the federal government's responsibility to protect the nation against foreign threats, the Congress should consider providing significantly more resources to state and local governments. These investments could be tied to appropriate enhancements in election system security.

**(U) Recommendation #12: Congress should consider additional funding for the National Institute of Standards and Technology to enable better outreach to state and local governments.**

(U) With additional resources, NIST could host more frequent engagements around the United States to promote the adoption of new standards and to provide more technical support to state and local officials. Furthermore, separately identifying the budget for this activity within the NIST would further convey the importance of this effort and allow Congress to more closely track progress.

**(U) Recommendation #13: Congress should consider a one-time grant to state and local election agencies to conduct a risk assessment of those agencies' computer systems.**

(U) Because voting is administered at the state and local level, even for federal candidate elections, there is a patchwork of electronic voting systems. In addition, those varied systems are not subject to consistent maintenance and replacement regimes.

(U) Congress should consider allocating

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

funds to be transferred to state and local election agencies to conduct a risk assessment of their systems. Doing this would, the Committee believes, further demonstrate the need for the implementation of the NIST cyber security standards for election agencies.

**(U) Recommendation #14: Congress should consider strengthening the Help America Vote Act of 2002 to ensure that both statewide voter registration and tabulation systems are better protected from foreign cyber threats.**

(U) As noted above, DHS Secretary Jeh Johnson designated U.S. election systems as critical infrastructure on January 6, 2017, which was one day after the release of the classified ICA and the same day as the release of the unclassified version. By labeling election systems as critical infrastructure, DHS can "prioritize cybersecurity assistance" for those who request it, as well as provide election systems the same international legal protections afforded to other critical infrastructure. Implementation of such a designation takes time. As of September 1, 2017, the U.S. Election Assistance Commission reported that the election critical infrastructure subsector plans were progressing, in hopes of finalization in time for the 2018 elections. The Committee applauds this designation because it helps address the threats to the nation's voting infrastructure.

(U) However, as articulated in recent news reports, even with election systems designated as critical infrastructure, the DHS "risk and vulnerability" assessments take time and resources, and there appears to be a lengthy wait list. Therefore, in preparing for the 2018 midterm elections, DHS should continue to work with the states on prioritizing these assessments for election systems – and other stakeholders must do more.

**(U) Recommendation #15: The Department**

**of Homeland Security should provide the owner or operator of any electronic election infrastructure affected by any significant foreign cyber intrusion with a briefing and include steps that may be taken to mitigate such intrusions.**

(U) The Committee found that commercial providers of electronic election infrastructure were not informed of foreign cyber intrusions to their systems. While the IC and federal government may be aware of malicious cyber activity targeting election systems, the information is of little value if appropriate threat information cannot be shared with the owners and operators of affected systems. Accordingly, the Committee recommends that DHS provide a briefing and mitigation steps to the owner or operator of election infrastructure systems targeting by a foreign cyber intrusion.

(U) In addition, DHS has offered state and local governments a network monitoring tool that alerts election system operators about known foreign threats using information obtained by the IC. Not all states have adopted this tool.

**(U) Recommendation #16: State and local governments should be encouraged to establish redundancies that are not dependent on current elections infrastructure, such as a mechanism that retains individual vote records, ensuring the integrity of the vote in the event of a compromise of voting infrastructure due to a foreign cyberattack. An example of such a redundancy is a contemporaneously created paper record reflecting the voter's selections.**

(U) The vulnerability of state and local election infrastructure has been well documented. These systems, which are not frequently updated or replaced, are not developed to defend against state-sponsored cyber threats. The fact that voting machines themselves, as well as tabulation systems, are not directly connected to the internet does not offer adequate security. Rather, it can create a false sense of security.

(U) To help protect the integrity of the process, state and local election authorities should consider building in additional redundancies to ensure an audit trail in the event of a compromise of the electronic voting systems. An example of this is a contemporaneously printed record of votes that is securely stored at the polling place and transported to the relevant election office at the end of Election Day. The Committee is mindful of the reason most jurisdictions replaced the paper ballot, but building in a redundancy using a paper record of a vote will help guard against the potential for manipulation of voting results in the event of a breach of the electronic voting machines.

**(U) Recommendation #17: While it is important to implement lessons learned from the Executive Branch's response, Congress should not hamper the Executive Branch's ability to use discretion in responding to a**

particular foreign threat.

(U) The Executive Branch's response to the 2016 Russian active measures campaign was neither timely nor effective. As discussed above, the Executive Branch did not publicly attribute Russian attempts to hack into various political institutions or compromise emails of U.S. people until October 7, 2016—roughly one month before the 2016 U.S. presidential election. The Executive Branch also waited to issue sanctions against Russia, expel Russian diplomats, and close Russian diplomatic facilities until December 29, 2016. Further, DHS did not designate U.S. election systems as critical infrastructure until January 6, 2017, which was two months after the 2016 U.S. presidential election. While the previous administration made attempts in diplomatic channels to dissuade Russia from its ongoing activities, such attempts apparently fell on deaf ears.

(U) However, despite the fact that the Executive Branch's remedial actions were arguably too little too late, any efforts by Congress to introduce certain legislative "solutions" are misguided. The President is the primary recipient of the intelligence produced by the IC, as well as the individual constitutionally empowered to command the armed forces of the United States. As such, if a foreign government conducts active measures targeting U.S. elections in the future, the Executive Branch should have the ability to craft a response based on the intelligence known at the time of the interference and, if necessary, the readiness of U.S. military forces. These are variables that the Congress cannot possibly anticipate in drafting potential legislation. Therefore, despite potential calls from both Democrats and Republicans to legislate the threshold necessary to trigger attribution or reaction by the President in the wake of foreign hostilities, the Committee urges Congress not to hamper the Executive Branch's role in responding to foreign threats.

**(U) Recommendation #18: Congress should consider repealing the Logan Act.**

(U) Congress passed the Logan Act and President Adams signed it into law on January 30, 1799. Broadly stated, the Logan Act prohibits U.S. citizens to influence any foreign government vis-à-vis any disputes that government may have with the United States. It provides a punishment of a fine and three years' imprisonment.

(U) Over the course of the Act's more-than-200-year history, there has never been a conviction for its violation, and there have only been a handful of indictments that never reached trial.

(U) Despite its demonstrated disuse, the law has gained occasional congressional interest. In 1978, Senator Ted Kennedy unsuccessfully sought to remove the Logan Act. In 1980, Congressman and former House Intelligence Committee Chairman, Anthony Beilenson, introduced legislation to repeal the Logan Act, stating that the primary use of the Logan Act was to provide for "periodic calls for prosecution motivated by

opposition to the cause being expressed instead of actual concern about treason." In 1994, Congress updated the Logan Act by changing the $5,000 fine to "shall be fined under this title."

(U) Due to the lack of prosecutions under the Logan Act and despite the various apparent violations since its passage, Congress should evaluate the law's utility and consider repealing it.

**(U) Recommendation #19: All U.S. presidential campaigns should receive unclassified counterintelligence briefings at an appropriate time prior to a nomination convention.**

(U) During the 2016 U.S. presidential election campaign, candidate Trump and candidate Clinton did not receive a classified intelligence briefing until after their respective nomination conventions. Since 1952, the sitting President typically offers the U.S. presidential candidates classified briefings as a matter of courtesy, but only after the nomination conventions. However, the Committee's investigation found that a counterintelligence briefing before the nomination convention, even at the unclassified level, would be a significant benefit to the candidates and enhance the integrity of the campaign.

(U) U.S. presidential campaigns are a significant target of interest to America's foreign adversaries. It should be expected that various foreign intelligence services will conduct offensive operations to penetrate such campaigns in the hopes of influencing U.S. policy and discourse. Therefore, it is critical that the IC educate presidential campaigns on counterintelligence issues as an important protection measure for campaign operations.

(U) For example, at an appropriate time, the IC could host unclassified counterintelligence training sessions for each campaign. Such training would assist the candidates and campaign leadership in understanding the severity of this issue, and should cover a range of topics, including:

- (U) The intelligence collection process;
- (U) Reasons why foreign intelligence services, generally, would want to penetrate a U.S. presidential campaign;
- (U) How to better secure campaign communications and practice good cyber operational security; and
- (U) Hypothetical examples of suspicious behavior that may warrant questioning or the dismissal of campaign staff.

**(U) Recommendation #20: When consistent with national security, the Intelligence Community should immediately inform U.S. presidential candidates when it discovers a legitimate counterintelligence threat to the campaign, and promptly notify Congress.**

(U) The Committee is not aware of any

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

notification to candidate Trump that the U.S. government conducted counterintelligence investigations of people associated directly or indirectly with the campaign. While the Committee understands and appreciates the IC's reasons for not disclosing such information to protect classified sources and methods, the FBI should have provided candidate Trump some sort of notification, even if it is general and at the unclassified level, that the IC is concerned that a potential counterintelligence threat exists to the campaign.

(U) The DNI should issue an ICD to provide guidance on how and when the IC should notify a U.S. presidential campaign of a legitimate counterintelligence threat. Similar to victim notifications in the cyber context, when the IC has an individual under an active counterintelligence investigation and the IC becomes aware of that individual's affiliation with a U.S. presidential campaign, the IC should have a responsibility to notify the candidate, when consistent with national security. There may be instances where such notifications are not consistent with national security, such as if the candidate himself or herself is under a counterintelligence investigation.

(U) Further, given the sensitivities associated with counterintelligence investigations, if the IC decides that campaign notification is required, the IC should promptly notify Congress of the campaign notification, including the classified details underpinning the counterintelligence threat. Depending on the sensitivity, such notifications can be made to the leadership of the House and Senate, as well as the chair and ranking Members of the House and Senate intelligence committees – known as the Gang of 8.

**(U) Recommendation #21: Both houses of Congress should consider requiring all staff to receive an annual counterintelligence awareness briefing.**

(U) As with presidential campaigns, congressional staff members are targets for foreign intelligence collection. The IC should coordinate, and Congress should consider requiring, an annual counterintelligence briefing for staff.

(U) The briefing should be unclassified, cover both physical and cyber threat awareness, and should emphasize that all staff are targets for foreign intelligence services. The Committee's investigation of the 2016 election demonstrated that many campaign staff members were unaware of their status as a potential target for foreign intelligence services. Congressional staff may also be unaware of the counterintelligence risks associated with their positions. Increasing the awareness of staff—even in an unclassified setting—that they are potential targets would enable them to take precautionary measures and be better prepared to counter the threat.

**Campaign Links to Russia**

**(U) Recommendation #22: Political campaigns and law enforcement should ensure**

**that their counterintelligence defenses appropriately account for the role of cut-outs and intermediaries.**

(U) Russian attempts to influence the American political process, including via intermediaries and cut-outs, did not end on Election Day. The universe of pre- and post-election contacts between Russian intermediaries and Trump associates described in Chapter 4 suggest a sophisticated effort to target unwitting Americans by leveraging existing relationships, interests, and opportunities.[3] Therefore, both U.S. government entities and campaigns in particular must strengthen their defenses against such subversive tactics, beginning with expanding counterintelligence education and training.

(U) The IC should work to provide as much information to campaigns and law enforcement agencies about foreign intelligence agencies' efforts to target them. The Committee is mindful that sensitive counterintelligence issues often involve some of the most highly classified secrets the U.S. government has, but the IC should work to provide some basic training at the unclassified level about foreign adversaries' use of intermediaries.

**(U) Recommendation #23: Congress should consider amending current campaign finance laws to further increase transparency regarding services provided by foreign persons or entities.**

(U) The Committee is concerned that current campaign finance reporting is insufficiently transparent. For example, the DNC and Hillary for America used Perkins Coie, which they billed as "legal services" or "legal and compliance consulting," to finance opposition research by Fusion GPS, which in turn utilized Christopher Steele, a foreign person, to compile the dossier that he created for use against candidate Trump.[4]

(U) Under current federal election law, foreigners are prohibited from making contributions or donations in connection with any campaign in the United States.[5] However, it is not illegal to contract with a foreign person or foreign entity for services, including conducting opposition research on a U.S. campaign, so long as the service was paid for at the market rate.

(U) In light of the use of foreign people and foreign companies for services by the 2016 U.S. presidential election campaigns, the Committee encourages Congress, in consultation with the Federal Election Commission (FEC), to consider whether Congress should amend campaign finance laws to require greater transparency when U.S. campaigns obtain services from foreign persons or entities. Congress should consider whether U.S. campaigns that contract with a foreign person or entity for services should immediately disclose to the FEC a contract with a foreign person or foreign entity, as well as a lengthy summary of the types of services provided by the foreign person or entity.

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET// ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ /NOFORN/

## Intelligence Community Assessment Leaks

(U) Based on the extraordinary number of leaks of classified information over the past year, it is apparent that government officials are not afraid of the criminal penalties for such unauthorized and illegal conduct.

(U) This leaves the Committee with an impression that criminal statutes related to leaks of classified information are not strong enough to deter potential criminal acts of leaking classified information.

(U) Recommendation #24: Each component of the Intelligence Community should update its guidance regarding media contacts to ensure the guidance applies to every employee, including senior officials.

(U) The Committee found significant leaks of classified information around the time of the ICA. The Committee believes many of those leaks were likely from senior officials within the IC. This recommendation is similar to a provision of the FY 2013 Intelligence Authorization Act that expired in early 2014. That provision required a notification to the congressional intelligence committees in the event of an authorized disclosure of classified information to the media or anybody else who had the intent to make the information public.[6] The purpose of the law was to ensure that congressional intelligence committees were informed on a timely basis when there was a disclosure of classified information to the media, and the statute specifically carved

out disclosures made under the Freedom of Information Act, in litigation or administrative proceedings, under executive orders, or to any federal employee with an active security clearance and a need to know.

(U) Recommendation #25: Congress should consider legislation to increase the penalties for unauthorized disclosures of classified information.

(U) To date, based on publicly available information, there have not been any prosecutions of leaks pertaining to the Russian active measures campaign. As evidenced by the lack of leak prosecutions, difficulties often arise in finding a culprit behind leaks of classified information. However, when the Executive Branch is successful in identifying an alleged leaker, there should be no bar to prosecuting that individual. While prosecutors may utilize multiple criminal statutes to prosecute individuals who leak or mishandle national defense information, the construct of the Espionage Act does not lend itself in favor of prosecution and as a sufficient deterrent from individuals breaking the law for their own political purposes. Therefore, Congress should consider legislation to clearly articulate stronger penalties for those individuals who make unauthorized disclosures of classified information to the media.

(U) For example, enactment of Congressman Chris Stewart's bill -- H.R. 3448, the Classified Information Protection Act -- would strengthen the Espionage Act. Unlike

TOP SECRET/ ▓▓▓▓▓▓▓▓▓▓▓ /NOFORN/

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

current unauthorized disclosure statutes which, by virtue of their complexity, create difficulties in building cases, H.R. 3448 clearly prohibits any current or former individual who had lawful access to classified information from knowingly providing such information to a person who is not authorized to access the information. If someone is found guilty under this proposal, the leaker will be fined, imprisoned for up to three years, or both. This legislation originally passed both chambers of Congress in 2000, but President Clinton vetoed the bill. Given the proliferation of leaks, it is essential for Congress to examine amending the Espionage Act to strengthen our laws needed to protect classified information.

(U) Furthermore, given the significant number of leaks and instances of mishandling classified information coming from within the IC in the past several years, Congress should consider ways to strengthen the protection of classified information. This legislation could include requiring the head of a federal agency to suspend the security clearance of an individual who intentionally or recklessly fails to comply with security procedures for handling classified information. The legislation could also provide for the ability of an agency's Inspector General to make recommendations to the President related to potential violations of security procedures by senior agency officials. Finally, the legislation should consider mandating annual training for all individuals with access to classified information on security procedures for handling classified information.

**(U) Recommendation #26: The Executive Branch should consider instituting mandatory polygraphs for all non-confirmed political appointees that have top secret clearances.**

(U) Despite employees in the Executive Branch having extraordinary access to a significant amount of highly classified information, there are very few processes in place to ensure that these individuals handle such information appropriately.

(U) The DNI is responsible for policies and procedures governing "eligibility for access to classified information or eligibility to hold a sensitive position made by any agency." However, pursuant to ICD 704, the DNI delegated the authority to grant access to an IC element's Sensitive Compartmented Information (SCI) and other controlled access program information to the heads of such element. As it relates to the administration of polygraphs during personnel security vetting, the DNI issued Intelligence Community Policy Guidance (ICPG) 704.6.

(U) ICPG 704.6 provides basic instruction as to the types of polygraphs and circumstances by which polygraphs should be administered. While IC elements should have discretion in terms of the timing and circumstances by which to conduct SIPs, every employee not subject to Senate-confirmation that is granted access to TOP SECRET classified information should be

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

subject to at least a counterintelligence scope polygraph (CSP). As a result, the DNI should revise ICD 704 and ICPG 704.6 to specifically reflect this requirement.

---

1. 50 U.S.C. § 1804.
2. 50 U.S.C. § 1801.
3. HPSCI, "Russian Active Measures During the 2016 Election Campaign," May 23, 2017, pp. 31-32.
4. Campaign Legal Center and Catherine Hinckley Kelley v. Democratic National Committee and Hillary for America, "Complaint," Federal Election Commission, www.campaignlegalcenter.org/document/fec-complaint-hillary-america-dnc-failure-disclose, Oct. 25, 2017.
5. 52 U.S.C. § 30121; 11 CFR 110.20.
6. Pub. L. No. 112-277, § 504 (2013).