Exhibit 49

# A Second Look at the Steele Dossier

**by John Sipher**

September 6, 2017

**[Editor's Note: In this special Just Security article, highly respected former member of the CIA's Senior Intelligence Service, John Sipher examines the Steele dossier using methods that an intelligence officer would to try to validate such information. Sipher concludes that the dossier's information on campaign collusion is *generally credible* when measured against standard Russian intelligence practices, events subsequent to Steele's reporting, and information that has become available in the nine months since Steele's final report. The dossier, in Sipher's view, is not without fault, including factual inaccuracies. Those errors, however, do not detract from an overarching framework that has proven to be ever more reliable as new revelations about potential Trump campaign collusion with the Kremlin and its affiliates has come to light in the nine months since Steele submitted his final report.]**

*　　　　*　　　　*

Recent revelations of Trump campaign connections to Russia have revived interest in the so-called Steele Dossier.  The dossier is composed of a batch of short reports produced between June and December 2016 by Orbis Business Intelligence, a London-based firm specializing in commercial intelligence for government and private-sector clients.  The collection of Orbis reports caused an uproar when it was published online by the US website BuzzFeed, just ten days before Donald Trump's inauguration.  Taken together, the series of reports painted a picture of active collusion between the Kremlin and key Trump campaign officials based on years of Russian intelligence work against Trump and some of his associates.  This seemed to complement general statements from US intelligence officials about Russia's active efforts to undermine the US election.  The greatest attention was paid to the first report, which conveyed salacious claims about Trump consorting with prostitutes in Moscow in 2013.  Trump himself publicly refuted the story, while Trump associates denied reported details about their engagement with Russian officials.  A lot of ink and pixels were also spent on the question whether it was appropriate for the media to publish the dossier. The furor quickly passed, the next news cycle came, and the American media has been largely reluctant to revisit the report over the months since.

Almost immediately after the dossier was leaked, media outlets and commentators pointed out that the material was unproven. News editors affixed the terms "unverified" and "unsubstantiated" to all discussion of the issue in the responsible media. Political supporters of President Trump simply tagged it as "fake news." Riding that wave, even legendary Washington Post reported Bob Woodward characterized the report as "garbage."

For professional investigators, however, the dossier is by no means a useless document. Although the reports were produced episodically, almost erratically, over a five-month period, they present a coherent narrative of collusion between the Kremlin and the Trump campaign. As a result, they offer an overarching framework for what might have happened based on individuals on the Russian side who claimed to have insight into Moscow's goals and operational tactics. Until we have another more credible narrative, we should do all we can to examine closely and confirm or dispute the reports.

Many of my former CIA colleagues have taken the Orbis reports seriously since they were first published. This is not because they are not fond of Trump (and many admittedly are not), but because they understand the potential plausibility of the reports' overall narrative based on their experienced understanding of both Russian methods, and the nature of raw intelligence reporting. Immediately following the BuzzFeed leak, one of my closest former CIA colleagues told me that he recognized the reports as the obvious product of a former Secret Intelligence Service (SIS) officer, since the format, structure, and language mirrored what he had seen over a career of reading SIS reports provided to CIA in liaison channels. He and others withheld judgment about the veracity of the reports, but for the reasons I outline further below they did not reject them out of hand. In fact, they were more inclined for professional reasons to put them in the **"trust but verify"** category.

So how should we unpack the so-called Steele dossier from an intelligence perspective?

I spent almost thirty years producing what CIA calls "raw reporting" from human agents. At heart, this is what Orbis did. They were not producing finished analysis, but were passing on to a client distilled reporting that they had obtained in response to specific questions. **The difference is crucial, for it is the one that American journalists routinely fail to understand**. When disseminating a **raw** intelligence report, an intelligence agency is not vouching for the accuracy of the information provided by the

report's sources and/or subsources. Rather it is claiming that it has made strenuous efforts to validate that it is reporting accurately what the sources/subsources claim has happened. The onus for sorting out the veracity and for putting the reporting in context against other reporting – which may confirm or deny the new report – rests with the intelligence community's professional analytic cadre. In the case of the dossier, Orbis was not saying that everything that it reported was accurate, but that it had made a good-faith effort to pass along faithfully what its identified insiders said was accurate. This is routine in the intelligence business. And this form of reporting is often a critical product in putting together more final intelligence assessments.

In this sense, the so-called Steele dossier is not a dossier at all. A dossier suggests a summary or case history. Mr. Steele's product is not a report delivered with a bow at the end of an investigation. Instead, it is a series of contemporaneous raw reports that do not have the benefit of hindsight. Among the unnamed sources are "a senior Russian foreign ministry official," "a former top-level intelligence officer still active inside the Kremlin," and "a close associate of Republican U.S. presidential candidate Donald Trump." Thus, the reports are not an attempt to connect the dots, but instead an effort to uncover new and potentially relevant dots in the first place.

### What's most relevant in the Orbis reports?

Let me illustrate what the reports contain by unpacking the first and most notorious of the seventeen Orbis reports, and then move to some of the other ones. The first 2 ½ page report was dated June 20, 2016 and entitled "Company Intelligence Report 2016/080." It starts with several summary bullets, and continues with additional detail attributed to sources A-E and G (there may be a source F but part of the report is blacked out). The report makes a number of explosive claims, all of which at the time of the report were unknown to the public.

Among other assertions, three sources in the Orbis report describe a multi-year effort by Russian authorities to cultivate, support and assist Donald Trump. According to the account, the Kremlin provided Trump with intelligence on his political primary opponents and access to potential business deals in Russia. Perhaps more importantly, Russia had offered to provide potentially compromising material on Hillary Clinton, consisting of bugged conversations during her travels to Russia, and evidence of her viewpoints that contradicted her public positions on various issues.

The report also alleged that the internal Russian intelligence service (FSB) had developed potentially compromising material on Trump, to include details of "perverted sexual acts" which were arranged and monitored by the FSB. Specifically, the compromising material, according to this entry in the report, included an occasion when Trump hired the presidential suite at a top Moscow hotel which had hosted President and Mrs. Obama, and employed prostitutes to defile the bed where the President had slept. Four separate sources also described "unorthodox" and embarrassing behavior by Trump over the years that the FSB believed could be used to blackmail the then presidential candidate.

The report stated that Russian President Putin was supportive of the effort to cultivate Trump, and the primary aim was to sow discord and disunity within the U.S. and the West. The dossier of FSB-collected information on Hillary Clinton was managed by Kremlin chief spokesman Dimitry Peskov.

Subsequent reports provide additional detail about the conspiracy, which includes information about cyber-attacks against the U.S. They allege that Paul Manafort managed the conspiracy to exploit political information on Hillary Clinton in return for information on Russian oligarchs outside Russia, and an agreement to "sideline" Ukraine as a campaign issue. Trump campaign operative Carter Page is also said to have played a role in shuttling information to Moscow, while Trump's personal lawyer, Michael Cohen, reportedly took over efforts after Manafort left the campaign, personally providing cash payments for Russian hackers. In one account, Putin and his aides expressed concern over kick-backs of cash to Manafort from former Ukrainian President Viktor Yanukovych, which they feared might be discoverable by U.S. authorities. The Kremlin also feared that the U.S. might stumble onto the conspiracy through the actions of a Russian diplomat in Washington, Mikhail Kalugin, and therefore had him withdrawn, according to the reports.

In late fall 2016, the Orbis team reported that a Russian-supported company had been "using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct 'altering operations' against the Democratic Party leadership." Hackers recruited by the FSB under duress were involved in the operations. According to the report, Michael Cohen insisted that payments be made quickly and discreetly, and that cyber operators should go to ground and cover their tracks.

**Assessing the Orbis reports**

Case 0:17-cv-60426-UU   Document 214-53   Entered on FLSD Docket 09/21/2018   Page 6 of 16

What should be made of these leaked reports with unnamed sources on issues that were deliberately concealed by the participants?  Honest media outlets have reported on subsequent events that appear to be connected to the reports, but do not go too far with their analysis, concluding still that the dossier is unverified.  Almost no outlets have reported on the salacious sexual allegations, leaving the public with very little sense as to whether the dossier is true, false, important or unimportant in that respect.

While the reluctance of the media to speculate as to the value of the report is understandable, professional intelligence analysts and investigators do not have the luxury of simply dismissing the information.  They instead need to do all they can to put it into context, determine what appears credible, and openly acknowledge the gaps in understanding so that collectors can seek additional information that might help make sense of the charges.

**Step One: Source Validation**

In the intelligence world, we always begin with source validation, focusing on what intelligence professionals call "the chain of acquisition."  In this case we would look for detailed information on (in this order) Orbis, Steele, his means of collection (e.g., who was working for him in collecting information), his sources, their sub-sources (witting or unwitting), and the actual people, organizations and issues being reported on.

Intelligence methodology presumes that perfect information is never available, and that the vetting process involves cross-checking both the source of the information as well as the information itself.  There is a saying among spy handlers, "vet the source first before attempting to vet the source's information."  Information from human sources (the spies themselves) is dependent on their distinct access to information, and every source has a particular lens.  Professional collectors and debriefing experts do not elicit information from a source outside of the source's area of specific access.  They also understand that inaccuracies are inevitable, even if the source is not trying to mislead.  The intelligence process is built upon a feedback cycle that corroborates what it can, and then goes back to gather additional information to help build confidence in the assessment.  The process is dispassionate, unemotional, professional and never ending.

Faced with the raw reports in the Orbis document, how might an intelligence professional approach the jumble of information?

The first thing to examine is Christopher Steele, the author of the reports, and his organization Orbis International.  Are they credible?

Steele was the President of the Cambridge Union at university, and was a career British intelligence officer with service in Moscow, Paris and Afghanistan prior to work as the head of the Russia desk at British intelligence HQS.  While in London he worked as the personal handler of Russian defector Alexander Litvinenko.  He was a respected professional who had success in some of the most difficult intelligence environments.  He retired from SIS in 2009 and started Orbis Business Intelligence along with a former colleague.  Prior to his work on the Russian dossier for Orbis, he was best known for his investigation of the world soccer association (FIFA), which provided direct support to the FBI's successful corruption case.  Steele and Orbis were also known for assisting various European countries in understanding Russian efforts to meddle in their affairs.

Like any private firm, Orbis' ability to remain in business relies on its track record of credibility.   Success for Steele and his colleagues depends on his integrity, reliability, and the firm's reputation for serious work.  In this regard, Steele is putting his reputation and his company's continued existence on the line with each report.  Yes, as with anyone operating in the murky world of intelligence, he could be duped.  Nonetheless, his reputation for handling sensitive Russian espionage operations over the years suggests that he is security conscious and aware of Russian counterintelligence and disinformation efforts.  His willingness to share his work with professional investigative agencies such as the FBI and the British Security Service also suggest that he is comfortable opening his work to scrutiny, and is seen as a serious partner by the best in the business.

The biggest problem with confirming the details of the Steele "dossier" is obvious: we do not know his sources, other than via the short descriptions in the reports.  In CIA's clandestine service, we spent by far the bulk of our work finding, recruiting and validating sources.  Before we would ever consider disseminating an intelligence report, we would move heaven and earth to understand the access, reliability, trustworthiness, motivation and dependability of our source.  We believe it is critical to validate the source before we can validate the reliability of the source's information.  How does the source know about what he/she is reporting?  How did the source get the information?  Who are

his/her sub-sources?  What do we know about the sub-sources?  Why is the source sharing the information?  Is the source a serious person who has taken appropriate measures to protect their efforts?

One clue as to the credibility of the sources in these reports is that Steele shared them with the FBI.  The fact that the FBI reportedly sought to work with him and to pay him to develop additional information on the sources suggest that at least some of them were worth taking seriously.  At the very least, the FBI will be able to validate the credibility of the sources, and therefore better judge the information.  As one recently retired senior intelligence officer with deep experience in espionage investigations quipped, "I assign more credence to the Steele report knowing that the FBI paid him for his research.  From my experience, there is nobody more miserly than the FBI.  If they were willing to pay Mr. Steele, they must have seen something of real value."

**Step Two: Assessing the Substantive Content**

As outsiders without the investigative tools available to the FBI, we can only look at the information and determine if it makes sense given subsequent events and the revelation of additional information.  Mr. Steele did not have the benefit of knowing Mr. Trump would win the election or how events might play out.  In this regard, does any of the information we have learned since June 2016 assign greater or less credibility to the information?  Were the people mentioned in the report real?  Were their affiliations correct?  Did any of the activities reported happen as predicted?

To a large extent, yes.

The most obvious occurrence that could not have been known to Orbis in June 2016, but shines bright in retrospect is the fact that Russia undertook a coordinated and massive effort to disrupt the 2016 U.S. election to help Donald Trump, as the U.S. intelligence community itself later concluded.  Well before any public knowledge of these events, the Orbis report identified multiple elements of the Russian operation including a cyber campaign, leaked documents related to Hillary Clinton, and meetings with Paul Manafort and other Trump affiliates to discuss the receipt of stolen documents.  Mr. Steele could not have known that the Russians stole information on Hillary Clinton, or that they were considering means to weaponize them in the U.S. election, all of which **turned out to be stunningly accurate**.  The U.S. government only published its conclusions in January 2017, with an assessment of some elements in October 2016.  It was also apparently news

to investigators when the New York Times in July 2017 published Don Jr's emails arranging for the receipt of information held by the Russians about Hillary Clinton. How could Steele and Orbis know in June 2016 that the Russians were working actively to elect Donald Trump and damage Hillary Clinton? How could Steele and Orbis have known about the Russian overtures to the Trump Team involving derogatory information on Clinton?

We have also subsequently learned of Trump's long-standing interest in, and experience with Russia and Russians. A February 2017 *New York Times* article reported that phone records and intercepted calls show that members of Trump's campaign and other Trump associates had repeated contacts with senior Russian officials in the year before the election. The *New York Times* article was also corroborated by CNN and Reuters independent reports. And even Russian officials have acknowledged some of these and other repeated contacts. Although Trump has denied the connections, numerous credible reports suggest that both he and Manafort have long-standing relationships with Russians, and pro-Putin groups. In August 2017, CNN reported on "intercepted communications that US intelligence agencies collected among suspected Russian operatives discussing their efforts to work with Manafort...to coordinate information that could damage Hillary Clinton's election prospects" including "conversations with Manafort, encouraging help from the Russians."

We learned that when Carter Page traveled to Moscow in July 2016, he met with close Putin ally and Chairman of the Russian state oil company, Igor Sechin. A later Steele report also claimed that he met with Parliamentary Secretary Igor Divyekin while in Moscow. Renowned investigative journalist Michael Isikoff reported in September 2016 that U.S. intelligence sources confirmed that Page met with both Sechin and Divyekin during his July trip to Russia. What's more, the Justice Department obtained a wiretap in summer 2016 on Page after satisfying a court that there was sufficient evidence to show Page was operating as a Russian agent.

Admittedly, Isikoff's reporting may have relied on Steele himself for that information. Isikoff, however, also reported that U.S. intelligence officials were confident enough in the information received about Page's meeting Russian officials to brief senior members of Congress on it. There are also other indicia that are also consistent with the Orbis report but only developed or discovered later. In early December 2016, Page returned to Moscow where he said he had "the opportunity to meet with an executive from" Sechin's

state oil company. In April 2017, Page confirmed that he met with and passed documents to a Russian intelligence officer in 2013. Court documents include an intercept in April 2013 of conversations between the Russians discussing their effort to recruit Page as "as an intelligence source." A Russian intelligence officer said of Page: "He got hooked on Gazprom ... I don't know, but it's obvious that he wants to earn lots of money ... For now his enthusiasm works for me. I also promised him a lot ... You promise a favor for a favor. You get the documents from him and tell him to go fuck himself." In late December 2016, Sechin's chief of staff, Oleg Erovinkin "who may have been a source for ex-British spy Christopher Steele's Trump dossier," according to multiple reports, was found dead in the back of his car in Moscow.

While the Orbis team had no way to know it, subsequent reports from U.S. officials confirmed that Washington-based diplomat Mikhail Kalugin was an undercover intelligence officer and was pulled out of the Embassy and sent home in summer 2016.

The Orbis documents refer repeatedly to Paul Manafort's "off-the-books" payments from ousted Ukrainian President Viktor Yanukovych's pro-Russian party, and Russian concerns that it may be a vulnerability that could jeopardize the effort. According to the Orbis report, the Russians were concerned about "further scandals involving Manafort's commercial and political role in Russia/Ukraine." And, indeed, there have been further scandals since the Orbis reports were written. Those include Manafort being compelled in June 2017 to register retroactively as a foreign agent of a pro-Russian political parties in Ukraine, and Mueller and New York Attorney Generals' reported investigation of Manafort for possible money laundering and tax evasion linked to Ukrainian ventures.

We do not have any reporting that implicates Michael Cohen in meetings with Russians as outlined in the dossier. However, recent revelations indicate his long-standing relationships with key Russian and Ukrainian interlocutors, and highlight his role in a previously hidden effort to build a Trump tower in Moscow. During the campaign, those efforts included email exchanges with Trump associate Felix Sater explicitly referring to getting Putin's circle involved and helping Trump get elected.

Further, the Trump Administration's effort lift sanctions on Russia immediately following the inauguration seems to mirror Orbis reporting related to Mr. Cohen's promises to Russia, as reported in the Orbis documents. A June 2017 Yahoo News article by Michael Isikoff described the Administration's efforts to engage the State Department about

lifting sanctions "almost as soon as they took office." Their efforts were halted by State
Department officials and members of Congress. Following the inauguration, Cohen was
involved, again with Felix Sater, to engage in back-channel negotiations seeking a means
to lift sanctions via a semi-developed Russian-Ukrainian plan (which also included the
hand delivery of derogatory information on Ukrainian leaders) also fits with Orbis
reporting related to Cohen.

The quid pro quo as alleged in the dossier was for the Trump team to "sideline" the
Ukrainian issue in the campaign. We learned subsequently the Trump platform
committee changed only a single plank in the 60-page Republican platform prior to the
Republican convention. Of the hundreds of Republican positions and proposals, they
altered only the single sentence that called for maintaining or increasing sanctions
against Russia, increasing aid for Ukraine and "providing lethal defensive weapons" to
the Ukrainian military. The Trump team changed the wording to the more benign,
"appropriate assistance."

Consider, in addition, the Orbis report saying that Russia was utilizing hackers to
influence voters and referring to payments to "hackers who had worked in Europe under
Kremlin direction against the Clinton campaign." A January 2017 Stanford study found
that "fabricated stories favoring Donald Trump were shared a total of 30 million times,
nearly quadruple the number of pro-Hillary Clinton shares leading up to the election."
Also, in November, researchers at Oxford University published a report based on analysis
of 19.4 million Twitter posts from early November prior to the election. The report found
that an "automated army of pro-Trump chatbots overwhelmed Clinton bots five to one in
the days leading up to the presidential election." In March 2017, former FBI agent Clint
Watts told Congress about websites involved in the Russian disinformation campaign
"some of which mysteriously operate from Eastern Europe and are curiously led by pro-
Russian editors of unknown financing."

The Orbis report also refers specifically to the aim of the Russian influence campaign "to
swing supporters of Bernie Sanders away from Hillary Clinton and across to Trump,"
based on information given to Steele in early August 2016. It was not until March 2017,
however, that former director of the National Security Agency, retired Gen. Keith
Alexander in Senate testimony said of the Russian influence campaign, "what they were
trying to do is to drive a wedge within the Democratic Party between the Clinton group
and the Sanders group." A March 2017 news report also detailed that Sanders supporter's

social media sites were infiltrated by fake news, originating from "dubious websites and posters linked back to Eastern Europe," that tried to shift them against Clinton during the general election. John Mattes, a former Senate investigator who helped run the online campaign for Sanders, said he was struck by Steele's report. Mattes said, **Steele "was writing in real time about things I was seeing happening in August, but I couldn't articulate until September."** It is important to emphasize here that Steele's source for the change in plan was "an ethnic Russian associate of Republican US presidential candidate Donald Trump [who] discussed the reaction inside his camp."

A slew of other revelations has directly tied many of the key players in the Trump campaign – most notably Paul Manafort, Carter Page, Michael Cohen, and Michael Flynn – who are specifically mentioned in the Orbis reports to Russian officials also mentioned in the reports.  To take one example, the first report says that Kremlin spokesman Dmitry Peskov was responsible for Russia's compromising materials on Hillary Clinton, and now we have reports that Michael Cohen had contacted Peskov directly in January 2016 seeking help with a Trump business deal in Moscow (after Cohen received the email from Trump business associate Felix Sater saying "Our boy can become president of the USA and we can engineer it. I will get all of Putin's team to buy in on this.").  To take another example, the third Orbis report says that Trump campaign manager Paul Manafort was managing the connection with the Kremlin, and we now know that he was present at the June 9, 2016 meeting with Donald Trump, Jr., Russian lawyer Natalia Veselnitskaya and Rinat Akhmetshin, who has reportedly boasted of his ties to and experience in Soviet intelligence and counterintelligence.  According to a recent New York Times story, "Akhmetshin told journalists that he was a longtime acquaintance of Paul J. Manafort."

The Orbis reports chronicle, and subsequent events demonstrate, that the Russian effort evolved over time, adapting to changing circumstances.  When their attack seemed to be having an effect, they doubled down, and when it looked like negative media attention was benefiting Ms. Clinton, they changed tactics.  The Orbis reports detail internal Kremlin frictions between the participants as the summer wore on.  If the dossier is to be believed, the Russian effort may well have started as an anti-Clinton operation, and only became combined with the separate effort to cultivate the Trump team when it appeared Trump might win the nomination.  The Russian effort was aggressive over the summer months, but seemed to back off and go into cover-up mode following the Access Hollywood revelations and the Obama Administration's acknowledgement of Russian interference in the fall, realizing they might have gone too far and possibly benefited

Ms. Clinton. However, when Trump won, they changed again and engaged with Ambassador Kislyak in Washington to get in touch with others in the Trump transition team. As this process unfolded, control of operation on the Russian side passed from the Ministry of Foreign Affairs, to the FSB, and later to the Presidential Administration. It should be noted in this context, that the much-reported meetings with Ambassador Kislyak do not seem to be tied to the conspiracy. He is not an intelligence officer, and would be in the position to offer advice on politics, personalities and political culture in the United States, but would not be asked to engage in espionage activity. It is likewise notable that Ambassador Kislyak receives only a passing reference in the Steele dossier and only having to do with his internal advice on the political fallout in the U.S. in reaction to the Russian campaign.

Of course, to determine if collusion occurred as alleged in the dossier, we would have to know if the Trump campaign continued to meet with Russian representatives subsequent to the June meeting. As mentioned, in February, the New York Times, CNN, and Reuters, reported that members of Trump's campaign and other Trump associates had repeated contacts with senior Russian officials in the year before the election, according to current and former American officials. Subsequent reports cite receipt of intelligence from European security agencies reporting on odd meetings between Trump associates and Russian officials in Europe. And, perhaps the best clue that there might be something to the narrative of meetings in summer 2016 was former CIA Director John Brennan's carefully chosen phrase in front of the Senate intelligence committee about the contacts – "frequently, people who go along a treasonous path do not know they are on a treasonous path until it is too late." This period will likely be the one most closely scrutinized by FBI investigators.

In retrospect, there is even some indication that the salacious sexual allegations should not be dismissed out of hand. Efforts to monitor foreigners and develop compromising material is completely consistent with Russian M.O. I am certain that they have terabytes of film and audio from inside my apartment in Moscow. Putin himself is known to have been implicated in several sex stings to embarrass his rivals, to include the famous broadcast of a clandestinely-acquired sex video to shame then Prosecutor General Yuriy Skuratov.

Perhaps more intriguing, the most explosive charge in the Steele document was the claim that Trump hired prostitutes to defile a bed slept in by former President Obama. The important factor to consider is that Trump did not engage with the prostitutes himself, but instead allegedly sought to denigrate Obama. If there is anything consistent in what we have learned about President Trump, it seems that his policies are almost exclusively about overturning and eradicating anything related to President Obama's tenure. In this sense, he is akin to the ancient Pharaohs, Byzantine and Roman Emperors like Caligula, who sought to obliterate the existence of their predecessors, even destroying and defacing their images. Is it inconceivable that he would get some satisfaction from a private shaming of the former President?

Separate Orbis reports also asserted that Trump himself engaged in unorthodox, perverted sexual behavior over the years that "has provided authorities with enough embarrassing and compromising material on the Republican presidential candidate to be able to blackmail him if they so wished." While it is not worth serious exploration, the notion that Trump might be involved with beautiful young women as alleged in the reports doesn't seem to be much of a stretch. His private life is well documented and litigated, such that it doesn't seem wholly out-of-bounds to tie the reports about his activity in Russia with his history of undue interest in young women. Again, there is no means to independently confirm the information and the media shouldn't try. An intelligence professional or investigator cannot shy away, however, and should try to ascribe some level of confidence in the information as part of the process of validating the various sources and the overall credibility of the reporting. If the specific reports prove untrue, it would cast doubt on other reporting from that source.

In these cases, blackmail does not need to be overt to be useful. Simple knowledge that a potential adversary might have compromising information can influence behavior. Whether or not his subsequent behavior as a candidate and President is consistent with possible overt or subtle blackmail is beyond my ability to assess or the FBI's ability to prove, and is instead for each citizen to ponder. Suffice it to say that Trumps obsequiousness toward Putin, his continued cover-ups, and his irrational acquiescence to Russian interests, often in direct opposition to his own Administration and Party, keep the issue on the table.

On the other hand, there is also information in the Steele reports that appears wrong or questionable. For example, the notion that Steele and his team could develop so many quality sources with direct access to discussions inside the Kremlin is worth serious skepticism. The CIA and other professional intelligence services rarely developed this kind of access despite expending significant resources over decades, according to published accounts. It is also hard to believe that Orbis could have four separate sources reporting on the incident at the Moscow hotel. The reputation of the elite hotel in the center of Moscow depends on the discretion of its staff, and crossing the FSB is not something taken lightly in Russian society. A source that could be so easily identified would be putting themselves at significant risk. Further, additional information in the reports cannot be checked without the tools of a professional investigative service. Of course, since the dossier was leaked, and we do not have additional follow-up reports, we don't know if Orbis would have developed other sources or revised their reporting accordingly as they were able to develop feedback. We also don't know if the 35 pages leaked by BuzzFeed is the entirety of the dossier. I suspect not.

* * *

So, more than a year after the production of the original raw reports, where do we stand?

I think it is fair to say that the report is not "garbage" as several commentators claimed. The Orbis sources certainly got some things right – details that they could not have known prior. Steele and his company appear serious and credible. Of course, the failure of the Trump team to report details that later leaked out and fit the narrative may make the Steele allegations appear more prescient than they otherwise might. At the same time, the hesitancy to be honest about contacts with Russia is consistent with allegations of a conspiracy.

All that said, one large portion of the dossier is crystal clear, certain, consistent and corroborated. Russia's goal all along has been to do damage to America and our leadership role in the world. Also, the methods described in the report fit the Russians to a tee. If the remainder of the report is largely true, Russia has a powerful weapon to help achieve its goal. Even if it is largely false, the Kremlin still benefits from the confusion, uncertainty and political churn created by the resulting fallout. In any regard, the Administration could help cauterize the damage by being honest, transparent and assisting those looking into the matter. Sadly, the President has done the opposite,

ensuring a Russian win no matter what.  In any event, I would suspect the Russians will look to muddy the waters and spread false and misleading information to confuse investigators and public officials.

As things stand, both investigators and voters will have to examine the information in their possession and make sense of it as best they can. Professional investigators can marry the report with human and signals intelligence, they can look at call records, travel records, interview people mentioned in the report, solicit assistance from friendly foreign police and intelligence services, subpoena records and tie it to subsequent events that can shed light on the various details.  We, on the other hand, will have to do our best to validate the information at hand.  Looking at new information through the framework outlined in the Steele document is not a bad place to start.

*Photo Credit: Associated Press*

[*Editor's note*: This article was update to provide additional analysis on Carter Page.]