Exhibit 52

# THE NEW YORKER

# CHRISTOPHER STEELE, THE MAN BEHIND THE TRUMP DOSSIER

*How the ex-spy tried to warn the world about Trump's ties to Russia.*

**By Jane Mayer**



***Audio:*** *Listen to this story. To hear more feature stories, download the Audm app for your iPhone.*

In January, after a long day at his London office, Christopher Steele, the former spy turned private investigator, was stepping off a commuter train in Farnham, where he lives, when one of his two phones rang. He'd been looking forward to dinner at home with his wife, and perhaps a glass of wine. It had been their dream to live in Farnham, a town in Surrey with a beautiful Georgian high street, where they could afford a house big enough to accommodate their four children, on nearly an acre of land. Steele, who is fifty-three, looked much like the other businessmen heading home, except for the fact that he kept his phones in a Faraday bag—a pouch, of military-tested double-grade fabric, designed to block signal detection.

A friend in Washington, D.C., was calling with bad news: two Republican senators, Lindsey Graham and Charles Grassley, had just referred Steele's name to the Department of Justice, for a possible criminal investigation. They were accusing Steele—the author of a secret dossier that helped trigger the current federal investigation into President Donald Trump's possible ties to Russia—of having lied to the very F.B.I. officers he'd alerted about his findings. The details of the criminal referral were classified, so Steele could not know the nature of the allegations, let alone rebut them, but they had something to do with his having misled the Bureau about contacts that he'd had with the press. For nearly thirty years, Steele had worked as a close ally of the United States, and he couldn't imagine why anyone would believe that he had been deceptive. But lying to an F.B.I. officer is a felony, an offense that can be punished by up to five years in prison.

The accusations would only increase doubts about Steele's reputation that had clung to him since BuzzFeed published the dossier, in January, 2017. The dossier painted a damning picture of collusion between Trump and Russia, suggesting that his campaign had "accepted a regular flow of intelligence from the Kremlin, including on his Democratic and other political rivals." It also alleged that Russian officials had been "cultivating" Trump as an asset for five years, and had obtained leverage over him, in part by recording videos of him while he engaged in compromising sexual acts, including consorting with Moscow prostitutes who, at his request, urinated on a bed.

In the spring of 2016, Orbis Business Intelligence—a small investigative-research firm that Steele and a partner had founded, in 2009, after leaving M.I.6, Britain's Secret Intelligence Service—had agreed to do opposition research on Trump's murky relationship with Russia. Under the arrangement, Orbis was a subcontractor working for Fusion GPS, a private research firm in Washington. Fusion, in turn, had been contracted by a law firm, Perkins Coie, which represented both Hillary Clinton's Presidential campaign and the Democratic National Committee. Several months after Steele signed the deal, he learned that, through this chain, his research was being jointly subsidized by the Clinton campaign and the D.N.C. In all, Steele was paid a hundred and sixty-eight thousand dollars for his work.

Steele had spent more than twenty years in M.I.6, most of it focussing on Russia. For three years, in the nineties, he spied in Moscow under diplomatic cover. Between 2006 and 2009, he ran the service's Russia desk, at its headquarters, in London. He was fluent in Russian, and widely considered to be an expert on the country. He'd also advised on nation-building in Iraq. As a British citizen, however, he was not especially knowledgeable about American politics. Peter Fritsch, a co-founder at Fusion who has worked closely with Steele, said of him, "He's a career public-service officer, and in England civil servants haven't been drawn into politics in quite the same way they have here. He's a little naïve about the public square."

And so Steele, on that January night, was stunned to learn that U.S. politicians were calling him a criminal. He told Christopher Burrows, with whom he co-founded Orbis, that the sensation was "a feeling like vertigo." Burrows, in his first public interview on the dossier controversy, recalled Steele telling him, "You have this thudding headache— you can't think straight, you have no appetite, you feel ill." Steele compared it to the

disorientation that he had felt in 2009, when his first wife, Laura, had died, after a long illness, leaving him to care for their three young children.

That night, Burrows said, Steele and his second wife, Katherine, who have been married since 2012, sat in their living room, wondering what would become of them. Would they be financially ruined by legal costs? (In addition to the criminal referral in the U.S., a Russian businessman, Aleksej Gubarev, had filed a libel lawsuit against Steele, saying that the dossier had falsely accused his company of helping the Russian government hack into the Democratic Party's internal e-mail system.) Would Steele end up in a U.S. federal penitentiary? Would a Putin emissary knife him in a dark alley somewhere?

In conversations with friends, Steele said he hoped that in five years he'd look back and laugh at the whole experience. But he tended toward pessimism. No matter how the drama turned out, "I will take this to my grave," he often predicted. A longtime friend of Steele's pointed out to me that Steele was in a singularly unenviable predicament. The dossier had infuriated both Vladimir Putin and Donald Trump by divulging allegedly corrupt dealings between them. "You've got oligarchs running both superpowers," the friend said. "And, incredibly, they both hate this same guy."

Legal experts soon assured Steele that the criminal referral was merely a political stunt. Nevertheless, it marked a tense new phase in the investigation into Trump's alleged ties to Russia. The initial bipartisan support in Congress for a serious inquiry into foreign meddling in America's democracy had given way to a partisan brawl. Trump's defenders argued that Steele was not a whistle-blower but a villain—a dishonest Clinton apparatchik who had collaborated with American intelligence and law-enforcement officials to fabricate false charges against Trump and his associates, in a dastardly attempt to nullify the 2016 election. According to this story line, it was not the President who needed to be investigated but the investigators themselves, starting with Steele. "They're trying to take down the whole intelligence community!" Steele exclaimed one day to friends. "And they're using me as the battering ram to do it."

---

VIDEO FROM THE NEW YORKER

The Absurdity of the Trump-Putin Summit in Helsinki

I t was not the first time that a congressional investigation had been used as a tool for destroying someone's reputation. Whenever a scandal hit Washington, opponents used subpoenas, classified evidence, and theatrical public hearings to spread innuendo, confusion, and lies. Senators Grassley and Graham declined to be interviewed for this article, but in January Grassley, the chairman of the Senate Judiciary Committee, gave a speech on the Senate floor defending the criminal referral. He noted that Steele had drawn on Russian contacts to amass the dossier. "Who was *actually* colluding with Russians?" Grassley asked. "It's becoming more clear."

Democratic members of the committee, who had not been consulted by Republicans about the criminal referral against Steele, were enraged. The California senator Dianne Feinstein, the ranking minority member on the committee, declared that the Republicans' goals were "undermining the F.B.I. and Special Counsel Mueller's investigation" and "deflecting attention" from it. Feinstein said that the criminal referral provided no evidence that Steele had lied, and, she added, "not a single revelation in the Steele dossier has been refuted."

Sheldon Whitehouse, a Democratic senator from Rhode Island, is a former prosecutor who also serves on the Judiciary Committee. "To impeach Steele's dossier is to impeach

Mueller's investigation," he told me. "It's to recast the focus back on Hillary." The Republicans' aim, he believed, was to "create a false narrative saying this is all a political witch hunt."

Indeed, on January 18th, the staff of Devin Nunes, the Republican chairman of the House Intelligence Committee, produced a report purporting to show that the real conspiracy revolved around Hillary Clinton. "The truth," Nunes said, is that Clinton "colluded with the Russians to get dirt on Trump, to feed it to the F.B.I. to open up an investigation into the other campaign." Glenn Kessler, who writes the nonpartisan Fact Checker blog at the Washington *Post*, awarded Nunes's statement four Pinocchios—his rating for an outright lie. "There is no evidence that Clinton was involved in Steele's reports or worked with Russian entities to feed information to Steele," Kessler wrote.

Nonetheless, conservative talk-show hosts amplified Nunes's message. On Fox News, Tucker Carlson denounced Steele as "an intense partisan with passionately left-wing views about American politics," and said, inaccurately, that his "sloppy and reckless" research "appears to form the basis" of the entire Mueller investigation. Sean Hannity charged that Steele's dossier was "claptrap" filled with "Russian lies" that were intended to poison "our own intelligence and law-enforcement network" against Trump. The editorial page of the *Wall Street Journal* accused Steele of turning the F.B.I. into "a tool of anti-Trump political actors." Rush Limbaugh warned his radio listeners, "The battle is between people like us and the Deep State who are trying to keep hidden what they did."

President Trump had mocked "the dirty dossier," suggesting that a "failed spy" had relied on "made-up facts by sleazebag political operatives." But on February 8th the President denounced Steele by name for the first time. "Steele of fraudulent Dossier fame," he tweeted, was "all tied into Crooked Hillary."

Two days later, Burrows, of Orbis, was at his home, in Winchester, southwest of London, struggling to express to me how odd and disturbing it was to have his business partner targeted by the President of the United States. A tight-lipped fifty-nine-year-old who is conservative in politics and in manner, Burrows, like Steele, had spent decades as a British intelligence officer. "This whole thing has been quite surreal," he said. "We are being made into a political football, in U.S. terms, which we really

regret. Chris is being accused of being the heart of some Deep State conspiracy, and he's not even in your state."

Steele's lawyers have advised him not to speak publicly about the controversy, and, because he is a former intelligence officer, much of his life must remain secret. His accusers know this, and, as Senator Whitehouse explained, "they are using selective declassification as a tactic—they use declassified information to tell their side, and then the rebuttal is classified." Both the criminal referral and Nunes's report used secret evidence to malign Steele while providing no means for his defenders to respond without breaching national-security secrets. But interviews with Steele's friends, colleagues, and business associates tell a very different story about how a British citizen became enmeshed in one of America's most consequential political battles.

S teele was born in 1964 in Aden, then the capital of Yemen. His father worked for the U.K.'s national weather service, and had postings overseas and in Great Britain. Steele's family was middle class, but its roots were blue-collar: one of Steele's grandfathers was a Welsh coal miner. An outstanding student, Steele was accepted at Cambridge University in 1982. He soon set his sights on becoming the president of the Cambridge Union, the prestigious debating society. It is such a common path for ambitious future leaders that, according to one former member, its motto should be "The Egos Have Landed." Getting elected president requires shrewd political skills, and Steele secured the position, in part, by muscling the university newspaper, for which he had been writing, into endorsing his candidacy. His jockeying created enemies. One anonymous rival recently told the *Daily Mail* that Steele used to be a "little creep."

Steele was a middle-of-the-road Labour Party supporter, and at the Cambridge Union his allies, known as the Anti-Establishment Faction, were state-schooled, middle-class students. Steele's camp competed against a blue-blooded Establishment Faction and a right-wing Libertarian Faction. His longtime friend, who was part of a like-minded society at Oxford, said, "Almost all of us had come from less posh families, and suffered a bit from the impostor syndrome that made us doubt we belonged there, so we worked many times harder to prove ourselves." He recalled Steele as an "astoundingly diligent" student with "huge integrity," adding, "He just puts the bit in his teeth and charges the hill. He's almost like a cyborg."

Graham Davies, now a well-known public-speaking coach in the U.K., became friends with Steele in the Cambridge Union. He described him as "ultra low-key but ultra high-intensity," adding, "He's a very quiet guy who listens more than he talks, which made him stand out." Davies went on, "Most of us like a bit of the spotlight, but Chris has always been the opposite. That's been part of his integrity. He's quietly in control." Davies, who is a conservative, told me that Steele has many conservative friends. (Steele supported the Labour government of Tony Blair until the Iraq War, but he voted for a local Conservative official in his home county.) "He's not an ideologue," Davies said. "He's got his political views, but he's a pragmatic thinker. Fairness, integrity, and truth, for him, trump any ideology."

Steele is said to be the first president of the Cambridge Union to invite a member of the Palestine Liberation Organization to speak. And he presided over numerous high-profile political debates, including one in which the proposition that President Ronald Reagan's foreign policies had hurt the U.K. carried the house.

Tellingly, none of Steele's old friends seem to remember the first time they met him. Of average height and build, with pleasant features, a clean-cut style of dress, and a cool, neutral gaze, he didn't draw attention to himself. He was a natural candidate to become professionally unnoticeable. Davies, who dines several times a year with Steele and other schoolmates, said, "He's more low-key than Smiley"—the John le Carré character. But, he noted, whenever Steele took on a task "he was like a terrier with a bone—when something needs investigating, he applies the most intense intellect I've ever seen."

Steele graduated in 1986, with a degree in social and political science, and initially thought that he might go into journalism or the law. One day, though, he answered a newspaper ad seeking people interested in working abroad. The advertiser turned out to be M.I.6, which, after a battery of tests, recruited Steele into its Russian-language program. By the time he was in his mid-twenties he was living in Moscow.

Steele worked out of the British Embassy for M.I.6, under diplomatic cover. His years in Moscow, 1990 to 1993, were among the most dramatic in Russian history, a period that included the collapse of the Communist Party; nationalist uprisings in Ukraine, the Caucasus, and the Baltic states; and the dissolution of the Soviet Union. Boris Yeltsin gained ultimate power in Russia, and a moment of democratic promise faded as

the K.G.B.—now called the F.S.B.—reasserted its influence, oligarchs snapped up state assets, and nationalist political forces began to emerge. Vladimir Putin, a K.G.B. operative returning from East Germany, reinvented himself in the shadowy world of St. Petersburg politics. By the time Steele left the country, optimism was souring, and a politics of resentment—against the oligarchs, against an increasing gap between rich and poor, and against the West—was taking hold.

After leaving Moscow, Steele was assigned an undercover posting with the British Embassy in Paris, but he and a hundred and sixteen other British spies had their cover blown by an anonymously published list. Steele came in from the cold and returned to London, and in 2006 he began running its Russia desk, growing increasingly pessimistic about the direction of the Russian Federation.

Steele's already dim view of the Kremlin darkened in November, 2006, when Alexander Litvinenko, a former Russian K.G.B. officer and a Putin critic who had been recruited by M.I.6, suffered an agonizing death in a London hospital, after drinking a cup of tea poisoned with radioactive polonium-210. Moscow had evidently sanctioned a brazen murder in his own country. Steele was put in charge of M.I.6's investigation. Authorities initially planned to indict one suspect in the murder, but Steele's investigative work persuaded them to indict a second suspect as well. Nine years later, the U.K.'s official inquiry report was finally released, and it confirmed Steele's view: the murder was an operation by the F.S.B., and it was "probably approved" by Vladimir Putin.

Steele has never commented on the case, or on any other aspect of his intelligence work, but Richard Dearlove, who led M.I.6 from 1999 to 2004, has described his reputation as "superb." A former senior officer recalls him as "a Russia-area expert whose knowledge I and others respected—he was very careful, and very savvy." Another former M.I.6 officer described him as having a "Marmite" personality—a reference to the salty British spread, which people either love or hate. He suggested that Steele didn't appear to be "going places in the service," noting that, after the Cold War, Russia had become a backwater at M.I.6. But he acknowledged that Steele "knew Russia well," and that running the Russia desk was "a proper job that you don't give to an idiot."

The British Secret Intelligence Service is highly regarded by the United States, particularly for its ability to harvest information from face-to-face sources, rather than from signals intelligence, such as electronic surveillance, as the U.S. often does. British and American intelligence services work closely together, and, while Steele was at M.I.6, British intelligence was often included in the U.S. President's daily-briefing reports. In 2008, Michael Hayden, the C.I.A. director, visited the U.K., and Steele briefed him on Russian developments. The following year, President Obama visited the U.K., and was briefed on a report that Steele had written about Russia. Steve Hall, a former chief of the C.I.A.'s Central Eurasia Division, which includes Russia, the former Soviet states, and the Balkans, told me, "M.I.6 is second only perhaps to the U.S. in its ability to collect intelligence from Russia." He added, "We've always coördinated closely with them because they did such a great job. We're playing in the Yankee Stadium of espionage here. This isn't Guatemala."

In 2008, Steele informed M.I.6 that he planned to leave the service and open a commercial intelligence firm with Burrows. He left in good standing, but his exit was hastened, because M.I.6 regarded his plans as a potential conflict of interest. Launching the business was a risky move: London was filled with companies run by former intelligence officers selling their contacts and inside knowledge. To differentiate itself, Orbis, which opened its office in Mayfair, attempted to exploit Steele's Russian expertise. The strategy appears to have paid off. According to people with knowledge of the company, Orbis grossed approximately twenty million dollars in its first nine years. Steele now drives a Land Rover Discovery Sport, and belongs to a golf club. He also runs a bit, but the feats that kept him in shape while he was a spy—he ran six marathons and twenty-five half-marathons, and competed in a dozen Olympic-length triathlon events—have been replaced by the carrying of a briefcase. His free time is devoted largely to his family, which includes three cats, one of whom not long ago replicated the most infamous allegation in the Steele dossier by peeing on a family member's bed.

Orbis's clients are mostly businesses or law firms representing corporations. Burrows said that although the company has fewer than ten full-time employees, "we're a bit like the bridge on the Starship Enterprise—we're a small group but we manage an enormous ship." To serve its clients, Orbis employs dozens of confidential "collectors" around the world, whom it pays as contract associates. Some of the collectors are

Case 0:17-cv-60426-UU   Document 214-56   Entered on FLSD Docket 09/21/2018   Page 11 of 40

private investigators at smaller firms; others are investigative reporters or highly placed experts in strategically useful jobs. Depending on the task and the length of engagement, the fee for collectors can be as much as two thousand dollars a day. The collectors harvest intelligence from a much larger network of unpaid sources, some of whom don't even realize they are being treated as informants. These sources occasionally receive favors—such as help in getting their children into Western schools —but money doesn't change hands, because it could risk violating laws against, say, bribing government officials or insider trading. Paying sources might also encourage them to embellish.

Steele has not been to Russia, or visited any former Soviet states, since 2009. Unlike some of his former M.I.6 colleagues, he has not been declared persona non grata by Putin's regime, but, in 2012, an Orbis informant quoted an F.S.B. agent describing him as "an enemy of Mother Russia." Steele concluded that it would be difficult for him to work in the country unnoticed. The firm guards the identities of its sources, but it's clear that many Russian contacts can be interviewed elsewhere, and London is the center of the post-Soviet Russian diaspora.

Orbis often performs anti-corruption investigations for clients attempting internal reviews, and helps hedge funds and other financial companies perform due diligence or obtain strategic information. One Orbis client who agreed to talk to me, a Western businessman with interests in Russia and Ukraine, described Steele to me as "very efficient, very professional, and very credible." He said that his company had successfully cross-checked Steele's research with other people, adding, "I don't know anyone who's been critical of his work. His reports are very good. It's an absolute no-brainer that he's just a political target. They're trying to shoot the messenger."

Orbis promises confidentiality, and releases no information on its clientele. Some of its purported clients, such as a major Western oil company, are conventional corporations. Others are controversial, including a London law firm representing the interests of Oleg Deripaska, the billionaire victor of Russia's aluminum wars, a notoriously violent battle. He has been described as Putin's favorite oligarch. Steele's possible financial ties to Deripaska recently prompted Senator Grassley to demand more information from the London law firm. If a financial trail between Deripaska and Orbis can be established, it is likely to raise even more questions about Steele, because Deripaska has

already figured in the Russia investigation, in an unsavory light. Paul Manafort, Trump's former campaign manager, has been accused of defrauding Deripaska's company while working for it in Ukraine. (Manafort has been indicted by Special Counsel Robert Mueller on charges of money laundering and other financial crimes. He has pleaded not guilty.) Even if Steele's rumored work for Deripaska is aboveboard, it illustrates the transition that he has made from the world of government service to the ethically gray world of commerce. Oligarchs battling other oligarchs provide some of the most lucrative work for investigators with expertise in Russia. Orbis maintains that, as long as its activities are limited to providing litigation support for Western law firms acting in Western courts, it is helping to settle disputes in a more civilized way than they would be in Russia. But Steele stepped into a murkier realm when he left M.I.6.

Republican claims to the contrary, Steele's interest in Trump did not spring from his work for the Clinton campaign. He ran across Trump's name almost as soon as he went into private business, many years before the 2016 election. Two of his earliest cases at Orbis involved investigating international crime rings whose leaders, coincidentally, were based in New York's Trump Tower.

Steele's first client after leaving M.I.6 was England's Football Association, which hoped to host the World Cup in 2018, but suspected dirty dealings by the governing body, FIFA. England lost out in its bid to Russia, and Steele determined that the Kremlin had rigged the process with bribes. According to Ken Bensinger's "Red Card," an upcoming book about the scandal, "one of Steele's best sources" informed him that the Deputy Prime Minister, Igor Sechin—now the C.E.O. of the Russian state-controlled oil giant Rosneft—is suspected of having travelled to Qatar "to swap World Cup votes."

Steele appears to have spoken anonymously to the *Sunday Times* of London about the case. An "ex-M.I.6 source" who investigated the bidding process told the paper, "The key thing with Russia was six months before the bid, it got to the point where the country feared the humiliation of being beaten and had to do something. . . . Putin dragged in all sorts of capabilities." He added, "Don't expect me or anyone else to produce a document with Putin's signature saying 'Please, X, bribe Y with this amount in this way.' He's not going to do that."

Case 0:17-cv-60426-UU   Document 214-56   Entered on FLSD Docket 09/21/2018   Page 13 of 40

Steele might have been expected to move on once his investigation of the bidding was concluded. But he had discovered that the corruption at FIFA was global, and he felt that it should be addressed. The only organization that could handle an investigation of such scope, he felt, was the F.B.I. In 2011, Steele contacted an American agent he'd met who headed the Bureau's division for serious crimes in Eurasia. Steele introduced him to his sources, who proved essential to the ensuing investigation. In 2015, the Justice Department indicted fourteen people in connection with a hundred and fifty million dollars in bribes and kickbacks. One of them was Chuck Blazer, a top FIFA official who had embezzled a fortune from the organization and became an informant for the F.B.I. Blazer had an eighteen-thousand-dollar-per-month apartment in Trump Tower, a few floors down from Trump's residence.

Nobody had alleged that Trump knew of any FIFA crimes, but Steele soon came across Trump Tower again. Several years ago, the F.B.I. hired Steele to help crack an international gambling and money-laundering ring purportedly run by a suspected Russian organized-crime figure named Alimzhan Tokhtakhounov. The syndicate was based in an apartment in Trump Tower. Eventually, federal officials indicted more than thirty co-conspirators for financial crimes. Tokhtakhounov, though, eluded arrest, becoming a fugitive. Interpol issued a "red notice" calling for his arrest. But, in the fall of 2013, he showed up at the Miss Universe contest in Moscow—and sat near the pageant's owner, Donald Trump.

"It was as if all criminal roads led to Trump Tower," Steele told friends.

Burrows told me that he and Steele made a pact when they left M.I.6: "We both agreed it was a duty to alert U.K. and allied authorities if we came across anything with national-security dimensions. It comes from a very long government service. We still have that ethos of wanting to do the right thing by our authorities."

By working with law-enforcement authorities on investigations, Steele has kept a foot in his former life. Some critics have questioned the propriety of this. Lindsey Graham recently argued, in the Washington *Post*, "You can be an F.B.I. informant. You can be a political operative. But you can't be both, particularly at the same time."

Burrows said that on several occasions Orbis had warned authorities about major security threats. Three years ago, a trusted Middle Eastern source told Orbis that a

group of ISIS militants were using the flow of refugees from Syria to infiltrate Europe. Orbis shared the information with associates who relayed the intelligence to German security officials. Several months later, when a concert hall in Paris, the Bataclan, was attacked by terrorists, Burrows and Steele felt remorse at not having notified French authorities as well. When Steele took his suspicions about Trump to the F.B.I. in the summer of 2016, it was in keeping with Orbis protocol, rather than a politically driven aberration.

Even before Steele became involved in the U.S. Presidential campaign, he was convinced that the Kremlin was interfering in Western elections. In April of 2016, not long before he took on the Fusion assignment, he finished a secret investigation, which he called Project Charlemagne, for a private client. It involved a survey of Russian interference in the politics of four members of the European Union—France, Italy, the United Kingdom, and Germany—along with Turkey, a candidate for membership. The report chronicles persistent, aggressive political interference by the Kremlin: social-media warfare aimed at inflaming fear and prejudice, and "opaque financial support" given to favored politicians in the form of bank loans, gifts, and other kinds of support. The report discusses the Kremlin's entanglement with the former Italian Prime Minister Silvio Berlusconi and the French right-wing leader Marine Le Pen. (Le Pen and Berlusconi deny having had such ties.) It also suggests that Russian aid was likely given to lesser-known right-wing nationalists in the United Kingdom and elsewhere. The Kremlin's long-term aim, the report concludes, was to boost extremist groups and politicians at the expense of Europe's liberal democracies. The more immediate goal was to "destroy" the E.U., in order to end the punishing economic sanctions that the E.U. and the U.S. had imposed on Russia after its 2014 political and military interference in Ukraine.

Although the report's language was dry, and many of the details familiar to anyone who had been watching Russia closely, Project Charlemagne was the equivalent of a flashing red light. It warned that Russian intelligence services were becoming more strategic and increasingly disruptive. Russian interference in foreign elections, it cautioned, was only "likely to grow in size and reach over time."

I n the spring of 2016, Steele got a call from Glenn Simpson, a former investigative reporter for the *Wall Street Journal* who, in 2011, had left journalism to co-found

Fusion GPS. Simpson was hoping that Steele could help Fusion follow some difficult leads on Trump's ties to Russia. Simpson said that he was working for a law firm, but didn't name the ultimate client.

The funding for the project originally came from an organization financed by the New York investor Paul Singer, a Republican who disliked Trump. But, after it became clear that Trump would win the Republican nomination, Singer dropped out. At that point, Fusion persuaded Marc Elias, the general counsel for the Clinton campaign, to subsidize the unfinished research. This bipartisan funding history belies the argument that the research was corrupted by its sponsorship.

Steele and Simpson had previously worked together, and they shared a mutual fascination with Russian oligarchs and international organized crime. They had symbiotic approaches. Fusion focussed on open-source research—mind-numbing dives into the fine print of public records. Steele's specialty was gathering intelligence from informed sources, many of them Russian.

*The dossier alleges that Putin backed Donald Trump over Hillary Clinton in order to "sow discord and disunity" in America.*

Illustration by Cristiana Couceiro; photographs by Alexei Nikolsky / AFP / Getty (man); Melina Mara / The Washington Post / Getty (woman); Frank Lukasseck / Getty (binoculars)

One question particularly gnawed at Simpson. Why had Trump repeatedly gone to Russia in search of business, yet returned empty-handed? Steele was tantalized, and took the job, thinking that he'd find evidence of a few dodgy deals, and not much else. He evidently didn't consider the danger of poking into a Presidential candidate's darkest secrets. "He's just got blinkers," Steele's longtime friend told me. "He doesn't put his head in the oven so much as not see the oven."

Within a few weeks, two or three of Steele's long-standing collectors came back with reports drawn from Orbis's larger network of sources. Steele looked at the material and, according to people familiar with the matter, asked himself, "Oh, my God—what *is* this?" He called in Burrows, who was normally unflappable. Burrows realized that they had a problem. As Simpson later put it, "We threw out a line in the water, and Moby-Dick came back."

Steele's sources claimed that the F.S.B. could easily blackmail Trump, in part because it had videos of him engaging in "perverted sexual acts" in Russia. The sources said that when Trump had stayed in the Presidential suite of Moscow's Ritz-Carlton hotel, in 2013, he had paid "a number of prostitutes to perform a 'golden showers' (urination) show in front of him," thereby defiling a bed that Barack and Michelle Obama had slept in during a state visit. The allegation was attributed to four sources, but their reports were secondhand—nobody had witnessed the event or tracked down a prostitute, and one spoke generally about "embarrassing material." Two sources were unconnected to the others, but the remaining two could have spoken to each other. In the reports Steele had collected, the names of the sources were omitted, but they were described as "a former top-level Russian intelligence officer still active inside the Kremlin," a "member of the staff at the hotel," a "female staffer at the hotel when TRUMP had stayed there," and "a close associate of TRUMP who had organized and managed his recent trips to Moscow."

More significant, in hindsight, than the sexual details were claims that the Kremlin and Trump were politically colluding in the 2016 campaign. The Russians were described as having cultivated Trump and traded favors with him "for at least 5 years." Putin was described as backing Trump in order to "sow discord and disunity both within the U.S." and within the transatlantic alliance. The report claimed that, although Trump had not signed any real-estate-development deals, he and his top associates had repeatedly accepted intelligence from the Kremlin on Hillary Clinton and other political rivals. The allegations were astounding—and improbable. They could constitute treason even if they were only partly true.

According to people familiar with the matter, as Steele began to assemble the first of seventeen memos, which became the dossier, Burrows expressed reservations about including the golden-showers allegation. He had a cautious temperament, and worried about the impact that the sensational item might have. But Steele argued that it would be dishonest and distorting to cherry-pick details, and that the possibility of a potential American President being subject to blackmail was too important to hide. "That's classic Steele," his longtime friend told me. "He's so straight."

In a fateful decision, Steele chose to include everything. People familiar with the matter say that Steele knew he could either shred the incendiary information or carry on. If he

kept investigating, and then alerted officials who he thought should know about his findings, he feared that his life—and, indeed, the life of anyone who touched the dossier—would never be the same.

At the time, Steele figured that almost nobody would ever see the raw intelligence. The credibility of Steele's dossier has been much debated, but few realize that it was a compilation of contemporaneous interviews rather than a finished product. Orbis was just a subcontractor, and Steele and Burrows reasoned that Fusion could, if it wished, process the findings into an edited report for the ultimate client. So Orbis left it up to Fusion to make the judgment calls about what to leave in, and to decide whether to add caveats and source notes of the kind that accompany most government intelligence reports.

John Sipher spent twenty-eight years as a clandestine officer in the C.I.A., and ran the agency's Russia program before retiring, in 2014. He said of Steele's memos, "This is source material, *not* expert opinion." Sipher has described the dossier as "generally credible," although not correct in every detail. He said, "People have misunderstood that it's a collection of dots, not a connecting of the dots. But it provided the first narrative saying what Russia might be up to." Alexander Vershbow, a U.S. Ambassador to Russia under George W. Bush, told me, "In intelligence, you evaluate your sources as best you can, but it's not like journalism, where you try to get more than one source to confirm something. In the intelligence business, you don't pretend you're a hundred per cent accurate. If you're seventy or eighty per cent accurate, that makes you one of the best."

On June 24, 2016, Steele's fifty-second birthday, Simpson called, asking him to submit the dossier. The previous day, the U.K. had voted to withdraw from the E.U., and Steele was feeling wretched about it. Few had thought that Brexit was possible. An upset victory by Trump no longer seemed out of the question. Steele was so nervous about maintaining secrecy and protecting his sources that he sent a courier by plane to Washington to hand-deliver a copy of the dossier. The courier's copy left the sources redacted, providing instead descriptions of them that enabled Fusion to assess their basic credibility. Steele feared that, for some of his Russian sources, exposure would be a death sentence.

Steele also felt a duty to get the information to the F.B.I. Although Trump has tweeted that the dossier was "all cooked up by Hillary Clinton," Steele approached the Bureau on his own. According to Simpson's sworn testimony to the House Intelligence Committee, Steele told him in June, 2016, that he wanted to alert the U.S. government, and explained, "I'm a former intelligence officer, and we're your closest ally." Simpson testified that he asked to think about it for a few days; when Steele brought it up again, Simpson relented. As Simpson told the Senate Judiciary Committee, "Let's be clear. This was not considered by me to be part of the work we were doing. This was like you're driving to work and you see something happen and you call 911." Steele, he said, felt "professionally obligated to do it." Simpson went along, he testified, because Steele was the "national-security expert," whereas he was merely "an ex-journalist."

The Pulitzer Prize-winning historian David Garrow has questioned Steele's motives in the *Wall Street Journal,* calling him a "paid operative" spreading "partisan gossip." He told me that Steele's whistle-blowing seemed "self-dramatizing," adding, "We see Steele viewing himself as a historically important person. He believes he has unique knowledge that he must warn the world about." As a historian who has written critically about the F.B.I.'s persecution of Martin Luther King, Jr., Garrow is troubled by Steele's zealousness. "In this secret-agent world, there's a desire to maximize their importance," Garrow said. "It's as if all these guys wanted to play themselves in the movies."

But Mark Medish, a former director of Russian affairs at the National Security Council, told me that "if Steele had not shared his findings, he might have been accused of dereliction or a coverup." He added, "It takes courage to deliver bad news, particularly when the stakes are so high." And Senator Whitehouse described Steele's actions as akin to warning the F.B.I. about a "physical detonation of some sort," noting, "If it had gone off, and he or the F.B.I. had ignored it, heads would roll."

Regardless of what others might think, it's clear that Steele believed that his dossier was filled with important intelligence. Otherwise, he would never have subjected it, his firm, and his reputation to the harsh scrutiny of the F.B.I. "I'm impressed that he was willing to share it with the F.B.I.," Sipher said. "That gives him real credibility to me, the notion that he'd give it to the best intelligence professionals in the world."

Case 0:17-cv-60426-UU    Document 214-56    Entered on FLSD Docket 09/21/2018    Page 19 of
40

On July 5, 2016, Steele went to his London office and met with the F.B.I. agent with whom he'd worked on the FIFA case. The agent responded to the first memo in the dossier, Steele has said, with "shock and horror." Simpson knew that Steele had informed the F.B.I., but he has said that, amid the tumult of the 2016 campaign, it more or less slipped his mind. (In testimony before the Senate Judiciary Committee, he recalled asking himself, "I wonder what the F.B.I. did? Whoops—haven't heard from them.") As the summer went on, there was little indication that the F.B.I. was paying much attention, either.

For all the Republicans' talk of a top-down Democratic plot, Steele and Simpson appear never to have told their ultimate client—the Clinton campaign's law firm—that Steele had gone to the F.B.I. Clinton's campaign spent much of the summer of 2016 fending off stories about the Bureau's investigation into her e-mails, without knowing that the F.B.I. had launched a counter-intelligence investigation into the Trump team's ties to Russia—one fuelled, in part, by the Clinton campaign's own opposition research. As a top Clinton-campaign official told me, "If I'd *known* the F.B.I. was investigating Trump, I would have been shouting it from the rooftops!"

At virtually the same time that Steele told the F.B.I. about Russia's interference in the 2016 Presidential campaign, the Kremlin was engaged—without his knowledge—in at least two other schemes to pass compromising information about Hillary Clinton to Trump's inner circle.

The first scheme involved the Trump foreign-policy adviser George Papadopoulos. In April, 2016, over drinks with an Australian diplomat at a London bar, he divulged that Russia had access to thousands of Clinton e-mails. The diplomat informed his supervisors of this bizarre-sounding claim, but Papadopoulos was young and inexperienced, and the Australians didn't give it much weight.

The second scheme unfolded at Trump Tower in New York. On June 9, 2016, top members of Trump's campaign—including Donald Trump, Jr., Paul Manafort, and Jared Kushner—had a private meeting on the twenty-fifth floor with Natalia Veselnitskaya, a Russian lawyer. The attendees had been promised that she would present them with dirt Moscow had collected on Hillary Clinton. The meeting was set up after Donald, Jr., was approached by an emissary close to the Agalarov family— Azerbaijani oligarchs with whom Trump had partnered on the 2013 Miss Universe

pageant, in Moscow. In an e-mail, the emissary promised Donald, Jr., that the documents "would incriminate Hillary and her dealings with Russia and would be very useful to your father," and described this gift as "part of Russia and its government's support for Mr. Trump." Instead of going to the F.B.I., as Steele had, Trump's older son responded giddily to the e-mail: "If it's what you say I love it especially later in the summer."

Donald, Jr., and the other participants insist that nothing of consequence happened at the Trump Tower meeting: Veselnitskaya expressed frustration with U.S. sanctions on Russia, but offered no information on Clinton. A number of former intelligence officers, however, believe that the meeting, which happened soon after Papadopoulos's encounter with the Australian diplomat, enhances the dossier's credibility. John McLaughlin, the deputy director of the C.I.A. from 2000 until 2004, told me, "I haven't formed a final thought, but clearly parts of it are starting to resonate with what we know to be true about the Russians' willingness to deliver information harmful to Hillary Clinton."

Furthermore, Steele's dossier had highlighted the Agalarov family's connection with Trump. Ten months before the *Times* reported on the Trump Tower meeting, exposing the role of the Agalarov family's emissary in setting it up, one of Steele's memos had suggested that an "Azeri business associate of Trump, Araz AGALAROV, will know the details" of "bribes" and "sexual activities" that Trump had allegedly engaged in while visiting St. Petersburg. (A lawyer for the Agalarovs denies these claims.)

On June 14, 2016, five days after the Trump Tower meeting, the Washington *Post* broke the news that the Russians were believed to have hacked into the Democratic National Committee's e-mail system. The first reports were remarkably blasé. D.N.C. officials admitted that they had learned about the hack months earlier. (It later surfaced that in November of 2014 Dutch intelligence officials had provided U.S. authorities with evidence that the Russians had broken into the Democratic Party's computer system. U.S. officials reportedly thanked the Dutch for the tip, sending cake and flowers, but took little action.) When the infiltration of the D.N.C. finally became public, various officials were quoted as saying that the Russians were always trying to penetrate U.S. government systems, and were likely just trying to understand American politics better.

The attitudes of Democratic officials changed drastically when, three days before the start of the Democratic National Convention in Philadelphia, WikiLeaks dumped twenty thousand stolen D.N.C. e-mails onto the Internet. The e-mails had been weaponized: what had seemed a passive form of spying was now "an active measure," in the parlance of espionage. The leaked e-mails, some of which suggested that the D.N.C. had secretly favored Clinton's candidacy over that of Bernie Sanders, appeared just when the Party was trying to unify its supporters. The Party's chair, Debbie Wasserman Schultz, was forced to resign, and recriminations and demonstrations disrupted the Convention.

MORE FROM THIS ISSUE

## MARCH 12, 2018

BRIEFLY NOTED

Briefly Noted Book Reviews

THE SPORTING SCENE

Are You Curling-Curious?

**By David Owen**

SHOUTS & MURMURS

TV Guide for Your Time at the Gym

**By Alex Watt**

FICTION

"The F Husba

**By Jose**

Trump's response was exultant. He said, "If it is Russia—which it's probably not, nobody knows who it is—but if it is . . . Russia, if you're listening, I hope you're able to find the thirty thousand e-mails that are missing. I think you will probably be rewarded mightily by our press." His campaign later described these comments as a joke.

At this point, a Clinton foreign-policy adviser, Laura Rosenberger, who had held various positions at the National Security Council and at the State Department during the Bush and Obama Administrations, grew seriously alarmed. She'd already noticed that Trump had pro-Russian positions on many issues, which seemed to her to be inexplicably outside the Republican mainstream. She'd also been struck by Trump's hiring of Paul Manafort, who had worked as a political consultant for pro-Kremlin forces in Ukraine. Trump's team then appeared to play a role in modifying the G.O.P. platform so that it better reflected Russia's position on Ukraine policy. "It was all

beginning to snowball," she told me. "And then, with the e-mail leaks, it was, like, 'Oh, fuck'—excuse my French—'we are under attack!' That was the moment when, as a national-security adviser, you break into sweats."

Rosenberger, meanwhile, had no idea that the Clinton campaign had indirectly employed a Russia expert: Steele. Orbis's work was sealed off, behind a legal barrier. Marc Elias, the attorney at Perkins Coie who was serving as the Clinton campaign's general counsel, acted as a firewall between the campaign and the private investigators digging up information on Trump. It's a common practice for law firms to hire investigators on behalf of clients, so that any details can be protected by attorney-client privilege. Fusion briefed only Elias on the reports. Simpson sent Elias nothing on paper—he was briefed orally. Elias, according to people familiar with the matter, was flabbergasted by the dossier but wasn't sure what to do with the allegations. "Sex stuff is kind of worthless in a campaign," Simpson told me. In the absence of live accusers or documentary evidence, such material is easy to dismiss, and can make the purveyor look sleazy.

At the same time, the financial machinations described in Steele's reports were complex, and difficult to confirm: "YANUKOVYCH had confided in PUTIN that he did authorise and order substantial kick-back payments to MANAFORT as alleged but sought to reassure him that there was no documentary trail left behind." (Manafort has denied this.) Elias broadly summarized some of the information to top campaign officials, including the campaign manager, Robby Mook, but Elias found much of the Kremlinology abstruse. He was more interested in finding actionable intelligence on the people who had exfiltrated the Democrats' internal e-mails, and how to stop them.

Mook told me, "The problem with the Russia story is that people just weren't buying it. Today, it's, like, 'Of course!' But back then people thought that we were just desperately peddling conspiracy theories." After the D.N.C.'s e-mails were hacked, Mook went on TV talk shows and pointed the finger at Russia, but, he says, his comments were often dismissed as "spin." On Jake Tapper's "State of the Union," he declared, "What's disturbing to us is that experts are telling us that Russian state actors broke into the D.N.C., stole these e-mails, and other experts are now saying that the Russians are releasing these e-mails for the purpose of actually helping Donald Trump." Tapper then interviewed Donald Trump, Jr., who ridiculed Mook's accusation as "disgusting" and

"phony"—even though it's now known that, just a few weeks earlier, he had met at Trump Tower with a Russian offering dirt on Clinton.

That summer, Steele noticed a few small news items further connecting Trump's circle to Russia. On July 7, 2016, two days after Steele met in London with the F.B.I., Carter Page, a Trump foreign-policy adviser, travelled to Moscow, on a campaign-approved visit, and delivered a lecture at the prestigious New Economic School. Page's remarks were head-turning. He criticized "Washington and other Western capitals" for "their often hypocritical focus on ideas such as democratization, inequality, corruption, and regime change."

Page was an odd choice for Trump. In New York in 2013, two Russian intelligence operatives had attempted to recruit Page, an oil-industry consultant, although wiretaps revealed that one of the operatives had described him as an "idiot." The F.B.I. later indicted the two Russian spies, and warned Page that the Kremlin was trying to recruit him, but he continued to pursue oil-and-gas deals in Russia. Ian Bremmer, the president of the Eurasia Group, a risk-consulting firm where Page had previously worked, said that Page had become a pro-Kremlin "wackadoodle."

Steele didn't know it, but U.S. authorities were independently monitoring Page. According to the recently released report by the Democratic minority on the House Intelligence Committee, the F.B.I. had interviewed Page about his contacts with Russian officials in March, 2016—the same month that Trump named him an adviser.

When Page gave his Moscow lecture, he declined to answer questions from the audience about whether he would be meeting Russian officials. Soon afterward, Steele filed another memo to Fusion, alleging that Page had indeed met with Russians close to Putin, as part of an ongoing effort by the Russians to cultivate sympathetic Trump aides. Steele's sources claimed that one person Page had met with was Igor Sechin, the C.E.O. of the oil giant Rosneft. Sechin had purportedly proposed to Page increasing U.S.-Russian energy coöperation in exchange for lifting the Ukraine-related sanctions on Russia. Page, the dossier said, had "reacted positively" but had been "non-committal." (Rosneft declined to comment. Page told me, "Steele got everything wrong as it relates to me.")

A subsequent Steele memo claimed that Sechin was so eager to get U.S. sanctions lifted that, as an incentive, he offered Page the opportunity to help sell a stake of Rosneft to investors. Steele's memo also alleged that while Page was in Russia he met with a top Kremlin official, Igor Diveykin, who floated the idea of leaking Russian *kompromat* on Clinton, in order to boost Trump's candidacy. According to Steele's memos, the damaging material on Clinton was political, not personal, and had been gathered partly from Russian intercepts.

Page has denied any wrongdoing. In a congressional interview in November, 2017, he initially said that he had not met with any Russian officials during his July trip. But, according to the Democrats' recent Intelligence Committee report, when Page was confronted with evidence he was "forced to admit" that he had met with a top Kremlin official, after all, as well as with a Rosneft executive—Sechin's close associate Andrey Baranov. The dossier may or may not have erred in its naming of specific officials, but it was clearly prescient in its revelation that during the Presidential campaign a covert relationship had been established between Page and powerful Russians who wanted U.S. sanctions lifted. Trump and his advisers have repeatedly denied having colluded with Russians. But, in Steele's telling, the Russians were clearly offering Trump secret political help.

Steele's memos describe two other Trump advisers as sympathetic to Russia: Paul Manafort, then the campaign manager, and Michael Flynn, an adviser whom Trump later appointed his national-security adviser. Flynn resigned from that post almost immediately, after it was revealed that he had engaged in conversations with the Russian Ambassador, Sergey Kislyak, about U.S. sanctions that Obama had imposed before leaving office. Flynn has become a central figure in Mueller's investigation, having pleaded guilty to lying to the F.B.I. about his conversations with Kislyak.

On July 26, 2016, after WikiLeaks disseminated the D.N.C. e-mails, Steele filed yet another memo, this time claiming that the Kremlin was "behind" the hacking, which was part of a Russian cyber war against Hillary Clinton's campaign. Many of the details seemed far-fetched: Steele's sources claimed that the digital attack involved agents "within the Democratic Party structure itself," as well as Russian émigrés in the U.S. and "associated offensive cyber operators."

Neither of these claims has been substantiated, and it's hard to imagine that they will be. But one of the dossier's other seemingly outlandish assertions—that the hack involved "state-sponsored cyber operatives working in Russia"—has been buttressed. According to Special Counsel Mueller's recent indictment of thirteen Russian nationals, Kremlin-backed operatives, hiding behind fake and stolen identities, posed as Americans on Facebook and Twitter, spreading lies and fanning ethnic and religious hatred with the aim of damaging Clinton and helping Trump. The Kremlin apparently spent about a million dollars a month to fund Internet trolls working round-the-clock shifts in a run-down office building in St. Petersburg. Their tactics were similar to those outlined in Steele's Charlemagne investigation, including spreading falsehoods designed to turn voters toward extremism. The Russian operation also involved political activism inside the U.S., including the organizing of bogus pro-Trump rallies.

In England, Steele kept cranking out memos, but he was growing anxious about the lack of response from the F.B.I. As the summer wore on, he confided in an American friend, Jonathan Winer, a Democratic lawyer and foreign-policy specialist who was working at the State Department. Steele told him that Orbis sources had come across unsettling information about Trump's ties to Russia. Winer recalls Steele saying that he "was more certain of it than about any information he'd gotten before in his life." Winer told me, "Chris was deeply disturbed that the Kremlin was infecting our country. By hacking our computers and using WikiLeaks to disseminate the information—it was an infection. He thought it would have really bad consequences for the U.S. and the U.K., for starters. He thought it would destabilize these countries. He wanted the U.S. government to know. He's a very institution-oriented person."

During the previous two years, Steele had been sending Winer informal reports, gratis, about raw intelligence that he'd picked up on Ukraine and related areas while working for commercial clients. Winer, who encouraged Steele to keep sending the reports, estimated that he had received more than a hundred and twenty of them by 2016. He and others at the State Department found the research full of insights. Winer recalls Victoria Nuland, the top official overseeing U.S. policy on Russia, expressing surprise at how timely Steele's reports were. A former top State Department official who read them said, "We found the reports about eighty per cent consistent with other sources we had. Occasionally, his sources appeared to exaggerate their knowledge or influence.

But Steele also highlighted some players and back channels between Russia and Ukraine who became important later. So the reports had value."

In September, 2016, Steele briefed Winer on the dossier at a Washington hotel. Winer prepared a two-page summary and shared it with a few senior State Department officials. Among them were Nuland and Jon Finer, the director of policy planning and the chief of staff to Secretary of State John Kerry. For several days, Finer weighed whether or not to burden Kerry with the information. He'd found the summary highly disturbing, but he didn't know how to assess its claims. Eventually, he decided that, since others knew, his boss should know, too.

When Kerry was briefed, though, he didn't think there was any action that he could take. He asked if F.B.I. agents knew about the dossier, and, after being assured that they did, that was apparently the end of it. Finer agreed with Kerry's assessment, and put the summary in his safe, and never took it out again. Nuland's reaction was much the same. She told Winer to tell Steele to take his dossier to the F.B.I. The so-called Deep State, it seems, hardly jumped into action against Trump.

"No one wanted to touch it," Winer said. Obama Administration officials were mindful of the Hatch Act, which forbids government employees to use their positions to influence political elections. The State Department officials didn't know who was funding Steele's research, but they could see how politically explosive it was. So they backed away.

Steele believed that the Russians were engaged in the biggest electoral crime in U.S. history, and wondered why the F.B.I. and the State Department didn't seem to be taking the threat seriously. Likening it to the attack on Pearl Harbor, he felt that President Obama needed to make a speech to alert the country. He also thought that Obama should privately warn Putin that unless he stopped meddling the U.S. would retaliate with a cyberattack so devastating it would shut Russia down.

Steele wasn't aware that by August, 2016, a similar debate was taking place inside the Obama White House and the U.S. intelligence agencies. According to an article by the Washington *Post*, that month the C.I.A. sent what the paper described as "an intelligence bombshell" to President Obama, warning him that Putin was directly involved in a Russian cyber campaign aimed at disrupting the Presidential election—

and helping Trump win. Robert Hannigan, then the head of the U.K.'s intelligence service the G.C.H.Q., had recently flown to Washington and briefed the C.I.A.'s director, John Brennan, on a stream of illicit communications between Trump's team and Moscow that had been intercepted. (The content of these intercepts has not become public.) But, as the *Post* noted, the C.I.A.'s assessment that the Russians were interfering specifically to boost Trump was not yet accepted by other intelligence agencies, and it wasn't until days before the Inauguration that major U.S. intelligence agencies had unanimously endorsed this view.

In the meantime, the White House was unsure how to respond. Earlier this year, at the Council on Foreign Relations, former Vice-President Joe Biden revealed that, after Presidential daily briefings, he and Obama "would sit there" and ask each other, "What the hell are we going to do?" The U.S. eventually sent a series of stern messages to the Russians, the most pointed of which took place when Obama pulled Putin aside on September 5th, at a G20 summit in China, and reportedly warned him, "Better stop, or else."

But Obama and his top advisers did not want to take any action against Russia that might provoke a cyber war. And because it was so close to the election, they were wary about doing anything that could be construed as a ploy to help Clinton. All along, Trump had dismissed talk of Russian interference as a hoax, claiming that no one really knew who had hacked the D.N.C.: it could have been China, he said, or a guy from New Jersey, or "somebody sitting on their bed that weighs four hundred pounds." Trump had also warned his supporters that the election would be rigged against him, and Obama and his top aides were loath to further undermine the public's faith.

In early September, 2016, Obama tried to get congressional leaders to issue a bipartisan statement condemning Russia's meddling in the election. He reasoned that if both parties signed on the statement couldn't be attacked as political. The intelligence community had recently informed the Gang of Eight—the leaders of both parties and the ranking representatives on the Senate and House Intelligence Committees—that Russia was acting on behalf of Trump. But one Gang of Eight member, Senate Majority Leader Mitch McConnell, expressed skepticism about the Russians' role, and refused to sign a bipartisan statement condemning Russia. After that, Obama, instead of issuing a statement himself, said nothing.

Steele anxiously asked his American counterparts what else could be done to alert the country. One option was to go to the press. Simpson wasn't all that worried, though. As he recalled in his subsequent congressional testimony, "We were operating under the assumption at that time that Hillary Clinton was going to win the election, and so there was no urgency to it."

Contemporaneous F.B.I. text messages disclosed recently by the *Wall Street Journal* reflect a similar complacency. In August, 2016, two F.B.I. employees, Lisa Page and Peter Strzok, texted about investigating possible collusion between Trump and the Russians. "OMG I CANNOT BELIEVE WE ARE SERIOUSLY LOOKING AT THESE ALLEGATIONS AND THE PERVASIVE CONNECTIONS," Strzok wrote. Page suggested that they could take their time, because there was little reason to worry that Clinton would lose. But Strzok disagreed, warning that they should push ahead, anyway, as "an insurance policy" in case Trump was elected—like "the unlikely event you die before you're 40."

When excerpts of these texts first became public, Trump defenders such as Trey Gowdy seized on them as proof that the F.B.I. had schemed to devise "an insurance policy" to keep Trump from getting elected. But a reading of the full text chain makes it clear that the agents were discussing whether or not they needed to focus urgently on investigating collusion.

In late summer, Fusion set up a series of meetings, at the Tabard Inn, in Washington, between Steele and a handful of national-security reporters. These encounters were surely sanctioned in some way by Fusion's client, the Clinton campaign. The sessions were off the record, but because Steele has since disclosed having participated in them I can confirm that I attended one of them. Despite Steele's generally cool manner, he seemed distraught about the Russians' role in the election. He did not distribute his dossier, provided no documentary evidence, and was so careful about guarding his sources that there was virtually no way to follow up. At the time, neither *The New Yorker* nor any other news organization ran a story about the allegations.

Inevitably, though, word of the dossier began to spread through Washington. A former State Department official recalls a social gathering where he danced around the subject with the British Ambassador, Sir Kim Darroch. After exchanging cryptic hints, to

make sure that they were both in the know, he asked the Ambassador, "Is this guy Steele legit?" The Ambassador replied, "Absolutely." Brennan, then the C.I.A. director, also heard the rumors. (Nunes reportedly plans to examine Steele's interactions with the C.I.A. and the State Department next.) But Brennan said recently, on "Meet the Press," that he heard just "snippets" about the dossier "in press circles," emphasizing that he didn't see the dossier until well after the election, and said that "it did not play any role whatsoever" in the intelligence community's appraisal of Russian election meddling. Brennan said of the dossier, "It was up to the F.B.I. to see whether or not they could verify any of it."

It wasn't until October 7, 2016, that anyone in the Obama Administration spoke publicly about Russia's interference. James Clapper, Obama's director of National Intelligence, and Jeh Johnson, the head of the Department of Homeland Security, issued a joint statement saying that the U.S. intelligence community was "confident" that Russia had directed the hacking of the Democratic National Committee's e-mails. James Comey, then the F.B.I. director, had reportedly changed his mind about issuing a public statement, deciding that it was too close to the election to make such a politically charged assertion.

In a normal political climate, the U.S. government's announcement that a foreign power had attacked one of the two dominant parties in the midst of a Presidential election would have received enormous attention. But it was almost instantly buried by two other shocking news events. Thirty minutes after the statement was released, the Washington *Post* brought to light the "Access Hollywood" tape, in which Trump describes how his celebrity status had allowed him to "grab" women "by the pussy." A few hours after that, WikiLeaks, evidently in an effort to bail out Trump by changing the subject, started posting the private e-mails of John Podesta, Clinton's campaign chairman. The intelligence community's assessment was barely noticed.

S teele finally met again with the F.B.I. in early October of 2016. This time, he went to Rome to speak with a team of agents, who avidly asked him for everything he had. The news generated by the publication of the D.N.C. e-mails had triggered the change. It had led the Australians to reconsider the importance of George Papadopoulos's claims, and to alert American authorities. On July 31, 2016, the F.B.I. had launched a formal investigation.

The agents asked Steele about Papadopoulos, and he said that he hadn't heard anything about him. After the meeting, Steele told Simpson that the Bureau had been amassing "other intelligence" about Russia's scheme. As Simpson later told the Senate Judiciary Committee, F.B.I. agents now "believed Chris's information might be credible." Although the Bureau had paid Steele for past work, he was not paid for his help on the Trump investigation. Orbis remained under contract to Fusion, and Steele helped the F.B.I. voluntarily. (He did request compensation for travelling to Rome, but he never received any.)

Soon after the meeting in Rome, the F.B.I. successfully petitioned the Foreign Intelligence Surveillance Court for a warrant to spy on Carter Page. Trump's defenders have accused the Bureau of relying on politically motivated smears to spy on Trump's campaign, but by then Page was no longer an adviser to Trump, and the F.B.I. had collected information in addition to what had been supplied by Steele.

The Bureau encouraged Steele to send any relevant information he came across, and that October he passed on a questionable item—a bit of amateur sleuthing that had been done by someone he'd never met, a former journalist and self-styled investigator named Cody Shearer. Jonathan Winer, Steele's friend at the State Department, had shared with him an unfinished memo written by Shearer. Not only did it claim that the F.S.B. had incriminating videotapes of Trump having sex in Moscow; it also made wild allegations that leaders of former Soviet states had given huge payments to Trump family members. Steele wasn't aware that Shearer had longtime ties to the Clintons, as did Sidney Blumenthal, a Clinton ally, who had given Shearer's report to Winer. Steele had never met Blumenthal, either, but he dutifully jotted down the chain of custody on the cover of the report before sending it on to the F.B.I., with the caveat that he couldn't vouch for its credibility. He noted, though, that some of the findings were "remarkably similar" to Orbis's.

Trump's defenders have seized on the Shearer memo, which Steele didn't write, using it to argue that Steele's research was politically tainted by the Clintons. Sean Hannity's official Web site carried the inaccurate headline "CHRISTOPHER STEELE AUTHORED ANOTHER DOSSIER, USED CLINTON CONTACTS."

As the election approached, the relationship between Steele and the F.B.I. grew increasingly tense. He couldn't understand why the government wasn't publicizing

Trump's ties to Russia. He was anguished that the American voting public remained in the dark. Steele confided in a longtime friend at the Justice Department, an Associate Deputy Attorney General, Bruce Ohr (whose wife, Nellie Ohr, was briefly a contractor for Fusion). In a memo to the F.B.I., Bruce Ohr recalled Steele saying that, given what he had discovered, he "was desperate that Donald Trump not get elected and was passionate about him not being President." According to people familiar with the matter, Ohr and other officials urged Steele not to be so upset about the F.B.I.'s secrecy, assuring him that, in the U.S., potentially prejudicial investigations of political figures were always kept quiet, especially when an election was imminent.

Steele was therefore shocked when, on October 28, 2016, Comey sent a letter to congressional leaders: the F.B.I. had come across new e-mails bearing on its previously closed investigation into Hillary Clinton's use of a private server as Secretary of State. He said that these e-mails required immediate review. The announcement plunged Clinton's campaign into chaos. Two days before the election, Comey made a second announcement, clearing her of wrongdoing, but by that point her campaign's momentum had stalled.

To Steele, the F.B.I., by making an incriminating statement so close to Election Day, seemed to be breaking a rule that he'd been told was inviolable. And, given what he—and very few others—knew about the F.B.I.'s Trump investigation, it also seemed that the Bureau had one standard for Clinton and another for her opponent. "Chris was concerned that something was happening at the F.B.I.," Simpson later told the House Intelligence Committee. "We were very concerned that the information that we had about the Russians trying to interfere in the election was going to be covered up." Simpson and Steele thought that "it would only be fair if the world knew that both candidates were under investigation."

At Fusion's urging, Steele decided to speak, on background, to the press. Identified only as a "former Western intelligence officer," he told David Corn, of *Mother Jones,* that he had provided information to the F.B.I. as part of a "pretty substantial inquiry" into Trump's ties to Russia. He noted, "This is something of huge significance, way above party politics."

The F.B.I., which had hoped to protect its ongoing probe from public view, was furious. Nunes, in his memo, claimed that Steele was "suspended and then terminated"

as a source. In reality, the break was mutual, precipitated by Steele's act of conscience.

Inside the Clinton campaign, John Podesta, the chairman, was stunned by the news that the F.B.I. had launched a full-blown investigation into Trump, especially one that was informed by research underwritten by the Clinton campaign. Podesta had authorized Robby Mook, the campaign manager, to handle budget matters, and Mook had approved Perkins Coie's budget request for opposition research without knowing who was producing it. Podesta and Mook have maintained that they had no idea a former foreign intelligence officer was on the Democrats' payroll until the *Mother Jones* article appeared, and that they didn't read the dossier until BuzzFeed posted it online. Far from a secret campaign weapon, Steele turned out to be a secret kept from the campaign.

On November 8, 2016, Steele stayed up all night, watching the U.S. election returns. Trump's surprise victory hit Orbis hard. A staff memo went out forgiving anyone who wanted to stay home and hide under his duvet. The news had one immediate consequence for Steele. He believed that Trump now posed a national-security threat to his country, too. He soon shared his research with a senior British official. The official carefully went through the details with Steele, but it isn't clear whether the British government acted on his information.

The election was over, but Steele kept trying to alert American authorities. Later that November, he authorized a trusted mentor—Sir Andrew Wood, a former British Ambassador to Moscow—to inform Senator John McCain of the existence of his dossier. Wood, an unpaid informal adviser to Orbis, and Steele agreed that McCain, the hawkish chair of the Senate Armed Services Committee, should know what was going on. Wood told me, "It was simply a matter of duty." Steele had gone to him before the election for counsel. They'd discussed the possibility that Steele's sources in Russia were wrong, or spreading disinformation, but concluded that none of them had a motive to lie; moreover, they had taken considerable risks to themselves to get the truth out. "I sensed he was distinctly alarmed," Wood told me. "I don't doubt his good faith at all. It's absurd for anyone to suggest he was engaged in political tricks."

The week before Thanksgiving, Wood briefed McCain at the Halifax International Security Forum. McCain was deeply concerned. He asked a former aide, David Kramer, to go to England to meet Steele. Kramer, a Russia expert who had served at

the State Department, went over the dossier with Steele for hours. After Kramer promised to share the document only with McCain, Steele arranged for Kramer to receive a copy in Washington. But a former national-security official who spoke with Kramer at the time told me that one of Kramer's ideas was to have McCain confront Trump with the evidence, in the hope that Trump would resign. "He would tell Trump, 'The Russians have got you,' " the former official told me. (A lawyer for Kramer maintains that Kramer never considered getting Trump to resign and never promised to show the dossier only to McCain.) Ultimately, though, McCain and Kramer agreed that McCain should take the dossier to the head of the F.B.I. On December 9th, McCain handed Comey a copy of the dossier. The meeting lasted less than ten minutes, because, to McCain's surprise, the F.B.I. had possessed a copy since the summer. According to the former national-security official, when Kramer learned about the meeting his reaction was "Shit, if they've had it all this time, why didn't they *do* something?" Kramer then heard that the dossier was an open secret among journalists, too. He asked, "Is there anyone in Washington who *doesn't* know about this?"

On January 5, 2017, it became clear that at least two Washingtonians remained in the dark about the dossier: the President and the Vice-President. That day, in a top-secret Oval Office meeting, the chiefs of the nation's top intelligence agencies briefed Obama and Biden and some national-security officials for the first time about the dossier's allegation that Trump's campaign team may have colluded with the Russians. As one person present later told me, "No one understands that at the White House we weren't briefed about the F.B.I.'s investigations. We had no information on collusion. All we saw was what the Russians were doing. The F.B.I. puts anything about Americans in a lockbox."

The main purpose of the Oval Office meeting was to run through a startling report that the U.S. intelligence chiefs were about to release to the public. It contained the agencies' unanimous conclusion that, during the Presidential campaign, Putin had directed a cyber campaign aimed at getting Trump elected. But, before releasing the report, the intelligence chiefs—James Clapper, the director of National Intelligence; Admiral Mike Rogers, the N.S.A. director; Brennan; and Comey—shared a highly classified version with Obama, Biden, and the other officials.

The highly classified report included a two-page appendix about the dossier. Comey briefed the group on it. According to three former government officials familiar with the meeting, he didn't name Steele but said that the appendix summarized information obtained by a former intelligence officer who had previously worked with the F.B.I. and had come forward with troubling information. Comey laid out the dossier's allegations that there had been numerous contacts between the Trump campaign and Russian officials, and that there may have been deals struck between them. Comey also mentioned some of the sexual details in the dossier, including the alleged golden-showers *kompromat*.

"It was chilling," the meeting participant recalls.

Obama stayed silent. All through the campaign, he and others in his Administration had insisted on playing by the rules, and not interfering unduly in the election, to the point that, after Trump's victory, some critics accused them of political negligence. The Democrats, far from being engaged in a political conspiracy with Steele, had been politically paralyzed by their high-mindedness.

Biden asked, "How seriously should we take this?" Comey responded that the F.B.I. had not corroborated the details in the dossier, but he said that portions of it were "consistent" with what the U.S. intelligence community had obtained from other channels. He also said that the F.B.I. had "confidence" in the dossier's author—a careful but definite endorsement—because it had worked not only with him but with many of his sources and sub-sources, whose identities the Bureau knew. "He's proven credible in the past, and so has his network," Comey said.

"If this is true, this is huge!" Biden exclaimed.

Someone asked how intelligence officials planned to handle the dossier with Trump. Comey explained that he'd decided to brief the President-elect about it the next day. He would do it on his own, he said, to avoid unnecessary embarrassment. But he thought that Trump needed to know about the dossier, even if the allegations were false, for two reasons: it could prove "impactful" if the dossier became public, and the dossier could be used as leverage over the President-elect. Trump later suggested that Comey had actually used the dossier to get leverage over him, but, according to the officials familiar with the meeting, Comey's motive was to protect the President-elect.

In fact, if Comey had wanted to use the dossier as leverage, he could have done so months earlier, before Trump was elected, since it had been in the F.B.I.'s possession.

Comey's meeting with the President-elect, in a conference room at Trump Tower, did not go well. Neither he nor Trump has disclosed details of their exchange, but Comey later released a public statement in which he said that as soon as he left the building he "felt compelled" to memorialize in writing what had occurred. He'd never felt the need to take such a legal step during the Obama years. Later, when he was questioned by a Senate panel, Comey explained that he had done so because of the "nature of the person," adding, "I was honestly concerned he might lie about the nature of our meeting." The briefing established a rocky dynamic that culminated in Trump's dismissing Comey, and with Trump adopting a hostile posture toward the intelligence and law-enforcement agencies investigating him.

Republican critics have accused the intelligence agencies of having blended Steele's work with their own investigations. But the F.B.I., by relegating the dossier to an appendix, deliberately separated it from the larger intelligence-community report. Steele has told friends that this approach left him exposed. The F.B.I. never asked his permission to do this. "They threw me under the bus," Steele has complained to friends.

Unsurprisingly, the salacious news leaked in no time. Four days after Comey briefed Trump, CNN reported that the President-elect had been briefed on a scandalous dossier supplied by a former British intelligence operative. Almost instantly, BuzzFeed posted a copy of Steele's dossier online, arguing that the high-level briefing made it a matter of public interest. BuzzFeed has declined to reveal its source for the dossier, but both Orbis and Fusion have denied supplying it. By a process of elimination, speculation has centered on McCain's aide, Kramer, who has not responded to inquiries about it, and whose congressional testimony is sealed.

Trump immediately denounced CNN's report as "fake news," and BuzzFeed as "a failing pile of garbage." He called the document "crap" compiled by "sick people," and at a news conference at Trump Tower he insisted that the golden-showers episode couldn't be true, because he was "very much of a germophobe."

The day after BuzzFeed posted the dossier, the *Wall Street Journal* identified Steele as its author. In England, reporters peered in his windows and tracked down his relatives, including the siblings of his deceased wife. Two reporters from RT, a Russian state news agency, seemed especially aggressive in staking out his house. In response, Steele and his family went into hiding. They reportedly left their three cats with neighbors, and Steele grew a beard.

The dossier's publication caused a series of repercussions. Aleksej Gubarev, the Russian Internet entrepreneur, sued Steele and Orbis, and also BuzzFeed, for libel. He said the dossier falsely claimed that his companies, Webzilla and XBT Holding, had aided the Russian hacking of the D.N.C. (Steele's lawyers have said that the dossier's publication was unforeseen, so he shouldn't be held responsible. BuzzFeed has argued that the content was not libelous.) Pretrial maneuvering in the libel case has resulted in a court ordering Gubarev to disclose whether he or his companies are under criminal investigation. His answer may shed some light on the dossier's depiction of him as a questionable character.

In Russia, there were rumors of a more primitive kind of justice taking place. During Glenn Simpson's testimony to the Senate Judiciary Committee, his lawyer asserted that "somebody's already been killed as a result of the publication of this dossier." Who that could be has been the subject of much media speculation. One possibility that has been mentioned is Oleg Erovinkin, a former F.S.B. officer and top aide to Igor Sechin, the Rosneft president. On December 26, 2016, Erovinkin was found dead in his car. No official cause of death has been cited. No evidence has emerged that Erovinkin was a Steele source, and in fact Special Counsel Mueller is believed to be investigating a different death that is possibly related to the dossier. (A representative for Mueller declined to answer questions for this article.) Meanwhile, around the same time that Erovinkin died, Russian authorities charged a cybersecurity expert and two F.S.B. officers with treason.

In the spring of 2017, after eight weeks in hiding, Steele gave a brief statement to the media, announcing his intention of getting back to work. On the advice of his lawyers, he hasn't spoken publicly since. But Steele talked at length with Mueller's investigators in September. It isn't known what they discussed, but, given the seriousness with which

Steele views the subject, those who know him suspect that he shared many of his sources, and much else, with the Mueller team.

One subject that Steele is believed to have discussed with Mueller's investigators is a memo that he wrote in late November, 2016, after his contract with Fusion had ended. This memo, which did not surface publicly with the others, is shorter than the rest, and is based on one source, described as "a senior Russian official." The official said that he was merely relaying talk circulating in the Russian Ministry of Foreign Affairs, but what he'd heard was astonishing: people were saying that the Kremlin had intervened to block Trump's initial choice for Secretary of State, Mitt Romney. (During Romney's run for the White House in 2012, he was notably hawkish on Russia, calling it the single greatest threat to the U.S.) The memo said that the Kremlin, through unspecified channels, had asked Trump to appoint someone who would be prepared to lift Ukraine-related sanctions, and who would coöperate on security issues of interest to Russia, such as the conflict in Syria. If what the source heard was true, then a foreign power was exercising pivotal influence over U.S. foreign policy—and an incoming President.

As fantastical as the memo sounds, subsequent events could be said to support it. In a humiliating public spectacle, Trump dangled the post before Romney until early December, then rejected him. There are plenty of domestic political reasons that Trump may have turned against Romney. Trump loyalists, for instance, noted Romney's public opposition to Trump during the campaign. Roger Stone, the longtime Trump aide, has suggested that Trump was vengefully tormenting Romney, and had never seriously considered him. (Romney declined to comment. The White House said that he was never a first choice for the role and declined to comment about any communications that the Trump team may have had with Russia on the subject.) In any case, on December 13, 2016, Trump gave Rex Tillerson, the C.E.O. of ExxonMobil, the job. The choice was a surprise to most, and a happy one in Moscow, because Tillerson's business ties with the Kremlin were long-standing and warm. (In 2011, he brokered a historic partnership between ExxonMobil and Rosneft.) After the election, Congress imposed additional sanctions on Russia, in retaliation for its interference, but Trump and Tillerson have resisted enacting them.

Eighteen months after the dossier's publication, Steele has impassioned detractors on both the left and the right. On the left, Stephen Cohen, a Russia scholar and *Nation* contributor, has denied the existence of any collusion between Trump and Russia, and has accused Steele of being part of a powerful "fourth branch of government," comprising intelligence agencies whose anti-Russia and anti-Trump biases have run amok. On the right, the *Washington Examiner's* Byron York has championed Grassley and Graham's criminal referral, arguing that Steele has a "credibility issue," because he purportedly lied to the F.B.I. about talking to the press. But did Steele lie? The Justice Department has not filed charges against him. The most serious accusation these critics make is that the F.B.I. tricked the FISA Court into granting a warrant to spy on Trump associates on the basis of false and politically motivated opposition research. If true, this would be a major abuse of power. But the Bureau didn't trick the court—it openly disclosed that Steele's funding was political. Moreover, Steele's dossier was only part of what the FISA warrant rested on. According to the Democrats' Intelligence Committee report, the Justice Department obtained information "that corroborated Steele's reporting" through "multiple independent sources."

It's too early to make a final judgment about how much of Steele's dossier will be proved wrong, but a number of Steele's major claims have been backed up by subsequent disclosures. His allegation that the Kremlin favored Trump in 2016 and was offering his campaign dirt on Hillary has been borne out. So has his claim that the Kremlin and WikiLeaks were working together to release the D.N.C.'s e-mails. Key elements of Steele's memos on Carter Page have held up, too, including the claim that Page had secret meetings in Moscow with Rosneft and Kremlin officials. Steele may have named the wrong oil-company official, but, according to recent congressional disclosures, he was correct that a top Rosneft executive talked to Page about a payoff. According to the Democrats' report, when Page was asked if a Rosneft executive had offered him a "potential sale of a significant percentage of Rosneft," Page said, "He may have briefly mentioned it."

And, just as the Kremlin allegedly feared, damaging financial details have surfaced about Manafort's dealings with Ukraine officials. Further, his suggestion that Trump had "agreed to sideline Russian intervention in Ukraine as a campaign issue" seems to have been confirmed by the pro-Russia changes that Trump associates made to the

Republican platform. Special Counsel Mueller's various indictments of Manafort have also strengthened aspects of the dossier.

Indeed, it's getting harder every day to claim that Steele was simply spreading lies, now that three former Trump campaign officials—Flynn, Papadopoulos, and Rick Gates, who served as deputy campaign chairman—have all pleaded guilty to criminal charges, and appear to be coöperating with the investigation. And, of course, Mueller has indicted thirteen Russian nationals for waging the kind of digital warfare that Steele had warned about.

On January 9th, Trump's personal attorney, Michael Cohen, filed a hundred-million-dollar defamation lawsuit against Fusion. He also sued BuzzFeed. Cohen tweeted, "Enough is enough of the #fake #RussianDossier." Steele mentioned Cohen several times in the dossier, and claimed that Cohen met with Russian operatives in Prague, in the late summer of 2016, to pay them off and cover up the Russian hacking operation. Cohen denies that he's ever set foot in Prague, and has produced his passport to prove it. A congressional official has told Politico, however, that an inquiry into the allegation is "still active." And, since the dossier was published, several examples have surfaced of Cohen making secretive payments to cover up other potentially damaging stories. Cohen recently acknowledged to the *Times* that he personally paid Stephanie Clifford, a porn star who goes by the name Stormy Daniels, a hundred and thirty thousand dollars; it is widely believed that Trump and Clifford had a secret sexual relationship.

In London, Steele is back at work, attending to other cases. Orbis has landed several new clients as a result of the publicity surrounding the dossier. The week after it became public, the company received two thousand job applications.

John Sipher, the former C.I.A. officer, predicts that Mueller's probe will render the final verdict on Steele's dossier. "People who say it's all garbage, or all true, are being politically biased," Sipher said. "There's enough there to be worthy of further study. Professionals need to look at travel records, phone records, bank records, foreign police-service cameras, and check it all out. It will take professional investigators to run it to ground." He believes that Mueller, whose F.B.I. he worked with, "is a hundred per cent doing that."

Until then, Sipher said, Steele, as a former English spook, is the perfect political foil: "The Trump supporters can attack the messenger, because no one knows him or understands him, so you can paint him any way you want." Strobe Talbott, a Russia expert who served as Deputy Secretary of State in the Clinton Administration, and who has known Steele professionally for ten years, has watched the spectacle in Washington with regret. Talbott regards Steele as a "smart, careful, professional, and congenial" colleague who "knows the post-Soviet space, and is exactly what he says he is." Yet, Talbott said, "they're trying to turn him into political polonium—touch him and you die." ♦

*This article appears in the print edition of the March 12, 2018, issue, with the headline "The Man Behind the Dossier."*



*Jane Mayer has been a New Yorker staff writer since 1995.* *Read more »*

CONDÉ NAST

© 2018 Condé Nast. All rights reserved. Use of and/or registration on any portion of this site constitutes acceptance of our User Agreement (updated 5/25/18) and Privacy Policy and Cookie Statement (updated 5/25/18). Your California Privacy Rights. The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Condé Nast. *The New Yorker* may earn a portion of sales from products and services that are purchased through links on our site as part of our affiliate partnerships with retailers. Ad Choices