**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 17-cv-60426-UU**

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.

    Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

    Defendants.

_____/

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

<div style="margin-left:50%">

DAVIS WRIGHT TREMAINE LLP
Katherine M. Bolger
Nathan Siegel
Adam Lazier
Alison Schary
1251 Avenue of the Americas, 21st Floor
New York, New York 10020

BLACK, SREBNICK, KORNSPAN &
STUMPF, P.A.
Roy Black
Jared Lopez
201 So. Biscayne Boulevard
Miami, Florida 33131

*Of Counsel*:
Nabiha Syed
BuzzFeed, Inc.
11 E. 18th Street, 13th Floor
New York, NY 10003

*Attorneys for Defendants*

</div>

## PRELIMINARY STATEMENT

On January 10, 2017, BuzzFeed published what has come to be known as the Dossier, which contains explosive allegations about President Trump's connections to Russia. BuzzFeed did so only after CNN had reported to the American public that the Dossier had been briefed to two presidents and was being investigated by federal law enforcement agencies. And it did so in the context of an article that made it clear to readers that BuzzFeed had not independently verified the Dossier's core allegations. This lawsuit tests whether one individual and his companies named in the Dossier have the right to recover for its publication.

The Court has already held that BuzzFeed would be entitled to the fair report defense if it could demonstrate certain facts about official actions involving the Dossier. Defendants have now established those facts in the record, and, for this reason, this Court should grant summary judgment.

And that is not the only ground to support summary judgment. BuzzFeed published the Dossier within an article that made clear to readers that it was not presenting the contents of the Dossier as objective facts, as would be required to support a defamation claim, but rather as unproven allegations made in an unfolding political controversy. Summary judgment should be granted for this reason, as well. And, even if Defendants could be said to have published facts about Plaintiffs, the Plaintiffs are public figures, as Defendants' companion motion argues. The record contains no clear and convincing evidence of actual malice, i.e. that Defendants knew or believed that the Dossier's accusations about Plaintiffs were false. Indeed, even if Plaintiffs were private figures, the record leaves no room for genuine dispute that Defendants were neither grossly irresponsible (if New York law applies) nor negligent (if Florida law applies) in publishing a document so significant that it has been at the epicenter of American political debate for almost two years. For any or all of these reasons, Defendants seek summary judgment.

## STATEMENT OF FACTS

### I.     THE PLAINTIFFS

Plaintiff Aleksej Gubarev lives in Cyprus, where he moved from Russia in 2002. Defendants' Statement of Undisputed Material Facts ("SUMF") ¶ 1. Plaintiff XBT Holding S.A. ("XBT") is incorporated and has its principal place of business in Luxembourg. SUMF ¶ 2. XBT is the parent holding company for Gubarev's internet hosting company. *Id*. Plaintiff

Webzilla, Inc. is incorporated in Florida, and, when BuzzFeed published the Dossier and when it commenced this lawsuit, had its principal place of business in Texas.  SUMF ¶ 3.  Webzilla has only one Florida employee, who divides his time between Webzilla and his own company, and it has a "virtual address" in Florida in a Regus building.  *Id.*

The Dossier, however, actually refers to "XBT/Webzilla."  Declaration of Katherine M. Bolger executed September 21, 2018 ("Bolger Decl."), Ex. 1 ("Complaint"), Ex. 3 at 35. "Webzilla" is a brand name, SUMF ¶ 4, which is used by six "Webzilla" companies incorporated around the world, including Plaintiff Webzilla.  *Id.*  Plaintiffs themselves often publicly described Webzilla as a European company, including in their public relations responses to the Dossier.  *Id.*  Plaintiffs lease data centers throughout the world; none are in Florida.  SUMF ¶ 4. Similarly, documents produced by Plaintiffs supposedly supporting their damages concern only "Webzilla" entities in Europe.  SUMF ¶ 4.

## II.     THE DOSSIER

### A.     <u>The Origin of the Dossier</u>

**B.**      **The Dossier Becomes the Subject of Multiple Official Actions by the Government**

        **1.**      **The FBI Begins Using Steele's Reports in an Investigation.** ███████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███ In July 2016 Steele – "a longtime FBI source" with a record of providing credible
information, SUMF ¶ 11, ████████████████████████████████████████
████████████████████████████ From then until at least the end
of October 2016, Steele provided information to the FBI as he researched the information
contained in the Dossier.  SUMF ¶ 12.

        In July 2016 the FBI opened a counterintelligence investigation into alleged collusion
between the Trump campaign and Russia.  SUMF ¶ 13.  By the fall of 2016, the FBI was
reviewing and attempting to corroborate Steele's reports.  *Id.*  In October 2016, the Justice
Department used information from Steele's reports to help obtain a FISA warrant to conduct
surveillance on Trump advisor Carter Page.  SUMF ¶ 15.  In its FISA application, the DOJ stated
that Steele's prior "reporting has been corroborated and used in criminal proceedings and the FBI
assesses [Steele] to be reliable." *Id.*  In October Steele met again with the FBI in Rome, at the
agency's invitation, to discuss his research.  SUMF ¶ 16.  Steele also shared his research with
Associate Deputy Attorney General Bruce Ohr and the State Department.  SUMF ¶ 14.

        On or about November 1, 2016 the FBI "suspended" its relationship with Steele,
informing him that "it was unlikely that the FBI would continue a relationship" with him because
Steele had spoken to journalists.  SUMF ¶ 17.  Yet Steele continued to share information after the
2016 election with at least one government official, namely Bruce Ohr, to whom Steele provided
all 16 pre-election memoranda in late November.  SUMF ¶ 18.  And the FBI continued its "source
validation report" to assess Steele's Dossier reports.  SUMF ¶ 19.

        **2.**      **Senator John McCain Procures the Dossier and Provides it to FBI
Director Comey and Other Government Agencies.** ███████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████



4

3. **Report No. 166** ████████████████████████████

████████████████████████████████████████████████████████

████████ On December 13, 2016, Steele wrote a final report, No. 166, which provided more details about the last two pre-election reports (Nos. 134 and 135), which had focused on a meeting that Trump's personal lawyer, Michael Cohen, allegedly had in Prague. *Id.* Among other things, Report No. 166 said that "XBT/Webzilla and its affiliates" and "entities linked to one Aleksei GUBAROV" [*sic*] were involved in the "altering operations against the Democratic Party leadership" that Cohen was allegedly trying to conceal. Compl., Ex. 3 at 34-35. ████████

████████████████████████████████████████████████████████

███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████

█████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████

4826-6987-1219v.3 0109842-000001

C.      **Two United States Presidents are Briefed on the Dossier**

In December 2016 President Obama instructed then-Director of National Intelligence

James Clapper to conduct an inter-agency assessment of Russian interference in the election,

which included the CIA, FBI and NSA.  SUMF ¶ 41.  On January 5, 2017 the resulting classified

Intelligence Community Assessment ("ICA") was shared with President Obama, and a public

version was released on January 6, 2017.  SUMF ¶ 42.  Attached to the classified ICA was a

two-page synopsis of "allegations derived from a 35 page Dossier" as subsequently published by

BuzzFeed.  *Id.*; *see, e.g.,* Bolger Decl. Ex. 33 (Report of House Permanent Select Committee on

Intelligence ("HPSCI Report")) at 110 n.47 (stating that "NSA Director Rogers clarified that, in

late December 2016, a two-page summary of the Steele dossier was 'added' as an 'Appendix to

the ICA draft'").  NSA Chief Michael Rogers described the two-page summary as "part of the

overall ICA review/approval process."  SUMF ¶ 43.

The same day, Clapper and/or the Directors of the FBI, CIA and NSA briefed President

Obama about the Dossier.  SUMF ¶ 44; *see, e.g.,* HPSCI Report at 107 ("[I]n early January

2017…IC leaders briefed President Obama and President-elect Trump, on 'the Christopher

Steele Information'"); ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████  On January 6, Director Comey

briefed Trump on "a summary of the Steele Dossier," and provided him with the two-page

synopsis.  SUMF ¶ 45; *see, e.g.,* HSPCI Report at 104 ("President-elect Trump was indeed

briefed on the contents of the Steele dossier").  And, in early January 2017, the FBI applied to

renew the FISA warrant regarding Carter Page and stated that it continued to find Steele reliable,

"notwithstanding the suspension of its relationship" with him.  SUMF ¶ 46.

III.    **BUZZFEED INVESTIGATES AND PUBLISHES THE DOSSIER**

A.      **BuzzFeed Obtains the Dossier**

In early December 2016, BuzzFeed investigative reporter Ken Bensinger first learned

from sources of reports written by Christopher Steele about President-elect Trump and Russia

and that those reports were being investigated by the FBI.  SUMF ¶ 47.  Bensinger was familiar

with Steele and thought him to be a source of highly credible information.  *Id.*  Bensinger tried to

obtain a copy of the reports, but was unsuccessful ███████████████████████

████████████████████████████████████



**B.**     <u>**BuzzFeed's Investigation of the Dossier**</u>

Upon receiving the Dossier, Bensinger phoned Mark Schoofs, BuzzFeed's senior editor in charge of investigative reporting. SUMF ¶ 52. Schoofs concluded that BuzzFeed should investigate a few of the specific allegations in the Dossier that he thought might be possible to verify, including Michael Cohen's alleged trip to Prague and allegations about pension payments to Russian emigres. *Id.* More than a half-dozen journalists were involved in varying degrees in the investigation, including one who traveled to Prague to try to see if any hotel might have a record of Michael Cohen staying there. SUMF ¶ 53. At that point BuzzFeed had no plans to publish the Dossier, in whole or in part, while it continued investigating. SUMF ¶ 54.

**C.**     <u>**CNN Reports About the Briefings and BuzzFeed Publishes the Dossier**</u>

On January 10, 2017, however, CNN reported that the two-page synopsis had been briefed to two presidents and the Dossier was being investigated by the FBI. SUMF ¶ 55. The CNN report revealed that the Dossier was influencing government actions related to the Russia controversy at the highest level. After consulting with several BuzzFeed senior editors and Bensinger, Smith decided that it was now time to publish the documents. SUMF ¶ 56.

When they made that decision, none of the BuzzFeed journalists involved knew or had any degree of awareness – let alone a "high degree" of awareness – that the allegations about



4826-6987-1219v.3 0109842-000001

Plaintiffs on the Dossier's last page were false, or harbored "serious doubts" about that.  SUMF ¶ 57.  The journalists knew that a key allegation in the Dossier – that Russia was behind the cyberattacks on the Democratic party leadership – had been publicly confirmed by U.S. intelligence agencies, and that Steele had apparently managed to learn those facts many months before Western intelligence agencies.  The allegations against Plaintiffs simply filled in a few details about that hacking operation.  SUMF ¶ 58(a).  BuzzFeed's journalists also thought that Michael Cohen's alleged role, including setting up payments for persons involved, was consistent with the "fixer" role he had long performed for Donald Trump.  SUMF ¶ 58(c).

Several of the BuzzFeed journalists were also familiar with Steele and his reputation for gathering accurate intelligence.  SUMF ¶ 58(d).  They also knew Senator McCain had taken the Dossier to Director Comey, which indicated that a well-respected Senator ███████ ████████████████████████ took it seriously.  SUMF ¶ 58(f).  Moreover, the CNN report suggested to them that law enforcement was taking the Dossier seriously as well. SUMF ¶ 58(g).

Notwithstanding his personal views as to the Dossier's truth, however, Smith recognized that those allegations of collusion and compromise were unproven, which could lead some readers to reasonably doubt their veracity.  SUMF ¶ 59.  So BuzzFeed published the Dossier as a PDF embedded within an article entitled *These Reports Allege Trump Has Deep Ties to Russia* (the "Article").  SUMF ¶ 60.  The Article focused their story on the Dossier itself – what it was and how it had come to play an important role in government activity.  Compl. Exs. 2-3.

The Article explained that "CNN reported Tuesday that a two-page synopsis of the report was given to President Obama and Trump", included prominent hyperlinks to the CNN story and made clear that the Dossier had been the subject of official government actions:

- The Article reported that "CNN reported Tuesday that a two-page synopsis of the report was given to President Obama and Trump."  SUMF ¶ 63.

- The words "CNN reported" were a hyperlink to the CNN Article, *id.*, which included the following statements:

  o   "The allegations were presented to Obama and Trump in a two-page synopsis that was appended to a report on Russian interference in the 2016 election." Bolger Decl., Ex. 2 (Declaration of Ben Smith) Ex. 1.

  o   "The FBI is investigating the credibility and accuracy of these allegations, which are based primarily on information from Russian sources, but has not confirmed many essential details in the memos about Mr. Trump." *Id.*

  o   "The classified briefings last week were presented by four of the senior-most US intelligence chiefs – Director of National Intelligence James Clapper, FBI

Director James Comey, CIA Director John Brennan, and NSA Director Admiral Mike Rogers." *Id.*

- The Article further reported that "CNN reported Tuesday that Arizona Republican John McCain gave a 'full copy' of the memos to Comey on Dec. 9, but that the FBI already had copies of many of the memos." Compl. Ex. 2

The Article summarized the Dossier as containing "allegations that the Russian government has been "'cultivating, supporting and assisting' President-elect Donald Trump for years and gained compromising information about him" and "allegations of contact between Trump aides and Russian operatives, and graphic claims of sexual acts documented by the Russians." *Id.* The Article repeated four times that those core allegations were "unverified"; explained that BuzzFeed "ha[d] been investigating various alleged facts in the Dossier but have not verified or falsified them", and that "[n]ow BuzzFeed News is publishing the full document so that Americans can make up their own minds about allegations about the president-elect that have circulated at the highest levels of the US government." *Id.*

Finally, the Article pointed out factual errors in details in the Dossier. *Id.* While none of the mistakes spoke to the core allegations of collusion and *kompromat*, the Article nonetheless reported that "[the Dossier] is not just unconfirmed: It includes some clear errors" and noted a couple of examples. *Id.* Shortly after it was published, the Article added statements from President Trump, Kellyanne Conway, and Michael Cohen denying the Dossier's claims. *Id.*; SUMF ¶ 62.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

BuzzFeed then redacted information pertaining to one source in the Dossier. *Id.*[3]

## ARGUMENT

This Court should grant summary judgment because the record establishes that the "official actions" described in the Article actually occurred and Defendants are, therefore, entitled to invoke the fair report defense. Summary judgment should also be granted because the Defendants made no defamatory statements of fact about Plaintiffs. In the alternative, summary judgment should be granted because Plaintiffs have not established that Defendants acted with

---

[3] BuzzFeed also redacted the name of Cohen's father-in-law, because he was not alleged to have played any role in the events described in the Dossier. Bolger Decl. Ex. 59 (Smith Declaration) at 67:17-25, 112:21-113:8.

9

the constitutionally required level of fault.

At bottom, to argue that a triable issue of fact exists as to whether publishing the Dossier was a tort is tantamount to asserting that the American public should, to this day, be ignorant about the text of a document that has been at the epicenter of government activity and public debate for almost two years.  This is inconsistent with our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964).

## I.      DEFENDANTS' PUBLICATION IS PRIVILEGED AS A FAIR REPORT

### A.      Defendants Published a "Report" of an "Official Proceeding"

This Court should grant summary judgment because the publication of the Dossier is absolutely privileged pursuant to New York Civil Rights Law § 74,  New York's fair report privilege.  In its June 4 ruling, this Court held that New York law applies to Defendants' fair report privilege affirmative defense.  Dkt. 171 at 5-10.  Specifically, this Court held that (1) "A confidential briefing to the President and the President-elect by the four most senior intelligence directors in the country" and (2) "an FBI investigation into the truth of the Dossier's allegations" would, if established by the record facts, constitute "official proceedings" for purposes of New York's statutory privilege.  *Id.* at 15-16.  The Court also held that while the text of the Article itself would not permit an ordinary reader to understand that the Dossier was subject to those proceedings, its conspicuous hyperlink to the CNN report satisfies that requirement.  *Id.* at 16-18.[4]   Finally, the Court held that while the official actions described in the Article and hyperlinks do relate to the specific allegations against Plaintiffs, even if they did not, "it would undermine the privilege to require that one who reports on official action tie every specific allegation in the report to a specific instance of official action."  *Id.* at 18-19.  Thus, the Court held that Defendants were entitled to invoke the fair report privilege if they were able to establish that "the official actions described in the CNN article (the classified briefings and FBI investigation) actually occurred."  *Id.* at 18-19.  Discovery ████████████████████████ ████████████████████████████████████████████████████ has now established that these official actions did, in fact, occur.

████████████████████████████████████████████

---

[4] Solely in the event that it may be necessary to preserve the issue, Defendants continue to maintain that the Article alone would also suffice under New York law.

4826-6987-1219v.3 0109842-000001



[REDACTED] The next day Director Comey separately briefed President-elect Trump on the Dossier. SUMF ¶ 45. Moreover, both Obama and Trump were provided a two-page synopsis of the Dossier as part of those briefings. SUMF ¶¶ 42, 45. [REDACTED]

Second, as to an FBI investigation: There was an FBI counterintelligence investigation that began in July 2016 and included evaluating the accuracy of Steele's reports. SUMF ¶¶ 13-19. The FBI found some of the Dossier sufficiently credible to be part of the basis for a FISA warrant. SUMF ¶ 15. [REDACTED]

[REDACTED] Steele functioned as a formal FBI source through October 2016, and even after that relationship ended, the FBI continued to conduct a "source validation report" of the Dossier. SUMF ¶¶ 12, 19. The FBI also relied on information in the Dossier to renew the FISA warrant in early January 2017 and thereafter, and it also obtained Report No. 166. SUMF ¶¶ 40, 46. And finally, although not material pursuant to this Court's rulings, it is in any event undisputed that [REDACTED] Thus, the undisputed record conclusively establishes exactly what this Court held that it must in order for Defendants to prevail – that the "official activities described in the" hyperlink in BuzzFeed's Article actually occurred. The Article, including the embedded Dossier, was therefore as a matter of law a privileged "report" of an "official proceeding" pursuant to Section 74 of the New York Civil Rights Law.

### B.   Defendants' Report Was "Fair and True"

This Court also indicated that Defendants satisfied  the final element of the privilege, that the report be a "fair and true" account of official proceedings. Dkt. 171 at 19. That element is satisfied so long as the report is a "fair" and "substantially accurate" account. *Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co.*, 49 N.Y.2d 63 (1979). Literal accuracy is not required; rather, "newspaper accounts of legislative or other official proceedings must be accorded some degree of liberality." *Id*. at 68.  In *Holy Spirit*, a case that also involved a press report about intelligence reports, the New York Court of Appeals found that element

satisfied because:

> the newspaper articles here at issue neither assigned to the intelligence reports
> allegations not contained in those documents, nor added, by virtue of word usage
> or otherwise, greater credence to those documents than was appropriate
> considering their nature as unverified and unevaluated claims linking appellant to
> Korean influences.

*Id.* at 67-68. The same is true here. As this Court has already found, "[w]ithout editorializing,
the Article accurately reproduces the Dossier," albeit with some names redacted. Dkt. 171 at 14.

The record only confirms this conclusion was correct 
Thus, the
summary judgment record establishes that Defendants' publication was nothing "other than a fair
and true report of an official proceeding." Dkt. 171 at 18.[5] It is, therefore, absolutely privileged,
and summary judgment should be granted.

## II.     BUZZFEED MADE NO DEFAMATORY ACCUSATIONS ABOUT PLAINTIFFS

In addition, by publishing the Dossier within the context of the Article, Defendants did
not publish any "defamatory statement of fact about the plaintiff", as New York and Florida law
both require. *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 176 (2d Cir. 2000);
*Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 714 (11th Cir. 1985). Whether words are
capable of bearing a defamatory meaning is "a legal question to be resolved by the courts in the
first instance." *Celle*, 209 F.3d at 176; *Keller*, 778 F.2d at 714. Importantly, the court must
consider the statements in the context of the publication as a whole. *Dillon v. City of N.Y.*, 261
A.D.2d 34, 38 (N.Y. App. 1999); *Byrd v. Hustler Magazine*, 433 So.2d 593 (Fla. 4th DCA
1983).

---

[5] In the alternative, summary judgment would be warranted if Florida law were applied, for the
same reasons set forth in previous briefing by Defendants, Dkt. 133 at 9-10, as applied to the
record here. Defendants recognize that the Court ruled otherwise, but renew that argument to
preserve it. In addition, the record now supports other reasons for applying the Florida privilege.
All parties agree that the Florida privilege would apply to information received from
"government officials." *See* Dkt. 115 at 6-7.                                              Moreover, an official, two-page
summary of the Dossier was prepared and Steele functioned as an FBI source while he wrote the
underlying reports. In these circumstances, Florida would deem the Dossier to have become a
"government document" for these purposes.

It is well-settled that raising questions, without providing answers, is not a "defamatory statement of fact" – rather, it "indicate[s] a defendant's 'lack of definitive knowledge about the issue.'" *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1338 (D.C. Cir. 2015). As a result, a question is only defamatory if it can "be reasonably read as an *assertion* of a false [and defamatory] *fact*; inquiry itself, however embarrassing or unpleasant to its subject, is not accusation." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1094 (4th Cir. 1994) (emphasis added). In *Chapin*, the Fourth Circuit affirmed dismissal of a libel claim arising out of an article that "pointedly questioned the finances" of the plaintiff's charity. *Id.* at 1091. The Court held the article was not defamatory because it "advances alternative answers to the questions it raises, presenting both favorable and unfavorable views, but does not ultimately adopt any particular answer as correct. From this, a reasonable reader would not be likely to conclude that one answer is true and the other false." *Id.* at 1098.[6]

Here too, the Article cannot be read to accuse Plaintiffs, or any of the persons discussed in the Dossier, of actually engaging in the conduct the Dossier describes. To the contrary, the Article provides much more than a question mark to "indicate [Defendants'] lack of definitive knowledge about the issue." *Abbas*, 783 F.3d 1328. The Article repeatedly refers to the Dossier as "unverified" and "unconfirmed"; it points out "some clear errors" in it; and it tells readers that the document was "prepared for political opponents" of Donald Trump. Compl. Ex. 2. It is a paradigmatic example of a "story constructed around questions, not conclusions," which "does not ultimately adopt any particular answer as correct." *Chapin*, 993 F.2d at 1098. Thus, as a matter of law, Defendants did not assert or imply that Plaintiffs actually engaged in any cyber-crimes.

## III.   SUMMARY JUDGMENT IS WARRANTED ON THE ELEMENT OF FAULT

### A.   There Is No Clear And Convincing Evidence of Actual Malice

Even if the Defendants could be said to have stated facts about Plaintiffs, there is no clear and convincing evidence that Defendants disbelieved those facts. Public figures, like the Plaintiffs, must prove by clear and convincing evidence that an allegedly defamatory statement was published with "actual malice." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974). This

---

[6] *See also Janklow v. Newsweek, Inc.*, 759 F.2d 644, 649 (8th Cir. 1985); *Beverly Hills Foodland, Inc. v. United Food and Commercial Workers Union, Local 655*, 39 F.3d 191, 195 (8th Cir. 1994); *Deripaska v. Assoc. Press*, 282 F. Supp. 3d 133, 145 (D.D.C. 2017); *Orr v. Lynch*, 60 A.D.2d 949, 950 (N.Y. App. 1978), *aff'd*, 45 N.Y.2d 903 (1978) .

standard applies now, at summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986) ("the appropriate summary judgment question [is] whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not").  "Actual malice" is a term of art in defamation law.  It does not mean common-law malice in the sense of ill will or spite, but rather it means knowledge of falsity or reckless disregard for the truth.  *Sullivan*, 376 U.S. at 279-80.  Moreover, "reckless disregard" does not mean recklessness in the typical objective sense of gross negligence.  Like knowledge of falsity, it is a purely "subjective test" that addresses the defendant's state of mind.  *Turner v. Wells*, 879 F.3d 1254, 1273 (11th Cir. 2018).  Essentially, "reckless disregard" means that the defendant actually, subjectively believed that a statement was very likely false, but went ahead and published it anyway.  *Id.*  ("This is a subjective test, focusing on whether the defendant 'actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false.'"); *Sullivan,* 376 U.S. at 280.  Thus, neither "a failure to investigate" nor "a departure from reasonable journalistic standards" constitutes actual malice.  *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016).

Moreover, when dealing with a large work like the Dossier, it does not suffice to demonstrate that Defendants disbelieved some fact somewhere within the 35-page document. The Article makes clear there were some errors.  Rather, Plaintiffs' burden is to prove that *specific* allegedly defamatory statements [about them] were made with actual malice." *Schiller v. Viacom, Inc.*, 2016 WL 9280239, at *8 (S.D. Fla. Apr. 4, 2016) (emphasis in original). This standard is so high that, in reviewing defamation cases against media defendants brought by public figures, the Eleventh Circuit last found a triable issue of fact in 1983.[7]

_____

[7] *See Michel*, 816 F.3d 686 (affirming dismissal of complaint for failure to plausibly plead actual malice); *Klayman v. City Pages*, 650 F. App'x. 744 (11th Cir. 2016) (affirming summary judgment); *Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230 (11th Cir. 1999) (reversing trial court judgment and entering judgment for defendant); *Meisler v. Gannett Co., Inc.*, 12 F.3d 1026 (11th Cir. 1994) (affirming summary judgment); *Silvester v. Am. Broad. Companies, Inc.*, 839 F.2d 1491(11th Cir. 1988) (affirming summary judgment).  *Cf. Hunt v. Liberty Lobby*, 720 F.2d 631 (11th Cir. 1983).  The results of more recent cases against non-media defendants are similar. *See, e.g., Turner,* 879 F.3d 1254 (affirming dismissal for failure to plausibly allege actual malice); *Edward Lewis Tobinick MD v. Novella*, 848 F.3d 935 (11th Cir. 2017) (granting an anti-SLAPP motion); *Dunn v. Airline Pilots Ass'n*, 193 F.3d 1185 (11th Cir. 1999) (affirming summary judgment for defendant).

Applying this exacting standard to the record here, the journalists involved in publishing the Article all affirm they thought the allegations about Plaintiffs were credible, plausible and consistent with other information they knew.  SUMF ¶ 58.  Such "professions of good faith" require the entry of summary judgment, unless Plaintiffs produce clear and compelling evidence that:

> …a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call…[or] the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*Michel*, 826 F.3d at 703 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)).  In addition, reckless disregard may sometimes be inferred if there is "some showing that the defendant purposefully avoided further investigation with the intent to avoid the truth."  *Id*.

The record here contains no such evidence.  Far from fabricating or imagining the allegations against Plaintiffs, Defendants did not even write them.  Nor were they based on an unverified anonymous phone call.  Steele was well-known to Defendants, other well-regarded persons took Steele's allegations seriously, and they were set out in writing within 35 detailed pages.  Nor were the allegations about Plaintiffs "inherently improbable" or suggest "obvious reasons" to doubt a well-respected Russia expert.  To the contrary, the specific statements about Plaintiffs were details within Steele's larger description of a cyber operation whose basic outline had been established by early January 2017, including that Russia had used "third-party intermediaries" to hack emails to promote Donald Trump's election.  HSCPI Report at 2; *see also* SUMF ¶ 58(a).

Nor is there any evidence that Defendants intended to "avoid the truth."  To the contrary, BuzzFeed did not publish the Dossier for two weeks because it was making substantial efforts to investigate some of its allegations.  It was only after CNN reported that the Dossier was part of official government actions that BuzzFeed chose to publish it.  And when BuzzFeed published the document it took care not to present the Dossier as established fact, invited readers to draw their own conclusions, and provided information that could cause readers to doubt Steele's main theses.  The Eleventh Circuit has been explicit that this kind of behavior cannot be considered acting with actual malice:

> Moreover, where the publisher includes information contrary to the general conclusions reached in an article, that showing tends to undermine the claims of

15

malice.  For example, where a news report informed its audience that its primary source was "not an unimpeachable source of information," it served to undermine claims showing that the report was issued with actual malice.  Similarly, where a magazine article cast doubt on its primary source by quoting other individuals calling the source a "liar" and a "con man," but explaining why the magazine chose to rely on the source anyway, the plaintiff had not proven actual malice. The reasoning behind the rule is simple. Where a publisher gives readers sufficient information to weigh for themselves the likelihood of an article's veracity, it reduces the risk that readers will reach unfair (or simply incorrect) conclusions, even if the publisher itself has.

*Michel*, 816 F.3d at 703 (citations omitted).[8]  Summary judgment is warranted on the issue of actual malice.

> **B.**     **Alternatively, Plaintiffs Cannot Establish the Standard of Fault Required For Private Figures**

Even if Plaintiffs were deemed to be private figures, the result should be no different.  As long as states do not impose liability without fault, "the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood" about a private figure.  *Gertz*, 481 U.S. at 347.  Under Florida law, the standard is ordinary negligence. *Miami Herald Publ'g Co. v. Ane*, 458 So. 2d 239, 241-42 (Fla. 1984).  Nonetheless, Florida courts have emphasized that on the issue of negligence "summary judgment is especially appropriate in libel cases where the facts are not essentially in dispute because of the chilling effect of libel suits upon First Amendment freedoms."  *Karp v. Miami Herald Publ'g Co.*, 359 So.2d 580, 581 (Fla. 3d DCA 1978).  Other courts have likewise granted summary judgment on a negligence standard.  *See, e.g., Walker v. City of Oklahoma City,* 2000 U.S. App. LEXIS 1677 (10th Cir. Feb. 7, 2000); *Brown v. Hearst Corp.*, 54 F.3d 21 (1st Cir. 1995).  For the reasons discussed below, *infra* at 18-20, Defendants submit that summary judgment is warranted if Florida law were applied to the element of fault.

If, however, the Court disagrees, then "there is a true conflict between" New York and

---

[8] *See also Klayman,* 650 F. App'x at 750 ("Evidence that an article contains information that readers can use to verify its content tends to undermine claims of actual malice."); *Chandok v. Klessig*, 632 F.3d 803, 815 (2d Cir. 2011) ("there is a critical difference between not knowing whether something is true and being highly aware that it is probably false. Only the latter establishes reckless disregard in a defamation action."); *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 287–88 (S.D.N.Y. 2013), *aff'd,* 807 F.3d 541 (2d Cir. 2015) (article that does "not actually assert that [the plaintiff was a forger], but only quoted people who raised questions about the issue... and allows the reader to make up his or her own mind…is far from what might be expected of an author acting with actual malice.").

Florida law.  *See* Dkt. 171 at 5.  Under New York law if the defendant's publication is "arguably within the sphere of legitimate public concern," a private figure must prove that the defendant acted with "gross irresponsibility."  *Chapadeau v. Utica Observer-Dispatch*, 38 N.Y.2d 196, 199, (N.Y. 1975).  That standard is "more severe than ordinary negligence." *Virelli v. Goodson-Todman Enterprises, Ltd.*, 159 A.D.2d 23, 25 (N.Y. App. 1990).  Here, no reasonable jury could find that it was "grossly irresponsible" to publish the Dossier, including Report No. 166.

                1.       <u>New York Law Applies To The Element of Fault</u>

This Court has already set out the legal framework for the choice of law analysis here. Dkt. 171 at 5-7.  As applied to the element of fault, the record reveals no reason why the analysis points to any different result.  If anything, the discovery record makes clear that Florida's relationship to this dispute is even more tenuous than was apparent from the pleadings alone.

<u>The Restatement Section 145(2) Contacts.</u>  As to the first contact, "the place where the injury occurred", the discovery record suggests no meaningful preference for either state's law. In a case of multistate defamation, a single state is rarely the place of injury.  Dkt. 171 at 8; *Nix v. ESPN, Inc.*, No. 1:18-cv-22208-UU (S.D. Fla. Aug. 30, 2018), Dkt. 27 at 7-8.  In such cases the *Restatement (Second) of Conflict of Laws* provides that a plaintiff corporation's principal place of business and an individual's domicile are usually the most relevant, but here none of those locales are in Florida.  *Restatement* § 150 cmt. f; *see Sarver v. Chartier*, 813 F.3d 891, 899 (9th Cir. 2016) (because plaintiff's "alleged injuries would most likely have occurred in multiple states, 'the place of injury will *not* play an important role in the selection of the state of applicable law'") (quoting *Restatement* § 145 cmt. e) (emphasis in original).

Moreover, Plaintiffs XBT and Gubarev have no relationship to Florida.  Any connection to this case is limited to the fact that one Plaintiff is incorporated here, but beyond that the record shows Webzilla, Inc.'s "presence" is a part-time employee and a virtual maildrop.  More importantly, the record makes clear that the principal injuries Plaintiffs are actually claiming "Webzilla" suffered relate to sister entities in Europe.  Turning to the second and third Restatement factors – "the place where the conduct occurred" and "the location of the parties" – they favor New York for the same reasons the Court set forth previously.  And the final factor, "the place where the parties' relationship is centered," is irrelevant as there is no such place.

<u>The Restatement Section 6 Factors.</u>  If the Court considers these factors as well, they also favor New York law for the same reasons this Court previously found.  Defendants still face

<div align="center">17</div>

another defamation suit in New York, and there too the plaintiffs deny they are public figures. *See* Dkt. 165-1 at 5-6.  Most importantly, like the fair report privilege, New York's gross irresponsibility standard "exist[s] to protect speakers, not to provide Plaintiffs a remedy."  Dkt. 171 at 9-10; *see Tzougrakis v. Cyveillance, Inc.*, 145 F. Supp. 2d 325, 329 (S.D.N.Y. 2001) ("gross irresponsibility" was adopted by the New York Court of Appeals in order "to protect the first amendment rights of newspaper publishers").  New York courts often refer to gross irresponsibility as a "qualified privilege" or "constitutional privilege" held by members of the media.  *See, e.g., Karaduman v. Newsday, Inc.*, 51 N.Y.2d 531, 537 (1980).  The standard focuses on the steps undertaken by the Defendants leading up to publication, almost all of which took place in and/or were directed from New York, while none occurred in Florida.  Thus, New York law should apply.  *See* Hon. Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* (5th Ed. 2017) at 15-62 ("The law of the plaintiff's domicile has little or no relation to [the applicable standard of fault]; the law of the defendant's domicile does.").

<div align="center">2.      <u>Publishing the Dossier Was Not "Grossly Irresponsible"</u></div>

New York law requires that "where the content of the article is arguably within the sphere of legitimate public concern…the party defamed…must establish by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties."  *Chapadeau*, 38 N.Y.2d at 199.  Gross irresponsibility is an "extremely high bar for a Plaintiff to meet."  *Cottrell v. Berkshire Hathaway, Inc.*, 8 Misc. 3d 564, 568 (N.Y. Sup. Ct. 2004).  As a result, beginning with *Chapadeau* itself, New York courts frequently grant summary judgment on the element of gross irresponsibility.  *See, e.g., Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1032 (2d Cir. 1997); *Konikoff v. Prudential Ins. Co.*, 234 F.3d 92, 106 (2d Cir. 2000); *Prince v. Fox Television Stations, Inc.*, 137 A.D.3d 486, 488 (N.Y. App. 2016).

Here, there can be no question that the subject-matter of the Article and Dossier is within the sphere of legitimate public concern.  *See, e.g., Gaeta v. N.Y. News, Inc.*, 62 N.Y.2d 340, 349 (1984); *Page v. Oath Inc.*, 2018 WL 1474620, at *2 (S.D.N.Y. Mar. 26, 2018).  In applying the standard New York courts have emphasized that no single set of factors determines gross irresponsibility, and so "[t]he exact parameters of the *Chapadeau* concept of recklessness can be divined, of course, only by reference to New York cases applying the standard to specific facts", particularly by reference to "[t]he case[s] closest to the facts here."  *Med-Sales Assocs.*, 663 F.

<div align="center">18</div>

Supp. at 913.  Crucially, New York courts recognize there is a difference between stories that report information about the plaintiff as objective fact, and stories which accurately report on investigative documents while making it clear that their underlying contents have not been verified.  *See, e.g., Konikoff*, 234 F.3d 92; *Crucey v. Jackall*, 275 A.D.2d 258 (N.Y. App. 2000).

The Article and Dossier fall into the latter category.  While BuzzFeed had many reasons to trust Steele's reports, SUMF ¶ 58, it initially refrained from publishing anything while it committed significant resources to investigate further.  After the CNN report broke, however, it published the Dossier within the context of an Article *about* the document, explaining its provenance and significance, not a story purporting to establish the veracity of its contents.

The facts here are much like those in *Crucey v. Jackall*.  That case involved a book containing allegations about the plaintiff made in affidavits collected by a private investigator hired by several elected officials to conduct an investigation into whether a law enforcement official had been wrongfully convicted.  275 A.D.2d  at 260 (Saxe, J., concurring).  The court held that because "the statements at issue had their genesis in an investigation conducted by various elected officials…it is unequivocally clear that the defendants did not act with gross irresponsibility."  *Id.* at 258-59.  A concurring opinion explained that:

> as a matter of law, that the assertions made about plaintiff in the book were accurate reports of the substance of the evidence obtained by the Molinari investigation…defendants' book does not say that the accusations contained in the affidavits were true or proven.

*Id.* at 264 (Saxe, J., concurring).  Justice Saxe further emphasized that:

> the book's challenged statements contained no assertion that was not in the source materials, nor did they add greater credence to the affidavits than was appropriate. Being "fair and accurate" reports of an investigation and the evidence it obtained, the challenged statements cannot logically be termed "grossly irresponsible" reporting.

*Id.* at 266.  Here too, the Article presented the Dossier much the same way the author in *Crucey* presented the investigative reports at issue there.

The Second Circuit reached analogous conclusions in *Konikoff*, 234 F.3d 92.  In that case, Prudential hired a law firm to conduct an independent investigation into allegations of real-estate fraud, and then released *verbatim* the firm's report.  *Id.* at 95-96.  One of the appraisers it discussed claimed that the report and an accompanying transcript contained defamatory allegations about her.  *Id.* at 96-97.  The Second Circuit affirmed summary judgment in favor of

4826-6987-1219v.3 0109842-000001

Prudential, finding "no indication that Prudential was grossly irresponsible in disseminating the statements."  *Id.* at 103.  Important to the Court's decision was the fact that Prudential had not sought to editorialize, redact, add to, or otherwise alter the law firm's report:

> Prudential could hardly have edited the reports to omit information *Prudential* thought to be inaccurate while honoring its goal of publicly disclosing, *in haec verba,* what [the law firm] thought to be the facts.  Prudential's censorship of the reports, even for the purpose of sparing the reputation of third parties, would have undermined its justifiable objective of baring all that the investigators had to say about the results of their inquiry.

*Id.* at 103.  The same reasoning applies here.

It also bears noting that while BuzzFeed may have been the first news organization to publish the Dossier, it was hardly the last.  Scores of other news organizations also immediately began to report on it.  SUMF ¶ 64.  Many actually included hyperlinks to the entire document on BuzzFeed's website, *id.*, and new reports analyzing in depth various portions of the document continue to be published to this day.  *Id.*  Since January 10, the Dossier has also been the subject of extensive Congressional testimony, endless political debate, several published books, and remains central to the controversy over Russia and President Trump.  *Id.*  To argue that a triable question exists as to whether it was "grossly irresponsible" for BuzzFeed to publish the Dossier is to argue that the American public should still be in the dark about the contents of a Dossier that has driven so much of American political life for almost two years.  That position would not reflect the "balance between the rights of private citizens to be protected against defamation and the constitutional guarantees of free speech and free press struck by New York courts" in adopting this exacting standard.  *Gaeta,* 62 N.Y.2d at 348-49.  ████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████  It was not grossly irresponsible to publish the Dossier.

## CONCLUSION

For the reasons stated herein, Defendants respectfully request that summary judgment be entered for Defendants.

Dated:  September 21, 2018                    Respectfully submitted,

*Of Counsel*:                                 /s/ Katherine M. Bolger
Nabiha Syed                                   Katherine M. Bolger
BuzzFeed, Inc.                                Nathan Siegel
11 E. 18th Street, 13th Floor                 Adam Lazier
New York, NY 10003                            Alison Schary
                                              Davis Wright Tremaine, LLP
                                              1251 Avenue of the Americas, 21st Floor
                                              New York, New York 10020
                                              katebolger@dwt.com
                                              nathansiegel@dwt.com
                                              adamlazier@dwt.com
                                              alisonschary@dwt.com


                                              /s/ Roy Black
                                              Roy Black
                                              Jared Lopez
                                              Black, Srebnick, Kornspan & Stumpf, P.A.
                                              201 So. Biscayne Boulevard
                                              Miami, Florida 33131
                                              rblack@royblack.com
                                              jlopez@royblack.com

                                              *Attorneys for Defendants*

21

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing, together with its exhibits, will be served electronically by email on all counsel or parties of record on the service list below this 21st day of September, 2018.

By: /s/ Jared Lopez
Jared Lopez, Esq.

## SERVICE LIST

Matthew Shayefar
Valentin D. Gurvits
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1806
Facsimile: 617-928-1802
matt@bostonlawgroup.com
vgurvits@bostonlawgroup.com

Evan Fray-Witzer
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-000
Facsimile: 617-423-4855
Evan@CFWLegal.com

Brady J. Cobb
Dylan Fulop
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com
dfulop@cobbeddy.com