# Exhibit 29

2017 WL 1047848
Roll Call, Inc.
Copyright (c) 2017 Roll Call, Inc.

Verbatim Transcript
March 20, 2017

House of Representatives
Permanent Select Committee on Intelligence
Committee Hearing

House Permanent Select Committee on Intelligence Hearing on Russian Active Measures Investigation

HOUSE PERMANENT SELECT COMMITTEE ON INTELLIGENCE
HEARING ON THE INVESTIGATION INTO RUSSIAN ACTIVE
MEASURES DURING THE 2016 ELECTION CAMPAIGN

MARCH 20, 2017

SPEAKERS:
REP. DEVIN NUNES, R-CALIF.
CHAIRMAN
REP. K. MICHAEL CONAWAY, R-TEXAS
REP. PETER T. KING, R-N.Y.
REP. FRANK A. LOBIONDO, R-N.J.
REP. TOM ROONEY, R-FLA.
REP. ILEANA ROS-LEHTINEN, R-FLA.
REP. CHRIS STEWART, R-UTAH
REP. MICHAEL R. TURNER, R-OHIO
REP. BRAD WENSTRUP, R-OHIO
REP. RICK CRAWFORD, R-ARK.
REP. TREY GOWDY, R-S.C.
REP. WILL HURD, R-TEXAS
REP. ELISE STEFANIK, R-N.Y.
REP. PAUL D. RYAN, R-WIS.
EX OFFICIO

REP. ADAM B. SCHIFF, D-CALIF.
RANKING MEMBER
REP. JIM HIMES, D-CONN.
REP. TERRI A. SEWELL, D-ALA.
REP. ANDRE CARSON, D-IND.
REP. MIKE QUIGLEY, D-ILL.
REP. JACKIE SPEIER, D-CALIF.
REP. ERIC SWALWELL, D-CALIF.
REP. JOAQUIN CASTRO, D-TEXAS
REP. DENNY HECK, D-WASH.
REP. NANCY PELOSI, D-CALIF.

2017 WL 1047848, 2017 WL 1047848 (2017)

EX OFFICIO

WITNESSES:
FBI DIRECTOR JAMES COMEY

ADMIRAL MICHAEL S. ROGERS (USN),
DIRECTOR, NATIONAL SECURITY AGENCY,
AND COMMANDER, U.S. CYBER COMMAND

NUNES: The committee will come to order.

I would like to welcome our witnesses, director of the FBI, Jim
Comey and director of the National Security Agency, Admiral Rogers.
Thank you both for being here today.

Before we begin, I would like to remind our members and witnesses
that this is an open hearing. I recognize the challenge of discussing
sensitive national security issues in public. However, as part of
this committee's investigation into Russian active measures during the
2016 election, it is critical to ensure that the public has access to
credible unclassified facts and to clear the air regarding
unsubstantiated media reports.

To our guests in the audience, welcome. We appreciate you being
here. I also expect that the proper decorum will be observed at all
times today and that disruptions during today's proceedings will not
be tolerated. I now recognize myself for five minutes for the purpose
of an opening statement.

The Putin regime has a long history of aggressive actions against
other countries, including the outright invasion of two of its
neighbors in recent years, as well as its brutal military action in
Syria to defend the Assad regime. But it's hostile acts take many
forms, aside from direct military assaults.

For example, the Kremlin is waging an international
disinformation campaign through the RT propaganda network which
traffics in anti-American conspiracy theories that rivaled the
extravagant untruths of Soviet era Pravda (ph). Russia also has a
long history of meddling in other countries, election systems and
launching cyber attacks on a wide range of countries and industries.

The Baltic's and other Russian neighbors have long decried these
attacks. But their warnings went unheeded in far too many nations'
capitals, including our own. The fact that the Russia -- that Russia
hacked U.S. election-related databases comes as no shock to this
committee. We have been closely monitoring Russia's aggression for
years.

2017 WL 1047848, 2017 WL 1047848 (2017)

A year ago, I publicly stated that our inability to predict
Putin's regime plans and intentions has been the biggest intelligence
failure that we have seen since 9/11 and that remains my view today.
However, while the indications of Russian measures targeting the U.S.
presidential election are deeply troubling, one benefit is already
clear. It has focused wide attention on the -- on the pressing
threats posed by the Russian autocrat.

In recent years, committee members have issued repeated and
forceful pleas for stronger action against Russian belligerents. But
the Obama administration was committed to the notion against all
evidence that we could reset relations with Putin. And it routinely
ignored our warnings. I hope today's hearing will shed light on three
important focus points of the committee's investigation on Russia
active measures.

First, what actions did Russia undertake against the United
States during the 2016 election campaign and did anyone from political
campaign -- a political campaign conspire in these activities? Number
two, were the communications of officials or associates of any
campaign subject to any kind of improper surveillance? The
intelligence community has -- has extremely strict procedures for
handling information pertaining to any U.S. citizens who are subject
even to incidental surveillance. And this committee wants to ensure
all surveillance activities have followed all relevant laws, rules and
regulations.

Let me be clear, I've been saying this for several weeks. We
know there was not a physical wiretap of Trump Tower. However, it's
still possible that other surveillance activities were used against
President's Trump and his associates. Number three, who has leak
classified information? Numerous current and former officials have
leak purportedly classified information in connection to these
questions. We aim to determine who has leaked or facilitated leaks of
classified information so that these individuals can be brought to
justice.

I hope that this committee's bipartisan investigation will result
in a definitive report on the Russian actions taken during the
election campaign. To that end, we encourage anyone who has
information about these topics to come forward and speak to the House
Intelligence Committee. I again think the witnesses for helping shed
light on these issues.

And I will let recognize Ranking Member Schiff. He's asked for
15 minutes for his opening statement, so I will go ahead and give him
15 minutes for his opening statement.

Mr. Schiff?

SCHIFF: Mr. Chairman, I thank you. And I also want to thank Director Comey and Admiral Rogers for appearing before us today as the committee holds its first open hearing into the interference campaign waged against our 2016 presidential election.

Last summer at the height of a bitterly contested and hugely consequential presidential campaign, a foreign adversarial power intervened in an effort to weaken our democracy and to influence the outcome for one candidate and against the other. That foreign adversary was of course Russia and it activated through its intelligence agencies and upon the direct instructions of its autocratic ruler Vladimir Putin, in order to help Donald J. Trump become the 45th president of the United States.

The Russian active measures campaign may have begun as early as 2015, when Russian intelligence services launched a series of spear fishing attacks designed to penetrate the computers of a broad array of Washington based Democratic and Republican party organizations, think tanks and other entities. This continued at least through the winter of 2016.

While at first the hacking may have been intended solely for the collection of foreign intelligence. In mid-2016 the Russians weapon eyes the stolen data and used platforms established by the Intel services, such as D.C. leaks in existing third-party channels like WikiLeaks to dump the documents. The stolen documents were almost uniformly damaging to the candidate Putin despised, Hillary Clinton. And by forcing her campaign to constantly respond to the daily drip of disclosures, the releases greatly benefited Donald Trump's campaign.

None of these facts is seriously in question. And they're reflected in the consensus conclusion of our intelligence agencies. We will never know whether the Russian intervention was determinative in such a close election. Indeed, it is unknowable in a campaign to which so many small changes could have dictated a different result. More importantly, and for the purposes of our investigation, it simply does not matter.

What does matter is this, the Russians successfully meddled in our democracy and our intelligence agencies have concluded they will do so again. Ours is not the first democracy to be attacked by the Russians in this way. Russian intelligence has been simile interfering in the internal and political affairs of our European and other allies for decades.

SCHIFF: What is striking here is the degree to which the Russians were willing to undertake such an audacious and risky action against the most powerful nation on Earth. That ought to be a warning

to us that if we thought that the Russians would not dare to so blatantly interfere in our affairs, we were wrong.

And if we do not do our very best to understand how the Russians accomplished this unprecedented attack on our democracy and what we need to do to protect ourselves in the future, we will only have ourselves to blame. We know a lot about the Russian operation, about the way they amplified the damage their hacking and dumping of stolen documents was causing through the use of slick propaganda like R.T., the Kremlin's media arm. But there is a lot we don't know.

Most important, we do not yet know whether the Russians have the help of U.S. citizens including people associated with the Trump campaign. Many of the Trump's campaign personnel, including the president himself, have ties to Russia and Russian interests. This is of course no crime. On the other hand, if the Trump campaign or anyone associated with it aided or abetted the Russians, it would not only be a serious crime, it would also represent one of the most shocking betrayals of democracy in history.

In Europe, where the Russians have a much longer history of political interference, they've used a variety of techniques to undermine democracy. They employed the hacking and dumping of documents and slick propaganda as they clearly did here. But they've also used bribery, blackmail, compromising material, and financial entanglement to secure needed cooperation from individual citizens of targeted countries.

The issue of U.S. person involvement is only one of the important matters that the chairman and I have agreed to investigate and which is memorialized in the detailed and bipartisan scope of investigation that we have signed. We'll also examine whether the intelligence community's assessment of the Russian operation is supported by the raw intelligence, whether the U.S. government responded properly or missed the opportunity to stop this Russian attack much earlier and whether the leak of information about Michael Flynn or others is indicative of a systemic problem.

We have also reviewed whether there is any evidence to support President Trump's claim that he was wiretapped by President Obama in Trump Tower and found no evidence whatsoever to support that slanderous accusation. And we hope that Director Comey can now put that matter permanently to rest.

Today, most of my Democratic colleagues will be exploring with the witnesses the potential involvement of U.S. persons in the Russian attack on our democracy. It is not that we feel the other issues are less important; they are very important, but rather because this issue is least understood by the public. We realize of course that the witnesses may not be able to answer many of the questions in open

session.

They may or may not be willing to disclose even whether there is
an investigation. But we hope to present to you directors and the
public why we believe this is a matter of such gravity that it demands
a thorough investigation not only by us as we intend to do but by the
FBI as well.

Let me give you a short preview of what I expect you'll be asked
by our members. Whether the Russian active measures campaign began as
nothing more than an attempt to gather intelligence or was always
intended to be more than that, we do not know and is one of the
questions we hope to answer. But we do know this; the months of July
and August 2016 appear to have been pivotal.

It was at this time the Russians began using the information they
had stolen to help Donald Trump and harm Hillary Clinton. And so the
question is, why? What was happening in July, August of last year and
were U.S. persons involved? Here are some of the matters drawn from
public sources alone since that is all we can discuss in this setting
that concern us and we believe should concern all Americans.

In early July, Carter Page, someone candidate Trump identified as
one of his national security advisors, travels to Moscow on a trip
approved by the Trump campaign. While in Moscow, he gives a speech
critical of the United States and other western countries for what he
believes is a hypocritical focus on democratization and efforts to
fight corruption.

According to Christopher Steele, a British -- a former British
intelligence officer, who is reportedly held in high regard by US
intelligence, Russian sources tell him that Page has also had a secret
meeting with Igor Sechin, CEO of the Russian gas giant, Rosneft.
Sechin is reported to be a former KGB agent and close friend of
Putin's.

According to Steele's Russian sources, Page is offered brokerage
fees by such an on a deal involving a 19 percent share of the company.
According to Reuters, the sale of a 19.5 percent share of Rosneft
later takes place with unknown purchasers and unknown brokerage fees.
Also, according to Steele's Russian sources, the campaign has offered
documents damaging to Hillary Clinton which the Russians would publish
through an outlet that gives them deniability like WikiLeaks.

The hacked documents would be in exchange for a Trump
administration policy that deemphasizes Russia's invasion of Ukraine
and instead focuses on criticizing NATO countries for not paying their
fair share. Policies which even as recently as the President's
meeting last week with Angela Merkel have now presently come to pass.

In the middle of July, Paul Manafort, the -- the Trump campaign manager and someone who was a long on the payroll of Pro Russian-Ukrainian interests attends the Russian -- the Republican Party Convention. Carter Page, back from Moscow, also attends the convention. According to Steele, it was Manafort who chose Page to serve as a go-between for the Trump campaign and Russian interests.

Ambassador Kislyak, who presides over a Russian Embassy in which diplomatic personnel would later be expelled as likely spies, also attends the Republican Party Convention and meets with Carter Page, and additional Trump advisors J.D. Gordon and Walid Phares. It was J.D. Gordon who approved Page's trip to Moscow.

Ambassador Kislyac also meets with Trump national campaign chair, National Security Campaign Chair and now attorney general, Jeff Sessions. Sessions would later deny meeting with Russian officials during his Senate confirmation hearing. Just prior to the convention, the Republican Party platform is changed, removing a section that supports the provision of lethal defensive weapons to Ukraine, an action that would be contrary to Russian interests.

Manafort categorically denies involvement by the Trump campaign and altering the platform, but the Republican Party delegate who offered the language in support of providing defensive weapons to Ukraine states it was removed at the insistence of the Trump campaign. Later, J.D. Gordon admits opposing the inclusion of the provision of the time it was being debated and prior to its being removed.

Later in July and after the convention, the first stolen e-mails detrimental to Hillary Clinton appear on WikiLeaks. A hacker who goes by the moniker, Guccifer 2.0, claims responsibility for hacking the DNC and giving the documents to WikiLeaks. A leading private cyber security firms including Crowdstrike, Mandiant and ThreatConnect review the evidence of the hack and conclude with high certainty that it was the work of APT 28 and APT 29 who are known to be Russian intelligence services.

The U.S. intelligence committee also later confirms that the documents were in fact stolen by Russian intelligence and Guccifer 2.0 acted as a front. Also in late July, candidate Trump praises WikiLeaks, says he loves them and openly appeals to the Russians to hack his opponents e-mails telling them that they will be richly rewarded by the press.

On August 8th, Roger Stone, a long time Trump political advisor and self-proclaimed political dirty trickster, boasts in his speech that he has communicated with Assange and that more documents would be coming, including an October surprise. In the middle of August, he also communicates with the Russian cut out Guccifer 2.0 and authors a

Breitbart piece denying Guccifer's links to Russian intelligence.

Then later, in August, Stone does something truly remarkable.
When he predicts that John Podesta's personal e-mails will soon be
published, trust me he says, it will soon be Podesta's time in the
barrel, #crookedHillary. In the weeks that follow, Stone shows
remarkable prescience. I have total confidence that WikiLeaks and my
hero, Julian Assange will educate the American people soon, he says,
#LockHerUp. Payload coming, he predicts and two days later it does.

WikiLeaks releases its first batch of Podesta e-mails. The
release of John Podesta's e-mails would then continue on a daily
basis, up until the election. On Election Day in November, Donald
Trump wins. Donald Trump appoints one of his high-profile surrogates,
Michael Flynn, to be his national security advisor. Michael Flynn has
been paid by the Kremlin's propaganda outfit RT in the past, as well
as another Russian entity.

In December, Michael Flynn has a secret conversation with
Ambassador Kislyak, about sanctions imposed by President Obama on
Russia over attacking designed to help the Trump campaign. Michael
Flynn lies about the secret conversation. The vice president
unknowingly then assures the country that no -- no such conversation
ever happened. The president is informed that Flynn has lied and
Pence has misled the country. The president does nothing.

Two weeks later, the press reveals that Flynn has lied and the
president is forced to fire Mr. Flynn. The president then praises the
man who lied, Mr. Flynn, and castigates the press for exposing the
lie.

Now, is it possible that the removal of the Ukraine provision
from the GOP platform was a coincidence? Is it a coincidence that
Jeff Sessions failed to tell the Senate about his meetings with a
Russian ambassador, not only at the convention, but a more private
meeting in his office and at a time when the U.S. election was under
attack by the Russians?

Is it a coincidence that Michael Flynn would lie about a
conversation he had with the same Russian Ambassador Kislyak, about
the most pressing issue facing both countries at the time they spoke,
the U.S. imposition of sanctions over Russian hacking of our election
designed to help Donald Trump? Is it a coincidence that the Russian
gas company, Rosneft, sold a 19 percent share after former British
intelligence officer Steele was told by Russian sources that Carter
Page was offered fees on a deal of just that size?

Is it a coincidence that Steele's Russian sources also affirmed
that Russian had stolen documents hurtful to Secretary Clinton that it

would utilize in exchange for Pro Russian policies that would later
come to pass? Is it a coincidence that Roger Stone predicted that
John Podesta would be a victim of a Russian hack and have his private
e-mails published and did so even before Mr. Podesta himself, was
fully aware that his private e-mails would be exposed?

Is it possible that all of these events and reports are
completely unrelated and nothing more than a entirely unhappy
coincidence? Yes, it is possible. But it is also possible, maybe
more than possible, that they are not coincidental, not disconnected
and not unrelated and that the Russians use the same techniques to
corrupt U.S. persons that they employed in Europe and elsewhere. We
simply don't know, not yet. And we owe it to the country to find out.

Director Comey, what you see on the dais in front of you in the
form of this small number of members and staff is all we have to
commit to this investigation. This is it. We are not supported by
hundreds or thousands of agents and investigators with offices around
the world. It is just us and our Senate counterparts.

In addition to this investigation we still have our day job which
involves overseeing some of the largest and most important agencies in
the country. Agencies which by the way are trained to keep secrets.
I point this out for two reasons and I'm -- I'm wrapping up Chairman.
First because we cannot do this work alone and nor should we. We
believe these issues are so important that the FBI must devote its
resources to investigating each of them thoroughly, to do any less
would be negligent in the protection of our country.

We also need your full cooperation with our investigation so that
we may have the benefit of what you know and so that we may coordinate
our efforts in the discharge of both our responsibilities. And
second, I raise this because I believe that we would benefit from the
work of an independent commission that can devote the staff resources
to this investigation that we do not have. And it can be completely
removed from any political considerations.

This should not be a substitute for the work that we, in the
intelligence committee, should and must do. But as an important
complement to our efforts, just as was the case after 9/11. The
stakes are nothing less than the future of our democracy and liberal
democracy. Because we're engaged in a new war of ideas, not communism
versus capitalism, but authoritarianism versus democracy and
representative government. And in the struggle, our adversary sees
our political process as a legitimate field of battle.

Only by understanding what the Russians did can we inoculate
ourselves from further Russian interference that we know is coming.
Only then can we protect our European allies, who are as we speak,

enduring similar Russian interference in their own elections.

And finally, I want to say a word about our own committee investigation. You will undoubtedly observe in the questions and comments that our members make during today's hearing that the members of both parties share a common concern over the Russian attack on our democracy. But bring a different perspective on the significance of certain issues or the quantum of evidence we have seen in the early -- earliest stages of this investigation. This is to be expected.

The question most people have is whether we can really conduct this investigation in the kind of thorough and nonpartisan manner that the seriousness of the issues merit or whether the enormous political consequences of our work will make that impossible.

The truth is, I don't know the answer, but I do know this, if this committee can do its work properly, if we can pursue the facts wherever they lead, unafraid to compel witnesses to testify, to hear what they have to say, to learn what we will. And after exhaustive work reach a common conclusion, it would be a tremendous public service and one that is very much in the national interest. So let us try.

I thank you, Mr. Chairman and I yield back.
NUNES: Thank you. Gentleman yields back.

With that that, Admiral Rogers, you're recognized for five minutes.

ROGERS: Thank you sir.

Chairman Nunes, Ranking Member Schiff and members of the committee. Thank you for the opportunity to appear before you today on behalf of the men and women of the National Security Agency.

I'm honored to appear besides my teammate Director Comey to discuss Russia's activities and intentions regarding the 2016 U.S. election. And want to assure the committee that my team is doing its best to fulfill the various requests of this committee to support your ongoing investigations into this subject.

ROGERS: Over the past weeks, NSA has been working closely with the committee to provide you the information that you require for your investigation and I can assure you we will continue to do so. When we last met in January, we discussed the classified version of the January intelligence committee -- community's assessment on assessing Russian activities and intentions in the recent U.S. elections.

Today, more than two months after we issued this assessment, we

stand by it as issued. There is no change in our confidence level on the assessment. Of course, the specifics of this assessment need to remain classified to protect sensitive sources and methods so today I will limit my discussion to information in the public domain, that of the publicly released intelligence community assessment.

I hope you will understand that there are some issues I cannot discuss in an open session, nor will I be able to provide specifics in some areas. As the committee fully knows, the intelligence community has a longstanding policy of not discussing surveillance targeting information, in particular cases, as to do so would invariably open the door to compel further disclosures and litigation or the release of classified information, all of which would be harmful to our national security.

Like the committee, we are also greatly concerned about leaks of classified information as they can reveal the sources and methods we employ to provide intelligence to American policymakers and warfighters and generate advantage for our nation while protecting its citizens and interest and their privacy. I also want to assure the committee that we take very seriously that obligation to protect U.S. persons' privacy. This applies to all stages of the production of foreign intelligence, but I'd like to emphasize one area in particular; the dissemination of U.S. person information.

We at NSA have strict procedures in place to make sure that our reporting and the contents of our reporting are disseminated only to those that have strict need-to- know for valid purposes which primarily means support of the development of foreign policy and to protect national security. I do want to specifically mention that among the collection and authorities that we have to target foreign actors in foreign spaces, FISA Section 702 and Executive Order 12333 have been instrumental in our ability to produce the intelligence made available to the committee and others in gathering the SIGINT facts of foreign activity in this election cycle.

It would be difficult to overstate the breadth and scale of malicious cyber activity occurring today. Our adversaries including nation states have not rested in trying to penetrate government systems, steal our private industries' intellectual property, and make even greater strides towards the development and achievement of cyber attack capabilities. We have a hardworking and dedicated team at NSA that works every day to generate insights on this activity and to thwart its effectiveness. But cyber defense is a team sport and one of NFA -- NSA's strongest partners in this effort is Director Comey's team at the FBI.

And I'm glad to be able to describe here today how we are working together to help protect the nation and our allies to include

providing a better understanding of Russian intentions and capabilities. In light of the I.C. assessment and findings, I welcome your investigation into overall Russian activities targeting the previous U.S. elections. NSA continues to employ rigorous analytic standards, applying them in every aspect of our intelligence reporting.

Our analysts have consistently proven to be reliable and thorough in their technical and analytic efforts and providing our policymakers and warfighters with SIGINT ammunition to make informed decisions to protect our nation's freedom and ensure the safety of its citizens. They are diligently continuing to monitor for additional reflections of Russian targeting of U.S. systems and those of our friends and allies around the world to share that information with our I.C. colleagues and foreign counterparts and to share that information with our I.C. colleagues and foreign counterparts and to produce unbiased, unprejudiced and timely reporting of SIGINT facts in their entirety.

I look forward your questions. Thank you, sir.

NUNES: Thank you, Admiral Rogers.

Director Comey, you're recognized for five minutes.

COMEY: Mr. Chairman, Ranking Member Schiff, members of the committee, thank you for including me in today's hearing. I'm honored to be here representing the people of the FBI.

I hope we have shown you through our actions and our words how much we at the FBI value your oversight of our work and how much we respect your responsibility to investigate those things are important to the American people. Thank you for showing that both are being taken very seriously.

As you know, our practice is not to confirm the existence of ongoing investigations, especially those investigations that involve classified matters, but in unusual circumstances where it is in the public interest, it may be appropriate to do so as Justice Department policies recognize. This is one of those circumstances.

I have been authorized by the Department of Justice to confirm that the FBI, as part of our counterintelligence mission, is investigating the Russian government's efforts to interfere in the 2016 presidential election and that includes investigating the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts. As with any counterintelligence investigation, this will also include an assessment of whether any crimes were committed.

Because it is an open ongoing investigation and is classified, I
cannot say more about what we are doing and whose conduct we are
examining. At the request of congressional leaders, we have taken the
extraordinary step in coordination with the Department of Justice of
briefing this Congress' leaders, including the leaders of this
committee, in a classified setting in detail about the investigation
but I can't go into those details here. I know that is extremely
frustrating to some folks. I hope you and the American people can
understand. The FBI is very careful in how we handle information
about our cases and about the people we are investigating.

We are also very careful about the way we handle information that
may be of interest to our foreign adversaries. Both of those
interests are at issue in a counterintelligence investigation. Please
don't draw any conclusions from the fact that I may not be able to
comment on certain topics. I know speculating is part of human
nature, but it really isn't fair to draw conclusions simply because I
say that I can't comment.

Some folks may want to make comparisons to past instances where
the Department of Justice and the FBI have spoken about the details of
some investigations, but please keep in mind that those involved the
details of completed investigations. Our ability to share details
with the Congress and the American people is limited when those
investigations are still open, which I hope makes sense.

We need to protect people's privacy. We need to make sure we
don't give other people clues as to where we're going. We need to
make sure that we don't give information to our foreign adversaries
about what we know or don't know. We just cannot do our work well or
fairly if we start talking about it while we're doing it. So we will
try very, very hard to avoid that, as we always do.

This work is very complex and there is no way for me to give you
a timetable as to when it will be done. We approach this work in an
open-minded, independent way and our expert investigators will
conclude that work as quickly as they can but they will always do it
well no matter how long that takes. I can promise you, we will follow
the facts wherever they lead. And I wanna underscore something my
friend Mike Rogers said, leaks of classified information are serious,
serious federal crimes for a reason...

(AUDIO GAP)

COMEY: ... they should be investigated and where possible
prosecuted in a way that reflects that seriousness so that people
understand it simply cannot be tolerated.

And I look forward to taking your questions.

NUNES: Thank you, Director Comey.

Admiral Rogers, first I wanna go to you. On January 6th, 2017,
the intelligence community assessment assessing Russian activities and
intentions in recent U.S. elections, stated that the types of systems
Russian actors targeted or compromised were not involved in vote
tallying.

So my question as of today, Admiral Rogers, do you have any
evidence that Russia cyber actors changed vote tallies in the state of
Michigan?

ROGERS: No I do not, but I would highlight we are a foreign
intelligence organization, not a domestic intelligence organization.
So it would be fair to say, we are probably not the best organization
to provide a more complete answer.

NUNES: How about the state of Pennsylvania?

ROGERS: No, sir.

NUNES: The state of Wisconsin?

ROGERS: No, sir.

NUNES: State of Florida?

ROGERS: No, sir.

NUNES: The state of North Carolina?

ROGERS: No, sir.

NUNES: The state of Ohio?

ROGERS: No, sir.

NUNES: So -- so you have no intelligence that suggests, or
evidence that suggests, any votes were changed?

ROGERS: I have nothing generated by the national security
industry, sir.

NUNES: Director Comey, do you have any evidence at the FBI that
any votes were changed in the states that I mentioned to Admiral
Rogers?

COMEY: No.

NUNES: Thank you. Admiral Rogers, I know that there was a leak of information regarding Director Clapper and Former Secretary of Defense Carter, were looking at relieving you of your -- of your duty.

Are you aware of those stories?

ROGERS: I'm aware of media reporting to that.

NUNES: And those stories were leaked as soon as you had visited with President-elect Trump. Is that correct?

ROGERS: Yes sir, I was asked if I would be prepared to interview with the Trump administration for a position, which I did.

NUNES: Did the leak of that information at all -- at all impact your ability and your assessment that you did for the intelligence community's assessment on January 6th?

ROGERS: No sir, if I spent time in this job worrying about un-sourced media reporting, I'd never get any work done.

NUNES: Thank you, Admiral.

Director Comey, I remain extremely concerned about the widespread illegal leaks that you just referenced in your -- in your testimony. Just for the record though, I wanna get this on the record.

Does the unauthorized disclosure of classified information to the press violate 18 USC 793, a section of the Espionage Act that criminalizes improperly accessing handling or transmitting national defense information?

COMEY: Yes.

NUNES: Would an unauthorized disclosure of FISA-derived information to the press violate 18 USC 798, a section of the Espionage Act that criminalizes the disclosure of information concerning the communication and intelligence activities of the United States?

COMEY: Yes, in addition to being a breach of our trust with the FISA Court that oversees our use of those authorities.

NUNES: Thank you, Director.

At this time, I'm gonna yield to Mr. Rooney, who chairs our NSA cyber committee, for questions.

ROONEY: Thank you, Mr. Chairman.

I'd like to direct my questions, first and foremost, to Admiral Rogers to convey my thanks to the many men and women for their dedication at the NSA for keeping our country safe. As well as I want to talk about the recent media stories, it may have led to confusion in the public about what the NSA is and is not legally collecting in. And the safeguards the NSA has put into place to protect personal data.

So I'd like to clarify is the chairman of the subcommittee on the NSA, I recently got to meet your deputy admiral last week out at the NSA and we visited and spoke of some of these things. And what -- what we can talk about your today publicly, if you could go into, if you can't, you can't. But I think that this is important for the people in the room and -- and listening outside understand.

Is it true that the NSA would need a court order based on probable cause to conduct electronic surveillance on a U.S. person inside the United States?

ROGERS: Yes sir.

ROONEY: And just to be clear, the section of the FISA that is expiring later this year, that's 702, which will be talking about a little bit, cannot be used to target U.S. persons or persons in the United States, is that correct?

ROGERS: Yes sir.

ROONEY: Section 702 focuses on non-U.S. persons outside the United States, primarily correct?

ROGERS: Yes sir.

ROONEY: Do you believe that the section 702 is important and valuable for U.S. national security?

ROGERS: Yes sir.

ROONEY: So it's safe to say that without having this tool, it would be a threat to our national security?

ROGERS: It would significantly impact my ability to generate the insights that I believe this nation needs.

ROONEY: In the media, there's a lot of reporting about something called incidental collection. Can you talk about what incidental

collection is?

ROGERS: Yes sir. Incidental collection is when we are targeting a valid foreign target, for example, in the course of that targeting we either get a reference to a U.S. person or suddenly a U.S. person appears as part of the conversation. That's what we call incidental collecting.

ROONEY: And -- and what you do when it went something like that happens, if there's a U.S. person part of an incidental collection, what kind of safeguards are put in place to make sure that...

ROGERS: So it depends specifically on the legal authority that we're using to execute the collection in the first place. But in broad terms, realizing again, it varies little bit by the specific authority that we're using to conduct the collection. We step back and we ask ourselves first, are we dealing with a U.S. person here? Is there something that we didn't expect to encounter that we've now encountered?

We'll ask ourselves what leads us to believe that it is a U.S. person. If we come to the conclusion that it is a U.S. person and we ask ourselves are we -- are we listening to criminal activity, are we seeing something of imminent threat or danger, for example, or are we just receiving something that has nothing to do with any of our valid collection authority? Based on that, we'll then take a series of actions.

In some case, we will just purge the collect, make no reporting on it, not retain the data. It's incidental collection, it has no intelligence value and it wasn't the purpose of what we were doing. In some cases then if we believe that there is intelligence value, for example, whether it's a reference to a U.S. person, as an example in a scenario.

In our reporting then we will mask the identity of the individual. We use a phrase like U.S. person one or U.S. person two. And I would remind everyone that for our purposes, U.S. person is defined very broadly. That is not just a U.S. citizen, that is a U.S. corporation, that is a ship or aircraft that is registered in the United States, that is an internet protocol address, for example.

So it's not just a particular individual, if that makes sense. The term for us is much broader because designed to ensure our protections of U.S. persons.

ROONEY: And this -- the procedures and protections you talked about are required and approved by the FISA court, is that correct?

ROGERS: Yes sir, and the attorney general.

ROONEY: And you mentioned in your opening statement that for that kind of information to be disseminated outside of your agency and the NSA that that dissemination would be strictly on a need-to-know basis, is that -- is that correct?

ROGERS: We use two criteria; is there a need to know in the course of the person or group that is asking for the identification, is there a valid need to know in the course of the execution of their official duties?

ROONEY: So like, who would that be?

ROGERS: It could be another element with the intelligence community, it could be another element within NSA, it could be a military customer, for example, who's reading some of our reporting. It could be a policymaker.

I apologize, there was one other point I wanted to make, but I've lost the thread in my mind. I apologize if I jump in at a moment...

ROONEY: I'm sorry, I cut you off.

ROGERS: I'll try to make...

ROONEY: Let's get back to masking briefly.

You spoke about masking and trying to keep a U.S. person's identity concealed. And when it is disseminated, you -- we often talk about in the intelligence community the exceptions to how -- if somebody's masks, how you unmask them. What would the exceptions to that masking be before it's disseminated?

ROGERS: So again, we use two criteria; the need to know on the person requesting us in the execution of their official duties and the second part was, is the identification necessary to truly understand the context of the intelligence value that the report is designed to generate? Those are the two criteria we use.

ROONEY: Is that identity of a U.S. person communicating with a foreign target? Is that ordinarily disseminated in a masked or unmasked form?
ROGERS: No. It is normally disseminated, if we -- if we make the decision that there's intelligence value and we're going to report on it, it is normally disseminated in a masked form. I would -- again, as I said, we use a reference, U.S. person one, U.S. person two...

ROONEY: Right.

ROGERS: I would highlight, if you look at the total breadth of our reporting, reporting involving U.S. persons at all is an incredibly small subset in my experience of our total reporting.

ROONEY: Who normally in the NSA would make the decision to unmask?

ROGERS: There are 20 individuals including myself who I have delegated this authority to approve unmask requests.

ROONEY: And does the level of approval change depending on the reason for unmasking? If it was something or somebody, say, really important would that matter or could it be...

ROGERS: Not -- it's not necessarily designated in writing that way, but certainly by custom and tradition, at times requests will be pushed up to my -- I'm the senior-most of the 20 individuals. Requests will be pushed to my level, say "hey, sir, we just want to make sure that you're comfortable with this."

ROONEY: Right. So 20 people, that -- you know, what procedures or safeguards are put in place to make sure that those 20 people are not unmasking wrongly?

ROGERS: So they retrieve specific training, there are specific controls put in place in terms of our ability to disseminate information out of the databases associated with U.S. persons.

ROONEY: OK. Let's run through the exceptions quickly through a following hypothetical. If the NSA collects a communication where a target under surveillance is talking to a U.S. person, how would the NSA determine whether disseminating the U.S. person information is necessary to understanding the foreign intelligence or assess its importance?

ROGERS: So first of all, try to understand the nature of the conversation. Is this truly something that involves intelligence or a national security implication for the United States or is this just very normal, reasonable conversations, in which case we have no desire to have any awareness of it, it's not applicable to our mission.

In that case, normally we'll purge the data. We'll ask ourselves, is there criminal activity involved, is there a threat, potential threat or harm to U.S. individuals being discussed in a conversation for example.

ROONEY: If there was criminal activity involved, what would you

do then?

ROGERS: If when we disseminate -- if we decide we need -- if it's criminal activity, we'll disseminate the information and if the FBI or other criminal activities are on the reporting stream, in some cases I also will generate a signed letter under my signature in specific cases to Department of Justice highlighting that what we think we have is potential criminal activity, but because we are not a law enforcement or justice organization we're not in a place to make that determination.

ROONEY: OK. Based on that, again, hypothetically, if the NSA obtained the communication of General Flynn while he was communicating with the surveillance target legally, would you please explain how General Flynn's identity could be unmasked based on the exceptions that we discussed?

ROGERS: Sir, I'm not going to discuss even hypotheticals about individuals, I'm sorry.

ROONEY: If I could make reference to a Washington Post article that I have here from February 9 which states -- do you -- let me say what it is and I'll ask if you've read it or -- or -- or if you've seen it. Which states national security under Michael Flynn privately discussed U.S. sanctions against Russia with the country's ambassador to the United States during the month before President Trump took office.

Contrary to public assertions by Trump officials current and -- and former U.S. officials said. The article goes on to say that nine current or former -- former officials who were in senior positions at multiple agencies at the time of the call spoke under the condition of anonymity to discuss intelligence matters. Did you read this article?

ROGERS: I apologize, sir. It's not -- an article that references nine particular individual -- it doesn't necessarily ring a bell. I've certainly seen plenty of media reporting that but again, I'm not going to comment on specifics.

ROONEY: Just basically under the breath of that article, when we when we hear that nine former, current -- or current officials had spoken to the press under the condition of anonymity, and we heard our director Comey and the Chairman speak of this is a potential crime -- a serious crime -- under the Espionage Act, assuming if this article is accurate, who would have the -- who would be in a position to request the unmasking of General Flynn's identity? Would that be you?

ROGERS: I would have the authority to do that.

ROONEY: Who else would?

ROGERS: The 19 other individuals.

ROONEY: Would that include director Comey?

ROGERS: I'm talking about...

ROONEY: In the NSA...
ROGERS: ... within the National Security Agency and we're talking about NSA reporting.

ROONEY: But -- but would people like Director Comey also be able to request that?

ROGERS: Yes.

ROONEY: And the attorney general and Director Clapper, are those type of people also on this list?

ROGERS: Again, I'm not going to -- in general, yes, they would be...

ROONEY: Generally speaking, not with regard to...

ROGERS: I'm not going to talk about...

ROONEY: OK.

ROGERS: ... of an individual or hypothetical scenarios.

ROONEY: Well, here's what I'm trying to get at. If -- if -- if what we're talking about is a serious crime as has -- as has been alleged, in your opinion, would leaking of an -- a U.S. person who has been unmasked and disseminated by intelligence community officials, would that leaking to the press hurt or help our ability to conduct national security matters?

ROGERS: Hurt.

ROONEY: OK. If -- if it hurts -- so this leak, which through the 702 tool, which we all agree is vital -- or you and I at least agree to that -- do you think that that leak actually threatens our national security? If it's a crime and if it's unveiling a masked person, and this tool is so important that it can potentially jeopardize this tool when we have to try to reauthorize it in a few months.

If this is used against the ability of us to reauthorize this tool and we can't get it done because whoever did this leak, or these

nine people that did this leak, create such a stir, whether it be, you know, in our legislative process or whatever, that they don't feel confident that a U.S. person under the 702 program can be masked successfully and not leaked to the press, doesn't that hurt, that leak hurt our national security?

ROGERS: Yes, sir.

ROONEY: Can you think of any reason why somebody would -- would want to leak the identity of a mass person?

ROGERS: No sir, I -- I mean I have raised this directly with my own workforce over the -- over the course of the last few months to remind everyone, part of the ethics of our profession, not just the legal requirement but the ethics of our profession as intelligence professionals is we do not engage in this activity.

And I've also reminded the men and women of the National Security Agency, if I become aware of any such conduct, there is no place for you on this team. It's unacceptable to the citizens of the nation that one would engage in this.

ROONEY: Well, I think that, you know, as we move forward, obviously, you know, I think that what you're speaking of is this sacred trust that the intelligence community has with the American people and with the people that are representing them here on this dais.

And if we -- I think that it's vital that for those who break that sacred trust, if they are not held accountable whether it by the NSA internally or by the FBI through conviction or investigations/prosecution and conviction through the attorney general's office of that crime, it is very difficult for us to be able to keep that sacred trust to know that what we're doing is -- is -- is valid and what we're doing has no nefarious motivations. And -- and -- and to us to be able to keep America safe without violating the constitutional protections that we all enjoy.

Mr. Chairman, I'm not sure how much more time I have left. I just wanted to...

ROGERS: Congressman, can I make one comment if I could, I apologize.

ROONEY: Yes, sir.

ROGERS: It comes to my mind based on your question, I just wanna remind everyone and in general. FISA collection on targets in the United States has nothing to do with 702, I just wanna make sure we're

not confusing the two things, here, 702 is collection overseas against
non-U.S. persons.

ROONEY: Right and -- and what -- and what we're talking about
here, is incidentally, if a U.S. person is talking to a foreign person
that we're listening to, whether or not that person is unmasked...

ROGERS: I just wanna make sure we all understand the context,
that's all.

ROONEY: Right, right, and -- and whether or not somebody in the
intelligence community that we put the trust in, is going to leak that
information to the press, for whatever reason. And I'm not even gonna
get into the gratuitous, you know, what that reason may be.

But it's really gonna hurt the people on this committee and you
all on the intelligence community, when we try to retain this tool
this year. And try to convince some of our colleagues that this is
really important for national security, when somebody in the
intelligence community says you know what? The hell with it, I'm
gonna release this person's name because I'm gonna get something out
of it.

We're all gonna be hurt by that if we can't reauthorize this
tool, do you agree with that?

ROGERS: Yes, sir.

ROONEY: Mr. Chairman, do I -- do I have enough time to talk
about the letter the committee sent?

NUNES: Sure.

ROONEY: The committee sent to you on March 15th, a letter --
yeah, to Admiral Rogers and to Director Comey. Have you had a chance
to look at this letter? I think that you've actually...

(CROSSTALK)

ROGERS: Yes sir, I in fact have given you a reply on the 17th.

ROONEY: Just real -- real quickly because I don't want to take
up any more time. Can you give us a sense of how many unmasked U.S.
persons identities were disseminated by the NSA from June 2016 to June
2017?

ROGERS: No sir. As I have indicated where the process of
compiling that information. I will provide it to the committee. But
until that work is done, I am not gonna comment.

ROONEY: Can you tell us whether any of those disseminations broadly were involved U.S. people relating to presidential candidates Donald J. Trump or Hillary Clinton, and their associates in 2016?

ROGERS: I won't answer until I complete the research sir.

ROONEY: Assuming that the NSA disseminated unmasked U.S. persons information relating to the Trump or Clinton campaigns, would that have been a reason for such unmasking?

ROGERS: I apologize. I don't truly understand the question.

ROONEY: Let me just move on to the next one.

Along those lines, if the NSA had wanted disseminate unmasked U.S persons information related to either the presidential campaign, who in the NSA would have approved such dissemination's?

ROGERS: Again, it would've been one of the 20 and I provided that in my initial response to the committee. I have outlined the procedures, I've outlined the specific 20 individuals.

ROONEY: Thank you, Admiral. I appreciate your -- your answers. I look forward to working with you on the subcommittee moving forward.

And Mr. Chairman, I yield back.

NUNES: Gentleman yields back.

Mr. Gowdy is recognized.

GOWDY: Thank you, Mr. Chairman.

Director Comey, we will begin on this line of questioning, then we'll finish it the next round. FISA and other similar related counterterrorism programs have been described, even this morning, as vital, critical and indispensable to our national security. And many of us on both sides of the aisle believe FISA and similar counterterrorism programs prevent terrorist attacks and save American lives.

But FISA and other surveillance programs are intentionally designed to preserve the privacy of U.S. citizens. They are intentionally designed to ensure the information is collected and used only for legitimate national security and criminal investigative purposes.

There are statutory safeguards, there are warrants based on

probable calls, there is a FISA court that is involved, there are audits on the backend and we think so highly of this material. It is a felony, punishable by up to 10 years in federal prison to unlawfully disseminate it. All of this was done to make sure this information gathered remains protected as it relates to U.S. citizens.

The way I view it, Director Comey, the American people have an agreement with their government. We are going to give you the tools to keep us safe, even if it infringes on our privacy Psalm (ph). We're going to give you the tools. And government in return promises to safeguard the privacy of U.S. citizens. And when that deal is broken, it jeopardizes American trust in the surveillance program.

So let me ask you, do you agree FISA is critical to our national security?

COMEY: I do.

GOWDY: Do you agree programs like FISA were intentionally designed to safeguard the identity of U.S. persons?

COMEY: Yes, there are other -- other important elements of it but that's a primary goal, I believe.

GOWDY: It wasn't an afterthought, it wasn't an accident. These are intentional safeguards that we put in place to protect U.S. citizens, is that correct?

COMEY: Correct.

GOWDY: Do you agree much of what is learned from these programs is classified or otherwise legally protected?

COMEY: All FISA applications review by the court collection by us pursuant to our FISA authority is classified.

GOWDY: The dissemination of which is a felony punishable by up to 10 years in prison?

COMEY: Sure, dissemination -- unauthorized dissemination.
GOWDY: Unauthorized dissemination of classified or otherwise legally protected material punishable by a felony up to 10 years in federal prison.

COMEY: Yes. Yes, as it should be.

GOWDY: All right.

In January of this year, the Washington Post reported, according

to a senior U.S. government official, a named U.S. citizen -- and I
will not use the name -- a named U.S. citizen phoned the Russian
ambassador several times on December 29.

In February of this year, the Washington Post reported nine, nine
current and former officials who were in senior positions at multiple
agencies at the time of the call, spoke on the condition of anonymity
to discuss intelligence matters and that officials began pouring over
intelligence reports, intercepted communications, and diplomatic
cables.

In February of this year, the New York Times reported a U.S.
citizen, whose name I will not use, discusses sanctions with the
Russian ambassador in a phone call according to officials who have
seen a transcript of the wiretapped conversation. And again in
February of this year, the New York Times reported on a phone call
involving a U.S. citizen including significant discussions of phone
records, intercepted calls, intercepted communications, and reported
the NSA captured calls and then asked the FBI to collect as much
information as possible.

My time is up so I will say this for this round. I thought it
was against the law to disseminate classified information. Is it?

COMEY: Yes, sir. It's a serious crime. I'm not going to
comment on those particular articles because I don't want to, in any
circumstance, compound a criminal act by confirming that it was
classified information but in general, yes, it's a serious crime and
it should be for the reasons you said.

GOWDY: We'll take it back up next round, Mr. Chairman.

NUNES: Gentleman yields back.

I'll now yield 15 minutes to Mr. Schiff.

SCHIFF: Director Comey, I want to begin by attempting to put to
rest several claims made by the president about his predecessor,
namely that President Obama wiretapped his phones. So that we can be
precise, I want to refer you to exactly what the president said and
ask you whether there is any truth to it.

First, the president claimed, quote, "Terrible. Just found out
that Obama had my wires tapped in Trump Tower just before the victory.
Nothing found. This is McCarthyism," unquote.

Director Comey, was the president's statement that Obama had his
wires tapped in Trump Tower a true statement?

COMEY: With respect to the president's tweets about alleged wiretapping directed at him by the prior administration, I have no information that supports those tweets and we have looked carefully inside the FBI. The Department of Justice has asked me to share with you that the answer is the same for the Department of Justice and all its components. The department has no information that supports those tweets.

SCHIFF: The president accused Mr. Obama and presumably the FBI of engaging in McCarthyism. As you understand the term McCarthyism, do you think President Obama or the FBI was engaged in such conduct?

COMEY: I'm not to try and characterize the tweets themselves. All I can tell you is we have no information that supports them.

SCHIFF: Were you engaged in McCarthyism, Director Comey?

COMEY: I try very hard not to engage in any isms of any kind, including -- including McCarthyism.

SCHIFF: The president second stated quote "Is it legal for a sitting president to be wiretapping a race for president prior to an election? Turned down by a court earlier, a new low," unquote.

Director Comey, can you answer the president's question? Would it be legal for present Obama to have ordered a wiretap of Donald Trump?

COMEY: I'm not going to characterize or respond to the tweets themselves.

I can tell you in general, as -- as Admiral Rogers and I were just saying, there is a statutory framework in the United States under which courts grant permission for electronic surveillance either in a criminal case or a national security case based on a showing of probable cause, carefully overseen. It's a rigorous, rigorous process that involves all three branches of government, and it's one we've lived with since the late 1970s. That's how it works.

So no individual in the United States can direct electronic surveillance of anyone, it has to go through an application process, ask a judge, the judge can I make the order.

SCHIFF: So President Obama could not unilaterally order a wiretap of anyone?

COMEY: No president could.

SCHIFF: Mr. Trump also asserted in that tweet that he was --

that the application -- or the president's order was turned down by a court. Was there any request made by the FBI or Justice Department to wiretap Donald Trump turned down by a court?

COMEY: That's one of those subjects I can't comment on one way or another. Please don't interpret that in any way other than I just can't talk about anything that relates to the Pfizer process in an open setting.

SCHIFF: Third, the president stated, I bet a good lawyer could make a great case out of the fact that President Obama was tapping my phones in October just prior to the election.

Director Comey, you're a good lawyer. Can you make out a great case that president Obama wiretapped Mr. Trump's phones just prior to the election in light of the fact you've said there is no evidence of that?

COMEY: All I can say is what I said before, that we don't have any information that supports those tweets.

SCHIFF: Well, in my view then, you would not be a great, but very unethical lawyer to make up such a case. And finally, the president made the following accusation. How low has president Obama gone to tap my phones during the very sacred election process? This is Nixon-Watergate. Bad or sick guy.

Director Comey, the president has compared Mr. Obama to Nixon and purported wiretap of Trump phones as another Watergate. What was the gravamen of the offense by Nixon and his operatives during Watergate? A lot of people who may be watching may be too young.

SCHIFF: To understand what Watergate was about, what was the gravamant of that offense?

COMEY: Well, as I recall it then, I was a kid, but I've studied it quite a bit in school. The gravamant of it was an abuse of power including break-ins, unlawful wire taps, obstruction of justice, sort of the cycle of criminal conduct.

SCHIFF: There was a break-in of the democratic headquarters by operatives of the president, was it not?

COMEY: That's my understanding is that's how it began -- the investigation began.

SCHIFF: It also involve the cover up by the president.

COMEY: Yes, as I said.

SCHIFF: Now here, I think you've said there's been no evidence of an illegal wiretap by president Obama, is that right?

COMEY: I've said the FBI and the Department of Justice have no information to support those tweets.

SCHIFF: But there is evidence, is there not, of a break in of the democratic headquarters by a foreign power using cyber means?

COMEY: Yes there was, as the -- as the intelligence community report, the un-class report, said in January, the Russian intelligence services hacked into a number of enterprises in the United States, including the Democratic National Committee.

SCHIFF: And there was an effort by the Russians to cover up their break-in of the Democratic Party headquarters, by using cutouts like WikiLeaks to publish the stolen material, isn't that right?

COMEY: Certainly to cover up their -- that they were the ones releasing it.

SCHIFF: Director Rogers, in an effort to explain why there was no evidence supporting the president's claim that Obama had wiretapped him, the president and his spokesman, Sean Spicer, have suggested that British intelligence through its NSA or GCHQ wiretapped Mr. Trump on President Obama's behalf.

Did you ever request that your counterparts in GCHQ should wiretap Mr. Trump on behalf of President Obama?

ROGERS: No sir, nor would I, that would be expressly against the construct of the Five Eyes agreement that's been in place for decades.

SCHIFF: And the Five Eyes are some of our closest intelligence partners and Britain -- Britain is one of them?

ROGERS: Yes, sir.

SCHIFF: Have you seen any evidence that anyone else in the Obama administration made such a request?

ROGERS: No sir, and again, my view is the same as Director Comey, I've seen nothing on the NSA side that we engaged in any such activity, nor that anyone ever asked us to engage in such activity.

SCHIFF: And if you were to ask the British to spy on America, that would be a violation of U.S. law, would it not?

ROGERS: Yes, sir.

SCHIFF: Our relationship with British intelligence is one of the closest we have with any foreign services, isn't that true?

ROGERS: Yes, sir.

SCHIFF: Now, the British allies -- our British allies have called the president's suggestion that they wiretapped him for Obama nonsense and utterly ridiculous. Would you agree?

ROGERS: Yes, sir.

SCHIFF: Does it do damage to our relationship with one of our closest intelligence partners for the president to make a baseless claim that the British participated in a conspiracy against him?

ROGERS: I think it clearly frustrates a key ally of ours.

SCHIFF: Certainly wouldn't endear the British intelligence services to continue working with us, would it?
ROGERS: I believe that the relationship is strong enough, this is something we'll be able to deal with.

SCHIFF: But it's not helpful...

ROGERS: Yes, sir...

SCHIFF: ... you would agree?

ROGERS: ... that -- that...

SCHIFF: Director Rogers, President Trump recently met with German Chancellor Angela Merkel during a joint press conference, the president suggested that they both had something in common, that they had both been wiretapped by President Obama.

Director Comey has just demonstrated why the claims by the president about his being wiretapped by Obama were unsupported by any evidence. But the claim he made about wiretapping directed at Merkel referred to something that came up in the context of the Snowden disclosures.

I'm not going to ask you to comment on whether the Chancellor was the subject of any eavesdropping. But I would like to ask you whether the Snowden disclosures did damage to our relationship with our German ally and whether the Chancellor herself expressed her concern at the time.

ROGERS: Yes, sir.

SCHIFF: In light of this, is it helpful to our relationship with
the Chancellor or our relationship with German intelligence, to bring
this up again in a public forum?

ROGERS: It certainly complicates things. But again, I'd like to
think that our relationship is such we're gonna be able to deal and
keep moving forward.

SCHIFF: So our relationships with the British and the Germans,
you hope, are strong enough to withstand any damage done by these
comments?

ROGERS: By anything in general, sir. We have foundational
interest with each other, we need to keep working together.

SCHIFF: This time, Director Comey, let me ask you a few
questions you may or may not be able to answer. Do you know who Roger
Stone is?

COMEY: Generally, yes.

SCHIFF: Are you aware that he was a partner of Paul Manafort?

COMEY: Mr. Schiff, I'm worried we're going to a place I don't
want to go, which is commenting on any particular person. And so I --
I don't think I should comment. I'm aware of public accounts but I
don't want to talk more than that.

SCHIFF: Are you aware that he has publicly acknowledged having
directly communicated with [****], someone that the intelligence
community has assessed was a person of Russian intelligence?

COMEY: I've read media accounts to that effect. I don't wanna
hurt anybody's feeling in the media. I don't know whether that's
accurate or not.

SCHIFF: If Mr. Stone acknowledged Mr. Podesta's time in the
barrel was coming in August 2016, would that have been prior to the
public release of stolen e-mails of Mr. Podesta's?

COMEY: I believe that's the correct chronology.

SCHIFF: Do you know how Mr. Stone would've known that Mr.
Podesta's e-mails were going to be released?

COMEY: That's not something I can comment on.

SCHIFF: Do you know that Mr. Podesta has said that at the time he was not even aware whether his e-mails had been stolen would be published?

COMEY: That's nothing something I comment on.

SCHIFF: At this point Mr. Chairman, I'm going to yield to Mr. Himes.

HIMES: Thank you to the ranking member. And gentlemen, thank you for being with us today.

Let me -- when I get my own time I'll -- I'll -- I'll have some follow-up questions. But let me start with a point that the chairman brought out I think very specifically which is that there's no evidence that votes were technically changed in any of the jurisdictions that he named.

Admiral Rogers, thanks for confirming that, but am I correct, that the -- when we say Russian hacking what we are referring to is the fact that the intelligence community believes that the Russians penetrated the networks of the DNC, of John Podesta, and other individuals, stole information and then disseminated that information. Is that a fair characterization of the -- of the conclusions of the intelligence community?

ROGERS: Yes sir.

HIMES: And did the intelligence community ever do an analysis as to whether the dissemination of that adverse information in a closely fought election had any effect on the American electorate?

ROGERS: No sir. The U.S. intelligence community does not do assessments ...

HIMES: Of course not.
(CROSSTALK)

ROGERS: ... U.S. opinion.

HIMES: That's -- that's -- that's not your job.

ROGERS: No sir.

HIMES: The fact is, those of us who go through campaigns know that's actually something we probably have a little bit more understanding of. Let me just ask this question then. Was there any equivalent dissemination of adverse information stolen from the RNC or individuals associated with the Trump campaign?

COMEY: No.

HIMES: Thank you.

Director Comey, in -- in the remaining minutes here. I appreciate your frankness on the topic of an ongoing investigation and appreciate your inability to go too much further than you went. But I do want to ask you a question to try to clear up some confusion.

This committee, of course, is engaged in investigation about links, as you said, between the Trump campaign and the Russians, should there be any possible collusion. We've had a number of statements very early in the investigation that there was no evidence of collusion. This is still very early in our investigation, is it fair to say that you're still relatively early in your investigation?

COMEY: It's hard to say because I don't how much longer it will take. But we've been doing this -- this investigation began in late July, so for counterintelligence investigation that's a fairly short period of time.

HIMES: So, you used the word coordination which to me suggests that you are in fact investigating whether there was coordination between U.S. persons and the Russians. Is it fair for me to assume that we shouldn't simply dismiss the possibility that there was coordination or collusion between the Russian efforts and U.S. persons as an investigatory body?

COMEY: Well all I can tell you is what we're investigating which includes whether there was any coordination between people associated with the Trump campaign and the Russians.

HIMES: OK. Thank you, I'll yield the remaining time to the ranking member.

SCHIFF: I will yield the remaining time this period to Representative Sewell.

SEWELL: Thank you.

So, with respect to the coordination, Director Comey, I just wanted to continue this line of questioning, can you say with any specificity what kinds of coordination or contacts you're looking at in your investigation generally when confronted with something like this?

COMEY: I can't.

SEWELL: Can you discuss whether or not there was any knowledge by any Trump- related person and the Russians?

COMEY: I can't.

SEWELL: So with respect to any ongoing investigation, whether the specificity of the person, U.S. person or otherwise, you can't comment on any of that.

COMEY: Correct.

SEWELL: OK. Can you characterize what the nature of your investigation generally, wouldn't -- when you do an investigation of this sort, can you talk a little bit about the process, generally?

COMEY: Not a whole lot. I can tell you we use our great, great people, we coordinate with our brothers and sisters in other parts of the intelligence community to see what they may know from around the world that might be useful to us and we use all the different tools and techniques that we use in all of our investigations. That's probably the most -- I'm not sure that's useful to you, but that's the most I can say.

SEWELL: How long does a counterintelligence investigation like this usually take? You said that it started in July.

COMEY: There is no usually. It's hard -- it's impossible to say, frankly.

SEWELL: I yield back my time.

NUNES: Thank you, Ms. Sewell. We'll go back to -- I'll yield myself 15 minutes and we'll go back to Mr. Gowdy.

GOWDY: Thank you, Mr. Chairman.

Director Comey, you and I were discussing the felonious dissemination of classified material during the last round. Is there an exception in the law for current or former U.S. officials who request anonymity?

COMEY: To release classified information?

GOWDY: Yes sir.

COMEY: No.

GOWDY: Is there an exception in the law for reporters who want to break a story?

COMEY: Well that's a harder question as to whether a reporter
incurs criminal liability by publishing classified information and one
probably beyond my ken. I'm not as good a lawyer as Mr. Schiff said I
used to be.

GOWDY: Well, I don't know about that but the statute does use
the word published, doesn't it?

COMEY: It does, but that's a question I know the Department of
Justice has struggled with through administration after
administration.

GOWDY: I know the department struggled with it, the 4th Circuit
struggled with it, lots of people have struggled with it but you're
not aware of an exception in the current dissemination of classified
information statute that carves out an exception for reporters.

COMEY: No, I'm not aware of anything carved out in the statute.
I don't think a reporter's been prosecuted certainly in my lifetime
though.

GOWDY: Well, there've been a lot of statutes that bore on this
investigation for which no one's ever been prosecuted or convicted and
that does not keep people from discussing those statutes, namely the
Logan Act. In theory, how would reporters know a U.S. citizen made a
telephone call to an agent of a foreign power?

COMEY: How would they know legally?

GOWDY: Yes.

COMEY: If it was declassified and then discussed in a judicial
proceeding or congressional hearing. Something like that.

GOWDY: And assume none of those facts are at play, how would
they know?

COMEY: Someone told them who shouldn't have told them.

GOWDY: How would a reporter know about the existence of
intercepted phone calls?

COMEY: Same thing. In a -- in a legitimate way, through a
appropriate proceeding where there's been declassification. In any
other way, in an illegitimate way.

GOWDY: How would reporters know if a transcript existed of an
intercepted communication?

COMEY: Same answer. It -- it -- the only legitimate way would
be through a proceeding -- appropriate proceeding, the illegitimate
way would be somebody told him who shouldn't have told them.

GOWDY: What does the term mask mean in the concept of FISA and
other surveillance programs?

COMEY: As Director Rogers explained, it's our practice, approved
by the FISA court, of removing the names of U.S. persons to protect
their privacy and their identity unless it hits certain exceptions.
So masking means, as Mike Rogers said -- I'll often see a intelligence
report from NSA that will say U.S. person number one, U.S. person
number two, U.S. person number three and there's no further
identification on the document.

GOWDY: Admiral Rogers said there are 20 people within the NSA
that are part of the unmasking process. How many people within the
FBI are part of the unmasking process?

COMEY: I don't know for sure. As I sit here, surely more, given
the nature the FBI's work. We come into contact with U.S. persons a
whole lot more than the NSA does because we may be conducting -- we
only conduct our operations in the United States to collect electronic
surveillance -- to conduct electronic surveillance, so I don't -- I
can find out the exact number, I don't know it as I sit here.

GOWDY: Well, I think, Director Comey, given the fact that you
and I agree this is critical, vital, indispensable, a similar program
is coming up for reauthorization this fall with a pretty strong head
wind right now. It would be nice to know the universe of people who
have the power to unmask a U.S. citizen's name. Because that might
provide something of a roadmap to investigate who might've actually
disseminated a masked U.S. citizen's name.

COMEY: Sure. The number is relevant but what I hope the U.S. --
the American people realize is the number's important, but the culture
behind it is in fact even more important. The training, the rigor,
the discipline. We are obsessive about FISA in the FBI for reasons I
hope make sense to this committee but we are -- everything that's FISA
has to be labeled in such a way to warn people this is FISA, we treat
this in a special way.

So we can get you the number, but I want to assure you the
culture of the FBI and the NSA around how we treat U.S. person
information is obsessive and I mean that in a good way.

GOWDY: Director Comey, I am not arguing with you and I do agree
that culture is important, but if there are 100 people who have the

ability to unmask and the knowledge of a previously masked name, then
that's 100 different potential sources of investigation and the
smaller the number is, the easier your investigation is.

So the number is relevant. I can see the culture is relevant.
NSA, FBI, what other U.S. government agencies have the authority to
unmask a U.S. citizen's name?

COMEY: I think all agencies that collect information pursuant to
FISA have what are called standard minimization procedures, which are
approved by the FISA court that govern how they will treat U.S. person
information. So I know the NSA does, I know the CIA does, obviously
the FBI does. I don't know for sure beyond that.

GOWDY: How about the department of -- how about Main Justice?

COMEY: Main Justice, I think does have standard minimization
procedures.

GOWDY: All right, so that's four. The NSA, FBI, CIA, Main
Justice. Does the White House have the authority to unmask a U.S.
citizen's name?

COMEY: I think other elements of the government that are
consumers of our products can ask the collectors to unmask. The
unmasking resides with those who collected the information.

And so if Mike Rogers's folks collected something and they sent
it to me in a report and it says U.S. person number one and it's
important for the FBI to know who that is, our request will go back to
them. The White House can make similar requests of the FBI or of NSA
but they can't on their -- they don't own their own collect and so
they can't on their own unmask. I got that about right?
ROGERS: No, that's correct.

COMEY: Yeah.

GOWDY: I guess what I'm getting at, Director Comey, is you say
it's vital, you say it's critical, you say it's indispensable. We
both know it's a threat to the reauthorization of 702 later on this
fall. And by the way, it's also a felony punishable by up to 10
years.

So how would you begin your investigation, assuming for the sake
of argument that a U.S. citizen's name appeared in the Washington Post
and the New York Times unlawfully. Where would you begin that
investigation?

COMEY: Well, I'm not gonna talk about any particular

investigation...

GOWDY: That's why I said in theory.

COMEY: You would start by figuring out, so who are the suspects? Who touched the information that you've concluded ended up unlawfully in the newspaper and start with that universe and then use investigative tools and techniques to see if you can eliminate people, or include people as more serious suspects.

GOWDY: Do you know whether Director Clapper knew the name of the U.S. citizen that appeared in the New York Times and Washington Post?

COMEY: I can't say in this forum because again, I don't wanna confirm that there was classified information in the newspaper.

GOWDY: Would he have access to an unmasked name?

COMEY: In -- in some circumstances, sure, he was the director of national intelligence. But I'm not talking about the particular.

GOWDY: Would Director Brennan have access to an unmasked U.S. citizen's name?

COMEY: In some circumstances, yes.

GOWDY: Would National Security Adviser Susan Rice have access to an unmasked U.S. citizen's name?

COMEY: I think any -- yes, in general, and any other national security adviser would, I think, as a matter of their ordinary course of their business.

GOWDY: Would former White House Advisor Ben Rhodes have access to an unmasked U.S. citizen's name?

COMEY: I don't know the answer to that.

GOWDY: Would former Attorney General Loretta Lynch have access to an unmasked U.S. citizen's name?
COMEY: In general, yes, as would any attorney general.

GOWDY: So that would also include Acting AG Sally Yates?

COMEY: Same answer.

GOWDY: Did you brief President Obama on -- well, I'll just ask you. Did you brief President Obama on any calls involving Michael Flynn?

COMEY: I'm not gonna get into either that particular case that matter, or any conversations I had with the president. So I can't answer that.

GOWDY: Well, Director Comey, there's been some speculation this morning on motive. I'm not all that interested in motive -- first of all, its really hard to prove.

Secondarily, you never have to prove it. But I get that people wanna know, I get the jury all wants -- always wants to know why. I think you and I can agree there are a couple of reasons that you would not have to unlawfully, feloniously, disseminate classified material. It certainly wasn't done to help an ongoing criminal investigation, because you already had the information, didn't you?

COMEY: Again, I can't answer in the context of this particular matter.

GOWDY: How about in theory? Is -- is -- is there something a reporter would have access to that the head of the FBI would not?

COMEY: It's hard for me to answer, I would hope not when it relates to the FBI...

GOWDY: I would hope not too, since its part of our surveillance programs. I would hope that you had access to everything as the head of the world's premier law-enforcement agency. I would hope that you had it all. So if you had it all, the motive couldn't have been to help you, because you already had it. And Admiral Rogers, the motive couldn't have been to help you, because you already had it.

So in the universe of possible motives for the felonious dissemination of classified material, we could rule out wanting to help the intelligence and the law enforcement communities. Those are two motives are gone now. That leaves some more nefarious motives. Is the investigation into the leak of classified information -- has it begun yet?

COMEY: I can't say because I don't want to confirm that that was classified information.

GOWDY: Well, I'm -- I don't want to quarrel with you Director Comey and I -- I do understand that you cannot ordinarily confirm or deny the existence of an investigation. But you did it this morning, citing DOJ policy given the gravity of the fact pattern.
Would you not agree that surveillance programs that are critical, indispensable, vital to our national security, some of which are awful reauthorization this fall, that save American lives and prevent

terrorist attacks also rises to the level of important?

COMEY: I think those programs are vital and leaks of information collected pursuant to court order under those programs are terrible. And as I said in my opening statement should be taken very, very seriously.

What I don't ever want to do is compound what bad people have done and confirm something that's in the newspaper. Because sometimes newspaper get it right, there's a whole lotta wrong information about --allegedly about classified activities that's in the newspaper. We don't call them and correct them either. That's another big challenge but we just don't go anywhere near it because we don't want to help and compound the offense that was committed.

GOWDY: I understand that Director Comey. And I'm trying really hard not to get you to discuss the facts at bar (ph). But some of the words that appeared in this public reporting, include the word transcript which has a very unique use in the matters that you and I are discussing this morning. That is a very unique use of that word, wiretap has a very specific meaning. The name of a U.S. citizen that was supposed to statutorily be protected, is no longer protected.

So some of this reporting -- let's assume 90 percent of it is inaccurate, that other 10 percent is still really, really important. And to the extent that you can rely on the dates in either the Washington Post or the New York Times, we are talking about February of this year is when the reporting first took place. So we are -- we're a month and a half or two months into something that you and I agree, is incredibly important and also happens the felony.

So I'm just simply asking you to assure the American people, you've already assured them you take it really seriously. Can you assure them that it is going to be investigated?

COMEY: I can't but I hope -- I hope people watching know how seriously we take leaks of classified information. But I don't want to confirm it by saying that were investigating it. And I'm sorry I have to draw the line, I just think that's the right way to be.

GOWDY: Well I'm not argue with you Director Comey but it is -- we're going to discuss a lot of important things today. Whether Russia attempted to influence our democratic process is incredibly important. Whether they sought to influence it as a separate analysis, incredibly important.

The motive behind that interference and influence, incredibly important. Our U.S. response, incredibly important. Some of that may rise to the level of the crime, some of it does not rise to level of a

crime. One thing you and I agree on is the felonious dissemination of class -- classified material most definitely is a crime.

So I would ask you and I understand some of the procedures that you are up against. I would -- I would humbly ask you to -- to seek authority from whomever you need to seek authority from. Because I'm going to finish the same way I started. This is an agreement between the American people and its government. We are going to -- we the American people give certain powers to government to keep us safe.

And when those powers are misused and the motive is not criminal investigations or national security, then I'll bet you my fellow citizens are rethinking their side of the equation. Because that U.S. citizen could be them next time. It could be you. It could be me. It could be anyone until we start seriously investigating and prosecuting what Congress thought was serious enough to attach a 10-year felony to.

With that, I would yield back, Mr. Chairman.

COMEY: Can I -- can I just add a response to what you said? I agree with you, Mr. Gowdy. Two things folks at home should know; first, an unauthorized disclosure of FISA is an extraordinarily unusual event so be assured we're going to take it very seriously because our trust, the American people, and the federal judges that oversee our work, is vital.

And second, that this conversation has nothing to do with 702. Folks often mix them together. 702 is about targeting non-U.S. persons overseas. Pursuant to the FISA statute, the FBI can apply to collect electronic surveillance in the United States but it's a different thing from 702. The conversation you and I are just having is about this which is vital and important, but I just didn't want to leave folks confused.

GOWDY: Director Comey, you are 100 percent correct and I am 100 percent correct in saying that that is a distinction that doesn't make a difference to most of the people watching television. You are exactly correct. What we are reauthorizing this fall has nothing to do with what we are discussing other than it is another government program where the people consent to allow government to pursue certain things with the explicit promise it will be protected.

So you're right, they're different but in the eyes of people watching, it is the U.S. government officials' leaking the name of a U.S. citizen and if it can happen here, it may happen there. Trust me, you and I both want to see it reauthorized. It is in jeopardy if we don't get this resolved.

NUNES: Our time is expired, I'll yield 15 minutes to Mr. Schiff.

SCHIFF: Thank you, Mr. Chairman.

I just want to follow up with a few questions about Roger Stone that I had started with earlier before I passed it to my colleagues. Director Comey, are you aware that Roger Stone played a role in the Trump campaign?

COMEY: I'm not going to talk about any particular person here today, Mr. Schiff.

SCHIFF: I'm going to continue to ask these questions because among other things, I want to make sure you are aware of these facts whether you're able to comment on them political dirty tricks?

COMEY: I'll give you the same answer, sir.

SCHIFF: I mentioned before that Mr. Stone was in direct communication with a creature of Russian GRU, Guccifer 2.0 and that's something the intelligence assessment talked about, the role of Guccifer 2.0.

Mr. Stone on August 17, are you aware, received communication from Guccifer 2.0 that said, quote "I'm pleased to say that you are great. Please tell me if I can help you any how. It would be a great pleasure to me." Are you aware of that communication from essentially Russian GRU through Guccifer to Mr. Stone?

COMEY: I have to give you the same answer.

SCHIFF: Are you aware that Mr. Stone also stated publicly that he was in direct communication with Julian Assange and WikiLeaks?

COMEY: Same answer.

SCHIFF: Are you aware that Mr. Stone also claimed that he was in touch with an intermediary of Mr. Assange?

COMEY: Same answer.

SCHIFF: This is a question I think you can answer. Do you know whether the Russian intelligence service has dealt directly with WikiLeaks or whether they too used an intermediary?

COMEY: We assessed they used some kind of cutout. They didn't deal directly with WikiLeaks. In contrast to D.C. Leaks and Guccifer 2.0.

SCHIFF: In early October, are you aware that Mr. Stone tweeted I

have total confidence that my hero, Julian Assange will educate the
American people soon. Are you aware of that tweet?

COMEY: I'm back to my original same answer.

SCHIFF: And are you aware that it was only days later that
WikiLeaks released the Podesta e-mails?

COMEY: Same answer.

SCHIFF: I'm going to yield now to Mr. Himes.

HIMES: Thank you, Mr. Schiff.

I know that we're going through the 90 minute mark in this
hearing so let me step back a second and just review the topics
because there's a lot on the table and I think my friends on the
Republican side will get no argument from this side on the importance
of investigating, prosecuting leaks.

Leaks are a threat to our national security whether they're
perpetrated by Edward Snowden, whether they're perpetrated by people
outside the White House or perhaps as we have seen in the last 60
days, maybe from people inside the White House.

But Mr. Comey, if I can use your phrase, intense public interest.
There is intense public interest in the fact that our new president
will attack anyone and everyone. He will attack the cast of Hamilton,
he will attack Chuck Schumer, he will attack our allies, Mexico,
Australia, Germany, he will attack the intelligence community, which
you lead. Associating you with McCarthyism and Nazism.

But there's one person in one country which is immune, which is
inoculated from any form of presidential attack no matter what the
behavior. No matter if there's a violation of the INF nuclear treaty,
no matter if Vladimir Putin kills political opponents, the new
president defends, obfuscates, does not attack. And the people around
the president, Michael Flynn, Jeff Sessions, Carter Page, Paul
Manafort, have an odd connection to Russia. A series of odd
connections. We all campaigned.

I don't think any of our campaign people have connections with a
foreign power, much less one that is an adversary of the United
States. And further, apart from these weird links, without exception,
the individuals I've quoted have dissembled or misled, maybe even lied
about the nature of those -- those connections until the political
pressure has gotten to a point where they have been fired or recused,
in the case of the Attorney General.

So I want to look briefly at one of these individuals -- and Director Comey, I understand your constraints but -- but let me ask a couple of questions regardless. Paul Manafort, who is Roger Stone's business partner and former -- and Trump's former campaign manager, I want to ask you a few questions about him.

First, Director Comey, can you tell me what the Foreign Agents Registration Act is?

COMEY: Sure. Not in an expert way, but it's a statute that requires people who are acting as agents of a non-U.S. government to register with the United States.

HIMES: Right. So the National Security Division of the Department of Justice writes -- this is their manual. The purpose of FARA, as it is known, is to ensure that the U.S. government and the people of the United States are informed of the source of information and the identity of persons attempting to influence U.S. public opinion, policy, and laws. Unquote.

Would you agree that guarding against foreign espionage or foreign influence measures falls under this heading?

COMEY: Yes.

HIMES: In general, is willful violation or failure to register pursuant to this law in some circumstances a crime?

COMEY: I believe it is. I'm not an expert on FARA, but I believe it is.

HIMES: And it could lead, certainly, to counterintelligence concerns, right?

COMEY: Yes.

HIMES: Now, Paul Manafort, as reported in the New York Times and other outlets and his deputy, Rick Gates ran a campaign in Washington to lobby government officials and push positive press coverage of pro Russian-Ukrainian officials. Paul Manafort began officially working for former Ukrainian President Yanukovych at least as far back as 2007, according to the Washington Post.

The lobbying was only discovered by Ukraine's new National Anti-Corruption Bureau, which found secret ledgers in Kiev, indicating almost $13 million in undisclosed cash payments from Ukrainian government coffers (ph), to Paul Manafort for lobbying done between 2007 and 2012, for Mr. Yanukovych -- Yanukovych.

Director Comey, did Paul Manafort ever register as a foreign agent under FARA?

COMEY: That's not something I can comment on.

HIMES: Whether he registered or not is not something that you can comment on?

COMEY: No.

HIMES: OK. Paul Manafort was, however, Donald Trump's campaign manager in July of 2016, correct?

COMEY: Mr. Himes, I really don't wanna get into answering questions about any individual U.S. person.

HIMES: OK...

COMEY: Look, I'm -- it's obvious from the public record. But I don't wanna start down the road of answering questions about somebody.

HIMES: OK. Well, I think the facts would show that he never did register. But as the ranking member pointed out, it perhaps should come as no surprise that the Republican platform, which was drafted at the Republican Convention in July of 2016, underwent a pretty significant change with respect to the American response to Russia's illegal invasion of Ukraine and their aggression in that country.

It appears, from our standpoint, that we had -- we had perhaps somebody who should've registered under FARA pulling the strings, there. There's more though and I don't know how much you'll be able to comment on this. But I wanna just explore for a second, the nature of the Russian government, because oftentimes the question becomes, was there contact with Russian officials.
And I want to read you a brief quote from a book on Putin's government. This is by Professor Karen Dawisha who wrote, "Instead of seeing Russian politics as an inchoate democratic system being pulled down by history, accidental autocrats, popular inertia, bureaucratic incompetence, or poor Western advice, I conclude that from the beginning Putin and his circle sought to create an authoritarian regime ruled by a close-knit cabal -- who used democracy for decoration rather than direction."

Mr. Comey, is it fair to say that the line that exists in the United States between government officers and government officials, is blurred in Russia? That there may be oligarchs or other individuals who on the surface appear to be private citizens, but who have connections to this close-knit cabal who might be agents of influence or might be doing the Kremlin's bidding in contact with others?

COMEY: That's fair to say and one of our counterintelligence missions is to try to understand who are those people and are they acting on behalf of the Russian government, those Russian citizens.

HIMES: Is it generally true that there is a category of Russian oligarchs that are likely part of this close-knit cabal?

COMEY: In a general sense.

HIMES: And if they go way back with Vladimir Putin, do the chances increase that they might be connected with the KGB, as is asserted by Professor Dawisha?

COMEY: The longevity of the association can be a consideration.

HIMES: And the KGB was the Russian intelligence service under the Soviet Union, right?

COMEY: Correct, former...

HIMES: And the Ukraine was part of the Soviet Union?

COMEY: Correct.

HIMES: Right. I'll just observe, Renault Akhmetov, a steel and iron (ph) or a magnate or oligarch, is the richest man in Ukraine and a strong Putin ally. He was the one who reportedly recommended Paul Manafort to Yanukovych.

Mr. Comey, last set of questions from me, I have a report that appeared in CNN yesterday. The headline is, "Former Trump Campaign Chief Paul Manafort Wanted for Questioning in Ukraine Corruption Case." And I -- I raise this with you because the story is told of Paul Manafort acting on behalf of Ukraine's former justice miniature -- minister Oleksandr Lavrynovych, which who was the justice minister under the previous pro-Russian regime who -- and I'll just read a segment from the story here.

Who was involved in jailing the former Prime Minister Tymoshenko who was the main political rival of the Kremlin backed President Viktor Yanukovych who Manafort advised until he was deposed in 2014. Tymoshenko was released from jail at the same time that Yanukovych was ousted. Many saw her sentencing as politically motivated by the pro-Russian government.

In response to the deterioration international climate, Ukrainian prosecutors say Manafort drafted a public relations strategy that included hiring Skadden Arps, an American law firm, to review the

Tymoshenko case. And show the conviction had a sound legal basis.
The story goes on to talk about the transfer of over $1 million,
potentially, illegally from Ukrainian coffers (ph) to Skadden Arps.

And the reason I bring all this up with you is because the story
also says and it appears to have been confirmed by the Department of
Justice that the current Ukraine regime, hardly a friend of the
Russians. And very much targeted by the Russians has made seven
requests to the United States government's -- the United States
government for assistance under the MLA treaty in securing the
assistance of Paul Manafort as part of this on anti-corruption case.
And in fact, the story says that you were presented personally with a
letter asking for that assistance.

So my question Director Comey is, is that all true? Have you
been asked to provide assistance to the current Ukrainian government
with respect to Paul Manafort? And how do you intend to respond to
that request?

COMEY: It's not something I can comment on. I can say
generally, we have a very strong relationship and cooperation in the
criminal and national security areas with our Ukrainian partners, but
I can't talk about the particular matter.

HIMES: The story says that the DOJ confirmed that there have
been requests for assistance on this matter. You can't go as far as
-- as confirming that in fact there have been these requests made?

COMEY: If they've done that, I would need them to do it again.
I -- I can't comment on it.

HIMES: OK. Well, I appreciate that and with that I will yield
back the remainder of my time to the ranking member.

SCHIFF: And I yield to Terri Sewell.

SEWELL: Thank you Mr. Ranking Member.

My questions this morning really revolve around the resignation
of the former national security adviser Michael Flynn.

Director Comey, much as been made about Russia's historical
interference with political elections around the world meant to cause
discord and -- and -- and disunity especially in Western alliance's.
Does the FBI generally assume that Russian ambassadors to the United
States like Ambassador Kislyak, are at least overtly, collecting
intelligence on influential Americans, especially political leaders.

COMEY: Ms. Sewell, that's not something I can answer in an open

setting.

SEWELL: Am I right that in the -- that in the Russian playbook
-- that it's in the Russian playbook to use diplomats and business
people and Russian intelligence officers, whether declared or not to,
collect intelligence on influential Americans for the purpose of
affecting U.S. policy?

COMEY: I can answer as a general matter. Nation states that are
adversaries of United States use traditional intelligence officers,
sometimes used intelligence officers operating under diplomatic cover,
use people we call co-opties (ph), maybe a private citizens, students,
academics, business people, all manner of human beings can be used in
a -- in an intelligence collection operation. But I'm not gonna talk
about the particular.

SEWELL: Would someone like Ambassador Kislyak Play that type of
role for Russia?

COMEY: I can't say here.

SEWELL: The declassified January intelligence community
assessment report that your agency helped to draft, the report that's
entitled assessing Russian activities and intentions in the recent
U.S. elections specifically states that, quote, "Since the Cold War,
Russian intelligence efforts related to the United States elections
have primarily focused on foreign intelligence collections that could
help Russian leaders understand a new U.S. administration's plans and
priorities," end quote.

So knowing what we know about Russia's efforts and the role of
the Russian ambassador, Director Comey, would you be concerned if any
one of your agents had a private meeting with the Russian ambassador?

COMEY: If an FBI agent had a private meeting with a Russian
government employee of any kind, it would be concerning and I assume
by private, one that's not disclosed or part of their operational
activity, yes.

SEWELL: That's right. And would you expect that agent to report
that meeting?

COMEY: Yes.

SEWELL: Admiral Rogers, similar question. If -- would you be
concerned if one of your intelligence officers had a private meeting
with the Russian ambassador? And would you expect that intelligence
officer to report that meeting?

ROGERS: Disclosures of interactions with foreign governments is
a requirement for all our employees to include myself, for example.

SEWELL: I ask these questions because on at least four occasions
that I can count, Mr. Flynn, a three-star general and a former
intelligence officer, someone with influence over the U.S. policy and
someone with knowledge of state secrets and the incoming national
security advisor, communicated with and met with the Russian
ambassador and failed to disclose it.

So I ask you directors, if you wouldn't stand for your own staff
to do this, why should we, the American people accept Michael Flynn
doing it?

COMEY: Ms. Sewell, I'll let Mike Rogers take it next but I -- I
don't -- I can't speak to what the disclosure obligations are for
other people in the government so it's hard for me to answer that. I
can answer and I answered, I hope accurately with respect to one of
the FBI special agents.

ROGERS: And I likewise would answer the same way in terms of the
NSA.

SEWELL: I yield back...

NUNES: ... gentleman's time -- gentleman's time has expired.
I'll yield myself 15 minutes.

Director Comey, you announced this morning that there'll be an
investigation into Trump associates possible and President Trump and
anyone around the campaign and any association with the Russian
government.

If this committee or anyone else for that matter, someone from
the public, comes with information to you about the Hillary Clinton
campaign or their associates or someone from the Clinton Foundation,
will you add that to your investigation? They have ties to Russian
intelligence services, Russian agents, would that be something of
interest to you?

COMEY: People bring us information about what they think is
improper unlawful activity of any kind, we will evaluate it. Not just
in -- not just in this context. Folks send us stuff all the time.
They should keep going that.

NUNES: Do you think it's possible that the Russians would not be
trying to infiltrate Hillary Clinton's campaign, get information on
Hillary Clinton and try to get to people that are around that campaign
or the Clinton Foundation?

COMEY: I'm not prepared to comment about the particular campaigns but the Russians in general are always trying to understand who the future leaders might be and what levers of influence there might be on them.

NUNES: I just hope that if -- if information does surface about the other campaigns, not even just Hillary Clinton's but any other campaigns, that you would take that serious also if the Russians were trying to infiltrate those campaigns around them.

COMEY: Of course we would.

NUNES: OK. I yield to Mr. Conaway.

CONAWAY: Thanks, Chairman. Gentlemen, thanks for being here.

Admiral Rogers, you'd mentioned analytic standards earlier in the conversation. Are those standards the same for all intelligence analysts across the various agencies?

ROGERS: There's a broad set of intelligence community promulgated standards for all of us and then there are specific issues associated, for example, with a particular authority that you're using to collect the information in the first place.

CONAWAY: So, gentleman, same thing your -- your agency -- your analysts would have I think similar type standards?

COMEY: Correct. That's one of the really good things that's happened since 9/11, especially since 2004 is the adoption of a common set of tradecraft provisions.

CONAWAY: So, on a CPA and we have generally astounded -- generally accepted accounting standards which are promulgated across a variety of things. Are those same standards publicly promulgated as -- but generally disseminated through all of your analysts, I would assume would have some sort of a test that they know those standards?

ROGERS: I think the specifics of the IC promulgated standards are classified but I could take that one for the record.

CONAWAY: When the IC attributes a hacking to a particular actor, you do that through generally forensic evidence. But when it comes to try to determine intent foreign leaders, can you walk us through how the NSA does that or the FBI does that?

ROGERS: We assess the range of information that we've collect -- collected in an attempt to generate understanding as to not only what

has occurred, but part of the intelligence professional -- profession is also trying to understand why, what was the intent. We'll use the range of information we have available to us, while we're primarily a single source organization.

It's one reason why organizations like CIA, the Defense Intelligence Agency, which take multiple sources try to put together a complete picture. So we're just one component of a broader effort.

CONAWAY: Director Comey, anything different than that?

COMEY: No, it's about putting together a puzzle. Sometimes from forensics alone, you can get a pretty good indication as to what they must be intending to accomplish, other times requires human sources and additional a signals intelligence to give you that sense.

CONAWAY: So both you agree, though, it's rarely a precise art -- or a precise science of determining intent of any foreign leader.

ROGERS: That's correct.

COMEY: All of intelligence work requires judgment. That's at the at the center of it.

ROGERS: But I will say in some cases, it's a much clearer case than in others. There are some...

(CROSSTALK)

CONAWAY: It depends on the sources you have inside a particular foreign leader's shop.

ROGERS: I'm not going to get into specifics.

CONAWAY: Just in general. If you have somebody whose next door neighbor -- never mind. Pivoting to the January 7 -- January 6 intelligence community assessment, both your agencies agree with the assessment that the Russian's goal was to undermine the public faith in U.S. democratic process. Is that still your assessments?

COMEY: Yes.

ROGERS: Yes.

CONAWAY: Same assessment said that the Russian's goal was to -- wanted to denigrate Secretary Clinton and harm her electability and potential presidency and that Putin wanted to discredit Secretary Clinton because he publicly blamed her since 2011 for insighting mass protests against his regime in late 2011, early 2012. You both still

agree with that assessment?

COMEY: Yes.

ROGERS: Yes.

CONAWAY: And then finally, Admiral Rogers, that assessment went on to say that president Putin and the Russian government aspired to help president -- I guess he would have been candidate Trump at the time -- but president-elect Trump's election chances when possible by discrediting Secretary Clinton. You had a lower...

ROGERS: Confidence level.

CONAWAY: ... confidence level. Is that still the case?

ROGERS: Yes, sir.

CONAWAY: Can you tell the group why you were...
ROGERS: I'm not going to get into specifics in an unclassified forum but for me, it boiled down to the level and nature of the sourcing on that one particular judgment was slightly different to me than the others.

COMEY: To be clear, Mr. Conaway, we all agreed with that judgment.

ROGERS: We all agreed with the judgment.

CONAWAY: Right, right, right. But you really agreed and he almost really agreed.

COMEY: Not term out folks use, but I...

(CROSSTALK)

CONAWAY: Director Comey, in terms of laying out those three assessment and whether or not the IC was consistent in its view of those three assessments across the entire campaign. And we walked through kind of the FBI's walk down that path.

Did -- as of early December of '16, did the FBI assess that the active measures were to undermine -- by the Russians were to undermine the faith in U.S. Democratic process as you come to that conclusion by early December?

COMEY: I think that's right, December of last year.

CONAWAY: Sixteen, yes sir.

COMEY: I think we're at that point, yes.

CONAWAY: And then active measures conducted against Secretary
Clinton, to denigrate her, hurt her campaign and also undermined her
presidency?

COMEY: Correct.

CONAWAY: All right. And then, the conclusion that active
measures were taken specifically to help President Trump's campaign,
you had that -- by early December, you already had that conclusion?

COMEY: Correct, that they wanted to hurt our democracy, hurt
her, help him. I think all three we were confident in, at least as
early as December.

CONAWAY: OK. The -- the paragraph that gives me a little
concern there, in terms of just the timing of when all of that
occurred because I'm not sure if we went back and got that exact same
January assessment six months earlier, it would've looked the same.
Because, you say, when we further assessed Putin and the Russian
government developed a clear preference for President-elect Trump.

Any idea when that clear preference in the analysis, when did
that get into the lexicon of whether you talk back and forth among
yourselves on a -- on a classified basis?

COMEY: I don't know for sure, but I think that was a fairly easy
judgment for the community. He -- Putin hated Secretary Clinton so
much, that the flipside of that coin was he had a clear preference for
the person running against the person he hated so much.

CONAWAY: Yeah and that and that my work on Saturday afternoon
when the -- my wife's Red Raiders are playing the Texas Longhorns.
She really likes the Red Raiders. But all the rest of the time, I
mean the logic is that because he really didn't like president -- the
Candidate Clinton, that he automatically liked Trump. That
assessment's based on what?

COMEY: Well, it's based on more than that. But part of it is
and we're not getting into the details of it here, but part of it is
the logic. Whoever the Red Raiders are playing, you want the Red
Raiders to win, by definition, you want their opponent to lose.

CONAWAY: I know, but this says that -- that you wanted both of
them -- you wanted her to lose and wanted him to win. Is that what
you were saying?

COMEY: Right, they're inseparable -- right, it's a two -- it's a two person...

CONAWAY: Right, right.

COMEY: ... event.

CONAWAY: I got you. So I'm just wondering when you decided you wanted him to win?

COMEY: Well, logically when he wanted her to lose, wanted...

CONAWAY: No, no, no, I'm not talking about him, Putin, I got that. I got that. But the question is, we're on this clear -- well let me finish up then.

So we go through that sentence about the clear preference for Donald Trump. And we don't know exactly when you guys decided that was the case. Then it says, when it appeared to Moscow that Secretary Clinton was likely to win the election, the Russian influence campaign then focused on undermining her expected presidency.

So -- and then election then says, the government -- the Russian government aspired to help President-elect Trump election chances. So when did they not think she was going to win?

COMEY: Well, the assessment of the Intelligence Committee was, as the summer went on and the polls appeared to show that Secretary Clinton was gonna win, the Russians sort of gave up and simply focused on trying to undermine her, it's your Red Raiders, you know they're not going to win.

COMEY: So you kind of hope key people on the other team get hurt so they're not such a tough opponent down the road. And so there was at some point...

(CROSSTALK)

CONAWAY: Sir, do you believe that the FBI was consistent through early December and on that that was the case. That they -- they assessed that they really wanted Trump to win it and were working to help him win and her lose.

COMEY: Yes, our analysts had a view that I don't believe changed, from late fall through to the report on January 6 that it had those three elements.

CONAWAY: All right. So then on December the 9th, well in advance of the January 6th deal, the -- the Washington Post, put out

an article. Their least sentence was that this -- and again, CIA, they're not here today but we'll hopefully have them next week, concluded in a secret assessment that Russia intervened in the '16 election to help Donald Trump win the presidency rather than to undermine the confidence in the electoral system. Rather than just undermine it, they don't mention Mrs. Clinton at all.

And then it says to help Trump elected, the U.S. senior briefed on the intelligence position -- that the U.S. -- that U.S. official briefed by -- briefed on intelligence presentation to U.S. Senators said that's the consensus view. How much did it -- this is written by name Adam Intas Elaine (ph) something and Greg Miller. Do they have drafted you last -- the January 6th document for the Intel Committee.

COMEY: I'm sorry.

CONAWAY: Did those writers from the Washington Post help you write the January 6 assessment?

COMEY: No, they did not.

CONAWAY: I wonder how they got almost the exact language on December the 9th.

COMEY: It hadn't been written yet. I don't know. This is the peril of trying to comment on newspaper articles that report to report classified information. I can't say much about them, they're often wrong.

CONAWAY: You mentioned earlier in one of our hearings that when anybody uses -- the I can't talk because I'm bound by position anonymity or whatever, that really is code for breaking the law generally, right?

When somebody says I'm talking to a reporter, I'm declassifying secret information, you can't tell -- the reporter can't tell who it is because, as Mr. Gowdy was saying earlier, speaking on condition of anonymity. That really should be interpreted because I'm breaking the law and I don't want to be ousted. It that a fair statement?

COMEY: Sometimes. I think there are other motives behind people requesting anonymity but that can be one of them.

CONAWAY: So it's you're statement to us then that the FBI was consistent in it's assessment that they integrate the U.S. electoral process, hurt Hillary and her potential and current across all of that across all of that, that they intended to help Trump, that's your testimony this morning?

COMEY: Correct.

CONAWAY: Thank you. I yield back.

NUNES: Mr. King?

KING: Thank you Mr. Chairman.

If you could yield me a few minutes into the next round -- I'll
just start with this -- make the comment.

First of all, let me thank Director Comey and Admiral Rogers for
being here today. And for what I believe it's been the cooperative
you've always given this committee. So thank you very much for that,
for your service.

Director Comey, I think we're in a predicament here today. I
understand your situation where you can't comment on the
investigation. And yet we've can have various scenarios laid out
which can go on for months and months and months without anyone be
able to disprove them until the investigation is completed.

I just like to use the example, for instance we could've said
that in 2012 President Obama was overheard on microphone telling
Medvedev that I'm reelected, tell Vladimir we can work out better
arrangements. We know that he ridiculed candidate Romney in the 2012
election when Romney said that he thought Russia still a threat.

And then in 2013 we saw that basically President Obama invited
the Russians into Syria when they've been pretty much removed from the
Middle East 40 years before. And also as far as aid to Ukraine, far
as I recall, the Obama administration always refuse to give the lethal
aid to Ukraine and it can be argued that the Republican platform in
2016 was actually stronger than the Democratic platform on that.

So again if we -- if there was investigation going on with the
Obama administration, we can lay out all these scenarios and say well
that proves something or it might prove something. Until the
investigation was completed, that type of almost possibly slanderous
comments could be made.

So I would just, again, if -- I'm not asking you to hurry the
investigation along, you have to do what you have to do. But I guess
I could ask you just in the remaining moments I have in this round, I
know that -- I guess it was just two weeks ago that Director Clapper
said that as far as he knows, all the evidence he's seen, there's no
evidence of any collusion at all between the Trump campaign and the
Russians.

Now obviously a detailed, exhaustive report was put out talking

about Russian influence in the campaign along with the intelligence apparatus had input into that. Do either you or Admiral Rogers have any reason to disagree with the conclusion of General Clapper that there's no evidence of collusion between the Russians and the Trump campaign.

COMEY: Mr. King, it's not something I can comment on.

ROGERS: Likewise, I'm not going to comment on an ongoing investigation's conclusions.

KING: But again, you're not going to disagree with General Clapper, you're just not going to comment. And the reason I'm pointing that out is, that's sort of the situation, you know, the other way around that you can't comment on something, often there's inference out there that because a person's name is brought up, because he may have worked with somebody at a certain time, that there's a guilt implied in that so that's one problem.

I'm not in any way being critical of either of you, I'm just saying this is a situation I think can be damaging to the country and does advance the Russian interest of trying to destabilize democracy and cause a lack of confidence in our system.

And with that, I yield back, Mr. Chairman.

NUNES: Gentleman yields back.

I recognize Mr. Schiff for 15 minutes.

SCHIFF: Thank you, Mr. Chairman.

I just have a couple of follow-up questions before I pass to Representative Sewell. It wasn't simply that the Russians had a negative preference against Secretary Clinton, they also had a positive preference for Donald Trump, isn't that correct?

COMEY: Correct.

SCHIFF: And I won't ask you to say whether this is an accurate characterization of Mr. Trump, I won't put you in that spot, but would it be logical for the Kremlin to prefer a candidate that disparaged NATO to be president of the United States?

COMEY: You're not going to put me in that spot, you said?

SCHIFF: Yes.

(LAUGHTER)

COMEY: I'm happy with that. I'm happy with that.

SCHIFF: I'm not going to put you in the spot of answering whether this is an accurate characterization of Mr. Trump's views, but it would be logical for the Kremlin to want someone who had a dim view of NATO. Is that right?

COMEY: All kidding aside, I don't think that's something I should be answering. That's beyond my responsibilities.

SCHIFF: Well, what is the Russian view of NATO. Do they like NATO? Do they want to see NATO strong?

COMEY: Again, I'm sure you have already spoken to people who are greater experts than I but yes, they don't like NATO. They think NATO encircles them and threatens them.

SCHIFF: And would they have a preference for a candidate that expressed an openness to repealing the sanctions over Ukraine?

COMEY: Again, I don't want to get into business of commenting on that. I know...

SCHIFF: Then let me ask you this way, Director. Would they like to see the sanctions on Ukraine go away?

COMEY: Yes.

SCHIFF: Would they have a preference for a candidate who expressed open admiration for Putin?

COMEY: Can I help you reformulate the question? Mr. Putin would like people who like him.

SCHIFF: Would they have a preference for a candidate who encouraged Brexit and other departures from Europe? Would they like to see more Brexits?

COMEY: Yes.

SCHIFF: And have the Russians in Europe demonstrated a preference for business people as political leaders with the hope that they can entangle them in financial interests or that they may allow their financial interests to take precedence over the interests of the countries in Europe they represent?

COMEY: In our joint report, we recount that the Russians -- that President Putin has expressed a preference for business leaders in leading other governments and mentions Gerhard Schroder and -- I'm

going to forget one. Berlusconi because he believes they're people
that are more open to negotiation, easier to deal with.

SCHIFF: At this point, let me yield to Representative Sewell.

SEWELL: I'd like to continue my questioning -- the line of
questioning on Michael Flynn.

I'm sure you can understand my concern that Mr. Flynn not only
failed to disclose the contacts with the Russian ambassador, but he
said he did not remember whether he discussed sanctions against Russia
with that ambassador and I find that really hard to believe. And
wouldn't you think that at the height of our concern about Russian
hacking, that Mr. Flynn would have remembered meeting with the Russian
ambassador and would have been --and would have told him to stop
meddling in our affairs, but that didn't happen, did it?

COMEY: Mrs. Sewell, that's not something I can answer.

SEWELL: Not only did Mr. Flynn not remember talking to the
Russian ambassador and not only did he not remember what they talked
about, he also appeared to have lied to Vice President-elect Mike
Pence all about it.

Now, Mr. Comey, do you think that Mr. Flynn's failure to disclose
the communication and contact he had with the Russian ambassador and
their topic of conversation along with a blatant lie to Vice President
Pence meet the standard for an investigation by the FBI?

COMEY: I have to give you the same answer, I'm not going to
comment.

SEWELL: Now, I know, Director Comey, that you probably can't
comment on this as well but I think it's really important that we
review a short timeline and -- that's based on press reportings
because we need to get this for the public record, I think.

So on December 25, 2016, Mr. Flynn reportedly exchanged text
messages with the Russian ambassador. On December 28, 2016, Mr. Flynn
reportedly spoke on the phone with the Russian ambassador. By then,
it was pretty clear that the Obama administration was going to take
actions against Russia. On December 29, 2016, Mr. Flynn reportedly
spoke on the phone with the Russian ambassador again.

That day, the Obama administration expelled 35 Russian operatives
from the United States and announced new sanctions. We also know from
press reportings that sometime in December, Mr. Flynn met in person
with the Russian ambassador at Trump Tower and that Mr. Trump's son-
in-law, Jared Kushner was also there. The purpose of the meeting was

to quote "Establish a line of communication" end quote, with the Kremlin.

I should add that the White House and Mr. Flynn didn't disclose this December face-to-face meeting until this month. On January 20 -- January 12, sorry -- 2017, press reported that Mr. Flynn contacted the Russian ambassador again.

And on January 15, 2015 vice President-elect, Mike Pence stated on several Sunday morning shows regarding Mr. Flynn's conversation with ambassador quote, "What I can confirm, having spoken to him about it, is that those conversations that happened to occur around the time that the United States took action to expel diplomats had nothing whatsoever to do with those sanctions," end quote.

On January 26, the -- the acting Attorney General, Sally Yates reportedly told president Trump's White House counsel, who immediately told President Trump that Mr. Flynn was vulnerable to Russian blackmail because of discrepancies between Vice President-elect Pence's public statement and Mr. Flynn's actual discussions.

On February 10, President Trump denied knowledge of this, telling reporters on Air Force One, quote, "I don't know about that," end quote, in response to questions about Mr. Flynn's conduct. The White House also publicly denied that Mr. Flynn and the Russian ambassador discussed sanctions. And of course on February 13, 2017, Mr. Flynn resigned as national security advisor.

Now, Director Comey, all of these accounts are open source press reportings. Given Russian's long-standing desire to cultivate relations with influential U.S. persons, isn't the American public right to be concerned about Mr. -- Mr. Flynn's conduct, his failure to disclose that contact with the Russian ambassador, his attempts to cover it up and what looks like the White House's attempts to sweep this under the rug.

Don't we, as the American people, deserve the right to know and shouldn't our FBI investigate such claims?

COMEY: I can't comment. I -- I understand people's curiosity about our work and intense interest in it, and as Mr. King said, oftentimes, speculation about it. But we can't do it well or fairly to the people we investigate if we talk about it. So I can't comment.

SEWELL: I'd like to turn to another topic about Mr. Flynn, his failure to disclose until pressured last week, by my colleagues on the House Oversight and Government Relations Committee, Government Reforms Committee, payments he received from Russia for his 2015 trip to the 10th anniversary Gala of RT, the Russian owned propaganda media

outlet.

According to the January 2017 declassified IC assessment report, RT's criticism of the United States was quote, "The last facet of its broader and long-standing anti-U.S. messaging likely aimed at undermining viewer's trust in the U.S. Democratic procedures," end quote. This January assessment points out that this was a strategy that Russia employed, going back to before, the 2012 elections, according to the IC assessment.

So Admiral Rogers, am I right that the RT is essentially owned by the Russian government? And how long has the intelligence community been looking at RT as an arm of the Russian government?

ROGERS: So we're certainly aware and have been for some period of time of the direct connections between Russian government and RT individuals, we're aware of monetary flow and other things. We have been...

(CROSSTALK)

SEWELL: And how long have you known about that, a few months, a few years, I mean how long has the United States...

(CROSSTALK)

ROGERS: Some number of years, I apologize ma'am, I just don't know off the top of my head.

SEWELL: Aren't I right to assume then, that the former Director of DIA, the Defense Intelligence Agency Mr. Flynn, would have been aware that RT's role as an anti-U.S. Russian propaganda outlet when he agreed to speak at their anniversary Gala in 2015. Isn't it reasonable to assume that he would know?

ROGERS: I'm not in a position to comment on the knowledge of something else from another person, ma'am.

SEWELL: Director Comey, would be unusual for a foreign government official to be -- to get paid by a foreign adversary to attend such an event? And would it be unusual and raise some questions at the FBI, if that person failed to disclose the payments received for that trip?

COMEY: I don't know in general and as to the specific, I'm -- I'm just not gonna comment.

SEWELL: Yes, sir. I understand that you can't comment. But I'd like to read an exchange between Mr. Flynn and a Yahoo news

correspondent from July 2016 regarding his trip to Russia, during the
RT event. The correspondent asked, "Were you paid for that event?"
Then, there was back and forth for a bit. And then Mr. Flynn said,
quote, "Yeah. I didn't take any money from Russia if that's what
you're asking me," end quote.

So Director Comey, isn't it true that the House Oversight
Committee last week, received information and released publicly that
Mr. Flynn accepted nearly $35,000 in speaking fees and traveling fees
from RT, this government -- Russian government owned media outlet.

COMEY: I believe I've seen news accounts to that effect.

SEWELL: Moreover, isn't it also true that according to the
emoluments clause of the United States Constitution, a person holding
any office of profit or trust cannot accept gifts or payments from a
foreign -- from a foreign country.

And doesn't the DOD, the Department of Defense prohibit retired
military officers from taking any consulting fees, gifts, traveling
expenses, honorariums, a salary from a foreign government, including
commercial enterprises owned by or controlled by a foreign government
like RT?

COMEY: That's not something I can comment on.
SEWELL: Can you -- can you speak to whether or not the
emoluments clause would apply to someone like Mr. Flynn, a retired
three-star general?

COMEY: I can't.

SEWELL: So isn't is -- I just find be really hard to believe
that given the emoluments clause does apply to retired officers like
Mr. Flynn. I can't believe that Mr. Flynn, a retired military officer
would take money from the Russian government in violation of the
United State Constitution. And I believe that such violations worthy
of a criminal investigation by the FBI.

What level of proof do we need in order for us to have a criminal
investigation by the FBI of Mr. Flynn?

COMEY: I can't comment on that.

SEWELL: Shouldn't the American people be concerned what -- I
think that it's really hard for us to fathom that he wouldn't know
that he should've disclosed that he received $30,000 as a part of --
of a speaking engagement to RT, the Russian U.S. anti-propaganda
outlet.

COMEY: I can't comment on that Ms. Sewell.

SEWELL: My final line of questioning is in regard to Mr. Flynn working as an agent of a foreign power.

Now Director Comey, following on Mr. Himes's line of questioning, am I correct that the Foreign Agents Registration Act requires that individuals who lobby on behalf of a foreign government must register with the United States government?

COMEY: I believe that's correct. I know keep saying I'm not an expert. The reason I'm saying that is, I don't know exactly how they define things like lobbying in the statute. But as a general matter, if you're going to represent a foreign government here in the United States, touching our government, you should be registered.

SEWELL: And isn't it true that just last November 2016, Mr. Flynn was working as a foreign agent doing work that principally benefited the government of Turkey and yet reported until just last week?

COMEY: I can't comment on that.

SEWELL: Isn't it true that Mr. Flynn was reportedly paid over half $1 million for this work?

COMEY: Same answer.

SEWELL: And isn't it true that the Trump White House, on at least two occasions, was asked by Mr. Flynn's lawyers whether he should report that work, the work that he was doing on behalf of the Turkish government. And yet the administration didn't give him any advice to the contrary.

Do you know anything about that?

COMEY: I have to give you the same answer.

SEWELL: So Director Comey, I know you cannot discuss whether any investigations are ongoing with U.S. persons, and I respect that. I think it's important though that the American people understand the scope and breath of what, in public open source press reportings of Mr. Flynn's actions that led to his resignation.

And while we can't talk about whether there are an investigation, I believe that we here at HPSCI, at the House Permanent Select Committee on Intelligence must put those facts into the public domain. And they are one, that Mr. Flynn lied about his communication with the -- with the Russian ambassador.

Secondly, That Mr. Flynn lied about taking money from the Russian
government and thirdly, that Mr. Flynn at a minimum did not disclose
work as an agent of a foreign -- of a foreign power and that the White
House did not help in this concern.

So gentlemen, it's clear to me that Mr. Flynn should be under
criminal investigation. And I know you cannot comment but I believe
it is my duty as a member of this committee to comment to the American
people that this -- that his engagement of lying and failure to
disclose really important information and contacts with a foreign
ambassador do rise to the level of -- of disclosure and to me,
criminal intent.

So I say this to say that the American people deserve to know the
full extent of Mr. Flynn's involvement with the Russians and the
extent to which it influenced the 2016 election. I believe our
democracy requires it.

Thank you, I yield back to my ranking member.

NUNES: Time's expired. Recognize myself for 15 minutes.

Mr. Comey and Mr. Rogers, you both said that the Russians had --
they favored Donald Trump, the selection. And you made that change,
from the beginning of December it was not that they were trying to
help Donald Trump, but that changed by early January. Mr. Conaway
talked about that. Do -- do Russians...

COMEY: I don't -- I don't agree with that. I want to make sure
I didn't misspeak earlier. We didn't change our view from December to
early January. We, the FBI -- and I don't know that anybody else did
on the I.C. team.

ROGERS: Me, from my perspective, we didn't have a fully formed
view until the end of December...

NUNES: At some point -- at some point, the assessment -- at some
point, the assessment changed from -- from going from just trying to
hurt Hillary Clinton to no, that they were actually trying to help
Donald Trump get elected. That was early December as far as I know
and then by January, you had all changed your mind on that.

COMEY: Well that's not my recollection.

ROGERS: That's not my recollection either, sir.

NUNES: OK. So is it -- do Russians historically prefer
Republicans to win over Democrats?

COMEY: I don't know the answer to that. I don't know the answer to that.

NUNES: Did the Russians prefer Mitt Romney over Barack Obama in 2012?

ROGERS: I don't know that we ever did -- drew a formal analytic conclusion.

NUNES: Did the Russians prefer John McCain in 2008 over Barack Obama?

ROGERS: I never saw a U.S. intelligence community analytic position on that issue.

NUNES: Don't you think it's ridiculous to say that -- for anyone to say that the Russians prefer Republicans over Democrats?

ROGERS: I didn't think that that's what you just heard us say, I apologize, sir.

COMEY: I hope you didn't hear us to say that. We don't know in those particular races and I'm not qualified enough...

NUNES: I'm just asking a general question. Wouldn't it be a little preposterous to say that historically, going back to Ronald Reagan and all that we know about maybe who the Russians would prefer, that somehow the Russians prefer Republicans over Democrats?

COMEY: There is -- I'm not going to discuss in an unclassed forum, in the classified segment of the reporting version that we did, there is some analysis that discusses this because remember this did come up in our assessment on the Russian piece. I'm not going to discuss this unclassified forum.

NUNES: Mr. -- Mr. King.

KING: Thank you, Mr. Chairman.

And I would just say on that because again, we're not going into the classified sections, that indicating that historically Russians have supported Republicans, and I know that language is there, to me puts somewhat of a cloud over the entire report. It seems to indicate the direction it was going in, but anyway, let me just say this for the record, and I know what your answer's going to be, but I have to get this statement on the record.

On March 15, former acting director of CIA, Mike Morell, who was

the acting director under President Obama and put on the record I've had differences with Mike Morell in the past but he was asked about the question of the Trump campaign conspiring with the Russians and his answer was there's smoke but there is not fire at all. There's no little camp fire, there's no little candle, there's no spark.

COMEY: I can't comment, Mr. King.

KING: Admiral Rogers.

ROGERS: I'm not going to comment on an ongoing investigation.

KING: I understand that. That was my way of getting on the record, so I appreciate that. You were talking about the significance of leaks and how important it is we stop them. And to me -- and I've been here a while -- I've never seen such a sustained period of leaks.

Going back to December where, not the Intelligence Committee, but the Washington Post was told the conclusion of the report -- a similar one -- what it was going to be. We have situations in the New York Times where they talk of meetings, they talk about transcripts, they talk about conversations.

There was one in particular that spoke about Trump campaign individuals meeting with Russian intelligence agents and again, Director Comey, I don't know if you can comment on this, but the White House chief of staff, said against that day, on the next day that Mr. McCabe from your office you went to him at the White House and told him that that story was BS.

Is there any way you can comment on whether or not Mr. McCabe told that to Mr. Priebus?

COMEY: I can't, Mr. King, but I can agree with your general premise. Leaks have always been a problem. I read over the weekend something from George Washington and Abraham Lincoln complaining about them. But I do think in the last six weeks, couple of months, there's been at least -- apparently a lot of conversation about classified matters that's ending up in the media.

Now, a lot of it is just dead wrong, which is one of the challenges because we don't correct it, but it does strike me there's been a lot of people talking or at least reporters saying people are talking to them in ways that have struck me as unusually active.

KING: I fully understand the media's fascination with palace intrigue, with which faction of the White House is trying to outdo the other, that's all -- to me, that's all legitimate, that goes with the game. But if you're talking about leaking classified information, if

you're talking about leaking investigations, I mean -- you've stated
today that there is an FBI investigation going on.
So if the New York Times can be believed, I would think there
would have to be somebody from the FBI who is telling them about these
purported meetings, which Mr. McCabe said was BS, with the Russian
intelligence agencies. Somebody who's familiar with that
investigation spoke to the New York Times. And so I'll use that as an
example and also, one where there's a small universe.

I think it was on January 6, when yourself, Admiral Rogers,
Director Brennan, and General Clapper went to Trump tower to meet with
President Trump. The media reports are that at the end of that
meeting, Director Comey, you presented president-elect Trump with a
copy of the now infamous or famous dossier. And I don't know how many
people were in the room, but within hours, that was leaked to the
media and that gave the media the excuse or the rationale to publish
almost the entire dossier.

Do you -- does that violate any law? I mean you were at a
classified briefing with the president-elect of the United States and
it had to be a very, very small universe of people who knew that you
handed them that dossier and it was leaked out within hours. Are you
making any effort to find out who leaked it and do you believe that
constitute a criminal violation?

COMEY: I can't say, Mr. King except I can answer in general.

KING: Yes.

COMEY: Any unauthorized disclosure of classified conversations
or documents is potentially a violation of law and a serious, serious
problem. I've spent most of my career trying to figure out
unauthorized disclosures and where they came from. It's very, very
hard.

Often times, it doesn't come from the people who actually know
the secrets. It comes from one hop out, people who heard about it or
were told about it. And that's the reason so much information that
reports to be accurate classified information is actually wrong in the
media. Because the people who heard about it didn't hear about it
right. But, it is an enormous problem whenever you find information
that is actually classified in the media.

We don't talk about it because we don't wanna confirm it, but I
do think it should be investigated aggressively and if possible,
prosecuted so people take as a lesson, this is not OK. This behavior
can be deterred and its deterred by locking some people up who have
engaged in criminal activity.

KING: Well, could you say it was -- obviously, Admiral Rogers
was in the room, you were in the room, General Clapper was in the room
and Director Brennan was in the room. Were there any other people in
the room that could've leaked that out?

I mean this isn't a report that was circulated among 20 people.
This is an unmasking of names where you may have 20 people in the NSA
and a hundred people in the FBI, its not putting together a report or
the intelligence agency. This is four people in a room with the
president-elect of the United States. And I don't know who else was
in that room and that was leaked out, it seemed within minutes or
hours, of you handing him that dossier and it was so confidential, if
you read the media reports that you actually handed it to him
separately.

So believe me, I'm not saying it was you. I'm just saying, it's
a small universe of people that would've known about that. And if it
is a disclosure of classified information, if you're going to start
with investigating the leaks, to me that would be one place where you
could really start to narrow it down.

COMEY: And again, Mr. King, I can't comment because I do not
ever wanna confirm a classified conversation with a president or
president-elect. I can tell you my general experience. It often
turns out, there are more people who know about something you
expected.

At first, both because there may be more people involved in the
thing than you realized, not -- not this particular, but in general.
And more people have been told about it or heard about it or staff
have been briefed on it. And those echoes are in my experience, what
most often ends up being shared with reporters.

KING: Well, could you tell us who else was in the room that day?

COMEY: I'm sorry?

KING: Could you tell us who else was in the room with you that
day?

COMEY: No, because I'm not going to confirm that there was such
a conversation because then, I might accidentally confirm something
that was in the newspaper.

KING: But could you tell us who was in the room, whether or not
there was a conversation?

COMEY: No, I'm not confirming there was a conversation. In a
classified setting, I might be able to share more with you, but I'm

not going to confirm any conversations with either President Obama or President Trump or when President Trump was the President-elect.

KING: Well, not the conversation or even the fact that you gave it to him, but can you -- can you tell us who was in the room for that briefing that you gave?

COMEY: That you're saying later ended up in the newspaper?

KING: Yes.

COMEY: So my talking about who was in the room would be a confirmation that was in the newspaper was classified information, I'm not going to do that. I'm not going to help people who did something that -- that is unauthorized.

KING: Yeah, but we all know that the four of you went to Trump Tower for the briefing, I mean that's not classified, is it?

COMEY: How do we all know that, though?

KING: OK.

(LAUGHTER)

COMEY: Yeah.

KING: You know, you can -- you see the predicament we're in, here.

COMEY: I get it. I get it. But we are duty-bound to protect classified information, both in the first when we get it, and then to make sure we don't accidentally jeopardize classified information by what we say about something that appears in the media.

KING: Well, if they're listening, I would just advise that Director Clapper and Director Brennan, we'll be asking them the same questions last week -- next week and perhaps, they can give us some answers.

Mr. Chairman, I -- I yield back.

NUNES: Gentleman yields back...

(CROSSTALK)

KING: Thank you. Thank you for testifying.

NUNES: Mr. Lobiondo is recognized.

LOBIONDO: Thank you, Mr. Chairman.

Director Comey, Admiral Rogers, thank you for your service and thank you for being here. Understanding that what both of you have been saying about the classified nature of the investigation, the classified nature of the topics we're talking about, can you give us any indication of when we, the committee, may in a classified setting know something from you. Would we have ongoing updates?

COMEY: Mr. LoBiondo, I don't know how long the work will take. I can't commit to updates, as you know. I have briefed the committee as a whole on some aspects of our work and I've briefed in great detail the chair and the ranking.

I don't know -- I can't -- I can't predict or commit to updates. But as your work goes on, we're in constant touch with you and we'll do the best we can, but I can't commit to that as I sit here.

LOBIONDO: So as the House Intelligence Committee and the Senate Intelligence Committee are conducting our bipartisan investigations and looking wherever it may lead with individuals or circumstances.

If you, through the FBI investigation, come across a circumstance with an individual or a situation would we be made aware of that under normal course of business?

COMEY: Not necessarily, but it's possible.

LOBIONDO: OK. So can you, either Director Comey or Admiral Rogers, tell us what we are doing or what we should be doing to protect against Russian interference in future elections or any meddling with our government or for that matter any state sponsor Iranians, North Koreans, Chinese, with any -- any meddling they may be doing?

ROGERS: So first, I think a public discussion and acknowledgment of the activity is a good positive first step because it shines us a flashlight on this, if you will. It illuminates a significant issue that I think we all have to -- have to deal with. There's a variety ongoing efforts both within the government, as well, in the private sector.

In terms of how we harden our defenses, I think we also need to have a discussion about just what for example, does critical infrastructure meeting in the 21st-century. I don't think we traditionally would have thought of an election infrastructure as critical. We traditionally viewed critical infrastructure as something that generated an industrial output, aviation, electricity,

finance, I don't think we've traditionally thought about it and informational kind of dynamic.

I think that's a challenge for us coming ahead and then continued partnership between the elements within the government, as well is in the private sector, that's the key to the future to me.

LOBIONDO: So just for the record, I also had a whole list of specific questions about individuals and/or circumstances that don't want to be repetitive and have you say, I can't comment on them. But I would anticipate when we move to classified session that this committee will be able to explore some of those -- some of the situations in a little more depth.

I have a couple of other questions about the -- about the -- the Russian intervention. But I don't have enough time to get into it right now.

Mr. Chairman, if you could give me a couple minutes when we get to the next round.

NUNES: (OFF-MIKE)

LOBIONDO: OK. So very briefly the -- if you can describe the elements of the Russia's active measures in the campaign in the 2016 election. We've only got 35 seconds, but that's the first thing I want to get into about exactly what they were doing if you can tell us anything about that.

ROGERS: So we saw cyber used, we saw the use of external media, we saw the use of disinformation, we saw the use of leaking of information, much of which was not altered.

I mean, we saw several, if you will, common traits that we have both seen over time as well as I would argue that the difference this time was that the -- the cyber dimension and the fact that the release of so much information that they had extracted via cyber is a primary tool to try to drive an outcome.

LOBIONDO: So in this setting, can you talk to us at all about what tools they used?

ROGERS: I'm not going to go into the specifics of how they executed the hacks. I apologize, no sir.

LOBIONDO: We'll try to get into that in classified. I'll hold off for now, thank you.

NUNES: Gentleman yields back.

Mr. Schiff's recognized for 15 minutes.

SCHIFF: Thank you, Mr. Chairman. I just had a couple follow-up questions.

Director Comey, can you tell me what an SF86 is?

COMEY: SF86?

SCHIFF: Yes.

COMEY: It's the standard background clearance form that all of us who are hired by the federal government and want to have access to classified information fill out.

SCHIFF: Would someone who is an incoming national security advisor have to fill out an SF86?

COMEY: Yes, I think so.

SCHIFF: Would that SF86 require that the applicant disclose any payments received from a foreign power?

COMEY: I think so. I mean, the form is the form. I think so and foreign travel as well.

SCHIFF: I'd make a request through you to the Justice Department or whatever IC component would have custody of Mr. Flynn's SF86, I'd make a request that that be provided to the committee.

And I yield now to Mr. Carson.

CARSON: Thank you, Ranking Member.

I'd like to focus my line of questioning on Russia's views toward Ukraine. In March 2014, Russia illegally annexed the Ukrainian territory of Crimea beginning a conflict which has effectively yet to be resolved.

Admiral Rogers, can you please briefly describe, as you understand it, sir, how Russia took Crimea?

ROGERS: I would argue the insertion of military force. They occupied it and physically removed it from Ukrainian control.

CARSON: Sir, we've heard terms like little green men and hybrid warfare. Can you please explain how these relate to Russia and Ukraine?

ROGERS: So on the Ukraine side, what we saw was over time, rather than the kind of overt kind of activity we saw to such a degree on the Crimea side, what we saw was a much bigger effort on the influence and attempts to distance Russian actions from any potential blowback to the Russian state, if you will, and hence the use of the little green men surrogates in military -- unmarked military uniforms, the flow of information, the provision of resources to support forcible separation of the Ukraine.

CARSON: Admiral, has Russia returned Crimea back to Ukraine, sir?

ROGERS: No.
CARSON: Do they have intentions to?

ROGERS: They publicly indicated that they will not.

CARSON: Admiral, why does Russia even care about Ukraine?

ROGERS: I'm sure in their view they view this is a primary national interest for them. It's on the immediate periphery of the Russian state.

CARSON: Am I right, sir, that they see it as a part of their broader objective to influence and impact Russia's -- Ukraine's desire for self-determination?

ROGERS: Yes. I think that's part of it.

CARSON: Sir, as Russia tried to claim stolen territory in Ukraine, the U.S. and the rest of the world saw the annexation for what it was; a crime. Shortly after Russia invaded, the United Nations essentially declared it a crime in a nonbinding resolution. In our own government, recognizing the seriousness of the event instituted new sanctions against Russia, is that right sir?

ROGERS: Yes sir.

CARSON: Now this was a time where much of the world was united but Russia invaded another country and illegally annexed it's territory as we all stood shoulder-to-shoulder with Ukraine. Now one person who didn't see it that way, however, was president Donald Trump.

On July 30, in an interview with ABC News, Mr. Trump said of Putin, and I quote, "He's not going into Ukraine, OK? Just so you understand, he's not going into Ukraine, all right?" end quote.

Now, Admiral, hadn't Putin already gone into Ukraine two years before and hadn't left?

ROGERS: We're talking about the Crimea and influence on the Ukraine generally, yes, sir.

CARSON: And he still hasn't left, correct, sir?

ROGERS: Now we're starting to get into some very technical questions about are the Russians physically in the Ukraine, is it surrogates that the Crimea is a very example of to me. They outright invaded with armed military force and have annexed it.

CARSON: But are they effectively still in Ukraine?

ROGERS: They're certainly supporting the ongoing effort in the Ukraine to split that country.

CARSON: We'll get back to Mr. Trump in a minute. First, tell me sir, what would it mean to Russia and to Putin to have sanctions lifted?
ROGERS: Clearly, even easing of economic impact, greater flexibility, more resources.

CARSON: Now according to NATO analysis, the Russian economy shrunk by as much as 3.5 percent in 2015 and had no growth in 2016 in big part because of western sanctions, especially those against the oil and gas industry.

Now, we're talking about a loss of over $135 billion just in the first year of sanctions. That's a huge sum of money and sanctions aren't meant to push their economy over a cliff, but to put long-term pressure on Putin to change his behavior. Putin, himself, said in 2016 that sanctions are severely harming Russia. So we know they've had success in putting pressure on the Kremlin.

Admiral, what would it mean geopolitically? Would it help legitimate Russia's illegal land grab?

ROGERS: Sir, I'm not -- I'm not in a position to talk broadly about the geopolitical implications. I mean we have stated previously, from an intelligence perspective, we tried to -- we have tried to outline to policy makers the specifics of the Russian invasion on Crimea, the specifics of the continued Russian support to separatists in the Ukraine that Russians continue to -- to pressure and the keep the Ukraine weak.

CARSON: Would it help cleave the United States from her allies?

ROGERS: If we remove the sanctions?

CARSON: There's a lot of steak -- there's a lot at stake here
for Russia. This is big money, big strategic implications. If they
can legitimate their annexation of Crimea, what's next? Are we
looking at a new iron curtain descending across Eastern Europe? You
know, most in our country recognize what is at stake in how the United
States, as the leader of the free world, is the only check on Russian
expansion.

So back to Mr. Trump and his cohort. At the republican
convention in July, Paul Manafort, Carter Page, and Trump himself
changed the republican party platform to no longer arm Ukraine. So
the same month that Trump denied Putin's role in Ukraine, his team
weakened the party platform on Ukraine and as we have and will
continue to hear, this was the same month that several individuals in
the Trump orbit held secret meetings with Russian officials, some of
which may have been on the topic of sanctions against Russia or their
intervention in Ukraine.

Now this is no coincidence in my opinion. In fact, the dossier
written by former MI6 agent, Christopher Steele alleges that Trump
agreed to sideline Russian intervention in Ukraine as a campaign
issue, which is effectively a priority for Vladimir Putin. There's a
lot in the dossier that is yet to be proven, but increasingly as we'll
hear throughout the day, allegations are checking out. And this one
seems to be as accurate as they come.
In fact, there is also one pattern I wanna point out before
yielding back, Manafort, fired, Page, fired, Flynn, fired. Why? They
were hired because of their Russian connections, they were fired.
However, because their connections became public, they were
effectively culpable. But they were also the fall guys. So I think
after we hear Mr. Quigley's line of questioning, we might guess who
could be next.

Mr. Chairman, Mr. Ranking Member, I yield back.

SCHIFF: I yield the balance to Representative Speier.

SPEIER: Thank you, Ranking Member. Thank you gentlemen for your
service to our country.

You know, I think it's really important as we sit here that we
explain this to the American people in a way that they can understand
it. Why are we talking about all of this? So my first question to
each of you is, is Russia our adversary? Mr. Comey?

COMEY: Yes.

2017 WL 1047848, 2017 WL 1047848 (2017)

SPEIER: Mr. Rogers?

ROGERS: Yes.

SPEIER: Is -- do they intend to do us harm?

ROGERS: They intend to ensure, I believe, that they gain advantage at our expense.

SPEIER: Director Comey?

COMEY: Yes, I wanna be -- harm can have many meetings. They're an adversary and so they wanna resist us, oppose us, undermine us, in lots of different ways.

SPEIER: So one of the terms that we hear often is hybrid warfare. And I'd like to just stand give a short definition of what it is. It blends conventional warfare, irregular warfare and cyber warfare. The aggressor intends to avoid attribution or retribution.

So would you say that Russia engaged in hybrid warfare in its effort to undermine our Democratic process and engage in our electoral process? Director Comey?

COMEY: I don't think I would use the term warfare. I think you'd -- you'd wanna ask experts in the definition of war. They engaged in a multifaceted campaign of active measures to undermine our democracy and hurt one of the candidates and -- and hope to help one of the other candidates.

ROGERS: I'd agree with the director.

SPEIER: All right, well, thank you both.
I actually think that their engagement was an act of war, an act of hybrid warfare and I think that's why the American people should be concerned about it.

Now, in -- in terms of trying to understand this, I -- I think of a spider web, with a tarantula in the middle. And the tarantula, in my view, is Vladimir Putin, who is entrapping many people to do his bidding and to engage with him. And I would include those like Roger Stone and Carter Page and Michael Caputo and Wilbur Ross and Paul Manafort and Rex Tillerson.

I'd like to focus first on Rex Tillerson in the three minutes I have, here. He was the CEO of Exxon Mobil. In 2008, he said that the likelihood of U.S./Russia businesses was, in fact, a poor investment, that Russia was a poor investment climate, that was in 2008. In 2011 he closed the $500 billion deal with Rosneft Oil. The CEO of Rosneft

is Igor Sechin, who is a confident of President Putin, second most powerful man in Russia and probably a former KGB agent.

The deal gives Exxon access to the Black Sea and the Kara Seas and Siberia for oil development. Rosneft gets minority interest in Exxon in Texas and the Gulf. Rex Tillerson calls Sechin a good friend. In 2012, Mr. Tillerson and Mr. Sechin go on a road show here in the United States to talk about this great deal that they had just consummated.

Also in 2012 there's a video of President Putin and Mr. Tillerson toasting champagne at the deal. And in 2013, Mr. Tillerson receives the Russian Order of Friendship and he sits right next to President Putin at the event.

So my question to you Director Comey is, is it of value to President Putin knowing what you know of him and that his interest in doing harm to us, is it of benefit to Mr. Putin to have Rex Tillerson as the Secretary of State?

COMEY: I can't answer that question.

SPEIER: Admiral Rogers?

ROGERS: Ma'am I'm not -- I'm not in the position answer that question.

SPEIER: All right. So in 2014 at Igor Sechin is sanctioned and he laments that he no longer will be able to come to the United States to motorcycle ride with Mr. Tillerson. Could you give me an understanding of what are some of the reasons that we impose sanctions, Direct Comey?

COMEY: On Sechin?

SPEIER: Well, just in general.

COMEY: Again, you'd have to ask an expert, but from my general knowledge it's to punish activities that are criminal in nature, that involve war crimes, that involve violations of U.N. resolutions or United States law in some other way, it's to communicate and enforce foreign policy interests and values of United States of America. That's my general sense, but an expert might describe it much better.

SPEIER: Admiral Rogers?

ROGERS: I would echo the Director's comments. It's also a tool that we use to attempt to drive and shake the choices and actions of others.

SPEIER: So in the case of Igor's session, who was sanctioned by the United States, in part to draw attention to the fact that Russia had invaded Crimea. It's an effort to try and send a very strong message to Russia, is that not true?

COMEY: I think that's right.

ROGERS: Yes ma'am.

SPEIER: With that, Mr. Chairman, I'll yield back for now.

NUNES: Gentleman yields back.

I'm going to yield myself 15 minutes and now yield to the general lady from Florida Ms. Ros-Lehtinen.

ROS-LEHTINEN: Thank you so much Mr. Chairman.

It's never acceptable, we can all agree, for any foreign power to interfere with our electoral process and this committee has long been focused on Russia's reprehensible conduct. And we will remain focused on the threat emanating from Moscow. And I agree with you Director Comey, when you say this investigation that is ongoing, we will follow the facts wherever they lead on a bipartisan level and there will be no sacred cows.

There are many important issues at stake, as you gentlemen have heard. There is bipartisan agreement on the danger of illegal leaks and our ability to reauthorize important programs upon which our intelligence community relies. But I want to assure the American people that there's also bipartisan agreement on getting to the bottom of Russian meddling in our election which must remain the focus of this investigation and yours.

So Admiral Rogers, I agree in what you said that a public acknowledgement of this foreign meddling to be a problem is important as we move forward. And following on Congressman LoBiondo's questions and based on this theme, I'd like to ask you gentlemen if you could describe what, if anything, Russia did in this election that to your knowledge they did or they didn't do in previous elections, how -- how it was -- were their actions different in this election than -- than in previous ones.

ROGERS: I'd say the biggest difference from my perspective was both the use of cyber, the hacking as a vehicle to physically gain access to information to extract that information and then to make it widely, publicly available without any alteration or change.
COMEY: The only thing I'd add is they were unusually loud in

their intervention. It's almost as if they didn't care that we knew what they were doing or that they wanted us to see what they were doing. It was very noisy, their intrusions in different institutions.

ROS-LEHTINEN: And what specifically based on this loudness did the FBI or the NSA do to prevent or counter this Russian active measure that we read about in the intelligence community assessment? As loud as they were, what did we do to counter that?

COMEY: Well, among other things, we alerted people who had been victims of intrusions to permit them to tighten their systems to see if they couldn't kick the Russian actors out. We also, as a government, supplied information to all the states so they could equip themselves to make sure there was no successful effort to affect the vote and there was none, as we said earlier.

And then the government as a whole in October called it out. And I believe it was Director Clapper and then-secretary Jeh Johnson issued a statement saying this is what the Russians are doing, sort of an inoculation.

ROS-LEHTINEN: And the loudness to which you refer, perhaps they were doing these kinds of actions previously in other elections but they were not doing it as loudly. What -- why do you think that they did not mind being loud and being found out?

COMEY: I don't know the answer for sure. I think part -- their number one mission is to undermine the credibility of our entire democracy enterprise of this nation and so it might be that they wanted us to help them by telling people what they were doing.

Their loudness, in a way, would be counting on us to amplify it by telling the American people what we saw and freaking people out about how the Russians might be undermining our elections successfully. And so that might have been part of their plan, I don't know for sure.

ROGERS: I've -- I agree with Director Comey. I mean, a big difference to me in the past was while there was cyber activity, we never saw in previous presidential elections information being published on such a massive scale that had been illegally removed both from private individuals as well as organizations associated with the democratic process both inside the government and outside the government.

ROS-LEHTINEN: And this massive amount and this loudness, now that it's become public knowledge, now that we have perhaps satisfied their -- their -- their thirst that it has become such a huge deal, do you expect their interference to be amplified in future U.S.

elections?

Do you see any evidence of that in European elections or do you think that this public acknowledgment would -- would tamper down the volatility?

COMEY: I'll let my -- maybe I'll just say as initial matter they'll be back. And they'll be in 2020, they may be back in 2018 and one of the lessons they may draw from this is that they were successful because they introduced chaos and division and discord and sewed doubt about the nature of this amazing country of ours and our democratic process.

It's possible they're misreading that as it worked and so we'll come back and hit them again in 2020. I don't know but we have to assume they're coming back.

ROGERS: I fully expect them to continue this -- this level of activity because I -- our sense is that they have come to the conclusion that it generated a positive outcome for them in the sense that calling into question the democratic process for example is one element of the strategy.

We're working closely, we -- our FBI teammates, others working closely with our European teammates to provide the insights that we have seen to try to assist them as they, themselves, France and Germany for example, about to undergo significant national leadership elections over the course of the next two months.

ROS-LEHTINEN: And in terms of the European elections, what -- what have you seen or any information that you can share with us about the Russian interference in that process?

ROGERS: So you see some of the same things that we saw in the U.S. in terms of disinformation, fake news, attempts to release of information to embarrass individuals, you're seeing that play out to some extent in European elections right now.

ROS-LEHTINEN: I look forward to continuing with you.

Thank you so much, Mr. Chairman.

NUNES: Gentlelady yields back.

Mr. Turner is recognized.

TURNER: Thank you, Mr. Chairman.

Mr. Comey, Admiral Rogers, thank you for being here today and for

your -- what appears to be attempts at being forthcoming with the
committee. I also want to thank the Chairman and the Ranking Member
Schiff. This is a bipartisan effort.

I think as you've looked to what this committee is undertaking,
everyone wants answers and everyone want answers to all of the
questions that are being asked because this does go to such an
important issue concerning our elections.

Admiral Rogers, I'm going to begin with a question to you
concerning the Foreign Intelligence Surveillance Act. Now Admiral, as
you know that the foreign service -- Foreign Intelligence Surveillance
Act provides the circumstances or the authority under which the
intelligence community may collect or intercept the communication of a
foreign person located outside of the United States, or as Mr. Comey's
indicated a person who is covered under a FISA court order.

Now, with Mr. Rooney and Mr. Gowdy you discussed the minimization
procedures under the Foreign Intelligence Surveillance Act and those
minimization procedures are supposed to protect the privacy rights of
U.S. citizens. Specifically, it's geared toward the communications of
those who maybe inadvertently or incidentally collected as a result of
the intelligence community's lawful collection of communications of
others.

So Mr. Rogers, is the intelligence community required to cease
collection or the interception of communications if result of the
collection or interception includes the communications of an incoming
U.S. administration official, the president-elect or the president-
elect's transition team.

ROGERS: It depends under what authority work, as I said early
on, there's a series of questions we go through, was there criminal
associated activity, does the conversation deal about threats to U.S.
persons, breaking of the law. So there's no simple yes or no, there's
a series of processes we have in place.

TURNER: Mr. Rogers, is there any provision of minimization that
requires you to cease collection? Because that is my question, are
you under any circumstances required to cease collection if the
collection results in the either inadvertent or incidental collection
of an incoming U.S. administration official, the president-elect or
the president-elect's transition team?

ROGERS: Purely on the basis of exposure, I wanna make sure I
understand the question, is -- is...

(CROSSTALK)

TURNER: Are you required to cease, if you are -- are undertaking
lawful collection under the Foreign Intelligence Surveillance Act of a
person or individual, either because they're a foreign person located
outside the United States or the person that you're collecting
against, is the subject of a FISA Court order.

If incidental to that collection or inadvertently, the collection
results in the collection of communications of an incoming U.S.
administration official, the president-elect or the president-elect's
transition team, are you required under the minimization procedures,
to cease collection?

ROGERS: Not automatically.

TURNER: Thank you. So the answer's no, correct?

Well, the reason why this is important is because intuitively, we
would all know that incoming administration would have conversations
with those that the intelligence community may be collecting against,
either by making phone calls to them or receiving phone calls to them.

And so it's important for us to understand that the minimization
procedures that are intended to collect the privacy rights of
Americans, do not inherently include the -- a prohibition of the
intelligence community incidentally or inadvertently, collecting the
communications of an incoming administration.

ROGERS: Yes, sir.

TURNER: Yep.

Mr. Comey, are you aware whether or not the Director of National
Intelligence Director Clapper, ever briefed the President of the
United States, then President Obama, concerning the possible
inadvertent or incidental collection or interception by the U.S.
intelligence community of any communication of members of the incoming
Trump administration?

COMEY: That's not something I can comment on.

TURNER: And then why not, Mr. Comey.

COMEY: A couple of reasons, it might involve classified
information, it might involve communications with the president of the
United States. On both of those grounds, I can't talk about it here.

TURNER: Mr. Comey, have you previously discussed your
conversations with President Obama with this committee?

COMEY: I don't remember. I may have with the chair and ranking, I don't remember with the full committee.

TURNER: Well, we'll have to refresh your memory on those conversations, then.

Mr. Comey, did and am used to combing. I did President Obama ever acknowledge to you of having been briefed, concerning possibly inadvertent or incidental collection or interception by the intelligence community of any communications of members of the incoming Trump administration?

COMEY: I have to give you the same answer, Mr. Turner.

TURNER: Well, Mr. Comey, the first question related to whether or not Mr. Clapper had briefed the president of the United States and we'll certainly be following up with him. He is going to be appearing before us next week and we'll certainly be directing the question to him also.

So Mr. Comey, are you aware of any evidence that General Flynn prior to the inauguration, ever communicated to the Russian government or a Russian government official that the Trump administration in the future would release, resend, or reverse U.S. sanctions against Russia or ever made any offer of a quid pro quo for releasing resending or reversing U.S. sanctions against Russia. Are you aware of any evidence?

COMEY: That's not something I can comment on, Mr. Turner.

TUNER: And why's that?

COMEY: I'm trying very hard not to talk about anything that relates to a U.S. person, or that might rule in or rule out things, might be investigating. I'm trying to be studiously vague here to protect the integrity of the investigation.

So please don't -- as I said in the beginning please don't interpret my no comment as meaning this or meaning that. I just can't comment.

TURNER: Well, Mr. Comey, there are statutes, guidelines and procedures concerning the what does it take for the FBI to open up a counterintelligence investigation into a U.S. citizen.

It is not just subject to discretion. You can't just say well let's go look at somebody, you have to have a basis. You've now informed us that you've opened a counterintelligence investigation into the Trump campaign, members the Trump campaign, concerning Russia

in July of 2006 (sic). Now we're trying to get a picture of what does
it take to tip over for investigation?

Now previously people have said that there been individuals who
attended a meeting with Russian officials, individuals who -- a member
who was paid to attend a conference, a picture that was taken,
traveled to a foreign place. There many people both in -- in all of
our administrations and sometimes, you know, certainly members who
have left Congress who would all qualify for that.
What -- what is the tipping point? I mean it can't just be that.
Don't you need some action or some information besides just attending
a meeting, having been paid to attend a conference, that a picture was
taken, or that you traveled to a country before your open to
investigation for counterintelligence by the FBI?

COMEY: The standard is, I think there's a couple different at
play. A credible allegation of wrongdoing or reasonable basis to
believe that an American may be acting as an agent of a foreign power.

TURNER: Well the reason why we're with this, Mr. Comey, is that
we obviously have the statements of Mr. Clapper that there is no
evidence of collusion with Russia and he just left the intelligence
community. And as you are aware, we now sit because this is you said,
Admiral Rogers, you know, the Russians wanted to put a cloud over our
system.

And Mr. Comey, by your announcement today, I mean, there is now a
cloud that undermines our system. There is a cloud that where we're
sitting with Mr. Clapper who was obviously in a very important
position to know, who stated to us that there is no evidence of
conclusion, and you will not give us evidence or -- or -- or give us
any -- any substantive evaluation of it.

We now sit with this cloud and it's important that -- Mr.
Chairman I have a few additional questions if I might when we regain
time.

NUNES: We'll get back to Mr. Turner.

Mr. Schiff's recognized for 15 minutes.

SCHIFF: Thank you Mr. Chairman.

I recognize representative Jackie Speier.

SPEIER: Thank you Mr. Schiff.

Again, let's go back to this tarantula web. So Mr. Tillerson, in
2014, started to lobby the United States government asking them to

shifter or lift the sanctions. Now in his -- his confirmation hearing he says he's -- as he said, I have never lobbied against sanctions, personally, to my knowledge, Exxon Mobil never directly lobbied against sanctions.

And yet there is lobbying reporting that shows that Exxon Mobil actually paid over $300,000 to lobbyists in 2014. And that Mr. Tillerson visited the White House five times in 2014 and treasury with Secretary Lew, seven times.

Is -- is there something disconcerting about a U.S. CEO attempting to undermine The sanctions imposed by our government against another country for acts that we find to be disadvantageous to the world order. Director Comey?

COMEY: That's not a question I can answer. For a variety of reasons, I'm not qualified to answer and I shouldn't be answering questions like that.

SPEIER: All right. OK. How about this then? Is it disconcerting to you as the director of the FBI that a U.S. CEO would say publicly that he is very close friends with President Putin and has had a 17-year relationship with him?

COMEY: That's not a question I can answer.

SPEIER: Would it raise any red flags?

COMEY: That's not a question I can answer.

SPEIER: Admiral Rogers?

ROGERS: Ma'am, lots of American corporations do business in Russia. I have no knowledge of the specifics you're talking about, I am in no way qualified or knowledgeable enough to comment on this.

SPEIER: All right, let's move on to someone else in that web. His name is Michael Caputo. He's a PR professional, conservative radio talk show host. In 1994, he moved to Russia and there he was working for the agency for international development. He was fired from that job because he refused to follow a State Department position.

He then opened a PR firm in Moscow and married a Russian woman. He subsequently divorced her and in 1999 his business failed. Roger Stone, a mentor to him, urged him to move to Florida and open his PR firm in Miami which is exactly what Mr. Caputo did. And then in 2000 he worked with Gazprom-Media to improve Putin's image in the United States.

Now, do we know who Gazprom-Media is? Do you know anything about Gazprom, Director?

COMEY: I don't.

SPEIER: Well, it's a -- it's an oil company. In 2007, he began consulting the Ukrainian parliamentary campaign. There he met his second wife.

So I guess my question is, what possible reason is there for the Trump campaign to hire Putin's image consultant? Any thoughts on that Director Comey?

COMEY: No thoughts.

SPEIER: Admiral Rogers?

ROGERS: Likewise, ma'am.

SPEIER: All right. Do either of you know what Michael Caputo is doing for the Trump effort today?

ROGERS: I have no idea.

COMEY: And I'm not going to talk about U.S. persons.

SPEIER: All right, let's move on now to Carter Page.

Carter Page was the founder of Global Energy, it's an investment fund. He has only one partner and that partner is Sergei Yatsenko who's the former executive of a Russian state-owned Gazprom oil company. Before that, from 2004 to 2007, he worked for Merrill Lynch in Moscow.

In March of 2016, Then-Candidate Trump referred to Carter Page as his foreign policy advisor to the Washington Post. The next day, Page asserts that he's an advisor on Russia and energy. But then subsequently, Candidate Trump says he doesn't know him.

SPEIER: On September 26, he takes a leave of absence from the campaign and then Page publicly supports a relationship with Russia, criticizes U.S. sanctions and NATO's approach to Russia, saying -- and then subsequently says he's divesting his stake in Gazprom in August. In 2014, he writes an article criticizing the U.S. sanctions, praising Sechin in an article and global policy and then rebuked the west for focusing on so-called annexation of Crimea.

In July of 2016, he gives a graduation speech at the new economic

school, denies meeting with the prime minister, Christopher Steele, in his dossier, says he met with, again, Igor Sechin, offering a 19 percent interest in Rosneft. It becomes the biggest transfer of public property to private ownership.

Now, Carter Page is a national security adviser to Donald Trump. Do you believe that -- why do we -- I guess, again, here's another company that has had sanctions imposed upon it. Could you again clarify why we impose sanctions on companies?

COMEY: Admiral Rogers did it better than I, so I'm going to [****] him.

SPEIER: OK.

ROGERS: I apologize. I don't remember the specifics of my answer, but I'll stand by my answer...

COMEY: Which was excellent.

SPEIER: All right.

I think at that point, I will yield back, Mr. Chair.

SCHIFF: I now yield to Mr. Quigley.

QUIGLEY: Thank you, Mr. Ranking Member.

Gentlemen, thank you for your service. Thank you for being here. We've talked a little bit about the Russian playboook, right? Extortion, bribery, false news, disinformation, they all sound very familiar, correct? Well, as we talk, without thinking about anybody in the United States, just generally the Russian playbook and how it's worked in particularly Eastern Europe and Central Europe, a lot of it involves trying to influence individuals in that country, correct?

ROGERS: Yes.
QUIGLEY: So what we've talked about a little bit today seems so -- be sort of a black and white notion of whether there was collusion, but does a Russian active measure attempting to succeed at collusion -- does the person involved have to actually know? I mean, does it have to involve knowing collusion for there to be damage?

COMEY: I can answer generally. In the world of intelligence, oftentimes there are people who are called co-optees, who are acting -- don't realize they're dealing with agents of a foreign power and so are doing things for someone they think is a friend or a business associate, not realizing it's for that -- the foreign government. So it can happen, it's actually quite a frequent technique.

QUIGLEY: Is it beyond that sometimes to include things where the -- the actor doesn't necessarily know what they're doing is helping that other government?

COMEY: Exactly.

QUIGLEY: And what are instances, just examples of what that might include in a generic sense, in Europe and so forth?

COMEY: Oftentimes, a researcher here in the United States may think they're dealing with a peer researcher in a foreign government and not knowing that that researcher is either knowingly or unwittingly passing information to a foreign adversary of the United States.

QUIGLEY: And can you explain and elaborate how this sort of -- problems with defining what collusion is -- the differences that might be involved with explicit or implicit collusion?

COMEY: Collusion is not a term, a legal term of art and it's one I haven't used here today, as we're investigating to see whether there was any coordination between people associated with the campaign...

QUIGLEY: Explicit or implicit coordination?

COMEY: I guess implicit, I -- I would think of it as knowing or unknowing. You can do things to help a foreign nation state, as I said, without realizing that you're dealing with. You think you're helping a buddy, who's a researcher at a university in China and what you're actually doing is passing information that ends up with the Chinese government. That's unwitting, I don't know whether it's same as your implicit.

Explicit would be, you know, I'm sending this stuff to this researcher in China and I'm doing it because I wanna help the Chinese government and I know he's hooked up with the Chinese government.

QUIGLEY: Admiral Rogers, would you give other examples of what you witnessed in your career?

ROGERS: Sometimes, U.S. individuals would be approached by other individuals connected with -- with foreign connections who will misrepresent what not just the researcher, they'll assume an identity if you will, hey I want you to think that I'm actually working for a business, exploring commercial interests, those kinds of things. Create a relationship and then it turns out, there really is no commercial interest, here they're acting as a direct extension of a foreign government...

(CROSSTALK)

COMEY: And romance can be a feature. Somebody dating someone to
create a close relationship and the U.S. government person thinks that
they're in love with this person and -- and vice versa and the other
person's actually an agent of a foreign power, that's sort of a
classic example.

QUIGLEY: You describe this as naive acquiescence?

COMEY: I don't -- I'm not sure I know what that means, exactly
(ph).

ROGERS: I don't know what that really means (ph).

QUIGLEY: You're -- you're going along with it and without really
acknowledging, understanding in your mind or being naive about the
issue.

COMEY: Sure, that can happen.

ROGERS: Yeah, you see that at times.

QUIGLEY: OK.

Going on to things that you -- you probably can't comment upon
which is of equal concern. We're all, at this point, very familiar
with Mr. Sessions's testimony before the United States Senate in which
he specifically said he had -- he wasn't one who had this contact with
the Russians. And then there was the amended, I guess, testimony in
which he acknowledged I believe two such testimonies. The first was
in July during the convention and then later in September afterwards.

All the while, that the issues that we are talking about today,
the hacking, the dumping of materials were taking placing and
certainly, someone in the position of Mr. Senator Sessions would've
been aware of this. Perhaps, would've remembered these conversations
or might've mentioned or asked the Russian ambassador to knock it off.
But apparently, none of those things happened or at least he didn't
remember that they happened. Unfortunately, what we're reading now is
that there was a third meeting as early as April of last year in
Washington, D.C., a meeting which Candidate Trump was present and the
Russian ambassador was present.

At some point in time, this goes well beyond an innocent, under
the best of circumstances, oh I forgot sort of thing, or that doesn't
count. When you correct your testimony in front of the United States
Senate, you're still under oath and you're swearing to the American

people that what you're saying is true. Well, the third time is well beyond that and is quite simply perjury.

So as we look at this as we go forward, gentlemen, I ask that you take that into consideration. This is far more than what we have talked about just in the general sense, did the Russians hack or not and the scope of this too, a concerted effort and plan to lie to the American public about what took place and what the motivations were beyond these -- this process. Again, I thank you for your service.

And I yield back to the ranking member.

SCHIFF: I yield to Mr. Swalwell of California.

SWALWELL: Thank you, Director Comey and Admiral Rogers.

Director Comey, you've served time in a courtroom as a prosecutor and I'm wondering if you remember the instruction that is read to juries every day that if you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says.

COMEY: Yes, that's familiar to me.

SWALWELL: And your testimony at the beginning of this hearing was that President Trump's claims that former President Obama had wiretapped him is false.

COMEY: I said we have no information that supports them.

SWALWELL: Thank you.

With respect to Donald Trump, do you remember the other instruction relating to truthfulness of a witness or a defendant? If the defendant makes a false or misleading statement relating to the charged crime knowing the statement was false or intending to mislead that conduct may also show he or she were aware of their guilt.

COMEY: Yes, familiar to me from my distant past.

SWALWELL: I want talk about the Kremlin playbook and there are a number of ways that a foreign adversary can seek to influence a person, do you agree with that?

COMEY: Yes.

SWALWELL: Financial?

COMEY: Yes, that can be one.

SWALWELL: Romance you said is another.

COMEY: Yes.

SWALWELL: Compromise?

COMEY: Correct.

SWALWELL: Setting up a compromise?
COMEY: Sure, to execute on a compromise, yes.

SWALWELL: How about inadvertently capturing a compromise, meaning they have vast surveillance and you stumble into that surveillance and are caught in compromise?

COMEY: And then they take that information, try and use it to coerce you? Yes, that's part of the playbook.

SWALWELL: I'll yield back, Chair, and continue once I'm back with us. Thank you, Director.

NUNES: Gentleman's time's expired.

We'll go back to Mr. Turner.

TURNER: Thank you.

I want to go back to the issue of -- Admiral Rogers indicated that the goal of the Russians is to put a cloud on our system to undermine our system. And -- and I would think, certainly today, Mr. Comey, with your announcement of an investigation that the Russians would be very happy with that as an outcome because the cloud of their actions and activities continues and will continue to undermine and until your finished with whatever your investigation is currently in the scope of.

I want to go back to the issue of how does one open an investigation because again, I'm -- I'm a little confused by -- by some of the things that we hear as to the basis of an investigation. Now, Mr. Comey, if -- if an individual attends a meeting with a foreign leader is -- is that enough to open a counter intelligence investigation?

COMEY: Without more that somebody met with somebody, no.

TUNER: No. OK. Without more than if they had their picture taken with a foreign leader, is that enough?

COMEY: It would depend upon where they were, who took the

picture.

TURNER: Well, assume that they're in would (ph) that -- the foreign country, and in that foreign leaders government offices or facilities, if they're having a picture taken with them, is that enough to open a counterintelligence investigation?

COMEY: It would depend.

TURNER: On -- on what? Because I'm saying if there's just a picture. Because I can tell you certainly there's lots of people who have had lots of pictures.

COMEY: Yeah.

TURNER: Is it enough that a person who has just had their picture taken with a foreign leader at the foreign leaders government official offices or place of residence?

COMEY: The reason I said it depends is it would depend. Did the person sneak over to the foreign country and meet them clandestinely, did -- was the picture -- reveal something else about the relationship? It just hard to...

TUNER: Well, let's say it's not clandestine. Let's say it's open, that the person has -- as -- has attended an event and has gone over to meet with the foreign person, foreign government official and is at their foreign government official facility or their official residence and has a picture taken and has no intention of covertly being present with the foreign person, is that picture enough to open a counterintelligence investigation?

COMEY: Tricky to answer hypotheticals, but I think my reaction to that is that doesn't strike me as enough. And I know your next question's going to be deeper into hypos.

TURNER: No, no, I'm not getting deep into hypos. These are pretty straightforward. So what if you're paid, you know, to attend a conference in a foreign -- in a foreign country and you're paid to attend that conference not directly by the foreign government, but nonetheless payment does occur for you to attend a conference? We know President Bill Clinton attended many such conferences and spoke and received payment.

Is receiving payment by attending to speak at a conference -- again, it's not covert, it's open. They're attending to speak at a conference, they receive payment for the purposes of speaking, is that enough to open a counterintelligence investigation?

COMEY: I can't say as I sit here. It would depend upon a lot of different things.

TURNER: If you had no other information or evidence other than the fact that they attended, is that enough for you, for the FBI to open a counterintelligence investigation of a private U.S. citizen?

COMEY: I can't answer the hypothetical because it would depend upon a number of other things.

TURNER: I limited it to where there would be no other things, Mr. Comey. I said only, if the only information that you had was that they had intended an event in which they were paid which was a conference and it was not covert, is that only sufficient information to open an investigation against a private U.S. citizen?

COMEY: Who paid them? Did they disclose it? What did they discuss when they were there? Who else was sitting with them? There's lots and lots of other circumstances that make that -- even that simple-seeming hypo difficult to answer.

TURNER: Well, let's say that they've traveled to a foreign country and they openly traveled, wasn't covert. Is traveling there enough?

COMEY: Just traveling around the world, no.

TURNER: OK, well I'm very concerned, Mr. Comey, about the issue of how an investigation is opened and -- and how we end up at this situation once again where Mr. Clapper, had (ph) the director of national intelligence, just said that when he left there was no evidence of collusion and yet, as Admiral Rogers said, we're sitting now where the Russians' goal is being achieved of causing a cloud or undermining our electoral process. So I certainly hope that you take an expeditious look at what you have undertaken because it affects the heart of our democracy.

Mr. Comey, I have a question against -- again concerning classified information. Now, I know that if I attend a classified briefing and I receive classified information and I go and tell someone that classified information, if I leak it, I release it, then I've committed a crime. But what if someone goes to a classified briefing, walks out of that briefing, and openly lies about the content of that briefing? Because it's unclear to me what happens then.

And it's important because, as you know, this committee and certainly both of you gentlemen have handled a lot of classified information and recently, more recently, the purported classified

information is put out in the press, The Washington Post, The New
York Times reports information. And you know and I know and we all
know, having handled classified information, that some of that
information is not true. Are the sources of that classified
information, if they come out and lie about the content of classified
information, have they committed a crime?

COMEY: That's a really interesting question. I don't think so.
If all they've done is lie to a reporter, that's not against the law.
If they've done it, I don't wanna break anybody's hearts with that but
that's not against the law. But it is not and the reason I'm
hesitating is, I can imagine a circumstance where it's part of some
broader conspiracy or something, but just that false statement to a
reporter is not a crime.

TURNER: And I just wanna underscore that for a -- just for a
second, because I agree with you. I think it's no crime. And so
every reporter out there that has someone standing in front of them
and saying oh, I'm taking this great risk of sharing with you U.S.
secrets, besides them purporting to be a traitor, are committing no
crime if they lie to them. So all of these news articles that contain
this information that we know is not -- not the case, are being done
so at damage to the United States but without the risk of a crime.

And my next aspect of your question to Mr. Comey, is this. What
is the obligation of the intelligence community to correct such
falsehoods? Some of this information that we read in the Washington
Post and the New York Times, is extremely false and extremely
incendiary and extremely condemning of individuals and certainly, our
whole system. What is your obligation, Mr. Comey, to be that source
to say I can't release classified information, but I can tell you,
it's not that?
COMEY: Yeah, it's a great question, Mr. Turner, because there's
a whole lot out there that is false. And I suppose some of it could
be people lying to reporters. I think that probably happens. But
more often than not, it's people who -- who act like they know when
they really don't know. Because they're not the people who actually
know the secrets, they're one or two hops out and they're passing
along (ph) things they think they know.

There is -- we had not only have no obligation to correct that,
we can't, because if we start calling reporters and saying hey, this
thing you said about this new aircraft we've developed, that's
inaccurate actually, it's got two engines. We just can't do that
because we'll give information to our adversaries that way and it's
very, very frustrating but we can't start down that road. Now, when
it's unclassified information, if a reporter misreports the contents
of a bill that's being debated in Congress or a policy, we can call
him and say hey, you ought to read it more carefully. You missed this

or missed that. We cannot do that with classified information.

It's very, very frustrating because I have read a whole lot of stuff, especially in the last two months, this is just wrong. But I can't say which is wrong and I can't say it to those reporters.

TURNER: Mr. Comey, if you could help us on this issue, I would greatly appreciate it because what happens, is that you come into a classified briefing with us and you tell us, perhaps what something that is absolutely false, it really shouldn't be classified because you're telling us it's not true. But yet, we can't go tell it's not true because you told us in a classified setting. If there's a way that we can at least have some exchange as to what's not true so the American people don't listen to false stories in The Washington Post and The New York Times that we all know are not true, that would be helpful.

COMEY: Yeah, I don't...

TURNER: If you could think about how you could help us with that.

COMEY: I'd love to invent that machine, but we can't because where do you stop that on that slope?

TURNER: Well, false is false, Mr. Comey.

COMEY: Because then, when I don't call The New York Times to say you got that one wrong, bingo, they got that one right. And so I -- it's just an enormously complicated endeavor for us. We have to stay clear of it entirely.

TURNER: Thank you, Mr. Comey, one last question. So we all read in the press that Vice President Pence publicly denied that General Flynn discussed sanctions with Russia. And I'm assuming that you saw those news reports. Did the FBI take any action in response to the vice president statements?

COMEY: I can't comment on that, Mr. Turner.
TURNER: Mr. Comey, The New York Times reported on February 14th, 2017, that General Flynn was interviewed by FBI personnel. Is that correct?

COMEY: I can't comment on that, Mr. Turner.

TURNER: Mr. Comey, I do not have any additional questions, but I thank you both for your participation. And again, I thank for the -- the chairman and ranking member for the bipartisan aspect of this investigation.

NUNES: Gentleman yields back.

Dr. Wenstrup is recognized.

WENSTRUP: Thank you, Mr. Chairman.

Thank you gentlemen for being here, I appreciate your endurance in this effort today. One question, how long has Russia or the Soviet Union been interfering or attempting to interfere with our election process?

ROGERS: In the report we've feebly (ph) talked about, we have seen this kind of behavior to some degree attempting to influence outcomes for decades.

(CROSSTALK)

WENSTRUP: Going back to -- going back the Soviet Union...

ROGERS: Right. Not to the same level necessary, but the basic trend has been there.

WENSTRUP: So I'm curious also about what triggers a counterintelligence investigation of a government official. And in some ways, I'm asking for myself. For example, last week I spoke at an event on form policy with Atlantic Council. Unbeknownst to me, the Iraqi ambassador of the United States was there. He comes up to me afterwards, introduces himself and says he'd like to meet with me at some time. So this isn't a theoretical, this is real and this is what I'm asking is this.

Will be in trouble or under investigation if I meet with him?

COMEY: This is the slope I tried to avoid going down with Mr. Turner. Dr. Wenstrup, I -- I don't think I should be answering hypotheticals. The question is...

WENSTRUP: It's not hypothetical because I'm asking you in advance because I want to know if I can meet with him and be under investigation or not and I don't think that's an unrealistic question. This is real. This is right now.

COMEY: I get that. The FBI does not give advisory opinions, and so if you're asking about your particular case, I just can't do that.

WENSTRUP: So you'll tell me afterwards?

COMEY: No, I'll -- I'll never tell you.

(LAUGHTER)

WENSTRUP: Well, you might. Somebody might, somebody might tell
the press, right? And that's where I'm going next because I want to
know what -- what can I discuss? What am I allowed to discuss? And
what -- what triggers the investigation is really what we're trying to
get to in general. You know, maybe not with the Iraqi ambassador, but
what about with the Russian ambassador? What are my obligations?
What am I -- do I need to advise someone that I'm meeting with them?
Do I have to discuss the agenda before I meet with them?

You know, just so we're clear. I mean, this is really what it's
coming down to, is a lot about what we're talking about. You know, so
I don't think it's unnecessary or ridiculous for me to ask that. And
so in intelligence reporting, if the identity of a U.S. official is
disseminated to those on an as needed basis -- or those that need to
know basis. Does that generally lead to a counterintelligence
investigation of that individual?

So in -- in general, if a U.S. official is -- is -- is in this
report and it's disseminated, does that lead to an investigation of
the individual?

COMEY: No, not in general, not as a rule. No.

WENSTRUP: OK. That answers...

(CROSSTALK)

COMEY: It would depend on lots of the circumstances.

WENSTRUP: Next, I want to go to the article from February 14 in
The New York Times which I believe we're all familiar. And you may
not be able to answer any of these, but the article sites four current
and former American officials. Do you know -- know the identity of
those four officials?

COMEY: Not going to comment on an article.

WENSTRUP: OK. Well, it's not necessarily on the article, but
OK. Do you know for a fact that the four current and former American
officials provided information for the story?

COMEY: I have to give you the same answer.

WENSTRUP: OK. With or without an investigation going on, has
anyone told you that they know who leaked the information or who
leaked any information on Russian involvement in the U.S. elections or

Russian involvement with the Trump election team?

COMEY: I'm not going to comment on that.

WENSTRUP: Is it possible that The New York Times misrepresented its sourcing for this February 14 article? Possible.

COMEY: I can't comment on that.

WENSTRUP: Is it possible that The New York Times was misled by individuals claiming to be current or former American officials.

COMEY: I'll give you the same answer, Dr. Wenstrup.

WENSTRUP: Can I ask why you can't comment on that?

COMEY: I think a number of reasons. I'm not confirming that the information in that article is accurate or inaccurate. I'm not going to get in the business of -- that we talked about earlier...

WENSTRUP: OK. Is it -- then let me ask you this.

COMEY: And there's other reasons.

WENSTRUP: Sure.

COMEY: That I'm also not going to confirm whether we're investigating things, and so if I start talking about what I know about a particular article, I run the risk of stepping on both of those landmines.

WENSTRUP: I guess one more question before the time is up and we'll come back to me, but I am curious, is it possible -- and nothing to do with this article. Is it possible that a so-called source to a media outlet may actually be a Russian advocate? Nothing to do with this story per say, just is it possible that a Russian surrogate could actually be the source that a newspaper is relying on?

COMEY: In general, sure, somebody could always be pretending to be something they're not.

WENSTRUP: Thank you.

And I yield back at this time.

NUNES: Gentleman yields back.

Mr. Schiff's recognized for 15 minutes.

SCHIFF: Thank you, Mr. Chairman.

Just a couple follow-up questions and then I'll pass it to Mr. Quigley for entering something into the record.

COMEY: Mr. Chairman, can I ask you for an estimated time? I'm not made of steel, so I might need to take a quick break.

NUNES: Would you like to do that now?

COMEY: If you can, I didn't know how much longer you planned to go.

NUNES: I think we want to keep going until the members have asked all their questions.

COMEY: OK. Just a quick rest stop?

NUNES: Yes. So we'll break for about 10 minutes.

COMEY: That's plenty.

(CROSSTALK)

(RECESS)

NUNES: I'm gonna call the hearing back into order after a brief recess. I wanna get on with questions. I'm gonna yield 15 minutes to the gentleman from California, Mr. Schiff.

SCHIFF: Director Comey, just a couple follow-up questions before I pass it to Mr. Quigley to enter something in the record. You've been asked a number of questions today about is it enough to open an investigation because someone travels or is enough because they have their photograph taken or enough because they attend a conference. I would imagine that you get so many leads, so many people writing to you with information that they're convinced shows (ph) a crime that if you investigated everything that people sent you, you would be squandering your investigative resources in a way you can't afford to do.

My understanding, and correct me if I'm wrong, is that in order for you to open an investigation, you need to see credible information or evidence that someone has either committed a federal crime or become an agent of a foreign power. Is that an accurate understanding?

COMEY: Yeah, that's a fair statement. And as you said, Mr. Schiff, we have to also choose which -- we get a lot of referrals,

which ones align with the threats that the FBI is trying to prioritize because we have limited resources.

SCHIFF: Exactly. So even when those criteria are met, that enough may not be -- that in and of itself may not be enough because you have so many other cases you need to investigate and you have to prioritize.

COMEY: Correct.

SCHIFF: I also wanna ask you, you mentioned that it wouldn't be appropriate for you to be telling reporters that stories they're writing are accurate or inaccurate when they may involve an investigation. That's not an appropriate thing for you to do.

COMEY: Correct, especially if the story involves classified information.

SCHIFF: And that's because you would either be disclosing classified information potentially in what you're confirming, or by rebutting a story that was inaccurate, you may be suggesting other stories that contain classified information or then (ph) accurate?

COMEY: Correct.

SCHIFF: Now, it's inappropriate for you to be batting down inaccurate stories. Would you also agree it's -- if it's inappropriate for you to be batting down inaccurate stories, would you also agree it's inappropriate for the White House to be asking the FBI to be rebutting stories they don't like?

COMEY: Yeah, that's when I don't wanna answer, Mr. Schiff, because I don't wanna talk about communications within the executive branch. I can speak for the FBI, that's not something the FBI can or should do.

SCHIFF: And if you were appearing up before the Senate for confirmation and they asked you as director of the FBI, if you were asked by the White House to refute or acknowledge press stories that they liked or didn't like, what would you tell the Senate in your confirmation hearing? Would that be appropriate for your office?

COMEY: I would figure out what was the right thing for the FBI to do and then do that thing.

SCHIFF: And that right thing would be not to be in the business of confirming or denying stories about classified information?

COMEY: Correct, that's what -- that's with the right thing is

for the FBI.

SCHIFF: Let me recognize Mr. Quigley for purposes of entering something in the record.

QUIGLEY: Thank you, Mr. Ranking Member. As I do that, I'm reminded of what Hugo Black said, "Only a free and unrestrained press can effectively expose deception in government." I respectfully ask to enter a March 8th article entitled, "Jeff Sessions Likely Met Russian Ambassador a Third Time."

SCHIFF: I now yield to Mr. Swalwell.

SWALWELL: Thank you to our ranking member.

And thank you again to -- to our director and Admiral Rogers. Director, would you agree that the FBI, when it's considering the counterintelligence investigation, views contacts between U.S. persons and say Russia differently than it would view contacts between U.S. persons and the U.K. or France or Germans?

COMEY: Yes, very much so.

SWALWELL: And that's because they're a foreign adversary?
COMEY: Correct.

SWALWELL: And so to land on Russia's radar as somebody that they may want to recruit, would you agree that being a businessperson, a prominent business person is something that would be attractive to them?

COMEY: Could be. Might depend upon what industry you're in.

SWALWELL: Could it also -- could also being a politician be something that would be attractive to them?

COMEY: Sure.

SWALWELL: And how about somebody who does business with Russians, would that be attractive to them?

COMEY: Could be. It would depend upon other things as well though.

SWALWELL: And we were starting to discuss this, efforts to recruit include investing in a U.S. person, is that correct?

COMEY: Efforts by Russia to invest typically?

SWALWELL: Yes.

COMEY: In their tradecraft, that can be one of the ways in which
they cultivate a relationship, sure.

SWALWELL: And if you are a U.S. person with a business, could it
also include investing in your business or being a partner in some of
your endeavors?

COMEY: Lots of different ways someone could try and establish a
relationship.

SWALWELL: And going back to compromise, can we assume that any
prominent U.S. person traveling to Russia would probably be covered by
Russian surveillance?

COMEY: Depend upon how you define prominent, but they have an
extensive surveillance operation of foreign visitors. So no matter
who you are, you ought to assume it, but whether that's true in
reality is harder for me to answer.

Or do you want to answer that differently?

ROGERS: No, I agree.

SWALWELL: And Russia is attempting to recruit and persuade
individuals that we've discussed before, just as other foreign
adversaries are because they want to get something out of them, is
that right?

COMEY: Correct.
SWALWELL: And in many cases, it could be if that person is ever
in a position of power that they could be in a position to influence
policy in the United States.

COMEY: To influence policy or to supply them with information
that's useful to them and maybe other purposes.

SWALWELL: Now, with respect to your counterintelligence
investigations, would be important for you if you were concerned that
a U.S. person had financial entanglements with a foreign adversary to
see that persons tax returns?

COMEY: That's a hypothetical I really want to avoid answering,
but the answer is it would depend really. It would depend upon a
whole lot of circumstances.

SWALWELL: That would be one of the pieces of evidence that you
would consider looking?

COMEY: Maybe, maybe. You -- you might be able to get the picture you need from other financial records that are more readily available.

SWALWELL: And you're aware director that President Trump has refused, breaking with tradition of the past 40 years to show the American people his tax returns?

COMEY: Not something I want to comment on. I'm aware of it from the media.

SWALWELL: Now, Russia also in their efforts to recruit individuals and develop individuals, praying on or following someone's financial distress is also an avenue number may pursue, is that right?

COMEY: Potentially, if it offers an avenue for leverage on someone.

SWALWELL: And Director, would you consider six bankruptcies that an individual may have as been a point of leverage?

COMEY: I can't say. I don't know.

SWALWELL: And Director, you're aware that President Trump is at six prior bankruptcies?

COMEY: That's not something I'm going to comment on.

SWALWELL: And Director, when your agents are conducting a counterintelligence investigation with respect to a foreign adversary in their efforts to recruit or cooperate with a U.S. person, would you look at the U.S. person's travel to that country?

COMEY: As part of evaluating whether there is an illicit relationship?

SWALWELL: Yes.
COMEY: Sure.

SWALWELL: And are you familiar that President Trump has traveled at least three times to Russia?

COMEY: That's not something I'm going to comment on.

SWALWELL: Are you aware that his son, Donald Trump Jr., has traveled at least six times to Russia?

COMEY: Same answer.

SWALWELL: Donald Trump has said a number of times that he has had nothing to do with Russia and I want to ask you, Director, if you're familiar with Deutsche Bank and its $300 million loan to Donald Trump and his organization.

COMEY: That's not something I'm going to comment on.

SWALWELL: Director, are you aware that Deutsche Bank has been investigated and fined over $400 million by New York State for failing to stop the corrupt transfer of more than $10 billion out of Russia?

COMEY: I think generally from press accounts.

SWALWELL: So an individual's association with the bank that has had dealings with Russian money laundering, that would be something that would be a red flag for a counterintelligence investigation I would assume.

COMEY: That's a hypo I don't want to answer.

SWALWELL: Director, would a U.S. businessperson who is associated with a foreign adversary having tenants in their office building that do business with that foreign adversary, would that be a red flag that a counterintelligence agent would look at?

COMEY: I can't answer that.

SWALWELL: Are you aware that in Trump Tower were two tenants, Vadim Trincher and Anatoly Golubchik, who ran a high-stakes illegal gambling ring that was run out of Trump Tower?

COMEY: Same answer.

SWALWELL: And are you aware that the prosecutor in that case was U.S. attorney Preet Bharara?

COMEY: Same answer.

SWALWELL: Are you aware, Director, that that U.S. attorney was recently fired?

COMEY: Yes.

SWALWELL: By the president of the United States?
COMEY: Well, I don't know who fired him. I know from press accounts that he was asked to leave.

SWALWELL: Director, are you aware of Felix Sater, a former

Soviet official and adviser to the Trump Organization?

COMEY: I'm not going to comment on it.

SWALWELL: And Director, outside of Mr. Sater's relationship with the Trump Organization, are you aware that the FBI knew of Mr. Sater because of a $40 million stock fraud case that was prosecuted by the federal government?

COMEY: Same answer.

SWALWELL: Director, would a U.S. person having multiple trademarks in addition to the other relationships that I just described be a red flag for a counterintelligence investigation if those trademarks were in Russia?

COMEY: Multiple trademarks?

SWALWELL: Yeah, registering trademarks in a foreign adversary's country.

COMEY: I don't know what to make of that.

SWALWELL: OK. Were you aware that Donald Trump had six trademarks in Russia?

COMEY: Not going to comment on that.

SWALWELL: Were you aware that Donald Trump tried to market his Trump Vodka brand in Russia?

COMEY: Same answer.

SWALWELL: Were you aware that Donald Trump ran Ms. Universe 2013 out of Moscow?

COMEY: Same answer.

SWALWELL: Are you aware that Donald Trump Jr. said on a number of occasions that Russian money is pouring into the Trump Organization and that there is a disproportionate cross-section of the company's revenue coming from Russian money?

COMEY: Same answer, Mr. Swalwell.

SWALWELL: So hypothetically speaking though, would a foreign adversary and its oligarchs having a disproportionate cross-section of a company's revenue coming from that country, would that be a red flag for a counterintelligence agent?

COMEY: I'm not -- I'm trying to be helpful, but I'm not going to answer that hypo...

SWALWELL: I understand. Thank you, Director. Director, are you familiar with a 2004 home purchase by President Trump in Palm Beach County for about $40 million?

COMEY: Not going to comment on that.

SWALWELL: Are you familiar with a 2008 sale of that same property for 129 percent increase at about $98 million?

COMEY: Same answer.

SWALWELL: Are you aware that the buyer in 2008 was a Russian businessman?

COMEY: Same answer.

SWALWELL: And under the earlier hypothetical, would a foreign adversary's oligarch purchasing a home in the United States for 129 percent more than the home was purchased four years before. Would that be a tool that a foreign adversary would use to try and recruit, develop or bring somebody onto their side?

COMEY: Same answer as before.

SWALWELL: You said that it's likely or somebody should assume they're being surveilled when they were in Russia. Would you assume that Donald Trump was being surveilled in 2013 when he was in Moscow?

COMEY: I'm not gonna answer. I -- I was trying to confine my answer to prominent people should assume, not you know, students and all those people who might go there for a brief holiday, I don't think I'd ask them to assume that.

SWALWELL: Right. Would it be safe to say that if Donald Trump was doing something he shouldn't have been doing while he was in Russia, the Russians probably saw it?

COMEY: Same answer as before.

SWALWELL: Would it be safe to assume that if a prominent person was doing something they shouldn't have been doing while they're in Russia, the Russians probably saw it?

COMEY: Yeah, I would stick to what I said before about prominent people should assume.

2017 WL 1047848, 2017 WL 1047848 (2017)

SWALWELL: Mr. Director, was Donald Trump under investigation during the campaign?

COMEY: Same answer as before. I'm not gonna answer that.

SWALWELL: Is he under investigation now?

COMEY: I'm not gonna answer that. Please don't over interpret what I've said as -- as the chair and ranking know, we have briefed him in great detail on the subjects of the investigation and what we're doing, but I'm not gonna answer about anybody in this forum.

SWALWELL: Director, from our perspective on the committee, the dots continue to connect. President Trump, his team, people in his orbit, to Russia. And the questions that we have, it's quite simple. Are these merely 100 different coincidences or is this a convergence where you're seeing deep personal, political and financial ties, meeting Russia's interference in our campaign?

So I'm wondering, Director, with your extensive counterintelligence expertise and in view of the Russian intelligence campaign to influence the election in which Donald Trump was candidate, do you consider this -- these number of connections between well-connected Russians and Donald Trump, the Trump Organization, the Trump family and the Trump campaign, to be a coincidence or a convergence?

COMEY: I'm not gonna answer, Mr. Swalwell.

SWALWELL: From your perspective, Director, have you ever seen in the history of American politics or at least since you've been alive, any political candidate have this many connections, personal, political and financial, to a foreign adversary?

COMEY: Same answer.

SWALWELL: Mr. Director and Admiral Rogers, this past election, our country was attacked. We were attacked by Russia. It was electronic. It was nearly invisible. Thanks to the hard work of the men and women who serve in our intelligence community, we know that the attack came from Russian. It was ordered by Vladimir Putin. He sought to help Donald Trump and to take down Hillary Clinton. The most disturbing finding for me and my fellow committee members is that Russia intends to do this again.

And I see this as an opportunity for everyone on this committee, Republicans and Democrats, to not look in the rearview window but to look forward and do everything we can to make sure that our country never again allows a foreign adversary to attack us. Because I think,

2017 WL 1047848, 2017 WL 1047848 (2017)

Director, you and Admiral Rogers would agree that it's not only Russia that is sharpening the knives to go back at us or to go at our allies. It's also other countries who have similar capabilities. And so, I think the best thing we can do now is unite around this investigation, have also a parallel, independent commission to make sure we get to the bottom of what happened, why we were so vulnerable and to assure the American people we'll never let this happen again.

And I yield back.

NUNES: Dr. Wenstrup?

WENSTRUP: Thank you, Mr. Chairman.

If I can, gentlemen, go back to what we were talking about a little bit before with interference from the Russians possibly in through our media. Have Russians or Soviets historically attempted to spread this information through the U.S. media? As (ph) you -- you mentioned they've been there in over decades trying to interfere, they use media as a resource.

ROGERS: We see them use media writ large as a resource to disseminate disinformation, false information.

WENSTRUP: And is that -- been pretty much regardless of who's in the White House?

ROGERS: It doesn't seem to tie to a particular political party, that tactic, if you will.

WENSTRUP: Thank you.

Mr. Comey, have you ever formed -- this is going back to the article from February 14 in the New York Times, have you ever formed an articulated opinion about the article from February 14 in the New York Times?

COMEY: Have I ever formed and articulated opinion?

WENSTRUP: Formed an opinion or articulated an opinion on that article?

COMEY: I don't want to say, Dr. Wenstrup.

WENSTRUP: OK. Thank you. When I look at your jobs and thank you for being there and doing your jobs. And I mean that sincerely, your job, you -- you observe and you investigate and you assess and you try to predict and you sometimes have to act, would that be correct?

COMEY: Sure.

WENSTRUP: In what you do. My question is, as far as predictions and actions, Hillary Clinton won the 2016 election for the United States presidency. Which certainly most had predicted, I would conject (ph) that even the Russians predicted that she would win. What -- what were the Russians planning for November 9 and beyond that had she won. You mentioned before, and the reason I ask that -- you mentioned before you said they'll be back.

My question is have they left? Because I -- I would contend they haven't left. This isn't something they their turning on and off. This is a constant. So any -- any idea what -- what may have happened November 9 and beyond that had she won?

COMEY: Hard to say.

WENSTRUP: The pattern has been to interrupt us regardless of who is in the White House.

COMEY: Yes. They want to mess with us and in a continuing and general way. It's hard to answer the counterfactual. I assume they would've continued their efforts to undermine President-Elect (sic) Clinton as they had begun doing during the summer, especially with European allies to create a divide there and probably lots of other things. What I meant by they'll be back is, they're not going away. But in the -- in the -- I mean that that in the sense of their next opportunity to mess with our election is two years from now and in four years. That's what I meant by back.

WENSTRUP: Thank you. I think your job is -- is difficult because there's a lot of conjecture about any relationship with Russians in general and questions from me and others about, can I meet with the Russian ambassador? Does that get me investigated? Business ties here and there, you know, I mean currently we share a space station with Russians. We buy engines from the Russians for -- for our rockets and in the '90s we had joint military exercises with the Russians. It gets a little bit tough as -- for you guys decide what and -- and when do we investigate and I appreciate you taking the time with us today.

And I yield back.

NUNES: Gentleman yields back.

Mr. Stewart?

STEWART: Thank you, Mr. Chairman.

And to the witnesses, thank you both. You know, I'm impressed. I was a B-1 pilot, when I took off one of the first certain (ph) thoughts I had was how long is it going to be until I get to go to bathroom? You guys went almost 4 hours. Our plan was to keep you here until you are in such pain that you would just answer all of our questions.

(LAUGHTER)

I have a list of questions here but I want to divert a little bit and -- and follow up on some of things that have been said here today. Mr. Comey, you confirmed that there's an investigation in the Trump campaign officials. The fact that there is an open investigation does not indicate guilt though, does it?
COMEY: Certainly not.

STEWART: And in fact many times in an investigation may find that there is no wrongdoing.

COMEY: That's one of the reasons we don't talk about it, so we don't smear people who don't end up charged with anything.

STEWART: I appreciate that and I would say that is especially likely to have, when I say especially talking about have the finding of no wrongdoing when there is a political motive. And if there's one thing that we've seen here today, I think, from some of the line of questions is clearly been a certain political motive in some of the questions that have been asked to you.

Mr. Clapper, the former DNI, and we all know who he is, this is someone who should know. I want to read what he said just a few weeks ago. Mr. Clapper then went on to say that to his knowledge there was no evidence of collusion between members of the Trump campaign and the Russians. We did not conclude any evidence in our report and when I say "our report," that is the NSA, FBI, and CIA with my office, the director of national intelligence said anything -- any reflection of collusion between the members of Trump campaign and the Russians, there was no evidence of that in our report.

Was Mr. Clapper wrong when he said that?

COMEY: I think he's right about characterizing the report which you all have read.

STEWART: Well, I want you to know I agree with Mr. Clapper. And at this point, everyone on this dais should agree with Mr. Clapper because we in the committee have seen no evidence, zero, that would indicate that there was collusion or criminal wrongdoing between any

members of the previous administration or campaign and Russian officials.

And I'm going to comment very quickly on the leaks. You've said very clearly that it is a crime, both of you have said that, you've indicated it endangers national security which I certainly agree with. It makes it hard for us to reauthorize very important tools that we will need in order to protect our national security and many times, it's inaccurate.

And I would ask you then if someone in intelligence community has some concerns, if they feel like there's been an overreach or the government is doing something they shouldn't be doing, any government official, is there a process they can go to where they could make that known and express their concerns?

COMEY: Yes. All of us, the intelligence community have robust whistleblower provisions that we educate our folks on and part of the whistleblower track is they can bring information to the appropriate committee of Congress.

STEWART: That's exactly right and are both of your agencies capable of handling accusations agree with me on that. I'd like to shift quickly if I could to the integrity of the report which the previous DNI when he determined along with your acquiescence, I might add, both of you, that Russia developed a clear preference for Mr. Trump and this is a huge deal. I mean, think about this story the American people have been told and some believe that our president was elected maybe because of the influence of a foreign government.

And I love you guys, you know that, and I defend you and we respect what you do but I do need to make this point and that is the intelligence community is not perfect, is it?

COMEY: Not perfect?

STEWART: Yes.

COMEY: Certainly not.

STEWART: Certainly not. We...

COMEY: I can speak for me, I don't -- he might be perfect.

(LAUGHTER)

STEWART: Mr. Rogers, I'll allow you to answer the same question.

ROGERS: I am not -- same as the Director.

STEWART: And as has been indicated here, and look again, that's
not a criticism, it's just the human endeavor. We sometimes make
mistakes as do agencies sometimes make mistakes and all of us can
think of examples of that including meaningful mistakes, by the way.
Mistakes that had clear implications for our policy. And as has been
indicated here as well, there's a difference in the level of
confidence.

Now, Mr. Comey, you have a higher degree of confidence in this
report than you do, don't you Mr. Rogers?

ROGERS: To be specific, a different level of content on one
specific assessment or judgment...

STEWART: Understanding (ph)...

ROGERS: But a concurrent overall, in that judgment.

STEWART: But that one judgment, that one is in a very important
part of this report. And if I could make just this last point and
this is an important point, I think. And that is the difficulty of
determining motive. I mean, we can go back, we can look at facts. We
can look at what happened. We can often determine who did it, who
they did it with, when they did it. But to determine motive, you've
got to crawl inside someone's head. And that's much, much more
difficult.

And in fact, quoting from the preamble in this report, talking
about a leader's intentions. It says, this objective is difficult to
achieve when seeking to understand complex issues in which foreign
actors go to extraordinary lengths to hide and obfuscate their
activities. Once again, we're trying to determine motive, which is
very different -- difficult. Do you agree with that? The determining
motive is one of the most difficult challenges when it comes to an
intelligence analysis?

COMEY: I -- I do Mr. Stewart. And I should -- I should
emphasize something that Admiral Rogers said earlier, we made no
judgment on whether the Russians were successful in any way and having
an impact on the election, I just wanna be clear. That -- that's not
in report because we didn't opine on it. We didn't -- that's not
within our -- our...

STEWART: I understand that, but we're looking at Russian
activities. And we're making a conclusion of why they did that. In
this case, that they preferred one -- one candidate over the other. I
was in Moscow last August. I came home and I did some media
interviews and talked to some folks. And I said, they're gonna mess

with our elections. And that wasn't based on any intelligence analyst
or specific information, this was just based on history, we knew that
they would. And I was always asked, well, who do they want to win?

And I said then, I don't think they care. I don't think they A,
could believe they could determine who would win and others (ph), as
we've said here a number of times, they just want to break down the
foundation, they just want to break the trust in our institutions.
They want to take away that faith we have in our electoral process.
And by the way, the intelligence community agreed with us, with me, on
that analysis. For a long, long time, up until December. And then
suddenly, they didn't.

And was when the president asked for this report and he asked for
it to be concluded very quickly and then the analysis changed
entirely. And -- and it went from no, no, no, they don't really care
to no, no, they want Mr. Trump to win. And I think there's another
plausible explanation, which is what I want to talk about in the few
minutes that I have remaining. Let me begin by asking you, do you
think that the Russians expected Secretary Clinton to win the
election?

COMEY: Yes, as of August certainly, August, September.

STEWART: OK.

Mr. Rogers?

ROGERS: Yes.

STEWART: OK. Well, look, Mr. Comey you indicated as of August,
September, do you believe they ever came to a conclusion that you know
what? Mr. Trump's going to win.

COMEY: No, our -- the assessment of the intelligence community
was that early on, they thought he might have a shot. And so they
wanted to mess with our election, hurt our country in general, that's
always the baseline. They hated her, Secretary Clinton, wanted to
harm her and thought they might have a chance to help Mr. Trump. And
then later, concluded that Mr. Trump was hopeless and they would focus
then on just trying to undermine Secretary Clinton, especially with
the European allies.

STEWART: Got that, so up -- up until summer and through the
fall, they believe that Secretary Clinton would win, is that true?

COMEY: I think the assessment was, late in the summer, they
concluded based on the polling I think a lot of people were reading,
that Mr. Trump didn't have a chance. And they shifted to just

focusing on just trying to undermine her.

STEWART: And I tell you, if you were to tell me and I know you didn't but I'm just saying, if anyone were to tell me that they concluded Mr. Trump is going to win. I'd just say they're nuts, because there was no one in the world who thought that. Every media organization, every political organization, every government organization that I'm familiar with last fall thought that Secretary Clinton would be the next President of the United States.

COMEY: I think the Russians agreed.

STEWART: I -- absolutely they did agree. Then this is the point and this is such a fine line, but it's such an important point, and that is how can you know for certain if the Russians were motivated by hurting the person they thought in fact, fully expected was going to be the next President of the United States and comparing that with a mode (ph) of this kind of a Hail Mary pass. You know what, maybe this guy's got a shot. Let's try and help him get elected because those motives would be -- and that's -- that' again coming back to my original point, determining motives is very difficult.

You have to either have very direct information or you have to be able to get inside someone's head and really figure out what it is that's driving them. And knowing the Russians expected Secretary Clinton to win, would you see that some of those things that they've done would be consistent with undermining her presidency, not necessarily because they thought Mr. Trump was going to win and they wanted help.

COMEY: Again, I think it's too close related sides of the same coin. I mean, to put it in a homely metaphor, I hate the New England Patriots and no matter who they play, I'd like them to lose. And so I'm at the same time rooting against the Patriots and hoping their opponent beats them. Because only two teams on the field but what the intelligence community concluded was early on, the hatred for Mrs. Clinton was -- was all the way along.

When Mr. Trump became the nominee, there was some sense that it'd be great if he could win, be great if we could help him. But we need to hurt her to matter what and then it shifted to he has no chance so let's just focus on undermining her. That was the judgment of the intelligence community.

ROGERS: Well, I'd also if I could highlight, I acknowledge the challenge at times about trying to understand intent, but the level -- we're not going to go in any specifics in an open unclassified forum. But the level of sourcing, the multiple sources we had, which were able to independently corroborate the judgment. And there's a reason

2017 WL 1047848, 2017 WL 1047848 (2017)

why we were high confidence in everything, except just one issue.

STEWART: Yeah.

ROGERS: To include the intent.

STEWART: I understand. I spent some time out at the CIA last week. I went -- was with the staff as best we could, through the 2000 some odd pages and by the way, not many people did. And some people are casting, you know, aspirations (ph) and not making the effort to go out there and actually look at that.

But I'm telling you that having done that, I think a reasonable person could say what I've said here today, that there is another -- another element to this. That there is another, as you said Mr. Comey, another side of the coin. And this is a very, very difficult to, in my opinion, thing to say with high levels of confidence. Which is why, once again the intelligence community isn't perfect sometimes. And we do make mistakes.

And Mr. Chairman, I yield back. I'd like to come back for just a few minutes if we could after.

NUNES: Gentleman yields back.

Mr. Schiff's recognized. SCHIFF:

Thank you. Just a couple of quick follow up questions by myself and Mr. Himes and then we'll go to Mr. Castro.

Director, you were asked about the Director Clapper's comments and I think your response indicated that they were correct as far as the unclassified intelligence assessment goes.

COMEY: Yes. I understood the question to be about the report itself.

SCHIFF: I want to make it clear to people though the intelligence assessment -- the unclassified intelligence assessment doesn't discuss the issue of U.S. person coordination with the Russians. And I assume that's because at the time of the report in January of this year that was under an investigation that you have now disclosed, is that right?

COMEY: Correct. The counterintelligence investigation is the FBI's business. The IC report was about what the intelligence community had about what Russia had done. So there is nothing in the report about coordination writing like that. It's a separate responsibly the FBI to try and understand that, investigate it and --

2017 WL 1047848, 2017 WL 1047848 (2017)

and assess it.

SCHIFF: So we shouldn't read Mr. Clapper's comments as suggesting that he takes a different view of whether you had sufficient -- sufficiently credible information and evidence to initiate a FBI counterintelligence investigation.

COMEY: I don't know exactly what he meant. All I can say is what -- what the fact is which as we just laid out. There's the report and then there's our investigation.

SCHIFF: And the report doesn't cover the investigation?

COMEY: Correct.

SCHIFF: Mr. Himes?

HIMES: Thank you, Mr. Schiff.

Gentlemen, in my original questions to you, I asked you whether the intelligence community had undertaken any sort of study to determine whether Russian interference had had any influence on the electoral process and I think you told me the answer was -- was no.

COMEY: Correct.

ROGERS: Correct, we said the U.S. intelligence community does not do analysis or reporting on the U.S. political process or U.S. public opinion, that is not our...

(CROSSTALK)

HIMES: OK. So thanks to the modern technology that's in front of me right here, I've got a tweet from the president an hour ago, saying the NSA and FBI tell Congress that Russia did not influence the electoral process so that's not quite accurate, that tweet?

COMEY: I'm sorry, I haven't been following anybody on Twitter while I've been sitting here...

HIMES: I can read it to you. It says the NSA and FBI tell Congress that Russia did not influence electoral -- the electoral process. This tweet has gone out to millions of Americans, 16.1 million to be exact. Is the tweet, as I read it to you, the NSA and FBI tell Congress that Russia did not influence the electoral process. Is that accurate?

COMEY: Well, it's hard for me to react to that, let me just tell you what we understand the -- the state of what we've said is. We've

offered no opinion, have no view, have no information on potential impact because it's never something that we looked at.

HIMES: OK. So it's not too far of a logical leap to conclude that your -- that the assertion that you have told the Congress that there was no influence on the electoral process is not quite right?

COMEY: Right, it wasn't -- it certainly wasn't our intention to say that today because we don't have any information on that subject. And that's not something that was looked at.

HIMES: Right.
Admiral Rogers, before I -- before I yield back to the ranking member, there's another tweet that says NSA Director Rogers tells Congress unmasking individuals endangers national security. My understanding was, as a member of the committee, that there is a lengthy and very specific process for the unmasking but that it does not inherently in of itself endanger national security.

ROGERS: I assume the comment is designed to address the leaking of such information, but again, I -- I have not read what you're saying to me so I'm not in a position to comment on it, sir.

HIMES: Thank you, I'll yield back to the ranking member.

SCHIFF: Mr. Castro?

CASTRO: Thank you. And thank you gentlemen for your service to the nation and for your testimony today. I wanna take a moment to turn the Christopher Steele dossier, which was first mentioned in the media just before the election and published in full by media outlets in January. My focus today is to explore how many claims within Steele's dossier are looking more and more likely, as though they are accurate. First, let me ask you, can you describe who Christopher Steele is?

COMEY: No, I'm not gonna comment on that.

CASTRO: Are you investigating the claims made in the dossier?

COMEY: I'm not gonna comment on that, Mr. Castro.

CASTRO: OK. Well, the reputation of the author, Christopher Steele is a former accomplished British intelligence officer with a career built on following Russia is important. This is not someone who doesn't know how to run a source and not someone without contacts. The allegations it raises about President Trump's campaign aids connections to Russians, when overlaid with known established facts and timelines from the 2016 campaign are very revealing. So let's

begin.

In general, as my colleagues have discussed before, is it true that a large number of oligarchs and wealthy businessman in Russia have profited from their continuing close relationships or cooperation with the Kremlin?

ROGERS: Can you say that one more time sir...

CASTRO: Sure.

ROGERS: I want to make sure I understand.

CASTRO: Have oligarchs and wealthy folks in Russia profited from their connection to the Kremlin?

ROGERS: Yes.

CASTRO: And, there are no free lunches in Russia. If you get wealthy under Putin, it's because you support Putin and are expected to support him. Is that fair to say?

ROGERS: I would assume there's a perception of his banage (ph), but I would assume it also varies by the specifics and the particular...

CASTRO: Sure.

ROGERS: ... individual and relationship we're talking about.

CASTRO: OK. But Putin never distrusts, he verifies, right? As a former KGB man, he wants to keep tabs on his wealthiest citizens, especially those that could ever pose a challenge to him. Is that right?

ROGERS: I assume he maintains knowledge of the situation around him to include particular centers of influence within Russia.
CASTRO: Thank you. So, is it likely that the Kremlin would accept or actively trade favors or other valuable or sensitive information, intelligence from foreign figures about Russian oligarch or wealthy businessmen living abroad?

ROGERS: Is it possible? Yes, but again, it depends on the particulars of the situation. I don't know that I would make a flat statement...

CASTRO: But it's certainly a possibility.

ROGERS: It's a possibility.

CASTRO: OK. Well, the dossier definitely seems right on these points. A quid pro quo relationship seems to exist between the Trump campaign and Putin's Russia.

A July 19, 2016 entry for example asserts that Russians were receiving intel from Trump's team on Russian oligarch and their families in the United States. An entry from June 20, 2016 states quote, "Trump and his inner circle have accepted regular flow of intelligence from the Kremlin, including on his democratic and other political rivals," which is something for something.

A July 30 entry likewise states that a source close to the Trump campaign confirms a regular exchange with the Kremlin has existed for at least eight years, including intelligence being fed back to Russia on oligarch activities in the United States. Is it generally true that Moscow actively seeks and supports, whether through the oligarch, overt Russian officials or undeclared intelligence officers, sympathetic or cooperative foreign figures abroad, whether through business dealings or political backing or a combination of the two.

COMEY: (OFF-MIKE)

ROGERS: Generally, it's a tactic we have seen over time, but again, I would caution us -- we're talking about very specific cases theoretically here and I'm not prepared to get into any of the specifics.

CASTRO: And I know that my colleagues have touched upon this, but I think it's important in the context of Christopher Steele's dossier to bring it up again. So, my question is, is it likely or plausible that the Russians might seek out Americans for Moscow's purposes.

COMEY: It is one of the focuses of our counterintelligence mission to try to understand the ways in which they try to do that, that's at the core of their intelligence gathering, is trying to coop recruits -- Americans -- to give them information.

CASTRO: So, the dossier states in an entry dated August 10, 2016, that a quote "Kremlin official involved in U.S. relations" suggested that Moscow might offer assistance to quote "sympathetic U.S. actors." Does this sound like a plausible tactic out of the Russian playbook?
COMEY: I'm not going to comment on that, Mr. Castro.

CASTRO: OK. Now, let's get even more specific. Among the U.S. actors, this Kremlin official mentions a Carter Page and Michael Flynn, whom my colleagues have already discussed at length and which

the dossier describes as quote "examples of successes by the Kremlin official."

We know that Carter Page went to Moscow on July 7 to give a speech to the new economic school. We're in possession of the slide deck from his speech there. And we know Carter Page obtained approval from the Trump camp from Trump campaign manager at the time, Corey Lewandowski, as reported in Politico, citing national security campaign official, J.D. Gordon.

CASTRO: Now, let me ask you another question with respect to somebody else. Is it correct that Igor Sechin, the president of Russian oil giant, Rosneft, is a former member of Russian intelligence and a long-time aide and confident of Vladimir Putin.

COMEY: Not going to answer that, Mr. Castro.

CASTRO: In an October 18, 2016, entry, the dossier states that, during Page's visit to Moscow, he met with Igor Senchin, offering, quote,"Page and Trump's associate, the brokerage of up to 19 percent stake in Rosneft," which Page conferring (ph) that, quote, "If Trump were elected U.S. President, sanctions on Russia would be lifted."

And although fortunately the White House hasn't been so naive as to [****] unilaterally lift sanctions on Russia, it was widely reported that on January 27th of this year, Rosneft sold a 19.5 percent stake in Rosneft in what Reuters calls, quote,"one of its biggest privatizations since the 1990s." Furthermore, Reuters reported that, quote, "Public records show the ownership structure of the -- of the stake ultimately includes a Cayman Islands company whose beneficial owners cannot be traced." What a coincidence.

Is this the subject of your investigation? One of the subjects of your investigation?

COMEY: Same answer.

CASTRO: OK.

COMEY: Meaning -- meaning I'm not going to comment.

CASTRO: I understand.

So, let's move to WikiLeaks for a moment, who played such a prominent role in the 2016 election. As has established before and reestablished at this hearing, WikiLeaks was at a minimum an unwitting pawn and, at a maximum, an active co-conspirator of the Kremlin's in publishing stolen DNC and senior Democratic officials' e-mails. And so you agree this was done in order to offer Moscow some measure of

separation as to mask its hand in having hacked and stolen the data in the first place, but so it could still have it publicly posted to inflict damage on the Clinton campaign?

COMEY: Yes, I think that's fair.

ROGERS: Yes.

CASTRO: OK. An entry from July 19, 2016, in the dossier states that a Trump associate knew that the Kremlin was using WikiLeaks in order to maintain quote, "plausible deniability of its involvement." Three days after this entry, WikiLeaks carries out the Kremlin's wishes and publishes upwards of 20,000 stolen DNC e-mails, and 8,000 associated e-mail attachments, and the rest, as they say, is history.

Another entry dated August 17th has Carter Page and a Russian associate discussing WikiLeaks publishing e-mails in order to swing Sanders' supporters away from Clinton and to Trump. And again, from a September 14th entry in the dossier, quote, "Kremlin has further compromising material on Clinton in form of e-mails and considers disseminating after parliamentary elections in late September." And on October 7th, WikiLeaks publishes John Podesta's hacked e-mails. So the coincidences keep piling up.

Let's turn, in the few minutes that I have remaining, again to Paul Manafort, as a follow-up to Mr. Himes' questioning. Suffice it to say, Paul Manafort was a major part of the Trump campaign, including serving as its chairman, convention manager, and chief strategist, before departing the campaign in disgrace in August 2016. It's also established the fact that Paul Manafort was a long-time official adviser to pro-Russian Ukrainian political leadership.

Is Paul Manafort -- Manafort a subject in your investigation?

COMEY: I'm not going to comment on that.

CASTRO: All right. Director, can you describe to the American people the Russian concept of kompromat?

COMEY: It's a technique that they use to gather information on people that may be embarrassing or humiliating, and using it to coerce cooperation.

CASTRO: In your career, have you known instances where that has been successfully leveraged?

COMEY: Yes, I believe our counter-intelligence division has encountered it a number of times.

CASTRO: Does that include private places, including places such

as hotels that are wired for audio and video?

COMEY: I don't think I remember enough about the particulars to say, but in theory, sure.

CASTRO: Thank you.

I yield back. I yield back to Ranking Member Schiff.

SCHIFF: I recognize Mr. Heck.

HECK: Admiral Rogers, before I get into my main body in my remarks, I want to go back to your earlier comment about that there is no evidence to indicate that there was a successful Russian hacking of voter results or tabulations. What I did not hear you say is whether or not there had been any attempts to hack into election systems of any kind.

ROGERS: Yes.

COMEY: I can answer that because the FBI's responsibility's in the United States. We saw no indication of that. We saw efforts to penetrate voter registration databases, state Boards of Elections, at that level. We saw no efforts aimed at the vote itself.

HECK: But you did see efforts to penetrate registration roles?

COMEY: Correct.

HECK: Did you see efforts to penetrate any other portions of election systems, other than registrations? In this country it's a highly-decentralized system and, as a consequence, you will recall, then-Secretary of Homeland Security, Jeh Johnson, indicated that election systems should become a part of our critical infrastructure for cybersecurity purposes.

COMEY: Their efforts were aimed at the voter registration systems in various states, and it takes different forms in various states. Sometimes there's a private vendor, sometimes it's state. But it -- that's where it was focused, and not on the -- the vote itself, vote machines, vote tabulation, vote transmission, that we've seen.

HECK: Thank you. I yield back to the Ranking Member [****].

SCHIFF: Time's -- time's expired, but let me go quickly to Mr. Turner.

TURNER: Thank you, Mr. Chairman.

There's been a lot of statements that have been made up here that is opposed to questions. And we don't certainly feel the need to clarify all of them, but there is one aspect that does need to be clarified because it's also involved both of your testimonies.

There's been discussion up here concerning the statements by James Clapper and, rather than do the conjecture as it has been made, I'm going to just read it. Chuck Todd said, "Let me ask you this. Does intelligence exist that can definitively answer the following question whether there were improper contacts between the Trump campaign and Russian officials?" James Clapper said, "We did not include any evidence in our report.

I say 'our,' that's NSA, FBI, and CIA, with my office and the Director of National Intelligence, that had anything, that had any reflection of collusion between members of the Trump campaign and the Russians. There was no evidence of that included in our report." Chuck Todd followed up. "I understand that, but does it exist?" James Clapper answered, "Not to my knowledge." So the text is not merely related to the report.
I yield back.

NUNES: Mr. Crawford's recognized.

CRAWFORD: Thank you, Mr. Chairman.

Thank you, gentlemen, for being here today. I'll start with Director Comey. Despite your expressed disdain for the New England Patriots, I think that Tom Brady would probably like to express his gratitude for the FBI's assistance in recovering his stolen Super Bowl jersey, so I'll do that on his behalf now.

COMEY: Thank you. By the way, I -- if I'm honest with myself, the reason I don't like the Patriots is they represent sustained excellence and, as a Giants' fan, that drives me crazy.

CRAWFORD: Director Comey, are you familiar with an article, July 18, 2016, from The Washington Post entitled "Trump Campaign Guts GOP's Anti-Russia Stance on Ukraine"?

COMEY: I'm not familiar with that article. I don't -- I don't remember it.

CRAWFORD: I'd ask (you) now to consent to add this to the record, just for your edification, Director. There's an allegation contained in that article that at a National Security Committee platform meeting Trump staffers wrote an amendment to an amendment

that stripped out platform's call -- call for providing, quote, "Lethal defensive weapons," and replace it with softer language, calling for, quote, "Appropriate assistance."

Are you familiar with a March 18, 2017, story in the Washington Examiner entitled "How Pundits Got Key Parts of the Trump Russia Story All Wrong"? Are you familiar with that?

COMEY: I don't think I am.

CRAWFORD: I'd ask you now to consent to add that to the record, and also for your edification I'll go to some of the -- the meat of that story. There -- are you aware of an allegation that Trump staffers gutted the Ukraine plank of the platform?

COMEY: Am I aware of the article on that?

CRAWFORD: Are you aware of any -- anything of that nature, the article or any -- any activity that -- that [****]?

COMEY: Do you want to talk about anything -- I'm willing to comment on whether I've seen different things in the media. I don't want to talk about anything beyond that.

CRAWFORD: OK. So, then, say you're not aware of the final platform that retained all of the language from the original platform, plus the portion of the amendment offered by the platform committee member?

COMEY: I don't want to comment.

CRAWFORD: OK. Then I'll go through -- I know that you're limited on what you comment on. I'll go through some of the -- some of the -- as I said, the meat of this. Reading from the platform, it says, quote, "We will meet the return of Russian belligerence with the same resolve that led to the collapse of the Soviet Union. We will not accept any territorial change in Eastern Europe imposed by force in Ukraine or elsewhere, and we'll use all appropriate measures to bring to justice the practitioners of aggression and assassination," end quote.

Does that sound to you as a -- like a pro-Russian or a pro-Putin statement, in your assessment?

COMEY: That's not for me to comment on.

CRAWFORD: OK. Further, in the platform it says quote "We support maintaining and if warranted increasing sanctions together with our allies against Russia and less and until Ukraine's

sovereignty and territorial integrity are fully restored. We also
support providing appropriate assistance to the Armed Forces of
Ukraine and greater coordination with NATO defense planning." And
again, that sounds like fairly clear language in their relationship to
Russia.

Would you agree?

COMEY: Same answer Mr. Crawford.

CRAWFORD: OK, thank you.

The final language I'll get to here in just a second -- there was
-- there was an amendment but the final language regarding that plank
of a platform with regard to national security relating to Russia. It
says "we support maintaining and if warranted, increasing sanctions
together with our allies against Russia and less and until Ukraine's
sovereignty and territorial integrity are fully restored. We also
support providing appropriate assistance to the Armed Forces of
Ukraine and greater coordination with NATO defense planning."

And again, that -- to me that sounds fairly clear and
straightforward that that is not conducive to a Putin administration.
Would you agree?

COMEY: Give you the same answer, Mr. Crawford.

CRAWFORD: Thank you, sir.

It's also important to note that that platform was adopted in
coordination with and in concert with the Trump administration as they
met at the convention and they went through the platform process. The
Trump campaign agreed to the platform condemning Kremlin belligerence,
calling for continued and perhaps increased sanctions against Russia
as I indicated in the text of that platform. For the full restoration
of Ukrainian territory, for refusing to accept quote "any territorial
change in Eastern Europe imposed by force, Ukraine or elsewhere and
pledging to aid Ukraine's armed forces."

So I -- I bring that up just to -- just to highlight and note the
fact that none of that appears to be pro-Putin or pro-Russian
language.

NUNES: Mr. Crawford, will you yield that to me?

CRAWFORD: Yes.

NUNES: So, Mr. Comey, I just want to make sure -- I know you're
not going to comment on this, but I hope that you'll take this back to

your investigators because there seems to be the -- the line out there that somehow the Republican Party watered down it's platform. And that's not true. That didn't happen, and in fact, what happened is -- is that the platform was actually increased. Increased its certainty against what the Russians were up to and it actually amended the platform to make it stronger than what it initially was.

So, you know, I know there's a lot of circumstantial evidence out there about all these supposed people that knew -- that knew the Russians, but the reality is and remains the case, Republican Party had a very strong platform that was against the Russians and it was increased in its -- its strength not decreased like has been reported. So I know that you won't comment, but I hope that at least you will -- we'll provide this to your investigative team so that we can at least get this off the table. Will you -- will you take this back?

COMEY: Sure.

NUNES: OK, we'll give it to you.

Sorry, Mr. Crawford. We'll go back.

CRAWFORD: Not at all. Thank you, Mr. Comey, I appreciate that.

Admiral Rogers, would you like to make a comment about the New England Patriots before I move forward?

ROGERS: I'm a Chicago Bears guy, born and [****].

CRAWFORD: Admiral, our employees -- you mentioned this before but I just want to go through this list. Are employees of intelligence community -- intelligence community agencies required to disclose visits with foreign nationals?

ROGERS: Yes, broadly, although I'd be the first to admit not all foreign international interactions are the same. Interactions with the British, for example, are in a very different place than other countries for example.

CRAWFORD: OK, appreciate that clarification. To your knowledge, are elected officials required to disclose contact with foreign nationals?

ROGERS: I don't know what the specifics are across the federal government because clearly in many jobs, that's part -- interaction with foreign counterparts is part of your job. I'm the first to acknowledge that. I interact with foreign counterparts as does Director Comey, regularly, in the course of our duties.

CRAWFORD: Are federal campaign employees required to disclose contacts with foreign nationals to your knowledge?

ROGERS: I apologize, I just don't know.

CRAWFORD: OK. Are private citizens required in any way to disclose or to report contact with foreign nationals? That you know of?

ROGERS: I don't know.

CRAWFORD: Is it customary for transition teams for a presidential campaign -- for transition team members to meet with foreign nationals to your knowledge? Is that customary?

ROGERS: It's an area I just don't have any knowledge.

CRAWFORD: Is that unusual?

ROGERS: I don't have any -- I don't have any knowledge on it.

CRAWFORD: Has it happened before?

ROGERS: I've never been part of a transition team. I don't know.

CRAWFORD: Are transition team members required by law to disclose contacts with foreign nationals?

ROGERS: I apologize, I don't know the law there.

CRAWFORD: Thank you.

I yield back to the Chairman.

NUNES: Thank you Mr. Crawford.

Ms. Stefanik's recognized.

STEFANIK: Thank you, Mr. Chairman.

Thank you, Director Comey and Admiral Rogers for your testimony today. My first set of questions are directed at Director Comey. Broadly, when the FBI has any open counter-intelligence investigation, what are the typical protocols or procedures for notifying the DNI, the White House, and senior Congressional leadership?

COMEY: There is a practice of a quarterly briefing on sensitive cases to the chair and ranking of the House and Senate Intelligence

Committees. And the reason I hesitate is, thanks to feedback we've gotten, we're trying to make it better. And that involves a briefing of the Department of Justice, I believe the DNI, and the -- some portion of the National Security Council at the White House...

STEFANIK: So if that's quarterly...

COMEY: ... to brief them before Congress is briefed.

STEFANIK: So it's quarterly for all three then, senior congressional leadership, the White House, and the DNI?

COMEY: I think that's right. Now that's by practice not by rule or by written policy which is why, thanks to the chair and ranking giving us feedback, we're trying to tweak it in certain ways.

STEFANIK: So since, in your opening statement, you confirmed that there is a counter-intelligence investigation currently open and you also referenced that it started in July. When did you notify the DNI, the White House, or senior congressional leadership?

COMEY: It's a good question. Congressional leadership, some time recently. They were briefed on the nature of the investigation in some detail as I said. Obviously the Department of Justice has been aware of it all along. The DNI, I don't know what the DNI's knowledge of it was because we didn't have a DNI until Mr. Coats took office and I briefed him his first morning in office.

STEFANIK: So just to drill down on this, if -- if the open investigation began in July and the briefing of congressional leadership only occurred recently, why was there no notification prior to the recent -- to the past month?

COMEY: I think our decision was it was a matter of such sensitivity that we wouldn't include it in the quarterly briefings.

STEFANIK: So when you state our decision is that your decision? Is that usually your decision what gets briefed in those quarterly updates?

COMEY: No, it's usually the decision of the head of our counter-intelligence division.

STEFANIK: And just again, to get the detailed -- on the record, why was the decision made not to brief senior congressional leadership until recently when the investigation had been open since July? A very serious investigation -- why was that decision to wait months?

COMEY: Because of the sensitivity of the matter.

STEFANIK: Stepping back more broadly, in the case of Russia, we know that cyber hacking is just one tactic that's typically part of a broader influence or information warfare campaign and we know the Russian government is ready and willing to employee hacking as but one of many tools in their toolkit to obtain information for use against the United States. Is there any evidence that Russia tried to hack other entities associated with the 2016 presidential campaign in addition to the DNC or the Clinton campaign operatives?

COMEY: Yes, many others.

STEFANIK: Can you specify those others? Did that include the RNC? Did that include any of the other campaigns of candidates in the primaries, either Democrats or Republicans?

COMEY: I think what we can say in an unclassified setting is what we have in the report that there were efforts to penetrate organizations associated with the Republican party and that -- I think that is what we said in the report. And that there were not releases of material taken -- hacked from any Republican associated organizations.

STEFANIK: But the hacking -- the use of cyber tools as part of their broader, whether you call it hybrid warfare or information warfare campaigns, it was done to both parties.

COMEY: Correct.

STEFANIK: Thank you. Taking a further step back of what's been in the news recently, and I'm referring to the Yahoo! hack, the Yahoo! data breech, last week the Department of Justice announced that it was charging hackers with ties to the FSB in the 2014 Yahoo! data breech. Was this hack done to your knowledge for intelligence purposes?

COMEY: I can't say in this forum.

STEFANIK: Press reporting indicates that Yahoo! hacked targeted journalists, dissidence and government officials. Do you know what the FSB did with the information they obtained?

COMEY: Same answer.

STEFANIK: OK, I understand that. How -- how did the administration determine who to sanction as part of the election hacking? How -- how familiar with that decision process and how is that determination made?

COMEY: I don't know. I'm not familiar with the decision

process. The FBI is a factual input but I don't recall and I don't
have any personal knowledge of how the decisions are made about who to
sanction.

STEFANIK: Looking forward -- and this is for both of you -- what
is the NSA and the FBI doing to keep Americans safe, to keep campaign
entities -- to keep any entity associated with a major campaign, save
from aggressive Russia cyber measures that were utilized in this past
election?

ROGERS: So, we continue to maximize the insights. We're
generating about an activity -- for example, this started with the NSA
initially gaining access, in the summer of '15, we became aware of
that activity, shared it with our FBI teammates. That continues, we
try to make sure that the insights we generate our shared with our law
enforcement teammates, who then re-interact with the private sector.

We're trying to work broadly across the U.S. government to
increase cybersecurity, as you heard discussed -- on-going discussions
about what's the role of the voting infrastructure in the United
States, in terms of critical infrastructure. Do we need to bring that
within the critical infrastructure framework? I know that topic has
been ongoing for some period of time.

STEFANIK: Director Comey?

COMEY: Yeah, I think that's right and just making sure that we
are sharing information when we get it that someone's being hit, but
more importantly we're showing people what we've learned from this
cycle, so they can tighten up.

STEFANIK: Thank you. It seems to me in my first line of
questioning, the more serious a counterintelligence investigation is.
That would seem to trigger a need to update not just the White House,
the DNI, but also Senior Congressional Leadership. And you stated, it
was due to the severity. I think moving forward, it seems that the
most severe and serious investigations should be notified to the
Senior Congressional Leadership.
And with that, thanks for the lenience, Chairman, I yield back.

(CROSSTALK)

COMEY: That's good feedback, Ms. Stefanik. The challenge for us
is sometimes we want to keep it tight within the executive branch, and
if we're going to go brief congressional leaders, the practice has
been, then we brief inside the executive branch. And so, we have to
figure out how to navigate that in a good way.

NUNES: We may have to update the law on that. Gentlelady (ph)

yields back.

Mr. Schiff is recognized for 15 minutes and I think -- then we'll come back to our side for 15 and that should be it.

SCHIFF: Thank you, Mr. Chairman. Just a couple of questions before I hand it back to Mr. Heck.

Do the Russians favor the United States provision of lethal, defensive weapons to Ukraine, Admiral?

ROGERS: No.

SCHIFF: They would strongly oppose such an idea, would they not?

ROGERS: They've been opposed to it to date.

SCHIFF: And I can tell you that the idea of providing lethal defensive weapons to Ukraine has bipartisan support here on the Hill, including Senator McCain, certainly myself, I would imagine many members of this committee.

There was an effort at the convention to strengthen the platform by including a provision that would provide lethal defensive weapons to Ukraine. That was defeated. The campaign manager for the Trump campaign at the time, Paul Manafort, denied the campaign was involved in defeating that amendment. But the delegate who offered the amendment later disclosed to the press that in fact it was dropped at the insistence of the Trump campaign.

J.D. Gordon, a national security adviser for the Trump campaign was forced later to admit that in fact, he had weighed in against the amendment that would have provided that the U.S. should give lethal defensive weapons to Ukraine.

So, I would join my chairman in asking you to look into this, particularly since we know that Ambassador Kislyak attended the convention and if there was any communication between the Russians and the Trump campaign, that had the effect any coordination that resulted in the defeat of an amendment that was against Russian interests, the committee would certainly like to know and we welcome that inquiry.

Mr. Heck?

HECK: Thank you, Ranking Member.
There a lot of emotions kicking around in this room today. I perceive anger and outrage and subdued somberness, one I feel overwhelmingly is sadness. We've heard nothing but terribly disturbing evidence of what has happened to our country at the hands

of arguably our greatest advisory.

And what's worse, the evidence we've heard so far all seems --
all seems to lead to the conclusion that they help from the inside.
That this was, in part, an inside job from U.S. persons -- willing
American accomplices or terribly naive ones, or probably both -- who
helped the Russians attack our country and our democracy.

We're both still at the early stages of our investigation. We're
not indicting anyone, merely laying out some of the evidence and the
facts, dirty though they be, sleazy though they be. And no matter
what, we can safely conclude at this point that never in the modern
era has a President and his Administration had so many foreign
entanglements.

Entanglements that continue to push American foreign policy away
from its core roots -- beliefs, interests and alliances towards
unprecedented positions that only Putin himself could approve of. How
else can we explain the modification to the Republican Party platform
in such a decidedly pro-Russian way.

Republicans who are always so strong against geopolitical foes
like Russia, I know my colleagues on this committee take the Russia
threat very seriously. Why wouldn't the people who inhabit the White
House? How else can we explain an Administration that beats up our
oldest allies, like Australia and Britain, and our strongest and most
sacrosanct alliance, like NATO, but never, ever say a bad word about
Putin. In fact, they say a lot of good words about Putin.

An administration that we have heard decisively makes up baseless
wiretapping charges against a former United States President, equates
our intelligence agencies to Nazi Germany, and argues moral
equivalents between a repressive, authoritarian states with an
abhorrent human rights record like Russia in our free and open
democracy. And yet, this Administration never, ever utters any
criticism of Russia.

Let's be clear though. This is not about party. It's not about
relitigating the election. It's not as if anything we do here will
put a President from a different political party in the Oval Office.
So, I hope that it's clear that it's about something much more
important. And no, it's not about political motivation, to my friend
who said and suggested that earlier, this is about patriotism, about
something way more important than party.

This is about country and the very heart of what this country is
built on, which is open, free, fair, trusted elections. We don't take
our investigation lightly and I know you don't. Indeed, you go
through a process to even decide to do that, whether to extend the

resources, to begin with credible allegations and reason to believe that there's something that warrants it. And I no doubt believe you've talked to lawyers in and out of the prosecution divisions about whether or not this warrants an investigation. I know you don't take this lightly.

What we have seen is damning evidence today of what Russia did. We've also seen damning evidence of how they did it. Russia has a history of using active measures, many of which we have heard about today. Let's recap them, we're getting near the end.

Hacking and dumping information to damage or embarrass their enemies. We heard about this, of course, with respect to WikiLeaks and Guccifer 2.0. Using third-party and cutouts, business people, oligarchs (ph) and other ostensibly private individuals to cultivate relationships.

We've discussed Ambassador Sergey Kislyak, CEO Igor Sechin, and of course, Vladimir Putin himself. We're also heard about Russia's use of companies like [****], the Bank of Cyprus, [****] and a confusing web of offshore shell companies used it would seem to hide or to launder money.

We've also heard how Russia released disinformation to spread rumors and confused the public and to sow distrust and the ability to even know truth objectively, using propaganda, media outlets, whether they're owned directly by Russia or not, to release such disinformation in order to claim plausible deniability of Russia's hands.

Here again, we see WikiLeaks and Guccifer 2.0, but we also see the use of propaganda outlets like RT. And of course, the use of U.S. persons of influence. Whether through active collision or coordination or naive acquiescence, we don't yet know the full extent to further Russia's attempts to undermine our elections and ultimately, weaken our democracy.

HECK: On that last point, we've heard about quite a few individuals in the Trump orbit who feel somewhere on that spectrum from mere naivete, disturbing enough if this naivete is a feature of those who are supposed to be running our country and foreign policy, to unwitting Russian dupes, to willing blindness, to active coordination. This rogues galleries includes those already fired -- Roger Stone, adviser to Donald Trump; Paul Manafort, adviser to Donald Trump; Michael Flynn, national security adviser to Donald Trump; Carter Page, adviser to Donald Trump.

But the cloud of deep suspicion in Russian entanglements extends to those still in power. Rex Tillerson, Secretary of State to Donald

Trump; Michael Caputo, adviser to Donald Trump; Jeff Sessions,
Attorney General for Donald Trump; and members of the Trump family
itself.

This matters. It's serious. Our battleships weren't sunk and
our towers didn't collapse a la 2011 (sic). But make no mistake, 2016
is a year that we should mark on our calendars, and it's still going
on. The attack didn't end on Election Day. And it will continue as
you have suggested unless we, all of us in this room, stop it.

Admiral Rogers, you've proudly worn that uniform your entire
career. I am proud of your service and grateful for it. But I would
ask you, sir, not even with respect to this specific investigation, to
use your own words as someone who no doubt has been in theater, who's
lost brothers and sisters in combat, to explain to me, but more
importantly to the American people -- don't assume they know the
answer. Tell them in your words why we should care about Russia's
active measures campaign aimed as destabilizing our democracy and that
of our allies. In your words, sir, why should they care?

ROGERS: I don't think it's best interests of our nation for any
external entity to attempt to manipulate outcomes, to shape choices.
That should be the inherent role of a democracy.

The investigation we're going through I think is a positive in
the sense it will help illuminate to all of us, regardless of party,
what are the implications here and what does it mean for us. Because
I think our conclusion and that of the intelligence community broadly
here is, this absent some change, this behavior is not likely to stop.
Absent some change in the dynamic, this is not likely to be the last
time we'll be having these discussions about that kind of activity. I
don't think that's in anybody's best interest for us as a nation.

HECK: Director Comey, parallel question. Again, in general
terms, not with respect to the specific investigation you have
revealed here today, not asking you to go into specifics on any
individuals, but please, explain briefly to me, and more importantly
to the American public, why we should care about Russia's use of U.S.
persons of Americans helping Russia destabilize our democracy.

COMEY: Well, like Admiral Rogers, I truly believe we are shining
city on a hill, to quote a great American. And one of the things we
radiate to the world is the importance of our wonderful, often messy,
but free and fair Democratic system and the elections that undergird
(ph) it. And so when there's something by a foreign nation state to
mess with that, to destroy that, to corrupt that, it's very, very
serious, threatens what is America.

And if any Americans are part of that effort, it's a very serious

matter. And so you would expect the FBI to want to understand, is
that so? And if so, who did what? But again, I want to be very
careful to people who over0interpret my words, to preserve our ability
to answer those questions, we're not talking about our work.

I'm not here voluntarily. Right? I would rather not be talking
about this at all. But we thought it was important to share at least
that much with the committee and the American people, and now we're
going to close our mouths to do our work to see if we can answer those
questions, because the answers matter.

HECK: They do indeed. I thank you both for those answers. And
I thank you both for your service to our country. I would like to
think that we can turn this from a sad event into a positive one.
This country has stood up and fought on behalf of its own health and
welfare and that of its citizens and met any number of challenges
throughout our nation's history. The worst thing we could do is
underestimate the nature of this challenge before us today.

HECK: With that, ranking member, I would appreciate it if I
could yield to my friend from Texas, Mr. Castro, briefly.

SCHIFF: Mr. Castro.

CASTRO: I thank you. One more question with respect to Lee (ph)
because I know that's been a big topic of the line of questioning and
of course is a concern to all of us. Regardless of political party.
But I want to ask you director, is it possible that some of those
leaks could come from not the intelligence community, but from members
of the White House staff for example?

COMEY: Sure it could come from lots of different places. And
it's often one of the things that is challenging as I said about a
leak investigation. You think it's going to be a small circle, but it
turns out a lot of people either knew about it, or heard echoes of it
and it's stories to tell to journalists about it. So in my experience
trying to figure these things out for decades, it's often coming from
places you didn't anticipate.

CASTRO: No and the reason I asked the question is because the
President has berated the FBI and the intelligence community on the
issue of leaks. And others have berated the intelligence community in
the press because of these leaks. But I think it's worth considering
that it's quite possible that there are folks who have a kind of
political Munchausen by proxy syndrome, where they leak information
because they want to be the savior once it blows up. You know they're
all sorts of individual's that serve on political staff and I think
that we ought to consider the possibility that perhaps it is somebody
at the White House.

Thank you. I yield back.

NUNES: [****]. The gentleman yields back.

The gentleman yields back to Mr. Hurd.

HURD: Thank you, Chairman.

And gentlemen, thank you all for being here. And thank you for
your continued service to your country. I've learned recently the
value of sitting in one place for a long period of time and listening
and today I'm has added to that understanding and I'm going to try to
ask questions that y'all can answer in this format and are within your
areas of expertise.
And Director Rogers, my first question to you -- the exploit that
was used by the Russian's to penetrate the DNC, was it sophisticated?
Was it a zero day exploit? A zero day being some type of -- for those
that are watching, an exploit that has never been used before?

ROGERS: In an open unclassified forum, I am not going to talk
about Russian tactics, techniques or procedures about how they
executed their hacks.

HURD: If members of the DNC had not -- let me rephrase this, can
we talk about spear fishing?

ROGERS: Sure, in general terms, yes sir.

HURD: Spear fishing is when somebody sends an email and they --
somebody clicks on something in that email...

ROGERS: Right, the user of things [****] they're receiving
an email either of interest or from a legitimate user, they open it up
and they'll often click if you will on a link -- an attachment.

HURD: Was that type of tactic used in the...

ROGERS: Again, I'm not in an unclassified forum just not going to
be...

HURD: Copy, I apologize. Director Comey, when was the first
time the FBI notified the DNC of the hack? Roughly.

COMEY: I think august of 2015.

HURD: And was that prior to information being leaked to -- being
sent on -- put on WikiLeaks?

COMEY: Yes the -- the first Russian directed releases where middle of June of the next year by D.C. leaks and this Guccifer 2.0 persona and then that was followed by Wikileaks. So about a year. A little less than a year really.

HURD: So there was about a year between the FBI's first notification of some potential problems with the DNC network and then that information getting on -- getting on Wikileaks.

COMEY: Yes, sir.

HURD: Have you been able to -- when did the DNC provide access for -- to the FBI for your technical folks to review what happened?

COMEY: Well we never got direct access to the machines themselves. The DNC in the spring of 2016 hired a firm that ultimately shared with us their forensics from their review of the system.

HURD: Director Rogers, did the NSA ever get access to the DNC hardware?

ROGERS: The NSA didn't ask for access. That's not in our job...

HURD: Good copy. So director FBI notified the DNC early, before any information was put on Wikileaks and when -- you have still been -- never been given access to any of the technical or the physical machines that were -- that were hacked by the Russians.

COMEY: That's correct although we got the forensics from the pros that they hired which -- again, best practice is always to get access to the machines themselves, but this -- my folks tell me was an appropriate substitute.

HURD: The -- at what point did the company and the DNC use -- share that forensic information to you?

COMEY: I don't remember for sure. I think June. I could be wrong about that.

ROGERS: The company went public in June of 16, with their conclusions. I would assume it was around that time.

COMEY: I think it was about the time -- I think it was a little bit before the announcement, but I'll say approximately June.

HURD: So -- so that was -- how long after the first notification of -- that the FBI did of the DNC?

COMEY: Ten months.

HURD: Ten months? So the FBI notified the DNC of the hack and it was not until 10 months later that you had any details about what was actually going on forensically on their network?

COMEY: That's correct, assuming I have the dates about right. But it was -- it was some months later.

HURD: Knowing what we know now, would the FBI have done anything different in trying to notify the DNC of what happened?

COMEY: Oh Sure.

HURD: What -- what -- what measures would you have done differently?

COMEY: We'd have set up a much larger flare. Yeah we'd have just kept banging and banging on the door, knowing what I know now. We made extensive efforts to notify, we'd have -- I might have walked over there myself, knowing what I know now. But I think the efforts we made, that are agents made were reasonable at the time.

HURD: Good copy. And do you have a ball park of the number of private sector entities that you have to notify of these types of breaches?

COMEY: Hundreds and thousands. In this particular case we had to notify hundreds, I think maybe more than 1,000 entities that the Russians were hitting at the same time.
HURD: Admiral Rogers, do you have anything to add to that?

ROGERS: No, because as we pass the information to the FBI, what started all this was a pretty massive effort on the part of our Russian counterparts.

HURD: I've said this many times. The outcome of grizzly staff (ph), what the intelligence community as the Russian hacking, has been the wedge, whether real or perceived between the executive branch, the intelligence community and the public.

And this is an asymmetrical tool, that the Russians are using to destabilize liberal democratic institutions. And I think it is important that we do everything we can to review this, which I fully believe federal law enforcement, is doing as y'all have talked to here. And I would like to end before yielding back to the chairman, that my colleague from California, the Ranking Member said in his opening statement, the question that most people have is whether we can really conduct this investigation, in the kind of thorough

nonpartisan manner that the seriousness of the issues merit, or whether the enormous political consequences of our work will make that impossible.

And he adds, the truth is, I don't know the answer. I do. We must. The American people demand this. The future of our democratic institutions demand it and I'm glad we have two people like y'all involved in this. Mr. Chairman I yield back my time to you.

NUNES: Gentleman yields back.

And Mr. Gowdy's got a follow up.

GOWDY: Thank you, Mr. Chairman. And Mr. Chairman I want to thank you and Ranking Member Schiff for having this. Here Mr. Chairman you were talking about Russia far before it became -- long before it became fashionable to talk about Russia. If memory serves me correctly, you referred to Russia as possibly our greatest national security threat post 9/11. And as you know Chairman I come from a state with a fellow name Graham, who is also no fan of Russia.

So Director Comey, Admiral Rogers, people in your line of work are incredibly respected both your current line of work and the work that you came from and people in my line of work are not and there's a reason. The justice system is respected and the political process is not. So this is -- while this hearings important. What's really important is what you do after this hearing.

GOWDY: And I want you to go find every single witness who may have information about interference, influence, motive, our response, collusion, coordination, whatever your jurisdiction is, wherever the facts may take you, though the heavens may fall, go do your jobs because nature abhors a vacuum. And right now you can't answer most of the questions, either by policy, by law, or because the investigation has not been complete. Therefore, a vacuum exists which people in my line of work are more than happy to fill. So I need you to fill. I need you to do it with all deliberate speed.

Director Comey, I think it's also important for my fellow citizens to take note of why the system that you come from, the one that I come from, is respected, and this system that I'm in now is not.

What is hearsay?

COMEY: Information you don't know of your own personal knowledge but learn from someone else.

GOWDY: It's an out of court statement offered to prove the truth

of the matter asserted.

COMEY: I was trying to be a little less lawyerly.

GOWDY: All right. Well, we'll go with your answer. And it is
almost never admissible in court. How about anonymous sources? When
you were in the southern district could you ever call on an anonymous
source to testify in one of your proceedings?

COMEY: No.

GOWDY: You couldn't even use hearsay, unless there was some
widely accepted exception. It would never -- a newspaper article
would never, ever be admitted as evidence in a courtroom. So the
system we respect would laugh you out of court if you came in armed
with a newspaper article. But in the political process, that's
enough.

Let me ask you this. Cross examination. Why are you able to
cross examine witnesses in trial? Why do we have a right to confront
witnesses?

COMEY: Well, it's embedded in our Constitution, and the reason
it makes great sense is, it's the crucible out of which you get truth.
GOWDY: It is the single best way to elucidate the truth -- to
test and to probe and to challenge, and to test someone's personal
exposure to the facts. Cross examination's the best tool that we
have. How do you cross examine an anonymous source? How do you cross
examine hearsay? I hope that you go find every single witness that
you need to talk to, and examine every single document.

People are counting on you two and your line of work to find the
facts. And people are welcome to draw whatever conclusions they want
from the facts. But when I hear the word evidence, as I've heard lots
and lots this morning, let me ask you this, Director Comey, did you
ever -- are you familiar with any trials where one witness may have
said the light was red and one witness may have said the light was
green?

Has that ever happened?

COMEY: Yes, that's why you have a trial.

GOWDY: Does it ever happen where one bank teller said the
assailant was 5'10" and one said the assailant was 6'2"?

COMEY: Sure.

GOWDY: So that's evidence. You've got evidence he's 6'2" and

evidence he's 5'11", he just can't be both. The light can't be red
and green. So the word evidence, while fancy and legal, the reality
is you find facts and then the finder of the fact can draw conclusions
and inferences from those facts.

So I wish you luck as you begin this process. It is all
important. The fact that someone may have had a line of questions
about leaks does not mean that they're not interested in all aspects
of Russia. And vice versa, the fact that they may not have asked
questions about leaks doesn't mean they're not interested in them.

You have jurisdiction over all of it. So, God bless you as you
go on this journey for the facts. And then people can draw whatever
conclusions they want. I hope that you will fill (ph) the vacuum that
is created when you all are not able to answer questions.

With that, I will yield back to the chairman.

NUNES: The gentleman yields back.

Mr. Comey, this is my final list of questions here. I just want
to make sure we get this on the record. Do you have any evidence that
any current Trump White House or administration official coordinated
with the Russian intelligence services?

COMEY: Not a question I can answer.

NUNES: I figured you were going to say that, but I just wanted
to make sure we got it on the record. How about counselor to the
president, Kellyanne Conway?
COMEY: It's the same answer. And as I said earlier, I
constantly want to ask people, don't over interpret the fact that I
say I can't comment. I'm not going to comment on anybody.

NUNES: Well, I think -- I understand that. But here's the
challenge. Is that you've announced that you have this big
investigation, but now you've got people that are involved in our
government that are -- the Secretary of State, for example -- these
are important players. And the longer this hangs out here, the bigger
the cloud is.

And I know that you're not going to tell me whether or not you
have any evidence, but I can tell you that we don't have any evidence.
And we're conducting our own investigation here, and if you have some
-- if you have evidence I'd -- especially as it relates to people in
the White House that are working in the White House or the
administration, I mean, that would be something that we really should
know about and we should know about quickly.

And so if you can't give it to the entire committee, I hope you can at least give it myself and Mr. Schiff because you know, there is a big gray cloud that you have put over people who have very important work to do to lead this country. And so the faster you can get to the bottom of this, it's going to be better for all Americans.

COMEY: I understand. Thank you.

NUNES: All right. With that, I want to thank the members today and especially our witnesses. It was a long day, but I think a good discussion.

END

REP. DEVIN NUNES
Chairman
Washington, D.C.

---

End of Document                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.