**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 17-cv-60426-UU**

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.

   Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

  Defendants.

_____/

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

DAVIS WRIGHT TREMAINE LLP
Katherine M. Bolger
Nathan Siegel
Adam Lazier
Alison Schary
1251 Avenue of the Americas, 21st Floor
New York, New York 10020

BLACK, SREBNICK, KORNSPAN &
STUMPF, P.A.
Roy Black
Jared Lopez
201 So. Biscayne Boulevard
Miami, Florida 33131

*Of Counsel*:
Nabiha Syed
BuzzFeed, Inc.
11 E. 18th Street, 13th Floor
New York, New York 10003

*Attorneys for Defendants*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

COUNTER-STATEMENT OF FACTS ................................................................... 2

ARGUMENT ........................................................................................................... 5

    I.       PLAINTIFFS SATISFY THE BASIC CRITERIA FOR PUBLIC FIGURES ...... 6

          A.    Plaintiffs Had Access to the Media ................................................ 7

          B.    Plaintiffs Voluntarily Invited Attention and Comment ............................... 8

    II.      PLAINTIFFS ARE LIMITED PUBLIC FIGURES ................................................. 9

          A.    Plaintiffs Misidentify the Relevant Public Controversies ......................... 10

          B.    Plaintiffs Involved Themselves in the Identified Public Controversies .... 11

          C.    Plaintiffs' Role in these Public Controversies is Germane to the
Allegedly Defamatory Statements ........................................................... 19

CONCLUSION ....................................................................................................... 20

## PRELIMINARY STATEMENT

With their usual rhetorical panache, Plaintiffs headline their brief with a rhetorical question from a column in the *New York Observer*:  "Who on God's green earth is Aleksej Gubarev?"  Yet they neglect to provide the columnist's answer, which was that Gubarev is probably a limited purpose public figure.  Shayefar Ex. 1 ("If a Russian national living in Cyprus with various companies worldwide is alleging injury in Broward County, the more likely he is to be held to be found a limited purpose public figure.").  The record here, which is far more extensive than when that column was written, demonstrates that its prediction was correct.

The record shows that after getting their start as pioneer advocates for the online pornography industry, Plaintiffs spent years publicly touting themselves as major players in the world of technology and web-hosting, and *the* major player in the Russian internet world.  Even now, on the same week Plaintiffs' filed a summary judgment motion depicting themselves as little more than a mom and pop shop, Gubarev told a McClatchy reporter that "Webzilla is one of the largest Internet providers in Europe."[1]  Even more importantly, Plaintiffs spent more than a year before the Dossier was published aggressively seeking – and meaningfully receiving – worldwide publicity to position Gubarev and XBT as "experts" and "thought leaders" on cybersecurity and "Russian tech."  For that very reason, Plaintiffs claim in this suit that they have an international reputation which has allegedly been damaged to the tune of at least $150 million.

The natural legal consequence of those voluntary actions is that Plaintiffs are limited public figures for purposes of this case.  Importantly, requiring public-figure plaintiffs to demonstrate actual malice "is not a punishment imposed upon the allegedly defamed party." *Rosanova v. Playboy Enters., Inc.*, 580 F.2d 859, 862 (5th Cir. 1978).  Rather, "[i]t preserves the balance between free debate on the one hand and compensation of individuals for harm inflicted by defamatory falsehood on the other."  *Id.*  Nonetheless, in an effort to avoid that burden, Plaintiffs' motion largely flees from their life's work.  Instead, Plaintiffs seek to reinvent themselves as a garden-variety small business limited to "small technology circles," who eschewed media attention until it was unwittingly forced upon them by the Dossier.  To accomplish that makeover, they even contradict their own official press statements.  *Compare, e.g.*, Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment ("Pl. Br.") at

---

[1] Response Declaration of Nathan Siegel dated October 1, 2018 ("Siegel Resp. Decl.") Ex. 7.

2 ("XBT and Webzilla are not Microsoft, Google or Facebook.") *with* Defs. SUMF ¶ 20 (press release stating that "Webzilla has transitioned itself to stand among the ranks of exclusive peers such as Netflix, Google, and Akamai, quietly taking its rightful place among the giants").

In addition, the legal arguments in Plaintiff's motion are little more than a preemptive strike on *Defendants*' motion for partial summary judgment on the public figure issue, which was filed four days after Plaintiffs'.  Accordingly, Plaintiffs' arguments all follow the same pattern.  First, they tell the Court what "position" Defendants *will* take, which they construct by reference to a few *sua sponte* statements plucked from colloquy in a status conference more than three months ago.  Next, they proceed to rebut that supposed "position", often arguing that Defendants are "slim[ing]" them because some of their clients display pornography.  But Plaintiffs did not correctly anticipate Defendants' arguments, including (but by no means limited to) those discussing why their conduct promoting the online pornography industry is relevant to whether they are public figures for a defamation case about misusing "porn traffic."  So much of their motion is irrelevant because it is directed at straw-man "positions" that are not at issue here.

The sole question of law at issue here is whether Plaintiffs are limited-purpose public figures, not whether they are "household names" like Oprah or Facebook.  That inquiry asks whether they had access to the media and engaged in affirmative conduct to attract public attention, particularly with respect to public controversies relevant to the alleged defamatory statements.  Having repeatedly "invit[ed] attention and comment" with respect to cybersecurity, online pornography, the Russian internet, and even Russian interference in the 2016 election – efforts that Plaintiffs say caused them to be included in the Dossier – they are public figures for purposes of this case.  *Silvester v. Am. Broad. Cos.*, 839 F.2d 1491, 1494 (11th Cir. 1988).

## COUNTER-STATEMENT OF FACTS

The facts relevant to this motion are set forth more fully in Defendants' Partial Motion for Summary Judgment ("Defs. Br.") and the accompanying Rule 56.1 Statement ("Defs. SUMF"), as well as in Defendants' Response to Plaintiffs' Rule 56.1 Statement ("Defs. 56.1 Resp."), filed herewith.  To avoid repetition, Defendants also refer the Court to those filings.[2]  Generally, almost all of Plaintiffs' Rule 56.1 Statements+ fall into one of several categories:

---

[2] Citations herein to "Pl. SUMF" shall refer to Plaintiffs' Statement of Undisputed Material Facts, dated September 17, 2018.  Defendants may also refer herein to exhibits attached to the

1.      **Immaterial facts**.  Most of their factual assertions are not material at all.  Some examples include multiple self-serving declarations of Plaintiffs' subjective beliefs, perceptions, and intentions, [3] and recitations that various individuals had not previously "heard of" Plaintiffs. [4]

2.      **Arguments**.  Much of Plaintiffs' Rule 56.1 Statement asserts argument, not facts. That includes statements which are merely exercises in semantics, characterizing the underlying, undisputed facts that speak for themselves.  For example, Plaintiffs assert that "Mr. Gubarev had never . . . publicly commented on any political matters."  Pl. SUMF ¶ 8.  However, they do not dispute that he explained in detail to a *Bloomberg* journalist why an alleged Trump campaign-Russia connection was "totally f---ed up," or that he publicly defended a controversial Russian internet law.  Defs. 56.1 Resp. ¶ 8; Shayefar Ex. 44.

Plaintiffs also complain they were not mentioned in "high-level technology media" in early 2016, but acknowledge they received coverage in *Forbes* and on *CNBC*.  Pl. SUMF ¶ 15. Plaintiffs likewise complain that Gubarev "was only interviewed for a handful of publications, most of them minor," but do not dispute he was interviewed by *Bloomberg*, *Business Insider*, *Forbes*, *VentureBeat* and *The Wall Street Journal*. [5]  They even assert that "the Bloomberg article does not make any reference whatsoever to the Democratic National Committee or the hacking of the same."  *Id.* ¶ 34.  However, the very premise of that article was that the Trump-Alfa Bank issue was merely "another" example of false charges that Trump was involved in Russian interference in the U.S. election, including the DNC hack.  *See* Defs. 56.1 Resp. ¶ 34.

3.      **Half-Truths**.  A third category consists of half-truths which are literally accurate (and undisputed), but ignore all the related undisputed facts that are far more significant.  For example, Plaintiffs include a vague reference to "Webzilla provid[ing] advertising support" for

---

Declaration of Nathan Siegel dated September 21, 2018 ("Siegel Decl."), the Declaration of Matthew Shayefar dated September 17, 2018 ("Shayefar Decl."), and the Response Declaration of Nathan Siegel dated October 1, 2018 ("Siegel Resp. Decl.").

[3] *See, e.g.*, Gubarev Decl. ¶ 6 ("I am largely unknown"); Pl. SUMF ¶ 4 ("Mr. Gubarev does not consider himself to be an expert"); *id.* ¶ 5 ("Mr. Gubarev does not consider himself to be a public person"); *id.* ¶ 12 ("any promotion of XBT's executives themselves was solely for the purpose of creating brand recognition"); *id.* ¶ 28 ("Mr. Gubarev gave comments to a Bloomberg reporter to promote Servers.com").  *See also id.* ¶¶ 7, 14, 16-17, 30.

[4] *See, e.g.,* Pl. SUMF ¶¶ 38, 40-44.  Other immaterial facts include *id.* ¶¶ 1-2, 7, 13.

[5] *See also* Pl. SUMF ¶ 15 ("Cutler PR was only able to get very limited exposure"); *id.* ¶ 16 ("Servers.com obtained so little from Cutler PR's work"); *id.* ¶ 22 ("KGlobal's efforts were so unsuccessful in driving attention to the company."); *id.* ¶¶ 18, 22-23, 27, 33.

"AWMOpen" conferences, which "was operated by a company in which Mr. Gubarev invested." Pl. Br. at 4; Pl. SUMF ¶ 26.  True enough, but that does not speak to the larger point that Gubarev, though his company, managed the "team" that created and ran the conferences and published a magazine, all to "rais[e] the profile" of adult webmasters.  Defs. 56.1 Resp. ¶ 26; Defs. SUMF ¶¶ 4-10.  Likewise, Plaintiffs claim that "Mr. Gubarev had never seen" one specific set of emails shown to him at his deposition, which touted him to reporters as an entrepreneurial success story and an expert and "thought leader" on "Russia tech."  Pl. SUMF ¶ 19.  Maybe so, but the material, undisputed point is that Gubarev, as XBT's CEO, authorized the public relations strategy to solicit journalists for interviews with that message.  Defs. 56.1 Resp. ¶ 19.

4.    **Facts Contradicted by the Record**.  And finally, there are a few asserted facts (though very few) which are not supported by any cited record materials and are indisputably false.  For example, Gubarev claims he has never spoken anywhere other than a "handful" of "small industry conferences."  Pl. SUMF ¶ 24.  In reality, he held a press conference in Moscow and spoke at Russia's most prestigious annual internet event, to an audience that included Putin's internet advisor German Klimenko.  Defs. 56.1 Resp. ¶ 24.

5.    **All Other Undisputed Material Facts**.  Perhaps the most important category of material, undisputed facts are the ones that are missing from Plaintiffs' Rule 56.1 Statement altogether.  At bottom, Plaintiffs do not and cannot meaningfully dispute that Gubarev promoted the very industry responsible for "porn traffic" though conferences and magazines, or that they have previously received negative press coverage and industry complaints to U.S. government authorities regarding the nature of the "porn traffic" on its networks.  Defs. SUMF ¶¶ 4-18, 80. While they quibble about their motives, they do not dispute that they hired two U.S.-based PR companies to launch publicity campaigns in the United States to solicit scores of journalists to interview Gubarev and write about Plaintiffs as experts and "thought leaders" on issues relating to cybersecurity and, in particular, the Russian tech sector.  Defs. SUMF ¶¶ 25-31, 49-61.  Nor do they dispute that they publicized their entry into the Russian internet market by promoting themselves as a transformative influence that would also facilitate compliance with Russia's controversial data security laws.  Defs. SUMF ¶¶ 32-42.  And while they strive mightily to minimize the subsequent coverage they received, the simple facts are that about a year's worth of those efforts had already yielded coverage in publications like *Forbes*, *CNBC*, *Bloomberg*, *Business Insider*, and *VentureBeat*, and interviews with the likes of *The Wall Street Journal*.  Pl.

SUMF ¶¶ 15, 20; Defs. SUMF ¶ 55.  Moreover, Plaintiffs were able to use their access to the media to successfully head off negative coverage about their involvement in Methbot, one of the largest and highly-publicized "botnet" scandals to date.  Defs. SUMF ¶¶ 63-72.

Finally, Plaintiffs do not (and cannot) dispute that Gubarev, on behalf of Plaintiffs, voluntarily provided a detailed, "expert opinion" to *Bloomberg* regarding the most specific public controversy referenced in the Dossier: Russian interference in the 2016 U.S. presidential election in favor of Donald Trump.  Plaintiffs even highlight that the *Bloomberg* reporter reached out to Gubarev specifically because he had already interviewed him as a result of Plaintiffs' public relations' efforts.  Bershidsky Decl. ¶¶ 3-4.  Thus, regardless of what Gubarev professes to believe about his popularity, the undisputed facts show that by 2016, he was actually known to a reporter for one of the world's most prestigious business media networks as a competent and willing resource for "expert" comments on a major Russia-related, cyber-security scandal.

Rather than address those salient facts, Plaintiffs instead launch a frontal attack on the credibility of Defendants' counsel.  They claim that "[c]ontrary to Defendants' direct representations to this Court, at no time did the Plaintiffs seek 'public commentary on Russian servers, on hacking.'"  Pl Br. at 5.  Had Plaintiffs waited to read Defendants' summary judgment motions rather than preemptively attack their lawyers, they might have understood why there is a wealth of evidence supporting what Ms. Bolger was referring to at a June status conference.[6]

## ARGUMENT

Defendants agree with Plaintiffs on one important point: whether they are public figures is a question of law for this Court to resolve now.  Defendants also agree that there is no choice-of-law question presented here, albeit for slightly different reasons than Plaintiffs suggest.[7]

---

[6] For example, as detailed above, Plaintiffs sent scores of emails to journalists soliciting interviews as experts on "Russian tech"; they held a press conference and gave interviews to Russian media boasting why their Russia-based servers were important; and they commented on hacking and other related cyber-security issues, including Alfa Bank (i.e., Russian) servers.

[7] Whether Plaintiffs are public figures is ultimately a question of federal constitutional law, not state law, so the Court's analysis should presumptively be guided by Eleventh Circuit case law on this issue.  *See McKee v. Cosby*, 874 F.3d 54, 60 (1st Cir. 2017) (applying Michigan law to substantive defamation claim but following First Circuit cases on First Amendment question of whether plaintiff is a public figure).  However, if a state were to adopt a broader definition for public figures than the federal standard, then state law could apply to the issue.  *Harris v. Quadracci*, 48 F.3d 247, 250 n.5 (7th Cir. 1995), *pet. for cert. docketed* (May 14, 2018) (No. 17-1542).  But here the parties appear to agree that both Florida and New York state courts follow

Otherwise, Plaintiffs' motion is a preemptive strike on the wrong enemy. Their arguments are all based on their premise that Defendants supposedly "telegraphed to Plaintiffs and the Court their two-pronged plan of attack" to "slime" them and otherwise behave like Darth Vader. Pl. Br. at 2. So each step in their argument begins by positing what they contend to be "Defendants' position" on the public figure issue (e.g., Pl. Br. at 4), and then proceeds to rebut that imagined "position."

To start with, Plaintiffs assume that Defendants' "position" is that "Plaintiffs are either general or limited purpose public figures." Pl Br. at 3. So a significant portion of their factual and legal arguments focus on whether they are "household names" like Google and Madonna. *Id.* at 2-3, 10-12. But all that is irrelevant, because Defendants agree they are not general public figures. Rather, what *is* relevant, to assess whether Plaintiffs are *limited* public figures for purposes of defamatory statements about illicit cyber-conduct involving Russia, is that XBT and Webzilla consistently held themselves out to the press and public as on par with the Googles of the cyber-world; as "one of the largest internet providers in Europe"; and as "the foundation for the development of international potential [in] the Russian market." *See* Defs. SUMF ¶¶ 20, 41; Siegel Resp. Decl. Ex. 7. Yet Plaintiffs ignore those facts entirely. And as discussed more fully below, the rest of Plaintiffs' motion follows the same pattern.

## I.    PLAINTIFFS SATISFY THE BASIC CRITERIA FOR PUBLIC FIGURES

Turning to the limited public figure issue, Plaintiffs contend that the applicable legal standard is what they characterize as the three-part *Silvester* test. They do not actually point to any case law, but rather rely entirely on what they claim "Defendants acknowledged" in a handful of words exchanged in an informal status conference. Pl Br. at 12 n.14. But the test is what it is, and the Eleventh Circuit's jurisprudence, beginning with *Silvester*, makes clear that the limited public figure analysis is more nuanced that Plaintiffs suggest.

*Silvester* and its progeny make clear that the Court's inquiry should begin by assessing whether Plaintiffs satisfy the two "fundamental" criteria for determining who is a public figure. *Silvester*, 839 F.2d at, 1494. *See also Turner v. Wells*, 879 F.3d 1254, 1272 (11th Cir. 2018). First, public figures (of any sort) have "greater access to the media, which gives them 'a more realistic opportunity to counteract false statements'" than purely private individuals. *Silvester*,

---

the federal standard. So while it is appropriate to note Florida or New York cases, there is no "choice of law" question presented on this issue here.

839 F.2d at 1494 (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344 (1974)).  Second, public figures have "voluntarily placed themselves in a position and acted in a manner which invited public scrutiny and comment."  *Id.*  Plaintiffs ignore that threshold, two-step inquiry, which strongly supports their being public figures.  *See* Defs. Br. at 11-13.

### A.      Plaintiffs Had Access to the Media

Plaintiffs only briefly address their access to the media at the end of their brief, and proceed as if the only media communications they ever had were with reporters who "gave them an opportunity to respond to defamatory statements" after the Dossier was published.  *Id.* at 17.  Defendants agree that access to media is primarily measured by access before the allegedly defamatory statements, *Silvester*, 849 F.2d at 1494, but Plaintiffs ignore all the undisputed evidence that they enjoyed such access.  The record makes clear that for more than a year before the Dossier was published, Plaintiffs through their public relations agents had access to much of the world's most important media.  If affirmatively obtaining interviews with and articles placed in publications like *CNBC*, *Forbes* (twice), *Bloomberg* (twice), *The Wall Street Journal*, *Business Insider*, and *VentureBeat* over a span of less than a year is not "access to the media," it would be difficult to imagine what is.  *Silvester*, 839 F.2d at 1495 (existence of newspaper articles, including those which "predate and are unrelated to" the allegedly defamatory statements, "highlight plaintiffs' longstanding access to the media").  In fact, when their involvement in a major "botnet" scandal (Methbot) threatened to seriously impair their business in late 2016, they were able to utilize their media access to head off a negative story before it was even published.  Defs. SUMF ¶¶ 63-72.  It would be difficult to find a more salient example of how media access provides a public figure with "a more realistic opportunity to counteract false statements than private individuals normally enjoy."  *Silvester*, 849 F.2d at 1494 (quoting *Gertz*, 481 U.S. at 344).  Most private persons lack the wherewithal to identify and deflect potential negative stories before they are ever published.  *See, e.g.*, *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 16-17 (1st Cir. 2011) (public relations campaign designed in part to "block messages critical of [plaintiffs]" was part of "conduct [that] shows beyond hope of legitimate contradiction that [plaintiffs] are limited purpose public figures") (internal quotation marks omitted).

Moreover, with respect to Plaintiffs' interactions with the media after the Dossier was published, the relevant point is that their conduct illustrates how they were already in a much better position than the average private person to "counteract false statements" once they were

published.  The record makes clear that Plaintiffs did far more than passively accept "the opportunity to respond to defamatory statements."  Pl. Br. at 17.  Rather, the first thing Gubarev did upon learning of the Dossier was to reach out to his pre-existing PR team to formulate a response, which included drafting statements, suggesting talking points for interviews, and filtering reporters' requests and Plaintiffs' responses.  Defs. SUMF ¶¶ 73-76.  *See Turner*, 879 F.3d at 1272 (that plaintiff "took advantage of his familiarity with the media by commissioning a response to the Report, which included [plaintiff] giving his conclusions" supported his being a public figure).  In fact, when they filed this lawsuit their PR expert was busy playing *CNN* and *Fox News* off against each other to obtain the best offer for an exclusive television interview.  *See* Siegel Decl. Ex. 110.  In short, Plaintiffs easily satisfy the first criteria for a public figure.

B.      **Plaintiffs Voluntarily Invited Attention and Comment**

Next, the record is replete with evidence that for many years Plaintiffs "voluntarily placed themselves in a position and acted in a manner which invited public scrutiny and comment."  *Silvester*, 839 F.2d at 1494.  Importantly, by its very formulation this factor – which as discussed below is also incorporated within the second prong of the three-part test for limited public figures – focuses on a plaintiff's *actions* that invite attention to them, rather than the volume of their press clippings.  For example, in *Silvester*, the Circuit held that the fact that the plaintiffs voluntarily "held positions of prominence in an industry" that was controversial invited attention and comment.  *Id.* at 1497.  *See also Little v. Breland*, 93 F.3d 755 (11th Cir. 1996) (by virtue of voluntarily becoming the president of non-profit to attract conventions to Mobile, Alabama, plaintiff invited attention and comment).

Here, the record makes clear that Plaintiffs engaged in conduct that "invited attention and comment."  They engaged multiple public relations agencies and solicited interviews with scores of major media journalists.  Defs. SUMF ¶¶ 25-31, 48-61.  They aggressively entered the Russian internet market by holding a press conference, speaking at a major forum, soliciting the attention of high-level government officials, and touting themselves as a transformative influence and guarantors of compliance with controversial data privacy laws.  *Id.* ¶¶ 32-47.  And, like the plaintiffs in *Silvester*, before those events Plaintiffs had voluntarily assumed positions of prominence in a highly controversial industry (online pornography), including creating both public fora (the conferences) and media (the magazine) "to improve the status of the Russian language segment in [the] international online business."  *Id.* ¶¶ 4-18.

Plaintiffs' motion largely ignores those points, and instead pre-emptively attacks Defendants for allegedly intending to "slime" Plaintiffs with "irrelevant" references to "pornography."  Pl. Br. at 2-3.  And here as well, they might have done better to wait and see what Defendants' actual "positions" are.  The point is not, as Plaintiffs imply, whether "there is pornography on the internet."  *Id.* at 3.  Rather, the point is that for purposes of a case in which Plaintiffs are seeking hundreds of millions of dollars because they allege they were falsely accused of illicitly using "porn traffic" in the service of Russian interests, their voluntary actions to promote and legitimize "porn traffic" in the "Russian language segment" are among the many facts that are directly relevant to whether they previously "invited attention and comment" to themselves.

Moreover, the Dossier was hardly the first time that Webzilla has received public scrutiny from investigative journalists, child welfare organizations, and American companies and trade associations for its practices regarding "porn traffic."  *See* Siegel Decl. Exs. 129-132, 134-35.  When Christopher Steele was writing Report No. 166, he accessed one of those reports from 2009 as part of assessing the credibility of the allegations against Plaintiffs.  Siegel Decl. Ex. 133 [Steele Depo.] at 47:11-18.  And when Fusion received Report No. 166, they too sought to independently assess the credibility of the allegations against Plaintiffs:

> We undertook a litigation search of XBT and Webzilla and a public record search with the internet.  We found extensive allegations, credible allegations.  Paragraph 3 talks about porn traffic.  We found a number of websites hosted by Webzilla [names of pornographic websites omitted] . . . We found extensive allegations in the public record from credible people like motion picture associations in filings to the U.S. and comments to the U.S. Copyright Office that Webzilla had ignored repeated entreaties to take down pirated traffic particularly in pornography.

Siegel Resp. Decl. Ex. 8 [Fusion Depo.] at 188:7-192:9.  In short, the undisputed facts show that Plaintiffs' prior conduct regarding "porn traffic" invited public attention that later directly contributed to the creation of the allegedly defamatory statements.  While those facts may be uncomfortable for Plaintiffs, they are hardly "wholly irrelevant" to assessing their status as public figures.

## II.   PLAINTIFFS ARE LIMITED PUBLIC FIGURES

The next step in the Court's inquiry is well-established:  "the court must (1) isolate the public controversy, (2) examine the plaintiffs' involvement in the controversy, and (3) determine whether 'the alleged defamation [was] germane to the plaintiffs' participation in the

controversy.'"  *Silvester*, 839 F.2d at 1494 (quoting *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980)).

### A.       Plaintiffs Misidentify the Relevant Public Controversies

Once again, Plaintiffs begin this part of their argument not by assessing the case law, but rather by basing their argument entirely on how they claim *Defendants* define the relevant controversy.  Not surprisingly, the straw-man position they posit defines the controversy very narrowly, as either "the meddling of the Russian government in the election in the United States of America" or even more narrowly as whether Plaintiffs hacked the DNC.  Pl. Br. at 13.  Either definition proves to be highly convenient for Plaintiffs, as the rest of their brief argues that apart from perhaps the *Bloomberg* article about Trump and Alfa Bank, all other public relations activity and press coverage is irrelevant and nothing more than a plot to "slime" them.  Pl. Br. at 14-19.  But once again their arguments all miss the mark, because most of the public controversies the allegedly defamatory statements relate to are much broader than that.

When defining the relevant controversy, "a court may find that there are multiple potential controversies, and it is often true that a narrow controversy may be a phase of another, broader one." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 586 (D.C. Cir. 2016) (citation and internal quotation marks omitted), *cert. denied*, 137 S. Ct. 1434 (2017).  *See also, e.g.*, *Little*, 93 F.3d at 757 (identifying two public controversies); *Tavoulareas v. Piro*, 817 F.2d 762, 773-74 (D.C. Cir. 1987) (identifying broad and narrow public controversies).  *Waldbaum* itself illustrates this point.  The actual news item at issue in that case was a very brief report of the plaintiff's termination as the CEO of a supermarket cooperative.  627 F.2d at 1290.  But none of the relevant public controversies the Court identified were about the plaintiff's job performance.  Rather, they were much more broadly defined and "overlapping," including "the viability of cooperatives as a form of commercial enterprise" as well as "unit pricing, open dating . . . and other issues." *Id.* at 1299.  Likewise, in *Dubai World Corp. v. Jaubert*, No. 09-14314-CIV, 2011 WL 579213 (S.D. Fla. Feb. 9, 2011), the allegedly defamatory statement accused a Dubai-based businessman of fraudulently overbilling his customers.  However, Judge Martinez held that "considering the larger context of the Washington Post article," the relevant controversies included "corporate fraud" and "whether or not foreigners are safe in Dubai." *Id.* at *15.

Moreover, courts expressly reject plaintiffs' machinations to try to frame the "public controversy" so narrowly as to be coterminous with the allegedly defamatory statements.  As one

court put it, "it would be inappropriate to shrink all controversies to the specific statements of which a plaintiff complains" – especially where, as here, the statements at issue "are a part of, and clearly related to, a much larger story" and "part of an article covering more ground than simply" allegations related to the plaintiff. *Nat'l Life Ins. Co. v. Phillips Publ'g, Inc.*, 793 F. Supp. 627, 637-38 (D. Md. 1992). Likewise, in *Hatfill v. New York Times Co.*, 532 F.3d 312 (4th Cir. 2008), the plaintiff research scientist sued over a series of editorial columns presenting evidence suggesting that he should be a prime suspect in the 2001 anthrax attacks. Dr. Hatfill – like Plaintiffs – urged the court to interpret the "particular public controversy" narrowly, encompassing only "who committed the anthrax attacks in 2001," or even just whether he committed them. 532 F.3d at 322. The Fourth Circuit rejected that position, holding that the statements about the plaintiff related to a "larger debate" about "the government's efforts to protect the nation from a bioterrorist attack." *Id.* at 323. *See also Jankovic*, 822 F.3d at 585-86 ("The court has defined controversies as being broader than the narrower discussion contained in the defamatory document."); *Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 529-30 (6th Cir. 2014) (finding plaintiff's struggle with student loans to be relevant to the broader public controversy regarding whether graduates are overburdened by debt).

As explained in Defendants' motion, the statements at issue here relate to several public controversies. Most broadly, there were preexisting public controversies relating to cybersecurity and cybercrime, including the use of "botnets" and "porn traffic." More narrowly, there was a preexisting controversy concerning malicious cyberactivity involving Russian and Russian-aligned actors, including the use of botnets and porn traffic. And most narrowly, there was a controversy about Russian interference in the 2016 election. Defs. Br. at 10, 15; Defs. SUMF ¶ 79. The Court need not identify one controversy to the exclusion of any other.

### B.   Plaintiffs Involved Themselves in the Identified Public Controversies

The second prong "examine[s] the plaintiffs' involvement in the controvers[ies]." *Silvester*, 839 F.2d at 1494. And once again, Plaintiffs set up their argument by positing the arguments they say that "Defendants intend to rely on" and then proceed to "rebut" them.[8]  But

---

[8] Those imagined arguments include "engaging in normal publicity efforts" (namely advertising), Pl. Br. at 14; what Plaintiffs characterize as "unsuccessful efforts to obtain publicity," *id.* at 15; "speaking to small industry groups and writing articles for small niche industry publications," "merely achieving a degree of recognition in a particular field," *id.* at 16; and "the fact that the media gave a plaintiff the opportunity to respond to defamatory statements," *id.* at 17.

here too, the reasons Plaintiffs are limited public figures bear little relationship to the "position" that Plaintiffs imagine.  Plaintiffs essentially posit the second prong of the test as one that just measures the volume of a plaintiff's actual press clippings.  Pl. Br. at 15.  Even if that were so, Plaintiffs would still be limited public figures given the media coverage they invited and received.  However, their characterization of what it means to be "involved" in a public controversy is wholly inconsistent with both the law of this Circuit and the basic principles underlying the limited public figure doctrine.

As explained in Defendants' brief in support of their motion for partial summary judgment, this Circuit has emphasized two ways to become involved in controversies.  One is to "voluntarily engage[] in a course [of conduct] that was bound to invite attention and comments." *Silvester*, 839 F.2d at 1496 (quoting *Rosanova v. Playboy Enters.*, 411 F. Supp. 440, 444-45 (S.D. Ga. 1976), *aff'd*, 580 F.2d 859 (5th Cir. 1978)).  For example, "voluntarily entering a strictly regulated, high-profile industry" can suffice to "invite[d] public scrutiny, discussions and criticism" even if media attention was not sought by the plaintiff.  *Id*. at 1497.  Likewise, the fact that a plaintiff had publicly associated himself with figures in organized crime made him a limited public figure with respect to an article describing him as a "mobster." *Rosanova*, 411 F. Supp. at 444-45.  *See also McDowell v. Paiewonsky*, 769 F.2d 942, 949 (3d Cir. 1985) ("When an individual undertakes a course of conduct that invites attention, even though such attention is neither sought nor desired, he may be deemed a public figure.").  Indeed, *Waldbaum* illustrates how the public figure inquiry involves more than just counting press clippings.  The plaintiff in *Walbaum* "was not frequently the subject of articles," 627 F.2d at 1300, and even the defamatory statement at issue appeared in a five-sentence article on page 35 of a supermarket industry newsletter. *Id.* at 1290.  But he was deemed a limited public figure because he had been an active CEO of a company that advocated for controversial polices within that industry.

Another way to become involved in public controversies is to affirmatively seek attention in the media and/or in other public fora.  *Silvester*, 839 F.2d at 1497.  Thus, speaking at press conferences, public meetings, and communicating with government officials is also voluntary conduct that invites attention.  *Carr v. Forbes, Inc.*, 121 F. Supp. 2d 485, 491 (D.S.C. 2000), *aff'd*, 259 F.3d 273 (4th Cir. 2001).  *See also Waldbaum*, 627 F.2d at 1300 (even though plaintiff received little press coverage, "he was somewhat familiar with press operations and had held

press conferences to discuss Greenbelt's policies and operations").  And the amount of media attention a plaintiff actually receives is also a relevant, but not dispositive factor.  *Id.*

Here, "looking at the overall picture" (*id.*), Plaintiffs were materially involved in all the identified public controversies.  The reasons why are set forth in detail on pages 16-19 of Defendants' partial summary judgment brief and the exhibits cited thereto, and rather than repeat them here Defendants refer the Court to that briefing.

By contrast, Plaintiffs' arguments as to why they are not limited public figures all miss the mark, because they are based on their erroneous speculation about what "Defendants intend to rely" on, rather than what Defendants actually argue.  Pl. Br. at 14.  First, Plaintiffs cite a number of cases for the unremarkable point that garden-variety advertising by a company does not, on its own, necessarily confer public figure status.  *Id.*  But Defendants' arguments do not rely on any advertising by Plaintiffs, and indeed the cases they cite only underscore why Plaintiffs *are* public figures based on the record here.

For example, in *Long v. Cooper*, 848 F.2d 1202, 1205 (11th Cir. 1988), the Eleventh Circuit found that a local electronics business's "mainstream" advertising practices were not sufficient to render it a limited public figure, because all it did was engage in direct-mail advertising that compared its prices to list prices.  *Id.* at 1205-06.  Even so, the Court noted that if the plaintiffs' advertisements had been a little edgier, such as by "ma[king] direct, specific comparisons of its prices to those of identified specialty dealers," the company and its president might well have become limited public figures.  *Id.* at 1205.[9]  More to the point, courts have consistently found that public relations campaigns to seek press coverage are quintessentially what qualifies corporate plaintiffs and their executives as limited public figures.[10]  Rather than

---

[9] The only advertising at issue at all in this case is Webzilla's ads touting itself as offering "liberal rules" to adult webmasters.  Given the controversial nature of "porn traffic," that is exactly the kind of advertising *Long* suggested would be relevant to a corporate plaintiff's limited public figure status.

[10] *See, e.g.*, *Lluberes*, 663 F.3d at 17 (plaintiffs were limited public figures where they "enjoyed access to the press" and "orchestrat[ed] a PR blitz"); *Patrick v. Cleveland Scene Publ'g*, 582 F. Supp. 2d 939, 951 (N.D. Ohio 2008) (plaintiff was a public figure in part because he "retained a public relations firm to represent his interests in the controversy"), *aff'd*, 360 F. App'x 592 (6th Cir. 2009); *Carr v. Forbes, Inc.*, 121 F. Supp. 2d 485, 492 (D.S.C. 2000) (plaintiff was a public figure in part because "his group paid a lobbyist/public relations firm over $1 million"), *aff'd*, 259 F.3d 273 (4th Cir. 2001); *FoodScience Corp. v. McGraw-Hill, Inc.*, 592 F. Supp. 362, 363, 365-66 (D.Vt. 1984) (plaintiff was a public figure in part because the company hired a "public

conventional advertising, Plaintiffs chose to "vigorously publicize" themselves as experts and "thought leaders" in the industry. Having "stepp[ed] into the public spotlight ... [they] must take the good with the bad." *Waldbaum*, 627 F.2d at 1294–95.[11]

Next, Plaintiffs' argue that their PR efforts were "unsuccessful" and therefore irrelevant to the public-figure inquiry. Pl. Br. at 15. But neither the law nor the facts support that assertion. Plaintiffs rely entirely on the presence of the word "successfully" in the first prong of the Second Circuit's four-part test for limited public figures, but even in that jurisdiction none of the cases they cite interpret that to mean that there is some threshold quantum of actual press coverage necessary to qualify as a public figure. To the contrary, *Waldbaum* and its progeny make clear that a plaintiff's prior conduct alone may be sufficient, and there are numerous examples of limited public figures who received little, if any prior press coverage, including within that Circuit. *See, e.g.*, *Fine v. ESPN*, No. 5:12-CV-0836, 2016 WL 6605107, at *7 (N.D.N.Y. Mar. 25, 2016) (wife of assistant college basketball coach who was a guest reporter

relations representative" in order "to influence and counter the adverse impact of the unfavorable publicity that attended the FDA investigation and subsequent litigation"); *OAO Alfa Bank v. Ctr. for Public Integrity*, 387 F. Supp. 2d 20, 45 (D.D.C. 2005) (plaintiffs were public figures in part because they "developed a well-coordinated and sophisticated public relations strategy through in-house press departments, external public relations firms, and corporate websites").

[11] At various points in their brief, Plaintiffs often cite to *Mitre Sports Int'l v. HBO*, 22 F. Supp. 3d 240 (S.D.N.Y. 2014), which found that a soccer-ball manufacturer was not a limited public figure with respect to allegations that its soccer balls were manufactured using child labor. While both the controversy at issue in *Mitre* and the nature of the defendant company's conduct was quite different from the circumstances presented here, there is in any event good reason to question whether *Mitre* correctly applied the Second Circuit's public figure jurisprudence. The decision seems at odds with New York cases finding companies with far less public outreach to be public figures. *See, e.g.*, *Arrigoni v. Velella*, 110 A.D.2d 601, 603-04 (N.Y. App. Div. 1985) (finding bus company that operated transit system of more than 300 buses with multi-million dollar annual revenues to be a public figure); *Samuels v. Berger*, 191 A.D.2d 627, 630 (N.Y. App. Div. 1993) (finding marine contracting company that purchased advertisements and otherwise attracted publicity to be a public figure). Moreover, as previously noted, in this Circuit cases like *Long* and *Silvester* make clear that corporate activity and communications, including even advertising, are likely to support finding public figure status where they address public controversies. The pattern of activity attributed to Mitre – including pre-existing press coverage of its manufacture of soccer balls using child labor, publicized corporate policies denouncing child labor, and participation in leading an international, informal treaty to eradicate child labor – would more than qualify it as a public figure under *Silvester* and its progeny. *See Mitre*, 22 F. Supp. 3d at 247-48, 251-52. However, the district court's interlocutory decision in *Mitre* was never reviewed on appeal, because the jury subsequently found that HBO did not act with gross irresponsibility.

once on a local TV station and a substitute co-anchor and guest on a local public-access); *Robertson v. Doe*, No. 05 Civ. 7046, 2010 WL 11527317, at *2 (S.D.N.Y. May 11, 2010) (plaintiff whose only media appearance was a single CNBC interview), *aff'd*, 443 F. App'x 659 (2d Cir. 2011); *Grass v. News Grp. Publ'ns*, 570 F. Supp. 178, 180-83 (S.D.N.Y. 1983) (plaintiff who sent more than two dozen letters to reporters, though the only letter resulting in press coverage was the allegedly defamatory article).

In any event, even if some threshold quantum of press coverage was required, Plaintiffs would easily meet it.  Between them they have organized conferences, published magazines, given press conferences, spoken at major public fora in Russia, and received coverage from *CNBC*, *Bloomberg*, *Business Insider*, *Forbes*, *VentureBeat*, *Inc.*, numerous Russian and European media outlets, as well as industry-specific media.  The case law is replete with examples of public figures who have had vastly less "success" in inviting attention to themselves.[12]  Moreover, Plaintiffs are simply wrong when they contend that their repeated efforts to tout their own prominence are "irrelevant" to the inquiry.  Pl Br. at 17 n.18.  *See Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) ("Given plaintiff Celle's own characterization of himself as a 'well known radio commentator' within the Metropolitan Filipino-American community, the district court correctly held that he is a public figure."); *Nat'l Life Ins. Co.*, 793 F. Supp. at 638 ("Finally, National Life itself struts its own prominence in its advertising and news articles.  Such self-definition has been considered a factor for determining prominence in the community.").

In their recitations of the "facts," Gubarev also repeatedly claims that he likes his privacy and doesn't want public attention.  Pl. SUMF ¶¶ 5-8.  While the facts certainly suggest otherwise, it makes no difference because Plaintiffs' actions are what is relevant, not their self-proclaimed personal desires:

> In our view of the law resulting from the inevitable collision between First
> Amendment freedoms and the right of privacy, the status of public figure Vel non
> does not depend upon the desires of an individual.  The purpose served by limited
> protection to the publisher of comment upon a public figure would often be

---

[12] *See, e.g.*, *Little*, 93 F.3d 755 (11th Cir. 1996) (president of non-profit to attract conventions to Mobile, Alabama); *Orr v. Argus-Press Co.*, 586 F.2d 1108 (6th Cir. 1978) (developer of shopping mall in Owosso, Michigan); *Bourne v. Arruda*, No. 10-cv-393, 2013 WL 93637, at *2 (D.N.H. Jan. 8, 2013) (individual who sent letter to local newspaper for publication); *James v. Gannett Co.*, 40 N.Y.2d 415 (1976) (nightclub belly dancer in Rochester, New York).

> frustrated if the subject of the publication could choose whether or not he would be a public figure. . .  It is no answer to the assertion that one is a public figure to say, truthfully, that one doesn't choose to be.

*Rosanova*, 580 F.2d at 861.  Likewise, it is irrelevant whether the purpose of Plaintiffs' publicity efforts was to ultimately sell more products and services.  *Silvester v. Am. Broad. Cos.*, 650 F. Supp. 766, 776 (S.D. Fla. 1986) (plaintiffs who become involved in public controversies to "promot[e] their business ventures in the hearty spirit of capitalism" are equally public figures), *aff'd*, 839 F.2d 1491 (11th Cir. 1988).

Finally, even if the *only* controversy at issue was Russian interference in the 2016 election, as Plaintiffs (erroneously) maintain, the result would be the same.  There is no dispute that Gubarev, on behalf of Plaintiffs, voluntarily provided information to a reporter that disputed allegations that the Trump campaign was communicating with a key Russian entity via their servers.  He also specifically requested that his company be "referenced" in the article, and invited the reporter to ask any follow-up inquires.  Defs. SUMF ¶¶ 56-61.  Nor was that exchange an isolated incident that was the product of some coincidence.  Rather, the reporter knew Gubarev as "the CEO of XBT Holding" and reached out to him as a "specialist," because Plaintiffs' had previously promoted Gubarev to Bloomberg as an "expert" and "thought leader" regarding "Russian tech."  Bershidsky Decl. ¶¶ 3-4; Defs. SUMF ¶¶ 51-55.  Particularly given the significance of the election controversy, that readily qualifies Plaintiffs as limited public figures.  *See Diaz v. Bd. of Educ. of Twp. of S. Brunswick*, No. 05-4667, 2006 WL 3490339 (D.N.J. Dec. 1, 2006) (plaintiff who was fired as a middle school teacher a month before the 2004 presidential election and appeared in the news to allege she was fired for partisan reasons was a limited public figure, given the proximity to the election); *Bourne*, 2013 WL 93637, at *2 (individual who sent a letter to local newspaper for publication was a limited public figure because he "plainly thrust himself into the public arena with respect to the issues raised in the letter"); *Grass*, 570 F. Supp. at 183 (plaintiff who sent letters to reporters correcting their reporting about a gubernatorial candidate was a limited public figure).

Plaintiffs offer essentially two arguments to the contrary.  First, they argue that they only played a "minor" rather than a "central" role in any controversy, including the election, relying primarily on *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157 (1979).  Pl. Br. at 17-18.  To the contrary, *Wolston* cogently illustrates why Plaintiffs' involvement in any of the relevant controversies, including the 2016 election, was sufficient to render them limited public figures.

Like this case, *Wolston* implicated a very broad controversy:  "Soviet espionage in the 1940's and 1950's."  443 U.S. at 165.  The plaintiff in *Wolston* had been identified (falsely, he alleged) in the defendant's book as one of numerous Soviet spies during that period.  But the plaintiff's only actual involvement in any espionage investigation was that he received a grand jury subpoena, failed to appear, and was cited for contempt.  His subsequent criminal proceedings then received some media coverage.  *Id.* at 162-63.  The Court held that he was not a public figure, because, like the attorney-plaintiff in *Gertz*, he "never discussed this matter with the press and limited his involvement to that necessary to defend himself against the contempt charge."  *Id.* at 167.  Similarly, in *Hutchinson v. Proxmire*, 443 U.S. 111 (1979), the Court held that a research scientist who received a government grant was not a public figure for purposes of a broad controversy like "concern about general public expenditures," because the scientist had never said anything publicly about "the broad question of concern about expenditures."  *Id.* at 135.

Those cases make clear that to be "involved" or play more than a "minor" role in a controversy, particularly ones as broadly defined as Soviet espionage or the federal budget, it is not necessary to be a world leader or to change the course of history, as the logic of Plaintiffs' argument implies.  If that were so, then the limited public figure category would be largely irrelevant, because the only persons who might qualify would likely be general public figures anyway.  Rather, as *Wolston* notes, engaging in voluntarily action to influence public opinion like "discuss[ing] this matter with the press" is the kind of activity likely to render a plaintiff a limited public figure – even if the plaintiff makes one contribution to a much larger debate.

For example, in *Colodny v. Iverson, Yoakum, Papiano & Hatch*, 936 F. Supp. 917 (M.D. Fla. 1996), the plaintiff wrote a book about former White House lawyer John Dean's role in the Watergate scandal.  No one suggested that the plaintiff's book altered history's understanding of "one of the most notorious events in American history," or had any significant lasting influence at all.  *Id.* at 922.  Nonetheless, the Court held that by virtue of publishing the book, the plaintiff had "participated sufficiently in that controversy" and had "easily acquired limited public figure status."  *Id.*  Likewise, in *Faltas v. State Newspaper*, 928 F. Supp. 637 (D.S.C. 1996), *aff'd*, 155 F.3d 557 (4th Cir. 1998), a doctor in Columbia, South Carolina wrote an op-ed in the local newspaper arguing that homosexuality was far more rare than current science suggested.  The court found the relevant public controversies to be "what should be taught about homosexuality

17

and whether it was appropriate to place restrictions on the rights of homosexuals." *Id.* at 645. There as well, no one suggested that article in a small South Carolina newspaper played any role in actually influencing the national resolution of those questions, which continue to generate controversy even today. But the Court held that the plaintiff "clearly voluntarily assumed a role of special prominence in a public controversy." *Id.* Likewise, in *Diaz*, the plaintiff was fired as a middle school teacher a month before the 2004 U.S. presidential election, and appeared in the news to allege she was fired for partisan reasons. The court held that, especially given the proximity of those events to a national election, she was a limited public figure. 2006 WL 3490339 at *2.

Here too, all of the identified public controversies – be it cybersecurity involving "porn traffic" and "botnets" in general, Russian-related malicious cyber-activity in particular, or Russia's interference in the 2016 election – are major matters of domestic and international significance that will likely remain so for years, if not decades. No one would seriously suggest that the actions of Plaintiffs, nor even many world leaders, necessarily would ultimately influence any final "resolution" of those controversies (if they ever even "resolve"). But the law is clear that one does not need to be President Putin or President Trump to qualify as a limited public figure for purposes of a defamation case implicating those controversies. Rather, the totality of all of the voluntarily actions plaintiffs have undertaken, statements they have made, and news coverage they have received is considerably more than what courts have found suffices to qualify numerous other defamation plaintiffs as limited public figures. And that is especially so here, where Plaintiffs maintain their comments in the *Bloomberg* article were sufficiently significant and controversial that they were the cause of their inclusion in the Dossier. Defs. SUMF ¶ 78.

Plaintiffs' only other response is to engage in hair-splitting, semantic assertions that Gubarev "did not consider [the *Bloomberg* reporter's] request to be political in nature," nor did the reporter "seek from Gubarev concerning the political ramifications of my story." Pl. SUMF ¶¶ 30, 32. Here too, those vague and self-serving declarations of subjective intent are irrelevant. The *Bloomberg* reporter did not ask him to help get a virus off his computer; rather he asked Gubarev to help him with "technical details" about "a great scandal under American election campaign programme." Shayefar Decl. Ex. 44. Mr. Bershidsky further explained to Gubarev that the election "scandal" was about a server registered to the Trump campaign allegedly

engaging in "secret communications with servers of Russian Alpha [*sic*] Bank," so those "technical details" went directly to the heart of the story's accuracy. *Id.* Gubarev responded that "our opinion is that the story is a far-fetched f--k". *Id.* Gubarev later characterized Plaintiffs' contribution as a "report for Bloomberg about fake news that Trump servers have connections to Alfa bank servers." Siegel Decl. Ex. 117.

So while no one maintains that Gubarev was asked whether he favored Donald Trump or Hillary Clinton, there is no dispute that Gubarev understood that the "expert opinion" he provided spoke to accuracy of "scandal[ous]" allegations concerning the U.S. presidential election. Had the plaintiff in *Colodny* written a book analyzing the "technical details" of the infamous 18-minute gap in one of the Watergate-era White House tapes to opine on its cause, he would not have been any less a limited public figure even assuming he was a professional engineer whose subjective interest in the topic was professional rather than partisan. *See Hatfill*, 532 F.3d at 323 (where "an expert in a field claims defamation when a news publication later suggests he might have committed a crime relevant to that field," the expert has been found to be a public figure).

In sum, the record reflects that Plaintiffs affirmatively involved themselves in multiple public controversies concerning cybersecurity, technology, and the Russian tech sector. *Dacey v. Fla. Bar, Inc.*, 427 F.2d 1292, 1295 (5th Cir. 1970).

## C.    Plaintiffs' Role in these Public Controversies is Germane to the Allegedly Defamatory Statements

Finally, there is an obvious relationship between a Dossier alleging that Plaintiffs were misusing porn traffic and botnets to aid Russian state interests, and Plaintiffs' prior efforts to publicly legitimize Russian-related "porn traffic, invite comment as experts and thought leaders on 'Russia tech' and cybersecurity, tout themselves as transformative players within the Russian internet sphere, and utilize their expertise to help debunk a major allegation of Russia-Trump collusion." *See* Defs. Br. at 19-20. Because Plaintiffs assume that Defendants contend the only relevant controversy is Russian election interference, and their only relevant conduct is what they said to *Bloomberg*, here too their arguments miss the mark.

But even if the election was the only controversy at issue, there is an obvious connection between the allegedly defamatory statements and Plaintiffs' comments to *Bloomberg*. Plaintiffs' argument seems to be that because Report No. 166 mentions one type of alleged Russian interference (hacking Democrats), and not another (Alfa Bank), its allegations are not "germane"

to Plaintiffs comments to Bloomberg. *Id.* They further contend that "the Dossier as a whole fails to make mention of any such connection" between Trump and Alfa Bank servers. *Id.* at 20.

Plaintiffs are simply wrong, as to both the law and the facts. The "germaneness" requirement is broadly construed, excluding only statements that are "*wholly unrelated* to the controversy." *Waldbaum*, 627 F.2d at 1298. (emphasis added). There need not be a precise, one-to-one match between what the defamatory statements say and what a plaintiff previously said. *See Fine*, 2016 WL 6605107 at *6 ("The law requires only that the statement need be no more than generally related to a dispute in issue to qualify for protection.") (citation omitted); *OAO Alfa Bank*, 387 F. Supp. 2d at 44 (allegations of corruption by two Russian oligarch plaintiffs were germane to the public controversy over corruption in post-Soviet Russia, noting that "[a]t the very least, it can safely be said that these statements are not 'wholly unrelated' to this broader debate"). The Dossier's allegation that Plaintiffs were among the FSB-directed hackers assisting the Trump campaign is obviously relevant to assessing their prior media comments supporting a Trump campaign claim denying cyber-collusion. In fact, the *Bloomberg* article itself related the Trump-Alfa Bank allegation to other allegations of collusion, including the DNC hack, and argued there was no evidence of any collusion. *See* Defs. 56.1 Resp. ¶ 34.

Moreover, even if the third prong were construed as narrowly as Plaintiffs suggest, it would make no difference. One of the reports within the Dossier is entirely about Alfa Bank and its principals. *See* Defs. 56.1 Resp. ¶ 35. As a result, those principals have filed three separate defamation lawsuits against BuzzFeed, Steele, and Fusion GPS. Each one alleges that the Dossier falsely links them to Russian interference in the election. *See* Siegel Resp. Decl. Ex. 9, ¶¶ 2, 31; *id.* Ex. 10, ¶¶ 4, 19, 23; *id.* Ex. 11, ¶¶ 17-18, 22, 27. In short, whether construed broadly or narrowly, the allegedly defamatory allegations in the Dossier are germane to Plaintiffs' involvement in public controversies.

## CONCLUSION

For the reasons above and in Defendants' motion for partial summary judgment, the Court should deny Plaintiffs' motion and find that Plaintiffs are limited-purpose public figures.

Dated:  October 1, 2018                 Respectfully submitted,

*Of Counsel*:                           /s/ Katherine M. Bolger
Nabiha Syed                             Katherine M. Bolger
BuzzFeed, Inc.                          Nathan Siegel
11 E. 18th Street, 13th Floor           Adam Lazier
New York, NY 10003                      Alison Schary
                                        Davis Wright Tremaine LLP
                                        1251 Avenue of the Americas, 21st Floor
                                        New York, New York 10020
                                        katebolger@dwt.com
                                        nathansiegel@dwt.com
                                        adamlazier@dwt.com
                                        alisonschary@dwt.com

                                        /s/ Roy Black
                                        Roy Black
                                        Jared Lopez
                                        Black, Srebnick, Kornspan & Stumpf, P.A.
                                        201 So. Biscayne Boulevard
                                        Miami, Florida 33131
                                        rblack@royblack.com
                                        jlopez@royblack.com

                                        *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing, together with its exhibits, will be served electronically by email on all counsel or parties of record on the service list below this 1st day of October, 2018.

By: /s/ Jared Lopez
Jared Lopez, Esq.

## SERVICE LIST

Matthew Shayefar
Valentin D. Gurvits
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1806
Facsimile: 617-928-1802
matt@bostonlawgroup.com
vgurvits@bostonlawgroup.com

Evan Fray-Witzer
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-000
Facsimile: 617-423-4855
Evan@CFWLegal.com

Brady J. Cobb
Dylan Fulop
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com
dfulop@cobbeddy.com