**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

ALEKSEJ GUBAREV,
XBT HOLDING S.A., and
WEBZILLA, INC.
    Plaintiffs,

v.

BUZZFEED, INC. and
BEN SMITH
    Defendants.

**Case No.**

**0:17-cv-60426-UU**

**PLAINTIFFS' OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

*"Having advanced an argument that calls for red meat and strong drink,*
*appellant offers us stale bread and tepid water to nourish it."*
--*Northern Heel Corp. v. Compo Indus.*, 851 F.2d 456 (1st Cir. 1988)

## Introduction

Plaintiffs are not naïve – they understand that the Court has, at times, expressed a certain level of healthy skepticism that Plaintiffs' claims could survive Defendants' Fair Report Privilege defense. With discovery now closed, however, Plaintiffs believe that the evidence will sweep away that skepticism. And, although Defendants throw in two additional arguments in support of their Motion for Summary Judgment – an argument that they made no defamatory accusations concerning Plaintiffs and an argument that Plaintiffs cannot prove the requisite level of fault – neither of those arguments fare any better. As such, Defendants' Motion should be denied in its entirety.

Rather than burden the Court with two recitations of the facts – one in this opposition and another in Plaintiffs' Opposition to Defendants' Statement of Undisputed Material Facts filed herewith ["POSMF"], Plaintiffs incorporate by reference the POSMF. Specific factual issues related to Plaintiffs' arguments are discussed, below, as needed.

## Argument

**I.    With Discovery Now Complete, it is Evident that Defendants Cannot Meet Their Burden of Proof to Invoke the Fair Report Privilege.**

Under New York law (which this Court has held applicable in this action with respect to privilege), the fair report privilege is codified in New York Civil Rights Law Section 74:

> A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published.
> 　　　This section does not apply to a libel contained in any other matter added by any person concerned in the publication; or in the report of anything said or done at the time and place of such a proceeding which was not a part thereof.

NYCRL §74. Under this statute, Defendants bear the burden of proving: (1) that the report containing the defamatory statements was a fair and true account of (2) an official proceeding, and (3) that an ordinary reader would understand the defamatory statements to have been part of the official proceedings. And, although Plaintiffs are well aware that this Court provisionally found that Defendants would likely be able to meet these three hurdles, at the conclusion of discovery, it is clear that they cannot.

2

A.    Defendants Cannot Demonstrate that their Report was Fair or True and Indeed, there is Every Indication that it was Neither.

Under Section 74, a report of an official action is only entitled to protection if it is a "fair and true" report of the proceeding.  NYCRL §74.  And, although the report does not require a "lexicographer's precision," it is well established that a report "cannot be said to be "substantially accurate," ... if it would have a "different effect" on the mind of the recipient than the "actual truth."  In other words, Section 74 does not afford protection if the specific statements at issue, considered in their context, suggest[] more serious conduct than that actually suggested in the official proceeding."  *Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 119 (2d Cir. 2005) (some internal quotation marks omitted).  *See, also, D'Annunzio v. Ayken, Inc*., 876 F. Supp. 2d 211, 218 (E.D.N.Y. 2012) ("[T]he privilege does not extend to statements in a report that imply misconduct beyond that alleged in the judicial proceeding on which the report is based. 'If the published account, along with the rest of the article, suggests more serious conduct than that actually suggested in the official proceeding, then the privilege does not attach, as a matter of law.'" (quoting *Daniel Goldreyer, Ltd. v. Van de Wetering*, 630 N.Y.S.2d 18 (1st Dep't 1995))); *Martin v. Daily News L.P.*, 2014 NY Slip Op 5369, ¶ 8, 121 A.D.3d 90, 101, 990 N.Y.S.2d 473, 482 (App. Div.) (privilege does not apply when, "as a result of this missing information and Louis's careless reporting, the columns created a false impression"); *Calvin Klein Trademark Tr. v. Wachner*, 129 F. Supp. 2d 248, 253 (S.D.N.Y. 2001) ("A report cannot be said to be 'substantially accurate,' however, if it would have a 'different effect' on the mind of the recipient than the 'actual truth.'  In other words, Section 74 does not afford protection if the specific statements at issue, considered in their context, 'suggest[] more serious conduct than that actually suggested in the official proceeding.'").  Here, Defendants have not and cannot meet their burden of proof that their report was "fair and true" because (even now) they do not and cannot actually know the scope and extent of the so-called "official proceeding."

Preliminarily, although it is understandable why Defendants continue to pretend that the "Dossier" is a single document, it simply is not.  The so-called "Dossier" is actually 17 separate memos produced on different dates; provided to different individuals; and transmitted at different times.  Indeed, Defendants' own undisputed facts acknowledge as much.  *See* Defendants' Statement of Undisputed Material Facts ["DSMF"], ¶¶ 7, 18, 25, 28, 31, 33.  For example, it is undisputed that when Christopher Steele first showed David Kramer the memos, he had not yet

3

authored the December Memo, which is the only memorandum at issue in this case.  DSMF, ¶ 25.  Similarly, it is undisputed that when Fusion first provided Kramer with these same memoranda, they provided him only with the first 16 memoranda and Kramer, in turn, only provided Senator McCain with the same 16 memoranda.[1]  DSMF, ¶¶ 28.  According to Steele, although the earlier memos had been discussed with and/or provided more widely to government officials and the media, he only provided the December Memo to Kramer (through Fusion) and one British government official.  DSMF, ¶¶ 34-36.

Indeed, in addition to the version of the memos provided to the FBI by McCain, Fusion provided a copy of the pre-election memos to DOJ official Bruce Ohr in November 2016.  POSMF, ¶ 14.  At some point, Fusion *may have* provided Mr. Ohr with a copy of the December Memo, though it could not recall one way or another.  *Id.*  The FBI also received a version of the pre-election memos from Mother Jones reporter David Corn.  POSMF, ¶ 13.

This is not to say that the December Memo did not ultimately find its way into the hands of the FBI.  The FBI's affidavit makes it clear that it did.  *See* Exhibit 8 to Bulger Decl.  The FBI's affidavit also acknowledges (as Defendants requested) that, prior to January 10, 2017, President Obama was briefed "about allegations contained in the Dossier."  *Id.*  It is not enough. In order to support Defendants' contention that their "report" was "true and fair," at least three other facts needed to be established: (1) that the briefing to President Obama took place on a date *after* the government received the December Memo; (2) that information from the December Memo was actually part of the briefing to the President; and (3) that the content of the briefing suggested in some way that the intelligence community was taking the *contents* of the Dossier itself (and not just its existence) seriously.

For example, the FBI's affidavit says only that someone at the FBI had possession of December Memo prior to January 10, 2017.  Other than that, it provides no specific date on which the memo was received.  Similarly, although the FBI's affidavit confirms that President Obama was briefed on (certain unspecified) allegations contained in an (unspecified) version of the "Dossier," prior to January 10, 2017, no more specific dates are provided.

*If*, for instance, the briefing to President Obama took place prior to December 13, 2016 (which is not ruled out by the facts confirmed by the FBI), then the briefing could not have

---

[1] Although Fusion subsequently provided Kramer with the December Memo, at that time McCain had already returned to Arizona and Kramer did not give him a copy.  POSMF, ¶ 34.

included the only memo relevant to this case.  In such an instance, Buzzfeed's publication of the December Memo – along with the "reporting" that the President had been briefed on the contents of the "Dossier" – would have led a reader to incorrectly conclude that the President had been briefed on the memorandum including the defamatory statements, even though he had not.

Similarly, although *someone* at the FBI *may have* physically received the December Memo *prior* to the briefing of the President (and, as noted, the FBI affidavit does not permit a that to be determined conclusively), if the December Memo had not worked its way to the higher levels of the FBI, its contents may not have been part of the briefing with Presidents Obama or Trump.  Again, if the December Memo was not yet part of what was being summarized, reporting that it was would not be "fair or true."  Finally, both James Comey and James Clapper have frequently stated that, because the contents of the Dossier had not been verified or its sourcing vetted, it was not considered part of the Intelligence Briefing to the Presidents, nor was it presented as such.  Instead – again, according to both Mr. Comey and Mr. Clapper – the two-page summary presented to the Presidents focused exclusively on the Dossier's most salacious aspects (e.g., alleged prostitution) and the President-elect was informed of the allegations **not** because the intelligence community was giving them credence substantively, but rather because they knew that the allegations were about to become public and they did not want to him to believe they had withheld the existence of the allegations from him.  POSMF, ¶ 42.

There is, of course, no way to actually know for sure what Messrs. Comey or Clapper said to the President, but, if it is in line with what each have said publicly, then the Buzzfeed's "reporting" (really, Buzzfeed's pointing to CNN's reporting) would leave the average reader with the mistaken belief that the allegations in the Dossier were being taken more seriously by the intelligence community than they were at the time.

Indeed, there is an area in which CNN's reporting about the "official proceeding" was demonstrably wrong, namely CNN's claim that McCain provided the FBI with a full copy of the Dossier.  The version of the "Dossier" that McCain gave to the FBI was not and could not have contained the December Memo since (as the FBI affidavit affirms), McCain only provided the FBI with the first 33 pages of the "Dossier" and he did so prior to the December Memo being written.  Nevertheless, Buzzfeed knowingly included this palpably false claim in its own report, setting off the words "full copy" in quotes precisely because they knew the claim to be wrong. POSMF, ¶ 61.  As such – because the CNN report falsely claims that McCain provided the *full*

"Dossier" to the FBI (including the December Memo) – the CNN report is not a "fair and true" report of the so-called "official proceeding" because it would leave the reader with a different impression about the allegations concerning Plaintiffs than would a true and fair report.  *See* Ex. 1 to Ex. 2 of Bulger Decl. ("CNN has reviewed a 35-page compilation of the memos.... CNN has also learned that on December 9, Senator John McCain gave a full copy of the memos – dated from June through December, 2016 – to FBI Director James Comey.").  All of this points up the inherent flaw in allowing Buzzfeed to take advantage of the fair report privilege simply by virtue of including a hyperlink to the CNN story.  There is no way to know if the copy of the memos published by Buzzfeed is the copy "reviewed" by CNN, or if either of those were the version briefed to the President (given that the government itself had multiple versions).

In a related vein, Buzzfeed's *own* reporting also leaves the reader with a different impression about the allegations concerning Plaintiffs than would a true and fair report. Buzzfeed claims in its article that "Harry Reid spokesman Adam Jentleson tweeted Tuesday that the former Senate Democratic leader had seen the documents before writing a public letter to FBI Director James Comey about Trump's ties to Russia."  Opp. Ex. 75.  The letter from Senator Reid to which Buzzfeed refers is dated October 30, 2016.  Ex. 39.  When Buzzfeed refers to "the documents," then (and it has clearly chosen its wording here carefully, though a reader would not know that), it *cannot* be referring to what it has actually published alongside those words, namely the full set of memos including the December Memo.  This is true because the December Memo had not yet been written when Senator Reid wrote his letter.  Contrary to Buzzfeed's implicit assertion, then, Senator Reid had *not* seen the version of the documents containing the December Memo at the time he wrote his letter to Comey.  Thus, a reader would be left with the incorrect impression that Senator Reid had read the allegations pertaining to Plaintiffs and that such allegations were part of Senator Reed's concerns when he wrote to Comey.

Because Buzzfeed's article then, could be seen as erroneous both in that it suggested that the President was briefed on the allegations contained in the December Memo (and, more specifically, the allegations concerning Plaintiffs) even though there is no evidence to support such an assertion, and because the article specifically claims that Senator Reid had seen "the documents" prior to writing to Comey, Buzzfeed's "report" cannot be found to be a fair and true report as a matter of law.  Accordingly, Buzzfeed is not entitled to the protections of Section 74. Or, at a minimum, the question presents a question of fact best left for a jury to decide.  *See, e.g.*,

*Wenz v. Becker*, 948 F.Supp. 319 (S.D.N.Y. 1996) (denying summary judgment where existed genuine issues of material fact as to whether the publication was a report on a judicial proceeding and, if it was, if it was fair and true); *Pisani v. Staten Island Univ. Hospital*, 440 F. Supp. 2d 168, 178 (E.D.N.Y. 2006) ("[B]ecause the Court finds that a reasonable jury could decide that the Hospital statement was not a fair and true report, the Court cannot conclude that, as a matter of law, the Hospital statement is protected by the judicial proceeding privilege.").

B.   Defendants Have Failed to Establish that there was any Official Action Concerning the December Memo or the Allegations Concerning Plaintiffs and, as Such, Cannot Prove that Element of their Defense.

Understanding, perhaps, that they would be unable to demonstrate what the law requires – that official action was taken ***concerning (at a minimum) the relevant document or (more likely) the defamatory statements themselves***, Defendants instead point to evidence of two separate – and inadequate – facts that they do believe they have established: (1) there was "official action" concerning ***some*** of the memos in the "Dossier;" and (2) the government was in ***possession*** of the December Memo at the relevant point in time.  Once again, it is not enough.

Plaintiffs have not brought suit alleging that they were defamed by the publication of 17 different memoranda written on different dates; they are alleging that they were defamed by the publication of a single document – the December Memo.  And, as this Court acknowledged in its preliminary order, for the privilege to apply the average reader must be able to "ascertain that what is reported as true is that there is an official proceeding underway or *official action being taken regarding the allegedly defamatory matter*...." D.E. 171, p. 13 (emphasis added).

This is, of course, consistent with both the plain language of Section 74 (which specifically excludes from protection "anything said or done" that was not part of the official proceeding), and the cases interpreting Section 74, which often look at each individual statement *alleged to be defamatory* and then ask the question of whether *that particular defamatory statement* was part of the judicial, legislative, or other official proceeding.  *See, e.g.*, *Greenberg v. Spitzer,* 2017 NY Slip Op 06432, ¶ 4, 62 N.Y.S.3d 372, 384 (App. Div.) (first holding that "it is incumbent on the party asserting the privilege 'to establish that the statements at issue reported on a judicial proceeding'" and then proceeding to determine, one by one, whether each alleged defamatory statement was part of a judicial proceeding); *Friedman v. Bloomberg L.P.*, 884 F.3d 83, 95 (2d Cir. 2017) (finding that while one alleged defamatory statement was entitled to protection under Section 74 as a fair report of a judicial proceeding, because a second alleged

7

defamatory comment "was in no way informing the public of what was 'go[ing] on in the courts' ... The § 74 privilege does not apply"); *Kenny v. Cleary*, 47 A.D.2d 531, 532, 363 N.Y.S.2d 606, 609 (App. Div. 1975) (examining each defamatory statement and concluding that certain statements that were "made before the commencement of [the] judicial proceeding ... do not qualify for absolute privilege"); *Freeze Right Refrigeration & Air Conditioning Servs., Inc. v. New York*, 475 N.Y.S.2d 383, 389 (App. Div. 1984) (although reporting on statements contained in a complaint were protected by Section 74, reporting on the defendant's denials of the allegations made is not "since it is the product of Blumenthal's own research after learning of the Department's findings.  Any discussion between Blumenthal and Malina is a matter dehors the scope of the official investigation.  In relevant part, section 74 also provides: [']This section does not apply to a libel contained in any other matter added by any person concerned in the publication; or in the report of anything said or done at the time and place of such a proceeding which was not a part thereof.[']  Thus, in order for the entire article to be beyond the reach of this complaint, recourse must be had to some doctrine in the law of defamation other than the absolute statutory privilege accorded to a report of an official proceeding.").

The proper question, then, is whether an average reader would have understood from Buzzfeed's article that there was some official action relating *to the defamatory statements made about Plaintiffs themselves*.  Putting aside the fact that there is no way that an average reader could have reached that conclusion from either Buzzfeed's article or CNN's article,[2] there is also

---

[2] This Court seemed to suggest in its earlier order that the Buzzfeed article *did* report on official proceedings concerning Plaintiffs because the Court believed the Buzzfeed article reported on official proceedings concerning Michael Cohen (and, by extension Plaintiffs, since the December Memo alleged that Mr. Cohen traveled to Prague and participated in a meeting concerning the plan to hack the Democratic National Committee).  D.E. 169, p. 18 ("The Dossier alleges that Plaintiffs were part of a cyber-operations scheme coordinated, at least in part, by Michael Cohen and the FSB.  The Article includes a statement from Michael Cohen denying all of the allegations in the Dossier.").  In this respect, though, the Court appears to have misapprehended Buzzfeed's reporting.  In stating that Mr. Cohen denied the allegations contained in the Dossier, Buzzfeed was not reporting that Mr. Cohen denied the allegations as part of a government investigation, but rather that he had told a *different* online publication, *Mic*, that the allegations were untrue.  *See* Buzzfeed's Article, Opp. Ex. 75 ("The Trump administration's transition team did not immediately respond to BuzzFeed News' request for comment.  However, the president-elect's attorney, Michael Cohen, told Mic that the allegations were absolutely false."); *Mic* article, Opp. Ex. 82.  *Mic*'s reporting on Mr. Cohen's denials of allegations is unquestionably outside of the scope of Section 74.  *See*, *generally*, *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209 (N.D.N.Y. 2014) (parsing each individual alleged defamatory statement and finding that those

no support in the FBI's affidavit (or elsewhere) for the proposition that the allegations concerning Plaintiffs actually *were* subject to any such investigation.[3]  And, indeed, there is absolutely no reason to believe that the allegations concerning Plaintiffs *were* subject to any official investigation: none of the Plaintiffs have ever been contacted by Special Counsel Robert Mueller, the F.B.I., the C.I.A., or any other government entity investigating the hacking of the DNC.[4]  POSMF, ¶ 11.  To the contrary, as a result of his extensive investigation, Special Counsel Mueller indicted twelve Russian intelligence officers.  POSMF, ¶ 11.

Similarly, the FBI's confirmation that it had the December Memo in its possession is not enough to demonstrate that it was the subject of any official action.  As the Courts have made clear, mere possession of a document by the relevant government actors does not automatically mean that reporting on such a document is protected by Section 74.  *See*, *e.g.*, *Abakporo v. Sahara Reporters*, 2011 U.S. Dist. LEXIS 109056 at *28-29 (E.D.N.Y. Sept. 26, 2011) ("Even assuming that the Petition reached the relevant Nigerian authorities, however, this fact would not transform the Petition into part of an 'official proceeding' under Section 74....  Construing the statutory privilege in the suggested manner would create a recipe for libel, as specious allegations could be broadcast with impunity once sent, even anonymously, to a government agency.  Both Courts of Appeals in this state have long cautioned against expanding immunity from defamation liability in this way."); *Stepanov v. Down Jones & Co., Inc.*, 2013 NY Slip Op 33584(U), ¶¶ 6-7 (Sup.Ct. April 18, 2013) (§74 inapplicable because, *inter alia*, "Defendant's

statements derived from interviews with ESPN not covered by the privilege even where they mirrored statements made as part of an official investigation).

[3] And, although Defendants have not proffered any evidence that the allegations concerning Plaintiffs were the subject of an official proceeding, it should also be noted that there is no public policy reason to afford the protections of the Fair Report Privilege to a lucky guess.  In other words, the privilege should not allow a defendant to make a wild guess about the existence of some "official action" (without any actual knowledge), yet escape liability if, after the fact, they are able to show that – by sheer luck – their original allegations were true.  *See*, *e.g.*, *Buffalino v. Associated Press*, 692 F.2d 266, 271 (2d Cir. 1982) ("The rule applied by the District Court does not serve that policy because it does nothing to encourage the initial reporting of public records and proceedings.  Certainly §611 should not be interpreted to protect unattributed, defamatory statements supported after-the-fact through a frantic search of official records.")

[4] As this Court knows, Plaintiffs were contacted by both the House and Senate Committees investigating Russian attempts to influence the 2016 Presidential elections, but only in an attempt to secure copies of the deposition transcripts of Mr. Steele and Mr. Kramer, not because they wished to question the Plaintiffs about their alleged involvement in any wrongdoing.

argument that the article is comparable to reports based solely on pleadings filed in a U.S. court is unavailing.  Filing a summons and complaint commences an action in court ... while a complaint submitted to an Attorney General may or may not commence an investigation."). Other courts have reached similar conclusions.  *See, e.g., Butcher v. Univ. of Mass.*, 94 Mass.App.Ct. 33, 40 (2018) ("[T]he fair report privilege 'does not apply to witness statements to police, whether appearing in an official police report or not, where no official police action is taken.'...  Extending the privilege to a witness's allegations merely because they appear in a police blotter does not further the doctrine's purpose of allowing the public to learn of official actions affecting the public interest."); *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 89 (D.C. 1980) ("[T]he Star's reliance on the 'hot line' log as an official document to provide occasion for the official report privilege is misplaced and incorrect.  This log representing the oral police communication from which the Star composed its article does not carry the dignity and authoritative weight as a record for which the common law sought to provide a reporting privilege.  Mere inaccurate business records of some sort ... will not suffice to create an official record to which the reporting privilege will attach.").

Because Buzzfeed has failed to establish that an official proceeding existed concerning either the alleged defamatory allegations or the December Memo, Buzzfeed's "reporting" is not entitled to the protections of Section 74.  Or, again, at a minimum, the question presents a question of fact best left for a jury to decide.  *See, e.g., Wenz*, 948 F.Supp. 319; *Ocean State Seafood, Inc. v. Capital Newspaper, Div. of Hearst Corp.*, 492 N.Y.S.2d 175, 179 (App. Div. 1985) ("We are similarly of the view that a jury question is also presented with respect to defendants' defense that the article's account of the imposition of a fine against plaintiffs in Justice Court was statutorily privileged as a 'fair and true report of any judicial proceeding.'").

C.   The Average Reader Would Not Conclude That Defendants' Article Was "Reporting On" Official Action.

In its preliminary order on Defendants' fair report privilege defense, this Court held that:

The [Buzzfeed] Article itself does not permit an ordinary reader to understand that the Dossier was the subject of classified briefings or an FBI investigation.  Rather, it is the hyperlinked CNN article that describes the confidential briefings and asserts that the FBI is investigating the truth of the Dossier's allegations.  The question then is: would an ordinary reader of the [Buzzfeed] Article conclude that the Dossier was subject to these official actions when these official actions are mentioned only in the hyperlinked CNN article?

D.E. 171, p. 16.  The Court then noted that only one other Court had addressed the question directly – the Nevada Supreme Court in *Adelson v. Harris*, 402 P.3d 665 (Nev. 2017).  The *Adelson* court, in turn, noted that it was facing "an issue of first impression, whether a hyperlink in an Internet publication that provides specific attribution to a document protected by the fair report privilege qualifies as a protected report for purposes of that privilege." *Id.*, at 668.  The *Adelson* Court went on to note that, "although courts have not addressed hyperlinks in the context of the fair report privilege ... courts have extensively discussed hyperlinks in the context of whether they impart notice for the purposes of contract formation." *Id.*, at 669.  That court then held the two questions are analogous, "because both standards ask whether an average person can identify and understand a hyperlink's importance." *Id.*, at 670.

Under *Adelson,* the relevant question is whether the hyperlink is sufficiently conspicuous that the average reader would have been on notice that the article was referring to and incorporating the information located at the hyperlink.  Even under this framework, however, the Defendants' argument fails both legally and factually.

First, it is important to recognize a crucial distinction between the hyperlink at issue in *Adelson* and the hyperlink at issue in the present case that compels a different outcome.  In *Adelson*, the defendant published an online petition that stated, among other things, that "Adelson 'personally approved' of prostitution in his Macau casinos." *Adelson v. Harris*, 973 F. Supp. 2d 467, 473 (S.D.N.Y. 2013).  The phrase "personally approved" was hyperlinked to an Associated Press story "discussing ongoing litigation from Nevada....  The AP article provided a summary of a sworn declaration Jacobs filed in the litigation alleging that Adelson had approved of prostitution in his Macau casino resorts.  Specifically, the article quotes a portion of the declaration in which Jacobs states that a 'prostitution strategy had been personally approved by Adelson.'" *Adelson*, 402 P.3d at 666-67.

The hyperlink in *Adelson* thereby provided the crucial connection between the ***defamatory statement itself*** and the official proceeding from whence the defamatory statement was drawn.  In other words, the hyperlink itself allowed the reader to understand that the defamatory statement itself was drawn from an official proceeding.  The hyperlink at issue in the present case does not serve the same function.  Here, the hyperlinked sentence read: "CNN reported Tuesday that a two-page synopsis of the report was given to President Obama and Trump," with the words "CNN reported" as the relevant hyperlink. *See* Opp. Ex. 75.  Unlike the

hyperlink in *Adelson,* the hyperlink at issue here did not provide the reader with a connection between the defamatory statement about Plaintiffs and the existence of any official action concerning them.  As such, the very rationale underpinning the *Adelson* decision is absent here.

Next, even if the Court were to find that the hyperlink in question here was relevant, the hyperlink would still be insufficient inasmuch as it was insufficiently conspicuous as defined in the contract line of cases to which *Adelson* analogizes.  Here, the relevant hyperlink in Buzzfeed's article included only the words "CNN reported," which were colored blue, but not otherwise distinguished by the typical signifiers of a hyperlink, such as the text being underlined, italicized, bolded, or in all-caps.[5]  New York courts (and others) have held that simply setting off words on a webpage in blue, without more, is insufficiently conspicuous to put the ordinary user on notice that the words contained a hyperlink.  *See, e.g.*, *Applebaum v. Lyft, Inc.* 263 F. Supp. 3d 454, 467 (S.D.N.Y. 2017).  As the *Applebaum* court specifically held:

> A reasonable consumer would not have understood that the light blue "Terms of Service" hyperlinked to a contract for review.  Lyft argues that coloring words signals "hyperlink" to the reasonable consumer, but the tech company assumes too much.  Coloring can be for aesthetic purposes.  Courts have required more than mere coloring to indicate the existence of a hyperlink to a contract....  Beyond the coloring, there were no familiar indicia to inform consumers that there was in fact a hyperlink that should be clicked and that a contract should be reviewed, such as words to that effect, underlining, bolding, capitalization, italicization, or large font.

*Id.* (and cases cited therein)

As the *Applebaum* court noted, the something "more" required is typically underlining, bolding, capitalization, italicization, or a larger font, none of which were present here.  Many other courts have similarly noted that hyperlinks are typically signified with ***both*** a different color and underlining.  *See*, *e.g*, *Plazza v. Airbnb, Inc.*, 289 F.Supp.3d 537, 543 (S.D.N.Y. 2018) ("The phrase 'Terms of Service' was in blue text and underlined, indicating a hyperlink"); *Meyer v. Kalanick*, 200 F.Supp.3d 408, 415 (S.D.N.Y. 2016) ("[T]he fact that the phrase 'Terms of Service & Privacy Policy' is underlined and in blue suggests that the phrase is a hyperlink"); *Adelson v. Harris*, 774 F.3d 803, 808 (2d Cir. 2014) ("[T]he hyperlinks were not hidden but visible in the customary manner, that is, by being embedded in blue, underlined text"); *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63 (1st Cir. 2018) ("First, Uber's 'Terms of Service & Privacy

---

[5] Oddly, Buzzfeed has now altered the way the article appears online so that the words "CNN reported" are bolded and underlined, but no longer blue.

Policy' hyperlink did not have the common appearance of a hyperlink.  While not all hyperlinks need to have the same characteristics, they are 'commonly blue and underlined.'"); *Berkson v. Gogo LLC*, 97 F.Supp.3d 359, 372 n.2 (E.D.N.Y. 2015) ("Words on a website that are underlined and highlighted in blue and that you can click on in order to open a new web page are an example of a hyperlink."); *Pincaro v. Glassdoor, Inc.*, 2017 U.S. Dist. LEXIS 147517, at *15-16 (S.D.N.Y. Sep. 12, 2017) ("[A] reasonably prudent user knows that text that is highlighted in blue and underlined is a hyperlink to another webpage where additional information will be found." (citing *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 77-78 (2d Cir. 2017))).

Although the difference between a link that is colored blue and underlined and one that is simply colored blue may initially appear to the Court to be a slight one, the *Berkson* Court (which undertook what is perhaps the most comprehensive legal examination of ways in which websites put users on notice of contractual terms) cautions courts against assuming that the average internet users has the same level of internet sophistication as the court itself:

> What of those less devoted to computers?  Should a survey be taken on how they view some of these directions?  Judges and law clerks tend to be sophisticated about navigating the internet and website.  Are they attributing their superior knowledge to that of "read-less and run" types? A "hyperlink," which is activated by clicking on an underlined word or term, with its serious legal ramifications, may not be fully understood by many consumers.

*Berkson*, 97 F.Supp.3d at 400.

Factually, this Court provisionally accepted Buzzfeed's argument that the (non-underlined) blue text that read "CNN Reported" was sufficiently conspicuous that the average reader would understand that Buzzfeed's article was "reporting on" an official proceeding, presumably under the assumption that the average reader would click through to the CNN story and read the relevant portions of it.  This conclusion, however, was based on a factual assumption that has proven not to be true.  According to information produced by CNN, only approximately ***one-third of one-percent of the people*** who viewed the Buzzfeed article clicked through to the CNN article.  POSMF, ¶ 61.  Specifically, between January 10, 2017 (when Buzzfeed first published the article) and February 3, 2017 (when Plaintiffs' names were redacted), the article was viewed more than 5.95 million times.  *Id.*  According to CNN, during a similar time period, the link from the Buzzfeed article to the CNN article was only clicked on 20,671 times.  *Id.*  This means that less than 0.35% of unique viewers of the Buzzfeed article actually clicked through to the CNN article, leaving 99.65% of readers who did not do so.

13

As the *Adelson* Court held: "[T]here is a drawback to hyperlinks as attributions—an average reader must identify a hyperlink, understand its importance, and ultimately open the link. When a hyperlink is not found, understood, or opened by a reader, it has failed as a source of attribution." *Adelson*, 402 P.3d at 669. Here, there can be little question that, even under the *Adelson* test, the hyperlink included in Buzzfeed's Article "failed as a source of attribution," inasmuch as it was "not found, understood, or opened" by 99.65% of the readers of its article.

Because the ordinary reader would not be able to determine from the Buzzfeed article that the publication was reporting on an official proceeding and because the hyperlink to the CNN article was insufficient to cure that defect, Defendants are not entitled to the protections of the fair report privilege. Or, at a minimum, the question raises genuine issues of material fact that must be resolved by a jury, which precludes a finding of summary judgment.

## II. Defendants Clearly Published Defamatory Accusations About Plaintiffs.

In one of their most bizarre arguments, Defendants assert that, despite having published the December Memo – which falsely accuses Plaintiffs of (among other things), being agents of the Russian FSB and using "botnets and porn traffic to transmit viruses, plant bugs, steal data, and conduct 'altering operations' against the Democratic Party leadership" – they did not actually make any defamatory statements about Plaintiffs and "did not assert or imply that Plaintiffs actually engaged in any cyber-crimes."[6]

As the basis for this truly remarkable argument, Defendants insist that they cannot be found liable for defamation based on their publication of the December Memo because, when they published it, they essentially shrugged and said, "Well, we don't know if this is true or anything. People are saying it is, but, who knows? – certainly not us."

As a general rule, of course, "the common law of libel has long held that one who republishes a defamatory statement adopts it as his own and is liable [for false, defamatory statements] in equal measure to the original defamer." *Sack on Defamation*, Fifth Ed., § 2.7.1 (2-114) (and numerous citations therein). Defendants cannot escape this liability simply by

---

[6] Although it is absurd for Buzzfeed to claim that it didn't *accuse* Plaintiffs of actually engaging in any cyber-crimes, it is true that, despite having paid a single one of its expert witnesses a jaw-dropping $4.1 million in fees, it was unable to find any evidence that "put the Plaintiffs behind a keyboard" committing the alleged cyber-crimes. *See* Opp. Ex. 83, 42:13-17, 63:4-19. It's similarly true that Special Counsel Mueller indicted the 12 Russian Intelligence Officers who *actually* committed the cyber-crimes Buzzfeed accused Plaintiffs of committing. POSMF, ¶ 11.

claiming that their publication of the December Memo was nothing more than Buzzfeed asking the world what it thought about the allegations. *See, e.g.*, *Cianci v. New Times Pub. Co.,* 639 F.2d 54, 60-61 (2d Cir. 1980) ("[O]ne who republishes a libel is subject to liability just as if he had published it originally, even though he attributes the libelous statement to the original publisher, and even though he expressly disavows the truth of the statement."); *Biro v. Conde Nast*, 883 F.Supp.2d 441, 461 (S.D.N.Y. 2012) ("The Second Circuit has expressly embraced the 'widely recognized' rule that 'one who republishes a libel is subject to liability just as if he had published it originally, even though he attributes the libelous statement to the original publisher, and even though he expressly disavows the truth of the statement.'"); *Levin v. McPhee,* 119 F.3d 189, 195 (2d Cir. 1997) ("That the statements implicating Levin in a murder appear among conflicting and speculative versions of an unresolved mystery reflects only that a jury issue exists as to how 'the words were likely to be understood by the ordinary and average reader,' ... and does not preclude a trier of fact from finding a defamatory connotation."); *Afro-American Publ'g Co. v. Jaffe*, 366 F.2d 649, 655 (D.C. Cir. 1966) ("Where readers would understand a defamatory meaning liability cannot be avoided merely because the publication is cast in the form of an opinion, belief, insinuation or even question.").[7]

Accordingly, Defendants' motion for summary judgment must be denied.

### III.   Although Plaintiffs are Private Figures Who Need Only Prove Defendants Acted with Negligence, a Jury Could Find that Defendants Acted with Actual Malice.

Although a Court cannot impose liability on Defendants with a finding of some degree of fault, it is also true that "[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon reputation." *Rosenblatt v. Baer*, 383 U.S. 75, 56 (1966). Accordingly,

---

[7] *See*, *also*, *Jones v. Scripps Media, Inc*., 2017 U.S. Dist. LEXIS 50883, at *25 n.14 (E.D. Mich. Apr. 4, 2017) ("WXYZ argues that a question may never form the basis of a defamation claim because a question is not capable of being proven true or false.  However, the Michigan Supreme Court has suggested that at least some questions may be defamatory." (citing *Smith v. Anonymous Joint Enterprise*, 487 Mich. 102, 793 N.W.2d 533, 549 (Mich. 2010) (courts must analyze allegedly defamatory statements "in their proper context," to avoid "elevat[ing] form over substance," and not to "rely[] merely on the use of a question mark as punctuation" when determining whether a statement "is capable of a defamatory meaning"))); *Obsidian Finance Group, LLC v. Cox*, 812 F.Supp.2d 1220, 1225 (D. Ore. 2011) (if a question "can be reasonably read as an assertion of false fact, it may be actionable" in a defamation claim); *Point Ruston, LLC v. Pacific Northwest Regional Council*, 2010 WL 3732984, at *8 (W.D. Wash. Sept. 13, 2010) ("[U]sing a '?' at the end of a statement does not automatically insulate [the defendant] from liability for defamation....").

the United States Supreme Court and the state courts, over many years, have established a set of standards for determining when defendants may be held liable for publishing false and defamatory statements. The standard applied, however, depends first on a determination of whether the plaintiff is deemed a public figure or a private figure. When a plaintiff is a private figure, the standard of fault may be met with a showing of ordinary negligence.

Defendants, of course, launch directly into a discussion of the "actual malice" standard reserved for public figure plaintiffs. Plaintiffs dispute that they are public figures and have briefed the Court on this issue in a Motion for Summary Judgment filed with the Court and will do so again in their opposition to Defendants' separate summary judgment motion on this issue. And, although Plaintiffs strongly believe that the evidence supports only one conclusion – that they are private figures – if the Court were to disagree with that position, Defendants' current motion would fail because a reasonable jury could conclude that Defendants published the defamatory statements about Plaintiffs with actual malice.

As the Supreme Court held in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986):

> [I]n a libel suit brought by a public official, the First Amendment requires the plaintiff to show that in publishing the defamatory statement the defendant acted with actual malice – 'with knowledge that it was false or with reckless disregard of whether it was false or not.' We held further that such actual malice must be shown with 'convincing clarity.' ... These *New York Times* requirements we have since extended to libel suits brought by public figures as well.

*Id.* at 244 (citations omitted). Despite this heightened standard, though, the Supreme Court has cautioned that, as in any case, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The heightened standard also does not change the general summary judgment prohibition that "the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. As the *Anderson* Court (at 255) further explained:

> Our holding that the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions does not denigrate the role of the jury. It by no means authorizes trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.... Neither do we suggest that the trial courts should act other than with caution in granting summary judgment

16

or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.

The actual malice test is a subjective one, "focusing on whether the defendant actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false." *Turner v. Wells*, 879 F.3d 1254, 1273 (11th Cir. 2018). "Because direct evidence of subjective belief rarely exists, a 'court will typically infer actual malice from objective facts.'" *Lemelson v. Bloomberg L.P.*, No. 17-1620, 2018 U.S. App. LEXIS 24716, at *8-9 (1st Cir. Aug. 30, 2018) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 692 F.2d 189, 196 (1st Cir. 1982), aff'd, 466 U.S. 485 (1984)).

In the present case, however, while there are indeed objective facts from which the Court can and should infer actual malice, there is also that which "rarely exists," namely direct evidence in the form of admissions from Defendants.  First, Buzzfeed's article itself states that:

- "The dossier, which is a collection of memos written over a period of months, includes specific, unverified, and potentially unverifiable allegations…"
- "BuzzFeed News reporters in the US and Europe have been investigating various alleged facts in the dossier but have not verified or falsified them."
- "The document was prepared for political opponents of Trump…"
- "It is not just unconfirmed: It includes some clear errors..."

POSMF, ¶ 57(a).  Moreover, immediately after Buzzfeed published the collection of Steele Memos, Ben Smith wrote to Buzzfeed's entire staff to explain his decision to publish the "explosive and unverified allegations about Donald Trump and Russia."  In that email, Mr. Smith admitted again that "there is serious reason to doubt the allegations."  *Id.* and Opp. Ex. 85.

Within an hour after that, Jake Tapper who had first broken the story for CNN, emailed Ben Smith to complain that Buzzfeed's publishing the memos was "uncollegial," "unprofessional," and "irresponsible."  In that email exchange, Mr. Smith admitted that Buzzfeed could not even be 100% certain the Christopher Steele was really a former MI6 agent because "There is not an official list of former U.K. intelligence agents or a named source confirming he is a former U.K. Intel agent!"  POSMF, ¶ 6 and Opp. Exs. 61 and 62.

The next day, Mr. Smith appeared on MSNBC's Meet the Press Daily, where he was interviewed by Chuck Todd.  In the course of that interview, Mr. Smith admitted:

- That the Buzzfeed article "stressed that there were – that – that there were solid reasons to ... distrust this [the memos] that noted t[w]o specific [errors]."
- "There are false claims."
- "[I]t is appropriate ... to tell your audience and to respect the fact that they can say

17

… this looks like nonsense."

- "[S]o you're allowed to take false claims and summarize them, but not show – I mean, I guess our impulse … is to show the audience the underlying document…."
- "I think that we are now in a media environment where you have to engage in false statements."

POSMF, ¶ 57(a).  In the same interview, Mr. Smith also admitted that Buzzfeed had not itself confirmed that the President had been briefed on the contents of the memos.  POSMF, ¶ 42.

Four days after that, Mr. Smith appeared on CNN (Opp. Ex. 84) and again admitted that:

- "I'm not sure that reading the thing and our report which said not only is this unverified, we know that there are specific things wrong."
- "We really stressed that there were false things in this document…"
- "I don't think that you or I or the FBI apparently can say with great confidence that either they have stood this up or knocked it down."
- "We did point out the things that we really, were very, very confident were false, in part to say to the reader 'caveat emptor.'"

In addition to all of this direct evidence and admissions, discovery has also produced significant "objective facts" from which a jury can further infer actual malice, including:

- Although Buzzfeed had a "no surprises" policy that said that, before it published allegations about someone, the person should be informed of the allegations and given an opportunity to respond, Buzzfeed did not contact Plaintiffs, give them notice of their intent to publish the allegations, nor give them the opportunity to respond.  POSMF, ¶¶ 57(d)-(e).
- Buzzfeed admitted that it did nothing to attempt to verify the allegations concerning the Plaintiff other than the fact that it sent a reporter to Prague to see if Cohen had travelled there, which it could not confirm.  POSMF, ¶¶ 52, 57(c).
- Although Buzzfeed claimed to spend two weeks attempting to verify portions of the Dossier, it was unable to do so and, indeed, those efforts had only served to reveal "clear errors" in the collection of documents.  POSMF, ¶¶ 57(a), (f).
- Prior to publishing, Defendants considered the positive effect the publication would have on Buzzfeed's website traffic.  POSMF, ¶ 56.
- Prior to publishing, Defendants considered the benefits to them in being the first to publish and were concerned about being scooped.  Id.

In response, Defendants' only arguments as to why they believe Plaintiffs cannot meet the "actual malice" test boil down to two assertions: (1) "Steele was well-known to Defendants [and] other well-regarded persons took Steele's allegations seriously" and (2) the defamatory statements about Plaintiffs were part of a larger document that they attempted to verify (but were unable to confirm anything about).  Motion, p. 15.  This is no more than Defendants claiming that they published because they *thought* the allegations were true, a claim that cannot save them:

The defendant in a defamation action brought by a public official cannot, however,

> automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is ... based wholly on an unverified anonymous telephone call....  Likewise, ***recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports***.

*St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) (emphasis added).

Defendants' publication of the defamatory statements about Plaintiffs are, in essence, the equivalent of a publication "based wholly on an unverified anonymous telephone call."  *Id.* Although Defendants understood that the Dossier came from Christopher Steele (which they did not even receive from him directly, but through David Kramer), they did not know at the time, and still do not know even today, the actual underlying source for the false allegations about Plaintiffs.  The December Memo, as Defendants received it, had the source of Steele's information about Plaintiffs redacted.  POSMF, ¶ 57(b).  Steele has also testified that the information in the December Memo was unsolicited.  *Id.*  When Defendants obtained the dossier, they knew that the Dossier was unverified.  *Id.*  After Defendants obtained it, they did not do a single thing to attempt to verify the allegations about Plaintiffs before publishing.  *Id.*, ¶ 52.

Among the reasons Defendants claim that they believed the allegations concerning Plaintiffs were credible, the only one that *actually* relates to Plaintiffs in any way is the statement that "the allegations against Plaintiffs related to Michael Cohen's alleged actions in the Dossier." DSMF, ¶ 58(c).  However, as will be described, it is exactly the facts about Michael Cohen's alleged connections with Russia that Defendants determined were "clear errors" that they redacted from the Dossier when they published it.  POSMF, ¶ 58.

However, this "clear error" and how Defendants dealt with it speaks directly to Defendants' purposeful avoidance of the truth about the allegations regarding Plaintiffs.  *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989*)* ("Although failure to investigate will not alone support a finding of actual malice ... the purposeful avoidance of the truth is in a different category.").  Buzzfeed's Article states that one of the Dossier's "clear errors" is that "The report says the settlement of Barvikha, outside Moscow, is 'reserved for the residences of the top leadership and their close associates.'  It is not reserved for anyone, and it is also populated by the very wealthy."

However, if one looks closely at the Dossier as published, one cannot find any allegations

19

about Barvikha.  *See* Opp. Ex. 75.  This is because it was part of information that Defendants redacted from pages 30 and 31 of the compilation of memos, constituting a memorandum dated October 18, 2016.  POSMF, ¶ 57(f).  The portion of the Dossier that Defendants redacted was:

> [Michael] COHEN had a wife of Russian origin, whose father, Efim SHUSTERMAN, was a leading Moscow property developer....  It appears that SHUSTERMAN has a country house (dacha) in the settlement of Barvikha, west of Moscow.  This village is reserved for the residences of the top leadership and their close associates.

Opp. Ex. 78.  This is not an insignificant connection, if true, inasmuch as it would suggest a connection between President Trump's personal lawyer/fixer and Russia's "top leadership and their close associates."  But Defendants knew that the allegations were not true and redacted the information prior to publication.  Ironically, though, Defendants nonetheless point to such false allegations concerning Cohen as a reason for them to believe the allegations about Plaintiffs.

And, although it is possible (even if unlikely) that a jury might give some weight to Defendants' arguments as they weigh them against Plaintiffs' arguments, this is precisely the type of genuine issue of material fact that must be weighed and decided by a jury. In the present case, then, there can be little question but that a jury could find that there was clear and convincing evidence that Defendants "entertained serious doubts as to the veracity of the published account" and, as such, even if the Court were to find the actual malice standard the applicable standard, Plaintiffs have met their summary judgment burden and Defendants' Motion for Summary Judgment must be denied.

Given that the facts in this case satisfy even the highest test of "actual malice" reserved for public figures, there should be little question about whether Plaintiffs are entitled to proceed to trial given that they are private figures, subject to lower burdens.  The standard for liability for defamation of private figures is considerably lower than "actual malice," though the appropriate test can differ between jurisdiction.  *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974).

To determine whether Florida or New York law should apply to this question, the Court must apply the "most significant relationship" test outlined in Section 145 of the Restatement (Second) of Conflict of Laws using the principles set forth in Section 6.  *Grupo Televisa, S.A. v. Telemundo Comm'n Grp., Inc.*, 485 F.3d 1233, 1240-1243 (11th Cir. 2007).  In this Court's Order dated June 5, 2018 (D.E. 171), this Court already applied the general Section 145 factors and found that they weigh slightly in favor of applying New York law, but not strongly enough

to be conclusive. *Id.*, pp. 8-9.  Accordingly, the Section 6 factors must be considered.

Plaintiffs acknowledge that the Court selected New York law for determining whether the fair reporting privilege applies to Defendants because that affirmative defense seeks to protect the speaker and the speaker was in New York.  As a matter of consistency and fairness, there is an argument that the law governing privileges should be the law where the speaker resides.

On the flipside, however, when selecting the applicable law to apply with respect to the standards of fault that for a private individual bringing a defamation claim, the same concerns of consistency and fairness counsel in favor of the law of the jurisdiction of the plaintiff.  This is true because the rights of the plaintiff should not be determined by a defendant's choice of domicile.  If this were not the case, every media defendant would simply choose the most defendant-friendly state as its domicile and no other state would be able to enact laws designed to protect its residents.  As such, to the extent that the Court believes the applicable burdens would differ depending on a choice of law, the Court should apply the laws of Florida.

In Florida "it is sufficient that a private plaintiff prove negligence...."  *Miami Herald Pub. Co. v. Ane*, 458 So.2d 239, 242 (1984).  Given that Defendants exhibited a reckless disregard for the truth or falsity of what they published about Plaintiffs, this standard is easily met in this case.[8]  *See, e.g., Lopez v. Ingram Micro, Inc.*, 1997 WL 401585 at * 4 (S.D. Fla. Mar. 18, 1997) (private plaintiff must prove that defendant published "without reasonable care as to whether that statement was true"); *Bernath v. Seavey*, 2017 WL 3268481 at * 6 (M.D. Fla. May 18, 2017) (finding negligence where "it is undisputed that Bernath failed to conduct any inquiry or investigation into the truth or falsity of the statements he made against Seavey.").

However, the same result obtains even if the Court finds that New York's standard of liability should be applied.  Because there is sufficient evidence to proceed to trial even if the "actual malice" standard was to be used, there is no question that Plaintiffs have sufficient evidence that Defendants "acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties."  *Chapadeau v. Utica Oberserver-Dispatch*, 38 N.Y.2d 196, 199 (1975).

Accordingly, Defendants' Motion for Summary Judgment must be denied.

---

[8] Negligence in libel in Florida, however, is a "jury question[] which preclude[s] the granting of summary judgment."  *Saro Corp. v. Waterman Broad.*, 595 So.2d 87, 89 (Fla. DCA 1992).

## Conclusion

For the reasons stated hereinabove, Defendants' Motion for Summary Judgment should be denied in its entirety.

Dated: October 5, 2018

**Respectfully Submitted:**

/s/ Evan Fray-Witzer
Evan Fray-Witzer (*pro hac vice*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-0000
Facsimile: 617-423-4855
Evan@CFWLegal.com

/s/ Valentin Gurvits
Valentin D. Gurvits (*pro hac vice*)
Matthew Shayefar (Fla. Bar No. 0126465)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1804
Facsimile: 617-928-1802
vgurvits@bostonlawgroup.com
matt@bostonlawgroup.com

/s/ Brady J. Cobb
Brady J. Cobb (Fla. Bar No. 031018)
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

**I hereby certify** that a true and correct copy of the foregoing was served electronically via email on all counsel or parties of record on the service list below on October 5, 2018.


/s/ Matthew Shayefar
Matthew Shayefar

## SERVICE LIST

Katherine M. Bolger
Adam Lazier
Davis Wright Tremaine, LLC
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
katebolger@dwt.com
adamlazier@dwt.com

Nathan Siegel
Alison Schary
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, Suite 800
Washington, DC 20006
nathansiegel@dwt.com
alisonschary@dwt.com

Roy Eric Black
Jared M. Lopez
Black Srebnick Kornspan & Stumpf
201 S Biscayne Boulevard, Suite 1300
Miami, Florida 33131
rblack@royblack.com
jlopez@royblack.com