Exhibit
60

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### MIAMI DIVISION

| | |
|---|---|
| ALEKSEJ GUBAREV,<br>XBT HOLDINGS S.A., and<br>WEBZILLA, INC.<br><br>    Plaintiffs,<br><br>v.<br><br>BUZZFEED, INC. and<br>BEN SMITH<br><br>    Defendants. | **Case No.**<br>**0:17-cv-60426-UU** |

### <u>DECLARATION OF CONSTANTIN LUCHIAN</u>

I, Constantin Luchian, do declare and state as follows:

1.      My name is Constantin Luchian.  I am over the age of 18 years.  This declaration is based on my personal knowledge and my review of Webzilla, Inc.'s business records.  All statements contained in this declaration are true and correct to the best of my knowledge, if called as a witness, I could and would testify as to the facts set forth in this declaration.

2.      I am a full-time resident of Jupiter, Florida.  I have lived in Florida for over 13 years.

3.      I am the Financial Director for Plaintiff Webzilla, Inc. ("Webzilla"), which is a wholly-owned subsidiary of Plaintiff XBT Holdings S.A. ("XBT"), through an intermediary company XBT Holding Ltd.

4.      I have been the Financial Director of Webzilla since 2009.

5.      Webzilla is incorporated as a domestic for-profit corporation in Florida and has been continuously registered as such with Florida's Division of Corporations since 2009.

Attached hereto as <u>Exhibit 1</u> is a true and correct printout of Webzilla's corporate information from Florida's Division of Corporations website.

6.   I perform all of my duties as the Financial Director of Webzilla from Florida.

7.   Since I have been the Financial Director of Webzilla, Webzilla has always maintained a physical presence in Florida.

8.   That Webzilla has a presence in Florida would be obvious to anyone who simply looked at the Webzilla.com website.  Attached hereto as <u>Exhibit 2</u> is a true and correct copy of the "Contact" page for Webzilla on its website at webzilla.com/contacts.html.

9.   At all times, Webzilla has maintained one or more physical locations in Florida. At various times, that physical location was at a separate office maintained by Webzilla (and sublet from executive office space providers such as Regus); sometimes it was as part of my company Incorporate Now's offices; and sometimes it maintained a presence in both locations.

10.   Although Webzilla temporarily stopped using the address at 110 E. Broward Blvd., Suite 1700, Fort Lauderdale, Florida. for a time, it has recently restarted its contract with Regus, the company that operates the office spaces at that location that Webzilla leased.

11.    In any event, though, whenever I was told that mail had arrived at one of Webzilla's Florida offices, I would personally go to the office to pick up the mail, or have it forwarded to me in Florida.  Even during the year or so that Webzilla did not have an up-to-date contract with Regus at the 110 E. Broward Blvd address, when FedEx or UPS made deliveries to that address, they knew to contact me and they delivered packages to my company, Incorporate Now, which is Webzilla's registered agent in Florida, at its address at 6750 N. Andrews Ave, Suite 200 in Fort Lauderdale, Florida.

12.   The telephone number listed for Webzilla on its website (+1-954-237-3587) has the area code 954, which is an area code for Broward County in Florida.

13.     Webzilla gets its Florida based telephone number from the company Vonage. Attached hereto as Exhibit 3 are true and correct copies of Vonage's bills for Webzilla's phone number, all listing the address at 110 E. Broward Blvd., Suite 1700, Fort Lauderdale, Florida.

14.     If someone calls the phone number listed for Webzilla on its website, they are calling me, in Florida.

15.     In the past, Webzilla has engaged other personnel based in Florida, including Konstantin Bolotin, who was Webzilla's director of operations through 2013.

16.     I oversee much of Webzilla's accounting from Florida.

17.     Webzilla files tax returns in Florida.  A true and correct copy of the first two pages of a copy of Webzilla's last filed tax return in Florida (with sensitive information blacked out) and its upload confirmation is attached hereto as Exhibit 4.

18.     I am the signatory for Webzilla on its Florida tax returns.

19.     Since 2009, Webzilla has maintained a bank account in Florida with Bank of America.

20.     I am a signatory of Webzilla's bank account in Florida.

21.     Webzilla's Registered Agent is Incorporate Now, with an address at 6750 N. Andrews Ave, Suite 200 in Fort Lauderdale, Florida.

22.     I am an owner, employee and director of Incorporate Now, the registered agent for Webzilla, and when any documents are provided to Webzilla at its registered agent address, I handle those documents.

23.     I am also Webzilla's registered agent to receive notifications of claimed infringement as registered with the United States Copyright Office.  Attached hereto as Exhibit 5 is a true copy of that designation filed with the Copyright Office and pulled from its website. The designation lists Webzilla's address as 110 E. Broward Blvd., Suite 1700, Fort Lauderdale, Florida 33301 and lists me as the Agent Designated to Receive Notification of Claimed Infringement.

24.     Webzilla has been involved in a number of lawsuits in the courts in Florida.  For example, Webzilla was named as a defendant in the case *Depicto Commercial Ltd. v. Webzilla LLC et al*, Case No. CACE 13-010329(2) in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida.  Webzilla was also named as a defendant in the case *AMA Multimedia, LLC v. ERA Technologies, Ltd. et al*, Case No. 1:15-cv-24289-FAM (S.D. Fla.) and *Hydentra, L.P. HLP General Partner, Inc. v. ERA Technologies, Ltd. et al.,* Case No. 1:15-cv-24293-MGC (S.D. Fla.).

25.     As Webzilla's Financial Director, I oversee the payments of all invoices to Webzilla and other companies in the XBT family and the sending out of invoices for Webzilla and other companies in the XBT family to their customers from Florida.

26.     The XBT family includes two other Florida incorporated companies, Dedicated Servers Inc. and IP Transit Inc., both of which use Incorporate Now as their registered agent.  Both Dedicated Servers Inc. and IP Transit Inc. receive correspondence and bills to addresses in Florida.  Attached hereto as Exhibit 6 is a true and correct printout of Dedicated Servers Inc.'s corporate information from Florida's Division of Corporations website.  Attached hereto as Exhibit 7 is a true and correct printout of IP Transit Inc.'s corporate information from Florida's Division of Corporations website

27.     Attached hereto as Exhibit 8 is true and correct printout of IP Transit's website, which also shows a Florida address and Florida telephone number.

28.     Webzilla has clients in Florida, including, without limitation, ServerClub Inc/Fresh IT Solutions, with an address in Fort Lauderdale, Florida, and 1405 Martin Clary, with an address in Clearwater, Florida.

29.     On January 10, 2017, Buzzfeed published an online article titled "These Reports Allege Trump Has Deep Ties to Russia" (the "Defamatory Article") that contained a "dossier" of information supposedly compiled by a private security company.  When I read the Defamatory

Article, I was in Florida and I was shocked to find that it made statements about Webzilla, XBT and Alexsej Gubarev (XBT's Chairman, CEO and director).

Signed under the pains and penalties of perjury this 27th day of March, 2017.

_____

Constantin Luchian

# Exhibit
# 1



Department of State  /  Division of Corporations  /  Search Records  /  Detail By Document Number  /

# Detail by Entity Name

Florida Profit Corporation
WEBZILLA INC.

### Filing Information

| | |
|---|---|
| **Document Number** | P09000064327 |
| **FEI/EIN Number** | N/A |
| **Date Filed** | 07/29/2009 |
| **Effective Date** | 07/29/2009 |
| **State** | FL |
| **Status** | ACTIVE |
| **Last Event** | AMENDMENT |
| **Event Date Filed** | 07/16/2012 |
| **Event Effective Date** | NONE |

### Principal Address

2777 Stemmons Fwy.
Suite 1655
Dallas, TX 75207

Changed: 01/17/2014

### Mailing Address

2777 Stemmons Fwy.
Suite 1655
Dallas, TX 75207

Changed: 01/17/2014

### Registered Agent Name & Address

INCORPORATE NOW
6750 N. Andrews Ave.
Suite 200
Fort Lauderdale, FL 33309

Name Changed: 03/01/2010

Address Changed: 03/31/2013

### Officer/Director Detail

**Name & Address**

**Title D**

Mishara, Rajesh Kumar
2777 Stemmons Fwy.
Suite 1655
Dallas, TX 75207


Title D


Bezruchenko, Kostyantyn
2777 Stemmons Fwy.
Suite 1655
Dallas, TX 75207

**Annual Reports**

| Report Year | Filed Date |
|---|---|
| 2014 | 01/17/2014 |
| 2015 | 02/04/2015 |
| 2016 | 02/23/2016 |

**Document Images**

| | |
|---|---|
| 02/23/2016 -- ANNUAL REPORT | View image in PDF format |
| 02/04/2015 -- ANNUAL REPORT | View image in PDF format |
| 01/17/2014 -- ANNUAL REPORT | View image in PDF format |
| 03/31/2013 -- ANNUAL REPORT | View image in PDF format |
| 07/16/2012 -- Amendment | View image in PDF format |
| 02/20/2012 -- ANNUAL REPORT | View image in PDF format |
| 04/19/2011 -- ANNUAL REPORT | View image in PDF format |
| 11/08/2010 -- Amendment | View image in PDF format |
| 04/05/2010 -- Amendment | View image in PDF format |
| 03/01/2010 -- ANNUAL REPORT | View image in PDF format |
| 07/29/2009 -- Domestic Profit | View image in PDF format |

Florida Department of State, Division of Corporations

# Exhibit
# 2



Home > Contact

# Contact Webzilla

## Corporate

| Europe | North America |
|---|---|
| **WEBZILLA Europe** | **WEBZILLA INC.** |
| Srtawinskylaan 601, 1077XX Amsterdam, The Netherlands | 110 E. Broward Blvd., Suite 1700, Fort Lauderdale, FL 33301, USA |
| Phone +31.20.893.2774 | Phone +1.954.237.3587 |

## Europe

**WEBZILLA Limited (Cyprus)**

53-55 Agios Athanasios Street, 2nd Floor, Limassol, 4102

Phone +357.25.345.346

## Sales

| Email | sales@webzilla.com |
|---|---|
| Chat | Live Chat |
| Skype | awebzilla |

## Support

| Email | support@webzilla.com |
|---|---|
| Chat | Live Chat |

## Billing Department

| Email | billing@webzilla.com |
|---|---|

## Acceptable Use Policy

| Email | legal@webzilla.com |
|---|---|

## Media Inquiries

| Email | pr@webzilla.com |
|---|---|

# Contact Form

Please fill out the form below to be connected to Webzilla.

| First Name * | | Last Name * | |
|---|---|---|---|

| Email * | | Phone | |
|---|---|---|---|

Company

Department | Sales

Comments

SUBMIT

DELL    SUPERMICRO    CISCO    JUNIPER    Microsoft    Linux    FreeBSD

WE ARE HERE FOR YOU  24/7/365     SALES  +31.20.893.2774     LIVE CHAT     EMAIL US

**WEBZILLA**
About Us
Network
Infrastructure

**SERVICES**
Dedicated Servers
Cloud
Colocation
Managed Services
CDN

**SALES CONTACTS**
Phone   +31.20.893.2774
Email   sales@webzilla.com
Chat    Live Chat
Skype   awebzilla

**SUPPORT CONTACTS**
Email   support@webzilla.com
Chat    Live Chat

**MEDIA**
Newsroom

**LINKS**
XBT Holding Website

**FOLLOW US**

© 2005 - 2016 Webzilla Enterprise Hosting  |  Sitemap  |  Legal

# Exhibit
# 3



# Summary of Charges

| | | | |
|---|---|---|---|
| **Billing Name:** | CONSTANTIN LUCHIAN | **Account #:** | 1008059988 |
| **Billing Address:** | 110 E Broward Blvd | **Billing Period:** | 12/27/2016-01/26/2017 |
| | Suite 1700 | | |
| | Fort Lauderdale, FL 33301 | | |
| | UNITED STATES | | |

**Your charges for this period:**

**$95.53**

This bill cycle ended on 01/26/2017



**Questions about your bill?**

Visit us at www.vonage.com

| | |
|---|---|
| **Monthly Charges** | $63.97 |
| **Surcharges** | $14.94 |
| **Government Mandated Taxes & Fees** | $16.62 |
| **Final Balance** | $95.53 |





## Monthly Charges                                    $63.97

| | |
|---|---|
| Residential Premium Unlimited Plan for 1-(954)-237-3587 (27/Jan-26/Feb) | $25.99 |
| Basic Residential FAX Plan for 1-(954)-302-2771 (27/Jan-26/Feb) | $9.99 |
| Vonage World Plan - Additional Line for 1-(954)-333-8989 (27/Jan-26/Feb) | $27.99 |

## Usage Summary

**(954) 237-3587**

**In Plan Minutes**

  *16 Domestic In Plan Minutes Used*

  *0 Vonage to Vonage Minutes Used*

**Charged Calls**

  *You have no charged calls for this period.*

**(954) 302-2771**

**In Plan Minutes**

  *You have not used any In Plan Minutes in this period.*

**Charged Calls**

  *You have no charged calls for this period.*

**(954) 333-8989**

**In Plan Minutes**

  *25 Domestic In Plan Minutes Used*

  *0 International In Plan Minutes Used*

  *0 Vonage to Vonage Minutes Used*





**Charges for**  12/27/2016-01/26/2017

**Account #:**                1008059988

## Usage Summary     (Continued)

| **Charged Calls** |
| :--- |
| *You have no charged calls for this period.* |

## Surcharges                                             $14.94

| | |
| :--- | ---: |
| Regulatory, Compliance and Intellectual Property Fee | $8.97 |
| Emergency 911 and Information Services Fee | $5.97 |

## Government Mandated Taxes & Fees            $16.62

| | |
| :--- | ---: |
| State 911 Fee | $1.20 |
| Sales Tax | $0.00 |
| Federal Program | $8.76 |
| State Gross Receipts Surcharge | $2.08 |
| Local Communications Service Tax | $4.58 |

## Final Balance                                         $95.53

| | |
| :--- | ---: |
| Final Balance | $95.53 |





**Charges for**  12/27/2016-01/26/2017

**Account #:**              1008059988

## Charged Calls:                                          **$0.00**





## Summary of Charges

| | | | |
|---|---|---|---|
| **Billing Name:** | CONSTANTIN LUCHIAN | **Account #:** | 1008059988 |
| **Billing Address:** | 110 E Broward Blvd | **Billing Period:** | 01/27/2016-02/26/2016 |
| | Suite 1700 | | |
| | Fort Lauderdale, FL 33301 | | |
| | UNITED STATES | | |

**Your charges for this period:**

### $96.80

This bill cycle ended on 02/26/2016

 **Questions about your bill?**

Visit us at www.vonage.com

| | |
|---|---|
| **Monthly Charges** | $63.97 |
| **Surcharges** | $14.94 |
| **Government Mandated Taxes & Fees** | $17.89 |
| **Final Balance** | $96.80 |





**Charges for**  01/27/2016-02/26/2016

**Account #:**              1008059988

## Monthly Charges                                    **$63.97**

| | |
|---|---|
| Residential Premium Unlimited Plan for 1-(954)-237-3587 (27/Feb-26/Mar) | $25.99 |
| Basic Residential FAX Plan for 1-(954)-302-2771 (27/Feb-26/Mar) | $9.99 |
| Vonage World Plan - Additional Line for 1-(954)-333-8989 (27/Feb-26/Mar) | $27.99 |

## Usage Summary

### (954) 237-3587

**In Plan Minutes**

    *2 Domestic In Plan Minutes Used*

    *0 Vonage to Vonage Minutes Used*

**Charged Calls**

    *You have no charged calls for this period.*

### (954) 302-2771

**In Plan Minutes**

    *You have not used any In Plan Minutes in this period.*

**Charged Calls**

    *You have no charged calls for this period.*

### (954) 333-8989

**In Plan Minutes**

    *14 Domestic In Plan Minutes Used*

    *0 International In Plan Minutes Used*

    *0 Vonage to Vonage Minutes Used*





**Charges for**  01/27/2016-02/26/2016

**Account #:**              1008059988

## Usage Summary     (Continued)

**Charged Calls**

*You have no charged calls for this period.*

## Surcharges                                    $14.94

| Regulatory, Compliance and Intellectual Property Fee | $8.97 |
|---|---|
| Emergency 911 and Information Services Fee | $5.97 |

## Government Mandated Taxes & Fees          $17.89

| State 911 Fee | $1.20 |
|---|---|
| Sales Tax | $0.00 |
| Federal Program | $9.94 |
| State Gross Receipts Surcharge | $2.11 |
| Local Communications Service Tax | $4.64 |

## Final Balance                                 $96.80

| Final Balance | $96.80 |
|---|---|





**Charges for**  01/27/2016-02/26/2016

**Account #:**            1008059988

## Charged Calls:                                         $0.00





## Summary of Charges

| | |
|---|---|
| **Billing Name:** CONSTANTIN LUCHIAN | **Account #:** 1008059988 |
| **Billing Address:** 110 E Broward Blvd Suite 1700 Fort Lauderdale, FL 33301 UNITED STATES | **Billing Period:** 01/27/2017-02/26/2017 |

**Your charges for this period:**

### $95.53

This bill cycle ended on 02/26/2017



**Questions about your bill?**

Visit us at www.vonage.com

| | |
|---|---|
| Monthly Charges | $63.97 |
| **Surcharges** | $14.94 |
| Government Mandated Taxes & Fees | $16.62 |
| **Final Balance** | $95.53 |





**Charges for**  01/27/2017-02/26/2017

**Account #:**              1008059988

## Monthly Charges                                              $63.97

| | |
|---|---:|
| Residential Premium Unlimited Plan for 1-(954)-237-3587 (27/Feb-26/Mar) | $25.99 |
| Basic Residential FAX Plan for 1-(954)-302-2771 (27/Feb-26/Mar) | $9.99 |
| Vonage World Plan - Additional Line for 1-(954)-333-8989 (27/Feb-26/Mar) | $27.99 |

## Usage Summary

### (954) 237-3587

**In Plan Minutes**

*12 Domestic In Plan Minutes Used*

*0 Vonage to Vonage Minutes Used*

**Charged Calls**

*You have no charged calls for this period.*

### (954) 302-2771

**In Plan Minutes**

*You have not used any In Plan Minutes in this period.*

**Charged Calls**

*You have no charged calls for this period.*

### (954) 333-8989

**In Plan Minutes**

*21 Domestic In Plan Minutes Used*

*0 International In Plan Minutes Used*

*0 Vonage to Vonage Minutes Used*





**Charges for**  01/27/2017-02/26/2017

**Account #:**                1008059988

## Usage Summary     (Continued)

| **Charged Calls** |
| --- |
| *You have no charged calls for this period.* |

## Surcharges                                                    $14.94

| Regulatory, Compliance and Intellectual Property Fee | $8.97 |
| --- | --- |
| Emergency 911 and Information Services Fee | $5.97 |

## Government Mandated Taxes & Fees                    $16.62

| State 911 Fee | $1.20 |
| --- | --- |
| Sales Tax | $0.00 |
| Federal Program | $8.76 |
| State Gross Receipts Surcharge | $2.08 |
| Local Communications Service Tax | $4.58 |

## Final Balance                                                 $95.53

| Final Balance | $95.53 |
| --- | --- |





## Charged Calls:                                    **$0.00**





# Estimated Charges

| | | | |
|---|---|---|---|
| **Billing Name:** | CONSTANTIN LUCHIAN | **Account #:** | 1008059988 |
| **Billing Address:** | 110 E Broward Blvd<br>Suite 1700<br>Fort Lauderdale, FL 33301<br>UNITED STATES | **Billing Period:** | 02/27/2017-03/26/2017<br>(Current) |

## Your estimated charges as of 03/21/2017:[1]

| **$95.53** | | Last payment<br>(posted on 02/27/2017) | $95.53 |
|---|---|---|---|

There are 6 days remaining in your current
bill cycle

| Next Automatic Payment | Monthly Charges | $63.97 |
|---|---|---|

| Scheduled Date: | 03/27/2017 |
|---|---|
| Payment Method: | American Express |
| | xxxxxxxxxxx1007 |

| Usage Charges | $0.00 |
|---|---|
| Surcharges | $14.94 |
| Government Mandated Taxes & Fees | $16.62 |
| Estimated Charges | $95.53 |



**Questions about your bill?**

Visit us at www.vonage.com

[1]Current Estimated Charges: Total estimated charges to date. Charges may vary from actual monthly bill, depending on your usage and any changes made to your account between now and the end of your billing cycle.See Billing FAQs for more information.





**Estimated Charges for**  02/27/2017-03/26/2017

**Account #:**              1008059988

---

## Last Payment                                    $95.53

Your last payment of $95.53 was posted on 02/27/2017. Thank You !

---

## Monthly Charges                                 $63.97

| | |
|---|---|
| Vonage World Plan - Additional Line for 1-(954)-333-8989 | $27.99 |
| Residential Premium Unlimited Plan for 1-(954)-237-3587 | $25.99 |
| Basic Residential FAX Plan for 1-(954)-302-2771 | $9.99 |

---

## Current Usage Summary                           $0.00

### (954) 237-3587 Residential Premium Unlimited

**In Plan Minutes**

*18 Domestic Minutes Used*

*0 Vonage to Vonage Minutes Used*

**Charged Calls**

*You have no charged calls for this period.*

### (954) 333-8989 Vonage World

**In Plan Minutes**

*19 Domestic Minutes Used*

*0 International Minutes Used*

*0 Vonage to Vonage Minutes Used*

**Charged Calls**

*You have no charged calls for this period.*

---





**Estimated Charges for**  02/27/2017-03/26/2017

**Account #:**          1008059988

## Current Usage Summary      (Continued)                    $0.00

(954) 302-2771 Vonage Fax

**In Plan Minutes**

   *You have not used any In Plan Minutes in this period.*

**Charged Calls**

   *You have no charged calls for this period.*

## Surcharges                                              $14.94

| | |
|---|---|
| Emergency 911 and Information Services Fee | $5.97 |
| Regulatory, Compliance and Intellectual Property Fee | $8.97 |

## Government Mandated Taxes & Fees                        $16.62

| | |
|---|---|
| State 911 Fee | $1.20 |
| Local Communications Service Tax | $4.58 |
| Federal Program Fee | $8.76 |
| State Gross Receipts Surcharge | $2.08 |

## Current Estimated Charges                               $95.53

| | |
|---|---|
| Current Estimated Charges | $95.53 |





## Charged Calls:                                    **$0.00**



## Summary of Charges

| | | | |
|---|---|---|---|
| **Billing Name:** | CONSTANTIN LUCHIAN | **Account #:** | 1008059988 |
| **Billing Address:** | 110 E Broward Blvd | **Billing Period:** | 06/27/2016-07/26/2016 |
| | Suite 1700 | | |
| | Fort Lauderdale, FL 33301 | | |
| | UNITED STATES | | |

**Your charges for this period:**

**$96.80**

This bill cycle ended on 07/26/2016

 **Questions about your bill?**

Visit us at www.vonage.com

| | |
|---|---|
| **Monthly Charges** | $63.97 |
| **Surcharges** | $14.94 |
| **Government Mandated Taxes & Fees** | $17.89 |
| **Final Balance** | $96.80 |





**Charges for**  06/27/2016-07/26/2016

**Account #:**               1008059988

## Monthly Charges                                    **$63.97**

| | |
|---|---:|
| Residential Premium Unlimited Plan for 1-(954)-237-3587 (27/Jul-26/Aug) | $25.99 |
| Basic Residential FAX Plan for 1-(954)-302-2771 (27/Jul-26/Aug) | $9.99 |
| Vonage World Plan - Additional Line for 1-(954)-333-8989 (27/Jul-26/Aug) | $27.99 |

## Usage Summary

**(954) 237-3587**

**In Plan Minutes**

*4 Domestic In Plan Minutes Used*

*0 Vonage to Vonage Minutes Used*

**Charged Calls**

*You have no charged calls for this period.*

**(954) 302-2771**

**In Plan Minutes**

*You have not used any In Plan Minutes in this period.*

**Charged Calls**

*You have no charged calls for this period.*

**(954) 333-8989**

**In Plan Minutes**

*19 Domestic In Plan Minutes Used*

*0 International In Plan Minutes Used*

*0 Vonage to Vonage Minutes Used*

---





**Charges for**  06/27/2016-07/26/2016

**Account #:**          1008059988

## Usage Summary     (Continued)

| **Charged Calls** |
| --- |
| *You have no charged calls for this period.* |

## Surcharges                                      $14.94

| Regulatory, Compliance and Intellectual Property Fee | $8.97 |
| --- | --- |
| Emergency 911 and Information Services Fee | $5.97 |

## Government Mandated Taxes & Fees            $17.89

| State 911 Fee | $1.20 |
| --- | --- |
| Sales Tax | $0.00 |
| Federal Program | $9.94 |
| State Gross Receipts Surcharge | $2.11 |
| Local Communications Service Tax | $4.64 |

## Final Balance                                   $96.80

| Final Balance | $96.80 |
| --- | --- |





**Charges for**  06/27/2016-07/26/2016

**Account #:**          1008059988

## Charged Calls:                                    $0.00





## Summary of Charges

| | | | |
|---|---|---|---|
| **Billing Name:** | CONSTANTIN LUCHIAN | **Account #:** | 1008059988 |
| **Billing Address:** | 110 E Broward Blvd<br>Suite 1700<br>Fort Lauderdale, FL 33301<br>UNITED STATES | **Billing Period:** | 09/27/2015-10/26/2015 |

**Your charges for this period:**

**$95.44**

This bill cycle ended on 10/26/2015

 **Questions about your bill?**

Visit us at www.vonage.com

| | |
|---|---|
| **Monthly Charges** | $63.97 |
| **Surcharges** | $14.94 |
| **Government Mandated Taxes & Fees** | $16.53 |
| **Final Balance** | $95.44 |





**Charges for**   09/27/2015-10/26/2015

**Account #:**                    1008059988

## Monthly Charges                                $63.97

| | |
|---|---|
| Residential Premium Unlimited Plan for 1-(954)-237-3587 (27/Oct-26/Nov) | $25.99 |
| Basic Residential FAX Plan for 1-(954)-302-2771 (27/Oct-26/Nov) | $9.99 |
| Vonage World Plan - Additional Line for 1-(954)-333-8989 (27/Oct-26/Nov) | $27.99 |

## Usage Summary

### (954) 237-3587

**In Plan Minutes**

*17 Domestic In Plan Minutes Used*

*0 Vonage to Vonage Minutes Used*

**Charged Calls**

*You have no charged calls for this period.*

### (954) 302-2771

**In Plan Minutes**

*You have not used any In Plan Minutes in this period.*

**Charged Calls**

*You have no charged calls for this period.*

### (954) 333-8989

**In Plan Minutes**

*8 Domestic In Plan Minutes Used*

*0 International In Plan Minutes Used*

*0 Vonage to Vonage Minutes Used*





**Charges for**   09/27/2015-10/26/2015

**Account #:**                    1008059988

## Usage Summary     (Continued)

| **Charged Calls** |
| --- |
| *You have no charged calls for this period.* |

## Surcharges                                                           $14.94

| Regulatory, Compliance and Intellectual Property Fee | $8.97 |
| --- | --- |
| Emergency 911 and Information Services Fee | $5.97 |

## Government Mandated Taxes & Fees              $16.53

| State 911 Fee | $1.20 |
| --- | --- |
| Sales Tax | $0.00 |
| Federal Program | $8.68 |
| State Gross Receipts Surcharge | $2.08 |
| Local Communications Service Tax | $4.57 |

## Final Balance                                                      $95.44

| Final Balance | $95.44 |
| --- | --- |



**Charges for**   09/27/2015-10/26/2015

**Account #:**                1008059988

## Charged Calls:                                                                    **$0.00**



# Exhibit
# 4

| Product: | Corporation | Category: | | IRS Center: | Ogden |
| Name: | WEBZILLA, INC. | | | e-PostMark: | 9/15/2016 6:33:44 PM |
| FEIN: | *****7050 | | | Notification: | |
| Fiscal Year Begin Date: | 1/1/2015 | Fiscal Year End Date: | 12/31/2015 | eSigned: | |

| Date | Type of Activity | Submission ID | Refund/(Due) | Updated By | eSign Date |
|------|------------------|---------------|--------------|------------|------------|
| 9/14/2016 | Upload Started | | | | |
| 9/14/2016 | Ready to Release by Customer | | | | |
| 9/15/2016 | Released for Transmission - Validation in Progress | | | Rebecca2 | |
| 9/15/2016 | Ready to transmit - Validation Complete | | | | |
| 9/15/2016 | Transmitted to FD | 75414220162590690a37 | | | |
| 9/15/2016 | Accepted by FD on 9/15/2016 | | | | |

## Florida Corporate Income/Franchise Tax Return

FEIN ███████████

For calendar year 2015
or tax year beginning _____ , 2015
ending _____

F-1120, R. 01/16   **1019**
Rule 12C-1.051
Florida Administrative Code
Effective 01/16

| | |
|---|---|
| **Name** | WEBZILLA, INC. |
| **Address** | 2777 N STEMMONS FWY., SUITE 1655 |
| **City/State/ZIP** | DALLAS, TX   75207 |

☐ Check here if any changes have been made to name or address

### Computation of Florida Net Income Tax

1. Federal taxable income (see instructions) - **Attach pages 1-5 of federal return**   Check here if negative
2. State income taxes deducted in computing federal taxable income (attach schedule) ......   Check here if negative
3. Additions to federal taxable income (from Schedule I) ......   Check here if negative
4. Total of Lines 1, 2 and 3 ......   Check here if negative
5. Subtractions from federal taxable income (from Schedule II) ......   Check here if negative
6. Adjusted federal income (Line 4 minus Line 5) ......   Check here if negative
7. Florida portion of adjusted federal income (see instructions) ......   Check here if negative
8. Nonbusiness income allocated to Florida (from Schedule R) ......   Check here if negative
9. **Florida exemption** ......
10. Florida net income (Line 7 plus Line 8 minus Line 9) ......
11. Tax due: 5.5% of Line 10 or amount from Schedule VI, whichever is greater (see instructions for Schedule VI) ......
12. Credits against the tax (from Schedule V) ......
13. Total corporate income/franchise tax due (Line 11 minus Line 12) ......
14. a) Penalty: F-2220 _____   b) Other _____
    c) Interest: F-2220 _____   d) Other _____   Line 14 Total ▶
15. Total of Lines 13 and 14 ......
16. Payment credits: Estimated tax payments   16a $ _____
    Tentative tax payment   16b $ _____
17. Total amount due: Subtract Line 16 from Line 15. If positive, enter amount due here and on payment coupon.
    If the amount is negative (overpayment), enter on Line 18 and/or Line 19
18. Credit: Enter amount of overpayment **credited** to next year's estimated tax here and on payment coupon ......
19. Refund: Enter amount of overpayment to be **refunded** here and on payment coupon ......

544081
10-06-15

---

### Florida Corporate Income Tax Return

1019
F-1120
R. 01/16

**Do Not Detach**   YEAR ENDING   12/31/15

To ensure proper credit to your account, enclose your check with tax return when mailing.

**Return is Due 1st Day of the 4th Month After Close of the Taxable Year**

Check here if you transmitted funds electronically ▶ ☐

| | |
|---|---|
| **Name** | WEBZILLA, INC. |
| **Address** | 2777 N STEMMONS FWY., SUITE 1655 |
| **City/State/ZIP** | DALLAS, TX   75207 |

0



WEBZILLA, INC.

**1019**
F-1120
R. 01/16
Page 2

FEIN �_____

| | |
|---|---|
| This return is considered incomplete unless a copy of the federal return is attached. | |

If your return is not signed, or improperly signed and verified, it will be subject to a penalty. The statute of limitations will not start until your return is properly signed and verified. Your return must be completed in its entirety.

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

**Sign here** ▶ Signature of officer (must be an original signature)       Date       Title ▶ **FINANCE DIRECTOR**

**Paid preparers only**

Preparer's signature ▶ **TONI MAYFIELD**       Date       Preparer check if self-employed ☐       Preparer's PTIN ▶ **P00294181**

Firm's name (or yours if self-employed) and address ▶ **WHITLEY PENN LLP**
**8343 DOUGLAS AVENUE, STE. 400**
**DALLAS, TX**       FEIN ▶ ▮▮▮▮       ZIP ▶ **75225**

## All Taxpayers Must Answer Questions A through M Below - See Instructions

A. State of incorporation: **FLORIDA**

B. Florida Secretary of State document number: **P09000064327**

C. Florida consolidated return?   YES ☐   NO ☒

D. ☐ Initial return   ☐ Final return (final federal return filed)

E. Taxpayer election section (s.) 220.03(5), Florida Statutes (F.S.)   ☒ General Rule
   ☐ Election A   ☐ Election B

F. Principal Business Activity Code (as pertains to Florida)
   **541519**

G. A Florida extension of time was timely filed?   YES ☒   NO ☐

H-1. Corporation is a member of a controlled group?   YES ☒   NO ☐   If yes, attach list.

H-2. Part of a federal consolidated return?   YES ☐   NO ☒   If yes, provide:
   FEIN from federal consolidated return: _____
   Name of corporation: _____

H-3. The federal common parent has sales, property, or payroll in Florida?   YES ☐   NO ☒

I. Location of corporate books:
   **2777 STEMMONS FWY., SUITE 1655**
   City, State, ZIP: **DALLAS, TX   75207**

J. Taxpayer is a member of a Florida partnership or joint venture?   YES ☐   NO ☒

K. Enter date of latest IRS audit:
   a) List years examined: _____

L. Contact person concerning this return: **CONSTANTIN LUCHIAN**
   a) Contact person telephone number: **954-237-3587**
   b) Contact person e-mail address: **CL@INCORPORATENOW.COM**

M. Type of federal return filed   ☒ 1120   ☐ 1120S or _____

### Where to Send Payments and Returns

Make check payable to and mail with return to:
   Florida Department of Revenue
   5050 W Tennessee Street
   Tallahassee FL 32399-0135

If you are requesting a **refund** (Line 19), send your return to:
   Florida Department of Revenue
   PO Box 6440
   Tallahassee FL 32314-6440

### Remember:

✔ **Make your check payable to the Florida Department of Revenue.**

✔ **Write your FEIN on your check.**

✔ **Sign your check and return.**

✔ **Attach a copy of your federal return.**

✔ **Attach a copy of your Florida Form F-7004 (extension of time) if applicable.**

544082
10-06-15

Exhibit
5



# Interim Designation of Agent to Receive Notification
## of Claimed Infringement

**Full Legal Name of Service Provider:** Webzilla Inc.

**Alternative Name(s) of Service Provider (including all names under which the service provider is doing business):** www.webzilla.com, Webzilla, WebZilla

Address of Service Provider: 110 E. Broward Blvd., Suite 1700, Fort Lauderdale, FL 33301

**Name of Agent Designated to Receive Notification of Claimed Infringement:** Constantin Luchian

**Full Address of Designated Agent to which Notification Should be Sent** (a P.O. Box or similar designation is not acceptable except where it is the only address that can be used in the geographic location):
1007 N. Federal Hwy., Suite 240, Fort Lauderdale, FL 33304

**Telephone Number of Designated Agent:** (954) 773 8743

**Facsimile Number of Designated Agent:** (954) 414 0865

**Email Address of Designated Agent:** abuse@webzilla.com

Signature of Officer or Representative of the Designating Service Provider:
⬛⬛⬛⬛⬛⬛⬛⬛                     Date: 6/25/2010

Typed or Printed Name and Title: Custodian of Record

**Note: This Interim Designation Must be Accompanied by a Filing Fee\* Made Payable to the Register of Copyrights.**
**\*Note: Current and adjusted fees are available on the Copyright website at www.copyright.gov/docs/fees.html**

Scanned
AUG 0 6 2010

Mail the form to:
**Copyright GC/I&R**
**P.O. Box 70400**
**Washington, DC 20024**



163977110

Received
JUN 3 0 2010
Copyright Office

Exhibit
6



Department of State / Division of Corporations / Search Records / Detail By Document Number /

# Detail by Entity Name

Florida Profit Corporation
DEDICATED SERVERS INC

**Filing Information**

| | |
|---|---|
| **Document Number** | P11000039978 |
| **FEI/EIN Number** | N/A |
| **Date Filed** | 04/25/2011 |
| **State** | FL |
| **Status** | ACTIVE |
| **Last Event** | AMENDMENT |
| **Event Date Filed** | 07/16/2012 |
| **Event Effective Date** | NONE |

**Principal Address**

2777 Stemmons Fwy.
Suite 1655
Dallas, FL 75207

Changed: 01/18/2014

**Mailing Address**

2777 Stemmons Fwy.
Suite 1655
Dallas, FL 75207

Changed: 01/18/2014

**Registered Agent Name & Address**

INCORPORATED NOW INC
6750 N. Andrews Ave.
Suite 200
Fort Lauderdale, FL 33309

Address Changed: 02/04/2015

**Officer/Director Detail**

**Name & Address**

Title D

MISHRA, RAJESH K
2777 N Stemmons Fwy.

Case 0:17-cv-60426-UU   Document 21-12   Entered on FLSD Docket 03/27/2017   Page 46 of 51

Suite 1655
Dallas, TX 75207

**Annual Reports**

| Report Year | Filed Date |
|-------------|------------|
| 2014        | 01/18/2014 |
| 2015        | 02/04/2015 |
| 2016        | 03/24/2016 |

**Document Images**

| | |
|---|---|
| 03/24/2016 -- ANNUAL REPORT | View image in PDF format |
| 02/04/2015 -- ANNUAL REPORT | View image in PDF format |
| 01/18/2014 -- ANNUAL REPORT | View image in PDF format |
| 03/30/2013 -- ANNUAL REPORT | View image in PDF format |
| 07/16/2012 -- Amendment | View image in PDF format |
| 02/22/2012 -- ANNUAL REPORT | View image in PDF format |
| 04/25/2011 -- Domestic Profit | View image in PDF format |

Florida Department of State, Division of Corporations

# Exhibit
# 7

FLORIDA DEPARTMENT *of* STATE                    DIVISION OF CORPORATIONS



Department of State / Division of Corporations / Search Records / Detail By Document Number /

# Detail by Entity Name

Florida Profit Corporation
IP TRANSIT INC

**Filing Information**

| | |
|---|---|
| **Document Number** | P09000064840 |
| **FEI/EIN Number** | N/A |
| **Date Filed** | 07/30/2009 |
| **Effective Date** | 04/17/2008 |
| **State** | FL |
| **Status** | ACTIVE |
| **Last Event** | AMENDMENT |
| **Event Date Filed** | 05/24/2010 |
| **Event Effective Date** | NONE |

**Principal Address**

2777 Stemmons Fwy.
Suite 1655
Dallas, TX 75207

Changed: 01/17/2014

**Mailing Address**

2777 Stemmons Fwy.
Suite 1655
Dallas, TX 75207

Changed: 01/17/2014

**Registered Agent Name & Address**

INCORPORATE NOW INC.
6750 N. Andrews Ave.
Suite 200
Fort Lauderdale, FL 33309

Name Changed: 02/28/2010

Address Changed: 03/31/2013

**Officer/Director Detail**

**Name & Address**

**Title VP**

Bezruchenko, Kostyantyn

2777 Stemmons Fwy.

Suite 1655

Dallas, TX 75207

**Annual Reports**

| Report Year | Filed Date |
|---|---|
| 2014 | 01/17/2014 |
| 2015 | 02/04/2015 |
| 2016 | 02/23/2016 |

**Document Images**

| | |
|---|---|
| 02/23/2016 -- ANNUAL REPORT | View image in PDF format |
| 02/04/2015 -- ANNUAL REPORT | View image in PDF format |
| 01/17/2014 -- ANNUAL REPORT | View image in PDF format |
| 03/31/2013 -- ANNUAL REPORT | View image in PDF format |
| 02/22/2012 -- ANNUAL REPORT | View image in PDF format |
| 04/19/2011 -- ANNUAL REPORT | View image in PDF format |
| 05/24/2010 -- Amendment | View image in PDF format |
| 02/28/2010 -- ANNUAL REPORT | View image in PDF format |
| 07/30/2009 -- Domestic Profit | View image in PDF format |

Florida Department of State, Division of Corporations

# Exhibit
# 8



Contact us    Sales    Support

Home    IP Transit    Transport    CDN ▾    Peering

# IP Transit

## Office Information

**IP Transit Inc**
110 E. Broward Blvd.
Suite 1700
Fort Lauderdale, FL 33301
USA

Tel: 954 333 8989
Fax: +31 303 100 299
Email: sales@iptransit.com

## IP Transit network

The network of IP Transit has been built from scratch and is designed for the lowest latencies, fewest hops, reliability and stable round trip times.

IP Transit Networks provide a Multihomed IP-transit service providing the best route selection for your destination to the Internet with built-in redundancy and fault tolerance, offering carrier-grade service to telecom operators, Internet service providers (ISP), Application Service Providers (ASP), content players, and other users demanding high-quality performance and connectivity into the Internet backbone and major eyeball networks.

You are looking for robust IP Transit services that provide speed, rock-solid dependability, flexibility and route efficiency through our pure IP fiber backbone, that we can provide with an IP address allocation or as a BGP feed.

As IP Transit Networks are designed to stay ahead of bandwidth requirements resulting from the projected growth in global IP traffic, we are ready to meet your current capacity needs and grow with your business as traffic increases, by offering low latency connectivity that scales.

IP Transit offers guaranteed performance levels in critical areas such as throughput, packet loss and latency with 100% availability. All this supported with industry leading SLA's.

## Cost Effective

With flat monthly rates as well as burstable usage (95th percentile) and volume-based billing structures available in order to fit your requirements.

IP Transit powers your global reach by connecting your customers to the world.

Home  |  Contact Us  |  Privacy Policy Statement

© 2009 by IP Transit, Inc. All rights reserved          W3C / CSS / XML

Exhibit
61

# Re: Fwiw

**From:**

"Tapper, Jake" <jake.tapper@turner.com>

**To:**

Ben Smith <ben@buzzfeed.com>

**Date:**

Tue, 10 Jan 2017 23:58:55 +0000

---

I think your move makes the story less serious and credible
I think you damaged its impact

On Jan 10, 2017, at 6:56 PM, Ben Smith <ben@buzzfeed.com> wrote:

> Because we do not know 100%!
>
> I think we changed that language to be clearer.
>
> On Tue, Jan 10, 2017 at 6:50 PM Tapper, Jake <Jake.Tapper@turner.com> wrote:
>
>> Then why are you saying he "claims" to be a former agent?
>>
>> On Jan 10, 2017, at 6:46 PM, Ben Smith <ben@buzzfeed.com> wrote:
>>
>>> Of course we do. There is not an official list of former U.K. intelligence agents or a named source confirming he is a former U.K. Intel agent!

CONFIDENTIAL

Exhibit
62

# Re: Fwiw

**From:**

"Tapper, Jake" <jake.tapper@turner.com>

**To:**

Ben Smith <ben@buzzfeed.com>

**Date:**

Wed, 11 Jan 2017 00:10:42 +0000

---

Because we've been reporting this for weeks and have talked to dozens of people
We didn't just get a document and throw it up online

On Jan 10, 2017, at 7:09 PM, Ben Smith <ben@buzzfeed.com> wrote:

> how do you know he's a former agent? it's slightly awk phrasing and we're changing (or changed I think?) but we're just saying , "we have not infact confirmed w British intelligence agencies that he worked for them, though that's widely understood to be the case by everyone involved"
>
> ---
> Ben Smith
> @buzzfeedben
> cell: 646 369 3687
> PGP: 3DB3 BF94 407C 26D0 789E  D5F4 E71F F1F5 D826 3929
>
> On Tue, Jan 10, 2017 at 6:50 PM, Tapper, Jake <Jake.Tapper@turner.com> wrote:
>
>> Then why are you saying he "claims" to be a former agent?
>>
>> On Jan 10, 2017, at 6:46 PM, Ben Smith <ben@buzzfeed.com> wrote:
>>
>>> Of course we do. There is not an official list of former U.K. intelligence agents or a named source confirming he is a former U.K. Intel agent!
>>>
>>> On Tue, Jan 10, 2017 at 6:44 PM Tapper, Jake <Jake.Tapper@turner.com> wrote:
>>>
>>>> Collegiality wise it was you stepping on my dick
>>>>
>>>> You could have waited til morning

BuzzFeed_007836

Professionally this is unverified info

Your guys unlike us don't even seem to know who the former agent it

On Jan 10, 2017, at 6:39 PM, Ben Smith <ben@buzzfeed.com> wrote:

It was not an easy call. But I don't see a strong reason you and I and John McCain should be talking about this -- and the CIA aggregating it -- and not sharing it with readers.

How uncollegial? We credited you. It was a good story.

On Tue, Jan 10, 2017 at 6:36 PM Tapper, Jake <Jake.Tapper@turner.com> wrote:

That was pretty uncollegial

Not to mention irresponsible

CONFIDENTIAL

BuzzFeed_007837



No one has verified this stuff

BuzzFeed_007838

# Exhibit
63

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

ALEKSEJ GUBAREV,
XBT HOLDING S.A., and
WEBZILLA, INC.
    Plaintiffs,

v.

BUZZFEED, INC. and
BEN SMITH
    Defendants.

**Case No.**

**0:17-cv-60426-UU**

## PLAINTIFF ALEKSEJ GUBAREV'S OBJECTIONS AND RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff Aleksej Gubarev ("Plaintiff") hereby responds to Defendants' First Set of Interrogatories to Plaintiff Aleksej Gubarev (the "Interrogatories"). Plaintiff's failure to object to a particular Interrogatory or willingness to respond to an Interrogatory is not, and shall not be construed as an admission of the relevant or admissibility into evidence of any such response or that the purported factual premise for any Interrogatory is valid or accurate. The inadvertent production of any privileged information shall not be deemed to be a waiver of any applicable privilege with respect to such response or with respect to any other response.

### Objections and Responses to Interrogatories

**INTERROGATORY NO. 1:**    Identify all persons who are believed or known by you to have information concerning any of the allegations in Count I of the Complaint, and for each state the subject-matter of their knowledge.

**Response:**

1.    Aleksej Gubarev, Chairman, CEO and Director of XBT Holding S.A., c/o Boston Law Group, PC, 825 Beacon Street, Suite 20, Newton, MA 02459, +1-617-928-1800. The

my time to my family and my work. Although it is true that I had been quoted a few times in news articles prior to Buzzfeed's publication of the Dossier, I do not believe that, outside a small circle of tech executives, I am known at all.

**INTERROGATORY NO. 3:** Identify all facts supporting your allegation that the portion of the Dossier quoted in paragraph 26 of the Complaint, as it applies to you, is false and defamatory.

**Objection**: Plaintiff objects to this Interrogatory on the basis that it is overly broad and unduly burdensome. Specifically, given that the statements quoted in paragraph 26 of the Complaint are false, *all* facts support Plaintiff's allegations that the statements are false. In other words, Plaintiff objects on the basis that this Interrogatory requests evidence of the absence of a fact or proof of a negative premise. As such, this Interrogatory is overly broad and unduly burdensome, if not impossible to respond to, and requests information that is not likely to lead to the discovery of admissible evidence. Plaintiff objects to this Interrogatory to the extent that it calls for a conclusion of law. Plaintiff objects to this Interrogatory on the basis that it is argumentative and premised upon assumed facts. Subject to, and without waiving, these objections, Plaintiff responds as follows:

**Response**: No part of the family of companies of which XBT Holding S.A. and Webzilla, Inc. are a part has "been using botnets and porn traffic to transmit viruses, plant bugs, steal data [or] conduct 'altering operations' against the Democratic Party leadership." No entities linked to me have been involved in any of these types of activities. I was not "recruited under duress by the FSB." I was not recruited by the FSB at all. I was not recruited for any such activities by anyone else at any other time or in any other circumstances whatsoever. I have no knowledge of, and have never met or spoken to, a person known as Seva Kapsugovich. Neither myself, nor any part of the family of companies of which XBT Holding S.A. and Webzilla, Inc. are a part, have ever acted with "another hacking expert" to mount a cyber-attach on the Democratic Party Leadership. Because I have not been involved in the activities attributed to me and "XBT/Webzilla" in the referenced part of the Dossier, we have not had "to go effectively to ground to cover [our] traces." I have not met with Michael Cohen in Prague about the issues discussed in the referenced portion of the Dossier (or any other matter). I have not received any payments for any of the allegations referenced in the referenced portion of the Dossier (because I

did not engage in any of the allegations referenced therein).  To be clear, I say that the facts alleged in the Dossier concerning me are false because each and every one of the facts alleged in the Dossier about me are, in fact, false.

**INTERROGATORY NO. 4:**     For any entity for which you have performed professional services between January 1, 2010 and the present, and for which you have been compensated (whether as an officer, director, employee, consultant, independent contractor or otherwise) identify that entity including but not limited to the dates during which you were so compensated, and provide a specific description of your duties and responsibilities in each instance.

**Objection**:     Plaintiff objects to this Interrogatory in its entirety on the basis that it is overly broad, unduly burdensome, and seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence.  Without limiting the foregoing, Mr. Gubarev's performance of professional services at any time are irrelevant to the issues present in this litigation.  To the extent that his performance (or, more accurately, non-performance) of professional services could be deemed relevant, Mr. Gubarev incorporates his response to Interrogatory No. 3 above.

**INTERROGATORY NO. 5:**     Identify every bank or financial institution from which you have sought a loan or other financing since January 1, 2015, whether such financing was granted, and the dates of such application and decision.

**Objection**:     Plaintiff objects to this Interrogatory to the extent that it is overly broad, unduly burdensome, and seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence.  Specifically, and without limiting the foregoing, Plaintiff objects to the extent that it calls for the production of information relating to any loan or other financing unaffected by the issues set forth in the Complaint.  Furthermore, Plaintiff objects to this Interrogatory to the extent that it seeks confidential information and will not provide a response containing confidential information until such time as an appropriate protective order governing the use of confidential material in this litigation is entered by the Court.  Subject to, and without waiving, these objections, Plaintiff responds as follows:

As to all objections:

_____          July 19, 2017
Matthew Shayefar, Esq.                    Date

## VERIFICATION

I, Aleksej Gubarev, being first duly sworn in accordance with law, do hereby depose and state that I have read the responses to Defendants' First Set of Interrogatories to Plaintiff Aleksej Gubarev and that the responses are true and correct to the best of my knowledge and information.

_____

Aleksej Gubarev
(Printed name)

## CERTIFICATE OF SERVICE

**I hereby certify** that a true and correct copy of the foregoing was served electronically via the email on all counsel or parties of record on the service list below on this 19th day of July, 2017.

/s/ Matthew Shayefar
Matthew Shayefar

## SERVICE LIST

Katherine M. Bolger
Adam Lazier
Nathan Siegel
Levine Sullivan Koch & Schulz, LLP
321 West 44 Street, Suite 1000
New York, New York 10036
kbolger@lskslaw.com
alazier@lskslaw.com
nsiegel@lskslaw.com

Lawrence Allan Kellogg
Jezabel Pereira Lima
Levine Kellogg Lehman Schneider & Grossman LLP
Miami Center
201 So. Biscayne Boulevard, 22nd Floor
Miami, Florida 33131
lak@lklsg.com
jl@lklsg.com

# Exhibit
64

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

ALEKSEJ GUBAREV,
XBT HOLDING S.A., and
WEBZILLA, INC.
    Plaintiffs,

v.

BUZZFEED, INC. and
BEN SMITH
    Defendants.

**Case No.**

**0:17-cv-60426-UU**

## DECLARATION OF ALEKSEJ GUBAREV

I, Aleksej Gubarev, do hereby declare as follows:

1.    My name is Aleksej Gubarev.  I am over the age of 18 years.  I am one of the Plaintiffs in the above captioned action.  I was also the former Chief Executive Officer and Chairman of Plaintiff XBT Holding S.A., which is the parent company of the parent company of Plaintiff Webzilla, Inc.  I am familiar with the facts herein and make this declaration from my own personal knowledge.

2.    Any significant connection that I had in the AWMOpen Conference stopped in 2012, when management of the conferenced was transferred to another company.  I have not received any income from AWMOpen since 2009.

3.    Although crutop.nu was listed as an informational sponsor for the AWMOpen Conference, the conference would never have received any money from crutop.nu for this.  As an informational sponsor, it meant only that crutop.nu made a post or similar promotion about the conference on its website.

4.    From 2004 through 2008, I did not know that Pavel Vrublesky or crutop.nu were involved in spam or cybercrimes.  As of this day, I still do not have any personal knowledge about any such allegations, though I did learn that Pavel Vrublesky did go to prison.

5.     While it is true that an XBT subsidiary acquired and owned the domain name DDoS.com, XBT did not end up using the domain name for any project and eventually sold the domain name on or about January 2, 2016.

6.     To be more specific, XBT never created a forum to educate people about online safety at DDoS.com or anywhere else.

7.     German Klimenko did not attend any of XBT or its subsidiaries' press events at any time.

8.     When I met German Klimenko in 2016 at the Russian Internet Forum, it was a very brief meeting, lasting less than two minutes where we only exchanged small talk about business in general because I understand that Mr. Klimenko is also a business person in the technology industry.

9.     When I spoke at the Russian Internet Forum in 2016, it was to a small room with approximately 100-150 people in it.

10.    I never gave a speech at the 2016 St. Petersburg International Economic Forum, whether in an official or unofficial capacity.  I was not invited to be a part of the open table.

11.    Neither myself nor any of XBT's subsidiaries have ever been contacted by or indicted by Special Counsel Robert Mueller, the FBI, the CIA or any other governmental entity investigating the hacking of the Democratic National Committee (with the exception of some communications from the House and Senate Committees arising from this litigation).

12.    Ultimately, I have no idea how or why I, XBT and Webzilla were referenced in the dossier.  I can think of a few theories, but I cannot prove any of them and I don't know which (if any) of them are more likely.  One theory is that someone was trying to get retribution against me for making a purely technical and non-political comment that was used in a news article that turned out to have political ramifications.  Another is that a potential competitor of me and XBT/Webzilla wanted to spread lies about us to damage our reputations and to gain an unfair advantage.  There have even been suggestions that Christopher Steele or Fusion GPS simply made up these allegations themselves, but, because they have not revealed the supposed source of the allegations, there is no way for me to know.

Signed under the pains and penalties of perjury this 5th day of October, 2018.

Aleksej Gubarev

Exhibit
65

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. |
| | * | |
| v. | * | |
| | * | (18 U.S.C. §§ 2, 371, 1030, 1028A, 1956, |
| VIKTOR BORISOVICH NETYKSHO, | * | and 3551 et seq.) |
| BORIS ALEKSEYEVICH ANTONOV, | * | |
| DMITRIY SERGEYEVICH BADIN, | * | |
| IVAN SERGEYEVICH YERMAKOV, | * | |
| ALEKSEY VIKTOROVICH | * | |
|     LUKASHEV, | * | |
| SERGEY ALEKSANDROVICH | * | |
|     MORGACHEV, | * | |
| NIKOLAY YURYEVICH KOZACHEK, | * | |
| PAVEL VYACHESLAVOVICH | * | |
|     YERSHOV, | * | |
| ARTEM ANDREYEVICH | * | |
|     MALYSHEV, | * | |
| ALEKSANDR VLADIMIROVICH | * | |
|     OSADCHUK, | * | |
| ALEKSEY ALEKSANDROVICH | * | |
|     POTEMKIN, and | * | |
| ANATOLIY SERGEYEVICH | * | |
|     KOVALEV, | * | |
| | * | |
| Defendants. | * | |
| | * | |

*******

## INDICTMENT

The Grand Jury for the District of Columbia charges:

## COUNT ONE
### (Conspiracy to Commit an Offense Against the United States)

1.    In or around 2016, the Russian Federation ("Russia") operated a military intelligence agency called the Main Intelligence Directorate of the General Staff ("GRU"). The GRU had multiple units, including Units 26165 and 74455, engaged in cyber operations that involved the staged releases of documents stolen through computer intrusions. These units conducted large-scale cyber operations to interfere with the 2016 U.S. presidential election.

2.      Defendants VIKTOR BORISOVICH NETYKSHO, BORIS ALEKSEYEVICH ANTONOV, DMITRIY SERGEYEVICH BADIN, IVAN SERGEYEVICH YERMAKOV, ALEKSEY VIKTOROVICH LUKASHEV, SERGEY ALEKSANDROVICH MORGACHEV, NIKOLAY YURYEVICH KOZACHEK, PAVEL VYACHESLAVOVICH YERSHOV, ARTEM ANDREYEVICH MALYSHEV, ALEKSANDR VLADIMIROVICH OSADCHUK, and ALEKSEY ALEKSANDROVICH POTEMKIN were GRU officers who knowingly and intentionally conspired with each other, and with persons known and unknown to the Grand Jury (collectively the "Conspirators"), to gain unauthorized access (to "hack") into the computers of U.S. persons and entities involved in the 2016 U.S. presidential election, steal documents from those computers, and stage releases of the stolen documents to interfere with the 2016 U.S. presidential election.

3.      Starting in at least March 2016, the Conspirators used a variety of means to hack the email accounts of volunteers and employees of the U.S. presidential campaign of Hillary Clinton (the "Clinton Campaign"), including the email account of the Clinton Campaign's chairman.

4.      By in or around April 2016, the Conspirators also hacked into the computer networks of the Democratic Congressional Campaign Committee ("DCCC") and the Democratic National Committee ("DNC").  The Conspirators covertly monitored the computers of dozens of DCCC and DNC employees, implanted hundreds of files containing malicious computer code ("malware"), and stole emails and other documents from the DCCC and DNC.

5.      By in or around April 2016, the Conspirators began to plan the release of materials stolen from the Clinton Campaign, DCCC, and DNC.

6.      Beginning in or around June 2016, the Conspirators staged and released tens of thousands of the stolen emails and documents.  They did so using fictitious online personas, including

2

"DCLeaks" and "Guccifer 2.0."

7.      The Conspirators also used the Guccifer 2.0 persona to release additional stolen documents through a website maintained by an organization ("Organization 1"), that had previously posted documents stolen from U.S. persons, entities, and the U.S. government.   The Conspirators continued their U.S. election-interference operations through in or around November 2016.

8.      To hide their connections to Russia and the Russian government, the Conspirators used false identities and made false statements about their identities. To further avoid detection, the Conspirators used a network of computers located across the world, including in the United States, and paid for this infrastructure using cryptocurrency.

## **Defendants**

9.      Defendant VIKTOR BORISOVICH NETYKSHO (Нетыкшо Виктор Борисович) was the Russian military officer in command of Unit 26165, located at 20 Komsomolskiy Prospekt, Moscow, Russia.  Unit 26165 had primary responsibility for hacking the DCCC and DNC, as well as the email accounts of individuals affiliated with the Clinton Campaign.

10.     Defendant BORIS ALEKSEYEVICH ANTONOV (Антонов Борис Алексеевич) was a Major in the Russian military assigned to Unit 26165.  ANTONOV oversaw a department within Unit 26165 dedicated to targeting military, political, governmental, and non-governmental organizations with spearphishing emails and other computer intrusion activity.  ANTONOV held the title "Head of Department."  In or around 2016, ANTONOV supervised other co-conspirators who targeted the DCCC, DNC, and individuals affiliated with the Clinton Campaign.

11.     Defendant DMITRIY SERGEYEVICH BADIN (Бадин Дмитрий Сергеевич) was a Russian military officer assigned to Unit 26165 who held the title "Assistant Head of Department." In or around 2016, BADIN, along with ANTONOV,  supervised other co-conspirators who targeted the DCCC, DNC, and individuals affiliated with the Clinton Campaign.

12.     Defendant IVAN SERGEYEVICH YERMAKOV (Ермаков Иван Сергеевич) was a Russian military officer assigned to ANTONOV's department within Unit 26165.  Since in or around 2010, YERMAKOV used various online personas, including "Kate S. Milton," "James McMorgans," and "Karen W. Millen," to conduct hacking operations on behalf of Unit 26165.  In or around March 2016, YERMAKOV participated in hacking at least two email accounts from which campaign-related documents were released through DCLeaks.  In or around May 2016, YERMAKOV also participated in hacking the DNC email server and stealing DNC emails that were later released through Organization 1.

13.     Defendant ALEKSEY VIKTOROVICH LUKASHEV (Лукашев Алексей Викторович) was a Senior Lieutenant in the Russian military assigned to ANTONOV's department within Unit 26165.  LUKASHEV used various online personas, including "Den Katenberg" and "Yuliana Martynova."   In or around 2016, LUKASHEV sent spearphishing emails to members of the Clinton Campaign and affiliated individuals, including the chairman of the Clinton Campaign.

14.     Defendant SERGEY ALEKSANDROVICH MORGACHEV (Моргачев Сергей Александрович) was a Lieutenant Colonel in the Russian military assigned to Unit 26165.  MORGACHEV oversaw a department within Unit 26165 dedicated to developing and managing malware, including a hacking tool used by the GRU known as "X-Agent."  During the hacking of the DCCC and DNC networks, MORGACHEV supervised the co-conspirators who developed and monitored the X-Agent malware implanted on those computers.

15.     Defendant NIKOLAY YURYEVICH KOZACHEK (Козачек Николай Юрьевич) was a Lieutenant Captain in the Russian military assigned to MORGACHEV's department within Unit 26165.  KOZACHEK used a variety of monikers, including "kazak" and "blablabla1234565." KOZACHEK developed, customized, and monitored X-Agent malware used to hack the DCCC

and DNC networks beginning in or around April 2016.

16.    Defendant PAVEL VYACHESLAVOVICH YERSHOV (Ершов Павел Вячеславович) was a Russian military officer assigned to MORGACHEV's department within Unit 26165.  In or around 2016, YERSHOV assisted KOZACHEK and other co-conspirators in testing and customizing X-Agent malware before actual deployment and use.

17.    Defendant ARTEM ANDREYEVICH MALYSHEV (Малышев Артём Андреевич) was a Second Lieutenant in the Russian military assigned to MORGACHEV's department within Unit 26165.  MALYSHEV used a variety of monikers, including "djangomagicdev" and "realblatr."  In or around 2016, MALYSHEV monitored X-Agent malware implanted on the DCCC and DNC networks.

18.    Defendant ALEKSANDR VLADIMIROVICH OSADCHUK (Осадчук Александр Владимирович) was a Colonel in the Russian military and the commanding officer of Unit 74455.  Unit 74455 was located at 22 Kirova Street, Khimki, Moscow, a building referred to within the GRU as the "Tower."  Unit 74455 assisted in the release of stolen documents through the DCLeaks and Guccifer 2.0 personas, the promotion of those releases, and the publication of anti-Clinton content on social media accounts operated by the GRU.

19.    Defendant ALEKSEY ALEKSANDROVICH POTEMKIN (Потемкин Алексей Александрович) was an officer in the Russian military assigned to Unit 74455.  POTEMKIN was a supervisor in a department within Unit 74455 responsible for the administration of computer infrastructure used in cyber operations.  Infrastructure and social media accounts administered by POTEMKIN's department were used, among other things, to assist in the release of stolen documents through the DCLeaks and Guccifer 2.0 personas.

### Object of the Conspiracy

20.     The object of the conspiracy was to hack into the computers of U.S. persons and entities involved in the 2016 U.S. presidential election, steal documents from those computers, and stage releases of the stolen documents to interfere with the 2016 U.S. presidential election.

### Manner and Means of the Conspiracy

<u>Spearphishing Operations</u>

21.     ANTONOV, BADIN, YERMAKOV, LUKASHEV, and their co-conspirators targeted victims using a technique known as spearphishing to steal victims' passwords or otherwise gain access to their computers. Beginning by at least March 2016, the Conspirators targeted over 300 individuals affiliated with the Clinton Campaign, DCCC, and DNC.

    a.     For example, on or about March 19, 2016, LUKASHEV and his co-conspirators created and sent a spearphishing email to the chairman of the Clinton Campaign. LUKASHEV used the account "john356gh" at an online service that abbreviated lengthy website addresses (referred to as a "URL-shortening service"). LUKASHEV used the account to mask a link contained in the spearphishing email, which directed the recipient to a GRU-created website. LUKASHEV altered the appearance of the sender email address in order to make it look like the email was a security notification from Google (a technique known as "spoofing"), instructing the user to change his password by clicking the embedded link. Those instructions were followed. On or about March 21, 2016, LUKASHEV, YERMAKOV, and their co-conspirators stole the contents of the chairman's email account, which consisted of over 50,000 emails.

    b.     Starting on or about March 19, 2016, LUKASHEV and his co-conspirators sent spearphishing emails to the personal accounts of other individuals affiliated with

the Clinton Campaign, including its campaign manager and a senior foreign policy advisor.  On or about March 25, 2016, LUKASHEV used the same john356gh account to mask additional links included in spearphishing emails sent to numerous individuals affiliated with the Clinton Campaign, including Victims 1 and 2. LUKASHEV sent these emails from the Russia-based email account hi.mymail@yandex.com that he spoofed to appear to be from Google.

c.     On or about March 28, 2016, YERMAKOV researched the names of Victims 1 and 2 and their association with Clinton on various social media sites.  Through their spearphishing operations, LUKASHEV, YERMAKOV, and their co-conspirators successfully stole email credentials and thousands of emails from numerous individuals affiliated with the Clinton Campaign.  Many of these stolen emails, including those from Victims 1 and 2, were later released by the Conspirators through DCLeaks.

d.     On or about April 6, 2016, the Conspirators created an email account in the name (with a one-letter deviation from the actual spelling) of a known member of the Clinton Campaign.  The Conspirators then used that account to send spearphishing emails to the work accounts of more than thirty different Clinton Campaign employees.  In the spearphishing emails, LUKASHEV and his co-conspirators embedded a link purporting to direct the recipient to a document titled "hillary-clinton-favorable-rating.xlsx."  In fact, this link directed the recipients' computers to a GRU-created website.

22.     The Conspirators spearphished individuals affiliated with the Clinton Campaign throughout the summer of 2016.  For example, on or about July 27, 2016, the Conspirators

attempted after hours to spearphish for the first time email accounts at a domain hosted by a third-party provider and used by Clinton's personal office.  At or around the same time, they also targeted seventy-six email addresses at the domain for the Clinton Campaign.

### Hacking into the DCCC Network

23.    Beginning in or around March 2016, the Conspirators, in addition to their spearphishing efforts, researched the DCCC and DNC computer networks to identify technical specifications and vulnerabilities.

    a.    For example, beginning on or about March 15, 2016, YERMAKOV ran a technical query for the DNC's internet protocol configurations to identify connected devices.

    b.    On or about the same day, YERMAKOV searched for open-source information about the DNC network, the Democratic Party, and Hillary Clinton.

    c.    On or about April 7, 2016, YERMAKOV ran a technical query for the DCCC's internet protocol configurations to identify connected devices.

24.    By in or around April 2016, within days of YERMAKOV's searches regarding the DCCC, the Conspirators hacked into the DCCC computer network.  Once they gained access, they installed and managed different types of malware to explore the DCCC network and steal data.

    a.    On or about April 12, 2016, the Conspirators used the stolen credentials of a DCCC Employee ("DCCC Employee 1") to access the DCCC network.  DCCC Employee 1 had received a spearphishing email from the Conspirators on or about April 6, 2016, and entered her password after clicking on the link.

    b.    Between in or around April 2016 and June 2016, the Conspirators installed multiple versions of their X-Agent malware on at least ten DCCC computers, which allowed them to monitor individual employees' computer activity, steal passwords, and maintain access to the DCCC network.

c.      X-Agent malware implanted on the DCCC network transmitted information from the victims' computers to a GRU-leased server located in Arizona. The Conspirators referred to this server as their "AMS" panel. KOZACHEK, MALYSHEV, and their co-conspirators logged into the AMS panel to use X-Agent's keylog and screenshot functions in the course of monitoring and surveilling activity on the DCCC computers. The keylog function allowed the Conspirators to capture keystrokes entered by DCCC employees. The screenshot function allowed the Conspirators to take pictures of the DCCC employees' computer screens.

d.      For example, on or about April 14, 2016, the Conspirators repeatedly activated X-Agent's keylog and screenshot functions to surveil DCCC Employee 1's computer activity over the course of eight hours. During that time, the Conspirators captured DCCC Employee 1's communications with co-workers and the passwords she entered while working on fundraising and voter outreach projects. Similarly, on or about April 22, 2016, the Conspirators activated X-Agent's keylog and screenshot functions to capture the discussions of another DCCC Employee ("DCCC Employee 2") about the DCCC's finances, as well as her individual banking information and other personal topics.

25.     On or about April 19, 2016, KOZACHEK, YERSHOV, and their co-conspirators remotely configured an overseas computer to relay communications between X-Agent malware and the AMS panel and then tested X-Agent's ability to connect to this computer. The Conspirators referred to this computer as a "middle server." The middle server acted as a proxy to obscure the connection between malware at the DCCC and the Conspirators' AMS panel. On or about April

20, 2016, the Conspirators directed X-Agent malware on the DCCC computers to connect to this middle server and receive directions from the Conspirators.

<u>Hacking into the DNC Network</u>

26.     On or about April 18, 2016, the Conspirators hacked into the DNC's computers through their access to the DCCC network.  The Conspirators then installed and managed different types of malware (as they did in the DCCC network) to explore the DNC network and steal documents.

    a.     On or about April 18, 2016, the Conspirators activated X-Agent's keylog and screenshot functions to steal credentials of a DCCC employee who was authorized to access the DNC network.  The Conspirators hacked into the DNC network from the DCCC network using stolen credentials.  By in or around June 2016, they gained access to approximately thirty-three DNC computers.

    b.     In or around April 2016, the Conspirators installed X-Agent malware on the DNC network, including the same versions installed on the DCCC network. MALYSHEV and his co-conspirators monitored the X-Agent malware from the AMS panel and captured data from the victim computers.  The AMS panel collected thousands of keylog and screenshot results from the DCCC and DNC computers, such as a screenshot and keystroke capture of DCCC Employee 2 viewing the DCCC's online banking information.

<u>Theft of DCCC and DNC Documents</u>

27.     The Conspirators searched for and identified computers within the DCCC and DNC networks that stored information related to the 2016 U.S. presidential election.  For example, on or about April 15, 2016, the Conspirators searched one hacked DCCC computer for terms that included "hillary," "cruz," and "trump."  The Conspirators also copied select DCCC folders, including "Benghazi Investigations."  The Conspirators targeted computers containing information

such as opposition research and field operation plans for the 2016 elections.

28.     To enable them to steal a large number of documents at once without detection, the Conspirators used a publicly available tool to gather and compress multiple documents on the DCCC and DNC networks.   The Conspirators then used other GRU malware, known as "X-Tunnel," to move the stolen documents outside the DCCC and DNC networks through encrypted channels.

    a.     For example, on or about April 22, 2016, the Conspirators compressed gigabytes of data from DNC computers, including opposition research.   The Conspirators later moved the compressed DNC data using X-Tunnel to a GRU-leased computer located in Illinois.

    b.     On or about April 28, 2016, the Conspirators connected to and tested the same computer located in Illinois.   Later that day, the Conspirators used X-Tunnel to connect to that computer to steal additional documents from the DCCC network.

29.     Between on or about May 25, 2016 and June 1, 2016, the Conspirators hacked the DNC Microsoft Exchange Server and stole thousands of emails from the work accounts of DNC employees.   During that time, YERMAKOV researched PowerShell commands related to accessing and managing the Microsoft Exchange Server.

30.     On or about May 30, 2016, MALYSHEV accessed the AMS panel in order to upgrade custom AMS software on the server.   That day, the AMS panel received updates from approximately thirteen different X-Agent malware implants on DCCC and DNC computers.

31.     During the hacking of the DCCC and DNC networks, the Conspirators covered their tracks by intentionally deleting logs and computer files.   For example, on or about May 13, 2016, the Conspirators cleared the event logs from a DNC computer.   On or about June 20, 2016, the

Conspirators deleted logs from the AMS panel that documented their activities on the panel, including the login history.

Efforts to Remain on the DCCC and DNC Networks

32.     Despite the Conspirators' efforts to hide their activity, beginning in or around May 2016, both the DCCC and DNC became aware that they had been hacked and hired a security company ("Company 1") to identify the extent of the intrusions.  By in or around June 2016, Company 1 took steps to exclude intruders from the networks.  Despite these efforts, a Linux-based version of X-Agent, programmed to communicate with the GRU-registered domain linuxkrnl.net, remained on the DNC network until in or around October 2016.

33.     In response to Company 1's efforts, the Conspirators took countermeasures to maintain access to the DCCC and DNC networks.

    a.     On or about May 31, 2016, YERMAKOV searched for open-source information about Company 1 and its reporting on X-Agent and X-Tunnel.  On or about June 1, 2016, the Conspirators attempted to delete traces of their presence on the DCCC network using the computer program CCleaner.

    b.     On or about June 14, 2016, the Conspirators registered the domain actblues.com, which mimicked the domain of a political fundraising platform that included a DCCC donations page.  Shortly thereafter, the Conspirators used stolen DCCC credentials to modify the DCCC website and redirect visitors to the actblues.com domain.

    c.     On or about June 20, 2016, after Company 1 had disabled X-Agent on the DCCC network, the Conspirators spent over seven hours unsuccessfully trying to connect to X-Agent.  The Conspirators also tried to access the DCCC network using previously stolen credentials.

34.     In or around September 2016, the Conspirators also successfully gained access to DNC computers hosted on a third-party cloud-computing service.  These computers contained test applications related to the DNC's analytics.  After conducting reconnaissance, the Conspirators gathered data by creating backups, or "snapshots," of the DNC's cloud-based systems using the cloud provider's own technology.  The Conspirators then moved the snapshots to cloud-based accounts they had registered with the same service, thereby stealing the data from the DNC.

### Stolen Documents Released through DCLeaks

35.     More than a month before the release of any documents, the Conspirators constructed the online persona DCLeaks to release and publicize stolen election-related documents.  On or about April 19, 2016, after attempting to register the domain electionleaks.com, the Conspirators registered the domain dcleaks.com through a service that anonymized the registrant.  The funds used to pay for the dcleaks.com domain originated from an account at an online cryptocurrency service that the Conspirators also used to fund the lease of a virtual private server registered with the operational email account dirbinsaabol@mail.com.  The dirbinsaabol email account was also used to register the john356gh URL-shortening account used by LUKASHEV to spearphish the Clinton Campaign chairman and other campaign-related individuals.

36.     On or about June 8, 2016, the Conspirators launched the public website dcleaks.com, which they used to release stolen emails.  Before it shut down in or around March 2017, the site received over one million page views.  The Conspirators falsely claimed on the site that DCLeaks was started by a group of "American hacktivists," when in fact it was started by the Conspirators.

37.     Starting in or around June 2016 and continuing through the 2016 U.S. presidential election, the Conspirators used DCLeaks to release emails stolen from individuals affiliated with the Clinton Campaign.  The Conspirators also released documents they had stolen in other spearphishing operations, including those they had conducted in 2015 that collected emails from individuals

affiliated with the Republican Party.

38.    On or about June 8, 2016, and at approximately the same time that the dcleaks.com website was launched, the Conspirators created a DCLeaks Facebook page using a preexisting social media account under the fictitious name "Alice Donovan."   In addition to the DCLeaks Facebook page, the Conspirators used other social media accounts in the names of fictitious U.S. persons such as "Jason Scott" and "Richard Gingrey" to promote the DCLeaks website.  The Conspirators accessed these accounts from computers managed by POTEMKIN and his co-conspirators.

39.    On or about June 8, 2016, the Conspirators created the Twitter account @dcleaks_.  The Conspirators operated the @dcleaks_ Twitter account from the same computer used for other efforts to interfere with the 2016 U.S. presidential election. For example, the Conspirators used the same computer to operate the Twitter account @BaltimoreIsWhr, through which they encouraged U.S. audiences to "[j]oin our flash mob" opposing Clinton and to post images with the hashtag #BlacksAgainstHillary.

<u>Stolen Documents Released through Guccifer 2.0</u>

40.    On or about June 14, 2016, the DNC—through Company 1—publicly announced that it had been hacked by Russian government actors.  In response, the Conspirators created the online persona Guccifer 2.0 and falsely claimed to be a lone Romanian hacker to undermine the allegations of Russian responsibility for the intrusion.

41.    On or about June 15, 2016, the Conspirators logged into a Moscow-based server used and managed by Unit 74455 and, between 4:19 PM and 4:56 PM Moscow Standard Time, searched for certain words and phrases, including:

| Search Term(s) |
| --- |
| **"some hundred sheets"** |
| **"some hundreds of sheets"** |
| **dcleaks** |
| **illuminati** |
| **широко известный перевод**<br>[widely known translation] |
| **"worldwide known"** |
| **"think twice about"** |
| **"company's competence"** |

42.     Later that day, at 7:02 PM Moscow Standard Time, the online persona Guccifer 2.0 published its first post on a blog site created through WordPress.  Titled "DNC's servers hacked by a lone hacker," the post used numerous English words and phrases that the Conspirators had searched for earlier that day (bolded below):

> **Worldwide known** cyber security company [Company 1] announced that the Democratic National Committee (DNC) servers had been hacked by "sophisticated" hacker groups.
>
> I'm very pleased the company appreciated my skills so highly))) [. . .]
>
> Here are just a few docs from many thousands I extracted when hacking into DNC's network. [. . .]
>
> **Some hundred sheets**! This's a serious case, isn't it?  [. . .]
>
> I guess [Company 1] customers should **think twice about company's competence**.
>
> F[***]   the   **Illuminati**   and   their   conspiracies!!!!!!!!!   F[***] [Company 1]!!!!!!!!!!

43.     Between in or around June 2016 and October 2016, the Conspirators used Guccifer 2.0 to release documents through WordPress that they had stolen from the DCCC and DNC.  The Conspirators, posing as Guccifer 2.0, also shared stolen documents with certain individuals.

        a.     On or about August 15, 2016, the Conspirators, posing as Guccifer 2.0, received a

request for stolen documents from a candidate for the U.S. Congress.   The Conspirators responded using the Guccifer 2.0 persona and sent the candidate stolen documents related to the candidate's opponent.

b.      On or about August 22, 2016, the Conspirators, posing as Guccifer 2.0, transferred approximately 2.5 gigabytes of data stolen from the DCCC to a then-registered state lobbyist and online source of political news.  The stolen data included donor records and personal identifying information for more than 2,000 Democratic donors.

c.      On or about August 22, 2016, the Conspirators, posing as Guccifer 2.0, sent a reporter stolen documents pertaining to the Black Lives Matter movement.  The reporter responded by discussing when to release the documents and offering to write an article about their release.

44.     The Conspirators, posing as Guccifer 2.0, also communicated with U.S. persons about the release of stolen documents.  On or about August 15, 2016, the Conspirators, posing as Guccifer 2.0, wrote to a person who was in regular contact with senior members of the presidential campaign of Donald J. Trump, "thank u for writing back . . . do u find anyt[h]ing interesting in the docs i posted?"  On or about August 17, 2016, the Conspirators added, "please tell me if i can help u anyhow . . . it would be a great pleasure to me."  On or about September 9, 2016, the Conspirators, again posing as Guccifer 2.0, referred to a stolen DCCC document posted online and asked the person, "what do u think of the info on the turnout model for the democrats entire presidential campaign."  The person responded, "[p]retty standard."

45.     The Conspirators conducted operations as Guccifer 2.0 and DCLeaks using overlapping computer infrastructure and financing.

a.      For example, between on or about March 14, 2016 and April 28, 2016, the

Conspirators used the same pool of bitcoin funds to purchase a virtual private network ("VPN") account and to lease a server in Malaysia.  In or around June 2016, the Conspirators used the Malaysian server to host the dcleaks.com website. On or about July 6, 2016, the Conspirators used the VPN to log into the @Guccifer_2 Twitter account.  The Conspirators opened that VPN account from the same server that was also used to register malicious domains for the hacking of the DCCC and DNC networks.

b.      On or about June 27, 2016, the Conspirators, posing as Guccifer 2.0, contacted a U.S. reporter with an offer to provide stolen emails from "Hillary Clinton's staff." The Conspirators then sent the reporter the password to access a nonpublic, password-protected portion of dcleaks.com containing emails stolen from Victim 1 by LUKASHEV, YERMAKOV, and their co-conspirators in or around March 2016.

46.     On or about January 12, 2017, the Conspirators published a statement on the Guccifer 2.0 WordPress blog, falsely claiming that the intrusions and release of stolen documents had "totally no relation to the Russian government."

<u>Use of Organization 1</u>

47.     In order to expand their interference in the 2016 U.S. presidential election, the Conspirators transferred many of the documents they stole from the DNC and the chairman of the Clinton Campaign to Organization 1.  The Conspirators, posing as Guccifer 2.0, discussed the release of the stolen documents and the timing of those releases with Organization 1 to heighten their impact on the 2016 U.S. presidential election.

a.      On or about June 22, 2016, Organization 1 sent a private message to Guccifer 2.0 to "[s]end any new material [stolen from the DNC] here for us to review and it will

17

have a much higher impact than what you are doing."  On or about July 6, 2016, Organization 1 added, "if you have anything hillary related we want it in the next tweo [*sic*] days prefable [*sic*] because the DNC [Democratic National Convention] is approaching and she will solidify bernie supporters behind her after."  The Conspirators responded, "ok . . . i see."  Organization 1 explained, "we think trump has only a 25% chance of winning against hillary . . . so conflict between bernie and hillary is interesting."

b.  After failed attempts to transfer the stolen documents starting in late June 2016, on or about July 14, 2016, the Conspirators, posing as Guccifer 2.0, sent Organization 1 an email with an attachment titled "wk dnc link1.txt.gpg."  The Conspirators explained to Organization 1 that the encrypted file contained instructions on how to access an online archive of stolen DNC documents.  On or about July 18, 2016, Organization 1 confirmed it had "the 1Gb or so archive" and would make a release of the stolen documents "this week."

48.  On or about July 22, 2016, Organization 1 released over 20,000 emails and other documents stolen from the DNC network by the Conspirators.  This release occurred approximately three days before the start of the Democratic National Convention.  Organization 1 did not disclose Guccifer 2.0's role in providing them.  The latest-in-time email released through Organization 1 was dated on or about May 25, 2016, approximately the same day the Conspirators hacked the DNC Microsoft Exchange Server.

49.  On or about October 7, 2016, Organization 1 released the first set of emails from the chairman of the Clinton Campaign that had been stolen by LUKASHEV and his co-conspirators.  Between on or about October 7, 2016 and November 7, 2016, Organization 1 released

approximately thirty-three tranches of documents that had been stolen from the chairman of the Clinton Campaign.  In total, over 50,000 stolen documents were released.

### Statutory Allegations

50.     Paragraphs 1 through 49 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

51.     From at least in or around March 2016 through November 2016, in the District of Columbia and elsewhere, Defendants NETYKSHO, ANTONOV, BADIN, YERMAKOV, LUKASHEV, MORGACHEV, KOZACHEK, YERSHOV, MALYSHEV, OSADCHUK, and POTEMKIN, together with others known and unknown to the Grand Jury, knowingly and intentionally conspired to commit offenses against the United States, namely:

    a.     To knowingly access a computer without authorization and exceed authorized access to a computer, and to obtain thereby information from a protected computer, where the value of the information obtained exceeded $5,000, in violation of Title 18, United States Code, Sections 1030(a)(2)(C) and 1030(c)(2)(B); and

    b.     To knowingly cause the transmission of a program, information, code, and command, and as a result of such conduct, to intentionally cause damage without authorization to a protected computer, and where the offense did cause and, if completed, would have caused, loss aggregating $5,000 in value to at least one person during a one-year period from a related course of conduct affecting a protected computer, and damage affecting at least ten protected computers during a one-year period, in violation of Title 18, United States Code, Sections 1030(a)(5)(A) and 1030(c)(4)(B).

52.     In furtherance of the Conspiracy and to effect its illegal objects, the Conspirators committed the overt acts set forth in paragraphs 1 through 19, 21 through 49, 55, and 57 through

64, which are re-alleged and incorporated by reference as if fully set forth herein.

53.     In furtherance of the Conspiracy, and as set forth in paragraphs 1 through 19, 21 through 49, 55, and 57 through 64, the Conspirators knowingly falsely registered a domain name and knowingly used that domain name in the course of committing an offense, namely, the Conspirators registered domains, including dcleaks.com and actblues.com, with false names and addresses, and used those domains in the course of committing the felony offense charged in Count One.

All in violation of Title 18, United States Code, Sections 371 and 3559(g)(1).

## COUNTS TWO THROUGH NINE
### (Aggravated Identity Theft)

54.     Paragraphs 1 through 19, 21 through 49, and 57 through 64 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

55.     On or about the dates specified below, in the District of Columbia and elsewhere, Defendants VIKTOR BORISOVICH NETYKSHO, BORIS ALEKSEYEVICH ANTONOV, DMITRIY SERGEYEVICH BADIN, IVAN SERGEYEVICH YERMAKOV, ALEKSEY VIKTOROVICH LUKASHEV, SERGEY ALEKSANDROVICH MORGACHEV, NIKOLAY YURYEVICH KOZACHEK, PAVEL VYACHESLAVOVICH YERSHOV, ARTEM ANDREYEVICH MALYSHEV, ALEKSANDR VLADIMIROVICH OSADCHUK, and ALEKSEY ALEKSANDROVICH POTEMKIN did knowingly transfer, possess, and use, without lawful authority, a means of identification of another person during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), namely, computer fraud in violation of Title 18, United States Code, Sections 1030(a)(2)(C) and 1030(c)(2)(B), knowing that the means of identification belonged to another real person:

| Count | Approximate Date | Victim | Means of Identification |
|---|---|---|---|
| 2 | March 21, 2016 | Victim 3 | Username and password for personal email account |
| 3 | March 25, 2016 | Victim 1 | Username and password for personal email account |
| 4 | April 12, 2016 | Victim 4 | Username and password for DCCC computer network |
| 5 | April 15, 2016 | Victim 5 | Username and password for DCCC computer network |
| 6 | April 18, 2016 | Victim 6 | Username and password for DCCC computer network |
| 7 | May 10, 2016 | Victim 7 | Username and password for DNC computer network |
| 8 | June 2, 2016 | Victim 2 | Username and password for personal email account |
| 9 | July 6, 2016 | Victim 8 | Username and password for personal email account |

All in violation of Title 18, United States Code, Sections 1028A(a)(1) and 2.

## COUNT TEN
### (Conspiracy to Launder Money)

56.     Paragraphs 1 through 19, 21 through 49, and 55 are re-alleged and incorporated by reference as if fully set forth herein.

57.     To facilitate the purchase of infrastructure used in their hacking activity—including hacking into the computers of U.S. persons and entities involved in the 2016 U.S. presidential election and releasing the stolen documents—the Defendants conspired to launder the equivalent of more than $95,000 through a web of transactions structured to capitalize on the perceived anonymity of cryptocurrencies such as bitcoin.

58.     Although the Conspirators caused transactions to be conducted in a variety of currencies, including U.S. dollars, they principally used bitcoin when purchasing servers, registering domains, and otherwise making payments in furtherance of hacking activity.  Many of these payments were

processed by companies located in the United States that provided payment processing services to hosting companies, domain registrars, and other vendors both international and domestic. The use of bitcoin allowed the Conspirators to avoid direct relationships with traditional financial institutions, allowing them to evade greater scrutiny of their identities and sources of funds.

59.     All bitcoin transactions are added to a public ledger called the Blockchain, but the Blockchain identifies the parties to each transaction only by alpha-numeric identifiers known as bitcoin addresses. To further avoid creating a centralized paper trail of all of their purchases, the Conspirators purchased infrastructure using hundreds of different email accounts, in some cases using a new account for each purchase. The Conspirators used fictitious names and addresses in order to obscure their identities and their links to Russia and the Russian government. For example, the dcleaks.com domain was registered and paid for using the fictitious name "Carrie Feehan" and an address in New York. In some cases, as part of the payment process, the Conspirators provided vendors with nonsensical addresses such as "usa Denver AZ," "gfhgh ghfhgfh fdgfdg WA," and "1 2 dwd District of Columbia."

60.     The Conspirators used several dedicated email accounts to track basic bitcoin transaction information and to facilitate bitcoin payments to vendors. One of these dedicated accounts, registered with the username "gfadel47," received hundreds of bitcoin payment requests from approximately 100 different email accounts. For example, on or about February 1, 2016, the gfadel47 account received the instruction to "[p]lease send *exactly* **0.026043** bitcoin to" a certain thirty-four character bitcoin address. Shortly thereafter, a transaction matching those exact instructions was added to the Blockchain.

61.     On occasion, the Conspirators facilitated bitcoin payments using the same computers that they used to conduct their hacking activity, including to create and send test spearphishing emails.

Additionally, one of these dedicated accounts was used by the Conspirators in or around 2015 to renew the registration of a domain (linuxkrnl.net) encoded in certain X-Agent malware installed on the DNC network.

62.     The Conspirators funded the purchase of computer infrastructure for their hacking activity in part by "mining" bitcoin.  Individuals and entities can mine bitcoin by allowing their computing power to be used to verify and record payments on the bitcoin public ledger, a service for which they are rewarded with freshly-minted bitcoin.  The pool of bitcoin generated from the GRU's mining activity was used, for example, to pay a Romanian company to register the domain dcleaks.com through a payment processing company located in the United States.

63.     In addition to mining bitcoin, the Conspirators acquired bitcoin through a variety of means designed to obscure the origin of the funds.  This included purchasing bitcoin through peer-to-peer exchanges, moving funds through other digital currencies, and using pre-paid cards.  They also enlisted the assistance of one or more third-party exchangers who facilitated layered transactions through digital currency exchange platforms providing heightened anonymity.

64.     The Conspirators used the same funding structure—and in some cases, the very same pool of funds—to purchase key accounts, servers, and domains used in their election-related hacking activity.

      a.     The bitcoin mining operation that funded the registration payment for dcleaks.com also sent newly-minted bitcoin to a bitcoin address controlled by "Daniel Farell," the persona that was used to renew the domain linuxkrnl.net.  The bitcoin mining operation also funded, through the same bitcoin address, the purchase of servers and domains used in the GRU's spearphishing operations, including accounts-qooqle.com and account-gooogle.com.

b.      On or about March 14, 2016, using funds in a bitcoin address, the Conspirators purchased a VPN account, which they later used to log into the @Guccifer_2 Twitter account.  The remaining funds from that bitcoin address were then used on or about April 28, 2016, to lease a Malaysian server that hosted the dcleaks.com website.

c.      The Conspirators used a different set of fictitious names (including "Ward DeClaur" and "Mike Long") to send bitcoin to a U.S. company in order to lease a server used to administer X-Tunnel malware implanted on the DCCC and DNC networks, and to lease two servers used to hack the DNC's cloud network.

**Statutory Allegations**

65.    From at least in or around 2015 through 2016, within the District of Columbia and elsewhere, Defendants VIKTOR BORISOVICH NETYKSHO, BORIS ALEKSEYEVICH ANTONOV, DMITRIY SERGEYEVICH BADIN, IVAN SERGEYEVICH YERMAKOV, ALEKSEY VIKTOROVICH LUKASHEV, SERGEY ALEKSANDROVICH MORGACHEV, NIKOLAY YURYEVICH KOZACHEK, PAVEL VYACHESLAVOVICH YERSHOV, ARTEM ANDREYEVICH MALYSHEV, ALEKSANDR VLADIMIROVICH OSADCHUK, and ALEKSEY ALEKSANDROVICH POTEMKIN, together with others, known and unknown to the Grand Jury, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds to a place in the United States from and through a place outside the United States and from a place in the United States to and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, namely, a violation of Title 18, United States Code, Section 1030, contrary to Title 18, United States Code, Section 1956(a)(2)(A).

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT ELEVEN
### (Conspiracy to Commit an Offense Against the United States)

66.     Paragraphs 1 through 8 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

### Defendants

67.     Paragraph 18 of this Indictment relating to ALEKSANDR VLADIMIROVICH OSADCHUK is re-alleged and incorporated by reference as if fully set forth herein.

68.     Defendant ANATOLIY SERGEYEVICH KOVALEV (Ковалев Анатолий Сергеевич) was an officer in the Russian military assigned to Unit 74455 who worked in the GRU's 22 Kirova Street building (the Tower).

69.     Defendants OSADCHUK and KOVALEV were GRU officers who knowingly and intentionally conspired with each other and with persons, known and unknown to the Grand Jury, to hack into the computers of U.S. persons and entities responsible for the administration of 2016 U.S. elections, such as state boards of elections, secretaries of state, and U.S. companies that supplied software and other technology related to the administration of U.S. elections.

### Object of the Conspiracy

70.     The object of the conspiracy was to hack into protected computers of persons and entities charged with the administration of the 2016 U.S. elections in order to access those computers and steal voter data and other information stored on those computers.

### Manner and Means of the Conspiracy

71.     In or around June 2016, KOVALEV and his co-conspirators researched domains used by U.S. state boards of elections, secretaries of state, and other election-related entities for website vulnerabilities.  KOVALEV and his co-conspirators also searched for state political party email addresses, including filtered queries for email addresses listed on state Republican Party websites.

72.     In or around July 2016, KOVALEV and his co-conspirators hacked the website of a state board of elections ("SBOE 1") and stole information related to approximately 500,000 voters, including names, addresses, partial social security numbers, dates of birth, and driver's license numbers.

73.     In or around August 2016, KOVALEV and his co-conspirators hacked into the computers of a U.S. vendor ("Vendor 1") that supplied software used to verify voter registration information for the 2016 U.S. elections.   KOVALEV and his co-conspirators used some of the same infrastructure to hack into Vendor 1 that they had used to hack into SBOE 1.

74.     In or around August 2016, the Federal Bureau of Investigation issued an alert about the hacking of SBOE 1 and identified some of the infrastructure that was used to conduct the hacking. In response, KOVALEV deleted his search history.   KOVALEV and his co-conspirators also deleted records from accounts used in their operations targeting state boards of elections and similar election-related entities.

75.     In or around October 2016, KOVALEV and his co-conspirators further targeted state and county offices responsible for administering the 2016 U.S. elections.   For example, on or about October 28, 2016, KOVALEV and his co-conspirators visited the websites of certain counties in Georgia, Iowa, and Florida to identify vulnerabilities.

76.     In or around November 2016 and prior to the 2016 U.S. presidential election, KOVALEV and his co-conspirators used an email account designed to look like a Vendor 1 email address to send over 100 spearphishing emails to organizations and personnel involved in administering elections in numerous Florida counties.   The spearphishing emails contained malware that the Conspirators embedded into Word documents bearing Vendor 1's logo.

### Statutory Allegations

77.     Between in or around June 2016 and November 2016, in the District of Columbia and

elsewhere, Defendants OSADCHUK and KOVALEV, together with others known and unknown to the Grand Jury, knowingly and intentionally conspired to commit offenses against the United States, namely:

a.    To knowingly access a computer without authorization and exceed authorized access to a computer, and to obtain thereby information from a protected computer, where the value of the information obtained exceeded $5,000, in violation of Title 18, United States Code, Sections 1030(a)(2)(C) and 1030(c)(2)(B); and

b.    To knowingly cause the transmission of a program, information, code, and command, and as a result of such conduct, to intentionally cause damage without authorization to a protected computer, and where the offense did cause and, if completed, would have caused, loss aggregating $5,000 in value to at least one person during a one-year period from a related course of conduct affecting a protected computer, and damage affecting at least ten protected computers during a one-year period, in violation of Title 18, United States Code, Sections 1030(a)(5)(A) and 1030(c)(4)(B).

78.    In furtherance of the Conspiracy and to effect its illegal objects, OSADCHUK, KOVALEV, and their co-conspirators committed the overt acts set forth in paragraphs 67 through 69 and 71 through 76, which are re-alleged and incorporated by reference as if fully set forth herein.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION

79.    Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to Defendants that the United States will seek forfeiture as part of any sentence in the event of Defendants' convictions under Counts One, Ten, and Eleven of this Indictment.  Pursuant to Title 18, United

States Code, Sections 982(a)(2) and 1030(i), upon conviction of the offenses charged in Counts One and Eleven, Defendants NETYKSHO, ANTONOV, BADIN, YERMAKOV, LUKASHEV, MORGACHEV, KOZACHEK, YERSHOV, MALYSHEV, OSADCHUK, POTEMKIN, and KOVALEV shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds obtained directly or indirectly as a result of such violation, and any personal property that was used or intended to be used to commit or to facilitate the commission of such offense.  Pursuant to Title 18, United States Code, Section 982(a)(1), upon conviction of the offense charged in Count Ten, Defendants NETYKSHO, ANTONOV, BADIN, YERMAKOV, LUKASHEV, MORGACHEV, KOZACHEK, YERSHOV, MALYSHEV, OSADCHUK, and POTEMKIN shall forfeit to the United States any property, real or personal, involved in such offense, and any property traceable to such property.  Notice is further given that, upon conviction, the United States intends to seek a judgment against each Defendant for a sum of money representing the property described in this paragraph, as applicable to each Defendant (to be offset by the forfeiture of any specific property).

## Substitute Assets

80.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of any Defendant --

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States of America, pursuant to Title 18, United States Code, Section

982(b) and Title 28, United States Code, Section 2461(c), incorporating Title 21, United States

Code, Section 853, to seek forfeiture of any other property of said Defendant.

Pursuant to 18 U.S.C. §§ 982 and 1030(i); 28 U.S.C. § 2461(c).


Robert S. Mueller, III
Special Counsel
U.S. Department of Justice

A TRUE BILL:


_____
Foreperson

Date: July 13, 2018