# Exhibit
66



# Christopher Steele

## Vol. 1

06/18/2018

Page 1

```
1                Mr Christopher Steele
2          CONFIDENTIAL - ATTORNEYS' EYES ONLY
            IN THE UNITED STATES DISTRICT COURT
3              SOUTHERN DISTRICT OF FLORIDA
   _____
4                                :
   ALEKSEJ GUBAREV, XBT HOLDING  : Case No:
5  SA and WEBZILLA, INC          : 17-cv-60426-UU
6              Plaintiffs        :
7                  -v-           :
8  BUZZFEED, INC and BEN SMITH   :
9              Defendants        :
   _____      :
10
11            Videotaped deposition
12                    of
13            Mr Christopher Steele
14
15          On Monday, June 18th 2018
16
17          Commencing at 9.35 am
18
19               Taken at:
20             15 Old Bailey
21                London
22                EC4M 7EF
23             United Kingdom
24
25  Reported by: Miss Pamela Henley
```

Page 2

```
1                Mr Christopher Steele
2
3              A P P E A R A N C E S
4
5  On behalf of the Plaintiffs:
6          CIAMPA FRAY-WITZER, LLP
7          20 Park Plaza
8          Suite 505
9          Boston, MA 02116
10         Telephone:  617 426 0000
11         Email: Evan@CRWLegal.Com
12             BY:  MR EVAN FRAY-WITZER
13
14         BOSTON LAW GROUP, PC
15         825 Beacon Street
16         Suite 20
17         Newton Centre, MA 02459
18         Telephone:  617 928 1800
19         Email: vgurvits@bostonlawgroup.com
20             BY:  MR VAL GURVITS
21
22
23
24
25
```

Page 3

```
1                Mr Christopher Steele
2  W LEGAL LIMITED
3  47 Red Lion Street
4  London WC1R 4PF
5  United Kingdom
6  Telephone: 020 7220 9139
7  Email: steven.loble@wlegal.co.uk
8         BY:  MR STEVEN LOBLE
9
10 W LEGAL LIMITED
11 47 Red Lion Street
12 London WC1R 4PF
13 United Kingdom
14 Telephone: 020 7220 9136
15 Email: sonalsachania@wlegal.co.uk
16         BY:  MS SONAL SACHANIA
17
18 ONE ESSEX COURT
19 Temple
20 London EC4Y 9AR
21 Telephone:  020 7583 2000
22 Email: hbrown@oeclaw.co.uk
23         BY:  MS HANNAH BROWN QC
24
25
```

Page 4

```
1                Mr Christopher Steele
2  On behalf of the Defendants:
3          DAVIS WRIGHT TREMAINE LLP
4          1251 Avenue of the Americas
5          New York, New York 10021
6          Telephone:  212 402 4068
7          Email: katebolger@dwt.com
8              BY:  MS KATHERINE M BOLGER
9
10         BLACK SREBNICK KORNSPAN STUMPF
11         201 S Biscayne Boulevard
12         Suite 1300
13         Miami, Florida 33131
14         Telephone:  305 371 6421
15         Email: rblack@royblack.com
16             BY:  MR ROY BLACK
17
18         MATRIX CHAMBERS
19         Griffin Building
20         Gray's Inn
21         London WC1R 5LN
22         United Kingdom
23         Telephone:  020 7404 3447
24             BY:  MR ALEX BAILIN QC
25
```

Page 37

1                    Mr Christopher Steele
2    the FCO submission means that this question should
3    not be asked.
4                    The witness can choose whether to
5    answer.
6         A.    I choose not to answer.
7    BY MR FRAY-WITZER:
8         Q.    Are you familiar with
9    Glenn Simpson?
10        A.    I am.
11        Q.    Can you tell us who Mr Simpson is?
12        A.    He is the co-owner and co-director
13   of Fusion GPS, an investigative firm based in
14   Washington DC.
15        Q.    When did you first meet Mr Simpson?
16        A.    I do not remember exactly when, but
17   I would say either late 2009, or early 2010.
18        Q.    Do you recall the circumstances of
19   meeting Mr Simpson?
20        A.    I do.
21        Q.    And can you tell us what those
22   were?
23        A.    I was introduced to him in London
24   by a British investigator who I already knew.
25        Q.    What was the purpose of the

Page 38

1                    Mr Christopher Steele
2    introduction?
3         A.    To get to know somebody else in the
4    sector and potentially to co-operate or do
5    business in the future.
6         Q.    Prior to working with Mr Simpson or
7    Fusion GPS on the matter that is the subject of
8    the present proceedings, did you work with
9    Mr Simpson or Fusion GPS on any other matters?
10        A.    Yes, a number of projects.
11        Q.    Are you able to tell us in general
12   terms what those projects were?
13        A.    I think only in very general terms.
14   So the classic due diligence, anti-money
15   laundering and strategic advice.
16        Q.    Can you tell us what you did to
17   prepare for your deposition today?
18        A.    I met twice with my British legal
19   team for about 2 to 3 hours each, and I had a half
20   an hour telephone conversation with my US attorney
21   yesterday.
22        Q.    Did you review any documents in
23   preparation for today?
24        A.    I did.
25        Q.    And what documents did you review?

Page 39

1                    Mr Christopher Steele
2         A.    I reviewed the documents that were
3    submitted to me by my legal team, which were a
4    range of different documents, but primarily our
5    own pleadings in the English proceedings, and the
6    two sealed, I believe, testimonies of Mr Kramer
7    and Mr Bensinger.
8                    And I reviewed the congressional
9    testimony, I think, to the judiciary committee of
10   Mr Simpson.  Those were the main documents that I
11   reviewed.  And, of course, the questions that have
12   been submitted. And the orders. Yes.
13        Q.    Did you discuss your deposition
14   with anyone prior to today?
15        A.    Only with the people that I have
16   indicated just now, so my English legal team and
17   my American attorney.
18        Q.    Did you discuss your deposition at
19   all with Mr Simpson?
20        A.    I did not.
21        Q.    Did you discuss your deposition at
22   all with anyone connected to BuzzFeed?
23        A.    I did not.
24        Q.    Did you discuss your deposition
25   with anyone from the Penn Quarter Group?

Page 40

1                    Mr Christopher Steele
2         A.    I did not.
3    (Exhibit 4 marked for identification)
4         Q.    Did you discuss your deposition
5    today with the FCO?
6         A.    I did not.
7         Q.    You are being shown what has been
8    marked as Exhibit Number 4 to your deposition, can
9    you tell me if you recognize this document.
10        A.    I do.
11        Q.    And can you tell us what this
12   document is?
13        A.    It is what it says it is, which is
14   an intelligence memorandum concerning Russia's
15   interference in the 2016 American presidential
16   election.
17        Q.    If I refer to this document as the
18   December memo, would that be acceptable?
19        A.    Yes.
20        Q.    When did you create this document?
21        A.    I believe it was created on the
22   given date, which is 13th December 2016.
23        Q.    I am sorry, I got ahead of myself,
24   let me just ask, did you create this document?
25        A.    I did create this document.

Page 41

1                    Mr Christopher Steele
2          Q.    If you would turn to the second
3    page of the document, please, paragraph 3, it
4    begins first with a black bar that is a redaction,
5    and it has:
6              "[Redacted] reported that over the
7    period March to September 2016 a company called
8    XBT/Webzilla and its affiliates had been using
9    botnets and porn traffic to transmit viruses,
10   plant bugs, steal data and conduct 'altering
11   operations' against the Democratic Party
12   leadership.  Entities linked to one Aleksej
13   GUBAROV were involved and he and another hacking
14   expert, both recruited under duress by the FSB,
15   Seva KAPSUGOVICH, were significant players in this
16   operation.  In Prague, COHEN agreed [to]
17   contingency plans for various scenarios to protect
18   the operation, but in particular what was to be
19   done in the event that Hillary CLINTON won the
20   presidency.  It was important in this event that
21   all cash payments owed were made quickly and
22   discreetly and that cyber and other operators were
23   stood down/able to go effectively to ground to
24   cover their traces."
25              Did I read that correctly?

Page 42

1                    Mr Christopher Steele
2          A.    I believe so, yes.
3    (Exhibit 5 marked for identification)
4          Q.    You are being shown what has been
5    marked as Exhibit Number 5, the witness statement
6    of Nicola Cain dated 1 December 2018 (sic).
7          A.    That cannot be right.
8          Q.    2017. Thank you. We have not
9    transported into the future! If you could look at
10   paragraph 18, please. It says:
11              "Paragraphs 18 to 21 of the Defence
12   explain that, having received the unsolicited
13   timed raw intelligence written up in the December
14   memorandum, Mr Steele and Orbis considered that it
15   had implications for national security of the US
16   and the UK and that it needed to be further
17   analyzed and verified."
18              First, did I read that correctly?
19          A.    You did.
20          Q.    Do you agree with that statement?
21          A.    I do.
22          Q.    Prior to receiving the unsolicited
23   raw information that was included in the December
24   memo had you ever heard of XBT Holdings?
25              MR MILLAR:  We object to that

Page 43

1                    Mr Christopher Steele
2    question.
3              THE WITNESS:  Okay.
4              MR MILLAR:  There are 2 objections,
5    first, it would require the consent of the Foreign
6    & Commonwealth Office to answer that question in
7    relation to the period prior to 2009, to the
8    extent that his answer deals with the period prior
9    to 2009.
10             But, secondly, we are, as I
11   understand it, on topic 2 now, the operative words
12   in topic 2 are Mr Steele's efforts to verify the
13   allegations.  So one needs to look to see what the
14   allegations are in paragraph 3 of the December
15   memorandum that are the basis of the defamation
16   action in Florida.  They are very specific.  They
17   have been read to my client, and the topic which
18   we spent a lot of time discussing in the hearings
19   in the High Court has been formulated as
20   addressing his efforts to verify those
21   allegations.
22             What he may or may not have known
23   about a particular company or entity prior to that
24   has nothing to do with his efforts at
25   verification.

Page 44

1                    Mr Christopher Steele
2              THE EXAMINER:  US plaintiffs.
3              MR FRAY-WITZER:  I would argue that
4    knowledge or lack of knowledge of the plaintiffs
5    in the US action would speak towards verification.
6    Whether or not he had any familiarity with these
7    entities is relevant to the question of what may
8    have been done or not done to verify the
9    allegations contained in the December memo.
10             THE EXAMINER:  US defendants.
11             MR BLACK:  We support the
12   relevance of the plaintiffs' question.
13             THE EXAMINER:  My opinion is it is
14   not within topic 2, which concerns efforts to
15   verify the allegations.  The witness may choose
16   whether to answer.
17         A.    I choose not to answer.
18   BY MR FRAY-WITZER:
19         Q.    And simply for the record then, I
20   will ask the next two questions, prior to
21   receiving the unsolicited raw information had you
22   ever heard of Webzilla?
23             MR MILLAR:  Same objection.
24         A.    Same answer.
25   BY MR FRAY-WITZER:

Page 141

1            Mr Christopher Steele
2            MS EIKHOFF:  I would say that we
3    would need probably 14 to 30 days.
4            MR GURVITS:  Let us do 20 days.
5            THE WITNESS:  There is a difference
6    between 20 days and 20 working days.
7            MR LOBLE:  If we say 4 weeks, 28
8    days.
9            MS BOLGER:  We have a scheduling
10   order in the American we have to respect, so we
11   would need a final copy of it such that we can
12   write a summary judgment brief if we needed to, to
13   include it, right. So today, can we get it by the
14   end of June?  Sorry how about the end of the first
15   week in July. Which is the 6th July.
16           THE WITNESS:  That is pushing it a
17   bit. First week in July.
18           MS EIKHOFF:  What is the date that
19   you need it for your review?
20           MS BOLGER:  Well, how about July,
21   can we agree on July 13th?
22           MS EIKHOFF:  And that is assuming
23   that get our copy of the transcript within 7 days.
24           MS BOLGER:  Yes.  That is almost
25   the 30 days you asked.

Page 142

1            Mr Christopher Steele
2            THE WITNESS:  That is fine.
3            MS EIKHOFF:  That is okay.
4            THE EXAMINER:  Thank you all very
5    much.  Mr Steele can be released and can discuss
6    his evidence with anyone he likes.
7            THE VIDEOGRAPHER:  This is the end
8    of the deposition of Christopher Steele.  Going
9    off the record at 1.49.
10           THE COURT REPORTER:  Could I get
11   the order on the record, I believe you would like
12   regular delivery?
13           MR FRAY-WITZER:  Yes, please.
14           THE COURT REPORTER:  And regular
15   delivery as well?
16           MS BOLGER:  Yes.
17           MR BLAKE:  Regular.
18           THE COURT REPORTER:   Thank you.
19
20
21
22
23
24
25

Page 143

1
2            CERTIFICATE OF WITNESS
3
4
5
6
7            I, Christopher Steele, am the
8    witness in the foregoing deposition. I have read
9    the foregoing deposition and, having made such
10   changes and corrections as I desired, I certify
11   that the transcript is a true and accurate record
12   of my responses to the questions put to me on
13   Monday, June 18th 2018.
14
15
16
17
18   Signed_____
19        Christopher Steele
20   Dated this _____ day of_____ 2018
21
22
23
24
25

Page 144

1
2            CERTIFICATE OF COURT REPORTER
3
4            I, Pamela E Henley, Court Reporter,
5    do hereby certify that I took the stenotype notes
6    of the foregoing deposition and that the
7    transcript thereof is a true and accurate record
8    transcribed to the best of my skill and ability
9            I further certify that I am neither
10   counsel for, related to, nor employed by any of
11   the parties to the action in which this deposition
12   was taken, and that I am not a relative or
13   employee of any attorney or counsel employed by
14   the parties hereto, nor financially or otherwise
15   interested in the outcome of the action.
16
17
18
19
20
21
22        _____
23            Pamela E Henley
24
25

Page 145

```
 1
 2
 3                      ERRATA
 4    (Please make any amendments or corrections on the
 5    errata sheet and not on the original deposition)
 6  CORRECTION                              PAGE
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23  _____        _____
24
25  Signature                   Date
```

Exhibit
67

# POLITICO

# POLITICO



Former FBI Director James Comey testifies before the Senate Select Committee on Intelligence on Capitol Hill on June 8. | Getty

## Full text: James Comey testimony transcript on Trump and Russia

By POLITICO STAFF | 06/08/2017 11:14 AM EDT | Updated 06/08/2017 01:48 PM EDT

*A transcript of former FBI Director James Comey's testimony before the Senate Intelligence Committee on June 8.*

**SEN. RICHARD BURR:** I call this hearing to order. Director Comey, I appreciate your willingness to appear before the committee today, and more importantly I thank you for your dedicated service and leadership to the Federal Bureau of Investigation. Your appearance today speaks to the trust we have built over the years and I'm looking forward

to a very open and candid discussion today. I'd like to remind my colleagues that we will reconvene in closed session at 1:00 P.M. today, and I ask that you reserve for that venue any questions that might get into classified information. The director has been very gracious with his time, the vice chairman and I worked out a very specific timeline for his commitment to be on the hill, so we will do everything we can to meet that agreement.

The Senate Select Committee on Intelligence exists to certify for the other 85 members of the United States Senate and the American people that the intelligence community is operating lawfully, and has the necessary authorities and tools to accomplish its mission, and keep America safe. Part of our mission, beyond the oversight we continue to provide to the intelligence community and its activities, is to investigate Russian interference in the 2016 U.S. elections. The committee's work continues. This hearing represents part of that effort. Jim, allegations have been swirling in the press for the last several weeks and today is your opportunity to set the record straight. Yesterday, I read with interest your statement for the record, and I think it provides some helpful details surrounding your interactions with the president. It clearly lays out your understanding of those discussions, actions you took following each conversation and your state of mind.

I very much appreciate your candor, and I think it provides helpful details surrounding your interactions with the president. It clearly lays out your understanding of those discussions, actions you took following each conversation and your state of mind.

I very much appreciate your candor, and I think it's helpful as we work through to determine the ultimate truth behind possible Russian interference in the 2016 elections. Your statement also provides texture and context to your interactions with the president, from your vantage point, and outlines a strained relationship. The American people need to hear your side of the story, just as they need to hear the president's descriptions of events. These interactions also highlight the importance of the committee's ongoing investigation. Our experienced staff is interviewing all relevant parties and some of the most sensitive intelligence in our country's possession. We will establish the facts separate from rampant speculation and lay them out for the American people to make their own judgment.

## The most reliable politics newsletter.

✉ up for POLITICO Playbook and get the latest news, every morning — in your inbox.

| Your email... |
|---|

By signing up you agree to receive email newsletters or alerts from POLITICO. You can unsubscribe at any time.

Only then will we as a nation be able to move forward and to put this episode to rest. There are several outstanding issues not addressed in your statement that I hope you'll clear up for the American people today. Did the president's request for loyalty, your impression, let the one-on-one dinner of January 27th was and I quote "at least in part" an effort to create some patronage relationship and March 30th phone call asking what you could do to lift the cloud of Russia investigation in any way alter your approach of the FBI's investigation into general Flynn or the broader investigation into Russia, and possible links to the campaign? In your opinion did potential Russian efforts to establish a link with individuals in the Trump orbit rise to the level we could define as collusion or was it a counter-intelligence concern? There's been a significant public speculation about your decision-making related to the Clinton email investigation. Why did you decide publicly, to publicly announce, FBI's recommendations that the Department of Justice not pursue criminal charges? You have described it as a choice between a bad decision and a worse decision. The American people need to understand the facts behind your action. This committee is uniquely suited to investigate Russia's interference in the 2016 elections. We also have a unified bipartisan approach to what is a highly charged partisan issue. Russian activities during 2016 election may have been aimed at one party's candidate, but as my colleague senator Rubio says frequently, in 2018 and 2020, it could be aimed at anyone, at home or abroad.

My colleague, Senator Warner and I, have worked to stay in lock step on this investigation. We've had our differences on approach, at times, but I've constantly stressed that we need to be a team, and I think Senator Warner agrees with me. We must keep these questions above politics and partisanship. It's too important to be tainted by anyone trying to score political points. With that, again, I welcome you director, and I turn to the vice chairman for any comments he might have.

**SEN. MARK WARNER:** Thank you, Mr. Chairman and let me start by again absolutely thanking all the members of the committee for the seriousness in which they've taken on this task. Mr. Comey, thank you for agreeing to come testify as part of this committee's investigation into Russia. I realize this hearing has been obviously the focus of a lot of Washington, in the last few days. But the truth is, many Americans who may be tuning in today probably haven't focused on every twist and turn of the investigation. So I'd like to briefly describe, at least from this senator's standpoint, what we already know, and what we're still investigating. To be clear, this investigation is not about relitigating the election. It's not about who won or lost. And it sure as heck is not about Democrats versus Republicans. We are here because a foreign adversary attacked us right here at home, plain and simple. Not by guns or missiles, but by foreign operatives seeking to hijack our most

important democratic process, our presidential election. Russian spies engaged in a series of online cyber raids, and a broad campaign of disinformation, all ultimately aimed at sowing chaos to undermine public faith in our process, in our leadership, and ultimately in ourselves.

And that's not just this senator's opinion. It is the unanimous determination of the entire U.S. intelligence community. So we must find out the full story, what the Russians did, and candidly as some other colleagues mentioned, why they were so successful, and more importantly we must determine the necessary steps to take to protect our democracy and ensure they can't do it again. The chairman mentioned elections in 2018 and 2020, in my home state of Virginia, we have elections this year in 2017. Simply put, we cannot let anything or anyone prevent us from getting to the bottom of this. Now Mr. Comey, let me say at the outset, we haven't always agreed on every issue. In fact I've occasionally questioned some of the actions you've taken, but I've never had any reason to question your integrity, your expertise, or your intelligence. You've been a straight shooter with this committee and have been willing to speak truth to power, even at the risk of your own career, which makes the way in which you were fired by the president ultimately shocking. Recall we began this entire process with the president and his staff first denying that the Russians were ever involved and then falsely claiming that no one from his team was ever in touch with any Russians. We know that's just not the truth. Numerous Trump associates had undisclosed contacts with Russians before and after the election, including the president's attorney general, his former national security adviser and his current senior adviser, Mr. Kushner. That doesn't even begin to count the host of additional campaign associates and advisers who have also been caught up in this massive web.

We saw Mr. Trump's campaign manager, Mr. Manafort, forced to step down over ties to Russian back entities. The national security adviser, General Flynn, had to resign over his lies about engagements with the Russians, and we saw the candidate himself express an odd and unexplained affection for the Russian dictator while calling for the hacking of his opponent. There's a lot to investigate. Enough, in fact, that director Comey publicly acknowledged that he was leading an investigation into those links between Mr. Trump's campaign and the Russian government. As the director of the FBI, Mr. Comey was ultimately responsible for conducting that investigation, which might explain why you're sitting now as a private citizen. What we do know was at the same time that this investigation was proceeding, the president himself appears to have been engaged in an effort to influence or at least co-opt the director of the FBI. The testimony Mr. Comey submitted for today's hearing is very disturbing. For example, on January 27th, after summoning Director Comey to dinner, the president appears to have threatened director's

job while telling him "I need loyalty. I expect loyalty." At a later meeting, on February 14th, the president asked the attorney general to leave the Oval Office, so that he could privately ask Director Comey again "To see way clear to letting Flynn go." That is a statement that Director Comey interpreted as a request that he drop the investigation connected to general Flynn's false statements.

Think about it. The president of the United States asking the FBI Director to drop an ongoing investigation. And after that, the president called the FBI Director on two additional occasions, March 30th and April 11th and asked him again "To lift the cloud on the Russian investigation." Now, Director Comey denied each of these improper requests. The loyalty pledge, the admonition to drop the Flynn investigation, the request to lift the cloud on the Russian investigation. Of course, after his refusals, Director Comey was fired. The initial explanation for the firing didn't pass any smell test. So now Director Comey was fired because he didn't treat Hillary Clinton appropriately.

Of course that explanation lasted about a day, because the president himself then made very clear that he was thinking about Russia when he decided to fire Director Comey. Shockingly, reports suggest that the president admitted as much in an Oval Office meeting with the Russians the day after director Comey was fired. Disparaging our country's top law enforcement official as a "nutjob," the president allegedly suggested that his firing relieved great pressure on his feelings about Russia. This is not happening in isolation. At the same time, the president was engaged in these efforts with Director Comey, he was also at least allegedly asking senior leaders of the intelligence community to downplay the Russia investigation or to intervene with the director. Yesterday we had DNI Director Coats and NSA Director Admiral Rogers, who were offered a number of opportunities to flatly deny those press reports. They expressed their opinions, but they did not take that opportunity to deny those reports. They did not take advantage of that opportunity. My belief, that's not how the President of the United States should behave. Regardless of the outcome of our investigation into the Russia links, Director Comey's firing and his testimony raise separate and troubling questions that we must get to the bottom of. Again, as I said at the outset, I've seen firsthand how seriously every member of this committee is taking his work. I'm proud of the committee's efforts so far. Let me be clear. This is not a witch hunt. This is not fake news. It is an effort to protect our I can from a new threat that quite honestly will not go away any time soon.

So Mr. Comey, your testimony here today will help us move towards that goal. I look forward to that testimony. Thank you, Mr. Chairman.

WHITE HOUSE

## Comey blasts White House for 'lies, plain and simple'

By **JOSH GERSTEIN** and **KYLE CHENEY**

**BURR:** Thank you, vice chairman. Director has discussed when you agreed to appear before the committee it would be under oath. I'd ask you to please stand. Raise your right hand.

Do you solemnly swear to tell the truth, the whole truth and nothing but the truth so help you god?

**FORMER FBI DIRECTOR JAMES COMEY:** I do.

BURR: Please be seated. Director Comey you're now under oath. And I would just note to members, you will be recognized by seniority for a period up to seven minutes, and again, it is the intent to move to a closed session no later than 1:00 P.M. With that director Comey, you are recognized, you have the floor for as long as you might need.

**COMEY:** Thank you, Mr. Chairman, ranking member Warner, members of the committee, thank you for inviting me here to testify today. I've submitted my statement for the record, and I'm not going to repeat it here this morning. I thought I would just offer some very brief introductory remarks and I would welcome your questions. When I was appointed FBI Director in 2013, I understood that I served at the pleasure of the president. Even though I was appointed to a 10-year term, which Congress created in order to underscore the importance of the FBI being outside of politics and independent, I understood that I could be fired by a president for any reason or for no reason at all. And on May the ninth, when I learned that I had been fired, for that reason I immediately came home as a private citizen. But then the explanations, the shifting explanations, confused me and increasingly concerned me. They confused me because the president and I had had multiple conversations about my job, both before and after he took office, and he had repeatedly told me I was doing a great job, and he hoped I would stay. And I had repeatedly assured him that I did intend to stay and serve out the years of my term. He told me repeatedly that he had talked to lots of people about me, including our current Attorney General, and had learned that I was doing a great job, and that I was extremely well-liked by the FBI workforce.

So it confused me when I saw on television the president saying that he actually fired me because of the Russia investigation, and learned again from the media that he was telling privately other parties that my firing had relieved great pressure on the Russian

investigation. I was also confused by the initial explanation that was offered publicly that I was fired because of the decisions I had made during the election year. That didn't make sense to me for a whole bunch of reasons, including the time and all the water that had gone under the bridge since those hard decisions that had to be made. That didn't make any sense to me. And although the law required no reason at all to fire an FBI director, the administration then chose to defame me and more importantly the FBI by saying that the organization was in disarray, that it was poorly led, that the workforce had lost confidence in its leader. Those were lies, plain and simple. And I am so sorry that the FBI workforce had to hear them, and I'm so sorry that the American people were told them.

I worked every day at the FBI to help make that great organization better, and I say help, because I did nothing alone at the FBI. There no indispensable people at the FBI. The organization's great strength is that its values and abilities run deep and wide. The FBI will be fine without me. The FBI's mission will be relentlessly pursued by its people, and that mission is to protect the American people and uphold the constitution of the United States. I will deeply miss being part of that mission, but this organization and its mission will go on long beyond me and long beyond any particular administration. I have a message before I close for my former colleagues of the FBI but first I want the American people to know this truth. The FBI is honest. The FBI is strong. And the FBI is and always will be independent. And now to my former colleagues, if I may. I am so sorry that I didn't get the chance to say goodbye to you properly. It was the nor of my life to serve beside you, to be part of the FBI family, and I will miss it for the rest of my life. Thank you for standing watch. Thank you for doing so much good for this country. Do that good as long as ever you can. And senators, I look forward to your questions.

**BURR:** Director, thank you for that testimony, both oral and the written testimony that you provided to the committee yesterday and made public to the American people. The chair would recognize himself first for 12 minutes, vice chair for 12 minutes, based upon the agreement we have. Director, did the special counsel's office review and/or edit your written testimony?

**COMEY:** No.

**BURR:** Do you have any doubt that Russia attempted to interfere in the 2016 elections?

**COMEY:** None.

**BURR:** Do you have any doubt that the Russian government was behind the intrusions in the D triple C systems and the subsequent leaks of that information?

**COMEY:** No, no doubt.

**BURR:** Do you have any doubt the Russian government was behind the cyber intrusion in the state voter files?

**COMEY:** No.

**BURR:** Are you confident that no votes cast in the 2016 presidential election were altered?

**COMEY:** I'm confident. When I left as director I had seen no indication of that whatsoever.

**BURR:** Director Comey, did the president at any time ask you to stop the FBI investigation into Russian involvement in the 2016 U.S. Elections?

**COMEY:** Not to my understanding, no.

**BURR:** Did any individual working for this administration, including the justice department, ask you to stop the Russian investigation?

**COMEY:** No.

**BURR:** Director, when the president requested that you, and I quote "Let Flynn go," General Flynn had an unreported contact with the Russians, which is an offense, and if press accounts are right, there might have been discrepancies between facts and his FBI testimony. In your estimation, was general Flynn at that time in serious legal jeopardy, and in addition to that, do you sense that the president was trying to obstruct justice or just seek for a way for Mike Flynn to save face, given that he had already been fired?

**COMEY:** General Flynn at that point in time was in legal jeopardy. There was an open FBI criminal investigation of his statements in connection with the Russian contacts, and the contacts themselves, and so that was my assessment at the time. I don't think it's for me to say whether the conversation I had with the president was an effort to obstruct. I took it as a very disturbing thing, very concerning, but that's a conclusion I'm sure the special counsel will work towards to try and understand what the intention was there, and whether that's an offense.

**BURR:** Director, is it possible that, as part of this FBI investigation, the FBI could find evidence of criminality that is not tied to the 2016 elections, possible collusion, or coordination with Russians?

**COMEY:** Sure.

**BURR:** So there could be something that fits a criminal aspect to this that doesn't have anything to do with the 2016 election cycle?

**COMEY:** Correct, in any complex investigation, when you start turning over rocks, sometimes you find things that are unrelated to the primary investigation that are criminal in nature.

**BURR:** Director, Comey, you have been criticized publicly for the decision to present your findings on the email investigation directly to the American people. Have you learned anything since that time that would have changed what you said or how you chose to inform the American people?

**COMEY:** Honestly, no. It caused a whole lot of personal pain for me but as I look back, given what I knew at the time and even what I've learned since, I think it was the best way to try to protect the justice institution, including the FBI.

**BURR:** In the public domain is this question of the "steel dossier," a document that has been around out in for over a year. I'm not sure when the FBI first took possession of it, but the media had it before you had it and we had it. At the time of your departure from the FBI, was the FBI able to confirm any criminal allegations contained in the steel document?

**COMEY:** Mr. Chairman, I don't think that's a question I can answer in an open setting because it goes into the details of the investigation.

**BURR:** Director, the term we hear most often is collusion. When people are describing possible links between Americans and Russian government entities related to the interference in our election, would you say that it's Normal for foreign governments to reach out to members of an incoming administration?

**COMEY:** Yes.

**BURR:** At what point does the normal contact cross the line into an attempt to recruit agents or influence or spies?

**COMEY:** Difficult to say in the abstract. It depends upon the context, whether there's an effort to keep it covert, what the nature of the request made of the American by the foreign government are. It's a judgment call based on a whole lot of facts.

**BURR:** At what point would that recruitment become a counterintelligence threat to our country?

**COMEY:** Again, difficult to answer in the abstract, but when a foreign power is using especially coercion, or some sort of pressure to try and co-opt an American, especially a government official, to act on its behalf, that's a serious concern to the FBI and at the heart of the FBI's counterintelligence mission.

**BURR:** So if you've got a 36-page document of specific claims that are out there, the FBI would have to for counter intelligence reasons, try to verify anything that might be claimed in there, one, and probably first and foremost, is the counterintelligence concerns that we have about blackmail. Would that be an accurate statement?

**COMEY:** Yes. If the FBI receives a credible allegation that there is some effort to co-opt, coerce, direct, employee covertly an American on behalf of the foreign power, that's the basis on which a counterintelligence investigation is opened.

**BURR:** And when you read the dossier, what was your reaction, given that it was 100% directed at the president-elect?

**COMEY:** Not a question I can answer in open setting, Mr. Chairman.

**BURR:** Okay. When did you become aware of the cyber intrusion?

**COMEY:** The first cyber — there was all kinds of cyber intrusions going on all the time. The first Russian-connected cyber intrusion I became aware of in the late summer of 2015.

**BURR:** And in that time frame, there were more than the DNC and the D triple C that were targets?

**COMEY:** Correct, a massive effort to target government and nongovernmental, near governmental agencies like nonprofits.

**BURR:** What would be the estimate of how many entities out there the Russians specifically targeted in that time frame?

**COMEY:** It's hundreds. I suppose it could be more than 1,000, but it's at least hundreds.

**BURR:** When did you become aware that data had been exfiltrated?

**COMEY:** I'm not sure exactly. I think either late '15 or early '16.

**BURR:** And did you, the director of the FBI, have conversations with the last administration about the risk that this posed?

**COMEY:** Yes.

**BURR:** And share with us, if you will, what actions they took.

**COMEY:** Well, the FBI had already undertaken an effort to notify all the victims, and that's what we consider the entities attacked as part of this massive spear-phishing campaign so we notified them in an effort to disrupt what might be ongoing, and then there was a series of continuing interactions with entities through the rest of '15 into '16, and then throughout '16, the administration was trying to decide how to respond to the intrusion activity that it saw.

**BURR:** And the FBI in this case, unlike other cases that you might investigate, did you ever have access to the actual hardware that was hacked, or did you have to rely on a third party to provide you the day that that they had collected?

**COMEY:** In the case of the DNC, and I believe the D triple C, but I'm sure the DNC, we did not have access to the devices themselves. We got relevant forensic information from a private party, a high class entity, that had done the work but we didn't get direct access.

**BURR:** But no content.

**COMEY:** Correct.

**BURR:** Isn't content an important part of the forensics from a counter-intelligence standpoint?

**COMEY:** It is but what was briefed to me by the people who were my folks at the time is that they had gotten the information from the private party that they needed to understand the intrusion by the spring of 2016.

**BURR:** Let me go back if I can very briefly to the decision to publicly go out with your results on the email. Was your decision influenced by the attorney general's tarmac meeting with the former president, Bill Clinton?

**COMEY:** Yes. In ultimately conclusive way that was the thing that capped it for me, that I had to do something separately to protect the credibility of the investigation, which meant both the FBI and the justice department.

**BURR:** Were there other things that contributed to that, that you can describe in an open session?

**COMEY:** There were other things that contributed to that. One significant item I can't but know the committee's been briefed on, there's been some public accounts of it which are nonsense but I understand the committee has been briefed on the classified facts. Probably the only other consideration that I guess I can talk about in open setting is that at one point the attorney general had directed me not to call it an investigation, but instead to call it a matter, which confused me and concerned me, but that was one of the bricks in the load that led me to conclude I have to step away from the department if we're to close this case credibly.

**BURR:** Director, my last question, you're not only a seasoned prosecutor. You've led the FBI for years. You understand the investigative process. You've worked with this committee closely, and we're grateful to you, because I think we've mutually built trust in what your organization does, and what we do. Is there any doubt in your mind that this committee carry out its oversight role in the 2016 Russia involvement with the elections in parallel with the now special counsel set up?

**COMEY:** No, no doubt. It can be done. Requires lots of conversations but Bob Mueller is one of the this country's great, great pros and I'm sure you'll be able to work it out with him to run it in parallel.

**BURR:** Thank you. I turn it over to the vice chairman.

**WARNER:** Thank you, director Comey, again, for your service. Your comments to your FBI family, I know were heartfelt. Know that there are some in the administration who tried to smear your reputation. You had Acting Director McCabe in public testimony a few weeks back, and in public testimony yesterday reaffirm that the vast majority in FBI community had great trust in your leadership, and obviously trust in your integrity. I want to go through a number of the meetings that you referenced in your testimony, and let's start with the January 6th meeting in Trump Tower, where you went up with a series of officials to brief the President-elect on the Russia investigation. My understanding is you remained afterwards to brief him, on again, "Some personally sensitive aspects of the information you relayed." Now you said after that briefing you felt compelled to document that conversation that you actually started documenting it as soon as you got into the car.

Now you've had extensive experience at the department of justice and at the FBI. You've worked under presidents of both parties. What was about that meeting that led you to

determine that you needed to start putting down a written record?

**COMEY:** A combination of things. I think the circumstances, the subject matter, and the person I was interacting with. Circumstances, first, I was alone with the president of the United States, or the president-elect, soon to be president. The subject matter I was talking about matters that touch on the FBI's core responsibility, and that relate to the president, president-elect personally, and then the nature of the person. I was honestly concerned he might lie about the nature of our meeting so I thought it important to document. That combination of things I had never experienced before, but had led me to believe I got to write it down and write it down in a very detailed way.

**WARNER:** I think that's a very important statement you just made. Then, unlike your dealings with presidents of either parties in your past experience, in every subsequent meeting or conversation with this president, you created a written record. Did you feel that you needed to create this written record of these memos, because they might need to be relied on at some future date?

**COMEY:** Sure. I created records after conversations that I think I did it after each of our nine conversations. If I didn't, I did it for nearly all of them especially the ones that were substantive. I knew there might come a day when I would need a record of what had happened, not just to defend myself, but to defend the FBI and our integrity as an institution and the Independence of our investigative function. That's what made this so difficult is it was a combination of circumstances, subject matter and the particular person.

**WARNER:** And so in all your experience, this was the only president that you felt like in every meeting you needed to document because at some point, using your words, he might put out a non-truthful representation of that meeting.

**COMEY:** That's right, senator. As I said, as FBI director I interacted with President Obama, I spoke only twice in three years, and didn't document it. When I was Deputy Attorney General I had a one one-on-one with President Bush been I sent an email to my staff but I didn't feel with president bush the need to document it in that way. Again, because of the combination of those factors, just wasn't present with either President Bush or President Obama.

**WARNER:** I think that is very significant. I think others will probably question that. Now, the chairman and I have requested those memos. It is our hope that the FBI will get this committee access to those memos so again, we can read that contemporaneous rendition so that we've got your side of the story. Now I know members have said and press have said

that a great deal has been made whether the president asked and indicated whether the president was the subject of any investigation, and my understanding is prior to your meeting on January 6th, you discussed with your leadership team whether you should be prepared to assure then President-elect Trump that the FBI was not investigating him personally. Now, I understand that your leadership team, agreed with that but was that a unanimous decision? Was there any debate about that?

**COMEY:** Wasn't unanimous. One of the members of the leadership team had a view you that although it was technically true we did not have a counter-intelligence file case open on then President-elect Trump. His concern was because we're looking at the potential, again, that's the subject of the investigation, coordination between the campaign and Russia, because it was President Trump, President-elect Trump's campaign, this person's view was

inevitably his behavior, his conduct will fall within the scope of that work. And so he was reluctant to make the statement. I disagreed. I thought it was fair to say what was literally true. There was not a counterintelligence investigation of Mr. Trump, and I decided in the moment to say it, given the nature of our conversation.

**WARNER:** At that moment in time, did you ever revisit that as in the subsequent sessions?

**COMEY:** With the FBI leadership team? Sure. And the leader had that view that didn't change. His view was still that it was probably although literally true, his concern was it could be misleading, because the nature of the investigation was such that it might well touch, obviously it would touch, the campaign, and the person that headed the campaign would be the candidate, and so that was his view throughout.

**WARNER:** Let me move to the January 27th dinner, where you said "The president began by asking me whether I wanted to stay on as FBI director."

He also indicated that "lots of people" again your words, "Wanted the job." You go on to say the dinner itself was "Seemingly an effort to" to quote have you ask him for your job and create some "patronage" relationship. The president seems from my reading of your memo to be holding your job or your possibility of continuing your job over your head in a fairly direct way. What was your impression, and what did you mean by this notion of a patronage relationship?

**COMEY:** Well, my impression, and again it's my impression, I could always be wrong but my common sense told me what was going on is, either he had concluded or someone had

told him that you didn't, you've already asked Comey to stay, and you didn't get anything for it. And that the dinner was an effort to build a relationship, in fact, he asked specifically, of loyalty in the context of asking me to stay. As I said, what was odd about that is we'd already talked twice about it by that point and he said I very much hope you'll stay. In fact, I just remembered sitting a third, when you've seen the. IC tour of me walking across the blue room, and what the president whispered in my ear was "I really look forward to working with you." So after those encounters —

**WARNER:** That was a few days before your firing.

**COMEY:** On the Sunday after the inauguration. The next Friday I have dinner and the president begins by wanting to talk about my job and so I'm sitting there thinking wait a minute three times we've already, you've already asked me to stay or talked about me staying. My common sense, again I could be wrong but my common sense told me what's going on here is, he's looking to get something in exchange for granting my request to stay in the job.

**WARNER:** Again, we ail understand, I was a governor, I had people work for me but this constant requests and again quoting you, him saying that he, despite you explaining your independence, he said "I need loyalty, I expect loyalty." Have you ever had any of those kind of requests before from anyone else you've worked for in the government?

**COMEY:** No, and what made me uneasy at that point I'm the director of the FBI. The reason that Congress created a t10-year term is so that the director is not feeling as if they're serving at, with political loyalty owed to any particular person. The statue of justice has a blindfolds on. You're not supposed to peek out to see there your patron was please pleased with what you're doing. That's why I became FBI director to be in of that position. That's why I was uneasy.

**WARNER:** February 14th, seems strange, you were in a meeting, and your direct superior the attorney general was in that meeting as well, yet the president asked everyone to leave, including the attorney general to leave, before he brought up the matter of general Flynn. What was your impression of that type of action? Have you ever seen anything like that before?

**COMEY:** No. My impression was something big is about to happen. I need to remember every single word that is spoken, and again, I could be wrong, I'm 56 years old, I've been, seen a few things, my sense was the attorney general knew he shouldn't be leaving which was why he was leaving and I don't know Kushner well but I think he picked up on the

same thing so I knew something was about to happen that I needed to pay very close attention to.

**WARNER:** I found it very interesting that, that in the memo that you wrote after this February 14th pull-aside, you made clear that you wrote that memo in a way that was unclassified. If you affirmatively made the decision to write a memo that was unclassified, was that because you felt at some point, the facts of that meeting would have to come clean and come clear, and actually be able to be cleared in a way that could be shared with the American people?

**COMEY:** Well, I remember thinking, this is a very disturbing development, really important to our work. I need to document it and preserve it in a way, and this committee gets this but sometimes when things are classified, it tangled them up.

**WARNER:** Amen.

**COMEY:** It's hard to share within an investigative team. You have to be careful how you handled it for good reason. If I write it such a way that doesn't include anything of a classification, that would make it easier for to us discuss within the FBI and the government, and to hold onto it in a way that makes it accessible to us.

**WARNER:** Well again it's our hope particularly since you are a pretty knowledgeable guy and wrote this in a way that it was unqualified this committee will get access that unclassified document. I this I it will be important to our investigation. Let me ask you this in closing. How many ongoing investigations at any time does the FBI have?

**COMEY:** Tens of thousands.

**WARNER:** Tens of thousands. Did the president ever ask about any other ongoing investigation?

**COMEY:** No.

**WARNER:** Did he ever ask about you trying to interfere on any other investigation?

**COMEY:** No.

**WARNER:** I think, again, this speaks volumes. This doesn't even get to the questions around the phone calls about lifting the cloud. I know other members will get to that, but I really appreciate your testimony, and appreciate your service to our nation.

**COMEY:** Thank you, Senator Warner. I'm sitting here going through my contacts with him. I had one conversation with the president that was classified where he asked about our, an ongoing intelligence investigation, it was brief and entirely professional.

**WARNER:** He didn't ask to you take any specific action?

**COMEY:** No.

**WARNER:** Unlike what we did vis-à-vis will Flynn and the Russia investigation?

**COMEY:** Correct.

**WARNER:** Thank you, sir.

**BURR:** Senator Risch?

**SEN. JAMES RISCH:** Thank you very much. Mr. Comey, thank you for your service. America needs more like you and we really appreciate it. Yesterday, I got and everybody got the seven pages of your direct testimony that is now a part of the record here. And the first — I read it, and then I read it again, and all I could think was number one, how much hated the class of legal writing when I was in law school, and you are the guy that probably got the A after reading this. I find it clear. I find it concise, and having been a prosecutor for a number of years and handling hundreds, maybe thousands of cases and read police reports, investigative reports, this is as good as it gets, and I really appreciate that. Not only the conciseness and the clearness of it, but also the fact that you have things that were written down contemporaneously when they happened, and you actually put them in quotes so we know exactly what happened and we're not getting some rendition of it that's in your mind.

**COMEY:** Thank you, sir.

**RISCH:** You're to be complimented.

**COMEY:** I had great parents and great teachers who beat that into me.

**RISCH:** That's obvious, sir. The chairman walked you through a number of things that the American people need to know and want to know. Number one, obviously, we all know about the active measures that the Russians have taken. I think a lot of people were surprised at this. Those of us that work in the intelligence community, it didn't come as a surprise, but now the American people know this, and it's good they know this, because this is serious and it's a problem. I think secondly, I gather from all this that you're willing to

say now that, while you were director, the president of the United States was not under investigation. Is that a fair statement?

**COMEY:** That's correct.

**RISCH:** All right, so that's a fact that we are rely on?

**COMEY:** Yes, sir.

**RISCH:** I remember, you talked with us shortly after February 14th, when the "New York Times" wrote an article that suggested that the trump campaign was colluding with the Russians. Do you remember reading that article when it first came out?

**COMEY:** I do, it was about allegedly extensive electronic surveillance in their communications.

**RISCH:** Correct. That upset you to the point where you surveyed the intelligence community to see whether you were missing something in that. Is that correct?

**COMEY:** That's correct. I want to be careful in open setting, but —

**RISCH:** I'm not going to go any further than that, so thank you. In addition to that, after that, you sought out both Republican and Democrat senators to tell them that, hey, I don't know where this is coming from, but this is not the case. This is not factual. Do you recall that?

**COMEY:** Yes.

**RISCH:** Okay. So again, so the American people can understand this, that report by the New York Times was not true. Is that a fair statement?

**COMEY:** In the main, it was not true. And again, all of you know this. Maybe the American people don't. The challenge, and I'm not picking on reporters about writing stories about classified information, is the people talking about it often don't really know what's going on, and going on are not talking about it. We don't call the press to say, hey, you don't that thing wrong about the sensitive topic. We have to leave it there.

I mentioned to the chairman the nonsense around what influenced me to make the July 5th statement. Nonsense. But I can't go explaining how it is nonsense.

**RISCH:** Thank you. All right. So those three things we now know regarding the active measures, whether the president is under investigation and the collusion between the

trump campaign and the Russians. I want to drill right down, as my time is limited, to the most recent dust up regarding allegations that the president of the United States obstructed justice. Boy, you nailed this down on page 5, paragraph 3. You put this in quotes. Words matter. You wrote down the words so we can all have the words in front of us now. There's 28 words now in quotes. It says, quote, I hope -- this is the president speaking — I hope you can see your way clear to letting this go, to letting Flynn go. He is good guy. I hope you can let this go. Now, those are his exact words, is that correct.

**COMEY:** Correct.

**RISCH:** You wrote them here and put them in quotes.

**COMEY:** Correct.

**RISCH:** Thank you for that. He did not direct you to let it go?

**COMEY:** Not in his words, no.

**RISCH:** He did not order you to let it go?

**COMEY:** Again, those words are not an order.

**RISCH:** He said, I hope. Now, like me, you probably did hundreds of cases, maybe thousands of cases, charging people with criminal offenses and, of course, you have knowledge of the thousands of cases out there where people have been charged. Do you know of any case where a person has been charged for obstruction of justice or, for that matter, any other criminal offense, where they said or thought they hoped for an outcome?

**COMEY:** I don't know well enough to answer. The reason I keep saying his words is I took it as a direction.

**RISCH:** Right.

**COMEY:** I mean, this is a president of the United States with me alone saying I hope this. I took it as, this is what he wants me to do. I didn't obey that, but that's the way I took it.

**RISCH:** You may have taken it as a direction but that's not what he said.

**COMEY:** Correct.

**RISCH:** He said, I hope.

**COMEY:** Those are his exact words, correct.

**RISCH:** You don't know of anyone ever being charged for hoping something, is that a fair statement?

**COMEY:** I don't as I sit here.

**RISCH:** Thank you, Mr. Chairman.

**BURR:** Senator Feinstein?

**SEN. DIANNE FEINSTEIN:** Thanks very much, Mr. Chairman. Mr. Comey, I just want you to know that I have great respect for you. Senator Cornyn and I sit on the judiciary committee and we have the occasion to have you before us. You're a man of strength and I regret the situations we all find ourselves in. I just want to say that. Let me begin with one overarching question. Why do you believe you were fired?

**COMEY:** I guess I don't know for sure. I believe — I think the president, at his word, that I was fired because of the Russia investigation. Something about the way I was conducting it, the president felt created pressure on him that he wanted to relieve. Again, I didn't know that at the time. I watched his interview. I read the press accounts of his conversations. I take him at his word there. Look, I could be wrong. Maybe he's saying something that's not true. I take him at his word, at least based on what I know now.

**FEINSTEIN:** Talk for a moment about his request that you pledge loyalty and your response to that and what impact you believe that had.

**COMEY:** I don't know for sure because I don't know the president well enough to read him well. I think it was — first of all, relationship didn't get off to a great start, given the conversation I had to have on January 6th. This didn't improve the relationship because it was very, very awkward. He was asking for something, and I was refusing to give it. Again, I don't know him well enough to know how he reacted to that exactly.

**FEINSTEIN:** Do you believe the Russia investigation played a role?

**COMEY:** In why I was fired?

**FEINSTEIN:** Yes.

**COMEY:** Yes. I've seen the president say so.

**FEINSTEIN:** Let's go to the Flynn issue. The senator outlined, "I hope you could see your way to letting Flynn go. He is a good guy. I hope you can let this go." But you also said in your written remarks, and I quote, that you "had understood the president to be requesting that we drop any investigation of Flynn in connection with false statements about his conversations with the Russian ambassador in December,". Please go into that with more detail.

**COMEY:** Well, the context and the president's word are what led me to that conclusion. As I said in my statement, I could be wrong, but Flynn had been forced to resign the day before. And the controversy around general Flynn at that point in time was centered on whether he lied to the vice president about his nature of conversations with the Russians, whether he had been candid with others in the course of that. So that happens on the day before. On the 1, the president makes reference to that. I understood what he wanted me to do was drop any investigation connected to Flynn's account of his conversations with the Russians.

**FEINSTEIN:** Now, here's the question, you're big. You're strong. I know the oval office, and I know what happens to people when they walk in. There is a certain amount of intimidation. But why didn't you stop and say, Mr. President, this is wrong. I cannot discuss this with you.

**COMEY:** It's a great question. Maybe if I were stronger, I would have. I was so stunned by the conversation that I just took in. The only thing I could think to say, because I was playing in my mind -- because I could remember every word he said -- I was playing in my mind, what should my response be? That's why I carefully chose the words. Look, I've seen the tweet about tapes. Lordy, I hope there are tapes. I remember saying, "I agree he is a good guy," as a way of saying, I'm not agreeing with what you asked me to do. Again, maybe other people would be stronger in that circumstance. That's how Ed myself. I hope I'll never have another opportunity. Maybe if I did it again, I'd do it better.

**FEINSTEIN:** You describe two phone calls that you received from president trump. One on March 30th and one on April 11. He, quote, described the Russia investigation as a cloud that was impairing his ability, end quote, as president, and asked you, quote, to lift the cloud, end quote. How did you interpret that? What did you believe he wanted you to do?

**COMEY:** I interpreted that as he was frustrated that the Russia investigation was taking up so much time and energy. I think he meant of the executive branch, but in the public square in general. It was making it difficult for him to focus on other priorities of his. But what he asked me was actually narrowing than that. I think what he meant by the cloud —

and, again, I could be wrong — but the entire investigation is taking up oxygen and making it hard for me to focus on what I want to focus on. The ask was to get it out that I, the president, am not personally under investigation.

**FEINSTEIN:** After April 11th, did he ask you more ever about the Russia investigation? Did he ask you any questions?

**COMEY:** We never spoke again after April 11th.

**FEINSTEIN:** You told the president, I would see what we could do. What did you mean?

**COMEY:** It was kind of a cowardly way of trying to avoid telling him, we're not going to do that. That I would see what we could do. It was a way of kind of getting off the phone, frankly, and then I turned and handed it to the acting deputy attorney general.

**FEINSTEIN:** So I want to go into that. Who did you talk with about that, lifting the cloud, stop the investigation back at the FBI, and what was their response?

**COMEY:** The FBI, during one of the two conversations — I'm not remembering exactly — I think the first, my chief of staff was sitting in front of me and heard my end of the conversation because the president's call was a surprise. I discussed the lifting the cloud and the request with the senior leadership team who, typically, and I think in all the circumstances, was the deputy director, my chief of staff, the general counsel, the deputy director's chief counsel and, I think in a number of circumstances, the number three in the FBI and a few of the conversations included the head of the national security branch. The group of us that lead the FBI when it comes to national security.

**FEINSTEIN:** You have the president of the United States asking you to stop an investigation that is an important investigation. What was the response of your colleagues?

**COMEY:** I think they were as shocked and troubled by it as I was. Some said things that led me to believe that. I don't remember exactly. But the reaction was similar to mine. They're all experienced people who never experienced such a thing, so they were very concerned. Then the conversation turned to about, so what should we do with this information? That was a struggle for us. Because we are the leaders of the FBI, so it's been reported to us, and I heard it and now shared it with the leaders of the FBI, our conversation was, should we share this with any senior officials at the justice department? Our primary concern was, we can't infect the investigative team. We don't want the agents and analysts working on this to know the president of the united States has asked, and when it comes from the president, I took it as a direction, to get rid of this investigation

because we're not going to follow that request. So we decided, we have to keep it away from our troops.

Is there anyone else we ought to tell at the justice department? We considered whether to tell -- the attorney general said we believe rightly he was shortly going to recuse. There was no other senate confirmed leaders in the justice department at that point. The deputy attorney general was Mr. Boente, acting shortly in the seat. We decided the best move would be to hold it, keep it in a box, document it, as we'd already done, and this investigation is going to do on. Figure out what to do with it down the road. Is there a way to corroborate it? It was our word against the president's. No way to corroborate this. My view of this changed when the prospect of tapes was raised. That's how we thought about it then.

**FEINSTEIN:** Thank you, Mr. Chairman.

**SEN. MARCO RUBIO:** Director Comey, the meeting in the oval office where he made the request about Mike Flynn, was that only time he asked you to hopefully let it go?

**COMEY:** Yes.

**RUBIO:** And in that meeting, as you understood it, he was asking not about the general Russia investigation, he was asking specifically about the jeopardy that Flynn was in himself?

**COMEY:** That's how I understood it. Yes, sir.

**RUBIO:** As you perceived it, while he hoped you did away with it, you perceived it as an order, given the setting, the position and some of the circumstances?

**COMEY:** Yes.

**RUBIO:** At the time, did you say something to the president about, that is not an appropriate request, or did you tell the white house counsel, it's not an appropriate request? Someone needs to tell the president he can't do these things.

**COMEY:** I didn't, no.

**RUBIO:** Why?

**COMEY:** I don't know. I think — as I said earlier, I think the circumstances were such that it was — I was a bit stunned and didn't have the presence of mind. I don't know. I don't

want to make you sound like I'm captain courageous. I don't know if I would have said to the president with the presence of mind, sir, that's wrong. In the moment, it didn't come to my mind. What came to my mind is be careful what you say. I said, I agree Flynn is a good guy.

**RUBIO:** On the cloud, we keep talking about this cloud, you perceive the cloud to be the Russian investigation in general?

**COMEY:** Yes, sir.

**RUBIO:** His specific ask was you'd tell the American people what you'd told him, told the leaders of Congress, Democrats and Republicans, he was not personally under investigation?

**COMEY:** Yes, sir.

**RUBIO:** What he was asking you to do, would you have done here today?

**COMEY:** Correct. Yes, sir.

**RUBIO:** Again, at that setting, did you say to the president, it would be inappropriate for you to do so and then talk to the White House counsel or somebody so hopefully they'd talked to him and tell him he couldn't do this?

**COMEY:** First time I said, I'll see what we can do. Second time, I explained how it should work, that the White House counsel should contact the deputy attorney general.

**RUBIO:** You told him that?

**COMEY:** The president said, okay. I think that's what I'll do.

**RUBIO:** To be clear, for you to make a public statement that he was not under investigation wouldn't be illegal but you felt it could potentially create a duty to correct if circumstances changed?

**COMEY:** Yes, sir. We wrestled with it before my testimony, where I confirmed that there was an investigation. There were two primary concerns. One was it creates a duty to correct, which I've lived before, and you want to be very careful about doing that. And second, it is a slippery slope. If we say the president and the vice president aren't under investigation. What is the principled investigation for stopping? So the leaderrship, at justice, acting attorney general Boente said, you're not going to do that.

**RUBIO:** On March 30th during the phone call about general Flynn, you said he abruptly shifted and brought up something that you call, quote, unquote, the McCabe thing. Specifically, the Mccabe thing as you understood it was that Mccabe's wife had received campaign money from what I assume means Terry McAuliffe?

**COMEY:** Yes.

**RUBIO:** Close to the Clintons. Did he say, I don't like this guy because he got money from someone close to Clinton?

**COMEY:** He asked me about McCabe and said, how is he going to be with me as president? I was rough on him on the campaign trail.

**RUBIO:** Rough on Mccabe?

**COMEY:** By his own account, he said he was rough on McCabe and Mrs. McCabe on the campaign trail. How is he going to be? I shared with the president, Andy is a pro. No issue at all. You have to know people of the FBI. They're not —

**RUBIO:** So the president turns to you and says, remember, I never brought up the McCabe thing because you said he was a good guy, did you perceive that to be a statement that, I took care of you. I didn't do something because you told me he was a good guy. So I'm asking you potentially for something in return. Is that how you perceived it?

**COMEY:** I wasn't sure what to make of it. That's possible. It was so out of context I didn't have a clear view of what it was.

**RUBIO:** On a number of occasions here, you bring up — let's talk about the general Russia investigation, OK? Page 6 of your testimony you say, the first thing you say is, he asked what we could do to, quote, unquote, lift the cloud, the general Russia investigation, you responded, we are investigating the matter as quickly as we could and there would be great benefit if we didn't find anything for having done the work well. He agreed. He emphasized the problems it was causing him. He agreed it'd be great to have an investigation, all the facts came out and we found nothing. He agreed that would be ideal, but this cloud is still messing up my ability to do the rest of my agenda. Is that an accurate assessment?

**COMEY:** Yes, sir. He went farther than that. He said, and if some of my satellites did something wrong, it'd be good to find that out.

**RUBIO:** That is the second part. The satellites, if one of my satellites, I imagine he meant some of the people surrounding his campaign, did something wrong, it'd be great to know

that, as well.

**COMEY:** Yes, sir. That's what he said.

**RUBIO:** Are those the only two instances in which that back and forth happened, where the president was basically saying, and I'm paraphrasing here, it's okay. Do the Russia investigation. I hope it all comes out. I have nothing to do with anything Russia. It'd be great if it all came out, people around me were doing things that were wrong?

**COMEY:** Yes. As I recorded it accurately there. That was the sentiment he was expressing. Yes, sir.

**RUBIO:** What it comes down to is the president asked three things of you. Asked for your loyalty. You said you'd be loyally honest.

**COMEY:** Honestly loyal.

**RUBIO:** Honestly loyal. He asked you on one occasion to let the Mike Flynn thing go because he was a good guy. By the way, you're aware he said the same thing in the press the next day. He is a good guy, treated unfairly, etc. I imagine your FBI agents read that.

**COMEY:** I'm sure they did.

**RUBIO:** The president's wishes were known to them, certainly by the next day when he had a press conference with the prime minister. Going back, the three requests were, number one, be loyal. Number two, let the Mike Flynn thing go. He is a good guy, been treated unfairly. Number three, can you please tell the American people what these leaders in congress already know, which you already know and what you told me three times, that I'm not under personally under investigation.

**COMEY:** That's right.

**RUBIO:** We learn more from the newspaper sometimes than the open hearings. Do you ever wonder why, of all the things in the investigation, the only thing never leaked is the fact the president was never personally under investigation, despite the fact that Democrats and Republicans and the leadership of congress have known that for weeks?

**COMEY:** I don't know. I find matters that are briefed to the gang of eight are pretty tightly held, in my experience.

**RUBIO:** Finally, who are those senior leaders at the FBI you share these conversations with?

**COMEY:** As I said in response to Sen. Feinstein's question, deputy director, my chief of staff, general counsel, deputy director's chief counse and then, more often than not, the number three person at the FBI, the associate deputy director. And quite often, head of the national security branch.

**BURR:** Senator?

**SEN. RON WYDEN:** Mr. Comey, welcome. You and I have had significant policy differences over the years, particularly protecting Americans access to secure encryption. But I believe the timing of your firing stinks. Yesterday, you put on the record testimony that demonstrates why the odor of presidential abuse of power is so strong. Now, to my questions. In talking to senator Warner about this dinner that you had with the president, I believe January 27th, all in one dinner, the president raised your job prospects, he asked for your loyalty and denied allegations against him. All took place over one supper. Now, you told senator Warner that the president was looking to, quote, get something. Looking back, did that dinner suggest that your job might be contingent on how you handled the investigation?

**COMEY:** I don't know that I'd go that far. I got the sense my job would be contingent upon how he felt I — excuse me — how he felt I conducted myself and whether I demonstrated loyalty. But I don't know whether I'd go so far as to connect it to the investigation.

**WYDEN:** He said the president was trying to create some sort of patronage. Behaving in a manner consistent with the wishes of the boss?

**COMEY:** Yes. At least consider how what you're doing will affect the boss as a significant consideration.

**WYDEN:** Let me turn to the attorney general. In your statement, you said that you and the FBI leadership team decided not to discuss the president's actions with Attorney General Sessions, even though he had not recused himself. What was it about the attorney general's interactions with the Russians or his behavior with regard to the investigation that would have led the entire leadership of the FBI to make this decision?

**COMEY:** Our judgment, as I recall, is that he was very close to and inevitably going to recuse himself for a variety of reasons. We also were aware of facts that I can't discuss in an opening setting that would make his continued engagement in a Russia-related

investigation problematic. So we were convinced — in fact, I think we'd already heard the career people were recommending that he recuse himself, that he was not going to be in contact with Russia-related matters much longer. That turned out to be the case.

**WYDEN:** How would you characterize Attorney General Sessions's adherence to his recusal? In particular, with regard to his involvement in your firing, which the president has acknowledged was because of the Russian investigation.

**COMEY:** That's a question I can't answer. I think it is a reasonable question. If, as the president said, I was fired because of the Russia investigation, why was the attorney general involved in that chain? I don't know. So I don't have an answer for the question.

**WYDEN:** Your testimony was that the president's request about Flynn could infect investigation. Had the president got what he wanted and what he asked of you, what would have been the effect on the investigation?

**COMEY:** We would have closed any investigation of general Flynn in connection with his statements and encounters — statements about encounters with Russians in the late part of December. We would have dropped an open criminal investigation.

**WYDEN:** So in effect, when you talk about infecting the enterprise, you would have dropped something major that would have spoken to the overall ability of the American people to get the facts?

**COMEY:** Correct. And as good as our people are, our judgment was, we don't want them hearing that the president of the United States wants this to go away because it might have an effect on their ability to be fair, impartial and aggressive.

**WYDEN:** Acting Attorney General Yates found out Mike Flynn could be blackmailed by the Russians and went immediately to warn the white house. Flynn is gone, but other individuals with contacts with the Russians are still in extremely important positions of power. Should the American people have the same sense of urgency now with respect to them?

**COMEY:** I think all I can say, senator, is it's a — the special counsel's investigation is very important, understanding what efforts there were or are by Russian government to influence our government is a critical part of the FBI's mission. And you've got the right person in Bob Mueller to lead it, it is a very important piece of work.

**WYDEN:** Vice president Pence was the head of the transition. To your knowledge, was he aware of the concerns about Michael Flynn prior to or during general Flynn's tenure as national security adviser?

**COMEY:** I don't — you're asking including up to the time when Flynn was —

**WYDEN:** Right.

**COMEY:** Forced to resign? My understanding is that he was. I'm trying to remember where I get that understanding from. I think from acting attorney general Yates.

**WYDEN:** So former acting attorney general Yates testified concerns about general Flynn were discussed with the intelligence community. Would that have included anyone at the CIA or Dan Coats' office, the DNI?

**COMEY:** I would assume, yes.

**WYDEN:** Michael Flynn resigned four days after attorney general sessions was sworn in. Do you know if the attorney general was aware of the concerns about Michael Flynn during that period?

**COMEY:** I don't as I sit here. I don't recall that he was. I could be wrong, but I don't remember that he was.

**WYDEN:** Let's see if you can give us some sense of who recommended your firing. Besides the letter from the attorney general, the deputy attorney general, do you have any information on who may have recommended or been involved in your firing?

**COMEY:** I don't. I don't.

**WYDEN:** Thank you, Mr. Chairman.

**BURR:** Senator Collins?

**SEN. SUSAN COLLINS:** Thank you, Mr. Chairman. Mr. Comey, let me begin by thanking you for your voluntary compliance with our request to appear before this committee and assist us in this very important investigation. I want first to ask you about your conversations with the president, three conversations in which you told him that he was not under investigation. The first was during your January 6th meeting, according to your testimony, in which it appears that you actually volunteered that assurance. Is that correct?

**COMEY:** That's correct.

**COLLINS:** Did you limit that statement to counterintelligence invest — investigations, or were you talking about any FBI investigation?

**COMEY:** I didn't use the term counterintelligence. I was briefing him about salacious and unverified material. It was in a context of that that he had a strong and defensive reaction about that not being true. My reading of it was it was important for me to assure him we were not person investigating him. So the context then was actually narrower, focused on what I just talked to him about. It was very important because it was, first, true, and second, I was worried very much about being in kind of a J. Edgar Hoover-type situation. I didn't want him thinking I was briefing him on this to sort of hang it over him in some way. I was briefing him on it because, because we had been told by the media it was about to launch. We didn't want to be keeping that from him. He needed to know this was being said. I was very keen not to leave him with an impression that the bureau was trying to do something to him. So that's the context in which I said, sir, we're not personally investigating you.

**COLLINS:** Then — and that's why you volunteered the information?

**COMEY:** Yes, ma'am.

**COLLINS:** Then on the January 27th dinner, you told the president that he should be careful about asking you to investigate because, "you might create a narrative that we are investigating him personally, which we weren't." Again, were you limiting that statement to counterintelligence investigations, or more broadly, such as a criminal investigation?

**COMEY:** I didn't modify the word investigation. It was, again, he was reacting strongly against the unverified material, saying I'm tempted to order you to investigate it. In the context of that, I said, sir, be careful about it. I might create a narrative we're investigating you personally.

**COLLINS:** There was the March 30th phone call with the president in which you reminded him that congressional leaders had been briefed that we were no personally — the FBI was not personally investigating president trump. And, again, was that statement to congressional leaders and to the president limited to counterintelligence investigations, or was it a broader statement? I'm trying to understand whether there was any kind of investigation of the president underway.

**COMEY:** No. I'm sorry. If I misunderstood, I apologize. We briefed the congressional leadership about what Americans we had opened counterintelligence investigation cases on. We specifically said, the president is not one of those Americans. But there was no other investigation of the president that we were not mentioning at that time. The context was, counterintelligence, but I wasn't trying to hide some criminal investigation of the president.

**COLLINS:** And was the president under investigation at the time of your dismissal on May 9th?

**COMEY:** No.

**COLLINS:** I'd like to now turn to the conversations with the president about Michael Flynn, which had been discussed at great length.

First, let me make very clear that the president never should have cleared the room and he never should have asked you, as you reported, to let it go, to let the investigation go. But I remain puzzled by your response. Michael Flynn is a good guy. You could have said, Mr. President, this meeting is inappropriate. This response could compromise the investigation. You should not be making such a request. It's fundamental to the operation of our government, the FBI be insulated from this kind of political pressure. You talked a bit today about that you were stunned by the president making the request. But my question to you is later on, upon reflection, did you go to anyone at the department of justice and ask them to call the white house counsel's office and explain that the president had to have a far better understanding and appreciation of his role vis-à-vis the FBI?

**COMEY:** In general, I did. I spoke to the attorney general and spoke to the new deputy attorney general, Mr. Rosenstein, when he took office and explained my serious concern about the way in which the president is interacting, especially with the FBI. As I said in my testimony, I told the attorney general, it can't happen that you get kicked out of the room and the president talks to me. Why didn't we raise the specific? It was of investigative interest to figure out, what just happened with the president's request? I wouldn't want to alert the white house it had happened until we figured out what we were going to do with it investigatively.

**COLLINS:** Your testimony was that you went to attorney general sessions and said, don't ever leave me alone with him again. Are you saying that you also told him that he had made a request that you let it go with regard to part of the investigation of Michael Flynn?

**COMEY:** No. I specifically did not. I did not.

**COLLINS:** Okay. You mentioned that from your very first meeting with the president, you decided to write a memo memorializing the conversation. What was it about that very first meeting that made you write a memo when you have not done that with two previous presidents?

**COMEY:** As I said, a combination of things. A gut feeling is an important overlay, but the circumstances, that I was alone, the subject matter and the nature of the person I was interacting with and my read of that person. Yeah, and really just gut feel, laying on top of all of that, that this is going to be important to protect this organization, that I make records of this.

**COLLINS:** Finally, did you show copies of your memos to anyone outside of the department of justice?

**COMEY:** Yes.

**COLLINS:** And to whom did you show copies?

**COMEY:** I asked — the president tweeted on Friday after I got fired that I better hope there's not tapes. I woke up in the middle of the night on Monday night because it didn't dawn on me originally, that there might be corroboration for our conversation. There might a tape. My judgment was, I need to get that out into the public square. I asked a friend of mine to share the content of the memo with a reporter. Didn't do it myself for a variety of reasons. I asked him to because I thought that might prompt the appointment of a special counsel. I asked a close friend to do it.

**COLLINS:** Was that Mr. Wittes?

**COMEY:** No.

**COLLINS:** Who was it?

**COMEY:** A close friend who is a professor at Columbia law school.

**COLLINS:** Thank you.

**SEN. MARTIN HEINRICH:** Mr. Comey, prior to January 27th of this year, have you ever had a one-on-one meeting or a private dinner with a president of the United States?

**COMEY:** No. Dinner, no. I had two one-on-ones with President Obama. One to talk about law enforcement issues, law enforcement and race, which was an important topic

throughout for me and for the president. Then once very briefly for him to say goodbye.

**HEINRICH:** Were those brief interactions?

**COMEY:** No. The one about law enforcement and race and policing, we spoke for probably over an hour, just the two of us.

**HEINRICH:** How unusual is it to have a one-on-one dinner with the president? Did that strike you as odd?

**COMEY:** Yeah. So much so, I assumed there would be others, that he couldn't possibly be having dinner with me alone.

**HEINRICH:** Do you have an impression that if you had found — if you had behaved differently in that dinner, and I am quite pleased that you did not, but if you had found a way to express some sort of expression of loyalty or given some suggestion that the Flynn criminal investigation might be pursued less vigorously, do you think you would have still been fired?

**COMEY:** I don't know. It's impossible to say looking back. I don't know.

**HEINRICH:** But you felt like those two things were directly relevant to the kind of relationship that the president was seeking to establish with you?

**COMEY:** Sure, yes.

**HEINRICH:** The president has repeatedly talked about the Russian investigation into the U.S. — or Russia's involvement in the U.S. Election cycle as a hoax and fake news. Can you talk a little bit about what you saw as FBI director and, obviously, only the parts that you can share in this setting that demonstrate how serious this action actually was and why there was an investigation in the first place?

**COMEY:** Yes, sir. There should be no fuzz on this whatsoever. The Russians interfered in our election during the 2016 cycle. They did with purpose. They did it with sophistication. They did it with overwhelming technical efforts. It was an active measures campaign driven from the top of that government. There is no fuzz on that. It is a high confidence judgment of the entire intelligence community and the members of this committee have seen the intelligence. It's not a close call. That happened. That's about as unfake as you can possibly get. It is very, very serious, which is why it's so refreshing to see a bipartisan focus on that. This is about America, not about a particular party.

**HEINRICH:** That is a hostile act by the Russian government against this country?

**COMEY:** Yes, sir.

**HEINRICH:** Did the president in any of those interactions that you've shared with us today ask you what you should be doing or what our government should be doing or the intelligence community to protect America against Russian interference in our election system?

**COMEY:** I don't recall a conversation like that.

**HEINRICH:** Never?

**COMEY:** No.

**HEINRICH:** Do you find it —

**COMEY:** Not with President Trump.

**HEINRICH:** Right.

**COMEY:** I attended a fair number of meetings on that with President Obama.

**HEINRICH:** Do you find it odd that the president seemed unconcerned by Russia's actions in our election?

**COMEY:** I can't answer that because I don't know what other conversations he had with other advisers or other intelligence community leaders. I just don't know sitting here.

**HEINRICH:** Did you have any interactions with the president that suggested he was taking that hostile action seriously.

**COMEY:** I don't remember any interactions with the president other than the initial briefing on January the 6th. I don't remember — could be wrong, but I don't remember any conversations with him at all about that.

**HEINRICH:** As you're very aware, it was only the two of you in the room for that dinner. You told us the president asked you to back off the Flynn investigation. The president told a reporter —

**COMEY:** Not in that dinner.

**HEINRICH:** Fair enough. Told the reporter he never did that. You've testified that the president asked for your loyalty in that dinner. White house denies that. A lot of this comes down to who should we believe. Do you want to say anything as to why we should believe you?

**COMEY:** My mother raised me not to say things like this about myself so I'm not going to. I think people should look at the whole body of my testimony. As I used to say to juries, when I talked about a witness, you can't cherry pick it. You can't say, I like these things he said but on this, he's a ten liar. You have to take it together. I've tried to be open, fair, transparent and accurate. Of significant fact to me is so why did he kick everybody out of the Oval Office? Why would you kick the attorney general, the president, the chief of staff out to talk to me if it was about something else? So that, to me, as an investigator, is a significant fact.

**HEINRICH:** As we look at testimony or as communication from both of you, we should probably be looking for consistency?

**COMEY:** Well, in looking at any witness, you look at consistency, track record, demeanor, record over time, that sort of thing.

**HEINRICH:** Thank you. So there are reports that the incoming Trump administration, either during the transition and/or after the inauguration, attempted to set up a sort of backdoor communication channel with the Russian government using their infrastructure, their devices, their facilities. What would be the risks, particularly for a transition, someone not actually in the office of the president yet, to setting up unauthorized channels with a hostile foreign government, especially if they were to evade our own American intelligence services?

**COMEY:** I'm not going to comment on whether that happened in an open setting, but the risk is — primary risk is obvious. You spare the Russians the cost and effort to break into our communications channels by using theirs. You make it a whole lot easier for them to capture all of your conversations. Then to use those to the benefit of Russia against the united States.

**HEINRICH:** The memos that you wrote, you wrote — did you write all nine of them in a way that was designed to prevent them from needing classification?

**COMEY:** No. On a few of the occasions, I wrote — I sent emails to my chief of staff on some of the brief phone conversations I had. The first one was a classified briefing. Though it was in a conference room at Trump Tower, it was a classified briefing. I wrote that on a

classified device. The one I started typing in the car, that was a classified laptop I started working on.

**HEINRICH:** Any reason in a classified environment, in a skiff, that this committee, it would not be appropriate to see those communications at least from your perspective as the author?

**COMEY:** No.

**HEINRICH:** Thank you, Mr. Chairman.

**BURR:** Senator?

**SEN. ROY BLUNT**: Thank you, Mr. Chairman. Mr. Comey, when you were terminated at the FBI, I said, and still continue to feel, that you have provided years of great service to the country. I also said that I'd had significant questions over the last year about some of the decisions that you made. If the president hadn't terminated your service, would you still be, in your opinion, the director of the FBI today?

**COMEY:** Yes, sir.

**BLUNT**: So you took as a direction from the president something you thought was serious and troublesome but continued to show up for work the next day?

**COMEY**: Yes, sir.

**BLUNT:** Six weeks later were still telling the president on March the 30th that he was not personally the target of any investigation?

**COMEY:** Correct. On March the 30th, and I think again on April 11th, as well, I told him we're not investigating him personally. That was true.

**BLUNT**: The point to me, the concern to me there is, all these things are going on. You now in retrospect, or at least to this committee, you had serious concerns about what the president had, you believed, directed you to do, and had taken no action. Hadn't even reported up the chain of command, assuming you believe there is a chain of command, that these things happened. Do you have a sense looking back that that was a mistake?

**COMEY**: No. In fact, I think no action was the most important thing I could do.

**BLUNT:** On the Flynn issue specifically, I believe you said earlier that you believe the president was suggesting you drop any investigation of Flynn's account of his conversation

with the Russian ambassador. Which was essentially misleading the vice president and others?

**COMEY**: Correct. I'm not going to go into the details but whether there were false statements made to government investigators, as well.

**BLUNT**: Any suggestion that the — General Flynn had violated the Logan Act, I always find incredible. The Logan Act has been on the books over 200 years. Nobody has ever been prosecuted for violating the Logan Act. My sense would be that the discussion, not the problem, misleading investigators or the vice president might have been?

**COMEY**: That's fair. Yes, sir.

**BLUNT:** Had you previously on February 14th discussed with the president in the previous meeting anything your investigators had learned or their impressions from talking to Flynn?

**COMEY**: No, sir.

**BLUNT**: So he said he's a good guy. You said he is a good guy. That was — no further action taken on that?

**COMEY**: He said more than that, but there was no — the action was, I wrote it up, briefed our senior team, tried to figure out what to do with it and made a decision. We're going to hold this and see what we make of it down the road.

**BLUNT**: Did it mean you had no responsibility to report that to the Justice Department in some way?

**COMEY**: I think at some point, and I don't know what Director Mueller is going to do with it, but at some point, I was sure we were going to brief it to the team in charge of the case. But our judgment was in the short term, doesn't make sense to — no fuzz on the fact I reported to the attorney general. That's why I stressed he shouldn't be kicked out of the room. Didn't make sense to report to him now.

**BLUNT**: You said the attorney general said, I don't want to be in the room with him alone again, but you continued to talk to him on the phone. What is the difference in being in the room alone with him and talking to him on the phone alone?

**COMEY**: I think what I stressed to the attorney general was broader than just the room. I said, I report to you. It is very important you be between me and the white house.

**BLUNT**: After that discussion with the attorney general, did you take phone calls from the president?

**COMEY**: Yes, sir.

**BLUNT**: Why did you just say you need to — why didn't you say, I'm not taking that call. Talk to the attorney general?

**COMEY**: I did on the April 11th call. I reported the calls — the March 30th call and the April 11th call to my superior, who was the acting deputy attorney general.

**BLUNT**: I don't want to run out of time here. In reading your testimony, January the 3rd, January the 27th and March the 30th, it appears to me on all three of those occasions, you unsolicited by the president, made the point to him he was not a target of an investigation?

**COMEY**: Correct. Yes, sir.

**BLUNT**: One, I thought the March 30th, very interesting, you said, well, even though you don't want — you may not want — that was 27th, where he said, why don't you look into that more? You said, you may not want that because we couldn't say with — we couldn't answer the question about you being a target of the investigation. You didn't seem to be answering that question anyhow. Senator Rubio pointed out the one unanswered, unleaked question seems to have been that. In this whole period of time. You said something earlier and I don't want to fail to follow up on, you said after dismissed, you gave information to a friend so that friend could get that information into the public media.

**COMEY:** Correct.

**BLUNT**: What kind of information was that? What kind of information did you give to a friend?

**COMEY**: That the — the Flynn conversation. The president had asked me to let the Flynn — forgetting my exact own words. But the conversation in the Oval Office.

**BLUNT**: So you didn't consider your memo or your sense of that conversation to be a government document. You considered it to be, somehow, your own personal document that you could share to the media as you wanted through a friend?

**COMEY**: Correct. I understood this to be my recollection recorded of my conversation with the president. As a private citizen, I thought it important to get it out.

**BLUNT**: Were all your memos that you recorded on classified or other memos that might be yours as a private citizen?

**COMEY**: I'm not following the question.

**BLUNT**: You said you used classified —

**COMEY**: Not the classified documents. Unclassified. I don't have any of them anymore. I gave them to the special counsel. My view was that the content of those unclassified, memorialization of those conversations was my recollection recorded.

**BLUNT**: So why didn't you give those to somebody yourself rather than give them through a third party?

**COMEY**:Because I was weary the media was camping at the end of my driveway at that point. I was actually going out of town with my wife to hide. I worried it would be feeding seagulls at the beach. If it was I who gave it to the media. I asked my friend, make sure this gets out.

**BLUNT:** It does seem to me what you do there is create a source close to the former director of the FBI as opposed to taking responsibility yourself for saying, here are the records. Like everybody else, I have other things I'd like to get into but I'm out of time.

**SEN. ANGUS KING:** First, I'd like to acknowledge Senator Blumenthal and Senator Nelson. The principal thing you'll learn is the chairs there are more uncomfortable than the chairs here. But welcome to the hearing. Mr. Comey, a broad question. Was the Russian activity in the 2016 election a one off proposition, or is this part of a long-term strategy? Will they be back?

**COMEY:** Oh, it is a long-term practice of theirs. It's stepped up a notch in a significant way in '16. They'll be back.

**KING:** I think that's very important for the American people to understand. That this is very much a forward looking investigation in terms of how do we understand what they did and how do we prevent it. Would you agree that is a big part of our role here?

**COMEY:** Yes, sir. It is not a Republican thing or a democratic thing. It really is an American thing. They're going to come for whatever party they choose to try and work on behalf of, and they're not devoted to either, in my experience. They're just about their own advantage. They will be back.

**KING:** That's my observation. I don't think Putin is a Republican or a Democrat. He's an opportunist.

**COMEY:** I think that's a fair statement.

**KING:** With regard to the — several of these conversations, in his interview with Lester Holt on NBC, the president said, I had dinner with him. He wanted to have dinner because he wanted to stay on. Is this an accurate statement?

**COMEY:** No, sir.

**KING:** Did you in any way initiate that dinner?

**COMEY:** No. He called me at my desk at lunchtime and asked me, was I free for dinner that night. Called himself. Said, can you come over for dinner tonight? I said, yes, sir. He said, will 6:00 work? I think 6:00 first. Then he said, I was going to invite your whole family but we'll do it next time. Is that a good time? I said, sir, whatever works for you. He said, how about 6:30? I said, whatever works for you, sir. Then I hung up and had to call my wife and break a date with her. I was supposed to take her to dinner that night.

**KING:** One of the all-time great excuses for breaking a date.

**COMEY:** Yeah. In retrospect, I love spending time with my wife and I wish I would have been there that night.

**KING:** That's one question I'm not going to follow up on, Mr. Comey. In that same interview, the president said, in one case I called him and in one case, he call me. Is that an accurate statement?

**COMEY:** No.

**KING:** Did you ever call the president?

**COMEY:** No. I might — the only reason I'm hesitating is, I think there was at least one conversation where I was asked to call the White House switchboard to be connected to him. I never initiated a communication with the president.

**KING:** In his press conference May 18th, the president responded, quote, no, no, when asked about asking you to stop the investigation into general Flynn. Is that a true statement?

**COMEY:** I don't believe it is.

**KING:** In regard to him being personally under investigation, does that mean that the dossier is not being reviewed or investigated or followed up on in any way?

**COMEY:** I obviously can't comment either way. I talk in an open setting about the investigation as it was when I was head of the FBI. It is Bob Mueller's responsibility now. I don't know.

**KING:** Clearly, your statements to the president back on the various times when you assured him it wasn't under investigation, as of that moment, is it correct?

**COMEY:** Correct.

**KING:** Now, on the Flynn investigation, is it not true that Mr. Flynn was and is a central figure in this entire investigation of the relationship between the Trump campaign and the Russians?

**COMEY:** I can't answer that in an open setting, sir.

**KING:** Certainly, Mr. Flynn was part of the so-called Russian investigation? Can you answer that question?

**COMEY:** I have to give you the same answer.

**KING:** All right. We'll be having a closed session shortly so we'll follow up on that. In terms of his comments to you about — I think in response to Senator Risch, he said, I hope you'll hold back on that, but when you get a — when a president of the United States in the Oval Office says something like, I hope or I suggest or would you, do you take that as a directive?

**COMEY:** Yes. It rings in my ear as, well, will no one rid me of this meddlesome priest.

**KING:** I was just going to quote that, in 1179, December 27th, Henry II said, who will rid me of the meddlesome priest, and the next day, he was killed. Exactly the same situation. We're thinking along the same lines. Several other questions, and these are a little more detailed. What do you know about the Russian bank VEB?

**COMEY:** Nothing that I can talk about in an open setting. I know —

**KING:** That takes care of the next three questions.

**COMEY:** I know it exists.

**KING:** What is relationship of ambassador — the ambassador from Russia to the United States to the Russian intelligence infrastructure?

**COMEY:** He's a diplomat who is the chief of mission at the Russian Embassy, which employs a robust cohort of intelligence officers. So, surely, he is whiting of their aggressive intelligence operations, at least some of it in the United States. I don't consider him to be an intelligence officer himself. He's a diplomat.

**KING:** Did you ever — did the FBI ever brief the Trump administration about the advisability of interacting directly with Ambassador Kislyak?

**COMEY:** All I can say sits here is there are a variety of defensive briefings given to the incoming administration about the counterintelligence risk.

**KING:** Back to Mr. Flynn. Would the — would closing out the Flynn investigation have impeded the overall Russian investigation?

**COMEY:** No. Well, unlikely, except to the extent — there is always a possibility if you have a criminal case against someone and squeeze them, flip them and they give you information about something else. But I saw the two as touching each other but separate.

**KING:** With regard to your memos, isn't it true that in a court case when you're weighing evidence, contemporaneous memos and contemporaneous statements to third parties are considered probative in terms of the validity of testimony?

**COMEY:** Yes.

**KING:** Thank you. Thank you, Mr. Chairman.

**BURR:** Senator Lankford?

**LANKFORD:** Former Director Comey, good to see you again.

**COMEY:** You, too.

**LANKFORD:** Multiple opportunities to visit, as everyone here has. I appreciate you and your service and what you have done for the nation for a long time, what you continue to do. I told you before in the heat of last year, when we had an opportunity to visit personally, that I pray for you and your family because you carry a tremendous amount of stress. That is still true today.

**COMEY:** Thank you.

**LANKFORD:** Let me walk through a couple things with you. Your notes are obviously exceptionally important because they give a rapid account of what you wrote down and what you perceived happened in those different meetings. Have you had the opportunity to reference those notes when you were preparing the written statement you put forward today?

**COMEY:** Yes. I think nearly all of my written recordings of my conversations, I had a chance to review them before filing my statement.

**LANKFORD:** Do you have a copy of any of the notes personally?

**COMEY:** I don't. I turned them over to Bob Mueller's investigators.

**LANKFORD:** The individual that you told about your memos, that then were sent on to The New York Times, did you have a copy of the memos or told orally?

**COMEY:** Had a copy at the time.

**LANKFORD:** Do they still have a copy of those memos?

**COMEY:** Good question. I think so. I guess I can't say for sure sitting here, but — I guess I don't know. But I think so.

**LANKFORD:** So the question is, could you ask them to hand that copyright back to you so you can hand them over to this committee?

**COMEY:** Potentially.

**LANKFORD:** I would like to move that from potentially to seeing if we can ask that question so we can have a copy of those. Obviously, the notes are really important to us, so we can continue to get to the facts as we see it. The written documents are exceptionally important.

**COMEY:** Yeah.

**LANKFORD:** Were there other documents we need to be aware of you used in your preparation for your written statement we should also have that would assist us in helping us with this?

**COMEY:** Not that I'm aware of, no.

**LANKFORD:** Past the February 14th meeting, which is an important meeting as we discuss the conversations here about Michael Flynn, when the president asked you about he hopes that you would let this go, and the conversation back and forth about being a good guy, after that time, did the president ever bring up anything about Michael Flynn again to you? Had multiple other conversations you had documents with the president.

**COMEY:** I don't remember him bringing it up again.

**LANKFORD:** Did a member of the white house staff come up to you asking you to drop the Michael Flynn case, anything referring to that?

**COMEY:** No.

**LANKFORD:** Did the Director of National Intelligence talk to you about that?

**COMEY:** No.

**LANKFORD:** Did anyone from the attorney general's office, the department of justice ask about that?

**COMEY:** No.

**LANKFORD:** Did the head of NSA talk to you about that?

**COMEY:** No.

**LANKFORD:** The key aspect here is if this seems to be something the president is trying to get you to drop it, it seems like a light touch to drop it, to bring it up at that point, the day after he had just fired Flynn, to come back here and say, I hope we can let this go, then it never reappears again. Did it slow down your investigation or any investigation that may or may not be occurring with Michael Flynn?

**COMEY:** No. Although I don't know there are any manifestations between February 14th and when I was fired. I don't know that the president had any way of knowing whether it was effective or not.

**LANKFORD:** Okay. Fair enough. If the president wanted to stop an investigation, how would he do that? Knowing it is an ongoing criminal investigation or counterintelligence investigation, would that be a matter of going to you, you perceive, and say, you make it stop because he doesn't have the authority to stop it? How would the president make an ongoing investigation stop?

**COMEY:** I'm not a legal scholar, but as a legal matter, the president is the head of the executive branch and could direct, in theory, we have important norms against this, but could anyone be investigative or not. I think he has the legal authority. All of us ultimately report in the executive branch to the president.

**LANKFORD:** Would that be to you, or the attorney general or who?

**COMEY:** I suppose he could if he wanted to issue a direct order could do it anyway. Through the attorney general or issue it directly to me.

**LANKFORD:** Well, is there any question that the president is not real fond of this investigation? I can think of multiple 140-word character expressions that he's publicly expressed he's not fond of the investigation. I heard you refer to before trying to keep the agents away from any comment that the president may have made. Quite frankly, the president has informed around 6 billion people that he's not real fond of this investigation. Do you think there's a difference in that?

**COMEY:** Yes. There's a big difference in kicking superior officers out of the oval office, looking the FBI director in the eye and saying I hope you let this go. I think if agents as good as they are heard the president of the United States did that, there's a real risk of a chilling effect on their work. That's why we kept it so tight.

**LANKFORD:** OK. You had mentioned before about some news stories and news accounts. Without having to go into all of the names and specific times and to be able to dip into all of that. Have there been news accounts about the Russian investigation or collusion about the whole event or as you read the story you were wrong about how wrong they got the facts?

**COMEY:** Yes, there have been many, many stories based on — well, lots of stuff but about Russia that are dead wrong.

**LANKFORD:** I was interested in your comment that you made as well that the president said to you if there were some satellite associates of his that did something wrong, it would be good to find that out. Did the president seem to talk to you specifically on March 30th saying I'm frustrated that the word is not getting out that I'm under investigation. But if there are people in my circle that are, let's finish the investigation, is that how you took it?

**COMEY:** Yes, sir. Yes.

**LANKFORD:** Then you made a comment earlier a the attorney general, the previous attorney general asking you about the investigation on the Clinton e-mails saying you were

asked to not call it an investigation anymore. But call it a matter. You said that confused you. You can give us additional details on that?

**COMEY:** Well, it concerned me because we were at the point where we refused to confirm the existence as we typically do of an investigation for months. And was getting to a place where that looked silly because the campaigns we're talking about interacting with the FBI in the course of our work. The Clinton campaign at the time was using all kinds of euphemisms, security matters, things like that for what was going on. We were getting to a place where the attorney general and I were both going to testify and talk publicly about it I wanted to know was she going to authorize us to confirm we have an investigation. She said yes, don't call it that, call it a matter. I said why would I do that? She said, just call it a matter. You look back in hindsight, if I looked back and said this isn't worth dying on so I just said the press is going to completely ignore it. That's what happened when I said we opened a matter. They all reported the FBI has an investigation open. So that concerned me because that language tracked the way the campaign was talking about the FBI's work and that's concerning.

**LANKFORD:** You gave impression that the campaign was somehow using the language as the FBI because you were handed the campaign language?

**COMEY:** I don't know whether it was intentional or not but it gave the impression that the attorney general was looking to align the way we talked about our work with the way it was describing that. It was inaccurate. We had an investigation open for the Federal Bureau of Investigation, we had an investigation open at the time. That gave me a queasy feeling.

**BURR:** Senator Manchin.

**SEN. JOE MANCHIN:** Thank you. I appreciate being here. West Virginia is interested in the hear we're having today. I've had over 600 requests for questions to ask you from my fellow West Virginians. Most of them have been asked and there are some to be asked if the classified hearing. I want to thank you first of all for coming to be here and volunteering to stay in the classified hearing. I don't know if you had a chance to watch our hearing yesterday —

**COMEY:** I watched part of it, yes.

**MANCHIN:** And it was quite troubling. My colleagues had very pointed questions they wanted answers to. And they weren't classified and could have been answered in the open setting and they refused to. So that makes us much more appreciative of your cooperation. Sir, the seriousness of the Russia investigation and knowing that it can be ongoing as

Senator Keegan alluded to. What are your concerns there? American public saying why are we making a big deal of this Russian investigation? Can you tell me about your thoughts?

**COMEY:** Yes, sir.

**MANCHIN:** Finally, did the president ever show any concern or interest or curiosity about what the Russians were doing?

**COMEY:** Thank you, senator. As I said earlier, I don't remember any conversations with the president about the Russia election interference.

**MANCHIN:** Did he ever ask you any questions concerning this?

**COMEY:** Well, there was an initial briefing of our findings. And I think there was conversation there I don't remember exactly where he asked what I found and what our sources were and what our confidence level was. The reason this is such a big deal. We have this big messy wonderful country where we fight with each other all the time. But nobody tells us what to think, what to fight about, what to vote for except other Americans. And that's wonderful and often painful. But we're talking about a foreign government that using technical intrusion, lots of other methods tried to shape the way we think, we vote, we act. That is a big deal. And people need to recognize it. It's not about Republicans or Democrats. They're coming after America, which I hope we all love equally. They want to undermine our credibility in the face the world. They think that this great experiment of ours is a threat to them. So they're going to try to run it down and dirty it up as much as possible. That's what this is about and they will be back. Because we remain — as difficult as we can be with each other, we remain that shining city on the hill. And they don't like it.

**MANCHIN:** It's extremely important, extremely dangerous what we're dealing with and it's needed is what you're saying.

**COMEY:** Yes, sir.

**MANCHIN:** Do you believe there were any tapes or recordings of your conversations with the president?

**COMEY:** It never occurred to me until the president's tweet. I'm not being facetious. I hope there are.

**MANCHIN:** Both of you are in the same here, you both hope there are taping and recordings?

**COMEY:** Well all I can do is hope. The president surely knows if he taped me. If he did, my feelings aren't hurt. Release all of the tapes I'm good with you.

**MANCHIN:** Sir, do you believe that Robert Mueller, our new special versus, on Russia, will be thorough and complete without intervention and would you about confident on his recommendations?

**COMEY:** Yes, Bob Mueller is one of the finest people and public servants this country has ever produced. He will do it well. He's a dogged-tough person and you can have high confidence when he's done, he's turned over all of the rocks.

**MANCHIN:** You've been asked a wide variety of questions and we're going to have more in our classified hearing. Something else I like to ask folks when they come here, what details of the saga should we be focused on and recommend that we do differently? To adjust our perspective on this.

**COMEY:** I don't know. One of the reasons I'm pleased to be here I think this committee has shown the American people although we have two parties and we disagree on things we can work together when it comes to the country. So I would hope that you would just keep doing what you're doing. And it's a good example for kids. That it's good in and of itself but we are an adult democracy.

**MANCHIN:** You mentioned six times on the phone with president did you ever allude that you were performing inadequately? —

**COMEY:** No, quite the contrary. I was about to get on a helicopter one time. The head of the DEA was in the helicopter waiting for me. He called in to check in and tell me I was doing an awesome job. And wanted to see how I was doing. I said I'm doing fine, sir. Then I finished the call and got on the helicopter.

**MANCHIN:** Mr. Comey, do you believe you would have been fired if Hillary Clinton became president?

**COMEY:** That's a great question. I don't know. I don't know.

**MANCHIN:** Have you had any thoughts about it?

**COMEY:** I might have been. I don't know. Look, I've said before, that was an extraordinarily difficult and painful time. I think I did what I had to do. I knew it was going to be very bad for me personally. And the consequences might have been if Hillary Clinton was elected I might have been terminated. I don't know. I really don't.

**MANCHIN:** My final question, after the February 14th meeting in the oval office you mentioned to Attorney General Jeff Sessions. Did you ever consider why Attorney General Sessions was not asked to stay in the room?

**COMEY:** Oh, sure. I did. And have. And in that moment, I knew —

**MANCHIN:** Did you ever talk to him about it?

**COMEY:** No.

**MANCHIN:** You never had a discussion with Jeff sessions on this?

**COMEY:** No, not at all.

**MANCHIN:** On any of your meetings?

**COMEY:** No.

**MANCHIN:** Did he inquire? Did he show any inquiry whatsoever what was that meeting about?

**COMEY:** No — you're right. I did say to him. I'd forgotten this, I talked to him and said you have to be between me and the president and that's incredibly important. I forgot my exact words I passed along my the president's message about the leaks. I passed that along to the attorney general I think it was the next morning in the meeting. But I did not tell him about the Flynn part.

**MANCHIN:** Do you believe this rises to obstruction of justice?

**COMEY**: I don't know, that's Bob Mueller's job to sort that out. .

**MANCHIN:** Thank you, sir.

**SEN. TOM COTTON:** Mr. Chairman.

**BURR:** Senator Cotton.

**COTTON:** Mr. Comey, you're encouraged.president will release the tapes will you encourage Mr. Mueller to release your memos?

**COMEY:** Sure.

**COTTON:** You said you did not record your conversations with President Obama or President Bush in memos. Did you do so with Attorney General Jeff Sessions or any other senior member of the trump Department of Justice?

**COMEY:** No. I think — I am sorry.

**COTTON:** Did you record conversations or memos with the attorney general or any other senior member of the Obama administration?

**COMEY:** No.

**COTTON:** Two phone calls, four phone calls are not discussed in your statement, for the record. What happens in those phone calls?

**COMEY:** The president called me I believe shortly before he was inaugurated as a follow-up to our conversation, private conversation on January the 6th. He just wanted to reiterate his rejection of that allegation and talk about—- he'd thought about it more. And why he thought it wasn't true. The verified — unverified parts. And during that call, he asked me again, hope you're going to say. You're doing a great job. I told him that I intended to. There was another phone call that I mentioned could have the date wrong, March 1st, where he called just to check in with me as I was about to get on the hospital. It was a secure call we had about an operational matter that is not related to any of this. Something that the FBI is working on. He wanted to make sure I understood how important he thought it was. A totally appropriate call. And then the fourth call, probably forgetting — may have been — I may have met the call when he called to invite me to dinner. I'll think about it as I'm answering other questions but I think I got that right.

**COTTON:** Let's turn our attention to the underlying activity at issue here. Russia's hacking of those e-mails and the allegation of collusion. Do you think Donald Trump colluded with Russia?

**COMEY:** That's a question I don't think I should answer in an opening setting. As I said, when I left, we did not have an investigation focused on president trump. But that's a question that will be answered by the investigation, I think.

**COTTON:** Let me turn to a couple statements by one of my colleagues, Senator Feinstein. She was the ranking member on this committee until January, which means that she had access to information that only she and Chairman Burr did. She's now the senior Democrat on the FBI Committee, which means she had access to information that many of us don't. On May 3rd on the Wolf Blitzer show she was asked "Do you believe you have evidence that

in fact that there was collusion between Trump associates and Russia during the campaign? She answered not at this time. On May 18th, on the same show, Mr. Blitzer said, "The last time you came on this show I I asked if you had seen any evidence that Russia had colluded with the Trump campaign." You said not at this time. Has anything changed since we last spoke? Senator Feinstein said no, it hasn't. Do you have any reason to doubt those statements?

**COMEY:** I don't doubt that the Senator Feinstein understood what she said. I just don't want to go down that route anymore because I'm — I want to be fair to President Trump.I am not trying to suggest something nefarious but I don't want to get into the business of not to this person, not to that person.

**COTTON:** On February 14th the New York Times published the story, the headline of which was "Trump campaign aides had repeated contacts with Russian intelligence." You were asked if that as an inaccurate story. Would it be fair to characterize that story as almost entirely wrong?

**COMEY:** Yes.

**COTON:** Do you have — at the time the story was published, any indication of any contact between Trump people and Russians, intelligence officers, other government officials or close associates of the Russian government?

**COMEY:** That's one I can't answer sitting here.

**COTTON:** We can discuss that in the classified setting then. I want to turn your attention now to Mr. Flynn. The allegations of his underlying conduct to be specific. His alleged interactions with the Russian ambassador on the telephone and then what he said to senior Trump administration officials and Department of Justice officials. I understand there are other issues with Mr. Flynn related to his receipt of foreign monies or disclosure ever official advocacy, those are serious allegations that I'm sure will be pursued but I want to speak specifically about his interactions with the Russian ambassador. There's a story on January 23rd in The Washington Post that says, entitled "FBI reviewed calls with Russian ambassador but found nothing illicit." Is this story accurate?

**COMEY:** I don't want to comment ton that senator. I'm pretty sure the bureau has not confirmed any interception of communications. So, I don't want to talk about that in an opening setting.

**COTTON:** Would it be improper for an incoming national security advisor to have a conversation with a foreign ambassador?

**COMEY:** In my experience, no.

**COTTON:** But you can't confirm or deny that the conversation happened and we would need to know the contents of that conversation to know if it in fact was proper.

**COMEY:** I don't think I can talk about that opening setting. Again, I've been out of government a month. So, I also don't want to talk about things when it's now somebody else's responsibility. But maybe in the classified setting we can talk more about that.

**COTTON:** You stated earlier that there was an open investigation of Mr. Flynn and the FBI. Did you or any FBI agent ever sense that Mr. Flynn attempted to deceive you or make false states to an FBI agent?

**COMEY:** I don't want to go too far. That was the subject of the criminal inquiry.

**COTTON:** Did you ever come close to closing the investigation on Mr. Flynn?

**COMEY:** I don't think I can talk about that in open setting either.

**COTTON:** We can discuss these more in the closed setting then. Mr. Comey, in 2004, you were a part of a well-publicized event about an intelligence program that had been recertified several times. And you were acting attorney general when Attorney General John Ashcroft was incapacitated due to illness. There was a dramatic showdown at the hospital here. The next day you said you that wrote the letter of resignation, signed it, went to meet with President Bush and explained why you produced to certify it is that accurate?

**COMEY:** Yes.

**COTTON:** At anytime during FBI director did you ever write and sign a letter of resignation?

**COMEY:** Letter of resignation? No, sir.

**COTTON:** Despite all of off that testified to today you didn't feel this rose to a level of honest difference of opinion between accomplished and skilled lawyers in that 2004 episode.

**COMEY:** I wouldn't characterize the events in 2004 that way but to answer, no, I didn't find, encounter any circumstance that led me intend to resign, consider to resign. No, sir.

**COTTON:** Thank you.

**BURR:** Senator Harris.

**SEN. KAMALA HARRIS:** Director Comey, I want to thank you you are now a private citizen and you're enduring a Senate Intelligence Committee hearing. Each of us gets seven minutes instead of five to ask you questions, thank you.

**COMEY:** I'm between opportunities now so —

**HARRIS:** You are — I'm sure you'll have future opportunities. You and I are both former prosecutors. I'm not going to require to you answer. I just want to make a statement that in my experience of prosecuting cases when a robber held a gun to somebody's head and said I hope you will give me your wallet, the word hope was not the operative word at that moment. But you don't have to respond to that point. I have a series of questions to ask you. And they're going to start with: Are you aware of any meetings between the trump administration officials and Russia officials during the campaign that have not been acknowledged by those officials in the White House?

**COMEY:** That's not — even if I remembered clearly, that's not a question I can answer in open setting.

**HARRIS:** Are you aware of any questions by Trump campaign officials or associates of the campaign to hide their communications with Russia officials through encrypted means?

**COMEY:** I have to give you the same answer.

**HARRIS:** In the course of the FBI's investigation did you ever come across anything that suggested that communication, records, documents or other evidence had been destroyed?

**COMEY:** I think a got to give you the aim answer is because it would touch on investigative matters.

**HARRIS:** And are you a wear of any potential efforts to conceal between campaign officials and Russian officials?

**COMEY:** I have to give you the aim answer is.

**HARRIS:** Thank you. As a former attorney general, I have a series of questions in connection with your connection with the attorney general while you were FBI director.

What is your understanding of the parameters of Attorney General Sessions' recusal from the Russia investigation?

**COMEY:** I think it's described in a written release from DOJ which I don't remember sitting here but the gist is he will be recused from all matters relating to Russia or the campaign. Or the activities of Russia and the '16 election or something like that.

**HARRIS:** So, is your knowledge of the extent of the recusal based on the public statements he's made?

**COMEY:** Correct.

**HARRIS:** Is there any kind of memorandum issued from the attorney general to the FBI outlining the parameters of his recusal?

**COMEY:** Not that I'm aware of.

**HARRIS:** Do you know if he reviewed any DOJ documents before he was recused?

**COMEY:** I don't know.

**HARRIS:** And after he was recused. I'm assuming same answer?

**COMEY:** Same answer.

**HARRIS:** And aside from any notice or memorandum that was not sent or was what process would be to make sure that the attorney general would not have any connection to the investigation torsion your knowledge?

**COMEY:** I don't know for sure. I know he had consulted with career ethics officials that know how to run a recusal at DOJ. But I don't know what mechanism they set up.

**HARRIS:** And the attorney general recused himself from the investigation, do you believe it was appropriate for him to be involved in the firing of the chief investigator of that case that had Russia interference?

**COMEY:** It's something that I can't answer sitting here. It's a reasonable question. It would depend on a lot of things I don't know, like did he know, what was he told, did he realize the investigation, things like that. I just don't know the answer.

**HARRIS:** You mentioned in your testimony that the president essentially asked you for a loyalty pledge. Are you aware of him making the same request of any other member the

cabinet?

**COMEY:** I don't know one way or another. I've never heard anything about it.

**HARRIS:** You mentioned you had the conversation where he hoped that you would let the Flynn matter go on February 14. Or thereabouts. It's my understanding that Mr. Sessions was recused from any involvement in the investigation, about a full two weeks later. To your knowledge, was the attorney general, did he have access to information about the investigation in those two weeks?

**COMEY:** In theory, sure. Because he's the attorney general. I don't know whether he had any contact with materials related to that.

**HARRIS:** To your knowledge was there any directive that he should not have any contact with any information about the Russian investigation between the February 14th date and the day he was ultimately recused himself on March 2nd.

**COMEY:** Not to my knowledge. I don't know one way or another.

**HARRIS:** And did you speak to the attorney general about the Russia investigation about his recusal?

**COMEY:** I don't think so, no.

**HARRIS:** Do you know if anyone in the department, in the FBI, forwarded any documents or information on memos of any sort, to the attention of the attorney general before his recusal?

**COMEY:** I don't know of any or remember any signaturing here. It's possible.

**HARRIS:** Do you know if the attorney general was involved, in fact, involved in any aspect of the Russia investigation after the 2nd of March?

**COMEY:** I don't. I would assume not. Let me say this way, I don't know of any information that would lead me to believe he did something to touch the Russia investigation after recusal.

**HARRIS:** In your written testimony, you indicate that after you were left alone with the president, you mentioned that it was inappropriate and should never happen again to the attorney general. And apparently, he did not reply. And you wrote that he did not reply.

What did he do, if anything? Did he just look at you? Was there a pause for a moment, what happened?

**COMEY:** I don't remember real clearly. I have a recollection of him just kind of looking at me. It was a danger I'm projecting on to him so this might be a faulty memory. But I kind of got — his body language gave me a sense like what am I going to do.

**HARRIS:** Did he shrug?

**COMEY:** I don't remember clearly. I think the reason I have that impression is I have some recollection of almost imperceptible like what am I going to do. But I don't have a clear recollection of that of that. He didn't say anything.

**HARRIS:** On that same February 14th meeting you said you understood the president to be requesting that you drop the investigation. After that meeting, however, you received two calls from the president March 30th and April 11th, where the president talked about cloud over his presidency. Has anything you've learned in the months since your February 14 meeting changed your understanding of the president's request — ¶I guess that would be what he said in public documents or public interviews?

**COMEY:** Correct.

**HARRIS:** And is there anything about this investigation that you believe is in any way biased or, or is not being informed by a process of seeking the truth?

**COMEY:** No. The appointment of a special counsel should offer great — especially given who that person is, great comfort to Americans. No matter what your political affiliation is, that this will be done independently, confidently and honestly.

**HARRIS:** And do you believe he should have full authority, Mr. Mueller, to be able to pursue that investigation?

**COMEY:** Yes. And knowing him well, over the years, if there's something that he thinks he needs, he will speak up about it.

**HARRIS:** Do you believe he should have full independence?

**COMEY:** Oh, yeah. And he wouldn't be part of if he wasn't going to get full Independence.

**HARRIS:** Thank you, Mr. Chairman.

**CORNYN:** Mr. Comey I'll repeat what I said in previous hearings that I believe you're a good and decent man who has been dealt with a difficult hand starting back with the Clinton e-mail investigation. I appreciate you being here voluntarily to cooperation with the investigation. As a general matter, if an FBI agent has reason to believe that a crime has been committed, do they have a duty to report it?

**COMEY:** That's a good question. I don't know that there's a legal duty to report it. They certainly have a cultural, ethical duty to report it.

**CORNYN:** You're unsure whether they would have a legal duty?

**COMEY**: That's a good question. I have not thought about that before. There's a statute that prohibits the felony, knowing a felony and taking steps to conceal it but that's a different question. Let me be clear, I would expect any FBI agent who has information about a crime to report it.

**CORNYN:** Me, too.

**COMEY:** But where you rest that obligation, I don't know. It exists.

**CORNYN:** And let me suggest as a general proposition, if you're trying to make an investigation go away, is firing an FBI director a good way to make that happen? By that, I mean --

**COMEY:** It doesn't make a lot of sense to me but I obviously am hopelessly biased given I was the one fired.

**CORNYN:** I understand it's personal.

**COMEY:** Given the nature of the FBI, I meant what I said. For all the indispensable people in the world, including the FBI, there's lots of bad things for me not being at the FBI, most of them for me, but the work is going to go on.

**CORNYN:** Nothing that you testified to as to today, has impeded the investigation of the FBI or director Mueller's ability to get to the bottom of this?

**COMEY:** Correct. Especially, Director Mueller is a critical part of that equation.

**CORNYN:** Let me take you back to the Clinton e-mail investigation. I think you've been tanked agency a hero or a villain, depending on whose political ox is being gored at many different times during the court of the Clinton e-mail investigation, and even now perhaps.

But you clearly were troubled by the conduct of the sitting Attorney General Loretta Lynch when it came to the Clinton e-mail investigation. You mentioned the characterization that you'd been asked to accept. That this was a matter. And not a criminal investigation. Which you said it was. There was the matter of President Clinton's meeting on the tarmac. With the sitting attorney general at the time when his wife was a subject to a criminal investigation. And you suggested that perhaps there are other matters that you may be able to share with us later on in a classified setting. But it seems to me that you clearly believe that Loretta Lynch, the attorney general, had an appearance of a conflict of interest on the Clinton e-mail investigation. Is that correct?

**COMEY:** That's fair. I didn't believe she could credibly decline that investigation. At least not without grievous damage to the Department of Justice and to the FBI.

**CORNYN:** And under Department of Justice and FBI norms, wouldn't it have been appropriate for the attorney general, or if she had recused herself which she did not do for the deputy attorney general to appoint a special counsel. That's essentially what's happened with director Mueller. Would that have been an appropriate step?

**COMEY:** Certainly, yes, sir.

**CORNYN:** And were you aware Ms. Lynch had been requested numerous times to appoint a special counsel and had refused.

**COMEY:** Yes. From, I think, Congress had — members of congress had repeatedly asked, yes, sir.

**CORNYN:** Yours truly did on multiple occasions. And that heightened your concerns about the appearance of a conflict of interest with the Department of Justice which caused you to make what you have described as an incorrectly painful decision to basically take the matter up yourself and led to that July press conference?

**COMEY:** Yes, sir. I ask — after President Clinton, former President Clinton met on the plane with the attorney general, I considered whether I should call for the appointment of a special counsel. And decided that would be an unfair thing to do because I knew there was no case there. We investigated it very, very thoroughly. I know this is a subject of passionate disagreement but I knew there was no case there. And calling for the appointment of special counsel would be brutally unfair because it would send the message, uh-huh, there's something here. That's my judgment. Lots of people have different views about it but that's what I thought about it.

**CORNYN:** Well if a special counsel had been appointed they could have made that determination there was nothing there and declined to pursue it, right?

**COMEY:** Sure. But it would have been many months later or a year later.

**CORNYN:** Let me just you ask to — given the experience of the Clinton e-mail investigation and what happened there. Do you think it's unreasonable for anyone, any president, who has been assured on multiple occasions that he's not the subject of an FBI investigation, do you think it's unreasonable for them to want the FBI director to publicly announce that, so that this cloud over his administration would be removed?

**COMEY:** I think that's a reasonable point of view. The concern would be, obviously, because as that boomerang comes back it's going to be a very big deal because there will be a duty to correct.

**CORNYN:** Well, we saw that in the Clinton e-mail investigation.

**COMEY:** Yes, I recall that.

**CORNYN:** I know you do. So, let me ask you, finally, in the minute we have left. There was this conversation back and forth about loyalty. And I think we all appreciate the fact that an FBI director is an unique public official in the sense he's not — he's a political appointee in one sense. But he has a duty of independence to pursue the law pursuant to the Constitution and laws of the United States. And so when the president asked you about loyalty, you got in this back and forth about, well, I'll pledge you my honesty. Then it looks like from what I've read you agreed upon honest loyalty. Is that the characterization?

**COMEY:** Yes.

**CORNYN:** Thank you very much.

**COMEY:** Yes, sir.

**BURR:** Senator Reed.

**REED:** Thank you, Mr. Chairman, thank you, Director Comey. There have been press reports that the president, in addition to asking to you drop the Flynn investigation has asked other senior intelligence officials to take steps which would tend to undermine the investigation of Russia. There are reports that he's asked Dan Coats and Mike Rogers to make public statements exonerating him or taking the pressure off of him. And also reports about Admiral Rogers and Director Pompeo to intervene and reach out to the FBI to ask

them. Are you aware of any of these -- do you have any information with respect to any of these allegations?

**COMEY:** I don't. I'm aware of the public reporting but I had no contact. No conversation with any of those leaders about that subject.

**REED:** Thank you. You have testified that you interpret the discussion with the president about Flynn as a direction to stop the investigation, is that correct?

**COMEY:** Yes.

**REED:** You testified that the president asked you to lift the cloud by especially making public statements dishonoring him and perhaps others, and you refused, correct?

**COMEY:** I didn't do it. I didn't refuse the president. I told him we would see what we can do. The second time he called. I told him in substance, that's something your lawyer will have to take up with the Justice Department.

**REED:** And part of the underlying logic as we discussed many times throughout this morning is the duty to correct. That is one of a theoretical issue but also a very practical issue. Was there — your feeling that the direction on the investigation could in fact include the president?

**COMEY:** Well, in theory. I mean, as I explained, the concern of one of my senior leader colleagues was, if you're looking at potential coordination between the campaign and Russia, the person at the head of the campaign is the candidate. So, logically, this person argued the candidate's knowledge, understanding, would logically become a part of your inquiry if it proceeds. So, I understand that argument. But my view was that what I said to the president was accurate and fair. And fair to him. I resisted the idea of publicly saying it. Although if the Justice Department had wanted to I would have done it because of the duty to correct and the slippery slope problem.

**REED:** Now, again, also, you've testified that the president asked you repeatedly to be loyal to him. And you responded you'd be honestly loyal. Which is your way of saying I'll be honest and I'll be ahead of the FBI independent, is that fair?

**COMEY:** Correct. I tried honest first. And also, you see it in my testimony. I also tried to explain to him why it's in his interest and every president's interest for the FBI to be apart, in a way, because it's credibility is important to a president and total country. And so, I tried to hold the line. Hold the line. It got very awkward. And then I said you'll always have

honesty from me. He said honest loyalty. And I then I proceeded with that as I saw that as a way to add this awkwardness.

**REED:** Is there any explanation?

**COMEY:** There was an explanation, I just don't buy it.

**REED:** Our, yes, so you're fired. Do you believe you're fired because you refused to take the president's direction, is that the ultimate reason?

**COMEY:** I don't know for sure. I know I was fired. Again, I take the president's words, I know I was fired because of something about the way I was conducting the Russia investigation was in some way putting pressure on him, in some way irritating him. And he decided to fire he because of that. I can't go farther than that.

**REED:** Now, the Russian investigation as you've pointed out and my colleagues is one of the most serious hostile acts against this country's history undermining our core of elections is not a discrete event. It will likely occur again and is likely being prepared for '18, '20 and beyond. And yet the president of the United States advised you because at your own — some relationship to the investigation. Then he shows up in the Oval Office with the Russian foreign minister first as classifying you as crazy and a real nutjob. He said "I faced great pressure because of Russia; that's taken off." Your conclusion would be that the president, I would think is downplaying the seriousness of this threat. In fact, took specific steps to stop a thorough investigation of the Russian influence, and also from what you've said or what was said this morning, doesn't seem particularly interested in these hostile threats by the Russians. Is that true?

**COMEY:** I don't know that I can agree to that level of detail. There's no doubt it's a fair judgment. It's my judgment I was fired because of the Russia investigation. I was fired in some way to change — or the endeavor was to change the way the Russia investigation is being conducted. That is a very big deal. And not just because it involves me. The nature of the FBI and the nature of its work requires that it not be the subject of political consideration. And on top of that, you have the Russia investigation itself is vital, because of the threat. And I know I should have said this earlier, but it's obvious, if any Americans were part of helping the Russians do that to us, that is a very big deal. And I'm confident if that is the case, director Mueller will find that evidence.

**REED:** Finally, the president tweeted that James Comey better hope there are no tapes of our conversations before they start leaking to the press. Was that a rather unsubtle attempt

to intimidate you from testifying and intimidate anyone who seriously crosses his path from doing it?

**COMEY:** I'm not going to sit here and try to attempts the president's tweets. To me, it's major impact. It occurred in the middle of the night, holy cow, there might be tapes. If there's tapes it's not just my word against him on the direction to get rid of the Flynn investigation.

**REED:** Thank you very much.

**BURR:** Senator McCain.

**McCAIN:** In the case of Hillary Clinton, you made the statement that there wasn't sufficient evidence to bring the suit against her, although it had been very careless in their behavior. But you did reach a conclusion, in that case that it was not necessary further pursue. Yet at the same time in the case of Mr. Comey, you said that there was not enough information to make a conclusion. Tell me the difference between your conclusion as far as former secretary Clinton is concerned and Mr. Trump?

**COMEY:** The Clinton investigation was a completed investigation that the FBI had been deeply involved in. So, I had an opportunity to understand all of the facts and apply those facts against the laws as I understood them. This investigation was underway, still going, when I was fired. So it's nowhere near in the same place. At least it wasn't when I was —

**McCAIN:** But it's still ongoing?

**COMEY:** Correct. As far as I know. It was when I left.

**McCAIN:** That investigation is going on. This investigation is going on. To reach separate conclusions?

**COMEY:** No, that one was done.

**McCAIN:** That investigation have any involvement of Secretary Clinton or any of her associates is completed?

**COMEY:** Yes, as of July 5th, the FBI completed its investigative work. That's what I was announcing what we had done and what we had found.

**McCAIN:** Well, at least in the mind-set of this member, there's a whole lot of questions remaining about what went on, particularly considering the fact that, as you mention, it's a,

quote, big deal as to what went on during the campaign. So, I'm glad you concluded that part of the investigation. But I — I think that the American people have a whole lot of questions out there, particularly since you just emphasized the role that Russia played. And obviously, she was a candidate for president at the time. So, she was clearly involved in this whole situation where fake news, as you've just described it, a big deal, took place. And you're going to have to help me out here. In other words, we're — the investigation that anything former Secretary Clinton had to do and we don't have to worry about it anymore?

**COMEY:** With respect to — I'm a little confused, senator. With respect to Secretary Clinton we investigated her use of a personal e-mail server.

**McCAIN:** I understand.

**COMEY:**That's the investigation of July 5th that I concluded.

**McCAIN:** So, at the same time, you made the announcement there would be no charges brought against then-Secretary Clinton for any activities involved in the Russia involvement and our engagement in our election. I don't quite understand how you can be done with that, but not done with the whole investigation of their attempt to affect the outcome of our election?

**COMEY:** No, I'm sorry, when I was fired on May 9th [there was] still an open investigation to understand the Russians and whether any Americans worked with them.

**McCAIN:** And the conclusion there was no need to bring charges against Secretary Clinton? So, you reached the conclusion with regard to the President Comey — the case of President Trump, you had an ongoing investigation. So, you've got one candidate who you're done with. And another candidate that you have a long way to go. Is that correct?

**COMEY:** I don't know how far the FBI has to go, but, yes ... Clinton clinton e-mail investigation was completed. The investigation of Russia's efforts in connection with the election. And whether there was any coordination and with whom the Russia campaign is ongoing when I left.

**McCAIN:** You just made it clear you said, quote, this is a quote, big deal, unquote. I think it's hard to recognize in one case you reach a complete conclusion. And on the other side, you have not. And you in fact, obviously, there's a lot more there as we know. As you called it a, quote, big deal. She's one of the candidates. But in her case, you say there will be no charges, in case of President Trump, the investigation continues. What has been brought

out in this hearing is more and more emphasis on the Russian engagement of and involvement in this campaign. How serious do you think this was?

**COMEY:** Very serious. I want to say something to be made clear, we had not announced nor provocation to announce that the Russians may have coordinated with Secretary Clinton's campaign.

**McCAIN:** Well, they may not have been involved with her campaign. They were involved with the entire presidential campaign, obviously.

**COMEY:** Yes, sir. That is the investigation that began last summer and so far as I'm aware continues.

**McCAIN:** So both President Trump and former candidate Clinton are both involved in the investigation, yet one of them, you said, there's going to be no charges. And the other one, the investigation continues. Well, I think there's a double standard there to tell you the truth. Then when the president said to you, he talked about the April 11th phone call, he said, quote, because I've been very loyal to you. Very loyal. We had that thing, you know. Does that arouse your curiosity as to what quote that thing was?

**COMEY:** Yes.

**McCAIN:** Why didn't you ask him?

**COMEY:** It didn't seem to me to be important for the conversation we were having to understand that I took it to be some — an effort to communicate to me this — that there is a relationship between us where I've been good to you, you should be good to me.

**McCAIN:** Yeah, but I think it would intensity arouse my curiosity if the president of the United States said we had that thing, you know. I'd like to know what the hell that thing is, particularly if I'm the director of the FBI.

**COMEY:** Yeah, I get that, senator. Honestly, I'll tell you what: this is speculation but what I concluded at the time, in his memory, he was searching back to our encounter at the dinner and was preparing himself to say I offered loyalty to you, you promise loyalty to me. All of a sudden, I think his memory did not happen and he pulled up short.

**McCAIN:** We would have had conversation if that happened to me, to be honest with you. Are you aware of anything that would lead you to believe that the president, or members of the administration or members of the campaign, could potentially be used to coerce or blackmail the administration?

**COMEY:** That's a subject for investigations. Not something I can comment on sitting here.

**McCAIN:** But you reached that conclusion as far as Secretary Clinton was concerned? But you're not reaching a conclusion as far as this administration is concerned? Are you aware of anything that would lead you to believe that information exists that could coerce members of the administration or blackmail the administration?

**COMEY:** That's not a question I can answer, senator.

**BURR:** Sir, time's expired.

**McCAIN:** Thank you.

**BURR:** Time has expired for the hearing. Can I say for members. We'll reconvene promptly at 1:00 P.M. In the hearing room. We have a vote scheduled for 1:45, I would suggest that all members promptly be there at 1:00, we have about three minutes. I'd like to have order. Photographers -- photographers return to where you were, please. This hearing is not adjourned yet. Either that, or we'll remove you. To members, we have about three minutes of update that we would love to cover as soon as we get into the closed session before we have an opportunity to spend some time with director Comey. Based on our agreement, it would be my intentions to adjourn that closed hearing between 2:00 and 2:10 so members would go vote and I would urge you to eat at that time. Jim, several members of this committee have had an opportunity to work with you since you walked in the door. I want to say personally on behalf of all the committee members we're grateful for your service to the country not just in your capacity as FBI director but as prosecutor, and more importantly being somebody that loves this country enough to tell it like it is. I want to say to your workforce, that we're grateful to them with the level of cooperation that they have shown us. With the trust we built between both organizations. The congress and the bureau. We couldn't do our job if it wasn't for their willingness to share candidly, with us, the work that we need to see. This hearing's the ninth public hearing this committee has had this year. That's twice the historical yearlong average of this committee. I think the vice chairman and my biggest challenge when this investigation has concluded is to return our hearings to the secrecy of a closed hearing. To encourage our members not to freely talk about intelligence matters, publicly.

And to respect the fact that we have a huge job.

And that's to represent the entire body of the United States Senate and the American people. To make sure that we work with the intelligence community to provide you the tools to keep America safe. And that you'll do it within the legal limit or those limits that

are set by the executive branch. We could not do it if it wasn't for our trusted partnership that you have been able to lead and others before you. So, as we depart from this, this is a pivotal hearing in our investigation. We're grateful for the professionalism you've season and your willingness, I would turn to the Vice Chairman.

**WARNER:** I simply want to echo, again, the thanks for your appearance. And there clearly still remain a number of questions. And the one thing I want to commit to you and more importantly, Jim and I want to commit to all of us still potentially watching, following, there's still a lot of unanswered questions. And we're going to get to the bottom of this, we're going to get the facts out. The American people deserve to know. There's implications of the trump officials and the Russians. But the macro. And I think it's important that all Americans realize that threat is real. It's continuous. It's not just towards our nation. It's towards all western democracies and we have to come to a selection.

**BURR:** Director, I thank you. On behalf of the committee, this hearing is adjourned.

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

POWERJobs

Press

Print Subscriptions

RSS

Site Map


Terms of Service

Privacy Policy

_____


© 2018 POLITICO LLC

Exhibit
68



# Baier to Comey: If Dossier Was "Salacious," Why Did You Use It To Get FISA Warrant?

  

Posted By Ian Schwartz
On Date April 26, 2018



FOX News' Bret Baier asked James Comey if he believed the Steele dossier was "salacious" why did he use it as part of the FISA application to obtain a warrant to surveil the Trump campaign. The former FBI director said his "recollection" is there was more than the dossier, it was part of it but not all of it, to get the FISA. He said a "broader mosaic of facts" was also used to get the warrant.

He said he was directed by the Director of National Intelligence, James Comey, to brief

Trump on the dossier.

BRET BAIER: You called the dossier unverified, salacious. Why did you use that to the FISA court to ask for surveillance for Carter Page? Not only use it but you led with it, a bulk of that FISA application deals with that dossier. Why?

JAMES COMEY: Yeah. That's not my recollection, Bret. And I don't know that the FISA application has been released. My recollection was it was part of a broader mosaic of facts that were laid before the FISA judge to obtain a FISA warrant.

BAIER: It was a lot more than the dossier in the FISA application?

COMEY: My recollection was there was a significant amount of additional material about Page and why there was probable cause to believe he was an agent of a foreign power. And the dossier was part of that but was not all of it or a critical part of it, to my recollection.

BAIER: The intel briefing at Trump Tower. You briefed the president-elect on the sliver of the dossier, really the salacious part about the prostitutes in Moscow and that allegation.

COMEY: Correct.

BAIER: Didn't include anything broader than that, right?

COMEY: Correct. My mission in that private briefing was just to tell him about that slice of it.

## Related Videos



📹 **Trey Gowdy: Director Comey's Recollection is Flawed**

S.C. congressman Trey Gowdy joins FNC's Rucker Carlson to react to fired FBI Director James Comey's comments in an interview with 'Special Report' anchor Bret Baier and the potential legal implications of Comey's claims. Gowdy challenges Comey to explain discrepancies between what he told...

Trey Gowdy    James Comey    Tucker Carlson



**📹 Comey: "I Don't Remember" Who Told Me About Steele Dossier, Found Out From "The Media"**

Former FBI director James Comey said he could not recall who originally told him about the Steele dossier in an interview with FOX News Channel's Bret Baier on Thursday. Comey said he first heard of its existence "in the media" and only learned about its true extent after a "reliable source"...

James Comey     BRET BAIER     Donald Trump



 **Comey Pushes Back Against Trump's "Leaker" Claim In Full 'Special Report' Interview: "He's Just Wrong"**

Former FBI Director James Comey sat down for an interview with FOX News Channel's 'Special Report' with Bret Baier on his decision-making process in the Hillary Clinton email investigation, the origins of the anti-Trump dossier, memos of conversations with President Trump and new book 'A Higher...

[ James Comey ] [ BRET BAIER ]

---

💬 **Comment**                                        Show comments **54**

Exhibit
69

# A HIGHER LOYALTY

TRUTH, LIES, AND
LEADERSHIP

## JAMES COMEY



FLATIRON
BOOKS
NEW YORK

—ROBERT M. GATES, DIRECTOR OF CENTRAL INTELLIGENCE

A SMALL FLEET of fully armored SUVs—carrying the directors of national intelligence, the Central Intelligence Agency, the National Security Agency, and the Federal Bureau of Investigation—made its way toward the tall, shining gold tower in the middle of Manhattan. It was January 6, 2017, two weeks before Inauguration Day, and we had all flown up that morning. The NYPD led our cars through the barricade and onto the side street between Madison and Fifth Avenues in Manhattan. We walked in a group, surrounded by our security people, and entered the side-street entrance for the Trump Tower residences.

The press, in their holding area on Fifth Avenue, couldn't see us arrive, nor could the protesters, in their own holding area not far away. Still, it was quite the scene in the comparatively quiet Trump Tower residences lobby. We were a two-elevator crowd of leaders and protectors. One elevator discharged a lady going to walk her tiny dog. She and her dog, both wearing expensive coats against a cold Fifth Avenue day, passed through our tight pack of dark suits and armed men. Chief spies holding locked bags with our nation's secrets politely mumbled, "'Scuse us."

After all the live TV images of job applicants and dignitaries coming and going through the gilded Fifth Avenue lobby as though on a reality TV show, the leaders of our country's biggest intelligence agencies were sneaking in to see the president-elect. We were sneaking in to tell him what Russia had done to try to help elect him.

This was to be the third and final briefing session by the leadership of the intelligence community—referred to inside the government as the IC—to describe the classified findings of an intelligence community assessment (ICA) of Russia's actions during the presidential election. At President Obama's direction, analysts from the CIA, NSA, and FBI, coordinated by senior analysts from ODNI—the Office of the Director of National Intelligence—had spent a month pulling together all sources of information to offer government officials, as well as the incoming Trump administration, a complete picture of the level of Russian interference in the 2016 presidential campaign. A watered-down, unclassified version of the ICA had been prepared for public release. But this was the meaty stuff. This was about sharing the most sensitive information, including sources and methods—precisely how we knew what we knew—spelling out in great detail why we had achieved the unusual state of a joint high-confidence opinion that Russia had intervened extensively in an American presidential election.

The four agencies had joined in the assessment, which was both stunning and straightforward: Russian president Vladimir Putin ordered an extensive effort to influence the 2016 presidential election. That effort, which came through cyber activity, social media, and Russian state media, had a variety of goals: undermining public faith in the American democratic process, denigrating Hillary Clinton and harming her electability and potential presidency, and helping Donald Trump get elected.

Our first briefing on the assessment had occurred the day before, January 5, 2017, with the incumbent of the Oval Office. In front of President Obama, Vice President Biden, and their senior aides, Jim Clapper, the director of national intelligence, laid out the work that had been done, the conclusions reached, and the basis for those conclusions. The president asked a variety of questions, as did the vice president.

It was at moments like these when I occasionally caught a glimpse of the warm, brotherly, and sometimes exasperating relationship between Barack Obama and Joe Biden, two very different personalities. The pattern was usually the same: President Obama would have a series of exchanges heading a conversation very clearly and crisply in Direction A. Then, at some point, Biden would jump in with, "Can I ask something, Mr. President?" Obama would politely agree, but something in his expression suggested he knew full well that for the next five or ten minutes we would all be heading in Direction Z. After listening and patiently waiting, President Obama would then bring the conversation back on course.

In this instance, we stayed on track. After an extended discussion on the intelligence assessment, the president asked what the plan was for further briefings. Director Clapper explained that we were to meet the Gang of Eight the next morning—the top officials in Congress, both Democrats and Republicans, briefed on intelligence matters—and then we would go immediately to New York City to brief the president-elect and his senior team.

Clapper explained to Obama that there was an unusual matter that needed to be brought to Mr. Trump's attention: additional material—what would become

commonly called "the Steele dossier"—that contained a variety of allegations about Trump. The material had been assembled by an individual considered reliable, a former allied intelligence officer, but it had not been fully validated. The material included some wild stuff. Among that stuff were unconfirmed allegations that the president-elect had been engaged in unusual sexual activities with prostitutes in Russia while on a trip to Moscow in 2013, activities that at one point involved prostitutes urinating on a hotel bed in the presidential suite of the Ritz-Carlton that the Obamas had used while on a visit there. Another allegation was that these activities were filmed by Russian intelligence for the possible purpose of blackmail against the president-elect. Director Clapper explained that we believed the media were about to report on this material and therefore we had concluded it was important for the intelligence community to alert the incoming president.

Obama did not appear to have any reaction to any of this—at least none he would share with us. In a level voice, he asked, "What's the plan for that briefing?"

With just the briefest of sidelong glances at me, Clapper took a breath, then said, "We have decided that Director Comey will meet alone with the president-elect to brief him on this material following the completion of the full ICA briefing."

The president did not say a word. Instead he turned his head to his left and looked directly at me. He raised and lowered both of his eyebrows with emphasis, and then looked away. I suppose you can read whatever you want into a wordless expression, but to my mind his Groucho Marx eyebrow raise was both subtle humor and an expression of concern. It was almost as if he were saying, "Good luck with *that*." I began to feel a lump in my stomach.

As the meeting broke up, my eyes fixed on the bowl of apples on the Oval Office coffee table. Because the president and Mrs. Obama were very health conscious—the First Lady had run a campaign in schools about exchanging junk food for fruits and vegetables—the apples had been a fixture of the Oval Office for years. I wasn't entirely certain they were edible, but I once saw Chief of Staff Denis McDonough grab two at a time. He surely wasn't eating plastic fruit replicas. My youngest daughter long ago had asked me to get her a presidential apple, and this was surely the last time the Oval Office, an apple, and I would ever be together. Now or never. Swipe an apple at the close of a meeting about Russian interference? So tacky. But fatherhood beats tacky. I scooped an apple. Nobody stopped me. I photographed it in the car and texted the picture to my daughter, delivering the product that

evening. She let me taste a slice. Not plastic.

* * *

Later that day, I received a call from Jeh Johnson, the secretary of Homeland Security, who had been a friend since we were federal prosecutors together in Manhattan in the 1980s. He had been in the Oval Office that morning for the briefing. I have no idea whether he was calling me at President Obama's suggestion, or if the two ever spoke about the matter, but he gave voice to how I viewed the Oval Office eyebrow raise.

"Jim, I'm worried about this plan for you to privately brief the president-elect," he said.

"Me, too," I replied.

"Have you ever met Donald Trump?" he asked.

"No."

"Jim, please be careful. Be very careful. This may not go well."

I thanked Jeh for the concern and the call. This was not making me feel better.

Still, I could see no way out of it. The FBI was aware of the material. Two United States senators separately contacted me to alert me to its existence and the fact that many in Washington either had it or knew of it. CNN had informed the FBI press office that they were going to run with it as soon as the next day. Whether it was true or not, an important feature of disarming any effort to coerce a public official is to tell the official what the enemy might be doing or saying. The FBI calls that a "defensive briefing."

How on earth could we brief the man about Russian efforts and not tell him about this piece? But it was so salacious and embarrassing that it didn't make sense to tell him in a group, especially not a group led by Obama appointees who were leaving office the moment Trump became president. I was staying on as FBI director, we knew the information, and the man had to be told. It made complete sense for me to do it. The plan was sensible, if the word applies in the context of talking with a new president about prostitutes in Moscow. Still, the plan left me deeply uncomfortable.

There was more to the discomfort: I long ago learned that people tend to assume that you act and think the way they would in a similar situation. They project their worldview onto you, even if you see the world very differently. There was a real

chance that Donald Trump, politician and hardball deal-maker, would assume I was dangling the prostitute thing over him to jam him, to gain leverage. He might well assume I was pulling a J. Edgar Hoover, because that's what Hoover would do in my shoes. An eyebrow raise didn't quite do this situation justice; it was really going to suck.

The bit about "pulling a J. Edgar Hoover" made me keen to have some tool in my bag to reassure the new president. I needed to be prepared to say something, if at all possible, that would take the temperature down. After extensive discussion with my team, I decided I could assure the president-elect that the FBI was not currently investigating him. This was literally true. We did not have a counterintelligence case file open on him. We really didn't care if he had cavorted with hookers in Moscow, so long as the Russians weren't trying to coerce him in some way.

The FBI's general counsel, Jim Baker, argued powerfully that such an assurance, although true, could be misleadingly narrow: the president-elect's other conduct was, or surely would be, within the scope of an investigation looking at whether his campaign had coordinated with Russia. There was also the concern that the FBI might then be obligated to tell President Trump if we did open an investigation of him. I saw the logic of this position, but I also saw the bigger danger of the new president, who was known to be impulsive, going to war against the FBI. And I was determined to do all I could, appropriately, to work successfully with the new president. So I rejected Jim Baker's thoughtful advice and headed to Trump Tower with "we are not investigating you" in my back pocket. Once again, we were in an unprecedented spot.

By the beginning of 2017, after all the controversies over the Clinton case, I had become a relatively identifiable public figure. Even if I wanted to hide from view, my height made that even harder. It was clear that any number of Republicans shared Hillary Clinton's view that I'd affected the election result in Trump's favor. As much as Clinton partisans felt anger—and in some cases even hatred—toward me, in Trump World, I was something of a celebrity. Which made my entrance into Trump Tower really uncomfortable. I didn't want to be seen as anything different from the other intelligence leaders doing their jobs.

We gathered in a small conference room belonging to the Trump Organization. It was blandly decorated and had been outfitted with a temporary heavy gold ceiling-to-floor curtain to block the glass wall that would otherwise show our meeting to the hallway. The president-elect entered the room on time, followed by the vice president–elect and the rest of the designated senior White House team.

This was the first time I'd ever seen Donald Trump face-to-face. He appeared shorter than he seemed on a debate stage with Hillary Clinton. Otherwise, as I looked at the president-elect, I was struck that he looked exactly the same in person as on television, which surprised me because people most often look different in person. His suit jacket was open and his tie too long, as usual. His face appeared slightly orange, with bright white half-moons under his eyes where I assumed he placed small tanning goggles, and impressively coiffed, bright blond hair, which upon close inspection looked to be all his. I remember wondering how long it must take him in the morning to get that done. As he extended his hand, I made a mental note to check its size. It was smaller than mine, but did not seem unusually so.

Trump brought his entire senior team into the small conference room. Vice President–Elect Mike Pence, Chief of Staff Reince Priebus, National Security Adviser Mike Flynn, and Press Secretary Sean Spicer sat at the oval conference table, with Trump and Pence seated at opposite ends. They were quiet and serious. As we shook hands, the vice president–elect held the handshake an extra few seconds and said my first name, drawing it out—"Jiiiimm." It struck me as an odd combination of someone greeting an old friend and consoling that friend. I don't think we had ever met, although I recall our speaking on the phone once fourteen years earlier, in 2003, when I was United States Attorney in Manhattan and we were investigating a guy who registered common misspellings of popular children's websites so that when a child mistyped "Disneyland.com" or "Bobthebuilder.com" they were directed to a pornography website. My reaction was "That should be a crime." When I found it had become a federal crime only months earlier, I asked for the contact information of the member of Congress responsible for the Truth in Domain Names Act so I could thank that person. It turned out to be Indiana congressman Mike Pence, who told me on the phone that he had pushed for the law after one of his own children was redirected in that sick way.

Director Clapper sat closest to the president-elect, with CIA Director John Brennan, NSA Director Mike Rogers, and me to his right. Against the wall behind me sat Trump's future CIA Director Mike Pompeo and designated Homeland Security Adviser Tom Bossert and Deputy National Security Adviser K. T. McFarland. The president-elect's CIA intelligence briefer—a career employee

assigned to deliver regular intelligence briefings to the incoming president—was also in the room to take notes.

By this point, I had worked relatively closely with two presidents, in addition to scores of other leaders in government. I was curious to see how Trump, the classic "fish out of water," would operate in a totally foreign role. Running a private family-held company is, of course, quite different from running a nation—or even running a large public corporation. You have to deal with various constituencies who don't report to you and to live under a web of laws and regulations that don't apply to a typical CEO.

As I'd seen from other leaders, being confident enough to be humble—comfortable in your own skin—is at the heart of effective leadership. That humility makes a whole lot of things possible, none more important than a single, humble question: "What am I missing?" Good leaders constantly worry about their limited ability to see. To rise above those limitations, good leaders exercise judgment, which is a different thing from intelligence. Intelligence is the ability to solve a problem, to decipher a riddle, to master a set of facts. Judgment is the ability to orbit a problem or a set of facts and see it as it might be seen through other eyes, by observers with different biases, motives, and backgrounds. It is also the ability to take a set of facts and move it in place and time—perhaps to a hearing room or a courtroom, months or years in the future—or to the newsroom of a major publication or the boardroom of a competitor. Intelligence is the ability to collect and report what the documents and witnesses say; judgment is the ability to say what those same facts mean and what effect they will have on other audiences.

In my first meeting with Trump, I looked to see how he struck that balance of confidence and humility and whether he showed signs of having sound judgment. I confess I was skeptical going in. My impression from the campaign was that he was a deeply insecure man, which made it impossible for him to demonstrate humility, and that he seemed very unlikely to be confident and humble enough to ask the "What am I missing?" question at the heart of sound judgment. But I didn't see enough at Trump Tower that day to see whether that assessment was correct or not. The president-elect was appropriately subdued and serious.

Director Clapper presented the intelligence community assessment, just as he had to President Obama and the Gang of Eight. There were a few questions and comments, most of which came from Tom Bossert in the back row. During the discussion of Russia's involvement in the election, I recall Trump listening without interrupting, and asking only one question, which was really more of a statement: "But you found there was no impact on the result, right?" Clapper replied that we had done no such analysis, which was not our business or expertise. What we could say is that we found no evidence of alteration of the vote count.

What I found telling was what Trump and his team didn't ask. They were about to lead a country that had been attacked by a foreign adversary, yet they had no questions about what the future Russian threat might be. Nor did they ask how the United States might prepare itself to meet that threat. Instead, with the four of us still in our seats—including two outgoing Obama appointees—the president-elect and his team shifted immediately into a strategy session about messaging on Russia. About how they could spin what we'd just told them. Speaking as if we weren't there, Priebus began describing what a press statement about this meeting might look like. The Trump team—led by Priebus, with Pence, Spicer, and Trump jumping in—debated how to position these findings for maximum political advantage. They were keen to emphasize that there was no impact on the vote, meaning that the Russians hadn't elected Trump. Clapper interjected to remind them of what he had said about sixty seconds earlier: the intelligence community did not analyze American politics, and we had not offered a view on that.

I had been in many intelligence briefings with the two previous presidents and had never seen Presidents Bush or Obama discuss communications and political strategy in front of intelligence community leaders. There had always been a line. The intelligence community does facts; the White House does politics and spin, and does it on its own. The searing lesson of the Iraq war—based on bad intelligence about weapons of mass destruction—was "never mix the two." I tried to tell myself that maybe this was because Trump and his team had little experience on these matters—Trump, of course, had no experience in government whatsoever—but in an instant, the line between intelligence and politics began to fade.

As I was sitting there, the strangest image filled my mind. I kept pushing it away because it seemed too odd and too dramatic, but it kept coming back: I thought of New York Mafia social clubs, an image from my days as a Manhattan federal prosecutor in the 1980s and 1990s. The Ravenite. The Palma Boys. Café Giardino. I couldn't shake the picture. And looking back, it wasn't as odd and dramatic as I thought it was at the time.

The Italian Mafia, as noted earlier, called itself La Cosa Nostra—"this thing of ours"—and always drew a line between someone who was a "friend of yours," meaning someone outside the family, and someone who was a "friend of ours," meaning an official member of the family. I sat there thinking, Holy crap, they are trying to make each of us an *"amica nostra"*—friend of ours. To draw us in. As crazy as it sounds, I suddenly had the feeling that, in the blink of an eye, the president-elect was trying to make us all part of the same family and that Team Trump had made it a "thing of ours." For my entire career, intelligence was a thing of mine and political spin a thing of yours. Team Trump wanted to change that.

I should have said something right then. After all, I hadn't exactly been shy when it came to asserting myself to leaders in other administrations. I'm not sure it would have made a difference, but maybe I should have told the new team about the norms of behavior, developed over generations, in fits and starts, to try to keep politics out of intelligence, to ensure that the president gets the best facts, whether he likes them or not, and to insulate the intelligence community from charges that its conclusions are politically cooked. Thinking that intelligence leaders would willingly contribute to a conversation about how to do PR in support of any presidential administration was at best a naïve notion, reflecting a misunderstanding of our role. Thinking that members of the outgoing Obama administration would be part of such an effort was just dumb.

But in that moment, I convinced myself that speaking up would be crazy. I didn't know these people and they didn't know me. We had just served up "the Russians tried to get you elected." Should I now give them a lecture about how to behave with us? And when I'm about to have a private session with the president-elect to talk about Russian hookers? Nope. Don't think so. So I said nothing. And nobody else said anything, either. Nobody on the Trump team thought to say, "Hey, maybe this is a conversation for later," or "Perhaps we should move on, Mr. President-Elect."

I actually think it was Trump who ended the communications strategy session by saying they could talk about it at another time. At that point, Reince Priebus asked if there was anything else that we should tell them.

Here we go, I thought.

Clapper said, "Well, yes, there is some additional sensitive material that we thought it made sense for Director Comey to review with you in a smaller group.

We will excuse ourselves so he can discuss it privately with you."

"Okay, how small?" the president-elect asked, looking at me.

"It's up to you, sir," I said, "but I was thinking the two of us."

Reince Priebus interjected, "How about me and the vice president–elect?"

"That's fine sir," I answered, turning to the president-elect. "It's entirely up to you. I just didn't want to do it with a larger group."

I don't know if Trump knew what I was about to say, but the president-elect waved his hand at Priebus and then pointed at me. "Just the two of us. Thanks, everybody."

The group shook hands with the visitors and everyone filed out. Jeh Johnson's words banged around my head. "Jim, please be careful. Be very careful."

We waited quietly while the others filed out. When we were alone, the president-elect spoke first, throwing out compliments. "You've had one heck of a year," he said, adding that I handled the email investigation "honorably" and had a "great reputation." This was nice of him to say, and there seemed to be genuine concern and appreciation in his voice. I nodded in gratitude, with a tight smile. He said that the people of the FBI "really like you" and expressed his hope that I would stay on as director.

I replied, "I intend to, sir."

Though it might have been the polite or obvious thing to say to ingratiate myself with the president-elect, I didn't thank him for saying this, because I already had the job, for a stated ten-year term, and didn't want it to appear as if I needed to reapply. In fact, only once in the Bureau's history was an FBI director fired before the end of his term—when Bill Clinton, without controversy, removed William Sessions in 1993 over allegations of serious ethical improprieties. Ironically, the man Clinton replaced him with, Louis Freeh, turned out to be a thorn in the administration's side as he pressed aggressively for investigations of alleged administration misdeeds.

After Trump finished with his opening monologue, which lasted for a minute or so, I explained the nature of the material I was about to discuss and why we thought it important that he know about it. I then began to summarize the allegation in the dossier that he had been with prostitutes in a Moscow hotel in 2013 and that the Russians had filmed the episode. I didn't mention one particular allegation in the dossier—that he was having prostitutes urinate on each other on

the very bed President Obama and the First Lady had once slept in as a way of soiling the bed. I figured that single detail was not necessary to put him on notice about the material. This whole thing was weird enough. As I spoke, I felt a strange out-of-body experience, as if I were watching myself speak to the new president about prostitutes in Russia. Before I finished, Trump interrupted sharply, with a dismissive tone. He was eager to protest that the allegations weren't true.

I explained that I wasn't saying the FBI believed the allegations. We simply thought it important that he know they were out there and being widely circulated.

I added that one of the FBI's jobs is to protect the presidency from any kind of coercion, and, whether or not the allegations were true, it was important that he know Russians might be saying such things. I stressed that we did not want to keep information from him, particularly given that the press was about to report it.

He again strongly denied the allegations, asking—rhetorically, I assumed—whether he seemed like a guy who needed the services of prostitutes.

He then began discussing cases where women had accused him of sexual assault, a subject I had not raised. He mentioned a number of women, and seemed to have memorized their allegations. As he began to grow more defensive and the conversation teetered toward disaster, on instinct, I pulled the tool from my bag: "We are not investigating you, sir." That seemed to quiet him.

My job done, the conversation ended, we shook hands and I left the conference room. The entire private session took about five minutes, and now I was away, retracing my steps to go out the back entrance. The other directors had gone ahead. On the way down the hall I passed two men in winter coats coming the other way. One looked familiar, but I kept walking. When he was past me, he called, "Director Comey?" and I stopped and turned. Jared Kushner introduced himself, we shook hands, and I continued on my way.

I walked out the side door, stepped into the armored car, and headed to the Manhattan FBI office to do what I loved. I walked floor upon floor of FBI offices and cubicles, thanking incredible people for their work. After the uncomfortable conversation I'd just had, it was like taking a shower.

On January 10, four days after my meeting with Trump, the online publication BuzzFeed published in full the thirty-five-page dossier that I had briefed Trump on. The article began:

*A dossier making explosive—but unverified—allegations that the Russian*

*government has been "cultivating, supporting and assisting" President-elect Donald Trump for years and gained compromising information about him has been circulating among elected officials, intelligence agents, and journalists for weeks. The dossier, which is a collection of memos written over a period of months, includes specific, unverified, and potentially unverifiable allegations of contact between Trump aides and Russian operatives, and graphic claims of sexual acts documented by the Russians.*

In response, the president-elect tweeted: "FAKE NEWS—A TOTAL POLITICAL WITCH HUNT!"

The following day, January 11, I had another conversation with the future president. In three years working under President Obama, I had never spoken to him on the phone and only talked to him alone in person twice. Yet here I was, still in the Obama administration, standing at my FBI headquarters office window, having my second private conversation with Donald Trump in five days. Below me, as I held the phone to my ear, I could see cars moving on a darkened Pennsylvania Avenue. Across the street, the Justice Department was aglow with busy offices. I remember looking up and to my right at the brightly lit Washington Monument. I could see it rising high above the new Trump hotel that had just been opened on Pennsylvania Avenue, walking distance from the White House.

President-Elect Trump was calling from New York. He started the call by again praising me, which now seemed like a conversational device rather than a sincere expression of approval. He added, "I sure hope you are going to stay." I assured him, again, that I was staying at the FBI.

He then moved to the purpose of the call. He said he was very concerned about the "leaking" of the Russian "dossier" and how it happened. I wasn't sure if he was implying that a federal agency leaked it, so I explained that the dossier was not a government document. It had been compiled by private parties and then given to many people, including in Congress and the press. The FBI hadn't asked that it be created or paid for it to be created. The document was not classified and not a government document, so it wasn't really correct that it had been "leaked."

He then said he had been thinking more about the part I had briefed him about privately at Trump Tower. He had been talking to people who had gone with him on the trip to Moscow for the Miss Universe 2013 pageant. He now recalled that he

had not even stayed overnight in Moscow. He claimed he had flown from New York, had only gone to the hotel to change his clothes, and had flown home that same night. And then he surprised me by bringing up the one allegation I had specifically tried not to discuss with him.

"Another reason you know this isn't true: I'm a germophobe. There's no way I would let people pee on each other around me. No way."

I actually let out an audible laugh. I decided not to tell him that the activity alleged did not seem to require either an overnight stay or even being in close proximity to the participants. In fact, though I didn't know for sure, I imagined the presidential suite of the Ritz-Carlton in Moscow was large enough for a germophobe to be at a safe distance from the activity. I thought all of that and said none of it.

Instead, I stared out at the monuments and wondered what had happened to me and our country that the FBI director was talking about this with our incoming president. Having delivered his defense on a subject I didn't care about, for the second time, the president-elect ended the call. I went to find my chief of staff, Jim Rybicki, to tell him the world had gone crazy and I was caught in the middle of it.

It stayed crazy.

CHAPTER 13

## TESTS OF LOYALTY

*Friendship, connections, family ties, trust, loyalty, obedience—this was the glue that held us together.*
—Mafia boss Joseph Bonanno, in his autobiography, *Man of Honor*

DONALD J. TRUMP WAS inaugurated the forty-fifth president of the United States on January 20, 2017, before a crowd whose number immediately and famously came into dispute. The new president was determined to demonstrate that the number of spectators who turned out for him, which was sizable, surpassed the number of people present for Barack Obama's 2009 inauguration. They did not. No evidence, photographic or otherwise, would move him off his view, which, as far as everyone but his press team seemed to agree, was simply false. This small moment was deeply disconcerting to those of us in the business of trying to find the truth, whether in a criminal investigation or in assessing the plans and intentions of America's adversaries. Much of life is ambiguous and subject to interpretation, but there are things that are objectively, verifiably either true or false. It was simply not true that the biggest crowd in history attended the inauguration, as he asserted, or even that Trump's crowd was bigger than Obama's. To say otherwise was not to offer an opinion, a view, a perspective. It was a lie.

Two days later, on Sunday, January 22, I attended a late-afternoon reception at the White House for the leaders of the various law enforcement agencies who had provided security and support for the inaugural activities. The FBI's counterterrorism, intelligence, and SWAT capabilities had been deployed that day, closely integrated with the Secret Service, as they are for every inauguration. I was told President Trump wanted to thank the agencies for all their hard work. This

# Exhibit
# 70

# FACTS
# AND
# FEARS

### HARD TRUTHS
### FROM A LIFE IN INTELLIGENCE

## JAMES R. CLAPPER

### with Trey Brown

VIKING

astutely prompted us to clarify points on several occasions; I was impressed by the way he actively consumed the intelligence we were providing.

We were scheduled to spend an hour in Trump Tower, but the meeting lasted an hour and a half. By the end, I believe everyone in the room realized that the evidence—particularly from signals intelligence and cyber forensics—to attribute the influence operation to Vladimir Putin and the Russian government was overwhelming. The entire Trump team was happy to hear our assessment that the Russians had not successfully tampered with actual vote tallies. The only question they posed that we couldn't answer was whether the Russian influence operation had any effect on the outcome of the election. I told the president-elect that we had neither the authority nor capabilities to assess what impact—if any—the Russian operation had.

As we closed the briefing, Jim Comey took advantage of a pause in conversation to address the president-elect. We'd agreed that one of the two of us would bring up "one additional matter," a subject "best discussed on a one-on-one basis" with the president-elect. The additional matter was a dossier—a collection of seventeen "pseudo-intelligence" reports created by a private company—which I first learned about from John Brennan a week or so after we'd been tasked to conduct the IC assessment. I didn't know until after my tenure as DNI that the dossier had begun as opposition research against Mr. Trump during the Republican primary race and then, sponsored by the Democrats, had continued to expand during the general election campaign. The memos covered a wide range of topics all related to long-standing interactions between Trump, his associates, and the Russians. It further alleged that the Russian government had compromising material on the president-elect and his team, which it had not disclosed during the course of the election or since.

Some details in the report were salacious, but in our professional opinions, the more ominous accounts alleged ties between members of the Trump team and the Russian government. Because we had not corroborated any of the sources used to generate the dossier, we had not included it as part of our IC assessment. We knew that at least two congressional members and some of the media had copies of the dossier, and that it could be published—in whole or in part—at any moment. While we could neither confirm nor refute anything in the document, we felt what I expressed as a "duty to warn" the president-elect that it existed and that it

potentially could be made public. I wondered at the time—and have often done so since—what the reaction would have been had we *not* warned the president-elect about the existence of the dossier, and he later learned we had known about it and chosen not to tell him.

We decided that it should be Jim to brief him about the matter, for two reasons: First, the FBI had initially uncovered the dossier in its earlier investigation into the Russian hacking of Clinton-campaign emails, and second, John and I were both retiring at noon on January 20, while Jim would continue on as FBI director for President Trump.

We all rose, and President-elect Trump thanked us. Reince Priebus asked him if he wanted anyone on his team to stay for the "additional matter," and the president-elect said no. So, leaving the two of them to talk, the rest of the party adjourned. Before we cleared the conference room, the Trump team had already begun drafting their press release about our meeting. I overheard their first point, that the US IC had assessed that the Russian interference did not change the outcome of the election—which was very different from our acknowledgment that we hadn't, and couldn't, assess its impact. We had to let it pass. In the hallway I took the opportunity to engage Tom Bossert, who in turn introduced me to the vice president-elect. I spoke with them briefly, suggesting that the new administration consider asking Nick Rasmussen to stay on as director of the National Counterterrorism Center, which it did.

In the car on the way back to Newark Airport, I called Brian Hale (who only requested to be described as "tanned and rested" if we mentioned him in this book) and told him to publish the unclassified IC assessment *immediately*. He replied that, just minutes before, he'd received the certified-as-unclassified version of the report as it was moved onto the ODNI system connected to the internet, and it was ready to go. Cutting the phone connection and sitting back, I felt just about as far from "tanned and rested" as one can get. My personal vision of dancing quietly off the stage while no one was paying attention had dissolved. I had less than fourteen days left on the job, and we still had hearings to get through with our oversight committees and each of the full houses of Congress within the next week. So far, I imagined—or hoped—that we appeared publicly to be like the proverbial duck gliding smoothly across the pond, but I could feel just how frantically we were kicking our legs beneath the surface. After we landed at Andrews, I called White

House chief of staff Denis McDonough to let him know that not only had we survived the briefing, but it had gone surprisingly well.

I got little rest over the weekend, both because I was preparing for the hearings and because I was running out of time to close on several issues that were important to the IC before the clock ran out on January 20. Early Monday morning I was on camera once again, this time under very different circumstances. Every four years, just ahead of Inauguration Day, our National Intelligence Council publishes its Global Trends report, an "unclassified strategic assessment of how key trends and uncertainties might shape the world over the next 20 years, to help senior US leaders think about and plan for the longer term." Global Trends represents years of work from our most strategically minded analysts, and I took a lot of pride in introducing the program of presentations planned for that day.

After advising the media and the spray of cameras, to chuckles, "If you're here to get the latest on the Russia hacks you're in the wrong place," I explained that "the Global Trends report does not represent the official, coordinated view of the US Intelligence Community; it does not represent the official view or policy of the US government, and it's not a prediction of the future." Instead it was, I told them, a framework for thinking about the world, designed to help each new administration. The report we published on January 9, 2017, was titled "Paradox of Progress," and it depicted a world at a crossroads, with "rising tensions within and between countries." It forecast:

> An ever-widening range of states, organizations, and empowered individuals will shape geopolitics. For better and worse, the emerging global landscape is drawing to a close an era of American dominance following the Cold War. So, too, perhaps is the rules-based international order that emerged after World War II. It will be much harder to cooperate internationally and govern in ways publics expect. Veto players will threaten to block collaboration at every turn, while information "echo chambers" will reinforce countless competing realities, undermining shared understandings of world events.
>
> Underlying this crisis in cooperation will be local, national, and international differences about the proper role of government across an array of issues ranging from the economy to the environment, religion, security, and the rights of individuals. Debates over moral boundaries—to

whom is owed what—will become more pronounced, while divergence in values and interests among states will threaten international security.

> It will be tempting to impose order on this apparent chaos, but that ultimately would be too costly in the short run and would fail in the long. Dominating empowered, proliferating actors in multiple domains would require unacceptable resources in an era of slow growth, fiscal limits, and debt burdens. Doing so domestically would be the end of democracy, resulting in authoritarianism or instability or both.

The "paradox" was that, within this dark vision, there were unprecedented opportunities to reshape our world for the better, all dependent on how individuals, governments, and international groups renegotiated their expectations of and obligations to one another. The report raised profound questions, based on years of diligent research and engagement with novel thinkers around the globe. In any sane world, I would have spent weeks preparing for the speech that morning and would have framed many of my final public engagements as DNI around the milestone report. Given the events of the past year and my continuing responsibility to report on the Russian operation against our election, I almost felt caught in a microcosm of the dark world the report described. So, that Monday, I gave my introductory speech, thanked the team who'd created the report, and departed for a farewell town hall at DHS and then to prepare for additional Russia-interference briefings with Mike, Jim, and John.

On Tuesday morning we were back on Capitol Hill. At 10:00, we briefed the House Intelligence Committee in a classified, closed hearing, a gathering that turned partisan, personal, and nasty. In particular, three of the Republican lawmakers challenged our conclusion that the Russians actively supported Trump and seemed to resent that we had not involved them in the creation of the IC assessment or informed them as soon as we had any new information. Our explanations only served to stoke their anger. The briefing ran past schedule, and we hurried from the House briefing room south of the Capitol to a hearing room in an office building north of the Capitol for an open, televised hearing with the Senate Intelligence Committee. We had about a twenty-minute break before the red lights went on above the cameras.

For the next two hours, as the American public, the Russian government, and the rest of the world watched, we answered questions about the Russian cyber and

influence operation. The senators, and simultaneously the media, sought to parse our every word, Democrats looking for collusion between Trump's team and the Russians, Republicans for evidence of a conspiracy that the IC was attempting to undermine the president-elect. Senators on both sides pressed Jim Comey to reveal whether there were open FBI investigations looking into either of the presidential campaigns. The Democrats certainly remembered the letter Jim had sent to the Hill eleven days before the election about reopening its investigation into Clinton's emails. When Jim told Senator Angus King, "Especially in a public forum, we never confirm or deny a pending investigation," King voiced quiet exasperation, and the left-leaning media outlets were apoplectic.

When the red lights went off, we immediately moved with the Senate committee to their secure facility. Strangely, after answering questions about it for two hours in public, we then presented the IC assessment to the committee for the first time. By the time this session ended, we'd been testifying for seven straight hours. When I finally had the free time to check on world events, I found that all the contentiousness of the hearings and briefings had been completely overshadowed by other breaking news: BuzzFeed had published the now-infamous dossier on Trump, the one that Jim had warned the president-elect about five days earlier. In a classic case of "shoot the messenger," Trump publicly blamed us for the publication of the dossier—yet another indication to me that his administration would not appreciate anyone's speaking truth to power, particularly if the truth was politically inconvenient.

I woke Wednesday to find that Trump had tweeted another early-morning attack on us: "Intelligence agencies should never have allowed this fake news to 'leak' into the public. One last shot at me. Are we living in Nazi Germany?" I was floored by the analogy, and Jewish communities in the United States and abroad called for him to apologize and retract the statement.

That afternoon in my office, I watched the president-elect in a televised news conference, doubling down on his Nazi tweet, again alleging that US intelligence agencies had "allowed" the dossier to leak—as though we had any control over a document we'd discovered already "out in the wild." He continued, "I think it's a disgrace. And I say that, and I say that, and that's something that Nazi Germany would have done and did do." Not helping the situation, the *New York Times* quickly published a story apparently intended to clarify that he meant to refer to

US intelligence as the Stasi, not the Gestapo.

As I was leaving the office for the drive to the NRO for a farewell town hall, I asked Stephanie Sherline to see if she could track down a phone number for Trump. Much to my surprise, several minutes later she told me the president-elect had agreed to speak with me later that afternoon. Connecting from the NRO, I thanked him for taking the call and said he'd gotten my attention when he'd referred to the IC as "Nazis." I explained to him that I wanted to defend the men and women of the Intelligence Community. I tried to appeal to his higher instincts and reiterated the points from my Election Day letter—that he was inheriting a national treasure and that the men and women of the IC wanted only to serve the nation and to make him successful as president. He thanked me and said that he valued the IC and the intelligence he'd been receiving. He then asked if I would put out a statement refuting what was in the dossier. The request felt very transactional—that he would play nice if I would do him a favor. I declined, saying that I couldn't refute or affirm what was in the dossier. He sounded disappointed.

On Thursday, Mike, Jim, John, and I briefed the entire Senate, and on Friday morning, the entire House. To accommodate the many of its 435 members who showed up, we gave the House presentation in an auditorium in the Capitol Visitor Center. After the briefing, the chair and ranking member of the Intelligence Committee—Devin Nunes and Adam Schiff—facilitated questions, with Republicans lined up at a microphone in the aisle on one side of the auditorium, and Democrats on the other. The questions were mostly partisan—from both sides—and we did our best to answer them within the scope of our IC assessment. When Adam Schiff recognized Congresswoman Debbie Wasserman Schultz, what followed was one of the more uncomfortable, dramatic, emotional displays I've witnessed on Capitol Hill. She ripped into Jim Comey over the hacking, the investigations, and the letter to the committees, channeling all of the frustration she'd felt since stepping down as DNC chair into a litany of allegations aimed at him. In the midst of so much chaos, partisanship, and controversy, her anguish was palpable. I truly admired Jim for responding calmly. I tried to think of something I could say to defuse the exchange, but I couldn't.

I traveled from the Capitol to NSA headquarters, where I held my final town hall with the workforce there, thanking them for their quiet service through all the controversies of the past few years and trying to reassure them about the future.

# Exhibit
71

1

2          IN THE UNITED STATES DISTRICT COURT

3             SOUTHERN DISTRICT OF FLORIDA

4

5   ALEKSEJ GUBAREV, XBT HOLDING    )Case No.
    S.A., AND WEBZILLA, INC.,       )17-CV-60426-
6                                   )UU
               Plaintiffs,          )
7                                   )
               vs.                  )
8                                   )
    BUZZFEED, INC. AND BEN          )
9   SMITH,                          )
                                    )
10             Defendants.          )
    -------------------------------)

11

12

13           DEPOSITION OF KEN BENSINGER

14                New York, New York

15           Wednesday, February 7, 2018

16

17

18

19

20

21

22

23

24   Reported by:
     TAMI H. TAKAHASHI, RPR, CSR
25   JOB NO. J1400361



1

2                          February 7, 2018

3                          9:41 a.m.

4

5        Deposition of KEN BENSINGER, held at the

6    offices of Davis Wright Tremaine, 1251 Avenue

7    of the Americas, New York, New York, pursuant

8    to Notice, before TAMI H. TAKAHASHI, a

9    Registered Professional Reporter and Notary

10   Public of the State of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1

2   K E N   B E N S I N G E R,   called as a

3        witness, having been duly sworn by a

4        notary public, was examined and testified

5        as follows:

6                        EXAMINATION

7   BY MR. FRAY-WITZER:

8        Q.   Good morning.

9        A.   Good morning.

10       Q.   If you would first state your name

11  for the record.

12       A.   My name is Ken Bensinger.

13       Q.   And would you spell your last name,

14  please.

15       A.   B, as in boy, E-N-S-I-N-G-E-R.

16       Q.   Have you ever been deposed before?

17       A.   No, I have not.

18       Q.   So I'd like to explain to you

19  up-front sort of what the ground rules are

20  for a deposition because they can be a little

21  unusual.

22            I will ask questions and obviously

23  I'm going to hope that we get answers.  Is

24  that acceptable?

25       A.   Yes.



                          Bensinger

1

2        Q.   And that book is scheduled to be

3   released this year; is that correct?

4        A.   That's correct.

5        Q.   Congratulations.

6        A.   Thank you.

7        Q.   Do Damon and Affleck still have an

8   option on the movie?

9        A.   Warner Brothers has the option.

10  They're assigned as the production company

11  and they are patiently awaiting the

12  manuscript.

13       Q.   The book, if I'm correct, is titled

14  "Red Card"; is that correct?

15       A.   Yes.

16       Q.   And it discusses as I understand it

17  the FIFA scandal, correct?

18       A.   Yes.

19       Q.   And you did a significant amount of

20  reporting on the FIFA scandal; is that fair

21  to say?

22       A.   Yes.

23       Q.   In connection with your reporting

24  on the FIFA scandal did you meet Christopher

25  Steele?



1                      Bensinger

2        A.    So when it comes to certain

3    sources, among them Christopher Steele, I

4    have a blanket promise of privilege.  And if

5    you ask me questions about those sources,

6    including Christopher Steele or other sources

7    that I may or may not have such a privilege

8    with, I'm going to have to decline to answer.

9        Q.   Is the fact that you met with

10   Christopher Steele at all, is that in your

11   mind privileged?

12   DI       MS. BOLGER:  I'm going to interrupt

13           for one second because you're asking

14           about reporting that has nothing to do

15           with this lawsuit.  You're asking about

16           a book that's subject to its own set of

17           privileges under the reporter's

18           privileges.

19               I'm going to instruct the witness

20           not to answer questions about reporting

21           on stories other than the story at

22           issue.  There's privilege issues within

23           that but he's not going to answer

24           questions about reporting for other

25           things today.  He doesn't have to.



1                     Bensinger

2              MR. FRAY-WITZER:  I think you can

3         understand that his relationship with

4         Christopher Steele is relevant to this

5         case and the dossier, and so far -- and

6         I don't intend to ask anything that

7         would implicate actual conversations.

8         So far I'm simply asking if he has had

9         discussions at all with Christopher

10        Steele in that context.

11             MS. BOLGER:  He's not going to

12        answer questions about discussions with

13        anybody related to the book.  You can

14        ask him questions about the dossier,

15        he'll give you what you feels

16        comfortable giving you, but he's not

17        going to answer questions about

18        conversations about the book.  It's not

19        relevant.

20             MR. FRAY-WITZER:  You're

21        instructing him not to answer?

22   DI        MS. BOLGER:  I am instructing him

23        not to answer.

24             MR. FRAY-WITZER:  I will probably

25        ask a few more questions on that topic



1                        Bensinger

2          that you can instruct him not to answer

3          on; though I will suggest that, given

4          the direct connection with Christopher

5          Steele in this case, that we may well

6          have to compel on and may well be back

7          here.  But it -- that's your option.

8              I'd suggest you might mark the

9          conversation attorneys' eyes only and

10         let him answer, but it's up to you how

11         you want to deal with that.

12    BY MR. FRAY-WITZER:

13         Q.  So I'll try again.  Wait for your

14    attorney's objection or instruction.

15             In connection with your reporting

16    on the FIFA scandal, did you have occasion to

17    have discussions with Christopher Steele?

18    DI        MS. BOLGER:  Don't answer the

19         question for the reasons I stated.

20    BY MR. FRAY-WITZER:

21         Q.  Did you have a continuing

22    relationship with Christopher Steele prior to

23    reporting on the dossier?

24    DI        MS. BOLGER:  Again, object to the

25         question.  I actually don't understand



```
1                    Bensinger
2        it.  And in addition, I'm going to
3        instruct him not to answer if it
4        relates to -- he does understand it and
5        it relates to reporting unrelated to the
6        dossier.
7   BY MR. FRAY-WITZER:
8        Q.   Prior to 2016, did you ever meet
9   Christopher Steele?
10  DI        MS. BOLGER:  Again, I'm going to
11       again instruct the witness not to answer
12       the question if it relates to reporting
13       other than that related to the dossier.
14  BY MR. FRAY-WITZER:
15       Q.   And actually with the understanding
16  of the objection that's been made, I'd like
17  you to answer the question because there's a
18  limitation in the objection.  The objection
19  said it has to deal with reporting on other
20  topics.  There could be an answer that is
21  still out there that doesn't meet that
22  objection.
23       A.   The question is specifically about
24  prior to 2016, if I met Christopher Steele --
25       Q.   Yes.
```



```
 1                   Bensinger
 2      A.   -- is that correct?
 3      Q.   Correct.
 4      A.   And my attorney's advice is that if
 5   it's related to other reporting, I should not
 6   answer that question; is that correct?
 7           MS. BOLGER:  Yes.
 8      A.   And our understanding is that I can
 9   answer it, I may be able to answer it
10   depending on --
11           MS. BOLGER:  Do you want to step
12        out just to discuss the scope of the
13        privilege?  I know there's a pending
14        question --
15           MR. FRAY-WITZER:  No, that's fair.
16           MS. BOLGER:  -- but there's a
17        privilege objection.
18           MR. FRAY-WITZER:  That's fair.
19           MS. BOLGER:  So do you want to step
20        out and talk to me?
21           THE WITNESS:  Yes.  Sorry.
22           MS. BOLGER:  No, no, not at all.
23           (Recess taken.)
24           (The following question was read:
25           "Q.  Prior to 2016, did you ever
```



1          CONFIDENTIAL - Bensinger

2    point to the authority of Christopher Steele

3    on such topics and the seriousness of the

4    allegation.

5          Q.   Did he tell you who the underlying

6    sources were of the information?

7          A.   No, he did not.

8          Q.   Did he provide you with any

9    information concerning the underlying sources

10   of the information?

11         A.   He said that Christopher Steele had

12   a deep, if not unparalleled, network of

13   sources within Russia and outside of Russia

14   with knowledge of affairs within Russia.  And

15   within this case, as I recall, within the

16   Trump campaign.

17         Q.   Other than what you've just told

18   us, did he tell you anything specifically

19   about the underlying sources of the memo?

20         A.   Not that I recall.

21         Q.   Did he say words to the effect of

22   "The information in the memo was not

23   verified"?

24         A.    I believe he said that there was

25   information in the memo that was unverified,



1              CONFIDENTIAL - Bensinger

2   dossier?

3        A.   I know that Heidi Blake and Stuart

4   Millar received copies of the dossier and I

5   know that Mark Schoofs had a copy of the

6   dossier.  Beyond that, I don't know.

7            (Plaintiffs' Exhibit 5, Dossier,

8        marked for identification as of this

9        date.)

10  BY MR. FRAY-WITZER:

11       Q.   You're being shown what's been

12  marked as Exhibit 5.  Let me ask:  Have you

13  seen this document before?

14       A.   Yes, I have.

15       Q.   Can you tell me what this document

16  is?

17       A.   This is the dossier that I obtained

18  from David Kramer.

19       Q.   Would you turn, please, to the last

20  page of the dossier.

21            At the top of the page, paragraph 3

22  there's a redaction bar and so let me first

23  ask the question:  When you received the

24  dossier, was that redaction already present?

25       A.   I believe so, yes.



1           CONFIDENTIAL - Bensinger
2           MS. BOLGER:  Ken, that's fine.
3       There's no pending question.
4           THE WITNESS:  Okay.
5           MR. FRAY-WITZER:  And don't take
6       that personally.  I say to that my
7       witnesses all the time.
8           THE WITNESS:  Okay.
9           MR. FRAY-WITZER:  Thank you.
10          (Time noted:  2:57 p.m.)
11
12
13                  _____
14                      KEN BENSINGER
15
16  Subscribed and sworn to before me
17  this_____ day of _____, 2018.
18
19  _____
20
21
22
23
24
25



1
2              C E R T I F I C A T E
3    STATE OF NEW YORK      )
4                           : ss.
5    COUNTY OF NEW YORK     )
6
7          I, TAMI H. TAKAHASHI, a Notary
8      Public within and for the State of New
9      York, do hereby certify:
10          That KEN BENSINGER, the witness
11      whose deposition is hereinbefore set
12      forth, was duly sworn by me and that
13      such deposition is a true record of the
14      testimony given by the witness.
15          I further certify that I am not
16      related to any of the parties to this
17      action by blood or marriage, and that I
18      am in no way interested in the outcome
19      of this matter.
20          IN WITNESS WHEREOF, I have hereunto
21      set my hand this 12th day of February
22      2018.
23
24      _____
25      TAMI H. TAKAHASHI



1              DEPOSITION ERRATA SHEET

2

3  Our Assignment No.:  J1400361

4  Case Caption:  Gubarev v. BuzzFeed

5

6     DECLARATION UNDER PENALTY OF PERJURY

7

8          I declare under penalty of perjury

9  that I have read the entire transcript of my

10  Deposition taken in the captioned matter or

11  the same has been read to me, and the same is

12  true and accurate, save and except for

13  changes and/or corrections, if any, as

14  indicated by me on the DEPOSITION ERRATA

15  SHEET hereof, with the understanding that I

16  offer these changes as if still under oath.

17                     _____

18                     KEN BENSINGER

19  Subscribed and sworn to on the _____ day of

20  _____, 20 _____ before me.

21  _____

22  Notary Public,

23  in and for the State of

24  _____.

25



Exhibit
72

1          IN THE UNITED STATES DISTRICT  COURT
           FOR THE SOUTHERN DISTRICT OF FLORIDA
2
                        Civil Action No. 17-cv-60426-UU
3

4
   ALEKSEJ GUBAREV, et al.,
5
                Plaintiffs,
6
   vs.
7

8  BUZZFEED, INC., et al.,

9                Defendants.
   _____X
10

11
                        44 West Flagler Street
12                      14th Floor
                        Miami, Florida
13

14                      Wednesday, December 13, 2017
                        9:59 a.m. - 1:32 p.m.
15

16
                ATTORNEYS' EYES ONLY
17

18              VIDEOTAPED DEPOSITION OF
                      DAVID KRAMER
19

20

21

22  ESQUIRE DEPOSITION SOLUTIONS
    800 211-DEPO
23  www.esquiresolutions.com

24  REPORTED BY:  JEROME E. HARRIS
    JOB NO: J0781312
25



1           THE VIDEOGRAPHER:  We are now on the record.

2      This begins Disk number 1 in the videotaped

3      deposition of David Kramer, taken in the matter

4      of Aleksej Gubarev, et al, versus Buzzfeed, Inc.,

5      et al.

6           This deposition is being held at Esquire

7      Deposition Solutions, 44 West Flagler Street,

8      14th Floor, Miami, Florida.  Today is

9      December 13th, 2017, and the time is 9:59 a.m.

10          My name is David Griffin, I'm the

11     videographer, our court reporter is Jeri Harris,

12     both on behalf of Esquire.

13          Counsel please introduce themselves.

14          MR. FRAY-WITZER:  Good morning.  For the

15     Plaintiffs, I am Evan Fray-Witzer.

16          MS. BOLGER:  On behalf of the Defendants,

17     Katherine Bolger from Davis, Wright, Tremaine.

18          MR. JIMENEZ:  And Marcos Jimenez for

19     Mr. Kramer, the witness.

20          MR. SIEGEL:  And Nathan Siegel on behalf of

21     the Defendants.

22 THEREUPON,

23                 DAVID KRAMER

24 was called as a witness by the Plaintiffs, and having

25 first been duly sworn, testified as follows:



1   Q.  When you were explaining to Mr. Bensinger how it

2   came to be that you were in possession of The Memos, did

3   you talk to him at all about the unverified nature of

4   the information in The Memos?

5   A.  Yes.  I said to him what I had said to the

6   others, which is I'm not in a position to verify or

7   refute this, but that it seemed to me to be serious

8   enough to be looked at in a professional way, and that

9   professional journalists were arguably in a position to

10  look into the matter.  And I stressed to him the

11  sensitivity of it; that it had to be handled very

12  carefully.  And he agreed.

13  Q.  Did he ask you if he could quote from any of The

14  Memos in his reporting?

15  A.  No.  Not that I recall, no.

16  Q.  Did you explain to Mr. Bensinger what Mr. Steele

17  had said to you, that some of the information was

18  unverified?

19  A.  I'm sorry, say it again.

20      MR. FRAY-WITZER:  Why don't we just --

21      (Thereupon, the requested portion was read

22      back by the reporter as above recorded.)

23  A.  Yes.

24  BY MR. FRAY-WITZER:

25  Q.  If you had known that Mr. Bensinger was going to



 1  take photographs of The Memos, would you have left him

 2  alone with them?

 3          MS. BOLGER: Let me object a second.  It's a

 4      hypothetical question.

 5  BY MR. FRAY-WITZER:

 6    Q.  You can answer.

 7    A.  I can answer?

 8    Q.  Yes.

 9    A.  Probably not, no.

10    Q.  If you had known that Buzzfeed would publish The

11  Memos, would you have given Mr. Bensinger access to

12  them?

13          MS. BOLGER:  Same objection.

14  BY MR. FRAY-WITZER:

15    Q.  You can answer.

16    A.  No.

17    Q.  In your conversations with Mr. Bensinger, did you

18  discuss at all Alex Gubarev?

19    A.  No.

20    Q.  Did you discuss at all Webzilla?

21    A.  No.

22    Q.  Did you discuss at all XBT Holdings?

23    A.  No.

24    Q.  I believe you testified that the first time that

25  you understood that Mr. Bensinger had taken pictures of



1                      CERTIFICATE OF OATH

2

3    STATE OF FLORIDA)

4    COUNTY OF MIAMI-DADE)

5

6              I, JEROME E. HARRIS, the undersigned

7    authority, hereby certify that the following-named

8    deponent personally appeared before me and was

9    thereupon duly sworn:

10

11                      DAVID KRAMER

12             WITNESS my hand and official seal this

13   13th day of December 2017.

14

15

16

17

18

19             _____

20                      JEROME E. HARRIS
                  Notary Public - State of Florida
21                  Commission No. FF 139869
                    expires September 4, 2018
22

23

24

25



1                    REPORTER'S DEPOSITION CERTIFICATE

2

STATE OF FLORIDA)
3
COUNTY OF MIAMI-DADE)

4

5               I, the undersigned authority, certify that I

6    was authorized to and did stenographically report the

7    foregoing deposition; and that the transcript is a true

8    record of the testimony given by the witness.

9

10              That the witness requested reading and

11   signing.

12

13              I further certify that I am not of counsel,

14   Am not related to nor employed by any attorney to this

15   suit and am not financially interested in the outcome

16   thereof.

17

18

19              Dated this 13th day of December 2017

20

21

22           *Jerome E. Harris*

23   _____

24                    JEROME E. HARRIS

25



1              DEPOSITION ERRATA SHEET

2

3        Our Assignment No.:   J0781312
         Case Caption:         Gubarev v. Buzzfeed

4

5            DECLARATION UNDER PENALTY OF PERJURY

6        I,                    declare under penalty of

7    perjury that I have read the entire transcript of my

8    Deposition taken in the captioned matter or the same has

9    been read to me, and the same is true and accurate, save

10   and except for changes and/or corrections, if any, as

11   indicated by me on the DEPOSITION ERRATA SHEET hereof,

12   with the understanding that I offer these changes as if

13   still under oath.

14   EXECUTED this _____ day of _____,

15   20_____, at _____        _____
                          City                    State

16

17

18                     _____
                              DAVID KRAMER
19

20

21   Subscribed and sworn to before me
     This_____ day of_____,_____,
22

23

24   Notary Public in and for said
         County and State
25



Exhibit
73

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.

   Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

   Defendants.

_____/

## RESPONSES AND OBJECTIONS OF DEFENDANT BUZZFEED, INC. TO PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANT BUZZFEED, INC.

     Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant BuzzFeed, Inc.

("BuzzFeed"), by and through its attorneys, hereby responds and objects as follows to Plaintiffs'

Interrogatories (the "Interrogatories"), without waiving any rights or objections to the

Interrogatories and without admitting the relevance, materiality or admissibility of the subject

matter or facts contained in the Interrogatories or responses.

### RESPONSES AND OBJECTIONS

**Interrogatory No. 1:** Please identify each individual providing information to answer these
   Interrogatories.

**Response:** BuzzFeed objects to this Interrogatory to the extent it purports to require it to provide

information privileged or confidential pursuant to attorney-client confidentiality or the work

product doctrine.

     Subject to, and without waiving, the foregoing objection, BuzzFeed identifies the following

people: Ben Smith, Mark Schoofs, Miriam Elder, Ken Bensinger.

**Interrogatory No. 2:** Please describe in detail how Buzzfeed came to be in possession of the
Dossier.

**Response:** BuzzFeed objects to this Request to the extent that it purports to require it to provide

documents or information that is protected by Article 1, Section 8 of the New York State

Constitution, Section 79-h of the New York Civil Rights Law, the Florida State Constitution, Fla.

Stat. 90.5015, the Texas State Constitution, Texas Civil Practices & Remedies Code §22.021-

22.027, the First and Fourteenth Amendments to the United States Constitution, and any other

constitutional, statutory or common law privilege that protects journalists from disclosing the

identity of their sources and otherwise disclosing information obtained during the course of their

newsgathering activity (collectively, the "Reporter's Privilege"). BuzzFeed further objects to this

Interrogatory to the extent it purports to require it to provide information privileged or confidential

pursuant to attorney-client confidentiality or the work product doctrine. BuzzFeed further objects

to this Interrogatory on the grounds that it seeks information better obtained through deposition

testimony.

      Subject to, and without waiving, the foregoing objections, BuzzFeed states that BuzzFeed

News Investigative Reporter Ken Bensinger had access to the Dossier from a confidential source.

**Interrogatory No. 3:** Please identify every individual at Buzzfeed who worked on or contributed
to article [sic.] containing the Dossier or any other article or story relating to the Dossier in any
respect, including the role that each such person played and the specific article or story they
worked on or contributed to.

**Response:** BuzzFeed objects to this Interrogatory as overly broad and not reasonably calculated to

lead to discovery of admissible evidence to the extent that it seeks information about (a) news

reports other than those identified in paragraphs 23 and 24 of the Complaint, or (b) reporting that

took place after January 10, 2017. BuzzFeed further objects to this Interrogatory to the extent that

it purports to require it to provide information that is protected by the Reporter's Privilege.

BuzzFeed further objects to this Interrogatory to the extent it purports to require it to provide

information privileged or confidential pursuant to attorney-client confidentiality or the work product doctrine.

Subject to, and without waiving, the foregoing objections, BuzzFeed identifies the following people:

a)  Ben Smith, editor-in-chief of BuzzFeed News.  Mr. Smith was involved in editing the article referred to in paragraph 23 of the Complaint (the "Article").  Mr. Smith also made the ultimate decision to publish the Article as well as the dossier referred to in paragraph 24 of the Complaint (the "Dossier").

b)  Miriam Elder, world editor of BuzzFeed News.  Ms. Elder helped write the Article, and was involved in discussions on January 10, 2017 whether to publish it and the Dossier.  She also conducted newsgathering in connection with the Dossier before BuzzFeed published the Article.

c)  Mark Schoofs, investigations and projects editor for BuzzFeed News.  Mr. Schoofs helped write the Article, and was involved in discussions on January 10, 2017 whether to publish it and the Dossier.  He also conducted newsgathering in connection with the Dossier before BuzzFeed published the Article.

d)  Ken Bensinger, investigative reporter at BuzzFeed News.  Mr. Bensinger participated in a few telephone calls with members of the BuzzFeed staff on January 10, 2017 regarding publication of the Article and Dossier, and reviewed a draft of the Article. He also conducted newsgathering in connection with the Dossier before BuzzFeed published the Article.

e)   Jane Bradley, investigations correspondent for BuzzFeed News.  Ms. Bradley conducted newsgathering in connection with the Dossier before BuzzFeed published the Article.

f)   Aram Roston, investigative reporter and editor for BuzzFeed News.  Mr. Roston conducted newsgathering in connection with the Dossier before BuzzFeed published the Article.

g)   Heidi Blake, UK investigations editor for BuzzFeed News.  Ms. Blake conducted newsgathering in connection with the Dossier before BuzzFeed published the Article.

h)   Ali Watkins, who at the time was a national security correspondent for BuzzFeed News, conducted newsgathering in connection with the Dossier before BuzzFeed published the Article.

i)   Sheera Frankel, who at the time was a Buzzfeed News reporter, conducted newsgathering in connection with the Dossier before Buzzfeed published the Article.

**Interrogatory No. 4:** Please identify every individual who had any input into the decision to publish the Dossier, including the input they made into the decision to publish the Dossier.

**Response:** BuzzFeed objects to this Interrogatory to the extent it purports to require it to provide information that is protected by the Reporter's Privilege.  BuzzFeed further objects to this Interrogatory to the extent it purports to require it to provide information privileged or confidential pursuant to attorney-client confidentiality.  BuzzFeed further objects to this Interrogatory on the grounds that it seeks information better obtained through deposition testimony.

Subject to, and without waiving, the foregoing objections, BuzzFeed identifies the following people who discussed whether to publish the Dossier: (a) Mr. Smith; (b) Mr. Schoofs; (c) Ms. Elder; (d) Mr. Bensinger; and (e) Shani Hilton, head of US news for BuzzFeed News.  The decision to publish the Dossier was made by Mr. Smith after consulting with others.

**Interrogatory No. 5:** Please describe in detail any and all efforts taken by Buzzfeed to determine the truth or veracity of the allegations in the Dossier concerning the Plaintiffs.

**Response:** BuzzFeed objects to this Interrogatory as overly broad and not reasonably calculated to lead to discovery of admissible evidence to the extent that it seeks information about reporting that took place after January 10, 2017. BuzzFeed further objects to this Interrogatory to the extent it purports to require it to provide information that is protected by the Reporter's Privilege. BuzzFeed further objects to this Interrogatory to the extent it purports to require it to provide information privileged or confidential pursuant to attorney-client confidentiality. BuzzFeed further objects to this Interrogatory on the grounds that it seeks information better obtained through deposition testimony. Buzzfeed further objects to the extent that this Interrogatory assumes there are allegations in the Dossier concerning "Webzilla", which Buzzfeed denies.

Subject to, and without waiving, the foregoing objections, prior to publishing the Article Buzzfeed did not specifically investigate any of the allegedly defamatory statements concerning any of the Plaintiffs.

**Interrogatory No. 6:** Please identify each person contacted by Buzzfeed or any of its reporters in connection with its reporting on the Dossier.

**Response:** BuzzFeed objects to this Interrogatory as overly broad and not reasonably calculated to lead to discovery of admissible evidence to the extent that it seeks information about reporting that took place after January 10, 2017. BuzzFeed further objects to this Interrogatory to the extent it purports to require it to provide information that is protected by the Reporter's Privilege. BuzzFeed further objects to this Interrogatory to the extent it purports to require it to provide information privileged or confidential pursuant to attorney-client confidentiality or the work product doctrine.

**Interrogatory No. 7:** Please identify the individual or individuals at Buzzfeed who were assigned to investigate the allegations in the Dossier concerning the Plaintiffs.

**Response:** BuzzFeed objects to this Interrogatory as overly broad and not reasonably calculated to lead to discovery of admissible evidence to the extent that it seeks information about reporting that took place after January 10, 2017. BuzzFeed further objects to this Interrogatory to the extent it purports to require it to provide information that is protected by the Reporter's Privilege. BuzzFeed further objects to this Interrogatory to the extent it purports to require it to provide information privileged or confidential pursuant to attorney-client confidentiality or the work product doctrine. BuzzFeed further objects to the extent that this Interrogatory assumes there are allegations in the Dossier concerning "Webzilla", which BuzzFeed denies.

Subject to, and without waiving, the foregoing objections, no one was assigned to specifically investigate any of the allegedly defamatory statements in the Dossier that concern any of the Plaintiffs.

**Interrogatory No. 8:** Please describe each and every step taken by the individual or individuals investigating the allegations in the Dossier concerning the Plaintiffs including, but not limited to, each person contacted and the content of each conversation or interview conducted.

**Response:** BuzzFeed objects to this Interrogatory as overly broad and not reasonably calculated to lead to discovery of admissible evidence to the extent that it seeks information about reporting that took place after January 10, 2017 and/or after receipt of notice of this litigation. BuzzFeed further objects to this Interrogatory to the extent it purports to require it to provide information that is protected by the Reporter's Privilege. BuzzFeed further objects to this Interrogatory to the extent it purports to require it to provide information privileged or confidential pursuant to attorney-client confidentiality or the work product doctrine. BuzzFeed further objects to this Interrogatory on the grounds that given its overbreadth, it seeks information better obtained through deposition

testimony. BuzzFeed further objects to the extent that this Interrogatory assumes there are allegations in the Dossier concerning "Webzilla", which BuzzFeed denies.

Subject to, and without waiving, the foregoing objection, prior to its publication BuzzFeed did not investigate the allegedly defamatory statements in the Dossier that concern any of the Plaintiffs.

**Interrogatory No. 9:** Please describe in detail each and every conversation prior to Buzzfeed's publication of the Dossier at Buzzfeed or between Buzzfeed's agents, reporters and/or editors in which any of the Plaintiffs were referenced.

**Response:** BuzzFeed objects to this Interrogatory as overly broad and not reasonably calculated to lead to discovery of admissible evidence to the extent that it seeks information unrelated to the Dossier. BuzzFeed further objects to this Interrogatory to the extent it purports to require it to provide information that is protected by the Reporter's Privilege. BuzzFeed further objects to this Interrogatory to the extent it purports to require it to provide information privileged or confidential pursuant to attorney-client confidentiality or the work product doctrine. BuzzFeed further objects to this Interrogatory on the grounds that it seeks information better obtained through deposition testimony.

Subject to, and without waiving, the foregoing objections, BuzzFeed responds that it is not currently aware of any such conversations.

**Interrogatory No. 10:** Please describe in detail each and every conversation prior to Buzzfeed's publication of the Dossier between Buzzfeed's agents, reports and/or editors and any third-parties in which any of the Plaintiffs were referenced.

**Response:** BuzzFeed objects to this Interrogatory as overly broad and not reasonably calculated to lead to discovery of admissible evidence to the extent that it seeks information unrelated to the Dossier. BuzzFeed further objects to this Interrogatory to the extent it purports to require it to provide information that is protected by the Reporter's Privilege. BuzzFeed further objects to this Interrogatory to the extent it purports to require it to provide information privileged or confidential

pursuant to attorney-client confidentiality or the work product doctrine. BuzzFeed further objects to this Interrogatory on the grounds to the extent it seeks information better obtained through deposition testimony.

Subject to, and without waiving, the foregoing objections, BuzzFeed responds that it is not currently aware of any such conversations.

**Interrogatory No. 11:** Please describe in detail each and every conversation following Buzzfeed's publication of the Dossier at Buzzfeed or between Buzzfeed's agents, reporters and/or editors in which any of the Plaintiffs were referenced.

**Response:** BuzzFeed objects to this Interrogatory to the extent it purports to require them to provide information that is protected by the Reporter's Privilege. BuzzFeed further objects to this Interrogatory to the extent it purports to require it to provide information privileged or confidential pursuant to attorney-client confidentiality or the work product doctrine. BuzzFeed further objects to this Interrogatory to the extent it seeks information about conversations that took place after it received notice of this litigation and/or after the publication of the Dossier. BuzzFeed further objects to this Interrogatory on the grounds that it seeks information better obtained through deposition testimony.

**Interrogatory No. 12:** Please describe in detail each and every conversation following Buzzfeed's publication of the Dossier between Buzzfeed's agents, reports and/or editors and any third-parties in which any of the Plaintiffs were referenced.

**Response:** BuzzFeed objects to this Interrogatory to the extent it purports to require it to provide information that is protected by the Reporter's Privilege. BuzzFeed objects to this Interrogatory to the extent it purports to require it to provide information privileged or confidential pursuant to attorney-client confidentiality or the work product doctrine. BuzzFeed further objects to this Interrogatory to the extent it seeks information about conversations that took place after it received notice of this litigation, and/or after the publication of the Dossier. BuzzFeed further objects to this Interrogatory on the grounds that it seeks information better obtained through deposition testimony.

**Interrogatory No. 13:** Please describe in detail the basis for Buzzfeed's assertion that the Dossier is a government document.

**Response:** BuzzFeed is unable to formulate a response because it is not aware of what Plaintiffs are referring to with respect to BuzzFeed "assert[ing] that the Dossier is a government document," and objects on that basis.

**Interrogatory No. 14:** Please describe in detail the basis for Buzzfeed's assertion that Gubarev is a public figure.

**Response:** BuzzFeed is currently aware of the following facts that support its allegation that Gubarev is a public figure, prior to conducting discovery which may yield additional facts:

a) Gubarev owns and operates a number of major corporations around the world publicly reported to collectively be worth hundreds of millions of dollars, and Plaintiffs have sought to attract press attention to their cyber-related operations.

b) Before BuzzFeed published the Article and Dossier, Gubarev was a frequent speaker on technology- and internet-related matters, and he was regularly sought out by the media for his expertise on those topics. He provided an interview to the media as an expert on technical aspects of President Trump's alleged ties to Russia's involvement in the 2016 U.S. election. *See* Leonid Bershidsky, *Clinton Plugs Another Weak Story About Trump's Ties to Putin*, Bloomberg (Nov. 1, 2016), https://www.bloomberg.com/view/articles/2016-11-01/clinton-plugs-another-weak-story-about-trump-s-ties-to-putin.

c) Plaintiffs admit in the Complaint that Gubarev had access to the media, pleading that "numerous journalists (more than 30) contacted Mr. Gubarev with some even arranging to travel to Cyprus to discuss the publication with Mr. Gubarev." *See* Compl. ¶ 28.

**Interrogatory No. 15:** Please identify every person outside of Buzzfeed with whom Buzzfeed consulted concerning the decision to publish the Dossier.

**Response:** BuzzFeed objects to this Interrogatory to the extent it purports to require it to provide information that is protected by the Reporter's Privilege. BuzzFeed objects to this Interrogatory to the extent it purports to require it to provide information privileged or confidential pursuant to attorney-client confidentiality or the work product doctrine. BuzzFeed further objects to this Interrogatory on the grounds that it seeks information better obtained through deposition testimony.

Subject to, and without waiving, the foregoing objections, BuzzFeed responds that it consulted with no one outside BuzzFeed regarding its decision to publish the Dossier.

**Interrogatory No. 16:** Please identify the individuals responsible for the decision to redact portions of the Dossier both before and after publication.

**Response:** BuzzFeed objects to this Interrogatory to the extent it purports to require it to provide information privileged or confidential pursuant to attorney-client confidentiality or the work product doctrine. BuzzFeed object to the term "responsible for the decision" as vague and argumentative.

Subject to, and without waiving, the foregoing objections, Miriam Elder and Mark Schoofs to the extent Buzzfeed was responsible for any redactions made prior to the commencement of this lawsuit.

**Interrogatory No. 17:** Please state the basis for your decision to redact each portion of the Dossier that was redacted.

**Response:** BuzzFeed objects to this Interrogatory to the extent it purports to require it to provide information that is protected by the Reporter's Privilege. BuzzFeed further objects to this

Interrogatory to the extent it purports to require it to provide information privileged or confidential pursuant to attorney-client confidentiality or the work product doctrine.

Subject to, and without waiving, the foregoing objections, all redactions made by BuzzFeed were made to remove information that could identify the person and/or entities being referenced.

**Interrogatory No. 18:** Please state the basis for your decision not to redact the Plaintiffs' names from the Dossier prior to your publication of the Dossier.

**Response:** BuzzFeed objects to this Interrogatory to the extent it purports to require it to provide information privileged or confidential pursuant to attorney-client confidentiality or the work product doctrine. BuzzFeed further objects to this Interrogatory on the grounds that it is argumentative and premised upon assumed facts.

**Interrogatory No. 19:** Please state the number of times that the original Dossier article was viewed prior to the redaction of the Plaintiffs' names either on the Buzzfeed.com website or any other Buzzfeed platform (including mobile platforms).

**Response:** BuzzFeed does not know how many page views the Article received as of the precise time on February 3, 2017 when it was updated with the version of the Dossier incorporating the February 3 Redactions. The Article received 5,952,131 unique page views between its original posting and 11:59 pm on February 3, 2017.

**Interrogatory No. 20:** Please state the amount of advertising or other revenues attributable to views of the Dossier article.

**Response:** BuzzFeed objects to this Interrogatory on the grounds that it is premature at this stage in the litigation. In making this objection, BuzzFeed does not suggest that there was any advertising or other revenues attributable to views of the Dossier article.

**Interrogatory No. 21:** Please describe in detail Buzzfeed's policies or procedures for the verification of facts prior to publication including how such policies or procedures are communicated to editors and reporters.

**Response:** BuzzFeed objects to this Interrogatory on the grounds that it is overly broad, vague, and unduly burdensome. BuzzFeed further objects to this Interrogatory on the grounds that it purports

to require BuzzFeed to obtain information that is not proportional to the needs of the case. BuzzFeed further objects to this Interrogatory on the grounds that it seeks information better obtained by deposition testimony. BuzzFeed further objects to this Interrogatory to the extent it seeks information about (a) news reports not containing the Dossier, or (b) policies or procedures not in effect on January 10, 2017. Subject to, and without waiving, the foregoing objections, BuzzFeed also refers Plaintiffs to its News Standards and Ethics Guide produced in response to these discovery requests.

**Interrogatory No. 22:** Please identify each person whom you have retained as an expert in this case, regardless of whether that person is expected to testify at trial, and describe that person's area of expertise and (if expected to testify) the areas of the person's expected testimony.

**Response:** BuzzFeed objects to the Interrogatory as premature at this stage of the litigation and beyond the scope of what is required to be disclosed under the Federal Rules. BuzzFeed will provide such information responsive to this request, as required by the Federal Rules, at such time as it has responsive information, if any.

**Interrogatory No. 23:** Please identify each individual whom you intend to call as a witness at trial and describe that person's expected areas of testimony.

**Response:** BuzzFeed objects to this Interrogatory as premature at this stage of the litigation. BuzzFeed will provide this information within the timeframe required by the Court's scheduling order.

**Interrogatory No. 24:** Please describe in detail each and every communication or conversation between any person working for or on behalf of Buzzfeed, on the one hand, and the United States Government (or any person part of the United States Government, including, without limitation, any person(s) in the executive branch or legislative branch), on the other hand, referencing, reflecting, or concerning the Plaintiffs.

**Response:** BuzzFeed objects to this Interrogatory to the extent it purports to require them to provide information privileged or confidential pursuant to attorney-client confidentiality or the work product doctrine. BuzzFeed further objects to this Interrogatory to the extent it seeks

information about conversations that took place after it received notice of this litigation and/or after it published the Dossier. BuzzFeed further objects to this Interrogatory on the grounds that it seeks information protected by the Reporter's Privilege, and that is better obtained by deposition testimony. Subject to, and without waiving, the foregoing objections, Buzzfeed is not presently aware of any such communications.

**Interrogatory No. 25:** Please describe in detail each and every communication or conversation between any person working for or on behalf of Buzzfeed, on the one hand, and the United States Government (or any person part of the United States Government, including, without limitation, any person(s) in the executive branch or legislative branch), on the other hand, referencing, reflecting, or concerning the Dossier.

**Response:** BuzzFeed objects to this Interrogatory to the extent it purports to require them to provide information privileged or confidential pursuant to attorney-client confidentiality or the work product doctrine. BuzzFeed further objects to this Interrogatory on the grounds that it seeks information protected by the Reporter's Privilege, and that is better obtained by deposition testimony. BuzzFeed further objects to this Interrogatory to the extent it seeks information about conversations that took place after it received notice of this litigation and/or after it published the Dossier.

Signed as to objections:


Dated:  July 17, 2017                         Respectfully submitted,

*/s/ Katherine M. Bolger*
Katherine M. Bolger
(admitted *pro hac vice*)
Nathan Siegel
(admitted *pro hac vice*)
Adam Lazier
(admitted *pro hac vice*)
LEVINE SULLIVAN KOCH & SCHULZ, LLP
321 West 44th Street, Suite 1000
New York, NY 10036
Tel:  (212) 850-6100

Lawrence A. Kellogg, P.A.
Jezabel P. Lima
LEVINE KELLOGG LEHMAN SCHNEIDER +
GROSSMAN LLP
201 South Biscayne Boulevard
Miami Center, 22nd Floor
Miami, FL 33131
Tel: (305) 403-8788

*Counsel for Defendants*

# Exhibit
74

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.

   Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

   Defendants.

_____/


## DEFENDANT BUZZFEED INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION

     Pursuant to Federal Rule of Civil Procedure 36, Defendant Buzzfeed, Inc. ("BuzzFeed"), by and through its attorneys, hereby responds and objects as follows to Plaintiffs' First Set of Requests for Admission (the "Requests").

## RESPONSES AND OBJECTIONS

**Request No. 1:** Admit that, prior to Buzzfeed's publication of the Dossier, you made no attempt to contact Gubarev.

**Response:** Admitted.

**Request No. 2:** Admit that, prior to Buzzfeed's publication of the Dossier, you made no attempt to contact Webzilla.

**Response:** Admitted.

**Request No. 3:** Admit that, prior to Buzzfeed's publication of the Dossier, you made no attempt to contact XBT.

**Response:** Admitted.

**Request No. 4:** Admit that, at the time of Buzzfeed's publication of the Dossier, you had no reason to believe that the allegations concerning Gubarev in the Dossier were true.

**Response:** Denied.

**Request No. 5:** Admit that, at the time of Buzzfeed's publication of the Dossier, you had no reason to believe that the allegations concerning Webzilla in the Dossier were true.

**Response:** BuzzFeed objects to this request in that it assumes there are allegations in the Dossier "concerning Webzilla," which BuzzFeed denies. To the extent any further response is necessary, BuzzFeed denies this Request.

**Request No. 6:** Admit that, at the time of Buzzfeed's publication of the Dossier, you had no reason to believe that the allegations concerning XBT in the Dossier were true.

**Response:** Denied.

**Request No. 7:** Admit that, at the time of Buzzfeed's publication of the Dossier, you knew that it contained unverified information.

**Response:** Admitted.

**Request No. 8:** Admit that, at the time of Buzzfeed's publication of the Dossier, you knew that it contained false information.

**Response:** BuzzFeed objects to this question as vague and ambiguous. To the extent the question assumes that all the information in the Dossier was false, BuzzFeed denies this Request, and otherwise refers Plaintiff to the Article, which identifies a misspelling and fact that BuzzFeed knew to be false.

**Request No. 9:** Admit that, at the time of Buzzfeed's publication of the Dossier, you had reason to doubt the truth or veracity of portions of the Dossier.

**Response:** BuzzFeed objects to this Request as vague and ambiguous, and notes that the Dossier is a 35-page document and the Request does not identify which "portions" of the Dossier are being referenced.

**Request No. 10:** Admit that, at the time of Buzzfeed's publication of the Dossier, you did doubt the truth or veracity of portions of the Dossier.

**Response:** BuzzFeed objects to this Request as vague and ambiguous, and notes that the Dossier is a 35-page document and it does not identify which "portions" of the Dossier are being referenced.

**Request No. 11:** Admit that, prior to Buzzfeed's publication of the Dossier, you did not redact the names of the Plaintiffs from the Dossier.

**Response:** BuzzFeed objects to this Request to the extent it asserts that the Dossier refers to Plaintiff Webzilla, Inc., which BuzzFeed denies.

Subject to, and without waiving, the foregoing objection, BuzzFeed admits that it did not redact the names "XBT/Webzilla" and "Aleksei GUBAROV" prior to publishing it.

**Request No. 12:** Admit that, prior to Buzzfeed's publication of the Dossier, you had the ability to redact the names of the Plaintiffs from the Dossier.

**Response:** BuzzFeed objects to this Request to the extent it asserts that the Dossier refers to Plaintiff Webzilla, Inc., which BuzzFeed denies.

Subject to, and without waiving, the foregoing objection, BuzzFeed admits that it had the technical ability to redact the names "XBT/Webzilla" and "Aleksei GUBAROV" from the Dossier prior to publishing it.

**Request No. 13:** Admit that, prior to Buzzfeed's publication of the Dossier, you considered the effect publication would have with respect to traffic to website and/or mobile platforms for Buzzfeed.

**Response:** Admitted.

**Request No. 14:** Admit that, prior to Buzzfeed's publication of the Dossier, you considered the potential financial benefit to Buzzfeed in publishing the Dossier.

**Response:** Denied.

**Request No. 15:** Admit that, prior to Buzzfeed's publication of the Dossier, you considered the benefits to Buzzfeed in being the first to publish the Dossier.

**Response:** Admitted.

**Request No. 16:** Admit that, prior to Buzzfeed's publication of the Dossier, you knew that other media outlets had refused to publish the Dossier.

**Response:** BuzzFeed objects to this Request's reference to other media outlets' alleged "refus[al] to publish the Dossier" as vague and ambiguous. To the extent any further response is necessary, this request is denied.

**Request No. 17:** Admit that, prior to Buzzfeed's publication of the Dossier, you knew that other media outlets had refused to publish the Dossier because the information contained therein was unverified.

**Response:** BuzzFeed objects to this Request's reference to other media outlets' alleged "refus[al] to publish the Dossier" as vague and ambiguous. To the extent any further response is necessary, this request is denied.

**Request No. 18:** Admit that Buzzfeed's publication of the Dossier resulted in financial benefit to Buzzfeed.

**Response:** Denied.

**Request No. 19:** Admit that Buzzfeed's publication of the Dossier resulted in increased advertising revenue for Buzzfeed.

**Response:** Denied.

**Request No. 20:** Admit that Buzzfeed's publication of the Dossier resulted in increased traffic to the Buzzfeed website.

**Response:** BuzzFeed objects to this request as vague and ambiguous.

**Request No. 21:** Admit that Buzzfeed's publication of the Dossier resulted in increased traffic to Buzzfeed's mobile platform.

**Response:** BuzzFeed objects to this request as vague and ambiguous.

**Request No. 22:** Admit that, after the filing of the present action, Buzzfeed apologized to Gubarev.

**Response:** BuzzFeed admits that it released the following statement on February 3, 2017: "We have redacted Mr. Gubarev's name from the published dossier, and apologize for including it," and otherwise denies this Request.

**Request No. 23:** Admit that, after the filing of the present action, Buzzfeed redacted the names of the Plaintiffs from the Dossier

**Response:** BuzzFeed objects to this Request to the extent it asserts that the Dossier refers to

Plaintiff Webzilla, Inc., which BuzzFeed denies.

Subject to, and without waiving, the foregoing objection, BuzzFeed admits that it redacted

the words "XBT/Webzilla" and "Aleksei GUBAROV" from the Dossier on February 3, 2017.

**Request No. 24:** Admit that Buzzfeed has never issued a retraction of the allegations contained in the Dossier concerning the Plaintiffs

**Response:** Admitted.

Dated:  July 17, 2017                    Respectfully submitted,

*/s/ Katherine M. Bolger*
Katherine M. Bolger
(admitted *pro hac vice*)
Nathan Siegel
(admitted *pro hac vice*)
Adam Lazier
(admitted *pro hac vice*)
LEVINE SULLIVAN KOCH & SCHULZ, LLP
321 West 44th Street, Suite 1000
New York, NY 10036
Tel:  (212) 850-6100

Lawrence A. Kellogg, P.A.
Jezabel P. Lima
LEVINE KELLOGG LEHMAN SCHNEIDER +
GROSSMAN LLP
201 South Biscayne Boulevard
Miami Center, 22nd Floor
Miami, FL 33131
Tel: (305) 403-8788

*Counsel for Defendants*

Exhibit
75

       

Buzzfeed **NEWS**

News    Videos    Quizzes    Tasty    DIY    More    Get Our News App

*TOP POST*
5,950,378 VIEWS 

# These Reports Allege Trump Has Deep Ties To Russia

A dossier, compiled by a person who has claimed to be a former British intelligence official, alleges Russia has compromising information on Trump. The allegations are unverified, and the report contains errors.

Originally posted on Jan. 10, 2017, at 6:20 p.m.
Updated on Jan. 10, 2017, at 9:09 p.m.

 Ken Bensinger
BuzzFeed News Reporter

 Miriam Elder
BuzzFeed News World Editor

 Mark Schoofs
BuzzFeed News Investigations
Editor

    


*Drew Angerer / Getty Images*

A dossier making explosive — but unverified — allegations that the Russian government has been "cultivating, supporting and assisting" President-elect Donald Trump for years and gained compromising information about him has been

### In The News Today

- President Trump's senior adviser Kellyanne Conway says she meant to say "Bowling Green terrorists" after citing a nonexistent "massacre."

- Hundreds of US residents are still trapped by Trump's executive immigration orders, fueling a bitter battle between civil rights attorneys and border patrol agents.

- Uber CEO Travis Kalanick is dropping out of Donald Trump's economic advisory panel after backlash among customers led to the "Delete Uber" hashtag.

- A pharmaceutical company hiked the price of its life-saving overdose antidote from $575 to $4,100 in the middle of an opioid epidemic.

Download the BuzzFeed News app

**BuzzFeed NEWS**


This Is How France's Nationalist Party Is Winning Gay Support
by J. Lester Feder

Connect With USNews

Like Us On Facebook

Follow Us On Twitter

P-D000015

circulating among elected officials, intelligence agents, and journalists for weeks.

The dossier, which is a collection of memos written over a period of months, includes specific, unverified, and potentially unverifiable allegations of contact between Trump aides and Russian operatives, and graphic claims of sexual acts documented by the Russians. BuzzFeed News reporters in the US and Europe have been investigating various alleged facts in the dossier but have not verified or falsified them. CNN reported Tuesday that a two-page synopsis of the report was given to President Obama and Trump.

Now BuzzFeed News is publishing the full document so that Americans can make up their own minds about allegations about the president-elect that have circulated at the highest levels of the US government.

The document was prepared for political opponents of Trump by a person who is understood to be a former British intelligence agent. It is not just unconfirmed: It includes some clear errors. The report misspells the name of one company, "Alpha Group," throughout. It is Alfa Group. The report says the settlement of Barvikha, outside Moscow, is "reserved for the residences of the top leadership and their close associates." It is not reserved for anyone, and it is also populated by the very wealthy.

The Trump administration's transition team did not immediately respond to BuzzFeed News' request for comment. However, the president-elect's attorney, Michael Cohen, told Mic that the allegations were absolutely false.

"It's so ridiculous on so many levels," he said. "Clearly, the person who created this did so from their imagination or did so hoping that the liberal media would run with this fake story for whatever rationale they might have."

And Trump shot back against the reports a short time later on Twitter.

His former campaign manager and current senior White House adviser, Kellyanne Conway, also denied the claims during an appearance on *Late Night With Seth Meyers,* adding that "nothing has been confirmed." She also said Trump was "not aware" of any briefing on the matter.

The documents have circulated for months and acquired a kind of legendary status among journalists, lawmakers, and intelligence officials who have seen them. *Mother Jones* writer David Corn referred to the documents in a late October column.

Harry Reid spokesman Adam Jentleson tweeted Tuesday that the former Senate Democratic leader had seen the documents before writing a public letter to FBI Director James Comey about Trump's ties to Russia. And CNN reported Tuesday that Arizona Republican John McCain gave a "full copy" of the memos to Comey on Dec. 9, but that the FBI already had copies of many of the memos.

**If you have tips related to this story, write us at trumpstories@buzzfeed.com. To send us information confidentially, go here.**

News moves fast. Keep up with the BuzzFeed News daily email.

Your Email Address

Sign up

## More News



Mexico's President Canceled His Meeting With Trump Rather Than Pay For The Wall



Gorsuch Would Join The Supreme Court Millionaires' Club If He's Confirmed



The White House Thinks Crimea Sanctions Should Stay Until Russia Returns It



Pentagon Report: The Military Spun Their Intel To Make ISIS Seem Weaker

P-D000016

## Read the report here:



CONFIDENTIAL/SENSITIVE SOURCE

COMPANY INTELLIGENCE REPORT 2016/080

US PRESIDENTIAL ELECTION: REPUBLICAN CANDIDATE DONALD TRUMP'S ACTIVITIES IN RUSSIA AND COMPROMISING RELATIONSHIP WITH THE KREMLIN

Summary

- Russian regime has been cultivating, supporting and assisting TRUMP for at least 5 years. Aim, endorsed by PUTIN, has been to encourage splits and divisions in western alliance

- So far TRUMP has declined various sweetener real estate business deals offered him in Russia in order to further the Kremlin's cultivation of him. However he and his inner circle have accepted a regular flow of intelligence from the Kremlin, including on his Democratic and other political rivals

- Former top Russian intelligence officer claims FSB has compromised TRUMP through his activities in Moscow sufficiently to be able to blackmail him. According to several knowledgeable sources, his conduct in Moscow has included perverted sexual acts which have been arranged/monitored by the FSB

- A dossier of compromising material on Hillary CLINTON has been collated by the Russian Intelligence Services over many years and mainly comprises bugged conversations she had on various visits to Russia and intercepted phone calls rather than any embarrassing conduct. The dossier is controlled by Kremlin spokesman, PESKOV, directly on PUTIN's orders. However it has not as yet been distributed abroad, including to TRUMP. Russian intentions for its deployment still unclear

Detail

1. Speaking to a trusted compatriot in June 2016 sources A and B, a senior Russian Foreign Ministry figure and a former top level Russian intelligence officer still active inside the Kremlin respectively, the Russian authorities had been cultivating and supporting US Republican presidential candidate, Donald TRUMP for at least 5 years. Source B asserted that the TRUMP operation was both supported and directed by Russian President Vladimir PUTIN. Its aim was to sow discord and

CONFIDENTIAL/SENSITIVE SOURCE

Page [ 1 ]  of 35

Ken Bensinger is an investigative reporter for BuzzFeed News and is based in Los Angeles. His secure PGP fingerprint is 97CC 6E32 10A2 23FE 4E84 98B4 9CFF 4214 9D26 8AA7
Contact Ken Bensinger at ken.bensinger@buzzfeed.com.

Miriam Elder is the world editor for BuzzFeed News and is based in New York. Her secure PGP fingerprint is 5B5F EC17 C20B C11F 226D 3EBE 6205 F92F AC14 DCB1
Contact Miriam Elder at miriam.elder@buzzfeed.com.

Pulitzer-prize winner Mark Schoofs is the investigations and projects editor for BuzzFeed News. While working at The Village Voice, Schoofs won the 2000 Pulitzer Prize for International Reporting for his series on AIDS in Africa.
Contact Mark Schoofs at mark.schoofs@buzzfeed.com.



Israeli Officials Actually Don't Want The US To Move Its Embassy To Jerusalem



Trump To Publish Weekly List Of Crimes Committed By Undocumented Immigrants In Sanctuary Cities



Trump's Immigration Order Is Seriously Complicating The CIA's Job



Thousands Of Harvard Alumni Implore Jared Kushner For A Meeting



Meet The "Good Trolls" Secretly Spying On Trump Supporters And Neo-Nazis



Fox News  @FoxNews   Follow

Suspect in Quebec mosque terror attack was of Moroccan origin, reports show fxn.ws/2k9is8W

Fox News Deleted A Tweet About The Quebec Shooting After Canada's Government Objected

More News

P-D000017

Got a confidential tip? Submit it here.

     **More ▾**



NEXT ON NEWS›

People Are Paying Heartfelt Tributes After The Death...

Tagged: donald trump, russia, viral

## Now Buzzing



The "Cash Me Outside" Teen Will Return To Dr. Phil Next Week, How Bow Dah

 

Here's The Dragtastic Cast Of "RuPaul's Drag Race" Season 9



Theresa May Made The Man In Charge Of Brexit Carry Her Handbag



Donald Trump's Granddaughter Sang A Song In Chinese For Lunar New Year And People Are Obsessed

P-D000018



[14 Times The Merriam-Webster Dictionary Was Shady AF](#)



[How Well Do You Remember The Characters On "Sabrina The Teenage Witch?"](#)



[28 Delicious Things To Cook In February](#)



[Mariah Carey Working Out In High Heels Is The Most Mariah Carey Thing Ever](#)



[Which Of These Options Is More Gross?](#)



[18 Tumblr Posts That Prove Parents Are Weird But Great](#)

P-D000019



Nordstrom Has Dropped Ivanka
Trump's Brand, Citing Lagging Sales

More Buzz

Advertise   Jobs   Mobile   Newsletter   Shop   US Edition

About   Press   RSS   Privacy   User Terms   Ad Choices   Help   Contact

© 2017 BuzzFeed, Inc



P-D000020

Exhibit
76

**In the Matter Of:**

GUBAREV vs BUZZFEED

17-CV-60426-UU

---

**BENJAMIN SMITH**

*February 08, 2018*

---

*Confidential*



800.211.DEPO (3376)
EsquireSolutions.com

1

2        IN THE UNITED STATES DISTRICT COURT

3            SOUTHERN DISTRICT OF FLORIDA

4

5   ALEKSEJ GUBAREV, XBT HOLDING    )Case No.
    S.A., AND WEBZILLA, INC.,       )17-CV-60426-
6                                   )UU
                 Plaintiffs,        )
7                                   )
             vs.                    )
8                                   )
    BUZZFEED, INC. AND BEN          )
9   SMITH,                          )
                                    )
10               Defendants.        )
    -------------------------------)

11

12

13           DEPOSITION OF BENJAMIN SMITH

14               New York, New York

15          Thursday, February 8, 2018

16

17

18

19

20

21

22

23

24  Reported by:
    TAMI H. TAKAHASHI, RPR, CSR
25  JOB NO. J1400363



1
2   B E N J A M I N   S M I T H, called as a
3       witness, having been duly sworn by a
4       notary public, was examined and testified
5       as follows:
6                       EXAMINATION
7   BY MR. FRAY-WITZER:
8       Q.   Good morning.
9       A.   Good morning.
10      Q.   Let me start by asking you if you
11  have ever been deposed before.
12      A.   No, I haven't.
13      Q.   Okay.  So I'm going to lay out for
14  you some of the ground rules of a deposition.
15           The first thing is that I will ask
16  you a series of questions.  Hopefully you'll
17  give a series of answers.  All of your
18  answers need to be verbal so head nods,
19  um-hums, uh-uhs, can't be recorded accurately
20  by the transcriptionist, so I would ask that
21  if you're giving an answer -- yes-or-no
22  answer that you say "yes" or "no"; if it's a
23  longer answer, that you give your longer
24  answer but your answers be verbal.
25           Is that okay?



1              CONFIDENTIAL - Smith

2         page 1.

3    BY MR. FRAY-WITZER:

4         Q.   So as part of one of your answers

5    here you stated, "I do think before you

6    publish something, at least, you should not

7    surprise people.  And we have a practice here

8    of writing what we call a 'no surprises'

9    letter to the subject of an investigation

10   that lays out in great, great detail what's

11   in a story.  And then you make sure you slip

12   that under their door, you mail it to them,

13   you e-mail it to them, you send it to their

14   lawyer.  It often adds to your reporting.

15   There's no reason that the subject of a story

16   should be surprised.  Maybe there's

17   occasionally a reason, but in most cases,

18   there isn't a reason, and you should test

19   your stronger reporting against their

20   response before you publish, not after."

21              Did I read that correctly?

22        A.   Yes.

23        Q.   Was it accurately reported that you

24   said that?

25        A.   Yes.



```
 1              CONFIDENTIAL - Smith
 2       Q.   Do you know if you reached out to
 3  any of them prior to the publication of the
 4  dossier?
 5       A.   I don't remember reaching out to
 6  any of them about -- specifically about the
 7  dossier prior to the publication of the
 8  dossier.
 9       Q.   Prior to the publication of the
10  dossier did BuzzFeed consider the impact that
11  publication would have on its Web traffic?
12       A.   Yes.
13       Q.   In what way did you consider that?
14       A.   We knew a lot of people would want
15  to read it because it was a very important
16  story.
17       Q.   And a lot of people did want to
18  read it; is that correct?
19       A.   Yes.
20       Q.   How does the story concerning the
21  dossier and the publication of the dossier,
22  how was the traffic for that story compared
23  to other stories run by BuzzFeed?
24       A.   It was one of our most-read stories
25  of the year.
```



```
 1                CONFIDENTIAL - Smith
 2        Q.   Was it one of the most-read stories
 3   since you joined BuzzFeed?
 4        A.   Yes.
 5        Q.   Having widely-read stories is
 6   valuable to BuzzFeed; is that correct?
 7        A.   Yes.
 8        Q.   Having widely-read stories
 9   increases your ability to sell space to
10   advertisers; is that correct?
11        A.   Yes.
12        Q.   There's a direct financial benefit
13   to BuzzFeed in having well-read stories; is
14   that correct?
15        A.   Yes.
16             (The witness was handed a
17        document.)
18             THE WITNESS:  Thank you.
19   BY MR. FRAY-WITZER:
20        Q.   So you're being shown what was
21   marked yesterday as Exhibit 6.
22        A.   Yes.
23        Q.   And can you tell me if you
24   recognize this exhibit?
25        A.   Yes.
```



1                    CONFIDENTIAL - Smith

2     conversation with him about that specific

3     point.

4          Q.   Was there a reason that the

5     publication of the dossier couldn't have

6     waited a short amount of time?

7          A.   Well, it did wait a short amount of

8     time.

9          Q.   Well, CNN published and within at

10    most an hour BuzzFeed published the entire

11    dossier.

12         A.   Yeah.

13         Q.   Why not wait until the next

14    morning?

15         A.   It was an incredibly important

16    story that was the central story in the

17    United States of America, where Americans had

18    learned of the existence of this incredibly

19    important document that had been briefed to

20    two presidents, and we felt that our

21    obligation was to report -- to fill out that

22    story to tell people what's going on.

23         Q.   You didn't want to be scooped?

24         A.   No, I don't want to be scooped.  Do

25    you mean in that context specifically?



1                CONFIDENTIAL - Smith

2        Q.    Yeah.

3        A.    Sorry.  Just rephrase the question.

4        Q.    Was one of your concerns that you

5    didn't want to be scooped on the publication

6    of the dossier?

7        A.    Yes.

8        Q.    Next question in the e-mail reads,

9    "What is, according to you, the difference

10   between publishing the Trump report without

11   verifying it, and publishing a rumor well

12   known in the circles of power?"

13            What is your response to that

14   question?

15       A.    Well, the dossier had been briefed

16   to the president of the United States, to the

17   president-elect of the United States, was

18   being taken seriously by the high -- most

19   important figures in the American

20   intelligence and law enforcement communities

21   and was affecting the actions of key American

22   officials.  So that's the difference.

23       Q.    She asks or someone on BuzzFeed

24   France asks, "Did you think about the

25   consequences this decision would have on



1                   CONFIDENTIAL - Smith

2               MR. FRAY-WITZER:  I have no further

3          questions.

4               MR. BLACK:  Okay.

5               MR. SIEGEL:  Okay.

6               (Time noted:  3:04 p.m.)

7

8

9                    _____

10                   BENJAMIN SMITH

11

12     Subscribed and sworn to before me

13     this_____ day of _____, 2018.

14

15     _____

16

17

18

19

20

21

22

23

24

25



1

2                    C E R T I F I C A T E

3    STATE OF NEW YORK      )

4                          : ss.

5    COUNTY OF NEW YORK     )

6

7            I, TAMI H. TAKAHASHI, a Notary

8       Public within and for the State of New

9       York, do hereby certify:

10           That BENJAMIN SMITH, the witness

11      whose deposition is hereinbefore set

12      forth, was duly sworn by me and that

13      such deposition is a true record of the

14      testimony given by the witness.

15           I further certify that I am not

16      related to any of the parties to this

17      action by blood or marriage, and that I

18      am in no way interested in the outcome

19      of this matter.

20           IN WITNESS WHEREOF, I have hereunto

21      set my hand this 13th day of February

22      2018.

23

24

25                   TAMI H. TAKAHASHI

1                  DEPOSITION ERRATA SHEET

2

3     Our Assignment No.:  J1400363

4     Case Caption:  Gubarev v. BuzzFeed

5

6        DECLARATION UNDER PENALTY OF PERJURY

7

8              I declare under penalty of perjury

9     that I have read the entire transcript of my

10    Deposition taken in the captioned matter or

11    the same has been read to me, and the same is

12    true and accurate, save and except for

13    changes and/or corrections, if any, as

14    indicated by me on the DEPOSITION ERRATA

15    SHEET hereof, with the understanding that I

16    offer these changes as if still under oath.

17                      _____

18                      BENJAMIN SMITH

19    Subscribed and sworn to on the _____ day of

20    _____, 20 _____ before me.

21    _____

22    Notary Public,

23    in and for the State of

24    _____.

25

