Exhibit
78

COMPANY INTELLIGENCE REPORT 2016/134

**RUSSIA/US PRESIDENTIAL ELECTION: FURTHER DETAILS OF KREMLIN LIAISON WITH TRUMP CAMPAIGN**

**Summary**

- Close associate of SECHIN confirms his secret meeting in Moscow with Carter PAGE in July

- Substance included offer of large stake in Rosneft in return for lifting sanctions on Russia. PAGE confirms this is TRUMP's intention

- SECHIN continued to think TRUMP could win presidency up to 17 October. Now looking to reorientate his engagement with the US

- Kremlin insider highlights importance of TRUMP's lawyer, Michael COHEN in covert relationship with Russia. COHEN's wife is of Russian descent and her father a leading property developer in Moscow

**Detail**

1. Speaking to a trusted compatriot in mid October 2016, a close associate of Rosneft President and PUTIN ally Igor' SECHIN elaborated on the reported secret meeting between the latter and Carter PAGE, of US Republican presidential candidate's foreign policy team, in Moscow in July 2016. The secret meeting had been confirmed to him/her by a senior member of SECHIN's staff, in addition to by the Rosneft President himself. It took place on either 7 or 8 July, the same day or the one after Carter PAGE made a public speech to the Higher Economic School in Moscow.

2. In terms of the substance of their discussion, SECHIN's associate said that the Rosneft President was so keen to lift personal and corporate western sanctions imposed on the company, that he offered PAGE/TRUMP's associates the brokerage of up to a 19 per cent (privatised) stake in Rosneft in return. PAGE had expressed interest and confirmed that were TRUMP elected US president, then sanctions on Russia would be lifted.

3. According to SECHIN's close associate, the Rosneft President had continued to believe that TRUMP could win the US presidency right up to 17 October, when he assessed this was no longer possible. SECHIN was keen to re-adapt accordingly and put feelers out to other business and political contacts in the US instead.

4. Speaking separately to the same compatriot in mid-October 2016, a Kremlin insider with direct access to the leadership confirmed that a key role in the secret TRUMP campaign/Kremlin relationship was being played by the Republican candidate's personal lawyer Michael COHEN. COHEN had a wife of Russian origin, whose father, Efim SHUSTERMAN, was a leading Moscow property developer.

30

**Source Comment**

5. SECHIN's associate opined that although PAGE had not stated it explicitly to SECHIN, he had clearly implied that in terms of his comment on TRUMP's intention to lift Russian sanctions if elected president, he was speaking with the Republican candidate's authority.

**Company Comment**

6. It appears that SHUSTERMAN has a country house (dacha) in the settlement of Barvikha, west of Moscow. This village is reserved for the residences of the top leadership and their close associates.

18 October 2016

CONFIDENTIAL

Exhibit
79

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No.: 17-cv-60426-UU

**ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.**

    **Plaintiffs,**

**vs.**

**BUZZFEED, INC. AND BEN SMITH,**

    **Defendants.**

_____/

## DEFENDANT BEN SMITH'S RESPONSE TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendant Ben Smith

("Smith"), by and through its attorneys, hereby responds and objects as follows to Plaintiffs'

First Set of Interrogatories (the "Interrogatories").

**Interrogatory No. 1.** Please identify each individual providing information to answer these interrogatories.

**Response:** All factual information in this document was provided by Smith.

**Interrogatory No. 2.** Please identify when (including date and time) you learned that the Dossier was part of an investigation by any part(s) of the US Government.

**Response:** Mr. Smith objects to this interrogatory to the extent it purports to require him to

provide information that is not within his personal knowledge. Mr. Smith further objects in that

the term "investigation" is not defined and is vague. Mr. Smith further objects to providing any

information that is protected by Article 1, Section 8 of the New York State Constitution, Section

79-h of the New York Civil Rights Law, the Florida State Constitution, Fla. Stat. 90.5015, the Texas State Constitution, Texas Civil Practices & Remedies Code § 22.021-22.027, the First and Fourteenth Amendments to the United States Constitution, and any other constitutional, statutory or common law privilege that protects journalists from disclosing information obtained during the course of their newsgathering activity (collectively, the "Reporter's Privilege").

Subject to, and without waiving, the foregoing objection, Mr. Smith states that in December 2016 he learned from a source that there was a document containing allegations about Presidents Trump's ties to Russia that had been written by a knowledgeable former British intelligence agent, the document was being reviewed by government officials, including Senator McCain, and that correspondence written several months earlier by Senator Harry Reid to FBI Director James Comey referred to the document. In or around December 2016, Mr. Smith came to believe that the documents shared with, and requested by the FBI, as reported by *Mother Jones* on October 31, 2016 was the same document referred to by the source, which is now known as the Dossier. On the afternoon of January 10, 2017, Mr. Smith came to believe that President, President-elect Obama, and other members of Congress had been briefed about the Dossier and became aware of more details concerning the handling of the Dossier by the FBI and intelligence agencies as described in a CNN report published at that time. Since January 10, 2017 Mr. Smith has become aware of more details about investigations conducted by, among others, the FBI, intelligence agencies, committees of the United States House and Senate, and Special Counsel Robert Mueller, largely through numerous news reports over the ensuing year.

**Interrogatory No. 3.** Please identify when (including date and time) Defendants learned that the Dossier was part of an investigation by any part(s) of the US Government.

**Response:** Mr. Smith objects to this interrogatory to the extent it purports to require him to provide information that is not within his personal knowledge. Mr. Smith further objects in that

the term "investigation" is not defined and is vague. Mr. Smith further objects to providing any information that is protected by the Reporter's Privilege. Mr. Smith further objects to this interrogatory to the extent that it purports to impose obligations on him beyond the scope of his obligations under the Federal Rules of Civil Procedure, including by purporting to require him to provide information in his personal capacity on behalf of Defendant BuzzFeed, Inc. ("BuzzFeed").

Subject to, and without waiving, the foregoing objection, Smith states that with respect to him personally, see the response to Interrogatory No. 2. He does not know the date and time at which anyone else at BuzzFeed became aware of such investigations.

**Interrogatory No. 4.** Please identify all facts that lead you to believe that the Dossier was part of an investigation by any part(s) of the US Government at the time that Buzzfeed published the Dossier on January 10, 2017 (including without limitation how you learned such facts).

**Response:** Mr. Smith objects to this interrogatory to the extent it purports to require him to provide information that is not within his personal knowledge. Mr. Smith further objects in that the term "investigation" is not defined and is vague. Mr. Smith further objects to providing any information that is protected by the Reporter's Privilege.

Subject to, and without waiving, the foregoing objection, Smith states with respect to him personally, see the Response to Interrogatory No. 3.

**Interrogatory No. 5.** Please identify all facts that lead Defendants to believe that the Dossier was part of an investigation by any part(s) of the US Government at the time that Buzzfeed published the Dossier on January 10, 2017 (including without limitation how Defendants learned such facts).

**Response:** Mr. Smith objects to this interrogatory to the extent to purports to require him to provide information that is not within his personal knowledge. Mr. Smith further objects in that the term "investigation" is not defined and is vague. Mr. Smith further objects to providing any information that is protected by the Reporter's Privilege. Mr. Smith further objects to this

interrogatory to the extent that it purports to impose obligations on him beyond the scope of his obligations under the Federal Rules of Civil Procedure, including by purporting to require him to provide information in his personal capacity on behalf of BuzzFeed.

Subject to, and without waiving, the foregoing objection, Smith states with respect to him personally, see the Response to Interrogatory No. 2.

**Interrogatory No. 6.** For each redaction in the Dossier as it was originally published by Buzzfeed on or about January 10, 2017, please identify whether the redaction was in the Dossier when Buzzfeed received the Dossier or whether Buzzfeed made the redaction itself.

**Response:** Mr. Smith objects to this interrogatory to the extent to purports to require him to provide information that is not within his personal knowledge. Mr. Smith further objects to providing any information that is protected by the Reporter's Privilege.

Subject to, and without waiving, the foregoing objection, Smith states with respect to him personally, Mr. Smith states that the __- redacton on the ___ page of the Dossier as originally published by BuzzFeed was made by BuzzFeed.

**Interrogatory No. 7.** For each redaction in the Dossier that Buzzfeed made in the Dossier before originally publishing the Dossier on or about January 10, 2017, please identify: (a) what was redacted; (b) who made the decision to make the redaction; and (c) why the redaction was made.

**Response:** Smith objects to this interrogatory to the extent to purports to require him to provide information that is not within his personal knowledge. Mr. Smith further objects to providing any information that is protected by the Reporter's Privilege.

Subject to, and without waiving, the foregoing objection, Smith states with respect to him personally, Mr. Smith states that (a) the name of an individual was redacted; (b) Mr. Smith made the decision to redact the individual's name, and (c) because there were no specific allegations made about the individual.

**Interrogatory No. 8.** Please identify all information in relating to how Christopher Steele is financing his legal fees arising from the publication of the Dossier (including, without limitation,

legal fees arising from Plaintiffs and their associates' lawsuit against Christopher Steele), including, without limitation, who is paying or helping to pay such legal fees.

**Response:**    Mr. Smith has no knowledge of any information sought by this interrogatory.

Signed as to objections:

Dated: ~~December~~ *January 29 2018* ~~, 2017~~

_s/s Katherine M. Bolger_
Katherine M. Bolger
(admitted *pro hac vice*)
Nathan Siegel
(admitted *pro hac vice*)
Adam Lazier
(admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Tel: (212) 489-8230

- and –

Roy Black
Jared Lopez
BLACK, SREBNICK, KORNSPAN &
STUMPF, P.A.
201 S. Biscayne Boulevard, Suite 1300
Tel: (305) 371-6421

*Counsel for Defendants*

## VERIFICATION

    I, Ben Smith, being first duly sworn in accordance with law, do hereby depose and state that I have read the answers to Plaintiffs' First Set of Interrogatories to Defendant Ben Smith and that the answers are true and correct to the best of my knowledge and information.

_____

Ben jamn E Sn Tb
(Printed Name)


STATE OF **New York**
COUNTY OF **New York**


    I hereby certify that on **January 29**, 2018 personally appeared before me, an officer duly authorized to administer oaths and take acknowledgments, Ben Smith, to me well known to be the person described or who has produced **a drivers license** as identification and who did take an oath and who executed the foregoing document, acknowledging before me that (s)he executed the same freely and voluntarily for the purposes therein expressed.

_____
Notary Public

Katherine M Bolger
Notary Public Printed Name

KATHERINE M. BOLGER
Notary Public, State of New York
No. 02BO6094407
Qualified in New York County
Commission Expires October 10, 2018

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served via email on all counsel of record on the service list below on the 14th day of February, 2018.

*/s/ Adam Lazier*
Adam Lazier

## SERVICE LIST

Matthew Shayefar
Valentin D. Gurvitz
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telehone: 617-928-1806
Facsimile: 617-928-1802
matt@bostonlawgroup.com
vgurvits@bostonlawgroup.com

Evan Fray-Witzer
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-000
Facsimile: 617-423-4855
Evan@CFWLegal.com

Brady J. Cobb
Dylan Fulop
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com

Exhibit
80

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 17-cv-60426-UU**


**ALEKSEJ GUBAREV, XBT HOLDING S.A.,**
**AND WEBZILLA, INC.**

   **Plaintiffs,**

**vs.**

**BUZZFEED, INC. AND BEN SMITH,**

   **Defendants.**

_____ /


**DEFENDANT BEN SMITH'S RESPONSE TO PLAINTIFFS'**
**FIRST SET OF INTERROGATORIES**

     Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant Ben Smith ("Mr.

Smith"), by and through its attorneys, hereby responds and objects as follows to Plaintiffs' First

Set of Interrogatories (the "Interrogatories").

**Interrogatory No. 1.** Please identify each individual providing information to answer these
interrogatories.

**Response:** All factual information in this document was provided by Mr. Smith.


**Interrogatory No. 2.** Please identify when (including date and time) you learned that the
Dossier was part of an investigation by any part(s) of the US Government.

**Response:** Mr. Smith objects to this interrogatory to the extent it purports to require him to

provide information that is not within his personal knowledge. Mr. Smith further objects in that

the term "investigation" is not defined and is vague. Mr. Smith further objects to providing any

information that is protected by Article 1, Section 8 of the New York State Constitution, Section

79-h of the New York Civil Rights Law, the Florida State Constitution, Fla. Stat. 90.5015, the

Texas State Constitution, Texas Civil Practices & Remedies Code § 22.021-22.027, the First and Fourteenth Amendments to the United States Constitution, and any other constitutional, statutory or common law privilege that protects journalists from disclosing information obtained during the course of their newsgathering activity (collectively, the "Reporter's Privilege").

Subject to, and without waiving, the foregoing objections, Mr. Smith states that in December 2016 he learned from a source that there was a document containing allegations about Presidents Trump's ties to Russia that had been written by a knowledgeable former British intelligence agent, the document was being reviewed by government officials, including Senator McCain, and that correspondence written several months earlier by Senator Harry Reid to FBI Director James Comey referred to the document. In or around December 2016, Mr. Smith came to believe that the documents shared with, and requested by the FBI, as reported by *Mother Jones* on October 31, 2016 was the same document referred to by the source, which is now known as the Dossier. On the afternoon of January 10, 2017, Mr. Smith came to believe that President, President-elect Obama, and other members of Congress had been briefed about the Dossier and became aware of more details concerning the handling of the Dossier by the FBI and intelligence agencies as described in a CNN report published at that time. Since January 10, 2017 Mr. Smith has become aware of more details about investigations conducted by, among others, the FBI, intelligence agencies, committees of the United States House and Senate, and Special Counsel Robert Mueller, largely through numerous news reports over the ensuing year.

**Interrogatory No. 3.** Please identify when (including date and time) Defendants learned that the Dossier was part of an investigation by any part(s) of the US Government.

**Response:** Mr. Smith objects to this interrogatory to the extent it purports to require him to provide information that is not within his personal knowledge. Mr. Smith further objects in that the term "investigation" is not defined and is vague. Mr. Smith further objects to providing any

information that is protected by the Reporter's Privilege. Mr. Smith further objects to this interrogatory to the extent that it purports to impose obligations on him beyond the scope of his obligations under the Federal Rules of Civil Procedure, including by purporting to require him to provide information in his personal capacity on behalf of Defendant BuzzFeed, Inc. ("BuzzFeed").

Subject to, and without waiving, the foregoing objections, Mr. Smith states that with respect to him personally, see the response to Interrogatory No. 2. He does not know the date and time at which anyone else at BuzzFeed became aware of such investigations.

**Interrogatory No. 4.** Please identify all facts that lead you to believe that the Dossier was part of an investigation by any part(s) of the US Government at the time that Buzzfeed published the Dossier on January 10, 2017 (including without limitation how you learned such facts).

**Response:** Mr. Smith objects to this interrogatory to the extent it purports to require him to provide information that is not within his personal knowledge. Mr. Smith further objects in that the term "investigation" is not defined and is vague. Mr. Smith further objects to providing any information that is protected by the Reporter's Privilege.

Subject to, and without waiving, the foregoing objections, Mr. Smith states with respect to him personally, see the Response to Interrogatory No. 2.

**Interrogatory No. 5.** Please identify all facts that lead Defendants to believe that the Dossier was part of an investigation by any part(s) of the US Government at the time that Buzzfeed published the Dossier on January 10, 2017 (including without limitation how Defendants learned such facts).

**Response:** Mr. Smith objects to this interrogatory to the extent to purports to require him to provide information that is not within his personal knowledge. Mr. Smith further objects in that the term "investigation" is not defined and is vague. Mr. Smith further objects to providing any information that is protected by the Reporter's Privilege. Mr. Smith further objects to this interrogatory to the extent that it purports to impose obligations on him beyond the scope of his

obligations under the Federal Rules of Civil Procedure, including by purporting to require him to provide information in his personal capacity on behalf of BuzzFeed.

Subject to, and without waiving, the foregoing objections, Mr. Smith states with respect to him personally, see the Response to Interrogatory No. 2.

**Interrogatory No. 6.** For each redaction in the Dossier as it was originally published by Buzzfeed on or about January 10, 2017, please identify whether the redaction was in the Dossier when Buzzfeed received the Dossier or whether Buzzfeed made the redaction itself.

**Response:** Mr. Smith objects to this interrogatory to the extent to purports to require him to provide information that is not within his personal knowledge. Mr. Smith further objects to providing any information that is protected by the Reporter's Privilege.

Subject to, and without waiving, the foregoing objections, Smith states with respect to him personally, Mr. Smith states that BuzzFeed redacted one name that appears on pages 30 and 31 of the Dossier as originally published by BuzzFeed.

**Interrogatory No. 7.** For each redaction in the Dossier that Buzzfeed made in the Dossier before originally publishing the Dossier on or about January 10, 2017, please identify: (a) what was redacted; (b) who made the decision to make the redaction; and (c) why the redaction was made.

**Response:** Mr. Smith objects to this interrogatory to the extent to purports to require him to provide information that is not within his personal knowledge. Mr. Smith further objects to providing any information that is protected by the Reporter's Privilege.

Subject to, and without waiving, the foregoing objections, Smith states with respect to him personally, Mr. Smith states that (a) the name of an individual was redacted; (b) Mr. Smith made the decision to redact the individual's name, and (c) because there were no specific allegations made about the individual.

**Interrogatory No. 8.** Please identify all information in relating to how Christopher Steele is financing his legal fees arising from the publication of the Dossier (including, without limitation, legal fees arising from Plaintiffs and their associates' lawsuit against Christopher Steele), including, without limitation, who is paying or helping to pay such legal fees.

**Response:**     Mr. Smith has no knowledge of any information sought by this interrogatory.

Signed as to objections:

Dated: January 9, 2018

*/s/ Katherine M. Bolger*
Katherine M. Bolger
(admitted *pro hac vice)*
Nathan Siegel
(admitted *pro hac vice)*
Adam Lazier
(admitted *pro hac vice)*
Alison Schary
(admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Tel: (212) 489-8230

- and –

Roy Black
Jared Lopez
BLACK, SREBNICK, KORNSPAN & STUMPF, P.A.
201 S. Biscayne Boulevard, Suite 1300
Tel: (305) 371-6421

*Counsel  for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served via email on all counsel of record on the service list below on the 9th day of January, 2018.


*/s/ Adam Lazier*
Adam Lazier

## SERVICE LIST

Matthew Shayefar
Valentin D. Gurvitz
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1806
Facsimile: 617-928-1802
matt@bostonlawgroup.com
vgurvits@bostonlawgroup.com

Evan Fray-Witzer
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-000
Facsimile: 617-423-4855
Evan@CFWLegal.com

Brady J. Cobb
Dylan Fulop
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com
dfulop@cobbeddy.com

Exhibit
81

# Ballard Spahr
## LLP

- - - - - - - - - - - - - - - - - - -

1909 K Street, NW
12th Floor
Washington, DC 20006-1157
TEL 202.661.2200
FAX 202.661.2299
www.ballardspahr.com

Charles D. Tobin
Tel: 202.661.2218
Fax: 202.661.2299
tobinc@ballardspahr.com

July 12, 2018

*Via E-Mail (evan@cfwlegal.com)*

Evan Fray-Witzer, Esq.
Ciampa Fray-Witzer, LLP
20 Park Plaza, Suite 505

Re: Subpoena to Turner Broadcasting Systems, Inc., d/b/a/ CNN
   *Aleksej Gubarev, et al. v. Buzzfeed, Inc. et al.*
   Case No. 17-cv-60426

Dear Mr. Fray-Witzer:

  As you know, we represent Turner Broadcasting Systems, Inc. ("TBS") and Cable News Network, Inc. ("CNN"), in connection with the records subpoena you served, on behalf of the plaintiffs, on TBS in this matter on June 8, 2018.

  To confirm the discussions you and I have had, our clients will withdraw the objections we served, in reliance on your representation that the plaintiffs have agreed:

- To narrow the subpoena to documents reflecting (1) the number of clicks from the BuzzFeed article to the CNN article for the time period January 10, 2017 – February 10, 2017; and (2) number of clicks from the BuzzFeed article to the CNN article from January 10, 2017 – present day;

- To not subpoena TBS or CNN again in this case.

  Enclosed please find documents Bates stamped CNN_000001 and CNN_000002, which provide the information responsive to your narrowed request. Note that we have marked the documents "Confidential" pursuant to the parties' Amended Confidentiality Stipulation and Protective Order entered by the Court on December 8, 2017.

  Thank you for your cooperation in our discussions.

Very truly yours,

*Charles D. Tobin / RTW*

Charles D. Tobin

CDT/rtw

Enclosures



# Entry Pages Report

Report Suite: CNN - ADBP Production (5/31/2011)
Date: Tue. 10 Jan. 2017 - Fri. 10 Feb. 2017
Segment: Buzzfeed referrals

| | |
|---|---|
| Report Type: Ranked | Compare to Report Suite: None |
| Selected Metrics: Entries | Compare to Segment: None |
| Broken Down by: None | Item Filter: None |
| Data Filter: (advanced filter...) | Percent Shown as: Number |

 Entries



Entry Pages Report | Buzzfeed referrals | Tue. 10 Jan. 2017 - Fri. 10 Feb. 2017 | Graph generated by Adobe Analytics at 10:27 AM EDT, 11 Jul 2018

| Entry Pages | Entries | |
|---|---|---|
| 1. cnn:c:/2017/01/10/politics/donald-trump-intelligence-report-russia/ | 20,671 | 100.0% |
| Total | 20,671 | |



# Entry Pages Report

Report Suite: CNN - ADBP Production (5/31/2011)
Date: Tue. 10 Jan. 2017 - Thu. 28 Jun. 2018
Segment: Buzzfeed referrals

| | |
|---|---|
| Report Type: Ranked | Compare to Report Suite: None |
| Selected Metrics: Entries | Compare to Segment: None |
| Broken Down by: None | Item Filter: None |
| Data Filter: (advanced filter...) | Percent Shown as: Number |

■ Entries



Entry Pages Report | Buzzfeed referrals | Tue. 10 Jan. 2017 - Thu. 28 Jun. 2018 | Graph generated by Adobe Analytics at 10:38 AM EDT, 11 Jul 2018

| Entry Pages | Entries | |
|---|---|---|
| 1. cnn:c:/2017/01/10/politics/donald-trump-intelligence-report-russia/ | 21,889 | 100.0% |
| Total | 21,889 | |


Adobe® Experience Cloud

Exhibit
82



# Michael Cohen, Trump's lawyer, emphatically denies claims in salacious circulated report

By Celeste Katz | Jan. 10, 2017

Donald Trump's lawyer says a salacious intelligence dossier accusing the president-elect of receiving intelligence on his political rivals and engaging in "sexual perversion" including hiring prostitutes to perform "golden showers" in his presence is nothing more than "fake news."

"Somebody is having a lot of fun at your expense," Michael Cohen, special counsel to Trump, laughingly told *Mic* in a phone interview on Tuesday night.

"It's so ridiculous on so many levels. Clearly the person who created this did so from their imagination or did so hoping the liberal media would run with this fake story for whatever rationale they might have."

Cohen issued the emphatic blanket denial after CNN reported the Russian government is claiming to have gathered "compromising personal and financial information" about the incoming president.

"It's absolutely silly," Cohen said of the dossier.

"At some point in time, this fake news nonsense needs to stop. We are talking about the president-elect of the United States of America, and if we want to portray an image of strength and intelligence throughout the world, we need to start acting intelligent," he said.

Golden showers in Obama's hotel bed! https://t.co/IGdKmM04pB

Cohen, one of Trump's closest longtime associates and a diehard defender of his boss, also scoffed at a reference in the same document which claimed he himself "allegedly met with NGO officials who are part of the Kremlin for some hacking scheme."

The Trump loyalist said he was in Los Angeles celebrating his 50th birthday with his wife and son during the late summer timeframe when the document claimed he was supposedly hobnobbing with the Russians at a secret meeting overseas.

"I've never been to Prague," Cohen told *Mic*, later going on to make the same assertion in a tweetaccompanied by a photo of a passport:





**Michael Cohen** ✔
@MichaelCohen212

I have never been to Prague in my life. #fakenews

6:21 PM - Jan 10, 2017

♡ 31.8K   💬 21.3K people are talking about this

"It all reads like a John le Carré novel," Cohen sneered.

Cohen went on to say that he "was told that this is coming out of a dossier that the Clinton campaign had put together on Mr. Trump, [his] children, [his son-in-law] Jared [Kushner], myself and others who are close to him to be used during the campaign, if necessary."

If that was the case, he said, "I would ask for my money back, because there's not a shred of accuracy to anything disclosed in their report."

A Clinton spokesman could not immediately be reached for comment.

Trump is scheduled to hold a long-awaited news conference in Manhattan on Wednesday morning.

8:44 p.m.: This story has been updated

Exhibit
83

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                    MIAMI DIVISION

 3

 4    ALEKSEJ GUBAREV, XBT      :
      HOLDING S.A., and         :
 5    WEBZILLA, INC.,           :
                                :
 6         Plaintiffs,          : Case No:
                                : 1:17-cv-60426-UU
 7    v.                        :
                                :
 8    BUZZFEED, INC., and       :
      BEN SMITH,                :
 9                              :
           Defendants.          :
10

11

12              **CONFIDENTIAL**

13      DEPOSITION OF ANTHONY J. FERRANTE

14

15            Friday, July 27, 2018

16                 10:20 a.m.

17

18            Davis Wright Tremaine
         1919 Pennsylvania Avenue, N.W.
19              Washington, D.C.

20

21      Terry L. Bradley, Court Reporter

22
```



```
 1              P R O C E E D I N G S

 2

 3              ANTHONY J. FERRANTE

 4    having been first duly sworn, testified as

 5    follows:

 6

 7                    EXAMINATION

 8  BY MR. FRAY-WITZER:

 9      Q.    Good morning.

10      A.    Good morning.

11      Q.    Would you please state your name for

12  the record.

13      A.    Anthony Ferrante.

14      Q.    And Mr. Ferrante, can you tell me,

15  have you ever been deposed before?

16      A.    I have not.

17      Q.    So the ground rules are pretty

18  simple, I think.  I'll try and ask you a series

19  of questions, you'll get a chance to answer.

20  If I ask you a question and you respond to it,

21  I will assume that you understood the question.

22  Is that fair?
```



1      A.    No.

2      Q.    And does that apply to your team as

3  well?

4      A.    My understanding is no.

5      Q.    What is the hourly rate that you are

6  charging in this engagement?

7      A.    I believe it is $880 per hour.

8      Q.    And is your rate the same regardless

9  of whether or not it's providing testimony or

10  investigation?  Or do you have different rates

11  for those things?

12      A.    I do not.  It's one rate.

13      Q.    To date how much has FTI billed

14  BuzzFeed in connection with the present

15  engagement?

16      A.    I believe the figure is just below

17  $4,100,000.

18      Q.    So if you look back at Exhibit No.

19  1, please, the second page, Paragraph No. 3,

20  there's a redaction line, and it says:

21  "Reported that over the period March to

22  September 2016 a company called XBT/Webzilla



1    altering operations?

2            MS. BOLGER:   Object to the form of

3    the question.

4            THE WITNESS:   I think we can

5    disagree that I believe I have answered the

6    question.  But I will further state that other

7    than the fact that XBT employees did little to

8    nothing to detect, stop and prevent the

9    significant malicious activity, I have no

10   evidence of them actually sitting behind a

11   keyboard.

12   BY MR. FRAY-WITZER:

13       Q.    And you have no evidence that Aleks

14   Gubarev personally did any of the things

15   alleged in the Steele dossier?

16       A.    Other than the fact that Aleksej

17   Gubarev owns and operates XBT and related

18   entities, he was outside the scope of my

19   assignment.

20       Q.    When you say that XBT employees did

21   not do enough in response to what you say is

22   use of XBT's infrastructure --



```
 1            DEPOSITION ERRATA SHEET

 2   Our Assignment No. J2466840

 3   Case Caption:

 4   Aleksej Gubarov

 5   vs.

 6   BuzzFeed

 7

 8      DECLARATION UNDER PENALTY OF PERJURY

 9     I declare under penalty of perjury that I

10   have read the entire transcript of my

11   Deposition taken in the captioned matter or the

12   same has been read to me, and the same is true

13   and accurate, save and except for changes

14   and/or corrections, if any, as indicated by me

15   on the DEPOSITION ERRATA SHEET hereof, with the

16   understanding that I offer these changes as if

17   still under oath.

18

19   Signed on the_____day of _____, 2018.

20      _____

21      Anthony J. Ferrante

22
```



1              CERTIFICATE OF NOTARY PUBLIC

2          I, Terry L. Bradley, the officer before

3    whom the foregoing deposition was taken, do

4    hereby certify that the witness whose testimony

5    appears in the foregoing deposition was duly

6    sworn by me; that the testimony of said witness

7    was taken by me in shorthand and thereafter

8    reduced to computerized transcription under my

9    direction; that said deposition is a true

10   record of the testimony given by said witness;

11   that I am neither counsel for, related to, nor

12   employed by any of the parties to the action in

13   which this deposition was taken; and further,

14   that I am not a relative or employee of any

15   attorney or counsel employed by the parties

16   hereto, nor financially or otherwise interested

17   in the outcome of the action.

18                   _____

19                   Notary Public in and for
                     the District of Columbia

20
     My Commission expires:  April 30, 2022

21

22



Exhibit
84

 Home ≡

# TRANSCRIPTS **Transcript Providers**

Shows By Category:

**Return to Transcripts main page**

## CNN RELIABLE SOURCES

**BuzzFeed Editor Defends Publishing Unconfirmed Trump Memo;**
**BuzzFeed Panned for Publishing Trump Dossier. Aired 11a-Noon ET**

Aired January 15, 2017 - 11:00   ET

THIS IS A RUSH TRANSCRIPT. THIS COPY MAY NOT
BE IN ITS FINAL FORM AND MAY BE UPDATED.

[11:00:06] BRIAN STELTER, CNN ANCHOR: Hey, I'm Brian Stelter. And this is RELIABLE SOURCES, our weekly look at the story behind the story, of how the media really works, how the news gets made.

This week, let's start a little differently, with some words to live by, really some words to report by.

"The president should be supported or opposed exactly to the degree which is warranted by his good conduct or bad conduct. His efficiency or inefficiency in rendering loyal, able and disinterested service to the nation as a whole. Therefore, it is absolutely necessary that there should be full liberty to tell the truth about his acts and this means it's exactly necessary to blame him when he does wrong as to praise him when he does right. Any other attitude in an American citizen is both base and servile."

"To announce that there should be no criticism of the president or that we are to stand by the president, right or wrong, is not only unpatriotic and servile but is morally treasonable to the American public. Nothing but the truth should be spoken about him or anyone else, but it's even more important to tell the truth, pleasant or unpleasant, about him than about anyone else."

Tell the truth, pleasant or unpleasant. Today's program is about this message. And later this hour, I'll tell you which

American president said this and why he said it.

The words are especially important today decades and decades later because President-elect Donald Trump does not respect dissent. He attacks truth-telling journalists and he bullies critics.

He may think this is a winning strategy for him but the rest of us lose. Let's face it, these are challenging times for journalists, very challenging times, and they are about to get more so five days from now.

Looking live here at the U.S. capitol, preparations under way for President-elect Trump to take the oath of office becoming our 45th president.

Today, there's a brand new report in "Esquire", a new report saying that Trump aides may want to evict the press corps. We have fresh reporting on that just coming in. We'll get to that in a few minutes.

But let's look first at the bold truth telling journalism that is happening. We all witnessed it this week, when CNN reported that intel chiefs, let's quote the headline here, "Intel chiefs presented Trump with claims of Russian effort to compromise him." These claims came partly from a former British intelligence agent's 35-page dossier.

CNN did not print it or quote from it, but BuzzFeed did. The big news site, BuzzFeed. Even though this memo is full of unverified allegations, some of them known to be false.

Was this a violation of journalistic ethics? Some media critics supported BuzzFeed, but many, many did not.

So, joining me now for an exclusive Sunday morning interview about this is Ben Smith, the editor-in-chief of the website.

Ben, you made the call when this happened. Do you regret it now a few days later? Do you have regrets about publishing this entire document?

BEN SMITH, EDITOR-IN-CHIEF, BUZZFEED: Absolutely not. We're proud we published it. And I feel, three days later, it seems clear it was the right thing to do, if you look at how much more we know than we knew three days ago. And I think in three months, it will look even clearer.

STELTER: What is it more know that we know now that you believe justifies the decision?

SMITH: We know this saga that dozens of journalists, intelligence officials, elected leaders knew of a British -- of a former British spy creating this document, handing it over to the FBI, John McCain handing it to the FBI of briefings which Jake Tapper and your team got an amazing scoop on of the CIA briefing the president and the vice president-elect.

It's really about incredible fight of highest levels of U.S. power, but away from the eyes of the American people over this document, and over the claims that as -- in the headline you showed. The claims that CNN and many, many other outlets reported and repeated. And I guess our call was, that in the first instance, once you have the document, as we did and many did and we --

STELTER: When did you get a hold of it?

SMITH: I'm not going to say exactly, but weeks before we published it.

STELTER: So, you've had it for weeks before CNN published the story.

SMITH: Yes. And we, like you, I think like you, like certainly other outlets who we ran across in the reporting, we're staking out places where we thought we could get information in Europe. We're running it down every way we could.

And at some point, you know, as Harry Reid is sending a letter based on it, as government and powerful officials are taking little actions based on it, not just sort of seeing it but acting based on it. I think there becomes an argument, should you print it? We were having that conversation. We had not certainly -- we're not close to doing that.

But then I think when your great scoop puts not just the fact of the document but claims attributed in your reporting to a source seen as credible and specific summaries of the claims into public, I think -- I think everybody's obligation then is to say, well, here are the actual claims. We're just not going to summarize --

STELTER: Well, you say summary in those claims -- CNN was careful not to share those details.

(CROSSTALK)

SMITH: I saw in that headline, the headline is, claims he was compromised by Russian intelligence. That is an incredibly explosive claim.

[11:05:01] And to say, you and I have here between us, a secret document with explosive, dark claims, and we don't -- you guys on the other side of the camera can't see it, but we can -- I don't really understand.

I guess I'm sort of interested actually -- because I see the case for reporting it out and not sharing it. I see the case for saying, here are these claims, here is this document that center of the fight. Take a look.

I think I actually don't see the case for the middle position. I actually thought, I realize you're not a spokesman for CNN, and I don't mean to put you --

STELTER: The middle position is journalism.

SMITH: No, the journalism that we were all doing was to try to verify the claims. Once you repeat them, and put them out there but to not share the underlying documents --

STELTER: But the actual claims were not put out there. The story that CNN published and the story "The New York Times" published said --

SMITH: The headline I saw, the headline I just saw --

STELTER: -- this was a topic briefed to the president-elect and that's was the news was.

SMITH: The headline you put up was claims he was compromised by Russian intelligence.

STELTER: But you're conflating these two the Trump aides.

SMITH: I'm actually --

STELTER: What you're saying you all published the claims. No, CNN did not. Neither did "The New York Times or "The Washington Post" or others.

SMITH: The he was compromised --

STELTER: Nobody went into these sordid details --

SMITH: The details, I agree.

STELTER: -- that you all put up on the web.

SMITH: I guess we thought that it was important when you had a blanket claim like he was compromised by the Russian intelligence, to share the details. I think that's important. I think our audience basically at this point expects you. And this is what you do on the Internet with hyperlinks. You do it by showing your source documents that you can.

But the default is, if you want your audience to trust you, you're not -- you don't just -- our job is not to be gatekeepers to decide what to suppress and keep from our audience. It's primarily to share with our audience what we've got. All that said --

STELTER: You say suppress. Journalists every day make editing decisions. And this was just an editing choice a about not putting a completely unverified rumors out on the internet.

SMITH: Well, you put some of them on the Internet. You just didn't put the details on the Internet. Yes?

STELTER: No. What happened from CNN and "The New York Times" and other outlets is they reported the existence of this concern inside the intelligence community and the existence of this briefing.

SMITH: And several of the details of it. But in summary, I agree not the most explosive detail, but the summary that you've been covering and I think it was worth -- there was a big difference between saying there are these dark and explosive claims that we're not going to tell you about and here's the actual thing. I'm not sure reading the thing and our report which said, not only it is unverified, we know there are specific things wrong, I think that's important to put out there and to let people see the underlying document.

That said, I also reasonable people can really disagree on this and they are. I don't think you're acting like a Trump aide. I don't think I am either. And I think like that's -- this is a -- this was a close call. I'm not suggesting otherwise.

STELTER: I'm trying to figure out if you are a "Washington Post" or WikiLeaks. It seems to me you're trying to be both, saying, we're going to dump this document online. We don't know if it's real. We don't know if you know it's a real document. You don't know if the truth -- you don't know if the facts on it are true or not.

That's not "The Washington Post" or CNN or "The New York Times" would do. You all aspire to be one of the world's great news divisions. But aren't you trying to be more like WikiLeaks in this case? SMITH: We are I think well within the tradition of American journalism, which is every time you use the world alleged on your air, every time you see the word "alleged" in print or on the web, that is saying we are repeating a claim we can't verify. Tha is a totally, within the standard particularly of covering law enforcement.

But, you know, you'll hear that dozens of times on CNN. You'll hear that word quite a bit in coverage.

And I think from our perspective, if you're going to say that, your obligation if you've got the indictment, you know, even if you think there's lots there that's false and the fact you can particularly -- you can point to things tha are false, if I can see it, if it's not going to scald my eyes out, I think, I mean, it's a question to reasonably ask your audience. If I'm up here saying I have a secret document, I'm going to summarize it but not I'm sure I'm comfortable showing it to you because I'm not sure I can trust you with it. Do you feel that you shouldn't see it?

STELTER: It's not about trusting the reader. I mean, let's put on screen what you said to the audience at the time.

SMITH: What do you mean it's not about trusting the reader?

STELTER: You said, "Americans can make up their own minds about the allegations about the president-elect that have circulated around the intelligence community."

But how can they make up their own minds without providing reporting to them? Without, you know -- how do you expect your readers to make up their own minds?

SMITH: I think that I would say is that, I think -- it's -- if you're going to report on a document, the presumption is that you share the document with your audience, let them know what you know.

STELTER: So, that's where this is really interesting, right? I would say and I think you and I agree on this, big old fashioned established news organizations start from the premise of, why should we share this?

SMITH: Yes.

STELTER: You start from the premise of, why shouldn't we?

SMITH: Why should we suppress this? Yes, that's right.

STELTER: And you use the word "suppress".

SMITH: That's a little tangential. Why shouldn't we share that? Yes.

STELTER: It's OK. But that's a fundamental -- that's a profound difference that we're describing between legacy media and digital media.

SMITH: I think that's right.

STELTER: So --

SMITH: But I don't think it's a difference of values. I think we are trying to best inform our audience to be true to our audience, to treat our audience with respect. I think you are too. I think these are different traditions of that.

But I think that conflation of that, with deliberate deception, is really inappropriate. We put that -- we put this out with a very clear summary of what it was, where it came from and we really stressed that there were false things in this document --

(CROSSTALK)

STELTER: You did. But why not publish a full reported explanation to the reader about what you've learned so far, what's false in it? Why not help them understand what they were seeing in this memo?

[11:10:02] SMITH: I mean, I don't think that you or I or the FBI apparently can say with great confidence that either they have stood this up or knocked it down.

STELTER: There were some details that we both know were false. You could have annotated that. You could have put a lot of redactions.

SMITH: I think, right. I think there are levels of how many reductions, of how much annotation. We did point out that things that we really, were very, very confident were false, in part to say to the reader, caveat --

STELTER: You did a little bit of that. Let's be honest, you rushed this out. CNN published and you published a couple of hours later, trying to get this on the Internet as fast as possible.

SMITH: I mean, it is both of our jobs to be fast and accurate as we can.

STELTER: Accurate and then fast.

SMITH: I think -- yes, of course.

STELTER: So, Sean Spicer, another Trump aide, tried to conflate what CNN published and what BuzzFeed published. Let's take a look actually what Sean Spicer the next day.

(BEGIN VIDEO CLIP)

SEAN SPICER, INCOMING WHITE HOUSE PRESS SECRETARY: The fact that BuzzFeed and CNN made the decision to run with this unsubstantiated claim is a sad and pathetic attempt to get clicks. The report is not an intelligence report plain and simple.

(END VIDEO CLIP)

STELTER: Were you trying to just get clicks? SMITH: I mean, I think Sean quoted me as he continued there in saying

it was unverified. I think -- you know, there's obviously an attempt to divide the press, to turn us on each other and to turn reasonable differences about editorial decisions into screaming matches between us on this show. I think that's a trap that the media has obviously repeatedly fallen into over the last couple of years, but I think it's better not to right now.

STELTER: OK. Well, there's attention between there's reasons to have unity and the other hand as CNN's Jake Tapper said, what you did was irresponsible and that irresponsible journalism hurts us all.

SMITH: I wouldn't say it was irresponsible to say we have a secret document. We're not going to share it. I would disagree with that. But I think it's a reasonable problem.

STELTER: So, it's not possible to have unity in the press corps if BuzzFeed is acting more like WikiLeaks, just dumping material in the Internet and telling the audience to decide if it's true or not.

SMITH: I think we reported a very important story about --

STELTER: Reporting? You just published. There's a difference between publishing and reporting.

SMITH: We explained the origin of the document. We described the extent to which it was accurate and inaccurate, and we shared information that was being -- by the way, that not just, you know, the head of the CIA, dozens if not hundreds of journalists, intelligence officials, elected leaders were seeing and acting on. I do think when you have a document in that kind of circulation among the country's elites, at the center of an incredibly heated political battle, the argument for keeping it away from the American people has to be really, really strong.

STELTER: I'm glad we're talking about this, because I think for the audience at home it's hopefully educational and informative.

SMITH: Yes, I think they should -- and I would if I were them, ask themselves, do I not want to see this. Do I not feel that I am responsible do I not feel that I can handle the notion that this document is not verified, that I can't trust the claims in it, but it's the document at the center of this fight.

STELTER: Let me give you one more example in trying to frame this. In 2013, you wrote about a decision not the go with a story about allegations of prostitutes and a U.S. senator. This was a Democratic U.S. senator. You decided not to go with it specifically because it wasn't verified.

Here is what you wrote at the time, "Stanton, McKay Coppins and I felt more or less vindicated in making the traditional don't-touch-it call when the story appeared to fall apart or least got murkier in a way that stories based the testimonies of anonymous prostitutes in foreign counties are vulnerable to." Now, this 35-page memo also has lots of anonymous information, unverified information. What's the difference now? Is the difference that Donald Trump is a Republican?

SMITH: No. The main difference is CNN initially has a great scoop, that the president of the United States and the president-elect were being briefed on the document. Had this document -- had the -- you know, I'm actually not going to mention the case because I don't want to get it wrong, but I'm pretty sure I know which U.S. senator we're talking about here. Had that document been picked up by the FBI and briefed to the president of the United States, I think it would have been inappropriate of us to say, but we're not going to show it to you.

STELTER: Has anyone from Trump --

SMITH: And I guess conversely, you and I get e-mail every day making outlandish charges against people. And whether or not widely circulated among the American elites, but U.S. senators are not acting on it.

STELTER: So, for you, the big difference was senators, intelligence officials, journalists all have this?

SMITH: Not just seeing it, but acting on it.

STELTER: Acting on it.

SMITH: People are making decisions based on it.

STELTER: Has anyone from the Trump's transition team or the Trump organization threatened to sue BuzzFeed this week?

SMITH: You know, I guess I am -- I am not always sure that I can identify on Twitter who specifically works for the Trump and his transition.

STELTER: You're saying you've received tweets from people threatening to sue?

SMITH: I've gotten tweets, many, many tweets this week.

STELTER: But no letter, no legal letter from any authority?

SMITH: No.

STELTER: I asked because there's been threats of suits in the past. We haven't seen that from Trump this week.

SMITH: It's also a tradition. You don't report on lawsuit, A, now, discarded American journalistic tradition of not reporting on lawsuit threats before they have been filed. But no, there haven't -- no, there haven't been any.

STELTER: Do you worry or do you care that publishing this sort of inoculated Donald Trump? That it conflated a lot of these news outlets and a lot of them just dismiss it entirely by calling you a failing pile of garbage?

SMITH: I mean, I saw this -- you know, I really didn't understand this. I saw the next morning people saying, you know, this was the moment after two and a half years of really getting totally rolled by Donald Trump and in many

cases, apologizing for coverage of Donald Trump that this was the morning that we were going to -- this was the morning the media was going to turn it around and really do a fantastic job and hold him to account and had only BuzzFeed not published this.

[11:15:21] And I really do think that's -- I mean, that's a fantasy.

STELTER: What's the BuzzFeed motto for covering Trump going forward? You wrote a memo last month to your staff, saying practically every story now, it all comes back to Trump. All roads lead back to Trump. What's your strategy for covering Trump in the weeks and months ahead?

SMITH: First, I would say, I don't think it all comes back to Trump. I think it all comes back to a broader, we're a global organization with reporters all over the place, in the U.K. and France. I think it comes back to this broader kind of rise of global nationalism and that's the story I feel like is at the center of things.

But, really, you know, I think we plan -- I feel -- I'm really proud of how we covered him through the campaign, because we were fair. We were tough. We didn't -- and I think we never engaged in the kind of fantasy of the Trump pivot that he was somebody other than he was going to be.

I think we also reckoned with as you do this very challenging fact that he and his spokespeople say things that aren't true all the time. And I think you have to engage that very directly. So, I think we plan to continue to cover him like that.

STELTER: BuzzFeed was blacklisted from much of the campaign --

(CROSSTALK)

SMITH: We were the charter --

STELTER: Outlets were not given press credentials. Do you expect that in the White House?

SMITH: I don't know. I mean, I'm certainly -- we have not had any trouble covering Donald Trump since about October.

STELTER: And last June, Trump told me, no, he will not, if he's elected president, be banning reporters in the press briefing room. However, now, we're five days. We'll see what happens.

SMITH: Yes.

STELTER: Ben, good to see you. Thank you.

SMITH: Yes. Good to see you. Thanks, Brian. STELTER: Coming up next here on the program, an all star panel of media observers and decision managers standing by with their thoughts on BuzzFeed's decision.

And later in the hour, FOX News and its biggest star, Bill O'Reilly, now in the news. Fox settling sexual harassment claims. How is O'Reilly being treated by FOX? How does that compare to Roger Ailes' departure from the network?

We'll cover that in a few minutes.

(COMMERCIAL BREAK)

[11:20:04] STELTER: Hey, welcome back. We're just getting started here.

We heard from Ben Smith, the editor in chief of BuzzFeed, about the controversial decision to go ahead and publish a 35-page memo involving unverified allegations about Donald Trump.

Let's bring in an all star panel of media critics and observers. Jeffrey Goldberg is here, the editor-in-chief of "The Atlantic"; Margaret Sullivan, a media columnist for "The Washington Post"; Mollie Hemingway, senior editor of "The Federalist"; and David Zurawik, media critic for 'The Baltimore Sun".

Margaret, you wrote this week that BuzzFeed crossed the line by publishing this dossier. Tell us why.

MARGARET SULLIVAN, THE WASHINGTON POST: Well, for me, it's fairly simple. There's a time honored and I think very wise rule in journalism that we try to get as close as possible to the truth. And in doing so, we don't make huge information dumps of unverified material which is what this was.

STELTER: David Zurawik, do you agree?

DAVID ZURAWIK, BALTIMORE SUN: I totally agree. You know, I think it cuts even deeper than that. I mean, I thought at first when I wrote about this the first time, I thought was I being too hard on Smith, Ben Smith. When I

heard him now with you trying to say this is respect for the intelligence of the audience and all that, I thought we haven't been hard enough.

They jettisoned one of the most important principles of American journalism, the one that trust with our audience is really based on, which is verification especially in case like this.

Dan Rather who had a storied career up to that point lost his job in 2004 because he went on the air making a claim about George W. Bush that wasn't verified. We don't know if it was wrong or right. Terrible price paid by CBS News in terms of ratings and revenue to end his career. But they did it. That's how important verification is to us.

And, Brian, when he sits there, you correctly called him on it. When he said we felt we had to report this. They didn't report anything. They did exactly what Margaret said, they dumped this stuff on the public.

How is the public going to know what's true and what isn't true? And then to say, well, some of it is false. Then, why don't you tell us what's false?

You know, the thing about one of Trump's aides, Cohen, being in Prague, and then Cohen put his passport online to show that he wasn't, they could have called him up. How hard is that to call him up and ask him?

STELTER: You know, I think about this, and I don't mean to sound fatalistic, but isn't this always what's going to happen? We're in a digital age where someone, somewhere is going to publish a secret document like this?

ZURAWIK: You're so right, Brian, really. And I looked at how many people viewed it at BuzzFeed and I thought, hey, he won. By his standards, he won.

STELTER: So, let me ask, Jeffrey Goldberg. Jeffrey, you're the head of "The Atlantic", would you have published this memo?

JEFFREY GOLDBERG, EDITOR-IN-CHIEF, THE ATLANTIC: Well, you know, we had access to the same information going back for a while and we didn't. I was trying to figure out if it was true or not.

So, clearly, I made a decision not to go forward unless we can verify information because I think that's what we're supposed to do. I think Ben is a great journalist. I just disagree with this decision. We're supposed to help the reader understand what's true and what's false. And that's why we exist.

I don't want to work ourselves out of jobs. I mean, to put in quotidian way, that's what we're here to do, is find out to the best of our ability. We'll get it wrong, but to find out whether something is true or false. I said, I do think tha once this dossier, once this document worked its way into the official bloodstream of Washington, if you will, in other words, once John McCain took it to various other officials, I think it was inevitable that this was going to come out.

So, I do understand Ben's argument that once there's a story, a CNN story that this thing exists and people at high levels are discussing it, it becomes -- the pressure becomes inevitable to tell people what's in it. It's unfortunate, bu that's the way these things work now.

STELTER: Now to the response from the Trump transition team, Mollie. Take a look at this montage we produced all of the mentions of fake news by the Trump team this week.

(BEGIN VIDEO CLIPS)

DONALD TRUMP (R), PRESIDENT-ELECT: You are fake news. SPICER: For all the talk lately about fake news.

TRUMP: Some of the media outlets that I deal with are fake news.

UNIDENTIFIED MALE: This fake news.

TRUMP: That fake news. It's all fake news. It's phony stuff. Fake news. Fake news. I was indeed as fake news.

(END VIDEO CLIPS)

STELTER: Mollie, isn't this a cynical attempt by Trump to appeal to his base labeling fake news, all the real reporting about this topic this week?

MOLLIE HEMINGWAY, SENIOR EDITOR, THE FEDERALIST: Well, just real quick, I want to say about Ben Smith, his original note. He said that this is what journalism is in 2017. I think sadly, he's right. That pushing unreliable stories to advance a highly partisan narrative is what too many journalists are doing.

But he did have a good point when he talked a about how this information that BuzzFeed provided did add contex and meaning to the story. The original CNN story sounded so unbelievably bad, like Russians had the goods on

Trump and CIA was taking it very seriously.

[11:25:07] BuzzFeed publishes the dossier, and that's what the CNN story was about, was the dossier, and people could see for themselves how ridiculous, how preposterous, how immediately debunkable some of the most outrageous or important claims were. It cast doubts not on CNN but on the intelligence community, what they are doing exactly. Obviously, they are leaking like sieves in an ongoing war against the president.

So, BuzzFeed kind of pulled the curtain back, showing how the intelligence community and particularly the more partisan brass, not the actual intelligence officers who do the good work, how they use the media to punish or destroy their political enemies. And that is a very important journalistic story and one that it think should be covered as journalists are cooperating with this intelligence community campaign against the president.

STELTER: Well, let's save the fake news part for later then. You're saying that intelligence sources are leaking trying to discredit Trump, that's what you see happening?

HEMINGWAY: I think -- you know, it's rather obvious there are these stories we're seeing, they come from not jus the intelligence community, but very high levels of the intelligence community. As we report on them, we should maybe not be so gullible or accepting of these stories.

I mean, DNI Clapper is a guy who lied to Congress about whether he was spying on them. He lied under oath about whether he was collecting information on hundreds of millions of Americans. We had the intelligence community get in trouble for some political decisions about releasing information on Syria, creating an echo chamber to push the Iran deal.

So, as we take this information from them, we should be applying skepticism. And that's something that's not just right now, but really going back decades and it's a lesson that we keep on sort of failing to learn that we should be skeptical and understanding again of how they use information to destroy those they oppose.

STELTER: All right. My fearsome foursome, stand by. Grab a coffee. We're going to be bring you back in a coupl of minutes.

Taking a quick break here because after the commercial, we want to talk about how Trump aides addressed this story, what they said about both the CNN and BuzzFeed story. My essay on denials and distortions right after a quick break.

(COMMERCIAL BREAK)

[11:30:43]

STELTER: Welcome back to RELIABLE SOURCES.

Deny, deny, deny. And when that doesn't work, conflate and confuse.

That's what spin doctors do. They have done it for decades, both Democrat and Republican. And, right now, that's what President Trump and his aides -- president-elect Trump and his aides are trying to do, number one, deny.

This is Kellyanne Conway reacting to the breaking news about the claims of Russian efforts to compromise Trump on NBC's "Late Night With Seth Meyers" on Tuesday.

(BEGIN VIDEO CLIP, "LATE NIGHT WITH SETH MEYERS")

SETH MEYERS, HOST, "LATE NIGHT WITH SETH MEYERS": The press report was about them...

KELLYANNE CONWAY, TRUMP SENIOR ADVISER: It's an allegation.

MEYERS: ... going to the president.

CONWAY: And it says that they never briefed him on it, that they appended two pages to the bottom of his intelligence report.

MEYERS: I believe it said they did brief him.

CONWAY: Well, he said that he's not aware of that.

(END VIDEO CLIP)

STELTER: "He's not aware of that," she said.

In fact, CNN said that it had confirmed that a two-page summary of the allegations against Trump was included in the documents that were presented to Mr. Trump, but cannot confirm if it was discussed in his meeting with the

intelligence chiefs -- so, the difference between this paper and a verbal discussion.

That was on Tuesday. Deny.

So, now for number two, conflate.

On Wednesday, Trump press secretary Sean Spicer lumped BuzzFeed and CNN together, wrongly suggesting that both outlets had dumped all the allegations from that 35-page memo online.

Conway seized on an NBC story that further muddied the waters. She tweeted: "From NBC, Trump was not told about unverified Russian dossier, official says. Will TV anchors, networks correct story?"

That brings me to number three. So, we have deny, conflate, and now confuse.

Listen to how Conway sowed confusion in this interview with Anderson Cooper.

(BEGIN VIDEO CLIP)

ANDERSON COOPER, CNN ANCHOR: What's inaccurate about what CNN reported?

CONWAY: Oh, my goodness, the whole headline.

You -- the -- the -- go read the entire story, four bylines, and a story that's just not true...

COOPER: CNN...

CONWAY: ... that the president-elect was presented with this information, that it was appended in a two-page document to the briefing.

NBC has said it was not. Other people have said it was not.

COOPER: NBC...

(END VIDEO CLIP)

STELTER: Cooper challenged her at every turn, but Conway glommed on to NBC's reporting and confused people.

"The New York Times," "The Washington Post" and other newsrooms did confirm the thrust of CNN's reporting. And so did government officials on the record.

Here's the thing. Journalism really is a process, sometimes a long and frustrating process. You pull information from sources while you push other sources to talk. Sometimes, it's wise to be transparent and tell the audience what you don't know.

And case in point, CNN originally said it could not confirm if the summary of the allegations was verbally discussed in Trump's meeting with the intel chiefs. But, on Thursday, there was a reporting breakthrough.

(BEGIN VIDEO CLIP)

COOPER: As we just learned tonight, the information actually came from Mr. Comey himself directly to Mr. Trump.

That's not fake information. That's not fake news. That's accurate reporting.

(END VIDEO CLIP)

STELTER: The conservative news site Red State called this more evidence CNN was right. It was confirmed by other news outlets pretty quickly.

I would add it's also more evidence that the denials and conflations were wrong. Maybe team Trump wanted all of us talking about the media, and, you know, not about the implications of a foreign government claiming to have compromising information about a U.S. president.

But this case did reveal something about Trump's media strategy.

I thought Jim Sciutto said it really well on Thursday night.

(BEGIN VIDEO CLIP)

JIM SCIUTTO, CNN CHIEF NATIONAL SECURITY CORRESPONDENT: What I worry about is a broader issue, which is a hostility to facts, right, and an effort, a concerted effort by Donald Trump and his team to call into question the very existence of facts, right, the very existence of nonpartisan news.

And it seems to be part of its strategy to attack information it finds inconvenient or critical. That's a problem for the way this country functions.

(END VIDEO CLIP)

STELTER: Jim's right.

That's why it's absolutely necessary that there should be full liberty to tell the truth about his acts.

Now, I read these words at the start of the program today. These words came from a Republican president, Theodore Roosevelt, in 1918. After leaving office, Roosevelt was disturbed by Woodrow Wilson's efforts to tamp down on dissent.

Roosevelt said, "Free speech, exercised both individually and through a free press, is a necessity in any country where the people themselves are free."

[11:35:11]

Those words were true 100 years ago. They are true again today. And I think we have all got to be reminded of that.

Coming up here, our A-list panel back to discuss Trump's treatment of the news media and this breaking news today, to talk about what's going to happen with the press corps at the White House, if they're going to move from their current location in the West Wing -- the details right after this.

(COMMERCIAL BREAK)

STELTER: Welcome back. I'm Brian Stelter.

Let's turn now to Donald Trump and his treatment of the press. Take a look at this breaking news from "Esquire" magazine, this story published overnight. It says the Trump administration may look to evict the press corps from

the White House.

Now, this is a little bit more complicated than the headline makes it sound. There is conversation going on between Sean Spicer, who I just spoke with via e-mail here, telling me there is conversation about looking for a new setting for press conferences and for news briefings, the daily briefings that the current White House administration has.

Spicer is saying maybe the room is too small. Maybe we need room for more journalists.

But there's a deeper, deeper concern among White House correspondents and others about exactly how Trump is going to approach this. Let's be honest. He's being aided, egged on and encouraged by conservative commentators like Sean Hannity and Republicans like Newt Gingrich, who wants Donald Trump to just ignore and dismiss the press.

[11:40:01]

Listen to what Newt says here on FOX.

(BEGIN VIDEO CLIP)

SEAN HANNITY, HOST, "HANNITY": Journalism is dead. Did Donald Trump bury them today?

NEWT GINGRICH (R), FORMER SPEAKER OF THE HOUSE: He didn't bury them today, but he certainly, I think, began to draw the lines for the fight that's coming.

They can close down the elite press. They can create totally new venues for informing the American people. They can go to Facebook and to YouTube and to Skype and they can have average citizens asking questions.

I think you would have a much richer dialogue if you broke up the monopoly of the elite news media.

(END VIDEO CLIP)

STELTER: Sean, journalism is not dead. Just ask FOX's journalists. And as for what Gingrich said about breaking up the elite news media, let's talk about that with Jeffrey Goldberg back with me, editor in chief of "The Atlantic," Margaret Sullivan, media columnist for "The Washington Post," Mollie Hemingway, senior editor at "The Federalist," and David Zurawik, media critic for "The Baltimore Sun."

Jeffrey Goldberg, these reports this morning about changes to the press briefing room, there's a lot of uncertainty, a lot of curiosity. I think that is exactly how the incoming administration wants it, wanting journalists to be back on their heels, to be on edge about this. What's your take?

GOLDBERG: Well, my take is that for generations presidents have allowed -- and the word is allowed -- allowed the press corps to have space within the White House itself.

It's an important signal to the country that this is the people's House. It's an important signal to the press that we treat you with respect and you're an integral part of governance. You're here to check us. The press has never felt as free as it wants to feel in terms of wandering around the White House.

But the optics here of moving the press out of White House, look, no one wants a battalion of reporters living on their first floor, except maybe you. You would probably have that in your house.

(CROSSTALK)

STELTER: I would. I would.

GOLDBERG: You would. But most people wouldn't.

But this is the price that you pay to have a free country, a democracy, a system of checks and balances, informal and formal. And so the optic of moving them out to some other more distant part of the White House complex is just terrible, in my opinion.

STELTER: I posted a full story about this on CNN.com. You all can see the reporting from Jim Acosta and Jeremy Diamond and I.

But, Mollie, let me go to you on this. What I see the Trump administration doing is trying in a very purposeful way to disrespect the press. And that's something perhaps many of Trump voters like to see.

HEMINGWAY: Right.

There's this larger context where our profession, unfortunately, has very low credibility with Republicans in particular. I think only 14 percent of the Republicans trust the media, only 30 percent of independents. Much

higher favorability and trust ratings with Democrats.

That's a really dangerous thing. We need to hold Trump accountable. But we don't really have the credibility to do that. And so he's exploiting that situation. And I think it's really incumbent upon us to really get our house in order and think about how to cover him, so that we will be in a position to hold him accountable.

Right now, it seems like much of our reporting is designed to whip half the country into a frenzy and get the other half to tune out. We need to kind of buckle down and figure out what are the appropriate battles to fight and what are the appropriate lines of questioning, so that we can regain credibility with our people.

STELTER: You say designed. You think it's intentional?

HEMINGWAY: Is what intentional? Sorry

STELTER: To have reporting that tears the country apart?

HEMINGWAY: Oh, there's all sorts of reasons why we have gotten to the point we're in. And certainly Donald Trump provokes this response in people.

But it doesn't really matter. It's our credibility on the line. It's our profession that we need to uphold. And we're just not doing a good job. The more we freak out, it just becomes like we're having a temper tantrum, instead of doing out job.

STELTER: Where is the freaking out? Where is the freaking out happening?

HEMINGWAY: You're seeing it just in the general tenor of the Twitter conversations and whatnot, but even in the press conferences and whatnot.

We really need to think about how we're going to pursue questioning, how we're going to deal with an administration that does a very good job of avoiding precise language, and also in just showing some good faith efforts. I don't think the media community has responded to our failures of 2016 with any sort of meaningful self-reflection, systematic changes or the type of changes that need to happen to regain that credibility with a huge section of the country.

STELTER: Margaret, what's your view on what Mollie is saying? Do you see authoritarian tendencies from

Trump, or is that an example of a journalist freak-out when it comes to this new president?

SULLIVAN: Brian, there's definitely reason to be concerned.

I think we're in for at least a somewhat combative relationship with the Trump administration. He's made his scorn for the press a centerpiece of his campaign and his time during the transition. So, I think there is a lot to be concerned about.

The thing that I would like to stress is that the press here does represent the public. And so it's not really about where the press is going to sit and whether there's going to be enough room in a particular briefing room and all of that. It's about the press being the representatives of the people. And to the extent we can drive that message home I think it will be very important, and it's very true.

[11:45:02]

STELTER: Mollie, you have a more conservative audience at "The Federalist." I think your inbox is different from mine.

Margaret is describing how we do represent the audience, the public. I get a ton of e-mails from viewers right now asking us to hold this new president accountable, hoping that CNN and other outlets like it will stand up to this president.

I think your inbox is different, right, Mollie? What are you hearing from your audience?

HEMINGWAY: Well, I know enough, since people tag us both on Twitter, to know that your inbox is a little different too. You're getting a lot of people who are complaining that the media are unnecessarily hostile to them, their way of life, their views, the things they care about and value.

And this is something that has been going on for decades. When they see Donald Trump fight back against the media, it makes them feel like he's fighting back for them. And that's why this whole conversation is happening in the context of a larger media environment that has been very unfair.

There's a reason why our ratings are so low, our credibility ratings, our trustworthiness ratings, and our favorability ratings. They're low because people don't trust us to do a good job of accurately reflecting the views of a huge swathe of the country. And there's no reason to deny that. We're not going a good job.

And so if we want to represent the people, we need to start representing the people. We need to have newsrooms full of diverse voices and having different arguments make it into news stories. We're not doing a great job with that right now.

And it's causing us major problems again that Donald Trump is able to exploit. And that's dangerous, because the media are important for holding all politicians accountable.

STELTER: Let me get David Zurawik in it.

(CROSSTALK)

ZURAWIK: Brian, yes.

Brian, both sides of this are -- I'm sitting here. I'm thinking both sides are true. Jeffrey is absolutely right. You move the press out of there, it's beyond optics. It's deep cultural symbolism, the representatives to the people moved literally off.

But you know what? President Obama did a lot of this himself. He limited the photography from inside the White House from independent sources. That's number one. He did all the things that Trump is taking to the exponential level now of trying to go around the press, talking to alternative sources. And I think there's some -- there's truth to what Mollie says as well in terms of the kind of coverage during this election. If you think back to the CNBC debate where the first question from John Harwood is, isn't this a cartoon campaign, that was -- press -- some people in the press were thinking that way, Brian.

And it was a brilliant campaign that Trump was running. He was spending almost no money. He was using social media. He was using television, but yet we came at him at that tone. A lot of us in the media wanted to ridicule him.

So, two things. One, he absolutely does need the press as an enemy, so he's going to do things to infuriate us to his base, just as Mollie said. And it's not justified. We have to stop him before he moves them out. Yes.

(CROSSTALK)

STELTER: That's the most important part of the "Esquire" story from overnight. There's a quote from an unnamed

senior transition source saying the media is the opposition party.

ZURAWIK: Yes.

STELTER: That's maybe the Trump view. I asked Sean Spicer. Spicer said: I respect the role of the media in a democracy.

But that unnamed quote is crucial.

Jeffrey Goldberg, I'm almost out of time, but last word to you. What are you telling your journalists at "The Atlantic" with regards to all of this we're talking about here?

GOLDBERG: Well, the general instruction, I think, is, we're not here to take cheap shots. If they are hard shots that are justified by the facts, take the hard shot.

I'm telling them that access is important. I want to interview people. I want to cover these people fairly, but we're not going to beg for access. We're going to just cover things as fairly as we can. And I think we're talking about something that's still theoretical. He's not president yet.

So, I don't want to go into this conversation about authoritarianism quite yet, because it's all prospective. And so let's just take this one day at a time and cover this White House vigorously, the way we would cover any White House.

STELTER: One hundred and twenty hours until inauguration hour.

Jeffrey, Margaret, Mollie, thank you very much.

David, please stick around for one more block.

But let's take a quick break here, and, afterwards, a story that might have slipped under your radar this week. It's been a busy news week. But FOX News reportedly settled a sexual harassment charge made against Bill O'Reilly made by a former on-air colleague -- the details right after this.

(COMMERCIAL BREAK)

[11:52:51]

STELTER: Welcome back to RELIABLE SOURCES. I'm Brian Stelter.

So much media news this week, you might have missed this development, Bill O'Reilly and FOX News.

This is FOX News settling a sexual harassment allegation made against big star Bill O'Reilly by former on-air colleague Juliet Huddy. Now, the settlement is reportedly in the six figures, according to CNN's own Dylan Byers and also reporting from "The New York Times" and the blog LawNewz.

Now, this is not the first time allegations of sexual harassment have been brought against O'Reilly. He settled apparently in the millions of dollars with producer Andrea Mackris in a well-documented, much- covered story in 2004, when she made similar claims.

Of course, the question here on the table is about O'Reilly in the context of Roger Ailes, the former FOX News boss who resigned under pressure last July. Ailes' behavior, the charges of harassment by Ailes, is what resulted in his downfall.

So, what about O'Reilly? Is there a double standard? Is there a difference here?

Joining me now, David Zurawik, media critic for "The Baltimore Sun" back from earlier.

David, one of two things could be going on here. Juliet Huddy had her lawyer send a letter to FOX last summer making these allegations against O'Reilly. Then there was this quiet settlement that was disclosed this week. Either she was harassed by O'Reilly or she was taking advantage of FOX at a time when the boss had just been taken down by harassment allegations.

What's your read on this story?

ZURAWIK: Brian, my read is that there has been so much of this, from Megyn Kelly to Gretchen Carlson to this case.

It's impossible that that was not the culture of FOX News that Roger Ailes established. And it's a sick culture. It's a troubling culture that talented women journalists -- Brian, you know how hard it is to do a show five nights a week, like Megyn Kelly did, and at the level of excellence that she did it.

Now imagine doing that when you were sexually harassed or afraid of being sexually harassed. And in her book, she talks about being sexually harassed by Ailes.

[11:55:01]

How in the world can you expect somebody to achieve there? And some of the -- and now it's like Penn State at FOX News with Jerry Sandusky. Nobody knew this was going on for all of this time with all these women. I don't think so.

STELTER: Right.

One theory here is that Ailes is close to Huddy and her family. Maybe Huddy decided to write this letter to FOX last summer because Ailes was trying to take down FOX and take down O'Reilly. That's a theory.

Another theory here is that Huddy finally felt like it was a comfortable environment where she could actually brin this allegation to actually talk about what had happened.

Let me show on screen the statement from FOX News saying there were very inaccurate things in this letter from Huddy's lawyers. It says: "The letter contained substantial falsehoods which both men have vehemently denied."

Along with O'Reilly, the other man that was brought up here is a co- president of FOX News.

Now, let me also show the statement's from O'Reilly own lawyer, who is denying these allegations. The lawyer said: "There is absolutely no basis for any claim of sexual harassment against Bill O'Reilly by Juliet Huddy."

This all comes, of course, David Zurawik, at the same time Gretchen Carlson, the fired FOX News anchor who then sued Ailes for harassment, is doing television interviews, including here on CNN and elsewhere, talking about this broader issue of harassment in newsrooms.

David, I'm almost out of time, but what do you think viewers need to take away from these kinds of allegations?

ZURAWIK: Listen, it's really troubling that it persisted to this day.

And it's not just troubling. Troubling sounds like a high-minded word. When I talk to some of the women who

have dealt with this in the industry, it's really painful to hear their stories.

And I'll tell you what. I have never seen a corporation...

STELTER: You're right.

I'm out of time, but you're right. It's not just about FOX. This is not just about FOX. It's about an industry-wide and culture-wide problem.

ZURAWIK: Yes.

STELTER: David, I'm sorry I'm out of time.

ZURAWIK: OK. STELTER: We will keep this going in our newsletter.

Thanks for tuning in today. And I will see you next week.



Business

Opinion

health

entertainment

Tech

style

travel

B/R

Video

Coupons

VR new

More...



© 2018 Cable News Network. Turner Broadcasting System, Inc. All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

Terms of Use | Privacy Policy | Accessibility & CC | AdChoices ▷ | About us | CNN Studio Tours |
CNN Store | Newsletters | Transcripts | License Footage | CNN Newsource

Exhibit
85

Message

| From: | Ben Smith [ben@buzzfeed.com] |
|---|---|
| Sent: | 1/10/2017 7:25:10 PM |
| To: | news@buzzfeed.com |
| CC: | Purple Team [purple@buzzfeed.com]; Headsup [headsup@buzzfeed.com] |
| Subject: | Publishing the Trump report |

As you have probably seen, this evening we published a secret dossier making explosive and unverified allegations about Donald Trump and Russia. I wanted to briefly explain to you how we made the decision to publish it.

We published the dossier, which Ken Bensinger obtained through his characteristically ferocious reporting, so that, as we wrote, "Americans can make up their own minds about allegations about the president-elect that have circulated at the highest levels of the US government."

Our presumption is to be transparent in our journalism and to share what we have with our readers. We have always erred on the side of publishing. In this case, the document was in wide circulation at the highest levels of American government and media. It seems to lie behind a set of vague allegations from the Senate Majority Leader to the director of the FBI and a report that intelligence agencies have delivered to the president and president-elect.

As we noted in our story, there is serious reason to doubt the allegations. We have been chasing specific claims in this document for weeks, and will continue to.

Publishing this document was not an easy or simple call, and people of good will may disagree with our choice. But publishing this dossier reflects how we see the job of reporters in 2017.

Ben



CONFIDENTIAL

BuzzFeed_004051

Exhibit
86

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF FLORIDA

3                    MIAMI DIVISION

4

5    _____

6    IN RE THIRD PARTY SUBPOENA TO  |   Case No.

7    FUSION GPS                     |   0 18-mc-60528-UU

8    _____|

9    ALEKSEJ GUBAREV,               |

10   XBT HOLDING S.A. and           |

11   WEBZILLA, INC.                 |   Case No.

12        Plaintiffs,               |   0 17-cv-60426-UU

13   -v-                            |

14   BUZZFEED, INC., and            |

15   BEN SMITH                      |

16        Defendants.               |

17   _____|

18

19

20

21



```
 1              MR. LEVY:  Josh Levy for the deponent.

 2              MS. CLATTENBURG:  Rachel Clattenburg for the

 3    deponent.

 4              THE VIDEOGRAPHER:  Will the court reporter

 5    please swear in the witness?

 6    Whereupon,

 7                       Peter R. Fritsch,

 8    a witness of lawful age, after being duly sworn to

 9    tell the truth, the whole truth and nothing but the

10    truth, testified as follows:

11                       EXAMINATION:

12    BY MR. FRAY-WITZER:

13       Q.   Good morning.

14       A.   Good morning.

15       Q.   I'm Evan Fray-Witzer.  I represent the

16    plaintiffs in this matter.

17              If you wouldn't mind, please, first telling

18    us your name for the record?

19       A.   Sure.  It's Peter R. Fritsch, and that's

20    F-R-I-T-S-C-H.

21       Q.   Thank you.
```



1              MR. LEVY:  At what time?

2     BY MR. FRAY-WITZER:

3          Q.   At any time.

4          A.   At any time?

5          Q.   At any time.

6          A.   Yes.

7          Q.   What conversations did Fusion have with the

8     Department of Justice concerning the pre-election

9     memos?

10         A.   We recall a meeting between Glenn Simpson

11    and Bruce Ohr, that's O-H-R, which took place at Mr.

12    Steele's request for the purpose of transmitting to

13    Mr. Ohr a copy of these pre-election memoranda.

14              That would have taken place after the

15    election.

16         Q.   On what date?

17         A.   I don't recall the specific date.  I think

18    it was late November.

19         Q.   And did Mr. Simpson provide Mr. Ohr with a

20    copy of the pre-election memo?

21         A.   Yes.  Again, at Mr. Steele's request and for



1    the purpose of reporting what Mr. Steele believed to

2    be a crime to a law enforcement official, one in

3    progress I should say.

4         Q.   You said that the provision of the

5    pre-election memos to Bruce Ohr was at Mr. Steele's

6    request.  What specifically did Mr. Steele say in

7    connection with that request?

8         A.   Could you please arrange to meet with Bruce

9    Ohr and give him a copy of the pre-election

10   memorandum.

11        Q.   Did he say anything else?

12        A.   No.  Other than -- and I don't know if this

13   was in this conversation or another -- Mr. Steele had

14   a longstanding relationship with Mr. Ohr.  Mr. Ohr, I

15   think is currently or most recently attached to

16   counter-narcotics efforts.

17             But for many years he was involved in Russia

18   matters and transnational crime.

19             So he was known to Mr. Steele.

20        Q.   I believe you testified -- and, again,

21   correct me if I'm wrong, that one of the topics of



1    with the December memo after he provided it to you?

2        A.    Again, as I think I testified or I hope I

3    testified, his goal in sending us this memorandum was

4    to supplement our understanding of the work.  But more

5    importantly to make a report or to have this

6    information shared with relevant, competent government

7    investigative authorities.

8        Q.    Did Mr. Steele ask Fusion to provide the

9    December memo to David Kramer so that he might provide

10   it to Senator McCain?

11       A.    Yes.

12       Q.    Did Mr. Steele ask Fusion to provide the

13   December memo to anyone other than David Kramer?

14       A.    Our recollection is that we may have also

15   given it to Mr. Ohr.

16       Q.    Do you know when Fusion might have given the

17   memo to Mr. Ohr?

18       A.    I don't recall that.

19       Q.    Do you know for certain whether or not

20   Fusion did or did not give the memo to Mr. Ohr?

21       A.    I'm trying to remember and I just don't



1   recall.  I believe we did.

2        Q.   Was there a meeting with Mr. Ohr subsequent

3   to the meeting that you had described earlier today?

4        A.   There may have been but we don't recall one.

5        Q.   How would Fusion have provided the memo to

6   Mr. Ohr if there was no meeting?

7        A.   I don't think we would have.

8        Q.   The meeting that you described earlier was

9   before December 13th, 2016.  Is that correct?

10       A.   That's correct.

11       Q.   And so I guess I'm confused.  If the only

12  way that you would have provided the document to Mr.

13  Ohr if you did was in a meeting and there was no

14  meeting after the first meeting, how would you have

15  provided the document to Mr. Ohr?

16       A.   I'm sorry.  I'm just -- we're not able to

17  recall a subsequent meeting.  There may have been.

18       Q.   So Fusion -- and this is fine, but Fusion

19  doesn't know one way or another whether or not there

20  was a meeting and whether or not the document was

21  provided to Mr. Ohr?



1              MR. SIEGEL:  Objection.

2              MR. LEVY:  Asked and answered, object --

3    objection.

4              THE WITNESS:  Right.

5    BY MR. FRAY-WITZER:

6       Q.   Did --

7       A.   I don't dispute that if it would have been

8    we would have done that.

9       Q.   But you don't know if you did?

10      A.   I don't recall.

11      Q.   Did Fusion provide the December memo either

12   on its own or as part of the dossier to any media

13   outlets?

14      A.   The December 13th memo?

15      Q.   Yes.

16              MR. LEVY:  Before publication of the

17   dossier?

18              MR. FRAY-WITZER:  Before January 10th, 2017.

19              THE WITNESS:  No. We don't believe so.

20   BY MR. FRAY-WITZER:

21      Q.   Did Fusion ask Mr. Kramer to provide copies



1          REPORTER'S CERTIFICATE

2          District of Columbia

3          County of Washington, to wit:

4              I, KENNETH NORRIS, a Notary Public of

5     the District of Columbia, County of Washington, do

6     hereby certify that the within named witness

7     personally appeared before me at the time and place

8     herein set out, and after having been duly sworn by

9     me, according to law, was examined.

10             I further certify that the examination

11    was recorded stenographically by me and this

12    transcript is a true record of the proceedings.

13             I further certify that I am not of

14    counsel to any of the parties, nor in any way

15    interested in the outcome of this action.

16             As witness my hand and notarial seal

17    this 30th day of August 2018.

18

19

20

21



1            CERTIFICATE OF DEPONENT

2

3            I hereby certify that I have read and

4    examined the foregoing transcript, and the same is a

5    true and accurate record of the testimony given by me.

6

7            Any additions or corrections that I feel are

8    necessary, I will attach on a separate sheet of paper

9    to the original transcript.

10

11       _____

12            Peter R. Fritsch

13

14

15

16

17

18

19

20

21



Exhibit
87

Sheppard, Mullin, Richter & Hampton LLP
379 Lytton Avenue
Palo Alto, California 94301-1479
650.815.2600 main
650.815.2601 fax
www.sheppardmullin.com

650.815.2605 direct
jchadwick@sheppardmullin.com

November 13, 2017

**VIA EMAIL AND U.S. MAIL**

Valentin Gurvits, Esq.
Boston Law Group, PC
825 Beacon Street, Suite 20
Newton Centre, MA 02459
Email: vgurvits@bostonlawgroup.com

Re:     <u>Gubarev, et al. v. Buzzfeed, Inc., et al., Case No. 0:17-cv-60426-UU</u>

Dear Val:

I am writing to follow up on my telephone message to you of November 9, 2017.  I have not heard back from you, so I am sending this letter to explain my client's position and to seek withdrawal of the subpoena issued to my client in this litigation.

I represent the Foundation for National Progress, publisher of Mother Jones.  On or about October 31, 2017, a subpoena issued on behalf of your clients was delivered to the Washington, D.C. bureau of Mother Jones.  Setting aside the issues as to the propriety of service, Mother Jones simply has no information with respect to the only potentially relevant subjects addressed by the subpoena.

We have carefully reviewed the subpoena, your clients' complaint, the docket, and other materials related to the underlying litigation.  It's apparent and, we believe, indisputable that the only potentially relevant subjects addressed by the subpoena pertain to the "December Memo," upon which your clients' claims are entirely based.  We understand that the subpoena also seeks testimony and documents with respect to the "Dossier."  However, it appears that the subpoena seeks information with respect to the "Dossier" only to the extent that it includes the "December Memo," as did the "Trump Dossier" published by Buzzfeed.  (Contrary to the representation in your subpoena, no copy of the "Dossier" was attached to the subpoena. However, we understand it to be the set of documents linked to the Buzzfeed article that is the subject of your clients' complaint, which is publicly accessible.)

Mother Jones has no information responsive to this subpoena regarding the "December Memo" or any version of the "Dossier" containing the "December Memo."  In October of 2016, Mother Jones received copies of memos prepared by a former counter-intelligence officer regarding Russian involvement in the U.S. presidential campaign.  Mother Jones did not receive or possess a copy of the "December Memo" prior to its publication by Buzzfeed.  Mother Jones did not communicate with Buzzfeed regarding the "December Memo."  Mother Jones was not even aware of the "December Memo" until after its publication by Buzzfeed. Mother Jones does not

know who provided the "December Memo" to Buzzfeed.  Mother Jones was not aware that it had been provided to Buzzfeed until after Buzzfeed published it.

These assurances should be sufficient for you to understand that Mother Jones does not have any relevant information responsive to the subpoena.  However, if necessary to resolve this matter and to cause the withdrawal of the subpoena, Mother Jones is willing to provide a declaration or affidavit confirming them.

I am hopeful that this explanation of the futility of pursuing this subpoena will be sufficient to cause you to withdraw it, as it should be.  If the subpoena is not withdrawn, Mother Jones will bring a motion to quash the subpoena.  In the circumstances of the underlying action and this subpoena, Mother Jones is protected from being compelled to testify by, at a minimum, the First Amendment and the statutory journalist's privileged provided under District of Columbia law.

As you are presumably aware, journalists are protected from being compelled to testify with respect to "(1) The source of any news or information procured by the person while employed by the news media and acting in an official news gathering capacity, whether or not the source has been promised confidentiality; or (2) Any news or information procured by the person while employed by the news media in the course of pursuing professional activities that is not itself communicated in the news media . . . ."  D.C. Code § 16-4701.  As to sources of news or information, the protection afforded by D.C. law is absolute—it cannot be overcome.  As to unpublished information generally, the privilege can be overcome only upon proof "by clear and convincing evidence that:  (1) The news or information is relevant to a significant legal issue before a judicial, legislative, administrative, or other body that has the power to issue a subpoena; (2) The news or information could not, with due diligence, be obtained by any alternative means; and (3) There is an overriding public interest in the disclosure."

The privilege provided by the First Amendment applies to both confidential information (such as the identities of sources) and non-confidential information (including unpublished information, such as notes and other materials generated in the editorial/newsgathering process, and testimony or documents sought to confirm published information).  Under the First Amendment privilege, a party seeking information from a journalist must show both (1) that the information sought goes to the heart of its claims or defenses in pending litigation, and (2) that it has exhausted all reasonable alternative sources of the information sought. *See, e.g. Tripp v. Department of Defense*, 284 F. Supp 2d 50, 54-55 (D.D.C. 2003); *In re Subpoena to Donovan Slack*, 768 F. Supp. 2d 189, 193-195 (D.D.C. 2011).

It is clear that these protections cannot be overcome in this case.  In the first place, Mother Jones has no information that is even relevant to your clients' claims in the underlying litigation, much less any information that goes to the heart of their case.  Moreover, it appears clear that your clients could not demonstrate any real need for the information even if Mother Jones had any responsive information, which it does not.  Second, based on our review of the docket, it is clear that your clients have not undertaken efforts to obtain any of the information sought by this subpoena from non-privileged sources.  Thus, they have not yet pursued alternative sources, much less exhausted them.

Under Federal Rule of Civil Procedure 45(d)(3)(A), a subpoena must and will be quashed if it "requires disclosure of privileged or other protected matter." The subpoena issued to Mother Jones seeks just such matter. In light of our explanation, continuing to pursue this subpoena cannot be justified, and we respectfully ask that it be withdrawn. If Mother Jones is forced to bring a motion to quash or to seek a protective order, it will also seek sanctions under Federal Rules of Civil Procedure 45 and 37.

Please respond as soon as possible, as any delay in responding will require Mother Jones to incur the burden and expense of moving to quash or seeking a protective order.

Sincerely,

James M. Chadwick
for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


cc:     Brady James Cobb (bcobb@cobbeddy.com)
        Evan Fray-Witzer (evan@cfwlegal.com)


SMRH:484702690.1

# Exhibit
## 88




# Did FBI get bamboozled by multiple versions of Trump dossier?

[🐦 TWEET]   [f SHARE]   [⋯ MORE]



**7/10/2018**

By John Solomon
*Opinion Contributor*

Like dandelions in an untreated lawn, the now infamous <u>Russian dossier</u> apparently multiplied in numbers — and emissaries delivering it to the FBI — the closer <u>Donald Trump</u> got to the White House.

We know from public testimony that dossier author and former British intelligence agent Christopher Steele <u>shared his findings with the FBI</u> in summer and fall 2016 before he was terminated as a confidential source for inappropriate media contacts.

And we learned that Sen. <u>John McCain</u> (R-Ariz.) provided a copy to the FBI after the November 2016 election — out of a sense of duty, his office says.

Now, memos the FBI is turning over to Congress show the bureau possessed at least three versions of the dossier and its mostly unverified allegations of collusion.

Each arrived from a different messenger: McCain, Mother Jones reporter David Corn, Fusion GPS founder (and Steele boss) Glenn Simpson.

That revelation is in an email that disgraced FBI counterintelligence agent Peter Strzok wrote to FBI executives around the time BuzzFeed <u>published a version</u> of the dossier on Jan. 10, 2017.

"Our internal system is blocking the site," Strzok wrote of the document posted on BuzzFeed. "I have the PDF via iPhone but it's 25.6MB. Comparing now. The set is only identical to what McCain had. (it has differences from what was given to us by Corn and Simpson.)"

The significance of Strzok's email is obvious to investigators who reviewed it in recent days. The FBI is supposed to be immune to manipulation by circular information flows, especially with sensitive investigations such as evaluating whether a foreign power tampered with an American election.

Yet, in this case, the generally same information kept walking through the FBI's door for months — recycled each time by a new character with ties to Hillary Clinton or hatred for Trump — until someone decided they had to act.

That someone was Strzok, whose own anti-Trump bias was laid bare by his personal text messages. He first opened a case on Russia-Trump collusion on July 31, 2016 after the first flow of information, then escalated to get a warrant targeting a former Trump adviser in October after a second flurry of allegations.

The pattern is so troubling that one investigator said this to me: "The dossier and its related dirt was on a circular flight path aboard a courier service called 'Air Clinton,' and the FBI kept signing for the packages."

Here is the evidence that supports those concerns.

Simpson and his firm were paid by Clinton's campaign to hire Steele to find dirt on Trump in Russia during the 2016 election.

Oddly — and perhaps contradicting Strzok's email — Simpson testified he was unaware of any version of the dossier being given to the FBI. "I don't know that there was a version provided to the FBI," he testified to the Senate Judiciary Committee.

In his House Intelligence Committee testimony, Simpson acknowledged he "acceded" to letting Steele talk to the FBI but insisted he himself never talked to the FBI about the dossier. "Did you meet with intelligence officials regarding the dossier?" he was asked. "No," Simpson replied. Pressed if he ever talked to the FBI, Simpson added: "I didn't approach the FBI."

In light of the new emails, investigators will want to determine if Simpson misled Congress or if Strzok misstated the source of one of the versions.

The chief courier of the Trump dirt was Steele, a former MI6 agent respected for past collaborations with the FBI on intelligence matters. But we now know he was "desperate" to defeat Trump, according to sworn testimony.

The first time Steele met the FBI on July 5, 2016, he got a lukewarm reception.

Then Australian diplomat Alexander Downer in late July recalled a May 2016 conversation he had with Trump adviser George Papadopoulos about possible Russian hacks of Clinton emails, and relayed that to U.S. authorities.

Downer — another "courier" in some investigators' minds — has his own ties to the Clintons. As Australia's foreign minister in 2006, he arranged one of the largest-ever foreign donations to the Clinton Foundation, a $25 million grant to fight AIDS.

Strzok quietly opened an investigation of possible Trump-Russia collusion on July 31, 2016, based in part on Downer's information.

A few weeks later, Clinton allies Sidney Blumenthal, who was paid for years by the Clinton Foundation, and Cody Shearer sent the government dirt on Trump that mirrored the Steele dossier, Congress has been told.

Then, in mid- to late September, the FBI re-engaged with Steele. Yet, soon after, agents were forced to part ways with Steele when they caught him having contacts with the media, a prohibition for confidential FBI sources.

In October, the FBI submitted and won a request for a Foreign Intelligence Surveillance Act warrant against Carter Page, another Trump adviser. In support of the request, it cited a Yahoo News article that, officials admit, was influenced by the Steele dossier.

Around the same time, in late October, Corn wrote an article in Mother Jones about Steele's Trump-Russia allegations.

In an email to me, Corn said he told the FBI about the dossier before writing that article. After Trump won the election, he shared a version of the document with the bureau in hopes of furthering his reporting. "I tried the FBI again after the election. On my own accord, I shared a copy of the dossier with the FBI in order to see if the bureau would authenticate the documents and now comment on them. Once again, it would not," he wrote me.

Corn dismissed any suggestion that made him an FBI source: "To characterize me as a source of the document is inaccurate. I was merely doing what a journalist does: trying to get more information on a story I was pursuing."

Corn's opposition to Trump is well documented in his articles, <u>a book he wrote</u>, and on Twitter where, this month, <u>he declared</u>: "Trump has a far greater affinity for the leader of a corrupt and repressive autocracy than he does for any leader of a liberal Western democracy. That should concern Democrats and Republicans."

In November, the world was mostly unaware the FBI was investigating the unproven Russia-Trump allegations when McCain sent the FBI a copy of the dossier. McCain had his own animus toward Trump, dating to when the future president dissed the former GOP presidential nominee's <u>record as a war hero</u>.

More important to investigators is where Team McCain got the dossier. In his congressional testimony, Simpson all but acknowledged he and Steele provided the information to McCain ally David Kramer, who provided it to the Arizona senator to forward to the FBI.

"I don't remember whether I called David or David called me, I just don't remember, but we got in touch," Simpson testified about his dossier-related contact with Kramer. Simpson's lawyer stopped him from answering more.

When asked why he'd talk to Kramer about the Trump dirt, Simpson gave an insightful answer: "We were concerned about whether the information that we provided previously had ever, you know, risen to the leadership level of the FBI."

In other words, it was a ploy using a Republican critic of Trump as the courier.

It's all the sort of recycling that, in another context, might make an environmentalist happy. But it's exactly the sort of circular intelligence-gathering and political pressure that the FBI is supposed to reject.

*John Solomon is an award-winning investigative journalist whose work over the years has exposed U.S. and FBI intelligence failures before the Sept. 11 attacks, federal scientists' misuse of foster children and veterans in drug experiments, and numerous cases of political corruption. He is The Hill's executive vice president for video.*

*The views expressed by contributors are their own and not the view of The Hill.*



THE HILL 1625 K STREET, NW SUITE 900 WASHINGTON DC 20006 | 202-628-8500 TEL | 202-628-8503 FAX
THE CONTENTS OF THIS SITE ARE ©2018 CAPITOL HILL PUBLISHING CORP., A SUBSIDIARY OF NEWS COMMUNICATIONS, INC.

Exhibit
89

 

# TRANSCRIPTS Transcript Providers

Shows By Category:

Return to Transcripts main page

## CNN NEWSROOM

**FBI Agent Who Sent Anti-Trump Texts Grilled by Lawmakers; Trump Meets with British P.M. Following NATO Summit. Aired 2:30-3p ET**

Aired July 12, 2018 - 14:30   ET

THIS IS A RUSH TRANSCRIPT. THIS COPY MAY NOT BE IN ITS FINAL FORM AND MAY BE UPDATED.

[14:30:00] PETER STRZOK, FBI AGENT: The Russians are a top-rate adversary in terms of their foreign intelligence service, in terms of how competently they are able to use their intelligence service to achieve their foreign policies and national security goals, many of which you referenced, their desire of the threat for NATO, trying to undermine the Western alliance, trying to minimize the role and influence and leadership of the United States around the world, attempting to minimize and undermine the extraordinary greatness of our democracy, to make it seem pedestrian and nothing special and on par with their kleptocracy and near dictatorship that they have to somehow make us seem less.

But as to intelligence perspective, I wouldn't presume to get into a foreign policy --

REP. STEVE COHEN, (D), TENNESSEE: They engage occasionally in assassination

STRZOK: They do.

COHEN: -- of political rivals?

STRZOK: Yes.

COHEN: And arrest of journalists for maybe talking and writing about things that the state does not believe in?

STRZOK: Yes.

COHEN: It's not America.

STRZOK: Not at all.

COHEN: Well, that's, unfortunately, what the Mueller investigation is looking into, is Russian collusion to influence our election and to influence our politics. And you have dedicated your life to working against that type of involvement and against that type of effort to subvert our Democracy and to undermine it. I thank you for that. It is astonishing to me that you would be put on trial has you have today. In these discussions in this committee meeting, somebody said, we don't want young people to look at the front pages constantly and see things about the FBI that's putting FBI and the Justice Department in question, on the front page. I would submit to this committee that the people who are putting that on the front page is this committee. And the people who won't accept what the investigator general said, that there was no bias involved in the actions of you or others that were investigating. "There was found no evidence that the conclusions by the prosecutors were affected by bias or other improper considerations, rather, they we determine they were based on the prosecutors' assessment of the facts, the law, and past department practices."

With that as a fact, there's no reason for this hearing. No reason at all. But it puts it on the front page again and again and again. And as you said earlier, the Russians are loving it because this is what they want. This is what they want. You would think it is Benghazi. It was a never-ending television show from Congress that got nowhere except tried to influence the people that watch FOX news. That's what this is about. This is really unfortunate. And as they say, you put lipstick on a pig, but this is nothing but a ruse to try to get to the Mueller investigation and make people think it's baseless, that it's biases, that it's 13 Democrats that are working on this and they are prejudiced and they're discriminatory and they're biased because they -- just as Jack Nicholson said in the movie, "A Few Good Men," you can't handle the truth. The truth is this is the most corrupt administration ever and it is going to be exposed by Robert Mueller, and thank god.

I yield back.

And I think you.

REP. TREY GOWDY, (R-SC), CHAIRMAN, HOUSE OVERSIGHT AND GOVERNMENT REFORM COMMITTEE: The gentleman from Tennessee yields back.

The gentleman from Ohio is recognized.

Mr. Jordan?

REP. JIM JORDAN, (R), OHIO: Thank you. Thank you, Chairman.

Agent Strzok, did you provide any information to reporters or journalists of media personality about anything related to Trump/Russia investigation in 2016, '17 or '18?

STRZOK: No.

JORDAN: Did the press talk to you, Agent Strzok, about this issue? Did they ever come to you?

STRZOK: The Trump/Russia collusion investigation?

(CROSSTALK)

JORDAN -- to you. I'm asking, first, did you talk to them? And did they come to you about anything related to the Trump/investigation of 2016, 2017 or 2018?

STRZOK: I received a number of calls from various members of the media, particularly when I returned from the Office of Special Counsel. In every instance --

(CROSSTALK)

JORDAN: Prior to going on the special counsel team, did you get any inquiries from the press that you took?

STRZOK: Not that I took. I referred them to the Office of Public Affairs of the FBI:

JORDAN: Have you read the dossier?

STRZOK: I have.

JORDAN: OK, and you wrote it, too, didn't you?

STRZOK: I don't know what you mean by writing about it?

JORDAN: We got an e-mail that you sent. It should be presented there or it should be in front of you there. I want you to take a look at this. This is an e-mail that you wrote to Lisa Page, Bill Priestap, Jim Baker, Jim Rybicki, and cc'd to Andrew McCabe. Subject line is "Buzzfeed is about to publish the dossier." Are you familiar with this e-mail?

STRZOK: I am.

JORDAN: All right. It says this, "Comparing now, the set is identical to what McCain had, parenthesis, it has difference from what was given to us by Corn and Simpson." Did you write all that?

STRZOK: Congressman, I -- let me answer it this way. First, if I could address the chairman over the --

(CROSSTALK)

STRZOK: -- that was authorized by the general counsel.

JORDAN: Hang on. Hang on a second. I just want my time to stop because -- are you addressing me or the chairman?

(CROSSTALK)

STRZOK: It is all going to come together in an answer.

GOWDY: Is there a question you want to direct.

STRZOK: No. It's something -- I wanted to answer your question from earlier, based on something I have been told by the FBI.

(CROSSTALK)

JORDAN: Wait, wait.

[14:35:04] GOWDY: I think I am aware of what the FBI told you, and you and I will have another chance to talk about that. But right now, the gentleman from Ohio controls the time.

JORDAN: You wrote this? That is the question. STRZOK: So, obviously, we have --

(CROSSTALK)

JORDAN: You see the "from" line?

(CROSSTALK)

JORDAN: Here's the "from" line. You see the "from" line?

STRZOK: Congressman, I do. And I understand --

JORDAN: And then it says, "Strzok." Then it says Lisa Page and a whole bunch of other key people at the FBI. So did you write it?

STRZOK: I did write this.

JORDAN: All right, let me ask a couple of questions about it. It has differences from what was given to us by Corn and Simpson." Who's Corn?

STRZOK: Sir, to answer that question -- and I would love to answer that question in every part of me. And you know why I would want to answer that question because you have this information.

JORDAN: Who sent it?

STRZOK: I have been -- sir, if I may. I cannot answer that question.

(CROSSTALK)

JORDAN: You wrote about it. It's now public.

Who's Corn and who's Simpson?

STRZOK: Based on direction of the FBI, sir, I am not able to answer questions about ongoing investigative matters.

JORDAN: I just want to figure this out. I want to figure out, Agent Strzok. You are referencing three copies of the dossier. The "Buzzfeed" copy you have, the one McCain's staff gave to you, and the one that you said you got from Corn and Simpson. The one McCain gave to you and the one "Buzzfeed" has are identical, in your words. But they have -- the Corn and Simpson one is different. How is that important?

STRZOK: Sir, here's -- it is important. And I want to answer your question. And here's the position that I am in, Congressman -

JORDAN: Let me --

(CROSSTALK)

STRZOK: May I answer your question?

UNIDENTIFIED CONGRESSWOMAN: Mr. Chair, may the witness be permitted to answer your question?

UNIDENTIFIED CONGRESSMAN: Mr. - Mr. Strzok repeatedly asked the question, doesn't let him answer it.

GOWDY: The gentleman from Ohio controls the time.

STRZOK: I have been directed that I may state that I have read the dossier. That I read the dossier as it came in, in parts and pieces.

(CROSSTALK)

JORDAN: You've already told me you read it.

STRZOK: And --

(CROSSTALK)

JORDAN: I want to know who Corn and Simpson are.

STRZOK: And, sir, what I am telling you is that I have been directed I may not state the various places where the FBI --

(CROSSTALK)

JORDAN: OK, let me ask you this.

(CROSSTALK)

JORDAN: I got that. I know what you are saying. I know what you're saying.

Did you ever communicate with David Corn?

STRZOK: No.

JORDAN: Did you ever communicate with Glenn Simpson?

STRZOK: No.

JORDAN: Did you ever communicate with Nellie Ohr?

STRZOK: No.

JORDAN: Did you ever communicate with Bruce Ohr?

STRZOK: Yes.

JORDAN: When did you communicate with Bruce Ohr?

STRZOK: My recollection is somewhere between three, possibly three, four or five times in late 2016, early 2017 time frame.

JORDAN: What did you talk about?

STRZOK: We talked about investigative matters that Mr. Ohr was involved in. JORDAN: Did you talk about the investigation we're focus on here,

Agent Strzok?

STRZOK: My direction from the FBI --

(CROSSTALK)

JORDAN: All right. All right. I got it. I got it.

STRZOK: -- may not answer that question.

JORDAN: Let's go back to the e-mail that you sent that you won't talk about. Are there three copies of the dossier as evidence by what you said in this e-mail?

STRZOK: Sir, to be clear, I want to talk about this e-mail. I want nothing more than to answer your questions --

(CROSSTALK)

JORDAN: You are not answering my questions.

Are there three copies?

STRZOK: Three copies of what?

JORDAN: The McCain copy, the "Buzzfeed" copy and the one that you got from Corn and Simpson?

STRZOK: Sir, the most I can tell you is we received a variety of copies of, and different types of --

(CROSSTALK)

JORDAN: Let me ask you one other question. Let me ask you one other question. Glenn Simpson testified in from of the Senate Judiciary Committee on August 22, 2017. He was asked, did anyone from Fusion ever communicate with the FBI? His response, no, no one from Fusion ever spoke with the FBI.

So here is what I am having trouble understanding. If Glenn Simpson says no one spoke with the FBI, how is it that you go the copy of the dossier from Simpson?

STRZOK: Sir, I can tell you I never had contact with Fusion, with Mr. Simpson, with Mr. Corn. And, again, sir --

UNIDENTIFIED CONGRESSMAN: Chairman, regular order.

REP. BOB GOODLATTE, (R-VA), CHAIRMAN, HOUSE JUDICIARY COMMITTEE: The gentleman will have a few more seconds since he was interrupted.

JORDAN: I mean, this is frustration that every single member of this committee feels, is when Agent Strzok won't -- but more importantly, the American people feel -- when Agent Strzok won't answer fundamental questions like the guy he references in an e-mail, Corn and Simpson, and won't tell me who they are, this is unbelievable. But that's where it's gotten to now and it's as frustrating as it could get, Mr. Chairman.

I yield back.

STRZOK: Mr. Chairman, may I respond?

GOODLATTE: Briefly.

STRZOK: Sir, it is as frustrating to me as it is to you. I can tell you sir, I would love --

(CROSSTALK)

JORDAN: You know what, Agent Strzok --

(CROSSTALK)

UNIDENTIFIED CONGRESSWOMAN: Mr. Chairman, may the witness be permitted to answer?

(CROSSTALK)

STRZOK: If it's so -

GOODLATTE: The gentleman will suspend.

JORDAN: If it is so frustrating, answer the question.

UNIDENTIFIED CONGRESSMAN: If you allow him to, I'm sure he will.

JORDAN: He has never answered the question who --

UNIDENTIFIED CONGRESSMAN: Stop interrupting him.

(CROSSTALK)

UNIDENTIFIED CONGRESSMAN: The gentleman -- will you instruct the gentleman from Ohio to stop badgering.

[14:39:59] GOODLATTE: We are about -- we are about to move on. The gentleman from Ohio's time is expired.

We're about to move on, where Mr. Strzok can answer a question that he refused to answer earlier on advice of counsel.

And I'm going to yield to Mr. Gowdy --

(CROSSTALK)

GOODLATTE: -- for the purpose of doing that right now.

STRZOK: Mr. Chairman, before Mr. Gowdy starts, may I respond to Mr. Jordan?

GOODLATTE: Very briefly. STRZOK: Very briefly, sir, I would love to do that. There's an appropriate time for oversight and, as you well know, it is at the end of an investigation, once it is concluded. I am certain Congress will absolutely have the opportunity to look at any investigation once it is closed and ask all these questions. And

would love to answer each and every one of your questions once the FBI --

(CROSSTALK)

GOODLATTE: Mr. Strzok, we already know that answer from you, and you have already been advised that you can't answer the questions here because, guess what, this is the United States Congress where you're testifying, not under the jurisdiction of the Federal Bureau of Investigation.

UNIDENTIFIED CONGRESSMAN: Mr. Chairman, we should not we cannot be asking about an ongoing investigation. That is sabotaging an ongoing investigation by this committee. And that's what he's not cooperating with and we should not do it.

(CROSSTALK)

UNIDENTIFIED CONGRESSMAN: -- he cannot cooperate with that.

GOODLATTE: These questions are table-setting questions regarding the formation of this, and he can answer those questions. But --

UNIDENTIFIED CONGRESSMAN: He cannot answer questions about an ongoing investigation.

GOODLATTE: Well, I've been advised that he can. And so Mr. Gowdy --

UNIDENTIFIED CONGRESSMAN: He's been advised by the FBI that he cannot.

GOODLATTE: No. He's been advised that he can. And Mr. Gowdy is going to, again, ask his question.

GOWDY: The gentleman from Ohio has asked for 15 seconds.

JORDAN: So, Agent Strzok, who's being square here? Glenn Simpson says no one from Fusion spoke with the FBI. You say in your e-mail, we got a copy of the dossier from Simpson.

(CROSSTALK)

UNIDENTIFIED CONGRESSMAN: Mr. Chairman, regular order.

GOODLATTE: We will have regular order. And we'll revisit that question.

Now, the chair recognizes the gentleman from South Carolina.

GOWDY: Agent Strzok, between July 31st, 2016 and August -

(CROSSTALK) UNIDENTIFIED CONGRESSMAN: Mr. Chairman, regular order.

GOODLATTE: This is regular order. The gentleman refused to answer the question earlier. He has been advised, and I have been advised by the FBI that he may answer the question that was in order earlier, and he's now going to answer the question.

UNIDENTIFIED CONGRESSMAN: But Mr. Chairman, Republicans have control of the time, and now the time goes to the Democrats.

GOODLATTE: The gentleman will be recognized shortly.

GOWDY: Agent Strzok, between July 31, 2016 and August 6, 2016, how many witness interviews did you conduct as part of the Russia/Trump campaign alleged collusion investigation?

STRZOK: I don't recall. I have to check the case file.

GOWDY: We waited all that time for that answer?

STRZOK: Yes, sir.

GOWDY: That's eerily similar to what you said a couple of hours ago.

STRZOK: Sir, I am telling you and I would reject the characterization that I refuse to answer anything. I want to answer these questions.

(CROSSTALK)

GOWDY: I just asked you one. I just asked you one. And I am looking for a number.

STRZOK: Sir, my answer is --

(CROSSTALK)

GOWDY: I'm looking for a number.

STRZOK: I do not know without the opportunity to check the case file.

GOWDY: You don't recall in the first week of an investigation that you originated, approved, were the contact person on, you don't recall how many witness interviews you did in the first week?

STRZOK: Sir, I remember that there were interviews conducted. I do not know when they fell on a calendar to be able to tell you whether they were --

(CROSSTALK)

GOWDY: When was the last time?

STRZOK: -- or the other on something that was occurring in the context of a myriad of other responsibilities.

GOWDY: When was the last time you looked at the file, Agent Strzok? STRZOK: Probably going on a year.

GOWDY: For those of us looking at it yesterday, would you disagree that the first interview took place on August 11th.

STRZOK: I don't know. I cannot answer that.

GOWDY: Well, prior to July 31, 2016, how many witness interviews did you conduct as part of the Russia/Trump campaign alleged collusion investigation?

STRZOK: None. None before July 31st, which would be none at the time you said what you said in that text on July 31st.

STRZOK: I don't understand the text you're referring to.

UNIDENTIFIED CONGRESSMAN: Point of order, Mr. Chairman. This is our time.

GOWDY: No. There are two more questions he would not answer.

GOODLATTE: The gentleman will continue.

GOWDY: Between May --

(CROSSTALK)

UNIDENTIFIED CONGRESSMAN: Can you explain why he's on our time?

GOODLATTE: He can -- he's not on your time.

UNIDENTIFIED CONGRESSMAN: Not mine personally. Democratic time.

GOODLATTE: It is on our time because he was advised earlier by the FBI that he could not answer the question and now he's advised that he can. The questions will be asked and answered.

GOWDY: Between May --

UNIDENTIFIED CONGRESSMAN: Parliamentary inquiry, what rules are we following that would dictate such an answer by you, Mr. Chairman?

GOODLATTE: We are following the rules of the committee.

UNIDENTIFIED CONGRESSMAN: Could you cite the rule?

GOODLATTE: No.

UNIDENTIFIED CONGRESSMAN: No?

(CROSSTALK)

UNIDENTIFIED CONGRESSMAN: Mr. Chairman, point --

(CROSSTALK)

UNIDENTIFIED CONGRESSWOMAN: Mr. Chairman, point of parliamentary inquiry.

(CROSSTALK)

GOODLATTE: -- can continue. But when you do, and the FBI tells him he can't answer questions and then they change their mind and says he can, we're going to take the time out to do that and then we're going to continue.

[14:45:08] UNIDENTIFIED CONGRESSWOMAN: Mr. Chairman, point of parliament inquiry.

(CROSSTALK)

UNIDENTIFIED CONGRESSWOMAN: Democratic members have the right --

GOODLATTE: The gentleman from South Carolina is recognized.

UNIDENTIFIED CONGRESSWOMAN: -- to know what the rules are in governing this hearing --

(CROSSTALK)

GOODLATTE: The gentleman --

(CROSSTALK)

GOODLATTE: The gentleman is not --

UNIDENTIFIED CONGRESSWOMAN: Are you making it up as you go along?

GOWDY: Agent Strzok, between May 17, 2017 and May 18, 2018, how many interviews did you conduct as part of the special counsel team?

STRZOK: I don't believe I conducted any.

GOWDY: Between May 17, 2017 and May 22, 2017, how many witness interviews did you conduct in that five-days period?

STRZOK: Sir, you just went back a year, from 2018 to 2017, and I don't know.

GOWDY: And 2017, May 17, 2017 --

STRZOK: OK.

GOWDY: -- to May 22, 2017.

STRZOK: Yes, I believe you said May '18. But '17, I don't know. And --

GOWDY: Whether I did or not, it is the '17, 2017.

STRZOK: Fair enough. And I don't recall.

GOWDY: Well, Chairman, I appreciate you letting me make it clear. And, again, the context, when you would not answer it, was you used the word "impeachment" on May 18, 2017. And you used the word "impeachment" on May 22, 2017. And your testimony is you can't recall a single interview you would have done as part of the investigation that was supposed to lead to impeachment. I think that line -- of course, I'm glad the FBI finally realized it, albeit, a couple of hours too late. When you are prejudging not just a result but a punishment, which is what impeachment is, when you are prejudging the conviction and the sentencing, when you have not conducted a single solitary interview, I am sorry, Agent Strzok, that's letting your bias impact your professional judgment.

STRZOK: Mr. Chairman, may I respond?

GOODLATTE: Briefly.

STRZOK: Sir, so, look, I never prejudged anything. Not in this case and not in any other. And second --

(CROSSTALK)

GOWDY: Impeachment for what, Agent Strzok? Impeachment for what -

(CROSSTALK)

UNIDENTIFIED CONGRESSMAN: Point of order, Mr. Chairman. What are the rules here?

(CROSSTALK)

UNIDENTIFIED CONGRESSMAN: Mr. Chairman, what are the rules?

GOODLATTE: The gentleman -- the gentleman will allow the witness --

(CROSSTALK)

GOODLATTE: -- to answer the question and then we'll move on.

STRZOK: Second --

UNIDENTIFIED CONGRESSMAN: He was given time to respond.

(CROSSTALK)

STRZOK: At the time, I was a deputy assistant director. I have section chiefs, unit chiefs in the field, supervisors, agents, people who typically do interviews, not me. If something is notable or high level, I may be involved, but it would be rare, if never, that I would get out there and conduct interviews, first of all. Second, you mentioned the use of the word "impeachment." That was used in the context of my not knowing what this would lead to. I was not prejudging impeachment. When I used that term --

(CROSSTALK)

GOWDY: Oh, Agent Strzok, please.

STRZOK: It might lead all the way to something -- (CROSSTALK)

GOODLATTE: Thank -- thank you, Agent Strzok.

GOWDY: Are you kidding me?

GOODLATTE: The chair now recognizes the gentleman from Missouri, Mr. Clay.

REP. LACY CLAY, (D), MISSOURI: Thank you, Mr. Chairman,

And Special Agent Strzok, I just continue to be amazed that my colleagues in the majority are more interested in your text messages than they are about the leader of the free world doing everything possible to undermine the Western alliance. It just amazes me, Special Agent Strzok, as a counterintelligent specialist, you know all too well the pervasive, constant and growing danger that the Russian Federation poses to this country, our allies and to democracy in general It is appalling that my colleagues in the majority continue to relitigate the 2016 election while the president does more damage in the Western -- to the Western alliance than the sum total of all previous Russian and Soviet leaders could have dreamed of. And it is remarkable that Mr. Trump accused our trusted ally Germany of being, and I quote, "totally under the control of Russia." I would say that the president is half right. Someone is totally under control of Russia, but it is not Germany. You know the president should look into the mirror and explain why virtually every decision he makes and every word --

JOHN BERMAN, CNN ANCHOR: You have been watching the House here with Peter Strzok, the FBI agent who sent the anti-Trump texts. This has been a very contentious hearing.

But let's go from pyrotechnics to pageantry for a moment.

[14:50:01] John Berman, here in London. About 65 miles northwest of where I am is Blenheim Palace. This was the birthplace of Sir Winston Churchill. You can see President Trump arrive there for a black-tie dinner hosted by British Prime Minister Theresa May. The president is pulling up right now in this motorcade and he'll be greeted by the prime minister, who, incidentally, has been standing outside for some time waiting for the president to arrive. In some ways, this is the most pomp and circumstance that we'll see during the president's stay in the United Kingdom, this black-tie dinner. Tomorrow he will have tea with the queen. But tonight, it's the dinner with the full rollout. The band is there and music will be playing with some special tunes composed just for this occasion.

Again, we are waiting to see the president walk out the car and arrive. There he is, Donald Trump, the president of the United States, arriving at the palace. And that's British Prime Minister Theresa May along with her husband, Philip May. The first lady, Melania Trump.

The president has been with Theresa May for the last two days in Brussels as part of the NATO meetings, and we know how they went. There was a lot of controversy there. The president leaning on the NATO allies to spend more in their own defense. British, for what it's worth, actually does spend more than the 2 percent the president is calling on all the NATO allies to spend.

We can't hear too much. I wanted to listen in to hear if we could pick up of anything of this moment.

Again, this is a black-tie dinner. It is not a state dinner, per se. And Blenheim Palace is not a royal palace. It is the one palace in Britain not owned by the monarchy or the church. It does have great significance as the birthplace of Winston Churchill. It's the ancestral home of the Spencer-Churchills, gifted to the family of the Duke of Marlboro the first Duke of Marlboro way back in the 1700s to honor the Battle of Blenheim over the French and the Bavarians. It was selected for this meal because the Brits know that President Trump is quite fond of Winston Churchill.

(MUSIC)

BERMAN: A lot has been made of the music that we are hearing right now, an especially composed fanfare by the state trumpeters of the Household Cavalry Band. We'll hear music from the bands of Scots and Irish and Welch guards.

Look, leaders around the world know that President Trump likes it when they roll out the red carpet for him. This was the event to prove that to the president. Again, carefully chosen specifically with that kind of protocol in mind

(MUSIC)

BERMAN: As we are watching this, I want to bring in Jim Acosta right now who's here from London not far from Winfield House where the president has been staying or will be staying here in London, about 65 miles from where he's standing right now.

Jim, explain to me where we are on this European journey for the president and what this part means?

JIM ACOSTA, CNN SENIOR WHITE HOUSE CORRESPONDENT: Well, this is a big part of the trip, John. Obviously, they're rolling out the red carpet here in England. But at the same time, I am not sure that carpet is any more red than the faces of European leaders across this continent. They are furious with this president after what happened over in NATO in Brussels, these tense conversations that went on behind closed doors. We'll see in the

next day or so as the president meets with British Prime Minister Theresa May and Queen Elizabeth is maybe a little bit of fence mending. We heard from our sources from behind the scenes that the president's conversation with European leaders were tough on both sides. They were giving and taking over this issue of burden sharing and defense spending. But what we were hearing repeatedly from the British side is that the British, as you said, John, are meeting their commitment of hitting 2 percent of GDP on defense spending. And they're trying almost to bend over backward that they are with the president on a lot of these issues. I think that hides and disguises some of the tense feelings that are prevalent behind the scene.

John, they are very worried about what the president is going to do when he meets with Russian President Vladimir Putin in Helsinki, Finland, on Monday. We heard that from a number of diplomatic sources. They're worried that the president is going to give away the store, that he's not going to be tough on Ukraine and on election meddling. And you heard the president addressed some of those concerns at that news conference that was announced suddenly to the press with about 15 minutes notice earlier this morning in Brussels. The president said, well, I am going to bring up election meddling with Vladimir Putin, but I think I know the answer that I am going to get from Vladimir Putin. That, obviously, that kind of talk does not sit well with the Europeans, especially when he was asked about the annexation of Crimea from Ukraine. And the president seems to blame Barack Obama for that, even though it was Putin that ordered the seizing of Crimea. It took days and weeks and months for the Russians to acknowledge that. Just all of those reasons, there's a lot of concerns and a lot of worries on this side of the Atlantic about this president.

And what happened at NATO, John, did not really dispel any of those concerns. Those concerns are prevalent. And I think it's being covered over to some extent with all this pomp and circumstance. You are not seeing the protests in London or the Trump baby balloon that's flying over London and so on. Because the British wanted to keep it away from camera as much as possible during this visit.

[14:56:03] BERMAN: Oh, I don't think there's any question that the itinerary of this trip was designed specifically to avoid as much controversy as humanly possible.

Jim Acosta, thanks so much.

Joining me in London as we're watching this, Matthew Doyle, a former advisor to Prime Minister Tony Blair. Kate Bennett is here with me as well.

Again, we are looking at Blenheim Palace right now. The president of the United States, Donald Trump, along with Melania Trump and the British Prime Minister Theresa May, and Philip May, Theresa May's husband. This is

the pageantry.

Matthew, it is interesting, Jim Acosta is talking about all the drama in Brussels. There's really two dramas playing out before our eyes, the drama that President Trump brings with him wherever he goes and, right now, that is the drama of America's place in the world, America's role in Europe, and its continued commitment to NATO. And there's the drama surrounding British Prime Minister Theresa May. I just don't think there's any question that this i really the most difficult week she has seen in that role. This is a very crucial day and a crucial two days for her. There's an intersection between these two dramas, isn't there?

MATTHEW DOYLE, FORMER SPOKESMAN & ADVISOR TO FORMER BRITISH PRIME MINISTER TONY BLAIR: For sure. I think what you are seeing is building on what's happening on the NATO summit for two days, the combination of issues that are on the plate for these two leaders to talk about. Look, there's a strategic opportunity for Britain here, and one that Theresa May will take advantage of, and that is, other than his caddy in Scotland, she will be the last person speaking to President Trump before he goes to see Vladimir Putin fo the summit in Helsinki. So Britain will be hoping it can be a part of sending a clear message for what he needs to do and say with the President Trump relationship. And no question that the NATO summit this week and his rhetoric in the past about bringing Russia back into the G-7, G-8 family will have concerned people.

But on the domestic front, these relationships between Britain and America are always difficult for prime minister and presidents, particularly when you have that difference of ideology. And yet, most people, if you look at the polling, do take a programmatic view that they understand the need for Britain and America to have that strong relationship, even if it is purely reasons of trades and business and so on. But, ultimately, this is an alliance of people and values rather than a political agreement necessarily between the two leaders.

BERMAN: It is an important point here for people to understand is that the special relationship, particularly from the views here in the United Kingdom, is real and is important. Yes, President Trump is a hugely controversial figure here, and there will be protests here. But by and large, Brits want to see this meeting and want to have it successful and they appreciate this moment to a point, but there are limits. Explain that.

BENNETT: Yes. The limits are that I think people recognize that relationship. And the polling shows 50 to 39 in the latest poll that people want the trip to go ahead. But equally, those numbers show the public are not in favor of him meeting with the queen. That makes that distinction between recognizing what may, in diplomatic language, sounds like a semantic distinction, but actually to the British public, this is an important distinction between a working visit, which is about the relationship between the two countries centering around common values, trade and people that's gone back to generations, verses feeling like we are rolling out the red carpet and honoring a guy

who frankly has views that the vast majority of the British public disagree with.

BERMAN: Yes.

DOYLE: What we are seeing at this event in Blenheim, however, is treading that line as far as you can. This is as close as a royal state visit as you can get without technically being one.

BERMAN: It is threading the needle. There's a lot of pomp and circumstance, a lot of pageantry here. But it's not a royal visit.

But, Kate Bennett, you've seen a bunch of these now. You know how much the president like this kind of things. And you would not think this is enough to satisfy him.

KATE BENNETT, CNN WHITE HOUSE REPORTER: No.

BERMAN: You don't think it is enough? BENNETT: No. I mean, it is the perfect amount. I have never seen

guests in black tie line up like that in front of the palace and watch as well. I mean, it just seems like -- as you said foreign leaders have learned, this is what Donald Trump likes.

BERMAN: Right.

BENNETT: This is what he prefers. They're going to go and see the queen tomorrow and --

U.S.

World

politics

Business

Opinion

health

entertainment

Tech

style

travel

B·R

Video

## Coupons



## More...

 U.S. Edition +

© 2018 Cable News Network. Turner Broadcasting System, Inc. All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

Terms of Use | Privacy Policy | Accessibility & CC | AdChoices ▶ | About us | CNN Studio Tours |
CNN Store | Newsletters | Transcripts | License Footage | CNN Newsource

Exhibit
90

In the Matter Of:

IN RE: GUBAREV vs BUZZFEED

**TRANSCRIPT OF VIDEO LINK**

*October 05, 2018*



800.211.DEPO (3376)
*EsquireSolutions.com*

1

2

3

4

5

6

7

8                    TRANSCRIPT OF VIDEO LINK
       Http://www.msnbc.com/mtp-daily/watch/chuck-todd-goes-
9      one-on-one-with-buzzfeed-editor-852858947658?v=raila&

10
     IN RE:  GUBAREV v. BUZZFEED, INC.
11

12

13

14

15

16

17

18

19

20

21

22   Transcribed by:
     Christine Aiello
23
     Job No. J2910305
24

25



1               V I D E O   L I N K

2

3          CHUCK TODD:  Ben Smith joins me now.

4          Ben, welcome, sir.

5          BEN SMITH:  Thanks for having me on, Chuck.

6          CHUCK TODD:  Okay.  I want you to explain this

7   sentence, publishing this dossier reflects how we see,

8   referring to yourself, the job of reporters in 2017.

9   That makes the -- makes me think this is a decision you

10  would have -- you would not have made the same decision

11  in the pre-Trump era.

12         BEN SMITH:  Oh, no, I don't -- I'm not really

13  referring to the pre-Trump era, I think more the

14  pre-Internet era.  I mean, I think there was an era,

15  and I think there are reasons for us to be nostalgic

16  for it, reasons for us to have issues with it, where we

17  could act as gatekeepers, where we could say, you know

18  what, crazy people are claiming that Barrack Obama's

19  birth certificate is forged, but we're not going to --

20  we're not going to write about that.  That's crazy.

21         CHUCK TODD:  Uh-huh.

22         BEN SMITH:  And -- and remember, during -- if

23  you remember, we were both there, during Obama's first

24  campaign, that was at first the approach; and then you

25  see these things spread, and you have to engage them.



1    And I think -- I think there -- there was an era when

2    you -- you would -- when you would be the gatekeeper

3    for -- - for information, and you would say to --

4    and -- and you would say to your audience, trust us --

5              CHUCK TODD:  Uh-huh.

6              BEN SMITH:  -- we're keeping things from you,

7    we have lots of secrets we're not telling you, but you

8    should trust us.  I think you could say that was a good

9    era or you could say that was a bad era.  That is not

10   the present day.

11             CHUCK TODD:  What --

12             BEN SMITH:  And so I guess I would -- I mean,

13   I think that -- so there were --

14             CHUCK TODD:  Yeah.

15             BEN SMITH:  And in that context, I'd say there

16   were --

17             CHUCK TODD:  Uh-huh.

18             BEN SMITH:  -- really two reasons that we --

19   that we did decide to publish this.  And we, like --

20   like many other organizations, had had it for weeks,

21   had reporters --

22             CHUCK TODD:  Uh-huh.

23             BEN SMITH:  -- in Europe and the United

24   States --

25             CHUCK TODD:  Right.



1      BEN SMITH:  -- trying to stand up or knock
2  down specific details.  They're -- and but this -- this
3  was a document that was not just circulating at the
4  highest levels of the intelligence community, the most
5  powerful intelligence officials in the country
6  referring to it in briefings to the President of the
7  United States, the President Elect,
8  reportedly disputedly --
9      CHUCK TODD:  Uh-huh.
10      BEN SMITH:  -- the political elite, you know,
11  top elected officials, the Gang of Eight, John --
12      CHUCK TODD:  Right.
13      BEN SMITH:  -- McCain, Susaad (phonetic),
14  certainly the media elite had it.
15      CHUCK TODD:  Right.
16      BEN SMITH:  And I think -- and we're not --
17  and not -- didn't just have it, we're starting to act
18  on it.  Harry Reid had written the letter referring to
19  it.  And I think when you have an object that is in
20  play that is --
21      CHUCK TODD:  Uh-huh.
22      BEN SMITH:  -- having consequences for the
23  way our elected leaders are acting, the question -- you
24  do have to ask the question of why should I suppress
25  them.  There are then good reasons, right?



1          CHUCK TODD:  Right.

2          BEN SMITH:  Once though it emerges, as it did

3   last night, the -- in the public conversation that

4   there is this secret document floating around full of

5   dark allegations --

6          CHUCK TODD:  Right.

7          BEN SMITH:  -- that we will not repeat to

8   you, that I feel like in this era you really have to

9   show your readers what that is in an appropriate

10  context.

11         CHUCK TODD:  Right.

12         BEN SMITH:  In our original report, I mean,

13  if you read what we wrote --

14         CHUCK TODD:  Yeah.

15         BEN SMITH:  -- it stressed that there were --

16  that -- that there were real solid reasons to --

17         CHUCK TODD:  Right.

18         BEN SMITH:  -- distrust this that noted to

19  specific eras.

20         CHUCK TODD:  All right.  But -- but you -- you

21  talk about context and you talk about putting the

22  responsibility on the readers, but at the -- at the

23  same time, don't you have a responsibility of not

24  spreading false information?  You are -- you -- you --

25  did you -- do you -- are you knowingly spreading false



1  information?

2          BEN SMITH:  I mean, I think as with the Obama

3  birth certificate thing during the Obama campaign, this

4  is an incredibly difficult balance that everybody in

5  our business navigates every day.

6          CHUCK TODD:  But you're not publishing a --

7          BEN SMITH:  There are false claims.

8          CHUCK TODD:  You're not publishing -- you --

9          BEN SMITH:  You are quoting people saying --

10         CHUCK TODD:  I understand, but did you --

11         BEN SMITH:  You're quoting people, whether

12  it --

13         CHUCK TODD:  -- publish a false birth

14  certificate?

15         BEN SMITH:  You -- well, you -- we certainly

16  quoted the President of the Elect of the United States

17  making false claims about it.  And years ago we debated

18  rather we should quote regular citizens in Iowa saying,

19  I -- you know, I don't believe his birth certificate.

20  And I remember us thinking at first, we probably

21  shouldn't, that we shouldn't pass that on; and then

22  saying --

23         CHUCK TODD:  Uh-huh.

24         BEN SMITH:  -- you know what, this has become

25  a force that is impacting conversation.  The



1  information environment, fake news, are now these --
2  they are factors in the conversation --
3          CHUCK TODD:  But haven't you just --
4          BEN SMITH:  -- they are things that we all --
5          CHUCK TODD:  -- participated in --
6          BEN SMITH:  -- navigate.
7          CHUCK TODD:  I mean, it -- look, the fake news
8  thing has turned into this -- you know, that it's the
9  worst phrase.
10          BEN SMITH:  I think different kinds of
11  information -- I think --
12          CHUCK TODD:  But didn't you just -- did --
13  did -- do you -- and -- and now I'm sure -- I know this
14  was not your intent, I've known you a long time, but
15  you just published fake news.
16          BEN SMITH:  We just published the dossier.
17  No, I think that's a really -- I think --
18          CHUCK TODD:  Why is that not a --
19          BEN SMITH:  -- people are throwing --
20          CHUCK TODD:  -- fair -- why is that an unfair
21  description?
22          BEN SMITH:  I think people love to throw the
23  term fake news around --
24          CHUCK TODD:  Trust me --
25          BEN SMITH:  -- to -- to --



1          CHUCK TODD:  -- I'm aware.

2          BEN SMITH:  -- to diminish anything they don't

3   like.

4          CHUCK TODD:  Of course.

5          BEN SMITH:  But I think this was a real story

6   about a real document that was really being passed

7   around between the very top officials of this country.

8   And then the question you say is, okay, it's okay for

9   you to, Chuck Todd to see this document --

10          CHUCK TODD:  Uh-huh.

11          BEN SMITH:  -- it's okay for me to see it,

12   okay for John McCain, okay for the CIA.  What's --

13          CHUCK TODD:  Uh-huh.

14          BEN SMITH:  Why is it not okay for your

15   audience?  Or why is it -- like, which of your audience

16   members are you comfortable showing it to.  And I think

17   when people are, as Harry Reid did, top officials are

18   making, not just --

19          CHUCK TODD:  Uh-huh.

20          BEN SMITH:  -- seeing it making decisions

21   based on it; it is appropriate --

22          CHUCK TODD:  But --

23          BEN SMITH:  -- to tell your audience and to

24   respect the fact that they can say --

25          CHUCK TODD:  All right.



1          BEN SMITH:  -- this looks like nonsense.

2          CHUCK TODD:  All right.  It seems to me

3    there -- there -- it's almost as if you're saying,

4    there was -- there was only two choices you had here,

5    not publish or publish.  There is a gray area.  I

6    understand this idea in this day and age that -- that

7    there are many readers that feel as if proof, show me

8    that you have the goods.  There is such thing as

9    redactions, and you could have redacted.

10          BEN SMITH:  There are --

11          CHUCK TODD:  You could have --

12          BEN SMITH:  There are --

13          CHUCK TODD:  -- said, here it is, and --

14          BEN SMITH:  I would say there are --

15          CHUCK TODD:  -- you know what --

16          BEN SMITH:  -- redactions in there.

17          CHUCK TODD:  -- and -- you didn't do many.

18   You did --

19          BEN SMITH:  That's correct.

20          CHUCK TODD:  -- very, very few, and in some

21   cases not enough, as far as even I -- I believe one

22   of -- one of the people that contributed to it.  So

23   it -- why not do that?  Why not go that middle ground?

24   I understand --

25          BEN SMITH:  I think --



1          CHUCK TODD:  -- you're making a case here.

2    Hey --

3          BEN SMITH:  I would say that --

4          CHUCK TODD:  -- all these leaders have this,

5    we know this is available.  CNN made the decision to

6    say -- to do what you just do, which said, hey, this is

7    out there, we know that this report exists, it's a

8    dossier, it's unverified information, stop.

9          BEN SMITH:  I think that there is obviously a

10   spectrum and a lot of decisions, and I think reasonable

11   people can really disagree about where you do that.

12         CHUCK TODD:  Uh-huh.

13         BEN SMITH:  To me, to say, as some of -- as

14   some organizations did, there is a secret document,

15   here is our summary of it, we are going to protect your

16   eyes from it --

17         CHUCK TODD:  Uh-huh.

18         BEN SMITH:  -- is an untenable -- is -- is --

19   is very difficult to explain or maintain because --

20   because you're -- so you're allowed to take false

21   claims and summarize them, but not show -- I mean, I

22   guess our impulse and I think the -- is -- is to show

23   the audience the underlying document and let them make

24   their own decisions and -- and -- and respect them

25   to -- to -- to doubt -- to be able to doubt --



1          CHUCK TODD:  But --

2          BEN SMITH:  -- this.

3          CHUCK TODD:  But at one point -- I understand

4    this, and that's all in transparency, but transparency

5    can turn into a crutch to turn into laziness.  I mean,

6    the job of the reporters is we're doing -- we're doing

7    our best to find truth, okay?  At the end of the day,

8    it's the best truth we can have.  And -- and --

9          BEN SMITH:  If we had --

10         CHUCK TODD:  And you are -- you are --

11         BEN SMITH:  If we had a -- if we had an

12   unlimited amount --

13         CHUCK TODD:  You made a knowingly decision --

14   you made a knowing decision to put out an untruth --

15         BEN SMITH:  If -- if we had --

16         CHUCK TODD:  -- or at least something --

17         BEN SMITH:  If we had --

18         CHUCK TODD:  -- you hadn't proven true yet.

19         BEN SMITH:  -- if we had -- if -- if we had

20   gotten that dossier, if -- if there had not been

21   public -- if there had not been a public conversation

22   about secret documents that no one was allowed to

23   see --

24         CHUCK TODD:  Uh-huh.

25         BEN SMITH:  -- we -- we -- we would have



1  continued, as I think we did, and our other competitors

2  did in Prague and other places to try to report this

3  out.  I mean, I would agree with you.  When you get a

4  tip, when you get an anonymous document --

5           CHUCK TODD:  Uh-huh.

6           BEN SMITH:  -- you know, as we do every day

7  at Buzzfeed news, is we -- when we -- you know,

8  recently --

9           CHUCK TODD:  But why aren't you?  Look,

10 take -- like go down that logical road.  You're

11 getting -- there's a lot of unsubstantiated sources on

12 there.  Why aren't you reporting all of your

13 unsubstantiated sources?  Why in this --

14          BEN SMITH:  I think --

15          CHUCK TODD:  -- particular case --

16          BEN SMITH:  I think if it was reported that

17 the President of the United States was being briefed

18 on -- on a salacious personal report about me or

19 about -- or some --

20          CHUCK TODD:  Uh-huh.

21          BEN SMITH:  -- other piece of gossip, we

22 would -- I think we would feel compelled to -- to --

23          CHUCK TODD:  By the way --

24          BEN SMITH:  -- print that document.

25          CHUCK TODD:  -- it's -- it's not confirmed



1  that he was definitely briefed on this document.

2          BEN SMITH:  I know, I saw your report on that.

3          CHUCK TODD:  Okay.  We have not --

4          BEN SMITH:  It had --

5          CHUCK TODD:  -- done that.

6          BEN SMITH:  -- been reported.  It was reported

7  last night.  I realize that that was done --

8          CHUCK TODD:  Did you guys make an effort to

9  confirm whether or not he actually was briefed on this,

10  and would that have made a decision -- difference in

11  your decision?

12          BEN SMITH:  We -- we did a lot of -- we did a

13  lot of reporting about the extent to which this was --

14  this was widely distributed at the highest levels.  I

15  do think there was also a big -- a report last night

16  that was part of that, we did not have all of that

17  ourselves.

18          CHUCK TODD:  Do you believe it's never -- let

19  me -- let me quote Margaret Sullivan, she just states

20  this flatly, it's never been acceptable to publish

21  rumor and innuendo, period.

22          BEN SMITH:  I think --

23          CHUCK TODD:  Do you agree with her?

24          BEN SMITH:  I think that we are now in a media

25  environment where you have to engage in false



```
 1  statements.
 2            CHUCK TODD:  In rumor and innuendo?
 3            BEN SMITH:  I mean, I guess I -- I -- I
 4  think -- I think it's an environment where you have
 5  to -- you -- you no longer have the luxury, where
 6  the -- and where the legacy media, which has at times
 7  turned away from saying, wow, there is all of this
 8  crazy stuff on the Internet, we're not going to touch
 9  it, we're going to stay out of it --
10            CHUCK TODD:  Uh-huh.
11            BEN SMITH:  -- we're going -- just going to
12  kind of let it spread; and I think that this is a place
13  where sunlight is a disinfectant, where it's important
14  to show your audience --
15            CHUCK TODD:  Well --
16            BEN SMITH:  -- what you have.
17            CHUCK TODD:  It -- there was a line.  When
18  does the line become yelling fire in a theater?
19            BEN SMITH:  I think that you're absolutely
20  right that there is -- that -- that -- that you can --
21  reasonable people can disagree.  I mean, I'm not sure
22  that you would say that the effect of publishing --
23  that the effect of publishing this has made people
24  think it's more credible, by the way.  Do you
25  believe -- do you think that?
```



1          CHUCK TODD:  No.  But do you believe that you

2     have helped the credibility of the media with the

3     public or hurt the credibility of journalism with the

4     public?

5          BEN SMITH:  I think in the long term we all

6     have to reckon with the reality that we've got to

7     engage information that is out there, true and false;

8     do our best to verify it; and be as transparent as we

9     can with our readers about what we know, what we don't

10    know, what we doubt.  It's an incredibly uncomfortable

11    thing, I think, for everybody.  I -- I realize lots

12    of --

13          CHUCK TODD:  Are you still comfortable --

14          BEN SMITH:  -- editors --

15          CHUCK TODD:  -- with this decision, or are

16    you --

17          BEN SMITH:  Oh, absolutely.  I think this was

18    exactly -- absolutely the right thing to do.

19          CHUCK TODD:  All right.  Ben Smith.  We could

20    go on and on, but my producer is yelling at me because

21    the clock keeps ticking.  Anyway, I appreciate you

22    coming in.

23          BEN SMITH:  Thanks for having me on --

24          CHUCK TODD:  Not --

25          BEN SMITH:  -- Chuck.



1          CHUCK TODD:  Not easy debating these things,

2     and yet I love having these media debates.  They are

3     exciting in newsrooms.  Anyway, Ben Smith, thank you.

4     We'll be right back.

5                         - - -

6          (Whereupon, the video link was concluded)

7                         - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1   STATE OF WASHINGTON)
                         ) SS:
 2   COUNTY OF WHATCOM  )

 3

 4

 5              I, CHRISTINE AIELLO, do hereby certify

 6   that I transcribed the audio, and that the foregoing is

 7   a true and complete transcription of the audio

 8   transcribed under my personal direction.

 9              IN WITNESS WHEREOF, I do hereunto set my

10   hand at Blaine, Washington, this 5th day of October,

11   2018.

12

13

14

15

16            _____

17                   Christine Aiello

18

19

20

21

22

23

24

25
```

