UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

ALEKSEJ GUBAREV,
XBT HOLDING S.A., and
WEBZILLA, INC.
   Plaintiffs,

v.

BUZZFEED, INC. and
BEN SMITH
   Defendants.

Case No.

0:17-cv-60426-UU

**PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
ON THE ISSUE OF PLAINTIFFS' STATUS AS PUBLIC FIGURES**

> *"I'm shocked, shocked to find that gambling is going on in here."*
> - Captain Renault in *Casablanca*

## Introduction

Who could have predicted it?

In Plaintiffs' Motion for Summary Judgment on Defendants' "Public Figure" Affirmative Defense, Plaintiffs predicted that Defendants would use the majority of *their* motion to: (1) say "pornography" as many times as possible and (2) flood the Court with irrelevant examples of Plaintiffs' (largely unsuccessful attempts) to obtain publicity for their various lines of servers.

Defendants bemoan that these predictions were red herrings. They then proceed to spend the majority of their motion saying "pornography" as many times as possible and flooding the Court with irrelevant examples of Plaintiffs' (largely unsuccessful attempts) to obtain publicity for their various lines of servers. In fairness, though, Defendants do not stop there. For good measure, they also throw in healthy doses of irrelevant guilt-by-association allegations; factual contradictions; and legal misdirection.

Because Plaintiffs have already addressed directly many of the legal arguments raised in Defendants' Motion in Plaintiffs' own motion on the issue, they will not repeat those arguments here but, instead, incorporate them by reference herein. Similarly, Plaintiffs incorporate by reference their Statement of Material Facts in Support of Plaintiffs' Motion for Summary Judgment on Defendants' "Public Figure" Affirmative Defense, D.E. 211-2 ["PSMF"], as well as the facts contained in Plaintiffs' Opposition to Defendants' Statement of Undisputed Material Facts filed herewith ["POSMF"]. Specific factual issues related to Plaintiffs' arguments and to point out factual inconsistencies in Defendants' Motion are discussed, below, as needed.

## Argument

**I.   Plaintiffs do not Meet the Eleventh Circuit's "Broader Two-Step Inquiry" Discussed by Defendants.**

Somewhat surprisingly, Defendants first argue that they are required to clear an initial two-step hurdle before the Court ever even considers the three-prong test first set forth by the D.C. Circuit Court of Appeals in *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1297 (D.C.Cir.1980) and subsequently adopted by the Eleventh Circuit in *Silvester v. American Broadcasting Companies, Inc.*, 839 F.2d 1491 (11th Cir.1988) (the "*Silvester Test*").

Plaintiffs concede that Defendants are indeed required to satisfy this preliminary two-step inquiry and note, with thanks, that Defendants have not and cannot do so. As Defendants state, before the Court ever considers whether Plaintiffs are limited-purpose public figures,[1] it needs to consider "two fundamental differences between public and private figures" and determine if Plaintiffs fall into the public figure category at all. *Silvester v. Am. Broad. Cos.*, 839 F.2d 1491, 1494 (11th Cir. 1988). First, Defendants must prove that, prior to the publication of the defamatory materials, that Plaintiffs had "greater access to the media" that gave them "'a more realistic opportunity to counteract false statements than private individuals normally enjoy.'" *Id.* (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344 (1974)). "Regular and continuing access to the media ... is one of the accouterments of having become a public figure." *Hutchinson v. Proxmire*, 443 U.S. 111, 136 (1979). Second "and more importantly, 'public figures ... voluntarily expose themselves to increased risk of injury from defamatory falsehoods concerning them.'" *Silvester*, 839 F.2d at 1494 (quoting *Gertz*, 418 U.S. at 345). "In short, public figures 'invite attention and comment.' *Id.*

Plaintiffs meet neither of these preliminary tests for public figures. First, with respect to access to the media: the idea that Plaintiffs "had regular and continuing access to the media" is simply laughable given the evidence. Certainly, Plaintiffs *wanted* such access so that they could promote their products and services, and they engaged two different public relations firms in the *hope* of obtaining access to the media to promote their products and services, but they were almost entirely unsuccessful those efforts.[2] Ultimately, precisely because these PR efforts were unsuccessful, Plaintiffs terminated the services of both the PR Firms.

Nor have Defendants presented any evidence that Plaintiffs took actions that voluntarily exposed themselves to "increased risk of injury from defamatory falsehoods concerning them" in the context the type of defamation alleged here. If the simple act of attempting to promote one's business were sufficient to transform a private figure into a public one, every business and every business owner in the country would be deemed to be public figures.

Defendants cite to four cases that they believe lends credence to their argument that

---

[1] Defendants concede that Plaintiffs are not general public figures. Defendants' Motion, p. 12 ("Plaintiffs are obviously not general public figures.").

[2] Parenthetically, individuals with regular and continuing access to the media rarely have to engage PR firms in an attempt to get even meager amounts of media coverage.

Plaintiffs meet this preliminary test because, in Defendants' words, the cases demonstrate that "numerous plaintiffs who never sought nor achieved anything close to the media attention that Plaintiffs enjoyed prior to the Dossier's publication have been deemed limited public figures." Defendants' Motion, p. 12.  A review of these four cases, however, disproves, rather than proves, Defendants' argument:

- *Little v. Breland*, 93 F.3d 755 (11th Cir. 1996) – In *Little*, the plaintiff was offered, and accepted, the position of President of Mobile, Alabama's Convention & Visitors Corporation.  In accepting the job, Little was walking into an number of preexisting public controversies: first, the decision to build a $60 million convention center "had been the subject of extensive public debate" and a "$1.37 million contract between the City of Mobile and the Mobile Convention & Visitors Corporation to provide sales and marketing services and to attract conventions to Mobile was a matter public controversy." *Id.*, 757.  Moreover, the prior "president had been forced out five months earlier, receiving 'a good deal of coverage' in the local media." *Id.*  As the Court further noted, "Little's hiring was covered by the local media.  He attended a Media Appreciation Night on May 7.  Little was described as 'the best person possible for the job' in a press release.  His plans for the Mobile Convention & Visitors Corporation and reactions to Mobile and the Convention Center were quoted extensively in the local media." *Id.*  Soon after accepting the job, however, a press release was issued announcing the Little had withdrawn his acceptance of the presidency, leading to a "front-page story" in the *Mobile Press-Register* entitled "*Little Has 'Change of Heart*,'" as well as local television coverage discussing his decision.  Thereafter, Breland, the reporter who had written Little's "Change of Heart" learned that Little was actually forced to resign as a result of sexual harassment allegations, leading to a follow up story containing the allegedly defamatory statements.  *Id.*  In holding that Little met the preliminary public figure test, the court found:

  > Little voluntarily accepted a taxpayer-supported job to market the $60 million convention center and attract visitors to Mobile.  His hiring, performance, and firing would all be the subject of public concern and debate.  Little sought out media attention at a press conference and was the subject of four newspaper articles and eight television news stories prior to the article in question.  Little was 'intimately involved in the public controversy.'

*Id.*, at 758 (quoting *Silvester*, 839 F.2d at 1496).

- *Orr v. Argus-Press Co.*, 586 F.2d 1108 (6th Cir. 1978) – In *Orr*, the plaintiff was "a Wisconsin attorney and president of the J.M.H. Development Company" who "proposed to

4

build a shopping mall in Owosso, Michigan." *Id.*, at 1110. "The venture was publicized in the local press, in part as a result of efforts by Orr and his associates to obtain publicity. To raise money, Orr prepared and distributed to local investors a prospectus describing the project." *Id.* After the project fell through, "Orr and a business associate were indicted in connection with the venture on a total of thirty-four charges of violations of the Michigan securities laws. Orr himself was charged with fifteen counts. Five counts charged the unlawful sale of unregistered stock; eight counts charged the unlawful failure to disclose information; two counts charged affirmative acts of deceit, alleging that Orr had told two potential investors that J. C. Penney Company, a large department store, had already leased space in the proposed mall when, in fact, the company had not done so." *Id.* Although it should be noted that the Sixth Circuit does not seem to utilize the same two-step test to determine if a plaintiff is a public figure, the Court held Orr met that Circuit's definition:

> We believe that Orr is a 'public figure' for the limited purpose of reporting on his arrest and indictment and the circumstances surrounding the collapse of his shopping mall proposal. Although not every lawyer and litigant involved in a judicial proceeding is a 'public figure,' according to the *Gertz* case and *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S. Ct. 958, 47 L. Ed. 2d 154 (1975), it appears from the reasoning of these opinions that a criminal defendant would be classified as a 'public figure' where, as here, his conduct in the community is a legitimate matter of public interest, the press has publicized his conduct in part as a result of his own efforts to obtain publicity, and his conduct has made him the target of a criminal proceeding about which the public has a need for information and interpretation.

*Id.* at 1116.

- *Bourne v. Arruda*, 2013 U.S. Dist. LEXIS 2797 (D.N.H. January 8, 2013) – In *Bourne*, the plaintiff wrote a letter to the editor of his local newspaper, the *Conway Daily Sun*, alleging that various town selectmen, including Defendant Arruda had "'produce[d] a forged cover letter to a Class VI road liability agreement,' that Arruda had deceived the public, and that town officials had engaged in discovery abuse and the spoliation of evidence." *Id.* at *5. In direct response to the allegations contained in Bourne's letter, Arruda spoke up at a Selectmen's meeting, accusing Bourne of having "engaged in fraud or deceit by 'alter[ing] a town document.'" *Id.* at *4. Bourne brought a defamation action alleging that Arruda's response to his letter at the Selectman's meeting was defamatory. In finding Bourne to be a (very) limited public figure (again, under a different test than the one issue here), the Court held:

5

> Bourne, by sending that letter to a local newspaper for publication, plainly thrust himself into the public arena with respect to the issues raised in the letter. The court finds no genuine issue of material fact regarding Bourne's 'limited purpose public figure' status, with respect to Arruda's comments responding to Bourne's letter to the editor.

*Id.* at 5-6.

- *James v. Gannett Co.*, 40 N.Y.2d 415 (1976) – Here, plaintiff Samantha James was a "professional belly dancer whose cabaret performances have placed her figure in the public spotlight. Her pursuit of this exotic specialty aroused a certain public curiosity and prompted the publication of a feature article about her life and trade, complete with photographs, in defendant's Rochester newspaper." *Id.* at 417. Ms. James agreed to be interviewed for what became a four-page story in the *Rochester Democrat & Chronicle* entitled "Samantha's Belly Business." *Id.* at 418. The Court described the resulting article:

> The story, prepared by one of the newspaper's reporters based upon an interview with the plaintiff, described the plaintiff as the "undisputed queen of the exotic stages of Upstate New York, Rochester's belly dancer in residence." Without delving into unnecessary detail, it suffices to note that the four-page story discussed the plaintiff's background, set forth her views on life in general, her approach to her business, and described two of her dancing routines. Accompanying photographs depicted the plaintiff in her dressing room, on the stage, and arriving for work. Quotations from the interview with plaintiff are sprinkled liberally throughout the article. In one of the opening paragraphs, the writer stated: "A petite (but for her bust), platinum blonde, Samantha vibrates from the 10x10-foot stage at the Encore Club three times a night, six nights a week."

*Id.* Ms. James took issue with two sentences in the article that she believed suggested that she was engaged in prostitution and brought suit. The Court first held that the Plaintiff's claims should be dismissed because the alleged comments were not capable of the defamatory meaning Plaintiff had assigned them. The Court nevertheless held that a second reason existed for the dismissal; namely, that Ms. James was a limited public figure "with respect to accounts of her stage performances." *Id.* at 423.[3] Specifically, the Court held, because the Plaintiff sought the

---

[3] In reaching this conclusion, the Court (somewhat delightfully) bemoans the fact that some members of the public enjoy reading about "public performers such as professional athletes, nightclub and concert singers, television and movie actors, and recording artists" more than they enjoy reading the news, but nevertheless acknowledge that newspapers have to give the public what they want: "Newspapers and magazines of general circulation necessarily report on persons upon whom public interest has fastened in order that the public might be induced to purchase their product. Newspapers cater to the public's demand for information and if a newspaper does

6

publicity concerning her performances and willingly participated in the interview with the specific aim of attracting larger crowds to her shows, she had "thrust herself into the public spotlight and sought a continuing public interest in her activities." *Id.*

None of these cases advance Defendants' argument even a little. Putting aside the fact that only one of the cases cited by Defendants even applies the proper test (and in that case, the plaintiff had much *more* relevant publicity and access to the media than Plaintiffs here), what emerges from all four of the cases is a consistent theme – the test applied looks specifically at the defamatory statements themselves and asks whether the Plaintiff took steps that voluntarily placed himself the public eye *with respect to the matters alleged*. This is precisely where Defendants' case fails most clearly. The defamatory statements in this case accused Mr. Gubarev of being a pawn of the FSB who, along with his companies, hacked the Democratic Party Leadership. Defendants have put forth no evidence to suggest that, with respect to those claims, Plaintiffs did anything that could be considered voluntarily thrusting themselves into the spotlight and, as such, their public figure affirmative defense must fail.

**II.    Defendants' Attempt to, Essentially, Frame the "Public Controversy" As "Cybersecurity and Cybercrime" Renders Meaningless the Entire Analysis.**

Turning, then, to the *Sylvester Test*, the first step is for the Court to "isolate the public controversy." *Sylvester*, 839 F.2d at 1494. Unfortunately, the cases seem to offer no explicit direction to a Court as to how to do so. Nevertheless, even a cursory review of the cases demonstrates that courts look primarily to the contours of the defamatory publication at issue to assist in determining if a public controversy exists and, if so, what its boundaries might be.

For example, in *Sylvester,* the Court first noted that the relevant publication was a broadcast of an edition of ABC's 20/20 new program "which dealt with allegations of corruption in the jai alai industry." *Id.* at 1493. From there, the Court then concluded that:

> The public controversy in this case is corruption in the jai alai industry. The major facet of the public controversy is the allegation of illegal cooperation and alliance between jai alai players, management, and professional "systems betters." Another aspect of the controversy is the Palm Beach Fronton fire, which resulted in the loss of many betting records. Associated with the Palm Beach fire is the unauthorized burial of many other important fronton records shortly after the fire. The loss of records, whether permanent or temporary, greatly hindered law enforcement

---

not provide the sought-after information, its readership may well turn to the competition. If the public wants information on public personalities, the newspaper, to survive, must supply it." *Id.* at 422.

>agencies' investigation of alleged improprieties involving systems betters and jai alai management.

*Id.* at 1495.

Similarly, in *Schiller v. Viacom, Inc.*, 2016 U.S. Dist. LEXIS 187391 (S.D. Fla. April 4, 2016), the alleged defamatory publication was a screenplay that had been adapted from media coverage of the kidnapping, torture, and attempted murder of the plaintiff by a pair of bodybuilders. In defining the "public controversy," the Court held:

>Plaintiff's kidnapping, crime, and subsequent criminal sentencing was a public controversy, as these were 'highly publicized' events subject to substantial media coverage.... This entire lawsuit, in fact, stems from media coverage of Plaintiff's kidnapping and subsequent criminal acts because the allegedly defamatory screenplay was adapted from Pete Collin's 1999 Miami New Times Article.... Moreover, the fact that Lugo, Doorbal and Delgado not only kidnapped Plaintiff, but also murdered two other individuals, underscores that the controversy surrounding Plaintiff had 'foreseeable and substantial ramifications for nonparticipants,' such that it constituted a public controversy.

*Id.* at *16.

Likewise, in *Little*, discussed above, the Court looked to the allegedly defamatory media reports concerning Little's sudden withdrawal of his acceptance of the presidency of the Mobile Convention & Visitors Corporation and concluded that "the record demonstrates that there was a preexisting public controversy surrounding both: 1) the leadership of the Mobile Convention & Visitors Corporation generally, and 2) Little's sudden unexplained departure specifically. *Little*, 93 F.3d at 757.

Here, the December Memo contemplates an international conspiracy involving an FSB effort to enlist computer hackers to infiltrate the computers of the Democratic leadership in an attempt to undermine the 2016 United States Presidential Election.

Plaintiffs do not dispute that there is an underlying and pre-existing "public controversy." However, in its attempt to define that controversy as being about "Cybersecurity and Cybercrime," Defendants would create a category so broad as to touch in some way literally every individual involved with the tech industry. It is a definition so broad as to be meaningless and would lead to the absurd result that almost any action taken by anyone connected to the tech industry could be construed as "injecting" oneself into a public controversy. It is not and cannot be the law.

And, although Plaintiffs argue that the Court should define the "public controversy" only as Russia's attempts to hack the Democratic Party, if the Court were to take a broader (yet still reasonable) view of the controversy, it could define the public controversy as Russia's attempts to interfere with the 2016 United States Presidential Election.

### III. Plaintiffs Made No Attempt to Voluntarily Insert Themselves into the Public Controversy.

With the "public controversy" properly defined (even if the Court were to use the broader of the two definitions), two things become immediately and abundantly clear: (1) there is no evidence to support the contention that Plaintiffs voluntarily inserted themselves into the controversy, and (2) Defendants have intentionally littered the record with facts and documents that serve no legitimate purpose, but instead are intended solely to prejudice the Court and, ultimately, a jury against them.

For example, Defendants spent much of their motion discussing the fact that some of Webzilla's clients hosted pornography websites and that, for a time, a company in which Mr. Gubarev was a passive investor sponsored a conference for the web professionals that work with such websites. As a starting point, there is simply no tenable argument that any of these activities, even if true, have any reasonable connection to the actual public controversy at issue here. It is as if Plaintiffs had sponsored the local flower show and Defendants were claiming that this was sufficient evidence to prove that Plaintiffs had inserted themselves into a controversy concerning the use of a fertilizer bomb to blow up the Federal Building in Oklahoma. Sponsoring a conference for web designers who created and maintain adult websites does not mean that someone has (years later) inserted themselves into a controversy about embedding malicious code into "porn bots" to subvert a Presidential election.

Ironically, in their own motion, Defendants undermine their own argument that Mr. Gubarev was attempting to garner publicity by sponsoring adult webmaster trade shows (through a company in which he passively invested). Defendants themselves claim that "For his porn-related activities, Gubarev used a pseudonym...." Defendants' Motion for Partial Summary Judgment on Plaintiffs' Status as Public Figures [hereinafter, "Defendants' Motion"], p. 2, fn. 1. In other words, and by Defendants' own measure, Mr. Gubarev did not *seek publicity* by virtue of his involvement with these adult- content conferences. To the contrary, he actively sought to *avoid* any publicity in connection with adult content.

9

Similarly, as Defendants themselves allege: "By 2013, Plaintiffs were winding down their direct involvement in promoting the adult web industry." Defendants' Motion, p. 3. In other words (and again, based on Defendants' own assertions, which is disputed by Plaintiffs), Plaintiffs were not even "promoting" adult content for the *four years prior to Buzzfeed publishing the so-called Dossier*. How, then, could such "promotion" (even if it occurred in the manner and scope as alleged by Defendants) be relevant to Defendants' argument that Plaintiffs voluntarily thrust themselves into the "public controversy" concerning the hacking of the Democratic Party Leadership or even Russia's attempts to subvert the 2016 Presidential election?

The simple answer is that these assertions are not relevant, nor are they intended to be. Indeed, Defendants make little effort even to claim otherwise, pointing to their allegations as evidence that Plaintiffs (at one point in time, at least) hung out with "bad people." It is an unseemly and baseless line of attack.

Apparently not having hit rock bottom, though, Defendants shift from the merely irrelevant to the repugnant, attempting to vaguely tie Plaintiffs to child pornography, claiming that "Plaintiffs' conduct invited scrutiny."[4] Citing primarily to a 2008 article written by a Dutch blogger and an anonymous 2009 internet posting, Defendants try to connect Plaintiffs to child pornography, alleging that such materials were hosted on Webzilla's servers (allegations, which have nothing to do with whether Plaintiffs attempted to insert themselves into the relevant public controversy).

As the Court can see, one of the items cited by Defendants in connection with this line of argument is a "CNN iReport" authored by what Defendants refer to as a "citizen journalist." Before it was discontinued by CNN, its "iReport" section allowed anyone with access to the Internet to post an "iReport" to its site. As CNN itself made clear: "Everything you see on iReport starts with someone in the CNN audience. The stories here are not edited fact-checked or screened before they post." *See* Opp. Ex. 145 to Declaration of Matthew Shayefar filed herewith.

---

[4] It cannot be repeated often enough that Defendants should not be allowed to point to the alleged conduct of Webzilla's clients and customers and claim, by sleight of hand, that it is the conduct of Plaintiffs. Defendants' lead trial counsel is a near-legendary criminal defense lawyer who has represented defendants accused of any number of heinous crimes. That counsel's *clients* may have committed such crimes in no way implicates counsel himself.

10

In other words, Defendants have dug under the darkest rocks of the internet and presented the Court with whatever it found wriggling there as if it had evidentiary value. Simply finding something on the internet, though does not make it true, relevant, nor appropriate "evidence" to support a legal argument.[5]

Similarly, Defendants point to Plaintiffs' use of crisis communications professionals to *minimize* the negative publicity that might have arisen out of an allegation that one of Webzilla's *clients* was involved in committing advertising fraud (the so-called Methbot fraud) as proof that Webzilla was "injecting themselves into controversy over Russian Cyber-Crime." Defendants' Motion, pp. 8-10. Indeed, Defendants' own motion recognizes that Webzilla's motivation was solely to "minimize the bad publicity" and to be prepared to "get in front of" the story if journalists decided to ask about it. Defendants' Motion, pp. 9-10. Ultimately, no journalists ended up contacting Webzilla about its client's alleged involvement in the Methbot fraud. POSMF, ¶ 63.

Here, too, the evidence put in front of this Court is precisely the *opposite* of what Defendants claim to be their arguments. The evidence cited does not show Plaintiffs' attempt to inject themselves into a public controversy – and certainly not the relevant public controversy. Rather, the evidence presented by Defendants shows an effort to distance oneself from a controversy (if necessary).

**IV.     There Is No Connection Between Plaintiffs' "Involvement in the Public Controversy" and the Actual Defamatory Statements Concerning the Plaintiffs.**

Finally, because Defendants' "evidence" of Plaintiffs' participation in the "public controversy" runs so far afield of anything even approaching relevance, it is useful to recall, momentarily, what the December Memo actually alleged about Plaintiffs:

> [Redacted] reported that over the period March-September 2016 a company called XBT/Webzilla and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct "altering operations" against the Democratic Party leadership. Entities linked to one Aleksei GUBAROV [sic] were involved and he and another hacking expert, both recruited under duress by the FSB, Seva KAPSUGOVICH, were significant players in this operation.

---

[5] That Christopher Steele also found the same iReport adds nothing to its "value." Indeed, shockingly, the alleged former MI6 agent testified that he had no idea that an iReport wasn't actually written by someone associated with CNN. See Deposition of Christopher Steele, Opp. Ex. 146, 47:11-49:15.

11

Plaintiffs did nothing to insert themselves into the public controversy concerning Russia's attempts to disrupt the 2016 Presidential elections and Defendants have presented the Court with no relevant admissible evidence to the contrary. As such, there can be no connection between Plaintiffs' involvement with the public controversy and the defamatory statements at issue here.

## **Conclusion**

For the reasons stated hereinabove, Defendants' Motion for Partial Summary Judgment on the Issue of Plaintiffs' Status as Public Figures should be denied in its entirety.

Dated: October 5, 2018

**Respectfully Submitted:**

/s/ Evan Fray-Witzer
Evan Fray-Witzer (*pro hac vice*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-0000
Facsimile: 617-423-4855
Evan@CFWLegal.com

/s/ Valentin Gurvits
Valentin D. Gurvits (*pro hac vice*)
Matthew Shayefar (Fla. Bar No. 0126465)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1804
Facsimile: 617-928-1802
vgurvits@bostonlawgroup.com
matt@bostonlawgroup.com

/s/ Brady J. Cobb
Brady J. Cobb (Fla. Bar No. 031018)
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

**I hereby certify** that a true and correct copy of the foregoing was served electronically via email on all counsel or parties of record on the service list below on October 5, 2018.

/s/ Matthew Shayefar
Matthew Shayefar

## SERVICE LIST

Katherine M. Bolger
Adam Lazier
Davis Wright Tremaine, LLC
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
katebolger@dwt.com
adamlazier@dwt.com

Nathan Siegel
Alison Schary
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, Suite 800
Washington, DC 20006
nathansiegel@dwt.com
alisonschary@dwt.com

Roy Eric Black
Jared M. Lopez
Black Srebnick Kornspan & Stumpf
201 S Biscayne Boulevard, Suite 1300
Miami, Florida 33131
rblack@royblack.com
jlopez@royblack.com