# IN THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
### Case No.: 17-cv-60426-UU

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.

   Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

   Defendants.

_____/

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGEMENT

DAVIS WRIGHT TREMAINE LLP
Katherine M. Bolger
Nathan Siegel
Adam Lazier
Alison Schary
1251 Avenue of the Americas, 21st Floor
New York, New York 10020

BLACK, SREBNICK, KORNSPAN &
STUMPF, P.A.
Roy Black
Jared Lopez
201 So. Biscayne Boulevard
Miami, Florida 33131

*Of Counsel*:
Nabiha Syed
BuzzFeed, Inc.
11 E. 18th Street, 13th Floor
New York, NY 10003

*Attorneys for Defendants*

Pursuant to Local Rule 56.1(a), Defendants submit this response to Plaintiffs' Statement of Material Facts in support of Plaintiffs' Motion for Summary Judgment.[1]

1. These facts are undisputed, but not material.

2. These facts are not material, except that Gubarev moved to Cyprus in 2002.

3. Defendants understand this to assert that Webazilla was a "small server company" when it was started by Gubarev in 2005, which is undisputed. The source of capital for Webazilla in 2005 is not material.

4. ███████████████████████████████████████████████████████

5. What Gubarev "considers himself to be," or how he goes about learning the information he imparts to the public, is immaterial. Rather, the undisputed material facts are that Gubarev, both directly and through Plaintiffs' public relations agents, held himself out to the press and public to be an "expert" on computer security. Defs. SUMF ¶¶ 46, 51. He also provided comments to the media about computer security and was contacted by a *Bloomberg* reporter as a "specialist" who could respond to questions concerning computer security (i.e., obtaining the logs of a server one does not own). Bershidsky Decl. ¶ 4; Defs. SUMF ¶¶ 57, 58.

6. What Gubarev "considers himself" is immaterial. Gubarev's self-serving testimony that he does not seek public attention does not create any genuine dispute of fact, because there is overwhelming objective evidence that he actually engaged in conduct to attract public attention, including soliciting and providing media interviews, holding press conferences

---

[1] Defendants filed their own motion for partial summary judgment on September 21, 2018, accompanied by a Statement of Undisputed Material Facts pursuant to Local Rule 56.1, asking this Court to hold that Plaintiffs are limited public figures. In the interest of avoiding repetitive submissions, Defendants respectfully incorporate the contents of that Statement of Undisputed Material Facts in support of their opposition to Plaintiffs' motion and will refer in this submission to paragraphs of that Statement ("Defs. SUMF") and the accompanying exhibits to the Declaration of Nathan Siegel ("Siegel Decl.") filed therewith. Unless otherwise noted, all citations to a paragraph of Defendants' Statement of Undisputed Material Facts include all exhibits cited within that paragraph.

and instructing Plaintiffs' public relations agents to ensure that his name be included in media publications. *See* Defs. SUMF ¶¶ 36, 38, 40-43, 46, 51-55, 57-61.

7. That Gubarev is not a politician, public official or has *generally* not "assumed an influential role in society" is immaterial because Defendants do not maintain that he is a public official or general purpose public figure. Nor are Gubarev's self-proclaimed "wants" and "beliefs" material. Rather, the undisputed material facts demonstrate that Gubarev was "known" to multiple journalists from influential media who interviewed him, anyone who read or viewed their resulting news reports, ███████████████████ and key Russian government officials like Mr. Klimenko. Defs. SUMF ¶¶ ███, 35, 36, 38-44, 46, 51-55, 57-61.

8. Plaintiffs do not define what they mean by their conclusory references to "politics" or "political matters." The undisputed material facts are that Gubarev interacted with key Russian officials, opined that alleged cyber-collusion between the Trump campaign and Russia's largest bank and Russia's data privacy law was a "far-fetched fuck," and authorized ███████████████████████████████████████████████████████████████████

9. Plaintiffs' motives for seeking publicity and recognition are immaterial.

10. That Plaintiffs' engaged Cutler PR in October 2015 is undisputed. How they chose that firm is immaterial.

11. Plaintiffs do not define what they mean by "public relations," so Defendants are unable to respond to that specific term. The undisputed facts are that prior to engaging Cutler PR, XBT had an in-house department responsible for issuing press releases and responding to press inquiries. Defs. SUMF ¶¶ 19-22. XBT also had a "PR manager" and a "marketing manager" at the time it hired Cutler PR. ███████████████████ ███████████████████████████████████ Those responsibilities were subsequently assumed by Cutler PR and KGlobal, among other services they performed. ███████████████████████████████

2

12. Plaintiffs' motive for promoting themselves is immaterial. Defendants agree that Plaintiffs left it up to Cutler PR to decide what media they would target.

13. Who took Dvas's photo is immaterial. In any event, the photo was taken by a professional photographer and was provided to Cutler PR by XBT's marketing department because Cutler requested a better photo than the one Dvas had previously used for business purposes. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14. Plaintiffs' own interpretation of Cutler's approach or motives for seeking media recognition of their senior executives are immaterial. The document speaks for itself and indicates that Cutler PR proposed to pitch articles that "are not product-specific, and they are not generally profile stories of the company"; instead, they would provide "thought leadership" to position Servers.com "as an expert in the field, adding to your overall credibility." Shayefar Decl. Ex. 18; *see also* Defs. SUMF ¶¶ 28, 29.

15. Defendants agree that Cutler PR obtained publicity in *Forbes*, *CNBC.com* and *Inc.*, all business publications in which Plaintiffs had never previously appeared. Plaintiffs' counsel's opinions that such publicity constitutes "limited exposure" in non-"high-level technology media" are immaterial; to the extent it may be relevant, the Court can take judicial notice that those are "high level" international publications. Moreover, prior to the Dossier's publication KGlobal succeeded in generating publicity in *VentureBeat*, *Tech Insider*, and other examples of what Plaintiffs call "high level" media. Defs. SUMF ¶ 55; Siegel Decl. Exs. 72-76.

16. Defendants do not dispute that Plaintiffs subjectively considered the publicity they obtained from Cutler insufficient and suspended its services because they sought even more "persistent citation level across business media with company news or experts' comments." Defs. SUMF ¶ 48.

17. The facts in this paragraph are undisputed. Plaintiffs' self-proclaimed motives for hiring KGlobal to seek publicity for them are immaterial.

3

18.     Defendants agree that Plaintiffs deferred to KGlobal's advice on the most effective PR strategy. Plaintiffs' counsel's opinion regarding what are "active steps" is argumentative. The undisputed material facts are that Plaintiffs authorized KGlobal to undertake numerous actions on their behalf, XBT's senior executives personally received media training from KGlobal, and Gubarev sat for multiple media interviews as a result of KGlobal's efforts. Defs. SUMF ¶¶ 50-55, 57-60, ▇ 73, 76.

19.     Defendants agree that KGlobal pitched Gubarev to journalists as stated in Shayefar Exhibits 21 and 22. Shayefar Exhibit 23 speaks for itself and does not merely "refer to" Gubarev, but "offers further information" from him. Defendants agree that "many dozens of emails" were sent out, including those in Shayefar Exhibit 24. Whether Gubarev ever saw the specific emails contained in his deposition exhibit PR-1 (Siegel Decl. Ex. 71), which did not include all the emails in Exhibits 21-24, is immaterial. Rather, the material, undisputed fact is that Gubarev authorized KGlobal to undertake the PR campaign reflected in the emails, including pitching him as a technology "thought leader" for media interviews. Shayefar Decl. Ex. 12 [Gub. I Depo.] 243:16-23; Defs. SUMF ¶ 51.

20.     Defendants agree that KGlobal organized an interview for a podcast called "AppMasters." Defendants also agree that KGlobal organized interviews with *Forbes* and *The Wall Street Journal*, and further note that KGlobal organized other interviews including with *Bloomberg*, *VentureBeat, Business Insider* and *Tech Insider*. Defs. SUMF ¶ 55. Plaintiffs described *VentureBeat* in their own Statement of Undisputed Material Facts as an example of "high-level technology media" that Plaintiffs hoped to attract through their PR efforts. Pl. SUMF ¶ 15. As of the date the Dossier was published Gubarev had "made it" into most of those publications. *See* Siegel Decl. Exs. 75, 76, 81. Others had not yet been published, and there is no evidence that Plaintiffs were ever informed they would *not* be published. The rest of the assertions in paragraph 20, such as that those publications are "almost all minor" and KGlobal's efforts were "largely unsuccessful," constitute argument that requires no response here.

21. It is not clear what Plaintiffs mean by "picked up." Multiple press releases issued by Plaintiffs have been "picked up" by other news organizations. For example, *Yahoo Finance* posted XBT's press release announcing that "Servers.com is expanding into Russia", including that "[t]he move enables XBT to deploy its solutions to the local market in observance of the legal standards of the Russian Federation." Siegel Resp. Decl. Ex. 3. The business information website *Crunchbase* "picked up" at least 5 press releases in 2016 alone. *Id.* Ex. 4. Plaintiffs' own exhibits indicate that its press releases were picked up and published on the websites of numerous news organizations. *See, e.g.,* Shayefar Decl. Ex. 41 at P-F000188-195 (listing "reprinted copies of your press release on a wide range of sites across the Web," such as the *Minneapolis Star Tribune, Sacramento Bee* and *LA Daily News*); *id.* at P-F000195-200 (listing where "the headline of your press release was re-printed on a remote site," such as *Yahoo News*, *Google News,* and *Wired*). The remaining assertions about the efficacy of press releases were the "personal opinion[s]" of Mr. Dvas, who testified that his personal views did not reflect company policy or practice because he "didn't share my opinion with my colleagues."

22. Defendants do not dispute that Plaintiffs briefly terminated KGlobal's services on or about December 15, 2016, for less than one week, because they subjectively "expect[ed] much more publicity" than they had received. The undisputed facts about the actual publicity that Plaintiffs both sought and received speak for themselves. *See* Defs. SUMF ¶¶ 53-61. Plaintiffs' assertion that KGlobal's efforts were "unsuccessful in driving attention to the company" is argument that requires no response.

23. Defendants agree that Gubarev and his companies have been referenced in the publications contained in Shayefar Exhibits 29-35, among others, which speak for themselves.

24. Disputed. The undisputed material facts reflect that Plaintiffs' "public appearances" have *not* been "limited to technology conferences." Nor has Gubarev "*only* spoken publicly at a handful of small industry conference" (emphasis added). Those undisputed material facts include:

5

(a) Gubarev spoke at the Russian Internet Forum in 2016 on the topic of "trends in the infrastructure of the global and Russian internet." Defs. SUMF ¶ 43. According to XBT's marketing director at the time, the Forum was "the biggest Russian internet event" of the year, and Servers.ru was also a sponsor that year. Defs. SUMF ¶ 45; Siegel Decl. Ex. 61; ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ German Klimenko, Putin's advisor on internet matters, attended that conference. Gubarev met him there and at several other events in Russia. Defs. SUMF ¶ 44.

(b) Gubarev led a press conference organized by Plaintiffs in Moscow to launch the expansion of their businesses there, which received attention in the Russian media and to which Klimenko was invited. Defs. SUMF ¶¶ 38-40.

(c) Gubarev also attended the 2016 St. Petersburg International Economic Forum ("SPIEC"), Russia's leading international economic conference. XBT's marketing director lobbied Klimenko in an effort to try to secure Gubarev an opportunity to speak about "cyber-security" there. Defs. SUMF ¶¶ 46-47; ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

(d) ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Twice Webzilla was honored with the award for "Best Hosting Company of the Year" ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Shayefar Decl. Ex. 37 [Bezruchenko Depo.] at 17:16-20:7.

25.  Defendants agree that XBT companies won these awards. Plaintiffs' characterization of these awards as "minor" is argument that requires no response.

26.  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

████████████████████████████████████████
████████████████████████████████████

27.     Defendants agree that XBT companies had over the years issued press releases, though all that have been produced indicate that started in approximately 2012. ████████ The content of those releases speak for themselves. The data attached by Plaintiffs indicate a steady increase in the attention their press releases received. A release in early 2014 received 175 views. Shayefar Decl. Ex. 27. By contrast, two press releases in 2016 received 2151 and 2897 views respectively. Shayefar Decl. Ex. 41 at P-F000202.

28.     These facts are undisputed. Gubarev also specifically requested that his personal name be included in articles on the topic of Prisma, in addition to the name of

---



[2] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[3]Plaintiffs appear to refer to Gubarev's wife and children to imply that ████████████ ████████████████████████████████████████████████████ However, because Plaintiffs do not go so far as to assert that as a fact, Defendants will not submit further documentary and photographic evidence, beyond that already in the record, which would make clear that any such assertion would be indisputably false.

Servers.com.  Siegel Decl. Ex. 139.  Gubarev's self-proclaimed motives for talking to a *Bloomberg* reporter are immaterial.

29.     Defendants agree that following Mr. Gubarev's comments to *Bloomberg*, on November 1, 2016 the reporter emailed Mr. Gubarev to ask "a question of you as a specialist" concerning a *Slate* story that the reporter described as "a great scandal under American election campaign programme."  Shayefar Decl. Ex. 44.  The reporter "knew him to be the CEO of XBT Holding."  Bershidsky Decl. at ¶ 4.  Although the reporter merely indicated he wanted Gubarev to help him "sort out technical details," Gubarev voluntarily responded with an "expert conclusion" that "our opinion is that the story was [a] far-fetched f--k," supported by two pages of annotated comments on the *Slate* story.  Shayefar Decl. Ex. 44.  Defendants agree that, to their knowledge, prior to this contact Gubarev had not commented specifically on alleged Trump-Russia connections, though Gubarev had publicly commented on controversial Russian policies concerning control of the internet.  Defs. SUMF ¶¶ 32-36.

30.     At the time that Gubarev provided those comments to *Bloomberg*, he understood that his comments were "related to politic[s]" and that "it's a very political article."  ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Gubarev reiterated his understanding after the Dossier was published; the next day he internally described his comments to *Bloomberg* as a "report for Bloomberg about fake news that Trump servers have connections to Alfa Bank servers."  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *See also id.* Ex. 120 (Gubarev told Dutch newspaper *De Volkskrant* that as a result of his comments to *Bloomberg*, "I'll never talk about politics again").  The "expert conclusion" Plaintiffs provided to *Bloomberg* speaks for itself.  Gubarev and Bershidsky's additional characterizations of their motives are immaterial.

31.     These facts are undisputed, though Gubarev represented to the reporter that the opinion was coming equally from himself.  *See* Shayefar Decl. Ex. 44 ("I found data, writing you expert conclusion for you with one of my colleagues").  It is also undisputed that Gubarev asked the reporter to write an additional article about a new business venture of his, called Haxus, that was not related to XBT.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

32. Mr. Bershidsky's affidavit speaks for itself. Regardless of what Gubarev's own political views may have been, the affidavit is consistent with Gubarev's testimony that "it's a very political article" and that Gubarev's technical opinions were "related to politics." ███

███████████████████████████████████

33. The *Bloomberg* article and reference to Mr. Gubarev therein speaks for itself. The "single technical issue" about which Gubarev's comments were summarized went to the heart of the truth of the allegations of collusion which Mr. Bershidsky claimed to "debunk[]."

34. Defendants agree that the words "Democratic National Committee" or "hacking of the same" do not appear within the four corners of the actual text of the *Bloomberg* article. However, to the extent that Plaintiffs' assertion that the article "does not make any reference whatsoever" to either is intended to mean anything more than that, it is indisputably false. As the article's headline makes clear ("Clinton Plugs *Another* Weak Story About Trump's Ties to Putin"), its broad thesis was that the specific allegations concerning Trump and Alfa Bank were just the latest example of Hillary Clinton "straining to link Trump to Putin when no solid link has been found after months of digging by reporters and federal agents." Shayefar Decl. Ex. 6. So the article expressed the opinion that "[p]erhaps it's time for her to desist" entirely because there was no evidence of any collusion between Trump and Putin of any kind. *Id.* Further, the article made clear that the "other weak stories about Trump's ties to Putin" that it set out to debunk included the allegations that the DNC hack resulted from collusion. The article began by hyperlinking to two press reports. The first was an op-ed piece in *The Washington Post*, which referred to the Alfa Bank allegations as merely one example of a broad body of evidence "that Donald Trump and/or those around him have some highly peculiar connections to Russia that would pose a danger to the United States." Siegel Resp. Decl. Ex. 6. Among the other examples discussed was "the Russian hacking of the [Democratic National Committee] and John Podesta's email." *Id.* The second report to which *Bloomberg* hyperlinked was the October 31 *Slate* story, which described the investigation into a possible Alfa Bank-Trump connection as a follow-up to the findings "that Russian hackers had infiltrated the servers of the

Democratic National Committee, an attack persuasively detailed by the respected cybersecurity firm CrowdStrike." Siegel Decl. Ex. 85.

35. This fact is undisputed, in that neither the Dossier nor the Article refers specifically to a server issue, and not material. If material, Report No. 112 in the Dossier discussed in detail the relationship among Alfa Bank, its founders, and President Putin, as did the *Slate* story that Mr. Bershidsky's article set out to rebut. Shayefar Decl. Ex. 11 (Dossier) at P-D000045-46. Report No. 112 is also referenced in the BuzzFeed article accompanying the Dossier, which pointed out that report's misspelling of Alfa Bank as "Alpha Bank." *Id.* Ex. 45.

36. Undisputed.

37. Undisputed.

38. Undisputed, though not material.

39. Undisputed, though not material.

40. Undisputed, though not material.

41. Undisputed, though note material.

42. Undisputed, though not material.

43. Undisputed, though not material.

44. It is undisputed that Mr. Ferrante had not heard of XBT Holding or Webzilla prior to being engaged by BuzzFeed, though that is not material. It is also undisputed, though not material, that Mr. Ferrante had previously heard of Gubarev "as an individual" from media reports and that he could not recall what those reports were about. Shayefar Decl. Ex. 50 [Ferrante Depo.] at 16:9-17:2.

Dated: October 1, 2018                      Respectfully submitted,

*Of Counsel*:                               /s/ Katherine M. Bolger
Nabiha Syed                                 Katherine M. Bolger
BuzzFeed, Inc.                              Nathan Siegel
11 E. 18th Street, 13th Floor               Adam Lazier
New York, NY 10003                          Alison Schary
                                            Davis Wright Tremaine LLP

10

1251 Avenue of the Americas, 21st Floor
New York, New York 10020
katebolger@dwt.com
nathansiegel@dwt.com
adamlazier@dwt.com
alisonschary@dwt.com

/s/ Roy Black
Roy Black
Jared Lopez
Black, Srebnick, Kornspan & Stumpf, P.A.
201 So. Biscayne Boulevard
Miami, Florida 33131
rblack@royblack.com
jlopez@royblack.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing, together with its exhibits, will be served electronically by email on all counsel or parties of record on the service list below this 1st day of October, 2018.

By: /s/ Jared Lopez
Jared Lopez, Esq.

## SERVICE LIST

Matthew Shayefar
Valentin D. Gurvits
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1806
Facsimile: 617-928-1802
matt@bostonlawgroup.com
vgurvits@bostonlawgroup.com

Evan Fray-Witzer
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-000
Facsimile: 617-423-4855
Evan@CFWLegal.com

Brady J. Cobb
Dylan Fulop
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com
dfulop@cobbeddy.com