# Exhibits 1-2

## REDACTED

# EXHIBIT 3



10/1/2018                                    Servers com Is Expanding to Russia



# Servers.com Is Expanding to Russia



**Marketwired** September 25, 2015

DALLAS, TEXAS--(Marketwired - Sep 25, 2015) - XBT Holding S.A., the parent company of the hosting provider Servers.com, announced the acquisition of the company Edinaya Set', in order to launch the regional versions of its services.

The move enables XBT to deploy its solutions to the local market in observance of the legal standards of the Russian Federation. As a result, customers of the company from Russia and abroad will be able to allocate servers in the Russian Federation, in full compliance with and according to the Federal Law in regards to the use and storage of Personal Data. This in turn will bring unparalleled performance and the low latency network of Servers.com to customers in Russia. XBT's unique global private network which connects all server infrastructure maintained by the holding's subsidiaries, is a significant reason behind the decision for Russia to be the next destination. The partnership hints at a deeper integration of services which is to follow.

"We have been looking for a local player which meets our development requirements," said Aleksej Gubarev, CEO of XBT Holding. "Edinaya Set' will become the base of our international operations in the region by guaranteeing better and more diversified services. This successful move will provide our

Quote Lookup

**Recently Viewed**

Your list is empty.

**What to Read Next**



customers with new opportunities, and will allow us to launch our project, Servers.com, in Russia under the brand Servers.ru before the end of 2015."

Edinaya Set's Managing Director, Sergey Krysenko agrees, "We have, so far, been developing our portfolio linearly. It has certainly worked but our newly-formed partnership allows us to improve. The experience we have accumulated, together with XBT's resources, will ensure that our IT infrastructure will receive a needed optimization."

The global hosting environment has motivated XBT Holding's management to continue the strategic expansion. The emerging markets in Asia have shown the importance of a transcontinental connection. Customers from East and West seek to broaden their portfolios with additional redundancy and better reach. Servers.com now allows for a complete line of services to be utilized, from the US to Europe and Asia.

The deal has been closed on August 25th, and all achieved agreements are now in effect.

### About XBT Holding

XBT Holding S.A. is a privately-owned global hosting, network solutions and web development provider founded in 2005, with offices in 8 countries. Worldwide enterprise and SMB customers rely on XBT's international expertise and comprehensive service portfolio, including managed dedicated hosting, colocation, shared and VPS hosting, high-performance network, cloud, web and application development services. The company operates a worldwide proprietary network through five carrier-neutral datacenters and 13 points of presence in the United States, Europe and Asia, with more than 16,000 servers throughout seven subsidiaries. XBT Holding partners with most major Tier 1 networks to ensure high-speed international connectivity up to 2 Tbps. XBT is now one of the fastest-growing companies in the Internet infrastructure industry. Visit XBT online at xbt.com.



**Syria rebel faction rejects Idlib deal**
AFP



**Florida Millionaire Predicts 'Cash Panic' In 2019**
Stansberry Research   Sponsored ☼



**Oil Price Fundamental Weekly Forecast – Anticipated Shortfall Expected to Continue to Drive Prices Higher**
FX Empire

10/1/2018                                   Servers com Is Expanding to Russia

## Today's Highest Yield Savings Accounts

**North Korea Foreign Minister Says Country Won't Disarm Without Trust**
Time

Initial Deposit

$ 25,000

| INSTITUTION | APY | Min. Balance for APY |
|---|---|---|
| Ally Bank - Savings | | Sp |

Location

hi          C

ally          1.85%          $0

Get De

**Three years of Russia strikes on Syria kill 18,000: monitor**
AFP



▣ **Start the conversation**

Sign in to post a message.

10/1/2018                                                Servers com Is Expanding to Russia

# EXHIBIT 4

# crunchbase

## Servers.com

‹   Overview   Unlock Charts   Acquisition Details   Related Hubs   Company Tech Stack by Siftery   Webs   ›



**Virtual Offices** Everything your business needs, wherever you are.

LEARN MORE

SERVCORP

AdChoices ▷

## Overview

| Acquired by | XBT |
|---|---|

| CB Rank (Company) | 58,684 |
|---|---|

### Servers.com

Next generation Cloud and Dedicated hosting, bringing 40G network and ubiquitous global private network to each server

Dallas, Texas, United States

**Categories**
Cloud Computing, Cloud Infrastructure, Content Delivery Network, IaaS, Web Hosting

**Headquarters Regions**
Dallas/Fort Worth Metroplex, Southern US

**Founded Date**
1998

**Operating Status**
Active

**Funding Status**
M&A

**Number of Employees**
11-50

**IPO Status**
Private

**Company Type**
For Profit

Website
**servers.com** ☒

Facebook
**View on Facebook** ☒

LinkedIn
**View on LinkedIn** ☒

Twitter
**View on Twitter** ☒

Phone Number
**+1 (888) 339-5605**

Servers.com is an automated and standardized hosting platform for small to medium scale business customers (SMB).The platform offers great diversity of service formats in one package, which gives the customers all the needed solutions and business tools under one roof, including flexible targeting and service pricing based on user's action data...

**Read More**



Which funding rounds raised the most money?

Sample Fundraising Analysis Chart

UNLOCK CHARTS



## Acquisition Details

Transaction Name
Servers.com acquired by XBT

Acquired by
XBT

Announced Date
Dec 2, 2013

Price
$300K

Crunchbase Pro Templates for Sales Pros

Crunchbase Pro Templates for Sales Pros

Get a list of early-stage companies by category & location.

VIEW SAVED SEARCH ›

## Related Hubs

| Hub Name | Number of Organizations |
|---|---|
| Private Dallas/Fort Worth Metroplex Companies | 4,926 |
| United States Cloud Computing Companies | 2,086 |
| Acquired Dallas/Fort Worth Metroplex Companies | 986 |
| Acquired Texas Companies | 2,688 |
| Texas Acquired Companies | 2,660 |
| United States Cloud Computing Acquired Companies | 409 |
| Web Hosting Companies that Exited | 710 |
| Content Delivery Network Companies | 408 |
| Cloud Computing Acquired Companies | 584 |
| Companies That Exited in 2013 | 5,074 |

VIEW ALL ›

## Company Tech Stack by Siftery

Active Products

Servers.com uses 9 technology products and services including Google Analytics, Google Tag Manager, and nginx.

UNLOCK MORE TECHNOLOGIES DATA ›

## Website Tech Stack by BuiltWith

Active Technology

Servers.com is actively using 25 technologies for its website. These include Viewport Meta, IPhone / Mobile Compatible, and Google Analytics.

UNLOCK WEBSITE TECHNOLOGIES DATA ›

## Web Traffic by SimilarWeb



Traffic

Servers.com is ranked 337,618 among websites globally based on its 52,755 monthly web visitors.

UNLOCK MORE WEBSITE TRAFFIC DATA ⟩

## Competitors & Revenue by Owler

Servers.com has $6.4M in revenue annually.

UNLOCK MORE COMPETITORS & REVENUE DATA ⟩

## Current Team

### Number of Current Team Members                    5

Servers.com has 5 current team members, including CEO Nick Dvas.

**Nick Dvas**
CEO

**Konstantin Bezruchenko**
CTO

**Jay Elisson**
Customer Relationship Manager

**Ilya Sokolov**
Lead Developer

**Siarhei Karatkevich**
Presales Engineer

## Past Team

### Number of Past Team Members                        2

| Person Name | ⌄ | Title At Company | ⌄ | Start Date | ⌄ | ⌄ | End Date | ⌄ |
|---|---|---|---|---|---|---|---|---|
| 👤 Nick Dvas | | COO | | 2014 | | | 2017 | |
| 👤 Roy Premchand | | Sales Manager | | — | | | — | |

## Events ⌄

| Number of Events | 3 |
|---|---|

**LATITUDE 59** Latitude59 Conference 2017
Sponsor
May 25, 2017

**ARCTIC15 FIND THE ONE** Arctic15 2017
Sponsor
May 3, 2017

**game dev day** GameDev Days 2017
Sponsor
Apr 7, 2017

## Recent News & Activity ⌄

Feb 2, 2017
Servers.com: Network Asia —Servers.com opens new data center in Hong Kong

Nov 1, 2016
Servers.com: Bloomberg —Clinton Plugs Another Weak Story About Trump's Ties to Putin

Jun 21, 2016
Servers.com: ACN Newsire Japanese —Servers.com Launches New Data Center in Singapore

Mar 21, 2016
Servers.com: ACN Newsire Japanese —Servers.com Established Partnership With a Record-Label of Famous Producer Scott Storch During the Participation in the World's Biggest Game Developers Conference (GDC)

Mar 18, 2016
Servers.com: Market Wired - Top —Servers.com Established Partnership With a Record-Label of Famous Producer Scott Storch During the Participation in the World's Biggest Game Developers Conference (GDC)

Feb 10, 2016
Servers.com: ACN Newsire Japanese —Servers.com Reveals Advanced Software-De fned Network for Cloud and Hosting

Feb 2, 2016
Servers.com: ACN Newsire Japanese —Servers.com Extends Global Presence With New Data Center in Moscow

Jul 28, 2015
Servers.com: TechCrunch —Servers.com Brings Its Bare-Metal Servers To The US

Dec 2, 2013
XBT acquired Servers.com for $300,000

## Twitter 

 **Servers.com**
@servers_com

For clients who need a dedicated rack space, we now provide private racks of up to 55U, with redundant power up to 11kW and high bandwidth uplinks up to 160 Gbps per leaf-switch.servers.com/private-racks



♡   [→                                                              Sep 5, 2018

 **Servers.com**
@servers_com

Add some scalability and high availability to your applications using our brand-new HTTP load balancing service. The price starts at 5€ per month; additional options include SSL termination and GeoIP headers.servers.com/load-balancer

 **Load Balancing Service | Products & services | Servers.com**
Distribute incoming application traffic across multiple servers. Scale your application and increase its availability.
servers.com

♡   [→                                                              Aug 16, 2018

 **Servers.com**
@servers_com

Are you a demand-side advertising platform fighting for lower RTTs? We offer servers in 7 data centers around the world, providing low round trip times to trading locations of prime

providing low round-trip times to trading locations of prime SSPs. And we have a free global private network between our data centers! servers.com/solutions/adte…



**Reducing Network Latency for AdTech | Solutions | Servers.com**
Bare metal and cloud servers in seven data centers around the world with low round-trip times to biggest supply-side platforms.
servers.com

♡   ⟶                                                                                  Jul 30, 2018

Servers.com Retweeted



**Steve Harrington**
@SHarrington1

With the help of @ExtremeNetworks, @servers_com implemented a network with powerful capabilities that remained simple to  manage #extr  soch.us/2NLNtgL



"Extreme has really great seamless support for OpenStack orchestration. This allows us to offer anything from bare-metal dedicated networking to cloud networking. It's integrated over the same network, with the same vendor, and delivers the same great quality."

– Konstantin Bezurchenko, Chief Technical Officer, Servers.com

Extreme
Customer Driven Networking

♡   ⟶                                                                                  Jul 25, 2018



**Servers.com**
@servers_com

Pleased to get this congratulation board from our long-standing partners at Dell EMC on the opening of our new AMS1 data center. Thanks, @DellEMC!





Jul 20, 2018

SERVERS.COM ON TWITTER >

Get snazzy
new eyeglasses?

YAHOO!

Search now

AdChoices ▷

© 2018 Crunchbase Inc. All Rights Reserved.

# Exhibits 5

**REDACTED**

# **EXHIBIT 6**

The Washington Post

Right Turn Opinion

# Trump's Putin problem returns in a big way



By Jennifer Rubin



Jennifer Rubin
Opinion writer reporting from a center-right perspective
Email   Bio   Follow
Opinion writer
November 1, 2016

While it remains improbable that anything found on Anthony Weiner's computer will change the FBI director's July conclusion that Hillary Clinton lacked requisite intent for criminal prosecution with regard to her home email server, it becomes more probable each day that Donald Trump and/or those around him have some highly peculiar connections to Russia that would pose a danger to the United States.

NBC reports:

The FBI has been conducting a preliminary inquiry into Donald Trump's former campaign manager Paul Manafort's foreign business connections, law enforcement and intelligence sources told NBC News Monday.

Word of the inquiry, which has not blossomed into a full-blown criminal investigation, comes just days after FBI Director James Comey's disclosure that his agency is examining a new batch of emails connected to an aide to Hillary Clinton. …

NBC News reported in August that Manafort was a key player in multi-million-dollar business propositions with Russian and Ukrainian oligarchs — one of them a close [Vladimir] Putin ally with alleged ties to organized crime — which foreign policy experts said raised questions about the pro-Russian bent of the Trump candidacy.

We don't know what, if anything, the FBI will find, whether Manafort violated any U.S. laws in his work with Russia's Ukrainian puppet and whether his alleged connections influenced his boss. But we do know that Trump has mouthed every Kremlin position (e.g. denying that Russia had invaded Ukraine, pretending that hacks of his political opponents had not been linked to Russia, questioning the resolve of NATO). He also has surrounded himself with pro-Russian advisers and surrogates. In other words, we know his judgment is compromised; we just

don't know how or why, in part because he still refuses to turn over his tax returns that might show a Russian connection.

Separately, Franklin Foer at Slate reports that a Russian bank had a server connection with a Trump server in New York. "The irregular pattern of server lookups actually resembled the pattern of human conversation — conversations that began during office hours in New York and continued during office hours in Moscow," he writes. "It dawned on the researchers that this wasn't an attack, but a sustained relationship between a server registered to the Trump organization and two servers registered to an entity called Alfa Bank." Both the bank and the Trump campaign deny any relationship or communication was going on, but there is plenty of smoke. When a New York Times investigation turned up the supposed server connection, something curious happened:

The Trump organization shut down the server after Alfa was told that the *Times* might expose the connection. Nicholas Weaver told me the Trump domain was "very sloppily removed." Or as another of the researchers put it, it looked like "the knee was hit in Moscow, the leg kicked in New York."

Four days later, on September 27, the Trump organization created a new host name, trump1.contact-client.com, which enabled communication to the very same server via a different route.

So, sure, this might amount to nothing untoward, but it comes in the context of the "efforts of Donald Trump's former campaign manager [Manafort] to bring Ukraine into Vladimir Putin's orbit; the other Trump advisor whose communications with senior Russian officials have worried intelligence officials [Carter Page]; the Russian hacking of the [Democratic National Committee] and John Podesta's email." Clinton adviser Jake Sullivan put out a statement, which read in part:

This secret hotline may be the key to unlocking the mystery of Trump's ties to Russia. It certainly seems the Trump Organization felt it had something to hide, given that it apparently took steps to conceal the link when it was discovered by journalists.

This line of communication may help explain Trump's bizarre adoration of Vladimir Putin and endorsement of so many pro-Kremlin positions throughout this campaign. It raises even more troubling questions in light of Russia's masterminding of hacking efforts that are clearly intended to hurt Hillary Clinton's campaign. We can only assume that federal authorities will now explore this direct connection between Trump and Russia as part of their existing probe into Russia's meddling in our elections.

To recap, we know that Clinton improperly set up a private server. We know that the Clinton foundation operated while she was secretary of state, that the Clintons' money-making endeavors got mixed with the foundation's work and that Clinton met at various times with some Clinton foundation donors (who included longtime allies, philanthropists and others one might expect to do business with the State Department). There is no evidence of any quid pro quo. We've always known that the Clintons valued private interests, especially when it involved money, more highly than they valued preventing the appearance of conflicts of interest or actual conflicts. She is known to be an ethically challenged person. No one would go into her presidency blind, and congressional oversight would be essential.

With Trump, however, we know he has allowed himself to become Putin's puppet. Maybe he is a "useful idiot" manipulated by aides with deep Russian connections, maybe he has his own financial connections (which tax returns might or might not reveal) or maybe the ignoramus billionaire simply is infatuated with authoritarians. We do not know, bluntly, how far the connection goes or where Trump's loyalties lie.

Given the choice between a knowledgeable, responsible candidate who has cut corners to secure wealth and power and a racist, xenophobic, ignorant and erratic personality unable or unwilling to learn much of anything (someone who is, worst of all, a puppet of one of America's enemies), we have little doubt that Trump is the greater of two evils.

Won't Clinton's presidency be tied up in scandals and investigations? Perhaps, but then Republicans don't have much to worry about her pursuit of an aggressive agenda, especially if the GOP keeps majorities in one or more houses. The danger from Trump is not that he would be a hobbled executive but that he would act on his authoritarian tendencies and pursue interests contrary to U.S. national security at the

behest of a foreign enemy. Sorry, Clinton haters, but Trump beats her hands down when it comes to unfitness. That doesn't mean that one has to vote for her (for some it's a bridge too far), but it *does* mean voting for him is unthinkable.

---

**1015 Comments**

---



**Jennifer Rubin**

Jennifer Rubin writes reported opinion from a center-right perspective for The Washington Post. Follow

---

The Washington Post

# The story must be told.

Your subscription supports journalism that matters.

**Try 1 month for $1**

---

**Stories from The Lily**  The Lily, a publication of The Washington Post, elevates stories about women.

Lily Lines: What percentage of Americans believe Christine Blasey Ford?

Music festivals have a gender problem. So these friends plotted to fix it.

**Perspective**
I'm not a supporter of Trump, but making fun of his appearance is harmful to us all. Here's why.

# EXHIBIT 7





LATEST NEWS

# Cloak-and-dagger saga over cybercrime, Trump dossier plays out in Miami courtroom

BY KEVIN G. HALL
*khall@mcclatchydc.com*

September 21, 2018 08:55 AM
Updated September 25, 2018 10:25 AM

WASHINGTON —A federal courtroom in Miami is now the intersection for a celebrity attorney, two major cybercrimes and a foreign tech firm with an ephemeral South Florida address and entanglement in the Trump-Russia probe.

District Judge Ursula Ungaro in Miami is hearing the defamation lawsuit brought early last year by Cyprus-based entrepreneur Aleksej Gubarev against online news outlet Buzzfeed. It published the infamous collection of research memos dubbed the Trump dossier. She must decide, potentially as early as Friday, whether to

dismiss the case or set a trial date.

The dossier was was the work of former British spy Christopher Steele, a Russia expert, who was also sued individually in London by Gubarev. Since the suits were filed in early 2017, however, they've grown into a much more complicated affair.

---

**Latest news by email**

The afternoon's latest local news

Enter Email Address

protected by reCAPTCHA
Privacy - Terms

SIGN UP

---



Christopher Steele is the author of the Trump-Russia dossier.

---

That's because Senate Judiciary Committee Chairman Charles Grassley, R-Iowa, unsuccessfully tried to force Judge Ungaro to hand over copies of Steele's deposition in the Miami lawsuit, which could be useful in undercutting Steele's credibility in the Trump-Russia probe. Grassley was rebuffed in early September.

By continuing to use this site, you give your consent to our use of cookies for analytics, personalization and ads. Read more

"If you want the real story of the DNC hack ask Gurvits to let you read Gubarev's deposition," Roy Black, the colorful lawyer hired by Buzzfeed, tweeted on June 7, upping the stakes in a reference to Gubarev's attorney, Val Gurvits.

Black, who conducted the deposition, is a prominent Miami defense attorney, known for defending police officers involved in shooting deaths and taking celebrity clients such as radio talker Rush Limbaugh and singer Justin Bieber. He declined to elaborate further, citing a court order to keep silent about the substance of the case, much of it sealed.

Gubarev is the founder and largest shareholder of Luxembourg-based XBT Holdings, whose family of tech companies provides servers, web hosting and an array of services. XBT owns South Florida-based Webzilla, which operates servers in Dallas, and both companies are identified in the controversial Steele dossier.



By continuing to use this site you give your consent to our use of cookies for analytics, personalization and ads. Read more

Case 0:17-cv-60426-UU Document 236-3 Entered on FLSD Docket 10/09/2018 Page 25 of 118



Miami attorney Roy Black

**C.M.Guerrero** - The Miami Herald file photo

The dossier is actually a collection of private "opposition research" memos, paid for first by people close to Trump's primary opponents and later by a Hillary Clinton supporter. Steele's dossier claimed on the final page of the 35-page document that XBT was used as a platform for the hack of the Democratic National Committee and subsequent release of private emails.

That allegation, unsupported with evidence, put a little-known company under an international spotlight. Gubarev sued Buzzfeed, claiming he never got a chance to dispute the unverified claims. The news site published the dossier on Jan. 10, 2017, weeks before President Trump's inauguration.

A new investigation by McClatchy-Miami Herald shows that going to trial might force XBT's owner to testify about uncomfortable topics. The investigation found that companies owned and operated by XBT were either used by or affiliated with companies connected to the spread of two notorious computer viruses —the Gozi virus and the Methbot virus.

The findings do not prove or disprove claims made about XBT in the dossier, but show how the company could have been used by cyber criminals, wittingly or unwittingly.

McClatchy found evidence that a web hosting company that is part of the broad XBT family was one of the many platforms used to spread the Methbot virus, a sophisticated operation that tricked online advertisers into paying for fake views of video ads.

The investigation found that Nikita V. Kuzmin, the creator of the Gozi virus, which stole online banking data, incorporated at least three companies in South Florida, with the administrative assistance of Webzilla officer Constantin Luchian. He's a Moldova-born naturalized U.S. citizen who runs a company called Incorporate Now, which had been based in Fort Lauderdale and now operates out of Lake Worth.

By continuing to use this site, you give your consent to our use of cookies for analytics, personalization and ads. Read more

Citing court documents and regulatory filings, McClatchy reported last November that XBT and its affiliates as well as Luchian had drawn the ire of anti-piracy groups. A chunk of the company's business involves hosting file-sharing sites, where pirated music, videos or movies can be downloaded. These downloads can also be baited with malware that can adversely affect a computer user's operating system in sundry ways.

Music industry associations and attorneys who investigate copyright infringement described XBT/Webzilla as a facilitator of piracy, something XBT's attorney vigorously denied.

Why XBT was named in a dossier was never clear and Steele has been silent. Several people familiar with Steele's thinking have said he does not know why his Russian sources fingered XBT. The dossier alleged that "XBT/Webzilla and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct 'altering operations.'" These are among the allegations that XBT denies and form the basis of the defamation suit.

The dossier also alleged that Gubarev had been coerced by the Russian government because it had compromising information on him, something he flatly denied to McClatchy when giving his first interview on the topic to any news organization, the day after Buzzfeed published the dossier.

Using tools to study digital fingerprints on the Internet, McClatchy stumbled on an email in code language associated with what is known as the Methbot virus. That address appeared in Internet traffic moving via a Fort Lauderdale-based web hosting company called Wz Communications.

Florida documents show it was incorporated in 2009 by XBT employee Kostyantyn Bezruchenko. His LinkedIn page lists him as chief technology officer for Servers.com, owned by XBT, and shows that in 2009 he was in the same role for Webzilla.

In a statement to McClatchy, Gubarev acknowledged that a blogger accused the company in December 2016 of being used in the Methbot fraud.

"As soon as Webzilla learned of the accusation, we immediately closed the client's account and retained the relevant hard drives —which we have kept in case they may be useful to law enforcement," Gubarev said. "To date, no law enforcement agency has contacted us about that alleged fraud or the hard drives."

By continuing to use this site, you give your consent to our use of cookies for analytics, personalization and ads. Read more



Aleksej Gubarev is suing the news website Buzzfeed.

The Methbot virus was largely unknown until the security firm WhiteOps, which took the unusual step in December 2016 of putting out a free report to expose what it called "an army of automated web browsers run from fraudulently acquired IP addresses." These automated commands, called bots, made it look like 300 million video ads were being viewed daily by people sitting at computers, attracting millions of dollars from Internet advertisers.

WhiteOps officials did not answer requests for comment, but in the 2016 report said that Methbot was unique because rather than launching bots through infected computers at homes and offices it used infected computer data centers — anywhere between 800 and 1,200 computer servers at any given time. The physical servers, it said, were in Dallas and the Dutch city of Amsterdam.

WhiteOps did not identify companies so it is unclear whether that is a reference to XBT, which has seven subsidiaries spread across three continents. In the Netherlands, Webzilla operates a data center with 6,000 servers. On its own website, Webzilla says it operates a data center in Dallas and 3,000 servers in the United States.

Both Dallas and Amsterdam have technology clusters, and there is no evidence XBT or its affiliated companies had any direct role in or knowledge of Methbot. But the spread of Methbot underscores how XBT or its affiliates could have been used in Russia's efforts to interfere in the 2016 election campaign.

By continuing to use this site, you give your consent to our use of cookies for analytics, personalization and ads. Read more

"Webzilla is one of the largest internet providers in Europe. It is impossible for an internet provider with tens of thousands of clients and hundreds of thousands of IP addresses to monitor all traffic going through its network," said Gubarev. "Much like a phone company cannot monitor all of its customers' conversations or how its customers use their telephones, no one on our team was aware [and could not possibly have been aware] of any improper activity."

Both the dossier and Gubarev can be right, offered Andrew Weisburd, a cyber security and intelligence expert at the German Marshall Fund, a foreign policy think tank.

"Their explanation is entirely plausible, as is the Steele Dossier's description of Mr. Gubarev as essentially a victim of predatory officers of one or more Russian intelligence services," said Weisburd. "I have some difficulty squaring those two things with …Gubarev's aggressive pursuit of Steele and BuzzFeed. Neither BuzzFeed nor Steele have accused Gubarev of being a willing participant in wrongdoing."

XBT also has an indirect overlap with the Gozi virus. The virus dates back to the mid-2000s and used so-called zombie malware to hack into a computer's browser and mimic its behavior in order to steal online banking logins and other vital information.

Federal prosecutors in the Southern District of New York arrested its creator, Nikita V. Kuzmin, in 2013. He was nabbed while visiting San Francisco, and prosecutors said at the time that his signature virus infected more than 100,000 computers worldwide, about 25 percent of them in the United States, including some at NASA, causing tens of millions of dollars in losses.

The Gozi virus was so successful that Kuzmin rented it out to other criminal organizations for a cut of the proceeds. He was sentenced to time served in May 2016 and sent home to Russia, but part of what led to his discovery was an email from Nikita@youdo.ru.

Kuzmin happened to be director of YouDo Inc., registered in Fort Lauderdale in 2010 by Incorporate Now, run by Webzilla officer Constantin Luchian. He also handled the registration for Kuzmin Fresh IT Solutions Inc. in 2010 and ServerClub Inc. in 2011.

It appears that Luchian continues to do business with Kuzmin because ServerClub remains an active Florida company, with Kuzmin listed in its 2017 annual report as its chief director. On its website, ServerClub describes itself as a dedicated hosting provider operating on leased servers. The address listed for Server club in documents and one its website is the same one as Incorporate Now in Lake Worth, and as Wz Communications, the web hosting company thought to have been used in the spread of the Methbot virus.

XBT said Incorporate Now is Luchian's business and is not related. He did not respond to calls left at Incorporate Now, whose mailing address leads to a shared office space that until recently housed a restaurant. He is listed on the website of the shared-space operator Social House, which calls itself "a boutique creative co-working and event space." Its owners did not return calls and emails seeking information about Incorporate Now.

By continuing to use this site, you give your consent to our use of cookies for analytics, personalization and ads. Read more

*Kevin G. Hall: 202-383-6038, @KevinGHall*

COMMENTS

TAKE US WITH YOU

Real-time updates and all local stories you want right in the palm of your hand.

 **MCCLATCHY WASHINGTON BUREAU APP**

**VIEW NEWSLETTERS**

SUBSCRIPTIONS

Newsletters

LEARN MORE

Customer Service

Securely Share News Tips

Contact Us

ADVERTISING

Advertise With Us

COPYRIGHT

By continuing to use this site, you give your consent to our use of cookies for analytics, personalization and ads. Read more

PRIVACY POLICY

TERMS OF SERVICE



By continuing to use this site, you give your consent to our use of cookies for analytics, personalization and ads. Read more

# Exhibit 8

**REDACTED**

# **EXHIBIT 9**

Filed
D.C. Superior Court
04/16/2018 14:43PM
Clerk of the Court

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

CIVIL DIVISION

X

MIKHAIL FRIDMAN, PETR AVEN, AND
GERMAN KHAN,
 do CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, NY 10005,

                       Plaintiffs,

        -v-

ORBIS BUSINESS INTELLIGENCE LIMITED
AND CHRISTOPHER STEELE,
9-11 Grosvenor Gardens
London SW1W OBD,

                  Defendants.

                            X

**18 - 0 0 0 2 6 6 7**

2018 CA

COMPLAINT

COMPLAINT
(JURY TRIAL DEMANDED
DEFAMATION)

     Plaintiffs Mikhail Fridman, Petr Aven, and German Khan, by their attorneys

Carter Ledyard & Milburn LLP, allege as follows:

INTRODUCTION

     1.     This is a defamation case brought by three international businessmen who

were defamed in widely disseminated political opposition research reports commissioned

by political opponents of candidate Donald Trump in the 2016 presidential election cycle.

The reports (which came to be known as the "Trump Dossier," the "Steele Dossier" and

simply as the "Dossier") were published both before and after the 2016 presidential

election by Defendants Orbis Business Intelligence Limited ("Orbis") and Christopher

Steele ("Steele" and, with Orbis, the "Orbis Defendants") pursuant to an engagement between Orbis and Fusion GPS ("Fusion")—a Washington, D.C. based firm specializing in political opposition research whose principal, Glenn Simpson ("Simpson"), is a former journalist. Fusion trafficked in procuring damaging information about political candidates from various sources, including willing suppliers of such information like Defendants. Defendants accepted this engagement by Fusion knowing it was intended to, and likely would, have profound effects in the United States, and specifically the District of Columbia, because the engagement was political opposition research intended to be used in connection with the election of the President of the United States.

2.      One of the reports, written by Defendants and supplied to Fusion, is gravely damaging in that, directly or by implication from the rest of the Dossier, it falsely accuses the Plaintiffs—and Alfa ("Alfa"), a consortium in which the Plaintiffs are investors—of criminal conduct and alleged cooperation with the "Kremlin" to influence the 2016 presidential election. But neither the Plaintiffs nor Alfa committed any of the acts recklessly attributed to them by the Defendants. To the contrary, the Plaintiffs and Alfa are collateral damage in a U.S. political operation in which Defendants willingly and knowingly participated, whose focus was an alleged relationship (between the Kremlin and the Trump campaign) which has nothing whatsoever to do with the Plaintiffs.

3.      The specific "report" that includes facially defamatory statements about the Plaintiffs is one of seventeen Company Intelligence Reports 2016 ("CIRs") authored by Defendants that comprise the Tnimp Dossier. The Defendants prepared Company Intelligence Report 112 (the "Report" or "CIR 112"), which makes statements about the Plaintiffs, for inclusion in the Trump Dossier, even though the Plaintiffs' past, current

and intended future activities have nothing to do with the Dossier's intended subject matter and purpose.  Broadly, the Dossier purports to describe details of an alleged scheme between the Russian government and the Trump presidential campaign to unlawfully manipulate the result of the 2016 U.S. presidential election in favor of candidate Trump.

4.      The Defendants prepared CIR 112 as part of their engagement by Fusion to conduct "opposition research" (known as "oppo research" by its practitioners and the media) against Trump, even though its text, unlike that of the other reports, does not mention Trump or his campaign.  Opposition research, in essence, is the gathering of information for the purpose of eventually discrediting or otherwise harming the candidacy of a candidate for a public office.  Opposition research is neither objective nor neutral.  Instead, it is skewed from the outset in favor of appearing to find negative information about individuals—the essence of the product that political opposition research practitioners such as the Defendants are hired to produce.

5.      Fusion and Simpson were initially hired to conduct opposition research by Republican Party political opponents of candidate Trump during the primary phase of the 2016 election cycle.  That engagement was terminated when it became clear that Mr. Trump would be the Republican nominee.  At that point, Fusion and Simpson solicited and obtained an engagement with the Democratic National Committee and the campaign of candidate Hillary Clinton to gather discrediting information about Mr. Trump, including any connections he might have to Russian businesses or Russia's government.  In connection with that engagement, Fusion hired Orbis and Steele, who promptly went to work on the project in June, 2016.  Steele used his network of "paid collectors" who

gathered information from "subsources" in Russia, which Steele compiled into written reports for Fusion over the course of several months in 2016.  Eventually, the reports, including the false and defamatory report at the heart of this case, were assembled in the document that has come to be known to the public as the Trump Dossier.

6.      Steele has acknowledged that his reports are unverified "raw intelligence" and has refused to identify his alleged "sources."  Indeed, the report at the heart of this case, CIR 112, has never been verified and none of its sources has ever been publicly identified.  Defendants recklessly placed the Dossier's allegations of misconduct, inclugin criminal action, by Plaintiffs beyond Defendants' control – which allowed those allegations to get into the hands of media devoted to breaking news on the hottest subjects of the day:  the Trump candidacy and his election as President.

7.      CIR 112, dated September 14, 2016, falsely accuses the Plaintiffs of criminal bribery in the 1990s, of an inappropriate relationship with Vladimir Putin over the course of decades, and of participation in an alleged Trump-Russia scheme to influence the 2016 U.S. presidential election.  At all relevant times Defendants were aware that they had not verified the contents of CIR 112 and that its content was provided by sources who would remain unidentified – whose credibility could therefore not be assessed by a reader of the Dossier.  Defendants could easily have removed that report from the Dossier before they delivered it to their client, and before they and their client Fusion started peddling it to media and journalists in September and October 2016.  They chose not to do so.  Nor did they attempt to determine the veracity of that report with the Plaintiffs themselves.

8.     At all times during the Defendants' engagement by Fusion, it was either intended or clearly foreseeable that if the Dossier's contents, including CIR 112, were made available to third parties, including journalists, such provocative material would be published and republished, including to the public at large.  Indeed, that is the entire purpose of "oppo research" in American politics.  Those third parties included government officials, persons with governmental positions who were acting in a private capacity, as well as news media and journalists who could make its content public.

9.     On information and belief, Fusion arranged for Defendant Steele to brief selected members of the print and online media about the information he was compiling on candidate Trump and his campaign.  Consistent with the intended purpose of - oppo research" to publicly discredit its target, Steele's briefings were designed to generate interest in the Dossier and secure eventual public dissemination of its content.  At least some of the briefings Steele personally provided were held in late summer, 2016, in Washington D.C. at the Tabard Inn, and attendees included The New Yorker reporter Jane Mayer.'  Briefings were also held for journalists from the New York Times, the Washington Post, CNN,  Yahoo News, and others in September 2016.  The New York Times, The Washington Post, and Yahoo News were given a second briefing.²  Shortly thereafter, Yahoo News published an article by Michael Isikoff that described some of the content of the Dossier (referred to there as "intelligence reports" and "reports"), which

---

1 Jane Mayer, Christopher Steele, the Man Behind the Trump Dossier, THE NEW YORKER, March 12, 2018, available at https://www.newyorker.com/magazine/2018/03/12/christopher-steele-the-man-behind-the-trump-dossier.

2 Defendants' Response to Claimants Request For Information. Gubarev, et al. v. Orbis Business Intelligence Limited and Christopher Steele, Claim No. HQ1700413, In the High Court of Justice, Queens Bench Division, May 18, 2017, at 8 ("The Orbis/Steele Response").

was still being compiled at that time.3  Many other media articles reported speculative

accounts of the Dossier's existence and contents.  In late October 2016, Defendant Steele

gave an interview to David Corn, a writer for Mother Jones magazine, which, on October

31, 2016, published an article by Corn headlined "A Veteran Spy Has Given The FBI

Information Alleging a Russian Operation to Cultivate Donald Trump."4  Corn's article

stated that he had "reviewed" the early reports in the Dossier, and then quoted from those

reports as well as statements made by Steele in the interview.  The publication to third

parties and public dissemination of the Dossier's content had begun in earnest.

          10.     In addition to cultivating media interest, the Defendants also arranged and

participated in a meeting in Great Britain between Defendant Steele and David Kramer,

who held no public office but was the director of a private foundation affiliated with U.S.

Senator John McCain.  A purpose of that meeting was to show Kramer the content of the

sixteen pre-election reports in the Dossier so he could brief Senator McCain, who at the

time was a well-known and outspoken critic of Trump's candidacy.  Subsequently, in

November 2016, Orbis and Steele arranged for a copy of all sixteen of the Dossier's then

existing reports to be provided to Kramer in D.C. by Fusion—for  redelivery and further

---

3 Michael Isikoff, U.S. intel officials probe ties between Trump advisor and Kremlin, YAHOO
NEWS, Sept. 23, 2016, available at https://www.yahoo.com/news/u-s-intel-officials-probe-ties-
between-trump-adviser-and-kremlin-175046002.html.

4 David Corn, A  Veteran Spy Has Given the FBI Information Alleging a Russian Operation to
Cultivate Donald Trump, MOTHER JONES, Oct. 31, 2016, available at
https://www.motherjones.com/politics/2016/10/veteran-spy-gave-tbi-info-alleging-russian-
operation-cultivate-donald-trump.

publication to Senator McCain in D.C.—including the report (CIR 112) that falsely accuses and defames Plaintiffs.5

11.      In September, 2016, in a Washington D.C. hotel room, Steele met with Jonathan Winer—then an official in the State Department —and briefed him on the contents of the Dossier.  Steele had a long history of supplying Winer with intelligence; between 2013 and 2016, Steele provided Winer with more than 100 reports, many of which Winer then shared with his colleagues in the State Department.°  Steele also briefed a D.C. based official from the Department of Justice, Bruce Ohr.

12.      As the 2016 presidential election neared, both print and online media in the United States and abroad began to expand their coverage of the Dossier and its alleged content.  That coverage only intensified after Trump won the election.  On January 10, 2017, one of those media entities, BuzzFeed, Inc., published the entire Dossier on the Internet, describing it there as "explosive."  The copy of the Dossier that BuzzFeed published included the false and defamatory allegations of CIR 112 about the Plaintiffs and Alfa, along with the article entitled "These Reports Allege Trump Has Deep Ties to Russia."'  The Dossier misspells Alfa's name throughout, incorrectly spelling it as "Alpha."  BuzzFeed's article did not mention CIR 112 or its allegations, but

---

5 The Orbis/Steele Response, at 5-6.

6 Jonathan M. Winer, Devin Nunes is Investigating Me.  Here's the Truth, THE WASHINGTON POST,  February 8, 2018, available at https://www.washingtonpost.com/opinions/devin-nunes-is-investigating-me-heres-the-truth/2018/02/08/cc621170-0cf4-11e8-8b0d-891602206fb7_story html?utm_term=.81c6a33fccf4.

7  Ken Bensinger, Miriam Elder, Mark Schoofs, These Reports Allege Trump Has Deep Ties To Russia, BUZZFEED NEWS, Jan. 10, 2017, available at https://www.buzzfeed.com/kenbensinger/these-reports-allege-trump-has-deep-ties-to-russia?utm_term=.is1Q2ka2J.

focused instead on president-elect Trump and his alleged relationships with Russia, explaining that it "was publishing the full document so that Americans can make up their minds about allegations about the president-elect that have circulated at the highest levels of the U.S. government."[8]

13.     The Defendants intended, anticipated, or foresaw a high likelihood that providing third parties (like David Kramer, Senator McCain, and Jonathan Winer) and journalists with access to the Dossier's defamatory content would result in its republication by news media outlets, including online news media such as BuzzFeed.

14.     Plaintiffs seek an award of compensatory and punitive damages for the harm to their personal and professional reputations, current business interests, and the impairment of business opportunities that resulted from the blatantly false and defamatory statements and implications about them published recklessly to third parties by the Defendants and republished by BuzzFeed and countless other media around the world.

## THE PARTIES

15.     Plaintiffs Fridman, Aven. and Khan are ultimate beneficial owners of Alfa.  Fridman and Khan are each citizens of both Russia and Israel, and Aven is a citizen of Russia.  Plaintiffs are not widely known in the United States, had no role or involvement in any aspect of the 2016 U.S. presidential election, and made no public comments about it.

[8] Id.

16.     On information and belief, defendant Orbis is a private limited company headquartered in London, England.  Orbis and Steele have had working relationships with Washington D.C.-based Fusion and Simpson for a number of years.  In or about July of 2016, Orbis was engaged by and contracted with Fusion and Simpson to research and compile reports, on Trump/Russia relationships for delivery to Fusion in Washington, D.C., where Fusion would evaluate them and deliver them to its clients for their political purposes, including dissemination to government officials, journalists and news media in Washington D.C. and elsewhere to oppose the candidacy of Donald Trump in the 2016 U.S. Presidential campaign.

17.     Defendant Christopher Steele, on information and belief, is a former British intelligence officer and a founder and a principal of Orbis.  Over the years of their working relationship, defendant Steele was D.C.-based Fusion's contact at Orbis for engagements and was primarily responsible for researching and creating the Dossier to be provided to Fusion in D.C. for further dissemination here and elsewhere.  Upon information and belief, as set forth above, Steele disseminated the defamatory material about Plaintiffs to journalists, including The Washington Post, Yahoo News and David Corn of Mother Jones magazine, and to third parties like David Kramer, Senator McCain, and Jonathan Winer, in Washington, D.C. in the fall of 2016.  Mr. Winer recently stated publicly in an article in the Washington Post that after his 2013 return to the U.S. State Department, Steele provided him with more than 100 of his Russia-focused reports, which Winer shared with a senior State Department official.[9]

---

[9]  Winer, supra. note 6.

18.     Both Steele and Simpson used their prior experiences as an operative in British intelligence who had covered Russian matters (Steele) and as an investigative journalist for the Wall Street Journal (Simpson) to give their oppo research output a gloss of credibility and reliability which, in this case, was unwarranted.

19.     Steele recently told a journalist that he did not interview his sources in Russia himself, but gathered his information through "paid collectors" and "subsources." And by Steele's own estimation, as much as 30% of the Dossier's content may not be "accurate."¹⁰

## JURISDICTION AND VENUE

20.     This Court has personal jurisdiction over the Orbis defendants pursuant to Section 13-423 of the Code of the District of Columbia because Orbis and Steele transacted business in the District of Columbia.  Defendants also caused tortious injury to Plaintiffs by acts and omissions within or directed to the District of Columbia (the "District").  Upon information and belief, in the District in the late summer and fall of 2016, Orbis and Steele disseminated defamatory material to Fusion and  to multiple journalists such as The Washington Post, David Corn (the District-based bureau chief of Mother Jones magazine) and Michael Isikoff of Yahoo News.  At least one of the briefings at which Steele distributed defamatory material about Plaintiffs to journalists was held at the Tabard Inn in the District, including a briefing of The New Yorker

---

¹⁰ Luke Harding, How Trump walked into Putin's web, THE GUARDIAN, Nov. 15, 2017, available at https://www.theguardian.corninews/2017/nov/15/how-trump-walked-into-putins-web-luke.

reporter Jane Mayer."  Steele also met with Jonathan Winer of the U.S. State Department at a hotel room in the District, and had discussions with District-based U.S. Department of Justice official Bruce Orh.  In September, 2016, according to Winer, at the height of the presidential election campaign, Winer and Steele met in the District  "and discussed the information now known as the 'dossier' so that Winer could "alert the State Department," which he did by preparing a "two page summary for a senior official" of the Department in the District.  Finally, Steele authorized District-based Fusion GPS to provide a copy of his reports to David Kramer in the District for forwarding to Senator McCain, also in the District.  In sum, Steele, acting for himself and Orbis, has engaged in a persistent  course  of conduct, often with Fusion and Simpson,  intended to have and which did have effects in the District, by meeting with District based media and government employees to bring his reports on "Russia matters" to their attention.  Those reports included the defamatory statements about Plaintiffs.  From within and without the District, Steele's actions, on behalf of Orbis and himself, resulted in the tortious injury to Plaintiffs alleged herein, and have subjected him and Orbis to the personal jurisdiction of this Court.

21.    In addition, Steele, on behalf of himself and Orbis, has engaged in other ongoing business relationships with entities located in the District.  On information and belief, Steele and Orbis have been retained repeatedly by the District-based F.B.I to assist in various investigations between 2009 and 2016 and, as alleged above, Steele and Orbis have had an ongoing professional relationship with Fusion for years.  And as also noted above, according to Winer, during his 2013-2016 employment at the State Department in

11  Mayer, supra, at note 1.

the District, Steele/Orbis provided over 100 intelligence reports, many of which Winer shared with other State Department officials.

## FACTUAL ALLEGATIONS

22.     On information an belief, Orbis and Steele were engaged by Fusion during the 2016 U.S. presidential campaign to gather "oppo research," including compromising and salacious information about then presidential candidate Donald Trump.  The scope of this engagement was not limited to Trump's business dealings in Russia, but also included the candidate's personal conduct.  A significant purpose of this "research" was its ultimate intended use by Trump's political opponents to try to thwart his candidacy.  Although Fusion had initially been hired by Republican opponents of Trump's candidacy, by the time Fusion engaged Orbis, Trump had secured the Republican nomination and the focus of opposition to Trump's candidacy had shifted to the Democrats.  Fusion was engaged by Perkins Coie, a law firm with an office in D.C., in that firm's capacity as representing the Democratic National Committee (DNC) and HFACC, Inc., a campaign organization supporting Hillary Rodham Clinton's candidacy for President.  Perkins Coie retained Fusion to provide such research services in April 2016, an engagement which continued until October 2016,[12] and Fusion, in turn, retained Defendants to carry out that task.

---

[12] Adam Entous, Devlin Barrett, Rosalind S. Helderman, Clinton campaign, DNC paid for research that led to Russia dossier, THE WASHINGTON POST, Oct. 24, 2017, available at https://www.washingtonpost.com/world/national-security/clinton-campaign-dnc-paid-for-research-that-led-to-russia-dossier/2017/10/24/226fabf0-b8e4-11e7-a908-a3470754bbb9_story.html?utm_term=.897b43950afc.

23.     On information and belief, the Orbis Defendants and Fusion communicated with one another to initiate and perform that engagement via postal or communicated with one another to initiate and perform that engagement via postal or courier services, email, facsimile, interne audio or video services and/or telephone calls between Washington, D.C. and London, England.  Orbis and Steele also acted directly in the District, including in joint meetings to brief members of the news media.

24.     The Orbis Defendants proceeded to research Trump's personal behavior in Russia and business dealings with Russian government officials, business leaders, and business entities.  Steele compiled the "investigative" results into at least seventeen written CIRs for delivery to Fusion in Washington, D.C.  By Steele's own description, the CIRs were "raw intelligence" containing unverified information from sources he did not personally interview."  The CIRs produced between June 2016 and the end of October 2016 (including CIR 112) were provided and thus published to Fusion, and, in turn, to lawyers at Perkins Coie and their clients at the DNC and HFACC.

25.     After Trump received the Republican nomination for President in July 2016, many media reports subsequently surfaced asserting, correctly, that Fusion had entered into an engagement with Democratic Party operatives interested in using oppo research to support Hillary Clinton's candidacy.  These media reports vastly increased other media's and the public's interest in the content of the Dossier.

26.     In the late Summer or early Fall of 2016, defendant Steele, acting on behalf of Orbis, personally provided briefings on the content of the Dossier he and Orbis had prepared to a select group of journalists in the United States.  Those journalists

13 The Orbis/Steele Response, at 7, #17.

included D.C.-based David Corn of Mother Jones magazine.  Mother Jones then

published an article by Mr. Corn about the existence, purpose, and content of the Dossier

based on Steele's briefing to Corn and the author's review of the oppo research made

available to him by Steele.

27.     Steele has admitted that, through a D.C. based intermediary who was not a

government official, David E. Kramer, he provided the oppo research in the Dossier to

Senator John McCain of Arizona, an outspoken political opponent of Donald Trump's

candidacy.

28.     As they performed their work for Fusion's clients, the Orbis Defendants

knew, anticipated or reasonably should have foreseen that, once in the hands of third

parties such as David Kramer, Senator McCain, journalists like Michael Isikoff and

David Corn, Perkins Coie, the political operatives at the DNC and HFACC, and their

media contacts, the CIRs would be further disseminated publicly.  Such further

dissemination would inevitably foster widespread discussion about the CIRs in the

United States.  That is exactly what happened.  Much of the ensuing media attention and

public discussion focused on Orbis' and Steele's roles in the creation and dissemination

of the Dossier, and the interviews solicited by them.

29.     Upon information and belief, during this campaign to promote the public

dissemination of their oppo research, Orbis and Steele provided background briefings to

the media without attribution.  During those briefings, Defendants never vouched for the

credibility of their sources or the accuracy and reliability of the content of the Dossier

and/or of CIR 112 specifically.

30.     Despite the fact that they did not know the unverified, anonymous, inherently harmful accusations in CIR 112 about Plaintiffs to be true, Defendants intentionally published CIR 112 [along with the other reports in the Dossier] to Fusion, David Kramer, and John McCain, and foresaw (or reasonably should have foreseen) that it would then be republished to (1) Perkins Coie; (2) Perkins Coie's clients (the DNC and the HFACC); (3) employees of the DNC and the HFACC; and (4) journalists and media. Elements of the Dossier, possibly including CIR112, may have been published even more extensively by being made available for viewing during arranged briefings of certain journalists by Defendant Steele.  Worldwide publication of the entire Dossier, whether by BuzzFeed or anyone else, was inevitable after these reckless actions by Defendants.

31.     CIR 112 specifically discusses the Plaintiffs.  Its heading, "RUSSIA/US PRESIDENTIAL ELECTION:  KREMLIN-ALPHA GROUP CO-OPERATION," is defamatory in the Trump/Russia context of the entire Dossier, as this heading suggests that Alfa and its executives, including the Plaintiffs, cooperated in the alleged Kremlin-orchestrated campaign to interfere in the 2016 U.S. presidential election—the overriding focus  of Steele's reports.  This is a plausible and, indeed, inescapable inference a reasonable reader would draw from the heading of CIR 112, both because of its own content and based on the headings of fifteen of the sixteen other CIRs that Defendants dated and/or published before the end of October 2016.  The Dossier's headings, as sequenced in the Dossier, are as follows:

US PRESIDENTIAL ELECTION: REPUBLICAN CANDIDATE DONALD TRUMP'S ACTIVITIES IN RUSSIA AND COMPROMISING RELATIONSHIP WITH THE KREMLIN (CIR 80 – JUNE 20, 2016)

RUSSIA/US PRESIDENTIAL ELECTION:  FURTHER INDICATIONS OF EXTENSIVE CONSPIRACY BETWEEN TRUMP'S CAMPAIGN TEAM AND THE KREMLIN ( CIR 95 – UNDATED)

RUSSIA:  SECRET KREMLIN MEETINGS ATTENDED BY TRUMP ADVISOR, CARTER PAGE IN MOSCOW (JULY 2016)  (CIR 94 – JULY 19, 2016)

RUSSIA-US PRESIDENTIAL ELECTION:  KREMLIN CONCERN THAT POLITICAL FALLOUT FROM DNC E-MAIL HACKING AFFAIR SPIRALLING [sic] OUT OF CONTROL (CIR 97 – JULY 30, 2016)

RUSSIA/USA:  GROWING BACKLASH IN KREMLIN TO DNC HACKING AND TRUMP SUPPORT OPERATIONS (CIR 100 – AUGUST 5, 2016)

RUSSIA/US PRESIDENTIAL ELECTION:  SENIOR KREMLIN FIGURE OUTLINES EVOLVING RUSSIAN TACTICS IN PRO-TRUMP. ANTI-CLINTON OPERATION (CIR 101 – AUGUST 10, 2016)

RUSSIA/US PRESIDENTIAL ELECTION: REACTION IN TRUMP CAMP TO RECENT NEGATIVE PUBLICITY ABOUT RUSSIAN INTERFERENCE AND LIKELY RESULTING TACTICS GOING FORWARD (CIR 102 – AUGUST 10, 2016)

RUSSIA/US PRESIDENTIAL ELECTION:  FURTHER DETAILS OF TRUMP LAWYER COHEN'S SECRET LIAISON WITH THE KREMLIN (CIR 136 – OCTOBER 20, 2016)

RUSSIA/UKRAINE:  THE DEMISE OF TRUMP'S CAMPAIGN MANAGER PAUL MANAFORT (CIR 105 – AUGUST 22, 2016)

RUSSIA/US:  KREMLIN FALLOUT FROM MEDIA EXPOSURE OF MOSCOW'S INTERFERENCE IN THE US PRESIDENTIAL CAMPAIGN (CIR 111— SEPTEMBER 14, 2016)

RUSSIA/US PRESIDENTIAL ELECTION:  KREMLIN-ALPHA GROUP CO-OPERATION (CIR 112 – SEPTEMBER 14, 2016)

RUSSIA/US PRESIDENTIAL ELECTION- REPUBLICAN CANDIDATE TRUMP'S PRIOR ACTIVITIES IN ST. PETERSBURG (CIR 113 – SEPTEMBER 14, 2016)

-16-

RUSSIA:  KREMLIN ASSESSMENT OF TRUMP AND RUSSIA INTERFER-
ENCE IN US PRESIDENTIAL ELECTION (CIR 130 – OCTOBER 12, 2016)

RUSSIA/US PRESIDENTIAL ELECTION:  FURTHER DETAILS OF KREMLIN
LIAISON WITH TRUMP CAMPAIGN  (CIR 134 – OCTOBER 18, 2016)

RUSSIA/US PRESIDENTIAL ELECTION: THE IMPORTANT ROLE OF
TRUMP LAWYER, COHEN IN CAMPAIGN'S SECRET LIAISON WITH THE
KREMLIN (CIR 135 – OCTOBER 19, 2016)

32.    CIR 112 , in sections labeled "Summary" and "Detail," makes a series of

factual allegations about the "current closeness" of an "Alpha Group-PUTIN

relationship," including the allegations that "[s]ignificant favors continue to be done in

both directions" and that "FRIDMAN and AVEN [are] still giving informal advice to

PUTIN, especially on the US."

33.    The Summary section of CIR 112 identifies a former employee of Alfa,

Oleg Govorun, who is now the head of a government department in Putin's

administration, as a "key intermediary" in the "PUTIN-Alpha relationship."  CIR 112

alleges that Govorun "delivered illicit cash directly to PUTIN" "throughout the 1990s,"

when Govorun was an "Alpha executive" and Putin was the Deputy Mayor of St.

Petersburg.

34.    The first paragraph of the Detail section of CIR 112 states the full names

of Plaintiffs Fridman, Aven, and Khan.  It then includes a report from an unnamed

"Russian government official:"

> although they had [sic] had their ups and downs, the
> leading figures in Alpha currently were on very good terms
> with PUTIN.  Significant favours continued to be done in
> both directions, primarily political ones for PUTIN and
> business/legal ones for Alpha. Also, FRIDMAN and
> AVEN continued to give informal advice to PUTIN on

-17-

foreign policy, and especially about the US where he distrusted advice being given him by officials.

35.     Under any reasonable reading of CIR 112, alone, and in the context of the full Dossier and the headings of sixteen of its seventeen CIRs ("the Trump/Russia context"), Plaintiffs Fridman, Aven, and Khan, along with Alfa, are alleged to maintain a highly inappropriate, and even criminal, relationship with Putin, based on criminal interaction dating back to the 1990s.  By clear and defamatory implication, CIR 112 purports to tie the Plaintiffs to a Kremlin-orchestrated campaign to interfere in the 2016 U.S. election.

36.     The second paragraph of the Detail section alleges that Mr. Fridman "recently met directly with PUTIN" and that "much of the dialogue and business between them was mediated" by Govorun, the former Alfa employee.  The paragraph describes Govorun as a "senior Presidential Administration official" who is "trusted by PUTIN:"

> during the 1990s GOVORUN had been Head of Government Relations at Alpha Group and in reality the "driver" and "bag carrier" used by FRIDMAN and AVEN to deliver large amounts of illicit cash to the Russian president, at that time deputy Mayor of St. Petersburg. Given that and the continuing sensitivity of the PUTIN-Alpha relationship, and need for plausible deniability, much of the contact between them was now indirect and entrusted to the relatively low profile GOVORUN.

37.     These allegations are false.  And their defamatory nature, even when read alone, is clear:  CIR 112 alleges that, in the 1990s, Alfa (a member of "Alpha Group") and two of its largest beneficial owners purportedly engaged in acts of criminal bribery by arranging for the "deliver[y] of large amounts of illicit cash" to Putin to secure favorable business treatment from him in his role as a public offical.  Moreover, Oleg

-18-

Govorun was not even employed by Alfa Bank until after Mr. Putin left St. Petersburg to join the Yeltsin administration in Moscow.

38.     Those statements, on their own, and especially when considered in the Trump/Russia context of the Dossier as a whole, are defamatory.  They imply that the alleged improper relationship between Alfa, the Plaintiffs, and Putin, which purportedly started in the 1990s, is ongoing. They also imply the fabrication that Govorun, the alleged "bag carrier" of the 1990s, who is now a senior official in Putin's administration, serves as the trusted intermediary between the Plaintiffs and Putin, including in connection with Plaintiffs' alleged involvement in Russia's interference in the U.S. election.

39.     The third paragraph of the Detail section characterizes the "PUTIN-Alpha relationship as both a carrot and stick:"

> Alpha held `kompromae on PUTIN and his corrupt business activities from the 1990s whilst although not personally overly bothered by Alpha's failure to reinvest the proceeds of its TNK oil company sales into the Russian economy since, the Russian president was able to use pressure on this count from senior Kremlin colleagues as a lever on FRIDMAN and AVEN to make them do his political bidding.

40.     This passage is defamatory in several ways.  Read in the context of the Dossier's Trump/Russia theme. it suggests that Plaintiffs Fridman and Aven use their knowledge of past bribery of Putin—"kompromat"—as a means of criminally extorting favorable treatment for their business interests from his government.  In the context of the other allegations, this passage also implies that Alfa and two of its largest beneficial owners, Plaintiffs Fridman and Aven, willingly maintain a close relationship with Putin and cooperated in some unspecified way in the Kremlin's alleged campaign to interfere

-19-

in the U.S. election in an effort to avoid retribution from Putin for not reinvesting business proceeds in Russia.

41.     The statements about the Plaintiffs in the context of the Dossier as a whole are false, defamatory, and gravely damaging.  The statements in the Detail section of CIR 112 about Plaintiffs allege a criminal relationship with Mr. Putin in the 1990s.   Even if considered independently, these statements raise substantial questions about why these almost twenty-year-old allegations were included by Defendants in a Dossier of "oppo research" about Donald Trump.  The statements of CIR 112, published in an unverified report attributed to an anonymous "top level Russian official" of unknown credibility or existence, raise a clear and plausible inference of reckless disregard of truth or falsity by Defendants.

## CAUSE OF ACTION

42.     Plaintiffs repeat and reallege paragraphs 1-41 above.

43.     By their direct and intentional publication to third parties such as clients, news media, journalists, and others, and by the foreseeable republication of the Dossier and CIR 112 by someone in that group, the Defendants published to a worldwide public false and defamatory statements concerning Plaintiffs and Alfa, including that:

(a)     they are implicated in the scandalous allegations involving Russia and President Trump referred to in the heading of CIR 112 and the other CIRs in the Dossier;

(b)     they and other officials and employees of Alfa "cooperated" with an alleged Kremlin campaign to interfere in the U.S. presidential election;

-20-

      (c)     they are parties to a highly inappropriate, and even criminal, relationship with Vladimir Putin;

      (d)     they engaged in acts of criminal bribery of Vladimir Putin in the 1990s, then the Deputy Mayor of St. Petersburg, to secure favorable business treatment; and

      (e)     they continue to use their knowledge of past bribery of Putin as a means of criminally extorting continuing favorable treatment for their business interests from the Putin government.

44.     Readers of the CIRs and the Dossier were also led to understand, incorrectly, that as a result of the Plaintiffs' alleged past—and current—close relationships and corrupt dealings with Mr. Putin, the Plaintiffs and Alfa were and are required to do Putin's bidding, including by cooperating in the Kremlin's alleged efforts to influence the outcome of the recent U.S. presidential election.

45.     The false statements by the Defendants referred to above defamed the Plaintiffs and Alfa, and have caused and will continue to cause serious injury to their personal, professional, and institutional reputations.

46.     The false and defamatory statements published and republished by the Defendants concerning the Plaintiffs and Alfa, as well as the obvious implications of those statements, were made negligently or with reckless disregard of whether they were true or false.

47.     Defendants are liable for the defamation of Plaintiffs and Alfa, and the resulting harm caused by the news media coverage of the Dossier, including the republication by BuzzFeed and countless other media.

JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.


WHEREFORE, Plaintiffs Mikhail Fridman, Petr Aven, and German Khan

demand judgment against Defendants Orbis and Steele for:

a.      compensatory damages in an amount to be proved at trial, together with

interest and the costs and disbursements of this action, plus reasonable attorneys' fees;

b.      punitive damages in an amount to be determined at trial; and

c.      such other and further relief as this Court may deem just and proper.

Dated: Washington, D.C.
       April 16, 2018

By:      /s/ Kim Hoyt Sperduto
Kim Hoyt Sperduto
DC Bar No. 416127

SPERDUTO THOMPSON PLC
1133 Twentieth Street, N.W.
Second Floor
Washington, D.C. 20036
202-408-8900
202-408-8910 (t)
ksperduto@sperdutothompson.com

Alan S. Lewis
John J. Walsh
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, NY 10005
Telephone:  212-238-8647
lewis@clm.com

Counsel for Plaintiffs
 Mikhail Fridman, et al.

-22-

Superior Court of the District of Columbia
CIVIL DIVISION
Civil Actions Branch
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

Mikhail Fridman, et al.

Plaintiff

vs.

**18-0002667**

Case Number

Orbis Business Intelligence Limited

Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government. you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to tile the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 6:3U a.m. and 5:uu p.m., Mondays through r ridays or between 9:UV a.m. and 12:0V noon on Saturdays. You may tile the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint:

Kim Sperduto

Clerk ()like,c●

Name of Plaintiff's Attorney

Sperduto Thompson PLC

By

Address
 t33 20ili St. NW. Sre:Itrl Flour. IV;ishintzzon. D.C. _inn:;'

1,:t   Apt

209- 408—8900

Date                    ZO      v.:::.●●●●●

Telephone
PoMna.iff11Egg (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction      De c6 mOrbai        hay•gui (202) 879-4828

tsto/Ntipie,(202)879-4828,E f.,J%4•40032.      Vha/c1\ 4.c?•9.  AdVIVI•  (202) 879-4828    g. etp-A.

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN TILE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.

if you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer. promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

Sec reverse side for Spanish translation
Vea al dorso la traduccion al esparlol

4

TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA
DIVISION CIVIL
Seccion de Acciones Civiles
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Telefono: (202) 879-1133 Sitio web: www.dccourts.gov

Demandante

contra

Numero de Caso:

Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestacion a is Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintitan (21) dias contados despues que usted haya recibido este citatorio, excluyendo el dia mismo de la entrega del citatorio. Si usted esta siendo demandado en calidad de oticial o agente del Gobierno de los Estados Unidos de Norteamerica o dcl Gobierno dcl Distrito dc Columbia, tienc usted sesenta (60) dias. contados despues que usted haya recibido este citatorio. para entregar su Contestacion. Ilene que enviarle por correo una copia de su Contestacion al abogado de la parte demandante. El nombre y direccion del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Coniestacion por correo a la direccion que aparece en este t_ ttaturio.

A usted tambien se le require presentar la Contestacion original al Tribunal en la Oficina 5000, silo en 500 Indiana Avenue. N.W., entre las 8:30 a m. y 5:00 p.m.. de tunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodia los sitbados. Usted puede presentar la Contestacion original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestacion o en el plazo de siete (7) dias de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestacien, podria dictarse un fallo en rcbeldia contra usted para que se haga efectivo el desagravio que se busca en la demanda.

SECRETARIO DEL TRIBUNAL

Nombre dcl abogado del Demandante

Por:

Direccion

Subsecretario

Fccha

Telefono

161/1111a.i7Ef*it  (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction       co mOt hai dick hk 4o1 (202) 879-4828

tigliWA.114ta1(202)879-4828    E.J4W-4144ga        VridicT         nartv:I.  (202) 879-4828   x,x4)-A.

IMPORTANTE: Si USTED INCUMPLE CON PRESENTAR UNA CONTESTACION EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR. USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRIA DICTARSE UN FALLO EN REBELDIA CONTRA USTED PARA QUE SE LE COBRE LOS DASIOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRIA RETENERSELE SUS INGRESOS, 0 PODRIA TOMARSELE SUS BIENES PERSONALES 0  BIENES RA10ES Y SER VENDIDOS PARA PAGAR EL FALLO. Si USTED PRETENDE OPONERSE A ESTA ACCION, NO DEJE DE CONTESTAR LA DEAL4NDA DENTRO DEL PLAZO EXIGIDO.

Si desea conversar con un abogado y lc parece que no puede pagarlc a uno, Ilame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue. N.W., para informarse sobre otros lugares donde puede pediriayuda al respecto.

Vea al dorso el original en ingles
See reverse side for English original

CV-3110 [Rev. June 2017]                                                                                        Super. Ct. Civ. R. 4

Superior Court of the District of Columbia
CIVIL DIVISION
Civil Actions Branch
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

Mikhail Fridman, et al.

Plaintiff

vs.

Case Number   18 - 0 0 0 2667

Christopher Steele

Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government. you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to tile the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 6:30 a.m. and 5:du p.m., Nlondays tnrough irtdays or between 9:UU a.m. and i2:UU noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. 11.4.ou-fail.,to file an Answer, judgment by default may be entered against you for the relief demanded in the co4fairnt,

Kim Sperduto

(0400.)/•theivret)•

Name of Plaintiffs Attorney

Sperduto Thompson PLC

By

Address
1133 20111 St. NW.          Floor,          D.C. .20f):::

909- 40k- 8900

Date

Telephone

PoMigia.iiitfEtig (202) 879-4828          veoilez appeler au (202) 879-4828 pour one traduction          D41có i717WrirtriAhlfglh (202)879-4828

Idelik Vi}APO,(202)879-48282.11-114P.          s'h.vOlt 41:749n narnl. (202) 879-4828   g,eco*

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITI UN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER' RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS. YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION. DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traduccion al espaïiol

# TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA
## DIVISION CIVIL
### Seccion de Acciones Civiles
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Telefono: (202) 879-1133 Sitio web: www.dccourts.gov

Demandante

contra

Numero de Caso:

Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cite a comparecer y se le require entregar una Contestacion a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiun (21) dies contados despues que Listed haya recibido este citatorio, excluyendo el dia mismo de la entrega del citatorio. Si usted esta siendo demandado en calidad de official o agente del Gobierno de los Estados Unidos de Norteamerica o del Gobierno del Distrito de Columbia, tienc usted sesenta (60) dies. contados despues que usted haya recibido este citatorio. para entregar su Contestacion. Tiene que enviarle por correo una copia de su Contestacion al abogado de la parte demandante. El nombre y direccion del abogado aparecen al final de este documento. Si el demandado no tiene abogado. tiene que enviarle al demandante una copia de la Contestacion por correo a la direccion que aparece en este C axon°.

A usted tambien se le require presentar la Contested& original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue. N.W., entre las 8:30 a.m. y 5:00 p.m.. de tunes a viemes o entre las 9:00 a.m. y las 12:00 del mediodia los sabados. Usted puede presentar la Contested& original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contested& o en el plazo de siete (7) dies de haberle hecho la entrega al demandante. Si Listed incumple con presentar una Contestacion, podria dietarse un fallo en rebeldia contra usted para que se haga efectivo el desagravio que se busca en la demanda.

SECRETARIO DEL TRIBUNAL

Nombre dcl abogado del Demandante

Poor:

Direecion                                                    Suhsecretario

Fecha

Telefono

OXIIIR.illtTEgit (202) 879-4828         Veuillez appeler au (202) 879-4828 pour une traduction         Uc co mot bai dick lift> gol (202)879-4828

ttttfr:Vg'iqitt(202)879-4828      jr_141gir441,1.V,              41:7 9n /tarry.  (202) 879-4828   R.e.co-A⁴

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACION EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR. USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRIA DICTARSE UN FALLO EN REBELDIA CONTRA USTED PARA QUE SE LE COBRE LOS DAFJOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE. PODRIA RETENERSELE SUS INGRESOS. 0 PODRIA TOMARSELE SUS BIENES PERSONALES 0 BIENES RAICES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCION, NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO.

Si dcsea convcrsar con un abogado y lc parece que no puede pagarle a uno, Ilamc pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue. N.W., para informarse sobre otros lugares donde puede pedirayuda al respecto.

Vea al dorso el original en ingles
See reverse side for English original

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

### INFORMATION SHEET

## 18-0002667

Mikhail Fridman. Petr Aven. and German Khan,

Case Number:

vs

Date: April 16, 2018

Orbis Business Intelligence Limited and Christopher Steele

0    One of the defendants is being sued
in their official capacity.

Name: (Please Print)
Kim Hoyt Sperduto

Relationship to Lawsuit

Firm Name:
Sperduto Thompson PLC

131  Attorney for Plaintiff

Telephone No.:
202-408-8900

Six digit Unified Bar No.:
416127

• Self (Pro Se)

• Other:

TYPE OF CASE:  0    Non-Jury          El  6 Person Jury          0   12 Person Jury
Demand: $ 75,000+                                   Other:

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:                          Judge:                          Calendar #:

Case No.:                          Judge:                          Calendar#:

NATURE OF SUIT:      (Check One Box Only)

A. CONTRACTS                              COLLECTION CASES

| | | |
|---|---|---|
| • 01 Breach of Contract | IIII 14 Under $25,000 Pltf. Grants Consent | M 16 Under 525.000 Consent Denied |
| MI 02 Breach of Warranty | 17 OVER 525.000 Pitt. Grants Consent | IIII 18 OVER S25.000 Consent Denied |
| • 06 Negotiable Instrument | • 27 InsuranceiSubrogation | M 26 InsuranceiSubrogation |
| NI 07 Personal Property | O .er S25.000 Pltf. Grants Consent | Over S25.000 Consent Denied |
| IIN 13 Employment Discrimination | M 07 InsuranceiSubrogation | • 34 Insurance/Subrogation |
| mi 15 Special Education Fees | Under S25.000 Pltf. Grants Consent | Under S25,000 Consent Denied |
| | - 28 Motion to Confirm Arbitration | |
| | Award (Collection Cases Only) | |

B. PROPERTY TORTS

| | | |
|---|---|---|
| • 01 Automobile | • 03 Destruction of Private Property | • 05 Trespass |
| M 02 Conversion | • 04 Property Damage | |
| M 07 Shoplifting. D.C. Code § 27-102 (a) | | |

C. PERSONAL TORTS

| | | |
|---|---|---|
| IIE 01 Abuse of Process | • 10 Invasion of Privacy | • 17 Personal Injury- (Not Automobile, |
| • 02 Alienation of Affection | • 11 Libel and Slander | Not Malpractice) |
| • 03 Assault and Battery | IM 12 Malicious Interference | IIi 18 Wrongful Death (Not Malpractice) |
| • 04 Automobile- Personal Injury | M 13 Malicious Prosecution | • 19 Wrongful Eviction |
| • 05 Deceit (Misrepresentation) | IIM 14 Malpractice Legal | M 20 Friendly Suit |
| m 06 False Accusation | 15 Malpractice Medical Including Wrongful Muth) | • 21 Asbestos |
| MI 07 False Arrest | • 16 Negligence- (Not Automobile, | IN 22 Toxic/Mass Torts |
| MI 08 Fraud | Not Malpractice) | NI 23 Tobacco |
| | | • 24 Lead Paint |

SEE REVERSE SIDE AND CHECK HERE          IF USED

CV-496/June 2015

# Information Sheet, Continued

## C. OTHERS

0    01 Accounting

E] 02 Att. Before Judgment
     05 Ejectment

0    09 Special Writ/Warrants
     (DC Code § 11-941)

Ej 10 Traffic Adjudication

E1 11 Writ of Replevin

0    12 Enforce Mechanics Lien

0    16 Declaratory Judgment

17 Merit Personnel Act (OEA)
(D.C. Code Title 1. Chapter 6)

0    18 Product Liability

24 Application to Confirm. Modify,
Vacate Arbitration Award (DC Code § 16.4401)

0    29 Merit Personnel Act (OHR)

0    31 Housing Code Regulations

0    32 Qui Tam

E1 33 Whistleblower

---

0    03 Change of Name

0    06 Foreign JudgmentiDomestic

0    08 Foreign Judgment/International

FT 13 Correction of Birth Certificate

71 14 Correction OT Marriage

0    15 Libel of Information

0    19 Enter Administrative Order as
     Judgment [ D.C. Code §
     2-1802.03 (h) or 32-151 9 (a)I

0    2l) Master Meter (D.C. Code §

0    21 Petition for Subpoena
     [Rule 28-I (b)]

0    22 Release Mechanics Lien

0    23 Rule 27(a)(1)
     (Perpetuate Testimony)

pi  26 Petition for Civil Asset Forfeiture (Vehicle)

0    27 Petition for Civil Asset Forfeiture (Currency)

n    23 Petition for Civil Asset Forfeiture (Other)

E1 25 Petition for Liquidation

## D.  REAL PROPERTY

0    09 Real Property-Real Estate

0    12 Specific Performance

0    04 Condemnation (Eminent Domain)

D   10 Mortgage Foreclosure/Judicial Sale

0    11 Petition for Civil Asset Forfeiture (RP)

0    08 Quiet Title

E1 25 Liens: Tax ⁄ Water Consent Granted

0    30 Liens: Tax / Water Consent Denied

0    31 Tax Lien Bid Off Certificate Consent Granted

---

/s/ Kim Hoyt Sperduto

April 16. 2018

Attorney's Signature

Date

```
                                            Filed
                                            D.C. Superior Court
                                            04/16/2018 14:43PM
                                            Clerk of the Court
```

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

CIVIL DIVISION

X

MIKHAIL FRIDMAN, PETR AVEN, AND
GERMAN KHAN,
 do CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, NY 10005,

                              **18 - 0 0 0 2 6 6 7**

                    2018 CA

                    COMPLAINT

                         Plaintiffs,

            -v-

ORBIS BUSINESS INTELLIGENCE LIMITED
AND CHRISTOPHER STEELE,
9-11 Grosvenor Gardens
London SW1W OBD,

                    Defendants.

                              X

COMPLAINT
(JURY TRIAL DEMANDED
DEFAMATION)

Plaintiffs Mikhail Fridman, Petr Aven, and German Khan, by their attorneys

Carter Ledyard & Milburn LLP, allege as follows:

INTRODUCTION

1.      This is a defamation case brought by three international businessmen who

were defamed in widely disseminated political opposition research reports commissioned

by political opponents of candidate Donald Trump in the 2016 presidential election cycle.

The reports (which came to be known as the "Trump Dossier," the "Steele Dossier" and

simply as the "Dossier") were published both before and after the 2016 presidential

election by Defendants Orbis Business Intelligence Limited ("Orbis") and Christopher

-1-

Steele ("Steele" and, with Orbis, the "Orbis Defendants") pursuant to an engagement

between Orbis and Fusion GPS ("Fusion")—a Washington, D.C. based firm specializing

in political opposition research whose principal, Glenn Simpson ("Simpson"), is a former

journalist.  Fusion trafficked in procuring damaging information about political

candidates from various sources, including willing suppliers of such information like

Defendants.  Defendants accepted this engagement by Fusion knowing it was intended to,

and likely would, have profound effects in the United States, and specifically the District

of Columbia, because the engagement was political opposition research intended to be

used in connection with the election of the President of the United States.

2.      One of the reports, written by Defendants and supplied to Fusion, is

gravely damaging in that, directly or by implication from the rest of the Dossier, it falsely

accuses the Plaintiffs—and Alfa ("Alfa"), a consortium in which the Plaintiffs are

investors—of criminal conduct and alleged cooperation with the "Kremlin" to influence

the 2016 presidential election.  But neither the Plaintiffs nor Alfa committed any of the

acts recklessly attributed to them by the Defendants.  To the contrary, the Plaintiffs and

Alfa are collateral damage in a U.S. political operation in which Defendants willingly and

knowingly participated, whose focus was an alleged relationship (between the Kremlin

and the Trump campaign) which has nothing whatsoever to do with the Plaintiffs.

3.      The specific "report" that includes facially defamatory statements about

the Plaintiffs is one of seventeen Company Intelligence Reports 2016 ("CIRs") authored

by Defendants that comprise the Tnimp Dossier.  The Defendants prepared Company

Intelligence Report 112 (the "Report" or "CIR 112"), which makes statements about the

Plaintiffs, for inclusion in the Trump Dossier, even though the Plaintiffs' past, current

and intended future activities have nothing to do with the Dossier's intended subject matter and purpose.  Broadly, the Dossier purports to describe details of an alleged scheme between the Russian government and the Trump presidential campaign to unlawfully manipulate the result of the 2016 U.S. presidential election in favor of candidate Trump.

4.      The Defendants prepared CIR 112 as part of their engagement by Fusion to conduct "opposition research" (known as "oppo research" by its practitioners and the media) against Trump, even though its text, unlike that of the other reports, does not mention Trump or his campaign.  Opposition research, in essence, is the gathering of information for the purpose of eventually discrediting or otherwise harming the candidacy of a candidate for a public office.  Opposition research is neither objective nor neutral.  Instead, it is skewed from the outset in favor of appearing to find negative information about individuals—the essence of the product that political opposition research practitioners such as the Defendants are hired to produce.

5.      Fusion and Simpson were initially hired to conduct opposition research by Republican Party political opponents of candidate Trump during the primary phase of the 2016 election cycle.  That engagement was terminated when it became clear that Mr. Trump would be the Republican nominee.  At that point, Fusion and Simpson solicited and obtained an engagement with the Democratic National Committee and the campaign of candidate Hillary Clinton to gather discrediting information about Mr. Trump, including any connections he might have to Russian businesses or Russia's government.  In connection with that engagement, Fusion hired Orbis and Steele, who promptly went to work on the project in June, 2016.  Steele used his network of "paid collectors" who

gathered information from "subsources" in Russia, which Steele compiled into written reports for Fusion over the course of several months in 2016.  Eventually, the reports, including the false and defamatory report at the heart of this case, were assembled in the document that has come to be known to the public as the Trump Dossier.

6.      Steele has acknowledged that his reports are unverified "raw intelligence" and has refused to identify his alleged "sources."  Indeed, the report at the heart of this case, CIR 112, has never been verified and none of its sources has ever been publicly identified.  Defendants recklessly placed the Dossier's allegations of misconduct, inclugin criminal action, by Plaintiffs beyond Defendants' control – which allowed those allegations to get into the hands of media devoted to breaking news on the hottest subjects of the day:  the Trump candidacy and his election as President.

7.      CIR 112, dated September 14, 2016, falsely accuses the Plaintiffs of criminal bribery in the 1990s, of an inappropriate relationship with Vladimir Putin over the course of decades, and of participation in an alleged Trump-Russia scheme to influence the 2016 U.S. presidential election.  At all relevant times Defendants were aware that they had not verified the contents of CIR 112 and that its content was provided by sources who would remain unidentified – whose credibility could therefore not be assessed by a reader of the Dossier.  Defendants could easily have removed that report from the Dossier before they delivered it to their client, and before they and their client Fusion started peddling it to media and journalists in September and October 2016.  They chose not to do so.  Nor did they attempt to determine the veracity of that report with the Plaintiffs themselves.

-4-

8.      At all times during the Defendants' engagement by Fusion, it was either intended or clearly foreseeable that if the Dossier's contents, including CIR 112, were made available to third parties, including journalists, such provocative material would be published and republished, including to the public at large.  Indeed, that is the entire purpose of "oppo research" in American politics.  Those third parties included government officials, persons with governmental positions who were acting in a private capacity, as well as news media and journalists who could make its content public.

9.      On information and belief, Fusion arranged for Defendant Steele to brief selected members of the print and online media about the information he was compiling on candidate Trump and his campaign.  Consistent with the intended purpose of - oppo research" to publicly discredit its target, Steele's briefings were designed to generate interest in the Dossier and secure eventual public dissemination of its content.  At least some of the briefings Steele personally provided were held in late summer, 2016, in Washington D.C. at the Tabard Inn, and attendees included The New Yorker reporter Jane Mayer.'  Briefings were also held for journalists from the New York Times, the Washington Post, CNN, Yahoo News, and others in September 2016.  The New York Times, The Washington Post, and Yahoo News were given a second briefing.2  Shortly thereafter, Yahoo News published an article by Michael Isikoff that described some of the content of the Dossier (referred to there as "intelligence reports" and "reports"), which

---

1 Jane Mayer, Christopher Steele, the Man Behind the Trump Dossier, THE NEW YORKER, March 12, 2018, available at https://www.newyorker.com/magazine/2018/03/12/christopher-steele-the-man-behind-the-trump-dossier.

2 Defendants' Response to Claimants Request For Information. Gubarev, et al. v. Orbis Business Intelligence Limited and Christopher Steele, Claim No. HQ1700413, In the High Court of Justice, Queens Bench Division, May 18, 2017, at 8 ("The Orbis/Steele Response").

was still being compiled at that time.3  Many other media articles reported speculative

accounts of the Dossier's existence and contents.  In late October 2016, Defendant Steele

gave an interview to David Corn, a writer for Mother Jones magazine, which, on October

31, 2016, published an article by Corn headlined "A Veteran Spy Has Given The FBI

Information Alleging a Russian Operation to Cultivate Donald Trump."4  Corn's article

stated that he had "reviewed" the early reports in the Dossier, and then quoted from those

reports as well as statements made by Steele in the interview.  The publication to third

parties and public dissemination of the Dossier's content had begun in earnest.

10.     In addition to cultivating media interest, the Defendants also arranged and

participated in a meeting in Great Britain between Defendant Steele and David Kramer,

who held no public office but was the director of a private foundation affiliated with U.S.

Senator John McCain.  A purpose of that meeting was to show Kramer the content of the

sixteen pre-election reports in the Dossier so he could brief Senator McCain, who at the

time was a well-known and outspoken critic of Trump's candidacy.  Subsequently, in

November 2016, Orbis and Steele arranged for a copy of all sixteen of the Dossier's then

existing reports to be provided to Kramer in D.C. by Fusion—for  redelivery and further

---

3 Michael Isikoff, U.S. intel officials probe ties between Trump advisor and Kremlin, YAHOO
NEWS, Sept. 23, 2016, available at https://www.yahoo.com/news/u-s-intel-officials-probe-ties-
between-trump-adviser-and-kremlin-175046002.html.

4 David Corn, A Veteran Spy Has Given the FBI Information Alleging a Russian Operation to
Cultivate Donald Trump, MOTHER JONES, Oct. 31, 2016, available at
https://www.motherjones.com/politics/2016/10/veteran-spy-gave-tbi-info-alleging-russian-
operation-cultivate-donald-trump.

publication to Senator McCain in D.C.—including the report (CIR 112) that falsely accuses and defames Plaintiffs.5

11.    In September, 2016, in a Washington D.C. hotel room, Steele met with Jonathan Winer—then an official in the State Department —and briefed him on the contents of the Dossier.  Steele had a long history of supplying Winer with intelligence; between 2013 and 2016, Steele provided Winer with more than 100 reports, many of which Winer then shared with his colleagues in the State Department.°  Steele also briefed a D.C. based official from the Department of Justice, Bruce Ohr.

12.    As the 2016 presidential election neared, both print and online media in the United States and abroad began to expand their coverage of the Dossier and its alleged content.  That coverage only intensified after Trump won the election.  On January 10, 2017, one of those media entities, BuzzFeed, Inc., published the entire Dossier on the Internet, describing it there as "explosive."  The copy of the Dossier that BuzzFeed published included the false and defamatory allegations of CIR 112 about the Plaintiffs and Alfa, along with the article entitled "These Reports Allege Trump Has Deep Ties to Russia."'  The Dossier misspells Alfa's name throughout, incorrectly spelling it as "Alpha."  BuzzFeed's article did not mention CIR 112 or its allegations, but

5 The Orbis/Steele Response, at 5-6.

6 Jonathan M. Winer, Devin Nunes is Investigating Me.  Here's the Truth, THE WASHINGTON POST,  February 8, 2018, available at https://www.washingtonpost.com/opinions/devin-nunes-is-investigating-me-heres-the-truth/2018/02/08/cc621170-0cf4-11e8-8b0d-891602206fb7_story html?utm_term=.81c6a33fccf4.

7 Ken Bensinger, Miriam Elder, Mark Schoofs, These Reports Allege Trump Has Deep Ties To Russia, BUZZFEED NEWS, Jan. 10, 2017, available at https://www.buzzfeed.com/kenbensinger/these-reports-allege-trump-has-deep-ties-to-russia?utm_term=.is1Q2ka2J.

-7-

focused instead on president-elect Trump and his alleged relationships with Russia, explaining that it "was publishing the full document so that Americans can make up their minds about allegations about the president-elect that have circulated at the highest levels of the U.S. government."[8]

13.     The Defendants intended, anticipated, or foresaw a high likelihood that providing third parties (like David Kramer, Senator McCain, and Jonathan Winer) and journalists with access to the Dossier's defamatory content would result in its republication by news media outlets, including online news media such as BuzzFeed.

14.     Plaintiffs seek an award of compensatory and punitive damages for the harm to their personal and professional reputations, current business interests, and the impairment of business opportunities that resulted from the blatantly false and defamatory statements and implications about them published recklessly to third parties by the Defendants and republished by BuzzFeed and countless other media around the world.

## THE PARTIES

15.     Plaintiffs Fridman, Aven. and Khan are ultimate beneficial owners of Alfa.  Fridman and Khan are each citizens of both Russia and Israel, and Aven is a citizen of Russia.  Plaintiffs are not widely known in the United States, had no role or involvement in any aspect of the 2016 U.S. presidential election, and made no public comments about it.

---

[8] Id.

16.    On information and belief, defendant Orbis is a private limited company headquartered in London, England.  Orbis and Steele have had working relationships with Washington D.C.-based Fusion and Simpson for a number of years.  In or about July of 2016, Orbis was engaged by and contracted with Fusion and Simpson to research and compile reports, on Trump/Russia relationships for delivery to Fusion in Washington, D.C., where Fusion would evaluate them and deliver them to its clients for their political purposes, including dissemination to government officials, journalists and news media in Washington D.C. and elsewhere to oppose the candidacy of Donald Trump in the 2016 U.S. Presidential campaign.

17.    Defendant Christopher Steele, on information and belief, is a former British intelligence officer and a founder and a principal of Orbis.  Over the years of their working relationship, defendant Steele was D.C.-based Fusion's contact at Orbis for engagements and was primarily responsible for researching and creating the Dossier to be provided to Fusion in D.C. for further dissemination here and elsewhere.  Upon information and belief, as set forth above, Steele disseminated the defamatory material about Plaintiffs to journalists, including The Washington Post, Yahoo News and David Corn of Mother Jones magazine, and to third parties like David Kramer, Senator McCain, and Jonathan Winer, in Washington, D.C. in the fall of 2016.  Mr. Winer recently stated publicly in an article in the Washington Post that after his 2013 return to the U.S. State Department, Steele provided him with more than 100 of his Russia-focused reports, which Winer shared with a senior State Department official.9

9  Winer, supra. note 6.

-9-

18.     Both Steele and Simpson used their prior experiences as an operative in British intelligence who had covered Russian matters (Steele) and as an investigative journalist for the Wall Street Journal (Simpson) to give their oppo research output a gloss of credibility and reliability which, in this case, was unwarranted.

19.     Steele recently told a journalist that he did not interview his sources in Russia himself, but gathered his information through "paid collectors" and "subsources." And by Steele's own estimation, as much as 30% of the Dossier's content may not be "accurate."10

JURISDICTION AND VENUE

20.     This Court has personal jurisdiction over the Orbis defendants pursuant to Section 13-423 of the Code of the District of Columbia because Orbis and Steele transacted business in the District of Columbia.  Defendants also caused tortious injury to Plaintiffs by acts and omissions within or directed to the District of Columbia (the "District").  Upon information and belief, in the District in the late summer and fall of 2016, Orbis and Steele disseminated defamatory material to Fusion and  to multiple journalists such as The Washington Post, David Corn (the District-based bureau chief of Mother Jones magazine) and Michael Isikoff of Yahoo News.  At least one of the briefings at which Steele distributed defamatory material about Plaintiffs to journalists was held at the Tabard Inn in the District, including a briefing of The New Yorker

---

10  Luke Harding, How Trump walked into Putin's web, THE GUARDIAN, Nov. 15, 2017, available at https://www.theguardian.corninews/2017/nov/15/how-trump-walked-into-putins-web-luke.

-10-

reporter Jane Mayer."  Steele also met with Jonathan Winer of the U.S. State Department at a hotel room in the District, and had discussions with District-based U.S. Department of Justice official Bruce Orh.  In September, 2016, according to Winer, at the height of the presidential election campaign, Winer and Steele met in the District  "and discussed the information now known as the 'dossier' so that Winer could "alert the State Department," which he did by preparing a "two page summary for a senior official" of the Department in the District.  Finally, Steele authorized District-based Fusion GPS to provide a copy of his reports to David Kramer in the District for forwarding to Senator McCain, also in the District.  In sum, Steele, acting for himself and Orbis, has engaged in a persistent  course  of conduct, often with Fusion and Simpson,  intended to have and which did have effects in the District, by meeting with District based media and government employees to bring his reports on "Russia matters" to their attention.  Those reports included the defamatory statements about Plaintiffs.  From within and without the District, Steele's actions, on behalf of Orbis and himself, resulted in the tortious injury to Plaintiffs alleged herein, and have subjected him and Orbis to the personal jurisdiction of this Court.

21.     In addition, Steele, on behalf of himself and Orbis, has engaged in other ongoing business relationships with entities located in the District.  On information and belief, Steele and Orbis have been retained repeatedly by the District-based F.B.I to assist in various investigations between 2009 and 2016 and, as alleged above, Steele and Orbis have had an ongoing professional relationship with Fusion for years.  And as also noted above, according to Winer, during his 2013-2016 employment at the State Department in

11  Mayer, supra, at note 1.

-11-

the District, Steele/Orbis provided over 100 intelligence reports, many of which Winer shared with other State Department officials.

## FACTUAL ALLEGATIONS

22.     On information an belief, Orbis and Steele were engaged by Fusion during the 2016 U.S. presidential campaign to gather "oppo research," including compromising and salacious information about then presidential candidate Donald Trump.  The scope of this engagement was not limited to Trump's business dealings in Russia, but also included the candidate's personal conduct.  A significant purpose of this "research" was its ultimate intended use by Trump's political opponents to try to thwart his candidacy.  Although Fusion had initially been hired by Republican opponents of Trump's candidacy, by the time Fusion engaged Orbis, Trump had secured the Republican nomination and the focus of opposition to Trump's candidacy had shifted to the Democrats.  Fusion was engaged by Perkins Coie, a law firm with an office in D.C., in that firm's capacity as representing the Democratic National Committee (DNC) and HFACC, Inc., a campaign organization supporting Hillary Rodham Clinton's candidacy for President.  Perkins Coie retained Fusion to provide such research services in April 2016, an engagement which continued until October 2016,[12] and Fusion, in turn, retained Defendants to carry out that task.

_____

[12] Adam Entous, Devlin Barrett, Rosalind S. Helderman, Clinton campaign, DNC paid for research that led to Russia dossier, THE WASHINGTON POST, Oct. 24, 2017, available at https://www.washingtonpost.com/world/national-security/clinton-campaign-dnc-paid-for-research-that-led-to-russia-dossier/2017/10/24/226fabf0-b8e4-11e7-a908-a3470754bbb9_story.html?utm_term=.897b43950afc.

23.     On information and belief, the Orbis Defendants and Fusion communicated with one another to initiate and perform that engagement via postal or communicated with one another to initiate and perform that engagement via postal or courier services, email, facsimile, interne audio or video services and/or telephone calls between Washington, D.C. and London, England.  Orbis and Steele also acted directly in the District, including in joint meetings to brief members of the news media.

24.     The Orbis Defendants proceeded to research Trump's personal behavior in Russia and business dealings with Russian government officials, business leaders, and business entities.  Steele compiled the "investigative" results into at least seventeen written CIRs for delivery to Fusion in Washington, D.C.  By Steele's own description, the CIRs were "raw intelligence" containing unverified information from sources he did not personally interview."  The CIRs produced between June 2016 and the end of October 2016 (including CIR 112) were provided and thus published to Fusion, and, in turn, to lawyers at Perkins Coie and their clients at the DNC and HFACC.

25.     After Trump received the Republican nomination for President in July 2016, many media reports subsequently surfaced asserting, correctly, that Fusion had entered into an engagement with Democratic Party operatives interested in using oppo research to support Hillary Clinton's candidacy.  These media reports vastly increased other media's and the public's interest in the content of the Dossier.

26.     In the late Summer or early Fall of 2016, defendant Steele, acting on behalf of Orbis, personally provided briefings on the content of the Dossier he and Orbis had prepared to a select group of journalists in the United States.  Those journalists

13 The Orbis/Steele Response, at 7, #17.

included D.C.-based David Corn of Mother Jones magazine.  Mother Jones then published an article by Mr. Corn about the existence, purpose, and content of the Dossier based on Steele's briefing to Corn and the author's review of the oppo research made available to him by Steele.

27.     Steele has admitted that, through a D.C. based intermediary who was not a government official, David E. Kramer, he provided the oppo research in the Dossier to Senator John McCain of Arizona, an outspoken political opponent of Donald Trump's candidacy.

28.     As they performed their work for Fusion's clients, the Orbis Defendants knew, anticipated or reasonably should have foreseen that, once in the hands of third parties such as David Kramer, Senator McCain, journalists like Michael Isikoff and David Corn, Perkins Coie, the political operatives at the DNC and HFACC, and their media contacts, the CIRs would be further disseminated publicly.  Such further dissemination would inevitably foster widespread discussion about the CIRs in the United States.  That is exactly what happened.  Much of the ensuing media attention and public discussion focused on Orbis' and Steele's roles in the creation and dissemination of the Dossier, and the interviews solicited by them.

29.     Upon information and belief, during this campaign to promote the public dissemination of their oppo research, Orbis and Steele provided background briefings to the media without attribution.  During those briefings, Defendants never vouched for the credibility of their sources or the accuracy and reliability of the content of the Dossier and/or of CIR 112 specifically.

-14-

30.     Despite the fact that they did not know the unverified, anonymous, inherently harmful accusations in CIR 112 about Plaintiffs to be true, Defendants intentionally published CIR 112 [along with the other reports in the Dossier] to Fusion, David Kramer, and John McCain, and foresaw (or reasonably should have foreseen) that it would then be republished to (1) Perkins Coie; (2) Perkins Coie's clients (the DNC and the HFACC); (3) employees of the DNC and the HFACC; and (4) journalists and media. Elements of the Dossier, possibly including CIR112, may have been published even more extensively by being made available for viewing during arranged briefings of certain journalists by Defendant Steele.  Worldwide publication of the entire Dossier, whether by BuzzFeed or anyone else, was inevitable after these reckless actions by Defendants.

31.     CIR 112 specifically discusses the Plaintiffs.  Its heading, "RUSSIA/US PRESIDENTIAL ELECTION:  KREMLIN-ALPHA GROUP CO-OPERATION," is defamatory in the Trump/Russia context of the entire Dossier, as this heading suggests that Alfa and its executives, including the Plaintiffs, cooperated in the alleged Kremlin-orchestrated campaign to interfere in the 2016 U.S. presidential election—the overriding focus  of Steele's reports.  This is a plausible and, indeed, inescapable inference a reasonable reader would draw from the heading of CIR 112, both because of its own content and based on the headings of fifteen of the sixteen other CIRs that Defendants dated and/or published before the end of October 2016.  The Dossier's headings, as sequenced in the Dossier, are as follows:

-15-

US PRESIDENTIAL ELECTION: REPUBLICAN CANDIDATE DONALD TRUMP'S ACTIVITIES IN RUSSIA AND COMPROMISING RELATIONSHIP WITH THE KREMLIN (CIR 80 – JUNE 20, 2016)

RUSSIA/US PRESIDENTIAL ELECTION:  FURTHER INDICATIONS OF EXTENSIVE CONSPIRACY BETWEEN TRUMP'S CAMPAIGN TEAM AND THE KREMLIN ( CIR 95 – UNDATED)

RUSSIA:  SECRET KREMLIN MEETINGS ATTENDED BY TRUMP ADVISOR, CARTER PAGE IN MOSCOW (JULY 2016)  (CIR 94 – JULY 19, 2016)

RUSSIA-US PRESIDENTIAL ELECTION:  KREMLIN CONCERN THAT POLITICAL FALLOUT FROM DNC E-MAIL HACKING AFFAIR SPIRALLING [sic] OUT OF CONTROL (CIR 97 – JULY 30, 2016)

RUSSIA/USA:  GROWING BACKLASH IN KREMLIN TO DNC HACKING AND TRUMP SUPPORT OPERATIONS (CIR 100 – AUGUST 5, 2016)

RUSSIA/US PRESIDENTIAL ELECTION:  SENIOR KREMLIN FIGURE OUTLINES EVOLVING RUSSIAN TACTICS IN PRO-TRUMP. ANTI-CLINTON OPERATION (CIR 101 – AUGUST 10, 2016)

RUSSIA/US PRESIDENTIAL ELECTION: REACTION IN TRUMP CAMP TO RECENT NEGATIVE PUBLICITY ABOUT RUSSIAN INTERFERENCE AND LIKELY RESULTING TACTICS GOING FORWARD (CIR 102 – AUGUST 10, 2016)

RUSSIA/US PRESIDENTIAL ELECTION:  FURTHER DETAILS OF TRUMP LAWYER COHEN'S SECRET LIAISON WITH THE KREMLIN (CIR 136 – OCTOBER 20, 2016)

RUSSIA/UKRAINE:  THE DEMISE OF TRUMP'S CAMPAIGN MANAGER PAUL MANAFORT (CIR 105 – AUGUST 22, 2016)

RUSSIA/US:  KREMLIN FALLOUT FROM MEDIA EXPOSURE OF MOSCOW'S INTERFERENCE IN THE US PRESIDENTIAL CAMPAIGN (CIR 111— SEPTEMBER 14, 2016)

RUSSIA/US PRESIDENTIAL ELECTION:  KREMLIN-ALPHA GROUP CO-OPERATION (CIR 112 – SEPTEMBER 14, 2016)

RUSSIA/US PRESIDENTIAL ELECTION- REPUBLICAN CANDIDATE TRUMP'S PRIOR ACTIVITIES IN ST. PETERSBURG (CIR 113 – SEPTEMBER 14, 2016)

RUSSIA:  KREMLIN ASSESSMENT OF TRUMP AND RUSSIA INTERFER-
ENCE IN US PRESIDENTIAL ELECTION (CIR 130 – OCTOBER 12, 2016)

RUSSIA/US PRESIDENTIAL ELECTION:  FURTHER DETAILS OF KREMLIN
LIAISON WITH TRUMP CAMPAIGN  (CIR 134 – OCTOBER 18, 2016)

RUSSIA/US PRESIDENTIAL ELECTION: THE IMPORTANT ROLE OF
TRUMP LAWYER, COHEN IN CAMPAIGN'S SECRET LIAISON WITH THE
KREMLIN (CIR 135 – OCTOBER 19, 2016)

32.    CIR 112 , in sections labeled "Summary" and "Detail," makes a series of

factual allegations about the "current closeness" of an "Alpha Group-PUTIN

relationship," including the allegations that "[s]ignificant favors continue to be done in

both directions" and that "FRIDMAN and AVEN [are] still giving informal advice to

PUTIN, especially on the US."

33.    The Summary section of CIR 112 identifies a former employee of Alfa,

Oleg Govorun, who is now the head of a government department in Putin's

administration, as a "key intermediary" in the "PUTIN-Alpha relationship."  CIR 112

alleges that Govorun "delivered illicit cash directly to PUTIN" "throughout the 1990s,"

when Govorun was an "Alpha executive" and Putin was the Deputy Mayor of St.

Petersburg.

34.    The first paragraph of the Detail section of CIR 112 states the full names

of Plaintiffs Fridman, Aven, and Khan.  It then includes a report from an unnamed

"Russian government official:"

> although they had [sic] had their ups and downs, the
> leading figures in Alpha currently were on very good terms
> with PUTIN.  Significant favours continued to be done in
> both directions, primarily political ones for PUTIN and
> business/legal ones for Alpha. Also, FRIDMAN and
> AVEN continued to give informal advice to PUTIN on

-17-

foreign policy, and especially about the US where he distrusted advice being given him by officials.

35.     Under any reasonable reading of CIR 112, alone, and in the context of the full Dossier and the headings of sixteen of its seventeen CIRs ("the Trump/Russia context"), Plaintiffs Fridman, Aven, and Khan, along with Alfa, are alleged to maintain a highly inappropriate, and even criminal, relationship with Putin, based on criminal interaction dating back to the 1990s.  By clear and defamatory implication, CIR 112 purports to tie the Plaintiffs to a Kremlin-orchestrated campaign to interfere in the 2016 U.S. election.

36.     The second paragraph of the Detail section alleges that Mr. Fridman "recently met directly with PUTIN" and that "much of the dialogue and business between them was mediated" by Govorun, the former Alfa employee.  The paragraph describes Govorun as a "senior Presidential Administration official" who is "trusted by PUTIN:"

> during the 1990s GOVORUN had been Head of Government Relations at Alpha Group and in reality the "driver" and "bag carrier" used by FRIDMAN and AVEN to deliver large amounts of illicit cash to the Russian president, at that time deputy Mayor of St. Petersburg. Given that and the continuing sensitivity of the PUTIN-Alpha relationship, and need for plausible deniability, much of the contact between them was now indirect and entrusted to the relatively low profile GOVORUN.

37.     These allegations are false.  And their defamatory nature, even when read alone, is clear:  CIR 112 alleges that, in the 1990s, Alfa (a member of "Alpha Group") and two of its largest beneficial owners purportedly engaged in acts of criminal bribery by arranging for the "deliver[y] of large amounts of illicit cash" to Putin to secure favorable business treatment from him in his role as a public offical.  Moreover, Oleg

-18-

Govorun was not even employed by Alfa Bank until after Mr. Putin left St. Petersburg to join the Yeltsin administration in Moscow.

38.     Those statements, on their own, and especially when considered in the Trump/Russia context of the Dossier as a whole, are defamatory.  They imply that the alleged improper relationship between Alfa, the Plaintiffs, and Putin, which purportedly started in the 1990s, is ongoing. They also imply the fabrication that Govorun, the alleged "bag carrier" of the 1990s, who is now a senior official in Putin's administration, serves as the trusted intermediary between the Plaintiffs and Putin, including in connection with Plaintiffs' alleged involvement in Russia's interference in the U.S. election.

39.     The third paragraph of the Detail section characterizes the "PUTIN-Alpha relationship as both a carrot and stick:"

> Alpha held `kompromae on PUTIN and his corrupt business activities from the 1990s whilst although not personally overly bothered by Alpha's failure to reinvest the proceeds of its TNK oil company sales into the Russian economy since, the Russian president was able to use pressure on this count from senior Kremlin colleagues as a lever on FRIDMAN and AVEN to make them do his political bidding.

40.     This passage is defamatory in several ways.  Read in the context of the Dossier's Trump/Russia theme. it suggests that Plaintiffs Fridman and Aven use their knowledge of past bribery of Putin—"kompromat"—as a means of criminally extorting favorable treatment for their business interests from his government.  In the context of the other allegations, this passage also implies that Alfa and two of its largest beneficial owners, Plaintiffs Fridman and Aven, willingly maintain a close relationship with Putin and cooperated in some unspecified way in the Kremlin's alleged campaign to interfere

-19-

in the U.S. election in an effort to avoid retribution from Putin for not reinvesting business proceeds in Russia.

41.     The statements about the Plaintiffs in the context of the Dossier as a whole are false, defamatory, and gravely damaging.  The statements in the Detail section of CIR 112 about Plaintiffs allege a criminal relationship with Mr. Putin in the 1990s.  Even if considered independently, these statements raise substantial questions about why these almost twenty-year-old allegations were included by Defendants in a Dossier of "oppo research" about Donald Trump.  The statements of CIR 112, published in an unverified report attributed to an anonymous "top level Russian official" of unknown credibility or existence, raise a clear and plausible inference of reckless disregard of truth or falsity by Defendants.

## CAUSE OF ACTION

42.     Plaintiffs repeat and reallege paragraphs 1-41 above.

43.     By their direct and intentional publication to third parties such as clients, news media, journalists, and others, and by the foreseeable republication of the Dossier and CIR 112 by someone in that group, the Defendants published to a worldwide public false and defamatory statements concerning Plaintiffs and Alfa, including that:

(a)     they are implicated in the scandalous allegations involving Russia and President Trump referred to in the heading of CIR 112 and the other CIRs in the Dossier;

(b)     they and other officials and employees of Alfa "cooperated" with an alleged Kremlin campaign to interfere in the U.S. presidential election;

-20-

(c)      they are parties to a highly inappropriate, and even criminal,

relationship with Vladimir Putin;

(d)      they engaged in acts of criminal bribery of Vladimir Putin in the

1990s, then the Deputy Mayor of St. Petersburg, to secure favorable business

treatment; and

(e)      they continue to use their knowledge of past bribery of Putin as a

means of criminally extorting continuing favorable treatment for their business

interests from the Putin government.

44.      Readers of the CIRs and the Dossier were also led to understand,

incorrectly, that as a result of the Plaintiffs' alleged past—and current—close

relationships and corrupt dealings with Mr. Putin, the Plaintiffs and Alfa were and are

required to do Putin's bidding, including by cooperating in the Kremlin's alleged efforts

to influence the outcome of the recent U.S. presidential election.

45.      The false statements by the Defendants referred to above defamed the

Plaintiffs and Alfa, and have caused and will continue to cause serious injury to their

personal, professional, and institutional reputations.

46.      The false and defamatory statements published and republished by the

Defendants concerning the Plaintiffs and Alfa, as well as the obvious implications of

those statements, were made negligently or with reckless disregard of whether they were

true or false.

47.      Defendants are liable for the defamation of Plaintiffs and Alfa, and the

resulting harm caused by the news media coverage of the Dossier, including the

republication by BuzzFeed and countless other media.

JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

WHEREFORE, Plaintiffs Mikhail Fridman, Petr Aven, and German Khan

demand judgment against Defendants Orbis and Steele for:

a.      compensatory damages in an amount to be proved at trial, together with

interest and the costs and disbursements of this action, plus reasonable attorneys' fees;

b.      punitive damages in an amount to be determined at trial; and

c.      such other and further relief as this Court may deem just and proper.

Dated: Washington, D.C.
       April 16, 2018

By:      /s/ Kim Hoyt Sperduto
         Kim Hoyt Sperduto
         DC Bar No. 416127

         SPERDUTO THOMPSON PLC
         1133 Twentieth Street, N.W.
         Second Floor
         Washington, D.C. 20036
         202-408-8900
         202-408-8910 (t)
         ksperduto@sperdutothompson.com

         Alan S. Lewis
         John J. Walsh
         CARTER LEDYARD & MILBURN LLP
         2 Wall Street
         New York, NY 10005
         Telephone:   212-238-8647
         lewis@clm.com

         Counsel for Plaintiffs
          Mikhail Fridman, et al.

-22-

Superior Court of the District of Columbia
CIVIL DIVISION
Civil Actions Branch
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

Mikhail Fridman, et al.

                                    Plaintiff

                            vs.                                          18-0002667

Orbis Business Intelligence Limited                        Case Number

                                    Defendant

                            SUMMONS

To the above named Defendant:

        You are hereby summoned and required to serve an Answer to the attached Complaint, either
personally or through an attorney, within twenty one (21) days after service of this summons upon you,
exclusive of the day of service. If you are being sued as an officer or agency of the United States Government
or the District of Columbia Government. you have sixty (60) days after service of this summons to serve your
Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The
attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed
to the plaintiff at the address stated on this Summons.

        You are also required to tile the original Answer with the Court in Suite 5000 at 500 Indiana Avenue,
N.W., between 6:3U a.m. and 5:uu p.m., Mondays through r ridays or between 9:UV a.m. and 12:0V noon on
Saturdays. You may tile the original Answer with the Court either before you serve a copy of the Answer on
the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer,
judgment by default may be entered against you for the relief demanded in the complaint:

Kim Sperduto                                        Clerk ()like rc

Name of Plaintiff's Attorney
                                                                   4.
Sperduto Thompson PLC                      By

Address
 t33 20ili St. NW. Sre:ltrl Flour. IV;ishintzzon. D.C. _inn:;'        1.;t   Apt

209- 408—8900                              Date               ZO    v.::.••••••

Telephone
PoMna.iff11Egg (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction    De c6 mOrbai    hay•gui (202) 879-4828
tsto/Ntipie,(202)879-4828,E f.,J%4•40032.   Vha/c1V  4.c?•9.  AdVIVI•  (202) 879-4828    g. etp-A.


    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN TILE TIME STATED ABOVE, OR IF, AFTER YOU
ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT
MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE
COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR
REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS
ACTION  DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.

    if you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer. promptly contact one of the offices of the
Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500
Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

                            Sec reverse side for Spanish translation
                            Vea al dorso la traduccion al esparlol

4

# TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA
## DIVISION CIVIL
### Seccion de Acciones Civiles
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Telefono: (202) 879-1133 Sitio web: www.dccourts.gov

Demandante

contra

Numero de Caso:

Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestacion a is Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintitan (21) dias contados despues que usted haya recibido este citatorio, excluyendo el dia mismo de la entrega del citatorio. Si usted esta siendo demandado en calidad de oticial o agente del Gobierno de los Estados Unidos de Norteamerica o dcl Gobierno dcl Distrito dc Columbia, tienc usted sesenta (60) dias. contados despues que usted haya recibido este citatorio. para entregar su Contestacion. IIene que enviarle por correo una copia de su Contestacion al abogado de la parte demandante. El nombre y direccion del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Coniestacion por correo a la direccion que aparece en este t_ ttaturio.

A usted tambien se le require presentar la Contestacion original al Tribunal en la Oficina 5000, silo en 500 Indiana Avenue. N.W., entre las 8:30 a m. y 5:00 p.m.. de tunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodia los sitbados. Usted puede presentar la Contestacion original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestacion o en el plazo de siete (7) dias de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestacien, podria dictarse un fallo en rcbeldia contra usted para que se haga efectivo el desagravio que se busca en la demanda.

SECRETARIO DEL TRIBUNAL

Nombre dcl abogado del Demandante

Por:

Direccion

Subsecretario

Fccha

Telefono

161/1111a.i7Ef*it  (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        co mOt hai dick hk  4o1 (202) 879-4828

tigliWA.114ta1(202)879-4828    E.J4W-4144ga        VridicT        nartv:I.  (202) 879-4828   x,x4)-A.

IMPORTANTE: Si USTED INCUMPLE CON PRESENTAR UNA CONTESTACION EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR. USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRIA DICTARSE UN FALLO EN REBELDIA CONTRA USTED PARA QUE SE LE COBRE LOS DASIOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRIA RETENERSELE SUS INGRESOS, 0 PODRIA TOMARSELE SUS BIENES PERSONALES 0  BIENES RA10ES Y SER VENDIDOS PARA PAGAR EL FALLO. Si USTED PRETENDE OPONERSE A ESTA ACCION, NO DEJE DE CONTESTAR LA DEAL4NDA DENTRO DEL PLAZO EXIGIDO.

Si desea conversar con un abogado y lc parece que no puede pagarlc a uno, Ilame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue. N.W., para informarse sobre otros lugares donde puede pediriayuda al respecto.

Vea al dorso el original en ingles
See reverse side for English original

CV-3110 [Rev. June 2017]                                                                                     Super. Ct. Civ. R. 4

Superior Court of the District of Columbia
CIVIL DIVISION
Civil Actions Branch
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

Mikhail Fridman, et al.

Plaintiff

vs.

Case Number 18 - 0 0 0 2667

Christopher Steele

Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government. you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to tile the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 6:30 a.m. and 5:du p.m., Nlondays tnrough irtdays or between 9:UU a.m. and i2:UU noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. 11.4.ou-fail.,to file an Answer, judgment by default may be entered against you for the relief demanded in the co4fairnt,

Kim Sperduto

Name of Plaintiffs Attorney

Sperduto Thompson PLC

Address

1133 20111 St. NW.        Floor,        D.C. .20f}:::

909- 40k- 8900

Telephone

By

(0400ʃ/•theivret)•

Date

PoMigia.iiitfEtig (202) 879-4828        veoilez appeler au (202) 879-4828 pour one traduction        D41 có i717WrirtriAhlfgln (202)879-4828
Idelik Vi}APO,(202)879-48282.11-114P.        s'h.vOlt 41:7•9n narnl. (202) 879-4828        g,eco*

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITI UN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER' RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS. YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION. DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traduccion al espaiiol

**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
DIVISION CIVIL
Seccion de Acciones Civiles
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Telefono: (202) 879-1133 Sitio web: www.dccourts.gov

Demandante

contra

Numero de Caso:

Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cite a comparecer y se le require entregar una Contestacion a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiun (21) dies contados despues que Listed haya recibido este citatorio, excluyendo el dia mismo de la entrega del citatorio. Si usted esta siendo demandado en calidad de official o agente del Gobierno de los Estados Unidos de Norteamerica o del Gobierno del Distrito de Columbia, tienc usted sesenta (60) dies. contados despues que usted haya recibido este citatorio. para entregar su Contestacion. Tiene que enviarle por correo una copia de su Contestacion al abogado de la parte demandante. El nombre y direccion del abogado aparecen al final de este documento. Si el demandado no tiene abogado. tiene que enviarle al demandante una copia de la Contestacion por correo a la direccion que aparece en este C axon°.

A usted tambien se le require presentar la Contested& original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue. N.W., entre las 8:30 a.m. y 5:00 p.m.. de tunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodia los sabados. Usted puede presentar la Contested& original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contested& o en el plazo de siete (7) dies de haberle hecho la entrega al demandante. Si Listed incumple con presentar una Contestacion, podria dietarse un fallo en rebeldia contra usted para que se haga efectivo el desagravio que se busca en la demanda.

SECRETARIO DEL TRIBUNAL

Nombre dcl abogado del Demandante

Poor:

Direccion                                                          Suhsecretario

Fecha

Telefono

OXIIIR.illtTEgit (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Uc co mot bai dick lift> gol (202)879-4828

ttttfr:Vg'iqitt(202)879-4828      jr_141gir441,1.V,              41:7 9n /tarry.  (202) 879-4828   R..e.co-A^

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACION EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR. USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRIA DICTARSE UN FALLO EN REBELDIA CONTRA USTED PARA QUE SE LE COBRE LOS DAFJOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE. PODRIA RETENERSELE SUS INGRESOS. 0 PODRIA TOMARSELE SUS BIENES PERSONALES 0 BIENES RAICES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCION, NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO.

Si dcsea convcrsar con un abogado y lc parece que no puede pagarle a uno, Ilamc pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue. N.W., para informarse sobre otros lugares donde puede pedirayuda al respecto.

Vea al dorso el original en ingles
See reverse side for English original

CV-3110 (Rev. June 2017]                                                    Super. Ct. Civ. R. 4

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

**INFORMATION SHEET**  18-0002667

Mikhail Fridman. Petr Aven. and German Khan,

Case Number:

vs

Date: April 16, 2018

Orbis Business Intelligence Limited and Christopher Steele

0   One of the defendants is being sued
in their official capacity.

Name:  (Please Print)
Kim Hoyt Sperduto

Firm Name:
Sperduto Thompson PLC

Telephone  No.:  Six digit Unified Bar No.:
202-408-8900  416127

Relationship to Lawsuit

131  Attorney for Plaintiff

•  Self (Pro Se)

•  Other:

TYPE OF CASE:  0  Non-Jury  El  6 Person Jury  0  12 Person Jury
Demand: $ 75,000+  Other:

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:  Judge:  Calendar #:

Case No.:  Judge:  Calendar#:

NATURE OF SUIT:  (Check One Box Only)

A. CONTRACTS  COLLECTION CASES

| | | |
|---|---|---|
| • 01 Breach of Contract | IIII 14 Under $25,000 Pltf. Grants Consent | M 16 Under 525.000 Consent Denied |
| MI 02 Breach of Warranty | 17 OVER 525.000 Pitt. Grants Consent IIII | 18 OVER S25.000 Consent Denied |
| • 06 Negotiable Instrument | • 27 InsuranceiSubrogation | M 26 InsuranceiSubrogation |
| NI 07 Personal Property | O .er S25.000 Pltf. Grants Consent | Over S25.000 Consent Denied |
| IIN 13 Employment Discrimination | M 07 InsuranceiSubrogation | • 34 Insurance/Subrogation |
| mi 15 Special Education Fees | Under S25.000 Pltf. Grants Consent | Under S25.000 Consent Denied |
| | - 28 Motion to Confirm Arbitration | |
| | Award (Collection Cases Only) | |

B. PROPERTY TORTS

| | | |
|---|---|---|
| • 01 Automobile | • 03 Destruction of Private Property | • 05 Trespass |
| M 02 Conversion | • 04 Property Damage | |
| M 07 Shoplifting. D.C. Code § 27-102 (a) | | |

C. PERSONAL TORTS

| | | |
|---|---|---|
| IIE 01 Abuse of Process | • 10 Invasion of Privacy | • 17 Personal Injury- (Not Automobile, |
| • 02 Alienation of Affection | • 11 Libel and Slander | Not Malpractice) |
| • 03 Assault and Battery | IM 12 Malicious Interference | IIi 18 Wrongful Death (Not Malpractice) |
| • 04 Automobile- Personal Injury | M 13 Malicious Prosecution | • 19 Wrongful Eviction |
| • 05 Deceit (Misrepresentation) | IIM 14 Malpractice Legal | M 20 Friendly Suit |
| m 06 False Accusation | 15 Malpractice Medical Including Wrongful Muth) | • 21 Asbestos |
| MI 07 False Arrest | • 16 Negligence- (Not Automobile, | IN 22 Toxic/Mass Torts |
| MI 08 Fraud | Not Malpractice) | NI 23 Tobacco |
| | | • 24 Lead Paint |

SEE REVERSE SIDE AND CHECK HERE  IF USED

CV-496/June 2015

# Information Sheet, Continued

## C. OTHERS

0  01 Accounting

E] 02 Att. Before Judgment

    05 Ejectment

0  09 Special Writ/Warrants

    (DC Code § 11-941)

Ej 10 Traffic Adjudication

El 11 Writ of Replevin

0  12 Enforce Mechanics Lien

0  16 Declaratory Judgment

17 Merit Personnel Act (OEA)

(D.C. Code Title 1. Chapter 6)

0  18 Product Liability

24 Application to Confirm. Modify,

Vacate Arbitration Award (DC Code § 16.4401)

0  29 Merit Personnel Act (OHR)

0  31 Housing Code Regulations

0  32 Qui Tam

E1 33 Whistleblower

0  03 Change of Name

0  06 Foreign JudgmentiDomestic

0  08 Foreign Judgment/International

FT 13 Correction of Birth Certificate

71 14 Correction Of Marriage

0  15 Libel of Information

0  19 Enter Administrative Order as

    Judgment [ D.C. Code §

    2-1802.03 (h) or 32-151 9 (a)I

0  2l) Master Meter (D.C. Code §

0  21 Petition for Subpoena

    [Rule 28-I (b)]

0  22 Release Mechanics Lien

0  23 Rule 27(a)(1)

    (Perpetuate Testimony)

pi 26 Petition for Civil Asset Forfeiture (Vehicle)

0  27 Petition for Civil Asset Forfeiture (Currency)

n  23 Petition for Civil Asset Forfeiture (Other)

E1 25 Petition for Liquidation

## D.  REAL PROPERTY

0  09 Real Property-Real Estate

0  12 Specific Performance

0  04 Condemnation (Eminent Domain)

D  10 Mortgage Foreclosure/Judicial Sale

0  11 Petition for Civil Asset Forfeiture (RP)

0  08 Quiet Title

El 25 Liens: Tax ⁄ Water Consent Granted

0  30 Liens: Tax / Water Consent Denied

0  31 Tax Lien Bid Off Certificate Consent Granted

/s/ Kim Hoyt Sperduto

April 16. 2018

Attorney's Signature

Date

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION
Civil Actions Branch
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Telephone: (202) 879-1133 • Website: www.dccourts.gov

GERMAN KHAN et al
    Vs.                                             C.A. No.       2018 CA 002667 B

ORBIS BUSINESS INTELLIGENCE LIMITED et al

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby ORDERED as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the summons, the complaint, and this Initial Order and Addendum. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in Super. Ct. Civ. R. 4(m).

(3) Within 21 days of service as described above, except as otherwise noted in Super. Ct. Civ. R. 12, each defendant must respond to the complaint by filing an answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in Super. Ct. Civ. R. 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an initial scheduling and settlement conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients Drior to the conference whether the clients are agreeable to binding or non-binding arbitration. This order is the only notice that parties and counsel will receive concerning this Conference.

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality. Review-Branch (202) 879-1750 may continue the Conference once, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than seven business days before the scheduling conference date.
No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www dccourts gov/.

elludge Robert E. Morin

::Case Assigned to: Judge ANTHONY C EPSTEIN
Date:   April 20, 2018
Initial Conference: 9:30 am, Friday, July 20, 2018
Location.   Courtroom 200
        500 Indiana Avenue N.W.
        WASHINGTON, DC 20001.

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement.  The early mediation schedule shall be included in the Scheduling Order following the ISSC.  Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and pro se parties of the date and time of the early mediation session and the name of the assigned mediator.  Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/.   To facilitate this process, all counsel and pro se parties in every medical  malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed  no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available.  Both forms may be obtained at www.dccourts.gov/medmalmediation.   One form is to be used for early mediation with a mediator from the multi-door medical  malpractice mediator roster; the second form is to be used for early mediation with a private mediator.  Both forms also are available  in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W.  Plaintiffs counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov.   Pro se Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical  malpractice mediators available  through the Court's Multi-Door Dispute Resolution Division, with biographical  information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles.   All individuals  on the roster are judges or lawyers with at least 10 years of significant  experience in medical  malpractice litigation D.C. Code § 16-2823(a),  If The parties cannot agree on a mediator, the Court will  appoint one. D C. Code § 16-2823(b):

The following  persons  are required by statute to attend personally the Early Mediation Conference. (1) all parties; (2) for parties that are not individuals,  a representative with settlement authority; ,(3) in cases involving  an insurance company,  a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case.  D C..Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report  prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another  mediation session, or otherwise  reduce the cost and time of trial preparation. D.C. Code§ 16-2826.  Any Plaintiff who is pro se may elect to file the report by hand with the Civil Actions Branch  The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief   Judge   Robert   E.   MOrin

CA10-60

# **<u>EXHIBIT 10</u>**

Case 0:17-cv-60426-WJZ Document 236-3 Entered on FLSD Docket 10/09/2018 Page 92 of
Case 1:17-cv-02041-RJL Document 1 Filed 10/03/17 Page 1 of 44
118

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

----------------------------------------------------------------X
                                            :

MIKHAIL FRIDMAN, PETR AVEN, AND     :
GERMAN KHAN,                                 :       Case No. _____ /2017
c/o CARTER LEDYARD & MILBURN LLP       :
2 Wall Street                                   :
New York, NY 10005,                    :       **COMPLAINT**
                                              :
                        Plaintiffs,      :
                                              :
                  -v-                 :
                                              :
BEAN LLC (A/K/A FUSION GPS) AND       :
GLENN SIMPSON,                           :
1700 Connecticut Avenue, Suite 400        :
Washington, D.C. 20009,              :
                                              :
                       Defendants.    :
----------------------------------------------------------------X

## COMPLAINT

      Plaintiffs Mikhail Fridman, Petr Aven, and German Khan, by their attorneys

Carter Ledyard & Milburn LLP, allege as follows:

## INTRODUCTION

      1.      This is a defamation case brought by three international businessmen who

were defamed in widely disseminated political opposition research reports commissioned

by political opponents of candidate Donald Trump. The reports (which came to be

known as the "Trump Dossier" and the "Dossier") were published in advance of the 2016

presidential election by the Defendants: the Washington, D.C. based firm Fusion GPS

("Fusion") and its principal Glenn Simpson, a former journalist specializing in political

opposition research. In that role, the Defendants traffic in procuring damaging

information about political candidates. The reports are gravely damaging in that they falsely accuse the Plaintiffs—and Alfa ("Alfa"), a consortium in which the Plaintiffs are investors—of criminal conduct and alleged cooperation with the "Kremlin" to influence the 2016 presidential election. But neither the Plaintiffs nor Alfa committed any of the acts irresponsibly attributed to them by the Defendants. To the contrary, the Plaintiffs and Alfa are collateral damage in a U.S. political operation—conducted by the Defendants—that has nothing to do with the Plaintiffs.

2.    The specific "report" that includes defamatory statements about the Plaintiffs is one of seventeen written Company Intelligence Reports 2016 ("CIRs") that comprise the Trump Dossier. The Defendants included Company Intelligence Report 112 (the "Report" or "CIR 112") in the Trump Dossier, even though the Trump Dossier's themes have nothing to do with the Plaintiffs. Broadly, those reports purport to describe details of an alleged scheme between the Russian government and the Trump presidential campaign to unlawfully manipulate the result of the presidential election in favor of candidate Trump. The Defendants gathered these reports in the process of conducting "opposition research" (known as "oppo research" by its practitioners and the media) against Trump. Opposition research, in essence, is the gathering of information for the purpose of eventually discrediting or otherwise harming a candidate for a public office. Opposition research is neither objective nor neutral. Instead, it is skewed from the outset in favor of appearing to find negative information about individuals—the essence of the product that political opposition research practitioners are hired to produce.

3.     As described below, the Defendants were initially hired to conduct this opposition research by Republican Party political opponents of candidate Trump. Those political opponents sought to gather discrediting information about candidate Trump to thwart his presidential run, including any connections he might have to Russian businesses or Russia's government. To perform that research, the Defendants hired a private investigator—a former British intelligence officer named Christopher Steele, who operated through an entity known as Orbis Business Intelligence Limited ("Orbis"). Steele used his own Russian sources to compile the reports, which were then delivered to the Defendants over the course of several months. Eventually, the reports, including the false and defamatory Report at the heart of this case, were assembled in the document that has come to be known to the public as the Trump Dossier. Even though the Dossier contained unverified allegations, Defendants recklessly placed it beyond their control and allowed it to fall into the hands of media devoted to breaking news on the hottest subject of the day: the Trump candidacy.

4.     One of the seventeen reports in the Dossier—CIR 112—accused the Plaintiffs of criminal conduct and participation in an alleged Trump-Russia scheme to influence the 2016 presidential election. Defendants knew that this Report was not verified, and that it defamed Plaintiffs on its face. Defendants could easily have removed that Report from the Dossier before they started peddling the Dossier to media and journalists in September and October 2016. They chose not to do so. Nor did they attempt to determine the veracity of that Report with the Plaintiffs themselves.

5.      At all times during the Defendants' engagement of Orbis and Steele, it
was either intended or clearly foreseeable that the Dossier's contents would be
republished (in whole or in part) to third parties, either by the Defendants themselves or
their clients.  Indeed, that is the entire purpose of "oppo research" in politics.  Those third
parties included government officials, as well as news media and journalists who could
make its content public.

6.      On information and belief, Defendants arranged for Steele to brief selected
members of the print and online media about the information he was compiling on
candidate Trump.  Consistent with the intended purpose of "oppo research" to publicly
discredit its target, Steele's briefings were designed to generate interest in the Dossier and
secure its eventual public dissemination.  Briefings were held for journalists from the
New York Times, the Washington Post, CNN, Yahoo News, and others in September
2016.  Shortly thereafter, Yahoo News published an article by Michael Isikoff that
described some of the content of the Dossier (referred to there as "intelligence reports"
and "reports"), which was still being compiled at that time.[1]  Many other media articles
reported speculative accounts of the Dossier's existence and contents.  In October 2016,
Steele was interviewed by David Corn, a writer for Mother Jones, which on October 31,
2016 published an article headlined "A Veteran Spy Has Given The FBI Information
Alleging a Russian Operation to Cultivate Donald Trump."[2]  The Corn article stated that
it had "reviewed" the early reports in the Dossier, and then quoted from those reports as

---

[1]  https://www.yahoo.com/news/u-s-intel-officials-probe-ties-between-trump-adviser-and-
kremlin-175046002.html

[2]  https://www.motherjones.com/politics/2016/10/veteran-spy-gave-fbi-info-alleging-russian-
operation-cultivate-donald-trump/

well as statements made by Steele in the interview. The public dissemination of the Dossier's content had begun in earnest.

7.      In addition to cultivating media interest, the Defendants also organized or approved a meeting in Great Britain between Steele and David Kramer, a director of a private foundation led by U.S. Senator John McCain. The purpose of that meeting was to brief Kramer on behalf of Senator McCain, who at the time was an outspoken critic of Trump's candidacy. Subsequently, in November 2016, Defendants provided a copy of the Dossier's first sixteen reports, including the Report that falsely accused and defamed Plaintiffs, to Kramer for redelivery to Senator McCain.

8.      As the 2016 presidential election neared, both print and online media in the United States and abroad began to expand their coverage of the Dossier and its alleged content. That coverage only intensified after Trump won the election. On January 10, 2017, one of those media entities, BuzzFeed, Inc., published the entire Dossier on the Internet, describing it as "explosive." The copy of the Dossier that BuzzFeed published included the false and defamatory allegations about the Plaintiffs and Alfa, along with an article entitled "These Reports Allege Trump Has Deep Ties to Russia."[3] The Dossier misspells Alfa's name throughout, incorrectly spelling it as "Alpha." In a recent court filing, Fusion admitted that it had "pre-publication" communications with BuzzFeed about its publication.[4]

---

[3]  https://www.buzzfeed.com/kenbensinger/these-reports-allege-trump-has-deep-ties-to-russia?utm_term=.srp6v32Bxl

[4]  Non-Party Fusion GPS's Motion to Quash Third-Party Subpoena or, in the Alternative, for a Protective Order at 1-2, *In re Third Party Subpoena to Fusion GPS*, (No.1:17-mc-02171-TSC), (D.D.C., August 31, 2017).

9.     The Defendants intended, anticipated, or foresaw a high likelihood that allowing their clients and/or the media access to the Dossier's defamatory content would result in its republication by news media outlets, including online news media such as BuzzFeed.

10.    Plaintiffs seek an award of compensatory and punitive damages for the harm to their personal and professional reputations, current business interests, and the impairment of business opportunities that resulted from the blatantly false and defamatory statements and implications about them published by the Defendants and republished by BuzzFeed and countless other media around the world.

## THE PARTIES

11.    Plaintiffs Fridman, Aven, and Khan are ultimate beneficial owners of Alfa.  Fridman and Khan are each citizens of both Russia and Israel, and Aven is a citizen of Russia.

12.    On information and belief, defendant Bean LLC is a Delaware corporation that conducts business under the name Fusion GPS.  Fusion is registered to transact business in Washington, D.C., where it is headquartered and conducts its operations.

13.    Defendant Glenn Simpson, on information and belief, is a principal of Fusion.  He was the principal actor involved in securing the Dossier from Orbis and Steele, arranging for press briefings about it in the late summer and early fall of 2016, and publishing the Dossier to Fusion's clients, government officials, and the news media. Simpson conducts his business for Fusion from an office in Washington, D.C., where his business included his activities with respect to the Dossier.  Both Simpson and his sub-

contractor Steele used their prior experience as, respectively, an investigative journalist for the Wall Street Journal and an operative in British intelligence covering Russian matters, to give their "oppo research" output a gloss of credibility and reliability which, in this case, was unwarranted. Neither of them has ever stated that the Dossier and CIR 112 were compiled in a fashion that accords with standards observed in their professions for establishing the credibility of sources and for verifying information provided by the sources. To the contrary, Steele has stated publicly that he did not abide by such standards in compiling the Dossier.[5]

## JURISDICTION AND VENUE

14.    This case is within this Court's jurisdiction pursuant to 28 U.S.C. § 1332(a)(2). Venue is proper in this District pursuant to 28 U.S.C. § 1391. The matter in controversy in the cause of action asserted herein exceeds $75,000.

## FACTUAL ALLEGATIONS

15.    On information and belief, the Defendants were engaged by Republican Party political opponents of Donald Trump prior to his nomination as the Republican presidential candidate. The Defendants were tasked with conducting "oppo research" against Trump, including the gathering of compromising and salacious information about Trump's personal behavior and business dealings in Russia. The Defendants in turn engaged Orbis and Steele for assistance in completing this task.

---

[5]  Defendants' Response to Claimants' Request For Information, *Gubarev, et al. v. Orbis Business Intelligence Limited and Christopher Steele*, Claim No. HQ17D00413, In The High Court of Justice, Queens Bench Division, May 18, 2017.

-7-

16.     Orbis proceeded to research Trump's personal behavior in Russia and business dealings with Russian government officials, business leaders, and business entities.  Steele compiled the "investigative" results into at least seventeen written CIR for delivery to the Defendants in Washington, D.C.  The CIRs included raw, unverified information.

17.     After Trump received the Republican nomination for President in July 2016, the Defendants' Republican clients terminated their relationship with Fusion.  Media reports subsequently surfaced asserting that Fusion had entered into a new engagement with Democratic Party operatives interested in using the oppo research to support Hillary Clinton's candidacy.

18.     As they continued their work for their new clients, the Defendants knew, anticipated or reasonably should have foreseen that once in the hands of third parties— such as their new clients, other political operatives, or the media—the CIRs would be further disseminated publicly, thereby fostering widespread discussion about them in the United States and worldwide.  That is exactly what happened.  Much of that media attention and public discussion focused on Defendants' and Steele's roles in the creation and dissemination of the Dossier, and included interviews with them.  During this campaign to promote the public dissemination of their "oppo research," which, upon information and belief, included the provision of background briefing to the media by Defendants without attribution, Defendants never vouched for the credibility of their sources or the accuracy and reliability of the content of the Dossier and CIR 112.

-8-

Defendants published the Dossier and CIR 112 despite the fact that they did not know whether the defamatory accusations in CIR 112 about Plaintiffs were true.

19.     CIR 112 specifically discusses the Plaintiffs.  Its title, by itself, is defamatory:  "RUSSIA/US PRESIDENTIAL ELECTION:  KREMLIN-ALPHA GROUP CO-OPERATION."  CIR 112 suggests that Alfa and its executives, including the Plaintiffs, "cooperated" in an alleged Kremlin-orchestrated campaign to interfere in the 2016 U.S. presidential election.

20.     CIR 112 then makes, in sections labeled "Summary" and "Detail," a series of factual allegations about the "current closeness" of an "Alpha Group/PUTIN relationship," including that "[s]ignificant favors continue to be done in both directions" and that "FRIDMAN and AVEN [are] still giving informal advice to PUTIN, especially on the US."

21.     The Summary section of CIR 112 identifies a former employee of Alfa, Oleg Govorun, who is now the head of a government department in Putin's administration, as a "key intermediary" in the "PUTIN-Alfa relationship."  CIR 112 alleges that Govorun "delivered illicit cash directly to PUTIN" "throughout the 1990s," when Govorun was an "Alpha executive" and Putin was the Deputy Mayor of St. Petersburg.

22.     The first paragraph of the Detail section of CIR 112 then states the full names of Plaintiffs Fridman, Aven, and Khan.  It then includes a report from a "Russian government official:"

> although they have had their ups and downs, the leading
> figures in Alpha currently are on very good terms with

PUTIN. Significant favors continued to be done in both directions, primarily political ones for PUTIN and business/legal ones for Alpha. Also, FRIDMAN and AVEN continued to give informal advice to PUTIN on foreign policy, and especially about the US where he distrusted advice being given him by officials.

23. Under any reasonable reading, Plaintiffs Fridman, Aven, and Khan, along with Alfa, are alleged to maintain a highly inappropriate, and even criminal, relationship with Putin. By clear and defamatory implication, Plaintiffs are also alleged to be involved in a Kremlin-orchestrated campaign to interfere in the 2016 U.S. election.

24. The second paragraph of the Detail section alleges that Mr. Fridman "recently met directly with PUTIN" and that "much of the dialogue and business between them was mediated" by Govorun, the former Alfa employee. The paragraph describes Govorun as a "senior Presidential Administration official" who is "trusted by PUTIN:"

during the 1990s GOVORUN had been Head of Government Relations at Alpha Group and in reality the 'driver' and 'bag carrier' used by FRIDMAN and AVEN to deliver large amounts of illicit cash to the Russian president, at that time deputy Mayor of St. Petersburg. Given that and the continuing sensitivity of the PUTIN-Alpha relationship, and need for plausible deniability, much of the contact between them was now indirect and entrusted to the relatively low profile GOVORUN.

25. These allegations are false. And their defamatory nature is clear: CIR 112 alleges that, in the 1990s, Alfa (a member of "Alpha Group") and three of its largest beneficial owners purportedly engaged in acts of criminal bribery of Vladimir Putin, a public official, to secure favorable business treatment.

26. That statement, particularly when considered in the context of the Dossier as a whole, implies that the alleged improper relationship between Alfa, the Plaintiffs,

-10-

and Putin is currently ongoing, and that Govorun, who is now an official in Putin's administration, serves as an intermediary.

27.     The third paragraph of the Detail section characterizes "the PUTIN-Alpha relationship as both a carrot and stick:"

> Alpha held 'kompromat' on PUTIN and his corrupt business activities from the 1990s whilst although not personally overly bothered by Alpha's failure to reinvest the proceeds of its TNK oil company sales into the Russian economy since, the Russian president was able to use pressure on this count from senior Kremlin colleagues as a lever on FRIDMAN and AVEN to make them do his political bidding.

28.     This passage is defamatory many times over.  It suggests that Plaintiffs Fridman and Aven use their knowledge of past bribery of Putin—"kompromat"—as a means of criminally extorting continuing favorable treatment for their business interests from his government.  It also implies that Alfa and two of its largest beneficial owners willingly maintain a close relationship with Putin and cooperated in some unspecified way in the Kremlin's alleged campaign to interfere in the U.S. election in an effort to avoid retribution from Putin for not reinvesting business proceeds in Russia.

29.     The statements about the Plaintiffs in the Dossier are false, defamatory, and gravely damaging.

## CAUSE OF ACTION

30.     Plaintiffs repeat and reallege paragraphs 1-29 above.

31.     By their direct and intentional publication to third parties such as clients, news media, journalists, and others, and by the foreseeable republication of the Dossier

Case 0:17-cv-60426-UU   Document 236-3   Entered on FLSD Docket 10/09/2018   Page 103 of
Case 1:17-cv-02041-RJL   Document 9   Filed 10/03/17   Page 72 of 14
118

and CIR 112 by someone in that group, the Defendants published to a worldwide public

false and defamatory statements concerning Plaintiffs and Alfa, including that:

      (a)     they are implicated in the scandalous allegations involving Russia

and President Trump referred to in CIR 112 and the other CIRs in the Dossier;

      (b)     they and other officials and employees of Alfa "cooperated" with

an alleged Kremlin campaign to interfere in the U.S. presidential election;

      (c)     they are parties to a highly inappropriate, and even criminal,

relationship with Vladimir Putin;

      (d)     they engaged in acts of criminal bribery of Putin, then the Deputy

Mayor of St. Petersburg, in the 1990s to secure favorable business treatment; and

      (e)     they continue to use their knowledge of past bribery of Putin as a

means of criminally extorting continuing favorable treatment for their business

interests from the Putin government.

32.     Readers of the CIRs and Dossier were also led to understand, incorrectly,

that as a result of their alleged past—and possibly current—close relationships and

corrupt dealings, the Plaintiffs and Alfa were and are required to do Putin's bidding,

including by cooperating in the Kremlin's recent alleged efforts to influence the outcome

of the recent U.S. presidential election.

33.     The false statements by the Defendants referred to above defamed the

Plaintiffs and Alfa, and have caused and will continue to cause serious injury to their

personal, professional, and institutional reputations.

-12-

Case 0:17-cv-60426-UU   Document 236-3   Entered on FLSD Docket 10/09/2018   Page 104 of
118
Case 1:17-cv-02041-RJL   Document 1   Filed 10/03/17   Page 13 of 14

34.     The false and defamatory statements published and republished by the

Defendants concerning the Plaintiffs and Alfa, as well as the obvious implications of

those statements, were made negligently or with reckless disregard of whether they were

true or false.

35.     Defendants are liable for the defamation of Plaintiffs and Alfa, and the

resulting harm caused by the news media coverage of the Dossier, including the

republication by BuzzFeed and countless other media.

WHEREFORE, Plaintiffs Mikhail Fridman, Petr Aven, and German Khan

demand judgment against Defendants Bean LLC, Fusion GPS, and Glenn Simpson for:

a.     compensatory damages in an amount to be proved at trial, together with

interest and the costs and disbursements of this action, plus reasonable attorneys fees;

b.     punitive damages in an amount to be determined at trial; and

c.     such other and further relief as this Court may deem just and proper.

Dated: New York, New York
         October 3, 2017

By:          */s/ Alan S. Lewis*
             Alan S. Lewis, Esq.
             John J. Walsh, Esq.
             CARTER LEDYARD & MILBURN LLP
             2 Wall Street
             New York, NY 10005
             Telephone:  212-238-8647
             *New York Counsel for Plaintiffs*
               *Mikhail Fridman, et al.*

By:          */s/ Kim H. Sperduto*
             Kim H. Sperduto, Esq. (# 416127)
             Sperduto Thompson PLC
             1133 Twentieth Street, NW Second Floor

Washington, DC 20036

Telephone:    202-408-8900

*Local Counsel for Plaintiffs*
 *Mikhail Fridman et al.*

# **<u>EXHIBIT 11</u>**

Case 1:17-cv-60426-UU Document 236-3 Entered on FLSD Docket 10/09/2018 Page 107 of 118

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

MIKHAIL FRIDMAN, PETR AVEN, AND
GERMAN KHAN,

Plaintiffs,

-v-

BUZZFEED, INC., BEN SMITH,
KEN BENSINGER, MIRIAM ELDER,
AND MARK SCHOOFS,

Defendants.

Index No.:
Date Purchased:  May 26, 2017

Plaintiff Designates New York County as
the Place of Trial.

The Basis of the Venue is CPLR §§ 503(a)
and (c).

Defendants' Principal Office Address is in
New York, New York.

SUMMONS

TO THE ABOVE NAMED DEFENDANTS:

YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a
copy of your answer, or, if the complaint is not served with this summons, to serve a notice of
appearance, on the Plaintiffs' attorneys within 20 days after service of this summons, exclusive
of the day of service (or within 30 days after the service is complete if this summons is not
personally delivered to you within the State of New York); and in case of your failure to appear
or answer, judgment will be taken against you by default for the relief demanded in the
complaint.

Dated: New York, New York
May 26, 2017

CARTER LEDYARD & MILBURN LLP

By:

Alan S. Lewis
John J. Walsh
2 Wall Street
New York, New York 10005
Telephone:  (212) 732-3200

Attorneys for Plaintiffs

TO:     BuzzFEED, INC.
        111 East 18th Street
        New York, New York 10003

FILED: NEW YORK COUNTY CLERK 05/26/2017 03:20 PM
NYSCEF DOC. NO. 1

Case 0:17-cv-60426-UU   Document 236-3   Entered on FLSD Docket 10/09/2018   Page 108 of
118

INDEX NO. 154895/2017
RECEIVED NYSCEF: 05/26/2017

MR. BEN SMITH
Editor-in-Chief
BuzzFeed, Inc.
111 East 18th Street
New York, New York 10003

MR. KEN BENSINGER
Investigative Reporter
Bilz7Feed, Inc.
7323 Beverly Boulevard
Los Angeles, California 90026

MR. MIRIAM ELDER
News World Editor
BuzzFeed, Inc.
111 East 18th Street
New York, New York 10003

MR. MARK SCHOOFS
News Investigations Editor
BuzzFeed, Inc.
111 East 18th Street
New York, New York 10003

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY

                                   X

MIKHAIL FRIDMAN, PETR AVEN, AND
GERMAN KHAN,                               Index No.     /2017

                     Plaintiffs,

                                            COMPLAINT
         -v-

BUZZFEED, INC., BEN SMITH,
KEN BENSINGER, MIRIAM ELDER,
AND MARK SCHOOFS,

                     Defendants.

                                   X

Plaintiffs Mikhail Fridman, Petr Aven and German Khan, by their attorneys

Carter Ledyard & Milburn LLP, allege as follows:

### INTRODUCTION

1.      This is an action for defamation based on false, damaging and highly

inflammatory statements about plaintiffs, Mikhail Fridman, Petr Aven and German Khan,

and about Alfa Group ("Alfa"), an umbrella term commonly used to describe a number of

entities in which Plaintiffs hold significant beneficial interests. The statements were

contained in the so-called Trump Dossier (the "Dossier") published in its entirety by

defendant BuzzFeed, Inc. ("BuzzFeed") on January 10, 2017. The Dossier was published

together with an article entitled "These Reports Allege Trump Has Deep Ties to Russia"

(the "Article") written by defendant Ken Bensinger and edited by defendants Miriam

Elder and Mark Schoofs. The decision to publish the Article and Dossier was made by

BuzzFeed's Editor-in-Chief, defendant Ben Smith.

2.      BuzzFeed admitted in the Article that the Dossier "include[d] specific,

unverified and potentially unverifiable allegations of contact between Trump aides and

Russian operatives" and that it "is not just unconfirmed: It includes some clear errors. The [Dossier] misspells the name of one company, 'Alpha Group,' throughout. It is Alfa Group." Even though the Dossier included many harmful allegations about Plaintiffs and Alfa, and even though BuzzFeed expressly acknowledged the unverified and potentially unverifiable nature of the Dossier's allegations, BuzzFeed published the unredacted Dossier and the Article anyway – without first affording the Plaintiffs an opportunity to address the unverified allegations made against them and against Alfa in the Dossier.

3.     Plaintiffs seek an award of compensatory and punitive damages for the harm to their personal and professional reputations and impairment of business opportunities that resulted from the blatantly false and defamatory statements and implications about them and Alfa published by Defendants.

THE PARTIES

4.     Plaintiffs Fridman, Aven, and Khan are ultimate beneficial owners of Alfa.

5.     Defendant BuzzFeed, Inc., a Delaware Corporation, is a global news organization headquartered in New York City. BuzzFeed describes itself as "the leading independent digital media company delivering news and entertainment to hundreds of millions of people around the world."

6.     Defendant Ben Smith, on information and belief, resides in Brooklyn, New York. He is the Editor-in-Chief of BuzzFeed under whose leadership, according to BuzzFeed, its "coverage has grown to include politics, business, investigative reporting, longform journalism, and entertainment while growing the site's traffic to over 200M monthly unique visitors."

2

7.    Defendant Ken Bensinger is an investigative reporter for BuzzFeed based in Los Angeles, California – and the author of the Article.

8.    Defendants Miriam Elder and Mark Schoofs are, respectively, BuzzFeed's News World Editor and News Investigations Editor.    They edited the Article and are based in New York City.

9.    On information and belief, defendants Smith, Bensinger, Elder and Schoofs are employees of BuzzFeed, and, in that capacity, their professional conduct is subject to BuzzFeed's control and supervision.

FACTUAL ALLEGATIONS

10.    On January 10, 2017, BuzzFeed published the Article with the headline "These Reports Allege Trump Has Deep Ties To Russia." The "Reports" referred to in the headline consist of seventeen Company Intelligence Reports 2016 ("CIRs"), "prepared for a political opponent of Trump by a person who is understood to be a former British intelligence agent," totaling 35 pages, which together comprise the Dossier.

11.    The Article describes the Dossier as "a collection of memos written over a period of months" containing "explosive – but unverified – allegations that the Russian government has been cultivating, supporting and assisting [then] President-elect Donald Trump for years and gained compromising information on him," including "specific, unverified, and potentially unverifiable allegations of contact between Trump aides and Russian operatives."

12.    BuzzFeed acknowledged that its "reporters in the US and Europe have been investigating various alleged facts in the [D]ossier but have not verified or falsified them," and that the Dossier's allegations are "explosive." BuzzFeed's Editor-in-Chief

3

Case 0:17-cv-60426-UU   Document 236-3   Entered on FLSD Docket 10/09/2018   Page 112 of 118

Defendant Smith nevertheless made the decision to publish, even in spite of his awareness that the Dossier was the secret product of a secretive private investigator, not intended to be part of public discourse or to make an argument in a public debate and that the Dossier's content also bore multiple hallmarks of its irresponsible collection and compilation.

13.     In publishing the Dossier's unverified content, BuzzFeed did so in a manner that allowed it to reach BuzzFeed's claimed readership of "hundreds of millions of people around the world" – with BuzzFeed's additional awareness that it would then be republished to millions more readers in every stratum of global society.

14.     The Article specifically refers to Alfa as having been named in the Dossier, while acknowledging that the Dossier "is not just unconfirmed:  It includes some clear errors.  The [Dossier] misspells the name of one company, 'Alpha Group,' throughout.  It is Alfa Group."

15.     The Article, by explicitly referring to Alfa, increases the likelihood that persons interested in Alfa (including but not limited to government intelligence officials, regulatory authorities, financial institutions, print and online news media and journalists) would search the Dossier to find out what it says about Alfa.

16.     CIR 112 (page 25 of the Dossier) bears the headline "RUSSIA/US PRESIDENTIAL ELECTION:  KREMLIN-ALPHA GROUP CO-OPERATION."

17.     Because the Article clarified that the Dossier's reference to "Alpha" Group was a misspelling of Alfa, readers of CIR 112 are given the impression that the various companies that bear the name "Alfa" or are closely related to Alfa – as well as the persons who are officials and employees of companies that are a part of the "Alfa

4

Group" – are implicated in the scandalous allegations involving Russia and President

Trump referred to in the Article and the other CIRs.

18.     That alone is defamatory, i.e., it suggests that Alfa and its officials and

employees "co-operated" with a Kremlin campaign to interfere in the U.S. Presidential

election.

19.     CIR 112 then lays out in sections labeled "Summary" and "Detail" a series

of factual allegations about the "current closeness" of an "Alfa Group/PUTIN

relationship," including that "[s]ignificant favors continue to be done in both directions

and FRIDMAN and AVEN still giving informal advice to PUTIN, especially on the US."

20.     The Summary section of CIR 112 also identifies a former employee of

Alfa, Oleg Govorun, now head of a governmental department in President Putin's

administration, as a "key intermediary" in the "PUTIN-Alfa relationship" who is alleged

to have "delivered illicit cash directly to PUTIN" "throughout the 1990s" while he was an

"Alpha executive."

21.     The first paragraph of the Detail section of CR112 then states the full

names of Messrs. Fridman, Aven and Khan, describing them as "oligarchs." This

paragraph goes on to state that a "Russian government official" reported:

>       that although they have had their ups and downs, the
> leading figures in Alpha currently are on very good terms
> with PUTIN.  Significant favors continued to be done in
> both directions, primarily political ones for PUTIN and
> business/legal ones for Alpha.  Also, FRIDMAN and
> AVEN continued to give informal advice to PUTIN on
> foreign policy, and especially about the US where he
> distrusted advice being given him by officials.

22.     Thus, Messrs. Fridman, Aven and Khan are drawn, under any reasonable

reader's understanding, into an alleged mutually beneficial, but highly inappropriate,

relationship with President Putin and, by clear and defamatory implication, the purported

Kremlin campaign to interfere in the recent U.S. election.

23.    The second paragraph of the Detail section alleges that Mr. Fridman

"recently met directly with PUTIN" and that "much of the dialogue and business between

them was mediated" by Mr. Govorun, the former Alfa employee, who is described as a

"senior Presidential Administration official," "trusted by PUTIN," who:

> during the 1990s . . . had been Head of Government Relations at
> Alpha Group and in reality the 'driver' and 'bag carrier' used by
> FRIDMAN and AVEN to deliver large amounts of illicit cash to
> the Russian president, at that time deputy Mayor of St. Petersburg.
> Given that and the continuing sensitivity of the PUTIN-Alpha
> relationship, and need for plausible deniability, much of the
> contact between them was now indirect and entrusted to the
> relatively low profile GOVORUN.

24.    The falsity and defamatory quality of these allegations of criminal conduct

is clear: In the 1990s Alfa Group and its three highest officials purportedly engaged in

acts of criminal bribery of Vladimir Putin, a public official, to secure favorable business

treatment.

25.    That statement, when considered together with other parts of the Dossier,

implies that the alleged relationship between Alfa, its officials and President Putin is

currently ongoing – and involves Mr. Govorun as an intermediary.

26.    The third paragraph of the Detail section characterizes "the PUTIN-Alpha

relationship as both a carrot and stick," asserting that:

> Alpha held `kompromat' on PUTIN and his corrupt business
> activities from the 1990s whilst although not personally overly
> bothered by Alpha's failure to reinvest the proceeds of its TNK oil
> company sale into the Russian economy since, the Russian
> president was able to use pressure on this count from senior
> Kremlin colleagues as a lever on FRIDMAN and AVEN to make
> them do his political bidding."

6

27. More than one defamatory meaning can be drawn from this passage. It suggests that Alfa and Messrs. Fridman and Aven use their knowledge of past bribery of President Putin as a means of criminally extorting continuing favorable treatment for their business interests from his government. Within the context of the entire Dossier, it also implies that Alfa and its three officials willingly maintain the close relationship with President Putin based on the "kompromat" they hold on him by cooperating in some unspecified way in the Kremlin's campaign to interfere in the U.S. election.

28. At the same time, in context, the whole of CIR 112 can also be understood to suggest that because of their past (and possibly current) relationship involving mutually beneficial corrupt practices, Alfa and its three officials are required to do President Putin's bidding, which includes cooperating in the Kremlin efforts to influence the outcome of the recent U.S. election. The statements quoted from the Dossier are false.

## CAUSE OF ACTION

29. Plaintiffs repeat and reallege paragraphs 1-28 above.

30. By their publication of the Article and Dossier on January 10, 2017, Defendants falsely stated to the world via the Internet, of and concerning Plaintiffs and Alfa, that they:

    (a) are implicated in the scandalous allegations involving Russia and President Trump referred to in the Article, CIR 112 and the other CIRs in the Dossier;

    (b) that Alfa and its officials and employees "cooperated" with a Kremlin campaign to interfere in the U.S. Presidential election;

7

      (c)     are parties to a mutually beneficial but highly inappropriate relationship with President Putin;

      (d)     engaged in acts of criminal bribery of Vladimir Putin, then the deputy mayor of St. Petersburg, in the 1990s to secure favorable business treatment; and

      (e)     continue to use their knowledge of past bribery of President Putin as a means of criminally extorting continuing favorable treatment for their business interests from the Putin government.

31.     Readers of the Article and Dossier were led to understand, incorrectly, that as a result of their past – and possibly current – close relationships and corrupt dealings, the Plaintiffs and Alfa are required to do President Putin's bidding, including cooperating in Kremlin efforts to influence the outcome of the recent U.S. election.

32.     The false statements by the Defendants referred to above defamed the Plaintiffs and Alfa and caused serious injury to the Plaintiffs' reputations (personal and professional) and to Alfa's reputation.

33.     The Article clearly states that the allegations contained in the Dossier were unverified and that the Dossier itself contained errors, including the repeated misspelling of Alfa's name, and could not be verified despite substantial efforts.  The false and defamatory statements published by Defendants of and concerning the Plaintiffs and Alfa, and the implications of those defamatory statements, were made with knowledge of their falsity or with reckless disregard of whether they were true or false.

34.     Defendants are liable to Plaintiffs for the defamation of Plaintiffs and Alfa and the resulting harm caused by BuzzFeed and the other Defendants, over whom

BuzzFeed exercises control and supervision with regard to what they publish on BuzzFeed's website.

WHEREFORE, Plaintiffs Mikhail Fridman, Petr Aven and German Khan demand judgment against Defendants BuzzFeed, Inc., Ben Smith, Ken Bensinger, Miriam Elder and Mark Schoofs for:

a. compensatory damages in an amount to be proved at trial, which in any event exceed $25,000 per Plaintiff, together with interest and the costs and disbursements of this action, plus reasonable attorneys' fees;

b. punitive damages in an amount to be determined at trial; and

c. such other and further relief as this Court may deem just and proper.

Dated: New York, New York
May 26, 2017

CARTER LEDYARD & MILBURN LLP

By:

Alan S. Lewis
John J. Walsh
2 Wall Street
New York, New York 10005
Telephone: 212-732-3200

Attorneys for Plaintiffs

9

FILED: NEW YORK COUNTY CLERK 05/26/2017 03:20 PM    INDEX NO. 154895/2017
NYSCEF DOC. NO. 1                                     RECEIVED NYSCEF: 05/26/2017

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------X

MIKHAIL FRIDMAN, PETR AVEN, AND :    Index No.
GERMAN KHAN, :    Date Purchased: May 26, 2017

                Plaintiffs, :    Plaintiff Designates New York County as
                      :    the Place of Trial.

          -v- :    The Basis of the Venue is CPLR §§ 503(a)
                      :    and (c).
BUZZFEED, INC., BEN SMITH, : 
KEN BENSINGER, MIRIAM ELDER, :    Defendants' Principal Office Address is in
AND MARK SCHOOFS, :    New York, New York.

              Defendants. : 

-----------------------------------------------------------------X    **SUMMONS & COMPLAINT**

CARTER LEDYARD & MILBURN LLP
COUNSELORS AT LAW
2 WALL STREET
NEW YORK, N.Y. 10005
—
(212) 732-3200

12 of 12