UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

ALEKSEJ GUBAREV,
XBT HOLDING S.A., and
WEBZILLA, INC.
   Plaintiffs,

v.

BUZZFEED, INC. and
BEN SMITH
   Defendants.

Case No.

0:17-cv-60426-UU

**PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

### Introduction

By the time it has reached this particular filing, Plaintiffs imagine that the Court may have heard all that it really wants to hear on whether Plaintiffs Aleksej Gubarev, Webzilla, Inc., and/or XBT Holding, S.A. are private figures or limited public figures.[1] As such, Plaintiffs will not repeat the arguments they have made in either their Motion for Summary Judgment or in their Opposition to Defendants' Motion for Summary Judgment. Instead, Plaintiffs will respond only to a selection of factual and legal arguments advanced by Defendants in their Opposition to Plaintiffs' Motion for Summary Judgment ("Opposition") that beg response.

### Facts

As was the case with their factual recitation in their own Motion for Summary Judgment, Defendants' recitation of facts in opposition reads like a screenplay that is "Inspired by True Events" as opposed to being actually based in fact.[2] Certainly, somewhere within Defendants' recitation is a story loosely connected to actual events, just not so connected as to support the weight of the legal arguments they attempt to lay on top of their fictionalized account of events. A few of these fictionalizations are worthy of discussion:

1. ***"Most of the factual assertions are not material at all ... examples include ... recitations that various individuals had not previously 'heard of' Plaintiffs."*** Opposition, p. 3.

Defendants assertion – in conjunction with a motion about whether or not Plaintiffs are public figures – is amusing. Although Defendants would have the Court believe that Plaintiffs had asked a few random people on the street if they had ever heard of Aleksej Gubarev or the other Plaintiffs, in reality, the "various individuals" who had never heard of Plaintiffs prior to seeing the December Memo included:

- Defendants' own expert witness, Anthony Ferrante, who (among other things) had previously served as the Director for Cyber Incident Response at the U.S. National Security Council at the White House and as the Chief of Staff of the FBI's Cyber Division. Mr. Ferrante testified that:

> [W]hile I was on the National Security Council, again I was the Director For Cyber Security Response and I choreographed U.S. Government response efforts to

---

[1] Defendants concede that none are general public figures.
[2] *See, e.g.*, "21 Surprisingly Inaccurate Movies That Are Based On True Stories," *BuzzFeed*, https://www.buzzfeed.com/ishabassi/historically-inaccurate-movies-based-on-true-stories, last accessed October 9, 2018.

    significant cyber events affecting the United States, domestic and abroad. Leading into the 2016 Presidential Election I worked on the National Security Council and choreographed the interagency response efforts to the targeting of the 50 states, and I led the preparedness and response efforts specific to cyber security, significant cyber security events that may or could take place leading up to and on election day in 2016.

Deposition of Anthony Ferrante, 53:6-19, Rep. Ex. 1.[3]

- David Kramer, who Defendants themselves term a "Russia expert" and who has spent more than 30 years working on issues connected to Russia, including acting as the Deputy Assistant Secretary in the State Department responsible for Russia, Ukraine, Belarus, and Moldova and who testified that "people connected to the Russian Government" were part of his "expertise." Deposition of David Kramer, 15:1-4, 130:1-7, Rep. Ex. 2.

- Fusion GPS – including its founder, Glenn Simpson, who had worked for the *Wall Street Journal* for 15 years and who (in testifying to the House Intelligence Committee) testified that:

    [I]n my last few years at the Wall Street Journal, I ... developed a line of reporting around the former Soviet Union and crime and corruption in the former Soviet Union.
    And I had written a series of articles about Vladimir Putin and a lot of corruption and organized crime activities sort of making its way westward from Russia, and eventually started doing a lot of work on Ukraine, corruption in Ukraine and gas trade in Ukraine, and connections to the Russian mafia. That's when I first came across Paul Manafort.
    And in any event, when I decided to leave the Journal in 2009, I had developed a lot of relationships with people who worked on organized crime issues, Russian organized crime issues, and had become known as someone who specialized in that.

Glenn Simpson House Intelligence Committee Testimony, pp. 22-23, Rep. Ex. 3.

- Defendant Ben Smith, who is not only Buzzfeed's editor-in-chief, but who has also spent almost the last 20 years working as a journalist and whose work included reporting for the *Baltic Times* in Latvia and writing stories for the *Wall Street Journal* about "Estonia, Latvia, Lithuania, and sometimes other countries in the region." Deposition of Ben Smith, 10:8-11:25, Rep. Ex. 4 hereto.

---

[3] All references to "Rep. Ex." herein are references to the exhibits attached to the Reply Declaration of Matthew Shayefar in Support of Plaintiffs' Motion for Summary Judgment filed herewith.

3

- Buzzfeed reporter Ken Bensinger, who has more than 20 years of reporting experience including as a reporter for the *Wall Street Journal* and the *Los Angeles Times* and who, after hearing of the existence of Christopher Steele's memos (but prior to obtaining them), spent time "doing research about and reading about Russian intelligence operations…" Deposition of Ken Bensinger, pp. 15-25, 78, Rep. Ex. 5 hereto.

Far from being "immaterial" then, the very fact the people one might *most* expect to have heard of Mr. Gubarev, Webzilla, or XBT – if any of them were the nefarious characters Defendants attempt to make them out to be – had never heard of Plaintiffs until seeing the defamatory statements in the December Memo proves that Plaintiffs are not public figures.

**2.**  *Gubarev "publicly defended a controversial Russian internet law."*  Opposition, p. 3.

Almost every part of Defendants' oft-repeated refrain on this topic is wrong. First, although Defendants cite two news articles referring to the Russian law as being "controversial," Russia is but one of any number of countries – including Australia (health data), two provinces of Canada (data collected by or for public bodies), China, Germany, India, Indonesia, Kazakhstan, Korea, Nigeria, Turkey (e-commerce data), and the United States (for contractors storing Department of Defense Data) – that require companies to store some or all of its citizens' electronic data within the country. *See*, *e.g.*, Information Technology Industry Council, "Data Localization Snapshot" (Current as of July 29, 2016), Rep. Ex. 6; "Apple Opening Data Center in China to Comply With Cybersecurity Law," *The New York Times* (July 12, 2017), Rep. Ex. 7; "WhatsApp Builds System to Comply With India's Payments Data Storage Norms," *Reuters* (October 9, 2018), Rep. Ex. 8; "Google agrees to comply with RBI's data localization norms," *LiveMint* (September 10, 2018), Rep. Ex. 9; "Apple to Store Users' Personal Data in Russia – Report," *The Moscow Times* (September 10, 2015), Rep. Ex. 10.

More to the point, though, the actual quotation from which Defendants breathlessly proclaim that Plaintiffs inserted themselves into public controversy by virtue of Mr. Gubarev having "publicly defended" Russia's "controversial" new law does no such thing. In an interview with a small, niche Russian-language magazine titled "Internet in Figures" Mr. Gubarev was asked, "What was the influence of external factors (regulation, macroeconomic situation) on market development? Did the law on personal data benefit the market?" In response, he stated (in full):

4

> Such factors always influence the market. It is worth noting that the law on personal data in Russia is not unique, such provisions exist in other countries. This law, of course, has changed some of the interactions on the market, but it is premature to assess it.

Siegal Declaration in Support of Defendants' Motion for Partial Summary Judgment, Exhibit 53.

This is what Defendants would have the Court believe constitutes a party injecting himself into a public controversy (concerning Russia's attempts to meddle in the 2016 United States presidential election).

3. ***"Plaintiffs were able to use their access to the media to successfully head off negative coverage about their involvement in Methbot"*** and ***"In fact, when their involvement in a major 'botnet' scandal (Methbot) threatened to seriously impair their business in late 2016, they were able to utilize their media access to head off a negative story before it was even published."*** Opposition, pp. 5, 7.

Defendants place so much emphasis on this "fact" that they proclaim to the court that "it would be difficult to find a more salient example of how media access provides a public figure with 'a more realistic opportunity to counteract false statements than private individuals normally enjoy." Opposition, p. 7.

Defendants' "factual" assertion, however, is akin to the undersigned counsel asserting that they have used their media connection to successfully "keep the media from writing about" his romantic involvement with Jennifer Anniston. While it is certainly true that the media have not written about any relationship between counsel and Ms. Anniston, it was not as a result of counsel's ability to quash such publicity. The same holds true for Plaintiffs. Although it is true that Plaintiffs were concerned about potential bad publicity that might arise from allegations that one of their customers was involved in a fraud, in the end, those fears were unfounded as the media simply did not inquire about the issue.[4] *See, e.g.*, Rep. Ex. 11 ("Nope, no contacts so far.").

---

[4] Defendants do point to one telephone call from Plaintiffs' PR firm to internet security blogger Brian Krebs. Siegal Declaration in Support of Defendants' Motion for Partial Summary Judgment, Exhibit 100. That email does not support Defendants' contention, however, that Mr. Dolan was able to quash the story – to the contrary the email is forthcoming in acknowledging that Mr. Krebs hadn't decided whether the story merited any kind of follow up ("He said he was still trying to determine whether it is worth a follow up story, but did not seem overly interested in Webzilla's role....").

**Argument**

As they have done with their response to Defendants' factual recitation, Plaintiffs will respond only to a selection of the more striking cases cited by Defendants in support of their opposition.

- Defendants cite *Turner v. Wells*, 879 F.3d 1254, 1272 (11th Cir. 2018) in support of their argument that – because Mr. Gubarev hired a public relations campaign to help him with the bad publicity resulting from Buzzfeed's publication of the dossier – that he was transformed into a limited public figure. Putting aside the fact that media defendants cannot, by virtue of their publication of defamatory materials, transform a private figure into a public one,[5] the facts of *Turner* are slightly different than those at issue here. In *Turner*, the plaintiff, James Turner was ***the offensive line coach for the Miami Dolphins***.[6] In addition to his position as ***the offensive line coach for the Miami Dolphins***, Coach Turner had also been:

> the focus of the 2012 season of <u>Hard Knocks</u>, an HBO television program that "showcase[ed] Turner's coaching style and featur[ed] interviews and footage of him on the field and in the locker room." During his coaching career, Turner was the subject of several articles discussing his career and coaching philosophy. Turner was a prominent person on the closely followed Dolphins professional sports team.

*Id.* at 1272.

Ultimately, the *Turner* court found that Turner's highly public position afforded him a unique ability to rebut the allegations made against him that he alleged to be defamatory, evidenced by the fact that he "took advantage of his familiarity with the media" and commissioned a response to the allegedly defamatory report. Mostly, though, the *Turner* court seemed to focus on the fact that the plaintiff was, as we may have mentioned, ***the offensive line coach for the Miami Dolphins***. *Id.* ("This holding compares well with the precedent of other

---

[5] *Hutchinson v. Proxmire*, 443 U.S. 111, 134-36 (1979) ("[W]e cannot agree that Hutchinson had such access to the media that he should be classified as a public figure. Hutchinson's access was limited to responding to the announcement of the Golden Fleece Award. He did not have the regular and continuing access to the media that is one of the accouterments of having become a public figure;" "Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure."). *See*, *also*, *Silvester v. American Broadcasting Companies, Inc.*, 839 F.2d 1491, 1496 (11th Cir. 1988) ("[T]he plaintiff must have been a public figure prior to the publication of the particular defamatory speech which is the issue of the litigation.").

[6] Yes, Defendants have actually analogized Mr. Gubarev's access to the media to that of a coach for the Miami Dolphins.

jurisdictions, who generally consider coaches of professional and collegiate sports teams to be public figures.").

- Defendants cite *Waldbaum v. Fairchild Publ'ns*, 627 F.2d 1287, 1290 (D.C. Cir. 1980), seemingly for the proposition that the definition of a public controversy should be wholly unconnected to the scope of the allegedly defamatory article. In support, Defendants claim that the defamatory article was a "very brief report of the plaintiff's termination as the CEO of a supermarket cooperative" but that "none of the relevant public controversies the Court identified were about plaintiff's job performance." Opposition, p. 10. Oddly, in staking out this interpretation of *Waldbaum*, Defendants have misstated both the alleged defamatory statement and the Court's identification of the public controversy. As the *Waldbaum* Court noted, the alleged defamatory statement was that the supermarket cooperative "has been losing money the last year and retrenching.... Waldbaum filed a libel action in the district court based upon this comment in the article. He contended that in fact Greenbelt had not been losing money or retrenching and that this allegedly false report damaged his reputation as a businessman." 627 F.2d at 1290. In defining the public controversy, the Court noted that:

> Evidence submitted with Fairchild's motion for summary judgment indicates clearly that Greenbelt was an innovative company often the subject of news reports. As the second largest cooperative in the nation it attracted attention, and its pathbreaking marketing policies e. g., unit pricing, open dating, and highly competitive advertising became the subject of public debate within the supermarket industry and beyond, debate that would affect consumers and retailers in the Washington area and, perhaps, elsewhere. We therefore believe that, before Supermarket News published its story about Waldbaum's dismissal, *public controversies existed over the viability of cooperatives as a form of commercial enterprise and over the wisdom of various policies that Greenbelt in particular was pioneering*."

*Id.* at 1299-1300 (emphasis added).

In finding the plaintiff a limited public figure, then, the Court examined the scope of the controversy (and the plaintiff's role in that controversy) and then the Court specifically looked both to the scope of the defamatory article and the plaintiff's very public activism within his industry specifically on the topic of whether and how supermarket cooperatives could be profitable. In the present case, the December Memo addresses a public controversy – namely the alleged efforts to hack the Democratic Party leadership. More broadly, the controversy could be seen to be Russia's efforts in general to meddle in the United States presidential election. The

7

controversy cannot, however, be defined as "cybersecurity" and "cybercrime" as Defendants argue.

● In support of their guilt-by-association theory of public figure status,[7] Defendants cite *Rosanova v. Playboy Enterprises*, 411 F.Supp. 440 (S.D. Ga. 1976) for the proposition that plaintiff "had publicly associated himself with figures in organized crime" and that this "made him a limited public figure with respect to an article describing him as a 'mobster.'" Opposition, p. 12. It would be fair to say that the facts in *Rosanova* were somewhat different than those present here. In Rosanova, the Court noted, among other things, that:

> Mr. Rosanova acknowledges that in 1963 he was identified as a member of organized crime in a chart prepared by the staff at a United States Senate Committee investigating that subject. It referred to him as a member of the "Chicago-Italian Organization". Plaintiff admits that he was socially acquainted with many of the persons listed on the chart and on a good-friend basis with others. His contact in many instances grew out of his business connection with two golf clubs in the Chicago area which defendant contends were recognized as gathering places for "underworld" figures.

> Mr. Rosanova has been the subject of governmental investigations and criminal prosecutions. He has never been convicted of any crime, however. He conceded in his deposition that "rap sheets" are kept on him by FBI as well as by the States of Illinois, California, Florida and Georgia. In 1972 his alleged activities resulted in an article in the Savannah Morning News, headlined "Governor says Probe Includes Savannah Inn", stating that "Gov. Jimmy Carter Thursday singled out the Savannah Inn and Country Club as one of the 30 or 40 businesses in the State under investigation for possible links with organized crime". Subsequently, an investigation was launched by the Georgia Alcohol and Tobacco Tax Unit which resulted in the suspension of the resort's liquor license. In the same year (1972) plaintiff was indicted for mail fraud in the federal court in Chicago. He was acquitted of the charge.

> Defendant presented an extensive resume of the publicity Mr. Rosanova has received in press, periodicals and books over a period of ten years before the Playboy article came out. There are over forty such articles and references. They predominantly relate to alleged underworld contacts and involvements. Articles concerning plaintiff's activities have appeared in newspapers in Chicago, Miami, Atlanta, New York and Los Angeles. Included among his alleged activities is his long-standing and close relationship with the Teamsters Union.

---

[7] Defendants argue that Plaintiffs sponsored adult webmaster conferences that were also sponsored by individuals who were allegedly involved in criminal activity and, indeed, that their having clients who may have engaged in criminal behavior somehow means that they have "associated themselves" with the criminal element. It is, to say the least, an interesting argument coming as it does from one of Florida's most renowned criminal defense attorneys.

*Id.* at 444-45.

In finding the plaintiff to be a limited public figure, the *Rosanova* Court noted that – given all of the above – the plaintiff had "voluntarily engaged in a course that was bound to invite attention and comment." *Id.* at 445.

In the present case, Defendants allege primarily that: (1) a number of Plaintiffs' clients used Plaintiffs' web infrastructure to do bad things, and (2) that Plaintiffs sponsored and attended industry conferences for adult webmasters.[8]  *Rosanova* appears to be distinguishable.

- Finally, after repeatedly complaining about "straw men" that didn't exist, Defendants set up one of their own, citing to *Colodny v. Iverson, Yoakum, Papiano & Hatch*, 936 F. Supp. 917 (M.D. Fla. 1996) to refute the argument (nowhere made by Plaintiffs) that a participant in a public controversy need not "change the course of history" in order to be a limited public figure.  In *Colodny*, the plaintiff had authored a book entitled "Silent Coup: The Removal of a President," that advanced a conspiracy theory concerning Watergate that alleged (among other things) that White House Counsel John Dean had repeatedly lied and perjured himself during his tenure as White House Counsel.  Dean's lawyers (who brought a separate defamation case against Colodny) wrote a letter to the *Tampa Tribue* stating that they were confident that Colodny's book would be exposed as "a fraud."  *Id.*, at 921.

Colodny assumed in his papers to the Court that he was a limited public figure for the purposes of his suit against the lawyers and the Court found him to be one as a matter of law noting, among other things, "his appearance on the Gordon Liddy Show" and finding that he was

---

[8] Buzzfeed's new-found aversion to adult industry conferences is more than a little bit hypocritical.  *See*, *e.g.*, Charlie Warzel, "Meet The Tech Entrepreneurs Trying To Take Back The Porn Industry," *BuzzFeed*, https://www.buzzfeednews.com/article/charliewarzel/if-they-build-it-will-we-come-meet-the-tech-entrepreneurs-tr (Sept. 24, 2015) ("It's a cloudless, mid-January day in Los Angeles, and I'm in a cramped, dimly lit hotel conference room off the Sunset Strip getting scolded by the star of Gang Bang Darlings 8."); Javier Moreno, "21 Of The Sexiest Products At This Year's AVN Awards," *BuzzFeed*, https://www.buzzfeed.com/javiermoreno/21-of-the-best-products-at-this-years-avn-awards (Jan. 23, 2015); Gabriel H. Sanchez, "49 Insane Photos From The World's Largest Porn Convention," *BuzzFeed*, https://www.buzzfeed.com/gabrielsanchez/photos-from-the-avn-adult-expo (Jan. 26, 2015); Javier Moreno, "This Is What Happened When I, A Regular Guy, Went To The AVN Awards Show," *BuzzFeed*, https://www.buzzfeed.com/javiermoreno/this-is-what-happened-when-i-a-regular-guy-went-to-the-avn-a (Feb. 3, 2015).

"clearly involved in an actual public controversy, Watergate, and participated sufficiently in that controversy 'to gain him general fame or notoriety in the community." *Id.*, at 922.

As with each of the other cited cases, *Colodny* adds nothing to the analysis of the present case other than to point out how distinguishable the cases are that find Plaintiffs to be limited public figures.

### **Conclusion**

For the reasons stated hereinabove and in Plaintiffs' Motion for Summary Judgment, the Court should allow Plaintiffs' motion and hold that Plaintiffs are private figures for the purposes of this action.

Dated: October 9, 2018

**Respectfully Submitted:**

/s/ Evan Fray-Witzer
Evan Fray-Witzer (*pro hac vice*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-0000
Facsimile: 617-423-4855
Evan@CFWLegal.com

/s/ Valentin Gurvits
Valentin D. Gurvits (*pro hac vice*)
Matthew Shayefar (Fla. Bar No. 0126465)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1804
Facsimile: 617-928-1802
vgurvits@bostonlawgroup.com
matt@bostonlawgroup.com

/s/ Brady J. Cobb
Brady J. Cobb (Fla. Bar No. 031018)
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com

*Attorneys for Plaintiffs*