# EXHIBIT 1

ATTORNEYS' EYES ONLY

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No.: 17-cv-60426-UU

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.

   Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

  Defendants.

_____/

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION FOR PARTIAL SUMMARY JUDGMENT
## ON THE ISSUE OF PLAINTIFFS' STATUS AS PUBLIC FIGURES

DAVIS WRIGHT TREMAINE LLP
Katherine M. Bolger
Nathan Siegel
Adam Lazier
Alison Schary
1251 Avenue of the Americas, 21st Floor
New York, New York 10020

BLACK, SREBNICK, KORNSPAN &
STUMPF, P.A.
Roy Black
Jared Lopez
201 So. Biscayne Boulevard
Miami, Florida 33131

*Of Counsel*:
Nabiha Syed
BuzzFeed, Inc.
11 E. 18th Street, 13th Floor
New York, NY 10003

*Attorneys for Defendants*

ATTORNEYS' EYES ONLY

## INTRODUCTION

The statements at issue in this case allege that Plaintiffs "had been using botnets and porn traffic" as part of Russian efforts to influence the 2016 U.S. Presidential election.  As the record makes clear, Plaintiffs have a long history of aggressively injecting themselves into public debate regarding porn traffic, botnets and cybersecurity, especially in relation to Russia.  As merely one example of that activity, Plaintiffs also publicly debunked an allegation of Trump-Russia cyber-collusion just before the election, and to this day Plaintiffs maintain they were included in the Dossier due to those comments.  Given their access to the media and their preexisting involvement in the very topics discussed in the Dossier, Plaintiffs are limited public figures.

Plaintiffs have now filed their own motion for summary judgment, which largely tries to flee from those facts by asserting that much of their conduct for years either did not work or does not matter.  Not so.  For the most part, Defendants will address Plaintiffs' specific claims in our opposition to that motion.  What is most important to note here is that Plaintiffs' motion is plainly an effort to file a pre-emptive opposition to this one.  To try to do that, Plaintiffs took different fragments from a three-month old transcript of an informal colloquy during a status conference to construct what they claim constitutes "Defendants' position" on the public figure issue, consisting of a supposed "two pronged attack."  Dkt. 208 at 2-3.  Their entire motion then purports to rebut that "position" of their own invention.  But as this Motion makes clear, the reasons Plaintiffs are limited public figures bear little resemblance to the imaginary, self-serving arguments that Plaintiffs hypothesize.

## STATEMENT OF FACTS

## I.    PLAINTIFFS' LEADING ROLE IN PROMOTING THE ONLINE PORNOGRAPHY INDUSTRY OPERATED BY RUSSIAN NATIVES

After moving to Cyprus in 2002, Gubarev became an outspoken, international advocate for the online pornography industry, especially for Russian-speakers who operate adult websites.

### A.    Gubarev Launches the AWMOpen Conferences

In 2003, Gubarev launched an international conference, called the "AWMOpen Conference," billed as a forum for Russian-speakers involved in the online pornography industry.  Defs. Statement of Undisputed Material Facts ("SUMF") ¶ 4.  Starting in Moscow, the conferences were hosted annually in different cities throughout the world, including Prague, Amsterdam, Pattaya (Thailand) and Malta, until at least 2015.  *Id.*  The AWMOpen Conferences

created the "Master X Award" and "GFY Award", which were awarded to adult webmasters at each conference.  SUMF ¶ 5.  After Gubarev founded the first Webzilla companies in 2005, the brand sponsored the AWMOpen conferences.  SUMF ¶ 6.  In conference brochures, Webzilla promoted itself as offering "high reliability, a wide channel, and liberal rules."  *Id.*  As recently as 2015 Gubarev and other top XBT executives attended the conferences.  SUMF ¶ 7.

**B.      Gubarev Publishes the *AWMOpen Magazine***

In 2006 Gubarev, through a company he founded, started *AWMOpen Magazine*, billed as "the leading magazine for Adult Webmastering."  SUMF ¶ 8.  The magazine's stated "main goal" was "media support of online industries" by enhancing their legitimacy.  *Id.*  The magazine was described as "the first full-color, glossy, informative and entertaining magazine in the Russian language segment" and "a step to improve the status of the Russian language segment in [the] international online business."  SUMF ¶ 10.[1]  Within a year the magazine was publishing both Russian and English editions.  *See* Declaration of Nathan Siegel, Ex. 16.[2]

**C.      The Controversial Nature of Many AWMOpen Sponsors and Participants**

Whether unwittingly or not, Gubarev's AWMOpen ventures also helped promote some notorious cyber-criminals who were subjects of widespread publicity.  For example, a principal "informational sponsor" of multiple conferences was "Redeye" and his website *crutop.nu*; "Redeye" was the alias used by a Pavel Vrublesky.  SUMF ¶¶ 11-13.  *Forbes* described Crutop as an online "forum . . . where representatives of the semi-legal Runet areas meet."  SUMF ¶ 13.  Brian Krebs, an influential investigative journalist on the topic of cyber-security, reported that

---

[1] For his porn-related activities Gubarev used a pseudonym, "Alex XE", as illustrated by the picture below from the 2008 AWOpen Conference in Thailand.  The staff for the Magazine and Conferences often put out materials under that pseudonym.  SUMF ¶ 9.



[2] Unless otherwise noted, all exhibits are attached to the Declaration of Nathan Siegel filed herewith.

2

"the business of spam, fake antivirus and rogue Internet pharmacies, shadow economies . . . were aided immensely by . . . Vrublesky himself.  Ex. 19; SUMF ¶ 13.   In 2009, the FTC alleged that "*Crutop.nu* is a Russian language website that features a variety of discussion forums that focus on making money from spam."  SUMF ¶ 13; *see also* Exs. 26, 27.  In 2013 Vrublesky was imprisoned in Russia for allegedly launching a bot attack.  SUMF ¶ 14.

Krebs reported in *Slate* that McColo, another Conference sponsor, was:

a minor celebrity in the cybercriminal underground . . . a place where cybercrooks could reliably set up shop with little worry that their online investments and schemes would be discovered or jeopardized by foreign law-enforcement investigators.

Ex. 22; *see also* SUMF ¶¶ 15-16.  In 2008, Krebs wrote in *The Washington Post* that McColo was closed following a report that it "was responsible for facilitating more than 75 percent of the junk e-mail blasted out each day globally."  SUMF ¶ 16.  Another AWMOpen sponsor, 3fn.net, was shut down by the FTC in 2009 for operating as a "rogue Internet service provider" facilitating illegal bots and pornography.  SUMF ¶¶ 17, 18.

## II.   PLAINTIFFS HOLD THEMSELVES OUT TO THE MEDIA AS MAJOR PLAYERS IN THE INTERNET WORLD

By 2013, Plaintiffs were winding down their direct involvement in promoting the adult web industry.  Around the same time, XBT and Webzilla began to aggressively circulate press releases promoting the message that the companies had become major international players in the broader internet world.  The companies used the service "Marketwired," a London-based company that circulates press releases to the press worldwide.  SUMF ¶ 19.  For example, in a 2014 release entitled "Webzilla is Now in the Company of Giants," the company stated that "Webzilla has transitioned itself to stand among the ranks of exclusive peers such as Netflix, Google, and Akamai, quietly taking its rightful place among the giants."  SUMF ¶ 20.[3]

Another theme that XBT and Webzilla's press releases began to emphasize was the companies' stated commitment to protecting its servers from malicious cyber-activity.  In a 2015 press release, XBT's CFO Rajesh Mishra stated that:

---

[3] *See also* Ex. 30 (2014 Press release announcing stating "Webzilla is a world leader in enterprise holding and cloud services" and "XBT is now one of the fastest-growing companies in the Internet infrastructure industry."); Ex. 31 (2014 press release lauding "the corporate ascension of XBT to the ranks of the world's top providers of internet infrastructure.")

> Ever since it gained popularity and became a household presence, the Internet has been elevating questions regarding the exposure of personal and business data. The creation of SecureVPN was to introduce a unique version of online safety and help with internet protection. The company focuses on safeguarding users who are conscious of their sensitive data and patterns online.

Ex. 33; SUMF ¶ 21.  Another release claimed that "[t]he acquisition of DDoS.com combined with the expertise developed by all the companies under the XBT umbrella in dealing with threats to security, including DDoS attacks, guarantees a service that will make the online world a safer place."  SUMF ¶ 22.  Mishra explained that XBT's purpose for DDoS.com was to "create a forum so that we can educate the people" about online safety.  SUMF ¶ 23.  Plaintiffs' executives also began granting interviews to trade publications covering the internet hosting industry.[4]  SUMF ¶ 24.

### III. PLAINTIFFS ACTIVELY SEEK COVERAGE IN THE AMERICAN MEDIA BY PROMOTING THEMSELVES AS TECHNOLOGY "THOUGHT LEADERS"

In 2015, Plaintiffs decided to more aggressively inject themselves into media discussions about web-related technology, especially in U.S.-based media and particularly about topics relating to the Russian cyber-world.  Plaintiffs hired an American public relations ("PR") firm, Cutler PR.  Cutler was charged with soliciting journalists to write articles about the company and its executives, particularly a new brand that XBT was launching, Servers.com.  SUMF ¶ 25; Ex. 38 at 45:21-48:14.  The PR strategy Plaintiffs pursued involved much more than standard press releases announcing the company's products, finances, or internal news.  Rather, Cutler aimed to establish the company and its executives more broadly as "Thought Leaders" about issues related to technology.  SUMF ¶ 26.

Cutler thus undertook to "pitch top list, feature, trend and op-ed stories" to the media, targeting both major general business media like *CNN Money*, *Bloomberg, Forbes* and *Reuters* and leading publications focusing on technology like *VentureBeat*, *CNET* and *Gizmodo*.  SUMF ¶ 27.  XBT also aimed to "raise key executives profiles with bylined articles" that Cutler pitched to news editors to publish.  SUMF ¶ 28.  Those articles were "not product specific, and they are not generally profile stories of the company."  Rather, Plaintiffs' goal was to establish

---

[4] *See, e.g.*, Ex. 36 ("Webzilla has years of experience working with leaders in the FX industry . . ."); Ex. 37 ("In 2013, XBT Holding S.A. began the creation of Servers.com . . . Nick Dvas, Project Manager for Servers.com, recently spoke with Linux.com about the company . . .").

"credibility" with journalists so that "the press will seek commentary on timely topics."
SUMF ¶ 29.

Cutler pitched multiple publications like *Forbes* and persuaded editors to publish several op-ed articles under the byline of one of the company's executives, Nikolai Dvas, such as an article published by *CNBC.com* on why Luxembourg (where XBT had a headquarters) is an attractive place to do business.  SUMF ¶ 30.  Luxembourg's Prime Minister re-posted the article on the government's Twitter feed, which Dvas thought was "good publicity."  *Id.*  Cutler also persuaded *Inc.*, another prestigious business publication, to list Servers.com as one of "18 Tech Companies to Get Excited About", noting that it "boasts super-secure" servers.  SUMF ¶ 31.

## IV.   PLAINTIFFS PROMOTE THEIR ENTRY INTO RUSSIA TO FACILITATE COMPLIANCE WITH CONTROVERSIAL RUSSIAN DATA PRIVACY LAWS

In 2015 Plaintiffs began to expand their business to Russia itself.  Russia had just enacted a highly controversial data privacy law requiring that the data of all Russian citizens be stored within Russia.  SUMF ¶ 32.  Critics saw it as an effort by Putin's government to assert control over information flowing in and out of Russia.  SUMF ¶ 33.  However, Plaintiffs viewed the new law as a business opportunity.  SUMF ¶ 34.

XBT purchased an existing Russian company ("Edinaya Set") to establish data center presence in Russia.  SUMF ¶ 32.  XBT issued press releases emphasizing how the new law relates to its services, and its executives spoke to the press about the Russian law and XBT's entry into Russia.  SUMF ¶¶ 35, 36; Ex. 47 ("the move enables XBT to deploy its solutions to the local market in observance of the legal standards of the Russian Federation"); Ex. 52 (XBT "provides the platform for businesses who maintain presence in Russia, as such entities are legally required to store personal data within Russia's physical borders."); Ex. 54 (XBT "launch[ed] local versions of XBT services in compliance with Russian legislation.").  Gubarev even publicly defended the controversial law:  "It is worth noting that the law on personal data in Russia is not unique, such provisions exist in other countries."  Ex. 53.

Plaintiffs also generated publicity about their launch in Russia in a variety of other ways.  They asked Cutler to "[p]itch info about opening of Russia office to U.S. media who might be able to cover it."  Ex. 56; SUMF ¶ 37.  Plaintiffs held a press conference in Moscow, which generated coverage in the Russian media.  SUMF ¶ 38; Ex. 57 ("Aleksej Gubarev launches Servers.ru hosing in Russia")."  Gubarev claimed the company offered "the fastest network in

Russia" and "the most powerful hardware in Russia." SUMF ¶ 40. Dvas even invited German Klimenko, President Putin's advisor on internet matters, to attend. SUMF ¶ 39.

Plaintiffs continued to generate press in Russia throughout 2016. SUMF ¶¶ 36, 38, 41. In interviews, Gubarev asserted that Plaintiffs' entry into Russia was a transformative development in the internet industry there. SUMF ¶ 41; Ex. 53 ("The main event of the year [is] our entry into the Russian market, as well as the launch and incredible success of our partner Prisma AI."); Ex. 54 (Gubarev said the launch of his companies "will become the foundation for the development of international potential [in] the Russian market."). Gubarev also commented on the importance of security safeguards against botnets. SUMF ¶ 42; Ex. 53 ("It is interesting, if earlier botnets infected home computers, now the same thing happens more often with cloud servers. According to our data . . . control and security are key factors in making decisions on choosing a host.").

In 2016, Gubarev also spoke at the Russian Internet Forum about "trend[s] in the infrastructure of the global and Russian internet." SUMF ¶ 43. The Forum is the "biggest Russian internet event" and was attended by key Russian officials including Klimenko, whom Gubarev met there. SUMF ¶ 44; Ex. 61. Servers.ru (the company's brand name in Russia) was a sponsor of the event. SUMF ¶ 45. Subsequently, XBT's marketing director lobbied Klimenko to secure Gubarev an opportunity to speak about "cyber-security" at the 2016 St. Petersburg International Economic Forum ("SPIEC"). SUMF ¶ 46. The SPIEC is organized by Putin as "a leading global platform for members of the business community to meet and discuss the key economic issues facing Russia, emerging markets, and the world as a whole." SUMF ¶ 47.

## V.   PLAINTIFFS ACCELERATE THEIR EFFORTS TO OBTAIN MEDIA COVERAGE AS EXPERTS ON RUSSIA-RELATED TECHNOLOGY ISSUES

Although Plaintiffs had been featured in high-profile publications like *CNBC.com* and *Inc.*, Plaintiffs thought that Cutler was not being aggressive in generating coverage in media that was sufficiently "popular." SUMF ¶ 48. So they looked for a replacement that could "maintain persistent citation level across business media with company news or experts' comments." SUMF ¶ 48. The company retained KGlobal, a PR firm based in Washington, D.C. SUMF ¶ 49.

In July 2016, a KGlobal team conducted a "full-day media training" for Gubarev and other executives, focused on "how to talk to a journalist." SUMF ¶ 50. KGlobal focused heavily on pitching Gubarev to journalists as an industry "thought leader" and "expert," especially on

matters related to Russian and technology.  SUMF ¶¶ 51, 54.  As KGlobal explained, "Pitching Alex as a thought leader means longevity . . . introducing Alex is very important and crucial in building rapport with editors, bringing awareness to Servers.com and establishing Alex as credible and a great resource that can be called upon for his expertise."  Ex. 67 at 3; *see also* Ex. 68.  And Gubarev specifically requested that "my name will be in publication as well."  Ex. 139; SUMF ¶ 52.

KGlobal reached out to news organizations like *Bloomberg*, *Associated Press*, *Gizmodo*, *TechCrunch* and many others to solicit interviews with Gubarev.  SUMF ¶ 53.  It quickly secured interviews with *Bloomberg*, *Business Insider*, and *Tech Insider*, which resulted in articles published in *Business Insider* and *VentureBeat*.  SUMF ¶ 55.  To attract interviews, KGlobal also publicized Plaintiffs' role in the development of Prisma, a Moscow-based photo-processing application which was downloaded by 70 million customers.  *See, e.g.,* Ex. 76.

To pitch Gubarev as a "thought leader," KGlobal told reporters that:

> We want to introduce a successful young Russian entrepreneur whose global company is based in the European Union.  Aleskey Gubarev, CEO of XBT Holding and CEO of the unique company servers.com . . . He is also a great resource for stories about the Russian tech, startup, and entrepreneur scene . . . and general startup/business/entrepreneur tips and advice.

Ex. 69; SUMF ¶ 54.  KGlobal made this pitch to *The Wall Street Journal*, *Forbes*, *PC Magazine*, *TechCrunch, CNN, San Francisco Chronicle, Milwaukee Journal Sentinel, Fortune* and many others, and noted that "Aleksej was named a finalist by Ernst Young's Russia's Entrepreneur of the Year."  SUMF ¶ 54.  The pitch even came with a photo:


Are you interested in speaking with Aleksej about new and upcoming news in the tech space?



Ex. 71.

As a result, Gubarev was interviewed by *Forbes* and by *Bloomberg* once again, had

interviews scheduled with the *Wall Street Journal*, and sat for a 20-minute podcast focused on his personal story as a sort of Russian Horatio Alger titled "Biggest Lesson of Growing a Company with Aleksej Gubarev."  SUMF ¶ 55.  KGlobal described that podcast series as "the #1 mobile app podcast" at the time.  *Id.*

## VI.   PLAINTIFFS COMMENT ON THE 2016 U.S. PRESIDENTIAL ELECTION

Plaintiffs' efforts to promote Gubarev as a go-to expert on Russian tech also resulted in him commenting on the 2016 election.  On October 31, 2016, *Slate* published a story about cyber-contacts between Russia's Alfa Bank and the Trump campaign.  SUMF ¶ 56.  Shortly thereafter, a *Bloomberg* reporter who knew Gubarev from a previous interview KGlobal had arranged reached out to him to ask:

> I don't know if you came across [the *Slate* article]. It is a great scandal under American election campaign programme  – ostensibly the server was registered on Donald Trump's company, it was involved in some secret communications with servers of Russian Alpha [sic] Bank. Could you help to me to sort out technical details of what is described here?

Ex. 88; SUMF ¶ 57; Ex. 86.  Gubarev directed an employee of one of the Webzilla companies to analyze the technical claims in the *Slate* story.  SUMF ¶ 58.  Gubarev then e-mailed the reporter an "expert opinion" that was an annotated, paragraph-by-paragraph commentary as to "whether this is true or not."  *Id.*  Plaintiffs' "opinion about the article," challenged the reliability of the conclusions in the *Slate* article.  SUMF ¶ 59.  Gubarev also made clear he wanted Plaintiffs to be identified in the article ("will we be referenced in the article?") and told the reporter "if anything [else] comes up, you can write to us."  Ex. 86 at 34:10-23; SUMF ¶ 60.

The resulting *Bloomberg* article, titled "Clinton Plugs Another Weak Story About Trump's Ties to Putin," called the accusations of collusion "a trumped-up story" that "is easily debunked."  SUMF ¶ 61. The article explained that:

> Another troubling aspect of the Foer article . . . Alexey Gubarev, chief executive officer of Luxembourg-registered XBT Holding, which owns the infrastructure-as-a-service provider Servers.com, told me there was no legitimate way to get access to the full logs of a server that you do not control.

Ex. 81.

## VII.   METHBOT:  PLAINTIFFS CONTINUE TO INJECT THEMSELVES INTO CONTROVERSY OVER RUSSIAN CYBER-CRIME

Even though Plaintiffs had generated publicity in publications like *Bloomberg*, *Business

*Insider*, *Yahoo Finance* and *VentureBeat* and landed interviews with *Forbes* and *The Wall Street Journal*, they still thought KGlobal was "not succeeding in getting as much publicity as [they] would have liked."  SUMF ¶ 62.  So they terminated KGlobal, but then a few days later re-hired it to help them "get in front of" a major story about a Russian-based, criminal botnet operation allegedly emanating in significant part from Plaintiffs' servers.  Ex. 90; SUMF ¶¶ 62, 63.

In December 2016 a cybersecurity firm called "White Ops" published a report detailing a massive fraud by Russian cybercriminals, dubbed "Methbot."  SUMF ¶ 64.  It reported "Russian cybercriminals are siphoning millions of advertising dollars per day away from U.S. media companies and the biggest U.S. brand name advertisers in the single most profitable bot operation discovered to date."  *Id.*  The news generated widespread international media coverage, including in *Forbes*, *Fortune*, *The New York Times*, and *CNN*.  SUMF ¶ 65.  When Dvas read the data published by White Ops, he realized that a lot of the bot activity was being conducted through IP addresses used by one of Plaintiffs' largest customers.  SUMF ¶ 66.  In November 2016 that customer had provided *7.5%* of XBT's total monthly revenues[5], and had personally come to Cyprus several times to meet Plaintiffs.  SUMF ¶¶ 66, 67.  In 2016, XBT (through its subsidiaries) earned nearly $2.2 million from the Methbot customer, which represented 4.4% of XBT's consolidated revenues for that year.  SUMF ¶ 68.

Gubarev and Dvas realized that "some curious journalist might eventually find out that the servers were ours," and if so the news would pose a public relations disaster.  Ex. 90.  So they asked KGlobal to help "minimize the bad publicity we could get from having this customer" by "establish[ing] control on the media field in this aspect."  SUMF ¶ 69.  KGlobal advised that "[g]iven the recent controversy over Russian hacking in the U.S. election," it was important to "get in front of the story."  *Id.*  So Plaintiffs instructed KGlobal to reach out proactively to White Ops and influential cybersecurity journalist Brian Krebs, who had written about the Methbot report.  SUMF ¶ 70.

Specifically, they instructed KGlobal to emphasize that Plaintiffs were also supposedly "victims" of the scam.[6]  *Id.*  Second, they instructed KGlobal to only reveal that the perpetrator

---

[5] XBT's consolidated monthly revenue for November 2016 was $5.3 million; the Methbot customer paid almost $400,000 that month.  SUMF ¶ 67.

[6] Plaintiffs' claimed to be "victims" because they terminated the customer once exposed, and they had to continue to pay for the servers he used.  Ex. 100; *see also* Ex. 101.  However,

was a Webzilla customer, and to avoid (unless asked) any connection to their newer brand, Servers.com.  SUMF ¶ 71.  That was because "Webzilla had some ambivalent episodes in its history and has had some customers with doubtful reputation."  *Id.*  As a result, Plaintiffs "want[ed] the damage to be limited to Webzilla" to try to protect the newer brand from being tarnished.  *Id.*  KGlobal reached out to Mr. Krebs.  SUMF ¶ 72.

## VIII.   PLAINTIFFS USE THEIR MEDIA ACCESS TO RESPOND TO THE DOSSIER

When the Dossier was published on January 10, 2017, Plaintiffs responded the same way they had to the Methbot news a few weeks earlier – they asked KGlobal to plan a press strategy. SUMF ¶ 73.  Moreover, on January 11 a leading Dutch newspaper, *de Volkskrant*, reported extensively about Plaintiffs' connection to the Dossier, focusing on Webzilla's history in the Netherlands.  SUMF ¶ 74.  So Webzilla B.V. retained the Amsterdam office of one of the world's largest PR firms – Hill & Knowlton Strategies ("HK") – to assist with media relations in Europe.  SUMF ¶ 75.

Both of Plaintiffs' PR firms monitored the press, spoke with journalists, arranged interviews for Gubarev and suggested talking points for him.  SUMF ¶ 76.  *See, e.g.*, Ex. 108 at P-P000014-15 (Gubarev texts a *Washington Post* reporter that he will "ask my PR team to set up a call"); Ex. 111 (KGlobal sends reporter a glossy photo of Gubarev); Ex. 110 (KGlobal offers interview with Gubarev to Tucker Carlson of Fox News); Exs. 112, 113, 116 (Plaintiffs work with HK to have reporters travel to Cyprus to interview Gubarev and edit draft article).  Gubarev gave interviews to major media worldwide.  *See, e.g.,* Ex. 137; Ex. 118; Ex. 119.  Plaintiffs tried to negotiate pre-conditions for an interview of Gubarev by *de Volkskrant*, including their right to review the resulting article before it was published.  SUMF ¶ 77.

In those interviews and now in testimony, Gubarev maintains that Plaintiffs were named in the Dossier as a direct response to the comments in *Bloomberg* helping to debunk the story about alleged Russia-Trump collusion.  SUMF ¶ 78; *see, e.g.*, Ex. 117 (Gubarev tells KGlobal, "It is 100% because I made report for Bloomberg about fake news that Trump servers have connections to Alfa bank servers"); Ex. 118 (*McClatchy* article reporting, "Gubarev suspected he might have been named in the report because of comments to Bloomberg's Russia business columnist Leonid Bershidsky"); Ex. 119 (*Wall Street Journal* article reporting, "Gubarev said his

---

Plaintiffs had already earned $2.2 million from the perpetrator in 2016 – 4.4% of XBT's revenues for that year.  SUMF ¶ 68.  Plaintiffs did not ask KGlobal to reveal those facts.

name ended up in the report after he was quoted in a news report as an expert voicing doubt about allegations that surfaced during the 2016 presidential campaign that Mr. Trump maintained a secret server that may have been in communication with a Russian bank"); Ex. 120 (Dutch newspaper reporting, "Gubarev thinks that he appears in the report because he got involved in political affairs").

## ARGUMENT

## I.    The First Amendment's Public Figure Doctrine

The public figure doctrine was created to give the press crucial "breathing space" to be able to report about newsworthy persons and controversies without fear of liability for mistaken facts. *Tavoulareas v. Piro*, 817 F.2d 762, 771 (D.C. Cir. 1987).  "Determining whether an individual is a public figure – and thus subject to the actual malice analysis – is a question of law for the court to decide."  *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016).

This Circuit's law emphasizes two "fundamental differences between public and private figures."  *Silvester v. Am. Broad. Cos.*, 839 F.2d 1491, 1494 (11th Cir. 1988).  First, public figures "usually have greater access to the media . . . ."  *Id.* (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344 (1974)).  *See also Turner v. Wells*, 879 F.3d 1254, 1272 (11th Cir. 2018) ("[T]he level of media access enjoyed by a particular claimant should be considered as part of the public figure calculus.") (citation omitted).  Second, public figures have "voluntarily placed themselves in a position and acted in a manner which invited public scrutiny and comment."  *Silvester*, 839 F.2d at 1494.

The doctrine is thus predicated on a "voluntary assumption of risk" rationale.  *Brewer v. Memphis Publ'g Co.*, 626 F.2d 1238, 1254 (5th Cir. 1980).  By electing to speak out in the press and other public fora about topics that impact the lives of others, public figures "accept the risk that the press, in fulfilling its role of reporting, analyzing, and commenting on well-known persons and public controversies, will focus on them and, perhaps, cast them in an unfavorable light."  *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1292 (D.C. Cir. 1980).  At the same time, public figures' access to the media gives them "a more realistic opportunity to counteract false statements than private individuals normally enjoy."  *Gertz*, 418 U.S. at 344.

Contrary to what Plaintiffs maintain, Dkt. 208 at 12, this Circuit's public figure analysis begins with a broader, two-step inquiry.  First, the Court must consider whether Plaintiffs satisfy the two basic criteria for all public figures: whether prior to the publication at issue they had (1)

11

access to the media and (2) "voluntarily placed themselves in a position and acted in a manner which invited public scrutiny and comment." *Silvester*, 839 F.2d at 1494. *See also Turner*, 879 F.3d at 1272 (key criteria is whether a plaintiff "chose to put himself in the public arena"). After assessing those general factors, the second step in the public figure analysis is for the Court to determine which category of public figures may fit the plaintiffs. *Id.*

As Plaintiffs correctly explain, the doctrine further differentiates between "general purpose" public figures (*i.e.*, celebrities), and the far more common category, limited public figures, who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz*, 418 U.S. at 345. Plaintiffs are obviously not general public figures. Plaintiffs' Motion obscures, however, the critical point that limited public figures need *not* be well known. Indeed, numerous plaintiffs who never sought nor achieved anything close to the media attention that Plaintiffs enjoyed prior to the Dossier's publication have been deemed limited public figures.[7] To determine whether Plaintiffs are limited-purpose public figures, "the court must (1) isolate the public controversy, (2) examine the plaintiffs' involvement in the controversy, and (3) determine whether 'the alleged defamation [was] germane to the plaintiffs' participation in the controversy.'" *Silvester*, 839 F.2d at 1494 (quoting *Waldbaum,* 627 F.2d at 1297).

**II.      Plaintiffs are Limited-Purpose Public Figures**

The record here presents a textbook example of what it means to be a limited public figure. First, Plaintiffs clearly satisfy the two basic *Gertz* criteria. Plaintiffs actually published media promoting online pornography, and they hired PR professionals with access to the media to invite and receive attention from prestigious media well before the Dossier was published.

Second, Plaintiffs also satisfy the applicable three-part test. Although in this context that alone would be enough, Plaintiffs Motion is mistaken in presuming that their public figure status in this case need turn solely on election commentary. Rather, well before that, Plaintiffs chose to seek public attention to improve the "status" of online pornography, as "thought leaders" on

---

[7] *See, e.g.*, *Little v. Breland*, 93 F.3d 755 (11th Cir. 1996) (president of non-profit to attract conventions to Mobile, Alabama); *Orr v. Argus-Press Co.*, 586 F.2d 1108 (6th Cir. 1978) (developer of shopping mall in Owosso, Michigan); *Bourne v. Arruda*, No. 10-cv-393, 2013 WL 93637, at *2 (D.N.H. Jan. 8, 2013) (individual who sent letter to local newspaper for publication); *James v. Gannett Co.*, 40 N.Y.2d 415 (1976) (nightclub belly dancer in Rochester, New York).

12

matters generally related to cybersecurity and Russia, as supposed "victims" of Russian botnets, as well as expert commentators on alleged Russia-Trump cyber-collusion – all of which are highly controversial topics.  The Dossier then alleged that Plaintiffs were actually involved in the very types of Russian-directed, malicious cyber activities they spoke out about.  In response, Plaintiffs used their professional public relations team's pre-existing access to the media to vigorously respond.  That dynamic defines what it means to be a limited public figure.  *See, e.g.*, *Hatfill v. N.Y. Times Co.*, 532 F.3d 312, 323 (4th Cir. 2008) ("where an expert in a field claims defamation when a news publication later suggests he might have committed a crime relevant to that field," the expert was a limited public figure).

> **A.      Plaintiffs Satisfy the Two Basic *Gertz* Criteria**

First, the record establishes Plaintiffs' access to the media prior to the Dossier's publication.  Plaintiffs, either directly or through their PR team, were in regular contact with multiple publications, like *Bloomberg*, *Forbes*, *The Wall Street Journal*, *Business Insider*, *CNBC* and *CNN* to name a few.  Indeed, Plaintiffs' international media reach was far more extensive than the handful of local newspaper articles and television reports related to the public figure plaintiff in *Little*.  Moreover, like the plaintiff football coach in *Turner*, Plaintiffs actually "took advantage of [their] familiarity with the media" to respond to the Dossier.  *Turner*, 879 F.3d at 1272.  In fact, just before the Dossier was published they also used their media access to pre-emptively try to "control" the media's narrative about Methbot.

Likewise, Plaintiffs voluntarily "acted in a manner which invited public scrutiny and comment."  *Silvester*, 839 F.2d at 1494.  Plaintiffs launched general media PR campaigns, reaching out to scores of journalists to solicit op-ed articles and interviews as "thought leaders" and self-described experts on "Russia tech."  Plaintiffs further invited media profiles of Gubarev as a Russian émigré with a Horatio Alger-like success story.  Courts have consistently held that engaging in similar public relations efforts qualifies businesses and their executives as limited public figures.[8]

---

[8] *See, e.g.*, *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 17 (1st Cir. 2011) (plaintiffs who "enjoyed access to the press" and "orchestrat[ed] a PR blitz" were limited public figures); *Patrick v. Cleveland Scene Publ'g*, 582 F. Supp. 2d 939, 951 (N.D. Ohio 2008) (plaintiff who "retained a public relations firm to represent his interests in the controversy"), *aff'd*, 360 F. App'x 592 (6th Cir. 2009); *Carr v. Forbes, Inc.*, 121 F. Supp. 2d 485, 492 (D.S.C. 2000) (plaintiff whose "group paid a lobbyist/public relations firm"), *aff'd*, 259 F.3d 273 (4th Cir.

### B.      This Case Involves Several Pre-Existing Public Controversies

Turning to the three-part test, a "public controversy" is "a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." *Waldbaum*, 627 F.2d at 1296; *see also Silvester*, 839 F.2d at 1495.  Prior media reports are persuasive proof of a public controversy.  *Little*, 93 F.3d at 758.  And there may be – and frequently is – more than one controversy pertinent to the allegedly defamatory statements. *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 586 (D.C. Cir. 2016), *cert. denied*, 137 S. Ct. 1434 (2017) ("a court may find that there are multiple potential controversies"); *Little*, 93 F.3d at 757-58 (finding two controversies); *Waldbaum*, 627 F.2d at 1297 n.27 (the same article can implicate "broad" and "narrow" controversies).  Indeed, "courts often define the public controversy in expansive terms."  *Jankovic*, 822 F.3d at 586.[9]

The allegations against Plaintiffs were in the last of Steele's 17 memos.  It is clear, however, that with rare exception each memo was neither written nor intended to be read in isolation.  Each assumes knowledge of information from prior memos, even at times by cross-referencing them.  For example, the last memo (No. 166) explains that it is merely adding details to the two memos that preceded it (Nos. 135/36).  Those memos in turn assume knowledge of prior memos, and so on.  *See, e.g.*, No. 135 (containing "*further* confirmation" of reasons for Ivanov's departure previously discussed in No. 111, as well as more information about "the exposure of [Carter] Page's" meeting in Moscow, previously discussed in Nos. 94, 101 & 134); No. 111 (noting "the so-called veterans' pensions ruse (reported previously)")."  BuzzFeed, of course, published all of the memos together.

Steele's second memo, written before he reported anything about alleged hacking of Democrats, focused entirely on explaining the broader phenomena of "Russia Cyber/Crime,"

---

2001); *FoodScience Corp. v. McGraw-Hill, Inc.*, 592 F. Supp. 362, 365-66 (D. Vt. 1984) (company that hired "public relations representative" in order "to influence and counter the adverse impact of the unfavorable publicity").

[9] *See, e.g.*, *Silvester*, 839 F.2d at 1495 (public controversy over "corruption in the jai alai industry"); *Dubai World Corp. v. Jaubert*, No. 09-14314-CIV, 2011 WL 579213, at *15 (S.D. Fla. Feb. 9, 2011) (public controversies over "corporate fraud" and "whether or not foreigners are safe in Dubai"); *Jankovic*, 822 F.3d at 586 (defining public controversy as "the progress of political and economic reform in Serbia and the integration of Serbia into international institutions" post-Milosevic) (citation omitted); *OAO Alfa Bank v. Center for Pub. Integrity*, 387 F. Supp. 2d 20, 43 (D.D.C. 2006) (public controversy regarding rise of oligarchs and decline of Russian economy into a "criminal-syndicalist state").

including both its "extensive program of state-sponsored offensive cyber operations" and how "non-state sponsored cybercrime was becoming an increasing problem inside Russia."  No. 86. Steele explained that "the FSB often uses coercion and blackmail" to recruit cyber-operatives, and that the FSB makes particularly "heavy use also, both wittingly and unwittingly, of CIS emigres working in western corporations."  *Id.* When in subsequent memos Steele reports specifically about efforts to hack Democrats' e-mails, he notes the use of this FSB *modus operandi*.  *See, e.g.*, No. 95 (noting the importance of "Russian émigré and associated offensive cyber operators based in the U.S."); No. 134 (explaining that "Michael Cohen's wife is of Russian descent and her father a leading property developer in Moscow").  Likewise, in his last memo Steele reports that Gubarev – who is a CIS émigré working in a Western corporation with operations in the U.S. – was "recruited under duress by the FSB," and that XBT/Webzilla "had been using botnets and porn traffic" to launch cyber-attacks on Democrats.

Like many cases, this one involves several, often "overlapping" public controversies. At the broadest level, cybersecurity and cybercrime have been constant topics in public discourse for years, as attacks on businesses, political institutions and individuals around the globe using "botnets," "porn traffic" and other means have become common.[10]  More narrowly, malicious cyber-activity emanating from Russian state and non-state actors has also long been the subject of public attention.[11]  And most narrowly, there was plainly a controversy concerning Russian interference in the 2016 election.[12]  Each of these issues fits easily within the definition of a "public controversy."  They are not "essentially private concern[s]," such as a divorce (*e.g.*, *Time v. Firestone*, 424 U.S. 448, 454-55 (1976)); rather they are issues of global significance whose resolution affects both the security of nations and everyone who uses a computer.

---

[10] SUMF ¶ 79; Exs. 18, 121, 122, 123, 124, 125, 126, 127, 128, 140.

[11] SUMF ¶ 79; Ex. 18 (2006 *Forbes* article describing "adult webmasters (AWM), in other words, sellers of pornography on the internet" as "a global network [that] has no borders and knows no distances so that the business that began in Moscow can be continued in other hemisphere[s]…"); Ex. 121 (2007 *New Yorker* article reporting that "many of the world's most prodigious and talented spammers are hidden in Eastern Europe and Russia"); Ex. 122 (2009 *Network World* report that "Russia is the top country of origin for phishing e-mails" and "gambling and pornography sites sometimes seem to have malicious links placed systematically them"); Ex. 140 (2001 AP article reporting that "Russian police often complain about the legal chaos that has turned Russia into an international center of child pornography production").

[12] SUMF ¶ 79; Exs. 124, 125, 126, 127, 128.

### C.       Plaintiffs Voluntarily Involved Themselves In these Public Controversies

The second prong of the test requires the court to "examine the plaintiffs' involvement in the controvers[ies]," *Silvester*, 839 F.2d at 1494, with a particular eye towards whether Plaintiffs "voluntarily involved [themselves]."  *Schiller v. Viacom, Inc.*, No. 1:15-cv-22129-UU, 2016 WL 9280239, at *6 (S.D. Fla. Apr. 4, 2016).   This Circuit has emphasized two ways to become involved in controversies.  One is to affirmatively seek attention in the media and other public fora.  *Silvester*, 839 F.2d at 1497.  Another is to "voluntarily engage[] in a course [of conduct] that was bound to invite attention and comments."  *Silvester*, 839 F.2d at 1496, *quoting Rosanova v. Playboy Enters.*, 411 F. Supp. 440, 444-45 (S.D. Ga. 1976), *aff'd*, 580 F.2d 859.  For example, "voluntarily entering into a strictly regulated, high profile industry" can suffice to "invite[d] public scrutiny, discussions and criticism" even if media attention was not sought by the plaintiff.  *Id.  See also Green Group Holdings LLC v. Schaefer*, No. 16-00145-CG-N, 2016 WL 6023841, at *16 (S.D. Ala. Oct. 13, 2016).  Likewise, the fact that a plaintiff had publicly associated himself with figures in organized crime made him a limited public figure with respect to an article describing him as a "mobster." *Rosanova*, 411 F. Supp. at 444-45.

 Here, Plaintiffs have involved themselves in public controversies both by engaging with the media and by their conduct.  They spent years aggressively soliciting, and receiving, media attention as one of the supposed "giants" in the internet world and as forward-looking "thought leaders" in the cyber-technology sector, including specifically as self-described experts for journalists covering cybersecurity in general and the Russian internet sector in particular.  They have repeatedly touted "the expertise developed by all the companies under the XBT umbrella in dealing with threats to security" and claimed to offer customers "a service that will make the online world a safer place." *Supra* at 4.  And notwithstanding the controversial nature of cyber-activity in Russia, Plaintiffs aggressively promoted themselves in press conferences and interviews as "the foundation of the development of the Russian market's international potential" and as a means to comply with Russia's controversial data privacy laws.  *Supra* at 6.

Gubarev also sought prominent speaking roles at international conferences attended and sponsored by Russian officials.  When Plaintiffs were linked to a major "botnet" scandal perpetrated by a Russian customer, they pro-actively tried to "control . . . the media field." *Supra* at 9.  And while those facts alone would be sufficient to render Plaintiffs public figures, here they even also publicly weighed in on the narrowest relevant controversy:  Russia's role in

the 2016 election.  Moreover, it was no accident that an Internet executive from Cyprus was asked by a reporter for one of the world's largest business media to comment on that topic, as that reporter's (Mr. Bershidsky) affidavit makes clear.  Dkt. 208-3.  Rather, that reporter only thought to contact Gubarev because *Bloomberg* had previously interviewed him as a direct result of Plaintiffs' aggressive efforts to offer themselves to journalists.  *See supra* at 4, 7-8.

Plaintiffs' conduct also invited scrutiny.  With respect to the use of "porn traffic" for malicious purposes, Gubarev helped create both media and public fora dedicated to enhancing the "status" of adult webmasters based in or originating from Russia.  *See Waldbaum*, 627 F.2d at 1299 (president of supermarket cooperative who was a "leading advocate of certain precedent-breaking policies" within his industry and was personally involved in monthly publication of company's newspaper was a limited public figure).  And the AWMOpen ventures featured some of the most notorious Russia-linked cyber-criminals.  *See supra* at 2-3.  Indeed, the Dossier was not the first time that Plaintiffs' relationship to questionable "porn traffic" was the subject of press scrutiny.  In 2008, the Dutch publication *Het Parool* published an expose examining 40 websites that were blacklisted for containing child pornography, and concluded that "almost all of the sites involved are openly hosted at two Dutch providers, Leaseweb and Webazilla …"  Ex. 129.  Another article focused on four sites identified by Dutch police, also hosted by "Webazilla from Utrecht and Leaseweb from Haarlem."  Ex. 130.  The allegations received more coverage after the Dutch Council for Journalism, an independent body that self-regulates Dutch media, rebuffed a complaint that the original article was flawed.  Ex. 131.  And in 2009, a citizen journalist writing on CNN's *iReport* reported that a German child protection organization, CareChild, publicly accused Webazilla of failing to act to take down child porn websites.  Ex. 132.  In fact, Christopher Steele read that article in conducting open source research on Plaintiffs.  Ex. 133 at 47:11-18.  Pornography is also a prime target for copyright thieves, and Webzilla has been the subject of multiple public reports to U.S. government authorities on that subject.[13]

Plaintiffs also chose to enter the Russian internet market by linking their business to its controversial data privacy laws and positioning themselves as transformative players in that market.  Indeed, after the Dossier was published journalists noted the connection between the

---

[13] *See, e.g.*, Ex. 134 at 6 (2015 Motion Picture Association of America report to U.S. Copyright Office stating that Webzilla hosted more than half the "cyberlocker" sites in the U.S. used by copyright thieves); Ex. 135, App'x C at 12 (2015 Joint Comments to U.S. Copyright Office of 18 music-related association's noting Webzilla's practices).

Plaintiffs' prior conduct and Steele's allegations:

> One reason XBT and Gubarev may have drawn suspicion is that their success in the open United States and European markets led to an expansion into Russia last year.  The XBT subsidiary Servers.com opened its Russian operation initially with 500 servers in Moscow, where the Internet is tightly controlled by the Kremlin's intelligence and military services. Since 2016, Russia has required that Internet providers there store data on servers there, giving Russia both a grip on information and the ability to thwart investigations elsewhere.

Ex. 136.  Moreover, Plaintiffs themselves have consistently maintained that they were included in the Dossier because they drew attention to themselves by  publicly casting doubt on the *Slate* story.  SUMF ¶ 78.  Thus, Plaintiffs have also "voluntarily engage[] in a course [of conduct] that was bound to invite attention and comments."  *Silvester*, 839 F.2d at 1496 [citation omitted].

The case law addressing the public figure status of corporations and/or their executives reinforces why Plaintiffs are limited public figures.  Plaintiffs spend most of their Motion citing cases holding that garden-variety, commercial advertisements do not necessarily configure public figure status.  True enough, but this case has nothing to do with that.  Rather, the law is clear that corporate plaintiffs who voluntarily engage with the press or with public issues have consistently held to be limited public figures – whether through advertisements or, like Plaintiffs, by soliciting journalists to write about them and/or entering controversial business sectors.  *Long v. Cooper*, 848 F.2d 1202, 1205 (11th Cir. 1988) (advertisements may result in public figure status, but not where their content "[n]ever commented upon or in any way addressed" any controversial topics); *Mile Marker, Inc. v. Petersen Publ'g, L.L.C.*, 811 So. 2d 841, 846 (4th DCA 2002) ("courts should examine the nature and extent of the advertising and publicity campaigns previously undertaken by the claimant, paying particular attention to the pursuit of a marketing strategy that emphasizes the controversy").  For example, in *Waldbaum*, the plaintiff was the president of a supermarket cooperative who, like Gubarev, "did not become merely a boardroom president whose vision was limited to the balance sheet," but one who also sought to vigorously publicize himself and his companies as innovators in the industry.  627 F.2d at 1300.  The D.C. Circuit noted that, having "stepp[ed] into the public spotlight . . . he must take the good with the bad."  *Id.* at 1294-95.  In *Silvester*, the plaintiffs were owners of jai alai frontons who were limited public figures because, like Plaintiffs here, they promoted their role in a controversial industry.  In *Trotter v. Jack Anderson Enterprises, Inc.*, 818 F.2d 431 (5th Cir.

1987), the president of a Guatemalan soft drink bottling company was deemed a limited public figure for purposes of a controversy over labor conflict, even though, unlike Plaintiffs here, the plaintiff had "limit[ed] public comment" and "maintain[ed] a low public profile." *Id.* at 436.[14]

Here, too, Plaintiffs did not merely circulate advertisements claiming that their servers were well-built or attractively priced. *See, e.g.*, *Long*, 848 F.2d at 1204. Rather, they undertook a systematic effort to "maintain persistent citation level across business media with . . . experts' comments" about controversial, cyber-related topics. *Supra* at 6. They were even professionally trained on "how to talk to a journalist." *Id.* And while Plaintiffs in their Motion repeatedly claim their motive for seeking press was to make money, the same could likely be said for all business plaintiffs and makes no difference. *Silvester v. Am. Broad. Cos.*, 650 F. Supp. 766, 776 (S.D. Fla. 1986), *aff'd*, 839 F.2d 1491 (11th Cir. 1988) (it is irrelevant that plaintiffs' motive for seeking attention may have been to "promote[] their business ventures in the hearty spirit of capitalism"). Accordingly, the record reflects that Plaintiffs affirmatively thrust themselves into the "vortex" of public controversies concerning cybersecurity, technology, and the Russian tech sector. *Dacey v. Fla. Bar, Inc.*, 427 F.2d 1292, 1295 (5th Cir. 1970).

### D.    The Dossier is Germane to Plaintiffs' Participation in the Controversies

The third factor considers whether the defamatory statements relate to Plaintiffs' participation in those public controversies. To avoid second-guessing editorial decisions, this factor may be satisfied as long as the statements are not "wholly unrelated" to the controversies. *Waldbaum*, 627 F.2d at 1298. Here, the Dossier's contents are plainly germane to Plaintiffs' participation in controversies regarding cybersecurity in general, Russian tech in particular, and the 2016 election. While Plaintiffs promoted the online pornography industry as worthy of respectable "status," the Dossier alleged that they used "porn traffic" for illicit ends. Indeed,

---

[14] *See also Maverick Boat Co. v. American Marine Holdings, Inc.*, Nos. 02-14102-CIV, 02-14283-CIV, 2004 WL 1093035, at *13 (S.D. Fla. Feb. 10, 2004) (boat manufacturers were limited public figures where they engaged in "extensive" advertising and "took affirmative steps to influence the public's perception of their product"), *aff'd*, 418 F.3d 1186 (11th Cir. 2005); *OAO Alfa Bank*, 387 F. Supp. 2d at 45-46 (plaintiff bank and its owners were limited public figures where they had "written articles in Russian newspapers, given interviews to newspapers and other media outlets . . . spoken on economic reform issues to international audiences, and developed a well-coordinated and sophisticated public relations strategy").

journalists reporting about the Dossier repeatedly noted that connection.[15]

Plaintiffs also invited attention as "thought leaders" and "experts" on cybersecurity and Russian tech who were dedicated to "making the online world a safer place," and touted their importance in the Russian internet space in light of Russia's data privacy policies.  They also claimed to be "victims" of a major botnet fraud emanating from Russia.  By contrast, the Dossier alleged that they were actually émigré cyber-criminals under the control of the FSB.  Plaintiffs also understood that the Dossier implicitly called into question their efforts to portray Gubarev as an exemplar of a Russian émigré success story.  An internal memo advised that Plaintiffs' media response to the Dossier should aim to "protect not only XBT/Webzilla brands, but personal brand of Alex, which happens to be our most valuable asset in terms of branding right now."  Ex. 103.

And last, but certainly not least, the Dossier is relevant to Plaintiffs decision to weigh in on the public controversy regarding alleged Russia-Trump election collusion.  Plaintiffs themselves assert that the *Bloomberg* article caused them to be included in the Dossier.   SUMF ¶ 78.  The very dynamic Gubarev claims occurred here is exactly what the limited public figure doctrine envisions:  a person and/or business  voluntarily speaks out on controversial issues, that triggers a response making defamatory charges, and the plaintiff then uses its access to the media to respond in kind.  Accordingly, Plaintiffs are limited public figures.

## CONCLUSION

For the reasons set forth above, this Court should grant partial summary judgment finding that Plaintiffs are limited-purpose public figures.

---

[15] *See, e.g.*, Ex. 118 (McClatchy News article noting that "XBT has been on a buying spree in recent years . . . [including] a site used heavily to host pornography, fozzy.com."); Ex. 138 (draft of Dutch newspaper article asking, "[w]hy do a substantial segment of the company's [Webzilla's] clients offer "adult content?"); Ex. 105 at 92:25-97:8; Ex. 136 (McClatchy News article reporting that "[p]irated pornography is often baited with malware that can affect users' computers in various ways . . .   A search of domain names shows many porn sites are hosted by Webzilla.").

Dated:  September 21, 2018      Respectfully submitted,

*Of Counsel*:      /s/ *Katherine M. Bolger*
Nabiha Syed      Katherine M. Bolger
BuzzFeed, Inc.      Nathan Siegel
11 E. 18th Street, 13th Floor      Adam Lazier
New York, NY 10003      Alison Schary
      Davis Wright Tremaine, LLP
      1251 Avenue of the Americas, 21st Floor
      New York, New York 10020
      katebolger@dwt.com
      nathansiegel@dwt.com
      adamlazier@dwt.com
      alisonschary@dwt.com

      /s/ *Roy Black*
      Roy Black
      Jared Lopez
      Black, Srebnick, Kornspan & Stumpf, P.A.
      201 So. Biscayne Boulevard
      Miami, Florida 33131
      rblack@royblack.com
      jlopez@royblack.com

      *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing, together with its exhibits, will be served electronically by email on all counsel or parties of record on the service list below this 21st day of September, 2018.

By: /s/ *Jared Lopez*
Jared Lopez, Esq.

## SERVICE LIST

Matthew Shayefar
Valentin D. Gurvits
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1806
Facsimile: 617-928-1802
matt@bostonlawgroup.com
vgurvits@bostonlawgroup.com

Evan Fray-Witzer
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-000
Facsimile: 617-423-4855
Evan@CFWLegal.com

Brady J. Cobb
Dylan Fulop
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com
dfulop@cobbeddy.com

ATTORNEYS' EYES ONLY

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No.: 17-cv-60426-UU

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.

   Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

   Defendants.

_____/

## STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
## ON THE ISSUE OF PLAINTIFFS' STATUS AS PUBLIC FIGURES

DAVIS WRIGHT TREMAINE LLP
Katherine M. Bolger
Nathan Siegel
Adam Lazier
Alison Schary
1251 Avenue of the Americas, 21st Floor
New York, New York 10020

BLACK, SREBNICK, KORNSPAN &
STUMPF, P.A.
Roy Black
Jared Lopez
201 So. Biscayne Boulevard
Miami, Florida 33131

*Of Counsel*:
Nabiha Syed
BuzzFeed, Inc.
11 E. 18th Street, 13th Floor
New York, NY 10003

*Attorneys for Defendants*

ATTORNEYS' EYES ONLY

Pursuant to Local Rule 56.1(a), Defendants submit this statement of material facts as to which Defendants contend there does not exist a genuine issue to be tried.

1. Until January 1, 2018, Aleksej Gubarev was the Chairman, CEO, and Director of XBT. Declaration of Nathan Siegel ("Siegel Decl.")[1] Ex. 1 at Resp. No. 1; Ex. 2 at Resp. No. 3.

2. Webzilla Inc. is a subsidiary of XBT. Compl. [Dkt. 1-2], ¶ 7.

3. Gubarev resides in Cyprus and is a citizen of Lithuania, Russia, and the Dominican Republic. Ex. 3 [Transcript of the Deposition of Aleksej Gubarev, Apr. 30, 2018 ("Gub. I Depo.")] at 16:16-17:2.

4. In 2003, Gubarev was involved in organizing an international conference, called the "AWMOpen Conference," which was a forum for Russian-speakers involved in the online pornography industry. The inaugural conference was held in Moscow, with subsequent conferences hosted annually in cities around the world including Prague, Amsterdam, Pattaya (Thailand) and Malta, until at least 2015. Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 3 [Gub. I Depo.] at 57:2-10; 60:16-18, 74:3-7.

5. The AWMOpen Conferences created the "Master X Award" and "GFY Award", which were awarded to adult webmasters at each conference. Ex. 3 [Gub. I Depo.] at 74:10-76:3; Ex. 9.

6. After Gubarev founded the first Webzilla companies in 2005, the brand sponsored AWMOpen conferences. Ex. 3 [Gub. I Depo.] at 69:1-12, 99:8-11; Ex. 8 at 1; Ex. 9 at 3; Ex. 10 at 2, Ex. 6 at 2; Ex. 11 at 1. In conference brochures, Webzilla promoted itself as offering "high reliability, a wide channel, and liberal rules." Ex. 8 at 1.

7. As recently as 2015 Gubarev and other top XBT executives attended the conferences. Ex. 12 [Transcript of the Deposition of Rajesh Mishra ("Mishra Depo.")] at 227:25-232:16; Ex. 13 at 43; Ex. 14 at 36.

8. In 2006 Gubarev started a company that founded *AWMOpen Magazine*, billed as "the leading magazine for Adult Webmastering." Ex. 3 [Gub. I Depo.] at 82:8-84:9; 87:24-88:5; Ex. 15; Ex. 16. The magazine's stated "goal" was "media support of online industries" by enhancing their legitimacy, with coverage "focusing mainly on adult business and other fields of online moneymaking." Ex. 16.

---

[1] Unless otherwise noted, all exhibits are attached to the Declaration of Nathan Siegel filed herewith.

ATTORNEYS' EYES ONLY

9.      Gubarev has used the pseudonym "Alex XE" in connection with AWMOpen and AWMOpen Magazine.  Ex. 17; Ex. 3 [Gub. I Depo.] at 11:18-25; 63:25-64:10.

10.     "Alex XE" wrote in an early issue of the AWMOpen Magazine that it was "the first full-color, glossy, informative and entertaining magazine in the Russian language segment." He emphasized that the magazine "is a step to improve the status of the Russian language segment in [the] international online business." Ex. 15.

11.     Between 2004 and 2008 a principal "informational sponsor" of the annual conferences was "Redeye" and his web forum *crutop.nu*.  Ex. 10 at 2; Ex. 6 at 1; Ex. 7 at 3; Ex. 11 at 4.

12.     "Redeye" was an alias used by Pavel Vrublesky.  Ex. 3 [Gub. I Depo.] at 81:11-18.

13.     Vrublesky and *Crutop.nu* have been publicly linked to spam and cybercrime.  Ex. 18 (2006 *Forbes* article describing Crutop as an online "forum . . . where representatives of the semi-legal Runet areas meet"); Ex. 19 (article by investigative journalist Brian Krebs reporting that Vrublesky aided "the business of spam, fake antivirus and rogue Internet pharmacies, [and] shadow economies"); Ex. 20 at 12, 18 (2009 FTC court filings alleging that "*Crutop.nu* is a Russian language website that features a variety of discussion forums that focus on making money from spam" and that it ran advertisements for "advertisers of dubious legality, including 'IncestMoney.com'").

14.     Public reports state that Vrublesky was imprisoned in Russia after being found guilty by a Russian court of launching a bot attack on a rival. Ex. 19.

15.     One of the sponsors for the 2007 AWMOpen Conference was a web-hosting company called McColo.  Ex. 3 [Gub. I Depo.] at 117:4-121:11; Ex. 21 at 2.

16.     McColo has been publicly linked to cybercrime and hosting spam and botnets. Ex. 22; Ex. 23; Ex. 24; Ex.25.  Before it was taken offline in 2008, it was reported to have been "was responsible for facilitating more than 75 percent of the junk e-mail blasted out each day globally."  Ex. 25.

17.     3fn.net has been a sponsor for the AWMOpen conference.  Ex. 3 [Gub. I Depo.] at 128:1-130:18; Ex. 5 at 1; Ex. 28.

18.     3fn.net was shut down by the FTC in 2009 for allegedly operating as a "rogue Internet service provider" that "actively recruits and colludes with criminals seeking to distribute

ATTORNEYS' EYES ONLY

illegal, malicious, and harmful electronic content including child pornography, spyware, viruses, trojan horses, phishing, botnet command and control servers, and pornography featuring violence, bestiality, and incest."   Ex. 26; Ex. 27; Ex. 3 [Gub. I Depo.] at 127:25-129:24.

19.     Beginning in 2012, XBT and Webzilla began to circulate press releases using the service "Marketwired," a London-based company that circulates press releases worldwide.  Ex. 29; Ex. 30; Ex.31.

20.     In a 2014 press release entitled "Webzilla is Now in the Company of Giants," the company stated that "Webzilla has transitioned itself to stand among the ranks of exclusive peers such as Netflix, Google, and Akamai, quietly taking its rightful place among the giants." Ex. 32.

21.     In a 2015 press release about XBT's service SecureVPN, XBT's CFO Rajesh Mishra stated that "[t]he creation of SecureVPN was to introduce a unique version of online safety and help with internet protection." Ex. 33.

22.      In a 2014 press release about XBT's acquisition of the domain name DDoS.com, the company stated: "The acquisition of DDoS.com combined with the expertise developed by all the companies under the XBT umbrella in dealing with threats to security, including DDoS attacks, guarantees a service that will make the online world a safer place." Ex. 34.

23.     One of XBT's purposes in acquiring DDos.com was to create a "forum to educate people" about online safety.  Ex. 12 [Mishra Depo.] at 124:12-126:3.

24.     XBT and Webzilla executives were interviewed by trade publications covering the internet hosting industry.  Ex. 35; Ex. 36 at P-F000021; Ex. 37.

25.     In the fall of 2015, Plaintiffs hired an American public relations firm, Cutler PR, and tasked it with focusing on the U.S. market and trying to get journalists to write articles related to the company and its executives.  Ex. 38 [Transcript of the Deposition of Nikolay Dvas ("Dvas Depo.")] at 43:21-24, 47:20-48:5, 58:21-59:1, 83:1-6.

26.     Cutler's plan was to establish the company and its executives as "Thought Leaders" about issues related to technology.  Ex. 38 [Dvas Depo.] at 49:10-52:1; Ex. 39 at 12; Ex. 40 at P-P000977; Ex. 41 at P-P001024.

27.     Cutler proposed to "pitch top list, feature, trend and op-ed stories" to the media, targeting both major general business media like *CNN Money*, *Bloomberg, Forbes* and *Reuters* and leading publications focusing on technology like *VentureBeat*, *CNET* and *Gizmodo*.  Ex. 38 [Dvas Depo.] at 49:10-54:24, 56:13-21; Ex. 39 at 14-15, Ex. 40 at P-P000977.

ATTORNEYS' EYES ONLY

28.     Cutler also aimed to "raise key [XBT] executives' profiles with bylined articles" that it pitched to news editors to publish.  Ex. 38 [Dvas Depo.] at 51:15-23; Ex. 39 at 12.

29.     Those articles were not intended to be "product specific" or "profile stories of the company"; rather, the intent of this approach was to establish "credibility" with journalists so that "the press will seek commentary on timely topics."  Ex. 38 [Dvas Depo.] at 51:4-14; Ex. 41 at P-P001024.

30.     Cutler pitched multiple publications like *Forbes* and persuaded editors to publish several op-ed type articles under the byline of one of the company's executives, Nikolai Dvas. One of these articles – about why Luxembourg (where XBT had its headquarters) is an attractive place to do business – was published by CNBC, and Luxembourg's Prime Minister re-posted the article to the government's Twitter feed.  Dvas was pleased with the article placement and considered it "good publicity."  Ex. 38 [Dvas Depo.] at 73:34-75:10, 76:10-25; Ex. 42; Ex. 43; Ex. 44.

31.     *Inc.*, a prestigious business publication, listed Servers.com as one of "18 Tech Companies to Get Excited About," noting that it "boasts super-secure" servers.  Cutler told Dvas it was responsible for that publicity.  Ex. 38 [Dvas Depo.] at 97:13-25; Ex. 45; Ex. 46.

32.     In 2015, XBT began to expand its business to Russia, which had just enacted a data privacy law requiring that the data of all Russian citizens be stored within Russia.  XBT purchased an existing Russian company ("Edinaya Set") to establish data center presence in Russia.  Ex. 3 [Gub. I Depo] at 265:5-266:12; Ex. 47; Ex. 48; Ex. 49 [Transcript of the 30(b)(6) Deposition of Alexsej Gubarev, June 28, 2018 ("30b6 Depo.")] at 73:19-74:1, 88:2-18; Ex. 50; Ex. 51.

33.     The law was the subject of considerable publicity, including criticism that it was an effort by Putin's government to assert control over information flowing in and out of Russia. Ex. 50, Ex. 51.

34.     Gubarev thought the new law was a business opportunity for XBT.  Ex. 49 [30b6 Depo.] at 88:2-18; Ex. 3 [Gub. I Depo.] at 265:5-268:6; Ex. 47 ("The move enables XBT to deploy its solutions to the local market in observance of the legal standards of the Russian Federation."); Ex. 52 (XBT "provides the platform for businesses who maintain presence in Russia, as such entities are legally required to store personal data within Russia's physical borders." ).

35.     XBT issued press releases emphasizing how the new law relates to its services. Ex. 3 [Gub. I Depo.] at 286:6; Ex. 47; Ex. 52.

36.     Gubarev and other XBT executives spoke to the press about the Russian law and XBT's entrance into Russia.  Ex. 3 [Gub. I Depo.] at 285:12-13, 287:10-15; Ex. 53; Ex. 54; Ex. 55.

37.     Dvas asked Cutler PR to pitch stories to U.S. media about XBT's entry into the Russian market.  Ex. 38 [Dvas Depo.] at 77:12-80:9, 82:19-25; Ex. 56.

38.     Gubarev led a press conference in Moscow announcing the launch of their data center there.  The launch received coverage in Russian media.  Ex. 38 [Dvas Depo.] at 110:20-114:6; Ex. 3 [Gub. I Depo.] at 285:22-286:12; Ex. 57.

39.     Dvas invited German Klimenko, President Vladimir Putin's adviser on internet affairs, to attend the press event in Moscow.  Ex. 38 [Dvas Depo.] at 128:25-129:4, 131:5-16; Ex. 58.

40.     In presentations, Gubarev described XBT as offering "the fastest network in Russia" and "the most powerful hardware in Russia."  Ex. 59; Ex. 38 [Dvas Depo.] at 116:15-118:2.

41.     In interviews, Gubarev asserted that "[t]he main event of the year [is] our entry into the Russian market, as well as the launch and incredible success of our partner Prisma AI," Ex. 53, and that XBT's entry into Russia "will become the foundation for the development of international potential [in] the Russian market," Ex. 54.

42.     Gubarev also commented: "It is interesting, if earlier botnets infected home computers, now the same thing happens more often with cloud servers.  According to our data . . . control and security are key factors in making decisions on choosing a host."  Ex. 53.

43.     In 2016 Gubarev spoke at the Russian Internet Forum about "trends in the infrastructure of the global and Russian internet."  Ex. 60; Ex. 38 [Dvas Depo.] at 126:5-21; Ex. 3 [Gub. I Depo.] at 254:20-255:3.

44.     The Russian Internet Forum was attended in 2016 by Russian officials responsible for the Internet, including Klimenko, whom Gubarev met there.  Ex. 38 [Dvas Depo.] at 132:13-134:3; Ex. 61 at P-P001256; Ex. 3 [Gub. I Depo.] at 272:6-10.

45.     Servers.ru (the company's brand name in Russia) was a sponsor of the Russian Internet Forum in 2016.  Ex. 38 [Dvas Depo.] at 124:2-125:5.

ATTORNEYS' EYES ONLY

46.    XBT's marketing director lobbied Putin internet advisor Klimenko to secure Gubarev an opportunity to speak about "cyber-security" at the 2016 St. Petersburg International Economic Forum ("SPIEC").  Ex. 38 [Dvas Depo.] at 127:10-129:4; Ex. 62.

47.    The SPIEC is organized each year on behalf of President Putin, who has also attended it.  It is described as "a leading global platform for members of the business community to meet and discuss the key economic issues facing Russia, emerging markets, and the world as a whole."  Ex. 63.

48.    Because Gubarev and Dvas believed that Cutler was not succeeding in generating publicity in media that was sufficiently "popular," they terminated Cutler in March 2016 and sought a replacement PR company that could "maintain persistent citation level across business media with company news or experts' comments."  Ex. 38 [Dvas Depo.] at 94:20-95:18, 118:11-120:11, 121:7-122:8, 160:3-8; Ex. 64; Ex. 65; Ex. 3 [Gub. I Depo.] at 256:19-257:2.

49.    In July 2016, Servers.com retained KGlobal, a PR firm based in Washington, D.C.  Ex. 38 [Dvas Depo.] at 137:21-138:3, 141:25-142:15; Ex. 66; Ex. 3 [Gub. I Depo.] at 243:10-12.

50.    In July 2016 a KGlobal team traveled to Cyprus to conduct a "full-day media training" for Gubarev and other executives, including training on "how to talk to a journalist."  Ex. 38 [Dvas Depo.] at 143:12-144:20; 147:21-148:4.

51.    KGlobal's PR plan included pitching Gubarev to journalists as an industry "thought leader" and "expert" on matters related to Russia and technology.  Ex.67; Ex. 68; Ex. 3 [Gub. I Depo.] at 246:6-8

52.    Gubarev specifically requested his name be included in publications.  Ex. 139.

53.    KGlobal contacted news organizations like *Bloomberg*, *Associated Press*, *Gizmodo*, *TechCrunch* and many others to solicit interviews with Gubarev.  Ex. 38 [Dvas Depo.] at 156:9-158:10; Ex. 70.

54.    KGlobal also contacted journalists to persuade them to interview Gubarev as a "successful young Russian entrepreneur" who is a "great resource for stories about the Russian tech, startup, and entrepreneur scene."  Ex. 69.  KGlobal made the same pitch to *Forbes*, *ReCode, PC Magazine*, *TechCrunch, CNN, San Francisco Chronicle, Milwaukee Journal Sentinel, Fortune* and many others, noting that "Aleksej was named a finalist by Ernst Young Russia's Entrepreneur of the Year" and distributing a photo to journalists. Ex. 71.

ATTORNEYS' EYES ONLY

55.     Gubarev gave interviews to reporters from *Bloomberg*, *Business Insider*, *VentureBeat*, and *Tech Insider*.  Exs. 72-75; Ex. 3 [Gub. I Depo.] at 257:7-258:2; Ex. 76. Gubarev was also interviewed by *Forbes* and by *Bloomberg* once again; had interviews scheduled with the *Wall Street Journal*; and sat for a 20-minute podcast titled "Biggest Lesson of Growing a Company with Aleksej Gubarev" for a podcast series KGlobal described as "the #1 mobile app podcast" at the time.  Ex. 77; Exs. 78-80; Ex. 81; Ex. 82; Ex. 83; Ex. 84.

56.     On October 31, 2016, *Slate* published a story about cyber-contacts between Russia's Alfa Bank and the Trump campaign.  Ex. 85.

57.     Shortly thereafter, a *Bloomberg* reporter who knew Gubarev from a previous interview reached out to him to ask him, "as a specialist," to help "sort out [the] technical details" of the communications described in the *Slate* article.  Ex. 88; Ex. 86 [Transcript of the Deposition of Aleksej Gubarev, May 16, 2018 ("Gub. II Depo.")] at 9:1-12:16; Ex. 87 [Gub. II Ex. 3]; Ex. 3 [Gub. I Depo.] at 257:25-262:12.

58.     Gubarev asked an employee of one of the XBT companies to analyze the technical claims in the *Slate* story and then e-mailed the reporter an "expert opinion" that was an annotated commentary as to "whether this is true or not."  Ex. 86 [Gub. II Depo.] at 12:17-16:18; Ex. 88.

59.     The "opinion about the [*Slate*] article" that Gubarev provided was that the information about allegations of collusion was either not reliable or not legally obtained.  Ex. 86 [Gub. II Depo.] at 15:18-23; Ex. 88.

60.     Gubarev asked the reporter if he would "be referenced in the article" and told the reporter to contact him if anything else was needed.  Ex. 86 [Gub. II Depo.] at 33:21-35:2; Ex. 88.

61.     The resulting *Bloomberg* article published the next day, titled "Clinton Plugs Another Weak Story About Trump's Ties to Putin," called the accusations of collusion "a trumped-up story" that "is easily debunked."  Ex. 81.  The article stated: "Alexey Gubarev, chief executive officer of Luxembourg-registered XBT Holding, which owns the infrastructure-as-a-service provider Servers.com, told me there was no legitimate way to get access to the full logs of a server that you do not control."  *Id.*; Ex. 3 [Gub. I Depo.] at 263:3- 264:14.

ATTORNEYS' EYES ONLY

62.     Gubarev terminated KGlobal in December 2016 because he and Dvas thought KGlobal was "not succeeding in getting as much publicity as [we] would have liked." Ex. 38 [Dvas Depo.] at 181:11-183:25; Ex. 89.

63.     A few days later, Dvas and Gubarev re-hired KGlobal for "crisis services" to help them handle a major story about a Russian-based, criminal botnet operation that was using servers from Webzilla and Servers.com. Ex. 90.

64.     In December 2016 a cybersecurity firm called "White Ops" published a report detailing what the firm said was a massive fraud by Russian cybercriminals, which it dubbed "Methbot." Ex. 91. It reported that "Russian cybercriminals are siphoning millions of advertising dollars per day away from U.S. media companies and the biggest U.S. brand name advertisers in the single most profitable bot operation discovered to date." *Id.* at 3. WhiteOps noted that the operation used "physical servers located in data centers in Dallas, TX and Amsterdam." *Id.* at 20.

65.     The news generated widespread international media coverage. Ex. 92 (citing reports in *Forbes, Fortune, New York Times* and *CNN*); Ex. 93 (articles referenced in Ex. 92).

66.     When Dvas read the data published by White Ops, he realized that the bot activity was being conducted using IP addresses attached to servers leased by one of the XBT group's largest customers. Ex. 38 [Dvas Depo.] at 186:16-22; 188:20-189:25; 195:23-196:8; 199:7-200:3; Ex. 90. That customer had personally come to Cyprus several times to meet Gubarev and other XBT executives. Ex. 38 [Dvas Depo.] at 191:3-25; Ex. 94.

67.     In November 2016, the Methbot customer paid almost $400,000 to XBT companies, which represented 7.5% of XBT's total revenue ($5.3 million) for that month. Ex. 95 at 3 (XBT November 2016 revenue); Ex. 96 (Methbot customer revenues).

68.     In 2016, XBT (through its subsidiaries) earned nearly $2.2 million from the Methbot customer, which represented 4.4% of XBT's consolidated revenues for that year. Ex. 96; Ex. 97.

69.     Dvas realized the company could face significant reputational damage if a journalist discovered that the servers belonged to Servers.com and Webzilla. Dvas asked KGlobal to help "minimize the bad publicity we could get from having this customer" by "establish[ing] control on the media field in this aspect." KGlobal advised that "[g]iven the recent controversy over Russian hacking in the U.S. election," it was important to "get in front of

the story." Ex. 38 [Dvas Depo.] at 198:1-7, 212:1-214:19; Ex. 90; Ex. 3 [Gub. I Depo.] at 179:1-15.

70.     Dvas instructed KGlobal to proactively reach out to White Ops and journalist Brian Krebs, who had written about the Methbot report, and to say that Plaintiffs were also "victims" of the scam.  Ex. 98; Ex. 38 [Dvas Depo.] at 213:7-214:19.

71.     Dvas also instructed KGlobal only to reveal that the perpetrator was a Webzilla customer and to avoid (unless asked) any connection to their newer brand, Servers.com.  Dvas explained that because "Webzilla had some ambivalent episodes in its history, and has had some customers with doubtful reputation," they "want[ed] the damage to be limited to Webzilla" rather than the newer brand.  Ex. 98; Ex. 99.

72.     Following Dvas's instructions, KGlobal reached out to Krebs as Webzilla's "spokesperson."  Ex. 100; Ex. 101; Ex. 38 [Dvas Depo.] at 233:9-234:5.

73.     When the Dossier was published on January 10, 2017, Gubarev immediately asked KGlobal to plan a press strategy.  Ex. 102.  An internal memo advised that Plaintiff's media response should aim to "protect not only XBT/Webzilla brands, but personal brand of Alex, which happens to be our most valuable asset in terms of branding right now."  Ex. 103.

74.     On January 11 a leading Dutch newspaper, *de Volkskrant*, reported about Plaintiffs' connection to the Dossier, focusing on Webzilla's history in the Netherlands.  Ex. 104.

75.     Webzilla B.V. retained the Amsterdam office of Hill & Knowlton Strategies to assist with media relations in Europe.  Ex. 105 [Transcript of the Deposition of Jochem Steman, May 16, 2018 ("Steman Depo.")] at 48:5-50:6; 59:12-61:6; Ex. 106.

76.     Both KGlobal and Hill & Knowlton monitored the press, spoke with journalists, arranged interviews for Gubarev and suggested talking points for him.  Ex. 107; Ex. 108 at P-H000014-15; Ex. 109; Ex. 110; Ex. 111; Ex. 105 [Steman Depo.] at 63:6-64:14, 71:6-11; Ex. 112; Ex. 113.

77.     Plaintiffs tried to negotiate pre-conditions for an interview of Gubarev by *de Volkskrant*, including their right to review the resulting article before it was published.  Ex. 105 [Steman Depo.] at 77:17-78:16, 86:25-87:15; Ex. 114; Ex. 115; Ex. 116.  The article was published on January 19. 2017.  Ex. 137.

ATTORNEYS' EYES ONLY

78.     Gubarev maintained that Plaintiffs were named in the Dossier as a direct response to his comments in *Bloomberg*. Ex. 117; Ex. 118; Ex. 119; Ex. 120; Ex. 86 [Gub. II Depo.] at 52:4-12.

79.     Prior to BuzzFeed's publication of the Dossier, the issues of cybersecurity and cybercrime; links between malicious cyber-activity and actors linked Russia and former Soviet states; and Russian interference in the 2016 U.S. election were topics of public discourse, receiving press coverage in major media outlets. Ex. 18; Ex. 121; Ex. 122; Ex. 123; Ex. 124; Ex. 125; Ex. 126; Ex. 127; Ex. 128; Ex. 140.

80.     The Dossier was not the first time that Plaintiffs' relationship to questionable "porn traffic" was the subject of press scrutiny. Ex. 129; Ex. 130; Ex. 131; Ex. 132.

Dated:  September 21, 2018                    Respectfully submitted,

*Of Counsel*:                                /s/ *Katherine M. Bolger*
Nabiha Syed                                  Katherine M. Bolger
BuzzFeed, Inc.                               Nathan Siegel
11 E. 18th Street, 13th Floor                Adam Lazier
New York, NY 10003                           Alison Schary
                                             Davis Wright Tremaine, LLP
                                             1251 Avenue of the Americas, 21st Floor
                                             New York, New York 10020
                                             katebolger@dwt.com
                                             nathansiegel@dwt.com
                                             adamlazier@dwt.com
                                             alisonschary@dwt.com

                                             /s/ *Roy Black*
                                             Roy Black
                                             Jared Lopez
                                             Black, Srebnick, Kornspan & Stumpf, P.A.
                                             201 So. Biscayne Boulevard
                                             Miami, Florida 33131
                                             rblack@royblack.com
                                             jlopez@royblack.com

                                             *Attorneys for Defendants*

ATTORNEYS' EYES ONLY

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No: 1:17-cv-60426-UU

ALEKSEJ GUBAREV, *et al.*,

      Plaintiffs,

v.

BUZZFEED, INC., *et al*.,

      Defendants.

_____/

**DECLARATION OF NATHAN SIEGEL IN SUPPORT OF**
**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**
**ON THE ISSUE OF PLAINTIFFS' STATUS AS PUBLIC FIGURES**

I, Nathan Siegel, pursuant to 29 U.S.C. § 1746, hereby declare as follows:

1.      I am a partner at the law firm of Davis Wright Tremaine LLP, counsel for

Plaintiffs BuzzFeed, Inc. and Ben Smith in the above-captioned proceeding.

2.      I make this declaration in order to annex exhibits relied upon in Defendants'

Memorandum of Points and Authorities in support of their Motion for Summary Judgment;

3.      Annexed hereto as **Exhibit 1** is a true and correct copy of XBT's Response to

Interrogatories dated July 19, 2017.

4.      Annexed hereto as **Exhibit 2** is a true and correct copy of XBT's Third

Supplemental Responses to Interrogatories dated February 18, 2018.

5.      Annexed hereto as **Exhibit 3** is a true and correct copy of the transcript from the

April 30, 2018 Deposition of Plaintiff Aleksej Gubarev.

6.      Annexed hereto as **Exhibit 4** is a true and correct copy of Exhibit AW-8 from the

April 30, 2018 Deposition of Aleksej Gubarev.

ATTORNEYS' EYES ONLY

7.    Annexed hereto as **Exhibit 5** is a true and correct copy of Exhibit PV-6 from the April 30, 2018 Deposition of Aleksej Gubarev.

8.    Annexed hereto as **Exhibit 6** is a true and correct copy of Exhibit PV-7 from the April 30, 2018 Deposition of Aleksej Gubarev.

9.    Annexed hereto as **Exhibit 7** is a true and correct copy of Exhibit PV-8 from the April 30, 2018 Deposition of Aleksej Gubarev.

10.    Annexed hereto as **Exhibit 8** is a true and correct copy of Exhibit AW-7 from the April 30, 2018 Deposition of Aleksej Gubarev.

11.    Annexed hereto as **Exhibit 9** is a true and correct copy of Exhibit AW-11 from the April 30, 2018 Deposition of Aleksej Gubarev.

12.    Annexed hereto as **Exhibit 10** is a true and correct copy of Exhibit PV-5 from the April 30, 2018 Deposition of Aleksej Gubarev.

13.    Annexed hereto as **Exhibit 11** is a true and correct copy of Exhibit PV-9 from the April 30, 2018 Deposition of Aleksej Gubarev .

14.    Annexed hereto as **Exhibit 12** is a true and correct copy of the transcript from the Deposition of Rajesh Mishra.

15.    Annexed hereto as **Exhibit 13** is a true and correct copy of Exhibit 52 from the Deposition of Rajesh Mishra.

16.    Annexed hereto as **Exhibit 14** is a true and correct copy of Exhibit 53 from the Deposition of Rajesh Mishra.

17.    Annexed hereto as **Exhibit 15** is a true and correct copy of Exhibit AM-1 from the April 30, 2018 Deposition of Aleksej Gubarev.

ATTORNEYS' EYES ONLY

18.      Annexed hereto as **Exhibit 16** is a true and correct copy of Exhibit AWM-1 from the April 30, 2018 Deposition of Aleksej Gubarev.

19.      Annexed hereto as **Exhibit 17** is a true and correct copy of a web page publicly available at http://www.fubarwebmasters.com:80/galleries.php?id=801&page=2, which includes a photograph of Gubarev wearing a nametag as "Alex Xe."

20.      Annexed hereto as **Exhibit 18** is a true and correct copy of Exhibit AG-6 from the April 30, 2018 Deposition of Aleksej Gubarev, along with the original Russian article available at http://www.forbes.ru/forbes/issue/2006-03/13804-virtualnoe-podpole, and a certified translation thereof.

21.      Annexed hereto as **Exhibit 19** is a true and correct copy of an August 2, 2013article by Brian Krebs for the website *Krebs on Security*, printed from the website at https://krebsonsecurity.com/2013/08/pavel-vrublevsky-sentenced-to-2-5-years/.

22.      Annexed hereto as **Exhibit 20** is a true and correct copy of the Memorandum of Points and Authorities in Support of Plaintiff's Motion for an *Ex Parte* Temporary Restraining Order and Order to Show Cause, filed publicly on June 1, 2009 by the Federal Trade Commission in the matter of *FTC v. Pricewert LLC d/b/a/ 3FN.net et al.*, Case No. 5:09-cv-02407-RMW (Dkt. 5), printed from the website at https://www.ftc.gov/sites/default/files/documents/cases/2009/06/0906043fnmemotro.pdf.

23.      Annexed hereto as **Exhibit 21** is a true and correct copy of Exhibit MC-1from the April 30, 2018 Deposition of Aleksej Gubarev.

24.      Annexed hereto as **Exhibit 22** is a true and correct copy of a November 18, 2014 article by Brian Krebs for *Slate*, printed from the website at

ATTORNEYS' EYES ONLY

http://www.slate.com/articles/technology/future_tense/2014/11/spam_nation_meet_the_russian_
cybercrooks_behind_the_digital_threats_in_your.html.

25.      Annexed hereto as **Exhibit 23** is a true and correct copy of a December 29, 2009
article for *Newsweek*, printed from the website at https://www.newsweek.com/russian-computer-
hackers-are-global-threat-75837.

26.      Annexed hereto as **Exhibit 24** is a true and correct copy of a November 12, 2008
article by Brian Krebs for the *Washington Post*, printed from the website at
http://www.washingtonpost.com/wp-dyn/content/article/2008/11/12/AR2008111200658_3.html

27.      Annexed hereto as **Exhibit 25** is a true and correct copy of Exhibit MC-2 from
the April 30, 2018 Deposition of Aleksej Gubarev.

28.      Annexed hereto as **Exhibit 26** is a true and correct copy of a June 4, 2009 press
release by the Federal Trade Commission, printed from the website at https://www.ftc.gov/news-
events/press-releases/2009/06/ftc-shuts-down-notorious-rogue-internet-service-provider-3fn.

29.      Annexed hereto as **Exhibit 27** is a true and correct copy of a May 19, 2010 press
release by the Federal Trade Commission, printed from the website at https://www.ftc.gov/news-
events/press-releases/2010/05/ftc-permanently-shuts-down-notorious-rogue-internet-service.

30.      Annexed hereto as **Exhibit 28** is a true and correct copy of Exhibit TFN-1 from
the April 30, 2018 Deposition of Aleksej Gubarev.

31.      Annexed hereto as **Exhibit 29** is a true and correct copy of a November 12, 2012
press release from MarketWired titled "XBT Holding Ltd. Acquires 1-800-HOSTING, Inc.,"
printed from the website at http://www.marketwired.com/press-release/xbt-holding-ltd-acquires-
1-800-hosting-inc-1724402.htm.

ATTORNEYS' EYES ONLY

32.     Annexed hereto as **Exhibit 30** is a true and correct copy of a document produced by Plaintiffs in this litigation bearing the Bates stamp P-F000247.

33.     Annexed hereto as **Exhibit 31** is a true and correct copy of document produced by Plaintiffs in this litigation bearing the Bates stamp P-F000266.

34.     Annexed hereto as **Exhibit 32** is a true and correct copy of document produced by Plaintiffs in this litigation bearing the Bates stamp P-F000231.

35.     Annexed hereto as **Exhibit 33** is a true and correct copy of document produced by Plaintiffs in this litigation bearing the Bates stamp P-F000258.

36.     Annexed hereto as **Exhibit 34** is a true and correct copy of document produced by Plaintiffs in this litigation bearing the Bates stamp P-F000256.

37.     Annexed hereto as **Exhibit 35** is a true and correct copy of document produced by Plaintiffs in this litigation bearing the Bates stamp P-F000013.

38.     Annexed hereto as **Exhibit 36** is a true and correct copy of document produced by Plaintiffs in this litigation bearing the Bates stamp P-F000018.

39.     Annexed hereto as **Exhibit 37** is a true and correct copy of Exhibit 2 to the Deposition of Nikolay Dvas.

40.     Annexed hereto as **Exhibit 38** is a true and correct copy of the transcript from the May 17, 2018 Deposition of Nikolay Dvas.

41.     Annexed hereto as **Exhibit 39** is a true and correct copy of Exhibit 4 to the Deposition of Nikolay Dvas.

42.     Annexed hereto as **Exhibit 40** is a true and correct copy of Exhibit 5 to the Deposition of Nikolay Dvas.

ATTORNEYS' EYES ONLY

43.     Annexed hereto as **Exhibit 41** is a true and correct copy of Exhibit 7 to the

Deposition of Nikolay Dvas.

44.     Annexed hereto as **Exhibit 42** is a true and correct copy of Exhibit 13 to the

Deposition of Nikolay Dvas).

45.     Annexed hereto as **Exhibit 43** is a true and correct copy of Exhibit 14 to the

Deposition of Nikolay Dvas.

46.     Annexed hereto as **Exhibit 44** is a true and correct copy of Exhibit 15 to the

Deposition of Nikolay Dvas.

47.     Annexed hereto as **Exhibit 45** is a true and correct copy of Exhibit 27 to the

Deposition of Nikolay Dvas).

48.     Annexed hereto as **Exhibit 46** is a true and correct copy of Exhibit 28 to the

Deposition of Nikolay Dvas.

49.     Annexed hereto as **Exhibit 47** is a true and correct copy of Exhibit R-5 from the

April 30, 2018 Deposition of Aleksej Gubarev.

50.     Annexed hereto as **Exhibit 48** is a true and correct copy of document P-F000122.

51.     Annexed hereto as **Exhibit 49** is a true and correct copy of the transcript of the

June 28, 2018 30(b)(6) deposition of Plaintiff Aleksej Gubarev.

52.     Annexed hereto as **Exhibit 50** is a true and correct copy of a September 1, 2015

article by Shaun Walker for *The Guardian*, printed from the website available at

https://www.theguardian.com/world/2015/sep/01/russia-internet-privacy-laws-control-web

53.     Annexed hereto as **Exhibit 51** is a true and correct copy of a July 4, 2014 article

by Alexei Anishchuk for *Reuters*, printed from the website at https://www.reuters.com/article/us-

ATTORNEYS' EYES ONLY

russia-internet-bill-restrictions/russia-passes-law-to-force-websites-onto-russian-servers-idUSKBN0F91SG20140704

54.     Annexed hereto as **Exhibit 52** is a true and correct copy of Exhibit R-7 from the April 30, 2018 Deposition of Aleksej Gubarev.

55.     Annexed hereto as **Exhibit 53** is a true and correct copy of Exhibit PR-24 from the April 30, 2018 Deposition of Aleksej Gubarev, along with a certified translation of the document.

56.     Annexed hereto as **Exhibit 54** is a true and correct copy of document produced by Plaintiffs in this litigation bearing the Bates stamp P-F000270, along with a certified translation of the document.

57.     Annexed hereto as **Exhibit 55** is a true and correct copy of Exhibit PR-39 from the April 30, 2018 Deposition of Aleksej Gubarev, along with a certified translation of the document.

58.     Annexed hereto as **Exhibit 56** is a true and correct copy of Exhibit 16 to the Deposition of Nikolay Dvas.

59.     Annexed hereto as **Exhibit 57** is a true and correct copy of Exhibit PR-38 from the April 30, 2018 Deposition of Aleksej Gubarev, along with a certified translation of the document.

60.     Annexed hereto as **Exhibit 58** is a true and correct copy of a June 25, 2018 article by Adam Segal for the Council on Foreign Relations, printed from the website at https://www.cfr.org/blog/who-was-german-klimenko-and-what-does-his-dismissal-mean-russian-internet.

ATTORNEYS' EYES ONLY

61.     Annexed hereto as **Exhibit 59** is a true and correct copy of Exhibit 30 to the

Deposition of Nikolay Dvas, along with a certified translation of the document.

62.     Annexed hereto as **Exhibit 60** is a true and correct copy of Exhibit 33 to the

Deposition of Nikolay Dvas, along with a certified translation of the document.

63.     Annexed hereto as **Exhibit 61** is a true and correct copy of Exhibit 32 to the

Deposition of Nikolay Dvas.

64.     Annexed hereto as **Exhibit 62** is a true and correct copy of Exhibit 34 to the

Deposition of Nikolay Dvas.

65.     Annexed hereto as **Exhibit 63** is a true and correct copy of the page titled "About

the Forum" on the publicly available website for the St. Petersburg International Economic

Forum (SPIEF), printed from the website at https://forumspb.com/en/about/?lang=en.

66.     Annexed hereto as **Exhibit 64** is a true and correct copy of Exhibit 24 to the

Deposition of Nikolay Dvas.

67.     Annexed hereto as **Exhibit 65** is a true and correct copy of Exhibit 31 to the

Deposition of Nikolay Dvas.

68.     Annexed hereto as **Exhibit 66** is a true and correct copy of Exhibit 38 to the

Deposition of Nikolay Dvas.

69.     Annexed hereto as **Exhibit 67** is a true and correct copy of Exhibit 51 to the

Deposition of Nikolay Dvas.

70.     Annexed hereto as **Exhibit 68** is a true and correct copy of Exhibit 52 to the

Deposition of Nikolay Dvas.

71.     Annexed hereto as **Exhibit 69** is a true and correct copy of Exhibit 50 to the

Deposition of Nikolay Dvas.

ATTORNEYS' EYES ONLY

72.     Annexed hereto as **Exhibit 70** is a true and correct copy of Exhibit PR 2 from the April 30, 2018 Deposition of Aleksej Gubarev.

73.     Annexed hereto as **Exhibit 71** is a true and correct copy of Exhibit PR 1from the April 30, 2018 Deposition of Aleksej Gubarev.

74.     Annexed hereto as **Exhibit 72** is a true and correct copy of Exhibit 45 to the Deposition of Nikolay Dvas.

75.     Annexed hereto as **Exhibit 73** is a true and correct copy of Exhibit 47 to the Deposition of Nikolay Dvas.

76.     Annexed hereto as **Exhibit 74** is a true and correct copy of Exhibit 46 to the Deposition of Nikolay Dvas.

77.     Annexed hereto as **Exhibit 75** is a true and correct copy of Exhibit 48 to the Deposition of Nikolay Dvas).

78.     Annexed hereto as **Exhibit 76** is a true and correct copy of Exhibit PR-83 from the April 30, 2018 Deposition of Aleksej Gubarev.

79.     Annexed hereto as **Exhibit 77** is a true and correct copy of Exhibit 53 to the Deposition of Nikolay Dvas.

80.     Annexed hereto as **Exhibit 78** is a true and correct copy of Exhibit 55 to the Deposition of Nikolay Dvas.

81.     Annexed hereto as **Exhibit 79** is a true and correct copy of Exhibit 56 to the Deposition of Nikolay Dvas.

82.     Annexed hereto as **Exhibit 80** is a true and correct copy of Exhibit 57 to the Deposition of Nikolay Dvas.

ATTORNEYS' EYES ONLY

83.     Annexed hereto as **Exhibit 81** is a true and correct copy of Exhibit PR-7 from the April 30, 2018 Deposition of Aleksej Gubarev.

84.     Annexed hereto as **Exhibit 82** is a true and correct copy of an E-mail from Alexey Gubarev to Modupeh Jahamaliah dated September 14, 2016 re: Interview with AppMaster/MyEmoji.com.

85.     Annexed hereto as **Exhibit 83** is a true and correct copy of the website page for the October 18, 2016 episode (Episode 485) of the AppMasters Podcast, titled "485: Biggest Lesson of Growing a Company with Aleksej Gubarev," printed from the website at https://appmasters.com/servers-aleksej-gubarev, along with a CD containing a true and correct copy of the podcast audio downloaded from the website.

86.     Annexed hereto as **Exhibit 84** is a true and correct copy of the June 1, 2018 Declaration of James W. McDermott on behalf of KGlobal, LLC, certifying records produced by KGlobal in this litigation.

87.     Annexed hereto as **Exhibit 85** is a true and correct copy of Exhibit 3 from the May 16, 2018 Deposition of Aleksej Gubarev.

88.     Annexed hereto as **Exhibit 86** is a true and correct copy of the transcript from the May 16, 2018 deposition of Plaintiff Aleksej Gubarev.

89.     Annexed hereto as **Exhibit 87** is a true and correct copy of Exhibit 3 from the May 16, 2018 Deposition of Aleksej Gubarev.

90.     Annexed hereto as **Exhibit 88** is a true and correct copy of Shayefar Decl. Exhibit 44 with certificate of accuracy translation.

91.     Annexed hereto as **Exhibit 89** is a true and correct copy of Exhibit 60 to the Deposition of Nikolay Dvas.

ATTORNEYS' EYES ONLY

92.     Annexed hereto as **Exhibit 90** is a true and correct copy of Exhibit 61 to the Deposition of Nikolay Dvas.

93.     Annexed hereto as **Exhibit 91** is a true and correct copy of Exhibit 62 to the Deposition of Nikolay Dvas.

94.     Annexed hereto as **Exhibit 92** is a true and correct copy of Exhibit 63 to the Deposition of Nikolay Dvas.

95.     Annexed hereto as **Exhibit 93** is a true and correct copy of articles referenced in Exhibit 63 to the Deposition of Nikolay Dvas.

96.     Annexed hereto as **Exhibit 94** is a true and correct copy of Exhibit 64 to the Deposition of Nikolay Dvas).

97.     Annexed hereto as **Exhibit 95** is a true and correct copy of Exhibit 32 to the Deposition of Rajesh Mishra.

98.     Annexed hereto as **Exhibit 96** is a true and correct copy of Exhibit 1 to the Deposition of Jeffrey Anderson.

99.     Annexed hereto as **Exhibit 97** is a true and correct copy of Exhibit 6 to the Deposition of Jeffrey Anderson.

100.    Annexed hereto as **Exhibit 98** is a true and correct copy of Exhibit 65 to the Deposition of Nikolay Dvas.

101.    Annexed hereto as **Exhibit 99** is a true and correct copy of Exhibit 66 to the Deposition of Nikolay Dvas.

102.    Annexed hereto as **Exhibit 100** is a true and correct copy of Exhibit 69 to the Deposition of Nikolay Dvas.

ATTORNEYS' EYES ONLY

103.   Annexed hereto as **Exhibit 101** is a true and correct copy of Exhibit 70 to the Deposition of Nikolay Dvas.

104.   Annexed hereto as **Exhibit 102** is a true and correct copy of Exhibit 81 to the Deposition of Nikolay Dvas.

105.   Annexed hereto as **Exhibit 103** is a true and correct copy of Exhibit 86 to the Deposition of Nikolay Dvas.

106.   Annexed hereto as **Exhibit 104** is a true and correct copy of Exhibits 6A and 6B to the Deposition of Jochem Steman.

107.   Annexed hereto as **Exhibit 105** is a true and correct copy of the transcript from the Deposition of Jochem Steman.

108.   Annexed hereto as **Exhibit 106** is a true and correct copy of Exhibit 3 to the Deposition of Jochem Steman.

109.   Annexed hereto as **Exhibit 107** is a true and correct copy of document produced by Plaintiffs in this litigation bearing the Bates stamp P-H000053.

110.   Annexed hereto as **Exhibit 108** is a true and correct copy of document produced by Plaintiffs in this litigation bearing the Bates stamp P-H000007.

111.   Annexed hereto as **Exhibit 109** is a true and correct copy of document produced by Plaintiffs in this litigation bearing the Bates stamp P-P000150.

112.   Annexed hereto as **Exhibit 110** is a true and correct copy of document produced by Plaintiffs in this litigation bearing the Bates stamp P-P000191.

113.   Annexed hereto as **Exhibit 111** is a true and correct copy of document produced by Plaintiffs in this litigation bearing the Bates stamp P-P000157.

ATTORNEYS' EYES ONLY

114.    Annexed hereto as **Exhibit 112** is a true and correct copy of Exhibits 7A and 7B from the Deposition of Jochem Steman.

115.    Annexed hereto as **Exhibit 113** is a true and correct copy of Exhibit 10 from the Deposition of Jochem Steman.

116.    Annexed hereto as **Exhibit 114** is a true and correct copy of Exhibits 8A and 8B from the Deposition of Jochem.

117.    Annexed hereto as **Exhibit 115** is a true and correct copy of Exhibits 9A and 9B from the Deposition of Jochem Steman.

118.    Annexed hereto as **Exhibit 116** is a true and correct copy of Exhibit 12 from the Deposition of Jochem Steman.

119.    Annexed hereto as **Exhibit 117** is a true and correct copy of document produced by Plaintiffs in this litigation bearing the Bates stamp P-P000021.

120.    Annexed hereto as **Exhibit 118** is a true and correct copy of Exhibit 16 to the Deposition of Anthony Ferrante.

121.    Annexed hereto as **Exhibit 119** is a true and correct copy of a February 14, 2017 article by Alan Cullison for the *Wall Street Journal*, printed from the website

https://www.wsj.com/articles/russian-tech-entrepreneur-denies-link-to-donald-trump-hacking-report-1487096190.

122.    Annexed hereto as **Exhibit 120** is a true and correct copy of Exhibits 24A and 24B from the Deposition of Jochem Steman.

123.    Annexed hereto as **Exhibit 121** is a true and correct copy of an August 6, 2007 article by Michael Specter for the *New Yorker*, printed from the website

https://www.newyorker.com/magazine/2007/08/06/damn-spam.

ATTORNEYS' EYES ONLY

124.     Annexed hereto as **Exhibit 122** is a true and correct copy of an August 26, 2009

article by Ellen Messmer for *Network World*, printed from the website

https://www.networkworld.com/article/2247722/wireless/trojan-attacks-up--phishing-attacks-

down-this-year--ibm-finds.html.

125.     Annexed hereto as **Exhibit 123** is a true and correct copy of a June 20, 2017

article by Andy Greenberg for *Wired*, printed from the website

https://www.wired.com/story/russian-hackers-attack-ukraine.

126.     Annexed hereto as **Exhibit 124** is a true and correct copy of an April 8, 2015

article by Evan Perez and Shimon Prokupecz for CNN, printed from the website

https://edition.cnn.com/2015/04/07/politics/how-russians-hacked-the-wh/index.html.

127.     Annexed hereto as **Exhibit 125** is a true and correct copy of a March 10, 2015

article by Evan Perez and Shimon Prokupecz for CNN, printed from the website

https://www.cnn.com/2015/03/10/politics/state-department-hack-worst-ever/index.html.

128.     Annexed hereto as **Exhibit 126** is a true and correct copy of a June 14, 2016

article by Ellen Nakashima for the *Washington Post*, printed from the website

https://www.washingtonpost.com/world/national-security/russian-government-hackers-

penetrated-dnc-stole-opposition-research-on-trump/2016/06/14/cf006cb4-316e-11e6-8ff7-

7b6c1998b7a0_story.html.

129.     Annexed hereto as **Exhibit 127** is a true and correct copy of an October 7, 2016

Joint Statement from the Department of Homeland Security and Office of the Director of

National Intelligence on Election Security, printed from the website

https://www.dhs.gov/news/2016/10/07/joint-statement-department-homeland-security-and-

office-director-national.

ATTORNEYS' EYES ONLY

130.     Annexed hereto as **Exhibit 128** is a true and correct copy of a December 29, 2016 Joint Analysis Report by Federal Bureau of Investigation and Department of Homeland Security titled *Grizzly Steppe – Russian Malicious Cyber Activity*, printed from the website https://www.us-cert.gov/sites/default/files/publications/JAR_16-20296A_GRIZZLY%20STEPPE-2016-1229.pdf.

131.     Annexed hereto as **Exhibit 129** is a true and correct copy of a February 19, 2008 article by Karen Spaink for *Het Parool*, printed from the website http://www.spaink.net/2008/02/19/child-pornography-fight-it-or-hide-it/.

132.     Annexed hereto as **Exhibit 130** is a true and correct copy of a February 19, 2008 article from *Het Parool*, printed from the website at https://www.parool.nl/binnenland/politie-liet-kinderporno-lopen~a12093/, along with a certified translation of the document.

133.     Annexed hereto as **Exhibit 131** is a true and correct copy of a December 2, 2008 article by Peter Olstoorn for *Webwereld*, printed from the website at https://webwereld.nl/overheid/39597-leaseweb-verliest-van-parool-en-spaink-over-kinderporno, along with a certified translation of the document.

134.     Annexed hereto as **Exhibit 132** is a true and correct copy of a July 28, 2009 report from *CNN iReport*, printed from the website at http://ireport.cnn.com/docs/DOC-305369.

135.     Annexed hereto as **Exhibit 133** is a true and correct copy of relevant excerpts from the June 18, 2018 Deposition of Christopher Steele.

136.     Annexed hereto as **Exhibit 134** is a true and correct copy of the October 16, 2015 comments submitted by the Motion Picture Association of America to the U.S. Intellectual Property Enforcement Coordinator in the Office of Management and Budget, printed from the

ATTORNEYS' EYES ONLY

U.S. government website Regulations.gov at https://www.regulations.gov/document?D=OMB-2015-0003-0058.

137.    Annexed hereto as **Exhibit 135** is a true and correct copy of Exhibit 17 to the Deposition of Anthony Ferrante.

138.    Annexed hereto as **Exhibit 136** is a true and correct copy of a November 15, 2017 article by Kevin G. Hall for *McClatchy News*, printed from the website at https://www.mcclatchydc.com/news/nation-world/national/article184786328.html.

139.    Annexed hereto as **Exhibit 137** is a true and correct copy of Exhibits AG-4A and AG-4B, from the April 30, 2018 Deposition of Aleksej Gubarev.

140.    Annexed hereto as **Exhibit 138** is a true and correct copy of Exhibits 18A and 18B of the Deposition of Jochem Steman.

141.    Annexed hereto as **Exhibit 139** is a true and correct copy of document produced by KGlobal, LLC in this litigation bearing the Bates stamp KGlobal003786.

142.    Annexed hereto as **Exhibit 140** is a true and correct copy of an August 9, 2001 article by Chris Brummitt for the *Associated Press*, printed from the website at https://www.apnews.com/1d99dcf5d238746af1ee9054e7c506a4.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 21, 2018 in Washington, District of Columbia.


                                        /s/ *Nathan Siegel*
                                        Nathan Siegel

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 17-cv-60426-UU**

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.

    Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

   Defendants.

_____/

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

<div align="right">

DAVIS WRIGHT TREMAINE LLP
Katherine M. Bolger
Nathan Siegel
Adam Lazier
Alison Schary
1251 Avenue of the Americas, 21st Floor
New York, New York 10020

BLACK, SREBNICK, KORNSPAN &
STUMPF, P.A.
Roy Black
Jared Lopez
201 So. Biscayne Boulevard
Miami, Florida 33131

*Of Counsel*:
Nabiha Syed
BuzzFeed, Inc.
11 E. 18th Street, 13th Floor
New York, New York 10003

*Attorneys for Defendants*

</div>

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................... 1

COUNTER-STATEMENT OF FACTS ......................................................................... 2

ARGUMENT .................................................................................................................. 5

    I.      PLAINTIFFS SATISFY THE BASIC CRITERIA FOR PUBLIC FIGURES ...... 6

          A.     Plaintiffs Had Access to the Media .............................................................. 7

          B.     Plaintiffs Voluntarily Invited Attention and Comment ............................... 8

    II.     PLAINTIFFS ARE LIMITED PUBLIC FIGURES ............................................... 9

          A.     Plaintiffs Misidentify the Relevant Public Controversies ......................... 10

          B.     Plaintiffs Involved Themselves in the Identified Public Controversies .... 11

          C.     Plaintiffs' Role in these Public Controversies is Germane to the Allegedly Defamatory Statements .......................................................... 19

CONCLUSION ............................................................................................................. 20

## PRELIMINARY STATEMENT

With their usual rhetorical panache, Plaintiffs headline their brief with a rhetorical question from a column in the *New York Observer*:  "Who on God's green earth is Aleksej Gubarev?"  Yet they neglect to provide the columnist's answer, which was that Gubarev is probably a limited purpose public figure.  Shayefar Ex. 1 ("If a Russian national living in Cyprus with various companies worldwide is alleging injury in Broward County, the more likely he is to be held to be found a limited purpose public figure.").  The record here, which is far more extensive than when that column was written, demonstrates that its prediction was correct.

The record shows that after getting their start as pioneer advocates for the online pornography industry, Plaintiffs spent years publicly touting themselves as major players in the world of technology and web-hosting, and *the* major player in the Russian internet world.  Even now, on the same week Plaintiffs' filed a summary judgment motion depicting themselves as little more than a mom and pop shop, Gubarev told a McClatchy reporter that "Webzilla is one of the largest Internet providers in Europe."[1]  Even more importantly, Plaintiffs spent more than a year before the Dossier was published aggressively seeking – and meaningfully receiving – worldwide publicity to position Gubarev and XBT as "experts" and "thought leaders" on cybersecurity and "Russian tech."  For that very reason, Plaintiffs claim in this suit that they have an international reputation which has allegedly been damaged to the tune of at least $150 million.

The natural legal consequence of those voluntary actions is that Plaintiffs are limited public figures for purposes of this case.  Importantly, requiring public-figure plaintiffs to demonstrate actual malice "is not a punishment imposed upon the allegedly defamed party." *Rosanova v. Playboy Enters., Inc.*, 580 F.2d 859, 862 (5th Cir. 1978).  Rather, "[i]t preserves the balance between free debate on the one hand and compensation of individuals for harm inflicted by defamatory falsehood on the other." *Id.*  Nonetheless, in an effort to avoid that burden, Plaintiffs' motion largely flees from their life's work.  Instead, Plaintiffs seek to reinvent themselves as a garden-variety small business limited to "small technology circles," who eschewed media attention until it was unwittingly forced upon them by the Dossier.  To accomplish that makeover, they even contradict their own official press statements.  *Compare, e.g.*, Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment ("Pl. Br.") at

---

[1] Response Declaration of Nathan Siegel dated October 1, 2018 ("Siegel Resp. Decl.") Ex. 7.

2 ("XBT and Webzilla are not Microsoft, Google or Facebook.") *with* Defs. SUMF ¶ 20 (press release stating that "Webzilla has transitioned itself to stand among the ranks of exclusive peers such as Netflix, Google, and Akamai, quietly taking its rightful place among the giants").

In addition, the legal arguments in Plaintiff's motion are little more than a preemptive strike on *Defendants*' motion for partial summary judgment on the public figure issue, which was filed four days after Plaintiffs'. Accordingly, Plaintiffs' arguments all follow the same pattern. First, they tell the Court what "position" Defendants *will* take, which they construct by reference to a few *sua sponte* statements plucked from colloquy in a status conference more than three months ago. Next, they proceed to rebut that supposed "position", often arguing that Defendants are "slim[ing]" them because some of their clients display pornography. But Plaintiffs did not correctly anticipate Defendants' arguments, including (but by no means limited to) those discussing why their conduct promoting the online pornography industry is relevant to whether they are public figures for a defamation case about misusing "porn traffic." So much of their motion is irrelevant because it is directed at straw-man "positions" that are not at issue here.

The sole question of law at issue here is whether Plaintiffs are limited-purpose public figures, not whether they are "household names" like Oprah or Facebook. That inquiry asks whether they had access to the media and engaged in affirmative conduct to attract public attention, particularly with respect to public controversies relevant to the alleged defamatory statements. Having repeatedly "invit[ed] attention and comment" with respect to cybersecurity, online pornography, the Russian internet, and even Russian interference in the 2016 election – efforts that Plaintiffs say caused them to be included in the Dossier – they are public figures for purposes of this case. *Silvester v. Am. Broad. Cos.*, 839 F.2d 1491, 1494 (11th Cir. 1988).

<div align="center">COUNTER-STATEMENT OF FACTS</div>

The facts relevant to this motion are set forth more fully in Defendants' Partial Motion for Summary Judgment ("Defs. Br.") and the accompanying Rule 56.1 Statement ("Defs. SUMF"), as well as in Defendants' Response to Plaintiffs' Rule 56.1 Statement ("Defs. 56.1 Resp."), filed herewith. To avoid repetition, Defendants also refer the Court to those filings.[2] Generally, almost all of Plaintiffs' Rule 56.1 Statements+ fall into one of several categories:

---

[2] Citations herein to "Pl. SUMF" shall refer to Plaintiffs' Statement of Undisputed Material Facts, dated September 17, 2018. Defendants may also refer herein to exhibits attached to the

1.      **Immaterial facts**.  Most of their factual assertions are not material at all.  Some examples include multiple self-serving declarations of Plaintiffs' subjective beliefs, perceptions, and intentions, [3] and recitations that various individuals had not previously "heard of" Plaintiffs.[4]

2.      **Arguments**.  Much of Plaintiffs' Rule 56.1 Statement asserts argument, not facts. That includes statements which are merely exercises in semantics, characterizing the underlying, undisputed facts that speak for themselves.  For example, Plaintiffs assert that "Mr. Gubarev had never . . . publicly commented on any political matters."  Pl. SUMF ¶ 8.  However, they do not dispute that he explained in detail to a *Bloomberg* journalist why an alleged Trump campaign-Russia connection was "totally f---ed up," or that he publicly defended a controversial Russian internet law.  Defs. 56.1 Resp. ¶ 8; Shayefar Ex. 44.

Plaintiffs also complain they were not mentioned in "high-level technology media" in early 2016, but acknowledge they received coverage in *Forbes* and on *CNBC*.  Pl. SUMF ¶ 15. Plaintiffs likewise complain that Gubarev "was only interviewed for a handful of publications, most of them minor," but do not dispute he was interviewed by *Bloomberg*, *Business Insider*, *Forbes*, *VentureBeat* and *The Wall Street Journal*.[5]  They even assert that "the Bloomberg article does not make any reference whatsoever to the Democratic National Committee or the hacking of the same."  *Id.* ¶ 34.  However, the very premise of that article was that the Trump-Alfa Bank issue was merely "another" example of false charges that Trump was involved in Russian interference in the U.S. election, including the DNC hack.  *See* Defs. 56.1 Resp. ¶ 34.

3.      **Half-Truths**.  A third category consists of half-truths which are literally accurate (and undisputed), but ignore all the related undisputed facts that are far more significant.  For example, Plaintiffs include a vague reference to "Webzilla provid[ing] advertising support" for

---

Declaration of Nathan Siegel dated September 21, 2018 ("Siegel Decl."), the Declaration of Matthew Shayefar dated September 17, 2018 ("Shayefar Decl."), and the Response Declaration of Nathan Siegel dated October 1, 2018 ("Siegel Resp. Decl.").

[3] *See, e.g.*, Gubarev Decl. ¶ 6 ("I am largely unknown"); Pl. SUMF ¶ 4 ("Mr. Gubarev does not consider himself to be an expert"); *id.* ¶ 5 ("Mr. Gubarev does not consider himself to be a public person"); *id.* ¶ 12 ("any promotion of XBT's executives themselves was solely for the purpose of creating brand recognition"); *id.* ¶ 28 ("Mr. Gubarev gave comments to a Bloomberg reporter to promote Servers.com").  *See also id.* ¶¶ 7, 14, 16-17, 30.

[4] *See, e.g.,* Pl. SUMF ¶¶ 38, 40-44.  Other immaterial facts include *id*. ¶¶ 1-2, 7, 13.

[5] *See also* Pl. SUMF ¶ 15 ("Cutler PR was only able to get very limited exposure"); *id.* ¶ 16 ("Servers.com obtained so little from Cutler PR's work"); *id.* ¶ 22 ("KGlobal's efforts were so unsuccessful in driving attention to the company."); *id.* ¶¶ 18, 22-23, 27, 33.

"AWMOpen" conferences, which "was operated by a company in which Mr. Gubarev invested." Pl. Br. at 4; Pl. SUMF ¶ 26. True enough, but that does not speak to the larger point that Gubarev, though his company, managed the "team" that created and ran the conferences and published a magazine, all to "rais[e] the profile" of adult webmasters. Defs. 56.1 Resp. ¶ 26; Defs. SUMF ¶¶ 4-10. Likewise, Plaintiffs claim that "Mr. Gubarev had never seen" one specific set of emails shown to him at his deposition, which touted him to reporters as an entrepreneurial success story and an expert and "thought leader" on "Russia tech." Pl. SUMF ¶ 19. Maybe so, but the material, undisputed point is that Gubarev, as XBT's CEO, authorized the public relations strategy to solicit journalists for interviews with that message. Defs. 56.1 Resp. ¶ 19.

4. **Facts Contradicted by the Record**. And finally, there are a few asserted facts (though very few) which are not supported by any cited record materials and are indisputably false. For example, Gubarev claims he has never spoken anywhere other than a "handful" of "small industry conferences." Pl. SUMF ¶ 24. In reality, he held a press conference in Moscow and spoke at Russia's most prestigious annual internet event, to an audience that included Putin's internet advisor German Klimenko. Defs. 56.1 Resp. ¶ 24.

5. **All Other Undisputed Material Facts**. Perhaps the most important category of material, undisputed facts are the ones that are missing from Plaintiffs' Rule 56.1 Statement altogether. At bottom, Plaintiffs do not and cannot meaningfully dispute that Gubarev promoted the very industry responsible for "porn traffic" though conferences and magazines, or that they have previously received negative press coverage and industry complaints to U.S. government authorities regarding the nature of the "porn traffic" on its networks. Defs. SUMF ¶¶ 4-18, 80. While they quibble about their motives, they do not dispute that they hired two U.S.-based PR companies to launch publicity campaigns in the United States to solicit scores of journalists to interview Gubarev and write about Plaintiffs as experts and "thought leaders" on issues relating to cybersecurity and, in particular, the Russian tech sector. Defs. SUMF ¶¶ 25-31, 49-61. Nor do they dispute that they publicized their entry into the Russian internet market by promoting themselves as a transformative influence that would also facilitate compliance with Russia's controversial data security laws. Defs. SUMF ¶¶ 32-42. And while they strive mightily to minimize the subsequent coverage they received, the simple facts are that about a year's worth of those efforts had already yielded coverage in publications like *Forbes*, *CNBC*, *Bloomberg*, *Business Insider*, and *VentureBeat*, and interviews with the likes of *The Wall Street Journal*. Pl.

SUMF ¶¶ 15, 20; Defs. SUMF ¶ 55.  Moreover, Plaintiffs were able to use their access to the media to successfully head off negative coverage about their involvement in Methbot, one of the largest and highly-publicized "botnet" scandals to date.  Defs. SUMF ¶¶ 63-72.

Finally, Plaintiffs do not (and cannot) dispute that Gubarev, on behalf of Plaintiffs, voluntarily provided a detailed, "expert opinion" to *Bloomberg* regarding the most specific public controversy referenced in the Dossier: Russian interference in the 2016 U.S. presidential election in favor of Donald Trump.  Plaintiffs even highlight that the *Bloomberg* reporter reached out to Gubarev specifically because he had already interviewed him as a result of Plaintiffs' public relations' efforts.  Bershidsky Decl. ¶¶ 3-4.  Thus, regardless of what Gubarev professes to believe about his popularity, the undisputed facts show that by 2016, he was actually known to a reporter for one of the world's most prestigious business media networks as a competent and willing resource for "expert" comments on a major Russia-related, cyber-security scandal.

Rather than address those salient facts, Plaintiffs instead launch a frontal attack on the credibility of Defendants' counsel.  They claim that "[c]ontrary to Defendants' direct representations to this Court, at no time did the Plaintiffs seek 'public commentary on Russian servers, on hacking.'"  Pl Br. at 5.  Had Plaintiffs waited to read Defendants' summary judgment motions rather than preemptively attack their lawyers, they might have understood why there is a wealth of evidence supporting what Ms. Bolger was referring to at a June status conference.[6]

## ARGUMENT

Defendants agree with Plaintiffs on one important point: whether they are public figures is a question of law for this Court to resolve now.  Defendants also agree that there is no choice-of-law question presented here, albeit for slightly different reasons than Plaintiffs suggest.[7]

---

[6] For example, as detailed above, Plaintiffs sent scores of emails to journalists soliciting interviews as experts on "Russian tech"; they held a press conference and gave interviews to Russian media boasting why their Russia-based servers were important; and they commented on hacking and other related cyber-security issues, including Alfa Bank (i.e., Russian) servers.

[7] Whether Plaintiffs are public figures is ultimately a question of federal constitutional law, not state law, so the Court's analysis should presumptively be guided by Eleventh Circuit case law on this issue.  *See McKee v. Cosby*, 874 F.3d 54, 60 (1st Cir. 2017) (applying Michigan law to substantive defamation claim but following First Circuit cases on First Amendment question of whether plaintiff is a public figure).  However, if a state were to adopt a broader definition for public figures than the federal standard, then state law could apply to the issue.  *Harris v. Quadracci*, 48 F.3d 247, 250 n.5 (7th Cir. 1995), *pet. for cert. docketed* (May 14, 2018) (No. 17-1542).  But here the parties appear to agree that both Florida and New York state courts follow

Otherwise, Plaintiffs' motion is a preemptive strike on the wrong enemy. Their arguments are all based on their premise that Defendants supposedly "telegraphed to Plaintiffs and the Court their two-pronged plan of attack" to "slime" them and otherwise behave like Darth Vader. Pl. Br. at 2. So each step in their argument begins by positing what they contend to be "Defendants' position" on the public figure issue (e.g., Pl. Br. at 4), and then proceeds to rebut that imagined "position."

To start with, Plaintiffs assume that Defendants' "position" is that "Plaintiffs are either general or limited purpose public figures." Pl Br. at 3. So a significant portion of their factual and legal arguments focus on whether they are "household names" like Google and Madonna. *Id.* at 2-3, 10-12. But all that is irrelevant, because Defendants agree they are not general public figures. Rather, what *is* relevant, to assess whether Plaintiffs are *limited* public figures for purposes of defamatory statements about illicit cyber-conduct involving Russia, is that XBT and Webzilla consistently held themselves out to the press and public as on par with the Googles of the cyber-world; as "one of the largest internet providers in Europe"; and as "the foundation for the development of international potential [in] the Russian market." *See* Defs. SUMF ¶¶ 20, 41; Siegel Resp. Decl. Ex. 7. Yet Plaintiffs ignore those facts entirely. And as discussed more fully below, the rest of Plaintiffs' motion follows the same pattern.

## I.      PLAINTIFFS SATISFY THE BASIC CRITERIA FOR PUBLIC FIGURES

Turning to the limited public figure issue, Plaintiffs contend that the applicable legal standard is what they characterize as the three-part *Silvester* test. They do not actually point to any case law, but rather rely entirely on what they claim "Defendants acknowledged" in a handful of words exchanged in an informal status conference. Pl Br. at 12 n.14. But the test is what it is, and the Eleventh Circuit's jurisprudence, beginning with *Silvester*, makes clear that the limited public figure analysis is more nuanced that Plaintiffs suggest.

*Silvester* and its progeny make clear that the Court's inquiry should begin by assessing whether Plaintiffs satisfy the two "fundamental" criteria for determining who is a public figure. *Silvester*, 839 F.2d at, 1494. *See also Turner v. Wells*, 879 F.3d 1254, 1272 (11th Cir. 2018). First, public figures (of any sort) have "greater access to the media, which gives them 'a more realistic opportunity to counteract false statements'" than purely private individuals. *Silvester*,

---

the federal standard. So while it is appropriate to note Florida or New York cases, there is no "choice of law" question presented on this issue here.

839 F.2d at 1494 (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344 (1974)).  Second, public

figures have "voluntarily placed themselves in a position and acted in a manner which invited

public scrutiny and comment."  *Id.*  Plaintiffs ignore that threshold, two-step inquiry, which

strongly supports their being public figures.  *See* Defs. Br. at 11-13.

### A.    Plaintiffs Had Access to the Media

Plaintiffs only briefly address their access to the media at the end of their brief, and

proceed as if the only media communications they ever had were with reporters who "gave them

an opportunity to respond to defamatory statements" after the Dossier was published.  *Id.* at 17.

Defendants agree that access to media is primarily measured by access before the allegedly

defamatory statements, *Silvester*, 849 F.2d at 1494, but Plaintiffs ignore all the undisputed

evidence that they enjoyed such access.  The record makes clear that for more than a year before

the Dossier was published, Plaintiffs through their public relations agents had access to much of

the world's most important media.  If affirmatively obtaining interviews with and articles placed

in publications like *CNBC*, *Forbes* (twice), *Bloomberg* (twice), *The Wall Street Journal*,

*Business Insider*, and *VentureBeat* over a span of less than a year is not "access to the media," it

would be difficult to imagine what is.  *Silvester*, 839 F.2d at 1495 (existence of newspaper

articles, including those which "predate and are unrelated to" the allegedly defamatory

statements, "highlight plaintiffs' longstanding access to the media").  In fact, when their

involvement in a major "botnet" scandal (Methbot) threatened to seriously impair their business

in late 2016, they were able to utilize their media access to head off a negative story before it was

even published.  Defs. SUMF ¶¶ 63-72.  It would be difficult to find a more salient example of

how media access provides a public figure with "a more realistic opportunity to counteract false

statements than private individuals normally enjoy."  *Silvester*, 849 F.2d at 1494 (quoting *Gertz*,

481 U.S. at 344).  Most private persons lack the wherewithal to identify and deflect potential

negative stories before they are ever published.  *See, e.g.*, *Lluberes v. Uncommon Prods., LLC*,

663 F.3d 6, 16-17 (1st Cir. 2011) (public relations campaign designed in part to "block messages

critical of [plaintiffs]" was part of "conduct [that] shows beyond hope of legitimate contradiction

that [plaintiffs] are limited purpose public figures") (internal quotation marks omitted).

Moreover, with respect to Plaintiffs' interactions with the media after the Dossier was

published, the relevant point is that their conduct illustrates how they were already in a much

better position than the average private person to "counteract false statements" once they were

published.  The record makes clear that Plaintiffs did far more than passively accept "the opportunity to respond to defamatory statements."  Pl. Br. at 17.  Rather, the first thing Gubarev did upon learning of the Dossier was to reach out to his pre-existing PR team to formulate a response, which included drafting statements, suggesting talking points for interviews, and filtering reporters' requests and Plaintiffs' responses.  Defs. SUMF ¶¶ 73-76.  *See Turner*, 879 F.3d at 1272 (that plaintiff "took advantage of his familiarity with the media by commissioning a response to the Report, which included [plaintiff] giving his conclusions" supported his being a public figure).  In fact, when they filed this lawsuit their PR expert was busy playing *CNN* and *Fox News* off against each other to obtain the best offer for an exclusive television interview. *See* Siegel Decl. Ex. 110.  In short, Plaintiffs easily satisfy the first criteria for a public figure.

>### B.   **Plaintiffs Voluntarily Invited Attention and Comment**

Next, the record is replete with evidence that for many years Plaintiffs "voluntarily placed themselves in a position and acted in a manner which invited public scrutiny and comment." *Silvester*, 839 F.2d at 1494.  Importantly, by its very formulation this factor – which as discussed below is also incorporated within the second prong of the three-part test for limited public figures – focuses on a plaintiff's *actions* that invite attention to them, rather than the volume of their press clippings.  For example, in *Silvester*, the Circuit held that the fact that the plaintiffs voluntarily "held positions of prominence in an industry" that was controversial invited attention and comment.  *Id.* at 1497.  *See also Little v. Breland*, 93 F.3d 755 (11th Cir. 1996) (by virtue of voluntarily becoming the president of non-profit to attract conventions to Mobile, Alabama, plaintiff invited attention and comment).

Here, the record makes clear that Plaintiffs engaged in conduct that "invited attention and comment."  They engaged multiple public relations agencies and solicited interviews with scores of major media journalists.  Defs. SUMF ¶¶ 25-31, 48-61.  They aggressively entered the Russian internet market by holding a press conference, speaking at a major forum, soliciting the attention of high-level government officials, and touting themselves as a transformative influence and guarantors of compliance with controversial data privacy laws. *Id.* ¶¶ 32-47.  And, like the plaintiffs in *Silvester*, before those events Plaintiffs had voluntarily assumed positions of prominence in a highly controversial industry (online pornography), including creating both public fora (the conferences) and media (the magazine) "to improve the status of the Russian language segment in [the] international online business." *Id.* ¶¶ 4-18.

Plaintiffs' motion largely ignores those points, and instead pre-emptively attacks Defendants for allegedly intending to "slime" Plaintiffs with "irrelevant" references to "pornography."  Pl. Br. at 2-3.  And here as well, they might have done better to wait and see what Defendants' actual "positions" are.  The point is not, as Plaintiffs imply, whether "there is pornography on the internet."  *Id.* at 3.  Rather, the point is that for purposes of a case in which Plaintiffs are seeking hundreds of millions of dollars because they allege they were falsely accused of illicitly using "porn traffic" in the service of Russian interests, their voluntary actions to promote and legitimize "porn traffic" in the "Russian language segment" are among the many facts that are directly relevant to whether they previously "invited attention and comment" to themselves.

Moreover, the Dossier was hardly the first time that Webzilla has received public scrutiny from investigative journalists, child welfare organizations, and American companies and trade associations for its practices regarding "porn traffic."  *See* Siegel Decl. Exs. 129-132, 134-35.  When Christopher Steele was writing Report No. 166, he accessed one of those reports from 2009 as part of assessing the credibility of the allegations against Plaintiffs.  Siegel Decl. Ex. 133 [Steele Depo.] at 47:11-18.  And when Fusion received Report No. 166, they too sought to independently assess the credibility of the allegations against Plaintiffs:

> We undertook a litigation search of XBT and Webzilla and a public record search with the internet.  We found extensive allegations, credible allegations.  Paragraph 3 talks about porn traffic.  We found a number of websites hosted by Webzilla [names of pornographic websites omitted] . . . We found extensive allegations in the public record from credible people like motion picture associations in filings to the U.S. and comments to the U.S. Copyright Office that Webzilla had ignored repeated entreaties to take down pirated traffic particularly in pornography.

Siegel Resp. Decl. Ex. 8 [Fusion Depo.] at 188:7-192:9.  In short, the undisputed facts show that Plaintiffs' prior conduct regarding "porn traffic" invited public attention that later directly contributed to the creation of the allegedly defamatory statements.  While those facts may be uncomfortable for Plaintiffs, they are hardly "wholly irrelevant" to assessing their status as public figures.

## II.    PLAINTIFFS ARE LIMITED PUBLIC FIGURES

The next step in the Court's inquiry is well-established:  "the court must (1) isolate the public controversy, (2) examine the plaintiffs' involvement in the controversy, and (3) determine whether 'the alleged defamation [was] germane to the plaintiffs' participation in the

controversy.'"  *Silvester*, 839 F.2d at 1494 (quoting *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980)).

### A.      Plaintiffs Misidentify the Relevant Public Controversies

Once again, Plaintiffs begin this part of their argument not by assessing the case law, but rather by basing their argument entirely on how they claim *Defendants* define the relevant controversy.  Not surprisingly, the straw-man position they posit defines the controversy very narrowly, as either "the meddling of the Russian government in the election in the United States of America" or even more narrowly as whether Plaintiffs hacked the DNC.  Pl. Br. at 13.  Either definition proves to be highly convenient for Plaintiffs, as the rest of their brief argues that apart from perhaps the *Bloomberg* article about Trump and Alfa Bank, all other public relations activity and press coverage is irrelevant and nothing more than a plot to "slime" them.  Pl. Br. at 14-19.  But once again their arguments all miss the mark, because most of the public controversies the allegedly defamatory statements relate to are much broader than that.

When defining the relevant controversy, "a court may find that there are multiple potential controversies, and it is often true that a narrow controversy may be a phase of another, broader one." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 586 (D.C. Cir. 2016) (citation and internal quotation marks omitted), *cert. denied*, 137 S. Ct. 1434 (2017).  *See also, e.g.*, *Little*, 93 F.3d at 757 (identifying two public controversies); *Tavoulareas v. Piro*, 817 F.2d 762, 773-74 (D.C. Cir. 1987) (identifying broad and narrow public controversies).  *Waldbaum* itself illustrates this point.  The actual news item at issue in that case was a very brief report of the plaintiff's termination as the CEO of a supermarket cooperative.  627 F.2d at 1290.  But none of the relevant public controversies the Court identified were about the plaintiff's job performance.  Rather, they were much more broadly defined and "overlapping," including "the viability of cooperatives as a form of commercial enterprise" as well as "unit pricing, open dating . . . and other issues." *Id.* at 1299.  Likewise, in *Dubai World Corp. v. Jaubert*, No. 09-14314-CIV, 2011 WL 579213 (S.D. Fla. Feb. 9, 2011), the allegedly defamatory statement accused a Dubai-based businessman of fraudulently overbilling his customers.  However, Judge Martinez held that "considering the larger context of the Washington Post article," the relevant controversies included "corporate fraud" and "whether or not foreigners are safe in Dubai." *Id.* at *15.

Moreover, courts expressly reject plaintiffs' machinations to try to frame the "public controversy" so narrowly as to be coterminous with the allegedly defamatory statements.  As one

court put it, "it would be inappropriate to shrink all controversies to the specific statements of which a plaintiff complains" – especially where, as here, the statements at issue "are a part of, and clearly related to, a much larger story" and "part of an article covering more ground than simply" allegations related to the plaintiff. *Nat'l Life Ins. Co. v. Phillips Publ'g, Inc.*, 793 F. Supp. 627, 637-38 (D. Md. 1992). Likewise, in *Hatfill v. New York Times Co.*, 532 F.3d 312 (4th Cir. 2008), the plaintiff research scientist sued over a series of editorial columns presenting evidence suggesting that he should be a prime suspect in the 2001 anthrax attacks. Dr. Hatfill – like Plaintiffs – urged the court to interpret the "particular public controversy" narrowly, encompassing only "who committed the anthrax attacks in 2001," or even just whether he committed them. 532 F.3d at 322. The Fourth Circuit rejected that position, holding that the statements about the plaintiff related to a "larger debate" about "the government's efforts to protect the nation from a bioterrorist attack." *Id.* at 323. *See also Jankovic*, 822 F.3d at 585-86 ("The court has defined controversies as being broader than the narrower discussion contained in the defamatory document."); *Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 529-30 (6th Cir. 2014) (finding plaintiff's struggle with student loans to be relevant to the broader public controversy regarding whether graduates are overburdened by debt).

As explained in Defendants' motion, the statements at issue here relate to several public controversies. Most broadly, there were preexisting public controversies relating to cybersecurity and cybercrime, including the use of "botnets" and "porn traffic." More narrowly, there was a preexisting controversy concerning malicious cyberactivity involving Russian and Russian-aligned actors, including the use of botnets and porn traffic. And most narrowly, there was a controversy about Russian interference in the 2016 election. Defs. Br. at 10, 15; Defs. SUMF ¶ 79. The Court need not identify one controversy to the exclusion of any other.

### B.    Plaintiffs Involved Themselves in the Identified Public Controversies

The second prong "examine[s] the plaintiffs' involvement in the controvers[ies]." *Silvester*, 839 F.2d at 1494. And once again, Plaintiffs set up their argument by positing the arguments they say that "Defendants intend to rely on" and then proceed to "rebut" them.[8] But

---

[8] Those imagined arguments include "engaging in normal publicity efforts" (namely advertising), Pl. Br. at 14; what Plaintiffs characterize as "unsuccessful efforts to obtain publicity," *id.* at 15; "speaking to small industry groups and writing articles for small niche industry publications," "merely achieving a degree of recognition in a particular field," *id.* at 16; and "the fact that the media gave a plaintiff the opportunity to respond to defamatory statements," *id.* at 17.

11

here too, the reasons Plaintiffs are limited public figures bear little relationship to the "position" that Plaintiffs imagine. Plaintiffs essentially posit the second prong of the test as one that just measures the volume of a plaintiff's actual press clippings. Pl. Br. at 15. Even if that were so, Plaintiffs would still be limited public figures given the media coverage they invited and received. However, their characterization of what it means to be "involved" in a public controversy is wholly inconsistent with both the law of this Circuit and the basic principles underlying the limited public figure doctrine.

As explained in Defendants' brief in support of their motion for partial summary judgment, this Circuit has emphasized two ways to become involved in controversies. One is to "voluntarily engage[] in a course [of conduct] that was bound to invite attention and comments." *Silvester*, 839 F.2d at 1496 (quoting *Rosanova v. Playboy Enters.*, 411 F. Supp. 440, 444-45 (S.D. Ga. 1976), *aff'd*, 580 F.2d 859 (5th Cir. 1978)). For example, "voluntarily entering a strictly regulated, high-profile industry" can suffice to "invite[d] public scrutiny, discussions and criticism" even if media attention was not sought by the plaintiff. *Id*. at 1497. Likewise, the fact that a plaintiff had publicly associated himself with figures in organized crime made him a limited public figure with respect to an article describing him as a "mobster." *Rosanova*, 411 F. Supp. at 444-45. *See also McDowell v. Paiewonsky*, 769 F.2d 942, 949 (3d Cir. 1985) ("When an individual undertakes a course of conduct that invites attention, even though such attention is neither sought nor desired, he may be deemed a public figure."). Indeed, *Waldbaum* illustrates how the public figure inquiry involves more than just counting press clippings. The plaintiff in *Walbaum* "was not frequently the subject of articles," 627 F.2d at 1300, and even the defamatory statement at issue appeared in a five-sentence article on page 35 of a supermarket industry newsletter. *Id.* at 1290. But he was deemed a limited public figure because he had been an active CEO of a company that advocated for controversial polices within that industry.

Another way to become involved in public controversies is to affirmatively seek attention in the media and/or in other public fora. *Silvester*, 839 F.2d at 1497. Thus, speaking at press conferences, public meetings, and communicating with government officials is also voluntary conduct that invites attention. *Carr v. Forbes, Inc.*, 121 F. Supp. 2d 485, 491 (D.S.C. 2000), *aff'd*, 259 F.3d 273 (4th Cir. 2001). *See also Waldbaum*, 627 F.2d at 1300 (even though plaintiff received little press coverage, "he was somewhat familiar with press operations and had held

12

press conferences to discuss Greenbelt's policies and operations").  And the amount of media attention a plaintiff actually receives is also a relevant, but not dispositive factor.  *Id.*

Here, "looking at the overall picture" (*id.*), Plaintiffs were materially involved in all the identified public controversies.  The reasons why are set forth in detail on pages 16-19 of Defendants' partial summary judgment brief and the exhibits cited thereto, and rather than repeat them here Defendants refer the Court to that briefing.

By contrast, Plaintiffs' arguments as to why they are not limited public figures all miss the mark, because they are based on their erroneous speculation about what "Defendants intend to rely" on, rather than what Defendants actually argue.  Pl. Br. at 14.  First, Plaintiffs cite a number of cases for the unremarkable point that garden-variety advertising by a company does not, on its own, necessarily confer public figure status.  *Id.*  But Defendants' arguments do not rely on any advertising by Plaintiffs, and indeed the cases they cite only underscore why Plaintiffs *are* public figures based on the record here.

For example, in *Long v. Cooper*, 848 F.2d 1202, 1205 (11th Cir. 1988), the Eleventh Circuit found that a local electronics business's "mainstream" advertising practices were not sufficient to render it a limited public figure, because all it did was engage in direct-mail advertising that compared its prices to list prices.  *Id.* at 1205-06.  Even so, the Court noted that if the plaintiffs' advertisements had been a little edgier, such as by "ma[king] direct, specific comparisons of its prices to those of identified specialty dealers," the company and its president might well have become limited public figures.  *Id.* at 1205.[9]  More to the point, courts have consistently found that public relations campaigns to seek press coverage are quintessentially what qualifies corporate plaintiffs and their executives as limited public figures.[10]  Rather than

---

[9] The only advertising at issue at all in this case is Webzilla's ads touting itself as offering "liberal rules" to adult webmasters.  Given the controversial nature of "porn traffic," that is exactly the kind of advertising *Long* suggested would be relevant to a corporate plaintiff's limited public figure status.

[10] *See, e.g.*, *Lluberes*, 663 F.3d at 17 (plaintiffs were limited public figures where they "enjoyed access to the press" and "orchestrat[ed] a PR blitz"); *Patrick v. Cleveland Scene Publ'g*, 582 F. Supp. 2d 939, 951 (N.D. Ohio 2008) (plaintiff was a public figure in part because he "retained a public relations firm to represent his interests in the controversy"), *aff'd*, 360 F. App'x 592 (6th Cir. 2009); *Carr v. Forbes, Inc.*, 121 F. Supp. 2d 485, 492 (D.S.C. 2000) (plaintiff was a public figure in part because "his group paid a lobbyist/public relations firm over $1 million"), *aff'd*, 259 F.3d 273 (4th Cir. 2001); *FoodScience Corp. v. McGraw-Hill, Inc.*, 592 F. Supp. 362, 363, 365-66 (D.Vt. 1984) (plaintiff was a public figure in part because the company hired a "public

conventional advertising, Plaintiffs chose to "vigorously publicize" themselves as experts and "thought leaders" in the industry.  Having "stepp[ed] into the public spotlight ... [they] must take the good with the bad."  *Waldbaum*, 627 F.2d at 1294–95.[11]

Next, Plaintiffs' argue that their PR efforts were "unsuccessful" and therefore irrelevant to the public-figure inquiry.  Pl. Br. at 15.  But neither the law nor the facts support that assertion.  Plaintiffs rely entirely on the presence of the word "successfully" in the first prong of the Second Circuit's four-part test for limited public figures, but even in that jurisdiction none of the cases they cite interpret that to mean that there is some threshold quantum of actual press coverage necessary to qualify as a public figure.  To the contrary, *Waldbaum* and its progeny make clear that a plaintiff's prior conduct alone may be sufficient, and there are numerous examples of limited public figures who received little, if any prior press coverage, including within that Circuit.  *See, e.g.*, *Fine v. ESPN*, No. 5:12-CV-0836, 2016 WL 6605107, at *7 (N.D.N.Y. Mar. 25, 2016) (wife of assistant college basketball coach who was a guest reporter

---

relations representative" in order "to influence and counter the adverse impact of the unfavorable publicity that attended the FDA investigation and subsequent litigation"); *OAO Alfa Bank v. Ctr. for Public Integrity*, 387 F. Supp. 2d 20, 45 (D.D.C. 2005) (plaintiffs were public figures in part because they "developed a well-coordinated and sophisticated public relations strategy through in-house press departments, external public relations firms, and corporate websites").

[11] At various points in their brief, Plaintiffs often cite to *Mitre Sports Int'l v. HBO*, 22 F. Supp. 3d 240 (S.D.N.Y. 2014), which found that a soccer-ball manufacturer was not a limited public figure with respect to allegations that its soccer balls were manufactured using child labor. While both the controversy at issue in *Mitre* and the nature of the defendant company's conduct was quite different from the circumstances presented here, there is in any event good reason to question whether *Mitre* correctly applied the Second Circuit's public figure jurisprudence.  The decision seems at odds with New York cases finding companies with far less public outreach to be public figures.  *See, e.g.*, *Arrigoni v. Velella*, 110 A.D.2d 601, 603-04 (N.Y. App. Div. 1985) (finding bus company that operated transit system of more than 300 buses with multi-million dollar annual revenues to be a public figure); *Samuels v. Berger*, 191 A.D.2d 627, 630 (N.Y. App. Div. 1993) (finding marine contracting company that purchased advertisements and otherwise attracted publicity to be a public figure).  Moreover, as previously noted, in this Circuit cases like *Long* and *Silvester* make clear that corporate activity and communications, including even advertising, are likely to support finding public figure status where they address public controversies.  The pattern of activity attributed to Mitre – including pre-existing press coverage of its manufacture of soccer balls using child labor, publicized corporate policies denouncing child labor, and participation in leading an international, informal treaty to eradicate child labor – would more than qualify it as a public figure under *Silvester* and its progeny.  *See Mitre*, 22 F. Supp. 3d at 247-48, 251-52.  However, the district court's interlocutory decision in *Mitre* was never reviewed on appeal, because the jury subsequently found that HBO did not act with gross irresponsibility.

once on a local TV station and a substitute co-anchor and guest on a local public-access); *Robertson v. Doe*, No. 05 Civ. 7046, 2010 WL 11527317, at *2 (S.D.N.Y. May 11, 2010) (plaintiff whose only media appearance was a single CNBC interview), *aff'd*, 443 F. App'x 659 (2d Cir. 2011); *Grass v. News Grp. Publ'ns*, 570 F. Supp. 178, 180-83 (S.D.N.Y. 1983) (plaintiff who sent more than two dozen letters to reporters, though the only letter resulting in press coverage was the allegedly defamatory article).

 In any event, even if some threshold quantum of press coverage was required, Plaintiffs would easily meet it.  Between them they have organized conferences, published magazines, given press conferences, spoken at major public fora in Russia, and received coverage from *CNBC*, *Bloomberg*, *Business Insider*, *Forbes*, *VentureBeat, Inc.*, numerous Russian and European media outlets, as well as industry-specific media.  The case law is replete with examples of public figures who have had vastly less "success" in inviting attention to themselves.[12]  Moreover, Plaintiffs are simply wrong when they contend that their repeated efforts to tout their own prominence are "irrelevant" to the inquiry.  Pl Br. at 17 n.18.  *See Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) ("Given plaintiff Celle's own characterization of himself as a 'well known radio commentator' within the Metropolitan Filipino-American community, the district court correctly held that he is a public figure."); *Nat'l Life Ins. Co.*, 793 F. Supp. at 638 ("Finally, National Life itself struts its own prominence in its advertising and news articles.  Such self-definition has been considered a factor for determining prominence in the community.").

 In their recitations of the "facts," Gubarev also repeatedly claims that he likes his privacy and doesn't want public attention.  Pl. SUMF ¶¶ 5-8.  While the facts certainly suggest otherwise, it makes no difference because Plaintiffs' actions are what is relevant, not their self-proclaimed personal desires:

> In our view of the law resulting from the inevitable collision between First Amendment freedoms and the right of privacy, the status of public figure Vel non does not depend upon the desires of an individual.  The purpose served by limited protection to the publisher of comment upon a public figure would often be

---

[12] *See, e.g.*, *Little*, 93 F.3d 755 (11th Cir. 1996) (president of non-profit to attract conventions to Mobile, Alabama); *Orr v. Argus-Press Co.*, 586 F.2d 1108 (6th Cir. 1978) (developer of shopping mall in Owosso, Michigan); *Bourne v. Arruda*, No. 10-cv-393, 2013 WL 93637, at *2 (D.N.H. Jan. 8, 2013) (individual who sent letter to local newspaper for publication); *James v. Gannett Co.*, 40 N.Y.2d 415 (1976) (nightclub belly dancer in Rochester, New York).

> frustrated if the subject of the publication could choose whether or not he would
> be a public figure. . .  It is no answer to the assertion that one is a public figure to
> say, truthfully, that one doesn't choose to be.

*Rosanova*, 580 F.2d at 861.  Likewise, it is irrelevant whether the purpose of Plaintiffs' publicity

efforts was to ultimately sell more products and services.  *Silvester v. Am. Broad. Cos.*, 650 F.

Supp. 766, 776 (S.D. Fla. 1986) (plaintiffs who become involved in public controversies to

"promot[e] their business ventures in the hearty spirit of capitalism" are equally public figures),

*aff'd*, 839 F.2d 1491 (11th Cir. 1988).

Finally, even if the *only* controversy at issue was Russian interference in the 2016

election, as Plaintiffs (erroneously) maintain, the result would be the same.  There is no dispute

that Gubarev, on behalf of Plaintiffs, voluntarily provided information to a reporter that disputed

allegations that the Trump campaign was communicating with a key Russian entity via their

servers.  He also specifically requested that his company be "referenced" in the article, and

invited the reporter to ask any follow-up inquires.  Defs. SUMF ¶¶ 56-61.  Nor was that

exchange an isolated incident that was the product of some coincidence.  Rather, the reporter

knew Gubarev as "the CEO of XBT Holding" and reached out to him as a "specialist," because

Plaintiffs' had previously promoted Gubarev to Bloomberg as an "expert" and "thought leader"

regarding "Russian tech."  Bershidsky Decl. ¶¶ 3-4; Defs. SUMF ¶¶ 51-55.  Particularly given

the significance of the election controversy, that readily qualifies Plaintiffs as limited public

figures.  *See Diaz v. Bd. of Educ. of Twp. of S. Brunswick*, No. 05-4667, 2006 WL 3490339

(D.N.J. Dec. 1, 2006) (plaintiff who was fired as a middle school teacher a month before the

2004 presidential election and appeared in the news to allege she was fired for partisan reasons

was a limited public figure, given the proximity to the election); *Bourne*, 2013 WL 93637, at *2

(individual who sent a letter to local newspaper for publication was a limited public figure

because he "plainly thrust himself into the public arena with respect to the issues raised in the

letter"); *Grass*, 570 F. Supp. at 183 (plaintiff who sent letters to reporters correcting their

reporting about a gubernatorial candidate was a limited public figure).

Plaintiffs offer essentially two arguments to the contrary.  First, they argue that they only

played a "minor" rather than a "central" role in any controversy, including the election, relying

primarily on *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157 (1979).  Pl. Br. at 17-18.  To the

contrary, *Wolston* cogently illustrates why Plaintiffs' involvement in any of the relevant

controversies, including the 2016 election, was sufficient to render them limited public figures.

Like this case, *Wolston* implicated a very broad controversy:  "Soviet espionage in the 1940's and 1950's."  443 U.S. at 165.  The plaintiff in *Wolston* had been identified (falsely, he alleged) in the defendant's book as one of numerous Soviet spies during that period.  But the plaintiff's only actual involvement in any espionage investigation was that he received a grand jury subpoena, failed to appear, and was cited for contempt.  His subsequent criminal proceedings then received some media coverage.  *Id.* at 162-63.  The Court held that he was not a public figure, because, like the attorney-plaintiff in *Gertz*, he "never discussed this matter with the press and limited his involvement to that necessary to defend himself against the contempt charge."  *Id.* at 167.  Similarly, in *Hutchinson v. Proxmire*, 443 U.S. 111 (1979), the Court held that a research scientist who received a government grant was not a public figure for purposes of a broad controversy like "concern about general public expenditures," because the scientist had never said anything publicly about "the broad question of concern about expenditures."  *Id.* at 135.

Those cases make clear that to be "involved" or play more than a "minor" role in a controversy, particularly ones as broadly defined as Soviet espionage or the federal budget, it is not necessary to be a world leader or to change the course of history, as the logic of Plaintiffs' argument implies.  If that were so, then the limited public figure category would be largely irrelevant, because the only persons who might qualify would likely be general public figures anyway.  Rather, as *Wolston* notes, engaging in voluntarily action to influence public opinion like "discuss[ing] this matter with the press" is the kind of activity likely to render a plaintiff a limited public figure – even if the plaintiff makes one contribution to a much larger debate.

For example, in *Colodny v. Iverson, Yoakum, Papiano & Hatch*, 936 F. Supp. 917 (M.D. Fla. 1996), the plaintiff wrote a book about former White House lawyer John Dean's role in the Watergate scandal.  No one suggested that the plaintiff's book altered history's understanding of "one of the most notorious events in American history," or had any significant lasting influence at all.  *Id.* at 922.  Nonetheless, the Court held that by virtue of publishing the book, the plaintiff had "participated sufficiently in that controversy" and had "easily acquired limited public figure status."  *Id.*  Likewise, in *Faltas v. State Newspaper*, 928 F. Supp. 637 (D.S.C. 1996), *aff'd*, 155 F.3d 557 (4th Cir. 1998), a doctor in Columbia, South Carolina wrote an op-ed in the local newspaper arguing that homosexuality was far more rare than current science suggested.  The court found the relevant public controversies to be "what should be taught about homosexuality

17

and whether it was appropriate to place restrictions on the rights of homosexuals." *Id.* at 645. There as well, no one suggested that article in a small South Carolina newspaper played any role in actually influencing the national resolution of those questions, which continue to generate controversy even today. But the Court held that the plaintiff "clearly voluntarily assumed a role of special prominence in a public controversy." *Id.* Likewise, in *Diaz*, the plaintiff was fired as a middle school teacher a month before the 2004 U.S. presidential election, and appeared in the news to allege she was fired for partisan reasons. The court held that, especially given the proximity of those events to a national election, she was a limited public figure. 2006 WL 3490339 at *2.

Here too, all of the identified public controversies – be it cybersecurity involving "porn traffic" and "botnets" in general, Russian-related malicious cyber-activity in particular, or Russia's interference in the 2016 election – are major matters of domestic and international significance that will likely remain so for years, if not decades. No one would seriously suggest that the actions of Plaintiffs, nor even many world leaders, necessarily would ultimately influence any final "resolution" of those controversies (if they ever even "resolve"). But the law is clear that one does not need to be President Putin or President Trump to qualify as a limited public figure for purposes of a defamation case implicating those controversies. Rather, the totality of all of the voluntarily actions plaintiffs have undertaken, statements they have made, and news coverage they have received is considerably more than what courts have found suffices to qualify numerous other defamation plaintiffs as limited public figures. And that is especially so here, where Plaintiffs maintain their comments in the *Bloomberg* article were sufficiently significant and controversial that they were the cause of their inclusion in the Dossier. Defs. SUMF ¶ 78.

Plaintiffs' only other response is to engage in hair-splitting, semantic assertions that Gubarev "did not consider [the *Bloomberg* reporter's] request to be political in nature," nor did the reporter "seek from Gubarev concerning the political ramifications of my story." Pl. SUMF ¶¶ 30, 32. Here too, those vague and self-serving declarations of subjective intent are irrelevant. The *Bloomberg* reporter did not ask him to help get a virus off his computer; rather he asked Gubarev to help him with "technical details" about "a great scandal under American election campaign programme." Shayefar Decl. Ex. 44. Mr. Bershidsky further explained to Gubarev that the election "scandal" was about a server registered to the Trump campaign allegedly

engaging in "secret communications with servers of Russian Alpha [*sic*] Bank," so those "technical details" went directly to the heart of the story's accuracy.  *Id.*  Gubarev responded that "our opinion is that the story is a far-fetched f--k".  *Id.*  Gubarev later characterized Plaintiffs' contribution as a "report for Bloomberg about fake news that Trump servers have connections to Alfa bank servers."  Siegel Decl. Ex. 117.

So while no one maintains that Gubarev was asked whether he favored Donald Trump or Hillary Clinton, there is no dispute that Gubarev understood that the "expert opinion" he provided spoke to accuracy of "scandal[ous]" allegations concerning the U.S. presidential election.  Had the plaintiff in *Colodny* written a book analyzing the "technical details" of the infamous 18-minute gap in one of the Watergate-era White House tapes to opine on its cause, he would not have been any less a limited public figure even assuming he was a professional engineer whose subjective interest in the topic was professional rather than partisan.  *See Hatfill*, 532 F.3d at 323 (where "an expert in a field claims defamation when a news publication later suggests he might have committed a crime relevant to that field," the expert has been found to be a public figure).

In sum, the record reflects that Plaintiffs affirmatively involved themselves in multiple public controversies concerning cybersecurity, technology, and the Russian tech sector.  *Dacey v. Fla. Bar, Inc.*, 427 F.2d 1292, 1295 (5th Cir. 1970).

### C.  Plaintiffs' Role in these Public Controversies is Germane to the Allegedly Defamatory Statements

Finally, there is an obvious relationship between a Dossier alleging that Plaintiffs were misusing porn traffic and botnets to aid Russian state interests, and Plaintiffs' prior efforts to publicly legitimize Russian-related "porn traffic, invite comment as experts and thought leaders on 'Russia tech' and cybersecurity, tout themselves as transformative players within the Russian internet sphere, and utilize their expertise to help debunk a major allegation of Russia-Trump collusion."  *See* Defs. Br. at 19-20.  Because Plaintiffs assume that Defendants contend the only relevant controversy is Russian election interference, and their only relevant conduct is what they said to *Bloomberg*, here too their arguments miss the mark.

But even if the election was the only controversy at issue, there is an obvious connection between the allegedly defamatory statements and Plaintiffs' comments to *Bloomberg*.  Plaintiffs' argument seems to be that because Report No. 166 mentions one type of alleged Russian interference (hacking Democrats), and not another (Alfa Bank), its allegations are not "germane"

to Plaintiffs comments to Bloomberg. *Id.* They further contend that "the Dossier as a whole fails to make mention of any such connection" between Trump and Alfa Bank servers. *Id.* at 20.

Plaintiffs are simply wrong, as to both the law and the facts. The "germaneness" requirement is broadly construed, excluding only statements that are "*wholly unrelated* to the controversy." *Waldbaum*, 627 F.2d at 1298. (emphasis added). There need not be a precise, one-to-one match between what the defamatory statements say and what a plaintiff previously said. *See Fine*, 2016 WL 6605107 at *6 ("The law requires only that the statement need be no more than generally related to a dispute in issue to qualify for protection.") (citation omitted); *OAO Alfa Bank*, 387 F. Supp. 2d at 44 (allegations of corruption by two Russian oligarch plaintiffs were germane to the public controversy over corruption in post-Soviet Russia, noting that "[a]t the very least, it can safely be said that these statements are not 'wholly unrelated' to this broader debate"). The Dossier's allegation that Plaintiffs were among the FSB-directed hackers assisting the Trump campaign is obviously relevant to assessing their prior media comments supporting a Trump campaign claim denying cyber-collusion. In fact, the *Bloomberg* article itself related the Trump-Alfa Bank allegation to other allegations of collusion, including the DNC hack, and argued there was no evidence of any collusion. *See* Defs. 56.1 Resp. ¶ 34.

Moreover, even if the third prong were construed as narrowly as Plaintiffs suggest, it would make no difference. One of the reports within the Dossier is entirely about Alfa Bank and its principals. *See* Defs. 56.1 Resp. ¶ 35. As a result, those principals have filed three separate defamation lawsuits against BuzzFeed, Steele, and Fusion GPS. Each one alleges that the Dossier falsely links them to Russian interference in the election. *See* Siegel Resp. Decl. Ex. 9, ¶¶ 2, 31; *id.* Ex. 10, ¶¶ 4, 19, 23; *id.* Ex. 11, ¶¶ 17-18, 22, 27. In short, whether construed broadly or narrowly, the allegedly defamatory allegations in the Dossier are germane to Plaintiffs' involvement in public controversies.

## CONCLUSION

For the reasons above and in Defendants' motion for partial summary judgment, the Court should deny Plaintiffs' motion and find that Plaintiffs are limited-purpose public figures.

Dated:  October 1, 2018

Respectfully submitted,

*Of Counsel*:
Nabiha Syed
BuzzFeed, Inc.
11 E. 18th Street, 13th Floor
New York, NY 10003

/s/ Katherine M. Bolger
Katherine M. Bolger
Nathan Siegel
Adam Lazier
Alison Schary
Davis Wright Tremaine LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
katebolger@dwt.com
nathansiegel@dwt.com
adamlazier@dwt.com
alisonschary@dwt.com

/s/ Roy Black
Roy Black
Jared Lopez
Black, Srebnick, Kornspan & Stumpf, P.A.
201 So. Biscayne Boulevard
Miami, Florida 33131
rblack@royblack.com
jlopez@royblack.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing, together with its exhibits, will be served electronically by email on all counsel or parties of record on the service list below this 1st day of October, 2018.

By: /s/ Jared Lopez

Jared Lopez, Esq.

## SERVICE LIST

Matthew Shayefar
Valentin D. Gurvits
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1806
Facsimile: 617-928-1802
matt@bostonlawgroup.com
vgurvits@bostonlawgroup.com

Evan Fray-Witzer
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-000
Facsimile: 617-423-4855
Evan@CFWLegal.com

Brady J. Cobb
Dylan Fulop
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com
dfulop@cobbeddy.com

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 17-cv-60426-UU**

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.

   Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

   Defendants.

_____/


**DEFENDANTS' OPPOSITION TO PLAINTIFFS' STATEMENT OF UNDISPUTED**
**MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGEMENT**

<div style="margin-left:50%">

DAVIS WRIGHT TREMAINE LLP
Katherine M. Bolger
Nathan Siegel
Adam Lazier
Alison Schary
1251 Avenue of the Americas, 21st Floor
New York, New York 10020

BLACK, SREBNICK, KORNSPAN &
STUMPF, P.A.
Roy Black
Jared Lopez
201 So. Biscayne Boulevard
Miami, Florida 33131

*Of Counsel*:
Nabiha Syed
BuzzFeed, Inc.
11 E. 18th Street, 13th Floor
New York, NY 10003

*Attorneys for Defendants*

</div>

Pursuant to Local Rule 56.1(a), Defendants submit this response to Plaintiffs' Statement of Material Facts in support of Plaintiffs' Motion for Summary Judgment.[1]

1. These facts are undisputed, but not material.

2. These facts are not material, except that Gubarev moved to Cyprus in 2002.

3. Defendants understand this to assert that Webazilla was a "small server company" when it was started by Gubarev in 2005, which is undisputed. The source of capital for Webazilla in 2005 is not material.

4. These facts are undisputed, and Defendants further state that one of the "popular" aspects of its services Webzilla advertised was its "liberal rules." Siegel Decl. Ex. 8 at 1.

5. What Gubarev "considers himself to be," or how he goes about learning the information he imparts to the public, is immaterial. Rather, the undisputed material facts are that Gubarev, both directly and through Plaintiffs' public relations agents, held himself out to the press and public to be an "expert" on computer security. Defs. SUMF ¶¶ 46, 51. He also provided comments to the media about computer security and was contacted by a *Bloomberg* reporter as a "specialist" who could respond to questions concerning computer security (i.e., obtaining the logs of a server one does not own). Bershidsky Decl. ¶ 4; Defs. SUMF ¶¶ 57, 58.

6. What Gubarev "considers himself" is immaterial. Gubarev's self-serving testimony that he does not seek public attention does not create any genuine dispute of fact, because there is overwhelming objective evidence that he actually engaged in conduct to attract public attention, including soliciting and providing media interviews, holding press conferences

---

[1] Defendants filed their own motion for partial summary judgment on September 21, 2018, accompanied by a Statement of Undisputed Material Facts pursuant to Local Rule 56.1, asking this Court to hold that Plaintiffs are limited public figures. In the interest of avoiding repetitive submissions, Defendants respectfully incorporate the contents of that Statement of Undisputed Material Facts in support of their opposition to Plaintiffs' motion and will refer in this submission to paragraphs of that Statement ("Defs. SUMF") and the accompanying exhibits to the Declaration of Nathan Siegel ("Siegel Decl.") filed therewith. Unless otherwise noted, all citations to a paragraph of Defendants' Statement of Undisputed Material Facts include all exhibits cited within that paragraph.

and instructing Plaintiffs' public relations agents to ensure that his name be included in media publications.  *See* Defs. SUMF ¶¶ 36, 38, 40-43, 46, 51-55, 57-61.

7.     That Gubarev is not a politician, public official or has *generally* not "assumed an influential role in society" is immaterial because Defendants do not maintain that he is a public official or general purpose public figure.  Nor are Gubarev's self-proclaimed "wants" and "beliefs" material.  Rather, the undisputed material facts demonstrate that Gubarev was "known" to multiple journalists from influential media who interviewed him, anyone who read or viewed their resulting news reports, a number of notorious cyber-criminals, and key Russian government officials like Mr. Klimenko.  Defs. SUMF ¶¶ 11-18, 35, 36, 38-44, 46, 51-55, 57-61.

8.     Plaintiffs do not define what they mean by their conclusory references to "politics" or "political matters."  The undisputed material facts are that Gubarev interacted with key Russian officials, opined that alleged cyber-collusion between the Trump campaign and Russia's largest bank and Russia's data privacy law was a "far-fetched fuck," and authorized Plaintiffs' PR agents to proactively speak to the press about the Methbot controversy because they understood it could be linked to "the recent controversy over Russian hacking in the U.S. election."  Defs. SUMF ¶¶ 36, 38, 39, 56-61, 69-72; Shayefar Decl. Ex. 44.

9.     Plaintiffs' motives for seeking publicity and recognition are immaterial.

10.    That Plaintiffs' engaged Cutler PR in October 2015 is undisputed.  How they chose that firm is immaterial.

11.    Plaintiffs do not define what they mean by "public relations," so Defendants are unable to respond to that specific term.  The undisputed facts are that prior to engaging Cutler PR, XBT had an in-house department responsible for issuing press releases and responding to press inquiries.  Defs. SUMF ¶¶ 19-22.  XBT also had a "PR manager" and a "marketing manager" at the time it hired Cutler PR.  Siegel Decl. Ex. 38 [Dvas Depo.] at 59:24-60:20; *see also id.* at 118:11-120:11, 122:9-14.  Those responsibilities were subsequently assumed by Cutler PR and KGlobal, among other services they performed.  Siegel Decl. Ex. 38 [Dvas Dep.] at 71:11-19; 148:14-149:3; 172:18-173:7.

12.     Plaintiffs' motive for promoting themselves is immaterial.  Defendants agree that Plaintiffs left it up to Cutler PR to decide what media they would target.

13.     Who took Dvas's photo is immaterial.  In any event, the photo was taken by a professional photographer and was provided to Cutler PR by XBT's marketing department because Cutler requested a better photo than the one Dvas had previously used for business purposes.  Siegel Decl. Ex. 38 [Dvas Dep.] at 88:10-90:13; Response Declaration of Nathan Siegel dated October 1, 2018 ("Siegel Resp. Decl.") Exs. 1, 2.

14.     Plaintiffs' own interpretation of Cutler's approach or motives for seeking media recognition of their senior executives are immaterial.  The document speaks for itself and indicates that Cutler PR proposed to pitch articles that "are not product-specific, and they are not generally profile stories of the company"; instead, they would provide "thought leadership" to position Servers.com "as an expert in the field, adding to your overall credibility."  Shayefar Decl. Ex. 18; *see also* Defs. SUMF ¶¶ 28, 29.

15.     Defendants agree that Cutler PR obtained publicity in *Forbes*, *CNBC.com* and *Inc.*, all business publications in which Plaintiffs had never previously appeared.  Plaintiffs' counsel's opinions that such publicity constitutes "limited exposure" in non-"high-level technology media" are immaterial; to the extent it may be relevant, the Court can take judicial notice that those are "high level" international publications.  Moreover, prior to the Dossier's publication KGlobal succeeded in generating publicity in *VentureBeat*, *Tech Insider*, and other examples of what Plaintiffs call "high level" media.  Defs. SUMF ¶ 55; Siegel Decl. Exs. 72-76.

16.     Defendants do not dispute that Plaintiffs subjectively considered the publicity they obtained from Cutler insufficient and suspended its services because they sought even more "persistent citation level across business media with company news or experts' comments."  Defs. SUMF ¶ 48.

17.     The facts in this paragraph are undisputed.  Plaintiffs' self-proclaimed motives for hiring KGlobal to seek publicity for them are immaterial.

3

18.      Defendants agree that Plaintiffs deferred to KGlobal's advice on the most effective PR strategy.  Plaintiffs' counsel's opinion regarding what are "active steps" is argumentative.  The undisputed material facts are that Plaintiffs authorized KGlobal to undertake numerous actions on their behalf, XBT's senior executives personally received media training from KGlobal, and Gubarev sat for multiple media interviews as a result of KGlobal's efforts.  Defs. SUMF ¶¶ 50-55, 57-60, 69-73, 76.

19.      Defendants agree that KGlobal pitched Gubarev to journalists as stated in Shayefar Exhibits 21 and 22.  Shayefar Exhibit 23 speaks for itself and does not merely "refer to" Gubarev, but "offers further information" from him.  Defendants agree that "many dozens of emails" were sent out, including those in Shayefar Exhibit 24.  Whether Gubarev ever saw the specific emails contained in his deposition exhibit PR-1 (Siegel Decl. Ex. 71), which did not include all the emails in Exhibits 21-24, is immaterial.  Rather, the material, undisputed fact is that Gubarev authorized KGlobal to undertake the PR campaign reflected in the emails, including pitching him as a technology "thought leader" for media interviews.  Shayefar Decl. Ex. 12 [Gub. I Depo.] 243:16-23; Defs. SUMF ¶ 51.

20.      Defendants agree that KGlobal organized an interview for a podcast called "AppMasters."  Defendants also agree that KGlobal organized interviews with *Forbes* and *The Wall Street Journal*, and further note that KGlobal organized other interviews including with *Bloomberg*, *VentureBeat, Business Insider* and *Tech Insider*.  Defs. SUMF ¶ 55.  Plaintiffs described *VentureBeat* in their own Statement of Undisputed Material Facts as an example of "high-level technology media" that Plaintiffs hoped to attract through their PR efforts.  Pl. SUMF ¶ 15.  As of the date the Dossier was published Gubarev had "made it" into most of those publications.  *See* Siegel Decl. Exs. 75, 76, 81.  Others had not yet been published, and there is no evidence that Plaintiffs were ever informed they would *not* be published.  The rest of the assertions in paragraph 20, such as that those publications are "almost all minor" and KGlobal's efforts were "largely unsuccessful," constitute argument that requires no response here.

4

21.    It is not clear what Plaintiffs mean by "picked up."  Multiple press releases issued by Plaintiffs have been "picked up" by other news organizations.  For example, *Yahoo Finance* posted XBT's press release announcing that "Servers.com is expanding into Russia", including that "[t]he move enables XBT to deploy its solutions to the local market in observance of the legal standards of the Russian Federation."  Siegel Resp. Decl. Ex. 3.  The business information website *Crunchbase* "picked up" at least 5 press releases in 2016 alone.  *Id.* Ex. 4.  Plaintiffs' own exhibits indicate that its press releases were picked up and published on the websites of numerous news organizations.  *See, e.g.,* Shayefar Decl. Ex. 41 at P-F000188-195 (listing "reprinted copies of your press release on a wide range of sites across the Web," such as the *Minneapolis Star Tribune, Sacramento Bee* and *LA Daily News*); *id.* at P-F000195-200 (listing where "the headline of your press release was re-printed on a remote site," such as *Yahoo News*, *Google News,* and *Wired*). The remaining assertions about the efficacy of press releases were the "personal opinion[s]" of Mr. Dvas, who testified that his personal views did not reflect company policy or practice because he "didn't share my opinion with my colleagues."  Siegel Decl. Ex. 38 [Dvas Depo.] at 178:7-180:21.

22.    Defendants do not dispute that Plaintiffs briefly terminated KGlobal's services on or about December 15, 2016, for less than one week, because they subjectively  "expect[ed] much more publicity" than they had received.  The undisputed facts about the actual publicity that Plaintiffs both sought and received speak for themselves.  *See* Defs. SUMF ¶¶ 53-61. Plaintiffs' assertion that KGlobal's efforts were "unsuccessful in driving attention to the company" is argument that requires no response.

23.    Defendants agree that Gubarev and his companies have been referenced in the publications contained in Shayefar Exhibits 29-35, among others, which speak for themselves.

24.    Disputed.  The undisputed material facts reflect that Plaintiffs' "public appearances" have *not* been "limited to technology conferences."  Nor has Gubarev "*only* spoken publicly at a handful of small industry conference" (emphasis added).  Those undisputed material facts include:

(a) Gubarev spoke at the Russian Internet Forum in 2016 on the topic of "trends in the infrastructure of the global and Russian internet." Defs. SUMF ¶ 43. According to XBT's marketing director at the time, the Forum was "the biggest Russian internet event" of the year, and Servers.ru was also a sponsor that year. Defs. SUMF ¶ 45; Siegel Decl. Ex. 61; Siegel Decl. Ex. 38 [Dvas Depo.] at 124:2-126:4. German Klimenko, Putin's advisor on internet matters, attended that conference. Gubarev met him there and at several other events in Russia. Defs. SUMF ¶ 44.

(b) Gubarev led a press conference organized by Plaintiffs in Moscow to launch the expansion of their businesses there, which received attention in the Russian media and to which Klimenko was invited. Defs. SUMF ¶¶ 38-40.

(c) Gubarev also attended the 2016 St. Petersburg International Economic Forum ("SPIEC"), Russia's leading international economic conference. XBT's marketing director lobbied Klimenko in an effort to try to secure Gubarev an opportunity to speak about "cyber-security" there. Defs. SUMF ¶¶ 46-47; Siegel Decl. Ex. 38 [Dvas Depo.] at 127:10-19.

(d) For many years Gubarev and other executives publicly appeared at, and Webzilla sponsored, the AWMOpen Conferences dedicated to the adult webmaster industry. Defs. SUMF ¶¶ 4-7. Twice Webzilla was honored with the award for "Best Hosting Company of the Year" given by the AWMOpen Conference, and its Chief Technology Officer gave acceptance speeches there. Shayefar Decl. Ex. 37 [Bezruchenko Depo.] at 17:16-20:7.

25.    Defendants agree that XBT companies won these awards. Plaintiffs' characterization of these awards as "minor" is argument that requires no response.

26.    Defendants agree that Webzilla was a sponsor of an industry conference for adult webmasters called AWMOpen. Defendants agree it is literally accurate that the AWMOpen conferences were "operated by a company that Gubarev invested in" and refer to

the record's more fulsome explanation of how those conferences were operated by Gubarev and his "team."[2]  That Gubarev's wife also attended the conferences is not material.[3]

27.     Defendants agree that XBT companies had over the years issued press releases, though all that have been produced indicate that started in approximately 2012.  Defs. SUMF ¶ 19.  The content of those releases speak for themselves.  The data attached by Plaintiffs indicate a steady increase in the attention their press releases received.  A release in early 2014 received 175 views.  Shayefar Decl. Ex. 27.  By contrast, two press releases in 2016 received 2151 and 2897 views respectively.  Shayefar Decl. Ex. 41 at P-F000202.

28.     These facts are undisputed.  Gubarev also specifically requested that his personal name be included in articles on the topic of Prisma, in addition to the name of

---

[2] *See* Siegel Decl. Ex. 3 [Gub. I Depo] at 102:6-104:7 (Gubarev testified that the website AWMOpen.com, which published information about the adult conferences, is owned and operated by his Dutch company); *id.* at 134:3-24 (Gubarev admitted that "the team on the Adult Webmasters Open . . . worked for me."); *id.* at 74:1-7 ("My team was organizing it [the 2008 AWMOpen Conference in Thailand]); *id.* at 92:12-25 ("I own this company" that organizes the AWMOpen conferences).  *See also id.* at 120:1-121:4 (when asked if he was aware that conference sponsor McColo was involved in child pornography and crime, Gubarev testified "If I was aware of that, I will not take him as a – the team would not take him as a sponsor."); *id.* at 94:6-18, 97:21-98:12 (Gubarev acknowledged that online Adult Conference brochures stated that the "Organizer of AWMOpen [is] Alex Z" and "AWMOpen is organized by Alex XE" referred to himself, but maintained they were not technically correct because "it was a team of people organize[d] it"); *id.* at 93:19-94:4, 104:8-107:22  (Gubarev acknowledged that Pavel Vrublesky's "Crutop" forum was a sponsor of AWMOpen, which Gubarev said meant that "they just publish about our event and what it is"); *id.* at 116:25-117:16 (when asked if he dealt with cyber-criminal Nikolai McColo in connection with sponsoring conferences, Gubarev testified, "I can't remember if me or my manager.  I remember something about this."); *id.* at 130:6-11 ("Q:  Why were there so many criminal sponsors to your [AWMOpen] program?  A:  What's illegal here? … How can we know that they do something wrong?").  *See also* Siegel Resp. Decl. Ex. 5 [Bezruchenko Depo.] at 308:12-309:4 (describing Webzilla employee who was also "doing some work for Aleksej, as far as I remember, for … AWM Open").

[3] Plaintiffs appear to refer to Gubarev's wife and children to imply that the Adult Conferences were not about promoting the hard-core pornography online industry, i.e. "porn traffic." However, because Plaintiffs do not go so far as to assert that as a fact, Defendants will not submit further documentary and photographic evidence, beyond that already in the record, which would make clear that any such assertion would be indisputably false.

Servers.com.  Siegel Decl. Ex. 139.  Gubarev's self-proclaimed motives for talking to a *Bloomberg* reporter are immaterial.

29.     Defendants agree that following Mr. Gubarev's comments to *Bloomberg*, on November 1, 2016 the reporter emailed Mr. Gubarev to ask "a question of you as a specialist" concerning a *Slate* story that the reporter described as "a great scandal under American election campaign programme."  Shayefar Decl. Ex. 44.  The reporter "knew him to be the CEO of XBT Holding."  Bershidsky Decl. at ¶ 4.  Although the reporter merely indicated he wanted Gubarev to help him "sort out technical details," Gubarev voluntarily responded with an "expert conclusion" that "our opinion is that the story was [a] far-fetched f--k," supported by two pages of annotated comments on the *Slate* story.  Shayefar Decl. Ex. 44.  Defendants agree that, to their knowledge, prior to this contact Gubarev had not commented specifically on alleged Trump-Russia connections, though Gubarev had publicly commented on controversial Russian policies concerning control of the internet.  Defs. SUMF ¶¶ 32-36.

30.     At the time that Gubarev provided those comments to *Bloomberg*, he understood that his comments were "related to politic[s]" and that "it's a very political article."  Siegel Decl. Ex. 86 [Gub. II Depo.] at 46:10-20; 53:17-54:7.  Gubarev reiterated his understanding after the Dossier was published; the next day he internally described his comments to *Bloomberg* as a "report for Bloomberg about fake news that Trump servers have connections to Alfa Bank servers."  Siegel Decl. Ex. 117.  *See also id.* Ex. 120 (Gubarev told Dutch newspaper *De Volkskrant* that as a result of his comments to *Bloomberg*, "I'll never talk about politics again").  The "expert conclusion" Plaintiffs provided to *Bloomberg* speaks for itself.  Gubarev and Bershidsky's additional characterizations of their motives are immaterial.

31.     These facts are undisputed, though Gubarev represented to the reporter that the opinion was coming equally from himself.  *See* Shayefar Decl. Ex. 44 ("I found data, writing you expert conclusion for you with one of my colleagues").  It is also undisputed that Gubarev asked the reporter to write an additional article about a new business venture of his, called Haxus, that was not related to XBT.  Siegel Decl. Ex. 86 [Gub. II Depo.] at 35:16-36:14, 37:10-18.

32.     Mr. Bershidsky's affidavit speaks for itself.  Regardless of what Gubarev's own political views may have been, the affidavit is consistent with Gubarev's testimony that "it's a very political article" and that Gubarev's technical opinions were "related to politics." Siegel Decl. Ex. 86 [Gub. II Depo.] at 46:10-20; 53:17-54:7.

33.     The *Bloomberg* article and reference to Mr. Gubarev therein speaks for itself. The "single technical issue" about which Gubarev's comments were summarized went to the heart of the truth of the allegations of collusion which Mr. Bershidsky claimed to "debunk[]."

34.     Defendants agree that the words "Democratic National Committee" or "hacking of the same" do not appear within the four corners of the actual text of the *Bloomberg* article. However, to the extent that Plaintiffs' assertion that the article "does not make any reference whatsoever" to either is intended to mean anything more than that, it is indisputably false.  As the article's headline makes clear ("Clinton Plugs *Another* Weak Story About Trump's Ties to Putin"), its broad thesis was that the specific allegations concerning Trump and Alfa Bank were just the latest example of Hillary Clinton "straining to link Trump to Putin when no solid link has been found after months of digging by reporters and federal agents."  Shayefar Decl. Ex. 6. So the article expressed the opinion that "[p]erhaps it's time for her to desist" entirely because there was no evidence of any collusion between Trump and Putin of any kind.  *Id.*  Further, the article made clear that the "other weak stories about Trump's ties to Putin" that it set out to debunk included the allegations that the DNC hack resulted from collusion.  The article began by hyperlinking to two press reports.  The first was an op-ed piece in *The Washington Post*, which referred to the Alfa Bank allegations as merely one example of a broad body of evidence "that Donald Trump and/or those around him have some highly peculiar connections to Russia that would pose a danger to the United States."  Siegel Resp. Decl. Ex. 6.  Among the other examples discussed was "the Russian hacking of the [Democratic National Committee] and John Podesta's email."  *Id.*  The second report to which *Bloomberg* hyperlinked was the October 31 *Slate* story, which described the investigation into a possible Alfa Bank-Trump connection as a follow-up to the findings "that Russian hackers had infiltrated the servers of the

Democratic National Committee, an attack persuasively detailed by the respected cybersecurity firm CrowdStrike."  Siegel Decl. Ex. 85.

35.     This fact is undisputed, in that neither the Dossier nor the Article refers specifically to a server issue, and not material.  If material, Report No. 112 in the Dossier discussed in detail the relationship among Alfa Bank, its founders, and President Putin, as did the *Slate* story that Mr. Bershidsky's article set out to rebut.  Shayefar Decl. Ex. 11 (Dossier) at P-D000045-46.  Report No. 112 is also referenced in the BuzzFeed article accompanying the Dossier, which pointed out that report's misspelling of Alfa Bank as "Alpha Bank." *Id.* Ex. 45.

36.     Undisputed.

37.     Undisputed.

38.     Undisputed, though not material.

39.     Undisputed, though not material.

40.     Undisputed, though not material.

41.     Undisputed, though note material.

42.     Undisputed, though not material.

43.     Undisputed, though not material.

44.     It is undisputed that Mr. Ferrante had not heard of XBT Holding or Webzilla prior to being engaged by BuzzFeed, though that is not material.  It is also undisputed, though not material, that Mr. Ferrante had previously heard of Gubarev "as an individual" from media reports and that he could not recall what those reports were about.  Shayefar Decl. Ex. 50 [Ferrante Depo.] at 16:9-17:2.

Dated:  October 1, 2018                    Respectfully submitted,

*Of Counsel*:                              /s/ Katherine M. Bolger
Nabiha Syed                                Katherine M. Bolger
BuzzFeed, Inc.                             Nathan Siegel
11 E. 18th Street, 13th Floor              Adam Lazier
New York, NY 10003                         Alison Schary
                                           Davis Wright Tremaine LLP

1251 Avenue of the Americas, 21st Floor
New York, New York 10020
katebolger@dwt.com
nathansiegel@dwt.com
adamlazier@dwt.com
alisonschary@dwt.com

<u>/s/ Roy Black</u>
Roy Black
Jared Lopez
Black, Srebnick, Kornspan & Stumpf, P.A.
201 So. Biscayne Boulevard
Miami, Florida 33131
rblack@royblack.com
jlopez@royblack.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing, together with its exhibits, will be served electronically by email on all counsel or parties of record on the service list below this 1st day of October, 2018.

By: /s/ Jared Lopez
Jared Lopez, Esq.

## SERVICE LIST

Matthew Shayefar
Valentin D. Gurvits
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1806
Facsimile: 617-928-1802
matt@bostonlawgroup.com
vgurvits@bostonlawgroup.com

Evan Fray-Witzer
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-000
Facsimile: 617-423-4855
Evan@CFWLegal.com

Brady J. Cobb
Dylan Fulop
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com
dfulop@cobbeddy.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No: 1:17-cv-60426-UU

ALEKSEJ GUBAREV, *et al.*,

      Plaintiffs,

v.

BUZZFEED, INC., *et al.*,

      Defendants.

_____/

## DECLARATION OF NATHAN SIEGEL IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I, Nathan Siegel, pursuant to 29 U.S.C. § 1746, hereby declare as follows:

1.     I am a partner at the law firm of Davis Wright Tremaine LLP, counsel for Defendants BuzzFeed, Inc. and Ben Smith in the above-captioned proceeding.

2.     I make this declaration in order to annex exhibits relied upon in Defendants' Memorandum of Law in opposition to Plaintiff's Motion for Summary Judgment.

3.     Annexed hereto as **Exhibit 1** is a true and correct copy of Exhibit 20 to the Deposition of Nikolay Dvas.

4.     Annexed hereto as **Exhibit 2** is a true and correct copy of Exhibit 21 to the Deposition of Nikolay Dvas.

5.     Annexed hereto as **Exhibit 3** is a true and correct copy of XBT's September 25, 2015 press release printed from the website at https://finance.yahoo.com/news/servers-com-expanding-russia-050000657.html.

6.     Annexed hereto as **Exhibit 4** is a true and correct copy of the CrunchBase entry for Servers.com, printed from the website at https://www.crunchbase.com/organization/servers-com#section-recent-news-activity.

7.     Attached hereto as **Exhibit 5** is a true and correct copy of relevant excerpts from the transcript of the May 3, 2018 deposition of Konstyantyn Bezruchenko.

8.     Attached hereto as **Exhibit 6** is a true and correct copy of a November 1, 2016 op-ed by Jennifer Rubin for the *Washinton Post*, printed from the website at https://www.washingtonpost.com/blogs/right-turn/wp/2016/11/01/trumps-putin-problem-returns-in-a-big-way.

9.     Attached hereto as **Exhibit 7** is a true and correct copy of a September 21, 2018 article by Kevin G. Hall for *McClatchy*, printed from the website at https://www.mcclatchydc.com/latest-news/article218740565.html.

10.     Attached hereto as **Exhibit 8** is a true and correct copy of relevant excerpts from the transcript of the August 30, 2018 Rule 30(b)(6) Deposition of Fusion GPS.

11.     Attached hereto as **Exhibit 9** is a true and correct copy of the complaint filed April 16, 2018 in the case of *Fridman et al. v. Orbis Business Intelligence Ltd. et ano.*, No. 2018 CA 002667 B (D.C. Super.).

12.     Attached hereto as **Exhibit 10** is a true and correct copy of the complaint filed October 3, 2017 in the case of *Fridman et al. v Bean LLC a/k/a/ Fusion GPS et ano.*, No. 17-cv-02041 (D.D.C.).

13.     Attached hereto as **Exhibit 11** is a true and correct copy of the complaint filed May 26, 2017 in the case of *Fridman et al. v. BuzzFeed, Inc. et al.*, Index No. 154895/2017 (Sup. Ct. N.Y. Cnty.).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 1, 2018 in Washington, District of Columbia.

Nathan Siegel