**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 17-cv-60426-UU**

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.

   Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

   Defendants.
_____/

**DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF ERIC COLE AND
INCORPORATED MEMORANDUM OF LAW**

                                     DAVIS WRIGHT TREMAINE LLP
                                     Katherine M. Bolger
                                     Nathan Siegel
                                     Adam Lazier
                                     Alison Schary
                                     1251 Avenue of the Americas, 21st Floor
                                     New York, New York 10020

                                     BLACK, SREBNICK, KORNSPAN &
                                     STUMPF, P.A.
                                     Roy Black
                                     Jared Lopez
                                     201 So. Biscayne Boulevard
                                     Miami, Florida 33131

                                     *Attorneys for Defendants*

Pursuant to Fed. R. Evid. 702, Defendants BuzzFeed, Inc. and Ben Smith move for an order excluding the testimony of Dr. Eric Cole, Plaintiffs' purported technical expert.

## PRELIMINARY STATEMENT

This Court should exclude Dr. Eric Cole's evidence because it is unreliable and baseless.  While Plaintiffs purport to offer Dr. Cole's testimony in rebuttal to that of Defendants' technical expert Anthony Ferrante, in fact his conclusions go far beyond rebuttal – and far beyond the facts.  Instead, although Dr. Cole admits that he did nothing more than read the Mr. Ferrante's report (the "Ferrante Report") and its exhibits, he purports to opine on the truth of the alleged defamatory statement and the meaning of the words contained therein.  Those opinions should be excluded as unreliable and unhelpful to the jury.  And, indeed, even Dr. Cole's criticism of the Ferrante Report should be excluded, because it too is baseless.  Other than reading the report, Dr. Cole made no effort to test or confirm Mr. Ferrante's findings before asserting that his report "lacks accuracy," that his technical analysis is "misleading," and that his conclusions are "completely false." In addition, Dr. Cole made no effort to learn anything whatsoever about Plaintiffs and, consequently, did not know that many of his criticisms of Mr. Ferrante's work were based on either his misunderstanding of the Plaintiffs or the Plaintiffs' failure to keep the data he chides Mr. Ferrante for not reviewing.  For these reasons, this Court should strike Dr. Cole's report and preclude his testimony at trial.

## FACTUAL BACKGROUND

### A.   The Allegations In the Dossier

As the Court knows, this lawsuit arises out of BuzzFeed's January 10, 2017 publication of the document widely known as the "Dossier," along with an accompanying article.  In particular, Plaintiffs complain about a paragraph on the last page of the Dossier that reads:

> [REDACTED] reported that over the period March-September 2016 a company called XBT/Webzilla and its affiliates have been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct "altering operations" against the Democratic Party leadership.  Entities linked to one Alexei GUBAROV [sic.] were involved and he and another hacking expert, both recruited under duress by the FSB, Seva KAPSUGOVICH, were significant players in this operations.

### B.   The Ferrante Report

On May 25, 2018, Defendants served an expert report from Anthony J. Ferrante, a Senior Managing Director and Global Head of Cybersecurity at FTI Consulting, Inc.  Ex. 1 (Ferrante

Report, without exhibits).  In the report, Ferrante reached several conclusions.  Most relevant here, he concluded that technical evidence suggests that Russian cyber espionage groups used infrastructure operated by subsidiaries of Plaintiff XBT Holdings, Inc. to conduct malicious cyberattacks on the Democratic Party leadership (the "Democratic Hack").  In particular, Mr. Ferrante concluded that:

    a) The "spear-phishing" email that duped Hillary Clinton campaign chairman John Podesta into disclosing his email password used a camouflaged hyperlink (a "bitlink") generated through the service Bitly.  Using data disclosed by Bitly (the "Bitly Data"), Ferrante determined that the same Bitly user account that generated the malicious bitlink sent to Podesta generated another spearphishing bitlink – also apparently targeted at Podesta, with "the same phishing signatures" – using an IP address owned by XBT subsidiary Root S.A.  *Id.* at 12-14;

    b) The Democratic National Committee's cybersecurity firm, Crowdstrike, publicly disclosed seven command-and-control IP addresses and five "malware hashes" (malicious software programs) as "indicators of compromise" that it had determined were used by Russian cyber-espionage group FANCY BEAR in the Democratic Hack.  Ferrante determined that two of these command-and-control IP addresses shared an encrypted Secure Socket Layer Certificate with a Root S.A. IP address (the "SSL Certificate").  *Id.* at 14-15;

    c) The Department of Homeland Security and the FBI released a Joint Analysis Report codenamed GRIZZLY STEPPE in December 2016, which identified indicators of compromise associated with Russian perpetrators of malicious online activity. Ferrante determined that 13 IP addresses identified in GRIZZLY STEPPE were owned by Root S.A.  *Id.* at 15-16.  In addition, Ferrante noted that, although Root S.A. had received abuse notifications indicating suspicious activity related to these IP addresses before the GRIZZLY STEPPE report and questions from the Luxembourg authorities after the report's release, Root S.A. did little or nothing to investigate the malicious activity occurring on its infrastructure.  *Id.* at 16-17.  "Based on industry experience," Ferrante concluded, "it would be highly unusual not to conduct an investigation into infrastructure components noted in government reports as

propagating malicious activity, if the operators were concerned about running a lawful, legitimate service." *Id*. at 17.

Ferrante also found technical evidence suggesting that Plaintiffs' infrastructure had been used by Russian state actors and other malicious cyber-actors in the past for large-scale cyber-attacks. *Id*. at 17-28. Finally, Ferrante concluded based on depositions and documents produced in this case that "XBT does not have an adequate enterprise infrastructure monitoring process in place or a formally defined procedure to investigate abuse notifications, which allows their infrastructure to be used without fear of repercussions." *Id*. at 7, 28.

### C. The Cole Report

In response to the Ferrante Report, on July 6, 2018, Plaintiffs served a report from Dr. Eric Cole. Ex. 2. Although Dr. Cole admitted during his deposition that the only analysis he undertook was reading Mr. Ferrante's report and doing some quick internet research, Ex. 3 at 12:1-17:15; 35:11-36:8, he claims to be a "technical expert" for Plaintiffs. Ex. 2 ¶ 1.

Dr. Cole reached several conclusions in his report. First, Dr. Cole concluded that the Ferrante Report "lacks accuracy and forensic soundness and does not provide any supporting evidence to back the statements made by the defendants" in the Dossier. *Id*. ¶ 19. He stated that the apparent role played by XBT IP addresses in cybercrime "is true for every ISP and is not unique to XBT/Webzilla," and that "[i]t is therefore false and defamatory for Buzzfeed to make a blanket statement that the plaintiffs are using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct 'altering operations' against the Democratic Party leadership." *Id*. ¶ 41.

Dr. Cole also questioned Ferrante's findings related to Plaintiffs' security procedures, arguing that "Mr. Ferrante fails to provide any of the depositions, communications, or any other factual information to support this claim." *Id*. ¶ 37.

Finally, Dr. Cole repeatedly concluded that "the defendants had no factual information or proof to support the claims made against the plaintiffs" in the Dossier and that the claims about Plaintiffs in the Dossier have "no factual backing, are unfounded, and there is no supporting evidence that backs this or any other claims." *See, e.g., id*. ¶ 18. He accordingly concluded that "it is therefore false and defamatory for Buzzfeed to make a blanket statement that the plaintiffs are using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct 'altering operations' against the Democratic Party leadership." *Id*. ¶ 41.

3

### D. The Cole Deposition

At his deposition on August 29, 2018, as discussed more fully below, Dr. Cole testified that the only basis he had for reaching any of these conclusions was his review of the Ferrante and its exhibits and some quick internet research. *See, e.g.*, Ex. 3 at 12:1-17:15; 35:11-36:8.

## ARGUMENT

Dr. Cole's evidence utterly fails to satisfy the requirement that expert evidence be "properly grounded, well-reasoned, and not speculative before it can be admitted." *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004). Because Dr. Cole did not conduct any independent investigation or analysis of the issues on which he purports to provide his expert opinion and instead simply offers speculation, his proposed evidence fails to satisfy the requirement of reliability set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and subsequent cases. And by purporting to give evidence on the meaning of the words at issue and reasonableness of BuzzFeed's journalistic practices, Dr. Cole steps far outside his supposed expertise. This Court should therefore strike his report and preclude him from testifying at trial.

### A. The Standard

The admission of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. *See Daubert*, 509 U.S. 579. The Eleventh Circuit had adopted a "rigorous" three-part test to determine whether expert evidence is admissible: (a) the expert must be "qualified to testify competently regarding the matters he intends to address"; (b) the expert's methodology must be "sufficiently reliable"; and (c) the testimony must "assist[] the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Frazier*, 387 F.3d at 1260 (citation omitted). The party offering the expert testimony has the burden of proving its admissibility. *Id.* at 1265.

Under the *Daubert* standard, the trial court is to "act as 'gatekeeper[]'" and admit only reliable evidence. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (citing *Daubert*, 509 U.S. at 589). In applying the gatekeeping function, courts must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). The bottom line is that "it remains a basic foundation for admissibility that proposed expert testimony must be supported by appropriate validation – *i.e.*, good grounds, based on what is known." *Frazier*, 387 F.3d at 1261

(quoting *Daubert*, 509 U.S. at 590) (internal quotation marks and alterations omitted).  The "court's gatekeeping function requires more than simply taking the expert's word for it."  *Id*. (internal quotation marks and citation omitted)

Because "an opinion has a significance proportioned to the sources that sustain it," *Martinez v. Rabbit Tanaka Corp.*, 2006 WL 5100536, at *14 (S.D. Fla. Jan. 6, 2006) (internal quotation marks and citation omitted), courts recognize that an expert's evidence is unreliable where "it bears an insufficient relationship to the underlying data," *Legg v. Voice Media Grp., Inc.*, 2014 WL 1767097, at *5 (S.D. Fla. May 2, 2014), or "when the only connection between the conclusion and the existing data is the expert's own assertions."  *McDowell v. Brown*, 392 F.3d 1283, 1300 (11th Cir. 2000).  It follows that "an expert opinion that … is not based upon any independent investigation or testing … does not meet Rule 702's criteria of showing that the proposed testimony is based upon sufficient facts or data."  *Fla. Power & Light Co. v. Qualified Contractors, Inc.*, 2005 WL 5955702, at *3 (S.D. Fla. Dec. 6, 2005); *see also, e.g.*, *Estate of Marin-Torres v. Gamo Outdoor USA*, 2016 WL 4051318, at *4 (S.D. Fla. May 4, 2016) (excluding most of expert's opinion because expert "has very little actual knowledge or understanding about how this incident actually occurred" and "conducted no analysis" on the relevant subject).  In this case, Dr. Cole did no investigation or testing sufficient to render his opinion reliable.

**B.     Dr. Cole's Evidence Should Be Excluded**

Dr. Cole's report and proposed testimony is unreliable and should be excluded in its entirety because it is based on Dr. Cole's unsupported (and often demonstrably inaccurate) assumptions and speculation, rather than the sort of evidence and independent analysis required by *Daubert* and the Federal Rules of Evidence.  In particular, far from providing any basis for his opinions, Dr. Cole acknowledged at his deposition that he failed to conduct *any* independent investigation into the allegations in the Dossier.  Ex. 3 at 62:3-12 ("My assignment was to look solely at Mr. Ferrante's report and not perform separate analysis.").  He admitted that his report was based on nothing more than his review of the Ferrante Report and its exhibits, and some quick internet research.  *Id*. at 12:1-17:15; 35:11-36:8.  In fact, he testified that he "did not perform any other analysis outside of Mr. Ferrante's report," *id*. at 42:8-43:2, and "was not tasked and did not perform any analysis of XBT."  *Id.* at 97:24-98:5.  He did not review any documents produced in this case that were not attached to the Ferrante Report, *id.* at 12:1-13:6,

5

never spoke to Gubarev, *id*. at 13:23-25, did not review any deposition testimony, *id*. at 13:16-20, never visited any XBT facilities or inspected any of their systems or system logs, *id.* at 13:7-11; 14:1-4, did not undertake any forensic analysis, *id.* at 17:5-15, did not repeat or replicate any of the technical analysis in the Ferrante Report, *id.* at 50:17-51:5; 116:23-117:13, and does not even know what services XBT offers its clients. *Id*. at 21:24-25:3. Dr. Cole also "did no independent research at all to establish the truth or falsity of the statements in the dossier." *Id.* at 42:8-43:2. These concessions on their own render Dr. Cole's opinions and testimony unreliable and this Court should therefore exclude them.

Dr. Cole advances four separate opinions in his report: (a) that the Dossier's allegations about Plaintiffs are "false"; (b) that the Dossier is defamatory and should be interpreted as accusing Plaintiffs of actively participating in the hack of Democratic Party leadership; (c) that the Ferrante report is inaccurate and misleading; and (d) that BuzzFeed should have known the Dossier's allegations about Plaintiffs were inaccurate, or done more to verify them before publishing. Because none of these opinions satisfy *Daubert*'s threshold requirements for admissibility, this Court should exclude Dr. Cole's report and evidence in their entirety.

1. <u>Dr. Cole's Conclusion That The Dossier is "False" Should Be Excluded</u>

To begin with, this Court should strike Dr. Cole's conclusions that the statement about Plaintiffs in the Dossier is false as unreliable. Dr. Cole's report concludes unequivocally at least four times that that the Dossier's allegations about XBT, Webzilla, and Gubarev are "false" or "unfounded." Ex. 2 ¶¶ 1, 19, 41, 59. This was baseless speculation on his part, and Dr. Cole admitted as much at his deposition:

> Q: As you sit here today, do you think that you have conducted a sufficient analysis to opine on whether XBT Holdings deployed botnets or distributed pornography with virus payloads to the Democratic Party?
>
> A: That is not what I was asked to do. That was not my assignment. My assignment was to look solely at Mr. Ferrante's report, so, no, that was not the tasking. I could do that, but that is not what I was asked to perform in this case… If you're looking for a different scope, where you're saying that I independently, outside of Mr. Ferrante, performed my own forensic analysis, that was not the scope, and I did not perform that work.

Ex. 3 at 119:8-120:7; *see also id.* at 36:9-41:11; 118:9-123:6.

This is evidently nothing new for Dr. Cole; this Court has criticized him for it in the past. In *National Union Fire Insurance Co. of Pittsburgh v. Tyco Integrated Security, LLC*, 2015 WL

6

11251759 (S.D. Fla. July 6, 2015), a case arising out of a data breach, Dr. Cole was proffered as a cybersecurity expert but also offered an opinion that the confidential information at issue was used in a subsequent burglary. The Court excluded his opinion on the burglary because Dr. Cole "admitted that his opinion in this respect was not based on his own knowledge or assessment" or "any independent investigation of the facts on his behalf." *Id*. at *8. It held that "it is evident that Dr. Cole lacks the knowledge necessary to opine on how the burglars were able to access the Enfield Facility and any opinion in this regard is speculative and lacks foundation. Dr. Cole is offered as a cybersecurity expert, not as an investigator with knowledge of the underlying facts." *Id*. Here, too, Dr. Cole admits that he is "not an investigator with knowledge of the underlying facts" and "lacks the knowledge necessary to opine" on whether the allegations in the Dossier are true or false, because he did absolutely nothing to investigate the allegations reported in the Dossier. He just tried to poke holes in Mr. Ferrante's report. As a consequence, his conclusion that the allegations in the Dossier are false is speculative, lacks foundation, and must be excluded.

In fact, the back half of Dr. Cole's report confirms the speculative nature of his "conclusions" regarding the truth or falsity of the Dossier. In the report, Dr. Cole sets up the straw man argument that Mr. Ferrante opined that the statements in the Dossier were true and then, in paragraphs 52-57, proceeds to say why that conclusion was unreliable. In fact, Mr. Ferrante reached no such conclusion about the Dossier – while he concluded that "[t]echnical evidence suggests that FANCY BEAR used XBT infrastructure to support malicious spear phishing campaigns against the Democratic Party leadership," he specifically noted that "more data from CrowdStrike and/or the DNC is required to determine" if XBT infrastructure supported the Democratic hack. *See* Ex. 1 at 12, 15.

Only Dr. Cole opined on the truth of the statements in the Dossier, then. But Dr. Cole admitted at his deposition that he did none of the things he himself says are necessary to assess the truth or falsity of the Dossier's allegations. Ex. 3 at 112:3-123:6. This alone should render his claims to know that the Dossier was false inadmissible. Remarkably, Dr. Cole did not even know that many of the steps he describes as necessary were, in fact, impossible. For example, he criticizes Mr. Ferrante for not reviewing XBT's server logs, Ex. 2 ¶¶ 50-56, but he never even bothered to ask whether XBT keeps those logs. Ex. 3 at 115:2-116:6. In fact, XBT's Chief Technology Officer testified that many of them no longer exist. *See* Ex. 4 at 169:16-173:8.

7

There is no basis for Dr. Cole to conclude that the Dossier is false. His opinion and testimony on this point should therefore be excluded.

2. <u>Dr. Cole's Opinions About the Meaning of the Dossier Should Be Excluded</u>

At various points in the opinion, Dr. Cole opines that the statements in the Dossier are defamatory, or gives his views on what the Dossier's allegations about Plaintiffs mean. *See, e.g.*, Ex. 2 ¶¶ 37, 41, 53-54, 59. Those opinions should also be excluded because members of the jury are perfectly capable of interpreting the Dossier for themselves. In addition to ensuring that expert evidence is reliable, a court should exclude expert evidence that would not "assist[] the trier of fact." *Frazier*, 387 F.3d at 1260  This means that "expert testimony 'is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves,'" or where the evidence "amounts to nothing more than [the expert] reciting arguments … counsel can argue in summation." *In re BankAtlantic Bancorp, Inc. Secs. Litig.*, 2010 WL 6363027, at *3, *7-8 (S.D. Fla. Sept. 9, 2010) (Ungaro, J.). An expert's opinion should also be excluded where "[i]t is simply his opinion of what he would do if he were a juror considering the facts which need no interpretation by an 'expert.'" *United States v. Masferrer*, 367 F. Supp. 2d 1365, 1378 (S.D. Fla. 2005).

Because juries are capable of interpreting the words at issue in a defamation case for themselves, expert evidence on the meaning of allegedly-defamatory words is generally inadmissible. In *Seropian v. Forman*, 652 So. 2d 490 (Fla. 4th DCA 1995), for instance, the court held that the trial court's admission of a political science expert's testimony on the meaning of words like "influence peddling" constituted "highly prejudicial error," because "[i]f *influence peddling* conveyed the obloquy that plaintiffs suggest, that fact should be readily understood by the ordinary jury without a political scientist swearing that it does." *Id*. at 497-98. Federal courts have reached the same conclusion. *See McCabe v. Rattiner*, 814 F.2d 839, 843 (1st Cir. 1987) (affirming trial judge's exclusion of expert testimony on meaning of "scam" because it "would not 'assist the trier of fact'"); *Tilton v. Capital Cities/ABC, Inc.*, 938 F. Supp. 751, 753 (N.D. Okla. 1995) (excluding expert evidence from linguist on meaning of words because "the jury is clearly capable of determining what the average viewer from a one time viewing understood as expressed or implied by the *PrimeTime Live* broadcasts in regard to Plaintiff."), *aff'd*, 95 F.3d 32 (10th Cir. 1996).

8

But Dr. Cole does not hesitate to offer his opinion on what the words at issue mean. His report discusses the meaning of the Dossier at length, repeatedly describing it as "defamatory," Ex. 2 ¶¶ 41, 59, and even purporting to define certain words in it. *See* Ex. 2 ¶¶ 53-54 ("Buzzfeed definitively printed 'XBT/Webzilla and its affiliates had been **using** botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct 'altering operations' against the Democratic Party leadership'[.] 'Using' means active action and/or application that is verifiable.'") (emphasis in original); *id*. ¶ 56 ("The term 'plant bugs' typically refers to the covert or illegal installation of a physical listening device in a home or office and is not a term used when referring to digital operations which is regularly referred to as 'spyware'").

These were much more than a few throw-away lines in the report. In fact, Dr. Cole admitted that what he himself calls the "key point" of his report – that the Ferrante Report contains "no supporting evidence to back up [its] claims," *id*. ¶ 56 – rests entirely on his interpretation of the meaning of the Dossier:

> Q: It says, "Assuming for the sake of argument, that [everything in the Ferrante report was] true." Then you say, "There is still no supporting evidence to back up these claims." Well, in this portion of the report, Mr. Ferrante talks about an IP address that was found on the CrowdStrike report that's linked to the SSL certificate. He refers to Exhibit 6 of the report, which is the printout that describes the SSL certificate. What other evidence were you looking for?
> …
> A: So here, [Ferrante] is saying that out of 40 IP addresses, one is owned by Root S.A. that's registered to XBT. To me, that's not any supporting evidence at all that – that XBT and its affiliates had been using botnets, porn traffic to transmit viruses, et cetera, that statement. So, to me, he is going in, and, yes one of the 40 was owned, but that is not supporting evidence to prove the fundamental statement that's at question in this case.
>
> Q: That's because the way you construe the fundamental question at issue in this case is that XBT itself undertook the bad acts? Correct?
>
> A: I'm taking the statement on face value.

Ex. 3 at 124:15-125:25.

This Court should apply well-established law and exclude this evidence. The jury is perfectly capable of deciding for itself what the allegations in the Dossier mean – indeed, if the Dossier conveys "the obloquy that plaintiffs suggest, that fact should be readily understood by the ordinary jury without [a cybersecurity expert] swearing that it does." *Seropian*, 652 So. 2d at

9

497. Dr. Cole's views on the meaning of the words, and his opinions premised on them, should therefore be excluded as unhelpful to the trier of fact.

### 3. Dr. Cole's Criticism of The Ferrante Report Should Be Excluded

Dr. Cole's opinion that the Ferrante Report "lacks accuracy and forensic soundness and does not provide any supporting evidence to back the statements made by the defendants," Ex. 2 ¶ 19, should also be excluded as unreliable. This is so for at least four reasons.

*First*, Dr. Cole's report is not admissible because it misconstrues the very opinion it purports to rebut. *See, e.g.*, *Tuscumbia City Sch. Sys. v. Pharmacia Corp.*, 2014 WL 12605648, at *1 (N.D. Ala. Sept. 3, 2014) (rebuttal expert report is restricted to addressing "the specific contentions made by the other party's experts"); *In re Polyurethane Foam Antitrust Litig.*, 2014 WL 6461355, at *46 (N.D. Ohio Nov. 17, 2014) (rejecting expert testimony for being based on a "straw man fallacy"). Instead of responding to Mr. Ferrante's actual findings, Dr. Cole puts words in his mouth and then criticizes him for "failing to provide any foundation" for the things he never said.

Dr. Cole challenges the Ferrante Report as failing to provide "definitive evidence or proof" of the literal truth of the allegedly defamatory statements about the Plaintiffs in the Dossier. Ex. 2 ¶ 20. But that's not what the Ferrante Report was doing, and it is not Defendants' obligation in this case. Mr. Ferrante never claimed to have established a direct link between Plaintiffs and the specific cyberattacks described in the Dossier – in fact, he candidly acknowledged that "more data from Crowdstrike and/or the DNC is required to determine" if XBT infrastructure supported the Democratic hack. Ex. 1 at 16. Instead, Mr. Ferrante described evidence from which a jury would be entitled to draw an inference that Plaintiffs have failed to meet their burden of proving the statements at issue to be substantially false, including technical connections between XBT infrastructure and Russian state-sponsored hackers, the use of XBT's infrastructure to stage a phishing attempt aimed at stealing John Podesta's emails, the inclusion of XBT-linked IP addresses in a U.S. government report identifying "Indicators of Compromise" associated with Russian state-sponsored hackers, the repeated appearance of XBT infrastructure in major cyberattacks in recent years, and XBT's suspicious behavior in response to government inquiries about the role of its infrastructure in Russia's meddling in the 2016 election. Dr. Cole's argument that the Ferrante Report does not definitively prove the Dossier to be true, or that there are other potential explanations (however unlikely) for Mr. Ferrante's findings, therefore misses

the point. Because Dr. Cole's report misconstrues Mr. Ferrante's evidence, it cannot be admissible to rebut it.

*Second*, Dr. Cole challenges Mr. Ferrante's technical analysis of the Bitly Data and the SSL Certificates, claiming that the Ferrante Report "lacks accuracy in the form of misleading technical information," and that Mr. Ferrante's conclusions are "completely false, because he failed to provide any technical evidence." Ex. 2 ¶¶ 58-59. But Dr. Cole's strong language is belied by his admission that he failed to examine the Bitly Data or SSL Certificates for himself, or to replicate any of Ferrante's technical analysis. Ex. 3 at 131:18-133:4; *see also id.* at 15:1-17:9; 33:14-43:11; 50:12-51:5. Because Dr. Cole has no way to know whether, as Mr. Ferrante claims, both sets of data connect XBT-owned IP addresses with Russian interference in the 2016 election, his suggestion that Ferrante's technical analysis is "misleading" is nothing more than his *ipse dixit*. It is exactly the sort of "analysis," conducted without even looking at the underlying system or data, that courts routinely reject as speculative and unreliable. *See, e.g.*, *Mohamed v. Am. Motor Co.*, 2017 WL 4310757, at *3-4 (S.D. Fla. Sept. 28, 2017) (excluding expert's evidence about computer platform used to send text messages because expert "did not test, review, or inspect the actual platform or system before rendering his opinion"); *Legg*, 2014 WL 1767097, at *5 (opinion was unreliable where the expert's opinion was based only on description of defendant's systems in its client handbook); *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006) ("To qualify as an expert on software, an expert should, at a minimum, examine the product and software upon which the expert bases his opinion."); *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 425-29 (S.D.N.Y. 2009) (striking expert opinion about capabilities of defendants' computer systems where expert "did not conduct any independent examination of Defendants' system or servers, but merely accepted what Defendant Reynolds told him about his system.").

*Third*, Dr. Cole's primary attack on the Ferrante Report is that Mr. Ferrante's conclusions about the use of the XBT infrastructure would be true of any internet service provider (ISP) in the world. Ex. 2 ¶¶ 22, 23. Much of his analysis is based on comparing XBT to its competitors, arguing that even if "XBT and its affiliated web hosting companies have provided gateways to the Internet for cybercriminals and Russian state sponsored actors to launch and control large scale malware campaigns over the past decade…. [T]his is true for every ISP and is not unique to XBT/Webzilla." *Id.* ¶ 42; *see also, e.g.*, *id.* ¶ 24 (discussing "XBT and other similar service

11

providers"); *id*. ¶¶ 43-47; *id*. ¶ 59. But Dr. Cole's comparisons of XBT to competitors are meaningless because, as he admitted at his deposition, he does not know what services XBT offers (he did not even bother to read the portion of XBT's website describing those services), or who its competitors actually are. Ex. 3 at 20:8-24:19. Similarly, in an effort to defend XBT's practices, he claims that XBT "transmit[s] over 500Gbit/s of data (equivalent of 13+ DVD disks) per second," Ex. 2 ¶ 24, and that it "ENABLES the successful transmission of millions of legitimate emails and files every day," *id*. ¶ 41 – but he cites no source for this information, and none of it appears in the sources he says he reviewed. Having done no independent analysis of XBT or the services it offers, he appears to have just made it up. Finally, despite basing much of his analysis on the assumption that XBT is an internet service provider, Dr. Cole does not even know how much of XBT's business is made up of internet service provision. Ex. 3 at 107:17-19. He therefore has no basis even to identify "competitors" of XBT, much less to conclude that XBT is or is not the same as those "competitors."

*Fourth*, Dr. Cole chides Mr. Ferrante for "fail[ing] to provide any of the depositions, communications, or any other factual information" to support his claim that "XBT did not have an adequate enterprise infrastructure monitoring process." Ex. 2 ¶¶ 37, 59. This is an odd claim to make, since the Ferrante Report contains a detailed breakdown of the evidence supporting Mr. Ferrante's claim that XBT and Root S.A. "do not actively prevent the use of their infrastructure to support malicious cyber activity." Ex. 1 at 28-31, accompanied by 21 footnotes referring to specific deposition testimony of XBT's Chief Technology Officer and Root S.A.'s Chief Executive Officer. *Id*. When asked about this at his deposition, Dr. Cole claimed that Mr. Ferrante's mistake was to cite "depositions of the executives," rather than testimony from XBT's "chief security officer or the security manager or the security engineer." Ex. 3 at 89:2-91:5. But he acknowledged that he has no idea whether such a person exists, *id.* at 91:6-10, and Plaintiffs have never identified anyone in those jobs. In fact, XBT's Chief Technology Officer – the very executive on whom Mr. Ferrante's opinion relied – testified that he (and not one of the hypothetical people invented by Dr. Cole) was "directly responsible for network security and monitoring." Ex. 4 at 179:21-23. And Dr. Cole admitted that, despite deriding Mr. Ferrante's conclusions about XBT's security procedures, he actually does not "have any knowledge as to whether they had good security procedures in place." Ex. 3 at 99:8-17.

12

The Federal Rules of Evidence require that if an expert witness "is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261 (citing advisory committee's note to 2000 amendments).  Dr. Cole has done none of that here.  Instead of offering facts in support of his criticisms of the Ferrante Report, at every turn his analysis relies on speculation and even sheer imagination.  His opinions about the Ferrante Report should therefore be excluded as unreliable.

4. Dr. Cole's Opinions on Journalism Standards Should Be Stricken

Finally, Dr. Cole wanders even further outside his expertise when he purports to offer an opinion on the standards of BuzzFeed's journalism, writing in his report that BuzzFeed "would be expected to know or at least verify" whether the term "plant bugs" referred to physical recording devices before publishing the Dossier.  Ex. 2 ¶ 56.  He snidely characterizes this as a "novice-level inaccuracy."  *Id*.

Even if an expert is qualified in one area, his or her evidence is inadmissible if it goes beyond that expertise.  *See, e.g.*, *In re Trasylol Prods. Liab. Litig.*, 2010 WL 1489793, at *8 (S.D. Fla. Feb. 24, 2010) (excluding doctor's opinions on pharmaceutical company's ethics); *see also Frazier*, 387 F.3d at 1260 (expert must be qualified "regarding the matters he intends to address.").  Here, of course, there is no reason whatsoever to believe Dr. Cole is qualified to opine on journalism.  He has not been proffered as a journalism expert and does not present himself as one – and, based on his CV, has no relevant experience evaluating journalism.  Ex. 5.  Nor does Dr. Cole, who has not reviewed any of the deposition transcripts and knows nothing about BuzzFeed's investigation into the Dossier, have any factual basis for offering an opinion on what BuzzFeed "would be expected" to know or do before publication, or to characterize its work as "novice-level" – whatever exactly that means.  And Plaintiffs certainly cannot use Dr. Cole's "rebuttal" report to make up for their failure to find a real journalism expert.  *See In re Air Crash Disaster*, 86 F.3d 498, 528 (6th Cir. 1988) ("The district court correctly decided that Northwest could not circumvent [restrictions on its expert evidence-in-chief] merely by sticking the label 'rebuttal' on a neglected part of its affirmative case.").

Dr. Cole's opinions on BuzzFeed's journalism should therefore be excluded.

13

## CONCLUSION

For all these reasons, Defendants request that the Court strike the expert report of Dr. Eric Cole and exclude his testimony at trial.

Dated:  October 15, 2018                    Respectfully submitted,

/s/ Katherine M. Bolger
Katherine M. Bolger
Nathan Siegel
Adam Lazier
Alison Schary
Davis Wright Tremaine LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
katebolger@dwt.com
nathansiegel@dwt.com
adamlazier@dwt.com
alisonschary@dwt.com

/s/ Roy Black
Roy Black
Jared Lopez
Black, Srebnick, Kornspan & Stumpf, P.A.
201 So. Biscayne Boulevard
Miami, Florida 33131
rblack@royblack.com
jlopez@royblack.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing, together with its exhibits, will be served electronically by email on all counsel or parties of record on the service list below this 15th day of October, 2018.

By: /s/ Jared Lopez
Jared Lopez, Esq.

## SERVICE LIST

Matthew Shayefar
Valentin D. Gurvits
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1806
Facsimile: 617-928-1802
matt@bostonlawgroup.com
vgurvits@bostonlawgroup.com

Evan Fray-Witzer
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-000
Facsimile: 617-423-4855
Evan@CFWLegal.com

Brady J. Cobb
Dylan Fulop
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com
dfulop@cobbeddy.com

4813-7461-5928v.4 0100812-000009