# EXHIBIT 3

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF FLORIDA

3                        - - -

4

5
-----------------------------x
6                              :
ALEKSEJ GUBAREV, XBT HOLDING  :
7  S.A., and WEBZILLA, INC.,    :
                               :
8             Plaintiffs,   : Case No.
         vs.                : 1:17-cv-60426-UU
9                              :
BUZZFEED, INC. and BEN SMITH, :
10                              :
             Defendants.    :
11 -----------------------------x

12

13    VIDEOTAPED DEPOSITION UNDER ORAL EXAMINATION OF

14                     ERIC COLE

15                 August 29, 2018

16                 Washington, D.C.

17

18

19

20

21

22

23

24 REPORTED BY:  MICHELE E. EDDY, RPR, CRR, CLR

25 JOB NO. 244332

1          Transcript of the deposition of ERIC COLE,

2    called for Oral Examination in the above-captioned

3    matter, said deposition taken pursuant to District

4    Rules of Practice and Procedure, by and before MICHELE

5    E. EDDY, a Certified Realtime Reporter, a Registered

6    Professional Reporter, and a Notary Public for the

7    District of Columbia, held at the offices of Davis

8    Wright Tremaine LLP, 1919 Pennsylvania Avenue,

9    Northwest, Suite 800, Washington, D.C., commencing at

10   10:04 a.m.

11                          - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              A P P E A R A N C E S

2

3    ON BEHALF OF THE PLAINTIFFS:

4              EVAN FRAY-WITZER, ESQUIRE

5              Ciampa Fray-Witzer, LLP

6              20 Park Plaza, Suite 505

7              Boston, Massachusetts 02116

8              (617) 426-0000

9              Evan@CFWLegal.com

10

11   ON BEHALF OF THE DEFENDANTS:

12             KATHERINE M. BOLGER, ESQUIRE

13             ALISON SCHARY, ESQUIRE

14             DAVIS WRIGHT TREMAINE LLP

15             1251 Avenue of the Americas

16             New York, New York  10020

17             (212) 489-8230

18             kate.bolger@dwt.com

19             alisonschary@dwt.com

20

21   ALSO PRESENT:

22             Kim Johnson, Videographer

23

24

25

1                    EXAMINATION INDEX

2

3    TESTIMONY OF ERIC COLE                          PAGE

4    EXAMINATION BY MS. BOLGER                          5

5

6

7

8

9                    E X H I B I T S

10            (Attached to the Transcript)

11   DEPOSITION EXHIBIT                              PAGE

12   Exhibit 1  Expert Report of Dr. Eric Cole        14

13   Exhibit 2  Expert Report of Anthony J. Ferrante  45

14   Exhibit 3  Expert Report of Dr. Eric Cole in     52

15              the matter of National Union Fire

16              Insurance versus Tyco

17

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S

 2                  August 29, 2018

 3                  Washington, D.C.

 4                       - - -

 5          THE VIDEOGRAPHER:  Here begins media

 6   number 1 in the video-recorded deposition of Eric

 7   Cole, taken in the matter of Aleksej Gubarev, et

 8   al. versus BuzzFeed, et al., in the U.S. District

 9   Court of Southern Florida, Case Number

10   17-cv-60426.

11          Today's date is August 29th, 2018.  The

12   time is 10:05.  This deposition is being held at

13   1919 Pennsylvania Avenue, Washington, D.C.  The

14   court reporter is Michele Eddy, the video camera

15   operator is Kim Johnson, both on behalf of U.S.

16   Legal Support.

17          Will counsel please introduce yourselves

18   and state whom you represent.

19          MS. BOLGER:  Sure.  Kate Bolger on

20   behalf of the defendants, and along with me is

21   Alison Schary.

22          MR. FRAY-WITZER:  Evan Fray-Witzer for

23   the plaintiffs.

24          THE VIDEOGRAPHER:  Will the court

25   reporter please swear the witness.
```

1                          - - -

2                    ERIC B. COLE, Ph.D.,

3   having been duly sworn, testified as follows:

4          EXAMINATION BY COUNSEL FOR DEFENDANTS

5   BY MS. BOLGER:

6       Q    Hi, Dr. Cole.  As I said, I am Kate

7   Bolger, and I represent the defendants.  I know

8   you've been deposed before so I won't waste too

9   much time on ground rules.  I will tell you,

10  though, that I do speak very quickly.  I'm a New

11  Yorker.  It's habit.  Feel free to slow me down if

12  I get too quick.

13          So what did you do to prepare for

14  today's deposition?

15      A    To prepare for today's deposition, I

16  reread my report, I reread the report of

17  Mr. Ferrante, I read the indictment, and I read

18  the deposition transcript of Mr. Ferrante.  And

19  then I also met with counsel.

20      Q    Great.

21          And by "the indictment," do you mean the

22  Mueller indictment of the 12 Russian nationals?

23      A    That is correct.

24      Q    When you met with Mr. Fray-Witzer -- was

25  it Mr. Fray-Witzer?

 1        A    Yes, it was.

 2        Q    Great.

 3             When you met with Mr. Fray-Witzer, did

 4   he provide you with any additional documents?

 5        A    No, he did not.

 6        Q    Great.

 7             You are here today as an expert witness

 8   on behalf of the plaintiffs.  Correct?

 9        A    That is correct.

10        Q    Great.

11             What was the scope of your assignment

12   for the plaintiffs?

13        A    The scope of my assignment was to review

14   the Mr. Ferrante report and provide my feedback

15   and analysis on the work that he performed.

16        Q    That was the whole scope of your

17   assignment.

18        A    Yes, that was.

19        Q    So you were not retained, then, to

20   investigate the truth or falsity of the

21   allegations contained in what has been referred to

22   as the "Steele dossier."  Correct?

23        A    Other than its relevance to the

24   Mr. Ferrante report, that is correct.

25        Q    Okay.  So you're aware that this lawsuit

1   is about, essentially, one paragraph in the

2   dossier.  Correct?

3        A    That is my understanding.

4        Q    And were you retained to investigate the

5   truth of that one paragraph of the dossier?

6        A    I was brought on to put -- look at that

7   paragraph in context of the Mr. Ferrante report to

8   see if Mr. Ferrante actually proved valid evidence

9   that that was a true statement or not.

10       Q    Okay.  But other than assessing

11  Mr. Ferrante's report, you did no additional

12  investigation into that paragraph.  Correct?

13       A    That is correct.

14       Q    Okay.  What documents did the plaintiffs

15  provide you with to draft your expert report?

16       A    Initially, it was -- I believe it's

17  referred to as the "December memo," which has the

18  paragraph that you reference, and then

19  Mr. Ferrante's report.

20       Q    Okay.  Were you provided with the

21  dossier as a whole?

22       A    No, I was not.

23       Q    Okay.  Have you ever read the dossier as

24  a whole?

25       A    No, I did not.

1      Q    Do you know what it's about?

2      A    I believe, in general, it's about the

3  Russians and the DNC, based on the context of that

4  one paragraph.

5      Q    Incidentally, in your opinion, did

6  Russian state actors launch malicious cyber

7  attacks against the DNC?

8           MR. FRAY-WITZER:  Objection.  You can

9  answer.

10     A    I did not perform that analysis.  That

11 would be a separate tasking that I would have to

12 perform.

13     Q    Right.  But you're a human being who

14 lives in the world.

15          In your opinion, did Russian state

16 actors launch a malicious cyber attack against

17 Democratic Party leadership?

18          MR. FRAY-WITZER:  Objection.  You can

19 answer.

20     A    Once again, I take analysis very

21 seriously.  I did not research, perform enough

22 in-depth to be able to form an opinion on that.

23     Q    Have you read The New York Times?

24          MR. FRAY-WITZER:  Objection.

25     A    No.

1        Q    Have you read The Washington Post

2   articles about the alleged Russian state actors'

3   attack on the Democratic National Party

4   leadership?

5        A    My background is cybersecurity.  So I

6   have done some analysis on the technical

7   feasibility of performing attacks and the overall

8   security and vulnerabilities but did not do enough

9   research to form an actual opinion of who actually

10  performed what attacks.

11       Q    My question was actually have you ever

12  read a Washington Post article about the Russian

13  state attacks on the Democratic National Party

14  leadership?

15            MR. FRAY-WITZER:  Objection.  You can

16  answer.

17       A    I do not believe so.  I read a lot.  So

18  I would have to go back and sort of check to see

19  what I actually did read or didn't read.

20       Q    Have you read any article ever about the

21  Republicans -- sorry.  That was a Freudian slip.

22            Have you ever read any articles --

23  strike that, please.

24            Have you ever read any articles about

25  Russian state actor attacks -- malicious cyber

1  attacks on Democratic Party leadership?

2      A     I track cybersecurity news.  So, yes,

3  because they were cyber attacks.  I don't remember

4  if they were TV, if they were radio, or if they

5  were print.  But I do remember seeing articles and

6  information about the Russians, and I have

7  performed some interviews on the technical nature

8  of those attacks.

9      Q     Okay.  What have you said about the

10  technical nature of those attacks?

11     A     Basically focused on the dangers of

12  phishing attacks, where if somebody sends an

13  email, you're one click away from a compromise.

14  So basically warning people that you have to be

15  careful, if an email looks legitimate, to make

16  sure what you click on.  Also going over the

17  nature of how a server can be compromised with

18  open ports and vulnerabilities.

19     Q     You gave those interviews about phishing

20  because, in fact, Russian state actors phished

21  John Podesta.  Correct?

22          MR. FRAY-WITZER:  Objection.  You can

23  answer.

24     A     I know phishing was one of the

25  components that was used in the attacks.

1       Q    You said initially the plaintiffs

2    provided you with a copy of one portion of the

3    dossier, correct, what the plaintiffs call the

4    December memo.  Correct?

5       A    Correct, that one paragraph.

6       Q    What else did they provide you?

7       A    Mr. Ferrante's report.

8       Q    Anything else?

9       A    No.

10      Q    I'm going to ask Michele to mark as

11   Exhibit 1 --

12      A    To --

13      Q    -- a copy of your report.

14           Oh, sorry, yes, Dr. Cole.

15      A    Just so we're clear, that was what they

16   were initially provided --

17      Q    Okay.

18      A    -- and then after I submitted my report,

19   I then was provided a copy of the Mueller

20   indictment and the deposition of Mr. Ferrante

21   after my report was submitted.  I just wanted to

22   make sure that was accurate.

23      Q    That's fine.  And that's everything

24   you've been provided, correct, by the plaintiffs?

25      A    Yes.

1        Q     Okay.

2              So did you -- you never received any

3    emails, internal emails from XBT or anything like

4    that to review in preparing for -- in preparing

5    your report?

6        A     That is correct.

7        Q     And you never received any logs from XBT

8    or Webzilla in preparing your report?

9        A     That is correct.  That was outside the

10   scope of my assignment, which was to focus on

11   Mr. Ferrante's report.

12       Q     Great.

13             You saw the exhibits to Mr. Ferrante's

14   report.  Correct?

15       A     Yes, I did.

16       Q     Did you ever see any testimony from any

17   XBT or Webzilla employees in preparing your

18   report?

19       A     Once again, the focus was on

20   Mr. Ferrante's report.  So, no, I did not.

21       Q     Did you ever speak to Mr. Gubarev about

22   Mr. -- sorry, strike that.

23             Did you ever speak to Mr. Gubarev in

24   preparing your report?

25       A     No, I did not.

1      Q    Okay.  Did you ever travel to any XBT

2   facility in preparing your report?

3      A    Once again, that was not the scope of my

4   assignment, but, no, I did not.

5      Q    Okay.  Great.

6           I'm going to ask Michele to mark as

7   Exhibit 1 your report in this matter.  I'm sure

8   you have this.  I'm just going to have a standing

9   apology for throwing things.

10          (Exhibit 1 was marked for identification

11   and attached to the deposition transcript.)

12   BY MS. BOLGER:

13      Q    Mr. Cole, am I correct?  Is this your

14   report in this matter?

15      A    Yes, this looks like a copy of my

16   report.

17      Q    Great.

18          If you turn to page 1, Dr. Cole, you'll

19   see it refers -- the very first line of the very

20   first page says, "I, Dr. Eric B. Cole, have been

21   retained as a technical expert on behalf of the

22   plaintiffs."

23          Do you see that?

24      A    Yes, I do.

25      Q    Great.

1          What technical work did you do in

2    preparing the report?

3      A    Reviewed Mr. Ferrante's report to verify

4    and validate the technical accuracy of his

5    analysis and the technical accuracy of the claims

6    that were made in Mr. Ferrante's report.

7      Q    What did you do to verify the technical

8    accuracy?

9      A    I looked for his statement, and then I

10   looked for evidence or things that would back up

11   any of the claims.  I would look at the

12   references, and I would use my experience and

13   expert opinion to validate whether that was true

14   or not.

15     Q    What do you mean by you would use your

16   experience?  What would you do?  In other words,

17   would you read Mr. Ferrante's report and then read

18   something else, or would you undertake some other

19   activity?

20     A    Depending on which portion.  So in some

21   portions where Mr. Ferrante made a claim, I would

22   look to see is there supporting evidence to back

23   that claim.  I would look up the referenced

24   evidence that Mr. Ferrante stated to say, does it

25   back the claim that he's trying to make.  And then

1    in some cases I would use -- when he talks about

2    IP addresses, I would use my technical

3    understanding of what an IP address is, how that

4    works, what does that mean, and how does it work

5    in the Internet as a whole in communication

6    systems to be able to form my analysis.

7        Q    Okay.  In undertaking that exercise, did

8    you ever use any documentation other than the

9    exhibits to Mr. Ferrante's report?

10       A    I believe there were a few exhibits that

11   that I've referenced in my report that I've

12   utilized, I think in one case, to show that

13   hosting providers do get compromised and do get

14   attacked.  So I did use some external references

15   that are listed in my report.

16       Q    Are you referring to the two articles

17   that are excerpted in your report?

18       A    That would be correct.

19       Q    Other than the two articles that are

20   excerpted in your report and the one exhibit that

21   you attached to your report, did you look at

22   anything other than the exhibits to Mr. Ferrante's

23   report in making your technical analysis?

24       A    No.  My assignment was to look at

25   Mr. Ferrante's report and the evidence.  So that

1   was my focus.  And then all my opinions, analysis,

2   and any references or techniques that were used

3   are contained in my report.

4        Q    Okay.  Fantastic.

5             Did you ever undertake any forensic

6   analysis in preparing the report?

7             MR. FRAY-WITZER:  Objection.  You can

8   answer.

9        A    Once again, my focus was on

10  Mr. Ferrante's report.  So, no, I did not.  If he

11  performed detailed forensic analysis, I probably

12  would have performed some to validate and back it.

13  But my tasking and assignment in this case was to

14  focus on reviewing and analyzing Mr. Ferrante's

15  report.

16       Q    So that's a no.  Right?

17       A    On the forensic analysis, correct.

18       Q    Okay.  What does XBT do?

19       A    They are a hosting provider.

20       Q    What does that mean?

21       A    That means they host servers for other

22  companies, other entities, and other websites that

23  want to have presence on the Internet.

24       Q    What does Webzilla do?

25       A    My understanding is Webzilla also hosts

1   content and is a hosting provider run by the owner

2   of XBT.

3       Q    Okay.  Where did you come to have that

4   understanding as to what they do?

5       A    Just based on some initial conversations

6   on this case with counsel, looking at

7   Mr. Ferrante's report and understanding the

8   general issues that are in question in this case.

9       Q    Okay.

10           Is it your contention that Webzilla and

11  XBT are ISPs?

12      A    I would probably consider them, from my

13  understanding, as more hosting providers, but in

14  doing that, they do have connectivity to the

15  Internet, and they do provide Internet access to

16  their customers.

17      Q    Who do you think their competitors are?

18           MR. FRAY-WITZER:  Objection.  You can

19  answer.

20      A    That was outside the scope of my

21  analysis.  I didn't perform a competitive

22  analysis.

23      Q    One of the arguments in your expert

24  opinion, in your expert report, just to

25  paraphrase -- I'm sure you'll correct me if I'm

1   wrong -- is that the kinds of statements

2   Mr. Ferrante makes about XBT could be made about

3   any number of other companies.  Correct?

4       A    Could you show me the exact section of

5   the report to make sure we have it correct?

6       Q    No.  You can -- you can answer my

7   question.  You don't need to see the exact

8   question.

9            The point is, your report says this

10  could have happened to any other -- a host of

11  other companies.  Correct?

12           MR. FRAY-WITZER:  Objection.  You can

13  answer.

14      A    Once again, I could look at my report.

15  You're asking me for specifics in my report, and I

16  don't have it memorized.

17      Q    I'm asking you, in your expert opinion,

18  isn't one of the flaws that you think

19  Mr. Ferrante's report has is that the statements

20  he makes about XBT could be said of other

21  companies?

22           MR. FRAY-WITZER:  Objection.  You can

23  answer.

24      A    That is true.  And some of the analysis,

25  for example, some of the references Mr. Ferrante

 1   uses in those references, when I look them up, is

 2   also true of Google, Amazon, and other large

 3   companies.

 4        Q    Okay.  What types of companies?

 5        A    Other companies that provide content on

 6   the Internet that host web servers that provide

 7   web content.

 8        Q    Which of those web servers -- which of

 9   those companies do you understand to be

10   competitors of Webzilla and XBT?

11             MR. FRAY-WITZER:  Objection.  You can

12   answer.

13        A    Once again, I -- I can tell you with

14   knowing how the Internet works, knowing how

15   hosting providers work and operate, and the fact

16   that they're just providing content, and the

17   amount of traffic that monitoring would not be

18   possible, that those claims could be made of

19   anyone who's hosting other companies and the

20   companies listed in the report.  Like I said, I

21   didn't do a competitive analysis, and I didn't

22   need to do a competitive analysis in order to come

23   up with those statements.

24        Q    There's a difference between a content

25   provider and a web hoster, a hosting company.

1   Correct?

2       A    There are some differences.

3       Q    Which one is -- are the plaintiffs in

4   this case that you are an expert on behalf of?

5   Are they more like web hosting companies, are they

6   more like content providers?  Who would you say --

7   where do they fit in that spectrum?

8            MR. FRAY-WITZER:  Objection.  You can

9   answer.

10      A    I'm sorry, I missed the question.  Are

11  you asking about the plaintiffs?

12      Q    I'm asking -- in your answer to my

13  question, you referenced content providers and web

14  hosting companies, and you sort of lumped them all

15  together.  And I'm asking you, there's a

16  difference between a content provider, an ISP, and

17  a hosting company.  Right?  There's differences

18  between those.  Correct?

19      A    There are some differences, yes.

20      Q    Sure.  So what are the plaintiffs?  Into

21  which bucket do the plaintiffs fit?

22      A    I would put them mainly under a hosting

23  provider.

24      Q    Do you know what services they provide

25  to their customers?

 1      A     Not a specific breakdown, no.

 2      Q     Do you know if they provide servers, for

 3   example?

 4      A     I believe that in hosting, they provide

 5   servers and Internet access for their customers.

 6      Q     Do you know if they have managed

 7   servers?

 8      A     Once again, outside the scope.  I was

 9   looking at Mr. Ferrante's report, the claims he

10   made, and then performing that analysis.  I didn't

11   do a detailed --

12      Q     So that's a no.

13      A     I didn't do a detailed analysis of XBT's

14   business model.

15      Q     So that's a no, right, to my question?

16   My question was, do you know if they provide

17   managed servers.  The answer to that question is

18   no.  Correct?

19      A     Once again, I know they're a hosting

20   provider.  So it would not surprise me if they

21   provide managed services or other things because

22   those are all related service offerings.

23      Q     Do you know if they provide colocation

24   services?

25      A     Once again, it wouldn't surprise me if

1    they did, but it wouldn't change my answer or my

2    analysis.

3        Q    But you don't know.  Correct?

4        A    It wasn't relevant to my analysis.

5        Q    So you don't know.  Correct?

6        A    I don't know specifically the business

7    model of XBT.

8        Q    Okay.  Do you know how many servers XBT

9    owns?

10       A    Once again, a detailed analysis of XBT

11   was outside my scope, and that was not relevant to

12   my analysis.  So I do not know.

13       Q    Do you know whether they own data

14   centers?

15       A    Once again, it wouldn't surprise me if

16   they did, based on their business, but a detailed

17   analysis of XBT's business model was outside the

18   scope, and it wasn't needed for me to perform my

19   analysis.  So I am not sure of the specific

20   details of XBT.

21       Q    Well, I got this information by looking

22   them up on the Internet.  Did you do that,

23   Dr. Cole?

24       A    I went to their website just to get a

25   general idea of the companies, but I didn't

1  perform a detailed analysis of their business

2  model.

3      Q    Well, I've read the website.  That's how

4  I know that information, Dr. Cole.  Did you read

5  the whole website?

6      A    Once again, that analysis wasn't needed

7  for me to be able to.  So, no, I did not do a

8  detailed analysis of XBT's business model.

9      Q    Do you consider reading a website to be

10  a detailed analysis?

11      A    It depends on what my assignment was.

12  If my assignment was to research XBT, understand

13  their service offerings, then, yes, I would go

14  through their website, and I would do a lot of

15  other analysis.  My assignment was to look at

16  Mr. Ferrante's report and perform an analysis,

17  and, in order to do that, I did not need to

18  perform a detailed analysis of XBT or go through

19  all their service offerings on their website.

20      Q    I mean, don't you want to know who hired

21  you, Dr. Cole?

22          MR. FRAY-WITZER:  Objection.  You can

23  answer.

24      A    Once again, I know the high level of the

25  case.  I know who hired me, XBT.  But, once again,

1   my assignment was not to go through and look at

2   all the service offerings of XBT.  If that was my

3   assignment, I definitely would have done that.

4        Q    Do you know how many ASNs XBT and its

5   affiliates control?

6        A    Once again, outside the scope of my

7   analysis.  So I do not know.

8        Q    Just for the record, because we should

9   define terms like that, what is an ASN?

10       A    An Autonomous System.  So that's

11  basically a subgrouping of IP addresses that are

12  typically assigned to an entity or a group or a

13  company.

14       Q    And the idea is -- you'll correct me if

15  this is technically inaccurate.  For this part of

16  the deposition, I'm just trying to get us to agree

17  on terms, okay?  So the idea is that if you

18  control an ASN, you have the ability to announce

19  and unannounce IP addresses, correct, within your

20  ASN?

21       A    At a high level, yes.

22       Q    We only need it to be high level,

23  Dr. Cole.

24       A    Okay.

25       Q    I went to law school.  But we all want

 1  to -- I just want to agree that an ASN -- so if

 2  XBT controls an ASN, that means XBT announces and

 3  withdraws IP addresses on that ASN.  Correct?

 4      A    If they are assigned that subnet of IP

 5  addresses.

 6      Q    Okay.  And no one else but XBT can

 7  assign or withdraw IP addresses within the ASNs

 8  they control.  Correct?

 9          MR. FRAY-WITZER:  Objection.  You can

10  answer.

11      A    In general, that's true.  They could

12  potentially give management or sublease out those,

13  but, in general, if you're assigned an ASN, you're

14  responsible for that.

15      Q    Okay.  Just to follow up on that

16  question, it would have to be XBT that assigned

17  those to someone else.  Correct?

18      A    So if an ASN was assigned to XBT, yes,

19  XBT would then have to reassign those to somebody

20  else.

21      Q    What I'm trying to have us, if possible,

22  agree on is that XBT controls the IP addresses

23  within the subnet, the ASN that they are

24  controlling.  Correct?

25      A    Yes.  They're responsible for managing

 1  those IP addresses.

 2      Q    Great.

 3           Okay.  If you would, please, turn to

 4  page 4 of your report.

 5           Oh, I'm sorry.  Dr. Cole, you and I have

 6  a bone of contention.  The page numbers are not --

 7  there are no page numbers on this report, sir.

 8      A    I was just going to --

 9      Q    I would like to speak to you sternly

10  about that, but if you -- if you wouldn't mind

11  counting to 4, you'll find paragraph 18 is where

12  I'm headed.

13      A    Is this page 1 or this page?

14      Q    It is not, I'm sorry.

15      A    So this page 1?

16      Q    Yes, sir.

17      A    Okay.  Two, three, four.

18      Q    You're on -- it's paragraph 18 that I

19  was hoping you would look at.

20      A    Perfect.

21      Q    Great.

22           So you'll see, which is the first in the

23  section of the report entitled, "Summary of

24  Opinions," and the second sentence in paragraph

25  18 --

1      A      Just one moment.  Could I grab my

2  reading glasses quick?

3      Q      Of course you can.

4      A      I thought I had them in my pocket, and I

5  forgot.

6              MS. BOLGER:  Why don't we go off the

7  record to let you do that.

8              THE VIDEOGRAPHER:  Off the record at

9  10:28.

10              (Discussion off the record.)

11              THE VIDEOGRAPHER:  Back on the record at

12  10:28.

13  BY MS. BOLGER:

14      Q      Great.

15              So I was directing you to the second

16  sentence in paragraph 18, which says, "It is my

17  opinion that defendants had no factual information

18  or proof to support the claims made against the

19  plaintiffs.  The claims made include the

20  statement, "A company called XBT/Webzilla and its

21  affiliates have been using botnets and porn

22  traffic to transmit viruses, plant bugs, steal

23  data, and conduct 'altering operations against

24  Democratic Party leadership."  I'll stop there

25  because that's the part I want you to focus on.

1           Do you see that?

2      A    Yes, I do.

3      Q    Okay.

4           What is the basis for your statement

5   that "the defendants had no factual information or

6   proof to support the claims made against the

7   plaintiffs"?

8      A    That was Mr. Ferrante's report.  So I

9   basically went through Mr. Ferrante's report in

10  which he made those claims, and then I looked at

11  his arguments and I looked at the information he

12  provided and did not see any factual data to

13  support that.  In many cases, which are

14  highlighted in my report, he made very

15  inconclusive statements saying, we don't know for

16  sure, we're not for sure, and really didn't

17  provide any factual information to support this

18  specific statement.

19     Q    Mr. Ferrante is not a defendant in this

20  action.  Correct?  You'll agree with me on that.

21     A    Correct.  He's the expert for your side.

22     Q    Great.

23          So it says, "It is my opinion that

24  defendants had no factual information."  Correct?

25          What infor- -- what is the basis for

1   your opinion that the defendants, as distinct from

2   Mr. Ferrante, had no factual information or proof

3   to support the claims made against the plaintiffs?

4           MR. FRAY-WITZER:  Objection.  You can

5   answer.

6       A    That statement was based on Mr. Ferrante

7   was hired by the defendants, Mr. Ferrante

8   performed the analysis for the defendants, and I

9   was provided Mr. Ferrante's report as the analysis

10  for the defendants.

11      Q    Okay.  But it's not your contention that

12  you're purporting to give an opinion about what

13  BuzzFeed knew or didn't know.  Correct?

14      A    Right.  That statement that says in "my

15  opinion that the defendants," that is referencing

16  Mr. Ferrante's report on behalf of the defendants.

17      Q    You've seen no documents created or

18  produced by the defendants in this case.  Correct?

19          MR. FRAY-WITZER:  Objection.

20      A    I've only seen what was in

21  Mr. Ferrante's report.  So the statements in this

22  report and that statement there were referring to

23  Mr. Ferrante's report on behalf of the defendants.

24      Q    But you've never seen a document from

25  BuzzFeed.  Correct?

1     A     I don't know if BuzzFeed provided any

2 documents to Mr. Ferrante, but other than what was

3 in Mr. Ferrante's report, I did not receive any

4 separate external documents from BuzzFeed.

5     Q     Okay.  Other than Mr. Ferrante's report,

6 and we've agreed he isn't a defendant, you didn't

7 see any news-gathering materials from BuzzFeed.

8 Correct?

9     A     Separate from Mr. Ferrante's report

10 because, once again, I don't know --

11     Q     That was the question.

12     A     -- if BuzzFeed provided any information

13 to him.  But other than what was in Mr. Ferrante's

14 report, I did not have any other information

15 outside of his report from BuzzFeed.

16     Q     Okay.  Setting aside Mr. Ferrante's

17 report and its exhibits, you never saw Ben Smith

18 interviewed to talk about why he decided to

19 publish the dossier.  Right?

20     A     Once again, the scope of my assignment

21 was to focus solely on Mr. Ferrante's report.  So,

22 correct, I did not look at anything outside of

23 Mr. Ferrante's report because that was outside the

24 scope of my assignment.

25     Q     I'm going to ask you to turn to page 10

1   of your report so get counting, Dr. Cole.  It's

2   paragraph 41.

3        A    Paragraph numbers are easier.

4        Q    Not for me.  You must be smarter than I

5   am.

6             Okay.  You'll see the sentence, "It is

7   therefore false and defamatory for BuzzFeed to

8   make a blanket statement that the plaintiffs are

9   using botnets and porn traffic to transmit

10  viruses, plant bugs, steal data, and conduct

11  'altering operations' against Democratic Party

12  leadership."

13            Are you with me?

14       A    Yes, I am.

15       Q    Great.

16            What does it mean to be defamatory?

17       A    To provide a false or incorrect

18  statement that could hurt the reputation of an

19  entity.

20       Q    Okay.  I didn't ask you what false

21  meant.  I asked you what defamatory meant.  What

22  does defamatory mean?

23       A    I believe I answered that.  So to

24  provide false or incorrect statements that could

25  be damaging to an entity.

1    Q    What's your basis for the claim that the

2    statement is false?

3    A    Once again, the scope of my assignment

4    was to review Mr. Ferrante's report.  So in

5    Mr. Ferrante's report, he did not provide any

6    conclusory evidence that would support that

7    statement.

8    Q    Did you ever -- did you rely on any

9    other document other Mr. Ferrante's report and its

10   exhibits in making that statement?

11   A    No.  And, once again, all my statements

12   in this report are in reference to Mr. Ferrante's

13   report on behalf of the defendants.

14   Q    Did you undertake any technical analysis

15   that provides a basis for that sentence?

16   A    I reviewed Mr. Ferrante's report and

17   looked at all his claims in cases where there was

18   technical analysis such as IP addresses or other

19   information.  I did perform that, and, once again,

20   there was no evidence in Mr. Ferrante's report

21   that that statement was true in any way, shape, or

22   form.

23   Q    Okay.  But we talked earlier about what

24   technical steps you undertook, and you said you

25   looked at his exhibits.  Correct?

1          MR. FRAY-WITZER:  Objection.

2     A     And I believe I also said I did

3  technical analysis of his statements.  I can

4  reference with IP addresses.  I would go in and

5  understand what he meant and determine the

6  validity of those statements.

7     Q     How did you go in and understand what he

8  meant and determine the validity of those

9  statements?

10     A     Based on my expertise.  So when he would

11  go in and say, well, packets came from an IP

12  address, then I would go in and look at the list

13  from CrowdStrike and look at that list and say,

14  but that IP address was not on any of the IP

15  addresses identified by CrowdStrike.

16          So when I talk about technical analysis,

17  it's based on my expertise of understanding the

18  terms and taking what he said and then looking at

19  the information, such as CrowdStrike, and

20  verifying or validating legitimacy.

21     Q     Other than looking up IP addresses on

22  the CrowdStrike list, did you do -- did you go in,

23  as you put it, to any other technical data?

24     A     Well, every component and section of his

25  report, I analyzed, and then all my findings are

1   in here.  So all of the technical analysis would

2   be listed within my report.

3       Q    I understand that, but I'm trying to

4   figure out what steps you undertook to get that

5   technical analysis, and, from what I understand,

6   Mr. Ferrante had a report with exhibits, and you

7   read the report and you looked at the exhibits,

8   and when a portion of the report referenced -- a

9   report referenced an exhibit, you looked at the

10  exhibit.

11          I want to know, other than reading

12  Mr. Ferrante's report, looking at the exhibits,

13  reading Mr. Ferrante's report and looking at the

14  CrowdStrike exhibit, you looked at or, as you have

15  said, go into anything else?

16          MR. FRAY-WITZER:  Objection.  You can

17  answer.

18      A    I believe in reference -- I believe it

19  was in reference to the CrowdStrike that there

20  were some additional IP addresses that I did

21  perform some analysis of to see if any of XBT's IP

22  addresses were on that list, but that was, once

23  again, tied to the analysis in Mr. Ferrante's

24  report.

25      Q    How did you do the analysis?  What did

1   you do to do the analysis?

2       A     Would take the IP addresses, do Whois

3   lookups, NsLookups, perform analysis to see who

4   they're registered to and who owns those IP

5   addresses.

6       Q     You consider all of those to be industry

7   standard ways to check that information?

8       A     Yes, I do.

9       Q     Did you undertake any forensic analysis

10  to determine whether XBT and its affiliates had

11  been using botnets and porn traffic to transmit

12  viruses?

13      A     Once again, the scope of my assignment

14  was to look at Mr. Ferrante's report.  It was not

15  to perform any additional forensic analysis.  And

16  because Mr. Ferrante didn't perform any forensic

17  analysis and my focus was solely on his report, I

18  did not perform any analysis.

19      Q     So the answer is no.

20      A     That was outside of my scope.  Correct.

21      Q     So the answer is no, you did not do that

22  analysis.

23      A     Right.  It was outside the scope so I

24  did not perform a detailed forensic analysis.

25  That was not what I was asked to do with this

1  assignment.

2       Q    Great.

3            Did you undertake any forensic analysis

4  to determine whether XBT and its affiliates had

5  been using botnets and porn traffic to steal data?

6       A    Once again, the scope of my assignment

7  was to look at Mr. Ferrante's report and verify

8  and validate the evidence.  As those questions

9  related to Mr. Ferrante's report, yes.  Anything

10 outside of what Mr. Ferrante did, then the answer

11 was no, I did not do any additional analysis other

12 than look at Mr. Ferrante's report.

13      Q    Sorry, Dr. Cole, that time I totally

14 lost you.  This is a very simple question.

15           Did you undertake any forensic analysis

16 to determine whether XBT and its affiliates had

17 been using botnets and porn traffic to conduct

18 altering -- sorry, to steal data?

19      A    Can you -- that was a little quick,

20 sorry.

21      Q    Sorry.  Did you --

22      A    I want to make sure I get all the words.

23      Q    I'm reading from the dossier.

24           Did you take any forensic analysis to

25 determine whether XBT and its affiliates had been

1  using botnets and porn traffic to steal data?

2          MR. FRAY-WITZER:  Objection.  You can

3  answer.

4      A    That was outside the scope of my

5  assignment so, no, I did not.

6      Q    Great.

7          Did you undertake any forensic analysis

8  to determine whether XBT and its affiliates had

9  been using botnets and porn traffic to conduct

10 altering operations against Democratic Party

11 leadership?

12     A    Once again, the scope of my assignment

13 was to look at Mr. Ferrante's report and perform

14 analysis so, no, I did not perform any external,

15 independent forensic analysis outside of my

16 assignment.

17     Q    So how can you opine that it was false,

18 that the dossier is false?

19     A    Once again, this statement was based on

20 the analysis in Mr. Ferrante's report.

21     Q    Dr. Cole, you've written several books.

22 You've written a bunch of articles.  You know how

23 to write the English language.  That sentence

24 doesn't say Mr. Ferrante's report was false.  That

25 sentence says, "It is therefore false and

1  defamatory for BuzzFeed to make a blanket

2  statement that the plaintiffs are using botnets

3  and porn traffic to transmit viruses, plant bugs,

4  steal data, and conduct 'altering operations'

5  against the Democratic Party leadership."  Does it

6  not?

7            MR. FRAY-WITZER:  Objection.  It follows

8  paragraphs 39 and 40.

9       A    Once again, you have to look at the

10  whole report.  If you look at the whole report,

11  the whole report was in reference to

12  Mr. Ferrante's report.  So this statement would be

13  taken in the context of my analysis with

14  Mr. Ferrante's report.

15       Q    When we began this deposition, I asked

16  you if you believed Russian state actors had

17  launched malicious cyber attacks against the

18  Democratic National Committee.  And you told me

19  you could not opine on that because you did not do

20  any forensic analysis.  Do you remember that, just

21  a couple minutes ago?

22       A    I believe I said I didn't do any

23  analysis.  I don't believe I used the word

24  "forensics."

25       Q    Okay.  That's fair.

 1              You didn't do any analysis here, either.

 2    You didn't do any analysis personally as to

 3    whether XBT and its affiliates were using botnets,

 4    did you?

 5              MR. FRAY-WITZER:  Objection.  You can

 6    answer.

 7         A    I disagree.  I absolutely did.

 8    Mr. Ferrante's report was a report commissioned

 9    and hired by the defendants to show that that

10    statement was true.  So I went through

11    Mr. Ferrante's report, and Mr. Ferrante's report

12    provided zero evidence and no factual data that

13    that statement was true.

14         Q    Right.  Answer my question now.  You

15    didn't do any analysis as to whether -- of XBT's

16    infrastructure, any logs, anything in XBT, to

17    determine whether they used botnets or porn

18    traffic to transmit viruses, did you?

19              MR. FRAY-WITZER:  Objection.  You can

20    answer.

21         A    That was outside the scope of my report

22    so, no, I did not.  But that's not what this

23    report is focused on.  The report is focused on --

24         Q    That's what that sentence says.

25         A    If I could finish.  This report was

1  focused on Mr. Ferrante's -- if you read the

2  entire report, I believe it is clear that 41 is

3  referring to Mr. Ferrante's report.

4      Q    That is -- opining that something hasn't

5  been proven true is different from saying

6  something is false.  Isn't it?

7      A    They are different.  And, once again,

8  the scope of mine was analyzing Mr. Ferrante's

9  report.  You have to be very careful of taking a

10  sentence out of context of a book, a report, or

11  any document.

12     Q    I agree.  I hope the plaintiffs do, too.

13          Dr. Cole, as you sit here, is it your

14  testimony that the only evidence you have that the

15  dossier is false is Mr. Ferrante's report?

16          MR. FRAY-WITZER:  Objection.

17     Q    And its exhibits?

18          MR. FRAY-WITZER:  Objection.  You can

19  answer.

20     A    The only analysis I was asked to perform

21  was to look at Mr. Ferrante's report.  So all of

22  the statements in this report are all based on

23  Mr. Ferrante's report.  That was the focus of my

24  assignment.

25     Q    The only evidence you have to support

1  your claim in paragraph 41 that it is false and

2  defamatory for BuzzFeed to make a blanket

3  statement that, quotation from the dossier, is

4  Mr. Ferrante's report and its exhibits.  Correct?

5      A    That is correct, because that was the

6  focus of my assignment and that was the focus of

7  my report.

8      Q    Right.  And you did no independent

9  research at all to establish the truth or falsity

10  of the statements in the dossier.

11          MR. FRAY-WITZER:  Objection.  You can

12  answer.

13      A    My assignment was focused solely on

14  Mr. Ferrante's report so I did not perform any

15  other analysis outside of Mr. Ferrante's report.

16          MS. BOLGER:  Would you mind reading back

17  my question.

18                  (Record read.)

19      Q    Correct?

20          MR. FRAY-WITZER:  Objection.  You can

21  answer.

22      A    I believe some of that was done in

23  looking at Mr. Ferrante's report.  But outside

24  Mr. Ferrante's report, the answer to your question

25  would be no, I did not do any other independent

1  analysis outside of looking at Mr. Ferrante's

2  report.

3      Q    What was the independent analysis you

4  did in looking at Mr. Ferrante's report?  I don't

5  understand that answer.

6          You did no independent analysis to

7  determine whether XBT and its affiliates undertook

8  any particular action.  Correct?  All you did was

9  look at Mr. Ferrante's report.

10     A    That is correct, I only looked at

11 Mr. Ferrante's report.

12     Q    Okay.  I'm going to ask you to turn to

13 page 5 of your report, please, which is paragraph

14 22.

15         In particular, it says -- the first

16 sentence, look at that.  "Other than inaccurate

17 and unsupported opinions, Mr. Ferrante does not

18 provide any actual proof to support any of the

19 above statements.  The only analysis Mr. Ferrante

20 performed is an analysis of IP addresses, which

21 contain no proof that any entity actually engaged

22 in any wrongdoing."

23         Are you with me on that?

24     A    Yes.

25     Q    So I want to talk to you about the

1    sentence, "The only analysis Mr. Ferrante

2    performed is an analysis of IP addresses."

3           Do you see that?

4       A    Yes, I do.

5       Q    I don't quite understand this sentence

6    so I'm asking you for clarification.  Is it your

7    testimony that Mr. Ferrante did nothing else

8    than -- other than look at IP addresses?

9       A    The supporting evidence in

10   Mr. Ferrante's report always comes back to IP

11   addresses, a small percent, taken out of context,

12   that belonged to XBT.  So that was the core of his

13   analysis throughout his report, where he was tying

14   XBT to these attacks, was all based on IP

15   addresses.

16      Q    So that sentence says, "the only

17   analysis."  I'm asking you, is it your testimony

18   that the only analysis Mr. Ferrante did was look

19   at IP addresses?

20      A    Once again, to make those conclusory

21   statements that he made in his report, they were

22   all based on IP addresses.

23      Q    I'm going to ask Michele to mark as

24   Exhibit 2 Mr. Ferrante's report in this matter.

25   For the record, I didn't attach the exhibits

1  because it was very large.  I do have a copy here.

2  If you need to look at them, you're welcome to

3  look at it, but I didn't attach them just for

4  tree-saving purposes.

5          (Exhibit 2 was marked for identification

6  and attached to the deposition transcript.)

7      A    Thank you.

8      Q    Dr. Cole, you'll agree with me that this

9  is the -- Dr. -- is Mr. Ferrante's report.

10 Correct?

11     A    (Document review.)

12     Q    I promise you, I'm not trying to trick

13 you.

14          MR. FRAY-WITZER:  We'll certainly accept

15 your representation.

16     Q    I promise you, I'm not trying to trick

17 you.

18     A    If this is your representation, then,

19 yes, okay.

20     Q    Would you turn to page 13 for me.

21          So you'll see that the second graph on

22 page 13 begins, "Bitly produced a system audit log

23 of 11,139 bitlinks created by john356gh, which

24 included the bitlink."  Are you with me on that,

25 on that paragraph?  Are you with me on the page?

1  Above the box.

2      A    Above the box.  Is it the bold?

3      Q    No, that whole graph starts out "Bitly

4  produced."

5      A    Oh, the paragraph, okay.  Perfect, yes.

6      Q    Would you just take a minute to read it.

7  As a surprise -- so I don't surprise you, my

8  question is going to be, doesn't this paragraph

9  describe activity other than simply looking at IP

10  addresses?

11     A    Once again, the core of the analysis,

12  and especially if you look at the bolded sentence,

13  is, "One of these bitlinks was created by an IP

14  address."  So once again, the foundation for

15  Mr. Ferrante linking XBT all comes back to that IP

16  address.  He performed --

17     Q    Well, if you -- I'm sorry, I thought you

18  were done.

19     A    He performed other analysis on top of it

20  with the bitlinks, but the ultimate connecting of

21  the dots for Mr. Ferrante always came back to the

22  IP address.

23     Q    Actually, what he says is that "Using

24  the signatures and data contained in the bitlink

25  that John Podesta clicked on, FTI identified three

1  additional phishing websites in the john356gh

2  account audit log data designed to look like

3  custom Google security pages for John Podesta."

4          Do you see that sentence?

5      A    Yes.  And then right after it, he ties

6  it together with "created by an IP address."

7      Q    Well, that's activity.  That's not just

8  reading IP addresses.  Correct?  The sentences.

9  That's just not looking at IP addresses.  Correct?

10 That's "using the signatures and data contained in

11 the bitlink that John Podesta clicked on, FTI

12 identified three additional phishing websites."

13 That's not just looking at IP addresses.  Correct?

14     A    That's a small piece.  If you look at

15 the analysis he performed to make his statement,

16 his conclusory statement, it ties back to the IP

17 address.  The IP address is the --

18     Q    That activity I described is not only --

19 the only analysis Mr. Ferrante performed is an

20 analysis of IP addresses.  Right?  That's

21 additional analysis.  Correct?

22     A    I would disagree.  To tie XBT to that

23 statement, ultimately, it did come down to the IP

24 address.  He performed different ways of looking

25 at it, like with bitlinks and others, but,

1  ultimately, his analysis statement, which is

2  bolded here -- he actually bolded it for

3  clarification -- is back to the IP address.

4       Q    Well, did you, using the signatures and

5  data contained in the bitlink that John Podesta

6  clicked on, identify three additional phishing

7  websites in the john356gh account?

8       A    I did not specifically go in, but I read

9  that.  And, once again, in my analysis, if you

10  look at a couple factors here, one, an only small

11  percent of those bitlinks were actually tied to IP

12  addresses that belonged to XBT, and then, once

13  again, his whole statement of tying all this

14  together is, once again, based on the IP address

15  owned by the Root S.A., which, once again, he's

16  saying because that IP address was registered to

17  XBT, then, therefore, the statement is true,

18  that's why my statement here is focused on the IP

19  because that's where Mr. Ferrante always connected

20  the dots with his analysis.

21       Q    Did you look at the Bitly data?

22       A    I looked at the information presented in

23  his report.

24       Q    Did you look at the Bitly data?

25       A    Yes, because the Bitly data is here so I

1  looked at it within his report, yes.

2      Q    Did you look at all the documents

3  produced by Bitly in this litigation?

4           MR. FRAY-WITZER:  Objection.  You can

5  answer.

6      A    I only looked at what was referenced in

7  Mr. Ferrante's report because that was the scope

8  of the assignment.

9      Q    Did you ask to look at anything else?

10     A    Once again, the scope of my assignment

11 was to focus solely on Mr. Ferrante's report, and

12 that's what I performed.

13     Q    If you look at page 14, under the

14 heading, "Additional Technical Connections,"

15 you'll see a paragraph that starts, "Technical

16 evidence suggests that Fancy Bear may have used an

17 IP address owned by XBT subsidiary, Root S.A., in

18 the past."

19          Do you see that?

20     A    I do see that sentence.

21     Q    I'm just orienting you on the page.

22     A    Thank you.

23     Q    If you see, at the end of that

24 paragraph, it says, "Similarly, FTI was not able

25 to identify a direct technical connection to XBT

1  infrastructure based on an analysis of the five

2  malware samples."

3          Do you see that?

4      A    Sorry, no.

5      Q    It's in the sentence right before the

6  bold.

7      A    Are you looking at "The CrowdStrike

8  report"?

9      Q    "Similarly" is the one, two -- fourth

10  line down in the paragraph, starts, "Similarly" --

11      A    Oh, there, okay.

12      Q    -- "FTI was not able to identify a

13  direct technical connection to XBT infrastructure

14  based on an analysis of the five malware samples."

15          Are you with me?

16      A    Yes.  Thank you.

17      Q    Okay.  So FTI did an analysis of the

18  five malware samples.  Correct?

19      A    That is correct.  And they were not able

20  to identify a connection.

21      Q    Did you do an analysis of the five

22  malware samples?

23      A    Once again, my focus and scope was on

24  just verifying the statements in Mr. Ferrante's

25  report.  I did not actually perform analysis of

1  the malware.

2       Q    You didn't reperform any of FTI's

3  analysis.

4       A    I could, but that was not the scope of

5  my assignment so, no, I did not.

6       Q    I'm not questioning your ability,

7  Dr. Cole.  I'm asking whether you did it.  Did you

8  do it?

9       A    I was not asked to do that so, no, I did

10 not.

11      Q    An IP address is a unique identifier.

12 Correct?

13           MR. FRAY-WITZER:  Objection.

14      A    An IP address is a unique sequence of

15 numbers but not necessarily a unique identifier

16 because you can move IP addresses between servers

17 or systems.

18      Q    Well, it's the equivalent of, if you

19 walked into a doctor's office, they would use your

20 Social Security number to identify your patient

21 record.  Correct?

22           MR. FRAY-WITZER:  Objection.  You can

23 answer.

24      A    I would not agree with that analysis.

25           MS. BOLGER:  I'm going to ask Michele to

1  mark as Exhibit 3 the testimony of Dr. Eric Cole

2  in the matter of National Union Fire Insurance

3  versus Tyco.

4           That one, I could have hurt you with,

5  Evan.

6           MR. FRAY-WITZER:  It was a good throw.

7           (Exhibit 3 was marked for identification

8  and attached to the deposition transcript.)

9  BY MS. BOLGER:

10      Q    For the record, Dr. Cole, you testified

11  in the matter of National Union Fire Insurance

12  company versus Tyco, and this is actually -- I

13  can't find the date -- on March 28th, 2016, in

14  Miami, actually.  Do you see that?

15      A    Yes, I do.

16      Q    You were retained as an expert in that

17  case?

18      A    That is correct.

19      Q    Generally, what was the subject of your

20  testimony?

21      A    I was going to be careful of

22  confidentiality, but if you have the depo

23  transcript, I assume that's a non- --

24      Q    It's a trial transcript.

25      A    Okay.  It was looking at the general

1  security of ADT Security.

2      Q    Would you mind turning to page 102.  I'm

3  not making you count.  These are numbered.

4           If you look at lines -- this is your

5  testimony, Dr. Cole.  You're welcome to check me

6  if you would like, but if you look at lines 18

7  through 21, you'll see that you testified, "An IP

8  address is a unique identifier.  It would be like

9  if you went to the doctor's office, they would use

10  your Social Security number to identify your

11  patient record.  That's just a unique identifier."

12           Are you with me?

13      A    Let's put it in context.

14           (Document review.)

15      Q    That's your testimony, right, Dr. Cole?

16      A    Yes, it is.

17      Q    So you've testified that an IP address

18  is a unique identifier akin to a Social Security

19  number.  Correct?

20      A    Yes.  In this context, I was referring

21  to the specific vulnerabilities in a vulnerability

22  scanning report.  I would probably -- once again,

23  that's why I was looking at the context of that,

24  specific to that vulnerability.  But IP addresses

25  are different than Social Security numbers in that

1  they can be reassigned or changed or put on

2  different systems.

3      Q    Not within an -- not outside of an ASN.

4  Right?  That's what we talked about in the

5  beginning.  Right?

6          MR. FRAY-WITZER:  Objection.  You can

7  answer.

8      A    You can go in, and ASNs can sell and

9  move IP addresses.  So over time they could be

10  changed, and, also, within an ASN they could

11  change which server they are linked to.

12      Q    Right.  But we've agreed from the

13  beginning of this lawsuit that if XBT controlled

14  the ASNs, they controlled the IP addresses within

15  those ASNs.  Correct?

16          MR. FRAY-WITZER:  Objection.  You can

17  answer.

18      Q    Are you going to change that testimony,

19  too?

20          MR. FRAY-WITZER:  Objection.

21      A    They -- they control those IP addresses

22  as long as that ASN belongs to them.

23      Q    Right.  Do you have any reason to

24  believe that XBT has changed any of the IP

25  addresses within its ASNs that are discussed in

1  these reports?

2      A    I did not see any information that would

3  support that.  But it's also important that owning

4  an XP -- sorry.  Owning an IP address within that

5  ASN, it could move between servers.

6      Q    But it would still be controlled by XBT.

7          MR. FRAY-WITZER:  Objection.  You can

8  answer.

9      Q    Even if it moved within servers.

10     A    That would be correct.

11     Q    Right.

12         You can't spoof an IP address -- I'm

13  going to strike that.

14         You said -- and I'm sorry if I'm using

15  the wrong word.  You said that you testified about

16  vulnerability?

17     A    Vulnerability scanning reports.

18     Q    Okay.  What are vulnerability scanning

19  reports?

20     A    A vulnerability scanning report is --

21  there's tools called vulnerability scanners that

22  you typically run within a network and you scan a

23  server, an IP address, and you look for open port

24  services and vulnerabilities that could be

25  exploited by an adversary.

1       Q     Thank you.

2             In your expert report you mentioned the

3    possibility that IP addresses can be spoofed, and,

4    just for the record, why don't you tell me what it

5    means to spoof an IP address, just so we all have

6    the same term.

7       A     A packet is like an envelope.  So when

8    you send out an envelope, you have the "to"

9    address and you have the "from" address.  I can

10   send a letter from my house, but I can put Evan's

11   return address.  There's no validation performed

12   by the post office of where it's really coming

13   from.  So if we all have kids, we might have sent

14   letters to our kids in December, and we would

15   spoof the address from the North Pole because

16   there's no validation.

17            So, in a packet you can do the same

18   thing, where somebody can send traffic, and they

19   can go in and spoof or alter the source IP address

20   to hide the true originator.

21       Q     Okay.  But IP addresses are different

22   than the address -- IP addresses are different

23   than the address on an envelope for the following

24   reason.  Correct?  If I send a message to you from

25   an IP address, if I send a packet to you on an IP

1  address, in order to complete the transaction

2  between the two of us, we actually have to have a

3  TCP connection.  Correct?

4          MR. FRAY-WITZER:  Objection.  You can

5  answer.

6      A    That's not true.  In the protocol stack

7  you have TCP or UDP.

8      Q    Okay.

9      A    So if you're using TCP, then, yes,

10  there's a three-way handshake that needs to be

11  completed, but there's an option in the IP header

12  called source routing where I can still go in,

13  spoof the IP address, and source route the packet.

14  So I can still have it go through me and spoof the

15  address of somebody else, and then if it's UDP,

16  it's connectionless, and the connection would work

17  with a spoofed address.

18      Q    The three-part handshake would work with

19  a spoofed address?

20      A    With TCP, then?

21      Q    Yes.  So here's my question.

22          This report published by Mr. Ferrante

23  has a lot of information about IP addresses that

24  are used to commit certain acts.  Will you agree

25  with me just on that very narrow point?

1      A    Can you just read that back, just to

2   make sure I get all the words.

3      Q    Yes.  I can repeat it.  What I'm saying

4   was, I'm trying to get you and I to agree on just

5   words.  You don't have to agree with me on

6   principles, just the words.

7      A    Evan said I can't agree with you.  No,

8   I'm joking.

9      Q    Mr. Ferrante's report describes specific

10  acts undertaken using specific IP addresses.  Will

11  you agree with me on that?

12     A    That is correct.

13     Q    Okay.  Each of those acts described

14  is -- is a completed transaction.  Correct?

15     A    Each of those acts are packets received

16  that could be received over TCP or UDP.

17     Q    Okay.  Each of those acts, however --

18  I'll ask that again.

19          Is it your testimony, as you sit here

20  today, that you believe the malicious attacks

21  described in Mr. Ferrante's report were not

22  undertaken on the IP addresses listed in the

23  report?

24          MR. FRAY-WITZER:  Objection.

25     A    Sorry, I lost you at the end there

1   so ...

2       Q    I'm trying to figure out what your

3   objection to Mr. Ferrante's use of IP addresses

4   is.  There's a couple ways I think you're

5   objecting to it, but there's one way I'm trying to

6   figure out.  Are you claiming that the

7   transactions described in Mr. Ferrante's report

8   did not happen on those IP addresses?

9           MR. FRAY-WITZER:  Objection.  You can

10  answer.

11      A    What I am saying is that IP addresses

12  could be spoofed, so that is a potential, and that

13  Mr. Ferrante did not consider that in his

14  analysis.  He just assumed that because the IP

15  address was registered to a certain provider, that

16  that meant that was the originator of the attack,

17  and there are many cases where spoofed IP

18  addresses are in place so that might not be the

19  case.  So that was just one of several flaws in

20  Mr. Ferrante's analysis.

21      Q    Okay.

22          MR. FRAY-WITZER:  See, now you want the

23  real-time.

24      Q    You said -- this is what I'm trying to

25  figure out -- that could be spoofed -- okay.  So

1   you said that you think that because the IP

2   address was registered to a certain provider, he

3   assumed that was the originator of the attack.

4   Okay.

5          What I mean -- what I'm asking you is,

6   are you saying that the IP address is wrong, or

7   are you saying what you believe Mr. Ferrante

8   concluded, which was that consequently XBT did the

9   attack, is wrong?  That's my question.

10          MR. FRAY-WITZER:  Objection.

11      A    Well, two things.  First, I've never

12  said that XBT actually did the attack.  I just

13  said it was traced back to an IP address.  So one

14  flaw with Mr. Ferrante is he was saying just

15  because the IP address was registered to XBT, that

16  that meant they did the attack, which was false.

17  And then the second argument I'm making is,

18  Mr. Ferrante is saying because the IP address was

19  registered to XBT, that the packets had to

20  originate from XBT.  He did not consider anywhere

21  in his report the idea that on the Internet,

22  especially during attacks, that IP addresses can

23  be spoofed.

24      Q    In other words, you mean you think that

25  there's a possibility that attacks that are

1  originated from IP addresses that belonged to ASNs

2  assigned to XBT could, in fact, be being

3  originated outside of those ASNs?

4      A    Yes, if the -- the source IP address

5  could be a spoof.  So somebody could be sending a

6  packet from another network and spoof the IP

7  addresses, and especially with regard to Fancy

8  Bear.  Fancy Bear was known to utilize spoofed IP

9  addresses in their attacks.

10     Q    I thought you didn't know anything about

11 Fancy Bear, Dr. Cole.

12          MR. FRAY-WITZER:  Objection.  That's not

13 the testimony.

14     A    I said I'm -- I used my -- I think I

15 clearly stated I used my expert analysis and

16 experience --

17     Q    When you want to, Dr. Cole.

18     A    Well, in my --

19          MR. FRAY-WITZER:  Objection.  There's no

20 question.

21     Q    But you didn't do that analysis when

22 you -- this -- this analysis that you think

23 Mr. Ferrante should have done, which says that

24 you're always supposed to take into account that

25 all IP addresses could be spoofed, that wasn't

1  your analysis of the CrowdStrike report, was it?

2          MR. FRAY-WITZER:  Objection.

3      Q    Turn to the back of your report.  I'm

4  sorry, you can answer that question.  You didn't

5  take that into account when you looked at the

6  CrowdStrike IP addresses, did you?

7      A    Once again, my assignment was different

8  than Mr. Ferrante's.  My assignment was to look

9  solely at Mr. Ferrante's report and not perform

10  separate analysis.  Once again, I could have done

11  that, but my focus was solely on Mr. Ferrante's

12  report.

13     Q    Well, that's not what you did in this

14  case.  If you turn to paragraph 51, which happens

15  to be on page 15, it reads, "In addition, based on

16  a list of IP addresses provided by the Democratic

17  National Committee (attached as Exhibit 1), listed

18  below, none of them resolved to Webzilla."  And

19  then you have a list of the IP addresses and the

20  entities to whom those IP addresses resolve.

21         Do you see that?

22     A    I do.

23     Q    Yes.  You did that research.  Correct?

24  That's not on the DNC exhibit list, is it?

25         MR. FRAY-WITZER:  Objection.  You can

 1  answer.

 2       A    Well, these IP addresses were based off

 3  of the list provided by the DNC --

 4       Q    Correct.

 5       A    -- in Exhibit 1.

 6       Q    That list is attached as Exhibit A to

 7  your report.

 8       A    Yes.

 9       Q    That list does not have the entities to

10  whom they resolve, does it?  You can look.  It's

11  attached as Exhibit A to your report.

12       A    Right.  That is just the IP addresses.

13       Q    Right.  You did the work resolving the

14  IP addresses to their owners.  Correct?

15       A    Correct.  And I believe we covered that

16  earlier, that I used Whois and others to do that,

17  yes.

18       Q    Right.  But in making that analysis, you

19  didn't take into account that those IP addresses

20  could be spoofed, did you?

21       A    Once again, two different components

22  here.  What this is showing is this in support

23  when Mr. Ferrante says that the IP address of the

24  attacks -- and I'm showing that according to the

25  DNC, none of those were registered to Webzilla.

1       Q     Right.  But you're faulting

2   Mr. Ferrante's analysis on the grounds that he

3   didn't take into account that IP addresses could

4   be spoofed in determining who their owners were,

5   but you didn't take that into account in this

6   either, did you?

7             MR. FRAY-WITZER:  Objection.  You can

8   answer.

9       A     It's two different arguments.  So what

10  I'm saying here is that the DNC provided a list of

11  IP addresses and that none of those IP addresses

12  are registered to Webzilla.  That has -- register

13  has nothing to do with spoofing.

14      Q     Well, all the IP addresses that

15  Mr. Ferrante talks about were registered to

16  Webzilla or XBT.  Correct?

17      A     The point -- the point in the report,

18  where I'm criticizing Mr. Ferrante, is not that he

19  took an IP address and said who it's registered

20  to.  He then drew the line that said because it's

21  registered, therefore, XBT, therefore, the packets

22  came from XBT.  And I'm saying he never considered

23  spoofed addresses in that analysis.

24      Q     Dr. Cole, I was with you until that last

25  sentence.  I understand that you are criticizing

1  Mr. Ferrante for saying that because -- I

2  understand that you think Mr. Ferrante is saying

3  that XBT did these things because their IP

4  addresses were used.  Right?  That's a criticism

5  of Mr. Ferrante that you are making.  Correct?

6        A    Right, that he is using solely the IP

7  address to make that conclusory statement, which

8  is not true.

9        Q    That's one thing, as in, you think that

10  Mr. Ferrante is putting bodies behind desks based

11  on IP addresses.  Do you understand what I mean by

12  that?

13        A    Yes, and that is one of my criticisms.

14        Q    Okay.  That criticism has nothing to do

15  with spoofing.  Correct?

16        A    Right.  So there's several arguments.

17  I'm getting concerned we're mixing --

18        Q    Just one at a time.  I understand.

19  That's what I'm trying to figure out.

20             That criticism has nothing to do with

21  spoofing.  You're just making the claim that he's

22  putting bodies behind desks based on IP addresses,

23  and you think that's wrong.  Right?  That's one

24  claim.  That's one criticism.  Right?

25        A    That is one of the arguments, yes.

1      Q    I don't understand the spoofing

2    argument.  The spoofing argument doesn't make

3    sense to me.  Are you saying that you think that

4    these transactions described throughout

5    Mr. Ferrante's report, for example, the fact that

6    there is an IP address that is linked to Root S.A.

7    that shares an SSL certificate with IP addresses

8    linked to Fancy Bear, are you saying you believe

9    that there could be spoofing involved in that link

10   of that IP address to the SSL certificate?

11            MR. FRAY-WITZER:  Objection.  You can

12   answer.

13      A    What I am saying is that -- admit, a lot

14   of the analysis Mr. Ferrante performed was very

15   one-sided, where he would provide one side and not

16   present the whole piece, and with doing IP

17   analysis, one of the things you need to consider

18   is the potential that it could be spoofed.  And

19   nowhere in Mr. Ferrante's report does he cover or

20   address the fact that IP addresses could be

21   spoofed.

22      Q    Is it your testimony that it is possible

23   to spoof an IP address that communicates with an

24   SSL certificate?

25      A    You could do source routing and spoof

1  the certificate, yes, that could be possible.

2       Q    So is it your testimony that it's wrong

3  that the IP address associated with the SSL

4  certificate was affiliated with Fancy Bear?

5            MR. FRAY-WITZER:  Objection.  You can

6  answer.

7       A    I'm sorry, what was the question?

8       Q    Is it your testimony that it's wrong

9  that the Root S.A. IP address associated with --

10  was associated with an SSL certificate affiliated

11  with Fancy Bear?  It's page 15 of Mr. Ferrante's

12  report.

13           MR. FRAY-WITZER:  Objection.

14      A    Sorry, which sentence are you asking?

15           MS. BOLGER:  You know what, this is

16  going to be a little bit of a long line of

17  questioning.  I have got to go to the bathroom so

18  let's take a break.

19           THE VIDEOGRAPHER:  Going off the record

20  at 11:14.

21              (A brief recess was taken.)

22           THE VIDEOGRAPHER:  We are back on the

23  record at 11:27.

24  BY MS. BOLGER:

25      Q    Again, just trying to understand your

 1    testimony, Dr. Cole, is it your testimony that

 2    Mr. Ferrante's statement -- and I'll look at

 3    page 13 -- that one of those bitlinks was created

 4    by an IP address owned by Root S.A.,

 5    94.242.205[.]147, is wrong?

 6         A    I do not believe I said that.

 7         Q    I'm asking you that.  Is it your opinion

 8    that that is wrong?

 9         A    No, it is not.  It is my opinion that

10    that is not a conclusive piece of evidence to then

11    say that that means that XBT committed those

12    attacks.

13         Q    This is what I referred to a little

14    while ago as the putting bodies behind desks

15    point.  Correct?

16         A    Okay, yes.

17         Q    Is that correct?  In other words, your

18    complaint about this is not that it is wrong that

19    those bitlinks were created by an IP address owned

20    by Root S.A.  Your criticism of this is that you

21    believe it is wrong for Mr. Ferrante to say, which

22    you think he does, that an XBT individual created

23    that bitlink.  Correct?

24         A    That -- that was one of the arguments.

25    The other one is that he is presenting this as

 1  something that is unique to only XBT and not that

 2  this happens to many other companies.  This type

 3  of analysis, as I've shown in my report, can be

 4  done with many other companies out there.

 5       Q    Great.  But you are not saying that that

 6  bitlink -- sorry.  It's too many negatives.

 7            You are -- you are not saying that this

 8  bitlink was not created by an IP address owned by

 9  Root S.A.

10       A    That is correct.  So I was getting all

11  the negatives.

12       Q    Apologies.

13            Okay.  Similarly, your -- is it your

14  opinion that -- if you'll turn to page 15 -- it

15  is -- it's so many negatives, Dr. Cole -- it is

16  not your opinion that the Root S.A. IP address

17  referenced in the sentence that begins "Further

18  review" -- are you with me on -- strike that whole

19  thing.  We'll start from the beginning.

20            There's a sentence here that says,

21  "Further review found that the SSL certificate has

22  been distributed to 40 other IP addresses and that

23  one of those is owned by Root S.A."  Correct?

24       A    That is correct.

25       Q    You are not questioning the ownership of

1    that IP address by Root S.A.  Correct?

2        A    That is correct.

3        Q    Nor its affiliation with the SSL

4    certificate.  Correct?

5        A    That is also correct.

6        Q    Similarly, on page 16, that lists the IP

7    addresses affiliated with Root S.A. that were

8    listed on the Grizzly Steppe report, you are not

9    arguing that Mr. Ferrante is wrong that these are,

10   in fact, owned by Root S.A.  Correct?

11       A    Right, I am not arguing that.  I am just

12   saying that that is not conclusory for the

13   statements he's making.

14       Q    For the reasons we discussed, which are,

15   one, you believe that his report says XBT did it,

16   and, two, you believe other companies were

17   involved and that should have been included in the

18   report.  Correct?

19       A    Correct.  And then the third one was

20   that he didn't anywhere in his report take into

21   account the fact that spoofing is a technique that

22   can be used by adversaries.

23       Q    But this is a document that's produced

24   by -- sorry.  Your -- as you sit here, you are

25   saying that it is possible that Root S.A. does not

1  own these IP addresses.

2          MR. FRAY-WITZER:  Objection.

3      A    Maybe I misunderstood the question.

4      Q    Your testimony is that you claim, as you

5  sit here, that someone could have used Root S.A.'s

6  IP addresses without them knowing it.

7      A    That is a possibility.

8      Q    How likely is that to have happened?

9          MR. FRAY-WITZER:  Objection.  You can

10 answer.

11     A    Not zero and not 100.

12     Q    It's probably more like 1 percent.

13 Correct?

14         MR. FRAY-WITZER:  Objection.  I mean,

15 don't speculate.  If you know --

16         MS. BOLGER:  Your expert witness, I'm

17 asking about his knowledge.  He can obviously

18 answer the question.

19         MR. FRAY-WITZER:  He can answer if he

20 has knowledge of it.

21         MS. BOLGER:  Sure.

22         MR. FRAY-WITZER:  But dispelling it --

23 BY MS. BOLGER:

24     Q    How likely is it that someone is

25 spoofing a Root S.A. IP address or, in this case,

1  all of the Root S.A. IP addresses used in this

2  report?

3      A    I would have to go back to check a

4  number, but I do a lot of work in investigations,

5  and we do run across spoofed IP addresses.  So it

6  does happen.

7      Q    You said you can only spoof an IP

8  address and actually complete extraction on UDP.

9  Correct?

10     A    No.  You can with TCP if you use source

11 routing.  You can actually do a source route and

12 still be able to complete a connection, and then

13 UDP is connectionless so you can also much easier

14 with UDP.

15     Q    UDP is effectively broadcasting

16 information.  Correct?

17     A    No.  So TCP is like certified mail, and

18 UDP is regular mail.  So you just send -- you send

19 and forget.  So it's still a one-to-one.  It

20 doesn't have to be a broadcast, but it's a

21 one-to-one with UDP.  There's just no confirm

22 receipt.

23     Q    It takes a huge amount of bandwidth.

24 Correct?

25           MR. FRAY-WITZER:  Objection.  You can

1    answer.

2         Q    To make a UDP transmission.

3         A    Actually, no, quite the opposite.  TCP,

4    because it has the three-way handshake and the

5    extra overhead, is actually more bandwidth.  So in

6    real-time communication or in areas where

7    bandwidth is an issue, that's typically where UDP

8    is used.

9         Q    Do you have any evidence that any of

10   these IP addresses referenced in Mr. Ferrante's

11   report were spoofed?

12        A    No, I do not.

13        Q    What is source routing and how would

14   that work?

15        A    If I get too in the weeds, stop me, but

16   you have your protocol stack, so at layer 3 you

17   have IP address and you have your IP header.  And

18   your IP header has options.  One of the options is

19   source routing.  So the general concept is

20   normally if Evan sends a packet to you, it would

21   have Evan's source IP address, and then you would

22   reply back to that.

23             What I can do is I can go in and spoof

24   Evan's source IP, but I can now use source routing

25   to say it has to route through me.  So now, when

1  you reply, you think you're going to Evan but the

2  source routing, it forces it to me.  I intercept

3  it so we're now communicating even though it looks

4  like you're going to Evan's IP.

5      Q    Okay.

6           Can you tell me where in the report,

7  Mr. Ferrante's report, you think he says that XBT

8  itself did any of these malicious acts?

9      A    Page 36, "Conclusions."

10     Q    Where?

11     A    Do you want me to read the paragraphs to

12  you?

13     Q    I want to know where.  Just point to a

14  paragraph.

15     A    So, first, "XBT and its affiliated web

16  hosting companies provided gateways to the

17  Internet for cybercriminals and Russian

18  state-sponsored actors to launch and control

19  large-scale malware campaigns over the past

20  decade."

21     Q    All right.  Stop there.

22          It doesn't say that XBT launched and

23  controlled large-scale malware campaigns.  Right?

24  It says it provided a gateway.  Correct?

25     A    What was the specific question?

1      Q     I asked you to tell me where in the

2   report it said that XBT itself launched attacks,

3   any of the cyber attacks articulated in the

4   report.

5      A     In the beginning he lists what his

6   assignment was, listing those three bullets.  And

7   at the end --

8      Q     Sorry, where are you, sir?

9      A     Page 3.

10      Q     Okay.  Where does it say that XBT itself

11   launched the malicious cyber attacks articulated

12   in the report?

13      A     His report was written to support the

14   statement made by BuzzFeed about XBT, and then in

15   the conclusion, he is saying that XBT affiliates

16   own infrastructure, XBT's infrastructure was all

17   used in the attacks.

18      Q     None of those sentences say that XBT did

19   the attacks, do they?

20      A     None of those say that, but in reading

21   the entire report, based on the statement he is

22   trying to prove, he is implying that in his

23   report.

24      Q     He's not saying it, is he?

25            MR. FRAY-WITZER:  Objection.

1     A     Once again, in my expert opinion, in

2  reading his report, he is implying that there is

3  evidence to support the statement made by

4  BuzzFeed.

5     Q     Is there something about your expert

6  knowledge that makes English language mean

7  different things to you than it does to me?

8          MR. FRAY-WITZER:  Objection.

9     A     Once again, in my expert opinion, he

10 wrote this report to basically prove the validity

11 of the BuzzFeed statement.

12    Q     If you look at your report, paragraph 40

13 says -- I'll let you get there, it's on page 10 --

14 "XBT/Webzilla is not responsible for every bit of

15 data that a bad actor passes over its

16 infrastructure any more than a post office is

17 responsible for the actions of the Unabomber."

18          Are you with me?

19    A     Yes, I am.

20    Q     Are you saying that web hosting

21 companies have no obligation at all to monitor or

22 control the traffic that travels over the network?

23    A     The idea of a web hosting provider is

24 that you're providing content to others.  As XBT

25 has done, if there are issues or problems and

1    they're made aware of them, then they would take

2    down that infrastructure or perform some action,

3    but there's no possible way they can monitor and

4    know all the traffic going over their

5    infrastructure.

6        Q    Do you think the post office is not

7    responsible for the actions of the Unabomber after

8    the first bomb goes through?

9            MR. FRAY-WITZER:  Objection.  You can

10   answer.

11       A    Once again, once you're made aware of a

12   problem, you typically would put measures in

13   place, but once again, regardless, that is not the

14   analysis that was performed in this case.  The

15   analysis in this case was whether the statement

16   made by BuzzFeed that XBT was involved and

17   transmitted malicious attacks against the DNC and

18   whether there was any proof in Mr. Ferrante's

19   report of that.

20           MS. BOLGER:  I'm so sorry, can I just

21   see my question again.

22       Q    So you said once you become aware of the

23   problem, you typically put measures in place.

24   Right?  You said that?

25       A    Once again, you have to look at a

1  case-by-case in cybersecurity, but, usually, if

2  you're aware, depending on what the issue is and

3  other problems, you might or might not take

4  action.

5      Q    What if you had 32 bad actions happen on

6  your network, same IP address?  Might you take

7  some actions then?

8           MR. FRAY-WITZER:  Objection.

9      A    Once again, it really depends on what

10 those actions are, the business, the agreements

11 you have in place.  There's a lot of factors that

12 come into play.

13     Q    What about if you had 58 malicious acts

14 on the same IP address?  Would you take some kind

15 of action then?

16          MR. FRAY-WITZER:  Objection.  Over what

17 time period?  What kind of action?

18     A    Once again, it depends on a lot of

19 factors in place.  Once again, as I showed in my

20 report, that a lot of these types of activities

21 occur with Google, occur with Amazon, and occur

22 with a lot of other big companies.  So it depends

23 on a lot of factors.

24     Q    In your expert opinion, if Google had

25 470 IP alerts on one IP address, would they

 1  undertake some action?

 2          MR. FRAY-WITZER:  Objection.

 3      A    Once again, it depends a lot on time

 4  period, on other components.

 5      Q    But if they had 470 abuse alerts on one

 6  IP address in, let's say, six months, in your

 7  expert opinion, should Google undertake some

 8  action?

 9      A    Once again, it depends on the type of

10  traffic, the business they're in, are a lot of

11  factors.

12      Q    You don't think that they should be

13  monitoring that?

14      A    Once again, with hosting providers and

15  others, there's a lot of traffic going back and

16  forth.  So I would have to look at the

17  circumstances, the cost-benefit analysis, the

18  overall security issues.  There's a lot of things

19  in play that would be used to make those

20  decisions.

21      Q    What if month after month they were

22  being told there were problems and they did

23  nothing to fix them?

24          MR. FRAY-WITZER:  Objection.

25      A    Once again, it depends on a lot of

1   circumstances, but that would be true of most of

2   the big breaches that we've had where your and my

3   Social Security number and other private data has

4   been compromised.

5       Q    What if a network provider was fully

6   aware that they had exposed systems and they did

7   nothing to fix it?  Wouldn't that be a problem?

8            MR. FRAY-WITZER:  Objection.  You can

9   answer.

10      A    Once again, it would depend on the

11  situation and the issues, but more importantly,

12  that wouldn't be relevant to the analysis of

13  whether BuzzFeed made a false statement against

14  XBT about them being involved with DNC attacks.

15  That's completely separate and irrelevant from the

16  overall security.

17      Q    In your opinion, what are the best

18  practices a web hosting company should have in

19  place to protect from malicious cyber activity?

20      A    Ones again, I would have to look at the

21  revenue, the profit margins, the size of the

22  organization, the business.

23      Q    XBT.  What are the best practices XBT

24  should have in place to protect against malicious

25  cyber activity?

1          MR. FRAY-WITZER:  Objection.

2      A    I would have to go in and look at their

3  infrastructure.  My company Secure Anchor, we do

4  assessments where we do exactly that.  It's

5  typically a three- to four-week effort in order to

6  provide those best practices because it's not

7  cookie cutter.  It's not one size fits all.

8      Q    You do that for a lot of companies,

9  right, Secure Anchor?  You do that analysis for a

10 lot of companies?

11     A    Many different size companies.

12     Q    You recommend that those types of

13 analysis be done.  Correct?

14     A    Once again, it depends on the size of

15 the business, the organization, the infrastructure

16 and changes.  Some clients, we do it often.  Some,

17 we do it very infrequent.

18     Q    You recommend that your clients have

19 terms of uses and then have some penalty for

20 violating them.  Correct?

21     A    Once again, I would have to look at the

22 circumstances.  Cookie cutter security doesn't

23 fit.  And the important thing is, whether they do

24 or don't is not relevant to the analysis I perform

25 in which I looked at the false statement that

1  BuzzFeed made about XBT.

2      Q    I disagree with you.  I think it's

3  actually pretty relevant.

4           So here's why I think it's relevant.  Do

5  you know if XBT has any kind of monitoring or any

6  other measures in place to protect against

7  malicious activity on its networks?

8           MR. FRAY-WITZER:  Objection.  You can

9  answer.

10     A    Once again, that was not the scope of my

11 analysis, and whether they did or did not has

12 nothing to do with the fact that BuzzFeed said

13 that XBT had been using botnets to transmit,

14 plant, and steal data and conduct alerting

15 operations.

16     Q    But it has to do with whether they've

17 allowed their infrastructure to be used for those

18 activities, doesn't it?

19          MR. FRAY-WITZER:  Objection.

20     A    Once again, it would depend on the

21 measures of the terms and service, but that's not

22 what the statement says.  The statement doesn't

23 say whether their infrastructure.  It says whether

24 XBT was transmitting, planting, and stealing data.

25     Q    Sure.  But, Dr. Cole, every minute of

1  this deposition you've been telling me you didn't

2  do any investigation into a BuzzFeed report.  You

3  did an investigation into Mr. Ferrante's report.

4  Mr. Ferrante's report says that "XBT and its

5  affiliated web hosting companies have provided

6  gateways to the Internet for cybercriminals and

7  Russian state-sponsored actors to launch and

8  control large-scale malware campaigns over the

9  past decade."  That's what you were hired to look

10  into.  Correct?

11          MR. FRAY-WITZER:  Objection.  You can

12  answer.

13      A    No.  As in my introduction, I was hired

14  specifically regarding the statement that was made

15  by BuzzFeed in relation to Mr. Ferrante's report.

16      Q    Dr. Cole, you've been testifying here

17  for an hour and a half that the only thing you

18  looked at was Mr. Ferrante's report.  Correct?

19          MR. FRAY-WITZER:  Objection.  That is

20  not his testimony.

21      Q    And its exhibits.

22          MR. FRAY-WITZER:  Objection.  That was

23  not his testimony.

24      A    I believe what my testimony was, I was

25  hired to look at Mr. Ferrante's report and

1  determine whether Mr. Ferrante's report was

2  accurate, correct, and proved whether this

3  statement made by BuzzFeed was correct.  And I

4  believe that's consistent with my testimony since

5  we've started.

6      Q    Mr. Ferrante's report says that "XBT and

7  its affiliated web hosting companies have provided

8  gateways to the Internet for cybercriminals and

9  Russian state-sponsored actors to launch and

10 control large-scale malware campaigns over the

11 past decade."  Correct?  It's what you pointed out

12 to me.  It's on page 36.

13     A    It's one -- it's a -- how many page

14 report is this?  It's a 25 --

15     Q    36.  It's the last page.  It's the one

16 you read to me.

17     A    36-page -- 36-page report and that's one

18 sentence out of the whole report.  If you read the

19 whole report, Mr. Ferrante is heavily implying his

20 report to support that statement made by BuzzFeed.

21     Q    But he is saying in his report that "XBT

22 and its web hosting companies have provided

23 gateways to the Internet for cybercriminals and

24 Russian state-sponsored actors to launch and

25 control large-scale malware campaigns over the

1   past decade."  Right?  That's what his report says

2   on page 36.  Correct?

3       A    That's one of the many, many, many

4   sentences in his report.

5       Q    Okay.  Wouldn't you agree with me that

6   what activities XBT takes to monitor its networks

7   to protect from malicious cyber activity is a

8   relevant question to whether XBT is providing a

9   gateway for cybercriminals?

10          MR. FRAY-WITZER:  Objection.  You can

11  answer.

12      A    First, that's not what BuzzFeed said.

13  BuzzFeed did not say they were a gateway.  And

14  Mr. Ferrante's report was not arguing the

15  security.  He was supporting that BuzzFeed's

16  statement was valid and accurate.

17      Q    Why don't you answer the question I

18  asked you.

19          MS. BOLGER:  Would you read it back,

20  please.

21                  (Record read.)

22          MR. FRAY-WITZER:  Objection.  You can

23  answer.

24      A    Once again, relevant to my -- sorry,

25  aligned with my assignment of what I was asked to

1  do, no, that was not a key component of it.  My

2  focus was to look at the statement, look at

3  Mr. Ferrante's report, and see if there was

4  supporting evidence.

5      Q    That's still not answering my question.

6  Mr. Ferrante's report says that XBT infrastructure

7  was used by Russian state actors and other

8  cybercriminals.  Agreed?

9          MR. FRAY-WITZER:  Objection.

10     A    That is one of the many, many things in

11 his report.

12     Q    Okay.

13         Isn't what XBT does or does not do to

14 monitor its network to prevent that kind of

15 activity relevant to Mr. Ferrante's conclusions?

16         MR. FRAY-WITZER:  Objection.  You can

17 answer.

18     A    Looking at Mr. Ferrante's report, I do

19 not believe that was relevant.  He did not provide

20 any details to their security.  He did not provide

21 any factual information.  So within my scope of

22 looking at Mr. Ferrante's report, he did not

23 provide any evidence, analysis, or components.  He

24 didn't go in and show me what their security was,

25 and he didn't align that to any of his statements.

1  So with my focus solely on his report, no, that

2  was not relevant analysis for me performing my

3  expert report.

4         Q     Okay.  Can you turn to page 28 of

5  Mr. Ferrante's report.  You will see a section

6  that begins, "Statements from Deposition

7  Testimony," and the first sentence is "Statements

8  made during the deposition support that Root S.A.,

9  and XBT as an organization, do not actively

10  prevent the use of their infrastructure to support

11  malicious cyber activity."

12              Do you see that?

13       A     I see that statement.

14       Q     Now, in your report you say that it's --

15  I can't remember the word you used.  I just need a

16  citation.

17              You say, "Mr. Ferrante provides zero

18  deposition transcripts in his report and shows

19  zero evidence to support his claim.  Mr. Ferrante

20  seems to think it is acceptable to make false

21  claims backed up by zero factual evidence."

22  That's in paragraph -- sorry.  It's the

23  penultimate page.

24              I truly don't understand this, Dr. Cole.

25  Is it your testimony that Mr. Ferrante didn't

1  review deposition transcripts?

2      A    No.  I'm saying my assignment was to

3  review this report.

4      Q    Yes.

5      A    He makes a statement that "statements

6  made during a deposition," but he doesn't provide

7  any of the statements, any of the facts, or any of

8  the information to back up his analysis that that

9  is a true or false statement.

10     Q    So I don't understand this.  If you turn

11  to the next page, page 29, you will see that

12  beginning with footnote 111, and carrying on with

13  some breaks from 111 through 134, he's citing

14  deposition transcript pages which correlate to

15  quotations in the report.

16          What is your basis for saying he didn't

17  review transcripts or put quotations in the

18  report, given that?

19     A    I don't believe any of these support or

20  show the technical evidence for his previous

21  statements.

22     Q    That's not what you just said.  What you

23  said is you don't think he looked at deposition

24  testimony.

25          MR. FRAY-WITZER:  Objection.

1      A    I do not believe I said that.

2      Q    Dr. Cole, you've spun me around on this.

3  In your report you say, "provides zero deposition

4  transcripts in his report and shows zero evidence

5  to support this claim."

6           These are citations to actual deposition

7  transcripts.  I don't understand what you're

8  claiming, based on the fact that there are actual

9  citations to deposition transcripts in this

10 report.

11     A    These are depositions of the executives,

12 and an executive not knowing about a server or a

13 platform is not conclusory that -- whether a

14 company does or does not have good security.

15     Q    What are the false claims backed up by

16 zero factual evidence that Mr. Ferrante makes?

17     A    (Document review.)

18          His statement says they do not actively

19 prevent the use of their infrastructure to support

20 malicious cyber activity, which I read as

21 technical protection measures in place, and he

22 does not show any deposition testimony to support

23 that claim of whether they're patching, whether

24 they're scanning, whether they're doing

25 vulnerability scanning.  It's just high-level

1 statements of what an engineer says or a

2 background check, which, to me, that is not

3 supportive of that technical statement.

4       Q    Is it your testimony that the testimony

5 of the CTO of XBT cannot be used to establish the

6 policies and practices of XBT?

7            MR. FRAY-WITZER:  Objection.  You can

8 answer.

9       A    I did not say that.  What I'm saying is,

10 Mr. Ferrante is making a claim that they do not

11 actively prevent the use of the infrastructure,

12 and I did not see any factual evidence that he

13 quoted in his report to support that.

14      Q    So you said, "These are depositions of

15 the executive, and an executive not knowing about

16 a server or platform is not conclusory that a

17 company does or does not have good security."

18 That's your -- that's your testimony.  Agreed?

19      A    Yes.

20      Q    This is the CTO of the company.  Who

21 else is responsible for knowing whether a company

22 does or does not have good security?

23            MR. FRAY-WITZER:  Objection.  You can

24 answer.

25      A    The CTO is the chief technology officer,

1  so they are typically responsible at a high level

2  for the strategic design of technology.  Usually

3  your chief security officer or the security

4  manager or the security engineer would have the

5  detailed information.

6       Q    Do you think that person exists at XBT?

7            MR. FRAY-WITZER:  Objection.  If you

8  know.

9       A    I don't know the org chart and the

10  breakdown of XBT.

11      Q    Who else at XBT has any knowledge of the

12  infrastructure at XBT?

13           MR. FRAY-WITZER:  Objection.  If you

14  know.

15      A    Once again, outside the scope of my

16  analysis.

17      Q    Would you be surprised that there is no

18  security engineer at XBT?

19           MR. FRAY-WITZER:  Objection.

20      A    Once again, I don't know the size of the

21  organization.  That was not my analysis.

22      Q    You don't know the size of the

23  organization.

24      A    I don't know their org chart, number of

25  people, number of servers.  That was not my task.

1   My task --

2         Q     Any idea how many clients they have?

3         A     Once again, when I'm brought in as an

4   expert, it's sometimes wide, sometimes narrow.  My

5   tasking was specifically to look at Mr. Ferrante's

6   report.

7         Q     How about how much -- how many -- how

8   much infrastructure they have, how many servers?

9         A     Once again, I was not asked to perform

10  that analysis.

11        Q     So you don't know if the CTO was the

12  person most knowledgeable in the company or not.

13        A     Once again, my statement in my report

14  was based on I do not believe that Mr. Ferrante

15  provided the proper technical supporting evidence

16  and factual information to back up his claim.

17        Q     So you can't opine, as you sit here,

18  that XBT and its affiliates have industry standard

19  security policies and procedures in place?

20              MR. FRAY-WITZER:  Objection.  You can

21  answer.

22        A     Once again, I can absolutely perform

23  assessment for them, but that's not what I was

24  asked to perform.  I was asked to perform

25  Mr. Ferrante's, and I do not believe what he put

1  in his report is supporting the factual evidence

2  for his claims.

3      Q    Right.  So you can't opine in this case

4  as to whether XBT has appropriate industry

5  standard security procedures in place.

6      A    Right.  I was not asked to perform that

7  analysis.  My tasking was very specifically

8  focused on Mr. Ferrante's report.

9      Q    That's fine.

10         I'm going to ask you to turn to page 11

11  of your report, which, oh, sorry, paragraph --

12         MR. FRAY-WITZER:  I don't have a

13  paragraph.

14         MS. BOLGER:  I didn't write down my

15  paragraph number.  Paragraph 43.

16  BY MS. BOLGER:

17      Q    Paragraph 43 says, "To avoid unnecessary

18  repetition by addressing each point made in the

19  report, I have summarized a list of some of the

20  largest cyber attacks in history, having come from

21  different parts of the world, specifically,

22  different Regional Internet Registries (RIRs) and

23  the Autonomous Systems (AS) which belong to those

24  regions."

25         Do you see that sentence?

1     A    Yes, I do.

2     Q    Dr. Cole, where is that summary?

3     A    It looks like it was accidentally

4  removed or deleted, because there was a section

5  after this that did have that information, but I

6  am not seeing it in this report.

7     Q    Between the two of us, I'm glad I'm not

8  going crazy.  Okay.  Thanks.  Thanks for that

9  answer, Dr. Cole.  Okay.

10          Was that analysis a basis for your

11 opinion in this case?

12    A    No.  It was just basically showing that

13 there were attacks that came from different

14 Autonomous Systems.  It was supplemental to the

15 other analysis that I performed.  So it wasn't

16 critical to any of the opinions that I put in this

17 report.

18    Q    As you sit here, is there anything else

19 that you can remember that's missing from the

20 report?

21    A    Not that I'm aware of.

22    Q    Do you know if XBT and its subsidiaries

23 have a firewall to prevent malicious activity?

24          MR. FRAY-WITZER:  Objection.  You can

25 answer.

 1      A     That was outside the scope of my

 2   analysis so I am not aware of their

 3   infrastructure, how their systems are set up or

 4   configured.

 5      Q     Would that be an industry standard thing

 6   to have?

 7      A     Once again, it depends on a lot of

 8   factors that I would have to look at and evaluate.

 9      Q     What if you're a hosting company?  Would

10   that be an industry standard thing to have?

11      A     Once again, it would depend on how

12   they're configured, how they're set up, and what

13   other components are in place.

14      Q     Okay.  Take a look for me at paragraph

15   31 -- no, 36.  You have a sentence here that says,

16   "To expand on this point, why aren't companies

17   such as AT&T, Verizon, Sprint, and CenturyLink,

18   which own the Internet backbones, also being held

19   accountable in this report for the services they

20   sell to Webzilla?"

21            Are you with me?

22      A     Yes.

23      Q     Does AT&T have a firewall to guard

24   against malicious activity?

25      A     Once again, I did not perform that

 1  analysis.

 2      Q    Would you expect, as an industry

 3  standard, that AT&T has a firewall to protect

 4  against malicious activity?

 5      A    Once again, I find, working with

 6  companies, that they have very unique, creative

 7  ways of implementing security.  So they might,

 8  they might not.

 9      Q    I thought you were an expert in the

10  field of Internet security and would have some

11  familiarity with industry standards.  Isn't that

12  why you're here today?

13          MR. FRAY-WITZER:  Objection.

14      A    I'm here today because I offered my

15  opinion on Mr. Ferrante's report.

16      Q    Your expert opinion as an industry

17  expert.  Right?

18      A    That is correct.

19      Q    Okay.

20          As an industry expert, what are the

21  standard procedures that a web hosting company

22  would have in place to guard against malicious

23  cyber activity?

24          MR. FRAY-WITZER:  Objection.  You can

25  answer.

1      A     Once again, it would be a variety of

2    different things, but it would depend on the

3    organization and situation.

4      Q     How about XBT.  What industry standard

5    procedure should they have in place to guard

6    against malicious cyber activity?

7      A     Once again, it would depend on the type

8    of data, the information they have, what

9    regulations are in place.  There's a lot of

10   factors that go into play to answer that.

11     Q     You don't know a lot about XBT.  Right?

12           MR. FRAY-WITZER:  Objection.  You can

13   answer.

14     A     Once again, my focus was on the

15   Mr. Ferrante report so I did not do analysis of

16   XBT.

17     Q     You don't know very much about XBT, do

18   you?

19           MR. FRAY-WITZER:  Objection.  You can

20   answer.

21     A     That was outside the scope of the report

22   so that is correct.  I do not have a detailed

23   understanding of XBT.

24     Q     You don't even have a general

25   understanding of XBT, do you?

1          MR. FRAY-WITZER:  Objection.

2     A    Once again, my focus was on the

3  statement made by BuzzFeed and Mr. Ferrante's

4  report.  I did not -- I was not tasked and did not

5  perform any analysis of XBT.

6     Q    So you don't have a general awareness of

7  XBT, do you, general understanding of XBT, do you?

8          MR. FRAY-WITZER:  Objection.  You can

9  answer.

10     A    That was outside the scope and that was

11  not my focus, so, no, I do not.

12     Q    Do you know if they've ever had abuse

13  alerts for, for example, hacking on any of the IP

14  addresses referenced in Mr. Ferrante's report?

15     A    Once again, outside the scope of my

16  analysis.  I was asked to look solely at

17  Mr. Ferrante's report in relation to the BuzzFeed

18  comment.  I did not perform that analysis.  I

19  could, but that's not what I was asked to do.

20     Q    So the answer is you do not know.

21     A    That is correct.

22     Q    You also do not know if they ever

23  followed up on any abuse alerts they may have

24  received on those IP addresses.  Correct?

25     A    Once again, outside the scope, but that

1  is correct.

2      Q    Okay.  It is nonetheless industry

3  standard to follow up on abuse alerts on IP

4  addresses.  Correct?

5          MR. FRAY-WITZER:  Objection.

6      A    Once again, depends on time periods,

7  industry, many other factors.

8      Q    Do you have any evidence that the

9  plaintiffs did have good security procedures in

10  place?

11      A    Once again, that was outside the scope,

12  and I don't think that was relevant to the

13  statement made by BuzzFeed.

14      Q    But you don't have any knowledge as to

15  whether they had good security procedures in

16  place.

17      A    That was outside the scope so, correct.

18      Q    And you don't have any evidence that

19  they did not have good security measures in place,

20  either.  Correct?

21      A    That was also outside the scope so that

22  would also be correct.

23      Q    I'm going to ask you to turn to

24  paragraph 49 of the report.

25          THE WITNESS:  When we're at a good spot,

 1  could we take a quick lunch break?

 2          MS. BOLGER:  Yes.  Let me make sure

 3  lunch is here.

 4          THE WITNESS:  Oh, you're bringing lunch.

 5          MS. SCHARY:  Yes, we are.

 6          THE WITNESS:  You guys are awesome.

 7  Okay.  Thank you.

 8          MR. FRAY-WITZER:  They take care of us

 9  pretty well.

10          THE WITNESS:  I'm impressed.  Thank you.

11  BY MS. BOLGER:

12      Q    So it's 49.  You actually don't need to

13  read it at the moment.

14          Do I understand you to say that, in your

15  expert opinion as an expert in the field of

16  cybersecurity, web hosting companies have no

17  responsibility for monitoring or stopping

18  malicious packets that traverse their networks?

19      A    I did not say that, but that was outside

20  the scope.  Once again, my focus was on the

21  statement that BuzzFeed made about XBT affiliates

22  using botnets to transmit, plant, and steal data.

23      Q    I'm not asking you about what your

24  report says.  I'm asking you, in your expert

25  opinion, as an expert in the field of

1  cybersecurity, is it your opinion that web hosting

2  companies have no responsibility for monitoring or

3  stopping malicious packets that traverse their

4  networks?

5          MR. FRAY-WITZER:  Objection.  You can

6  answer.

7      A    As I said, it depends on the business,

8  their SLAs, a lot of factors in play that I would

9  have to look at in order to be able to form that

10  analysis.  I could, but that was outside the scope

11  of what I was asked to do.

12     Q    But you're the person who brought this

13  post office analogy.  Right?  That's all you,

14  Dr. Cole.  That has nothing to do with

15  Mr. Ferrante.  That has nothing to do with the

16  dossier.  I assure you the words "post office" do

17  not appear in Mr. Ferrante's report, and although

18  a lot of words appear in the dossier, "post

19  office" is not one of them.  Okay?

20          Can we all agree "post office" is all

21  you?  Right?

22          MR. FRAY-WITZER:  Objection.

23     Q    Is there ever an obligation of the post

24  office to stop bombs from going through?

25          MR. FRAY-WITZER:  Objection.  That's

1  just so clearly outside of the witness' scope or

2  testimony or report.

3      A    Once again, I was using a general

4  analogy to try to help explain technical concepts

5  and common terms.  I would need a lot more

6  information and a lot more data to make --

7      Q    You weren't explaining technical terms

8  when you said, "XBT/Webzilla is not responsible

9  for every bit of data that a bad actor passes over

10  its infrastructure any more than a post office is

11  responsible for the actions of the Unabomber."

12  Those are your words, Dr. Cole.  I didn't give

13  them to you.  Mr. Ferrante didn't.

14          Are you telling me you think that the

15  post office can never be responsible for the

16  actions of the Unabomber?

17          MR. FRAY-WITZER:  Objection.

18      A    I did not say that.  That's not what my

19  statement says.

20      Q    That is what it says.  Read it.  Look at

21  paragraph 40.  That's exactly what it says.

22          "XBT/Webzilla is not responsible for

23  every bit of data that a bad actor passes over its

24  infrastructure any more than a post office is

25  responsible for the actions of the Unabomber."

1           Do you see that?

2       A    I see that sentence.

3       Q    Okay.  Is it your testimony that the

4   post office can never be responsible for the

5   actions of the Unabomber?

6       A    You're adding "never" and other words in

7   that's not in there.  I just said it's not

8   responsible for every bit, every bit of data, and

9   I'm saying it's not responsible for the actions of

10  one person.

11      Q    Do you know that after the Unabomber

12  started to use the United States mail to send

13  bombs, the United States mail service changed

14  their practices to scan the mail?  Do you know

15  that?

16          MR. FRAY-WITZER:  Objection.  You can

17  answer if you know.

18      A    I believe, if we go back to my earlier

19  testimony, I did make a statement similar to,

20  after something bad happens, there sometimes is

21  actions and changes that are made.

22      Q    That's the best practice.  Right?

23      A    Well, those could be reactionary

24  measures.  Those could be standard practices.

25  Once again, it depends a lot on what the activity

1  was, what the impact was and many other factors.

2          MR. FRAY-WITZER:  Just for the record,

3  it's Mr. Ferrante's report that first brings up

4  old-fashioned mail delivery and uses it as an

5  analogy.  So the word "post office" might not have

6  been in there.

7          MS. BOLGER:  Evan, you're an excellent

8  testifier.  Well done, Evan.

9          Do you want to take a break for lunch?

10          MS. SCHARY:  It's here.

11          MS. BOLGER:  We can eat lunch.

12          THE VIDEOGRAPHER:  Off the record at

13  12:12.

14              (A lunch recess was taken.)

15

16

17

18

19

20

21

22

23

24

25

1      AFTERNOON SESSION commencing at 12:45 p.m.

2           THE VIDEOGRAPHER:  Here begins media

3   number 2 in the video-recorded deposition of Eric

4   Cole.  We're back on the record at 12:45.

5   BY MS. BOLGER:

6      Q    Hi, again, Dr. Cole.

7           If you look at your report, page 12, and

8   it's the articles that you reference and quote in

9   the report.  So let's see what that's after,

10  paragraph-wise.  After 46.

11     A    Okay.

12     Q    These are not full articles.  Right?

13  These are the excerpts of articles?

14     A    I believe that to be true.  I listed the

15  full URL, but I believe these are just portions.

16     Q    The first one is from 2006.  Correct?

17     A    That looks to be correct, yes.

18     Q    Before the iPhone was invented?

19     A    I think that's -- I was trying to

20  remember when the iPhone was invented, but I'll

21  have to trust your word on that.

22     Q    I can tell you that my daughter was

23  invented in 2008, and it was about six months

24  before she made her entrance into the world.

25     A    Oh, okay.  So you have a good data

1  point.

2        Q    I do.

3             Did you select these articles

4  personally?

5        A    Yes.  I went in and just looked for a

6  few sample articles.

7        Q    Why these two?

8        A    Just ones that give a range on showing

9  that there's lots of traffic, lots of volume.  I

10 thought these were concise articles that supported

11 the arguments I was making in my report.

12       Q    Okay.  In both of these articles, the --

13 they're about ISPs.  Correct?

14       A    That is correct.

15       Q    We talked earlier in the day about the

16 fact that the plaintiffs here are a hosting

17 company.  Right?

18       A    I do remember that conversation, yes.

19       Q    That's different than an ISP.  Correct?

20       A    Yes.  As I believe I mentioned, hosting

21 providers have an ISP component, but they do

22 provide more -- typically, more infrastructure.

23       Q    Okay.  Is it your expert opinion that

24 the standards between the two of them, an ISP and

25 a hosting company, should be the same?

 1      A     For the pieces -- the pipes to the

 2   Internet, there would be similarities, but a

 3   hosting provider would have some differences.

 4      Q     Okay.  Then these articles don't relate

 5   exactly to the plaintiffs.

 6      A     Well, a hosting provider has the hosting

 7   piece and then the ISP piece.  So it would relate

 8   to the ISP piece, and the reason I focused on that

 9   was Mr. Ferrante really focused on the IP address

10   component outward, and that would be more the

11   ISP-related piece.  If he was focused a lot more

12   on the configuration of the servers, then I

13   probably would have picked hosting providers, but

14   I felt most of his analysis was more ISP-related

15   functionality than the actual hosting provider

16   functionality.

17      Q     Do you know what percentage of XBT's

18   business is ISP provision?

19      A     No, I do not.

20      Q     Do you know that, for example,

21   Mr. Gubarev has testified that they're not a

22   telecommunications company?

23      A     I will take your word for that.

24      Q     Okay.  And you didn't know that other

25   than my telling you that?

1      A      Well, to me, a hosting provider does

2   have an ISP component to it.  It does have a

3   connectivity to the Internet, but, yes, they

4   are -- they are viewed more as a hosting provider

5   than ISP.

6      Q      Wait.  So do you -- do you know if XBT

7   customers pay XBT to get Internet access in the

8   way of a -- I'm from New York City, so a Time

9   Warner Cable or a Spectrum or something like that?

10      A      That was outside the scope of my

11   analysis so, no, I do not know.

12      Q      I can represent to you that, as a

13   general matter, they do not.  Mr. Fray-Witzer will

14   correct me if I'm wrong.

15              Does that change your analysis at all?

16      A      No, it doesn't.

17      Q      Why not?  I'm seriously asking.

18      A      Okay.  Because, once again, what I'm

19   really focusing on is the traffic/IP address

20   component, and, to me, even though these articles

21   are on ISP, they're still relevant based on the

22   discussion and argument made by Mr. Ferrante.

23      Q      In both of these articles -- and I have

24   the complete ones if you want to look at them, but

25   you may be able to answer from your memory.  In

1 both of these articles, they talk about the fact

2 that ISP companies have the ability to monitor

3 traffic.  Correct?

4             MR. FRAY-WITZER:  Objection.  You can

5 answer.

6     A     Okay.  I believe you're referring to the

7 functionality of security where you could monitor,

8 but it could impact performance?

9     Q     Yes.

10     A     Okay.

11     Q     So, yes, in both of these articles, the

12 articles discuss the fact that ISPs have the

13 technological capacity to monitor traffic.

14 Correct?

15     A     At a high level, I believe that to be

16 correct, yes.

17     Q     Okay.  Well, actually, I thought both of

18 these articles were at a relatively high level.

19 Do you disagree with me on that?

20     A     I guess I said that because we're not

21 referring to a specific sentence.  We're referring

22 to the article as a whole, yes.

23     Q     Right.  The article, as a whole,

24 referred to the industry as a whole.  The whole

25 discussion is quite high level.  Would you agree

 1  with me on that?

 2      A    Yes, I would.

 3      Q    And these are laypeople's articles.

 4  Correct?

 5      A    Yes.

 6      Q    Right.  In not very big publications.

 7  They're pretty small publications.  Correct?

 8          MR. FRAY-WITZER:  Objection.  The Daily

 9  News?

10          MS. BOLGER:  It's not the Daily News.

11  It's not the New York Daily News.  I would never

12  disparage the New York Daily News.

13          MR. FRAY-WITZER:  I was going to say,

14  from a New Yorker.

15          MS. BOLGER:  I mean, please.  You defame

16  me.

17  BY MS. BOLGER:

18      Q    One is from IDG News Services, and one

19  is from the New Scientist.  Correct?

20      A    That looks to be accurate.

21      Q    So these are laypeople's articles.

22  Correct?

23      A    Yes.  And that was the intention.

24      Q    No, I'm not being critical.  All right.

25          And the point is that in both of these

1   articles they talk about the fact that ISPs have

2   the capacity to monitor the Internet.  They talk

3   about whether the wisdom of they should be taking

4   steps to monitor traffic on the Internet.

5   Correct?

6        A    Yes.  It's always the balance between

7   the functionality security and the cost factor

8   associated with it.

9        Q    Do you know Mr. Kan or Mr. Marks?

10       A    No, I do not.

11       Q    Do you know anything about Mr. Kan or

12  Mr. Marks?

13       A    No, I do not.

14       Q    I'm going to ask you to turn to my --

15  got to start writing down numbers -- 50, please,

16  paragraph 50, which is on page 15.

17            MS. BOLGER:  Do you know what, I'm so

18  sorry, don't go anywhere, but can we just take a

19  five-minute break.

20            MR. FRAY-WITZER:  Yes, of course.

21            (Discussion off the record.)

22            THE VIDEOGRAPHER:  Going off the record

23  at 12:53.

24            (A brief recess was taken.)

25            THE VIDEOGRAPHER:  Back on the record at

1    12:54.

2    BY MS. BOLGER:

3        Q    Okay.  So I wanted to look at paragraph

4    50.  So this is -- "This investigation has no

5    information" -- "this investigation" is in

6    reference to Mr. Ferrante's investigation -- "has

7    no information based on collection and analysis

8    from XBT Holding systems.  No analysis of server

9    logs and hard drives.  No analysis of router logs.

10   No email or other digital communication analysis

11   to determine if XBT Holding had any operational

12   plans to deploy botnets and distribute pornography

13   with virus payloads to the Democratic Party."

14           Do you see that?

15       A    Yes, I do.

16       Q    What logs do you think Mr. Ferrante

17   should have looked at?

18           MR. FRAY-WITZER:  Objection.  You can

19   answer.

20       A    Once again, I would need -- I would need

21   some network diagrams and understand the

22   infrastructure of XBT.  But, in general, if he is

23   making claims that their infrastructure was used,

24   you would look at the server logs, you could look

25   at router logs, you could look at network device

 1  logs.

 2      Q    Well, you -- you're -- you're saying in

 3  this paragraph that Mr. Ferrante's investigation

 4  is flawed because he didn't look at logs.  In

 5  reaching that conclusion, what logs did you want

 6  him to look at?

 7          MR. FRAY-WITZER:  Objection.  You can

 8  answer.

 9      A    I thought I just said that.  It would be

10  the --

11      Q    You equivocated quite a bit.  I want the

12  actual answer --

13      A    Okay.

14      Q    -- to what you meant by faulting his

15  investigation by saying he didn't look at logs.

16      A    So if he's saying certain IP addresses

17  or servers were involved, you would look at the

18  logs of those servers, look at the hard drives to

19  see if there's any evidence.  And then you would

20  also look at the logs of routers or switchers or

21  other network devices.

22      Q    And know there are logs that you believe

23  XBT maintained.

24          MR. FRAY-WITZER:  Objection.

25      A    Once again, that's why -- that's why I

 1  said I would need to look at their infrastructure

 2  and how they're setting things up, but, typically,

 3  to go in and make claims like Mr. Ferrante, you

 4  would go in and look at the servers, you would

 5  look at the systems, you would monitor traffic,

 6  you would perform more detailed analysis of the

 7  actual systems, the servers and the hard drives.

 8       Q    Right.  And XBT you would expect to

 9  maintain that information.  Correct?

10            MR. FRAY-WITZER:  Objection.  You can

11  answer.

12       A    Once again, they could either maintain,

13  or, in a lot of these, you can go in and set up

14  sniffers.  You could turn on logging.  You could

15  gather other information also.  I would have to

16  look at the infrastructure.

17       Q    It's your conclusion he should have done

18  it.  So I want to know what you think he should

19  have done.  You can't -- it can't be a

20  case-by-case basis.  You're saying Mr. Ferrante

21  didn't do something.  Tell me the thing

22  Mr. Ferrante should have done with the XBT

23  infrastructure.

24            MR. FRAY-WITZER:  Objection.  You can

25  answer.

      1      A    I thought I did, but I'll try again.

      2      Q    No.  You keep telling me that it could

      3  be this, it could be that, it could be this, you

      4  don't know what they have.  "I don't know what

      5  they have" isn't a satisfactory answer in this

      6  context because you're saying he didn't do a

      7  thing.

      8      A    And I think I said the server logs and

      9  hard drives and router logs.  So I would --

     10      Q    And you expect XBT to have maintained

     11  those.

     12           MR. FRAY-WITZER:  Objection.  You can

     13  answer.

     14      A    Right.  So for this investigation, to

     15  have gone in, look at a network diagram; then

     16  examine the servers, look at the server

     17  configuration, how they're set up, their hard

     18  drives; and look at logs and whether or not

     19  they're maintained, there's still evidence on hard

     20  drives that be recovered and analyzed.

     21           So I think what I put here is "No

     22  analysis of server logs or hard drives.  No

     23  analysis of routers.  No email or other digital

     24  communication."

     25      Q    Did you look at server logs?

1      A    Once again, my assignment was to mirror

2    Mr. Ferrante.  So if Mr. Ferrante --

3      Q    So the answer is no.

4      A    If Mr. Ferrante did it, I would have.

5    But since he did not do that and my scope was to

6    focus solely on his report, I did not do that.

7      Q    That's not true.  I asked you earlier if

8    you had done -- redone the analysis in

9    Mr. Ferrante's report, and you told me you had not

10   done so.  Correct?

11          MR. FRAY-WITZER:  Objection.

12     Q    You did not redo the analysis in

13   Mr. Ferrante's report.  Correct?

14          MR. FRAY-WITZER:  Objection.  You can

15   answer.

16     A    I would have to look back at the

17   statement, but my focus was on Mr. Ferrante's

18   report.  So I went through, looked at what he did

19   and analyzed and provided analysis on the

20   correctness of it.  So I just followed what he did

21   in his report.  I was not hired to do independent,

22   separate forensic analysis.

23     Q    Right.  But you didn't redo his analysis

24   of the Bitly data.  Right?

25     A    Right.  I used the information in

1  Mr. Ferrante's report to do my analysis.

2      Q    Right.  You didn't redo his analysis of

3  the Bitly data.  Correct?

4      A    Right.  I used his report.  I did not

5  redo or perform any analysis outside the scope of

6  looking at his report, which was what my

7  assignment was.

8      Q    And you didn't redo his analysis of the

9  malware hashes as they related to the SSL

10 certificate controlled by Fancy Bear.  Correct?

11     A    Once again, that was outside the scope.

12 I could have, but no, I did not do that because

13 that's not what I was asked to do.

14     Q    Right.  Your report is about the

15 conclusions in Mr. Ferrante's report, but you did

16 not redo the analysis.  Correct?

17     A    That is correct.

18     Q    So now my question was, did you do a

19 forensic analysis of the server logs at XBT.  And

20 you said no.  Correct?

21     A    That is correct.

22     Q    And you did not do a forensic analysis

23 of the XBT hard drives.  Correct?

24     A    Once again, outside the scope, so that

25 is correct.

1      Q     You did not do an analysis of XBT's

2   routers logs.  Correct?

3      A     That would be outside the scope so that

4   would also be correct.

5      Q     You did not do an analysis of the email

6   or other digital communications at XBT.  Correct?

7      A     Once again, outside the scope so that

8   would be correct.

9      Q     So just as you believe Mr. Ferrante

10  cannot opine on whether XBT had operational plans

11  to deploy botnets and distribute pornography, you

12  cannot opine on that either, can you?

13     A     Once again, Mr. Ferrante and myself had

14  two different assignments.  So if we look at the

15  beginning of his report, what he was asked to do

16  and what I was asked to do are two different

17  things.  My sole focus was not to perform an

18  analysis.  It was to look solely at Mr. Ferrante's

19  report and provide a technical analysis.

20     Q     I'm going to ask again because you

21  didn't answer me.  So just as you believe

22  Mr. Ferrante cannot opine on whether XBT had

23  operational plans to deploy botnets and distribute

24  pornography, you cannot opine on that either, can

25  you, because you didn't do a forensic analysis

1  either, did you?

2      A    Once again, Mr. Ferrante and myself had

3  two different assignments, if you look at the

4  beginning of our reports.  My focus was solely on

5  looking at his report.  So that was outside the

6  scope and that was not part of what I was tasked

7  to do so I did not perform that.

8      Q    As you sit here today, do you think that

9  you have conducted a sufficient analysis to opine

10 on whether XBT Holdings deployed botnets or

11 distributed pornography with virus payloads to the

12 Democratic Party?

13     A    That is not what I was asked to do.

14 That was not my assignment.  My assignment was to

15 look solely at Mr. Ferrante's report so, no, that

16 was not the tasking.  I could do that, but that is

17 not what I was asked to perform in this case.

18     Q    Okay.  So you do not have -- sorry.

19 Strike that.

20          So you have not conducted a sufficient

21 analysis to opine on whether XBT Holdings deployed

22 botnets and distributed pornography with virus

23 payloads to the leadership of the Democratic

24 Party.

25     A    My assignment and scope was to look at

1    Mr. Ferrante's report.  In looking at

2    Mr. Ferrante's report and using that as my basis,

3    I draw my conclusions in the report.  If you're

4    looking for a different scope, where you're saying

5    that I independently, outside of Mr. Ferrante,

6    performed my own forensic analysis, that was not

7    the scope, and I did not perform that work.

8        Q    So you cannot reach a conclusion as to

9    whether XBT Holdings deployed botnets and

10   distributed pornography with virus payloads to the

11   leadership of the Democratic Party, can you?

12       A    Once again, that was not the scope.

13   That was not what I was asked to do.  So I cannot

14   answer a question that was outside the scope.  So,

15   no, I did not answer that question because that

16   was not my assignment or what my direction was.

17       Q    So you didn't reach a conclusion as to

18   whether XBT Holdings deployed botnets and

19   distributed pornography with virus payloads to the

20   leadership of the Democratic Party.  Right?

21       A    With response to Mr. Ferrante's report,

22   I did --

23       Q    No, your conclusion about your work.

24   Did you reach a conclusion as to whether XBT

25   Holdings deployed botnets and distributed

1  pornography with virus payloads to the leadership

2  of the Democratic Party?

3           MR. FRAY-WITZER:  Objection.  You can

4  answer.

5      A    With respect to Mr. Ferrante -- you need

6  to let me answer my question.

7           With response to Mr. Ferrante's report,

8  I went in and used the information in this report

9  to come up with conclusions on that.  If you're

10  asking if I did an independent, separate analysis

11  outside of Mr. Ferrante's report, that was outside

12  the scope of what I was asked to do, and I did not

13  perform that.

14     Q    I'm asking you what opinion you're

15  offering in this case.  Are you offering the

16  opinion in this case that XBT did not deploy

17  botnets and distributed -- or distribute

18  pornography with virus payloads to the Democratic

19  Party, based on your own analysis?

20     A    The opinion I'm offering in this case is

21  that -- using the information in Mr. Ferrante's

22  report, who was hired by the defendant -- that

23  there was no evidence to support the claim that

24  "XBT/Webzilla and its affiliates had been using

25  botnets and porn traffic to transmit viruses,

1   plant bugs, steal data, and conduct 'altering

2   operations' against the Democratic Party

3   leadership.  Entities linked to one Aleksej

4   Gubarev were involved, and he and another hacking

5   expert, but recruited under duress by the FSB,

6   were significant players in the operation."

7       Q    Right.  You're offering the opinion that

8   Mr. Ferrante didn't prove it.

9            I'm asking you whether in your research

10  you were able to establish that XBT did not deploy

11  botnets or distribute pornography with virus

12  payloads to the DNC.

13           MR. FRAY-WITZER:  Objection.  You can

14  answer.

15      A    Once again, my focus was --

16      Q    Dr. Cole, juries know when you're

17  fudging.  Come on, answer the question.

18      A    I am answering.

19           MR. FRAY-WITZER:  Objection.

20      Q    Answer the question.

21           MR. FRAY-WITZER:  Objection.  The

22  witness has answered the question about eight

23  times.  I'm letting him answer it as many times as

24  you want to ask it.

25      A    Once again, the focus of my analysis was

1    to look at Mr. Ferrante's report, and I told you

2    the conclusion I have drawn.  If you are asking me

3    if I did a separate, independent analysis outside

4    of looking at Mr. Ferrante's report, that was not

5    what I was tasked to do.  That was outside the

6    scope, and that was not performed.

7         Q    Can you look at paragraph 56 for me.

8         A    (Document review.)

9         Q    So paragraph 56 says, "Assuming, only

10   for the sake of argument, that everything in the

11   FTI report was true, there is still no supporting

12   evidence to back up these claims.  If proper

13   procedure were followed and a forensic

14   investigation were conducted, the following and

15   most basic questions would have been answered."

16        Before we talk about the questions,

17   which we will, I have to confess, I flatly don't

18   understand the first sentence of that paragraph.

19   What does that mean?  "Assuming, for the sake of

20   argument, that everything is true, there's still

21   no supporting evidence to back up these claims."

22        What do you mean by that?  What are you

23   talking about?

24        A    I'm saying that I don't agree with the

25   claims, but even if they were true, there was no

1   supporting evidence or analysis to prove the

2   statements that were made.

3        Q    So I still don't understand that.  So

4   let's just take a specific example, and then you

5   can explain to me what it means.

6            So let's talk about the IP

7   certificate -- sorry, the IP address that shares

8   the SSL certificate with Fancy Bear.

9            Do you know what I'm talking about?

10       A    Yes, I do.

11       Q    It's page 13 of his report.

12           I'm sorry, I totally told you the wrong

13  thing.  It's page 15.

14           So you're assuming it's true.  Right?

15  It says, "Assuming, for the sake of argument, that

16  it's true."  Then you say, "There is still no

17  supporting evidence to back up these claims."

18           Well, in this portion of the report,

19  Mr. Ferrante talks about an IP address that was

20  found on the CrowdStrike report that's linked to

21  the SSL certificate.  He refers to Exhibit 6 of

22  the report, which is the printout that describes

23  the SSL certificate.  What other evidence were you

24  looking for?

25               MR. FRAY-WITZER:  Objection.  It's just

 1  not what the report is saying.

 2       Q    Dr. Cole, if you can explain to me what

 3  the report is saying and take Evan's instruction

 4  and his testimony, I'd be happy to hear you do it.

 5  I truly don't understand what you're talking about

 6  because I don't know what evidence there is if

 7  that's not the evidence to support the claim.

 8            MR. FRAY-WITZER:  I guess I would just

 9  suggest starting on paragraph 55 since 56 follows.

10            MS. BOLGER:  Again, you're not

11  testifying.

12       A    So here, he is saying that out of 40 IP

13  addresses, one is owned by Root S.A. that's

14  registered to XBT.  To me, that's not any

15  supporting evidence at all that -- that XBT and

16  its affiliates had been using botnets, porn

17  traffic to transmit viruses, et cetera, that

18  statement.  So, to me, he is going in, and, yes,

19  one of the 40 was owned, but that is not

20  supporting evidence to prove the fundamental

21  statement that's at question in this case.

22       Q    That's because the way you construe the

23  fundamental question at issue in this case is that

24  XBT itself undertook the bad acts?  Correct?

25       A    I'm taking the statement on face value.

 1  "A company called XBT/Webzilla and its affiliates

 2  had been using botnets and porn traffic to

 3  transmit viruses, plant bugs, steal data," and

 4  then entities directly linked to Aleksej Gubarev

 5  were involved.  So I'm looking at that, and he

 6  does not provide any factual support to support

 7  that entire claim.

 8      Q    So you're saying that even if it's true

 9  that XBT infrastructure was used to launch the

10  Bitly attack; was connected to this SSL

11  certificate that Fancy Bear had; had 13 IP

12  addresses listed on the Grizzly Steppe report; was

13  used in a worldwide massive ad fraud campaign; had

14  one, two, three, four, five, six connections to

15  Russian cyber actors; was involved in one, two,

16  three, four, five, six other malicious cyber

17  attacks, you think that evidence is completely

18  irrelevant to the allegations in the dossier.

19          MR. FRAY-WITZER:  Objection.  You can

20  answer.

21      A    Once again, some of the -- just for the

22  record, some of the things you quoted, I don't

23  directly agree with the statements.  IP addresses

24  out of many, including other big companies like

25  Google and Amazon, were listed there.  So I do not

1   believe he provided any concrete evidence that

2   supports that this statement made by BuzzFeed has

3   any factual relevance.

4          Q    Are you done?

5          A    Yes.

6          Q    I'm sorry, I don't understand your -- I

7   hate to ask my question again because it was so

8   long, but I don't understand your response, and

9   I'll tell you why I don't understand your

10  response.  Paragraph 56 says, "Assuming, only for

11  the sake of argument, that everything in the FTI

12  report was true."  Do you see that?  That's your

13  words, got it?

14         A    (Nodding head yes.)

15         Q    So now I'm going to tell you, assume

16  everything in the report was true.  I understand

17  it's just an assumption, but it's your assumption.

18              Assuming that it is true, that all of

19  the bad acts articulated in this report are true

20  and happened on XBT infrastructure, are you

21  seriously telling me that you think you can

22  discount all of them collectively as irrelevant to

23  the allegations in the dossier?

24              MR. FRAY-WITZER:  Objection.  You can

25  answer.

1      Q    As an actual serious cyber security

2   investigator.

3           MR. FRAY-WITZER:  Objection.  You can

4   answer.

5      A    That's not what I said.  So the first

6   thing we have to look at is, the FTI report never

7   once uses the word "prove," "proves," or "proof."

8      Q    That's not -- Dr. Cole, that's outside

9   your hypothetical.  You set up the hypothetical.

10  You said the hypothetical was -- everything was

11  true.

12          MR. FRAY-WITZER:  He's answering the

13  question.

14          MS. BOLGER:  No, he's not answering my

15  question.

16  BY MS. BOLGER:

17     Q    You set up the hypothetical.  The

18  hypothetical is, assume it's true.  So don't argue

19  with the report.  Answer the hypothetical you set

20  up.  You said assume it's true.  So assume it's

21  true.  Are you really telling me it's irrelevant?

22          MR. FRAY-WITZER:  Please let the witness

23  answer the question.

24          MS. BOLGER:  Let him try for once.

25     A    So if you go in and look at the report,

1  what I'm saying is that the FTI report never once

2  uses the word "proof," "proves," or "proof," and

3  the whole matter here is not infrastructure.  It's

4  whether the "XBT/Webzilla and its affiliates had

5  been using botnets and porn traffic to transmit

6  viruses, plant bugs, and steal data, and conduct

7  'altering operations' against the Democratic

8  leadership," and with regard to that statement,

9  the FTI report does not provide any supporting

10 evidence to back that claim.

11     Q    Dr. Cole, you didn't listen to anything

12 I said.  And, honestly, juries know when you're

13 fudging.  And you're fudging, Dr. Cole.

14          MR. FRAY-WITZER:  Objection.  This is

15 just an attack on the witness.

16     Q    Let's go with our hypothetical.

17          MR. FRAY-WITZER:  Ask your question,

18 please.

19     Q    Let's go with your hypothetical.  Let's

20 go with your hypothetical.  Your hypothetical is,

21 assume it's all true.  Are you telling me that if

22 everything in the FTI report was true, it still

23 has no relevance to the allegations in the

24 dossier?

25          MR. FRAY-WITZER:  Objection.

1      A      Once again, even if we go with that, if

2  we're looking at the actual allegation that we're

3  talking about, Mr. Ferrante did not provide

4  supporting evidence to back up the claims that

5  "XBT/Webzilla and its affiliates had been using

6  botnets and porn traffic to transmit viruses,

7  plant bugs, steal data, and conduct 'altering

8  operations' against the Democratic Party

9  leadership."  And I think it is crystal clear,

10  even to a jury, that the FTI report never once

11  uses the word "prove," "proves," or "proof."

12      Q      You're reading an entire different part

13  of the report than I am.

14      A      No, I'm not.  I'm reading the exact

15  section.

16      Q      I'm reading the sentence, "Assuming,

17  only for the sake of argument, that everything in

18  the FTI report was true," which you wrote and you

19  won't do.

20           Okay.  Let's -- oh, by the way, if

21  you'll flip now to the questions on the next page,

22  there's a whole listing of questions.  Did you ask

23  any of these questions of XBT?

24      A      Once again, my assignment was to utilize

25  Mr. Ferrante's report.  If Mr. Ferrante asked the

1  questions, then I would have.  But because he

2  didn't, and my focus was solely on Mr. Ferrante's

3  report, I did not ask those questions because that

4  was out of scope of what I was asked to do.

5      Q    You didn't ask all the questions

6  Mr. Ferrante asked in the other parts of the

7  report, did you?

8      A    I'm not following the question.

9      Q    You just said that if Mr. Ferrante had

10  asked the questions, you would have asked the

11  questions.  But that's actually not true for the

12  whole report.  You've said now twice that you

13  didn't redo Anthony's report.  So it's not true

14  that if Anthony had asked the questions, you would

15  have asked the questions, because throughout the

16  report Mr. Ferrante did things that you didn't do.

17  Right?

18            MR. FRAY-WITZER:  Objection.

19      Q    You never reverse engineered the malware

20  hashes, did you?

21      A    I went through his analysis and used his

22  information.

23      Q    Did you reverse engineer the malware

24  that was used at the DNC?

25      A    No, I did not.

1      Q    Mr. Ferrante did.  Would you agree with

2   me?

3      A    I believe Mr. Ferrante's team did.

4      Q    Okay.  But you did not, right.  Okay.

5   So you did not redo Mr. Ferrante's analysis.

6   Correct?

7      A    In that particular case, no, I did not

8   use what was in there.

9      Q    And you did not reverse engineer the SSL

10  certificate.  Correct?

11     A    Because I felt there was sufficient

12  information in his report that I didn't need to do

13  that.

14     Q    And you didn't analyze and review the

15  Bitly data.  Correct?

16     A    Once again, my focus was solely on

17  Mr. Ferrante's report so I used the information

18  within his report.

19     Q    Okay.  So you didn't do everything

20  Mr. Ferrante did.  Correct?

21     A    I reviewed and analyzed everything

22  Mr. Ferrante did.

23     Q    You did not do all of his analysis.

24  Correct?

25     A    My tasking was not to redo his analysis.

1    My tasking was to look at his report and provide a

2    technical evaluation.  So I was not asked to redo

3    his analysis.  I could have, but that was not what

4    the scope of the assignment was.

5         Q    Great.

6              Take a look on page 17 under the heading

7    "Steal" -- I'm sorry, "Conducting 'altering

8    operations.'"  It's the next page.  You're on the

9    right page.  You're on the right page.

10        A    Oh, page 17.  I thought you meant

11   paragraph 17.

12        Q    No, I'm sorry.  I apologize.

13        A    Sorry.

14        Q    No, we speak different languages,

15   Dr. Cole.  Page 17, "Conduct 'altering

16   operations.'"

17             The very first bullet point is "What

18   ransomware or destructive malware" --

19        A    Are you under "Steal data"?

20        Q    No, under "Conducting 'altering

21   operations.'"

22        A    Sorry.  Okay.

23        Q    And then "What analysis was done on this

24   destructive malware to determine what data was

25   successfully ransomed or damaged from the

 1    Democratic Party machines?"

 2            Do you see that?

 3        A    Yes, I do.

 4        Q    But Mr. Ferrante did do that analysis.

 5    Correct?

 6        A    I do not believe he did -- I don't

 7    believe he identified the ransomware or

 8    destructive malware indicators and performed the

 9    analysis on the Democratic Party machines.

10        Q    No, he did it on the malware.  He did

11    the analysis on the malware itself.  Correct?

12        A    He did some basic analysis, but not of

13    all the destructive malware indicators that were

14    discovered on the Democratic Party machines.

15        Q    I'm not sure I understand the

16    distinction you're making.  And this may be

17    semantic, Dr. Cole.

18            FTI obtained the malware, deconstructed

19    the malware, and then analyzed the malware.  Do

20    you agree with that?

21        A    Some of the malware.  I didn't see that

22    that was all of the malware and all of the

23    specifics from the Democratic Party machines.

24        Q    Okay.  Turn to page 14 of Mr. Ferrante's

25    report.

1          It says, "The CrowdStrike report

2    included seven command-and-control IP addresses

3    and five malware hashes (i.e., malicious software

4    programs) as the IOCs in the DNC hack."  IOC is

5    indicator of compromise.  Right, Dr. Cole?

6        A    Yes.

7        Q    And then it says FTI performed an

8    analysis of the five malware samples.

9             Do you see that?

10       A    Yes, I do.

11       Q    So what do you think -- you said you

12   thought they only performed analysis on some of

13   the malware.  There were five named malware

14   hashes.  They performed analysis on those five

15   named malware hashes.  What is it that you think

16   they didn't do?

17       A    Well, this report doesn't state whether

18   that was all of the malware on the Democratic

19   Party machines.

20       Q    Well, the CrowdStrike report says it's

21   all of the malware on the Democratic machines.

22   That's what it says.  "The CrowdStrike report

23   included seven command-and-control IP addresses

24   and five malware hashes."

25       A    I don't see anywhere where it says that

1    was a complete --

2        Q    "As the IOCs in the DNC hack."  That's

3    what it says.

4        A    Right.  So that's why I said that was

5    some.  That doesn't say that was all.

6        Q    Did you review the CrowdStrike report?

7        A    Yes.  There were several -- that's just

8    focused on one of the attacks.  I'll have to go --

9    if you have the report, we can look at it.

10       Q    Did you review the CrowdStrike report

11   where you wrote your report?

12       A    Yes, I did.

13       Q    Do you have any reason to believe that

14   there was other malware?

15       A    (Document review.)

16       Q    It won't be in your report.

17       A    I'm just looking at the questions.

18            It says in Mr. Ferrante's report, "FTI

19   reviewed the IP registration information for the

20   seven command-and-control IP addresses, but none

21   were affiliated with XBT."  It doesn't say they

22   performed full forensic analysis, and the analysis

23   they did perform actually showed that there was no

24   affiliation with XBT.

25       Q    That's not the sentence I -- we were not

1  talking about the IP addresses.  We were talking

2  about the malware samples.  It says, "based on

3  analysis of the five malware samples."

4            You told me -- you testified that you

5  believed that FTI did not conduct an analysis of

6  all of the malware samples.  I am trying to figure

7  out what the basis for that is, given that the FTI

8  report specifically says there were five malwares,

9  we analyzed -- five pieces of malware, we analyzed

10 five pieces of malware.

11           I'm trying to figure out why you think

12 it is they didn't analyze malware.

13           MR. FRAY-WITZER:  Objection.

14    A    I'm just seeing that "FTI reviewed the

15 IP registration information" --

16    Q    Read the next sentence.

17    A    What's that, "Similarly"?

18    Q    Yes, it ends with "based on an analysis

19 of the five malware samples."

20    A    But Mr. Ferrante doesn't explain any of

21 the details of what they performed or what they

22 did.  And from what he's listing here, it looks

23 like they just did IP registration information.

24    Q    Well, that's not what you just

25 testified.  You just testified you thought they

1    didn't do an analysis on all of the malware

2    samples.  Now you're saying, well, maybe they did

3    it on all of the malware samples, but they didn't

4    do the right kind of analysis.  I don't understand

5    what the basis for your claim is that they didn't

6    do a malware analysis.

7        A    What they have in their report is that

8    they reviewed the IP registration information and,

9    similarly, was not able to identify a direct

10   connection based on the analysis.  So reading

11   these --

12       Q    That's the IP information.  The next

13   sentence says, "based on an analysis of the five

14   malware samples."

15       A    Right, but if you're reading the

16   paragraph together, I'm taking that that the

17   analysis they performed was just reviewing the IP

18   registration information.  They do not say they

19   did any other detailed analysis.

20       Q    Wow.  But if you're wrong about that and

21   they did it, is your conclusion wrong in your

22   report?

23            MR. FRAY-WITZER:  Objection.

24       A    No, it would still be correct.

25       Q    Why?  You said they're -- you said here

1  you're faulting them for not doing a malware

2  analysis, but they did -- but what if they did?

3  Would you be wrong?

4      A    I'm saying this is a -- this is a

5  comprehensive list of all questions that are

6  listed here.  If they answered one or part of one,

7  they still didn't answer all of them.

8      Q    So they had to answer every single one

9  of these questions to satisfy you.

10          MR. FRAY-WITZER:  Objection.

11      A    They had to provide the detail behind

12  this.  And I still don't agree.  In their

13  report -- now, if they did things not in their

14  report, that's great.  But what's in the report --

15  I do not believe what they have in their report

16  satisfies these questions.

17      Q    Did you do any of these questions?

18      A    Once again, that was not the scope of my

19  analysis.  It was to look at Mr. Ferrante's.  So,

20  no, I did not.

21      Q    If you look at the previous page, the

22  Bitly data.

23      A    Whose report?

24      Q    Mr. Ferrante's.  I'm sorry, page 13.

25          It says that FTI -- established a

1 connection -- sorry -- "produced a system audit

2 log of 11,139 bitlinks created by john356gh, which

3 included the bitlink, created ... and the IP

4 address used to create the bitlink."  Then there's

5 a chart beneath that actually shows the bitlink,

6 the underlying URL, and the URL -- the Base64

7 encoding for the actual email that actually hacks

8 John Podesta.

9          Isn't that -- isn't that FTI analyzing

10 the malware?

11          MR. FRAY-WITZER:  Objection.  You can

12 answer.

13     A    This is just looking at the Bitly, and

14 the important thing is, clearly states, "FTI could

15 not establish a technical connection between the

16 IP addresses used that John Podesta clicked on and

17 XBT."

18     Q    Yes, we all know how to pick and choose

19 from a report to make our points, Dr. Cole, but

20 that wasn't my question.

21          My question was, doesn't the chart show

22 the bitlink, the underlying URL, and the URL

23 encoding of the actual email that actually phished

24 John Podesta?

25          MR. FRAY-WITZER:  Objection.  You can

 1  answer.

 2      A    It is showing the URL, and, once again,

 3  you can't take sentences out of context.  If you

 4  look at the entire sentence, they do -- they

 5  perform the analysis, and then it's important to

 6  show that they could not establish a technical

 7  connection between the IP address that John

 8  Podesta clicked on and XBT.  And this is a perfect

 9  example of the lack of evidence that I reference

10  in my report.

11      Q    Right.  But you -- your report says that

12  they didn't do any analysis of malware indicators

13  associated with the hack.  This is a malware

14  indicator connected with the hack, is it not?

15      A    Can you show me where in my report I

16  said they did not do any analysis?

17      Q    Are you actually quibbling with the word

18  "any"?  Yes.  "If proper procedure were followed

19  and a forensic investigation were conducted" --

20      A    Which paragraph?

21      Q    56.

22      A    -- "the following and most basic

23  questions would have been answered and included in

24  a report for at least the following four

25  categories."  Right?

 1          I'm telling you, isn't this information,

 2   which is about the actual malware that actually

 3   phished John Podesta, included in the report?

 4          MR. FRAY-WITZER:  Objection.  You can

 5   answer.

 6      A    Once again, this is the bitlink data so

 7   this is showing the link.  To me, once again,

 8   these questions were based off of -- they did not

 9   show the detailed analysis to support their

10   claims, and, once again, this analysis actually

11   supports my claim that they could not establish a

12   technical connection between the IP address that

13   John Podesta clicked on and XBT.

14      Q    But you didn't do any of this analysis.

15      A    Once again, that was outside the scope.

16   I did not perform that analysis.  My focus was on

17   Mr. Ferrante's report.

18      Q    What degree were you awarded from Pace

19   University?

20      A    A doctorate in professional studies.

21      Q    A DPS.  Correct?

22      A    Yes.

23      Q    On your CV it says it's "now a Ph.D."

24   What does that mean?

25      A    So when I took, it was a DPS, and I was

1  notified by the school that they did a conversion

2  over to a Ph.D.

3      Q    So it is your testimony that you have a

4  Ph.D.?

5          MR. FRAY-WITZER:  Objection.

6      A    I tell people that I have a DPS.

7  They're equivalent, and that's why I go by

8  Dr. Cole.

9      Q    Well, they're not equivalent, just like

10  a JD is not equivalent.  Right?

11     A    But I'm saying the school, the school

12  notified me that it was converted over, but at the

13  time I got the degree, it was a DPS.

14     Q    The school notified you that your degree

15  was converted?

16     A    I would have to go back and look at the

17  exact email.  I believe that's what it said.

18     Q    How many total fees did you bill in this

19  matter?

20     A    I would have to look at the invoicing,

21  but, if I was guessing, maybe around 50 hours.

22  That would be a guess.  I would have to look at

23  the exact invoice.

24     Q    I'm entitled to that information, and I

25  would like to have it.

1          Other than you, who else worked on

2    writing this report?

3        A    I wrote the report.  I have some folks

4    that just helped me with basic organizational

5    stuff, but the report, the analysis, the thoughts

6    were all me.

7        Q    Who are those people?

8        A    I have an assistant that does, like,

9    scheduling and stuff like that for setting up

10   meetings, and others, but once again, the

11   functional foundational material for the report

12   was all me.

13       Q    What's the name of your assistant?

14       A    Geraldine.

15       Q    Geraldine what?

16       A    Malloy.

17       Q    You said you have some folks that help

18   you with basic organizational stuff.  So who are

19   the other folks?

20       A    Greg Kipper.

21       Q    What does Mr. Kipper do?

22       A    He does various work for Secure Anchor,

23   helps me with some security assessments, and some

24   other work.

25       Q    He didn't once sue my client for

1  defamation, did he?  Did you ever -- I know -- the

2  reason I laughed when you said "Greg Kipper" was

3  because there is a famous defamation plaintiff

4  named Greg Kipper.

5       A    Oh, okay.  I was wondering.

6       Q    That's why I laughed.

7       A    I missed the humor.

8       Q    That's why I laughed.  It was just funny

9  in this context.  Greg Kipper was, like, an

10  80-year-old man, so don't worry about it.  But,

11  anyway, it just made me laugh.

12      A    Thank you for clarifying.  I was

13  wondering.

14      Q    I wondered what you -- that's why I said

15  it.

16           Other than Mr. Kipper and Ms. Malloy,

17  anybody else?

18      A    No.

19           MS. BOLGER:  I have to run to the

20  bathroom so let's take a break.  We may be

21  wrapping up.

22           THE WITNESS:  Excellent.  Thank you.

23           THE VIDEOGRAPHER:  We're off the record

24  at 1:31.

25               (A brief recess was taken.)

1          THE VIDEOGRAPHER:  Back on the record at

2   1:38.

3          MS. BOLGER:  That is it.  I have no

4   further questions, Dr. Cole.  Thank you so much

5   for spending so much time with us.

6          THE WITNESS:  Thank you.

7          MR. FRAY-WITZER:  Thank you.

8          THE VIDEOGRAPHER:  This concludes the

9   video-recorded deposition of Eric Cole.  We're off

10  the record at 1:38.

11

12      (Whereupon, at 1:38 p.m., the deposition

13                  was concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

1                          ALEKSEJ GUBAREV V. BUZZFEED

2                          ERIC COLE

3

4                     INSTRUCTIONS TO THE WITNESS

5               Please read your deposition over carefully

6   and make any necessary corrections.  You should state

7   the reason in the appropriate space on the errata

8   sheet for any corrections that are made.

9               After doing so, please sign and date the

10  errata sheet.

11              You are signing same subject to the changes

12  you have noted on the errata sheet, which will be

13  attached to your deposition.

14              It is imperative that you return the

15  original errata sheet to the deposing attorney within

16  thirty (30) days of receipt of the deposition

17  transcript by you.  If you fail to do so, the

18  deposition transcript may be deemed to be accurate and

19  may be used in court.

20

21

22

23

24

25

* * *

ACKNOWLEDGEMENT OF WITNESS

I, ERIC COLE, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any corrections appear on the attached Errata sheet signed by me.


_____        _____
(DATE)              (SIGNATURE)



SUBSCRIBED AND SWORN before and to me this ____ day of _____, 2018.



                    _____
                            Notary Public


My commission expires:

1             CERTIFICATE OF SHORTHAND REPORTER

2

3             I, Michele E. Eddy, Registered Professional

4    Reporter and Certified Realtime Reporter, the court

5    reporter before whom the foregoing deposition was

6    taken, do hereby certify that the foregoing transcript

7    is a true and correct record of the testimony given;

8    that said testimony was taken by me stenographically

9    and thereafter reduced to typewriting under my

10   supervision; and that I am neither counsel for,

11   related to, nor employed by any of the parties to this

12   case and have no interest, financial or otherwise, in

13   its outcome.

14

15             IN WITNESS WHEREOF, I have hereunto set my

16   hand and affixed my notarial seal this 5th day of

17   September, 2018.

18

19   My commission expires July 14, 2022

20

21

22   _____

23   MICHELE E. EDDY
     NOTARY PUBLIC IN AND FOR
24   THE DISTRICT OF COLUMBIA

25

1              E R R A T A   S H E E T

2                 U.S. LEGAL SUPPORT

3

4    CASE NAME:  ALEKSEJ GUBAREV V. WEBZILLA

5    DATE OF DEPOSITION:  August 29, 2018

6    WITNESS' NAME:  ERIC COLE

7    PAGE     LINE    CHANGE              REASON

8    _____    _____   _____     _____

9    _____    _____   _____     _____

10   _____    _____   _____     _____

11   _____    _____   _____     _____

12   _____    _____   _____     _____

13   _____    _____   _____     _____

14   _____    _____   _____     _____

15   _____    _____   _____     _____

16   _____    _____   _____     _____

17   _____    _____   _____     _____

18   _____    _____   _____     _____

19

20                   _____
                     ERIC COLE
21   SUBSCRIBED AND SWORN TO
     BEFORE ME THIS _____DAY
22   OF _____ 2018.

23   _____
     NOTARY PUBLIC

24

25

## Exhibits

**EX 0001 Eric Cole 0829**
**18**  4:12 12:11 14:7,10
  62:17 63:5
**EX 0002 Eric Cole 0829**
**18**  4:13 44:24 45:5
**EX 0003 Eric Cole 0829**
**18**  4:14 52:1,7

---

### 1

**1**  5:6 12:11 14:7,10,
  18 27:13,15 62:17
  63:5 71:12
**10**  31:25 76:13
**100**  71:11
**102**  53:2
**10:05**  5:12
**10:28**  28:9,12
**11**  93:10
**11,139**  45:23 140:2
**111**  88:12,13
**11:14**  67:20
**11:27**  67:23
**12**  6:22 105:7
**12:12**  104:13
**12:45**  105:1,4
**12:53**  111:23
**12:54**  112:1
**13**  45:20,22 68:3
  124:11 126:11 139:24
**134**  88:13
**14**  49:13 134:24
**15**  62:15 67:11 69:14
  111:16 124:13
**16**  70:6
**17**  133:6,10,11,15
**17-cv-60426**  5:10
**18**  27:11,18,25 28:16
  53:6
**1919**  5:13
**1:31**  145:24

---

### 2

**2**  44:24 45:5 105:3

---

**2006**  105:16
**2008**  105:23
**2016**  52:13
**2018**  5:2,11
**21**  53:7
**22**  43:14
**25**  84:14
**28**  87:4
**28th**  52:13
**29**  5:2 88:11
**29th**  5:11

---

### 3

**3**  52:1,7 73:16 75:9
**31**  95:15
**32**  78:5
**36**  74:9 84:12,15 85:2
  95:15
**36-page**  84:17
**39**  39:8

---

### 4

**4**  27:4,11
**40**  39:8 69:22 76:12
  102:21 125:12,19
**41**  32:2 41:2 42:1
**43**  93:15,17
**46**  105:10
**470**  78:25 79:5
**49**  99:24 100:12

---

### 5

**5**  43:13
**50**  111:15,16 112:4
  143:21
**51**  62:14
**55**  125:9
**56**  123:7,9 125:9
  127:10 141:21
**58**  78:13

---

### 6

**6**  124:21

---

### 8

**80-year-old**  145:10

---

### 9

**94.242.205[.]147**  68:5

---

### A

**ability**  25:18 51:6
  109:2
**absolutely**  40:7 92:22
**abuse**  79:5 98:12,23
  99:3
**accept**  45:14
**acceptable**  87:20
**access**  18:15 22:5
  108:7
**accidentally**  94:3
**account**  47:2 48:7
  61:24 62:5 63:19
  64:3,5 70:21
**accountable**  95:19
**accuracy**  15:4,5,8
**accurate**  12:22 84:2
  85:16 110:20
**action**  29:20 43:8
  77:2 78:4,15,17
  79:1,8
**actions**  76:17 77:7
  78:5,7,10 102:11,16,
  25 103:5,9,21
**actively**  87:9 89:18
  90:11
**activities**  78:20
  82:18 85:6
**activity**  15:19 46:9
  47:7,18 80:19,25
  82:7 85:7 86:15
  87:11 89:20 94:23
  95:24 96:4,23 97:6
  103:25
**actor**  10:25 76:15
  102:9,23
**actors**  9:6,16 11:20
  39:16 74:18 83:7
  84:9,24 86:7 126:15
**actors'**  10:2

---

**acts** 57:24 58:10,13,
15,17 74:8 78:13
125:24 127:19

**actual** 10:9 43:18
89:6,8 107:15 113:12
114:7 128:1 130:2
140:7,23 142:2

**ad** 126:13

**adding** 103:6

**addition** 62:15

**additional** 7:4 8:11
35:20 36:15 37:11
47:1,12,21 48:6
49:14

**address** 16:3 34:12,14
46:14,16,22 47:6,17,
24 48:3,14,16 49:17
51:11,14 53:8,17
55:4,12,23 56:5,9,
11,15,19,22,23,25
57:1,13,15,17,19
59:15 60:2,6,13,15,
18 61:4 63:23 64:19
65:7 66:6,10,20,23
67:3,9 68:4,19 69:8,
16 70:1 71:25 72:8
73:17,21 78:6,14,25
79:6 107:9 108:19
124:7,19 140:4 141:7
142:12

**addresses** 16:2 25:11,
19 26:3,5,7,22 27:1
33:18 34:4,15,21
35:20,22 36:2,5
43:20 44:2,8,11,15,
19,22 46:10 47:8,9,
13,20 48:12 51:16
53:24 54:9,14,21,25
56:3,21,22 57:23
58:10,22 59:3,8,11,
18 60:22 61:1,7,9,25
62:6,16,19,20 63:2,
12,14,19 64:3,11,14,
23 65:4,11,22 66:7,
20 69:22 70:7 71:1,6
72:1,5 73:10 98:14,
24 99:4 113:16
125:13 126:12,23
135:2,23 136:20
137:1 140:16

**addressing** 93:18

**admit** 66:13

**ADT** 53:1

**adversaries** 70:22

**adversary** 55:25

**affiliated** 67:4,10
70:7 74:15 83:5 84:7
136:21

**affiliates** 25:5 28:21
36:10 37:4,16,25
38:8 40:3 43:7 75:15
92:18 100:21 121:24
125:16 126:1 129:4
130:5

**affiliation** 70:3
136:24

**AFTERNOON** 105:1

**agree** 25:16 26:1,22
29:20 41:12 45:8
51:24 57:24 58:4,5,
7,11 85:5 101:20
109:25 123:24 126:23
132:1 134:20 139:12

**agreed** 31:6 54:12
86:8 90:18

**agreements** 78:10

**akin** 53:18

**Aleksej** 5:7 122:3
126:4

**alerting** 82:14

**alerts** 78:25 79:5
98:13,23 99:3

**align** 86:25

**aligned** 85:25

**Alison** 5:21

**allegation** 130:2

**allegations** 7:21
126:18 127:23 129:23

**alleged** 10:2

**allowed** 82:17

**alter** 56:19

**altering** 28:23 32:11
37:18 38:10 39:4
122:1 129:7 130:7
133:7,15,20

**Amazon** 20:2 78:21
126:25

**amount** 20:17 72:23

**analogy** 101:13 102:4
104:5

**analysis** 7:15 9:10,20
10:6 15:5 16:6,23
17:1,6,11,17 18:21,

22 19:24 20:21,22
22:10,13 23:2,4,10,
12,17,19 24:1,6,8,
10,15,16,18 25:7
30:8,9 33:14,18
34:3,16 35:1,5,21,
23,25 36:1,3,9,15,
17,18,22,24 37:3,11,
15,24 38:7,14,15,20
39:13,20,23 40:1,2,
15 41:20 42:15 43:1,
3,6,19,20 44:1,2,13,
17,18 46:11,19
47:15,19,20,21 48:1,
9,20 50:1,14,17,21,
25 51:3,24 59:14,20
61:15,21,22 62:1,10
63:18 64:2,23 66:14,
17 69:3 77:14,15
79:17 80:12 81:9,13,
24 82:11 86:23 87:2
88:8 91:16,21 92:12
93:7 94:10,15 95:2
96:1 97:15 98:5,16,
18 101:10 107:14
108:11,15 112:7,8,9,
10 114:6 115:22,23
116:8,12,19,22,23
117:1,2,5,8,16,19,22
118:1,5,18,19,25
119:9,21 120:6
121:10,19 122:25
123:3 124:1 131:21
132:5,23,25 133:3,23
134:4,9,11,12 135:8,
12,14 136:22 137:3,
5,18 138:1,4,6,10,
13,17,19 139:2,19
141:5,12,16 142:9,
10,14,16 144:5

**analyze** 132:14 137:12

**analyzed** 34:25 115:20
116:19 132:21 134:19
137:9

**analyzing** 17:14 41:8
140:9

**Anchor** 81:3,9 144:22

**announce** 25:18

**announces** 26:2

**answering** 86:5 122:18
128:12,14

**Anthony** 131:14

**Anthony's** 131:13
**Apologies** 69:12
**apologize** 133:12
**apology** 14:9
**areas** 73:6
**argue** 128:18
**arguing** 70:9,11 85:14
**argument** 60:17 66:2
  108:22 123:10,20
  124:15 127:11 130:17
**arguments** 18:23 29:11
  64:9 65:16,25 68:24
  106:11
**article** 10:12,20
  109:22,23
**articles** 10:2,22,24
  11:5 16:16,19 38:22
  105:8,12,13 106:3,6,
  10,12 107:4 108:20,
  23 109:1,11,12,18
  110:3,21 111:1
**articulated** 75:3,11
  127:19
**ASN** 25:9,18,20 26:1,
  2,3,13,18,23 54:3,
  10,22 55:5
**ASNS** 25:4 26:7 54:8,
  14,15,25 61:1,3
**assessing** 8:10
**assessment** 92:23
**assessments** 81:4
  144:23
**assign** 26:7
**assigned** 25:12 26:4,
  13,16,18 61:2
**assignment** 7:11,13,17
  13:10 14:4 16:24
  17:13 24:11,12,15
  25:1,3 31:20,24 33:3
  36:13 37:1,6 38:5,
  12,16 41:24 42:6,13
  49:8,10 51:5 62:7,8
  75:6 85:25 88:2
  116:1 117:7 119:14,
  25 120:16 130:24
  133:4
**assignments** 118:14
  119:3
**assistant** 144:8,13
**assume** 52:23 127:15
  128:18,20 129:21

**assumed** 59:14 60:3
**assuming** 123:9,19
  124:14,15 127:10,18
  130:16
**assumption** 127:17
**assure** 101:16
**AT&T** 95:17,23 96:3
**attach** 44:25 45:3
**attached** 14:11 16:21
  45:6 52:8 62:17
  63:6,11
**attack** 9:16 10:3
  59:16 60:3,9,12,16
  126:10 129:15
**attacked** 16:14
**attacks** 9:7 10:7,10,
  13,25 11:1,3,8,10,
  12,25 39:17 44:14
  58:20 60:22,25 61:9
  63:24 68:12 75:2,3,
  11,17,19 77:17 80:14
  93:20 94:13 126:17
  136:8
**audit** 45:22 47:2
  140:1
**August** 5:2,11
**Autonomous** 25:10
  93:23 94:14
**Avenue** 5:13
**avoid** 93:17
**awarded** 142:18
**aware** 7:25 77:1,11,22
  78:2 80:6 94:21 95:2
**awareness** 98:6
**awesome** 100:6

---

**B**

**back** 10:18 15:10,22,
  25 17:12 28:11 42:16
  44:10 46:15,21 47:16
  48:3 58:1 60:13 62:3
  67:22 72:3 73:22
  79:15 85:19 88:8
  92:16 103:18 105:4
  111:25 116:16
  123:12,21 124:17
  129:10 130:4 143:16
**backbones** 95:18
**backed** 87:21 89:15

**background** 10:5 90:2
**bad** 76:15 78:5 102:9,
  23 103:20 125:24
  127:19
**balance** 111:6
**bandwidth** 72:23 73:5,
  7
**Base64** 140:6
**based** 9:3 18:5 23:16
  30:6 34:10,17 38:19
  41:22 44:14,22 48:14
  50:1,14 62:15 63:2
  65:10,22 75:21 89:8
  92:14 108:21 112:7
  121:19 137:2,18
  138:10,13 142:8
**basic** 123:15 134:12
  141:22 144:4,18
**basically** 11:11,14
  25:11 29:9 76:10
  94:12
**basis** 29:4,25 33:1,15
  88:16 94:10 114:20
  120:2 137:7 138:5
**bathroom** 67:17 145:20
**Bear** 49:16 61:8,11
  66:8 67:4,11 117:10
  124:8 126:11
**began** 39:15
**beginning** 54:5,13
  69:19 75:5 88:12
  118:15 119:4
**begins** 5:5 45:22
  69:17 87:6 105:2
**behalf** 5:15,20 7:8
  14:21 21:4 30:16,23
  33:13
**believed** 39:16 137:5
**belong** 93:23
**belonged** 44:12 48:12
  61:1
**belongs** 54:22
**Ben** 31:17
**beneath** 140:5
**big** 78:22 80:2 110:6
  126:24
**bill** 143:18
**bit** 67:16 76:14
  102:9,23 103:8
  113:11

**bitlink** 45:24 46:24
47:11 48:5 68:23
69:6,8 140:3,4,5,22
142:6
**bitlinks** 45:23 46:13,
20 47:25 48:11 68:3,
19 140:2
**Bitly** 45:22 46:3
48:21,24,25 49:3
116:24 117:3 126:10
132:15 139:22 140:13
**blanket** 32:8 39:1
42:2
**bodies** 65:10,22 68:14
**bold** 46:2 50:6
**bolded** 46:12 48:2
**Bolger** 5:19 6:5,7
14:12 28:6,13 42:16
51:25 52:9 67:15,24
71:16,21,23 77:20
85:19 93:14,16
100:2,11 104:7,11
105:5 110:10,15,17
111:17 112:2 125:10
128:14,16,24 145:19
**bomb** 77:8
**bombs** 101:24 103:13
**bone** 27:6
**book** 41:10
**books** 38:21
**botnets** 28:21 32:9
36:11 37:5,17 38:1,9
39:2 40:3,17 82:13
100:22 112:12
118:11,23 119:10,22
120:9,18,25 121:17,
25 122:11 125:16
126:2 129:5 130:6
**box** 46:1,2
**breaches** 80:2
**break** 67:18 100:1
104:9 111:19 145:20
**breakdown** 22:1 91:10
**breaks** 88:13
**bringing** 100:4
**brings** 104:3
**broadcast** 72:20
**broadcasting** 72:15
**brought** 8:6 92:3
101:12

**bucket** 21:21
**bugs** 28:22 32:10 39:3
122:1 126:3 129:6
130:7
**bullet** 133:17
**bullets** 75:6
**bunch** 38:22
**business** 22:14 23:6,
16,17 24:1,8 78:10
79:10 80:22 81:15
101:7 107:18
**Buzzfeed** 5:8 30:13,25
31:1,4,7,12,15 32:7
39:1 42:2 75:14
76:4,11 77:16 80:13
82:1,12 83:2,15
84:3,20 85:12,13
98:3,17 99:13 100:21
127:2
**Buzzfeed's** 85:15

C

**Cable** 108:9
**call** 12:3
**called** 28:20 55:21
57:12 126:1
**camera** 5:14
**campaign** 126:13
**campaigns** 74:19,23
83:8 84:10,25
**capacity** 109:13 111:2
**care** 100:8
**careful** 11:15 41:9
52:21
**carrying** 88:12
**case** 5:9 16:12 17:13
18:6,8 21:4 24:25
30:18 52:17 59:19
62:14 71:25 77:14,15
93:3 94:11 119:17
121:15,16,20 125:21,
23 132:7
**case-by-case** 78:1
114:20
**cases** 16:1 29:13
33:17 59:17
**categories** 141:25
**centers** 23:14
**Centurylink** 95:17

**certificate** 66:7,10,
24 67:1,4,10 69:21
70:4 117:10 124:7,8,
21,23 126:11 132:10
**certified** 72:17
**cetera** 125:17
**change** 23:1 54:11,18
108:15
**changed** 54:1,10,24
103:13
**chart** 91:9,24 140:5,
21
**check** 10:18 36:7 53:5
72:3 90:2
**chief** 90:25 91:3
**choose** 140:18
**circumstances** 79:17
80:1 81:22
**citation** 87:16
**citations** 89:6,9
**citing** 88:13
**City** 108:8
**claim** 15:21,23,25
33:1 42:1 65:21,24
71:4 87:19 89:5,23
90:10 92:16 121:23
125:7 126:7 129:10
138:5 142:11
**claiming** 59:6 89:8
**claims** 15:5,11 20:18
22:9 28:18,19 29:6,
10 30:3 33:17 87:21
89:15 93:2 112:23
114:3 123:12,21,25
124:17 130:4 142:10
**clarification** 44:6
48:3
**clarifying** 145:12
**clear** 12:15 41:2
130:9
**click** 11:13,16
**clicked** 46:25 47:11
48:6 140:16 141:8
142:13
**client** 144:25
**clients** 81:16,18 92:2
**Cole** 5:7 6:2,6 12:14
14:13,18,20 23:23
24:4,21 25:23 27:5
32:1 37:13 38:21
41:13 45:8 51:7

52:1,10 53:5,15
61:11,17 64:24 68:1
69:15 82:25 83:16
87:24 89:2 94:2,9
101:14 102:12 105:4,
6 122:16 125:2 128:8
129:11,13 133:15
134:17 135:5 140:19
143:8
**collection**  112:7
**collectively**  127:22
**colocation**  22:23
**command-and-control**
135:2,23 136:20
**commencing**  105:1
**comment**  98:18
**commissioned**  40:8
**commit**  57:24
**committed**  68:11
**Committee**  39:18 62:17
**common**  102:5
**communicates**  66:23
**communicating**  74:3
**communication**  16:5
73:6 112:10 115:24
**communications**  118:6
**companies**  17:22 19:3,
11,21 20:3,4,5,9,19,
20 21:5,14 23:25
69:2,4 70:16 74:16
76:21 78:22 81:8,10,
11 83:5 84:7,22
95:16 96:6 100:16
101:2 109:2 126:24
**company**  20:25 21:17
25:13 28:20 52:12
80:18 81:3 89:14
90:17,20,21 92:12
95:9 96:21 106:17,25
107:22 126:1
**competitive**  18:21
20:21,22
**competitors**  18:17
20:10
**complaint**  68:18
**complete**  57:1 72:8,12
108:24 136:1
**completed**  57:11 58:14
**completely**  80:15
126:17

**component**  34:24 86:1
106:21 107:10 108:2,
20
**components**  11:25
63:21 79:4 86:23
95:13
**comprehensive**  139:5
**compromise**  11:13
135:5
**compromised**  11:17
16:13 80:4
**concept**  73:19
**concepts**  102:4
**concerned**  65:17
**concise**  106:10
**concluded**  60:8
**conclusion**  75:15
113:5 114:17 120:8,
17,23,24 123:2
138:21
**conclusions**  74:9
86:15 117:15 120:3
121:9
**conclusive**  68:10
**conclusory**  33:6 44:20
47:16 65:7 70:12
89:13 90:16
**concrete**  127:1
**conduct**  28:23 32:10
37:17 38:9 39:4
82:14 122:1 129:6
130:7 133:15 137:5
**conducted**  119:9,20
123:14 141:19
**Conducting**  133:7,20
**confess**  123:17
**confidentiality**  52:22
**configuration**  107:12
115:17
**configured**  95:4,12
**confirm**  72:21
**connected**  48:19
126:10 141:14
**connecting**  46:20
**connection**  49:25
50:13,20 57:3,16
72:12 138:10 140:1,
15 141:7 142:12
**connectionless**  57:16
72:13

**connections**  49:14
126:14
**connectivity**  18:14
108:3
**considered**  64:22
**consistent**  84:4
**construe**  125:22
**contained**  7:21 17:3
46:24 47:10 48:5
**content**  18:1 20:5,7,
16,24 21:6,13,16
76:24
**contention**  18:10 27:6
30:11
**context**  8:7 9:3 39:13
41:10 44:11 53:13,
20,23 115:6 141:3
145:9
**control**  25:5,18 26:8
54:21 74:18 76:22
83:8 84:10,25
**controlled**  54:13,14
55:6 74:23 117:10
**controlling**  26:24
**controls**  26:2,22
**conversation**  106:18
**conversations**  18:5
**conversion**  143:1
**converted**  143:12,15
**cookie**  81:7,22
**copy**  12:2,13,19 14:15
45:1
**core**  44:12 46:11
**correct**  6:23 7:8,9,
22,24 8:2,12,13
11:21 12:3,4,5,24
13:6,9,14 14:13
16:18 17:17 18:25
19:3,5,11 21:1,18
22:18 23:3,5 25:14,
19 26:3,8,17,24
29:20,21,24 30:13,
18,25 31:8,22 33:25
36:20 42:4,5,19
43:8,10 45:10 47:8,
9,13,21 50:18,19
51:12,21 52:18 53:19
54:15 55:10 56:24
57:3 58:12,14 62:23
63:4,14,15 64:16
65:5,15 68:15,17,23
69:10,23,24 70:1,2,

4,5,10,18,19 71:13
72:9,16,24 74:24
81:13,20 83:10,18
84:2,3,11 85:2 96:18
97:22 98:21,24 99:1,
4,17,20,22 105:16,17
106:13,14,19 108:14
109:3,14,16 110:4,7,
19,22 111:5 114:9
116:10,13 117:3,10,
16,17,20,21,23,25
118:2,4,6,8 125:24
132:6,10,15,20,24
134:5,11 138:24
142:21

**correctness** 116:20

**correlate** 88:14

**cost** 111:7

**cost-benefit** 79:17

**counsel** 5:17 6:4,19
18:6

**count** 53:3

**counting** 27:11 32:1

**couple** 39:21 48:10
59:4

**court** 5:9,14,24

**cover** 66:19

**covered** 63:15

**crazy** 94:8

**create** 140:4

**created** 30:17 45:23
46:13 47:6 68:3,19,
22 69:8 140:2,3

**creative** 96:6

**critical** 94:16 110:24

**criticism** 65:4,14,20,
24 68:20

**criticisms** 65:13

**criticizing** 64:18,25

**Crowdstrike** 34:13,15,
19,22 35:14,19 50:7
62:1,6 124:20 135:1,
20,22 136:6,10

**crystal** 130:9

**CTO** 90:5,20,25 92:11

**custom** 47:3

**customers** 18:16 21:25
22:5 108:7

**cutter** 81:7,22

**CV** 142:23

**cyber** 9:6,16 10:25
11:3 39:17 75:3,11
80:19,25 85:7 87:11
89:20 93:20 96:23
97:6 126:15,16 128:1

**cybercriminals** 74:17
83:6 84:8,23 85:9
86:8

**cybersecurity** 10:5
11:2 78:1 100:16
101:1

---

# D

**D.C.** 5:3,13

**Daily** 110:8,10,11,12

**damaged** 133:25

**damaging** 32:25

**dangers** 11:11

**data** 23:13 28:23
29:12 32:10 34:23
37:5,18 38:1 39:4
40:12 46:24 47:2,10
48:5,21,24,25 76:15
80:3 82:14,24 97:8
100:22 102:6,9,23
103:8 105:25 116:24
117:3 122:1 126:3
129:6 130:7 132:15
133:19,24 139:22
142:6

**date** 5:11 52:13

**daughter** 105:22

**day** 106:15

**decade** 74:20 83:9
84:11 85:1

**December** 8:17 12:4
56:14

**decided** 31:18

**decisions** 79:20

**deconstructed** 134:18

**defamation** 145:1,3

**defamatory** 32:7,16,
21,22 39:1 42:2

**defame** 110:15

**defendant** 29:19 31:6
121:22

**defendants** 5:20 6:4,7
28:17 29:5,24 30:1,
7,8,10,15,16,18,23
33:13 40:9

**define** 25:9

**degree** 142:18 143:13,
14

**deleted** 94:4

**delivery** 104:4

**Democratic** 9:17 10:3,
13 11:1 28:24 32:11
38:10 39:5,18 62:16
112:13 119:12,23
120:11,20 121:2,18
122:2 129:7 130:8
134:1,9,14,23
135:18,21

**depend** 80:10 82:20
95:11 97:2,7

**depending** 15:20 78:2

**depends** 24:11 78:9,
18,22 79:3,9,25
81:14 95:7 99:6
101:7 103:25

**deploy** 112:12 118:11,
23 121:16 122:10

**deployed** 119:10,21
120:9,18,25

**depo** 52:22

**deposed** 6:8

**deposition** 5:6,12
6:14,15,18 12:20
14:11 25:16 39:15
45:6 52:8 83:1 87:6,
8,18 88:1,6,14,23
89:3,6,9,22 105:3

**depositions** 89:11
90:14

**describe** 46:9

**describes** 58:9 124:22

**design** 91:2

**designed** 47:2

**desks** 65:10,22 68:14

**destructive** 133:18,24
134:8,13

**detail** 139:11

**detailed** 17:11 22:11,
13 23:10,16 24:1,8,
10,18 36:24 91:5
97:22 114:6 138:19
142:9

**details** 23:20 86:20
137:21

**determine** 34:5,8
36:10 37:4,16,25

38:8 40:17 43:7 84:1
112:11 133:24
**determining** 64:4
**device** 112:25
**devices** 113:21
**DI** 5:1
**diagram** 115:15
**diagrams** 112:21
**difference** 20:24
21:16
**differences** 21:2,17,
19 107:3
**digital** 112:10 115:23
118:6
**direct** 49:25 50:13
138:9
**directing** 28:15
**direction** 120:16
**directly** 126:4,23
**disagree** 40:7 47:22
82:2 109:19
**discount** 127:22
**discovered** 134:14
**discuss** 109:12
**discussed** 54:25 70:14
**discussion** 28:10
108:22 109:25 111:21
**disparage** 110:12
**dispelling** 71:22
**distinct** 30:1
**distinction** 134:16
**distribute** 112:12
118:11,23 121:17
122:11
**distributed** 69:22
119:11,22 120:10,19,
25 121:17
**District** 5:8
**DNC** 9:3,7 62:24 63:3,
25 64:10 77:17 80:14
122:12 131:24 135:4
136:2
**doctor's** 51:19 53:9
**doctorate** 142:20
**document** 30:24 33:9
41:11 45:11 53:14
70:23 89:17 123:8
136:15
**documentation** 16:8

**documents** 7:4 8:14
30:17 31:2,4 49:2
**dossier** 7:22 8:2,5,
21,23 12:3 31:19
37:23 38:18 41:15
42:3,10 101:16,18
126:18 127:23 129:24
**dots** 46:21 48:20
**DPS** 142:21,25 143:6,
13
**draft** 8:15
**draw** 120:3
**drawn** 123:2
**drew** 64:20
**drives** 112:9 113:18
114:7 115:9,18,20,22
117:23
**duly** 6:3
**duress** 122:5

---

**E**

**earlier** 33:23 63:16
103:18 106:15 116:7
**easier** 32:3 72:13
**eat** 104:11
**Eddy** 5:14
**effectively** 72:15
**effort** 81:5
**email** 11:13,15 112:10
115:23 118:5 140:7,
23 143:17
**emails** 13:3
**employees** 13:17
**encoding** 140:7,23
**end** 49:23 58:25 75:7
**ends** 137:18
**engaged** 43:21
**engineer** 90:1 91:4,18
131:23 132:9
**engineered** 131:19
**English** 38:23 76:6
**entire** 41:2 75:21
126:7 130:12 141:4
**entities** 17:22 62:20
63:9 122:3 126:4
**entitled** 27:23 143:24
**entity** 25:12 32:19,25
43:21

**entrance** 105:24
**envelope** 56:7,8,23
**equivalent** 51:18
143:7,9,10
**equivocated** 113:11
**Eric** 5:6 6:2 14:20
52:1 105:3
**essentially** 8:1
**establish** 42:9 90:5
122:10 140:15 141:6
142:11
**established** 139:25
**et al** 5:8
**evaluate** 95:8
**evaluation** 133:2
**Evan** 5:22 52:5 58:7
73:20 74:1 104:7,8
**Evan's** 56:10 73:21,24
74:4 125:3
**evidence** 8:8 15:10,
22,24 16:25 33:6,20
37:8 40:12 41:14,25
44:9 49:16 68:10
73:9 76:3 86:4,23
87:19,21 88:20 89:4,
16 90:12 92:15 93:1
99:8,18 113:19
115:19 121:23
123:12,21 124:1,17,
23 125:6,7,15,20
126:17 127:1 129:10
130:4 141:9
**exact** 19:4,7 130:14
143:17,23
**EXAMINATION** 6:4
**examine** 115:16
**excellent** 104:7
145:22
**excerpted** 16:17,20
**excerpts** 105:13
**executive** 89:12 90:15
**executives** 89:11
**exercise** 16:7
**exhibit** 12:11 14:7,10
16:20 35:9,10,14
44:24 45:5 52:1,7
62:17,24 63:5,6,11
124:21
**exhibits** 13:13 16:9,
10,22 31:17 33:10,25
35:6,7,12 41:17 42:4

44:25 83:21
**exists** 91:6
**expand** 95:16
**expect** 96:2 114:8
  115:10
**experience** 15:12,16
  61:16
**expert** 7:7 8:15 14:21
  15:13 18:23,24 19:17
  21:4 29:21 52:16
  56:2 61:15 71:16
  76:1,5,9 78:24 79:7
  87:3 92:4 96:9,16,
  17,20 100:15,24,25
  106:23 122:5
**expertise** 34:10,17
**explain** 102:4 124:5
  125:2 137:20
**explaining** 102:7
**exploited** 55:25
**exposed** 80:6
**external** 16:14 31:4
  38:14
**extra** 73:5
**extraction** 72:8

---

**F**

**face** 125:25
**facility** 14:2
**fact** 11:20 20:15 61:2
  66:5,20 70:10,21
  82:12 89:8 106:16
  109:1,12 111:1
**factor** 111:7
**factors** 48:10 78:11,
  19,23 79:11 95:8
  97:10 99:7 101:8
  104:1
**facts** 88:7
**factual** 28:17 29:5,
  12,17,24 30:2 40:12
  86:21 87:21 89:16
  90:12 92:16 93:1
  126:6 127:3
**fair** 39:25
**false** 32:7,17,20,24
  33:2 38:17,18,24,25
  41:6,15 42:1 60:16
  80:13 81:25 87:20
  88:9 89:15

**falsity** 7:20 42:9
**familiarity** 96:11
**famous** 145:3
**Fancy** 49:16 61:7,8,11
  66:8 67:4,11 117:10
  124:8 126:11
**Fantastic** 17:4
**faulting** 64:1 113:14
  139:1
**feasibility** 10:7
**feedback** 7:14
**Feel** 6:11
**fees** 143:18
**felt** 107:14 132:11
**Ferrante** 6:17,18
  7:14,24 8:7,8 12:20
  15:21,24 19:2,25
  29:19 30:2,6,7 31:2
  35:6 36:16 37:10
  43:17,19 44:1,7,18
  46:15,21 47:19 48:19
  57:22 59:13 60:7,14,
  18 61:23 63:23
  64:15,18 65:1,2,5,10
  66:14 68:21 70:9
  84:19 87:17,19,25
  89:16 90:10 92:14
  97:15 101:15 102:13
  107:9 108:22 112:16
  114:3,20,22 116:2,4
  118:9,13,22 119:2
  120:5 121:5 122:8
  124:19 130:3,25
  131:6,9,16 132:1,20,
  22 134:4 137:20
**Ferrante's** 8:11,19
  12:7 13:11,13,20
  15:3,6,17 16:9,22,25
  17:10,14 18:7 19:19
  22:9 24:16 29:8,9
  30:9,16,21,23 31:3,
  5,9,13,16,21,23
  33:4,5,9,12,16,20
  35:12,13,23 36:14
  37:7,9,12 38:13,20,
  24 39:12,14 40:8,11
  41:1,3,8,15,21,23
  42:4,14,15,23,24
  43:1,4,9,11 44:10,24
  45:9 49:7,11 50:24
  58:9,21 59:3,7,20
  62:8,9,11 64:2 66:5,

19 67:11 68:2 73:10
  74:7 77:18 83:3,4,
  15,18,25 84:1,6
  85:14 86:3,6,15,18,
  22 87:5,25 92:5,25 93:8
  96:15 98:3,14,17
  101:17 104:3 112:6
  113:3 116:9,13,17
  117:1,15 118:18
  119:15 120:1,2,21
  121:7,11,21 123:1,4
  130:25 131:2 132:3,
  5,17 134:24 136:18
  139:19,24 142:17
**field** 96:10 100:15,25
**figure** 35:4 59:2,6,25
  65:19 137:6,11
**find** 27:11 52:13 96:5
**findings** 34:25
**fine** 12:23 93:9
**finish** 40:25
**Fire** 52:2,11
**firewall** 94:23 95:23
  96:3
**fit** 21:7,21 81:23
**fits** 81:7
**five-minute** 111:19
**fix** 79:23 80:7
**flatly** 123:17
**flaw** 60:14
**flawed** 113:4
**flaws** 19:18 59:19
**flip** 130:21
**Florida** 5:9
**focus** 13:10,19 17:1,
  9,14 28:25 31:21
  36:17 41:23 42:6
  49:11 50:23 62:11
  86:2 87:1 97:14
  98:2,11 100:20
  116:6,17 118:17
  119:4 122:15,25
  131:2 132:16 142:16
**focused** 11:11 40:23
  41:1 42:13 48:18
  93:8 107:8,9,11
  136:8
**focusing** 108:19
**folks** 144:3,17,19
**follow** 26:15 99:3

footnote  88:12
forces  74:2
forensic  17:5,11,17
  36:9,15,16,24 37:3,
  15,24 38:7,15 39:20
  116:22 117:19,22
  118:25 120:6 123:13
  136:22 141:19
forensics  39:24
forget  72:19
forgot  28:5
form  9:22 10:9 16:6
  33:22 101:9
found  69:21 124:20
foundation  46:14
foundational  144:11
four-week  81:5
fourth  50:9
fraud  126:13
Fray-witzer  5:22
  6:24,25 7:3 9:8,18,
  24 10:15 11:22 17:7
  18:18 19:12,22 20:11
  21:8 24:22 26:9
  30:4,19 34:1 35:16
  38:2 39:7 40:5,19
  41:16,18 42:11,20
  45:14 49:4 51:13,22
  52:6 54:6,16,20 55:7
  57:4 58:24 59:9,22
  60:10 61:12,19 62:2,
  25 64:7 66:11 67:5,
  13 71:2,9,14,19,22
  72:25 75:25 76:8
  77:9 78:8,16 79:2,24
  80:8 81:1 82:8,19
  83:11,19,22 85:10,22
  86:9,16 88:18 90:7,
  23 91:7,13,19 92:20
  93:12 94:24 96:13,24
  97:12,19 98:1,8 99:5
  100:8 101:5,22,25
  102:17 103:16 104:2
  108:13 109:4 110:8,
  13 111:20 112:18
  113:7,24 114:10,24
  115:12 116:11,14
  121:3 122:13,19,21
  124:25 125:8 126:19
  127:24 128:3,12,22
  129:14,17,25 131:18
  137:13 138:23 139:10

140:11,25 142:4
  143:5
free  6:11
Freudian  10:21
FSB  122:5
FTI  46:25 47:11 49:24
  50:12,17 123:11
  127:11 128:6 129:1,
  9,22 130:10,18
  134:18 135:7 136:18
  137:5,7,14 139:25
  140:9,14
FTI's  51:2
fudging  122:17 129:13
full  105:12,15 136:22
fully  80:5
functional  144:11
functionality  107:15,
  16 109:7 111:7
fundamental  125:20,23
funny  145:8


                G

gateway  74:24 85:9,13
gateways  74:16 83:6
  84:8,23
gather  114:15
gave  11:19
general  9:2 18:8
  23:25 26:11,13 52:25
  73:19 97:24 98:6,7
  102:3 108:13 112:22
Generally  52:19
Geraldine  144:14,15
get all  37:22 58:2
give  26:12 30:12
  102:12 106:8
glad  94:7
glasses  28:2
good  52:6 89:14
  90:17,22 99:9,15,19,
  25 105:25
Google  20:2 47:3
  78:21,24 79:7 126:25
grab  28:1
graph  45:21 46:3
great  6:20 7:2,6,10
  13:12 14:5,17,25
  27:2,21 28:14 29:22

32:15 37:2 38:6 69:5
  133:5 139:14
Greg  144:20 145:2,4,9
Grizzly  70:8 126:12
ground  6:9
grounds  64:2
group  25:12
guard  95:23 96:22
  97:5
Gubarev  5:7 13:21,23
  107:21 122:4 126:4
guess  109:20 125:8
  143:22
guessing  143:21
guys  100:6


                H

habit  6:11
hack  135:4 136:2
  141:13,14
hacking  98:13 122:4
hacks  140:7
half  83:17
handshake  57:10,18
  73:4
happen  59:8 72:6 78:5
happened  19:10 71:8
  127:20
happy  125:4
hard  112:9 113:18
  114:7 115:9,17,19,22
  117:23
hashes  117:9 131:20
  135:3,14,15,24
hate  127:7
head  127:14
headed  27:12
header  57:11 73:17,18
heading  49:14 133:6
hear  125:4
heavily  84:19
held  5:12 95:18
helped  144:4
helps  144:23
hide  56:20
high  24:24 25:21,22
  91:1 109:15,18,25
high-level  89:25

highlighted 29:14
hired 24:20,25 30:7
  40:9 83:9,13,25
  116:21 121:22
history 93:20
Holding 112:8,11
Holdings 119:10,21
  120:9,18,25
honestly 129:12
hope 41:12
hoping 27:19
host 17:21 19:10 20:6
hoster 20:25
hosting 16:13 17:19
  18:1,13 20:15,19,25
  21:5,14,17,22 22:4,
  19 74:16 76:20,23
  79:14 80:18 83:5
  84:7,22 95:9 96:21
  100:16 101:1 106:16,
  20,25 107:3,6,13,15
  108:1,4
hosts 17:25
hour 83:17
hours 143:21
house 56:10
huge 72:23
human 9:13
humor 145:7
hurt 32:18 52:4
hypothetical 128:9,
  10,17,18,19 129:16,
  19,20

I

i.e 135:3
idea 23:25 25:14,17
  60:21 76:23 92:2
identification 14:10
  45:5 52:7
identified 34:15
  46:25 47:12 134:7
identifier 51:11,15
  53:8,11,18
identify 48:6 49:25
  50:12,20 51:20 53:10
  138:9
IDG 110:18
impact 104:1 109:8

implementing 96:7
implying 75:22 76:2
  84:19
important 55:3 81:23
  140:14 141:5
importantly 80:11
impressed 100:10
in-depth 9:22
inaccurate 25:15
  43:16
Incidentally 9:5
include 28:19
included 45:24 70:17
  135:2,23 140:3
  141:23 142:3
including 126:24
inconclusive 29:15
incorrect 32:17,24
independent 38:15
  42:8,25 43:3,6
  116:21 121:10 123:3
independently 120:5
indicator 135:5
  141:14
indicators 134:8,13
  141:12
indictment 6:17,21,22
  12:20
individual 68:22
industry 36:6 92:18
  93:4 95:5,10 96:2,
  11,16,20 97:4 99:2,7
  109:24
infor- 29:25
information 11:6
  23:21 24:4 28:17
  29:5,11,17,24 30:2
  31:12,14 33:19 34:19
  36:7 48:22 55:2
  57:23 72:16 86:21
  88:8 91:5 92:16 94:5
  97:8 102:6 112:5,7
  114:9,15 116:25
  121:8,21 131:22
  132:12,17 136:19
  137:15,23 138:8,12,
  18 142:1 143:24
infrastructure 40:16
  50:1,13 75:16 76:16
  77:2,5 81:3,15
  82:17,23 86:6 87:10

89:19 90:11 91:12
  92:8 95:3 102:10,24
  106:22 112:22,23
  114:1,16,23 126:9
  127:20 129:3
infrequent 81:17
initial 18:5
initially 8:16 12:1,
  16
instruction 125:3
Insurance 52:2,11
intention 110:23
intercept 74:2
internal 13:3
Internet 16:5 17:23
  18:15 20:6,14 22:5
  23:22 60:21 74:17
  83:6 84:8,23 93:22
  95:18 96:10 107:2
  108:3,7 111:2,4
interviewed 31:18
interviews 11:7,19
introduce 5:17
introduction 83:13
invented 105:18,20,23
investigate 7:20 8:4
investigation 8:12
  83:2,3 112:4,5,6
  113:3,15 115:14
  123:14 141:19
investigations 72:4
investigator 128:2
invoice 143:23
invoicing 143:20
involved 66:9 70:17
  77:16 80:14 113:17
  122:4 126:5,15
IOC 135:4
IOCS 135:4 136:2
IP 16:2,3 25:11,19
  26:3,4,7,22 27:1
  33:18 34:4,11,14,21
  35:20,21 36:2,4
  43:20 44:2,8,10,14,
  19,22 46:9,13,15,22
  47:6,8,9,13,16,17,
  20,23 48:3,11,14,16,
  18 49:17 51:11,14,16
  53:7,17,24 54:9,14,
  21,24 55:4,12,23
  56:3,5,19,21,22,25

57:11,13,23 58:10,22
59:3,8,11,14,17
60:1,6,13,15,18,22
61:1,4,6,8,25 62:6,
16,19,20 63:2,12,14,
19,23 64:3,11,14,19
65:3,6,11,22 66:6,7,
10,16,20,23 67:3,9
68:4,19 69:8,16,22
70:1,6 71:1,6,25
72:1,5,7 73:10,17,
18,21,24 74:4 78:6,
14,25 79:6 98:13,24
99:3 107:9 113:16
124:6,7,19 125:12
126:11,23 135:2,23
136:19,20 137:1,15,
23 138:8,12,17
140:3,16 141:7
142:12

**iphone**  105:18,20

**irrelevant**  80:15
126:18 127:22 128:21

**ISP**  21:16 106:19,21,
24 107:7,8,18 108:2,
5,21 109:2

**ISP-RELATED**  107:11,14

**ISPS**  18:11 106:13
109:12 111:1

**issue**  73:7 78:2
125:23

**issues**  18:8 76:25
79:18 80:11

---

### J

**JD**  143:10

**John**  11:21 46:25
47:3,11 48:5 140:8,
16,24 141:7 142:3,13

**john356gh**  45:23 47:1
48:7 140:2

**Johnson**  5:15

**joking**  58:8

**juries**  122:16 129:12

**jury**  130:10

---

### K

**Kan**  111:9,11

**Kate**  5:19 6:6

**key**  86:1

**kids**  56:13,14

**Kim**  5:15

**kind**  78:14,17 82:5
86:14 138:4

**kinds**  19:1

**Kipper**  144:20,21
145:2,4,9,16

**knew**  30:13

**knowing**  20:14 71:6
89:12 90:15,21

**knowledge**  71:17,20
76:6 91:11 99:14

**knowledgeable**  92:12

---

### L

**lack**  141:9

**language**  38:23 76:6

**languages**  133:14

**large**  20:2 45:1

**large-scale**  74:19,23
83:8 84:10,25

**largest**  93:20

**laugh**  145:11

**laughed**  145:2,6,8

**launch**  9:6,16 74:18
83:7 84:9,24 126:9

**launched**  39:17 74:22
75:2,11

**law**  25:25

**lawsuit**  7:25 54:13

**layer**  73:16

**laypeople's**  110:3,21

**leadership**  9:17 10:4,
14 11:1 28:24 32:12
38:11 39:5 119:23
120:11,20 121:1
122:3 129:8 130:9

**Legal**  5:16

**legitimacy**  34:20

**legitimate**  11:15

**letter**  56:10

**letters**  56:14

**letting**  122:23

**level**  24:24 25:21,22
91:1 109:15,18,25

**lines**  53:4,6

**link**  66:9 142:7

**linked**  54:11 66:6,8
122:3 124:20 126:4

**linking**  46:15

**list**  34:12,13,22
35:22 62:16,19,24
63:3,6,9 64:10 93:19
139:5

**listed**  16:15 20:20
35:2 58:22 62:17
70:8 105:14 126:12,
25 139:6

**listen**  129:11

**listing**  75:6 130:22
137:22

**lists**  70:6 75:5

**litigation**  49:3

**lives**  9:14

**log**  45:22 47:2 140:2

**logging**  114:14

**logs**  13:7 40:16
112:9,16,24,25
113:1,4,5,15,18,20,
22 115:8,9,18,22,25
117:19 118:2

**long**  54:22 67:16
127:8

**looked**  15:9,10 29:10,
11 33:17,25 35:7,9,
14 43:10 48:22 49:1,
6 62:5 81:25 83:18
88:23 106:5 112:17
116:18

**lookups**  36:3

**lost**  37:14 58:25

**lot**  10:17 24:14 57:23
66:13 72:4 78:11,18,
20,22,23 79:3,10,15,
18,25 81:8,10 95:7
97:9,11 101:8,18
102:5,6 103:25
107:11 114:13

**lots**  106:9

**lumped**  21:14

**lunch**  100:1,3,4
104:9,11,14

---

### M

**machines**  134:1,9,14,
23 135:19,21

**made**  15:6,21 19:2
  20:18 22:10 28:18,19
  29:6,10,14 30:3
  44:21 75:14 76:3
  77:1,11,16 80:13
  82:1 83:14 84:3,20
  87:8 88:6 93:18 98:3
  99:13 100:21 103:21
  105:24 108:22 124:2
  127:2 145:11
**mail**  72:17,18 103:12,
  13,14 104:4
**maintain**  114:9,12
**maintained**  113:23
  115:10,19
**make**  11:15 12:22
  15:25 19:5 32:8
  37:22 39:1 42:2
  44:20 47:15 58:2
  65:7 66:2 73:2 79:19
  87:20 100:2 102:6
  103:19 114:3 140:19
**makes**  19:2,20 76:6
  88:5 89:16
**making**  16:23 33:10
  53:3 60:17 63:18
  65:5,21 70:13 90:10
  106:11 112:23 134:16
**malicious**  9:6,16
  10:25 39:17 58:20
  74:8 75:11 77:17
  78:13 80:19,24 82:7
  85:7 87:11 89:20
  94:23 95:24 96:4,22
  97:6 100:18 101:3
  126:16 135:3
**Malloy**  144:16 145:16
**malware**  50:2,14,18,22
  51:1 74:19,23 83:8
  84:10,25 117:9
  131:19,23 133:18,24
  134:8,10,11,13,18,
  19,21,22 135:3,8,13,
  15,18,21,24 136:14
  137:2,3,6,9,10,12,19
  138:1,3,6,14 139:1
  140:10 141:12,13
  142:2
**malwares**  137:8
**man**  145:10
**managed**  22:6,17,21

**management**  26:12
**manager**  91:4
**managing**  26:25
**March**  52:13
**margins**  80:21
**mark**  12:10 14:6 44:23
  52:1
**marked**  14:10 45:5
  52:7
**Marks**  111:9,12
**massive**  126:13
**material**  144:11
**materials**  31:7
**matter**  5:7 14:7,14
  44:24 52:2,11 108:13
  129:3 143:19
**means**  17:21 26:2 56:5
  68:11 124:5
**meant**  32:21 34:5,8
  59:16 60:16 113:14
  133:10
**measures**  77:12,23
  82:6,21 89:21 99:19
  103:24
**media**  5:5 105:2
**meetings**  144:10
**memo**  8:17 12:4
**memorized**  19:16
**memory**  108:25
**mentioned**  56:2 106:20
**message**  56:24
**met**  6:19,24 7:3
**Miami**  52:14
**Michele**  5:14 12:10
  14:6 44:23 51:25
**mind**  27:10 42:16 53:2
**mine**  41:8
**minute**  46:6 82:25
**minutes**  39:21
**mirror**  116:1
**missed**  21:10 145:7
**missing**  94:19
**misunderstood**  71:3
**mixing**  65:17
**model**  22:14 23:7,17
  24:2,8
**moment**  28:1 100:13
**monitor**  76:21 77:3
  85:6 86:14 109:2,7,
  13 111:2,4 114:5

**monitoring**  20:17
  79:13 82:5 100:17
  101:2
**month**  79:21
**months**  79:6 105:23
**move**  51:16 54:9 55:5
**moved**  55:9
**Mueller**  6:22 12:19

---

### N

**named**  135:13,15 145:4
**narrow**  57:25 92:4
**National**  10:3,13
  39:18 52:2,11 62:17
**nationals**  6:22
**nature**  11:7,10,17
**necessarily**  51:15
**needed**  23:18 24:6
**negatives**  69:6,11,15
**network**  55:22 61:6
  76:22 78:6 80:5
  86:14 112:21,25
  113:21 115:15
**networks**  82:7 85:6
  100:18 101:4
**news**  11:2 110:9,10,
  11,12,18
**news-gathering**  31:7
**nodding**  127:14
**non-**  52:23
**nonetheless**  99:2
**North**  56:15
**notified**  143:1,12,14
**Nslookups**  36:3
**number**  5:6,9 19:3
  51:20 53:10,19 72:4
  80:3 91:24,25 93:15
  105:3
**numbered**  53:3
**numbers**  27:6,7 32:3
  51:15 53:25 111:15

---

### O

**objecting**  59:5
**objection**  9:8,18,24
  10:15 11:22 17:7
  18:18 19:12,22 20:11
  21:8 24:22 26:9

30:4,19 34:1 35:16
38:2 39:7 40:5,19
41:16,18 42:11,20
49:4 51:13,22 54:6,
16,20 55:7 57:4
58:24 59:3,9 60:10
61:12,19 62:2,25
64:7 66:11 67:5,13
71:2,9,14 72:25
75:25 76:8 77:9
78:8,16 79:2,24 80:8
81:1 82:8,19 83:11,
19,22 85:10,22 86:9,
16 88:25 90:7,23
91:7,13,19 92:20
94:24 96:13,24
97:12,19 98:1,8 99:5
101:5,22,25 102:17
103:16 109:4 110:8
112:18 113:7,24
114:10,24 115:12
116:11,14 121:3
122:13,19,21 124:25
126:19 127:24 128:3
129:14,25 131:18
137:13 138:23 139:10
140:11,25 142:4
143:5
**obligation**  76:21
101:23
**obtained**  134:18
**occur**  78:21
**offered**  96:14
**offering**  121:15,20
122:7
**offerings**  22:22
24:13,19 25:2
**office**  51:19 53:9
56:12 76:16 77:6
101:13,16,19,20,24
102:10,15,24 103:4
104:5
**officer**  90:25 91:3
**old-fashioned**  104:4
**one-sided**  66:15
**one-to-one**  72:19,21
**open**  11:18 55:23
**operate**  20:15
**operation**  122:6
**operational**  112:11
118:10,23

**operations**  28:23
32:11 38:10 39:4
82:15 129:7
**operations'**  122:2
130:8
**operations.'**  133:8,
16,21
**operator**  5:15
**opine**  38:17 39:19
92:17 93:3 118:10,
12,22,24 119:9,21
**opining**  41:4
**opinion**  9:5,15,22
10:9 15:13 18:24
19:17 28:17 29:23
30:1,12,15 68:7,9
69:14,16 76:1,9
78:24 79:7 80:17
94:11 96:15,16
100:15,25 101:1
106:23 121:14,16,20
122:7
**opinions**  17:1 27:24
43:17 94:16
**opposite**  73:3
**option**  57:11
**options**  73:18
**order**  20:22 24:17
57:1 81:5 101:9
**org**  91:9,24
**organization**  80:22
81:15 87:9 91:21,23
97:3
**organizational**  144:4,
18
**orienting**  49:21
**originate**  60:20
**originated**  61:1,3
**originator**  56:20
59:16 60:3
**outward**  107:10
**overhead**  73:5
**owned**  48:15 49:17
68:4,19 69:8,23
70:10 125:13,19
**owner**  18:1
**owners**  63:14 64:4
**ownership**  69:25
**owning**  55:3,4
**owns**  23:9 36:4

**P**

**p.m.**  105:1
**Pace**  142:18
**packet**  56:7,17,25
57:13 61:6 73:20
**packets**  34:11 58:15
60:19 64:21 100:18
101:3
**pages**  47:3 88:14
**paragraph**  8:1,5,7,12,
18 9:4 12:5 27:11,
18,24 28:16 32:2,3
42:1 43:13 45:25
46:5,8 49:15,24
50:10 62:14 74:14
76:12 87:22 93:11,
13,15,17 95:14 99:24
102:21 111:16 112:3
113:3 123:7,9,18
125:9 127:10 133:11
138:16 141:20
**paragraph-wise**  105:10
**paragraphs**  39:8 74:11
**paraphrase**  18:25
**part**  25:15 28:25
119:6 130:12 139:6
**parts**  93:21 131:6
**Party**  9:17 10:3,13
11:1 28:24 32:11
38:10 39:5 112:13
119:12,24 120:11,20
121:2,19 122:2 130:8
134:1,9,14,23 135:19
**passes**  76:15 102:9,23
**past**  49:18 74:19 83:9
84:11 85:1
**patching**  89:23
**patient**  51:20 53:11
**pay**  108:7
**payloads**  112:13
119:11,23 120:10,19
121:1,18 122:12
**penalty**  81:19
**Pennsylvania**  5:13
**penultimate**  87:23
**people**  11:14 91:25
143:6 144:7
**percent**  44:11 48:11
71:12

percentage  107:17
perfect  27:20 46:5
  141:8
perform  9:10,12,21
  18:21 23:18 24:1,16,
  18 33:19 35:21 36:3,
  15,16,18,24 38:13,14
  41:20 42:14 50:25
  62:9 77:2 81:24
  92:9,22,24 93:6
  95:25 98:5,18 114:6
  117:5 118:17 119:7,
  17 120:7 121:13
  136:23 141:5 142:16
performance  109:8
performed  7:15 10:10
  11:7 17:11,12 30:8
  43:20 44:2 46:16,19
  47:15,19,24 49:12
  56:11 66:14 77:14
  94:15 120:6 123:6
  134:8 135:7,12,14
  136:22 137:21 138:17
performing  10:7 22:10
  87:2
period  78:17 79:4
periods  99:6
person  91:6 92:12
  101:12 103:10
personally  40:2 106:4
Ph.d.  6:2 142:23
  143:2,4
phished  11:20 140:23
  142:3
phishing  11:12,19,24
  47:1,12 48:6
pick  140:18
picked  107:13
piece  47:14 66:16
  68:10 107:7,8,11
pieces  107:1 137:9,10
pipes  107:1
place  59:18 77:13,23
  78:11,19 80:19,24
  82:6 89:21 92:19
  93:5 95:13 96:22
  97:5,9 99:10,16,19
plaintiff  145:3
plaintiffs  5:23 7:8,
  12 8:14 12:1,3,24
  14:22 21:3,11,20,21
  28:19 29:7 30:3 32:8

39:2 41:12 99:9
  106:16 107:5
plans  112:12 118:10,
  23
plant  28:22 32:10
  39:3 82:14 100:22
  122:1 126:3 129:6
  130:7
planting  82:24
platform  89:13 90:16
play  78:12 79:19
  97:10 101:8
players  122:6
pocket  28:4
Podesta  11:21 46:25
  47:3,11 48:5 140:8,
  16,24 141:8 142:3,13
point  19:9 57:25
  64:17 68:15 74:13
  93:18 95:16 106:1
  110:25 133:17
pointed  84:11
points  140:19
Pole  56:15
policies  90:6 92:19
porn  28:21 32:9 36:11
  37:5,17 38:1,9 39:3
  40:17 121:25 125:16
  126:2 129:5 130:6
pornography  112:12
  118:11,24 119:11,22
  120:10,19 121:1,18
  122:11
port  55:23
portion  12:2 15:20
  35:8 124:18
portions  15:21 105:15
ports  11:18
possibility  56:3
  60:25 71:7
post  10:1,12 56:12
  76:16 77:6 101:13,
  16,18,20,23 102:10,
  15,24 103:4 104:5
potential  59:12 66:18
potentially  26:12
practice  103:22
practices  80:18,23
  81:6 90:6 103:14,24
prepare  6:13,15

preparing  13:4,8,17,
  24 14:2 15:2 17:6
presence  17:23
present  66:16
presented  48:22
presenting  68:25
pretty  82:3 100:9
  110:7
prevent  86:14 87:10
  89:19 90:11 94:23
previous  88:20 139:21
principles  58:6
print  11:5
printout  124:22
private  80:3
problem  77:12,23 80:7
problems  76:25 78:3
  79:22
procedure  97:5 123:13
  141:18
procedures  92:19 93:5
  96:21 99:9,15
produced  30:18 45:22
  46:4 49:3 70:23
  140:1
professional  142:20
profit  80:21
programs  135:4
promise  45:12,16
proof  28:18 29:6 30:2
  43:18,21 77:18 128:7
  129:2 130:11
proper  92:15 123:12
  141:18
protect  80:19,24 82:6
  85:7 96:3
protection  89:21
protocol  57:6 73:16
prove  75:22 76:10
  122:8 124:1 125:20
  128:7 130:11
proved  8:8 84:2
proven  41:5
proves  128:7 129:2
  130:11
provide  7:4,14 8:15
  12:6 18:15 20:5,6
  21:24 22:2,4,16,21,
  23 29:17 32:17,24
  33:5 43:18 66:15

81:6 86:19,20,23
88:6 106:22 118:19
126:6 129:9 130:3
133:1 139:11
**provided** 8:20 12:2,
16,19,24 29:12 30:9
31:1,12 40:12 62:16
63:3 64:10 74:16,24
83:5 84:7,22 92:15
116:19 127:1
**provider** 17:19 18:1
20:25 21:16,23 22:20
59:15 60:2 76:23
80:5 107:3,6,15
108:1,4
**providers** 16:13 18:13
20:15 21:6,13 79:14
106:21 107:13
**providing** 20:16 76:24
85:8
**provision** 107:18
**publications** 110:6,7
**publish** 31:19
**published** 57:22
**purporting** 30:12
**purposes** 45:4
**put** 8:6 21:22 34:23
53:13 54:1 56:10
77:12,23 88:17 92:25
94:16 115:21
**putting** 65:10,22
68:14

---

**Q**

**question** 10:11 18:8
19:7,8 21:10,13
22:15,16,17 26:16
31:11 37:14 40:14
42:17,24 46:8 57:21
60:9 61:20 62:4 67:7
71:3,18 74:25 77:21
85:8,17 86:5 117:18
120:14,15 121:6
122:17,20,22 125:21,
23 127:7 128:13,15,
23 129:17 131:8
140:20,21
**questioning** 51:6
67:17 69:25
**questions** 37:8
123:15,16 130:21,22,

23 131:1,3,5,10,11,
14,15 136:17 139:5,
9,16,17 141:23 142:8
**quibbling** 141:17
**quick** 6:12 28:2 37:19
100:1
**quickly** 6:10
**quotation** 42:3
**quotations** 88:15,17
**quote** 105:8
**quoted** 90:13 126:22

---

**R**

**radio** 11:4
**range** 106:8
**ransomed** 133:25
**ransomware** 133:18
134:7
**reach** 120:8,17,24
**reaching** 113:5
**reactionary** 103:23
**read** 6:17 8:23 9:23
10:1,12,17,19,20,22,
24 15:17 24:3,4 35:7
41:1 42:18 46:6 48:8
58:1 74:11 84:16,18
85:19,21 89:20
100:13 102:20 137:16
**reading** 24:9 28:2
35:11,13 37:23 42:16
47:8 75:20 76:2
130:12,14,16 138:10,
15
**reads** 62:15
**real-time** 59:23 73:6
**reason** 54:23 56:24
107:8 136:13 145:2
**reasons** 70:14
**reassign** 26:19
**reassigned** 54:1
**receipt** 72:22
**receive** 31:3
**received** 13:2,7
58:15,16 98:24
**recess** 67:21 104:14
111:24 145:25
**recommend** 81:12,18
**record** 25:8 28:7,8,
10,11 42:18 44:25

51:21 52:10 53:11
56:4 67:19,23 85:21
104:2,12 105:4
111:21,22,25 126:22
145:23
**recovered** 115:20
**recruited** 122:5
**redo** 116:12,23 117:2,
5,8,16 131:13 132:5,
25 133:2
**redone** 116:8
**reference** 8:18 33:12
34:4 35:18,19 39:11
105:8 112:6 141:9
**referenced** 15:23
16:11 21:13 35:8,9
49:6 69:17 73:10
98:14
**references** 15:12
16:14 17:2 19:25
20:1
**referencing** 30:15
**referred** 7:21 8:17
68:13 109:24
**referring** 16:16 30:22
41:3 53:20 109:6,21
**refers** 14:19 124:21
**regard** 61:7 129:8
**Regional** 93:22
**regions** 93:24
**register** 64:12
**registered** 36:4 48:16
59:15 60:2,15,19
63:25 64:12,15,19,21
125:14
**registration** 136:19
137:15,23 138:8,18
**Registries** 93:22
**regular** 72:18
**regulations** 97:9
**relate** 107:4,7
**related** 22:22 37:9
117:9
**relation** 83:15 98:17
**relevance** 7:23 127:3
129:23
**relevant** 23:4,11
80:12 81:24 82:3,4
85:8,24 86:15,19
87:2 99:12 108:21

**rely** 33:8
**remember** 11:3,5 39:20
 87:15 94:19 105:20
 106:18
**removed** 94:4
**repeat** 58:3
**reperform** 51:2
**repetition** 93:18
**reply** 73:22 74:1
**report** 6:16 7:14,24
 8:7,11,15,19 12:7,
 13,18,21 13:5,8,11,
 14,18,20,24 14:2,7,
 14,16 15:2,3,6,17
 16:9,11,15,17,20,21,
 23,25 17:3,6,10,15
 18:7,24 19:5,9,14,
 15,19 20:20 22:9
 24:16 27:4,7,23
 29:8,9,14 30:9,16,
 21,22,23 31:3,5,9,
 14,15,17,21,23 32:1
 33:4,5,9,12,13,16,20
 34:25 35:2,6,7,8,9,
 12,13,24 36:14,17
 37:7,9,12 38:13,20,
 24 39:10,11,12,14
 40:8,11,21,23,25
 41:2,3,9,10,15,21,
 22,23 42:4,7,14,15,
 23,24 43:2,4,9,11,13
 44:10,13,21,24 45:9
 48:23 49:1,7,11
 50:8,25 53:22 55:20
 56:2 57:22 58:9,21,
 23 59:7 60:21 62:1,
 3,9,12 63:7,11 64:17
 66:5,19 67:12 69:3
 70:8,15,18,20 72:2
 73:11 74:6,7 75:2,4,
 12,13,21,23 76:2,10,
 12 77:19 78:20 83:2,
 3,4,15,18,25 84:1,6,
 14,17,18,19,20,21
 85:1,4,14 86:3,6,11,
 18,22 87:1,3,5,14,18
 88:3,15,18 89:3,4,10
 90:13 92:6,13 93:1,
 8,11,19 94:6,17,20
 95:19 96:15 97:15,21
 98:4,14,17 99:24
 100:24 101:17 102:2
 104:3 105:7,9 106:11
 116:6,9,13,18,21
 117:1,4,6,14,15
 118:15,19 119:5,15
 120:1,2,3,21 121:7,
 8,11,22 123:1,4,11
 124:11,18,20,22
 125:1,3 126:12
 127:12,16,19 128:6,
 19,25 129:1,9,22
 130:10,13,18,25
 131:3,7,12,13,16
 132:12,17,18 133:1
 134:25 135:1,17,20,
 22 136:6,9,10,11,16,
 18 137:8 138:7,22
 139:13,14,15,23
 140:19 141:10,11,15,
 24 142:3,17 144:2,3,
 5,11
**reporter** 5:14,25
**reports** 55:1,17,19
 119:4
**represent** 5:18 6:7
 108:12
**representation** 45:15,
 18
**Republicans** 10:21
**reputation** 32:18
**reread** 6:16
**research** 9:21 10:9
 24:12 42:9 62:23
 122:9
**resolve** 62:20 63:10
**resolved** 62:18
**resolving** 63:13
**respect** 121:5
**response** 120:21 121:7
 127:8,10
**responsibility** 100:17
 101:2
**responsible** 26:14,25
 76:14,17 77:7 90:21
 91:1 102:8,11,15,22,
 25 103:4,8,9
**retained** 7:19 8:4
 14:21 52:16
**return** 56:11
**revenue** 80:21
**reverse** 131:19,23
 132:9
**review** 7:13 13:4 33:4
 45:11 53:14 69:18,21
 88:1,3,17 89:17
 123:8 132:14 136:6,
 10,15
**reviewed** 15:3 33:16
 132:21 136:19 137:14
 138:8
**reviewing** 17:14
 138:17
**RIRS** 93:22
**Root** 48:15 49:17 66:6
 67:9 68:4,20 69:9,
 16,23 70:1,7,10,25
 71:5,25 72:1 87:8
 125:13
**route** 57:13 72:11
 73:25
**router** 112:9,25 115:9
**routers** 113:20 115:23
 118:2
**routing** 57:12 66:25
 72:11 73:13,19,24
 74:2
**rules** 6:9
**run** 18:1 55:22 72:5
 145:19
**Russian** 6:22 9:6,15
 10:2,12,25 11:20
 39:16 74:17 83:7
 84:9,24 86:7 126:15
**Russians** 9:3 11:6

**S**

**S.A.** 48:15 49:17 66:6
 67:9 68:4,20 69:9,
 16,23 70:1,7,10,25
 71:25 72:1 87:8
 125:13
**S.a.'s** 71:5
**sake** 123:10,19 124:15
 127:11 130:17
**sample** 106:6
**samples** 50:2,14,18,22
 135:8 137:2,3,6,19
 138:2,3,14
**satisfactory** 115:5
**satisfies** 139:16
**satisfy** 139:9
**scan** 55:22 103:14
**scanners** 55:21

**scanning** 53:22 55:17, 18,20 89:24,25
**Schary** 5:21 100:5 104:10
**scheduling** 144:9
**school** 25:25 143:1, 11,14
**Scientist** 110:19
**scope** 7:11,13,16 13:10 14:3 18:20 22:8 23:11,18 25:6 31:20,24 33:3 36:13, 20,23 37:6 38:4,12 40:21 41:8 49:7,10 50:23 51:4 82:10 86:21 91:15 95:1 97:21 98:10,15,25 99:11,17,21 100:20 101:10 102:1 108:10 116:5 117:5,11,24 118:3,7 119:6,25 120:4,7,12,14 121:12 123:6 131:4 133:4 139:18 142:15
**section** 19:4 27:23 34:24 87:5 94:4 130:15
**Secure** 81:3,9 144:22
**security** 10:8 47:3 51:20 53:1,10,18,25 79:18 80:3,16 81:22 85:15 86:20,24 89:14 90:17,22 91:3,4,18 92:19 93:5 96:7,10 99:9,15,19 109:7 111:7 128:1 144:23
**select** 106:3
**sell** 54:8 95:20
**semantic** 134:17
**send** 56:8,10,18,24,25 72:18 103:12
**sending** 61:5
**sends** 11:12 73:20
**sense** 66:3
**sentence** 27:24 28:16 32:6 33:15 38:23,25 40:24 41:10 43:16 44:1,5,16 46:12 47:4 49:20 50:5 64:25 67:14 69:17,20 84:18 87:7 93:25 95:15 103:2 109:21 123:18

130:16 136:25 137:16 138:13 141:4
**sentences** 47:8 75:18 85:4 141:3
**separate** 9:11 31:4,9 62:10 80:15 116:22 121:10 123:3
**sequence** 51:14
**server** 11:17 54:11 55:23 89:12 90:16 112:8,24 115:8,16, 22,25 117:19
**servers** 17:21 20:6,8 22:2,5,7,17 23:8 51:16 55:5,9 91:25 92:8 107:12 113:17, 18 114:4,7 115:16
**service** 22:22 24:13, 19 25:2 82:21 103:13
**services** 21:24 22:21, 24 55:24 95:19 110:18
**SESSION** 105:1
**set** 95:3,12 114:13 115:17 128:9,17,19
**setting** 31:16 114:2 144:9
**shape** 33:21
**shares** 66:7 124:7
**show** 16:12 19:4 40:9 86:24 88:20 89:22 140:21 141:6,15 142:9
**showed** 78:19 136:23
**showing** 63:22,24 94:12 106:8 141:2 142:7
**shown** 69:3
**shows** 87:18 89:4 140:5
**side** 29:21 66:15
**signatures** 46:24 47:10 48:4
**significant** 122:6
**similar** 103:19
**similarities** 107:2
**similarly** 49:24 50:9, 10 69:13 70:6 137:17 138:9
**simple** 37:14

**simply** 46:9
**single** 139:8
**sir** 27:7,16 75:8
**sit** 41:13 58:19 70:24 71:5 92:17 94:18 119:8
**situation** 80:11 97:3
**size** 80:21 81:7,11,14 91:20,22
**SLAS** 101:8
**slip** 10:21
**slow** 6:11
**small** 44:11 47:14 48:10 110:7
**smarter** 32:4
**Smith** 31:17
**sniffers** 114:14
**Social** 51:20 53:10, 18,25 80:3
**software** 135:3
**sole** 118:17
**solely** 31:21 36:17 42:13 49:11 62:9,11 65:6 87:1 98:16 116:6 118:18 119:4, 15 131:2 132:16
**sort** 10:18 21:14
**source** 56:19 57:12,13 61:4 66:25 72:10,11 73:13,19,21,24 74:2
**Southern** 5:9
**speak** 6:10 13:21,23 27:9 133:14
**specific** 22:1 23:19 29:18 53:21,24 58:9, 10 74:25 109:21 124:4
**specifically** 23:6 48:8 83:14 92:5 93:7,21 137:8
**specifics** 19:15 134:23
**spectrum** 21:7 108:9
**speculate** 71:15
**spoof** 55:12 56:5,15, 19 57:13,14 61:5,6 66:23,25 72:7 73:23
**spoofed** 56:3 57:17,19 59:12,17,25 60:23 61:8,25 63:20 64:4, 23 66:18,21 72:5

73:11

**spoofing** 64:13 65:15, 21 66:1,2,9 70:21 71:25

**spot** 99:25

**Sprint** 95:17

**spun** 89:2

**SSL** 66:7,10,24 67:3, 10 69:21 70:3 117:9 124:8,21,23 126:10 132:9

**stack** 57:6 73:16

**standard** 36:7 92:18 93:5 95:5,10 96:3,21 97:4 99:3 103:24

**standards** 96:11 106:24

**standing** 14:8

**start** 69:19 111:15

**started** 84:5 103:12

**starting** 125:9

**starts** 46:3 49:15 50:10

**state** 5:18 9:6,15 10:2,13,25 11:20 39:16 86:7 135:17

**state-sponsored** 74:18 83:7 84:9,24

**stated** 15:24 61:15

**statement** 8:9 15:9 28:20 29:4,18 30:6, 14,22 32:8,18 33:2, 7,10,21 38:19 39:2, 12 40:10,13 42:3 47:15,16,23 48:1,13, 17,18 65:7 68:2 75:14,21 76:3,11 77:15 80:13 81:25 82:22 83:14 84:3,20 85:16 86:2 87:13 88:5,9 89:18 90:3 92:13 98:3 99:13 100:21 102:19 103:19 116:17 125:18,21,25 127:2 129:8

**statements** 19:1,19 20:23 29:15 30:21 32:24 33:11 34:3,6,9 41:22 42:10 43:19 44:21 50:24 70:13 86:25 87:6,7 88:5,7, 21 90:1 124:2 126:23

**states** 103:12,13 140:14

**steal** 28:22 32:10 37:5,18 38:1 39:4 82:14 100:22 122:1 126:3 129:6 130:7 133:7,19

**stealing** 82:24

**Steele** 7:22

**Steppe** 70:8 126:12

**steps** 33:24 35:4 111:4

**sternly** 27:9

**stop** 28:24 73:15 74:21 101:24

**stopping** 100:17 101:3

**strategic** 91:2

**strike** 10:23 13:22 55:13 69:18 119:19

**studies** 142:20

**stuff** 144:5,9,18

**subgrouping** 25:11

**subject** 52:19

**sublease** 26:12

**submitted** 12:18,21

**subnet** 26:4,23

**subsidiaries** 94:22

**subsidiary** 49:17

**successfully** 133:25

**sue** 144:25

**sufficient** 119:9,20 132:11

**suggest** 125:9

**suggests** 49:16

**summarized** 93:19

**summary** 27:23 94:2

**supplemental** 94:14

**support** 5:16 28:18 29:6,13,17 30:3 33:6 41:25 43:18 55:3 63:22 75:13 76:3 84:20 87:8,10,19 88:19 89:5,19,22 90:13 121:23 125:7 126:6 142:9

**supported** 106:10

**supporting** 15:22 44:9 85:15 86:4 92:15 93:1 123:11,21 124:1,17 125:15,20

**supportive** 90:3

**supports** 127:2 142:11

**supposed** 61:24

**surprise** 22:20,25 23:15 46:7

**surprised** 91:17

**swear** 5:25

**switchers** 113:20

**sworn** 6:3

**system** 25:10 45:22 140:1

**systems** 16:6 51:17 54:2 80:6 93:23 94:14 95:3 112:8 114:5,7

---

**T**

---

**takes** 72:23 85:6

**taking** 34:18 41:9 111:3 125:25 138:16

**talk** 31:18 34:16 43:25 109:1 111:1,2 123:16 124:6

**talked** 33:23 54:4 106:15

**talking** 123:23 124:9 125:5 130:3 137:1

**talks** 16:1 64:15 124:19

**task** 91:25 92:1

**tasked** 98:4 119:6 123:5

**tasking** 9:11 17:13 92:5 93:7 119:16 132:25 133:1

**TCP** 57:3,7,9,20 58:16 72:10,17 73:3

**team** 132:3

**technical** 10:6 11:7, 10 14:21 15:1,4,5,7 16:2,23 33:14,18,24 34:3,16,23 35:1,5 49:14,15,25 50:13 88:20 89:21 90:3 92:15 102:4,7 118:19 133:2 140:15 141:6 142:12

**technically** 25:15

**technique**  70:21
**techniques**  17:2
**technological**  109:13
**technology**  90:25 91:2
**telecommunications**
  107:22
**telling**  83:1 102:14
  107:25 115:2 127:21
  128:21 129:21 142:1
**term**  56:6
**terms**  25:9,17 34:18
  81:19 82:21 102:5,7
**testified**  6:3 52:10
  53:7,17 55:15 107:21
  137:4,25
**testifier**  104:8
**testifying**  83:16
  125:11
**testimony**  13:16 41:14
  44:7,17 52:1,20
  53:5,15 54:18 58:19
  61:13 66:22 67:2,8
  68:1 71:4 83:20,23,
  24 84:4 87:7,25
  88:24 89:22 90:4,18
  102:2 103:3,19 125:4
  143:3
**thing**  56:18 65:9
  69:19 81:23 83:17
  95:5,10 114:21 115:7
  124:13 128:6 140:14
**things**  14:9 15:10
  22:21 60:11 65:3
  66:17 76:7 79:18
  86:10 97:2 114:2
  118:17 126:22 131:16
  139:13
**thought**  28:4 46:17
  61:10 96:9 106:10
  109:17 113:9 115:1
  133:10 135:12 137:25
**thoughts**  144:5
**three-**  81:5
**three-part**  57:18
**three-way**  57:10 73:4
**throw**  52:6
**throwing**  14:9
**tie**  47:22
**tied**  35:23 48:11
**ties**  47:5,16

**time**  5:12 6:9 37:13
  54:9 65:18 78:17
  79:3 99:6 108:8
  143:13
**times**  9:23 122:23
**today**  7:7 58:20
  96:12,14 119:8
**today's**  5:11 6:14,15
**told**  39:18 79:22
  116:9 123:1 124:12
  137:4
**tools**  55:21
**top**  46:19
**total**  143:18
**totally**  37:13 124:12
**traced**  60:13
**track**  11:2
**traffic**  20:17 28:22
  32:9 36:11 37:5,17
  38:1,9 39:3 40:18
  56:18 76:22 77:4
  79:10,15 106:9
  109:3,13 111:4 114:5
  121:25 125:17 126:2
  129:5 130:6
**traffic/ip**  108:19
**transaction**  57:1
  58:14
**transactions**  59:7
  66:4
**transcript**  6:18 14:11
  45:6 52:8,23,24
  88:14
**transcripts**  87:18
  88:1,17 89:4,7,9
**transmission**  73:2
**transmit**  28:22 32:9
  36:11 39:3 40:18
  82:13 100:22 121:25
  125:17 126:3 129:5
  130:6
**transmitted**  77:17
**transmitting**  82:24
**travel**  14:1
**travels**  76:22
**traverse**  100:18 101:3
**tree-saving**  45:4
**trial**  52:24
**trick**  45:12,16
**true**  8:9 15:13 19:24
  20:2 26:11 33:21

  40:10,13 41:5 48:17
  56:20 57:6 65:8 80:1
  88:9 105:14 116:7
  123:11,20,25 124:14,
  16 126:8 127:12,16,
  18,19 128:11,18,20,
  21 129:21,22 130:18
  131:11,13
**trust**  105:21
**truth**  7:20 8:5 42:9
**turn**  14:18 27:3 31:25
  43:12 45:20 62:3,14
  69:14 87:4 88:10
  93:10 99:23 111:14
  114:14 134:24
**turning**  53:2
**TV**  11:4
**Tyco**  52:3,12
**tying**  44:13 48:13
**type**  69:2 79:9 97:7
**types**  20:4 78:20
  81:12
**typically**  25:12 55:22
  73:7 77:12,23 81:5
  91:1 106:22 114:2

---

## U

**U.S.**  5:8,15
**UDP**  57:7,15 58:16
  72:8,13,14,15,18,21
  73:2,7
**ultimate**  46:20
**ultimately**  47:23 48:1
**Unabomber**  76:17 77:7
  102:11,16,25 103:5,
  11
**unannounce**  25:19
**underlying**  140:6,22
**understand**  20:9 24:12
  34:5,7 35:3,5 43:5
  44:5 64:25 65:2,11,
  18 66:1 67:25 87:24
  88:10 89:7 100:14
  112:21 123:18 124:3
  125:5 127:6,8,9,16
  134:15 138:4
**understanding**  8:3
  16:3 17:25 18:4,7,13
  34:17 97:23,25 98:7

**undertake**  15:18 17:5
    33:14 36:9 37:3,15
    38:7 79:1,7
**undertaken**  58:10,22
**undertaking**  16:7
**undertook**  33:24 35:4
    43:7 125:24
**Union**  52:2,11
**unique**  51:11,14,15
    53:8,11,18 69:1 96:6
**United**  103:12,13
**University**  142:19
**unnecessary**  93:17
**unsupported**  43:17
**URL**  105:15 140:6,22
    141:2
**utilize**  61:8 130:24
**utilized**  16:12

─────────────

              V

**valid**  8:8 85:16
**validate**  15:4,13
    17:12 37:8
**validating**  34:20
**validation**  56:11,16
**validity**  34:6,8 76:10
**variety**  97:1
**verify**  15:3,7 37:7
**verifying**  34:20 50:24
**Verizon**  95:17
**versus**  5:8 52:3,12
**video**  5:14
**video-recorded**  5:6
    105:3
**viewed**  108:4
**violating**  81:20
**virus**  112:13 119:11,
    22 120:10,19 121:1,
    18 122:11
**viruses**  28:22 32:10
    36:12 39:3 40:18
    121:25 125:17 126:3
    129:6 130:6
**volume**  106:9
**vulnerabilities**  10:8
    11:18 53:21 55:24
**vulnerability**  53:21,
    24 55:16,17,18,20,21
    89:25

─────────────

              W

**Wait**  108:6
**walked**  51:19
**wanted**  12:21 112:3
**Warner**  108:9
**warning**  11:14
**Washington**  5:3,13
    10:1,12
**waste**  6:8
**ways**  36:7 47:24 59:4
    96:7
**web**  20:6,7,8,25 21:5,
    13 74:15 76:20,23
    80:18 83:5 84:7,22
    96:21 100:16 101:1
**website**  23:24 24:3,5,
    9,14,19
**websites**  17:22 47:1,
    12 48:7
**Webzilla**  13:8,17
    17:24,25 18:10 20:10
    62:18 63:25 64:12,16
    95:20
**weeds**  73:15
**Whois**  36:2 63:16
**wide**  92:4
**wisdom**  111:3
**withdraw**  26:7
**withdraws**  26:3
**witness'**  102:1
**wondered**  145:14
**wondering**  145:5,13
**word**  39:23 55:15
    87:15 104:5 105:21
    107:23 128:7 129:2
    130:11 141:17
**words**  15:16 37:22
    58:2,5,6 60:24 68:17
    101:16,18 102:12
    103:6 127:13
**work**  7:15 15:1 16:4
    20:15 57:16,18 63:13
    72:4 73:14 120:7,23
    144:22,24
**worked**  144:1
**working**  96:5
**works**  16:4 20:14
**world**  9:14 93:21

    105:24
**worldwide**  126:13
**worry**  145:10
**Wow**  138:20
**wrapping**  145:21
**write**  38:23 93:14
**writing**  111:15 144:2
**written**  38:21,22
    75:13
**wrong**  19:1 55:15
    60:6,9 65:23 67:2,8
    68:5,8,18,21 70:9
    108:14 124:12
    138:20,21 139:3
**wrongdoing**  43:22
**wrote**  76:10 130:18
    136:11 144:3

─────────────

              X

**XBT**  13:3,7,17 14:1
    17:18 18:2,11 19:2,
    20 20:10 23:7,8,10,
    20 24:12,18,25 25:2,
    4 26:2,6,16,18,19,22
    36:10 37:4,16,25
    38:8 40:3,16 43:7
    44:12,14 46:15 47:22
    48:12,17 49:17,25
    50:13 54:13,24 55:6
    60:8,12,15,19,20
    61:2 64:16,21,22
    65:3 68:11,22 69:1
    70:15 74:7,15,22
    75:2,10,14,15,18
    76:24 77:16 80:14,23
    82:1,5,13,24 83:4
    84:6,21 85:6,8 86:6,
    13 87:9 90:5,6 91:6,
    10,11,12,18 92:18
    93:4 94:22 97:4,11,
    16,17,23,25 98:5,7
    100:21 108:6,7
    112:8,11,22 113:23
    114:8,22 115:10
    117:19,23 118:6,10,
    22 119:10,21 120:9,
    18,24 121:16 122:10
    125:14,15,24 126:9
    127:20 130:23
    136:21,24 140:17
    141:8 142:13

**XBT's**  22:13 23:17
 24:8 35:21 40:15
 75:16 107:17 118:1
**XBT/WEBZILLA**  28:20
 76:14 102:8,22
 121:24 126:1 129:4
 130:5
**XP**  55:4

---

### Y

**York**  9:23 108:8
 110:11,12
**Yorker**  6:11 110:14