# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

ALEKSEJ GUBAREV,
XBT HOLDING S.A., and
WEBZILLA, INC.
    Plaintiffs,

v.

BUZZFEED, INC. and
BEN SMITH
    Defendants.

**Case No.**

**0:17-cv-60426-UU**

## PLAINTIFFS' *DAUBERT* MOTION TO EXCLUDE THE EXPERT OPINIONS OF MICHAEL J. SULICK

### INTRODUCTION

In a nineteen-page, single spaced "Expert Witness Report," former CIA employee Michael Sulick purports to discuss everything from Vladimir Putin's rise to power to the use of assassination as a method of intimidation by Russian Tsars in the early 1900s.  What Mr. Sulick never discusses in his report however – not once – is Plaintiffs Aleksej Gubarev, Webzilla, Inc. ("Webzilla"), and XBT Holding, S.A. ("XBT") or even Christopher Steele, Buzzfeed, the Dossier, or any fact arguably at issue in the present case.  Instead, relying almost entirely historical anecdotes, unnamed "biographies," uncited "media reports," and references to fictional television shows such as *The Americans*, Mr. Sulick offers "expert testimony" that fails to explain how or why his expertise might be useful to a jury; how he applied his expertise to the facts discussed; or how any of the historical anecdotes provided have any relevance to the issues to be decided in this case.

Because his report does not even approach the requirements for an expert report articulated by the United States Supreme Court in *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) and the requirements of Rule 702 of the Federal Rules of Evidence, Plaintiffs move to exclude the expert report and opinions of Michael J. Sulick in their entirety.

## ARGUMENT

### I.   Legal Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which states that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> (b) the testimony is based on sufficient facts or data;
>> (c) the testimony is the product of reliable principles and methods; and
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert*, the Supreme Court addressed the gatekeeping function of the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable." 509 U.S. at 589. "The trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to: (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592. *See*, *also*, *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir.2004) ("The district court's role is especially significant since the expert's opinion 'can be both powerful and quite misleading because of the difficulty in evaluating it.' Indeed, no other kind of witness is free to opine about a complicated matter without any firsthand knowledge of the facts in the case." (internal citation omitted) (quoting *Daubert*, 509 U.S. at 595)).

In *Kumho*, the Court extended Daubert to non-scientist experts and confirmed that the *Daubert* gatekeeping requirement is vital one. As the Supreme Court held in *Kumho Tire*:

> [T]he objective of that requirement is to ensure the reliability and relevancy of expert testimony.  It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Kumho*, 526 U.S. at 152.

The Eleventh Circuit, in turn, developed a rigorous three-part test to determine whether to admit an expert report or opinion under *Daubert*.  *See United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (Rule 702 requires a "rigorous three-part inquiry").  "Expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the

matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998).

The party offering an expert has the burden of satisfying each of these elements by a preponderance of the evidence. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005). *See, also, Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999) ("The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence.").

"Even if a witness is qualified as an expert regarding a particular issue, the process used by the witness in forming his expert opinion must be sufficiently reliable under *Daubert* and its progeny." *Bowe v. Pub. Storage*, 2015 U.S. Dist. LEXIS 178180 at *18 (S.D. Fla. June 2, 2015). An expert's "rank speculation would only unfairly prejudice Plaintiffs by advocating for a certain result in the guise of offering expert opinions. This is unacceptable." *Id.* at *13.

"[A]n expert must, in his report, provide 'a complete statement of all opinions the witness will express *and the basis and reasons for them*.'... [A] naked reference to his own background ... is no showing of reliability at all...." *Harrison v. Royal Caribbean Cruises, Ltd.,* 2013 U.S. Dist. LEXIS 202067, at *7 (S.D. Fla. Nov. 7, 2013) (quoting Fed.R.Civ.P. 26(a)(2)(B)(i)) (emphasis in original).

Where a witness is "'relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it."'" *Affiliati Network, Inc. v. Wanamaker*, 2017 U.S. Dist. LEXIS 217403, at *7-8 (S.D. Fla. Aug. 14, 2017) (quoting *Frazier*, 387 F.3d at 1261).

II.      **The Expert Testimony of Michael J. Sulick is Unreliable and Will Not Assist the Trier of Fact.**

The Sulick Report, attached hereto as Exhibit 1, could almost serve as a law school issue-spotting exam on inadmissibility issues under *Daubert* inasmuch as it fails to meet admissibility requirements in almost every way imaginable. Indeed, when the Court reads Mr. Sulick's so-

called "Expert Witness Report," it will see that it is, in actuality, no such thing.  Although Mr. Sulick's background might conceivably qualify him as an expert on any number of topics – his report identifies him as having "served twenty-eight years in the Central Intelligence Agency" in various capacities – his report does not actually offer an expert opinion on any of them.  Instead, Mr. Sulick offers what purports to be general history and background on a wide variety of subjects including: "the structures and histories of U.S., British and Russian Intelligence services," "Vladimir Putin's KGB history," and "Russian regime political assassinations."  And, while each of these topics may be fascinating in the abstract, none of them are actually relevant to the matters to be proved at trial, as is evidenced by the fact that Mr. Sulick's report never once mentions Aleksej Gubarev, XBT, Webzilla, Buzzfeed, Christopher Steele, or the Dossier.

Preliminarily, although Mr. Sulick identifies himself as having "served twenty-eight years in the Central Intelligence Agency" in various capacities, he provides no dates for such service.  According to his report, he has not served as an expert witness in any case in the last four years.

According to Mr. Sulick, the scope of his assignment in this case was:

to provide general background on the structures and histories of the US, British and Russian intelligence services; the modus operandi of the Russian intelligence services, including their use of so-called "active measures" designed for deception and disinformation, especially in US election campaigns, and their use of front companies and civilians in intelligence operations; President Vladimir Putin's KGB history; Russian intelligence monitoring of internet activity inside the country; and Russian regime political assassinations.

Sulick Report, p. 1.

As a preliminary matter, then, Mr. Sulick's report should be deemed inadmissible inasmuch as it fails to meet the relevance requirements of *Daubert*: none of the topics listed by Mr. Sulick as the topics of his report are actually issues to be decided by the jury in this case and, as such, the testimony offered fails to "assist the trier of fact to understand or determine a fact in issue."  FRE 702; *Daubert*, 509 U.S. at 592-93.  Additionally, Mr. Sulick's report is inadmissible given that the vast majority (if not the entirety) of the report consists of a recitation of historical facts and Mr. Sulick's actual expertise plays little or no role in any of the statements made.  *See*, *e.g.*, *Affiliati*, *supra* at *13 (excluding statements that are "statements of fact, rather than expert opinions, which are not useful to the trier of fact"); *Frazier*, 387 F.3d at 1262 ("[E]xpert testimony is admissible if it concerns matters that are beyond the understanding of the average

4

lay person."); *Toler v. Engelhard Corp.*, 2006 U.S. Dist. LEXIS 23297, at *29 (M.D. Ga. Mar. 20, 2006) ("With respect to issues of fact, expert testimony should demonstrate 'scientific, technical, or other specialized knowledge.'... Such testimony should explain information 'beyond the understanding and experience of the average citizen.'" (citing F.R.E. 702 and quoting *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985)).

Next, according to Mr. Sulick, his "testimony is based on my career expertise and general historical knowledge of those areas in additional [sic] to research on current Russian intelligence issues, court cases involving Russian intelligence activities and other relevant materials." Sulick Report, pp. 1-2. Mr. Sulick fails to attach a single document to his report and, for the most part, he fails entirely to even identify the materials he claims to have considered or relied upon as part of his research. For these reasons alone Mr. Sulick's report must be rejected. *See, e.g., Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 2005 WL 5955701, at *5 (S.D. Fla. Aug. 17, 2005) (excluding expert opinion based on a website which was determined to be unreliable); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir.1999) ("The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence."); *Affiliati*, *supra* at *10 ("Hochman does not indicate, in any way, that his opinions are supported by reliable sources or sources that are accepted within the industry.").

Moreover, to the extent that Mr. Sulick is relying upon his own expertise to proffer an opinion (assuming that his report actually proffers some opinion), he fails to ever explain *how* or *why* his expertise leads to his conclusion and how his experience is reliably applied to the facts. Instead, Mr. Sulick's report is the quintessential example of an expert improperly asking the Court to "take the expert's word for it." *See, e.g., United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) ("'[I]f the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it."'" (quoting Fed.R.Evid. 702 advisory committee's note (2000 amends.))); *Witt v. Stryker Corp.*, 648 F. App'x 867, 873 (11th Cir. 2016) ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'... If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical

purposes, subsumed by the qualification prong." (internal quotation marks and citations omitted)).

Breaking down Mr. Sulick's report, section by section, then, each section proves to be inadmissible for one or more of the above-listed reasons.

**Section 3[1] – Structure of US Intelligence** – In this section, Mr. Sulick discusses general information concerning the structure of the United States Intelligence Community, including, for example, the names of the branches of the U.S. Military and the names and functions of various intelligence agencies, including the Central Intelligence Agency, the Federal Bureau of Investigation, the National Security Agency, and the Defense Intelligence Agency.

Mr. Sulick provides no citation to any materials he consulted or utilized in stating these facts and provides no information concerning how or why his expertise is relevant to these facts. He makes no connection whatsoever between the stated facts and any fact at issue in the present case, nor is there any explanation as to how Mr. Sulick's expertise is required for a jury to understand any of these facts. For each of these reasons, Mr. Sulick's statements of general history/general information on these topics should be excluded.

**Section 4 - Structure of British Intelligence** – In this section, Mr. Sulick discusses general information concerning the structure of the British Intelligence Community, including, for example, the names and functions of various intelligence agencies, including the Secret Intelligence Service (SIS or MI-6) and the British Security Service (BSS or MI-5).

Mr. Sulick provides no citation to any materials he consulted or utilized in stating these facts and provides no information concerning how or why his expertise is relevant to these facts. He makes no connection whatsoever between the stated facts and any fact at issue in the present case, nor is there any explanation as to how Mr. Sulick's expertise is required for a jury to understand any of these facts. For each of these reasons, Mr. Sulick's statements of general history/general information on these topics should be excluded.

**Section 5 - Structure of Russian Intelligence** – In this section, Mr. Sulick discusses general information and historical background concerning the structure of the Russian

---

[1] Section 1 lists Mr. Sulick's qualifications and section 2 lists the "purpose and summary" of the report. For the Court's convenience, Plaintiffs have numbered the sections to match the numbering of Mr. Sulick's report.

Intelligence Community, including, for example, the names and functions of various intelligence agencies, including the KGB and the FSB.

Mr. Sulick provides no specific citation to any materials he consulted or utilized in stating these facts[2] and provides no information concerning how or why his expertise is relevant to these facts. He makes no connection whatsoever between the stated facts and any fact at issue in the present case, nor is there any explanation as to how Mr. Sulick's expertise is required for a jury to understand any of these facts. For each of these reasons, Mr. Sulick's statements of general history/general information on these topics should be excluded.

**Section 6 – Russian Intelligence Methods** – In this section, Mr. Sulick purports to speak about the methods by which Russian intelligence agencies collect information through the use of espionage. The section is replete with unsupported anecdotal evidence, going so far as referencing the Tom Hanks movie *Bridge of Spies* and the fictional FX television series *The Americans* as illustrative of the points being made in this section.

Other than references to "based on a true story" movie and a fictionalized television show, Mr. Sulick provides no specific citation to any materials he consulted or utilized in stating these facts and provides no information concerning how or why his expertise is relevant to these facts. To the extent that he has referred to anything, then, the Court must consider the references to be unreliable. He makes no connection whatsoever between the stated facts and any fact at issue in the present case, nor is there any explanation as to how Mr. Sulick's expertise is required for a jury to understand any of these facts. For each of these reasons, Mr. Sulick's statements of general history/general information on these topics should be excluded.

Additionally, because this section at least starts to *approach* an issue that has some relevance to the allegations of this case, but does so in a way that adds nothing useful for the jury and may actually serve to confuse the jury, these statements should be excluded. *See*, *e.g.*, *Frazier*, 387 F.3d at 1263 ("Because of the powerful and potentially misleading effect of expert evidence ... sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403. Exclusion under Rule 403 is appropriate if the probative

---

[2] Mr. Sulick makes passing reference to Human Rights Watch in this section, without specifying what from Human Rights Watch he is referring to. Sulick Report, p. 4 ("As noted by Human Rights Watch, Putin has also increased FSB powers through laws designed to stifle regime criticism and restrict basic freedoms under the guise of combating extremism.").

value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury....  Indeed, 'the judge in weighing possible prejudice against probative force under Rule 403 ... exercises more control over experts than over lay witnesses.'...  Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." (citations omitted)).

Section 7 – Russian Active Measures – In this section, Mr. Sulick purports to speak about the methods by which Russian intelligence agencies conduct disinformation campaigns, dating back to the alleged actions of the Russian Tsar in 1917.  In this section, which is replete with unsupported anecdotal evidence, Mr. Sulick makes a passing reference to Special Counsel Robert Mueller's indictment of the Internet Research Agency's use of social media to spread discord in the runup to the 2016 presidential election (p. 7) and to an unidentified *New York Times* article that, supposedly, reported on a "GRU report obtained" by the *Times* (p. 8).  Other than these passing references, which are never fully explained, Mr. Sulick provides no specific citation to any materials he consulted or utilized in stating these facts and provides no information concerning how or why his expertise is relevant to these facts.  He makes no connection whatsoever between the stated facts and any fact at issue in the present case, nor is there any explanation as to how Mr. Sulick's expertise is required for a jury to understand any of these facts.  Additionally, because this section at least starts to *approach* an issue that has some relevance to the allegations of this case, but does so in a way that adds nothing useful for the jury and may actually serve to confuse the jury, these statements should be excluded.  *Frazier*, 387 F.3d at 1263.

Section 8 – Active Measures in US Elections – In this section, Mr. Sulick purports to speak about how Russian intelligence agencies offered to support the presidential candidacies of Adalai Stevenson and Hubert Humphrey and spread disinformation about President Ronald Reagan.  In this section, which is dominated by unsupported anecdotal evidence, Mr. Sulick makes a passing reference to Special Counsel Robert Mueller's indictment of the Internet Research Agency's use of social media to spread discord in the runup to the 2016 presidential election (p. 7).  Other than this passing reference, which is never fully explained, Mr. Sulick provides no specific citation to any materials he consulted or utilized in stating these facts and provides no information concerning how or why his expertise is relevant to these facts.  He

makes no connection whatsoever between the stated facts and any fact at issue in the present case, nor is there any explanation as to how Mr. Sulick's expertise is required for a jury to understand any of these facts. Additionally, because this section at least starts to *approach* an issue that has some relevance to the allegations of this case, but does so in a way that adds nothing useful for the jury and may actually serve to confuse the jury, these statements should be excluded. *Frazier*, 387 F.3d at 1263.

**Section 9 – Russian Use of Front Companies in Intelligence Operations** – In this section, Mr. Sulick purports to speak about how Russian intelligence agencies will allegedly create "front companies" to "conceal its economic activity behind a web of shell companies and offshore accounts." Sulick Report, p. 9. Mr. Sulick also discusses in this section pressure that Russia will allegedly place on legitimate companies in order to pressure them "to perform a specific task or multiple tasks." *Id.*, p. 10. Although Mr. Sulick vaguely refers to a number of sources in connection with his historical assertions, the vast majority of this section still offers unsupported anecdotal evidence for which no support or explanation is offered. Mr. Sulick provides no information concerning how or why his expertise is relevant to these facts. He makes no connection whatsoever between the stated facts and any fact at issue in the present case, nor is there any explanation as to how Mr. Sulick's expertise is required for a jury to understand any of these facts. Additionally, because this section might improperly lead a jury to believe that Ms. Sulick was making some sort of conclusion concerning the Plaintiffs, the section is particularly dangerous in its tendency to mislead and confuse the jury and should therefore be excluded. *Frazier*, 387 F.3d at 1263.

**Section 10 – Russian Use of Civilians in Intelligence Operations** – In this section, Mr. Sulick purports to speak about how Russian intelligence agencies will allegedly coerce "ordinary citizens" into helping "facilitate clandestine operations." Sulick Report, p. 10. Other than a passing reference to an unrelated indictment concerning an alleged attempt of a "dual Kazakh and Canadian national residing in Canada" to hack Yahoo accounts and vague references to "media reports," (p. 11), this section contains nothing but unsupported anecdotal evidence for which no support or explanation is offered. Mr. Sulick provides no information concerning how or why his expertise is relevant to these facts. He makes no connection whatsoever between the stated facts and any fact at issue in the present case, nor is there any explanation as to how Mr. Sulick's expertise is required for a jury to understand any of these facts. Additionally, because

this section might improperly lead a jury to believe that Ms. Sulick was making some sort of conclusion concerning the Plaintiffs, the section is particularly dangerous in its tendency to mislead and confuse the jury and should therefore be excluded.  *Frazier*, 387 F.3d at 1263.

**Section 11 – Putin's Rise through the KGB** – In this section, which relies entirely on "various biographies," Mr. Sulick discusses Vladimir Putin's career as a KGB officer and rise to power.  Other than these "various biographies," Mr. Sulick provides no citation to any materials he consulted or utilized in stating these facts and provides no information concerning how or why his expertise is relevant to these facts.  He makes no connection whatsoever between the stated facts and any fact at issue in the present case, nor is there any explanation as to how Mr. Sulick's expertise is required for a jury to understand any of these facts. For each of these reasons, Mr. Sulick's statements of general history/general information on these topics should be excluded.

**Section 12 – Political Assassinations** – In this section, which provides absolutely no citations whatsoever, Mr. Sulick speaks about Russian intelligence efforts aimed at "eliminating regime opponents" utilizing poison dart guns and poison tipped umbrellas.  Sulick Report, pp. 12-13.  Although the section is certainly interesting in a cocktail-party kind of way, Defendants make no pretense that it is actually relevant to the case in an expert-witness kind of way.  Mr. Sulick provides no citation to any materials he consulted or utilized in stating these facts and provides no information concerning how or why his expertise is relevant to these facts.  He makes no connection whatsoever between the stated facts and any fact at issue in the present case, nor is there any explanation as to how Mr. Sulick's expertise is required for a jury to understand any of these facts. For each of these reasons, Mr. Sulick's statements of general history/general information on these topics should be excluded.

**Section 13 – DNC Hacking** – In a section that begins with an acknowledgement that Mr. Sulick has no knowledge other than what has been publicly reported in the media and official US Government reports (none of which are actually cited or attached to Mr. Sulick's report), Mr. Sulick purports to opine about the reasons why the Russian government might have engaged in such activities.  Mr. Sulick provides no specific citation to any materials he consulted or utilized in stating these facts and provides no information concerning how or why his expertise is relevant to these facts.  He makes no connection whatsoever between the stated facts and any fact at issue in the present case, nor is there any explanation as to how Mr. Sulick's expertise is

required for a jury to understand any of these facts.  For each of these reasons, Mr. Sulick's statements of general history/general information on these topics should be excluded. Additionally, because this section might improperly lead a jury to believe that Ms. Sulick was making some sort of conclusion concerning the Plaintiffs, the section is particularly dangerous in its tendency to mislead and confuse the jury and should therefore be excluded.  *Frazier*, 387 F.3d at 1263.

**Section 14 – Russian Monitoring of Internet Activity** – In this section, Mr. Sulick purports to discuss the implementation of a Russian data localization law.  Mr. Sulick does not cite to any materials he consulted or utilized in stating these facts other than references to "many observers" and "some telecom and internet providers."  Mr. Sulick provides no information concerning how or why his expertise is relevant to these facts.  He makes no connection whatsoever between the stated facts and any fact at issue in the present case, nor is there any explanation as to how Mr. Sulick's expertise is required for a jury to understand any of these facts.  For each of these reasons, Mr. Sulick's statements of general history/general information on these topics should be excluded.  Additionally, because this section might improperly lead a jury to believe that Ms. Sulick was making some sort of conclusion concerning the Plaintiffs, the section is particularly dangerous in its tendency to mislead and confuse the jury and should therefore be excluded.  *Frazier*, 387 F.3d at 1263.

**Section 15 – Source Reliability** – Citing vaguely to the glossaries of three purported US intelligence agency publications (which are not attached to Mr. Sulick's report), Mr. Sulick in this section states that the United States Intelligence Community has a program designed to test the veracity and accuracy of Human Intelligence sources.  The inclusion of this section would seemingly be an attempt to vouch for the work performed by Christopher Steele, a former British intelligence agent.  Preliminarily, even if Mr. Sulick had any basis for the statements contained in this section, what US intelligence agencies may or may not do to verify information from human intelligence has no bearing on what a *former British* intelligence officer may or may not have done.  In addition, Mr. Sulick is not permitted – as it appears he is attempting to do – to opine on the credibility of other witnesses.  *See, e.g.*, *Affiliati*, *supra* at *23-24 (citing *United States v. Beasley*, 72 F.3d 1518, 1528 (11th Cir. 1996)); *Pellegrino v. Wengert*, 2016 U.S. Dist. LEXIS 90175, 2016 WL 3678600, at *9 (S.D. Fla. July 12, 2016) (excluding expert testimony concerning the "credibility of the other witnesses" because such testimony is "not permitted");

11

*Lohr v. Zehner*, 2014 U.S. Dist. LEXIS 92100 (M.D. Ala. July 8, 2014) (finding "credibility determination [was] not sufficiently reliable to go before a jury as expert opinion"); *United States v. Falcon*, 245 F. Supp. 2d 1239, 1248 (S.D. Fla. 2003) ("Permitting Dr. Poliacoff's testimony would run contrary, to the well-established principle that, absent extraordinary circumstances, credibility determinations are for the jury, and not expert witnesses.").

Additionally, Mr. Sulick provides no information concerning how or why his expertise is relevant to these facts. He makes no connection whatsoever between the stated facts and any fact at issue in the present case, nor is there any explanation as to how Mr. Sulick's expertise is required for a jury to understand any of these facts. For each of these reasons, Mr. Sulick's statements of general history/general information on these topics should be excluded. And, because this section might improperly lead a jury to believe that Ms. Sulick was making some sort of conclusion concerning the Plaintiffs, the section is particularly dangerous in its tendency to mislead and confuse the jury and should therefore be excluded. *Frazier*, 387 F.3d at 1263.

**<u>Section 16 – Russian Monitoring of Internet Activity</u>** – Finally, in this section, Mr. Sulick purports to discuss the methods used by intelligence agencies to build trust with their sources. Mr. Sulick does not cite to any materials he consulted or utilized in stating these facts. Mr. Sulick provides no information concerning how or why his expertise is relevant to these facts. He makes no connection whatsoever between the stated facts and any fact at issue in the present case, nor is there any explanation as to how Mr. Sulick's expertise is required for a jury to understand any of these facts. For each of these reasons, Mr. Sulick's statements of general history/general information on these topics should be excluded. Additionally, because this section might improperly lead a jury to believe that Ms. Sulick was making some sort of conclusion concerning the Plaintiffs, the section is particularly dangerous in its tendency to mislead and confuse the jury and should therefore be excluded. *Frazier*, 387 F.3d at 1263.

<u>Conclusion</u>

For the reasons stated hereinabove and in accordance with *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), and FRE 702, this Court should exclude the expert report, testimony and opinions of Michael J. Sulick in their entirety.

Dated: October 15, 2018

**Respectfully Submitted:**

/s/ Evan Fray-Witzer
Evan Fray-Witzer (*pro hac vice*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-0000
Facsimile: 617-423-4855
Evan@CFWLegal.com

/s/ Valentin Gurvits
Valentin D. Gurvits (*pro hac vice*)
Matthew Shayefar (Fla. Bar No. 0126465)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1804
Facsimile: 617-928-1802
vgurvits@bostonlawgroup.com
matt@bostonlawgroup.com

/s/ Brady J. Cobb
Brady J. Cobb (Fla. Bar No. 031018)
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

**I hereby certify** that a true and correct copy of the foregoing was served electronically via the CM/ECF electronic filing system on all counsel or parties of record on the service list below on October 15, 2018.

/s/ Matthew Shayefar
Matthew Shayefar

## SERVICE LIST

Katherine M. Bolger
Adam Lazier
Davis Wright Tremaine, LLC
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
katebolger@dwt.com
adamlazier@dwt.com

Nathan Siegel
Alison Schary
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, Suite 800
Washington, DC 20006
nathansiegel@dwt.com
alisonschary@dwt.com

Roy Eric Black
Jared M. Lopez
Black Srebnick Kornspan & Stumpf
201 S Biscayne Boulevard, Suite 1300
Miami, Florida 33131
rblack@royblack.com
jlopez@royblack.com

# Exhibit
# 1

Expert Witness Report of Michael J. Sulick

1. *Qualifications*

My name is Michael J. Sulick. I served twenty-eight years in the Central Intelligence Agency, primarily in clandestine operations with a specialty in Russian intelligence and counterintelligence. During my career I served as the Senior CIA representative in Russia and later at CIA Headquarters I was the Chief of the Central Eurasian Division, where I was responsible for intelligence collection operations and managing foreign liaison relationships in Russia, Eastern Europe and the former republics of the Soviet Union. After that, I served as Chief of CIA Counterintelligence where I worked closely with the FBI on major espionage cases involving Russian intelligence. Finally, I was the Director of CIA's National Clandestine Service responsible for coordinating the espionage activities of the US Intelligence Community and managing global covert operations on terrorism, weapons proliferation, and regional and country-specific issues. In the course of this career, I have become familiar with Russian intelligence and its espionage activities. Prior to government service, I received a BA and MA in Russian studies and a Ph.D. in comparative literature with a special focus on Russian literature. In retirement, I have written two books on espionage by American citizens, which, among other cases, deals with 49 individuals spying on behalf of the Soviet Union and their Warsaw Pact allies and the Russian Federation.

A list of my publications is provided in Appendix A.

2. *Purpose and Summary*

I have been retained by Black, Srebnick, Kornspan & Stumpf, P.A. who are counsel for the defendants in this case, to provide expert testimony. I receive $600 per hour for my work. Specifically, I have been asked to provide general background on the structures and histories of the US, British and Russian intelligence services; the modus operandi of the Russian intelligence services, including their use of so-called "active measures" designed for deception and disinformation, especially in US election campaigns, and their use of front companies and civilians in intelligence operations; President Vladimir Putin's KGB history; Russian intelligence monitoring of internet activity inside the country; and Russian regime political assassinations. My testimony is based on my career expertise and general historical knowledge of those areas in additional to research on current Russian intelligence issues, court cases

involving Russian intelligence activities and other relevant materials. I reserve the right to revise or supplement this report.

3. *Structure of US Intelligence*

The US Intelligence Community is comprised of 16 different agencies. The principal ones are the Central Intelligence Agency (CIA), Federal Bureau of Investigation (FBI), National Security Agency (NSA), and Defense Intelligence Agency (DIA). The CIA is responsible for the collection and analysis of intelligence information, primarily acquired through human intelligence (i.e., spies). The CIA has no law enforcement authority and is mainly focused on overseas intelligence gathering. The FBI is the domestic security service in the US as well as the primary federal law enforcement agency; its main national security functions involve counterespionage and counterterrorism. The National Security Agency (NSA) is responsible for the establishment of defense against cyber threats, information assurance, i.e., securing national security classified information systems, and gathering information in electronic signals and systems about international terrorists, foreign powers, organizations and persons. The Defense Intelligence Agency (DIA) is a combat support agency of the Department of Defense. The DIA is responsible for collection, analysis, and dissemination of information about military intentions and capabilities of foreign governments and non-state actors, intelligence support to US military operations and coordination among uniformed military service components, including the Army, Air Force, Navy, Marine and Coast Guard intelligence services. The National Reconnaissance Office (NRO) builds and operates satellites that acquire imagery intelligence from space. Among its missions are monitoring the proliferation of weapons of mass destruction, tracking international terrorists, developing accurate military targeting data and bomb damage assessments, and assessing the impact of natural disasters such as earthquakes, tsunamis and floods. The National Geospatial Intelligence Agency (NGA), as the name suggests, is the primary US Government agency for the analysis and dissemination of geospatial intelligence or GEOINT, the exploitation and analysis of imagery and information from satellite reconnaissance that describes, assesses and visually depicts physical features and geographically referenced activities on the Earth. The other members of the US Intelligence Community specialize in intelligence specific to their agency roles such as Treasury, Department of Energy, Department of Homeland Security, and Department of Justice.

The 911 Commission on the 2001 terrorist attacks proposed the establishment of a new position, the Director of National Intelligence (DNI), for improved coordination of the activities of the agencies of the intelligence community. In December 2004, the position was enacted into law as part of intelligence reform legislation (the Intelligence Reform and Terrorist Prevention Act) in December 2004. The DNI serves as the head of the intelligence community, responsible for overseeing and directing the intelligence budget, serving as principal advisor to the President and the National Security Council on intelligence matters related to national security, and integrating and coordinating foreign, military and domestic intelligence programs.

## 4. *Structure of British Intelligence*

The structure of the British intelligence community is similar to that of its US counterpart, primarily because, at the start of World War II, British intelligence played a significant role in the creation of the US' first national intelligence agency, the Office of Strategic Services. The Secret Intelligence Service (SIS), like the CIA, is responsible for collecting intelligence information overseas while the British Security Service (BSS), like the FBI, is the United Kingdom's principal internal security service. Britain's Government Communications Headquarters (GCHQ), like the NSA, is responsible for signals Intelligence. Like the American DIA, British Defence Intelligence provides intelligence support and analysis to military operations.

BSS and SIS are still often referred to as MI-5 and MI-6 respectively. MI stands for "military intelligence: and the MI-5 and MI-6 terms date back to World War II when their intelligence functions were subordinate to the War Office.

The Joint Intelligence Organization is responsible for overseeing the work of the Joint Intelligence Committee which is charged with providing intelligence assessments to the cabinet and senior officials based on information collected and analyzed by the various British intelligence agencies.

## 5. *History of Russian Intelligence*

Russia has a centuries long tradition of espionage dating back to earliest Tsarist times to counter threats from abroad and to monitor dissent by its own citizens. After the Russian revolution, the Soviets relied on espionage for the same purposes and adopted much of the Tsarist era modus operandi to counter foreign threats and monitor its own citizens. Soviet

intelligence agencies went through a series of name changes throughout the twentieth century, culminating in the establishment of the all-powerful KGB (Russian acronym for "Committee for State Security") in 1954.

While the British, American and other western governments separate internal security functions from collecting information on foreign threats to avoid concentration of power in intelligence agencies, the Soviet Union combined these functions in the KGB. After the fall of the USSR, these functions were separated. Currently the SVR, the acronym for Foreign Intelligence Service, is responsible for collecting intelligence on foreign threats (similar to the role of the CIA in the US and British Secret Intelligence Service {SIS} in the UK), while the FSB, acronym for the Federal Security Service, is responsible for monitoring internal security threats (similar to the FBI in the US and the British Security Service {BSS} in the UK).

Vladimir Putin was appointed Director of the FSB by Boris Yeltsin in 1998. Putin, since becoming President in 2000, has increasingly expanded the authorities and responsibilities of the FSB. In an effort to consolidate the work of Russian intelligence agencies, Putin transferred to the FSB the border guards and most of the nation's signals intelligence capabilities (similar to the roles of America's National Security Agency {NSA} and Britain's Government Communication Headquarters {GCHQ}. As noted by Human Rights Watch, Putin has also increased FSB powers through laws designed to stifle regime criticism and restrict basic freedoms under the guise of combating extremism. For example, the FSB has greater latitude to hold suspect offenders in detention without counsel. The FSB is also responsible for monitoring compliance with a law requiring any NGO (non-governmental organization) engaging in "political" activity and receiving even a minimal amount of foreign donations to register as "foreign agents."

In particular, Putin has given the FSB responsibility to enforce legislation regulating the internet. In December 2017 Putin signed a decree that basically established the FSB as the main custodian of the nation's cyber security. FSB responsibilities for cyber security are reinforced by laws and decrees that provide the security service with unchecked access to internet communications by authorizing strict control over internet providers. Further information on this area is provided below in paragraph 14.

The other primary Russian intelligence agency is the GRU, acronym for the Main Intelligence Directorate, which is responsible for military intelligence and is part of the General Staff of the Armed Forces. While the GRU's primary responsibility is intelligence support to the armed forces, it

gathers human intelligence on many of the same issues as the
other agencies. The GRU also has responsibilities and
capabilities in signals intelligence, imagery reconnaissance,
and, more recently, offensive and defensive cyber operations.
The US Intelligence Community report on the hacking of the
Democratic National Committee assesses that the GRU was
responsible for penetrating DNC systems and releasing emails
through Wikileaks.

6. *Russian Intelligence Methods*

        Russian intelligence collects information through espionage
by identifying individuals with access to the secret information
of foreign governments and groups and cultivating relationships
with them to determine vulnerabilities that can be exploited to
recruit them as spies. Russian defectors have characterized
these motives by the acronym MICE, i.e., money, ideology,
compromise or coercion, and ego, although other motives are also
exploited such as a target's thrill seeking or revenge against a
superior or government.
        Russian intelligence at times uses so-called "false flag"
operations to recruit spies, in which the intelligence officer
poses as someone from another country to assess and cultivate a
target for recruitment as a spy. The technique is used against
targets who may be unsympathetic or hostile to Russia and more
likely to cooperate with a citizen of the country used in the
approach. Russian intelligence agencies also rely on blackmail
and coercion to compel their targets to spy for them. A
representative example was John Vassall, a British civil servant
stationed in Moscow in the 1950s, who was photographed in
homosexual activity by the KGB and blackmailed into providing a
wealth of naval technology secrets for over a decade.
        A Russian intelligence facility overseas is called a
"residency." Residencies are divided into "legal" and "illegal"
sections. "Legal" intelligence officers are government officials
working in official government installations such as embassies
and trade missions, and the officers operate in these
installations under cover in, for example, the political,
economic or consular sections of the Russian mission abroad.
This "official" cover provides the intelligence officer with
natural access to host country officials and diplomats of other
foreign embassies. Another advantage is that, if caught in an
espionage operation, these intelligence officers are protected
by diplomatic immunity from imprisonment and are normally
declared *persona non grata* and expelled from the country.
        "Illegal" intelligence officers operate in alias with a
non-Russian identity and, as such, they are obviously not

protected by diplomatic immunity and operate independently of "legal" residencies. Illegals are trained for years to learn the language and culture of their supposed countries of origin and build a cover "legend" about their biographies that will pass the scrutiny of their target countries. In the 1930s and 1940s, Soviet intelligence relied heavily on illegals to build and maintain the largest network of spies in US history (over 500). Illegals served as the "handler" of key spies of the era, including State Department employee Alger Hiss and the "atomic spies," Julius and Ethel Rosenberg and David Greenglass. In the 1950s, the FBI arrested Soviet illegal Rudolf Abel, who was sentenced to thirty years' imprisonment. He was subsequently exchanged in a spy trade for U-2 pilot Francis Gary Powers, whose plane was shot down over the Soviet Union. The story of the swap is featured in the Tom Hanks' movie *Bridge of Spies*. Soviet illegals are also the subject of the popular TV series, *The Americans*, which deals with an illegals couple in the US in the 1980s.

Russian intelligence continues to use illegals today. In 2010, the FBI arrested 10 Russian illegals operating in the US. The illegals posed as American citizens and attempted to cultivate contacts with academics, businessmen and policy makers to acquire access to intelligence information.

7. *Russian Active Measures*

In addition to collecting information through espionage, Russian intelligence agencies have responsibility for "active measures," a term for clandestine operations designed to influence events, governments and individuals in favor of Kremlin foreign policy goals while also allowing plausible deniability of Russian involvement. Active measures, a form of political warfare, comprise a broad spectrum of activities, including disinformation, propaganda, forgeries and counterfeiting of official documents, and establishment and support of front organizations and insurgent groups. A principal goal of disinformation active measures is to sow discord in the countries of its adversaries and drive wedges among allies of those adversaries.

One of the earliest and most successful examples of Russian deception operations occurred soon after the communist revolution. After the communist takeover in 1917, Russian counterrevolutionaries and supporters of the Tsar fled to Europe and organized into various groups, all plotting to overthrow the new Soviet government. Soviet intelligence created an entirely false anti-Soviet organization, the "Trust," that established contact with the groups and urged improved cooperation among

them, tactics that were designed to facilitate penetration of the real plotters, identify counterrevolutionary leaders, and, ultimately, to completely neutralize their efforts to subvert the communist regime. Many of the principal counterrevolutionary leaders were lured back to Russia under false pretenses only to be arrested and executed by Soviet intelligence. The operation is in many ways a precursor of its modern day cyber version, the Internet Research Agency and other groups, that assumed false identities on social media sites to spread confusion and sow discord in the American electorate on controversial issues. The Russian company's operation is detailed in the Special Counsel indictment, *US v. Internet Research Agency et al.* (1:18-cr 32, District of Columbia.)

Soviet intelligence relied heavily on active measures throughout the Cold War, especially disinformation. The KGB often focused on planting false stories in the US as well as in third world media where suspicion of US motives in certain nations was already heightened. Among the false stories planted by the KGB were the following: the AIDS virus was developed by the US Army as a biological warfare weapon; the US developed a special weapon that killed only non-whites; Martin Luther King was assassinated by the US Government; and John F. Kennedy was assassinated by a right-wing cabal headed by the CIA. According to KGB files smuggled from Russia by archivist Vasiliy Mitrokhin, a book on this last topic, *Oswald: Assassin or Fall Guy?* by Joachim Joesten, promoted the CIA-led cabal theory and was published by a Soviet-funded front company.

Exploitation of the internet and social media for deception is the latest iteration of Russian disinformation tactics. In contrast to the past, however, the internet and social media enhance the potential influence of disinformation because of the ability to convey false stories more immediately and more broadly than past methods and at lower cost and with less possibilities of determining attribution.

Cyber operations, including disinformation via social media, cyber warfare and cyber espionage, have increased considerably since Vladimir Putin came to power. After Russia was criticized globally for its brutality in the first Chechen war (1994-1996), Putin's intelligence services used disinformation in the second conflict (1999-2000) to divert from Russia's own brutal behavior, make claims about Chechen insurgents' relations with international terrorist movements, and highlight supposed Chechen atrocities (in fairness, there were indeed real atrocities committed by Chechen forces).

Disinformation has been an integral part of an intense Russian cyberwarfare campaign in its conflict with the Ukraine. The Russians launched denial of service attacks against

Ukrainian media, finance, energy and government sectors (an estimated 6500 attacks against 35 targets in 2016, according to the Ukrainian President). According to a GRU report obtained by the *New York Times*, these attacks were complemented by disinformation spread by so-called "trolls" using fake personas as supposed ordinary Ukrainian citizens, who saturated social media sites expressing disillusion with opposition protests in Kiev and falsely claiming Ukrainian fascists were inciting violence against pro-Russian citizens. One fake persona created for the GRU operation issued direct threats on Facebook against 14 pro-Russian politicians.

8. *Active Measures in US Elections*

The Russian interference in the 2016 election that is detailed in US Intelligence Community assessments and in the special counsel's indictment *US v. Internet Research Agency et al.* (1:18-cr 32, District of Columbia) is not the first case of active measures in US political campaigns. In 1959, the Soviet ambassador to the US approached Adlai Stevenson to promise propaganda support if the former candidate would run against Richard Nixon since Stevenson's views on nuclear testing were more amenable to the Soviets. A decade later Soviet Ambassador to the US Dobrynin offered support to the Hubert Humphrey presidential campaign. Both Stevenson and Humphrey forcefully rebuffed the Soviets' offer.

When Ronald Reagan was a possible candidate for the presidency in 1976, the KGB planted stories suggesting that his health and mental stability were affected by his father's alcoholism. The Soviets grew so concerned over Reagan's hardline policy on the USSR during his first term that the KGB launched an intensified disinformation campaign to combat his re-election. KGB Chairman Yuriy Andropov ordered all his officers abroad to undertake disinformation operations. Planted stories portrayed Reagan as a warmonger, and the KGB counterfeited and clandestinely distributed documents suggesting that he would even use nuclear weapons on America's allies if they didn't fully adhere to US foreign policy.

9. *Russian Use of Front Companies in Intelligence Operations*

The Soviet KGB used front companies and organizations throughout the Cold War to advance USSR foreign policy interests. These entities provided plausible deniability to cloak Russian intelligence involvement, the authentic cover of professionals to legitimize activities, and entrée to circles normally closed to intelligence officers. Since the fall of the

Soviet Union, Russia's successor organizations have relied
heavily on front companies for the same deception. As noted in
the study, *The Kremlin Playbook*, by the Center for Strategic and
International Studies (CSIS), in Eastern Europe, Russia, with
the help of its intelligence services, "has sought to conceal
its economic activity behind a web of shell companies and
offshore accounts." Among other goals, these front companies
quietly acquired key assets in energy sectors to ensure Russia's
continued role as the primary gas and oil supplier to the
region.

The use of front companies for intelligence purposes is not
limited to Eastern Europe. In the US, Russian intelligence used
companies to acquire American military-related technology
prohibited from export. In 2015 the Russian émigré owner of
Texas-based Arc Electronics and his confederates, also Russia
emigres, were convicted of illegally purchasing and exporting
microelectronics products using false end user certificates. The
operation was run by the Russian FSB to obtain the products for
use by the military in enhancing radar and missile guidance
systems (*US v. Alexander Fishenko et al.*, CR-12-626, Eastern
District of New York). In a similar case in 2016, Alexey
Barysheff, a dual national Russian and American citizen, and two
Russian nationals from the Brooklyn-based BKLN Spectra company
were arrested on the same charges of violating export control
laws to ship military technology to Russia through Finland.
(Department of Justice Press Release, October 6, 2016).

Russian intelligence is increasingly using front companies
and cutouts to mask its role in cyber operations and enhance its
cyber intrusion capabilities. The most noted recent example is
the "Internet Research Agency" in St. Petersburg, whose cyber
operations on 2016 US elections have been detailed in the
special counsel's indictment cited earlier.

In a less well-known example, a Wikileaks release of emails
stolen from Italian computer company Hacking Team revealed that
the FSB had acquired the company's remote control system
surveillance software that enables governments to monitor the
communications of internet users, decipher their encrypted files
and emails and record Skype and other Voice over Internet
Protocols. The FSB obtained the software through cutouts by
purchasing the technology through a Russian company, Advanced
Monitoring, which in turn sold it to a noted Russian government
military research institute, Kvant. The institute presumably
passed the software to the FSB.

One point of clarification: a front company is an entity
set up by and controlled by another organization to shield that
organization from legal liability and/or hide the organization's
involvement in the business of the front company.  While Russian

intelligence uses front companies, it will also use companies, the majority of whose business is legitimate and unrelated to Russian government interests, to perform a specific task or multiple tasks. If a company is unwilling to cooperate, the FSB can exert considerable pressure through harassment and intimidation. Health inspectors and officials from other agencies suddenly find minor infractions at the company, its employees are harassed, and, if these less coercive measures do not work, the FSB will raid the offices on trumped up charges and threaten closure of the business.

The FSB will also infiltrate employees into Russian companies for intelligence purposes. As one example, Igor Sushchin, an officer of an FSB cyber unit, was embedded as chief of information security in Renaissance Capital, a Russian financial firm to monitor the activities of select employees. Sushchin is wanted by the FBI for his involvement in the massive intrusion and theft of Yahoo accounts from 2014-2016 (*US v. Dmitriy Dokuchaev et al.*, Indictment, Northern District of California, 15 March 2017, CR 17-103.)

10. *Russian Use of Civilians in Intelligence Operations*

Russian intelligence has traditionally used ordinary citizens as so-called "co-optees" among its own citizens to facilitate clandestine operations because of their special skills, natural professional cover, or access to targets of intelligence interest. The KGB, as well as its successor organizations today, at times used these co-optees to gather assessment data on targets during personal contacts or broker introductions between the targets and professional intelligence officers. Russian internal security, currently the FSB, has traditionally used — and often coerced —  co-optees to spy on regime opponents and protesters.

Russian intelligence exploitation of companies and employees is often facilitated by the widespread presence of former intelligence officers in the commercial sector. After the collapse of the USSR and resultant weakening of the intelligence agencies, scores of former officers flocked to the business world to serve in roles ranging from advisors to security guards. Once Putin, a former KGB officer, came to power, he enlisted many of his former colleagues to fill executive positions in state-owned companies. As examples, Igor Sechin, a close Putin associate and reportedly a former Soviet intelligence officer, heads Rosneft, the world's largest publicly traded oil company; another Putin associate, Dmitriy Yakunin, once a senior KGB executive, was the head of Russian Railways.

In recent years, Russian intelligence has been widely reported to enlist co-optees among the computer hacker community for its cyber operations. The Russian government has steadfastly denied employing hackers but recent incidents belie the claim. A noted hacker, Dmitriy Dokuchaev, is wanted by the FBI on various charges of computer fraud and espionage, including the theft of credit card numbers and Yahoo accounts. According to Russian press reports in 2017, the same Dokuchaev eventually worked for the FSB's cyberintelligence unit and was arrested by Russian authorities in 2017 on charges of passing secrets to the US, which would appear to indicate that the Russian government not only employs the services of hackers but even appoints them as senior officials of its security service.

One of Dokuchaev's alleged co-conspirators in the Yahoo case fits the co-optee profile. Karim Baratov, a dual Kazakh and Canadian national residing in Canada, is accused in the US indictment of being hired by the FSB to hack into the accounts of thousands of Yahoo users (*US v. Dmitriy Dokuchaev et al.*, Indictment, Northern District of California, 15 March 2017, CR 17-103.)

The Yahoo case may not be the only example of Russian intelligence use of companies and individuals to cooperate in cyber operations. In 2016, the US Government banned a Russian company, Zor Security, owned by hacker Alisa Esage Shevchenko, from doing business with American firms or entering the United States. Zor Security was accused of providing the GRU with technical research and development for cyber operations against the U.S. The information may have included the company's so-called "zero day" software vulnerabilities. Ms. Shevchenko has denied the accusations.

Media reports indicate the Russian government is openly seeking college students majoring in computer science and programmers to apply for government employment or join the military but is also using criminal hackers for its operations. A deputy minister of defense in a 2013 interview did not exclude the use of hackers with criminal histories in military cyber units. Dmitriy Alperovich, co-founder and chief technology officer of the prominent US cybersecurity firm Crowdstrike, who was born in Russia and maintains ties there, claims there are cases where cybercriminals are arrested but never end up in prison.

11. *Putin's Rise through the KGB*

According to various biographies, Putin, a career KGB officer between 1975-1991, initially worked in the Second Chief Directorate, which was responsible for internal security and

monitoring dissidents (the present-day FSB was formed from this directorate). Putin then transferred to the First Chief Directorate (the predecessor of the current SVR, Foreign Intelligence Service) that operated overseas and he was stationed in Dresden, East Germany from 1985-1990. Within the KGB, the First Chief Directorate was considered more prestigious and cosmopolitan because of their officers' overseas service and its officers tended to look down on the Second Chief Directorate as simple policemen. Within the First Directorate, however, an assignment to a Warsaw Pact country was less distinguished than postings in the West — and less luxurious since Eastern Europe still lacked the consumer goods available in the West.

Putin reportedly resigned as a lieutenant colonel the day of the 1991 coup. He then worked as an advisor on international affairs to Leningrad Mayor Anton Sobchak and, after the mayor lost a re-election bid, he moved to Moscow to work in Yeltsin's presidential administration, where he was the deputy chief of the Presidential Property Management Department. Putin was responsible for the foreign property of the state and organized the transfer of former assets of the Soviet Union and Communist Party to the Russia Federation. The position enabled him to win allies and build influence and favor in the government, especially with Yeltsin.

Putin was appointed director of the FSB in 1998 by President Yeltsin. Once Putin became president, he improved conditions and morale in all Russian intelligence agencies, but, in particular, the FSB, whose authorities he has increased throughout his terms as president.

Among other measures, Putin expanded the FSB's power by giving it responsibility for a significant part of Russian signals intelligence capabilities, control of the border guards, and other functions. By way of comparison, the FSB's present responsibilities encompass those of the US' FBI, NSA, Customs, Immigration, and Coast Guard.

Putin also established new laws that removed many restraints on the FSB in investigating and prosecuting regime opponents, especially in the cyber arena.

12. *Political Assassinations*

Russian intelligence has been entrusted with the task of eliminating regime opponents for centuries. In the 20th century, the Soviet KGB was reputed to have a special section, Department 13 or the "Department of Wet Affairs," specifically dedicated to assassinations. In 1954, one KGB assassin, Nikolay Khokhlov, aborted a mission to kill a nationalist leader and defected to the west where he provided information on the unit. The KGB

subsequently attempted to poison Khokhlov but he survived the attack. A second KGB assassin, Bogdan Stashinsky, killed two Ukrainian nationalist leaders with a poison dart gun but also defected in Berlin in 1961 and supplemented Khokhlov's information. The practice continued throughout the Cold War — according to a former KGB officer, Oleg Kalugin, in 1978 the KGB supplied its Bulgarian partners with a poison-tipped umbrella to assassinate dissident Georgi Markov in London. According to another defector, Oleg Gordievskiy, there were no political assassinations during the rule of Gorbachev and Yeltsin.

During Putin's reign, assassination has been restored as a tool to destroy regime opponents, including businessmen, former intelligence officers, and journalists, not only inside Russia but abroad. In the United Kingdom, for example, former FSB officer Alexander Litvinenko died of polonium poisoning, and a British inquiry into his death has concluded, based on strong circumstantial evidence of Russian state responsibility, that the FSB operation to kill Litvinenko was probably approved by Putin and his then spy chief Nikolay Patrushev.

Another Russian, businessman Alexander Perepilichny, who was assisting Swiss prosecutors investigating Russian government money laundering, died suddenly while jogging, but traces of poison were found in his system. Most recently, former GRU officer Sergey Skrypal and his daughter were poisoned but fortunately have survived. After the Skrypal incident, British police and the British Security Service are reportedly reopening investigations into Russian state involvement in 14 suspicious deaths in the United Kingdom.

Some observers have noted that the Kremlin pursues two seemingly contradictory goals with the methods used in these assassinations. On one hand, without solid evidence the Russians can deny responsibility for the attacks, but, on the other, the use of biological substances associated with Russian stockpiles — polonium in Litvinenko's case and "novichok" in the Skrypal incident — hints at Russian involvement enough to intimidate and silence other opponents.

13. *DNC hacking*

My knowledge of the DNC hacking operation is limited to information acquired from the media and official US Government reports. However, I can attest that such computer operations by intelligence services have dual applications. One is pure espionage, i.e., acquisition of information about the target's plans and intentions, identification of key players, identification of target individuals sympathetic to Russian foreign policy goals, relationships among these individuals,

personal data that might reveal vulnerabilities that can be exploited to further these goals or even recruit the individuals as sources, and even locations frequented where intelligence officers can arrange seemingly "accidental" contact. The second application relates to active measures — - information that can be revealed to embarrass or diminish the prestige of the target or drive a wedge within the target organization, as illustrated by the Wikileaks release of DNC emails with compromising information about dealings with the Bernie Sanders campaign.

14. *Russian monitoring of internet activity*

Over the last two decades the Russian government has increased its monitoring of internet activity in the country. The primary legislation for this oversight is called SORM, the Russian acronym for "System of Operational Investigative Measures." The law has been amended twice since 1995 and government control was tightened in both versions, as evidenced by an increase of convictions for alleged "extremism" offenses. In 2010, 30 social media users were convicted of such offenses, but by 2016 that number had skyrocketed to 216.

SORM requires all internet service providers in Russia to install, at their own expense, a special device on their servers that allows the FSB to monitor credit card transactions, email messages and web browsing activity. The FSB is not required to provide telecommunications and internet providers with any documentation on targets of interest prior to accessing the information. The legislation has also been amended to permit other law enforcement agencies the same access as the FSB. While the FSB was initially required to obtain a court warrant, this only applied to communications content and not metadata. The FSB is also not required to show the warrant to anyone, and providers have no access to acquire information from the special devices.

Government authorities for monitoring communications were expanded yet again in July 2016 under the guise of counterterrorism and public safety by the so-called Yarovaya laws, named after their author, parliamentarian Irina Yarovaya of Putin's United Russia party. The law requires all telecommunications and internet providers to disclose communications, metadata, and all other "necessary information" to agencies upon request and without a court order. The law also facilitates government efforts to identify users and access personal information without any judicial oversight.

Providers are also required to store recordings of phone conversations, text messages and users' internet traffic for up

to six months (the original period was three years, but this was subsequently amended). However, considering the huge data storage requirements, many observers are skeptical that this mandate is technically feasible at present, but the law certainly reflects the Kremlin's desire for all encompassing control and monitoring of its citizenry. Punishments for violations of all the monitoring laws were also stiffened by the legislation authored by Yarovaya.

Foreign entities would also be required under the law to obtain Russian licenses to provide communications services, which would then subject them to the Yarovaya statutes. According to the Russian newspaper Izvestiya, some global internet companies have allegedly received warning letters from the Russian government to fulfill licensing requirements.

Some telecom and internet providers have expressed serious concern about the enormous costs required to implement the data storage aspects of the law, which, according to some Russia media reports, could amount to 2.2 billion rubles. As I have indicated earlier, Russian intelligence has for centuries used blackmail to secure intelligence cooperation.  The costs entailed in Yarovaya implementation could provide the FSB with additional leverage to coerce companies to cooperate in clandestine operations in return for receiving "exemptions" from the law's requirements.

15. *Source Reliability*

US Intelligence Community agencies dealing in HUMINT (Human intelligence, i.e., spies) has a program for "asset validation," which is designed to determine the veracity and accuracy of a source's reporting and his suitability as a clandestine asset. The process of asset validation continues through the life of the relationship. Sometimes informally referred to as "vetting," the process is intended to determine if a source is who he/she claims to be, is free of external control, is capable of behaving in a secure manner, and possesses access to information commensurate with his position. The asset validation process consists of examination and evaluation, including background checks, continual psychological assessment by the officer responsible for meeting the source, polygraph, and reviews of the source's reporting. (Reference: CI Glossary, Office of the Director of National Intelligence; Guidance for the Conduct of DoD Human Source Validation, 22 June 2009; Glossary, Defense Humint Center, DIA)

16. Building Source Trust; Protection of Sources

Key to recruitment of clandestine sources is the development of a personal relationship by the intelligence officer as he/she cultivates and assesses the individual for recruitment. The personal relationship builds trust with the source. After recruitment, that trust is reinforced by both sides' fulfillment of the gains from the relationship, i.e., the source providing intelligence and/or completing intelligence-related tasks, and the intelligence officer satisfying the source's needs, whether they be money, ego gratification or other motives for cooperating with US intelligence. An essential aspect of any clandestine relationship is the intelligence officer ensuring the security of his source, continually training on and reviewing security measures and exercising "tradecraft," i.e., methods, techniques and technologies designed to avoid scrutiny and maintain the secrecy of the relationship.

Executed on this 25th day of May 2018.

s/ Michael J. Sulick
    Michael J. Sulick

Appendix A:
List of Publications Authored in the Last 10 years


Books

- *Spying in America: Espionage in America from the Revolution to the Dawn of the Cold War*, 2012;
- *American Spies: Espionage Against the United States from the Cold War to the Present, 2013.*
Both books published by Georgetown University Press.

Forewords

- Foreword to *Harbor Knight* by Ralph Garcia, March 2013;
- Foreword to *Global Security Consulting* by Luke Bencie, October 2014.

Articles

- "Al Qaeda Answers CIA Hiring Call," op-ed, *Los Angeles Times*, July 10, 2005;
- "As the USSR Collapsed : A CIA Officer in Lithuania," *CIA Studies in Intelligence*, April 15, 2007;
- "Counterintelligence in the War Against Terrorism," *CIA Studies in Intelligence*, February 20, 2013;
- "Intelligence in the Cold War," *AFIO Guide to the Study of Intelligence,* Winter 2014-15;
- "Russian Disinformation," *The Intelligencer,* Winter 2017-18.


Articles Published in The Cipher Brief (online national security publication):

- "Russia in Latin America: A Challenge to the U.S.," January 5, 2016;
- "The Insider Threat," January 21, 2016;
- "Espionage and Social Media," January 30, 2016;
- "ISIS and the Caucasus," March 10, 2016;
- "Russia and Europe's Interdependence," July 8, 2016;
- "Russia's Checkered History of Intelligence Sharing with the U.S.," August 10, 2016;
- "The US and Russia: No Detente Anytime Soon," December 14, 2016;
- "Thorns in The Bear's Paw: Putin's Vulnerabilities", April 4, 2017;

- "State of Play: A Paean to Putin: The Oliver Stone Interviews," June 20, 2017;
- "Putin Looks Elsewhere to Retaliate Against US Acts in Syria," June 22, 2017;
- Reviews of TV Show "The Americans," Season 4, Episodes 1-13, 2016;
- Reviews of TV Show "Homeland," Season 6, Episodes 1-12, 2017;
- Review of novel, *The 14th Colony* by Steve Berry; April 29, 2016;
- Review of novel, *The Black Widow*, by Daniel Silva; August 10, 2016;
- Review of novel, *Duty and Honor*, by Grant Blackwood; August 19, 2016;
- Review of novel, *Order to Kill*, by Kyle Mills, November 4, 2016;
- Review of novel, *House of Spies*, by Daniel Silva; September 22, 2017.

Appendix B

Disclosure of past testimony as an expert at trial or deposition
during the previous four years: none.