UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| ALEKSEJ GUBAREV,<br>XBT HOLDING S.A., and<br>WEBZILLA, INC.<br>    Plaintiffs,<br><br>v.<br><br>BUZZFEED, INC. and<br>BEN SMITH<br>    Defendants. | Case No.<br><br>0:17-cv-60426-UU |

**PLAINTIFFS' *DAUBERT* MOTION TO EXCLUDE THE EXPERT
OPINIONS OF ANTHONY J. FERRANTE**

**Introduction**

Four million dollars[1] doesn't buy what it used to in an expert witness. In this case, it apparently does not buy an expert opinion that does what it purported to set out to do, namely provide any admissible expert testimony that is actually related to the factual issues to be decided by the jury. And so, recognizing apparently that former FBI agent Anthony Ferrante would be unable to find any evidence that would prove the truth of the actual defamatory statements published about Plaintiffs by Buzzfeed, Defendants instead instructed Mr. Ferrante to try to prove statements that, while not actually contained in the defamatory article, might be "close enough" so that no one would notice. Specifically, whereas the defamatory statements accuse Mr. Gubarev ***personally*** of having been pressured by the FSB into using his companies to hack into the Democratic Party leadership as part of a plot to undermine the United States Presidential elections – Defendants instead charged Mr. Ferrante with finding evidence that might suggest that ***third parties*** utilized XBT's and/or Webzilla's ***infrastructure*** to accomplish these goals. The entirety of Mr. Ferrante's report, then, is based on proving facts that are not relevant to the

---

[1] Ferrante Depo., p. 42 ("Q. To date how much has FTI billed BuzzFeed in connection with the present engagement?  A.·· I believe the figure is just below $4,100,000.").

questions to be answered by the jury. And, even if Mr. Ferrante had been investigating relevant questions, his report cannot support the opinions offered. Because his report does not meet the requirements for an expert report articulated by the United States Supreme Court in *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) and the requirements of Rule 702 of the Federal Rules of Evidence, Plaintiffs move to exclude the expert report and opinions of Anthony J. Ferrante in their entirety.

**Argument**

**I.**     **Legal Standard**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which states that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert*, the Supreme Court addressed the gatekeeping function of the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable." 509 U.S. at 589. "The trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to: (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592. *See*, *also*, *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir.2004) ("The district court's role is especially significant since the expert's opinion 'can be both powerful and quite misleading because of the difficulty in evaluating it.' Indeed, no other kind of witness is free to opine about a complicated matter without any firsthand knowledge of the facts in the case." (internal citation omitted) (quoting *Daubert*, 509 U.S. at 595)).

In *Kumho*, the Court extended Daubert to non-scientist experts and confirmed that the *Daubert* gatekeeping requirement is vital one. As the Supreme Court held in *Kumho Tire*:

> [T]he objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the

same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Kumho*, 526 U.S. at 152.

The Eleventh Circuit, in turn, developed a rigorous three-part test to determine whether to admit an expert report or opinion under *Daubert*. *See United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (Rule 702 requires a "rigorous three-part inquiry"). "Expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998).

The party offering an expert has the burden of satisfying each of these elements by a preponderance of the evidence. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005). *See*, also, *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999) ("The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence.").

"Even if a witness is qualified as an expert regarding a particular issue, the process used by the witness in forming his expert opinion must be sufficiently reliable under *Daubert* and its progeny." *Bowe v. Pub. Storage*, 2015 U.S. Dist. LEXIS 178180 at *18 (S.D. Fla. June 2, 2015). An expert's "rank speculation would only unfairly prejudice Plaintiffs by advocating for a certain result in the guise of offering expert opinions. This is unacceptable." *Id.* at *13.

"[A]n expert must, in his report, provide 'a complete statement of all opinions the witness will express *and the basis and reasons for them*.'... [A] naked reference to his own background ... is no showing of reliability at all...." *Harrison v. Royal Caribbean Cruises, Ltd.,* 2013 U.S. Dist. LEXIS 202067, at *7 (S.D. Fla. Nov. 7, 2013) (quoting Fed.R.Civ.P. 26(a)(2)(B)(i)) (emphasis in original).

Where a witness is "'relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it."'" *Affiliati*

*Network, Inc. v. Wanamaker*, 2017 U.S. Dist. LEXIS 217403, at *7-8 (S.D. Fla. Aug. 14, 2017) (quoting *Frazier*, 387 F.3d at 1261).

## II. The Expert Testimony of Anthony J. Ferrante is Unreliable and Will Not Assist the Trier of Fact.

The Ferrante Report, attached hereto as Exhibit 1, is particularly remarkable in one important respect (other than its astonishing price tag): despite being offered as an expert witness to provide evidence of the truth of the statements made about Plaintiffs in the December Memo, Mr. Ferrante acknowledges outright that he was not actually asked to render an opinion on – and does not render an opinion on – the allegations made in the December memo concerning Plaintiffs. Instead, apparently knowing that they would find no evidence to support the actual allegations made in the December Memo, Defendants charged Mr. Ferrante with finding evidence of what they believed he could find (despite it not being the same as the defamatory statements made) and, moreover, instructed him specifically to focus solely on the evidence that painted Plaintiffs in a negative light, and to ignore evidence to the contrary.

More specifically, the December Memo alleged that:

> [O]ver the period March-September 2016 a company called XBT/Webzilla and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct "altering operations" against the Democratic Party leadership. Entities linked to one Aleksei GUBAROV [sic] were involved and he and another hacking expert, both recruited under duress by the FSB, Seva KAPSUGOVICH, were significant players in this operation. In Prague, COHEN agreed contingency plans for various scenarios to protect the operations, but in particular what was to be done in the event that Hillary CLINTON won the presidency. It was important in this event that all cash payments owed were made quickly and discreetly and that cyber and that cyber and other operators were stood down / able to go effectively to ground to cover their traces.

*See* December Memo, attached as Exhibit 2.

In other words, what the December Memo *actually* accused Plaintiffs of was: (1) having been personally involved, albeit under duress in (2) using botnets and porn traffic to (3) transmit viruses, plant bugs, steal data, and conduct "altering operations" against the Democratic Party leadership. According to Mr. Ferrante, however, the complete scope of his assignment was to "to conduct a technical investigation and collect evidence that links XBT *infrastructure* to the described malicious cyber activity in the Steele dossier" and his conclusions and opinions were related only to the use of Plaintiffs' computer infrastructure. Ferrante Depo., Exhibit 3 hereto, p. 14 (emphasis added). *See, also,* Ferrante Depo., p. 15 ("The scope of my assignment was to

4

conduct a complex technical investigation to collect evidence, to identify evidence that linked XBT *infrastructure* to the described malicious activity in the Steele dossier and to serve as an expert witness on that evidence." (emphasis added)); pp. 44-47 (statement that "Entities linked to one Aleksei GUBAROV [sic] were involved and he and another hacking expert, both recruited under duress by the FSB, Seva KAPSUGOVICH, were significant players in this operation" was outside the scope of the assignment); p. 50 ("Q. Was part of your engagement by BuzzFeed to conduct a factual inquiry into the truth or falsity of allegations contained in the dossier, separate and aside from the cyber aspect of it? A. The scope of our assignment was to conduct a technical investigation and to collect evidence that linked XBT to the allegations stated in the Steele dossier."); pp. 59-60 ("Q. In your high-priority objectives you talk about botnets and porn traffic being hosted by XBT and Webzilla. ***Why were you considering the question of hosting as opposed to whether or not XBT and Webzilla were themselves doing those things***? A. … ***I would say because the scope of our assignment was to identify evidence that linked XBT infrastructure to this malicious activity as stated in the Steele dossier***. Q. And so you have not concluded in your report or otherwise that XBT itself used botnets and porn traffic as opposed to its infrastructure.· Is that correct? A. Other than the fact that was -- Other than the fact that the malicious cyber activity described in the Steele dossier was facilitated by using their infrastructure. Q. And I'm sorry. I think I understand your answer, but I just want to clarify You've -- Your conclusion, your opinion is that XBT and/or Webzilla's infrastructure was utilized to do the malicious things described in the Steele dossier, correct? A. Correct." (emphasis added)); pp. 62-63 ("Q. I understand that you don't want to answer the question that I'm actually asking. But the question that I'm actually asking is: Putting aside the infrastructure question, were you able to determine that any XBT employee used botnets or porn traffic to transmit viruses, plant bugs, steal data or conduct altering operations? THE WITNESS: I think we can disagree that I believe I have answered the question. But I will further state that other than the fact that XBT employees did little to nothing to detect, stop and prevent the significant malicious activity, ***I have no evidence of them actually sitting behind a keyboard***." (emphasis added)); p. 63 ("Q. And you have no evidence that Aleks Gubarev personally did any of the things alleged in the Steele dossier? A. Other than the fact that Aleksej Gubarev owns and operates XBT and related entities, he was outside the scope of my assignment.").

5

As an overarching matter, then, Mr. Ferrante's report should be deemed inadmissible inasmuch as it fails to meet the relevance requirements of *Daubert*. To the extent that Defendants are attempting to prove the truth of the statements contained in the December Memo, those statements accuse the defendants of **directly** hacking the Democratic Party leadership under pressure from the FSB. The December Memo says **nothing** about Plaintiffs' infrastructure being misused by third parties (clients or otherwise) to hack the Democratic Party leadership, nor does the December Memo allege that Plaintiffs' had lax security measures that allowed third parties (clients or otherwise) to misuse their infrastructure. This is a huge and important distinction and it is a distinction that Defendants and their expert intentionally attempt to blur. As a result, not only would Mr. Ferrante's testimony "fail to assist" the factfinder in determining an actual "fact in issue," it would actively mislead the jury into believing that Mr. Ferrante had discovered evidence of the truth of the actual statements contained in the December Memo, where he clearly did not. As such, his testimony must be excluded. *See United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004) ("Because of the powerful and potentially misleading effect of expert evidence ... sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403. Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury.... Indeed, 'the judge in weighing possible prejudice against probative force under Rule 403 ... exercises more control over experts than over lay witnesses.' ... Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." (citations omitted)); *Bowe v. Pub. Storage*, 2015 U.S. Dist. LEXIS 178179, *12 (S.D. Fla. June 2, 2015) (rejecting expert testimony where expert's opinion "does not test the relevant inquiry" and is therefore "irrelevant to any issue before the jury" and "because they have very little probative value which would be substantially outweighed by their potential to confuse the jury").

In addition to the above reasons why Mr. Ferrante's report must be rejected in its entirety, the individual opinions proffered by Mr. Ferrante must additionally be rejected for the following reasons.

### A. The Democratic Party Hacks

Mr. Ferrante's report begins by stating that Crowdstrike, a "cybersecurity technology and threat intelligence company," "was contracted by the DNC to investigate the hack on its infrastructure" and that Crowdstrike issued a report entitled "Bears in the Midst: Intrusion into the Democratic National Committee" that concluded that "Russian cyber espionage groups COZY BEAR (also known as APT29) and FANCY BEAR (also known as APT28) infiltrated the DNC network." Ferrante Report, p. 11. What Mr. Ferrante's report largely obscures, however, and what would tend to further confuse the jury, is the extent to which the data from the Crowdstrike report and additional data provided directly by the Democratic National Committee fails to support even Mr. Ferrante's (irrelevant) attempts to directly link Plaintiffs' infrastructure to the attacks on the DNC. As Mr. Ferrante acknowledges:

- Crowdstrike's report identified four IP addresses that it believed to belong to the "Command and Control" computers responsible for the hack on the DNC and *none of those IP addresses were connected in any way to Plaintiffs.* Ferrante Depo, pp. 77-83.

- The Democratic National Committee produced in this litigation a list of additional IP addresses that were believed to have been responsible for the hack on the DNC and, once again, *none of those IP addresses were connected in any way to Plaintiffs.* Ferrante Depo, p. 84.

- "The CrowdStrike report included seven command and control ["C&C"] IP addresses and five malware hashes as the IOCs[2] in the DNC hack. FTI reviewed the IP registration information for the seven C&C IP addresses, but none were affiliated with XBT. Similarly, FTI was not able to identify a direct technical connection to XBT infrastructure based on an analysis of the five malware samples." Ferrante Report, p. 14; Ferrante Depo., p. 98.

To the extent, then, that Mr. Ferrante set out to prove an irrelevancy – that Plaintiffs' *infrastructure* was utilized to hack the Democratic Leadership (as opposed to the Plaintiffs doing so themselves as alleged in the December Memo), his report concludes that no such direct connection existed. And, although Plaintiffs would obviously want to point this fact out to the jury if Mr. Ferrante were allowed to testify to the jury at all, this conclusion simply serves to emphasize how Mr. Ferrante's report does nothing to prove the truth of the allegations contained

---

[2] Indicators of Concern.

7

in the December Memo, which are the subject of this lawsuit. As such, Mr. Ferrante's testimony should be excluded in its entirety.

### B. The Bitly Link

Having failed to establish a direct connection even to Plaintiffs' infrastructure, Mr. Ferrante next opines that "Technical evidence suggests that FANCY BEAR used XBT infrastructure to support malicious spear phishing campaigns against the Democratic Party Leadership." Ferrante Report, p. 12. In doing so, Mr. Ferrante begins his analysis by relying entirely on "documents published by WikiLeaks," specifically a "phishing" email purportedly sent to Clinton campaign manager John Podesta, in an attempt to get him to click on a link that would, in turn, bring him to a page that looked like a Google security page in order to lure him into entering his username and password.

Preliminarily, Mr. Ferrante makes no attempt to explain how or why the Court should accept that the Wikileaks document – which purports to be a stolen email anonymously provided to Wikileaks – is in any way reliable. As such, Mr. Ferrante's conclusions concerning the Bitly Link are already built on an inadmissible foundation, which should lead the Court to reject Mr. Ferrante's testimony on this topic. *See*, *e.g.*, *Affiliati Network, Inc. v. Wanamaker*, 2017 U.S. Dist. LEXIS 217403, *26 (S.D. Fla. August 14, 2017) ("Hochman fails to proffer any information whatsoever to indicate that the BBB or #REPORTSCAM websites constitute reliable sources to support Hochman's opinions. In other words, Hochman relies entirely on anecdotal complaints by anonymous sources, without verifying, or attempting to verify, the authenticity of any of the ratings or reviews on these two websites, which is unacceptable under *Daubert*." (citing *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1250 (11th Cir. 2005), for "Uncontrolled anecdotal information offers one of the least reliable sources to justify opinions about both general and individual causation.")).

Mr. Ferrante continues, stating that he next relied upon an internal investigation conducted by the company Bitly to determine how its service "was used in the spear phishing attack of the DNC and Democratic Party leadership." Ferrante Report, p. 12. Once again, Mr. Ferrante provides no information as to why the Court should rely on the Bitly internal investigation

Nevertheless, even if the Court were to look past Mr. Ferrante's reliance on anonymous source information found on the internet and unverified internal investigations of third parties,

his own data in no way supports even his weak conclusion that "Technical evidence *suggests* that FANCY BEAR used XBT infrastructure to support malicious spear phishing campaigns against the Democratic Party leadership." Ferrante Report, p. 12 (emphasis added). To the contrary, Mr. Ferrante states that (according to the Bitly data), 41 different IP addresses were used to create suspicious Bitlinks that may have been used in the phishing attack on the DNC. Of those 41 IP addresses, one single IP address was owned by Root S.A. (a subsidiary of XBT). This does not mean (nor does Mr. Ferrante claim that it means) that Plaintiffs themselves utilized this IP address to create the suspicious Bitlink as opposed to it possibly having been created by a client of Root S.A. (or even a customer of a client of Root S.A.). Regardless, though, Mr. Ferrante's report then admits that "Based on the information currently available, FTI cannot definitively state that the bitlink created using the Root S.A. IP address was ever sent to or received by John Podesta." Ferrante Report, p. 14; Ferrante Depo, pp. 92-96.

In short, the only thing that Mr. Ferrante's investigation – built on anonymous and unsubstantiated documents – is able to conclude is that: (1) someone utilized 41 different IP addresses to create suspicious Bitly links, one of which (though Mr. Ferrante does not know which one) was used to actually send a phishing email to John Podesta; (2) one of those 41 IP addresses was owned by a subsidiary of XBT; and (3) there is no way to know if the link that Mr. Podesta clicked on was sent by the IP address owned by Root S.A. or by any of the 40 other IP addresses *not* owned by Root S.A. Based on this, to allow Mr. Ferrante to testify (on this rank speculation) that "Technical evidence suggests that FANCY BEAR used XBT infrastructure to support malicious spear phishing campaigns against the Democratic Party Leadership" would fly in the face of the requirements of *Daubert*. As this Court held in *Bowe v. Pub. Storage*, 2015 U.S. Dist. LEXIS 178180 (S.D. Fla. June 2, 2015):

> Skorheim's opinions are also misleading because they are presented as expert analysis where they are instead hypothetical musings not grounded in actual facts or based on any specific methodology, and appear to be Skorheim's self-directed Socratic inquiry. Finally, Skorheim's opinion that Plaintiffs have not produced sufficient evidence to fairly establish and estimate economic harm is a decision that the jury can, and will, decide based on the evidence presented. Skorheim's rank speculation would only unfairly prejudice Plaintiffs by advocating for a certain result in the guise of offering expert opinions. This is unacceptable. *See Evans v. Mathis Funeral Home, Inc.,* 996 F.2d 266, 268 (11th Cir. 1993) (affirming exclusion of expert testimony where testimony was within common knowledge of jurors and testimony was based on assumptions that were not supported by the record); *King v. Cessna Aircraft Co.,* No. 03-20482-CIV, 2010 U.S. Dist. LEXIS

50728, 2010 WL 1980861, at *5 (S.D. Fla. May 18, 2010) ("We thus cannot cast a
blind eye to such rank speculation being presented to our jury under the guise of
reliable expert testimony.").

*Id.* at *13. *See*, *also*, *Eberli v. Cirrus Design Corp.,* 615 F. Supp. 2d 1357, 1365 (S.D. Fla. 2009) ("The fact that the opinion itself merely lists potential causes instead of drawing any conclusion underscores how speculative it is.").

### C.      Additional Technical Connections

Mr. Ferrante next opines that "Technical evidence *suggests* that FANCY BEAR may have used an IP address owned by XBT Subsidiary, Root S.A., in the past." Ferrante Report, p. 14 (emphasis added). Mr. Ferrante then notes that one IP address owned by Root S.A. (but not necessarily used by Root S.A. as opposed to one of its customers) used a security certificate called an SSL Certificate that (according to Mr. Ferrante) that was also used by one of the suspicious servers listed in the Crowdstrike report (discussed above) which Mr. Ferrante claims, without explanation "suggests that the certificate is controlled by FANCY BEAR." At the end of all of this speculation and "suggestion," Mr. Ferrante concedes that he has insufficient evidence to reach any conclusion: "FTI notes that because this is an indirect link, more data from Crowdstrike and/or the DNC is required to determine if XBT infrastructure supported the DNC hack." Ferrante Report, p. 15. This is, then, not simply rank speculation, but rank speculation on an issue that (even if actual evidence supported Mr. Ferrante's conclusion) is still *not* what was actually alleged about the Plaintiffs in the December Memo.

### D.      Other U.S. Election Meddling

Mr. Ferrante next opines that "Technical evidence suggests that IP addresses owned by Root S.A. were included in the tools and infrastructure used by Russian intelligence to interfere in the 2016 U.S. Election." Ferrante Report, p. 15. The report from which Mr. Ferrante draws this conclusion – the so-called Grizzly Steppe report (attached hereto as Exhibit 4) supports no such conclusion. The report, which was apparently issued by the Department of Homeland Security and the FBI, was designed to warn owners of certain IP addresses that those intelligence agencies had detected what *might* be suspicious activity attributable to Russian actors originating from those IP addresses. The Grizzly Steppe report itself, however, makes clear that: "Upon reviewing the traffic from these IPs, some traffic may correspond to malicious activity, and some may correspond to legitimate activity." Grizzly Steppe Report, p. 5. The report then goes on to list literally hundreds upon hundreds of IP addresses that *may have been* affected, including 13

IP addresses owned by Root S.A. Grizzly Steppe Report, pp. 13-53. With respect to these IP addresses, the Grizzly Steppe report notes simply "It is recommended that network administrators review traffic to/from the IP address to determine possible malicious activity." Ferrante Depo., pp. 103-104. None of this supports Mr. Ferrante's unsupported speculation that "evidence suggests that IP addresses owned by Root S.A. were included in the tools and infrastructure used by Russian intelligence to interfere in the 2016 U.S. Election" and, as such, Mr. Ferrante's conclusion must be excluded.

Additionally, Mr. Ferrante notes that Marc Goederich, managing director of Root S.A., was contacted by authorities in Luxenberg who inquired about the IP addresses listed in the Grizzly Steppe report. Ferrante Report, p. 16. Mr. Ferrante opined, without explanation, that he believed that Mr. Goederich's response to authorities was somehow insufficient. Mr. Ferrante offered no basis for this opinion other than his "experience," despite the fact that the Luxenberg authorities themselves seemed satisfied with Mr. Goedrich's response. Ferrante Depo, pp. 107-108.[3]

In reaching this conclusion, Mr. Ferrante offers no explanation for what experience he is drawing upon, or how or why it applies to the facts at issue. Instead, he is asking the Court to "take the expert's word for it." *See*, *e.g.*, *United States v. Frazier,* 387 F.3d 1244, 1261 (11th Cir. 2004) ("[I]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient

---

[3] Q. …you talk about an inquiry from the Luxembourg authorities to Root S.A. concerning one of the IP addresses listed in the Grizzly Steppe report, correct?
A. Correct.
Q. And you note that Mr. Goederich responded to the Luxembourgish authorities, and you conclude, you say: Based on our experience this is not an adequate response to a government inquiry. And you're talking about the response that Mr. Goederich gave to the Luxembourgish police, correct?
A. To be clear, Mr. Goederich's response was -- and I'm quoting -- "It is a tour exit note." And quoting again: "Doesn't get us very far." Correct.· In my expert opinion, Mr. ·Goederich's response to the authorities is less than adequate.
Q. Did the Luxembourgish authorities ask Mr. Goederich for more information?
A. I don't know.
Q. In your experience, if a government agency wants more information they know how to ask, right?
A. In my experience, you're absolutely correct. In my experience, a government agent knocking on the door, a telecommunications company is absolutely going to ask for more than just one data point, especially if 13 are listed.

basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"); *Witt v. Stryker Corp.,* 648 F. App'x 867, 873 (11th Cir. 2016) ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.' ... If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong."). Here, too, Mr. Ferrante's conclusion must be excluded.

### E. The Methbot Operation

Mr. Ferrante then goes on a long diversion (Ferrante Report, pp. 17-22) to discuss what is referred to as the "Methbot Operation," which was, in its simplest terms, a scam in which automated bots made it appear as if human beings were clicking on advertising links, thereby causing the advertisers to pay revenues for what they believed were legitimate views of the advertisements. *See*, *e.g.*, Ferrante Depo., pp. 113-115. Mr. Ferrante's report acknowledged that, when Plaintiffs learned from a third-party White Ops paper that one of its customers might have been involved in the Methbot Operation, utilizing Plaintiffs' servers, it "took action to terminate the responsible customer." Ferrante Report, p. 21; Ferrante Depo. pp. 119-120. Mr. Ferrante also acknowledged that he had learned that "when XBT became aware of the methbot operation they pulled the hard drives related to that operation and maintained them in case law enforcement ever wanted to look at them." Ferrante Depo, pp. 119-120. Mr. Ferrante also acknowledged that he had no reason to believe that the Methbot Operation had anything to do with the attempts to hack the 2016 U.S. elections (other than the fact that both operations used "bots," which is much like saying that two disparate activities might be connected because they both used email). Ferrante Depo., p. 115.

Nevertheless, Mr. Ferrante uses this gratuitous reference to the Methbot Operation to opine only that "it is a highly unusual and risky business practice for hosting companies to provide services without signed contracts, especially instances when the customer is requesting a large number of servers and the company is at risk of losing a large amount of revenue." Ferrante Report, p. 22. Mr. Ferrante does not appear to have any expertise concerning the running of a hosting company or what contracts hosting companies should enter into, nor does he cite any source for his opinion or explain how his expertise might make this opinion useful to a

jury. In short, Mr. Ferrante's random conclusion does not comport with the requirements of *Daubert* in any respect.

F.  **Malicious Cyber Activity**

Mr. Ferrante next proceeds to discuss a number of other instances – unrelated entirely to the acts described in the December Memo – that he claims demonstrates that – at one time or another – Plaintiffs' ***networks*** have been utilized by bad actors looking to do bad things. From a general standpoint, Mr. Ferrante's opinions here veer from the merely irrelevant into the territory of impermissible "character" evidence inasmuch as it seeks to prove that, if Plaintiffs had clients or customers who utilized their infrastructure to do bad things in the past, that a jury can infer that the same happened here. Fed. R. Evid. 404(a)(1). Putting aside that such evidence must be rejected because it is irrelevant, is more prejudicial than probative, and is impermissible character evidence – an examination of Mr. Ferrante's report proves him time and again to be unreliable in his conclusions and his reliance on materials which he cannot (and has not) demonstrated to be reliable in any way.

For example, Mr. Ferrante first cites to a report issued by a private security firm, ESET, in an attempt to link IP addresses owned by an XBT subsidiary to a malware attack called CRASHOVERRIDE. Ferrante Report, p. 22. However, the very ESET report cited by Mr. Ferrante to reach his conclusion contained a caution that indicated "Warning! Most of the servers with these IP addresses were part of Tor network, which means that the use of these indicators could result in a false positive match." Ferrante Depo., p. 124. Mr. Ferrante admitted that he did not include this information in his report because "in my opinion I believe that to be irrelevant." *Id.*

Ultimately, for each of these alleged malicious events, Mr. Ferrante fails to discuss the reliability of the sources relied upon and, for the most part, fails to demonstrate how he applied his expertise to the facts alleged, as opposed to simply repeating statements made by others about wholly irrelevant matters.

G.  **Statements from Deposition Testimony**

Mr. Ferrante includes a section in his report, pages 28-31, where he reviews the deposition testimony of two of XBT's personnel, Mr. Konstantin Bezruchenko and Mr. Marc Goederich, and comes to the conclusion that Root and XBT "do not actively prevent the use of their infrastructure to support malicious cyber activity." The entirety of this section should be

13

excluded for two reasons. First, the section is irrelevant to the subject at hand – specifically whether Webzilla/XBT "had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct 'altering operations' against the Democratic Party leadership," which are the defamatory statements in this action. *See Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1311-12 (11th Cir. 1999) ("The judge's role is to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value."). Second, the entire section is nothing more than Mr. Ferrante claiming that the Court should "trust him" that XBT and Root's efforts were not adequate. Where a witness is "'relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it."'" *Affiliati Network, Inc. v. Wanamaker*, 2017 U.S. Dist. LEXIS 217403, at *7-8 (S.D. Fla. Aug. 14, 2017) (quoting *Frazier*, 387 F.3d at 1261). Mr. Ferrante has failed to do so and, as such, his testimony here too must be rejected.

### H. Public Reputation Related to Malicious Cyber Activity

Finally, Mr. Ferrante presents the court with a chart that purports to list a number of articles taken from various sources (ranging from newspaper reports to blog articles) in support of a contention that various subsidiaries of XBT have been mentioned in the media at various times as having hosted client websites that allegedly engaged in questionable behavior such as copyright violations or the display of pornography. Putting aside the utter irrelevance of this section; the fact that Mr. Ferrante never once explains why the Court should rely on the content of the cited newspaper articles or blogs; the unduly prejudicial nature of the factual allegations; and the fact that Mr. Ferrante does not explain either how this information falls within his area of expertise, how he applied his expertise to his conclusions, or why a jury might benefit from his testimony – putting all of that aside, even a cursory review of some of Mr. Ferrante's examples demonstrates how little regard he had for relevance or accuracy when drafting his report.

For example, Mr. Ferrante's very first example of alleged wrongdoing involves a 2008 report in the Dallas Morning News that hosting company 1-800-Hosting was under investigation for "hosting websites linked to two Russian cyber criminals." Ferrante Report, p. 32. As Mr.

Ferrante admits, however, ***Plaintiffs did not actually own 1-800-Hosting in 2008 when the alleged "wrongdoing" occurred.*** *Id. See, also*, Ferrante Depo., pp. 131-133.

Similarly, Mr. Ferrante's citation to a McClatchy DC Bureau article for the proposition that XBT subsidiary fozzy.com "is a site used to heavily host pornography" actually mischaracterizes the fact that the McClatchy article (written, incidentally, as a result of Buzzfeed's publication of the December Memo) actually simply points out that XBT had ***purchased*** fozzy.com, which it claimed (at one point in time) hosted pornography. Ferrante Depo., pp. 135-137. Mr. Ferrante admitted that he had no idea if fozzy.com continued to heavily host pornography. Indeed, although not mentioned by Mr. Ferrante, the very same McClatchy article also stated "analyst Carl Brooks of 451 Research, a Boston-based consultancy, said in a December interview. 'They don't have a bad reputation, by any means.' He said the same went for XBT Holdings: 'To the best of my knowledge, XBT is not particularly nefarious'." Ferrante Depo., p. 139.

Finally, and most astonishingly, despite citing a 10 year old Dutch blogger for the proposition that Plaintiffs' servers hosted websites that contained child pornography, Mr. Ferrante admitted not only that he did not know if the allegations made in the reports were true, but that it would not make a difference to his "data points" if the reports were wholly false. Ferrante Depo., pp. 162-173. In other words, Mr. Ferrante admits that it simply didn't matter to him whether the items he relied on in preparing his report were true or not.

## Conclusion

For the reasons stated hereinabove and in accordance with *Daubert v. Merrill Dow Pharms., Inc.,* 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137 (1999) and FRE 702, this Court should exclude the expert report and opinions of Anthony J. Ferrante in their entirety.

Dated: October 15, 2018

**Respectfully Submitted:**

/s/ Evan Fray-Witzer
Evan Fray-Witzer (*pro hac vice*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-0000
Facsimile: 617-423-4855
Evan@CFWLegal.com

/s/ Valentin Gurvits
Valentin D. Gurvits (*pro hac vice*)
Matthew Shayefar (Fla. Bar No. 0126465)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1804
Facsimile: 617-928-1802
vgurvits@bostonlawgroup.com
matt@bostonlawgroup.com

/s/ Brady J. Cobb
Brady J. Cobb (Fla. Bar No. 031018)
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com

*Attorneys for Plaintiffs*