Exhibit
3

```
1            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF FLORIDA
2                  MIAMI DIVISION

3

4    ALEKSEJ GUBAREV, XBT     :
     HOLDING S.A., and        :
5    WEBZILLA, INC.,          :
                              :
6         Plaintiffs,         : Case No:
                              : 1:17-cv-60426-UU
7    v.                       :
                              :
8    BUZZFEED, INC., and      :
     BEN SMITH,               :
9                             :
          Defendants.         :
10

11

12              **CONFIDENTIAL**

13      DEPOSITION OF ANTHONY J. FERRANTE

14

15          Friday, July 27, 2018

16               10:20 a.m.

17

18          Davis Wright Tremaine
       1919 Pennsylvania Avenue, N.W.
19            Washington, D.C.

20

21    Terry L. Bradley, Court Reporter

22
```



```
 1                APPEARANCES OF COUNSEL

 2

 3    For the Plaintiffs:

 4       CIAMPA FRAY-WITZER, LLP
         EVAN FRAY-WITZER, ESQ.
 5       VAL GURVITS, ESQ.
         20 Park Plaza
 6       Suite 505
         Boston, MA 02116
 7       T-617.426.0000
         E-evan@cfwlegal.com

 8

 9    For the Defendants:

10       DAVIS WRIGHT TREMAINE
         KATE BOLGER, ESQ.
11       ALISON SCHARY, ESQ.
         1257 Avenue of the Americas
12       New York, NY 10036
         T-212.402.4068
13       E-katebolger@dwt.com

14       BUZZFEED
         NABIHA SYED, ESQ.
15       ASSISTANT GENERAL COUNSEL
         111 East 18th Street
16       New York, NY 10003
         T-212.431.7464
17       E-nabiha.syed@buzzfeed.com

18

19

20

21

22
```



1              INDEX OF EXAMINATION

2

3    EXAMINATION                              PAGE

4    By Mr. Fray-Witzer. . . . . . . . .        6

5                    ~~~~~

6

7              INDEX OF EXHIBITS

8

9    1.  Company Intelligence Report         37
     2.  Foreign Policy Article -            48
10       J. Winter.  Former Senior FBI
         Official is Leading
11       BuzzFeed's Effort to Verify
         Trump Dossier (2/12/2018)
12   3.  Expert Report - A. Ferrante         57
     4.  DHS Statement on the Issue of       68
13       Binding Operational Directive
         17-01 (9/13/2017)
14   5.  McClatchy DC Article - K. Hall.     70
         Did this convicted Russian
15       pedophile help meddle in the
         U.S. elections? (April 2017)
16   6.  CrowdStrike Report -               76
         D. Alperovitch.  Bears in the
17       Midst:  Intrusion into the
         Democratic National Committee
18       (6/15/2016)
         *Exhibit 3 - Expert Report
19   7.  Letter - Frost to Fray-Witzer      83
         (6/8/2018)
20   8.  Chart - Bit.ly Data               91
         *Exhibit 5 - Expert Report
21

22



1 | EXHIBITS (Continued).

2 | 9.  NCCIC/FBI Joint Analysis Report –    102
          GRIZZLY STEPPE – Russian
3 |       Malicious Cyber Activity
          (12/29/2016)
4 |       *Exhibit 7 – Expert Report
      10. Routing History                    108
5 |       *Exhibit 8 – Expert Report
      11. Indictment                         115
6 |   12. WIN32/INDUSTROYER – A new threat   123
          for industrial control
7 |       systems
          *Exhibit 12 – Expert Report
8 |   13. Cosmicduke                         124
          *Exhibit 13 – Expert Report
9 |   14. Kaspersky – Unveiling "Careto" –   127
          The Masked APT (February 2014)
10 |      *Exhibit 14 – Expert Report
      15. Trend Micro Blog – Pawn Storm      129
11 |      Abuses Open Authentication in
          Advanced Social Engineering
12 |      Attacks (4/25/2017)
          *Exhibit 28 Expert Report
13 |  16. McClatchy D.C. – Russian tech      136
          expert named in Trump report
14 |      says US intelligence never
          contacted him (1/11/2017)
15 |  17. Joint Comments Before the U.S.     142
          Copyright Office Library of
16 |      Congress
      18. Trend Micro Blog – Unscrupulous    147
17 |      Russian Cybercriminals Attempt
          to Capitalize on Grisly Death
18 |      (4/26/2009)
      19. Krebs on Security – Carbanak Gang  150
19 |      Tied to Russian Security Firm?
          (July 16)
20 |  20. Krebs on Security – Who Else Was    153
          Hit by the RSA Attackers?
21 |      (October 11)

22 |



```
1   EXHIBITS (Continued).

2     21. PJ Media - Claim: Firm Hired        174
            BuzzFeed to Verify Steele
3           Dossier Has Checkered Past in
            Venezuela (3/7/2018)
4     22. Home World News - Leak reveals      177
            plot to destabilize
5           Venezuelan govt (11/6/2013)
      23. Infodio - Is FTI Consulting's       180
6           LatAm Division Ever Going to
            be a Shareholder Concern?
7     24. Host Exploit - World Hosts Report   181
            (March 2014)
8     25. Host Exploit - World Hosts Report   183
            (September 2013)
9     26. Host Exploit - World Hosts Report   184
            (March 2013)
10    27. Host Exploit - World Hosts Report   186
            (Q3 2012)
11    28. Host Exploit - Top 50 Bad Hosts     187
            and Networks Report (Q4 2010)
12    29.Host Exploit - Top 50 Bad Hosts      188
            and Networks Report (Q1 2011)
13    30. Host Exploit - Top 50 Bad Hosts     194
            and Networks Report (Q2 2011)
14    31.Host Exploit - Top 50 Bad Hosts      195
            and Networks Report (Q3 2011)
15
      (Original Exhibits retained by Court Reporter.)
16
                      ~~~~~
17

18

19

20

21

22
```



```
 1                P R O C E E D I N G S

 2

 3                ANTHONY J. FERRANTE

 4      having been first duly sworn, testified as

 5      follows:

 6

 7                     EXAMINATION

 8    BY MR. FRAY-WITZER:

 9       Q.    Good morning.

10       A.    Good morning.

11       Q.    Would you please state your name for

12    the record.

13       A.    Anthony Ferrante.

14       Q.    And Mr. Ferrante, can you tell me,

15    have you ever been deposed before?

16       A.    I have not.

17       Q.    So the ground rules are pretty

18    simple, I think.  I'll try and ask you a series

19    of questions, you'll get a chance to answer.

20    If I ask you a question and you respond to it,

21    I will assume that you understood the question.

22    Is that fair?
```



1          MS. BOLGER:  I think I object to

2   that instruction.

3          But you can answer that.

4          THE WITNESS:  It's fair.

5   BY MR. FRAY-WITZER:

6     Q.    Okay.  Let me also say that because

7   you are being recorded by a stenographer, your

8   answers have to be verbal, so nods and head

9   shakes don't come up on the transcript, so

10  "yes" and "no" where appropriate, please.

11    A.    Understood.

12    Q.    If at any time during the deposition

13  you would like to take a break, please just let

14  me know, we'll take a break.  The only time

15  that I would ask you not to break is if there's

16  a question pending.  So once you've answered a

17  question, I'm happy to take a break as

18  frequently as you'd like.  Is that fair?

19    A.    Understood.

20    Q.    Mr. Ferrante, can you tell us first,

21  please, are you currently employed?

22    A.    I am.



1        Q.      And for whom are you employed?

2        A.      FTI Consulting.

3        Q.      And what is FTI Consulting?

4        A.      It's a business consulting firm.  A

5   global business consulting firm, headquartered

6   here in Washington, D.C.

7        Q.      And what types of consulting does

8   FTI do?

9        A.      They do a myriad of business

10  consulting services, professional service,

11  around the globe.  29 countries.

12       Q.      And more specifically, what services

13  do you perform for FTI?

14       A.      I lead the global cyber security

15  practice at FTI.

16       Q.      And what does the global cyber

17  security practice do?

18       A.      We offer services to our clients,

19  ranging from proactive cyber security services

20  through reactive cyber security services,

21  breach response, for example, defense

22  compliance, for example, complex cyber



1    investigations.

2         Q.    What falls under the category of

3    proactive cyber security?

4         A.    Compliance.  The government, U.S.

5    Government will publish various regulatory

6    compliance standards, and organizations need to

7    comply.  So I would be retained to help them

8    meet those compliance metrics.

9         Q.    What kinds of organizations have you

10   performed proactive cyber security work for?

11         MS. BOLGER:  I'm going to object.

12   Sometimes client relationships are

13   confidential.

14         Anthony, client confidences you

15   should not reveal them, but if they're public

16   information, obviously you can respond to Mr.

17   Fray-Witzer's question.

18         THE WITNESS:  Sure.  I can't reveal

19   client identities, but I can say that we

20   represent a myriad of clients across all

21   industries.

22   BY MR. FRAY-WITZER:



1      Q.    What kind of industries?

2      A.    Defense, telecommunications,

3   technology.

4      Q.    Do you represent --

5            And I don't need the names of them,

6   but do you represent any server companies?

7      A.    Yes.

8      Q.    And do you represent any ISPs?

9      A.    None that I can think of at this

10  moment.

11           MS. BOLGER:  Gentlemen, you both

12  whisper.  Raise your voices for me, please.

13  BY MR. FRAY-WITZER:

14     Q.    Can you tell me please what reactive

15  cyber security involves?

16     A.    Um, cyber incidents range from

17  ransomware to a breach where systems are

18  compromised, and our services respond to those,

19  for example.  I would say anything that's not

20  planned we are sometimes retained to help

21  remediate.

22     Q.    What are complex investigations?



1      A.     Complicated investigations involving

2   sophisticated techniques, methods,

3   understanding of complicated subject matter.

4      Q.     Complicated subject matter in what

5   arena?

6      A.     Well, in my domain complex subject

7   matter would be cyber security.

8      Q.     Do you --

9             And I'm not asking about FTI, but do

10  you personally do any kind of investigatory

11  work that is not cyber security related?

12     A.     I don't understand the question.

13     Q.     Well, you said that you do complex

14  investigations in the cyber security arena.  Do

15  you do any other kind of investigations that

16  aren't necessarily cyber security?

17     A.     I am a seasoned investigator.  Yes.

18     Q.     And so for FTI do you do other types

19  of investigations?

20     A.     I am a seasoned investigator, and --

21     Q.     What areas of investigation have you

22  performed for FTI, other than cyber security



1   investigations?

2           MS. BOLGER:  Without revealing

3   client confidences.

4           THE WITNESS:  I would say

5   traditional investigative work, background

6   checks, um, research utilization of

7   subscription databases, collection of evidence,

8   analysis of evidence.

9   BY MR. FRAY-WITZER:

10      Q.   And that gives me some information

11  about the kind of techniques that you use.

12  What I'm really trying to figure out is:  What

13  kinds of investigations, other than cyber

14  security, do you perform?  What are the topics?

15      A.   So I don't understand your question,

16  and I'm having a tough time answering it

17  without divulging specific clients.  So I would

18  say that my investigative --

19           -- my investigations thus far have

20  relied on traditional and complex investigative

21  techniques.

22      Q.   Let me just give you a random



1  | example.

2  |       Sometimes if a company has

3  | experienced employee fraud, they'll hire an

4  | investigator.  That would be a kind of category

5  | that I'm talking about.  Fraud investigations

6  | for corporate clients.

7  |       Does that help you sort of give you

8  | an idea to the categories that I'm looking for?

9  |       MS. BOLGER:  That category.

10 |       THE WITNESS:  Sure.  I mean, it

11 | helps.  Again, you know, my investigations --

12 |       I'm a seasoned investigator and

13 | conduct complex investigations, ranging from an

14 | audit of an organization to ensure that they

15 | are compliant with new defense regulatory

16 | requirements, an internal investigation to

17 | identify and insider threat, a cyber security

18 | incident that may have been facilitated by an

19 | internal or external actor, to after an

20 | incident would occur to reconstruct the events

21 | and determine what happened, how it happened,

22 | and who was responsible.



1    BY MR. FRAY-WITZER:

2        Q.    Have you ever served as an expert

3    witness before?

4        A.    I have not.

5        Q.    Prior to this current case, have you

6    ever been engaged by BuzzFeed?

7        A.    I have not.

8        Q.    When were you first engaged by

9    BuzzFeed in this matter?

10       A.    I believe it was August 2017.

11       Q.    Do you know how it is that you came

12   to be engaged by BuzzFeed?  In other words, how

13   they found you.

14       A.    I do not know specifically.

15       Q.    What was the scope of your

16   assignment from BuzzFeed?

17       A.    The scope of my assignment was to

18   conduct a technical investigation and collect

19   evidence that links XBT infrastructure to the

20   described malicious cyber activity in the

21   Steele dossier.

22       Q.    Is that a complete description of



1   what your assignment was from BuzzFeed?

2           MS. BOLGER:  As a testifying expert,

3   right?

4           MR. FRAY-WITZER:  No.  I'm asking if

5   that was the complete description of his

6   assignment from BuzzFeed.

7           THE WITNESS:  Yes.

8   BY MR. FRAY-WITZER:

9       Q.    And I just want to make sure I

10  understand then.  It's your testimony that the

11  scope of your assignment from BuzzFeed was to

12  examine whether there were links from the XBT

13  infrastructure to the malicious activity

14  described in the Steele dossier.  Is that

15  correct?

16      A.    The scope of my assignment was to

17  conduct a complex technical investigation to

18  collect evidence, to identify evidence that

19  linked XBT infrastructure to the described

20  malicious activity in the Steele dossier and to

21  serve as an expert witness on that evidence.

22      Q.    When you were first retained by



1  BuzzFeed to conduct the investigation that

2  you're describing, did you have any

3  preconceived notions about any of the

4  plaintiffs in this case?

5      A.    No.

6      Q.    Had you'd heard of Aleks Gubarev

7  before being retained by BuzzFeed?

8      A.    I'm sorry.  Can you repeat that.

9      Q.    Had you heard of Aleks Gubarev

10 before being retained by BuzzFeed?

11     A.    I'd heard of him as an individual.

12     Q.    And in what context had you heard of

13 him?

14     A.    I just remember hearing of him prior

15 to being retained, just in media reporting.

16     Q.    And when you say "media reporting",

17 are you talking about reporting on the Steele

18 dossier?

19     A.    Don't recall.

20     Q.    Did you have --

21           What was your understanding of Aleks

22 Gubarev as an individual prior to starting



1  this?

2      A.    I had no opinion.

3      Q.    Had you heard of XBT Holdings prior

4  to being retained by BuzzFeed?

5      A.    I did not.

6      Q.    Had you heard of Webzilla prior to

7  being retained by BuzzFeed?

8      A.    I did not.

9      Q.    Did BuzzFeed provide you with any

10  materials for you to look at or consider in

11  connection with your assignment?

12     A.    They did not.

13     Q.    They didn't provide you with any

14  documents?

15     A.    They did not, prior to my being

16  retained of course.  Once I was retained and we

17  started working the case, of course we started

18  to collaborate on the case.

19     Q.    So, I'm sorry.  Let me re-ask the

20  question then.

21     A.    Sure.

22     Q.    After you were retained by BuzzFeed



1  did they provide you with any materials?

2      A.    Of course.

3      Q.    What materials did BuzzFeed provide

4  you with?

5      A.    Um, I don't recall the exact date,

6  but I remember it was a, I want to say, a few

7  weeks or maybe even a few months that they

8  actually provided what they viewed as a, I

9  would say, a true copy of the dossier, rather

10 than the version that we had obtained through

11 public sources.

12     Q.    How did the, what you've described

13 as a true copy of the dossier, how did that

14 differ from what you had obtained from public

15 sources?

16     A.    It didn't.

17     Q.    Then I guess I'm just confused.  You

18 distinguished the two from each other.  How --

19          Were they different at all?

20     A.    I just said they did not.  You asked

21 me if they gave me documents, and I told you

22 they did.



1      Q.    Okay.  And you described that they

2    provided you with a true copy of the dossier as

3    opposed to what you had from public sources.

4    And so I'm wondering how those two differ?

5              MS. BOLGER:  Asked and answered.

6              THE WITNESS:  They didn't.

7    BY MR. FRAY-WITZER:

8      Q.    Other than a copy of the dossier,

9    did they provide you with any documents?

10     A.    Through the course of the

11   investigation when material was requested

12   through discovery and discovery was returned,

13   of course they passed us those documents for

14   review.

15     Q.    What documents did they provide you

16   for review?

17     A.    There's a myriad of documents.  Um,

18   the data related to Bit.ly.  We had requested

19   additional documents from XBT and --

20              Or we had requested various

21   information from XBT, and XBT did not provide

22   it, objected to providing it, and they passed



1    us XBT's objections for review and

2    strategizing, in which we then moved to compel

3    and XBT still didn't provide those documents.

4    So throughout that process documents were

5    passed back and forth.

6        Q.    Other than the copy of the dossier,

7    the data related to Bit.ly, the documents from

8    XBT and XBT's objections, what materials did

9    BuzzFeed give you to review?

10       A.    Depositions from Goederich and

11   Bezruchenko.  That's all I can recall at the

12   moment.

13       Q.    Did anyone else at FTI work on the

14   assignment from BuzzFeed with you?

15       A.    Yes.

16       Q.    And who else at FTI?

17       A.    Colleagues within my cyber security

18   practice and other practices within the firm.

19       Q.    I'd like the names of the

20   individuals, please.

21       A.    I don't have an accurate list of

22   names, but I can name Joseph Knight, Cody



1   Brown, David Best, Brett McNeil, Victor

2   Epstein, Katie Donnelly, Kelly Foy, Amber

3   Buykes, Doug Rogers, Thomas Fedorik, Michelle

4   Riesley --

5       Q.    I'm sorry?

6       A.    Michelle Riesley.

7             -- Michael Horoho, Anthony Kelly.

8   That's all I can recall at this time.

9       Q.    Who is Joseph Knight?

10      A.    Joseph Knight is a colleague at FTI

11  Consulting who specializes in data and

12  analytics.

13      Q.    And who is Cody Brown?

14      A.    Cody Brown is a member of my team, a

15  cyber security subject matter expert.

16      Q.    I should ask:  Is Joseph Knight in

17  the D.C. office?

18      A.    He is.

19      Q.    And is Cody Brown in the D.C.

20  office?

21      A.    He's based out of the New York

22  office.



1    Q.    And who is David Best?

2    A.    David Best is a cyber security

3    subject matter expert.

4    Q.    And based out of?

5    A.    Philadelphia.

6    Q.    And Brett McNeil?

7    A.    Brett McNeil is an intelligence

8    collector based out of the Chicago office.

9    Q.    What does it mean to be an

10   intelligence collector?

11   A.    An individual that collects

12   intelligence.

13   Q.    What kind of intelligence?

14   A.    Whatever that individual is assigned

15   to.  I would describe him as a sophisticated

16   investigator.

17   Q.    In connection with the assignment

18   from BuzzFeed what intelligence was Brett

19   McNeil asked to collect?

20   A.    We identified through open sources

21   all attributes of XBT's infrastructure, all

22   technical attributes of XBT's infrastructure,

1  and Brett was involved with identifying those

2  attributes of XBT's infrastructure and related

3  entities.

4      Q.    Who is Victor Epstein?

5      A.    Victor Epstein is also an

6  intelligence collector.  His role was similar

7  to Brett McNeil's.

8      Q.    And where is Victor out of?

9      A.    Victor is out of the Boston office.

10     Q.    And who is Katie Donnelly?

11     A.    Katie Donnelly is out of the

12  Washington, D.C. office, and she's an

13  intelligence collector.

14     Q.    And what type of intelligence was

15  she asked to collect in connection with

16  BuzzFeed?

17     A.    Similar to the work Brett and Victor

18  did.

19     Q.    Kelly Foy?

20     A.    Kelly Foy.

21     Q.    And who is Kelly Foy?

22     A.    Kelly Foy, again an intelligence



1   collector similar to Katie, Brett and Victor.

2       Q.    Also out of D.C.?

3       A.    Kelly is out of Chicago.

4       Q.    Amber Buykes?

5       A.    Out of Chicago, also an intelligence

6   collector.

7       Q.    And what was she assigned to

8   collect?

9       A.    Similar to Brett, Katie, Amber,

10  Victor.

11      Q.    So far it's all about XBT

12  infrastructure.  Is that correct?

13      A.    It's about identifying attributes of

14  XBT's infrastructure related entities.

15  Correct.

16      Q.    Doug Rogers?

17      A.    Doug Rogers is a forensic

18  accountant.

19      Q.    Out of what office?

20      A.    Washington, D.C.

21      Q.    And what was Doug tasked to do in

22  connection with the BuzzFeed engagement?



1        MS. BOLGER:  In connection with the

2   expert report published for which Mr. Ferrante

3   is here to testify to.

4        MR. FRAY-WITZER:  Well, he was

5   retained, he performed an investigation, and so

6   I can ask about all of the aspects of the

7   investigation performed.

8        MS. BOLGER:  You can ask about the

9   testimony that Mr. Ferrante --

10       You can ask about the subject matter

11  which Mr. Ferrante has been offered as a

12  testifying expert, right.  If there's other

13  information that FTI provided in a consulting

14  basis that doesn't relate to the information

15  Mr. Ferrante is about to testify to, then that

16  would be a consulting expert testimony.

17       I actually don't know, to tell you

18  the truth, what the answer's going to be to

19  your question, but I'm telling you that if

20  there is --

21       Mr. Ferrante is here to offer a

22  particular expert opinion as a testifying



1  expert, and any other work that's not --

2         -- that's outside of that opinion

3  would be considered on a consulting basis.

4         MR. FRAY-WITZER:  Okay.  I don't

5  think you can separate one witness in

6  particular where --

7         If he was conducting an

8  investigation and it came up with useful

9  information, you could have then included it in

10  the expert report.  If it didn't come up with

11  useful information, you can't shield it by

12  simply saying:  That's not in the report so

13  we're not going to let him testify about it.

14         MS. BOLGER:  So I actually disagree

15  with you on the law.  I agree with you that if

16  there's information that informed Mr.

17  Ferrante's testifying opinion that's the

18  subject matter of the testimony which Mr.

19  Ferrante is here to offer, then I think you're

20  probably right.  But I think if there's a whole

21  other subject matter that someone collected

22  information on that had nothing do with the



1  expert report, it would be as matter of law

2  considered a consulting expert opinion.

3  That's --

4           So you and I can disagree on the

5  law.  I'm going to instruct the witness that if

6  this is testimony --

7           -- if there's any research done that

8  was done on a subject matter unrelated to any

9  of the opinions offered in the expert report

10  that he's here to testify to, I'm going to ask

11  him not to answer that question.  I actually

12  don't know if that's the answer, but that's

13  what my objection is.

14           MR. FRAY-WITZER:  Okay.

15           (Phone ringing.)

16           Do you need to get it?

17           MS. BOLGER:  I actually do need to

18  get it.  Can I take a 10-minute break?

19           (Recess taken at 10:50 a.m.)

20           (Deposition resumed at 10:57 a.m.)

21           MR. FRAY-WITZER:  So actually you

22  and I were in discussion.



1          MS. BOLGER:  I think we were done

2    and Anthony can answer your question.

3          MR. FRAY-WITZER:  And actually

4    though, I want to make clear that to the extent

5    that you are instructing this witness not to

6    answer about subjects that might not have been

7    included in the report, we do --

8          MS. BOLGER:  Or relied on.

9          MR. FRAY-WITZER:  -- we do disagree

10   about that.  And so if you're going to instruct

11   him, then I'd like you to instruct him formally

12   and we will probably take it up with the Court.

13         MS. BOLGER:  Why don't we actually

14   ask the question again since I've lost the

15   question.  We'll let the witness answer, and we

16   can decide what we're doing next.

17   BY MR. FRAY-WITZER:

18      Q.    What forensic accounting assignments

19   did Doug Rogers have in connection with the

20   BuzzFeed engagement?

21      A.    I actually can't speak to the work

22   that he did.  I'm just not familiar with it.



1      Q.    Who assigned him whatever work he

2  did?

3      A.    Um, I mean, I assigned him.  I just

4  can't speak to what he did.  Accounting is not

5  my background.

6      Q.    What did you assign him to do?

7      A.    As we looked into XBT and related

8  entities, we wanted to ensure that we didn't

9  miss any business entities, and Doug was tasked

10  to look into that.

11      Q.    Why would a forensic accountant be

12  investigating business entities?

13      A.    It's my understanding that --

14            It's my understanding that Doug

15  looked into --

16            Doug had a good understanding of

17  business filings and business accounting

18  practices, and it's my understanding that Doug

19  provided that those sort of --

20            -- that insight into the research as

21  we tried to link business entities to XBT.

22      Q.    Did any of Doug's work have to do



1    with examining finances?  Or was it limited to

2    connecting business entities?

3        A.    I can't say definitively.

4        Q.    To the extent that you assigned him

5    the work.

6        A.    Doug is a forensic accountant, and

7    Doug was tasked to link business entities to

8    XBT.

9        Q.    Who is Thomas Vicorick?

10       A.    Excuse me?

11       Q.    Thomas, I think it was Vicorick?

12       A.    I don't recall that name.

13       Q.    Was there a Thomas?

14       A.    I don't recall that name.

15       Q.    Michelle Riesley?

16       A.    Michelle Riesley.

17       Q.    Riesley?

18       A.    She is an intelligence collector.

19       Q.    And out of what office?

20       A.    Chicago.

21             Thomas Fedorik.

22       Q.    Fedorik.  I was writing quickly.



1    We'll go back to him in a second.

2              What kind of intelligence was

3    Michelle collecting?

4         A.    Again, similar to Brett, Amber, she

5    was tasked with identifying XBT and related

6    entities, related infrastructure.

7         Q.    Thomas Vicorick?

8         A.    Thomas Fedorik --

9         Q.    Fedorik.

10        A.    -- is out of New York, and he was

11   involved with proofreading and leading.

12        Q.    What does "leading" mean?

13        A.    Making sure staff was happy.

14        Q.    We need one of those in my office.

15        A.    You know, Tom's a seasoned

16   intelligence collector, and --

17        Q.    Michael Horoho?

18        A.    Michael Horoho is a data expert.

19        Q.    And when you say "data expert", what

20   do you mean?

21        A.    Large quantities of data, processing

22   that data, understanding what the data means,

1   analyzing that data.

2       Q.    And Anthony Kelly?

3       A.    Also a data expert.

4       Q.    And is Anthony's expertise similar?

5       A.    Yes.

6       Q.    Is there anyone else that you recall

7   from FTI who worked on the BuzzFeed engagement?

8       A.    Not at this moment.

9       Q.    In the course of your investigatory

10  work, did you or anyone from your team contact

11  anyone at the FBI?

12      A.    No.

13      Q.    Did you or anyone at your team

14  contact anyone at the Department of Justice?

15      A.    No.

16      Q.    Did you or anyone at your team

17  contact anyone at any government agency in

18  connection with the BuzzFeed engagement?

19      A.    In connection with the BuzzFeed

20  engagement we did not.

21      Q.    Did you contact anyone at a

22  government agency in connection with the



1   investigatory work?

2       A.    Can you be more clear.

3       Q.    Well, you seemed to differentiate

4   when you answered the last question about not

5   with respect to the BuzzFeed engagement, so I

6   wanted to know --

7       A.    I differentiated because I am a

8   career government employee with extensive

9   contacts in and throughout the government, and

10  I want to be crystal clear that I did not speak

11  to anyone within the government regarding my

12  work on this case, but I do maintain positive

13  social relationships with government employees.

14      Q.    Sure.  Okay.  Did you or anyone at

15  your team contact Fusion GPS?

16      A.    At the --

17            I would say when we were first

18  retained we had an information exchange with

19  two representatives from Fusion GPS.

20      Q.    Which --

21            MS. BOLGER:  I'm going to take a

22  quick break.  Hold on.





1          Talk to me outside.

2          (Recess taken at 11:05 a.m.)

3          (Deposition resumed at 11:06 a.m.)

4          Can you ask your next question.

5   BY MR. FRAY-WITZER:

6      Q.    Which representatives of Fusion GPS

7   did you speak to?

8          MS. BOLGER:  So the meetings with

9   Fusion GPS were part of a joint defense

10  agreement in another matter not related to this

11  matter, and obviously Mr. Ferrante can give you

12  some information that wouldn't be privileged,

13  like who was there, but the information in that

14  meeting actually related to a different matter.

15          MR. FRAY-WITZER:  Okay.  Well, Mr.

16  Ferrante's testimony was that when they were

17  first retained in this matter they had an

18  information exchange with Fusion GPS.  So I

19  guess I'm --

20          MS. BOLGER:  It's not in this

21  matter.  I mean, there's a different --

22          There are other matters, right?



1    This information exchange was not --

2              It was pursuant to a joint defense

3    agreement in a different matter.

4              MR. FRAY-WITZER:  I just don't think

5    that's what the testimony was so far.

6              MS. BOLGER:  I think you're an

7    excellent questioner and I don't mean this with

8    disrespect, but I don't think your question was

9    sufficiently precise that you could make that

10   distinction at this moment.

11   BY MR. FRAY-WITZER:

12       Q.    Well, let's start with:  Who were

13   the representatives of Fusion GPS?

14       A.    I don't actually recall their last

15   names, I just remember Laura and Jake, I

16   believe.  I may even be wrong there.

17       Q.    Did you meet with Glen Simpson?

18       A.    No.

19       Q.    In your meeting with Fusion GPS did

20   you discuss Aleks Gubarev?

21             MS. BOLGER:  I'm going to again say

22   that the meeting was pursuant to a joint



1  defense privilege in a different matter, so I'm

2  going to instruct the witness not to answer the

3  question.

4          MR. FRAY-WITZER:  I've now limited

5  very specifically to one of the plaintiffs in

6  this matter.  I'm not sure how his name would

7  have come up in connection with a completely

8  unrelated case.  I understand you're

9  instructing the witness not to answer, but I

10  will say that we'll take that up.

11          MS. BOLGER:  That's fine.  You know

12  you're not the only lawsuit in town on this

13  subject.

14          MR. FRAY-WITZER:  We're the only

15  important lawsuit.

16          (Laughing.)

17  BY MR. FRAY-WITZER:

18     Q.    So just to be fair, I'm going to ask

19  a series of questions.  You should wait because

20  I suspect you'll get similar instructions.

21          In connection with your meeting at

22  Fusion GPS did you discuss XBT Holdings?



1          MS. BOLGER:  I'll instruct the

2   witness not to answer for the same reasons.

3   BY MR. FRAY-WITZER:

4       Q.    In your meeting with Fusion GPS did

5   you discuss Webzilla?

6          MS. BOLGER:  Same instruction.

7   BY MR. FRAY-WITZER:

8       Q.    In your meeting with Fusion GPS did

9   you discuss the contents of the December memo?

10         MS. BOLGER:  Same instruction.

11         And also objection.  Vague.  I don't

12   know that this witness knows what the December

13   memo is.

14   BY MR. FRAY-WITZER:

15      Q.    Do you know what the December memo

16   is?

17      A.    I actually don't.

18      Q.    Why don't we mark this.

19         (Exhibit 1 marked for

20   identification.)

21         So you've been shown what's been

22   marked as Exhibit No. 1.  Why don't you take a



1   moment to look at it, and tell me please if

2   you've ever seen this document before?

3          (Witness reviewed document.)

4      A.    What's the question?

5      Q.    The question was:  Have you ever

6   seen this document before?

7      A.    I've seen this text.  This 2-page

8   document I've never seen before.

9      Q.    When you say you've seen this text,

10  did you see this document as part of a larger

11  collection of memos that has become known as

12  the Steele dossier or the dossier?

13     A.    Yes.

14     Q.    Do you understand that the Steele

15  dossier is actually a collection of 16 or 17

16  separate memorandum?

17          MS. BOLGER:  I object.  That's a

18  misrepresentation.

19          But you can answer that.

20          THE WITNESS:  Can you ask your

21  question again.

22  BY MR. FRAY-WITZER:

1      Q.    Do you understand that the Steele

2   dossier is a collection of 16 or 17 separate

3   memorandum?

4           MS. BOLGER:   Same objection.

5           THE WITNESS:   I understand the

6   Steele dossier to be a collection of

7   memorandums.

8   BY MR. FRAY-WITZER:

9      Q.    Do you understand that this document

10  in front of you marked as No. 1 was the final

11  memo issued by Christopher Steele?

12     A.    I have no basis on which to make

13  that --

14           -- to agree or disagree.

15     Q.    If --

16     A.    I don't know how many memos Steele

17  actually published.

18     Q.    If during the deposition we refer to

19  this document as the December memo, will you

20  understand what we're talking about?

21           MS. BOLGER:   I will object to that

22  characterization, but the witness can certainly



1  agree to it.

2          THE WITNESS:  I think in the

3  interest of clarity, why don't we just refer to

4  it as 1.

5  BY MR. FRAY-WITZER:

6      Q.    Okay.  We will call it Exhibit No.

7  1.

8      A.    I think that's fair.

9      Q.    In your meeting with Fusion GPS did

10  you discuss any of the information included in

11  Exhibit No. 1?

12          MS. BOLGER:  Objection.  Same as

13  before.  That meeting was protected by a joint

14  defense privilege in another matter.

15  BY MR. FRAY-WITZER:

16      Q.    In connection with your meeting with

17  Fusion GPS did you have any discussions about

18  Seva Kapsugovich?

19          MS. BOLGER:  Same objection.  Same

20  instruction.

21  BY MR. FRAY-WITZER:

22      Q.    Did you or anyone from your team



1  contact Christopher Steele in connection with

2  the engagement from BuzzFeed?

3      A.    No.

4      Q.    Did you attempt to contact

5  Christopher Steele?

6      A.    No.

7      Q.    Did you attempt to contact anyone at

8  Orbis Business?

9      A.    The answer is no.

10     Q.    Did you contact anyone at

11  CrowdStrike?

12     A.    Independent of counsel, no.

13     Q.    So did you or any member of your

14  team directly contact anyone at CrowdStrike?

15     A.    Independent of counsel, no.

16     Q.    With counsel did you or anyone from

17  your team contact CrowdStrike?

18     A.    No one, myself included, no one from

19  my team, myself included, ever contacted

20  CrowdStrike directly.

21     Q.    Were you part of any conference call

22  or call with anyone from CrowdStrike?



1      A.      No.

2      Q.      And does that apply to your team as

3   well?

4      A.      My understanding is no.

5      Q.      What is the hourly rate that you are

6   charging in this engagement?

7      A.      I believe it is $880 per hour.

8      Q.      And is your rate the same regardless

9   of whether or not it's providing testimony or

10  investigation?  Or do you have different rates

11  for those things?

12     A.      I do not.  It's one rate.

13     Q.      To date how much has FTI billed

14  BuzzFeed in connection with the present

15  engagement?

16     A.      I believe the figure is just below

17  $4,100,000.

18     Q.      So if you look back at Exhibit No.

19  1, please, the second page, Paragraph No. 3,

20  there's a redaction line, and it says:

21  "Reported that over the period March to

22  September 2016 a company called XBT/Webzilla



1   and its affiliates had been using botnets and

2   porn traffic to transmit viruses, plant bugs,

3   steal data and conduct 'altering operations'

4   against the Democratic Party leadership.

5   Entities linked to one Aleksej Gubarev were

6   involved, and he and another hacking expert,

7   both recruited under duress by the FSB, Seva

8   Kapsugovich, were significant players in this

9   operation."

10          Did I read that correctly as a

11  starting point?

12      A.    Correct.

13      Q.    Is it correct to say that when you

14  spoke about your engagement being to

15  investigate the allegations contained in the

16  dossier, that's the portion that we're talking

17  about that you were focusing your investigation

18  on.  Is that correct?

19          MS. BOLGER:  Objection.  That is not

20  his testimony.  He did not testify --

21          You characterized his testimony

22  incorrectly, but he will --

1          -- can take care of himself.

2          MR. FRAY-WITZER:  You can answer the

3    question.

4          THE WITNESS:  My answer to your

5    question is:  You mischaracterized the scope of

6    my assignment.

7    BY MR. FRAY-WITZER:

8      Q.    Why don't you tell me how you think

9    I've mischaracterized that?

10     A.    So I will tell you the scope of my

11   assignment.  The first part of what you read.

12   The scope of my assignment was to conduct a

13   technical investigation to collect evidence

14   related to:  "A company called XBT/Webzilla and

15   its affiliates had been using botnets and porn

16   traffic to transmit viruses, plant bugs, steal

17   data and conduct 'altering operations' against

18   the Democratic Party leadership."

19     Q.    So just so that I understand, the

20   second sentence that I had read:  "Entities

21   linked to one Aleksej Gubarev were involved and

22   he and another hacking expert, both recruited



1  under duress by the FSB, Seva Kapsugovich, were

2  significant players in this operation."

3          Do I understand you to be saying

4  that you were not investigating the part that I

5  just read?

6      A.    Other than the fact that Aleksej

7  Gubarev owned and operated XBT, it was outside

8  the scope of my investigation.

9      Q.    So am I correct that you didn't

10  investigate, for example, whether or not

11  Aleksej Gubarev was working for the FSB?

12      A.    Other than the fact that Aleksej

13  Gubarev owns and operates XBT, that was outside

14  the scope of my investigation.

15      Q.    So you were not investigating

16  whether or not he was working for the FSB?

17      A.    Other than the fact that Aleksej

18  Gubarev owns and operates XBT, it was outside

19  the scope of my investigation.

20      Q.    Did you do any investigation with

21  respect to Seva Kapsugovich?

22      A.    The scope of my investigation was to



1   conduct a technical investigation and to

2   collect evidence related to the malicious cyber

3   activity described in the dossier, as quoted:

4   "A company called XBT/Webzilla and its

5   affiliates had been using botnets and porn

6   traffic to transmit viruses, plant bugs, steal

7   data and conduct 'altering operations' against

8   the Democratic Party leadership."

9        Q.    Again, my question is different.  I

10  don't think --

11            I don't think that this is a

12  complicated question.  Did you investigate Seva

13  Kapsugovich?

14       A.    It was not in the scope of my

15  investigation.

16       Q.    Whether or not Aleks Gubarev was

17  recruited under duress by the FSB was not in

18  the scope of your investigation, correct?

19       A.    Other than the fact he owns and

20  operates, Aleksej Gubarev owns and operates

21  XBT, wasn't the scope of my investigation.

22       Q.    You're not saying that XBT is the



1    FSB, right?

2        A.    That is not my opinion.

3        Q.    Have you ever spoken with Jana

4    Winter?

5        A.    I have.

6        Q.    Did she interview you in connection

7    with an article that she wrote for Foreign

8    Policy Magazine?

9        A.    She did not interview me.

10       Q.    Did she speak to you in connection

11   with the article?

12       A.    She did.

13       Q.    To the best of your recollection,

14   what did you say to Jana Winter?

15       A.    I spoke with Jana Winter because she

16   was about to publish an article which was just

17   factually inaccurate.

18       Q.    In what ways was it factually

19   inaccurate?

20       A.    Um, she was to publish an article

21   that stated that I was a government employee

22   working in private industry on a 3-year



1  assignment, which was factually incorrect.

2      Q.    Do you know how Jana Winter came to

3  know of your engagement for BuzzFeed to begin

4  with?

5      A.    I do not.

6      Q.    Why don't we mark this as No. 2.

7            (Exhibit 2 marked for

8  identification.)

9            You're being shown what's been

10  marked as Exhibit No. 2.  Can you tell me if

11  you have seen this document before?

12      A.    I have.

13      Q.    And this document is the article

14  that was printed in Foreign Policy Magazine,

15  correct?

16            MS. BOLGER:  Object.  Online version

17  of the article, but I can't compare it with the

18  magazine.

19            THE WITNESS:  Based on my

20  recollection this does look like a printout

21  from what appears to be their website.

22  BY MR. FRAY-WITZER:



1        Q.    If you would look at the second

2   page, please, approximately 2/3 of the way down

3   the page it says:  "At FTI, Ferrante launched

4   what's now been a months-long stealth effort

5   chasing down documents and conducting

6   interviews on the ground in various countries

7   around the world.  His team directed BuzzFeed

8   lawyers to subpoena specific data and testimony

9   from dozens of agencies or companies across the

10   country and assembled a cyber ops war room to

11   analyze that data, according to sources

12   familiar with the work."

13            Did I read that correctly?

14        A.    You read it correctly.

15        Q.    Did you and your team conduct

16   interviews on the ground in various countries

17   in connection with the engagement by BuzzFeed?

18        A.    We did not.

19        Q.    Did you or any member of your team

20   conduct any interviews outside of the United

21   States in connection with your engagement by

22   BuzzFeed?



1      A.    We did not.

2      Q.    Was part of your engagement by

3    BuzzFeed to conduct a factual inquiry into the

4    truth or falsity of allegations contained in

5    the dossier, separate and aside from the cyber

6    aspect of it?

7      A.    The scope of our assignment was to

8    conduct a technical investigation and to

9    collect evidence that linked XBT to the

10   allegations stated in the Steele dossier.

11     Q.    You've probably seen some of the

12   same media reports as I have in which they

13   categorize part of your assignment to try and

14   find the "pee-pee tape".  Was that part of your

15   assignment from BuzzFeed?

16            (Laughing.)

17            MS. BOLGER:  You can answer that,

18   Anthony.

19            As much as I want to object to the

20   word, just for the sake of history I want to

21   object to the word pee-pee, I don't have an

22   objection.



1          THE WITNESS:  I'm sorry.  What was

2    the question?

3          (Laughing.)

4          MR. FRAY-WITZER:  Would you read

5    that back please.

6          (Court Reporter read back.)

7          THE WITNESS:  That was outside the

8    scope of my assignment.

9    BY MR. FRAY-WITZER:

10      Q.    Prior to being employed by FTI,

11   where were you employed immediately before

12   working for FTI?

13      A.    Immediately before I was a

14   Department of Justice employee, employed

15   specifically at the Federal Bureau of

16   Investigation.

17      Q.    And was one of your assignments when

18   you were with the FBI to investigate Russian

19   interference in the 2016 Presidential Election?

20      A.    Correct.

21      Q.    What aspects of Russian interference

22   were you working on?



1          MS. BOLGER:  Object to the question.

2          You can answer, Anthony.

3          THE WITNESS:  So the question you

4    asked was:  Where was I immediately employed

5    prior to FTI?

6          I was a Department of Justice

7    employee, specifically employed by the Federal

8    Bureau of Investigation.  My last 2 years at

9    the FBI I was detailed to the National Security

10   Council at the White House where I served as

11   the Director For Cyber Incident Response on the

12   National Security Council on the Cyber Security

13   Directorate.  In my capacity as the Director

14   For Cyber Incident Response I choreographed

15   U.S. Government response efforts to significant

16   cyber events.

17          So your question -- I'm sorry.  If

18   you can re-ask or we can have it reread -- I

19   would like to answer it.

20   BY MR. FRAY-WITZER:

21     Q.    Which aspects of Russian

22   interference in the presidential election did



1   you work on while at the FBI or National

2   Security Council?

3           MS. BOLGER:  I'm going to object as

4   vague.

5           But you can answer.

6           THE WITNESS:  So while I was on the

7   National Security Council, again I was the

8   Director For Cyber Security Response and I

9   choreographed U.S. Government response efforts

10  to significant cyber events affecting the

11  United States, domestic and abroad.  Leading

12  into the 2016 Presidential Election I worked on

13  the National Security Council and choreographed

14  the interagency response efforts to the

15  targeting of the 50 states, and I led the

16  preparedness and response efforts specific to

17  cyber security, significant cyber security

18  events that may or could take place leading up

19  to and on election day in 2016.

20  BY MR. FRAY-WITZER:

21      Q.    When you say "the targeting of the

22  50 states", what are you referring to?



1      A.     I'm referring to --

2             I will limit my answer to publicly

3   available information because I don't want to

4   reveal anything classified.

5      Q.     Absolutely.

6      A.     But I'm referring to the targeting

7   of malicious cyber activity to states in the

8   United States, the various state Boards of

9   Elections and state infrastructure surrounding

10  cyber electoral infrastructure, voter

11  registrations.

12     Q.     So in simple terms I think we're

13  talking about attempts to interfere with actual

14  state by state electoral processes.  Is that

15  accurate?

16     A.     I would say that is correct.  Any

17  sort of malicious cyber activity that was

18  targeting states within the United States and

19  their electoral process.

20     Q.     Were you also involved in the

21  attempts to influence social media?

22     A.     I was not.



1      Q.    Were you involved in the

2   investigations into the attempts to hack into

3   the Democratic National Committee?

4      A.    I was not involved with the

5   investigative efforts.  No.

6      Q.    Was there some aspect of that

7   investigation that you were involved with?

8      A.    No.  There was no aspect of the

9   investigation that I was involved in.

10          While I was on the National Security

11  Council serving in my role as Director For

12  Cyber Incident Response, the targeting and

13  hacking of the Democratic National Committee

14  was a significant event that, of course, rose

15  to high levels within the White House.  And in

16  my capacity it was my job to understand that

17  the investigation was being worked and to

18  assure leadership within the White House that

19  it was being worked.

20      Q.    Understanding that you were not

21  yourself part of the investigation, were you

22  kept up-to-date about the progress of the



1  investigation?

2      A.    No.

3      Q.    Were you given information about the

4  results of the investigation?

5      A.    No.

6      Q.    How could you assure the White House

7  that the investigation was being worked if you

8  were not being provided with any information

9  about the investigation?

10     A.    I would say it's a very tight rope.

11 But the targeting and hacking of the Democratic

12 National Committee was a very, very serious

13 matter to all leaders within government, and my

14 job as the Director For Cyber Incident Response

15 was to ensure that the interagency was

16 communicating and collaborating and talking as

17 much as possible.  And that was my role.  I had

18 confidence, and I knew through my work and

19 communicating back to the FBI that updates were

20 being provided to the White House directly at

21 senior levels.  So specifics on the

22 investigation were being briefed at senior



1    levels.  And again, my role was to just ensure

2    that people were communicating in that the

3    various entities within the U.S. Government

4    were coordinating.

5        Q.    So just so I'm sure that I

6    understand it, your role was to make sure that

7    people were communicating, but you didn't

8    necessarily know the content of what they were

9    communicating.  Is that right?

10       A.    Right.

11             (Exhibit 3 marked for

12   identification.)

13             Can we take a hospitality break?

14             MR. FRAY-WITZER:  Yep.  Absolutely.

15             (Recess taken at 11:39 a.m.)

16             (Deposition resumed at 11:44 am.)

17   BY MR. FRAY-WITZER:

18       Q.    You're being shown what's been

19   marked as Exhibit No. 3.  If you would take a

20   look at that, please, and tell me if you

21   recognize that document.

22       A.    Yes.  It appears to be my expert



1   report.

2       Q.    And let me just ask you, you signed

3   this report on May 25th, 2018, on Page 37.  Is

4   that correct?

5       A.    Correct.

6       Q.    From May 25th, 2018 to the present,

7   has your opinion changed from what's contained

8   in your expert report?

9       A.    It has not.

10      Q.    If you turn to Page 3 of your

11  report, please, under your Scope of Assignment,

12  you say:  "Specific, high-priority objectives

13  were to determine whether:  Botnets and porn

14  traffic, hosted by XBT, Webzilla, and its

15  affiliates facilitated theft of data from

16  Democratic Party leadership."

17          Is that correct?

18      A.    I'm not seeing where you're reading

19  this from.  I'm sorry.

20      Q.    Page 3.

21      A.    Oh, okay.  Yes.

22      Q.    If you could, while you're looking



1   at this document, also have Exhibit 1

2   available, and the second page.

3           From Exhibit 1, Paragraph 3, one of

4   the allegations in that exhibit is that:

5   "XBT/Webzilla and its affiliates had been using

6   botnets and porn traffic to transmit viruses,

7   plant bugs, steal data and conduct 'altering

8   operations' against the Democratic Party

9   leadership."

10          Correct?

11      A.    Correct.

12      Q.    In your high-priority objectives you

13  talk about botnets and porn traffic being

14  hosted by XBT and Webzilla.  Why were you

15  considering the question of hosting as opposed

16  to whether or not XBT and Webzilla were

17  themselves doing those things?

18      A.    Can you repeat the question.

19          MR. FRAY-WITZER:  Can you read it

20  back, please.

21          (Court Reporter read back.)

22          THE WITNESS:  Okay.  Thank you.



1          I would say because the scope of our

2    assignment was to identify evidence that linked

3    XBT infrastructure to this malicious activity

4    as stated in the Steele dossier.

5    BY MR. FRAY-WITZER:

6        Q.    And so you have not concluded in

7    your report or otherwise that XBT itself used

8    botnets and porn traffic as opposed to its

9    infrastructure.  Is that correct?

10       A.    Other than the fact that was --

11             Other than the fact that the

12   malicious cyber activity described in the

13   Steele dossier was facilitated by using their

14   infrastructure.

15       Q.    And I'm sorry.  I think I understand

16   your answer, but I just want to clarify.

17   You've --

18             Your conclusion, your opinion is

19   that XBT and/or Webzilla's infrastructure was

20   utilized to do the malicious things described

21   in the Steele dossier, correct?

22       A.    Correct.



1      Q.    But other than the fact that their

2   infrastructure was used, you have not concluded

3   that XBT/Webzilla themselves did those things?

4      A.    In my opinion I think you're

5   extremely oversimplifying complex cyber

6   investigations.  In through the course of my

7   assignment in collecting evidence --

8             -- in collecting evidence,

9   substantial evidence that links XBT

10  infrastructure to many significant malicious

11  cyber events repeatedly, in my expert opinion

12  their infrastructure was most certainly used.

13  And I think what you're trying to say is that

14  were we ever able to put a human behind a

15  keyboard at XBT?

16            And that's why I think you're

17  oversimplifying complex cyber investigations.

18  They're not binary.  They're not black and

19  white.  And what we've done is collect

20  substantial evidence that most certainly links

21  XBT to the described malicious activity.

22     Q.    Through it's infrastructure?



1        A.    Correct.

2        Q.    You have not concluded that a single

3   XBT employee used botnets or porn traffic to

4   transmit viruses, plants bugs, steal data or

5   conduct altering operations, correct?

6        A.    Again, I would say that I think

7   you're oversimplifying complex cyber

8   investigations.  And based on the information

9   made available to me, I was able to link XBT

10  infrastructure to multiple significant cyber

11  events over the last few years.  And when those

12  significant cyber events took place and they

13  were brought to their attention, they did

14  little to detect, stop or prevent future

15  activities from taking place.

16       Q.    I understand that you don't want to

17  answer the question that I'm actually asking.

18  But the question that I'm actually asking is:

19  Putting aside the infrastructure question, were

20  you able to determine that any XBT employee

21  used botnets or porn traffic to transmit

22  viruses, plant bugs, steal data or conduct



1  altering operations?

2          MS. BOLGER:  Object to the form of

3  the question.

4          THE WITNESS:  I think we can

5  disagree that I believe I have answered the

6  question.  But I will further state that other

7  than the fact that XBT employees did little to

8  nothing to detect, stop and prevent the

9  significant malicious activity, I have no

10  evidence of them actually sitting behind a

11  keyboard.

12  BY MR. FRAY-WITZER:

13      Q.    And you have no evidence that Aleks

14  Gubarev personally did any of the things

15  alleged in the Steele dossier?

16      A.     Other than the fact that Aleksej

17  Gubarev owns and operates XBT and related

18  entities, he was outside the scope of my

19  assignment.

20      Q.    When you say that XBT employees did

21  not do enough in response to what you say is

22  use of XBT's infrastructure --



1          And you'd agree with me that you can

2    invest a lot of time and energy into cyber

3    security and it's not going to make you immune,

4    right?

5          MS. BOLGER:  Object to the form of

6    the question.  I actually don't understand the

7    question, so can you do it again.  I don't

8    understand what you mean by immune from what?

9          I don't understand the question.

10          MR. FRAY-WITZER:  I understand that.

11          MS. BOLGER:  Okay.

12          THE WITNESS:  Yeah.  Can you be a

13    little more specific.  Immune from what?  Let's

14    start there.

15    BY MR. FRAY-WITZER:

16    Q.    Well, it's actually a direct quote

17    from a seminar that you gave to general counsel

18    where you said:  You can invest a lot of time

19    and energy into cyber security and it's not

20    going to make you immune.

21          What did you mean when you said it?

22          MS. BOLGER:  Well, can we have the



1   context of what he said?  What did he say

2   before?  What did he say after?

3              MR. FRAY-WITZER:  Okay.  The

4   objection should be:  Objection to form.

5              As we know.

6              MS. BOLGER:  We know a lot of

7   things.

8              MR. FRAY-WITZER:  So?

9              THE WITNESS:  Sure.  Happy to answer

10  that.

11             What I meant -- although I don't

12  recall the event, but I know the subject

13  matter -- what I mean is that in cyber security

14  there's no silver bullet and that it takes a

15  myriad of steps to help mitigate and thwart

16  malicious cyber activity.

17  BY MR. FRAY-WITZER:

18     Q.    And you can do a lot of work and

19  still not be immune from hackers or malicious

20  activity on your networks.  Isn't that true?

21     A.    Of course.

22     Q.    If you turn to Page 8 of your

1  report, please.  And this describes the

2  methodology you used in your technical

3  investigation.  Is that correct?

4      A.    Yes.  High level.

5      Q.    And you describe it as a three-step

6  approach.  You used "third-party tools to

7  identify all publicly available IP addresses

8  and infrastructure that are hosted by XBT

9  subsidiaries."

10          Correct?

11      A.    Correct.

12      Q.    And then you say you compared "the

13  infrastructure hosted by XBT to government and

14  private security firm threat intelligence

15  repositories of IP addresses, domains, and

16  malware samples known to propagate malicious

17  cyber activity."

18          Correct?

19      A.    That's what it says.

20      Q.    And then you reviewed and

21  investigated the "matches to determine the type

22  and nature of malicious activity or ties to the



1    hack of Democratic Party leadership and other

2    interference in the 2016 U.S. election."

3         Correct?

4         A.    Correct.

5         Q.    There's a footnote on the page.  You

6    say:  "Threat intelligence data used in our

7    report comes from the various private security

8    firms and government agencies referenced

9    throughout the report.  All firms are reputable

10   within the security industry."

11        Correct?

12        A.    Correct.  That's what the footnote

13   says.

14        Q.    What were the security firms that

15   you utilized in creating your report?

16        A.    Um, I mean, they're all footnoted in

17   my report.  But I mean, I couldn't answer this

18   right off the top of my head.  I would say

19   every security firm that we utilized is most

20   certainly footnoted in the report.

21        Q.    So Trend Micro for example?

22        A.    If it's in my report, then yes.



1          Q.     And Kaspersky?

2          A.     If it's in my report, then yes.

3          Q.     I'll represent to you that Kaspersky

4     is in your report.

5                 Is the United States Government

6     allowed to use software by Kaspersky?

7          A.     I would refer you to the United

8     States Government.  I don't speak on behalf of

9     the United States Government.

10                (Exhibit 4 marked for

11     identification.)

12         Q.     I'm showing you what's been marked

13     as Exhibit No. 4, Department of Homeland

14     Security Statement on the Issuance of Binding

15     Operational Directive 17-01, dated

16     September 13th, 2017.

17                You've seen that document before,

18     right?

19         A.     Um, I can't recall if I've ever seen

20     this exact document, but I'm familiar with the

21     information around it.

22         Q.     And it says there:  "The Department



1   is concerned about the ties between certain

2   Kaspersky officials and Russian intelligence

3   and other government agencies".

4           It's the first page towards the

5   bottom.

6       A.    Yep.  Correct.

7       Q.    And you were aware of that, correct?

8       A.    Correct.

9       Q.    So when you say that all the firms

10  are reputable within the security industry,

11  Kaspersky is kind of questionable nowadays,

12  isn't it?

13      A.    I'm not sure of your question.

14      Q.    The United States Government is

15  worried that certain Kaspersky officials are

16  working with Russian intelligence.  Does that

17  not make Kaspersky suspect to you?

18      A.    I'm sorry.  What was your question?

19          MR. FRAY-WITZER:  Could you read it

20  back, please.

21          (Court Reporter read back.)

22          THE WITNESS:  I would be concerned.



1  BY MR. FRAY-WITZER:

2      Q.    After the directive came out did you

3  advise any of your clients concerning the use

4  of Kaspersky software?

5      A.    I did not.

6      Q.    You're a cyber security expert who

7  provides guidance to clients on proactive

8  measures they can take with respect to

9  protecting their networks.  The United States

10 Government has said Kaspersky software is

11 suspect, and you didn't advise your clients not

12 to use it?

13     A.    I did not.

14     Q.    You didn't have any conversations

15 with your clients about Kaspersky software

16 after this directive was issued?

17     A.    I was not retained and questioned,

18 and my opinion was not sought on this topic.

19         (Exhibit 5 marked for

20 identification.)

21     Q.    You've been shown what's been marked

22 as Exhibit No. 5.  It is a McClatchy D.C.



1   article entitled:  Did this convicted Russian

2   pedophile help meddle in the U.S. elections?

3            And it's a story about Seva

4   Kapsugovich.

5            In conducting your investigation for

6   BuzzFeed, did you become aware of this article?

7       A.    I don't recall.

8       Q.    Do you recall whether or not at any

9   point in time you learned that Seva Kapsugovich

10  was in a Russian prison at the time that he was

11  supposedly hacking into the Democratic National

12  Committee?

13      A.    I do not recall.

14      Q.    Would that information have been

15  important in your determination as to the

16  veracity of items contained in the Steele

17  dossier?

18      A.    I would view this --

19           If I was aware of this, I would view

20  this as a data point.  A data point of many

21  data points that I uncovered.

22           MS. BOLGER:  For the record, I would

1   note on Page 6 it says:  "That a Russian spy

2   agency would work with a convict like

3   Kapsugovich to hack into computers in the

4   United States is not farfetched, given the

5   FSB's well-documented tolerance and even

6   embrace of criminal organizations."

7   BY MR. FRAY-WITZER:

8       Q.    If you turn to Page 10 of your

9   report, under the heading Overview of ASN

10  Infrastructure, you have a chart that

11  identifies XBT-owned companies and the number

12  of distinct IP addresses connected to those

13  companies, correct?

14      A.    Correct.

15      Q.    And just looking at the numbers that

16  you have listed there, it's fair to say it's

17  over 1.3 million IP addresses, correct?

18      A.    I mean, you can do the math quickly.

19      Q.    In Footnote 8 you say:  "The number

20  of active IP addresses as of January 10th,

21  2018."

22              And then it says:  "The metrics



1  include active and historical IP information."

2          What did you mean by that?

3      A.    Well, in our efforts to identify XBT

4  infrastructure and affiliates we did a

5  historical search of any and all infrastructure

6  that may have been owned and operated by XBT or

7  its affiliates.  So what I'm saying is if XBT

8  owned and operated an IP address on one day but

9  then shut it down weeks or a month later, we

10  still investigated that as being owned and

11  operated by XBT.

12      Q.    On Page 11, first full paragraph,

13  you say:  "FTI further investigated matches by

14  using WHOIS to determine the entity or

15  individual that registered the IP address."

16          MS. BOLGER:  I'm lost.  Where are

17  you?

18          MR. FRAY-WITZER:  Full first

19  paragraph under the chart, third to last

20  sentence.

21          MS. BOLGER:  Gotcha.  Sorry.

22  BY MR. FRAY-WITZER:



1      Q.    I guess my question is:  Did you use

2    WHOIS to look up close to 1.3 million IP

3    addresses?

4      A.    We used WHOIS and various other

5    tools.  But the answer to your question at a

6    very high level is:  Yes, we did.

7      Q.    1.3 million addresses?

8      A.    Correct.

9      Q.    Under the Democratic Party Hacks you

10   say:  "FTI investigated whether it could find

11   any technical connections between XBT and the

12   allegations made in the dossier about XBT and

13   its affiliates, including Webzilla, by

14   analyzing technical data published by

15   government agencies, third-party security firms

16   or produced in response to a subpoena request."

17            Is that correct?

18      A.    I'm sorry I'm not seeing this.

19      Q.    Page 11 under Democratic Party

20   Hacks.

21      A.    Yep.  I'm with you there.

22      Q.    Can you tell me all of the technical

1   data that you recall looking at to analyze --

2             -- that you say you analyzed?

3        A.    Um, I mean, it's all outlined in my

4   report.  My expert report.

5        Q.    To the extent that you can remember,

6   what do you recall looking at in connection

7   with this?

8        A.    I think we're doing ourselves a

9   disservice by not walking through the report

10  and me articulating each piece because there's

11  just so much.

12       Q.    We'll walk through the report.

13       A.    Yep.  So at a very high level

14  without walking through the report, IP

15  addresses, malware, ASN infrastructure, SSL

16  certificates.  Again, off the top of my head.

17            And then actually when we conclude

18  this question, if I could take a hospitality

19  break.

20            MR. FRAY-WITZER:  Absolutely.

21            (Recess taken at 12:11 p.m.)

22            (Deposition resumed at 12:19 p.m.)



```
 1   BY MR. FRAY-WITZER:

 2       Q.    So just because I want to be clear,

 3   when you say you did -- or FTI did -- look at

 4   1.3 million IP addresses, do you mean that

 5   someone manually looked at the WHOIS for

 6   1.3 million addresses?

 7       A.    Um, what we did is we put together a

 8   data script that was able to churn through the

 9   IP addresses and the prefixes in an automated

10   way and then cluster the information.

11            (Exhibit 6 marked for

12   identification.)

13            MS. BOLGER:  Do you have one for me?

14            MR. FRAY-WITZER:  I do.

15            You may have other cases, but tell

16   me that you have as much fun in your other

17   cases.

18            MS. SCHARY:  Instruct the witness

19   not to answer.

20            MS. BOLGER:  There's less references

21   to bodily fluids in other cases.

22            MS. SCHARY:  Speak for yourself.
```



1   BY MR. FRAY-WITZER:

2       Q.    So you're being shown what's been

3   marked as Exhibit No. 6.  Can you tell me if

4   you recognize that document?

5       A.    Yes, it looks familiar.  It looks

6   like a CrowdStrike intelligence report titled:

7   Bears in the Midst:  Intrusion into the

8   Democratic National Committee.

9       Q.    And in fact at the top of the first

10  page you'll see that it says Exhibit 3.  It's

11  an exhibit to your report, correct?

12      A.    I do see that now.

13      Q.    And so this is something that you

14  considered in connection with your

15  investigation in this matter, correct?

16      A.    This is indeed a data point we

17  considered.

18      Q.    Who is CrowdStrike?

19      A.    CrowdStrike is an industry

20  recognized cyber security firm.

21      Q.    And what was their connection to the

22  hack of the Democratic National Committee?



1          MS. BOLGER:  Objection.

2          You can answer.

3          THE WITNESS:  It's my understanding

4    that they were retained by the Democratic

5    National Committee to investigate malicious

6    cyber activity on their network.  The DNC's

7    network.

8    BY MR. FRAY-WITZER:

9      Q.    And according to the report,

10   CrowdStrike had access and was given access to

11   the DNC's network, correct?

12     A.    Um, according to the report.

13     Q.    And if you would turn to Page 8 of

14   that document.  And you'll see a chart, and

15   above the chart it's Indicators of Compromise.

16          Do you see that?

17     A.    Yes, I do.

18     Q.    And the chart contains six IP

19   addresses starting with 185.100.84.134:443.

20          Do you see that?

21     A.    Uh-huh.  I do.

22     Q.    And there are three others below



1  that, and then at the bottom of the page there

2  are two more IP addresses, correct?

3       A.    Correct.

4       Q.    And all of those IP addresses are

5  identified as command and control servers for

6  the hack.  Is that correct?

7       A.    You're stating this based on what?

8       Q.    Well, if you look, the first column

9  has the IP address, the second column says Cozy

10  Bear -- which is the Adversary -- the third

11  column, Indicator of Compromise Type C2.

12  That's command and control, correct?

13       A.    Is that defined in the report?

14       Q.    Do you understand them to be using

15  that term as command and control?

16       A.    I understand C2 to be an industry

17  recognized command and control.  I just want to

18  ensure that it is indeed in this product it

19  means the same thing.

20       Q.    I believe they do identify it as

21  command and control.

22            But as you've said, it's the



1  industry standard for command and control,

2  correct?

3      A.   Yes.

4      Q.   Did FTI investigate the six IP

5  addresses identified in this document?

6      A.   Yes.

7      Q.   And none of those IP addresses were

8  connected in any way to XBT.  Is that correct?

9      A.   Um, let me consult my expert report.

10          So, um --

11          So, can we please reread the

12  question just because I want to be completely

13  accurate in my response.

14          (Court Reporter read back.)

15          That is incorrect.

16  BY MR. FRAY-WITZER:

17      Q.   Are any of these IP addresses owned

18  by XBT or its affiliates?

19      A.   No.  That is not how they are

20  linked.

21          MS. BOLGER:  I don't think this is a

22  complete exhibit, but I think it might be a



1  printing error.  I'm not suggesting that you

2  left --

3          The column on Page 8 --

4          MR. FRAY-WITZER:  Uh-huh.

5          MS. BOLGER:  There seems to be a

6  column, the end of a column missing, and

7  potentially missing rows on 8.  And I'm not --

8          For the record, I think there might

9  be missing information on this document.

10  That's all I'm saying.

11          MR. FRAY-WITZER:  Yeah, I don't

12  believe there is.  I think there's a line

13  that's missing at the bottom of the chart, but

14  there's --

15          MS. BOLGER:  But there's --

16          MR. FRAY-WITZER:  Oh, you mean to

17  the right?

18          MS. SCHARY:  Yeah.

19          MS. BOLGER:  Yeah.

20          MR. FRAY-WITZER:  The IP addresses.

21          MS. BOLGER:  There's also a missing

22  item.  There's a missing IP address on this



1  chart.  It's 23 --

2          MR. FRAY-WITZER:  Why don't we --

3          MS. BOLGER:  It's

4  23.227.196.217.443.

5          MR. FRAY-WITZER:  Yeah, I couldn't

6  write quickly enough.

7          MS. BOLGER:  I'm sorry.

8          MR. FRAY-WITZER:  But I'm sure

9  the --

10          MS. BOLGER:  Yeah.  It's just that

11  there's a missing IP address.

12          MS. SCHARY:  Would you like me to

13  try to reprint it formatted landscape?

14          MR. FRAY-WITZER:  That would be

15  great.  If you don't mind.  Yeah, I'd like a --

16          MS. BOLGER:  I'm not trying to trick

17  you up, it's just that --

18          MR. FRAY-WITZER:  Yeah, I'd like a

19  good copy of it for the record anyway.

20  BY MR. FRAY-WITZER:

21      Q.    If you look at Pages 11 and 12 of

22  your expert report, do you claim that any of



1  the IP addresses identified by CrowdStrike are

2  owned by XBT or its affiliates?

3      A.    No.

4            MS. BOLGER:  On Pages 11 and 12 of

5  the report?

6            THE WITNESS:  Yeah.  I guess as I --

7            MR. FRAY-WITZER:  Sure.  I'll re-ask

8  it.

9            THE WITNESS:  As I look at Pages 11

10  and 12, there's lots of information on Pages 11

11  and 12.  So can we be a little more clear.

12  BY MR. FRAY-WITZER:

13      Q.    Yep.  We'll be more general.

14            Your report does not say anywhere

15  that the IP addresses identified by CrowdStrike

16  are owned by XBT or its affiliates, correct?

17      A.    Correct.

18            (Exhibit 7 marked for

19  identification.)

20            MS. BOLGER:  7?

21            MR. FRAY-WITZER:  7.

22  BY MR. FRAY-WITZER:



1      Q.    You're being shown what's been

2   marked as Exhibit No. 7.  And in particular,

3   let me direct you to Page 4, which is Exhibit

4   A.  Have you seen this list of IP addresses

5   before?

6      A.    I have.

7      Q.    Did FTI investigate these IP

8   addresses?

9      A.    We did.

10     Q.    XBT and its affiliates do not own

11  any of those IP addresses, correct?

12     A.    Correct.

13     Q.    If you'd turn to Page 12 of your

14  report, you are in the middle of the page

15  discussing the Bit.ly link, correct?

16     A.    Correct.

17     Q.    And your conclusion at the top is:

18  "Technical evidence suggests that Fancy Bear

19  used XBT infrastructure to support malicious

20  spear phishing campaigns against the Democratic

21  Party leadership."

22             Correct?

1      A.     That's what it says.  Correct.

2      Q.     And when you then talk about the

3   specifics.  What you say is:  "Bit.ly's

4   investigation found that the account

5   'John356gh' was used to create the bitlink

6   embedded in the phishing e-mail sent to John

7   Podesta.  Further review showed that the

8   account created 11,139 bitlinks from 10/20/2015

9   through 6/30/2016 using 41 distinct IP

10  addresses."

11         Correct?

12     A.     Correct.  That's what my expert

13  report says.

14     Q.     Then on the next page you explain

15  that 1 out of those 11,139 links was created by

16  an IP address owned by Root S.A., correct?

17         Halfway down the page:  "One of

18  those bitlinks was created by an IP address

19  owned by Root S.A."

20     A.     Correct.

21     Q.     So we're talking about 1 out of

22  11,139 links, correct?



1      A.    I think you're mis-categorizing.

2  There were 41 unique IP addresses used to

3  create 11,000 bitlinks.  And of the 41 unique

4  IP addresses, yes, 1 was owned and operated by

5  Root S.A., a subsidiary of XBT.

6      Q.    It specifically says:  "One of those

7  bitlinks was created by an IP address owned by

8  Root S.A."

9           That's what you wrote, right?

10     A.    And that is accurate.

11     Q.    1 of those bitlinks.  1 out of the

12 11,139 links, correct?

13          MS. BOLGER:  That's not --

14          Sorry.  I object to the form of the

15 question.  I think it mischaracterizes the

16 document.

17          THE WITNESS:  I think your question

18 mischaracterizes what the evidence states.

19 Evidence shows that there were 41 unique IP

20 addresses used.  1 of the 41 IP addresses was

21 owned and operated by Root S.A., a subsidiary

22 of XBT.



1   BY MR. FRAY-WITZER:

2       Q.    And that one IP address, according

3   to your document, created 1 bitlink out of

4   11,139 bitlinks.

5            MS. BOLGER:  Objection.  I really

6   believe that mischaracterizes the document.

7            THE WITNESS:  The one IP address

8   created 1 of 4 spear phishing bitlinks

9   targeting John Podesta.

10  BY MR. FRAY-WITZER:

11      Q.    According to your report there were

12  a total of 11,139 bitlinks created as part of

13  this spear phishing effort, correct?

14      A.    Correct.  11,000 --

15            Let me get the exact number.

16            11,139 bitlinks were created.  I

17  mean, that is correct.  That is indicative of

18  an advanced persistent threat.

19      Q.    How many bitlinks were created by an

20  IP address owned by Root S.A.?

21      A.    One.

22      Q.    You talk about 41 distinct IP



1  addresses, of which one was owned by Root S.A.

2  Is it your opinion that the owners of all 40 of

3  the other IP addresses are also culpable for

4  the hack of the DNC?

5     A.    No.  It's my opinion that XBT and

6  its infrastructure --

7          XBT infrastructure is linked to a

8  pattern of significant malicious activity.

9     Q.    I'm talking about this specific

10  incident.

11    A.    Yes.  And I think understanding the

12  complexity of cyber investigations you have to

13  evaluate the totality of evidence collected in

14  evaluating it.  And cyber crime is complex, and

15  you cannot --

16          You have to appreciate that while

17  other entities may have been used at some

18  period of time, when looking at the totality of

19  the information you gain an appreciation.  And

20  it is my expert opinion that XBT's

21  infrastructure was used for repeated

22  significant malicious cyber activity.



1        Q.    Did you examine the other 40 IP

2   addresses and the owners of those addresses to

3   determine if in your opinion they had also been

4   repeated targets of cyber crime?

5        A.    So I'll answer your question in two

6   parts.  Yes, we examined the other IPs.  But

7   the second part of your question, if you could

8   repeat it or have it read back to me.

9              (Court Reporter read back.)

10             So again, yes, we examined those

11  other IP addresses, but no, we did not examine

12  them beyond identifying the owners and

13  operators of the infrastructure because it was

14  outside the scope of the investigation.

15       Q.    So you have no opinion as to whether

16  or not the other 40 unique IP addresses,

17  whether the owners of those IP addresses had

18  been similarly victims of cyber crime in the

19  past?

20             MS. BOLGER:  Objection.

21  Mischaracterizing his testimony.  There's no

22  question of victims of cyber crime.  The



1   witness never gave any testimony that these

2   people were victims of cyber crime.

3           MR. FRAY-WITZER:  I'll rephrase the

4   question.

5           MS. BOLGER:  It's just wrong.

6   BY MR. FRAY-WITZER:

7       Q.    You have no opinion as to whether or

8   not the owners of the other 40 IP addresses

9   also had infrastructures that you would

10  categorize as having been repeatedly used in

11  the connection of cyber crime?

12          MS. BOLGER:  To commit cyber crimes.

13  Not as victims of cyber crimes.

14          MR. FRAY-WITZER:  I didn't say

15  "victims" that time.

16          MS. BOLGER:  Okay.

17          THE WITNESS:  Not in my expert

18  report.

19  BY MR. FRAY-WITZER:

20      Q.    Did you make a conclusion that isn't

21  in your expert report about that?

22      A.    No.



1           (Exhibit 8 marked for

2    identification.)

3           MS. BOLGER:  Trying to make me use

4    glasses, Evan?

5           MR. FRAY-WITZER:  I wasn't very

6    happy about this printing either.

7           MS. SCHARY:  You've got to learn

8    about landscape printing.

9           MR. FRAY-WITZER:  Yeah.

10          MR. BOLGER:  It's not readable.

11          MR. FRAY-WITZER:  I don't have very

12   significant questions about this.  If you want

13   to reprint it, that's fine, but I don't --

14          MS. BOLGER:  I'll just for the

15   record tell you that I believe that the right

16   side is cut off, and so it's not a complete

17   document.  But I'm certainly not going to stop

18   you from asking questions about it, Evan.

19          MR. FRAY-WITZER:  And it's not going

20   to be significant.

21          MS. BOLGER:  That's fine.

22   BY MR. FRAY-WITZER:



1      Q.    So you're being shown what's been

2   marked as Exhibit No. 8.  You can see on the

3   first page on the top right it says Exhibit 5.

4   It's an exhibit from your report.  Is that

5   correct?

6      A.    Correct.

7      Q.    And this is the Bit.ly data that you

8   are discussing in your expert report when you

9   talk about having received information from

10  Bit.ly.  Is that correct?

11     A.    Correct.

12     Q.    So this document, although cut off,

13  represents the 11,139 Bit.ly links that were

14  created as part of the spear phishing campaign,

15  correct?

16     A.    Correct.

17     Q.    And so somewhere in there one of

18  those is connected to Root S.A., correct?

19     A.    Correct.

20     Q.    And indeed, you don't know whether

21  or not the link that was created by the IP

22  address owned by Root S.A. was ever actually

1  e-mailed to John Podesta, correct?

2       A.    Based on the information available

3  to me we do not know if the specific e-mail

4  that was created and indicated in Column B was

5  e-mailed.

6       Q.    And in fact, you specifically say

7  that:  FTI could not establish a technical

8  connection between the IP address used to

9  create -- that's the Bit.ly link that you've

10  associated with Root S.A. -- and the link that

11  John Podesta clicked on.

12            Correct?

13       A.    Other than the fact that the

14  e-mails, the Bit.ly links were created, and the

15  encoded base 64 material was identical.

16       Q.    But that's true for all 11,139

17  Bit.ly links, right?

18       A.    No, that's false.  That's true for

19  four of them.  Four of them.  Four-Bit.ly links

20  were created to target John Podesta.  One of

21  the four was created using Root S.A.

22  infrastructure.



1        Q.    And your report specifically says:

2   FTI could not establish a technical connection

3   between the IP address used to create the

4   Bit.ly link that John Podesta clicked on and

5   XBT.

6        Correct?

7        A.    With respect to the IP address, that

8   is accurate as it's stated in my report.  What

9   I'm saying is that the IP address that created

10  the Bit.ly link, created a Bit.ly link that was

11  identical to another one created by Leaseweb on

12  Leaseweb infrastructure, and that is the one

13  that John Podesta actually clicked on.  So what

14  I'm articulating in my report is that four

15  Bit.ly links were created to target John

16  Podesta.  Two of them I demonstrate in my

17  report because they contain the exact same base

18  64 encoding to target John Podesta.  One of

19  them he clicks on we know.  The other one was

20  staged on XBT infrastructure owned and operated

21  by XBT.  One of their subsidiaries was Root

22  S.A.  So while my report does say FTI could not



1  establish a technical connection between the IP

2  address, we did find a technical connection

3  between the content of the Bit.ly link that was

4  created and mailed to John Podesta.

5      Q.    I'm just reading from the report, so

6  I would think that this could be "yes" or "no".

7          You concluded that:  FTI could not

8  establish a technical connection between the IP

9  address used to create the Bit.ly link that

10 John Podesta clicked on and XBT.

11         That's what your report says, isn't

12 it?

13         MS. BOLGER:  The next word is

14 "however".

15         MR. FRAY-WITZER:  Okay.  And that's

16 fine.  We can read or you can question the

17 witness after I'm done.

18 BY MR. FRAY-WITZER:

19     Q.    But I've read a sentence.  Is that

20 not what your report says?

21     A.    I'm smiling because cyber

22 investigations are not black and white.  You



1  have to look at the totality of the

2  information.  We've looked at the totality of

3  the information.  Yes, one sentence in my

4  report states:  FTI could not establish a

5  technical connection between the IP address

6  used to create a Bit.ly link that John Podesta

7  clicked on and XBT.

8           One sentence does state that.  I

9  will confirm.

10     Q.    And that was my only question.

11  Thank you.

12           On the next page, on Page 14, you

13  also say:  "Based on the information currently

14  available FTI cannot definitively state that

15  the bitlink created using the Root S.A. IP

16  address was ever sent to or received by John

17  Podesta."

18           Did I read that correctly?

19     A.    Again, that is --

20     Q.    Did I read that correctly?

21           MS. BOLGER:  Let the witness answer

22  the question, Evan.



1              THE WITNESS:  You read it correctly.

2    And I will say that cyber investigations are

3    extremely complex, and my report is based on

4    information that was made available to me.

5    BY MR. FRAY-WITZER:

6        Q.    And just to be clear, when we're

7    talking about a Root S.A. IP address, we're

8    talking about an IP address that Root S.A.

9    owns, correct?

10       A.    Um, correct.  Root S.A. is a

11   subsidiary of XBT.

12       Q.    And when we say that Root S.A. owns

13   the IP address, do you know if Root S.A. itself

14   uses the IP address, or if one of Root S.A.'s

15   customers or clients uses that IP address?

16       A.    Based on information that was made

17   available to us, we were unable to determine

18   that.

19              MR. FRAY-WITZER:  Why don't we take

20   a break for a minute.

21              (Recess taken at 12:48 p.m.)

22              (Deposition resumed at 1:37 p.m.)



1    BY MR. FRAY-WITZER:

2        Q.    Okay.  Page 14 of your expert

3    report.  Under Additional Technical

4    Connections.  Here you specifically say:  "The

5    CrowdStrike report included seven command and

6    control IP addresses and five malware hashes as

7    the IOCs in the DNC hack.  FTI reviewed the IP

8    registration information for the seven C&C IP

9    addresses, but none were affiliated with XBT.

10   Similarly, FTI was not able to identify a

11   direct technical connection to XBT

12   infrastructure based on an analysis of the five

13   malware samples."

14            Did I read that part correct?

15       A.    That is correct.  That is what my

16   expert report states.

17       Q.    And then you continue to say that

18   there was an indirect link that you found

19   involving an SSL certificate.  Is that correct?

20       A.    That is correct.

21       Q.    And you say that the suspect SSL

22   certificate has been distributed to 40 other IP



1   addresses, and that one of those was owned by

2   Root S.A., correct?

3       A.    Um --

4           MS. BOLGER:  Where are you reading?

5           MR. FRAY-WITZER:  Page 15.

6           THE WITNESS:  I'm trying to find

7   that sentence.

8           MR. FRAY-WITZER:  Sure.  Top of Page

9   15, first paragraph:  "Further review found

10  that the SSL certificate had been distributed

11  to 40 other IP addresses, and that one of those

12  is owned by Root S.A."

13          THE WITNESS:  Correct.  That's what

14  this sentence states.

15  BY MR. FRAY-WITZER:

16      Q.    Do you know who owns the other 39 IP

17  addresses?

18      A.    Off the top of my head I do not.

19      Q.    Did FTI investigate who owns the

20  other 39 IP addresses?

21      A.    I'm certain we did.

22      Q.    Do you think that the owners of the



1  other 39 IP addresses were all somehow

2  connected to Fancy Bear?

3      A.    Based on the fact that the SSL

4  certificate was indeed utilized on the total 42

5  IP addresses, yes.  They are all technically

6  connected to Fancy Bear, which is an industry

7  code name for Russian state sponsored malicious

8  cyber activity.

9      Q.    But that doesn't mean that the

10 owners of those IP addresses are somehow

11 actively working with or cooperating with Fancy

12 Bear, does it?

13     A.    We can't state that.  You can't come

14 to that conclusion based on the information

15 that is available.

16     Q.    And indeed, your conclusion in this

17 section is:  "FTI notes that because this is an

18 indirect link, more data from CrowdStrike

19 and/or the DNC is required to determine if XBT

20 infrastructure supported the DNC Hack."

21          Right?

22     A.    The sentence does state that:  "FTI



1  notes that because this is an indirect link,

2  more data from CrowdStrike and/or the DNC is

3  required to determine if XBT infrastructure

4  supported the DNC Hack."

5         That's what this sentence states,

6  but it's taken out of context and ignoring the

7  aforementioned totality of the information

8  which states that there is an SSL certificate

9  that was created which is not an easy --

10        -- an easy technical task to do.  It

11  was created and then installed on 42 different

12  IP addresses.  Two of those IP addresses were

13  used to target and hack the DNC, and one of

14  those IP addresses was owned and operated by

15  Root S.A.

16        Evan, I'll further state that in

17  preparation for my testimony today, that of the

18  40 IP addresses that I reference in my report,

19  we further found that one of those IP addresses

20  was actually used to target the German

21  Parliament, and --

22    Q.    I didn't want to interrupt you.



1      A.    Yep.  That's the end of my

2  statement.

3            (Exhibit 9 marked for

4  identification.)

5      Q.    So you've been shown what's been

6  marked as Exhibit No. 9.  You'll also notice on

7  the first page words in the upper right hand

8  corner it says Exhibit 7, which indicates that

9  it is Exhibit 7 from your expert report.  Can

10  you tell me what this document is.

11      A.    This is the Grizzly Steppe joint

12  analysis report -- JAR is what they're known as

13  in industry -- published by the Department of

14  Homeland Security and the Federal Bureau of

15  Investigation.

16      Q.    Now, if you could turn, please --

17  the pages are only numbered up to 13 -- but the

18  page immediately after 13, which starts the

19  rest of this document that lists IP addresses.

20  And do you see those IP addresses listed?

21      A.    I do.

22      Q.    And then I'm going to ask you --



1          It's a little difficult because it's

2     not numbered, but it's all indented and then

3     there's a page about ten pages in.

4          A.    I think I got it.

5          Q.    So the IP addresses are listed, and

6     it says IP watch list.  And then for each line

7     it says:  "It is recommended that network

8     administrators review traffic to/from the IP

9     addresses to determine possible malicious

10    activity."

11          Correct?

12          A.    I'm not sure where you're reading

13    from.

14          Q.    Pretty much every line after it --

15          A.    I see.  I was reading at the top.

16    My apologies.

17          Yes.  "It is recommended that

18    network administrators review traffic to/from

19    the IP address to determine possible malicious

20    activity."

21          Q.    So, am I correct that that is the

22    FBI recommending to the owners of these IP



1  addresses that they review the traffic and see

2  if there's been malicious activity on those IP

3  addresses?

4          MS. BOLGER:  Object to the form.

5          If you know.

6          THE WITNESS:  I would say that the

7  FBI and Department of Homeland Security did add

8  that caveat.

9  BY MR. FRAY-WITZER:

10     Q.    And of that list of IP addresses,

11  you identified 13 that were owned by XBT

12  subsidiary Root S.A., correct?

13     A.    Correct.  Correct.

14     Q.    And you say that:  "These findings

15  indicate RIS actors have utilized XBT owned

16  infrastructure."

17          Correct?

18          Page 16 of your report.

19          MS. BOLGER:  I'm sorry.

20          Oh.  Right under the chart.

21          MR. FRAY-WITZER:  Yes.

22          THE WITNESS:  Correct.



1  BY MR. FRAY-WITZER:

2      Q.    Are you saying that for every --

3            MS. BOLGER:  Sorry.  Can I just

4  interrupt.  For the record, that actually

5  refers to Exhibit 8, not Exhibit 7.  I don't

6  know if that's relevant.  Just for the record.

7  You can ask whatever question you want.

8            MR. FRAY-WITZER:  There's a footnote

9  that says refer to Exhibit 8, but it's actually

10 under a chart that identifies the IP addresses,

11 and it's immediately following a sentence that

12 says:  "FTI identified 13 IP addresses listed

13 in the Grizzly Steppe report that are owned by

14 XBT subsidiary Root S.A.  These findings

15 indicate RIS actors have utilized XBT owned

16 infrastructure."

17           MS. BOLGER:  Footnote:  Refer to

18 Exhibit 8.

19           MR. FRAY-WITZER:  Sure.

20 BY MR. FRAY-WITZER:

21     Q.    Are you saying that every one of the

22 IP addresses listed here means that RIS actors



1  have utilized the infrastructure of the owners

2  of those IP addresses?

3      A.    I'm saying that based on my

4  experience investigating cyber crime and my

5  experience in the U.S. Government that a cyber

6  security analyst has determined that that is

7  correct.  At one point in time malicious actors

8  attributed to Russian nation state activity,

9  utilized every single indicator of compromise

10  in this report.

11     Q.    Why, if you know, does the

12  government simply say we recommend that network

13  administrators review the traffic to determine

14  possible malicious activity?

15         If it's conclusive, why not give a

16  sort of more conclusive warning to the owners

17  of these IP addresses?

18     A.    Evan, with all due respect, I'd have

19  to refer you to the Department of Homeland

20  Security and Federal Bureau of Investigation.

21     Q.    Fair enough.

22         On Page 16 of your expert report you



1   talk about -- and it's sort of in the middle of

2   the paragraph, full paragraph under the

3   chart -- you talk about an inquiry from the

4   Luxembourg authorities to Root S.A. concerning

5   one of the IP addresses listed in the Grizzly

6   Steppe report, correct?

7        A.    Correct.

8        Q.    And you note that Mr. Goederich

9   responded to the Luxembourgish authorities, and

10  you conclude, you say:  Based on our experience

11  this is not an adequate response to a

12  government inquiry.

13            And you're talking about the

14  response that Mr. Goederich gave to the

15  Luxembourgish police, correct?

16       A.    To be clear, Mr. Goederich's

17  response was -- and I'm quoting -- "It is a

18  tour exit note."

19            And quoting again:  "Doesn't get us

20  very far."

21            Correct.  In my expert opinion, Mr.

22  Goederich's response to the authorities is less



1   than adequate.

2       Q.    Did the Luxembourgish authorities

3   ask Mr. Goederich for more information?

4       A.    I don't know.

5       Q.    In your experience, if a government

6   agency wants more information they know how to

7   ask, right?

8       A.    In my experience, you're absolutely

9   correct.  In my experience, a government agent

10  knocking on the door, a telecommunications

11  company is absolutely going to ask for more

12  than just one data point, especially if 13 are

13  listed.

14          (Exhibit 10 marked for

15  identification.)

16      Q.    So looking at what's been marked as

17  Exhibit No. 10, it's Exhibit 8 to your report.

18  It is the Exhibit 8 noted in your footnote that

19  you say:  Refer to Exhibit 8.

20          Can you tell us what we're looking

21  at in this exhibit.

22      A.    We're looking at the technical



1  information of IP addresses and which ASNs they

2  belong to and the history of the IP address.

3      Q.   So you're not even going to have to

4  pretend, but pretend that I have no idea what

5  this document actually conveys to us.  Looking

6  just at the first page, tell me what

7  information you're intending this document to

8  convey when you say in your footnote:  Refer to

9  Exhibit 8.

10     A.   So this is showing the history of

11 the IP address and which ASN it was attached to

12 and when it was attached to it.

13          MS. BOLGER:  Just for the record,

14 the document was actually originally produced

15 in color, and I don't know if it's meaningful.

16 Mr. Ferrante can clean that up.

17 BY MR. FRAY-WITZER:

18     Q.   Would the colors tell us anything

19 more?

20     A.   Um, I mean, it will show --

21          What you can see right now is the

22 gradient on the page, and it just shows the



1  utilization of the IP and a specific ASN and

2  when.

3      Q.   Does it tell us the identity of who

4  is utilizing the IP address?

5      A.   I mean, we believe --

6           We know who's utilizing it.  It's

7  Root S.A.

8      Q.   I'm sorry.  Does this document tell

9  us who is utilizing the IP address?

10     A.   "This document", meaning Exhibit 8?

11     Q.   Yes.

12          Well, I'm sorry.  Let me be clear.

13  Because I just want --

14          It's Exhibit 10 to the deposition.

15  It's Exhibit 8 to your expert report.

16     A.   Yes.  Yes.  It's a good point of

17  clarification.  Exhibit 10 to the deposition.

18          Technically, yes, it associates the

19  IP address with an ASN, which is a unique

20  identifier.

21     Q.   So if I understand it, what you mean

22  in your report is that this document,



1  Exhibit 10 to the deposition, shows us that

2  Root S.A. has utilized these IP addresses, but

3  it doesn't tell us anything about Russian

4  intelligence actors, does it?

5      A.    Other than --

6          Well, I disagree with your statement

7  because I think it absolutely does.  It clearly

8  states the IP address, which is a unique

9  identifier 212.117.180.130.  It states that it

10  has been owned and operated by ASN 5577, which

11  is owned and operated by Root S.A.  And the IP

12  address is clearly stated in the Department of

13  Homeland Security and Federal Bureau of

14  Investigation Grizzly Steppe joint analysis

15  report.

16      Q.    And I guess, let me clarify the

17  question because I understand what you're

18  saying.

19          If the Grizzly Steppe report didn't

20  exist, just Exhibit 10 to the deposition, that

21  by itself doesn't tell you anything about

22  Russian intelligence actors utilizing these IP



1   addresses, does it?  It's only in conjunction

2   with the Grizzly Steppe report?

3        A.   Yes.  I'm smiling because the

4   Grizzly Steppe report absolutely does exist.

5             (Laughing.)

6        Q.   I understand.  I understand that it

7   exists.  Indeed I have a copy of it here.

8        A.   Yes.

9        Q.   But if it didn't exist, this

10  document by itself wouldn't tell us about

11  Russian interference or Russian intelligence

12  actors, right?

13       A.    Evan, I don't know if I can agree

14  with you there because if the Grizzly Steppe

15  report didn't exist there could be a myriad of

16  other intelligence sources that we could

17  associate this IP with other malicious --

18            So if you're saying there was

19  nothing on this planet but this document, of

20  course not.

21       Q.   Okay.  I was just --

22            Yes, that's fine.



1      A.     But that's --

2             I mean, for the record, that's not

3    how investigations are conducted.  Evidence is

4    obtained in all corners of the planet.

5      Q.     If you turn to Page 17 of your

6    report, towards the bottom you discuss the

7    methbot operation, M-E-T-H-B-O-T.

8             Do you see where I'm referring to?

9      A.     I do.  The methbot operation.

10     Q.     Can you tell us, please, what the

11   methbot operation was.

12     A.     Well, in its most simplistic terms,

13   the methbot operation was a botnet.  It was a

14   botnet, and it was functioning, and in some

15   sense -- as quoted by white ops -- aggressively

16   scaling during late October through late

17   December.  And in a technical sense the methbot

18   was a collection of computers controlled by

19   command and control infrastructure.  And in

20   this case the methbot syphoned millions of

21   dollars -- I believe it was $5 million per

22   day -- in click frauds.  Advertisement click

1    frauds.

2        Q.    And correct me if I'm wrong.  My

3    understanding in the most general terms is that

4    the methbot fraud operated by convincing

5    advertisers that their sites were getting

6    clicks when they weren't really getting clicks,

7    and so they were being charged advertising

8    dollars that they shouldn't have had to pay.

9    Is that essentially?

10       A.    Well, I would challenge your term,

11   your definition or your description of

12   convincing.  The methbot was a technical

13   operation that actually manipulated --

14            -- created a botnet and manipulated

15   an experience, an automated experience to seem

16   like a human would be clicking on

17   advertisements when indeed it wasn't.  It was

18   the botnet.

19       Q.    And so I don't think we're

20   disagreeing here.  It was a fraud on

21   advertisers whereby money was paid for clicks

22   that advertisers thought were people but were



1    really bots?

2        A.    Sure.

3        Q.    Okay.  The methbot operation itself,

4    was not connected with the 2016 election,

5    correct?

6        A.    Um, I can't state that conclusively.

7        Q.    Do you have any reason to believe

8    that the methbot operation was connected to --

9    and when I say "connected to", I mean, was part

10   of the attempt to influence the 2016 elections.

11       A.    Other than the fact that the methbot

12   was a large botnet, and I know botnets were

13   used in malicious cyber activity targeting the

14   2016 Presidential Election, I have no

15   additional evidence.

16             (Exhibit 11 marked for

17   identification.)

18       Q.    So you're being shown what's been

19   marked as Exhibit No. 11.  Can you tell me if

20   you've seen this document before?

21       A.    I have.

22       Q.    What do you understand this document



1   to be?

2        A.    I understand this to be the

3   indictment.

4            Let me just check the signature

5   page.

6            Correct.  The indictment of the 12

7   Russian nation state actors who facilitated

8   malicious cyber activity leading into the 2016

9   Presidential Election.

10       Q.    When you issued your expert report

11  you obviously could not have considered the

12  indictment because it didn't at least exist

13  publicly at that time.  Having seen and

14  considered the indictment at this point, does

15  the indictment change any of your conclusions

16  in the expert report?

17       A.    No, it does not change my

18  conclusions at all.  And in one respect it

19  affirms my conclusions because the malware

20  described in the indictment, the X-Agent and

21  X-Tunnel, is known to have utilized the same

22  SSL certificate that was observed communicating



1   with or being utilized on XBT infrastructure.

2      Q.    The indictment names 12 individuals

3   as the direct actors in the hacking of the DNC

4   and the Democratic Leadership, correct?

5      A.    Correct.

6      Q.    None of those individuals are the

7   plaintiffs in this case, correct?

8      A.    No.

9      Q.    Have you read the entire indictment?

10      A.    I have.

11      Q.    In your professional expert opinion,

12   do you believe that the Mueller investigation

13   did a thorough job in investigating the hack of

14   the DNC and the Democratic leadership?

15      A.    Well, I'd be basing my opinion at

16   this point in time purely based on this

17   indictment.  I have no insights into what

18   evidence Special Counsel Mueller and his team

19   has obtained.  Based on this indictment I

20   believe them to be conducting a very thorough

21   investigation.

22      Q.    Have you worked with Director



1    Mueller personally?

2        A.    Um, I mean, worked with Director

3    Mueller personally?  I would say "no".

4              Director Mueller was the FBI

5    Director for 9, 10 years of my tenure at the

6    FBI when I was an FBI cyber security subject

7    matter expert in the field in New York.  I met

8    him multiple times, actually briefed him on

9    some sophisticated work that I had done.  And

10   then when I promoted to become the Chief of

11   Staff of the FBI Cyber Division in Washington I

12   had the privilege of briefing him again on

13   specialized programs and cases.  I was very

14   proud to have congratulated him in his last day

15   at the FBI and wish him well.  But other than

16   that, that was the extent of my work with him.

17   So --

18       Q.    Is it your opinion that he is

19   thorough in his work?

20       A.    Absolutely.

21       Q.    Are you aware that the Mueller

22   investigation has never contacted Aleks



1  Gubarev, Webzilla or XBT to ask them to be

2  interviewed in connection with the interference

3  with the 2016 election?

4      A.    Am I aware of that?  Not until

5  you've just told me, and I'm taking your word

6  for it.  And I will follow up that statement

7  with:  In my experience as an FBI agent,

8  government official, and as a seasoned

9  investigator, I would not draw any conclusions

10  from that statement.

11      Q.    If you'd turn to Page 21 of your

12  report.  You're still discussing the methbot

13  operation here.  In the middle of the page you

14  write:  "Documentation produced by the

15  plaintiffs provides evidence that XBT became

16  aware of the methbot operation after the white

17  ops report was released and took action to

18  terminate the responsible customer."

19          Do you see that?

20      A.    I do.  I do read that statement.

21  That's correct.

22      Q.    Are you aware as well from the



1  depositions that you've read or from any other

2  source that when XBT became aware of the

3  methbot operation they pulled the hard drives

4  related to that operation and maintained them

5  in case law enforcement ever wanted to look at

6  them?

7      A.    I am aware of that and refer my

8  understanding based on your statements.  I

9  didn't realize it was hard drives.

10      Q.    Would you agree that terminating the

11  responsible customer and maintaining the hard

12  drives are the type of thing that you would

13  expect and want a server company to do when

14  informed of something like the methbot

15  operation?

16      A.    I would agree that it is some of the

17  steps that I would take to preserve evidence

18  and to investigate the malicious activity.  I

19  also believe that it is the, I guess, tip of

20  the iceberg of the myriad of things that I

21  would do if I was the owner and operator of the

22  infrastructure or the independent entity



1   retained to investigate such a matter.

2            I'm also aware that in addition to

3   preserving that data, XBT did not contact the

4   authorities, and also took steps to un-publish

5   their publicly routable and available IP space

6   utilized in the malicious botnet activity,

7   which to me is extremely suspicious.

8            I would also add that through the

9   course of our relationship that we have

10  asked -- and counsel correct me -- but I

11  believe also moved to compel the data related

12  to the botnet that XBT possesses, and it's yet

13  to be turned over.

14            And on that note, if I may request a

15  hospitality break.

16            MR. FRAY-WITZER:  Sure.

17            (Recess taken at 2:12 p.m.)

18            (Deposition resumed at 2:16 p.m.)

19  BY MR. FRAY-WITZER:

20     Q.    If you would turn, please, to Page

21  23 of your report.  And about a third of --

22            I'm sorry.  I'll wait 'til you're



1  there.

2              About a third of the way down the

3  page you have a heading Win 32/Indestroyer

4  (sic) Malware.  Industoyer Malware.

5              Do you see that?

6     A.    Yes.  I might pronounce it

7  Industoyer.

8              MS. BOLGER:  I believe that's a typo

9  and it is Indestroyer.

10             THE WITNESS:  Excellent.

11  BY MR. FRAY-WITZER:

12     Q.    And you write:  "An ESET white paper

13  published in June 2017 identified that same

14  Root S.A. owned IP address cited in the

15  CRASHOVERDRIVE report had been used as a

16  command and control server for the

17  Win32/Industroyer malware software."

18             Do you see that?

19     A.    Yes, I do.

20     Q.    And that was your conclusion based

21  on the ESET report.  Is that correct?

22     A.    Correct.  I utilized the



1  intelligence report published by ESET, which is

2  a common industry investigative technique.

3  Common and recognized.  Industry recognized

4  investigative technique.

5          (Exhibit 12 marked for

6  identification.)

7      Q.    By sheer lucky coincidence Exhibit

8  No. 12 to the deposition is Exhibit No. 12 to

9  your expert report.

10     A.    You're in sync.

11     Q.    Is this the ESET report that you

12  were just talking about?

13     A.    It appears to be.  Yes.

14     Q.    If you would turn to Page 15 of that

15  report, please, that is where it indicates the

16  IP addresses of the C&C servers as you

17  discussed a minute ago.  Do you see that?

18     A.    I'm not there yet.  Please standby.

19          Page 14 you said?

20     Q.    15.

21     A.    15.

22          Okay.  In the lower right hand



1    quadrant of the page?

2        Q.    Yes.

3        A.    Okay.

4        Q.    And those are the --

5              That's how you identified the IP

6    addresses of the C&C servers, correct?

7        A.    Correct.

8        Q.    And right below the listing of IP

9    addresses it says:  "Warning!  Most of the

10   servers with these IP addresses were part of

11   Tor network, which means that the use of these

12   indicators could result in a false positive

13   match."

14             Correct?

15       A.    That's what it states.  Correct.

16       Q.    You didn't give that caution in your

17   report when you talked about the ESET report,

18   did you?

19       A.    I did not.  And in my opinion I

20   believe that to be irrelevant.

21             (Exhibit 13 marked for

22   identification.)



1    Q.    So you're being shown what's been

2  marked as Exhibit 13.  And in your expert

3  report you note that this white paper

4  identified a Root S.A. owned IP address that

5  was used as command and control server for the

6  Cozy Bear designed Cosmicduke malware.  And

7  maybe I was just too tired when I read this,

8  but can you tell me where in here it references

9  Cozy Bear?

10    A.    I would have to go through the

11  entire report to find the reference.  But I

12  will say based on experience and industry-wide

13  recognition, Cozy Bear is the industry term

14  used by CrowdStrike, the cyber security firm,

15  and is well known that Cozy Bear is Russian

16  nation state actors as is Cosmicduke well known

17  in industry to be Russian actors.

18          MS. BOLGER:  I would also note for

19  the record that the sentence that you read,

20  Evan, cited two documents, this one and another

21  one, stat.ripe.net/widget/routing-history.

22          The sentence that Evan just read has



1    three footnotes, one of which is this,

2    Exhibit 13, and then there are exhibit --

3              Footnote 70 is a link to something

4    else.

5              MR. FRAY-WITZER:  And the --

6              MS. BOLGER:  I'm not representing

7    anything about it other than that.

8    BY MR. FRAY-WITZER:

9        Q.    The stat.ripe.net links that you

10   provided us are links that demonstrate the

11   ownership of IP addresses over time, correct?

12       A.    Correct.  That would be Footnote No.

13   70.

14       Q.    Yeah.  So that would have nothing to

15   do with identifying the link or the virus, the

16   malware, as being created by Cozy Bear, right?

17       A.    I'd have to see it, but yeah, based

18   on experience it's not going --

19              It's not going to link an IP

20   directly from the ripe.net website to a threat

21   actor set.

22



1              (Exhibit 14 marked for

2    identification.)

3        Q.    So you've been given what's been

4    marked as Exhibit No. 14, which is also your

5    Exhibit 14.

6        A.    Okay.

7        Q.    And in your expert report you talk

8    about technical connections to APT Careto on

9    Page 24 of your expert report.  Do you see it?

10       A.    I do.

11       Q.    And you reference this Kaspersky

12   white paper, correct?

13       A.    Correct.

14       Q.    This particular malicious threat

15   actually targeted users who were using

16   Kaspersky software.  Isn't that correct.

17       A.    Um, it has been a while since I've

18   read this report, so I don't want to --

19       Q.    Well, I'll direct you to Page 26.

20       A.    Okay.

21       Q.    And Kaspersky actually in that

22   report says:  "We initially became aware of



1  Careto when we observed attempts to exploit a

2  vulnerability in our products."

3         Do you see that?

4     A.    I do.

5     Q.    And so one of the things that this

6  malicious -- kind of we would call it a virus

7  or a malicious script -- did, was it targeted

8  users of Kaspersky software.  Is that correct?

9     A.    That's what Page 26 states.

10    Q.    And Kaspersky software, ironically,

11  is designed to let users battle malware.  Is

12  that correct?

13    A.    It is viewed --

14         Kaspersky software is viewed in the

15  industry as an antivirus solution.  Correct.

16    Q.    On Page 25 of your report, towards

17  the bottom of that page you're talking about a

18  RIG Exploit Kit as part of your section on

19  other malicious cyber activity, correct?

20    A.    Correct.

21    Q.    And the report that you're talking

22  about was created by Talos, correct?



1      A.    Correct.

2      Q.    And on Page 26 it reads:  "Talos

3  reportedly contact both Eurobyte and Webzilla

4  in late 2015 and provided both companies with

5  information about the hosts.  According to

6  Talos, Webzilla responded and blocked the

7  customers that were generating the events."

8          Correct?

9      A.    That's what my report states.  Yes.

10     Q.    And so according to your report and

11 according to Talos, when Webzilla was notified

12 about this malicious activity it blocked the

13 customers that were generating the events,

14 correct?

15     A.    Correct.

16          (Exhibit 15 marked for

17 identification.)

18     Q.    So you're being shown what's been

19 marked as Exhibit No. 15.  If you look at the

20 top right hand corner you'll see that it's

21 marked as Exhibit 28 to your expert report.  Do

22 you see that?



1        A.    I do.

2        Q.    The overview of exhibits contained

3    on the last page of your expert report only

4    goes up to 27.  As far as I can tell Exhibit 28

5    isn't actually referenced anywhere in your

6    report, and so I'm mostly trying to ask you

7    what this is and why it's here.

8            MS. BOLGER:  Evan, you are probably

9    the kind of guy who always used I before E too.

10           MR. FRAY-WITZER:  Except after C.

11           MR. GURVITS:  I was waiting for

12   that.

13           MS. BOLGER:  For the record, there

14   is a reference to 28.  So it's on Page 14,

15   Footnote 28.

16           THE WITNESS:  It must be regarding

17   the exploitation of --

18           MS. BOLGER:  Don't guess.  Look at

19   Page 14, Footnote 28.

20           THE WITNESS:  Yes.  It is how the

21   Podesta phishing e-mail was created and sent to

22   him to steal his username and password and how



1   the actors staged or created his Bit.ly link on

2   the Root S.A. infrastructure.

3   BY MR. FRAY-WITZER:

4        Q.    If you would turn, please, to Page

5   32 of your expert report.  And just to be

6   clear, this section starts on Page 31.  It's

7   entitled Public Reputation Related to Malicious

8   Cyber Activity.  And then starting on Page 32

9   there's a table that lists a number of

10  different items that you have said are related

11  to this category, correct?

12       A.    Correct.

13       Q.    So starting with the first entry on

14  Page 32, you're discussing 1-800-Hosting, Inc.

15  Is that correct?

16       A.    Correct.

17       Q.    And you're talking about malicious

18  activity that allegedly occurred in 2008 on

19  1-800-Hosting, correct?

20       A.    Correct.  Activity on 1-800-Hosting,

21  Inc., in 2008.  Correct.

22       Q.    And you note in that box at the end:



1  "FTI notes this activity pre-dates XBT's

2  acquisition of 1-800-Hosting.  XBT acquired the

3  company in November 2012."

4          Correct?

5     A.    Correct.  That's what my report

6  states.

7     Q.    So why would activity in 2008 which

8  predated XBT's ownership of 1-800-Hosting have

9  something to do with XBT's reputation?

10    A.    Um, again, when conducting complex

11  technical investigations like this you evaluate

12  a myriad of data points.  And throughout the

13  course of this investigation we came across

14  this data point and believed that it was part

15  of a recurring theme which is ongoing,

16  malicious cyber activity, in some cases at the

17  hands of the Russian Government, Russian state

18  actors, in some cases continued even after it

19  was brought to the attention of the owners and

20  operators.

21    Q.    How is it a data point that 4 years

22  before XBT purchased 1-800-Hosting,



1   1-800-Hosting was the subject of malicious

2   activity?  How does that possibly reflect on

3   XBT?

4           MS. BOLGER:  Object.  Asked and

5   answered.

6           But you can answer again.

7           THE WITNESS:  Yeah.  I would just

8   say it's a data point.  XBT acquired them, and

9   it was --

10          It's more alleged Russian state

11  actors utilizing infrastructure that XBT

12  decided to purchase.

13  BY MR. FRAY-WITZER:

14      Q.    They didn't own the infrastructure

15  at the time the activity occurred, right?

16      A.    Correct.

17      Q.    Your report doesn't say that the

18  activity continued after they purchased

19  1-800-Hosting, correct?

20      A.    Correct.

21      Q.    Your next entry for Fozzy Inc.,

22  says:  "According to the McClatchy D.C. bureau,



1  fozzy.com is a site 'used to heavily host

2  pornography'."

3          Did I read that correctly?

4      A.    Correct.

5      Q.    Let me ask you first:  What do you

6  believe the relevance of that to be?

7      A.    Um, as stated, I'd have to go back

8  to Exhibit 1.  The scope of the investigation

9  was to --

10          The scope of my investigation was to

11  conduct a sophisticated technical investigation

12  to determine links between XBT/Webzilla and its

13  affiliates.  It alleges that they "had been

14  using botnets and porn traffic to transmit

15  viruses, plant bugs, steal data and conduct

16  'altering operations' against Democratic Party

17  leadership."

18          I found that data point to be

19  relevant because Fozzy Inc., an XBT entity is

20  hosting -- according to the McClatchy D.C.

21  bureau -- is a hosting site "used to heavily

22  host pornography."



1        Q.    So let me first ask you:  Do you

2    know if fozzy.com is hosting pornography?

3        A.    I'm confident throughout the course

4    of the investigation our investigators did

5    research on the domain and its purpose.

6        Q.    Tell me every fact that you believe

7    your investigators uncovered that supports what

8    I think you're saying is your belief that

9    fozzy.com hosts pornography?

10       A.    If it's not in my expert report then

11   I don't believe it to be relevant.  My expert

12   report states exactly what it states, that

13   according to McClatchy fozzy.com hosts --

14           -- is a site "used to heavily host

15   pornography."

16       Q.    And my question is:  Did you do

17   independent research to determine if that was

18   true?

19       A.    I can't answer that at this time.

20       Q.    You don't know if you did

21   independent research?

22       A.    I do know we did independent



1  research because we wouldn't have not

2  investigated this.  But outside of what the

3  report states, I'm sure our findings didn't add

4  any more information other than what's stated

5  in the report.

6      Q.   If you had discovered that fozzy.com

7  was hosting pornography, would you not have

8  included that in your report?

9      A.   Can you repeat the question.

10     Q.   If you had discovered that fozzy.com

11 was hosting pornography, would you not have

12 included that in your report?

13     A.    If we discovered that fozzy.com was

14 hosting pornography, would we have included it

15 in the report?

16          Yes.

17          (Exhibit 16 marked for

18 identification.)

19     Q.   So you are being shown an article

20 from McClatchy D.C. Bureau.  This is the

21 article that you reference in your report about

22 fozzy.com, correct?



1      A.     Correct.

2      Q.     If you turn to the last page of that

3   article, the third paragraph on the page says:

4   "XBT has been on a buying spree in recent

5   years, accumulating companies in the

6   web-hosting and related fields, including

7   DDoS.com, 1-800-Hosting, SecureVPN.com,

8   ColocateUSA, Server.lu in Luxembourg,

9   Singapore's 8 to Infinity, and a site used

10  heavily to host pornography, fozzy.com.  It

11  acquired Webzilla about a decade ago, which is

12  a medium-sized web-hosting company."

13          Did I read that correctly?

14     A.     You did.

15     Q.     So as a starting point, the article

16  says that XBT acquired a site that allegedly

17  used to heavily host pornography?

18          MS. BOLGER:  No.  Objection.  That's

19  not what it says.

20          MR. FRAY-WITZER:  I'm sorry.

21          Used heavily to --

22          MS. BOLGER:  That's a big



1  difference.

2  BY MR. FRAY-WITZER:

3       Q.    Sorry.  Let's try that again.

4             They acquired a company that was

5  allegedly used heavily to host pornography,

6  correct?

7       A.    The article states that they've been

8  on a buying spree and in that buying spree they

9  acquired or purchased a site used heavily to

10 host --

11            -- to host pornography, fozzy.com.

12      Q.    Do you know if after the purchase of

13 fozzy.com that site continued to host

14 pornography?

15      A.    Um, I couldn't say at this time.

16      Q.    Based open your experience are there

17 any major hosting companies in the world that

18 don't host some pornography?

19            MS. BOLGER:  If you know the answer

20 to that big old question, you can give it.

21            THE WITNESS:  I mean -- -

22            What is the question again?



1          MR. FRAY-WITZER:  Could you read it

2    back, please.

3          (Court Reporter read back.)

4          THE WITNESS:  I couldn't answer that

5    question.  I'm sorry.

6    BY MR. FRAY-WITZER:

7      Q.    The article that you cited continues

8    by saying:  "Although Webzilla operates from

9    Texas, it has a "pretty deep Russian client

10   base," analyst Carl Brooks of 451 Research, a

11   Boston-based consultancy, said in a December

12   interview.  'They don't have a bad reputation,

13   by any means.'  He said the same went for XBT

14   Holdings:  'To the best of my knowledge, XBT is

15   not particularly nefarious'."

16          Did I read that correctly?

17     A.    You read the McClatchy article

18   correctly.

19     Q.    You didn't think to include those

20   portions of the McClatchy article in your

21   expert report, did you?

22     A.    I did not because I believe it to be



1    contradictory to the substantial evidence that

2    we were able to collect and indicates that XBT

3    infrastructure was indeed utilized to conduct

4    multiple significant malicious cyber

5    activities, some of which at the hands of the

6    Russian Government, and some of which that took

7    place and were brought to the attention of XBT

8    officials and they did nothing about.

9            Let me also be clear that these

10   significant cyber events were probably in most

11   recent history the most significant cyber

12   events to take place on the globe, targeting of

13   the Democratic National Committee, the

14   targeting of the 50 states leading up to the

15   2016 Presidential Election, the targeting and

16   disruption of the Ukrainian power grid in which

17   250 people lost electricity on December 23rd,

18   and other significant events outlined in my

19   expert report.  So with all due respect to Mr.

20   Brooks, I don't think he did the research that

21   we did.

22       Q.    So just to recap, because where we



1   were is:  In your expert report you quoted the

2   McClatchy article for the limited quote of

3   saying that fozzy.com is a site "used to

4   heavily host pornography", but you didn't feel

5   that it was necessary to quote the portions of

6   that article in which people said that XBT does

7   not have a nefarious reputation, correct?

8       A.    For the reasons I just described.

9       Q.    But that's what you did.  You quoted

10  the portion that you wanted to quote, and you

11  left out the other portion, correct?

12          MS. BOLGER:  Objection.

13          THE WITNESS:  Again, for the reasons

14  I just described.

15  BY MR. FRAY-WITZER:

16      Q.    On Page 33 of your expert report you

17  are discussing at the top Webzilla:  "Cited in

18  a March 2016 report submitted to the U.S.

19  Copyright Office Library of Congress regarding

20  music pirating and violations of the DMCA."

21          Correct?

22      A.    Correct.  Digital Millennium



1  Copyright Act.

2      Q.    And you note that:  "In the report,

3  Webzilla is cited as a hosting company refusing

4  to terminate service with their customers,

5  despite receiving thousands of notices of

6  infringement attributable to their subscribers'

7  accounts."

8          Correct?

9      A.    Correct.

10     Q.    Now as a starting point, just to

11  clarify, in this section you're talking about

12  copyright violations that are taking place,

13  allegedly, on Webzilla's infrastructure,

14  correct?

15     A.    Correct.

16     Q.    That same report, the RIAA,

17  complains about Google too, don't they?

18     A.    I don't have the report in front of

19  me, but if you point me to that point I'd be

20  happy to review.

21          (Exhibit 17 marked for

22  identification.)



1          Which page are we looking at, sir?

2     Q.    Why don't we look at Page 18:

3  "Infringements noticed just by RIAA to Google

4  about one rogue service, Mp3Skull, at its

5  various domain addresses."

6          And then they list some 2 million

7  infringements attributable to that one rogue

8  service.

9          MS. BOLGER:  Can I just object.

10  It's a very significant document, and you're

11  attempting to use it to cross examine the

12  plaintiff.

13          -- the witness.  I mean, I'm tempted

14  to almost ask him to read it so he knows what

15  he's talking about, but gosh, we'd be here all

16  day.  But I am telling you that it's very

17  difficult to know exactly what any one

18  58-page -- or whatever it is -- document is

19  saying by one page.  So for the record, I'm

20  just making my objection.

21          Anthony, if you want to take the

22  time to read it, you go right ahead.



1              MR. FRAY-WITZER:  It's cited in his

2       expert report as a document he relied on, and

3       it's cited in his expert report as a document

4       that he is using to say that something about

5       Webzilla.

6              MS. BOLGER:  Webzilla is named in

7       here.  That's the portion he's citing.

8              MR. FRAY-WITZER:  Yes.  So is

9       Google.  So is YouTube.  And my point is --

10             MS. BOLGER:  That's fine.  I just

11      want him to read for context.

12             MR. FRAY-WITZER:  -- the RIAA likes

13      to complain about lots of people.

14             THE WITNESS:  So I'm sorry, Evan,

15      what is your question?

16      BY MR. FRAY-WITZER:

17         Q.    The RIAA complains about Google in

18      this report as well, do they not?

19         A.    They do.

20         Q.    And just generally if you recall

21      from your reading of this document, they

22      complain about a number of other hosts and



1   providers and websites that they do not believe

2   were doing sufficient things to combat

3   copyright abuses, correct?

4       A.    They do.  I think you're comparing

5   apples to oranges though when you put XBT and

6   Google in the same boat.  You know, I'd have to

7   sit down and read this again because it has

8   been some time, but there's a difference

9   between Google and XBT.  Google is a search

10  engine, XBT is a hosting company.  So the

11  copyright material is being hosted and

12  distributed from XBT infrastructure, while

13  Google is just the search engine that is

14  directing people to copyrighted material, which

15  is think is a big difference.  There's hosting

16  and then there's showing you a map of how to

17  get there.

18      Q.    They complain about YouTube.  That's

19  not just a map.  YouTube actually provides --

20          MS. BOLGER:  Where's the YouTube

21  reference?

22          MR. FRAY-WITZER:  If you don't want



1   to take my representation about it, that's

2   fine.

3            MS. BOLGER:  Of course I'll take

4   your representation about it, but I don't know

5   what it says about it.  Tell me what it says

6   about it.

7            THE WITNESS:  Yeah.

8            Sorry.  I'll let you guys talk.

9   BY MR. FRAY-WITZER:

10      Q.    Looking back at Page 33 of your

11   expert report, the next item listed McHost,

12   which you identify as a customer of XBT,

13   correct?

14      A.    Correct.

15      Q.    And you wrote:  "According to

16   TrendLabs Security Intelligence Blog, McHost is

17   a Russian web-hosting company that is

18   purportedly 'very friendly with

19   Russian/Ukrainian cyber criminals' and

20   described as a 'criminal haven for

21   Russian/Ukrainian cyber criminals'."

22            Did you I read that correctly?



1      A.    You did.  You read that correctly.

2      Q.    And then you link or you footnote a

3  link to the blog that you are talking about,

4  correct?

5      A.    Correct.

6      Q.    I'm going to show you that in a

7  moment, but -- and this is a question I'm just

8  curious about -- throughout your report most of

9  the time when you refer to articles they became

10  exhibits to your report.  Why is this not an

11  exhibit to your report?

12      A.    I couldn't say.

13      Q.    Is there any reason why some of the

14  articles that you reference you attach as

15  exhibits and some you don't?

16      A.    I couldn't say at this time.  I

17  mean --

18           (Exhibit 18 marked for

19  identification.)

20      Q.    So you're being shown what's been

21  marked as Exhibit 18.  Can you tell me if you

22  recognize that?

1      A.    This appears to be the blog post

2    cited in my report.

3      Q.    The blog post, which is indeed the

4    one cited in your report, is dated April 26th,

5    2009.  Is that correct?

6      A.    Correct.

7      Q.    It's a 9-year old blog post

8    concerning McHost, correct?

9      A.    Correct.

10     Q.    In 2009 was McHost a customer of

11   XBT?

12     A.    I can't answer that right now.

13     Q.    Did you investigate it?

14     A.    I'm sure we did.

15     Q.    And what did you conclude?

16     A.    As I just stated, I can't answer

17   that right now.

18     Q.    In 2009 McHost was not a customer of

19   XBT.  So how does it possibly reflect on XBT

20   that a customer that they did not have at the

21   time this report was written may have done some

22   bad things?



1        A.     Because it shows a continued pattern

2   of believed --

3               -- entities believed to be

4   facilitating malicious cyber activity at the

5   hands of Russian state actors utilizing XBT

6   infrastructure at one time or another.

7        Q.     So these folks, McHost, allegedly

8   did bad things when they were not a customer of

9   XBT, and you believe that that reflects poorly

10  on XBT?

11       A.     I believe it speaks to the type of

12  clientele that they attract.  And that's

13  exactly the data point that I wish to

14  represent.

15       Q.     Also on Page 33 of your expert

16  report the next entry down is CubeHost,

17  correct?

18       A.     Correct.

19       Q.     Again, listed as a customer of XBT,

20  correct?

21       A.     Correct.

22       Q.     And you say that CubeHost is:



1    "Named in a Krebs on Security article as a

2    dormant site registered to Artem Tveritinov --

3            T-V-E-R-I-T-I-N-O-V.

4            -- CEO of Infocube, an anti-virus

5    information security company that is allegedly

6    a 'minor partner' of Kaspersky labs.  The phone

7    numbers listed in the domain name registration

8    for cubehost.biz are two Chinese phone numbers

9    traced back to other domains seen launching

10   malware.  Tveritinov's company is also accused

11   of spreading malicious software used to steal

12   banking information."

13           Did I read that correctly?

14       A.    You did.

15           (Exhibit 19 marked for

16   identification.)

17       Q.    You're looking at what's been marked

18   as Exhibit No. 19.  And can you tell me if you

19   recognize that article?

20       A.    Yeah.  It's a Krebs on Security

21   article that we used to reference malicious

22   activity and also tie to CubeHost.



1      Q.    If you would turn to the second page

2   of that article, the fourth paragraph down that

3   starts with:  "Going back to".

4      A.    Uh-huh.

5      Q.    The second sentence there reads:

6   "Among the very few domains registered to those

7   Chinese phone numbers that haven't been seen

8   launching malware is a website called

9   cubehost.biz."

10          Did I read that correctly?

11     A.    You did.

12     Q.    So you're citing here a customer of

13  XBT because that website, that customer

14  website, wasn't involved in launching malware.

15     A.    Okay.  Your question?

16          MR. FRAY-WITZER:  Would you read the

17  question back.

18          (Court Reporter read back.)

19          THE WITNESS:  Again, I'm not

20  understanding the question.

21  BY MR. FRAY-WITZER:

22     Q.    How does it reflect poorly on XBT



1  that one of their customers, CubeHost, didn't

2  launch malware?

3      A.    At this time I can't answer that.

4      Q.    The next item down Colo4, LLC, also

5  is a customer of XBT, correct?

6      A.    Correct.

7      Q.    And you say:  "Named in a Krebs on

8  Security article as one of numerous companies

9  with networks 'shown to have been phoning home

10  to some of the same control infrastructure that

11  was used in RSA attack.'  FTI notes that

12  several large companies are on the list,

13  including Motorola, eBay, IBM, Research in

14  Motion, and that not every company on the list

15  may be culpable."

16          Did I read that correctly?

17      A.    You did.

18      Q.    When you say "numerous companies",

19  it was actually 760 companies, correct?

20      A.    I don't have the report right in

21  front of me.

22

1              (Exhibit 20 marked for

2    identification.)

3        Q.    So you're being shown what's been

4    marked as Exhibit No, 20.  This is the Krebs on

5    Security article referenced in your expert

6    report, correct?

7        A.    Correct.

8        Q.    And in the first paragraph of this

9    article it says:  "The subtext of the story was

10   that if this could happen to one of the largest

11   and most integral security firms, what hope was

12   there for organizations that aren't focused on

13   security?."

14             So as a starting point, RSA --

15   that's a security firm.  Is that correct?

16       A.    Correct.

17       Q.    And it was hit with this malware.

18   Is that correct?

19       A.    Correct.

20       Q.    And the article is discussing who

21   else was hit by this malicious activity.  Is

22   that correct?



1      A.      Correct.

2      Q.      And when you say that one of XBT's

3   customers was "one of numerous companies with

4   networks 'shown to have been phoning home'",

5   it's 760 other organizations, correct?

6           MS. BOLGER:  I object to the form of

7   the question.

8           THE WITNESS:  So I guess --

9           What is your question?

10  BY MR. FRAY-WITZER:

11     Q.      First page, second paragraph:  "The

12  information suggests that more than 760 other

13  organizations had networks that were

14  compromised."

15          Do you see that?

16     A.      I actually don't.

17     Q.      First page, second paragraph.

18          MS. BOLGER:  It's in italics next to

19  the image.

20          THE WITNESS:  "The information

21  suggests that more than 760 other organizations

22  had networks that were compromised with some of



1  the same resources used to hit RSA."

2  BY MR. FRAY-WITZER:

3      Q.    So when you say "numerous companies"

4  were hit by this, 760 of them, right?

5          MS. BOLGER:  That's not what it

6  says.

7          I object to the form of the

8  question.  I think you're comparing apples to

9  oranges, but I may just be confused.

10         THE WITNESS:  So this is included in

11  the report because, again, this is a single

12  data point viewed in a larger collection of

13  data points.  And what this is articulating is

14  that Colo4, LLC, a customer of XBT -- therefore

15  on XBT's infrastructure -- has been observed to

16  be communicating with some of the same

17  infrastructure used in the RSA attack.

18  BY MR. FRAY-WITZER:

19     Q.    As well as 760 other organizations,

20  correct?

21     A.    760 --

22         MS. BOLGER:  Object.  I don't



1   understand.  I object to that question.

2            You can answer.

3            THE WITNESS:  It was 760 total, so I

4   would --

5            MR. FRAY-WITZER:  759 other

6   companies.

7            THE WITNESS:  -- politely correct

8   you and say 759 other companies.

9            But as I've stated earlier in my

10  testimony, those 759 other companies were not

11  the scope of my investigation, nor do they show

12  a pattern like XBT does of continual

13  significant malicious cyber activity.

14  BY MR. FRAY-WITZER:

15      Q.   Well, you don't know that, do you?

16  Did you investigate the other 759 companies so

17  that you can say that they don't exhibit a

18  pattern?

19      A.   Like I said, I preface that

20  statement with they were not the scope of my

21  investigation.

22      Q.   But then if I'm correct, you



1  concluded by saying these other companies did

2  not demonstrate a pattern of activity like XBT.

3  You don't know that.

4        A.    I prefaced that statement with:

5  They were not the scope of my investigation.

6              XBT was, and XBT does demonstrate a

7  continual pattern of malicious cyber activity.

8        Q.    Do you know if these other 759

9  companies have other instances of malicious

10 cyber activity on their networks?

11       A.    They were not the scope of my

12 investigation.

13       Q.    So you don't know?

14       A.    They were not the scope of my

15 investigation.

16       Q.    Even if they're not the scope of

17 your investigation, you might know.  So I'm

18 just asking for a "yes" or "no" as to whether

19 or not you know if these other 759 companies

20 have also had a -- as you put it -- pattern of

21 malicious cyber activity on their

22 infrastructures?



1    A.    I couldn't answer that.  As a cyber

2  security professional and someone who is

3  currently under oath, I couldn't answer that.

4    Q.    Because you don't know whether or

5  not they have been the subject of that kind of

6  activity?

7    A.    Because they were not the scope of

8  my investigation.  1you're asking me to opine

9  on something that I have not investigated.

10    Q.    I'm simply asking you to confirm

11  that you can't know one way or another.  You

12  don't know one way --

13         MS. BOLGER:  Asked and answered

14  about ten times.

15         MR. FRAY-WITZER:  Hasn't been

16  answered once yet.  I just want the answer.

17         THE WITNESS:  Because I haven't

18  investigated it.  I haven't investigated the

19  other 759 entities.

20  BY MR. FRAY-WITZER:

21    Q.    And so you don't know one way or

22  another?



1          MS. BOLGER:  Asked and answered,

2    Evan.

3          MR. FRAY-WITZER:  It's a "yes" or

4    "no" question.

5          MS. BOLGER:  No.  You think it's a

6    "yes" or "no" question.

7          MR. FRAY-WITZER:  That's true.

8          MS. BOLGER:  That does not make it

9    so.

10          You can answer again.

11          THE WITNESS:  They were not the

12    scope of my investigation.

13    BY MR. FRAY-WITZER:

14     Q.    From your general experience do you

15    know if these 759 other companies --

16          Putting aside the investigation,

17    from your experience as a cyber security

18    expert, do you know one way or another if these

19    759 other companies have -- as you've put it --

20    a pattern of malicious activity occurring on

21    their networks?

22          MS. BOLGER:  You can answer the



1    question, but I have to take a break.

2              THE WITNESS:  Again, they were not

3    the scope of my investigation, so I'm unable to

4    answer that question.

5              MS. BOLGER:  I have to take a break,

6    John.

7              (Recess taken at 3:12 p.m.)

8              (Deposition resumed at 3:21 p.m.)

9    BY MR. FRAY-WITZER:

10       Q.    I know you're hoping I've forgotten

11   this line of questioning, but I'm going to try

12   one more time.

13       A.    No.  I think we mean the same thing.

14       Q.    I think we do too.

15              I'm just asking, even aside from

16   your investigation in this matter, do you have

17   any reason to believe that the other 759

18   companies listed have been or have not been

19   subject to persistent malicious activity on

20   their networks?

21              MS. BOLGER:  Objection.  That's not

22   what the article says, but okay.



1              THE WITNESS:  I just don't know.

2    BY MR. FRAY-WITZER:

3       Q.    Okay.  You say in your expert report

4    that several large companies are on the list.

5    According to the Krebs report approximately

6    20 percent of the current Fortune 100 companies

7    are on the list.  Is that correct?

8              Same first page, same second

9    paragraph.

10             MS. BOLGER:  I'm going to object

11   again.  I think you're comparing apples to

12   oranges.  I don't think that the article says

13   what you say it says, and I don't want the

14   record to reflect that Mr. Ferrante is

15   ratifying it because I don't think --

16             I think you guys are talking past

17   each other.

18             THE WITNESS:  What is your question?

19   BY MR. FRAY-WITZER:

20      Q.    Your report says:  FTI notes that

21   several large companies are on the list.

22             I'm saying the Krebs article says:



1  "Almost 20 percent of the current Fortune 100

2  companies are on this list."

3          Correct?

4      A.    That's what the report states.  Yes.

5      Q.    Okay.  If you go back one page on

6  your expert report to Page 32, at the bottom

7  you're talking about Webzilla, and you say:

8  "Cited by Dutch reporter Karen Spaink in

9  February 2008 as hosting child pornography."

10          So first of all, just to clarify,

11  we're talking about something from 10 years

12  ago, correct?

13      A.    February 2008 is the date.

14      Q.    10 years ago?

15      A.    Approximately.

16      Q.    Yes.  Who is Karen Spaink?

17      A.    As indicated in the report, she is a

18  Dutch reporter.

19      Q.    She's primarily a blogger.  Isn't

20  that true?

21      A.    I have no --

22          I have no authority to categorize



1   what sort of journalist she is.

2       Q.    Do you have any knowledge about the

3   truth or falsity of what Karen Spaink was

4   writing about?

5           MS. BOLGER:  Offer it for its truth.

6   Read the report.

7           THE WITNESS:  I wouldn't --

8           I would refer you to the report.

9   The report is, as I've said earlier in my

10  testimony, another data point of many data

11  points that indicate links from XBT

12  infrastructure to the alleged activities cited

13  in the Steele dossier.

14  BY MR. FRAY-WITZER:

15      Q.    If it's completely untrue it doesn't

16  provide any data point, does it?

17          MS. BOLGER:  I object to that

18  actually.  You brought a lawsuit --

19          No.  You brought a lawsuit about

20  defamation.  You're asking the witness to make

21  legal conclusions about relevance, and he's not

22  in a position to do that.  You can ask his

1   expert opinion, but you can't ask him what's

2   relevant.

3           MR. FRAY-WITZER:  He just testified

4   that something was a data point.  And I get to

5   ask:  If it's a data point, if it's completely

6   untrue.

7           His, words his report.

8           MS. BOLGER:  And you actually --

9           He cannot make legal conclusions.

10  He is not here to assess what's relevant or not

11  relevant to this.  He's allowed to have an

12  opinion about what's relevant to his expert

13  report.

14          MR. FRAY-WITZER:  That's all I'm

15  talking about.  He said in his expert report

16  and in his expert opinion that this is a data

17  point.

18          MS. BOLGER:  In a subject titled

19  Public Reputation Related to Malicious Cyber

20  Activity.  That's where he put the data point.

21          MR. FRAY-WITZER:  Please do not

22  coach the witness.  You can say "objection",



1  you can instruct him not to answer, but please

2  do not coach the witness.

3          MS. BOLGER:  You brought a lawsuit

4  for defamation which seeks information about

5  reputation, and I think you're spinning things

6  around.

7          MR. FRAY-WITZER:  I am asking about

8  the report and about the witness' testimony,

9  which is what I'm permitted to do.  And I'd ask

10  you again -- because you know that what we're

11  supposed to say is "objection", "objection to

12  form", "you can answer", "you can't answer",

13  but not coaching the witness.

14          MS. BOLGER:  Well, you know you're

15  not supposed to ask the witness to make legal

16  conclusions.

17          MR. FRAY-WITZER:  I'm not asking for

18  a legal conclusion.

19          MS. BOLGER:  You can answer the

20  question, Anthony.

21  BY MR. FRAY-WITZER:

22      Q.    You have just said that this item is



1  a data point in your conclusions about XBT.  If

2  the information --

3      A.    I actually didn't say that.

4      Q.    Okay.

5      A.    I said this is a data point in many

6  data points.

7      Q.    But it is one data point?

8      A.    It is one.  That is why it is in my

9  expert report, because it is one data point of

10  many data points.

11      Q.    And if the information contained in

12  that article was completely untrue, would it

13  still be a data point amongst data points?

14          MS. BOLGER:  Related to what?

15          THE WITNESS:  I had no basis to make

16  that --

17          I can't answer that question.

18  BY MR. FRAY-WITZER:

19      Q.    You've just said that this

20  information is a data point amongst data

21  points, right?

22      A.    Correct.  Available on the public



1   internet that I observed through basic open

2   source research.

3        Q.    Do you believe that everything on

4   the internet is true?

5        A.    Of course not.

6        Q.    Okay.  If this is --

7              If this information is untrue, does

8   it provide a relevant data point for your

9   analysis?

10             MS. BOLGER:  Again, you're asking

11  about relevance.  He's not here to talk about

12  relevance.

13             MR. FRAY-WITZER:  I'm asking about

14  his analysis.

15             THE WITNESS:  What is the question?

16             MR. FRAY-WITZER:  Could you read it

17  back, please.

18             (Court Reporter read back.)

19             MS. BOLGER:  And I object.

20             THE WITNESS:  This material was

21  included in as a data point amongst many data

22  points.  Whether or not it is true, I can't



1   determine that.  If you're telling me it's not

2   true, I welcome that information.  But at this

3   point in time I have no reason to believe it's

4   not true.

5   BY MR. FRAY-WITZER:

6       Q.    Do you have any reason to believe it

7   is true?

8       A.    Other than that it was reported in

9   the Dutch media, no.

10      Q.    We can agree though that not

11  everything reported in the media is true,

12  correct?

13      A.    Are you asking for my expert opinion

14  or my personal opinion?

15      Q.    Do those two diverge on that

16  question?

17      A.    I'm not here to provide my expert

18  opinion on what is published in the media.  I'm

19  here to provide my expert report on the scope

20  of my investigation.  And I assure you that

21  everything, all data points in this report,

22  were investigated and utilized as data points



1   to demonstrate significant evidence.

2       Q.    What investigation did FTI do to

3   determine the truth or falsity of the

4   allegations in this Dutch report?

5       A.    I can't answer that right now.

6       Q.    Did FTI do any investigation to

7   determine whether or not any XBT infrastructure

8   is used to host child pornography?

9           MS. BOLGER:  Within the scope of the

10  expert report.

11          THE WITNESS:  Um, going back to the

12  statement in the dossier, the scope of our

13  investigation was to investigate XBT/Webzilla,

14  and its affiliates, collect evidence that it

15  had been using botnets and porn traffic to

16  transmit viruses, plant bugs, steal data and

17  conduct altering operations against Democratic

18  Party leadership.

19          MR. FRAY-WITZER:  That --

20          THE WITNESS:  So that was --

21          MR. FRAY-WITZER:  -- has nothing to

22  do with the question I've asked.



1                    THE WITNESS:  I know.  So let me

2     finish.

3                    So that was the scope of my

4     investigation, and we viewed this as a data

5     point because it involved pornography.  An

6     allegation that pornography was hosted.

7     BY MR. FRAY-WITZER:

8          Q.    I'll ask the question again.

9                    Did FTI conduct any investigation

10    into whether or not any XBT infrastructure has

11    been used to host child pornography?

12         A.    We investigated whether or not XBT

13    infrastructure had been linked to pornography.

14    We did not specifically or exclusively look for

15    child pornography.  We looked for all

16    pornography and references to hosting

17    pornography.  Again, this is one data point

18    that indicated that they had been.

19         Q.    But only if it's true.  It's not a

20    data point if it's not true.

21                    MS. BOLGER:  I object to the

22    question.



1   BY MR. FRAY-WITZER:

2       Q.    Did FTI try to contact Karen Spaink?

3       A.    We did not.

4       Q.    Did FTI investigate independently

5   the allegations made in the article?

6       A.    Yes.  I just stated that we did.

7   Because it was the scope of the investigation

8   we investigated XBT, its infrastructure, its

9   affiliates, and collected evidence that it had

10  been using botnets and porn traffic to transmit

11  viruses, plant bugs and steal data.

12      Q.    Did you investigate whether or not

13  there were Danish websites on the national

14  police force's blacklist that were hosted on

15  Webzilla?

16          MS. BOLGER:  I'm sorry.  I actually

17  did not hear a word you just said.  Can you

18  keep your voice up, Evan.

19          MR. FRAY-WITZER:  Would you mind

20  reading it back.

21          (Court Reporter read back.)

22          MS. BOLGER:  Okay.  That's what I

1   thought I heard it.  There's no Danish websites

2   anywhere in this report.

3          Dutch.

4          MR. FRAY-WITZER:  Dutch.

5          Did I say Danish?

6          MS. BOLGER:  You said Danish.

7          MR. FRAY-WITZER:  Dutch websites.

8          THE WITNESS:  Is there a question?

9          MR. FRAY-WITZER:  Yes.

10         THE WITNESS:  Oh, I'm sorry.

11  BY MR. FRAY-WITZER:

12     Q.    Did you independently investigate

13  whether or not Dutch websites on the national

14  police force's blacklist hosted child

15  pornography --

16         Sorry.  Let me try that again.

17  Third time's a charm.

18         Did you independently investigate

19  whether or not Dutch websites on the national

20  police force's blacklist were hosted by

21  Webzilla?

22     A.    If that information was provided to



1  us, yes, we absolutely investigated them.

2      Q.    Well, that's the information in the

3  article that you're referencing.  And I want to

4  know if you've independently researched the

5  allegations in that article?

6      A.    Of course.  It's the scope of our

7  investigation.  And if it was cited in this

8  article, we were absolutely going to work to

9  corroborate it.

10          MS. BOLGER:  I'm sorry.  I need to

11  take one more break.

12          MR. FRAY-WITZER:  Absolutely.

13          MS. BOLGER:  Did you ask a question?

14          Let me just take a break.

15          (Recess taken at 3:36 p.m.)

16          (Deposition resumed at 3:38 p.m.)

17          THE WITNESS:  Your question, sir?

18          MR. FRAY-WITZER:  Actually, so that

19  I don't misrepresent it, would you read back

20  the last answer, please.

21          (Court Reporter read back.)

22  BY MR. FRAY-WITZER:



1      Q.    What steps did FTI take to

2   corroborate the information contained in that

3   Dutch article?

4      A.    We looked for additional open source

5   material on the allegation.

6      Q.    If you had found information that

7   corroborated those allegations, you would have

8   included that in your expert report, correct?

9      A.    If we found additional information

10  stating this, yes, we would have included it.

11  We believe --

12            I mean, I believe that this

13  information speaks to reputation.  This is what

14  is publicly available on the web about XBT, and

15  that's why we included it in the report.

16            (Exhibit 21 marked for

17  identification.)

18            MS. BOLGER:  My record is 101

19  exhibits in a day.  You going to make it Evan?

20            MR. FRAY-WITZER:  I'm not going to

21  make it.  Not even close.

22  BY MR. FRAY-WITZER:



1      Q.    So I'm showing you what's been

2   marked as Exhibits No. 21, an article from

3   pjmedia.com entitled Claim:  Firm Hired by

4   BuzzFeed to Verify Steele Dossier Has Checkered

5   Past in Venezuela.  And if you turn to the

6   second page at the bottom, it reads:  "Boyd

7   told PJ Media that FTI has worked for some of

8   the 'worst scum of Venezuela.  We're talking

9   kingpins, thugs behind assassination attempts,

10  and corruption of billions of dollars.'"

11        Does that really speak to FTI's

12  reputation because it was printed on the

13  internet?

14      A.    I think this is different.  I

15  mean --

16      Q.    Is this a data point that would

17  point us towards FTI's reputation?

18        MS. BOLGER:  In his expert opinion

19  here to testify about subject matters set forth

20  in his report?

21        MR. FRAY-WITZER:  He's an expert

22  witness.  He can testify as to --



1             MS. BOLGER:  Well, he's here as an

2    expert, so in your expert opinion, Anthony, as

3    the person who wrote that dossier, do you have

4    any evidence that this is relevant?

5             MR. FRAY-WITZER:  As an investigator

6    who has determines what he believes to be

7    relevant data points, would this be a relevant

8    data point in an investigation?

9             MS. BOLGER:  It's not relevant to

10   his conclusions.

11            You can answer it, Anthony.

12            THE WITNESS:  I'm not sure I'm

13   following your question.

14   BY MR. FRAY-WITZER:

15      Q.    Would this be --

16            As an expert investigator, as you've

17   said you are, would this be a relevant data

18   point if we were trying to determine FTI's

19   reputation?

20            MS. BOLGER:  Is it relevant to the

21   technological investigation as to whether XBT

22   infrastructure was used to interfere with the



1  Democratic leadership?  Is that the question?

2  That's what he's an expert on.

3          MR. FRAY-WITZER:  Do you mean

4  "objection"?

5          MS. BOLGER:  He's not an expert on

6  what you think someone's reputation on the

7  media is.  But yes, it means objection.

8          MR. GURVITS:  How about if we stick

9  to objections instead of talking it out.

10          MS. BOLGER:  You do, your thing I'll

11  do mine.

12          THE WITNESS:  The question is:  Is

13  this a data point?

14  BY MR. FRAY-WITZER:

15     Q.    Yeah.  Do you think that's a data

16  point?

17     A.    I do think this is a data point.

18          (Exhibit 22 marked for

19  identification.)

20     Q.    And this article that alleges that

21  FTI is attempting to undermine the Venezuelan

22  Government --



```
1              MS. BOLGER:  Where is this one from?
2    BY MR. FRAY-WITZER:
3       Q.    Is that a data point as well?
4              MS. BOLGER:  Actually, I would like
5    to know:  Where did you get this?
6              It doesn't have a URL, it doesn't
7    have any --
8              There's no way for us to know where
9    this was published.  So if you're going to ask
10   him a question, you've got to tell him.
11             MR. FRAY-WITZER:  From RT.
12             MS. BOLGER:  From RT?  Okay.  Just
13   making sure I asked.
14             MR. FRAY-WITZER:  Slightly more
15   reputable than the Dutch blogger.
16             MS. BOLGER:  And PJ Media.
17             MR. FRAY-WITZER:  And PJ Media.
18   BY MR. FRAY-WITZER:
19      Q.    If this is really a data point, do
20   you believe it?
21             MS. BOLGER:  Is it a data point?
22             MR. FRAY-WITZER:  Yeah.
```



1   BY MR. FRAY-WITZER:

2       Q.    Do you believe this to be a data

3   point about FTI's reputation?

4              MS. BOLGER:  Of course.

5              MR. GURVITS:  Can I just on record,

6   Kate, ask you not to answer the question for

7   the witness.  I know you think it's a data

8   point, but we'd really like to hear the

9   witness' position on this.

10             MS. BOLGER:  Sure thing.

11             THE WITNESS:  So what is the

12  question?

13  BY MR. FRAY-WITZER:

14      Q.    Do you think that this is a data

15  point about FTI's reputation?

16      A.    I'd have to read the article to know

17  exactly what the data point would be on, but

18  this is --

19             -- of course it's a data point.

20  It's an informational piece.  I don't know what

21  it says, so I can't state what it's a data

22  point about.

1              (Exhibit 23 marked for

2    identification.)

3         Q.    Number 23.  Turn to Page 3.

4              "The head of FTI Consulting's Latin

5    American office, Frank Holder, is a man with a

6    checkered past.  Holder, a former CIA

7    operative, has been involved in all manner of

8    scandals, from Argentina all the way to

9    Venezuela.  He stands accused of stealing

10   information, of extortion, of faking due

11   diligence reports, of lying, of vilifying his

12   clients perceived enemies, of stealing clients

13   funds, and of forging documents."

14             Do you think this is a data point

15   concerning FTI's reputation?

16             MS. BOLGER:  I have no idea where

17   you're looking.

18             Oh, here it is.

19             THE WITNESS:  For the record, I

20   don't understand what Mr. Holder has to do with

21   this investigation.  But as I've said in the

22   previous two pieces, this is an informational



1    data piece.

2              Informational data point.

3    BY MR. FRAY-WITZER:

4        Q.    If you turn to Page 33 of your

5    expert report, you talk about FTI reviewing

6    Host Exploit's:  "Top-50 Bad Hosts and

7    Networks" reports published between

8    December 2010 and March 2014 that rank

9    web-hosting companies by concentration of

10   malicious activity.

11             Do you see that?

12       A.    I do.

13       Q.    I'm going to ask you to look at a

14   number of those reports.  The questions will be

15   similar with respect to all of them.

16             (Exhibit 24 marked for

17   identification.)

18             MS. BOLGER:  What are we on?

19             MR. FRAY-WITZER:  24.

20   BY MR. FRAY-WITZER:

21       Q.    If you turn to Page 6 of the report,

22   Webzilla is listed at No. 29 in this report.



1    Is that correct?

2        A.    Correct.  I see that.

3        Q.    That's what you're referring to in

4    your report, correct?

5        A.    Uh-huh.

6        Q.    I'm sorry it has to be a "yes" or

7    "no"?

8        A.    I'm sorry.  Yes, correct.

9        Q.    And No. 10 is GoDaddy.com, correct?

10       A.    Yes.

11       Q.    And No. 7 is CloudFlare, correct?

12       A.    Correct.

13       Q.    At No. 38 is Google, correct?

14       A.    Correct.

15       Q.    These are all listed as Top-50 bad

16   hosts and networks, correct?

17       A.    The report states it is the ranking

18   of the highest observed concentrations of

19   malicious activity.

20       Q.    And I think as your report

21   categorizes it, this is Host Exploit's listing

22   of bad hosts and networks, right?



1      A.     Correct.  Again, this is an industry

2  product, a cyber security industry product in

3  which the industry evaluates various providers

4  and ranks them based on reputation.

5            (Exhibit 25 marked for

6  identification.)

7      Q.     Exhibit 25.  This is the

8  September 2013 report, again on Page 6.  I

9  don't see -- maybe I'm missing it.  I'm sure

10  someone will tell me if I am -- I don't see

11  Webzilla or any XBT companies listed on this

12  list of 50, do you?

13      A.     I mean, I'm not looking.  I also

14  note that I don't see it in my expert report.

15      Q.     You skipped this one.  Is that

16  correct?

17      A.     I skipped it?

18      Q.     You didn't include this one in your

19  report.

20      A.     It's because it didn't speak to the

21  reputation of XBT.

22      Q.     No. 10 is Confluence Networks.  Is



1  that correct?

2      A.    Okay.

3      Q.    Is that correct?

4      A.    That's what it states.

5      Q.    No. 18 is GoDaddy, correct?

6      A.    Correct.

7      Q.    No. 42 is Google again, correct?

8      A.    Correct.

9            (Exhibit 26 marked for

10  identification.)

11      Q.    This is the March 2013 report.  I do

12  not see any XBT companies listed, do you?

13      A.    I mean, I'm just looking now.  I

14  don't see any at the moment.

15      Q.    GoDaddy is again listed at No. 27

16  here, correct?

17      A.    Correct, it is.

18      Q.    SoftLayer at 17?

19      A.    Sure.

20      Q.    Confluence at 7?

21      A.    Sure.

22            I would add that these reports are



1  based on concentration of activity.

2  Concentration of malicious activity.  It

3  doesn't state the significance of the activity.

4  I think that's a big differentiation when

5  you're comparing volume to impact and

6  significance of the activity, which is a big

7  difference.

8       Q.    You cite these reports --

9       A.    Yes.

10      Q.    -- in your expert report.

11      A.    I don't cite the previous two.  You

12  bring them in as exhibits.  I cite reports

13  which speak to Webzilla's reputation, which the

14  reports that I cite reference Webzilla in a

15  negative light based on them being on these

16  reports.

17      Q.    And also cited in a negative light

18  is GoDaddy and SoftLayer and Google.  Is that

19  correct?

20      A.    Yes.

21      Q.    Okay.

22



1              (Exhibit 27 marked for

2    identification.)

3              This time we're on Page 9.  This is

4    the Quarter 3, 2012 report.

5         A.    May I ask if this report was

6    referenced in my expert report?

7              I'm looking at Quarter 3.

8              It's not.

9         Q.    SoftLayer is listed at 17.  Is that

10   correct?

11        A.    Correct.

12        Q.    And Google is listed at 31.  Is that

13   correct?

14        A.    Correct.

15        Q.    And at 47 is Amazon?

16        A.    Correct.

17              Let me just state for the record

18   that I don't find this to be unusual.

19   Organizations like that, the volume of traffic

20   that they see in their network, it's expected

21   that just the nature of malicious cyber

22   activity that it will traverse other networks.



1   So it doesn't surprise me.  But again, back to

2   what I had stated earlier, that I think we're

3   not comparing the same types of activity.

4   These reports are comparing volume, when the

5   scope of my investigation was to find evidence

6   of malicious activity linked to XBT

7   infrastructure.

8           MR. FRAY-WITZER:  I will always let

9   you talk as long as you'd like.  I'll just

10  point out that I didn't actually have a

11  question, and I could probably get through the

12  remainder of these documents relatively quickly

13  if you're answering the questions that I'm

14  asking.  But I will give you the freedom to

15  determine on your own if you would like to add.

16          MS. BOLGER:  I on the other hand

17  will tell you to wait until there's a pending

18  question.

19          (Laughing.)

20          (Exhibit 28 marked for

21  identification.)

22      Q.    This is the 4th Quarter 2010 report.



1  We're back to Page 6.

2       A.    Yes, sir.

3       Q.    At No. 17 is LimestoneNetworks,

4  correct?

5       A.    Correct.

6       Q.    At 27 is SoftLayer, correct?

7       A.    Correct.

8       Q.    And at 28 is Google, correct?

9       A.    Correct.

10      Q.    And at 37 is GoDaddy, correct?

11      A.    Correct.

12            (Exhibit 29 marked for

13  identification.)

14            MS. BOLGER:  I'll just note for the

15  document, that all of these reports have many,

16  many pages.  To the extent that you're asking

17  the witness to make conclusions about all the

18  pages in the document I would ask him to take a

19  look.  I don't think you're doing that at the

20  moment.  I'm just suggesting that if you looked

21  at Page 15 of the last report, you would have

22  found WZ Communications as the leading botnet

1   command and control servers.  So all of these

2   documents are a little bit more complicated,

3   but the documents speak for themselves.

4           MR. FRAY-WITZER:  As does the

5   reports, and there's no question in front of

6   the witness.

7   BY MR. FRAY-WITZER:

8       Q.    So, on Page 7 of this report --

9       A.    Well, I just want to state for the

10  record that this report is referenced in my

11  expert report, and so I am reading as quickly

12  as possible to find the reference.

13          MS. BOLGER:  Page 15.

14          THE WITNESS:  Yes.  On Page 15,

15  Section 9.3, Botnet C&C Servers, WZ

16  Communications is ranked --

17          -- is one of the worst ten hosts for

18  command and control servers.

19          MS. BOLGER:  Do you have a copy of

20  29?

21          MR. FRAY-WITZER:  The one that --

22          Did I not give it to you?  Sorry.



1          MS. BOLGER:  I'm not taking it

2    personally.

3    BY MR. FRAY-WITZER:

4          Q.    The 1st Quarter 2011 report.

5          A.    Uh-huh.

6          Q.    Page 7.

7          A.    Uh-huh.

8          Q.    Again, in the listing of the Top-50,

9    No. 21 is LimestoneNetworks, correct?

10         A.    I see that.  Correct.

11         Q.    And 40 is SoftLayer, correct?

12         A.    Yes, I see that.  Correct.

13         Q.    41 is GoDaddy?

14         A.    I see that.  Correct.

15         Q.    And 47 is Google, correct?

16         A.    I see that.  Correct.

17               Um, I do want to continue reading.

18   Because this report is referenced in my expert

19   report.  And Section 9, Bad Hosts by topic,

20   Section 9.1.1 Botnet Command and Control

21   Servers, WZ Communications is listed.  And

22   again, it's listed as the worst ten hosts for



1   command and control servers.

2       Q.    I think you testified that certain

3   of these reports that I've showed you which are

4   not included in your expert report, you did not

5   include in your expert report because you did

6   not think that those reports spoke to XBT's

7   reputation.  Did I -- is that correct?

8            MS. BOLGER:  I think that --

9            I'll object as misstating testimony,

10  but I'm sure Anthony can fix that.

11           THE WITNESS:  Okay.  I'm going to

12  ask if we can repeat the question or have it

13  read back to me.

14           MR. FRAY-WITZER:  Why don't I break

15  it down a little bit.

16           THE WITNESS:  Okay.

17  BY MR. FRAY-WITZER:

18      Q.    There were some reports where XBT

19  entities were not mentioned, correct?

20      A.    Correct.

21      Q.    And those reports were not included

22  in your expert report, correct?



1     A.    Correct.

2     Q.    And I believe you testified that

3   they were not included in your expert report

4   because they weren't relevant to XBT's

5   reputation.

6           MS. BOLGER:  Object.  I think that

7   misstates testimony, but that's fine.

8           THE WITNESS:  I don't know if I said

9   exactly that, but they were not included in my

10  expert report because they did not speak to the

11  negative aspects to XBT's reputation.

12  BY MR. FRAY-WITZER:

13    Q.    So Host Exploit issues these

14  reports, it looks like almost quarterly,

15  correct?

16    A.    I don't know when they issue them.

17  They're based on year and quarter.

18    Q.    And the reports that you chose to

19  include in your expert report are those that

20  spoke to -- and I think this is what you just

21  said -- XBT's bad reputation.

22    A.    Correct.



1    Q.    So anything that omitted XBT would

2  speak to XBT not having a bad reputation.

3          MS. BOLGER:  I object to the form.

4          THE WITNESS:  I don't agree with

5  that statement.

6  BY MR. FRAY-WITZER:

7    Q.    Why not include all of the reports

8  from Host Exploit?

9    A.    Because --

10         MS. BOLGER:  Evan, I note for the

11  record that the report actually does say that

12  they reviewed all reports.  And so I think

13  you're mischaracterizing what the report says.

14         MR. GURVITS:  Counsel, please stop

15  coaching the witness and just object.

16         MS. BOLGER:  I'm actually not

17  coaching.  I'm actually telling you I think

18  your question misstates the document.  I don't

19  think you should be misstating the expert

20  report that you're asking about.

21         MR. GURVITS:  That's an objection.

22  BY MR. FRAY-WITZER:



1    Q.    Included in your expert report, if

2  you look at Page 34:  "The following negative

3  information was developed for Webzilla and WZ

4  Communications."

5         And then you list certain years and

6  certain quarters of reports, correct?

7    A.    Correct.

8    Q.    And you don't list out all of the

9  times that XBT was not included in these

10 reports, correct?

11   A.    Correct.

12         (Exhibit 30 marked for

13 identification.)

14   Q.    This is the 2d Quarter 2011.

15         Page 8.  WZ Communications is listed

16 at 31, correct?

17   A.    Correct.

18   Q.    At 25 is LimestoneNetworks?

19   A.    Correct.

20   Q.    At 28 is GoDaddy?

21   A.    Correct.

22   Q.    At 30 is SoftLayer?



1        A.    Correct.

2        Q.    And at 35 is Google, correct?

3        A.    Correct.

4              (Exhibit 31 marked for

5    identification.)

6        Q.    This is the 3rd Quarter 2011 report.

7              On Page 9.  WZ Communications is at

8    26, correct?

9        A.    Correct.

10       Q.    Goggle is at 30, correct?

11       A.    Correct.

12       Q.    SoftLayer is at 12, correct?

13       A.    Correct.

14             MR. FRAY-WITZER:  Let's take a

15   5-minute break.

16             MS. BOLGER:  Sure.

17             (Recess taken at 4:07 p.m.)

18             (Deposition resumed at 4:11 p.m.)

19             MR. FRAY-WITZER:  This is going to

20   be very disappointing to you.  We are going to

21   suspend at this point based on the instructions

22   not to answer about Fusion GPS and the



1  conversations with Fusion GPS.  We will decide

2  what we're going to do with respect to that,

3  but we will suspend at this time.

4          MS. BOLGER:  That's fine.  I will

5  tell you for the record, we do have a joint

6  defense agreement with them.  I cannot violate

7  a joint defense agreement without permission of

8  the other half of the joint defense agreement

9  even if I wanted to, right?  So we have a joint

10 defense agreement.

11         MR. FRAY-WITZER:  Okay.  Thank you

12 very much.

13         MS. BOLGER:  We're done.

14         Read and sign.

15         MR. FRAY-WITZER:  Regular.

16         MS. BOLGER:  Copy.

17         (Deposition concluded at 4:16 p.m.)

18

19

20

21

22



1           DEPOSITION ERRATA SHEET

2    Our Assignment No. J2466840

3    Case Caption:

4    Aleksej Gubarov

5    vs.

6    BuzzFeed

7

8        DECLARATION UNDER PENALTY OF PERJURY

9      I declare under penalty of perjury that I

10   have read the entire transcript of my

11   Deposition taken in the captioned matter or the

12   same has been read to me, and the same is true

13   and accurate, save and except for changes

14   and/or corrections, if any, as indicated by me

15   on the DEPOSITION ERRATA SHEET hereof, with the

16   understanding that I offer these changes as if

17   still under oath.

18

19   Signed on the_____day of _____, 2018.

20   _____

21     Anthony J. Ferrante

22



```
1                    DEPOSITION ERRATA SHEET

2     Page No._____ Line No._____ Change to:_____

3     _____

4     Reason for change:_____

5     Page No._____ Line No._____ Change to:_____

6     _____

7     Reason for change:_____

8     Page No._____ Line No._____ Change to:_____

9     _____

10    Reason for change:_____

11    Page No._____ Line No._____ Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____ Line No._____ Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____ Line No._____ Change to:_____

18    _____

19    Reason for change:_____

20

21    SIGNATURE_____DATE:_____

22                   Anthony J. Ferrante
```



1                  DEPOSITION ERRATA SHEET

2       Page No._____ Line No._____ Change to:_____

3       _____

4       Reason for change:_____

5       Page No._____ Line No._____ Change to:_____

6       _____

7       Reason for change:_____

8       Page No._____ Line No._____ Change to:_____

9       _____

10      Reason for change:_____

11      Page No._____ Line No._____ Change to:_____

12      _____

13      Reason for change:_____

14      Page No._____ Line No._____ Change to:_____

15      _____

16      Reason for change:_____

17      Page No._____ Line No._____ Change to:_____

18      _____

19      Reason for change:_____

20

21      SIGNATURE:_____DATE_____.

22                  Anthony J. Ferrante



1            CERTIFICATE OF NOTARY PUBLIC

2            I, Terry L. Bradley, the officer before

3     whom the foregoing deposition was taken, do

4     hereby certify that the witness whose testimony

5     appears in the foregoing deposition was duly

6     sworn by me; that the testimony of said witness

7     was taken by me in shorthand and thereafter

8     reduced to computerized transcription under my

9     direction; that said deposition is a true

10    record of the testimony given by said witness;

11    that I am neither counsel for, related to, nor

12    employed by any of the parties to the action in

13    which this deposition was taken; and further,

14    that I am not a relative or employee of any

15    attorney or counsel employed by the parties

16    hereto, nor financially or otherwise interested

17    in the outcome of the action.

18                 _____

19                 Notary Public in and for
                   the District of Columbia

20
      My Commission expires:  April 30, 2022

21

22

