**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 17-cv-60426-UU**

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.

    Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

  Defendants.

_____/

**DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF JEFF ANDERSON**
**AND INCORPORATED MEMORANDUM OF LAW**

      Pursuant to Fed. R. Evid. 702, Defendants move for an order excluding the testimony of

Jeff Anderson, Plaintiffs' purported expert witness on the issue of alleged damages.

**PRELIMINARY STATEMENT**

      Plaintiffs' damages expert, Jeff Anderson, has offered some eye-popping numbers as

potential damages in this case.  However, the two damage theories he offers to support them are

inadmissible as a matter of law.  Anderson's estimate of XBT's supposed "lost business value" is

not a legally cognizable theory of damages, nor in a defamation case may a plaintiff seek to

pursue the equitable remedy of unjust enrichment.  At bottom, while XBT's revenue *grew* by

17% in 2017, Anderson assumes they would have been even higher but for various BuzzFeed

articles.  That theory is so riddled with legally impermissible opinions and unsupported

assumptions regarding both causation and damages that he has *already* had to revise them, thus

demonstrating why they were unreliable in the first place.  His testimony should be excluded.

**FACTUAL BACKGROUND**

      Plaintiffs offer Jeff Anderson to provide expert opinions as to alleged damages.

Anderson submitted a report dated February 23, 2018 (Exhibit 1 hereto), and then a

Supplemental Report dated May 17, 2018 with revised estimates (Exhibit 2 hereto).  Anderson

offers two theories.  First, he estimates the "lost business value" ("LBV") of Plaintiff XBT as

somewhere within a "range" of $32.3 to $137.6 million.  Ex. 2 at 2.  Second, he estimates "the benefit to Buzzfeed" of publishing multiple articles and the Dossier to be $13,859,960.  *Id.*

## A.    Lost Business Value

1.    What Anderson Means by "Business Value"

Anderson's estimate of XBTs "*lost* business value" is a function of how he estimates a company's "business value" generally.  "Business value" simply means the "fair market" price a hypothetical buyer would pay to purchase a company at one point in time.  Ex. 3 (And. Dep.) at 58:10-22.[1]  In broad terms, Anderson estimates a company's business value by taking its *annual earnings* and multiplying that by a "*valuation multiple*" – a number used to estimate the total enterprise value of the business.  Ex. 2 at 9-10.  The specific method Anderson uses for each element of his business value formula is as follows:

a.    *Annual Earnings (EBITDA)*:  Anderson used "EBITDA" to measure a company's annual earnings.  Literally, EBITDA means "earnings before interest, taxes, depreciation and amortization."  Ex. 3 (And. Dep.) at 67:19-21.  Anderson used the following formula to calculate XBT's annual EBITDA:

"*Operating profits* plus *depreciation expenses* plus *amortization expenses*"

 Ex. 2 at 7.  The first element of that formula, *operating profits*, is in broad terms XBT's revenue minus its costs and operating expenses (which do not include interest, tax, depreciation, and amortization expenses).  For example, in 2016 XBT's Operating Profits were calculated as follows:

| | |
|---|---|
| Revenue | $ 49,727,371 |
| Cost of Sales | $ (12,889,527) |
| Total (Operating) Expenses | $ (28,467,598) |
| Operating Profits | $ 8,370,246 |

---

[1] Anderson's estimate of LBV is solely for Plaintiff XBT.  XBT is a holding company, and as such it does not conduct any business itself.  Rather, it owns the shares of roughly 25 subsidiaries, which actually conduct business.  Ex. 4 (Mishra Dep.) at 30:15-31:12; Ex. 14 at 24.  Each subsidiary produces a separately audited annual financial statement has a separate bank account, pays separate taxes (if any), and maintains its own corporate form and structure.  Ex. 4 (Mishra Dep.) at 28:24-29:24; 113:10-19; *see also* Ex. 7 (collecting 2016 audited financial statements for all XBT subsidiaries).  So Anderson's estimate of XBT's "business value" actually estimates the total "fair market value of XBT and its subsidiaries."  Since Plaintiff Webzilla, Inc. is just one of many XBT subsidiaries, Anderson does not provide any estimate of LBV for it.  Ex. 3 (And. Dep.) at 64:21-65:12.

To calculate XBT's 2016 EBITDA, Anderson then added its depreciation and amortization expenses:

| | |
|---|---|
| Operating Profits | $8,370,246 |
| Depreciation | $9,938,410 |
| Amortization | $2,593,883 |
| EBITDA | $20,902,539[2] |

b. *Valuation Multiple*.  The second step in Anderson's method of calculating business value is to multiply the EBITDA by a number he selects for business valuation purposes.  For XBT Anderson chose a multiple of 17, which he called the "industry multiple."  To arrive at that figure, Anderson used the average multiple for what he contends are six "comparable companies" to XBT.  As a result, Anderson estimates XBT's "business value" as its EBITDA multiplied by 17.  Ex. 2 at 9-10.  Thus, using Anderson's method, XBT's business value as of January 1, 2017 was $355.3 million ($20,902,539 x 17).

2. How Anderson Estimated XBT's Lost Business Value

To estimate XBT's LBV, Anderson performed two sets of calculations:

a. What XBT's business value *would have been* on January 1, 2018 without BuzzFeed's conduct.  Ex. 3 (And. Dep.) at 171:16-22; Ex. 2 at 6-10.  Anderson estimated that on Jan. 1, 2018 XBT's business value *would have been* somewhere within a range of $447.7 million to $553 million.  *Id.* at 12.  To arrive at those figures, Anderson assumed XBT's earnings would have grown anywhere from 26% to 56% in one year, increasing its EBITDA from $20.9 million in 2017 to somewhere within a range of $26.4 – $32.6 million in 2018.  *Id.* at Figure 8.

a. What XBT's business value *actually was* as of January 1, 2018.  Anderson estimated XBT's value to actually be $415.4 million as of June 1, 2018.  *Id.*  However, when Anderson performed his analysis, XBT did not have financial statements for 2017.  Moreover, XBT only provided Anderson with estimates of one side of the ledger necessary to calculate its 2017 EBITDA – an estimate of its 2017 annual revenues.  Strikingly, XBT estimated that its revenue actually *increased* by approximately $8.5 million in 2017 – from $49.7

---

[2] Anderson's numbers are taken from XBT's 2016 Consolidated Financial Statements.  Ex. 14.  The numbers producing "operating profit" are found at Exhibit 7 to Anderson's Supplemental Report.  The depreciation and amortization numbers are taken from Exhibit 9 to that report, and the resulting EBITDA calculation is at Exhibit 6.

million to $58.2 million, an increase of 17%. Ex. 3 (And. Dep.) at 168:22-169:14; Ex. 2 at Exhibit 5.

However, XBT did not provide Anderson with any estimate of its expenses for 2017, which is also necessary to accurately calculate EBITDA. As a result, Anderson assumed that in 2017 XBT's expenses grew by the same rate as its revenues. Ex. 3 (And. Dep.) at 70:24-73:19. Anderson admitted that if XBT's actual 2017 expenses turn out to be different, then "if the numbers change, they would change" all his estimates. *Id.* As discussed below, they are very different.

Based on those calculations, the difference between what Anderson estimates XBT's 2017 EBITDA would have been in 2018, and the $415.4 million he claims it actually was, is somewhere within a "range" of $32.3 to $137.6 million. *Id.* The key assumptions Anderson made to derive that estimate are listed and analyzed below.

        3.     <u>Anderson's Key Assumptions</u>

        a.     <u>Timing of Valuation</u> - *First*, Anderson admits that his LBV estimate is valid as of only one date – January 1, 2018. That is because, like a house, the "fair market value" of a company can constantly change. So any business's "fair market" value would depend on the date it was sold. Ex. 3 (And. Dep.) at 59:4-13. Anderson simply picked January 1, 2018 because "that was approximately around the time that we were retained in this case," *id.* at 58:7-59:20, so had he been retained earlier or later the numbers could be different:

> Q.     Okay. But if you had been retained on June 30, 2018, the number
>          could have been different? Right?
> A.     It could have been.

*Id.* at 60:16-25. Moreover, Anderson conceded that he does not know whether the LBV he estimates would continue in perpetuity, or would later be made up by XBT. *Id.* at 78:14-24 ("[I]n terms of what is going to happen going [sic] in the future, I don't know.").

        4.     <u>Assumed Revenue Growth</u>.

In the four years between 2011 and 2015, XBT's revenues grew at an average annual rate of 3%. Ex. 2 at 8 (Figure 2). In 2016, its revenues grew by 28%. *Id.* Anderson's LBV estimate assumed that XBT's revenue would have grown even more in 2017, about 29%. Instead it grew by 17%, to $58.3 million, still XBT's second best performance since 2010.

      a.      <u>Anderson assumed the accuracy of XBT's own untested projections</u>.

Anderson's assumption of near 30% growth was based entirely on a projection in a Business Plan prepared by XBT in November 2016 ("the Business Plan"), which projected its 2017 revenue at $64.2 million. *Id.* at 8; Ex. 3 (And. Dep.) at 77:6-21. Anderson testified that he assumed the projection was accurate because a year earlier in 2015, XBT had accurately projected its revenue for 2016. *Id.* at 83:24-84:13; 99:3-16. Anderson admitted that he had not checked any other years and did not actually know what XBT's "track record" for making projections. *Id*. at 84:9-13, 99:3-16. He just assumed that XBT had a track record of making accurate financial projections because XBT's CFO, Rajesh Mishra, told him that:

> Q.      Well, other than the one [for 2016], and we will get to the one in a second, but are you asserting that other than that one that XBT has outperformed projections contained in their business plans in the past?
> A.      Based on conversations I had with the CFO, he said they had in the past as well. They were fairly conservative.
> Q.      Did you ever test whether that was true?
> A.      I don't know if I have ever seen those.

*Id*. at 85:11-22. However, Mishra himself admitted in his deposition that he projected 30% growth in 2017 for no reason other than that was about what the company was doing in 2016. Ex. 4 (Mishra Dep.) at 160:2-14. Mishra just assumed that would continue indefinitely, *id.* at 162:16-25, but could not recall any basis to support that assumption:

> Q.      Did you ever go back to try to understand whether the revenue increase that you experienced in the last four months of 2016 was something that you could continue to expect, would not only be realized to grow, or whether it might be an anomaly?
> A.      I don't remember.
> Q.      You don't remember?
> A.      No.
> Q.      You never tried to figure out why your revenue had jumped in the last four months of 2016, correct?
> A.      I may have, but I don't remember.

*Id.* at 163:25-164:11. Moreover, Anderson subsequently admitted that he had seen another set of prior financial projections by XBT, which were included in a 2013 KPMG valuation of the company. XBT projected that its revenue would be $43.7 million in 2013, $53.1 million in 2014 and $62.8 million in 2015. Ex. 11 at 20. Its actual revenues for those years were $32.3, $36.2 and $38.8 million respectively. Ex. 2 at 8 (Fig. 2). Similarly, XBT's projected EBITDA for 2013 was $18.8 million while the actual was 12; for 2015 XBT projected $25.6 million vs. an

actual of 12.6.  Ex. 3 (And. Dep.) at 96:15-96:17; Ex. 11 at 20; Ex. 2 at 8 (Fig. 2).  Anderson

testified that he discounted those inaccurate projections because "it was far enough in the past"

and that it was his "understanding" that XBT's track record has improved in subsequent years –

again simply because Mishra told him so.  Ex. 3 (And. Dep.) at 90:1-91:1; 96:15-99:12.

        b.      <u>Anderson consulted an irrelevant outside report</u>.  When crediting XBT's

2016 Business Plan, Anderson did not perform any analysis of XBT's actual or potential

customers, or XBT's prices compared to its competitors, or any actions its competitors might be

taking that could affect its performance, nor did he inspect any of the company's books and

ledgers.  Ex. 3 (And. Dep.) at 91:11-92:3.  Instead, Anderson also testified that he also credited

XBT's projected 30% growth for 2017 because he reviewed an independent  research report

which showed, in Anderson's words, "pretty amazing growth" for "the industry as a whole" – an

annual rate of 45.9%.  *Id.* at 87:4-89:24.

      However, by its own terms the report Anderson relied upon was about a different

"industry."  It analyzed the "massive scale cloud" infrastructure industry, and the report's

authors explicitly excluded companies like XBT from that "industry."  The report confined that

industry to six companies, and said "no providers outside this group could" qualify.  Ex. 12 at 4.

And the authors emphasized that the industry they analyzed excluded "providers that have a

portfolio with various different services such as traditional managed hosting, private clouds and

public clouds, or even colocation."  *Id.* (emphasis added).  XBT offers those services,

extensively.  Ex. 5 (Bezruchenko Dep.) at 23:22-24:14 (managed hosting"); 44:23-44:9

(colocation); 93:2-96:20 ("private cloud").  In fact, the categories "managed servers" and

"colocation" accounted for most of XBT's revenues in 2017.  Ex. 6 (XBT 30b6 Dep.) at 119:3-

121:22; Ex. 13 at 4.

        c.      <u>Anderson has already tried to change his assumption because it proved to</u>

<u>be wrong</u>.  Anderson also admitted that his original assumption to credit XBT's projected

revenue for 2017 has *already* proved to be incorrect.  That is because shortly after XBT made its

revenue projections for 2016, it lost its largest customer after a private security firm, White Ops,

revealed that a massive botnet fraud was being perpetrated in significant part from XBT servers.

Ex. 3 (And. Dep.) at 28:22-29:5; *see also* Ex. 4 (Mishra Dep.) at 141:12-143:22.  The customer

using those servers paid $2.2 million in 2016 – 4.4% of XBT's total annual revenue.  Ex. 9.  And

the revenue he provided increased as the year went along – to the point where in November 2016

it was $398,000, or *7.5%* of all XBT revenues that month.  Ex. 3 (And. Dep.) at 122:9-22; Ex. 9.  When news of the Methbot fraud broke in late December 2016, XBT not only instantly lost that source of revenue, it still had payment obligations for the cost of the more than 1,000 servers the Methbot customer was using.  Ex. 23 (Dvas Dep.) at 237:19-239:24; Ex. 6 (XBT 30b6 Dep.) at 151:23-154:1.  Moreover, going forward XBT also claimed to institute more rigorous screening procedures for clients as a result of Methbot.  Ex. 5 (Bezruchenko Dep.) at 240:21-242:15.

As a result of losing the Methbot customer, Mishra reduced the revenue projections in XBT's 2016 Business Plan by $1.2 million for 2017.  Ex. 4 (Mishra Dep.) at 141:20-144:21.  But XBT never told Anderson that, and instead Anderson received the original Business Plan prepared prior to the Methbot news.  Ex. 3 (And Dep.) at 113:15-114:9.  Since Anderson simply took what he was handed at face value, his calculation of XBT's LBV in his original Expert Report was based on a revenue projection that XBT had already reduced.  He only realized his assumptions in his Report were wrong after he read the transcript of Mishra's deposition in this case, which included testimony about Methbot.  *Id.* at 113:15-22.  So Anderson issued a Supplemental Report, in which he reduced the projection of XBT's 2017 income by about $1.4 million, to $62.8 million, to supposedly account for the loss of the Methbot customer.  That relatively small change reduced his total estimate of LBV about $16-$18 million on both ends of the range.  *Compare* Ex. 1 at 11 & Ex. 2 at 12.

Moreover, although by that point Anderson already knew he had been provided with bad information from XBT, for the $1.4 million figure Anderson again relied entirely on more assumptions that Mishra told him:  (1) that XBT would find new clients for all those servers by June 2017, and (2) that the customer had been paying about $200,000 a month to XBT when he was lost.  Ex. 3 (And Dep.) at 27:2-30:9.  But Anderson testified that in fact he has "no idea what happened to those servers", including how long it actually took to lease them to others.  *Id.* at 30:13-33:16.  Moreover, Anderson admitted that "if it took twelve months, it could have an impact" on his calculations.  *Id.* at 33:10-34:9.  In fact, Anderson's assumptions were wrong.  XBT admitted that the Methbot customer was actually generating over $300,000 a month at the time he was terminated, not $200,000.  Ex. 6 (XBT 30b6 Dep.) at 146:2-149:1.  And XBT was still paying for some of those servers well over a year later.  Ex. 23 (Dvas Dep.) at 237:19-239:24; Ex. 6 (XBT 30b6 Dep.) at 151:23-154:1.

5.    EBITDA Assumptions

XBT's annual projections include expenses as well as revenues.  Mishra admitted that the November 2016 projections that Anderson relied on not only assumed that XBT's revenues in 2017 would grow by about $15 million, to $64.2, they also assumed that XBT's expenses would remain virtually flat – only $700,000 more than the company spent in 2016.  In other words, Mishra assumed that revenue would rise by 30%, at virtually no cost at all.  Ex. 4 (Mishra Dep.) at 165:3-166:21.  However, Mishra admitted that every year starting in 2013 XBT has substantially under-projected its expenses.  *Id.* at 166:22-169:15.  For example, in late 2015, the only projection Anderson points to as being accurate, XBT underestimated its total 2016 expenses by about $ 7 million.  *Id.* at 148:3-151:4.

As a result, Anderson's calculations relating to the expense side of the ledger have already proved to be unreliable.  Anderson's estimate of XBT's actual value as of January 1, 2018 assumed that XBT's operating profit in 2017 would be $9.8 million.  Ex. 2 at Ex. 5.  However, draft financial statements XBT recently produced for 2017 show an operating profit of $5.9 million, a difference of *40%*.  Ex. 8.

6.    Comparable Company Assumptions.

To estimate XBT's business value, Anderson multiplied XBT's estimated EBITDA by an "industry multiple" using six comparable companies.  In its November 2016 Business Plan, XBT identified four companies as its current competition:  (Softlayer, Leaseweb, OVH and Rackspace).  Ex. 10 at 13.  Mishra testified that those four companies remain XBT's most direct competitors today.  Ex. 4 (Mishra Dep.) at 177:7-13.

However, although Anderson relied on all the financial projections in that Business Plan, he did not use this list to calculate an "industry multiple" for comparable companies.  He does not dispute they are comparable, but testified that since (like XBT) they were mostly private companies there would not be data available to calculate a multiple.  Ex. 3 (And Dep.) at 164:13-166:23.  Instead, Anderson relied on a list selected in a 2013 KPMG valuation of XBT.  *Id.* at 74:17-75:1.  This was the same valuation Anderson deems irrelevant for purposes of assessing the track record of XBT's financial projections, because "something done four or five years ago, it absolutely does not seem relevant to something happening in late 2016 when the 2017 projections were done."  *Id.* at 98:6-22.

Nonetheless, Anderson testified that he credited the 2013 list of comparable companies because "we're talking three, four years later, and there is not a major shift in the landscape that would dictate that these companies are not any more comparable today as they were in 2013." *Id.* at 157:2-158:10. Moreover, "they are all in the data center industry." *Id*. at 158:20-25. By contrast, Mishra testified that at least on company on the 2013 list (Dupont Fabros) was not comparable because it is organized as a real estate investment trust. Otherwise, Mishra was not even familiar with all the companies on the 2013 list. Ex. 4 (Mishra Dep.) at 177:14-178:25. There was, however, one company – Rackspace – that was on both XBT's 2017 and KPMG's 2013 list. Anderson acknowledged that Rackspace has a multiple of 7, not 17. Ex. 3 (And Dep.) at 164:25-164:15.

In addition, KPMG's 2013 valuation concluded that because XBT was a private company, the valuations of the mostly public companies it had selected should be discounted by 20-30% to compare them to XBT. However, Anderson said "I don't believe that it was necessary to apply that discount," and so disregarded it when he selected 17 as his industry multiplier. Ex. 3 (And Dep.) at 160:1- 163:5.

7. <u>Causation</u>

Anderson's most fundamental assumption is that but for the publication of the Dossier (and more, see below), XBT would have achieved 100% of its projected revenue and earnings in 2017, after supposedly adjusting for the Methbot fraud. *Id.* at 77:6-78:2. Anderson testified:

> Q. What is your basis for assuming that setting aside the loss of the Methbot customer, the sole reason that XBT did not hit its adjusted projections for 2017 was the publication of the dossier by BuzzFeed?
> A. The timing of the decline in revenues and earnings.
> Q. Okay. What qualifications do you have to make the judgment that that publication caused what you say is decline in revenue and earnings?
> A. It's an assumption made in my analysis that the dossier is the reason for the decline in earnings.
> Q. Okay. And what is the basis for that assumption?
> A. Discussions with counsel, again the timing of the event, time of the release of the dossier and the subsequent decline in revenue and earnings.
> Q. Nothing other than that?
> A. Off the top of my head, I don't know.

*Id*. at 131:10-132-7. Additionally, Anderson cannot identify a single customer lost as a result of any BuzzFeed publication. *Id*. at 19:24-20:15.

Anderson's report also asserted that "XBT suffered increased bank scrutiny following the publication of the dossier. Their bank accounts in multiple countries were frozen and banks threatened to close their accounts altogether." Ex. 2 at 6. Anderson admitted that he only wrote that because Mishra told him so, and he has no idea whether any bank accounts were actually closed. Ex. 3 (And Dep.) at 134:1-135:17. The report further asserts that "banks dramatically increased their scrutiny on potential new clients" and the company, thus "driving away many clients in the process." Ex. 2 at 6-7. Anderson admitted that, other than what Mishra told him, his only purported basis for that statement was a single e-mail from one bank, ABN AMRO, which asked for some information from European Webzilla entities (not Plaintiff Webzilla, Inc.) as part of a "periodic review" of their accounts. Ex. 3 (And Dep.) at 135:18-138:17. Anderson has no idea whether this had any impact:

> Q.      And you don't know whether -- how quickly Webzilla may have gotten financing from ABN AMRO?  Right?
> A.      I don't know.
> Q.      Okay.  Did you ever ask?
> A.      It may have been part of a general discussion.  I don't remember.
>
>                                    ****
>
> Q.      But again the fact that the bank may have wanted to ask for a periodic review … you don't have any information that this request for a, quote, "periodic review" caused -- drove away a single customer of Webzilla?
> A.      Again I don't know that.  Yes.  I don't know.

Id. at 140:8-14; 148:6-15; *see also id*. at 138:18-149:16.

Moreover, Anderson's damage theories are not even solely tied to the January 10, 2017 BuzzFeed Article at issue in this case. Rather, he estimates "the damages stemming from the Defendants' publication of an online article ("the Defamatory Article") and *eight follow up articles* ("the Follow-up Articles") (collectively, the "Defamatory Articles"). Ex. 2 at 2. The other eight articles Anderson identifies were published between January 11 and January 15, 2017 and included a hyperlink to the January 10 Article. Ex. 2 at 23-24; Exs. 15-22. They include articles such as one titled "People Can't Believe Trump is Feuding With Civil Rights Leader John Lewis." Ex. 20.

**B.      Benefit to BuzzFeed**

Anderson's second opinion calculates what he calls the "benefit to BuzzFeed from the millions of views the Defamatory Articles received." Ex. 2 at 2. Anderson attempted to monetize the supposed value of the "views" that BuzzFeed received of the all 9 articles. Ex. 3

(And Dep.) at 177:13-178:25; 190:6-15, 208:18-22.  Data produced by BuzzFeed showed that about 6.7 million people viewed the January 10 Article since it was published, and about 2.3 million people viewed the eight subsequent articles.  Anderson calculates the benefit to be $13,859,960.  Ex. 2 at 2.

For much of his deposition, Anderson insisted this figure was an estimate of the benefit to BuzzFeed of specifically publishing the allegations against the Plaintiffs.  To support that opinion, Anderson assumed that every single one of the 9 million people who clicked on any page within those nine articles read all 35 pages of the Dossier cover-to-cover – even though most of the articles did not embed the Dossier:

> Q.      You think all 9 million people whoever clicked on an article that mentioned the dossier read all the pages of the dossier? Is that seriously what you are asserting?
> A.      I assumed the 9 million people based on the information provided by BuzzFeed read the dossier.
> Q.      When you say read the dossier, what do you mean?
> A.      Read the dossier.
> Q.      All 35 pages from beginning to end?
> A.      Read the dossier.
> Q.      Okay.  Do you assume that all 9 million of those people read the couple of sentences that are at issue in this case?
> A.      I assume they read the dossier.
> Q.      Including the couple of issues that in this case?
> A.      I assume they read the entire dossier.

Ex. 3 (And Dep.) at 199:14 - 200:11.  Though Anderson conceded that "I don't have the expertise to get into nine million people's minds" to discern their reading habits, he insisted that assumption "was the basis for my opinion" and that if it was wrong, "I stand corrected" and "will adjust my analysis accordingly.  *Id.* at 201:19-203:10.  But then late in his deposition, Anderson completely changed his core assumption:

> Q.       …[A]nd your assumption is that every person who came to this article also looked at the dossier as it was embedded here and either clicked through or scrolled through all 35 pages and read all of them?
>
> A.       No. So let me clarify . . . Because I think I -- I think I tried to do it in a very unclear way -- before we went off the record.  The assumption, and I stated it in my report -- is that all we are looking at is the value to BuzzFeed or the benefit BuzzFeed received from the views to the pages.  Regardless of whether they read all, part, or none of the entire dossier.

*Id.* at 231:8-233:13.  Anderson further "clarified" that his estimate of the "benefit" included anyone who clicked on any page within any of the articles.  *Id.* at 218:2-219:7; 233:9-13

ARGUMENT

Anderson's opinions must be excluded because they fail to meet the threshold requirements of reliability and relevance that govern the admissibility of expert testimony. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

## I.    ANDERSON'S OPINIONS ARE IRRELEVANT AS A MATTER OF LAW

When "as a matter of law" an expert's proffered testimony is "necessarily irrelevant" to any question in the case, it must be excluded.  *Brewer v. Insight Tech., Inc.*, 2014 WL 12623024, at *5 (M.D. Fla. Jan. 3, 2014).  Thus, "[t]o the extent that [the plaintiff] proffered experts intend to testify to [an impermissible] theory of damages, their testimony is irrelevant and inadmissible."  *United States ex rel. Landis v. Tailwind Sports Corp.*, 2017 WL 5905509, at *4 (D.D.C. Nov. 28, 2017).  Anderson's testimony must be excluded for this reason alone.

### A.    <u>Anderson's Damage Theories Are Legally Impermissible</u>

1.    <u>Lost Business Value</u>.  There are two reasons why Anderson's opinion must be excluded as a matter of law.  First, unless a business has suffered "complete destruction," its economic damages must be measured as lost profits.  *See In re Sherwood Invs. Overseas Ltd.*, 2016 WL 5719450, at *9-10 (M.D. Fla. Sept. 30, 2016) (damages calculated as "lost profits" are only available to continuing businesses and "lost business value" is only available where there has been complete destruction of a business).  *See also Preferred Care Partners Holding Corp. v. Humana, Inc.*, 2009 WL 10668573, at *2 (S.D. Fla. Apr. 13, 2009) ("It is well established that, under Florida law, '[i]f a business is completely destroyed, the proper measure of damages is the market value of the business on the date of the loss ... [but if] the business is not completely destroyed, then it may recover lost profits.'") (citation omitted); *Montage Grp., Ltd. v. Athle-Tech Computer Sys., Inc.*, 889 So. 2d 180, 193 (Fla. 2d DCA 2004) ("If a business is completely destroyed, the proper total measure of damages is the market value of the business on the date of the loss.").

XBT has not suffered total destruction; Anderson estimates it to be worth $415 million as of January 2018.  But its claim for "lost business value" effectively seeks to recover the damages a destroyed business would seek.  Anderson does not purport to estimate lost profits.  Ex. 3 (And

12

Dep.) at 62:21-63:9 ("that's the only measure of damages I have presented").  As a result, Anderson's estimate of LBV is irrelevant and inadmissible as a matter of law.

Additionally, Anderson's testimony must be excluded because XBT may not seek damages incurred by its subsidiaries, particularly under the circumstances here.  For purposes of forum-shopping, Plaintiffs have sought to utilize its distinct corporate structure to sue in multiple jurisdictions.  Thus, in this jurisdiction "Webzilla, Inc." sued as a distinct Plaintiff, and on that basis all Plaintiffs claim jurisdiction and assert the protection of Florida law.  In the U.K., "Wezbilla B.V." and "Webzilla Limited" sued Christopher Steele for the same reasons. Moreover, in their discovery responses, Plaintiffs claimed they would apportion damages between Buzzfeed and Steele.  *See* Ex. 24 at 3.  Nonetheless, Anderson's estimates the collective LBV for all XBT subsidiaries, including the U.K. Plaintiffs.  Ex. 3 (And. Dep.) at 65:23-64:24.

Plaintiffs cannot have it both ways.  They may not utilize distinct entities within their corporate structure to bring lawsuits, and then ignore them to seek damages.  A parent company may not recover damages incurred by its subsidiaries – it may not "create a subsidiary and then ignore its separate corporate existence whenever it would be advantageous to the parent.". *Feinberg v. Katz*, 2002 WL 1751135, at *6 (S.D.N.Y. July 26, 2002) (parent company and its sole shareholder "cannot bring claims to recover for damages incurred by its subsidiary") (citation omitted).[3]  Thus, Anderson's estimate of LBV should be excluded for this reason too.

        2.      <u>Unjust Enrichment/Benefit to BuzzFeed.</u>  In his initial report, Anderson explicitly described his second theory as "damages stemming from . . . the unjust enrichment of Defendants."  Ex. 1 at 6.  Perhaps anticipating this motion, his Supplemental Report deleted the words "unjust enrichment" and any reference to "damages," and replaced it with "the benefit to Buzzfeed."  Ex. 2 at 1, 2.  But just like the proverbial lipstick on a pig, that makes no difference. This theory seeks to disgorge from BuzzFeed, and enrich Plaintiff, in the amount of the "benefit"

---

[3] *See also Elandia Int'l, Inc. v. Koy*, 2010 WL 2179770, at *6 (S.D. Fla. Feb. 22, 2010) ("[A] corporation does not have standing to assert claims belonging to a related or closely affiliated corporation simply because their businesses are intertwined."), *R&R adopted*, 2010 WL 2196040 (S.D. Fla. June 1, 2010); *Mobius Risk Grp. LLC v. Global Clean Energy Holdings, Inc.*, 2011 WL 3568074, at *5 (S.D. Tex. Aug. 15, 2011) ("Courts that have addressed [whether or when a parent company may recover damages incurred by its subsidiaries] have consistently held that a parent my not do so."); *Tullet Prebon, PLC v. BCG Partners, Inc.*, 2010 WL 2545178, at *4 (D.N.J. June 18, 2010) ("Wrongdoing to a subsidiary does not confer standing upon the parent company, even where the parent is the sole shareholder of the subsidiary."), *aff'd*, 427 F. App'x 236 (3d Cir. 2011).

it supposedly received.  This is plainly a calculation of "unjust enrichment," an equitable remedy.  *See High Frequency Prods., Inc. v. Wynn's Climate Sys., Inc.*, 892 F. Supp. 1515 (S.D. Fla. 1995), *aff'd*, 91 F.3d 167 (Fed. Cir. 1996); *see also Am. Honda Motor Co. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1178 (M.D. Fla. 2005).

As an equitable remedy, unjust enrichment is not available where there is an adequate legal remedy.  *High Frequency Prods.*, 892 F. Supp. at 1520.  Plaintiffs are suing for defamation and seek almost $150 million, so they cannot allege they have no adequate remedy at law. Plaintiffs therefore may not also seek recovery for alleged unjust enrichment.  *See Vandermus v. Milhous*, 2012 WL 12855474, at *4 (S.D. Fla. Aug. 14, 2012).  Indeed, courts specifically addressing claims for unjust enrichments awards in defamation cases have consistently rejected them because "there is an adequate remedy at law available" for public figures – money damages for defamation."  *Ventura v. Kyle*, 825 F.3d 876, 887-88 (8th Cir. 2016) (internal quotation marks and citations omitted), *cert. denied*, 137 S. Ct. 667 (2017).[4]  Accordingly, Anderson's testimony on the "benefit" to BuzzFeed should be excluded.

### B.     Anderson's Causation Assumptions Are Also Legally Impermissible

Both of Anderson's theories must be excluded as a matter of law for yet another reason -- they assert legally impermissible theories of causation, including theories that patently violate the First Amendment.  *First*, both theories are premised on the claim that *nine Buzzfeed articles* caused XBT's LBV and benefitted BuzzFeed.  And Anderson admits that for purposes of his causation assumptions, it does not matter whether a BuzzFeed reader ever read the allegedly defamatory statements on the last page of the Dossier.  For example, if a reader only read the paragraphs in one of the articles discussing Congressman John Lewis's activity in the civil rights movement (Ex. 20), in Anderson's view BuzzFeed should still have to pay Plaintiffs $1.54 million (his estimate of the "benefit" of a page view).  Ex. 3 (And Dep.) at 203:24-204:12.

It is a black-letter principle of defamation law that a plaintiff may not recover damages that were caused by speech that is not defamatory.  Otherwise, the defendant would be paying

---

[4] *See also Metro. Opera Ass'n v. Local 100, Hotel Emps & Rest. Emps Int'l Union*, 239 F.3d 172 (2d Cir. 2001) (defamation provides for an adequate legal remedy, consequently, equitable remedies are not appropriate); *Alberti v. Cruise*, 383 F.2d 268 (4th Cir. 1965) (defamation provides an adequate remedy at law); *McMahon v. Kindlarski*, 512 F.3d 983 (7th Cir. 2008); *Oorah, Inc. v. Schick*, 2012 WL 3233674, at *4 (E.D.N.Y. Aug. 6, 2012) ("Oorah may seek damages if the School commits libel or slander; as it failed to demonstrate the inadequacy of that remedy, equitable relief was inappropriate."), *aff'd*, 552 F. App'x 20 (2d Cir. 2014).

damages for constitutionally protected speech. *See Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 191 (2d Cir. 2000) (remitting an award of damages where one of three allegedly defamatory statements was found not to be actionable); *see also Marcus v. Bressler*, 277 A.D.2d 108, 110 (1st Dep't 2000) (striking punitive damages award where it was "clear that the . . . award was intended to punish not merely the act of slander that was the gravamen of the counterclaim," but also "non-actionable expressions of opinion"); *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 136 (1st Cir. 1997) (setting aside verdict where it was unclear whether it was based on defamatory statement or non-actionable speech); *Simon v. Navon*, 71 F.3d 9, 19 (1st Cir. 1995) (same); *Avins v. White*, 627 F.2d 637, 646 (3d Cir. 1980). But Plaintiffs do not and could not allege that nine articles were defamatory – this case is based on only one of them. Because Anderson assesses damages for protected speech, his testimony must be excluded.

*Second*, another related problem with Anderson's causation theories is that he makes no distinction between damages allegedly caused by someone who read the allegedly defamatory statements about Plaintiffs on BuzzFeed.com, and others who read about Plaintiffs somewhere else. Anderson made that explicit at his deposition – stating that "you can't unring the bell that the names had been included in the Dossier. They [the Plaintiffs] are late referenced even today in articles on Recode and other sites, CNN . . . ." Ex. 3 (And Dep.) at 222:20-223:4. However, defamation plaintiffs may not seek to hold a defendant liable for defamatory statements by others "absent a showing that the original author was responsible for or ratified the republication." *Fashion Boutique of Short Hills, Inc.v. Fendi USA, Inc.*, 314 F.3d 48, 59 (2d Cir. 2002) (affirming exclusion of damages expert). As the record in this case shows, many news organizations have reported about Plaintiffs since January 10, 2017. Anderson's effort to hold BuzzFeed responsible anytime the name "Gubarev" has appeared in the news in connection with the Dossier is impermissible as a matter of law.

And finally, Anderson's opinions about causation are also wholly unreliable. He opines that "but for" the "Defamatory Articles," XBT would have achieved 100% of its financial projections for 2017. Ex. 2 at 11. But Anderson cannot recall that he has ever been qualified as a defamation expert; in fact he appears to have misunderstood that the *Hulk Hogan v. Gawker* case in which he testified was not a defamation case. Ex. 3 (And Dep.) at 17:13-25. *See also Gawker Media LLC v. Bollea*, 129 So. 3d 1196, 1198 (Fla 2d DCA 2014) (listing Hogan's claims

for invasion of privacy, right of publicity, and intentional infliction of emotional distress).[5]  And when asked directly what qualifications he held to render an opinion about causation, he dodged the question and said it was an "assumption."  Ex. 3 (And Dep.) at 131:10-132:7.

Anderson also made numerous claims about Plaintiffs supposedly having trouble with banks, creditors and customers.  But he admitted he was referring to a single email from a single bank which merely asked for information.  He has no knowledge whether Plaintiffs' relationship with that or any other bank, creditor, or customer has actually been disrupted.  *See supra* at 9-10.  And perhaps most strikingly, his opinion about causation has already changed in this case because he now attributes at least some of Plaintiffs' supposed revenue "shortfall" to the Methbot scandal.  *See supra* at 6-7.  However, even after learning that XBT had given him outdated numbers, he made no effort to check whether the impact of Methbot might have been larger than Mishra represented, nor to investigate  whether their might be any other causes of revenue loss apart from the "Defamatory Articles."  Ex. 3 (And Dep.) at 22:24-124:22; 128:1-129:2.  After Anderson learned about Methbot he asked Mishra "is there anything else"?  Mishra responded "no," and Anderson just "accepted that."  *Id.*

To establish causation, "[p]roof must show with reasonable certainty that the plaintiff suffered damages and that the damages flowed as the natural and proximate result of defendant's . . . conduct."  *Aldon Indus., Inc. v. Don Myers & Assocs.*, 517 F.2d 188, 191 (5th Cir. 1975).  Anderson's report and testimony cannot meet this standard.  "Leaving a jury to decide whether its experts' forecasts are too speculative to show causation . . . is not a valid option."  *In re Invs. Overseas Limited*, 2015 WL 4486470, at *32.  Anderson's damage estimates are predicated on an opinion regarding causation that is far too speculative and unreliable to satisfy *Daubert* standards.

## II.  ANDERSON'S ESTIMATES ARE NOT RELIABLE

### A.  Lost Business Value

Even if "lost business value" was a viable theory of damages available to XBT, Anderson's estimates are unreliable and therefore inadmissible for multiple reasons.

1.  Arbitrary Timing.  First, the use of January 1, 2018 as the date by which to measure lost business value, merely because that is when Anderson is retained, is entirely

---

[5] Anderson's damage estimates here total roughly $150 million, quite similar to the jury verdict in the *Hogan* case, which totaled $140 million.

arbitrary and thus not reliable. As Anderson acknowledged, by definition it is not static and thus has no relationship to the actual damages, if any, XBT could be said to have incurred. In fact, one of the reasons that lost business value is the preferred method of calculating damages when a business is destroyed is that its value may be calculated "on the date of its destruction," rather than over a speculative time period. *Montage Grp.*, 889 So. 2d at 193. But because XBT is a viable business, Anderson selected a wholly arbitrary equivalent of the "date of the loss" and his estimates are thus unreliable. *Sun Ins. Marketing Network, Inc. v. AIG Life Ins. Co.*, 254 F. Supp. 2d 1239, 1248 (M.D. Fla. 2003) ("Why ten years? [Plaintiff's expert] chose ten years because Plaintiff's counsel asked him to use that period of time . . . .").

   2. <u>Broad, Speculative "Range"</u>. Second, it bears noting that even when a company seeks lost profits:

> [T]he general rule is that anticipated profits of a commercial business are too speculative and dependent upon changing circumstances to warrant a judgment for their loss [but] a plaintiff may obtain this generally disfavored form of relief by presenting sufficient evidence to determine damages for lost profits with a reasonable degree of certainty, rather than by means of speculation and conjecture.

*Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319, 1339 (S.D. Fla. 2006) (internal quotation marks, alteration, and citations omitted), *aff'd*, 294 F. App'x 501 (11th Cir. 2008). Thus, "assumptions used to support [conclusions about future lost profits must] be reasonably certain, not mere best case scenario predictions." *Sun Ins. Mktg. Network*, 254 F. Supp. 2d at 1247. Even at first blush, Anderson proposes a very broad "range" of estimating LBV in which the "high number" is almost five times the "low." That estimate on its face fails to provide "a reasonable degree of certainty."

   3. <u>Unsupported Assumptions</u>. The fundamental premise of Anderson's estimates of LBV is that XBT's projections for growth in it 2016 Business Plan were perfectly accurate and would have occurred but for the Buzzfeed articles. Ex. 2 at 10-11. But the records show "nothing to indicate that [Plaintiffs' expert] did more than parrot the projections in the business plan." *MasForce Europe, BVBA v. MEC3 Co.*, 2013 WL 12156469, at *6 (M.D. Fla. 2013). Anderson accepted those projections based largely on the uncorroborated statements of Mishra – not only as to the accuracy of the 2016 Business Plans, but as to previous ones that Anderson admitted he never actually reviewed. *See* Anderson Dep. at 83:24-84:13, 85:11-22,

90:1-92:25, 99:3-16; *Fla. Power & Light Co. v. Qualified Contractors, Inc.*, 2005 WL 5955702, at *3 (S.D. Fla. Dec. 6, 2005) ("[A]n expert opinion that . . . is not based upon any investigation or testing . . . does not meet Rule 702's criteria of showing that the proposed testimony is based upon sufficient facts or data.").

And the one independent report Anderson did rely on expressly excluded companies like XBT from its projections. *See supra* at 6. Moreover, Anderson's blind faith in XBT's business plan was especially unreliable because there was no underlying basis for those projections. Mishra admitted that the business plan projections merely reflected his assumption that XBT would continue to grow indefinitely at the same rate, unsupported by any analysis of the company's actual past or future growth. And Mishra admitted that XBT had a poor track record with its financial projections, at least as to the expense side. *See supra* at 4-6. *Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc.*, 921 So. 2d 43, 46 (Fla. 3d DCA 2006) ("It is as inappropriate to use purely speculative forecasts of future revenue to determine the market value of a business as it is to use such speculative forecasts in determining lost future profits."). Anderson's testimony must therefore be excluded. *MasForce Europe, BVBA*, 2013 WL 12156469, at *6 (proposed expert had not "performed any independent evaluation to substantiate the projections in [the plaintiff's] business plan").

Experts may not simply accept the conclusions of others in forming their opinions, but instead must perform independent analyses. "While qualification under Federal Rule of Evidence 702 permits a witness to offer opinion testimony, it does not permit that witness to offer factual testimony without personal knowledge in contravention of Rule 602." *See Martinez v. Rabbit Tanaka Corp.*, 2006 WL 5100536, at *9 (S.D. Fla. 2006); *see also First Premium Servs., Inc. v. Best Western Int'l Inc.*, 2004 WL 7203535 at *3 (S. D. Florida 2004) (excluding expert testimony where expert failed to perform any independent analysis of the accuracy of plaintiff's tax returns, which formed basis for damages calculation); *Mooring Capital Fund, LLC v. Phoenix Cent., Inc.*, 2009 WL 4263359, at *3 (W.D. Okla. Feb. 12, 2009) (excluding proposed damages expert when his analysis on damages resulting from plaintiff's inability to develop a plot of land "is entirely based on [defendant's] projections"), *aff'd*, 388 F. App'x 814 (10th Cir. 2010); *Fla. Power & Light*, 2005 WL 5955702, at *3 (rejecting expert testimony where testimony was merely a regurgitation of plaintiff's theory of case "without any independent or objective basis"); *Ellipsis, Inc. v. Color Works, Inc.*, 428 F. Supp. 2d 752, 761 (W.D. Tenn.

2006) (expert's report unreliable and inadmissible when expert "relied exclusively on data provided by [the client]" and failed to verify information that provided underlying basis for estimates and assumptions). As explained by the court in *Mooring*, expert testimony based on unsubstantiated assertions by a party are disallowed because of "the potential for jury confusion and the lack of helpfulness of an opinion which *appears* to be based on the expert's findings or expertise, but is not, and is in fact based on self-serving information provided by an interested party." 2009 WL 4263359, at *3.

Moreover, the record here presents an unusual case where Andersons's assumptions and resulting estimates have already proved to be actually unreliable. Because Anderson performed no independent analysis of the basis for XBT's projections, he wrote his initial expert report knowing nothing about the Methbot fraud. He then had to change his assumptions after *Defendants* confronted *Mishra* – they very source of information Anderson relied on – with those facts. Even so, Anderson's calculations about the impact of Methbot continued to rely entirely on what Mishra told him, and those assumptions too were erroneous. *See supra at* 6-7. *Estate of Marin-Torres v. Gamo Outdoor USA*, 2016 WL 4051318, at *4 (S.D. Fla. May 4, 2016) (excluding most of expert's opinion because expert "has very little actual knowledge or understanding about how this incident actually occurred" and "conducted no analysis" on the relevant subject). Moreover, some of the EBITDA-related assumptions Anderson made to calculate XBT's business value as of January 1, 2018 have already proved to be off by up to 40% once XBT's actual estimates of its 2017 financial performance became available. And perhaps most striking, Anderson's "benefit" estimates assumed that every single person who has ever clicked on any page of one of nine BuzzFeed articles read the Dossier itself end-to-end. That assumption was so patently absurd that Anderson withdrew it in the middle of his deposition – and yet contended that made no difference to his conclusions. *See supra* at 11. The record thus shows actual, not merely arguable, unreliability.

4.    No Analysis of Comparable Businesses. Andersons' estimates of LBV are also predicated on using the companies listed in the 2013 KPMG valuation as comparable businesses for purposes of determining his industry multiplier. In so doing, he rejected XBT's own identification of companies that are comparable today, with one exception – and it has a multiple of 7, not 17. He also assumed that KPMG's choices were still valid five years later, on the basis of no independent research at all – merely because they were in some sense "in the data center

industry."  Even so, he disregarded KPMG's conclusion that those companies were *not* comparable unless their values were discounted 20-30%.

Florida courts have addressed the analysis an expert must undertake for purposes of identifying comparable companies to use as a "yardstick" to measure lost profits.  *Devon Med., Inc. v. Ryvmed Med., Inc.*, 60 So. 3d 1125, 1129 (Fla. 4th DCA 2011).  While that is not the inquiry Anderson undertook, the underlying purpose for identifying comparable companies is similar.  Generally, expert testimony that "ma[kes] a blanket statement regarding similarity and did not prove how Medi Supply resembled Ryvmed in size, location, profits, and position" is insufficient is too speculative and unreliable.  *Id.*  For that reason as well, Anderson's testimony should be struck.

## CONCLUSION

For the reasons set forth herein, Defendant respectfully requests that the Court strike the Report of Plaintiff's damages expert, Jeff Anderson and exclude Mr. Anderson from testifying.


Dated:  October 15, 2018                    Respectfully submitted,

/s/ Katherine M. Bolger
Katherine M. Bolger
Nathan Siegel
Adam Lazier
Alison Schary
Davis Wright Tremaine, LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
katebolger@dwt.com
nathansiegel@dwt.com
adamlazier@dwt.com
alisonschary@dwt.com

/s/ Roy Black
Roy Black
Jared Lopez
Black, Srebnick, Kornspan & Stumpf, P.A.
201 So. Biscayne Boulevard
Miami, Florida 33131
rblack@royblack.com
jlopez@royblack.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing, together with its exhibits, will be served electronically by email on all counsel or parties of record on the service list below this 12th day of October, 2018.

By: /s/ Alison Schary

Alison Schary

## SERVICE LIST

Matthew Shayefar
Valentin D. Gurvits
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1806
Facsimile: 617-928-1802
matt@bostonlawgroup.com
vgurvits@bostonlawgroup.com

Evan Fray-Witzer
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-000
Facsimile: 617-423-4855
Evan@CFWLegal.com

Brady J. Cobb
Dylan Fulop
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com
dfulop@cobbeddy.com