# EXHIBIT 3

1          IN THE UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF FLORIDA

3

4

5

6
****************************
7   ALEKSEJ GUBAREV, XBT HOLDING
    S.A., AND WEBZILLA, INC.,
8
         Plaintiffs,
9
    vs.                              Case No.:
10                                   1:17-cv-60426-UU
    BUZZFEED, INC. AND BEN SMITH,
11
         Defendants
12  ****************************

13

14                    CONFIDENTIAL

15    VIDEOTAPED DEPOSITION OF JEFFREY ANDERSON

16              Thursday, May 31, 2018

17                   10:12 a.m.

18                   Held at:

19            Ciampa Fray-Witzer, LLP

20               20 Park Plaza

21                 Suite 505

22            Boston, Massachusetts

23

24     Judith McGovern Williams, CSR, CRR
         Registered Professional Reporter
25

1    APPEARANCES:

2    CIAMPA FRAY-WITZER LLP

3     Evan Fray-Witzer, Esquire

4     20 Park Plaza

5     Suite 505

6     Boston, Massachusetts 02116

7     617-426-0000

8     evan@cfwlegal.com

9    and

10   BOSTON LAW GROUP, PC

11    Val Gurvits, Esquire

12    825 Beacon Street

13    Suite 20

14    Newton Center, Massachusetts  02459

15    617-928-1800

16    vgurvits@bostonlawgroup.com

17    Both on behalf of the Plaintiffs

18

19

20

21

22

23

24

25

```
 1     APPEARANCES (continued):

 2     DAVIS WRIGHT TREMAINE LLP

 3      Nathan Siegel, Esquire

 4      Alison B. Schary, Esquire

 5      1919 Pennsylvania Avenue NW

 6      Suite 800

 7      Washington, D.C.  20006-3401

 8      202-973-4237

 9      nathansiegel@dwt.com

10      alisonschary@dwt.com

11      On behalf of the Defendants

12

13     Also present:

14      Robert Giannini, Videographer

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2     WITNESS                                PAGE

3     JEFFREY ANDERSON

4     By Mr. Siegel                          8

5

6                    E X H I B I T S

7

8     EXHIBIT          DESCRIPTION            PAGE

9

10    Exhibit 1   One-page chart             37

11    Exhibit 2   Supplemental Expert Report  62

12    Exhibit 3   Holding Consolidated 2016   93

13    Exhibit 4   XBT Holding SA, Report and  93

14                Consolidated Financial

15                Statements for the year

16                ended 31 December 2016

17    Exhibit 5   XBT Holding Limited Equity  96

18                Valuation, 2 August 2013,

19                bearing production numbers

20                P-G 000645 through

21                P-G 000703

22    Exhibit 6   Charts                     104

23    Exhibit 7   Three-page e-mail, bearing 137

24                production numbers P-A

25                000734 through P-A 000736

1       Exhibit 8   XBT Holding SA                    164

2                   Consolidated Business Plan

3                   prepared November 2016,

4                   bearing production numbers

5                   P-G 001035 through

6                   P-G 001087

7       Exhibit 9   Expert report of Jeff             170

8                   Anderson, bearing

9                   production numbers P-S

10                  000005 through P-S 0000044

11      Exhibit 10  BuzzFeed news article             203

12      Exhibit 11  Company Intelligence              217

13                  Report 2016/080, bearing

14                  production numbers P-D

15                  000021 through P-D 000055

16      Exhibit 12  BuzzFeed news article             219

17      Exhibit 13  One-page chart                    230

18      Exhibit 14  SEMrush Organic Research:         236

19                  Positions Generated on

20                  February 16, 2018

21

22

23      (Original exhibits retained by the court

24      reporter.)

25

1              P R O C E E D I N G S

2                      - - -

3              It is stipulated and agreed

4      by and between counsel that the

5      deponent will read and sign the

6      deposition transcript before a

7      Notary Public within 30 days of

8      receipt of the transcript.  The

9      filing of the transcript is waived.

10             It is further stipulated and

11     agreed by and between counsel that

12     all objections, except as to the

13     form of the question, and all

14     motions to strike are reserved until

15     the time of trial.

16                     - - -

17             THE VIDEOGRAPHER:  Good

18     morning.  We are on the record.

19     This is the videographer, Bob

20     Giannini, with court reporter Judy

21     Williams, with U.S. Legal Support.

22     Today's date is May 31, 2018, and

23     the time is 10:12 a.m.

24             We are here at Ciampa

25     Fray-Witzer located at 20 Park

1    Plaza, Boston, Massachusetts, to

2    take the video deposition of Jeff

3    Anderson in the matter of Alex

4    Gubarev versus BuzzFeed, case

5    number 17-CV-6042 UU.

6            Will counsel please introduce

7    themselves for the record?

8            MR. SIEGEL:  Nathan Siegel

9    from Davis, Wright, Tremaine for the

10   defendants, and with me is my

11   colleague Alison Schary.

12           MR. FRAY-WITZER:  Evan

13   Fray-Witzer for plaintiffs.

14           MR. GURVITS:  Val Gurvits for

15   plaintiffs.

16           THE VIDEOGRAPHER:  Okay.

17   Will the court reporter please swear

18   in the witness?

19                  - - -

20           JEFFREY ANDERSON, first

21   having been satisfactorily

22   identified by the production of his

23   California driver's license and duly

24   sworn by the Notary Public,

25   testified under oath as follows in

```
 1        answer to examination.

 2                      - - -

 3              MR. SIEGEL:  I will just say

 4        for the record the depositions by

 5        agreement of the parties have been

 6        conducted under the usual

 7        stipulations that all objections

 8        other than as to the form of the

 9        question are preserved.  Right?

10              MR. FRAY-WITZER:  And motions

11        to strike similarly preserved until

12        time of trial.

13              MR. SIEGEL:  Correct.

14              E X A M I N A T I O N

15   BY MR. SIEGEL:

16        Q.   Good morning, Mr. Anderson.

17        A.   Good morning.

18        Q.   I know you have been deposed before,

19   so we don't need to go through the --

20              Approximately how many times do you

21   think you have been deposed?

22        A.   7.  7 to 10.  Somewhere in there.

23        Q.   7 to 10?

24        A.   Yes.

25        Q.   And approximately how many times
```

1    have you testified in court?

2          A.    4 times.

3          Q.    4 times?

4          A.    Yes.

5          Q.    Tell us what you do.

6          A.    So I value intellectual property,

7    assess damages, help with the monetization of

8    IP, all forms of IP, writer publicity,

9    trademarks, copyrights, patents, trade

10   secrets, know-how, proprietary technologies,

11   and the list goes on, but we only focus on

12   intellectual property, and then because we

13   actually value IP for transactional purposes,

14   whether it is sale side, buy side, joint

15   ventures, and also help to determine what the

16   licensing fees or rates should be for the

17   licensing of those assets, and we also do

18   expert testimony such as this.

19         Q.    So as you see it, how do the claims

20   in this case relate to the valuing of

21   intellectual property?

22         A.    Well, there is certainly

23   intellectual property elements involved with

24   the website, how the website did from it.

25   Then really IP is a subset of a business.  And

1     so by doing intellectual property valuation,

2     we always have to start with the value of a

3     business, and so value of business is really a

4     broader segment.  So by knowing how to value

5     IP, we also value businesses.

6          Q.   Would you agree that the plaintiffs

7     here, right, are a commercial business?

8     Correct?

9          A.   Correct.

10         Q.   Other than Mr. Gubarev.  XBT and

11    Webzilla.

12              Just to clarify, as I read your

13    report, my understanding is that you are being

14    offered to testify as to two things, right:

15    Damages to XBT and Webzilla?

16         A.   That's correct.

17         Q.   Correct.  We will call them the

18    business plaintiffs.

19              What you call unjust enrichment as

20    to BuzzFeed?  Correct?

21         A.   The benefit BuzzFeed received, yes.

22         Q.   And as I understand it, you are not

23    offering any testimony about personal damages

24    for Mr. Gubarev?  Is that correct?

25         A.   I am not.

1          Q.    And that would include economic or

2     noneconomic damages that are allegedly

3     personal to Mr. Gubarev?

4          A.    Unless somehow it ties to the

5     damages that I have assessed, no.

6          Q.    Okay.  Well, I understand that.  But

7     you are not -- you are not here to make some

8     causal link as to how much any theory of

9     damages of the companies might have filtered

10    down to Mr. Gubarev personally?  Is that

11    correct?

12         A.    I have not assigned a number of

13    damages to Mr. Gubarev personally.

14         Q.    Okay.  So would it be fair to say

15    that valuing XBT, Webzilla, and any other

16    subsidiaries of those companies doesn't

17    actually involve valuing intellectual

18    property?

19         A.    Well, certainly valuing any business

20    does involve valuing intellectual property.

21    As IP, I think Greenspan said it 10 years ago,

22    most businesses in the United States now are

23    predominantly IP.

24              And so by valuing businesses, we are

25    inherently valuing the IP elements to those

1    businesses.  If you look at just a balance

2    sheet, for example, it is not going to have

3    all of the value of the business.  The vast

4    majority of that is going to be comprised of

5    intellectual property.  So yes, IP is involved

6    in the valuation of businesses.

7         Q.   How is the vast majority of XBT's

8    business intellectual property?

9         A.   Well, if you look at their balance

10   sheet, for example, it is a far lower asset

11   delineation than the value of the business as

12   a whole which is then comprised of

13   intellectual property.

14        Q.   Right.  But how much of Webzilla's

15   business is comprised of intellectual

16   property?

17        A.   I don't know the exact number.

18        Q.   Could you even estimate a

19   percentage?

20        A.   The vast majority.

21        Q.   How?  How is the vast majority

22   comprised of intellectual property?

23        A.   Because their tangible assets,

24   physical assets, are a fairly de minimus

25   portion of the value of the business.

1          Q.   So what do you understand XBT's --

2    what is their business?  How would you

3    describe it?

4          A.   They are a data center, Web hosting,

5    they hold servers, co-locations.  So they are

6    an integrated Web platform services company.

7          Q.   Okay.  And would it be fair to say

8    that their primary business is that they --

9    people lease their servers in order to host

10   their websites?

11         A.   That is an element of their

12   business, yes.

13         Q.   Isn't that the primary element of

14   their business?

15         A.   I believe the majority of their

16   business is comprised of that, yes.

17         Q.   Okay.  So how does the business --

18   how does leasing or otherwise offering

19   physical servers to people primarily involve

20   intellectual property?

21         A.   Well, because you have customer

22   relationships, vendor relationships, banking

23   relationships.  So these relationships are all

24   intellectual property.  They are more

25   intangible assets, not protected -- and you

1    understand that, I don't need to lecture you

2    on it, so intellectual properties are

3    protected.  So these would be intangible

4    assets which still fall under the umbrella of

5    intangibles.

6           Q.   How is a physical server an

7    intangible asset?

8           A.   I am not saying a physical server

9    is.

10          Q.   How much of Webzilla's value

11   consists of intangible assets?

12          A.   Again the majority of the value

13   consists of intangible assets.

14          Q.   And could you -- is intellectual

15   property and intangible assets the same thing?

16          A.   No.  As I just explained, intangible

17   assets are the overarching umbrella, if you

18   will.  Intellectual properties are a subset of

19   that.

20               So intellectual properties, my

21   definition at least, is those which can be

22   legally protected.  There are some that are

23   gray areas.  Things such as customer lists,

24   vendor relationships, customer relationships,

25   those are considered intangible assets.  So

1     there is a difference, but they are all

2     intangible assets.

3          Q.   Now you haven't been asked to

4     specifically value either any intellectual

5     property that Webzilla or XBT owns?  Right?

6     In other words you haven't been asked to say,

7     okay, what is it that XBT and Webzilla has

8     that is intellectual property and this is how

9     much it is worth?  Is that fair?

10         A.   That's correct.  I have not done

11    that.

12         Q.   And you haven't been asked to

13    identify specifically what intangible assets

14    do they own and how much are they worth?

15         A.   I have not specifically identified

16    that.

17         Q.   You are simply offering a value of

18    the whole company, including all assets?

19    Right?

20         A.   Well, I have valued the business

21    under certain premises.

22         Q.   Have you ever offered any expert

23    testimony as to valuing an entire business

24    before?

25         A.   Yes.

1        Q.   Give me some examples.

2        A.   Well, I valued Gawker.

3        Q.   Okay.  And Gawker was a website?

4    Right?

5        A.   It was a website.  A business,

6    though.

7        Q.   Yes.  Have you ever offered any

8    expert testimony valuing a -- estimating the

9    damages, right, for an entire business?

10       A.   Yes.

11       Q.   What are some examples of that?

12       A.   So another case I am working on

13   currently is an issue of defamation, and the

14   entire business took a hit.  Their revenues,

15   earnings declined, so I valued the business

16   under two scenarios.

17       Q.   What business?  What kind of

18   business?

19       A.   This was a health services business.

20       Q.   Okay.  And have you testified --

21   have you been qualified as an expert in that

22   case yet?

23       A.   I have not been deposed yet.

24       Q.   Okay.  Could you give me an example

25   of cases in which you have been qualified as

1   an expert where you valued an entire business?

2       A.   I would have to look at my CV, but I

3   believe most -- I mean most of the cases that

4   we work on, we have to value the business and

5   then parse out the IP --

6       Q.   Okay.

7       A.   -- or the intangible assets.  And so

8   even in nonlitigation cases, we do values for

9   joint ventures where we have to value the

10  entire business and determine who is bringing

11  what assets to the table and then divide up

12  the pie, so to speak.

13      Q.   Okay.  Have you ever been qualified

14  as an expert in a defamation case before?

15      A.   Yes.

16      Q.   Which case?

17      A.   Well, I believe the Hulk

18  Hogan/Gawker case was a defamation case.

19      Q.   I can tell you it wasn't a

20  defamation case.  It is an invasion of privacy

21  case.

22           Have you ever been qualified as an

23  expert in a defamation case?

24      A.   I would have to look at my CV.  I

25  don't know.

1      Q.   In learning information that led up

2    to your writing your report in this case, who

3    did you talk to that you understood to be

4    employed by the plaintiffs?

5      A.   I spoke with the CFO, Raj Kumar.

6      Q.   Tell me about that.  Where did that

7    conversation take place?

8      A.   That was in La Jolla.

9      Q.   He came out to visit you in

10   La Jolla?

11     A.   He did.

12     Q.   And La Jolla is where you live and

13   work, I take it?

14     A.   Correct.

15     Q.   And did -- and what did he tell you?

16          MR. FRAY-WITZER:  Objection.

17   You can answer.

18     A.   We discussed how the defamatory

19   articles were detrimental to the business, how

20   it impacted revenues, earnings, ability to get

21   loans from banks.  I asked him about past

22   valuations that had been done.  That was most

23   of the extent of the conversation.

24   BY MR. SIEGEL:

25     Q.   What did he tell you about what past

1    valuations had been done?

2         A.    What do you mean what did he tell

3    me?

4         Q.    Well, you said you asked him about

5    past valuations of the company.  What did you

6    learn?  What did he say?  What information did

7    he give you?

8         A.    He -- he said that KPMG had done a

9    study in 2013, and that they used that study

10   for internal purposes and to determine, you

11   know, bank loans, items to present to

12   financiers.

13        Q.    Okay.  Were there any other

14   valuations that he told you about?

15        A.    That's the only one that I'm aware

16   of.

17        Q.    What did he tell you was the -- what

18   did he assert to you was the impact of the

19   publication of statements in the dossier that

20   may relate to XBT Webzilla?

21        A.    They lost significant revenues,

22   earnings, growth.  They had a complete lack of

23   ability to get financing.

24        Q.    Okay.  Did -- how did Mr. Mishra

25   tell you -- did Mr. Mishra identify any

1    customers for you that he contends

2    XBT/Webzilla lost as a result of the

3    publication of the dossier?

4         A.   I know -- banks or?

5         Q.   No, no, no.  Specific customers.  I

6    mean people who provide revenue to Webzilla --

7         A.   I don't know --

8         Q.   -- and XBT?

9         A.   I don't know that I got a specific

10   example.

11        Q.   Okay.  Did you ask?

12        A.   Yes.

13        Q.   And he wasn't able to give you any

14   specific examples?

15        A.   He did not know.

16        Q.   And with -- did he identify any

17   specific streams of revenue that he -- any

18   specific revenue that he said, "Here, this is

19   revenue that the company was earning in 2016.

20   We lost it in 2017 as a result of the

21   publication of the dossier"?

22        A.   My understanding was that more or

23   less across the board there was a decline in

24   revenues from the various segments.

25        Q.   And how did he contend that any

1    decline in revenue was attributable to the

2    publication of the dossier?

3         A.   Because it happened immediately

4    after the dossier was released.

5         Q.   And so that was -- and that's the

6    only reason?

7         A.   Well, no.  And there were issues

8    with lenders.

9         Q.   What were those issues with lenders?

10        A.   They either wouldn't provide loans

11   because of this or, you know, created great

12   hurdles to getting those loans because of it.

13        Q.   And how long -- did you have any

14   understanding of how long those issues lasted?

15        A.   I don't know specific time frame.

16        Q.   Did you ask?

17        A.   I believe we had a general

18   discussion about it, but I don't know if I

19   asked the specific question.

20        Q.   Have you read Mr. Mishra's

21   deposition?

22        A.   I have.

23        Q.   Do you see in his deposition he said

24   that these various concerns with lenders were

25   all taken care of within a month or so?

1              MR. FRAY-WITZER:  Objection.

2         A.   I don't -- I don't recall reading

3    that specifically.

4    BY MR. SIEGEL:

5         Q.   You don't recall reading that.

6    Okay.

7              You don't recall reading anything

8    like that?

9         A.   I recall reading that eventually

10   some lenders, not all, but some, were willing

11   to come back to the table, but I don't know

12   the exact time frame of that.

13        Q.   Which lenders were not willing to

14   come back to the table?

15        A.   I know ABN AMRO, they had issues

16   with them.  I don't recall the other specific

17   banks.

18        Q.   Okay.  Do you know whether ABN AMRO,

19   whether those issues with ABN AMRO were ever

20   resolved?

21        A.   I don't know if or when they were.

22        Q.   Okay.  Did Mr. Mishra ever provide

23   you any documentation to substantiate which

24   lenders he was talking about?

25        A.   Yes.

1          Q.    Which ones?  What documentation did

2     he provide you?

3          A.    ABN AMRO I saw.

4          Q.    There was a single email, right,

5     which we will talk about.  Anything else?

6          A.    That's all I recall at this point.

7          Q.    And did you ever do anything

8     yourself to try to verify whether what

9     Mr. Mishra was telling you about problems that

10    they had with -- he contends that they had

11    with banks was true?

12         A.    What do you mean?

13         Q.    Well, that in fact that --

14    Mr. Mishra told you that they had had some

15    problems with obtaining financing?  Right?

16         A.    He did.  Yes.

17         Q.    Okay.  But he didn't tell you how

18    long those problems lasted?

19         A.    Again I don't remember the exact

20    time frame of those issues.

21         Q.    Okay.  And did you ever, other than

22    the e-mail about ABN AMRO, did you ever do

23    anything yourself to verify whether

24    Mr. Mishra's assertions were true?

25         A.    I asked for all information that was

1    available.  I mean we discussed it when we met

2    in La Jolla.  But I don't know what else

3    independently I could have done in that

4    regard.

5         Q.  Well, okay.  So and you said he

6    provided you that single e-mail?  Right?  Did

7    he provide you any other information about

8    supposed problems with banks?

9         A.  I know there was again discussions

10   about issues with other banks.

11        Q.  Okay.  So you just relied on what

12   Mr. Mishra told you?

13        A.  I relied in part, yes, on what he

14   told me.

15        Q.  Okay.  How many times did you talk

16   to him?

17        A.  Aside from the meeting, maybe one or

18   two other times.

19        Q.  And how long did that meeting last?

20        A.  Two, three hours.

21        Q.  And when did you speak to him

22   subsequently?

23        A.  I spoke with him yesterday.

24        Q.  What did you talk about?

25        A.  I talked about the various revenue

1    streams and which ones were hit the most.

2         Q.   And what did he tell you?

3         A.   It was the Web servers were one of

4    the biggest hits.

5         Q.   Okay.  And did he -- again did he

6    give you any specific customers that

7    supposedly stopped being customers as a result

8    of the dossier?

9         A.   Again I -- my understanding was this

10   was across the board, and so he couldn't

11   provide a specific it was this one customer,

12   so I don't know that.

13        Q.   Okay.  And did he give you any

14   specific examples of any potential customers

15   that he contends didn't become customers as a

16   result of the dossier publication?

17        A.   I asked that question.  I think his

18   response was it's almost impossible to know

19   which ones didn't come in as a result of this,

20   because nobody was willing to specifically say

21   or very few people specifically claimed it was

22   because of X.  It was more of a broader there

23   is issues; we need to stand back.

24        Q.   And what else did you talk to

25   Mr. Mishra about yesterday?

1         A.    I believe that --

2                 MR. FRAY-WITZER:  Objection.

3         A.    -- was it.

4    BY MR. SIEGEL:

5         Q.    Did you talk to Mr. Mishra about

6    anything else yesterday?

7                 MR. FRAY-WITZER:  Objection.

8                 MR. SIEGEL:  Why is that

9         objectionable?

10                MR. FRAY-WITZER:  Because he

11        wasn't talking about conversations

12        yesterday.

13                MR. SIEGEL:  Oh, I thought he

14        said he talked to him yesterday.

15   BY MR. SIEGEL:

16        Q.    Did I mishear you?

17        A.    I did talk to him yesterday.

18                MR. FRAY-WITZER:  Okay.

19        That's all right.  Then I withdraw

20        the objection.

21                MR. SIEGEL:  Okay.

22   BY MR. SIEGEL:

23        Q.    I think you answered this, but just

24   to keep the record clear, did you talk to him

25   about any other subjects yesterday?

1          A.    I don't believe so.

2          Q.    Okay.  So you had the meeting in

3     La Jolla.  You had the conversation yesterday.

4     Any other conversations with Mr. Mishra?

5          A.    There may have been one other

6     conversation two, three weeks ago.

7          Q.    And what did you talk about?

8          A.    I believe it involved the alleged

9     Methbot client.

10         Q.    Tell me as best you can what you

11    recall about that conversation.

12         A.    That there was no issue that stemmed

13    from that other than that the 2017

14    projections, certain revenue, should have been

15    taken out from those projections because of

16    the loss of a client.

17         Q.    And what do you mean that there was

18    no other issue stemming from that?

19         A.    Well, there was no -- nothing that I

20    have seen, nothing reported on any

21    relationship between Webzilla and XBT or them

22    hosting any servers for the alleged Methbot

23    client.  And so there was nothing that stemmed

24    from that, no other issues that came from

25    that.

1          Q.   Did Mr. -- that's what Mr. Mishra

2     said?  Right?

3          A.   Yes.

4          Q.   Okay.  Was this conversation before

5     you issued your supplemental report?

6          A.   Yes.

7          Q.   And did you discuss with Mr. Mishra

8     how to value the loss of that client for

9     purposes of 2017 revenue?

10         A.   Well, we discussed the revenues that

11    were anticipated from that client.

12         Q.   And what did he tell you?

13         A.   That they thought it would be less

14    than five or six months to be able to then

15    sell those, you know, slots to other clients.

16         Q.   Okay.  Did you -- did Mr. Mishra

17    tell you in fact how long it took to do that

18    or if that had even been completed?

19         A.   I'm not sure what you mean.

20         Q.   Well, let's back up a second.  Okay?

21         A.   Sure.

22         Q.   The publication of information about

23    Methbot occurred in December of 2016.  Right?

24         A.   That's my understanding.  Yes.

25         Q.   Okay.  And so in or around I think

1    it was December 21 -- but the date for these

2    purposes doesn't matter.  So in December of

3    2016, the company lost this customer that was

4    associated with that report?  Right?

5        A.   Yes.

6        Q.   And if I understand what you are

7    saying, Mr. Mishra said that they thought it

8    would take five to six months from the time

9    they lost the customer to find other

10   customers, right, to lease those servers?  Is

11   that fair?

12       A.   No.  That's not what I said.  I said

13   is he said he thought it would take less than

14   the five to six months.

15       Q.   Okay.  Fine.  So less than five to

16   six months to find other customers, right, to

17   lease the servers that that customer had been

18   using?  Is that fair?  Is that a fair

19   understanding?

20       A.   That's the discussion that we had.

21       Q.   So my question is:  So that

22   according to Mr. Mishra they thought that by

23   June 2017 or probably even earlier, right, any

24   loss of revenue attributable to that customer

25   would be stopped?  Is that fair?

1          A.    That -- yes.  Certainly less than

2     five to six months --

3          Q.    Okay.

4          A.    -- they would be able to find

5     another client.

6          Q.    Less that five or six months in

7     December of 2017 when that customer was lost?

8          A.    2016 that they would be able to find

9     someone.

10          Q.    Sorry.  You are right.

11                So my question is what happened?

12          A.    What do you mean?

13          Q.    Well, you had this conversation with

14     Mr. Mishra in May of 2018?  Right?

15          A.    Yes.

16          Q.    By May of 2018, either those servers

17     were all leased by June of 2017 or they

18     weren't?  Right?

19          A.    Correct.

20          Q.    So what actually happened to those

21     servers?

22          A.    I believe they were able to release

23     those specific servers to other clients.

24          Q.    And what is your belief based on?

25          A.    Based on the discussions that I have

1    had with them.

2        Q.   But you said that Mr. Mishra

3    projected back when Methbot happened that they

4    would be able to release the servers?

5        A.   Um-hmm.

6        Q.   Did he tell you anything about what

7    actually happened to all of those servers?

8        A.   I don't know.  I don't know if he

9    gave me specifically those numbered servers,

10   or however they identified them, I don't know

11   that.

12       Q.   So sitting here today, you don't

13   actually know whether XBT/Webzilla was able to

14   release all of those servers within five to

15   six months of the Methbot or the alleged

16   Methbot fraud being exposed?  Right?

17       A.   Again according to my conversations,

18   their understanding was it would take at most

19   five to six, but Mr. Mishra believed it would

20   be less than that to be able to release those

21   servers.

22       Q.   But my point is -- and I am going to

23   ask you again.  I understand that that's what

24   he said they believed; right?  But we're a

25   year away from June of 2017.

 1          A.    Um-hmm.

 2          Q.    So what actually happened to those

 3    servers?

 4          A.    My view on this was to look at it

 5    from that perspective.  I was trying to

 6    understand the projections that were done in

 7    November of 2016, how would those have been

 8    affected by the --

 9          Q.    Right.

10          A.    -- alleged Methbot issue.  So my

11    focus was what would it have taken to get

12    those servers back online with other clients,

13    and that was the discussion that I had.

14          Q.    Right.  And if those projections

15    were wrong, wouldn't that affect your

16    valuation of the business?

17          A.    If the November of 2016 projections

18    were wrong?

19          Q.    Well, yes.  I will ask you that to

20    start with.

21          A.    That's -- if there was an issue with

22    those --

23          Q.    Okay.

24          A.    -- then we would address that as we

25    did.

1          Q.    And one of the issues was Methbot?

2     Right?  That was an issue?  Correct?

3          A.    That was a potential issue which we

4     addressed.

5          Q.    So wouldn't the way to address it be

6     to know how much revenue was actually lost

7     from that customer in 2017?

8          A.    And that's what we attempted to do

9     with our analysis.

10          Q.    But you are telling me you haven't

11     done that?  That's an empirical question?

12     Right?  There are a certain number of servers

13     that were used by those customers.  What

14     happened to those servers in 2017?

15          A.    Again I don't know what happened to

16     those servers.

17          Q.    Right.

18          A.    My understanding was that it would

19     take five to six months at most.

20          Q.    Right.

21          A.    So I backed out --

22          Q.    Okay.  But if it didn't take five to

23     six months --

24          A.    Um-hmm.

25          Q.    -- wouldn't that have affected the

1    value of the business?

2         A.   If something didn't --

3         Q.   What if it took 12 months?  Would

4    that affect the value of the business?

5         A.   If it -- if it took less than six

6    months, it could have an impact.

7         Q.   No, no.

8         A.   And if it took 12 months it could

9    have an impact.

10        Q.   What if even today some of those

11   servers have not been released?  Some of those

12   servers are still sitting unused, would that

13   affect the value of the business?

14        A.   If that was directly related to the

15   Methbot issue, sure, but if it was related to

16   the defamatory articles released by BuzzFeed,

17   then you can't claim that it was a Methbot

18   issue.

19        Q.   Right.  But how would you know?

20        A.   Because there was -- again there was

21   no reporting or any indications that Webzilla

22   and XBT were hosting this alleged Methbot

23   client.  It was a nonissue.

24        Q.   What was a nonissue?

25        A.   Other than backing out six months of

1    projected revenue, which we did --

2         Q.   Right.

3         A.   -- there was no other issue with the

4    Methbot -- alleged Methbot client.

5         Q.   Well, but -- okay.  Let's just

6    establish for the record.  Okay?

7              You don't know how much revenue XBT

8    actually lost in 2017 as a result of the

9    Methbot client?  Is that fair?

10        A.   That's a good question.  The --

11   there is -- doing projections for business,

12   which business valuation and IP valuation is

13   what we do, you have to come up with

14   assumptions.

15        Q.   Right.

16        A.   And the best assumption for what

17   revenue was potentially lost from the alleged

18   Methbot client was what revenues had been

19   earned in the prior six months.  And so we

20   deducted that from the projections in 2017.

21        Q.   Why would that be -- why would the

22   prior six months -- why pick that time frame?

23        A.   Because that was the most recent

24   revenues earned from that client, and so it is

25   most reasonable to project or assume that

1    those revenues, that same amount of revenue,

2    would be removed once -- from those 2017

3    projections done in November of 2016.

4         Q.   What if the revenues that were

5    earned from that client in November and

6    December of 2016 were substantially higher

7    than the revenues that were earned from the

8    client in the four months prior to that?

9    Wouldn't the most recent revenues earned by

10   that client be the best indicator of how much

11   revenue was going to be lost in 2017?

12        A.   If you are asking if one month is a

13   reasonable indication for projecting six

14   months out, no.

15        Q.   Two months?

16        A.   I believe six months is a reasonable

17   indication given that that was the time frame,

18   at most, anticipated this would affect the

19   business.

20        Q.   But wouldn't that assume that the

21   amount of revenue that that client was going

22   to generate in the first six months of 2017

23   was going to be the same as the amount of

24   revenue that the client generated in the last

25   six months of 2016?

```
1            A.   Yes.

2            Q.   Okay.

3            A.   The assumption was --

4            Q.   But if the revenue stream was going

5     way up throughout the last six months of 2016;

6     right?

7            A.   If it was?

8            Q.   If it was.  Are you saying that it

9     wasn't?

10           A.   It was not a straight line.  No.  It

11    was not.

12           Q.   Okay.  It jumped enormously in

13    November and December of 2016?  Right?

14           A.   There were dips in it as well.

15           Q.   There were dips?

16           A.   Yes.

17           Q.   Let's get document 10.

18                MR. SIEGEL:  Mark this as

19           Exhibit 1.

20           (One-page chart marked

21           Exhibit 1 for identification.)

22                MR. FRAY-WITZER:  Do you have

23           a copy for us?

24                MR. SIEGEL:  Sure.  Sorry.

25    BY MR. SIEGEL:
```

1          Q.   I am going to show you Exhibit 1,

2     which I believe is document 10 in your report,

3     your supplemental report.

4               (Handing Exhibit 1 to the

5          witness.)

6          Q.   You understand Exhibit 1 to be the

7     revenue from the Methbot customer, right, in

8     2016?  Right?

9          A.   I do.

10         Q.   So show me where the dip is in the

11    last six months of 2016.

12              (Pause.)

13              (Witness viewing Exhibit 1.)

14         A.   Well, there is an $87,000 drop from

15    November to December.

16         Q.   Do you have any idea why that is?

17         A.   The client was lost --

18         Q.   And --

19         A.   -- around the 20th, 23rd.

20         Q.   Right.  Or even a couple of days

21    before that.  Doesn't that indicate that even

22    the revenue the client was generating for

23    December had it continued for the rest of the

24    month was as high or higher than it was in

25    November?  Right?

1    A.   Hey, I have no indication of what

2    that number would have been.

3    Q.   Really?  If the client generated

4    $311,000 in revenue the first three weeks of

5    December, you can't assume that the amount of

6    revenue that would have been generated in the

7    last 9 or 10 days of the month would be at

8    least $100,000?

9    A.   It's an assumption that I did not

10   need to make for this.

11   Q.   Well, okay.  But my question is

12   there is no actual dip?  Right?  There is no

13   discernible dip in the last six months of

14   2016?

15   A.   It was essentially flat in the

16   middle three months.

17   Q.   Right.  And then it -- and then it

18   jumped, more than doubled, right, in November?

19   A.   Um-hmm.

20   Q.   And that continued in December?

21   Correct?  For the first three weeks at least?

22   A.   Yes.  But it was also up to 190,000

23   in April.

24   Q.   Okay.

25   A.   And then dropped down to 170.  There

1    is no linear --

2           Q.   Do you know why it jumped in

3    November and December?

4           A.   I do not.

5           Q.   Did you ever consider that?  You

6    don't think that would be relevant to

7    estimating what the likely loss of revenue

8    from that customer would have been in 2017?

9           A.   Why the decline from 190 to 170?

10          Q.   No, no, no, no.  Why the jump from

11   170 to 398 and then to 311 in the first three

12   weeks in December?

13          A.   Again the best indication that I was

14   able to see was the last six months.

15          Q.   No, no, no.  That is not my

16   question.

17               Did you ever ask why the revenue

18   from that customer jumped in November?

19          A.   I don't know if I asked that

20   specific question.

21          Q.   Did you ever think about it?

22          A.   I thought about all of these

23   numbers.

24          Q.   Okay.

25          A.   And I asked the client what the

1    impact would be, and from reading in the

2    deposition, they estimated 200,000 a month --

3         Q.   Right.

4         A.   -- would have been lost.  And so I

5    took the last six months, which ended up being

6    higher than that.

7         Q.   Right.

8         A.   231,000, I believe.  And I felt that

9    was a conservative estimate of the revenues

10   that would be lost from this client.

11        Q.   If the client had been generating

12   $400,000 revenue a month in the preceding two

13   months or seven weeks before it was dropped,

14   you would assume that the client's revenue

15   would have dropped significantly at some point

16   in the first six months of 2017?  Right?

17        A.   I am sorry.  Say that again?

18        Q.   Well, your assumption -- if your

19   assumption is that the client would have

20   generated $230,000 of revenue in the first six

21   months of the 2017 -- right?

22        A.   On average.

23        Q.   On average.  That would have

24   required a significant dip in revenue from

25   what the client had been paying in November

1    and December 2016?  Right?

2          A.    In -- in January?

3          Q.    At some point in the next -- in the

4    ensuing six months, right, the revenue would

5    have had to have dropped substantially?

6          A.    At some point on average.

7          Q.    Yes.  And what basis do you have to

8    assume that that would have happened?

9          A.    Again discussions with the client

10   regarding this client.

11         Q.    And what basis did those discussions

12   provide that this client's revenue would have

13   dropped substantially from roughly $400,000 a

14   month in the first six months of 2017?

15         A.    That was their estimate of -- again

16   they estimated 200,000.

17         Q.    Right.

18         A.    So I --

19         Q.    And is it possible that their

20   estimate is wrong?

21         A.    I have no indication that that

22   estimate is wrong.

23         Q.    Well, okay.  So I am asking

24   empirically -- not because they estimated it

25   -- what facts are you aware of that suggest to

1       you that revenue from that client would have

2       dropped from about $400,000 a month to a

3       number that would have produced an average of

4       $230,000 a month in the first six months of

5       2017?

6            A.    Again based on the discussions I

7       have had and based on really standard

8       practice, which is not to take a two-month

9       indication and extrapolate that forward.

10           Q.    So it is just standard practice?  It

11      has nothing to do with the actual activity

12      that this customer was actually conducting?

13      Right?

14           A.    I'm not understanding that question.

15           Q.    Well, in other words, this is all

16      just based on, for want of a better word,

17      guesswork?  Right?

18           A.    I prefer to say this is based on

19      reasonable estimates using historical

20      figures --

21           Q.    Okay.

22           A.    -- and discussions with the client,

23      who knows this better than -- than anyone

24      else.

25           Q.    Okay.  And if a -- and you don't

1    think it is relevant that the customer's

2    activity jumped for between March 16 and

3    October 16 and then jumped again substantially

4    in November and December?  You don't think

5    that that November-December jump is relevant?

6                    MR. FRAY-WITZER:  Objection.

7         You can answer.

8         A.   Again looking at the historical

9    revenues we may have here since October of

10   '15 --

11   BY MR. SIEGEL:

12        Q.   Right.

13        A.   -- this was not a linear

14   relationship.  It did not go up X percent

15   every single month.  There were -- it went up,

16   it went down, it went up, it went down.  And

17   so the best indication was taking an average

18   of the monthly revenues.

19        Q.   How long were the leases for the

20   servers used by this customer?

21        A.   I don't know.

22        Q.   You don't know.  Do you think that

23   would be relevant to estimating the impact?

24        A.   My understanding is the server

25   leases run anywhere from one to three years.

1              Q.    Okay.

2              A.    Some clients were new.

3              Q.    If XBT and Webzilla were releasing

4    sufficient servers to produce $400,000 in

5    revenue from November and December and those

6    leases were for one to three years, that

7    doesn't suggest to you that the impact of

8    losing $400,000 of revenue would have been

9    higher than an average of $230,000 for the

10   first six months of 2016?

11                   MR. FRAY-WITZER:  Objection.

12        You can answer.

13                   MR. SIEGEL:  I will back it

14        up again.  All right.

15   BY MR. SIEGEL:

16             Q.    In order to generate $400,000 of

17   revenue, right, XBT and Webzilla would have

18   had to lease additional servers?  Right?

19                   MR. FRAY-WITZER:  Objection.

20   BY MR. SIEGEL:

21             Q.    Okay.  And those leases would have

22   been for one to three years?  Right?

23                   MR. FRAY-WITZER:  Objection.

24             A.    Potentially.

25   BY MR. SIEGEL:

1      Q.   So as of the end of December, XBT

2      had on its hands servers with one to three

3      year leases, right --

4                MR. FRAY-WITZER:  Objection.

5      BY MR. SIEGEL:

6      Q.   -- that were sufficient to host

7      $400,000 a month worth of activity; isn't that

8      right?  Not 200?  400?

9      A.   The 400,000 they had at the end of

10     2016, again it depends on the starting point

11     of when the servers released, the financing

12     elements that went into that --

13     Q.   Right.

14     A.   -- other clients that came or went

15     during that time frame.  So I can't answer

16     what servers were locked up under contract at

17     that point in time.  I don't know.

18     Q.   But the answer to that question

19     would be relevant to determining the actual

20     impact of losing a customer that had been

21     generating $400,000 a month in revenue in the

22     last two months of 2016, wouldn't it?

23     A.   If there is additional information

24     that shows that, I will take that into

25     consideration --

1          Q.   Okay.

2          A.   -- and adjust my analysis.

3          Q.   Okay.  Did -- the last question on

4     that.

5               With respect to releasing -- with

6     respect to XBT's supposedly releasing these

7     servers to other customers, right, your

8     assumption is that they would have been able

9     to release them at the same price?  Right?

10         A.   To release them?

11         Q.   At the same price that the Methbot

12    customer was paying.

13         A.   Well, no.  My assumption was that

14    they for six months --

15         Q.   Right.

16         A.   -- they didn't lease 231 some

17    thousand on average -- over that six-month

18    period they didn't release that.

19              Now the client said that they likely

20    could have released --

21         Q.   Right.

22         A.   -- those specific Methbot servers

23    likely sooner than that.

24         Q.   Have you read Mr. DeVoss'

25    deposition?

1          A.    No.

2          Q.    Are you aware Mr. DeVoss testified

3     that as of the date of this deposition, which

4     was last week, there were still servers that

5     had been leased by the Methbot customer that

6     had not been released?

7          A.    I'm not aware of that.

8          Q.    Do you think that might affect your

9     analysis?

10         A.    It depends on if there are other

11    reasons why those servers couldn't be

12    released.

13         Q.    Okay.  And you read Mr. Mishra's

14    deposition?  Right?

15         A.    I did.

16         Q.    And Mr. Mishra testified that he

17    couldn't answer the question whether in fact

18    the servers used by Methbot customers had been

19    released within the first six months of 2017?

20    Right?  That's what he said?

21         A.    I don't remember the exact words he

22    used.  I don't know.

23         Q.    You don't think that is what he

24    said?

25         A.    I think what he had said was that it

1    would take five to six months, but it could be

2    sooner.

3          Q.    Then when asked if it did take five

4    to six months he said, "I don't know"; is that

5    fair?

6          A.    If he said that, I'll believe you.

7          Q.    Okay.  But that makes no -- that has

8    no -- that makes no difference in your view to

9    how you value the loss of the Methbot

10   customer?

11               MR. FRAY-WITZER:  Objection.

12        You can answer.

13         A.    Well, what do you mean makes no

14   difference?

15   BY MR. SIEGEL:

16         Q.    The fact that neither -- the fact

17   that Mr. Mishra can't say whether in fact his

18   assumptions about five to six months were

19   correct --

20         A.    Yes.

21         Q.    -- makes no difference to you?

22         A.    Well, perhaps one of the reasons

23   that he can't say is because BuzzFeed released

24   the dossier, which mentioned

25   XBT/Webzilla/Mr. Gubarev.

1          Q.   What basis do you have -- that is

2     just your speculation?

3               MR. FRAY-WITZER:  Objection.

4          A.   It is not speculation they did

5     release it.

6     BY MR. SIEGEL:

7          Q.   Yes.  But it is your speculation

8     that that is a reason the company couldn't

9     release Methbot servers?  Right?  That's your

10    speculation?  Right?

11              MR. FRAY-WITZER:  Objection.

12         You can answer.

13         A.   It is not speculation in the sense

14    that again there was no indication that there

15    were any reports of Webzilla or XBT hosting

16    any servers --

17    BY MR. SIEGEL:

18         Q.   Right.

19         A.   -- used by the alleged Methbot

20    client.  There was no perpetuation of that,

21    which is the exact opposite of the

22    perpetuation of the salacious spectacular

23    statements made in the dossier.  And so I

24    think to say that they are --

25         Q.   Which salacious spectacular

1    statements are you talking about?

2          A.    In the dossier?

3          Q.    Yes.

4          A.    Well, I believe there are several of

5    them.

6          Q.    So tell me some.

7          A.    Well, that XBT and Webzilla were --

8    that the Russian FSB had coerced them to, you

9    know, to benefit their purposes.

10         Q.    And what else?  Are there any others

11   that you are referring to?

12         A.    I would have to look at the dossier.

13         Q.    Okay.  Just sitting here now, are

14   there any others that you can think of that

15   when you said salacious spectacular statements

16   that's what you are refusing to?

17         A.    They used porn sites and porn

18   traffic to infect, used bots to infect

19   computers to hack the DNC.

20         Q.    The statements you are talking about

21   of all of those that you say relate to these

22   plaintiffs?

23         A.    What do you mean relate to these

24   plaintiffs?

25         Q.    In other words, are you talking

1    about other portions of the dossier, like the

2    famous hotel tape with respect to Donald

3    Trump?

4         A.   I am talking about the statements

5    made about Webzilla, XBT and Mr. Gubarev.

6         Q.   Okay.  So sitting here today, is it

7    fair to say that you don't know for a fact why

8    it took XBT/Webzilla --

9              MR. SIEGEL:  Well, strike

10        that.  I will start again.

11   BY MR. SIEGEL:

12        Q.   You don't know for a fact why it may

13   have taken XBT/Webzilla more than six months

14   to release those servers, if at all, the

15   Methbot servers?

16        A.   There is a -- an ebb and flow of

17   which servers may be utilized.

18        Q.   Right.

19        A.   If you are talking about specific

20   serial-numbered servers, I don't have the

21   answer to that.

22        Q.   Okay.  Did you talk to anybody else

23   who works for any of the plaintiffs --

24        A.   Yes.

25        Q.   -- other than Mr. Mishra?

1          A.   I spoke with Mr. Gubarev.

2          Q.   And tell me about that conversation.

3          A.   It was the same discussion revolving

4     the alleged Methbot client.

5          Q.   And what did he tell you?

6          A.   That he had spoken with their PR

7     agent, Mr. Charles Dolan.

8          Q.   Um-hmm.

9          A.   And he was prepared to send a

10    release to clients discussing how this was,

11    you know, nothing that they condone, and there

12    was no again reporting, no indication that

13    there was any pick up of this story, that

14    anyone knew about it.  And so they decided not

15    to send that out.  They decided not to send

16    out any PR release about it because it was a

17    nonissue.

18         Q.   Okay.  All right.  Did he tell you

19    that they actually did provide information to

20    an investigative journalist who reports on

21    cybersecurity matters?

22         A.   I'm not sure what you are talking

23    about.

24         Q.   Do you know who Brian Krebs is?

25         A.   I have heard of Krebs online.

1          Q.   Do you know that they provided

2     information to Brian Krebs about their

3     association with Methbot?

4          A.   Who provided information?

5          Q.   XBT.

6          A.   What information?

7          Q.   Mr. Dolan did.

8          A.   I don't know what information.

9          Q.   You just don't know?  That is not

10    something that you discussed with Mr. Gubarev?

11         A.   I did not discuss that.

12         Q.   All right.  Other than how to

13    respond to the Methbot issue, did you talk

14    about anything else with Mr. Gubarev?

15         A.   I believe that was it.

16         Q.   When did this conversation with

17    Mr. Gubarev take place?

18         A.   Before I submitted my supplemental

19    report.

20         Q.   Okay.  Other than Mr. Gubarev and

21    Mr. Mishra, have you talked to anybody else

22    who you understand to be employed by XBT?

23         A.   I don't think so.

24         Q.   Was that conversation with

25    Mr. Gubarev over the phone?

1            A.   Yes.

2            Q.   I assume that you have communicated

3    with counsel for the plaintiffs in this case?

4            A.   I have talked to them?

5            Q.   Yes.

6            A.   Yes.

7            Q.   Other than the documents that have

8    been included in your expert report, and I

9    think listed by math, is there any other

10   information that they provided you?

11           A.   I -- I don't know.

12           Q.   Okay.  What do you understand to be

13   XBT's -- let me ask it a simple way.  All

14   right?

15                How does XBT make money as you

16   understand it?

17           A.   They lease servers.  They have

18   clients.  They provide value-add services to

19   them, security services.

20           Q.   Okay.  And what are the -- so that's

21   where they get their revenue from or how they

22   generate revenue?  Right?

23           A.   Correct.

24           Q.   What are the primary sources of

25   costs, right, that XBT has to spend in order

1    to generate that revenue?

2         A.    My understanding is that, well, the

3    primary is server space.

4         Q.    Okay.

5         A.    And employees.

6         Q.    Okay.  Is it fair to say that as you

7    understand it, right, the more hosting

8    customers that XBT has, right, the more costs

9    they will incur in order to lease servers to

10   provide for those to those customers?  Is that

11   fair?  In general.

12        A.    In general, but not proportionately.

13        Q.    Okay.  I'm not asking you

14   proportionately.  I am not asking you about it

15   to make it specific.

16              But in general to attract more

17   customers, to release more servers, they will

18   need to spend some more money, right, to

19   provide those servers?  Is that fair in

20   general?

21        A.    Well, but I think that's backwards.

22        Q.    Okay.

23        A.    I think it is instead that they get

24   loans lined up to lease the servers.

25        Q.    Right.

1          A.    And then once they have those lined

2     up, so they can release them to the clients,

3     then they get the client on board.

4          Q.    I get it.  So you are saying that

5     sort of the cost comes first and the revenue

6     follows?

7          A.    Well, there is -- yes.  Getting the

8     financing lined up --

9          Q.    Okay.

10         A.    -- comes first --

11         Q.    Right.

12         A.    -- before they spend the cost to

13    sign up the client --

14         Q.    Right.

15         A.    -- which is --

16         Q.    But the financing is -- the

17    financing is an agreement to pay a certain

18    number of costs?  Right?

19         A.    That is typically what financing is.

20    Yes.

21         Q.    Fair enough.  Okay.

22              Now you -- the first part of your

23    expert report provides an estimate of what you

24    say is lost business value?  Right?

25         A.    Yes.

1          Q.   Explain what that means.

2          A.   It means that because of the

3     defamatory articles, there was a decline in

4     revenue and associated earnings, and as a

5     result of those declines, the value of the

6     business declined.

7          Q.   Okay.  So I'm actually asking you a

8     different question.  We will get into some of

9     that, those assertions for now.

10              But what do you mean by the value of

11    a business?  That's what I am asking.  Just in

12    general, what does a business's value mean?

13         A.   It is an enterprise value.

14         Q.   Okay.  Explain what that means in

15    layperson's terms as best you can.

16         A.   It is what you could sell the

17    business for.

18         Q.   Okay.  So it is how much you could,

19    if there was a hypothetical buyer, how much

20    you could sell the business to that

21    hypothetical buyer for?

22         A.   At fair market value.

23         Q.   And your estimate of lost business

24    value, okay --

25              MR. SIEGEL:  Well, strike

1          that.  I will ask you a different

2          question.

3     BY MR. SIEGEL:

4          Q.   Does the value of the business

5     change over time?

6          A.   It can.

7          Q.   It can; right?  So, in other words,

8     it might be that a buyer on January of 2014

9     were to pay one price for a business, but a

10    buyer a year later might pay a different price

11    based on something that happened in the

12    interim, right, in general?

13         A.   That could be a case, yes.

14         Q.   So what is the point in time at

15    which you are valuing XBT's business?

16         A.   January 1, 2018.

17         Q.   Okay.  And why that date?

18         A.   Because that was approximately

19    around the time that we were retained in this

20    case.

21         Q.   Okay.

22         A.   And I would say a clean point to

23    value the company at.

24         Q.   Okay.  Is the value of the company

25    in your opinion different today than it was on

1     January 1, 2018?

2          A.    I don't know.

3          Q.    So and do you intend to offer any

4     different value between now --

5                MR. SIEGEL:  Strike that.

6     BY MR. SIEGEL:

7          Q.    If you were to testify at trial,

8     okay, do you intend to offer any different

9     valuation at trial based on conditions as of

10    the date of trial?

11         A.    If there is additional information

12    or I am asked to do so, then I am willing to.

13         Q.    Okay.

14         A.    But I don't know if I'm -- if that

15    is going to happen or not.

16         Q.    So but my question is why, if you

17    are trying to claim that you are estimating

18    damages caused by the dossier, why pick

19    January 1, 2018?

20         A.    Again it was around the time that we

21    were retained.

22         Q.    Okay.  But if you had been retained

23    on June 30, 2018, the number could have been

24    different?  Right?

25         A.    It could have been.

1          Q.   Okay.  And why choose that measure

2     of damages?

3          A.   Lost business value?

4          Q.   Yes.

5          A.   That was the discussion that I had

6     with counsel of what the measure of damages

7     was going to be.

8          Q.   So that's what counsel asked you to

9     estimate?

10              MR. FRAY-WITZER:  Objection.

11         You can answer.

12              MR. SIEGEL:  Fair enough.

13         Okay.

14    BY MR. SIEGEL:

15         Q.   Okay.  Is that -- was that a

16    decision that you made that that was the best

17    way to measure damages in this case?

18         A.   I don't know if -- I don't know if

19    that was an organic decision as a group.  I

20    don't know the answer to that.

21         Q.   Okay.

22              MR. FRAY-WITZER:  Nathan,

23         just whenever you get a chance for a

24         bathroom break.  It doesn't have to

25         be immediately.  Just whenever you

1          get a chance.

2                    MR. SIEGEL:  Okay.  I have

3          got a few more just on this.

4                    MR. FRAY-WITZER:  That's

5          fine.

6                    MR. SIEGEL:  And then that

7          will be a good breaking point.

8                    Could we have the

9          supplemental report?

10                   Let's mark this as Exhibit 2.

11        (Supplemental Expert Report marked

12        Exhibit 2 for identification.)

13                   (Handing Exhibit 2 to the

14        witness.)

15    BY MR. SIEGEL:

16        Q.   I ask you to turn to page 8,

17    Mr. Anderson.

18                   (Witness complying.)

19        Q.   I'm sorry.  I meant page 7.

20                   (Witness complying.)

21        Q.   If you look under "Damages

22    analysis," subpoint 5, the first sentence says

23    you have asked counsel to analyze damages.

24    The second sentence says:

25                   "Damages stemming from these actions

1    include but are not limited to XBT's lost

2    business value."

3              So but are you providing any measure

4    or estimate of damages other than lost

5    business value?

6         A.   In this report?

7         Q.   Yes.

8         A.   That's the only measure of damages

9    that I have presented.

10        Q.   And so does that -- does that mean

11   that you are -- and I'm not talking about the

12   benefit to BuzzFeed for the moment -- I am

13   talking about damages to the plaintiff,

14   okay? --

15        A.   Okay.

16        Q.   -- for purposes of these questions.

17             So is there any -- is there any

18   other damages theories that you are intending

19   to testify about?

20        A.   Again at this point in time other

21   than what I've put in my report is what I

22   intend to testify to.

23        Q.   All right.  So the question is

24   simply when you said "include but are not

25   limited to," what did you mean by that?

1          A.    I mean that statement means that

2     we're not making any claims there are not

3     potentially other damage elements that we have

4     not been asked to address.  It is just not to

5     focus or limit it to XBT's lost business

6     value.

7          Q.    Okay.  Let me ask you, setting aside

8     Mr. Gubarev personally, if you are valuing the

9     entire business, right, the entire value of

10    the business, what other damages could there

11    be with respect to the business?

12         A.    I don't know.

13         Q.    Okay.  So you are not intending to

14    offer any testimony on anything other than

15    measuring the lost business value, setting

16    aside the benefit to BuzzFeed?

17         A.    And again unless new information

18    comes up I'm asked to address something else,

19    for right now this is all I'm -- this is all I

20    have analyzed.

21         Q.    Okay.  And in your estimate of

22    business value, right, is an estimate for as

23    an accountant would call it the consolidated

24    company?  Is that fair?

25         A.    It's a fair market value of XBT and

 1      its subsidiaries.

 2              Q.   And all of its subsidiaries?  Right?

 3              A.   Correct.

 4              Q.   So you have not made any effort to

 5      apportion that market value by figuring out

 6      the market value of each subsidiary?  Is that

 7      fair?

 8              A.   I have not.

 9              Q.   Okay.  And you have not made any

10      effort to calculate any business value for

11      Webzilla, Inc. specifically?

12              A.   I have not.

13              Q.   Okay.  Is it -- would it also be

14      accurate to say that you have not made any

15      effort to determine how much of what you

16      contend is lost business valuable should be

17      attributed to BuzzFeed and how much should be

18      attributed to Christopher Steele?

19                   MR. FRAY-WITZER:  Objection.

20              A.   Business valuable?

21      BY MR. SIEGEL:

22              Q.   Back up.

23                   Are you aware that XBT is also suing

24      and  Mr. Gubarev and one of its European

25      subsidiaries are suing Mr. Steele in London?

1    Are you aware of that?

2         A.   I have heard that, but I don't know

3    anything about it.

4         Q.   And they are suing Mr. Steele over

5    the same statements that they are suing

6    BuzzFeed over?

7         A.   Again I have not looked into that at

8    all.

9         Q.   Okay.  So you haven't looked at that

10   at all.  So you haven't made any effort to

11   say, you know what, BuzzFeed -- you gave a

12   range of lost business value, right, from 32

13   million to 137 I think is your estimate?  Your

14   latest estimate?  Roughly?  Right?

15        A.   Well, roughly.

16        Q.   Okay.  So you haven't made any

17   effort to say of that 32 million, X percentage

18   was caused by BuzzFeed and Y percentage was

19   caused by Christopher Steele?  Right?  That is

20   not something that you have looked at?

21        A.   I have not --

22        Q.   Okay.

23        A.   -- discussed, looked at that,

24   anything.

25        Q.   Okay.

1          MR. SIEGEL:  This is a good

2     breaking point.

3          MR. FRAY-WITZER:  Okay.

4          THE VIDEOGRAPHER:  The time

5     is 11:13.  We are off the record.

6          (Recess taken at 11:13 a.m.)

7          (Recess ended at 11:27 a.m.)

8          THE VIDEOGRAPHER:  The time

9     is 11:28.  We are back on the

10     record.

11  BY MR. SIEGEL:

12     Q.   Okay.  Mr. Anderson, turning now to

13  the actual methodology you used for your

14  estimate of business value, it relies in part

15  on something called EBITDA.  Right?

16     A.   EBITDA.

17     Q.   EBITDA.  So that is the way -- you

18  like to pronounce it EBITDA.  Good.

19          What is EBITDA?

20     A.   It is earnings before interest,

21  taxes, depreciation and amortization.

22     Q.   So in order to calculate EBITDA, you

23  need to know the revenue a company generated?

24  Right?  That's one component?

25     A.   Sure.

1          Q.   And you also need to know their

2     cost, their operating costs and expenses?

3     Right?

4          A.   Correct.

5          Q.   And EBITDA is a function of both of

6     those; right?  It is a function of how much

7     revenue a company has and how much their costs

8     were; right?

9          A.   Yes.  It is a function of operating

10    income essentially.

11         Q.   And operating income is a function

12    of how much do you make versus how much do you

13    spend?

14         A.   Exactly.

15         Q.   Okay.  And then you also use a

16    measure called EBITDA margin?  Right?

17         A.   Correct.

18         Q.   Explain what that is.

19         A.   It is essentially EBITDA --

20         Q.   Right.

21         A.   -- as a percentage of revenue.

22         Q.   Okay.

23         A.   It is a percentage.

24         Q.   Okay.  So the higher the EBITDA, the

25    higher the margin will be?  Right?

1          A.    Well, in relation to --ceteris

2     paribus, all things being the same, yes.

3          Q.    Okay.  So I just want to summarize

4     some elements of your methodology to make sure

5     that we all are understanding them correctly.

6          A.    Sure.

7          Q.    Okay?  So -- and I will start with

8     your first report, and then I understand the

9     second one adjusted some of the numbers, so

10    we'll cover that.  Okay?

11         A.    (The witness nodding his head.)

12         Q.    So you first took the projection

13    that XBT made in November of 2016 of its 2017

14    revenue, cost, and EBITDA?  Right?  That's

15    what you started with?

16         A.    Correct.

17         Q.    Okay.  And then you also based on

18    that calculated what their projected EBITDA

19    margin would be for 2017?  Right?

20         A.    Based on those projections, yes.

21         Q.    And that was 51.9 percent?

22         A.    Correct.

23         Q.    Okay.  And then you looked at -- and

24    I understand there were two different numbers

25    at two different points in time, but you

1    looked at the best data that you had for their

2    actual 2017 revenue numbers?  Right?

3         A.   I did.

4         Q.   Okay.  Now would it be correct to

5    say that even in your supplemental report you

6    do not have data about their actual 2017

7    costs?

8         A.   That's correct.

9         Q.   Okay.  So even today, right, we

10   don't know what their actual 2017 EBITDA was?

11        A.   That's -- I have not seen it.

12        Q.   Okay.  And similarly, so we don't

13   know what their actual 2017 margin?  Right?

14        A.   EBITDA margin?

15        Q.   Right.

16        A.   Correct.

17        Q.   So in order to make your

18   calculations, you estimated, right, what their

19   2017 EBITDA would be?

20        A.   For one element, I did, yes.

21        Q.   Okay.  Can you go to Exhibit 5 of

22   your supplemental report?

23             (Witness complying.)

24        Q.   If you look at Exhibit 5, do you see

25   where it says "as is scenario 2017"?

1        A.    I do.

2        Q.    So revenue is 58.27 million.  That

3   is based on the actual numbers that XBT

4   provided, right, as of the time of this

5   report?

6        A.    Correct.

7        Q.    Just based on your understanding,

8   are those -- are those numbers still

9   unaudited?

10        A.    Yes.

11        Q.    Okay.  So it is at least possible

12   that that number could change in their final

13   audited statements?

14        A.    Sure.

15        Q.    Okay.  Now operating profit, you

16   have in italics, I believe, 9.8 million

17   roughly.  How did you calculate that number?

18        A.    So that is based on common size,

19   which is essentially different elements of an

20   income statement in relation to a percentage

21   in relation to revenues.  And we used 2016's

22   relational percentages for each of those

23   measures, operating profit, et cetera, to get

24   to the number, since we didn't have the

25   expenses, as you said.

1          Q.   So in my -- I am going to ask you to

2     in my more simpleton terms -- if I am

3     understanding accurately what you are saying,

4     okay, are you saying that -- I am just going

5     to give you a hypothetical for purposes of if

6     I am understanding it, right.  Are you saying

7     that if hypothetically XBT had $50 million of

8     revenue in 2016 and they had $30 million of

9     cost, right, so the percentage was 60 percent

10     in 2016, are you saying that you apply that

11     same percentage to their 2017 revenue to

12     estimate EBITDA, or is that not what you're

13     saying?

14          A.   I think you are on the right track.

15          Q.   Okay.

16          A.   We are just saying whatever the

17     relationship to expenses and revenue and

18     depreciation, amortization, which are elements

19     you need to get to an EBITDA number --

20          Q.   Okay.

21          A.   -- what that relationship to revenue

22     was in 2016 we assumed that relationship would

23     be the same in 2017.

24          Q.   Okay.  And if -- so would it be fair

25     to say that if it turns out that the

1    proportion in 2017 changed, the relationship

2    changed, then their actual EBITDA number would

3    be different than what you have calculated

4    here?  Right?

5         A.   Sure.  If the numbers change, they

6    would change.

7         Q.   Okay.  Have you had any discussions

8    with XBT about when they expect the actual

9    2017 numbers to be available?

10        A.   I have asked for actual or audited.

11        Q.   Um-hmm.

12        A.   And my understanding is that they're

13   in the works.  I haven't seen them yet.

14        Q.   Okay.  And would it be your

15   intention to revise these numbers once the

16   actual audited 2017 financials are available?

17        A.   Yes.  If that's -- if that is

18   provided to me and asked of me, I will

19   supplement this.

20        Q.   Okay.  Okay.  Okay.

21             So after performing these

22   calculations, what I understand you did next

23   was you compared your estimate of what you

24   call as is 2017 EBITDA, right, with two

25   different calculations?  Right?  One was XBT's

1    actual projected 2017 EBITDA?  Right?

2         A.   With some adjustments, but yes.

3         Q.   Okay.  And that was your high-end

4    calculation?  Right?

5         A.   Correct.

6         Q.   You used their projected EBITDA

7    margin?  Right?

8         A.   Correct.

9         Q.   And you also for what you call a

10   low-end calculation used their 2016 EBITDA

11   margin and applied that to your estimate of

12   2017 as is EBITDA?  Right?

13        A.   Yes.

14        Q.   Okay.

15        A.   I took the 42 percent EBITDA margin

16   for 2016 and used that for 2017.

17        Q.   Okay.  Then the next thing that you

18   did to get your estimate of business value is

19   taking that low-end figure and taking that

20   high-end figure, you multiplied them by 17?

21        A.   17 times EBITDA multiple, yes.

22        Q.   And that 17 was a function of the

23   average EBITDA multiple of five companies that

24   had been identified in a 2013 valuation by

25   KPMG as comparable?  Right?

1          A.    Yes.  I used the KPMG comparables.

2          Q.    Okay.  And it looked to me like the

3    information that you used for their EBITDA

4    multiples, those were from S & P reports?

5          A.    There is -- I just want to correct.

6    There is actually six companies.

7          Q.    Six companies?

8          A.    Not five.

9          Q.    Fair enough.

10               And the information that you

11   provided about the what the EBITDA multiples

12   of those companies are were from S & P

13   reports?

14         A.    It is from Capital IQ --

15         Q.    Yes.

16         A.    -- which is a subsidiary of S & P.

17         Q.    Okay.  And the multiples that you

18   used for those six companies were -- was it

19   the most recent data you could find as of the

20   time that you did the report?

21         A.    Correct.

22         Q.    Right.  So it is not what their

23   multiples were in 2013?  It is what their

24   multiples were, the best available information

25   as of the time you wrote your report?

1          A.   As close as possible to the

2     valuation date of January 1, 2018.

3          Q.   Okay.  Now for your purposes -- and

4     the adjustments you made when you wrote your

5     second report, right, were, number one, you

6     used their updated revenue number?  Right?

7          A.   Correct.

8          Q.   And secondly, you backed out your

9     estimate of revenue from the Methbot customer?

10         A.   From the projections.

11         Q.   From their 2016 projections?

12         A.   Well, their 2017 projection.

13         Q.   Yes.

14         A.   Done in November of 2016.

15         Q.   Correct.  You are absolutely right.

16    Okay.

17              So it seemed to me that there were a

18    number of assumptions that you made in this

19    analysis, but I want you to tell me if I am

20    wrong.  Okay?

21              Assumption number one is that once

22    you adjusted the November of 2016 projection

23    for your estimate of the Methbot customer,

24    right, which brought the number I think to

25    62.8, okay, you are asserting, right, that the

1    difference between what XBT says they have

2    actually earned in 2018 -- at least as of the

3    most recent information, right, which is 58.27

4    million?

5         A.    2017.

6         Q.    Yes.  Okay.  Thank you.  I will try

7    to make this even simpler.  Right?

8              You adjusted the projection for 2017

9    to 62.8 million, right, to take into account

10   the Methbot customer?  Right?

11        A.    Yes.

12        Q.    XBT at least as of the most recent

13   information they have provided says that they

14   have earned -- that their revenue in 2017,

15   their actual revenue, was 58.27?  Right?

16        A.    Correct.

17        Q.    And your report asserts that the --

18   that but for the publication of the dossier,

19   right, they would have hit 62.8 instead of

20   58.27?  Right?

21        A.    That's correct.

22        Q.    Okay.  And you are also asserting,

23   right, that but for the dossier they would

24   also have hit their projections of operating

25   costs and EBITDA?  Right?

1          A.    Correct -- well, in one scenario,

2     yes.

3          Q.    Okay.  Okay.

4                Second assumption, I think, but

5     let's talk about this, is that as of

6     January 1 -- you did a valuation as of

7     January 1, 2018?  Okay?

8          A.    Correct.

9          Q.    And that valuation asserts that

10    there was a -- there was a shortfall of

11    roughly four and a half million dollars in

12    revenue, which you say was caused by the

13    publication of the dossier.  Right.

14                Doesn't your analysis assume that

15    those, at least as of January 1, 2018, that

16    those losses -- well, you call shortfall --

17    would never be made up?  In other words, that

18    that shortfall is there in perpetuity?

19                MR. FRAY-WITZER:  Objection.

20    You can answer.

21          A.    It assumes that at this point in

22    time those revenues have not been made, and in

23    terms of what is going to happen going in the

24    future, I don't know.

25    BY MR. SIEGEL:

1          Q.   Okay.  The next assumption is that

2     the companies that KPMG identified as what

3     they thought were comparable companies in 2013

4     are also comparable companies today?

5          A.   Correct.

6          Q.   And the fourth assumption you made

7     is that the statements in the dossier about

8     the plaintiffs are false?

9          A.   Yes.  That's an assumption.

10         Q.   And what assumption is that based

11    on?  What is that based on?

12         A.   I don't know if there is an

13    assumption.  The assumption is that, yes, that

14    there was damaging statements made that were

15    false in the dossier.

16         Q.   And on what basis do you have to

17    assume that the statements in the dossier to

18    the extent they relate to the plaintiffs were

19    false?

20         A.   I have heard, been told that they

21    were false statements.  There has been no

22    proof I have seen that they weren't false

23    statements.

24         Q.   Okay.  And that is based entirely on

25    what your conversations are with the

1    plaintiffs?  Right?

2              Do you have any expertise, are you

3    claiming any expertise, to make a judgment

4    about whether the allegations in the dossier

5    as they might pertain to the plaintiffs are

6    false?

7         A.   I am not making any assumption other

8    than --

9         Q.   Okay.

10        A.   I am not giving any opinion whether

11   they are or are not.

12        Q.   Okay.  If we assume that they were

13   true, would your valuation still hold?

14              MR. FRAY-WITZER:  Objection.

15        A.   I haven't considered that at all.

16   BY MR. SIEGEL:

17        Q.   So can you answer that question one

18   way or the other?

19        A.   I don't know.

20        Q.   Do you think that all the statements

21   in the dossier are false?

22        A.   I don't know.

23              MR. FRAY-WITZER:  Objection.

24   BY MR. SIEGEL:

25        Q.   Meaning when I say statements, I

1     don't just mean -- all the information that

2     Christopher Steele provided in the dossier, do

3     you think it is all false?

4          A.   I have no opinion on that.

5          Q.   Do you think any of it is true?

6          A.   I have no opinion on that.

7          Q.   None whatsoever?

8          A.   None.

9          Q.   Do you think that the Russians

10    interfered in the 2016 American election?

11               MR. FRAY-WITZER:  Objection.

12         A.   I have no idea.

13    BY MR. SIEGEL:

14         Q.   You have no idea?

15         A.   I don't know.

16         Q.   You have no opinion about whether

17    that's true or not?

18               MR. FRAY-WITZER:  Objection.

19         A.   I do not.

20    BY MR. SIEGEL:

21         Q.   Does it make a difference to you

22    that the entire American intelligence

23    community has opined that the Russians did

24    interfere in the 2016 election?

25         A.    I have seen a lot of statements

1    going both ways.  I have no opinion myself.

2          Q.   Okay.  Now you used XBT's

3    projections made in November of 2016, right,

4    for 2017 revenue, costs, et cetera?  Right?

5          A.   With adjustments to them, yes.

6          Q.   With the adjustments.  Okay.

7               So would it be fair to say that you

8    assumed that those projections that were made

9    in November of 2016 with the single adjustment

10   we have talked about were accurate?

11         A.   Yes.  I have no indication they're

12   not.

13         Q.   Why did you make that assumption?

14         A.   Because they have a fairly rigorous

15   standard which they go through to produce

16   those projections.

17         Q.   What is that?

18         A.   It is a long process with their

19   analyst to identify what revenues are going to

20   be captured in the future.

21         Q.   Did you talk to Mr. Mishra about

22   what the basis of his projection was?

23         A.   I asked him about the activities

24   they go through to --

25         Q.   And what did he tell you?

1      A.   He said they go through a long

2  process with their analyst of identifying what

3  those future opportunities are going to be.

4      Q.   Didn't Mr. Mishra testify that he

5  has just simply assumed that the same growth

6  rate that the company had enjoyed in 2016 was

7  going to continue in 2017?

8           MR. FRAY-WITZER:  Objection.

9      You can answer.

10     A.   It's -- I don't know if that's the

11  case.

12  BY MR. SIEGEL:

13     Q.   You don't know if he testified to

14  that?

15     A.   I don't know.

16     Q.   You read his deposition?  Right?

17     A.   I did.

18     Q.   Did you undertake any independent

19  research of your own to try to assess whether

20  those projections made in November of 2017 --

21  2016 were accurate?

22     A.   Yes.

23     Q.   What?

24     A.   I looked at their projections they

25  did in 2015 for 2016.

1          Q.   Okay.

2          A.   And they actually exceeded their

3     EBITDA and revenue figures that they had

4     projected, so their actuals were higher than

5     their projections.  For me it gave me comfort

6     the 2017 projections, especially given the

7     close nature of that, were accurate and

8     reasonable.

9          Q.   Did you look at any other

10    projections that they had made other than

11    their 2015 projections for 2016?

12         A.   I don't recall if I have seen those

13    or not.

14         Q.   Okay.  Let's look at your -- at the

15    supplemental report again and go to page 11.

16              (Witness complying.)

17         Q.   Okay.  In the second full paragraph

18    where it says "to assess the reliability," do

19    you see that?

20         A.   I do.

21         Q.   It says:

22              "We also compared projections made

23    in prior years to their actual business

24    performance.  In the past, XBT has

25    outperformed projections contained in their

1      business plans."

2              Right?

3              And then you cite one document,

4      document 60.

5              So would it be fair to say that

6      actually you compared -- you simply looked at

7      one projection for one year?

8          A.   I may have seen others.  I don't

9      recall.  But I know there is -- there is

10     certainly the one that I looked at.

11         Q.   Okay.  Well, other than the one, and

12     we will get to the one in a second, but are

13     you asserting that other than that one that

14     XBT has outperformed projections contained in

15     their business plans in the past?

16         A.   Based on conversations I had with

17     the CFO, he said they had in the past as well.

18     They were fairly conservative.

19         Q.   Did you ever test whether that was

20     true?

21         A.   I don't know if I have ever seen

22     those.

23         Q.   Did you ask?

24         A.   I believe we did.

25         Q.   Why didn't you get them?

1                MR. FRAY-WITZER:  Objection.

2           A.   I don't know.

3      BY MR. SIEGEL:

4           Q.   So did the fact that you asked for

5      information and they didn't provide it to you

6      give you any pause as to whether the assertion

7      about their track record of projecting was

8      true?

9                MR. FRAY-WITZER:  Objection.

10          A.   I ask for a lot of things and don't

11     necessarily get all of them.  So I don't know

12     if it gave me a pause.

13     BY MR. SIEGEL:

14          Q.   Well, what else did you ask for that

15     you didn't get?

16               MR. FRAY-WITZER:  Objection.

17          A.   I don't know.  I am saying I asked

18     for a lot of things in most cases.

19     BY MR. SIEGEL:

20          Q.   Well, did you ever test to see

21     whether what you contend is -- was their track

22     record in 2015 was an anomaly?

23          A.   I'm not sure what you're asking.

24          Q.   Well, you are saying -- you make the

25     assertion that they have in the past

1    outperformed projections contained in their

2    business plans.  Right?

3         A.   Right.

4         Q.   What you are really talking about is

5    one projection made in 2015?  Right?  How do

6    you know that that wasn't an anomaly in terms

7    of their record of making accurate

8    projections?

9         A.   Well, based on again discussions

10   with the CFO, but also external research I

11   conducted on the industry as a whole which

12   showed pretty amazing growth, I think on

13   average 45.9 percent over a five-year period.

14        Q.   And over what five-year period?

15        A.   2016 to 2020 I believe.  I believe

16   it was actually higher.  60 percent or so was

17   anticipated in 2016.  50 percent.  And it was

18   kind of a slightly downward sloping curve, but

19   on average compounded annual growth rate of I

20   believe 45.9, but so they were projecting 28

21   percent, which I actually cut down to 26

22   percent, and so that falls well under

23   projections for the industry as a whole.  So

24   it seemed very reasonable.

25        Q.   Where is there any information of

1      projections for the industry as a whole in

2      your report?

3           A.   I think I cite to a document in the

4      back.

5           Q.   Which one?

6           A.   I think it is document fifty --

7      let's see -- 56.

8           Q.   Did you compare how XBT had

9      performed in the previous five years compared

10     to the industry as a whole?

11          A.   They had slightly less growth than

12     the industry as a whole, which again my

13     26 percent growth rate in 2017 was far below

14     what the industry estimates were.

15          Q.   Well, what -- how much did the

16     industry as a whole grow in the previous five

17     years and how much did XBT grow?

18          A.   I don't have that number off the top

19     of my head.

20          Q.   So how do you know whether it was

21     slight?

22          A.   What do you mean slight?

23          Q.   You said that they were slightly

24     behind the industry as a whole in the prior

25     five years.  If you don't know what the

1    numbers are, how do you know?

2          A.    I looked at those numbers.  I don't

3    -- they didn't have a bearing on the 2016 to

4    2017 projections that were done given the

5    research that I looked at and the fact that

6    their 2016 projections done in 2015 were

7    exceeded, so.

8          Q.    Tell me again what the five-year

9    projection for the industry as a whole was.

10         A.    I believe it was 45.9 percent

11   compounded annual growth.  So that is on

12   average over a five-year period it was I

13   believe 60 percent in the first year,

14   declining to 54.  I would have to look at the

15   document, but on average, 45.9.

16         Q.    Does that mean on average of 45.9

17   each year?

18         A.    Each year.

19         Q.    So not over the five-year period?

20         A.    No, no.  45.9 percent compound

21   annual.  So that's an annual growth right each

22   year.  So 45 percent this year, next year.

23         Q.    Next year?

24         A.    Yes.

25         Q.    That's what I am trying to clarify.

1              Did you ever -- in order to assess

2     whether XBT's November of 2016 forecasts were

3     accurate, did you look at the forecast that

4     they made in the 2013 KPMG valuation?

5          A.   I looked at the KPMG valuation.  I

6     focused predominantly on their comparables

7     that they used, as that was really the sole

8     focus of it, but I did look at the

9     projections.  Yes.

10         Q.   What did you think of the accuracy

11    of those projections?

12         A.   I don't recall.

13         Q.   You don't recall?

14         A.   I don't.

15         Q.   That made no difference to you?

16              MR. FRAY-WITZER:  Objection.

17         A.   In 2013?

18    BY MR. SIEGEL:

19         Q.   Yes.

20         A.   It was far enough in the past.

21         Q.   So that made no difference to you

22    with respect to the statement that in the past

23    XBT has outperformed projections contained in

24    their business plans?  That made no

25    difference?

1            MR. FRAY-WITZER:  Objection.

2       You can answer.

3       A.   If there was one year they missed

4   their projections but other years that they --

5   BY MR. SIEGEL:

6       Q.   But you don't know if there is

7   anything other than one year in which they hit

8   their projections?  Right?

9       A.   Other than discussions that I have

10  had.

11      Q.   Okay.  In order to verify the

12  reliability of their November of 2016

13  forecast, did you look at any information

14  about specifically what customers they thought

15  they were going to be able to attract?

16      A.   No.

17      Q.   What prices were they charging

18  compared to the rest of the industry?

19      A.   No.

20      Q.   What actions their competitors might

21  be taking that could affect their business?

22      A.   What do you mean by that?

23      Q.   Well, anything that their

24  competitors were doing that might have

25  affected whether XBT could continue to grow at

1    that rate?

2         A.    The industry as a whole was growing

3    fairly rapidly.  So I mean I considered that.

4         Q.    Okay.  And did you consider whether

5    XBT had the capacity to continue that growth?

6         A.    Yes.

7         Q.    How did you consider that?

8         A.    Well, because they had -- the

9    discussion we were having before about they

10   get the financing lined up, then once they

11   have the financing lined up they sign the

12   client, buy the servers, and move forward, and

13   they had the capacity, they had the financial

14   ability to do that, the relationships with the

15   banks --

16        Q.    Right.

17        A.    -- until the dossier was produced,

18   and then that caused issues.

19        Q.    Well, we will talk about that.

20              I mean how do you know that they had

21   the ability to actually get the financing for

22   all of the increase in capacity they were

23   projecting?

24        A.    Based on discussions I have had with

25   the company.

1          Q.   Okay.  Let's get document 60 and

2     document 9.

3                    MR. SIEGEL:  Exhibit 3.

4          (XBT Holding Consolidated 2016 marked

5          Exhibit 3 for identification.)

6                    (Handing Exhibit 3 to the

7           witness.)

8                    THE WITNESS:  Thank you for

9           printing this large.

10                    MR. SIEGEL:  Yes.  I figured

11           that out.

12                    And we will also mark this as

13           Exhibit 4.

14          (XBT Holding SA, Report and

15          Consolidated Financial Statements for

16          the year ended 31 December 2016

17          marked Exhibit 4 for identification.)

18                    MR. FRAY-WITZER:  I guess

19           this is a good time to mention that

20           we will mark the deposition as

21           confidential.

22                    MR. SIEGEL:  Indeed.

23     BY MR. SIEGEL:

24          Q.   And for ease of discussion, can you

25     turn to page 9 of Exhibit 4, page 9 of the

1    audited statement?

2         A.   Yes.  Not this one.  This one.

3              (Pause.)

4              (Witness viewing Exhibit 4.)

5         Q.   Okay.  So looking at document 3 now,

6    so XBT projected roughly $48.1 million in 2016

7    revenue?

8         A.   Um-hmm.

9         Q.   Right.  And they realized 49.7?

10   Right?

11        A.   That's correct.

12        Q.   Okay.  Now go down to their

13   projection of net profit on Exhibit 3.

14             (Witness complying.)

15        Q.   Their projection of net profit was

16   11.6 million?  Right?

17        A.   Correct.

18        Q.   And if you go to Exhibit 4, page 9,

19   their actual net profit was 6.2 million?

20   Right?

21        A.   Yes.

22        Q.   So their profit was a little more

23   than half of what they projected?

24        A.   From an accounting perspective, yes.

25        Q.   What do you mean by that?

1          A.    Well, that's why we use EBITDA.

2          Q.    Um-hmm.

3          A.    Because it is a measure of cash

4    flow.  So it isolates financing, investments,

5    how the company is financially structured.

6          Q.    Okay.

7          A.    So that you can compare on an even

8    playing field with other companies, and so

9    while their reported net income from

10   accounting purposes was lower, their EBITDA,

11   which is a much more important figure from the

12   valuation perspective, was actually higher.

13         Q.    Okay.  Did you ask for any -- other

14   than your discussion about the impact of the

15   Methbot customer, did you ever ask for whether

16   XBT had updated this projection at any point?

17         A.    I asked for their latest

18   projections.  So I believe I did.

19         Q.    Okay.  And did they give you

20   anything other than this?  Did they say that

21   they had a more updated version of their 2016

22   projections than document 60?

23         A.    This is what was provided to me.

24         Q.    Okay.  Let's get document 54.

25               MR. SIEGEL:  Let's mark this

1          as Exhibit 5.

2          (XBT Holding Limited Equity

3          Valuation, 2 August 2013, bearing

4          production numbers P-G 000645 through

5          P-G 000703 marked Exhibit 5 for

6          identification.)

7                    (Handing Exhibit to the

8           witness.)

9                    THE WITNESS:  Thank you.

10    BY MR. SIEGEL:

11         Q.   And I will also ask you to look at

12    your report, your latest report, and turn to

13    figure 2, which is on page 8.

14                   (Witness complying.)

15         Q.   Okay?  And take Exhibit 5, and turn

16    to page 20, which is also Bates numbered 665.

17                   (Witness complying.)

18         Q.   Okay.  So Exhibit 5, right, on page

19    20 are projections that XBT made for purposes

20    of this 2013 evaluation, right, valuation?

21         A.   Right.

22         Q.   And at that point they projected

23    2013 revenue to be 43.7 million?  Right?

24         A.   Correct.

25         Q.   And if you look at their actual

1    revenue in figure 26 your report, it was 32.8?

2    Right?

3         A.   Correct.

4         Q.   And they projected EBITDA to be

5    18.77?  Right?

6         A.   (The witness nodding his head.)

7         Q.   And the actual was 12?

8         A.   Correct.

9         Q.   So in looking at 2014, right, they

10   projected their revenue as 53.1, and their

11   annual was 36.2?  Right?

12        A.   Correct.

13        Q.   And their projected EBITDA was 25.6,

14   and their actual was 12.6?  Right?

15        A.   For which year?

16        Q.   2014.

17        A.   Correct.

18        Q.   So why did you not use -- would you

19   agree with me that those projections were way

20   off --

21                  MR. FRAY-WITZER:  Objection.

22        You can answer.

23   BY MR. SIEGEL:

24        Q.    -- what they actually -- their

25   actual performance?

1               MR. FRAY-WITZER:  Objection.

2          You can answer.

3          A.    The projections are higher than what

4     they actually received.

5     BY MR. SIEGEL:

6          Q.    Okay.  Why did you not take into

7     account those, their track record with those

8     projections for purposes of determining

9     whether you could rely on their November of

10    2016 projection?

11         A.    Well, presumably these projections

12    were done in 2012 or early 2013.

13         Q.    Um-hmm.

14         A.    So four or five years prior to the

15    projections done for 2017, and my

16    understanding is that their projections were

17    constantly evolving, improving, getting better

18    at predicting, estimating what is going to

19    happen in the future.  So something done four

20    or five years ago, it absolutely does not seem

21    relevant to what was happening in late 2016

22    when the 2017 projections were done.

23         Q.    Okay.  Actually it wasn't four or

24    five years ago; right?  It was about three or

25    three and a half years before the 2016

1    projection?  Right?

2         A.    Three or four years.  Yes.

3         Q.    Okay.  And other than that -- we

4    have gone over this before, right -- but other

5    than the one projection made in November of

6    2015, you don't know what the track record

7    between 2013 and 2015 actually was?

8         A.    I don't know.  Was it -- I don't

9    know if it was done in November of 2015.

10        Q.    I am sorry.  Okay.  The one that was

11   done in 2015 for 2016?  Right?

12        A.    Right.

13        Q.    You don't know what their track

14   record was subsequently to 2013 or in 2014?

15   Right?

16        A.    That's correct.

17        Q.    Okay.  XBT's 2016 projection for

18   2017, right, if you look at figure 2, right,

19   their EBITDA in 2016 was --

20        A.    Which one is figure 2?  I am sorry.

21        Q.    I am sorry.  Figure 2 of your

22   report.

23        A.    Okay.

24        Q.    Their 2016 EBITDA was roughly 21

25   million, right, 20.9 million?

1          A.    Their actual?

2          Q.    Their actual.  Right?

3          A.    Yes.

4          Q.    And they projected EBITDA for 2017

5    was a little over 33 million?

6          A.    Yes.

7          Q.    Right?

8          A.    Yes.

9          Q.    So that is an increase of over

10   50 percent?  Right?  It is actually

11   60 percent?  Right?

12         A.    Roughly.

13         Q.    Why do you think that was

14   reasonable?

15         A.    Well, because they were moving

16   towards a new model of owning servers,

17   physically own servers as opposed to lease

18   servers, so the margin, the earnings or

19   operating margin collected by the entities

20   leasing the servers would be able to be earned

21   by XBT.

22         Q.    And how did you know they were

23   moving towards that?

24         A.    That was the discussion we had with

25   the client.

1          Q.   Did you ever see any information to

2     actually verify whether that was true?

3          A.   I believe there were discussions

4     with banks regarding this change in model.  I

5     don't remember where I saw some documentation

6     on it.  But I believe I was shown something to

7     indicate that.

8          Q.   Well, what were you shown?

9          A.   I believe there was discussions

10    about the new model in their projections or

11    annual report provided to financiers.

12         Q.   Okay.  I haven't seen any of that.

13    Did you provide any of that information or

14    cite any of that information in your report?

15         A.   It would either be cited in my

16    documents or it was a discussion.  Again I

17    don't know for sure if I saw a document.

18         Q.   Okay.

19         A.   But I believe I did, but I may not.

20         Q.   The assumption --

21              MR. SIEGEL:  Well, strike

22         that.

23    BY MR. SIEGEL:

24         Q.   XBT's projection, right, was that --

25    their unadjusted projection, not taking into

1    account Methbot, was that their revenue was

2    going to grow to 64.2 million, right, in 2017?

3         A.    Correct.

4         Q.    Okay.  So that would have been an

5    increase of ballpark $15 million, right, from

6    2016?

7         A.    28 percent.

8         Q.    Okay.  But they projected that their

9    EBITDA was going to grow by 60 percent?

10        A.    Right.

11        Q.    That is a phenomenal difference in

12   margins?  Right?

13             MR. FRAY-WITZER:  Objection.  You

14   can answer.

15        A.    Well, the increase again in margin

16   was due to the change in business model of

17   owning the servers --

18   BY MR. SIEGEL:

19        Q.    Right.

20        A.    -- as opposed to leasing them.

21        Q.    That projects that over

22   three-quarters of their increased revenue will

23   be recognized as actual earnings; right?  For

24   want of a better word, as income?  Right?  As

25   annual income?

1          A.    Well, their EBITDA would be

2     51.9 percent.

3          Q.    But my point is that in order to

4     achieve that, right, they are going to have

5     $15 million more in revenue roughly?

6          A.    Um-hmm.

7          Q.    And $12 million more in EBITDA?

8     Right?

9          A.    Correct.

10          Q.    That means that over three-quarters,

11     they are projecting that over three-quarters

12     of their increased revenue will be profit, for

13     want of a better word?  Right?

14          A.    Correct.

15          Q.    Why was that reasonable?

16          A.    Again because of the new model of

17     going to owned servers.  There is economies --

18     there is economies to scale in increasing

19     revenue, having more purchasing power, better

20     access to capital goes.  All of these factor

21     in to increasing your bottom-line margin.

22          Q.    Sure.  But do you have any basis to

23     -- I mean what specific information do you

24     have that leads you to conclude that it would

25     be reasonable for XBT to assume that

1    twelve-fifteenths of their increased revenue

2    in 2017 would be profit?

3          A.   Based on discussions that I have

4    had.

5          Q.   And nothing more than that?

6          A.   That's, you know, at this point

7    that's all I can recall.

8          Q.   Okay.  Let's do -- can I have Mishra

9    32?

10               MR. SIEGEL:  So we can mark

11          this as 6.  This was also Mishra

12          Exhibit 32.

13          (Charts marked Exhibit 6 for

14          identification.)

15               (Handing Exhibit 6 to the

16          witness.)

17               THE WITNESS:  Thank you.

18    BY MR. SIEGEL:

19          Q.   And I will also ask you to take out

20    the big spreadsheet, document 60.

21          A.   Okay.

22               (Witness complying.)

23          Q.   And turn to page 4 of -- I am sorry

24    -- page 3 of document Exhibit 6.

25               (Witness complying.)

1      Q.   This is at least Mr. Mishra

2   testified were their actual 2016 numbers.

3   Okay?

4      A.   Okay.

5      Q.   So if you look at what XBT projected

6   for 2016 in document 60, right, and compare it

7   to the 2016 monthly actuals, right, it would

8   be fair to say, wouldn't it, that for the

9   first six months of 2016 the company

10   underperformed their projections?  Right?

11      A.   They were close, but, yes, they were

12   lower.

13      Q.   Well, in January and February they

14   weren't close, were they?  They were a million

15   dollars off?

16      A.   In June they were higher.

17      Q.   Right.  But I am saying -- okay.

18      A.   May they were close.

19      Q.   Well, June they were actually lower?

20   Right?  June was -- their projection was 3.97

21   and the actual is 3.784?

22      A.   Lower.  Yes.

23      Q.   A couple of hundred thousand dollars

24   in June -- I mean in May, right.  Okay.

25           But they ended up the year a little

1    bit ahead of their projection?  Right?

2         A.   Correct.

3         Q.   So what actually happened in 2016

4    was they underperformed their projection in

5    the first half of the year and overperformed

6    it in the second half of the year?  Right?

7         A.   They were slightly lower in the

8    beginning of the year and higher in the end.

9    Yes.

10        Q.   Okay.  Now look at August 2016 and

11   then look at September of 2016.  Do you see

12   that there is roughly a million dollar jump in

13   revenue between August and September of '16?

14        A.   I do.

15        Q.   And then so they moved from roughly

16   4.2 in August of '16 to 5.1 in September?

17   Right?  And then for the rest of the year,

18   they continued to go a little bit higher into

19   the fives?  Right?

20        A.   Correct.

21        Q.   Okay.  Do you know why their revenue

22   jumped a million dollars between August and

23   September of '16?

24        A.   They brought in new clients?  I

25   don't know the specific reason.

1          Q.   Do you know why?

2          A.   I -- like I just said, they brought

3     on new clients.

4          Q.   Do you know for a fact that they

5     did?

6          A.   Well, I don't know who they brought

7     on.

8          Q.   But do you know for a fact that that

9     revenue jump occurred because they brought on

10    new clients or are you just assuming that?

11         A.   That's -- that's an assumption.

12         Q.   Okay.  Did you ever ask why their

13    revenue jumped a million dollars in one month

14    and then continued at a higher level or even

15    slightly higher level for the rest of the

16    year?

17         A.   I don't know if I had that specific

18    discussion.

19         Q.   So how -- is it possible that that

20    was simply an anomaly of some kind since you

21    don't know the reason that happened?

22              MR. FRAY-WITZER:  Objection.

23         You can answer.

24         A.   Well, an anomaly that it happened in

25    the last four months of the year?

1    BY MR. SIEGEL:

2         Q.   Yes.  In other words, what

3    information, if any -- in order to assume that

4    the company was going to grow another

5    28 percent or 29 percent in 2017, right, the

6    assumption is that that growth that had been

7    achieved in the last five months or so of 2016

8    was going to continue?  Right?  In other

9    words, that they would at least sustain and

10   maybe even go slightly higher the levels of

11   revenue that they were realizing in the last

12   few months of 2016?  Right?

13        A.   Right.  I think the plan of the

14   business was to continue to grow.  Yes.

15        Q.   Right.  And how do you know -- what

16   information do you have that that bump was

17   sustainable?

18        A.   There is nothing to indicate it

19   wasn't.  I mean they went from less than three

20   million in the beginning of the year to almost

21   four by the middle of the year --

22        Q.   Right.

23        A.   -- and then five by the end of the

24   year.  It seems like a fairly natural

25   progression.

1       Q.   Well, they went from three to four

2  over seven months, right, but they went from

3  four to five in one month?  Right?

4       A.   Right.

5       Q.   You don't think it is relevant at

6  all how they achieved 20 percent growth in

7  revenue in a single month?

8       A.   They were on -- their plan was

9  growth.  So, no, I don't think -- I'm not

10  understanding your question.

11       Q.   Well, their plan wasn't necessarily

12  to grow 20 percent in a month; right?  That is

13  a substantial bump, wouldn't you --

14       A.   Their plan was to grow 28 percent

15  over the year.

16       Q.   Right.

17       A.   And they did that.  Or their plan

18  was to grow slightly below 28 percent and they

19  exceeded that.

20       Q.   The plan that happened was there was

21  an increase of 20 percent in one month.  In

22  your view it doesn't matter?  That is

23  completely irrelevant to understand why that

24  happened?

25               MR. FRAY-WITZER:  Objection.

1          You can answer.

2          A.   I think we're looking at -- you

3    can't see the forest through the trees type of

4    things.  There are flows on how clients come

5    into any business.  So you may have some

6    months where you get a jump --

7          Q.   Right.

8          A.   -- and then it levels off.  You may

9    have some that slightly decline.  But the

10   general plan and trajectory was growth.  They

11   anticipated growth --

12         Q.   Right.

13         A.   -- and they achieved the growth.

14         Q.   You don't know the reason that they

15   achieved $1 million of growth in a single

16   month is because they got more clients?  You

17   just don't know that; right?

18         A.   I would have to assume it is more

19   clients.  I don't know specifically.

20         Q.   If you wanted to figure out what the

21   answer was, how would you go about doing that?

22   If you wanted to empirically determine why

23   their revenue grew by a million dollars in a

24   month, how would you go about doing that?

25         A.   I would have to ask for invoices or

1    ledgers.

2         Q.   Right.  So you would have to ask for

3    information that would let you know what the,

4    you know, who were their customers and what

5    was the monthly revenue they got from each

6    customer?  Right?

7         A.   I would have to get down to a very

8    granular -- granular level, yes.

9         Q.   Okay.  Fair enough.

10             Sitting here today, is it possible

11   that the reason their revenue grew by a

12   million dollars in between August and

13   September of '16 and continued at that level

14   and even higher for the rest of the year was

15   because the statements in the dossier were

16   true?

17             MR. FRAY-WITZER:  Objection.

18        A.   I'm not understanding.

19   BY MR. SIEGEL:

20        Q.   Well, what did the dossier actually

21   allege about the plaintiffs as you understand

22   it?

23        A.   That they were coerced by the FSB to

24   perpetuate porn sites and bots that would hack

25   into the DNC.

1          Q.   Okay.  And what else did it allege

2     that might pertain to the plaintiffs?

3          A.   I'm not sure.

4          Q.   Okay.  Did you read the portions of

5     the dossier that dealt with Michael Cohen?

6          A.   I read the whole dossier.

7          Q.   You read the whole dossier.  And

8     what did it say about Michael Cohen?

9          A.   I don't remember.

10         Q.   Really?  You don't remember at all?

11    Right?

12         A.   No.

13         Q.   Didn't it say that Michael Cohen had

14    a meeting in August or September of 2016,

15    right, to discuss how to make payments to

16    people who were involved in these hacking

17    operations?

18         A.   I don't know.

19              MR. FRAY-WITZER:  Objection.

20         You can answer.

21    BY MR. SIEGEL:

22         Q.   You don't know?

23         A.   (The witness shaking his head.)

24         Q.   Okay.  Well, if that statement were

25    true, right, if it were true, if the

1    statements in the dossier that Michael Cohen

2    arranged for payments to be made to people

3    involved in this election interference, if

4    that's true, and if it is also true that the

5    plaintiffs in this case were in fact involved

6    in election interference, isn't it at least

7    possible that the reason their revenue jumped

8    between August of 2016 -- between August of

9    2016 and September of 2016 is because they got

10   revenue from that?

11            MR. FRAY-WITZER:  Objection,

12       objection.

13       A.   I -- I mean I -- I have no idea.

14   BY MR. SIEGEL:

15       Q.   Okay.  When you wrote your report,

16   your first report in February, did you know

17   anything about Methbot?

18       A.   No.

19       Q.   So how did you come to learn about

20   it?

21       A.   Mr. Raj's deposition and then

22   subsequent conversations.

23       Q.   So did it trouble you?  I take it

24   when you met with Mr. Mishra before you wrote

25   your first report he never said anything about

1    a Methbot customer?

2          A.   If he did, I did not hear it.  I --

3    yes.  No.

4          Q.   Did that trouble you --

5               MR. FRAY-WITZER:  Objection.

6    BY MR. SIEGEL:

7          Q.   -- that you hadn't been provided

8    with that information?

9          A.   Did it trouble me?  I -- no.

10         Q.   It didn't?

11         A.   They didn't believe it was a -- they

12   thought it was a nonissue, Methbot, and so I

13   didn't know about it, and once I found out

14   about it, I supplemented my report.

15         Q.   Well, when you say they believed it

16   was a nonissue, what do you mean?

17         A.   Well, again they had Mr. Charles

18   Dolan, who was their PR firm, who went to look

19   out to see what, if there was any story here,

20   if there was any pickup, any reporting --

21         Q.   Right.

22         A.   -- of Webzilla.

23         Q.   Even with that they estimated they

24   were going to lose about $200,000 a month for

25   up to five to six months?  Right?

1          A.    That was Mr. Mishra's estimate.

2     Yes.

3          Q.    So it doesn't trouble you that he

4     didn't tell you that in February?

5                MR. FRAY-WITZER:  Objection.

6          You can answer.

7          A.    Trouble me?  No.  Once I found out

8     the information, I supplemented my report.

9     There is a lot of moving pieces.

10    BY MR. SIEGEL:

11         Q.    Okay.  Now you -- we talked about

12    this before -- but you came up with your

13    adjustment, right, by taking the six months

14    that the customer had -- the last six months

15    of 2016, right, what the customer paid?

16    Right?

17         A.    And removing that from the 2017

18    projections.

19         Q.    Correct.  But weren't the 2017

20    projections assuming that 2016 revenue would

21    grow by 30 percent?

22         A.    I believe it was 28 percent.

23         Q.    28 percent.  That's fine.

24                So why wouldn't it have been six

25    months plus 28 percent?

1          A.   I'm sorry?  I am not understanding.

2          Q.   Well, if you are assuming -- if --

3     if Methbot's -- I am sorry -- if XBT's

4     projection, right, is based on the assumption

5     that they are taking their 2016 revenue?

6          A.   Um-hmm.

7          Q.   Okay?  And they are going to grow it

8     by 28 percent?  Right?

9          A.   Um-hmm.

10         Q.   If they are losing 1.3 whatever of

11    their 2016 revenue, wouldn't you need to add

12    28 percent to that to back that out of the

13    2017 estimate?

14              MR. FRAY-WITZER:  Objection.

15         You can answer.

16    BY MR. SIEGEL:

17         Q.   Do you understand what I am saying?

18         A.   I think I understand what you are

19    saying, but I -- the logic behind it, I'm not

20    following.

21         Q.   Well, okay.  XBT estimated that they

22    were going to grow 28 percent in November of

23    2016?  Right?

24         A.   (The witness nodding his head.)

25         Q.   But the 28 percent base -- the base

1      from which they were going to grow 28 percent

2      included the Methbot customer?  Right?

3          A.   Correct.

4          Q.   Okay.  So if you back out the

5      Methbot customer, it is not 28 percent

6      anymore?  It is more than 28 percent?  Right?

7      It is more like 30 percent that they are going

8      to have to grow once they lose the Methbot

9      customer in order to achieve their targets?

10         A.   So they -- but this is why I backed

11     out the six months --

12         Q.   Right.

13         A.   -- which was the time frame that

14     they anticipated based on the past.

15         Q.   Well, wouldn't it be -- if you

16     backed out six months of 2016 revenue, right,

17     and you applied the 2016 revenue to 2017, but

18     if the 2017 --

19         A.   I am sorry.  I didn't follow that.

20         Q.   Okay.  You determined that the

21     Methbot customer had paid 1.3 million and

22     change in the last six months of 2016.  Right?

23         A.   Correct.

24         Q.   And you deducted that from their

25     2017 -- their projection for 2017?

1          A.    Correct.

2          Q.    But their projection for 2017,

3    right, assumed that their revenue stream in

4    2016 would grow by 28 percent?  Right?

5          A.    Correct.

6          Q.    So if you are going to try to assess

7    the impact of losing a customer worth 1.3

8    million in 2016 dollars, right, wouldn't you

9    need to add --

10          A.    What do you need to --

11               MR. FRAY-WITZER:  Wait.

12    BY MR. SIEGEL:

13          Q.    Well, if you are going to back

14    out --

15          A.    Yes.

16          Q.    -- from a projection --

17          A.    Um-hum.

18          Q.    -- for 2017, okay, the loss of a

19    customer that had paid 1.3 million in 2016 --

20          A.    Um-hmm.

21          Q.    -- wouldn't you need to add

22    28 percent to that figure?  Because the

23    assumption for 2017 is all of the revenue that

24    they have collected in 2016 is going to grow

25    by 28 percent?

1              MR. FRAY-WITZER:  Objection.

2         A.   No.  Because we backed out those

3    revenues.  It was anticipated that those would

4    be filled within a six-month period.  They

5    would refill those server places, release

6    them, and then the growth would continue.

7    BY MR. SIEGEL:

8         Q.   But there is no anticipation that --

9    but wouldn't the assumption be that they would

10   get more revenue from doing that?  In other

11   words, if they are assuming that they are

12   going to get 28 percent more revenue in 2017

13   than 2016, if all of a sudden it turns out

14   that some of their 2016 revenue has

15   disappeared, you don't think that you need to

16   add 28 percent to back it out from 2017?

17             MR. FRAY-WITZER:  Objection.

18        You can answer.

19        A.   I -- again I'm not -- I'm not

20   following the logic.  And no.  We -- they

21   assumed they were going to get 28 percent

22   revenue growth in 2017.  We said no, it is

23   going to be 26 percent, because we are going

24   to back out the 1.3 and change million.

25             And so those places would be filled

1    by the time that six-month period that we

2    backed those numbers out, maybe sooner, would

3    have been refilled, and then they would have

4    continued on to their projections.

5             So adding 28 percent on top of that,

6    I am sorry, but I do not follow the logic on

7    that.

8        Q.   Okay.  I will ask it to you another

9    way.

10            The total amount that they collected

11   in 2016 from the Methbot customer was around

12   2.2 million.  Right?

13       A.   Well, less than that -- well, yes,

14   roughly.

15       Q.   Okay.  So if you backed out the --

16   if you didn't -- if you backed out the Methbot

17   customer from 2016, their revenue would have

18   been 47.5?  Right?  Not 49.7?

19       A.   But there would be no reason to back

20   out the alleged Methbot customer in 2016,

21   because if they hadn't signed --

22       Q.   Right.

23       A.   -- the alleged Methbot customer,

24   then they would have signed someone else to

25   take that place.

         1          Q.    How do you know that?

         2          A.    That's the business model.  Again

         3    they get -- line up the financing, find the

         4    client, put them in on the server, so.

         5          Q.    But couldn't they have -- wouldn't

         6    they have found -- it wasn't like they got a

         7    Methbot customer so they said, okay, we're not

         8    getting any more customers; right?  In 2016 or

         9    in any year they are trying to get as many

        10    customers as they can?  Right?

        11               MR. FRAY-WITZER:  Objection.

        12          You can answer.

        13          A.    My understanding is that they are,

        14    you know, one of the -- the what slows down

        15    the process, the bottleneck, if you will, is

        16    the ability to have -- it is a financing

        17    issue.  It is having the financing to then get

        18    the equipment to then have the clients come to

        19    you.

        20               So it is not necessarily -- just

        21    because -- there is a limit to that financing

        22    that they can achieve based on historical

        23    operations and projections.

        24               And so I don't agree with the

        25    assertion that they could have had the

1    replacement for Methbot in 2016 and Methbot.

2    I don't necessarily agree with that assertion.

3         Q.   So are you saying that they were at

4    100 percent capacity when they had the Methbot

5    customer?

6         A.   I don't know what capacity they were

7    at.

8         Q.   You don't know.  Okay.  Okay.

9              Now in November of 2016, right, the

10   company had $5.3 million in revenue?  Right?

11        A.   Roughly, yes.

12        Q.   And in November of '16, November of

13   2016, $400,000 of that came from the Methbot

14   customer?  Right?

15        A.   Just under 400,000, yes.

16        Q.   Okay.  That is over 7 percent of the

17   company's total revenue for that month was

18   coming from the Methbot customer?

19        A.   Approximately.

20        Q.   That's a lot, isn't it?

21             MR. FRAY-WITZER:  Objection.

22        A.   I don't know.

23   BY MR. SIEGEL:

24        Q.   How do you know that that customer

25   was the only customer that may have been

1    involved in Methbot?

2         A.   I -- I don't -- I don't know.

3         Q.   So is it possible that there were

4    other customers that left as a result of the

5    exposure of Methbot?

6         A.   I have --

7              MR. FRAY-WITZER:  Objection.

8         You can answer.

9         A.   I have no idea.

10   BY MR. SIEGEL:

11        Q.   You have no idea?

12        A.   I don't know.

13        Q.   Okay.  You didn't try to find out,

14   did you?

15        A.   I do not know if there is a

16   possibility.  I suppose anything is possible.

17        Q.   Right.

18        A.   But I don't know.

19        Q.   So you don't actually know whether

20   the only losses that the company experienced

21   in 2017 as a result of the exposure of

22   Methbot, right, was the loss of that single

23   customer?

24              MR. FRAY-WITZER:  Objection.

25        You can answer.

1          A.   I was provided with the customer

2     involved in the allegations, and so I have no

3     reason to believe this information is not

4     accurate.

5     BY MR. SIEGEL:

6          Q.   Well, but wouldn't it be -- you

7     don't know that XBT knows?  Right?  In other

8     words, there was -- they -- White OPS exposed

9     some Methbot activity?  Right?

10         A.   Correct.

11         Q.   Alleged Methbot activity?

12         A.   Correct.

13         Q.   But there may have been other

14    Methbot activity White OPS didn't discover;

15    right?

16              MR. FRAY-WITZER:  Objection.

17    BY MR. SIEGEL:

18         Q.   White OPS didn't purport to say this

19    is 100 percent of all activity involved in

20    this alleged fraud?

21         A.   I have no idea if there was anything

22    else.

23         Q.   Okay.  Let's go to page 11 of your

24    report.

25              (Witness complying.)

1          Q.   "In order to account for the loss of

2     the Methbot customer" you said at the top of

3     page 11:  "We backed out this amount from

4     XBT's revenue projections" -- meaning the

5     amount of the six months of revenue?

6          A.   Correct.

7          Q.   -- "and reduced their projected

8     EBITDA by the same proportion as the reduction

9     in revenue."

10              Why would you reduce their EBITDA by

11     that -- by the same proportion?

12          A.   To address any direct costs

13     associated with it.

14          Q.   But wasn't the point of the loss of

15     the Methbot customer that the company was

16     going to continue to incur those costs, at

17     least for a while?

18          A.   Until they could replace them with

19     someone else.

20          Q.   Right.  So the loss of the revenue

21     would not have been offset by an immediate

22     proportional reduction in cost?  Right?

23          A.   There could have been other costs

24     associated with it, though, that were not

25     incurred.

1          Q.   You don't know that?  Right?

2          A.   It is an assumption that --

3          Q.   Right.

4          A.   -- the EBITDA would have declined at

5     the same rate as the revenue.

6          Q.   But knowing the actual circumstances

7     of this situation, right, the company had a

8     certain amount of fixed costs, right, that

9     were -- that it had incurred as a result of

10    having this customer.  When the customer left,

11    the revenue disappeared.  But those server

12    costs didn't disappear?  Right?

13         A.   Yes, I don't know if any or all did

14    or did not disappear.

15         Q.   Well, you just said that it would

16    take at least five to six months to release

17    all of those servers, right, so there was at

18    least some time when the server costs did not

19    appear -- when they were continuing to incur

20    all of the costs or almost all of the costs

21    that were associated with the Methbot customer

22    even though they weren't realizing any

23    revenue?

24         A.   But I don't know how the financing

25    on that works, if it -- I don't know how that

1      carries over.

2           Q.   So if you don't know, what basis do

3      you have to assume that the cost reduction

4      would have been proportional to the revenue

5      loss?

6           A.   Well, again it was a straight line.

7      I assumed that the reduction in revenue would

8      be the same as the reduction in EBITDA.

9           Q.   Okay.

10               MR. FRAY-WITZER:  Nathan,

11          just so you know, lunch is ready

12          whenever you would like to break.

13               MR. SIEGEL:  Okay.  Let me

14          just ask a couple more questions,

15          and then we are at a good break.

16     BY MR. SIEGEL:

17          Q.   When you learned about the Methbot

18     customer, right, did you consider whether

19     there might be other things that might have

20     affected the accuracy of XBT's projections

21     other than the dossier that you didn't know

22     about?

23          A.   I'm not sure what you mean.

24          Q.   Well, okay.  Fair enough.  That was

25     a convoluted question.

1              And so after reading Mishra's

2      deposition, you learned that there was a

3      Methbot customer issue?  Right?

4              A.   Correct.

5              Q.   And that that issue was something

6      that should be taken into account in

7      recalculating the 2017 projections?  Right?

8              A.   Correct.

9              Q.   Did you consider, okay, I didn't

10     know about the Methbot customer; are there any

11     other issues that I didn't know about that

12     might affect the accuracy of those

13     projections?

14             A.   Sure.  I asked if there was anything

15     else, and they said no.

16             Q.   Okay.  So tell me what you asked.

17             A.   I said, "What was the impact of

18     Methbot?" and "Is there anything else?"

19             Q.   Anything else?  I'm not sure what

20     you mean by anything else.

21             A.   Anything else that would impact the

22     accuracy of the projections.

23             Q.   Okay.  And they said no?

24             A.   They said there was the Methbot

25     client.

1          Q.    And you just took that on faith?

2          A.    I accepted that.

3          Q.    Okay.  Okay.  And I take it in the

4     course of your preparing this expert report

5     other than the, you know, the information they

6     provided you, you didn't actually conduct an

7     inspection of their ledgers or other books and

8     records?

9          A.    No, I did not.

10          Q.    Okay.

11               MR. SIEGEL:  This is a good

12          break point.

13               MR. FRAY-WITZER:  Okay.

14               THE VIDEOGRAPHER:  The time

15          is 12:39.  We are off the record.

16               (Luncheon recess taken at

17          12:39 p.m.)

18

19

20

21

22

23

24

25

1          A F T E R N O O N   S E S S I O N

2                  1 : 2 6   P. M.

3                      - - -

4          THE VIDEOGRAPHER:  The time

5      is 1:26.  We are back on the record.

6   BY MR. SIEGEL:

7          Q.   Do you know whether XBT or any of

8   its subsidiaries made any changes in their

9   procedures for screening clients as a result

10  of Methbot?

11         A.   I don't know.

12         Q.   Well, are you aware that they at

13  least have asserted that, for example, they

14  would have a new policy not to announce

15  external or internal customer IP blocs within

16  their networks without deep KYC of their

17  clients?  Is that something you have ever

18  heard before?

19         A.   No.

20         Q.   So if the company was tightening up

21  its procedures on screening new clients, is it

22  possible that that could have affected their

23  ability to grow more customers?

24         MR. FRAY-WITZER:  Objection.

25         A.   Without further information, I

1    wouldn't know the answer to that.

2    BY MR. SIEGEL:

3        Q.   Okay.  I take it you don't know for

4    a fact whether it did or it didn't, in other

5    words, whether the fact that they say that

6    they increased their know-your-client scrutiny

7    meant that they may have lost some clients as

8    a result?

9        A.   I don't know.

10       Q.   Okay.  What is your basis for

11   assuming that setting aside the loss of the

12   Methbot customer the sole reason that XBT did

13   not hit its adjusted projections for 2017 was

14   the publication of the dossier by BuzzFeed?

15       A.   The timing of the decline in

16   revenues and earnings.

17       Q.   Okay.  What qualifications do you

18   have to make the judgment that that

19   publication caused what you say is decline in

20   revenue and earnings?

21       A.   It's an assumption made in my

22   analysis that the dossier is the reason for

23   the decline in earnings.

24       Q.   Okay.  And what is the basis for

25   that assumption?

1          A.   Discussions with counsel, again the

2     timing of the event, time of the release of

3     the dossier and the subsequent decline in

4     revenue and earnings.

5          Q.   Nothing other than that?

6          A.   Off the top of my head, I don't

7     know.

8          Q.   Let's look at your supplemental

9     report.

10              (Witness complying.)

11         Q.   On page 6, looking at the

12    second-to-last paragraph.  The second sentence

13    says:

14              "As a result of the BuzzFeed

15    publication, Mr. Gubarev has, quote, 'found

16    his personal and professional reputation in

17    tatters.'"

18              I understand from what we were

19    saying before is you are not actually

20    providing expert testimony about Mr. Gubarev's

21    personal reputation?  Is that right?

22         A.   That's correct.

23         Q.   The basis for that statement that

24    you cite is the complaint in this case?

25    Right?

1          A.    That's correct.

2          Q.    So did you just assume that

3    everything that is alleged in the complaint is

4    true?

5          A.    I assumed this statement from the

6    complaint was true.

7          Q.    And why did you assume that was

8    true?

9          A.    No reason to believe it wasn't true.

10         Q.    Are there other statements in the

11   complaint that you have reason to believe are

12   not true?

13         A.    Not that I can think of right now.

14         Q.    The next sentence says:

15              "Bot XBT and Webzilla have suffered

16   and continue to suffer economic losses due to

17   their now tarnished reputations."

18              And again you cite the complaint.

19              Is there anything else other than

20   what you have testified so far that leads you

21   to conclude that XBT and Webzilla have

22   suffered and continue to suffer major economic

23   losses due to BuzzFeed's publication?

24         A.    Other than what is in my report and

25   what we have discussed, I don't believe so.

1        Q.   Okay.  The next sentence says that:

2             "XBT suffered increased bank

3   scrutiny following the publication of the

4   dossier.  Their bank accounts in multiple

5   countries were frozen and banks threatened to

6   close their accounts altogether."

7             And you cite a conversation with

8   Mr. Mishra.  Right?

9        A.   That's correct.

10       Q.   Do you have any other evidence that

11  their banks in multiple countries were frozen

12  and banks threatened to close their accounts

13  altogether?

14       A.   Other than what is described in my

15  report, cited to in my report, no.

16       Q.   Do you know whether any of those

17  accounts were actually ever closed?

18       A.   Again all I know is what I was told,

19  what we discussed, based on the information I

20  reviewed, that's what I know.

21       Q.   So the answer to my question is no,

22  you don't know whether any of the company's

23  bank accounts were ever actually closed?

24       A.   Well, frozen was the word that I

25  used.  I don't know about closed.

1          Q.   Well, you said that they threatened

2     to close.  But do you know whether they -- put

3     it this way.  Do you know whether those bank

4     accounts were unfrozen?

5          A.   I don't know.

6          Q.   And I take it you didn't ask

7     Mr. Mishra?

8          A.   I believe we had a general

9     discussion about that.  I don't remember if

10    that specific topic came up.

11         Q.   And the next sentence says:

12              "Banks threatened to close their

13    accounts altogether."

14              But you don't know whether any of

15    those accounts were actually closed

16    altogether?

17         A.   I do not.

18         Q.   Okay.  You then say:

19              "The banks dramatically increased

20    their scrutiny on potential new clients.  They

21    needed much more in-depth information about

22    the company and how it gets money."

23              Just leaving that right there, what

24    is your basis for that statement?

25         A.   The email from ABN AMRO.

1        Q.   Okay.  Which just asked for more

2   information?  Right?

3        A.   A lot of information, yes.

4        Q.   And how does asking for more

5   information correlate to a loss in revenue?

6                  MR. FRAY-WITZER:  Objection.

7   You can answer.

8        A.   The -- it is an extra hurdle put in

9   place.  If, you know, hypothetically, if you

10  have a situation where you have a line of

11  credit, a relationship with a bank --

12  BY MR. SIEGEL:

13       Q.   Right.

14       A.   -- you say I am bringing on a new

15  client, I need X amount of loan to get

16  equipment.  The, you know, the past history

17  with them has been okay, or show me the

18  projections, whatever the case may be, a

19  fairly simple process streamlined.

20                  Then having that streamlined process

21  disrupted and now having to find detailed

22  information to numerous questions, I mean it

23  is only going to slow down that process, which

24  slowing down the ability to get financing

25  would have a negative impact on the business.

1           Q.   Okay.  Do you have any idea how long

2      -- let's go to document 67.

3                MR. SIEGEL:  Let's show him

4           this.  Or I will just show him the

5           report.  Wait a sec.  Apparently

6           this is one we forgot to run off.

7                MR. FRAY-WITZER:  Nathan, do

8           you need me to make copies of

9           something?

10                MR. SIEGEL:  Yes.  That would

11           be appreciated.

12                MR. FRAY-WITZER:  Why don't

13           we go off the record for a moment.

14                THE VIDEOGRAPHER:  The time

15           is 1:35.  We are off the record.

16                (Recess taken at 1:35 p.m.)

17                (Recess ended at 1:39 p.m.)

18                THE VIDEOGRAPHER:  The time

19           is 1:39.  We are back on the record.

20      BY MR. SIEGEL:

21           Q.   Okay.  I am showing you Exhibit 7.

22           (Three-page e-mail, bearing

23           production numbers P-A 000734 through

24           P-A 000736 marked Exhibit 7 for

25           identification.)

```
 1              (Handing Exhibit 7 to the

 2         witness.)

 3    BY MR. SIEGEL:

 4         Q.   Which you cite as document 67 in

 5    your report.

 6         A.   Yes.

 7         Q.   So is this your sole source of

 8    information that banks increased their

 9    scrutiny on these companies?

10              MR. FRAY-WITZER:  Objection.

11         A.   Aside from conversations I had with

12    the company.

13    BY MR. SIEGEL:

14         Q.   So this is the only documentation

15    that you have seen to substantiate that

16    assertion?

17         A.   I believe so.

18         Q.   Do you know whether Webzilla

19    continued to receive financing or whatever

20    other services they got from ABN AMRO?

21         A.   I don't know.

22         Q.   You don't know?

23         A.   (The witness shaking his head.)

24         Q.   All you have here is an email from

25    January 31, 2018?  Right?  Do you know if
```

1    Webzilla provided the information that ABN

2    AMRO was asking for?

3         A.   I don't know.

4         Q.   So I take it you also don't know if

5    they did provide it how quickly they provided

6    it?

7         A.   I don't know.

8         Q.   Okay.  You make the assertion that:

9              "The banks dramatically increased

10   their scrutiny driving away many clients in

11   the process."

12             Right?  And by clients, you mean XBT

13   clients?  Is that what you mean?

14        A.   Clients of the entire company, yes.

15        Q.   Okay.  Not of the banks?  Of the --

16        A.   Plaintiffs here.

17        Q.   Plaintiff companies.  Okay.

18             What evidence do you have that

19   clients were driven away by any additional

20   scrutiny that banks imposed on the companies,

21   the plaintiff companies?

22        A.   Well, again it was the discussions

23   with the company.  It goes back to the whole

24   need to have the financing to then get the

25   servers to have the clients.  So that is my

1    understanding of the issue that occurred when

2    it came to financiers such as ABN AMRO.

3         Q.   So how were clients driven away, as

4    you understand it?

5         A.   Well, if you don't have the product

6    or service to provide, then presumably a

7    client can go elsewhere then.

8         Q.   Okay.  And you don't know whether --

9    how quickly Webzilla may have gotten financing

10   from ABN AMRO?  Right?

11        A.   I don't know.

12        Q.   Okay.  Did you ever ask?

13        A.   It may have been part of a general

14   discussion.  I don't remember.

15        Q.   And you don't think that that is

16   information that would be relevant to know?

17        A.   I mean I asked what were the issues

18   with banks, financiers.

19        Q.   Right.

20        A.   And what can you show me that shows

21   there was that issue, and this was a document

22   that I was provided with.

23        Q.   And do you have any information as

24   to over what time period this scrutiny that

25   you are discussing occurred?

1          A.   I don't know the exact dates.

2          Q.   Do you know whether it stopped, in

3    other words, whether this increased scrutiny

4    stopped at some point?

5          A.   I think with some financiers, it

6    stopped at some point, months later.  With

7    others, it may not -- they may never have, you

8    know, regained that relationship.

9          Q.   But you don't know?  You don't know

10   the answer to either of those questions, do

11   you?

12         A.   Again this is based on conversations

13   I have had, so I don't have a document that

14   says it, but that's my understanding.

15         Q.   Okay.  Do you have any understanding

16   as to whether it may have been as quickly as a

17   month that their relationships with these

18   banks resumed?

19         A.   It could have been, but I don't know

20   the exact timing.

21         Q.   It is kind of like applying for a

22   mortgage?  Right?  You apply for a mortgage,

23   and the bank comes back and says, "Look, we

24   want some more information"?  Right?

25              MR. FRAY-WITZER:  Objection.

1    BY MR. SIEGEL:

2         Q.   So it may take you a little longer

3    to get your house as a result, right, than

4    what you expected?

5              MR. FRAY-WITZER:  Objection.

6    BY MR. SIEGEL:

7         Q.   If you provide the bank the

8    information, the bank ultimately approves it?

9    Right?

10             MR. FRAY-WITZER:  Objection.

11        A.   What was the question?

12   BY MR. SIEGEL:

13        Q.   Well, you know, I apply for a

14   mortgage.  Right?

15        A.   Okay.

16        Q.   And the bank comes back and says,

17   "You know what?  We need some more

18   information."

19        A.   Okay.

20        Q.   So I get them that information and

21   they ultimately approve the loan.  Right?

22        A.   Um-hmm.

23        Q.   So I moved into my house maybe a

24   week or two later but I ultimately have the

25   house.  Right?

```
 1          A.   Okay.

 2               MR. FRAY-WITZER:   Objection.

 3    BY MR. SIEGEL:

 4          Q.   And then I move on.

 5               So how does whatever scrutiny you

 6    understand the company might have experienced

 7    in January and/or February of 2018 -- 2017,

 8    sorry, how does that translate into permanent

 9    revenue loss?

10          A.   I mean this email is from more than

11    a year later.

12          Q.   What is that?

13          A.   This email is from more than a year

14    later.  So more than a year later they still

15    have the increased hurdles to meet.

16          Q.   Okay.  Do you have any idea whether

17    this email is typical of what they were

18    experiencing more than a year later?

19          A.   My understanding is that this is not

20    typical.  This is as a result of the

21    difficulties --

22          Q.   I don't mean that.  Whether this is

23    typical of all of their relationships with

24    sources of finance --

25          A.   I --
```

1          Q.    -- as of January of 2018?

2          A.    My understanding was that this was

3    -- this was not the case prior to the release

4    of the dossier.

5          Q.    No, no, no.  I'm not saying that.  I

6    am saying do you have any understanding

7    whether as of January 2018 --

8          A.    Um-hmm.

9          Q.    -- right, the kinds of questions

10   that are being asked in this email are typical

11   of the same scrutiny being applied by

12   Webzilla's other sources of finance.

13         A.    Yeah, I don't know.

14         Q.    You don't know.  Okay.

15               Let me -- right.  These -- this

16   particular email, right, relates to financing

17   for Webzilla BV?  Right?

18               (Pause.)

19               (Witness viewing Exhibit 7.)

20         A.    Correct.

21         Q.    And Webzilla Limited?  Right?

22         A.    Correct.

23         Q.    Not Webzilla, Inc.?

24         A.    Correct.

25         Q.    Okay.  Does this email indicate to

1    you that in fact there is a continuing

2    relationship that Webzilla has with ABN AMRO

3    as of January of 2018?

4         A.   You know, they -- they are

5    communicating, so if that is a relationship.

6         Q.   Right.  In other words, doesn't this

7    email indicate to you that Webzilla, the

8    particular Webzilla companies, have an ongoing

9    relationship with ABN AMRO, and ABN AMRO was

10   just asking them to periodically provide more

11   information?

12        A.   You could -- there is many different

13   ways you could look at this.  I -- you know --

14        Q.   Well, this asks for a periodic

15   review of Webzilla accounts.  Right?

16        A.   Um-hmm.

17        Q.   Right?

18        A.   Yes.

19        Q.   It doesn't say we're going to hold

20   up any financing for you until you give us

21   this information?  Right?

22        A.   I would have to read it again.  But

23   I -- look.  I will believe you if it doesn't

24   say those exact words.

25        Q.   Okay.  Do you have any information

1    that this request for a, quote, periodic

2    review for all Webzilla accounts, right, had

3    any effect on either the amount of financing

4    Webzilla may have received from ABN AMRO or

5    the speed in which they received it?

6         A.   Well, I think it certainly affected

7    the speed based on the discussion we

8    previously had about this.

9         Q.   Well, no.  How do you know -- this

10   email --

11        A.   Um-hmm.

12        Q.   How did this email affect the speed

13   with which Webzilla may have received

14   financing from ABN AMRO?

15        A.   Well, like we discussed, it is

16   additional, you know, hoops to jump through,

17   so to speak.

18        Q.   But it doesn't say that?  Right?  It

19   doesn't say you have applied for financing but

20   we're not going to give it to you until you

21   provide us this information?  Right?  It just

22   says we have to perform periodic reviews.  Can

23   you give us this information so we can perform

24   our periodic review.  Right?

25        A.   Right.

1          Q.   There is nothing in the email that

2     indicates that any money at all is being held

3     up as a result of their request for this

4     information?

5          A.   Well, I think it is implied that

6     until this is -- these requests are met that

7     money will be held up.

8          Q.   You think it is implied?

9          A.   Yes.

10         Q.   Based on what?

11         A.   Well, based on the fact that they

12    are saying we need to review all of this.  So

13    presumably -- and this is an assumption -- but

14    if they didn't provide all of this information

15    or couldn't or it took too long to get it,

16    then they may decline the financing.

17         Q.   You have no idea whether any of that

18    occurred?  Right?

19         A.   Like I said, I don't know.

20         Q.   Okay.  And again you don't have any

21    information that this request for a, quote,

22    "periodic review" actually drove away a single

23    client?

24         A.   I mean this goes back to the

25    conversation we had before.  I mean they make

1    the statement in here "As you probably know

2    due to the bad press regarding Webzilla" now

3    we are obligated -- obliged to perform a

4    periodic review.  Again it goes back to the

5    statements I made earlier.

6         Q.   Of course.  But again the fact that

7    the bank may have wanted to ask for a periodic

8    review --

9         A.   Um-hmm.

10        Q.   -- you don't have any information

11   that this request for a, quote, "periodic

12   review" caused -- drove away a single customer

13   of Webzilla?

14        A.   Again I don't know that.  Yes.  I

15   don't know.

16        Q.   Let's look at page 11.

17        A.   Of my report?

18        Q.   Yes.

19             (Witness complying.)

20        Q.   The first full paragraph says:

21             "The projected increase in EBITDA

22   margin from 2016's actual margin of 42 percent

23   was attributed to the planned evolution of the

24   company's business model to one based on

25   physical storage.  If not for the setbacks

1    following the defamatory articles, this

2    transition would have continued to increase

3    XBT's profitability."

4              And you cite a conversation with

5    XBT's CFO.

6              So other than a conversation with

7    XBT's CFO, is there any other basis you have

8    to make that statement?

9        A.   No.

10       Q.   Okay.  And again just to reiterate,

11   you have not actually drilled down to look at

12   a single example of an individual customer who

13   allegedly cancelled or didn't become a

14   customer as a result of the publication?

15   Right?

16       A.   I have not seen that.

17       Q.   Okay.  Did you consider whether the

18   -- well, you in conducting your what you claim

19   is your benefit analysis, you looked at Google

20   trends, right, regarding BuzzFeed page feeds,

21   right, around the time of the dossier?

22       A.   I looked at Google trends regarding

23   Google searches --

24       Q.   Yes.

25       A.   -- for the term BuzzFeed.

1          Q.   Fair enough.  Did you ever look at

2     Google trends for searches for XBT, Webzilla,

3     or Gubarev?

4          A.   I did not.

5          Q.   Is it possible that one of the

6     causes of any downturn in business, if the

7     companies actually experienced that, was the

8     publicity from filing this lawsuit?

9          A.   I -- I -- I don't know.

10         Q.   You don't know?

11         A.   (The witness shaking his head.)

12         Q.   And you haven't looked at whether,

13    for example, according to Google trends more

14    people looked for XBT, Webzilla or Gubarev

15    around the time this lawsuit was filed than

16    when the dossier was published?

17         A.   I don't know that.

18         Q.   And would you consider that

19    relevant?  Is it possible that the publicity

20    from filing the lawsuit caused a loss of

21    customers for Webzilla and XBT?

22         A.   I don't think that would have any

23    bearing on my analysis.

24         Q.   Why?

25         A.   Well, because the causation of the

1    lawsuit was the release of the dossier, and so

2    it seems a little convoluted to me to say that

3    because someone sued someone because somebody

4    did something wrong to them that then -- I

5    just don't understand that logic.

6         Q.   So that's just your personal

7    opinion?  Right?

8         A.   Yes.

9         Q.   Okay.  But setting aside the

10   question of whether your personal opinion,

11   okay, is whether it is fair or not, as an

12   empirical matter, right, isn't it possible

13   that publicity generated by the filing of this

14   lawsuit contributed to a loss of customers for

15   XBT and Webzilla?

16        A.   Again I don't know.  I haven't seen

17   any indication that that's the case.  I don't

18   know.

19        Q.   Well, what do you mean you haven't

20   seen any indication that that's the case?  How

21   have you seen any indication related to the

22   dossier?

23        A.   The subsequent decline in revenues

24   and earnings.

25        Q.   And wasn't there a subsequent

 1    decline in revenue after the lawsuit was

 2    filed?

 3              MR. FRAY-WITZER:  Objection.

 4         A.   I -- I -- I don't recall.

 5    BY MR. SIEGEL:

 6         Q.   Really?  So when was the lawsuit

 7    filed?  Do you know?

 8         A.   I don't know the exact date.

 9         Q.   I will represent to you it was filed

10    in or around February 3, 2017.

11         A.   Okay.

12         Q.   Okay.  Is it your contention that

13    you have no idea whether the company

14    experienced a decline in revenue after

15    February 3, 2017, relative to what it had in

16    2016, at least as you contend?

17         A.   Yes, I don't know if that is

18    directly related to the filing of the lawsuit.

19         Q.   Well, you don't know whether it is

20    directly related to the dossier either, do

21    you?

22         A.   Again that was an assumption that I

23    made in my analysis.

24         Q.   Why are you making that assumption

25    but you are not willing to make the assumption

1    that the filing of the lawsuit -- that the

2    publicity about what was in the dossier

3    resulting from the filing of the lawsuit

4    caused a subsequent decline in income?

5        A.   My argument would be that if

6    anything perhaps the filing of the lawsuit

7    helped to mitigate some of the losses because

8    the losses in revenues bottomed in February

9    and then started to improve, and so on face

10   value at least it appears that the filing of

11   the lawsuit may have helped to dig them out of

12   the hole created by the publication of the

13   dossier.

14       Q.   That's your guess?  Right?

15       A.   Well, no.  It's an educated

16   assumption based on the numbers, the chart,

17   the timing of these events.

18       Q.   Actually, their revenue fell more

19   after the lawsuit was filed than after the

20   dossier was published?  Right?  The revenue

21   fell more in February than it did in January;

22   isn't that right?

23       A.   And the assumption is that that is

24   still the effects of the dossier being filed,

25   and then there is a lag between when they're

1    going to bottom and recover or begin to

2    recover -- they never fully recovered from it.

3         Q.   So you just want to make the

4    assumption that the lawsuit doesn't matter,

5    right, because that would be uncomfortable for

6    your client?

7              MR. FRAY-WITZER:  Objection.

8         A.   Well, I -- it -- there is nothing to

9    do with comfort for anyone.  This is just my

10   opinion based on the facts that I have seen.

11   BY MR. SIEGEL:

12        Q.   You have no particular expertise to

13   offer that opinion, right, as to what -- as to

14   whether the original publication itself or the

15   filing of the lawsuit had more of an impact on

16   potential customers?

17        A.   Again as I said, it was an

18   assumption I made --

19        Q.   Right.

20        A.   -- that the dossier caused the

21   decline in revenue and earnings.  You asked me

22   a question about the filing of the lawsuit.

23        Q.   Right.

24        A.   And my opinion now is that it

25   bottomed shortly after the -- the declining

1    revenues bottomed shortly after the filing of

2    the lawsuit and then started to recover.  And

3    so -- I don't see -- what's the question

4    again?

5         Q.   Okay.  And so your assumption is

6    that the filing of the lawsuit helped revenues

7    to grow?

8              MR. FRAY-WITZER:  Objection.

9         You can answer.

10        A.   It helped to mitigate --

11   BY MR. SIEGEL:

12        Q.   Are you an expert in public

13   relations?

14        A.   No.

15        Q.   So what expertise as a valuer of

16   intellectual property do you claim to have to

17   assert -- to even opine -- at least to provide

18   an expert opinion --

19        A.   Um-hmm.

20        Q.   -- on whether publishing the dossier

21   or filing a lawsuit over the same allegations

22   has more of an impact on revenue?

23        A.   Well, you asked me in a hypothetical

24   situation that the filing of a lawsuit caused

25   more harm, and I'm saying in that hypothetical

1        that my opinion is that the filing of the

2        lawsuit perhaps helped to mitigate the

3        losses --

4               Q.   Right.

5               A.   -- by showing the truth that it --

6        that the dossier was false with regards to the

7        allegations.

8               Q.   Or it could have drawn -- driven

9        even more customers away, right, by

10       republishing what those allegations were?

11       Right?

12              A.   I don't know that that's true.

13              Q.   But you don't know that it is false

14       either?

15              A.   I have stated I don't know.  You

16       asked me for my opinion on it.

17              Q.   Okay.  Do you know anything about

18       how much revenue the companies have been

19       earning in 2018 so far?

20              A.   I do not.

21              Q.   Have you asked for that information?

22              A.   I have asked for the most current

23       available financials.

24              Q.   Okay.  So far as you know, they are

25       just not available?

1          A.   I have not seen them.

2          Q.   Okay.  Let's go back to the KPMG

3     evaluation.  I forget what exhibit number that

4     was.

5          A.   5.

6          Q.   Now there are a number of companies

7     in this valuation that KPMG for purposes of

8     this analysis that they conducted in 2013 said

9     were comparable, right, or at least opined

10    were comparable.  Right?

11         A.   That's correct.

12         Q.   And turn to page 17 or Bates number

13    662.

14              (Witness complying.)

15         Q.   And those six companies are listed

16    there?  Right?

17         A.   Yes.

18         Q.   Why did you assume that -- why did

19    you use these 2013 -- this 2013 report for

20    purposes of determining what companies were

21    comparable to XBT today?

22         A.   Because I have worked with KPMG in

23    the past.  Another reputable source and --

24         Q.   But KPMG isn't asserting those would

25    be a list of comparable companies today, is

1    it?

2         A.   Well, they haven't asserted that

3    they are not.

4         Q.   You didn't ask them?  Right?

5         A.   I haven't seen any assertion that

6    they are not.  But we're talking three, four

7    years later, and there is not a major shift in

8    the landscape that would dictate that these

9    are not any more comparable today as they were

10   in 2013.

11        Q.   Did you undertake any analysis

12   yourself to determine whether these companies

13   are comparable to XBT today?

14        A.   I looked at their description of

15   what they do.

16        Q.   Um-hmm.

17        A.   I looked at their financials

18   obviously to get to their EBITDA multiples.

19   So I did look at the companies.  Yes.

20        Q.   What does -- well, and what leads

21   you -- what, if anything, leads you to

22   conclude that they are all comparable

23   companies today?

24        A.   Well, they are all within the data

25   center industry.

1        Q.   Isn't DuPont Fabros primarily a real

2    estate company?  It is a REIT, right, or it

3    was a REIT?

4        A.   I believe that's REITs involving

5    servers, though.

6        Q.   Okay.  So do you think that a

7    company that is a REIT is comparable to XBT?

8        A.   I mean that is really a structure

9    for a -- again I don't know, legal tax

10   purposes that was used.

11       Q.   Right.

12       A.   But the core business of owning and

13   leasing server space did not change.

14       Q.   Did you read Mr. Mishra's deposition

15   where he opined that he didn't think that was

16   a comparable company?

17       A.   I did see that.

18       Q.   And do you think he is wrong?

19       A.   I still believe that DuPont Fabros

20   is a reasonable comparable.

21       Q.   Okay.  So you won't take

22   Mr. Mishra's views or assertions for this

23   purpose?  Right?

24       A.   When it comes to the valuation

25   elements that I have worked on, no.

1          Q.   Let's go to page Bates 654 of the

2     KPMG valuation.

3               (Witness complying.)

4          Q.   And do you see where it says, there

5     is a little line that says "comparable

6     companies"?

7          A.   I do.

8          Q.   And the second bullet point under

9     that:

10              "Marketability discount in the range

11    20 to 30 percent was used to reflect the fact

12    that the company being valued" -- meaning XBT

13    -- "is private and does not have shares traded

14    in a public exchange."

15              Right?

16         A.   I see that.

17         Q.   So did you apply a 20 to 30 percent

18    discount to the EBITDA to multiples that you

19    used?

20         A.   No.

21         Q.   Why not?

22         A.   Because I don't think it is

23    appropriate.

24         Q.   Why?

25         A.   Because other companies that

1        exchanged hands at that time, one of the

2        comparables that Mr. Mishra identified that he

3        thought was more comparable, Softlayer, was

4        purchased by IBM in 2013, and they were

5        acquired on a forward EBITDA.  So forward

6        projections of a year --

7              Q.   Okay.

8              A.   -- at 11.1 times.

9                   These comparables had a 10.99

10       forward EBITDA multiple.

11                  So 10.99, 11.1, are very close.

12       Softlayer was higher.  A private company.  No

13       market discount was applied for lack of

14       marketability.  I did not find it necessary.

15             Q.   But the EBITDA margin that you came

16       up was 17, not 11?

17             A.   It is a different time.

18             Q.   Right?

19             A.   It is a different time.

20             Q.   And Softlayer was purchased at what

21       margin?

22             A.   11.1 forward EBITDA in 2013.

23             Q.   Okay.  So you think that -- well,

24       but you didn't use Softlayer as a comparable

25       company?  Right?

1          A.   Right.  I didn't have public

2     information about Softlayer at the date of my

3     valuation.  They were rolled into IBM, and

4     they were public prior to that.

5          Q.   Right.

6          A.   So during the acquisition,

7     information came out about the multiples that

8     were applied --

9          Q.   Right.

10         A.   -- and the fact that at the same

11    time period --

12         Q.   Um-hmm.

13         A.   -- that the KPMG study was done, the

14    KPMG comparables had a 10.99 forward multiple

15    on the EBITDA.  Softlayer was purchased at an

16    11.1 forward multiple on the EBITDA.

17         Q.   Okay.

18         A.   Therefore --

19         Q.   You think KPMG was wrong?

20         A.   What?

21         Q.   You think KPMG was wrong?

22         A.   About what?

23         Q.   They shouldn't have applied a 20 to

24    30 percent discount?

25         A.   Again I said I don't -- I don't

 1     believe it was necessary to apply that

 2     discount.

 3          Q.   Okay.

 4          A.   But it doesn't mean I don't agree

 5     with their choice of comparables.

 6          Q.   But you don't agree with how they

 7     valued XBT relative to those comparables?  You

 8     value it higher?

 9          A.   They actually value it on -- they

10     take several approaches to value.  One is on

11     an income approach.  They say the value on the

12     income approach actually yields a higher

13     multiple of EDITDA -- I think it was 14 or 15,

14     something like that -- as opposed to the

15     10.99.

16          Q.   If you think the Softlayer sale is

17     more relevant, why not apply a margin of 11,

18     not 17 -- a multiple of 11, not 17, to your

19     damages analysis?

20          A.   Well, as I said, it's a different

21     time.  It is a totally different market.  I

22     mean if you have seen the markets they are up

23     200, 300 percent from the bottoms.  You have

24     got companies such as AWS, Oracle, Microsoft,

25     Google, that have, you know, increased even

1    greater than that.  So the multiples on the

2    entire market, you look at PE multiples, the

3    EBITDA multiples, any multiples over a three-

4    or four-year period have gone up

5    significantly.  It would not be appropriate to

6    use a 11.1 multiple in 2018.

7         Q.   Let's look at document 63.

8              MR. SIEGEL:  I think this is

9         number 8.  Is that right?

10             THE REPORTER:  Yes.

11        (XBT Holding SA Consolidated Business

12        Plan prepared November 2016, bearing

13        production numbers P-G 001035 through

14        P-G 001087 marked Exhibit 8 for

15        identification.)

16             (Handing Exhibit 8 to the

17        witness.)

18             THE WITNESS:  Thank you.

19   BY MR. SIEGEL:

20        Q.   And let's go to page 13 of this

21   document, which is Bates number 1050.

22             (Witness complying.)

23        Q.   Now in this November of 2016

24   business plan, it identifies four direct

25   competitors, right:  Softlayer.com,

1    Leaseweb.com, OVH.com and Rackspace.com?

2    Right?

3         A.    Correct.

4         Q.    Why didn't you use those companies

5    for your, as comparables, for your EBITDA

6    margin analysis -- I am sorry -- your EBITDA

7    multiple analysis?

8         A.    Well, I did use Rackspace.

9         Q.    Okay.  And the Rackspace multiple

10   was seven?  Right?

11        A.    It was low.

12        Q.    It was by far the lowest of any of

13   those six companies that you used?  Right?

14        A.    Right.  But I kept it in my

15   analysis.

16        Q.    Did you check the multiples for the

17   other three companies?

18        A.    Again the only one that I could find

19   information on was Softlayer due to the

20   acquisition by IBM.  The other two are

21   private.  I couldn't find information.

22        Q.    Okay.  So you couldn't find any.

23   Did you try to find information about them?

24        A.    Yes.

25        Q.    So you looked and you say you

1    couldn't find it?

2         A.   Yes.

3         Q.   Why would these companies -- why

4    wouldn't these companies which XBT itself has

5    identified as their direct competitors in late

6    2016 be a better group of comparables to use

7    than the ones KPMG identified three years

8    earlier, three and a half years earlier?

9         A.   Really two answers to that question.

10        Q.   Okay.

11        A.   The first is private companies do

12   not disclose this information.  It is not

13   readily available.  And so if you don't have

14   the information, you can't use that.

15             And number two, well, I did use

16   Rackspace.  So one of the four I used -- two

17   of the four.  Softlayer as we had discussed

18   had actually a higher EBITDA multiple than the

19   comps that I used from the KPMG study which

20   indicates that these -- these comparables, at

21   least as far as XBT displays them, are in fact

22   in line with the comparables used in the KPMG

23   analysis.

24        Q.   Okay.  And that is an assumption you

25   are making based on the multiple that was used

1    in the Softlayer sale in 2013?

2         A.   What is an assumption I was making?

3         Q.   Let me ask you this.  If it turns

4    out you are wrong, if the Rackspace 7 percent

5    multiple, for example, is actually much more

6    representative of the multiple for those

7    direct competitors, would that cause you to

8    change your damages estimate?

9         A.   If the Rackspace 7 percent multiple?

10        Q.   Yes.

11        A.   I'm not sure what that means.

12        Q.   Okay.  I will take it again.

13             Let's assume that for these four

14   companies, all right, identified in the

15   November of 2016 report, okay, that their

16   average EBITDA margin is the same as

17   Rackspace.  It is 7 percent.  Just make that

18   assumption.  Okay?  I understand that may not

19   be what the fact is, but let's assume that it

20   is.

21             If that were the case, would that

22   cause you to revise your business valuation

23   estimate in your report?

24        A.   So you are -- I think what you are

25   asking me is if all four of these companies

1    had a -- not a 7 percent -- but a 7 times, 7X

2    multiple.

3         Q.   7 times.  That is right.  I am

4    sorry.

5         A.   You are confusing me.

6         Q.   I have got it.  If their average

7    multiple was 7 times, not 17 --

8         A.   Okay.

9         Q.   -- if their average multiple was 7

10   times, would that cause you to revise your

11   estimate of lost business value?

12        A.    It would depend on the information

13   that I have that supports that, the timing of

14   the data available to show those multiples,

15   how that -- I would then likely if it was

16   verifiable reasonable data incorporate it into

17   the other multiples that I have used from the

18   six identified in the KPMG analysis.  If it

19   was higher.  It could be lower.  If that data

20   was available and I had it, sure, I could

21   incorporate that into my analysis.

22        Q.   Okay.  Now as of the end of 2016 --

23   I'm sorry -- '17; right?  XBT's actual revenue

24   in 2017 went up about $9 million as compared

25   to 2016?  Right?

1          A.   Can I look?

2          Q.   Sure.

3               (Pause.)

4          Q.   I think it is 49.7, 58.27.

5          A.   Yes.  Yes.  49.7 to 58.27.

6          Q.   So eight and a half?  Fair?  Eight

7     and a half.

8               And that's an increase of eight and

9     a half million dollars even with the loss of

10    the Methbot customer?  Right?  In other words,

11    they lost the Methbot customer at the end of

12    2016, but their total revenue still went up by

13    eight and a half million?  Right?

14         A.   Correct.

15         Q.   Why do you think it went up by eight

16    and a half million?

17         A.   Why did revenue go up by eight and a

18    half million dollars?

19         Q.   Yes.

20         A.   Because they continued their

21    business.  They tried to get through the

22    issues created by the dossier.  They didn't

23    shut the doors down.

24         Q.   Okay.

25               MR. SIEGEL:  Let's just mark

1          for purposes of the record his first

2          report, 9.

3          (Expert report of Jeff Anderson,

4          bearing production numbers P-S 000005

5          through P-S 0000044 marked Exhibit 9

6          for identification.)

7                    (Handing Exhibit 9 to the

8          witness.)

9                    THE WITNESS:  Thank you.

10     BY MR. SIEGEL:

11          Q.   Okay.  So just for the record, can

12     you confirm that this is your first report

13     that you did on February 23, 2018, and it was

14     supplemented subsequently?  Right?

15          A.   Without flipping through and reading

16     it all, yes, I believe you.

17          Q.   Now go back to your supplemental

18     report.

19          A.   Which page?

20          Q.   12.

21                (Witness complying.)

22          Q.   And I am looking at figure 8.

23          A.   Okay.

24          Q.   And this is -- I think you have

25     already testified to this effect, but just to

1    make sure, to make it clear -- that so what

2    you call the as-is scenario, right, that is

3    the -- your estimate of the as-is scenario,

4    the actual value of the business, right, as of

5    January 1, 2018?  Right?

6         A.   This is.  Yes.  The as-is business

7    value.

8         Q.   Right?

9         A.   Yes.

10        Q.   So what that means is that if,

11   hypothetically, XBT were to have sold the

12   company on January 1, 2018, the price would

13   have been an estimate of $415,377,000?  Right?

14   That's what that means?

15        A.   The fair market value.  Yes.

16        Q.   And your contention is that but for

17   the publication of the dossier the selling

18   price, the fair market value as you put it, as

19   of January 1, 2018, would have been somewhere

20   in between 447 million and 553 million?

21   Right?

22        A.   But for.  Correct.  Yes.

23        Q.   Okay.

24             MR. SIEGEL:  Want to take a

25        break here?

```
 1                    MR. FRAY-WITZER:  Yes.

 2                    MR. SIEGEL:  Because we will

 3          move on to a new topic.

 4                    THE VIDEOGRAPHER:  The time

 5          is 2:17 p.m.  We are off the record.

 6                    (Recess taken at 2:17 p.m.)

 7                    (Recess ended at 2:29 p.m.)

 8                    THE VIDEOGRAPHER:  The time

 9          is 2:30.  We are back on the record.

10     BY MR. SIEGEL:

11          Q.   Sir, now I am going to turn to the

12     second part of your report, which is your

13     estimate of what you call the benefit to

14     BuzzFeed.

15               Why did you estimate that?

16          A.   I was asked by counsel to look at

17     the benefit BuzzFeed received from posting the

18     defamatory articles.

19          Q.   Okay.  And do you have any

20     understanding for what purpose that opinion

21     will be offered?

22          A.   I do not.

23          Q.   Okay.  What is your understanding of

24     how BuzzFeed makes money?

25          A.   Well, they sell those hot plates.
```

1    That's one thing.  But they get traffic.

2         Q.   Products?

3         A.   Products.  They sell some products.

4         Q.   All right.

5         A.   But they have traffic to their

6    website, advertising.

7         Q.   So let's break that down.  How does

8    BuzzFeed as you understand it, convert --

9    well, how does BuzzFeed make money off traffic

10   to their website?

11        A.   Typically from advertising.

12        Q.   What kind of advertising?

13        A.   What do you mean what kind of

14   advertising?

15        Q.   I am asking you.  When you say

16   advertising, what do you mean?

17        A.   Corporations' products, services

18   will advertise.

19        Q.   Okay.  And what is your

20   understanding of how BuzzFeed has monetized

21   advertising over time?

22        A.   Well, the more traffic they get, the

23   more advertising dollars they can receive.

24        Q.   What you're talking about -- is what

25   you are talking about what are often called

1    banner or programatic ads?

2              MR. FRAY-WITZER:  Objection.

3         A.   They can be.  Yes.

4    BY MR. SIEGEL:

5         Q.   So just to make sure that we're

6    talking about the same thing, all right, let's

7    set aside BuzzFeed for a moment.  All right?

8              Let's say hypothetically a person

9    clicks on the website for Ford.com, all right,

10   because they are looking at cars.  All right.

11   They click on the website.  When they click on

12   Ford.com a little, you know, a little ad pops

13   up for lawn mothers.  Is that what you're

14   talking about?

15             MR. FRAY-WITZER:  Objection.

16        A.   I don't think Ford does that.

17   BY MR. SIEGEL:

18        Q.   I am not saying that Ford does.  All

19   right.  Let's use BuzzFeed.

20        A.   All right.

21        Q.   You they click on BuzzFeed.com,

22   anywhere on BuzzFeed.com, and to flip it,

23   right --

24        A.   Um-hmm.

25        Q.   -- an ad for Ford pops up.  Is that

1    what we're talking about?

2                    MR. FRAY-WITZER:  Objection.

3         You can answer.

4         A.   Is that what you are asking me?

5    BY MR. SIEGEL:

6         Q.   Yes.  Is that the kind of

7    advertising you are talking about?

8         A.   Yes.  An ad will pop up.

9         Q.   Okay.  Do you have any information

10   as to how long BuzzFeed has been running

11   banner ads?

12        A.   I don't know the length of time.

13        Q.   You have no idea?

14        A.   I don't know.

15        Q.   Did you do anything to investigate

16   that?

17        A.   No.  It has no direct bearing on my

18   analysis.

19        Q.   Why?

20        A.   Because what I looked at was the

21   value of traffic.

22        Q.   Okay.  We'll get to that in a

23   second.

24                  But do you know whether BuzzFeed was

25   running banner ads at all when the dossier was

1    published?

2                MR. FRAY-WITZER:  Objection.

3        A.   I don't recall.

4    BY MR. SIEGEL:

5        Q.   You don't recall whether you know or

6    not?

7        A.   Yes.  I don't recall.  I mean I saw

8    the image of it in the complaint and went to

9    the website, but I don't recall if there were

10   banner ads.  It looked like there may have

11   been, but I don't recall.

12       Q.   That's not what I am asking you.  Do

13   you know whether BuzzFeed.com anywhere on its

14   websites in January of 2017 was running banner

15   advertising?

16               MR. FRAY-WITZER:  Objection.

17       A.   I don't know.

18   BY MR. SIEGEL:

19       Q.   So do you have any -- how -- what

20   understanding, if any, do you have of how in

21   January of 2017 BuzzFeed made money?

22       A.   Well, made money?  That's I guess my

23   confusion.

24       Q.   Earned revenue?

25       A.   Revenue is what you are talking

1    about?

2         Q.   Yes.

3         A.   My analysis didn't look at revenue

4    earned by BuzzFeed.

5         Q.   Right.  And so wouldn't revenue

6    earned by BuzzFeed be what the benefit to

7    BuzzFeed was, or profit earned by BuzzFeed?

8         A.   It could be at some point in the

9    future --

10        Q.   Right.

11        A.   -- a benefit, but that is not the

12   measure of value that I looked at.

13        Q.   Well, what measure of value do you

14   look at?

15        A.   I looked at the measure of value of

16   the traffic and what the value of that traffic

17   to BuzzFeed was.

18        Q.   Well, what -- and when you say

19   traffic, what do you mean by traffic?

20        A.   Page views.

21        Q.   Okay.  And I will ask you again.  Do

22   you know how BuzzFeed makes money, earns

23   revenue, from page views?

24        A.   And again my understanding was

25   through advertising, but again that's not an

1    element of how I looked at the value of those

2    clicks, that traffic, that went to the page.

3         Q.   Okay.  Why not?

4         A.   Because that is -- because the

5    revenue, directly or indirectly, earned if

6    there were or were not banner ads, side banner

7    ads, whatever you want to call it, on the page

8    of others is not the indication of value that

9    I looked at.

10        Q.   Okay.  What is the indication of

11   value that you looked at?

12        A.   The traffic.

13        Q.   And how did you value -- and

14   traffic, you mean by the total number of page

15   views, right, which you say was about

16   9 million roughly?

17        A.   Correct.

18        Q.   We will break that down as to what

19   that consisted of, but just using that number

20   for now, so how did you value those 9 million

21   page views?

22        A.   I valued it on the basis of what

23   would be the cost of generating that level of

24   traffic or what is the value of that level of

25   traffic to BuzzFeed.

1    Q.   Now how do you -- and -- okay.

2         So as I understand it, right, what

3    you actually did was you came up with an

4    estimate of how much it would cost a company,

5    right, how much it would have cost BuzzFeed to

6    do its own advertising campaign, right, own

7    marketing campaign on Google, or, well, search

8    engines to generate 9 million page views?  Is

9    that accurate?

10   A.   Yes.  What the cost --

11   Q.   Right.

12   A.   -- to generate that level of page

13   views would be based on BuzzFeed's historical

14   search terms that drive traffic to the

15   website.

16   Q.   Okay.  And assuming -- just on a

17   high level -- if your estimate was accurate,

18   if it would have cost BuzzFeed $14 million to

19   -- and what we are talking about is BuzzFeed

20   goes out and takes out banner ads on other

21   websites?  Right?

22             MR. FRAY-WITZER:  Objection.

23   BY MR. SIEGEL:

24   Q.   Banner ads on Google?

25   A.   Are you asking me if BuzzFeed does

1    that?

2         Q.   Yes.  I am asking you.

3         A.   I don't know that they do.

4         Q.   No, no, no.  I am saying your --

5    what is it that in your analysis, right, what

6    would BuzzFeed have spent the $14 million on?

7         A.   Generating the traffic.

8         Q.   And -- I understand that.  The goal

9    is to generate the traffic.

10             But what would they have

11   specifically purchased in order to try to

12   generate that traffic?

13        A.   The higher-placed links under

14   certain search terms that used to really look

15   like ads and now they do not anymore.  I mean

16   they may say ad on it.  But it is the links in

17   Google, for example, in a search engine.

18        Q.   All right.  Okay.  So just walk me

19   through this.  Okay?  And assume I am a

20   complete simpleton about this.

21        A.   Sure.

22        Q.   I will ask you one question.  Is

23   what BuzzFeed is doing, is part of what

24   BuzzFeed is doing, would be doing under your

25   scenario, right, would be I'm on Google,

1    right, and when I am on Google an ad for

2    BuzzFeed pops up?

3                MR. FRAY-WITZER:  Objection.

4    BY MR. SIEGEL:

5        Q.   Is that what you're talking about?

6        A.   No.

7        Q.   Okay.  So I think what you just said

8    was that BuzzFeed would be paying for certain

9    search terms to have preference or for it to

10   be given preference when certain search terms

11   are input into Google?

12       A.   To make it simple --

13       Q.   Okay.

14       A.   -- we will go back to Ford.

15       Q.   Okay.

16       A.   So Ford, you search Ford on Google.

17       Q.   Right.

18       A.   And if you did it on your phone

19   right now it would probably have the first

20   link that shows up would be Ford.

21       Q.   Um-hmm.  Ford.com?

22       A.   Well, it would be -- it would take

23   you to Ford.com.

24       Q.   Right.

25       A.   But it would be Ford.

```
 1        Q.    Um-hmm.

 2        A.    And it would have probably in

 3   parentheses a little ad --

 4        Q.    Um-hmm.

 5        A.    -- and maybe two, the second link,

 6   would take you to -- I don't know -- they have

 7   a new Expedition out.  Maybe the second link

 8   would take you directly to the Expedition page

 9   and that could be an ad.

10        Q.    Okay.

11        A.    Maybe the third link would be

12   Ford.com's nonad website, organic website.  So

13   does that explain that?

14        Q.    Yes.  And from what I understand you

15   were saying that Ford would have paid Google a

16   certain amount of money so that when somebody

17   inputs "Ford" into Google that's what shows

18   up?  Is that --

19        A.    It is a free market really in how

20   they price the search terms.

21        Q.    Okay.

22        A.    But others -- so GM theoretically --

23   could also pay for Ford.

24        Q.    To be --

25        A.    If somebody searches "Ford," it
```

1    could pop up at the very top "General Motors."

2         Q.   I have got it.

3         A.   Or GM's Suburban has more power than

4    the first Expedition, and that could be the

5    first link.

6         Q.   All right.  And as I understand your

7    analysis, hypothetically the amount that

8    BuzzFeed would be paying Google, right, would

9    vary according to the search term?  Right?  So

10   that they would pay a higher price for

11   BuzzFeed?  Right?  If someone puts in

12   "BuzzFeed," they would be paying a higher

13   price for BuzzFeed.com to pop up at the top?

14   Right?

15              MR. FRAY-WITZER:  Objection.

16   BY MR. SIEGEL:

17        Q.   And if they were searching for the

18   term "corny jokes," for example, that would be

19   a lower price, right, for BuzzFeed to pop up

20   at the top?

21              MR. FRAY-WITZER:  Objection.

22        A.   Yes.  I have a list.  On Exhibit 12

23   I show the top 100.

24   BY MR. SIEGEL:

25        Q.   Right.

1          A.    So it ranges from BuzzFeed's "Sponge

2     Bob," "micropenis," I mean there is a lot of

3     search terms that drive traffic to BuzzFeed's

4     website.  Now "BuzzFeed" is the highest search

5     term.

6          Q.    Right.

7          A.    And, you know, that has -- you are

8     right.  It has a higher cost per click of

9     $2.50 as opposed to the --

10         Q.    Right.

11         A.    -- buck and a half.

12         Q.    Setting aside the question of

13    whether the analysis is correct, even if --

14    assuming the analysis was correct, okay, and

15    it would cost BuzzFeed $14 million to do that,

16    right, how do you know that that would

17    translate into $1 million or $5 million or

18    $10 million or $15 million of benefit to

19    BuzzFeed?

20         A.    How are you defining "benefit"?

21    Revenue?

22         Q.    Yes.

23         A.    Okay.  So like I said earlier,

24    revenue -- it's -- websites generate value by

25    having people come to the website, page views,

1    monthly active users, daily active users.  So

2    having a steady base of users and traffic to a

3    site generates the value.  It is similar to

4    Facebook in its early days where they were

5    running at a loss.  They weren't generating

6    much in revenue, but they had a massive user

7    base.

8            So the theory is that, and it has

9    turned into practice as can be shown through

10   something like a Facebook which is now one of

11   the largest companies in the world, once you

12   have the base and have the traffic that

13   continually comes to the site you can monetize

14   it in other future ways.

15       Q.   Right.

16       A.   So the direct benefit doesn't

17   necessarily have to be revenue from

18   advertising on the page as opposed to having

19   traffic come to your website so that you can

20   then later monetize that through other

21   opportunities that may arise.

22       Q.   And you don't provide any estimate,

23   right, of how much you contend BuzzFeed could,

24   as you call it, later monetize those 9 million

25   page views?  Right?

1          A.   Well, no.  I contend that the value

2     of that traffic is approximately $14 million.

3          Q.   And does that $14 million represent

4     the down-the-road benefit, shall we call it,

5     down-the-road revenue for BuzzFeed?  What does

6     it reflect?

7          A.   Again it reflects the value of that

8     traffic.

9          Q.   Well, that is how much BuzzFeed

10    would have paid?  Right?  That's a cost

11    actually?  Right?  It is how much it would

12    have cost BuzzFeed --

13         A.   Sure.

14         Q.   -- under your analysis to generate

15    an additional 9 million page views?  Right?

16         A.   It's a cost.

17         Q.   But how do we know whether having

18    spent that $14 million those 9 million page

19    views -- do you have any estimate of how much

20    money BuzzFeed would realize down the road,

21    either immediately or down the road or

22    whatever, from those 9 million page views?

23              MR. FRAY-WITZER:  Object.

24    BY MR. SIEGEL:

25         Q.   They spend $14 million, right, but

1    how much are they going to get from it?

2                   MR. FRAY-WITZER:  Objection.

3         You can answer.

4         A.    Again it is the future

5    opportunities.  But just to go back to it, you

6    are right.  It is a cost.

7    BY MR. SIEGEL:

8         Q.    Right.

9         A.    And there is three basic approaches

10   to valuation -- four.  But the three are:

11   market approach, which we used for the

12   business valuation --

13        Q.    Okay.

14        A.    -- income approach, which is one of

15   the ones KPMG used, and then there is a cost

16   approach.  The cost approach is essentially

17   what we used here.  It is the cost to generate

18   that traffic is a measure of the value of that

19   traffic.

20        Q.    Okay.  And just for purposes of the

21   record so I understand, how would you define

22   the income approach?

23        A.    Income approach is based on future

24   earnings, projected out typically five years,

25   with then some terminal period, some defined

1    level of growth over that terminal period --

2         Q.   Right.

3         A.   -- discounted to the valuation date

4    of present value.

5         Q.   Okay.  So is income approach

6    tantamount to -- I know you used the wording,

7    so that is the more -- in layperson's terms is

8    that like an estimate of profits?

9         A.   Not profits.  EBITDA would be a much

10   more --

11        Q.   EBITDA?

12        A.   -- relevant measure.

13        Q.   And EBITDA as a measure of earnings

14   as opposed to profits?  A measure of earnings?

15        A.   It is really cash flow.

16        Q.   Okay.  Okay.

17             So does it make any difference in

18   your analysis to know how much BuzzFeed itself

19   estimated a page view was worth in January of

20   2017 to it?

21        A.   It would depend on what that measure

22   is, where it stemmed from, and the data

23   supporting it.  So it would depend.

24        Q.   Okay.  Are you familiar, for

25   example, with the term RPM, revenue per

1    thousand page views?

2          A.    Revenue per mille.

3          Q.    What is that?

4          A.    Per mille.

5          Q.    Mille?

6          A.    Mille, meaning thousand.  Yes.

7          Q.    Would it make any difference to you

8    to know what BuzzFeed's estimate of its RPM,

9    if any, was?

10         A.    Again it would depend on the context

11   of what that is based on.

12         Q.    Right.

13         A.    Timing, what does it cover.  I would

14   have to see that.

15         Q.    Okay.  Are you familiar with the

16   term "native advertising"?

17         A.    Vaguely, yes.

18         Q.    What do you understand native

19   advertising to be, to mean?

20         A.    To be something that is -- I don't

21   want to guess, so please tell me.

22         Q.    No.  I am not going to tell you.  I

23   am asking you do you have any understanding of

24   what the term "native advertising" means.

25         A.    I don't have an answer for that

1    right now.

2         Q.   Okay.  Do you know whether BuzzFeed

3    engaged in native advertising in January of

4    2017?

5         A.   I don't know.

6         Q.   Okay.  Now your theory looks at

7    total page views for eight articles?  Right?

8         A.   The follow-up articles plus the

9    original.

10        Q.   Correct.  So your theory asserts,

11   right, that BuzzFeed was unjustly enriched any

12   time anyone clicked on and read or read

13   anything in any of those eight articles?

14   Right?

15        A.   Yes.

16        Q.   Okay.  You don't know how many of

17   those 9 million people ever viewed the

18   dossier, do you?

19        A.   I assume they have all.  It is

20   embedded in the article.

21        Q.   Well, wait a minute.  But you don't

22   know -- right.

23             In order to read the dossier, you

24   would have to click on the dossier after being

25   in the article?  Right?

1              MR. FRAY-WITZER:  Objection.

2         A.   My understanding is it was embedded

3    in the article.

4    BY MR. SIEGEL:

5         Q.   Right.  But in order to read it, you

6    needed to click on the embedded link?  Right?

7              MR. FRAY-WITZER:  Objection.

8         A.   Again my understanding is it is

9    embedded.

10   BY MR. SIEGEL:

11        Q.   Have you looked at it?

12        A.   At the dossier?  Yes.

13        Q.   Have you looked at how BuzzFeed

14   published the dossier?

15        A.   Yes.

16        Q.   You don't have to read the dossier

17   at all to read any of those articles, do you?

18        A.   That was the reason people went to

19   the article.

20        Q.   How do you know?

21        A.   Because that's why BuzzFeed posted

22   the dossier, was for people to read it.  At

23   least that is what Mr. Smith said.

24        Q.   Okay.  But do you -- do you think

25   that all 9 million people who clicked on all

1  of those articles actually read the dossier?

2       A.    I think it is actually probably a

3  conservative number.

4       Q.    When you click on -- the other seven

5  articles that you are talking about don't all

6  embed the dossier?  Isn't that right?

7       A.    Correct.

8       Q.    They link to other articles which

9  embed the dossier, to the original article

10  which embeds the dossier?  Right?

11       A.    Correct.

12       Q.    So somebody who read one of those

13  follow-up articles would only have looked at

14  the dossier if they clicked through to the

15  other article and then clicked through to the

16  dossier?  Right?

17            MR. FRAY-WITZER:  Objection.

18       A.    That's not necessarily the case.

19  BY MR. SIEGEL:

20       Q.    Why?

21       A.    Well, you are saying that is the

22  only way they could have read the dossier.

23  The dossier is on other websites as well that

24  later picked it up from BuzzFeed.

25       Q.    Okay.  But I am saying if you are --

1    if you are saying that BuzzFeed is -- is it

2    your assertion that all 9 million -- BuzzFeed

3    was unjustly enriched because all 9 million

4    people who clicked on any of those articles

5    read the dossier?

6         A.   My assumption is that all of those

7    page views viewed the dossier, yes.

8         Q.   And what basis do you have to assume

9    that?

10        A.   Again I saw an interview on CNN

11   where Mr. Smith said the only reason they

12   posted it is because they wanted everybody to

13   view it, and so people that went to that

14   article went there to view the dossier.

15        Q.   But what Mr. Smith may have said he

16   wanted doesn't mean that all 9 million people

17   actually read it?  I mean you have no

18   information at all as to what each of those 9

19   million people actually read when they clicked

20   onto any of those eight BuzzFeed articles, do

21   you?

22        A.   Well, the information that I have is

23   what I requested through counsel, which was to

24   ask BuzzFeed to provide the viewership of the

25   articles and the dossier.

1        Q.    Right.

2        A.    BuzzFeed provided this information,

3   which I am using.

4        Q.    And that information from BuzzFeed

5   did not measure how many people clicked on the

6   dossier?  Right?

7                MR. FRAY-WITZER:  Objection.

8        A.    Again we asked for how many people

9   viewed the dossier and the article, and this

10  is what was sent to us.

11  BY MR. SIEGEL:

12       Q.    No.  That is not what I asked you

13  for.  You asked for page views of the

14  articles.

15            You have no information, do you --

16  are you assuming that the information that

17  BuzzFeed provided is number of people that

18  actually clicked on the dossier --

19                MR. FRAY-WITZER:  Objection.

20  BY MR. SIEGEL:

21       Q.    -- or that BuzzFeed even has that

22  information?

23       A.    Again what I said is that I assumed

24  that those 9 million, roughly 9 million

25  views --

1          Q.    Right.

2          A.    -- viewed the dossier.

3          Q.    And what is that assumption based

4     on?

5          A.    Again it is based on statements made

6     by Mr. Smith.  It is based on the fact that

7     people --

8          Q.    No, no.  Mr. Smith never said that

9     all 9 million people who clicked on any of

10    those eight articles, some of which hadn't

11    even been written when Mr. Smith was talking,

12    in fact read the dossier?  Mr. Smith never

13    said that, did he?

14         A.    I never said he said that.

15         Q.    Okay.  So how -- you have no

16    information at all, do you, as to how many

17    people actually read any portion of the

18    dossier itself?  Isn't that right?

19         A.    All I have is the information

20    provided by BuzzFeed in the context provided

21    by Mr. Smith.

22         Q.    And no, no, no.  And what

23    information did you understand BuzzFeed to

24    provide?

25         A.    The amount of views of the article

1    and dossier.

2         Q.   No, no, no.  And what is your

3    understanding of the article and dossier?

4    BuzzFeed never was asked to and never provided

5    any information as to how many people actually

6    read the dossier?

7         A.   Well, I don't know why they

8    wouldn't, but that's what we asked for.

9         Q.   No, it wasn't.

10        A.   Well, that is what I asked for.

11        Q.   Okay.  So you may be making a

12   mistaken assumption, isn't that right, that

13   those numbers that BuzzFeed provided you

14   represent number of people that actually

15   clicked on the dossier?  Right?

16             MR. FRAY-WITZER:  Objection.

17        A.   Again I think if anything it is an

18   understatement of the benefit that BuzzFeed

19   received given the subsequent exposure through

20   the media, the article -- the interview on

21   CNN.

22   BY MR. SIEGEL:

23        Q.   No, no, no.  That's not what I am

24   asking you.  I am not asking you for the

25   benefit.

1            I am saying you have no idea sitting

2      here today how many people read any portion of

3      the dossier on or through BuzzFeed's website?

4      Correct?  You have no -- you do not know what

5      that number is?  Right?

6            A.    I assumed that nine -- that the 9

7      million people from the information provided

8      to me by BuzzFeed read the article and the

9      dossier.

10           Q.    And if that assumption is wrong,

11     does that change your analysis?

12           A.    If I am provided with different

13     information, I will reassess my analysis.

14           Q.    Well, who told you?  Who told you

15     that, that information was the number of

16     people who actually read the dossier?  Have

17     you ever communicated with BuzzFeed?

18           A.    No.

19           Q.    So how could BuzzFeed have told you

20     that?  That is something your counsel may have

21     told you?  Right?

22           A.    Again I asked for the information.

23     I received these views.

24           Q.    Well, you didn't receive it from

25     BuzzFeed?  Right?  BuzzFeed never transmitted

1    anything directly to you?  Right?  You never

2    made a request to BuzzFeed for any

3    information?  Right?

4         A.   Any requests were made through

5    counsel.

6         Q.   Right.  So you never communicated

7    with BuzzFeed to ask BuzzFeed for anything?

8    Right?

9         A.   Of course not.

10        Q.   And BuzzFeed never provided any

11   information directly to you?  Right?

12        A.   Oh, other than public statements

13   that were made by BuzzFeed.

14        Q.   Okay.  Okay.

15             So BuzzFeed -- you have no

16   information, right, other than what your

17   counsel may have told you as to what those

18   9 million views were, in other words, what

19   people actually viewed?

20        A.   There is no information I have seen

21   that would indicate otherwise.

22        Q.   There is no information you have

23   seen that would indicate that those 9 million

24   people did view the dossier?

25        A.   The --

1          Q.   What information is there?

2          A.   The whole purpose of posting the

3    dossier, according to Mr. Smith himself, was

4    that it would be inappropriate not to post the

5    dossier regardless of knowing whether or

6    not --

7          Q.   Sure.  But come on.

8          A.   If I can finish?

9          Q.   You can read -- go ahead.

10         A.   It would be inappropriate not to

11   post the dossier so that the American public

12   could view its content.  That was the whole

13   reason they posted.

14         Q.   You think all 9 million people

15   whoever clicked on an article that mentioned

16   the dossier read all the pages of the dossier?

17   Is that seriously what you are asserting?

18              MR. FRAY-WITZER:  Objection.

19         You can answer.

20         A.   I assumed the 9 million people based

21   on the information provided by BuzzFeed read

22   the dossier.

23   BY MR. SIEGEL:

24         Q.   When you say read the dossier, what

25   do you mean?

1          A.    Read the dossier.

2          Q.    All 35 pages from beginning to end?

3          A.    Read the dossier.

4          Q.    Okay.  Do you assume that all

5     9 million of those people read the couple of

6     sentences that are at issue in this case?

7          A.    I assume they read the dossier.

8          Q.    Including the couple of issues that

9     in this case?

10         A.    I assume they read the entire

11    dossier.

12         Q.    That is a yes-or-no question.  You

13    assume that all 9 million people who clicked

14    on any page on any of those eight articles

15    read the couple of sentences in the dossier

16    that are at issue in this case?  That's a

17    yes-or-no question.

18         A.    And I answered that question --

19         Q.    Yes.

20         A.    -- that I assumed they all read the

21    dossier.

22         Q.    So the answer to my question is yes?

23         A.    That's -- that's exactly what I

24    said.  Yes.

25         Q.    Okay.  What expertise do you have to

1    make that assumption?

2                MR. FRAY-WITZER:  Objection.

3         A.   I have to make an assumption about

4    the value, the benefit to BuzzFeed, and so --

5    BY MR. SIEGEL:

6         Q.   Yes.  But what expertise do you have

7    to get into the minds of all 9 million people

8    who may have clicked on an article that in

9    some way relates to the dossier and make a

10   judgment about whether they read all 35 pages

11   of the dossier?  What expertise do you have on

12   that?

13        A.   The expertise I have is to determine

14   the benefit that BuzzFeed received from

15   posting the dossier, and as I said before, the

16   benefit as established in my report is likely

17   conservative and understated given all of the

18   further perpetuance of this.

19        Q.   That is not the question I asked

20   you.  I asked you what expertise do you have

21   to get into the minds of 9 million people who

22   may have clicked on any of those eight

23   articles?  What expertise do you have to opine

24   that all 9 million of those people read all 35

25   pages of the dossier, including the couple of

 1    sentences related to the plaintiffs?

 2         A.   So I don't have expertise to get

 3    into 9 million people's minds.  I will make

 4    that statement.  But I do have expertise to

 5    make assumptions regarding the benefit that

 6    BuzzFeed received from the posting of the

 7    dossier, and that is what I did.

 8         Q.   Okay.  But you don't have the

 9    expertise to make that assumption, do you,

10    what exactly all 9 million people who clicked

11    on one of those articles actually read?

12         A.   Based on the information provided to

13    me by BuzzFeed and statements made --

14         Q.   No, no.  You don't know what the

15    information that BuzzFeed provided you was.

16    Your counsel provided you information.

17    BuzzFeed didn't provide you with anything.

18         A.   I will stand corrected.  Based on

19    the information provided to counsel and then

20    provided to me --

21         Q.   Right.

22         A.   -- the 9 million views, that was the

23    basis for my opinion.

24         Q.   Okay.  And if it turns out you are

25    just dead wrong about that assumption, would

1    that change your analysis?

2          A.   As I have said before --

3          Q.   If it turns out there is no evidence

4    that even a million of those people ever read

5    anything in the dossier itself, would that

6    change your analysis?

7          A.   As I said before, if new information

8    is available, I will take that into

9    consideration and adjust my analysis

10   accordingly.

11         Q.   Okay.  So let's test that.  Let's

12   get document 35.  45.  I am sorry.

13               MS. SCHARY:  45?

14               MR. SIEGEL:  Yes.

15               Which exhibit is this?

16               THE REPORTER:  10.  It is

17        number 10.

18         (BuzzFeed news article marked

19        Exhibit 10 for identification.)

20               (Handing Exhibit 10 to the

21        witness.

22               THE WITNESS:  Thank you.

23   BY MR. SIEGEL:

24         Q.   So my first question to you -- and

25   this is one of the eight articles that you

1   identified that BuzzFeed was unjustly enriched

2   by publishing?  Right?

3       A.   Yes.

4       Q.   So my first question to you is:

5   Where does the dossier appear in this article?

6              (Pause.)

7              (Witness viewing Exhibit 10.)

8       A.   I don't see it appears.

9       Q.   So how has BuzzFeed been unjustly

10  enriched by publishing this article?

11      A.   It perpetuates the story of the

12  dossier.

13      Q.   So how does it perpetuate the story

14  of the dossier?

15      A.   It talks directly about Russian

16  interference in the election your.

17      Q.   So your assertion is that any media

18  company that wrote an article about Russian

19  interference in the election has been unjustly

20  enriched by doing so?

21             MR. FRAY-WITZER:  Objection.

22      A.   No.

23  BY MR. SIEGEL:

24      Q.   Do you think Russia interfered in

25  the election?

 1                   MR. FRAY-WITZER:  Objection.

 2          A.    I told you I don't know.

 3     BY MR. SIEGEL:

 4          Q.    So how was it unjust for BuzzFeed to

 5     publish an article about John Lewis' opinion

 6     about Russian interference in the election?

 7     How is that -- how has BuzzFeed been unjustly

 8     enriched by doing that?

 9          A.    It is my understanding there were

10     links contained in here that took you back to

11     the dossier.

12          Q.    Well, do you see any?

13          A.    Well, there are links, but I don't

14     see this on the website.

15                   MR. FRAY-WITZER:  And I will

16             just note that there are links in

17             the original article.  I am looking

18             at it online right now.

19                   MR. SIEGEL:  Okay.  I was

20             going to ask that.

21                   THE WITNESS:  So this is not

22             a complete representation.

23                   (Pointing to Exhibit 10.)

24                   MS. SCHARY:  I will pull it

25             up.

1              MR. SIEGEL:  Let's go off the

2         record.

3              MR. FRAY-WITZER:  Actually it

4         is in the document.

5              MR. SIEGEL:  All right.

6              MR. FRAY-WITZER:  If you go

7         to --

8              THE VIDEOGRAPHER:  Are you

9         going off the record?

10              MR. SIEGEL:  Yes.  We will go

11         back on in a second.

12              THE VIDEOGRAPHER:  Are we

13         going off?

14              MR. SIEGEL:  Yes.

15              THE VIDEOGRAPHER:  I am not

16         off yet.  Give me a chance.

17              MR. SIEGEL:  Okay.

18              THE VIDEOGRAPHER:  The time

19         is 3:04.  We are off the record.

20              (Recess taken at 3:04 p.m.)

21              (Recess ended at 3:05 p.m.)

22              THE VIDEOGRAPHER:  The time

23         is 3:05.

24     BY MR. SIEGEL:

25         Q.   So I think what we have established

1      here is that on page 10 of this article,

2      right, there was a link in the sentence

3      "BuzzFeed News published the dossier"?  Right?

4          A.   Correct.

5          Q.   Now but under your analysis, right,

6      let's go to page 5.

7               (Witness complying.)

8          Q.   If someone had clicked on this

9      article, right, and they had stopped at

10     page 5, right, and they read the words "Many

11     chose to highlight Lewis' civil rights work

12     including his being beaten by police in Selma

13     in 1965 to counter Trump's claim that he was

14     'all talk,'" right, if a reader clicked on

15     this page and stopped there --

16         A.   Um-hmm.

17         Q.   -- right?  Under your analysis,

18     though, correct, that reader is included in

19     your estimate of how BuzzFeed has been

20     unjustly enriched?  Right?

21         A.   I assumed that readers of this

22     clicked through to or went down to where it

23     said BuzzFeed published the dossier.

24         Q.   So you assumed that every single --

25     the hundreds of thousands of readers of this

1    article got all the way through all the

2    Twitter postings, all the pictures, all the

3    copy, went to page 10, and then on page 10

4    they clicked on the word "published"?  Right?

5              MR. FRAY-WITZER:  Objection.

6    BY MR. SIEGEL:

7         Q.   And after clicking on the word

8    "published," they then clicked which brought

9    them to another article, they then found the

10   dossier, and read the dossier from beginning

11   to end?  That's what you assumed?

12        A.   What I assumed is that the viewers

13   of this --

14        Q.   Right.

15        A.   -- I was measuring the benefit to

16   BuzzFeed.  Right?

17        Q.   Okay.

18        A.   So the measure of the benefit to

19   BuzzFeed was the views of BuzzFeed's original

20   article publishing the dossier and any

21   follow-up articles which mentioned reference

22   linked back to the dossier.  Again I still

23   contend that that is likely a conservative

24   measure due to the other benefits that

25   BuzzFeed received.

1      Q.   Why are you merely referencing the

2    dossier be an unjust benefit to BuzzFeed if

3    somebody who read this article never read the

4    dossier even under your theory?

5      A.   It perpetuates the story to read the

6    dossier, go see the dossier.

7      Q.   So your contention is that any news

8    story that as you call it perpetuates the

9    dossier is unjust and that that news

10   organization should give back the benefit of

11   that to Mr. Gubarev?

12            MR. FRAY-WITZER:  Objection.

13     A.   I never stated that this was a

14   measure of damages.  I said it was the benefit

15   received --

16     Q.   Right.

17     A.   -- to BuzzFeed.

18     Q.   But why do you think it would be

19   fair for BuzzFeed or any other news

20   organization to have to give back what you

21   call the benefit of reporting about the

22   dossier?

23            MR. FRAY-WITZER:  Objection.

24     A.   I -- I never said they needed to

25   give back the $14 million.  It was a -- it was

1    an estimate of the benefit received by

2    BuzzFeed.

3            Q.   Yes.

4            A.   That's it.

5            Q.   But isn't it your understanding that

6    the plaintiffs in this claim are going to

7    argue that BuzzFeed should give that

8    $14 million to them?

9                 MR. FRAY-WITZER:  Objection.

10           A.   I don't know that.

11   BY MR. SIEGEL:

12           Q.   Then what relevance does that

13   opinion have to this case?

14                MR. FRAY-WITZER:  Objection.

15           A.   From a legal standpoint, I have no

16   idea.

17   BY MR. SIEGEL:

18           Q.   Well, you have testified about your

19   -- do you think -- are you comfortable with

20   that, the notion that by publishing "Many

21   chose to highlight Lewis' civil rights work

22   including his being beaten by police in Selma

23   in 1965" that BuzzFeed should have to give to

24   the plaintiffs any benefit that they might

25   have received from publishing that?

1              MR. FRAY-WITZER:  Objection.

2         A.    Again I never said they should have

3    to give anything.  That was not a contention

4    made.  That was not an assumption made.  That

5    was not a statement made, either in my

6    testimony now or in my report.

7    BY MR. SIEGEL:

8         Q.    Okay.  Well, then let me ask you

9    this.  Let's get out your report again.

10             (Witness complying.)

11        Q.    Let's go to 13.

12        A.    Which report?

13        Q.    The supplemental one is fine.  I am

14    sorry.  I may be wrong.

15             (Witness complying.)

16        Q.    Okay.  Let's first go to page 2.

17             (Witness complying.)

18        Q.    Under the assignment, do you see

19    that, the second paragraph?  It says:

20             "Specifically, Consor was asked to

21    analyze and provide an opinion on the damages

22    stemming from the defendants' publication of

23    an online article and eight follow-up

24    articles."

25             Right?

1              "Our analysis included:  the lost

2      business value of XBT, and the benefit to

3      BuzzFeed from the millions of views the

4      defamatory articles received."

5              So how do you square that with what

6      you just testified?

7          A.   I --

8          Q.   That you don't understand your

9      benefit analysis to be part of your opinion on

10     damages?

11         A.   That's not --

12              MR. FRAY-WITZER:  Objection.

13         A.   -- what this reads.  That's not what

14     it says.

15     BY MR. SIEGEL:

16         Q.   That is not what your meant by that?

17         A.   It has nothing to do with what I

18     meant.  It is not what it says.

19         Q.   It is your words, so.

20              MR. FRAY-WITZER:  I think you're

21     reading the wrong report.  I could be wrong.

22              MR. SIEGEL:  No.  I am reading the

23     supplemental expert report.

24              MR. FRAY-WITZER:  Okay.

25     BY MR. SIEGEL:

1      Q.   So go ahead and explain what you

2   meant by that.

3      A.   Well, let me just read it.  This is

4   in plain English.  At least I tried to write

5   it that way.

6           "Specifically, Consor was asked to

7   analyze and provide an opinion on the damages

8   stemming from the defendants' publication of

9   an online article, a defamatory article, and

10   eight follow-up articles, the follow-up

11   articles, collectively the defamatory

12   articles."

13           Let's break it down one sentence at

14   a time here.

15      Q.   Fair enough.

16      A.   The damages stemming from the

17   defamatory article and the follow-up article

18   specifically tie back to the lost business

19   value of XBT.

20      Q.   But not the benefit analysis?

21      A.   It doesn't say that.

22      Q.   Okay.  That's the way I read it.  It

23   is your words.

24      A.   It doesn't say that.  Let me read

25   the second sentence.  Can I read the second

1    sentence?

2         Q.   Sure.

3         A.   Let's clarify this.  "Our analysis

4    included" -- we are talking about an

5    analysis -- "a broad analysis included the

6    lost business value of XBT and the benefit to

7    BuzzFeed from the millions of views the

8    defamatory articles received."

9              So I don't see the -- I don't see

10   how you are reading it differently.

11        Q.   Okay.  So I understand what you are

12   saying, now these are two separate

13   calculations?  Right?  One is you are

14   calculating how much, you are estimating how

15   much did the publication of these eight

16   articles cause XBT to lose business value?

17   Right?

18        A.   Correct.

19        Q.   Okay.  And then separately what was

20   the benefit to BuzzFeed?  And you are saying

21   that that is not what you would call an

22   estimate of damages, that second part?

23        A.   I will testify at trial if asked

24   about the benefit to BuzzFeed.

25        Q.   Okay.

1          A.    Whether that is used as --

2          Q.    Fair enough.

3          A.    -- some measure of one thing or

4     another, I'm not a lawyer.  I don't know.

5          Q.    Right.  Let me ask you one last

6     question then.  Just in terms of the lost

7     business value calculation, do you have any

8     ability to apportion how much of your estimate

9     of lost value is attributable to each of these

10    eight articles?

11         A.    No.

12         Q.    Okay.  So it is the combined effect

13    of all of them?

14         A.    It is the cumulative effect.

15         Q.    Okay.  Okay.  So that then will lead

16    to my next question, which -- ah-ha.  Okay.

17              So am I correct -- I think this may

18    be what Evan is referring to -- that while in

19    your first report you used the words "unjust

20    enrichment," you did not use those words in

21    the second report?

22         A.    Correct.

23         Q.    And I take it that was deliberate?

24         A.    Correct.

25         Q.    Okay.  Okay.  So while you are

1    making no value judgment about whether

2    BuzzFeed was or wasn't unjustly enriched, this

3    is a straightforward calculation, estimate as

4    you contend, of the benefit to having

5    published the dossier and follow-up reporting

6    regarding the dossier?

7         A.   As measured by the value of those

8    page views.

9         Q.   Okay.  And just so -- just using

10   document 45 as an example, okay?

11        A.   I am sorry.  Which one is that?

12        Q.   Document 45 is the John Lewis

13   article.

14        A.   Exhibit 10?

15        Q.   Yes.

16             So just, and again without saying

17   whether it is unjust or not, right, if a

18   person -- if one of those 9 million people,

19   right, clicked on this article, and they only

20   read to the middle of page 5, the sentence

21   that "Many chose to highlight Lewis' civil

22   rights work" with the picture of Selma, okay,

23   that page view would still be included in your

24   analysis of the benefit to BuzzFeed?  Right?

25        A.   Yes.  Because again this is the best

1    indication based on the data we have --

2         Q.    Okay.

3         A.    -- of the benefit to BuzzFeed.  And

4    again I contend that it is likely a

5    conservative indication due to the other

6    publicity and benefit that BuzzFeed received

7    from the -- the story.

8         Q.    Okay.

9         A.    From the dossier.

10        Q.    Let's look at page 43.

11        A.    Of what?

12        Q.    I am sorry.  Document 43.

13             MR. SIEGEL:  Never mind.  I

14        will scratch that.

15             Let's get the dossier itself.

16             Also let me look at 39.

17        (Company Intelligence Report

18        2016/080, bearing production numbers

19        P-D 000021 through P-D 000055 marked

20        Exhibit 11 for identification.)

21             MR. SIEGEL:  What are we on?

22        11?

23             THE REPORTER:  11 is next.

24             (Handing Exhibit 11 to the

25        witness.)

1    BY MR. SIEGEL:

2        Q.   Okay.  So I will represent to you

3    that 11 obviously is the dossier.  Go to what

4    is Bates numbered 27.

5             (Witness complying.)

6        Q.   Okay.  The bottom, page 27 says:

7             "Inter alia, source E, acknowledged

8    that the Russian regime had been behind the

9    recent leak of embarrassing email messages

10   emanating from the Democratic National

11   Committee to the Wikileaks platform."

12            Right?

13       A.   That's what it reads, yes.

14       Q.   And your calculation of the benefit

15   to BuzzFeed includes the benefit, any benefit

16   that BuzzFeed received from publishing that

17   information?  Right?

18       A.   I am sorry.  I am not understanding

19   your question.

20       Q.   Well, this is one of the claims in

21   the dossier, right, that I just read, that the

22   Russian regime has been behind the recently

23   given embarrassing email messages, right, from

24   the DNC?  Right?

25       A.   Right.

1        Q.   So your calculation of the benefit

2    to BuzzFeed includes any benefit that BuzzFeed

3    may have received from publishing the

4    information that I just read within the

5    dossier?  Right?

6        A.   It's from publishing the entire

7    dossier.

8        Q.   Okay.  And let's look at --

9            MR. SIEGEL:  This will be

10       document 39 in your report,

11       Exhibit 12.

12       (BuzzFeed news article marked

13       Exhibit 12 for identification.)

14            (Handing Exhibit 12 to the

15       witness.)

16            THE WITNESS:  Thank you.

17   BY MR. SIEGEL:

18       Q.   So just to -- you know, just to

19   clarify, this is, of course, the original

20   article, right, in which BuzzFeed embedded the

21   dossier.  So if a reader had read the first

22   two pages of Exhibit 2, right, and stopped

23   there, didn't proceed to actually read the

24   dossier, right, that page view would still be

25   included in your estimate of the benefit to

1    BuzzFeed?  Right?

2          A.    Again I had assumed that they viewed

3    the entire dossier.

4          Q.    I understand you assumed that.

5          A.    Yes.

6          Q.    But what I am asking you is that

7    even if your assumption was wrong -- right?

8          A.    Um-hmm.

9          Q.    Even if there was a reader who

10   clicked on this article and only read to the

11   end of the article itself, right, on page 2,

12   that reader would still be included in your

13   calculation of the benefit to BuzzFeed, that

14   page view would still be included?

15         A.    And if additional information is

16   provided that shows that this -- that this is

17   not the case, then I would take that into

18   consideration and adjust my analysis.

19         Q.    Okay.  And if a reader read page 1,

20   page 2, and then read page 1 of the dossier,

21   which is page 3 of this exhibit, right, but

22   didn't click through to any of the other 34

23   pages of the dossier, right, that reader, that

24   page view, would also be included in your

25   benefit -- in your calculation of the benefit

1      to BuzzFeed?

2           A.   Yes.

3           Q.   Okay.  Are you aware that BuzzFeed

4      redacted the names of the plaintiffs from the

5      dossier in early February?

6           A.   Yes.

7           Q.   So but your calculation of benefit

8      includes page views that occurred after that?

9      Right?

10          A.   It does.

11          Q.   So somebody who clicked on the

12     dossier after early February, or an article or

13     the dossier, would not have been able to read,

14     to identify who the plaintiffs are?  Right?

15          A.   No.

16          Q.   So --

17          A.   That's not correct.

18          Q.   No?

19          A.   No.

20          Q.   And why do you say that?

21          A.   Because even the supposed apology in

22     articles that reference to it specifically

23     name Mr. Gubarev, XBT and Webzilla have been

24     redacted.  You can't unring that bell.

25          Q.   Well, but if somebody had -- if

1    somebody -- let's just take document 39,

2    right, which is Exhibit 12.  The original

3    publication of that article, right --

4         A.    Um-hmm.

5         Q.    -- that article is still on

6    BuzzFeed's website?  Right?

7         A.    Correct.

8         Q.    So if somebody had clicked on that

9    article in July of 2017, right, that would be

10   a page view that is included in your analysis

11   of benefit?  Right?

12        A.    Yes.

13        Q.    But if somebody had clicked on that

14   article in July of 2017 they would have

15   learned no information -- and even if they

16   clicked through and read the entire dossier,

17   right, that person would have learned nothing

18   attributable to Gubarev, XBT or Webzilla?

19   Right?

20        A.    Again that -- there is the finite

21   assumptions that you are making there, and you

22   can't unring the bell that the names had been

23   included in the dossier.  They are later

24   referenced even today in articles on Recode

25   and other sites, CNN, saying that BuzzFeed

1     apologized, never redacted but apologized, or

2     they redacted, never retracted the statements,

3     and it still mentions in those Gubarev, XBT

4     and Webzilla.

5          Q.   How do you know that a person

6     clicking on that article in July 2017 has ever

7     read that in Recode?

8          A.   The fact that you can't -- the cat

9     is out of the bag.  You can't put it back in.

10    And so the measure of benefit to BuzzFeed we

11    used conservatively was the views of the

12    original article and the follow-up articles.

13    That is the best indication that we have based

14    on the data available of the benefit received.

15         Q.   Okay.  But again you are making an

16    assumption that every person who clicked on

17    any of the eight BuzzFeed articles you are

18    talking about after the plaintiffs' names were

19    redacted, and even if they read the dossier on

20    BuzzFeed's site, that they somehow knew who

21    the plaintiffs were, who those names that had

22    been redacted were?

23         A.   I am sorry.  Ask the question again?

24         Q.   Yes.  How -- I understand how you

25    could be arguing that BuzzFeed still -- under

1    your theory BuzzFeed got some benefit from the

2    continued publication of the dossier after the

3    plaintiffs filed their lawsuit, but if a

4    person was not previously familiar with XBT,

5    Webzilla or Gubarev, and that person clicked

6    on the website, on that story, right, in

7    Exhibit 12 --

8         A.   Um-hmm.

9         Q.   -- in July of 2017, and that person

10   read the entire dossier --

11        A.   Um-hmm.

12        Q.   -- after reading the entire dossier,

13   they would still have never heard the names

14   XBT, Gubarev and Webzilla, how has BuzzFeed

15   benefitted from doing anything vis-a-vis the

16   plaintiffs at least in that scenario?

17        A.   What do you mean benefitted from the

18   plaintiffs?

19        Q.   What has Buzzfeed benefitted from?

20   In other words, what benefit to BuzzFeed are

21   you claiming has happened by virtue of that

22   reader who clicks in July of 2017, reads the

23   dossier, and still has no idea that this has

24   anything to do with any of the plaintiffs?

25        A.   So that the benefit that we measured

1    was the traffic that BuzzFeed attained from

2    publishing the original article and the

3    follow-up articles.  I mean that's -- that's

4    the benefit that we measured.

5         Q.   Okay.  Irrespective of whether or

6    not the plaintiffs were mentioned, explicitly

7    mentioned?

8         A.   Irrespective.

9         Q.   Okay.  Are you assuming that all of

10   the 9 million people only read one article but

11   not any others?

12        A.   What do you mean?

13        Q.   Well, in other words, let's assume

14   that a person read all eight articles.

15        A.   Um-hmm.

16        Q.   Right?  Is that -- can you imagine

17   that there are people who might have looked at

18   all eight articles?  Is that an unreasonable

19   assumption to make?

20        A.   There could have been.

21        Q.   Okay.  That person didn't read the

22   dossier, but would it also be reasonable to

23   assume that that person didn't read the

24   dossier nine times?  Right?

25        A.   That doesn't make a difference in

1    the analysis that we have done here.

2         Q.   Okay.

3         A.   Again based on the data we have,

4    based on the information provided to us by

5    BuzzFeed, it was a measure of the value of

6    those page views, and that measurement of

7    value, as we went through this earlier, if

8    BuzzFeed had to generate that same level of

9    traffic through the use of an ad campaign on a

10   search engine such as Google what would it

11   have cost to get that traffic.  So it is

12   irrespective.

13        Q.   Page views of the article.  So we

14   can go round and round in circles.  But okay.

15             Would it matter to you, to your

16   analysis, if somebody -- well, let me ask you

17   this.

18             Your analysis of how much it would

19   have cost to as I think you would call it

20   drive 9 million people to a page on the

21   BuzzFeed site, right, that's what you are

22   measuring?  The cost of an ad campaign -- of a

23   marketing campaign to do that, to bring

24   9 million people to the BuzzFeed site?  Right?

25        A.   I am confused.  But let me check

1    that over.

2           Q.   All right.

3           A.   I am measuring the benefit to

4    BuzzFeed through generating 9 million views

5    worth of traffic to the website.

6           Q.   Okay.  Now what if somebody who read

7    one of those eight articles was already on the

8    website when they got to that article.  Would

9    that make any difference in your analysis?

10          A.   It -- no.  Because it still -- the

11   measure -- the measure here is -- it's the

12   cost approach.  We talked about this.  Right?

13          Q.   Right.

14          A.   So it is still if that had to be

15   replicated again, what is the value of that

16   traffic, of those page views.  And it doesn't

17   change the premise or the methodology used.

18          Q.   But my question is I think what --

19   my understanding of the marketing campaign

20   that you are talking about is directed at

21   people who are not already on the BuzzFeed

22   website.

23               MR. FRAY-WITZER:  Objection.

24   BY MR. SIEGEL:

25          Q.   Isn't that right?

1              MR. FRAY-WITZER:  Objection.

2         A.   We're stepping back from that.

3    BY MR. SIEGEL:

4         Q.   Okay.

5         A.   We have to take a bigger picture

6    view of this.

7         Q.   Okay.

8         A.   It is just strictly a measure of the

9    value of 9 million views.  If you went to

10   BuzzFeed tomorrow and said you have got to

11   generate 9 million views, you have got to get

12   them right away, this is how much it would

13   cost BuzzFeed to generate those views from a

14   nonorganic perspective, from a demand, pushing

15   demand to get those views.

16        Q.   And does it matter whether a million

17   of those views were people who were already on

18   the BuzzFeed website?

19        A.   It -- it -- no.  It is still -- a

20   million of the people?  It is still a view.

21   If you have to push that 9 million views, it

22   is still the same concept.

23        Q.   So even if one of those people -- so

24   you are saying it doesn't make any difference

25   whether a person views two pages on BuzzFeed

1    or four pages on BuzzFeed or six pages on

2    BuzzFeed?

3         A.   I am saying to get the 9 million

4    views that were received by the eight

5    articles --

6         Q.   All right.

7         A.   -- the cost of that, and, therefore,

8    the benefit to BuzzFeed was the $14 million.

9         Q.   But that is -- the $14 million,

10   right --

11        A.   And it's --

12        Q.   -- isn't that the cost of bringing

13   somebody to BuzzFeed.com?  Right?

14             MR. FRAY-WITZER:  Objection.

15        A.   No.

16   BY MR. SIEGEL:

17        Q.   Is it the cost of bringing them to a

18   specific article?  Is that what you are

19   asserting?

20        A.   It could be to -- we discussed this

21   with Ford, right, where it could have been --

22   the first one could be the Ford main website

23   and the second ad could be to the new

24   Expedition website.  And so it could be to the

25   main website.  It could be to a specific link.

1              MR. SIEGEL:  Let's get the

2         document that shows the page views.

3         No, no, no.  The document.  The

4         Excel spreadsheet.

5              Can we mark this as

6         Exhibit 13?

7         (One-page chart marked Exhibit 13 for

8         identification.)

9              MR. FRAY-WITZER:  Can we take

10        a break?

11             THE VIDEOGRAPHER:  The time

12        is 3:31.  We are off the record.

13             (Recess taken at 3:31 p.m.)

14             (Recess ended at 3:46 p.m.)

15             THE VIDEOGRAPHER:  The time

16        is 3:47.  We are back on the record.

17   BY MR. SIEGEL:

18        Q.   Okay.  Mr. Anderson, I am going to

19   -- you know, I am going to do something a

20   little unconventional, because I think as you

21   know one of the difficulties of dealing with

22   websites is they don't always look exactly on

23   paper as they do on a machine.  I am going to

24   ask you to look at it.

25             (Handing laptop computer to

```
 1           the witness.)

 2                   MR. SIEGEL (addressing the

 3           videographer):  If you could sort of

 4           hone in on the computer?  Is that

 5           possible?

 6                   THE VIDEOGRAPHER:  Sure.

 7   BY MR. SIEGEL:

 8       Q.   This is the first article, the

 9   article they published the dossier itself.

10           This is going to get doubly tricky.

11           So what I wanted just to clarify is

12   that -- so, you know, this is the top of the

13   article?  Right?  This is where the dossier is

14   embedded within the article.  Right?

15       A.   Right.

16       Q.   Is it still your assumption that

17   everyone who read this article would have both

18   read this front page of the dossier and then

19   you would have to click through, right, you

20   would have to click --

21                   MR. FRAY-WITZER:  Objection.

22   BY MR. SIEGEL:

23       Q.   -- to get to each of the next 34

24   pages?

25                   MR. FRAY-WITZER:  Can I just
```

1            say you don't have to click?  Not

2       even once?

3            MR. SIEGEL:  You can scroll

4       down?

5            MS. SCHARY:  Scroll.

6            MR. SIEGEL:  I'm sorry.

7   BY MR. SIEGEL:

8       Q.   You can either click each one or you

9   could scroll down through all 34 or all 35 of

10  them, right, and your assumption is that every

11  person who came to this article also looked at

12  the dossier as it was embedded here and either

13  clicked through or scrolled through all 35

14  pages and read all of them?

15      A.   No.  So let me clarify.

16      Q.   Okay.

17      A.   Because I think I -- I think I tried

18  to do it in a very unclear way --

19      Q.   Okay.

20      A.   -- before we went off the record.

21           The assumption, and I stated it in

22  my report --

23      Q.   Okay.

24      A.   -- is that all we are looking at is

25  the value to BuzzFeed or the benefit BuzzFeed

1    received from the views to the pages.

2         Q.   Okay.

3         A.   Regardless of whether they read all,

4    part, or none of the entire dossier.

5         Q.   Okay.

6         A.   It is still the value BuzzFeed

7    received from posting the dossier and the

8    subsequent views of those pages.

9         Q.   And I just want to make sure.  When

10   you say pages, it could be a page in the

11   article, not necessarily in the dossier

12   itself?

13        A.   Correct.

14        Q.   Okay.

15             (Handing laptop computer back

16        to Mr. Siegel.)

17        A.   And that's how we -- that is how it

18   is explained in the report, too.

19        Q.   This is Exhibit 13.

20             (Handing Exhibit 13 to the

21        witness.

22        Q.   And this is the exhibit that you

23   identify in the -- you cite in your report as

24   the page view numbers that BuzzFeed produced,

25   and actually your clarification just took care

1   of a number of follow-up questions I had, so

2   you may get out of here sooner.

3          A.   Okay.

4          Q.   So --

5          A.   Are we done?

6          Q.   We're not done.  I can't give you

7   that much.

8          A.   All right.  All right.

9          Q.   So what I will ask, though, is what

10  was -- you see that, you know, this document,

11  this Excel spreadsheet has a lot of columns

12  with different headers on each of those

13  columns.  What was your understanding of what

14  those headers mean?

15         A.   Where the traffic presumably came

16  from.

17         Q.   Right.  That's correct.  Okay.  And

18  so my question is let's take, for example,

19  the, looking for the original one, number 8.

20  Right?  These reports allege Trump has deep

21  ties to Russia.  Right?

22         A.   Right.

23         Q.   This document indicates that under

24  column F, which says "BuzzFeed," right,

25  1,293,097 page views came from someone who was

1    already on the BuzzFeed.com site and went to

2    that article?

3         A.   Right.

4         Q.   Right.  And similarly column E, I

5    can just represent to you, is the app, the

6    mobile app, is the BuzzFeed mobile app.

7         A.   Okay.

8         Q.   293,465 get there from the BuzzFeed

9    app.

10         And my question -- so this indicates

11   that of the 6.659 million page views of that

12   article, approximately 1.6 million came from

13   people who were already within the BuzzFeed

14   website in some way.  Does that make any

15   difference to your analysis?

16         A.   No.  But I think it -- I am glad you

17   asked the question.  I think it further

18   highlights the statements I made earlier about

19   how the numbers I presented, the 14 million,

20   is really a conservative number.  Because then

21   the 5 million or so roughly, 1.6 I think you

22   said it was, right, so 5 million roughly --

23         Q.   Right.

24         A.   -- that that went though the

25   original article not from BuzzFeed, came from

```
 1    some outside source.

 2         Q.   True.

 3         A.   And any number of those, which I

 4    don't have that information, which is why I

 5    didn't -- I say it is conservative -- but any

 6    number of those may never have been to

 7    BuzzFeed.  So now it is a new potential user

 8    and follower of BuzzFeed, which has

 9    exponentially more value than the further

10    views of other nondossier-related articles,

11    which again is why I said it is really a

12    conservative number.

13         Q.   Okay.  I take it, though, you don't

14    actually based on this information know how

15    many of those 5 million people may have been

16    to BuzzFeed before or were regular readers of

17    BuzzFeed and just got there from somewhere

18    else?  We don't know that?  Right?

19         A.   No, I don't.  And if I had that

20    information, I would do a different analysis.

21         Q.   Okay.  Let's get the SEMrush

22    exhibit.

23              MR. SIEGEL:  This is 14.

24         (SEMrush Organic Research:  Positions

25         Generated on February 16, 2018 marked
```

1          Exhibit 14 for identification.)

2                    (Handing exhibit 14 to the

3      witness.

4                    THE WITNESS:  Thank you.

5    BY MR. SIEGEL:

6        Q.   Okay.  Exhibit 14 again is your

7    document 59, I believe, that you cite in your

8    report.  Could you go to page 7 where it says

9    "Organic search:  positions 1 through 100"?

10       A.   Is it doc 59 or doc 22?

11       Q.   I am sorry.  It is this one.

12   Exhibit 14.

13       A.   Right.  Okay.

14       Q.   The SEMrush document.

15       A.   And what page?

16       Q.   Page 7.

17                  (Witness complying.)

18       A.   Okay.

19       Q.   Okay.  So just to understand the

20   analysis here again, key word number one on

21   this list is BuzzFeed?  Right?

22       A.   (The witness nodding his head.)

23       Q.   So what I understand you are saying

24   is that SEMrush is estimating that if BuzzFeed

25   wanted to pay Google or other search engines

1    to drive people to its site when they put the

2    -- when they put in the word BuzzFeed to a

3    search, right --

4          A.   Correct.

5          Q.   -- it would cost them $2.50 per

6    click to do that?  Right?

7          A.   Yes.

8          Q.   $2.50 per click for that?

9          A.   If BuzzFeed was used as a search

10   term on Google, for example, and then a link

11   posted at the top.

12         Q.   Okay.

13         A.   Yes.

14         Q.   And is it $2.50 per click-through?

15   In other words, is it $2.50 per person who

16   actually clicks onto BuzzFeed.com?  How does

17   the pricing work?

18         A.   That is a cost per click.  If

19   someone clicks on it --

20         Q.   Right.

21         A.   -- then they are charged that to go

22   through.

23         Q.   So, in other words, they click on a

24   link to BuzzFeed?  If they actually click on a

25   link to BuzzFeed, they are charged $2.50 for

1    that?

2        A.   Well, it wouldn't necessarily have

3    to be a link to BuzzFeed.  Like we talked

4    about, GM could use Ford.  Right?

5        Q.   So you could also pay $2.50 to

6    direct traffic somewhere else?

7        A.   It could.  It could be a nonBuzzFeed

8    site.

9        Q.   Fair enough.

10       A.   It is a market -- it is a --

11       Q.   All right.  That is helpful.  So

12   whatever site the purchaser of this search

13   word was trying to drive traffic to, right,

14   would pay $2.50 for that to each click

15   whatever website it was drying to drive

16   traffic to?

17       A.   Correct.

18       Q.   And your analysis uses a weighted

19   average of the first 100 search terms?

20       A.   Correct.

21       Q.   Why did you choose to do a weighted

22   average of the first 100?

23       A.   Well, it is a more accurate

24   reflection of the actual cost for a click as

25   opposed to taking a simple average, because

1    you have -- if we took a simple average, some

2    of these have very high costs.  I am trying to

3    find one here.  Some of these are $20 a click.

4    16.52 for "Why is Caillou bald."  So if we

5    took a simple average, it would actually skew

6    the results.  A weighted average provides a

7    more accurate indication of the cost.

8         Q.    Turn to page 2 of this document.

9               (Witness complying.)

10        Q.    So if I am reading this correctly,

11   the information that is at the top of the

12   page 2, right, indicates that there are

13   actually a total of 6.2 million keywords?

14   Right?  They gave us the top 100 but there are

15   actually 6.2 million in total?

16        A.    Right.

17        Q.    And the total amount of traffic

18   those generated was 19 and a half million, and

19   their estimate of traffic cost is $18 million?

20        A.    Correct.

21        Q.    So why wouldn't that number, in

22   other words, the average cost of all traffic

23   to BuzzFeed, which would be what?  18 million

24   over 19.5, so about 92 cents, why wouldn't

25   that be the most accurate number to use?

1        A.    Because in identifying the cost to

2    actually drive the 9 million or so in

3    traffic --

4        Q.    Right.

5        A.    -- first of all it would be absurd

6    to have to do a campaign using 6.2 million

7    keywords.

8        Q.    Um-hmm.

9        A.    If you are going to do it, you are

10    going to use at most the top 100 keywords to

11    drive that traffic.  So it is a more accurate

12    representation of what it would take and what

13    it would cost to generate that traffic.

14        Q.    Okay.  Did you ever check what the

15    cost per click or whether there is one listed

16    for what Gubarev, XBT or Webzilla would be?

17        A.    No.

18        Q.    Or dossier?

19        A.    I did not.

20        Q.    Did that have any relevance to your

21    analysis in your view?

22        A.    No.  Because again I am measuring

23    the benefit to BuzzFeed from the posting of

24    the dossier.

25        Q.    Right.

1          A.   So really the question is what is

2     the value of that traffic to BuzzFeed as

3     measured through the top 100.  And so it --

4     whether it is XBT or Webzilla, dossier, it is

5     not an accurate reflection of what that value

6     would be.

7          Q.   Do you have an understanding of how

8     SEMrush calculates the cost per click?

9          A.   Yes.

10          Q.   And how do they do that?

11          A.   So they base it on -- again there is

12     a market for how much it costs to different

13     keywords.  Some keywords, for example, I

14     believe it is mesothelioma attorney, is the

15     highest -- one click is like $1,600 or more,

16     because the cases are worth a lot of money,

17     million-dollar payouts from the trust or

18     whatnot.  And the market is willing to pay --

19     presumably the mesothelioma attorneys who want

20     to use those ads, they bid those prices up to

21     the $1,600.  And that changes.  It can change

22     daily, monthly.  It depends on the demand.  It

23     is a supply-and-demand issue.

24          Q.   Okay.  The words dossier or Gubarev,

25     XBT, Webzilla, are not in the top 100 search

1    terms, right, at least identified by SEMrush?

2         A.   Yes.  I think the date we pulled

3    this was the date that the dossier was

4    published.  And so I don't think it is on

5    here.

6         Q.   Okay.  Are you specifically planning

7    to supplement your report with any additional

8    information?

9         A.   I have no plans to do it or not to

10   do it.

11        Q.   Okay.

12        A.   If it comes up.

13        Q.   Okay.  I am just asking you sitting

14   here today you're not aware of any?

15        A.   No.

16        Q.   You don't have a specific intent to

17   supplement?

18        A.   No instructions nor have I been

19   asked to do so.

20             MR. SIEGEL:  Obviously we

21        would reserve the right, if there is

22        a further supplementation, to

23        continue the deposition on that.

24   BY MR. SIEGEL:

25        Q.   As I understand it, you are being

1    paid $700 an hour for this case for testimony?

2         A.    That's correct.

3         Q.    And other people in your company are

4    paid $500 an hour?

5         A.    That's correct.

6         Q.    And are you paid $700 an hour for

7    all your work or just the testifying part?

8         A.    Testimony, preparation.  Pretty much

9    postreport work, trial and trial preparation.

10        Q.    That is $700?

11        A.    Yes.

12        Q.    And you are paid $500 an hour for

13   the work you did --

14        A.    Report writing.

15        Q.    -- for the report itself?

16        A.    Right.

17        Q.    And just to clarify.  I looked at

18   your agreement with the plaintiffs.  It looks

19   like the rates range from $500 to like 900 or

20   950 for the chairman, CEO.  I take it you are

21   not the chairman, CEO?  Right?

22        A.    No.  I am the managing director.

23        Q.    You are the managing director.

24   Okay.

25                  MR. SIEGEL:  Why don't we go

```
 1            off the record a second.

 2                    THE VIDEOGRAPHER:  Okay.  The

 3            time is 4:03.  We are off the

 4            record.

 5                    (Recess ended at 4:03 p.m.)

 6                    (Recess ended at 4:04 p.m.)

 7                    THE VIDEOGRAPHER:  The time

 8            is 4:04.  We are back on the record.

 9      BY MR. SIEGEL:

10            Q.   So just looking at the SEMrush data

11      again in Exhibit 14, if you would turn to

12      page 7.

13                    (Witness complying.)

14            Q.   If you look at position number 1,

15      does that indicate that when people typed in

16      the search word BuzzFeed, 2.24 million of them

17      actually went to the BuzzFeed site?  Is that

18      what that is saying?

19            A.   Yes.  That's the percent -- well,

20      2.24 million was traffic generated from.

21            Q.   Okay.  So here is -- the question is

22      if BuzzFeed is already getting 2.24 million,

23      right, views --

24            A.   Um-hmm.

25            Q.   -- when people are typing in
```

1    "BuzzFeed" to a search engine, why would they

2    pay for -- why would they pay $2.50 a click to

3    -- when they are already getting 2.24 million?

4    Why would they do that?

5         A.   Yes.  And I'm not saying they would.

6    What I am saying is that's the value of that

7    search term for that level of traffic.  And so

8    it is not necessarily that -- what you paid

9    doesn't necessarily have to be what something

10   is worth.

11        Q.   Right.  Okay.  But why -- if

12   BuzzFeed were to -- how would it be an actual

13   benefit to BuzzFeed if BuzzFeed were to start

14   paying $2.50 a click for that search term?

15        A.   Again the premise of this was what's

16   the value or the measure of benefit of the

17   traffic to BuzzFeed.

18        Q.   Right.

19        A.   And so the search term "BuzzFeed,"

20   which is why we didn't just limit it to

21   BuzzFeed -- obviously it would make the number

22   higher than $2.50 -- but that is why we took

23   the top 100.  We are saying of all the search

24   terms that drive traffic to BuzzFeed, what is

25   the value of those search terms, and so that's

1    a measure of the benefit that BuzzFeed

2    received from the 9 million in traffic.

3         Q.   Okay.  And is that the benefit to a

4    hypothetical average website, in other words,

5    to any website?  Is that an estimate of the

6    benefit to any website?

7         A.   Well, no, because we did it based on

8    actual BuzzFeed traffic.

9         Q.   Um-hmm.

10        A.   And so it is based on the search

11   terms that drove traffic to BuzzFeed in

12   January of 2017.

13        Q.   Um-hmm.

14        A.   And so the search terms that drove

15   traffic to a different website, go back to

16   Ford.com, would be different search terms, and

17   each of those search terms would have a

18   different value.  So they would be different

19   situations.

20        Q.   Does it matter in your analysis

21   whether most of the traffic to BuzzFeed

22   doesn't come from search engines?  Does it

23   matter?

24        A.   For the calculation of the value

25   here using again the cost approach --

1          Q.    Um-hmm.

2          A.    -- it doesn't make a difference

3    where the actual traffic comes from.  It is an

4    indication of that benefit.  And I have got to

5    say it again.  It is a conservative indication

6    for the other reasons we have discussed.

7          Q.    Okay.

8                MR. SIEGEL:  That's all I

9          have.  Oh, well, this is -- yes.

10         Let me just --

11               I think why don't we just

12         actually make -- we can do this

13         afterwards.  I think document 76 was

14         attorney eyes' only.  Right?  The

15         exhibit, the spreadsheet exhibit.

16         So we can just designate those pages

17         accordingly.  I don't think we need

18         to designate the whole deposition

19         for attorney eyes' only.  We will

20         take a look when the transcript

21         comes out.

22               MR. FRAY-WITZER:  I think the

23         questions that related to that

24         document.

25               MR. SIEGEL:  Specifically?

1              MR. FRAY-WITZER:  Yes.

2              MR. SIEGEL:  I agree.  Okay.

3              THE WITNESS:  Thank you.

4              THE VIDEOGRAPHER:  The time

5       is 4:08.  That concludes today's

6       deposition.  We are off the record.

7              (Whereupon, at 4:08 p.m., the

8       deposition was adjourned.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              DEPONENT'S ERRATA SHEET

2             AND SIGNATURE INSTRUCTIONS

3

4          The original of the Errata Sheet has

5     been delivered to EVAN FRAY-WITZER, ESQUIRE.

6          When the Errata Sheet has been

7     completed by the deponent and signed, a copy

8     thereof should be delivered to each party of

9     record and the ORIGINAL delivered to NATHAN

10     SIEGEL, ESQUIRE, to whom the original

11     deposition transcript was delivered.

12

13             INSTRUCTIONS TO DEPONENT

14          After reading this volume of your

15     deposition, indicate any corrections or

16     changes to your testimony and the reasons

17     therefor on the Errata Sheet supplied to you

18     and sign it.  DO NOT make marks or notations

19     on the transcript volume itself.

20

21          REPLACE THIS PAGE OF THE TRANSCRIPT

22     WITH THE COMPLETED AND SIGNED ERRATA SHEET

23     WHEN RECEIVED.

24

25

1    ATTACH TO DEPOSITION OF JEFFREY ANDERSON

2    CASE: ALEKSEJ GUBAREV, XBT HOLDING S.A., AND
            WEBZILLA, INC. V. BUZZFEED, INC. AND BEN
3          SMITH

4    DATE TAKEN:  May 31, 2018

5                      ERRATA SHEET

6          Please refer to the preceding page

7    errata sheet instructions and distribution

8    instructions.

9    PAGE        LINE        CHANGE        REASON

10                                         _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18         I have read the foregoing transcript of

19   my deposition and except for any corrections

20   or changes noted above, I hereby subscribe to

21   the transcript as an accurate record of the

22   statements made by me.

23         Executed this ____ day of

24   _____, 2018.

25         _____
                      JEFFREY ANDERSON

<pre>
 1                  CERTIFICATE

 2     Commonwealth of Massachusetts

 3     Plymouth, ss.

 4

 5

 6            I, Judith McGovern Williams, a

 7     Notary Public in and for the Commonwealth of

 8     Massachusetts, do hereby certify:

 9            That JEFFREY ANDERSON, the witness

10     whose deposition is hereinbefore set forth,

11     was duly sworn by me and that such deposition

12     is a true record of the testimony given by the

13     said witness.

14            IN WITNESS WHEREOF, I have hereunto

15     set my hand this 5th day of June, 2018.

16

17

                Judith McGovern Williams
18           Registered Professional Reporter
                Certified Realtime Reporter
19              Certified LiveNote Reporter
           Certified Shorthand Reporter No. 130993
20

21

       My Commission expires:
22
       April 19, 2024
23

24

25
</pre>

**$**

**$1** 110:15 184:17
**$1,600** 242:15,21
**$10** 184:18
**$100,000** 39:8
**$12** 103:7
**$14** 179:18 180:6
 184:15 186:2,3,18,25
 209:25 210:8 229:8,9
**$15** 102:5 103:5
 184:18
**$18** 240:19
**$2.50** 184:9 238:5,8,
 14,15,25 239:5,14
 246:2,14,22
**$20** 240:3
**$200,000** 114:24
**$230,000** 41:20 43:4
 45:9
**$30** 72:8
**$311,000** 39:4
**$400,000** 41:12 42:13
 43:2 45:4,8,16 46:7,
 21 122:13
**$415,377,000** 171:13
**$48.1** 94:6
**$5** 184:17
**$5.3** 122:10
**$50** 72:7
**$500** 244:4,12,19
**$700** 244:1,6,10
**$87,000** 38:14
**$9** 168:24

**-**

**--ceteris** 69:1

**0**

**0000044** 170:5
**000005** 170:4
**000021** 217:19
**000055** 217:19
**000645** 96:4
**000703** 96:5

**000734** 137:23
**000736** 137:24
**001035** 164:13
**001087** 164:14

**1**

**1** 37:19,21 38:1,4,6,
 13 59:16 60:1,19
 76:2 78:6,7,15 130:2
 171:5,12,19 220:19,
 20 237:9 245:14
**1,293,097** 234:25
**1.3** 116:10 117:21
 118:7,19 119:24
**1.6** 235:12,21
**10** 8:22,23 11:21
 37:17 38:2 39:7
 203:16,17,19,20
 204:7 205:23 207:1
 208:3 216:14
**10.99** 161:9,11 162:14
 163:15
**100** 122:4 124:19
 183:23 237:9 239:19,
 22 240:14 241:10
 242:3,25 246:23
**1050** 164:21
**10:12** 6:23
**11** 84:15 124:23 125:3
 148:16 161:16
 163:17,18 217:20,22,
 23,24 218:3
**11.1** 161:8,11,22
 162:16 164:6
**11.6** 94:16
**11:13** 67:5,6
**11:27** 67:7
**11:28** 67:9
**12** 34:3,8 97:7 170:20
 183:22 219:11,13,14
 222:2 224:7
**12.6** 97:14
**12:39** 129:15,17
**13** 164:20 211:11
 230:6,7 233:19,20
**137** 66:13
**14** 163:13 235:19
 236:23 237:1,2,6,12
 245:11

**15** 44:10 163:13
**16** 44:2,3 106:13,16,
 23 111:13 122:12
 236:25
**16.52** 240:4
**17** 74:20,21,22 157:12
 161:16 163:18 168:7,
 23
**17-CV-6042** 7:5
**170** 39:25 40:9,11
**18** 240:23
**18.77** 97:5
**19** 240:18
**19.5** 240:24
**190** 40:9
**190,000** 39:22
**1965** 207:13 210:23
**1:26** 130:5
**1:35** 137:15,16
**1:39** 137:17,19

**2**

**2** 62:10,12,13 96:3,13
 99:18,20,21 130:2
 211:16 219:22
 220:11,20 240:8,12
**2.2** 120:12
**2.24** 245:16,20,22
 246:3
**20** 6:25 96:16,19
 109:6,12,21 160:11,
 17 162:23
**20.9** 99:25
**200** 46:8 163:23
**200,000** 41:2 42:16
**2012** 98:12
**2013** 19:9 74:24 75:23
 79:3 90:4,17 96:3,
 20,23 98:12 99:7,14
 157:8,19 158:10
 161:4,22 167:1
**2014** 59:8 97:9,16
 99:14
**2015** 83:25 84:11
 86:22 87:5 89:6
 99:6,7,9,11
**2016** 20:19 28:23 29:3
 30:8 32:7,17 36:3,6,
 25 37:5,13 38:8,11

39:14 42:1 45:10
46:10,22 69:13 72:8,
10,22 74:10,16
76:11,14,22 81:10,24
82:3,9 83:6,21,25
84:11 87:15,17 89:3,
6 90:2 91:12 93:4,16
94:6 95:21 98:10,21,
25 99:11,17,19,24
102:6 105:2,6,7,9
106:3,10,11 108:7,12
112:14 113:8,9
115:15,20 116:5,11,
23 117:16,17,22
118:4,8,19,24
119:13,14 120:11,17,
20 121:8 122:1,9,13
152:16 164:12,23
166:6 167:15 168:22,
25 169:12
**2016's** 71:21 148:22
**2016/080** 217:18
**2017** 20:20 27:13 28:9
29:23 30:7,17 31:25
33:7,14 35:8,20
36:2,11,22 40:8
41:16,21 42:14 43:5
48:19 69:13,19 70:2,
6,10,13,19,25 72:11,
23 73:1,9,16,24
74:1,12,16 76:12
77:5,8,14 82:4 83:7,
20 84:6 88:13 89:4
98:15,22 99:18 100:4
102:2 104:2 108:5
115:17,19 116:13
117:17,18,25 118:2,
18,23 119:12,16,22
123:21 128:7 131:13
143:7 152:10,15
168:24 176:14,21
188:20 190:4 222:9,
14 223:6 224:9,22
247:12
**2018** 6:22 30:14,16
59:16 60:1,19,23
76:2 77:2 78:7,15
138:25 143:7 144:1,7
145:3 156:19 164:6
170:13 171:5,12,19
236:25
**2020** 87:15

**20th** 38:19
**21** 29:1 99:24
**22** 237:10
**23** 170:13
**231** 47:16
**231,000** 41:8
**23rd** 38:19
**25.6** 97:13
**26** 87:21 88:13 97:1
119:23
**27** 218:4,6
**28** 87:20 102:7 108:5
109:14,18 115:22,23,
25 116:8,12,22,25
117:1,5,6 118:4,22,
25 119:12,16,21
120:5
**29** 108:5
**293,465** 235:8
**2:17** 172:5,6
**2:29** 172:7
**2:30** 172:9

### 3

**3** 93:3,5,6 94:5,13
104:24 152:10,15
220:21
**3.784** 105:21
**3.97** 105:20
**30** 6:7 60:23 115:21
117:7 160:11,17
162:24
**300** 163:23
**31** 6:22 93:16 138:25
**311** 40:11
**32** 66:12,17 104:9,12
**32.8** 97:1
**33** 100:5
**34** 220:22 231:23
232:9
**35** 200:2 201:10,24
203:12 232:9,13
**36.2** 97:11
**39** 217:16 219:10
222:1
**398** 40:11
**3:04** 206:19,20
**3:05** 206:21,23

**3:31** 230:12,13
**3:46** 230:14
**3:47** 230:16

### 4

**4** 9:2,3 93:13,17,25
94:4,18 104:23
**4.2** 106:16
**400** 46:8
**400,000** 46:9 122:15
**42** 74:15 148:22
**43** 217:10,12
**43.7** 96:23
**447** 171:20
**45** 89:22 203:12,13
216:10,12
**45.9** 87:13,20 89:10,
15,16,20
**47.5** 120:18
**49.7** 94:9 120:18
169:4,5
**4:03** 245:3,5
**4:04** 245:6,8
**4:08** 249:5,7

### 5

**5** 62:22 70:21,24
96:1,5,15,18 157:5
207:6,10 216:20
235:21,22 236:15
**5.1** 106:16
**50** 87:17 100:10
**51.9** 69:21 103:2
**53.1** 97:10
**54** 89:14 95:24
**553** 171:20
**56** 88:7
**58.27** 71:2 77:3,15,20
169:4,5
**59** 237:7,10

### 6

**6** 104:11,13,15,24
130:2 132:11
**6.2** 94:19 240:13,15
241:6

**6.659**  235:11
**60**  72:9 85:4 87:16
 89:13 93:1 95:22
 100:11 102:9 104:20
 105:6
**62.8**  76:25 77:9,19
**63**  164:7
**64.2**  102:2
**654**  160:1
**662**  157:13
**665**  96:16
**67**  137:2 138:4

---

**7**

**7**  8:22,23 62:19
 122:16 137:21,24
 138:1 144:19 167:4,
 9,17 168:1,3,7,9
 237:8,16 245:12
**76**  248:13
**7X**  168:1

---

**8**

**8**  62:16 96:13 164:9,
 14,16 170:22 234:19

---

**9**

**9**  39:7 93:2,25 94:18
 170:2,5,7 178:16,20
 179:8 185:24 186:15,
 18,22 190:17 191:25
 193:2,3,16,18 194:24
 195:9 197:6 198:18,
 23 199:14,20 200:5,
 13 201:7,21,24
 202:3,10,22 216:18
 225:10 226:20,24
 227:4 228:9,11,21
 229:3 241:2 247:2
**9.8**  71:16
**900**  244:19
**92**  240:24
**950**  244:20

---

**A**

**a.m.**  6:23 67:6,7

**ability**  18:20 19:23
 92:14,21 121:16
 130:23 136:24 215:8
**ABN**  22:15,18,19 23:3,
 22 135:25 138:20
 139:1 140:2,10
 145:2,9 146:4,14
**absolutely**  76:15
 98:20
**absurd**  241:5
**accepted**  129:2
**access**  103:20
**account**  77:9 98:7
 102:1 125:1 128:6
**accountant**  64:23
**accounting**  94:24
 95:10
**accounts**  134:4,6,12,
 17,23 135:4,13,15
 145:15 146:2
**accuracy**  90:10 127:20
 128:12,22
**accurate**  65:14 82:10
 83:21 84:7 87:7 90:3
 124:4 179:9,17
 239:23 240:7,25
 241:11 242:5
**accurately**  72:3
**achieve**  103:4 117:9
 121:22
**achieved**  108:7 109:6
 110:13,15
**acknowledged**  218:7
**acquired**  161:5
**acquisition**  162:6
 165:20
**actions**  62:25 91:20
**active**  185:1
**activities**  82:23
**activity**  43:11 44:2
 46:7 124:9,11,14,19
**actual**  39:12 43:11
 46:19 67:13 70:2,6,
 10,13 71:3 73:2,8,
 10,16 74:1 77:15
 84:23 94:19 96:25
 97:7,14,25 100:1,2
 102:23 105:2,21
 126:6 148:22 168:23
 171:4 239:24 246:12
 247:8 248:3

**actuals**  84:4 105:7
**ad**  174:12,25 175:8
 180:16 181:1 182:3,9
 226:9,22 229:23
**add**  116:11 118:9,21
 119:16
**adding**  120:5
**additional**  45:18
 46:23 60:11 139:19
 146:16 186:15 220:15
 243:7
**address**  32:24 33:5
 64:4,18 125:12
**addressed**  33:4
**addressing**  231:2
**adjourned**  249:8
**adjust**  47:2 203:9
 220:18
**adjusted**  69:9 76:22
 77:8 131:13
**adjustment**  82:9
 115:13
**adjustments**  74:2 76:4
 82:5,6
**ads**  174:1 175:11,25
 176:10 178:6,7
 179:20,24 180:15
 242:20
**advertise**  173:18
**advertising**  173:6,11,
 12,14,16,21,23 175:7
 176:15 177:25 179:6
 185:18 189:16,19,24
 190:3
**affect**  32:15 34:4,13
 36:18 48:8 91:21
 128:12 146:12
**affected**  32:8 33:25
 91:25 127:20 130:22
 146:6
**agent**  53:7
**agree**  10:6 97:19
 121:24 122:2 163:4,6
 249:2
**agreed**  6:3,11
**agreement**  8:5 57:17
 244:18
**ah-ha**  215:16
**ahead**  106:1 199:9
 213:1

Alex  7:3
alia  218:7
Alison  7:11
allegations  80:4
  124:2 155:21 156:7,
  10
allege  111:21 112:1
  234:20
alleged  27:8,22 31:15
  32:10 34:22 35:4,17
  50:19 53:4 120:20,23
  124:11,20 133:3
allegedly  11:2 149:13
altogether  134:6,13
  135:13,16
amazing  87:12
American  81:10,22
  199:11
amortization  67:21
  72:18
amount  36:1,21,23
  39:5 120:10 125:3,5
  126:8 136:15 146:3
  182:16 183:7 195:25
  240:17
AMRO  22:15,18,19
  23:3,22 135:25
  138:20 139:2 140:2,
  10 145:2,9 146:4,14
analysis  33:9 47:2
  48:9 62:22 76:19
  78:14 131:22 149:19
  150:23 152:23 157:8
  158:11 163:19 165:6,
  7,15 166:23 168:18,
  21 175:18 177:3
  180:5 183:7 184:13,
  14 186:14 188:18
  197:11,13 203:1,6,9
  207:5,17 212:1,9
  213:20 214:3,5
  216:24 220:18 222:10
  226:1,16,18 227:9
  235:15 236:20 237:20
  239:18 241:21 247:20
analyst  82:19 83:2
analyze  62:23 211:21
  213:7
analyzed  64:20
and/or  143:7
Anderson  7:3,20 8:16
  62:17 67:12 170:3

230:18
announce  130:14
annual  87:19 89:11,21
  97:11 101:11 102:25
anomaly  86:22 87:6
  107:20,24
answers  166:9
anticipated  28:11
  36:18 87:17 110:11
  117:14 119:3
anticipation  119:8
anymore  117:6 180:15
apologized  223:1
apology  221:21
app  235:5,6,9
Apparently  137:5
appears  153:10 204:8
applied  74:11 117:17
  144:11 146:19 161:13
  162:8,23
apply  72:10 141:22
  142:13 160:17 163:1,
  17
applying  141:21
apportion  65:5 215:8
appreciated  137:11
approach  163:11,12
  187:11,14,16,22,23
  188:5 227:12 247:25
approaches  163:10
  187:9
approve  142:21
approves  142:8
approximately  8:20,25
  59:18 122:19 186:2
  235:12
April  39:23
areas  14:23
argue  210:7
arguing  223:25
argument  153:5
arise  185:21
arranged  113:2
article  190:20,25
  191:3,19 192:9,15
  193:14 194:9 195:25
  196:3,20 197:8
  199:15 201:8 203:18
  204:5,10,18 205:5,17
  207:1,9 208:1,9,20

209:3 211:23 213:9,
  17 216:13,19 219:12,
  20 220:10,11 221:12
  222:3,5,9,14 223:6,
  12 225:2,10 226:13
  227:8 229:18 231:8,
  9,13,14,17 232:11
  233:11 235:2,12,25
articles  18:19 34:16
  58:3 149:1 172:18
  190:7,8,13 191:17
  192:1,5,8,13 193:4,
  20,25 194:14 195:10
  200:14 201:23 202:11
  203:25 208:21 211:24
  212:4 213:10,11,12
  214:8,16 215:10
  221:22 222:24
  223:12,17 225:3,14,
  18 227:7 229:5
  236:10
as-is  171:2,3,6
asks  145:14
assert  19:18 155:17
asserted  130:13 158:2
asserting  76:25 77:22
  85:13 157:24 199:17
  229:19
assertion  86:6,25
  121:25 122:2 138:16
  139:8 158:5 193:2
  204:17
assertions  23:24 58:9
  159:22
asserts  77:17 78:9
  190:10
assess  9:7 83:19
  84:18 90:1 118:6
assessed  11:5
asset  12:10 14:7
assets  9:17 12:23,24
  13:25 14:4,11,13,15,
  17,25 15:2,13,18
  17:7,11
assigned  11:12
assignment  211:18
association  54:3
assume  35:25 36:20
  39:5 41:14 42:8 55:2
  78:14 79:17 80:12
  103:25 108:3 110:18
  127:3 133:2,7 157:18

167:13,19 180:19
190:19 193:8 200:4,
7,10,13 225:13,23
**assumed** 72:22 82:8
83:5 118:3 119:21
127:7 133:5 194:23
197:6 199:20 200:20
207:21,24 208:11,12
220:2,4
**assumes** 78:21
**assuming** 107:10
115:20 116:2 119:11
131:11 179:16 184:14
194:16 225:9
**assumption** 35:16 37:3
39:9 41:18,19 47:8,
13 76:21 78:4 79:1,
6,9,10,13 80:7 82:13
101:20 107:11 108:6
116:4 118:23 119:9
126:2 131:21,25
147:13 152:22,24,25
153:16,23 154:4,18
155:5 166:24 167:2,
18 193:6 195:3
196:12 197:10 201:1,
3 202:9,25 211:4
220:7 223:16 225:19
231:16 232:10,21
**assumptions** 35:14
49:18 76:18 202:5
222:21
**attained** 225:1
**attempted** 33:8
**attorney** 242:14
248:14,19
**attorneys** 242:19
**attract** 56:16 91:15
**attributable** 21:1
29:24 215:9 222:18
**attributed** 65:17,18
148:23
**audited** 71:13 73:10,
16 94:1
**August** 96:3 106:10,
13,16,22 111:12
112:14 113:8
**average** 41:22,23 42:6
43:3 44:17 45:9
47:17 74:23 87:13,19
89:12,15,16 167:16
168:6,9 239:19,22,25

240:1,5,6,22 247:4
**aware** 19:15 42:25
48:2,7 65:23 66:1
130:12 221:3 243:14
**AWS** 163:24

---

## B

**back** 22:11,14 25:23
28:20 31:3 32:12
45:13 65:22 67:9
88:4 116:12 117:4
118:13 119:16,24
120:19 130:5 137:19
139:23 141:23 142:16
147:24 148:4 157:2
170:17 172:9 181:14
187:5 205:10 206:11
208:22 209:10,20,25
213:18 223:9 228:2
230:16 233:15 245:8
247:15
**backed** 33:21 76:8
117:10,16 119:2
120:2,15,16 125:3
**backing** 34:25
**backwards** 56:21
**bad** 148:2
**bag** 223:9
**balance** 12:1,9
**bald** 240:4
**ballpark** 102:5
**bank** 19:11 134:2,4,23
135:3 136:11 141:23
142:7,8,16 148:7
**banking** 13:22
**banks** 18:21 20:4
22:17 23:11 24:8,10
92:15 101:4 134:5,
11,12 135:12,19
138:8 139:9,15,20
140:18 141:18
**banner** 174:1 175:11,
25 176:10,14 178:6
179:20,24
**base** 116:25 185:2,7,
12 242:11
**based** 30:24,25 43:6,
7,16,18 59:11 60:9
69:17,20 71:3,7,18
79:10,11,24 85:16
87:9 92:24 104:3

116:4 117:14 121:22
134:19 141:12 146:7
147:10,11 148:24
153:16 154:10 166:25
179:13 187:23 189:11
195:3,5,6 199:20
202:12,18 217:1
223:13 226:3,4
236:14 247:7,10
**basic** 187:9
**basis** 42:7,11 50:1
79:16 82:22 103:22
127:2 131:10,24
132:23 135:24 149:7
178:22 193:8 202:23
**Bates** 96:16 157:12
160:1 164:21 218:4
**bathroom** 61:24
**bearing** 89:3 96:3
137:22 150:23 164:12
170:4 175:17 217:18
**beaten** 207:12 210:22
**begin** 154:1
**beginning** 106:8
108:20 200:2 208:10
**belief** 30:24
**believed** 31:19,24
114:15
**bell** 221:24 222:22
**benefit** 10:21 51:9
63:12 64:16 149:19
172:13,17 177:6,11
184:18,20 185:16
186:4 196:18,25
201:4,14,16 202:5
208:15,18 209:2,10,
14,21 210:1,24
212:2,9 213:20
214:6,20,24 216:4,24
217:3,6 218:14,15
219:1,2,25 220:13,25
221:7 222:11 223:10,
14 224:1,20,25 225:4
227:3 229:8 232:25
241:23 246:13,16
247:1,3,6 248:4
**benefits** 208:24
**benefitted** 224:15,17,
19
**bid** 242:20
**big** 104:20

bigger  228:5
biggest  25:4
bit  106:1,18
blocs  130:15
board  20:23 25:10
  57:3
Bob  6:19 184:2
books  129:7
Boston  7:1
Bot  133:15
bots  51:18 111:24
bottleneck  121:15
bottom  154:1 218:6
bottom-line  103:21
bottomed  153:8 154:25
  155:1
bottoms  163:23
break  61:24 127:12,15
  129:12 171:25 173:7
  178:18 213:13 230:10
breaking  62:7 67:2
Brian  53:4 54:2
bring  226:23
bringing  17:10 136:14
  229:12,17
broad  214:5
broader  10:4 25:22
brought  76:24 106:24
  107:2,6,9 208:8
buck  184:11
bullet  160:8
bump  108:16 109:13
business  9:25 10:3,7,
  18 11:19 12:3,8,11,
  15,25 13:2,8,12,14,
  16,17 15:20,23 16:5,
  9,14,15,17,18,19
  17:1,4,10 18:19
  32:16 34:1,4,13
  35:11,12 36:19 57:24
  58:6,11,17,20,23
  59:4,9,15 61:3 63:2,
  5 64:5,9,10,11,15,22
  65:10,16,20 66:12
  67:14 74:18 84:23
  85:1,15 87:2 90:24
  91:21 102:16 108:14
  110:5 121:2 136:25
  148:24 150:6 159:12
  164:11,24 167:22
  168:11 169:21 171:4,

6 187:12 212:2
  213:18 214:6,16
  215:7
business's  58:12
businesses  10:5
  11:22,24 12:1,6
buy  9:14 92:12
buyer  58:19,21 59:8,
  10
buzzfeed  7:4 10:20,21
  34:16 49:23 63:12
  64:16 65:17 66:6,11,
  18 131:14 132:14
  149:20,25 172:14,17,
  24 173:8,9,20 174:7,
  19 175:10,24 176:21
  177:4,6,7,17,22
  178:25 179:5,18,19,
  25 180:6,23,24
  181:2,8 183:8,11,12,
  19 184:4,15,19
  185:23 186:5,9,12,20
  188:18 190:2,11
  191:13,21 192:24
  193:1,2,20,24 194:2,
  4,17,21 195:20,23
  196:4,13,18 197:8,
  17,19,25 198:2,7,10,
  13,15 199:21 201:4,
  14 202:6,13,15,17
  203:18 204:1,9
  205:4,7 207:3,19,23
  208:16,19,25 209:2,
  17,19 210:2,7,23
  212:3 214:7,20,24
  216:2,24 217:3,6
  218:15,16 219:2,12,
  20 220:1,13 221:1,3
  222:25 223:10,17,25
  224:1,14,19,20 225:1
  226:5,8,21,24 227:4,
  21 228:10,13,18,25
  229:1,2,8 232:25
  233:6,24 234:24
  235:6,8,13,25 236:7,
  8,16,17 237:21,24
  238:2,9,24,25 239:3
  240:23 241:23 242:2
  245:16,17,22 246:1,
  12,13,17,19,21,24
  247:1,8,11,21
Buzzfeed's  133:23
  179:13 184:1,3 189:8

197:3 208:19 222:6
  223:20
Buzzfeed.com  174:21,
  22 176:13 183:13
  229:13 235:1 238:16
BV  144:17

                C

Caillou  240:4
calculate  65:10 67:22
  71:17
calculated  69:18 73:3
calculates  242:8
calculating  214:14
calculation  74:4,10
  215:7 216:3 218:14
  219:1 220:13,25
  221:7 247:24
calculations  70:18
  73:22,25 214:13
California  7:23
call  10:17,19 64:23
  73:24 74:9 78:16
  171:2 172:13 178:7
  185:24 186:4 209:8,
  21 214:21 226:19
called  67:15 68:16
  173:25
campaign  179:6,7
  226:9,22,23 227:19
  241:6
cancelled  149:13
capacity  92:5,13,22
  122:4,6
capital  75:14 103:20
captured  82:20
care  21:25 233:25
carries  127:1
cars  174:10
case  7:4 9:20 16:12,
  22 17:14,16,18,20,
  21,23 18:2 55:3
  59:13,20 61:17 83:11
  113:5 132:24 136:18
  144:3 151:17,20
  167:21 192:18 200:6,
  9,16 210:13 220:17
  244:1
cases  16:25 17:3,8
  86:18 242:16

cash 95:3 188:15
cat 223:8
causal 11:8
causation 150:25
caused 60:18 66:18,19
 78:12 92:18 131:19
 148:12 150:20 153:4
 154:20 155:24
center 13:4 158:25
cents 240:24
CEO 244:20,21
cetera 71:23 82:4
CFO 18:5 85:17 87:10
 149:5,7
chairman 244:20,21
chance 61:23 62:1
 206:16
change 59:5 71:12
 73:5,6 101:4 102:16
 117:22 119:24 159:13
 167:8 197:11 203:1,6
 227:17 242:21
changed 73:1,2
charged 238:21,25
charging 91:17
Charles 53:7 114:17
chart 37:20 153:16
 230:7
charts 104:13
check 165:16 226:25
 241:14
choice 163:5
choose 61:1 239:21
chose 207:11 210:21
 216:21
Christopher 65:18
 66:19 81:2
Ciampa 6:24
circles 226:14
circumstances 126:6
cite 85:3 88:3 101:14
 132:24 133:18 134:7
 138:4 149:4 233:23
 237:7
cited 101:15 134:15
civil 207:11 210:21
 216:21
claim 34:17 60:17
 149:18 155:16 207:13
 210:6

claimed 25:21
claiming 80:3 224:21
claims 9:19 64:2
 218:20
clarification 233:25
clarify 10:12 89:25
 214:3 219:19 231:11
 232:15 244:17
clean 59:22
clear 26:24 171:1
click 174:11,21 184:8
 190:24 191:6 192:4
 220:22 231:19,20
 232:1,8 238:6,8,18,
 23,24 239:14,24
 240:3 241:15 242:8,
 15 246:2,14
click-through 238:14
clicked 190:12 191:25
 192:14,15 193:4,19
 194:5,18 195:9
 196:15 199:15 200:13
 201:8,22 202:10
 207:8,14,22 208:4,8
 216:19 220:10 221:11
 222:8,13,16 223:16
 224:5 232:13
clicking 208:7 223:6
clicks 174:9 178:2
 224:22 238:16,19
client 27:9,16,23
 28:8,11 30:5 34:23
 35:4,9,18,24 36:5,8,
 10,21,24 38:17,22
 39:3 40:25 41:10,11,
 19,25 42:9,10 43:1,
 22 47:19 50:20 53:4
 57:3,13 92:12 100:25
 121:4 128:25 136:15
 140:7 147:23 154:6
client's 41:14 42:12
clients 28:15 30:23
 32:12 45:2 46:14
 53:10 55:18 57:2
 106:24 107:3,10
 110:4,16,19 121:18
 130:9,17,21 131:7
 135:20 139:10,12,13,
 14,19,25 140:3
close 76:1 84:7
 105:11,14,18 134:6,
 12 135:2,12 161:11

closed 134:17,23,25
 135:15
CNN 193:10 196:21
 222:25
co-locations 13:5
coerced 51:8 111:23
Cohen 112:5,8,13
 113:1
colleague 7:11
collected 100:19
 118:24 120:10
collectively 213:11
column 234:24 235:4
columns 234:11,13
combined 215:12
comfort 84:5 154:9
comfortable 210:19
commercial 10:7
Committee 218:11
common 71:18
communicated 55:2
 197:17 198:6
communicating 145:5
community 81:23
companies 11:9,16
 74:23 75:6,7,12,18
 79:2,3,4 95:8 138:9
 139:17,20,21 145:8
 150:7 156:18 157:6,
 15,20,25 158:12,19,
 23 160:6,25 163:24
 165:4,13,17 166:3,4,
 11 167:14,25 185:11
company 13:6 15:18
 19:5 20:19 29:3 50:8
 59:23,24 64:24 67:23
 68:7 83:6 92:25 95:5
 105:9 108:4 122:10
 123:20 125:15 126:7
 130:20 135:22 138:12
 139:14,23 143:6
 152:13 159:2,7,16
 160:12 161:12,25
 171:12 179:4 204:18
 217:17 244:3
company's 122:17
 134:22 148:24
comparable 74:25
 79:3,4 157:9,10,21,
 25 158:9,13,22
 159:7,16,20 160:5

161:3,24

**comparables** 75:1 90:6
161:2,9 162:14
163:5,7 165:5 166:6,
20,22

**compare** 88:8 95:7
105:6

**compared** 73:23 84:22
85:6 88:9 91:18
168:24

**competitors** 91:20,24
164:25 166:5 167:7

**complaint** 132:24
133:3,6,11,18 176:8

**complete** 19:22 180:20
205:22

**completed** 28:18

**completely** 109:23

**complying** 62:18,20
70:23 84:16 94:14
96:14,17 104:22,25
124:25 132:10 148:19
157:14 160:3 164:22
170:21 207:7 211:10,
15,17 218:5 237:17
240:9 245:13

**component** 67:24

**compound** 89:20

**compounded** 87:19
89:11

**comprised** 12:4,12,15,
22 13:16

**comps** 166:19

**computer** 230:25 231:4
233:15

**computers** 51:19

**concept** 228:22

**concerns** 21:24

**conclude** 103:24
133:21 158:22

**concludes** 249:5

**conditions** 60:9

**condone** 53:11

**conduct** 129:6

**conducted** 8:6 87:11
157:8

**conducting** 43:12
149:18

**confidential** 93:21

**confirm** 170:12

**confused** 226:25

**confusing** 168:5

**confusion** 176:23

**conservative** 41:9
85:18 192:3 201:17
208:23 217:5 235:20
236:5,12 248:5

**conservatively** 223:11

**consideration** 46:25
203:9 220:18

**considered** 14:25
80:15 92:3

**consisted** 178:19

**consists** 14:11,13

**consolidated** 64:23
93:4,15 164:11

**Consor** 211:20 213:6

**constantly** 98:17

**contained** 84:25 85:14
87:1 90:23 205:10

**contend** 20:25 65:16
86:21 152:16 185:23
186:1 208:23 216:4
217:4

**contends** 20:1 23:10
25:15

**content** 199:12

**contention** 152:12
171:16 209:7 211:3

**context** 189:10 195:20

**continually** 185:13

**continue** 83:7 91:25
92:5 108:8,14 119:6
125:16 133:16,22
243:23

**continued** 38:23 39:20
106:18 107:14 111:13
120:4 138:19 149:2
169:20 224:2

**continuing** 126:19
145:1

**contract** 46:16

**contributed** 151:14

**conversation** 18:7,23
27:3,6,11 28:4 30:13
53:2 54:16,24 134:7
147:25 149:4,6

**conversations** 26:11
27:4 31:17 79:25
85:16 113:22 138:11
141:12

**convert** 173:8

**convoluted** 127:25
151:2

**copies** 137:8

**copy** 37:23 208:3

**copyrights** 9:9

**core** 159:12

**corny** 183:18

**Corporations'** 173:17

**correct** 8:13 10:8,9,
16,17,20,24 11:11
15:10 18:14 30:19
33:2 39:21 49:19
55:23 65:3 68:4,17
69:16,22 70:4,8,16
71:6 74:5,8 75:5,21
76:7,15 77:16,21
78:1,8 79:5 94:11,17
96:24 97:3,8,12,17
99:16 102:3 103:9,14
106:2,20 115:19
117:3,23 118:1,5
124:10,12 125:6
128:4,8 132:22 133:1
134:9 144:20,22,24
157:11 165:3 169:14
171:22 178:17
184:13,14 190:10
192:7,11 197:4
207:4,18 214:18
215:17,22,24 221:17
222:7 233:13 234:17
238:4 239:17,20
240:20 244:2,5

**corrected** 202:18

**correctly** 69:5 240:10

**correlate** 136:5

**cost** 57:5,12 68:2
69:14 72:9 125:22
127:3 178:23 179:4,
5,10,18 184:8,15
186:10,12,16 187:6,
15,16,17 226:11,19,
22 227:12 228:13
229:7,12,17 238:5,18
239:24 240:7,19,22
241:1,13,15 242:8
247:25

**costs** 55:25 56:8
57:18 68:2,7 70:7
77:25 82:4 125:12,
16,23 126:8,12,18,20

240:2 242:12
**counsel** 6:4,11 7:6
55:3 61:6,8 62:23
132:1 172:16 193:23
197:20 198:5,17
202:16,19
**counter** 207:13
**countries** 134:5,11
**couple** 38:20 105:23
127:14 200:5,8,15
201:25
**court** 6:20 7:17 9:1
**cover** 69:10 189:13
**created** 21:11 153:12
169:22
**credit** 136:11
**cumulative** 215:14
**current** 156:22
**curve** 87:18
**customer** 13:21 14:23,
24 25:11 29:3,9,17,
24 30:7 33:7 38:7
40:8,18 43:12 44:20
46:20 47:12 48:5
49:10 76:9,23 77:10
95:15 111:6 114:1
115:14,15 117:2,5,9,
21 118:7,19 120:11,
17,20,23 121:7
122:5,14,18,24,25
123:23 124:1 125:2,
15 126:10,21 127:18
128:3,10 130:15
131:12 148:12
149:12,14 169:10,11
**customer's** 44:1
**customers** 20:1,5
25:6,7,14,15 29:10,
16 33:13 47:7 48:18
56:8,10,17 91:14
111:4 121:8,10 123:4
130:23 150:21 151:14
154:16 156:9
**cut** 87:21
**CV** 17:2,24
**cybersecurity** 53:21

---

**D**

**daily** 185:1 242:22

**damage** 64:3
**damages** 9:7 10:15,23
11:2,5,9,13 16:9
60:18 61:2,6,17
62:21,23,25 63:4,8,
13,18 64:10 163:19
167:8 209:14 211:21
212:10 213:7,16
214:22
**damaging** 79:14
**data** 13:4 70:1,6
75:19 158:24 168:14,
16,19 188:22 217:1
223:14 226:3 245:10
**date** 6:22 29:1 48:3
59:17 60:10 76:2
152:8 162:2 188:3
243:2,3
**dates** 141:1
**Davis** 7:9
**days** 6:7 38:20 39:7
185:4
**de** 12:24
**dead** 202:25
**dealing** 230:21
**dealt** 112:5
**December** 28:23 29:1,2
30:7 36:6 37:13
38:15,23 39:5,20
40:3,12 42:1 44:4
45:5 46:1 93:16
**decided** 53:14,15
**decision** 61:16,19
**decline** 20:23 21:1
40:9 58:3 110:9
131:15,19,23 132:3
147:16 151:23 152:1,
14 153:4 154:21
**declined** 16:15 58:6
126:4
**declines** 58:5
**declining** 89:14
154:25
**deducted** 35:20 117:24
**deep** 130:16 234:20
**defamation** 16:13
17:14,18,20,23
**defamatory** 18:18
34:16 58:3 149:1
172:18 212:4 213:9,
11,17 214:8

**defendants** 7:10
**defendants'** 211:22
213:8
**define** 187:21
**defined** 187:25
**defining** 184:20
**definition** 14:21
**deliberate** 215:23
**delineation** 12:11
**demand** 228:14,15
242:22
**Democratic** 218:10
**depend** 168:12 188:21,
23 189:10
**depends** 46:10 48:10
242:22
**deponent** 6:5
**deposed** 8:18,21 16:23
**deposition** 6:6 7:2
21:21,23 41:2 47:25
48:3,14 83:16 93:20
113:21 128:2 159:14
243:23 248:18 249:6,
8
**depositions** 8:4
**depreciation** 67:21
72:18
**describe** 13:3
**description** 158:14
**designate** 248:16,18
**detailed** 136:21
**determine** 9:15 17:10
19:10 65:15 110:22
158:12 201:13
**determined** 117:20
**determining** 46:19
98:8 157:20
**detrimental** 18:19
**Devoss** 48:2
**Devoss'** 47:24
**dictate** 158:8
**difference** 15:1 49:8,
14,21 77:1 81:21
90:15,21,25 102:11
188:17 189:7 225:25
227:9 228:24 235:15
248:2
**differently** 214:10
**difficulties** 143:21
230:21

dig  153:11
dip  38:10 39:12,13
   41:24
dips  37:14,15
direct  125:12 164:24
   166:5 167:7 175:17
   185:16 239:6
directed  227:20
directly  34:14
   152:18,20 178:5
   182:8 198:1,11
   204:15
director  244:22,23
disappear  126:12,14
disappeared  119:15
   126:11
discernible  39:13
disclose  166:12
discount  160:10,18
   161:13 162:24 163:2
discounted  188:3
discover  124:14
discuss  28:7 54:11
   112:15
discussed  18:18 24:1
   28:10 54:10 66:23
   133:25 134:19 146:15
   166:17 229:20 248:6
discussing  53:10
   140:25
discussion  21:18
   29:20 32:13 53:3
   61:5 92:9 93:24
   95:14 100:24 101:16
   107:18 135:9 140:14
   146:7
discussions  24:9
   30:25 42:9,11 43:6,
   22 73:7 87:9 91:9
   92:24 101:3,9 104:3
   132:1 139:22
displays  166:21
disrupted  136:21
divide  17:11
DNC  51:19 111:25
   218:24
doc  237:10
document  37:17 38:2
   85:3,4 88:3,6 89:15
   93:1,2 94:5 95:22,24
   101:17 104:20,24

105:6 137:2 138:4
   140:21 141:13 164:7,
   21 203:12 206:4
   216:10,12 217:12
   219:10 222:1 230:2,3
   234:10,23 237:7,14
   240:8 248:13,24
documentation  22:23
   23:1 101:5 138:14
documents  55:7 101:16
Dolan  53:7 54:7
   114:18
dollar  106:12
dollars  78:11 105:15,
   23 106:22 107:13
   110:23 111:12 118:8
   169:9,18 173:23
Donald  52:2
doors  169:23
dossier  19:19 20:3,21
   21:2,4 25:8,16 49:24
   50:23 51:2,12 52:1
   60:18 77:18,23 78:13
   79:7,15,17 80:4,21
   81:2 92:17 111:15,20
   112:5,6,7 113:1
   127:21 131:14,22
   132:3 134:4 144:4
   149:21 150:16 151:1,
   22 152:20 153:2,13,
   20,24 154:20 155:20
   156:6 169:22 171:17
   175:25 190:18,23,24
   191:12,14,16,22
   192:1,6,9,10,14,16,
   22,23 193:5,7,14,25
   194:6,9,18 195:2,12,
   18 196:1,3,6,15
   197:3,9,16 198:24
   199:3,5,11,16,22,24
   200:1,3,7,11,15,21
   201:9,11,15,25 202:7
   203:5 204:5,12,14
   205:11 207:3,23
   208:10,20,22 209:2,
   4,6,9,22 216:5,6
   217:9,15 218:3,21
   219:5,7,21,24 220:3,
   20,23 221:5,12,13
   222:16,23 223:19
   224:2,10,12,23
   225:22,24 231:9,13,
   18 232:12 233:4,7,11

241:18,24 242:4,24
   243:3
doubled  39:18
doubly  231:10
down-the-road  186:4,5
downturn  150:6
downward  87:18
dramatically  135:19
   139:9
drawn  156:8
drilled  149:11
drive  179:14 184:3
   226:20 238:1 239:13,
   15 241:2,11 246:24
driven  139:19 140:3
   156:8
driver's  7:23
driving  139:10
drop  38:14
dropped  39:25 41:13,
   15 42:5,13 43:2
drove  147:22 148:12
   247:11,14
drying  239:15
due  102:16 133:16,23
   148:2 165:19 208:24
   217:5
duly  7:23
Dupont  159:1,19

E

e-mail  23:22 24:6
   137:22
earlier  29:23 148:5
   166:8 184:23 226:7
   235:18
early  98:12 185:4
   221:5,12
earned  35:19,24 36:5,
   7,9 77:2,14 100:20
   176:24 177:4,6,7
   178:5
earning  20:19 156:19
earnings  16:15 18:20
   19:22 58:4 67:20
   100:18 102:23
   131:16,20,23 132:4
   151:24 154:21 187:24
   188:13,14

**earns** 177:22
**ease** 93:24
**ebb** 52:16
**EBITDA** 67:15,16,17,
  18,19,22 68:5,16,19,
  24 69:14,18 70:10,
  14,19 72:12,19 73:2,
  24 74:1,6,10,12,15,
  21,23 75:3,11 77:25
  84:3 95:1,10 97:4,13
  99:19,24 100:4 102:9
  103:1,7 125:8,10
  126:4 127:8 148:21
  158:18 160:18 161:5,
  10,15,22 162:15,16
  164:3 165:5,6 166:18
  167:16 188:9,11,13
**economic** 11:1 133:16,
  22
**economies** 103:17,18
**EDITDA** 163:13
**educated** 153:15
**effect** 146:3 170:25
  215:12,14
**effects** 153:24
**effort** 65:4,10,15
  66:10,17
**election** 81:10,24
  113:3,6 204:16,19,25
  205:6
**element** 13:11,13
  70:20 178:1
**elements** 9:23 11:25
  46:12 64:3 69:4
  71:19 72:18 159:25
**email** 23:4 135:25
  138:24 143:10,13,17
  144:10,16,25 145:7
  146:10,12 147:1
  218:9,23
**emanating** 218:10
**embarrassing** 218:9,23
**embed** 192:6,9
**embedded** 190:20
  191:2,6,9 219:20
  231:14 232:12
**embeds** 192:10
**empirical** 33:11
  151:12
**empirically** 42:24
  110:22

**employed** 18:4 54:22
**employees** 56:5
**end** 46:1,9 106:8
  108:23 168:22 169:11
  200:2 208:11 220:11
**ended** 41:5 67:7 93:16
  105:25 137:17 172:7
  206:21 230:14 245:5,
  6
**engaged** 190:3
**engine** 180:17 226:10
  246:1
**engines** 179:8 237:25
  247:22
**English** 213:4
**enjoyed** 83:6
**enormously** 37:12
**enriched** 190:11 193:3
  204:1,10,20 205:8
  207:20 216:2
**enrichment** 10:19
  215:20
**ensuing** 42:4
**enterprise** 58:13
**entire** 15:23 16:9,14
  17:1,10 64:9 81:22
  139:14 164:2 200:10
  219:6 220:3 222:16
  224:10,12 233:4
**entities** 100:19
**equipment** 121:18
  136:16
**Equity** 96:2
**essentially** 39:15
  68:10,19 71:19
  187:16
**establish** 35:6
**established** 201:16
  206:25
**estate** 159:2
**estimate** 12:18 41:9
  42:15,20,22 57:23
  58:23 61:9 63:4
  64:21,22 66:13,14
  67:14 72:12 73:23
  74:11,18 76:9,23
  115:1 116:13 167:8,
  23 168:11 171:3,13
  172:13,15 179:4,17
  185:22 186:19 188:8
  189:8 207:19 210:1

  214:22 215:8 216:3
  219:25 240:19 247:5
**estimated** 41:2 42:16,
  24 70:18 114:23
  116:21 188:19
**estimates** 43:19 88:14
**estimating** 16:8 40:7
  44:23 60:17 98:18
  214:14 237:24
**European** 65:24
**evaluation** 96:20
  157:3
**Evan** 7:12 215:18
**event** 132:2
**events** 153:17
**eventually** 22:9
**evidence** 134:10
  139:18 203:3
**evolution** 148:23
**evolving** 98:17
**exact** 12:17 22:12
  23:19 48:21 50:21
  141:1,20 145:24
  152:8
**examination** 8:1
**examples** 16:1,11
  20:14 25:14
**exceeded** 84:2 89:7
  109:19
**Excel** 230:4 234:11
**exchange** 160:14
**exchanged** 161:1
**exhibit** 37:19,21
  38:1,4,6,13 62:10,
  12,13 70:21,24 93:3,
  5,6,13,17,25 94:4,
  13,18 96:1,5,7,15,18
  104:12,13,15,24
  137:21,24 138:1
  144:19 157:3 164:14,
  16 170:5,7 183:22
  203:15,19,20 204:7
  205:23 216:14
  217:20,24 219:11,13,
  14,22 220:21 222:2
  224:7 230:6,7
  233:19,20,22 236:22
  237:1,2,6,12 245:11
  248:15
**expect** 73:8

expected  142:4
**Expedition**  182:7,8
  183:4 229:24
expenses  68:2 71:25
  72:17
experienced  123:20
  143:6 150:7 152:14
experiencing  143:18
expert  9:18 15:22
  16:8,21 17:1,14,23
  55:8 57:23 62:11
  129:4 132:20 155:12,
  18 170:3 212:23
expertise  80:2,3
  154:12 155:15 200:25
  201:6,11,13,20,23
  202:2,4,9
explain  58:1,14 68:18
  182:13 213:1
explained  14:16
  233:18
explicitly  225:6
exponentially  236:9
exposed  31:16 124:8
exposure  123:5,21
  196:19
extent  18:23 79:18
external  87:10 130:15
extra  136:8
extrapolate  43:9
eyes'  248:14,19

_____

F

**Fabros**  159:1,19
face  153:9
**Facebook**  185:4,10
fact  23:13 28:17
  48:17 49:16,17 52:7,
  12 86:4 89:5 107:4,8
  113:5 131:4,5 145:1
  147:11 148:6 160:11
  162:10 166:21 167:19
  195:6,12 223:8
factor  103:20
facts  42:25 154:10
fair  11:14 13:7 15:9
  29:11,18,25 35:9
  49:5 52:7 56:6,11,19
  57:21 58:22 61:12
  64:24,25 65:7 72:24

75:9 82:7 85:5 105:8
  111:9 127:24 150:1
  151:11 169:6 171:15,
  18 209:19 213:15
  215:2 239:9
fairly  12:24 82:14
  85:18 92:3 108:24
  136:19
faith  129:1
fall  14:4
falls  87:22
false  79:8,15,19,21,
  22 80:6,21 81:3
  156:6,13
familiar  188:24
  189:15 224:4
famous  52:2
**February**  105:13
  113:16 115:4 143:7
  152:10,15 153:8,21
  170:13 221:5,12
  236:25
feeds  149:20
fees  9:16
fell  153:18,21
felt  41:8
field  95:8
fifty  88:6
figure  74:19,20 95:11
  96:13 97:1 99:18,20,
  21 110:20 118:22
  170:22
figured  93:10
figures  43:20 84:3
figuring  65:5
filed  150:15 152:2,7,
  9 153:19,24 224:3
filing  6:9 150:8,20
  151:13 152:18 153:1,
  3,6,10 154:15,22
  155:1,6,21,24 156:1
filled  119:4,25
filtered  11:9
final  71:12
finance  143:24 144:12
financial  92:13 93:15
financially  95:5
financials  73:16
  156:23 158:17
financiers  19:12
  101:11 140:2,18

141:5
**financing**  19:23 23:15
  46:11 57:8,16,17,19
  92:10,11,21 95:4
  121:3,16,17,21
  126:24 136:24 138:19
  139:24 140:9 144:16
  145:20 146:3,14,19
  147:16
find  29:9,16 30:4,8
  75:19 121:3 123:13
  136:21 161:14
  165:18,21,22,23
  166:1 240:3
fine  29:15 62:5
  115:23 211:13
finish  199:8
finite  222:20
firm  114:18
five-year  87:13,14
  89:8,12,19
fives  106:19
fixed  126:8
flat  39:15
flip  174:22
flipping  170:15
flow  52:16 95:4
  188:15
flows  110:4
focus  9:11 32:11 64:5
  90:8
focused  90:6
follow  117:19 120:6
follow-up  190:8
  192:13 208:21 211:23
  213:10,17 216:5
  223:12 225:3 234:1
follower  236:8
**Ford**  174:16,18,25
  181:14,16,20,25
  182:15,17,23,25
  229:21,22 239:4
**Ford.com**  174:9,12
  181:21 247:16
**Ford.com's**  182:12
**Ford.com.**  181:23
forecast  90:3 91:13
forecasts  90:2
forest  110:3
forget  157:3

forgot  137:6
form  6:13 8:8
forms  9:8
forward  43:9 92:12
  161:5,10,22 162:14,
  16
found  114:13 115:7
  121:6 132:15 208:9
four-year  164:4
fourth  79:6
frame  21:15 22:12
  23:20 35:22 36:17
  46:15 117:13
fraud  31:16 124:20
Fray-witzer  6:25
  7:12,13 8:10 18:16
  22:1 26:2,7,10,18
  37:22 44:6 45:11,19,
  23 46:4 49:11 50:3,
  11 61:10,22 62:4
  65:19 67:3 78:19
  80:14,23 81:11,18
  83:8 86:1,9,16 90:16
  91:1 93:18 97:21
  98:1 102:13 107:22
  109:25 111:17 112:19
  113:11 114:5 115:5
  116:14 118:11 119:1,
  17 121:11 122:21
  123:7,24 124:16
  127:10 129:13 130:24
  136:6 137:7,12
  138:10 141:25 142:5,
  10 143:2 152:3 154:7
  155:8 172:1 174:2,15
  175:2 176:2,16
  179:22 181:3 183:15,
  21 186:23 187:2
  191:1,7 192:17
  194:7,19 196:16
  199:18 201:2 204:21
  205:1,15 206:3,6
  208:5 209:12,23
  210:9,14 211:1
  212:12,20,24 227:23
  228:1 229:14 230:9
  231:21,25 248:22
  249:1
free  182:19
front  231:18
frozen  134:5,11,24

FSB  51:8 111:23
full  84:17 148:20
fully  154:2
function  68:5,6,9,11
  74:22
future  78:24 82:20
  83:3 98:19 177:9
  185:14 187:4,23

G

gave  31:9 66:11 84:5
  86:12 240:14
Gawker  16:2,3
general  21:17 56:11,
  12,16,20 58:12 59:12
  110:10 135:8 140:13
  183:1
generate  36:22 45:16
  55:22 56:1 179:8,12
  180:9,12 184:24
  186:14 187:17 226:8
  228:11,13 241:13
generated  36:24 39:3,
  6 41:20 67:23 151:13
  236:25 240:18 245:20
generates  185:3
generating  38:22
  41:11 46:21 178:23
  180:7 185:5 227:4
get all  86:11
Giannini  6:20
give  16:1,24 19:7
  20:13 25:6,13 72:5
  86:6 95:19 145:20
  146:20,23 206:16
  209:10,20,25 210:7,
  23 211:3 234:6
giving  80:10
glad  235:16
GM  182:22 239:4
GM's  183:3
goal  180:8
good  6:17 8:16,17
  35:10 62:7 67:1,18
  93:19 127:15 129:11
Google  149:19,22,23
  150:2,13 163:25
  179:7,24 180:17,25
  181:1,11,16 182:15,
  17 183:8 226:10

237:25 238:10
granular  111:8
gray  14:23
great  21:11
greater  164:1
Greenspan  11:21
grew  110:23 111:11
group  61:19 166:6
grow  88:16,17 91:25
  102:2,9 108:4,14
  109:12,14,18 115:21
  116:7,22 117:1,8
  118:4,24 130:23
  155:7
growing  92:2
growth  19:22 83:5
  87:12,19 88:11,13
  89:11,21 92:5 108:6
  109:6,9 110:10,11,
  13,15 119:6,22 188:1
Gubarev  7:4 10:10,24
  11:3,10,13 49:25
  52:5 53:1 54:10,14,
  17,20,25 64:8 65:24
  132:15 150:3,14
  209:11 221:23 222:18
  223:3 224:5,14
  241:16 242:24
Gubarev's  132:20
guess  93:18 153:14
  176:22 189:21
guesswork  43:17
Gurvits  7:14

H

hack  51:19 111:24
hacking  112:16
half  78:11 94:23
  98:25 106:5,6 166:8
  169:6,7,9,13,16,18
  184:11 240:18
handing  38:4 62:13
  93:6 96:7 104:15
  138:1 164:16 170:7
  203:20 217:24 219:14
  230:25 233:15,20
  237:2
hands  46:2 161:1
happen  60:15 78:23
  98:19

**happened** 21:3 30:11,
 20 31:3,7 32:2
 33:14,15 42:8 59:11
 106:3 107:21,24
 109:20,24 224:21
**happening** 98:21
**harm** 155:25
**head** 69:11 88:19 97:6
 112:23 116:24 132:6
 138:23 150:11 237:22
**headers** 234:12,14
**health** 16:19
**hear** 114:2
**heard** 53:25 66:2
 79:20 130:18 224:13
**held** 147:2,7
**helped** 153:7,11
 155:6,10 156:2
**helpful** 239:11
**Hey** 39:1
**high** 38:24 179:17
 240:2
**high-end** 74:3,20
**higher** 36:6 38:24
 41:6 45:9 68:24,25
 84:4 87:16 95:12
 98:3 105:16 106:8,18
 107:14,15 108:10
 111:14 161:12 163:8,
 12 166:18 168:19
 183:10,12 184:8
 246:22
**higher-placed** 180:13
**highest** 184:4 242:15
**highlight** 207:11
 210:21 216:21
**highlights** 235:18
**historical** 43:19 44:8
 121:22 179:13
**history** 136:16
**hit** 16:14 25:1 77:19,
 24 91:7 131:13
**hits** 25:4
**Hogan/gawker** 17:18
**hold** 13:5 80:13
 145:19
**Holding** 93:4,14 96:2
 164:11
**hole** 153:12
**hone** 231:4

**hoops** 146:16
**host** 13:9 46:6
**hosting** 13:4 27:22
 34:22 50:15 56:7
**hot** 172:25
**hotel** 52:2
**hour** 244:1,4,6,12
**hours** 24:20
**house** 142:3,23,25
**Hulk** 17:17
**hundred** 105:23
**hundreds** 207:25
**hurdle** 136:8
**hurdles** 21:12 143:15
**hypothetical** 58:19,21
 72:5 155:23,25 247:4
**hypothetically** 72:7
 136:9 171:11 174:8
 183:7

---

**I**

**IBM** 161:4 162:3
 165:20
**idea** 38:16 81:12,14
 113:13 123:9,11
 124:21 137:1 143:16
 147:17 152:13 175:13
 197:1 210:16 224:23
**identification** 37:21
 62:12 93:5,17 96:6
 104:14 137:25 164:15
 170:6 203:19 217:20
 219:13 230:8 237:1
**identified** 7:22 15:15
 31:10 74:24 79:2
 161:2 166:5,7 167:14
 168:18 204:1 243:1
**identifies** 164:24
**identify** 15:13 19:25
 20:16 82:19 221:14
 233:23
**identifying** 83:2
 241:1
**image** 176:8
**imagine** 225:16
**immediately** 21:3
 61:25 186:21
**impact** 19:18 34:6,9
 41:1 44:23 45:7
 46:20 95:14 118:7

 128:17,21 136:25
 154:15 155:22
**impacted** 18:20
**implied** 147:5,8
**important** 95:11
**imposed** 139:20
**impossible** 25:18
**improve** 153:9
**improving** 98:17
**in-depth** 135:21
**inappropriate** 199:4,
 10
**include** 11:1 63:1,24
**included** 55:8 117:2
 207:18 212:1 214:4,5
 216:23 219:25
 220:12,14,24 222:10,
 23
**includes** 218:15 219:2
 221:8
**including** 15:18 200:8
 201:25 207:12 210:22
**income** 68:10,11 71:20
 95:9 102:24,25 153:4
 163:11,12 187:14,22,
 23 188:5
**incorporate** 168:16,21
**increase** 92:22 100:9
 102:5,15 109:21
 148:21 149:2 169:8
**increased** 102:22
 103:12 104:1 131:6
 134:2 135:19 138:8
 139:9 141:3 143:15
 163:25
**increasing** 103:18,21
**incur** 56:9 125:16
 126:19
**incurred** 125:25 126:9
**independent** 83:18
**independently** 24:3
**indication** 36:13,17
 39:1 40:13 42:21
 43:9 44:17 50:14
 53:12 82:11 151:17,
 20,21 178:8,10
 217:1,5 223:13 240:7
 248:4,5
**indications** 34:21
**indicator** 36:10

**indirectly** 178:5
**individual** 149:12
**industry** 87:11,23
  88:1,10,12,14,16,24
  89:9 91:18 92:2
  158:25
**infect** 51:18
**information** 18:1 19:6
  23:25 24:7 28:22
  46:23 53:19 54:2,4,
  6,8 55:10 60:11
  64:17 75:3,10,24
  77:3,13 81:1 86:5
  87:25 91:13 101:1,
  13,14 103:23 108:3,
  16 111:3 114:8 115:8
  124:3 129:5 130:25
  134:19 135:21 136:2,
  3,5,22 138:8 139:1
  140:16,23 141:24
  142:8,18,20 145:11,
  21,25 146:21,23
  147:4,14,21 148:10
  156:21 162:2,7
  165:19,21,23 166:12,
  14 168:12 175:9
  193:18,22 194:2,4,
  15,16,22 195:16,19,
  23 196:5 197:7,13,
  15,22 198:3,11,16,
  20,22 199:1,21
  202:12,15,16,19
  203:7 218:17 219:4
  220:15 222:15 226:4
  236:4,14,20 240:11
  243:8
**inherently** 11:25
**input** 181:11
**inputs** 182:17
**inspection** 129:7
**instructions** 243:18
**intangible** 13:25
  14:3,7,11,13,15,16,
  25 15:2,13 17:7
**intangibles** 14:5
**integrated** 13:6
**intellectual** 9:6,12,
  21,23 10:1 11:17,20
  12:5,8,13,15,22
  13:20,24 14:2,14,18,
  20 15:4,8 155:16

**intelligence** 81:22
  217:17
**intend** 60:3,8 63:22
**intending** 63:18 64:13
**intent** 243:16
**intention** 73:15
**Inter** 218:7
**interest** 67:20
**interfere** 81:24
**interfered** 81:10
  204:24
**interference** 113:3,6
  204:16,19 205:6
**interim** 59:12
**internal** 19:10 130:15
**interview** 193:10
  196:20
**introduce** 7:6
**invasion** 17:20
**investigate** 175:15
**investigative** 53:20
**investments** 95:4
**invoices** 110:25
**involve** 11:17,20
  13:19
**involved** 9:23 12:5
  27:8 112:16 113:3,5
  123:1 124:2,19
**involving** 159:4
**IP** 9:8,13,25 10:5
  11:21,23,25 12:5
  17:5 35:12 130:15
**IQ** 75:14
**irrelevant** 109:23
**irrespective** 225:5,8
  226:12
**isolates** 95:4
**issue** 16:13 27:12,18
  32:10,21 33:2,3
  34:15,18 35:3 54:13
  121:17 128:3,5
  140:1,21 200:6,16
  242:23
**issued** 28:5
**issues** 21:7,9,14
  22:15,19 23:20 24:10
  25:23 27:24 33:1
  92:18 128:11 140:17
  169:22 200:8
**italics** 71:16

**items** 19:11

---

### J

**January** 42:2 59:8,16
  60:1,19 76:2 78:6,7,
  15 105:13 138:25
  143:7 144:1,7 145:3
  153:21 171:5,12,19
  176:14,21 188:19
  190:3 247:12
**Jeff** 7:2 170:3
**JEFFREY** 7:20
**John** 205:5 216:12
**joint** 9:14 17:9
**jokes** 183:18
**Jolla** 18:8,10,12 24:2
  27:3
**journalist** 53:20
**judgment** 80:3 131:18
  201:10 216:1
**Judy** 6:20
**July** 222:9,14 223:6
  224:9,22
**jump** 40:10 44:5
  106:12 107:9 110:6
  146:16
**jumped** 37:12 39:18
  40:2,18 44:2,3
  106:22 107:13 113:7
**June** 29:23 30:17
  31:25 60:23 105:16,
  19,20,24

---

### K

**key** 237:20
**keywords** 240:13
  241:7,10 242:13
**kind** 16:17 87:18
  107:20 141:21
  173:12,13 175:6
**kinds** 144:9
**knew** 53:14 223:20
**know-how** 9:10
**know-your-client**
  131:6
**knowing** 10:4 126:6
  199:5
**KPMG** 19:8 74:25 75:1
  79:2 90:4,5 157:2,7,

22,24 160:2 162:13,
14,19,21 166:7,19,22
168:18 187:15
**Krebs** 53:24,25 54:2
**Kumar** 18:5
**KYC** 130:16

---

**L**

**La** 18:8,10,12 24:2
27:3
**lack** 19:22 161:13
**lag** 153:25
**landscape** 158:8
**laptop** 230:25 233:15
**large** 93:9
**largest** 185:11
**lasted** 21:14 23:18
**late** 98:21 166:5
**latest** 66:14 95:17
96:12
**lawn** 174:13
**lawsuit** 150:8,15,20
151:1,14 152:1,6,18
153:1,3,6,11,19
154:4,15,22 155:2,6,
21,24 156:2 224:3
**lawyer** 215:4
**layperson's** 58:15
188:7
**lead** 215:15
**leads** 103:24 133:20
158:20,21
**leak** 218:9
**learn** 19:6 113:19
**learned** 127:17 128:2
222:15,17
**learning** 18:1
**lease** 13:9 29:10,17
45:18 47:16 55:17
56:9,24 100:17
**leased** 30:17 48:5
**leases** 44:19,25 45:6,
21 46:3
**Leaseweb.com** 165:1
**leasing** 13:18 100:20
102:20 159:13
**leaving** 135:23
**lecture** 14:1

**led** 18:1
**ledgers** 111:1 129:7
**left** 123:4 126:10
**legal** 6:21 159:9
210:15
**legally** 14:22
**lenders** 21:8,9,24
22:10,13,24
**length** 175:12
**level** 107:14,15
111:8,13 178:23,24
179:12,17 188:1
226:8 246:7
**levels** 108:10 110:8
**Lewis** 216:12
**Lewis'** 205:5 207:11
210:21 216:21
**license** 7:23
**licensing** 9:16,17
**limit** 64:5 121:21
246:20
**limited** 63:1,25 96:2
144:21
**linear** 40:1 44:13
**lined** 56:24 57:1,8
92:10,11
**link** 11:8 181:20
182:5,7,11 183:5
191:6 192:8 207:2
229:25 238:10,24,25
239:3
**linked** 208:22
**links** 180:13,16
205:10,13,16
**list** 9:11 157:25
183:22 237:21
**listed** 55:9 157:15
241:15
**lists** 14:23
**live** 18:12
**loan** 136:15 142:21
**loans** 18:21 19:11
21:10,12 56:24
**located** 6:25
**locked** 46:16
**logic** 116:19 119:20
120:6 151:5
**London** 65:25
**long** 21:13,14 23:18
24:19 28:17 44:19

82:18 83:1 137:1
147:15 175:10
**longer** 142:2
**looked** 66:7,9,20,23
69:23 70:1 75:2
83:24 85:6,10 89:2,5
90:5 149:19,22
150:12,14 158:14,17
165:25 175:20 176:10
177:12,15 178:1,9,11
191:11,13 192:13
225:17 232:11 244:17
**lose** 114:24 117:8
214:16
**losing** 45:8 46:20
116:10 118:7
**loss** 27:16 28:8 29:24
40:7 49:9 118:18
123:22 125:1,14,20
127:5 131:11 136:5
143:9 150:20 151:14
169:9 185:5
**losses** 78:16 123:20
133:16,23 153:7,8
156:3
**lost** 19:21 20:2,20
29:3,9 30:7 33:6
35:8,17 36:11 38:17
41:4,10 57:24 58:23
61:3 63:1,4 64:5,15
65:16 66:12 131:7
168:11 169:11 212:1
213:18 214:6 215:6,9
**lot** 81:25 86:10,18
115:9 122:20 136:3
184:2 234:11 242:16
**low** 165:11
**low-end** 74:10,19
**lower** 12:10 95:10
105:12,19,22 106:7
168:19 183:19
**lowest** 165:12
**lunch** 127:11
**luncheon** 129:16

---

**M**

**machine** 230:23
**made** 50:23 52:5 61:16
65:4,9,14 66:10,16
69:13 76:4,18 78:17,
22 79:6,14 82:3,8

83:20 84:10,22 87:5
90:4,15,21,24 96:19
99:5 113:2 130:8
131:21 148:5 152:23
154:18 176:21,22
195:5 198:2,4,13
202:13 211:4,5
235:18
**main** 229:22,25
**major** 133:22 158:7
**majority** 12:4,7,20,21
13:15 14:12
**make** 11:7 39:10 55:15
56:15 68:12 69:4
70:17 77:7 80:3
81:21 82:13 86:24
112:15 131:18 137:8
139:8 147:25 149:8
152:25 154:3 167:17
171:1 173:9 174:5
181:12 188:17 189:7
201:1,3,9 202:3,5,9
225:19,25 227:9
228:24 233:9 235:14
246:21 248:2,12
**makes** 49:7,8,13,21
172:24 177:22
**making** 64:2 80:7 87:7
152:24 166:25 167:2
196:11 216:1 222:21
223:15
**managing** 244:22,23
**March** 44:2
**margin** 68:16,25 69:19
70:13,14 74:7,11,15
100:18,19 102:15
103:21 148:22
161:15,21 163:17
165:6 167:16
**margins** 102:12
**mark** 37:18 62:10
93:12,20 95:25
104:10 169:25 230:5
**marked** 37:20 62:11
93:4,17 96:5 104:13
137:24 164:14 170:5
203:18 217:19 219:12
230:7 236:25
**market** 58:22 64:25
65:5,6 161:13 163:21
164:2 171:15,18
182:19 187:11 239:10

242:12,18
**marketability** 160:10
161:14
**marketing** 179:7
226:23 227:19
**markets** 163:22
**Massachusetts** 7:1
**massive** 185:6
**math** 55:9
**matter** 7:3 29:2
109:22 151:12 154:4
226:15 228:16
247:20,23
**matters** 53:21
**meaning** 80:25 125:4
160:12 189:6
**means** 58:1,2,14 64:1
103:10 167:11
171:10,14 189:24
**meant** 62:19 131:7
212:16,18 213:2
**measure** 61:1,6,17
63:3,8 68:16 95:3
177:12,13,15 187:18
188:12,13,14,21
194:5 208:18,24
209:14 215:3 223:10
226:5 227:11 228:8
246:16 247:1
**measured** 216:7 224:25
225:4 242:3
**measurement** 226:6
**measures** 71:23
**measuring** 64:15
208:15 226:22 227:3
241:22
**media** 196:20 204:17
**meet** 143:15
**meeting** 24:17,19 27:2
112:14
**mention** 93:19
**mentioned** 49:24
199:15 208:21 225:6,
7
**mentions** 223:3
**mesothelioma** 242:14,
19
**messages** 218:9,23
**met** 24:1 113:24 147:6
**Methbot** 27:9,22 28:23
31:3,15,16 32:10

33:1 34:15,17,22
35:4,9,18 38:7
47:11,22 48:5,18
49:9 50:9,19 52:15
53:4 54:3,13 76:9,23
77:10 95:15 102:1
113:17 114:1,12
117:2,5,8,21 120:11,
16,20,23 121:7
122:1,4,13,18 123:1,
5,22 124:9,11,14
125:2,15 126:21
127:17 128:3,10,18,
24 130:10 131:12
169:10,11
**Methbot's** 116:3
**methodology** 67:13
69:4 227:17
**Michael** 112:5,8,13
113:1
**micropenis** 184:2
**Microsoft** 163:24
**middle** 39:16 108:21
216:20
**mille** 189:2,4,5,6
**million** 66:13,17
71:2,16 72:7,8 77:4,
9 78:11 94:6,16,19
96:23 99:25 100:5
102:2,5 103:5,7
105:14 106:12,22
107:13 108:20
110:15,23 111:12
117:21 118:8,19
119:24 120:12 122:10
168:24 169:9,13,16,
18 171:20 178:16,20
179:8,18 180:6
184:15,17,18 185:24
186:2,3,15,18,22,25
190:17 191:25 193:2,
3,16,19 194:24 195:9
197:7 198:18,23
199:14,20 200:5,13
201:7,21,24 202:3,
10,22 203:4 209:25
210:8 216:18 225:10
226:20,24 227:4
228:9,11,16,20,21
229:3,8,9 235:11,12,
19,21,22 236:15
240:13,15,18,19,23
241:2,6 245:16,20,22

246:3 247:2
**million-dollar** 242:17
**millions** 212:3 214:7
**mind** 217:13
**minds** 201:7,21 202:3
**minimus** 12:24
**minute** 190:21
**mishear** 26:16
**Mishra** 19:24,25 22:22
23:9,14 24:12 25:25
26:5 27:4 28:1,7,16
29:7,22 30:14 31:2,
19 48:16 49:17 52:25
54:21 82:21 83:4
104:8,11 105:1
113:24 134:8 135:7
161:2
**Mishra's** 21:20 23:24
48:13 115:1 128:1
159:14,22
**missed** 91:3
**mistaken** 196:12
**mitigate** 153:7 155:10
156:2
**mobile** 235:6
**model** 100:16 101:4,10
102:16 103:16 121:2
148:24
**moment** 63:12 137:13
174:7
**monetization** 9:7
**monetize** 185:13,20,24
**monetized** 173:20
**money** 55:15 56:18
135:22 147:2,7
172:24 173:9 176:21,
22 177:22 182:16
186:20 242:16
**month** 21:25 36:12
38:24 39:7 41:2,12
42:14 43:2,4 44:15
46:7,21 107:13
109:3,7,12,21
110:16,24 114:24
122:17 141:17
**monthly** 44:18 105:7
111:5 185:1 242:22
**months** 28:14 29:8,14,
16 30:2,6 31:15
33:19,23 34:3,6,8,25
35:19,22 36:8,14,15,

16,22,25 37:5 38:11
39:13,16 40:14 41:5,
13,16,21 42:4,14
43:4 45:10 46:22
47:14 48:19 49:1,4,
18 52:13 105:9
107:25 108:7,12
109:2 110:6 114:25
115:13,14,25 117:11,
16,22 125:5 126:16
141:6
**morning** 6:18 8:16,17
**mortgage** 141:22
142:14
**mothers** 174:13
**motions** 6:14 8:10
**Motors** 183:1
**move** 92:12 143:4
172:3
**moved** 106:15 142:23
**moving** 100:15,23
115:9
**multiple** 74:21,23
134:4,11 161:10
162:14,16 163:13,18
164:6 165:7,9
166:18,25 167:5,6,9
168:2,7,9
**multiples** 75:4,11,17,
23,24 158:18 160:18
162:7 164:1,2,3
165:16 168:14,17
**multiplied** 74:20

---

## N

**names** 221:4 222:22
223:18,21 224:13
**Nathan** 7:8 61:22
127:10 137:7
**National** 218:10
**native** 189:16,18,24
190:3
**natural** 108:24
**nature** 84:7
**necessarily** 86:11
109:11 121:20 122:2
185:17 192:18 233:11
239:2 246:8,9
**needed** 135:21 191:6
209:24

**negative** 136:25
**net** 94:13,15,19 95:9
**networks** 130:16
**news** 203:18 207:3
209:7,9,19 219:12
**nodding** 69:11 97:6
116:24 237:22
**nonad** 182:12
**nonbuzzfeed** 239:7
**nondossier-related**
236:10
**noneconomic** 11:2
**nonissue** 34:23,24
53:17 114:12,16
**nonlitigation** 17:8
**nonorganic** 228:14
**Notary** 6:7 7:24
**note** 205:16
**notion** 210:20
**November** 32:7,17
36:3,5 37:13 38:15,
25 39:18 40:3,18
41:25 44:4 45:5
69:13 76:14,22 82:3,
9 83:20 90:2 91:12
98:9 99:5,9 116:22
122:9,12 164:12,23
167:15
**November-december**
44:5
**number** 7:5 11:12
12:17 33:12 39:2
43:3 57:18 60:23
71:12,17,24 72:19
73:2 76:5,6,18,21,24
88:18 157:3,6,12
164:9,21 166:15
178:14,19 192:3
194:17 196:14 197:5,
15 203:17 234:1,19
235:20 236:3,6,12
237:20 240:21,25
245:14 246:21
**numbered** 31:9 96:16
218:4
**numbers** 40:23 69:9,24
70:2 71:3,8 73:5,9,
15 89:1,2 96:4 105:2
120:2 137:23 153:16
164:13 170:4 196:13
217:18 233:24 235:19

numerous 136:22

## O

oath 7:25
Object 186:23
objection 18:16 22:1
26:2,7,20 44:6
45:11,19,23 46:4
49:11 50:3,11 61:10
65:19 78:19 80:14,23
81:11,18 83:8 86:1,
9,16 90:16 91:1
97:21 98:1 102:13
107:22 109:25 111:17
112:19 113:11,12
114:5 115:5 116:14
119:1,17 121:11
122:21 123:7,24
124:16 130:24 136:6
138:10 141:25 142:5,
10 143:2 152:3 154:7
155:8 174:2,15 175:2
176:2,16 179:22
181:3 183:15,21
187:2 191:1,7 192:17
194:7,19 196:16
199:18 201:2 204:21
205:1 208:5 209:12,
23 210:9,14 211:1
212:12 227:23 228:1
229:14 231:21
objectionable 26:9
objections 6:12 8:7
obligated 148:3
obliged 148:3
obtaining 23:15
occurred 28:23 107:9
140:1,25 147:18
221:8
October 44:3,9
offer 60:3,8 64:14
154:13
offered 10:14 15:22
16:7 172:21
offering 10:23 13:18
15:17
offset 125:21
one-page 37:20 230:7
ongoing 145:8
online 32:12 53:25
205:18 211:23 213:9

operating 68:2,9,11
71:15,23 77:24
100:19
operations 112:17
121:23
opine 155:17 201:23
opined 81:23 157:9
159:15
opinion 59:25 80:10
81:4,6,16 82:1
151:7,10 154:10,13,
24 155:18 156:1,16
172:20 202:23 205:5
210:13 211:21 212:9
213:7
opportunities 83:3
185:21 187:5
opposed 100:17 102:20
163:14 184:9 185:18
188:14 239:25
opposite 50:21
OPS 124:8,14,18
Oracle 163:24
order 13:9 45:16
55:25 56:9 67:22
70:17 90:1 91:11
103:3 108:3 117:9
125:1 180:11 190:23
191:5
organic 61:19 182:12
236:24 237:9
organization 209:10,
20
original 154:14 190:9
192:9 205:17 208:19
219:19 222:2 223:12
225:2 234:19 235:25
outperformed 84:25
85:14 87:1 90:23
overarching 14:17
overperformed 106:5
OVH.COM 165:1
owned 103:17
owning 100:16 102:17
159:12
owns 15:5

## P

P-A 137:23,24

P-D 217:19
P-G 96:4,5 164:13,14
P-S 170:4,5
p.m. 129:17 137:16,17
172:5,6,7 206:20,21
230:13,14 245:5,6
249:7
pages 199:16 200:2
201:10,25 219:22
220:23 228:25 229:1
231:24 232:14 233:1,
8,10 248:16
paid 115:15 117:21
118:19 182:15 186:10
244:1,4,6,12 246:8
paper 230:23
paragraph 84:17
132:12 148:20 211:19
parentheses 182:3
paribus 69:2
Park 6:25
parse 17:5
part 24:13 57:22
67:14 140:13 172:12
180:23 212:9 214:22
233:4 244:7
parties 8:5
past 18:21,25 19:5
84:24 85:15,17 86:25
90:20,22 117:14
136:16 157:23
patents 9:9
pause 38:12 86:6,12
94:3 144:18 169:3
204:6
pay 57:17 59:9,10
182:23 183:10 237:25
239:5,14 242:18
246:2
paying 41:25 47:12
181:8 183:8,12
246:14
payments 112:15 113:2
payouts 242:17
PE 164:2
people 13:9,19 20:6
25:21 112:16 113:2
150:14 184:25 190:17
191:18,22,25 193:4,
13,16,19 194:5,8,17
195:7,9,17 196:5,14

197:2,7,16 198:19,24
199:14,20 200:5,13
201:7,21,24 202:10
203:4 216:18 225:10,
17 226:20,24 227:21
228:17,20,23 235:13
236:15 238:1 244:3
245:15,25
**people's** 202:3
**percent** 44:14 69:21
72:9 74:15 87:13,16,
17,21,22 88:13
89:10,13,20,22
100:10,11 102:7,9
103:2 108:5 109:6,
12,14,18,21 115:21,
22,23,25 116:8,12,
22,25 117:1,5,6,7
118:4,22,25 119:12,
16,21,23 120:5
122:4,16 124:19
148:22 160:11,17
162:24 163:23 167:4,
9,17 168:1 245:19
**percentage** 12:19
66:17,18 68:21,23
71:20 72:9,11
**percentages** 71:22
**perform** 146:22,23
148:3
**performance** 84:24
97:25
**performed** 88:9
**performing** 73:21
**period** 47:18 87:13,14
89:12,19 119:4 120:1
140:24 162:11 164:4
187:25 188:1
**periodic** 145:14
146:1,22,24 147:22
148:4,7,11
**periodically** 145:10
**permanent** 143:8
**perpetuance** 201:18
**perpetuate** 111:24
204:13
**perpetuates** 204:11
209:5,8
**perpetuation** 50:20,22
**perpetuity** 78:18
**person** 174:8 216:18
222:17 223:5,16

224:4,5,9 225:14,21,
23 228:25 232:11
238:15
**personal** 10:23 11:3
132:16,21 151:6,10
**personally** 11:10,13
64:8
**perspective** 32:5
94:24 95:12 228:14
**pertain** 80:5 112:2
**phenomenal** 102:11
**phone** 54:25 181:18
**physical** 12:24 13:19
14:6,8 148:25
**physically** 100:17
**pick** 35:22 53:13
60:18
**picked** 192:24
**pickup** 114:20
**picture** 216:22 228:5
**pictures** 208:2
**pie** 17:12
**pieces** 115:9
**place** 18:7 54:17
120:25 136:9
**places** 119:5,25
**plain** 213:4
**plaintiff** 63:13
139:17,21
**plaintiffs** 7:13,15
10:6,18 18:4 51:22,
24 52:23 55:3 79:8,
18 80:1,5 111:21
112:2 113:5 139:16
202:1 210:6,24
221:4,14 223:21
224:3,16,18,24 225:6
244:18
**plaintiffs'** 223:18
**plan** 108:13 109:8,11,
14,17,20 110:10
164:12,24
**planned** 148:23
**planning** 243:6
**plans** 85:1,15 87:2
90:24 243:9
**plates** 172:25
**platform** 13:6 218:11
**playing** 95:8
**Plaza** 7:1

**point** 23:6 31:22
41:15 42:3,6 46:10,
17 59:14,22 62:7
63:20 67:2 78:21
95:16 96:22 103:3
104:6 125:14 129:12
141:4,6 160:8 177:8
**pointing** 205:23
**points** 69:25
**police** 207:12 210:22
**policy** 130:14
**pop** 175:8 183:1,13,19
**pops** 174:12,25 181:2
**porn** 51:17 111:24
**portion** 12:25 195:17
197:2
**portions** 52:1 112:4
**position** 245:14
**positions** 236:24
237:9
**possibility** 123:16
**post** 199:4,11
**posted** 191:21 193:12
199:13 238:11
**posting** 172:17 199:2
201:15 202:6 233:7
241:23
**postings** 208:2
**postreport** 244:9
**potential** 25:14 33:3
135:20 154:16 236:7
**potentially** 35:17
45:24 64:3
**power** 103:19 183:3
**PR** 53:6,16 114:18
**practice** 43:8,10
185:9
**preceding** 41:12
**predicting** 98:18
**predominantly** 11:23
90:6
**prefer** 43:18
**preference** 181:9,10
**premise** 227:17 246:15
**premises** 15:21
**preparation** 244:8,9
**prepared** 53:9 164:12
**preparing** 129:4
**present** 19:11 188:4

presented  63:9 235:19
preserved  8:9,11
press  148:2
pretty  87:12 244:8
previous  88:9,16
previously  146:8
  224:4
price  47:9,11 59:9,10
  171:12,18 182:20
  183:10,13,19
prices  91:17 242:20
pricing  238:17
primarily  13:19 159:1
primary  13:8,13 55:24
  56:3
printing  93:9
prior  35:19,22 36:8
  84:23 88:24 98:14
  144:3 162:4
privacy  17:20
private  160:13 161:12
  165:21 166:11
problems  23:9,15,18
  24:8
procedures  130:9,21
proceed  219:23
process  82:18 83:2
  121:15 136:19,20,23
  139:11
produce  45:4 82:15
produced  43:3 92:17
  233:24
product  140:5
production  7:22 96:4
  137:23 164:13 170:4
  217:18
products  173:2,3,17
professional  132:16
profit  71:15,23
  94:13,15,19,22
  103:12 104:2 177:7
profitability  149:3
profits  188:8,9,14
programatic  174:1
progression  108:25
project  35:25
projected  31:3 35:1
  69:18 74:1,6 84:4
  94:6,23 96:22 97:4,
  10,13 100:4 102:8

105:5 125:7 148:21
  187:24
projecting  36:13 86:7
  87:20 92:23 103:11
projection  69:12
  76:12,22 77:8 82:22
  85:7 87:5 89:9
  94:13,15 95:16 98:10
  99:1,5,17 101:24,25
  105:20 106:1,4 116:4
  117:25 118:2,16
projections  27:14,15
  32:6,14,17 35:11,20
  36:3 69:20 76:10,11
  77:24 82:3,8,16
  83:20,24 84:5,6,10,
  11,22,25 85:14 87:1,
  8,23 88:1 89:4,6
  90:9,11,23 91:4,8
  95:18,22 96:19 97:19
  98:3,8,11,15,16,22
  101:10 105:10
  115:18,20 120:4
  121:23 125:4 127:20
  128:7,13,22 131:13
  136:18 161:6
projects  102:21
pronounce  67:18
proof  79:22
properties  14:2,18,20
property  9:6,12,21,23
  10:1 11:18,20 12:5,
  8,13,16,22 13:20,24
  14:15 15:5,8 155:16
proportion  73:1
  125:8,11
proportional  125:22
  127:4
proportionately
  56:12,14
proprietary  9:10
protected  13:25 14:3,
  22
provide  20:6 21:10
  22:22 23:2 24:7
  25:11 42:12 53:19
  55:18 56:10,19 86:5
  101:13 139:5 140:6
  142:7 145:10 146:21
  147:14 155:17 185:22
  193:24 195:24 202:17
  211:21 213:7

provided  24:6 54:1,4
  55:10 71:4 73:18
  75:11 77:13 81:2
  95:23 101:11 114:7
  124:1 129:6 139:1,5
  140:22 194:2,17
  195:20 196:4,13
  197:7,12 198:10
  199:21 202:12,15,16,
  19,20 220:16 226:4
providing  63:3 132:20
public  6:7 7:24
  155:12 160:14 162:1,
  4 198:12 199:11
publication  19:19
  20:3,21 21:2 25:16
  28:22 77:18 78:13
  131:14,19 132:15
  133:23 134:3 149:14
  153:12 154:14 171:17
  211:22 213:8 214:15
  222:3 224:2
publicity  9:8 150:8,
  19 151:13 153:2
  217:6
publish  205:5
published  150:16
  153:20 176:1 191:14
  207:3,23 208:4,8
  216:5 231:9 243:4
publishing  155:20
  204:2,10 208:20
  210:20,25 218:16
  219:3,6 225:2
pull  205:24
pulled  243:2
purchased  161:4,20
  162:15 180:11
purchaser  239:12
purchasing  103:19
purport  124:18
purpose  159:23 172:20
  199:2
purposes  9:13 19:10
  28:9 29:2 51:9 63:16
  72:5 76:3 95:10
  96:19 98:8 157:7,20
  159:10 170:1 187:20
push  228:21
pushing  228:14
put  63:21 121:4 135:2
  136:8 171:18 223:9

238:1,2
**puts** 183:11

---

## Q

**qualifications** 131:17
**qualified** 16:21,25
17:13,22
**question** 6:13 8:9
21:19 25:17 29:21
30:11 33:11 35:10
39:11 40:16,20 43:14
46:18 47:3 48:17
58:8 59:2 60:16
63:23 80:17 109:10
127:25 134:21 142:11
151:10 154:22 155:3
166:9 180:22 184:12
200:12,17,18,22
201:19 203:24 204:4
215:6,16 218:19
223:23 227:18 234:18
235:10,17 242:1
245:21
**questions** 63:16
127:14 136:22 141:10
144:9 234:1 248:23
**quickly** 139:5 140:9
141:16
**quote** 132:15 146:1
147:21 148:11

---

## R

**Rackspace** 165:8,9
166:16 167:4,9,17
**Rackspace.com** 165:1
**Raj** 18:5
**Raj's** 113:21
**range** 66:12 160:10
244:19
**ranges** 184:1
**rapidly** 92:3
**rate** 83:6 87:19 88:13
92:1 126:5
**rates** 9:16 244:19
**read** 6:5 10:12 21:20
47:24 48:13 83:16
112:4,6,7 145:22
159:14 190:12,23
191:5,16,17,22

192:1,12,22 193:5,
17,19 195:12,17
196:6 197:2,8,16
199:9,16,21,24
200:1,3,5,7,10,15,20
201:10,24 202:11
203:4 207:10 208:10
209:3,5 213:3,22,24,
25 216:20 218:21
219:4,21,23 220:10,
19,20 221:13 222:16
223:7,19 224:10
225:10,14,21,23
227:6 231:17,18
232:14 233:3
**reader** 207:14,18
219:21 220:9,12,19,
23 224:22
**readers** 207:21,25
236:16
**readily** 166:13
**reading** 22:2,5,7,9
41:1 128:1 170:15
212:21,22 214:10
224:12 240:10
**reads** 212:13 218:13
224:22
**ready** 127:11
**real** 159:1
**realize** 186:20
**realized** 94:9
**realizing** 108:11
126:22
**reason** 21:6 50:8
106:25 107:21 110:14
111:11 113:7 120:19
124:3 131:12,22
133:9,11 191:18
193:11 199:13
**reasonable** 35:25
36:13,16 43:19 84:8
87:24 100:14 103:15,
25 159:20 168:16
225:22
**reasons** 48:11 49:22
248:6
**reassess** 197:13
**recalculating** 128:7
**recall** 22:2,5,7,9,16
23:6 27:11 84:12
85:9 90:12,13 104:7
152:4 176:3,5,7,9,11

**receipt** 6:8
**receive** 138:19 173:23
197:24
**received** 10:21 98:4
146:4,5,13 172:17
196:19 197:23 201:14
202:6 208:25 209:15
210:1,25 212:4 214:8
217:6 218:16 219:3
223:14 229:4 233:1,7
247:2
**recent** 35:23 36:9
75:19 77:3,12 218:9
**recently** 218:22
**recess** 67:6,7 129:16
137:16,17 172:6,7
206:20,21 230:13,14
245:5,6
**Recode** 222:24 223:7
**recognized** 102:23
**record** 6:18 7:7 8:4
26:24 35:6 67:5,10
86:7,22 87:7 98:7
99:6,14 129:15 130:5
137:13,15,19 170:1,
11 172:5,9 187:21
206:2,9,19 230:12,16
232:20 245:1,4,8
249:6
**records** 129:8
**recover** 154:1,2 155:2
**recovered** 154:2
**redacted** 221:4,24
223:1,2,19,22
**reduce** 125:10
**reduced** 125:7
**reduction** 125:8,22
127:3,7,8
**reference** 208:21
221:22
**referenced** 222:24
**referencing** 209:1
**referring** 51:11
215:18
**refill** 119:5
**refilled** 120:3
**reflect** 160:11 186:6
**reflection** 239:24
242:5
**reflects** 186:7

**refusing** 51:16
**regained** 141:8
**regard** 24:4
**regime** 218:8,22
**regular** 236:16
**REIT** 159:2,3,7
**reiterate** 149:10
**REITS** 159:4
**relate** 9:20 19:20
  51:21,23 79:18
**related** 34:14,15
  151:21 152:18,20
  202:1 248:23
**relates** 144:16 201:9
**relation** 69:1 71:20,
  21
**relational** 71:22
**relations** 155:13
**relationship** 27:21
  44:14 72:17,21,22
  73:1 136:11 141:8
  145:2,5,9
**relationships** 13:22,
  23 14:24 92:14
  141:17 143:23
**relative** 152:15 163:7
**release** 30:22 31:4,
  14,20 47:9,10,18
  50:5,9 52:14 53:10,
  16 56:17 57:2 119:5
  126:16 132:2 144:3
  151:1
**released** 21:4 34:11,
  16 46:11 47:20 48:6,
  12,19 49:23
**releasing** 45:3 47:5,6
**relevance** 210:12
  241:20
**relevant** 40:6 44:1,5,
  23 46:19 98:21 109:5
  140:16 150:19 163:17
  188:12
**reliability** 84:18
  91:12
**relied** 24:11,13
**relies** 67:14
**rely** 98:9
**remember** 23:19 48:21
  101:5 112:9,10 135:9
  140:14

**removed** 36:2
**removing** 115:17
**replace** 125:18
**replacement** 122:1
**replicated** 227:15
**report** 10:13 18:2
  28:5 29:4 38:2,3
  54:19 55:8 57:23
  62:9,11 63:6,21 69:8
  70:5,22 71:5 75:20,
  25 76:5 77:17 84:15
  88:2 93:14 96:12
  97:1 99:22 101:11,14
  113:15,16,25 114:14
  115:8 124:24 129:4
  132:9 133:24 134:15
  137:5 138:5 148:17
  157:19 167:15,23
  170:2,3,12,18 172:12
  201:16 211:6,9,12
  212:21,23 215:19,21
  217:17 219:10 232:22
  233:18,23 237:8
  243:7 244:14,15
**reported** 27:20 95:9
**reporter** 6:20 7:17
  164:10 203:16 217:23
**reporting** 34:21 53:12
  114:20 209:21 216:5
**reports** 50:15 53:20
  75:4,13 234:20
**represent** 152:9 186:3
  196:14 218:2 235:5
**representation** 205:22
  241:12
**representative** 167:6
**republishing** 156:10
**reputable** 157:23
**reputation** 132:16,21
**reputations** 133:17
**request** 146:1 147:3,
  21 148:11 198:2
**requested** 193:23
**requests** 147:6 198:4
**required** 41:24
**research** 83:19 87:10
  89:5 236:24
**reserve** 243:21
**reserved** 6:14
**resolved** 22:20

**respect** 47:5,6 52:2
  64:11 90:22
**respond** 54:13
**response** 25:18
**rest** 38:23 91:18
  106:17 107:15 111:14
**result** 20:2,20 25:7,
  16,19 35:8 58:5
  123:4,21 126:9 130:9
  131:8 132:14 142:3
  143:20 147:3 149:14
**resulting** 153:3
**results** 240:6
**resumed** 141:18
**retained** 59:19 60:21,
  22
**retracted** 223:2
**revenue** 20:6,17,18,19
  21:1 24:25 27:14
  28:9 29:24 33:6
  35:1,7,17 36:1,11,
  21,24 37:4 38:7,22
  39:4,6 40:7,17
  41:12,14,20,24 42:4,
  12 43:1 45:5,8,17
  46:21 55:21,22 56:1
  57:5 58:4 67:23
  68:7,21 69:14 70:2
  71:2 72:8,11,17,21
  76:6,9 77:14,15
  78:12 82:4 84:3 94:7
  96:23 97:1,10 102:1,
  22 103:5,12,19 104:1
  106:13,21 107:9,13
  108:11 109:7 110:23
  111:5,11 113:7,10
  115:20 116:5,11
  117:16,17 118:3,23
  119:10,12,14,22
  120:17 122:10,17
  125:4,5,9,20 126:5,
  11,23 127:4,7 131:20
  132:4 136:5 143:9
  152:1,14 153:18,20
  154:21 155:22 156:18
  168:23 169:12,17
  176:24,25 177:3,5,23
  178:5 184:21,24
  185:6,17 186:5
  188:25 189:2
**revenues** 16:14 18:20
  19:21 20:24 28:10
  35:18,24 36:1,4,7,9

41:9 44:9,18 71:21
78:22 82:19 119:3
131:16 151:23 153:8
155:1,6
**review** 145:15 146:2,
24 147:12,22 148:4,
8,12
**reviewed** 134:20
**reviews** 146:22
**revise** 73:15 167:22
168:10
**revolving** 53:3
**rights** 207:11 210:21
216:22
**rigorous** 82:14
**road** 186:20,21
**rolled** 162:3
**roughly** 42:13 66:14,
15 71:17 78:11 94:6
99:24 100:12 103:5
106:12,15 120:14
122:11 178:16 194:24
235:21,22
**round** 226:14
**RPM** 188:25 189:8
**run** 44:25 137:6
**running** 175:10,25
176:14 185:5
**Russia** 204:24 234:21
**Russian** 51:8 204:15,
18 205:6 218:8,22
**Russians** 81:9,23

---

**S**

---

**SA** 93:14 164:11
**salacious** 50:22,25
51:15
**sale** 9:14 163:16
167:1
**satisfactorily** 7:21
**scale** 103:18
**scenario** 70:25 78:1
171:2,3 180:25
224:16
**scenarios** 16:16
**Schary** 7:11 203:13
205:24 232:5
**scratch** 217:14
**screening** 130:9,21

**scroll** 232:3,5,9
**scrolled** 232:13
**scrutiny** 131:6 134:3
135:20 138:9 139:10,
20 140:24 141:3
143:5 144:11
**search** 179:7,14
180:14,17 181:9,10,
16 182:20 183:9
184:3,4 226:10
237:9,25 238:3,9
239:12,19 242:25
245:16 246:1,7,14,
19,23,25 247:10,14,
16,17,22
**searches** 149:23 150:2
182:25
**searching** 183:17
**sec** 137:5
**second-to-last** 132:12
**secrets** 9:10
**security** 55:19
**segment** 10:4
**segments** 20:24
**sell** 28:15 58:16,20
172:25 173:3
**selling** 171:17
**Selma** 207:12 210:22
216:22
**semrush** 236:21,24
237:14,24 242:8
243:1 245:10
**send** 53:9,15
**sense** 50:13
**sentence** 62:22,24
132:12 133:14 134:1
135:11 207:2 213:13,
25 214:1 216:20
**sentences** 200:6,15
202:1
**separate** 214:12
**separately** 214:19
**September** 106:11,13,
16,23 111:13 112:14
113:9
**serial-numbered** 52:20
**server** 14:6,8 44:24
56:3 119:5 121:4
126:11,18 159:13
**servers** 13:5,9,19
25:3 27:22 29:10,17

30:16,21,23 31:4,7,
9,14,21 32:3,12
33:12,14,16 34:11,12
44:20 45:4,18 46:2,
11,16 47:7,22 48:4,
11,18 50:9,16 52:14,
15,17,20 55:17 56:9,
17,19,24 92:12
100:16,17,18,20
102:17 103:17 126:17
139:25 159:5
**service** 140:6
**services** 13:6 16:19
55:18,19 138:20
173:17
**set** 174:7
**setbacks** 148:25
**setting** 64:7,15
131:11 151:9 184:12
**shaking** 112:23 138:23
150:11
**shares** 160:13
**sheet** 12:2,10
**shift** 158:7
**shortfall** 78:10,16,18
**shortly** 154:25 155:1
**show** 38:1,10 136:17
137:3,4 140:20
168:14 183:23
**showed** 87:12
**showing** 137:21 156:5
**shown** 101:6,8 185:9
**shows** 46:24 140:20
181:20 182:17 220:16
230:2
**shut** 169:23
**side** 9:14 178:6
**Siegel** 7:8 8:3,13,15
18:24 22:4 26:4,8,
13,15,21,22 37:18,
24,25 44:11 45:13,
15,20,25 46:5 49:15
50:6,17 52:9,11
58:25 59:3 60:5,6
61:12,14 62:2,6,15
65:21 67:1,11 78:25
80:16,24 81:13,20
83:12 86:3,13,19
90:18 91:5 93:3,10,
22,23 95:25 96:10
97:23 98:5 101:21,23
102:18 104:10,18

108:1 111:19 112:21
113:14 114:6 115:10
116:16 118:12 119:7
122:23 123:10 124:5,
17 127:13,16 129:11
130:6 131:2 136:12
137:3,10,20 138:3,13
142:1,6,12 143:3
152:5 154:11 155:11
164:8,19 169:25
170:10 171:24 172:2,
10 174:4,17 175:5
176:4,18 179:23
181:4 183:16,24
186:24 187:7 191:4,
10 192:19 194:11,20
196:22 199:23 201:5
203:14,23 204:23
205:3,19 206:1,5,10,
14,17,24 208:6
210:11,17 211:7
212:15,22,25 217:13,
21 218:1 219:9,17
227:24 228:3 229:16
230:1,17 231:2,7,22
232:3,6,7 233:16
236:23 237:5 243:20,
24 244:25 245:9
248:8,25 249:2
**sign** 6:5 57:13 92:11
**signed** 120:21,24
**significant** 19:21
41:24
**significantly** 41:15
164:5
**similar** 185:3
**similarly** 8:11 70:12
235:4
**simple** 55:13 136:19
181:12 239:25 240:1,
5
**simpler** 77:7
**simpleton** 72:2 180:20
**simply** 15:17 63:24
83:5 85:6 107:20
**single** 23:4 24:6
44:15 82:9 109:7
110:15 123:22 147:22
148:12 149:12 207:24
**Sir** 172:11
**site** 185:3,13 223:20
226:21,24 235:1

238:1 239:8,12
245:17
**sites** 51:17 111:24
222:25
**sitting** 31:12 34:12
51:13 52:6 111:10
197:1 243:13
**situation** 126:7
136:10 155:24
**situations** 247:19
**six-month** 47:17 119:4
120:1
**size** 71:18
**skew** 240:5
**slight** 88:21,22
**slightly** 87:18 88:11,
23 106:7 107:15
108:10 109:18 110:9
**sloping** 87:18
**slots** 28:15
**slow** 136:23
**slowing** 136:24
**slows** 121:14
**Smith** 191:23 193:11,
15 195:6,8,11,12,21
199:3
**Softlayer** 161:3,12,
20,24 162:2,15
163:16 165:19 166:17
167:1
**Softlayer.com** 164:25
**sold** 171:11
**sole** 90:7 131:12
138:7
**sooner** 47:23 49:2
120:2 234:2
**sort** 57:5 231:3
**source** 138:7 157:23
218:7 236:1
**sources** 55:24 143:24
144:12
**space** 56:3 159:13
**speak** 17:12 24:21
146:17
**specific** 20:5,9,14,
17,18 21:15,19 22:16
25:6,11,14 30:23
40:20 47:22 52:19
56:15 103:23 106:25
107:17 135:10
229:18,25 243:16

**specifically** 15:4,13,
15 22:3 25:20,21
31:9 65:11 91:14
110:19 180:11 211:20
213:6,18 221:22
243:6 248:25
**spectacular** 50:22,25
51:15
**speculation** 50:2,4,7,
10,13
**speed** 146:5,7,12
**spend** 55:25 56:18
57:12 68:13 186:25
**spent** 180:6 186:18
**spoke** 18:5 24:23 53:1
**spoken** 53:6
**Sponge** 184:1
**spreadsheet** 104:20
230:4 234:11 248:15
**square** 212:5
**stand** 25:23 202:18
**standard** 43:7,10
82:15
**standpoint** 210:15
**start** 10:2 32:20
52:10 69:7 246:13
**started** 69:15 153:9
155:2
**starting** 46:10
**stated** 156:15 209:13
232:21
**statement** 64:1 71:20
90:22 94:1 112:24
132:23 133:5 135:24
148:1 149:8 202:4
211:5
**statements** 19:19
50:23 51:1,15,20
52:4 66:5 71:13
79:7,14,17,21,23
80:20,25 81:25 93:15
111:15 113:1 133:10
148:5 195:5 198:12
202:13 223:2 235:18
**States** 11:22
**steady** 185:2
**Steele** 65:18,25 66:4,
19 81:2
**stemmed** 27:12,23
188:22

stemming 27:18 62:25
  211:22 213:8,16
stepping 228:2
stipulated 6:3,10
stipulations 8:7
stopped 25:7 29:25
  141:2,4,6 207:9,15
  219:22
storage 148:25
story 53:13 114:19
  204:11,13 209:5,8
  217:7 224:6
straight 37:10 127:6
straightforward 216:3
stream 37:4 118:3
streamlined 136:19,20
streams 20:17 25:1
strictly 228:8
strike 6:14 8:11 52:9
  58:25 60:5 101:21
structure 159:8
structured 95:5
study 19:9 162:13
  166:19
subjects 26:25
submitted 54:18
subpoint 62:22
subsequent 113:22
  132:3 151:23,25
  153:4 196:19 233:8
subsequently 24:22
  99:14 170:14
subset 9:25 14:18
subsidiaries 11:16
  65:1,2,25 130:8
subsidiary 65:6 75:16
substantial 109:13
substantially 36:6
  42:5,13 44:3
substantiate 22:23
  138:15
Suburban 183:3
sudden 119:13
sued 151:3
suffer 133:16,22
suffered 133:15,22
  134:2
sufficient 45:4 46:6
suggest 42:25 45:7

suing 65:23,25 66:4,5
summarize 69:3
supplement 73:19
  243:7,17
supplemental 28:5
  38:3 54:18 62:9,11
  70:5,22 84:15 132:8
  170:17 211:13 212:23
supplementation
  243:22
supplemented 114:14
  115:8 170:14
supply-and-demand
  242:23
Support 6:21
supporting 188:23
supports 168:13
suppose 123:16
supposed 24:8 221:21
supposedly 25:7 47:6
sustain 108:9
sustainable 108:17
swear 7:17
sworn 7:24

---

### T

table 17:11 22:11,14
takes 179:20
taking 44:17 74:19
  91:21 101:25 115:13
  116:5 239:25
talk 18:3 23:5 24:15,
  24 25:24 26:5,17,24
  27:7 52:22 54:13
  78:5 82:21 92:19
talk,' 207:14
talked 24:25 26:14
  54:21 55:4 82:10
  115:11 227:12 239:3
talking 22:24 26:11
  51:1,20,25 52:4,19
  53:22 63:11,13 87:4
  158:6 173:24,25
  174:6,14 175:1,7
  176:25 179:19 181:5
  192:5 195:11 214:4
  223:18 227:20
talks 204:15
tangible 12:23

tantamount 188:6
tape 52:2
targets 117:9
tarnished 133:17
tatters.' 132:17
tax 159:9
taxes 67:21
technologies 9:10
telling 23:9 33:10
term 149:25 183:9,18
  184:5 188:25 189:16,
  24 238:10 246:7,14,
  19
terminal 187:25 188:1
terms 58:15 72:2
  78:23 87:6 179:14
  180:14 181:9,10
  182:20 184:3 188:7
  215:6 239:19 243:1
  246:24,25 247:11,14,
  16,17
test 85:19 86:20
  203:11
testified 7:25 9:1
  16:20 48:2,16 83:13
  105:2 133:20 170:25
  210:18 212:6
testify 10:14 60:7
  63:19,22 83:4 214:23
testifying 244:7
testimony 9:18 10:23
  15:23 16:8 64:14
  132:20 211:6 244:1,8
theoretically 182:22
theories 63:18
theory 11:8 185:8
  190:6,10 209:4 224:1
thing 14:15 74:17
  173:1 174:6 215:3
things 10:14 14:23
  69:2 86:10,18 110:4
  127:19
thought 26:13 28:13
  29:7,13,22 40:22
  79:3 91:14 114:12
  161:3
thousand 47:17 105:23
  189:1,6
thousands 207:25
threatened 134:5,12
  135:1,12

three-  164:3
three-page  137:22
three-quarters  102:22
  103:10,11
tie  213:18
ties  11:4 234:21
tightening  130:20
time  6:15,23 8:12
  21:15 22:12 23:20
  29:8 35:22 36:17
  46:15,17 59:5,14,19
  60:20 63:20 67:4,8
  69:25 71:4 75:20,25
  78:22 93:19 117:13
  120:1 126:18 129:14
  130:4 132:2 137:14,
  18 140:24 149:21
  150:15 161:1,17,19
  162:11 163:21 172:4,
  8 173:21 175:12
  190:12 206:18,22
  213:14 230:11,15
  245:3,7 249:4
times  8:20,25 9:2,3
  24:15,18 74:21 161:8
  168:1,3,7,10 225:24
timing  131:15 132:2
  141:20 153:17 168:13
  189:13
today  31:12 34:10
  52:6 59:25 70:9 79:4
  111:10 157:21,25
  158:9,13,23 197:2
  222:24 243:14
today's  6:22 249:5
told  19:14 23:14
  24:12,14 79:20
  134:18 197:14,19,21
  198:17 205:2
tomorrow  228:10
top  88:18 120:5 125:2
  132:6 183:1,13,20,23
  231:12 238:11
  240:11,14 241:10
  242:3,25 246:23
topic  135:10 172:3
total  120:10 122:17
  169:12 178:14 190:7
  240:13,15,17
totally  163:21
track  72:14 86:7,21
  98:7 99:6,13

trade  9:9
traded  160:13
trademarks  9:9
traffic  51:18 173:1,
  5,9,22 175:21
  177:16,19 178:2,12,
  14,24,25 179:14
  180:7,9,12 184:3
  185:2,12,19 186:2,8
  187:18,19 225:1
  226:9,11 227:5,16
  234:15 239:6,13,16
  240:17,19,22 241:3,
  11,13 242:2 245:20
  246:7,17,24 247:2,8,
  11,15,21 248:3
trajectory  110:10
transactional  9:13
transcript  6:6,8,9
  248:20
transition  149:2
translate  143:8
  184:17
transmitted  197:25
trees  110:3
Tremaine  7:9
trends  149:20,22
  150:2,13
trial  6:15 8:12 60:7,
  9,10 214:23 244:9
tricky  231:10
trouble  113:23 114:4,
  9 115:3,7
true  23:11,24 80:13
  81:5,17 85:20 86:8
  101:2 111:16 112:25
  113:4 133:4,6,8,9,12
  156:12 236:2
Trump  52:3 234:20
Trump's  207:13
trust  242:17
truth  156:5
turn  62:16 93:25
  96:12,15 104:23
  157:12 172:11 240:8
  245:11
turned  185:9
turning  67:12
turns  72:25 119:13
  167:3 202:24 203:3

twelve-fifteenths
  104:1
Twitter  208:2
two-month  43:8
type  110:3
typed  245:15
typical  143:17,20,23
  144:10
typically  57:19
  173:11 187:24
typing  245:25

---

U

U.S.  6:21
ultimately  142:8,21,
  24
Um-hmm  31:5 32:1
  33:24 39:19 53:8
  73:11 94:8 95:2
  98:13 103:6 116:6,9
  118:20 142:22 144:8
  145:16 146:11 148:9
  155:19 158:16 162:12
  174:24 181:21 182:1,
  4 207:16 220:8 222:4
  224:8,11 225:15
  241:8 245:24 247:9,
  13 248:1
Um-hum  118:17
umbrella  14:4,17
unadjusted  101:25
unaudited  71:9
unclear  232:18
uncomfortable  154:5
unconventional  230:20
underperformed  105:10
  106:4
understand  10:22 11:6
  13:1 14:1 29:6 31:23
  32:6 38:6 54:22
  55:12,16 56:7 69:8,
  24 73:22 109:23
  111:21 116:17,18
  132:18 140:4 143:6
  151:5 167:18 173:8
  179:2 180:8 182:14
  183:6 187:21 189:18
  195:23 212:8 214:11
  220:4 223:24 237:19,
  23 243:25

**understanding** 10:13
20:22 21:14 25:9
28:24 29:19 31:18
33:18 43:14 44:24
56:2 69:5 71:7 72:3,
6 73:12 98:16 109:10
111:18 116:1 121:13
140:1 141:14,15
143:19 144:2,6
172:20,23 173:20
176:20 177:24 189:23
191:2,8 196:3 205:9
210:5 218:18 227:19
234:13 242:7
**understated** 201:17
**understatement** 196:18
**understood** 18:3
**undertake** 83:18
158:11
**unfrozen** 135:4
**United** 11:22
**unjust** 10:19 205:4
209:2,9 215:19
216:17
**unjustly** 190:11 193:3
204:1,9,19 205:7
207:20 216:2
**unreasonable** 225:18
**unring** 221:24 222:22
**unused** 34:12
**updated** 76:6 95:16,21
**user** 185:6 236:7
**users** 185:1,2
**usual** 8:6
**utilized** 52:17
**UU** 7:5

---

**V**

**Vaguely** 189:17
**Val** 7:14
**valuable** 65:16,20
**valuation** 10:1 12:6
32:16 35:12 60:9
74:24 76:2 78:6,9
80:13 90:4,5 95:12
96:3,20 157:7 159:24
160:2 162:3 167:22
187:10,12 188:3
**valuations** 18:22
19:1,5,14

**value-add** 55:18
**valued** 15:20 16:2,15
17:1 160:12 163:7
178:22
**valuer** 155:15
**values** 17:8
**valuing** 9:20 11:15,
17,19,20,24,25 15:23
16:8 59:15 64:8
**vary** 183:9
**vast** 12:3,7,20,21
**vendor** 13:22 14:24
**ventures** 9:15 17:9
**verifiable** 168:16
**verify** 23:8,23 91:11
101:2
**version** 95:21
**versus** 7:4 68:12
**video** 7:2
**view** 32:4 49:8 109:22
188:19 193:13,14
198:24 199:12 216:23
219:24 220:14,24
222:10 228:6,20
233:24 241:21
**viewed** 190:17 193:7
194:9 195:2 198:19
220:2
**viewers** 208:12
**viewership** 193:24
**viewing** 38:13 94:4
144:19 204:7
**views** 159:22 177:20,
23 178:15,21 179:8,
13 184:25 185:25
186:15,19,22 189:1
190:7 193:7 194:13,
25 195:25 197:23
198:18 202:22 208:19
212:3 214:7 216:8
221:8 223:11 226:6,
13 227:4,16 228:9,
11,13,15,17,21,25
229:4 230:2 233:1,8
234:25 235:11 236:10
245:23
**virtue** 224:21
**vis-a-vis** 224:15
**visit** 18:9

---

**W**

**wait** 118:11 137:5
190:21
**waived** 6:9
**walk** 180:18
**wanted** 110:20,22
148:7 193:12,16
231:11 237:25
**ways** 82:1 145:13
185:14
**Web** 13:4,6 25:3
**website** 9:24 16:3,5
173:6,10 174:9,11
176:9 179:15 182:12
184:4,25 185:19
197:3 205:14 222:6
224:6 227:5,8,22
228:18 229:22,24,25
235:14 239:15 247:4,
5,6,15
**websites** 13:10 176:14
179:21 184:24 192:23
230:22
**Webzilla** 10:11,15
11:15 15:5,7 19:20
20:6 27:21 34:21
45:3,17 50:15 51:7
52:5 65:11 114:22
133:15,21 138:18
139:1 140:9 144:17,
21,23 145:2,7,8,15
146:2,4,13 148:2,13
150:2,14,21 151:15
221:23 222:18 223:4
224:5,14 241:16
242:4,25
**Webzilla's** 12:14
14:10 144:12
**week** 48:4 142:24
**weeks** 27:6 39:4,21
40:12 41:13
**weighted** 239:18,21
240:6
**whatnot** 242:18
**whatsoever** 81:7
**White** 124:8,14,18
**Wikileaks** 218:11
**Williams** 6:21
**withdraw** 26:19

word  43:16 102:24
  103:13 134:24 208:4,
  7 237:20 238:2
  239:13 245:16
wording  188:6
words  15:6 43:15
  48:21 51:25 59:7
  78:17 108:2,9 119:11
  124:8 131:5 141:3
  145:6,24 169:10
  198:18 207:10 212:19
  213:23 215:19,20
  224:20 225:13
  238:15,23 240:22
  242:24 247:4
work  17:4 18:13
  207:11 210:21 216:22
  238:17 244:7,9,13
worked  157:22 159:25
working  16:12
works  52:23 73:13
  126:25
world  185:11
worth  15:9,14 46:7
  118:7 188:19 227:5
  242:16 246:10
Wright  7:9
write  213:4
writer  9:8
writing  18:2 244:14
written  195:11
wrong  32:15,18 42:20,
  22 76:20 151:4
  159:18 162:19,21
  167:4 197:10 202:25
  211:14 212:21 220:7
wrote  75:25 76:4
  113:15,24 204:18

---

X

XBT  10:10,15 11:15
  15:5,7 19:20 20:8
  27:21 34:22 35:7
  45:3,17 46:1 50:15
  51:7 52:5 54:5,22
  55:15,25 56:8 64:25
  65:23 69:13 71:3
  72:7 73:8 77:1,12
  84:24 85:14 88:8,17
  90:23 91:25 92:5
  93:4,14 94:6 95:16

96:2,19 100:21
  103:25 105:5 116:21
  124:7 130:7 131:12
  133:15,21 134:2
  139:12 150:2,14,21
  151:15 157:21 158:13
  159:7 160:12 163:7
  164:11 166:4,21
  171:11 212:2 213:19
  214:6,16 221:23
  222:18 223:3 224:4,
  14 241:16 242:4,25
XBT's  12:7 13:1 47:6
  55:13 59:15 63:1
  64:5 73:25 82:2 90:2
  99:17 101:24 116:3
  125:4 127:20 149:3,
  5,7 168:23
XBT/WEBZILLA  20:2
  31:13 52:8,13
XBT/WEBZILLA/MR  49:25

---

Y

year  31:25 46:3 59:10
  85:7 89:13,17,18,22,
  23 91:3,7 93:16
  97:15 105:25 106:5,
  6,8,17 107:16,25
  108:20,21,24 109:15
  111:14 121:9 143:11,
  13,14,18 161:6
years  11:21 44:25
  45:6,22 84:23 88:9,
  17,25 91:4 98:14,20,
  24,25 99:2 158:7
  166:7,8 187:24
yes-or-no  200:12,17
yesterday  24:23 25:25
  26:6,12,14,17,25
  27:3
yields  163:12