# EXHIBIT 5

Kostyantyn Bezruchenko
May 03, 2018

```
 1
                     UNITED STATES DISTRICT COURT
 2                   SOUTHERN DISTRICT OF FLORIDA
                            MIAMI DIVISION
 3
                     CASE NO. 1:17-cv-60426-UU
 4


 5
     ALEKSEJ GUBAREV, XBT HOLDING
 6   S.A., AND WEBZILLA, INC.,

 7          Plaintiff,

 8   -vs-


 9
     BUZZFEED, INC. AND BEN SMITH,
10
            Defendant.
11   _____/


12


13                          VIDEOTAPED


14
                            DEPOSITION
15
                               OF
16
                       KOSTYANTYN BEZRUCHENKO
17


18

19                         May 3, 2018
                       10:06 a.m. - 5:28 p.m.
20          201 S. Biscayne Boulevard, Suite 1300
                       Miami, Florida 33131
21


22
                    Stenographically Reported By:
23                      SHARON VELAZCO, RPR
                    Registered Professional Reporter
24


25
```

```
 1  BY MS. BOLGER:
 2      Q.   When did you see the documents?
 3      A.   Like, recently.
 4      Q.   In preparation for the lawsuit?
 5      A.   I think so.
 6      Q.   Were you involved in those discussions at the
 7  time they were happening?
 8      A.   I don't remember.  Probably I wasn't in U.S., so
 9  I was not involved.
10      Q.   Other than doing the investigation, as you just
11  described it, were you involved in any other of the
12  responses by XBT to the Methbot fraud?
13      A.   Can you repeat your question?
14      Q.   Sure.
15           Other than the investigation you described -- and
16  I'm using that term loosely -- were you involved in any
17  other response to the Methbot fraud?
18      A.   Alleged Methbot fraud, yes.
19      Q.   What's the answer?
20      A.   Not to my knowledge.
21      Q.   Did you all make any new policy -- any policy
22  changes based on the Methbot fraud?
23      A.   Absolutely.
24      Q.   And what were those?
25      A.   We -- we not allowing the customers -- we are
```

1  making hard time to the customers to bring their IP spaces
2  to our network.
3       Q.   Can you explain that to me?
4       A.   Yes.  We are making additional due diligence on
5  the reasons why the customer want to bring their IP space
6  into our network.
7       Q.   Okay.  What else?
8       A.   That's all.
9       Q.   How would that have prevented XBT's servers and
10 XBT's IP addresses from being used to perpetrate an ad
11 fraud?
12           MR. FRAY-WITZER:  Objection.
13           THE WITNESS:  I don't know.
14 BY MS. BOLGER:
15      Q.   Well, what was it designed to prevent, that
16 remediation?
17      A.   All we know is the customer used extensive IP
18 addresses, which it brings to do alleged fraud.  So that's
19 the only thing we know.  And we are protecting from this
20 thing.  That's only thing, piece of thing we know, and we
21 are protecting from this e-mail.  That's all.
22      Q.   Is it your testimony that the fraudster, the
23 alleged fraudster, used only his own IP addresses to
24 perpetuate the fraud, or do you know that some of them
25 were --

```
 1      A.    Some of them were our company IP addresses.
 2      Q.    Okay.  So the change you made to not -- or make
 3 it more difficult for customers to bring their own IP
 4 addresses doesn't address the fact that the customer used
 5 your own IP addresses, correct?
 6      A.    That's correct.
 7      Q.    Okay.  Other than the change you just discussed,
 8 did you make any other changes in response to the Methbot
 9 fraud?
10      A.    No.
11      Q.    Would you describe that as a KYC change?
12      A.    Yes.  We are asking customers to explain why they
13 need to have own IP space in our network.  All of the
14 reasons behind, all of the, like, technologists, they need
15 to use that for, so that's all.
16      Q.    Okay.  None of those changes would in any way
17 make it harder for a customer to perpetrate some kind of
18 fraud on your own IP addresses, right?
19      A.    What kind of fraud?
20      Q.    Any kind of fraud.
21      A.    I don't know.
22      Q.    Did you ever go back and vet existing clients
23 based on these new rules, these new KYC rules?
24      A.    Yes.
25      Q.    Which ones?
```

```
 1                        ------
 2          (The deposition was concluded at 5:28 p.m.)
 3        (Reading and signing of the deposition was waived by
 4   the witness and all parties.)
 5
 6                         CERTIFICATE OF OATH
 7
 8   STATE OF FLORIDA
 9   COUNTY OF MIAMI-DADE
10
11            I, SHARON VELAZCO, Registered Professional
12   Reporter, Notary Public, State of Florida, certify that
13   KOSTYANTYN BEZRUCHENKO personally appeared before me on
14   the 3rd day of May, 2018, and was duly sworn.
15            Signed this 8th day of May, 2018.
16
17
18            _____
                 SHARON VELAZCO, RPR
19               Notary Public, State of Florida
                 Commission No.: FF 146173
20               Commission Expires: August 19, 2018
21
22
23
24
25
```

```
 1                    CERTIFICATE OF REPORTER

 2

 3   STATE OF FLORIDA

 4   COUNTY OF MIAMI-DADE

 5

 6          I, SHARON VELAZCO, Registered Professional

 7   Reporter, certify that I was authorized to and did

 8   stenographically report the deposition of KOSTYANTYN

 9   BEZRUCHENKO; that a review of the transcript was not

10   requested; and that the transcript is a true record of my

11   stenographic notes.

12          I further certify that I am not a relative,

13   employee, attorney, or counsel of any of the parties, nor

14   am I a relative or employee of any of the parties'

15   attorneys or counsel connected with the action, nor am I

16   financially interested in the action.

17

18          Dated this 8th day of May, 2018.

19

20          _____
            SHARON VELAZCO, RPR
21          Registered Professional Reporter

22

23

24

25
```