**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 17-cv-60426-UU**

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.,

   Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

  Defendants.

_____/

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**
**ON THE ISSUE OF PLAINTIFFS' STATUS AS PUBLIC FIGURES**

DAVIS WRIGHT TREMAINE LLP
Katherine M. Bolger
Nathan Siegel
Adam Lazier
Alison Schary
1251 Avenue of the Americas, 21st Floor
New York, New York 10020

BLACK, SREBNICK, KORNSPAN &
STUMPF, P.A.
Roy Black
Jared Lopez
201 So. Biscayne Boulevard
Miami, Florida 33131

*Of Counsel*:
Nabiha Syed
BuzzFeed, Inc.
11 E. 18th Street, 13th Floor
New York, New York 10003

*Attorneys for Defendants*

Plaintiffs' Opposition to Defendants' partial summary judgment motion continues to reflect their hope that the best defense is a good offense. Having spent years promoting themselves as internet "giants"; hiring professional public relations firms to aggressively seek and obtain publicity in the world's most prestigious business media; claiming to be the transformative influence on the Russian internet sphere; and ███████████████████ ████████████████████████████████████████████████Plaintiffs continue to portray themselves as victims. Why? Simply because Defendants recounted those facts (with which they quibble, but never really dispute), and explained why they support the conclusion that Plaintiffs are limited public figures here. Shakespeare would have said it best: "the [Plaintiff] doth protest too much, methinks."[1]

## I.    PLAINTIFFS SATISFY THE FUNDAMENTAL TEST FOR PUBLIC FIGURES

Plaintiffs now acknowledge that this Circuit's public figure analysis starts with a basic two-step inquiry, but they characterize it as erecting some kind of higher hurdle to holding that a plaintiff is a public figure. Pl. Opp. at 3. To the contrary, the point of the threshold analysis is that a plaintiff who satisfies these basic criteria is much more likely to be a public figure. That is because this Circuit has long recognized that the public figure inquiry cannot readily be reduced to a rigid formula. *Rosanova v. Playboy Enters., Inc.*, 580 F.2d 859, 861 n.2 (5th Cir. 1978). Thus, the purpose of the initial two-step inquiry is to help inform the court's ultimate determination. *See, e.g.*, *Turner v. Wells*, 879 F.3d 1254, 1272 (11th Cir. 2018) ("But our inquiry does not end here [with the two basic criteria]. Next, we must decide *which type of public figure [the plaintiff] is*, "general" or "limited.") (emphasis added); *Carroll v.*

---

[1] Moreover, notwithstanding the plethora of briefing on the public figure issue, it is also no longer clear that the Court will need to decide whether Plaintiffs are public figures. Defendants have moved for summary judgment on the issue of fault, regardless of Plaintiffs' status. Defendants' motion maintains that if Plaintiffs are public figures they cannot show actual malice. Alternatively, the motion maintains that if Plaintiffs are private figures, they cannot show gross irresponsibility or negligence either. In their opposition to Defendants' summary judgment motion, Plaintiffs only respond by claiming they can prove actual malice. Dkt. 240 at 20-21. They argue that if they can prove actual malice, that would *ipso facto* also prove gross irresponsibility or negligence. *Id.* Otherwise, they do not assert any independent basis for proving either of those fault standards. *Id.* Therefore, if the Court finds that Plaintiffs cannot show actual malice, they would also have failed to create any triable issue as to gross irresponsibility or negligence. In that event, Defendants should be entitled to summary judgment regardless of Plaintiffs' status, and this motion would be mooted.

*TheStreet.com*, 2014 WL 5474061, at *13 (S.D. Fla. July 10, 2014) ("The Circuit also looks to a plaintiff's access to the media" in addition to the three-part test); *Colodny v. Iverson, Yoakum, Papiano & Hatch*, 936 F. Supp. 917, 922 (M.D. Fla. 1996) ("Because he had 'ready access to the media,' Colodny had easily acquired limited public figure status."). Other Circuits employ a similar approach, but do so by employing a four or five-part test for limited public figures that incorporates the same criteria. *See, e.g.*, *Hatfill v. N.Y. Times Co.*, 532 F.3d 312, 319 (4th Cir. 2008) (five-part test starts with whether "the plaintiff had access to channels of effective communication").

     **A.**    <u>**Access to the Media.**</u>  Turning to the first *Gertz* criterion, Plaintiffs contend that people with access to the media do not need to hire PR firms. They also continue to claim that because they subjectively wanted even *more* attention than they received from *Bloomberg, Forbes, CNBC, Inc., The Wall Street Journal*, numerous Russian media outlets, etc., that they therefore lacked access to the media. Pl. Opp. at 3. In effect, Plaintiffs ask this Court to hold that the more publicity a plaintiff craves, the more that cuts *against* their being a public figure.

     Plaintiffs do not cite a single case in support of those wholly illogical propositions, nor a single one that has ever held that retaining public relations agents precisely because they offer media access means that a plaintiff lacks it. To the contrary, the case law consistently holds that such activity is precisely what "access to the media" means, and also constitutes clear evidence of the second fundamental criterion: voluntarily "inviting attention and comments." Defs. Opp. at 7-8; *see also Thompson v. National Catholic Reporter Publ'g Co.*, 4 F. Supp. 2d 833, 838 (E.D. Wisc. 1998); *Nicholson v. Promotors on Listings*, 159 F.R.D. 343, 352 (D. Mass. 1994) (both holding that public relations expertise constitutes access to the media).

███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

2

such conduct unquestionably shows that Plaintiffs had "a more realistic opportunity to counteract false statements than private individuals normally enjoy." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344 (1974). Indeed, engaging public relations professionals to try to head off negative press before it is ever published is "conduct [that] shows beyond hope of legitimate contradiction that that [plaintiffs] are limited purpose public figures." *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 16-17 (1st Cir. 2011).

B.       <u>**Voluntary Conduct that Invites Scrutiny and Comment.**</u>   With respect to the second basic *Gertz* criterion, Plaintiffs again argue that "if the simple act of attempting to promote one's business" renders them public figures, than all businesses and their executives would be. Pl. Opp. at 3. True enough, but Defendants have never claimed that. Rather, the law is clear that what is most relevant is the objective nature and content of a plaintiff's conduct and/or speech, not the plaintiff's self-proclaimed motives for voluntarily speaking. *Rosanova*, 580 F.2d at 861. *See also Reuber v. Food Chem. News*, *Inc.*, 925 F.2d 703, 710 (4th Cir. 1991) (declining to consider a "subjective element" because "the determination of public figure status" requires an "objective approach").

Thus, there are numerous cases holding business and their executives to be limited public figures on the basis of conduct or speech motivated by promotional considerations, where that speech implicated issues that may affect the public. *See, e.g.*, *Silvester v. ABC, Inc*., 839 F.2d 1491 (11th Cir. 1988); *Orr v. Argus-Press Co.*, 586 F.2d 1108 (6th Cir. 1978) (speech intended to promote the plaintiff developer's construction project); *James v. Gannett Co.*, 40 N.Y.2d 415 (1976) (speech intended to promote belly dancer's business). By contrast, mere garden-variety advertising by a business – such as listing the prices of a product in a direct mail circular – is unlikely to qualify. *Long v. Cooper*, 848 F.2d 1202, 1205 (11th Cir. 1988). Here, the whole point of Plaintiffs' various public relations campaigns was to move beyond 'product specific' advertising, and instead invite attention to themselves as experts and "thought leaders" on "timely topics" that would more likely be of interest to the readers of general business and technology media like *The Wall Street Journal,* Bloomberg, and *VentureBeat.* SUMF ¶ 29.

Next, Plaintiffs spend almost a third of their opposing brief reciting in detail the facts and holdings of four cases that Defendants cited in a single footnote in their opening brief. Pl. Opp. at 4-7; *see also* Defs. Br. at 15 n.12. As Plaintiffs briefly acknowledge, Defendants cited those

cases to help illustrate why Plaintiffs' various assertions that they are not "household names" like Facebook or Madonna are irrelevant to whether they are limited public figures here. Curiously, Plaintiffs never dispute that those cases support that point, nor could they. Each of the plaintiffs in those cases received, at most, varying degrees of occasional mention in the local media of a small city or town. None ever spoke to any media with anything like the world-wide influence of *Bloomberg*, the *Wall Street Journal* or *Forbes*, nor were any of them football coaches for the Miami Dolphins. *See* Pl. Reply at 6. None hired public relations firm to obtain any publicity, nor did any claim to be major or transformative players in either an industry (internet hosting) or locales (like Russia and Europe) of broad public significance.

Otherwise, Plaintiffs merely point out that those cases also support the proposition that the limited public figure analysis considers "whether the Plaintiff took steps that voluntarily placed himself in the public eye with respect to the matters alleged." Pl. Opp. at 7. Defendants agree, and indeed that describes the final prong of the *Silvester* test, which is discussed below. *Silvester*, 839 F.2d at 1494 (asking "whether 'the alleged defamation [was] germane to the plaintiffs' participation in the controversy'") (citation omitted).

## II.    PLAINTIFFS SATISFY ALL CRITERIA FOR LIMITED PUBLIC FIGURES

Turning to the next step in the analysis, the three-part test, Plaintiffs' entire argument can be summarized as follows. First, while they never quite state this explicitly, their arguments presume that there can only be a single "public controversy." Pl. Opp. at 7 (courts ask "if a public controversy exists and, if so, what its boundaries are"). Next, they maintain that the "controversy" is essentially defined by the "contours" of the allegedly defamatory publication – which in this case they claim is either "Russia's attempt to hack the Democratic Party" or, at most "Russia's attempts to interfere with the 2016 United States Presidential Election." *Id.* at 7, 9. Third, having defined the controversy as such, Plaintiffs then spend the rest of their briefs lambasting Defendants for supposedly smearing them because Defendants point to evidence that is not narrowly confined to the 2016 election. Yet Plaintiffs fail to cite *a single case* to support their arguments about the second and third prongs of the *Silvester* test. Pl. Opp. at 9-12.

Each step in Plaintiffs' argument is simply wrong. To start with, it is well-established that a single defamatory publication may implicate multiple public controversies, both narrow and broad. *See* Defs. Br. at 14, Defs. Opp. at 10. It is also well-established that the "contours" (whatever that means) of a specific defamatory statement does not define the outer limits of

potentially relevant public controversies.  *See* Defs. Opp. at 10-11.  Defendants identified three public controversies to which the defamatory statements, considered within the context of the Dossier, relate.  Defs. Br. at 15; Defs. Opp. at 11.  Plaintiffs' collective briefing barely mentions, let alone meaningfully responds, to any of them.  It is only by ignoring all of those well-established principles that Plaintiffs proceed to portray themselves as victims of Defendants' supposedly nefarious effort to "litter[] the record" with "unseemly," "baseless," and "repugnant" (though admittedly accurate) facts taken from "the darkest rocks of the internet."  Pl. Br. at 9-11.

Nonetheless, at bottom, it does not matter how the Court defines the relevant controvers(ies).  Whether defined narrowly or broadly, Plaintiffs are limited public figures for purposes of this case.

### A.     The Narrowest Controversy:  Russian Interference in the 2016 Election

To start with, the Parties actually agree on the definition of at least one relevant controversy:  Russian efforts to interfere in the 2016 election.  *See* Defs. Br. at 15; Pl. Br. at 13; Defs. Opp. at 11; Pl. Opp. at 9.   Moreover, there is no dispute that Gubarev, as "the CEO of XBT Holding," commented on matters pertinent to that controversy (be they "technical" or "political"), and that he was contacted by a Bloomberg journalist precisely because Plaintiffs had been soliciting interviews on "timely topics."  And no matter how much he may now try to take his words back, Gubarev himself has repeatedly tied those comments to the subsequent ones in the Dossier.  Moreover, there are multiple examples of cases in which plaintiffs with no prior involvement have spoken out regarding similar significant controversies – be it a presidential election, gay rights, or a political scandal like Watergate – and been deemed limited public figures.  *See* Defs. Opp. at 16-19.  The Court therefore need not consider anything further, because Plaintiffs are limited public figures under any definition of the controversy here.

### B.     A Broader Controversy:  Russian Abuse of the Internet

The second, and slightly broader, controversy Defendants identified is the manipulation and abuse of the internet by Russian actors, both state and non-state.  Plaintiffs never disputed that such a controversy existed when the Dossier was published (and still does today).  And whatever Plaintiffs may mean by confining controversies to "the contours of the defamatory publication at issue," they do not dispute that this controversy is within the "contours" of the Dossier.  As Defendants have explained, one of Steele's first memos focused exclusively on that broader topic.  The specific defamatory statement about Plaintiffs later in the Dossier was just

5

one of several examples of Russia's *modus operandi* for malicious cyber operations that Steele discussed in subsequent memos.[2]

Defendants have also identified multiple ways in which Plaintiffs voluntarily injected themselves into that controversy, including (1) their PR campaign to promote themselves to journalists as "experts" and "thought leaders" on "Russian tech"; (2) their claims to the press, public and key Russian government officials to be a newly-transformative influence on the Russian internet; (3) █████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████; (4) their publicly linking their businesses to new and highly controversial Russian data privacy laws; and (5) █████████████████████████████████████████████████████████ ███████████████.

As part of their efforts to portray themselves as victims, Plaintiffs focus mostly on the last point, even though it is just one of many ways they have injected themselves into the controversy over the Russian internet. ███████████████████████████ they dodge the issue by "responding" to a straw-man argument Defendants never made. They argue that ████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████. Whether that might be so would depend on the circumstances, but it is not what Defendants argue here.

Rather, Defendants' point is simply that there is an obvious relationship between a Dossier alleging that Plaintiffs ███████████████████████████████████ █████████, and Plaintiffs' ███████████████████████████████████████████ ██████████████████████████████████████. With respect to that point,

---

[2] Identifying that controversy is also consistent with *Waldbaum*. Though Plaintiffs seem to suggest otherwise, Pl. Reply at 7-8, the allegedly defamatory statement in that case *was* just one sentence from a five-line item that appeared on page 35 of a newsletter announcing the plaintiff's termination. *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1290 (D.C. Cir. 1980). That sentence noted that the plaintiff's employer was losing money. The D.C. Circuit concluded that single statement pertained to a public controversy "over the viability of cooperatives as a form of commercial enterprise." *Id.* Defendants do not argue, as Plaintiffs claim they do, that a public controversy "should be wholly unconnected to the scope of the allegedly defamatory article." Pl. Reply at 7. Rather, the point is that if anything, the scope of the Dossier is more obviously related to the controversy over ██████████████████████ than the relationship between the defamatory statement and the much broader controversy recognized in *Waldbaum*.

Plaintiffs never dispute that there has long been a controversy over ██████████████ ████████████████████████████████████████████. Nor can they genuinely dispute that Gubarev started companies and oversaw a "team" that ██████ ████████████████████████████████████████████████████████████████████ ███████████████████.[3]

Next, Plaintiffs argue that Gubarev ██████████████████████████████ ████████████████████████████████████████████████████████████. This argument fails for two reasons. First, there is no evidence that Gubarev ████████ ████████. To the contrary, pictures of him appearing and speaking at various conferences prominently ██████████████████████████████████████████████████████ ████████████. *See* Siegel Reply Decl. Ex. 1. In any event, public figure status may be determined by "voluntarily engaging in activities that necessarily involve the risk of increased exposure and injury to reputation," whether or not the plaintiff subjectively yearned for publicity. *Brewer v. Memphis Publ'g Co.*, 626 F.2d 1238, 1254 (5th Cir. 1980); *see also* Defs. Opp. at 8, 12, 15. ████████████████████████████████████████████████████ is such conduct. *Waldbaum*, 627 F.2d at 1299 (fact that plaintiff's supermarket company "published its own monthly newspaper" to promote cooperatives supported limited public figure status); *Nat'l Life Ins. Co. v. Phillips Publ'g, Inc.*, 793 F. Supp. 627, 636 (D. Md. 1992) (fact that life insurance company "distributed a monthly public relations magazine" and another "monthly magazine" supported limited public figure status).

Plaintiffs further argue that because Gubarev's ████████████████████████████ ██████████████ several years before the Dossier was published, they cannot be relevant to

---



[3] ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████. To say the least, Plaintiffs' efforts to quibble with those facts are both immaterial and disingenuous. They characterize Gubarev as a "passive investor" and dislike the term "involved" ████████ ████████████████████████████████, but the facts speak for themselves. ████████████ ████████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

Plaintiffs' status in early 2017.  Pl. Opp. at 10.  This too fails with respect to both the record facts and the governing law.  First, the record makes clear that Plaintiffs continued to rely in part on



And in any event, as a matter of law, even if (unlike Plaintiffs here) plaintiffs have actually ceased any conduct inviting attention years before the allegedly defamatory publication, they remain limited public figures as long as the controversy they previously injected themselves into remains relevant.  *Brewer*, 626 F.2d at 1257.  The public controversy over ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮, far from receding, has only heightened as time goes on.

Moreover, while Plaintiffs may dislike the attention they have received ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Nor do Plaintiffs dispute that other journalists reporting about the Dossier have scrutinized Plaintiffs' prior involvement ▮▮▮▮▮▮▮▮▮▮  Defs. Br. at 19-20; Defs. Opp. at 9.

Finally, Plaintiffs quibble with Defendants' characterization of just one of Gubarev's many interviews in the Russian media, and claim that he did not really defend Russia's internet law by saying other countries do the same thing – though oddly their brief makes the very same point, by comparing the Russian law to other countries to minimize its significance.  Pl. Reply at 4.  In any event, Plaintiffs take little real issue with the numerous facts showing how they promoted themselves as serious and transformative players in the Russian internet sphere, and tied their business directly to compliance with that law.  Thus, Plaintiffs are limited public figures with respect to this controversy as well.



### C.     The Broadest Controversy: Cybersecurity ███████████████████████████

Finally, Defendants identified a broader, pre-existing public controversy regarding cybersecurity, ███████████████████████████████████████. All of the evidence above discussed above demonstrates Plaintiffs' involvement in this controversy as well.  In response, Plaintiffs argue that this topic is "so broad" that "it would lead to the absurd result that almost any action taken by anyone connected to the tech industry could be construed as "injecting" oneself into a public controversy."  Pl. Opp. at 8.  But no such "absurd result" would follow.  To the contrary, the contrast between Plaintiffs and the millions of other private persons merely "connected to the tech industry" exemplifies why they, and not those others, are limited public figures.

A public controversy exists where "the issue was being debated publicly and [] it had foreseeable and substantial ramifications for nonparticipants."  *Waldbaum*, 627 F.2d at 1297.  Plaintiffs never argue that the risks posed to cybersecurity ██████████████████ does not meet that definition; indeed, they appear to concede that it does.  And there are many examples in the case law of similarly "broad" public controversies, such as "the relations between the sexes" and "public nudity," *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 137 (2d Cir. 1984); "corruption in post-Soviet Russia," "the decline of the Russian economy," *OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 43 (D.D.C. 2006); and gay rights, *Faltas v. State Newspaper*, 928 F. Supp. 637 (D.S.C. 1996), *aff'd*, 155 F.3d 557 (4th Cir. 1998).

But the breadth of those controversies does not mean that *anyone* who has a relationship with the opposite sex, or frequents a nude beach, or works in Russia, or has a view about gay rights has injected themselves into those controversies.  But if, like Plaintiffs, a business and/or person were to hire a public relations firms to promote themselves as "experts" or "thought leaders" on one of these issues; *and* claim to be a transformative influence on some particular aspect of one; *and* publicly link their business to some controversial law related to one; *and* ████████████████████████████████████████████████████████████ ████████████████████████████████ *then* that business and its executive would very likely be a limited public figures for purposes of a defamatory statement related to one of those controversies.  And that is why the Plaintiffs here are limited public figures for purposes of this case.

**CONCLUSION**

For the aforesaid reasons, this Court should grant Defendants' motion for partial summary judgment.

Dated:  October 12, 2018

Respectfully submitted,

/s/ Katherine M. Bolger

Katherine M.  Bolger
Nathan Siegel
Adam Lazier
Alison Schary
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
katebolger@dwt.com
nathansiegel@dwt.com
adamlazier@dwt.com
alisonschary@dwt.com

/s/ Jared Lopez

Jared Lopez
Roy Black
BLACK, SREBNICK, KORNSPAN & STUMPF, P.A.
201 So.  Biscayne Boulevard
Miami, Florida 33131
rblack@royblack.com
jlopez@royblack.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing, together with its exhibits, will be served electronically by email on all counsel or parties of record on the service list below this 12th day of October, 2018.

By: /s/ Alison Schary
Alison Schary

## SERVICE LIST

Matthew Shayefar
Valentin D. Gurvits
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1806
Facsimile: 617-928-1802
matt@bostonlawgroup.com
vgurvits@bostonlawgroup.com

Evan Fray-Witzer
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-000
Facsimile: 617-423-4855
Evan@CFWLegal.com

Brady J. Cobb
Dylan Fulop
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com
dfulop@cobbeddy.com