**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 17-cv-60426-UU**

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.

   Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

  Defendants.

_____/

**DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF ERIC COLE AND**
**INCORPORATED MEMORANDUM OF LAW**

DAVIS WRIGHT TREMAINE LLP
Katherine M. Bolger
Nathan Siegel
Adam Lazier
Alison Schary
1251 Avenue of the Americas, 21st Floor
New York, New York 10020

BLACK, SREBNICK, KORNSPAN &
STUMPF, P.A.
Roy Black
Jared Lopez
201 So. Biscayne Boulevard
Miami, Florida 33131

*Attorneys for Defendants*

Pursuant to Fed. R. Evid. 702, Defendants BuzzFeed, Inc. and Ben Smith move for an order excluding the testimony of Dr. Eric Cole, Plaintiffs' purported technical expert.

## PRELIMINARY STATEMENT

This Court should exclude Dr. Eric Cole's evidence because it is unreliable and baseless. While Plaintiffs purport to offer Dr. Cole's testimony in rebuttal to that of Defendants' technical expert Anthony Ferrante, in fact his conclusions go far beyond rebuttal – and far beyond the facts. Instead, although Dr. Cole admits that he did nothing more than read the Mr. Ferrante's report (the "Ferrante Report") and its exhibits, he purports to opine on the truth of the alleged defamatory statement and the meaning of the words contained therein. Those opinions should be excluded as unreliable and unhelpful to the jury. And, indeed, even Dr. Cole's criticism of the Ferrante Report should be excluded, because it too is baseless. Other than reading the report, Dr. Cole made no effort to test or confirm Mr. Ferrante's findings before asserting that his report "lacks accuracy," that his technical analysis is "misleading," and that his conclusions are "completely false." In addition, Dr. Cole made no effort to learn anything whatsoever about Plaintiffs and, consequently, did not know that many of his criticisms of Mr. Ferrante's work were based on either his misunderstanding of the Plaintiffs or ███████ ████████████████████████████████████████████████ For these reasons, this Court should strike Dr. Cole's report and preclude his testimony at trial.

## FACTUAL BACKGROUND

### A.    The Allegations In the Dossier

As the Court knows, this lawsuit arises out of BuzzFeed's January 10, 2017 publication of the document widely known as the "Dossier," along with an accompanying article. In particular, Plaintiffs complain about a paragraph on the last page of the Dossier that reads:

> [REDACTED] reported that over the period March-September 2016 a company called XBT/Webzilla and its affiliates have been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct "altering operations" against the Democratic Party leadership. Entities linked to one Alexei GUBAROV [sic.] were involved and he and another hacking expert, both recruited under duress by the FSB, Seva KAPSUGOVICH, were significant players in this operations.

### B.    The Ferrante Report

On May 25, 2018, Defendants served an expert report from Anthony J. Ferrante, a Senior Managing Director and Global Head of Cybersecurity at FTI Consulting, Inc. Ex. 1 (Ferrante

Report, without exhibits).  In the report, Ferrante reached several conclusions. 



C.      **The Cole Report**

In response to the Ferrante Report, on July 6, 2018, Plaintiffs served a report from Dr. Eric Cole.  Ex. 2.   Although Dr. Cole admitted during his deposition that the only analysis he undertook was reading Mr. Ferrante's report and doing some quick internet research, Ex. 3 at 12:1-17:15; 35:11-36:8, he claims to be a "technical expert" for Plaintiffs.  Ex. 2 ¶ 1.

Dr. Cole reached several conclusions in his report.  First, Dr. Cole concluded that the Ferrante Report "lacks accuracy and forensic soundness and does not provide any supporting evidence to back the statements made by the defendants" in the Dossier.  *Id*. ¶ 19.

Dr. Cole also questioned Ferrante's findings related to Plaintiffs' security procedures, arguing that "Mr. Ferrante fails to provide any of the depositions, communications, or any other factual information to support this claim."  *Id*. ¶ 37.

Finally, Dr. Cole repeatedly concluded that "the defendants had no factual information or proof to support the claims made against the plaintiffs" in the Dossier and that the claims about Plaintiffs in the Dossier have "no factual backing, are unfounded, and there is no supporting evidence that backs this or any other claims."  *See, e.g., id*. ¶ 18.  He accordingly concluded that "it is therefore false and defamatory for Buzzfeed to make a blanket statement that the plaintiffs are using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct 'altering operations' against the Democratic Party leadership."  *Id*. ¶ 41.

D.      **The Cole Deposition**

At his deposition on August 29, 2018, as discussed more fully below, Dr. Cole testified that the only basis he had for reaching any of these conclusions was his review of the Ferrante and its exhibits and some quick internet research.  *See, e.g.*, Ex. 3 at 12:1-17:15; 35:11-36:8.

## ARGUMENT

Dr. Cole's evidence utterly fails to satisfy the requirement that expert evidence be "properly grounded, well-reasoned, and not speculative before it can be admitted."  *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004).  Because Dr. Cole did not conduct any independent investigation or analysis of the issues on which he purports to provide his expert opinion and instead simply offers speculation, his proposed evidence fails to satisfy the requirement of reliability set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and subsequent cases.  And by purporting to give evidence on the meaning of the words at issue and reasonableness of BuzzFeed's journalistic practices, Dr. Cole steps far outside his supposed expertise.  This Court should therefore strike his report and preclude him from testifying at trial.

A.      **The Standard**

The admission of expert testimony is governed by Rule 702 of the Federal Rules of Evidence.  *See Daubert*, 509 U.S. 579.  The Eleventh Circuit had adopted a "rigorous" three-part test to determine whether expert evidence is admissible: (a) the expert must be "qualified to testify competently regarding the matters he intends to address"; (b) the expert's methodology must be "sufficiently reliable"; and (c) the testimony must "assist[] the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."  *Frazier*, 387 F.3d at 1260 (citation omitted).  The party offering the expert testimony has the burden of proving its admissibility.  *Id.* at 1265.

Under the *Daubert* standard, the trial court is to "act as 'gatekeeper[]'" and admit only reliable evidence.  *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (citing *Daubert*, 509 U.S. at 589).  In applying the gatekeeping function, courts must "ensure that speculative, unreliable expert testimony does not reach the jury."  *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).  The bottom line is that "it remains a basic foundation for admissibility that proposed expert testimony must be supported by appropriate validation – *i.e.*, good grounds, based on what is known."  *Frazier*, 387 F.3d  at 1261

(quoting *Daubert*, 509 U.S. at 590) (internal quotation marks and alterations omitted).  The "court's gatekeeping function requires more than simply taking the expert's word for it."  *Id.* (internal quotation marks and citation omitted)

Because "an opinion has a significance proportioned to the sources that sustain it," *Martinez v. Rabbit Tanaka Corp.*, 2006 WL 5100536, at *14 (S.D. Fla. Jan. 6, 2006) (internal quotation marks and citation omitted), courts recognize that an expert's evidence is unreliable where "it bears an insufficient relationship to the underlying data," *Legg v. Voice Media Grp., Inc.*, 2014 WL 1767097, at *5 (S.D. Fla. May 2, 2014), or "when the only connection between the conclusion and the existing data is the expert's own assertions."  *McDowell v. Brown*, 392 F.3d 1283, 1300 (11th Cir. 2000).  It follows that "an expert opinion that … is not based upon any independent investigation or testing … does not meet Rule 702's criteria of showing that the proposed testimony is based upon sufficient facts or data."  *Fla. Power & Light Co. v. Qualified Contractors, Inc.*, 2005 WL 5955702, at *3 (S.D. Fla. Dec. 6, 2005); *see also, e.g.*, *Estate of Marin-Torres v. Gamo Outdoor USA*, 2016 WL 4051318, at *4 (S.D. Fla. May 4, 2016) (excluding most of expert's opinion because expert "has very little actual knowledge or understanding about how this incident actually occurred" and "conducted no analysis" on the relevant subject).  In this case, Dr. Cole did no investigation or testing sufficient to render his opinion reliable.

## B.       Dr. Cole's Evidence Should Be Excluded

Dr. Cole's report and proposed testimony is unreliable and should be excluded in its entirety because it is based on Dr. Cole's unsupported (and often demonstrably inaccurate) assumptions and speculation, rather than the sort of evidence and independent analysis required by *Daubert* and the Federal Rules of Evidence.  In particular, far from providing any basis for his opinions, Dr. Cole acknowledged at his deposition that he failed to conduct *any* independent investigation into the allegations in the Dossier.  Ex. 3 at 62:3-12 ("My assignment was to look solely at Mr. Ferrante's report and not perform separate analysis.").  He admitted that his report was based on nothing more than his review of the Ferrante Report and its exhibits, and some quick internet research.  *Id.* at 12:1-17:15; 35:11-36:8.  In fact, he testified that he "did not perform any other analysis outside of Mr. Ferrante's report," *id.* at 42:8-43:2, and "was not tasked and did not perform any analysis of XBT."  *Id.* at 97:24-98:5.  He did not review any documents produced in this case that were not attached to the Ferrante Report, *id.* at 12:1-13:6,

never spoke to Gubarev, *id.* at 13:23-25, did not review any deposition testimony, *id.* at 13:16-20, never visited any XBT facilities or inspected any of their systems or system logs, *id.* at 13:7-11; 14:1-4, did not undertake any forensic analysis, *id.* at 17:5-15, did not repeat or replicate any of the technical analysis in the Ferrante Report, *id.* at 50:17-51:5; 116:23-117:13, and does not even know what services XBT offers its clients. *Id.* at 21:24-25:3. Dr. Cole also "did no independent research at all to establish the truth or falsity of the statements in the dosser." *Id.* at 42:8-43:2. These concessions on their own render Dr. Cole's opinions and testimony unreliable and this Court should therefore exclude them.

Dr. Cole advances four separate opinions in his report: (a) that the Dossier's allegations about Plaintiffs are "false"; (b) that the Dossier is defamatory and should be interpreted as accusing Plaintiffs of actively participating in the hack of Democratic Party leadership; (c) that the Ferrante report is inaccurate and misleading; and (d) that BuzzFeed should have known the Dossier's allegations about Plaintiffs were inaccurate, or done more to verify them before publishing. Because none of these opinions satisfy *Daubert*'s threshold requirements for admissibility, this Court should exclude Dr. Cole's report and evidence in their entirety.

1. Dr. Cole's Conclusion That The Dossier is "False" Should Be Excluded

To begin with, this Court should strike Dr. Cole's conclusions that the statement about Plaintiffs in the Dossier is false as unreliable. Dr. Cole's report concludes unequivocally at least four times that that the Dossier's allegations about XBT, Webzilla, and Gubarev are "false" or "unfounded." Ex. 2 ¶¶ 1, 19, 41, 59. This was baseless speculation on his part, and Dr. Cole admitted as much at his deposition:

> Q: As you sit here today, do you think that you have conducted a sufficient analysis to opine on whether XBT Holdings deployed botnets or distributed pornography with virus payloads to the Democratic Party?
>
> A: That is not what I was asked to do. That was not my assignment. My assignment was to look solely at Mr. Ferrante's report, so, no, that was not the tasking. I could do that, but that is not what I was asked to perform in this case… If you're looking for a different scope, where you're saying that I independently, outside of Mr. Ferrante, performed my own forensic analysis, that was not the scope, and I did not perform that work.

Ex. 3 at 119:8-120:7; *see also id.* at 36:9-41:11; 118:9-123:6.

This is evidently nothing new for Dr. Cole; this Court has criticized him for it in the past. In *National Union Fire Insurance Co. of Pittsburgh v. Tyco Integrated Security, LLC*, 2015 WL

11251759 (S.D. Fla. July 6, 2015), a case arising out of a data breach, Dr. Cole was proffered as a cybersecurity expert but also offered an opinion that the confidential information at issue was used in a subsequent burglary.  The Court excluded his opinion on the burglary because Dr. Cole "admitted that his opinion in this respect was not based on his own knowledge or assessment" or "any independent investigation of the facts on his behalf."  *Id.* at *8.  It held that "it is evident that Dr. Cole lacks the knowledge necessary to opine on how the burglars were able to access the Enfield Facility and any opinion in this regard is speculative and lacks foundation.  Dr. Cole is offered as a cybersecurity expert, not as an investigator with knowledge of the underlying facts."  *Id.*  Here, too, Dr. Cole admits that he is "not an investigator with knowledge of the underlying facts" and "lacks the knowledge necessary to opine" on whether the allegations in the Dossier are true or false, because he did absolutely nothing to investigate the allegations reported in the Dossier.  He just tried to poke holes in Mr. Ferrante's report.  As a consequence, his conclusion that the allegations in the Dossier are false is speculative, lacks foundation, and must be excluded.

In fact, the back half of Dr. Cole's report confirms the speculative nature of his "conclusions" regarding the truth or falsity of the Dossier.  In the report, Dr. Cole sets up the straw man argument that Mr. Ferrante opined that the statements in the Dossier were true and then, in paragraphs 52-57, proceeds to say why that conclusion was unreliable. ████████

████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████
████████████████████████

Only Dr. Cole opined on the truth of the statements in the Dossier, then.  But Dr. Cole admitted at his deposition that he did none of the things he himself says are necessary to assess the truth or falsity of the Dossier's allegations.  Ex. 3 at 112:3-123:6.  This alone should render his claims to know that the Dossier was false inadmissible.  Remarkably, Dr. Cole did not even know that many of the steps he describes as necessary were, in fact, impossible. ████████

██████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

There is no basis for Dr. Cole to conclude that the Dossier is false. His opinion and testimony on this point should therefore be excluded.

2.  Dr. Cole's Opinions About the Meaning of the Dossier Should Be Excluded

At various points in the opinion, Dr. Cole opines that the statements in the Dossier are defamatory, or gives his views on what the Dossier's allegations about Plaintiffs mean. *See, e.g.*, Ex. 2 ¶¶ 37, 41, 53-54, 59.  Those opinions should also be excluded because members of the jury are perfectly capable of interpreting the Dossier for themselves.  In addition to ensuring that expert evidence is reliable, a court should exclude expert evidence that would not "assist[] the trier of fact." *Frazier*, 387 F.3d at 1260  This means that "expert testimony 'is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves,'" or where the evidence "amounts to nothing more than [the expert] reciting arguments … counsel can argue in summation." *In re BankAtlantic Bancorp, Inc. Secs. Litig.*, 2010 WL 6363027, at *3, *7-8 (S.D. Fla. Sept. 9, 2010) (Ungaro, J.).  An expert's opinion should also be excluded where "[i]t is simply his opinion of what he would do if he were a juror considering the facts which need no interpretation by an 'expert.'" *United States v. Masferrer*, 367 F. Supp. 2d 1365, 1378 (S.D. Fla. 2005).

Because juries are capable of interpreting the words at issue in a defamation case for themselves, expert evidence on the meaning of allegedly-defamatory words is generally inadmissible.  In *Seropian v. Forman*, 652 So. 2d 490 (Fla. 4th DCA 1995), for instance, the court held that the trial court's admission of a political science expert's testimony on the meaning of words like "influence peddling" constituted "highly prejudicial error," because "[i]f *influence peddling* conveyed the obloquy that plaintiffs suggest, that fact should be readily understood by the ordinary jury without a political scientist swearing that it does." *Id*. at 497-98. Federal courts have reached the same conclusion.  *See McCabe v. Rattiner*, 814 F.2d 839, 843 (1st Cir. 1987) (affirming trial judge's exclusion of expert testimony on meaning of "scam" because it "would not 'assist the trier of fact'"); *Tilton v. Capital Cities/ABC, Inc.*, 938 F. Supp. 751, 753 (N.D. Okla. 1995) (excluding expert evidence from linguist on meaning of words because "the jury is clearly capable of determining what the average viewer from a one time viewing understood as expressed or implied by the *PrimeTime Live* broadcasts in regard to Plaintiff."), *aff'd*, 95 F.3d 32 (10th Cir. 1996).

8

But Dr. Cole does not hesitate to offer his opinion on what the words at issue mean.  His report discusses the meaning of the Dossier at length, repeatedly describing it as "defamatory," Ex. 2 ¶¶ 41, 59, and even purporting to define certain words in it.  *See* Ex. 2 ¶¶ 53-54 ("Buzzfeed definitively printed 'XBT/Webzilla and its affiliates had been **using** botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct 'altering operations' against the Democratic Party leadership'[.]  'Using' means active action and/or application that is verifiable.'") (emphasis in original); *id.* ¶ 56 ("The term 'plant bugs' typically refers to the covert or illegal installation of a physical listening device in a home or office and is not a term used when referring to digital operations which is regularly referred to as 'spyware'").

These were much more than a few throw-away lines in the report.  In fact, Dr. Cole admitted that what he himself calls the "key point" of his report – that the Ferrante Report contains "no supporting evidence to back up [its] claims," *id.* ¶ 56 – rests entirely on his interpretation of the meaning of the Dossier:



This Court should apply well-established law and exclude this evidence.  The jury is perfectly capable of deciding for itself what the allegations in the Dossier mean – indeed, if the Dossier conveys "the obloquy that plaintiffs suggest, that fact should be readily understood by the ordinary jury without [a cybersecurity expert] swearing that it does." *Seropian*, 652 So. 2d at

497.  Dr. Cole's views on the meaning of the words, and his opinions premised on them, should therefore be excluded as unhelpful to the trier of fact.

   3.   Dr. Cole's Criticism of The Ferrante Report Should Be Excluded

   Dr. Cole's opinion that the Ferrante Report "lacks accuracy and forensic soundness and does not provide any supporting evidence to back the statements made by the defendants," Ex. 2 ¶ 19, should also be excluded as unreliable.  This is so for at least four reasons.

   *First*, Dr. Cole's report is not admissible because it misconstrues the very opinion it purports to rebut.  *See, e.g.*, *Tuscumbia City Sch. Sys. v. Pharmacia Corp.*, 2014 WL 12605648, at *1 (N.D. Ala. Sept. 3, 2014) (rebuttal expert report is restricted to addressing "the specific contentions made by the other party's experts"); *In re Polyurethane Foam Antitrust Litig.*, 2014 WL 6461355, at *46 (N.D. Ohio Nov. 17, 2014) (rejecting expert testimony for being based on a "straw man fallacy").  Instead of responding to Mr. Ferrante's actual findings, Dr. Cole puts words in his mouth and then criticizes him for "failing to provide any foundation" for the things he never said.

   Dr. Cole challenges the Ferrante Report as failing to provide "definitive evidence or proof" of the literal truth of the allegedly defamatory statements about the Plaintiffs in the Dossier.  Ex. 2 ¶ 20.  But that's not what the Ferrante Report was doing, and it is not Defendants' obligation in this case.  ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████  Dr. Cole's argument that the Ferrante Report does not definitively prove the Dossier to be true, or that there are other potential explanations (however unlikely) for Mr. Ferrante's findings, therefore misses

the point.  Because Dr. Cole's report misconstrues Mr. Ferrante's evidence, it cannot be admissible to rebut it.



*See, e.g., Mohamed v. Am. Motor Co.*, 2017 WL 4310757, at *3-4 (S.D. Fla. Sept. 28, 2017) (excluding expert's evidence about computer platform used to send text messages because expert "did not test, review, or inspect the actual platform or system before rendering his opinion"); *Legg*, 2014 WL 1767097, at *5 (opinion was unreliable where the expert's opinion was based only on description of defendant's systems in its client handbook); *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006) ("To qualify as an expert on software, an expert should, at a minimum, examine the product and software upon which the expert bases his opinion."); *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 425-29 (S.D.N.Y. 2009) (striking expert opinion about capabilities of defendants' computer systems where expert "did not conduct any independent examination of Defendants' system or servers, but merely accepted what Defendant Reynolds told him about his system.").

11



The Federal Rules of Evidence require that if an expert witness "is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261 (citing advisory committee's note to 2000 amendments).   Dr. Cole has done none of that here.   Instead of offering facts in support of his criticisms of the Ferrante Report, at every turn his analysis relies on speculation and even sheer imagination.   His opinions about the Ferrante Report should therefore be excluded as unreliable.

        4.    <u>Dr. Cole's Opinions on Journalism Standards Should Be Stricken</u>

Finally, Dr. Cole wanders even further outside his expertise when he purports to offer an opinion on the standards of BuzzFeed's journalism, writing in his report that BuzzFeed "would be expected to know or at least verify" whether the term "plant bugs" referred to physical recording devices before publishing the Dossier. Ex. 2 ¶ 56.   He snidely characterizes this as a "novice-level inaccuracy."   *Id*.

Even if an expert is qualified in one area, his or her evidence is inadmissible if it goes beyond that expertise.   *See, e.g.*, *In re Trasylol Prods. Liab. Litig.*, 2010 WL 1489793, at *8 (S.D. Fla. Feb. 24, 2010) (excluding doctor's opinions on pharmaceutical company's ethics); *see also Frazier*, 387 F.3d at 1260 (expert must be qualified "regarding the matters he intends to address.").   Here, of course, there is no reason whatsoever to believe Dr. Cole is qualified to opine on journalism.   He has not been proffered as a journalism expert and does not present himself as one – and, based on his CV, has no relevant experience evaluating journalism. Ex. 5. Nor does Dr. Cole, who has not reviewed any of the deposition transcripts and knows nothing about BuzzFeed's investigation into the Dossier, have any factual basis for offering an opinion on what BuzzFeed "would be expected" to know or do before publication, or to characterize its work as "novice-level" – whatever exactly that means.   And Plaintiffs certainly cannot use Dr. Cole's "rebuttal" report to make up for their failure to find a real journalism expert. *See In re Air Crash Disaster*, 86 F.3d 498, 528 (6th Cir. 1988) ("The district court correctly decided that Northwest could not circumvent [restrictions on its expert evidence-in-chief] merely by sticking the label 'rebuttal' on a neglected part of its affirmative case.").

Dr. Cole's opinions on BuzzFeed's journalism should therefore be excluded.

## CONCLUSION

For all these reasons, Defendants request that the Court strike the expert report of Dr. Eric Cole and exclude his testimony at trial.

Dated:  October 15, 2018                Respectfully submitted,

/s/ Katherine M. Bolger
Katherine M. Bolger
Nathan Siegel
Adam Lazier
Alison Schary
Davis Wright Tremaine LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
katebolger@dwt.com
nathansiegel@dwt.com
adamlazier@dwt.com
alisonschary@dwt.com

/s/ Roy Black
Roy Black
Jared Lopez
Black, Srebnick, Kornspan & Stumpf, P.A.
201 So. Biscayne Boulevard
Miami, Florida 33131
rblack@royblack.com
jlopez@royblack.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing, together with its exhibits, will be served electronically by email on all counsel or parties of record on the service list below this 15th day of October, 2018.

By: /s/ Jared Lopez
    Jared Lopez, Esq.

## SERVICE LIST

Matthew Shayefar
Valentin D. Gurvits
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1806
Facsimile: 617-928-1802
matt@bostonlawgroup.com
vgurvits@bostonlawgroup.com

Evan Fray-Witzer
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-000
Facsimile: 617-423-4855
Evan@CFWLegal.com

Brady J. Cobb
Dylan Fulop
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com
dfulop@cobbeddy.com

# EXHIBIT  1-4


# REDACTED

# EXHIBIT 5

# Dr. Eric B. Cole
## Cybersecurity Expert

43605 Edison Club Ct | Ashburn, VA 20147 | www.securityhaven.com | 703–675–2055



A computer and cyber security expert with over 20 years of hands-on experience, Dr. Cole consults in information technology with a focus on cybersecurity. He served as a member of the Commission on Cyber Security for the 44th President and is a member of several advisory boards such as the Purdue University Executive Advisory Board. He is the author of several textbooks and books, a sought-after speaker, and was inducted into the InfoSec European Hall of Fame in 2014.

**PROFESSIONAL EXPERIENCE**

**Secure Anchor Consulting Services: 2005-Present**
*Founder and CEO*

Provides consulting services to Fortune 500, Fortune 50, financial institutions, international organizations and the federal government. One assignment included a major system design and assessment for an international financial institution in Hong Kong. Employs cutting edge technology and technical components (network security, network architecture, and incident response, NOC/SOC design) to provide security solutions. Serves as an expert witness for a variety of litigation involving government and commercial companies.

**SANS (SysAdmin Audit Network Security): 1999-Present**
*Director of Research-Computer Network Attack-Enterprise Security Architecture*
*Director of the Cyber Defense Initiative*

Lead instructor and course developer for several security courses, including the top selling courses. One of the highest rated instructors and one of the few instructors teaching a variety of courses.  Executed and contributed to the development of several of the GIAC certifications including GIAC Certified Security Essentials (GSEC)**,** GIAC Certified Advanced Incident Handling Analysts (GCIH) and GIAC Certified Firewall Analysts (GCFW).  Responsible for staying up on technology and developing new course material covering the state of the art in networking, information technology, and security. Created and led several key efforts including the Levelone Notebook, top 10/20 vulnerability list and the Cyber Defense Initiative, which included authoring the Critical Controls for Effective Cyber Defense.  Developed business plans for and created new technological initiatives.  Constantly researched, tested and evaluated new security products and research efforts.

**STI (SANS Technology Institute): 1999-2015**
*Dean of Faculty*

A member of a five-person team tasked with creating a degree-granting educational institution and obtaining certification from the state of Maryland. Offered two Master's degree programs focused on technical people needing managerial skills and managers needing technical skills. Designed and implemented curriculum and provided leadership to faculty. STI successfully received accreditation from the state of Maryland.

**McAfee: 2009-2010**
*SVP, CTO of the Americas*

As McAfee's visionary and evangelist, responsible for strongly influencing the company's strategic and technical direction, development, and growth as the global leader in digital security solutions. Key leader in the execution of technology strategy for platforms, partnerships, and external relationships. Worked closely with CEO, EVP of Product Operations, and other key stakeholders to establish a product vision

and road map to achieve McAfee's goals, and focused on identifying and capturing intellectual property and driving new innovation across the company.

**Lockheed Martin: 2005-2009**
*IS&GS Chief Scientist*
*LM Senior Fellow*

The Sytex Group, Inc. (TSGI) was acquired by Lockheed Martin with a key component being the intellectual property created under the CTO leadership.  I was selected by Lockheed Martin into its prestigious fellowship program, an award it makes to less than 1% of its 130,000 employees. As a Lockheed Martin Senior Fellow (the first Fellow within Lockheed Martin's Information Technology Division), I was a frequently invited speaker at a variety of conferences and security events.  As Lockheed Martin Chief Scientist, performed research and development to advance the state-of-the art in information systems security. Specialized in: secure network design, perimeter defense, vulnerability discovery, penetration testing, and intrusion detection systems. Played a lead technical advisory role in many high-profile, security-focused projects for Federal clients to include civil, Intel and Department of Defense, including the FBI Sentinel, DHS Eagle, JPL, Hanford and FBI IATI programs.

**The Sytex Group, Inc. (TSGI): 2001-2005**
*Chief Technology Officer (CTO)*

Positioned the company to achieve corporate growth and meet financial targets by utilizing and enhancing technology. Worked as an executive team member to determine and implement technical direction and focus of company.  Extensive experience with running projects including managing development efforts to exceed client requirements. Created an intellectual property portfolio that included patents, journals, books, and white papers, resulting in an overall increase in market value and customer engagement. The efforts of the research team's intellectual property increased advertising, market share and customer satisfaction through conferences, proposal and magazine articles. Maintained full accountability for revenue of $55 million and was indirectly involved in revenue of over $80 million. Provided continuous leadership to a research team of over 20 people creating intellectual property that surpassed teams 20 times their size. Yearly patents were in line with the top 1000 producing patent companies in the United States.

Developed and executed on creative techniques for influxing technology into non-technical business units to drive revenue and profit. Interfaced with government officials, including the Pentagon, White House and Capitol Hill, and corporate executives to identify critical network security problems that needed to be addressed and researched.

**GraceIC: 2000-2001**
*Chief Security Officer (CSO)*

Designed and executed strategy for establishing GraceIC as a leader in the network security arena. Developed the product line and built the services. Managed and directed security employees. Provided leadership and implemented internal security infrastructure, such as secure email, proper protection of data and security policies. Presented at several national and international conferences and wrote several articles. Performed and documented research into the area of future applications and solutions to the network security problem existing in the current market. Trained sales people, program managers and engineers on how to sell, manage, and deliver security services. Maintained a pulse on technology in the marketplace to produce market plans.

**American Institutes for Research: 1999-2000**
*Chief Information Officer (CIO)*

Brought in to fix and revamp the entire IT infrastructure based on the organization having experienced several security breaches, virus outbreaks and unreliable performance on the network. Within three months, stabilized the entire IT infrastructure and within nine months rebuilt the entire infrastructure. Designed the network to achieve a balance between functionality and security while minimizing the monetary impact to the organization. After one year, there were no severe security breaches and all attempted breaches were contained prior to causing any significant monetary loss. Virus problems were contained and controlled and network uptime was 99.999%. Security and performance were greatly increased while overall IT costs were reduced by 15%. In addition, provided technical support for DARPA-sponsored research projects. Helped invent technology and innovation that lead to a spin-off company, Pynapse, which created a state of the art intrusion detection system known as Checkmate that was later sold to SAIC.

**Vista Information Technologies: 1998-1999**
*VP of Enterprise Security Services*

Developed the Enterprise Security Services Group and was responsible for all internal and external security issues. Tracked and managed separate profit and loss center for security. Grew the team from one person to over 12 people and executed on several million in annual revenue in less than a year. Set up the security and other monitoring services for the NOC/SOC. Created all security services offerings and generated all necessary marketing and sales material. Followed and assured compliance with business plan and financial tracking of security group. Performed security assessments and consulted on all areas of security. Designed, implemented, and monitored security solutions including firewall design, intrusion detection, vulnerability assessment and penetration testing. Performed evaluation and analysis of security tools and provided technical recommendations and product improvements for VC funded startups. Key presenter at Cisco sponsored security seminars around the country and performed partnership activities with Fortune 500 organizations.

**Teligent: 1996-1998**
*Director of Security*

Created and managed IT Corporate Security Department. Central point of contact for all security concerns. Evaluated strategic plans and operational activities by performing risk assessment and determining how it might impact corporate security. Designed security solutions to meet operational needs. Integrated security and helped create NOC to provide for proper monitoring of network. Developed the company's security policy and all required security guidelines. Set up lab to properly test and enhance the security features of the network. Performed and executed on several computer investigations. Assisted and advised the legal department on laws, regulations, and policies relating to computer and information security. Evaluated several secure email solutions and installed PGP company-wide. Established and set up web traffic monitoring and password tracking systems.

**Central Intelligence Agency: 1991-1996**
*Program Manager / Technical Director for the Internet Program Team with Office of Technical Services*

A Senior Officer of the agency that implemented the Internet Program Team that specialized in rapid development and in exploiting the latest Internet technologies to meet customers' requirements. The team designed, developed, tested, and deployed products over three to six month intervals. Designed and developed several secure communication systems. Responsible for providing technical direction, technical design, security assessment, and programming modules. Secured internal servers, continually performed intrusion detection, and reviewed audit logs.

Performed independent security reviews and penetration testing of (World Wide Web) servers for other offices.  Identified several weaknesses and devised ways to fix those problems and secure the system.

Received letter of appreciation from the DCI (Director of Central Intelligence) and six Exceptional Performance Awards.

*Computer Engineer with Office of Security*

Member of the information security assessment team. Evaluated and performed security assessment of network operating systems. Identified potential vulnerabilities and ways to secure the holes. Designed a large scale auditing system with automated review capability. Worked on several virus investigations.

**EDUCATION**

Doctorate degree (now PhD) in Network Security, Pace University

Master of Science in Computer Science, New York Institute of Technology.

- Honors: Harry Schure Graduate Memorial Award (awarded to one graduating senior)

Bachelor of Science in Computer Science, with a minor in Business, New York Institute of Technology

- Honors: Graduated Magna Cum Laude, Dorothy Schure Memorial Award, Jules Singer Award, Grace Hopper Award from Computer Associates, Presidential Academic Award (4.0 all semesters), Presidential Service Award, Dean's List, Member of Who's Who Among Students in American Universities, and Member of Nu Ypsilon Tau Honor Society.

**CERTIFICATIONS**

CISSP (Certified Information Systems Security Professional)

Created several of the GIAC (Global Information Assurance Certification) programs and exams

**ORGANIZATIONS / MEMBERSHIPS**

Association for Computing Machinery (ACM)

Institute of Electrical and Electronics Engineers (IEEE)

Computer Security Institute (CSI)

Information Systems Security Association (ISSA)

International Computer Security Association (ICSA)

International Who's Who in Information Technology

Common Vulnerability and Exposures (CVE) - member of the editorial board (by invitation only)

HoneyNet Project - member (by invitation only)

SANS Institute - author and speaker

**PUBLICATIONS**

**Books**

Eric Cole. *Advanced Persistent Threat: Understanding the Danger and How to Protect Your Organization.* Syngress, 2012.

Eric Cole. *Network Security Bible.2nd Edition,* Wiley, 2009.

Eric Cole, Ronald L. Krutz, James Conley, Brian Reisman, Mitch Ruebush, Dieter Gollman, and Rachelle Reese. *Wiley Pathways Network Security Fundamentals Project Manual.* Wiley, 2007.

Eric Cole and Sandra Ring. *Insider Threat: Protecting the Enterprise from Sabotage, Spying, and Theft.* Syngress, 2006.

Eric Cole. *Hiding in Plain Sight: Steganography and the Art of Covert Communication.* Wiley, 2003.

Eric Cole. *Hackers Beware: The Ultimate Guide to Network Security*, New Riders/Sams Publishing, 2001.

**Monthly Column**

TechTarget - http://www.techtarget.com/contributor/Eric-Cole

- Supply chain security: Controlling third-party risks
- Cyberhunting: Why enterprises need to hunt for signs of compromise
- Six ways to improve endpoint device security
- Why security operations centers are the key to the future
- Offensive countermeasures: How they can slow down adversaries
- Accidental insider threats and four ways to prevent them

**Selected White Papers**

https://www.sans.org/reading-room/analysts-program

- Decision Criteria and Analysis for Hardware-Based Encryption
- Threat Hunting: Open Season on the Adversary
- Automating the Hunt for Hidden Threats

**Selected Journal Articles**

Eric Cole, Sandy Ring, "Taking a Lesson from Stealthy Rootkits," IEEE Security and Privacy, Vol 2 (4), pp. 38-45, Aug 2004

Eric Cole, Sandy Ring, "Volatile Memory Computer Forensics to Detect Kernel Level Compromise," Lecture Notes in Computer Science, Information and Communications Security, Springer Press, Vol 3269, ICICS Sep 2004, Malaga, Spain

Eric Cole, David Esler, and Sandy Ring, "Self-healing Mechanisms for Kernel System Compromises," Proceedings of ACM Workshop on Self-managed Systems (WOSS) 04, Oct 2004, Newport Beach, CA, USA

Eric Cole, Vignesh Kumar and Sandy Ring, "Ant colony based optimization based model for network zero-configuration," Proceedings of SPCOM 04, Dec 2004, Bangalore India

Eric Cole, Vignesh Kumar, Sandy Ring, "Transform Domain Steganography Detection using Fuzzy Inference Systems," IEEE International Symposium on Multimedia Software Engineering, 2004

Eric Cole, Vignesh Kumar and Sandy Ring, "Least Significant Bit-Spatial Domain Steganography Detection using Least Significant Bit Plane Smoothness," The 6th IASTED International Conference on SIGNAL AND IMAGE PROCESSING, 2004

Eric Cole, Sandy Ring, "Detecting Kernel Rootkits," Sys Admin Magazine, Vol. 12 (9), pp. 28- 33, Sept 2003

Eric Cole, Ron Krutz, "The Computer Forensics CMM," Proceedings of the SPIE Defense & Security Symposium, 28 March-1 April 2005

Eric Cole and Angela Orebaugh, "Intrusion Prevention and Active Response: Implementing an Open Source Defense," SysAdmin Magazine, 2005

**PRESENTATIONS**

Numerous keynotes and presentations given to corporations and government entities as well as classes and courses taught on the subjects of cyber threats, information security, and technology innovation.

**RECENT EXPERT WITNESS TESTIMONY**

Activision Blizzard v. Acceleration Bay, Case No. IPR2016-00724 – Expert report and deposition

Finjan, Inc. v. ESET SPOL. S.R.O. and ESET DEUTSCHLAND GMBH, District Court - 4th Civil Chamber Werdener Str. 1, 40227 Düsseldorf - Expert report

Finjan, Inc. v. Sophos, Inc., Case No. 14-CV-01197-WHO – Expert report, deposition and testimony – Client awarded $15 million verdict September 2016

Finjan v. ProofPoint, Inc. and Armorize Technologies, Inc., Case No. 3:13-cv-05808-HSG – Expert report and deposition – Case settled May 2016

National Union Fire Insurance Company of Pittsburgh, Pennsylvania v. Tyco Integrated Security, LLC et al., Case No. 13-080371-CIV-BLOOM/HUNT – Expert report, deposition and testimony April 2016

FTC v. LifeLock, Case No. CV-10-00530-PHX-MHM – Expert report – Case settled and client awarded a $100 million settlement based on analysis in expert report August 2015

Finjan, Inc. v. Blue Coat Systems, Inc., Case No. 13-cv-03999-BLF – Expert report, deposition and testimony – Client awarded $40 million verdict July 2015

The Trustees of Columbia University in the City of New York v. Symantec Corporation, Civil Action No. 3:13-cv-00808 – Expert report and deposition – Case settled September 2014