# <u>EXHIBIT 5</u>

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 SOUTHERN DISTRICT OF FLORIDA

 3

 4

 5

 6
         *****************************
 7       ALEKSEJ GUBAREV, XBT HOLDING
         S.A., AND WEBZILLA, INC.,
 8
              Plaintiffs,
 9
         vs.                          Case No.:
10                                    1:17-cv-60426-UU
         BUZZFEED, INC. AND BEN SMITH,
11
              Defendants
12       *****************************

13

14                        CONFIDENTIAL

15       VIDEOTAPED DEPOSITION OF JEFFREY ANDERSON

16                  Thursday, May 31, 2018

17                       10:12 a.m.

18                       Held at:

19                 Ciampa Fray-Witzer, LLP

20                     20 Park Plaza

21                      Suite 505

22                 Boston, Massachusetts

23

24         Judith McGovern Williams, CSR, CRR
              Registered Professional Reporter
25
```

```
 1   valuations had been done?

 2        A.   What do you mean what did he tell

 3   me?

 4        Q.   Well, you said you asked him about

 5   past valuations of the company.  What did you

 6   learn?  What did he say?  What information did

 7   he give you?

 8        A.   He -- he said that KPMG had done a

 9   study in 2013, and that they used that study

10   for internal purposes and to determine, you

11   know, bank loans, items to present to

12   financiers.

13        Q.   Okay.  Were there any other

14   valuations that he told you about?

15        A.   That's the only one that I'm aware

16   of.

17        Q.   What did he tell you was the -- what

18   did he assert to you was the impact of the

19   publication of statements in the dossier that

20   may relate to XBT Webzilla?

21        A.   They lost significant revenues,

22   earnings, growth.  They had a complete lack of

23   ability to get financing.

24        Q.   Okay.  Did -- how did Mr. Mishra

25   tell you -- did Mr. Mishra identify any
```

 1      customers for you that he contends

 2      XBT/Webzilla lost as a result of the

 3      publication of the dossier?

 4           A.    I know -- banks or?

 5           Q.    No, no, no.  Specific customers.  I

 6      mean people who provide revenue to Webzilla --

 7           A.    I don't know --

 8           Q.    -- and XBT?

 9           A.    I don't know that I got a specific

10      example.

11           Q.    Okay.  Did you ask?

12           A.    Yes.

13           Q.    And he wasn't able to give you any

14      specific examples?

15           A.    He did not know.

16           Q.    And with -- did he identify any

17      specific streams of revenue that he -- any

18      specific revenue that he said, "Here, this is

19      revenue that the company was earning in 2016.

20      We lost it in 2017 as a result of the

21      publication of the dossier"?

22           A.    My understanding was that more or

23      less across the board there was a decline in

24      revenues from the various segments.

25           Q.    And how did he contend that any

```
 1        decline in revenue was attributable to the

 2        publication of the dossier?

 3             A.   Because it happened immediately

 4        after the dossier was released.

 5             Q.   And so that was -- and that's the

 6        only reason?

 7             A.   Well, no.  And there were issues

 8        with lenders.

 9             Q.   What were those issues with lenders?

10             A.   They either wouldn't provide loans

11        because of this or, you know, created great

12        hurdles to getting those loans because of it.

13             Q.   And how long -- did you have any

14        understanding of how long those issues lasted?

15             A.   I don't know specific time frame.

16             Q.   Did you ask?

17             A.   I believe we had a general

18        discussion about it, but I don't know if I

19        asked the specific question.

20             Q.   Have you read Mr. Mishra's

21        deposition?

22             A.   I have.

23             Q.   Do you see in his deposition he said

24        that these various concerns with lenders were

25        all taken care of within a month or so?
```

```
 1                    MR. FRAY-WITZER:  Objection.

 2          A.   I don't -- I don't recall reading

 3     that specifically.

 4     BY MR. SIEGEL:

 5          Q.   You don't recall reading that.

 6     Okay.

 7               You don't recall reading anything

 8     like that?

 9          A.   I recall reading that eventually

10     some lenders, not all, but some, were willing

11     to come back to the table, but I don't know

12     the exact time frame of that.

13          Q.   Which lenders were not willing to

14     come back to the table?

15          A.   I know ABN AMRO, they had issues

16     with them.  I don't recall the other specific

17     banks.

18          Q.   Okay.  Do you know whether ABN AMRO,

19     whether those issues with ABN AMRO were ever

20     resolved?

21          A.   I don't know if or when they were.

22          Q.   Okay.  Did Mr. Mishra ever provide

23     you any documentation to substantiate which

24     lenders he was talking about?

25          A.   Yes.
```

1          Q.   Which ones?  What documentation did

2     he provide you?

3          A.   ABN AMRO I saw.

4          Q.   There was a single email, right,

5     which we will talk about.  Anything else?

6          A.   That's all I recall at this point.

7          Q.   And did you ever do anything

8     yourself to try to verify whether what

9     Mr. Mishra was telling you about problems that

10    they had with -- he contends that they had

11    with banks was true?

12         A.   What do you mean?

13         Q.   Well, that in fact that --

14    Mr. Mishra told you that they had had some

15    problems with obtaining financing?  Right?

16         A.   He did.  Yes.

17         Q.   Okay.  But he didn't tell you how

18    long those problems lasted?

19         A.   Again I don't remember the exact

20    time frame of those issues.

21         Q.   Okay.  And did you ever, other than

22    the e-mail about ABN AMRO, did you ever do

23    anything yourself to verify whether

24    Mr. Mishra's assertions were true?

25         A.   I asked for all information that was

```
 1        available.  I mean we discussed it when we met

 2        in La Jolla.  But I don't know what else

 3        independently I could have done in that

 4        regard.

 5              Q.   Well, okay.  So and you said he

 6        provided you that single e-mail?  Right?  Did

 7        he provide you any other information about

 8        supposed problems with banks?

 9              A.   I know there was again discussions

10        about issues with other banks.

11              Q.   Okay.  So you just relied on what

12        Mr. Mishra told you?

13              A.   I relied in part, yes, on what he

14        told me.

15              Q.   Okay.  How many times did you talk

16        to him?

17              A.   Aside from the meeting, maybe one or

18        two other times.

19              Q.   And how long did that meeting last?

20              A.   Two, three hours.

21              Q.   And when did you speak to him

22        subsequently?

23              A.   I spoke with him yesterday.

24              Q.   What did you talk about?

25              A.   I talked about the various revenue
```

```
 1              get a chance.

 2                      MR. SIEGEL:  Okay.  I have

 3              got a few more just on this.

 4                      MR. FRAY-WITZER:  That's

 5              fine.

 6                      MR. SIEGEL:  And then that

 7              will be a good breaking point.

 8                      Could we have the

 9              supplemental report?

10                      Let's mark this as Exhibit 2.

11              (Supplemental Expert Report marked

12              Exhibit 2 for identification.)

13                      (Handing Exhibit 2 to the

14              witness.)

15          BY MR. SIEGEL:

16              Q.   I ask you to turn to page 8,

17          Mr. Anderson.

18                      (Witness complying.)

19              Q.   I'm sorry.  I meant page 7.

20                      (Witness complying.)

21              Q.   If you look under "Damages

22          analysis," subpoint 5, the first sentence says

23          you have asked counsel to analyze damages.

24          The second sentence says:

25                      "Damages stemming from these actions
```

Jeffrey Anderson - Confidential
May 31, 2018                                                      63

 1    include but are not limited to XBT's lost

 2    business value."

 3              So but are you providing any measure

 4    or estimate of damages other than lost

 5    business value?

 6         A.   In this report?

 7         Q.   Yes.

 8         A.   That's the only measure of damages

 9    that I have presented.

10         Q.   And so does that -- does that mean

11    that you are -- and I'm not talking about the

12    benefit to BuzzFeed for the moment -- I am

13    talking about damages to the plaintiff,

14    okay? --

15         A.   Okay.

16         Q.   -- for purposes of these questions.

17              So is there any -- is there any

18    other damages theories that you are intending

19    to testify about?

20         A.   Again at this point in time other

21    than what I've put in my report is what I

22    intend to testify to.

23         Q.   All right.  So the question is

24    simply when you said "include but are not

25    limited to," what did you mean by that?

```
 1          A.   I mean that statement means that

 2     we're not making any claims there are not

 3     potentially other damage elements that we have

 4     not been asked to address.  It is just not to

 5     focus or limit it to XBT's lost business

 6     value.

 7          Q.   Okay.  Let me ask you, setting aside

 8     Mr. Gubarev personally, if you are valuing the

 9     entire business, right, the entire value of

10     the business, what other damages could there

11     be with respect to the business?

12          A.   I don't know.

13          Q.   Okay.  So you are not intending to

14     offer any testimony on anything other than

15     measuring the lost business value, setting

16     aside the benefit to BuzzFeed?

17          A.   And again unless new information

18     comes up I'm asked to address something else,

19     for right now this is all I'm -- this is all I

20     have analyzed.

21          Q.   Okay.  And in your estimate of

22     business value, right, is an estimate for as

23     an accountant would call it the consolidated

24     company?  Is that fair?

25          A.   It's a fair market value of XBT and
```

```
 1     its subsidiaries.

 2          Q.    And all of its subsidiaries?  Right?

 3          A.    Correct.

 4          Q.    So you have not made any effort to

 5     apportion that market value by figuring out

 6     the market value of each subsidiary?  Is that

 7     fair?

 8          A.    I have not.

 9          Q.    Okay.  And you have not made any

10     effort to calculate any business value for

11     Webzilla, Inc. specifically?

12          A.    I have not.

13          Q.    Okay.  Is it -- would it also be

14     accurate to say that you have not made any

15     effort to determine how much of what you

16     contend is lost business valuable should be

17     attributed to BuzzFeed and how much should be

18     attributed to Christopher Steele?

19                MR. FRAY-WITZER:  Objection.

20          A.    Business valuable?

21     BY MR. SIEGEL:

22          Q.    Back up.

23                Are you aware that XBT is also suing

24     and  Mr. Gubarev and one of its European

25     subsidiaries are suing Mr. Steele in London?
```

```
 1      Are you aware of that?
 2           A.   I have heard that, but I don't know
 3      anything about it.
 4           Q.   And they are suing Mr. Steele over
 5      the same statements that they are suing
 6      BuzzFeed over?
 7           A.   Again I have not looked into that at
 8      all.
 9           Q.   Okay.  So you haven't looked at that
10      at all.  So you haven't made any effort to
11      say, you know what, BuzzFeed -- you gave a
12      range of lost business value, right, from 32
13      million to 137 I think is your estimate?  Your
14      latest estimate?  Roughly?  Right?
15           A.   Well, roughly.
16           Q.   Okay.  So you haven't made any
17      effort to say of that 32 million, X percentage
18      was caused by BuzzFeed and Y percentage was
19      caused by Christopher Steele?  Right?  That is
20      not something that you have looked at?
21           A.   I have not --
22           Q.   Okay.
23           A.   -- discussed, looked at that,
24      anything.
25           Q.   Okay.
```

```
 1        Q.   Okay.  The next sentence says that:
 2             "XBT suffered increased bank
 3   scrutiny following the publication of the
 4   dossier.  Their bank accounts in multiple
 5   countries were frozen and banks threatened to
 6   close their accounts altogether."
 7             And you cite a conversation with
 8   Mr. Mishra.  Right?
 9        A.   That's correct.
10        Q.   Do you have any other evidence that
11   their banks in multiple countries were frozen
12   and banks threatened to close their accounts
13   altogether?
14        A.   Other than what is described in my
15   report, cited to in my report, no.
16        Q.   Do you know whether any of those
17   accounts were actually ever closed?
18        A.   Again all I know is what I was told,
19   what we discussed, based on the information I
20   reviewed, that's what I know.
21        Q.   So the answer to my question is no,
22   you don't know whether any of the company's
23   bank accounts were ever actually closed?
24        A.   Well, frozen was the word that I
25   used.  I don't know about closed.
```

 1          Q.   Well, you said that they threatened

 2     to close.  But do you know whether they -- put

 3     it this way.  Do you know whether those bank

 4     accounts were unfrozen?

 5          A.   I don't know.

 6          Q.   And I take it you didn't ask

 7     Mr. Mishra?

 8          A.   I believe we had a general

 9     discussion about that.  I don't remember if

10     that specific topic came up.

11          Q.   And the next sentence says:

12               "Banks threatened to close their

13     accounts altogether."

14               But you don't know whether any of

15     those accounts were actually closed

16     altogether?

17          A.   I do not.

18          Q.   Okay.  You then say:

19               "The banks dramatically increased

20     their scrutiny on potential new clients.  They

21     needed much more in-depth information about

22     the company and how it gets money."

23               Just leaving that right there, what

24     is your basis for that statement?

25          A.   The email from ABN AMRO.

```
 1        Q.   Okay.  Which just asked for more
 2   information?  Right?
 3        A.   A lot of information, yes.
 4        Q.   And how does asking for more
 5   information correlate to a loss in revenue?
 6             MR. FRAY-WITZER:  Objection.
 7        You can answer.
 8        A.   The -- it is an extra hurdle put in
 9   place.  If, you know, hypothetically, if you
10   have a situation where you have a line of
11   credit, a relationship with a bank --
12   BY MR. SIEGEL:
13        Q.   Right.
14        A.   -- you say I am bringing on a new
15   client, I need X amount of loan to get
16   equipment.  The, you know, the past history
17   with them has been okay, or show me the
18   projections, whatever the case may be, a
19   fairly simple process streamlined.
20             Then having that streamlined process
21   disrupted and now having to find detailed
22   information to numerous questions, I mean it
23   is only going to slow down that process, which
24   slowing down the ability to get financing
25   would have a negative impact on the business.
```

```
1            Q.   Okay.  Do you have any idea how long

2      -- let's go to document 67.

3                MR. SIEGEL:  Let's show him

4           this.  Or I will just show him the

5           report.  Wait a sec.  Apparently

6           this is one we forgot to run off.

7                MR. FRAY-WITZER:  Nathan, do

8           you need me to make copies of

9           something?

10                MR. SIEGEL:  Yes.  That would

11          be appreciated.

12                MR. FRAY-WITZER:  Why don't

13          we go off the record for a moment.

14                THE VIDEOGRAPHER:  The time

15          is 1:35.  We are off the record.

16                (Recess taken at 1:35 p.m.)

17                (Recess ended at 1:39 p.m.)

18                THE VIDEOGRAPHER:  The time

19          is 1:39.  We are back on the record.

20      BY MR. SIEGEL:

21            Q.   Okay.  I am showing you Exhibit 7.

22          (Three-page e-mail, bearing

23          production numbers P-A 000734 through

24          P-A 000736 marked Exhibit 7 for

25          identification.)
```

```
 1                    (Handing Exhibit 7 to the

 2            witness.)

 3       BY MR. SIEGEL:

 4            Q.   Which you cite as document 67 in

 5       your report.

 6            A.   Yes.

 7            Q.   So is this your sole source of

 8       information that banks increased their

 9       scrutiny on these companies?

10                    MR. FRAY-WITZER:   Objection.

11            A.   Aside from conversations I had with

12       the company.

13       BY MR. SIEGEL:

14            Q.   So this is the only documentation

15       that you have seen to substantiate that

16       assertion?

17            A.   I believe so.

18            Q.   Do you know whether Webzilla

19       continued to receive financing or whatever

20       other services they got from ABN AMRO?

21            A.   I don't know.

22            Q.   You don't know?

23            A.   (The witness shaking his head.)

24            Q.   All you have here is an email from

25       January 31, 2018?  Right?  Do you know if
```

```
 1        Webzilla provided the information that ABN

 2        AMRO was asking for?

 3             A.   I don't know.

 4             Q.   So I take it you also don't know if

 5        they did provide it how quickly they provided

 6        it?

 7             A.   I don't know.

 8             Q.   Okay.  You make the assertion that:

 9                  "The banks dramatically increased

10        their scrutiny driving away many clients in

11        the process."

12                  Right?  And by clients, you mean XBT

13        clients?  Is that what you mean?

14             A.   Clients of the entire company, yes.

15             Q.   Okay.  Not of the banks?  Of the --

16             A.   Plaintiffs here.

17             Q.   Plaintiff companies.  Okay.

18                  What evidence do you have that

19        clients were driven away by any additional

20        scrutiny that banks imposed on the companies,

21        the plaintiff companies?

22             A.   Well, again it was the discussions

23        with the company.  It goes back to the whole

24        need to have the financing to then get the

25        servers to have the clients.  So that is my
```

1    understanding of the issue that occurred when

2    it came to financiers such as ABN AMRO.

3         Q.   So how were clients driven away, as

4    you understand it?

5         A.   Well, if you don't have the product

6    or service to provide, then presumably a

7    client can go elsewhere then.

8         Q.   Okay.  And you don't know whether --

9    how quickly Webzilla may have gotten financing

10   from ABN AMRO?  Right?

11        A.   I don't know.

12        Q.   Okay.  Did you ever ask?

13        A.    It may have been part of a general

14   discussion.  I don't remember.

15        Q.   And you don't think that that is

16   information that would be relevant to know?

17        A.   I mean I asked what were the issues

18   with banks, financiers.

19        Q.   Right.

20        A.   And what can you show me that shows

21   there was that issue, and this was a document

22   that I was provided with.

23        Q.   And do you have any information as

24   to over what time period this scrutiny that

25   you are discussing occurred?

```
1              A.    I don't know the exact dates.

2              Q.    Do you know whether it stopped, in

3       other words, whether this increased scrutiny

4       stopped at some point?

5              A.    I think with some financiers, it

6       stopped at some point, months later.  With

7       others, it may not -- they may never have, you

8       know, regained that relationship.

9              Q.    But you don't know?  You don't know

10      the answer to either of those questions, do

11      you?

12             A.    Again this is based on conversations

13      I have had, so I don't have a document that

14      says it, but that's my understanding.

15             Q.    Okay.  Do you have any understanding

16      as to whether it may have been as quickly as a

17      month that their relationships with these

18      banks resumed?

19             A.    It could have been, but I don't know

20      the exact timing.

21             Q.    It is kind of like applying for a

22      mortgage?  Right?  You apply for a mortgage,

23      and the bank comes back and says, "Look, we

24      want some more information"?  Right?

25                   MR. FRAY-WITZER:  Objection.
```

```
 1      BY MR. SIEGEL:

 2           Q.   So it may take you a little longer

 3      to get your house as a result, right, than

 4      what you expected?

 5                     MR. FRAY-WITZER:  Objection.

 6      BY MR. SIEGEL:

 7           Q.   If you provide the bank the

 8      information, the bank ultimately approves it?

 9      Right?

10                     MR. FRAY-WITZER:  Objection.

11           A.   What was the question?

12      BY MR. SIEGEL:

13           Q.   Well, you know, I apply for a

14      mortgage.  Right?

15           A.   Okay.

16           Q.   And the bank comes back and says,

17      "You know what?  We need some more

18      information."

19           A.   Okay.

20           Q.   So I get them that information and

21      they ultimately approve the loan.  Right?

22           A.   Um-hmm.

23           Q.   So I moved into my house maybe a

24      week or two later but I ultimately have the

25      house.  Right?
```

```
 1          A.   Okay.

 2               MR. FRAY-WITZER:  Objection.

 3   BY MR. SIEGEL:

 4          Q.   And then I move on.

 5               So how does whatever scrutiny you

 6   understand the company might have experienced

 7   in January and/or February of 2018 -- 2017,

 8   sorry, how does that translate into permanent

 9   revenue loss?

10          A.   I mean this email is from more than

11   a year later.

12          Q.   What is that?

13          A.   This email is from more than a year

14   later.  So more than a year later they still

15   have the increased hurdles to meet.

16          Q.   Okay.  Do you have any idea whether

17   this email is typical of what they were

18   experiencing more than a year later?

19          A.   My understanding is that this is not

20   typical.  This is as a result of the

21   difficulties --

22          Q.   I don't mean that.  Whether this is

23   typical of all of their relationships with

24   sources of finance --

25          A.   I --
```

1          Q.    -- as of January of 2018?

2          A.    My understanding was that this was

3      -- this was not the case prior to the release

4      of the dossier.

5          Q.    No, no, no.  I'm not saying that.  I

6      am saying do you have any understanding

7      whether as of January 2018 --

8          A.    Um-hmm.

9          Q.    -- right, the kinds of questions

10     that are being asked in this email are typical

11     of the same scrutiny being applied by

12     Webzilla's other sources of finance.

13         A.    Yeah, I don't know.

14         Q.    You don't know.  Okay.

15              Let me -- right.  These -- this

16     particular email, right, relates to financing

17     for Webzilla BV?  Right?

18                  (Pause.)

19                  (Witness viewing Exhibit 7.)

20         A.    Correct.

21         Q.    And Webzilla Limited?  Right?

22         A.    Correct.

23         Q.    Not Webzilla, Inc.?

24         A.    Correct.

25         Q.    Okay.  Does this email indicate to

1    you that in fact there is a continuing

2    relationship that Webzilla has with ABN AMRO

3    as of January of 2018?

4         A.   You know, they -- they are

5    communicating, so if that is a relationship.

6         Q.   Right.  In other words, doesn't this

7    email indicate to you that Webzilla, the

8    particular Webzilla companies, have an ongoing

9    relationship with ABN AMRO, and ABN AMRO was

10   just asking them to periodically provide more

11   information?

12        A.   You could -- there is many different

13   ways you could look at this.  I -- you know --

14        Q.   Well, this asks for a periodic

15   review of Webzilla accounts.  Right?

16        A.   Um-hmm.

17        Q.   Right?

18        A.   Yes.

19        Q.   It doesn't say we're going to hold

20   up any financing for you until you give us

21   this information?  Right?

22        A.   I would have to read it again.  But

23   I -- look.  I will believe you if it doesn't

24   say those exact words.

25        Q.   Okay.  Do you have any information

1    that this request for a, quote, periodic

2    review for all Webzilla accounts, right, had

3    any effect on either the amount of financing

4    Webzilla may have received from ABN AMRO or

5    the speed in which they received it?

6        A.   Well, I think it certainly affected

7    the speed based on the discussion we

8    previously had about this.

9        Q.   Well, no.  How do you know -- this

10   email --

11       A.   Um-hmm.

12       Q.   How did this email affect the speed

13   with which Webzilla may have received

14   financing from ABN AMRO?

15       A.   Well, like we discussed, it is

16   additional, you know, hoops to jump through,

17   so to speak.

18       Q.   But it doesn't say that?  Right?  It

19   doesn't say you have applied for financing but

20   we're not going to give it to you until you

21   provide us this information?  Right?  It just

22   says we have to perform periodic reviews.  Can

23   you give us this information so we can perform

24   our periodic review.  Right?

25       A.   Right.

1        Q.    There is nothing in the email that

2    indicates that any money at all is being held

3    up as a result of their request for this

4    information?

5        A.    Well, I think it is implied that

6    until this is -- these requests are met that

7    money will be held up.

8        Q.    You think it is implied?

9        A.    Yes.

10       Q.    Based on what?

11       A.    Well, based on the fact that they

12   are saying we need to review all of this.  So

13   presumably -- and this is an assumption -- but

14   if they didn't provide all of this information

15   or couldn't or it took too long to get it,

16   then they may decline the financing.

17       Q.    You have no idea whether any of that

18   occurred?  Right?

19       A.    Like I said, I don't know.

20       Q.    Okay.  And again you don't have any

21   information that this request for a, quote,

22   "periodic review" actually drove away a single

23   client?

24       A.    I mean this goes back to the

25   conversation we had before.  I mean they make

```
 1      the statement in here "As you probably know

 2      due to the bad press regarding Webzilla" now

 3      we are obligated -- obliged to perform a

 4      periodic review.  Again it goes back to the

 5      statements I made earlier.

 6          Q.   Of course.  But again the fact that

 7      the bank may have wanted to ask for a periodic

 8      review --

 9          A.   Um-hmm.

10          Q.   -- you don't have any information

11      that this request for a, quote, "periodic

12      review" caused -- drove away a single customer

13      of Webzilla?

14          A.   Again I don't know that.  Yes.  I

15      don't know.

16          Q.   Let's look at page 11.

17          A.   Of my report?

18          Q.   Yes.

19              (Witness complying.)

20          Q.   The first full paragraph says:

21              "The projected increase in EBITDA

22      margin from 2016's actual margin of 42 percent

23      was attributed to the planned evolution of the

24      company's business model to one based on

25      physical storage.  If not for the setbacks
```

```
 1                        CERTIFICATE

 2     Commonwealth of Massachusetts

 3     Plymouth, ss.

 4

 5

 6              I, Judith McGovern Williams, a

 7     Notary Public in and for the Commonwealth of

 8     Massachusetts, do hereby certify:

 9              That JEFFREY ANDERSON, the witness

10     whose deposition is hereinbefore set forth,

11     was duly sworn by me and that such deposition

12     is a true record of the testimony given by the

13     said witness.

14              IN WITNESS WHEREOF, I have hereunto

15     set my hand this 5th day of June, 2018.

16

17
                    Judith McGovern Williams
18              Registered Professional Reporter
                    Certified Realtime Reporter
19                  Certified LiveNote Reporter
            Certified Shorthand Reporter No. 130993
20

21
       My Commission expires:
22
       April 19, 2024
23

24

25
```