# EXHIBIT 5

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                SOUTHERN DISTRICT OF FLORIDA

 3

 4

 5

 6
        ****************************
 7      ALEKSEJ GUBAREV, XBT HOLDING
        S.A., AND WEBZILLA, INC.,
 8
             Plaintiffs,
 9
        vs.                               Case No.:
10                                        1:17-cv-60426-UU
        BUZZFEED, INC. AND BEN SMITH,
11
             Defendants
12      ****************************

13

14                      CONFIDENTIAL

15        VIDEOTAPED DEPOSITION OF JEFFREY ANDERSON

16              Thursday, May 31, 2018

17                     10:12 a.m.

18                     Held at:

19              Ciampa Fray-Witzer, LLP

20                   20 Park Plaza

21                    Suite 505

22               Boston, Massachusetts

23

24      Judith McGovern Williams, CSR, CRR
         Registered Professional Reporter
25
```

 1    valuations had been done?
 2        A.   What do you mean what did he tell
 3    me?
 4        Q.   Well, you said you asked him about
 5    past valuations of the company.  What did you
 6    learn?  What did he say?  What information did
 7    he give you?
 8        A.   He -- he said that KPMG had done a
 9    study in 2013, and that they used that study
10    for internal purposes and to determine, you
11    know, bank loans, items to present to
12    financiers.
13        Q.   Okay.  Were there any other
14    valuations that he told you about?
15        A.   That's the only one that I'm aware
16    of.
17        Q.   What did he tell you was the -- what
18    did he assert to you was the impact of the
19    publication of statements in the dossier that
20    may relate to XBT Webzilla?
21        A.   They lost significant revenues,
22    earnings, growth.  They had a complete lack of
23    ability to get financing.
24        Q.   Okay.  Did -- how did Mr. Mishra
25    tell you -- did Mr. Mishra identify any

1    customers for you that he contends
2    XBT/Webzilla lost as a result of the
3    publication of the dossier?
4        A.   I know -- banks or?
5        Q.   No, no, no.  Specific customers.  I
6    mean people who provide revenue to Webzilla --
7        A.   I don't know --
8        Q.   -- and XBT?
9        A.   I don't know that I got a specific
10   example.
11       Q.   Okay.  Did you ask?
12       A.   Yes.
13       Q.   And he wasn't able to give you any
14   specific examples?
15       A.   He did not know.
16       Q.   And with -- did he identify any
17   specific streams of revenue that he -- any
18   specific revenue that he said, "Here, this is
19   revenue that the company was earning in 2016.
20   We lost it in 2017 as a result of the
21   publication of the dossier"?
22       A.   My understanding was that more or
23   less across the board there was a decline in
24   revenues from the various segments.
25       Q.   And how did he contend that any

1  decline in revenue was attributable to the
2  publication of the dossier?
3       A.   Because it happened immediately
4  after the dossier was released.
5       Q.   And so that was -- and that's the
6  only reason?
7       A.   Well, no.  And there were issues
8  with lenders.
9       Q.   What were those issues with lenders?
10      A.   They either wouldn't provide loans
11 because of this or, you know, created great
12 hurdles to getting those loans because of it.
13      Q.   And how long -- did you have any
14 understanding of how long those issues lasted?
15      A.   I don't know specific time frame.
16      Q.   Did you ask?
17      A.   I believe we had a general
18 discussion about it, but I don't know if I
19 asked the specific question.
20      Q.   Have you read Mr. Mishra's
21 deposition?
22      A.   I have.
23      Q.   Do you see in his deposition he said
24 that these various concerns with lenders were
25 all taken care of within a month or so?

```
 1                MR. FRAY-WITZER:  Objection.
 2         A.   I don't -- I don't recall reading
 3    that specifically.
 4    BY MR. SIEGEL:
 5         Q.   You don't recall reading that.
 6    Okay.
 7                You don't recall reading anything
 8    like that?
 9         A.   I recall reading that eventually
10    some lenders, not all, but some, were willing
11    to come back to the table, but I don't know
12    the exact time frame of that.
13         Q.   Which lenders were not willing to
14    come back to the table?
15         A.   I know ABN AMRO, they had issues
16    with them.  I don't recall the other specific
17    banks.
18         Q.   Okay.  Do you know whether ABN AMRO,
19    whether those issues with ABN AMRO were ever
20    resolved?
21         A.   I don't know if or when they were.
22         Q.   Okay.  Did Mr. Mishra ever provide
23    you any documentation to substantiate which
24    lenders he was talking about?
25         A.   Yes.
```

1    Q.   Which ones?  What documentation did
2    he provide you?
3    A.   ABN AMRO I saw.
4    Q.   There was a single email, right,
5    which we will talk about.  Anything else?
6    A.   That's all I recall at this point.
7    Q.   And did you ever do anything
8    yourself to try to verify whether what
9    Mr. Mishra was telling you about problems that
10   they had with -- he contends that they had
11   with banks was true?
12   A.   What do you mean?
13   Q.   Well, that in fact that --
14   Mr. Mishra told you that they had had some
15   problems with obtaining financing?  Right?
16   A.   He did.  Yes.
17   Q.   Okay.  But he didn't tell you how
18   long those problems lasted?
19   A.   Again I don't remember the exact
20   time frame of those issues.
21   Q.   Okay.  And did you ever, other than
22   the e-mail about ABN AMRO, did you ever do
23   anything yourself to verify whether
24   Mr. Mishra's assertions were true?
25   A.   I asked for all information that was

1      available.  I mean we discussed it when we met
2      in La Jolla.  But I don't know what else
3      independently I could have done in that
4      regard.
5           Q.   Well, okay.  So and you said he
6      provided you that single e-mail?  Right?  Did
7      he provide you any other information about
8      supposed problems with banks?
9           A.   I know there was again discussions
10     about issues with other banks.
11          Q.   Okay.  So you just relied on what
12     Mr. Mishra told you?
13          A.   I relied in part, yes, on what he
14     told me.
15          Q.   Okay.  How many times did you talk
16     to him?
17          A.   Aside from the meeting, maybe one or
18     two other times.
19          Q.   And how long did that meeting last?
20          A.   Two, three hours.
21          Q.   And when did you speak to him
22     subsequently?
23          A.   I spoke with him yesterday.
24          Q.   What did you talk about?
25          A.   I talked about the various revenue

1   streams and which ones were hit the most.
2        Q.   And what did he tell you?
3        A.   It was the Web servers were one of
4   the biggest hits.
5        Q.   Okay.  And did he -- again did he
6   give you any specific customers that
7   supposedly stopped being customers as a result
8   of the dossier?
9        A.   Again I -- my understanding was this
10  was across the board, and so he couldn't
11  provide a specific it was this one customer,
12  so I don't know that.
13       Q.   Okay.  And did he give you any
14  specific examples of any potential customers
15  that he contends didn't become customers as a
16  result of the dossier publication?
17       A.   I asked that question.  I think his
18  response was it's almost impossible to know
19  which ones didn't come in as a result of this,
20  because nobody was willing to specifically say
21  or very few people specifically claimed it was
22  because of X.  It was more of a broader there
23  is issues; we need to stand back.
24       Q.   And what else did you talk to
25  Mr. Mishra about yesterday?

1    A.   Discussions with counsel, again the
2    timing of the event, time of the release of
3    the dossier and the subsequent decline in
4    revenue and earnings.
5    Q.   Nothing other than that?
6    A.   Off the top of my head, I don't
7    know.
8    Q.   Let's look at your supplemental
9    report.
10             (Witness complying.)
11   Q.   On page 6, looking at the
12   second-to-last paragraph.  The second sentence
13   says:
14             "As a result of the BuzzFeed
15   publication, Mr. Gubarev has, quote, 'found
16   his personal and professional reputation in
17   tatters.'"
18             I understand from what we were
19   saying before is you are not actually
20   providing expert testimony about Mr. Gubarev's
21   personal reputation?  Is that right?
22   A.   That's correct.
23   Q.   The basis for that statement that
24   you cite is the complaint in this case?
25   Right?

1      A.   That's correct.
2      Q.   So did you just assume that
3  everything that is alleged in the complaint is
4  true?
5      A.   I assumed this statement from the
6  complaint was true.
7      Q.   And why did you assume that was
8  true?
9      A.   No reason to believe it wasn't true.
10     Q.   Are there other statements in the
11 complaint that you have reason to believe are
12 not true?
13     A.   Not that I can think of right now.
14     Q.   The next sentence says:
15          "Bot XBT and Webzilla have suffered
16 and continue to suffer economic losses due to
17 their now tarnished reputations."
18          And again you cite the complaint.
19          Is there anything else other than
20 what you have testified so far that leads you
21 to conclude that XBT and Webzilla have
22 suffered and continue to suffer major economic
23 losses due to BuzzFeed's publication?
24     A.   Other than what is in my report and
25 what we have discussed, I don't believe so.

1    Q.   Okay.  The next sentence says that:
2         "XBT suffered increased bank
3    scrutiny following the publication of the
4    dossier.  Their bank accounts in multiple
5    countries were frozen and banks threatened to
6    close their accounts altogether."
7         And you cite a conversation with
8    Mr. Mishra.  Right?
9    A.   That's correct.
10   Q.   Do you have any other evidence that
11   their banks in multiple countries were frozen
12   and banks threatened to close their accounts
13   altogether?
14   A.   Other than what is described in my
15   report, cited to in my report, no.
16   Q.   Do you know whether any of those
17   accounts were actually ever closed?
18   A.   Again all I know is what I was told,
19   what we discussed, based on the information I
20   reviewed, that's what I know.
21   Q.   So the answer to my question is no,
22   you don't know whether any of the company's
23   bank accounts were ever actually closed?
24   A.   Well, frozen was the word that I
25   used.  I don't know about closed.

1      Q.   Well, you said that they threatened
2   to close.  But do you know whether they -- put
3   it this way.  Do you know whether those bank
4   accounts were unfrozen?
5      A.   I don't know.
6      Q.   And I take it you didn't ask
7   Mr. Mishra?
8      A.   I believe we had a general
9   discussion about that.  I don't remember if
10  that specific topic came up.
11     Q.   And the next sentence says:
12          "Banks threatened to close their
13  accounts altogether."
14          But you don't know whether any of
15  those accounts were actually closed
16  altogether?
17     A.   I do not.
18     Q.   Okay.  You then say:
19          "The banks dramatically increased
20  their scrutiny on potential new clients.  They
21  needed much more in-depth information about
22  the company and how it gets money."
23          Just leaving that right there, what
24  is your basis for that statement?
25     A.   The email from ABN AMRO.

```
 1        Q.   Okay.  Which just asked for more
 2   information?  Right?
 3        A.   A lot of information, yes.
 4        Q.   And how does asking for more
 5   information correlate to a loss in revenue?
 6             MR. FRAY-WITZER:  Objection.
 7        You can answer.
 8        A.   The -- it is an extra hurdle put in
 9   place.  If, you know, hypothetically, if you
10   have a situation where you have a line of
11   credit, a relationship with a bank --
12   BY MR. SIEGEL:
13        Q.   Right.
14        A.   -- you say I am bringing on a new
15   client, I need X amount of loan to get
16   equipment.  The, you know, the past history
17   with them has been okay, or show me the
18   projections, whatever the case may be, a
19   fairly simple process streamlined.
20             Then having that streamlined process
21   disrupted and now having to find detailed
22   information to numerous questions, I mean it
23   is only going to slow down that process, which
24   slowing down the ability to get financing
25   would have a negative impact on the business.
```

```
 1        Q.   Okay.  Do you have any idea how long
 2   -- let's go to document 67.
 3             MR. SIEGEL:  Let's show him
 4        this.  Or I will just show him the
 5        report.  Wait a sec.  Apparently
 6        this is one we forgot to run off.
 7             MR. FRAY-WITZER:  Nathan, do
 8        you need me to make copies of
 9        something?
10             MR. SIEGEL:  Yes.  That would
11        be appreciated.
12             MR. FRAY-WITZER:  Why don't
13        we go off the record for a moment.
14             THE VIDEOGRAPHER:  The time
15        is 1:35.  We are off the record.
16             (Recess taken at 1:35 p.m.)
17             (Recess ended at 1:39 p.m.)
18             THE VIDEOGRAPHER:  The time
19        is 1:39.  We are back on the record.
20   BY MR. SIEGEL:
21        Q.   Okay.  I am showing you Exhibit 7.
22        (Three-page e-mail, bearing
23        production numbers P-A 000734 through
24        P-A 000736 marked Exhibit 7 for
25        identification.)
```

1           (Handing Exhibit 7 to the
2      witness.)
3   BY MR. SIEGEL:
4      Q.   Which you cite as document 67 in
5   your report.
6      A.   Yes.
7      Q.   So is this your sole source of
8   information that banks increased their
9   scrutiny on these companies?
10          MR. FRAY-WITZER:  Objection.
11     A.   Aside from conversations I had with
12  the company.
13  BY MR. SIEGEL:
14     Q.   So this is the only documentation
15  that you have seen to substantiate that
16  assertion?
17     A.   I believe so.
18     Q.   Do you know whether Webzilla
19  continued to receive financing or whatever
20  other services they got from ABN AMRO?
21     A.   I don't know.
22     Q.   You don't know?
23     A.   (The witness shaking his head.)
24     Q.   All you have here is an email from
25  January 31, 2018?  Right?  Do you know if

```
 1    Webzilla provided the information that ABN

 2    AMRO was asking for?

 3         A.    I don't know.

 4         Q.    So I take it you also don't know if

 5    they did provide it how quickly they provided

 6    it?

 7         A.    I don't know.

 8         Q.    Okay.  You make the assertion that:

 9              "The banks dramatically increased

10    their scrutiny driving away many clients in

11    the process."

12              Right?  And by clients, you mean XBT

13    clients?  Is that what you mean?

14         A.    Clients of the entire company, yes.

15         Q.    Okay.  Not of the banks?  Of the --

16         A.    Plaintiffs here.

17         Q.    Plaintiff companies.  Okay.

18              What evidence do you have that

19    clients were driven away by any additional

20    scrutiny that banks imposed on the companies,

21    the plaintiff companies?

22         A.    Well, again it was the discussions

23    with the company.  It goes back to the whole

24    need to have the financing to then get the

25    servers to have the clients.  So that is my
```

```
 1    understanding of the issue that occurred when
 2    it came to financiers such as ABN AMRO.
 3         Q.   So how were clients driven away, as
 4    you understand it?
 5         A.   Well, if you don't have the product
 6    or service to provide, then presumably a
 7    client can go elsewhere then.
 8         Q.   Okay.  And you don't know whether --
 9    how quickly Webzilla may have gotten financing
10    from ABN AMRO?  Right?
11         A.   I don't know.
12         Q.   Okay.  Did you ever ask?
13         A.   It may have been part of a general
14    discussion.  I don't remember.
15         Q.   And you don't think that that is
16    information that would be relevant to know?
17         A.   I mean I asked what were the issues
18    with banks, financiers.
19         Q.   Right.
20         A.   And what can you show me that shows
21    there was that issue, and this was a document
22    that I was provided with.
23         Q.   And do you have any information as
24    to over what time period this scrutiny that
25    you are discussing occurred?
```

```
 1                        CERTIFICATE

 2     Commonwealth of Massachusetts

 3     Plymouth, ss.

 4

 5

 6              I, Judith McGovern Williams, a

 7     Notary Public in and for the Commonwealth of

 8     Massachusetts, do hereby certify:

 9              That JEFFREY ANDERSON, the witness

10     whose deposition is hereinbefore set forth,

11     was duly sworn by me and that such deposition

12     is a true record of the testimony given by the

13     said witness.

14              IN WITNESS WHEREOF, I have hereunto

15     set my hand this 5th day of June, 2018.

16              [signature: Judith McGovern Williams]

17
            Judith McGovern Williams
18        Registered Professional Reporter
           Certified Realtime Reporter
19         Certified LiveNote Reporter
       Certified Shorthand Reporter No. 130993
20

21
       My Commission expires:
22
       April 19, 2024
23

24

25
```