# **<u>EXHIBIT 1</u>**

A

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**

<u>Case No: CR-2017-664</u>

<u>The Royal Courts of Justice</u>
<u>Strand, London WC2A 2LL</u>

B

<u>Date of hearing:</u> <u>05 February 2018</u>
<u>Start Time:</u> <u>10.30</u>   <u>Finish Time:</u> <u>17.00</u>

<u>Page Count:</u>   89
<u>Word Count:</u>   37699
<u>Number of Folios:</u>   <u>524</u>

C

Before:

**SENIOR MASTER FONTAINE**
**(SENIOR MASTER & QUEEN'S REMEMBRANCER)**

D

(1)  **ALEXSEJ GUBAREV**          <u>Plaintiffs</u>
(2)  **XBT HOLDING S.A.**
(3)  **WEBZILLA INC**

- and -

<u>Defendants</u>

E

(1) **BUZZFEED INC**
(2) **BEN SMITH**

- and -

<u>Applicant</u>

**CHRISTOPHER STEELE**

F

**MR. GAVIN MILLAR, QC and MR. EDWARD CRAVEN for Mr. Steele.**

**MISS HANNAH BROWN, QC for the Plaintiffs.**

G

**MR. ALEX BAILIN, QC and MR. BEN SILVERSTONE for the Defendants.**

**MR. BLAKE appeared for the Foreign & Commonwealth Office.**

H

**P R O C E E D I N G S**

- - - - - - - - - - - - - - - - - - - -

1

A

*If this Transcript is to be reported or published, there is a requirement to ensure that no reporting restriction will be breached. This is particularly important in relation to any case involving a sexual offence, where the victim is guaranteed lifetime anonymity (Sexual Offences (Amendment) Act 1992), or where an order has been made in relation to a young person.*

B

*This Transcript is Crown Copyright. It may not be reproduced in whole or in part other than in accordance with relevant licence or with the express consent of the Authority. All rights are reserved.*

Digital Transcription by Marten Walsh Cherer Ltd
1st Floor, Quality House, 6-9 Quality Court, Chancery Lane, London WC2A 1HP
Tel No: 020 7067 2900 Fax No: 020 7831 6864 DX: 410 LDE

C
Email: info@martenwalshcherer.com
Web: www.martenwalshcherer.com

D

E

F

G

H

2

**A**

MASTER FONTAINE:   Good morning.

MR. MILLAR: I appear with Mr. Craven, for Mr. Steele and my learned friend Miss Brown represents the plaintiffs, and my learned friends Mr. Bailin and Mr. Silverstone represent the defendants, and my learned friend Mr. Blake appears for the Foreign & Commonwealth Office.

**B**

MASTER FONTAINE: Thank you.  Would you bear with me a moment, Mr. Millar, while I work out who is who? Sorry, who appears for the plaintiffs? I am just trying to find it on this sheet. Hannah Brown, Miss Brown.  Thank you very much.  Yes, Mr. Millar, thank you.

**C**

MR. MILLAR: Master, you should have three hearing files, three skeletons, and a bundle of authorities.

MASTER FONTAINE: Yes, I do.  Thank you.

MR. MILLAR: The first application before the court is Mr. Steele's application of 1st December 2017 to set aside or vary your order of 9th November for him to be examined orally to provide evidence in these defamation proceedings.  There is also an application before the court by the US defendants to vary the order, if not set aside on our application, or presumably if it is not varied in the way we seek in the alternative.  The FCO is at this stage taking a back seat.  As you will be aware, it is indicated that it may consider issuing a certificate under section 3.3 of the 1975 Act which would, if issued, preclude an order for evidence to be given, which is identified by the certificate as prejudicial to national security.  The FCO will await the outcome of this hearing before deciding what to do.  The Letter of Request from the US court, and therefore the order, were obtained by the plaintiffs in the Florida proceedings and the order is at volume 1, tab 9, page 53.

**D**

**E**

**F**

**G**

MASTER FONTAINE: Yes.

MR. MILLAR: As you know, Master, according to this my client, Mr. Steele, would be examined, cross-examined, and re-examined as necessary for up to seven hours by the parties' trial counsel: page 54, 6D and E.  Paragraph 6H identifies the areas of questioning by reference to 14 subject matters in Schedule A and you granted (see page 56) at limb 6 liberty to set aside or vary.

**H**

3

A

The background to the libel proceedings in Florida needs to be understood when considering the subject matters in the order.  As you know, Master, Mr. Steele is a former FCO Crown servant and at the end of his time at the FCO in 2009 he had acquired particular expertise through his service in the affairs of Russia and the

B

Commonwealth independent states, and then set up a corporate intelligence consultancy, Orbis Intelligence Limited, with another ex-FCO Crown servant, Christopher Burrows.

Between June and early November 2016, Orbis was engaged by research consultancy in Washington DC, Fusion GPS, to prepare a series of confidential memoranda based on intelligence concerning Russian efforts to influence the US

C

presidential election process and links between Donald Trump and Russia.

On 8th November, Donald Trump was elected President and around 13th December Mr. Steele prepared another confidential memorandum on his own initiative. That is worth a quick glance. It is in volume 2, tab 11, page 126. You will see that the number at

D

the top of this company intelligence report is 2016/166 and the heading below it, below the top line, is self-explanatory.  It is a two-page memorandum and on the second page there are 13 lines in which reference was made to the plaintiff, Mr. Gubarev and his companies, of which there are many, most of them containing in their name either XBT

E

or Webzilla.  If you count down in paragraph 3 to the brackets surrounding the last five lines, the 13 lines above that are the relevant words complained of about the plaintiffs in the US proceedings.

The complaint in the Florida proceedings is back at page 16 in tab 11 ----

F

MASTER FONTAINE: Can you just check the page numbers?

MR. MILLAR: Sorry, 165.

MASTER FONTAINE: Yes.

MR. MILLAR: You can see at the top that the issue date or filing date appears to be 3rd

G

February 2017.  The plaintiffs are Mr. Gubarev and two of his companies, XBT Holdings SA, a Luxembourg holding company, and Webzilla Inc, a Florida company.

At paragraphs 1-3 it describes what happened on 10th January 2017: "Perhaps one of the most reckless and irresponsible moments in modern journalism Buzzfeed and its editor chief, Ben Smith, chose to publish a dossier of unverified information compiled by a

H

private security company in which various allegations were made concerning, among

4

A

other things, computer hacking allegedly carried out by persons or organisations with ties to Russia, the Russian government, and/or the Federal Security Service of the Russian Federation SB, and although Buzzfeed and Smith specifically knew that at least portions of 'the dossier' were untrue they printed the entire document without meaningful redactions, including those portions that falsely accused the plaintiffs of

B

participating in an alleged conspiracy to commit crimes against the democratic leadership not to mention a conspiracy to undermine American democracy in the 2016 election.  With respect to the plaintiffs these allegations were wholly and completely false."  Just two more lines: "Buzzfeed and Mr. Smith published these allegations

C

without having even taken the most basic step of contacting the plaintiffs to ask if the allegations had any merit."

There is a further reference at paragraph 34 of the pleading, I think, to the private security company but apart from that those are the only references to Mr. Steele's

D

company in this pleading.   I am sorry, at the bottom of page 169: "Mr. Daventry(?) asked for the 35-page unverified dossier information as the same description is used compiled by a private security company."

That is Orbis but it does not feature in the complaint as pleaded in America beyond

E

that.  The collection of the confidential Orbis memoranda, which has become known as "the dossier" that Buzzfeed had published online on 10th January in that reckless and irresponsible moment, is at page 93, and following, in tab 11.  If one glances through it you can see it runs from page 93 to page 125, the ability obviously to publish an

F

attachment to an article online with a link facilitates the publication of this volume of material on a news website.  It contained a considerable amount of detail, I am not going to go through it now, about events, names of people, Americans and Russians, meetings, and so on, and allegations under the general heading of the August work that I have

G

described.

Then at the end of it we get to that, as it were, stray December memorandum that we looked at, at page 126, the post-presidential election memorandum that gives rise to the litigation.  Nowhere in the pre-election memoranda in that clutch of pages from 93-

H

125 is there any reference whatsoever to Mr. Gubarev or any of his XBT Webzilla companies.  They only appear in those 13 lines at paragraph 3 of the December

5

A

memorandum.  But, of course, "the dossier" as published online also included the December memorandum as well; that whole clutch of memoranda were published online.

B

Paragraphs 1-3 of the complaint in the US, which I just took you to and would now ask you to go back to page 165, really encapsulates the plaintiffs' complaint in America. In other words, their case is against Buzzfeed.  They sue Buzzfeed and Mr. Smith for publishing the hacking allegations about them in paragraph 3 of the December memorandum online on 10th January.  They seek to establish that the allegations about them were untrue.

C

Just for completeness, at page 170, paragraph 26, you will see the 13 lines therein set out, the words complained of are those words up to but not including the words in parentheses in paragraph 3, and at 27 you will see below the words complained of there is a strident assertion of falsity by the US plaintiffs, the words are split into five

D

propositions, each of which is specifically said to be false.  The amended answer in the Florida proceedings is at page 185, a few pages further on, which is Buzzfeed's amended answer, in effect its defence.  It is not, if you glance through it, terribly illuminating because it consists largely of denials of averments in the complaint but it is clear that the

E

plaintiffs have been put to proof of falsity in the American proceedings.  The strident assertion of falsity at paragraph 27 in the complaint, which we just looked at, is denied and you will see that on page 189, paragraph 27 of the amended answer, Buzzfeed and Mr. Smith say they "lack sufficient information to form a belief as to the truth or falsity

F

of the allegations in paragraph 27 of the complaint," and on that basis deny each and every one of them.  So, they are being put to proof, the US plaintiffs, on falsity.

Just quickly looking on at page 193 there are positive or affirmative defences pleaded. The ones which are relevant here are a fair report privilege, the second defence, and a neutral report privilege, err defence, and there is also a free speech defence over

G

the page, number 4 under the first and 14th Amendments, and also on page 194 fifth defence, "Plaintiffs are public figures and cannot meet their burden to prove actual malice by clear convincing evidence," which would be a requirement under *New York Times v Sullivan* if the plaintiffs were public figures.  It is yet to be decided in the

H

Florida proceedings.

6

**A**

I turn to the parallel proceedings in the Queen's Bench Division.  On the same day given at the top of the US complaint, that is 3rd February 2017, the same Mr. Gubarev and three of his XBT Webzilla companies, including the holding company, issued a rather less straightforward claim for defamation against my client and Orbis in the Queen's Bench Division. The claim form is at page 84.   You can see the four ----

**B**

MASTER FONTAINE: Page 84 of the second bundle?

MR. MILLAR: Yes, at tab 11.  They are all in the main exhibit, tab 11.  You will see that the first claimant is the individual, Mr. Gubarev, there are two European Webzilla companies at 2 and 3, and there is the Luxembourg holding company, XBT, at 4.  It is right to say that it recently discontinued its claim in QBD but it does not seem to us that makes any difference because Mr. Gubarev is the personification of these companies, the claimant, in both jurisdictions.

**C**

If I could just take you, Master, to one or two bits of the claim. At page 88, paragraph 6, you see in bold exactly the same words complained of in the QBC libel claim.  8(2) is perhaps the critical paragraph.  Let me read it in full: "Pending disclosure the claimants freely admit that they do not know the precise identities of those to whom the defendants originally provided the December memorandum.  However, the defendants prepared and initially published the December memorandum intending that its contents should be re-published to the world at large further, or alternatively, in circumstances where it was reasonably foreseeable that its contents would be re-published to the world at large."

**D**

**E**

So, the reference to "initially published" is publication in the technical sense in libel.   What they are saying is there was an initial publication, that is only dissemination to another person, of the words complained of.  We do not know what the initial dissemination was of the confidential December memorandum to other individuals by all this, but we are concerned about publication to the world at large.  You will see over the page at 8.3 that the publication in the libel sense sued on is again the 10th January publication by Buzzfeed to the world at large, which is obviously, they would say, the damaging publication.

**F**

**G**

The claimants have chosen not to sue Buzzfeed in this jurisdiction.  It is a notable feature of this QBD claim that they seek to fix my client and Orbis with legal liability

**H**

7

A

for the Buzzfeed publication of the words complained of.  They do that on the basis of the inference pleaded that we have just seen in paragraph 8.2 of the particulars of claim. How does this claim relate to the Florida claim?  At page 90, paragraph 10, we will see that the claim is restricted in the QBD to readership in the European Union whereas in

B

these proceedings in Florida, as we understand it, no doubt Miss Brown will confirm this to you on behalf of her clients, there is no attempt to claim damages for publication of the words by Buzzfeed to read as in the EU.  Our understanding is that on that basis there is no risk of double recovery but both claims have been confined to the

C

geographical area of the court.

In the QBD proceedings the defence was served in April of last year and is at page 128.  If you turn to page 129 in the listing of the dramatis personae in the defence you will see at paragraph 13 that there is mention of a Mr. David Kramer, former US State Department civil servant and US Assistant Secretary of State, who is an Assistant to

D

Senator McCain.  Over the page, at 130, perhaps the key paragraphs are 20 and 21, dealing with the December memorandum containing the words complained of: "The defendants considered correctly that the raw intelligence in the December memo (a) was of considerable importance in relation to alleged Russian interference in the US

E

presidential election; (b) had implications for the national security of the US and the UK; (c) needed to be analyzed and further investigated/verified."

It is an explicit pleading at paragraph 20 in this jurisdiction that the material needed to be verified.

F

At 20.1: "Accordingly, the second defendant provided a copy of the December memorandum.  2(a).  A Senior UK government national security official acting in his official capacity by confidential basis in hard copy form; (b) Fusion GPS in Washington DC by enciphered email with an instruction to Fusion to provide a hard copy to Senator

G

McCain via Mr. David Kramer."  That is the account in the defence of the initial dissemination publication, if you like, in technical libel terms of the December memorandum, limited obviously not to the world at large but only to those individuals for those purposes.

H

You will see, Master, over the page at 131, paragraphs 26 and 27 which deal with the averment in the particulars of claim that we just looked at, at paragraph 8.2, the

A

inferential case that we intended but was reasonably foreseeable that the material would be published to the world at large.  The inability of the claimants to specify who received the memorandum initially is noted, because it was confidential it is hardly surprising, and at 27 this is the averment that we intended it to be re-published to the

B

world at large is denied in its entirety.   Here the claimants will have to make out that inferential case in the teeth of that pleaded case in the defence and those denials.

Before serving the reply, the claimants sought further information by way of an RFI and this was provided in May.  At page 135, there are a number of questions asked,

C

which all bar one were responded to at that stage; 21 questions in all.  Having had the benefit of that further information, the claimants filed their reply in June, which is at page 145.  The reply is a lengthy document and it amplifies at some considerable length, as I say, the circumstantial case by which the claimants seek to show that Mr. Steele and

D

Orbis can be held liable for Buzzfeed's publication of the words complained of.

As we have explained in our skeleton, the claimants are trying to keep open in this reply the hypotheses, if I can put it that way, that the purpose of sending the December memorandum to Fusion through the enciphered email was that they, Fusion, the consultancy in Washington DC, should give it to the media for publication.  That is one

E

hypothesis they want to keep open in the teeth of the denial.  Secondly, they want to keep open the hypothesis that it was not sent for onward delivery to Mr. Kramer and Senator McCain but may have been sent by us, Mr. Steele and Orbis, to persons other than that small group identified at paragraph 21 of the defence.

F

Please also note, Master, at page 153 in the reply, paragraph 19 at the bottom, the claimants rely on the fact and plead the fact that the defendants had provided the pre-election memoranda, or at least some of them, to the FBI.  Please also note, turning to page 161, paragraph 35, that there are some assertions, rather elusive assertions, in these

G

subparagraphs 35.1, 35.3, about Senator McCain and his representative David Kramer.  For example, it is said at 35.1: "Senator McCain has been a high profile opponent of Mr. Trump.  It would be material to the question of whether he was acting solely in his official capacity in seeking and obtaining the memoranda, moving the December

H

memorandum to know if Senator McCain ever was a client of Fusion or was closely connected to clients of Fusion in the context of these matters."

9

A

At 35.3 it is pleaded: "It is wholly unclear what proper interest Mr. Kramer might have had in the subject matter of the December memorandum, why Senator McCain would use him as an agent to obtain information from the second defendant [that is Mr. Steele] for exclusive use for formal investigation for the purposes of American national

B

security.  It is not pleaded that Mr. Kramer has and had security clearance or that he had any role whatsoever in relation to security matters."

Elusive because it is not quite clear where those paragraphs are going but, presumably, the claimants also want to keep open the hypothesis that Mr. Kramer or Senator McCain did receive a copy of the December memorandum and they were

C

responsible for dissemination to the media.  All options are being kept open as far as we can see looking at the reply.

Finally, at page 162, paragraph 39, the claimants plead: "In light of the pleading of the defence and followed by privilege by us in our defence it may be necessary for the

D

defendants to make an application for disclosure of the identity of any source of the allegations made against the claimants in the December memorandum."  They have advanced a reason, the technical basis of the plea for qualified privilege is unimportant, it is a subsidiary plea in the defence but it is there, they have seized on that to raise the

E

threat or the possibility of a source disclosure application in QBD proceedings.

Those are the pleadings.  The Letter of Request was dated 10th August 2017 and the last page is 240.  It starts at tab 12 in this bundle, page 230.  As you know, it was sent by District Judge Ursula Ungaro, in the United States District Court, Southern District of

F

Florida, Miami Division.  On the first page, 230, at the bottom, it states: "The court considers the evidence sought by the plaintiff is directly relevant to the issues in dispute and is not discovery intended to lead to discovery for trial."

Then at 233, after the identification of the parties and their representatives, it says

G

under the heading, "Nature and Purpose of the Proceedings and Summary of the Facts," very brief, "the dossier" on the last line of 233, paragraph 7, "more specifically 'the dossier' is believed to have been compiled by and at the direction of Christopher Steele, a director of Orbis."  At page 237, at the top, the court was told that the witness, Mr.

H

Steele, was in an adversarial posture to the plaintiffs and as such requests for voluntary compliance with the taking of his deposition would be futile because they were suing

10

**A**

him in London.  Then further down that page the 14 subject matters that appear in your order, Master, are listed word for word as they appear in the order.

At 238, there is an important but somewhat puzzling passage, or sentence, below the 14th subject matter, which says: "For the reasons set forth above, the court believes

**B**

Mr. Steele will be able to give evidence directly relevant to the main issues between the parties."  It is not altogether clear what is being referred to, given the limited nature of what has gone before save perhaps that averment that it was Mr. Steele who prepared "the dossier".  The main issues referred to in that sentence are not identified in the notice.

**C**

Mr. Steele, by his US lawyers, had tried to intervene to quash the making of the request and you will see that at tab 13, the next tab, page 242.  He did so pointing to the fact that the plaintiffs would be getting an opportunity to cross-examine Mr. Steele, which would not be available to the claimants in the QBD action until trial.  You will see

**D**

that at page 243.  It says: "The deposition sought is impermissible and unlawful on multiple grounds not the least of which is that the selfsame plaintiffs have a direct defamation action pending against Mr. Steele in the UK in which the requested deposition is strictly prohibited.  The plaintiffs thus are seeking to employ this court in

**E**

an end run around their limitations in the parallel UK action."

Perhaps importantly, if you turn on to 246, Judge Ungaro's reasoning in rejecting the attempt to intervene in the US, she says at the top of 246: "This court presumes, however, that the Senior Master of the Court of Judicature Queen's Bench Division will

**F**

limit the scope of the request pursuant to British law."  A little further down, just above the top hole punch: "The court therefore denies the request to intervene trusting that his rights under British law will be protected by the British court."

The application to this court for the order was made on 3rd November, volume 1,

**G**

tab 6, page 37, and we do not need to look at it.  It was a sort of pro forma application and the witness statement of Mr. Loble in support, his first witness statement, which is at volume 2, tab 8, did not say anything more illuminating about the basis on which the Florida court had made that assertion, that it believed Mr. Steele would be able to give

**H**

evidence directly relevant to the main issues between the parties.

11

A

I will return, if I may, to the 14 subject matters in your order, Master, as made, which is at volume 1, tab 9, and I hope that as promised at the beginning of that section of my submissions we have set the scene for the consideration of these subject matters. They are, as I have said, as per the Letter of Request and the application.   The first thing the plaintiffs wanted to cross-examine Mr. Steele about included his employment history and professional qualifications.  That, of course, may be a routine request in certain types of other cases, including where an expert has caused concern to us because of his period at the FCO.  As I hope is apparent from what I have been through, no explanation has ever been forthcoming from the plaintiffs or had not been at the time of the order as to why they wanted to depose him about those things, employment history and professional qualifications, as I say, he is not an expert witness, he is a witness of fact, still less why any of that could be directly relevant to the main issues between the parties.

At 12 and 14 in the order as made are all concerned with "the dossier".  Again no explanation has ever been forthcoming from the plaintiffs as to why they wanted to cross-examine Mr. Steele this widely in the US proceedings, or how Mr. Steele's evidence on all of those things, at 2-14, framed in terms of "the dossier", all those pages that I took you to earlier, could conceivably be directly relevant to the main issues between the parties.

The width of the potential questioning can be illustrated by glancing at 4 and 7. Number 4 was the steps that Mr. Steele took to obtain information for "the dossier". Potentially, all the steps he took to obtain all the information for those pages in "the dossier" I took you to, the dates, the events, people, the allegations, and so on and so forth.  You only need to flick through those documents to see that this cross-examination could go all over the place.

Paragraph 7: much the same point, there is a request to cross-examine on Mr. Steele's sources of information for "the dossier".  Again because of the width of the information in "the dossier" as a whole, the number of sources would doubtless reflect that width of information and again potentially endless cross-examination about where snippets of information were obtained from and who they were obtained from.   Equally, it is obvious, we say, that the product of the seven hours cross-examination of Mr. Steele

Marten Walsh Cherer Ltd
Tel:  020 7067 2900

**A**

on this basis would tell the claimants in the QBD action, Mr. Gerbarov as the personification and a claimant in each jurisdiction, pretty well everything that they may want to know about how their inferential case in the QBD may fare at trial. You will have seen at the back of our skeleton we have done a schedule cross-referring these 14 original matters to the matters in issue on the pleadings in the QB case. Subject matters

**B**

12 and 13, to take only two more examples before I conclude, the provision of "the dossier" to media outlets, plural, a provision of "the dossier" to other third parties, presumably not parties that Mr. Steele has admitted to them being given in his pleading, not media organisations, other third parties, would allow lengthy cross-examination on

**C**

what I have described as the hypothesis that the QBD claimants want to pursue at the trial here, namely, that he gave them to people other than those he submitted to, and so on and so forth.

**D**

Since your order was made, Master, we wrote to the plaintiffs on 20th November 2017, and I just want to take you, if I may, to that letter back in volume 2, tab 11, page 218. Discussing the subject matters just above the hole punch, we pointed out to the plaintiffs that serious source protection, source safety issues arose in relation to the intended questioning most obviously, of course, in relation to subject matter seven. If I

**E**

may just be permitted a comment as a matter of perhaps general knowledge or common sense about the activities of the Russian State, even without Mr. Lucas's witness statement, it is extraordinary that we had to point this out to them. It is simply impossible, we would respectfully suggest, to believe that they did not understand when

**F**

they sought the order the concerns that would arise about identifying the sources of intelligence in "the dossier".

**G**

We also pointed out to them that their case in the US was based on defamatory, i.e. false and damaging statements about them in only paragraph 3 of 2016/166. You will see, finally, towards the bottom of that page, we had pointed out also that there had never been a list of questions they sought answers to Christopher Steele. We asked whether there would be one and there still is not, even now, a list of questions. We informed them of our intention to apply to set aside.

**H**

If you turn over to page 220, two pages further on, two days later we told them, amongst other things, in the very last paragraph of this email from my instructing

13

**A**

solicitors to Mr. Loble that the FCO was considering issuing a certificate under section 33 of the Act.

Then if you turn over to page 121, you will see what happens next.  Later that day, we received what we all now understand as the alternative version of Schedule A, which is at page 222, apparently by way of an offer of some sort.  The obvious conclusion is

**B**

that our correspondence to them over those two days forced a changed position.

The plaintiffs' alternative version of Schedule A, at page 222, was an object lesson in equivocality.  It is not clear what the amendment to paragraph 1 is supposed to mean. You will see that in brackets after "employment history" the words "in general terms"

**C**

have been added in.  Nor was it clear how the proviso in italics at the top, which says: "Other than with respect to number 1  below, all questions are to be asked only in relation to paragraph 3 of the company report 2016 at 166."  I am not clear how that proviso was to be reconciled with the drafting of 2-9, the new version of the subject

**D**

matters which still referred to "the dossier".

Further, it was not at all clear to us why 6-9 were there at all given that in the covering email, Master, if you turn back a page, Mr. Loble said, last paragraph: "The thrust of the questioning" whatever that may mean, "whether or not the contents of the

**E**

relevant paragraph of 'the dossier' were verified or not." Paragraph 3, the thrust is whether those 13 lines in paragraph 3 were verified or not.

If you go back to 6-9, one wonders, with concern on behalf of my client, why they still want to question about those things, which are a long way removed from what is

**F**

claimed to be the intent and thrust of the cross-examination and which, frankly, if it were the case that the only thing they wanted to question on was whether those 13 lines were verified, take very little time indeed.  There is no express reference to sources. Subject matter seven you will see has gone in the teeth of our objection.  There is only an

**G**

assurance in the covering email, if you flick back to the first sentence in that paragraph: "My clients are not pursuing the identity of Mr. Steele's sources."  Exactly what this is supposed to mean is unclear.  The word "identity" tends to be a little bit elusive when one is dealing with protection of sources.  This is the risk of jigsaw identification.

**H**

Presumably, it means that they would not ask for the names of the sources for the paragraph 3 allegations, though we have noted that in their skeleton for this hearing at

A  paragraph 36 they now say, although I am bound to say it is not much clearer, they will not ask questions which go to – which go to – the identity of the sources. It says: "US defendants have also confirmed that they will not be asking questions which go to the identity of Mr. Steele's sources.

B  There is, plainly, plenty of scope under the remaining subject matters to elicit evidence tending to identify or lead to lines of enquiry that may identify the sources, for example, the oddly worded subject matter of paragraph 4 in the varied Schedule A. Let's say you read it as Mr. Steele's solicitation of information, the information in the 13

C  lines in paragraph 3, could include questions about the people who led him to the sources of the information in 3, or the people who dealt with them in obtaining the information that appears in paragraph 3 in the written-up version of the memorandum.

Unsurprisingly, Mr. Steele's concerns were not laid by this belated demonstration of magnanimity by the plaintiffs in the teeth or our intended application to set the order

D  aside. Since then, since we received this, the plaintiffs' approach has continued to be an object lesson in equivocality. There has been no application from them or a new Letter of Request leading to an application for an order in different terms; one. Two, they now tell us in their skeleton at paragraph 18 that they are "content" for the court to amend the

E  order to reflect their proposal. With respect, we would suggest on the authorities this is clearly not appropriate.

Even if Schedule A were drafted properly in the way it is not in that version, it would plainly be a substantially different order to that envisaged in the Letter of

F  Request. You will have noticed, for example, you may not have but I am going to point it out to you, that number 9 in Schedule A, the revised Schedule A, seeks to introduce, one may say smuggle in, a completely new topic that was not in the Letter of Request at all.

G  To cap it all, they are neutral on Buzzfeed's rather odd application to re-expand their varied Schedule A, which is not yet an order of the court whether by new Letter of Request or an application to amend the existing order.

That is really all I wanted to say on the facts and it brings us to the law. As Master

H  you will be aware under the 1975 Act there are two fundamental issues: one, is there jurisdiction to make an order and, two, the exercise of the discretion to make an order if

15

**A**

there is jurisdiction.  In the *State of Norway* case – will you tell me if I need to take you to these passages.

MASTER FONTAINE: I am familiar with the *State of Norway* one.

MR. MILLAR: I am sure you are familiar with most of them.  There are one or two I may go

**B**

to but, otherwise, I will just give you the references.   In *State of Norway*, which is at tab 10 in the authorities bundle, page 481F, Kerr LJ, made clear that there is no jurisdiction if this court concludes the evidence sought is not primarily for use in the civil proceedings or the foreign court or tribunal, and that there is some other primary purpose in play.

**C**

How should the court consider the Letter of Request?  This is obviously an important issue in this case given the limited wording and information in the Letter of Request.  Perhaps we ought just to look at the *First American* case, at tab 4 in the authorities bundle, internal page 1165, D-E, within the judgment of the Vice Chancellor

**D**

(as he then was) Sir Richard Scott, a well- known passage but instructive nonetheless: "In summary considering the Letters of Request in this case, the court should, in my opinion, ask first whether the intended witness can reasonably be expected to have relevant evidence to give on the topics mentioned in the Letter of Request and, second, whether the intention underlying the formulation of those topics is an intention to obtain

**E**

evidence for use at the trial in the foreign court, or is some other investigatory and therefore impermissible intention."

If I could just take you to tab 7, a little further on, to (?)*Bred v Busson*, in the

**F**

judgment of Bernton J (as he then was) at paragraph 27.3 in the middle of his summary of principles that govern these applications: "The issue whether the order sought is for an illegitimate investigation rather than to obtain evidence to be adduced at trial is to be determined principally by reference to the terms of the Letter of Request and of the proposed order.  However, the court will consider the evidence before it as a whole."

**G**

If we go back to the *State of Norway* case, at tab 10, page 482, as you will know, Master, a number of the authorities make clear that a Letter of Request from US courts which are for US pre-trial discovery, that is discovery of information reasonably

**H**

calculated to lead to discovery of admissible evidence at trial, are impermissible.  That is

16

A

a consequence of section 2.3 of the Act.  This is referred to in some of the UK authorities as an illegitimate investigation or purpose.

On that please see Kerr LJ in *State of Norway* at 482E.  He says: "In the present context fishing may occur in two ways.  The first way as I have just described is the process of pre-trial discovery in the United States that the drafting and preparation of a

B

Letter of Request has erred into or strayed into, perhaps understandably in some cases, American style pre-trial discovery."  That is at E.  Then at F Kerr LJ goes on and says: "Secondly, fishing is in my view also relevant in another sense in the present context, perhaps best described as a roving inquiry by means of the examination and cross-

C

examination of witnesses, not designed to establish by means of their evidence allegations of fact which had been raised bona fide with adequate particulars but to obtain information which may lead to obtaining evidence in general support of the parties' case."

D

Requests from any foreign court can be just simply too wide to be legitimate.  They are impermissible as a roving inquiry.  Of course, the width of the matters in the Letter of Request may on examination lead without much more to that conclusion.  As Lord Woolf put it in *The State of Minnesota*, which is at tab 15, paragraph 64: "It may be

E

apparent from the Letter of Request that it is aimed at listing information 'which might lead to the obtaining of evidence rather than establish allegations of fact.'"

MASTER FONTAINE: Sorry, which page did you say in *The State of Minnesota* case?

F

MR. MILLAR: Tab 15, paragraph 64.  It is really a restatement of the point that had been made in the earlier case by Kerr LJ but it is well put and it is targeted at an examination of the Letter of Request.  It is right at the bottom of that page.

MASTER FONTAINE: Yes.

MR. MILLAR: "Where the terms of the LOR are too widely drawn, it will lead to the

G

inference that it was designed to elicit information rather than evidence of points of fact."  Therefore, there is an onus on the applicant to show that the information sought is not of that type but is indeed directly relevant to issues in the foreign proceedings in the sense of being adduced at trial in support of those issues.  If we go back to tab 7, the

H

helpful summary by Bernton J of the governing principles in *Bred v Busson*, paragraph 27, Master, you will see at 4 he says, after the one paragraph we looked at, "Considering

17

**A**

the evidence as a whole, particularly pertinent will be the stage at which  the order is sought and the extent to which the party seeking the order" that is the US plaintiffs, "is able to demonstrate that the information sought was relevant to issues in the foreign proceedings in the sense of being capable of being adduced at trial in support of those issues."

**B**

Then at 6: "Statements in a Letter of Request to the effect that evidence is sought for use at trial are relevant but not conclusive.  A Letter of Request must be viewed as a whole."

**C**

Then at 10, with references, and I will give you one more for the proposition at 10: "The court will take into account any safeguards or restrictions incorporated in the terms of the proposed order," that is the Letter of Request. "However, an order made by this court cannot depart substantially from the terms of the Letter of Request."  The requirement of the statutes is that the order of the court gives effect to the Letter of Request.  The limitation on the power of amendment to the terms of the deposition sought by the Letter of Request was referred to by Lord Fraser in the *Westinghouse* case and Sir Richard Scott in the *First American* case, and was also dealt with in the *State of Norway* case back at tab 10 by both Kerr LJ and Glidewell LJ, page 483G.  You will see he considers a submission that directions by the judge to bring the letters rogatory within what is permissible under the statute and the rules as a matter of discretion were inappropriate. Counsel for the witnesses had no real answer to those submissions.

**D**

**E**

**F**

More pertinently, Glidewell LJ, at 491F, considered Lord Fraser in the *Westinghouse* case.  Kerr LJ said: "I do not regard the dicta as authority for the proposition that the court should re-draft the request.  In the present case the request is so wide that to avoid the prospect that questions under it would be objectionable as fishing would, in my view, require to be redrafted and on that basis, because it cannot be redrafted it should not be made."

**G**

That is obviously a question of fact and degree and the classic example of amendment, Master, you will be aware from the cases it is the blue pencil that takes out certain documents. Where the border is between the impermissible and permissible in terms of amending is a question of fact and degree.  But, of course, the court should refuse to make the order even if there is some relevant evidence that the witness could

**H**

18

A

give in the foreign proceedings.  It is simply too wide and the request is of an investigatory character.

Could I take you to tab 16, Moore-Bick J (as he then was) in one of the *US v Philip Morris* cases.  At paragraph 76, having summarised some of the authorities we have looked at, *State of Norway* and *First American*, this is at first instance:  "These

B

authorities support the conclusion that the court should not make an order for the examination of a witness if it is satisfied that the Letter of Request is mainly of an investigatory character,  even though it is satisfied the witness may be able to give some relevant admissible evidence, unless it is possible to exclude certain areas of the request

C

without undue difficulty."

Master, you will be aware that a separate strand, as it were, in the case law in which the courts have held that an order may be refused, are those cases in which the court identifies oppression in the Letter of Request and the order.  The issue is well

D

summarised in the *First American* court case, at tab 4, in the judgment of Sir Richard Scott that we looked at earlier, at the bottom of 1165, over to the top of 1166: "The second matter of importance is that in deciding what response to make to a Letter of Request the court should bear in mind the need to protect intended witnesses from an

E

oppressive request. There is a balance to be struck in each case between the legitimate requirements of a foreign court and the burden that those requirements may place on the intended witness."

One of the reasons why the courts have in the past considered requests oppressive

F

is because the witnesses had to testify without any sufficient indication of the matters to be addressed in the questioning.  You will see that back in *Bred v Busson*, tab 7, in the light of Burton J's principles at paragraph 27, the bottom of page 7.  He says: "There will be occasions where the subject matter of the testimony sought is so extensive as to

G

preclude specifications.  However, where that is the case the court in the exercise of its discretion may refuse to make an order on the basis it would be oppressive to the witness to require him to prepare himself to give evidence and to require him to give evidence without sufficient indication of the matters to be addressed."

H

Finally, at tab 12, on the issue of sources, could I refer you, Master, to the *Rio Tinto v Vale* case.  This was a similar situation to the present one.  The applicants were

19

**A**

seeking information from three corporate investigations entities who had written confidential business intelligence reports, not about Russia but about the contemporary political and commercial situation in Guinea, and Mrs. Justice Andrews accepted on the question of confidential sources for the reports there was what she described as a public policy overlap with the desire to protect journalists' sources.

**B**

You will see that at paragraph 37 on page 6, which I will read, if I may: "Nevertheless, it seems to me that in this rather different context the court may take judicial cognizance of the truism that even in a democratic society such as this

**C**

jurisdiction, or the United States, whistleblowers may be castigated for speaking out, suffer prejudice to themselves or their families whether or not they act within the four corners of the law and whether or not they are exposing wrongdoing. The nature is such that those who engage in corruption, particularly if they are in positions of power, do not take kindly to their wrongdoing being exposed.  There are many corners of the globe

**D**

where journalists are targeted and even imprisoned for fair and impartial reporting or accused of being spies.  Jurisdiction expressly recognises the importance of keeping confidential the identity of journalists sources, indeed there is legislation to protect them, and I accept Mr. George's submission there is a degree of public policy overlap between

**E**

that situation and this, especially in light of the evidence that some of the sources concerned are sources of information to journalists who may themselves be associates of one of the companies.  There is no reason to suppose that any of the sources in this case have acted unlawfully but that does not mean they have nothing to fear if their identities

**F**

come to light.  I am persuaded that much of what is said by Mr. Hubbard and Ms. O'Connor rings true although some of the sources may face more serious risks than others it is in the public interest that they should not be discouraged from speaking out or from providing intelligence of this nature."

**G**

On the facts, Mrs. Justice Andrews found that the risks to sources were too great and the order was varied to protect, and this is paragraphs 47 and 48, against disclosure of any information, this is 48, three lines down, that would identify the individual sources.

**H**

That is a quick trot through what we say are the relevant legal principles and I turn to my submissions now, please.  First of all, the question of jurisdiction, as I have said,

20

A

that can be in dispute where it is contended that the evidence sought is not primarily for use in the civil proceedings before the foreign court or tribunal.  This is beyond question a very unusual case.  One might even venture the submission it is a unique case involving huge political controversy in the US which rumbles on, on an almost daily basis.  This magnifies and distorts every piece of information about "the dossier" that emerges.  There is a strong inference, we say, that the US plaintiffs' purpose in seeking the Letter of Request and order were to conduct a sort of mini public inquiry roving over the 14 subject matters at great length, originally six hours, at which they could attack the credibility of Mr. Steele and his sources.  We say that is most obvious when one considers that they originally sought to question about the whole dossier which you have seen and which is an extensive document and to identify his sources for the whole dossier.

B

C

The obvious, we would say, inference is that they were setting out or wanted to set out through cross-examination to try and discredit the whole methodology as valueless.  The deposition once in the US court could then be unsealed and reported in the US media and the effect would be to increase the pressure on Mr. Steele not to defend the QBD proceedings and to try and avoid getting into litigation on more detailed issues of fact.  It would in the process inevitably have put the wellbeing of the sources at increased risk.  As I say, you do not need to read Mr. Lucas's statement to realise that that would be the case given the nature of the information about the Russian State and the security and intelligence agencies in "the dossier" as a whole.

D

E

Our first submission is that you should in these unusual circumstances infer from the way the original Letter of Request was cast an impermissible purpose and therefore there is no jurisdiction.  If that submission is unsuccessful, the court has to turn to look at the exercise of the discretion again in the way I have described at the start of my submissions on the law.  The width of the order, as we have seen from the authorities the width of the Letter of Request and the consequent order, also of course goes to the exercise of jurisdiction if it is established.

F

G

In our submission, the Letter of Request here is formulaic.  It tells us nothing of value whatsoever about the legal issues which the evidence to be elicited is said to be of direct relevance to and why the witness can give evidence of that type.  It is telling that

H

21

the witness evidence of the US plaintiffs, half of the US plaintiffs, in this application does not seek to go through Schedule A, either in its original or its concession form, limb by limb, and explain what relevant evidence the US plaintiffs say Mr. Steele can give and that they would want him to give on that topic, on that subject matter, and which issue, contested issue, in the US proceedings that evidence would go to.  As you will be aware, and one sees it in the report of cases, this happens with these orders, Letters of Request that specify categories of information or subject matters.  Often you see the evidence in support going through them and addressing detail saying what the relevance is. There is nothing like that here at all.

On the contrary, all they are really saying now, as we understand it, is that the "thrust of their questioning", a phrase used in the email from Mr. Loble of 22nd November, the thrust of their questioning, all six or even three hours of it after the concession, three hours of it, will be whether the allegations in paragraph 3 of the December memorandum were verified or not.  As I have said, 13 lines, straightforward allegations, what the allegation is, are they verified or not by Mr. Steele.  Three hours.  That is plainly not the thrust of the cross-examination.  If that was the thrust of the cross-examination it would be done in a few minutes.

Mr. Loble says the key evidence sought by them, the key evidence sought by the US plaintiffs, is the extent to which, if at all, Mr. Steele verified the allegations against the plaintiffs.  That is paragraph 34.2 of his second witness statement.  Again, the case has been shrunk down in the witness statement to a small area of key evidence which the US plaintiffs now say they want to elicit, one topic, verification, one bit of what was originally one subject matter, paragraph 3 of the December memorandum.  For the reasons we have explained at paragraph 68 of our skeleton argument, this has nothing to do with whether the allegations are false and you do not need to be a libel lawyer to understand this.

Presumably, the falsity is the thing they have to establish in the US proceedings, the allegation that Mr. Gubarev was involved in that hacking in that way through his companies is not true and he will stand up in the witness box to say that in America, he will assert that, and explain why it is not true.  That is the thing they have to establish.  Presumably, although it has never really been spelt out by the US plaintiffs, what they

22

A

want him to say in his deposition evidence is, "I repeated what a source or sources said when I wrote paragraph 3 but did not take any further steps to verify it."   If he says that, it does not mean that what the source said was false, or indeed bear upon whether it was false or not, any more than if he said, "Yes, I did it, I took some steps to verify it but I

B

included what I thought was worth including by way of intelligence."  It is not going to bear on whether it was false or not. Whether it was false or not is an issue of fact relating to the conduct of the US plaintiffs, did they conduct themselves in that way.

C

The ambit of the exercise having shrunk to this miniscule point one then returns mentally, as it were, to the original Letter of Request and it is clear beyond doubt that this was an impermissible fishing exercise.  The Letter of Request was self-evidently investigatory in nature and not confined to obtaining relevant evidence.  Even if that is relevant evidence, it is only a sliver of evidence for the trial of the US libel proceedings.

D

It is far too wide and raised endless irrelevant matters.

We say it cannot be saved by the amendments that the US plaintiffs are now, according to their skeleton, content should be made, "content" being the word used in the skeleton.  The alternative Schedule A would still on this analysis go too far and it is, anyway, a wholesale rewriting of the Letter of Request.  It is not just deleting a couple of

E

categories of documents or topics with a blue pencil.  It is a fundamental change to the basis of the Letter of Request to rewrite it to allow only questioning about verification of paragraph 3.  The elephant that was the original request will have shrunk to the size of an ant.

F

As to Buzzfeed's case which I will respond to, if necessary, there is no basis whatsoever for saying that Mr. Steele could give evidence of relevance to Buzzfeed's state of mind when Mr. Smith decided to publish the whole dossier in January, or whether their report is a report of an official proceeding, the publication of the memos

G

placed online was protected as neutral reportage.  We note that Buzzfeed has never attempted to say how or why he could give evidence on those things.  His defences rest on the evidence of Mr. Smith, who took the decision to publish as Buzzfeed did and legal argument about the surrounding political circumstances.

H

In any event, even if they cannot obtain the evidence they want this way, Buzzfeed, the court has no duty to assist them.  As we understand the legislation, it is assisting the

**A**

US court at the instance of the plaintiffs, not the defendants.  There is no duty to put stuff back into the order that the plaintiffs, as the applicants for the order, take out.  If they want to try and achieve their form of order they need to make their own application for a Letter of Request and, of course, they have never done that and, indeed, they are

**B**

supposedly entirely neutral as to whether we should be successful in our application to set aside.  It is just an opportunistic attempt to keep open a line of fishing for information that they would quite like to have but which there is no jurisdiction for the court to provide them with. That is our first submission if there is jurisdiction, given the width of

**C**

the original order and, indeed, the remaining order, the order in either form would be an impermissible investigatory order.

Our second main submission relates to the QBD case, as you know.  It really has two alternative prongs.  First, you cannot make the order because the result would necessarily give rise to an inequality of arms in the QBD process such that article 6

**D**

would be violated.  That is a submission under section 6 of the Human Rights Act, the court's obligation to act compatibly with my clients' fair trial rights and if it is correct and it is a matter of fact and degree whether a procedural unfairness amounts to a violation of article 6 in every instance, we accept that, if that submission is a good one

**E**

then that is that, the order cannot be made.

Even if it is not precluded by section 6 of the HRA, we say the court should exercise its discretion to refuse the order in either form that the plaintiff seeks because it is oppressive.  It is oppressive because it would give Mr. Gubarev a dry run at cross-

**F**

examining Mr. Steele, the defendant in his claim in the QBD, or several hours on the wide-ranging basis for the inferential case he runs in QBD, that complex inferential case.

As we understand it, the US plaintiffs seek to answer this by saying, first of all, Mr. Steele could be the subject of a request for further information in the QBD but, of

**G**

course, we have already been the subject of an extensive request and a request for further information cannot elicit the quantity and the detail of information obtainable by three or six hours cross-examination.  That is obvious.  Even if there was something further that they could legitimately ask about as needed, necessary, and proportionate, for the British

**H**

proceedings, it would not in any way be comparable to this sort of cross-examination.

Marten Walsh Cherer Ltd
Tel:  020 7067 2900

**A**

Secondly, they point to the *Secretary of State v Crane*, at tab 18 in the bundle, in answer to our submission that it would be unfair to him to expose him to this cross-examination from the claimant in QBD proceedings before the trial.  This was not a 1975 Act case, is the first point.  It was about disqualification proceedings against two company directors.  What had happened was that these had been stayed because the police wished to prosecute them for related offences and the investigating officer had turned up at the hearing in front of the registrar in the disqualification proceedings to see if any information emerged which would assist the intended prosecution.  It had not managed to charge the two directors yet but they were adamant they were going to do that.

**B**

**C**

The issue was whether the registrar should have stayed the civil disqualification proceedings as indeed the registrar did in those circumstances until after the conclusion of the postulated criminal proceedings.  There is no comparison between that case and this case.  I think Ferris J said it was wrong of the registrar to stay the disqualification proceedings.  There is no comparison between the facts or the ruling in *Crane*.  First, of course, we are not asserting a right of silence in criminal proceedings and so claiming we have some sort of parallel right in civil proceedings against us by the state, or by anybody else.

**D**

**E**

Secondly, we are not trying to stay any civil proceedings, still less proceedings of the sort that were in issue in the *Crane* case where the Secretary of State has a statutory duty to pursue them, statutory disqualification proceedings.  What we are doing is completely different.  We are defending ourselves in a civil libel claim in QBD as defendants in the libel claim in QBD against an application to depose us and cross-examine us by the main claimant in the QBD proceedings, which would assist him and other claimants in the QBD proceedings.

**F**

**G**

Our point is about losing that level playing field protection that is given by the CPR in a QBD claim and the level playing field is that you disclose at the same time, you exchange witness statements at the same time, and the trial is the first opportunity to cross-examine.  The playing field is level throughout each stage in the proceedings.  This is complete disruption of that principle.  We say whether or not it is precluded by section 6, but we think it is, of the Human Rights Act, because it is fundamentally unfair, it is

**H**

Marten Walsh Cherer Ltd
Tel:  020 7067 2900

certainly oppressive so the court should exercise its discretion against making that order. As I said earlier, Mr. Gubarev will be able to find out pretty well everything he needs to know and wants to know about how his inferential case is going to fare at trial when Mr. Steele is put in the witness box. It is wholly unfair.

Thirdly, we address the question of sources. Of course, my learned friend will say it is not an issue because we have given these assurances, taking subject matter seven out. It needs to be a little more careful than that. It is dealt with in our skeleton at paragraphs 85-89. Of course, the issue starts with the question, as always, what on earth were the US plaintiffs doing wanting to cross-examine him about all of the sources in "the dossier". That was their original position, we want under subject matter seven to probe and ask questions about, without any restriction and precluding us asking for the name of the source, every source, any bit of information we are interested in, that lengthy dossier, what on earth were they doing asking for that. It is clearly not directly relevant factual evidence from their point of view in the libel claim and they are only suing on those 13 lines.

It is extremely worrying for somebody in Mr. Steele's position, with responsibility for "the dossier". The cosmetic changes to the wording of the order proposed by the plaintiffs cannot wipe away that piece of history. That is the problem. It cannot wipe away the fact that they wanted to mine information through cross-examination about all those matters. Nor in the circumstances does it allow concern that the questioning proposed even under the amended Schedule A might lead to answers being given which would lead to jigsaw identification. So, somebody looks at the deposition and knows something about the background to paragraph 3, and an answer that is given enables them to identify the source, or think they have identified the source, with the sort of unthinkable consequences that are referred to in Mr. Lucas's statement. So, we rely on Mrs. Justice Andrew's approach in the *Vale* case. We say the only safe way to eliminate the risk is to refuse the order.

We deal with confidentiality and national security at paragraphs 90 and 91 in our skeleton argument. The US parties say, particularly the US plaintiffs, on a number of occasions, they have not said what is the information, what is the evidence they may give that will create a concern about that, whether under cross-examination under the

26

**A**

original order or the new order.  They will say the FCO have not said what is the evidence he may give.

It rather seems to miss the point.  The whole point is to avoid having to say what the underlying concern is.  It is always difficult addressing answers that may cause national security concerns to condescend to detail.  It is wholly unsurprising that we

**B**

have not said that and the FCO have not said that.  The question is, can you see scope in the cross-examination for that and, plainly, there is when skirting around and circling around how paragraph 3 was compiled, the methodology, what was involved in obtaining the information, and so on and so forth.

**C**

We say the order must be set aside and, as you have seen from the last two pages of our skeleton argument, if it is not it must be varied to shrink it dramatically and to provide protection for us and the sources in light of our concerns about national security and source protection.

**D**

I have probably taken up too much time already but I hope you have read those last two pages.

MASTER FONTAINE: Yes, I have read all of those.  Thank you very much, Mr. Millar.

Yes, Miss Brown.

**E**

MISS BROWN:  Master, when I read my learned friend's submissions I felt they open on a rather melodramatic basis and, indeed, my learned friend touched upon this melodrama in his submissions.  He seeks to invite the court to see this as an invitation to the English court, or the enlistment of the English court to support a mini-public inquiry or a roving

**F**

inquiry into a political controversy in the United States, and elsewhere, by subjecting a former FCO councillor to detailed interrogation about the compilation and dissemination of exceptionally sensitive raw data – and I am taking this from my learned friend's skeleton – on matters of acute concern to the national security and international relations of the United Kingdom and United States.

**G**

My learned referred repeatedly in his submissions to oppressive cross-examination by the plaintiffs.  I just want to flag up from the beginning, of course, as you will know, Master, the US plaintiffs will not be cross-examining Mr. Steele.  It will be limited to

**H**

examination-in-chief and re-examination.

27

**A**

Also, I would like to bring things generally back to earth and back to reality.  In preparing "the dossier" Mr. Steele was not acting as an FCO councillor but he was acting in a private and commercial capacity having retired from the FCO some seven years previously.  The English court has not been asked to support a roving inquiry into

**B**

a political controversy anywhere.  It has been asked by the United States court to provide assistance in obtaining relevant evidence from a witness for the purpose of libel proceedings on foot in the United States court.

Mr. Gubarev is as Russian national living in Cyprus and he and his companies are

**C**

seeking to enforce their legal rights in the United States against Buzzfeed, seeking substantial damages arising out of the publication by Buzzfeed of what are on any view grossly defamatory allegations.  That is where the plaintiffs' interest lies in making this application.  As a result of the plaintiffs' reasonable response to concerns that were expressed by Mr. Steele's legal advisers, the range of issues for questioning are limited

**D**

essentially, Master, to three: One, Mr. Steele's background, general introductory and, as my learned friend accepted, fairly standard stuff introducing evidence; two, compilation not now of "the dossier" as a whole but of one paragraph concerning my clients; three, the dissemination by  Mr. Steele of that one paragraph contained in the December memorandum.  So, far from being a wide-ranging roving inquiry, in fact three very

**E**

discrete topics.

Further, the US plaintiffs have, and did swiftly, agreed to exclude from the scope of examination questions relating to, and that includes which would be likely to, lead to identification of Mr. Steele's sources.  Once the issue of sources was removed, neither Mr. Steele nor the FCO have identified what in the remainder of the proposed topics could raise any national security issue.  Of course, we are not saying what evidence; that

**F**

would undermine the point of the question.

We have asked Mr. Steele's solicitors and we have asked the FCO to identify what

**G**

topics could possibly raise national security issues.  We have not had any answer from that and, as you are aware, Master, the FCO's position is that it is still thinking about it. Of course, if in due course the FCO issues an application and issues a certificate, that

**H**

matter will then be determinative.  As it presently stands, Master, you equally have no

28

assistance as to what of the remaining topics could possibly raise national security issues.

In this respect, Master, it is important, of course, to distinguish between the content of "the dossier", which clearly did contain sensitive raw data on matters of acute concern to national security and international relations of the United States and the United Kingdom, and the topics for questioning of Mr. Steele which do not.  It is important, of course, not to elide the two; and, Master, we say Mr. Steele's resistance to being examined is in contrast with his previous enthusiasm to speak directly and indirectly to journalists both before and after publication by Buzzfeed in relation to the contents of "the dossier", his background, and in general terms what he did to compile "the dossier".

Master, I identified at paragraphs 4(f)(v)-(vii) some of the articles in relation thereto, and at (viii) passages in the evidence of Mr. Simpson to Congress where he has confirmed, amongst other matters, that he and Mr. Steele had sought to interest the press both in the contents of the memoranda and in the failure of the FBI to investigate, and he has also given some information, general information, about what Mr. Steele was asked to do and how he went about doing it.   Master, I do not know if you have had any opportunity to read those passages.

MASTER FONTAINE: I have read them.

MISS BROWN:  I am very grateful.  Master, you will be aware that it is stated on behalf of Mr. Steele and repeated in my learned friend's skeleton, at paragraph 19, that neither Mr. Steele nor Orbis provided copies of any of the memoranda to media organisations or journalists, nor did they authorise that to happen, but there still remains no explanation from Mr. Steele as to the fact that it is absolutely clear that a copy of the pre-election memoranda was provided, or some of them at least, to *Mother Jones*.  I do not know whether, Master, you picked that up from the *Mother Jones* articles.

MASTER FONTAINE: Sorry, did you say that some of the memoranda had been provided to *Mother Jones*?

MISS BROWN:  The pre-election memoranda.  I expressly referred to the *Mother Jones* article.  It may be worth just fishing it out.  It is at bundle 2, tab 14.  You see it in a couple of pages.  At 313, if you have that, Master, just at the top of the page in the first full paragraph, the last sentence starts: "And a former senior intelligence officer for a

29

A

western country who specialises in Russian counter-intelligence tells *Mother Jones* that in recent months he provided the bureau with memos based on recent interaction with Russian sources contending the Russian government had for years tried to co-opt and assist Trump and that the FBI requested more detailed information."

B

Then if we drop down a paragraph: "In June," and then it goes on to speak to his relations, that he had spent almost two decades on Russian intelligence, and so forth. Then drop down another paragraph to *Mother Jones*: "…has reviewed that report," that is referring to the first report which was handed to the FBI, you see that from the paragraph above, "and other memos this former spy wrote. The first memo based on the

C

former intelligence officer's conversation with Russian sources noted Russian regime has been cultivating, supporting, and assisting Trump for at least five years aim endorsed by Putin," and so forth.

D

Then the last sentence: "It is also reputed that Russian intelligence had compiled a dossier on Hilary Clinton based on bugged conversations she had on various visits to Russia, and intercepted telephone calls."

E

Master, it is quite clear that *Mother Jones* had seen copies of some, or all, of the pre-election memoranda. Then we see to similar effect, and we do not need to spend much time on it, the next *Mother Jones* article which came out shortly after the publication by Buzzfeed. So, that first one was October, I think, yes, October, just before the presidential elections, and then at 315 there is another article just after

F

publication: "The spy who wrote the Trump Russia memos, it was hair-raising stuff. When I wrote the story…."

MASTER FONTAINE: Sorry, whereabouts is this?

MISS BROWN: This is at 315, just a couple of pages on, Master. It is the second *Mother Jones* article.

G

MASTER FONTAINE: I see, yes. Where does this refer to copies of the memoranda?

MISS BROWN: Then further down, just under the picture, second sentence: "The memos noted that the spy sources had provided him with information indicating that Russian intelligence had mounted…." and so forth.

H

Then over the page, Master, at 316: "In October I spoke with a former spy who wrote these memos under the condition I not name him or reveal his nationality or the

30

**A**

spy service where he had worked for nearly two decades, mostly on Russian matters." Then the former spy told me he had been retained in early June by private research firm in the United States looking to (unclear) activities," and so forth.  "The former intelligence official went to work and contacted his network of sources in Russia and

**B**

elsewhere.  He soon received what he called hair-raising information," and so forth.

The next paragraph: "The former spy said he would soon decide whether information he was receiving was sufficiently serious to forward it to the contact he had at the FBI."  Then the response of the FBI in the next paragraph, was "shock and

**C**

horror".  Then the next paragraph: "The former spy told me he was reluctant to be talking to a reporter.  He pointed out it is common practice but he indicated that he believed the material was important and he was unsure how the FBI was handling it."

Then at the bottom: "I also was able to review the memos the former spy had

**D**

written and I quoted a few key portions in my article," so that is referring back to the earlier article.  Then just over the page, speaking about Mr. Steele: "When I spoke with the former spy he appeared confident about his material acknowledging these memos were works in progress, genuinely concerned about their implications, came across as serious and sombre.  He realised he was taking a risk but he seemed duty bound to share

**E**

information he deemed crucial.  He noted that these allegations deserved a substantial inquiry within the FBI yet so far the FBI has not yet said whether such an investigation has been conducted.  As the former spy said to me, the story has to come out."

Just in relation to further communications between Mr. Steele and journalists, it is

**F**

worth a quick flick of *The Guardian* article, which summarises a book written by a *Guardian* journalist called Mr. Harding, and that starts at page 268, so earlier in the bundle.  It states:  "Christopher Steele believes his dossier on Trump and Russia is 70 to 90% accurate.  The respected ex-MI6 officer told the *Guardian* journalist and author

**G**

Luke Harding that his FBI contacts had greeted his intelligence report with shock and horror."  There is a photo of him on the next page.

Then, Master, if you have read them that is fine but it really is quite a lot of detail coming in from Mr. Steele, clearly, about his background.  So when we are talking about

**H**

questions of background in general terms, and it is said, "Gosh, no, can't possibly give you that sort of thing, highly confidential, national security," it is worth having a look at

31

A

that page to see what Mr. Steele appears to have told Mr. Harding for the purposes of his book.  It says, in particular, a number of points also relating to the sources, which is that the sources for those reports, by those earlier reports in relation to annexation of Crimean covert invasion of Eastern Ukraine, prepared, we are told by Mr. Steele, the

B

sources of those reports were the same as those quoted in "the dossier" on Trump, which included allegations that the Kremlin had purposely compromised material on the President, and so forth.

Then the book traces Steele's career as an MI6 officer, and so it goes on.  Then it

C

describes, over the page, how when Steele delivered a total of 16 reports to Fusion between June and early November, his sources started to go quiet beginning in July when Trump's ties up to Russia became under scrutiny.  According to Harding's account, Steele was shocked by the extent of collusion his sources were reporting, and so

D

forth.

Quite a lot of information being given by Mr. Steele to various journalists for the purposes, initially, of trying to create interest in the contents of "the dossier" and also for the purposes, as Mr. Simpson accepted in his evidence to Congress, of trying to get the

E

press to put pressure on the FBI to investigate and laterally, in fact, going into even more detail in relation to what he was doing and his own background.  It is against that background we invite you, Master, to come to this application; interestingly, not a subject that my learned friend has touched upon at all.

F

In relation to the law, there is no real issue between us in terms of legal principle in general, not least because there are so many helpful summaries and I am quite sure, Master, that you are already very familiar with the principles.  I will ask you, if I may, to go to *Credit Suisse*, which is in tab 2 of the authorities bundle, which has another helpful

G

summary, at paragraphs 14 and 15.  At 14, there is a list of guiding propositions, all of which will be familiar: "First, if a Letter of Request satisfied the pre-conditions for making an order it is the duty of the court as a matter of policy to do what it can to assist the foreign court in obtaining evidence."  Simply put, do as you would have done to yourself.  "Two, the court should approach the request positively and with the intention

H

to give it effect."

32

In his judgment, in *State of Norway*, you have already been taken to it, Master: "The court should strive to give effect to the request of the foreign court unless it is driven to the clear conclusion that it cannot properly do so."

"Third, although the court has to be satisfied that the evidence is required for the purpose of civil proceedings in the requesting court, in the ordinary way and in the absence of evidence to the contrary, the English court should be prepared to accept the statement of the requesting court that such is the purpose for which it is required.

Fourth," and this is a related point, Master, "if the Letter of Request states that a particular person is a necessary witness, then the English court should not itself embark upon an investigation as to whether the requesting court is correct for the purpose of determining in advance whether the evidence is relevant and admissible."

Then if one drops down: "Sixth, it is impermissible to use the Act for the purpose of wide-ranging and unfair list of enquiries in the hope that something will turn up." That is the fishing expedition.

Then paragraph 15: "Mr. Smith submits that these propositions must be refined in the light of the observation of Sir Richard Scott in the *First American* where the Vice Chancellor said: 'In summary in considering the Letters of Request in this case the court should, in my opinion, ask first whether the intended witnesses can reasonably be expected to have relevant evidence to give on the topics mentioned in the amended schedule of requested testimony and, second, whether the intention underlying the formulation of those topics is an intention to obtain evidence for use at the trial or is some other investigatory and therefore impermissible intention.'

On one view the suggestion that the court must ask the first question is inconsistent with what I have identified as proposition four, which discourages this court from embarking on an investigation as to whether the requesting court is correct in determining that the evidence is relevant and admissible. It seems to me, however, that Mr. Howard, QC, counsel for the claimant, is correct in his submission that the approach of the court will depend on whether the requesting court has itself considered questions of relevance. If it has, then it is hardly in the interests of comity that the court to whom the request is made should embark on a close consideration of questions of relevance

33

and what is likely to be more limited material and a less clear understanding of the issues than the requesting court.

If, on the other hand, the requesting court has plainly not considered the question of relevance, or it is clear even on a broad examination that the evidence is not relevant, then the Vice Chancellor's first question must be addressed."

On a similar theme, Master, if I can ask you to turn to *Westinghouse*, which is at tab 11, again a couple of familiar passages.  First of all, Lord Diplock, at page 634A-C: "The English court cannot be expected to know the systems of civil procedure of all countries from which requests for an order under the Act may come.  It has to be satisfied that the evidence is required for the purpose of civil proceedings in the requesting court but in the ordinary way in the absence of evidence to the contrary it should, in my view, be prepared to accept the statement by the requesting court that such is the purpose for which the evidence is required.  The Letters of Request from the United States District Court contained in the preamble what on a fair reading is, in my view, an adequate statement to this effect.  So the High Court had jurisdiction to make the order.  It was not bound to do so but I think that the court should hesitate long before exercising its discretion in favour of refusing to make an order unless it was satisfied that the application will be regarded as falling within the description of frivolous, vexatious, or an abuse of the process."

Then further on, Lord Keith, at page 654F: "In the face of the statement in letters rogatory there is a certain person is a necessary witness for the applicant.  I am of the opinion that the court of request should not be astute to examine the issues in the action and the circumstances of the case with excessive particularity for the purpose of determining in advance whether the evidence of that person will be relevant and admissible.  That is essentially a matter for the requesting court.  Should it appear necessary to apply some safeguard against an excessively wide-ranging examination that can be achieved by making the order for examination subject to suitably worded limitation."

Pausing there, we say that undertaking an examination of the issues in the US action with excessive particularity with an attempt to identify whether Mr. Steele's evidence will be relevant and admissible is exactly what you are being asked to do on

A

behalf of Mr. Steele, and it is exactly what you are not supposed to do, we would respectfully submit.  We will come on to that in a moment.

Then, I think lastly, at this stage if I can ask you, Master, to look at (?)*First American v Zyatt*, which is at tab 4, just the headnote, it states:  "In all but the clearest

B

cases the decision as to whether particular answers or answers on particular topics would constitute relevant admissible evidence was primarily a matter for the foreign court and as a general rule English courts should therefore accede to Letters of Request issued by foreign courts if they could properly do so."

C

Master, if we can then seek to apply those legal principles to this request.  First of all, the request, at tab 5 of the first bundle, and you have already been taken to this passage that "the court confirms that it considered the evidence that is directly relevant to the issues in dispute," but I would ask you, Master, to note in particular the following passage ----

D

MASTER FONTAINE: Which page?

MISS BROWN:  I am sorry, page 26, tab 5.  – "and is not discovery within the meaning of article 23 of the Hague Evidence Convention, that is, discovery intended to lead to relevant evidence at trial."

E

So, Master, pausing there, not only do you have express confirmation from the United States court that it considers that this evidence is relevant to the issues in the American proceedings, but you actually have express confirmation that this evidence is not discovery in the wider sense that does sometimes cause difficulties with requests from American courts for examinations to the English court.  The precise difficulties

F

identified by Bernton J in *Arpad Busson*, that is exactly what he was talking about, the fact that in America discovery can mean something rather wider and the more wide-ranging discovery intended to lead to evidence or lead to evidence that could lead to relevant matters for trial.  Here you have express confirmation that it is not wide-ranging

G

disclosure but this is discovery intended to lead to relevant evidence for trial.

The concerns in *Arpad Busson* simply do not arise because here you can see the court has directly addressed its mind to that issue and confirmed that, no, this evidence is

H

evidence for trial.

35

**A**

Then at 34, just further on, again repeated that for the reasons set forth which were clearly the exposition of the issues that were stated earlier in the request, of course a summary, but the summary identifying that it was Mr. Steele who actually wrote "the dossier" that has given rise to the proceedings in the United States, "believes that the

**B**

witnesses will be able to provide evidence directly relevant to the main issues between the parties and without which the aims of justice could not be properly met.  The United States District Court for the District believes that this information is not available from any other source."

**C**

So, we say, Master, that unless it is the clearest of cases, and we say it clearly is not, you should not go behind that statement by the American court, that is he satisfied that Mr. Steele can give relevant evidence and that is evidence that is for use at trial in those proceedings.

**D**

My learned friend seeks to criticise the American court and undermine your reliance upon the statements in the request on the basis that it did not take very long for the court to think about it; a point made in the skeleton argument.  To this we say, maybe that was because, with respect, it is so obvious that in libel proceedings in which the

**E**

truth of the defamatory statements are in issue, and my clients bear the burden of proving a negative, that is, that the allegations are untrue and the circumstances by which those allegations came to be published are in issue, the author of the defamatory statements who was responsible for their first being made available to parties other than himself will have relevant evidence to give.

**F**

The United States defendants did not contest the application and that is confirmed in the copy of the original application that you have before you.  I do not think we need to go there but there is confirmation that it was discussed with the defendants and they did not contest the application for the request before the United States court.  I am told it

**G**

is page 23 of this bundle, Master; indeed, it is paragraph 8.  I do not think you need to turn to it but I can read it: "Defendants have indicated that although they deny many of the statements made in the motion and Letter of Request, they do not object to the relief sought.  If the Letter of Request is granted, the defendants have reserved their right to

**H**

cross-examine Mr. Steele."

36

**A**

We say in those circumstances it is not terribly surprising, did not take very long for the American court to think about it.   In addition, of course, I will say in passing that it is not surprising that the defendants did not object because it is quite clear from the stance they have taken before you, Master, that they do consider the evidence of Mr.

**B**

Steele to be relevant to the issues between the parties in the American proceedings and, indeed, their stance reflects that in fact the wider scope of topics is relevant albeit that for reasons of reasonableness and pragmatism the plaintiffs have agreed to limit them essentially to the relevant paragraph in the December dossier.

**C**

We say equally misplaced is my learned friend's reliance upon the United States court's dismissal of Mr. Steele's motion.  First of all, the United States court had already determined the issue of relevance because the Letter of Request had already been issued. The motion of Mr. Steele was dismissed subsequently on 15th August.  First of all, the

**D**

United States court approach to Mr. Steele's motion does not affect its finding and confirmation of relevance of Mr. Steele's evidence.  What we have seen in the dismissal of the motion and indeed Mr. Steele's own motion was that he was telling the United States court that his deposition was prohibited by English law, which was wrong, in fact. The United States judge's position was, understandably, well, if so, then no doubt the

**E**

English court will limit the scope of the request applying English law.

First of all, absolutely no impact at all on the American court's confirmation that Mr. Steele's evidence is relevant to the issues between the parties.  Secondly, perfectly properly, the American court saying to the English court, if there are issues that arise that Mr. Steele's interest needs to be protected, then we are relying on the English court

**F**

to do so.  Therefore, my learned friend's submission which involves trying to suggest that the American court was wrong to say the evidence of Mr. Steele was relevant to the issues in the American proceedings is misconceived, we say, in contrary to authority.

**G**

As the authorities say, and is quite obvious, the American court is best placed to assess the question of relevance being more fully apprized of the issues in those proceedings, both legal and factual.  It is not immaterial that the legal position is quite different in the States to what it is here, not least the burden being on the plaintiffs to prove the falsity of

**H**

the allegations.

37

There is no evidence as the authorities require to suggest that the American court is wrong.  The only evidence is Miss Cain's statement at paragraph 39 of her witness statement, that it is not apparent to her why Mr. Steele's evidence would advance the case of either party in the American proceedings, together with a suggestion by her that Mr. Steele's pleadings in the English proceedings would suffice.

First of all, you have the evidence of Mr. Loble on instruction from the American attorneys that Mr. Steele's pleadings in the English proceedings are not surprisingly not sufficient and are likely to be considered inadmissible hearsay and, in addition, of course as a matter of common sense would be of extremely limited weight in the American proceedings, even if they were admissible.  Secondly, of course, noting that she is at odds in her conclusion both with the parties in the American court, all of whom are much better placed to consider relevance.

Further, my learned friend's submissions from paragraph 66 onwards of his written submissions, and he touched on them this morning in his oral submission, we respectfully say ----

MASTER FONTAINE: Sorry, paragraph which?

MISS BROWN:  Paragraph 66, and onwards.  There are a few paragraphs that seek to do exactly what the authorities say you should not be doing, for the court to closely examine why Mr. Steele's evidence may or may not be relevant to the issues in the American proceedings.  With respect, we say that they maybe miss the point as to why his evidence is relevant.  It is not a terribly subtle point, Master.  What my learned friend's submissions try to do is dissect by reference to United Kingdom, or English I should say, libel law including even referring to English libel authorities, to suggest that Mr. Steele's evidence is not relevant.

I say this is misconceived.  First of all, they ignore that in the American proceedings the truth of the allegation is in issue.  So, I would respectfully submit that it is fairly obvious that it is relevant to establish in the falsity of the allegations to understand the circumstances in which the allegations came to be made.  We would respectfully disagree with the assertion that whether or not the information was verified has no bearing on the establishment of whether or not the allegations were true, or as it is in the United States the burden on my clients to prove that the allegations are false.

Marten Walsh Cherer Ltd
Tel:  020 7067 2900

A

My learned friend took you, Master, to the first paragraph in the American proceedings, which are at page 165, so tab 11, second bundle, page 165.  In the very first paragraph, the allegation is: "On 10th January perhaps one of the most reckless and irresponsible moments of journalism" etc. "Buzzfeed and Mr. Smith chose to publish a dossier of unverified information."

B

There we go, right in the first paragraph the importance of the assertion that this information was unverified.  Where you are seeking to prove a negative it is all very well my learned friend suggesting that Mr. Gubarev will be able to go along before the American court and say, "It is untrue," but he is not going to leave it at that.   The

C

evidence from a person who wrote this part of "the dossier" that says, if it is the case, "This information came from sources I cannot disclose but I did not verify it," is of course relevant, Master, to the likelihood or otherwise of the allegations in fact being true.

D

As Mr. Millar put it, the questions on which my clients wish to ask questions of Mr. Steele are relevant to seeking to undermine the credibility of the allegations in that paragraph of "the dossier".  We say, Master, with respect, it is not rocket science to understand that the author of the allegations has relevant evidence to give as to how he

E

came to make the allegations going to the question of whether my client can in the American proceedings prove that those allegations are untrue, to satisfy the burden of proof on him so to do.

F

Equally, my learned friend's submissions rather miss the point as to the relevance of the topics of 6-9 which go to Buzzfeed's culpability in publishing and I am sure, Master, you have picked it up but you were not taken to it, in the US proceedings you will have seen, I am sure, at paragraph 43, so the same bundle you were just in, at page 174 – it is bundle 2, tab – I am focusing on the varied amended Schedule A, Master.

G

MASTER FONTAINE: So I can refer to that, which page is it?

MISS BROWN: The amended is at page 303.  It is probably in a few places.

MASTER FONTAINE: Yes, it is.

MISS BROWN: I think if you have seen it elsewhere – somebody is telling me it is at page

H

200 something.

MASTER FONTAINE: I have found it, it is 222.

**A** MISS BROWN: Master, just having a look, one is general introductory stuff, background. Then 2, 3, 4, and 5 are how Mr. Steele came to make the allegations, essentially, then 6, 7, 8, and 9 relate to the initial dissemination, if we can put it like that, of "the dossier".

MASTER FONTAINE: In this respect, you are presumably referring to "the dossier" as a whole and not just paragraph 3.

**B** MISS BROWN: No, Master, we have agreed, this is the issue that was taken up by the US defendants ----

MASTER FONTAINE: I see.

MISS BROWN: It is in the second paragraph, at the top, in italics.

**C** MASTER FONTAINE: Yes, that is what I wanted to be clear of, in other words, where you say "dossier" you mean   paragraph 3?

MISS BROWN: It would be the December memorandum.

MASTER FONTAINE: Yes, paragraph 3.

**D** MISS BROWN: Yes.  I have prepared, and I gave it to my learned friends this morning, a redraft that takes into account the drafting issues.  My learned friend says it is not clear having the second paragraph and so I can hand it up to you, Master, now if it is helpful.

**E** I have simply taken those drafts to hand and made an amendment because it is easier as a matter of drafting.  We say it is quite clear, you have the second paragraph there, and it limits everything apart from the first paragraph.

MASTER FONTAINE: Thank you.

**F** MISS BROWN: If it is wished to make it absolutely clear, there is some suggestion, I think, that really the amended Schedule A has been drafted in that way to somehow give the plaintiffs room for manoeuvre, that is not the intent at all, and it would not be the effect. It actually says what it says and that would no doubt be reinforced by the examiner. There you have it made clear in each paragraph.  Indeed, we have also adopted the

**G** suggestion that the last two sentences of paragraph 3 should be removed, which seem to relate to Carter Page rather than my clients.  It is a drafting point that was made in my learned friend's skeleton which over the weekend I picked up and so prepared this.

MASTER FONTAINE: Which paragraph, 3?

**H**

40

**A**

MISS BROWN:  Paragraph 3, Master, if you turn the page at wherever you have Schedule A, behind it I hope you have the relevant paragraph 3 that is being talked about in the proceedings.

MASTER FONTAINE: I see; yes.

**B**

MISS BROWN:  The bit in brackets, the last two sentences, at the foot, appear to relate to Carter Page rather than my clients.  That is a point that was taken in his skeleton by my learned friends, so we have said, fine, we are prepared to  make that quite clear as well.  That is why there is reference to excluding the last two sentences.

MASTER FONTAINE: I see.  Thank you.

**C**

MISS BROWN:  Indeed, annex to the draft order here we have crossed those out to make it clear.  I think we may have crossed out more than two sentences.  I think it is the Carter Page stuff that is supposed to be crossed out.

MASTER FONTAINE: I understand; yes.

**D**

MISS BROWN:  The relevance, then, Master, of the circumstances in which Mr. Steele first published, used in the technical sense, that is first handed over copies of the December memorandum to third parties and those third parties seem to be potentially the media, Fusion, and others, and the others that we are aware of are, of course, Mr. Kramer and/or

**E**

Senator McCain, are clearly relevant to the issue of culpability of Buzzfeed for the simple reason that it feeds into the circumstances in which Buzzfeed obtained a copy and what it was told or aware of when it obtained a copy.  For example, take an  obvious example, if relevant copies were provided to third parties, were provided on a

**F**

confidential basis, as Mr. Steele has stated in his defence in the English proceedings, then that is clearly relevant to the state of mind of Buzzfeed in terms of how they obtained it.  It depends whether it said "confidential" on the document or whether the email which it was sent under and which as we understand was a protected email, would have made that clear to Buzzfeed when they obtained a copy of it.  Of course it is

**G**

relevant to Buzzfeed's state of mind to see the extent to which when it originally left the hands of Mr. Steele it was done so on the basis of confidentiality, and so forth.

My learned friend rightly states, at paragraph 70 of his skeleton, that some

**H**

information has already been provided by Mr. Steele in the UK proceedings, which is all well and good and we say, yes, exactly, but it is no good to the plaintiffs in the American

**A**

proceedings.  As we said, we cannot use Mr. Steele's pleadings in the English proceedings in the American proceedings because they are likely to be inadmissible hearsay and, in any event, as a matter of common sense they are not going to carry much weight.  We need to hear it straight from the horse's mouth in this examination for the purposes of the American proceedings.

**B**

My learned friend said in relation to a question about provision of "the dossier" to third parties in his submissions this morning – shall I just finish this point?

MASTER FONTAINE: Yes, and then we will break.

**C**

MISS BROWN:  -- that the reference, he said, to third parties must mean parties other than those that Mr. Steele has admitted providing to in his defence in the English proceedings.  He then used that as a platform to suggest that what the plaintiffs are really up to here is not trying to get relevant evidence for the American proceedings but to dig around a bit to get more evidence in which to pursue their case in the English

**D**

proceedings.  He has that quite wrong, Master, for the very simple reason that the third parties in issues are Mr. Kramer and Senator McCain because, as I have said, we cannot use what he has admitted to in the English proceedings in the American proceedings.

**E**

We fully expect Mr. Steele's evidence, when he is examined, not cross-examined, by my clients for the purposes of the American proceedings, to reflect what he is saying in his English proceedings.  That is fine but we cannot make use of it just as a pleading in the English proceedings.  So, no, it is not trying to root around for other people of

**F**

which we are totally unaware. That is why we say it is not terribly onerous, frankly, to say in evidence for the purposes of the deposition what has already been stated on the pleadings in the English proceedings.

Master, I think I can probably pause there.

MASTER FONTAINE: Yes, does that end that particular point?

**G**

MISS BROWN:  I think so.  If there are any more points to make on the point, I will pick them up afterwards.

MASTER FONTAINE: Yes, when we resume.  We will rise now and resume at 2 o'clock.  Thank you very much.

*(Adjourned for a short time)*

**H**

MASTER FONTAINE: Yes.

42

A

MISS BROWN: Just touching on the issue of relevance, we say not only is this not a clear case that Mr. Steele has no relevant evidence to give in relation to the issues in the American proceedings, but it is in fact a clear case that he does have relevant evidence to give in the issues in the American proceedings. We say equally misconceived are the fishing allegations that are made on behalf of Mr. Steele.

B

If I may here ask you, Master, to refer again to the decision in *First American*, at tab 4, at page 1163H: "If oral evidence is being sought for the purpose of use at trial and if there is good reason to believe that the intended witness has knowledge of matters in issue at the trial so as to be likely to be able to give evidence relevant to those issues, I

C

do not understand how an application to have the intended witness orally examined can be described as fishing. It cannot be necessary that it be known in advance what answers to the questions the witness can give, nor can it be necessary that the answers will be determinative for one or other of the issues in the action.

D

Section 2.2 of the Act bars the court from making an order for oral testimony to be taken pursuant to a Letter of Request unless the order is of a type that could have been made for the purpose of obtaining oral testimony for domestic litigation. In the case of a witness who there has reason to believe has relevant evidence to give a subpoena served

E

on the witness in order to obtain his evidence at trial could not be set aside on the ground that it was fishing. In a comparable case a court would not be deprived by section 2.2 of the power to accede to a Letter of Request. The question whether as a matter of discretion the court would be prepared to make an order pursuant to the Letter of

F

Request and, if so, what order would be another matter but there would be no jurisdictional reason why the court should not make the order sought."

Then again at D: "I regard the case as authority", that is *State of Norway*, "for the

G

proposition that as a matter of discretion a request for oral testimony should not be acceded to if the intention were to obtain information rather than to obtain evidence for use at trial. This is not, in my opinion, authority for any broad proposition. Moreover, it is not always possible to draw a sharp distinction between, on the one hand, questions

H

designed to establish allegations of fact and, on the other hand, questions designed to extract information which may lead to obtaining evidence in support of the parties. There may be some questions which are obviously one or the other but a number of

43

**A**

questions may potentially lead either to an answer which is probative of an allegation of fact or to an answer that prompts a further line of enquiry without being probative, or to both.

**B**

In framing questions to ask a witness from whom no proof has been taken, the questioner can be expected to ask a number of preliminary questions in order to (inaudible) This is not fishing.  This is a normal technique of examination.  A topic for legitimate questioning may have merely background significance.  I repeat that, in my opinion, if there is sufficient ground for believing that an intended witness may have relevant evidence to give on topics which are relevant to the issues in the action, a Letter of Request seeking an order for the oral examination of a witness on those topics cannot be denied on the ground that it is fishing."

**C**

**D**

I have already drawn your attention, Master, to the fact that the American court has expressly disavowed that the purpose is for early stage discovery or fishing, which would not be permitted.  Also, in this context, it is relevant to note that at the time of the request which came before you, Master, in November, the application came before you in November, the trial was due to start in March. You get that from the first page.  I do not think we need to go back to it but it is on the first page of the request, Master.

**E**

This is of itself a good indicator that this is not a fishing expedition and we see that in the *Landrover* case, which is at tab 8.  You have been taken to the relevant paragraph but for a slightly different purpose.  It is tab 8, page 6.

MASTER FONTAINE: Yes.

**F**

MISS BROWN:  Again, you get it in *Arpad Busson* at paragraph 27.

MASTER FONTAINE: Whereabouts on page 6?

MISS BROWN:  I am sorry: "These observations appear to me pertinent to the (unclear) Although the Master's judgment does not refer to them in terms I am told …."

**G**

MASTER FONTAINE: What paragraph are you reading?

MISS BROWN:  I am sorry, paragraph 23.

MASTER FONTAINE: Thank you.  At the top of the page; yes.

MISS BROWN: Then it is the second paragraph: "The reference in his judgment to the proximity of the trial date suggests that he was focusing on the purpose lying behind the

**H**

44

**A**

request rather than the label which might be applied to the stage of mitigation.  I do not consider that the applicant is unable to show that the Master was wrong."

I am sorry, I find it more clearly in the *Arpad Busson*.  I apologise. That would

**B**

have been the better authority, at tab 4, which is the one you were taken to.  It is tab 7, paragraph (iv) of paragraph 27: so page 7 of the report, there is a little paragraph (iv) marked there: "Particularly pertinent will be the stage at which the order is sought," the short point being that given that this was not an early stage application, but it was an application, which, if the trial had not in fact been moved to August, was due to start next month, Master, which rather undermines the suggestion that it is an early stage

**C**

discovery in the wider sense, a fishing application.

MASTER FONTAINE: Yes.

MISS BROWN:  Moreover, Master, the topics for examination, in particular now that they

**D**

have been limited by the plaintiffs, to the relevant paragraph in the December memorandum save for the first background paragraph, are not  vague or uncertain, let alone a roving multifaceted public inquiry.  They are clear and discrete and as I have already submitted, Master, they are essentially threefold: one, that background finding your way in that we have just seen referred to in *First American*, which will also in

**E**

general terms be relevant, of course, to the issue of truth or falsity because, of course, it is relevant to the likelihood of the allegations being true what in general terms Mr. Steele's background was.  We have confirmed it is only in general terms.  We are not seeking detailed evidence but in general terms the background.

**F**

Then the next one, two, three, and four that I have said simply relate to how he came to make the allegations in the first paragraph of the December memorandum and which, so far as we can tell from the evidence, it is worth noting appears to have been put together between, I think, the last one was something like the end of October, the last

**G**

memorandum, and 13th December.  We are not asking for vast period of time either.  It is the sort of period that seems to be about a month, a month-and-a-half of activity on the part of Mr. Steele putting together the December memorandum and we are not going back vast tracks of time.  We are going back to a specific period of time in 2016. That is really all two, three, four, and five are, they are all sub-questions of the same question,

**H**

which is how he came to put together this paragraph of the December memorandum.

Marten Walsh Cherer Ltd
Tel:  020 7067 2900

A

Then the remaining six, seven, eight and nine, are all really related again to one single topic but they have been put into subparagraphs, really, for the facility of Mr. Steele and that is the circumstances and what Mr. Steele did in providing a copy of the now December memorandum to parties other than himself.  When I say third parties, some of those third parties have been expressly identified, Fusion, Media, and other third

B

parties.  As I have said, Mr. Steele himself has given evidence in the English proceedings that he provided a copy, I think, to a (*unclear*) case security officer and (*inaudible*) for onward transmission to Mr. Kramer, for onward transmission to Senator McCain, and I think also possibly to the FBI but I am not quite sure.

C

That is all those questions are related.  I will come back to the ninth question in a moment, if I may, in terms of the drafting issues.  We say as a headline it is simply a subset of earlier questions.  It would in fact come within the scope of the provision of "the dossier" to media outlets, to ask whether any payments were made or offered in

D

relation to publication of the subset.  It has been made express in order to give Mr. Steele due notice of it; that is all.

We say, clearly, in relation to the limited Schedule A these are not vague and uncertain topics.  In relation to my learned friend's suggestion that really it is not open to the plaintiffs to respond to the express concerns raised in the 20th December letter, I

E

think it was the 20th November letter, by RPC where they say, "First of all we are worried about sources; secondly, we are worried about it being the whole dossier, not just the relevant paragraph," it is said it is not open to the plaintiffs to respond positively to those concerns and say, "Well, okay, in these circumstances acting reasonably, acting

F

in accordance with the overriding objective, and being reasonable we are prepared to limit the request to  reflect those concerns."  It is said, "No, instead a new application has to be made."  We said that is clearly not right and in relation to that, if I can ask you, Master, to turn to the decision in *Refco*, which is at tab 6 of your bundle, paragraph 32.

G

It was in the context of seeking to take oral evidence.  There is a distinction to be drawn between oral evidence and documentary evidence, Master. I am sure you are familiar with it.

H

It states:  "Lord Woolf in *The State of Minnesota* said that because of the approach of the English court to try and give effect to Letters of Request, if they could, that the

46

**A**

court will take into account any limitations, corrections, or conditions, which the party seeking the order is willing for the court to take into account, it will, if appropriate, be prepared to give the request an amended effect."

MASTER FONTAINE: Are you reading from the *Refco* case now?

**B**

MISS BROWN: Yes, at paragraph 32, tab 6, the first sentence of paragraph 32. It then goes on to deal with documents, which are subject to a slightly more stringent test, which is where the blue line test comes in. It does not apply to all evidence, Master. To say that it is not open to the plaintiffs to act reasonably and responsibly to concerns that have been raised on behalf of Mr. Steele and to limit the topics in the way in which they have

**C**

is not correct. That must be even more so, Master, where you have seen that when concerns were raised on behalf of Mr. Steele, before the American court, the American court said, really, it is appropriate for the English court to address any concerns that you, Mr. Steele, may have in relation to the scope of these topics.

**D**

So, the American court has responded that the English court should have a look at it. The plaintiffs have responded by saying, "Okay, we can live with restricting the topics in this way and we can live with taking out, we can understand the situation in relation to sources." It is entirely unnecessary despite that to start all over again, go back

**E**

to the American court, get a fresh request, in order to come back to precisely the situation we are in before you.

MASTER FONTAINE: I agree with you in regard to limiting the request, but if you are intending to change it or to add things that were simply not in the original request, then

**F**

my view is that one does have to go back to the requesting court because this court can only act in relation to a Letter of Request. We cannot substitute our view for theirs, as it were.

MISS BROWN: Master, I do understand that. In that respect, the only addition is the last

**G**

question. It is new in the sense that it did not appear in the original request. We say it is a subset and I am sure I can take instructions without paragraph 9. I would say this, until I read my learned friend's skeleton that had been raised in relation to paragraph 9 saying it is a new one. It is, we would say, clearly just a subset of the prior question.

**H**

Otherwise, all we have done is agree to have provision in the order to limit its effect, limit the scope of the questions. Not new questions but limiting them. Whether that

Marten Walsh Cherer Ltd
Tel:  020 7067 2900

**A**

**B**

goes in the body of the order or whether it goes as I have drafted it here in the specific topics, it does not really make any difference.  We have said, and I will come to this in a minute, in relation to sources, because it clearly is quite a sensitive subject, we have not only taken it out of this schedule but we have agreed that there should be a specific part of the order which says, no questions that disclose the identity – I have particular language – which covers the jigsaw point.  The only new question is the last one.  I am sure we could live without it.  It is in fact a subset but it gives notice of one line of questioning.

**C**

Master, then in relation to what constitutes or how specific the topics must be I think you have seen them, you are familiar with *First American*, again it is a good summary of really the test to be applied, but at 1167B and E: "In the present case, however, notwithstanding the width of some of the paragraphs of the schedule of requests and testimony I do not see any reason to doubt that the questions put to the witness on specified topics would in general be questions intended to elicit the evidence for use at trial."

**D**

Then at E: "Notwithstanding their width, each of the paragraphs of the schedule describes a topic which has some relevance to the issues in the case and in respect of each topic the intended witness can, in my opinion, reasonably be expected to give some relevant evidence."

**E**

Then if we look at 1167G, where the court goes on expressly to deal with width of topics: "However, I must now consider whether the width of the topic renders the Letters of Request oppressive."

**F**

It is a different question to jurisdiction, once you are satisfied Mr. Steele could give relevant evidence, as a separate exercise of your discretion whether or not the topics are oppressive: "This too was a ground of objection to the letters which the judge regarded as considerable weight in *The State of Minnesota*, Lord Woolf held that, because of the need to hold a balance between the requesting court and the witnesses who are to be examined, if the request is given effect the court will not allow uncertain, vague, or other objection or request to be implemented.  A witness is entitled to know within reasonable limits the matters about which he or she is to be examined."

**G**

**H**

48

**A**

Master, I ask rhetorically here, can it seriously be said that particularly in relation to amended Schedule A, or if we put a restriction in your order, Master, that the questions, the topics at 8 or 9 should be limited to the paragraph in the document, that Mr. Steele does not know within reasonable limits the matters about which he is to be examined. I do not think so, Master. He knows exactly what he is going to be asked about. He is going to be asked about preparing that paragraph of the December memorandum and he is going to be asked about the circumstances in which he released it to parties other than himself, Fusion, any secret service, the UK secret service that is referred to in the pleadings, and whether Fusion with a view to going to Senator McCain via Mr. Kramer. It is all in his pleadings.

**B**

**C**

I also say let us keep it in proportion when talking about the width of topics. This is a world away, Master, from the width of topics, for example, that were not allowed in *First American* and in relation to that I will not read it out loud but, Master, if you could just read down from where we left off to C on 1168, you get a feel for the width of the topics that the court was concerned with there.

**D**

MASTER FONTAINE: (*Pause*) Yes, I see.

MISS BROWN: It is a world away from the width of the topics in amended Schedule A.

**E**

Also, my learned friend referred to the suggestion of cross-examination by my clients' American attorneys for six or seven hours would be oppressive, as to which we say two things. First of all, just again remember that the American plaintiffs will not be cross-examining, they will be examining in-chief and, in addition to that Mr. Loble does expressly say at paragraph 43 of his second witness statement that he has been told by the American attorneys that they do not anticipate that Mr. Steele's examination, cross-examination by the defendants, and re-examination, will in fact take all day, but given that everybody has gone to this expense to make this application and they will be coming, obviously, at considerable expense over from the States to undertake this task, that it is appropriate to leave sufficient time to ensure that all questions that are properly to be asked can be asked in the time allowed by this court. He has expressly confirmed that it is not anticipated, in fact, that it will take all day. We say that it is really not oppressive to Mr. Steele to be required to attend for examination, cross-examination, and

**F**

**G**

**H**

49

re-examination, for one day.  It has taken a day, or will have taken a day to argue about it, Master.

I can then come, if I may, to the drafting points and these are the points my learned friend raised at paragraph 44, none of which had in fact been previously raised. That is why I seek to address them now and I did seek to address them with the amended Schedule A.  We are very happy to take into account any concerns that are raised and none are difficult to deal with.  The alternative, Master, it occurs to me to revising in the way that I have done Schedule A would be for your order itself to contain the restriction that topics 2-8 or 2-9 should be related only to paragraph 3 of, I call it, the December memorandum because it is easier, in so far as they concern the United States plaintiffs. That is another way of achieving the same end.  The suggestion that is made that there was some deliberate vagueness is, I would say, unsustainable.

I have addressed you already, Master, on the new question 9.  I fully accept your point, Master.  I am sure we can live without it because it strikes us as merely making express a question that can rightly be asked under the question, provision of the December memorandum to media outlets.

MASTER FONTAINE: It may be a matter for issue between you.  It is not a matter for me, it seems, to go beyond what is in the Letter of Request and second guess what they intended to include.

MISS BROWN:  Master.  I think I have made this point already but I will repeat it.  The plaintiffs' agreement to limit the scope of topics should not be regarded as a concession that the original request was too wide, but it is an exercise in reasonableness, pragmatism, and responsible conduct of litigation in accordance with the overriding objective.  So, the plaintiffs have in exactly the same way sought to address genuine national security concerns by agreeing to drop questions relating to sources and inviting Mr. Steele, and the FCO as well, to identify what other topics still remaining in amended Schedule A cause concern in order that such concerns can be addressed.  I do not know, Master, if you need to see the correspondence between Mr. Loble and RPC, and the FCO, in which he expressly invited them to say what topics cause concern, and there has been no response, no explanation to that. The passages are highlighted in my skeleton, Master.

In the same way as they sought responsibly to respond to national security concerns, so they sought responsibly to respond to the concerns raised in relation to the scope. My learned friend suggests that the plaintiffs' agreement to restrict the topics is, and I quote from the skeleton, "a telling insight into the real purpose of the application". What, I ask rhetorically, is the real purpose of the application other than for the US plaintiffs to have, to pursue, their highly valuable libel proceedings against Buzzfeed in the United States. If there is some ulterior purpose, it is all really designed to achieve some different end, Master, then why did they agree to limit the scope so readily. It is all getting rather excited and conspiracy theorist to suggest there is some ulterior motive behind this application, which we submit is absolutely clearly designed to elicit information for the purposes of the US litigation.

I have dealt in this respect in my skeleton, at paragraph 34, with Miss Cain's suggestion that the motive is to put pressure on Mr. Steele by leaving him and his sources fearful of attack outside the courtroom. We say this is an allegation made entirely without foundation. We also say it should not have been made and it did not make its way, in terms, into my learned friend's skeleton although it seemed to be hinted at in the oral submissions. I have already said, Master, it is not my clients' pursuit of their legal remedies which have put the sources at risk but Mr. Steele's production and release of "the dossier" and then its publication by Buzzfeed. That we get from Miss Cain's own evidence where she explained that in fact Mr. Steele was rightly horrified by the publication of "the dossier" in its entirety and the fact that that publication alone has put these sources at risk because, to put it simply, people who want to find out the identity of the sources have enough information already to put two and two together to do so should they so wish. So, it is not my clients who have some ulterior motive in making this application.

At paragraph 75 my learned friend seeks to attach some nefarious intent to the form of the draft order and the order made by you, Master, on 9th November. They say, in their skeleton: "This," this being the fact that there is some ulterior motive to this application, "is confirmed by paragraph 6D and E of the order drafted by the US plaintiffs and made by the court. According to those subparagraphs the form of

Marten Walsh Cherer Ltd
Tel: 020 7067 2900

A   questioning which the US parties may engage in is completely unrestricted." They go
on then to quote from those paragraphs of the draft order.

   Master, you will not need me to tell you that the draft order and the order made
were in accordance with your, the Senior Master, template, which had been provided to

B   my instructing solicitors in relation to a previous application and has been used ever
since. I would also point out that no point had previously been taken on the wording of
the order and, therefore, the plaintiffs' agreement with the American defendants to
redistribute the time for examination, re-examination, and cross-examination, so
essentially it is three hours examination, three hours cross-examination by the

C   defendants, and one hour re-examination. That was agreed to before any point such as
this was made when it was first made in my learned friend's skeleton argument served
on Friday at lunchtime.

   So, it has nothing to do with being, and I quote from my learned friend's skeleton,

D   "forced to acknowledge its unsustainability", let alone with "exposing the extraordinary
breadth of the initial application and order." It was simply this court's standard template
and since then again in that same spirit of cooperation the plaintiffs' and defendants'
legal teams have agreed to split the timing with greater equality.

E   MASTER FONTAINE: I note that D and E also provide what at first glance looks rather odd
   for examination, cross-examination, and re-examination by each of them and although
   one would not use that formulation in domestic proceedings it is sometimes used in these

F   type of orders because, of course, it is usually not a witness which is either party's
   witness, as it were. So, sometimes parties agree to that type of order. Your reference to
   Mr. Millar referring to cross-examination was not quite right because the order does
   provide for cross-examination.

   MISS BROWN: Yes, Master, although we have since made it quite clear that the plaintiffs

G   will be doing the examining and the re-examining. Mr. Loble rightly points out to me,
   and I will get the order out, I have not got it in front of me, that J in the order, I think
   probably provides the clarification that you can only ask questions that you will be
   entitled to ask: "No question may be asked of a witness that in the opinion of the

H   examiner is not a question of the nature that could properly be asked by counsel who is
   examining a witness at trial in the High Court."

52

**A**

In any event, Master, it certainly was not nefarious intent on the part of the plaintiffs because they used the standard template.  They have since then, without any point having been raised on it by Mr. Steele's legal team, agreed the form of order subject to your view, Master, that I have indicated, that is three hours examination-in-chief, three hours cross-examination and one hour re-examination.

**B**

MASTER FONTAINE: Yes.

MISS BROWN: We would also note, Master, on this point being made the fact that the original schedule was related to the whole dossier and not the relevant paragraph of the December memorandum, etiquette tends to suggest nefarious intent or ulterior motive, I

**C**

would respectfully submit that it is quite easy, again it is not rocket science, to see how Mr. Steele's evidence on production of "the dossier" as a whole could well be relevant or is relevant to the issues in the proceedings between the parties in the United States, and indeed its provision to third parties.

**D**

So, in relation to the first key issue, that is whether or not the allegations are true, my learned friend put it quite well this morning in his oral submissions that to undermine the credibility of "the dossier" as a whole would go to undermine a part.  It is not right to say that Mr. Steele's evidence would not be relevant in relation to the whole

**E**

but we have agreed, as we have indicated, as a matter of reasonableness and proportionality to limit the scope.  Similarly, in relation to the  handing over of "the dossier" as a whole to third parties, by which I mean anyone other than Mr. Steele, it is not difficult to see how the circumstances in which other parts of "the dossier", the

**F**

earlier memoranda, were handed over to third parties could be relevant to the issues in the US litigation.  I do not really, I think, need to address you very much on that subject, Master, because the point is rather made by the defendants' application to un-restrict that part of Schedule A, and they explained in some detail in their evidence why the wider

**G**

issues are in fact relevant to the US proceedings. It is not right to say the fact that we have agreed voluntarily to limit means that the original request was itself evidence but was not relevant and admissible in the American proceedings.

As for the suggestion that the entire purpose of the plaintiffs going to the time and

**H**

expense of seeking to examine Mr. Steele in this manner is to provide a preview of Mr. Steele's evidence in the English proceedings, we say that simply does not work as a

53

A

matter of submission if you, Master, are satisfied that the evidence is relevant to the United States proceedings.   So we say in circumstances where it has been confirmed by the United States court that should very much be your starting point but, as I have said, it is pretty obvious that Mr. Steele's evidence is relevant to the issues in the American

B

proceedings.

We would note that it would be an awful lot of expense and effort to go to when the claimants will in, fact, be entitled to a preview of Mr. Steele's evidence in the usual way in the English proceedings because, of course, he will be required to give a witness statement.  We have referred to the passage from Lord Wilberforce's judgment in

C

*Westinghouse,* at page 611G; it is tab 11 in the authorities bundle.  I have cited it in my skeleton at paragraph 35.4 but it is at the foot, at G: "Unless a case of bad faith is made against Westinghouse, which is expressly disclaimed, it is impossible to deny that the letters rogatory were issued for the purposes of obtaining evidence in enrichment

D

proceedings.  The fact, if it be said, that evidence so obtained may be used in other proceedings and indeed may be central in those proceedings is no reason for refusing to allow it to be requested.  All evidence, once brought out in court, is in the public domain and to accept the argument would largely stultify the letters rogatory procedure.  I must

E

therefore reject this separate contention and express my conclusion on the other factors."

That, Master, leads in to the allegation that to require Mr. Steele to be examined is oppressive and/or a breach of his article 6 rights in the context of his being a defendant in the English libel proceedings.   My learned friend's skeleton refers to the case of

F

(?)*Dombo v Buhere*.  I do not know if I need to take you to it.  I do not think I do because it is referred to in the next authority I am going to come to.  It is miles away from the present case.  That was a case before the European Court, in Dutch proceedings, in which the claimant's witness had been barred from giving evidence as being previously employed by the claimant and there is some rule of Dutch procedure

G

that does not allow party witnesses to give evidence.

MASTER FONTAINE: I am familiar with the case.

MISS BROWN:  On the other hand, the defendant's witness was allowed to give evidence.  It

H

really shed no light on this case whatsoever apart from sometimes proceedings are not conducted fairly, which does not really take us very far.  Much more interesting and

Marten Walsh Cherer Ltd
Tel:  020 7067 2900

A

highly relevant, however, is *Microtech*, which is at tab 9 of the bundle.  In *Microtech* the proposed witness was the defendant in proceedings in the Chancery Division in which fraud was alleged against the defendant and in which the Master held that in the Chancery proceedings the allegation of fraud was unparticularised such that the Master

B

considered that the application to depose was a tactical approach to embark on a train of enquiry to obtain evidence to enable them to particularise their case in the Chancery Court.

It was readily distinguishable therefore from the current case, not least because this

C

case is not a fraud case.  The case in the English court is not a fraud case and if I can ask you, Master, to look at paragraph 52, where there is citation from the *First American* case, which I think was also referred to in my learned friend's skeleton.  There is a quote from Sir Richard Scott's judgment.  If I could ask you to skip to the bottom of the quote: "I accept that in general that would be so but allegations" – I am sorry, if I could ask you

D

to go back, you see the quote that I have just read to you, Master, from Lord Wilberforce in *Westinghouse*, then underneath: "I accept that in general that would be so but allegations of fraud raise special considerations and so long as *First American* hold themselves free to use any information they may obtain from these two witnesses in a

E

civil action for fraud in which the witnesses or their firm are defendants the requests are, in my judgment, oppressive."

They are identifying the key area of distinction with the current case, which is not a

F

fraud case.  Then to make that position all the more clear, if I can ask you, Master, to turn to paragraph 54:  "A number of points emerge from these passages.  First, it is clear that in cases where fraud is not alleged, it is not oppressive to give effect to a Letter of Request even where the main purpose of the request is not to obtain evidence for the existing action in the requesting court but it is for use in other proceedings."

At paragraph 111, the court made the point: "Whether or not the evidence obtained

G

on the deposition can ultimately be deployed in the English proceedings will be a matter to be determined by the UK judge i.e. the fairness of the English proceedings will be a matter in the control of the English judge."  You get that in the last sentence of

H

paragraph 111.

Marten Walsh Cherer Ltd
Tel:  020 7067 2900

A

Then, finally, in this case, Master, if I can ask you to look at the analysis on this issue, which is at paragraphs 120-128; if I could ask you, Master, to read those paragraphs.

MASTER FONTAINE: (*Pause*) Yes, thank you.

B

MISS BROWN:  Master, we say that really rather puts an end to the article 6 point and also deals with the more generally put point of oppression in the English proceedings and that no doubt the judge in the English proceedings will be astute to ensure that those proceedings are conducted fairly to Mr. Steele.

C

I would also make a number of additional points on this issue.  Of course, this is not a fraud case.  In *Microtech* it was a fraud case. This is not even a fraud case.  The point I was going to draw to your attention, Master, is that as Mr. Loble states in his second witness statement, it is anticipated that Mr. Steele's evidence will be exculpatory so far as it is relevant to the key issues in the English proceedings, which is all about dissemination, essentially, responsibility of Mr. Steele for ultimate publication, because he is likely to say, it is anticipated, that he provided the December memorandum in an encrypted email under conditions of confidentiality, whether or not he is going to say with "confidential" written on it, and so forth, of course we do not know all the answers to the questions, but it is likely to be exculpatory and unlikely to be unhelpful to him and likely to reflect what he has already pleaded in the English proceedings.  When it is said that that is just speculation on the part of the plaintiffs, it is not really because the plaintiffs are rather anticipating that what Mr. Steele will say will reflect what he said in his pleadings so far.  It is not speculation.  That is the basis for it.

D

E

F

As for the point at paragraph 80 of my learned friend's skeleton, that Mr. Steele will be required to show his cards whilst seeing none of his opponents'.  As to that, we say on the authorities that really does not help him.  We have just seen that in *Microtech*.  In any event, it is difficult, we say, to understand.  The approach of the English court to litigation is a hands on the table approach.  It is not keeping things tucked in your back pocket to pull out during the course of cross-examination.

G

H

So, in reality, of course, the plaintiffs are going to have a pretty good idea of what Mr. Steele is going to say when he comes to be cross-examined at trial because he will have set it out in a witness statement and in his pleading. The only point for referring to

56

A

the fact that if a point that is subject of these topics is relevant in the English proceedings and has not yet appeared as part of the pleadings, a request for further information can be made, it is simply this. I am not saying that they are going to, or they are not going to make a request but let's take the sources example. That has been raised in a reply.  Now,

B

if it becomes material to the English proceedings, one can see that it may be subject to a request for further information as something which will enable the claimants to better prepare their case and to understand Mr. Steele's case.

C

Obviously, that may be subject to added objections on the grounds of national security but put those issues apart, it is an application that may be made.  All of this information is solely within the knowledge of Mr. Steele.  That is the point for saying in reality the plaintiffs are getting nothing out of Mr. Steele for the English proceedings that they could not in the course of the proceedings in the ordinary way obtain.  In fact, a lot of it has already been stated by him in his pleadings on the issues as indicated.   The

D

one point that has not been touched on is sources but that is one point that we have expressly agreed not to ask about.  That really does not take Mr. Steele any further.

Lastly, Master, and I do not intend to go back to it now but on the issue of provision of "the dossier" to third parties Mr. Steele really has already set out his stall in

E

the English proceedings in his defence and in his further information.  If I could just give you page references, and you have already seen a number of them but they are in bundle 2, tab 11, page 129-130, 132, 135, and 140.  This is really where he is saying who he gave it to, and the fact that it was given in confidential circumstances within encrypted

F

emails, and so forth.  He has also stated his position in relation to the manner in which the information was gathered for the December memorandum and there the page references are 130 and 138; 138 is the further information where he said the information was not actively sought, it was merely received.  So, he has already set out his stall in

G

relation to the topics that are the subject of this request by the plaintiffs.  The one point he has not actually expressly addressed is the question of verification.

Then, almost finally, given the likelihood that the American trial will be heard first, that seems very likely so far as I can tell because at the moment it was going to be

H

March, now it is August, that is in Mr. Steele's second witness statement, as I understand it the English proceedings are at a very early stage.  I do not think they have

57

**A**

had a full CMC yet though it seems pretty clear the US proceedings and the trial will happen first.  That will be in open court.  So, just as Mr. Steele's deposition will be in open court at that stage, so will Mr. Gubarev giving evidence.  If Mr. Steele wants to see Mr. Gubarev giving evidence he will have that opportunity; it will all be in open court before the English proceedings, as things look at the moment.

**B**

Then there is reference in my learned friend's skeleton, although not touched on by my learned friend this morning, to reliance on possible contribution proceedings against us, by Mr. Steele against Buzzfeed: paragraph 82D of their skeleton.  As to that there are two things.  One, Mr. Steele may well be (unclear) by the evidence he is going to give in

**C**

the deposition along the lines we have already indicated and, secondly, those will necessarily only happen after the QB proceedings have occurred when  Mr. Steele will already have been cross-examined, so he is certainly in no worse position there.  We say there really is absolutely no question of oppression or a risk of unfairness in the trial of

**D**

the English proceedings by reason of you, Master, permitting the examination, that is as the American proceedings are going forward.

That leads us, then, to two final topics and the first is confidentiality of who the source is.   My learned friend is quite right, I am going to say that given the plaintiffs

**E**

and the defendants have made it absolutely clear that they are content for your order to recite that no question should be asked which lead to the identification of the sources. The language we have suggested is no questions will be permitted which seeks to identify or increase the risk of identification of sources of information.  Really, it is

**F**

unnecessary to continue to discuss this issue.  The language there covers my learned friend's jigsaw point.  Of course, we all know that you do not have to know possibly the actual name, there may be other indications that would help lead to identification but both plaintiffs and defendants have agreed an order in those terms should be made.

**G**

The fact that the identity of the sources may become relevant in the English proceedings, may be subject to a request for further information or otherwise, is absolutely not relevant to your determination, Master.  It is a matter for the English proceedings because we have said we are not going to ask those questions.   My learned

**H**

friends can argue about that if and when they have to in the context of the English proceedings.  The fact that the initial request included as a topic identification of sources

A

is, we respectfully submit, hardly surprising because identification of the sources would be relevant to an assessment of their reliability and therefore going to proving the falsity, as the burden lies on Mr. Gubarev and the plaintiffs, of the allegations, of course, but the plaintiffs have accepted that they cannot ask those questions. That is the end of it. It

B

was not wrong to put it in the initial request. It was not seeking evidence that is obviously not relevant. Quite properly, they have responded in the way in which they have and accepted that that should not be a topic for examination or cross-examination.

All of that having been said, Master, and I am not going to take you to it in great

C

detail, we have noted in our evidence and in my skeleton at paragraph 29 that it, in fact, appears that this is a little bit of shutting the stable door after the horse has bolted and it does appear the harm has already substantively been done. That is a point I have already made. Be that as it may, the plaintiffs and the defendants have agreed not to pursue that line of questioning.

D

Then *Rio Tinto v Vale*, Master, really does not take matters any further. The court did not set aside the entire order, far from it, they were not even invited to do what you are invited to do and say, "Gosh, can't go anywhere near, it must set aside the entire order." What they were arguing about in *Rio Tinto* was whether the sources should be

E

named or anonymised. That was the argument. The learned judge held that they should be anonymised. Fine, but we are not even going to ask the questions. That really does not take us any further at all, apart from to note that the learned judge did not feel the need to set aside the request all together, or the order.

F

That leads us finally to national security. We submit that this really is hopeless. I have already said we have asked Mr. Steele's solicitors why national security interests may be affected and they passed the question on to the FCO. We asked the FCO and their response – I will take you, Master, to it, it is about the last document, I think, if not

G

the last – in file 2, tab 14, page 323. It probably starts at 328; in the way of emails they often go backwards.

MASTER FONTAINE: Yes.

MISS BROWN: There you see this is from Mr. Loble to Mr. Holder and then it is really the

H

third paragraph: "We made it very clear to Mr. Steele's solicitors our clients are not pursuing identity of sources. You have provided material for the dossier. The thrust of

59

A

questioning will be whether the contents were verified.  On that basis I shall be grateful if you could let me know whether you still have an interest in the matter and, if so, please explain on what basis so we can seek to find an accommodation for your concerns."

B

Then if you turn, Master, please, to 323, I think Mr. Holder was away and it gets taken up by Laskowski.  It is at the foot of that page, 323, Mr. Laskowski: "Thank you for your email.  I refer to my email to Edward Holder earlier today and have not received a response.  Attached is the draft of a revised Schedule A to the order made by the court which we proposed to Mr. Steele's lawyers.  Please let me know by return which, if any, topics for examination are of concern to you."

C

Then you see the response at the top, in fact from Mr. Holder: "As you will see from the application, consideration is being given to issuing a certificate in the event it becomes necessary to do so following determination of Mr. Steele's application.  We will be in contact once the application has been determined."

D

So, (unclear) advise what topics could conceivably raise, those that are left, national security concerns.  Apparently the FCO are still thinking about it.  The short point is, Master, if they consider that there are grounds to issue a certificate, no doubt a certificate will be issued.  Unlikely, I would suggest, it will go to the entirety of the topics.  It may go to an aspect of a topic.  We do not know.  As and when a certificate is issued, or any application is substantively pursued by the FCO, it can be dealt with on the merits.  From your perspective for today, Master, there really is no national security issue and none has been identified in terms of the topics, and we have asked.

E

F

We say it is not that surprising that the FCO have not yet issued a certificate or identified what topics may be of concern once sources are out of the picture, because in preparing "the dossier", as I said, Mr. Steele was acting as an FCO officer but in a private commercial capacity having retired from public service some years before.  The content of the information in "the dossier" may well have raised national security issues, we say the topics for examination of Mr. Steele do not, and there is a risk, as I said at the outset, of conflation of the two.  Once you take out the issue of identifying the sources or risk thereof, there is no national security risk, not least given the extent of the information already in the public domain.  I took you to that a bit at the beginning,

G

H

60

A

Master.  There is much more.  Anybody can Google this.  There are vast tracks of it coming from Mr. Steele.  I have shown you some of that.  I drew your attention, I have not taken you to them in my oral submissions, to what has been said by Mr. Simpson in Congress, but quite a lot of detail there about the differing roles.

B

MASTER FONTAINE: I did read part of the extracts that you referred to.

MISS BROWN: I am grateful, Master, but essentially he is saying that the role of Mr. Steele was to talk to people, people in the DS forum, as he put it.  There is quite a lot of information there sufficient for our purposes but we need it to come from Mr. Steele.

C

We say that is probably why the FCO have not yet issued a certificate.  We also note, and I know, Master, you will be only too well aware of this, assuming no certificate is issued, Mr. Steele still retains the right to object to any  questions during the course of the examination.  Of course, there is a procedure provided.  I am not inviting you to do

D

so but there is a procedure and you will have noted, Master, that we have agreed that Mr. Steele can have his English legal team there to take any proper objection that may be taken to questions put to him in the course of examination.

So, (a) the conduct of the examination will, of course, be supervised by the Examiner, will be subject to the provisions of the CPR, which are designed there to

E

provide for a fair exercise and no questions beyond that which could be asked in English proceedings; there is the procedure for objection, the general procedure, and there is the specific procedure for objection in relation to privilege.  It is all there. It is all written into the rules.  We have said that Mr. Steele can have his legal team there.

F

We do suggest it should be on the language that we have suggested, not the language that has been suggested in their alternative order by Mr. Steele's solicitors that you should be able to take advice from them.  The order we have suggested is standard form in these circumstances. What we have in mind is that he should not be allowed to

G

be taking advice between the asking of the question and the answering of it, and I know, Master, you will be familiar with the provisions of the decision in *Rathbone* where that was expressly disallowed as appropriate.  That is why we have chosen our language and I do believe that is the standard language in these circumstances.

H

So, therefore, Master, I respectfully invite you to dismiss Mr. Steele's application. I invite you to amend the order to include the provisions that the plaintiffs have agreed;

61

**A**

that no questions may be asked that are directed to or would increase the risk of identification of Mr. Steele's sources; to limit the scope of the topics in the manner that has been suggested, either by amending Schedule A in the manner I have suggested or if you prefer it, Master, by including an appropriately worded paragraph in the body of

**B**

your order, either would be equally effective; to provide that Mr. Steele should have representation as I have indicated.  As I say, otherwise I would respectfully submit there is no need for any additional restrictions because Mr. Steele is adequately protected by the provisions of the CPR. I would also invite you, Master, to amend the order to reflect the changes that have been agreed with the American defendants in relation to timetable

**C**

and allowing their English lawyers to attend as well.

  Master, those are my submissions in relation to Mr. Steele's application.  I was not intending to address you in relation to the defendants' application which I do not think gets me anywhere.

**D**

MASTER FONTAINE: No.  Thank you very much.

MISS BROWN:  Unless I can help you further.

MASTER FONTAINE: Thank you.  I think that probably leads me – do you want to reply first before I deal with the defendants' application?

**E**

MR. BAILIN: I am entirely in your hands, Master.   I spoke to Mr. Millar and I was going to suggest it may make it easier since you have effectively three  rival versions if I set out my stall and then Mr. Millar is free to respond to me and the plaintiffs. There is nothing between myself and the plaintiffs in the sense that they are neutral upon my application.

**F**

That would seem to make sense, if that is helpful to you, Master.

MASTER FONTAINE: I think it may be.  Are you content with that approach, Mr. Millar? (*inaudible reply*) Thank you very much.

**G**

MR. BAILIN: Master, could I invite you to turn up our skeleton argument, paragraph 5.

MASTER FONTAINE: Yes.

MR. BAILIN: Appended to the back of it should be, I hope, our version of the order and the way we did it, everyone says theirs is the most helpful, of course, but the way we have done it is to track our proposed changes on to your original order so that you can see

**H**

what changes are proposed.  I do not know if that is at the end of the skeleton or came separately.  I have a separate copy.

62

A

MASTER FONTAINE: No, I have it here.

MR. BAILIN: Thank you.

MASTER FONTAINE: So, you have done it on the plaintiffs' amended version, is that right?

MR. BAILIN: No, what we did was just take your order and track our changes on to it.

B

MASTER FONTAINE: I see.

MR. BAILIN: So you can see, as it were, the extent of what we are asking for.  If you look at paragraph 5 of our skeleton argument, Master, you will see that in fact what we are asking for, and I do not imagine it is going to be accepted from my left, is, in fact, we submit, eminently reasonable.  All we seek is as follows, Master.  We do not seek to add

C

to the order that you made.  In paragraph 5 of our skeleton, we set out in summary what the changes we seek are to the order.  Paragraph 5 of our skeleton says what we seek, which is the main bone of contention between myself and Mr. Millar, we seek to continue to be committed to ask questions about "the dossier" as a whole; that is what the Letter of Request said.  That is what your order said.  To that extent it is not, as it

D

were, a variation, it is an unrestricting, it is an upholding of your order.  It is a variation application because I have two rival variations which seek to shrink it.  Ultimately, as you can see from paragraph 5A of our skeleton, I simply seek to uphold your order in

E

that regard as regards "the dossier" as a whole.  I will obviously come to justify that in a moment.

Secondly, 5B of our skeleton, we are content so that Mr. Steele is under no misapprehension to include a provision making it express that he will not be asked about

F

anything which could lead to identification of sources.  If he wants that express protection we do not object to it and we have inserted that, as you can see, in our draft at "L".  If someone wants to beef up that drafting to make it absolutely clear that jigsaw identification is not permitted they can; we do not have a problem with that.

G

MASTER FONTAINE: I am just trying to find where the equivalent clause is in the plaintiffs' revised draft.

MR. BAILIN: We have it in "L", they have it in "J".

MASTER FONTAINE: Yes.  Thank you.

H

MR. BAILIN: As I say, we certainly are not going – we are happy to leave the pen, as it were, in your hands, Master, in that regard.  The point of principle, namely, that we do not

63

**A**

seek to ask and that Mr. Steele should have protection in respect of confidential source material is there.  The Examiner will enforce that.  Mr. Steele has his lawyers there to ensure the Examiner enforces that.   That is not, as it were, adding to the order.  That is just providing some express protection.  Paragraph 5A is not adding to the order either.  It is upholding the order.

**B**

At paragraph 5C we seek to have equitable division of questioning time.  As Miss Brown very fairly indicates, they have now agreed to that.  Master, Mr. Steele's proposal is that we have half-an-hour of questioning time.  I will come to that in a moment.

**C**

Lastly, of course, just like Mr. Steele, we seek to have English lawyers present because the procedure, as you are well aware, must be conducted in accordance with English law and therefore the US attorneys will need our advice and presence to ensure that.

We would respectfully submit that B-D cannot possibly sensibly be objected to.  In respect of A I will come to make submissions now, if I may.  You have been taken to many of the relevant documents so I hope I can be relatively brief.  The Letter of Request referred, as you know, to "the dossier" as a whole.  We have seen that in the

**D**

Letter of Request itself, page 29 if you want to remind yourself; paragraph 7 of the Letter of Request referred to "the dossier" as a whole.   You, Master, I do not know if you recall actually specifically added that to the top of the draft order.  You do not need to turn it up but if you compare the version submitted by Mr. Loble and the order that

**E**

you made, the only difference is that you inserted "dossier" as defined as in paragraph 7 of the Letter of Request.

MASTER FONTAINE: That was only because it was not defined.

**F**

MR. BAILIN: Fine.  Master, I am grateful for that indication but, obviously, you were thereby giving effect, as you intended to, to the Letter of Request.   You have already been taken to the critical passage in the Letter of Request, page 26 of the bundle, that

**G**

Judge Ungaro makes the express finding that ----

MASTER FONTAINE: Sorry, which bundle is it?

MR. BAILIN: The first bundle, please.  It is tab 5, page 26.

MASTER FONTAINE: Yes.

**H**

MR. BAILIN: You were taken to this. Obviously, this is the express statement by Judge Ungaro that the evidence sought is directly relevant to the issues in dispute.  The

64

**A**

statement expressly states it is not for the purposes of discovery.   Mr. Millar says this is a formulaic Letter of Request.  Master, it is a detailed Letter of Request.  In fact, unlike some as you will have seen in the cases referred to, some of the Letters of Request amount to almost just a paragraph of some of the case law.  This is a detailed Letter of

**B**

Request.  It goes through the allegations.  It goes through the chronology of the US proceedings.  It concludes that the evidence from Mr. Steele is relevant and it sets out a list, a detailed list, but not a burdensome, oppressive, or excessive list. It sets out a detailed list of the topics necessary to obtain that evidence.

**C**

You have been taken through the relevant case law.  I do not need to turn it up. The most important case, we would submit, the most helpful distillation of the principles was that of Simon J in *Credit Suisse*.  That was tab 2 in the authorities bundle.  You may recall those six propositions.  In essence, that relevance is primarily a matter for the requesting court. It is only in the clearest of cases that you should embark upon any

**D**

determination of relevance yourself based upon as what would necessarily be the case less specific evidence than the US judge would have.

Just turn that up to remind yourself, if you would, at tab 2 of the authorities, paragraphs 15-16.  That case is very helpful because it pulls together all the earlier cases,

**E**

*First American*, *Rio Tinto, The State of Norway*.   You are familiar with them all, of course, but that was the one you will recall with the five core principles.  The preconditions for the order are made.  Then it is your duty to give effect to the order. You should approach the Letter of Request positively.  You should strive to give it effect

**F**

unless you cannot properly do so.  You should be prepared to accept the statement of the requesting court as to the purpose for which the request is sought, and if it identifies a witness to give relevant evidence you should not embark on an investigation as to whether that court is correct or not. The positive submission made that you should embark, you should enter this *First American* territory, namely, you should consider

**G**

whether the witness can reasonably be expected to give relevant evidence.  That submission was rejected, at the bottom of paragraph 15: "If the requesting court has considered the question of relevance, it is hardly in the interests of comity that you

**H**

should embark on close consideration of questions of relevance on what is likely to be

65

A

more limited material and a less clear understanding of the issues than the requesting court."

That is, as it were, not just jingoist deference.  It is institutional competence.  So, Master, you are not, we would submit, in *First American* territory.  You have a

B

statement by a judge who was seized of the issues, he recited the issued, that this was relevant evidence, this is a relevant witness, and sets out the topics.  We are not in a clear case where you should go behind that.  Master, I think there is only one other, perhaps two, the *Landrover* case which came after this, at tab 8, made a similar point, the judgment of Treacy J.

C

MASTER FONTAINE: I think it is Treacy.

MR. BAILIN: I am grateful.  It is Carr and Kerr that I always get wrong.  It is page 3, paragraph 18.3.  The English court can look at the issue of relevance in broad terms and in all but the clearest case decide whether the particular answers or topics constitute

D

whether they are admissible evidence.  That is all of a piece with Simon J in *Credit Suisse*.  It is put another way if you need it, referring to the *Norway* case, in tab 10, page 484E in the judgment of Kerr LJ, the last one I need to refer to for the principles.

E

MASTER FONTAINE: Just a moment.  Which tab did you say, Mr. Bailin?

MR. BAILIN: Tab 10, please.

MASTER FONTAINE: Page?

MR. BAILIN: Page 484E.  We are dealing with all those dicta you have been taken to, which you will be pleased to know I will not take you back to, in *Westinghouse*.  Kerr LJ says,

F

halfway between E and F: "Those dicta are no authority as I see it for the proposition that the court should in effect redraft a request in different terms."  Master, it is fundamental.  We do not seek to do that.  Our variation does not seek to redraft this request in different terms, it seeks to uphold it and insert an addition of protection,

G

whereas Mr. Millar's version, as he fairly accepted, "dramatically introduces changes", those were his words.  The White Book summarises the case law as follows, at paragraph 34 21.2 : "The English court ought not to embark on any exercise which restructures or recasts the original request so that it becomes different in substance from

H

the original request." So, Master, adding or changing the request is one thing.

MASTER FONTAINE: What was the reference in the White Book?

66

A

MR. BAILIN: It was 34 21.2.

MASTER FONTAINE: Thank you.

MR. BAILIN: Of course, Master, the English court must protect the deponent's fundamental rights; that includes source protection, that includes oppression but, Master, our variation does not seek to do anything which would cut across that protection.  On the contrary, we are content with express protection to be inserted.

B

The last authority I need to refer to, you have been taken to it but you were not actually taken to this passage, *First American*, which is tab 4, at page 1166E. It is an important observation by the Vice Chancellor there.

C

MASTER FONTAINE: Yes.

MR. BAILIN: It is discussing what does and does not constitute fishing.  I will come to that in a moment.  It is the observation of Sir Richard Scott, the Vice Chancellor, at the bottom of D, that last sentence: "The width of a request may be an inevitable consequence of the complexities of the issue and the witnesses involved (inaudible)…"  Master, it is Mr. Millar who was keen to stress that this case was possibly unique with, I think he said, effectively worldwide political implications.  So, Master, it is inevitable that the width of issues there are going to have some meat in them and it is inevitable that a witness like Mr. Steele in mitigation like this will need to be cross-examined about matters properly.  That is why, for example, Master, we seek up to three hours, the same as the plaintiffs.  It is perfectly reasonable amounts of time.  Mr. Steele's version of the order is 30 minutes.  If common sense must prevail, I will spare the blushes of my US attorneys, they are good but they are not that good, if they are going to cross-examine Christopher Steele in 30 minutes, Master.  One needs to be sensible about that.

D

E

F

Master, there is always, of course, and it is an additional protection and it was referred to if you want a reference in the *Credit Suisse* case, paragraph 17, and I do not need to turn it up, there is always the additional protection that notwithstanding the number of lawyers who are present during the deposition procedure, if some evidence comes out which is in fact inadmissible in the US proceedings, of course it is always without prejudice to admissibility in the foreign court in any event.  The foreign court can rule that out.  That is an additional layer of protection even though the judge has already determined what topics are relevant.

G

H

67

Master, we would submit that Judge Ungaro's determination that "the dossier" as a whole and the topics as drafted in the Letter of Request as given effect to in your order are sufficient conclusively to determine relevance in this case, and it is really not necessary for you to go beyond that.

We will go briefly beyond that, if it is necessary to do so, and we do it in this way, Master.  If it is necessary to justify why the judge reached that decision, we do so in the following way.  First, the plaintiffs very fairly accept that although they have since the order agreed to narrow it, where they have narrowed it from "dossier" to "the December memos only" that is for pragmatic reasons.  They very fairly, through Miss Brown, accept that they can see why "the dossier" as a whole could be relevant to the issues.

Master, we say that is fairly put but, in fact, you must be very alive to that because fairness cannot yield to pragmatism.  The judge determined that "the dossier" as a whole was relevant to the issues in the US proceedings.  Pragmatism cannot chop down that tree.  It is obvious that "the dossier" as a whole is relevant in the issues.  You know from the US proceedings that the article which Buzzfeed published included "the dossier" as a whole.  It was not simply an article which attached the December memo.  We have seen "the dossier".  I do not need to take you to it again.

It is noteworthy, Master, that of course "the dossier" as a whole is exhibited by the US plaintiffs in their complaint.  They do not just exhibit the paragraph dealing with the plaintiffs.  If you want, you can find that.  You have seen it already.  The whole dossier was exhibited.  The article that Buzzfeed published, if you want the reference it is in bundle 2, tab 11, page 182.  That article published, as you know, the whole dossier. Obviously, the defendants who published the whole dossier were informed by the contents of "the dossier" as a whole.  Their decision to publish "the dossier" as a whole was informed by the content of "the dossier" as a whole.  If you were to restrict the questioning to the December memos only, that would be wholly artificial and insufficient.  It would, moreover, prejudice the defendants because the issues in the US proceedings go beyond the mere truth or falsity of the allegations in the December memos. You know that from what you have already been shown but I can remind you.

Master, you will recall if you turn up tab 11 in bundle 2, page 174, for example, this is the US plaintiffs' complaint. So, if you look at, for example, paragraph 43, one of

Marten Walsh Cherer Ltd
Tel:  020 7067 2900

**A**

the issues in the case, not simply whether it is true or false but whether the defendants acted recklessly or maliciously in publishing "the dossier" as a whole.

MASTER FONTAINE: Sorry, is that in para. 43, did you say?

MR. BAILIN: Yes, for example, whether the statements were made negligently, without reasonable care as to their truth or falsity.

**B**

MASTER FONTAINE: But you said "the dossier" as a whole.

MR. BAILIN: Yes, you can see that, for example, if you turn up page 193 where you see the defences: "the defendants' publication and defamatory statements in 'the dossier' within the context of the article is protected by fair report privilege. The defendants'

**C**

publication and defamatory statements in 'the dossier' within the context of the article is protected by neutral report privilege." "Within the context of the article", the article is the article Buzzfeed published, which published the whole dossier. So the defendants'

**D**

decision to publish "the dossier" was in formed by the content of "the dossier" as a whole.

So, just to break it down, although I have, as it were, invited you not to drill down and perform some relevance assessment because you do not need to, if you need to you

**E**

can see this, the defendants were motivated by the content of "the dossier", therefore they ought to be able to question that dossier as a whole. Whether they were reckless or malicious in publishing "the dossier" will depend, for example, in part on who else had "the dossier" before publication, how did they get "the dossier", Mr. Steele's confidence level in "the dossier", whether the publication was a fair and true report of official

**F**

proceedings, and that may sound to us as though it sounds like how could the Buzzfeed article be a report of court proceedings, but in the US that extends, for example, to reporting upon an official investigation. Here there was an FBI investigation into the allegations in "the dossier" so that defence is in play. So, the defendants, for example,

**G**

will need to cross-examine Mr. Steele, whom they have relevant evidence to give on, which official agencies, such as the FBI, he gave "the dossier" to directly or indirectly. Lastly, whether "the dossier" publication constitutes neutral reportage, a disinterested report of a newsworthy event, in the US the freedom to report credible allegations

**H**

without assuming responsibility for them, that is (inaudible) and that will depend in part on Mr. Steele's efforts to verify material within "the dossier".

69

A

Master, Mr. Steele really says in two respects he pushes back against us. He says, first of all, and this is paragraph 66, this is as much as we get as to why he is opposed to my application. It really comes in two places, paragraph 66 of his skeleton and Miss Cain's witness statement at paragraph 52. Those are the only two places where he deigns to explain why in fact he is opposed to (*inaudible*).

B

I will deal with 66B first. Miss Brown has already touched upon it. Paragraph 66B, Mr. Steele says, well, how can my employment status possibly be relevant to the truth of the allegations. As Miss Brown put it, obviously in general terms your status is relevant to the credibility of "the dossier" that you produced. Mr. Steele is not simply some gossipmonger. His general (*inaudible*) is highly relevant to the credibility of "the dossier" that he produced and therefore whether the defendants were reckless or negligent in publishing it, even though some of it could not be verified. Miss Brown has already made the point that much is apparently known about Mr. Steele's former employment, and has an extensive interaction with the media such as Mr. Harding in this book. There is a whole chapter on what Mr. Steele did.

C

D

Secondly, it is said by Mr. Steele, in 66A, I think it is put as follows, because his English pleadings assert that he did not give "the dossier" to anyone in the media, how can he possibly give relevant evidence on Buzzfeed's state of mind. I think that is the point that is being made: "I did not give it to anyone in the media so how can I possibly give any answers which will be relevant to your clients' state of mind." Master, there is a twofold answer to that. The first answer is that he did give off the record briefings to the media on "the dossier". If you want to drill down into this, for example, at page 142, tab 11, it is interesting that he lists media organisations that he briefed off the record, *New York Times, Washington Post, Yahoo, The New Yorker,* and *CNM.* Of course, it is notable those do not include *Mother Jones.*

E

F

G

MASTER FONTAINE: What is the reference again?

MR. BAILIN: It was page 142, Master.

MASTER FONTAINE: Of….

MR. BAILIN: Of tab 11. The other point, Master, is this. Of course, we would like to question Mr. Steele on what he told the media, not just what he showed them, what he told the media and what he authorised others to tell the media. Lest it be thought that is

H

70

A   fishing, Master, the reason, for example, that is of interest is that it is just one reference for you.  Mr. Simpson, Glen Simpson, whose testimony you have in tab 15, he was being questioned by Congress and not by counsel in the US proceedings.  It did take nine hours, and 350 pages, as a guide.  Mr. Simpson was asked by the US Senate

B   Committee, was Mr. Steele truthful in his English pleadings on the issue of who he had briefed in the media: page 547 of the transcript.

MASTER FONTAINE: And what page in the bundle?

MR. BAILIN: Sorry, in the bundle it is 547.  It is 536, I am sorry.  They are reading out

C   sections of the English pleading to him.  Exhibit 5 is being read out.  That is the RFI response which you have already seen.  They read out Mr. Steele's pleading.

MASTER FONTAINE: Sorry, I do not think I can have the right page.

MR. BAILIN: It is page 536 in tab ----

MASTER FONTAINE: At the top of the page.

D   MR. BAILIN: It should be bottom right-hand corner, 536, in tab 15. Sorry, in volume 2 ----

MASTER FONTAINE: Yes, I have volume 2, tab 15, page 536.

MR. BAILIN: Yes, Mr. Simpson is there being asked at line 12, there is a big quote above it, the big quote above it is Mr. Steele's pleading.

E   MASTER FONTAINE: Thank you.

MR. BAILIN: Sorry, I should have made that clearer.  Mr. Steele's pleading is being quoted to him and Mr. Simpson is asked ----

MASTER FONTAINE: His defence, in other words, in the US proceeding?  In the UK

F   proceeding?

MR. BAILIN: No, the English pleading, what Mr. Steele says about who he briefed in the media, that pleading is read out to Mr. Simpson and he is asked: "Is that a full and accurate account of all the news organisations which Fusion and Mr. Steele shared

G   information from the memoranda."  He is asked, is Mr. Steele telling the truth in the English proceedings about who he showed to the media.  His answer is illuminating: "I would say it is largely right. Although any that may have been omitted, any media organisations that may have been omitted in that pleading, may be, yes."  So when I say

H   that my clients want to question Mr. Steele about who he briefed, for example, in the

71

A

media, that is not speculative.  There is an evidential basis for that.  It is relevant to their state of mind and who else had "the dossier" and Mr. Steele's briefing about it.

B

Master, that is really, in essence, what we say about why "the dossier" as a whole is relevant.  Ultimately, if you stand back, the defendants published "the dossier" as a whole and their decision to do so was motivated by its content and that bites on the defences in various ways that I have set out.  We say you do not actually need to go through the exercise and do it yourself because on the authorities the US judge has done that and you ought to respect and honour that because this is not a *First American* situation where you have a basis for going outside the  determination of relevance made by the US judge.

C

The plaintiffs are neutral on our application but they fairly accepted that "the dossier" as a whole may be relevant and there is another reference for you, Mr. Loble in his witness statement makes that point, at paragraph 26.4.3, page 66 of tab 10.  He says that "the dossier" as a whole may be highly material to the (*inaudible*) issues.

D

Master, aside from paragraph 66, the only other material you have to suggest that it would not be is Miss Cain's assertion.  She says in paragraph 52 of her witness statement ----

E

MASTER FONTAINE: Sorry, did you say 26 or 66 of Mr. Loble's statement?

MR. BAILIN: Mr. Loble, the paragraph is 26.4.3 and the page was 66, in tab 10.  I do not need to turn it up unless you wish to….

MASTER FONTAINE: No, I just want to make sure I have the reference right.

F

MR. BAILIN: I am grateful.  That is page 66.  Then for Miss Cain, she is at tab 3, page 18, paragraph 52.  I think Miss Brown has probably made the point already but I will make it as well.  She says she cannot conceive of why the questions in the list, or rather the list of topics, can conceivably be relevant to the Florida proceedings.  Master, that is a bare

G

assertion.  It is contrary to the evidence I have taken you to. It is contrary to the relevance assessment made by Judge Ungaro whose trial it is.

MASTER FONTAINE: Sorry, I am just trying to find where she says it on page 18.

MR. BAILIN: It is in paragraph 52.  I have a rogue reference, I think.

H

MASTER FONTAINE: She says that (*unclear*) this evidence has anything whatsoever to do with this publication. That is only about his employment history.

A

MR. BAILIN: That is as much as we get.  She says in 51, sorry, perhaps 51 is a better

reference, Master, back on page 17: "The court should not simply accept the assertion in

the Letter of Request that your own evidence would be of relevance … could

conceivably be the case."  We say, Master, that is contrary to the evidence I have shown

B

you, it is contrary to Judge Ungaro, and it is made by a witness, with the greatest respect,

of course, who is not qualified in US law, whereas my witness and Mr. Loble's counsel

were.

Mr. Steele then relies, Master, upon a line of argument that in fact this Letter of

C

Request is disguised discovery, the sort of (?)*Bred* line of authorities.  I do not think I

can say anything that would add to what Miss Brown has said on the point.  The US

judge made an express finding this was not a discovery exercise.  It is not a list of

documents.  There is no material before you which could begin to justify such a

D

decision.  We are not in disguised discovery case territory.

That then leads, really, to two bases on which Mr. Steele pushes back against my

amendments: first, because it is said we might expose his sources.  I have already made

my submissions on that.  We are content for any express protection, drafted in whatever

E

form to meet concerns.  The Examiner will enforce that.  Mr. Steele will have lawyers to

ensure that is enforced.  It is then said in relation to ulterior motivation, I think this is put

against us as well, we are motivated in fact to use this old procedure to obtain evidence

for the reason (*inaudible*) does not even get off the ----

F

MR. MILLAR: Sorry, that is not put against them.  The ground against them is they are

opportunists.  (*Laughter*)

MR. BAILIN: I will deal with that complaint, then, Master!  I am grateful for that.  What we

say and I think is being said is that, although you are not a party to the English

proceedings, you will opportunistically gather information which you could then later

G

use against us if we make you a Part 20 defendant, or something like that.  Master, it

does not get off the ground.

MASTER FONTAINE: That is what journalists did.

MR. BAILIN: I will not respond to that!

H

MASTER FONTAINE: With all due respect to those at the back of the room.

73

A

MR. BAILIN: Master, the point, really, is that we are not a party to the English proceedings and at the stage at which it is said we may become one, Mr. Steele will already have given evidence so there would not be anything in the English proceedings that we would not have had anyway.  So, Master, if you turn back, as it were, to paragraph 5 of my skeleton argument, that is really my submissions on the contentious part, namely, "the dossier" as a whole.

B

Amount and division of time of questioning, I have already made my submissions. The plaintiffs agree it has to be equitable.  Up to three hours is not excessive or oppressive.  Lastly, obviously, there will be the US attorneys and the English lawyers present in the same way that all the other parties will have their English lawyers present. So, Master, I am sure all sides of the court will say that they are being eminently reasonable but we submit that, in fact, what we seek here when we look at paragraph 5 of our skeleton, which summarises it, it is not an unreasonable position at all.  We seek to uphold the Letter of Request as regards "the dossier", insert some extra protection for Mr. Steele, and have equitable time and legal representation.

C

D

MASTER FONTAINE: Yes. Thank you, Mr. Bailin.  Mr. Millar, do you want to respond to both of those?

E

MR. MILLAR: First of all, in reply to the US plaintiffs, the Letter of Request was in its entirety prepared by the US plaintiffs' lawyers and on the basis of their drafting the judge signed it.  There is no evidence at all to suggest that there was a hearing, that there was consideration of developments of the list of topics. There is no evidence at all from the plaintiffs as to how they went about obtaining that order from the US court, and it is not unfair or uncharitable to American courts to say that in a lot of these cases you see English judges noting that these Letters of Request are drafted by the applicants' lawyers and simply signed off by the judge.  One would have expected were we going to have this argument about the huge significance of those few lines in the Letter of Request that there would have been some evidence before the court about an inquiry into relevance, consideration of relevance, rather than simply statements drafted by the US plaintiffs' lawyers.

F

G

H

The US plaintiffs say that it is obvious that understanding the circumstances in which the allegations were made, this is the allegations in paragraph 3 of the December

74

**A**

memorandum, is relevant to whether they are true.  That is the bone of contention between us. They do not go to truth, the circumstances in which Mr. Steele disseminated it, obtained the information, or his attempts to verify, which is what I think she had in mind when she was talking about the circumstances in which the allegations were made.

**B**

She means the underlying allegations.

With respect, she still has not explained why, when the issue is, was Mr. Gubarev a hacker, and he is going to say he was not a hacker and did not hack the Democratic National Committee, whether Mr. Steele did more or less in terms of verifying the contents of paragraph 3 that could be probative of that issue of fact one way or the other.

**C**

She then handed up the new version of the order so this is the third attempt by the plaintiffs to come up with a version of the order.  We have the early November version, the late November version, and now the 5th February version.  I have to say I saw this at court.  I was given this at court this morning.  I have read it over lunch.  It is a

**D**

completely different order to the one envisaged by the Letter of Request.  They seek significantly less time to question, three hours, not six hours.  They have rewritten sections to refer simply either to paragraph 3 or the December memorandum only and it still has a new topic, paragraph 9.  It is obvious lining the two up and comparing them

**E**

that the first one was, as we have said, an attempt to conduct a mini-public inquiry about Mr. Steele and his activities.  This one has shrunk very, very substantially both in its terms and effect, and that is simply impermissible.

My learned friend, Miss Brown, then tried to explain on behalf of the US plaintiffs

**F**

why it was relevant to go through, working from her third version, from the US plaintiffs' third version of the order, why it was relevant to go through Mr. Steele's admitted dissemination of 2016/166 as admitted in the pleadings in this country.  One has to keep her draft open in front of you.  As per ----

**G**

MASTER FONTAINE: The most recent draft?

MR. MILLAR: Yes, as per 6-9 in the most recent draft.  So, she has had a go at 2-5 as relevant to truth, which we say is unsuccessful, and now she is having a go, or was having a go at 6-9 and she said, "You know, we only really want him to say what he has

**H**

said in the pleadings because they are not on the record in the American case."  Why any of this is relevant to Mr. Smith's thinking in deciding as a journalist and editor to publish

A   the entirety of "the dossier" is not explained.  If that is what this is about and one got the impression of things being made up on the hoof as our application progressed and has progressed, but if this is what they want and this is all true now, that this is all they want, in other words, (a) was there little or no verification of the 13 lines; (b) did you only give

B   copies of the December memorandum to those few people you have pleaded at paragraph 21 in the English defence; (c) did you give it to them on terms as to confidentiality as pleaded in the English proceedings or were they free to pass it around the place, that is all they want to ask.

C   MASTER FONTAINE: Sorry, could you repeat the….

MR. MILLAR: Yes, (a) the 13 lines, was it the case that there was little or no verification of this.  She says that will help us prove truth.  We do not agree but let's assume that is all they want to ask.  (b) can you put on the record because it is not admissible on the record in America by way of evidence rather than pleading in the English proceedings that you

D   only gave copies of the December memorandum to those people mentioned at defence paragraph 21, the English security official, Fusion to give to Kramer, Kramer to give to McCain, and that you did it for the purposes pleaded there.  He says he is going to say that anyway.  That is what he is going to say but we want to put it on the record.  (c) is

E   what you say in that defence about doing all that on terms as to confidentiality, which is pleaded repeatedly in the defence and the further information in this country, is that true. Please put that on the record.

        That is all they want. Why do we need 2-9?  Why do we need 2 and 3? Why is 3

F   not enough?  Three says: Mr. Steele's – I am so sorry.  Why do we need 2, 3, and 4, why can we not just have 5, Mr. Steele's efforts to verify the allegations, and why can we not have a more focused version of 5?  Why do we need 6, 7, 8, and 9, if that is all they want?  Why is there no list of questions for Mr. Steele asking him in substance the

G   question now at 5, what steps did you take to verify 13 lines, and the two questions that I have given you at (b) and (c) about distribution and confidentiality.  There is an army of lawyers on the other side, America and here.  It is not exactly challenging to draft a Letter of Request or even a third attempt at a variation of your order, targeted at those

H   things. We remain as sceptical as we were when we saw the first draft and this draft does

**A**

absolutely nothing in its reformulation to encourage us that this is not still going to turn into an attempt for a public inquiry.

My learned friend said it is important to note the stage at which the application was made for the Letter of Request.  The Letter of Request was made or the application was made in early August – early August – eight months before the then due trial date in

**B**

America when, as I understand it, American style discovery was still continuing in the litigation.  It is true they delayed three months in making the application here on the back of the Letter of Request and we have never had an explanation as to why they did that but it is surely the Letter of Request that you look at in determining what stage in

**C**

the litigation in America was afoot for the purposes of trying to ascertain what they were up to.

They say that the topics now in this draft, their third attempt, are limited, they are now limited, vague or uncertain, but you have our point, Master, this is not what they

**D**

wanted.  It is what they have been forced to through the second iteration and the third iteration by our objections and our applications; we got iteration two because we said we were going to reply to set aside.  We got iteration three because we said iteration two did not make sense and left open lots of holes.  That is not reasonable conduct.  That is being

**E**

pushed into a position for tactical reasons in litigation.

You were taken to the quote in *Refco* but I will not take you to it, which is at tab 6, paragraph 32, on the question of whether this is so far removed from the original Letter of Request that they could not permissibly be made.  That is a question of fact and

**F**

degree.  It is clear from the authorities that that is the case.  When you go back and look at the quote in *Refco* it is about limitations which the applicant for the Letter of Request is willing for the court to take into account and where that situation arises the court may, if appropriate, amend.  So there are two stages in it: were these limitations the applicant

**G**

was willing for the court to take into account, is it appropriate in any event to make the amendment.  They plainly were not limitations the applicant for the Letter of Request was willing for the court to take into account for the reasons I have explained, that they had been pushed into making these concessions by our persistence.  Are they appropriate

**H**

to amend; answer, it is not appropriate for the reasons I have explained.  These are half-hearted amendments which on the account given by my learned friend of the very

77

A

limited facts that they want to establish from Mr. Steele by (a), (b) and (c), go way beyond what they would be seeking in a proper application for a Letter of Request.

My learned friend took this point about cross-examination.  I have no idea why because I only took it because the original order made in November, which is at page 54, on the US plaintiffs' application, provides for cross-examination.  To be honest, I do not think Mr. Steele is in the slightest bit bothered whether it is a pro forma or not.  It is in his perspective a very odd scope for questioning:  "The plaintiffs' US trial counsel can be permitted to examine the witness orally in truth for a maximum of six hours or such other period as the Examiner may permit and cross-examine and re-examine the witness as necessary within that period."

Why on earth we should accept an assurance from the US plaintiffs now that they have no desire to cross-examine when that was the order they applied for is beyond me.  It has not changed.  Unless I am misreading the third iteration of the order, at paragraph 6D it says the same: three hours, not six hours, and cross-examine and re-examine the witness for a maximum of one hour.  They clearly want to keep open all options.  This is not an exercise where the examiner has jurisdiction to identify an adverse witness or say the witness has become hostile and therefore you can cross-examine.  It is the order that shapes the scope for the form of questioning and any English lawyer will know, an American lawyer will know, there is a huge difference between examining in-chief and cross-examining.

So, in the third iteration, the new question line is still in, it is not provided for in the Letter of Request.  I suppose, actually, there is a fourth iteration because my learned friend now says in another show of magnanimity, we can live without question 9 as well.  The only way in which they have ever tried to explain or justify this extraordinary sequence of events, the very wide first order and then the various subsequent iterations, is by pointing to the wording of the Letter of Request back in August, and the fact that it says all of that stuff in the original Letter of Request is relevant, and Judge Ungaro signed that off.

It never said, nor did my learned friend say, why did they draft the Letter of Request in those terms? This is our first point about jurisdiction.  Why?  They never said.  There is no evidence about it.  My learned friend did not address it.  She told you

78

A

more times than I could count how reasonable they had been over the last few months in shrinking the order.  She did not tell you why they did that.  I will ask this rhetorically using my learned friend's formulation, did they just forget that the US case was about 13 lines in the December memo?  That is just forgetfulness?  I could remind them about

B

that.  Was it just repeated sloppy drafting to keep saying in subject matters 12-14, "the dossier", "the dossier", "the dossier", when the case was about the December memorandum?  Clearly not. There has never been any evidence or explanation as to why such a wide initial order was sought.  As we have said in our submissions, I do not want to repeat them, it was either that they have a wider purpose, which is to put what was at

C

that stage a six-hour deposition on all these topics into the public domain or for other reasons, or it was a US American style roving inquiry and nobody applied their mind to this charitable view, nobody applied their mind to a properly formulated Letter of Request.

D

She said that I had said to cross-examine  Mr. Steele about all those matters as originally planned would undermine "the dossier" as a whole. I do not think I did say that, that would depend on his answers, self-evidently.  What I said is that the purpose that we discerned lurking between the original draft is exactly the sort of examination,

E

cross-examination, that many other people, particularly Republicans in Congress, have been trying to do with Mr. Steele, to discredit him for a wider political purpose.  It is exactly the same exercise.

She then dealt with the fairness and article 6 points and said he will have to give a

F

witness statement in the English proceedings.  This is hardly the same as being deposed for six or three hours at this stage in the English proceedings.  I have tried to make the point that the CPR level the playing field at each procedural stage, it is an obvious point, there is an exchange of witness statements, it is not one-sided.  On any view, the

G

objective result of that sort of examination will be to give him a dry run at the sort of answers that will come out in the UK proceedings at trial, and I notice that although it is in our skeleton and although I referred to it in oral submissions this morning,  my learned friend has not said in an undertaking that they will not apply to unseal the

H

deposition once it is filed in the US.

79

A

My learned friend made a submission in relation to *Dombo v Buhere* that one has heard I am afraid so many times in relation to Strasbourg authorities.  The reason why one cites Strasbourg authorities is not for the facts but for the statements of principle that they contain.  The relevance of *Dombo v Buhere* is that it was the first clear statement of the equality of arms principle in Strasbourg in that bundle of rights that exists under

B

article 6 in civil proceedings.

Our point is obviously an equality of arms point, that the proceedings in the UK become lopsided if the claimants have the benefit of this sort of deposition at this early stage in the proceedings.  The way you tackle Strasbourg authorities is you take the

C

principle and you apply it to the facts of this case.  It is nothing more sophisticated than that.

She referred to *Microtech,* which is referred to in her skeleton argument, but I will respond to those submissions in this way.  This is the judgment of Morris J.  The

D

*Microtech* case which you looked at, at A9  - we had better just turn it up.  It is authorities tab 9, you are invited to read specifically 124, 125, 126, and 127.  No crime is being alleged here against Christopher Steele so the reasoning at 124 cannot apply.  The first thing the judge says is, "I am not worried about unfairness to him because if he is asked something which intrudes upon his right to assert the privilege against self-

E

incrimination, the amendment in America, he can protect himself by asserting in the examination."   That is 124.  It is an unusual point in the case but it does not apply here.

F

Mr.  Steele cannot refuse to answer these questions by asserting his privilege against self-incrimination because a crime is not alleged.

Paragraph 125 does not apply here either.  It is obviously, of course, the case that the judge at the trial can control what evidence is fairly admitted at the trial but that is not our concern about the lack of equality of arms. It is not the trial or that they may

G

attempt to get the deposition in at the trial, but I think they would be entitled as of right to put to him in cross-examination things that he had said in the deposition, particularly if they appear to be inconsistent with anything he was saying at the trial.  Put that to one side using it as cross-examination material, it is not that we say they put it in as evidence

H

in the trial, our concern is that they will know it all months in advance of the discovery and witness exchange stage in the domestic proceedings and will be able to tailor their

A

approach in the QBD proceedings in the knowledge of the content of all his answers on these specific points.

It is self-evident what the difficulty is for the US plaintiffs in seeing the distinction between pleaded averments in the QBD proceedings and three hours or six hours, whichever it is, questioning, perhaps cross-examination under oath and giving answers in those circumstances, they are completely different exercises. It is no answer to say he has given a full pleading here and answered some further information. He has not had to do anything comparable to being questioned in that way.

B

C

The assertion was repeated that he is only going to give exculpatory evidence but, with respect, that is inappropriate, the court cannot simply assume that, but it is naïve in the extreme, particularly if there is going to be cross-examination. The idea is to elicit skilfully by questioning by experienced lawyers evidence that may turn to your advantage in either set of proceedings. We do not know what he is going to be asked because he has never been given a list of questions.

D

There was one part of my learned friend's submissions that I was fortified by, which was her assertion that there is no unfairness at all in him being deposed now in the QBD because, of course, the one thing if this order is made that would reinstate the equality of arms would be an order requiring Mr. Gubarev to be deposed at this stage in the QBD. I took her submissions on that as a willingness for Mr. Gubarev ----

E

MISS BROWN: I did not say that. I just want to make it quite clear, that is not what I said. I was not discussing a possibility of deposing. An application is not even made. I said that by the time the English proceedings come to trial the trial in the US proceedings is in all likelihood going to have taken place, in which case Mr. Gubarev would have given evidence in the American proceedings in open court.

F

MASTER FONTAINE: That is what I understood you to have said, Miss Brown.

G

MR. MILLAR: But earlier than that she said there was no unfairness; that was the subsequent point, that whenever it comes on, maybe now in August, who knows, he will give evidence in a different trial not on the issues that we are dealing with in the UK trial, and we will be able to observe that. All that is true but that is not our equality of arms point. Our equality of arms point is that he is deposing the defendant in the claim he is bringing in this country now when it is contrary to all the fairness rules of procedure that we have

H

81

**A**

in this country, and I would like to know if it is her case there is no unfairness in that to Mr. Steele as the defendant in the QB proceedings, whether she thinks it would be unfair if we obtained an order to depose Mr. Gubarev now in the QB proceedings in parallel with his deposition in the American proceedings.  That would reinstate the equality of arms and in light of her submissions, which we have noted, we will now give

**B**

consideration to doing that, but I do not imagine she is going to jump up and say, "No, it is absolutely fine, we can keep in step as between claimant and defendant in the QB proceedings by having Mr. Gubarev deposed on a range of issues relevant to that trial."  Of course she is not going to say that.  Nobody will say that in her position because it is

**C**

patently disadvantageous to be deposed in this way at the early stage that they want to do it.

She then dealt with national security but did not seem to understand that the topic at the end is national security and confidentiality, the topic we were addressing at the end of our submissions.  The US plaintiffs do not seem to understand, although we pointed

**D**

them out in our application and skeleton argument, the contractual obligations that Mr. Steele is under as an ex-Crown servant with his service history.  He is bound to protect himself against questioning on oath about his time at the FCO.  He is bound to do that. That confidentiality can be overridden by a court in this country but he has a contractual

**E**

obligation of confidentiality as an ex-FCO Crown servant.  That is what we are doing. We are seeking to preserve his obligations.  It is really not difficult to think of the things that he may be asked under heading one which he cannot answer as a matter of his contractual obligations and if a list of questions was ever needed, not we are going to

**F**

question him in general terms about his time as a public servant, if ever a list of questions was needed, and it has not been forthcoming, it was in relation to that topic.

Then I turn to Buzzfeed.  Mr. Bailin suggested that his amendments at his skeleton 5, A, B, C and D, were all perfectly reasonable but we notice that his redraft – I am

**G**

drowning in redrafts here but it was the one he handed up today with the fax – does alter 2, 3, and 4 as per the second iteration of the US plaintiffs' version.  They are quite content to see it shrunk to paragraph 3 questioning on 2, 3, and 4 but not, apparently, 5. Their position is strikingly opportunistic.  They did not seek any of this evidence by way

**H**

of an application for a Letter of Request.  They do not now oppose our application to set

82

**A**

it aside in its entirety. They do not want to lose the application to rove to the extent they want to, in particular what they feel they can get away with in 2, 3, and 4, and then rove yet more widely in 5, 6, 7, 8, and 9.  They lose the opportunity to fish in that way presented by the Letter of Request so they are saying, my learned friend, Miss Brown,

**B**

made a great virtue of the fact the plaintiffs were not going to go back before the election, they are going to, if they get their way, trackback and trawl through all the events of the summer and the autumn under headings 5, 6, 7, 8, and 9.  They are even trying to keep the new paragraph 9 in the US plaintiffs' order.

**C**

We may as well all be blunt about this, they are trying to get a litigation advantage by having an opportunity to question him about things they think may help them elicit some evidence that helps them in the American case, the US plaintiffs having made the application.   My learned friend, Mr. Bailin said, I think in a slip of the tongue, the US

**D**

judge in the Letter of Request recited the issues in the case.  I do not think he is looking at the same Letter of Request I was looking at.  It says Mr. Steele is believed to have drafted "the dossier".  No attempt in the Letter of Request to itemise the issues in dispute in the US proceedings to which Mr. Steele's evidence on the then 14 different topics would go.  That was my whole criticism of the Letter of Request.

**E**

There is no list of questions from Buzzfeed either.  They seem startlingly shy and reticent about doing it in the same way the US plaintiffs do.  It is what lawyers do, they frame and ask questions but there is an apparent aversion to doing it in this case.  What

**F**

are the facts, I ask rhetorically, that they actually want to seek to establish under their version of the order.  I listened with interest to Mr. Bailin's submission but was none the wiser.

Then he says, we should not be constrained by the plaintiffs' accepting that they should narrow the Letter of Request for pragmatic reasons.  They have done exactly that

**G**

in 2, 3, and 4.  The US plaintiffs' willingness to shrink the questioning on those topics, paragraph 3 of the company report, was an act of, to use his word, pragmatism no less than the remainder of the US plaintiffs' different iterations.  So, it seems they are quite happy to chop down some bits of it which have gone for pragmatic reasons but not

**H**

others.

Marten Walsh Cherer Ltd
Tel:  020 7067 2900

A

He said the defendants, and I have to say it was not at all clear to me the territory he was going into beyond his assertion that you have to rely on the wording of the Letter of Request, but he said the defendants were motivated to publish the whole dossier by the content of "the dossier".  Then he jumped to, "So we can ask questions of Mr. Steele about his dissemination of 'the dossier'."   The two are entirely different things.  Who did you give it to, and their list of questions at 5, 6, 7, 8, and 9, in their new list of topics, including at 9 that question about payments offered to media organisations, have nothing to do with content of "the dossier".  They are about their functional questions about who got it.

B

C

He says, "We only oppose their position," paragraph 66A and B of our skeleton. With respect, he did not read it fully because we deal at paragraph 51, and following, with much more fundamental objections to the opportunistic position adopted by Buzzfeed, which I have dealt with already in this reply.  The application is inappropriate because, in effect, they are playing a tactical game.  They have never made an application for a Letter of Request. They are not opposing our application to set aside on the basis of which we conclude we do not think any of this is necessary.  It is sufficient to have their application rejected, we would suggest, and I have said before, this court's obligation is not to help them fish around there having been a Letter of Request, there having been an order for the bits they want to retain and to try and get answers on under headings that remain in the order, the obligation of the court is to assist the American court and that ship has clearly sailed now.

D

E

F

We do maintain what we say at 66A, and again, as I say, nothing that Mr. Bailin said this afternoon has changed our submission on that; nothing that would be covered, so far as we can see, in 5, 6, 7, 8, and 9, about the functional dissemination of the document by Mr. Steele would bear in any way upon the state of mind in Buzzfeed in deciding to publish it.  None of that evidence that Mr. Steele could give, who did you disseminate the document to, could go to Mr. Smith's or Buzzfeed's state of mind in publishing in the way they did on 10th January, there is no plea or evidence from Buzzfeed that his actions in those respects made any difference to the state of mind of Mr. Smith or Buzzfeed, that they knew about them or that they bore upon the journalistic

G

H

84

A

decision to publish.  It is fishing and it is opportunistic fishing.  They do not want to lose what was given to them by the original Letter of Request.

Their 6, 7, 8, and 9 are very wide.  No explanation has been given for that or for why there are not some targeted questions.  Then at the end Mr. Bailin no doubt through

B

timeless forgot his lines, he is supposed to be neutral on the setting aside the application but he proceeded to tell you why the complaint we make about the width and the purpose of the original order was ill-founded.  That is not a submission he can make, with respect, and remain neutral on the first application made to set aside the order.

Unless I can assist further, those are our submissions in reply.

C

MASTER FONTAINE: Do you want to reply, Mr. Bailin?

MR. BAILIN: Master, I am not quite sure how it is put.  The reality was that Mr. Steele's application to set aside and vary combined reasons.  The reason that we are neutral on the set aside is this, if it is not clear from our skeleton, Mr. Steele is the plaintiffs'

D

witness.  It is for the plaintiffs in the United States to decide how they wish to prove their case.  They are deciding who to call.  It is a matter for the plaintiffs to decide how they wish to prove and what evidence they wish to call.  They have gone to the liberty of obtaining the Letter of Request.

E

When it was obtained we were neutral on that in the terms that it was sought.  If it had been obtained in different terms, we can hypothesise about whether we would be neutral or not, if it had been unduly restrictive, and so forth.  The position is as recorded. If you need the reference, the US defendants were neutral on the issue of the Letter of

F

Request, page 23 in tab 4; that is the US plaintiffs' motion where they seek the Letter of Request and they record the defendants' position as follows: "The defendants have indicated that, although they deny many of the statements in this motion and the Letter of Request, they do not object to the relief sought.  If the Letter of Request is granted the

G

defendants have reserved their right to cross-examine Mr. Steele."  That remains our position.

Obviously, if Mr. Steele is relying, for example, upon ulterior motive as a reason for pushing back against my variation, then I do not accept that.  That does not mean that

H

I am now suddenly switching and saying, "I am opposed to set aside."  I am not.  If he is using that as a reason for pushing back against my variation and having his drastically

Marten Walsh Cherer Ltd
Tel:  020 7067 2900

**A**

reduced order, then obviously I oppose that.  In terms of the set aside itself, consistent with the US defendants' position before the US judge, that is our position.  It is the plaintiffs' witness and the plaintiffs decide who to call.

**B**

We are neutral on the set aside overall but, obviously, if the set aside is refused and this witness is to be deposed, then we submit for the reasons I have set out fairness dictates that we be permitted to question on all topics relevant to the US issues in a way that would ensure that the deposition is not lopsided.  I hope there no self-contradictory or inconsistency in that approach.  That is our position, if this witness is to be deposed it

**C**

must be done on a fair basis both in terms of time and to ensure that all the relevant topics as determined by the US judge are included within it, otherwise it would be a stewed exercise.

MASTER FONTAINE: Thank you.  Is there someone here for the Foreign & Commonwealth Office?  Is that Mr. Blake?

**D**

MR. BLAKE:  Yes.

MASTER FONTAINE: Mr. Blake, I assume you do not want to make any submissions at the moment, is that right?

**E**

MR. BLAKE:  No, I certainly do not make any submissions about these applications.  Section 3.3 of the 1975 Act applies only after and subject to any order that is made.  So, it is necessary, and I think everybody in this room agrees that it is necessary, to await the outcome of those various applications before making an assessment based on the final order.

**F**

MASTER FONTAINE: Thank you.

MR. BLAKE: The main reason for lodging the actual application for now is to address you on matters such as the time period for making the certificate, if there is to be one, and

**G**

also the presence of a representative of the Secretary of State at the examination.  I can address you on those now or I can address you once the order is determined.

MASTER FONTAINE: Yes.  Unless any of the parties here want Mr. Blake to make the Foreign & Commonwealth position clear on those issues, if they are not already, I am

**H**

content for that to be done after we know what decision I am going to make.  Does anyone have any different view?  (*No response*)  I am going to reserve my judgment because, clearly, this is a very unusual case and clearly the issues are, as some of you

86

A

have referred to, the subject of both these proceedings and very much in the public domain and in the news, and important issues.  The issues underlying the application are complicated to some extent so it is proper that I should take care and thought over my decision. What I want to find out from all of you is in terms of timetabling how quickly you need a decision on this issue.  Miss Brown, you may be the best person placed in the

B

US proceedings.

MISS BROWN:  May I take instructions? (*Conferring*)  My instructions are, obviously, as quickly as possible within the constraints of reasonableness and your own time, Master. I understand the difficulties you have in writing judgments when you have such a busy

C

timetable.  Obviously, there is a trial at the moment due to be starting in August; that is quite a long time to go.  I am told that we would obviously prefer to get on with it as soon as possible because once a decision has been made then dates will have to be arranged.

D

MASTER FONTAINE: Yes, I wondered if there was any timetable set in the US proceedings or pre-trial matters.  I see disclosure has already occurred but whether they have similar types of directions that we do, I imagine they will not be dissimilar.

MISS BROWN:  May I take instructions for one moment?

E

MASTER FONTAINE: Yes.

MR. BAILIN:  I do not know if it assists but discovery is due to complete on 15th March but it may be extended.

MISS BROWN:  (*Conferring*)  I was just discussing that with my instructing solicitor. That

F

is my understanding as well although, as we would point out, this is not what we would term "discovery".  It is not my understanding that the deposition has to have occurred before 15th March.

MASTER FONTAINE: No, there may be a time in place for, for example, the evidence of – I

G

do not know whether they have ----

MISS BROWN: I am not quite sure that they do have quite the same.  We are certainly not aware of that stipulation.

MASTER FONTAINE: There may not be.  They may not have exchange of witness

H

statements as we used not to do.

Marten Walsh Cherer Ltd
Tel:  020 7067 2900

**A**

MISS BROWN:  I am told the defendants' American lawyer is here and who may know the answer to this.

MISS BOLGER:  I am the defendants' American lawyer.  My name is Katherine Bolger.

MASTER FONTAINE: Hello, Miss Bolger. I do not know whether you have any information which may be helpful in relation to the US proceedings.

**B**

MISS BOLGER:  It has accurately been stated by my learned friends, which I have always wanted to say, the end date for discovery in America is March 15th but that is likely to be pushed. The trial date is August 15th and between those two dates there will be dispositive motions.  As a general matter, this would be considered discovery within the American sense of the word but obviously American judges can make accommodations that evidence can come in on a different schedule, but those are the dates and, your Honour, they are, to use a typical American term, very squishy, they may change, but March 15th is certainly the current end date for discovery.

**C**

**D**

MASTER FONTAINE: Yes.  Can you assist me with whether in the US civil proceedings there is any timetabling for exchange of witness statements or whether the witnesses simply come to trial and give their evidence at trial?

MISS BOLGER: We do not exchange witness statements.

**E**

MASTER FONTAINE: Yes. Thank you very much.  I will do my best, obviously, to let you have a judgment as soon as I can.  It will probably be a written judgment, or a draft reserved written judgment.  I wonder, if I give you my PA's email address, if you could send to her the email addresses of all those parties who would like to be supplied at the same time with the draft judgment.  If someone could take a note, her email address is: elaine.harbert1@hmcts.gsi.gov.uk

**F**

MR. MILLAR: Master, just so it does not take anybody by surprise, the kind of time period that we are talking about for a proper assessment to be carried out and any certificate, if it is required or necessary, is three weeks.  There would need to be at least three weeks in between any judgment and ----

**G**

MASTER FONTAINE: Handing down. Yes.  Thank you.  In that case, I think there is nothing more I can usefully do today.  Thank you all very much for your contributions and I will let you have the draft judgment as soon as I can.  Thank you.

**H**

..........

Marten Walsh Cherer Ltd
Tel:  020 7067 2900

A

B

C

Digital Transcription by Marten Walsh Cherer Ltd
1st Floor, Quality House, 6-9 Quality Court, Chancery Lane, London WC2A 1HP
Tel No: 020 7067 2900 Fax No: 020 7831 6864 DX: 410 LDE
Email: info@martenwalshcherer.com
Web: www.martenwalshcherer.com

D

E

F

G

H

Marten Walsh Cherer Ltd
Tel:  020 7067 2900