**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 17-cv-60426-UU**

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.,

   Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

  Defendants.

_____/

**DEFENDANTS' MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFFS' *DAUBERT* MOTION TO
EXCLUDE THE EXPERT OPINIONS OF ANTHONY FERRANTE**

DAVIS WRIGHT TREMAINE LLP
Katherine M. Bolger
Nathan Siegel
Adam Lazier
Alison Schary
1251 Avenue of the Americas, 21st Floor
New York, New York 10020

BLACK, SREBNICK, KORNSPAN &
STUMPF, P.A.
Roy Black
Jared Lopez
201 So. Biscayne Boulevard
Miami, Florida 33131

*Of Counsel*:
Nabiha Syed
BuzzFeed, Inc.
11 E. 18th Street, 13th Floor
New York, New York 10003

*Attorneys for Defendants*

## PRELIMINARY STATEMENT

Plaintiffs' motion to exclude the expert opinions of Anthony Ferrante is exactly what Defendants have come to expect—a witty and superficial treatment of a complicated topic to distract this Court from the weakness of their position.

And it is no wonder why.  Anthony Ferrante—a former Director for Cyber Incident Response on the U.S. National Security Council, former Chief of the Staff of the FBI's Cyber Division, and the current Global Head of Cybersecurity at FTI Consulting, Inc. ("FTI")[1]—has found irrefutable technical evidence of something that Plaintiffs have denied since the Dossier's publication: that their infrastructure *was* likely used by Russian cyber-espionage groups to attack Democratic party leadership.  Specifically, he found that (1) the user who successfully duped John Podesta into disclosing his email password targeted Podesta from an IP address owned by an XBT subsidiary; (2) several command-and-control IP addresses used by the Russian cyber-espionage group FANCY BEAR in the hack of the Democratic National Committee shared a unique technical identifier with an IP address owned by the same subsidiary; (3) that unique technical identifier was also used in the cyber-attack on the German parliament and was affiliated with the same method of attack upon the Democratic party described in the indictment of 12 Russian nationals; and (4) 13 of the IP addresses identified in the US Government's GRIZZLY STEPPE report on the Democratic hack belonged to that same XBT subsidiary.  Moreover, Plaintiffs received hundreds of abuse alerts related to those IP addresses, but did little or nothing to investigate the malicious activity occurring on its infrastructure.

In addition, Mr. Ferrante found evidence that XBT infrastructure was used for a massive botnet fraud called Methbot during the time the Dossier claims XBT affiliates were using botnets to conduct the Democratic hack.  He further identified evidence that Russian cyber-espionage groups used XBT infrastructure in no fewer than 6 other malicious cyber-attacks since 2014.  *Id.* at 16-17.  He also concluded that XBT and its affiliates maintained an infrastructure that lent itself to such attacks, and that at the very least XBT did nothing to prevent the attacks.   To put it bluntly, Mr. Ferrante's found evidence of deep connections between XBT and malicious cyber-activity by Russian state cyber-actors, including those responsible for the Democratic hack.

But Plaintiffs ask this Court to strike this evidence as irrelevant because, they claim, Mr. Ferrante did not definitively prove that Mr. Gubarev, or someone at his direction, personally

---

[1] *See* Plaintiff's Motion to Exclude Anthony Ferrante, Ex. 1 ("Ferrante Report" or "Report") at 2.

sat behind a desk in Cyprus and clicked on a button to hack the Democratic leadership. Even more remarkably, they say it is irrelevant if "third parties" were "misusing" their infrastructure to try to hack Democrats, because Plaintiffs claim to be as pure as snow and knew nothing about it. Mot. at 6-8. That argument fails as a matter of law, for multiple reasons.

*First*, defamation law allows defendants to offer evidence that an allegedly defamatory statement was *substantially true*. Contrary to Plaintiffs' self-serving arguments, the Dossier does not purport to specify exactly how "entities linked" to Gubarev were involved in hacking Democrats, and Mr. Ferrante's evidence of connections between XBT infrastructure and the Russian cyber-operatives who hacked Democrats—coupled with his opinion that XBT, at a minimum, turned a blind eye to these activities—are plainly relevant to a jury's determination as to whether the statements are substantially true. *Second*, that Plaintiffs deny any knowledge of this activity is hardly dispositive, particularly given the many abuse alerts that Plaintiffs received. The fact that XBT infrastructure was in fact involved in the Democratic hack— notwithstanding Plaintiffs' repeated and demonstrably false statements to the contrary—is classic circumstantial evidence challenging Plaintiffs' credibility on that question. *Third*, Mr. Ferrante's evidence supports Christopher Steele and his sources' credibility, another key issue in dispute. Put simply, Mr. Ferrante's evidence strongly suggests that Mr. Steele was onto something and that Plaintiffs were not included in the Dossier due to a mistake or commercial vendetta. *Finally*, Mr. Ferrante's evidence regarding Methbot and other malicious cyber-activity is directly relevant to other issues in the case, including damages and the nature of Plaintiffs' reputation before the Dossier's publication.

Plaintiffs' objections also "plainly go to the weight and sufficiency of [Mr. Ferrante's] opinions rather than to their admissibility." *Maiz v. Virani*, 253 F.3d 641, 669 (11th Cir. 2001). Plaintiffs complain that Mr. Ferrante's conclusions do not prove false their own self-serving reading of the Dossier and fault him for noting when the data "suggests" rather than unequivocally proves certain conclusions. But "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK* Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003). Instead, these arguments should be raised at trial through "[v]igorous cross-examination" and "presentation of contrary evidence." *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 596 (1993).

Finally, Plaintiffs provide no other basis to strike Mr. Ferrante's opinion. Plaintiffs do

not challenge Mr. Ferrante's qualifications as an expert, and they do not offer any basis to find that his methodologies are unreliable under *Daubert* and *Kumho*.  As for Plaintiffs' obsession with how much Mr. Ferrante was paid, they are free to raise that at trial too.  But it should hardly come as a surprise that conducting a complex investigation about a subject that government authorities have already spent hundreds of millions of dollars investigating—and defending against Plaintiffs' claim for damages totaling at least 40 times what Mr. Ferrante was paid—is an expensive undertaking.  Accordingly, Plaintiffs' *Daubert* motion should be denied.

## FACTUAL BACKGROUND

### A.    The Ferrante Report

As his Report discloses, Mr. Ferrante conducted a technical investigation that involved reviewing available technical data related to the malicious cyberattacks on Democratic institutions during the 2016 election, as well as recent major cyberattacks the world-over, to determine whether there were any technical links between these attacks and XBT's infrastructure, including IP addresses registered to XBT subsidiaries.  *See* Report at 8 ("Methodology").  Based on this methodology, Mr. Ferrante made several findings:

**An XBT IP address was used to stage a spear-phishing email aimed at Hillary Clinton campaign manager John Podesta.**  *See* Report at 11-14.  The spear-phishing email that duped Mr. Podesta into disclosing his email password used a camouflaged hyperlink (a "bitlink") generated through the service Bitly.  *Id.*; Bolger Decl. Ex. 17 (Report Ex. 4) at 7. [2]  Using data disclosed by Bitly (the "Bitly Data"), Mr. Ferrante determined that the same user account that successfully hacked Mr. Podesta created four nearly identical malicious links that were encoded to appear onscreen as a Google security alert prompting Mr. Podesta to change his Gmail password—and that one of those four phishing links was created using an IP address registered to XBT subsidiary Root S.A. ("Root").  *Id.*

**An XBT IP address shared a unique technical identifier with two of the IP addresses used to perpetrate the DNC hack.**  *See* Report at 14-15.  Using technical data published by the security firm that investigated the DNC hack, Mr. Ferrante discovered that there were seven "command and control" IP addresses used in the DNC hack.  *Id.*  These IP addresses were able to control the botnets that invaded the DNC system.  By reverse engineering pieces of malware

---

[2] Unless indicated otherwise, all cited exhibits are annexed to the Declaration of Katherine M. Bolger in Support of Defendants' Opposition filed herewith.

used in that botnet, Mr. Ferrante discovered that one of those IP address shared a Secure Socket Layer ("SSL") certificate—a unique technical identifier—with two IP addresses owned by XBT subsidiary Root.  *Id.*  An SSL certificate is deliberately created by the administrator for a web server to facilitate encrypted communications and cannot be transferred to another owner without the original administrator managing it; this indicates that the Russian cyber-espionage group involved in hacking the DNC controls the SSL certificate.  This SSL certificate was distributed to only 42 IP addresses, which included the two IP addresses used to hack the DNC as well as the Root IP address.[3]  *Id.*

Plaintiffs characterize this evidence as exonerating them, Mot. at 7-10, and at Mr. Ferrante's deposition, Plaintiffs asked him if the July 13, 2018 indictment of the 12 Russian nationals for hacking the DNC undercut his opinion that Plaintiffs had connections to the Democratic hack.  Ex. 2 at 115:18-117:8.  Mr. Ferrante testified that the indictment in fact strengthened his belief in Plaintiffs' involvement because malware described in the indictment— the "X-Tunnel" and "X-Agent" malware used to infiltrate the DNC—employed the same SSL certificate.  Ex. 2 at 116:10-117:1; *see also* Ex. 4 (July 13, 2018 Indictment).

**Thirteen XBT-linked IP addresses were included in a December 2016 U.S. government report (the "Grizzly Steppe Report") identifying "indicators of compromise" used by Russian intelligence services to interfere in the 2016 election—and XBT did not bother to undertake even a minimal investigation until nearly nine months later.**  *See* Report at 15-17.  XBT does not dispute that 13 IP addresses belonging to their subsidiary Root are listed on the Grizzly Steppe Report.  Mot. 10-12.  They *do* dispute, however, that the Russian government hacked the DNC, *see* Ex. 5 (Deposition of Nikolay Dvas) at 281:6-282:23, Ex. 6 (Deposition of Kostyantyn Bezruchenko) at 251:5-253:22, and Ex. 7 (April 30 2018 Deposition of Aleksej Gubarev) at 238:3-238:5, and Mr. Goederich joked with the Luxembourg authorities about Grizzly Steppe, such as "Do you believe everything the Americans might say?"  Ex. 8 (Deposition of Marc Goederich) at 185:4-187:11 and Ex. 9 (Goederich Dep. Exs. 19A, 19B).  Unsurprisingly, when Mr. Ferrante reviewed documentation and testimony produced in this action to assess XBT's response to the report's identification of the Root IP addresses, he

---

[3] As Mr. Ferrante testified at his deposition, the data further indicates that another one of the 42 IP addresses in this group was used to perpetrate a major cyberattack on the German parliament in 2015, which German intelligence attributed to Fancy Bear.  *See* Ex. 2 (Deposition of Anthony J. Ferrante) at 101:5-21 and Ex. 3 (May 13, 2016 Article for BBC News).

concluded the response was wholly inadequate.  He did so because:

1.      When Luxembourg authorities asked Root about the IP addresses in January 2017, Mr. Goederich made jokes, Ex. 9, and did only the most cursory investigation.  Report at 30-31.  Mr. Goederich *did not even bother to tell* XBT that the IP addresses were on the report. *Id.* at 31.

2.      XBT did not directly inquire with Root about the IP addresses in the Grizzly Steppe Report until September 2017, nine months after the report's publication and *after* Defendants' counsel had identified Root in this lawsuit.  Ex. 7 at 214:6-24; Ex. 6 at 257:5-262:3; Ex. 10 (April 2018 Gubarev Dep. Ex. INT-2).  Only then, in September 2017, did XBT undertake any substantive investigation.  It showed hundreds of abuse notifications on those IP addresses.  Mr. Ferrante determined that at least two of the 13 IP addresses were used by XBT customer King Servers, a Russia-based company known for attempting to infiltrate U.S. state election boards.  Report at 17.  Based on the information produced here and his experience, Mr. Ferrante opined that XBT undertook "minimal, if any internal investigation . . . into the IP addresses noted on the Grizzly Steppe Report on a timely basis," and that its failure to do so was "highly unusual" within the industry.  *Id.* at 17.

**A significant portion of servers belonging to two XBT subsidiaries were part of a massive botnet operated by Russian criminals—the "Methbot" advertising fraud scheme.** *See* Report at 17-22.  On December 20, 2016, the security firm WhiteOps published a report revealing a massive fraud run by Russian cybercriminals, which it called "the largest and most profitable advertising fraud operation to strike digital advertising to date."  *Id.* at 17-18.  Using the indicators of compromise (IOCs) published by White Ops, Mr. Ferrante discovered that as many of 74% of the IP addresses associated with WZ Communications, Inc. and 78% of the IP addresses associated with Servers.com (both subsidiaries of XBT) may have been part of Methbot, and in particular that XBT-linked IP addresses were part of the botnet's aggressive expansion in September and October 2016.  *Id.* at 18, 20-21.  Within days after the Methbot fraud was made public, technical data shows that XBT manually withdrew these IP addresses. *Id.* at 21.[4]  From documents produced here, Mr. Ferrante determined that XBT's anticipated loss

---

[4] Plaintiffs' internal documents show that when they learned about the WhiteOps report, they did not reach out to law enforcement but instead hired a PR firm for "crisis communications" to try to spin the story.  Ex. 7 at 200:6-201:22; Ex. 5 at 185:20-190:18, 199:10-201:3, 275:20-276:11;

from terminating the Methbot customer amounted to 4-5% of XBT's total revenue for 2016 and noted that Gubarev claimed this significant customer had operated without a contract.  *Id.* at 21-22.  Based upon his industry experience, Mr. Ferrante opined that it would be "highly unusual and risky business practice" for a company like XBT to provide services without a signed contract, particularly to such a significant customer.  *Id.*  Mr. Ferrante further opined that XBT's response to Methbot—including its decisions to *manually* unpublish the implicated IP addresses and not contact law enforcement—was "extremely suspicious."  Ex. 2 at 120:10-121:7.

**XBT-owned infrastructure has been repeatedly used to support malicious cyber-campaigns tied to Russian state actors as well as other high-profile cyber-attacks on critical infrastructure worldwide.**  *See* Report at 22-28.  Using available data, Mr. Ferrante found that IP addresses owned by XBT subsidiaries were used as command-and-control servers in at least a dozen major cyber-attacks by Russian state actors, including the 2015 attack on the Ukrainian power grid.  *Id.*  As Mr. Ferrante testified, these attacks were among "the most significant cyber-events to take place on the globe" in recent history.  Ex. 2 at 140:9-21.

**XBT does not follow industry best practices to monitor its infrastructure or prevent malicious cyber-activity.**  *See* Report at 28-31.  Mr. Ferrante reviewed the depositions of XBT's CTO Konstyantin Bezruchenko and Root's Managing Director Marc Goederich**,** and identified numerous areas where XBT and Root did not follow best practices and where their procedures were "inadequate" compared to others in the industry.  *Id.* at 29.

**XBT subsidiaries and some of their web-hosting customers are repeatedly cited in public reports as known hosts of malicious cyber-activity.**  *See* Report at 31-35.  Mr. Ferrante reviewed public sources and discovered that an industry publication *Host Exploit* has repeatedly named several Webzilla subsidiaries of XBT in the "Top 50 Bad Hosts and Networks."  *Id.* at 33-35.  Further, in reviewing XBT's technical infrastructure, Mr. Ferrante determined that XBT's customers included other web-hosting companies, some of whom were publicly linked to malicious cyber-activity.  Report at 31-33.

### ARGUMENT

In determining the admissibility of expert testimony pursuant to Fed. R. Evid. 702, the

---

Ex. 11 (Dvas Dep. Ex. 63).  Plaintiffs admitted that the customer responsible for the Methbot fraud was a major client who Gubarev and other executives met personally—and yet despite being the source for millions of dollars in revenue, Gubarev claimed that they forgot to have him sign a contract.  Ex. 7 at 169:5-178:1.

Court must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address;
> (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and
> (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).  "While there is inevitably some overlap among the basic requirements—qualification, reliability, and helpfulness—they remain distinct concepts and the courts must take care not to conflate them."  *Id.*.

The Court's focus in a *Daubert* motion "must be solely on principles and methodology, not on the conclusions they generate."  *Daubert*, 509 U.S. at 595.  "[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence."  *Quiet Tech. DC–8*, 326 F.3d at 1341.  Accordingly, a party's "challenges to the weight and sufficiency" of expert testimony "are not properly raised under *Daubert*."  *Walters v. Altec Indus., Inc.*, 2003 WL 25686829, at *2 (M.D. Fla. Sept. 3, 2003) (burden "is not to prove that the proffered opinions are correct, but that by a preponderance of the evidence they are reliable and relevant").

## I.    MR. FERRANTE'S TESTIMONY IS RELEVANT AND HELPFUL

### A.    Mr Ferrante's Testimony Is Relevant

Taking the *Frazier* test in reverse order, it is clear that Mr. Ferrante's testimony is relevant to whether Plaintiffs can prove that the Dossier is materially false and to their measure of damages.  Expert evidence is relevant if it "logically advances a material aspect of the proposing party's case."  *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (citation omitted).  There is no question that Mr. Ferrante serves this purpose.

#### 1.    Mr. Ferrante's Testimony Is Relevant To Material Falsity

The Dossier includes the statement that "a company called XBT/Webzilla and its affiliates had been using botnets and porn traffic . . . to steal data . . . [from] the Democratic Party leadership.  Entities linked to one Aleksei Gubarov were involved . . . ."  Ex. 1 (Dossier).  The day after the Dossier was published, XBT released a statement, which included the following:

> Online publication Buzzfeed published an unsubstantiated report on Tuesday, January 10, that alleged that Webzilla, its parent company XBT Holding and their representatives were connected to the emails leaked from the Democratic Party in

> the United States. Webzilla and XBT Holding absolutely deny having had any
> connection with this activity.
> There has been absolutely no involvement by Webzilla, XBT or any of its other
> subsidiaries with the people or alleged activities in this unsubstantiated report.

Ex. 12 (Jan. 12, 2017 XBT Statement). Mr. Ferrante's investigation, however, concluded that, to

use the words of the Dossier, "entities linked" to Gubarev likely *were* "involved" in Russian

efforts to "steal data" from "the Democratic Party leadership," through a specific "affiliate" of

"XBT/Webzilla." Report at 36. Mr. Ferrante's evidence likewise indicates that the public

statement XBT released in response to the Dossier was false, because XBT *did* have some

"connection with this activity" and there *was* some "involvement by subsidiaries with the people

or alleged activities" discussed in the Dosser. It is an insult to common sense to suggest that

such testimony is irrelevant to the jury's assessment of whether the Dossier's allegations against

Plaintiffs were materially false. And it certainly has no basis in defamation law.

Plaintiffs "bear the burden of showing that the speech at issue is false." *Philadelphia

Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986). But "[t]he alleged false statement does

not have to be 'perfectly accurate' if the 'gist' or the 'sting' of the statement is true." *Turner v.

Wells*, 198 F. Supp. 3d 1355, 1365 (S.D. Fla. 2016) (citation omitted), *aff'd*, 879 F.3d 1254 (11th

Cir. 2018); *see also* Hon. Robert D. Sack, SACK ON DEFAMATION, LIBEL, SLANDER AND RELATED

PROBLEMS, § 3.7 (2006) ("The proof of truth or falsity must go to the 'gist' or 'sting' of the

defamation"). Thus, defendants are entitled to prevail in defamation actions when they can show

that the statement at issue is substantially true—even if not accurate in every detail. *See Printers

II, Inc. v. Prof'ls Publ'g, Inc.,* 784 F.2d 141, 146-47 (2d Cir. 1986); *Vetere v. Associated Press,

Inc.,* 1989 WL 39664 (S.D.N.Y. Apr. 17, 1989) (statement that plaintiff is "a former member of

the American Nazi Party" substantially true even though he "denies that he was ever a member

of the American Nazi Party" because he distributed literature on behalf of National Socialist

White People's Party and participated in one of their marches); *Miller v. Journal-News*, 211

A.D.2d 626 (N.Y. App. Div. 1995) (statement that plaintiff was suspended was substantially true

even though he was only placed on administrative leave); *Weber v. Multimedia Entm't, Inc.*,

2000 WL 526726, at \*10 (S.D.N.Y. May 2, 2000) (description of plaintiff as drug addict was

substantially true because plaintiff "admits to having used cocaine and marijuana, and possibly

amphetamines, albeit some years before the taping of the Program"). A "statement is not

considered false unless it would have a different effect on the mind of the reader from that which

the pleaded truth would have produced." *Masson v. New Yorker Magazine*, 501 U.S. 496, 517 (1991) (citation and internal quotation marks omitted). And in this case, whether "as a whole" the statement at issue in the Dossier "is substantially true is an issue for the jury." *Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1254 (S.D. Fla. 2014). Thus, Mr. Ferrante's testimony is highly relevant because Defendants are entitled to argue to the jury that if the Dossier had simply recounted the facts as Mr. Ferrante will testify to them, it would not have had a materially different effect on the minds of the readers than the words Christopher Steele actually used.

Mr. Ferrante concludes that the technical links he identified between XBT infrastructure and Russian interference in the 2016 election—via the Bitly data from the Podesta spear-phishing attack, the SSL certificate linked to the DNC hack, and the U.S. government's Grizzly Steppe report listing Russian IOCs involved in the election interference—are evidence that servers belonging to an "entity linked" to Gubarev, i.e., Root, an "affiliate" of "XBT/Webzilla," were involved in malicious cyber-operations aimed at "Democratic Party leadership", as the Dossier alleges. Moreover, Mr. Ferrante will testify that XBT "does not have an adequate enterprise infrastructure monitoring process in place . . . which allows their infrastructure to be used without fear of repercussions," Report at 7, and that "it would be highly unusual not to conduct an investigation into infrastructure components noted in government reports as propagating malicious activity, if the operators were concerned about running a lawful, legitimate service." *Id.* at 17. Mr. Ferrante also concluded that vast numbers of servers belonging to other "entities linked" to Gubarev and "XBT/Webzilla" were being used in a large-scale, Russian-operated botnet operation (Methbot) at the same time. *Id.* at 17-22. That testimony suggests that at best Plaintiffs turned a blind eye toward Russian state actors who used their infrastructure and thus were not innocent bystanders to the conduct alleged in the Dossier.

Nonetheless, Plaintiffs claim that Mr. Ferrante's testimony is irrelevant because it does not "accuse the plaintiffs of directly hacking the Democratic Party leadership under pressure from the FSB." *See* Mot. at 6. Remarkably, they all but concede that Mr. Ferrante's evidence could support the conclusion that their infrastructure was used as part of an effort to hack the DNC by Russian, state-sponsored actors. But they maintain that does not matter, because they maintain "[t]he December Memo says nothing about Plaintiffs' infrastructure being misused by third parties (clients or otherwise) to hack the Democratic Party leadership." *Id.* at 6.

That is sheer sophistry. The Dossier does not purport to specify exactly *how* "entities linked" Gubarev were "involved" in malicious cyber-activity.  It certainly does not insist that Gubarev was sitting at his desk in Cyprus personally conducting or directing the hacking while an FSB agent was looking over his shoulder.  Plaintiffs are free to argue to the jury they should interpret the Dossier that way, but how to interpret what the Dossier alleges is the jury's province, not something to be dictated by Plaintiffs.  *See* Defendants' Motion *In Limine* No. 9. Mr. Ferrante's evidence supports the proposition that Plaintiffs knew their infrastructure was being misused by Russian state (and non-state) actors and turned a blind eye to that activity.  If the jury credits that position, it could reasonably conclude that that "gist or sting" of the Dossier does not materially "differ[] from the actual truth."  *Klayman*, 22 F.Supp.3d at 1254.

That is especially so because Plaintiffs have spent the last two years denying that any election-related hacking activity was conducted from their infrastructure by anyone, period. XBT's public statement on January 12, 2017 claimed "absolutely no involvement" with the "alleged activities" in the Dossier.  Ex. 12.  But the only evidence Plaintiffs have ever offered to support that is their own self-serving *ipse dixits* and an expert opinion based entirely on self-serving *ipse dixits*.[5]  XBT executives admitted at their depositions that XBT and Webzilla did not perform any internal investigation into whether their network had been used for malicious cyber-activity after finding themselves named in the Dossier; instead, they simply asserted that they "knew" it was not true.[6]  *See, e.g.*, Ex. 6 at 302:25-303:6 ("Q. You're saying it is because I say it is . . . why are you so sure you didn't do it? A. Because we didn't do it.  It's—it's that simple.

---

[5] The only document produced in discovery that remotely approaches an investigation into the allegations in the Dossier is a two-page cursory memo titled "Internal Investigation Report on BuzzFeed Publication," whose metadata indicates that it was created in September 2017—more than eight months after the Dossier was published and well into the discovery period in this litigation.  Ex. 13 (Bezruchenko Dep. Ex. 21).  That document notes the limits of the "investigation," including that XBT only maintained certain historical logs for 3 months.  *Id.*

[6]  Notably, the public relations consultants that Plaintiffs worked with thought it important to determine whether they could be sure no such activity was occurring on their networks.  The day after the Dossier was published, Plaintiffs' PR representative in the U.S. asked Gubarev to "[p]lease be absolutely certain that none of your servers were in anyway involved—even innocently."  Ex. 15 (Dvas Dep. Ex. 82).  Similarly, Plaintiffs' public relations consultant in the Netherlands, Hill & Knowlton, advised Plaintiffs to be prepared to address whether their "[o]wn internal investigation" indeed "rule[d] out" or "produced no indication" of any hacking or abuse of their systems.  Ex. 16 (Steman Dep. Ex. 10). But no investigation took place.

We didn't do it."); Ex. 5 at 279:15-281:5 ("Q. To this day, are you absolutely certain that no server connected to any subsidiary of XBT was ever used in any attempt to hack Democrats in the United States? A. I'm certain. Q. And on what basis are you certain? A. Just I'm -- I'm positive.  That's it."); Ex. 7 at 53:7-17 ("Q. [W]hat investigation did you do into the servers owned by XBT or any of its subsidiaries to see if it was involved in any hacking activity in the democratic party? A. . . . I know we didn't do it . . . I don't have to do any investigation against me personally.  I don't do it."); Ex. 8 at 244:2-6 ("Q. [W]ere you concerned that maybe some portion of XBT or Webzilla was involved in some kind of malicious activity? A. No, I did not think about it any further at the moment."); Ex. 14 (Deposition of Jochem Steman) at 79:9- 82:20 ("Q: Sitting here today, do you believe the allegations are true? A: No. Q: How do you know? A: Because I know.").

Now faced with persuasive evidence that their servers *were* involved, Plaintiffs have changed their story and the nature of their *ipse dixits*.  They now concede there might have been efforts to hack Democrats from their infrastructure, but they claim that it must have been the work of some mysterious third party "customer" they knew nothing about.  Mot. at 9-10, 12-13.  They offer no evidence to support that assertion, but rather just demand that this Court "take their word for it."  Report at 11.  But that is a credibility question for the jury to decide; the Court is certainly not required to credit Plaintiffs every time they come up with a new, self-serving story in response to expert testimony whose substance they do not contest.  To the contrary, the jury is entitled to consider whether Mr. Ferrante's evidence, Plaintiffs' shifting explanations, and other evidence in the case support the conclusion that Plaintiffs' protestations of innocence lack credibility.  *See City of St. Petersburg*, 2009 WL 3335013, at *4; *Walters*, 2003 WL 25686829, at *3; *see also Klayman*, 22 F.Supp.3d at 1254.

For example in *Wells v. Liddy*, the plaintiff, a secretary who worked in the DNC office that was the target of the Watergate break-in, sued Gordon Liddy for saying she was involved in a call-girl ring.  37 F. App'x 53, 55 (4th Cir. 2002).  The court admitted evidence that there was prostitution in a building with which Wells was affiliated because it was evidence of substantial truth.  *Wells*, 37 F. App'x at 60-61.  The Fourth Circuit concluded the admission of this evidence was proper because "evidence that a prostitution ring was operating at the Columbia Plaza is only one piece of circumstantial evidence that Liddy presents in an attempt to draw the conclusion that Wells was connected with the prostitution ring.  It is a well-settled principle that

"circumstantial evidence is no less probative than direct evidence." *Wells*, 37 F. App'x at 68 n.9 (citation omitted); *see also Galaxy Computer Servs., Inc. v. Baker*, 325 B.R. 544, 563 (E.D. Va. 2005) (denying motion to exclude computer expert who could testify that files at issue "were deleted or altered sometime after June 19, 2003" but could not "specify who deleted the data from the hard drives or when the data was deleted"). Here as well, Mr. Ferrante offers important evidence, both direct and circumstantial, that is relevant to establishing the substantial truth of the allegedly defamatory statement however the jury may construe it.

2.     Mr. Ferrante's Evidence Supports That Defendants
        Reasonably Published Christopher Steele's Allegations

Mr. Ferrante's evidence also supports Christopher Steele and his sources' credibility, another key issue in dispute. Whatever the standard of fault in this case, Plaintiffs will argue that it was irresponsible of Defendants to publish unverified allegations made by Mr. Steele and based on Steele's sources. Mot. at 4-5. But Mr. Ferrante's evidence demonstrates that there was good reason for Mr. Steele's sources to identify Plaintiffs as among the (but certainly not the only) actors involved in the Russian-sponsored operation to interfere in the U.S. election, and that it was thus not irresponsible of Defendants to view Mr. Steele as a highly credible source.

3.     Mr. Ferrante's Testimony Is Relevant to Damages

Finally, Mr. Ferrante's testimony is also relevant to the issue of damages. As explained more fully in Defendants' motion to exclude Jeffrey Anderson (Dkt. 260), after Defendants raised the Methbot scheme during the depositions of XBT executives, Plaintiffs' damages expert hastily revised his estimate to "back out" millions of dollars in revenue attributable to the customer responsible for the fraud. Plaintiffs have thus conceded that Methbot is directly relevant to whether their alleged damages were caused by the Dossier or other factors.

Regardless of whether Mr. Anderson is permitted to testify, Plaintiffs will presumably try to offer some theory of actual damages, as their trial exhibits indicate.[7] If the Court permits that, Defendants will be entitled to challenge their claims and point out the Methbot-related revenues as a distinct (and illegitimate) contributor to XBT's revenue growth in 2016. Mr. Ferrante's expert testimony will help explain to the jury what Methbot is and Plaintiffs' role in the botnet fraud, which will help the jury's assessment of Methbot's impact on Plaintiffs' reputation and claimed damages.

_____

[7] As set forth in Defendants' Motion in Limine No. 7, Defendants object to any attempts by Plaintiffs to use a theory of damages not disclosed in discovery.

Mr. Ferrante's testimony about XBT's repeated involvement in major malicious cyber-operations (Report at 22-28) and its publicly documented reputation related to malicious cyber-activity (Report at 31-35) are also highly relevant to damages.  Courts have long recognized that, even if a defendant's statements are false, a plaintiff's other disreputable conduct mitigates damages because a defendant can show that "if [the defendant] had printed the truth about [the plaintiff], his reputation would have been tarnished."  *Lawlor v. Gallagher Presidents' Report, Inc.*, 394 F. Supp. 721, 734 n.26 (S.D.N.Y. 1975), *remanded without opinion*, 538 F.2d 311 (2d Cir. 1976); *see also Condit v. Dunne*, 225 F.R.D. 100, 110 n.4 (S.D.N.Y. 2004) (plaintiff's previously unreported sexual relationships relevant to mitigation of damages because "both publicly available information and Condit's private actions could have contributed to Condit's alleged reputation damage"); *Crane v. N.Y. World Telegram Corp.*, 308 N.Y. 470, 476 (1955) ("Well settled is the basic rule that the amount of plaintiff's recovery may be reduced by proof of facts 'tending but failing to prove the truth' of the libel's charge.") (citation omitted).  "In an action for defamation or libel … the issue of the plaintiff's reputation and character scarcely can be avoided because the plaintiff typically seeks to recover compensation for damage to his or her reputation."; *Schafer v. Time, Inc.*, 142 F.3d 1361, 1370 (11th Cir. 1998) (holding that evidence regarding specific instances of misconduct by plaintiff are admissible in libel case under Fed. R. Evid. 405(b)).  It is also well-established that defendants in a defamation action may offer evidence of pre-existing information critical of Plaintiffs.  *See Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 303 (2d Cir.1986) (allowing evidence of public knowledge of plaintiff's prior bad acts on the question of substantial truth and damages).  In their motion to exclude, Plaintiffs object to the reliability of the sources that Mr. Ferrante surveyed.  *See* Mot. at 2-3, 12.  But Plaintiffs' belief that the sources are not credible is a topic for cross-examination, not a basis to exclude.  Mr. Ferrante's testimony is, therefore, certainly relevant to this proceeding.

**B.    Mr. Ferrante's Testimony Will Help Explain Complex Concepts for the Jury**

Finally, Mr. Ferrante's testimony will be helpful to the jury because this case involves complex technical concepts, including web-hosting, IP addresses, hacking, botnets, and technical indicators of compromise.  Expert testimony is appropriate where it "would doubtless assist the jury in understanding the concepts and issues of this case."  *Remington v. Newbridge Secs. Corp.*, 2014 WL 505153, at *3 (S.D. Fla. Feb. 7, 2014) (holding expert's testimony would assist the jury "given the highly technical nature" of issues in the case); *see also Palm Beach Golf Ctr.-*

*Boca, Inc. v. Sarris*, 2016 WL 4154912, at *2 (S.D. Fla. May 24, 2016) (holding expert testimony was necessary where the dispute's issues where "arcane and inaccessible even to many legal professionals not versed in the subject"). Here, Plaintiffs' fact witnesses have some fluency in these topics by nature of their profession, but Defendants will need to rely on Mr. Ferrante to offer direct testimony to explain these terms and concepts, to contextualize Defendants' cross-examination of Plaintiffs' witnesses, and to provide a foundation for Defendants' arguments to the jury. And given that Mr. Ferrante was a university professor with more than 10 years' experience investigating cybercrimes, he is perfectly suited to provide that testimony. Because Mr. Ferrante's testimony would be relevant and helpful, he should be permitted to testify at trial.

## II.     MR. FERRANTE'S TESTIMONY IS RELIABLE

### A.   Plaintiffs Do Not Challenge the Methodology of Mr. Ferrante's Technical Investigation

As an initial matter, and perhaps most tellingly, nowhere in their *Daubert* motion do Plaintiffs challenge Mr. Ferrante's methodology, as detailed in his Report. As a matter of law, *Daubert* motions must challenge the expert witness' methodology not the weight and sufficiency of his conclusions. *Walters*, 2003 WL 25686829, at *3.[8]  *See also City of St. Petersburg v. Total Containment, Inc.*, 2009 WL 3335013, at *4 (S.D. Fla. Mar. 19, 2009). And here, Plaintiffs do not challenge:

- Mr. Ferrante's methods for identifying the infrastructure of IP addresses that have historically been registered to XBT subsidiaries (Report at 9-11). Tellingly, Plaintiffs also do not dispute that the specific IP addresses Mr. Ferrante identifies as linked to various malicious cyber-activity in his Report were, in fact, registered to the identified XBT subsidiaries (Report at 10, 14, 15, 22, 24);

- Mr. Ferrante's methodology for analyzing the Bitly data, identifying the four bitlinks designed to look like custom Google security pages for Clinton campaign manager John Podesta, translating the encoded URLs, and identifying one of these four bitlinks as having been created with a Root IP address (Report at 11-13);

- Mr. Ferrante's methodology for identifying an SSL certificate shared by a Root IP address and two of the "command and control" IP addresses involved in the DNC hack (Report at 14-15); and

- Mr. Ferrante's methodology for linking XBT infrastructure to Methbot.

Plaintiffs also do not (and cannot) dispute that IP addresses belonging to XBT subsidiary Root were listed in the U.S. Government's Grizzly Steppe report relating to Russian interference

---

[8] In fact, Mr. Ferrante's findings are also highly relevant, as explained in Section III *infra*.

in the 2016 election (Report at 15-17); that IP addresses belonging to XBT subsidiaries were identified by security researchers among "indicators of compromise" relating to multiple other major cyberattacks, many of which were publicly linked to Russian state actors (Report at 22-28); and that XBT subsidiaries and customers have been publicly linked to malicious cyberactivity, including the hosting of botnets (Report at 31-35).  Nor do Plaintiffs dispute the accuracy of the testimony attributed to Konstyantin Bezruchenko and Marc Goederich, or provide any basis to doubt the reliability of Mr. Ferrante's assessments of XBT's practices and procedures as compared to industry best practices.  Report at 29-31.

In fact, Plaintiffs have *no substantive response whatsoever* to the findings from Mr. Ferrante's technical investigation regarding the Bitly link in the Podesta email, Ex. 17 (Report Ex. 4) at 7.  Their own rebuttal expert, Dr. Eric Cole, admitted that he did not even review the data produced by Bitly and did not otherwise attempt to replicate any of Mr. Ferrante's technical analysis.  Dkt. 259-3 (Deposition of Eric Cole) at 12:1-13:6, 15:1-17:9; 33:14-43:11; 50:12-51:5, 116:23-117:13, 131:18-133:4.  Neither Dr. Cole's report nor Plaintiffs' *Daubert* motion even mentions the SSL certificate finding; instead, Plaintiffs simply assert that nothing other than a one-to-one match between the command-and-control IP addresses identified in investigations to date and IP addresses assigned to XBT is relevant.  Mot. at 7-8.  Because Plaintiffs did not challenge Defendants' methodology, therefore, there motion to exclude should be denied.

### B.  Mr. Ferrante's Opinions Are Not "Unreliable"

Lacking any basis on which to challenge Mr. Ferrante's methodologies, Plaintiffs instead try to argue that various data Mr. Ferrante examined is "unreliable" for four reasons, each of which is unconvincing.  *First*, Plaintiffs claim it is unreliable because it came from reports published by governments and other security firms or from third parties other than the Plaintiffs.[9] But "[e]xperts routinely rely on the work of others, a practice permitted by Fed.R.Evid. 703, so long as the facts or data on which they rely is of the type reasonably relied on by experts in the relevant field."  *City of St. Petersburg*, 2009 WL 3335013, at *4; *see also U.S. Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F. Supp. 2d 768, 775 (N.D. Ill. 2009) ("That Florez mentions other facts in evidence in his reports—facts that a competent investigator would no doubt regularly

---

[9] Plaintiffs refused to produce the vast majority of the technical log data that Defendants requested, claiming that the company did not maintain such logs.  *See* Ex. 18 (October 2017 Emails Between Plaintiffs' and Defendants' Counsel).

rely on for context in the field—is not a basis to exclude his testimony.").  As Mr. Ferrante explained in his Report and at his deposition, it is "a common industry investigative technique" to rely on repositories of IOCs and other data published by third parties, including threat intelligence reports by governments and cybersecurity firms. Ex. 2 at 122:20-123:4; *see also* Report at 9 n.5 (explaining that "[c]ybersecurity experts, including myself, regularly rely on this information in our work").  Plaintiffs do not dispute that this is common investigative practice, nor does Plaintiffs' rebuttal expert: indeed Mr. Cole copies and pastes two third-party articles *in their entirety* into his report.  Dkt. 259-2 at 12-15.  Similarly, the Bitly data relied on by Mr. Ferrante was produced in response to a subpoena in this action and contain the bitlinks created by the Bitly account (john356gh) responsible for creating the phishing email that successfully compromised John Podesta's email account. Ex. 19 (Declaration of Mark Josephson, CEO of Bitly, Inc).  Plaintiffs never sought to depose Bitly and there is no reason to doubt that this data is reliable.[10]  Nor is there any basis for Plaintiff to challenge the authenticity of the *actual phishing email* from Podesta's account that was publicly released by Wikileaks because it links directly to the Bitly data.[11]  Report at 8.  Accordingly, Plaintiff's claim that Mr. Ferrante is relying on data that is "anonymous and unsubstantiated" is simply incorrect.

*Second*, Plaintiffs incorrectly argue that Mr. Ferrante's analysis of this data is "rank speculation."  Mot. at 8-9.[12]  To the contrary, Mr. Ferrante meticulously explained the basis for

---

[10] Nearly two months after Mr. Ferrante's report was served, Special Counsel Robert Mueller indicted 12 Russian intelligence officials for election-related hacking.  The indictment specifically identifies the account "john356gh" at a "URL-shortening service" (i.e., Bitly) as being used to send a spear-phishing email to "the chairman of the Clinton Campaign" (i.e., Podesta), resulting in the theft of his emails and their release by "Organization 1" (i.e., Wikileaks). Ex. 4 ¶¶ 21(a), 49.  The details in the indictment line up with the phishing email released by Wikileaks and cited in Mr. Ferrante's report. *Compare* Ex. 17 at 7 *with* Ex. 4 ¶ 21 (a).

[11] The bitlink visible in the Wikileaks email is consistent with line 6047 of the Bitly Data, which is the basis for Mr. Ferrante's technical analysis.  (Defendants have not attached as an exhibit the full data set because the file is voluminous.  It was attached as Exhibit 5 to the Ferrante Report and was produced in native format by Bitly.  Defendants can provide the native version at the request of the Court.)

[12] The cases cited by Plaintiff are inapposite.  In *Affiliati Network, Inc. v. Wanamaker*, No. 1:16-cv-24097-UU, 2017 WL 7361048 (S.D. Fla. Aug. 14, 2017), the court excluded an expert who relied solely on anonymous online complaints and ratings to conclude an ultimate issue in the case: whether the defendant had caused damage to the plaintiff's reputation. *Id.* at *9.  Similarly, in *Bowe v. Pub. Storage*, No. 1:14-cv-21559-UU, 2015 WL 10857339 (S.D. Fla. June 2, 2015),

his opinions, documented the technical evidence that he found, and noted the limits of his information where applicable.  Plaintiffs are again really just criticizing Mr. Ferrante's evidence for being circumstantial, but as noted above, that is no basis for excluding it.  *See, e.g.*, *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 565 (11th Cir. 1998).  Most importantly, Mr. Ferrante's opinions—in direct contrast to those offered by Plaintiffs' rebuttal expert, Dr. Eric Cole[13]—do not invade the province of the jury by offering definitive assertions of whether the statements in the Dossier are "true" or "false," or whether they are "defamatory."

*Third*, Plaintiffs claim that because Mr. Ferrante describes the evidence as "suggesting" certain conclusions, that means his opinions are "speculation" and unreliable.  That is not remotely the case.  "[A]bsolute certainty is not required" of an expert.  *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988); *see also United States v. Barnes*, 481 F. App'x 505, 514 (11th Cir. 2012) (affirming admission of experts who testified that hair and footprints found at scene were "consistent with" and "corresponded" to defendant and "could have" come from him).  As Mr. Ferrante explained to Plaintiffs' counsel at his deposition:

> I think you're oversimplifying complex cyber investigations. They're not binary. They're not black and white.  And what we've done is collect substantial evidence that most certainly links XBT to the described malicious activity.

Ex. 2 (Ferrante Dep.) at 61:16-21.  Unlike Dr. Cole, Mr. Ferrante was conservative in his language and did not offer opinions that overstated the underlying evidence.  That makes his testimony *more* reliable, not less.

*Finally*, Plaintiffs claim that because Mr. Ferrante relied on his professional experience to critique XBT's practices and policies, his opinions must be "unreliable."  But, "[e]xperts have knowledge of the standards that govern their fields—that is part of what qualifies them as

---

this Court excluded an expert who opined about the sufficiency of the evidence to prove an element of the case, thereby invading the province of the jury.  *Id.* at *4. In that case, the expert had sought to offer literal "hypotheticals"— i.e., speculating about harm to a hypothetical plaintiff.  There is nothing hypothetical about Mr. Ferrante's Report, which details the specific technical data upon which it relies.

[13] As discussed more fully in Defendants' *Daubert* motion to exclude the testimony of Dr. Eric Cole (Dkt. 259), Dr. Cole repeatedly asserted that the statements in the Dossier were "false" and "defamatory," despite admitting that he undertook *no* investigation to determine their truth or falsity (relying only on Plaintiffs' say-so) and has no expertise in defamation.  *See* Dkt. 259 (Cole *Daubert*) at 3-4, 6, 8, 10. This is precisely the type of "advoca[cy] for a certain result in the guise of offering expert opinions" that is inadmissible.  *Bowe*, 2015 WL 10857339, at *4.

experts." *Erickson v. Baxter Healthcare, Inc.*, 131 F. Supp. 2d 995, 1001 (N.D. Ill. 2001).  For this reason, "there is no question that an expert may still properly base his testimony on professional study or personal experience." *Maiz*, 253 F.3d at 669 (internal quotation marks omitted) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999)) (rejecting party's claim that exert testimony was not reliable because it was "based largely on his personal experience rather than verifiable testing or studies").  Mr. Ferrante's professional experience includes leading complex cyber-investigations and directing responses to malicious cyber-activity in the public and private sector, and he currently leads FTI's practice providing expertise on "cybersecurity resilience, prevention, response, remediation, and recovery services."  Report at 2.  There is no question that Mr. Ferrante's experience permits him to testify about best practices within the industry in which he has worked at the highest levels for more than a decade.

Moreover, Mr. Ferrante did not simply make a conclusory statement that XBT did not follow best practices; he identified specific statements by Bezruchenko and Goederich and identified the particular area of concern raised by each, in comparison to standard industry practices.  *See* Report at 28-31.[14]  Similarly, Plaintiffs' insistence that Mr. Ferrante cannot describe their contract-free arrangement with the customer identified as running the Methbot botnet on XBT servers as "highly unusual and risky" because he has not personally run a hosting company has no merit.  Mr. Ferrante obviously has extensive experience with best practices regarding cybersecurity for tech companies, which include web-hosting companies.  And even if he did not directly work with web-hosting companies, he is still entitled to testify "regarding narrow sub-topics within his broader expertise." *Remington*, 2014 WL 505153, at *4. The lack of a contract with the Methbot customer only reinforces what Mr. Ferrante described as Plaintiffs' "extremely suspicious" in connection with the Methbot fraud.  Ex. 2 at 121:2-7.

Accordingly, Mr. Ferrante's methodology in reaching his conclusions is "sufficiently reliable" to be admitted.  *Frazier*, 387 F.3d at 1260.

## III.    MR. FERRANTE IS QUALIFIED AS AN EXPERT

Finally, Plaintiffs do not even appear to dispute the first of the *Frazier* factors – i.e. they do not challenge to Mr. Ferrante's qualification as an expert.  *See, e.g.*, *Passlogix, Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378, 390 (S.D.N.Y. 2010) (computer forensics expert was qualified

---

[14] Plaintiffs never asked Mr. Ferrante to provide additional detail about any of these opinions at his deposition.

under *Daubert* where he had "twelve years of law enforcement experience in computer crime forensics and three years of experience in private computer forensics" and taught classes on the subject). Nor could they: Mr. Ferrante is obviously qualified to testify on the subjects set forth in his expert report. As disclosed in his Report, Mr. Ferrante has "more than 15 years of top-level cybersecurity experience, providing incident response and preparedness planning to more than 1,000 private sector and government organizations, including over 175 Fortune 500 companies and 70 Fortune 100 companies." Report at 2; *see also* Ex. 20 (Ferrante CV, Report Ex. 1). Mr. Ferrante is currently the Senior Managing Director and Global Head of Cybersecurity at FTI Consulting, Inc. ("FTI"), where his consulting practice focuses on "cybersecurity resilience, prevention, response, remediation, and recovery services." *Id.* In this role, Mr. Ferrante assists clients with both "proactive" and "reactive" cybersecurity services, including compliance with regulatory standards, breach response, and complex cyber-investigations. Mr. Ferrante testified that such investigations may "rang[e] from an audit of an organization to ensure that they are compliant with new defense regulatory requirements, an internal investigation to identify an insider threat, a cybersecurity incident that may have been facilitated by an internal or external actor, to after an incident would occur to reconstruct the events and determine what happened, how it happened, and who was responsible." Ex. 2 at 7:20-13:22.

Prior to joining the private sector, Mr. Ferrante served on the U.S. National Security Council as the Director for Cyber Incident Response, coordinating "U.S. response to unfolding domestic and international cybersecurity crises and issues." Before that, he was Chief of Staff for the FBI's Cyber Division, having joined the FBI in 2005 and served as a member of its "Cyber Action Team." Mr. Ferrante has also taught as an adjunct professor of computer science at Fordham University's graduate school, where he founded and co-directed the Masters of Science in the Cybersecurity Program and served as co-director of the cybersecurity research program. Report at 2; Ex. 20.

As Plaintiffs implicitly concede by declining to challenge his qualifications, Mr. Ferrante is qualified to serve as an expert.

## CONCLUSION

For the reasons set forth above, Defendants' *Daubert* motion to exclude Anthony Ferrante should be denied in full.

Dated:  October 29, 2018                Respectfully submitted,

                                        /s/ Katherine M. Bolger
                                        Katherine M. Bolger
                                        Nathan Siegel
                                        Adam Lazier
                                        Alison Schary
                                        Davis Wright Tremaine, LLP
                                        1251 Avenue of the Americas, 21st Floor
                                        New York, New York 10020
                                        katebolger@dwt.com
                                        nathansiegel@dwt.com
                                        adamlazier@dwt.com
                                        alisonschary@dwt.com

                                        /s/ Roy Black
                                        Roy Black
                                        Jared Lopez
                                        Black, Srebnick, Kornspan & Stumpf, P.A.
                                        201 So. Biscayne Boulevard
                                        Miami, Florida 33131
                                        rblack@royblack.com
                                        jlopez@royblack.com

                                        *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing, together with its exhibits, will be served electronically by email on all counsel or parties of record on the service list below this 29th day of October, 2018.

By: /s/  Adam Lazier
Adam Lazier

## SERVICE LIST

Matthew Shayefar
Valentin D. Gurvits
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1806
Facsimile: 617-928-1802
matt@bostonlawgroup.com
vgurvits@bostonlawgroup.com

Evan Fray-Witzer
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-000
Facsimile: 617-423-4855
Evan@CFWLegal.com

Brady J. Cobb
Dylan Fulop
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com
dfulop@cobbeddy.com