UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

ALEKSEJ GUBAREV,
XBT HOLDING S.A., and
WEBZILLA, INC.
    Plaintiffs,

v.

BUZZFEED, INC. and
BEN SMITH
    Defendants.

Case No.

0:17-cv-60426-UU

**PLAINTIFFS' MOTION *IN LIMINE* #1
TO PRECLUDE THE INTRODUCTION OF TESTIMONY OR EVIDENCE
CONCERNING METHBOT**

## Introduction

Given Defendants' repeated attempts to make this case about anything other than what it is actually about, it is important to start with a basic reminder of what lies at the heart of this case. On January 10, 2017, Defendants published a collection of seventeen privately-produced memos that had been created as part of a paid opposition-research assignment for a political candidate. The memos were created over the span of many months and only the last of those memos is at issue in this case. That memo, referred to herein as the "December Memo," stated, in relevant part, that:

> [Redacted] reported that over the period March-September 2016 a company called XBT/Webzilla and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct "altering operations" against the Democratic Party leadership. Entities linked to one Aleksei GUBAROV [sic] were involved and he and another hacking expert, both recruited under duress by the FSB, Seva KAPSUGOVICH, were significant players in this operation. In Prague, COHEN agreed contingency plans for various scenarios to protect the operations, but in particular what was to be done in the event that Hillary CLINTON won the presidency. It was important in this event that all cash payments owed were made quickly and discreetly and that cyber and that cyber and other operators were stood down/able to go effectively to ground to cover their traces.

1

In other words, Buzzfeed's publication accused Plaintiffs of: (1) using botnets and porn traffic to transmit viruses, plant bugs, steal data, and conduct "altering operations" against the Democratic Party Leadership, (2) being agents of the FSB, (3) being part of an elaborate conspiracy that would need to go into hiding if Hillary Clinton had won the Presidency, and (4) (implicitly) attempting to undermine the 2016 United States Presidential election.  These are the statements that Plaintiffs allege to be defamatory.

## Argument

Federal Rule of Evidence 401 provides, in relevant part, that evidence is only "relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Federal Rule of Evidence 403 provides that the "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Bowe v. Pub. Storage*, 2015 U.S. Dist. LEXIS 178180, at *12 (S.D. Fla. June 2, 2015).  Additionally, "because of the powerful and potentially misleading effect of expert evidence, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403." *Edwards v. Shanley*, 580 F. App'x 816, 823 (11th Cir. 2014) (citation omitted).

Pursuant to Federal Rule of Evidence 801(c), "'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Although experts may sometimes rely on hearsay in forming their expert opinions, an expert cannot, simply by virtue of being an expert, include in his report or testimony hearsay that fall outside the expert's area of expertise. *Bowe v. Pub. Storage*, 2015 U.S. Dist. LEXIS 178180, at *27-28 (S.D. Fla. June 2, 2015) ("Dr. Hausman's opinions regarding the economic factors surrounding the self-storage market and the economic reasonableness of the access fee are irrelevant to this inquiry.  Dr. Hausman's relevant opinions, that a reasonable consumer would not find the access fee important, are not based on his expertise and instead constitute a presentation of other evidence in the guise of an expert opinion." (*citing Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) ("[A] party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony."))).

Throughout this litigation, Defendants have attempted to introduce evidence and argument concerning the so-called "Methbot Operation" and have signaled their intent to do so at trial. The term "Methbot Operation" merits some initial explanation. In December of 2016, a private company, "White Ops," that sells cybersecurity software to companies issued a White Paper entitled "The Methbot Operation," that first coined the phrase. See Exhibit 1 hereto. In the simplest of terms, according to White Ops' report, the Methbot Operation was a digital advertising scam that created fake websites (that looked like real websites) and then used automated programs ("bots") to view advertising videos on the fake websites. Because advertisers generally pay based on how many people view their advertisements and the "bots" pretended to be "people," advertisers were supposedly tricked into paying for advertisements that were "viewed" almost entirely by "bots" and not actual people. According to the White Ops report, advertisers were tricked into paying up to $3 million a day for advertisements that weren't actually being viewed by humans.

It bears noting, of course, that White Ops – which sells companies software to protect them from cyber fraud – has a direct financial incentive in convincing companies that the scope of threats is massive. And, indeed, subsequent reporting theorized that White Ops used faulty algorithms to grossly exaggerate the scope of the Methbot operation. See, e.g., "Was Methbot's Financial Impact Grossly Exaggerated?" AdAge (February 23, 2017), attached hereto as Exhibit 2 ("But Methbot's financial impact may have been grossly exaggerated. 'It was not millions of dollars a day,' said Mike Zaneis, president and CEO of the digital ad industry's Trustworthy Accountability Group. 'Not a chance.' Google, which works with nearly every publisher and advertiser on the planet, said it saw negligible impact from Methbot. 'This was kind of just another threat, so it wasn't something you were necessarily surprised by,' said Andres Ferrate, chief advocate of ad traffic quality at the company. 'In terms of the impact, it was so small that it raised some eyebrows internally after we went through our standard operating procedure,' he added.").

In any event, the ***Methbot White Paper never once mentions or references any of the Plaintiffs***. The report did, however, identify certain IP addresses associated with the Methbot Operation, some of which corresponded to servers that were being operated by one of Webzilla's clients, utilizing servers leased from Webzilla. The connection between the leased servers and Methbot was not publicized at the time the White Ops paper was released.

3

Because Webzilla cannot see the data that is stored or transmitted by its clients, it had no way of knowing for what purpose the client was utilizing the leased servers. In other words, legitimate advertising "looks" the same as fake advertising. After reviewing the Methbot White Paper, Webzilla became concerned that its client might be utilizing its servers to perpetuate a fraud in violation of Webzilla's terms of service. Webzilla contacted the client to ask for an explanation and, when none was forthcoming, it shut down the client's access to the servers and pulled the relevant hard drives from inside those servers so that they could be preserved for any law enforcement agency that might want them in connection with an investigation of the Methbot Operation. No law enforcement agency ever requested the hard drives, which Webzilla continues to hold.

There is absolutely no connection between one of Webzilla's customers having (allegedly) been involved in an advertising fraud operation and the defamatory statements published by Defendants. Indeed, even Defendants' proffered cybersecurity expert has conceded that he has no reason to believe that the Methbot Operation had any connection the attempts to hack the 2016 U.S. elections (other than the fact that both operations used "bots," which is much like saying that two disparate activities might be connected because they both used email). Transcript of Deposition of Anthony J. Ferrante, 115:7-15 ("Q. Do you have any reason to believe that the methbot operation was connected to – and when I say 'connected to', I mean, was part of the attempt to influence the 2016 elections. A. Other than the fact that the methbot was a large botnet, and I know botnets were used in malicious cyber activity targeting the 2016 Presidential Election, I have no additional evidence.").

Indeed, although "bot" is simply a generic term for any automated programs that performs some function, legitimate or otherwise, the public generally perceives the term to refer to something "malicious."[1] See, e.g., "Most Americans have heard about social media bots;

---

[1] Indeed, Buzzfeed itself began as an "instant messaging bot." See, e.g., "How BuzzFeed CEO Jonah Peretti took an instant messaging bot and turned it into a $1.5 billion media empire," Business Insider (June 1, 2017), attached hereto as Exhibit 3. Similarly, Buzzfeed utilized bots to collect information related to the 2016 United States Presidential elections. See, e.g., "Bot or Not? News organizations try to engage users with chatbots," NYU Journalism (March 2, 2017), attached hereto as Exhibit 4 ("In the news space, chatbots have been used to both gather and disseminate information. BuzzFeed, for instance, used Buzzbot to survey people's reactions to the 2016 Democratic and Republican National Conventions.").

many think they are malicious and hard to identify," Pew Research Center (October 15, 2018), attached hereto as Exhibit 5.

References to the Methbot Operation would serve no legitimate purpose in this trial. Not only does the December Memo *not* speak to any type of advertising fraud, it certainly does not speak to such fraud being committed – if at all – by Webzilla's *customers*. As such, Defendants should be precluded under Rule 401 from eliciting testimony or offering exhibits concerning the Methbot Operation because such evidence or testimony would be irrelevant to the issues presented here.

Additionally, evidence or testimony concerning the Methbot Operation should be precluded under Rule 403 because its admission would be unduly prejudicial. Defendants simply want to be able to say the words "bot" and "fraud" knowing that such references will tend to prejudice Plaintiffs without adding any probative value. Indeed, in his discussion of the Methbot Operation, Plaintiffs' expert, Anthony Ferrante, was unable to make any actual connection between the Methbot Operation and the allegations contained in the December Memo. Instead, Mr. Ferrante makes an enormous leap in his expert report to opine that "it is a highly unusual and risky business practice for hosting companies to provide services without signed contracts, especially instances when the customer is requesting a large number of servers and the company is at risk of losing a large amount of revenue." As detailed in Plaintiffs' *Daubert* motion seeking to exclude Mr. Ferrante's testimony, Mr. Ferrante does not appear to have any expertise concerning the running of a hosting company or what contracts hosting companies should enter into, nor does he cite any source for his opinion or explain how his expertise might make this opinion useful to a jury. Such testimony should be precluded both because it is outside of Mr. Ferrante's expertise and also because such testimony would be an attempt by Defendants to "call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony."

## Conclusion

For the reasons stated hereinabove, Defendants should be precluded from eliciting or offering testimony or evidence concerning the so-called "Methbot Operation."

Dated: October 29, 2018

**Respectfully Submitted:**

/s/ Evan Fray-Witzer
Evan Fray-Witzer (*pro hac vice*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-0000
Facsimile: 617-423-4855
Evan@CFWLegal.com

/s/ Valentin Gurvits
Valentin D. Gurvits (*pro hac vice*)
Matthew Shayefar (Fla. Bar No. 0126465)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1804
Facsimile: 617-928-1802
vgurvits@bostonlawgroup.com
matt@bostonlawgroup.com

/s/ Brady J. Cobb
Brady J. Cobb (Fla. Bar No. 031018)
Dylan Fulop (Fla. Bar No. 123809)
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com
dfulop@cobbeddy.com

*Attorneys for Plaintiffs*