UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

ALEKSEJ GUBAREV,
XBT HOLDING S.A., and
WEBZILLA, INC.
   Plaintiffs,

v.

BUZZFEED, INC. and
BEN SMITH
   Defendants.

Case No.

0:17-cv-60426-UU

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**MOTION TO EXCLUDE TESTIMONY OF JEFF ANDERSON**

Plaintiffs' Motion to Exclude the Testimony of Plaintiffs' damages expert, Jeff Anderson, is a classic example of "We don't like what he says, so we don't think he should be able to say it." However, that is not a legitimate basis, under Rule of Evidence 702 or the *Daubert* standard, upon which to exclude an expert's testimony. Anderson's calculations of the damages suffered by Plaintiff XBT Holding S.A. ("XBT") is wholly permissible and there is no basis upon which his testimony should be excluded from trial.

**I.**    **Anderson's Methodology is Unchallenged and Therefore Admissible**

As a preliminary matter, at no time do Defendants raise any legitimate questions as to the accuracy of Anderson's methodology for calculating XBT's lost business value ("LBV"). Defendants spent more than two pages of their Motion by-and-large providing a summary of Anderson's methodology, explaining how he took XBT's EBITDA (earnings before interest, taxes, depreciation and amortization) and multiplied it by an "industry multiple" to arrive at XBT's "as-is" value and how he then compared it against two different calculations of XBT's "but-for" value if Defendants had not published the defamatory statements about Plaintiffs, but this explanation is not itself a critique, but rather a summary of sorts. Motion, pp. 2-4.

Tellingly, *at no point* in their entire 20-page Motion do Defendants ever say that Anderson's methodology of calculating market value was wrong. They do not argue that

1

Anderson shouldn't have used EBITDA.  They do not argue that Anderson shouldn't have used an industry multiplier.  They do not argue that Anderson shouldn't have multiplied the EBITDA by the industry multiplier to come up with the as-is valuation.  They do not argue that Anderson shouldn't have used the same methodology to come up with "but-for" valuations of the company if the defamatory statements weren't published.  And they do not argue that it was inappropriate for Anderson to compare the "as-is" valuation against the "but-for" valuations to come up with his damages figure.  The foregoing was Anderson's methodology and neither Defendants nor their rebuttal expert, David R. Kaplan, in his rebuttal report, have ever claimed that Anderson's methodology was incorrect.

Despite this, Defendants argue that Anderson's testimony should be excluded because they do not agree with some of the assumptions Anderson made and some of the data points that he used.  However, none of these are bases upon which an expert's testimony can or should be excluded, but are instead just Defendants' assertions as to what they perceive to be correct or incorrect in Anderson's report.  Even assuming that Defendants' criticisms were correct, the proponent of an expert's testimony need not prove that the expert's conclusions are correct and it is not the Court's function to determine the same either.  *See*, *e.g.*, *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) ("[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable."); *Allapattah Servs., Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1335, 1353–54 (S.D. Fla. 1999) ("While the cross-examination, affidavits, and counter-testimony were significantly probing, and did in fact raise legitimate questions as to the weight to be given to each expert's methodology and data used, it is not a district judge's function at a *Daubert* hearing to determine that the expert's testimony was irrefutable or certainly correct. It is sufficient that each expert's reasoning and methodology had a reliable foundation in the knowledge and experience of his discipline, regardless of claimed errors of interpretation."); *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) ("The question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based.... It is not the trial court's role to decide whether an expert's opinion is correct. The trial court is limited to determining whether expert testimony is pertinent to an issue in the case and whether the

methodology underlying that testimony is sound." (citing *Walker v. Soo Line R. Co.*, 208 F.3d 581, 589-90 (7th Cir. 2000) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 259 (1999))).

As is further detailed below, the bulk of Defendants' criticisms of Anderson's report are that they do not agree with the data points that Anderson used in his properly applied methodology. But these criticisms do not support excluding his testimony as they are not attacks on whether Anderson's testimony is reliable, only attacks that could go to the weight of the evidence. It is undisputed that "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence.... Quite to the contrary, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993)). Any allegations of errors in Andersons calculations, though Plaintiffs dispute there are any, are issues that must be left to the consideration of the jury. *See*, *Marlite, Inc. v. Eckenrod*, 2010 WL 11505461, at *4 (S.D. Fla. June 18, 2010) ("Finally, we find that the alleged list of errors in damage calculations do not warrant excluding Negreira's testimony. The *Daubert* inquiry does not require consideration of whether the expert's testimony is correct, but only whether the testimony is reliable and should be considered by the jury." (citing *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292-93 (11th Cir. 2005))).

All this is particularly true where Defendants' rebuttal expert, though he raises his disagreements with Anderson's calculation and the numbers that Anderson used in his methodology, does not actually disagree with Anderson's *methodology*. *Id.* ("And, finally, the fact that Defendants' own expert did not challenge this methodology, rather than objecting to the factors used to calculate the damage under this methodology, supports the Plaintiffs' theory that this measure of damages may be supported by the claims in this case."); *Quiet Tech.*, 326 F.3d at 1345 ("Put differently, Quiet does not argue that it is improper to conduct a CFD study using the sorts of aerodynamic data that Frank employed, but rather that the specific numbers that Frank used were wrong. Thus, the alleged flaws in Frank's analysis are of a character that impugn the accuracy of his results, not the general scientific validity of his methods.").

Nonetheless, Plaintiffs also respond to each of the alleged inadequacies presented by Plaintiffs in their Motion.

## II. <u>Anderson's Assumptions Were Reasonable and Reliable</u>

Defendants first attack Anderson for making certain reasonable, permissible, and reliable assumptions in the application of his unimpeached methodology. For the reasons set forth below, these attacks are not well founded and do not support the exclusion of Anderson's testimony.

### A. The Timing of the Valuation Was Proper and Permissible

Federal Rule of Civil Procedure 26(a)(2)(B) obligates any party that desires to present the testimony of an expert witness to provide a written report setting forth the opinions of the expert. Because of this Rule, and, it should go without saying, because every calculation of damages and in fact any observation and calculation of any kind in our world, must be pegged to a specific time and place, Anderson's report calculates XBT's lost business value as of the date January 1, 2018, approximately a year after Defendants published the defamatory statements and approximately when Anderson was retained in this matter.

Defendants' criticism is that Anderson picked this date for the valuation rather than any other date. However, Defendants' would have apparently criticized *any* date selected by Anderson because, Defendants do not suggest that some other date would have been more appropriate. Nonetheless, January 1, 2018 was the most appropriate date available upon which Anderson could have performed the calculations. Because XBT performs its audited financial statements based on the calendar year (i.e., January 1 through December 31 of each year), the date on which Anderson would have the most accurate numbers for his calculation would be immediately after the close of the books – specifically, January 1, 2018.

It appears, however, that Defendants would prefer that Anderson update his calculations on a daily basis every single day up to and including the date of trial. This is not only unreasonable, but it would be in violation of Rule 26.

Defendants also criticize Anderson because "he does not know whether the LBV he estimates would continue in perpetuity, or would later be made up by XBT." Motion, p. 4. In other words, Defendants are criticizing Anderson for not peering into his crystal ball to sort through the inscrutable mists of time to tell us the future of XBT. However, Anderson was not

engaged as a fortune-telling expert, nor would such soothsaying satisfy any application of the *Daubert* standard had he attempted to do so.

B.     **Anderson's Reliance on XBT and its Projections Was Appropriate**

Anderson's damages calculation compares XBT's "as-is" business valuation of ▓▓▓▓▓▓▓▓ against two "but-for" valuations to create a range of damages.  One of the but-for valuations was based on Anderson's analysis of XBT's historical EBITDA margin (a valuation of ▓▓▓▓▓▓▓▓ which provided the lower bound on the damages calculation) and another was based on Anderson's analysis of XBT's projected EBITDA margin (a valuation of ▓▓▓▓▓▓▓▓ which provided the upper bound).

The projected EBITDA margin was based on a business plan prepared by XBT in November of 2016, which projected a ▓▓ increase in revenue for 2017.  XBT's Chief Financial Officer testified that XBT's business plans take "tons of work and a lot of people" and that they are used for XBT to obtain leasing and credit.  Deposition of Rajesh Mishra (Dkt. No. 212-15), 75:14-76:3, 211:24-212:6.  Specifically, XBT's CFO stated that, among other reasons, one of the reasons why they expected a ▓▓ increase in revenue in 2017 was because they already hit a ▓▓ increase in 2016 and were continuing to grow the business.  *Id.*, 160:2-14.  Defendants acknowledge that XBT had accurately projected its revenue for 2016 in 2015.  Motion, p. 5.  And, given that even in the face of Defendants' defamatory acts, XBT's revenue grew by ▓▓ in 2017, the ▓▓ projected revenue increase was not unreasonable or unreliable.

Moreover, Anderson's reliance on XBT's projections that revenues would grow without significant growth in expenses was also well founded.  As XBT's CFO testified, XBT has been working on opening its own data center (under the new company datacenter.com), which would lower operating costs.  *See* Deposition of Rajesh Mishra, 169:2-6.  And it is not surprising that XBT's operating profits in 2017 were lower than expected – not only were revenues lower because of lost business from the defamatory statements, XBT has suffered significant legal expenses and public relations expenses in connection with fighting the defamatory statements.  *Id.*, 173:8-175:6.

Notwithstanding the foregoing, Defendants argue that it was impermissible for Anderson to rely upon the well-based projection of XBT for his damages calculations.  But this criticism is unfounded.  Not only was the assumption based on a proper foundation, but an expert may not be excluded from testifying simply because the opposing party disputes that the evidence relied

5

upon was correct.  Anderson was entitled to rely upon the findings of XBT's Chief Financial Officer and the legitimate books of the company, even if Defendants claim they were incorrect.  Here, Defendants "fail[] to distinguish between an expert's unquestioned ability to render an opinion based on assumed facts and an opposing party's ability to factually disprove the expert's factual assumptions.  The prospect that the opposition might disprove assumed facts ... presents no barrier to the admissibility of an expert's opinion." *Flying Fish Bikes, Inc. v. Giant Bicycle, Inc.*, 2014 WL 12621218, at *1 (M.D. Fla. Dec. 8, 2014).  In fact, the *Flying Fish Bikes* case continues on to further dispose of Defendants' arguments here, finding that it was perfectly acceptable for the damages expert in that case to rely upon information provided by a business broker because that is the kind of information experts in the field generally rely upon to come up with their opinions – and it goes without saying that any expert would consider the audited financials, business projections and statements of the CFO of a company if they were attempting to determine the value of the company.  *Id.*[1]  *See*, *also*, *Knight v. Miami-Dade Cty.*, 2014 WL 11813876, at *4 (S.D. Fla. May 14, 2014) ("Any challenge to the reasonableness of Dr. Marraccini's reliance on other's work product, data, and analyses may be raised at trial, and Defendants are free to explore any perceived bias or lack of competency of Dr. Marraccini.  This is what cross-examination will highlight at trial."); *In re TMI Litig.*, 193 F.3d 613, 692 (3rd Cir. 1999) ("*Daubert* does not require that the proffered expert is correct....  Rather, the proponent of the challenged testimony need only demonstrate that their opinions are reliable.  So long as the expert's testimony rests upon '"good grounds", it should be tested by the adversary process— competing expert testimony and active cross-examination— rather than excluded from juror's scrutiny for fear that they will not grasp its complexities or satisfactor[il]y weigh its inadequacies.'" (quoting *Ruiz–Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998))).

      Finally, contrary to Defendants' assertions later in the Motion, pages 17-19, Anderson did not simply regurgitate XBT's business plan.  First, Anderson presents *two* but-for valuations of the company – the first of which was based largely on his own independent calculation of

---

[1] As in this case, the defendant in *Flying Fish Bikes* argued that the damages expert's opinion was "formulated '[b]y simply taking Mr. Kane's word without making any effort to question or verify its accuracy.'"  *Id.*, at *2.  The Court summarily dismissed this argument by again explaining that a dispute as to the accuracy of an assumption had no bearing on admissibility.

XBT's EBITDA margin based on audited historical EBITDA numbers for XBT. Anderson Report, p. 10. Second, Anderson did make adjustments to the business plan and the numbers therein where he found it appropriate – specifically, he ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *Id.*, pp. 10-11. Next, Anderson assessed the reliability of the internal projection from the relied-upon business plan against a previous business plan and determined that the business plans were conservative and therefore acceptable to be relied upon. *Id.*, p. 11. Separately, he also checked whether the projections were unreasonable by checking them against a public report about other businesses in the hosting space. Deposition of Jeffrey Anderson (Exhibit 3 to Motion), 87:4-13. And lastly, even after all of this, Anderson used the (modified) projection numbers only as an upper estimate on the but-for EBITDA range and, as already noted above, tempered that upper estimate with a more conservative lower estimate based on an EBITDA margin he determined himself.

Because Anderson was relying on the completely reasonable and well-founded statements of XBT's CFO and the financial statements of XBT audited by KPMG, one of the four most-respected auditing firms in the world, there is no basis upon which to exclude Anderson's testimony. Anderson's testimony therefore is completely distinguishable from the cases cited by Defendants where experts blindly regurgitated information and documents that were not audited and had no other indicia of reliability. *See, e.g., First Premium Servs., Inc. v. Best W. Int'l, Inc.*, 2004 WL 7203535, at *1 (S.D. Fla. Jan. 8, 2004) (expert relied on tax returned prepared by president of company who "could not guarantee their reliability" and then did a "common sense basis" calculation of multiplying by 14 and subtracting some amount for unforeseen factors); *Mooring Capital Fund, LLC v. Phoenix Cent., Inc.*, 2009 WL 4263359 (W.D. Okla. Feb. 12, 2009) (court excluded expert damages testimony not because expert relied on projections from plaintiffs, but because expert "*assume[d]* the accuracy of defendants' *damages* calculations or claims and then testif[ied] so as to suggest the conclusions are his or that he has determined, based on his experience and expertise, that those calculations are correct or reasonable."); *Ellipsis, Inv. v. The Color Works, Inc.*, 428 F.Supp.2d 752 (W.D. Tenn. 2006) (expert relied on data provided by client that was so factually inaccurate and flawed that no reasonable expert could base an opinion on them).

In this case, Anderson relied upon audited and well-founded documents and information, to which he then applied his own reliable and unimpeached methodology and experience.

### C. Defendants' Reference to an "Outside Report" is a Red Herring

Defendants criticize Anderson's testimony because at his deposition he admitted to comparing XBT's growth and projected growth against an outside report about other businesses in the online infrastructure industry which showed annual growth of 45.9%. However, Anderson never claimed that this outside report formed the basis for his calculation. To the contrary, Anderson only reviewed this outside report to confirm that XBT's growth "wasn't an anomaly." Deposition of Jeffrey Anderson (Exhibit 3 to Motion), 87:4-13. The fact that XBT was excluded from the report is misleading and irrelevant when all Anderson sought from the report was to see how other businesses in the hosting space were growing during the years. It is actually quite befuddling how Defendants first attack Anderson for his perceived reliance on XBT's documents and then attack him for looking at third party documents and information as being "irrelevant."

### D. Anderson's Supplement of His Report Only Underscores its Reliability

Defendants criticize Anderson because he supplemented his report after learning that some of XBT's projected revenues should have been backed out because ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This criticism rings hollow. Anderson's testimony is not made unreliable because he took extra steps to make sure his original results were more accurate. It is quite the opposite – Anderson's insistence on making sure his unimpeached methodology was applied to the best facts available only speaks to the reliability and accuracy of his conclusions and why they should be permitted to be presented to the jury.[2]

---

[2] Defendants once again also attack Anderson for relying on the facts of XBT's business as presented to him by XBT's officers – specifically that XBT would be able to find new clients to make up for ▮▮▮▮▮▮▮▮▮▮▮▮. To the extent that Defendants dispute that XBT would be able to find new clients for ▮▮▮▮▮▮▮▮▮▮▮▮ that is not a question of admissibility, but a factual matter of dispute to be presented to the jury. And, given that XBT's business was so immensely damaged by Defendants' defamation, it is no surprise, but instead a testament to the damage Defendants caused, that XBT has not found new customers to make up for ▮▮▮▮▮▮▮▮▮▮▮▮
 Defendants are also just plain wrong when they say that Anderson relied on an assumption from XBT that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Anderson Report, p. 11 n. 29.

### E. Anderson Used Appropriate Comparable Companies to Determine the Multiplier

Defendants next imply that Anderson used improper comparable companies to come to an "industry multiple" of 17x to apply against the EBITDA to arrive at his valuation numbers. As explained below, Defendants are wrong that the companies are incomparable. But, even assuming *arguendo* that the companies are not exactly comparable (which, of course, is *never* the case), that is no basis upon which to exclude Anderson's testimony. As cases cited *supra* make abundantly clear, Defendants' allegations that Anderson used the wrong values in his formula, even if true, would not make Anderson's testimony inadmissible. *See*, *e.g.*, Quiet Technology, 326 F.3d at 1345 ("Quiet's argument is that Frank misused a method that, in the abstract, is reliable. It does not contest the formulation that $PT_{Intake} = FPR(P_{amb})$. Instead, it says that Frank miscalculated FPR. Put differently, Quiet does not argue that it is improper to conduct a CFD study using the sorts of aerodynamic data that Frank employed, but rather that the specific numbers that Frank used were wrong. Thus, the alleged flaws in Frank's analysis are of a character that impugn the accuracy of his results, not the general scientific validity of his methods.").

Nonetheless, the comparable companies and the numbers from them that Anderson used to arrive at an industry multiplier were correct.[3] Anderson used six companies with publicly available financial numbers that were originally identified by KPMG in a valuation of XBT that it performed in August of 2013. Each of the six companies, Akamai Technologies, Dupont Fabros Technology, Equinix, Inc., InterXion Holding NV, iomart Group plc and Rackspace, currently still offers services or products that are the same as or comparable to services and products offered by XBT and its subsidiaries. Akamai operates a content delivery network and both it and iomart provide cloud services. *See* Exhibit 1 (excerpt from Akamai's 2017 Form 10-K) Exhibit 2 (screenshot from iomart website) hereto. XBT offers these services through its subsidiaries Universal CDN and Servers.com, respectively. *See* Exhibit 3 (screenshot from XBT's website) hereto. Dupont Fabros, InterXion, and Equinix all provide data center services. *See* Exhibit 4 (excerpt from Dupont Fabros June, 2017 Form 10-Q), Exhibit 5 (screenshot from

---

[3] Defendants' main criticism is that XBT's CFO was unfamiliar with all of the comparable companies. Motion, p. 9. It is irrelevant, particularly with respect to the admissibility of Anderson's testimony, that a finance guy does not know what tech companies, that he does not work for, do or do not do.

9

Interxion website) and Exhibit 6 (excerpt from Equinix 2017 Form 10-K). XBT offers data center services through its subsidiary Datacenter.com. See Exhibit 7 (screenshot from datacenter.com website). And although Defendants do not dispute that Rackspace is a comparable company, Rackspace provide managed dedicated hosting.[4] See Exhibit 8 (screenshot from Rackspace.com website). XBT's subsidiary, and the other corporate plaintiff in this action, Webzilla, provides those services. Exhibit 3.[5]

### F. Anderson Was Entitled to Assume Causation

In what is the most bewildering argument, Defendants claim that Anderson improperly assumed that the damages he calculated were caused by Defendants' defamatory actions. This was not Anderson's assignment and is an issue to be shown by Plaintiffs' fact witnesses. As one court recently held, it is "beyond serious challenge" that a damages expert is permitted to assume liability. *Robroy Indus.-Texas, LLC v. Thomas & Betts Corp.*, 2017 WL 1319553, at *4-5 (E.D. Tex. Apr. 10, 2017) ("He is a damages witness. As such, he is allowed to assume liability and address only the issue of damages." (and cases collected therein)). *See*, also, *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, 2011 WL 2295269, at *3 (S.D. Fla. June 8, 2011) ("An expert witness, however, may assume liability for purposes of calculating damages...."); *Orthofix, Inc. v. Gordon*, 2016 WL 1273160, at *3 (C.D. Ill. Mar. 31, 2016) ("It is entirely appropriate for a damages expert to assume liability for the purpose of his or her opinion. To hold otherwise would be illogical."); *Gaedeke Holdings VII, Ltd. v. Baker*, 2015 WL 11570978, at *3 (W.D. Okla. Nov. 30, 2015) ("Proof of causation often comes from fact witnesses, and it is appropriate for expert witnesses to assume causation will be established and then proceed to calculate the damages."); *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 986 F. Supp. 2d 574, 656 (W.D. Pa. 2013) ("It is entirely appropriate for a damages expert to assume liability for

---

[4] It should be noted that even if only Rackspace's multiplier of 7x was used by Anderson, instead of the 17x average of all the comparable companies, Anderson's damages range would be between ▮▮▮▮▮▮▮▮▮▮▮▮▮ Accordingly, Defendants' difference in opinion does not negate that Plaintiffs are entitled to a recovery in this case, only that Plaintiffs' damages are a smaller ▮▮▮▮▮▮▮ number.

[5] It is worth noting that at the deposition of XBT's Chief Technical Officer, he testified as to another four companies that he considered to be competitors of XBT: Amazon Web Services, Leaseweb, Google and OVH. Leaseweb and OVH are privacy companies, but publicly available information for Amazon and Google show that their multiples are 42.6x and 18.3x, respectively. If Anderson was to use the average of these two multiples (30.45x), the calculated damages would have been between approximately ▮▮▮▮▮▮▮▮▮▮▮▮▮

the purposes of his or her opinion."); *Sancom v. Qwest Commc'ns Corp.*, 683 F. Supp. 2d 1043, 1068 (D.S.D. 2010) ("It is well settled that a damages expert ... can testify as to damages while assuming the underlying liability.").

### III. Anderson's Opinions Are Relevant and Admissible as a Matter of Law

#### A. XBT is Entitled to Seek Lost Business Value

Defendants claim that Plaintiffs are not permitted to seek lost business value as damages because Plaintiffs have not suffered a complete destruction of their businesses. This argument is unsupported by the law because the cases Defendants cite stand for the *converse* of their position. The cases relied upon by Defendants hold that *if* a business has been destroyed then the business can *only* get lost business value and not lost profits. *See*, *e.g.*, *In re Sherwood Investments Overseas Limited, Inc.*, 2016 WL 5719450 (M.D. Fla. Sept. 30, 2016) ("Where the business at issue is completely destroyed — I.e., the business has ceased operations — 'the proper total measure of damages is the market value of the business on the date of the loss, not lost profits.'" (quoting *City of Key West v. Duck Tours Seafari, Inc.*, 972 So. 2d 901, 903 (Fla. Dist. Ct. App. 2007))). These cases do not support the proposition that you can *only* get lost business value *if* a business has been destroyed.

In fact, the Eleventh Circuit has summarily approved lost business value damages in at least one case where there was not a total destruction of the business. In *United Aluma Glass v. Bratton Corp.*, 8. F.3d 756 (11th Cir. 1993), the plaintiff UAG, a subcontractor, filed suit against the subcontractor above it, Bratton, after Bratton cancelled UAG's subcontract. Based on the testimony of UAG's expert witness, the jury granted UAG damages of $262,957.24, of which $200,000 was for "loss of business value." Bratton appealed the loss of business value claim, raising no less than three arguments for why it should not have been permitted. In dismissing the appeal, the Eleventh Circuit simply explained "We find no merit in any of these issues raised by Bratton and Blout [the general contractor], and no discussion is warranted." *Id.* at 758.

And while a plaintiff cannot obtain both lost business value *and* lost profits for the same wrongful acts of a defendant, a plaintiff is entitled to receive one of them even if the business still has value. *See*, *e.g.*, *Gustafson v. General Motors Acceptance Corp.*, 470 F.2d 1057, 1061 (8th Cir. 1973) (plaintiff was entitled to $25,000 in lost business value after selling business for $45-$50,000, but not entitled to an additional $161,000 for loss of future income). The reason for this is because lost business value and lost profits are so closely intertwined, with lost profits

11

being a significant part of determining lost business value, such that it would be considered a double recovery. *See*, *e.g.*, *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 664 n. 14 (5th Cir. 1974) ("We, of course, realize that because future profits potential is a principal element of a firm's going concern value an award should not include both."). However, in this case, Plaintiffs are not asking for both.

Nor should Anderson's testimony be excluded on Defendants' incorrect assertion that XBT is seeking damages incurred by its subsidiaries. This is just plainly false. XBT has not brought this cause of action on behalf of any subsidiaries; XBT was directly named in the December Memo as having hacked the Democratic Party leadership. And that XBT is a holding company with its revenues accruing through the businesses of its subsidiaries is irrelevant – all the damages that XBT suffered are to the value of XBT as a holding company, which is exactly what Anderson's report and testimony seeks to explain. Defendants have crafted a particularly cruel Catch-22 – "You can't claim damages to the subsidiaries of XBT because we didn't make defamatory statements about the subsidiaries, we only made it about XBT, and you can't claim damages to XBT because XBT only gets its revenue through subsidiaries." In any case, again, Defendants are wrong. Anderson's damages calculation is based on damages suffered by XBT – specifically the loss in business value suffered by XBT following Defendants' publication of the defamatory statements.

Moreover, the cases cited by Defendants on page 13 of their Motion do not support their position. Those cases all stand for the proposition that if Defendants had defamed one of XBT subsidiaries only, then XBT could not bring a cause of action on behalf of that subsidiary. But that is not the case here – Defendants explicitly defamed XBT and XBT is entitled to the damages to its business value arising therefrom.

Accordingly, Anderson's calculation of lost business value to XBT damages is permissible and admissible.

**B.     Anderson's Calculation of BuzzFeed's Benefits from the Defamatory Article is Relevant and Admissible**

Separate from his calculation of the damages XBT suffered as a result of Defendants' defamatory acts, Anderson also performed a calculation based on his expertise of the benefit that BuzzFeed obtained from publishing the Dossier and linking to it from various other articles it published after it first published the Dossier. This calculation is NOT a calculation of damages.

*See*, *e.g.*, Anderson Report, p. 15 (conclusion sets forth two separate opinions, the first being the "Damages as measured by XBT's lost business value" and the second being "The benefit to Buzzfeed from views of the Defamatory Articles"). However, it is still a calculation that is relevant to this case for the purposes of indicating to the jury the value that BuzzFeed obtained from publishing the Dossier, which the jury may consider for any number of permissible reasons including (among others) a determination of punitive damages. This calculation is also important because, as Defendants have admitted, Defendants ███████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████ And as Plaintiffs have separately briefed this Court in their Opposition to Defendants' Motion for Summary Judgment, BuzzFeed's benefit from publishing the Dossier is relevant to the question of whether Defendants acted with actual malice or negligence when they published the Dossier. Accordingly, given that BuzzFeed

███████████████████████████████████████████████████████████████████

█████████ it is fully appropriate for Plaintiffs to present to the jury the *value* of that benefit, which is the purpose of Anderson's calculations.

      C.    **Anderson's Assumptions of Causation are Legally Permissible**

Defendants also claim that Anderson's causation assumptions were legally impermissible for three reasons. However, even if these arguments were correct (which they are not), they would not form a basis for excluding Anderson's testimony.

First, Defendants argue that Plaintiffs seek to hold Defendants liable for speech that was not defamatory because Anderson calculated BuzzFeed's benefit from the publication of the Dossier and articles that referenced it. This argument completely mischaracterizes Anderson's opinion regarding BuzzFeed's benefit. As set forth in Anderson's Supplemental Report, the calculation of the benefit to BuzzFeed is not a calculation of damages that would be due to Plaintiffs – it was only an analysis to determine the benefit to BuzzFeed from the publication of the Dossier and was a completely separate calculation from the damages that he calculated. *See*, *e.g.*, Anderson Report, p. 15 (conclusion setting forth two separate opinions, the first being the "Damages as measured by XBT's lost business value" and the second being "The benefit to Buzzfeed from views of the Defamatory Articles"). Accordingly, the entire argument that "Anderson assesses damages for protected speech" is wholly off-mark and irrelevant.

Second, Defendants argue that Anderson's damages seek to hold Defendants liable for defamatory statements by others. Motion, p. 15. However, there can be no serious dispute that the Dossier and therefore the defamatory statements were made available to the general public only because Defendants decided that they would release it in full and unredacted form. Any further discussions in the media about Plaintiffs in connection with the defamatory statements in the Dossier that came thereafter was only because Defendants had put the defamatory statements out in the public already, and therefore Defendants are responsible for those republications.

Finally, Defendants once again return to their position that Anderson assumed that if the defamatory statements were not published by BuzzFeed, XBT would have hit its projections. Once again, however, Defendants are placing a burden on Anderson that is not his burden to shoulder – specifically, proof of causation or liability comes not from the damages expert but from other means. *See*, *supra*, Section II(F). Anderson was entitled to assume liability in this case and to rely upon the information he received from XBT, all of which was reasonable and all of which would be relied upon by an expert in the field. Accordingly, there is no basis upon which Anderson's testimony should be excluded from trial.

**IV.     Anderson's Estimates are Reliable**

In the final section of their Motion, Defendants repeat some of their same arguments about "reliability" that are nothing more than arguments that they disagree with some of the inputs and outputs to Anderson's unimpeached methodology. Plaintiffs have already responded to many of those points above, but for one:

**A.     The "Range" of Damages is Not as Broad as Implied by Defendants**

Defendants next attack Anderson testimony because he presented a range of damages between ███████████████████ claiming that because the high number is so different from the low number that the estimate could not be reasonably certain. First, it goes without saying that any calculation of damages is by its very nature an estimate. If there was a way to unquestionably calculate damages to the cent, then many economics graduates, lawyers, and judges would soon be out of work.

Nonetheless, Defendants' assertion indicates either that they misunderstand how the valuation is calculated or that they are purposefully misleading the Court by claiming that the high number is "almost ███ times" the low number. As the Anderson Report makes clear, the range of damages is a necessity arising from Anderson using two equally-viable methods to

determine the "but-for" valuation of XBT: one based on historical EBITDA margins of the company, which gives a but-for valuation of ▮▮▮▮ and one based on projected EBITDA margins, which gives a but-for valuation of ▮▮▮▮  When viewed in this context, the range is not a "▮▮ times" difference, but instead the higher range differs by the lower range by less than ▮▮   It is only when you subtract out the "as-is" valuation of the company ▮▮▮▮▮▮, does the range seem larger.

Nonetheless, a wide range of damages it not impermissible. *See*, *e.g.*, *United Aluma Glass*, 8 F.3d at 758 (finding "no merit" to argument that expert witness that testified that loss of business value damages was between $271,143 and $451,905 "was based on speculation and conjecture"). Moreover, that Anderson has provided a range of damages cuts directly against Plaintiffs' argument that Anderson has provided "mere best-case scenario predictions." Motion, p. 17.

## Conclusion

For the reasons set forth above, Plaintiffs respectfully request that this honorable Court DENY Defendants' Motion to Exclude the testimony of Jeffrey Anderson in its entirety.

Dated: October 29, 2018

**Respectfully Submitted:**

/s/ Evan Fray-Witzer
Evan Fray-Witzer (*pro hac vice*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-0000
Facsimile: 617-423-4855
Evan@CFWLegal.com

/s/ Valentin Gurvits
Valentin D. Gurvits (*pro hac vice*)
Matthew Shayefar (Fla. Bar No. 0126465)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1804
Facsimile: 617-928-1802
vgurvits@bostonlawgroup.com
matt@bostonlawgroup.com

/s/ Brady J. Cobb
Brady J. Cobb (Fla. Bar No. 031018)
Dylan Fulop (Fla. Bar No. 123809)
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com
dfulop@cobbeddy.com

*Attorneys for Plaintiffs*