UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| ALEKSEJ GUBAREV,<br>XBT HOLDING S.A., and<br>WEBZILLA, INC.<br>    Plaintiffs,<br><br>v.<br><br>BUZZFEED, INC. and<br>BEN SMITH<br>    Defendants. | Case No.<br><br>0:17-cv-60426-UU |

**PLAINTIFFS' REPLY IN SUPPORT OF *DAUBERT* MOTION TO EXCLUDE THE
EXPERT OPINIONS OF ANTHONY J. FERRANTE**

*"When I use a word ... it means just what I choose it to mean - neither more nor less."*
*"The question is," said Alice, "whether you can make words mean so many different things."*
*"The question is," said Humpty Dumpty, "which is to be master – that's all."*

*Through the Looking Glass,* Lewis Carroll

\*\*\*

One might think that a major news outlet and its editor in chief would have some respect for the plain meaning of the words they publish.  Apparently, one would be wrong.  Defendants' opposition to Plaintiffs' *Daubert* Motion to Exclude the Expert Opinions of Anthony J. Ferrante continues to pretend that words can mean whatever Defendants would like them to mean.  It has been a consistent theme for Defendants throughout this litigation.  And so, Defendants contend that, despite having published a memo that plainly alleged that Aleksej Gubarev was *himself* a "hacking expert" and a "significant player," "recruited under duress by the FSB" to "steal data and conduct 'altering operations' against the Democratic Party Leadership" for which he received "cash payments" and developed a contingency plan to go "to ground to cover [his] traces," that this doesn't mean that Mr. Gubarev *himself* had to have been directly involved in (or even known about) any of those things.  And, when that same memo alleged that the means by which Mr. Gubarev accomplished these things was by having his companies "XBT/Webzilla

and its affiliates" use "botnets and porn traffic to transmit viruses [and] plant bugs," that didn't mean that XBT or Webzilla, or their subsidiaries actually did anything themselves (at Mr. Gubarev's direction or otherwise), but instead really means that maybe, possibly, a subsidiary's infrastructure was used by some third party to accomplish such goals. Or maybe not. Apparently, this is all the same to Defendants and their expert, Anthony Ferrante.

Despite Defendants' contentions to the contrary, words do have meanings. And Mr. Ferrante, in his report and in his deposition, repeatedly acknowledged that the scope of his assignment was limited solely to "conduct[ing] a technical investigation and collect evidence that links XBT *infrastructure* to the described malicious cyber activity in the Steele dossier." Ferrante Depo., p. 14 (emphasis added). He found no direct evidence of anyone employed by Defendants doing any of the things alleged in the memo. Ferrante Depo., p. 63 ("[T]he question that I'm actually asking is: Putting aside the infrastructure question, were you able to determine that any XBT employee used botnets or porn traffic to transmit viruses, plant bugs, steal data or conduct altering operations? ... [A.] I will further state that other than the fact that XBT employees did little to nothing to detect, stop and prevent the significant malicious activity, ***I have no evidence of them actually sitting behind a keyboard***." (emphasis added)).

And, indeed, Mr. Ferrante testified that he did not even *consider* Mr. Gubarev's involvement other than to the extent that he owned XBT. Ferrante Depo., p. 44-45 ("So just so that I understand, the second sentence that I had read: 'Entities 21 linked to one Aleksej Gubarev were involved and he and another hacking expert, both recruited under duress by the FSB, Seva Kapsugovich, were significant players in this operation.' Do I understand you to be saying that you were not investigating the part that I just read?  A. Other than the fact that Aleksej Gubarev owned and operated XBT, it was outside the scope of my investigation."); Ferrante Depo., p. 63 ("And you have no evidence that [Mr.] Gubarev personally did any of the things alleged in the Steele dossier?  A. Other than the fact that Aleksej Gubarev owns and operates XBT and related entities, he was outside the scope of my assignment.").

Once again, because most of the ground Plaintiffs would go over has already been well-trod in their original motion, Plaintiffs will try to address briefly only those arguments raised anew in Defendants' Opposition.

**Argument**

I. **Mr. Ferrante's Testimony is Not Relevant to the Actual False Statements Published by Defendants.**

If Defendants had evidence that Plaintiffs had actually done any of the things that the December Memo alleged they had done, they would have presented it to the Court by now. Indeed, if Mr. Ferrante and his team of former FBI agents had unearthed evidence that Plaintiffs had done that which the December Memo alleges they had done, such evidence would have been highlighted in bold on the first page of his report. Having found no such evidence, despite having spent more than $4 million looking, Defendants resorted to Plan B – instructing Mr. Ferrante to try to find evidence linking Plaintiffs' infrastructure to the allegations contained in the December memo. Even with respect to this irrelevant information, Mr. Ferrante's work revealed spectacularly few results concerning the actual allegations made in the December Memo. And so, Mr. Ferrante widened his net again – apparently looking for evidence that Plaintiffs' infrastructure had been used (at any point in time) for wrongful acts that had nothing to do with the actual allegations contained in the December Memo so that Defendants could improperly argue (as they do) that a jury could conclude from evidence of past misuse of Plaintiffs' infrastructure that Plaintiffs' infrastructure was again misused here. And all of this then given the imprimatur of legitimacy by putting the words in the mouth of a cybersecurity expert. This kind of misleading, irrelevant, and unduly prejudicial testimony is precisely the type that the Court is intended to prevent. *See*, *e.g.*, *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir.2004) ("The district court's role is especially significant since the expert's opinion 'can be both powerful and quite misleading because of the difficulty in evaluating it.' Indeed, no other kind of witness is free to opine about a complicated matter without any firsthand knowledge of the facts in the case." (internal citation omitted) (quoting *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993))).

II. **Mr. Ferrante's "Evidence" in no Way Supports Defendants' (Brand New) Argument that Mr. Ferrante's Report "Supports Christopher Steele and His Sources' Credibility."**

Throughout this litigation, Defendants have maintained that, because they did not know who Christopher Steele's sources were at the time they published the Dossier – and in no way relied on the credibility of either Mr. Steele or his sources – that discovery concerning Mr. Steele, his sources, and Buzzfeed's sources were completely irrelevant. Indeed, Defendants

3

(successfully) asserted such argument to prevent Plaintiffs from compelling them to discuss their sources at all.  Now, for the first time, Defendants claim that information that they did not possess at the time of publication should be admitted as it tends to lend credibility to Mr. Steele and his sources.  If anything, this is an argument as to why Mr. Ferrante's report should be *excluded*.  If Defendants are correct and this post-publication information somehow enhances Mr. Steele's and his source's credibility – information on which Defendants insisted they did not rely (and on which basis they resisted discovery) – then this information would tend to confuse the jury, not inform them.

### III.     Defendants' New Methbot Argument Should be Rejected.

Defendants for the first time advance a new reason why they believe Mr. Ferrante's testimony concerning the Methbot Operation – an alleged advertising fraud purportedly run by a former customer of Plaintiffs – is supposedly necessary and relevant to the question of damages. As is described in detail in connection with Plaintiffs' Motion *in Limine* to Preclude Evidence or Testimony Concerning the Methbot Operation, once Plaintiffs were put on notice that one of their customers might be misusing their servers to perpetuate an advertising fraud, Plaintiffs cancelled the customer's account and access to the servers, removing the relevant hard drives to be preserved in case law enforcement was interested in reviewing the same.  The cancellation of this customer's account led to a reduction in monthly revenue that Plaintiffs' damages expert did not originally fully account for in his forward-looking calculations.  Plaintiffs asked the damages expert to prepare a supplement to his report backing out the losses attributable to Plaintiffs' decision to terminate this client, which the expert did.

As a result of this innocuous and appropriate revision (a revision which *lowered* Plaintiffs' claimed damages to Defendants' benefit), Defendants claim that extended testimony concerning the mechanics of completely unrelated and irrelevant wrongdoing allegedly committed by one of Plaintiffs' customers needs to be presented to the jury.  The argument is silly.  Although the reduction in revenue may be relevant to Plaintiffs' claimed damages, the *reason* for the reduction remains irrelevant and unduly prejudicial.  There is simply no legitimate reason why the jury could not be told that the reduction in revenue was due to the loss of a large client or even that the reduction was the result of Plaintiffs terminating a client they believed to be violating Plaintiffs' terms of service.  There is, of course, an illegitimate reason for extended testimony concerning the alleged Methbot Operation – namely an improper attempt to talk about

4

wrongdoing allegedly committed by one of Plaintiffs' customers that has nothing to do with the allegations made in the December Memo in a deliberate attempt to confuse the jury into believing that Plaintiffs had done something wrong.

### IV. Defendants' Reputational Arguments are Similarly Misguided.

Defendants again assert that the fact that Mr. Ferrante's team of former FBI agents was able to discover a smattering of untrue, unverified, irrelevant, and inadmissible decades-old blog articles concerning Plaintiffs (or customers of Plaintiffs, or even entities that weren't customers of Plaintiffs when they allegedly did bad things but who became customers at some point) – many of which are no longer even widely available on the internet – are probative of Plaintiffs' "reputation" and/or Defendants' state of mind at the time of publication. Both assertions are ludicrous. First, with respect to Plaintiffs' reputations (and as is discussed at length in Plaintiffs' filings concerning their status as private figures as well as their motions *in limine*), the fact that Defendants could (through the expenditure of millions of dollars) discover other untrue allegations about Defendants does not mean that those allegations are relevant to Plaintiffs' "reputation." A blog article that few have seen or read simply is not probative to a party's reputation in the community.

Similarly, information that Defendants admit that they did not possess at the time they published the defamatory statements simply cannot be probative of their state of mind at the time they published, nor does *Condit v. Dunne*, 225 F.R.D. 100 (S.D.N.Y. 2004), cited by Defendants, suggest otherwise. Preliminarily, it is important to note that *Condit* is a case concerning the scope of permissible *discovery*, not admissibility and, as such, is of little relevance here. It should be noted, however, that even under the much more expansive scope afforded to discovery, the *Condit* court nonetheless concluded that "Plaintiff is correct, however, that information regarding Condit's sexual relationships are not relevant to defendant Dunne's state of mind to the extent that Dunne did not know that information at the relevant time." *Id.* at 111.[1]

---

[1] It is understandable that, in the context of a discovery motion, the Court allowed the defendant to inquire into other alleged bad acts directly related to those alleged in the defamatory publication because such testimony might lead to the discovery of admissible evidence concerning the plaintiffs' pre-publication reputation. If the defendant were able to find other credible information that might be damaging to Condit's reputation, then he might have been able to subsequently show that such information was publicly known. Here, Defendants have

Additionally, there is no evidence whatsoever that Mr. Ferrante has any expertise that would allow him to speak to the reputation of Plaintiffs (or anyone else) and to the extent Defendants are offering Mr. Ferrante for that purposes, it is yet another reason for his testimony to be excluded.[2] In reality, Defendants are simply attempting to use their expert to get in through the back door that which the Court would never allow in through the front – hearsay evidence with absolutely no reliability that is so temporally removed in time and factually irrelevant that it could never be put before a jury.

V.      **Conclusions That No Conclusion Can Be Reached Are Hardly Helpful to the Jury.**

Throughout Mr. Ferrante's report, he discusses facts that are spun to sound ominous only for him to then conclude that no conclusion can be drawn from the facts presented.  For example, and as is discussed at length in various other briefs, Mr. Ferrante's discussion of Bit.ly links includes his assertion that an IP address used by a Root S.A. client created a Bit.ly link (one of more than 11,000 such links created) with information that was identical to the link that John Podesta clicked on.  Having said that, however, Mr. Ferrante admits not only that he does not know if the link created by the IP address assigned to a Root S.A. customer was ever clicked on by John Podesta – he does not even know if the link was even emailed to anyone.  None of this is helpful to the jury, nor is it intended to be.  It is intended not to be useful but, to the contrary, to confuse the jury and mislead them into believing that Mr. Ferrante is saying something other than "there's a 1 in 11,139 chance that a link created by an IP address used by a customer of a subsidiary of XBT was the link that John Podesta clicked on."

Similarly, Defendants attempt to make much of Plaintiffs' "failure" to discuss Mr. Ferrante's "finding" concerning a suspicious "SSL certificate" shared with 40 different IP addresses, including one owned by Root S.A.  It is hard to know what Defendants expected Plaintiffs to say, though, when (despite the nefarious-sounding language), Mr. Ferrante's report ultimately concluded only that: "because this is an indirect link, more data from CrowdStrike and/or the DNC is required to determine if XBT infrastructure supported the DNC Hack." Ferrante Report, p. 15.  And, indeed, in his deposition, Mr. Ferrante went further, acknowledging

---

never shown – or attempted to show – that anyone else ever saw (much less credited) the decades-old assertions.
[2] Even if Mr. Ferrante had such expertise, which he does not, the information relied upon is so unreliable that no reasonable expert would have relied on such materials.

6

that the information didn't support a conclusion that any of the owners of the 40 IP addresses were actually working with Fancy Bear. Ferrante Depo., p. 100 ("Q. But that doesn't mean that the owners of those IP addresses are somehow actively working with or cooperating with Fancy Bear, does it?  A. We can't state that. You can't come to that conclusion based on the information that is available.").

In other words, Mr. Ferrante's entire discussion of SSL Certificates allegedly controlled by the Russian entity Fancy Bear lead only to the conclusion that there was no way to know if the other IP addresses that shared the certificate had any actual connection to Fancy Bear, nor could any conclusion be drawn from the shared SSL Certificate as to any connection to the DNC Hack.  Since Defendants appear disappointed that Plaintiffs did not discuss these "conclusions" elsewhere, Plaintiffs will note here that Mr. Ferrante's "conclusions" concerning the suspicious shared SSL certificate should be excluded because such conclusions (that nothing can be concluded) will not assist the jury, will indeed (if anything) mislead the jury, and is therefore more prejudicial than probative.  Indeed, it would seem that the only reason Defendants want to put this information in front of the jury is in the hope that they stop listening after they hear the "scary" words and before Mr. Ferrante admits that his investigation concerning the SSL Certificates resulted in no useful facts.

VI. **Mr. Ferrante's Experience is Relevant Only to the Extent that it Encompasses the Opinions Offered and Even Then Only to the Extent that He has Explained How His Experience Led to the Conclusions Reached.**

Next, Defendants again prop up a straw man of their own creation so that they may knock it down one last time.  Namely, Defendants claim that Plaintiffs have argued that experience cannot form the basis for an expert's testimony.  Plaintiffs have said no such thing.  What Plaintiffs *have* said is that Mr. Ferrante's experience as an FBI cybersecurity investigator is not relevant to topics not included within that area of expertise, such as whether a web hosting company must have a distinct written contract with every one of its customers or an assessment of the reputation of companies that Mr. Ferrante had never heard of prior to this assignment.  Plaintiffs have also argued that, even within his areas of experience, Mr. Ferrante's opinions are only admissible to the extent that he has connected his experience to the conclusions drawn, which in many places he has not done.

Finally, with respect to all of the above – the reliability, usefulness, and admissibility of Mr. Ferrante's expert report – Plaintiffs make one (admittedly unusual) request of the Court:

7

Plaintiffs ask that the Court read Mr. Ferrante's deposition transcript in its entirety because, if the Court does so, Plaintiffs believe the Court will reach the inescapable conclusion that the vast majority of Mr. Ferrante's report is wholly irrelevant and what little remains is either unreliable, outside of Mr. Ferrante's areas of expertise, or intentionally designed to *sound* as if Mr. Ferrante is saying that Plaintiffs did something wrong when, in reality, Mr. Ferrante uses lots of "scary" words, only to then whisper, *sotto voce*, that, of course, he has no idea and can't conclude that any of what he has found means that Plaintiffs did anything wrong at all.

Ironically, Mr. Ferrante's expert report eerily parallels Buzzfeed's report on the Dossier – in the end, Mr. Ferrante has done little more than say, we can't tell you if any of this actually means anything but here it is so you can decide for yourself. That is precisely the opposite of testimony that will assist a jury in understanding the evidence presented and, as such, should be excluded in its entirety.

## Conclusion

For the reasons stated hereinabove and in Plaintiffs' Motion to Exclude the Testimony of Anthony J. Ferrante, this Court should exclude the expert report and opinions of Anthony J. Ferrante in their entirety.

Dated: November 5, 2018

**Respectfully Submitted:**

/s/ Evan Fray-Witzer
Evan Fray-Witzer (*pro hac vice*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-0000
Facsimile: 617-423-4855
Evan@CFWLegal.com

/s/ Valentin Gurvits
Valentin D. Gurvits (*pro hac vice*)
Matthew Shayefar (Fla. Bar No. 0126465)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1804
Facsimile: 617-928-1802
vgurvits@bostonlawgroup.com
matt@bostonlawgroup.com

/s/ Brady J. Cobb
Brady J. Cobb (Fla. Bar No. 031018)
Dylan Fulop (Fla. Bar No. 123809)
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com
dfulop@cobbeddy.com

*Attorneys for Plaintiffs*