# EXHIBIT  3

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF FLORIDA

3               MIAMI DIVISION

4

5    _____

6    IN RE THIRD PARTY SUBPOENA TO  |   Case No.

7    FUSION GPS                     |   0 18-mc-60528-UU

8    _____|

9    ALEKSEJ GUBAREV,               |

10   XBT HOLDING S.A. and           |

11   WEBZILLA, INC.                 |   Case No.

12       Plaintiffs,               |   0 17-cv-60426-UU

13   -v-                            |

14   BUZZFEED, INC., and            |

15   BEN SMITH                      |

16       Defendants.               |

17   _____|

18

19

20

21



```
 1                   Deposition of Peter R. Fritsch

 2                          Washington, DC

 3                      Thursday, August 30, 2018

 4                           10:00 a.m.

 5

 6

 7   Job No: J2625547

 8   Pages:  1-271

 9   Reported by:  Kenneth Norris

10

11

12

13

14

15

16

17

18

19

20

21
```



 1        A.   No, he didn't.

 2        Q.   Just so that I understand, prior to the Wall

 3   Street Journal publishing that information, Fusion was

 4   unaware that the Wall Street Journal intended to

 5   publish that information.  Is that correct?

 6        A.   That is correct.

 7        Q.   Prior to the publication of the memos, did

 8   Fusion undertake any efforts to verify the allegations

 9   in the December memo concerning Alex Gubarev?

10             MR. LEVY:  Take your time to read through

11   it.

12             THE WITNESS:  Yes, we did.  We took

13   extensive steps to verify the information.

14   BY MR. FRAY-WITZER:

15        Q.   And specifically the information concerning

16   Alex Gubarev?

17        A.   Yes, that's right, we did.

18        Q.   What steps did Fusion take to verify the

19   allegations concerning Alex Gubarev?

20        A.   We took extensive steps to, as I believe I

21   testified, XBT, Webzilla and Mr. Gubarev were all new



```
 1   names to us.  So we went to the public record to

 2   determine who these people are and to determine

 3   whether the information in Paragraph 3 of this memo

 4   was credible.

 5           What we found was an extensive record of a

 6   company based in Luxemburg with no fewer than 51

 7   subsidiary companies or shell companies, located in

 8   places like the British Virgin Islands, Cypress,

 9   Panama, India and Russia and the United States that

10   was constructed in such a way to obscure the

11   beneficial ownership of the company.

12           That's an important detail in our mind.

13           We undertook a litigation search of XBT and

14   Webzilla and a public record search with the internet.

15   We found extensive allegations, credible allegations.

16   Paragraph 3 talks about porn traffic.  We found a

17   number of websites hosted by Webzilla;

18   asianpissinggirls.com, japanesetoiler.com.  In Fort

19   Lauderdale, osuck.com.  They were hosted by Webzilla.

20           We found extensive allegations in the public

21   record from credible people like motion picture
```



 1  associations in filings to the U.S. and comments to

 2  the U.S. Copyright Office that Webzilla had ignored

 3  repeated entreaties to take down pirated traffic

 4  particularly in pornography.

 5          We found that -- and this is a very telling

 6  fact for us -- we found Mr. Gurvits's name on

 7  extensive litigation in defense of alleged criminal

 8  hackers and networks in the Ukraine and Russia.

 9          And that -- we found that FireEye had

10  determined that --

11          (The reporter requested clarification.)

12          THE WITNESS:  FireEye, which is an internet

13  security firm had determined that Webzilla was hosting

14  a Propeller Ads -- a company called Propeller Ads

15  which involved various individuals, also tied to Mr.

16  Gubarev.

17          We understood there was a couple companies.

18  One was called Co-locate USA, which is a known

19  spamming network which is actually owned by Webzilla

20  is what we understand.

21          There was another company called Digital --



 1   I can't remember it right now.  It was involved

 2   allegedly in the Methbot attack which was --

 3               (The reporter requested clarification.)

 4               THE WITNESS:  Methbot, M-E-T-H-B-O-T, that

 5   at its height was stealing somewhere between three and

 6   $5 million a day from unsuspecting internet users.

 7               So what we found was a pattern and a fact

 8   set that corroborated and substantially raised the

 9   credibility of the underlying reporting in this

10   memorandum.

11   BY MR. FRAY-WITZER:

12       Q.   I asked you what steps you took prior to the

13   publication.  Is it your testimony that you undertook

14   those steps prior to BuzzFeed's publication of the

15   dossier?

16               MR. LEVY:  Objection, asked and answered.

17               MR. FRAY-WITZER:  Except he's answering a

18   totally different question.

19               MR. LEVY:  No, he's not.

20               MR. FRAY-WITZER:  Okay.  Well, then let him

21   answer it.



 1              MR. SIEGEL:  That's testimony, Evan.

 2   BY MR. FRAY-WITZER:

 3       Q.   Did you --

 4              MR. SIEGEL:  Ask your question.

 5   BY MR. FRAY-WITZER:

 6       Q.   Did you -- did Fusion undertake those

 7   research efforts before BuzzFeed published the

 8   dossier?

 9       A.   Yes, we did.

10       Q.   Then let me ask you this.  You said it was

11   very relevant to you that Val Gurvits's name was on

12   the pleading.  Why was that relevant prior to the

13   publication of the dossier?

14              MR. LEVY:  Objection, lacks foundation.

15              THE WITNESS:  May I answer?

16   BY MR. FRAY-WITZER:

17       Q.   Please.

18       A.   Well, as an investigative matter, as a

19   research matter, who someone's lawyer is, whether it's

20   for the formation of a company or the defense of

21   allegations against them is entirely relevant in our



 1  mind.

 2       Q.   And what relevance did that have prior to

 3  the publication of the dossier?

 4            MR. LEVY:  Objection, lack of foundation.

 5            THE WITNESS:  Again --

 6            MR. FRAY-WITZER:  He testified that it was

 7  relevant to him.  That's the foundation.  What's the

 8  relevance?

 9            MR. LEVY:  Preserving the objection.

10            MR. FRAY-WITZER:  Fine.

11            THE WITNESS:  The relevance -- I mean, we

12  were trying to understand, as I testified to you -- we

13  were trying to understand who XBT, Webzilla and Mr.

14  Gubarev are.  We had no idea.

15            So we employed our methodology, which as I

16  said is an extensive collection effort, and a

17  litigation review found those commonalities.

18  BY MR. FRAY-WITZER:

19       Q.   On what date did Fusion start that review?

20       A.   Almost immediately.

21       Q.   Almost immediately upon what?



1        A.    Sorry, upon receipt of the December 13th

2   memo.

3        Q.    You -- and by you I mean Fusion was asked

4   and ordered by the Court in this case to produce to us

5   all documents that demonstrated investigation or

6   information that you had concerning Webzilla, XBT or

7   Mr. Gubarev that you had prior to the publication of

8   the dossier.  There's not a single document that

9   reflects anything that you're talking about.  Why is

10  that?

11            MR. SIEGEL:  Objection.

12            MR. LEVY:  Objection, that's incorrect.  And

13  if you'd let the witness testify as opposed to

14  characterizing documents in his own testimony as

15  you've done for the last six hours, we'd greatly

16  appreciate it.

17  BY MR. FRAY-WITZER:

18       Q.    Why aren't there any documents that

19  demonstrate such an investigation prior to the

20  publication?

21            MR. LEVY:  Objection, lack of foundation.



FUSION GPS 30(b)(6), Attorneys Eyes Only          August 30, 2018
ALEKSEJ GUBAREV -v- BUZZFEED INC.                              195

```
 1   BY MR. FRAY-WITZER:

 2       Q.   Tell me what documents you produced that

 3   demonstrate any kind of investigation that Fusion

 4   undertook prior to the publication of the dossier?

 5       A.   I think our document production speaks for

 6   itself.

 7       Q.   Tell me a single document that indicates

 8   that Fusion undertook an investigation of XBT,

 9   Webzilla or Mr. Gubarev prior to the publication of

10   the dossier?

11            MR. LEVY:  Objection, asked and answered.

12            MR. SIEGEL:  Objection.

13            THE WITNESS:  I'm sorry.  I'm not sure how I

14   can answer that.

15   BY MR. FRAY-WITZER:

16       Q.   You said you reviewed the documents that you

17   produced before today's deposition?

18       A.   Yes.

19       Q.   Correct?

20       A.   Correct.

21       Q.   So identify for me, tell me any document
```



 1  that demonstrates an investigation prior to the

 2  publication --

 3       A.   The entire.  I apologize for not letting you

 4  finish.

 5            The entire Dr. Tubrook case, dot com case,

 6  the entire WebArt case were all things that we found

 7  in the public record prior to publication.  Not

 8  difficult to find.

 9            MR. LEVY:  We can bring out the document

10  production for Mr. Fritsch to look through if it's

11  helpful for you.  He's given you some examples, he can

12  give you others.  You have the production.

13  BY MR. FRAY-WITZER:

14       Q.   Is there a document that you believe you

15  produced that demonstrates -- that has a date on it

16  prior to the publication of the dossier, that

17  demonstrates that Fusion was engaged in an

18  investigation of the sort you're talking about?

19       A.   I'm sorry.  As I sit here today I'd have to

20  sit down with the documents and go -- and review them.

21  Which I'm happy to do.



 1        Q.   I believe you testified that you did go

 2   through them and review them prior to this deposition?

 3             MR. LEVY:   Objection, asked and answered.

 4   BY MR. FRAY-WITZER:

 5        Q.   Did you go through them and review them

 6   prior to the deposition?

 7        A.   I did.

 8        Q.   So, why can't you tell us today as you sit

 9   here what document has any date that predates the

10   publication of the dossier that you believe supports

11   your assertion that there was such an investigation

12   before the publication of the dossier?

13        A.   I'm sorry.  I'm not trying to be difficult.

14   I just can't recall.  The document production that I

15   reviewed with Mr. Levy was probably four or five

16   inches thick, if not larger.

17        Q.   What evidence did Fusion find that Alex

18   Gubarev had been recruited under duress by the FSB?

19        A.   I don't believe we found any such evidence.

20   Again, as I believe I've testified and as Mr. Steele

21   evidently testified, the purpose or the goal was to



 1   share this information in urgent fashion with

 2   competent authorities in law enforcement and

 3   government who could pursue them.

 4        Q.   Well --

 5        A.   This is not the kind of information that is

 6   easily confirmed in the open source.

 7        Q.   What evidence did Fusion find that XBT,

 8   Webzilla was conducting altering operations against

 9   the democratic party leadership?

10        A.   Again, by altering operations by the way, I

11   believe we're talking about hacking.

12             We found no specific allegations about XBT,

13   Webzilla in the open source.  However, at this time it

14   was an extensive matter of public record that the

15   democratic party leadership had been hacked.  And,

16   again, as I believe I testified, we determined that

17   XBT, Webzilla operates the kind of network with the

18   capability to carry out those kinds of acts.

19             We also understood XBT, by the way, since

20   2015 to be working in Russia through its acquisition

21   of Edinaya Set, E-D-I-N-A-Y-A, separate word, S-E-T.



1   Our understanding is we need to be in close

2   cooperation with the State to offer internet services

3   for hosting in Russian.

4          Prime Minister Medvedev just a couple of

5   months ago signed a new law requiring companies to

6   cooperate with the State under the guise of its

7   National Security and Counter Terrorist Act.

8          So to us, again, the credibility's

9   reinforced by the profile of the company.

10     Q.   Did Fusion have any actual evidence of

11  cooperation between XBT, Webzilla and the Russian

12  government?

13         MR. LEVY:  Objection, asked and answered.

14         He just answered the question.

15         MR. FRAY-WITZER:  No.  He just testified

16  that there are requirements that he believes are in

17  place and I want to know if he has any actual evidence

18  that this company is cooperating with the Russian

19  government.

20         MR. LEVY:  Objection.  Same objection as in

21  that was part of his testimony, it wasn't all of his



1  testimony.

2          THE WITNESS:  One thing we found in the open

3  source, just to help you understand that, is that --

4  and I'm going to mangle the name -- but XBT after the

5  Russian government shut down the messaging app

6  telegram, it did talk about the contract, it's

7  Roskomnadzor.  I can't remember the name.

8          (The reporter requested clarification.)

9          THE WITNESS:  I'm sorry.  I don't know how

10  to spell it.

11          There's a report in the open source that

12  talks about a contract with Edinaya Set, the company I

13  referenced earlier that belongs to XBT Holdings to

14  work with the Russian government.

15          So, again, from a researcher standpoint, a

16  lot of those facts are important.

17          When you're trying to assess the credibility

18  of a report like this, not the truth, the credibility

19  of it.

20  BY MR. FRAY-WITZER:

21      Q.   Have you produced this alleged contract



1  between Edinaya Set and the Russian government?

2       A.   No, we did not.  We're not privy to private

3  company contracts with the Russian government.

4       Q.   Have you produced the open source

5  information that you say supports the existence of

6  such a contract?

7       A.   I can't recall.

8       Q.   Did you find this supposed open source

9  information prior to BuzzFeed publishing the dossier?

10      A.   No.

11      Q.   After BuzzFeed published the dossier, Fusion

12  undertook great efforts to investigate Gubarev,

13  Webzilla and XBT.  Isn't that true?

14      A.   I'm not sure what you characterize as great

15  efforts.  But we did take -- undertake an effort to

16  investigate, and I'll tell you why.

17           Again, we, like Mr. Steele, shared a concern

18  that now the president, incoming president of the

19  United States or about to be inaugurated president of

20  the United States was an asset of some -- some caliber

21  of the Russian government.  So we did undertake that



1  as part of our -- we're exercising our rights as

2  citizens and also our responsibility as citizens to do

3  that.

4         We Felch like we had a certain amount of

5  knowledge and understanding of these networks and the

6  fact set, and so we decided that we needed to keep

7  doing that.

8      Q.   Did Mr. Steele ask you to try and verify the

9  information after the dossier had been published?

10     A.   No, and he didn't have to.

11     Q.   Did BuzzFeed ask you to verify information

12 concerning Webzilla, XBT or Mr. Gubarev?

13     A.   Absolutely not.  It's fair to say our

14 communications with BuzzFeed were not robust after

15 publication of the dossier.

16     Q.   What communications did Fusion have with

17 BuzzFeed after the publication of the dossier?

18         MR. LEVY:  Asked and answered.

19         THE WITNESS:  About what?

20 BY MR. FRAY-WITZER:

21     Q.   About Webzilla, XBT or Mr. Gubarev.



1      A.    None that we can recall.

2            (Fritsch Exhibit No. 13 was marked for

3    identification.)

4    BY MR. FRAY-WITZER:

5      Q.    You've been shown what's been marked as

6    Exhibit Number 13.  Can you tell me what this document

7    is?

8      A.    Sure.

9            This is an e-mail from Ed Baumgartner who

10   works for a company called Edward Austin.

11           Ed is a contractor of ours who has

12   advanced -- I think he has an advanced degree in

13   Russian Language and History and maybe Literature from

14   Harvard University.  And is someone who we rely on to

15   conduct research.

16     Q.    When did Fusion engage Mr. Baumgartner to

17   conduct the research that resulted in these memos?

18     A.    I'm afraid I don't recall.  We don't recall.

19     Q.    Why did Fusion engage Mr. Baumgartner to

20   conduct the research that resulted in these memos?

21     A.    We wanted to learn more about several



1    matters.  One of which involved Mr. Gubarev.

2        Q.   Why at this point in time did Fusion want to

3    learn more information about Mr. Gubarev?

4        A.   Because we received a memo on December 13th

5    from Christopher Steele and Orbis.  Again, one of the

6    most knowledgeable Western Russianists in the world

7    who represented to us that he had credible information

8    that XBT Holdings and Webzilla was involved in the

9    hacking of the democratic party leadership.

10       Q.   You're saying that Mr. Steele specifically

11   represented to you that he had credible information

12   about those things, not that he considered them to be

13   raw intelligence that needed to be verified and

14   confirmed?

15           MR. LEVY:  Objection.

16           MR. SIEGEL:  Objection.

17           MR. LEVY:  Please just ask him questions.

18   Rephrase the question, Evan.

19   BY MR. FRAY-WITZER:

20       Q.   Is it your testimony -- and I think you just

21   said this, that Mr. Steele specifically told you that



 1  he had credible information of the allegations

 2  concerning XBT, Webzilla that are contained in the

 3  December memo.  Is that your testimony?

 4          MR. LEVY:  Want to read back the testimony?

 5          MR. FRAY-WITZER:  No.  I'd like the witness

 6  to answer the question.

 7          MR. LEVY:  We have a problem because you ask

 8  him a question, he answers it.  And then you try to

 9  recapitulate his answer and ask him if you got it

10  right.  This happened, I can't -- I've lost track of

11  how many times this has happened during the course of

12  this deposition.

13  BY MR. FRAY-WITZER:

14      Q.  Is that your testimony?

15      A.  I'm sorry.  The back and forth really

16  confuses me, and I apologize for that.

17      Q.  Is it your testimony that Mr. Steele

18  explicitly told you that he had credible evidence that

19  XBT, Webzilla were involved in the allegations that he

20  makes in the December memo?

21      A.  It's my testimony that Mr. Steele provided



1   us the memorandum marked Exhibit 11 on December 13th,

2   2016.  And, therefore, they are credible because Mr.

3   Steele sent them to us.  And Mr. Steele, once again is

4   a highly trained professional who is trained in

5   sorting out good intelligence from disinformation and

6   not credible intelligence.

7        Q.   Is it your belief that 100 percent of

8   everything in the dossier is credible?

9        A.   You're asking me for my personal belief, or

10  our personal belief?

11       Q.   Fusion's belief.

12       A.   I'm sorry.  I think that's a tough question

13  to answer, what an entire company believes.

14            However I'll tell you that I think that we

15  believe that the information is highly credible.  I

16  also think we believe extensive parts of the memoranda

17  that we're calling the dossier have been corroborated.

18       Q.   And I think I'm asking a different question.

19            Is it your belief that 100 percent of all

20  the information contained in the dossier is credible?

21            MR. LEVY:  Objection, asked and answered.



 1              THE WITNESS:  Yes, I do.

 2   BY MR. FRAY-WITZER:

 3       Q.    And only because you've made this

 4   distinction before, do you believe that 100 percent of

 5   the information contained in the dossier is true?

 6       A.    I don't know.

 7       Q.    In Exhibit 13 would you turn, please, to --

 8   it has the number one at the bottom -- actually let me

 9   give you the Bates number at the very bottom --

10       A.    Sure.

11       Q.    -- which ends in 14.

12       A.    Sure.

13       Q.    That is the beginning of the memo concerning

14   Aleksei Gubarev from Mr. Baumgartner.  Is that

15   correct?

16       A.    That's correct.

17       Q.    If you would turn to Page 4 of that and that

18   has a Bates number that ends in 17, and there's a

19   heading at the top of the page:  Interviews.

20              Were you aware that Mr. Baumgartner had

21   conducted interviews as part of his work being



1   performed for you?

2          A.   In advance of receipt of this memorandum?

3          Q.   Yes, did you know he was going to conduct

4   interviews?

5          A.   We reviewed this and don't specifically

6   recall that.

7               However, we understand that part of what

8   Edward does is conduct interviews or his network

9   conducts interviews, I should say.

10         Q.   The section on interviews begins, "Our

11  interviews of people familiar with Gubarev paint a

12  picture of a relatively well known person in the IT

13  sector with an entirely positive reputation as a

14  successful self made entrepreneur."

15              Did I read that correctly?

16         A.   You did.

17         Q.   In the next paragraph Mr. Baumgartner

18  writes, "Source from Mail.Ru Group describes Gubarev

19  as follows:  'He created from scratch a successful

20  business that continues to grow.  I have never heard

21  anyone say anything negative about him.'"



```
 1              Did I read that portion correctly?

 2      A.   You did.

 3      Q.   "I have a very ambiguous feeling about all

 4  these allegations against him from the U.S. press.

 5  Yes, nobody has ever heard him talking about hacking

 6  or having any ties to intelligence agencies."

 7              Did I read that correctly?

 8      A.   You did.  I would only note that you don't

 9  hear a lot of talk about ties to the intelligence

10  agencies.

11              I don't know if you got that.  But I also

12  forgot what I said.

13      Q.   Without --

14              MR. LEVY:  You want to finish your answer?

15              THE WITNESS:  I'm okay.

16  BY MR. FRAY-WITZER:

17      Q.   The remainder of the interviews that Mr.

18  Baumgartner conducted are consistent with his

19  conclusion that everyone he had spoke with had an

20  entirely positive reputation attributed to Mr.

21  Gubarev.  Is that correct?
```



 1      A.   I don't know.  I'd have to read it again.

 2           MR. LEVY:  Is there a conclusion you want to

 3   point him to in the language?

 4           MR. FRAY-WITZER:  Well, in the first

 5   paragraph, yes.

 6   BY MR. FRAY-WITZER:

 7      Q.   "They paint a picture of a relatively well

 8   known person in the IT sector with an entirely

 9   positive reputation as a successful self made

10   entrepreneur."

11           The interviews he conducted are consistent

12   with that conclusion that he makes.  Is that correct?

13      A.   I agree that the first sentence says that.

14      Q.   Did Mr. Baumgartner provide Fusion with any

15   negative information about Mr. Gubarev that it

16   obtained from its interviews with people?

17      A.   What do you mean by negative information?

18      Q.   Did Mr. Baumgartner report to Fusion that

19   people he interviewed said that Alex Gubarev was a

20   hacker?

21      A.   First of all, I don't know that I said that



1   Mr. Baumgartner interviewed anybody.

2           Second of all, that characterization that

3   you just made is not reflected in this memorandum.  I

4   agree.

5           I'd also say that Mr. Baumgartner is not a

6   highly trained or decorated intelligence official from

7   a major government.

8       Q.   And yet, you did decide to hire him for some

9   reason.  Is that not correct?

10      A.   We did hire Mr. Baumgartner.

11      Q.   Did you pay Mr. Baumgartner?

12      A.   Yes.

13      Q.   How much did you pay Mr. Baumgartner for

14  performing this work?

15      A.   I can't recall.  But it was not an extensive

16  engagement.  I think he conducted a couple interviews

17  or his network conducted a couple of interviews.

18          I'd also add that I think what this memo

19  reflects is an honest methodology that seeks to

20  collect and capture all views and opinions on all

21  sides of the matter.



FUSION  GPS  30(b)(6), Attorneys Eyes Only                    August 30, 2018
ALEKSEJ GUBAREV -v- BUZZFEED INC.                                        212

1          Q.    I just don't want to interrupt you.

2          A.    I'm done.

3                (Fritsch Exhibit No. 14 was marked for

4      identification.)

5                THE WITNESS:   I'm sorry.  Evan, do you mind

6      if we take a quick break?

7                MR. FRAY-WITZER:   No.

8                THE VIDEOGRAPHER:   Going off the record at

9      1614.

10               (Whereupon, a recess ensued.)

11               THE VIDEOGRAPHER:   Back on the record at

12     1626.

13     BY MR. FRAY-WITZER:

14         Q.    Just before we went off the record, you

15     testified about efforts that you say Fusion undertook

16     after receiving the December memo but before

17     BuzzFeed's publication of the dossier to verify

18     allegations against Gubarev, Webzilla and XBT.

19               Specifically which Fusion employees worked

20     on verifying those allegations?

21         A.    I can't recall that, sorry.  I know that



 1 | Glenn did so. I know that Mr. Berkowitz did so. I know

 2 | that Laura Seago did so.  I know that I myself did so.

 3 |     Q.   Before the publication of the --

 4 |          MR. LEVY:  I don't know if he finished his

 5 | answer.

 6 |          MR. FRAY-WITZER:  Oh, I'm sorry.

 7 |          THE WITNESS:  That's what I recall.

 8 | BY MR. FRAY-WITZER:

 9 |     Q.   Before the publication of the dossier what

10 | specific steps did you take to verify the allegations?

11 |     A.   I did some internet searches about XBT,

12 | Webzilla.  We looked in PayServ for various court

13 | documents.

14 |          We looked in --

15 |     Q.   I'm sorry.  I don't want to stop you other

16 | than to say I should clarify the question.

17 |          In this instance I mean you personally.

18 | What steps did you personally take prior to the

19 | publication of the dossier?

20 |     A.   I did some web searching.  We looked in

21 | PayServ, we -- and I shared some of what we saw with



 1  colleagues such as Glenn, such as Laura.  Not a lot

 2  frankly.

 3      Q.   What web searching did you personally

 4  undertake?

 5      A.   I'm sorry.  I can't recall that.

 6      Q.   What PayServ searching did you personally

 7  undertake?

 8      A.   Sorry, I can't recall that either.

 9      Q.   When you say --

10      A.   You're asking about a very specific period

11  of time that's less than a month.

12      Q.   Yes.

13      A.   Including holidays?

14      Q.   Correct.

15      A.   Right.  And, so, what I'm telling you is not

16  a lot.  But enough to find a lot of the documents that

17  I've referenced today.

18      Q.   But you can't tell me any specific web

19  searching that you personally undertook during that

20  period of time?

21          MR. LEVY:  Objection, asked and answered.



```
 1              REPORTER'S CERTIFICATE

 2              District of Columbia

 3              County of Washington, to wit:

 4                  I, KENNETH NORRIS, a Notary Public of

 5     the District of Columbia, County of Washington, do

 6     hereby certify that the within named witness

 7     personally appeared before me at the time and place

 8     herein set out, and after having been duly sworn by

 9     me, according to law, was examined.

10                  I further certify that the examination

11     was recorded stenographically by me and this

12     transcript is a true record of the proceedings.

13                  I further certify that I am not of

14     counsel to any of the parties, nor in any way

15     interested in the outcome of this action.

16                  As witness my hand and notarial seal

17     this 30th day of August 2018.

18

19

20

21
```

