# EXHIBIT 7



# HIVE

MEDIA

# "WE COULD FIGHT THIS THING TO THE END": AS CHRISTOPHER STEELE PREPARES TO BE DEPOSED ABOUT HIS DOSSIER IN LONDON, BUZZFEED GIRDS FOR A LONG STRUGGLE

What did the former British spy believe about some of the details in his now-famous report? Finally, in a Russian tech executive's defamation suit against BuzzFeed, a window into the Russia-collusion murk may open.



**BY JOE POMPEO**

JUNE 4, 2018 11:58 AM

  

READ ARTICLES LEFT VANITY FAIR                    SEEK



Christopher Steele, the former MI6 agent who set-up Orbis Business Intelligence and compiled a dossier on Donald Trump, in London.
By Victoria Jones/PA Images/Getty Images.

"It truly doesn't matter to BuzzFeed's defense whether the story about prostitutes in a Moscow hotel room ends up being true or false." That's **Val Gurvits,** lead counsel on a team of four attorneys representing a Russian technology executive, **Aleksej Gubarev,** who is suing BuzzFeed for defamation. The lawsuit stems from BuzzFeed not initially redacting Gubarev's name when it published **Christopher Steele's** explosive, unverified Russia dossier, the most infamous component of which is an unsubstantiated (and vigorously denied) anecdote about the Kremlin possessing footage of **Donald Trump** watching call girls urinate on a hotel bed where the Obamas once slept. Gurvits and Steele are due to come face to face in three weeks when Steele submits to a deposition. By all accounts, it will be the first time that Steele will talk about the dossier in an official, non-clandestine capacity, something he's tried hard to avoid up to now, and excitement is high that Steele's testimony may provide a key to the all-important, still mysterious Russia-collusion codex.

READ MORE FROM VANITY FAIR                                                    SEEK

**Try *Vanity Fair* and receive a free tote.**
**Join Now ▸**

Gubarev makes a cameo in the second-to-last paragraph of Steele's 35-page compendium of intelligence memos detailing alleged Russian efforts to compromise Trump and sway the 2016 election in his favor. Steele, a former British spy and longtime Russian espionage expert, compiled the dossier on behalf of an American intelligence firm, Fusion GPS, that was retained in 2016 both by a Republican Trump opponent and factions within the Hillary Clinton campaign and the Democratic National Committee. The brief passage at issue in the lawsuit, and pertinent to Steele's upcoming deposition, alleges that XBT Holdings, a somewhat shadowy Web-hosting firm—with subsidiaries including Webzilla—of which Gubarev is the controlling shareholder and a former C.E.O, "had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and 'conduct altering operations' against the Democratic party leadership." According to XBT and Gubarev, the claim is hogwash. They sued BuzzFeed (in the U.S.) and Steele (in the U.K.), despite BuzzFeed apologizing and quickly scrubbing their names.

Publishing the dossier in its raw, unvetted form was a highly controversial editorial decision that blew the lid off of a political thriller for the ages. To some journalistic and political insiders, the dossier and its sometimes salacious contents were well-known from the summer of 2016, though Steele had never intended for it to become public. It's essentially raw work product; he's privately said he believes it is 70 to 90 percent accurate—not exactly the standard a serious news organization aspires to. Gubarev, who declined an interview request, has cast himself as an innocent bystander in all of this. A Web entrepreneur and Russian expat in his late thirties, whose companies have come under scrutiny for alleged Internet piracy, sometimes allegedly involving online pornography, Gubarev claims to have incurred significant reputational and financial harm as a result of being named in the dossier, and the suit is seeking up to a staggering $130 million in financial reparations, in addition to an as yet unspecified amount for Gubarev's "reputational and emotional distress," according to Gurvits. "These are hard to quantify—how much should you get when someone falsely claims you are a K.G.B. spy and a cyber-criminal?" Speaking by phone from his Boston office last week, he added: "We're not damaged by the fact that there's an allegation that Donald Trump colluded with Russia. We are damaged by the false allegations

READ MORE FROM VANITY FAIR                                                                                    SEEK

that my clients are F.S.B. agents who hacked the D.N.C. computers. We're annoyed that we got mixed up in a political fight."

### Watch Now: Rachel Bloom Teaches You Dating Slang



From a First Amendment standpoint, too, the Gubarev suit has considerable sex appeal. It's a case that involves a rich, previously unheard of, Cyprus-dwelling Russian venture capitalist going to war with the great unicorn of American digital media, and doing so in the wake of fellow digital darling Gawker Media's life-ending legal defeat at the hands of **Hulk Hogan** and **Peter Thiel.** But as the two sides gird for battle in a Florida courtroom this November, it's the dossier factor that makes the whole thing so supremely juicy. The trial "could represent the first public airing of an investigation into the veracity of some of the dossier's claims," according to a February report in *Foreign Policy,* which scooped that BuzzFeed had retained an intelligence firm—FTI Consulting, led by a former F.B.I. official, **Anthony Ferrante,** who coordinated the government's response to Russian election interference—that "has been traveling the globe on a secret mission to verify parts of the Trump dossier." That investigation, which BuzzFeed would neither confirm nor deny, is running parallel to **Robert Mueller's** widening special-counsel probe—eyebrow-raising snippets of which continue to leak out in the press with no apparent end in sight.

READ MORE FROM VANITY FAIR                                                                                         SEEK

One presumes Ferrante's team is digging into the dossier's claim that Gubarev was "recruited under duress" by Russian agents. (Gubarev denied this in an interview on January 11, 2017, telling McClatchy he was never threatened or blackmailed—or contacted by U.S. intelligence services, for that matter. "I don't know why I was there," he said, referring to the dossier.) Again, BuzzFeed wouldn't comment on anything pertaining to Ferrante, but a spokesman told me, "We're using every tool to determine the extent of Gubarev's connections to the D.N.C. hack and the Kremlin." (That includes a motion, still pending, to compel the D.N.C. to turn over information BuzzFeed believes could show a link between Gubarev and the hack.)

What makes matters more interesting is that Steele is now being forced to break his silence. The broad strokes of how the 54-year-old spook–turned–independent contractor put the dossier together have been relayed in a series of swashbuckling long-form journalism narratives, including one from the April 2017 issue of *Vanity Fair*. *The New Yorker* published an exhaustive Christopher Steele profile by **Jane Mayer** in March, and a book called *Collusion*, by **Luke Harding** of *The Guardian,* was flying off shelves after its release late last year. These various reports were informed by conversations with sources close to Steele and, one presumes, off the record conversations with Steele himself. He also is known to have furtively briefed several reporters about the dossier ahead of the 2016 election, but he has never apparently spoken about the dossier on the record.



That will change on June 18 when Steele appears for his deposition, which a U.K. judge signed off on two weeks ago. The deposition will take place outside of court, in a London office space rented by the plaintiffs. "We are expecting at least 20 people in the room," said Gurvits. "Lawyers from both sides of the ocean representing Gubarev and BuzzFeed, lawyers representing Steele, lawyers representing the Crown, a stenographer, a videographer, etc. So we had to rent an office in a 'Regus-type' office building large enough to fit everyone." Steele will be videotaped responding to questions submitted in advance by attorneys from both sides, who have been allotted up to seven hours for the grilling. The deposition will not be a public event. But Steele's sworn verbal testimony will be entered into the Florida trial, where

READ MORE FROM VANITY FAIR                                                                 SEEK

it will indeed become a part of the public record. The downside for dossier addicts is that **Sir Robert Jay** of the Royal Court of Justice ruled on May 18 that Steele's questioning be limited to the narrow slice of the dossier pertaining to Gubarev and XBT, thereby dismissing a request from BuzzFeed for Steele to answer questions about the dossier as a whole. (Steele, for his part, had fought being deposed at all. His U.S.-based attorney, **Christina Eikhoff,** declined to comment.)

If BuzzFeed's motion hadn't been denied, according to a member of BuzzFeed's legal team, the Web site's attorneys at Davis Wright Tremaine would have sought information about how the dossier was assembled, straight from the horse's mouth. They would have aimed for Steele to state under oath, for instance, that his unnamed sources were inviolate, or to confirm that Steele believes the dossier is 70 to 90 percent accurate. Such testimony could have bolstered BuzzFeed's central argument that it was justified in publishing the dossier in full not only because it was of immense public interest given the magnitude of the collusion allegations being discussed at the highest levels of government, but because much of the dossier's content has subsequently been corroborated by other news outlets.

A lawyer from the BuzzFeed team declined to discuss what they plan to ask Steele now. But as for Gurvits, who previously lost a motion to compel the revelation of Steele's Gubarev source, he said he will seek to establish that Steele believes the allegations against Gubarev are untrue. Gurvits also will try to undermine Steele's credibility, a seemingly risky move given Steele's sterling reputation in the intelligence world. "I'm sure I can establish in this deposition that he hasn't been to Russia in 17 years," Gurvits told me. "I'm not so sure a guy who hasn't been to Russia in a little south of 20 years is really connected there." (Steele worked in Moscow under diplomatic cover in the early 90s, but it has been too dangerous for him to operate within Russia ever since his undercover status with Britain's MI6 was blown in 1999; he is known to meet with sources outside of Russia, as well as communicating with high-level Russian contacts through intermediaries.) "I'm going to establish that the information about my client was wholly unsolicited," Gurvits continued, "that [Steele] himself doesn't believe it's true, and that he hasn't done anything to vet if it's truthful. . . . We've been very careful to read the books [and articles] published about him. Where else do I know that one of his friends called BuzzFeed a bunch of tossers? I might ask him about that at the deposition." (As I've previously reported, BuzzFeed also is trying to depose former F.B.I. Director **James Comey** and former Director of National Intelligence

READ MORE FROM VANITY FAIR                                                                                          SEEK

**James Clapper** to establish that the dossier was being discussed among top members of the national-security apparatus. That motion is still pending.)

**Kevin Goldberg,** a Washington-based First Amendment attorney with Fletcher, Heald & Hildreth, told me he thinks "there's a lot riding on that deposition because, if true, the fact that BuzzFeed didn't contact Gubarev or anyone at XBT is problematic. Steele's deposition testimony could be relevant not only to the truth or falsity of the allegations but the extent to which BuzzFeed would have been justified in relying on" what Steele wrote in the dossier. "Their level of fault, or lack thereof," said Goldberg, "could come into play if a false and defamatory statement of fact was made. Testimony provided by Steele could be influential as to whether BuzzFeed acted appropriately, because it may show that BuzzFeed had good reason to rely on factual statements he included in the dossier."

Dossier aficionados like Harding will be keenly interested in whatever escapes Steele's lips on June 18, even if they're keeping their expectations low given the limited scope of the deposition and Steele's knack for discretion. "It's highly unlikely that Steele will say anything about his methods or his sources," Harding told me, "and frankly, why should he?" Of the BuzzFeed-Gubarev showdown overall, Harding said, "It's an intriguing scene in a Shakespearean play, but it's not an entire act. When the definitive history of this unhappy epoch is written, this will be a footnote."

I n my interview with Gurvits, he focused on how the prosecution is concerned only with a very small portion of a wide-ranging set of documents. "They're not being sued for what the rest of the dossier said," he told me. "They're being sued because the last memorandum in the very last paragraphs contains several sentences that accuse my client of being an F.S.B. spy who committed crimes against the United States by misusing his computer network. That's really what it says." BuzzFeed's argument is that it made a decision, in the public interest, to publish the dossier as a whole, and therefore has a right to defend the publication of the dossier as a whole. This defense earned some credence last month in a separate but essentially identical defamation case that several Russian businessmen, also named in the dossier, filed against BuzzFeed in New York. That lawsuit is not as far along, but in a May 7 legal filing, the presiding judge acknowledged that the dossier was "part of briefings to President Obama, Vice President Biden and President-Elect Trump on January 6, 2017 and that the Dossier was given to the FBI Director." Therefore, according to this judge, the article with which BuzzFeed published the dossier was one that

READ MORE FROM VANITY FAIR                                                    SEEK

"reported on an issue of national public interest." (On Monday, as this article was going to press, the judge in the Florida case likewise recognized the relevance of these briefings. In a ruling on the application of privileges meant to protect the press when reporting on government activity and matters of public interest, she wrote, "The Court cannot conclude as a matter of law that the Article is other than a fair and true report of an official proceeding. . . . This does not dispose of the case, however, because application of the privilege turns on whether facts essential to its application are undisputed.")

Gurvits told me that as a 53-year-old former asylum seeker who fled the Soviet Union in 1977, he values "the freedoms we enjoy in this country." But he countered that "the responsible journalist would take that document, do the work redacting the things they can't prove, and publish what they can."

There are many journalists who would agree with him, as evidenced by a fiery ethics debate that erupted after the story broke last January. On the one-year anniversary of dossier day, however, BuzzFeed editor-in-chief **Ben Smith** published a *New York Times* op-ed defending the Web site's decision. He wrote that "a year of government inquiries and blockbuster journalism has made clear that the dossier is unquestionably real news. That's a fact that has been tacitly acknowledged even by those who opposed our decision to publish."

I pointed out to Gurvits that there might be a whiff of retaliation around the Gubarev suit, similar to how Thiel bankrolled Hogan's sex-tape jihad against Gawker Media out of an apparent thirst for revenge over negative articles. He pushed back. "The case is not retaliatory," Gurvits said. "My client is still to this day suffering damages from what [BuzzFeed] did. There are banks that have refused to do business with him, banks that closed his account, banks that won't open credit lines for him. Bankers do due diligence the same way you and I would. For a man who is an entrepreneur, who lives and dies by his banking relationships and by his reputation, this is very damaging. So he wants a judgment that says he's been slandered."

Whether or not Gurvits can prove his client was financially wronged to the tune of $130 million is another matter. In a February 28 court appearance, Judge **Ursula Ungaro** questioned Gurvits about the plaintiff's so-called damages report. "So it looks to me like the report just basically says, look, there was a dip in revenues and we're attributing it to the

READ MORE FROM VANITY FAIR                                                                                                                        SEEK

publication of the defamatory article," she said, according to the transcript. "And so we're not saying there was any particular lost revenue, that there was, for instance, a bank that cut us off because of the defamatory article. We're just saying revenues dipped. It must be because of the article. Is that right?" "Yes, Your Honor," Gurvits replied. (When I asked for clarification on this, he told me via e-mail, "Our damages were established by our damages expert, **Jeff Anderson,** whose confidential report was submitted to the court. Mr. Anderson, by the way, was also the damages expert in the Hulk Hogan v. Gawker case, which resulted in a judgment against Gawker for $140 million.")

Let's say Gubarev wins and the judge goes for broke—$130 million isn't just pocket change for BuzzFeed, which missed its $350 million target in 2017, with revenues in the final quarter of the year just north of $100 million for the first time, according to a May 29 staff memo from C.E.O. **Jonah Peretti.** Gawker Media went bankrupt over the $140 million Hogan judgment, but it was a much smaller company that didn't have the resources to duke it out on appeal. Not so with BuzzFeed, which feels optimistic that the case is being adjudicated in federal court in Miami as opposed to state court in St. Petersburg, where Hogan was seemingly able to capitalize on a sort of provincial suspicion of New York-media hot shots. "It's also worth noting," said Goldberg, the First Amendment lawyer, "that Florida has a statute that might come into play and help BuzzFeed, in a worst case scenario, limit damages to actual damages incurred by the plaintiffs, without exposure to more general damages for harm to reputation or the possibility of a massive punitive damage award."

BuzzFeed, for its part, isn't even thinking in those terms. As the spokesman put it, "We're definitely in a position where we could fight this thing to the end."

## DONALD TRUMP

FOLLOW

READ MORE FROM VANITY FAIR                                                                              SEEK

## HILLARY CLINTON

Follow to get the latest news and analysis about the players in your inbox.

[SEE ALL PLAYERS](#)

  

### YOU MIGHT LIKE

**Bohemian Rhapsody: The True Story Behind Freddie Mercury's Relationships**
Vanity Fair


**The 16 Best Dressed Men on the Red Carpet**
Vanity Fair


**READ MORE FROM VANITY FAIR**

SEEK

Riverdale's Mark Consuelos and Skeet Ulrich Teach You Riverdale Slang
Vanity Fair



Bohemian Rhapsody: Freddie Mercury and His Cats, a Love Story
Vanity Fair



"I See Him as a Modern-Day Pablo Escobar": Inside Bill Browder's War Against Putin
Vanity Fair



An Illustrated History of Donald Trump's Hair. Warning! Don't Read Before Lunch!
Vanity Fair



READ MORE FROM VANITY FAIR                                                    SEEK

FOLLOW VF



© 2018 Condé Nast. All rights reserved. Use of and/or registration on any portion of this site constitutes acceptance of our User Agreement (updated 5/28/18) and Privacy Policy and Cookie Statement (updated 5/28/18). Your CA Privacy Rights. The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Condé Nast.

AD CHOICES

READ MORE FROM VANITY FAIR                                                                                           SEEK