**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 17-cv-60426-UU**

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.,

    Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

   Defendants.

_____/

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 1**
**TO PRECLUDE INTRODUCTION OF TESTIMONY**
**OR EVIDENCE CONCERNING METHBOT**

      The popular Yiddish word "chutzpah," defined by Google's online dictionary as "shameless audacity," captures perfectly the essence of Plaintiffs' Motion in Limine No. 1. That is so for two primary reasons. *First,* Plaintiffs are seeking to exclude evidence which is integral to *Plaintiffs' calculation of their own alleged damages*. *Second*, both for purposes of damages and other issues like substantial truth, Plaintiffs' arguments are all premised on the assumption that the Court must accept their own version of the facts about the Methbot scandal: i.e., that they were good guys who were unwittingly victimized by someone else's malfeasance. But the only evidence to support that story is their self-serving testimony, and there is a wealth of circumstantial evidence to the contrary. The evidence therefore clearly presents a jury question as to whether, at the very time of the alleged Democratic hack, Plaintiffs were knowingly involved in, or willfully blind to, a massive botnet operation that was by far their most lucrative stream of business at the time. Plaintiffs' Motion in Limine No. 1 should be denied.

**FACTUAL BACKGROUND**

      The Methbot scandal has been discussed in multiple motions addressing multiple issues in this case – which in and of itself illustrates this motion's lack of merit. *See, e.g.,* Defs. Opp. to Ferrante *Daubert* (Dkts. 275, 297) at 5-6. Nonetheless, because this motion seeks to exclude such evidence entirely, we review the relevant facts below.

A.      <u>The Actual Evidence About Plaintiffs' Involvement in Methbot</u>

As is detailed in the expert report of Anthony Ferrante (Dkt. 248, Ex. 1) (the "Ferrante Report"), on December 20, 2016, the cyber-security firm White Ops released a report detailing what it said was a massive advertising "botnet" fraud being perpetrated by cyber-criminals based in Russia.  *See, e.g.*, Ex. 1; Ferrante Report at 17-22.  The news was widely covered in major media world-wide.  Ex. 2 at 3.  In its report, White Ops also released related technical data, including some IP addresses allegedly involved in the scam.  Ex. 3 (Dvas Dep.) at 186:15-22; Ferrante Report at 18.  Mr. Ferrante found that as the Methbot operation was escalating in the latter part of 2016, **76 percent** of the IP addresses associated with two of XBT's principal subsidiaries – Servers.com and WZ Communications, Inc. (affiliated with Webzilla) – matched those identified by White Ops.  *See* Ferrante Report at 18.

Nick Dvas, an XBT executive, testified that XBT first learned about Methbot because he read the media coverage about the White Ops report, then read the White Ops report itself, and then looked at the IP addresses released by White Ops, and then somehow connected those IP addresses to Plaintiffs.  Ex. 3 (Dvas Dep.) at 185:17-191:2; Ex. 6.  Plaintiffs further testified that *all* of the suspicious IP addresses were being used by a single customer, who they claim was named Alexander Zhukov.  Ex. 3 (Dvas Dep.) at 188:20-189:25.  Zhukov was well-known to Plaintiffs – he was a "big client" who had personally visited them in Cyprus several times.  Ex. 3 (Dvas Dep.) at 191:3-194:22; Ex. 5.  Plaintiffs further claimed that they had no idea Mr. Zhukov might have been engaged in any illicit activity, and acted quickly to terminate his access to their servers.  Ex. 3 (Dvas Dep.) at 191:3-194:25; Ex. 5.

However, apart from e-mail notices evidencing that they appear to have terminated a customer and kept the hard drives (Ex. 3 (Dvas Dep.) at 241:1-244:8), Plaintiffs have not produced a shred of documentary evidence to substantiate *any* of this story.  They claim to have no *internal* communications supporting their testimony about when or how they came to know about Methbot and how they reached the decision to supposedly terminate one particular customer.  Instead, they claim that all such communications just happened to be oral.  Ex. 3 (Dvas Dep.) at 190:1-21.  Yet they produced a significant paper trail of *external* communications with their outside public relations agency in which, for purposes of devising a PR strategy, they tell it the same story they tell here.  *See, e.g.,* Exs. 2, 5-12, 20.

More broadly, there is virtually no paper trail to substantiate almost everything they say about Mr. "Zhukov." That is remarkable given that if he actually existed as a single client, the evidence indicates that he was by far Plaintiffs' largest customer.[1] Yet they never entered into a written contract with "Zhukov," which Gubarev now claims was a "mistake." Ex. 13. Their internal records consist of a credit card check with a "tolerance threshold" of $1,000 and notations regarding multiple Russian names and e-mail addresses they are unable to identify. Ex. 3 (Dvas Dep.) at 245:1-252:19. And though he was supposedly a client for more than a year who personally visited them several times, they have not produced a single actual e-mail, message or other communication from "Zhukov."

Rather, the only paper trail consists of hundreds of pages of invoices which only raise more questions. Webzilla has invoices billed to an "Alexander Zhukov" – with no address or contact information for that supposed customer. *See* Ex. 14.[2] On the other hand, Servers.com produced invoices for hundreds of thousands of dollars that have no customer name at all, just a Gmail.com address (ibettors2@gmail.com), ostensibly in St. Petersburg. *See* Ex. 16. And in November 2016, when the Methbot fraud escalated sharply, Servers.com suddenly began to produce invoices to the "Mintek Group" ostensibly at some snail-mail address in the Seychelles. *See* Ex. 17. XBT claims they made that change because Zhukov "asked" for it. Ex. 15 (XBT 30(b)(6) Dep.) at 142:4-145:5. Yet once again Plaintiffs have not provided a shred of evidence to substantiate that claim, and indeed profess to have no idea whether the "Mintek Group" ever existed or why it would have made sense for such large invoices to suddenly be mailed to the Seychelles.

**B.      Evidence About the Financial Impact of Methbot on Plaintiffs**

The facts also show that the supposed Methbot customer was integral to Plaintiffs' financial performance in 2016, especially for its flagship brand, Servers.com. White Ops reported that the Methbot operation grew gradually from late 2015 through the summer of 2016, and then escalated significantly during the last quarter of 2016. XBT's financial reports show

---

[1] Plaintiffs could not identify any other customer who was leasing more servers. Dvas Dep. at 195:23-195:8. Moreover, at Methbot's peak Mr. "Zhukov" paid Plaintiffs $400,000 a month. Plaintiffs could not identify a single other customer, either then or now, that has ever paid them even half that monthly amount. Ex. 3 (Dvas Dep.) at 30:22-35:23; Ex. 15 (XBT 30(b)(6) Dep.) at 129:5-132:8.

[2] Because Exhibits 14, 16, and 17 are voluminous, Defendants have included only the first page of each.

that its monthly revenues grew in lockstep with the reported Methbot operation; they gradually increased for the first eight months of 2016, and then jumped by 20 percent in September 2016 and continued to increase thereafter.  Moreover, even under Plaintiffs' version of the facts, the "Zhukov" customer's contribution to XBT's bottom line fit a similar pattern and made a substantial impact.  Below is a chart which shows XBT's total consolidated revenues for each month in 2016, and Mr. Zhukov's alleged contribution to those revenues:

| | XBT Consolidated Revenue[3] | Revenue from Zhukov[4] | Zhukov Percentage |
|---|---|---|---|
| Jan. | $2,953,847 | $65,554 | 2.2% |
| Feb. | $2,947,857 | $76,004 | 2.6% |
| March | $3,201,392 | $131,223 | 4.1% |
| April | $3,674,263 | $190,195 | 5.2% |
| May | $3,707,789 | $170,335 | 4.6% |
| June | $3,784,952 | $170,379 | 4.5% |
| July | $4,108,935 | $169,761 | 4.1% |
| Aug. | $4,197,186 | $170,634 | 4.1% |
| Sept. | $5,112,591 | $170,221 | 3.3% |
| Oct. | $5,267,935 | $170,569 | 3.2% |
| Nov. | $5,343,047 | $398,884 | 7.5% |
| Dec.[5] | $5,467,576 | $311,752 | 5.7% |
| TOTAL | $49,727,371 | $2,195,511 | 4.4% |

But even these figures understate how central the revenue from Methbot was to Plaintiffs' overall business strategy in 2016 – including their plans for future growth.  According to Plaintiffs, Zhukov first became a customer in October 2015.  Ex. 19.  That was the very time when XBT began to launch its new brand, called Servers.com, in the United States, Russia and

---

[3] Ex. 18.
[4] Ex. 19.
[5] According to Plaintiffs, Zhukov ceased being a customer on or about December 20, 2016, so this figure is only for two-thirds of December.

elsewhere.  As Dvas later stated, XBT "made a decision to invest heavier in Servers.com infrastructure, since it is way more modern and better built compared to Webzilla."  Ex. 20. Launching Servers.com was also what prompted Plaintiffs to hire outside public relations firms. Ex. 3 (Dvas Depo.) at 46:2-16.  And XBT's financial projections at the end of 2016, which form the basis of its damages theory, focused heavily on Servers.com as the company's engine for future growth.  Ex. 21 at P-G001038-39.

The invoices Plaintiffs produced for Zhukov show that out of the approximately $2.2 million he paid them in 2016, $2 million was paid to Servers.com.  Plaintiffs' individual financial statements for each subsidiary show that the entire "Servers.com" brand – which consisted of five subsidiaries around the world – had $7,539,000 in revenues in 2016.  *See* Ex. 7B to Anderson *Daubert* Motion (Dkts. 249-8, 260-1) at 10, 29, 57, 85, 106.  Thus, Zhukov accounted for **26.4 percent** of the 2016 revenues of XBT's flagship brand.

As the Court is by now aware, XBT's revenues actually increased substantially in 2017, from $49.7 million in 2016 to $58.4 million in 2017.  Nonetheless, its claim for damages is predicated on the assertion that but for the publication of the Dossier, XBT would have made $62.8 million in 2017.  Ex. 22 (Anderson Dep.) at 77:8-21.  Originally, Plaintiffs claimed they would have made $64.2 million in 2017, based on a financial projection made in November 2016 – the very point at which their monthly revenues from Zhukov were approaching $400,000 a month.  Yet as a result of Defendants' conducting discovery about their involvement in Methbot, Plaintiffs lowered those projections – both internally and for purposes of their expert's report – to supposedly account for the loss of the Methbot:

> Q.  Okay. Now for your purposes – and the adjustments you made when you wrote your second report, right, were, number one, you used their updated revenue number? Right?
> A.  Correct.
> Q.  And secondly, you backed out your estimate of revenue from the Methbot customer?
> A.  From the projections.
> Q.  From their [XBT's] 2016 projections?
> A.  Well, their 2017 projection.
> Q.  Yes.
> A.  Done in November of 2016.

Ex. 22 (Anderson Dep.) at 76:3-14.

To say the least, the parties dispute how much Methbot impacted Plaintiffs' bottom line in 2017.  Plaintiffs now claim the impact was about $1.3 million, a figure that seems dubious on

its face.  It is substantially less than "Zhukov" actually contributed in 2016 ($2.2. million), and his contribution was sharply rising each month towards the end of that year.  Indeed, when the scandal broke, Gubarev told Plaintiffs' public relations firm that the impact would likely be "2-2.5 million" or "a few million dollars."  Ex. 5 at 2-3; Ex. 13.

Plaintiffs' expert also admitted that even under his client's version of the facts, he has "no idea" whether other customers might have been involved in the fraud and might have disappeared on their own once news of the Methbot scandal broke.  Ex. 22 (Anderson Dep.) at 122:24-124:22.  Moreover, Plaintiffs claim that as a result of Methbot they instituted more rigorous "know your client" screening procedures going forward – which presumably could have affected their ability to attract new clients.  Ex. 5 at 2.  And perhaps most importantly, even under Plaintiffs' version of the facts, Methbot eliminated overnight more than a quarter of the revenue earned by the brand that was supposed to be XBT's engine for growth in 2017.  In short, as Defendants' expert explained, the data could readily support the conclusion that if there was any "shortfall" in Plaintiffs' 2017 revenues, it was *entirely* attributable to Methbot, rather than the Dossier.  Ex. 4 at 6-7, 17-21, 26-29.

## ARGUMENT

Methbot is unquestionably relevant to this case.  First, it is undisputed that Methbot is directly relevant to Plaintiffs' damages in this case, by their own calculations.  Remarkably, Plaintiffs' motion makes no mention of the fact that (1) their CFO claims to have revised the company's projections to try to account for the loss of Zhukov and (2) their damages expert accordingly revised his expert report specifically to "back out" what Plaintiffs calculated as the revenue attributable to the Methbot customer.  In short, while the Parties dispute the extent of Methbot's impact on Plaintiffs' bottom line, there is no dispute that it had a sufficiently material impact so that it must be factored into any assessment of XBT's alleged damages.  Methbot is therefore directly relevant to both causation of and any amount of damages.

And because the impact of Methbot is integral to Plaintiffs' own business projections, it will be relevant regardless of whether it is Mr. Anderson or someone else who is permitted to testify about alleged damages.  In fact, on the very day Plaintiffs filed this motion *in limine*, they also filed their opposition to Defendants' *Daubert* motion to exclude Mr. Anderson's testimony.  In that filing, they told the Court that the amount of lost revenue attributable to Methbot is "a factual matter of dispute to be presented to the jury."  Dkt. 279 at 8 n.2.  And finally, Plaintiffs'

involvement in Methbot could well have contributed to their alleged damage to their reputation, especially since it was something that was readily discoverable by others in the industry. *Condit v. Dunne*, 225 F.R.D. 100, 110 n.4 (S.D.N.Y. 2004) (plaintiff's previously unreported sexual relationships relevant to mitigation of damages because "both publicly available information and Condit's private actions could have contributed to Condit's alleged reputation damage").

Methbot is also directly relevant to the issue of truth. Importantly, Plaintiffs do not argue in their motion *in limine* that even *if* their involvement in Methbot was something other than innocent, evidence about Methbot should nonetheless be excluded. Rather, they proclaim their innocence, and on that basis argue it is irrelevant and prejudicial. But Plaintiffs' self-serving claim that they "had no way of knowing for what purpose the client was utilizing the leased servers" is hotly disputed. Pl. MIL No. 1 at 3-4. Plaintiffs' testimony to that effect is basically a question of credibility, and there is a wealth of evidence to the contrary.

For example, as Plaintiffs themselves breathlessly emphasize, "**the Methbot White Paper never once mentions or references any of the Plaintiffs,**" nor did the related media coverage. *Id.* at 3 (emphasis in the original). Yet Dvas – who at the time was CEO of Servers.com – purports to have immediately "discovered" that their largest customer was one of the main culprits and implemented a plan of action accordingly, with no internal paper trail to substantiate that story. A more plausible explanation is that Plaintiffs were well aware that at least 26.4% of their flagship brand's business came from an advertising fraud, and so as soon as they saw news coverage about its discovery they acted immediately to try to establish plausible deniability and enact a public relations strategy focused on concealing Servers.com's role in the fraud. Ex. 20 (Dvas e-mails his PR spokesperson, "please, don't be proactive with servers.com mentioning. We want the damage to be limited to Webzilla."). That would also be consistent with the absence of any discoverable communications with their supposed largest customer, the absence of any contract, and invoices e-mailed to Gmail addresses or unknown places in the Seychelles.

In short, Plaintiffs are free to pitch their version of the facts to the jury, but there is clearly a fact question as to whether at exactly the same time the Dossier alleges that "entities affiliated with" Plaintiffs were allegedly using "botnets" aimed at disrupting the 2016 election, their flagship brand allowed Russian nationals to run a massive botnet ring on its servers in exchange for effectively keeping it in business at a critical time. *See e.g., Wells v. Liddy*, 37 F.

App'x 53, 60-61 (4th Cir. 2002) (admitting evidence that there was prostitution in a building with which plaintiff was affiliated because it was circumstantial evidence of substantial truth of allegations that plaintiff was involved in a call-girl ring).

As previously noted, Plaintiffs do not even try to argue that version of the facts would render Methbot irrelevant. Nor could they. The Eleventh Circuit has squarely held that "[i]n an action for defamation or libel … the issue of the plaintiff's reputation and character scarcely can be avoided because the plaintiff typically seeks to recover compensation for damage to his or her reputation." *Schafer v. Time, Inc.*, 142 F.3d 1361, 1370 (11th Cir. 1998). As a result, *Schafer* held that specific instances of misconduct by a plaintiff were admissible in a libel case under Fed. R. Evid. 405(b)). Moreover, Plaintiffs' involvement in Methbot bears a far more direct relationship to the allegedly defamatory statements at issue than did the specific instances of misconduct admitted in *Schafer*. There, the Court permitted cross-examination about matters such as possible parole violations and failure to pay child support, in a case in which the issue was how the plaintiff's photo had mistakenly come to be associated with the bombing of Pan Am Flight 103 over Scotland. *Id*. at 1371-72. *See also Guccione v. Hustler Magazine, Inc*., 800 F.2d 298, 303 (2d Cir.1986) (allowing evidence of public knowledge of plaintiff's prior bad acts on the question of substantial truth and damages).

In sum, Plaintiffs have no basis to preclude discussion of Methbot at trial. Plaintiffs have already conceded that it is relevant to their calculation of damages, and they continue to represent its importance to the Court to this day. Methbot further provides circumstantial evidence that is highly probative of the substantial truth or falsity of the allegations, the reliability of Christopher Steele's information, the credibility of Plaintiffs' witnesses, and Plaintiffs' reputation for purposes of damages. Accordingly, Plaintiffs' motion *in limine* should be denied.

Dated:  November 13, 2018    Respectfully submitted,
             /s/ Katherine M. Bolger
             Katherine M. Bolger
             Nathan Siegel
             Adam Lazier
             Alison Schary
             Davis Wright Tremaine, LLP
             1251 Avenue of the Americas, 21st Floor
             New York, New York 10020
             katebolger@dwt.com

nathansiegel@dwt.com
adamlazier@dwt.com
alisonschary@dwt.com

/s/ Roy Black
Roy Black
Jared Lopez
Black, Srebnick, Kornspan & Stumpf, P.A.
201 So. Biscayne Boulevard
Miami, Florida 33131
rblack@royblack.com
jlopez@royblack.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing, together with its exhibits, will be served electronically by email on all counsel or parties of record on the service list below this 13th day of November, 2018.

By: /s/  Adam Lazier
Adam Lazier

## SERVICE LIST

Matthew Shayefar
Valentin D. Gurvits
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1806
Facsimile: 617-928-1802
matt@bostonlawgroup.com
vgurvits@bostonlawgroup.com

Evan Fray-Witzer
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-000
Facsimile: 617-423-4855
Evan@CFWLegal.com

Brady J. Cobb
Dylan Fulop
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com
dfulop@cobbeddy.com