# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No: 17-cv-60426-UU

---

ALEKSEJ GUBAREV, XBT HOLDINGS S.A.
AND WEBZILLA, INC
                    Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,
                    Defendants.

---

**EXPERT REPORT OF DAVID P. KAPLAN**

**BERKELEY RESEARCH GROUP**
**1800 M STREET, N.W.**
**WASHINGTON, DC  20036**



# TABLE OF CONTENTS

I.     QUALIFICATIONS .................................................................................................. 1

II.    ASSIGNMENT AND SUMMARY OF CONCLUSIONS .................................. 2

III.   ANDERSON'S CALCULATION OF ALLEGED XBT LOST BUSINESS VALUE IS UNRELIABLE ................................................................................... 10

    A.   Use Of Lost Business Value Methodology To Estimate Alleged XBT Damages Is Misplaced And Inappropriate ........................................................ 11

    B.   Anderson Has Not Provided Any Reliable Evidence That XBT Lost Any Actual Sales Caused By The Conduct At Issue ..................................... 15

    C.   XBT's 2017 Revenue Forecast Does Not Provide A Reliable Basis For Anderson's Calculations. .................................................................................. 23

    D.   XBT's 2017 EBITDA Forecast Does Not Provide A Reliable Basis For Anderson's Calculations ................................................................................... 29

    E.   XBT's Actual Performance During 2017 Is Inconsistent With The Damage Analysis Advanced By Anderson ....................................................... 31

    F.   Anderson's Comparable Company Calculation Is Not Reliable ................. 33

IV.   ANDERSON'S SO-CALLED BENEFIT ANALYSIS IS UNRELABLE ...... 37

    A.   Anderson's Benefit Analysis Does Not Represent Any Enhanced Revenues Or Profits Earned By BuzzFeed ...................................................... 37

    B.   Anderson Has Not Produced Evidence That The Number Of Views Used In His Benefit Calculations Necessarily Include Individuals Actually Reviewing The Dossier (Including Reference To XBT) ................... 38

    C.   Anderson's Count Of Views Can Include Individuals Already On The BuzzFeed Website And Regular Readers Of The Website ........................... 40

    D.   Anderson's $1.54 Calculation Does Not Represent What BuzzFeed Pays for Digital Marketing ................................................................................. 42

V.    CONCLUSION ..................................................................................................... 45

## I.    QUALIFICATIONS

1.      I am David P. Kaplan.  I am an economist.  I am an Executive Director and Vice Chairman of the Berkeley Research Group, or "BRG."  BRG is an economic and financial consulting firm with over 1,000 employees and offices both in and outside the United States.

2.      I specialize in the analysis of how changes in various forms of business conduct affect industries, markets, individual firms, and individuals.  In particular, I have analyzed claims for individual firm damages in a large number of matters, including those related to allegations of breach of contract, patent disputes, and claims related to trade secrets, by way of example.  I have testified as an expert economist concerning the issue of claimed damages to an individual firm in a number of matters in both Federal and State Court.  I also have submitted economic expert testimony concerning damage claims in both Federal and State Courts in class action matters involving issues of alleged violations of antitrust laws and breach of contract, by way of example.

3.      I taught Business Statistics in the MBA program at Johns Hopkins University for some 10 years where I regularly lectured on the use of statistical methods to analyze individual firm performance such as data reflecting sales and profits.  I also taught Economics at George Mason University for some 10 years where I regularly lectured on issues associated with how changes in certain behavior, such as implementing changes in prices, by way of example, could affect individual firms and markets.  I also have served as a Guest Lecturer at Columbia University, the University of Utah, and the George Washington University School of Law.

4.      I previously served as an executive of a public company where I would regularly be involved in analyzing issues associated with firm performance such as sales, costs, and

profitability and related issues concerning business valuations. In my current executive position, I also regularly analyze financial data (sales, profits, etc.) concerning firm performance.

5.      I have served as an economic consultant to the Department of Justice, the Federal Trade Commission, and the Senate Judiciary Committee and have spoken before a number of organizations, such as the American Bar Association, including presentations concerning the issue of claimed damages. I also have published a number of articles and co-authored a book concerning economic issues.

6.      I earned a B.A. and a Masters' Degree in Economics from George Washington University. My current vitae is attached as **Exhibit 1**. My hourly rate is $750 an hour.[1]

## II.    ASSIGNMENT AND SUMMARY OF CONCLUSIONS

7.      I was asked to consider two expert reports submitted by Jeff Anderson on February 23, 2018 ("Anderson First Report") and on May 17, 2018 ("Anderson Second Report") and supporting materials. In his reports, Mr. Anderson submitted estimates of claimed damages to XBT Holding S.A. and Webzilla (hereinafter collectively referred to as "XBT")[2] allegedly caused by the publication of the so-called "Dossier" by BuzzFeed on January 10, 2017 and eight so-called "Follow Up Articles" published by BuzzFeed in the five days following January 10, 2017.[3] (I will refer to the publication of the Dossier by BuzzFeed and the so-called "Follow Up Articles" hereinafter as BuzzFeed's conduct at issue.) According to his first report, submitted in

---

[1] I also earned a J.D. degree from George Washington School of Law but I do not practice law and I am offering no legal opinions in this matter.

[2] "XBT" refers to XBT Holdings S.A. and all of its subsidiaries, as Mr. Anderson referred to XBT. (Anderson First Report, at p. 2.) This analysis does not purport to address whether, as a legal matter, XBT may recover any damages alleged to have been incurred by its subsidiaries.

[3] Anderson Second Report, at pp. 4-7. <u>See also</u> Anderson Dep. Ex. 13. My discussions of BuzzFeed herein are intended to also refer to Ben Smith.

February, Mr. Anderson estimated that XBT's lost business value (with business value defined

as the "fair market value" a third party would pay to purchase XBT) allegedly caused by

BuzzFeed's conduct at issue ranged from a low of approximately $48.5 million to a high of

$156.1 million and that BuzzFeed had enjoyed an "unjust enrichment" from the conduct at issue

measured by Mr. Anderson at $14.0 million.[4]  In his second report, submitted on May 17, 2018,

a few months later, the claimed lost business value claim advanced by Mr. Anderson had been

reduced to a low of $32.3 million (a reduction of $16.3 million) and a high of $137.6 million (a

reduction of $18.5 million) and he calculated an alleged "benefit" to BuzzFeed associated with

the conduct at issue at roughly $13.9 million.[5]

        8.      Mr. Anderson's estimate of XBT's alleged lost business value involves a number

of steps.[6]  First, he presented data reflecting XBT's actual reported revenue for 2017 ($58.3

million) and XBT's actual EBITDA margin (earnings before interest, taxes, depreciation, and

amortization) for 2016 of 42.0 percent.[7]  Second, based on an XBT November 2016 Business

Plan (after an attempt to remove sales of one customer terminated by XBT in December 2016 for

engaging in allegedly fraudulent behavior) Mr. Anderson determined that XBT forecasted 2017

sales to be $62.8 million and forecasted that its EBITDA margin for 2017 would be 51.9

percent.[8]  Next, Mr. Anderson took XBT's 2017 forecasted sales ($62.8 million) and multiplied

this figure by XBT's actual 2016 EBITDA margin (42.0 percent) to arrive at XBT's so-called

---

[4] Anderson First Report, at pp. 1-4 and 13.  See also Anderson Dep. Tr. at 58.
[5] Anderson Second Report, at pp 1-4.
[6] I address the issue of alleged lost business value because that is the measure of damages contained in Mr. Anderson's report.  This analysis does not purport to address whether lost business value is a legally permissible measure of damages in this case.
[7] Id., at pp 7-12.  The 2017 revenue figures used by Mr. Anderson are based on unaudited figures which could change. (Anderson Dep. Tr. at 70-71 and 73.)
[8] Anderson Second Report, at pp. 7-12.

but-for EBITDA of $26.4 million for 2017.[9]  He also multiplied this same 2017 revenue estimate

($62.8 million) times XBT's forecasted 2017 EBITDA margin (51.9 percent) to arrive at a

higher-end estimate of XBT's 2017 but-for EBITDA of $32.6 million.[10]  Mr. Anderson then

calculated XBT's so-called "as-is" 2017 EBITDA by taking reported actual 2017 XBT sales

($58.3 million) and multiplying this figure by XBT's 2016 EBITDA margin of 42.0 percent to

arrive at "as-is" XBT's 2017 EBITDA of $24.5 million.[11]  Mr. Anderson then multiplied all three

estimates of XBT's 2017 EBITDA ($26.4 million, $32.6 million, and $24.5 million) by 17 based

on what he advances as an average calculation of the "multiple" between EBITDA earned by six

so-called "comparable" companies to XBT and their reported business valuation.[12]  These

calculations, according to Mr. Anderson, generate an alleged but-for business value for XBT of

$447.7 million when using XBT's alleged but-for 2017 EBITDA using a 42.0 percent margin (17

times $26.4 million) and $553.0 million using a 51.9 percent EBITDA margin (17 times $32.6

million).[13]  These calculations, according to Mr. Anderson, assume the conduct at issue had not

taken place and reflect the purported business value of XBT as of January 1, 2018.[14]  From these

two figures, Mr. Anderson then subtracted what Mr. Anderson calculates as XBT's purported as-

is business value in as of January 1, 2018 of $415.4 million (17 times $24.5 million), or the

purported business value of XBT taking into consideration the conduct at issue, to arrive at

alleged XBT lost business value estimated to range between $32.3 million ($447.7 million minus

$415.4 million) and $137.6 million ($553.0 minus $415.4).[15]

---

[9] Id.
[10] Id.
[11] Id.
[12] Id.
[13] Id.
[14] Id., at p. 2. See also Anderson Dep. Tr. at 59-60.
[15] Anderson Second Report, at pp. 7-12.  Mr. Anderson testified that he was not estimating any alleged damages, if any, suffered by Aleksej Gubarev. (Anderson Dep. Tr. at 10-11.)

9.     To calculate the alleged benefit to BuzzFeed associated with the conduct at issue, Mr. Anderson first calculates that the BuzzFeed articles at issue were "viewed" 8,988,432 times.[16]  Mr. Anderson then sets out to calculate what it would have cost BuzzFeed to "generate an equivalent amount of traffic via a targeted digital marketing campaign."[17]  To generate this estimate, Mr. Anderson relied on data published by a firm called Semrush and Mr. Anderson calculated that it would cost BuzzFeed $1.54 per "click" (or so-called cost per click or "CPC") to generate the same amount of "traffic" to its website.[18]  He then calculated the alleged benefit to BuzzFeed associated with the conduct at issue as $13.9 million ($1.54 times 8,988,432).[19]

10.     Based on my review of Mr. Anderson's work product, his deposition, depositions of other individuals, documents produced in the litigation, and publicly available materials, in addition to my background and experience, I have reached the following conclusions (the materials I considered are identified in **Exhibit 2**):

### Use Of Lost Business Valuation Methodology

a.   Mr. Anderson's use of a lost business value methodology is based on the mistaken conclusion that claimed lost sales and profits necessarily result in a diminution in business value.  But business value is based on expectations of future sales and profits and if any lost sales and profitability suffered by XBT allegedly caused by the conduct at issue were only temporary in nature or expected to be temporary, then Mr. Anderson has no reliable basis by which to conclude that XBT necessarily suffered a diminution in business value caused by the conduct at issue.  Mr. Anderson has not established that if XBT lost sales and profits during 2017 caused by the conduct at issue, that any such loss was not temporary in nature or expected to be temporary in nature.

b.   In fact, Mr. Anderson testified that his business value calculations were conducted as of January 1, 2018 and his calculations could be different if he

---

[16] Anderson Second Report, at pp. 13-15.
[17] Id.
[18] Id.
[19] Id.

chose a different date because business valuations change due to changes in market conditions and he does not know what XBT's business value is today.

c. When considering possible sales lost by XBT allegedly caused by the conduct at issue, it also should be noted that an XBT executive testified that if XBT loses customers that newly created XBT server availability associated with any such loss is then available to potential new customers. In fact, the same XBT executive testified that XBT can "recover" from losing any particular customer by deploying the newly available server capacity to other customers within five or six months.

## Causation

d. Mr. Anderson has not presented any reliable evidence that XBT actually lost any sales attributed to the conduct at issue. He conducted no independent investigation of this issue and could not identify a single lost customer attributable to the conduct at issue.

e. XBT's monthly revenues may have been lower in the first part of 2017 than they were in the latter part of 2016 for reasons unrelated to the conduct at issue and Mr. Anderson has not conducted any independent analysis to separate the impact of such factors from the alleged effect of the conduct at issue.

f. XBT's monthly revenues may have been significantly affected during 2017 because it terminated a significant customer in December 2016 for engaging in alleged fraudulent behavior while using XBT servers or what has been identified as the MethBot fraud. Mr. Anderson testified that he did not know if the particular customer terminated by XBT in December 2016 related to the MethBot issue was the only customer involved in the so-called MethBot conduct or, if as the result of the MethBot conduct, XBT changed its procedures in such a way that may have diminished the number of new clients it retained during 2017 (changes that XBT did, in fact, adopt according to an XBT executive.) XBT's revenues also may have been impacted by publicity associated with its involvement in the so-called MethBot fraud.

g. I understand that XBT also has sued Christopher Steele and Orbis Business Intelligence for alleged "defamatory actions" and claimed in an Interrogatory Response that XBT's alleged lost sales during 2017 were attributable to both the actions of BuzzFeed _and_ those of Mr. Steele and Orbis Business Intelligence. In an Interrogatory Response, XBT also represented that claimed damages due to these allegedly lost 2017 sales had to be "apportioned" between conduct by BuzzFeed and those by Mr. Steele and Orbis Business Intelligence. Indeed, in this Interrogatory Response, plaintiffs claim that they are not "seek[ing] to hold BuzzFeed responsible for damages it suffered as an

account of the actions and omissions of Christopher Steele and Orbis Business Intelligence." Mr. Anderson has provided no such apportionment.

### Reliance On XBT's 2017 Revenue Forecast

h.   Mr. Anderson's entire lost business value damage estimates, ranging from a low of $32.3 million to the high of $137.6 million, are entirely predicated on concluding that XBT's forecasted 2017 revenue of $62.8 million is reliable and higher than XBT actual 2017 revenue reported of $58.3 million. But Mr. Anderson conducted no independent market analysis to test the reliability of XBT's 2017 revenue forecast.

i.   Mr. Anderson's reliance on XBT's 2017 forecasted revenue of $62.8 million is misplaced because XBT overstated its forecasted revenue estimates by many millions of dollars in prior years.

j.   Mr. Anderson's reliance on XBT's forecasted revenue also is unreliable because of how the forecast was adjusted for XBT's termination of a customer involved in the so-called MethBot fraud. In November 2016, XBT originally forecast its 2017 revenue to be $64.2 million. This estimate was subsequently reduced by Mr. Anderson to $62.8 million (a reduction of roughly $1.4 million) because XBT terminated a significant customer in December 2016 for allegedly engaging in the so-called MethBot fraud. However, neither XBT nor Mr. Anderson has presented any reliable evidence of how the loss of this customer specifically may have adversely affected XBT's forecasted sales during 2017. Importantly, Mr. Anderson presented no independent analysis of XBT's performance in 2017 in any attempt to rigorously test how XBT's sales might have been affected during 2017 due to the loss of this customer.

k.   Mr. Anderson's reliance on XBT's 2017 forecasted revenues in his calculations also is unreliable because XBT's 2017 revenue projection was based on the assumption that XBT sales, which were increasing in the latter half of 2016, particularly beginning in September 2016 and continuing until December 2016, according to an XBT executive's testimony, would continue throughout 2017. However, neither Mr. Anderson nor executives of XBT could explain why XBT's sales increased in September 2016 and never presented any reliable economic evidence that whatever explained this increase in sales was necessarily going to continue to cause XBT's sales to increase during 2017.

### Reliance On XBT 2017 EBITDA Forecast

l.   Mr. Anderson's reliance on XBT's forecasted 2017 EBITDA margin of 51.9 percent in his calculations is equally unreliable. In prior years, XBT's estimates of its EBITDA margins were substantially overstated. Again, Mr.

Anderson presented no independent investigation to test the reliability of XBT's estimated 2017 EBITDA margin.

m. In this regard, it should be noted that XBT was forecasting that in 2017 its revenue would increase by roughly $13.1 million (from $49.7 million in 2016 to $62.8 million in 2017) and its' EBITDA by some $11.7 million (from $20.9 million in 2016 to $32.6 million in 2017). Mr. Anderson does not present any independent basis that would allow one to reliably conclude that XBT could convert some 89 cents for each dollar in forecasted increased revenue ($11.7 million divided by $13.1 million) into profits (measured by EBITDA) other than being told by an XBT representative that such an achievement was possible.

## XBT Actual 2017 Performance

n. Despite the conduct at issue, XBT's sales increased substantially during 2017 compared to 2016 and prior years. During 2016, XBT's sales, including the customer terminated by XBT for engaging in alleged fraud, were $49.7 million and they increased to $58.3 million in 2017 (an increase of $8.6 million). If the customer engaged in the alleged fraud is removed from XBT's 2016 sales, its sales increase in 2017 was $10.8 million ($58.3 million minus $47.5 million) or more than any other yearly change in XBT's nominal sales from 2011 to 2016.

o. In fact, XBT's sales in each month during 2017 were higher than each comparable month in 2016.

p. This empirical evidence is inconsistent with any claim that XBT suffered the diminution in business value advanced by Mr. Anderson. It also is inconsistent with Mr. Anderson's calculations that base a claimed loss of business value ranging from $32.3 million to $137.6 million on a purported loss of revenue by XBT in 2017 of $4.5 million.

## Use Of Comparable Companies

q. Mr. Anderson's reliance on six specific companies to calculate his "comparable" EBITDA multiple of 17 is not reliable. The companies selected by Mr. Anderson were included in a study performed during 2013, some five years ago. Mr. Anderson conducted no rigorous examination to establish that these same companies were sufficiently comparable to XBT on January 1, 2018 to use in his multiple calculations.

r. In a November 2016 Business Plan, in fact, XBT identified four firms as direct competitors to XBT, only one of which (Rackspace) was consistent with the six identified in 2013 (and Rackspace had a so-called multiple of seven compared to the 17 used by Mr. Anderson in his calculations.)

Moreover, XBT executives did not identify any of these six companies as competitive with XBT in their deposition testimony and specifically rejected any number of the six as being competitors to XBT.

s.   Mr. Anderson also did not apply a discount to his calculated multiple due to lack of "marketability" related to XBT because it is a private company as opposed to a public company, a specific discount included in the same 2013 study relied on by Mr. Anderson.

### Alleged Benefit To BuzzFeed

t.   Mr. Anderson's benefit analysis does not represent any calculation of increased revenues or profits earned by BuzzFeed associated with the conduct at issue, including any alleged increased benefit to BuzzFeed directly attributable to the specific mention of XBT or Webzilla (or Mr. Gubarev) in the Dossier.

u.   Mr. Anderson also testified at his deposition that his benefit calculations assume that each relevant view included in his calculations included a specific review of the Dossier, including a review of the content related to XBT. However, Mr. Anderson did not present evidence that would support the conclusion that these assumptions were true. When confronted at his deposition with the possibility that these two assumptions were not true, Mr. Anderson testified that if these two assumptions were not true he would have to "reassess" his so-called benefit analysis and "adjust his analysis accordingly."

v.   Mr. Anderson then changed his testimony and explained that his calculation includes so-called views "regardless" of whether the individuals "read all, part, or none of the entire dossier." In other words, Mr. Anderson is now advancing a claim of a benefit to BuzzFeed even if no individual actually read the Dossier itself, including any reference to XBT. In fact, Mr. Anderson's calculations of views can include individuals that reviewed the Dossier after the plaintiffs' names were removed by BuzzFeed in February 2017.

w.   Mr. Anderson's calculation of views, according to his testimony, can also include individuals that were already on the BuzzFeed website and Mr. Anderson does not provide any reasonable explanation as to why BuzzFeed would pay for an advertising campaign to drive individuals to visit its website when those individuals were already on its website. Similarly, his calculation of views can include individuals that were regular users of the BuzzFeed website and Mr. Anderson again does not adequately explain why BuzzFeed would pay such individuals to view its website.

x.   Mr. Anderson claims that his benefit analysis represents what it would cost BuzzFeed to "generate an equivalent amount of traffic via a targeted digital

marketing campaign." However, the $1.54 used by Mr. Anderson in his benefit calculation, as I understand his analysis, does <u>not</u> represent what BuzzFeed pays to have individuals visit its website through the use of advertisements that are generated on search engines like Google. Rather, it represents (assuming the data are reliable) what other third parties paid search engines like Google during January 2017 when an advertisement was "clicked" on when a certain word (or so-called keyword) was searched by that individual. (A figure that is then adjusted by Mr. Anderson by the amount of "traffic driven" to BuzzFeed's website for each of the relevant keywords.)

y. Mr. Anderson has not established, however, that what third parties pay for such advertisements when certain keywords are searched (and the relevant advertisement is clicked upon) is necessarily representative of what BuzzFeed would pay to generate traffic to its website as part of any "targeted digital marketing campaign." In fact, as best I understand Mr. Anderson's analysis, the use of the keywords that are included in his calculation of the $1.54 generate traffic to the BuzzFeed website without BuzzFeed having to pay anything to generate this traffic by use of any advertisement.

z. Mr. Anderson has simply not established that as part of any "targeted digital marketing campaign" that BuzzFeed would pay $1.54 for an individual "view." Indeed, Mr. Anderson has not presented any reliable evidence that if BuzzFeed wanted to increase traffic to its website it would adopt the type of "digital marketing campaign" that is the focus of his benefit analysis.[20]

11. Below I discuss these issues in more detail. It should be noted that I reserve the right to modify or amend these opinions based on any new information that might become available to me.

## III. ANDERSON'S CALCULATION OF ALLEGED XBT LOST BUSINESS VALUE IS UNRELIABLE

12. Mr. Anderson's calculation of alleged XBT lost business value purportedly caused by the BuzzFeed conduct at issue is unreliable for the reasons discussed below.

---

[20] It also should be noted that if BuzzFeed's publication of the Dossier is legally permitted, then Mr. Anderson's calculations are moot and irrelevant. Mr. Anderson's calculations also would be moot and irrelevant if the statements concerning XBT in the Dossier were not false.

**A.** **Use Of Lost Business Value Methodology To Estimate Alleged XBT Damages Is Misplaced And Inappropriate**

13.     Mr. Anderson claims in his report that "if not for the publication of the Defamatory Articles, XBT's business value today likely would be substantially higher than where it currently stands."[21]  (Here, Mr. Anderson is defining business value as what a third party would pay to buy XBT measured by the fair market value of the company.)[22]  To estimate this alleged diminution in business value, as discussed above, Mr. Anderson focuses on a claimed diminution in XBT's performance measured in sales and profits (measured by EBITDA) during 2017 compared to forecasted levels of XBT performance for 2017.  Mr. Anderson then multiplies the purported diminution by 17 (based on the relationship presented by Mr. Anderson between EBITDA and business value for six allegedly comparable companies to XBT) to arrive at claimed XBT lost business value damages measured by Mr. Anderson.  The lost business value methodology advanced by Mr. Anderson that supports these estimates of alleged damages is misplaced and inappropriate here for a number of reasons.[23]

14.     First, it is predicated on the unsupported assumption that XBT did not or could not recover any purported lost sales attributed to the conduct at issue during 2017 or thereafter. Mr. Anderson concludes that because XBT allegedly experienced a "decline" in "revenue and associated earnings" during 2017 purportedly as a result of the conduct at issue that XBT necessarily experienced "decline" in business value.[24]  But Mr. Anderson is wrong when he concludes that XBT necessarily suffered a decline in business value because it allegedly suffered

---

[21] Anderson Second Report, at p. 7.
[22] Anderson Dep. Tr. at 58.
[23] It should be noted that it is not even obvious that Mr. Anderson actually decided to advance this theory of damage independently or whether it was suggested to him by counsel. (Id., at 61.)
[24] Id., at 57-58.

a decline in performance during 2017 purportedly attributed to the conduct at issue, measured by Mr. Anderson as a decline in revenue and profitability.  Business valuation is based on expectations of future sales and profitability.  If XBT's claimed lost sales and profits were only temporary in nature or expected to be temporary in nature, then Mr. Anderson has no reliable basis upon which to conclude that XBT would have necessarily suffered an actual diminution in business value associated with the conduct at issue.  Mr. Anderson testified that his lost business value calculations, based on XBT's claimed "shortfall" during 2017, only "assumes" that as of January 1, 2018 claimed diminished 2017 revenues have not been "made" up but he does not know ("I don't know") what is going to "happen" to XBT's performance beyond the first day of 2018.[25]

15.     In this regard, it should be noted that a senior XBT executive (Mr. Mishra) testified that a lost XBT customer could be replaced within some five to six months.[26]  He testified that XBT can "recover" from the financial impact of lost customers by gaining new customers.[27]  Indeed, as discussed more below, Mr. Anderson, based on Mr. Mishra's testimony, adjusted XBT's forecasted 2017 sales downward for only a six month period for a customer terminated by XBT in December 2016 based on the premise that this customer would be replaced by other customers within no longer than six months.[28]  XBT also submitted an Interrogatory Response consistent with the conclusion that XBT's monthly revenues beginning in August 2017 exceeded the highest 2016 monthly sales level established in December 2016.[29]

---

[25] Id., at 78.

[26] Mishra Dep. Tr. at 20 and 142-144.

[27] Id., at 142-144.

[28] Anderson Second Report, at pp. 10-11 and ft. 29.

[29] Plaintiff XBT Holding S.A.'s Supplemental Responses To Defendants' First Set Of Interrogatories, Response to Interrogatory Number 10 ("XBT Interrogatory Response").  It should be noted in this regard that the calculations included by XBT in this Interrogatory Response reflect over $300,000 in revenue in December 2016 for a customer terminated by XBT during this month for allegedly engaging in fraudulent behavior. (Mishra Dep. Tr. at 138-145;

16.     With respect to this issue, I also compared XBT's reported 2017 actual monthly revenue figures (figures that could change because they are not audited figures according to Mr. Anderson)[30] to the monthly revenue figures that are generated when XBT 2017 forecasted revenue figures used by Mr. Anderson in his lost business value calculations ($62.8 million) are divided by 12 to arrive at an implied average monthly revenue number for XBT during 2017. This calculation generates an average monthly sales figure of $5.2 million or $62.8 million divided by 12.  As illustrated in **Exhibit 3**, by July 2017**,** using these figures, XBT's reported actual monthly sales exceeded forecasted monthly sales.

17.     In an attempt to reflect the difference between XBT's reported actual 2017 sales (Anderson defines as "as-is revenues") and those XBT revenues during 2017 that would have allegedly been generated but for the conduct at issue, Mr. Anderson presents his Figure 3.[31] (This is attached here as **Exhibit 4**.)  As presented by Mr. Anderson, the purpose of this Figure is to illustrate that reported XBT actual 2017 revenues never "catch up" to so-called 2017 but-for revenues for each month of 2017 and it is at least implied that this difference continues beyond 2017.  This figure is highly misleading.  As discussed above, XBT itself in an Interrogatory Response conceded that XBT's actual revenues during 2017 exceeded December 2016 XBT revenues (even including in the calculation a customer terminated by XBT for participating in allegedly fraudulent behavior in December 2016) by August 2017.  Moreover, as illustrated in **Exhibit 3**, and as discussed above, XBT's reported actual 2017 monthly sales by July 2017 exceeded the average monthly sales figure ($5.2 million) implied by the XBT forecasted 2017

---

and Anderson Second Report Document Number 10.)  If these sales were removed from XBT's December 2016 revenue figures, then XBT's monthly sales in 2017 were higher than those in December 2016 by July 2017 not August according to data included in this Interrogatory Response.
[30] Anderson Dep. Tr. at 70-71 and 73.
[31] Anderson Second Report, at p. 9.

revenue ($62.8 million), a figure that serves as the foundation for Mr. Anderson's lost business value calculations. To further illustrate this point, I redrew Mr. Anderson's Figure 3 to reflect the figures represented in my **Exhibit 3**. This Figure is attached as **Exhibit 5**. Like **Exhibit 3**, these data reflect that XBT's reported actual 2017 monthly sales exceeded the average monthly sales figure implied by XBT's 2017 forecasted revenue by July 2017.

18.     The unreliability of Mr. Anderson's use of a claimed lost business valuation method to estimate claimed damages here also is illustrated by an additional point. Mr. Anderson represented that but for the conduct at issue XBT's business value "today would be substantially higher than where it currently stands."[32] But at his deposition, Mr. Anderson admitted that this claim was not accurate. He testified that his estimation of XBT's alleged lost business valuation was conducted as of January 1, 2018 because that was around the time he was retained in this matter.[33] He admitted that he does not know what the business value of XBT is today ("I don't know") and if he had been retained on June 30, 2018 the XBT business valuation could be different than what he calculated as of January 1, 2018.[34] In this regard, he also agreed that what a company might pay for a firm such as XBT can change over time based on developments in the interim.[35] In other words, according to Mr. Anderson's own testimony, one cannot be confident that XBT's business value would be any different today but for the conduct at issue.

19.     It also should be emphasized that, to the best of my knowledge, at no point has XBT attempted to sell the company to a third party subsequent to the publication of the Dossier

---

[32] Id., at p. 7.
[33] Anderson Dep. Tr. at 59-60.
[34] Id.
[35] Id.

(or create liquidity by any other mechanism). In other words, XBT did not actually suffer any diminished value measured by an actual diminution in funds paid for the company that can be attributed to the conduct at issue.

20.     One final point with respect to this issue. Mr. Anderson's estimates of alleged XBT lost business value, ranging from a low of $32.3 million to a high of $137.6 million, are, in the first instance, based on the claim that XBT's reported actual sales in 2017 ($58.3 million) were less than XBT's forecasted 2017 sales ($62.8 million) or a difference of $4.5 million.[36] In other words, even before adjusting purported lost sales for any associated lost profit, Mr. Anderson's lost business value methodology translates claimed lost sales of $4.5 million by XBT during 2017 to alleged damages ranging from $32.3 million to $137.6 million. These data are reflected in **Exhibit 6**.

**B.     Anderson Has Not Provided Any Reliable Evidence That XBT Lost Any Actual Sales Caused By The Conduct At Issue**

21.     Mr. Anderson has not provided any reliable evidence that XBT lost any actual sales caused by the conduct at issue. In fact, he conducted no independent investigation of this issue beyond noting that XBT's monthly sales were lower in the beginning of 2017 than they were at the end of 2016 and that the Dossier was published on January 10, 2017. Mr. Anderson testified that as part of his work he "assum[ed]" that publication of the Dossier was "the reason for the decline" in XBT's performance in the first part of 2017 and when asked the basis for that assumption he testified it was based on "discussions with counsel, again the timing of the event, time of the release of the dossier and the subsequent decline in revenue and earnings" but he did

---

[36] Anderson Second Report, at pp. 11-12.

not identify any other specific market factors that support his assumption.[37]  Mr. Anderson has simply not rigorously investigated the possibility that XBT's monthly revenues may have been lower in the first part of 2017 as compared to the last part of 2016 due to factors unrelated to the conduct at issue or attempted to isolate any reduction in revenues attributed to the conduct at issue as opposed to other reasons.  For example, he presents no specific analysis of XBT's pricing policies or specific activities taken by XBT's competitors that could have adversely affected XBT's sales during the early months of 2017.

22.     In this regard, it should be emphasized that Mr. Anderson, despite claiming in his report that the conduct at issue drove "away many" XBT customers, could not identify even one specific customer that XBT lost because of the conduct at issue.  He testified:

> Q.  Okay.  And again just to reiterate, you have not actually drilled down to look at a single example of an individual customer who allegedly cancelled or didn't become a customer as a result of the publication?  Right?
>
> A.  I have not seen that.[38]

23.     I also noted that certain XBT executives could not identify any specific customers lost by XBT caused by the conduct at issue.  For example, Mr. Mishra, XBT's Chief Financial Officer, could not identify any such customers.[39]  The current Chief Executive Officer of XBT, Mr. Dvas, also could not identify any specific customers lost due to the conduct at issue.[40]

---

[37] Anderson Dep. Tr. at 131-133.
[38] Id., at 20, 25, and 148-149; and Anderson Second Report, at pp. 6-7.
[39] Mishra Dep. Tr. at 20 and 183-185.
[40] Dvas Dep. Tr. at 21 and 300.  See also Goederich Dep. Tr. at 245-246.

Aleksej Gubarev, former Chief Executive Officer of XBT, also did not identify any specific lost customer attributable to the conduct at issue as best I understand his testimony.[41]

24.     Available evidence does establish that XBT's sales may well have declined in 2017 for reasons unrelated to the conduct at issue.  On December 21, 2016 XBT discovered that one of its customers, Aleksander Zhukov, was allegedly engaged in what has been called the MethBot fraud (concerning advertising) after White Ops published a report concerning the alleged fraud and made available a list of IP addresses purportedly involved in the conduct.[42] After being informed of this alleged conduct, XBT terminated this customer immediately according to XBT executives.[43]  (An article cited in an internal XBT email apparently described the MethBot fraud as "the biggest ad fraud ever.")[44]  Mr. Gubarev testified, for example, that XBT "shut down" this customer "immediately" upon learning about its alleged participation in the fraudulent behavior in December 2016.[45]  The loss of this customer in December 2016, a loss unrelated to the conduct at issue, could have obviously caused XBT to lose revenues in 2017.

25.     The possible loss of revenues attributable to this customer could have been substantial.  According to one internal XBT email, it was projected that XBT could lose revenues in "the low millions of dollars" because this customer was terminated.[46]  According to data produced by Mr. Anderson, revenues generated by XBT attributable to this customer were, in fact, $2.3 million during 2016.[47]  According to these same data, revenues generated by this

---

[41] Gubarev Dep. Tr. at 27-28, 195-197 and 249.  Mr. Gubarev did identify one customer (Propeller Ads) who apparently, according to Mr. Gubarev's testimony, decided to "freeze" an "extension" with XBT subsequent to January 10, 2017 (Id., at 193-194.)

[42] Gubarev Dep. Tr. at 173-175; "The Methbot Operation," White Ops, December 20, 2016.

[43] Mishra Dep. Tr. at 138-145; Gubarev Dep. Tr. at 173-175 and 188-192; and Bezruchenko Dep. Tr. at 89-90.  See also Dvas Dep. Ex. 61.

[44] Gubarev Dep. Tr. at 174-175; and Gubarev Dep. Ex. MB-1.

[45] Id., at 173-175.

[46] Id., at 188; and Dvas Dep. Tr. at 211.  See also P-P001536-539; and P-P001530-531.

[47] Anderson Second Report Document 10; and Anderson Second Report, at pp. 10-11 and ft. 29.

customer increased from $170,569 in October 2016 to $398,884 in November 2016 and for

approximately the first 21 days in December 2016, XBT generated $311,752 in revenue from

this customer (or a run rate for December of $460,205 if the average revenue per day attributable

to this customer, $14,845, is extended for the entire month of December).[48]  Mr. Anderson

testified that this one customer represented approximately seven percent of XBT's total revenue

in November 2016.[49]

26.      The precise amount of XBT 2017 revenue possibly lost because this customer was

terminated is not known.  XBT executives testified that they actually do not know how much

revenue XBT lost in 2017 because it terminated Mr. Zhukov.  Mr. Mishra testified that he did not

"know" how much money XBT lost as a result of terminating this customer in December 2016.[50]

Mr. Dvas, currently the Chief Executive Officer of XBT, also testified he did not know how

much money XBT lost as a result of terminating Mr. Zhukov ("I don't know").[51]

27.      In addition to the loss of this customer associated with the MethBot fraud, Mr.

Anderson has not reliably established that XBT did not lose any other revenues because of its

association with the alleged fraudulent behavior.  Indeed, Mr. Anderson testified that he had "no

idea" ("I don't know") if XBT lost other customers associated with the MethBot alleged fraud,

---

[48] Id.  The $14,845 revenue per day calculation is arrived at by dividing reported December 2016 revenue generated by XBT for this customer ($311,752) by 21 days.  This figure is then multiplied by 31, the total number of days in December, to arrive at $460,205.  If the customer was terminated on December 22, using this same methodology, the estimated December 2016 revenue generated by this customer would equal $439,287.  These calculations assume that revenues earned by XBT associated with this customer could be attributed to the number of days that the customers made use of XBT servers during December 2016, that the customer would have continued to use the XBT servers for the remainder of December, and would pay for those days it did make use of the servers during December at the same daily rate as calculated before the customer was terminated.

[49] Anderson Dep. Tr. at 122.

[50] Mishra Dep. Tr. at 142-145.

[51] Dvas Dep. Tr. at 21 and 211.  In this regard, I noted that Mr. Anderson testified that he did not know what happened to the XBT servers during 2017 that were being used by Mr. Zhukov. (Anderson Dep. Tr. at 33, 46, and 52.)  Mr. Dvas testified that some of the XBT servers used by Mr. Zhukov were leased to other customers but some were not. (Dvas Dep. Tr. at 238-239.  See also Mishra Dep. Tr. at 144-146.)

including whether other XBT customers, like Mr. Zhukov, were involved in the alleged fraudulent behavior.[52]

28.     XBT also expressed concern that if XBT's involvement with this alleged fraud became public it could harm XBT's "reputation" and, as a result, possibly cause a loss of additional customers.[53]  Mr. Anderson testified, however, that the possibility of additional lost XBT customers associated with such adverse publicity was a "nonissue" because there were no "indications" or any "reports" available to the public that XBT servers (including servers operated by Webzilla and Servers.com) were associated with Mr. Zhukov and the alleged MethBot fraud.[54]  I am not aware, however, of any specific research Mr. Anderson undertook to reach this conclusion other than representing that XBT apparently did not ask its public relations firm to take any action associated with this issue.[55]  With respect to this issue, I did note that XBT did inform third parties of their association with the MethBot issue and Mr. Zhukov.  In December 2016, they informed authors of the so-called White Ops Report, published on December 20, 2016, which itself disclosed the alleged MethBot fraud, that Webzilla was a "hosting provider" for Mr. Zhukov.[56]  XBT, through its public relations firm, also disclosed their involvement with Mr. Zhukov to Brian Krebs, a journalist who writes about "cyber-security."[57]  Mr. Anderson was apparently unaware that XBT shared its involvement with the MethBot fraud with Mr. Krebs.[58]  Mr. Gubarev testified that they made these disclosures to third parties in

---

[52] Anderson Dep. Tr. at 122-124.
[53] Gubarev Dep. Tr. at 179.  See also Dvas Dep. Ex. 61.
[54] Anderson Dep. Tr. at 34, 50, 53, and 113-114.  Servers.com is also part of XBT. (Dvas Dep. Tr. at 237-239.)
[55] Anderson Dep. Tr. at 34, 50, 53, and 113-114.
[56] Dvas Dep. Tr. at 212-214; and Gubarev Dep. Tr. at 200-207.  See also Dvas Dep. Ex. 62.
[57] Dvas Dep. Tr. at 212-214; and Dvas Dep. Ex. 35.
[58] Anderson Dep. Tr. at 53-54.

December 2016 because at least Webzilla's involvement with Mr. Zhukov was "mentioned already" in one article and he was "100 percent this was [in] some publication."[59]

29.     I also noted in this regard that Mr. Dvas testified that the White Ops Report, published on December 20, 2016 and which discussed the alleged fraud at issue, identified certain IP addresses that were associated with Webzilla and Servers.com.[60]  The White Ops Report noted that a list of the IP addresses at issue in the alleged fraud were available for download from the White Ops website.[61]  As a means of countering the alleged fraud, White Ops encouraged "advertisers" and other "affected parties" to download and "block" the list of "IP addresses known to belong to Methbot" as the "fastest way to shut down the operation's ability to monetize."[62]  From the list of IP addresses available for download, it also may have been possible for third parties to draw an association between Webzilla and Servers.com and the alleged fraud.  My research indicates that certain third parties may, in fact, have drawn such an association between Webzilla and Servers.com and the alleged fraud as evidenced by certain statements made in the comments section of an article published by Mr. Krebs discussing the alleged fraud that was posted on Mr. Kreb's website.[63]  Other research also suggests that an association between IP address used by the alleged Methbot fraud and Webzilla and Servers.com was known by certain third parties as of January 11, 2017.[64]

30.     XBT may have lost additional sales during 2017 associated with the MethBot issue because it changed the screening procedures it used when working with its customers.  Mr.

---

[59] Gubarev Dep. Tr. at 200-207.
[60] Dvas Dep. Tr. at 186-189; and Dvas Dep. Ex. 62 at p. 7.
[61] See "The Methbot Operation," White Ops, December 20, 2016, at p. 3.
[62] Id., at pp. 3 and 15.
[63] See Brian Krebs, "Report: $3-5M in Ad Fraud Daily from 'Methbot,' Krebs on Security, December 20, 2016.  See also Goederich Dep. Tr. at 157, 182, 197, and 218.
[64] See, e.g., "Protest Trump Arizona- Planning Page," Facebook.com, January 11, 2017.

Bezruchenko, an executive at XBT involved in overseeing issues related to technology, testified that because of the so-called MethBot fraud XBT adopted a new policy with respect to screening new customers.[65]  He explained that XBT began conducting "additional due diligence" to better understand the reasons why customers want to access XBT servers, or as Mr. Bezruchenko explained, XBT wanted to better understand the "reasons why the customer want[ed] to bring their IP space into our network."[66]  Mr. Anderson was unaware of this change in XBT policy and did not know ("I don't know") if the change in policy caused XBT to lose any customers in 2017.[67]

31.     In his report and deposition testimony, Mr. Anderson did make reference to claimed changes in XBT's access to bank financing following the publication of the Dossier. For example, Mr. Anderson represented that XBT "suffered increased bank scrutiny" following publication of the Dossier, that XBT "bank accounts in multiple countries were frozen and banks threat[ened] to close their accounts all together," and that banks "dramatically increased their scrutiny on potential new clients."[68]  Mr. Anderson admitted that his assertion as to the alleged increased scrutiny by banks was based upon representations by XBT and review of a single e-mail from a single lender.[69]  He expressed no knowledge of the actual outcome or impact of the alleged scrutiny.[70]  Mr. Anderson has not identified any specific customers that XBT actually

---

[65] Bezruchenko Dep. Tr. at 23, 240-242.  See also P-P001536-539.
[66] Id., at 240-242.
[67] Anderson Dep. Tr. at 130-131.  Mr. Anderson also did not express any opinion ("I don't know") associated with the possibility that the lawsuit initiated by XBT in February 2017 may have caused XBT to lose sales. (Anderson Dep. Tr. at 150-156.)  He did argue that the filing of the lawsuit may have actually mitigated any lost sales by helping XBT "dig" out from alleged adverse publicity associated with publication of the Dossier but he described such a scenario as "hypothetical" and he simply did not know what impact filing the lawsuit had on XBT's sales. (Id.)
[68] Anderson Second Report, at pp. 6-7; and Anderson Dep. Tr. at, for example, 19 and 140-148.
[69] Anderson Second Report, at pp. 6-7 and fts. 15 and 16; Anderson Second Report Document Number 67; and Anderson Dep. Tr. at 134-148.
[70] Anderson Dep. Tr. at 134-148.

lost in 2017 as a direct result of such claimed conduct or if any customers were lost, whether they were replaced by new customers using server capacity made available by any lost customers.  As discussed above, Mr. Anderson has not identified any specific customer lost by XBT due to any such behavior.[71]  Mr. Mishra also was unable to identify any such specific customer, and nor were Mr. Dvas and Mr. Gubarev (as I understand his testimony).  With respect to this issue, I also noted testimony by Mr. Mishra that indicated that any number of claimed disruptions to XBT's relationship with lending institutions associated with the conduct at issue were temporary with various relationships restored within 15 days or a month after XBT filed the its lawsuit against BuzzFeed in February 2017.[72]

32.     When examining XBT's monthly sales data beginning in January 2014, I also discovered that in March 2015 XBT's monthly sales hit a high of $3.5 million but then declined to $3.2 million in April 2015 and individual monthly XBT sales did not exceed $3.5 million until April 2016, over one year later.  These data are reflected in **Exhibit 7**.  This decline in sales was obviously not caused by the conduct at issue with the Dossier published on January 10, 2017.  I did not find any analysis by Mr. Anderson that explains why XBT's sales declined in April 2015 from March 2015 and remained lower than the March 2015 high for so many months and if the reason or reasons for this sales pattern might also have adversely affected XBT's sales in 2017.

33.     When considering the issue of causation and potential lost sales, it also should be noted that XBT executives, including Mr. Mishra, as discussed above, the firm's Chief Financial Officer, testified that if customers are lost the newly created XBT server availability associated with any such loss is then available to potential new customers.  In fact, Mr. Mishra testified that

---

[71] See Anderson Dep. Tr. at 148-149.
[72] Mishra Dep. Tr. at 194-197.

XBT can "recover" from losing any particular customer by deploying the newly available server capacity within five or six months.[73]

34.     Finally, Mr. Anderson did not know ("I have not . . . looked at that") if, as a lawsuit filed by XBT against Christopher Steele apparently alleges, Mr. Steele may have caused XBT to lose sales.[74]  In this regard, I noted that XBT filed an Interrogatory Response specifically referring to the alleged loss of sales during the first several months of 2017 and represented that this alleged loss was associated with the "defamatory actions" of BuzzFeed "as well as Christopher Steele and Orbis Business Intelligence" and, as a result, the claimed damages needed to be "apportioned" between BuzzFeed, Christopher Steele, and Orbis Business Intelligence.[75] Indeed, in this same Interrogatory Response, plaintiffs claim not to "seek to hold BuzzFeed responsible for the damages it suffered as an account of the actions and omissions of Christopher Steele and Orbis Business Intelligence."[76]  Mr. Anderson provides no such apportionment.

### C.     XBT's 2017 Revenue Forecast Does Not Provide A Reliable Basis For Anderson's Calculations.

35.     Mr. Anderson's entire lost business value calculations are based on XBT's 2017 revenue forecast ($62.8 million) and the difference between this forecast and XBT's reported actual 2017 revenues of $58.3 million (as yet an unaudited figure).[77]  If XBT's forecast of its 2017 revenue is not reliable, then all of Mr. Anderson's lost business value calculations are not

---

[73] Id., at 144.  See also Dvas Dep. Tr. at 238-239; and Gubarev Dep. Tr. at 191.

[74] Anderson Dep. Tr. at 65-66.

[75] XBT Interrogatory Response, at Number 10.

[76] Id.  See also Peter Kafka, "After Being Sued, BuzzFeed Has Apologized To A Russian Executive Named In The Unverified Trump Dossier," recode, February 3, 2017.

[77] Anderson Dep. Tr. at 70-71 and 77.  In this regard, I noted that the Chief Executive Officer of XBT, Mr. Dvas, testified that XBT's actual revenues for 2017 were between $60 million and $70 million. (Dvas Dep. Tr. at 21 and 296.)

reliable.  XBT's 2017 revenue forecast does not provide a reliable basis for Mr. Anderson's

calculation for a number of reasons.

36.     First, Mr. Anderson testified that XBT's previous forecasts of revenue, based on

his conversations with Mr. Mishra, were "fairly conservative."[78]   XBT's previous forecasts,

including those apparently not reviewed by Mr. Anderson, of future revenues have not always

been reliable.[79]  For example, as set forth in **Exhibit 8**, in 2012 XBT forecasted its 2013 revenue

to be $43.7 million but actual sales were only $32.8 million or an overstatement of some $10.9

million.  In 2012, XBT also forecasted 2014 revenues at $53.1 million but actual sales were only

$36.2 million, an overstatement of $16.9 million, and in 2012 XBT forecasted 2015 revenues at

$62.8 million but actual sales were only $38.8 million, an overstatement of $24.0 million.[80]

Unlike all other years, as reflected in **Exhibit 8**, XBT's estimate of 2016 revenue was relatively

close to its actual 2016 revenue with a forecast that was actually lower than actual sales by $1.7

million.  On balance, taking all four years into consideration, 2013 through 2016, XBT has

overstated its future revenue by an average of $12.5 million a year ($10.9 million plus $16.9

million plus $24.1 million plus a minus $1.7 million divided by four.)[81]

---

[78] Anderson Dep. Tr. at 85-86.
[79] Id.
[80] See also Mishra Dep. Tr. at 76-78, 82, and 94.
[81] XBT's forecasted 2013 revenues were based on a business plan generated by XBT in 2012. (Mishra Dep. Tr. at 75-77.)  Mr. Mishra described that business plan "as an accurate plan." (Id.)  This business plan overstated XBT's 2013 revenue by $10.9 million during 2012 as set out in **Exhibit 8**.  This same business plan forecasted XBT revenues for 2014 and 2015 as reflected in **Exhibit 8** and Anderson Second Report Document Number 54, at P-G000645 and 665-666.  Mr. Mishra testified that XBT actually prepared estimates of forecasted revenue each individual year suggesting that XBT prepared a revenue forecast for 2014 during 2013 and for 2015 during 2014. (Mishra Dep. Tr. at 78-79, 88, and 112.)  I have not been able to locate any specific XBT projections for 2014 and 2015 beyond those included in the business plan developed by XBT during 2012.  Mr. Anderson testified that he had not reviewed any such forecasts. (Anderson Dep. Tr. at 83, 90-91, and 99.)  I reserve the right to review any additional information that becomes available reflecting XBT forecasts for 2014 and 2015.  In this regard, I did note that in Mr. Anderson's Document Number 60, there is a set of numbers for 2015 that are labeled "plan."  However, I do not have any information concerning what these figures represent or when they were prepared.  According to Mr. Anderson's deposition testimony, he did not appear to rely on these data. (Id.)  If one were only to use the difference

37.     As discussed above, XBT's forecasts of revenues for 2013, 2014, and 2015 that were prepared in 2012, were substantially overstated. Mr. Anderson did not dispute these findings.[82] He argued, however, that given how close the XBT 2016 revenue forecast was to actual 2016 XBT revenue that he felt comfortable relying on the XBT 2017 revenue forecast in his calculations as "accurate and reasonable."[83] He also argued that, apparently based on his conversations with Mr. Mishra, that XBT's projections of revenue were "constantly evolving, improving, getting better at predicting, estimating what is going to happen in the future" and, as a result, he did not believe that projections generated years ago were "relevant to what was happening in late 2016 when the 2017 projections were done."[84] Mr. Anderson also represented that XBT employs a "fairly rigorous standard" when they produce revenue projections.[85]

38.     I do not agree with Mr. Anderson that the XBT revenue forecasts for 2013 through 2015, that were generated by XBT in 2012, can be so easily discarded when considering the reliability of XBT's forecast of 2017 revenue. These overstatements reflect a fundamental misunderstanding of XBT's ability to generate revenue in the future. In considering the relevance of XBT's revenue forecasts for 2013, 2014, and 2015, I also noted that these forecasts were included in the 2013 study relied on by Mr. Anderson when generating his so-called six comparable companies used to generate his multiple calculations.[86] I also noted that Mr. Anderson did not conduct any independent study of various factors that could affect the

---

between XBT's forecasted revenues and actual revenues for 2013 and 2016, then XBT has overstated its future revenue by an average of $4.6 million ($10.9 million minus $1.7 million divided by two).

[82] Anderson Dep. Tr. at 96-98. Mr. Anderson actually appeared to be unaware of these data at his deposition. (Id., at 90-91.)

[83] Id., at 83-84.

[84] Id., at 98.

[85] Id., at 82-83.

[86] Anderson Second Report, at pp. 7-8; and Anderson Second Report Document Number 54 at P-G000645 and 665.

reliability of the 2017 forecasted revenues such as identifying which specific customers XBT might be able to attract during 2017 and XBT's pricing policies.[87]

39.    In considering the reliability of XBT's 2017 revenue forecast, I also noted testimony by Mr. Mishra which, rather than reflecting some so-called "rigorous standard," seems to suggest that XBT's revenue forecast for 2017 was based, at least in part, on the fact that XBT's monthly revenues were increasing in the latter half of 2016, beginning in particular during September 2016, and that he believed based on this trend that XBT would continue to grow the company in 2017.[88]

40.    In considering the reliability of using these 2016 monthly sales data as a basis for projecting 2017 XBT revenue, I noted that XBT's monthly 2016 revenue experienced its largest monthly increase in sales in September 2016, from $4.2 million to $5.1 million, and remained above $5 million per month for the remainder of 2016, a level not achieved in any prior month in 2016.[89]  Mr. Mishra, however, could not provide any insight as to why XBT experienced this increase in sales beginning in September 2016 and could not remember if the monthly increase might reflect an anomaly that might not continue into the future.[90]  He also admitted that to explain why XBT's sales increased in September 2016 he would have to analyze the relevant underlying sales invoices but he had not conducted any such investigation, and that at the time of his deposition, he had no idea ("no") why XBT's sales increased in September 2016.[91]

41.    Mr. Anderson also testified that XBT's actual monthly revenue in 2016 underperformed during the first six months of 2016 when compared to the 2016 forecasted

---

[87] Anderson Dep. Tr. at 91.
[88] Mishra Dep. Tr. at 159-164.
[89] Anderson Second Report, at Exhibit 4.
[90] Mishra Dep. Tr. at 163-164.
[91] Id., at 154-156.

revenue ("yes, they were lower") and agreed that XBT's monthly revenue increased by some $1 million in September and continued above $5 million per month for the remainder of the year.[92] Like Mr. Mishra, Mr. Anderson could not explain ("I don't know the specific reason") why XBT's monthly sales increased in September 2016.[93] To the extent that whatever caused XBT's monthly sales to increase in the latter half of 2016 was not sustainable, then any forecast based on this trend would not be reliable.[94] We, of course, know that one reason that XBT's sales increased in November and December 2016 that was not sustainable into 2017 was sales to the customer that XBT terminated for allegedly participating in fraudulent behavior.

42.     Mr. Anderson's use of XBT's 2017 forecasted revenue in his lost business value calculations also is unreliable because of the method employed by Mr. Anderson to adjust the original XBT projection ($64.2 million)[95] in an attempt to take into consideration XBT's decision to terminate the customer (Mr. Zhukov) allegedly engaged in fraudulent behavior in December 2016. To account for this termination, relying only on the testimony of Mr. Mishra and discussions Mr. Anderson had with Mr. Mishra that this customer could be replaced by XBT in no more than six months, Mr. Anderson calculated that Mr. Zhukov represented $1.4 million in XBT sales in the last six months of 2016 and Mr. Anderson subtracts this amount from the original XBT forecasted revenue of $64.2 million to arrive at a revised 2017 XBT forecasted revenue of $62.8 million.[96] This calculation is unreliable for a number of reasons.

¾  First, Mr. Mishra testified that he, in fact, did not know ("I don't know") how much money XBT actually lost because this customer was

---

[92] Anderson Dep. Tr. at 105-111.
[93] Id.
[94] With respect to this issue, Mr. Anderson testified that he had "no idea" if XBT's sales increased in September 2016 because certain aspects of the Dossier related to Mr. Cohen's conduct were true. (Anderson Dep. Tr. at 111-113.)
[95] Anderson First Report, at p. 10.
[96] Anderson Second Report, at pp. 10-11 and ft. 29.  See also Anderson Dep. Tr. at 28-30 and 42.

27

terminated.[97]  He also testified that he was not aware if the servers used by this customer had been transferred to other customers.[98]  Mr. Anderson, after first claiming that the servers at issue were released to other customers, also admitted that he did not know what happened to the relevant servers.[99]  I noted with respect to this issue that Mr. Dvas, the Chief Executive Officer of XBT, testified that only "some" of the servers used by Mr. Zhukov were being used by other customers.[100]  If not all of the relevant servers were put into use by other customers then it is possible that XBT's lost sales due to the termination of Mr. Zhukov could exceed the six month estimate advanced by Mr. Mishra and relied on by Mr. Anderson.  I noted in this regard that XBT's sales to Mr. Zhukov were $2.3 million for all of 2016.[101]

¾  Second, sales by XBT to Mr. Zhukov increased from $170,569 in October 2016 to $398,884 in November 2016 and were $311,752 through approximately December 21, 2016 suggesting a run rate, as discussed above, of sales by XBT to Mr. Zhukov of over $450,000 for the entire month of December 2016.[102]  Mr. Anderson's decision to add up XBT's sales to Mr. Zhukov for the last six months of 2016 and use this summation in his calculations does not properly account for this sales trend.  (In this regard, I noted that Mr. Anderson testified that he did not know why XBT's sales to Mr. Zhukov "jumped" in November and December 2016.)[103]  For example, if one used the November sales number of almost $400,000 to predict XBT's sales to Mr. Zhukov during 2017 and still assumed that XBT could replace Mr. Zhukov's sales with other customers in six months, the adjustment to XBT's 2017 forecasted sales would be some $2.4 million (six times $398,884) not the $1.4 million used by Mr. Anderson in his calculations.  If 12 months were used this number would climb to $4.8 million (12 times $398,884). If the estimated monthly sales for December discussed above were used for this calculation, the resulting figures for six months would be $2.8 million (six times $460,205) and $5.5 million for 12 months (12 times $460,205).

¾  Third, XBT's forecasted sales for 2017, before any adjustment for sales to Mr. Zhukov, increased by 29.2 percent from actual 2016 sales ($64.2 million minus $49.7 million divided by $49.7 million).[104]  Yet when forecasting sales that XBT would lose during 2017 after terminating Mr.

---

[97] Mishra Dep. Tr. at 144-145
[98] Id.
[99] Anderson Dep. Tr. at 30-33 and 46.
[100] Dvas Dep. Tr. at 238-239.
[101] Anderson Second Report at Document Number 10.
[102] Id.
[103] Anderson Dep. Tr. at 39-40.
[104] Anderson First Report, at p. 10.

Zhukov in December 2016, Mr. Anderson takes XBT's sales to Mr. Zhukov for the last six months of 2016 and assumes no growth in these sales for the first six months of 2017.[105] If these sales were increased by a rate of 29.2 percent, then the resulting increase in projected sales by XBT to Mr. Zhukov during 2017 would be $1.6 million even if one assumed that XBT could replace Mr. Zhukov's sales with new sales within six months ($1.2 million times 1.292).

43.     In support of his decision to rely on the XBT's forecast for 2017 revenue in his lost business value calculations, Mr. Anderson also pointed to a study that indicated that the industry in which XBT competed within was expected to grow by 45.9 percent a year beginning in 2016 and continuing through 2020.[106] When advancing these data, however, Mr. Anderson fails to provide any evidence that XBT's prior performance reflected overall industry growth. In fact, Mr. Anderson testified that he did not know how much the industry grew in the previous five years or how much XBT grew in these same five years, although he testified that XBT grew at a slower rate than the industry.[107]

### D.     XBT's 2017 EBITDA Forecast Does Not Provide A Reliable Basis For Anderson's Calculations

44.     Mr. Anderson's low end estimate and high end estimate of XBT's alleged lost business value both make use of the difference between XBT's forecasted 2017 revenue ($62.8 million) and reported 2017 XBT actual revenue of $58.3 million. However, Mr. Anderson's lost business calculations make use of XBT's actual 2016 EBITDA margin of 42.0 percent when generating his low end estimate of alleged lost business value ($32.3 million).[108] His high end estimate ($137.6 million) makes use of XBT's projected 2017 EBITDA margin of 51.9

---

[105] Anderson Second Report, at pp. 10-11 and ft. 29.
[106] Anderson Dep. Tr. at 87-90. See also Anderson Second Report Document Number 56, at p. 5.
[107] Anderson Dep. Tr. at 87-90.
[108] Anderson Second Report, at pp. 11-12.

percent.[109]  XBT's projected 2017 EBITDA margin of 51.9 percent does not provide a reliable basis for Mr. Anderson's calculations.

45.     As with its revenue estimates, XBT's previous forecasts of EBITDA, with the exception of 2016, have proved to be substantially overstated.  As reflected in **Exhibit 9**, during 2012 XBT forecasted 2013 EBITDA to be $18.8 million but it was actually only $12.0 million, an overstatement of $6.8 million.  In 2014, based on forecasts generated by XBT in 2012, XBT's forecast of EBITDA was overstated by $13.0 million and by $15.9 million in 2015.  In 2016, XBT's forecasted EBITDA was $19.8 million and its actual EBITDA was $20.9 million.[110]  On average, over the years 2013 through 2016, XBT overstated its EBITDA by $8.6 million per year ($6.8 million plus $13.0 million plus $15.9 million minus $1.1 million divided by four).[111] When considering the reliability of XBT's forecasted 2017 EBITDA margin it also should be noted that we do not presently know what XBT's actual EBITDA margin was in 2017.[112]

46.     Mr. Anderson did not conduct any independent research to verify the reliability of XBT's forecasted EBITDA margin of 51.9 percent.  According to Mr. Anderson, XBT's forecast 51.9 margin was based on an alleged plan by XBT for a business model based on "owned physical storage" as opposed to leasing servers and that this "transition would have continued to increase XBT's profitability."[113]  Mr. Anderson does not, however, provide any evidence other than his conversation with Mr. Mishra to support the conclusion that the conduct at issue

---

[109] Id.

[110] See, generally, Mishra Dep. Tr. at 94, 167-169, and 173-175; and Anderson Dep. Tr. at 96-97.

[111] If XBT's forecast of EBITDA compared to actual EBITDA is only used for 2013 and 2016, XBT's average yearly overstatement of EBITDA would equal $2.8 million ($6.8 million minus $1.1 million divided by two).  As reflected in **Exhibit 10**, I did note that XBT did overstate its forecast of XBT's profit before tax for every year, 2013 through 2016, including a significant overstatement in 2016. (See Anderson Dep. Tr. at 94-95; and Mishra Dep. Tr. at 148 and 150-151.)

[112] Anderson Dep. Tr. at 70.  See also Dvas Dep. Tr. at 298.

[113] Anderson Second Report, at p. 11; and Anderson Dep. Tr. at 102-104.

somehow prevented XBT from making this allegedly planned transition during 2017. (In this regard, it should be noted again that XBT's actual 2017 EBITDA margin is not presently available.) Mr. Anderson testified that other than a conversation with Mr. Mishra he had no other basis to justify his use of the 51.9 percent in his calculations.[114]

47. In investigating the reliability of XBT's forecasted 2017 51.9 percent EBITDA margin, I noted that XBT was forecasting revenue to increase from $49.7 million in 2016 to $62.8 million in 2017, or an increase of $13.1 million, and its EBITDA over the same two years was forecasted to increase by $11.7 million from $20.9 million in 2016 to a forecasted amount of $32.6 million in 2017.[115] These forecasts indicate that during 2017 XBT was going to generate, as measured by EBITDA, 89 cents of profit ($11.7 million divided by $13.1 million) for every dollar of increased revenue. Other than a conversation with Mr. Mishra, Mr. Anderson refers to no other evidence to support such a level of performance.[116]

### E. XBT's Actual Performance During 2017 Is Inconsistent With The Damage Analysis Advanced By Anderson

48. Based on available data, including unaudited XBT 2017 revenue data, XBT's actual performance during 2017 is not consistent with the damage analysis advanced by Mr. Anderson. For example, despite the alleged conduct at issue, as set forth in **Exhibit 11**, XBT's revenues increased from $49.7 million to $58.3 million from 2016 to 2017, an increase of $8.5 million or an increase of 17.2 percent. Mr. Anderson agreed that XBT's revenues increased by approximately $8.5 million between 2016 and 2017.[117] This increase in yearly revenue is greater than every yearly change in XBT's revenue from 2011 to 2016 except for the change from 2015

---

[114] Anderson Dep. Tr. at 85, 91, 102-104, and 148-149.
[115] Anderson Second Report, at pp. 10-11.
[116] Anderson Dep. Tr. at 102-104.
[117] Id., at 168-169.

to 2016 ($10.9 million). In fact, XBT's increase in revenue during 2017 ($8.5 million) is greater

than XBT's total increase in revenue from 2011 ($32.3 million) to 2015 ($38.8 million) or $6.4

million over these four years.[118] These data are reflected in **Exhibit 11**.

49.      If one were to remove XBT's sales to Mr. Zhukov during 2016, then XBT's

revenue increases from $47.5 million in 2016 to $58.3 million in 2017 or an increase of $10.7

million (or 22.6 percent). These data are set forth in **Exhibit 12**. In fact, as set forth in **Exhibit**

**13**, using these same data, data that removes XBT's sales to Mr. Zhukov for both 2015 and 2016,

XBT's revenue increased in nominal terms more during 2017 ($10.7 million) than in any other

single year between 2011 and 2016, including between 2015 and 2016. On a percentage basis,

as set forth in **Exhibit 14**, using these same data, XBT's revenue increase during 2017 was

greater than in all years 2011 through 2015 and close to the percentage change from 2015 to

2016. Using these same data, I also calculated XBT's average annual change in revenue for the

years 2011 through 2016 and compared it to the change from 2016 to 2017. I found that on

average XBT increased yearly revenue between 2011 and 2016 by $3.0 million per year

compared to a $10.7 million increase from 2016 to 2017. These data are included in **Exhibit 15**.

50.      I also compared XBT monthly revenue during 2017 to that generated by XBT in

2016. I discovered, as set forth in **Exhibit 16**, that in every single month, XBTs monthly

revenue was higher during 2017 when compared to 2016. I found this pattern both when

including XBT's sales to Mr. Zhukov and when these sales are excluded from XBT's monthly

revenue. These data also are included in **Exhibit 16**.

---

[118] Mr. Dvas, the current Chief Executive Officer of XBT, testified that XBT apparently added a large customer (Multiplay) during 2017. (Dvas Dep. Tr. at 31.)

51.     Based on data generated by Mr. Anderson, I also compared certain other financial data reflecting XBT's performance during 2017 compared to 2016.  These data are included in **Exhibit 17**.  For example, not only did XBT's revenue increase between 2016 and 2017, but its profitability also increased based on data advanced by Mr. Anderson.  In particular, XBT's profit before and after tax increased between 2016 and 2017.

### F.     Anderson's Comparable Company Calculation Is Not Reliable

52.     As discussed above, Mr. Anderson's lost business value calculations also are based on data he presented purportedly representing the relationship between EBITDA and business value for six companies (Akamai, Dupont, Equinix, InterXion, iomart, and Rackspace) that he defines as "comparable" to XBT.[119]  Specifically, he reports this calculated relationship for each company based on data sourced to Capital IQ and then averages all six reported multiples to arrive at a multiple of 17, a multiple that he then employs in his lost business value calculations by multiplying it by his two estimated but-for EBITDA figures for XBT in 2017 and comparing the results to the so-called "as-is" EBITDA figure for XBT for 2017.[120]  The difference in these calculations represent his estimates of lost business value allegedly caused by the conduct at issue.  In addition to the methodological issues discussed above, Mr. Anderson's use of data for these six companies for his stated purpose is not reliable.

53.     In justifying his decision to use data from these six companies, Mr. Anderson claims that these six companies are "comparable" to XBT.[121]  However, the study relied on by Mr. Anderson to justify his conclusion (prepared by KPMG) was conducted in 2013, some five

---

[119] Anderson Second Report, at pp. 7-12.
[120] Id.; and Anderson Dep. Tr. at 75.
[121] Anderson Second Report, at pp. 7-12

years ago.[122]  Mr. Anderson has not presented any reliable basis that would support the conclusion that these same six companies would still be considered comparable to XBT today, some five years later.  When justifying his decision to use these same six companies in his calculations, Mr. Anderson testified that he "looked at" what these companies "do," although he provided no description of this purported analysis in his reports.[123]  I noted in this regard, that Mr. Anderson testified that "something done four or five years ago, it absolutely does not seem relevant to what was happening in late 2016."[124]

54.    Mr. Anderson did claim in his Second Report that these same six companies "are similar to XBT's identified competition" and referenced XBT's Business Plan prepared in November 2016 in support of this claim.[125]  However, this Business Plan, the same plan relied on by Mr. Anderson for XBT's forecasted 2017 revenues and EBITDA, identifies four companies as "direct competitors" to XBT, and only one of the four (Rackspace) is included in the six used by Mr. Anderson in his calculations (and Rackspace has the lowest multiple, seven, of the six used by Mr. Anderson in his calculations).[126]  The other three firms (SoftLayer, Leaseweb, and OVH) are not included in the analysis advanced by Mr. Anderson and, instead, he continues to use data in his calculations for five companies not identified as "direct competitors" by XBT in November 2016.[127]

55.    In consideration of this issue, I also noted Mr. Mishra' deposition testimony where he represented that the four firms identified in the XBT November 2016 Business Plan are

---

[122] Anderson Second Report, at pp 7-8; and Anderson Second Report Document Number 54.
[123] Anderson Dep. Tr. at 157-158.
[124] Id., at 98.
[125] Anderson Second Report, at p. 10, ft. 25; and Anderson Second Report Document Number 63.
[126] Anderson Second Report, at p. 10; and Anderson Second Report Document Number 63 at P-G001035 and 1050.
[127] See Anderson Second Report Document Number 63, at P-G001035 and 1050.  See also Anderson Second Report, at p. 10.

still ("I think so") direct competitors to XBT.[128]  Mr. Mishra also described one of the six

companies used by Mr. Anderson in his analysis, Dupont Fabros, as "more or less" being in the

"real estate business" and that XBT is not in "real estate."[129]  I also noted that another XBT

executive, Mr. Bezruchenko, did not identify any of the six companies relied on by Mr.

Anderson in his multiple analysis and specifically testified that one of the six, Akamai, was not a

competitor to XBT and that Rackspace, another of the six, was not a competitor "today."[130]

     56.    When reviewing the 2013 study relied on by Mr. Anderson when selecting the six

companies he used in his analysis of allegedly "comparable" multiples, I noted that the authors

of the study, KPMG, concluded that the multiples for the six companies analyzed should be

discounted by 20 percent to 30 percent when compared to XBT because XBT was a private

company and did not have shares traded in a public exchange (a so-called lack of marketability

discount).[131]  Mr. Anderson did not employ such a discount in his analysis.[132]

     57.    Mr. Anderson argued such a discount was not necessary because he found that

one of the four companies identified by XBT as a direct competitor in 2016, SoftLayer, was

purchased by IBM in 2013 at a multiple of 11.1 (when comparing EBITDA to business value)

which was close to the EBITDA to business value multiple included in the 2013 KPMG study of

---

[128] Mishra Dep. Tr. at 177.

[129] Id., at 177-178.  Mr. Anderson also testified that Dupont Fabros was involved in the real estate business, although he believed that their "REIT" did involve servers. (Anderson Dep. Tr. at 158-159.)  In this regard, I noted that the Capital IQ source relied on by Mr. Anderson described Dupont Fabros as a "real estate investment trust (REIT)." (S&P Capital IQ, "Dupont Fabros Technology, Inc.," May 18, 2018, at p. 1.)  Equinix, another of the six companies relied by Mr. Anderson in his multiple calculation, also is reported to be a REIT.  (S&P Capital IQ, "Equinix Inc.," May 18, 2018, at p. 1.) and another of his six companies, InterXion, is described as also being involved in the "real estate management/holding" business. (S&P Capital IQ, "InterXion Holding N.V.," May 18, 2018, at p. 1.)  I noted that these three companies have the highest multiples in Mr. Anderson's analysis (all above 20).  (Anderson Second Report, at p. 10.)

[130] Bezruchenko Dep. Tr. at 54.

[131] Anderson Second Report, at pp 7-8; and Anderson Second Report Document Number 54, at P-G000645, 654, and 683.

[132] Anderson Dep. Tr. at 160-166.

10.99.[133]  (Mr. Anderson's use of a multiple of 17 is based on using updated data for the six

companies included in the 2013 KPMG study.)[134]  According to Mr. Anderson, because the

reported 2013 multiple for SoftLayer, a private company at the time, was close to that generated

by KPMG for the six other companies in 2013, he did not need to discount the multiples he

calculated for six companies using more recent data when arriving at the multiple he used in his

lost business value calculations for XBT.[135]

58.     In my opinion, the SoftLayer data point is by itself insufficient to reject applying

a lack of marketability discount to the multiples Mr. Anderson calculated for the six companies

when being used to generate a multiple for XBT for a number of reasons.  First, the SoftLayer

example is just one data point and Mr. Anderson has not presented any reliable evidence that this

one transaction five years ago necessarily reflects a representative discount when comparing

private to public companies.  In this regard, just by way of example, I found information that

reported that another of the four companies identified as direct competitors to XBT in 2016,

OVH, was valued at an EBITDA to business value of six in 2016.[136]  Six is obviously much less

than the 17 used by Mr. Anderson in his calculations.  I highlight this additional data point to

reflect that Mr. Anderson's decision to use the one example concerning SoftLayer is not

necessarily reliable when attempting to determine what if any discount should be applied to Mr.

Anderson's multiple calculation for XBT related to a lack of marketability.[137]  Second, I am not

aware that Mr. Anderson has offered any evidence reflecting the factors that may have affected

---

[133] Id.
[134] Anderson Second Report, at p. 10 and Exhibit 10.
[135] Anderson Dep. Tr. at 160-168.
[136] "OVH EUR 250.Omn Late Stage," August 2016.
[137] In this regard, based on a document produced by Mr. Anderson, I noted that Rackspace apparently was purchased in August, 2016 at a multiple of 6.1 which is less than the seven used by Mr. Anderson in his analysis for Rackspace. (Anderson Second Report, at p. 10; and Anderson Second Report Document Number 61, at p. 103.)

the price that IBM paid for SoftLayer in 2013 and how these factors might be same or different when attempting to value XBT on January 1, 2018.

## IV.    ANDERSON'S SO-CALLED BENEFIT ANALYSIS IS UNRELABLE

59.    Mr. Anderson calculates that because of the conduct at issue BuzzFeed enjoyed a benefit.[138]  To calculate this claimed benefit, Mr. Anderson first reports that the BuzzFeed articles at issue were viewed 8,988,432 times and that in order to generate the same number of views, BuzzFeed would pay $1.54 per view (so-called "CPC" or cost per click) or $13,859,960 (8,988,432 times $1.54).[139]  He describes his calculation as the "value" of the "traffic" associated with the conduct at issue to BuzzFeed defined by the number of "page views."[140]  He further described his calculations as reflecting the "cost" to BuzzFeed of "generating that level of traffic or what is the value of that level of traffic to BuzzFeed."[141]  Mr. Anderson's so-called benefit analysis does not represent any revenue or profit generated by BuzzFeed associated with the conduct at issue, if any, and the calculations themselves are unreliable for a number of reasons.

### A.    Anderson's Benefit Analysis Does Not Represent Any Enhanced Revenues Or Profits Earned By BuzzFeed

60.    Mr. Anderson's benefit analysis does not represent any increased revenues or profits earned by BuzzFeed associated with the publication of the Dossier and associated articles, if there were any such increased revenue and profits, including any alleged benefit to BuzzFeed directly attributable to the specific discussion of XBT or Webzilla (or Mr. Gubarev) in the Dossier.  He testified that his benefit analysis "didn't look at revenue earned by BuzzFeed."[142]

---

[138] Anderson Second Report, at pp. 12-15.
[139] Id.
[140] Anderson Dep. Tr. at 177 and 185-186.
[141] Id., at 178.
[142] Id., at 176-177.

In this regard, it should be emphasized that, after first asserting at his deposition that it did, Mr. Anderson subsequently rejected labelling his calculation of alleged benefits to BuzzFeed as representative of any unjust enrichment enjoyed by BuzzFeed associated with the conduct at issue.[143] In fact, Mr. Anderson was not willing at his deposition to label his calculation of alleged benefits to BuzzFeed as any form of damages.[144]

### B. Anderson Has Not Produced Evidence That The Number Of Views Used In His Benefit Calculations Necessarily Include Individuals Actually Reviewing The Dossier (Including Reference To XBT)

61. At his deposition, when first describing the methodology he employed when generating his benefit calculation, Mr. Anderson explicitly explained that the foundation of his analysis was the "assumption" that when each of the purported almost nine million times the relevant BuzzFeed articles were viewed, that each page view included a specific review of the Dossier itself ("my assumption is that all of those page views viewed the dossier") and that he "assumed" that when the Dossier was reviewed the content of the Dossier that relates to XBT also was reviewed ("I assume they read the entire dossier").[145] Mr. Anderson, however, was unable at his deposition to point to evidence that would support these two assumptions that he specifically testified were essential to his opinion concerning alleged benefits enjoyed by BuzzFeed attributable to the conduct at issue.[146]

62. For example, Mr. Anderson claimed that he asked that BuzzFeed (through plaintiffs' counsel) produce data reflecting the number of times the Dossier itself was viewed

---

[143] Id., at 190 and 215-216. Mr. Anderson did discuss at his deposition that if the BuzzFeed website gained more views, BuzzFeed might be able to "later monetize" that enhanced traffic in the "future" but provides no other detail or calculations with respect to this claim. (Id., at 184-186.)

[144] Id., at 210 and 214-215 ("I don't know that" when asked if plaintiffs are going to argue that "BuzzFeed should give that $14 million to them").

[145] Id., at 192-193, 200, 207, and 220.

[146] Id.

("we asked for how many people viewed the dossier and the article" and BuzzFeed was "to provide the viewership of the articles and the dossier") and he "assumed" that data he relied on to reflect his calculation of views actually represented the number of times the entire Dossier itself was specifically reviewed, including a specific discussion related to XBT ("I assume they read the entire dossier").[147]  But Mr. Anderson did not refer to any specific evidence in his reports or his deposition that would support his assumption that the data he reviewed that was produced by BuzzFeed actually reflected the number of times the Dossier itself was reviewed or whether even if some of the readers reflected in BuzzFeed's data reviewed any portion of the Dossier, what they read included references to XBT at the end of the document.[148]  Mr. Anderson was not able to provide evidence that individuals that "clicked" on the BuzzFeed articles actually read the Dossier itself, or if some did, which portions of it they read.[149]   Mr. Anderson also testified that if his two assumptions were not accurate, then he would here to "reassess" his analysis and "adjust my analysis accordingly."[150]

63.     After initially providing this testimony at his deposition, Mr. Anderson offered a different theory to support his benefit analysis later on at his deposition.  He testified that he included in his benefit analysis any view "regardless of whether they read all, part, or none of the

---

[147] Id., at 193-194, 200, and 219-220.

[148] Id.  With respect to this issue, I did review certain requests for documents submitted by plaintiffs to BuzzFeed but they did not, to the best of my understanding, represent a request for information that reflected the number of times the Dossier itself was reviewed. (Defendant BuzzFeed, Inc.'s Response To Plaintiffs' Third Request For Production Of Documents And Things, dated February 26, 2018, Including Request Number 74 through 81.)  Moreover, with respect to this issue, I spoke with Nick Hardy, a Senior Business Analyst at BuzzFeed, who was familiar with the BuzzFeed page view data relied upon by Mr. Anderson for his view counts.  Mr. Hardy told me that the BuzzFeed data only reflected the number of times that a relative article was clicked upon.  The count does not, however, provide any information about what was actually read by the individual clicking on a relevant article.  It would not, for example, provide any information on whether the Dossier was actually read by the individual clicking on the article.

[149] Anderson Dep. Tr. at 192-200.  In this regard, I noted that Mr. Anderson assumed that a reader of a so-called "Follow-Up" article "clicked through to or went down to where it said BuzzFeed published the dossier." (Anderson Dep. Tr. at 207.)

[150] Id. at 197 and 203.

entire dossier."[151]  In consideration of this issue, I noted that Mr. Anderson, according to his testimony, included views that occurred after XBT's names had been removed from the Dossier in his tabulation of views in his benefit calculations.[152]  Mr. Anderson testified, in fact, that he counted in his calculations any page views of the identified articles "irrespective" of whether plaintiffs were actually mentioned.[153]  He also admitted that he would have included in his calculations any time that someone clicked on one of the BuzzFeed articles but never actually read the Dossier at all, or any of its references to XBT.[154]

64.     In other words, Mr. Anderson is now advancing a claim of a benefit to BuzzFeed measured by so-called views even if individuals represented by such views did not actually read the Dossier itself or any reference to XBT.  In considering the relevance of this theory, I noted that in their Complaint, plaintiffs claim that the allegedly offensive conduct at issue here was the specific mention of XBT in the Dossier.[155]  It is not obvious how Mr. Anderson's calculations reliably measure how BuzzFeed benefited from the specific conduct at issue here − the specific mention of XBT in the Dossier − if someone never read about XBT in the Dossier or read the Dossier after references to XBT had been removed.

**C.     Anderson's Count Of Views Can Include Individuals Already On The BuzzFeed Website And Regular Readers Of The Website**

65.     In evaluating Mr. Anderson's calculation of views and alleged benefits enjoyed by BuzzFeed, I also noted that Mr. Anderson included in his count of views, according to his testimony, over 1.5 million individuals that were already on the BuzzFeed website (including

---

[151] Id., at 232-233.
[152] Id., at 221-223.
[153] Id., at 224-225.
[154] Id., at 232-233.
[155] Complaint For Damages, dated February 3, 2017, at ¶s 2 and 32.

people accessing the BuzzFeed app) when they clicked on one of the relevant articles.[156]  In fact, Mr. Anderson admitted that he did not know how many individuals included in his calculation of views may have visited the BuzzFeed website previously or were regular readers of the BuzzFeed website.[157]  Again, Mr. Anderson does not adequately explain why BuzzFeed would pay these individuals to visit the BuzzFeed website.  In this regard, Mr. Anderson testified that if he knew this information he "would do a different analysis."[158]

66.     Based on my understanding of Mr. Anderson's count of views included in his calculation, it also is possible that the same individual could have read each of the relevant BuzzFeed articles and Mr. Anderson would count each of these instances as a separate view.[159]  Similarly, as I understand his methodology, he would count as a separate view one person reading the same article multiple times.[160]  Again, it is not obvious why BuzzFeed would pay multiple times to have the same individual read each of the relevant articles or, after having read one of the relevant articles, BuzzFeed would pay to have that person read the same article again.

---

[156] Anderson Dep. Tr. at 234-235; and Anderson Dep. Ex. 13.  During my conversation with Mr. Hardy at BuzzFeed, he informed me that the column heading labeled as "buzzfeed_web" on Anderson Deposition Exhibit 13 and Anderson Second Report Document Number 76, the source for Mr. Anderson's count of views, represented individuals clicking on a relevant article who was already on the BuzzFeed website and that those page views under the heading "buzzfeed_app" represented individuals that clicked on a relevant article that were already on the BuzzFeed app.  I noted in this regard, that Mr. Anderson apparently argued that a potential new follower of BuzzFeed was of "exponentially more value" to BuzzFeed. (Id., at 235-236.)  This argument would appear to suggest that a current user was of less value to BuzzFeed.  Such considerations are not reflected in Mr. Anderson's calculations.
[157] Anderson Dep. Tr. at 235-236
[158] Id.
[159] See Id., at 225-226.
[160] During my conversation with Mr. Hardy, with BuzzFeed, he informed me that the number of page views that are included in the data relied on by Mr. Anderson would include as separate page views an individual clicking on the same article multiple times.

**D.      Anderson's $1.54 Calculation Does Not Represent What BuzzFeed Pays for Digital Marketing**

67.      Mr. Anderson multiplies his number of views (8,988,432) times $1.54 to arrive at his benefit calculation of $13,859,960.[161]  Mr. Anderson claims that this figure represents the "cost to generate an equivalent amount of traffic via a targeted digital marketing campaign."[162] To generate his $1.54 estimate, as described by Mr. Anderson, he first, based on data generated by a third party company, Semrush, identified the "top 100 keywords that generated traffic to BuzzFeed in January 2017."[163]  According to Mr. Anderson, these keywords represent "words or phrases which, when typed into a search engine," such as Google, "generate traffic to a website."[164]  Mr. Anderson further explains that in "addition to reporting the percentage of user traffic generated from each keyword, Semrush reports the average cost to use each keyword to drive traffic" and that the "amount a company or website pays when someone clicks on an ad displayed amongst the search results" is called the "cost per click" or "CPC."[165]  He further explained that using the "January 2017 CPC for each of the top 100 keywords, as well as the estimated percentage of traffic driven to BuzzFeed's website for each of these keywords, [he] calculated a weighted average CPC for BuzzFeed's top 100 keywords of $1.54."[166]  Mr. Anderson seems to argue that BuzzFeed was able to avoid costs when generating views to its website as a result of the conduct at issue.[167]

68.      However, based on my understanding of the data relied upon by Mr. Anderson and Mr. Anderson's description of his analysis, his calculation does <u>not</u> represent what BuzzFeed

---

[161] Anderson Second Report, at pp. 12-14.
[162] <u>Id</u>.
[163] <u>Id</u>.
[164] <u>Id</u>.
[165] <u>Id</u>.
[166] <u>Id</u>.
[167] <u>See</u> Anderson Dep. Tr. at 179 and 186-187.

actually pays to generate traffic to its website.  In other words, he has not reliably measured what BuzzFeed would have paid to generate the views that are the focus of his analysis.  Rather, his calculations reflect what other third parties paid in January 2017 as measured by Semrush when an advertisement is placed on a search engine like Google, when a certain keyword is searched by an individual, and when that relevant advertisement is actually clicked.[168]  Mr. Anderson represents that his calculation reflected the cost per click for the "top 100 keywords that generated traffic to BuzzFeed in January 2017" and the weighted cost per click for each of these 100 keywords.[169]  But the CPC calculated by Mr. Anderson, as I understand his analysis, is <u>not</u> being paid by BuzzFeed to generate traffic to its website.  The CPC is being paid by third parties when the advertisement they placed on the search engines are clicked upon.

69.      For example, Mr. Anderson's calculations reflect a cost per click of $2.50 when the keyword "BuzzFeed" is searched.[170]  But BuzzFeed, as I understand Mr. Anderson's analysis, is not paying Google $2.50, for example, each time an individual searches the word BuzzFeed.  Rather, it is third parties that are paying the search engine the $2.50 during July 2017 (as calculated by Semrush) when the term BuzzFeed is searched and when searched, an advertisement is generated on the search engine associated with the third party and that advertisement is clicked.  As Mr. Anderson admitted, BuzzFeed would not pay $2.50 per click ("I'm not saying they would") for individuals who are directly searching the term BuzzFeed.[171]

---

[168] At his deposition, when discussing what his measurement of cost represented, Mr. Anderson described so-called "higher-placed links."  (Anderson Dep. Tr. at 179-183.)  As I understand Mr. Anderson's analysis, his reference to so-called "higher-placed links" refers to "higher-placed links" that represent an advertisement.  According to his report, the cost per click he is measuring is the "amount a company or website pays when someone clicks on an ad displayed amongst the search results."  (Anderson Second Report, at p. 14.)

[169] Anderson Second Report, at pp. 12-14.

[170] Anderson Dep. Tr. at 245-246; Anderson Dep. Ex. 14 at p. 7; and Anderson Second Report, at Exhibit 12.

[171] Anderson Dep. Tr. at 245-246.

70.     Mr. Anderson has not established, however, that what third parties pay for such advertisements when certain keywords are searched is necessarily representative of what BuzzFeed would pay to generate traffic to its website.  In fact, as best I understand Mr. Anderson's analysis, the use of the keywords that are involved in his calculation of the $1.54 generate traffic to the BuzzFeed website without BuzzFeed having to pay anything to generate this traffic through the use of advertisements.  Nor has Mr. Anderson presented any reliable evidence that BuzzFeed would ever use the type of "targeted digital marketing campaign" to generate traffic to its website that is the focus of Mr. Anderson's calculations.[172]

71.     I also noted that Mr. Anderson did not appear to understand BuzzFeed's business model for generating advertising revenue when the Dossier was published.  At the time the Dossier was published, my research indicates that BuzzFeed generated advertising revenue by using so-called "native advertising," where a firm's product would be mentioned in content published on the BuzzFeed website.[173]  In return for publishing a native advertisement, my research indicates that BuzzFeed would charge a client a set fee per story.[174]  Mr. Anderson did not appear to even know what native advertising was.[175]  I understand that beginning in August 2017, BuzzFeed generated advertising revenue for use of both banner advertisements and native advertising on its own website[176]  When estimating any purported benefit to BuzzFeed as a result of the conduct at issue, Mr. Anderson has not provided any evidence that BuzzFeed was able to

---

[172] I noted in this regard that even if this figure represented what BuzzFeed would pay for such advertisements, that Mr. Anderson admitted that what a company pays for something "doesn't necessarily have to be what something is worth." (Id., at 245-246.)
[173] Fergal Gallagher, "How Does BuzzFeed Make Money?," Tech Times, March 6, 2015.
[174] Id.
[175] Anderson Dep. Tr. at 189-190.
[176] Tanya Dua, "BuzzFeed Is Ditching Its Anti-Banner-Ad Stance To Better Cash In On Its Huge Audience," Business Insider, August 28, 2017.  I understand that BuzzFeed conducted some experiments with banner advertisements in 2016. (Id.)

increase such advertising revenue. I also noted in this regard that according to Mr. Anderson's own analysis of Google Trends, search engine interest in the term "BuzzFeed" appeared temporary in nature.[177]

72.     One final point with respect to Mr. Anderson's $1.54 calculation. It is based on the weighted average cost of reported CPC's for January 2017 as calculated by Semrush for only the top 100 relevant keywords according to Mr. Anderson's Exhibit 12.[178] According to this exhibit, which is based on the Semrush data, the amount of "traffic" (with traffic defined as individuals visiting the relevant website) represented by the top 100 keywords only represents about 20 percent of the total traffic reported.[179] These data are reflected in **Exhibit 18** and are based on the data included in Mr. Anderson's Exhibit 12. A review of the backup provided by Mr. Anderson, however, indicates that 6.2 million separate keywords would generate a link to the BuzzFeed website and these 6.2 million keywords generated traffic of 19.5 million.[180] The reported "traffic cost" for these 6.2 million keywords was $18 million, implying a cost of $0.92 per click ($18 million divided by 19.5 million) not the $1.54 used by Mr. Anderson.[181]

## V.     CONCLUSION

73.     In my opinion, for the reasons set forth above, Mr. Anderson has not generated a reliable estimate of any damages suffered by XBT as a result of the conduct at issue and his

---

[177] Anderson Second Report, at p. 13. In this regard, I noted that an XBT executive authored on email on January 12 2017, a few days after the Dossier was published by BuzzFeed, that concluded that the "first storm seems to have subsided" and that there were "no follow-up stories, other than 1 regional [story]." (See Steman Dep. Tr. at 65-66; and Steman Dep. Ex. 5B.)
[178] Anderson Second Report, Exhibit 12.
[179] Id.
[180] Anderson Dep. Ex. 14, at p. 2; and Anderson Dep. Tr. at 240-241.
[181] Anderson Dep. Ex. 14, at p. 2.

calculation of alleged benefits enjoyed by BuzzFeed associated with this same conduct is equally unreliable.

David P. Kaplan