# EXHIBIT 3

2nd Witness Statement of S F Loble
Filed on Behalf of the Plaintiffs
16 January 2018
Exhibits "SFL 3" – "SFL 4"

**CR 2017–664**

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**

**IN THE MATTER OF THE EVIDENCE (PROCEEDINGS IN OTHER JURISDICTIONS) ACT 1975**

**AND IN THE MATTER OF THE HAGUE CONVENTION OF 18TH MARCH 1970 ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS**

**AND IN THE MATTER OF A CIVIL PROCEEDING NOW PENDING BEFORE THE UNITED STATES COURT FOR THE SOUTHERN DISTRICT OF FLORIDA MIAMI DIVISION**

| | |
|---|---|
| **ALEXSEJ GUBAREV, XBT HOLDING S.A. and WEBZILLA INC.**<br>**Plaintiffs**<br><br>**v.**<br><br>**BUZZFEED INC. and BEN SMITH**<br>**Defendants** | **Case No.**<br><br>**0:17-cv-60426-UU** |

**2ND WITNESS STATEMENT OF S F LOBLE**

I, **Steven Frederick Loble** of 47 Red Lion Street, London WC1R 4PF, Solicitor and a Litigation Director with W Legal Limited of the same address state that:

1. I make this witness statement in response to the application of the witness, Christopher Steele, to set aside the Order made by the Senior Master on 9 November 2017 and sealed on 15 November 2017 ("the Order"). The facts in this witness statement are within my own knowledge or have been communicate to me by the Plaintiffs' US attorneys, or are known to me from the documents in my possession. There is now produced and shown to me marked "SFL 3" a bundle of copy documents to which I shall refer.

2. I shall deal with the evidence of Nicola Cain and Edward Lucas in support of the application to set aside or vary the order below.

**Background**

3. Mr Steele's company, Orbis Business Intelligence Limited ("Orbis"), is in the private sector. In 2016 Orbis was engaged by an American political and business research firm, Fusion GPS, to conduct research into the then Presidential candidate, Donald Trump. It appears from media reports (which have been confirmed by Fusion) that Fusion GPS's client was, from about May 2016 (when Mr Trump became the presumptive Republican nominee) until at least November 2016 (when Mr Trump won the US Presidential election), the Democratic National Committee and the presidential campaign of Hillary Clinton, although Fusion was not engaged directly by either of these two entities, but rather by a law firm working on their behalf The instruction of Orbis was a purely commercial arrangement for which Orbis received payment ("SFL 3", pages 1-9).

4. It appears that Orbis/Mr Steele produced a number of memoranda which together comprise what has become known as the "dossier". Most of the memoranda pre-date the November 2016 US election ("the pre-election memoranda"). The last of the memoranda post-dated the election and was produced in December 2016 ("the December 2016 memorandum"). It appears that at least the pre-election memoranda were provided by Fusion to their client (see "SFL 3 ", pages 7-12.)

5. Mr Steele gave interviews to media representatives about the pre-election memoranda, including the New York Times, the Washington Post, CNN, the New Yorker, Yahoo! News, and a prominent US magazine, "Mother Jones", which published an article on 31 October 2016 which quoted extensively from Mr Steele (although without naming him). The article also stated "*Mother* Jones has reviewed that report and other memos this former spy wrote. ..." and proceeded to quote from various of the pre-election memoranda. From this it is clear that Mother Jones had been provided with copies of all or some of the pre-election memoranda. Mr Steele gave a further interview to Mother Jones on about 13 January 2017, immediately following the publication of the dossier by Buzzfeed, in which he apparently said to the interviewer "The story has to come out". Orbis/Mr Steele have never disputed or challenged the contents of the Mother Jones articles.

Copies of the October 2016 and January 2017 Mother Jones articles are at "SFL3" pages 56-58 and 59 to 61 respectively.

6. The December 2016 memorandum (which contains the defamatory statements the subject of the US and the UK libel proceedings) was provided by Orbis to Fusion GPS and also to an unnamed "senior government national security official in the UK". The basis upon which the memorandum was provided to Fusion GPS is in issue in the English proceedings. It appears that a copy of the December 2016 memorandum may have been provided by Fusion GPS to a David Kramer and, by Mr Kramer, to Senator John McCain.

7. Orbis/Mr Steele had also apparently provided copies of all or some the pre-election dossier to the FBI (see October 2016 Mother Jones article at 57).

8. The dossier was made available by someone to Buzzfeed which published it on the internet on 10 January 2017.

9. Mr Steele has given a number of interviews to journalists and/or spoken to people who have then spoken to journalists since the publication of the dossier on Buzzfeed. I refer to an article in the Independent on 13 January 2013 ("SFL3" at pages 7-11) in which it is reported that "Mr Steele also decided to pass on information to both British and American intelligence officials after concluding that such material should not just be in the hands of political opponents of Mr Trump, who had hired his services but was a matter of national security for both countries". I refer also to an article in the Guardian Newspaper dated 15 November 2017, a copy of which is at "SFL3" pages 13-17 which quotes from a recently published a book "Collusion: How Russia Helped Donal Trump Win" by Guardian journalist Luke Harding. The article (and book) quote from "friends" of Mr Steele including reporting Mr Steele as "having told friends" that he believes that 70% to 90% of the dossier is accurate. The necessary implication is that at least 10% to 30% of the dossier is not accurate.

**The US Libel Proceedings**

10. The key factual issues in the US proceedings are:

(i) whether publication of the allegations by Buzzfeed was made "negligently, without reasonable care as to their truth or falsity: with knowledge of their falsity; and/or with reckless disregard for the truth or falsity of the allegations."

(ii) Whether the allegations made in relation to the Plaintiffs in the December 2016 memorandum are true.

**The English Libel Proceedings**

11. As for the English proceedings, the UK Plaintiff's English counsel has confirmed as follows:

(i) in relation to issue of liability the Defence rests upon one fundamental issue: a denial that Orbis/ Mr Steele were responsible as a matter of law for the words complained of becoming public. Orbis/ Mr Steele assert that they treated the December 2016 memorandum as confidential and made that clear to those with whom they dealt.

(ii) As a related matter, Orbis/Mr Steele also assert in the English proceedings that they are entitled to the protection of a form of qualified privilege (i.e. that they had a legal or moral duty to act as they did) if anyone to whom they provided the memorandum did in fact republish it to the public.

(iii) Orbis and Mr Steel make no case that publication of the allegations against the Claimants was in the public interest.

(iv) The factual enquiry in the English Proceedings will focus on the issue of responsibility for dissemination of the dossier and not on the truth or otherwise of the defamatory allegations. As a matter of law they are presumed to be false, and the Defendants are not contending otherwise as a matter of fact.

**Mr Steele's application**

12. Mr Steele's application to set aside or vary the Order is made on the basis that the Order was "made without jurisdiction; alternatively, the application for the order was an abuse of process and/or the court should have declined in the exercise of tis discretion to make the order."

13. The application is supported principally by the witness statement of Ms Nicola Cain of Reynold Porter Chamberlain LLP ("RPC"). Ms Cain largely does not link the matters to which she speaks to the grounds set out in the Notice of Application. I address the matters to which she speaks below.

14. Mr Steele has also served a witness statement of Mr David Edward Lucas which appears to be in the manner of an expert report on the risk to sources of intelligence contained in the dossier. Given that the Plaintiffs had, prior to the issue of the application, confirmed in correspondence by my firm to RPC that the Plaintiffs are not seeking to identify Mr Steele's sources of information, this evidence is irrelevant and I will not address it further. I deal with the issue of sources of information further at paragraphs 28 and following below.

**The application for an order for examination**

15. Ms Cain complains that the application for an order was made without notice. This is, however, in accordance with the CPR.

16. I had an exchange of correspondence with Ms Cain in August 2017 in which I invited her to let me know Mr Steele's position on the Plaintiff's application in order that I could take instructions. Ms Cain did not, however, provide any substantive response. I exhibited the correspondence between us to my witness statement in support of the without notice application. I refer to "SFL 2" at pages 7-13. By email dated 10 November this was confirmed by me to Ms Cain (see "NC 1" page 130). I also exhibited at "SFL 2", pages 1-6 copies of Mr Steele's Motion to Intervene in the US Proceedings to oppose the request for international assistance to compel Mr Steele's examination and the Judgment refusing the Motion.

17. Further, I note that Ms Cain also wrote to the Court and the Senior Master responded in the following terms:

> "I made the order sought on 9 November 2017, with two amendments to the draft order, first for the name of the Examiner to be included and secondly an amendment inserting a definition in the Schedule to the Order...

You are entitled to apply to set aside, vary or stay the application within 7 days of service of the Order. If that is to be done please can both parties attempt to agree a time estimate and mutual dates of agreement so I can list a hearing."

("NC 1" at page 136)

18. Mr Steele sought to delay service of the Order on him. I refer to "SFL 3" at pages 18-45 which is a chain of emails relating to service. By email dated 15 November 2017, I sought confirmation from RPC that if the Master's Order was served on them, it would be treated as personal service on Mr Steele. Such confirmation was not forthcoming. Despite Mr Steele's lack of co-operation in relation to service, I sent to RPC copies of the application papers and the Order by email on 16 November. On 18 November, a process server sought to effect personal service on Mr Steele. The process server told me that he met Mr Steele's mother-in-law at Mr Steele's address. She seemed to know all about the matter and within an hour the process server received a telephone call from Mr Mathieson of RPC. Mr Steele was subsequently served by appointment on 22 November at RPC's London offices. Mr Steele's application was due to be issued and served by close of business on 1 December but was served by email on 4 December 2017.

**Communications with Mr Steele's solicitors**

19. Mr Steel's application and Ms Cain's evidence has been prepared with almost no reference to the correspondence which has passed between me and RPC and which is exhibited at "SFL 3" pages 18 to 51. This is despite the fact that the correspondence pre-dates Mr Steele's application and Ms Cain's witness statement and has addressed some key issues raised by Ms Cain.

20. Following the personal service on Mr Steele, I sent to Mr Mathieson an email ("SFL3" at page 46) in which I confirmed:

    (i) The Plaintiffs will not seek to identify Mr Steele's sources of information;

    (ii) The Plaintiffs are prepared to restrict the subject matter of the examination and that the "thrust of the questioning is whether or not the contents of the relevant paragraph of the dossier, which is attached to the Schedule, were verified or not".

21. I attached to my email a revised Schedule A (list of topics for examination) ("SFL 32 at page 47). The revised list of topics, amongst other changes, deleted a topic relating to the identity of Mr Steele's sources of information.

22. In addition, by email dated 24 November 2017, I confirmed that all questions, except the first question concerning Mr Steele's background, would be restricted to the specific paragraph in the dossier containing the defamatory statements. I also confirmed that the Plaintiffs are prepared to amend the Order to reflect this ("SFL 3" page 51).

23. Despite the above, Mr Steele maintained his objection on the basis that the topics "offend [Mr Steele's] rights" and "engage issues of national security". While I asked for an explanation as to which portions or categories of topics for questioning could "possibly be related to national security and why", I have received no such explanation. I refer to the email correspondence at "SFL3" pages 42 and following.

**Jurisdiction**

24. Although Mr Steele's application is made on the basis that the Order was made without jurisdiction, this is not explained in Ms Cain's witness statement. It is obviously wrong. Mr Steele is a resident and was served personally in London. His company, Orbis, is an English company operating from offices in London.

25. Further, the US Court has expressly confirmed in its Request that the evidence is to be used in the US proceedings and has, as above, confirmed that the evidence sought is directly relevant to the issues in dispute: See Request at "SFL 1" at p 1.

**Evidence necessary for US Proceedings**

26. At paragraphs 39 and 51 of her witness statement, Ms Cain appears to challenge the need for Mr Steele to be examined for the purposes of the US Proceedings. She appears to suggest that Mr Steele's pleadings in the English Proceedings will be sufficient. As to this:

    (i) As above, the US District Court of Southern District of Florida, Miami Division ("the US Court") has determined that the evidence sought is "directly relevant to the issues in dispute" between the parties to those proceedings. The Court has also confirmed that it "believes that the witnesses ... will be able to provide

evidence directly relevant to the main issues between the parties and without which the ends of justice could not be properly met.": See "SFL 1" pages 1 and 8-9.

(ii) Ms Cain's assertion that the pleadings in the English Proceedings will be sufficient for the parties' purposes in the US Proceedings is wrong. I am advised by Mr Fray-Witzer of Ciampa Fray-Witzer LLP, the Plaintiffs' US attorneys, that as a matter of law pursuant to the Federal Rules of Evidence, Mr. Steele's pleadings in the English Proceedings would likely be inadmissible as hearsay in the US Proceeding.

(iii) I also note that, apart from being inadmissible in the US Proceeding, Mr Steele's pleadings in the English proceedings do not address the key issue the subject matter of the examination, namely the issue of the lack of verification of the information contained in the relevant paragraph of the dossier.

(iv) As above, the key factual issues in the US proceedings include whether or not the defamatory allegations in issue are true and Buzzfeed's lack of care in publishing the dossier. It is, obviously, highly material to that determination to have evidence from Mr Steele as to:

(1) His background: this is part of the narrative at trial to explain why Mr. Steele was retained to perform these services (topic 1).

(2) How he came to make the allegations in the December memorandum/whether the allegations were verified. This evidence will go to whether the allegations are true (topics 2-5).

(3) The circumstances of the provision of the dossier to various parties identified in topics 6-9 including whether cautions were given to such parties about the unverified nature of the allegations in the dossier and warnings were given not to publish the same without independent verification. This evidence will go to the lack of care exhibited by Buzzfeed (topics 6-9).

...

**Protection of Sources**

27. At paragraphs 40 to 44 of her witness statement Ms Cain deals with the issue of protection of sources. As to this evidence:

    (i) As already noted, Ms Cain's evidence largely ignores that I have already confirmed, in writing on behalf of the Plaintiffs, that the examination will not seek to identify Mr Steele's sources of information. Further the revised Schedule A has removed from the list of topics for questioning the question related to the identification of Mr Steele's sources.

    (ii) I would also note that it appears from Ms Cain's evidence that the sources have already been comprised and are already at risk. In paragraph 41 Ms Cain states that Mr Steele has told her that "there was often enough information in the report to render the source/s identifiable to someone with sufficient knowledge of the matters the source/s was/were disclosing". At paragraph 44 Ms Cain states that Mr Steele has instructed her that the publication of the dossier by Buzzfeed "may have compromised the source, putting their lives, their families and their livelihoods at risk." I would also note that it was the obvious consequence of the publication of the dossier that questions would be asked about the identity (and therefore the reliability) of the sources. At paragraph 43 Ms Cain asserts that it "will no doubt be obvious to this court even if it is not obvious to the parties and their lawyers in the Florida proceedings" that the dossier was not intended for public consumption. This evidence ignores that, as above:

        (1) Fusion's clients were political opponents of Mr Trump and the purpose of their instruction was to obtain information to undermine the Trump Presidential campaign. Thus, the specific purpose for which Mr Steele was hired was to collect information to be used publicly. One cannot gather such information for such a purpose and at then claim surprise when the information gathered is disseminated.

        (2) Mr Steele participated in a number of interviews with various news outlets prior to the US Presidential elections in which he briefed them on

the contents of the pre-election memoranda with a view to generating interest in the alleged connections between the Russian Government and Mr Trump. This was clearly action intended to increase the public consumption of the information contained in the memoranda.

(3) There is now produced and shown to me marked "SFL 4" a true copy of the evidence to the Congress which was given by Glenn Simpson of Fusion. This was released publicly on 9 January 2018 at the request of Fusion GPS. Mr Simpson of Fusion GPS confirmed that it was part of the purpose of the investigation to share information with journalists (see "SFL 4" pages 203-206). Mr Simpson also indicated that attempts were made to try to encourage journalists to ask questions of the FBI in relation to the investigation ("SFL 4", page 229). He also gave detailed evidence about the provision of the dossier to Mr Kramer (see "SFL 4" page 253) and Mr Steele' dealings with the FBI, including briefing journalists on the same (see "SFL 4" page 229).

(4) It was apparent from the October 2016 Mother Jones Article that Mother Jones had been provided with copies of some or all of the pre-election memoranda.

(5) Mr Steele has acknowledged wanting the "story to come out."

**National Security**

28. Ms Cain raises the issue of national security. As above, despite my firm's request for an explanation as to why national security interests might be affected by the examination, RPC has not articulated in what way national security may be affected by the giving of the requested evidence by Mr Steele.

29. As far as Mr Steele's work history is concerned, the Plaintiffs will be content with a recital on the record in the terms set out in paragraph 7 of Ms Cain's witness statement, although, no doubt, Mr Steele could provide some more detail without endangering national security. I note that Mr Harding appears to have been provided with a significant amount of detail as to Mr Steele's background as appears from the Guardian Article

referred to at paragraph 9 above. I also refer to pages 52-55 of "SFL 3" which is an extract from Mr Harding's book, "Collusion". In addition, Mr Simpson spoke about Mr Steele's background during his evidence to Congress (see "SFL 4" at page 88). I would also note that in his evidence to Congress Mr Simpson also described Mr Steele's role, what he did in relation to the research into Mr Trump and his preparation of the dossier and the use to which the dossier was put (see the above references in the transcript and above).

30. I have already considered above the position of sources. Given the confirmations which have been given by my firm on the Plaintiff's instructions, via his US attorneys, there is no risk of identification of Mr Steele's sources.

31. While Ms Cain refers (paragraph 45) to correspondence with the FCO, and the prospect of an application under Section 3(3) of the 1975 Act, no such application has been made. The FCO has merely indicated that it may make such an application "in the event that it becomes necessary to do so following the determination of Mr Steele's application." Again, I invited the FCO to let me know which, if any, topics for examination caused concern but I have received no substantive response. At pages 62-72 of "SFL 3" are copies of my correspondence with the FCO.

**Abuse of Process**

32. Based on paragraph 52 of Ms Cain's witness statement Mr Steele contends that the application to depose him is an abuse on process on two grounds.

33. At paragraph 52(a), Ms Cain asserts that "[t]here is an obvious inference that one motive of the Plaintiffs in the Florida proceedings in seeking this Order is to pressurise the defendants and their sources by gaining access to highly confidential information which would enter the public domain through the US proceedings. This would expose those involved in putting together the 'dossier' and leave them vulnerable to attack outside the courtroom". As to this:

    (i) I have addressed the obvious relevance of the evidence sought to the US proceedings above. As above, the US District Court Southern District of Florida Miami Division is satisfied and has confirmed that the evidence sought is directly relevant to the issues in dispute.

(ii) The allegation that the Plaintiffs have some ulterior motive in pursuing the application is unfounded and should be withdrawn, in particular the suggestion that the application is intended to put pressure on Mr Steele and his sources by exposing them to attack "outside the courtroom". As to this:

(1) The information which is contained in the dossier put together by Mr Steele has already entered the public domain and, as above, Mr Steele has himself been involved in numerous interviews with journalists (directly or indirectly), before and after the publication of the dossier by Buzzfeed and is reportedly keen that "the story has to come out".

(2) As above, it is Ms Cain's evidence that the publication of the dossier has already put Mr Steele's sources at risk.

(3) The allegation again ignores my firm's express confirmation that the Plaintiffs do not seek identification of Mr Steele's sources. As above, it is the publication of the dossier, not the pursuit by the Plaintiffs of their legal remedies, which has already put the security of Mr Steele's sources at risk.

34. At paragraph 52(b), Ms Cain asserts that the order has been formulated and obtained in order to enable the Claimants in the English proceedings to obtain evidence prior to disclosure and exchange of witness statements in those proceedings. It is alleged that the examination amounts to a breach of Mr Steele's ECHR Article 6 rights. As to this:

(i) As above, the evidence sought is obviously highly relevant to the US proceedings.

(ii) As above, the key evidence sought (namely the extent to which, if at all, Mr Steele verified the allegations against the Plaintiffs) is of only marginal relevance to the English proceedings.

(iii) The topics at paragraphs 6-9 of the revised Schedule A could potentially be relevant to issues in the English proceedings. However, as to this:

(1) As above, the evidence is relevant in the US proceedings. That is the reason why it is the subject of the examination.

(2) It is necessary to obtain Mr Steele's evidence by examination because he is not willing to attend trial in the US voluntarily and the Plaintiffs are unable to compel his attendance, as also confirmed by the US Court's Request for Judicial Assistance (SFL1 at page 8). Otherwise, the Plaintiffs would have sought to call Mr Steele as a witness in the US proceedings. Following the adjournment of the original March trial date, I am told by Mr Fray-Witzer that it is now expected that the US trial will commence in August 2018.

(3) The topics the subject of the revised Schedule A are matters which are peculiarly within the knowledge of Mr Steele (and Orbis). Therefore, to the extent that any such issues are potentially relevant to the issues in the English proceedings, the Claimants in the English proceedings would be entitled to ask for the information by means of a Request for Further Information, to the extent that Mr Steele (and Orbis)'s position was not sufficiently pleaded, in order to enable the Claimants in the English proceedings to prepare their own case or to understand the case they have to meet.

(4) The English proceedings are libel proceedings, not criminal proceedings. Mr Steele and Orbis have no right to silence or to otherwise withhold disclosing matters relevant to their defence until oral evidence is given. Indeed, as Ms Cain acknowledges, he will be required to set out his evidence in advance of trial in a witness statement. Thus to the extent that the topics set out in the revised Schedule A are relevant in the English Proceedings, Mr Steele will need to address them in advance of trial in his witness statement in any event.

(5) To the extent that Mr. Steele's testimony is relevant in the English proceedings, it is expected that such testimony would only assist Mr Steele in his defence. Specifically, Plaintiffs expect Mr Steele to testify that he provided news outlets with cautions against publishing information contained within the dossier without independent verification of the same. Such testimony would (to the extent it is

relevant at all in the English proceedings) would only prove to be exculpatory.

**The position of the Defendants to the US proceedings**

35. I refer to the application issued by the US Defendants by which they seek to expand the topics for examination beyond those agreed and set out in the revised Schedule A by the US Plaintiffs as set out above (i.e. the US Defendants' attorneys do not want to limit the scope of the topics listed on the revised Schedule A at paragraphs 5-9 to paragraph 3 of the December 2016 memorandum, as opposed to the dossier as a whole). The US Plaintiffs are neutral on the US Defendants' application (which is still currently defective), that is the Plaintiffs are content to stand by their agreement to limit the scope of the topics as set out in the revised Schedule A and will neither support nor oppose the application (if heard), save only that they do not wish it or the US Defendants to impede either the hearing on 5 February or the conduct of the examination itself.

36. In any event, the Court will see from the correspondence at page 11 to the exhibit to Ms Bolger's witness statement that:

(i) it has been agreed by the Plaintiff's US attorneys that the time for examination of Mr Steele should be split more equitably between the Plaintiffs' and Defendants' attorneys such that it has been agreed between them that the Plaintiffs' attorneys will have 3 hours to examine Mr Steele, the Defendants' attorneys will have 3 hours to cross examine Mr Steele, and the Plaintiffs will have one hour to re-examine Mr Steele.

(ii) The Plaintiff's US attorneys have also confirmed that the only document which it is intended to put to Mr Steele is the dossier itself.

(iii) The US Defendants' attorneys have confirmed that "Buzzfeed has no interest in asking any questions which may identify the sources of Mr. Steele's information."

**The evidence of David Kramer**

37. It has been widely reported (see "SFL 4" page 253) that David Kramer, who has connections with United States Senator John McCain, met with Mr Steele and was provided with a copy of the dossier by Mr Steele.

38. Mr. Kramer has recently been deposed in the United States in connection with the US proceedings. Mr. Kramer's testimony is currently designated as confidential, although the plaintiffs are seeking to have that designation removed.

39. If Mr. Kramer's testimony is de-designated, Mr Steele will be asked questions about Mr. Kramer's testimony which is directly relevant to the issues listed in the revised Schedule A.

**Summary**

40. Ms Cain's concerns apparently relate to:

(i) The protection of sources;

(ii) National security;

(iii) The UK Claimants' "preview" of evidence;

(iv) Fair procedure.

41. For the reasons set out above, none of these concerns are valid.

(i) The Plaintiffs (and US Defendants) have agreed not to ask about the identity of Mr Steele's sources;

(ii) As a result of (i), there can be no national security issue and the FCO, despite having been invited to become involved, have not done so;

(iii) As above, the core factual issues in the US and English are different. In any event, to the extent that the evidence is potentially relevant in the English proceedings there is no procedural unfairness to Mr Steele in being required to state his position in relation to the relevant topics at this stage. To the extent that the

issues are relevant in the English proceedings, he will have to do so in advance of trial in any event.

42. The Plaintiffs have proposed a revised schedule of topics for examination which addresses Mr Steele's key concern. The Examiner and the lawyers for the parties, including the witness, will ensure that the Examination is conducted in a fair manner.

43. The Order allows a day for the Examination. I note that Mr Steele has suggested a total of three hours. I am instructed by the Plaintiffs' US attorneys that the Examination is unlikely to last the whole day. However, given the expense of obtaining the order, preparing for the Examination and the travel and hotel costs associated with the Examination, the attorneys do not wish to have an artificially limited time in which to conduct the Examination. As above, the Plaintiffs' US attorneys have been in correspondence with the US Defendants' attorneys and have agreed a revised timetable for the Examination.

44. Accordingly, I ask that Mr Steele's application be dismissed, with costs.

I believe that the facts stated in this witness statement are true.

..................................................

**Steven Loble**
16 January 2018

2nd Witness Statement of S F Loble
Filed on Behalf of the Plaintiffs
16 January 2018
Exhibits "SFL 3" – "SFL 4"

**CR 2017-664**

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**

**IN THE MATTER OF THE EVIDENCE (PROCEEDINGS IN OTHER JURISDICTIONS) ACT 1975**

**AND IN THE MATTER OF THE HAGUE CONVENTION OF 18TH MARCH 1970 ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS**

**AND IN THE MATTER OF A CIVIL PROCEEDING NOW PENDING BEFORE THE UNITED STATES COURT FOR THE SOUTHERN DISTRICT OF FLORIDA MIAMI DIVISION**

| | |
|---|---|
| **ALEXSEJ GUBAREV, XBT HOLDING S.A. and WEBZILLA INC.** **Plaintiffs** | |
| **v.** | **Case No.** |
| **BUZZFEED INC. and BEN SMITH** **Defendants** | **0:17-cv-60426-UU** |

## 2nd WITNESS STATEMENT OF S F LOBLE

**W Legal Limited**
47 Red Lion Street
London
WC1R 4PF

Ref SL

Tel 020 7220 9130