## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## Case No.: 17-cv-60426-UU

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.,

  Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

  Defendants.

_____/

**REPLY IN FURTHER SUPPORT OF DEFENDANTS' MOTION *IN LIMINE* NO. 10 TO HAVE THE JURY REVIEW THE ARTICLE AND DOSSIER AND FOR THE COURT TO DELIVER PRELIMINARY INSTRUCTIONS PRIOR TO OPENING STATEMENTS, AND INCORPORATED MEMORANDUM OF LAW**

Defendants BuzzFeed, Inc. and Ben Smith respectfully submit this reply in further support of their motion *in limine* No. 10.

### PRELIMINARY STATEMENT

Plaintiffs' Opposition to this motion makes one wonder exactly what they have suddenly become afraid of. Plaintiffs have long acknowledged the relevance of the whole Dossier, starting with attaching it to their Complaint. Moreover, they have repeatedly pointed to the whole Dossier to support their case – in their summary judgment arguments, their expert reports, their own Motions in Limine and in numerous other ways. As a result, no motion *in limine* filed by either party sought to exclude the full Dossier from coming into evidence. To the contrary, both sides have designated the Dossier as a trial exhibit, without objection from the other.

So Defendants' Motion *in Limine* No. 10 raises a very narrow issue – not *whether* the jury would see the Dossier, but simply *when* they would first see it. As to that, Plaintiffs actually state that they have no objection to the jury reading materials before opening arguments. Opp. at 2 n.2. Otherwise, it would appear that Plaintiffs are trying, by way of purporting to respond to that narrow request, to file another and quite different *de facto* motion *in limine* of their own to exclude the Dossier entirely. But it is too late for that, and they do not explain how that position

could possibly be squared with their own case as it is set forth in all the other pre-trial materials before the Court. In any event, Plaintiffs have been right all along – the full Dossier and the accompanying article (the "Article") are plainly relevant. And since Plaintiffs have no objection to the jury reading the Article and the portions of the Dossier they think are most important, they offer no real opposition to this motion, which should therefore be granted.

Finally, Plaintiffs' only objection to jurors learning about the often-arcane legal principles they will be expected to apply at the outset of trial is that such an instruction is not "standard procedure." But this is not a "standard" case, to say the least, and courts – including the Supreme Court – have recognized that a preliminary instruction can be an important tool to help jurors keep up with complex defamation cases like this one.

## ARGUMENT

### A. The Jurors Should be Instructed to Read the Complete Text of the Article and Dossier Prior to Opening Statements

The issue here is both narrow and simple. Each Party has filed a motion *in limine* which requests some specific action be taken in this case regarding the full Dossier. In their Motion *In Limine* No. 3 ("MIL No. 3"), Plaintiffs agree that "it is certainly useful and necessary for the jury to have a basic understand of the so-called 'Dossier' as a whole." Dkt. 276 at 2. Therefore, their MIL No. 3 did not seek to exclude the whole Dossier. Rather, it sought to exclude a particular category of "testimony and argument about the purported benefit to the public in having the Dossier as a whole in the public domain," *id*., which Defendants oppose.

And the only issue actually raised in this motion *in limine*, Defendants' No. 10, is simply one of timing: whether it is better for the jurors to see and read for themselves what Defendants published at the outset of the case, or whether they should be expected to rely on how counsel characterizes the Dossier until it is actually admitted into evidence at trial. Especially in light of the fact that the jurors will be instructed to interpret the words at issue in the context of the publication as a whole and through the eyes of an ordinary person, *see* Dkt. 274 ("Mot.") at 3, Defendants believe that this is an easy decision: jurors should be given the opportunity to see the publication at issue as an ordinary person would have seen it – without any "spin" put on it by counsel. For all their bluster, Plaintiffs do not actually take issue with the proposition that it would be a good idea for the jury to see the written materials that are at issue before opening statements. Opp. at 2 n.2. Since that is all that is at issue here, this motion *in limine* should be granted.

2

But it would appear that rather than contest that point, Plaintiffs have elected to now argue that the jury never needs to see the full Dossier as published by BuzzFeed *at all*. If that is indeed what they are arguing, it is far too late for that. In any event, their argument makes no sense because the evidence and arguments they have submitted to date repeatedly rely on both discussing the Dossier as a whole and specific portions within it outside the December memo.

To note just a few examples, the Complaint attaches the Article and the full Dossier, as it was published. Plaintiffs try to raise a genuine issue of fact with respect to actual malice by pointing to other statements throughout the whole Dossier. *See, e.g.*, Dkt. 234-1 (Pls.' Opp. to Mot. for Summ. J.) at 17 (claiming that qualifications in article, and errors in other parts of Dossier, provide "direct evidence" of actual malice); *id.* at 19-20 (arguing that redactions of allegations regarding Michael Cohen's father-in-law from October 18 memo is evidence of actual malice). Their damages expert, Jeffrey Anderson, estimates the "benefit to Buzzfeed" of publishing the entire Dossier (and more). Dkt. 249-3 at 12-15. And most of the deposition testimony Plaintiffs designate from non-parties like Fusion GPS and David Kramer either discuss the full Dossier generally, or specific portions other than the December memo. To note just one example from Fusion:

> Q. And if you look at the first page at the top, it reads: Company Intelligence Report 2016-080. What do you understand the purpose of company intelligence report to be?
> A. Orbis's internal nomenclature or labelling system.
> Q. And did you understand the reference to company intelligence report to distinguish it from, for example, a government document?
> MR. SIEGEL: Objection.
> THE WITNESS: I don't know. I never thought of that.
> Q. And I'd like for you to take a look through what's been marked as Exhibit Number 8. And tell me, if you can, does this represent all of the memorandum that Christopher Steele produced and provided to Fusion GPS?
> A. Yes, I believe so.

Ex. 1 (Fusion Dep.) at 111:2-20; *see also* Dkt. 237 (Joint Pretrial Stipulation) Ex. E at 3 (designating that testimony). All of that testimony would be nonsensical if the jury never sees the Dossier. And Plaintiffs know that – so both parties have designated the entire Dossier as a trial exhibit, in multiple iterations, *without objection from the other*. *See* Plaintiffs' Trial Exhibits A2, J1-J3, J10; Defendants' Trial Exhibits DEX 095, DEX 0223.[1] Even Plaintiffs'

---

[1] All exhibits are listed along with corresponding objections in Exhibit A (Plaintiffs' exhibits) and Exhibit B (Defendants' exhibits) to the Joint Pretrial Stipulation, Dkt. 237.

other oppositions to Defendants' motions *in limine* repeatedly rely on other portions of the Dossier. *See, e.g.*, Dkt. 314 (Opp. to MIL 1) at 2-3 (arguing that redactions of names other than Plaintiffs should be admissible); Dkt. 315 (Opp. to MIL 2) at 2-3 (arguing that Plaintiffs should be able to admit entire "shitty media men" list because it is analogous to publishing the entire Dossier); Dkt. 316 (Opp. to MIL 3) at 1 (arguing that evidence of journalism standards is admissible because "Defendants published wholesale and without meaningful redaction 35 pages of memos"); Dkt. 324 (Opp. to MIL 7) at 1, 4-5 (arguing the relevance of "Buzzfeed's benefits from publishing the Dossier").

Likewise, the Article and the full Dossier, especially in combination, are essential to Defendants' case regarding almost every element of Plaintiffs' defamation claim. It is, after all, what Defendants actually published: the Article, with the full Dossier as an embedded file, with its pages numbered up to 35. *See* Ex. 2 (Compl.) ¶¶ 22-23 & Exs. 2 and 3 thereto. And the Article, which Plaintiffs would be content to have the jury read at the outset (Opp. at 2 n.2), both describes the Dossier generally (*e.g.,* "dossier, compiled by a person who also claimed to be a former British intelligence official, alleges Russia has compromising information on Trump") and makes multiple references to different, specific statements within it that are not in the December memo ("graphic claims of sexual acts documented by Russians"; "Buzzfeed News reporters in the U.S. and Europe have been investigating various alleged facts in the dossier"; "[t]he report misspells the name of one company, 'Alpha Group,' throughout"). And even the December memo was not written as a standalone document. It repeatedly refers back to other portions of the Dossier, and thus is not fully intelligible without it. *See* Dkt. 311 (Defs.' Opp. to Pls.' MIL No. 3) at 3.

It borders on frivolous to argue that the jury cannot read the very publication which contains the allegedly defamatory statements, and even more so to argue that the full context of those statements must be deliberately removed. In any event, the full Dossier is plainly relevant for Defendants as well. *First*, as Defendants discussed in this motion, New York and Florida law say much more than "that it is *sometimes* necessary to consider the defamatory statements in the context of the publication in which is contained" for the jury to assess defamatory meaning, Opp. at 4 (emphasis added) – both are absolutely clear that, in assessing defamatory meaning, the jury must look at what the defendant published, not just the portions that the plaintiffs complain about. Mot. at 3. Plaintiffs fail to cite a single case in which a court held that the jury could

4

measure defamatory meaning without considering the full publication.[2] For example, Defendants maintain that when the full Dossier is read in the context of the Article, it does not amount to a statement of fact accusing anyone of engaging in actual misconduct. The jury cannot consider that without reading the Dossier.

*Second,* both New York and Florida law establish that the jury will have to consider the full Dossier in order to decide the issue of substantial truth, because "[t]he accuracy of the report should be assessed on the publication as a whole, not isolated portions of it." *Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*, 844 F.2d 955, 959 (2d Cir. 1988); *see also Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1254 (S.D. Fla. 2014) ("[T]he trier of fact must consider the context of the publication in determining whether the gist or sting associated with it differs from the actual truth."). To note just two examples of how that relates to this case, other portions of the Dossier discuss how Russia conducts state-sponsored cyber-operations (e.g., Report No. 86), which form part of the context for assessing the allegations against Plaintiffs. And other portions explain in more detail what the Dossier says about Michael Cohen.

*Third*, the jury will need the Article and full Dossier to assess fault. As Defendants noted in their response to Plaintiffs' MIL No. 3, the jury cannot understand Defendants' decision-making without seeing what they actually published. Not only did Defendants publish the Dossier because they believed there was a strong public interest in seeing the "full document," but the fact that they accompanied the Dossier with an article putting the document in context and letting readers know it was unverified is compelling evidence that they did not act with actual malice. *See* Dkt. 311 (Defs.' Opp. to Pls.' MIL No. 3) at 4. The full Dossier is also relevant because Plaintiffs' allegations of actual malice can be defeated with evidence that Defendants believed the allegations at issue to be credible because they knew other information in the Dossier had already been corroborated. *See, e.g.*, *St. Amant v. Thompson*, 390 U.S. 727,

---

[2] Plaintiffs' only response is to assert that the cases Defendants cite "address factual scenarios in which the Court looked at only a single unified publication." Opp. at 4. This ignores the fact that Defendant *did* publish the Dossier as a single unified publication – it even had page numbers. And, in any event, the cases make clear that this obligation applies even if a publication is comprised of separate parts – like the Article with its embedded PDF of the Dossier. *See, e.g.*, *Byrd v. Hustler Magazine, Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983) ("When words and pictures are presented together, each is an important element of what, *in toto*, constitutes the publication. Articles are to be considered with their illustrations; pictures are to be viewed with their captions; stories are to be read with their headlines.").

5

733 (1968) (no actual malice where defendant "testified that he had verified other aspects of [source's] information"); *Tavoulareas v. Piro*, 817 F.2d 762, 791 (D.C. Cir. 1987) (no actual malice where reporter "corroborated *much* of the information provided by" source); *OAO Alfa Bank v. Center for Pub. Integrity*, 387 F. Supp. 2d 20, 52-54 (D.D.C. 2005) (no actual malice where reporter had been told that "other information that [intelligence source] had provided was correct, including a great deal of information that was not public knowledge at the time").

Defendants have produced evidence establishing that when they decided to publish the Dossier they believed the allegations at issue to be credible and plausible because they already knew, among other things that: (a) other parts of Christopher Steele's account of Russian interference in the 2016 election had been corroborated;[3] (b) allegations in other parts of the Dossier fit with and explained events they knew had taken place in 2016, such as the abrupt and mysterious departures of senior Russian officials described in the Dossier and Carter Page's trip to Moscow;[4] and (c) allegations in other parts of the Dossier were consistent with other things they knew, such as Michael Cohen's role as Donald Trump's "fixer" and the use of surveillance and *kompromat* by Russian intelligence agencies.[5] In their minds, all of this confirmed Steele's reliability and that of his work and is, therefore, relevant to malice. And as previously noted, any argument from Plaintiffs that evidence about the Dossier as a whole is irrelevant to actual malice would also contradict their own position on summary judgment, where they too relied on the Dossier as a whole in an attempt to raise a triable issue of actual malice. *See, e.g.*, Dkt. 234-1 (Pls.' Opp. to Mot. for Summ. J.) at 17.

And should the Court decide that Plaintiffs are private figures, evidence about the Dossier as a whole would be relevant to deciding whether they acted with gross irresponsibility or negligence. This is true not only for the reasons set out in Defendants' opposition to MIL No. 3, Dkt. 311 at 4-5, but also because it is neither grossly irresponsible nor negligent to rely on a source who has proven his credibility by providing other accurate information. *See, e.g.*, *Gaeta v. N.Y. News, Inc.*, 62 N.Y.2d 340, 351 (1984) (no gross irresponsibility where reporter had confirmed other information provided by source); *Karp v. Miami Herald Publ'g Co.*, 359 So. 2d

---

[3] Ex. 3 (Smith Decl.) ¶ 19; Ex. 4 (Bensinger Decl.) ¶¶ 22-24; Ex. 5 (Schoofs Decl.) ¶¶ 9, 13; Ex. 8 (Elder Decl.) ¶ 5.
[4] Ex. 3 (Smith Decl.) ¶ 19; Ex. 5 (Schoofs Decl.) ¶¶ 9, 13; Ex. 6 (Elder Decl.) ¶ 5.
[5] Ex. 3 (Smith Decl.) ¶ 22; Ex. 4 (Bensinger Decl.) ¶ 27; Ex. 5 (Schoofs Decl.) ¶ 13; Ex. 6 (Elder Decl.) ¶ 5.

580, 581-82 (Fla. 3d DCA 1978) (no negligence where source "was well known to the reporter and had given the reporter accurate information in the past"). As with actual malice, then, the fact that the allegations about Plaintiffs were details within Christopher Steele's larger description of a cyber-operation whose basic outline had been established before publication by early January 2017 is important evidence here.

The rest of Plaintiffs' arguments show just how far one has to reach to try to argue the Dossier is not relevant to a case that was filed because BuzzFeed published it. Plaintiffs compare the full Dossier to "an entire copy of the *Sunday New York Times*," and say that it is no more relevant here than a full newspaper would be to a lawsuit over a single article. Opp. at 1. That is absurd, because this *is* a lawsuit over a single article, which included an embedded 35-page document. The analogy to their Sunday newspaper hypothetical would be apt if Defendants were asking that the jury read every other article that was published on Buzzfeed News' website on January 10, 2017. But Defendants ask no such thing.

Plaintiffs also focus their Opposition on *Masson v. New Yorker Magazine, Inc.*, 85 F.3d 1394 (9th Cir. 1996). *See* Opp. at 1-2, 5-6. But Plaintiffs just misunderstand what happened in *Masson*, a case which definitively rebuts their positions here. *Masson* arose out of a two-part series of magazine articles that was so lengthy (48,500 words) that the articles were subsequently re-published as a 165-page book, called *The Freud Archives. Masson v. New Yorker Magazine, Inc.*, 686 F. Supp. 1396, 1397 (N.D. Cal. 1987). As a result, the author (Janet Malcom), the magazine publisher (*The New Yorker*), and the book publisher (Alfred A. Knopf) were sued as defendants. The allegedly defamatory statements consisted of just five brief quotations within the book/articles, which totaled just 22 words. *See Masson*, 85 F.3d at 1395 n.1. Thus, the actual allegedly defamatory words in *Masson* were a much smaller fraction of the entire article/book than the allegedly defamatory statements in this case, in relation to the whole Dossier.[6]

Nonetheless, at trial the claim against *The New Yorker* turned entirely on the fact that "[t]he jury did not find liability for the quotation which presented the strongest case for the plaintiff; [because] it is apparent that it did not believe that the New Yorker entertained doubts *about the article as a whole.*" *Masson v. New Yorker Magazine*, 832 F. Supp. 1350, 1359 (N.D.

---

[6] According to Microsoft Word, the allegedly defamatory statements here comprise 130 words, while the whole Dossier is 9,097 words.

7

Cal. 1993) (emphasis added).  In other words, it was essential for the jury to consider the article as a whole in order to assess the magazine's state of mind in publishing the actual allegedly defamatory statements.  In fact, the evidence the jury considered there was much more than the whole article – it also considered the original manuscript as well as the magazine's galleys.  *Id.* at 1357.[7]

The evidentiary issue in *Masson* Plaintiffs point to had nothing to do with the jury reading the entire articles and book that contained the allegedly defamatory quotations, which it did.  Rather, it concerned the extent to which a different book written by Janet Malcom about an unrelated case, called *The Journalist and the Murderer*, should also be admitted into evidence because it contained some statements in which Malcolm was allegedly, but obliquely, commenting on the *Masson* case.  The trial court admitted some of the excerpts it found to be most relevant, but excluded the rest because it held that "the jury would then have to read [the entire book] in order to get a full understanding so that they could see that things are not taken out of context," which would cause undue delay since the book was not even at issue in the case. *Masson*, 85 F.3d at 1399; *see also id*. at 1399-1400 (noting that district court "concluded that the jury would have to read the entire book to understand the author's message").  The Ninth Circuit affirmed this decision.  *Id*. at 1400.  The only way the same issue would be presented in this case would be if, for example, Plaintiffs wanted the jury to read all of Ken Bensinger's recent book about corruption at FIFA, entitled *Red Card*, because it mentions Christopher Steele.  But they do not.

Finally, *United States v Schiff*, 544 F. App'x 729 (9th Cir. 2013), also cited by Plaintiffs (Opp. at 6), was a criminal prosecution for failure to pay income taxes.  It has nothing remotely to do with whether the full text of what was published should be admitted into evidence in a defamation case, or when the jury may first see it.  For all these reasons, this Court should instruct the jury to read the full Dossier and the accompanying article before opening statements.

---

[7] Plaintiffs are correct that the Ninth Circuit opinion in *Masson* does not address the trial court's decision to require the jury to read the entire magazine article before opening statements. Defendants' counsel is personally aware of this order because their former law partner was a trial counsel in *Masson*.

8

### B. The Court Should Instruct the Jury on the Law of Defamation Before Opening Statements

Plaintiffs' opposition to Defendants' request that the Court give the jury a preliminary instruction is even less clear. Beyond a bald assertion that the instructions "may actually serve to distract or confuse the jury before any evidence is heard," Plaintiffs never even try to explain why the preliminary instruction Defendants request would be a bad thing. Their main point instead appears to be that there is no reason to depart from what they call "the standard procedure of instructing the jury on the law only at the close of a case" because the jury will be able to do what they assert "the jurors in every other defamation case do – namely, understand and follow the law as instructed by the Court at the close of trial." Opp. at 6-7.

But the point is that jurors in defamation cases can often use some help understanding obscure concepts like actual malice, which even the Supreme Court has recognized "is unfortunately confusing." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 n.7 (1989). This means that "[k]eeping the jury on track" in a libel case can pose a particularly "formidable challenge for the judge." *Tavoulareas*, 817 F.2d at 806-07 (Ginsburg, J., concurring). Waiting until the end of the trial, after the jurors have seen all the evidence without understanding the applicable legal standards – which one commentator has compared to "telling jurors to watch a baseball game and decide who won without telling them the rules until the end of the game" – is often too late. William W. Schwarzer, *Reforming Jury Trials*, 132 F.R.D. 575, 583 (1991). The notion that "the judge should act to reduce the risk that 'the protective benefits of the *Sullivan* rule will become mythical'" by "explain[ing], instruct[ing], or clarify[ing] continuously, from the commencement of trial through to the jury's deliberations," *Tavoulareas*, 817 F.2d at 807 (Ginsburg, J., concurring), is therefore only common sense. And, contrary to Plaintiffs' argument, a preliminary instruction certainly would not amount to a dangerous departure from "standard procedure." In fact, the Supreme Court, citing then-Judge Ginsburg's concurrence in *Tavoulareas*, has recognized that "[b]y instructing the jury 'in plain English' at appropriate times during the course of the trial concerning the not-so-plain meaning of [actual malice], the trial judge can help ensure that the *New York Times* standard is properly applied." *Harte-Hanks*, 491 U.S. at 667 n.7. And other courts have successfully used similar procedures in high-profile libel trials. *See, e.g.*, *Tavoulareas*, 817 F.2d at 807 n.2 (Ginsburg, J., concurring) (discussing how the court in *Westmoreland v. CBS* "allowed counsel an opportunity to address the jury from time to time" during the trial, and how the judge "found it a very useful way to

9

4839-8362-4571v.2 0100812-000009

keep the jury on track during the course of the long and complex *Westmoreland* trial") (citing Pierre N. Leval, *From the Bench: Westmoreland v. CBS*, 12 *Litigation* 7, 66 (1985)).

As the literature cited in Defendants' motion – which Plaintiffs simply ignore – shows, what Defendants request here is nothing unusual: judges and respected trial lawyers recognize that preliminary instructions can be useful in all kinds of complex trials. Mot. at 5 n.1. There are, however, particular risks in this case that make a preliminary instruction especially appropriate. Plaintiffs argue that the issues in this case "are no more complex than those presented in any defamation case," Opp. at 7, but that is simply not so. This case raises the issue of actual malice (necessary for liability as to public figures, and punitive damages for any plaintiff), which courts have emphasized can be a particularly confusing concept for jurors. And very few defamation cases involve nine-figure damage claims or politically-divisive allegations at the heart of the biggest news story in the country. All of these considerations heighten the need for the Court to take proactive steps to ensure that the jury is able to consider and decide the case in a manner that is fair for both sides. Although there are, as Judge Ginsburg noted, a number of different approaches that the Court may take to achieve this, Defendants believe that a preliminary instruction on the applicable law strikes the best balance between helping the jury without unduly delaying or complicating the trial.

## CONCLUSION

For all these reasons, Defendants request that the Court direct the jurors, upon being seated, to read the Article and Dossier in their entirety, and that the Court instruct the jury on the law to be applied in this case prior to opening statements.

Dated: November 20, 2018        Respectfully submitted,

/s/ Katherine M. Bolger
Katherine M. Bolger
Nathan Siegel
Adam Lazier
Alison Schary
Davis Wright Tremaine LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
katebolger@dwt.com
nathansiegel@dwt.com
adamlazier@dwt.com

10

alisonschary@dwt.com

/s/ Roy Black
Roy Black
Jared Lopez
Black, Srebnick, Kornspan & Stumpf, P.A.
201 So. Biscayne Boulevard
Miami, Florida 33131
rblack@royblack.com
jlopez@royblack.com

*Attorneys for Defendants*

11

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing, together with its exhibits, will be served electronically by email on all counsel or parties of record on the service list below this 20th day of November, 2018.

By: /s/  Adam Lazier
  Adam Lazier

## SERVICE LIST

Matthew Shayefar
Valentin D. Gurvits
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1806
Facsimile: 617-928-1802
matt@bostonlawgroup.com
vgurvits@bostonlawgroup.com

Evan Fray-Witzer
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-000
Facsimile: 617-423-4855
Evan@CFWLegal.com

Brady J. Cobb
Dylan Fulop
COBB EDDY, PLLC
1112 North Flagler Drive
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com
dfulop@cobbeddy.com

4839-8362-4571v.2 0100812-000009