IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 17-cv-60426-UU

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.,

   Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

   Defendants.
_____/

**DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR
MOTION *IN LIMINE* NO. 7 TO EXCLUDE EVIDENCE AND ARGUMENT
REGARDING ALLEGED LOST BUSINESS VALUE, "BENEFIT TO BUZZFEED,"
AND LOST PROFITS AS MEASURES OF CLAIMED DAMAGES**

DAVIS WRIGHT TREMAINE LLP
Katherine M. Bolger
Nathan Siegel
Adam Lazier
Alison Schary
1251 Avenue of the Americas, 21st Floor
New York, New York 10020

BLACK, SREBNICK, KORNSPAN &
STUMPF, P.A.
Roy Black
Jared Lopez
201 So. Biscayne Boulevard
Miami, Florida 33131

*Attorneys for Defendants*

**PRELIMINARY STATEMENT**

Fed. R. Civ. P. 26(1)(A)(iii) requires the disclosure of "a computation of each category of damages claimed by the disclosing party." In addition, on January 10, 2018, the Court ordered Plaintiffs "by the end of February, to provide a damage analysis that identifies the element of damages and the source of the damage, and the amounts." Ex. 3 to Defs. MIL No. 7, at 32:14-17. In response, Plaintiffs produced computations of XBT's "lost business value," and the supposed "benefit to BuzzFeed" of publishing multiple articles related to the Dossier.

Now, faced with a *Daubert* motion and a motion *in limine* to exclude those two categories of damages as patently inadmissible, Plaintiffs are trying to argue that they can come up with entirely *new* theories of damages on the eve of trial, including "lost profits," with no notice to Defendants of the amount they are seeking or the methodology for computing them. But the time has long since passed for Plaintiffs to kick this particular can down the road, especially since Defendants have had no opportunity to conduct discovery on those topics.

**FACTUAL HISTORY OF PLAINTIFFS' DAMAGES "DISCLOSURES"**

For purposes of assessing Plaintiffs' Opposition, it is important to briefly review the history of their disclosures related to damages in this case. By the end of February 2018, in response to this Court's Order, Plaintiffs provided two disclosures relating to damages: an expert report, and a supplemental interrogatory response. Only one of those disclosures – the expert report - provided any "computation" of the "amount" of damages Plaintiffs intended to claim.

**A.     Plaintiffs' Expert Reports**

1.     The Expert Report:  On February 23, 2018, Plaintiffs produced the expert report of Jeffrey Anderson. The report stated unequivocally that "[d]amages stemming from these actions include, but are not limited to, XBT's lost business value ["LBV"], and the unjust enrichment of the Defendants . . . ." Ex. 6 at 6. For the avoidance of doubt, the entire section of Anderson's report analyzing the second category was headlined "BuzzFeed's Unjust Enrichment." *Id.* at 1, 12. Anderson estimated XBT's LBV to be between $48.5 million to $156 million, and BuzzFeed's "unjust enrichment" to be approximately $14 million. *Id.* at 3.

Anderson's calculations were based, in part, on XBT's consolidated revenues, expenses, and profits for 2017. But XBT had not produced any audited figures for its revenues, and none at all for its expense or profits. As a result, Anderson used an unaudited figure of $57.4 million

for its 2017 revenues. *Id.* at 11 & Ex. 4. For expenses and thus profits, Anderson projected all those figures based on XBT's 2016 ratio of expenses to revenues. *Id.*

        2.        <u>The Supplemental Expert Report</u>: On May 17, 2018 Plaintiffs produced a "Supplemental Expert Report," which modified the original Report in two ways. *First*, for XBT's LBV, Anderson purported to account for the loss of the Methbot customer. Ex. 7 at 10-11. Anderson also used an updated, but still unaudited figure for XBT's 2017 revenues, which was $58.3 million, almost $1 million higher than the number he used a few months earlier. *Id.* at 11. But XBT still had not produced anything about its expenses and profits for 2017, and so Anderson continued to project those. *Id.* at 11-12. Anderson's revised estimate of "LBV" was somewhere between $32.3 and $137.6 million. *Id. Second*, the Supplemental Report report's analysis of the "benefit to BuzzFeed" scrubbed the words "unjust enrichment" from each of the *nine* times it was used in his original report. Otherwise, it did not materially change.

At his deposition, Anderson confirmed that LBV was "the only measure of damages that I have presented" and that he was not offering any opinions about any other theory of damages. Ex. 8 (Anderson Dep.) at 62:21-64:20. Importantly, Anderson also confirmed that even for his Supplemental Report, he had no actual data about XBT's 2017 expenses and worked purely off his assumptions about those. *Id.* at 70:4-72:23. Anderson admitted that if XBT's actual expenses for 2017 turned out to be different, then his estimate of the company's "as-is" business value would also change. *Id.* at 72:24-73:6 ("Sure. If the numbers change, they would change.").

**B.**        <u>**Plaintiffs' Interrogatory Responses Regarding Damages**</u>

On February 18, 2018, Plaintiffs also served a supplemental interrogatory response in response to the Court's Order to disclose their damages. Even so, XBT's response stated that XBT "is unable at this time to provide a full accounting of all damages it has suffered," and so it "reserve[d] the right to supplement this response as discovery is ongoing and additional information and expert opinions are collected." Ex. 4 to Defs. MIL No. 7 at 2. The interrogatory response then described three categories of information, none of which purported to provide an actual "computation" of the "amounts" of damages Plaintiffs would seek at trial.

        1.        XBT included the same chart and table reproduced at pages 6-7 of their opposition brief, and claimed that "even assuming" that XBT's revenues would not have grown at all in 2017, "the XBT family [of businesses] lost $8,327,325.70 in revenue as compared to

December 2016." Ex. 4 to Defs. MIL No. 7, at 3. However, XBT made clear that figure was not intended to be an actual computation of damages because "this does not take into account the growth the XBT was experiencing, which would make actual lost revenue significantly higher." *Id*. XBT also qualified this disclosure even further, explaining that "this number constitutes total loss from the defamatory actions of both Defendants as well as Christopher Steele and Orbis Business Intelligence, and the damages at this time have not been apportioned." *Id*. XBT stated that "Plaintiffs do not seek to hold BuzzFeed responsible" for damages caused by Steele and Orbis. *Id*. Finally, this disclosure neither mentioned nor purported to include any calculation of lost profits. Nor could it, because it contains no information at all about XBT's expenses in 2017.

   2. XBT also stated that it was seeking "out of pocket expenses suffered by Plaintiffs in responding to the publication of the defamatory article." *Id*. However, it did not provide an amount of such expenses. Rather, it merely referred to "documentary evidence of which has been produced." *Id*. But its document production contains no computation of such expenses, and indeed many of the documents do not seem to reflect any expenses at all.

   3. Finally, XBT's responses asserted that "Plaintiffs have also suffered damages to their reputation and value, which they estimate to be over $10,000,000, *the precise amount of which will have to be determined by an appropriate expert*. Plaintiffs have also suffered damages to lender relationships, *the dollar amount of which cannot be at this time determined by Plaintiffs themselves*." *Id*. (emphasis added). As discussed above, Anderson subsequently estimated a range of lost "value," and "benefit to BuzzFeed." Plaintiffs have never produced any other calculation purporting to calculate any other "dollar amount" of damages of any kind.

**C.** **Plaintiffs' Post-Discovery Productions**

  Discovery in this case closed on June 15, 2018. Although their last interrogatory responses expressly stated they did not purport to provide a "full accounting" of damages "at this time," Plaintiffs never supplemented them further. On July 3, 2018, Plaintiffs produced for the first time an *unaudited* 2017 consolidated financial statement for XBT. This was the first time Plaintiffs ever produced any information about its 2017 expenses at all, and they are reported only in high-level summary categories. Ex. 9 at 2, 18-19. Then, on October 24, 2018, Plaintiffs produced XBT's final, audited consolidated statements for 2017. Ex. 1 to Defs. MIL No. 7.

Those various statements show substantial differences between the figures used in Plaintiffs' February interrogatory responses and Anderson's reports. XBT reported total 2017 revenues of $58.4 million, which was $1 million higher than the figures available at the time of its interrogatory responses. There were even material differences between XBT's July 2018 draft numbers and the October 2018 final numbers. Most notably, net profit in the July draft was reported to be $1.8 million (Ex. 9 at 4), but in October it changed to $2.9 million (Ex. 1 at 7). Moreover, Plaintiffs have never produced a monthly breakdown of their expenses in 2017.

## ARGUMENT

**A.   XBT May Not Seek "Lost Business Value."**

In response to the portion of this motion *in limine* that seeks to exclude XBT's LBV as a permissible measure of damages, Plaintiffs appear to have simply cut and pasted nearly wholesale their argument from their opposition to Defendants' *Daubert* motion to exclude Anderson. As Defendants have already responded to these same points in their Anderson *Daubert* reply brief, we refer the Court to that briefing rather than repeat it here. *See* Dkts. 296, 309 at 1-3.[1]

**B.   Plaintiffs May Not Seek the Various Other Categories of Damages They Now Propose As Alternatives or Supplements to "Lost Business Value"**

1.   Plaintiffs May Not Seek "Lost Profits" Because They Failed to Disclose Both Any Computation of and the Evidentiary Basis for Such Damages

Rule 26(a)(1)(A)(iii) requires Plaintiffs to disclose "a computation of each category of damages claimed" and to produce "the documents or other evidentiary material … on which each computation is based." Plaintiffs have never disclosed a computation of alleged "lost profits," and still have not done so to this day. Accordingly, they are barred by Rule 37(c)(1) from presenting a theory of "lost profits" damages at trial, unless they can demonstrate that their failure to disclose was "substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). *See Mortg. Payment Prot., Inc. v. Cynosure Fin., Inc.*, 2010 WL 11507658, at *2 (M.D. Fla. Nov. 5, 2010) (party that fails to disclose information required by Rule 26 bears the burden of

---

[1] The only new argument Plaintiffs appear to raise is they maintain there is a contradiction between seeking to exclude XBT's LBV and any damages incurred by non-party subsidiaries. Opp. at 3. But the two points are consistent, and indeed unrelated. Regardless of who the parties to this case might be, none could recover LBV because that is only available to destroyed businesses. Thus, unless one of those subsidiaries could claim to have been destroyed by the Dossier, the subsidiaries also could not use LBV as a measure of their damages.

4

establishing "substantial justification or harmlessness"). There is plainly no such justification for doing so here, given that it would also independently violate this Court's Order regarding damage disclosures.

Indeed, Plaintiffs *still* have not disclosed what they consider their "lost profits" to be, and even today they have not produced the basic documents and information necessary to make such a computation. For the very first time in this case, their opposition brief purports to offer a basis for seeking lost profits, but even there Plaintiffs offer three wildly different potential computations of their "lost profits" – and each of these is further couched as an "approximate" or a "minimum" estimate that could change dramatically at trial. Opp. at 6-7.

"Method" No. 1. First, Plaintiffs claim that Defendants should look to the chart and table from their February 2018 interrogatory response, which purported to show seven months of 2017 revenues, and simply "subtract[] out expenses during the same period" to calculate lost profit. But Plaintiffs have *never* produced expenses for this period – or on a monthly basis at all – and they do not even bother to offer such numbers in their opposition brief. Thus, even Plaintiffs don't purport to be able to derive a profits figure from that chart and table, and never offer one.

Further, even as to the revenue numbers, Plaintiffs' interrogatory response expressly said that those were not the actual revenue numbers Plaintiffs intended to use, because they did not account for any growth in 2017 or apportionment as between BuzzFeed and Steele. Moreover, by their own admission those numbers are inaccurate even as to actual monthly revenues, because their audited total revenue figures are different. But Plaintiffs have also never disclosed any final, audited monthly revenue figures.

"Method" No. 2. As an alternative, Plaintiffs insist that Defendants should go fishing through the audited financial statements they produced – *on October 24, 2018* – and use those to determine their lost profits. But as Defendants pointed out in their motion, simply producing financial statements is not sufficient to satisfy Rule 26's required disclosure of a damages computation. Plaintiffs "may not shift to Defendants the burden of attempting to determine the amount of Plaintiff's alleged damages" and cannot satisfy the disclosure requirement simply by "providing–without an explanation–undifferentiated financial statements." *Azure LLC v. Figueras Seating U.S.A., Inc.*, 2014 WL 12512542, at *1 (S.D. Fla. Jan. 10, 2014). "Rather, Plaintiff must compute in dollars how much it claims for each category of damages." *Id.* Such a computation "is especially necessary when plaintiff seeks complex damages such as lost profits."

5

*Water v. HDR Eng'g, Inc.*, 2011 WL 13176484, at *5 n.10 (M.D. Fla. May 11, 2011). In their opposition, Defendants did not bother to address or respond to this clear law.

Even here, Plaintiffs still don't provide a definitive computation of their alleged lost profits using this method. Instead, they assert that "a simple subtraction calculation" comparing XBT's 2016 and 2017 audited financial statements would show lost profits of "at least" $3.4 million "in 2017 alone." MIL No. 7 Opp. at 7. In other words, Plaintiffs leave open the door to claim *more* than this amount for 2017, *and* to extend their calculations beyond 2017.

Moreover, calculating lost profits is hardly a "simple subtraction calculation" by comparing two high-level numbers in a financial statement. And it would be grossly prejudicial to Defendants to permit Plaintiffs to submit some amount to the jury on the basis of high-level financial statements produced after the close of discovery, which Defendants have never had an opportunity to inquire about. Specifically, Plaintiffs suggest they want to say that the Dossier caused their profits to decrease by at least $3.4 million in 2017, and by additional amounts they still will not reveal after 2017. In short, Plaintiffs want to argue that but for the Dossier, they would have made at least as much in 2017 as they did in 2016, and likely much more.

But the financial statements Plaintiffs produced last month reveal that the decrease in profit from 2016 to 2017 was attributable entirely to *increased expenses*, not decreased revenue. In fact, XBT's revenues increased by nearly $9 million from 2016 to 2017. Ex. 1 at 5. But the increased expenses causing the lower 2017 profits are reported only in high-level summary categories. It is hardly clear whether any of those expenses could plausibly be attributed to the publication of the Dossier, but Defendants have had no opportunity to conduct discovery regarding what those expenses actually were.

For example, among the increased expenses in 2017 were approximately $1.8 million in additional staff costs in 2017, as the company employed an average of 13 more people than in 2016. Ex. 1 at 25. It is not clear how salary costs incurred because XBT decided to grow its staff in 2017 would qualify as recoverable damages in this defamation lawsuit. Even more striking, the category called "other professional fees" rose from $1.6 million in 2016 to $4.2 million in 2017. *Id.* at 27. That is a difference of $2.6 million, which alone accounts for almost all of the difference between 2016 and 2017 profits. The obvious question raised is whether those expenses include Plaintiffs' legal fees for this lawsuit *and* the lawsuit against Christopher Steele in the U.K. But the law does not permit Plaintiffs to seek attorneys' fees, and they may

6

not do so through the back door by claiming them as "expenses" contributing to "lost profits." Because Plaintiffs have not disclosed any information or evidence explaining those increased 2017 expenses, any attempt to use this statement to show "lost profits" by a "simple subtraction calculation" in the financial statements would be impermissibly speculative. *See, e.g., ICMfg & Assocs., Inc. v. Bare Bd. Grp., Inc.*, 238 So. 3d 326, 337 (Fla. Dist. Ct. App. 2017) (rejecting expert's valuation of "lost profits" as too speculative where, inter alia, "he made no investigation of the facts to determine the existence of a link between the Appellants' conduct and the claimed lost profits").

"Method" No. 3. Plaintiffs also posit a *third* method that they could use to estimate lost profits: they claim that they can subtract actual 2017 profits from the $20 million profits projected in their November 2016 business plan (which happened to be prepared at the height of the Methbot operation on Plaintiffs' servers) to come up with a "lost profits" calculation of approximately $17 million "for 2017 alone." Opp. at 7. This method suffers from the same deficiencies as the first two. It comes far too late, Plaintiffs still refuse to say how much they actually intend to seek, and it would be grossly prejudicial to Defendants since no discovery about Plaintiffs' expenses could have taken place during the discovery period in this case.

This third alternative method should be excluded for yet another reason. "Florida law requires that assumptions used to support the conclusions [of lost profits] be reasonably certain, not mere best case scenario predictions." *Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.*, 254 F. Supp. 2d 1239, 1247 (M.D. Fla. 2003). Plaintiffs' unsupported, pie-in-the-sky estimate that their profits would soar from $6.3 million to $20 million in a single year is not remotely reliable as the basis for a lost profits analysis. *See N. Dade Cmty. Dev. Corp. v. Dinner's Place, Inc.*, 827 So. 2d 352, 353 (Fla. Dist. Ct. App. 2002) (rejecting award of lost profits supported only by a page of projected earnings in a business prospectus that was "little more than an unsupported wish list of what the [party] hoped would occur in the coming years"). Moreover, as set forth more fully in Defendants' *Daubert* motion, Plaintiffs by their own admission have *never* come close to accurately predicting their expenses, and indeed have always wildly underestimated them. *See* Anderson *Daubert* Motion (Dkts. 249, 260) at 5-6, 8.

The bottom line: Defendants still have no idea what Plaintiffs might intend to seek as their "lost profits." Is it $8.3 million minus some unidentified amount of expenses from January to July of 2017 (Method #1)? Is it $3.4 million, based on a "simple subtraction" of their profits

7

from their 2017 audited financial statements (Method #2)?  Is it $17 million in lost profits from 2017 based on a speculative business plan (Method #3)?  Or some other number using one of these methods as a "minimum" and projecting losses well into the future – such that the actual number might be five or ten times higher?  Plaintiffs cannot hide the ball.  It has been nine months since the deadline by which this Court ordered Plaintiffs to disclose any damage calculations, discovery closed over five months ago, and any trial is eight weeks away.  Plaintiffs must be held to the computation and theory of damages they chose and disclosed when ordered to do so, and may not shift gears at this late stage, much less keep Defendants guessing well into any trial.[2]

        2.    <u>XBT May Not Recover General or Special Damages That Are Baked into Other Theories of Recovery or Not Available to a Corporate Entity</u>

In addition to lost profits, Plaintiffs claim that they can also recover "out-of-pocket expenses" and "general damages" to their reputation, including emotional harm.  That is not quite accurate.  While Mr. Gubarev may try to claim damages based on emotional harm, the corporate plaintiffs may not.  *See Hershell Gill Consulting Eng'rs, Inc. v. Miami-Dade Cty., Fla.*, 333 F. Supp. 2d 1305, 1341 (S.D. Fla. 2004) (corporate entities may not recover damages for emotional distress or pain and suffering).  Similarly, Mr. Gubarev may try to offer evidence (if it is otherwise admissible) to show his out-of-pocket costs relating to the alleged defamatory statements, other than attorneys' fees.

But the corporate plaintiffs may not claim "out-of-pocket expenses" if they are also seeking "lost business value" or "lost profits," which already account for expenses incurred.  To allow recovery of such individual expenses would amount to an impermissible double recovery. *See Abbott v. Local Union No. 142 of United Ass'ns of Journeymen & Apprentices of Pipe Fitting Indus. of U.S. & Canada*, 429 F.2d 786, 790 (5th Cir. 1970) (corporation may not separately recover out-of-pocket costs that were also included as corporate expenses in a lost profits analysis).  In any event, Plaintiffs have likewise never disclosed an amount of "out of

---

[2] If nonetheless Plaintiffs are permitted to seek lost profits, Defendants request that the trial be continued and that discovery be re-opened for a period of time sufficient for them to conduct meaningful discovery regarding both the amount of and basis for any such computation.  If Plaintiffs actually thought they needed to wait for more financial information to calculate their damages, they could have sought an extension of the discovery schedule accordingly.  Instead, they opposed every requested extension of discovery.

8

pocket expenses" they intend to seek, and Defendants cannot be asked to sift through large document dumps to try to figure that out either.

As to damages to XBT's "business relationship" and "reputation," Plaintiffs specifically stated in their interrogatory response that such damages would necessarily rely on opinions and evidence from experts or third parties – which they never produced or provided.  *See* Ex. 4 to Defs. MIL No. 7 at 3.

3. Plaintiffs Must Prove Actual Damages

Finally, Plaintiffs argue that the statements at issue in this case are defamatory *per se*. Opp. at 5.  It is not entirely clear why they deem that to be relevant here.  In any event, Florida law is clear that while it retains some relevance in private defamation cases, defamation *per se* is no longer a relevant concept for purposes of seeking damages from a media defendant in a defamation case.  In the wake of *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), the Florida Supreme Court held that in a defamation action against the media, "it is no longer accurate" to say that plaintiffs need not prove damages on a theory that the statements are defamatory *per se*. *Mid-Fla. Television Corp. v. Boyles*, 467 So. 2d 282, 283 (Fla. 1985).  "Thus, after *Gertz,* in libel cases involving media defendants … proof of damages must always be established."  *Blake v. Giustibelli*, 182 So. 3d 881, 884–85 (Fla. Dist. Ct. App.), *reh'g denied* (Jan. 29, 2016), *review denied sub nom. Blake v. Ann-Marie Giustibelli, P.A.*, 2016 WL 869895 (Fla. Mar. 7, 2016), and *cert. denied*, 137 S. Ct. 161, 196 L. Ed. 2d 121 (2016).  In short, Plaintiffs must play by the ordinary rules of computation and disclosure for any damages they seek in this case.

**C.    Plaintiffs May Not Seek to Quantify Any Supposed "Benefit to BuzzFeed"**

Plaintiffs appear to concede that they may not seek damages for unjust enrichment in this action.  But their intention to present to the jury the supposed "value" of publishing the Dossier is obviously an attempt to do just that, and they cite no authority to explain why they may seek to do indirectly what the law expressly bars them from doing directly.  While Plaintiffs claim this is "***not*** a calculation of 'unjust enrichment' damages and neither Mr. Anderson nor anyone else will testify that it is," Opp. at 4, the record makes clear that calculating unjust enrichment is *precisely* what Mr. Anderson was doing when he posited $14 million in "benefit to BuzzFeed" as a measure of damages.  That Anderson's supplemental report scrubbed the phrase "unjust enrichment" nine times, without changing anything else, speaks for itself as to why Plaintiffs cannot make this evidence admissible simply by changing its title.

9

Plaintiffs claim this evidence is relevant to actual malice. To the contrary, is well-settled that "the fact that the defendant published the defamatory material in order to increase its profits [does not] suffice to prove actual malice." *Harte-Hanks Commc'ns Inc. v. Connaughton*, 491 U.S. 657, 667 (1989). "If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels." *Id.* In any event, even if Plaintiffs were permitted to question Defendants about any financial motive at the time the Dossier was published, that does not equate to permitting an expert to provide a specific calculation of actual enrichment that allegedly occurred after the fact, to put a number of $14 million in front of the jury even though the law expressly precludes the jury from considering that as a measure of damages.

Further, Plaintiffs do not bother to address the fact that this calculation of "benefit to BuzzFeed" is based on publishing the *entire* Dossier, as well as nine additional news articles about a variety of topics that simply contain a link to the article in which the Dossier was embedded. Thus, even if such a figure could in theory be admissible, Mr. Anderson's calculation does not estimate any actual "benefit to BuzzFeed" from publishing the allegedly defamatory statements. As a matter of First Amendment law, Plaintiffs may not seek to punish Defendants for publishing the entire Dossier, let alone for nine other news reports, because to do so would publish Defendants for publishing protected speech that is not alleged to be defamatory. Accordingly, even if there were any minimal relevance to this evidence, it would be highly prejudicial for Plaintiffs to put a $14 million figure in front of the jury that they *admit* is unrecoverable as compensatory damages, that is not relevant to fault, and that is based upon the publication of statements not at issue in this case and fully protected by the First Amendment.

## CONCLUSION

For the reasons set forth above and in Defendants' opening brief, Defendants respectfully ask this Court to grant their Motion *in Limine* No. 7.

Dated:  November 20, 2018            Respectfully submitted,

/s/ Katherine M. Bolger
Katherine M. Bolger
Nathan Siegel
Adam Lazier
Alison Schary
Davis Wright Tremaine, LLP

10

        1251 Avenue of the Americas, 21st Floor
        New York, New York 10020
        katebolger@dwt.com
        nathansiegel@dwt.com
        adamlazier@dwt.com
        alisonschary@dwt.com

        <u>/s/ Roy Black</u>
        Roy Black
        Jared Lopez
        Black, Srebnick, Kornspan & Stumpf, P.A.
        201 So. Biscayne Boulevard
        Miami, Florida 33131
        rblack@royblack.com
        jlopez@royblack.com

        *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing, together with its exhibits, will be served electronically by email on all counsel or parties of record on the service list below this 20th day of November, 2018.

By: /s/ Cary McClelland
　　　Cary McClelland

## SERVICE LIST

Matthew Shayefar
Valentin D. Gurvits
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1806
Facsimile: 617-928-1802
matt@bostonlawgroup.com
vgurvits@bostonlawgroup.com

Evan Fray-Witzer
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-000
Facsimile: 617-423-4855
Evan@CFWLegal.com

Brady J. Cobb
Dylan Fulop
COBB EDDY, PLLC
1112 North Flagler Drive
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com
dfulop@cobbeddy.com