UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

ALEKSEJ GUBAREV,
XBT HOLDING S.A., and
WEBZILLA, INC.
   Plaintiffs,

v.

BUZZFEED, INC. and
BEN SMITH
   Defendants.

Case No.

0:17-cv-60426-UU

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 3
TO EXCLUDE EVIDENCE OF JOURNALISTIC STANDARDS**

*"The essence of journalism is a discipline of verification. In the end, the discipline of verification is what separates journalism from entertainment, propaganda, fiction, or art."*

Bill Kovach and Tom Rosensteil,
*The Elements of Journalism*

**Introduction**

On January 10, 2017, Defendants published wholesale and without meaningful redaction 35 pages of memos written by someone who they believed (but weren't completely sure) to be a former British MI-6 agent who, in turn, was simply reporting what he claimed to have been told by his (unidentified) sources. Defendants did so despite – by their own admission – having been unable to verify any of the claims contained within the memos, having concluded that the memos contained "clear errors," and with the belief that there was "serious reason to doubt the allegations" contained in what they were publishing. Defendants have admitted that, prior to publishing the memos, they made no attempts whatsoever to contact any of the Plaintiffs to give them an opportunity to respond to the allegations. And they have admitted that, although they

had the technical ability to make redactions to the memos prior to publication – and indeed chose to redact some other names contained in the memos – they did not bother to do so with respect to the Plaintiffs.

Defendants' decision to publish the memos without first contacting any of the Plaintiffs would also seem to fly in the face of what Mr. Smith confirmed in his deposition is Buzzfeed's usual practice of sending subject of articles a "no surprises" letter.  Smith Depo., Exhibit 1 hereto, p. 77 ("[W]e have a practice here of writing what we call a 'no surprises' letter to the subject of an investigation that lays out in great, great detail what's in a story.· And then you make sure you slip that under their door, you mail it to them, you e-mail it to them, you send it to their lawyer.· It often adds to your reporting.  There's no reason that the subject of a story should be surprised.").

Buzzfeed's decision to publish the unverified memos was met with widespread condemnation from journalists, academics, and media outlets from every part of the political spectrum.  See, e.g., "BuzzFeed drops a Trump bombshell, irresponsibly," *The Poynter Institute*, January 11, 2017 ("Publishing an entirely unvetted document is a significant departure from the way editors of most significant publications would define the role of reporting."); "BuzzFeed Posts Unverified Claims on Trump, Igniting a Debate," *The New York Times*, January 10, 2017, Exhibit 2 ("In a brief interview in the Times newsroom on Tuesday evening, Dean Baquet, the executive editor of The Times, said the paper would not publish the document because the allegations were 'totally unsubstantiated.' 'We, like others, investigated the allegations and haven't corroborated them, and we felt we're not in the business of publishing things we can't stand by,' Mr. Baquet said."); "BuzzFeed was wrong to publish the Trump rumours. Here's why," *The Guardian*, January 12, 2017, Exhibit 3 ("Prestige, trust, truth: flimsy and amorphous

2

but essential for the survival of good journalism, as opposed to rumour and lies.  In these dangerous times - both for journalism and the world – 'newsworthy' is not enough.  It is wrong for any respected news organisation to publish information it knows may not be true."); "How BuzzFeed crossed the line in publishing salacious 'dossier' on Trump," *The Washington Post*, January 11, 2017, Exhibit 4 ("Smith was clear with readers that the information he was publishing couldn't be verified and, indeed, there was no reason to believe that much of it was true.  What I fault him for was plunging down a slippery ethical slope from which there is no return.  In an era when trust in the media is already in the gutter, this does absolutely nothing to help.  But even that isn't the core point, which is far simpler: It's never been acceptable to publish rumor and innuendo.  And none of the circumstances surrounding this episode — not CNN's story, not Trump's dubious history with Russia, not the fact that the intelligence community made a report on it — should change that ethical rule."); "Why BuzzFeed Was Wrong to Publish the Trump Dossier," *Neiman Reports,* January 11, 2017, Exhibit 5 ("When your first sentence includes the words 'explosive' and 'unverified' and 'allegations,' that's a strong clue you should not publish.  That's the height of irresponsibility.").

In response to these criticisms, Defendant Ben Smith not only appeared on multiple news programs, discussing his rationale for publishing the memos – and responding to media criticism of that decision – he has also written two separate Op-Ed articles for the *New York Times* doing the same.  See Exhibits 6 and 7.

And, in the course of this litigation, Mr. Smith and Buzzfeed Reporter Ken Bensinger have each provided sworn testimony touting not only their own long and distinguished careers in journalism, but also the various awards and accolades bestowed on Buzzfeed and its reporters.  *See*, *e.g*, Smith Depo., Exhibit 1, pp. 10-17; Declaration of Ken Bensinger (D.E. 80-2)

("Buzzfeed News is an award winning and renowned news and information digital publication and journal with editorial staff of more than 300 people working in multiple offices throughout the United States and around the world. Its headquarters are located in New York. In 2016 alone, BuzzFeed News won numerous prestigious awards for its journalism, earning recognition from the Frontpage Awards, GLAAD Media Awards, the American Society of Magazine Editors, the Livingston Awards, Scripps Howard, and the Society for Professional Journalism, among others. In addition, BuzzFeed News was a finalist for the Pulitzer Prize in International Reporting. Mark Schoofs, the investigations editor with whom I worked closely on reporting the Dossier won the Pulitzer Prize in International Reporting in 2000.  I have been a journalist for 20 years. In 2016, I and two other colleagues shared the National Magazine Award from the American Society of Magazine Editors for reporting we did while at BuzzFeed. I have also won two Gerald Loeb Awards for Distinguished Finance & Business Reporting, as well as numerous other journalism prizes.").

None of this is disputed and none of this is beyond the ability of a jury to comprehend without the assistance of "expert" testimony.  Nevertheless, Defendants for the first time contend that, despite their long and storied careers in journalism – and despite the fact that they will each undoubtedly testify at length about their journalistic careers – Defendants maintain that they cannot possibly be examined about the standards of the profession in which they are employed and how their decision to publish the unverified memos violated (and was seen to violate) the norms of that profession.

## Argument

The information that Defendants seek to exclude is clearly relevant to the jury's consideration of Defendants' culpability and level of fault, including considerations of

negligence and malice, as well as the jury's consideration of the appropriateness of punitive damages. Nonetheless, Defendants argue for the exclusion of any evidence or testimony concerning journalistic standards and their failure to adhere to such standards, claiming that such evidence may only be admitted through an expert witness.

In support of this unsupportable proposition, Defendants cite primarily to non-journalism-related cases that stand only for the unremarkable proposition that, where evidence offered requires specialized knowledge of the type governed by Rule 702, that lay opinion testimony should not be permitted concerning that evidence.

Indeed, the only journalism-related case cited by Defendants, *Talley v. Time, Inc.*, 2018 U.S. Dist. LEXIS 32461, at *8 (W.D. Okla. Feb. 28, 2018), stands only for the proposition that expert testimony concerning journalistic standards may (for certain limited purposes) be admissible, not that such testimony is *required*. Other Courts have specifically noted this distinction in the context of offering proof on journalistic standards. *See*, *e.g.*, *Edwards v. Paddock Publs*, 327 Ill. App. 3d 553, 562 (2001) ("While defendants are not precluded from introducing expert testimony regarding the customs and practices or standards of the journalism profession ... plaintiff is not required to present expert opinion testimony to establish that a media defendant breached the duty of ordinary care.").

And, as Defendants must surely be aware, the vast majority of Courts to actually directly address the issue raised in Defendants' Motion have specifically held that a determination of whether a media defendant violated journalistic standards is an issue well within the abilities of a jury to decide without the need for expert testimony. *See*, *e.g.*, *Greenberg v. CBS, Inc.*, 419 N.Y.S.2d 988, 998 (App. Div. 1979) ("[E]xpert testimony was unnecessary. The elementary standards of basic news reporting are common knowledge. News articles and broadcasts must

contain the answers to the essential inquiries of who, what, where, when, why and how."); *Edwards*, 327 Ill. App. 3d at 562 ("[W]hether defendants exercised due care in gathering the factual information for their newspaper article is not a technical matter outside the ken of a lay juror that would require expert testimony."); *Gaeta v. N.Y. News, Inc.,* 454 N.Y.S.2d 179, 181 (N.Y. Sup. Ct. 1982) ("The standard of care required of news reporters may be determined without the benefit of expert opinion."); *Richmond Newspapers, Inc. v. Lipscomb*, 234 Va. 277, 296 (1987) ("[M]ost of the courts held that a jury was just as capable as an expert of deciding whether the reporter was negligent in failing to make further inquiry.  We find that a jury in this state is as competent as any expert to form an intelligent and accurate opinion as to whether a reporter should have conducted additional investigations."); *Schrottman v. Barnicle*, 386 Mass. 627, 642 (1982) ("Nor do we believe that expert testimony is necessary to enable triers of fact to apply a standard of ordinary negligence to the methods used by a journalist to record interviews. Due care in gathering information is not technical matter for which a jury unaided by experts would have no basis for decision."); *Kassel v. Gannett Co.*, 875 F.2d 935, 943 (1st Cir. 1989) ("'Due care in gathering information is not [a] technical matter for which a jury unaided by experts would have no basis for decision.' ... And in the case at bar, none of the activities undertaken by defendant or its hirelings were so arcane or complex as to demand explication by a professional." (quoting *Scrottman*, 386 Mass. at 642)); *Bancroft Life & Cas. ICC, Ltd. v. Intercontinental Mgmt.*, 2012 U.S. Dist. LEXIS 167399, at *16 (W.D. Pa. Nov. 26, 2012) ("The Court agrees that expert testimony is not necessary to prove defamation" (*dicta*)); *Kohn v. W. Haw. Today*, 65 Haw. 584, 589 (1982) ("[W]here the issue of negligence is within the competence and understanding of the jury, additional expert testimony is unnecessary.... The lack of expert testimony on a particular issue ordinarily does not bar a plaintiff's right to

6

recovery, unless the evidence is of such a technical nature that laypersons are incompetent to draw their own conclusions from the facts presented without the aid of such evidence.... These evidentiary rules also have validity in the defamation area.").[1]

In the present case, and depending on how the testimony of Messrs. Smith and Bensinger unfolds, Plaintiffs may well seek to question one or both witnesses about how their decision to publish the unverified memos deviated from journalistic standards (including Buzzfeed's own standards), as evidenced by the widespread media reaction to Buzzfeed's decision to publish the unverified memos. Defendants are, of course, free to ask Messrs. Smith and Bensinger about media reaction that agreed with their decision or they are free to simply disagree with the widespread condemnation of their decision to publish the unverified memos.

None of this requires any specialized information or knowledge, necessitating an expert witness. Indeed, there are no specific degrees that one must obtain, or classes that one must take, to become a working journalist. Although journalistic norms certainly exist, there is no "science" governing journalistic ethics that are beyond the comprehension of an ordinary juror. There are, however, some common-sense rules: don't publish unverified allegations about people; don't publish allegations that you have "serious reasons to doubt;" provide those named in articles an opportunity to respond to the allegations you are planning on printing before you

---

[1] Because the case law on the subject seemed overwhelming clear, Plaintiffs did not engage an expert witness on journalistic ethics. Indeed, Plaintiffs assume that, had they tried to introduce such an expert, the Court would now be faced with Defendants' *Daubert* motion seeking to exclude such testimony as unnecessary for the jury to decide the issue of journalistic standards, citing the very same case law quoted above. If for some reason this Court were to find, in contravention of the cited cases, that expert testimony is required, Plaintiffs would respectfully request that they be given an opportunity to immediately procure such an expert to produce an expert report. The trial date is still more than two months away and Plaintiffs would make any such expert available for deposition prior to trial.

print them; and don't prioritize financial benefit over truth and accuracy. These are concepts that are well within the purview of the average juror and which require no expert testimony.

### Conclusion

For the reasons stated hereinabove, Defendants' Motion in Limine No. 3 to Exclude Evidence of Journalistic Standards should be denied in its entirety.

Dated: November 13, 2018

**Respectfully Submitted:**

/s/ Evan Fray-Witzer
Evan Fray-Witzer (*pro hac vice*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-0000
Facsimile: 617-423-4855
Evan@CFWLegal.com

/s/ Valentin Gurvits
Valentin D. Gurvits (*pro hac vice*)
Matthew Shayefar (Fla. Bar No. 0126465)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1804
Facsimile: 617-928-1802
vgurvits@bostonlawgroup.com
matt@bostonlawgroup.com

/s/ Brady J. Cobb
Brady J. Cobb (Fla. Bar No. 031018)
Dylan Fulop (Fla. Bar No. 123809)
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com
dfulop@cobbeddy.com

*Attorneys for Plaintiffs*