UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

ALEKSEJ GUBAREV,
XBT HOLDING S.A., and
WEBZILLA, INC.
   Plaintiffs,

v.

BUZZFEED, INC. and
BEN SMITH
   Defendants.

Case No.

0:17-cv-60426-UU

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION *IN LIMINE* #1 TO PRECLUDE THE INTRODUCTION OF TESTIMONY OR EVIDENCE CONCERNING METHBOT**

*"White Ops isn't a disinterested party, and since after all it's peddling the cure for ad fraud, its approach has drawn suspicion. ... [T]his is a big distraction.  This is self-interested reporting. These companies are selling the tools to fight malicious bots."*[1]

\*

*"Google, which works with nearly every publisher and advertiser on the planet, said it saw negligible impact from Methbot."*[2]

\*

*"Methbot? More Like Mehbot."*[3]

\*

Defendants are correct about one thing: there *is* a certain amount of *chutzpah*[4] at play here, but that *chutzpah* is in Defendants' attempts to mislead the court into believing: (1) that the so-called "Methbot" report was something other than what it was and (2) that they seek to admit

---

[1] "The fraud fighter: How White Ops helped put ad waste (and itself) on the map," *Digiday* (February 13, 2017), attached hereto as Exhibit 1.
[2] "Was Methbot's Financial Impact Grossly Exaggerated?" *AdAge* (February 23, 2017), attached as Exhibit 2.
[3] "Methbot? More Like Mehbot," Integral Ad Science Insider (January 6, 2017), attached hereto as Exhibit 3.
[4] Defendants' resort to the "Google Dictionary" for their definition of "*chutzpah*" is a *shonde* (disgrace), particularly where there was a perfectly good legal citation for them to reference. *See* Kozinski, A. and Volokh, E., *Lawsuit, Shmawsuit*, 103 YALE L.J. 463 (1993) ("The most famous definition of 'chutzpah' is, of course, itself law-themed: Chutzpah is when a man kills both his parents and begs the court for mercy because he's an orphan.").

evidence of the Methbot report for a purpose other than their real purpose.

Preliminarily, given that Defendants' continued attempts to portray the Methbot report as being something other than what it is, it is important to understand that the Methbot report was simply a "white paper" issued as a marketing tool by a company that makes its money by selling online fraud detection services to corporations.  *See*, *e.g.*, *DigiDay* article, Exhibit 1 ("White Ops also realized it had a killer marketing strategy: To sell its fraud detection tools to ad platforms, brands, publishers, it would establish itself as the authority on ad fraud, and the customers would follow.  White Ops co-founder and CEO Michael Tiffany calls it 'substantive marketing.'"); *AdAge* article, Exhibit 2 ("Methbot has been a double-edged sword for White Ops.  The company's report exposing the scam won it praise and business, but other players in ad tech criticized its conclusions.  Since the report's release, many ad tech leaders have both quietly and publicly questioned the accuracy of White Ops' report.  In a January post titled, 'Methbot? More like 'Mehbot,' Jason Shaw, director of data science at ad fraud outfit Integral Ad Science, questioned if White Ops' report had been embellished for the sake of sensationalism.").

And, although Defendants may argue that that the scope of the Methbot operation and the reliability of White Ops' marketing report are factual questions, that response in itself would actually be a further basis for the exclusion of evidence concerning the Methbot report: Defendants should not be allowed to use extrinsic evidence of a collateral matter to turn this trial into a trial-within-a-trial about an alleged advertising scam that has no relation to the allegations actually made in the December Memo.  This is particularly true given that the evidence adduced during discovery demonstrates that once the White Ops paper was released, Plaintiffs: disconnected the customer's access to its servers; pulled the relevant hard drives and preserved them for law enforcement; and cancelled the customer's accounts.  Indeed, *even Defendants' own expert acknowledged* that "Documentation produced by the plaintiffs provides evidence that XBT became aware of the Methbot Operation after the White Ops report was released and took action to terminate the responsible customer."[5]  Ferrante Report, D.E. 248-2, p. 21.

---

[5] It is also important to note that – although Plaintiffs were sufficiently concerned about the allegations raised in the White Ops paper to take the steps outlined above, even now those allegations remain just that – allegations directed at a *former customer* of Plaintiffs.  Again, this simply bolsters the argument that Defendants should not be permitted to use extraneous evidence to prove a matter that is collateral to the fact at issue in this case.

Nevertheless, in their Opposition, Defendants make two arguments for admission of the Methbot report and testimony concerning the same, neither of which bolsters their case. First, Defendants argue that admission of the white paper and testimony concerning Methbot is somehow necessary to explain why Plaintiffs' damages expert "backed out" revenues received from the customer allegedly responsible for the Methbot operation in his damages calculation. This is nonsensical. As Plaintiffs noted in their Reply in Support of their Motion to Exclude the Expert Testimony of Anthony Ferrante, although the fact that there was a reduction in revenue may be relevant to Plaintiffs' claimed damages, the *reason* for the reduction remains irrelevant and unduly prejudicial. There is simply no legitimate reason why the jury could not be told that the reduction in revenue was the result of Plaintiffs terminating a client they believed to be violating Plaintiffs' terms of service. No legitimate reason exists that would require the admission of the White Ops report – or testimony about the Methbot operation – simply to explain the reduction of revenue factored into Plaintiffs' expert's report.[6] The reason for the reduction does not alter the math.

Once the Court moves past this damages "red herring," it comes to Defendants' true motivation – namely that it wants to use the Methbot report as supposed "evidence" of the truth of the allegations contained in the December Memo. Specifically, Defendants attempt to argue that *if* Plaintiffs or Plaintiffs' customers were involved with the alleged Methbot operation, that the jury could infer that Plaintiffs had used botnets to hack the Democratic party leadership, as alleged in the December memo.

Even if the Court could get past the attenuated nature of this leap of logic, it would be faced with the fact that Defendants are specifically attempting to improperly use "prior bad acts" evidence in violation of Fed. R. Evid. 404(b)(1), which provides that, "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." *See*, *also*, *Beckles v. Fed. Express Corp.*, 2011 U.S. Dist. LEXIS 163744, at *30 (S.D. Fla. Aug. 22, 2011) (evidence that plaintiff's boss' boss had used the n-word, "referred to African Americans, women, and homosexuals in a derogatory fashion," "tended to fill executive positions with Caucasians," and

---

[6] Indeed, given that Plaintiffs' expert issued a revision to his report, there is no legitimate reason why Defendants would need to do anything other than question Plaintiffs' expert as to the numbers contained in the revised report.

had been "named as a defendant in at least two lawsuits alleging race discrimination and retaliation," inadmissible in racial discrimination lawsuit against employer under Rule 404(b)); *Button v. Royal Caribbean Cruises, Ltd.*, 2013 U.S. Dist. LEXIS 196141, at *4 (S.D. Fla. July 24, 2013) (defendants precluded from offering testimony that sea captain previously "never had a marine incident" prohibited under Rule 404(b) as impermissible character evidence); *Grimes v. Felder*, 2018 U.S. App. LEXIS 24455, at *1-2 (11th Cir. Aug. 27, 2018) (holding that, where plaintiff sought to introduce evidence that a corrections officer had slapped an inmate hours before allegedly slapping the plaintiff, trial court properly excluded such evidence under Rule 404(b)).

And, as Plaintiffs have argued previously, even if the Methbot report or testimony concerning Methbot had some minimal relevance to the allegations at issue here, that relevance would be strongly outweighed by the prejudicial effect of admission of such evidence. *See*, *e.g.*, Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."); *Beckles*, *supra* at *31-32 ("[T]he probative value of evidence relating to the prior lawsuits, even if offered to show motive or intent, would be substantially outweighed by the potential for unfair prejudice.").

## CONLUSION

For the reasons stated hereinabove and in Plaintiffs' Motion *in Limine*, Defendants should be precluded from eliciting or offering testimony or evidence concerning the so-called "Methbot Operation."

Dated: November 20, 2018

**Respectfully Submitted:**

/s/ Evan Fray-Witzer
Evan Fray-Witzer (*pro hac vice*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-0000
Facsimile: 617-423-4855
Evan@CFWLegal.com

/s/ Valentin Gurvits
Valentin D. Gurvits (*pro hac vice*)
Matthew Shayefar (Fla. Bar No. 0126465)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1804
Facsimile: 617-928-1802
vgurvits@bostonlawgroup.com
matt@bostonlawgroup.com

/s/ Brady J. Cobb
Brady J. Cobb (Fla. Bar No. 031018)
Dylan Fulop (Fla. Bar No. 123809)
COBB EDDY, PLLC
1112 North Flagler Drive
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com
dfulop@cobbeddy.com

*Attorneys for Plaintiffs*