UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| ALEKSEJ GUBAREV,<br>XBT HOLDING S.A., and<br>WEBZILLA, INC.<br>    Plaintiffs,<br><br>v.<br><br>BUZZFEED, INC. and<br>BEN SMITH<br>    Defendants. | Case No.<br><br>0:17-cv-60426-UU |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION *IN LIMINE* #2
TO PRECLUDE THE INTRODUCTION OF TESTIMONY OR EVIDENCE
CONCERNING VARIOUS IRRELEVANT/HIGHLY PREJUDICIAL TOPICS**

### Introduction

With their Opposition to Plaintiffs' Second Motion *in Limine*, Defendants continue their game of three-card Monte – hoping that with all their tossing around of irrelevancies, the Court will lose track of where the Queen actually lies. As practiced as Defendants are with the cards, though, the focus here should remain on the defamatory statements Defendants published about Plaintiffs and the absolute irrelevancy (and unduly prejudicial nature) of the materials Defendants hope to admit at trial.

As Plaintiffs have repeatedly stressed, the defamatory statements made by Defendants, contained in the December Memo were that:

> [Redacted] reported that over the period March-September 2016 a company called XBT/Webzilla and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct "altering operations" against the Democratic Party leadership. Entities linked to one Aleksei GUBAROV [sic] were involved and he and another hacking expert, both recruited under duress by the FSB, Seva KAPSUGOVICH, were significant players in this operation. In Prague, COHEN agreed contingency plans for various scenarios to protect the operations, but in particular what was to be done in the event that Hillary CLINTON won the presidency. It was important in this event that all cash payments owed were made quickly and discreetly and that cyber and that cyber and other operators were stood down/able to go effectively to ground to cover their traces.

1

In the present Motion, Plaintiffs have sought to preclude Defendants from offering evidence or testimony at trial concerning: (1) allegations of child pornography being hosted on customer websites in Plaintiffs' networks; (2) other allegations of wrongdoing by Plaintiffs' customers on Plaintiffs' networks (or off the networks); (3) Plaintiffs having, at one point in time, sponsored adult entertainment webmaster trade conferences; and (4) evidence of companies in which Mr. Gubarev has only passive investments.

## Argument

I. **Plaintiffs Have Properly Identified Categories of Irrelevant and Highly Prejudicial Materials.**

Defendants first complain that, in their motion, Plaintiffs have identified four separate and discrete categories of materials to be excluded, and then argue that it is somehow improper to identify "categories" of materials to be excluded instead of (just) individual pieces of evidence. It is an interesting argument coming from Defendants who filed ten different Motions *in Limine*, each of which identified broad categories of materials Defendants seek to have excluded from trial. Moreover, the objection is simply another attempt at misdirection – Plaintiffs' Motion is, in reality, relatively specific, identifying documents and testimony presented to date that they seek to have excluded. But, as Defendants well know (and as their own Motions *in Limine* amply demonstrate), it is often insufficient for a party to identify simply a line of testimony or a specific document in a motion *in limine*, which would risk a ruling that focuses entirely on a known piece of evidence, while leaving unintended loopholes for the party to attempt to sneak in the materials the Court intended to exclude. Finally, Defendants' complaint is belied by the fact that they spend the remainder of their Opposition responding to the very specifics they claimed Plaintiffs' Motion lacked.

II. **Decade-Old Blog Posts (Some Anonymous) Alleging the Existence of Child Pornography on Plaintiffs' Networks is Not Sufficiently Relevant to Overcome the Unduly Prejudicial Nature of Such Allegations.**

Defendants continue to argue in their Opposition that they should be allowed to introduce, because it is somehow relevant, evidence of a smattering of decade-old blog posts (at least one of which is anonymous) that allege that child pornography was (at some point) hosted (by someone) on Webzilla's networks. Defendants argue that such "evidence" is either proof of the truth of the defamatory statements or proof of Plaintiffs' reputation. The posts clearly do

neither and, even if there was some slight evidentiary value (and there is not), such value would clearly be outweighed by the highly prejudicial nature of the posts.

Defendants' first justification fails for multiple reasons: first, to the extent Defendants seek to introduce this evidence as "proof" of the truth of the defamatory statements, they are seeking to use materials that are clearly untrue, unverified, and unreliable hearsay evidence from a decade ago.  None of the potential witnesses are competent to testify as to the truth of the allegations contained in the hearsay and, indeed, Mr. Steele's testimony reveals that he didn't even understand that a "CNN iReport" was not actually written, edited, or even vetted by CNN and Mr. Ferrante's testimony was that he had no way of knowing if the allegations were true and that it did not matter for his purposes if the allegations were true or not.  Putting that aside, the December Memo makes no mention of child pornography whatsoever and certainly not in connection with Plaintiffs.  The December Memo alleges that Plaintiffs used "porn traffic to transmit viruses, plant bugs, steal data and conduct 'altering operations' against the Democratic Party leadership."  The evidence that Defendants wish to introduce – decade-old allegations of the existence of child pornography on Plaintiffs' networks – is vastly different.

Defendants' second justification fares no better.  In support of their argument that the blog posts are evidence of "Plaintiffs' reputation," Defendants claim that "both Fusion GPS and Christopher Steele testified that in assessing the credibility of the Dossier and specifically the allegations about Plaintiffs, they reviewed and considered publicly available information about Plaintiffs' connections to the adult webhosting industry and previous reports about their hosting of child pornography."  Defendants' Opposition, p.6.  *This assertion is not even remotely supported by the testimony cited by Defendants.*  Mr. Steele did testify as to having located a CNN iReport from 2009 (though the report was never identified or entered as an exhibit at his deposition) and believing (incorrectly) that a CNN iReport was in some way connected to someone at CNN.  But, other than that, he said nothing about child pornography.  And, Fusion GPS's testimony said nothing about child pornography at all (or even a CNN iReport), but rather Fusion GPS claimed only that they had found a "number of websites" hosted by Webzilla that were adult content websites.[1]  In other words, the former MI-6 agent Christopher Steele found a

---

[1] Fusion GPS did not produce any documents supporting this claim.  Plaintiffs have no idea what any of the three websites mentioned in the transcript are; and none of the three mentioned websites appear to exist as of the date of this writing.

single anonymous blog post that he misunderstood to be created by CNN, and Fusion GPS (a professional research company founded by former reporters) found nothing whatsoever relating to allegations of child pornography. To the extent that this says *anything* about Plaintiffs' "reputation," it says that there was no suggestion that Plaintiffs were at all connected to child pornography.

Because the "evidence" Defendants wish to present concerning allegations of child pornography having been hosted a decade ago on a Webzilla server is not relevant to the allegations made, because the "evidence" offered is unverified hearsay, and because the "evidence" is unduly prejudicial, it should be excluded in its entirety.

**III.     Defendants Should be Precluded from Offering Evidence or Testimony Concerning the Actions of Plaintiffs' Customers as Opposed to Plaintiffs Themselves.**

Defendants' Opposition says next-to-nothing about Plaintiffs' motion to exclude evidence concerning actions that may have taken place on Plaintiffs' infrastructure as opposed to actions taken by Plaintiffs themselves. Indeed, as part of their effort to "shuffle the cards," Defendants do not respond to Plaintiffs' motion category-by-category, but rather Defendants make two blanket arguments that all of the categories of evidence are relevant to substantial truth and relevant to Plaintiffs' reputation, leaving it to the Court to try to match Defendants' arguments to the relevant categories of evidence enumerated in Plaintiffs' motion. It is understandable why Defendants have taken this tack – when the specific evidence Defendants seek to introduce is examined, it becomes apparent that such evidence is both irrelevant to the actual claims at issue and unduly prejudicial.

First, Defendants seek to have admitted evidence concerning Plaintiffs' customers that Defendants' own expert admits does not even demonstrate any culpability on the part of Plaintiffs' customers (much less Plaintiffs themselves). For example, Defendants seek to admit evidence that, in 2011 (six years before the publication of the defamatory materials), a purported customer of Plaintiffs, Colo4, was "one of numerous companies with networks 'shown to have been phoning home to some of the same control infrastructure that was used in RSA attack.'" Ferrante Report, p. 33. Mr. Ferrante's reference to "numerous companies" is a bit of an understatement. As the referenced article noted, there were 760 companies effected including "Abbott Labs, the Alabama Supercomputer Network, Charles Schwabb & Co., Cisco Systems, eBay, the European Space Agency, Facebook, Freddie Mac, Google, the General Services Administration, the Inter-American Development Bank, IBM, Intel Corp., the Internal Revenue

Service (IRS), the Massachusetts Institute of Technology, Motorola Inc., Northrop Grumman, Novell, Perot Systems, PriceWaterhouseCoopers LLP, Research in Motion (RIM) Ltd., Seagate Technology, Thomson Financial, Unisys Corp., USAA, Verisign, VMWare, Wachovia Corp., and Wells Fargo & Co." *See*, Who Else Was Hit by the RSA Attackers?, Krebs on Security (Oct 24, 2011), https://krebsonsecurity.com/2011/10/who-else-was-hit-by-the-rsa-attackers/ (attached hereto as Exhibit 1).

Indeed, Mr. Ferrante himself admitted in his report that "not every company on the list may be culpable." Ferrante Report, p. 33. So, to again break down what Defendants assert is "relevant" it is that: in 2011, one of Plaintiffs' purported *customers* was one of 760 companies (including RSA, a company whose entire purpose is to fight malware on the internet, as well as some of the largest technology firms on the planet) to be targeted by hackers seeking to use their networks which, by their own expert's estimation, is not proof of culpability. As with much of the evidence Defendants seek to admit, the inadmissibility is made plain by simply explaining the "evidence" itself.

Next, Defendants ignore entirely the fact that they seek to have admitted not only evidence of acts that Plaintiffs' *customers* allegedly took while utilizing Plaintiffs' infrastructure, but also evidence of acts that Plaintiffs' customers allegedly took on other networks *when they were **not** customers of Plaintiffs*. For example, Defendants seek to admit evidence that "McHost," which, at some point in time, leased servers from Plaintiffs was alleged (in a blog article) to have ties to cybercriminals. At the time this blog post was published, however, McHost was not a customer of any of the Plaintiffs. Similarly, Defendants try to persuade the Court that they should be allowed to present evidence that, in 2008, a company called 1-800-Hosting was alleged to have ties to cybercriminals despite the fact that Defendants' own expert also admits that, in 2008, Plaintiffs had no connection to 1-800-Hosting but rather Plaintiffs purchased 1-800-Hosting four years later, in 2012. In other words, nine years before Defendants published the defamatory materials, a company that was ***not*** affiliated with Plaintiffs allegedly had connections to cybercriminals. Defendants contend that this is relevant because ... well, actually, Defendants have no actual arguments as to why any of this is relevant, but they hope nonetheless that the Court has lost track of the fact that the Queen is now hidden up their sleeve.

This theme continues with Defendants' assertion that evidence that a company they purchased, Fozzy.com, was at one point in time alleged to host pornography. When asked if

5

Fozzy.com hosted pornography *after* being purchased by Plaintiffs, Mr. Ferrante admitted that he did not know, that he (and his team of former FBI agents) would certainly have tried to find proof that Fozzy.com was currently hosting pornography, and that he would have included such information in his report had he actually discovered any such information.  Ferrante Depo. pp 133-36.

Even more shocking is Defendants' desire to admit evidence that another of Plaintiffs' purported one-time clients, CubeHost, was allegedly *owned by* an individual who owned other websites (not hosted by Plaintiffs) that had allegedly been connected to the spread of malware.  Astonishingly, however, at his deposition, Mr. Ferrante was forced to admit that the very blog post that he relied on for this "incriminating evidence" noted that Cubehost itself was **not** suspected of having been connected to the spread of malware.  To break this down, then, Defendants are seeking to introduce (as somehow relevant), the fact: (1) that Plaintiffs at some point in time hosted a website, (2) that was **not** suspected of having done anything wrong but, (3) instead, was owned by an individual who, (4) owned other websites that were **not** hosted by Plaintiffs, (5) that were suspected of spreading malware.  *This* is what Defendants claim is somehow relevant here.

Finally, Defendants have sought to admit evidence concerning the so-called Grizzly Steppe report, which is discussed in greater detail in Plaintiffs' *Daubert* Motion to exclude the testimony of Mr. Ferrante.  With respect to that report, Defendants, through Mr. Ferrante, hope to confuse the jury into thinking that the report says something relevant when it does no such thing.  The Grizzly Steppe report was a warning issued by the Department of Homeland Security and the FBI to warn the owners of literally hundreds upon hundreds of IP addresses that their sites **may have been** used to transmit suspicious activity attributable to Russian actors.  Of the hundreds of listed IP addresses, 13 were owned by an XBT subsidiary, Root S.A.  Grizzly Steppe Report, Exhibit 2 hereto, pp. 13-53.  With respect to the hundreds of possibly-effected IP addresses, the Grizzly Steppe report notes simply "It is recommended that network administrators review traffic to/from the IP address to determine possible malicious activity."  Ferrante Depo., pp. 103-104.  None of this supports Mr. Ferrante's unsupported speculation that "evidence suggests that IP addresses owned by Root S.A. were included in the tools and infrastructure used by Russian intelligence to interfere in the 2016 U.S. Election" and, indeed,

6

Defendants' intent to use it as such itself demonstrates the danger in allowing such information – whose probative value is clearly outweighed by the danger of undue prejudice to Plaintiffs.

**III.     Defendants Should be Precluded from Offering Evidence or Testimony Concerning Adult Webmaster Trade Conferences.**

Until recently, Defendants have contended only that evidence concerning adult webmaster conferences was somehow relevant to their argument that Plaintiffs are limited public figures. Unwilling to let go of this wholly-irrelevant line of inquiry, Defendants now contend that the evidence is somehow also relevant to both the issue of the truth of the allegations in the December Memo and as to Plaintiffs' reputation. Again, because this topic has been discussed extensively elsewhere, Plaintiffs will respond only briefly.

Defendants' primary contention in their Opposition is that Plaintiffs' past-sponsorship of trade conferences for adult webmasters somehow proves that Plaintiffs have a "reputation" for "promoting" adult webhosting. The contention is both absurd and irrelevant. First, as Defendants themselves note, Mr. Gubarev did not use his own name in connection with such sponsorships, but rather he and the company that sponsored the trade conference used the alias, "Alex XE." Given that Mr. Gubarev's name was not associated with such sponsorships, even if they were somehow relevant from a factual standpoint, they are irrelevant to Mr. Gubarev's *reputation*. If (as Defendants themselves acknowledge), Mr. Gubarev's name was not associated with such promotions, then his reputation was also not affected by them. And, as Defendants also acknowledge, "By 2013, Plaintiffs were winding down their direct involvement in promoting the adult web industry." Defendants' Motion for Partial Summary Judgment on the Issue of Plaintiffs' Status as Public Figures, p. 3. In other words (and again, based on Defendants' own assertions), the corporate Plaintiffs were not even "promoting" adult content for the *four years prior to Buzzfeed publishing the so-called Dossier*.

Moreover, there is a vast difference between having clients who host adult websites and using "porn traffic" to "transmit viruses and bugs." The former is a perfectly legal and common occurrence within the web-hosting industry, while the latter is malicious criminal activity. Defendants' attempts to conflate the two simply points to the dangers in allowing such irrelevant evidence to be presented to the jury.

7

### IV.     **Defendants Should Be Precluded from Offering Evidence or Testimony Concerning Aleksej Gubarev's Passive Investments in Non-XBT Companies.**

Finally, and as an extension of Plaintiffs' argument that the sponsorship of adult webmaster trade conferences has no relevance to any fact to be decided at trial, Mr. Gubarev's passive investment in the companies that helped organize those conferences is even a step further removed from relevance. Defendants do not really deny as much in their Opposition, though they first feign ignorance as to Plaintiffs' meaning before proceeding to argue that evidence that Mr. Gubarev was an investor in the companies that produced the trade shows for adult webmasters is somehow relevant to the allegations contained in the December Memo. The evidence of such investments would simply take the jury further down the path of irrelevance without any concomitant benefit to the jury's factfinding role. Because Mr. Gubarev's passive investments are irrelevant to any fact in dispute in this case and introduction of evidence concerning such investments would be unduly prejudicial and offer no probative value, such testimony and evidence should be excluded.

### Conclusion

For the reasons stated hereinabove and in Plaintiffs' Motion *in Limine*, Defendants should be precluded from offering evidence or testimony at trial concerning: (1) allegations of child pornography being hosted on Plaintiffs' networks; (2) other allegations of wrongdoing by Plaintiffs' customers on Plaintiffs' networks; (3) Plaintiffs having, at one point in time, sponsored an adult entertainment webmaster trade conferences; and (4) evidence of companies in which Mr. Gubarev has only passive investments.

Dated: November 20, 2018

**Respectfully Submitted:**

/s/ Evan Fray-Witzer
Evan Fray-Witzer (*pro hac vice*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-0000
Facsimile: 617-423-4855
Evan@CFWLegal.com

/s/ Valentin Gurvits
Valentin D. Gurvits (*pro hac vice*)
Matthew Shayefar (Fla. Bar No. 0126465)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1804
Facsimile: 617-928-1802
vgurvits@bostonlawgroup.com
matt@bostonlawgroup.com

/s/ Brady J. Cobb
Brady J. Cobb (Fla. Bar No. 031018)
Dylan Fulop (Fla. Bar No. 123809)
COBB EDDY, PLLC
1112 North Flagler Drive
Fort Lauderdale, Florida 33304
Telephone: 954-527-4111
Facsimile: 954-900-5507
bcobb@cobbeddy.com
dfulop@cobbeddy.com

*Attorneys for Plaintiffs*