# Exhibit
1

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF FLORIDA

 3                    MIAMI DIVISION

 4

 5      _____

 6      IN RE THIRD PARTY SUBPOENA TO  |   Case No.

 7      FUSION GPS                      |   0 18-mc-60528-UU

 8      _____|

 9      ALEKSEJ GUBAREV,               |

10      XBT HOLDING S.A. and           |

11      WEBZILLA, INC.                 |   Case No.

12           Plaintiffs,              |   0 17-cv-60426-UU

13      -v-                            |

14      BUZZFEED, INC., and            |

15      BEN SMITH                      |

16           Defendants.              |

17      _____|

18

19

20

21
```



1          MR. LEVY:  Josh Levy for the deponent.

2          MS. CLATTENBURG:  Rachel Clattenburg for the

3    deponent.

4          THE VIDEOGRAPHER:  Will the court reporter

5    please swear in the witness?

6    Whereupon,

7                        Peter R. Fritsch,

8    a witness of lawful age, after being duly sworn to

9    tell the truth, the whole truth and nothing but the

10   truth, testified as follows:

11                        EXAMINATION:

12   BY MR. FRAY-WITZER:

13       Q.   Good morning.

14       A.   Good morning.

15       Q.   I'm Evan Fray-Witzer.  I represent the

16   plaintiffs in this matter.

17          If you wouldn't mind, please, first telling

18   us your name for the record?

19       A.   Sure.  It's Peter R. Fritsch, and that's

20   F-R-I-T-S-C-H.

21       Q.   Thank you.



1  which is the Court's order on recast Motion to Quash

2  of Nonparty Fusion GPS.  Have you seen this court

3  order before?

4          (Fritsch Exhibit No. 5 was marked for

5  identification.)

6          THE WITNESS:  Yes, I have.

7  BY MR. FRAY-WITZER:

8      Q.   So are you familiar with the listed areas of

9  inquiry for which you've been designated Fusion GPS's

10  30(b)(6) witness?

11     A.   Yes, I am.

12     Q.   Can you tell me, please, other than the

13  conversations that you've had with your counsel, what

14  did you do to prepare for today's deposition?

15     A.   Everything I did, I did with counsel in

16  preparation for today.

17     Q.   Did you speak with any Fusion GPS employees

18  or contractors in preparation for today?

19     A.   Not without counsel present.

20     Q.   What did you do to inform yourself with

21  respect to conversations that Glenn Simpson had in



1  connection with the matters to be discussed today?

2            MR. LEVY:  I'm going to instruct the witness

3  to not answer that question inasmuch as it would

4  implicate the attorney-client privilege or the

5  attorney work product doctrine.

6            Otherwise you can answer that question.

7            THE WITNESS:  I'm sorry.  I'm a little

8  confused.  I may answer it or I may not?

9            MR. LEVY:  If there are people with whom

10  you've spoken through counsel, you may talk about the

11  people you've -- with whom you've spoken.

12            THE WITNESS:  Oh, sorry.  Sure.

13            I consulted with Mr. Simpson, I consulted

14  with other relevant employees.

15  BY MR. FRAY-WITZER:

16     Q.   Which employees are those?

17     A.   Various partners; Jason Felch who is a

18  partner of ours at our company, Thomas Catan, Laura

19  Seago and Jake Berkowitz.

20     Q.   I'm sorry.  Laura?

21     A.   Seago.  She's an employee.



```
 1              (The reporter requested clarification.)

 2              THE WITNESS:  S-E-A-G-O.  Jacob Berkowitz,

 3   B-E-R-K-O-W-I-T-Z.

 4              And our -- and administrative support staff

 5   who keep things such as contracts and other records.

 6   BY MR. FRAY-WITZER:

 7       Q.   How long were your conversations with Glenn

 8   Simpson in preparation for today?

 9              MR. LEVY:  I'm going to repeat the same

10   instruction.

11              Go ahead.

12              THE WITNESS:  I'm not sure honestly.  Hours.

13   BY MR. FRAY-WITZER:

14       Q.   Would you say it's more than five hours?

15       A.   That sounds fair.

16       Q.   And your conversations with Jason Felch?

17       A.   Felch.

18       Q.   Felch.

19       A.   That's F-E-L-C-H.

20       Q.   How long did you speak with Mr. Felch?

21       A.   Briefly, maybe an hour.
```



1        Q.    How long did you speak with Mr. Catan?

2        A.    Same sort of timeframe.

3              If it's helpful, I was present for many of

4     the events that are the subject of the deposition

5     today.

6        Q.    Was it Laura Seago?

7        A.    Laura.

8        Q.    And how long did you speak with Laura Seago?

9        A.    It's Seago, S-E-A-G-O.

10             A half hour.

11        Q.   And how long did you speak with Jacob

12    Berkowitz?

13        A.    Hour or two.

14        Q.    Just in general terms, what was Mr.

15    Berkowitz's involvement with the areas to be inquired

16    about today?

17        A.    He's a researcher in our office who was

18    working on various client matters in 2015, '16

19    including research into Trump and Russia.

20        Q.    And the same question for Laura Seago, what

21    topics did you discuss with Laura Seago?



1        A.    The production of records primarily.

2        Q.    What subjects did you discuss with Thomas

3    Catan?

4        A.    I can't recall but likely the collection of

5    documents that could be produced.

6        Q.    And what topics did you discuss with Jason

7    Felch?

8        A.    His recollections of his contacts with Mr.

9    Bensinger of BuzzFeed.

10       Q.    Did you have any discussions with Nellie Ohr

11   concerning the matters to be discussed today?

12             MR. LEVY:  Objection, foundation.

13             MR. FRAY-WITZER:  Foundation for the

14   question?

15             MR. LEVY:  Yes.

16             MR. FRAY-WITZER:  It's been widely reported

17   that Ms. Ohr did work on collection of information for

18   the dossier.  I have no way of knowing if the

19   reporting is true.  But if it is, then that would be

20   someone that I would have expected the witness to

21   speak with.

1          MR. LEVY:  What's the question?

2   BY MR. FRAY-WITZER:

3      Q.   Did you have conversations with Nellie Ohr

4   concerning the topics to be discussed today?

5      A.   I did not.

6      Q.   Did you have any conversations with

7   Christopher Steele in preparation for today?

8      A.   I did not.

9      Q.   Did you have any conversations with either

10  BuzzFeed or anyone representing BuzzFeed in

11  preparation for today?

12     A.   No, I did not.

13     Q.   Other than the people that you've mentioned

14  already, can you recall anyone else that you might

15  have spoken to in preparation for your deposition

16  today?

17     A.   No, I can't.

18     Q.   Did you review any documents in preparation

19  for your deposition today?

20     A.   Yes, I did.

21     Q.   To the best of your recollection, can you



1  that.

2      Q.   Prior to December 13th, 2016, did Fusion GPS

3  have any communication with anyone from BuzzFeed?

4          MR. LEVY:  About this work?

5  BY MR. FRAY-WITZER:

6      Q.   Concerning the Trump investigation?

7      A.   Prior to publication?

8      Q.   And prior to December 13th, 2016?

9      A.   Yes, we did.

10     Q.   With whom did Fusion have communications?

11     A.   Just to be clear, you're asking me regarding

12  what exactly?  The Trump Russia investigation or the

13  dossier, what exactly is the --

14     Q.   Well, regarding the investigation or the

15  memos that were produced as a result of that

16  investigation?

17     A.   Right.  To the best of our recollection, we

18  did have some communications with Ken Bensinger.

19     Q.   And who specifically had communications with

20  Ken Bensinger?

21     A.   Glenn Simpson, myself.  Mr. Felch had some



1  communications I believe beforehand with -- but you

2  should understand that he and Mr. -- Mr. Bensinger and

3  Mr. Felch are friends.  They both live in Los Angeles.

4          So, I don't believe however that they

5  discussed our ongoing work, that's Mr. Felch and Mr.

6  Bensinger.

7     Q.   Did you and Mr. Bensinger discuss your

8  ongoing work on or before December 13th, 2016?

9     A.   Me personally?

10    Q.   Yes.

11    A.   No, I did not.

12    Q.   Did Mr. Simpson have discussions with Mr.

13 Bensinger concerning the ongoing work prior to

14 December 13th, 2016?

15    A.   Yes, I believe he did.

16    Q.   Were those conversations in person or by

17 telephone or some other method?

18    A.    I think both.  And I'll run through our

19 recollection of it, if that's helpful.

20          We recall that Jason, Mr. Felch in Los

21 Angeles, had contacted Glenn at some point saying that



1  Ken, his friend, Mr. Bensinger, was interested in

2  following up on some of the -- on Trump and Russia

3  generally, and would we be willing to talk to him

4  about that.

5          So my recollection is that they had a

6  telephonic conversation.  And we think that's the

7  beginning of December, end of November.

8          I don't believe we discussed anything

9  related to the dossier in that conversation or our

10  research.  It was more, hey, you're generally

11  interested.  We'd -- we'd be willing to discuss those

12  matters with you.

13          Subsequent to that, we -- and by we, I mean

14  myself, Mr. Simpson and a couple of our partners

15  including Mr. Catan and Mr. Felch met -- had a -- sort

16  of a social company retreat, sort of thing I guess

17  you'd call it in Northern California.  And Ken was in

18  town and he joined us for a couple of hours, I want to

19  say or a few hours.  I think he spent the night, but

20  he arrived very late.  And that was a purely social

21  encounter to the best of our recollection.

1           Thereafter, Mr. Bensinger got in touch

2    again, and I don't remember if that was telephonically

3    or in person or we don't recall.  And he -- he did

4    represent at one point that he knew Mr. Steele from

5    his previous -- and I think we talked about that

6    earlier -- from his work covering FIFA.

7           We, at that time, didn't confirm or deny

8    anything about Mr. Steele or our relationship with

9    him.

10          Subsequently, he did, in fact, request or

11   understand or learn that there was a -- that there

12   were these reports that you've marked Exhibit 8 and

13   asked Glenn specifically for a copy of those reports

14   which we declined to provide.

15       Q.   Why did you decline to provide a copy of the

16   report?

17       A.   In simplest terms, we just didn't know Ken

18   very well.  He is an accomplished investigative

19   reporter.  That we know.

20          Jason Felch, who is also an accomplished

21   reporter told us that Ken was a reliable person.  And



1   so -- however, you know, the meetings that we had with

2   various journalists that I alluded to earlier, all of

3   those individuals are people we've known for many,

4   many, many years and developed a sense of trust with.

5          And though Ken had a certain -- enjoyed a

6   solid reputation, we just didn't know him well enough

7   to do that.

8       Q.   And, again, prior to December 13th, 2016,

9   would --

10      A.   I'm done, I believe.

11      Q.   Were there additional conversations with Mr.

12  Bensinger?

13      A.   Yes.  There was a meeting later in

14  December -- I'm sorry.  You asked after December 13?

15      Q.   Prior to December 13th?

16      A.   Prior to December 13th.  I don't believe so.

17      Q.   Were there any conversations between anyone

18  at Fusion and Ben Smith prior to December 13th, 2016?

19      A.   About?

20      Q.   About the Trump investigation or the memos

21  that arose out of that investigation?



1        A.    No, he didn't.

2        Q.    Just so that I understand, prior to the Wall

3   Street Journal publishing that information, Fusion was

4   unaware that the Wall Street Journal intended to

5   publish that information.  Is that correct?

6        A.    That is correct.

7        Q.    Prior to the publication of the memos, did

8   Fusion undertake any efforts to verify the allegations

9   in the December memo concerning Alex Gubarev?

10            MR. LEVY:  Take your time to read through

11   it.

12            THE WITNESS:  Yes, we did.  We took

13   extensive steps to verify the information.

14   BY MR. FRAY-WITZER:

15        Q.    And specifically the information concerning

16   Alex Gubarev?

17        A.    Yes, that's right, we did.

18        Q.    What steps did Fusion take to verify the

19   allegations concerning Alex Gubarev?

20        A.    We took extensive steps to, as I believe I

21   testified, XBT, Webzilla and Mr. Gubarev were all new



1  names to us.  So we went to the public record to

2  determine who these people are and to determine

3  whether the information in Paragraph 3 of this memo

4  was credible.

5        What we found was an extensive record of a

6  company based in Luxemburg with no fewer than 51

7  subsidiary companies or shell companies, located in

8  places like the British Virgin Islands, Cypress,

9  Panama, India and Russia and the United States that

10  was constructed in such a way to obscure the

11  beneficial ownership of the company.

12        That's an important detail in our mind.

13        We undertook a litigation search of XBT and

14  Webzilla and a public record search with the internet.

15  We found extensive allegations, credible allegations.

16  Paragraph 3 talks about porn traffic.  We found a

17  number of websites hosted by Webzilla;

18  asianpissinggirls.com, japanesetoiler.com.  In Fort

19  Lauderdale, osuck.com.  They were hosted by Webzilla.

20        We found extensive allegations in the public

21  record from credible people like motion picture



1   associations in filings to the U.S. and comments to

2   the U.S. Copyright Office that Webzilla had ignored

3   repeated entreaties to take down pirated traffic

4   particularly in pornography.

5           We found that -- and this is a very telling

6   fact for us -- we found Mr. Gurvits's name on

7   extensive litigation in defense of alleged criminal

8   hackers and networks in the Ukraine and Russia.

9           And that -- we found that FireEye had

10  determined that --

11          (The reporter requested clarification.)

12          THE WITNESS:  FireEye, which is an internet

13  security firm had determined that Webzilla was hosting

14  a Propeller Ads -- a company called Propeller Ads

15  which involved various individuals, also tied to Mr.

16  Gubarev.

17          We understood there was a couple companies.

18  One was called Co-locate USA, which is a known

19  spamming network which is actually owned by Webzilla

20  is what we understand.

21          There was another company called Digital --



1   I can't remember it right now.  It was involved

2   allegedly in the Methbot attack which was --

3            (The reporter requested clarification.)

4            THE WITNESS:  Methbot, M-E-T-H-B-O-T, that

5   at its height was stealing somewhere between three and

6   $5 million a day from unsuspecting internet users.

7            So what we found was a pattern and a fact

8   set that corroborated and substantially raised the

9   credibility of the underlying reporting in this

10  memorandum.

11  BY MR. FRAY-WITZER:

12      Q.   I asked you what steps you took prior to the

13  publication.  Is it your testimony that you undertook

14  those steps prior to BuzzFeed's publication of the

15  dossier?

16           MR. LEVY:  Objection, asked and answered.

17           MR. FRAY-WITZER:  Except he's answering a

18  totally different question.

19           MR. LEVY:  No, he's not.

20           MR. FRAY-WITZER:  Okay.  Well, then let him

21  answer it.



1           MR. SIEGEL:  That's testimony, Evan.

2    BY MR. FRAY-WITZER:

3        Q.   Did you --

4           MR. SIEGEL:  Ask your question.

5    BY MR. FRAY-WITZER:

6        Q.   Did you -- did Fusion undertake those

7    research efforts before BuzzFeed published the

8    dossier?

9        A.   Yes, we did.

10       Q.   Then let me ask you this.  You said it was

11   very relevant to you that Val Gurvits's name was on

12   the pleading.  Why was that relevant prior to the

13   publication of the dossier?

14          MR. LEVY:  Objection, lacks foundation.

15          THE WITNESS:  May I answer?

16   BY MR. FRAY-WITZER:

17       Q.   Please.

18       A.   Well, as an investigative matter, as a

19   research matter, who someone's lawyer is, whether it's

20   for the formation of a company or the defense of

21   allegations against them is entirely relevant in our



1  mind.

2      Q.   And what relevance did that have prior to

3  the publication of the dossier?

4          MR. LEVY:  Objection, lack of foundation.

5          THE WITNESS:  Again --

6          MR. FRAY-WITZER:  He testified that it was

7  relevant to him.  That's the foundation.  What's the

8  relevance?

9          MR. LEVY:  Preserving the objection.

10         MR. FRAY-WITZER:  Fine.

11         THE WITNESS:  The relevance -- I mean, we

12 were trying to understand, as I testified to you -- we

13 were trying to understand who XBT, Webzilla and Mr.

14 Gubarev are.  We had no idea.

15         So we employed our methodology, which as I

16 said is an extensive collection effort, and a

17 litigation review found those commonalities.

18 BY MR. FRAY-WITZER:

19     Q.   On what date did Fusion start that review?

20     A.   Almost immediately.

21     Q.   Almost immediately upon what?



1      A.    Sorry, upon receipt of the December 13th

2   memo.

3      Q.    You -- and by you I mean Fusion was asked

4   and ordered by the Court in this case to produce to us

5   all documents that demonstrated investigation or

6   information that you had concerning Webzilla, XBT or

7   Mr. Gubarev that you had prior to the publication of

8   the dossier.  There's not a single document that

9   reflects anything that you're talking about.  Why is

10  that?

11           MR. SIEGEL:  Objection.

12           MR. LEVY:  Objection, that's incorrect.  And

13  if you'd let the witness testify as opposed to

14  characterizing documents in his own testimony as

15  you've done for the last six hours, we'd greatly

16  appreciate it.

17  BY MR. FRAY-WITZER:

18     Q.    Why aren't there any documents that

19  demonstrate such an investigation prior to the

20  publication?

21           MR. LEVY:  Objection, lack of foundation.



 1   BY MR. FRAY-WITZER:

 2       Q.   Tell me what documents you produced that

 3   demonstrate any kind of investigation that Fusion

 4   undertook prior to the publication of the dossier?

 5       A.   I think our document production speaks for

 6   itself.

 7       Q.   Tell me a single document that indicates

 8   that Fusion undertook an investigation of XBT,

 9   Webzilla or Mr. Gubarev prior to the publication of

10   the dossier?

11            MR. LEVY:  Objection, asked and answered.

12            MR. SIEGEL:  Objection.

13            THE WITNESS:  I'm sorry.  I'm not sure how I

14   can answer that.

15   BY MR. FRAY-WITZER:

16       Q.   You said you reviewed the documents that you

17   produced before today's deposition?

18       A.   Yes.

19       Q.   Correct?

20       A.   Correct.

21       Q.   So identify for me, tell me any document



1  that demonstrates an investigation prior to the

2  publication --

3      A.   The entire.  I apologize for not letting you

4  finish.

5          The entire Dr. Tubrook case, dot com case,

6  the entire WebArt case were all things that we found

7  in the public record prior to publication.  Not

8  difficult to find.

9          MR. LEVY:  We can bring out the document

10  production for Mr. Fritsch to look through if it's

11  helpful for you.  He's given you some examples, he can

12  give you others.  You have the production.

13  BY MR. FRAY-WITZER:

14      Q.   Is there a document that you believe you

15  produced that demonstrates -- that has a date on it

16  prior to the publication of the dossier, that

17  demonstrates that Fusion was engaged in an

18  investigation of the sort you're talking about?

19      A.   I'm sorry.  As I sit here today I'd have to

20  sit down with the documents and go -- and review them.

21  Which I'm happy to do.



1       Q.   I believe you testified that you did go

2   through them and review them prior to this deposition?

3          MR. LEVY:  Objection, asked and answered.

4   BY MR. FRAY-WITZER:

5       Q.   Did you go through them and review them

6   prior to the deposition?

7       A.   I did.

8       Q.   So, why can't you tell us today as you sit

9   here what document has any date that predates the

10  publication of the dossier that you believe supports

11  your assertion that there was such an investigation

12  before the publication of the dossier?

13      A.   I'm sorry.  I'm not trying to be difficult.

14  I just can't recall.  The document production that I

15  reviewed with Mr. Levy was probably four or five

16  inches thick, if not larger.

17      Q.   What evidence did Fusion find that Alex

18  Gubarev had been recruited under duress by the FSB?

19      A.   I don't believe we found any such evidence.

20  Again, as I believe I've testified and as Mr. Steele

21  evidently testified, the purpose or the goal was to



1 | share this information in urgent fashion with

2 | competent authorities in law enforcement and

3 | government who could pursue them.

4 |    Q.   Well --

5 |    A.   This is not the kind of information that is

6 | easily confirmed in the open source.

7 |    Q.   What evidence did Fusion find that XBT,

8 | Webzilla was conducting altering operations against

9 | the democratic party leadership?

10 |    A.   Again, by altering operations by the way, I

11 | believe we're talking about hacking.

12 |       We found no specific allegations about XBT,

13 | Webzilla in the open source.  However, at this time it

14 | was an extensive matter of public record that the

15 | democratic party leadership had been hacked.  And,

16 | again, as I believe I testified, we determined that

17 | XBT, Webzilla operates the kind of network with the

18 | capability to carry out those kinds of acts.

19 |       We also understood XBT, by the way, since

20 | 2015 to be working in Russia through its acquisition

21 | of Edinaya Set, E-D-I-N-A-Y-A, separate word, S-E-T.



1   Our understanding is we need to be in close

2   cooperation with the State to offer internet services

3   for hosting in Russian.

4          Prime Minister Medvedev just a couple of

5   months ago signed a new law requiring companies to

6   cooperate with the State under the guise of its

7   National Security and Counter Terrorist Act.

8          So to us, again, the credibility's

9   reinforced by the profile of the company.

10      Q.   Did Fusion have any actual evidence of

11  cooperation between XBT, Webzilla and the Russian

12  government?

13          MR. LEVY:  Objection, asked and answered.

14          He just answered the question.

15          MR. FRAY-WITZER:  No.  He just testified

16  that there are requirements that he believes are in

17  place and I want to know if he has any actual evidence

18  that this company is cooperating with the Russian

19  government.

20          MR. LEVY:  Objection.  Same objection as in

21  that was part of his testimony, it wasn't all of his



1  testimony.

2          THE WITNESS:  One thing we found in the open

3  source, just to help you understand that, is that --

4  and I'm going to mangle the name -- but XBT after the

5  Russian government shut down the messaging app

6  telegram, it did talk about the contract, it's

7  Roskomnadzor.  I can't remember the name.

8          (The reporter requested clarification.)

9          THE WITNESS:  I'm sorry.  I don't know how

10 to spell it.

11         There's a report in the open source that

12 talks about a contract with Edinaya Set, the company I

13 referenced earlier that belongs to XBT Holdings to

14 work with the Russian government.

15         So, again, from a researcher standpoint, a

16 lot of those facts are important.

17         When you're trying to assess the credibility

18 of a report like this, not the truth, the credibility

19 of it.

20 BY MR. FRAY-WITZER:

21     Q.   Have you produced this alleged contract



1              REPORTER'S CERTIFICATE

2              District of Columbia

3              County of Washington, to wit:

4                   I, KENNETH NORRIS, a Notary Public of

5     the District of Columbia, County of Washington, do

6     hereby certify that the within named witness

7     personally appeared before me at the time and place

8     herein set out, and after having been duly sworn by

9     me, according to law, was examined.

10                  I further certify that the examination

11    was recorded stenographically by me and this

12    transcript is a true record of the proceedings.

13                  I further certify that I am not of

14    counsel to any of the parties, nor in any way

15    interested in the outcome of this action.

16                  As witness my hand and notarial seal

17    this 30th day of August 2018.

18

19

20

21

