**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:17-cv-60426-UU

ALEKSEJ GUBAREV, *et al.*,

     Plaintiffs,

v.

BUZZFEED, INC., *et al.*,

     Defendants.

_____/

## ORDER

THIS CAUSE comes before the Court upon Plaintiffs' Motion for Summary Judgment on Defendants' "Public Figure" Affirmative Defense (D.E. 208) and Defendants' Motion for Partial Summary Judgment on Issue of Plaintiffs' Status as Public Figures (D.E. 225).

For the reasons discussed below Plaintiffs' motion is granted; Defendants' motion is denied.

## BACKGROUND

The facts recited below are undisputed except as otherwise noted.

### I.    The Parties

Plaintiff Aleksej Gubarev is a resident of the Republic of Cyprus.  D.E. 212-2 ¶ 3.  Until January 1, 2018, he was the chairman and CEO of Plaintiff XBT Holdings S.A. ("XBT").  *Id*. ¶ 1. XBT is a Luxembourg company.  D.E. 38 ¶ 7.  Plaintiff Webzilla, Inc. ("Webzilla"), which is a Florida corporation, is a subsidiary of XBT.  *Id*. ¶ 8; D.E. 212-2 ¶ 2.

Defendant BuzzFeed, Inc. ("BuzzFeed") is a Delaware corporation with offices in eighteen cities around the world, including New York.  D.E. 38 ¶ 9.  Defendant Ben Smith is BuzzFeed's editor-in-chief, and he resides in Brooklyn, New York.  *Id*. ¶ 10.

## II.  The Dossier

On January 10, 2017, BuzzFeed published an online article entitled *These Reports Allege Trump Has Deep Ties to Russia* (the "Article"), which included a 35-page dossier (the "Dossier").  D.E. 1-3, ¶ 1; D.E. 38 ¶ 1; D.E. 1-2 p. 19–21.  In the Article, BuzzFeed described the Dossier as a compilation of memoranda assembled "for political opponents of Trump by a person who is understood to be a former British Intelligence agent."  D.E. 1-2 p. 20.  One memorandum, dated December 13, 2016, contains statements about Plaintiffs.  As published by BuzzFeed, the pertinent portion of that memorandum appeared as follows:

> ████████  reported that over the period March-September 2016 a company called XBT/Webzilla and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data, and conduct "altering operations" against the Democratic Party leadership.  Entities linked to one Alexei GUBAROV [sic] were involved and he and another hacking expert, both recruited under duress by the FSB,[1] Seva KAPSUGOVICH were significant players in this operation. In Prague, COHEN[2] agreed [sic] contingency plans for various scenarios to protect the operation, but in particular what was to be done in the event that Hillary CLINTON won the presidency.  It was important in this event that all cash payments owed were made quickly and discreetly and that cyber and other operators were stood down/able to go effectively to ground to cover their traces. (We reported earlier that the involvement of political operatives Paul MANAFORT and Carter PAGE in the secret TRUMP-Kremlin liaison had been exposed in the media in the run-up to Prague and that damage limitation of these also was discussed by COHEN with the Kremlin representatives).

D.E. 1-3. ¶ 26, D.E. 1-2 p. 19–21.

The Article included the following disclaimers:

> The dossier, which is a collection of memos written over a period of months, includes   specific,   unverified,   and   potentially   unverifiable   allegations . . . .

---

[1]  FSB refers to the Russian intelligence service.
[2]  "COHEN" refers to Michal Cohen, then-candidate Donald Trump's lawyer.  D.E. 1-2, p. 18.

> BuzzFeed News reporters in the US and Europe have been investigating various alleged facts in the dossier but have not verified or falsified them . . . [The Dossier] is not just unconfirmed: It includes some clear errors.

*Id.* ¶ 3, D.E. 1-2, p. 20.

Plaintiffs allege that the Dossier's statements about them are false.  D.E. 1-3 ¶ 27. Plaintiffs also allege that although BuzzFeed tasked its reporters with investigating the allegations, Defendants never contacted Plaintiffs to determine whether the allegations that they hacked the Democratic Party had merit.  *Id.* ¶ 28, D.E. 38 ¶ 28.  Plaintiffs assert that because Defendants could not verify the Dossier and knew that it contained "some clear errors," Defendants published it without reasonable care for, or with reckless disregard as to the truth. *Id.* ¶ 43.  They go on to allege that Defendants' decision to publish the Dossier defamed them. *Id.* ¶ 51.

Defendants assert, among other affirmative defenses, that Plaintiffs are public figures and thus are required to prove actual malice.  D.E. 38, p. 10.

### III.    Plaintiffs' Public Relations Activities

In 2005, Gubarev started Webazilla (later named Webzilla) as a small server company. D.E. 211-2 ¶ 3.  Over the next decade or so, Gubarev and his team grew Webzilla and started other computer hosting companies, including Servers.com.  *Id.* ¶ 4.  All of these companies operate under the umbrella of XBT.  *Id.*

Beginning in 2012, XBT and Webzilla began to circulate press releases using a London-based company, Marketwired, which circulates press releases worldwide.  D.E. 212-2 ¶ 19.  In a 2014 press release, Webzilla described itself as a peer of giant companies like Netflix, Google, and Akamai.  *Id.* ¶ 20. That same year, XBT issued a press release about its acquisition of a website called DDoS.com, which it described as improving XBT's ability to deal with online

security threats.  *Id*. ¶ 22.  Then in 2015, XBT issued a press release about a service called SecureVPN, which it described as a "unique version of online safety and help with internet protection."  *Id*. ¶ 21.

In 2015, Servers.com hired a public relations firm, Cutler PR, to generate publicity.  D.E. 211-2. ¶ 9.  It was the first of XBT's subsidiaries to do so.  *Id*.  Servers.com let Cutler decide what media they would target.  *Id*. ¶ 12.  Cutler proposed drafting articles for industry trade publications.  D.E. 211-12, p. 61.  Cutler described the articles as "not generally profile stories of the company," but rather, representative of "the company's views (as articulated through a senior executive) on a particular topic in the industry."  *Id*.  Their purpose was to show that Servers.com and its executives were experts in the field of data hosting and thus to add to their credibility.  *Id*.; D.E. 212-2 ¶ 26.

Cutler persuaded several publications to publish op-ed style articles promoting Servers.com.  D.E. 212-2 ¶ 30.  One publication, called *Inc*., described Servers.com as one of "18 Tech Companies to Get Excited About," and noted that Servers.com "boasts super-secure servers."  *Id*. ¶ 31.  Cutler claimed responsibility for that publicity.  *Id*.

Servers.com was unsatisfied with Cutler's efforts, and so suspended its services after only five months.  D.E. 211-2. ¶ 16.  Four months after that, Servers.com retained a new public relations firm, KGlobal.  *Id*. ¶ 17.  KGobal was retained for the sole purpose of increasing Servers.com's sales.  *Id*.  As with Cutler, Servers.com deferred to KGlobal's advice about public relations strategy.  *Id*. ¶ 18.

Part of this strategy involved trying to convince various publications to write profiles Gubarev.  *Id*. ¶ 19.  Gubarev specifically requested that his name be included in the articles.  D.E. 212-2 ¶ 52.  To some publications, KGlobal called Gubarev "a great resource for stories

about the Russian tech, startup and business scene . . . ."  D.E. 211-2 ¶ 19; D.E. 211-14, p. 2.  To others, it simply referred to him as the CEO of Servers.com and offered to introduce the publication to that company's services.  *Id.*   These efforts resulted in interviews with *AppMasters*, *Forbes*, *Bloomberg*, *Business Insider*, *VentureBeat*, and *Tech Insider*.  *Id.* ¶ 20; D.E. 212-2 ¶ 55.  KGlobal provided training to Gubarev and other executives on "how to talk to a journalist."  D.E. 212-2 ¶ 50.  KGlobal also assisted Servers.com in issuing press releases; some of which were republished by online publications.  D.E. 211-2 ¶ 21.

The relationship between Servers.com and KGlobal lasted only about three months; Gubarev terminated it after concluding that KGlobal was not generating sufficient publicity.  *Id.* ¶ 22; D.E. 212-2 ¶ 62.

Besides these two relationships with public relations firms, Gubarev and XBT's various subsidiaries have been referenced in a few other publications which discussed a photography app that they created and Gubarev's professional success.[3]  *Id.* ¶ 23; D.E. 211-15.  They have also won awards as hosting providers and were interviewed by internet hosting trade publications.  *Id.* ¶¶ 24, 25.  Additionally, Gubarev and XBT's subsidiaries appeared at or sponsored events related to their businesses.  D.E. 211-2 ¶ 24.

## IV.      Plaintiffs' Business Outreach In Russia

In or around 2015, as XBT began expanding its business into Russia, that country enacted a data privacy law.  D.E. 212-2 ¶ 32.  Gubarev thought the new law was a business opportunity for XBT.  *Id.* ¶ 34.  XBT issued a press release describing its entrance into the Russian data storage market.  *Id.* ¶ 35; D.E. 212-49.  Gubarev and other XBT executives spoke to the press

---

[3] This summary of the cited publications' contents is the Court's own based on the English-language publications included as exhibits.  The other publications are not in English, but Defendants do not challenge Plaintiffs' description of them as relating to "marketing of business or local matters in Cyprus" and so the Court accepts that characterization as undisputed.

about the Russian law and XBT's entrance into Russia.  *Id*. ¶ 36.  In interviews, Gubarev

mentioned that botnets were infecting cloud servers with increasing frequency and that control

and security were key factors in choosing a server host.  *Id*. ¶ 42.  Gubarev also gave a press

conference announcing the launch of Servers.com in Russia, which received coverage from one

Russian website.  *Id*. ¶ 39; D.E. 212-59.

Gubarev also spoke at a 2016 conference called the Russian Internet Forum about trends

in global and Russian internet infrastructure.[4]  *Id*. ¶ 43.  Servers.com (using its Russian name,

Servers.ru) was a sponsor of the forum.  *Id*. ¶ 45.

### V.       The AWMOpen Conference

Beginning in the early 2000s and ending in the early 2010s, one of Gubarev's companies

organized and operated a conference for adult webmasters.[5]  D.E. 211-2 ¶ 26; D.E. 212-2 ¶ 4.

Gubarev and other XBT executives attended the conference.  *Id*. ¶ 7; D.E. 211-2 ¶ 26.  And in

2006, Gubarev started a company that founded *AWMOpen Magazine*.  *Id*. ¶ 8.  Webzilla

sponsored the conference.  D.E. 212-2 ¶ 6.  Other sponsors included (at various times) a

company called McColo and another called 3fn.net.  *Id*. ¶¶ 16, 17.

### VI.      Plaintiffs' Public Statements During and After the 2016 Election

#### A.  The *Slate* Article

On October 31, 2016, *Slate* published a story about possible communication between a

computer server associated with the Trump campaign and computer servers associated with a

Russian bank called Alfa Bank.  D.E. 212-2 ¶ 56.  On November 1, a *Bloomberg* reporter to

---

[4] Plaintiffs contend that Gubarev spoke only to a small group at the conference, not to the entire conference.
[5] The record is not entirely clear about what webmasters are, what they do, or whether "adult webmasters" are involved in pornography.  One article (D.E. 212-18) says that adult webmasters are sellers of internet pornography, and Defendants assert that the AWMOpen conference was for people involved "in the online pornography business."  Gubarev, however, denied that the conference was for the online pornography industry.  D.E. 212-6, 115:10–14.  And one of the conference announcements attached to Defendants' statement of facts says that conference welcomes attendees from "various areas of online businesses."  D.E. 212-11, p.2.

whom Gubarev had previously promoted Servers.com contacted Gubarev. *Id.* ¶ 57; D.E. 211-2 ¶ 29. He asked Gubarev, "as a specialist," to help him "sort out [the] technical details" of the cyber-contacts described in the *Slate* article. *Id.*; D.E 212-90. Gubarev asked an employee of XBT to analyze the technical claims in the *Slate* article (Gubarev himself lacked expertise on the issue) and then forwarded the reporter what he described as an "expert conclusion." *Id.* ¶ 85; D.E. 211-2 ¶ 31. Gubarev said, "[o]ur opinion is that the story was far-fetched f**k." D.E. 212-90. The opinion doubted that the sources cited in the *Slate* article could have had access to the full server logs. *Id.*

After providing the requested analysis, Gubarev asked the reporter, "[w]ill there be a reference for us in the article?" *Id.* The reporter responded that he would use the provided quotes. *Id.* And indeed, when *Bloomberg* published the article it credited Gubarev with raising the question of whether the sources cited in the *Slate* article based their conclusions on full and complete server logs. D.E. 212-83. The *Bloomberg* article did not cite Gubarev's opinion in support of any other statement. *Id.*

### B. The White Ops Report

In December 2016, a cybersecurity firm called White Ops published a report detailing an alleged fraud perpetrated by Russian cybercriminals, which it dubbed "Methbot." D.E. 212-2 ¶ 64; 212-93. The White Ops report alleged that Russian cybercriminals were siphoning millions of dollars in advertising revenue from U.S. media companies. *Id.* The report generated media coverage in several publications including *Forbes*, *Fortune*, *New York Times*, and *CNN*. *Id.* ¶ 65.

Upon reading the White Ops report, XBT came to believe that a client who leased servers from Webzilla was implicated in the scheme. *Id.* ¶ 66; D.E. 213 pp. 189–90. XBT realized that it could face significant reputational damage if journalists discovered that it owned those servers.

*Id*. ¶ 69.  Accordingly, it rehired KGlobal to help minimize any bad press.  *Id*.  KGlobal advised

that in light of the recent controversy over Russian hacking in the presidential election, it was

important to "get in front of the story."  *Id*.

XBT instructed KGlobal to reach out to White Ops and a journalist who had written

about the report to say that Plaintiffs were also victims of the Methbot scam.  *Id*. ¶ 70.  XBT also

instructed KGlobal to reveal only that the client was a Webzilla customer and to avoid any

connection with their newer brand, Servers.com.  *Id*. ¶ 71.

## LEGAL STANDARD

Summary judgment is authorized only when the moving party meets its burden of

demonstrating that "the pleadings, depositions, answers to interrogatories and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. When

determining whether the moving party has met this burden, the Court must view the evidence

and all factual inferences in the light most favorable to the non-moving party." *Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144, 157 (1970); *Rojas v. Florida*, 285 F.3d 1339, 1341-42 (11th Cir.

2002).

The party opposing the motion may not simply rest upon mere allegations or denials of

the pleadings; after the moving party has met its burden of proving that no genuine issue of

material fact exists, the non-moving party must make a showing sufficient to establish the

existence of an essential element of that party's case and on which that party will bear the burden

of proof at trial." *See Celotex Corp. v. Catrell*, 477 U.S. 317 (1986); *Poole v. Country Club of*

*Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997); *Barfield v. Brierton*, 883 F.2d 923, 933

(11th Cir. 1989).

If the record presents factual issues, the Court must not decide them; it must deny the motion and proceed to trial. *Envntl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981). Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co. v. Cont'l Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969). If reasonable minds might differ on the inferences arising from undisputed facts, then the Court should deny summary judgment. *Impossible Elec. Techs., Inc. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1031 (5th Cir. 1982); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

Moreover, the party opposing a motion for summary judgment need not respond to it with evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes*, 398 U.S. at 160. The moving party must demonstrate that the facts underlying the relevant legal questions raised by the pleadings or are not otherwise in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 611-12 (5th Cir. 1967). The Court must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 255.

## ANALYSIS

Defendants' fifth affirmative defense is that Plaintiffs are public figures and cannot meet their burden of proving actual malice. D.E. 38, p. 10.  Both sides move for summary judgment on this affirmative defense; Defendants argue that Plaintiffs are limited public figures and

9

Plaintiffs argue that they are not.  Resolution of this issue is a matter of law for the Court to decide.  *Michael v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016).

## I.        The Public Figure Doctrine

In *New York Times Co. v. Sullivan*, the Supreme Court held that when the press publishes a defamatory statement about a public official, the publication is protected by the First Amendment unless the official proves that the press published the statement with actual malice. 376 U.S. 254, 281 (1964).  This rule applies not only to public officials but to any public figure. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974).  The Supreme Court in *Gertz* articulated two types of public figures: (1) those who achieve such "pervasive fame or notoriety" that they are public figures for all purposes ("all-purpose public figures"); and (2) those who inject themselves into a particular public controversy and thereby become public figures only with respect to a limited range of issues ("limited public figures").  *Id* at 351.  The parties agree that Plaintiffs are not all-purpose public figures, but they disagree about whether they are limited public figures.

Determining whether Plaintiffs are limited public figures requires a two-part analysis.  In the first part, the Court considers two questions: (1) whether Plaintiffs "have greater access to the media which gives them a more realistic opportunity to counteract false statements than private individuals normally enjoy;" and (2) whether Plaintiffs have "voluntarily placed themselves in a position and acted in a manner which invited public scrutiny and comment."  *Silvester v. Am. Broad. Companies, Inc.*, 839 F.2d 1491, 1494 (11th Cir. 1988).

In the second part of the analysis, the Court considers whether the Plaintiffs are limited public figures with respect to the particular public controversy at issue.  *See id*.  This requires the Court to do three things: "(1) isolate the public controversy, (2) examine the plaintiffs'

10

involvement in the controversy, and (3) determine whether 'the alleged defamation was germane to the plaintiffs' participation in the controversy.'"   *Id*. (quoting *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980)).

As the parties point out, the second of the basic *Gertz* criteria is incorporated into the second of the limited-public figure criteria.  This is so because a limited public figure is a public figure only *with respect to the particular controversy at issue*.  *Gertz*, 418 U.S. at 351. Accordingly, where, as here, the dispute is limited to whether Plaintiffs are limited (not all-purpose) public figures, the Court will not address the second *Gertz* factor separately; instead it is subsumed by the second *Silvester* factor.[6]

## II.   Plaintiffs Had Greater Access to the Media Than the Typical Private Individual

One of the trappings of a public figure is "regular and continuing access to the media." *Hutchinson v. Proxmire*, 443 U.S. 111, 136 (1979).  Defendants argue that Plaintiffs had regular and continuing access to the media either directly or through their public relations firms. Plaintiffs respond that although they wanted to develop regular and continuing access to the media, they were not successful in doing so.

The record here reveals sufficient contacts with the media to satisfy this first criterion. Plaintiffs' public relations efforts resulted in articles in and interviews with several publications including, *Inc.*, *Forbes*, *Bloomberg*, *Business Insider*, *VentureBeat*, and *Tech Insider*.  Although this was not as much media attention as Plaintiffs may have wanted, it is more than the typical private citizen enjoys.  *See Silvester*, 839 F.2d at 1494.  Notably, Plaintiffs were able to leverage their media contacts in an attempt to negate the impact of the White Ops report.  Specifically, XBT was able to reach out to a journalist in an attempt to minimize any reputational harm the

---

[6] Indeed, it would be impossible to analyze the second *Gertz* factor without first isolating the controversy at issue and determining Plaintiffs' involvement in it.

Methbot scam might have on Plaintiffs.  D.E. 212-2 ¶ 70.  This sort of media access goes straight

to the heart of the first *Silvester* criterion.  Unlike the typical private individual, Plaintiffs had

access to the media and could attempt to sculpt their public image.  *See Gertz*, 418 U.S. at 344

("[P]ublic figures usually enjoy significantly greater access to the channels of effective

communication and hence have a more realistic opportunity to counteract false statements than

private individuals normally enjoy.").  Accordingly, the first *Silvester* criterion is satisfied.

### III.      Defining the Controversy

The first prong of the limited-public figure test requires the Court to isolate the public

controversy.  *Silvester*, 839 F.2d at 1494.  An issue is a public controversy if it "was being

debated publicly and if it had foreseeable and substantial ramifications for nonparticipants."  *Id*.

at 1495 (quoting *Waldbaum*, 627 F.2d at 1296).  To determine the contours of a public

controversy, the Court must examine "whether persons actually were discussing some specific

question."  *Waldbaum*, 627 F.2d at 1296.  "A general concern or interest will not suffice."  *Id*.

Newsworthiness alone is not proof of a public controversy, but press coverage of a public debate

or concern is helpful to isolate the controversy.  *See id*.

Defendants have provided the Court with a few news articles that help to point out the

scope of the public controversy, but both parties refer primarily to the Dossier itself to identify

the scope of the controversy.  Plaintiffs argue that the controversy should be defined as an

international conspiracy of the FSB to enlist computer hackers to infiltrate the Democratic Party

in an attempt to undermine the 2016 presidential election.  They also argue that the Court could

take a broader view of the controversy and define it as Russia's attempts to interfere with the

2016 election. Defendants, on the other hand, advocate for a broad view of the controversy,

arguing that there were, in fact, many relevant public controversies including cybersecurity, cybercrime, malicious cyber activity by Russians, and Russian interference in the 2016 election.

Briefly the Court will summarize the news articles and other public documents proffered by Defendants for the purpose of identifying the relevant public controversy. The first is an article written in 2006, which discusses, among other things, how certain Russian individuals make money selling pornography, music, and spam mailing services. D.E. 212-21. The article describes these activities as "semi-legal." *Id.* Two articles discuss, in general terms, the prevalence of email spam, phishing scams, and Trojan viruses. D.E. 212-124; 212-125. Four articles and two press releases from the Department of Homeland Security and the National Cybersecurity and Communications Integration Center ("NCCIC") discuss the Russian government's hacking of the State Department, the White House, and the Democratic National Convention. D.E. 212-123–213-130; 212–130. The NCCIC report goes beyond the DNC hack to detail Russian cyber interference with governmental, political, and private entities to interfere with the 2016 election. D.E. 212-130. Additionally, several articles from the early and mid-2000s discuss child pornography websites and the difficulties of policing them. D.E. 212-131–212-134; 212-142. Lastly, two commentaries from various music and film associations discuss the prevalence of online copyright piracy. D.E. 212-136; 212-137.

Based on these materials, Defendants would broadly define the controversy to include all cybercrime (like child pornography), and cybersecurity in general. However, the law does not allow the relevant public controversy to be divorced from the allegedly defamatory statements and the context in which they were made. *See, e.g.*, *Hatfill v. The New York Times Co.*, 532 F.3d 312, 323 (4th Cir. 2008) ("In light of the purpose of the public figure doctrine to encourage robust and uninhibited commentary on public issues, it stands to reason that we should look to

the scope of the message conveyed in The New York Times through the articles that Dr. Hatfill

is challenging."); *Nat'l Life Ins. Co. v. Phillips Pub., Inc.*, 793 F. Supp. 627, 637 (D. Md. 1992)

("Moreover, it would be inappropriate to shrink all controversies to the specific statements of

which a plaintiff complains. Defendants' alleged defamatory statements here, as in other

controversies, are a part of, and clearly related to, a much larger story.").

Here, the Dossier, as described by BuzzFeed in the article publishing it, concerns

"allegations that the Russian government has been 'cultivating, supporting and assisting'

President-elect Donald Trump for years." D.E. 1-2, p. 20.  The CNN article to which BuzzFeed

hyperlinked described the Dossier as related to "a report on Russian interference in the 2016

election." D.E. 137-6.  And as some of the news articles and government press releases make

clear, there was significant media and government attention paid to Russia's cyber interference

in the 2016 election. *See* D.E. 212-123–213-130; D.E. 212–130.  Plainly, the Dossier was

important at the time of its publication because it related to the ongoing controversy involving

Russian interference in the election.

Moreover, where the Dossier mentions cybercrime and internet pornography, it does so

only in the context of Russian interference with the election.  Cybersecurity and cybercrime as

general topics, however, are untethered from the Dossier and, more importantly, the public

debate about Russian interference with the election, which made the Dossier a matter of public

importance. [7]   Accordingly, the Court rejects Defendants' broadest articulation of the

controversy and determines that the relevant controversy is Russian interference in the 2016

election.

---

[7] Moreover, they are not controversies in the normal sense of that word.  Cybercrime and cybersecurity are broad topics.  But divorced from some specific event or debate, they are not controversies.  *See American Heritage Dictionary* 319 (2nd ed. 1985) (defining "controversy" as "[a] dispute, esp. a lengthy and public one, between sides holding opposing views"); *see also Waldbaum*, 627 F.2d at 1297 ("A general concern or interest will not suffice.").

#### IV.     Plaintiffs' Involvement in the Controversy

The second prong of the limited-public figure analysis addresses the extent of Plaintiffs'

involvement in the public controversy.  *Silvester*, 839 F.2d at 1496.  Plaintiffs must be more than

"tangential participants" in the controversy; they must have achieved "special prominence" in it.

*Id*.; *Waldbaum*, 627 F.2d at 1297.  Specifically, to fulfill this prong Plaintiffs either "(1) must

purposely try to influence the outcome of the public controversy, or (2) could realistically have

been expected, because of [their] position in the controversy, to have an impact on its

resolution."  *Id*. (quoting *Waldbaum*, 627 F.2d at 1297).  To conduct this analysis, the Court

looks to Plaintiffs' past conduct, press coverage, and the public reaction to their conduct and

statements.  *Waldbaum*, 627 F.2d at 1297–98.

 Having defined the relevant controversy as Russian interference with the 2016 election,

the question now before the Court is: to what extent did Plaintiffs involve themselves in the

ongoing public debate about that interference.  The record reveals only one instance where

Plaintiffs commented on that controversy: Gubarev's statement, published by *Bloomberg*, calling

into question whether the sources cited in the *Slate* article based their conclusions on full server

logs.  *See* D.E. 212-83.

To recap, in October 2016, *Slate* published an article about possible communications

between a computer server associated with the Trump campaign and servers associated with a

Russian bank.  D.E. 212-2 ¶ 56.  That article cited a number of computer experts who said they

reviewed the campaign server's logs.  *Id*.  A *Bloomberg* reporter asked Gubarev "as a specialist"

to help him "sort out [the] technical details" of the cyber communications described in the *Slate*

article.  D.E. 212-90.  Gubarev had an XBT employee analyze the technical claims and provided

the reporter with his opinion that the *Slate* article was far-fetched.  *Id*.  The *Bloomberg* reporter

subsequently published the following:

> Alexey [sic] Gubarev, chief executive officer of Luxembourg-registered XBT
> holding, which owns the infrastructure-as-a-service provider Servers.com, told me
> there was no legitimate way to get access to the full server logs of a server that
> you do not control.  That raises the question of whether the records obtained by
> Foer's "Concerned Nerds" were complete.

D.E. 212-83.

This is Plaintiffs' only public statement predating BuzzFeed's publication of the Dossier

that was related to Russian interference in the 2016 election.  And it is only tangentially related.

It is not related to the Russian hacking allegations which were at the heart of the public

controversy.  *See* D.E. 212-123–213-130; 212–130.  Rather, it is a technical opinion about

whether someone could have reviewed the full logs of a campaign server, which may have been

in communication with the servers at a Russian bank.  This one technical opinion cannot

reasonably be read as an attempt to influence the outcome of the public debate about Russian

interference in the election.  Nor could it realistically have been expected to have an impact on

the resolution of that controversy.  *See Silvester*, 839 F.2d at 1496 ("It is clear that plaintiffs must

be more than tangential participants in the controversy."); *see also Wolston v. Reader's Digest*

*Ass'n, Inc.*, 443 U.S. 157, 165 (1977) (holding that the plaintiff was not a limited public figure

where his involvement was limited to grand jury testimony and a citation for contempt).

Accordingly, Plaintiffs do not have "special prominence" within the controversy and are not

limited public figures.  *See Waldbaum*, 627 F.2d at 1297, 1300 ("Not everyone who participates

in activities that affect the public becomes a public figures.  Nevertheless, when one assumes a

position of great influence within a specific area and *uses that influence to advocate and practice*

*controversial policies that substantially affect others*, he becomes a public figure for that

debate.") (emphasis added).  And finally, the record is devoid of any evidence tending to show a public reaction to this statement.  *See Waldbaum*, 627 F.2d at 1297–98.

Defendants cite several cases in support of the argument that even if Gubarev's statement to *Bloomberg* is Plaintiffs' only involvement with the controversy, Plaintiffs are still public figures.  Those cases are unpersuasive because each of the plaintiffs there was significantly more involved in the controversy than Plaintiffs here.  In *Colodny v. Iverson, Yoakum, Papiano & Hatch*, 936 F. Supp. 917 (M.D. Fla. 1996), for example, the relevant controversy was the Watergate scandal and the plaintiff wrote a book about it.  In *Faltas v. State Newspaper*, 928 F. Supp. 637 (D.S.C. 1996), *aff'd*, 155 F.3d 557 (4th Cir. 1998), the controversy was what should be taught about homosexuality and whether the rights of homosexuals could be restricted.  The plaintiff there wrote a newspaper op-ed arguing that homosexuality was rarer than science suggested.  Finally, in *Diaz v. Bd. of Educ. of the Twp. of S. Brunswick*, No. CIV.A.05-4667(WJM), 2006 WL 3490339, at *1 (D.N.J. Dec. 1, 2006), the controversy was the 2004 presidential election, and the plaintiff gave interviews for two newspaper articles and appeared on the Fox News television program "Good Morning America" where she claimed to have been fired for her political views.  In each of these cases, the plaintiffs' public statements were not only more extensive than Gubarev's but were also aimed more precisely at the heart of the relevant controversy.

Defendants have also proffered substantial evidence of other public statements by Plaintiffs that were not related to Russian interference in the election.  The Court will briefly address those statements and explain why they are not germane.  First, Plaintiffs' public statements related to cybercrime and cybersecurity do not relate to Russian interference in the election.  As discussed above, Defendants argue that the controversy should include

17

cybersecurity and cybercrime generally.  Accordingly, they argue that all of Plaintiffs' efforts to publicize their expertise, market share, and secure servers made them intimately involved with those controversies.  If the public controversy was defined so broadly, then Defendants would stand on firmer ground.  But the controversy is narrower than that.  Plaintiffs' public involvement in cybersecurity and cybercrime issues, therefore, is not germane unless it is tied to Russian interference with the election.  And, with the exception of Gubarev's comments published in *Bloomberg*, they are not.

The same goes for Plaintiffs involvement with the AWMOpen Conference.  Even assuming that Defendants' version of the facts is correct—that the conference was for online pornographers and that some of the participants were involved in cybercrime (*See* D.E. 212-2 ¶¶ 4–18)—general involvement with the online pornographic industry (legal or otherwise) is not germane to Russian interference with the election.

Likewise, Plaintiffs' efforts to minimize reputational damage after the White Ops report are not germane.  The White Ops report alleged that Russian cybercriminals were stealing advertising revenue from U.S. media companies.  D.E. 212-2 ¶ 64.  Although relevant to cybercrime in general, it is not relevant to Russian interference with the 2016 election.  In sum, with the exception of the *Bloomberg* article, Defendants have not identified any other public involvement by Plaintiffs in the relevant controversy.  Accordingly, Plaintiffs are not public figures.

## V.      The Alleged Defamation Is Germane to Plaintiffs' Participation in the Controversy

Because Plaintiffs were only tangential participants in the relevant controversy, the final prong of the limited-public figure test is largely a moot point, but in the interest of completeness, the Court will briefly address it.  The final prong asks whether the alleged defamation was

germane to Plaintiffs' participation in the controversy. *Silvester*, 839 F.2d at 1494. The standard

is whether it is "wholly unrelated." *Waldbaum*, 627 F.2d at 1288.

To recap, the alleged defamation here is the following statement from the Dossier:

████████ reported that over the period March-September 2016 a company called XBT/Webzilla and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data, and conduct "altering operations" against the Democratic Party leadership. Entities linked to one Alexei GUBAROV [sic] were involved and he and another hacking expert, both recruited under duress by the FSB, Seva KAPSUGOVICH were significant players in this operation.

D.E. 1-3. ¶ 26.

Plaintiffs' participation in the relevant controversy was Gubarev's one statement published in *Bloomberg*. D.E. 212-83; *see* Part IV, above. The alleged defamation and Gubarev's statement are both related to Russian interference in the election, even though their relation to one another is remote. But again, because Plaintiffs were only tangential participants in the controversy, they are not limited public figures.

## CONCLUSION

For the reasons set forth above, it is hereby

ORDERED AND ADJUDGED that Plaintiffs' Motion (D.E. 208) is GRANTED; Defendants' Motion (D.E. 225) is DENIED.

DONE AND ORDERED in Chambers, Miami, Florida, this _18th_ day of December, 2018.

_____
URSULA UNGARO
UNITED STATES DISTRICT JUDGE

cc: counsel of record via cm/ecf