**EXHIBIT 1**

EXECUTIVE SESSION

COMMITTEE ON THE JUDICIARY,

JOINT WITH THE

COMMITTEE ON GOVERNMENT REFORM AND OVERSIGHT,

U.S. HOUSE OF REPRESENTATIVES,

WASHINGTON, D.C.


INTERVIEW OF:  JAMES COMEY


Friday, December 7, 2018


Washington, D.C.


The interview in the above matter was held in Room 2141, Rayburn House Office Building, commencing at 10:12 a.m.

Members Present: Representatives Goodlatte, Issa, King, Gohmert, Jordan, Buck, Ratcliffe, Gaetz, Biggs, Nadler, Jackson Lee, Cohen, Deutch, Bass, Gowdy, Sanford, Meadows, Hurd,

Cummings, Cooper, Krishnamoorthi, Gomez, and Plaskett.

Chairman Goodlatte.  This is a transcribed interview of James Comey.  Chairman Gowdy and I requested this interview as part of a joint investigation by the House Committee on the Judiciary and the House Committee on Oversight and Government Reform into decisions made and not made by the Department of Justice and the Federal Bureau of Investigation regarding the 2016 Presidential election.

Would the witness please state his name and the last position he held at the Federal Bureau of Investigation for the record?

Mr. Comey.  Certainly, Mr. Chairman.  My name is James Brien Comey, Jr., and my last position was Director until May 9th of 2017.

Chairman Goodlatte.  I want to thank you for appearing today.  My name is Bob Goodlatte.  I am chairman of the Judiciary Committee, and I will now ask everyone else who is here in the room, other than Mr. Comey's personal counsel, who we will get to in a moment, to introduce themselves for the record.

Mr. Gowdy.  Trey Gowdy, South Carolina.

Mr. Ratcliffe.  John Ratcliffe, Texas.

Mr. Meadows.  Mark Meadows, North Carolina.

Mr. Jordan.  Jim Jordan, Ohio.

Mr. Biggs.  Andy Biggs, Arizona.

Mr. Buck.  Ken Buck, Colorado.

Mr. <u>Don.</u>  Ethan Don, FBI.

Ms. <u>Bessee.</u>  Cecilia Bessee, FBI.

Mr. <u>Parmiter.</u>  Robert Parmiter, House Judiciary Committee staff.

Mr. <u>Baker.</u>  Arthur Baker, House Judiciary Committee staff.

Mr. <u>Somers.</u>  Zach Somers, House Judiciary Committee, majority.

Mr. <u>Nadler.</u>  Jerrold Nadler, New York.

Mr. <u>King.</u>  Steve King, Iowa, Four.

Mr. <u>Gomez.</u>  Jimmy Gomez, California.

Mr. <u>Cooper.</u>  Jim Cooper, Fifth District of Tennessee.

Mr. <u>Cohen.</u>  Steve Cohen, Memphis.

Ms. <u>Bass.</u>  Karen Bass, California.

Mr. <u>Cummings.</u>  Elijah Cummings, Maryland.

Ms. <u>Jackson Lee.</u>  Sheila Jackson Lee, Texas.

Mr. <u>Krishnamoorthi.</u>  Raja Krishnamoorthi, Illinois.

Mr. <u>Breitenbach.</u>  Ryan Breitenbach, House Judiciary Committee staff.

Mr. <u>Ventura.</u>  Chris Ventura, House Judiciary Committee staff.

Ms. <u>Husband.</u>  Shelley Husband, House Judiciary, majority.

Mr. <u>Castor.</u>  Steve Castor, Oversight and Government Reform.

Mr. <u>Buddharaju.</u>  Anudeep Buddharaju, Oversight and Government Reform.

Ms. Doocy.  Mary Doocy.

Ms. Greene.  Emily Greene.

Mr. Gaetz.  Matt Gaetz, Florida, House Judiciary Committee.

Mr. Ritchie.  Branden Ritchie, House Judiciary, majority.

Mr. Dalton.  Jason Dalton, FBI Congressional Affairs.

Ms. Hariharan.  Arya Hariharan, House Judiciary, minority

Ms. Shen.  Valerie Shen, House Oversight and Government Reform.

Ms. Sachsman Grooms.  Susanne Sachsman Grooms, House Oversight.

Mr. Thadani.  Akhil Thadani, House Judiciary, Democrat.

Mr. Gohmert.  Louie Gohmert.

Mr. Sanford.  Mark Sanford, House Judiciary.

Mr. Apelbaum.  Perry Apelbaum.

Mr. Hiller.  Aaron Hiller, House Judiciary, minority.

Chairman Goodlatte.  The Federal Rules of Civil Procedure do not apply in this setting, but there are some guidelines that we follow that I'd like to go over.  Our questioning will proceed in rounds.  The majority will ask questions first for an hour, and then the minority will have an opportunity to ask questions for an equal period of time.  We will go back and forth in this manner until there are no more questions and the interview is over.

Typically, we take a short break at the end of each hour

of questioning, but if you would like to take a break apart from that, please let us know.  We also may take a break for lunch at the appropriate point.

As I noted earlier, you are appearing today voluntarily. Accordingly, we anticipate that our questions will receive complete responses.  To the extent that you decline to answer our questions or if counsel instructs you not to answer, we will consider whether a subpoena is necessary.

As you can see, there is an official reporter taking down everything that is said to make a written record, so we ask that you give verbal responses to all questions, and I know you understand that.

Mr. Comey.  Yes, sir.

Chairman Goodlatte.  So that the reporter can take down a clear record, it is important that we don't talk over one another or interrupt each other if we can help it.  Both committees encourage witnesses who appear for transcribed interviews to freely consult with counsel if they so choose, and you are appearing today with counsel.

Could counsel for Mr. Comey please state their names for the record?

Mr. Kelley.  Yes, Mr. Chairman.  It is David N. Kelley from Dechert LLP.

Chairman Goodlatte.  We want you to answer our questions in the most complete and truthful manner possible, so we will

take our time.  If you have any questions or if you do not understand one of our questions, please let us know.  If you honestly do not know the answer to a question or do not remember it, it is best not to guess.  Please give us your best recollection.  It is okay to tell us if you learned information from someone else.  If there are things you don't know or can't remember, just say so, and please inform us who, to the best of your knowledge, might be able to provide a more complete answer to the question.

Mr. Comey, you should also understand that, although this interview is not under oath, you are required by law to answer questions from Congress truthfully.

Do you understand that?

Mr. Comey.  Yes, I do, sir.

Chairman Goodlatte.  This also applies to questions posed by congressional staff in an interview.  Do you understand this?

Mr. Comey.  Yes, sir.

Chairman Goodlatte.  Witnesses who knowingly provide false testimony could be subject to criminal prosecution for perjury or for making false statements.

Do you understand this?

Mr. Comey.  Yes, I do.

Chairman Goodlatte.  Is there any reason you are unable to provide truthful answers to today's questions?

Mr. Comey.  No, sir.

Chairman <u>Goodlatte.</u>  Finally, I'd like to just note that, as was discussed last weekend with your attorneys with regard to withdrawing your motion to quash our subpoena, we anticipate, after speaking with the Clerk's Office, that we will be able to provide a copy of the transcript of today's interview sometime tomorrow.

In the meantime, as we also discussed with your attorneys, you are free to discuss today's interview publicly once it is concluded.  Chairman Gowdy and I ask that everyone else here in the room also refrain from speaking publicly about today's interview until it has concluded.

That is the end of my preamble.  Do you have any questions before we begin?

Mr. <u>Gaetz.</u>  Matt Gaetz from Florida.  I wanted to state that I was not a party to any such agreement and don't consider myself bound by it.  I also don't know of any provision in the Constitution, the rules of the House, or any Federal law that would prohibit members of the committee from engaging in free speech, debate, and opining at any time.

Mr. <u>Gowdy.</u>  Mr. Chairman, I think -- I do intend to comply with the representations we made to this witness.  I would encourage all of my colleagues to do so.  There's a reason that we have something called the rule of completeness.  It is manifestly unfair to take part of what someone says and disregard the whole.  I also think there's an argument to be made that when

the chairman of a committee makes a representation to a witness, that it should not only bind the members of the committee, but it also reflects poorly on the House as an institution to not abide by what the chairman represented.

So I will abide by what the chairman agreed to with this and other witnesses, and I would encourage all of my colleagues to do so, if, for no other reason, to protect the integrity of the House and because that's what serious investigations do.

Mr. Nadler.  Mr. Chairman.

Chairman Goodlatte.  The gentleman from New York, the ranking member.

Mr. Nadler.  Thank you.  Mr. Chairman, I find myself in rare but happy agreement with Mr. Gowdy.  I think representations were made to the witness.  I think we ought to be bound by it.

And I think that if Mr. Gaetz does not consider himself bound by it, he should perhaps be asked to leave at this point, as should anybody else who tells us upfront they will not feel bound by what this committee has represented to the witnesses.

Chairman Goodlatte.  I will not ask him to leave since he hasn't violated the commitment we have made.  However, I would ask him to respect that this is a representation made by all of the members of these two committees by the chairmen of the committees.  And, yes, you did not make the representation yourself; I understand that.  But it is important that we respect

the integrity of this interview.

And, with that, the time --

Mr. Gohmert.  Mr. Chairman, may I ask a question?  Wasn't the terms that you just dictated part of an agreement that was in lieu of litigation, sort of a settlement agreement rather than litigate the subpoena?

Chairman Goodlatte.  It is correct that, in the proceedings that were ongoing last weekend with regard to Mr. Comey's motion to quash the subpoena that I issued, that an understanding was reached that he would appear voluntarily for a private transcribed interview with the conditions that I read a moment earlier.

Mr. Gohmert.  So it is actually an agreement between the parties that ended litigation, which normally is enforceable.

Chairman Goodlatte.  I think that is correct.

The time is now 10:20.  We will get started with the first round of questions.

Mr. Kelley.  If I may, Mr. Chairman, before we start, I appreciate very much you having read the terms of the agreement, which you did so accurately, and we appreciate that.  And given the comments of Mr. Gaetz, we appreciate and will be sure that the chairmen of both committees will do the best they can to ensure that the terms of the agreement are abided.

Mr. Comey is here voluntarily, as you said, for the interview.  He looks forward to answering your questions

concerning the subject matter that you laid out.  We are getting a little bit late start, but we have a hard stop at 4:15, and we think we can get a lot done until that time.  Should there be any additional questions thereafter, we can certainly talk about how to accomplish that best, should there be a need to schedule a subsequent opportunity to interview him.  We also would like your indulgence for maybe a short 30-minute, if less, break for lunch.

Chairman <u>Goodlatte.</u>  We definitely will take that into account.

And, with that, the chair recognizes the chairman of the Oversight Committee, Mr. Gowdy.

Mr. <u>Gowdy.</u>  Good morning, Director Comey.  I'm going to go through the first series of questions in an unusually leading way, but that is in the interest of time and --

Chairman <u>Goodlatte.</u>  I think we have to say that if we do have a hard stop today at 4:15, we're going to have to agree that we will continue it at another time, because we, I think, run the risk that we'll not ask all the questions that need to be asked by that time.

Mr. <u>Kelley.</u>  And as I said, Mr. Chairman, if there are additional questions and a compelling need to have another opportunity, we can talk about how to schedule that.

Mr. <u>Meadows.</u>  Mr. Chairman, I guess what I would rather do is have -- before we get into questioning, let's have an

understanding that the 4:15 hard stop is new information right now.  And I think in a spirit of being here voluntarily, we need to have an understanding that if all the questions are not asked and answered, that an agreement to agree in the future is certainly a problem, Mr. Chairman.

Mr. Kelley.  What I agreed to do in the future, sir, is to schedule another time.

Mr. Meadows.  That's fine.  As long as we're agreeing to schedule another time, that's fine.

Mr. Gowdy.  Director Comey, Peter Strzok was an FBI agent who was assigned to the Clinton Espionage Act investigation.  Do I have that right?

Mr. Comey.  That is correct.

Mr. Gowdy.  What was his title?

Mr. Comey.  His title was special agent.  I think he had a variety of different supervisory assignments during the pendency of that investigation from mid-2015 to the end of '16.  I don't remember exactly what those were.

Mr. Gowdy.  Did he interview witnesses?

Mr. Comey.  Did he interview witnesses?  Yes, he did during the Clinton investigation, is my understanding.

Mr. Gowdy.  Did he review documents?

Mr. Comey.  My understanding is, yes, he did review documents.

Mr. Gowdy.  Did he provide advice, counsel, insight to you

in your role as the Director?

Mr. <u>Comey.</u>  I don't -- I'm just hesitating over the description of advice, counsel.  He was a supervisory special agent of some role who would periodically brief me on the status of the investigation, was his primary responsibility as it related to me.

Mr. <u>Gowdy.</u>  Let me see if I can ask the question more artfully.  Did he help you prepare or edit your July 5th press statement?

Mr. <u>Comey.</u>  July 5th press statement?  Yes, he did help edit that.

Mr. <u>Gowdy.</u>  Lisa Page, she was an attorney with the FBI in 2016.  Is that right?

Mr. <u>Comey.</u>  Lisa Page, yes, that is correct.  Lisa Page was an attorney I think before 2016, but certainly during 2016 assigned to the Office of General Counsel.

Mr. <u>Gowdy.</u>  What role did she have with the Clinton Espionage Act investigation?

Mr. <u>Comey.</u>  Lisa Page's role in the investigation into whether Hillary Clinton had mishandled classified information was in her capacity as a lawyer assigned to support the Deputy Director of the FBI, Andrew McCabe.

Mr. <u>Gowdy.</u>  Did she assist you in drafting or editing your July 5th press statement?

Mr. <u>Comey.</u>  I believe she did assist in drafting -- or

editing the statement of July 2016.

Mr. <u>Gowdy</u>.  So, from January 2016 up until your July 5th press statement, it is fair to say that both Special Agent Peter Strzok and FBI Attorney Lisa Page were working on the Clinton Espionage Act or mishandling of classified information investigation?

Mr. <u>Comey</u>.  The reason I'm hesitating, Mr. Gowdy, is I've never applied the label of Espionage Act investigation.  It was an investigation into the mishandling of classified information. I don't mean to quibble, but that's how I thought of it and talked about it.

Yes, they each participated in some respect in that investigation or in our public statement about the investigation and things like that.

Mr. <u>Gowdy</u>. February of 2016, Lisa Page wrote:  Trump simply cannot be President.

February of 2016, Peter Strzok wrote:  Trump's abysmal, hoping people will just dump him.

February of 2016, Lisa Page wrote:  She might be our next President.  The last thing you need us going in there loaded for bear.

March 2016, Lisa Page wrote:  Trump is a loathsome human.

March of 2016, Strzok wrote:  Trump's an idiot.

March of 2016, Strzok wrote:  Hillary should win 100 million to zero.

Do you recall whether the Democrat primary was still ongoing in March of 2016?

Mr. Comey.  I'm not in a position to answer -- you gave a long preamble to that about things that I don't know from my own knowledge.  So I'm going to exclude that part of your preamble and just answer the question at the end.

Do I know whether the Democratic primary was ongoing in March of 2016?  I think so, yes.

Mr. Gowdy.  Well, let me back up, in fairness to you, and ask whether or not you've had a chance to read any of the text exchanges between Peter Strzok and Lisa Page?

Mr. Comey.  I've seen some of them in the open source, in the media, obviously, since I was fired as Director.

Mr. Gowdy.  Did you read any of them in preparation for today?

Mr. Comey.  No, I did not.

Mr. Gowdy.  So, if you are correct that the Democratic primary was still open in March of 2016, I read that as Special Agent Peter Strzok commenting that she should win the primary 100 million to zero.

And I guess an alternative reading of that would be that he already had her as the nominee and she should win the general 100 million to zero.

Is there another reading other than those two, winning the primary or winning the general?

Mr. Comey. I'm not in a position to interpret their text exchanges, so I can't answer that.

Mr. Gowdy. In the course of human history, has anyone won an election 100 million to zero, to your knowledge?

Mr. Comey. In the United States?

Mr. Gowdy. Anywhere.

Mr. Comey. I don't mean to be facetious. I can't speak to Stalin's reelection or Mao Tse-tung reelection campaigns. In --

Mr. Gowdy. 100 million to zero is a lot.

Mr. Comey. Sure. I'm not trying to be facetious, but I remember as a student the vote in Soviet Russia was 99.9 percent to --

Mr. Gowdy. We are going to get to Russia in a little bit. We'll get to Russia in a little bit.

Mr. Comey. So in the -- I can answer your question, Mr. Gowdy. In the United States, I'm not aware of any such lopsided vote.

Mr. Gowdy. So, in March of 2016, Peter Strzok is investigating Secretary Clinton -- we'll use your phrase -- for the alleged mishandling of classified information. And at least according to this text, he has her winning the primary and/or the general election. Is that fair?

Mr. Comey. I can't answer that because I don't know the text or what the intention was. So I'm just not the witness to

answer that.

Mr. <u>Gowdy.</u>  How about the plain language of the text, what do you interpret that to mean?

Mr. <u>Comey.</u>  I really can't without knowing them and knowing the context of them.  I'm just not your best witness to answer that.

Mr. <u>Gowdy.</u>  July of 2016, do you know which agent interviewed Secretary Clinton?

Mr. <u>Comey.</u>  I believe two FBI agents participated in the July interview of Secretary Clinton, one of which was Peter Strzok, and the other was another veteran special agent.

Mr. <u>Gowdy.</u>  Do you know the other veteran special agent's name?

Mr. <u>Comey.</u>  I think so.  I'm hesitating only because I may butcher his name, and I don't know whether the FBI wants the names of special agents on a public record.  So I think I know his name.

Ms. <u>Bessee.</u>  If the agent is not at the SES level and above, you probably cannot state the name.

Mr. <u>Gowdy.</u>  When you say "probably cannot," is that a legal prohibition, or is that an FBI policy prohibition?

Ms. <u>Bessee.</u>  An FBI policy and a DOJ policy prohibition.

Mr. <u>Gowdy.</u>  Does the FBI take the position that that's binding on Congress?

Ms. <u>Bessee.</u>  Based on my direction from the FBI Director and from the Deputy Attorney General's Office, that is our

direction.  We can go back and ask the question if we can reveal the name.

Mr. Gowdy.  Well, how about do that for me.  For the meantime, we'll just refer to that person as FBI Agent 1.

Director Comey, after the Clinton interview on July 2nd, if memory serves, 2016, FBI Agent 1 wrote:  "I'm done interviewing the President," dash, and then typed 302.

Another FBI employee responded:  You interviewed the President, question mark.

And FBI Agent 1 wrote back:  You know, HRC.

A couple days later, you were before Congress, and you said, among other things, "The decision was made and the recommendation was made the way you would want it to be, by people who didn't give a hoot about politics."

Now, Representative Ratcliffe is going to go into how that decision was made.  My question to you is, had you known about these texts, would you have kept Peter Strzok and Lisa Page on the Espionage Act/mishandling of classified information case?

Mr. Comey.  In your question, Mr. Gowdy, you talked about texts that I'm not aware of that involve an agent other than Peter Strzok or FBI employee other than Peter Strzok and Lisa Page, so I can't answer that part of it.

To the extent you're asking about communications of Page and Strzok, if I had known about those things that they were communicating that I've seen in open source, I would not have

had them stay on the -- playing any role in connection with that investigation.

Mr. Gowdy.  Would you have fired them?

Mr. Comey.  That I can't answer in the abstract.  I'd certainly want the FBI disciplinary process to work and to look at it, to decide whether discipline was appropriate and what that would be.  But I can't answer the ultimate question.

Mr. Gowdy.  But if I understood your answer to the first part of that correct, you would not have allowed them to remain on the Clinton investigation had you been aware of those texts.

Mr. Comey.  My judgment would have been -- and based -- the challenge for me is I haven't read all the texts, but based on what I saw -- have seen in the media since I left the FBI, that unless there was some explanation for that that I was missing, in my judgment, they wouldn't have remained part of the investigation.

Mr. Gowdy.  Well, I don't want you to answer that question in the abstract.  Peter Strzok did offer a justification.  He said that he was not biased for Clinton or against Trump.  Not that his bias didn't impact his work, he got around to that later.  He just said he wasn't biased.

So, if you had brought him in and he had said, "Oh, but, Director Comey, I know I said he was a loathsome human being and I know I said that she should win 100 million to zero, but that doesn't mean I can't do my job," because that is certainly what

he told my Democrat colleagues, which they bought, so my question
is, would you have bought that?  Would you have left him on the
investigation had you known about these texts?

Mr. Comey.  I would have certainly been open to listening
to any explanation, but when you're the leader of a justice
agency, the appearance of bias is as important as the existence
of actual bias.

And although I have seen no evidence of any bias in any of
the participants in that effort, the appearance of bias would
have been very important to me.  So I -- again, it's hard to go
back and live a life you didn't live, but I would imagine my
judgment would have been you can't remain on the case.

Mr. Gowdy.  When Special Counsel Mueller was made aware of
the texts, he did immediately kick Strzok off of his team.  Do
you have any reason to disagree with his decision?

Mr. Comey.  No.  I don't know the details of his decision,
but, again, I've seen the open source reporting to that.  And
if that's true, it's a reasonable decision by a reasonable
leader.

Mr. Gowdy.  And you believe, as we sit here today, that had
you been aware of the texts contemporaneously, you too would have
kicked Strzok off of the Midyear Exam investigation?

Mr. Comey.  I think I answered that one already.  I would
certainly be open to an explanation that I don't know, can't
imagine sitting here.  But absent an explanation, the appearance

issue would have been very important to me, and it's unlikely I would have left him on the case.

Mr. <u>Gowdy.</u>  Why is the appearance of bias as insidious as actual bias?

Mr. <u>Comey.</u>  The appearance of bias is as important.  I don't know exactly what the word "insidious" means, so I'm not saying that one.  It's as important as actual bias because the faith and confidence of the American people that your work is done in an independent, fair, and competent way matters enormously.  And so a reasonable appearance of bias can corrupt that faith in your work as much as actual bias can.

Mr. <u>Gowdy.</u>  Had you known about the texts contemporaneously, would you have allowed Peter Strzok and Lisa Page to move from the Espionage Act or mishandling investigation to the Russia investigation?

Mr. <u>Comey.</u>  I would have thought of it the same way, in that if either bias or appearance of bias, political bias, is very important to not have as part of your investigative work.  So I would have thought that way about any investigation that was likely to touch the public interest in the way that that investigation did.  So most likely I would think about it the same way.

Mr. <u>Gowdy.</u>  Well, I don't want to put words in your mouth, but I do want to gain as much clarity as I can into this. You -- if I understand you correctly, you believe you would have

not kept them on either investigation, but you would be open to an explanation, but you can't think of what that explanation could have been that would have persuaded you to keep them?

Mr. <u>Comey.</u>  That's right.  I try as a leader always to be open to things I might be missing, but absent something like that, I think it's likely -- again, it's hard to live a life you didn't live.  But it's likely I wouldn't have kept them on the case for that reason, the reasons I said.

Mr. <u>Gowdy.</u>  If you had gained familiarity with a text from Lisa Page where she said, "Please tell me Trump won't ever be President," and Strzok responded, "No, no, he won't, we'll stop it," do you think you would have kept them on the investigation?

Mr. <u>Comey.</u>  I think of -- again, assuming you're recounting actual texts, I would think of it in the same way I thought of the ones you recounted earlier.  I'd be concerned about bias or the perception of bias, and -- so I think about it the same way I thought about the earlier text you laid out.

Mr. <u>Gowdy.</u>  Well, I want to remain open-minded to any other interpretations of that text, but what other interpretation could there be:  Please tell me he won't be President.  No, period, no, comma, He won't.  We'll stop it.

What explanation could there be that was benign enough to leave them on the very investigation they were commenting on?

Mr. <u>Comey.</u>  I don't know.  And that -- I think that's what it means to be open-minded, to give people a chance to explain

something and then to think about their explanation.  I don't know what it would be, and maybe there's none, but -- yeah, that's how I would think about it.

Is there some explanation for this?  If there is, tell me what it is, and then I'll make a judgment based on that.  I can't get inside the head of people writing texts that I never saw, so that's why it's a little tricky for me to answer.

Mr. Gowdy.  What was the Russia investigation?  When you hear the phrase "Russia investigation," what do you think?

Mr. Comey.  To my mind, the term "Russia investigation" often refers to two different things:  First, the investigation to understand what are the Russians doing to interfere in our election during the 2015-16 period; and then, second, it's often used to refer to the counterintelligence investigations that the FBI opened in late July.

And so I hear it used interchangeably there, and those two things obviously connect, but I've always thought of it in two separate elements.

Mr. Gowdy.  Okay.  We'll go with that.  Late July of 2016, the FBI did, in fact, open a counterintelligence investigation into, is it fair to say the Trump campaign or Donald Trump himself?

Mr. Comey.  It's not fair to say either of those things, in my recollection.  We opened investigations on four Americans to see if there was any connection between those four Americans

and the Russian interference effort.  And those four Americans did not include the candidate.

Mr. Gowdy.  Do you recall who drafted the FBI's initiation document for that late July 2016 Russia investigation?

Mr. Comey.  I do not.

Mr. Gowdy.  Would you disagree that it was Peter Strzok?

Mr. Comey.  I don't know one way or the other.

Mr. Gowdy.  Do you know who approved that draft of an initial plan for the Russia investigation in late July 2016?

Mr. Comey.  I don't.

Mr. Gowdy.  Would you disagree that it was Peter Strzok?

Mr. Comey.  That Peter Strzok approved?  I don't know one way or the other.

Mr. Gowdy.  Drafted and approved it.

Mr. Comey.  I don't know one way or the other.

Mr. Gowdy.  Have you read that initiation document?

Mr. Comey.  I don't think so.  I don't remember ever seeing it.

Mr. Comey.  Do you recall seeing the phrase "Trump campaign" in that initiation document?

Mr. Comey.  Well, I don't remember seeing it, ever seeing it, so certainly don't remember any portion of it, because I don't remember ever seeing it.

Mr. Gowdy.  If it said Trump campaign, do you still have the same answer you had when I asked you whether or not it involved

the Trump campaign?

Mr. <u>Comey.</u>  That's a question, Mr. Gowdy, I can't answer without having seen the document.  So I'd be speculating about a document I don't think I've ever seen.

Mr. <u>Gowdy.</u>  Well, I want to be fair to you and make sure I understand your testimony.  You have not, did not read the FBI initiation document that launched the Russia investigation, or you read it and do not recall what it said?

Mr. <u>Comey.</u>  I don't remember ever seeing it.

Mr. <u>Gowdy.</u>  How does the FBI launch counterintelligence investigations?  What documents are required?

Mr. <u>Comey.</u>  I don't know for sure because it's opened far below the Director's level.  But there's documentation in criminal investigations and in counterintelligence investigations to explain the predication for the opening of a file, that is, the basis for the opening of a file.

Mr. <u>Gowdy.</u>  Who at the FBI has the authority to launch a counterintelligence investigation into a major political campaign, and would that eventually have to be approved by you?

Mr. <u>Comey.</u>  I don't know for a variety of reasons.  I've never encountered a circumstance where an investigation into a political campaign was launched, and so I don't know how that would be done.  And -- so that's my best answer to that question.

Mr. <u>Gowdy.</u>  When did you learn there was a counterintelligence investigation into potential Russian ties

with the Trump campaign?

Mr. <u>Comey.</u>  I was briefed sometime at the end of July that the FBI had opened counterintelligence investigations of four individuals to see if there was a connection between those -- any of those four and the Russian effort.

Mr. <u>Gowdy.</u>  And who were those four individuals?

Mr. <u>Comey.</u>  I don't think that the Bureau has said that publicly, and so I'm not going to answer that unless it's okay with the government.

Mr. <u>Gowdy.</u>  Well, lucky for us we have the Bureau right here with us.

Ms. <u>Bessee.</u>  Mr. Chairman, my understanding, this is an unclassified setting, and also anything that goes to the special counsel's ongoing investigation would be off limits for this witness to be able to respond to if they are individuals that are currently being looked at or investigated as part of the Russian investigation, the ongoing Russian investigation.

Mr. <u>Gowdy.</u>  Let me make sure I understand the Bureau's position.  The former Director, actually the Director at the time, can confirm publicly that there is a counterintelligence investigation, but he cannot now tell us who that counterintelligence investigation involved?

Ms. <u>Bessee.</u>  That is correct.

Mr. <u>Gowdy.</u>  Director Comey, can you tell us the factual predicate that may have led to the launching of that

counterintelligence investigation?

Mr. <u>Comey</u>.  I don't think that I can describe the factual predicate for two reasons:  I don't remember precisely; and to the extent I remember, I think those are classified facts that implicate the concern the Bureau just expressed.

Mr. <u>Gowdy</u>.  Some of our friends in the media use the word "collusion" from time to time.  What is the crime of collusion?

Mr. <u>Comey</u>.  What is the crime of collusion?  I do not know. I've never heard the term "collusion" used in the way it's been used in our world over the last couple years before that.  I don't know of a crime that involves collusion.  I think in terms of conspiracy or aiding and abetting.

Mr. <u>Gowdy</u>.  With counterintelligence investigations, is there always a criminal component or sometimes a criminal component?

Mr. <u>Comey</u>.  Counterintelligence investigations involve an effort to understand the plans and intentions and activities of a foreign adversary.  Sometimes that leads to the use of criminal tools to disrupt.  Sometimes it involves other tools to disrupt. So criminal is an element of counterintelligence investigations always because it's a potential tool to disrupt.

Mr. <u>Gowdy</u>.  Do you recall your March 2017 testimony in an open setting before the House Intelligence Committee?

Mr. <u>Comey</u>.  In a general way.

Mr. <u>Gowdy</u>.  It was when I believe the Bureau first confirmed

the existence of a counterintelligence investigation.

Mr. Comey.  Okay.  I remember that.  I remember generally it was in March, but sure.

Mr. Gowdy.  Do you recall in what way you used the word "criminal" and at what point in your testimony?

Mr. Comey.  Without looking at the testimony, I don't.

Mr. Gowdy.  Do you recall Rod Rosenstein's memo appointing special counsel?

Mr. Comey.  No, I don't.

Mr. Gowdy.  What is the difference between collusion and conspiracy?

Mr. Comey.  I don't know because I don't know what collusion means.  It's a term I haven't heard in my career in the Justice Department, so I don't know.

Mr. Gowdy.  Let's assume that collusion and conspiracy are synonyms, and we'll just use the word "conspiracy" because the word "collusion," despite its nonstop use, has no criminal consequences.

Would it be a crime to access the DNC server or Podesta's email without permission or in an unlawful way?

Mr. Comey.  That's a hard one to answer in the abstract. It's potentially a crime whenever someone either, without authorization, enters a computer system or conspires to enter a computer system without authorization.

Mr. Gowdy.  Did the FBI, in July of 2016, have any evidence

anyone in the Trump campaign conspired to hack the DNC server?

Mr. Comey.  Did we have evidence in July of '16 that anyone in the Trump campaign conspired to hack the DNC server?  The challenge in answering that is -- and please don't take this nonanswer to imply that there is such information.

I just -- I don't think that the FBI and special counsel want me answering questions that may relate to their investigation of Russian interference during 2016.  And I worry that that would cross that line, Mr. Gowdy.

Mr. Gowdy.  All right.  Well, I'm not asking you what happened after the initiation.  July 2016, when this was launched, when Peter Strzok drafted the initiation documents, did the FBI have evidence at the time that any member of the Trump campaign conspired to access the DNC server?

Mr. Comey.  And, again, the challenge with answering that is it's a slope to answering questions about what we did or didn't know about Russian activity and the connection of any Americans to it during 2016, and I think that implicates the same problem I just talked about.

Mr. Gowdy.  Well, Director, we're trying to understand what the factual predicate for launching a counterintelligence investigation was.

Mr. Comey.  Sure.  I understand the gravamen of your question.

Mr. Gowdy.  You can't tell us, or you won't tell us?

Mr. <u>Comey.</u>  Probably a combination of both; that is, as I said in response to your earlier question, I don't remember seeing the opening memos on counterintelligence cases opened in late July, so I can't recall exactly what the predication was.

But, to the extent I recall facts developed during our investigation of Russian interference and the potential connection of Americans, I think that's a question that the FBI doesn't want me answering.  So it's both a can't and a won't.

Mr. <u>Gowdy.</u>  Do you believe your firing is evidence of obstruction of justice?

Mr. <u>Comey.</u>  I don't know that I can answer that question because I'm not -- because I'm a witness, in a sense.  I don't know the universe of facts that would reflect on that, so I can't answer it.

Mr. <u>Gowdy.</u>  Have you ever had conversations with Rod Rosenstein where he indicated that he did not believe the contents of the memo he drafted?

Mr. <u>Comey.</u>  I've never had any conversation with Rod Rosenstein about the memo he drafted, assuming you mean the memo that related to my firing.

Mr. <u>Gowdy.</u>  Yes.

Mr. <u>Comey.</u>  I've never had any conversation with him about that at all.

Mr. <u>Gowdy.</u>  Have you read the memo?

Mr. <u>Comey.</u>  Yes.

Mr. <u>Gowdy.</u>  Do you think it lays out a defensible case for terminating you as the FBI Director?

Ms. <u>Bessee.</u>  Mr. Chairman, to the extent that question goes -- again, goes to the special counsel's investigation into obstruction, the witness will not be able to answer.

Mr. <u>Gowdy.</u>  I think the whole world has read the memo and -- or most of the world.  My question is whether or not Director Comey -- I think he's already answered he had no conversations with Rod Rosenstein.

My question is, whether or not -- and he's entitled to his opinion -- whether or not he believes that that framed a sufficient factual basis for his termination as the FBI Director.

Ms. <u>Bessee.</u>  He is entitled to his opinion, but to the extent -- because he also stated that he is also a witness in the investigation.

Mr. <u>Gowdy.</u>  Which investigation is he a witness in?

Ms. <u>Bessee.</u>  To the special counsel.  He said he is a potential witness.

Mr. <u>Gowdy.</u>  Well, you just said witness.  Is there an obstruction of justice investigation?

Ms. <u>Bessee.</u>  I believe there is an investigation that the special counsel is looking into.

Mr. <u>Gowdy.</u>  Well, we all know that.  Is it an obstruction of justice investigation?

Ms. <u>Bessee.</u>  Mr. Chairman, can you rephrase the question,

please?

Mr. Gowdy. Yes. We all know that. Is it an obstruction of justice investigation?

Ms. Bessee. Can you rephrase the question for the witness?

Mr. Gowdy. Yes. Director Comey, you're familiar with the memo drafted by Rod Rosenstein. You have not talked to Rod Rosenstein, as I understand your testimony. Do you believe the memo, just on the cold four pages of the memo, four corners of that document, do you believe it provides sufficient basis for your termination? Even if you would have done it differently, is it a basis for your termination?

Mr. Comey. I can't answer that, Mr. Chairman, because it requires me to get into the mind of the decisionmaker, who is the President, and I'm not in a position to do that.

Mr. Gowdy. Do you have any evidence the memo was subterfuge to fire you, but not for the -- but for a different reason?

Mr. Comey. I have no evidence at all about how the memo came to be created. I know that it was part of the documentation that was attached, what was sent to me, delivered to the FBI on the day I was fired. That's the only thing I have personal knowledge of.

Mr. Ratcliffe. Director Comey, I'd like to ask you some questions about the events surrounding your July 5th, 2016, press conference to announce your decision not to charge Hillary Clinton for the mishandling of classified information.

One of the things that happened the week before that press conference was, on June 27th of 2016, a meeting between Attorney General Lynch and former President Bill Clinton, a meeting that got a lot of attention.  Do you recall that?

Mr. Comey.  I do recall press coverage of a meeting on June 27th.  Mr. Ratcliffe, one thing I have to make sure is clear.  You said my decision not to prosecute Hillary Clinton.  I made a recommendation on behalf of the FBI to the Department of Justice.  I just want to make sure that's precise.  I do recall the coverage around that meeting.

Mr. Ratcliffe.  And that is a meeting that took place on a tarmac in Phoenix, Arizona?

Mr. Comey.  That's my recollection, yes, sir.

Mr. Ratcliffe.  Do you agree that any discussion about the Hillary Clinton mishandling classified information investigation, as you called it today, between the Attorney General and the spouse of the subject of the investigation would have been inappropriate?

Mr. Comey.  Any discussion of the substance of the investigation?  Potentially inappropriate.  Again, I'd have to understand whether there was some other appropriate basis for the communication, but it would be concerning.

Mr. Ratcliffe.  Potentially inappropriate is your answer.  Also potentially illegal?

Mr. Comey.  Well, that one's a hard one to answer.  Any

conversation is potentially illegal, depending on what people talk about.  And so it would be potentially inappropriate, absent some explanation that would move it into the range of appropriate.  That's why I'm giving you that answer because I don't know what was talked about.

Mr. Ratcliffe.  Highly unusual for an Attorney General to meet with the spouse of the subject of one of her investigations. Do you agree with that?

Mr. Comey.  I would agree with that.

Mr. Ratcliffe.  And important to find out as much detail as possible about that conversation.  Would you agree with that?

Mr. Comey.  I don't know that I would agree with that because the fact of the communication is in some ways more important than the substance of it.  So I don't think I'd agree with that in the abstract.

Mr. Ratcliffe.  Did you recall that Attorney General Lynch subsequently admitted that her actions in meeting with former President Clinton cast a shadow over the Department of Justice?

Mr. Comey.  I actually don't remember that.

Mr. Ratcliffe.  Do you remember what you said about the meeting on the tarmac?

Mr. Comey.  I don't.  I mean, if you give me more context, maybe I'd remember.

Mr. Ratcliffe.  Do you recall saying it was part of your decision, one of the factors in your decision to take the, I

think, unprecedented step of holding the press conference on July 5th of 2016?

Mr. Comey.  Yes.  I remember it being a factor, an important factor in my decision to step away from the Attorney General.  I think I've talked about it in a variety of different contexts.  But I was very concerned by the appearance of that interaction.

Mr. Ratcliffe.  You mentioned it was one of a number of things that caused you to take that action, correct?

Mr. Comey.  Correct.

Mr. Ratcliffe.  One of those I believe you've testified previously was the fact that the Attorney General had asked you to refer to this investigation as a matter, correct?

Mr. Comey.  That is correct.

Mr. Ratcliffe.  One of the other things that you were concerned about was material or documentation, as yet unverified, indicating some possible agreement between Attorney General Lynch and the Clinton campaign about the investigation, correct?

Mr. Comey.  Not that second piece because I've been very -- tried to be very careful in public comments about this. There was material that had not been verified that I believed if it became public would be used to cast doubt on whether the Attorney General had acted appropriately with respect to the investigation.  I haven't gone -- I don't think I'm allowed to

go beyond that in characterizing that material.

Mr. Ratcliffe.  It was information that would, you believe, if released, have caused some to question the objectivity of the Department of Justice?

Mr. Comey.  Correct.

Mr. Ratcliffe.  Was there anything in that information that also would have raised questions about your objectivity or ability?

Mr. Comey.  Not to my knowledge.

Mr. Ratcliffe.  Did you share with the Attorney General or the Deputy Attorney General or anyone at Main Justice your concerns that this information raised about the Attorney General's either real objectivity or the perception of her objectivity?

Mr. Comey.  Yes.

Mr. Ratcliffe.  Who?  Who did you raise that with?

Mr. Comey.  My recollection is that, at some point in the first half of 2016, both the Deputy -- that the Deputy Attorney General was briefed on the nature of that material, and at some time after that, the Attorney General was briefed and interviewed about the nature of that material.

Mr. Ratcliffe.  Do you know who the Attorney General was interviewed by?

Mr. Comey.  I don't know for sure.  I believe one of the participants in the conversation was the Deputy Director.  At

that point, it was Andrew McCabe.  But there were others present as well, is my recollection.  I was not there.

Mr. Ratcliffe.  Was there a discussion about the Attorney General needing to recuse herself as a result of that information?

Mr. Comey.  Not to my knowledge.

Mr. Ratcliffe.  In the event of an Attorney General recusal, what does the Department of Justice policy say about a succession order of authority?

Mr. Comey.  My recollection is that the Department of Justice policy then makes the Deputy Attorney General the Acting Attorney General for purpose of that matter, that case.

Mr. Ratcliffe.  So, at that point, in the days leading up to the July 5th press conference, had you concluded or did you think that Attorney General Loretta Lynch should not be able to make a decision about whether to prosecute Hillary Clinton for the mishandling of classified information?

Mr. Comey.  I don't remember reaching that conclusion.  I remember being concerned about whether she should remain involved, especially after the tarmac visit, tarmac conversation.  But before I had an opportunity to discuss that with anyone at DOJ, the Attorney General announced that she would not recuse but would accept my recommendation and that of the career prosecutors.

Mr. Ratcliffe.  And 5 days after that tarmac incident, the

FBI and prosecutors from the Department of Justice did, in fact, interview Secretary -- former Secretary Clinton, correct?

Mr. Comey.  I think it was 5 days.

Mr. Ratcliffe.  It was on July 2nd.

Mr. Comey.  It was the Saturday after that tarmac meeting.

Mr. Ratcliffe.  You mentioned some of the agents earlier. Do you know how many folks combined, from the FBI and the Department of Justice, were present for the interview of Secretary Clinton?

Mr. Comey.  The DOJ team for the interview of Secretary Clinton I think -- I could be wrong, but I think was five people: two special agents from the FBI and three lawyers from the Department of Justice.

Mr. Ratcliffe.  You did not participate in the interview?

Mr. Comey.  No, sir.

Mr. Ratcliffe.  Who drafted the questions that Secretary Clinton was going to be asked?

Mr. Comey.  I don't know.

Mr. Ratcliffe.  Did you participate at all in the questions?

Mr. Comey.  No, I did not.

Mr. Ratcliffe.  Why wasn't that interview recorded?

Mr. Comey.  The interview wasn't recorded because the FBI does not record noncustodial, voluntary interviews.

Mr. Ratcliffe.  Why wasn't that interview conducted before

a grand jury?

Mr. Comey.  I don't recall exactly.  I think for a number of strategic reasons.  You'll know, as an experienced person, that the grand jury is often a limiting way to conduct a wide-ranging interview, but I don't remember for sure.

Mr. Ratcliffe.  Let me see if I can refresh your recollection.  I think you had a conversation with Inspector General Horowitz about that.  On page 141 of the inspector general's report --

Mr. Kelley.  Can we have a copy of that so we can follow along?

Mr. Ratcliffe.  Does someone have an extra copy?

Page 141, the top of the page.  See where it says:  "Comey told us"?

Mr. Comey.  Yes, sir.

Mr. Ratcliffe.  So I'm reading for the record:  Comey told us that he did not remember discussing with anyone the possibility of subpoenaing Clinton before the grand jury.  However, he stated:  At that point, I really didn't think there was a there there.  And the question was, is she going to lie to us?

Did I read that correctly?

Mr. Comey.  Yes, you read it correctly.

Mr. Ratcliffe.  Does that refresh your recollection?

Mr. Comey.  It really doesn't.  I'm sure I said this

because it's a transcript from the IG interview, but I don't -- I honestly don't remember saying that.  It seems reasonable, though.

Mr. Ratcliffe.  Well, as you read that, if it's accurately -- if you're accurately quoted, it sounds like you had your mind made up about whether or not Hillary Clinton was going to be prosecuted for the mishandling of classified information before her interview.

Mr. Comey.  I don't think that's exactly right.  My judgment going into the interview was that we had not found sufficient evidence to recommend prosecution for any substantive offenses related to the mishandling of classified information. Still a possibility that she would lie to us and give us an opening to prosecute her or that there would be further investigation. But going into it, based on almost a year of investigation, I didn't see a substantive case there.

Mr. Ratcliffe.  Do you recall, Director Comey, an exchange that you and I had?  You appeared before the House Judiciary Committee on September 28th of 2016, and I asked you a question. I said:  Did you make the decision not to prosecute or not to charge Hillary Clinton for the mishandling of classified information before or after her July 2nd, 2016, interview?  And your answer was:  After.

Do you recall that?

Mr. Comey.  Yep.

Mr. Ratcliffe.  When I asked you how that could possibly be the case, your response was:  If colleagues of ours think I'm lying, please have them contact me privately.

Now, I will tell you, Director, when I asked you that question and you gave me that answer, there were a number of things that I was not aware of.  One of the things that I didn't know was that the day before the interview, the Hillary Clinton interview on July 1st, Lisa Page texted Peter Strzok about Loretta Lynch and her decision to follow your recommendation, and said, quote:  Yeah, it's a real profile in courage, since she -- meaning Lynch -- knows no charges will be brought.

Do you recall reading that text anywhere, or hearing about it?

Mr. Comey.  I don't remember I read it.  I think I've heard about it in the media.

Mr. Ratcliffe.  It's also in the inspector general report.  Did you read the inspector general report?

Mr. Comey.  I did, so I must have seen it there.  Yes, I read it, so I must have seen it there.

Mr. Ratcliffe.  Well, the text doesn't -- doesn't say that Hillary Clinton might not be charged or that charges probably won't be brought.  It says that the Attorney General knows that charges won't be brought.

Do you have any explanation for why Lisa Page, Peter Strzok, and Attorney General Loretta Lynch might have known that Hillary

Clinton wasn't going to be charged before her July 2nd, 2016, interview if you hadn't made the decision yet?

Mr. Comey.  I don't.  I don't know what she means in there or what the nature of the communication was.

Mr. Ratcliffe.  Could it be based on one of the other things that I didn't know when you and I had that exchange, and that was the fact that I didn't know that 2 months before that July 2nd interview, on May the 2nd, you had actually circulated a draft memo of a public announcement stating that neither you nor any reasonable prosecutor would charge Hillary Clinton with the mishandling of classified information.  Do you recall that?

Mr. Comey.  I'm sorry.  Recall what, Mr. Ratcliffe?

Mr. Ratcliffe.  Recall that memo?

Mr. Comey.  Sure.  I recall a variety of drafts in May of that memo.

Mr. Ratcliffe.  Would you agree with me that that draft of that memo certainly would be or its contents would appear to be inconsistent with the testimony that I just related that you and I had in September of 2016?

Mr. Comey.  No, I don't agree.

Mr. Ratcliffe.  Who's Jim Rybicki?

Mr. Comey.  Jim Rybicki was my chief of staff.  As -- I'm sorry.

Mr. Ratcliffe.  One of the things that I didn't know when you and I had that exchange was how Mr. Rybicki was going to

testify.  And he has testified that the only charges that could have come out of her interview would have been false statements to an FBI agent, not any violations of the Espionage Act.

Would you agree with Mr. Rybicki's testimony?

Mr. Comey.  No, I would not.  I'm not familiar with it, but assuming it's what you just summarized, I would not.

Mr. Ratcliffe.  Well, I think I've related to you that at least a number of folks -- Peter Strzok, Lisa Page, Loretta Lynch, Jim Rybicki -- all seem to have the idea that Hillary Clinton wasn't going to be charged for the mishandling of classified information -- she might be charged for lying to the FBI -- but that she wasn't going to be charged for the mishandling of classified information.

Do you still think that the answer that you gave me on September 28 of 2016 was an accurate statement?

Mr. Comey.  I do.

Mr. Ratcliffe.  Do you think that that statement was at all misleading to me or other Members of Congress?

Mr. Comey.  I guess I can't speak to your mental state.  It wasn't intended to be misleading.

Mr. Ratcliffe.  You didn't answer my question when I asked it by saying:  Well, I had pretty much made the decision that she wasn't going to be charged because everyone knew I had circulated a draft memo.

You didn't say to me what you said to the inspector general,

that you really didn't think there was no there there.  You just said no.

Do you think that's a candid statement?

Mr. <u>Comey.</u>  I do.  I do.

Mr. <u>Ratcliffe.</u>  So your testimony then is the same as it is today, that when you went into the Hillary Clinton -- or when the FBI and the Department of Justice went in to interview Hillary Clinton, a decision had not been made about whether or not to prosecute her for anything and all charges were still on the table at that point?

Mr. <u>Comey.</u>  Correct.  The final decision of what our recommendation would be had not been made.

Mr. <u>Ratcliffe.</u>  The final decision.

Mr. <u>Comey.</u>  Well, sure.  You'd be incompetent if you didn't have a view of the case after a year.  And, as I said, as I said to the inspector general, it didn't look to me like there was a substantive case there.  But you're about to interview the subject, and so you want to keep your mind open to the possibility that you will develop something that needs to be pursued.

Mr. <u>Ratcliffe.</u>  Well, that's a great explanation.  Why didn't you give me that explanation in September of 2016 when I asked you that question?

Mr. <u>Comey.</u>  It's an explanation, Mr. Ratcliffe, that's entirely consistent with the answer I gave you.  I don't remember you asking me to explain why I say that.  If you did, I'm sorry

if I didn't answer that question, but they're consistent.

Mr. <u>Ratcliffe.</u>  So it was a serious interview with Hillary Clinton that was about to take place intended at getting at the truth of everything that was troubling you?

Mr. <u>Comey.</u>  That's not how I thought about it.  It was about interviewing the subject near the close of a year-long investigation.

Mr. <u>Ratcliffe.</u>  Okay.  So, when the team of FBI agents and lawyers interviewed Hillary Clinton, what questions did they ask Secretary Clinton about the tarmac meeting?

Mr. <u>Comey.</u>  I don't know.

Mr. <u>Ratcliffe.</u>  Would that be reflected in the 302 or in the FBI summary of the interview?

Mr. <u>Comey.</u>  I would expect so.  You're asking about whether they asked Hillary Clinton about the meeting that Bill Clinton had with Loretta Lynch.

Mr. <u>Ratcliffe.</u>  Yes.

Mr. <u>Comey.</u>  I don't know whether they asked that.  I would expect if it was asked, it would likely be reflected in the 302.

Mr. <u>Ratcliffe.</u>  Would you like to review those?

Mr. <u>Comey.</u>  Not unless you really want me to.

Mr. <u>Ratcliffe.</u>  Well, I've read them, and I've asked folks about them.  There's no mention of the word "tarmac" or "Loretta Lynch" anywhere that appears in the 302 or the summary that the FBI has made publicly available.

So my question is, do you know whether or not any questions were asked about that tarmac meeting?

Mr. Comey.  It's the same answer; I don't know.

Mr. Ratcliffe.  So 5 days after the Attorney General meets with the spouse of a subject on a tarmac, the meeting that a lot of folks are talking about and that raised concerns enough to be one of the reasons that caused you to take the actions that you took in holding the press conference, none of those folks in the room thought about asking Hillary Clinton any questions about that?

Mr. Comey.  I don't know what they thought.  And, as I said earlier, I don't know whether she was asked about that.

Mr. Ratcliffe.  Would that have been a reasonable question to Secretary Clinton, what did your husband discuss about this case, if anything, 5 days ago with the Attorney General?

Mr. Comey.  I don't know the answer to that.  As it relates to her mishandling of classified information as Secretary of State, I don't know.

Mr. Ratcliffe.  Well, I thought you were looking for any crimes, not just the mishandling of information.

Mr. Comey.  The FBI doesn't investigate people to find any crimes.

Mr. Ratcliffe.  I didn't say investigate people, but in the course of investigating if you become aware of things that cause concern to investigators, like you've expressed you had, isn't

there an obligation to pursue that?

Mr. <u>Comey.</u>  Hard to answer in the abstract.  Depends upon what the facts were that you had.  But sure, if you develop facts in the course of an investigation of the possible commission of another crime, in almost all circumstances, you follow up on it. I don't know what that would drive, in terms of the interview of Hillary Clinton.

Mr. <u>Ratcliffe.</u>  So do you know what questions the agents or prosecutors asked Hillary Clinton about that troubling information that we talked before about potential compromise of Attorney General Lynch with respect to her objectivity?

Mr. <u>Comey.</u>  I don't know whether they asked any questions that related to Loretta Lynch of Hillary Clinton.

Mr. <u>Ratcliffe.</u>  If they did, it should be reflected in the 302 or the FBI summary of the interview, correct?

Mr. <u>Comey.</u>  You would expect that in the ordinary course. The only reason I'm hesitating is that I don't know whether questions were asked about that, but if questions are asked and the answer may implicate -- may be considered classified, sometimes that's not put in the 302.  But I don't know whether that's the case here.

Mr. <u>Ratcliffe.</u>  Weren't those questions that you wanted answered?

Mr. <u>Comey.</u>  Of Hillary Clinton?

Mr. <u>Ratcliffe.</u>  Of anyone that could answer a question

about whether or not there was any problem with the objectivity of the Attorney General, based on contacts with the Clinton campaign.

Mr. Comey.  I did not see anything that led me to conclude that Loretta Lynch was acting inappropriately in supervising the Department of Justice in that investigation.  The appearance of conflict or the appearance that she was compromised in some fashion was what drove me to separate myself from her in July.

Mr. Ratcliffe.  So, as you've already mentioned, one of the things you thought might happen or you wanted to find out was whether or not Hillary Clinton might lie during that interview. Knowingly making a false statement to the FBI is a crime, correct?

Mr. Comey.  That is correct.

Mr. Ratcliffe.  Making a false public statement ordinarily is not a crime, correct?

Mr. Comey.  That is correct.  Thank goodness, for a lot of people.

Mr. Ratcliffe.  But false statements made in public can be evidence of knowledge or intent, absence of mistake, or provide all kinds of other evidentiary context, correct?

Mr. Comey.  Potentially, yes.

Mr. Ratcliffe.  In fact, correct me if I'm wrong, but wasn't David Petraeus' comments, false comments in public a basis for why you argued that he had knowledge or intent to commit the crime of mishandling classified information?

Mr. Comey.  I don't remember that about the Petraeus case, that public statements figured in it.

Mr. Ratcliffe.  You don't recall, or it didn't happen?

Mr. Comey.  Well, I don't remember it being a feature, so it's possible I'm just not remembering or that it didn't happen. It just -- as I think about that case, I don't remember anything about public statements as a factor in that case.  I remember a lot about lying to the agents during an interview, but not public statements.

Mr. Ratcliffe.  All right.  So let me ask you about Hillary Clinton's public statements.  Do you recall Secretary Clinton publicly stating that she neither sent nor received classified information?

Mr. Comey.  I don't specifically in her public statements, so I don't specifically.

Mr. Ratcliffe.  If there were those public statements, would you have expected the agents to ask her about that during her interview?

Mr. Comey.  I don't know.  I would expect them to ask about what she was thinking when she communicated in the way she did, but whether to ask her, "Did you say on the campaign trail X or Y," I don't know.  That would be up to their judgment.

Mr. Ratcliffe.  Do you recall Secretary Clinton making that same statement under oath before Congress?

Mr. Comey.  I don't.

Mr. Ratcliffe.  Do you recall -- maybe I can refresh your
recollection.  I think, on October 22nd of 2015, in response to
a question from Congressman Jordan, Secretary Clinton said,
quote, "There was nothing marked classified in my emails either
sent or received," end quote.

Does that refresh your recollection about Secretary Clinton
making that statement?

Mr. Comey.  I don't -- it doesn't help me with her
testimony, but I actually do remember being asked, maybe by
Mr. Jordan, when I testified about whether that was accurate or
not.

Mr. Ratcliffe.  Is it accurate?

Mr. Comey.  My recollection is there were -- I hope I don't
get this wrong.  In some email, there was a letter C deep in the
email to mark some of the paragraphs that looked to us like
portion markings, as I recall.  And I'm sorry if I'm misrecalling
that, but I have the recollection of that.

Mr. Ratcliffe.  Well, I have your public statement on July
5th.  I think you mentioned the fact that there were actually
three emails that were marked classified.

Mr. Comey.  When I talked on July the 5th?

Mr. Ratcliffe.  Yes.

Mr. Comey.  Okay.

Mr. Ratcliffe.  Any reason to --

Mr. Kelley.  Do you have a copy of that statement we can

take a look at?

Mr. <u>Ratcliffe.</u>   I do.

Do you have -- as you review that, do you independently have a recollection about Hillary Clinton's July 2nd interview where agents asked her questions about those classification markings, whether it appeared on one document or multiple documents?

Mr. <u>Comey.</u>   I don't.

Mr. <u>Ratcliffe.</u>   You don't have any recollection?

Mr. <u>Comey.</u>   No, I don't have an independent recollection, sitting here, of what they asked her about that.  I have some recollection that the topic came up, but I don't remember what was asked or said about that.

Mr. <u>Ratcliffe.</u>   What do you recall about -- you mentioned the letter C coming up during that interview and what that might mean?

Mr. <u>Comey.</u>   I don't -- I'm sorry.  Do you want me to still look at the statement?  So far, I haven't found the thing about the C, so I'll pause there for a second.

I don't remember what came up in her interview about that. What I was referring to earlier is I remember some member I think of the Judiciary Committee asking me about that portion marking that appeared -- I was thinking in one email, but it sounds like you think there's more than one.

I don't see anything, sir, in my statement -- I could be missing it -- about the portion marking.

Mr. Ratcliffe.  I will resume with that when we resume our questioning.

Mr. Comey.  Okay.

Chairman Goodlatte.  I think, in the interest of expediency, we'll proceed with the Democrats right now, and then we'll take a 30-minute lunch break after the Democrats.

[11:32 a.m.]

Ms. Chen.  Okay.  The time is 11:32, and we're back on the record for the Democrat's first round.

Mr. Cohen, if you would like to ask a few questions.

Mr. Cohen.  Are we ready?

Mr. Comey.  Yes, sir.

Mr. Cohen.  Thank you.  I'm Steve Cohen from Tennessee.

First thing I'd like to ask you, Mr. Comey, is, Mr. Trump asked you once to lay off the Flynn investigation, and I was just wondering what your reaction was to his having pled guilty and him having, according to Mr. Mueller, provided much truthful information that is apparently going to be a part of the investigation that Mr. Mueller is pursuing.

What was your reaction?  Did you feel kind of good that you didn't tell Mr. Trump that you would be loyal and drop that investigation?  How did it make you feel?

Mr. Comey.  Well, there was no chance at all that I was going to abide that direction to let that go.  When I saw the public accounts of his plea and cooperation, I felt, as a citizen, glad that he was held accountable for his crimes and that he was assisting the United States.  So it seemed to me like a just outcome.

Mr. Cohen.  Did Mr. Trump or anybody else in the administration ever ask you anything about specifics about the Russia involvement in the 2016 election?

Ms. Bessee. Congressman, to the extent it goes into the purview of the special counsel, the witness will not be able to answer that question.

Mr. Cohen. Let me ask you this, Mr. Comey: There was a memo that some had said had something to do -- and you maybe even said -- had something to do with your going forth on July 5 to announce that you and not the Attorney General was going to not investigate and go further with the Clinton email investigation, and that that memo was something that the FBI had in their possession for some time concerning, allegedly, Attorney General Lynch communicating to Ms. Renteria that this was going to be kind of not going to be pursued and not to worry about it. And then later, I think, many think that that was really a Russian operative that got somehow some information that wasn't true and got it into the Justice Department.

Do you know what I'm talking about?

Mr. Comey. I know generally, and I have to tread carefully here, because I think the underlying material is still classified. So there was material -- this is what I've said publicly, and so I'll say it again, there was material that was classified that if unclassified, released, would open the Attorney General up to the accusation -- whether it was true or not -- the accusation that she had not been acting fairly and impartially in overseeing the investigation.

So far as I knew at the time, and still think, the material

itself was genuine, which is a separate question, though, from whether it was what it said was accurate.

Mr. Cohen.  When you say it was genuine, I mean, did you not think that at this point that it was conjured up by the Russians to try to maybe influence actions at the Justice Department or at the FBI?

Mr. Comey.  We didn't think that at the time.  I don't know whether that view has changed.

Mr. Cohen.  Okay.  Was Peter Strzok considered the top counterintelligence FBI agent?

Mr. Comey.  I don't know whether Peter Strzok was considered the top.  He was very highly regarded as a counterintelligence professional, and I saw that borne out in the nature and quality of his work with me.  But whether he's the top or not, I don't know, but certainly among the best.

Mr. Cohen.  In the past, had his work not resulted in the outing of some Russian spies and their being returned to Russian, expelled from this country?

Mr. Comey.  I don't remember specifically.  I just remember his reputation was very, very strong in the counterintelligence world.

Mr. Cohen.  So it would make sense that he would be assigned to this investigation?

Mr. Comey.  It would make sense that he'd be assigned to the investigation into the potential mishandling of classified

information by Secretary Clinton.  It would also make sense he'd be assigned to the Russia investigations.

Mr. Cohen.  And what was Ms. Page's reputation as an attorney and as a public servant?

Mr. Comey.  Ms. Page was less well-known.  She was a more junior attorney assigned to the deputy attorney -- excuse me, the deputy director, so I knew less about her.  In my interactions with her, what I liked about her is she would be candid and blunt and often disruptive in a meeting, which I kind of liked.  The FBI can be very hierarchal.  She would tend to speak up even when, in a normal FBI meeting, it wasn't her turn, and I found that very helpful.

Mr. Cohen.  The attacks that Mr. Trump has made on the FBI and the Justice Department, and particularly Mr. Strzok and Ms. Page and you and others, can you tell us how that's affected the morale of the FBI?

Mr. Comey.  It's hard for me to give you a high-confidence answer because I'm not there any longer, so I'll give you my sense, which I think is right but I don't have high confidence in it, is that it has hurt morale in some senses, and in other senses, has redoubled the commitment of the people of the FBI to its mission and its apolitical nature.  So I think it's actually a tale of two cities in that way.

Mr. Cohen.  When you were at the FBI, did you have any reason to investigate the people who propagated stories that Seth Rich

was murdered by folks within the DNC or other democratic operatives or any of the people that talked about this pizza operation, the pizzagate thing?  Did you ever investigate the people that started those conspiratorial stories?

Mr. <u>Comey.</u>  I don't remember.  I don't remember investigations on those topics.  I remember at one point receiving an email from someone, a private citizen, to my personal account, raising issues about the -- is it Ping Pong?  Whatever the pizza place was that was involved in some conspiracy theories.  I remember sending it to my staff saying, make sure this gets to the appropriate place, but I don't know whether there were investigations.

Mr. <u>Cohen.</u>  If Mr. Mueller were fired, how would that affect further investigations of crime that are ongoing now?

Mr. <u>Comey.</u>  I don't know at this point.  I don't know.  And as an informed outsider, I think that it would -- you'd almost have to fire everyone in the FBI and the Justice Department to derail the relevant investigations, but I don't know exactly what the effect would be.

Mr. <u>Cohen.</u>  Mr. Trump has said that the folks that work for him are 12 angry Democrats.  Do you know those 12 or so people --

Mr. <u>Comey.</u>  I don't.

Mr. <u>Cohen.</u>  -- who they are?

Mr. <u>Comey.</u>  I know by name some of them, and I think I've met some of them personally, but I don't know them well.

Mr. Cohen.  Do you know if any of them are angry?

Mr. Comey.  Not to my knowledge, but I'm sure they're like all normal humans; sometimes they're happy, sometimes they're sad, sometimes they're angry, but I can't comment on that characterization beyond that.

Mr. Cohen.  All right.  Despite the emails between Mr. Strzok and Ms. Page, was there anything you ever saw that you believe caused the FBI or the Justice Department, particularly the FBI, to not operate and investigate in an unbiased fashion?

Mr. Comey.  No, I never saw -- and in those two people's cases -- I never saw any indication at all of bias by Mr. Strzok or Ms. Page.  And, in fact, Peter Strzok helped draft my letter to Congress on October 28th that Hillary Clinton blames for her defeat.  So it's hard for me to see how he was on Team Clinton secretly at that point in time.  And he also was one of the handful of people in the entire world who knew we were investigating four Americans who had some connection to Mr. Trump during the summer of 2016, and he didn't tell a soul.  So it's hard to reconcile that with his being on Team Clinton.

And so all of that is consistent with my view, I never saw any indication of anything but the facts and the law from those people.

Mr. Cohen.  Thank you for your testimony.  And thank you for your service to our country.

I yield.

Mr. Nadler.   Thank you.

Mr. Comey, I've been troubled by escalating attacks against the Department of Justice, the Special Counsel's Office, and the FBI, attacks against the independence of the institutions, the integrity of their employees, and the legitimacy of the Department of Justice and FBI investigations.

As I'm sure you're aware, President Trump and his allies have repeatedly described Special Counsel Mueller and his investigation as illegitimate and politically biased.

On November 27th, President Trump tweeted in reference to the special counsel, quote:  The fake news media builds Bob Mueller up as a saint, when in actuality, he's the exact opposite. He is doing tremendous damage to our criminal justice system where he's only looking at one side and not the other.  Heroes will come of this and it won't be Mueller and his terrible gang of angry Democrats.  Look at their past and look where they come from.  And now a $30 million witch hunt continues and they have got nothing but ruined lives.  Where is the server?  Let these terrible people go back to the Clinton Foundation and Justice Department, close quote.

On December 3rd, President Trump tweeted, quote:  Bob Mueller, who is a much different man than people think, and his out-of-control band of angry Democrats don't want the truth, they only want lies.  The truth is very bad for their mission, close

quote.

I'll note that Robert Mueller is well-known to be a lifelong Republican.

Now, generally speaking, does being identified as a Democrat mean a prosecutor would be too conflicted to conduct a fair investigation of a Republican or vice versa?

Mr. <u>Comey.</u>  No, it does not.

Mr. <u>Nadler.</u>  Are you aware of any, quote, "conflicted" people on the special counsel's team?

Mr. <u>Comey.</u>  I am not.

Mr. <u>Nadler.</u>  Do you agree with the characterization that the special counsel's investigation is a witch hunt?

Mr. <u>Comey.</u>  I do not.

Mr. <u>Nadler.</u>  What is your general impression of the individuals on the special counsel's team?

Mr. <u>Comey.</u>  I know them by reputation, and it's an all-star team of people whose names I've known for years as great Federal prosecutors.  Others are unknown to me.  But I know the reputation and substance of the person leading them, the best.  Although we're not friends, I admire Bob Mueller.  He is more than people realize.

Mr. <u>Nadler.</u>  Do you agree with the characterization that the special counsel's team is out of control and are not seeking the truth?

Mr. <u>Comey.</u>  I don't have any reason to believe that's true.

Mr. Nadler.  And how confident are you that the members of the special counsel team are conducting the investigation based solely on the facts and the law and not on their political affiliation?

Mr. Comey.  I've seen no indication.  Again, all I follow it through is the public media.  I've seen no indication of that in the media.  And, again, I also know the person who leads them and the kind of culture he creates, and it's one of integrity.

Mr. Nadler.  Why do you think the President publicly attacks Robert Mueller and his investigators as frequently as he does?  Is it to undermine public confidence in their findings or some other reason?

Mr. Comey.  I don't know.

Mr. Nadler.  Do you agree with the President's characterization that Robert Mueller is damaging the criminal justice system?

Mr. Comey.  I do not.

Mr. Nadler.  How would you characterize the special counsel investigation and its importance, not only to our national security, but as a means of restoring public confidence in our elections and law enforcement agencies?

Mr. Comey.  Watching it from the outside, my judgment as an experienced prosecutor and investigator is it's been conducted with extraordinary speed, with extraordinary professionalism, and zero disclosure outside of public court

filings.  It represents the way our criminal justice system is supposed to work in investigating, and I believe it's incredibly important to the rule of law in this country that the work be allowed to finish.

Mr. Nadler.  Now, you may have answered this already, but one specific assertion is that you and Special Counsel Mueller are, quote, "best friends."

On September 5th, President Trump brought up Special Counsel Mueller in an interview with The Daily Caller stating, quote:  And he's Comey's best friend, and I could give you a hundred pictures of him and Comey hugging and kissing each other. You know he's Comey's best friend, close quote.

Are you best friends with Robert Mueller?

Mr. Comey.  I am not.  I admire the heck out of the man, but I don't know his phone number, I've never been to his house, I don't know his children's names.  I think I had a meal once alone with him in a restaurant.  I like him.  I am not a -- I'm an associate of his who admires him greatly.  We're not friends in any social sense.

Mr. Nadler.  Thank you.  I will not ask whether you've ever hugged and kissed him.

Mr. Comey.  A relief to my wife.

Mr. Nadler.  On page 88 of your book, A Higher Loyalty: Truth, Lies in Leadership, you recount a hospital scene during the Bush administration with then-FBI Director Robert Mueller.

In the first full paragraph you wrote, quote:  Mueller and I were not particularly close and had never seen each other outside of work, but I knew Bob understood and respected our legal position and cared deeply about the rule of law.  His whole life was about doing things the right way, close quote.

How do you know Robert Mueller cares deeply about the rule of law and doing things the right way?

Mr. <u>Comey.</u>  Well, from watching him work.  I was his supervisor when I was deputy attorney general and he was the FBI director.  But most importantly, through that incident, watching him be prepared to resign, to end his career, because he thought the Bush administration was doing things inconsistent with the law, and he wasn't going to be any part of it, wasn't going to have it.  And that strength bolstered me during that difficult period but was just typical of the way he approached things.

Mr. <u>Nadler.</u>  And he was at that point part of the Bush administration.  Is that correct?

Mr. <u>Comey.</u>  Correct.  He was the FBI director.

Mr. <u>Nadler.</u>  And how confident are you that he will do things the right way with respect to the special counsel investigation?

Mr. <u>Comey.</u>  There are not many things I would bet my life on.  I would bet my life that Bob Mueller will do things the right way, the way we would all want, whether we're Republicans or

Democrats, the way Americans should want.

Mr. <u>Nadler.</u>  And is it fair to say that there are no facts that you know of to support the notion that Special Counsel Mueller is politically motivated or biased?

Mr. <u>Comey.</u>  I don't know of any.  I'm smiling at this moment because I can't imagine any, given the nature of that person and his life.

Mr. <u>Nadler.</u>  And it's still accurate that you're not particularly close to Robert Mueller?

Mr. <u>Comey.</u>  It is accurate.

Mr. <u>Nadler.</u>  On October 17th, the FBI responded to a Freedom of Information Act request for, quote, "photographs of former FBI Director James Comey and Robert Mueller hugging and kissing each other," by saying "no responsive records were located."

I assume you're not aware of any such photographs?

Mr. <u>Comey.</u>  I'm not aware of any such photograph.  I have never hugged or kissed the man.  Again, I'm an admirer but not that kind of admirer.

Mr. <u>Nadler.</u>  The FBI and the Department of Justice have been more broadly accused of conducting investigations driven by political bias instead of just by the facts and the rule of law.

During your tenure at the FBI and the Department of Justice, were you aware of any FBI investigation motivated by political bias?

Mr. Comey.  None.  Never.

Mr. Nadler.  Were you aware of any Justice Department investigations that were motivated by political bias?

Mr. Comey.  Never.  None.

Mr. Nadler.  On May 22nd, Republican Members of Congress introduced House Resolution 907 requesting that the Attorney General appoint a second special counsel to investigate misconduct at the Department of Justice and the FBI.

That resolution alleged, quote, "Whereas, there is an urgent need for the appointment of a second special counsel in light of evidence that raises critical concerns about decisions, activities, and inherent bias displayed at the highest levels of the Department of Justice and the Federal Bureau of Investigation regarding FISA abuse, how and why the Hillary Clinton email probe ended, and how and why the Donald Trump-Russia probe began," close quote.

Is there any evidence of inherent bias displayed at the highest levels of the DOJ and the FBI regarding how and why the Hillary Clinton email probe ended?

Mr. Comey.  Not that I'm aware of.

Mr. Nadler.  Are you aware of any evidence of inherent bias displayed at the highest levels of the DOJ and the FBI against Donald Trump as part of the Trump-Russia investigation?

Mr. Comey.  I am not.

Mr. Nadler.  Are you aware of any actions ever taken to

damage the Trump campaign at the highest levels of the Department of Justice or the FBI?

Mr. Comey.  I am not.

Mr. Nadler.  Are you aware of any actions ever taken to personally target Donald Trump at the highest levels of the Department of Justice or the FBI?

Mr. Comey.  I am not.

Mr. Nadler.  And you have previously noted, I believe, that if Agent Strzok, who had expressed his personal political opinions negatively about then-candidate Trump, had wanted to misuse his office to damage the Trump campaign, he could easily have done so by leaking information about the fact that there was an ongoing investigation.  Is that not correct?

Mr. Comey.  Certainly, yes.

Mr. Nadler.  And he could have done that, but he did not do that?

Mr. Comey.  He did not.

Mr. Nadler.  That would be evidence that he was not doing anything to bring his political opinions into making judgments at the FBI?

Mr. Comey.  Certainly inconsistent with the conspiracy theory that he was trying to hurt Donald Trump.  If you're going to have a conspiracy theory, you've got to explain all the facts. And it's hard to reconcile his not leaking that Trump associates were under investigation and his drafting of a letter to Congress

on October 28th that Secretary Clinton believed hurt her chances of being elected.

Mr. Nadler.  At a campaign rally in August, President Trump said, quote, "Our Justice Department and our FBI have to start doing their jobs and doing it right and doing it now because people are angry.  People are angry," close quote.

In another rally in September, the President said, quote, "Look what's being exposed at the Department of Justice and the FBI.  You have some real bad ones.  You see what's happening at the FBI.  They're all gone.  They're all gone.  But there's a lingering stench and we're going to get rid of that too," close quote.

Do you agree with the President's characterization that the Department of Justice and the FBI are not doing their jobs?

Mr. Comey.  I do not.

Mr. Nadler.  Do you believe there are some "real bad ones" at the FBI or DOJ?

Mr. Comey.  I do not.

Mr. Nadler.  Are you at all concerned that the President of the United States is trying to smear and undermine the credibility of his investigators at the Justice Department?

Mr. Comey.  Deeply concerned.  I think the part of that that's right is that people are angry.  Some people are angry because they've been lied to for so long about the nature and quality of the FBI and the Department of Justice.

Mr. Nadler.  I'm sorry.  Lied to --

Mr. Comey.  Lied to by the President and his supporters about the nature and quality of the Department of Justice and the FBI.  It's shortsighted, and anybody who knows those organizations, knows it's not true.

Mr. Nadler.  And what implications might there be under the Justice Department and the rule of law?

Mr. Comey.  Those kind of lies hurt the ability of the FBI to be believed at a doorway or in a courtroom.  That makes all of us less safe.  These are honest institutions made up of normal flawed human beings, but people committed to doing things the right way.  When they're lied about constantly, it hurts the faith and confidence of the American people in them, and that is bad for all of us.  I don't care what your political stripe is.

Mr. Nadler.  And how does that impact our national security?

Mr. Comey.  Our national security turns upon the ability of an FBI agent to convince the girlfriend of a jihadi that we will protect her if she cooperates with us.  If we're seen as a political group of one kind or another, an untrustworthy group, that trust is eroded and the agent loses the ability to make that case.  If a jury doesn't believe an FBI agent when he or she says, I found this or I heard this in the course of this case, we're less safe because the case can't be made.

Mr. Nadler.  Okay.  And these are direct consequences of statements made, such as I've quoted, by the President and by other people who go along with him?

Mr. Comey.  I believe they are.

Mr. Nadler.  And what impact do you believe that actions of this Congress' resolutions, such as H.R. 907 that I quoted a few minutes ago, and investigations, frankly, such as this one, have on the ability of the Justice Department to conduct fair and thorough investigations and prosecutions?

Mr. Comey.  To the extent it echoes the lies and the smears from the President, it simply increases the chances that the Department of Justice and the FBI's credibility will be undermined.

I'm a big fan of oversight and truth-seeking, but when people veer from truth-seeking into trying to find any excuse to bad-mouth an organization that's investigating the President, we've lost our way.

Mr. Nadler.  Would you be surprised to know that criminal defendants are using attacks similar to those levied by the President and Republicans?

Mr. Comey.  No.

[Comey Exhibit No. 1

Was marked for identification.]

Mr. Nadler.  And I want to introduce an exhibit.  It's an article from the Huffington Post.  The headline, Trump's FBI

Attacks Are Helping Accused Terrorists Defend Themselves in Court.

This article details the defense of three alleged domestic terrorists in Kansas.  They are anti-Muslim militia members accused of planning to bomb an apartment complex with predominantly Somali immigrant residents.

Defense counsel argued the men were targeted by, quote, "a biased FBI conspired against them in the lead up to the 2016 election due to their political beliefs," close quote.

What is your reaction to that?

Mr. Comey.  Well, again, I don't know the particular case, but taking the news article at face value, it's an example of the kind of thing that I worry about.  When corrosive attacks are directed at our institutions of justice, we will all pay a price for that.

Mr. Nadler.  And, therefore, you'd believe that the current political rhetoric endorsed by the President and his allies, such as I've quoted, is potentially damaging to law enforcement's ability to keep Americans safe?

Mr. Comey.  I do.  I'm not against criticizing law enforcement organizations or law enforcement leaders.  I've been criticized, I think, reasonably.  But when you attack the fiber of the institution and say it's corrupt and untrustworthy and aiming at political enemies, you do lasting damage to an institution this country relies upon, and everybody should

realize that's a mistake.

Mr. Nadler.  Thank you.  I have no further questions.

Ms. Jackson Lee.

Ms. Jackson Lee.  Good morning, moving into good afternoon. Thank you for your presence here.

I want to put on the record that Democrats never received a copy of the agreement.  So I hope that, in short order, the majority will provide us with the agreement regarding the quashing of the subpoena.

Mr. Kelley.  I will be more than happy to, and its merely an email correspondence.

Ms. Jackson Lee.  I appreciate getting something in writing.  Thank you so very much.

Let me thank you, Mr. Comey, for your service to the Nation. I share your view that the American people would have been better served if the lame duck House Republican majority of this committee had scheduled a public hearing instead of a private interview behind closed doors to discuss matters that are vital to the health of our democracy.

I fully expect that to be a standard practice for this committee in the 116th Congress under a new Democratic majority. So I have several questions, which I'd like to lay the predicate for.

Dealing with the FBI investigation of Secretary Clinton's emails, the investigation was an outgrowth of the House

Republican Benghazi investigation.  A sad investigation, which we now know, because it was confirmed by House Majority Leader McCarthy that it was for one purpose.  It had at its principal aim was to undermine and damage the public image and standing of Secretary Hillary Clinton, whom House Republicans feared would be the 2016 Democratic Presidential nominee.

You'll recall that House Republicans relentlessly questioned, second-guessed, and attacked her integrity and that of career FBI agents when you announced at your famous July 5th, 2016, press conference that the FBI concluded that there was no evidence to support a finding Secretary Clinton had violated the law.  House Republicans bitterly criticized you and questioned the integrity and legitimacy of the investigation.

For your part, you were confident enough in the determination reached by the FBI that you've stated under oath the case itself was not a cliffhanger and that no reasonable prosecutor would ever bring such a case on these facts.  House Republicans disagreed with you extensively.  They wanted you to prosecute Secretary Clinton regardless of the facts.

And from July 2016 through October 2016, House Republicans engaged in an almost daily ritual of holding hearings, desperately trying to tear down your investigation and your recommendation.  They did not stop attacking you until October 28th, the day you sent your letter to the congressional leaders announcing that, in an unrelated investigation, the FBI

had learned of the existence of emails that appeared to be pertinent to an investigation of Secretary Clinton's email server.

House Republicans promptly leaked your update, according to the media, characterizing your action as a decision by the FBI to reopen its investigation, even though the FBI had not at that time reviewed any of the emails in question and notwithstanding the fact that you advised them the FBI was not then in a position to assess whether or not this material may be significant.

For the next 8 days, a period in which millions of Americans were casting their ballots during early voting, the baseless claims of House Republicans were repeated ad nauseam by them and candidate, Mr. Trump, dominating media coverage in the final days, and did not stop even after your announcement 2 days before the election on November 5th, 2016.  That upon further review, that the FBI had again found no basis to believe that Secretary Clinton had committed a crime.

Given this chronology and the benefit of hindsight, do you regret not following the Justice Department's policy and practice of refraining from taking investigatory or prosecutory actions that could affect the outcome of an election to be held within the ensuing 60 days of an election?

Mr. Comey.  I don't.  I regret being involved at all, but even in hindsight, I think that that was the decision I had to

take.  And I don't want to quibble, but there's no policy around taking action in a runup to an election, but there's a really important norm that I believe in.  If you can avoid it, you take no action in the runup to an election.  It might have an impact on the election, I believe in that, even today.

Ms. <u>Jackson Lee.</u>  Well, I can't put words in your mouth, but you were, in essence, engaged or interfering or participating in an election of the known and documented leaders of the free world.

I would consider the elections of the President of the United States in a world context as one of the most significant elections that we would ever have in the world.

Again, would you not consider that maybe in that context that the timing was very difficult?

Mr. <u>Comey.</u>  Oh, excruciating.  Causes me great pain even to sit here and talk about it today, but the two alternatives I saw, I chose the least bad.  I still think the other alternative was worse.  And as between bad and worse, I had to choose bad. I wish we weren't involved, but given that we were involved, we tried to make the right decision for the right reasons.

Ms. <u>Jackson Lee.</u>  You sent a letter dated October 28th, 2016, to indicate that there was a reopening of the investigation.  I count the numbers of addressees as 16.

Why would you need to send -- did you send this classified? Did you send this with an indication that this was not to be

exposed to the media?  Did you make the point or have your liaisons make the point to the Members of Congress that this should not have been exposed?

Mr. Comey.  I don't know for sure.  It wasn't classified. It was a private communication to the eight chairs and rankings of the committees that had received information from the FBI. And the Congressional Affairs staff of the FBI thought those were the people it ought to go to.  It was not, as you said earlier, we didn't release anything to the public, but it wasn't classified.

Ms. Jackson Lee.  But I think you can -- would you pretty well agree that 16 addressees is almost inevitably going to be released?

Mr. Comey.  Yes.

Ms. Jackson Lee.  Do you think that the FBI could have been more cautious, whether you did government affairs, 8 days out or how many days out before the election?

Mr. Comey.  I don't know, is the honest answer.  The staff that works Congressional Affairs thought we had to inform these eight committee chairs and rankings.  And so I think about it the way you do, that raised the serious prospect it would be released to the public, and -- but that was a risk we thought we had to run.

Ms. Jackson Lee.  Why did not Attorney General Lynch or Deputy Attorney General Yates not make the announcements of

July 5th, October 28th, or November -- 2016?

Were they consulted?  Did they concur in your judgment?

Mr. Comey.  Separate incidents.  July 5th, I informed them that I was going to make an announcement, and so they weren't consulted on the substance of the announcement.

The October 28th letter, I informed them the day before that I thought I had to inform Congress but would be happy to discuss it with them.  And they said they didn't wish to discuss it with me.

And so in the first instance, I don't think they had much opportunity to engage with me on it because I said I think I need to do this separately.  In October, they did but chose not to take the chance -- take the opportunity.

Ms. Jackson Lee.  Why wouldn't you yield to Deputy Attorney General Yates to make that announcement?  Is that not the normal protocol in any structured law enforcement versus prosecutor from the low level -- let me not call local district attorneys low level -- but from the level of local government all the way up to the Federal Government, that the district attorney, the prosecutor, the attorney general, the attorney general of the State of whatever, makes the announcement regarding any prosecutorial stance?

Mr. Comey.  Definitely.

Ms. Jackson Lee.  And then why was that not done here?

Mr. Comey.  First of all, to agree with the first part of

your question, yeah, the normal circumstances, the Attorney

General would make that announcement with the FBI director --

        Ms. <u>Jackson Lee.</u>   Absolutely.

        Mr. <u>Comey.</u>  -- standing next to her.  Absolutely.  And so

I had never even actually heard of a circumstance where the FBI

made an announcement separate from the -- without coordinating

it with the Attorney General.  I thought we had to do that if

the American people are going to have confidence that the result

was apolitical.

        Now, it would have been great if Loretta Lynch had recused

herself and made Sally Yates the acting attorney general.  I

think what I would have done in that circumstance is hand it to

Sally, who did not have the issues that Loretta had -- I like

them both -- but didn't have the issues that Loretta had with

potential appearance of bias, but Loretta announced that she

would not recuse herself.  She would just accept my

recommendation and that of the career prosecutors.

        And so I felt like I didn't have the option to hand it to

Sally because Loretta had stayed in charge.  That makes sense.

And so I called each of them and said, I'm going to make an

announcement this morning.  I'm not going to coordinate it with

you.  I hope when you see it, you'll understand why.

        And the goal was to make sure the American people knew, this

wasn't the Obama administration.  This wasn't some political

fix.  There was no case there because apolitical professionals

thought so.

Ms. Jackson Lee. Let me move on.

It is true, is it not, that Secretary Clinton's campaign was not the subject of a Federal counterintelligence investigation by our Nation's law enforcement?

Mr. Comey. To my knowledge, it was not.

You're saying the Clinton campaign?

Ms. Jackson Lee. Yes.

Mr. Comey. To my knowledge, it was not.

Ms. Jackson Lee. But the same is not true with respect to the Trump campaign, which was under investigation for colluding with a hostile foreign power to influence the outcome of the 2016 election?

Mr. Comey. The Trump campaign was not under investigation. The FBI, in late July, opened counterintelligence investigations of four Americans to see if they were working in any way with the Russians to influence our elections.

Ms. Jackson Lee. Those individuals were affiliated with the campaign? I believe they were in some form.

Mr. Comey. At least some of them were. The FBI and the Department of Justice have not confirmed the names of those folks publicly, which is why I'm not going into the specifics.

Ms. Jackson Lee. However, during the discovery of that investigation, which was comparable to an investigation of

another candidate, that information was not announced or presented to the American people or asked of the Attorney General to make a statement based upon the facts that the FBI had.  No announcement was made about that.  Is that correct?

Mr. Comey.  That's correct.  And it was treated the way the Clinton investigation had been treated.  We said nothing during the beginning of it.  It wasn't until the following spring that we confirmed to Congress that there even was an investigation of any sort without naming the people.  So the rule actually was consistently applied.

Ms. Jackson Lee.  But you never ever came to the American people during the election to indicate that there were investigations of principals that may have been involved in the Trump campaign on any matter?

Mr. Comey.  That's correct, because of our policies and approach to those investigations, all investigations.

Ms. Jackson Lee.  Let me offer to say, I don't know if the American people could decipher between the distinction.  What is left in the minds is you announced one, you didn't announce the other.

Mr. Comey.  Yeah, I agree with that --

Ms. Jackson Lee.  When you met with the President at the White House on January 27th, 2017, the meeting during which he asked you to let Flynn go, did the President know at the time that the FBI was investigating Russia's interference in the 2016

elections?

Mr. Comey.   The meeting you're referring to was Valentine's Day, February 14th of 2017, not the 27th.   And I don't know --

Ms. Jackson Lee.   I stand corrected.   Thank you.

Mr. Comey.   I don't know what the President knew at that point.

Ms. Jackson Lee.   What did you understand the President to be asking for when he requested that you let Flynn go?   To stop investigating Michael Flynn's conduct or stopping investigating Russian interference of the 2016 election?

Mr. Comey.   The first.   As I've testified, I understood him to be directing me -- asking, but I took it as a direction -- to drop an investigation of Flynn's interaction with the FBI over his conversations with the Russians in the transition.

Ms. Jackson Lee.   What was your impression of that request?

Mr. Comey.   That it was improper and that I was not going to abide by it.

Ms. Jackson Lee.   Were you silent at that time or did you indicate that to the President?

Mr. Comey.   My recollection is he said something about Flynn being a good guy and that he hoped I would let it go.   And I answered, "I agree he's a good guy," or words to that effect, but I didn't agree to his request.   I actually just commented on part of what he had said.

Ms. Jackson Lee.   And did you pursue responding back to him

or was there silence after that?  Meaning, did you engage subsequent to that of his point?  Because, obviously, when the President of the United States speaks, and though you're in an independent agency, he might believe that work should begin on responding to his request.

Mr. Comey.  I don't know what he believed.  I never spoke to him about it again.

Ms. Jackson Lee.  Did you feel a certain pressure?

Mr. Comey.  I felt that he was asking me, directing me to drop a criminal investigation, which I thought was improper, so I went back, wrote a memo about it, briefed the leadership of the FBI so we could figure out what to do about it.

[Comey Exhibit No. 2

Was marked for identification.]

Ms. Jackson Lee.  This is my last question, and it requires an exhibit.  Pages 68, 69 of the transcript from former FBI General Counsel James Baker.

The question was:  "You had said that the President's firing of Director Comey, you considered to be a threat to national security.  And my question was, in what way was it a threat to national security?"

The answer was:  "So the investigation at a high level was about Russia, period, full stop.  And it was trying to assess, in this particular instance, what the Russians were doing or had done with respect to the 2016 Presidential election.  We are

trying to investigate what the Russians did and what any -- and whether there were any Americans or others who had done things in support of those efforts, either knowingly or unknowingly, so that we could understand the full nature and scope of what the Russians had attempted to do.

And so to the extent that this action of firing Director Comey may have been caused by or was the result of a decision to shut down that investigation, which I thought was a legitimate investigation, then that would frustrate our ability to some degree to ascertain what the Russians as well as any other Americans or others had done in furtherance of the objectives of the Russian Federation.

So not only -- I guess the point is not only would it be an issue about obstructing the investigation, but the obstruction itself would hurt our ability to figure out what the Russians had done and what is and what would be the threat to the national security.  Our inability or our -- the inability or the delays, the difficulties that we might have with respect to trying to figure out what the Russians were doing, because our main objective was to thwart them."

Director Comey, do you agree with Mr. Baker's assessment that President Trump's firing you was a threat to national security?

Mr. Comey.  I don't know enough to say to the -- if it's true that the firing was designed to thwart the Russian

investigation, then I would agree, understanding of what Russia was doing.  But I don't know enough about the reasons -- what the real reasons were for the firing to give you a definitive answer.

Ms. Jackson Lee.  Well, Mr. Comey, didn't you write memos about the conversation?  Wasn't it important enough to you as a law enforcement officer who deals with national security to solidify or to cement your memory in a memo?

Mr. Comey.  Sure.

Ms. Jackson Lee.  So wouldn't that lead to a conclusion that this was really a dangerous posture to be in and it might jeopardize national security?

Mr. Comey.  Sure, it might.  I just can't answer the ultimate question as to whether it did because I don't know for certain what the motivation was in firing me.

Ms. Jackson Lee.  In hindsight as well?

Mr. Comey.  Well, I've heard President Trump say on television that he fired me because of the Russia thing.

Ms. Jackson Lee.  So with that in mind, would you say that was a threat to national security?

Mr. Comey.  If that was the reason for the firing.  But I've also heard him say other things at other times that that wasn't the reason, and so it's really not -- I'm not able to answer it because I can't see enough of the facts.  I'm sure that's something the special counsel is examining.

Ms. <u>Jackson Lee.</u>  Do you agree that your firing could have threatened the ability of the FBI to learn what the Russians as well as any other Americans or others had done in the furtherance of the objectives of the Russian Federation?

Mr. <u>Comey.</u>  Potentially.

Ms. <u>Jackson Lee.</u>  In the past 18 months since that testimony, do you feel more certain that you were fired because of the Russian investigation?  If so, why?

Mr. <u>Comey.</u>  I'm still in the same place, that I've heard the President say that, but I've also heard him say different things.  So I can't answer the question.

Ms. <u>Jackson Lee.</u>  Is there any need to further investigate Hillary Clinton's emails based upon the decision that you made not to prosecute?

Mr. <u>Comey.</u>  Not that I can possibly see.

Ms. <u>Jackson Lee.</u>  You consider this case closed?

Mr. <u>Comey.</u>  Yes.  There's no serious person who thinks there's a prosecutable case there.  And so, not that can I see.

Ms. <u>Jackson Lee.</u>  I yield.  Thank you.

Mr. <u>Cummings.</u>  Thank you very much.

Director Comey, Elijah Cummings, the ranking member of the Oversight Committee.

You've already testified to Congress about the Russia investigation a number of times.  The last time was June 2017 during the Senate Intelligence Committee hearing, so that was

about 18 months ago.

During your June 2017 testimony before the Senate Intelligence Committee, you stated, and I quote, "The Russia investigation itself is vital because of the threat, and I know I should have said this earlier, but it's obvious if any Americans were part of helping the Russians do that to us, that is a very big deal," end of quote.

Director Comey, can you elaborate on what, quote, "the threat," unquote, is that makes the Russia investigation so vital?

Mr. Comey.  The aim of the Russian effort in 2016 was to destabilize, undermine, damage our democracy.  That was their overwhelming goal.  And so you have a foreign nation that is attacking the United States of America in an effort to undermine that which is essentially us, our democratic process.  So that's a very serious threat.  And understanding whether any Americans were part of that effort is incredibly important because the threat of those Americans by virtue of their alliance with the Russians would pose to our country.

Mr. Cummings.  Can you describe for us the magnitude of the national security threat the FBI was investigating?

Mr. Comey.  Well, I don't know that I can say it better than I just said it.  We saw, as did the rest of the intelligence community, in 2016, the Russians engaged in a widespread, sophisticated effort to undermine this democracy, to hurt one

of the candidates, Secretary Clinton, and to help the other
candidate, Donald Trump.  Given the stakes of the election and
the nature that we are a democracy, it is hard to imagine anything
more important than understanding and thwarting that threat.

Mr. <u>Cummings.</u>  If someone were to impede or prematurely
halt the special counsel's Russia investigation, how severe
would the implications be to our national security, in your
opinion?

Mr. <u>Comey.</u>  Well, in my opinion, it would undermine our
national security by not holding accountable people who might
have been involved in either the Russians or people who worked
with them, first.  And second, it would send an absolutely
appalling message about the rule of law in this country of ours.

Mr. <u>Cummings.</u>  And would there also be severe implications
for our democracy and the rule of law?

Mr. <u>Comey.</u>  Yes.  The Russians' goal was for everyone in
the world to have doubt about the nature and credibility of the
American democracy, to dirty it up so it's not a shining city
on the hill.  So their attack had implications for that, the role
of the American democratic experiment.  And if someone were to
order it stopped, the investigation into that, it would have a
similar effect.

Mr. <u>Cummings.</u>  You stated it was, quote, "obvious," end
quote, that any Americans helping the Russians interfere with
our election is a big deal.  And I agree.

Can I ask you to spell out in as basic terms as possible why that would be a very big deal?  I also think it is a big deal that the President's campaign chairman and his national security advisor both pleaded guilty to committing crimes.  Michael Flynn and the President's national security advisor pleaded guilty to having lied to the FBI about his contacts with the Russian Government, about sanctions.  So the national security advisory lied about his contacts with the foreign government over a national security issue.

How serious of a national security risk is it to have the national security advisor lying about his contacts with a foreign government adversary to the FBI and the American people?

Mr. Comey.  Mr. Cummings, I don't think I can answer the last part of that question because it touches on the work of the special counsel.

I can answer the first part, which is, the reason it's a big deal is you have an adversary nation attacking America.  If Americans in our country are assisting them, it's aiding and abetting the enemy in attacking our country.

We take it seriously when people were helping German saboteurs infiltrate Long Island during World War II.  We take it seriously when scientists are selling secrets to the Soviets about our nuclear capabilities.  I take it just as seriously if there are Americans who were -- and I'm not saying that there were -- but if there were Americans who were assisting this

attack on our democracy, it's of the same type, which is why I said it's so obvious.

Mr. Cummings.  The President's national security advisor has access to our country's most closely held secrets.  The Russians knew that, and they had talked to Flynn and what he talked about, and they knew that Flynn and others in the White House were lying about those communications.

Does that create the concern that the national security advisor had been compromised by a foreign adversary?

Mr. Comey.  I think I have to give you the same answer about the particular, that even though the man has pled guilty, it's still something I think is within the purview of the special counsel, so I ought not to be opining on it.

Mr. Cummings.  All right.  What is the risk to our country of having the person with access to our most closely held secrets be compromised or potentially compromised by a foreign adversary?  And I'm not saying that you're concluding that it happened.  I am just asking, what's the risk, if that were the case?

Mr. Comey.  Thank you for that.

Mr. Cummings.  You follow me?

Mr. Comey.  Yeah, I follow you, and I'd like to take it to one more level of abstraction.

Mr. Cummings.  Sure.

Mr. Comey.  Not talk about any particular person.

A big part of the FBI's counterintelligence work in the United States is trying to understand whether foreign adversaries have gained any leverage over anyone in a position to influence a policy of the United States Government or to reveal its secrets.   And so it's at the heart of our counterintelligence work, because that's how the bad guys overseas hurt us.   One of the ways is they co-opt people, recruit them, or coerce them into giving up information that's inconsistent with American interest.   And so it's a critical issue without regard to the person.

Mr. Cummings.  Okay.  When Deputy Attorney General Sally Yates learned of the significant national security risk, she went over and warned the White House counsel, who was Don McGahn.

Proper protocol when the White House learned about that potential national security risk would have been for the White House to suspend General Flynn's access to classified information while they looked into the matter, but they didn't do that.  So we've been told that General Flynn held his active clearance until he was fired by the White House about 18 days later.

In your experience at the FBI, when the FBI learned that an individual who had an active security clearance might be a risk to our national security, did the FBI follow the standard procedure I described and suspend that individual's security clearance pending an investigation?

Mr. Comey. Well, obviously I can't comment on the particulars of the Flynn case.

Mr. Cummings. Right.

Mr. Comey. But in general --

Mr. Cummings. Would that be -- no, you go ahead.

Mr. Comey. A normal response would be to suspend their clearance, but there may be operational reasons why you wouldn't do that. Say you have somebody inside the FBI you think might be a spy. You don't want to alert them to the fact that you're on to them. Suspending their clearance might alert them that you're on to them. So you might instead just try to put them in a bit of a box and restrict the information there without them knowing.

Mr. Cummings. Assuming -- so the question then becomes, in your opinion, why would a suspension of a clearance be significant there, assuming you don't have that history that you just stated?

Mr. Comey. Well, if we had someone in the FBI that we thought might be working for a foreign power, you want to stop the damage. And so that's why the normal practice, absent operational concerns, would be to stop the damage by cutting off their access to information that they might give to the adversary.

Mr. Cummings. Just a few more questions.

You have decades of dedicated service to our country and

have served in senior roles at the Department of Justice and as the head of the FBI, and so I want to get your views about national security.

Do you think that President Trump's actions pose a treat to our national security?  Can you explain?

Mr. Comey.  Well, I think -- maybe the best answer I can give is, I think the relentless attacks on the institutions of justice are something we will all be sorry we stood silent, if we stood silent and watched that happened.  Because those institutions, the Justice Department and the FBI, and the rest of the intelligence community, are essential to our national security, that they are credited and believed, which they should be.  And when you run them down for political reasons, you may see a short-term gain; you see a long-term damage to our country and its security.

Mr. Cummings.  Where do we go from here, Mr. Comey, and how do we rebuild after the attacks on our democratic institutions and the constant breaching of our ethical norms?

Mr. Comey.  Well, our consolation should be the depth and strength of America's values.  The FBI will be fine.  It will snap back, as will the rest of our institutions.  There will be short-term damage, which worries me a great deal, but in the long run, no politician, no president can, in a lasting way, damage those institutions, because their values are too strong.  The American military, the intelligence community, the law

enforcement community, it would take generations to screw them up in a permanent way. So we're going to be okay.

What falls to all of us is to speak up so that we reduce the damage in the short run and don't become numb to something that, frankly, we should all be ashamed of. And I think a whole lot of people will be ashamed of some day that they stood silent while this happened.

Mr. Cummings. Well, thank you for your service, sir.

Mr. Gomez. Thank you.

Mr. Comey, Congressman Jimmy Gomez from California.

A few questions. There have been a lot of discussion about bias here. I wanted to bring up the potential nominee for the next Attorney General of the United States, Bill Barr.

Bill Barr has stated that he sees more reason for the Department of Justice to investigate Hillary Clinton's tenure as Secretary of State than investigate conspiracy between the Trump campaign and Russia. Do you think this is a useful and reasonable allocation of DOJ or FBI resources?

Mr. Comey. I don't. So it's hard for me to react, Congressman, to a statement. I don't know what he meant by that or what the full context was. Unless there are facts that I didn't see when I was Director of the FBI, I don't see a basis for continued investigation on the email front. I don't know what he -- I can't imagine he saw something as a private citizen, so I don't know what to think of that. And I think very highly

of him.  I mean, I used to work for him.  I probably know him better than I know Bob Mueller.  I probably just damned him by saying he's a friend of mine, but I respect him.  I just don't know what he meant by that.

Mr. Gomez.  Do you think Bill Barr may be acting out of political motivation when suggesting a new Clinton probe?

Mr. Comey.  I don't know.

Mr. Gomez.  Bill Barr supported Trump during the campaign. And then during the campaign, he also publicly supported your decision to disclose the Clinton investigation had been reopened.  Later, however, he supported President Trump's decision to fire you on the basis that you, quote/unquote, sandbagged the Department of Justice with your unilateral action on the Clinton probe.

Do you think that Bill Barr is fit to oversee the FBI and the special counsel investigation in a nonpartisan manner if he were to return to serve as Attorney General?

Mr. Comey.  I think he's certainly fit to be Attorney General.  As I said, I think very highly of him.  Whether he should be involved in those particular cases or not is a question I can't answer.  I'm sure he'll reflect on it carefully, he's a very smart guy, and get expert advice on it.  I just can't answer it without knowing more.

Mr. Gomez.  What factors would he take into consideration if he were to be involved in overseeing the special counsel

investigation?

Mr. <u>Comey.</u>  Well, most importantly you want to consider, any time you are a leader of an institution of justice, whether there's a reasonable appearance that you lack the impartiality necessary to be involved in a particular case.  And so you'd want to look at prior statements, prior engagement in litigation, those kinds of things to see whether reasonable folks could have a doubt about whether you are calling it as you see it or on one team or the other.  And given the things you just laid out, it raises a question with respect to him, so I'm sure he's going to want to look at it, as will the Senate, very closely.

Mr. <u>Gomez.</u>  What do you think may be the factors that led President Trump to nominate or will nominate Bill Barr as Attorney General?

Mr. <u>Comey.</u>  I don't know.  I know Bill for years and his record as a lawyer and as the Attorney General, and I think they're impressive.  But I don't know what the President was thinking.

Mr. <u>Gomez.</u>  I do believe that Congress has a role in the oversight of the executive branch.  My concern is what are the lines of that oversight.  What factors could you take into account that oversight leads to interference with an ongoing investigation?  Or is there anything in your mind that would be off limits?

Mr. <u>Comey.</u>  Well, hard to answer in the abstract.  I mean,

I can say this:  I'm a big fan of oversight.  My staff used to think I was kidding when I said I want to come here and answer every question when I was Director of the FBI.

I think it's important that this branch of government exercise its power.  I think one of the really bad things about the drift of American history, in my lifetime, is this organization, this institution has given up a lot of its power. And so I like the idea of oversight.

That said, investigations have to be done with a Lady Justice with a blindfold on, and so you really can't have oversight by a political branch of ongoing investigations and still credibly claim that the Lady Justice is wearing the blindfold.  So what I would suggest is you do oversight after investigations are completed to see if the institution was acting in an appropriate way.

As I said, when I moved to quash the subpoena, I support oversight of the executive branch.  I just have concerns about interference with ongoing investigations, and when oversight moves from seeking truth to seeking something else, it concerns me.

Mr. Gomez.  Some of the questions that have been brought up to me from my constituents relate to the decision to reveal the Hillary Clinton investigation 11 days before an election but not regarding the individuals that were being investigated in regards to any potential conspiracy with the Trump

administration or the Russian Government.

Can you get into that a little bit? I know you did earlier, but there is still -- you're getting shots from both sides of the aisle and on some of the decisionmaking. And my constituents are really interested in that response.

Mr. Comey. Yes. It's a reasonable question, yes. Everybody seems to think I'm on somebody else's side, but the treatment of the two cases illustrates the rule.

In the Clinton investigation, we didn't say anything about that investigation for a year, except simply 3 months in to confirm that we had an investigation. And that was an investigation that began publicly, with a public referral. So the whole world knew we had it. We formally confirmed it after investigating for 3 months, then we said nothing until it was done.

That's the way we treated the Russian counterintelligence investigations. We opened them in late July, didn't know whether we had anything. In fact, when I was fired as director, I still didn't know whether there was anything to it. And so we would never consider making a statement about classified investigations that were just beginning.

The problem in late October was we -- me and Loretta Lynch -- had told the world, "We're done with the Clinton email investigation. Move on." And I got hammered in this room by Republicans, and in many other rooms. And I stood my ground and

said, "No, there's no there, there.  Move on."

On October 27th, I learned that that was no longer true. And I had my team telling me, not only is it no longer true, but the result may change from our review of these hundreds of thousands of emails, and we can't finish it before the election.

And so what do I do?  Do I stay silent and leave the Congress and the American people relying on something I now know is a lie or do I speak?  And those are two really bad options.  And my choice was to take the least bad.  Tell Congress what I told you repeatedly is no longer true and try to make sure it's, "we don't know," "we're not sure," but to speak.  Because to conceal would be to destroy the FBI and the Department of Justice.

Forget Hillary Clinton's Presidency, although that would be severely damaged if she became President on that basis.  I made the judgement that the Department of Justice and the FBI will be ruined if I concealed a lie from this Congress. Reasonable people can disagree about that, but it illustrates that we treated the two consistently.  And what trapped us in October was we had told everybody it was over in the summertime.

Mr. Gomez.  Thank you.

Ms. Sachsman Grooms.  We're out of time.

We'll go off the record.

[1:00 p.m.]

Mr. Gowdy.  We'll go back on the record.

Director Comey, I'm going to summarize from a portion of what we refer to as the Comey memos.  This one is from February of 2017.  I don't know whether or not you have a copy of your memos or whether or not you have recollection of what's in them.

Mr. Kelley.  We don't have copies with us.  If you want to give them to us, it might expedite things.

Mr. Gowdy.  And, again, this is one from February of 2017.

Mr. Comey.  Which date in February?

Mr. Gowdy.  I want to say it's the 14th, but I could be wrong -- 14th.

Mr. Comey.  Okay.  Got it.

Mr. Gowdy.  And at the top, it says, "I attended an Oval Office" -- you got that one?

Mr. Comey.  I got it.

Mr. Gowdy.  Fourth paragraph, and just tell me whether or not I'm fairly summarizing this.  I'm not going to read it all, but:  He -- and I assume "he" is the President, President Trump -- began by saying he wanted want to talk about Mike Flynn. That's in quotes.  He said that, although Flynn hadn't done anything wrong in his call with the Russians, he had to let him go because he misled the Vice President, whom he described as a good guy.  Now, was the "he" -- is the "he" modifying Vice President Pence or Mike Flynn, when you say whom he described

as a, quote, good guy?

Mr. <u>Comey.</u>  I took him to be meaning Mr. Flynn is a good guy.

Mr. <u>Gowdy.</u>  Okay.  He explained that he just couldn't have Flynn misleading the Vice President.  In any event, he had other concerns about Flynn; he had a great guy coming in, so he had to let Flynn go.  Have I fairly summarized that paragraph?

Mr. <u>Comey.</u>  Yes.

Mr. <u>Gowdy.</u>  All right.  Next page, second full paragraph, I think.  Yeah, second full paragraph, it begins:  He then.

You got it?

Mr. <u>Comey.</u>  Got it.

Mr. <u>Gowdy.</u>  He then returned to the topic of Mike Flynn, saying:  Flynn's a good guy and has been through a lot.  He misled the Vice President, but he didn't do anything wrong in the call.  Said:  I hope you can see your way clear of letting this go, to letting Flynn go.  He is a good guy.  I hope you can let this go.  I replied by saying I agree he is a good guy, but said no more.

Have I fairly described that paragraph?

Mr. <u>Comey.</u>  Yes.  In fact, I think you read it.

Mr. <u>Gowdy.</u>  Do the contents of that paragraph, are they sufficient to launch an obstruction of justice investigation?

Mr. <u>Comey.</u>  Potentially.

Mr. <u>Gowdy.</u>  What part of it potentially could lead to the

initiation of an obstruction of justice investigation?

Mr. <u>Comey.</u>  The President asking -- one interpretation of it is the President asking the FBI to drop a criminal investigation.

Mr. <u>Gowdy.</u>  Did you act or fail to act in any way in the Flynn matter because of what the President said to you?

Mr. <u>Comey.</u>  Act or fail to act?  I didn't abide this direction.  In fact, kept it to a fairly small group in FBI headquarters so it would not have any impact on the investigation.

Mr. <u>Gowdy.</u>  But I'm asking you specifically --

Mr. <u>Comey.</u>  I took acts -- the reason I'm hesitating is I took acts to make sure it had no impact on the investigation.

Mr. <u>Gowdy.</u>  I'm with you, but it did not -- did his comments prevent you from following the leads that you thought should have been followed?

Mr. <u>Comey.</u>  No.

Mr. <u>Gowdy.</u>  Did his comments prevent you from taking any act as the Director of the FBI that you thought were warranted by the other fact pattern?

Mr. <u>Comey.</u>  No.  This had -- I did not abide this.  And it did not affect the investigation, so far as I'm aware, in any way.

Mr. <u>Gowdy.</u>  Did you initiate an obstruction of justice investigation based on what the President said?

Mr. Comey.  I don't think so.  I don't recall doing that,
so I don't think so.

Mr. Gowdy.  Would you recall initiating a criminal
investigation into the President of the United States?

Mr. Comey.  Yes, I'm sorry.  I didn't personally, but I
took it also to mean, did anyone else in the FBI open a file with
an obstruction heading or something?  Not to my knowledge is the
answer.

Mr. Gowdy.  Did you talk to Andy McCabe the day you were
fired?

Mr. Comey.  I don't think so.  I don't think -- it's
possible, but I don't think so.

Mr. Gowdy.  Did you talk to Lisa Page the day you were fired?

Mr. Comey.  That I'm sure of.  No.

Mr. Gowdy.  Did you talk to Peter Strzok the day you were
fired?

Mr. Comey.  No.

Mr. Gowdy.  Do you know whether or not an obstruction of
justice investigation was launched the day you were fired?

Mr. Comey.  I don't.

Mr. Gowdy.  If Flynn had said, "Director Comey" -- I'm
sorry.

If President Trump had said, "Director Comey, General Flynn
made a mistake, and he didn't have the intent to violate the law,"
would you have viewed that as obstruction?

Mr. Comey.  I can't answer that hypothetical.

Mr. Gowdy.  Well, we're going to have to get our way through it a little bit.  Is someone saying, "Look, he just made a mistake" -- mistake is a defense to certain crimes, right?  So that could be interpreted as didn't commit a criminal offense.

Mr. Comey.  The reason I don't feel comfortable going into hypotheticals is obstruction is a crime that turns on intent, and I can't speak in -- either in fact or in hypotheticals to intent here.

Mr. Gowdy.  Well, what was the President's intent when -- in your opinion, when he said, "I hope you can see your way clear to letting this go"?

Mr. Comey.  I don't know for sure.

Mr. Gowdy.  So it would be the failure of an essential element of an obstruction of justice case if the person who received that information did not view it as an attempt to impact his decisionmaking?

Mr. Comey.  I don't think that's right as a matter of law. I don't think the reaction of the object of the obstructive effort, their perception, is dispositive.

Mr. Gowdy.  Were you obstructed?

Mr. Comey.  Because I think I could have -- I could endeavor to obstruct something and you not realize what I'm doing.

Mr. Gowdy.  Were you obstructed?

Mr. Comey.  Well, I don't know -- there was no impact, so

far as I'm aware, on the investigation, from this conversation.

Mr. Gowdy.  If he had said, "Look, General Flynn doesn't have the intent to commit a crime," how would you have viewed that?

Mr. Kelley.  Do you understand the question?

Mr. Comey.  Yeah, I still would not offer an opinion as to what his intention was in doing that.  I would find it very concerning, just as I found this very concerning, but I didn't then, and I don't now, have an opinion on the ultimate question about whether it was obstruction.

Mr. Gowdy.  Well, the reason I ask general -- Director Comey, is, there was another Chief Executive who referred to an ongoing criminal matter by saying she made a mistake, and she lacked criminal intent.  Did you view that as potentially obstruction of justice?

Mr. Comey.  Talking about President Obama now?

Mr. Gowdy.  Yes.

Mr. Comey.  I didn't see it as -- through the lens of obstruction of justice.  I saw it as threatening our ability to credibly complete the investigation.

Mr. Gowdy.  In what way?

Mr. Comey.  The President of the United States offering a view on a matter or a case that's under investigation, when that President is of the same party as the subject of the investigation and working for her election, would tend to cast doubt in

reasonable people's minds about whether the investigation had been conducted and completed fairly, competently, and independently.

Mr. Gowdy.  So, if it doesn't rise to the level of obstruction, how would you characterize the Chief Executive saying that the target of an investigation that was ongoing simply made a mistake and lacked the requisite criminal intent?

Mr. Comey.  It would concern me.  It concerns me whenever the Chief Executive comments on pending criminal investigations, something we see a lot today, which is why it concerned me when President Obama did it.

Mr. Gowdy.  Well, it concerns me too, Director Comey.  I'm also concerned that people treat similarly situated people the same.  And did you make a memo after President Obama said she made a mistake and lacked the requisite criminal intent?

Mr. Comey.  He said that on FOX News.

Mr. Gowdy.  Right.

Mr. Comey.  I did not make a memo about the FOX News broadcast.

Mr. Gowdy.  Did you have a meeting with your investigative team to make sure that they were not in any way impacted by what he said?

Mr. Comey.  No.

Mr. Gowdy.  Who is Christopher Steele?  Well, before I go to that, let me ask you this.

At any -- who interviewed General Flynn, which FBI agents?

Mr. Comey.  My recollection is two agents, one of whom was Pete Strzok and the other of whom is a career line agent, not a supervisor.

Mr. Gowdy.  Did either of those agents, or both, ever tell you that they did not adduce an intent to deceive from their interview with General Flynn?

Mr. Comey.  No.

Mr. Gowdy.  Have you ever testified differently?

Mr. Comey.  No.

Mr. Gowdy.  Do you recall being asked that question in a HPSCI hearing?

Mr. Comey.  No.  I recall -- I don't remember what question I was asked.  I recall saying the agents observed no indicia of deception, physical manifestations, shiftiness, that sort of thing.

Mr. Gowdy.  Who would you have gotten that from if you were not present for the interview?

Mr. Comey.  From someone at the FBI, who either spoke to -- I don't think I spoke to the interviewing agents but got the report from the interviewing agents.

Mr. Gowdy.  All right.  So you would have, what, read the 302 or had a conversation with someone who read the 302?

Mr. Comey.  I don't remember for sure.  I think I may have done both, that is, read the 302 and then spoke to people who

had spoken to the investigators themselves.  It's possible I spoke to the investigators directly.  I just don't remember that.

Mr. Gowdy.  And, again, what was communicated on the issue of an intent to deceive?  What's your recollection on what those agents relayed back?

Mr. Comey.  My recollection was he was -- the conclusion of the investigators was he was obviously lying, but they saw none of the normal common indicia of deception: that is, hesitancy to answer, shifting in seat, sweating, all the things that you might associate with someone who is conscious and manifesting that they are being -- they're telling falsehoods. There's no doubt he was lying, but that those indicators weren't there.

Mr. Gowdy.  When you say "lying," I generally think of an intent to deceive as opposed to someone just uttering a false statement.

Mr. Comey.  Sure.

Mr. Gowdy.  Is it possible to utter a false statement without it being lying?

Mr. Comey.  I can't answer -- that's a philosophical question I can't answer.

Mr. Gowdy.  No, I mean, if I said, "Hey, look, I hope you had a great day yesterday on Tuesday," that's demonstrably false.

Mr. Comey.  That's an expression of opinion.

Mr. Gowdy. No, it's a fact that yesterday was --

Mr. Comey. You hope I have a great day --

Mr. Gowdy. No, no, no, yesterday was not Tuesday.

Mr. Comey. Oh, see, I didn't even know that. Yeah.

Mr. Gowdy. So is it possible to make a false statement without having the intent to deceive?

Mr. Comey. Yes.

Mr. Gowdy. All right. Is making a false statement without the intent to deceive a crime?

Mr. Comey. I don't know. I can't answer that without thinking better about it.

Mr. Gowdy. So would it, therefore, be relevant, whether or -- I'll let you finish talking to your lawyer.

Mr. Comey. Sorry, go ahead.

Mr. Gowdy. Would it, therefore, be relevant whether or not General Flynn had an intent to deceive?

Mr. Comey. Let me step away from the case. In investigating any false statement case, you want to understand, did the defendant, the subject, know they were making a false statement? Because you aren't prosecuted for accidents, slips of memory, things like that. So, in any false-statement case, it's important to understand, what's the proof that they knew what they were saying was false?

Mr. Gowdy. And, again -- because I'm afraid I may have interrupted you, which I didn't mean to do -- your agents, it

was relayed to you that your agents' perspective on that
interview with General Flynn was what?  Because where I stopped
you was, you said:  He was lying.  They knew he was lying, but
he didn't have the indicia of lying.

Mr. Comey.  Correct.  All I was doing was answering your
question, which I understood to be your question, about whether
I had previously testified that he -- the agents did not believe
he was lying.  I was trying to clarify.  I think that reporting
that you've seen is the product of a garble.  What I recall
telling the House Intelligence Committee is that the agents
observed none of the common indicia of lying -- physical
manifestations, changes in tone, changes in pace -- that would
indicate the person I'm interviewing knows they're telling me
stuff that ain't true.  They didn't see that here.  It was a
natural conversation, answered fully their questions, didn't
avoid.  That notwithstanding, they concluded he was lying.

Mr. Gowdy.  Would that be considered Brady material and
hypothetically a subsequent prosecution for false statement?

Mr. Comey.  That's too hypothetical for me.  I mean,
interesting law school question:  Is the absence of
incriminating evidence exculpatory evidence?  But I can't
answer that question.

Mr. Gowdy.  Well, you used to be the United States Attorney
for the Southern District of New York.  Would you have turned
over that information?

Mr. Comey.  I can't answer that in the abstract.  I just can't.  It depends upon too many unique circumstances to a case.

Mr. Gowdy.  Who is Christopher Steele?

Mr. Comey.  My understanding is that Christopher Steele is a former intelligence officer of an allied nation who prepared a series of reports in the summer of 2016 that have become known as the Steele dossier.

Mr. Gowdy.  How long did he have a relationship with the FBI?

Mr. Comey.  I don't know.

Mr. Gowdy.  Did you ever meet him?

Mr. Comey.  No.

Mr. Gowdy.  Never met him, never talked to him?

Mr. Comey.  Sorry.

Okay.  No, I never met him, never spoken to the man.

Mr. Gowdy.  When did you learn he was working for Fusion GPS?

Mr. Comey.  I don't know that I ever knew that -- certainly while I worked at the FBI.  I think I've read that in open source, but I didn't know that while I was FBI.

Mr. Gowdy.  Who did you think he was working for?

Mr. Comey.  I thought he was retained as part of a Republican-financed effort -- retained by Republicans adverse to Mr. Trump during the primary season, and then his work was underwritten after that by Democrats opposed to Mr. Trump during

the general election season.

Mr. Gowdy.  When did you learn that his work went from being financed by what you described as Republicans to what you described as Democrats?

Mr. Comey.  Sometime in September, October, is my best guess.  I don't remember for sure, when I was briefed on the materials that had been provided to the FBI.

Mr. Gowdy.  Well, ordinarily, it wouldn't be important whether it was December or October, but --

Mr. Comey.  September or October.

Mr. Gowdy.  Right.  Ordinarily, it wouldn't be important.  Just so happens, in this fact pattern, it might be.

Pardon me?

Mr. Kelley.  I thought you said "December or October."

Mr. Gowdy.  Oh, December -- or September?

Mr. Kelley.  You said September first; he said --

Mr. Gowdy.  Ordinarily -- let me correct it then.

Ordinarily, it wouldn't be important whether it was September or October.  In this fact pattern, it may be.  Do you have any recollection, did anything else happen in September or October that may refresh your recollection on when you learned it?

Mr. Comey.  No.  It was either September/October, is my best recollection.  If I had to say, which I will, more likely September than October, but I'm really not certain.

Mr. <u>Gowdy.</u>  Do you know whether you learned it before there were any court filings or pleadings filed in connection with the Russia investigation?

Mr. <u>Comey.</u>  Court filings?  I don't remember court filings.  Oh, you're talking about FISA?  Sorry.

Mr. <u>Gowdy.</u>  I was trying to avoid use of the word, but that's okay.

Mr. <u>Comey.</u>  I think it's been used publicly, which is why I just used it.

Mr. <u>Gowdy.</u>  I think it has too, but that doesn't mean it should have been.

Mr. <u>Comey.</u>  Yeah.

I certainly learned of it before the end of October.  And I think the filing that you're referring to obliquely was at the end of October sometime.  So it was before that.

Mr. <u>Gowdy.</u>  When did you learn that Fusion GPS was hired by Perkins Coie?

Mr. <u>Comey.</u>  I never learned that, certainly not while I was Director.

Mr. <u>Gowdy.</u>  Well, when did you learn the DNC had hired Perkins Coie?

Mr. <u>Comey.</u>  I never learned that.  Again, while I was Director.  I think I've read it in the media, but, yeah, even today, I don't know whether it's true.

Mr. <u>Gowdy.</u>  Now, when you say you never learned it but may

have read it in the media --

Mr. <u>Comey.</u>  After I left as Director.

Mr. <u>Gowdy.</u>  While you were the Director, you never knew that the DNC hired a law firm that hired an oppo research firm that hired Christopher Steele?

Mr. <u>Comey.</u>  No, I don't think so.  I don't have any recollection of being told that or reading that or learning that while I was Director.

Mr. <u>Gowdy.</u>  Is it relevant to you who was paying Chris Steele?

Mr. <u>Comey.</u>  Yes, in the sense that I thought it was important to understand that it was politically motivated effort, first by Republicans, then by Democrats.

Mr. <u>Gowdy.</u>  Whose obligation in the Bureau would it have been to bring it to your attention?

Mr. <u>Comey.</u>  I don't know about your use of the word "obligation."  I'd have to think that through more carefully, but I do know that I was told about it, I think, by the general counsel, but I'm not sure.  And I don't know whether that stemmed from an obligation.

Mr. <u>Gowdy.</u>  All right.  We'll get at that another way.  The word "obligation" stemmed from the fact that this is a counterintelligence investigation into a political campaign. I think you testified -- and I hope you agree -- the source who was paying for that information would be relevant.

Mr. Comey.  First of all, I have to disagree with your
assertion that it was a counterintelligence investigation into
a political campaign.  I've said that earlier, that it wasn't.
It was four counterintelligence files on four Americans.  The --

Mr. Gowdy.  I know you said that, Director Comey, but I
think you --

Mr. Kelley.  Let him finish his answer, please.

Mr. Comey.  Who -- who paid and the particulars of who paid
would be important to people working the case, but the level of
specificity that the Director needed to know is, to my mind, a
different question.

Mr. Gowdy.  If the Director were signing a court filing that
had a representation in it, the Director would want to know
whether or not those representations were accurate.

Mr. Comey.  The Director would want to know that the
process -- carefully constructed process of the FBI had been
followed, that the right people had reviewed things, that the
right signoffs had been held, before I would sign the
certification that came with it.  That's probably the most I can
say about the role of the Director in a FISA.

Mr. Gowdy.  Was Christopher Steele also working with or for
the Bureau while he was working for Fusion GPS?

Mr. Comey.  I don't know.

Mr. Gowdy.  Do you know whether the FBI was paying
Christopher Steele for any of his work in the fall -- summer or

fall of 2016?

Mr. <u>Comey</u>.  My recollection is that the FBI was not paying him, that the FBI had reimbursed him for some travel expenses and had raised the prospect that if there was fruitful further work, he could be paid for it.  But my recollection is that he was not paid.  These are the things I remember learning when I was Director.  Could be wrong, but I think that's what I was told.

Mr. <u>Gowdy</u>.  I think you have answered the next question then.  Assuming that you are incorrect and the FBI was paying him, you don't recall how much the FBI paid him?

Mr. <u>Comey</u>.  Well, as I said, my recollection is that he was reimbursed for expenses and that he was not paid for his work in connection with the Russia subject, but that the prospect was raised.  So, of course, given that I don't recall that he was paid for his work, the answer would be I don't recall how much he was paid because he wasn't paid, in my recollection.

Mr. <u>Gowdy</u>.  When the Bureau uses sources or informants, are there agreements signed?  Are there certain obligations on behalf of the source or the informant?

Mr. <u>Comey</u>.  Yeah, I'm not expert enough to answer that. I'm sure that there are, but I don't know the particulars.

Mr. <u>Gowdy</u>.  Is it -- would it be unusual for the FBI to tell a source or an informant, you can't commit any other crimes while you're working for the Bureau?

Mr. <u>Comey</u>.  I believe that's the case.

Mr. Gowdy.  Would it be unusual for the Bureau to tell a source or an informant, you can't have media contacts while you're working for the Bureau?

Mr. Comey.  I don't know whether that's part of the standard warnings or directions to a source.

Mr. Gowdy.  And you're not familiar --

Mr. Kelley.  Excuse me.  One second, please.

Mr. Comey.  Okay, thank you.

I'm sorry.  Go ahead.

Mr. Gowdy.  How did Chris Steele's information reach the FBI?

Mr. Comey.  I don't know for sure.  I have some recollection that he passed it to an agent that he knew and that that agent sent it on to headquarters.  I think that's the way in which it reached the Counterintelligence Division, but I don't remember the specifics of that.

Mr. Gowdy.  How did the Bureau investigate whatever information Steele provided?

Mr. Comey.  I don't know in particular.  I know that the Counterintelligence Division was investigating various aspects of the reports he had supplied, and that investigation was ongoing when I was fired.

Mr. Gowdy.  Do you know whether the Bureau endeavored to either contradict or corroborate factual assertions made in what has later been described as the Steele dossier?

Mr. Comey.  My understanding is that that effort -- that
an effort was under way to try to replicate, either rule in or
rule out, as much of that collection of reports that's commonly
now called the Steele dossier as possible, and that that work
was ongoing when I was fired.

Mr. Gowdy.  When did that work begin?

Mr. Comey.  My recollection is sometime in '16, but I don't
know when.

Mr. Gowdy.  Before or after it was used in a court filing?

Mr. Comey.  I think before that.  I think -- I think when
it was received, there was an effort immediately to try and
evaluate it to understand it, and that continued over the next
6 months.

Mr. Gowdy.  What is the basis of your belief that there was
an immediate attempt to corroborate or contradict the underlying
factual assertions?

Mr. Comey.  I have some recollection, vague, of being told
we're trying to assess this to understand what we can make of
it, what parts we can rely on, what parts we can't.  But I
don't -- I don't remember more than that.

Mr. Gowdy.  Was Steele the original source of the
information, or did he himself have sources and subsources?

Ms. Bessee.  Mr. Chairman, to the extent that it
goes -- your line of questioning goes beyond Christopher Steele
in particular and into other sources that may impact special

counsel's investigation, I will have to instruct the witness not to answer the questions.

Mr. Gowdy.  He can't answer whether Chris Steele was the original source for all of the information in the Steele dossier?

Ms. Bessee.  To the extent it goes into --

Mr. Gowdy.  I didn't mention the phrase "special counsel."

Ms. Bessee.  I know you have not, Mr. Chairman.

Mr. Gowdy.  I'm just asking the former Director of the FBI, who received information from a source, whether that source had knowledge of the underlying accuracy of that information or whether the source was relying on other sources.  I don't know how that implicates anything Bob Mueller's doing.

Ms. Bessee.  If the source relies on other information, because this is all part of an ongoing investigation, it may impact --

Mr. Gowdy.  How?

Ms. Bessee.  Why don't we have the witness -- if it impacts the investigation, because the witness has knowledge as to whether it would or not, he may not be able to answer the question. So I will have the witness --

Mr. Gowdy.  That's a different answer if he doesn't -- if he doesn't have recollection.

Do you know whether Chris Steele relied on sources and subsources to compile the information that ultimately made it to the FBI?

Mr. <u>Comey.</u>  My recollection is he did have a source network of sources and subsources and that this collection of reports reflected reporting by those, that source network.

Mr. <u>Gowdy.</u>  Did the FBI make any effort to identify those sources and subsources that Steele would have relied upon?

Mr. <u>Comey.</u>  Yes.

Mr. <u>Gowdy.</u>  With success?

Mr. <u>Comey.</u>  I don't remember, and I think I don't remember because the work was not finished before I left.

Mr. <u>Gowdy.</u>  I'm not asking you for names, but I'm asking you for a sense of scope.  How many sources and subsources did Steele rely upon?

Ms. <u>Bessee.</u>  Mr. Chairman, again, the number or the how many sources or subsources would go to things involved in the special counsel investigation.  So the witness will not be able to answer that.

Mr. <u>Gowdy.</u>  For the life of me, I don't understand how that could possibly be so.  What I do know to be so is I need -- and think I have a right -- to ask the former Director of the FBI, given the fact that we've already established Steele had sources and subsources, whether or not the Bureau made an effort to contact and corroborate or contradict the information provided by those sources.  Is it the Bureau's position that I'm incorrect?

Ms. <u>Bessee.</u>  Could we have a minute to talk to the witness?

Mr. <u>Gowdy.</u>  Well, if it's -- yeah, if we can toll the clock. I mean, I'm already running out of time.

Mr. <u>Comey.</u>  Can I have your question again, Mr. Gowdy?

Mr. <u>Gowdy.</u>  Pardon me?

Mr. <u>Comey.</u>  What's the question again?

Mr. <u>Gowdy.</u>  God, if I remember.  I think it was whether or not the Bureau made any effort -- oh, I think what I asked is whether or not you had an idea the scope, the breadth, of the number of sources or subsources Steele relied upon.

Mr. <u>Comey.</u>  I don't.  I have a recollection that there were a variety of sources and subsources, but I don't have a sense of the scope.

Mr. <u>Gowdy.</u>  Do you have a sense that the Bureau was able to identify every source and subsource Steele relied upon?

Mr. <u>Comey.</u>  I don't know one way or another.

Mr. <u>Gowdy.</u>  I'm going to let Mr. Ratcliffe take over from here, other than I'm going to ask you whether hearsay is ordinarily admissible in court or not.

Mr. <u>Comey.</u>  Is this a quiz?

Mr. <u>Gowdy.</u>  No.  Well, if I didn't think you could answer it, I wouldn't have asked you.  I know you know the answer.

Mr. <u>Comey.</u>  It depends upon whether it fits within one of the exceptions to the hearsay rule.

Mr. <u>Gowdy.</u>  Assuming -- what's the general rule?  We won't get to the exceptions.  The general rule, is hearsay admissible

or not admissible?

    Mr. Comey.  Well, the general rule is that hearsay is not admissible unless it falls within one of the exceptions to the hearsay rule.

    Mr. Gowdy.  Right.  And we're going to assume for the sake of argument that there's no exception unless you can identify one.  What is the definition of -- well, is it an out-of-court statement offered to prove the truth of the matter asserted?

    Mr. Comey.  Yes, that's my recollection.

    Mr. Gowdy.  All right.

    Mr. Kelley.  You know, Mr. Gowdy, we've agreed to be here to talk about the questions and decisions made and not made in connection with the investigation of Russia and Clinton's emails.

    Mr. Gowdy.  Yes.

    Mr. Kelley.  And we've been very patient, but why don't we get to the point instead of asking ridiculous questions about the definition --

    Mr. Gowdy.  The fact that you think it's ridiculous is of no consequence to me whatsoever, Mr. Kelley.

    Mr. Kelley.  I'm sure it's not.

    Mr. Gowdy.  It's not.  And I've asked almost every other witness, none of whom had an attorney that didn't understand the relevance of that question.  So that's between you and Mr. Comey.  But the reason that I want to ask about hearsay is

the ability to rely upon information that cannot be cross-examined.  That's why I want to ask about it.  And if you can't see that, then y'all can discuss that on the next break, but I'm going to go back into it, and for now, it will be Mr. Ratcliffe's turn.

Mr. Ratcliffe.  Mr. Comey, do you recall that you signed a FISA application on October 21st, 2016, relating to Carter Page?

Mr. Comey.  I don't recall the date.  I do remember signing such a FISA in October.

Mr. Ratcliffe.  Would you have reviewed the FISA application before you signed it?

Mr. Comey.  Yes.

Mr. Ratcliffe.  Do you recall that the FISA application would have been titled -- or was titled "verified application"?

Mr. Comey.  No, I don't recall that.

Mr. Ratcliffe.  Don't all FISA applications state that they are verified applications?

Mr. Comey.  I don't know.  I don't -- sitting here today, I can't remember the word "verified."

Mr. Ratcliffe.  What did the FISA application that you signed on October 21st of 2016, aver in terms of probable cause for a warrant on Carter Page?

Ms. Bessee.  Congressman, he can only respond to information that's not classified or that's been put out there

in the public.  If there is something that he can look at,
because, as you know, part of that -- parts of that application
is classified.

Mr. Ratcliffe.  I was told that -- that the Director didn't
want to review any classified information today and that he came
here without any provisional clearances because he didn't want
them, but yet he was prepared to answer any questions that may
pertain to classified information.  Is that incorrect?

Mr. Kelley.  That is incorrect.  We were told in advance
that this would not deal with anything law enforcement sensitive
or classified information.

Mr. Ratcliffe.  Who told you that?

Mr. Kelley.  House counsel.  Not so much who told me, so
much as a representation made before a United States district
judge.

Mr. Meadows.  So, Mr. Chairman, I would recommend that
there are two different statements that the attorney just made.
One was classified; the other was law enforcement sensitive.  I
can't imagine that House counsel would have inadvertently agreed
to that.  We need to check with Mr. Hungar and make sure that
we're consistent with that.

Chairman Goodlatte.  We'll do that.  The House counsel's
position is very clear, that the Congress does not recognize an
ongoing investigation prohibition on answering questions.  We
do obviously recognize a classified, and we're prepared to create

that environment, if necessary, to ask that question in that environment.

Mr. Ratcliffe.  Did the FISA application that you certified, or verified, allege that there was probable cause to believe that Carter Page was working for or with the Russian Government?

Mr. Comey.  I don't remember specifically.  My recollection is it was -- it was submitted to the court as part of an application where the Department of Justice was alleging that he was an agent of a foreign power, namely, the Russian Federation, but I can't remember what it said about probable cause.

Mr. Ratcliffe.  Would it have averred that there was probable cause to believe that he was in a position to influence the Trump campaign or Trump campaign officials?

Mr. Comey.  I don't remember that.

Mr. Ratcliffe.  But you did review it?

Mr. Comey.  Yes.  I remember reading it for the purpose of signing the certification that the FBI Director has to sign.

Mr. Ratcliffe.  Do you recall that part of the probable cause submitted to the court was the -- what you've referred to as the Steele dossier?

Mr. Comey.  I don't.

Mr. Ratcliffe.  Following up on Mr. Gowdy's question about Christopher Steele, do you know whether he had any direct

knowledge about collusion, coordination, or conspiracy between anyone associated with the Trump campaign, or was it based on other sources and subsources?

Mr. Comey.  My recollection is that it was the latter, that he didn't have personal knowledge of most, maybe all, of the things that were in the reports, but they were reported to him by sources and that the, sort of, the core allegation of the dossier, as I recall, was that there was an effort to coordinate with the Russian interference campaign, but that was not the product of Steele's personal knowledge is my -- I could be wrong about that, but that's my recollection.

Mr. Ratcliffe.  All right, so, if there were other sources or subsources, would you agree that that information would be double and triple hearsay?

Mr. Comey.  I don't know.  Could be.  I don't know.

Mr. Ratcliffe.  Do you know whether each application -- or do you know whether the application that you signed states that the FBI has reviewed this verified application for accuracy?

Mr. Comey.  I don't remember that specifically.  It sounds like the kind of thing that would be in there as a matter of course, but I don't remember.

Mr. Ratcliffe.  And what would be the purpose of verifying to the FISA court that the Department of Justice and the FBI have corroborated the allegations?

Mr. Comey.  Well, you're trying to convince a Federal judge

that you have probable cause, and so the better you can present your evidence and the way it might overlap or interlock, the better the chance you have of convincing the judge you have probable cause.

Mr. Ratcliffe.  So I want to relate to you some of the testimony that we've already received.  FBI Deputy Director Andy McCabe testified before Congress that the FBI could provide no points of verification to verify the Steele information other than the fact that Carter Page had traveled to Russia in July of 2016.  Were you aware of that when you signed the application on October 21st of 2016?

Mr. Comey.  I don't remember any of that right now.

Mr. Ratcliffe.  Bill Priestap who -- what does Bill Priestap do at the FBI?

Mr. Comey.  I think he's still the Assistant Director in charge of the Counterintelligence Division.

Mr. Ratcliffe.  Okay.  He testified that corroboration of the Steele dossier was in its, quote/unquote, infancy, at the time of the application that you signed on October 21st, 2016. Did you know that?

Mr. Comey.  I don't remember hearing that, but that makes sense to me, if my recollection is correct, that we got it in September or maybe October.  It would, by definition, be in its infancy in October.

Mr. Ratcliffe.  All right.  And do you know when

Christopher Steele was terminated as a source for the FBI?

Mr. Comey.  I don't.  And I don't know for a fact that he was terminated.

Mr. Ratcliffe.  So have you reviewed any FBI source validation report on Christopher Steele?

Mr. Comey.  I have not.

Mr. Ratcliffe.  So you don't know whether or not such a report would reflect that, as of November 1st of 2016, Christopher Steele's reporting in the Steele dossier was determined by the FBI to be only, quote, minimally corroborated, end quote?

Mr. Comey.  I don't know that.

Mr. Ratcliffe.  So those things that I've just related to you about testimony as I've represented it from Andy McCabe and Bill Priestap, and the report as I've represented it to you from the FBI, does that cause you any concern about the fact that you signed a verified application for a warrant to surveil Carter Page when the Steele dossier was only minimally corroborated or in its infancy in its corroboration?

Mr. Comey.  I don't know enough or remember enough 2 years later to have a reaction.  I don't know their testimony.  I haven't looked at the thing.

Mr. Ratcliffe.  I'm just asking you to accept what I've represented as true, and if it is true, does that cause you concern?  Should the FISA court have been granting warrants

where the information submitted and verified, in fact, had only
been minimally corroborated?

Mr. Comey.  Yeah, I can't answer that because I --  look,
I accept what you're saying, but I don't know what else you're
not telling me that was in the FISA application and what was done.
I just don't know enough about what happened to offer a view one
way or the other.

Mr. Ratcliffe.  Okay.  Well, do you recall that, on
numerous occasions subsequent to October 21st of 2016, you, in
your capacity as the FBI Director, referred to the Steele dossier
as salacious and unverified?

Mr. Comey.  Yes.  I don't know that I was referring to all
of it.  Maybe I was, but I had in mind some particular portions
of it that were salacious and unverified.

Mr. Ratcliffe.  But, again, your characterization of it was
that it was unverified, even though you had verified it to the
court?

Mr. Comey.  Well, it was coming to us from a reliable source
with a track record, and it's an important thing when you're
seeking a PC warrant.  But what I understand by verified is we
then try to replicate the source information so that it becomes
FBI investigation and our conclusions rather than a reliable
source's.  That's what I understand it, the difference to be.
And that work wasn't completed by the time I left in May of 2017,
to my knowledge.

Mr. <u>Ratcliffe.</u>  Well, when you talk about getting a warrant
and the PC and the importance there, isn't it important for the
judge to be able to weigh the reliability and the credibility
of all the sources for the information, particularly those that
saw or heard the relevant information that serves as the
predicate for seeking the warrant?

Mr. <u>Comey.</u>  Not necessarily.  I mean, I can imagine -- I
think I've dealt with warrants where you just identify that your
primary CI, or primary source, has subsources, and so long as
the court is aware of that phenomenon and that you're speaking
to the reliability of the primary source, to my mind, that's a
totally legit warrant application.

Mr. <u>Ratcliffe.</u>  Who is Sally --

Mr. <u>Comey.</u>  And I don't remember this one well enough to
comment on it.  I'm thinking about other criminal cases I've
worked.

Mr. <u>Ratcliffe.</u>  Who is Sally Moyer?  Sally Moyer?

Mr. <u>Comey.</u>  A lawyer in the General Counsel's Office.

Mr. <u>Ratcliffe.</u>  Do you know if she was involved in the
preparation of the FISA application?

Mr. <u>Comey.</u>  I don't.

Mr. <u>Ratcliffe.</u>  If she testified -- and I'll represent to
you that she testified that the FISA court -- it was 49-51, maybe
50-50, that the FISA court would have approved the warrant
without the Steele dossier.  If I represent that to you, does

that cause you concern that the court was relying on a document
that was largely unverified and minimally corroborated?

Mr. <u>Comey.</u>  No.  Because it asked me to assume the truth
of the last part of your question, and I don't know that to be
the case.

Mr. <u>Ratcliffe.</u>  Who -- you've already said you're not sure
that Christopher Steele was terminated as a source for the FBI,
correct?

Mr. <u>Comey.</u>  Correct.

Mr. <u>Ratcliffe.</u>  If he was terminated as a source for the
FBI, it would be improper for him to continue to do work for the
FBI.  Would you agree with that, as a source?

Mr. <u>Comey.</u>  I guess I don't know what "work" means.  I would
say in general, but I would imagine there would be circumstances
where someone -- in fact, I know -- sorry, go ahead.

Mr. <u>Ratcliffe.</u>  So let me see if I can break it down.  So
does the FBI -- the FBI has an entire manual, don't they, on
governing the use of confidential human sources?

Mr. <u>Comey.</u>  Yes.

Mr. <u>Ratcliffe.</u>  All kinds of rules and validations,
correct?

Mr. <u>Comey.</u>  Correct.

Mr. <u>Ratcliffe.</u>  And if Christopher Steele was, in fact,
terminated, it would have been for violating those standards or
rules or validations?

Mr. Comey.  I don't know for sure.  It could be for violating them, but -- I don't know for sure whether it could be something else too.

Mr. Ratcliffe.  As you've sat here today -- as you sit here today, have you heard anything about the fact that Christopher Steele was terminated for leaking information to the press?

Mr. Comey.  As I sit here today, since I left the FBI, I've read stuff in the media about that.  I don't believe I had ever heard anything about that while I was still at the FBI.

Mr. Ratcliffe.  Okay.  So, if Christopher Steele -- again, I know you don't know whether he had been terminated, but if he was and he continued to provide information as a source to the FBI, who would have authorized that?

Mr. Comey.  I don't know.  And it's too much of a hypothetical for me to even begin to answer.  I don't know. Because I don't know -- I don't know whether any of the -- the preamble to your question is true.

Mr. Ratcliffe.  Are you aware that Christopher Steele had a relationship -- and by "relationship," I mean a working relationship -- with Bruce Ohr?

Mr. Comey.  Am I aware that he had a working relationship with Bruce Ohr?  No.

Mr. Ratcliffe.  Are you aware of any communications or contact between Christopher Steele and Bruce Ohr?

Mr. Comey.  I am not aware.

Mr. Ratcliffe.  Who is Bruce Ohr?

Mr. Comey.  He's a lawyer for the Department of Justice, who I don't know exactly what his job was.  I remember him from the Southern District of New York.  But a DOJ lawyer.

Mr. Ratcliffe.  Would you expect a DOJ lawyer to be part of the chain of custody of evidence relating to the Steele dossier or a FISA application?

Mr. Comey.  I'm not sure I know what that means.  Chain of custody with respect to a FISA application.  With respect to the -- I just don't understand that question.

Mr. Ratcliffe.  Yeah.  Should a DOJ lawyer be used as a cutout to transfer evidence in connection with a FISA application?

Mr. Comey.  I don't know.

Mr. Ratcliffe.  Who would have approved that?

Mr. Comey.  I don't know.  I keep trying to imagine circumstances in which -- I'm not familiar with a circumstance in which it's happened, but I don't know enough --

Mr. Meadows.  Are you aware of any other time where a DOJ attorney actually acted as a conduit to provide information that would go into a FISA application?

Mr. Comey.  What do you mean by "conduit"?

Mr. Meadows.  Well, with Mr. Ohr, Mr. Steele, it's been widely reported -- I'm sure you've read the reports, Director Comey, but in testimony, we would have an interaction between

Mr. Steele, Mr. Simpson, and Mr. Ohr, and then that information was given to two individuals at the FBI, ████████, ████████ ████████. Are you aware of any other time where a DOJ attorney was used in that manner to give information that ultimately went into a FISA application?

Mr. Comey. I can't remember a circumstance like that.

Mr. Meadows. So the answer is no?

Mr. Comey. Well, yeah, I -- I'm only hesitating because it's possible. I just -- in my personal experience, I've not -- I don't remember anything like that.

Mr. Meadows. All right.

I yield back.

Mr. Ratcliffe. Director Comey, does the FBI and the Department of Justice, is there a duty to present exculpatory evidence to the FISA court?

Mr. Comey. I don't know whether there's a legal duty. We certainly consider it our obligation, because of our trust relationship with Federal judges, to present evidence that would paint a materially different picture of what we're presenting.

Mr. Ratcliffe. So, if there was -- if the FBI and the Department of Justice had information that was contradictory to the predicate for which the warrant is being sought before the FISA court, you would expect that information to be presented to the court so that they could weigh the sufficiency of all of the information?

Mr. <u>Comey.</u>  In general, I think that's right.  You want to present to the judge reviewing your application a complete picture of the evidence, both its flaws and its strengths.

Mr. <u>Ratcliffe.</u>  What's a defensive briefing?

Mr. <u>Comey.</u>  In the counterintelligence world, it's a mechanism by which the FBI will alert somebody to a counterintelligence threat that might tend to defeat the threat.

Mr. <u>Ratcliffe.</u>  Are they done for Presidential candidates?

Mr. <u>Comey.</u>  Not routinely.  What's routinely done for candidates is a general briefing of -- what I meant by "defensive briefing" is it's specific to you and threats we see at you.  With candidates, my recollection is we gave a general counterintelligence briefing about the threat coming from different nations.

Mr. <u>Ratcliffe.</u>  Do you recall doing that for Secretary Clinton when she was the nominee?

Mr. <u>Comey.</u>  I don't.  But I assume that someone did.

Mr. <u>Ratcliffe.</u>  Okay.  Do you know if one was done for candidate Trump?

Mr. <u>Comey.</u>  Again, I don't know for sure, but I expect it was done, just as it was done for Secretary Clinton.

Mr. <u>Ratcliffe.</u>  Where would I get that information?  Who would I ask, since you don't know?

Mr. <u>Comey.</u>  Probably the Director of National Intelligence's Office.  I have some recollection that they

arranged for briefings of the candidates once they were nominated, and then part of that briefing would include a threat briefing from the FBI about the counterintelligence threat.

Mr. Ratcliffe.  So you -- you would not have participated in that, is what it sounds like.

Mr. Comey.  Yeah, I did not.  That's why I don't have any recollection of it, but --

Mr. Ratcliffe.  But someone from the FBI would have?

Mr. Comey.  Yes.

Mr. Ratcliffe.  Do you know who that would have been?

Mr. Comey.  No.  And it could have been -- let me just add this for clarity as you're looking -- there was an FBI senior executive who was assigned to the Director of National Intelligence as the National Counterintelligence Executive, NCIX or something, it may well have been that executive who works for the DNI doing it, but who that person -- sorry.

Mr. Ratcliffe.  So I'm going to ask the question -- I think I know the answer based on what you've just said.  But at the time a defensive briefing was done for candidate Trump, do you know if the FBI had any evidence that anyone associated with the Trump campaign had colluded or conspired or coordinated with Russia in any way?

Mr. Comey.  I don't know the dates, whether -- I don't know whether it was before late July when we opened the four counterintelligence files, or not.  And so, if it was after July

29th, then the answer would be, yes, we had some reason to suspect that there were Americans who might have assisted the Russians. If it was before then, the answer is no.

I can't remember when the conventions were and that sort of thing.

Mr. Meadows.  So your testimony here today is that, before July 31st of 2016, you had no indication that there was someone wanting to intrude into the Trump campaign?

Mr. Comey.  I don't know when I learned anyone wanted to intrude into the Trump campaign.  I knew as of late July that the Russians had a massive effort to mess with our democracy ongoing.  I don't think before the end of July I had any information that Americans might be assisting that effort.

Mr. Meadows.  And so at what point did George Papadopoulos come on your radar, Director Comey?

Mr. Comey.  Late July, which is what -- oh, sorry.

Mr. Meadows.  So, you're saying late July --

Ms. Bessee.  Congressman?

Mr. Meadows.  Well, hold on.  Hear me out.  Hear the question.  Because we've had other testimony that would indicate, in a nonclassified setting, that goes right to the heart of this matter, even from Mr. Papadopoulos himself.  So, prior to July 31st of 2016, when you opened what is now known as, I guess, Crossfire Hurricane, or this investigation, was there no effort on part -- on the part of the FBI or no

knowledge -- let me correct that -- no knowledge on the part of the FBI of anybody, George Papadopoulos or any others, that potentially could have been involved in this Russian narrative?

Mr. <u>Comey.</u>  This -- Counsel, this I've said publicly, and it's been cleared, I think, in my book, so I'm going to say it again.  My recollection is the first information we had, certainly the first information that came to my attention that Americans might be working with the Russians as part of their efforts, came at the end of July -- I think the 31st is too late, but the last week of July -- when we received information from an allied nation about the conversations their ambassador had in England with George Papadopoulos.

That was the beginning of it, which is the first time we turned to trying to figure out whether any Americans were working with the Russians.

Mr. <u>Meadows.</u>  So any information that was collected prior to that would have been done without the FBI's knowledge, without your direct knowledge?  Is that what you're telling me?

Mr. <u>Comey.</u>  I don't know what you mean by "any information that was collected."

Mr. <u>Meadows.</u>  So any counterintelligence collection that was done by the FBI would have been done without your knowledge prior to the last week of July 2016?

Mr. <u>Comey.</u>  I'm sorry to keep quibbling, but I don't know what you mean by "any information collected."  The FBI has lots

of collection going on all the time.

Mr. <u>Meadows.</u>  As it relates to Russian interference and the potential use of people within the Trump campaign, was there any initiation on the part of the FBI to collect information prior to the last week of July of 2016?  And if so -- well, answer that question.

Mr. <u>Comey.</u>  So I want to make sure I'm getting it right. Was there --

Mr. <u>Meadows.</u>  I want you to get it right, too, because it's at conflict with -- what you're saying is at conflict with what we've had in other testimony.

Mr. <u>Comey.</u>  Okay.  Well, I mean, I can't help that.  I'll tell you what I -- what I know, that, if you're asking, was there any information that the FBI had that people associated with the Trump campaign might be working with the Russians -- if we had any such information before the end of July?  Is that the question?

Mr. <u>Meadows.</u>  Well, you can answer that question.

Mr. <u>Comey.</u>  Yeah, I'm not aware of any information before the end of July on that subject --

Mr. <u>Meadows.</u>  Right.

Mr. <u>Comey.</u>  -- and it was our first information at the end of July that prompted the opening of those four files.

Mr. <u>Meadows.</u>  So, prior to the end of July, did you direct or did you have knowledge of the FBI trying to collect information

about the possible Russian-Trump campaign -- and I won't use the word "collusion" -- but interactions as it relates to the 2016 Presidential election?

Mr. Comey.  Not that I'm aware of.  I'm sure there was lots of effort to figure out what the heck was going on with the Russians because we saw their effort blossom in the middle of June.  But I'm not aware of any information before that at the end of July about the possibility that Americans were working with the Russians.

Mr. Meadows.  So --

Mr. Comey.  That's what led to the opening of those --

Mr. Meadows.  So, if Mr. Baker or anyone within the FBI had actively engaged in that prior to the last week of July of 2016, that would have been without your knowledge?

Mr. Comey.  See I don't --

Mr. Meadows.  That's what you're testifying --

Mr. Comey.  -- it's possible I knew at the time.  I don't remember any information before the end of July that bore on that topic.

Mr. Gowdy.  Director, we only have a couple minutes before it's the Democrats' turn.  I think during the last time we talked -- well, the first time we talked, you said you did not talk to Rod Rosenstein after you received word that you had been terminated?

Mr. Comey.  That's correct.

Mr. <u>Gowdy.</u>  Have you had a conversation with the President since you were terminated?

Mr. <u>Comey.</u>  No.

Mr. <u>Gowdy.</u>  Have you had a conversation with Jeff Sessions?

Mr. <u>Comey.</u>  No.

Mr. <u>Gowdy.</u>  Did you have a conversation with Bob Mueller from the time you were terminated until the time he was appointed special counsel?

Mr. <u>Comey.</u>  No.

Mr. <u>Gowdy.</u>  Did you have a conversation with anyone who is currently on Special Counsel Mueller's team between the time you were terminated and the time special counsel was appointed?

Mr. <u>Comey.</u>  No.

Mr. <u>Meadows.</u>  Let me ask one clarifying question, if you don't mind.

Director Comey, you were saying that you had no knowledge that Perkins Coie was actually involved with the Democrat National Committee and involved in this particular investigation that ultimately was initiated.  Is that correct?

Mr. <u>Comey.</u>  I, when I was FBI Director, don't remember ever being told anything about Perkins Coie.  I think I've since read stuff in the media, but not when I was Director.

Mr. <u>Meadows.</u>  So are you saying that James Baker, your general counsel, who received direct information from Perkins Coie, did so and conveyed that to your team without your

knowledge?

Mr. Comey.  I don't know.

Mr. Meadows.  What do you mean you don't know?  I mean, did he tell you or not?

Mr. Comey.  Oh, I -- well --

Mr. Meadows.  James Baker, we have testimony that would indicate that he received information directly from Perkins Coie; he had knowledge that they were representing the Democrat National Committee and, indeed, collected that information and conveyed it to the investigative team.  Did he tell you that he received that information from them?  And I can give you a name if you want to know who he received it from.

Mr. Comey.  I don't remember the name Perkins Coie at all.

Mr. Meadows.  What about Michael Sussmann?

Mr. Comey.  I think I've read that name since then.  I don't remember learning that name when I was FBI Director.

I was going to ask you a followup, though.  When you say "that information," what do you mean?

Mr. Meadows.  Well, it was cyber information as it relates to the investigation.

Mr. Comey.  Yeah, I have some recollection of Baker interacting with -- you said the DNC, which sparked my recollection -- with the DNC about our effort to get information about the Russian hack of them --

Mr. Meadows.  Yeah, that's -- that's not -- that's not what

I'm referring to.

     Mr. Comey.  -- but I don't -- I don't remember anything
beyond that.

     Mr. Meadows.  And so I can give you something so that
you -- your counsel can look at it and refresh your memory,
perhaps, as we look at that, but I guess my concern is your earlier
testimony acted like this was news to you that Perkins Coie
represented the Democratic National Committee, and yet your
general counsel not only knew that but received information from
them that was transmitted to other people in the investigative
team.  And I find it interesting that the Director would not know
about that because it is not normal that your general counsel
would be a custodian of evidence.  Is that correct?  Was
it -- was it normal that people sought out your general counsel
to make them aware of potential concerns?  Is that normal?

     Mr. Comey.  I kind of think it is not as uncommon as you're
suggesting it is.

     Mr. Meadows.  Well, Mr. Baker thought it was uncommon.  He
said he couldn't ever recall it ever happening before.

     Mr. Comey.  I don't know what the "it" is.  What I'm
struggling with here is --

     Mr. Meadows.  Where someone reaches out to the general
counsel to give them evidence to say that they want the FBI to
look into it.  He couldn't recall another time.  And you're
saying it's not uncommon.

Mr. Comey.  Used to happen to me all the time.  People would email me, saying, check this out, check that out, so --

Mr. Meadows.  It may happen with the Director, but it didn't happen with the general counsel.

Mr. Comey.  Okay.  That surprises me a little bit, but in any event, I don't remember him raising it.  I don't think it's particularly noteworthy that he wouldn't tell me, but I don't know enough to react to it.

Mr. Meadows.  So he says a unique situation that had only, in his mind, happened twice in his history with the Bureau, and you're saying that it was so unique there that -- yet he did not tell you about that?  Is that your testimony?

Mr. Comey.  No.

Mr. Meadows.  That's not your testimony?

Mr. Comey.  No.

Mr. Meadows.  Or he didn't tell you?

Mr. Comey.  No.  I -- I didn't -- I heard you characterizing my testimony as me saying it's so unique.  I don't remember --

Mr. Meadows.  I'm saying he said it was unique; did he tell you?

Mr. Comey.  I'm struggling because I haven't seen his testimony.  So maybe you could let me look at it during the break, and then I can answer on our next round.

Mr. Meadows.  Yeah, it's -- it's just a two -- two

sentence, and I'll read it to you:  It was unusual for me to be the recipient of information directly from the public or a lawyer or anyone else about an allegation of a crime, close quote.

Mr. Comey.  Okay.  I mean, I accept your reading of it.  It doesn't change my reaction that it doesn't -- I don't remember it.  Second, it doesn't strike me as extraordinary that, if that had happened, he wouldn't give me the particulars.

Mr. Meadows.  We're out of time.

[Recess.]

[2:12 p.m.]

Ms. <u>Sachsman Grooms.</u>   Okay.   We'll go back on the record.   It is 2:12.   I just have a little bit of cleanup from the last round, and then I'll pass off to the members.

BY MS. SACHSMAN GROOMS:

Q   In the last round, you were talking about the importance of the FBI and DOJ sharing the complete picture of the evidence with the FISA court.   Is that accurate?

A   Yes.

Q   Okay.   Does that require every detail of that information or a general picture?

A   No, it doesn't -- look, I don't think there's a Brady obligation that applies in the probable cause presentation requirement context or you have to turn over your entire file. You have a general duty of candor to the court, so you try to make them generally aware of the state of the evidence that they're relying upon.

Q   And I think this might have gotten a little bit garbled through the questions in the last round.   I think you said that it was relevant to you to provide to the court the information regarding who was paying Christopher Steele.   Is that accurate?

A   I don't remember whether I focused on it at the time. I think it's important that any material issue of bias be surfaced for a court about one of your sources, and so I think it made sense for the Department of Justice to alert the court

that there was politically motivated financial support for this
effort.

Q    And so in order to do that, you thought it was important
to say the sort of general statement that it had been funded or
politically motivated in the financing by Republicans or
Democrats in general?

A    Right.  And the particulars of which Democrats, which
Republicans, I wouldn't think would be important to the court.
They'd want to be aware of the general bias, and that's my
reaction.

Q    Okay.  And I wanted to be really clear on that because,
in the last round, I think there were a number of questions about
the particulars of whether you knew or the court knew that the
DNC had specifically paid Perkins Coie as a law firm and that
had been the conduit to paying Christopher Steele.

Did you think the particulars of that were important to
either your analysis or to the FISA court?

A    No, I wouldn't think so.  It actually doesn't even seem
important to me now, who cares what particular organizations or
particular people.  The court needed to be aware that there's
a potential for bias because there's a political motivation to
the support for this effort.

Q    Did you then or do you know have any concerns about the
process that occurred around the Carter Page FISA?

A    I do not.

Q   In the last round, I think you were asked a number of questions around the timing of the initiation of the Russia investigation as it pertains to the connection to U.S. persons. And I think during that you said that was towards the end of July that that occurred.  Is that right?

A   That's my recollection, yes.

Q   I think the underlying questions that came up have to do with some actions that were taken by Peter Strzok and by others in the time period before the end of July.  They traveled to London, they did investigatory work on a number of different things.

If they were doing that work, is it fair to say that that work would not have been part of investigating U.S. persons connected to the Russians in that time period prior to the end of July?

A   I don't know.  If my recollection is correct that we opened the cases on the U.S. persons at the end of July, then it's possible there was work being done immediately before that to flesh out and understand the information that would then predicate the cases that would be opened at the end of July, but I don't know that.  I remember the cases being opened at the end of July, and I don't know the nature and quality of any work that went on before that.

Q   But Peter Strzok and his team were working on larger scale Russia things before that, right?

A    Right, to try to understand what are the Russians doing, what's the scope of it, what's its intention.

Q    And without getting into the particulars of what they were doing, those things could have included traveling to foreign countries or interviewing witnesses, et cetera?

A    Of course.  I just don't remember it.

Q    And then I just had one more thing.  At the end of the last round, there was a long discussion about Mr. Baker and his testimony and how he had testified that there was this unique instance, and I just wanted to read into the record some of his testimony from his second day when he came back, because we saw him twice.

And in that, at the very beginning, he said he wanted to bring up this thing that he had not recalled from the previous one, and I'm just going to read from the record.  He said:  So I recalled after, just actually a few days ago, that another incident when this time an attorney on behalf of a client came to me and wanted -- came specifically to me and wanted to make information available to the FBI in the form of electronic media that he wanted to get into the --

Mr. Jordan asked:  Different case or same case?

Mr. Baker said:  Different case.

Mr. Jordan said:  Okay.

Mr. Baker said:  Well, a completely different case, different attorney, different client, but insisted on meeting

only with me or the Director, and then he did not have the material with him at the time. We had to actually dispatch FBI agents to go to a -- from a field office to go to collect this material. It was in the -- to the best of my recollection, it was roughly in the late summer, fall of 2016 timeframe.

So I just wanted to clarify that for the record.

Mr. Krishnamoorthi. Director Comey, thank you for coming, and thank you for your service to your country.

In March 2017, you disclosed in public testimony that the FBI had begun an investigation into, quote: The Russian Government's efforts to interfere in the 2016 Presidential election, including, quote, the nature of any links between individuals associated with the Trump campaign and the Russian Government and whether there was any coordination between the campaign and Russia's efforts, close quote.

When did the FBI first learn of credible evidence that the Russian Government was trying to interfere in the 2016 Presidential election?

Mr. Comey. I believe it was with the release in mid June of the DCLeaks and Guccifer 2.0 stolen emails.

Mr. Krishnamoorthi. Mid June 2016?

Mr. Comey. Correct.

Mr. Krishnamoorthi. Were you, at that time, aware of the meeting at Trump Tower on June 9th, 2016, between Donald Trump, Junior, Paul Manafort, Jared Kushner, and some Russian

nationals?

Mr. Comey.  I think that's a question that I can't answer because it dives into a nonpublic level of detail about the Russia investigation.

Mr. Krishnamoorthi.  Okay.  So in mid June 2016, you first learned about the Russian Government's interference or attempt to interfere in the 2016 Presidential election.  When did the FBI first learn of credible evidence that individuals associated with the Trump campaign may be coordinating with the Russian Government?

Mr. Comey.  The first I'm aware of that was the end of July of 2016, which is what led us to open counterintelligence cases on four different Americans.

Mr. Krishnamoorthi.  Okay.  And what was your reaction to this?

Mr. Comey.  I don't remember a particular reaction, other than that it was going to be very important that we do this in a close hold way so that we don't alert the people we're going to investigate that we're looking at this and so that the investigation is able to be done in a quality way in the middle of a political season.  I remember being concerned about that.  And then just open minded about whether there's anything to it or not.  I couldn't tell at the beginning whether there was.

Mr. Krishnamoorthi.  Have you ever been affiliated with any kind of investigation similar to this where a foreign government

may be coordinating or somehow connecting with a political campaign of the United States?

Mr. Comey.  Not -- I don't remember.  I've been involved with a lot of cases where foreign governments may be connected in an illicit way to public figures.  That's a big part of the FBI's counterintelligence work.  I don't remember a campaign context.

Mr. Krishnamoorthi.  Got it.  Has the FBI ever investigated the potential coordination between a Presidential campaign and a foreign adversary before?

Ms. Bessee.  Congressman, to the extent it goes to any -- any investigative activity that the FBI may be investigating, the witness will not be able to answer to either confirm or deny.  Do you want to ask that question in general? I don't know how you ask that hypothetically, but --

Mr. Krishnamoorthi.  No, this is about past, not the current Mueller investigation or any current investigation.

Mr. Comey.  I don't remember being involved in any such investigation prior to 2016.

[Comey Exhibit No. 3

Was marked for identification.]

Mr. Krishnamoorthi.  Okay.  I would like to introduce the following document from the Baker transcript, page 72.  This is the transcript of former FBI general counsel James Baker's October 18th, 2018, interview with the committees.

It begins, question:  And what was the initial
concern/issue raised in the investigation?

Answer:  Well, the initial -- the initial issue was whether
there had been interactions of an unlawful nature or that were
a threat to the national security or both in connection with
the -- at least some people in the now President's campaign with
the Russian Federation, witting or unwitting.

Question:  And these were related to George Papadopoulos?

Answer:  Yes.  Information that he conveyed, yes.

Question:  Can you confirm that the initial allegation that
started the Russia counterintelligence investigation had
nothing to do with the Steele dossier?

And there's an interruption by the counsel to caution him
to answer in an unclassified setting.

And then he answers, answer:  Based on the information that
I have seen in the public domain, I think I can answer it.  And
I think the answer is it did not have to do with the dossier.

Director Comey, do you agree with Mr. Baker that the initial
allegation in the FBI's counterintelligence operation into the
Trump campaign's potential coordination with the Russian
Government, quote/unquote, had nothing to do with the Steele
dossier?

Mr. Comey.  Yes.  That's correct.

Mr. Krishnamoorthi.  And do you agree the initial
allegation was actually related to information that George

Papadopolous conveyed?

Mr. Comey.  That he conveyed to a diplomat that was then conveyed to the U.S. several months after he first conveyed it, yes.

Mr. Krishnamoorthi.  Thank you.

Let me go into another topic.  So earlier in these proceedings, I had the chance to question Peter Strzok about leaks from the FBI, and we had this exchange.

This is me asking the question:  Could you explain to me a little bit about Director Comey's fear of leaks from the New York field office and how that, in your view, affected the revelation of the warrant for Weiner's laptop?

Answer from Strzok:  You have to ask Director Comey that. I think there was discussion I remember and particularly some of it was in the context of reporting from Mr. Giuliani and others about connections to New York.

So let me just ask you what I asked him.  How concerned were you about leaks from the New York field office to Rudy Giuliani or other media personalities in 2016?

Mr. Comey.  I was concerned that there appeared to be in the media a number of stories that might have been based on communications reporters or nonreporters like Rudy Giuliani were having with people in the New York field office.  In particular, in I want to say mid October, maybe a little bit later, Mr. Giuliani was making statements that appeared to be based on his

knowledge of workings inside the FBI New York.  And then my recollection is there were other stories that were in the same ballpark that gave me a general concern that we may have a leak problem -- unauthorized disclosure problem out of New York, and so I asked that it be investigated.

Mr. Krishnamoorthi.  Oh, okay.  So the investigation began at some point after you asked for the investigation to start?

Mr. Comey.  I think sometime in October, maybe they didn't get going on it until November, an effort led by our internal affairs component, as I understand it, began to try and understand, do we have leaks and what are they?

Mr. Krishnamoorthi.  And to your knowledge, has anyone been held accountable for these purported leaks?

Mr. Comey.  Not to my knowledge.  The investigation ultimately led to disciplining of FBI Deputy Director McCabe because the investigation turned up communications that he had apparently authorized about a pending investigation of the Clinton Foundation, but I don't know beyond that.

Mr. Krishnamoorthi.  How about anything related to the New York field office?

Mr. Comey.  I don't -- I never got a report out on that before I was fired.

Mr. Krishnamoorthi.  I see.  Okay.  Here's the concern, Director Comey.  If no one's been held accountable, especially from the New York field office, and if there are leaks from the

New York field office to potentially people like Rudy Giuliani, who's the current lawyer for the President, then they have an active window into the investigation of them, and that's why I think a lot of people are concerned about whether that investigation concluded or not.

Who would we talk to about this particular issue if we wanted to learn the status of that investigation?

Mr. Comey.  Well, the FBI, whoever you normally talk to there, would be the place to start.  I don't know whether they're in a position to comment or not.  I don't know what its status was when I was fired in May.

Mr. Krishnamoorthi.  Got it.

Okay.  Next topic.  The Washington Post reported previously and The Atlantic confirmed that former acting FBI Director McCabe opened an obstruction of justice investigation into the President after your firing.  Prior to that, had an obstruction of justice investigation been opened into the President or other senior officials with regard to Michael Flynn?

Mr. Comey.  Not to my knowledge, no.

Mr. Krishnamoorthi.  Okay.  I was reading in your book that on February 14th, 2017, after your conversation with the President, you then returned to your car and then emailed your colleagues about this particular conversation with regard to Mr. Flynn.

What came of that at that point?  Did you hold off on a

potential investigation into obstruction of justice or what was your -- what was your thought process there?  Because I know that you also said in the book that you didn't know who to go to, you couldn't go to Sessions and the Deputy Attorney General was -- I'll let you answer.

Mr. Comey.  I met with the senior leadership team of the FBI, shared with them a memo that I created about the February 14th conversation, and we debated what to do.  And because we didn't feel we could go to Attorney General Sessions because he was about to be recused, there was no Deputy Attorney General because Mr. Rosenstein had not been confirmed yet, and we didn't want to do anything that might chill the investigative team.  We decided that we would simply hold on to it, keep the information close hold until the Department of Justice sorted out how they were going to supervise this and then we could bring them into it and figure out what should we do to investigate this. And so that's why I say, to my knowledge, no investigation was opened on the obstruction of justice at that point.

Mr. Krishnamoorthi.  Okay.

Mr. Comey.  We held it, and we actually never got to the chance -- the Department of Justice didn't get to the point of figuring out how they were going to supervise the investigation until after I was fired.

Mr. Krishnamoorthi.  Why -- for a layperson who may not understand why you even thought about this amounting to potential

obstruction of justice, can you walk us through that?  Why is this something that might cause the concern about an allegation of obstruction of justice?

Mr. Comey.  Well, the President of the United States asked me, directed me in my apprehension of it to drop a criminal investigation, and so that is an extraordinary use of power and could amount to obstruction of justice.  That is a corrupt endeavor to impede the administration of justice.  I don't know what the answer is to the ultimate question, but given that, it was something that needed to be investigated.

Mr. Krishnamoorthi.  And is the reason why you say "could" because you need to get to the intent behind why the investigation is being asked to be dropped?

Mr. Comey.  Correct.

Mr. Krishnamoorthi.  Okay.  You know, we are going to be in the majority in the House starting in January, and so one of the questions that folks like myself have is, stepping back for a second, you know, you were there for quite a while during the Russia investigation, from end of July 2016 through the time that you were let go in May 2017.  So almost 1 year.  You learned a lot probably during that time.

What lessons did you learn during that time that would inform us as we conduct oversight, not necessarily from the standpoint of a forensic criminal investigation, but from the standpoint of protecting our democracy?

Mr. Comey.  I don't know that I can give you a thoughtful enough answer sitting here after 5 hours of questions.  I'd have to think about that one because it's an important question I would not want to answer causally.  So I'm going to have to take a rain check on that one.  Yeah.

Maybe the one thing is, as you exercise incredibly important oversight power, I said earlier, I think this branch of government has neglected its authorities and needs to assert its authorities, but in doing that, to be sensitive about the need to coordinate with ongoing investigations so nothing happens to affect or to cast doubt on the credibility of an ongoing investigation.

Mr. Krishnamoorthi.  Very good.  Let me just make sure I don't have a final question here for you.

I think that's it for me.  Thank you.

Mr. Comey.  Thank you.

Mr. Deutch.  Mr. Comey, thanks for being here.  Nice to see you again.

Mr. Comey.  You too.

Mr. Deutch.  Just one quick followup to what you just said that this branch that has neglected its responsibilities shouldn't act in a way that would cast doubt on any of the investigations.  You're referring -- are you referring to the actions of this branch in recent days or years?

Mr. Comey.  Not in the second part of that sentence; in the

first part, yes, generally.  But what I meant by the second one is special counsel's investigation is going to be ongoing, I would assume, when the majority changes, and I think it's just very important for whoever is in the majority to be sure to be sensitive to the need to balance oversight with an ongoing criminal investigation.  That's what I meant by that.

Mr. Deutch.  I appreciate that.

I wanted to pick up on this last line of questions.  There were press reports that on May 10th, 2017, the day after the President fired you, he met with Russia's foreign minister and the Russian ambassador in the Oval Office, and told them, quote: I just fired the head of the FBI.  He was crazy, a real nut job.  I face great pressure because of Russia.  That's taken off, closed quote.

Then the next day, President Trump stated during a nationally televised interview with Lester Holt that, quote, "this Russia thing," close quote, was on his mind when he decided to fire you.

And then during your June 2017 Senate Intelligence Committee hearing, you were asked why you believe President Trump fired you, and you responded, and I quote you:  I guess I don't know for sure.  I believe I take the President at his word that I was fired because of the Russia investigation.  Something about the way I was conducting it the President felt created pressure on him that he wanted to relieve, closed quote.

Do you still believe that the President fired you because of the Russia investigation?

Mr. Comey.  I think on balance that I do.  The only hesitation I have is I've seen the President since saying other things that it wasn't because of that, and so I'm in a position where I can't know for sure.

Mr. Deutch.  When you stated, "I take the President at his word," were you referring to either his meeting with the Russians or his interview with Lester Holt?

Mr. Comey.  Both, but more so to the Holt interview because it was on the record.  I don't know whether the Washington -- I think it was The Washington Post reporting on that encounter with the Russian ambassador and foreign minister was accurate, so I tend to put more weight on his own words speaking to Lester Holt.

[Comey Exhibit No. 4

Was marked for identification.]

Mr. Deutch.  I'd like to introduce exhibit 4.  It's the Baker 10/3/18 transcript, pages 147 to 148.  That's the transcript of former FBI general counsel James Baker's October 3rd interview with the committee.

It reads, question:  Can you explain what the atmosphere was like at the FBI after the President fired Comey?

Answer:  I'm not sure that I can reduce it to one or two words.  It was an, I guess, horrible atmosphere.  It was shock, dismay, confusion at least initially that night and then -- and

then a sense of resolve that came pretty quickly as well to continue the FBI's mission.  And as I was saying earlier to the Congressman, make sure that we were all adhering to our oaths to the constitution and executing our responsibilities.

Question:  Was there concern at the FBI that the President had fired Director Comey because he was trying to obstruct the FBI's investigation into the Russia matter?

Answer:  Yes.

Question:  Was that the concern you had?

Answer:  Yes.

Question:  Was that concern shared by others?

Answer:  I think so, yes.

Question:  Who?  Who else?

Answer:  The leadership of the FBI, so the acting director.  I can't remember if we appointed an acting deputy director immediately.  The heads of the national security apparatus, the national security folks within the FBI, the people that were aware of the underlying investigation and who had been focused on it.

And, Director Comey, did you share Mr. Baker's concern that the President had fired you because he wanted to obstruct or impede the FBI's investigation into the Russia matter?

Mr. Comey.  I did because of his words.

Mr. Deutch.  And does it surprise you to hear that the leadership, the national security officials at the FBI were

concerned that President Trump fired you in an attempt to obstruct the FBI's investigation into the Russia matter?

Mr. Comey.  No, it doesn't surprise me at all.

Mr. Deutch.  Turning just for a moment before I wrap up to summer -- earlier summer of 2018, July 29th, in fact, the President tweeted, and I quote:  There is no collusion.  The Robert Mueller rigged witch hunt headed now by 17, increased from 13, including an Obama White House lawyer, angry Democrats, was started by a fraudulent dossier paid for by crooked Hillary and the DNC.  Therefore, the witch hunt is an illegal scam.

Mr. Comey, was the FBI's investigation into Russian interference and potential coordination with the Trump campaign started by a fraudulent dossier?

Mr. Comey.  It was not.

Mr. Deutch.  Can you explain how you know that?

Mr. Comey.  Because I know what the basis was for starting the investigation.  It was the information we'd received about a conversation that a Trump foreign -- campaign foreign policy adviser had with an individual in London about stolen emails that the Russians had that would be harmful to Hillary Clinton.  It was weeks or months later that the so-called Steele dossier came to our attention.

Mr. Deutch.  Was there anything illegal or improper about the way the FBI started the Trump-Russia investigation?

Mr. Comey.  No.  And, in fact, I would hope that

Republicans and Democrats would agree that we would have been derelict not to investigate.

Mr. Deutch. On May 20th, 2018, President Trump tweeted, again I quote:  I hereby demand, and will do so officially tomorrow, that the Department of Justice look into whether or not the FBI/DOJ infiltrated or surveilled the Trump campaign for political purposes, and if any such demands or requests were made by people within the Obama administration.

Director Comey, do you believe the FBI or DOJ ever investigated the Trump campaign for political purposes?

Mr. Comey.  I not only don't believe it, I know it not to be true.

Mr. Deutch.  I'm sorry, would you repeat that?

Mr. Comey.  I know it not to be true.  I know that we never investigated the Trump campaign for political purposes.

Mr. Deutch.  Did President Obama or anyone in his administration ever make a demand or a request the FBI or DOJ infiltrate or surveil the Trump campaign?

Mr. Comey.  No, not to my knowledge.

Mr. Deutch.  And, Mr. Comey, how would you have reacted if you had received a request of this nature from any administration?

Mr. Comey.  Well, they wouldn't -- no one would dare ask me or anybody else at the FBI that because they know the reaction, which would be not only no, but hell no.

Mr. <u>Deutch.</u>  In the tweet I read, President Trump appears to be directly demanding that the Department of Justice launch an investigation into his political opponents.  You've already stated the answer to a request like that would be hell no.  And why is that, Mr. Comey?

Mr. <u>Comey.</u>  Because that represents the final corruption and destruction of our system of justice.  If we start investigating people by fiat from the leader because of their political affiliation, what are we anymore, which is why it has been so dispiriting not to see both sides of the political aisle react to this with shock and loud voices.  It's just not who we are.  I don't care who the President is, it's not who we are.

Mr. <u>Deutch.</u>  I appreciate that.

My final question just refers to something you said earlier today.  You said that there's no crime of collusion as it's used, I think, in terms of conspiracy or aiding and abetting.  I haven't heard the term collusion in my years at Justice.

This investigation or I would say just to try to make this easier for you to answer, given your description of collusion, collusion would not be the basis for an investigation conducted by the FBI?

Mr. <u>Comey.</u>  Right, because it's not a thing in the criminal statutes, that I understand at least.  It would be investigating where anyone conspired with the Russians or aided and abetted the Russians.

Mr. Deutch.  Thank you, Mr. Comey.  I appreciate it.

Ms. Plaskett.  Good afternoon.  Good afternoon, everyone.

Mr. Comey, before we begin, I wanted to ask a question from the last round just as a point of clarification.  In the discussion about why you put -- in late October made an announcement again about the Hillary Clinton email investigation, you said it was for consistency.  What precluded or what made you believe or the FBI not believe that allowing the public to be aware of the investigation of Russia and possible interference or aiding and abetting by Trump aides in his campaign would justify that as well?

Mr. Comey.  Why wouldn't we announce --

Ms. Plaskett.  Why wouldn't you have announced that?

Mr. Comey.  Well, for a number of reasons.  It would -- there wouldn't be any policy exception that would permit it; that is, it would jeopardize the ongoing investigation and it would be brutally unfair because we didn't know whether we had anything.  We literally just started.  And as I said, by the time I was fired, we still hadn't come to a conclusion.  And so we'd be revealing something that was inherently misleading and jeopardizing our ability to investigate by revealing it.

It's for that reason -- I actually don't remember any discussion about whether to reveal that we had these classified counterintelligence files.  Instead, what we debated a lot was should we tell the American people that the Russians are messing

with our election more broadly.

Ms. Plaskett.  But you stated in the last round that when you made the announcement in October about new emails, you didn't know what it would conclude either.  So why would you make the announcement if you had no idea what those second round of emails might lead you to believe?

Mr. Comey.  I see.  Because we had already, not only told the world about the Clinton Foundation -- excuse me, the Clinton investigation at its conclusion, we had then vigorously defended, in my view, rightly, the result and told people to move on, this was done well, this was done competently and honestly, you can trust your FBI.

Now I know that's not true, and so that leaves me with two choices:  I can either let the American people continue to rely upon something I know not to be true --

Ms. Plaskett.  Which part was not true?

Mr. Comey.  That the case is done, you can move on.

Ms. Plaskett.  Okay.  That the case was done.

Mr. Comey.  -- or I can tell Congress that what I said repeatedly is no longer true.  Both of those are bad options. One, in my view, is catastrophic, that concealing from the American people and Congress that what we told you over and over and over again in the summer is no longer true would be devastating to the organizations.  Now, reasonable people can disagree about that, but those were the two choices.  And so it

wasn't we were beginning a new investigation; we were restarting an investigation that the whole world knew about and was relying upon what were now false statements about it being completed. And then obviously critical to that was my troop saying, not only can we not finish this before the election, the result may change, because in this huge trove of emails appear to be emails that were missing from her Blackberry that we never found before.

And so given that constellation of circumstances, I really didn't feel like I had any choice.   I had to choose speaking over concealing.

Ms. <u>Plaskett.</u>  Okay.  Thank you.  Thank you for that clarification.

Mr. <u>Comey.</u>  Yeah.  Good question.

Ms. <u>Plaskett.</u>  What I wanted to ask a few questions about the body of evidence you're aware of related to President Trump and obstruction of justice.  And I'm referring to your book, A Higher Loyalty:  Truth, Lies in Leadership.  And on page 271, you write in the first full paragraph, I'm quoting:  I also don't know whether the special counsel will find criminal wrongdoing by the President or others who have not been charged as of this writing.  One of the pivotal questions I presume that Bob Mueller's team is investigating is whether or not, in urging me to back the FBI off our investigation of his national security advisor and firing me, President Trump was attempting to obstruct justice, which is a Federal crime.  It's certainly possible

there is at least circumstantial evidence in that regard, and there may be more that the Mueller team will assemble, end of quote.

So I guess my first question was, were you aware of individuals charged -- that were charged as of that writing?

Mr. <u>Comey.</u>  I don't think I meant -- I can't think of anybody I was thinking of, if that makes sense.

Ms. <u>Plaskett.</u>  Right.

Mr. <u>Comey.</u>  I wasn't -- I don't -- maybe that's an awkward sentence construction, but I don't think I was trying to carve somebody out.

Ms. <u>Plaskett.</u>  But were you, in your mind, thinking of people who you believe would probably be charged but had not been charged as yet?

Mr. <u>Comey.</u>  I don't think so.

Ms. <u>Plaskett.</u>  Okay.  And what were the circumstantial evidence that you were referring to?

Mr. <u>Comey.</u>  That the President of the United States asked me to drop a pending criminal investigation.

Ms. <u>Plaskett.</u>  And that's --

Mr. <u>Comey.</u>  And did it after clearing the room and removing my boss and the Vice-President of the United States from the room in order to speak to me alone.

Ms. <u>Plaskett.</u>  Okay.  And those were the only pieces of circumstantial evidence that you had?

Mr. Comey.  That's all I can think of right now.

Ms. Plaskett.  Okay.  And do you consider President Trump asking you to back off the FBI -- back the FBI off of investigating then national security advisor the circumstantial evidence, right?

Mr. Comey.  Well, a piece of it, yes, and the manner in which it was done.

Ms. Plaskett.  And the manner in which it was done.

Do you consider President Trump firing you a circumstantial evidence of attempting to obstruct justice?

Mr. Comey.  Potentially, and that would require a lot of facts I can't see, so I wouldn't give you as strong an answer there.  It's potentially circumstantial evidence.  The first bit, the Oval Office conversation is circumstantial evidence.

Ms. Plaskett.  So we've talked about the Oval Office incident as well as your firing as potential circumstantial evidence.  Can you identify anything else outside of those things that's circumstantial or potentially direct evidence of President Trump attempting to obstruct justice, including public information and recent events?

Mr. Comey.  I don't think that's for me to answer.

Ms. Bessee.  Okay.  I was going to say the same thing the witness said.  To the extent, because he's also a potential witness for an ongoing investigation, he may be limited to what -- or he may not be able to answer the question.

Ms. Plaskett.  Would he be able to answer the question related to those things that have occurred after his firing?

Ms. Bessee.  To the extent that he has knowledge of them based on his -- because he's a potential witness -- it depends on the question, so maybe if you ask the question we can assess --

Ms. Plaskett.  So the question would be, can you identify any circumstantial or direct evidence that you may have obtained after being fired which would lead you to believe that the President has obstructed justice?

Mr. Comey.  I don't think I can answer that for this reason, that I'm not aware of any evidence that might be responsive to that question that's not in the public realm.

Ms. Plaskett.  Right.

Mr. Comey.  And so the next part of it would require me to characterize tweets and statements and things, which I don't think I can do.

Ms. Plaskett.  You can't characterize tweets?  I characterize them.

Mr. Comey.  That's what I'm saying.  You're as qualified to do it as I, and so I don't think I ought to be in a position of trying to characterize things that are publicly available.

Ms. Plaskett.  Well, I think because of your years of experience having prosecuted people, you would be able to identify what a jury would find as circumstantial better than most of us in this room.  But if not, we can move on.

Mr. Comey.  But I'm a potential witness.

Ms. Plaskett.  Got it.

Mr. Comey.  So I just think it's a slippery slope for me to start characterizing public information.

Ms. Plaskett.  Sure.  You stated that attempting to obstruct justice, even if it does not work, is still a Federal crime.  Would you agree?

Mr. Comey.  That's my recollection.

Ms. Plaskett.  And there's been a growing narrative amongst conservative media that obstruction of justice is a mere process crime, that even if President Trump did obstruct justice, it really isn't that big of a deal if Special Counsel Mueller can't also demonstrate that he committed the ostensible underlying crime of colluding with or aiding and abetting with Russia to interfere with the election.  Do you agree with that?

Mr. Comey.  No, and I've been hearing that for 30 years. Crimes that involve investigation -- that involve attacks on the criminal justice system, perjury, false statements, obstruction of justice, jury tampering, are things -- are statutes that Congress passed to protect the core of this country's rule of law, and so I never think of them as process crimes.  They're serious and important Federal crimes.

Ms. Plaskett.  And how important do you think it would be if the President of the United States attempted to impede a criminal investigation into his associates or his campaign?

Mr. Comey.  I don't think I'm comfortable answering with respect to the President, but I don't have to because I can answer generally.  I think it's very serious when anybody endeavors to obstruct the due administration of justice.

Ms. Plaskett.  Well, if it was -- anybody would be a very serious thing, but how much more serious would that issue be to the functioning of our democracy if it was, in fact, the President?

Mr. Comey.  You know, I'm worried about offering that opinion.  I think it's very important that all of us in senior leadership positions in the government uphold our oaths, and critical to the President's oaths is to ensure that the laws are faithfully executed.  So if someone who's taken that oath is obstructing justice, as we learned 45 years ago in Watergate, it's an incredibly important offense.

Ms. Plaskett.  And does that present a national security threat?

Mr. Comey.  That's a hard one to answer.  It would depend upon who it is and the circumstances and whatnot.  I don't think I can answer that in the abstract.

Ms. Plaskett.  Okay.  Thank you.

Mr. Comey.  Thank you.

Ms. Jackson Lee.  Sheila Jackson Lee.  Mr. Comey, it looks like we're going to be doing a bionic, I may be talking really fast and meteoric, and so I may be looking to put things in the

record and not really seeking a question.

So let me just do this.  On the overall obstruction of justice, New York Times article that indicated they had it however here:  Mr. Comey's firing was more unusual and important because he was overseeing the Russia investigation, a certain number of experts said.  Questions about what will happen with that investigation now that he is gone are the main reason they said his firing is likely to be highly significant, with long-term ramifications for policy and government.  These experts came from the University of Chicago, Denver, Harvard, Maryland, University of Virginia, Yale University.

Do you, frankly, think that your firing without determination of why will have long-term policy and governmental impact?

Mr. <u>Comey.</u>  I don't know.  It'll depend upon whether the law is able to work as intended and the special counsel can complete his work.  I don't know where he'll end up, so it's hard for me to answer at this point.

Ms. <u>Jackson Lee.</u>  Let me answer -- or ask some questions regarding the inspector general's report.  I think it was around the 26th that -- September 26 that you received some indication about the Weiner laptop, 2016.  And it started in New York, and people started to see emails flourishing, and FBI agents thought it was crucial -- I'm looking for my materials here -- thought it was crucial that you -- that they begin to investigate.  And

it seems that there was some suggestion in the IG's report of a question whether there was unnecessary delay.

Mr. Comey.  Yes, I remember that.

Ms. Jackson Lee.  But it seems that he concluded that no emails, texts, anything, conversations he could find to suggest that it was purposeful delay, and I think that's important to be on the record.  Do you agree with that?

Mr. Comey.  I agree.  I've seen -- I didn't realize until I read the IG's report that chronology, because it wasn't presented to me for decision until the end of October, but there was reason to believe it would have been ready for decision earlier than that.  But I never saw any indication that that was intentional delay.

Ms. Jackson Lee.  So let me read this last text or last comment.  As I said, I'm going to go as quickly as I can.

The last paragraph on that particular section regarding Mr. Weiner's laptop:  Comey, Lynch, and Yates face difficult choices in October 2016.  However, we found it extraordinary that Comey assessed that it was best that the FBI Director not speak directly with the Attorney General and Deputy Attorney General about how best to navigate this most important decision and mitigate the resulting harms, and that Comey's decisions resulted in the Attorney General and Deputy Attorney General concluding that it would be counterproductive to speak directly with the FBI Director.  We believe that open and candid

communications among leaders in the department and its components is essential for the effective functioning of the department.

Without you suggesting what their thoughts were, upon reflection, because this, as I started out, was an election of the leaders of the free world, one of them was going to be elected. And I know earlier in his report you had -- it was an assumption that Secretary Clinton would win, and I don't consider that a factual basis to not do something, and then the idea that you didn't want to be in the -- in the position of concealing.

Upon reflection or not reflection, why did you not speak to or find it important to speak to both the deputy and the Attorney General so there could have been a collaborative decision on what to do?

Mr. Comey.  That's a really good question.  My thinking at the time was, I need to give them the chance to take this decision from me, but I also need to give them the chance to avoid it, and so that's what I did.  I told them, I think I -- I had my staff tell them -- I think I need to tell Congress about this, but I'd be happy to talk to you.  And they came back saying, we think it's a bad idea, but we don't want to talk to him.

I read that -- I may be wrong, but I read that as them saying, over to you Jim.  And this drives my wife crazy that I was willing to take that hit, but I thought it was important that if they don't want to be involved in the decision, that I make the

decision.  Now, what I maybe should have done was say, no, back
to you Loretta and Sally, but that felt cowardly to me at the
time.  And if I were to live life over again, I might have marched
across the street and said, hey, you folks see it differently
than I and why, instead of the way I approached it.  But I gave
them the chance and they said, don't need to talk to you.

Ms. Jackson Lee.  So we look at good practices, can we leave
it on the point that, yes, march across the street and you sit
down as a group and make the final decision?  Would that have
been, you know, without saying it was cowardly, without saying
they didn't want to do it, but that's sort of DOJ, because you
were having something so much so at a heightened level that that
would have been the better practice?

Mr. Comey.  Maybe, but I actually don't want to -- I really
like those two people.  I don't let them too much off the hook.
They're the Attorney General and the Deputy Attorney General of
the United States for heaven's sakes.  They know that I think
I have to do this thing, so call me up and talk to me about it,
give me your views of it, you're my boss.  But instead, they
communicate back saying over to you, Jim.

So I'm not sure I want to take all the fault for that.  I
agree with you.  I think the best practice would have been the
three of us to sit down and talk it through.

Ms. Jackson Lee.  Okay.  I will -- the point behind that
was that maybe the October 5th did not need to be announced only

primarily because you were just in the midst of your October 28 -- just in the midst of the investigation, and I don't think you would have been considered a concealer if you were just in the midst of the investigation.

But let me quickly go to this issue here.  Let me raise this question, and then I have about 1 minute and 50 seconds or something to ask these questions here.

Director Comey, in your June 8, 2017, written testimony to the Senate Intelligence Committee, you wrote about a February 14, 2017, meeting with President Trump in which he stated, quote, I hope you can see your way clear to letting this go, to letting Flynn go.  He's a good guy.  I hope you can let this go.

You then described your reaction, quote, I had understood that the President to be requesting that we drop any investigation of Flynn in connection with false statements about his conversations with the Russian ambassador in December.

Director Comey, is that still your understanding?

Mr. Comey.  Yes.

                [Comey Exhibit No. 5

                Was marked for identification.]

Ms. Jackson Lee.  And I'd like to introduce the following document as exhibit 5, which is pages 90 to 91 of the transcript from former FBI general counsel James Baker's October 18, 2018, interview with the committee.

And just in going to that earlier comment, you obviously you see now, today, of the final results of Director Flynn in terms of the Mueller indictment on the very facts that you were dealing with, and I just want to put that on the record.

I would like to introduce the following exhibit, No. 5, and which is pages 90 to 91 of the transcript from former FBI general counsel James Baker's October 18, 2018, interview with the committee.  It reads:  Did you also have concerns that the statements by the President were requesting that the FBI drop the investigation of General Flynn?

Mr. Comey.  I'm sorry, I thought you were reading his statement.

Ms. Jackson Lee.  The answer is yes.  Forgive me.

And why would it be concerning if the President asked the FBI to drop the investigation of his national security advisor?

You said:  Well, it's an --

Mr. Comey.  Jim Baker said.

Ms. Jackson Lee.  Jim Baker.

It's an investigation, period.  It's the President, I mean, I guess you would say breaking the norm in that sense, the President actually intervening --

Let me be very clear.  I'm reading Jim Baker's comments. Thank you very much.

-- intervening while it's going on with respect to a particular investigation.

It also goes back to what we talked about earlier.  It has
to -- it's not just some investigation; it's an investigation
that is also related to the investigation -- or to Russia -- to
the Russia matter that we were investigating, right?  So it was
not a free-standing independent investigation; it was something
related to these other things.  So it was alarming in that regard
too.

Do you share Mr. Baker's concerns about the President asking
the FBI to drop the investigation of his national security
advisor?  Do you agree that the Flynn investigation was related
to the Russia matter?

Mr. Comey.  I do.

Ms. Jackson Lee.  The transcript continues:  Is it
alarming even if the FBI has no intention of dropping the
investigation?

Well, we didn't have any intention of dropping the
investigation, so -- but it's alarming nonetheless, yes, because
we'll know at a minimum the existence of the fact of the -- at
a bare minimum, the fact of this conversation.  Just again, looks
bad if it were ever to -- if it was ever -- would look bad if
it was ever to become public, because it looks like the
President's trying to put his finger on the scale to cause the
investigation to go into a particular way, and that would hurt
the FBI's credibility, reputation for independence.  That was
very alarming.

Question:  You said it would look like that to the public.
Did you believe that that's what actually was going on?

The answer:  The President was trying to put his finger on
the scale.  Yes, that's what I thought was going on.

Do you agree with Mr. Baker's assessment that President
Trump was trying to put his finger on the scale by asking you
to drop Flynn's investigation?

Mr. Comey.  Potentially.  As I said earlier, I would want
to understand more about the President's intent before I reached
a conclusion.

Ms. Jackson Lee.  And so you think potentially, not
affirmatively?

Mr. Comey.  Well, it would look like the President was
trying to put his finger on the scale, but I understand the term
"put his finger on the scale" to mean obstructing justice.  And
as I said earlier, I'd want to know more of the facts, which I'm
sure the special counsel's work to understand, about the
President's intent before I reached that conclusion.

Ms. Jackson Lee.  And you don't believe that the statement
on public television "it was a Russia thing" is an affirmative
statement without qualification by the President of the United
States?  It was a Russia thing that I fired Mr. Comey on.

Mr. Comey.  Oh, I do.  And the only thing I added, though,
is since then he has said other things trying to, it seems, walk
that back.  And so again, I rely on his words.  I saw him say

that, but I've since seen him try to say other things.

Ms. Jackson Lee.  Well, you're a quintessential law enforcement officer and you know that is probably the tendency of any witness to walk back.  Is that not true?

Mr. Comey.  No, the tendency of this witness is trying to be fair and open minded.

Ms. Jackson Lee.  No, I'm projecting it to the President. Anybody who's being asked about something they said and it gets a lot of fury, it is a tendency to walk back.

Mr. Comey.  Well, it depends upon the person.  Some people will try to walk back things, others not.

Ms. Jackson Lee.  Were you also worried that it would hurt the FBI's credibility and reputation for independence?

Mr. Comey.  Yes.

Ms. Jackson Lee.  Thank you.

Mr. Comey.  Thank you.

Mr. Raskin.  Mr. Comey, I'm Jamie Raskin from Maryland.  I want to start, Director Comey, with your written testimony of the Senate Intelligence Committee on June 8th of 2017, when you wrote about your famous dinner with President Trump at the White House on January 27th.  And you said that the President was trying to, quote, create some sort of patronage relationship. And at one point he said to you, quote, I need loyalty.  I expect loyalty.  Is that your recollection?

Mr. Comey.  Yes.

Mr. Raskin.  Okay.  On pages 237 and 238 of your book, A Higher Loyalty, you also recount your dinner with President Trump and your reaction to this request.  At the bottom of page 237 you write, quote, to my mind, the demand was like Sammy the Bull's Cosa Nostra induction ceremony with Trump in the role of the family boss asking me if I have what it takes to be a made man. I did not and would never.

Can you just elaborate on why that was the first thing that came into your mind, this comparison to a made boss ceremony for La Cosa Nostra?

Mr. Comey.  It was an impression that kept popping into my head when I interacted with President Trump, and particularly it started when I watched him interact as President-elect that first week of January at Trump Tower, and I kept trying to push it away because it seemed too dramatic.  But his leadership style -- I'm not trying to suggest he's out robbing banks -- but his leadership style reminded me of that of a mafia boss, of a Cosa Nostra boss, because it's all about me, what you can do for me, it's all about your loyalty to me.  It's not about any higher values or institutional values.  It's about how are you feeding me the boss, how are you taking care of me the boss.

Mr. Raskin.  And that was novel to your experience in terms of dealing with Presidents of the United States?

Mr. Comey.  Correct.  I dealt closely with three, and this was the first time I'd had that reaction.

Mr. Raskin.  Okay.  And just to be clear, what is your loyalty to, as the director of the FBI or a law enforcement official?

Mr. Comey.  To a variety of external values, most importantly, the Constitution and the laws of the United States, and then to the regulations that restrict and govern the FBI, and also to the values that make the FBI such an important part of American life:  integrity, independence, competence, and fairness.

Mr. Raskin.  Has anything happened since these events that have changed your perception of the President's modus operandi in terms of his dealing with his subordinates and people who work for the government?

Mr. Comey.  No.  I think people who thought maybe I was being dramatic have come to believe that maybe I wasn't being dramatic in that observation.

Mr. Raskin.  Yeah.  How many -- have you ever prosecuted mafia bosses?

Mr. Comey.  Yes.

Mr. Raskin.  How many?

Mr. Comey.  Well, not the -- I've prosecuted capos.  I'm sitting next to an organized crime prosecutor.  So I've prosecuted probably five to seven senior leaders.  I've never prosecuted the boss of an organized crime family.

Mr. Raskin.  Got you.  The President's former personal

attorney, Michael Cohen, has been in the headlines recently. I'm not going to ask you specific questions about his case, but I wanted to clarify for the record some of the legal and investigative processes that lend itself to that type of case.

You may recall that when Mr. Cohen's apartment, office, and hotel room were first raided by the FBI in April of this year, the President attacked these steps. He declared that, quote, attorney-client privilege is dead. It was, quote, a total witch hunt. And he described the investigation as a, quote, disgraceful situation and an attack on our country.

Now, the raid was conducted by the FBI pursuant to a search warrant and at the direction of the Office of the U.S. Attorney for the Southern District, I think. Can you walk us through the steps that the FBI and DOJ take before approving a search warrant on an attorney and seizing documents that might include potentially privileged materials?

Mr. Comey. In very shorthand I will. It's a complicated process, but it involves a long series of approvals because it's what we would call a sensitive investigative matter. It touched on attorney-client relationships potentially, which are the core of our Nation, and so it would require approval to a very high level in the FBI, a very high level in the Department of Justice, and then have to go to a Federal judge.

Mr. Raskin. Okay. Was there anything that took place in these investigative steps that destroyed the attorney-client

privilege such that it would justify the President's statement that the attorney-client privilege is dead?

Mr. Comey.  Well, I can answer in general, because I don't know that case.  The entire sensitive investigative matter process is designed to be respectful of the privileges that might be touched by a search on a lawyer's office.

Mr. Raskin.  Okay.  President Trump has kept up his drum beat against his former lawyer.  Most recently, the attacks were in response Mr. Cohen's plea deal with the special counsel's office in which he admitted to lying about the Trump Tower Moscow project in contact with Russian Government officials during the 2016 campaign.

The President responded within hours tweeting, quote: Michael Cohen asks judge for no prison time.  You mean he can do all of the terrible unrelated to Trump things having to do with fraud, big loans, taxes, et cetera, and not serve a long prison term?  He makes up stories to get a great and already reduced deal for himself and get his wife and father-in-law who has the money, question mark, off scot-free.  He lied for this outcome and should, in my opinion, serve a complete sentence.

I would like to draw on your years of experience as an organized crime prosecutor and senior DOJ official and head of the FBI to unpack some of the prosecutorial methods that are under attack by the President.

First, why do criminal defendants such as Michael Cohen

decide to change course and flip?

Mr. <u>Comey.</u>  I can only answer that in general not about the case in particular.

Mr. <u>Raskin.</u>  In general.

Mr. <u>Comey.</u>  Because they conclude that it's in their self-interest to try to obtain a reduction in their sentence by providing substantial assistance to the people of the United States by helping solve other crimes.

Mr. <u>Raskin.</u>  Yes.  At certain points, I think the President has meditated the possibility of making it a crime to flip or saying it should be against the law to flip.  What do you make of that suggestion, as a prosecutor?

Mr. <u>Comey.</u>  It's a shocking suggestion coming from any senior official, no less the President.  It's a critical and legitimate part of the entire justice system in the United States.

Mr. <u>Raskin.</u>  Does the government routinely grant defendants who cooperate with the government and render honest testimony reduced sentences in exchange for their cooperation?

Mr. <u>Comey.</u>  Routinely, the prosecutors ask the judge to take that substantial assistance into account and reduce their sentences.

Mr. <u>Raskin.</u>  Okay.  So it's not directly up to the prosecutor --

Mr. <u>Comey.</u>  Correct.

Mr. Raskin.  -- but they will recommend to the court, if the person follows through --

Mr. Comey.  Right, if they tell the truth and provide substantial assistance in the investigation or prosecution of others.

Mr. Raskin.  Yes.  You know --

Mr. Comey.  That's how we make mob cases, terrorism cases, child abuse cases, drug cases, kidnapping cases.  It's essential to the workings of our criminal justice system.

Mr. Raskin.  Yes.  It may be difficult to extricate ourselves from the last couple of years, but if we were to go back to a more innocent time, would you agree that it's dangerous or would you disagree that it's dangerous to have a sitting President commenting on active criminal proceedings and investigations and trying to interfere in them?

Mr. Comey.  I think we have become numb to lying and attacks on the rule of law by the President, all of us have to a certain extent, and it's something we can't ever become numb to.

Mr. Raskin.  Okay.  I will close with that.  Thank you very much, Director Comey.

Ms. Hariharan.  It is 3:13, and we'll go off the record.

[Recess.]

[3:23 p.m.]

Chairman <u>Goodlatte.</u>  Back on the record.

Mr. <u>Jordan.</u>  Mr. Chairman, is it okay?  Okay, thank you.

Director, let me just go back and try to clear up a few things probably mostly for me.  The last hour I think you were talking about this with the minority as well.

You have your meeting with the President in February of 2017, where the President talks about can you see your way clear to go easy on Mike Flynn or whatever, something to that effect.  You then had a meeting with your senior staff and wrote a memo memorializing what took place in your meeting with the President.  Is that right?

Mr. <u>Comey.</u>  Correct.  I met with the senior leadership team and prepared and reviewed with them a memo.

Mr. <u>Jordan.</u>  Say it again.  I'm sorry.  Prepared to what?

Mr. <u>Comey.</u>  I prepared and then reviewed with them my memo.

Mr. <u>Jordan.</u>  So they worked on the memo with you?

Mr. <u>Comey.</u>  No.  I wrote the memo.  I gave them a copy of it to read, and then we sat down and talked.

Mr. <u>Jordan.</u>  You sat down and talked about it, okay.  And who all was in that meeting, again?

Mr. <u>Comey.</u>  I don't know for sure, but I'm sure Deputy Director McCabe was there; General Counsel Baker was there; my chief of staff; Jim Rybicki was there.  I believe the number three at the FBI at that point, who was the Associate Deputy

Director, was there.

Mr. Jordan.  That individual's name?

Mr. Comey.  At that point, it was David Bowdich.

Mr. Jordan.  Bowdich, okay.

Mr. Comey.  And then I believe that -- and this I'm less certain of -- that the head of the National Security Branch, Carl Ghattas, was there, and -- or Bill Priestap, the head of Counterintelligence.  I'm not sure about with the last two guys, but I think it's a possibility.

Mr. Jordan.  Deputy Director McCabe, Chief Counsel Baker, Chief of Staff Rybicki, Mr. Bowdich, Mr. Ghattas, Mr. Priestap.

Mr. Comey.  That's the universe of people I think could have been there.

Mr. Jordan.  You think they were all there.  Was Peter Strzok there?

Mr. Comey.  I'm sorry.  I didn't say I think they were all there.  I said that's the universe of people who could have been there.  I'm certain about McCabe, Rybicki, and Baker.

Mr. Jordan.  You're certain of the top three?

Mr. Comey.  Yeah.

Mr. Jordan.  The other three that you mentioned could have been there.

Mr. Comey.  Yeah.

Mr. Jordan.  What about Mr. Strzok?

Mr. Comey.  I don't remember him being there.

Mr. Jordan.  And Ms. Page?

Mr. Comey.  I don't remember her being there.

Mr. Jordan.  And what did McCabe, Baker, and Rybicki advise you to do, and then any of the others who -- if you can remember, what did they advise you to do after you showed them the memo and then talked about your -- you know, what had happened with you and the President?

Mr. Comey.  I don't remember who said what, but I remember two points of consensus:  We were all very concerned about it; and, second, we agreed that we ought to hold it very close, not brief the investigative team at this point and not go over and talk to the leadership of the Department of Justice, to hold onto it until we got a new Deputy Attorney General and they sorted out how they were going to supervise the Russia investigation.

Mr. Jordan.  Why did you decide not to share it with the leadership of the Justice Department?

Mr. Comey.  Because we believed that the Attorney General, Mr. Sessions, was --

Mr. Jordan.  Excuse me one second.  I've got to move.  I'm having trouble seeing you here.

Mr. Comey.  We believed that the Attorney General, Mr. Sessions, was on the cusp of recusing himself from anything related to Russia, so it didn't make any sense to brief him on it, and that there was no Deputy Attorney General at that point.

Mr. Jordan.  Why would you make that assumption?  I mean,

just because -- I mean, first of all, if he was on the cusp of leaving, that's a judgment call.  Maybe he was; maybe -- I can't recall exactly what was going on in February.

But he's still the Attorney General.  He had not recused himself.  If this is something important enough for you to memorialize, talk to your top people, why not then share it with the top law enforcement official in the government?

Mr. Comey.  Because we believed -- it turns out correctly -- that he was about to step out of any involvement, anything related to Russia.

Mr. Jordan.  I understand that.  But just because you believe he's about to do something doesn't change the fact that he's the Attorney General and, frankly, as the Attorney General for our government, should receive that kind of information, I would think.

Mr. Comey.  It's a judgment call we made that it was prudent to wait, given our expectation he wouldn't be the Attorney General in a matter of days with respect to that topic.

Mr. Jordan.  Okay.  So, if you're that concerned about Mr. Sessions, why didn't you share it with the Deputy Attorney General?

Mr. Comey.  There was no Deputy Attorney General at that point in time.

Mr. Jordan.  Ms. Yates had already stepped down.

Mr. Comey.  Correct.

Mr. Jordan.  Okay.  So who is number three at the Justice Department?  Why not share it with them?

Mr. Comey.  I don't know who was number three at that point. There was an acting -- there was a U.S. Attorney acting as the Deputy Attorney General, who we knew would be in the seat only until Rod Rosenstein was confirmed.  And so it didn't make sense to brief a matter like that to him, it was our judgment, and so we would just hold it.

And there was no -- we saw no investigative urgency.  If there was something we had to do right away, we might have thought about it differently, but given how we thought about the investigative state in which it was, it made sense to hold onto it.

Mr. Jordan.  I just want to be clear.  So you knew at the time that there was no Deputy Attorney General; Ms. Yates had stepped down.  You knew at the time that Jeff Sessions was the Attorney General, but you thought he may be recusing himself at some point in the near future.  And you also knew at the time Rod Rosenstein had been nominated to fulfill or to fill the DAG position.  Is that all right?

Mr. Comey.  Correct.

Mr. Jordan.  That was what you knew and assumed at the time. And so you made a decision we're going to wait until Mr. Rosenstein has the position and we're going to go talk to him?

Mr. <u>Comey.</u>  I think what we decided was -- I don't think we were that specific.  We said:  Let's wait until the Department of Justice gets its leadership team on and figures out how it wants to staff the -- this case.  Because you'll recall, during his confirmation hearing, one of the things Rod Rosenstein had promised the Senate was he would think about whether to appoint a special prosecutor once he became Deputy Attorney General.

Mr. <u>Meadows.</u>  So how did you know that he was on the cusp, according to your words, the cusp of recusal?  How would you know that?

Mr. <u>Comey.</u>  A couple of reasons.  It seemed like an obvious case for recusal, given his role in the campaign.  And I think -- in fact, I know we had been told by that point that the career officials at the Department of Justice were recommending that he recuse himself.  I think we knew that at that point.  So it seemed a foregone conclusion the Attorney General was going to step out of Russia matters.

Mr. <u>Meadows.</u>  So who told you?

Mr. <u>Comey.</u>  I don't remember.

Mr. <u>Meadows.</u>  Why would they have told you?

Mr. <u>Comey.</u>  Well, the person who told me would have been someone on my senior team.

Mr. <u>Meadows.</u>  Yeah, but why would that have been communicated?  Before a recusal actually took place, why would

they be communicating that to you, Director Comey?

Mr. <u>Comey.</u>  Why would my staff be telling me?

Mr. <u>Meadows.</u>  No.  Why would someone at the Department of Justice tell you that Jeff Sessions is going to recuse himself that would actually change your actions and what you decided to do?

Mr. <u>Comey.</u>  First of all, I know I said this before, but no one told me from the Department of Justice.  If your question is, why would someone at the Department of Justice tell someone at the FBI, that I don't know.

Mr. <u>Meadows.</u>  So who told you?  I mean, obviously, it changed your decision.  So you're saying that you have no knowledge of who told you that Jeff Sessions was on the cusp of recusal?

Mr. <u>Comey.</u>  Yeah.  It didn't --

Mr. <u>Meadows.</u>  That's your testimony?

Mr. <u>Comey.</u>  It didn't change my decision.  It was --

Mr. <u>Meadows.</u>  Well, it obviously did because you didn't take it to the Attorney General, which is the highest law enforcement officer.  You didn't take it to him.  So your testimony just now suggested that it did change your actions.

Mr. <u>Comey.</u>  No.  I'm suggesting it was a factor in a decision I made.  It was reality, and I stared at that reality and, based on that reality, I made a decision.  The decision was, let's hold onto it until they sort out their leadership.

Mr. Jordan.  Didn't in your memos you highlight the idea that if the President has something like what he told you in this meeting that prompted the memo and prompted this meeting, that there's a proper chain he's supposed to follow?  In fact, the President should go to the Attorney General.  They should look at the information, and then they should bring it to you as the director of the FBI.

You laid out a chain and a sequence that should happen if the President wants to get information to you, but it seems to me here we are now, you have this information that should be, I think, shared with the Attorney General and wasn't.

Mr. Comey.  I'm not sure I follow your question, Mr. Jordan.  I don't remember a conversation with the President in this context about who he should talk to.

Mr. Jordan.  I think you, if I remember your memo -- I have to go back and look -- but if I remember your memo, one of the things you talked about is that if the President wants to share information like he shared with you about General Flynn, he should do that through the appropriate channels, being through the Attorney General, then through the Attorney General, Justice Department, and then it comes to you, as the Director of the FBI.

Mr. Comey.  Yeah.  I'm not recalling that.  He wasn't sharing information about Mr. Flynn.  He was asking me to drop an investigation of Flynn.

There are other contexts in which at the end of March or

April where I told the President that the way it should work if
he has an inquiry is to have the White House counsel call over
to the leadership of the Department of Justice and do it that
way.

Mr. Jordan.  Okay.  Okay.  I want to move on to -- I want
to go back to Bruce Ohr and Christopher Steele real quick, if
I can.  Do you know Bruce Ohr personally?

Mr. Comey.  Yes.  Not well.  I've met him, and he was a
prosecutor in New York around the time that I was a prosecutor
in New York.

Mr. Jordan.  And did you -- just to recap, I think Mr. Gowdy
was here earlier today.  Did you know that Christopher Steele
was giving information to Mr. Ohr?

Mr. Comey.  I didn't know that, and I don't know that for
a fact.

Mr. Jordan.  So you didn't know that Christopher Steele was
passing information to Mr. Ohr and he was then providing it -- Mr.
Ohr was then providing it to the FBI?

Mr. Comey.  I don't know if that's true, and I didn't know
anything like that when I was Director.

Mr. Jordan.  Did you know if Christopher Steele had any bias
against President Trump?

Mr. Comey.  No.

Mr. Jordan.  Did you -- I'm just curious your thoughts.
Maybe you can't comment on this.  But why did the FBI need Bruce

Ohr?  If you were getting information directly from Mr. Steele, why did you need Bruce Ohr to also get information from Mr. Steele and then give it to the FBI?

Mr. Comey.  I can't answer that because I don't -- as I said in response to your earlier questions, I don't know anything about a Bruce Ohr connection to Mr. Steele.

Mr. Jordan.  Why was Christopher Steele terminated, his relationship with the FBI terminated, in November of 2016?

Mr. Comey.  I don't know.

Mr. Jordan.  Okay.  Did you know that the FBI continued to use Mr. Steele's information after he was terminated by the FBI?

Mr. Comey.  What do you mean by use his information?

Mr. Jordan.  The fact that after he's terminated, he continues to give information to Bruce Ohr, who Bruce Ohr, after each and every time he communicates with Christopher Steele, then sits down with the FBI, and there are, my understanding, several 302s, I think more than a dozen 302s that talk about those interactions that Mr. Ohr had with Mr. Steele.

Mr. Comey.  I don't know anything about that.

Mr. Jordan.  Okay.  Were you aware that Christopher Steele had met with representatives in the media in September of 2016?

Mr. Comey.  No.

Mr. Jordan.  So didn't know anything about that and didn't know that he had met with Mr. Isikoff with Yahoo News?

Mr. Comey.  No.  And I don't even know whether that's true,

but I didn't know anything about it.

Mr. Jordan.  Okay.  It's been reported that there's a
series of emails that talk about the idea that Christopher
Steele -- not the idea, the fact that Christopher Steele had met
with representatives in the press in September of 2016.  Do you
know anything about that series of emails?

Mr. Comey.  No.  I don't -- no, I don't remember anything
about it.  Don't think I ever got an email about it or saw an
email about it.

Mr. Gowdy.  Director Comey, what element was missing in
July of 2016, when you had the press conference, that might have
been found in October on Anthony Weiner's computer?

Mr. Comey.  I don't know it's an element, but what
was -- the key ingredient that was missing in the Clinton
investigation was any indication that she knew she was doing
something she shouldn't be doing.  And so what the Weiner trove
potentially held was evidence of that intention, especially in
the form of the emails from her BlackBerry during her first 3
months as Secretary of State.

Mr. Gowdy.  Tell me how the existence of that information
may have impacted the element of intent.

Mr. Comey.  Again, I don't know that I'd call -- I don't
know whether I would describe it as an element.  My understanding
is -- and I remember you and I talking about this it seems like
years ago -- the Department of Justice has always required before

it will bring that misdemeanor indications of intention or harm to the United States or obstruction of justice, those kinds of things.  And that was the ingredient we didn't have in the Clinton case.

And so the Weiner trove held the prospect that we -- because it might contain evidence of the beginning of her use of her unclass system, might hold that evidence.

Mr. Gowdy.  Well, I'm sure you can see, because a smart guy and a good lawyer, the next question is, how can you begin to even draft a non-pros memo if you haven't interviewed two dozen witnesses, including the target, but you're already drafting a non-pros, but the moment you find out that there may be a computer you have not accessed, you reopen the investigation; whatever you found on Weiner's computer, could you not have also found when you were interviewing the two dozen witnesses?

Mr. Comey.  Potentially.  What I was doing in May was 10 months into an investigation, seeing on the current course and speed where it's going to end, planning.  Just -- I'm sure you did too.  I drafted plenty of indictments before I finished investigations because it looked like we were going to get enough to charge a person.  And so that's what it was about.

And, again -- I know I said this in response to the Democrats' questions -- the prospect, what made Weiner's computer a horse of a different color was the size of the trove and the emails potentially from the first 3 months as Secretary

of State a very different kettle of fish.

Mr. Gowdy. Is it because -- and, again, I know you don't like answering hypos, and I don't actually like asking them -- but what in particular the beginning stages of her tenure would have addressed an element that you thought was missing?

Mr. Comey. Oh, that's easy to answer. If there was going to be evidence that she knew she was communicating in a way she shouldn't, explicit evidence, common sense tells you it's likely to be at the beginning when someone encountered her mode or means of communication and said: Hey, boss, you know you can't do that. You know you can't talk about this kind of thing or that kind of thing on an unclass system.

It's much more likely to be at the beginning, which we never found, those 3 months, than much later.

Mr. Gowdy. All right. Well, let me ask you about the beginning. Bryan Pagliano, when the FBI interviewed him, who did he say instructed him to set up the server?

Mr. Kelley. I'm sorry. Who is the name, please?

Mr. Gowdy. Bryan Pagliano.

Mr. Comey. I don't remember.

Mr. Gowdy. Do you remember Bryan Pagliano?

Mr. Comey. Yeah, I remember the name.

Mr. Gowdy. A Department of State employee who, by all indications, set up the server for Secretary Clinton. Do you know whether he was asked what he was told about why this was

being done?

Mr. <u>Comey.</u>  I don't today.

Mr. <u>Gowdy.</u>  Could that witness also have provided some evidence of intent, based on those conversations?

Mr. <u>Comey.</u>  The guy who set up the server?

Mr. <u>Gowdy.</u>  Sure.

Mr. <u>Comey.</u>  Maybe.  Maybe.

Mr. <u>Gowdy.</u>  Do you know where he worked?

Mr. <u>Comey.</u>  No.  I mean, I'm sure I did at some point.  I don't remember.

Mr. <u>Gowdy.</u>  He worked at the Department of State, or he was paid by the Department of State.  Did the Bureau pull any hour sheets or performance evaluations to see whether or not he actually did work at the Department of State?

Mr. <u>Comey.</u>  I don't know.

Mr. <u>Gowdy.</u>  Did the Bureau talk to his supervisor?

Mr. <u>Comey.</u>  I don't -- I don't remember certainly today. I don't know whether I ever knew that.

Mr. <u>Gowdy.</u>  What was he granted immunity for and from?

Mr. <u>Comey.</u>  I don't recall.  I'm sure I knew 2 years ago, but I don't remember.

Mr. <u>Gowdy.</u>  Who is Paul Combetta?

Mr. <u>Comey.</u>  Another one of the figures somehow in the setup of the server or something.  I can't -- I remember the name, but I don't remember what his role was.

Mr. <u>Gowdy.</u>  He worked at Platte River.  Does that refresh your recollection?

Mr. <u>Comey.</u>  Platte River Networks, yeah.  I forget whether they supplied the server or one of the servers.  They were involved in the setup or maintenance of the Secretary's private email server.

Mr. <u>Gowdy.</u>  Were they also involved in any deletions of her emails?

Mr. <u>Comey.</u>  I don't know.  It sounds familiar, but I honestly can't remember.

Mr. <u>Gowdy.</u>  Do you recall the product BleachBit?

Mr. <u>Comey.</u>  Oh, yes, I do.

Mr. <u>Gowdy.</u>  Do you know where that came from?

Mr. <u>Comey.</u>  I certainly don't today.  I don't know whether I ever did.

Mr. <u>Gowdy.</u>  Do you recall a conference call between Cheryl Mills, David Kendall, perhaps Heather Samuelson, and Platte River about the time the public learned she had this unusual email arrangement?

Mr. <u>Comey.</u>  Vaguely.  I'm not sure I remember those participants.

Mr. <u>Gowdy.</u>  Do you recall emails being destroyed by Platte River after the public learned that she had this email arrangement?

Mr. <u>Comey.</u>  Yes.  That rings more of a bell.  I remember

something about -- and I don't know whether it was Combetta or
not -- but somebody having failed to do what they asked him to
do and panicking and going back and deleting emails on one of
the old servers maybe.

Mr. <u>Gowdy.</u>  That is definitely one version of how that
conference call went, that he in the past had been told to have
a short retention, and he got on the phone with some of Secretary
Clinton's attorneys and had -- I won't use the word -- but an
oh-something bad moment and realized he had not done it.  There
are other versions that we don't have access to because
privileges were asserted surrounding that conversation.  Do you
recall anything about that?

Mr. <u>Comey.</u>  No.  I remember privilege issues, but not about
that conversation.

Mr. <u>Gowdy.</u>  Who made the decision to allow Cheryl Mills and
Heather Samuelson to sit in on Secretary Clinton's interview?

Mr. <u>Comey.</u>  I think the DOJ did, although I'm trying to
remember whether I knew personally.  FBI people knew about it
and didn't object to it.

Mr. <u>Gowdy.</u>  They did or did not?

Mr. <u>Comey.</u>  Did not, to my recollection.

Mr. <u>Gowdy.</u>  We've interviewed some Bureau employees who
thought it was a very unusual arrangement that they were not
familiar with.  How would you describe allowing multiple fact
witnesses to be present while a fact witness is being

interviewed?

Mr. <u>Comey.</u>  Certainly unusual in that you had two people who had been witnesses, who were the Secretary -- the subject's lawyers, who after we cleared as to them were allowed to attend the interview.  Unusual.

Mr. <u>Gowdy.</u>  When you say "unusual," in the time you spent in the Southern District and at the FBI and the Department of Justice, can you recall another time where fact witnesses also served as potential counsel?

Mr. <u>Comey.</u>  Yes.  I can't -- and we would have to negotiate that with -- I'm trying to remember the terms -- a Curcio hearing and having all kinds of discussions about how to handle it in a charged case.

I don't know that I can remember -- sitting here, I can't remember an uncharged, so an investigative stage case, where a lawyer for the subject emerged as a fact witness.  I can't.  I'm sure if I have more time to think about it, maybe I will, but I can't right now.

Mr. <u>Gowdy.</u>  Why does the Bureau typically not interview multiple fact witnesses at the same time?

Mr. <u>Comey.</u>  Because you'd ideally like people not to know what others' stories are so they're not able to get their story together.

Mr. <u>Gowdy.</u>  Some of the same reasons they have a sequestration rule.  So you don't want witnesses to hear other

witnesses.

Mr. Comey.  Yeah, ideally.  You want to keep them all in separate boxes.

Mr. Gowdy.  So why was this interview handled differently?

Mr. Comey.  I don't remember for sure.  I think a key factor was they were her lawyers, and so our ability to keep them from talking to each other was slim to none regardless and that they had been -- we had finished our evaluation of them as potential subjects.  And so I think the judgment of the team was it's unusual, but it's really not something that's going to hurt our investigation.

Mr. Gowdy.  Can you think of another investigation you were involved with where that happened?

Mr. Comey.  No.

Mr. Gowdy.  Did you interview Patrick Kennedy?

Mr. Comey.  I didn't interview anybody.

Mr. Gowdy.  Did the Bureau interview Patrick Kennedy?

Mr. Comey.  State Department official?

Mr. Gowdy.  State Department official.

Mr. Comey.  I don't know.  It rings some bell, but maybe I know his name from something else.

Mr. Gowdy.  Did the Bureau gain an understanding of how she could have kept her emails from the time she separated from service at the State Department, but yet felt the need to delete them in March of 2015?

Mr. <u>Comey.</u>  I don't know.

Mr. <u>Gowdy.</u>  Destruction of evidence can be considered evidence of what?

Mr. <u>Comey.</u>  It can either be a separate offense or evidence of consciousness of guilt.

Mr. <u>Gowdy.</u>  Of the statutes the Bureau had under investigation -- and what I mean by that is the fact pattern may have applied to certain statutes -- which statutes do you recall were at issue or at play in this investigation?

Mr. <u>Comey.</u>  I don't know if I remember even the numbers anymore.  I think it was 18 U.S.C. 1924, which I think is the misdemeanor, and 793, which is a variety of sections relating to espionage, mishandling of classified information, theft of classified information.  I think those were the two.  I could be wrong about that.  I've tried to suppress it, but I think those are the two.

Mr. <u>Gowdy.</u>  So maybe a felony retention, a gross negligence standard, also a felony, I think, and then a misdemeanor?  Does that sound right?

Mr. <u>Comey.</u>  Yes.  Maybe you can help me.  I think it was 793 and 1924.  I think 1924 is the misdemeanor.  793 --

Mr. <u>Gowdy.</u>  You are correct.  1924, you are correct.  793, and there's a section (f), which is gross negligence, and then there's a section (d), which is a higher level of scienter.  Does that sound right?

Mr. <u>Comey.</u>  It does sound right.

Mr. <u>Gowdy.</u>  In your judgment, what element was missing that prevented or thwarted a successful -- well, let me ask you this: Is it your position there was insufficient evidence to charge or your position that there was insufficient evidence, even if charged, to secure a conviction?

Mr. <u>Comey.</u>  As I recall, our judgment was that, given the way the Department of Justice for 50 or 100 years had treated those statutes, we did not have sufficient evidence of intent for any -- anybody in the counterespionage section to bring those charges, that they would never bring a gross negligence prosecution, and that all the misdemeanor cases involved some other element of proof that raised it up to the level at which they would bring that statute to bear.

So I don't -- I don't think we spent a lot of time figuring out whether we had a beyond a reasonable doubt case, because it was so obvious we had a case that nobody would prosecute.

Mr. <u>Gowdy.</u>  Had there ever been prosecutions under the gross negligence statute?

Mr. <u>Comey.</u>  One, as I recall, since 1917.

Mr. <u>Gowdy.</u>  Was the statute ever used in applications for search warrants?

Mr. <u>Comey.</u>  I don't know.  I don't know if I ever knew that.

Mr. <u>Gowdy.</u>  So, as we sit here today -- and I know you and I have had this conversation, and it's been a while -- your best

explanation for what was lacking -- I get the fact the statute wasn't used that often, but no statute is used for the first time until it is.

So what -- did you view the statute as being unconstitutional?  Did you view it as being so vague as to not sustain a conviction, or was there an element of the statute you think was missing?

Mr. Comey.  See if I get this right.  My recollection is not crystal clear at this point.  I remember learning that there were grave reservations for decades in the Department of Justice about the constitutionality of 793(f), I think it is, and an understanding -- and I confirmed that understanding by reading the legislative history myself -- that when Congress passed that statute and made it a felony in 1917, their intention was for the definition of gross negligence to approach willfulness, very similar to the kind of intention that the Department of Justice would require for a 1924 prosecution.

And we had proof that got us nowhere near willfulness.  And so our judgment was we got no chance on 793, even if they would bring the second prosecution in American history in this context, and we sure got no chance on the intention requirement that they've imposed on the statute forever.  And so our judgment was, look, we worked this hard; we're nowhere near where anybody would bring this.

It turns out I got criticized that my case for having no

case was not strong enough.  The inspector general hit me that I should have told the public they also would never bring a case where the people communicating all had a clearance and a need to know the information, and that Director Comey failed to be accurate with the American people in saying not only was this no case; it was more of a no case than he realized.

Mr. Gowdy.  All right.  You have smart lawyers at the Department, smart lawyers at the Bureau.  So you knew all of that pretty early on in the investigation.  This is one of the first things you're going to ask is, what is the case law?  Have there been other prosecutions?

Mr. Comey.  Yeah.  I didn't know it to that level of detail until the spring, but I knew from just talking to our troops early on it's going to be a hard case to make, given the way the Department of Justice has always understood these statutes. Let's get at it, see what we can find.

Mr. Gowdy.  So what were you looking for?  What could have changed that analysis?  What specific piece or pieces of evidence could have changed that?

Mr. Comey.  Significant evidence of knowledge of lawlessness, the nature of the unlawful conduct, significant evidence of communication with people without a clearance or a need to know, significant evidence of obstruction of justice and false statements by the subject, and probably other things that are in the other cases, but those are three that pop into my head

2 years on.

Mr. Gowdy.  Did you find any evidence of either successful or attempted foreign intrusions in her server?

Mr. Comey.  My recollection is that we did not find evidence that foreign actors had intruded into the server, but that our experts thought we wouldn't see it, given the nature of the server and the nature of the adversary.  That's my best recollection.

Mr. Gowdy.  So there was no draft of your July 5th statement that may have included any language about possibly hostile actors having access to emails?

Mr. Comey.  I don't remember for sure, but it wouldn't surprise me if there were because I was trying to describe what our folks said, which is:  We don't see the evidence, but given the nature of the actors, we wouldn't be likely to see the evidence.  But I don't remember exactly how I phrased it.

Mr. Gowdy.  So you don't recall a draft that may have used phrases like likelihood, significant likelihood edited down to a potential?

Mr. Comey.  I don't, sitting here.  It wouldn't surprise me, though, as part of the editing process.

Mr. Gowdy.  If there had been evidence, in your judgment, would that have met the allowed access by people without sufficient security classifications?

Mr. Comey.  Not necessarily, because the kind of evidence I understand that DOJ looks for is I intentionally shared

information with you, who didn't have a clearance.  The carelessness involved in having a system that a bad guy could hack into is a different sort, and so that's not what I was talking about earlier.

Mr. Gowdy.  Did all of Secretary Clinton's attorneys have the requisite security clearances?

Mr. Comey.  Not to my knowledge.  Not all of them, no.

Mr. Gowdy.  Do you recall which ones did not, and would they have been any of the ones who actually culled through her emails?

Mr. Comey.  I don't recall as to people.  I have some recollection that maybe David Kendall from another case had a clearance or something.  But of the attorneys, surely not all of them had the requisite clearance to be viewing classified information.

Mr. Gowdy.  Would that have met the evidentiary burden for an element if you gave emails to someone who did not have a security clearance?

Mr. Comey.  No.  DOJ would laugh us across the street if we came over with that, that someone in the course of legal representation had their lawyer review something.  No chance.

Mr. Gowdy.  It sounds to me, though, with all due respect, that you are describing an intent statute, an intent to disseminate or share classified information with somebody who is not entitled to it.  So why would Congress come up with a gross negligence standard if we're going to read it as intent?

Mr. <u>Comey.</u>  I don't know for sure.  You'd have to ask the
1917 Congress.  But my recollection of the reading the history
of it is there was a movement to try and have the espionage statute
sweep more broadly than just intentional misconduct.  And there
was a debate in Congress, which is why people who voted it for
it said:  I'll go along with gross negligence, but it better be
up at the willful level, close to intentional misconduct.  But
I don't know beyond that.

Mr. <u>Gowdy.</u>  Do you know whether anyone at the Bureau or the
Department shared questions with Ms. Mills' or Samuelson's
attorney before the interview?

Mr. <u>Comey.</u>  No, I don't.

Mr. <u>Gowdy.</u>  Would you be surprised if that happened?  Is
that outside the normal protocol, from your experience?

Mr. <u>Comey.</u>  I don't know.  It would depend.  I guess I
could imagine it if they were negotiating over privileged spheres
and trying to navigate privilege.  I could imagine an
investigator sharing, "Look, this is what I want to talk about,
this, this and this," to try and avoid a privilege assertion,
but I don't know.

Mr. <u>Gowdy.</u>  What other investigatory tools did you have
other than a voluntary interview?

Mr. <u>Comey.</u>  With respect to?

Mr. <u>Gowdy.</u>  Either Mills, Samuelson, Kendall, Pagliano,
Combetta.

Mr. <u>Comey.</u>  Conceivably, you could -- lots of investigative tools, but the closest to an interview would be a grand jury subpoena, questioning someone in the grand jury.

Mr. <u>Gowdy.</u>  And tell me why that was not done for any of the witnesses.

Mr. <u>Comey.</u>  I don't know for sure.  The judgment of the investigative team surely that it wasn't necessary.  My recollection, which is not crystal clear, as to Secretary Clinton is that there were more degrees of freedom in doing an interview than doing it in a grand jury setting, where, as you know, it's very restrictive.

Mr. <u>Gowdy.</u>  I do know that.  I also know, unless something's changed, the attorney's not allowed in a grand jury when a witness is being interviewed, and there would be no situation under which multiple witnesses would be interviewed at the same time by a grand jury.

Mr. <u>Comey.</u>  That's right.

Mr. <u>Gowdy.</u>  Fair?

Mr. <u>Comey.</u>  Fair, although, as you know, because this is what gums it up, the witness can ask to go outside and consult with their attorney --

Mr. <u>Gowdy.</u>  Absolutely.

Mr. <u>Comey.</u>  -- as frequently as they like during a grand jury proceeding.

Mr. <u>Gowdy.</u>  Absolutely.  So what I'm trying to get at is,

what do you give up by using the grand jury?

    Mr. <u>Comey.</u>  What did the --

    Mr. <u>Gowdy.</u>  What do you give up?  What investigatory advantage do you lose?  If you have a choice between a voluntary interview and a grand jury appearance, what are you risking losing with the grand jury interview?

    Mr. <u>Comey.</u>  A number of things.  If you're going to talk about TS/SCI information, you have a real problem with the grand jury.  You'll have to clear a grand jury, which is really tricky, and both because of the intrusion on their private lives and just how difficult it is to clear 23 U.S. citizens who have been summoned for jury duty.

    And so you have to figure out what can we discuss in the grand jury and what can't we discuss in the grand jury.  So what you're gaining with the informal interview is, in a SCIF, an agility that you wouldn't have in a grand jury and then the ability of a group of investigators all to fire at the person and watch and poke and watch and poke in a way you can't in a grand jury.

    Mr. <u>Gowdy.</u>  Well, I'm out of time.  I'm going to let Ratcliffe go.  But I do need you to -- if the witnesses don't have clearances, then how much conversation would there be with those witnesses about classified information over which they had no clearance?

    Mr. <u>Comey.</u>  I think they gave everybody in that room an

interim clearance to discuss TS/SCI information that day.  So you were able to give interim clearances to a small group of people.

Mr. <u>Gowdy</u>.  I was more referring to the lawyers that may have culled through the emails when they were asked to do so, and do you know whether they had clearances when they went through her emails?

Mr. <u>Comey</u>.  As I said earlier, I'm sure at least some of them didn't.  Maybe all of them didn't.  I have some recollection that maybe David Kendall or somebody had a clearance, but certainly not all of them.

Mr. <u>Gowdy</u>.  And he would have had a clearance -- well, who represented David Petraeus?

Mr. <u>Comey</u>.  Maybe it was David Kendall.  Maybe that's why I'm remembering it.

Mr. <u>Gowdy</u>.  It was.

Mr. <u>Comey</u>.  He's an experienced lawyer who has represented a lot of people in classified investigations.

Mr. <u>Gowdy</u>.  He is.

Mr. <u>Comey</u>.  Maybe he did.  But others, I'm sure they all didn't have clearances.

Mr. <u>Gowdy</u>.  And I think Congressman Ratcliffe made reference to the fact that you -- or at least there are quotes attributed to you -- are not happy with the decision to let him plead to a misdemeanor as opposed to a felony.  Is that true?

Mr. Comey.  That's true.

Mr. Gowdy.  And part of it was because you assigned a higher level of knowledge or duty to him, given his role as a general?

Mr. Comey.  And the nature of the offense was just proof that he knew he was doing something he shouldn't do was overwhelming, and on top of that, he lied about it to the FBI.

Mr. Gowdy.  Right.  I really am going to let John go now. He lied to the FBI; that is a crime.  Lying to the public is not, as we've established.  But is it not evidence of intent and/or consciousness of guilt?  I mean, Secretary Clinton told the public that no classified information traversed her server, and that was false, right?

Mr. Comey.  She maintained that -- as I recall, that she did not -- she thought she had successfully talked around the classified subjects.  And the challenge for the prosecutors and investigators was proving that is false.

Mr. Gowdy.  Well, and it would have been really interesting had she phrased it to the public:  I did my best to avoid talking around any documents that may have been classified.

But that is not what she said.  She said:  No classified information was either sent or received.

Do you recall that?

Mr. Comey.  Generally.  I think that's right.  And, as you said, during her interview, she maintained that:  I believed we had successfully talked -- we had not crossed the line.  We had

talked around these subjects and were sufficiently vague as to not implicate the classification requirements.

Mr. <u>Gowdy.</u>  She also said that no records were destroyed, that they were all retained.  Do you recall her saying that?

Mr. <u>Comey.</u>  I don't remember.  I believe you, but I don't remember that.

Mr. <u>Gowdy.</u>  Do you recall her saying her attorneys were overly inclusive in what they considered to be public as opposed to private?

Mr. <u>Comey.</u>  No, I don't remember that one.

Mr. <u>Gowdy.</u>  You agree false statements sometimes is as much evidence of intent as you're going to get?

Mr. <u>Comey.</u>  In some cases.

Mr. <u>Gowdy.</u>  Demonstrably false exculpatory statements.

Mr. <u>Comey.</u>  Hard to answer in the abstract, but in some cases it can be your best evidence.

Mr. <u>Jordan.</u>  Thank you, Mr. Chairman.

Director, I want to have you look at an email, if you would, please.  I'm more concerned with the second email where the from line is McCabe, Andrew McCabe.  I'll give you a minute to look it over and then just want to run through it.

Mr. <u>Comey.</u>  The one dated Sunday, January 8th?

Mr. <u>Jordan.</u>  Yes, 12:08.

Mr. <u>Comey.</u>  Okay, I've read it.

Mr. <u>Jordan.</u>  Okay.  So in the first line:  "According to

Kortan, CNN is close to going forward with the sensitive story."
What is "the sensitive story"?

Mr. <u>Comey.</u>  I think it is the salacious -- the sexual
details from a portion of the Steele dossier.

Mr. <u>Jordan.</u>  Okay.  What's been commonly called the
salacious and unverified, that part of the dossier?

Mr. <u>Comey.</u>  That's what I call it, yep.

Mr. <u>Jordan.</u>  All right.  Second paragraph:  "CNN states
that they believe the pressure has built and is unavoidable."

Actually, let's go to the:  "Mike relates that he will try
to skirt the most controversial stuff, focus on the question of
possible compromise generally."

What does "possible compromise" refer to?

Mr. <u>Comey.</u>  I don't know what he means.  It means in the
beginning, it sounds like he'll try to avoid the sex stuff, but
I don't know what he means by "focus on the question of possible
compromise generally."

Mr. <u>Jordan.</u>  You read that the way I do.  The most
controversial stuff is what you just told me the sensitive story
is.  But the second clause, the question of possible compromise
generally, you don't know what that means?

Mr. <u>Comey.</u>  I don't.  Yeah, I don't know what he means.

Mr. <u>Jordan.</u>  Okay.  Next sentence:  "The trigger for them
is they know the material was discussed in the brief and presented
in an attachment."

I have an idea what I think that sentence means, but you
tell me, if you would.

Mr. Comey.  I take that as a reference to someone has told
them that the President-elect was briefed on this controversial
stuff, and -- yeah, that he was briefed on this controversial
stuff and that their knowledge of that is what is triggering them
to do the reporting.

My recollection is, we understood that CNN had the salacious
and unverified information, which was one of the reasons we told
the President-elect about it.  And in it's kind of a
bootstrapping, they're now saying, we have found out that the
President-elect was briefed on it and so we're going to go with
it.  That's what -- I could be wrong about that, Mr. Jordan, but
that's how I understand that.

Mr. Jordan.  That's exactly how I read it.  Now, just to
be clear, the material that was discussed in the brief, that's
the brief you gave the President-elect?

Mr. Comey.  Correct.

Mr. Jordan.  All right.  And somehow someone told CNN that
you had done just that?

Mr. Comey.  It appears so from this email.  That's how I'm
reading --

Mr. Jordan.  Any idea who told them that?

Mr. Comey.  Say again, I'm sorry?

Mr. Jordan.  Any idea who told them that you had actually

briefed the President-elect about this subject?

Mr. <u>Comey.</u>   No.

Mr. <u>Jordan.</u>   No idea?

Mr. <u>Comey.</u>   No idea.

Mr. <u>Jordan.</u>   It's been reported that Mr. Clapper may have been involved in giving that information to CNN.   Any indication that that's accurate?

Mr. <u>Comey.</u>   No.   Same answer, I don't know.

Mr. <u>Jordan.</u>   Okay.   What's the attachment?

Mr. <u>Comey.</u>   I don't see an attachment.

Mr. <u>Jordan.</u>   The trigger for them is they know the material was discussed in the brief that you gave to the President-elect on January 6 and presented in an attachment.

Did you give -- was there some attachment?

Mr. <u>Comey.</u>   Oh, I see.   I think I know what that means.

Mr. <u>Jordan.</u>   What is that?

Mr. <u>Comey.</u>   The way in which -- I just want to be careful here because I don't want to talk about classified information. I believe they're discussing the literal format, written format in which material was presented to the President-elect's team and to the President-elect, and they're referring to some of the material being in an attachment and not in the body of the document.   That's what I understand that to mean.

Mr. <u>Jordan.</u>   So, in other words, you told the President certain things, but you also left him some kind of attachment,

some written, some piece of paper or something as well, and they knew about that?

Mr. <u>Comey.</u>   Yeah.   And that's a garble, because that -- I take them to mean an attachment, but the attachment, to my recollection, didn't contain the salacious and unverified stuff, and that that was simply conveyed orally from me to the President-elect.

Mr. <u>Jordan.</u>   I understand.   Any idea how they got -- how CNN gets ahold of the attachment that you gave the President of the United States?

Mr. <u>Comey.</u>   I don't understand it to be saying that they have the attachment.   I read this sentence to say the trigger for them is they know the material was discussed in the brief and presented in an attachment.

Mr. <u>Jordan.</u>   Okay.   So they didn't physically have that, they just knew that that's how it was presented to the President?

Mr. <u>Comey.</u>   I don't know.   I'm just reading this.

Mr. <u>Jordan.</u>   All right.   Next sentence:   "So far it does not look like they will characterize FBI efforts."

What does that mean?

Mr. <u>Comey.</u>   I don't know for sure, but I have enough of a reaction I'll offer it to you, that I take this as likely being that the FBI Director briefed the President-elect about this material.   I could be wrong about that, but I don't know what other FBI efforts he could be referring to.

Mr. Jordan.  So Andy McCabe is telling you, so far, based on what he has learned or Mr. Kortan has learned, that CNN is going to run with this story, but they don't fully know that you're the individual who briefed the President on this issue? That's what that sentence is about?

Mr. Comey.  Yeah, that's how I'm reading it.  And I could be wrong, but I'm reading this as CNN has somehow gotten on to the idea that the President-elect was told about certain information, but they actually don't know who did the telling, which is an indication -- I could be wrong about this too -- that it didn't come from the FBI.

Mr. Jordan.  In the question section, he says, "a few questions," and he has two here.  Asking you:  "Do you have any guidance on who, if any, we should notify?"

Did you notify anyone about this?

Mr. Comey.  I don't remember.  I don't remember notifying anybody, but it's possible.

Mr. Jordan.  He suggests that you tell Deputy Attorney General Yates.  Did you do that?

Mr. Comey.  I don't remember doing that.

Mr. Jordan.  What about, he next says, "the briefing partners."  Did you let them know?

Mr. Comey.  I don't -- it's possible.  I don't remember doing that, though, and I take that to mean the directors of CIA, NSA, and National Intelligence, but I don't remember doing that.

Mr. Jordan.  That was my next question.  The briefing partners are who, those individuals?

Mr. Comey.  That's what I understand this to mean.

Mr. Jordan.  And those would be the individuals who accompanied you to New York for this briefing with the President?

Mr. Comey.  Correct.

Mr. Jordan.  President-elect at the time?

Mr. Comey.  Correct.

Mr. Jordan.  Okay.  Okay.  That's all I got.  Thank you.

Mr. Ratcliffe.  Director Comey, I want to pick up where we were talking earlier, and I want to give you back your statement from your July 5th press conference.

Setting aside the questions about whether or not Secretary Clinton had the intent to or was just reckless or careless in mishandling classified information, do you take issue with the characterization by your former general counsel, Jim Baker, who told this committee that Secretary Clinton's mishandling of classified -- that Secretary Clinton mishandled classified information in a manner that he described as appalling?

Mr. Kelley.  Could we see that portion of the transcript, please?

Mr. Ratcliffe.  I don't have the portion.  I'll represent to you --

Mr. Kelley.  And which day was that testimony?

Mr. Ratcliffe.  If you want to take the time, it's referred

to in the inspector general report, and I'll find where he represented, not just to this committee, but to the inspector general and used the word "appalling."  You want me to do that?

Mr. <u>Kelley.</u>  Yes, sir.

Mr. <u>Ratcliffe.</u>  Okay.

Mr. <u>Kelley.</u>  If you're going to refer to transcripts, we ought to take a look at them.

Mr. <u>Ratcliffe.</u>  Let me just ask you, Director, whether it's in the transcript or not, was Hillary Clinton's mishandling of classified information appalling?

Mr. <u>Comey.</u>  It's not -- I accept your representation. It's not a term that I have used.  I think of it as really sloppy and --

Mr. <u>Ratcliffe.</u>  Okay, really sloppy?  Look at your press conference.  I guess by your counting, it looks like Hillary Clinton mishandled classified information on at least -- and by mishandled, I mean that classified information went across an unclassified device or server -- on at least 110 emails and 52 email chains.  Is that right?

Mr. <u>Comey.</u>  I think that's right.

Mr. <u>Ratcliffe.</u>  And that eight of those were top secret. She mishandled top secret information at least eight times, by your counting?

Mr. <u>Comey.</u>  That's correct.

Mr. <u>Ratcliffe.</u>  And that she mishandled classified

information at a secret level 36 times, by your counting?

Mr. Comey. That's right. These are all -- this is what makes up the 110 or whatever it is.

Mr. Ratcliffe. Exactly. She mishandled confidential information at least eight times, by your counting?

Mr. Comey. Correct.

Mr. Ratcliffe. Doesn't -- your statement doesn't reflect it, but do you know if any of those were special access program, SCI, Sensitive Compartmentalized Information? Do you know if any of those were releasable only to five allied partners?

Mr. Comey. I don't -- I don't remember. I believe some of the topics that were discussed in the top secret category were also designated as Sensitive Compartmented Information. I'm not certain of that, but I believe that to be the case. I don't know with respect to the other restrictions on dissemination.

Mr. Ratcliffe. Okay. So -- and I found the reference in the inspector general report where page 166 --

Mr. Kelley. Thank you. 166?

Mr. Ratcliffe. 166, the bottom paragraph: Baker told the OIG that he thought the conduct of former Secretary Clinton and her aides was appalling with respect to how they handled classified information, and arrogant in terms of their knowledge and understanding of these matters.

Did I read that correctly?

Mr. Comey. Yes, sir.

Mr. <u>Ratcliffe.</u>  So he says appalling and you say really sloppy.  Okay.

And as Congressman Gowdy related, Secretary Clinton, about that mishandling, made a number of statements under oath -- or made a number of statements in public that were inaccurate, and I represented to you that at least one occasion she made that statement under oath when she said, I never sent or received classified information, correct?

Mr. <u>Comey.</u>  Yes, she did say that.

Mr. <u>Ratcliffe.</u>  I want to let you take a look at -- we were looking for it before, but Hillary Clinton's 302.  And on the page that I've referenced, I found the place where the agents and prosecutors were reviewing with her an email that had been marked.  Do you find where I'm following?

Mr. <u>Comey.</u>  The bottom paragraph?

Mr. <u>Ratcliffe.</u>  Yes.  Take a second and read that.

Mr. <u>Comey.</u>  [Reviewing.]

Mr. <u>Ratcliffe.</u>  All right.  Does that refresh your recollection about, during the interview, Secretary Clinton being confronted with emails that had been marked classified?

Mr. <u>Comey.</u>  It looks like at least one.  Here's the confusion, though.  It had portion markings on the original.  I think what they're explaining here is the overall document marking had been added later.

Mr. <u>Ratcliffe.</u>  Okay.

Mr. Comey.  But it was definitely she was asked about a C, which those of us who know this business, that was a portion marking for a confidential classification.

Mr. Ratcliffe.  Okay.  But they had a discussion about that.  So during at least in the time that she was being interviewed, she understood that she had either sent or received information that had been marked classified?

Mr. Comey.  She appears to from this, yep.

Mr. Ratcliffe.  Do you recall that in the course of the Midyear investigation, that the FBI became aware that personal aides, Huma Abedin, and Hillary Clinton's lawyer, Cheryl Mills, also mishandled classified information?

Mr. Comey.  I don't -- I don't remember specifically.  I remember there was some -- no, that was after.  I --

Mr. Ratcliffe.  And, again, by mishandled, I'm referring to classified information going across an unclassified device that they -- personal or work device that they had.

Mr. Comey.  I don't remember that about Ms. Mills.  I remember a concern about that about Ms. Abedin, but what I was remembering is from the Weiner stuff from after -- I remember that being an issue after October 27th or 8th.

Mr. Ratcliffe.  All right.  Congressman Gowdy asked you about Paul Combetta.  I was surprised that you didn't really remember the role that he played in this, so let me -- do you recall that Paul Combetta was an employee at the Platte River

Network who intentionally destroyed evidence known to be subject to a congressional subpoena and a preservation order and then lied to the FBI about it?

Mr. Comey.  I think so.  I think Mr. Gowdy refreshed me on that.  And which was the reason, as I recall, that there was an issue as to whether he would get any kind of immunity in exchange for his testimony thereafter.

Mr. Ratcliffe.  But he did receive immunity?

Mr. Comey.  Yeah.  I just couldn't remember, in response to Mr. Gowdy's questions about him and the other guy, what the form of immunity was.

Mr. Ratcliffe.  All right.  So I guess as I try and summarize what I've heard today, Hillary Clinton mishandled classified information more than a hundred times.  She made false statements about it.  The FBI was aware that at least one of her aides also mishandled classified information.  And one of the folks employed on behalf of Secretary Clinton intentionally destroyed evidence known to be subject to a congressional subpoena and preservation order and lied to the FBI about it.

And on July 5th, 2016, you stood before the American people and said that neither you nor any reasonable prosecutor would bring any charges in this fact pattern.  Is that accurate?

Mr. Comey.  Yep.  I believed it then, I believe it now. And anybody that thinks we were on team Clinton trying to cut

her a break is smoking something.

Mr. Ratcliffe.  I'll object to everything after "yep" as nonresponsive to my question.

But is Jim Baker a reasonable prosecutor?

Mr. Comey.  Yeah, I think he is.  He hasn't done a lot of criminal prosecution, he's in the intelligence world, but I think he's a reasonable prosecutor.

Mr. Ratcliffe.  Do you recall what Jim Baker's response was on May the 2nd when you presented him with the non-pros memo or exoneration memo about whether or not Hillary Clinton should be charged with mishandling classified information?

Mr. Comey.  You mean my draft of a possible public statement?

Mr. Ratcliffe.  Yes.

Mr. Comey.  I don't remember exactly.  He was a big part of the editing process.

Mr. Ratcliffe.  Let's see if I can find what -- Mr. Baker -- well, let me -- do we have the Baker transcript?

Mr. Jordan.  Director, I'm just curious, where did the names Midyear Exam and Crossfire Hurricane come from?

Mr. Comey.  I don't know for sure.  What I was long told is that the names for all of these things came from some random name generator in the bowels of the Counterintelligence Division.  I never had any information to the contrary, but

occasionally I would see names that seemed like they couldn't be random.  Those both seem kind of random to me.

Mr. Jordan.  So is it customary for any investigation the FBI does, it receives some code name or some name?

Mr. Comey.  I think no.  Almost -- maybe all of the classified counterintelligence investigations are given a code name that's unclassified so that people who are outside of a classified space can make reference to it without giving anything away.

Mr. Jordan.  Is this a random list, you know, that sometimes we hear some algorithm giving us this -- spitting us out this information, or are these just people on the investigation coming up with a name that they choose?

Mr. Comey.  I don't know.  I never found -- I was curious about the name Midyear Exam, so I used to ask.  Never found any reason to think it was connected in any way to the case or the circumstances of it.  But there were -- as I said, there were other cases where I saw names -- I can't remember right now -- that seemed like they were tailored.  This one didn't seem tailored to me.

Mr. Jordan.  Does the same answer apply to Crossfire Hurricane?

Mr. Comey.  Yes.

Mr. Jordan.  Okay.

Mr. Ratcliffe.  Mr. Comey, I want you to have the benefit

230

of the transcript.  I highlighted my exchange with Mr. Baker on page --

Mr. <u>Kelley.</u>  Do you know what the date of this testimony was?  The second day?  Did he testify about this subject on the first day?

Mr. <u>Ratcliffe.</u>  He did not.

Mr. <u>Comey.</u>  Where are we?  I'm sorry, sir.

Mr. <u>Ratcliffe.</u>  Page 152.  I asked the question:  All right.  And I have reason to believe that you originally believed it was appropriate to charge Hillary Clinton with regard to violations of the law, various laws, with regard to the mishandling of classified information.  Is that accurate?

Mr. Baker's answer was yes.

Did you find that?

Mr. <u>Comey.</u>  I'm reading the rest where he explains.

Mr. <u>Ratcliffe.</u>  He does, and I will just -- the conversation continues, as you'll see, that he explained that you persuaded him that Hillary Clinton should not be charged after reviewing a binder of emails.

Mr. <u>Kelley.</u>  Could you point to the spot where it says Mr. Comey persuaded him?

Mr. <u>Ratcliffe.</u>  No.  I'm not referring to the transcript there.  I said I was paraphrasing it.

Do you see that?

Mr. <u>Kelley.</u>  I'm sorry, I misunderstood the question.

You're paraphrasing what?

Mr. <u>Ratcliffe.</u>  So my question -- I read the question and the answer.  The question was to Mr. Baker:  I have reason to believe that you originally believed it was appropriate to charge Hillary Clinton with regard to violations of the law, various laws, with regard to the mishandling of classified information. Is that accurate?

And his response was yes.

Then I was commenting that he went on to explain that he had -- whether he was persuaded or changed his mind after reviewing a binder of emails.  I was offering that in fairness to the witness.

Mr. <u>Kelley.</u>  I just thought -- maybe I misheard you.  I thought you said that Mr. Comey had persuaded him.  I didn't see that in the transcript.

Mr. <u>Ratcliffe.</u>  I may have been mistaken.

Do you recall, Director Comey, having a conversation with Mr. Baker about this issue?

Mr. <u>Comey.</u>  I don't.  I mean, I remember him editing my statement.  And he also -- he says here, I discussed it internally and eventually became persuaded that charging her was not appropriate, and he goes on to explain why.  But I don't know with -- he says with a number of different folks.  I don't know who he talked to.

I don't remember him being of the view at any point that

she should be prosecuted.  But in any event, by the time we got to May, he definitely wasn't expressing that view.  He was helping me understand how we might close this thing in a transparent way.

Mr. <u>Ratcliffe.</u>  So in your transcript statement, you closed your remarks by saying -- have you got those?

Mr. <u>Comey.</u>  Yes.

Mr. <u>Ratcliffe.</u>  -- that we, referring to the FBI, we did the investigation in a professional way.  Only facts matter, and the FBI found them here in an entirely apolitical and professional way.

Do you see that?

Mr. <u>Comey.</u>  Yep.  I got it.

Mr. <u>Ratcliffe.</u>  In light of the text messages of Agent Strzok and Attorney Lisa Page and Agent 1 and all of the folks that have been referred to today, do you still believe that?

Mr. <u>Comey.</u>  Yes, very much.

Mr. <u>Ratcliffe.</u>  Our time expired?

Chairman <u>Goodlatte.</u>  I'll just put this on the record now. This does not complete the questions that we have, and I know there have been some discussions about scheduling a second date and we would like to get that finalized for everybody's planning purposes.

Mr. <u>Kelley.</u>  Mr. Somers and I have spoken about that, and we've agreed to return on Monday, the 17th of December.  But we

would like to know in advance how much more, many rounds you need.
I mean, we went through a full day today.

Chairman Goodlatte. Got it. We'll do the best we can on
that. And we will --

Mr. Gaetz. Before we go off the record, Mr. Chairman, I
have a question. The rules that I don't consider myself bound
by but that were expressed earlier in the committee, do those
carry over to the subsequent questioning of the witness, or is
it the interpretation of the chairs that during the -- that this
is a suspension of the questioning but not a suspension of the
rules package which you believe binds the members?

Mr. Goodlatte. I was just about to get to that. I think
that the best way to proceed would be to release the transcript
tomorrow, and it will be available at some point tomorrow, and
that comment by Mr. Comey and anyone else is fair game after the
conclusion of this. And then we'll impose the same rules when
we get to the second one.

Mr. Kelley. We agree that's appropriate.

Mr. Goodlatte. Very good.

Ms. Sachsman Grooms. Back on the record. Just two quick
follow-up questions.

[4:29 p.m.]

Ms. Sachsman Grooms.   At the end of the last round, Mr. Ratcliffe went through kind of a summary of what I interpreted to be his conclusions about the Clinton case.   He went through Clinton misclassified information, she made false statements, the FBI knew that her staff had mishandled unclassified information.   He went through a number of different things.   At the end, he asked you about your decision not to move forward to prosecute or recommend prosecution of the case.

I just wanted to clarify, when you were answering that, were you adopting that set of sort of summary comments by Mr. Ratcliffe or were you just commenting on that last bit?

Mr. Comey.   I was answering his question, which was, do you have a different view -- or do you have the same view of the case today, is what I understood it to be.   And the answer is, absolutely, I do.

Ms. Sachsman Grooms.   And just to be clear, I didn't hear you say any time during today that you had uncovered any proof that Secretary Clinton had made false statements.   Is that accurate?

Mr. Comey.   That's correct.

Ms. Sachsman Grooms.   Okay.   Thank you.   That's all I had. We can go off the record.

[Whereupon, at 4:38 p.m., the interview was recessed, to

reconvene on Monday, December 17, 2018.]