**EXHIBIT 2**

EXECUTIVE SESSION

COMMITTEE ON THE JUDICIARY,

JOINT WITH THE

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM,

U.S. HOUSE OF REPRESENTATIVES,

WASHINGTON, D.C.


INTERVIEW OF:  JAMES COMEY


                    Monday, December 17, 2018


                        Washington, D.C.


     The interview in the above matter was held in Room 2141,
Rayburn House Office Building, commencing at 10:13 a.m.
     Members Present:  Representatives Goodlatte, Jordan, Gowdy,
Ratcliffe, Johnson of Georgia, Meadows, Cummings, and Clay.

Chairman Goodlatte.  All right.  We'll go on the record. This is the continuation of the transcribed interview of Mr. James Comey.

And, Mr. Comey, do you understand that the questions you were asked at the beginning of the first day of interviews all still apply and that you are under oath?

Mr. Comey.  Yes, sir.  This is not under oath, but I have an obligation to tell the truth.

Chairman Goodlatte.  Correct.

And we will, as we did with the first one, make every effort to have the transcription available tomorrow, and we'll get it out as quickly as we possibly can.

Let's go around the room and have everyone here introduce themselves.  And I'm Bob Goodlatte, Member of Congress from Virginia.

Mr. Gowdy.  Trey Gowdy, South Carolina.

Mr. Ratcliffe.  John Ratcliffe, Texas.

Mr. Meadows.  Mark Meadows, North Carolina.

Mr. Jordan.  Jim Jordan, Ohio.

Chairman Goodlatte.  All right.  Let's get staff.

Ms. Shen.  Valerie Shen, House Oversight, Democrats.

Mr. Hiller.  Aaron Hiller, House Judiciary, Democrats.

Ms. Hariharan.  Arya Hariharan, House Judiciary, Democrats.

Ms. Sachsman Grooms.  Susanne Sachsman Grooms, House Oversight, Democrats.

Mr. [_____]. [              ], FBI.

Mr. <u>Ventura.</u>  Christopher Ventura, House Judiciary, Republicans.

Mr. <u>Buddharaju.</u>  Anudeep Buddharaju, House Oversight, majority.

Mr. <u>Castor.</u>  Steve Castor, OGR, majority.

Mr. <u>Brebbia.</u>  Sean Brebbia, House Oversight, majority.

Ms. <u>Green.</u>  Meghan Green, House Oversight, majority.

Mr. [_____]. [                ], FBI.

Ms. <u>Doocy.</u>  Mary Doocy, Rep. Meadows.

Ms. <u>Husband.</u>  Shelly Husband, House Judiciary, minority.

Mr. <u>Breitenbach.</u>  Ryan Breitenbach, House Judiciary, majority.

Mr. <u>Baker.</u>  Arthur Baker, House Judiciary, Republicans.

Mr. <u>Somers.</u>  Zachary Somers, House Judiciary, Republicans.

Mr. [___]. [      ], FBI.

Mr. [_____]. [            ], FBI OGC.

Mr. <u>Kelley.</u>  David Kelley, Dechert LLP, on behalf of Mr. Comey.

Chairman <u>Goodlatte.</u>  All right.  We'll turn it to Mr. Gowdy.

Mr. <u>Gowdy.</u>  Good morning, Director Comey.

I want to direct your attention to a February 8th memo from you.  Do you have those memos in front of you?  And if not, we'll get you a copy.

Mr. <u>Comey.</u>  Thank you.

Mr. <u>Gowdy.</u>  I believe that memo starts, "I went to the White House today for a 4 p.m. meet and greet," if that helps you.

Mr. <u>Comey.</u>  I see it, yeah.  I have it in front of me.

Mr. <u>Gowdy.</u>  All right.  Will you flip to the next page?  Do you see where the first paragraph, first sentence:  "He then asked me if this was a 'private conversation'"?

Mr. <u>Comey.</u>  I see that.

Mr. <u>Gowdy.</u>  And do you see, "I replied it was"?

Mr. <u>Comey.</u>  I see that, yes.

Mr. <u>Gowdy.</u>  What did you mean by "it was"?

Mr. <u>Comey.</u>  That the two of us were speaking together alone, that there was nobody else participating in the conversation.

Mr. <u>Gowdy.</u>  So by "private" you meant that there was nobody else in the room?

Mr. <u>Comey.</u>  I think that's what he was asking and that's what I was replying, as best I recall, that it was just the two of us in the room, it wasn't being recorded, there was nobody else involved in the conversation.

Mr. <u>Gowdy.</u>  So you didn't take "private" to mean confidential, that this is just between us?

Mr. <u>Comey.</u>  That's a good question.  Let me think about it for a second.

I think I took it as, is this just the two of us in this conversation?

Mr. <u>Gowdy.</u>  But that would've been readily apparent to both

of y'all, that you were the only two in the room, wouldn't it?

Mr. Comey.  Yeah, I guess that's right.  That's why I'm hesitating.  But, yeah, I think that's what I meant when I said this.  He asked if it was a private conversation, which I took to mean is it the two of us having this conversation.  I said, yes, that it was.

Mr. Gowdy.  So you did not take from that any implicit confidentiality, that this is just between us?

Mr. Comey.  Yeah, I don't think so.  I'm hesitating because it's possible, but I don't think so.

Mr. Gowdy.  Well, it strikes me the options are that it was private and that you were the only two in the room, which both of you already knew, which begs the question why he had to say it and you had to agree to it, or "private" means just between us.

Mr. Comey.  Yeah, that would ask me -- you're asking me to try to tell you what was in his head.  I don't know.

Mr. Gowdy.  Well, shortly after that meeting concluded, did you memorialize that conversation?

Mr. Comey.  I did.

Mr. Gowdy.  And to whom, if anyone, did you share or distribute the memo?

Mr. Comey.  Sometime shortly after I wrote it, I shared it with the senior leadership team of the FBI.

Mr. Gowdy.  Pardon me.  Could you say that again?

Mr. Comey.  Shortly after I wrote it -- I'm looking if I put

a time on it.  Shortly after I wrote it, I shared it with the senior leadership team of the FBI.

Mr. Gowdy.  Would that include Andy McCabe, Jim Baker, and Jim Rybicki?

Mr. Comey.  Yes.

Mr. Gowdy.  Anyone else?

Mr. Comey.  Possibly the head of the National Security Branch at the FBI, possibly the head of the Counterintelligence Division of the FBI.

Mr. Gowdy.  When President Obama gave his "60 Minutes" interview in October of 2015 and remarked, in the midst of your Clinton investigation, that Clinton merely committed a mistake and lacked the intent to harm national security, did you address that with him personally?

Mr. Comey.  I did not.

Mr. Gowdy.  Did you send word through Attorney General Loretta Lynch that it is not appropriate for the head of the executive branch to comment on a pending investigation?

Mr. Comey.  I did not.

Mr. Gowdy.  How did you communicate to the White House that commenting on an ongoing investigation is not appropriate?

Mr. Comey.  I don't recall that I did in connection with that statement by the President.

Mr. Gowdy.  President Obama said of her email arrangement, "I don't think it posed a national security problem."  How would he

have known that at the time?

        Mr. Comey.  I can't answer that question.

        Mr. Gowdy.  He also said, "This is not a situation in which America's national security was endangered."  How would he have known that at the time?

        Mr. Comey.  Same answer.  I can't answer that for him.

        Mr. Gowdy.  Did President Obama know that his emails were among those found in her emails?

        Mr. Comey.  I can't answer that.

        Mr. Gowdy.  Do you know when the President learned that some of his emails were among those found in her emails?

        Mr. Comey.  I can't answer that, and I don't know.

        Mr. Gowdy.  You never had a conversation with him about it?

        Mr. Comey.  No.

        Mr. Gowdy.  Never directed anyone at the Bureau to tell him?

        Mr. Comey.  No.

        Mr. Gowdy.  About David Petraeus, President Obama said, "I have no evidence at this point, from what I've seen, that classified information was disclosed that in any way would have a negative impact on our national security."

        Do you know what evidence he would've seen at that point?

        Mr. Comey.  I don't.  And I don't remember him saying that about Petraeus.

        Mr. Gowdy.  Did you brief the President on the Petraeus investigation?

Mr. <u>Comey.</u>  No.

Mr. <u>Gowdy.</u>  Did anyone at the FBI?

Mr. <u>Comey.</u>  Not to my knowledge.

Mr. <u>Gowdy.</u>  President Obama said Mrs. Clinton had not tried
to, quote, "hide anything or squirrel away information."  Do you
know how he knew that?

Mr. <u>Comey.</u>  I don't.

Mr. <u>Gowdy.</u>  In fact, were all of her emails located?

Mr. <u>Comey.</u>  You have to clarify that, Mr. Gowdy.  "All of her
emails," meaning what?

Mr. <u>Gowdy.</u>  Any one that she would have generated during the
time period that she was Secretary of State that possibly could've
involved public record.

Mr. <u>Comey.</u>  I don't know.

Mr. <u>Gowdy.</u>  Well, were any destroyed?

Mr. <u>Comey.</u>  Yes, by her --

Mr. <u>Gowdy.</u>  Then, if they were destroyed, they weren't
located.  I'm not trying to ask you a trick question.  If they
were destroyed, they weren't located.

Mr. <u>Comey.</u>  Well, that's one of the reasons I'm hesitating,
is there were emails that, by her account, were destroyed.  We
found a lot of emails, including after late October.  Whether
those that we found were the same as that which had been destroyed
is impossible to answer.

Mr. <u>Gowdy.</u>  When President Trump asked you to see your way to

letting the Flynn matter go, was it just you and him in the room?

Mr. Comey.  Before I answer that, sir, my understanding is you were going to ask questions about decisions made in 2016, and that conversation occurred in February of 2017.

Mr. Gowdy.  Director Comey, I understand when it occurred. We're looking at decisions made and not made in 2016 and 2017.

Mr. Comey.  Okay.

Mr. Gowdy.  So, when President Trump asked you to see your way clear to letting the Flynn matter go, was it just you and him in the room?

Mr. Comey.  Yes.

Mr. Gowdy.  So no one at the FBI knew, except you, that that comment had been made.

Mr. Comey.  At the time it was made, correct.

Mr. Gowdy.  All right.  You decided to share it with others.

Mr. Comey.  Correct.

Mr. Gowdy.  Okay.  So it was a conversation that only you -- it was a comment only you heard.  I think your previous testimony was it had --

[Discussion off the record.]

Mr. Comey.  Sorry.  Go ahead.

Mr. Gowdy.  I think your previous testimony was it did not impact any decisions you made or cause you to not make decisions. Did I recall that correctly from your last time?

Mr. Comey.  I think that's a fair summary of my testimony

from a week or so ago.

Mr. <u>Gowdy.</u>  All right.  So you're the only one that heard it, it had no impact on you, and you chose to share it.

Mr. <u>Comey.</u>  Those three things are true.  Implicit in your question is some connection among the three.  I'm just agreeing those three things are true.

Mr. <u>Gowdy.</u>  Okay.

Mr. <u>Comey.</u>  It didn't have an impact on the investigation.  I heard it -- I was the only one in the room besides the President.  And I briefed the senior leadership team of the FBI.

Mr. <u>Gowdy.</u>  What I'm trying to do, Director Comey, is contrast -- well, we'll do it this way.  I'll ask you, when any of the comments were uttered by President Obama on either of the investigations we just went over, Petraeus or Hillary Clinton, they were public comments.  Did you also gather your senior staff around to make sure that those comments did not impact any decisions they made?

Mr. <u>Comey.</u>  I don't recall ever gathering them to discuss -- let me back up for a second.  I don't recall talking to my senior staff about whether President Obama was going to have an impact on our investigations.  I don't.

Mr. <u>Gowdy.</u>  Can you understand my curiosity why you would publish a private comment to make sure it did not impact them but not take up a public comment to make sure it did not impact them?

Mr. <u>Kelley.</u>  Is that a question?

Mr. <u>Gowdy.</u>  Yes.

Mr. <u>Comey.</u>  The public comments, because they were widely broadcast, were ones that were apparent to the senior leadership team of the FBI.  If I didn't tell the senior leadership team of the FBI about my conversation with President Trump, they wouldn't otherwise know and couldn't help me figure out what to do with what was potential obstruction of justice.

Mr. <u>Gowdy.</u>  All right.  Well, let's get into that then.

After he asked you if it was a private conversation and you said it was, what did he ask you about?  What was his specific question?  Do you recall?

Mr. <u>Comey.</u>  The "he" you're talking about is Reince Priebus?  We're back on the February 8th --

Mr. <u>Gowdy.</u>  Back to the February 8 memo.  Right after he said is this a private conversation and you said it was, what was the next issue he broached with you?

Mr. <u>Comey.</u>  He said he wanted -- I'm reading from the top of my own memo, second page.  He said he wanted to ask me a question and I could decide whether it was appropriate to answer.  He then asked, do you have a FISA order on Mike Flynn?

Mr. <u>Gowdy.</u>  All right.  And did you answer it, or did you tell him it was inappropriate for him to ask?

Mr. <u>Comey.</u>  In a way, both.  I paused and said that I would answer here but this illustrated the kind of question that had to be asked and answered through established channels.  And then I

answered his question.

Mr. <u>Gowdy.</u>  So it is possible that a question be properly asked but it needs to go a different route.  And I assume by that you meant White House Counsel needs to ask the Attorney General and then it filtered down to you?

Mr. <u>Comey.</u>  I'm sorry.  I'm not following your question, Mr. Gowdy.

Mr. <u>Gowdy.</u>  I'm assuming that there is a category of questions that it is permissible or okay to ask but it has to be asked in a different route, through a different mechanism.

Mr. <u>Comey.</u>  In general, yes, that there are norms and traditions and policies that guide communications.  And I was trying to help him understand some of those here.

Mr. <u>Gowdy.</u>  Does the President have the ability to end an investigation?

Mr. <u>Comey.</u>  That's a legal question, Mr. Gowdy, I don't think I'm qualified to answer.

Mr. <u>Gowdy.</u>  Oh, Director Comey, you've had a distinguished career in the Southern District of New York, you've worked for the Department of Justice, you've headed the world's premier law enforcement agency.  You're plenty a good enough lawyer to take a crack at whether or not the Chief Executive can end an investigation.

Let me do it this way.  If you don't feel comfortable, what does the word "plenary" mean?

Mr. Comey.  What does the word "plenary" mean?

Mr. Gowdy.  "Plenary."  To say the pardon powers are plenary, what does it mean?

Mr. Comey.  Yeah, I'm not expert enough to give you an expert answer on that.  And as to your -- go ahead.

Mr. Gowdy.  Do you disagree with the following?

"The Presidential pardon power extends to every offense known to the law and may be exercised at any time after its commission, either before legal proceedings are taken or during their pendency or after conviction and judgment."

Do you take exception to what I just read?

Mr. Comey.  I don't think it's appropriate for me to comment on what you just read.

Mr. Gowdy.  Director Comey, have you ever discussed the President's conduct in terms of either obstruction of justice or potential obstruction of justice?  In any interview, have you ever discussed his comments through that lens, through that prism?

Mr. Comey.  Yeah, I need you to focus the question, obviously.  Do you mean when I was FBI Director did I speak to the FBI leadership team?

Mr. Gowdy.  I mean any interviews in the last couple of weeks.

Mr. Comey.  Oh, I've been asked many times do I think the President was guilty of obstruction of justice.

Mr. Gowdy.  And my question to you is, can a President end an

investigation?

Mr. <u>Comey.</u>   And I think that calls for a legal conclusion, a constitutional legal judgment that I'm not qualified to make.

Mr. <u>Gowdy.</u>   Does the President have the ability to end a prosecution?

Mr. <u>Comey.</u>   It's the same question, I think, so my answer is the same.

Mr. <u>Gowdy.</u>   Well, Director Comey, does the pardon power only extend after a conviction?

Mr. <u>Comey.</u>   I'm not expert enough to answer that question.

Mr. <u>Gowdy.</u>   Was the President part of your Michael Flynn investigation?

Mr. <u>Comey.</u>   I don't know what you mean by that.

Mr. <u>Gowdy.</u>   Well, when two agents went over to interview Michael Flynn at the White House, was the -- we'll do it this way. Why did they go interview Michael Flynn?

Mr. <u>Comey.</u>   Because they were directed to.

Mr. <u>Gowdy.</u>   I know.  By you.  For what purpose?

Mr. <u>Comey.</u>   To see if they could, by interviewing Mr. Flynn, gain an understanding about why the Vice President was making statements that purported to repeat statements he had made that were false.

Mr. <u>Gowdy.</u>   You knew what the Vice President was saying was false, right?

Mr. <u>Comey.</u>   Correct.

Mr. <u>Gowdy.</u>  Had Michael Flynn ever repeated that he had never spoken to the Russian Ambassador or, if so, limited the scope of conduct to something you knew not to be true?

Mr. <u>Comey.</u>  I'm sorry, sir.  I don't understand that question.

Mr. <u>Gowdy.</u>  Had Michael Flynn ever publicly said that he had not talked to the Russian Ambassador or limited the scope of that conversation in a way such that you knew to not be true?

Mr. <u>Comey.</u>  I don't believe Mr. Flynn made any public comments about his interactions with the Russians certainly before the agents interviewed him on January 24th.

Mr. <u>Gowdy.</u>  What is the Logan Act?

Mr. <u>Comey.</u>  It's a criminal statute that, as I understand it, in general, prohibits private citizens from engaging in negotiations with foreign powers on behalf of the United States Government.

Mr. <u>Gowdy.</u>  How many times has it been prosecuted in our country's jurisprudence?

Mr. <u>Comey.</u>  I don't know.  I have some recollection that there were prosecutions 100 years ago or something like that, but that's about all I recall.

Mr. <u>Gowdy.</u>  Any successful prosecutions?

Mr. <u>Comey.</u>  I don't know one way or the other.

Mr. <u>Gowdy.</u>  So, again, I'm trying to understand.  It is not the FBI's job, unless I'm mistaken, to correct false statements

that political figures say to one another.  So why did you send two Bureau agents to interview Michael Flynn?

Mr. Comey.  Because one of the FBI's jobs is to understand the efforts of foreign adversaries to influence, coerce, corrupt the Government of the United States.  So they were sent there as part of that counterintelligence mission to try and understand why it appeared to be the case that the National Security Advisor was making false statements about his conversations with the Russians to the Vice President of the United States.

Mr. Gowdy.  Had Michael Flynn previously been under investigation by the Bureau?

Mr. Comey.  I can't answer that.

Mr. Gowdy.  Why not?

Mr. Comey.  Because I don't believe that the Bureau has ever publicly confirmed what Americans were under investigation, counterintelligence investigation, connected to the Trump campaign.

Mr. Gowdy.  Well, he's pled guilty, right?  Hasn't been sentenced yet, but he's pled guilty.

Mr. Comey.  Yes.

Mr. Gowdy.  Pled to making a false statement.

Mr. Comey.  I've seen that, yes.

Mr. Gowdy.  All right.  Didn't plead to conspiracy, coordination, collusion with Russia.

Mr. Comey.  Not to my understanding.

Mr. Gowdy.  Right.  Was Michael Flynn under investigation for his ties with Russia at the time you sent the Bureau agents over to interview him?

Mr. Comey.  I think I'm obligated to give you the same answer.  I can't comment on that.

Mr. Gowdy.  And the reason you can't comment is why?

Mr. Comey.  Again, there are FBI lawyers here who will tell me if I'm wrong, but I do not believe the United States Government has ever publicly confirmed what Americans were the subjects of counterintelligence investigations prior to that date.

Mr. Gowdy.  Well, you said four Americans.  You've said that before.  Correct?

Mr. Comey.  Sure.  That fact is public.

Mr. Gowdy.  Right.  So it's four Americans.  You just testified that one of the Bureau's missions is to find out whether or not people are working in concert with foreign nations?

Mr. Comey.  Correct.

Mr. Gowdy.  Is that why the agents went to interview Michael Flynn, to find out whether or not he was working on behalf of the Russian state?

Mr. Comey.  I'd give you the same answer I gave before.  The agents went to interview Flynn to try and understand why the National Security Advisor was making false statements to the Vice President of the United States about his interactions with the Russians during the transition.

Mr. <u>Gowdy.</u>  What questions did you -- what two Bureau agents did you send?

Mr. <u>Comey.</u>  Only one of them has been identified publicly, so I can do that.  Peter Strzok was one of the two.  The other was a career counterintelligence agent.

Mr. <u>Gowdy.</u>  And what questions did they ask related to Flynn's relationship with Russia?

Mr. <u>Comey.</u>  I don't know the answer to that.

Mr. <u>Gowdy.</u>  The Bureau knew that Michael Flynn was not telling the truth.  You knew that before you sent the agents over there, right?

Mr. <u>Comey.</u>  No, I didn't know that.

Mr. <u>Gowdy.</u>  What did you know?

Mr. <u>Comey.</u>  I knew certain classified facts about the nature of his interactions with the Russians.  I knew that the Vice President was making statements that he attributed to conversations he'd had with Mr. Flynn that were starkly at odds with those classified facts.

Mr. <u>Gowdy.</u>  You had the option of going to the Vice President and telling him that you knew for a fact what he was being told by General Flynn was not correct.  That was one option, wasn't it?

Mr. <u>Comey.</u>  I'm not going to answer a hypothetical.  We didn't do that.

Mr. <u>Gowdy.</u>  I know you didn't, Director Comey, but it's not unfair to ask what your options were.  If you're concerned that

someone is lying to the Vice President, one of your options is to go tell the Vice President, "Someone's lying to you."

Mr. Comey.  Before interviewing the person who might be doing the lying?

Mr. Gowdy.  Sure.

Mr. Comey.  Sure, I suppose that's an option.  I don't think it's one a reasonable investigator would take, but it's an option.

Mr. Gowdy.  Did Mr. Flynn have the right to have counsel present during that interview?

Mr. Comey.  No.

Mr. Gowdy.  What was the policy the Bureau followed with other administrations if you wanted to interview an employee of that administration?

Mr. Comey.  I don't know that there was a policy.  My understanding was the normal practice was to coordinate an interview through the White House Counsel's Office.

Mr. Gowdy.  Recently -- and I want to make sure I get your words right.  Tell me if this fairly captures what you said in response to a question.

Mr. Kelley.  Do you have a page cite?

Mr. Gowdy.  No.  It's an interview he gave last week.

Mr. Kelley.  Do you have a copy of it?

Mr. Gowdy.  No, but I'm happy to -- why don't I ask him if he recognizes it first, and if he wants a copy of it, I'm happy to give him one.

Mr. <u>Kelley.</u>  He usually needs it to read along, but go ahead.

Mr. <u>Gowdy.</u>  Well, if he needs it, Mr. Kelley, I'll be happy to give it to him.  I'm not trying to trick him.  But he said it, and there's a chance he may remember it.

"Something we, I, probably wouldn't have done or maybe gotten away with in a more organized investigation, a more organized administration."

Mr. <u>Comey.</u>  Yeah, I remember saying that.

Mr. <u>Gowdy.</u>  All right.  What did you mean by "gotten away with"?

Mr. <u>Comey.</u>  As I said, I don't think there were policies or rules -- I could be wrong, but I don't think so -- in prior administrations, but there were norms and practices, that, in a more established environment, there would've been an expectation that the FBI would coordinate the interview through White House Counsel.

Mr. <u>Gowdy.</u>  I understand that.  I'm just kind of hung up on the phrase "gotten away with."

Mr. <u>Comey.</u>  Well, that there would've been -- that there wouldn't have been an opportunity to call Mr. Flynn and ask him to sit and talk to him, that, in an administration where the rhythm of the context between the FBI and the White House was more established, there would've been a strong expectation that we coordinate it through White House Counsel instead of calling the National Security Advisor directly.  That's what I meant by it.

Again, I'd never worked in a transition time before, but my understanding was that, in a more established administrative environment, you wouldn't get away with just calling the witness and saying, "Can we come and talk to you?"

Mr. Gowdy.  And you followed the protocol with Presidents Bush and President Obama?

Mr. Comey.  I don't remember having occasion like this with either of those Presidents.

Mr. Gowdy.  Why not advise General Flynn of the consequences of making false statements to the FBI?

Mr. Comey.  Two reasons, really.

First, the Deputy Director called him, told him what the subject matter was, told him he was welcome to have a representative from White House Counsel there.  So he knew what he was going to be asked about.  He was an extraordinarily experienced person and so reasonably should be assumed to understand you can't lie to the FBI.

Second, it's not protocol.  The FBI does not do that in noncustodial interviews.

And, third, you want to find out what the witness will say to you before you heat up an interview by raising the prospect that the witness might be lying to you.

Mr. Gowdy.  All right.  So you knew what he said before you interviewed him.

Mr. Comey.  I don't understand that question.

Mr. <u>Gowdy.</u>  You knew exactly what General Flynn had said to the Russian Ambassador before you interviewed him.

Mr. <u>Comey.</u>  Yes.

Mr. <u>Gowdy.</u>  Exactly what was said.

Mr. <u>Comey.</u>  Well, I'm only hesitating because I don't know what I don't know, but we understood clearly the nature and extent of a variety of communications, telephonic, between Mr. Flynn and the Russian Ambassador.

I'm only hesitating because, if there were other communications, other phones, other means of communication, we wouldn't know that.  But we had clear transcripts of the conversations that we had.

Mr. <u>Gowdy.</u>  So if there were calls between Flynn and the Russian Ambassador that were missed, I don't think anybody expects you to know the contents of those calls.  But the call in question, you knew exactly what was said.

Mr. <u>Comey.</u>  Yes.

Mr. <u>Gowdy.</u>  And General Flynn asked specifically whether or not he needed an attorney present, and what was the FBI's response?

Mr. <u>Comey.</u>  I don't remember that he asked that question.  I believe the Deputy Director volunteered to him that you are welcome to have somebody present from the White House Counsel's Office.  And I think he said, in substance, there'd be no need for that.

Mr. <u>Gowdy.</u>  And you don't think that's because Flynn asked;
you think that's because McCabe just volunteered?  "You can have
someone, but it will slow up the process."

Mr. <u>Comey.</u>  My recollection could be wrong, of course, but my
recollection is that the Deputy Director offered it to him and did
not add that bit about slowing the process, but said, "If you wish
to, you can have somebody there from the White House Counsel's
Office."

Mr. <u>Gowdy.</u>  All right.  So we have two agents that you
personally sent to interview General Flynn.  You knew exactly what
he had said.  There was no counsel present.  The Bureau did not go
through White House Counsel when he was not advised ahead of time
of the consequences of making a false statement to the FBI.

Mr. <u>Comey.</u>  I'm hesitating, Mr. Gowdy, just because it's a
question with a bunch of different pieces.  I have to take issue
with one at the beginning.  It may seem a small thing, but I
didn't personally send the agents.  I didn't know what agents
would go.  I wanted Flynn interviewed as soon as possible.

Mr. <u>Gowdy.</u>  Well, Director Comey, I'm trying to come to grips
with what this three-word sentence means:  "I sent them."  What
does that sentence mean to you when it's uttered by you?

Mr. <u>Comey.</u>  Yeah, it means I wanted Flynn interviewed, which
is why agents went and interviewed him at the White House.  I took
your question to mean that I knew the identity of the agents who
were going to go.  I didn't want to leave you with that

impression.

The agents went to interview Flynn because I said I want Flynn interviewed, I want him interviewed as soon as possible.

Mr. Gowdy.  I'd be shocked if you handpicked the agents, Director Comey.  My point was you sent them.

You knew that there was a different protocol with the Bush and the Obama administrations.  You had the option of calling Don McGahn, but you decided not to do so.  Either Flynn asked whether he should have a lawyer present or Andy McCabe told him it would slow him down, one or the other.  And he was not advised of the consequences of making a false statement before he was interviewed.

Is all of that accurate?

Mr. Comey.  No, your question's not accurate.

Mr. Gowdy.  What part is inaccurate?

Mr. Comey.  Well, probably a bunch, but I'll take one.

Implicit in your question was your assertion that there were two states of the world:  either Flynn asked for a lawyer and was told something or was told something else.  Neither of those is consistent with my recollection.

My recollection is the Deputy Director said, "If you wish to have someone there from White House Counsel, you're welcome to."  I don't remember that he added "it'll slow down the process" or anything like that.

Mr. Gowdy.  Well, are you familiar with Andy McCabe's memo?

Are you familiar with what he filed with the court?

     Mr. <u>Comey.</u>  Generally, yes.  I haven't read it.  I read press accounts of it.

     Mr. <u>Gowdy.</u>  Well, how about we get a copy of that for Director Comey so we can be working off of the same piece of paper.

     While we're waiting on them to get you that document, Director Comey, how about I take that phrase out and simply insert that McCabe said, "If you have a lawyer present, we'll need to involve the Department of Justice"?  Do you recall that?

     Mr. <u>Comey.</u>  I don't.  He could have, but I don't recall that as I sit here.

     Mr. <u>Gowdy.</u>  Jimmy, I'm going to let you go, so we don't have to wait on this document to get here.

     Mr. <u>Jordan.</u>  Director, in the conversations that you'd had between Mr. Flynn and the Russian Ambassador, was there anything wrong in those conversations, anything said that was not appropriate, anything wrong, anything that caused you to be -- caused him to be under investigation just based on what he said in those conversations?

     Mr. <u>Comey.</u>  I'm pausing, Mr. Jordan, because I don't -- I guess I have two concerns.  One is, I don't know whether the conversations -- I think they're still classified, the contents of those conversations.  I haven't seen them in a long, long time, so I don't think I can answer that question.

Mr. Jordan.  To Mr. Gowdy's question, you asked the reason you went to interview General Flynn was because statements made by the Vice President contradicted what you knew that he had said in -- he, Flynn -- had said in conversations with Ambassador Kislyak.

And all I'm asking is, was that the only reason you went to him, or was there other things that were said in his conversations with Mr. Kislyak that caused you concern and you wanted to go talk to him?

Mr. Comey.  The Vice President had said that the National Security Advisor had told the Vice President that the subject of sanctions never came up in General Flynn's conversations with the Russians.  That's my memory of what the Vice President said.  We knew that was not true.

Mr. Jordan.  You knew that sanctions had come up in the conversation.

Mr. Comey.  Correct.

Mr. Jordan.  But that, in and of itself, is not a problem.

Mr. Comey.  Is not --

Mr. Jordan.  The fact that the Vice President -- or, excuse me, the fact that incoming National Security Advisor talks with -- at this time, he could've already been National Security Advisor, but -- incoming National Security Advisor talks with the Russian Ambassador about sanctions, that's not a problem.  Your concern was that the Vice President was reporting publicly or

saying publicly that Flynn had not talked about that because Flynn had told him that.

Mr. Comey.  Our concern was -- and Mr. Gowdy asked me about the Logan Act.  That was not my focus, as I recall, at the time; that I gather there was a statute that prohibited private citizens and all that but that it wasn't something that had been prosecuted in 100 years, and so that was not our focus.

Our focus was it appeared that the National Security Advisor was lying to the Vice President about his communications with the Russians, and that made no sense to us, and we wanted to understand what is happening here.

Mr. Jordan.  But my point is you knew his conversation -- you knew what his conversation was with the Russian Ambassador.  And I'm asking, on its face, was there anything in that conversation that was wrong?

Mr. Comey.  And I hesitate only with "wrong."  I think a Department of Justice prosecutor might say, on its face, it was problematic under the Logan Act because of private citizens negotiating and all that business.  That was not my focus at the time, as I recall.

Mr. Jordan.  The day before you sent two agents over to interview General Flynn, there's a story in The Washington Post.

Maybe we can give the Director a copy of that story.  Can we get a copy of that?

And I just want to read the first sentence in the story.

"The FBI in late December" -- well, I'll let you get a copy, if we've got one.

Do we have a copy of that?  It's right here?  Okay.

Let me just read it, Director.

"The FBI in late December reviewed intercepts of communications between the Russian Ambassador to the United States and retired General Mike Flynn, the National Security Advisor to then-President-elect Trump, but has not found any evidence of wrongdoing or illicit ties to the Russian Government, U.S. officials said."

And all I'm asking is, is that accurate?

Mr. Comey.  Can I look at the article, Mr. Jordan?

Mr. Jordan.  I'm sorry.

Mr. Comey.  Yeah, I don't think I can answer that question, Mr. Jordan, because the answer calls for classified information.

Mr. Jordan.  It "has not found any evidence of wrongdoing or illicit ties to the Russian Government exist."  You can't say whether that's accurate or not?

Mr. Comey.  I can't.

Mr. Jordan.  Okay.

And then later down, the fourth paragraph, the paragraph that begins "Although Flynn's contacts with Russian Ambassador Kislyak," after the comma, it says, "Flynn himself is not the active target of an investigation, U.S. officials said."

Is that accurate?

Mr. <u>Comey.</u>  I can't answer that.

Mr. <u>Jordan.</u>  Okay.

I want to go back to memo No. 1, if we could get your first memo to --

Mr. <u>Comey.</u>  The February 8th one?

Mr. <u>Jordan.</u>  No.  I want to go back to the very first one that you did on the January 6th meeting up in -- excuse me, January 7th meeting in New York.  Friday, the 6th, you meet.  The memo is actually dated the 7th.  Do you have that one?

Mr. <u>Comey.</u>  Yes.  It's in -- sorry.

Mr. <u>Jordan.</u>  Okay.  Who all went with you, again, to New York to brief the President-elect?

Mr. <u>Comey.</u>  I went literally by myself because I was doing other FBI business.  But we met at Trump Tower with the Director of the CIA, the Director of the NSA, and the Director of National Intelligence, and a bunch of security folks, obviously.

Mr. <u>Jordan.</u>  So just tell me, though, the head of the CIA -- tell me -- refresh my memory who everyone is again.  Who's CIA?

Mr. <u>Comey.</u>  John Brennan was then the Director of CIA.  Michael Rogers was then the Director of the NSA.  And Jim Clapper was the Director of National Intelligence.

Mr. <u>Jordan.</u>  So Mr. Clapper was with you?

Mr. <u>Comey.</u>  I'm sorry, sir?

Mr. <u>Jordan.</u>  Mr. Clapper was there in New York?

Mr. <u>Comey.</u>  Correct.

Mr. <u>Jordan.</u>  Okay.  And you guys, had you talked before?
Because, in this memo, you said, "Clapper wanted me to speak to
the President-elect."  So had you talked before this and kind of
choreographed how the meeting was going to go and who was going to
do what?

Mr. <u>Comey.</u>  Yes.  And we had briefed here on Capitol Hill
that morning to the so-called Gang of Eight and the day before to
President Obama and his senior national security team.  So we'd
done the briefing twice already.

And then General Clapper, who was the leader of the team, had
explained to me how it was going to go at Trump Tower.

Mr. <u>Jordan.</u>  Okay.  So you kind of orchestrated and
choreographed how it was going to go at Trump Tower.

What did you brief the President on exactly?

Mr. <u>Comey.</u>  There were two parts to this conversation.  The
second part was just the President-elect and I alone.  The first
part was the Director of National Intelligence reporting to him,
Mr. Trump, and his team the results of the intelligence community
assessment that we had briefed here on the Hill that morning and
the President -- the then-current President the night before.

Mr. <u>Jordan.</u>  In that first part -- was there anything in that
first part about the dossier?

Well, let me ask it this way.  Was the dossier only briefed
in the second part with you and the President-elect, just the two

of you?  Was that the only time the dossier was brought up in that briefing?

Mr. <u>Comey.</u>  I just want to confirm that you mean the so-called Steele dossier by that term?

Mr. <u>Jordan.</u>  Yes, the dossier.

Mr. <u>Comey.</u>  Yeah.  I don't -- the reason I'm hesitating is there was a portion of the Steele reporting that was the subject of my private meeting with the President-elect during the prior session.  I don't know whether any of the Steele materials were referenced there.

And the reason I'm hesitating, Mr. Jordan, is there was a reference to the materials in part of the written report, the intelligence community assessment that General Clapper left with the President-elect.

Mr. <u>Jordan.</u>  That's where I wanted to go.  So the dossier you don't think was talked in the general -- talked about in the bigger, larger, general briefing, but a portion of it was discussed when you met with the President-elect alone.

Mr. <u>Comey.</u>  That's correct.

Mr. <u>Jordan.</u>  And the portion was the salacious part about the Russian hotel.

Mr. <u>Comey.</u>  Correct, the --

Mr. <u>Jordan.</u>  Okay.

Mr. <u>Comey.</u>  -- stuff about -- the alleged stuff about the prostitutes.

Mr. <u>Jordan.</u>  Why didn't you brief the President on the entire dossier?  Why just that part?

Mr. <u>Comey.</u>  Well, that's why I'm hesitating and saying I'm not sure whether it was mentioned, I don't think it was, in the first session, but it was written about in the document that was left, the so-called ICA, the intelligence community assessment.

But I don't remember General Clapper talking about reporting from the Steele reports in that first session.  I could be wrong, but I don't remember it.  I remember it clearly in the written document that was left but not in his oral presentation.

Mr. <u>Jordan.</u>  Did you choose just to brief the President-elect on the salacious part of the dossier, or was that something Clapper and the rest of the team had instructed you to brief the President on in just the private meeting with you and the President?

Mr. <u>Comey.</u>  Well, ultimately, it was Clapper's call.  I agreed -- we agreed that it made sense for me to do it and to do it privately, separately.  So I don't want to make it sound like I was ordered to do it.

Mr. <u>Jordan.</u>  So I guess what --

Mr. <u>Comey.</u>  I agreed that it made sense.

Mr. <u>Jordan.</u>  -- what I'm saying is, if it was -- I just want to know why.  Why didn't you brief him on the whole thing, talk about this dossier put together by a foreign intelligence source, we have this information?  Why just the salacious part?  Why not

the whole thing?

Mr. Comey.  I don't think -- again, I could be wrong that he brought it up, but I don't think he brought it up in the first session, because it wasn't central to the conclusions of the joint intelligence community assessment.  There were lots of other sources to support the conclusions, and because it wasn't important to the conclusion, I don't think he brought it up in his oral presentation.

It was brought up in my -- just that piece, it was brought up privately, because the goal of the private session was to alert the incoming President to this piece of it that we thought was about to become public.

Mr. Jordan.  Okay.

Second page of your memo, at least the way my copy is, the third-to-last paragraph:  I said I was -- I said I wasn't saying this was true, only that I wanted to let him know that it had been reported and that reports were in many hands.

Do you see that?

Mr. Comey.  Yes, I do.

Mr. Jordan.  Next sentence, you said:  I said media like CNN had them, and they were looking for a news hook.

What is a news hook?

Mr. Comey.  As I understood the term used by the press people of the FBI, it was an excuse to publish some event, some reason to say something was news.

Mr. Jordan.  Could a news hook be the fact that you had
actually just briefed the President-elect on this material?  Could
that be a news hook, in and of itself?

Mr. Comey.  I didn't think of it that way, but I think that
when CNN or one of them ultimately reported, that was, in part,
the hook they had used, that it had been briefed.

Mr. Jordan.  Last sentence in that paragraph:  I said that it
was inflammatory stuff and that they would get killed for
reporting it straight up from source report.

What did you mean by that sentence?

Mr. Comey.  I think what it says:  that it was salacious and
unverified material that a responsible journalist wouldn't report
without corroborating in some way.  Reporting it straight from the
source reports wouldn't be corroborating it.

Mr. Jordan.  So that's what I'm not understanding, is you
felt this was so important that it required a private session with
you and the President-elect, you only spoke of the salacious part
of the dossier, but yet you also say there's no way any good
reporter would print this.

But you felt it was still critical that you had to talk to
the President-elect about it.  And I would argue you created the
very news hook that you said you were concerned about.

Mr. Comey.  I didn't hear a question, Mr. Jordan.

Mr. Jordan.  I guess the question is, if it's so inflammatory
that reporters would get killed for reporting it, why was it so

important to tell the President?  Particularly when you weren't
going to tell him the rest of the dossier -- about the rest of the
dossier.

    Mr. Comey.  Well, I don't recall saying to him -- and I don't
read what I wrote here immediately afterwards to say this
either -- that it wouldn't be reported.  What I mean by "killed"
is they'd be severely criticized for reporting it, as I
believe -- I forget the outfit that did it -- Buzzfeed, I think,
was severely criticized for reporting it.

    So I wasn't telling him it's not going to come out.  We're
warning him that it may come out.

    Mr. Jordan.  In this meeting, did you tell the President who
had financed the dossier?

    Mr. Comey.  No.

    Mr. Jordan.  Were you concerned at all that the President
might get the wrong impression, that maybe, in fact, you
were -- you had this important information, that some way you
could hold that over the President's head?  Were you concerned
about that?  And did you convey it in such a way as to make sure
he didn't go away with that impression?

    Mr. Comey.  I was very concerned that he might interpret it
as an effort to pull a J. Edgar Hoover on him.

    Mr. Jordan.  And how did you convey it, then, and -- what did
you say to make sure he understood it in the proper context, or at
least the context you were trying to convey it?

Mr. Comey.  By explaining to him the reason that I was doing it and explaining that it was unverified, that it wasn't something that we were investigating, and then, once the conversation, in my judgment, started to go off the rails, by then telling him we were not investigating him personally.

Mr. Jordan.  Okay.

Can you go to the memo No. 2, the one that's, I think, dated the 28th, January 28th, 2017, I think recounting your conversations at dinner with the President from the day before, the 27th.  And I want to go to page 4 of that.

Again, this is where Mr. Gowdy was, in some ways, earlier, but I kind of want to -- I just want to try to understand this.

When did the White House learn that you had actually interviewed -- so your conversation with the President -- you have dinner with the President on the 27th of January.  The 24th is the day -- 3 days earlier is when Mr. Flynn is interviewed by two agents.

When did the White House actually then learn that General Flynn had been interviewed by the FBI?

Mr. Comey.  I don't know.  It's hard because I don't know what you mean by "the White House."  My recollection is that the Deputy Attorney General went over on the 25th and, I think, on the 26th and spoke to the White House Counsel.  My recollection is that this -- that he had been interviewed came up then.  But I don't know whether people knew about it the day we interviewed

him, people besides General Flynn.

Mr. <u>Jordan.</u>  Did the President know?

Mr. <u>Comey.</u>  I don't know.

Mr. <u>Jordan.</u>  In the next-to-last paragraph, last sentence, you said, "I did not comment at any point during this topic" -- and the topic is about General Flynn -- "and there was no mention or acknowledgment of any FBI interest in or contact with General Flynn."

Tell me what that sentence means there.

Mr. <u>Comey.</u>  Say again, sir?

Mr. <u>Jordan.</u>  That last sentence you wrote, what do you mean in that sentence?  What are you talking about?

Mr. <u>Comey.</u>  Exactly what I said here, that at no time during the dinner was there a reference, allusion, mention by either of us about the FBI having contact with General Flynn or being interested in General Flynn investigatively.

Mr. <u>Jordan.</u>  That was what I wanted to know.  So this is not just referring to the President didn't bring it up.  You didn't bring it up either.

Mr. <u>Comey.</u>  Correct, neither of us brought it up or alluded to it.

Mr. <u>Jordan.</u>  Why not?  He's talking about General Flynn.  You had just interviewed him 3 days earlier and discovered that he was lying to the Vice President, knew he was lying to the Vice President, and, based on what we've heard of late, that he lied to

your agents.  Why not tell his boss, why not tell the head of the executive branch, why not tell the President of the United States, "Hey, your National Security Advisor just lied to us 3 days ago"?

Mr. Comey.  Because we had an open investigation, and there would be no reason or a need to tell the President about it.

Mr. Jordan.  Really?

Mr. Comey.  Really.

Mr. Jordan.  You wouldn't tell the President of the United States that his National Security Advisor wasn't being square with the FBI?

Mr. Comey.  I wouldn't until our investigation -- I certainly wouldn't consider it while the investigation was open.

Mr. Jordan.  I mean, but this is not just any investigation, it seems to me, Director.  This is a top advisor to the Commander in Chief.  And you guys, based on what we've heard, felt that he wasn't being honest with the Vice President and wasn't honest with two of your agents.  And just 3 days later, you're meeting with the President, and, oh, by the way, the conversation is about General Flynn.  And you don't tell the President anything?

Mr. Comey.  I did not.

Mr. Jordan.  Okay.

Mr. Meadows.  So, Director Comey, let me make sure I understand this.  You were so concerned that Michael Flynn may have lied or did lie to the Vice President of the United States, but that once you got that confirmed, that he had told a

falsehood, you didn't believe that it was appropriate to tell the President of the United States that there was no national security risk where you would actually convey that to the President of the United States?  Is that your testimony?

     Mr. <u>Comey.</u>  That is correct.  We had an --

     Mr. <u>Meadows.</u>  I just find that --

     Mr. <u>Kelley.</u>  Let him finish the answer.

     Mr. <u>Comey.</u>  We had an open investigation, criminal investigation, counterintelligence investigation.  There was no way I would discuss that with the President.

     Now, I was aware that the Deputy Attorney General had gone and voiced the Department of Justice's concerns about his susceptibility to blackmail at a high level to the White House.

     But, during this dinner, it did not -- I did not and would not talk about a pending criminal investigation with the President.

     Mr. <u>Meadows.</u>  Well, was it a criminal investigation at that point or a counterintelligence investigation?

     Mr. <u>Comey.</u>  It was both.  Every counterintelligence investigation has, as an aspect, criminal --

     Mr. <u>Meadows.</u>  It has potential criminal -- but it was opened as a counterintelligence investigation.

     Mr. <u>Comey.</u>  Correct.

     Mr. <u>Meadows.</u>  And so, was there a criminal investigation opened at this point?

Mr. <u>Comey.</u>  Yes.

Mr. <u>Jordan.</u>  I mean, Director, it just strikes me as that's, it seems to me, twice in a 3-day period where you did not inform the White House of something that seemed to be pretty important information.

I want to move on to memo No. 6, which is the 3/30/17 memo, if I could.

Mr. <u>Comey.</u>  Okay.  I have it.

Mr. <u>Jordan.</u>  Now, Director, actually, one of the things I wanted to ask you, too, is -- so when I went through the memos, I think on seven different occasions you referenced the fact that you are not investigating the President.  And the President is pretty clear he would love for you to have made that information public, told the American people that the President, their President, the guy they elected, wasn't under investigation.

Why didn't you do that?  Why wouldn't you just tell the American people he is not under investigation?

Mr. <u>Comey.</u>  Two reasons.  First, I wouldn't do it without the approval and direction of the leadership of the Department of Justice, one.  Two, saying that publicly had significant consequences, both in terms of creating a duty to correct and potentially being misleading.

Mr. <u>Jordan.</u>  At the end of this memo, you say, "I called Acting Attorney General and relayed the substance of the above and said I was telling him so he could decide what guidance to give

me, if any," which sort of squares with what you just
answered -- what you just said to my previous question.

What did the AG say?

Mr. Comey.  I don't recall him saying anything then except
"Thanks for telling me," and then my conversation with the Acting
AG ended.  I didn't hear back from him on the subject before the
President called me again 10 or so days later.

Mr. Jordan.  But from March 30th, 2017, when you write this
memo until you leave the FBI a month and a half later, you never
heard back from the Attorney General with an answer to your
question?

I mean, that's a pretty important question.  The President
is -- seven different times in your interactions with the
President, he has said, "Hey, can you let the American people know
I'm not under investigation?"  You said, "You know what?  There's
a way to do this.  We're going to work through proper channels.
I'm going to call Dana Boente over at Justice, and we're going to
get an answer."  And you do that on the 30th of March.  And you're
still FBI Director until May 9th, I believe.  So, in that 7-week
time period, no answer from the Justice Department?

Mr. Comey.  To be clear, I just want to correct one thing you
said, Mr. Jordan.  I didn't tell the President we would get an
answer.  I told him that I would relay his request.

Mr. Jordan.  I didn't ask --

Mr. Comey.  I contacted --

Mr. <u>Jordan.</u>  -- that, but that's fine.

Mr. <u>Comey.</u>  After the President called back -- and I think it
was April 11th -- to ask about it again, the President
said -- when I told him I had relayed his request, the President
said he would have the White House Counsel follow up directly with
the Department of Justice to get an answer.

And I think my chief of staff spoke to Mr. Boente at that
point to tell him that we'd gotten another call, and Mr. Boente
said, in substance, "Oh, God, I was hoping that would go away."
And --

Mr. <u>Jordan.</u>  Wait, wait.  Say that again.  Acting Attorney
General Boente said what?

Mr. <u>Comey.</u>  My recollection is he said something to the
effect of, "Oh, God, I was hoping that would go away" when he was
contacted the second time to say the President wanted to know the
answer.

Mr. <u>Jordan.</u>  And the second time, that contact was from you
or White House Counsel?

Mr. <u>Comey.</u>  No.  I'm sorry.  Maybe I'm screwing it up.

The President called me March 30th.  I relayed his request to
the Acting Attorney General.  I didn't hear back.

The President calls me again.  Again, I think it's
April 11th.  Says, "What did you do with what I had asked?"  I
told him I had given it to the Acting Attorney General.  And we
had a conversation where he said he understood the way to proceed

was to have the White House Counsel ask the Justice Department to
get out that he wasn't under investigation.

Then we gave a heads-up.  I think -- I don't think I did it
directly.  I think my chief of staff did it.  Called Mr. Boente
and said, "The President just called.  Wants to know what happened
with that thing."  And Mr. Boente's reaction was, in substance,
"Oh, God, I was hoping that would go away."

Mr. Jordan.  But that's on the 10th of April.

Mr. Comey.  I think the 11th of April maybe.  I could have
the dates wrong.

Mr. Jordan.  Okay, 10th or 11th of April.  So, again, you've
got another month still on the job.  Nothing happened?

Mr. Comey.  I don't know what happened.  I don't remember any
further conversations that I was involved in until I was fired on
May the 9th.

Mr. Jordan.  Okay.

Mr. Gowdy.  Director Comey, I think your counsel has a copy
of one of the exhibits to the Cohen sentencing memo that purports
to be the notes of Andy McCabe.  Do you see that?

Mr. Comey.  I see the document dated January 24th, 2017.

Mr. Gowdy.  That's right.  Will you look at the last
paragraph with me, kind of the sentence in the middle?  "I
explained that I thought the quickest way to get this done was to
have a conversation between him and the agents only."

Does that change your impression of whether or not the Bureau

discouraged him from having White House Counsel or other lawyers present?

Mr. <u>Comey.</u>  Let me just read the whole paragraph, if I could. Okay.  Could you say your question again, sir?

Mr. <u>Gowdy.</u>  Well, you and I were quibbling a little bit over whether or not you took exception to something in a serial question I asked you about whether the Bureau discouraged General Flynn from having either White House Counsel or other counsel present.  And you took exception to that, and that's why I went and got the document.  And I'm wondering whether or not you still take exception to that in light of what you read.

Mr. <u>Comey.</u>  I take exception to your characterization of it as discouraging.  But I'm reading Andy -- and I'm sure Andy this wrote this accurately, that he had said the quickest way to get this done was to have a conversation between him and the agents only.

Mr. <u>Gowdy.</u>  All right.

Mr. <u>Comey.</u>  So I would read it as encouraging him to meet with the agents without White House Counsel present.

Mr. <u>Gowdy.</u>  Well, what's the next sentence?

Mr. <u>Comey.</u>  "I further stated that if Lieutenant General Flynn wished to include anyone else in the meeting, like the White House Counsel, for instance, that I would need to involve the Department of Justice.  He stated this would not be necessary."

Mr. <u>Gowdy.</u>  Then, if you look at the first sentence, "I explained to Lieutenant General Flynn that my desire was to have two of my agents interview him as quickly, quietly, and discreetly as possible."

So you've got the Deputy Director of the FBI saying let's do this quick, it's not going to be quick if you involve other people, and you do not think that that sends the --

[Discussion off the record.]

Mr. <u>Gowdy.</u>  I'm not going to make you listen to two people at the same time.

Mr. <u>Comey.</u>  I got it.  Go ahead.  Sorry.

Mr. <u>Gowdy.</u>  You do not think that that left the impression with General Flynn that he needed to go ahead and do it without counsel involved?

Mr. <u>Comey.</u>  I can't speak to the impression it left with General Flynn.  I take these words -- in a memo I haven't seen before, but I take them to be accurately recounting what Andy's conversation was.

Mr. <u>Gowdy.</u>  Why was it important to do it so quickly?

Mr. <u>Comey.</u>  I don't know what Andy meant by "quickly."  I wanted it done quickly because the best investigations are done promptly, before things sit around and people have an opportunity to take your investigation in different directions.  You jump on it; you go get an interview done.

Mr. <u>Gowdy.</u>  All right.  But if --

Mr. <u>Comey.</u>  That's how I've always investigated.

Mr. <u>Gowdy.</u>  -- if your goal is to get the Vice President to quit misspeaking publicly, you could have told the Vice President, "Quit saying that.  It's not true."

Mr. <u>Comey.</u>  Could have.  Yeah.

Mr. <u>Gowdy.</u>  I want you to flip over to the affidavit, if you will, from Peter Strzok, who was one of the two Bureau agents that interviewed Flynn.

Mr. <u>Comey.</u>  I'm sorry, I don't see an affidavit.

Mr. <u>Gowdy.</u>  Page 3.  Do you see that?

Mr. <u>Comey.</u>  I'm looking for an affidavit.  I don't -- hold on.

Mr. <u>Gowdy.</u>  Maybe it's a 302.

Mr. <u>Comey.</u>  I see a 302 from an interview on 7/19/2017 of Peter Strzok.

Mr. <u>Gowdy.</u>  I am looking at one date of August 22nd, 2017.

Mr. <u>Comey.</u>  Okay, hold on.

I got it.  I'm sorry.

Mr. <u>Gowdy.</u>  Can you look at page 3?

Mr. <u>Comey.</u>  Oh, I see.  The write-up is August 22nd; the interview is 7/19.  That's what was confusing me.

I got it.  Page 3.

Mr. <u>Gowdy.</u>  All right.  Second full paragraph, begins "Before the interview"?

Mr. <u>Comey.</u>  I see that, yep.

Mr. <u>Gowdy.</u>  "Before the interview,
McCabe" -- redacted -- "and others decided the agents would not
warn Flynn that it was a crime to lie during an FBI interview
because they wanted Flynn to be relaxed and they were concerned
that giving him the warnings might adversely affect the rapport."

You could fashion an argument, Director Comey, that the
purpose of an FBI interview is not so much to establish a rapport
as to get the facts and the truth.

Do you believe that warning someone that there are
consequences for not telling the truth adversely affects your
getting the truth?

Mr. <u>Comey.</u>  It can, yes.

Mr. <u>Gowdy.</u>  So you did consider warning him and decided not
to.

Mr. <u>Comey.</u>  I did not.

Mr. <u>Gowdy.</u>  But you see that McCabe and others did.

Mr. <u>Comey.</u>  I see this paragraph in the 302 that they had a
conversation about it.  I wasn't present for it, but I see that
they did.

Mr. <u>Gowdy.</u>  And they made the deliberate decision not to
advise him that there were consequences for lying because they,
quote, "did not want to adversely affect the rapport."

Mr. <u>Comey.</u>  I see that.  Totally reasonable, consistent with
the FBI's practice in thousands of interviews.

Mr. <u>Gowdy.</u>  Well, in our next hour, Director Comey, we are

going to go -- we are going to contrast the decision to not allow
Michael Flynn to have an attorney, or discourage him from having
one, with allowing some other folks the Bureau interviewed to have
multiple attorneys in the room, including fact witnesses.

Can you see the dichotomy there, or is that an unreasonable
comparison?

Mr. Comey.  I'm not going to comment on that.  I remember you
asking me questions about that last week.  I'm happy to answer
them again.

Mr. Gowdy.  You will not say whether or not it is an
unreasonable comparison to compare allowing multiple attorneys,
who are also fact witnesses, to be present during an interview but
discouraging another person from having counsel present?

Mr. Comey.  I'm not going to answer that in a vacuum,
Mr. Gowdy.  Someone who has a lawyer, and you know as an
investigator that person is represented -- to have an interview
with that person that you know to be represented is a violation of
your ethical duties as a lawyer and an FBI agent.  So they're
totally different circumstances.

Mr. Gowdy.  Is that why you went through White House Counsel
for the Obama and the Bush administrations?

Mr. Comey.  I didn't go through White House Counsel for the
Obama --

Mr. Gowdy.  You've said that was the protocol.

Mr. Kelley.  No, that's not what he said.  He said he hasn't

had experience doing that in either the Obama or Bush administrations.

Mr. Gowdy.  You said the protocol was to go through White House Counsel, correct?

Mr. Comey.  That was what I understood, yes.

Mr. Gowdy.  Were there any deviations from that protocol?

Mr. Comey.  I don't know.

Mr. Gowdy.  So it was protocol and practice to go through White House Counsel to interview administration officials under Bush and Obama.

Mr. Comey.  No.  My understanding was, to do an interview at the White House complex, we would arrange -- the FBI would arrange those interviews through the White House Counsel's Office.  I never participated in one, don't know of one, but I have a recollection that's what the protocol was.  Not that they would have a lawyer present, but to arrange it, they would do it through the White House Counsel.

Mr. Gowdy.  There's a note that Sally Yates was very upset when she learned about the interview.  Is that accurate?

Mr. Comey.  Yes.

Mr. Gowdy.  What was she upset about?

Mr. Comey.  That I had sent the agents to do the interview without telling her.

Mr. Gowdy.  Why would that upset her?

Mr. Comey.  Because she had been involved in conversations

about what to do about the apparent false statements that the Vice President was making publicly and felt that she should've been consulted before agents were dispatched to interview Flynn.

Mr. <u>Gowdy.</u>  And I think your testimony was, at least once and possibly twice, she went and met with White House Counsel after your Flynn interview?

Mr. <u>Comey.</u>  Correct.  Maybe both of the next 2 days.  At least one of those 2 days.

Mr. <u>Gowdy.</u>  And she took Mary McCord with her?  Does that ring a bell?

Mr. <u>Comey.</u>  Yeah, it rings a general bell.  I think so.  I'm certain she went.  It rings a bell that Mary McCord went, but I can't say for certain.

Mr. <u>Gowdy.</u>  Am I mischaracterizing prior testimony by saying that the Bureau was about to wrap up its Michael Flynn investigation at the time this conversation with the Russian Ambassador took place?

Mr. <u>Comey.</u>  I don't think that's one I can answer.  In other words, I think that calls for an answer that's still classified. And I'll consult with the FBI.  If they tell me it's not, I'm happy to tell you later.

Mr. <u>Gowdy.</u>  Okay.

[Discussion off the record.]

[11:20 a.m.]

Mr. <u>Comey.</u>  Sorry, no luck.  I can't answer that question.

Mr. <u>Gowdy.</u>  You can't answer any part of it?  You can't answer that there was an investigation of Michael Flynn?  You can't answer that it was about to wrap up?  Both?

Mr. <u>Comey.</u>  Either of those.

Mr. <u>Gowdy.</u>  Okay.  A couple more questions, and then we'll cede time to our colleagues on the other side.

If President Trump had told you he was going to let Michael Flynn go, is that obstruction?

Mr. <u>Comey.</u>  I'm not going to answer a hypothetical, Mr. Gowdy.

Mr. <u>Gowdy.</u>  Why not?

Mr. <u>Comey.</u>  Because I'm not.  It is irresponsible to answer hypotheticals.  I tried to do a lot of it last time.  I will answer factual questions, but the what-ifs and what-abouts, I'm just not going the answer those.

Mr. <u>Gowdy.</u>  All right.  Well, let me see if we can get at it this way.  From a factual standpoint, what is your understanding of the power to pardon?

Mr. <u>Comey.</u>  I'm not qualified to answer.  I mean, I know the pardon power is written in the United States Constitution.  It is broad.  It is sweeping.  Beyond that, you would have to talk to an expert.

Mr. <u>Gowdy.</u>  What are the limitations -- you're right that it

is broad and sweeping.  What are the limitations?

Mr. Comey.  The same answer I gave you earlier, I'm not qualified to answer that question.

Mr. Gowdy.  If the President had told you he was going to talk to Jeff Sessions about letting Flynn go, would that constitute obstruction?

Mr. Comey.  I'm not going to answer a hypothetical.

Mr. Gowdy.  All right.

Mr. Jordan.  Hey, can I get one more question real quick?

Director, are there other versions of your memos, other drafts or other versions?

Mr. Comey.  Not that I'm aware of.  Than what you have here before me?

Mr. Jordan.  Right.

Mr. Comey.  Not that I'm aware of.

Mr. Jordan.  When you the drafted memo -- I think last time we talked, you said put together a memo; you would meet with your top people, go through it, go over it.  What kinds of changes were made?  Were there changes made to the memo after you had had those discussions with the leadership of the FBI?

Mr. Comey.  I don't remember any changes to memos after I initialed them and dated them and then shared them with the team. I don't remember any changes as a result of consultation with the team.

Mr. Jordan.  Okay.  Thank you.

Ms. Shen.  So the time is 11:24.  We're back on the record.

Director Comey, I'm Valerie Shen.  I work for the Democratic staff on House Oversight, and I'm going to turn it over to Representative Clay for a few questions.

Mr. Clay.  Thank you.  And thank you for being here, Mr. Director.  In the last round, you explained to Congressman Jordan that you did not want to tell the public that the President was not under investigation.  One reason you said was that it would be potentially misleading.  And what do you mean by that?  Can you explain?

Mr. Comey.  I was referring to a debate we had inside the FBI before I went to meet with the President on January the 6th.  The FBI's general counsel had argued that although it was literally true that we didn't have an investigative file open on the President, to tell him that he wasn't under investigation was potentially misleading because, one, we were investigating people around him; and, two, that his conduct as the head of the campaign would inevitably come within the scope of the investigation.

Mr. Clay.  And you also said that there would be a duty to correct.  Can you explain what you meant by that?

Mr. Comey.  If we told Congress or the American people or both that the President was not under investigation, that if at any point he became under investigation, which has happened -- in this case, as I understand it, special counsel has told Mr. Trump he is the subject of their investigation -- we would have an

obligation to correct the public record and announce that the President of the United States was now under investigation.

Mr. <u>Clay.</u>  I see.  I want to ask about your time at the Justice Department, and I realize that for most of your adult life you have been involved in law enforcement.  Is that correct?

Mr. <u>Comey.</u>  That's correct.

Mr. <u>Clay.</u>  And so, specifically, when you served as Deputy Attorney General and named a special prosecutor in 2005 to investigate the Valerie Plame leak, what are the circumstances and considerations that go into naming a special counsel or special prosecutor?

Mr. <u>Comey.</u>  I made the decision as the Acting Attorney General in late December of 2003 to appoint a special prosecutor to investigate in that circumstance for several reasons.  First, we had an open criminal investigation that involved as subjects senior officials in the Bush administration, including people who worked in the White House, the Vice President's chief of staff, the chief political adviser, Mr. Rove, to President Bush and that, in order to ensure public faith and confidence that the investigation was being done in a fair, competent, and independent way, it was important that it be overseen by someone other than the political appointees at the Department.

Mr. <u>Clay.</u>  So does the DOJ historically respect the independence and role of a special counsel, historically?

Mr. <u>Comey.</u>  Yes.

Mr. Clay.  And then who typically supervises the work of a special counsel, using your experience with the Plame investigation?

Mr. Comey.  In the Plame investigation, the special counsel was given a written delegation of his authorities and his powers, and he was supervised by me as the Acting Attorney General.  And that's a fairly typical arrangement.  The special prosecutor will be supervised either by the Attorney General directly or the Deputy Attorney General.

Mr. Clay.  And how easy would it have been for you to interfere or shut down the Plame investigation?

Mr. Comey.  Well, hard to say.  I suppose, in the abstract, there were delegated authorities to the special counsel who was a person of extraordinary integrity and reputation.  So both for reasons of literal language of his delegation would make it difficult to interfere; and the nature and character of the individual involved would make it difficult to interfere; and then, third, the culture of the Department of Justice is powerful and wonderful, in my view, and that would make it very difficult for a leader to interfere.

Mr. Clay.  So, in those instances, there are layers of checks and balances as far as someone being able to pull the plug on an investigation?

Mr. Comey.  Correct.  And I would add to that congressional oversight, the role of the inspector general, the oversight of the

press, lots and lots of things that, in a good way, make it hard for an executive to act in an improper way.

Mr. <u>Clay.</u>  Thank you.  To the best of your knowledge, has Deputy AG Rosenstein fairly and appropriately supervised Special Counsel Mueller's probe?

Mr. <u>Comey.</u>  I can't answer that because I was fired on May the 9th before the special counsel was appointed.

Mr. <u>Clay.</u>  Okay.  What dangers or risks does the special counsel's office face with the forced resignation of Attorney General Sessions?

Mr. <u>Comey.</u>  I can't answer that question, sir.

Mr. <u>Clay.</u>  Okay.  Do you have any concerns about the appointment of Matthew Whitaker to be Acting Attorney General?

Mr. <u>Comey.</u>  I don't think I'm qualified to answer that question as a civilian.

Mr. <u>Clay.</u>  Do you believe it is appropriate for him to replace Deputy AG Rosenstein as the day-to-day supervisor of the special counsel's investigation?

Mr. <u>Comey.</u>  That's another one I can't see enough to answer responsibly from the outside.

Mr. <u>Clay.</u>  But it would raise alarm bells if it occurred in your mind, to you, would it?

Mr. <u>Comey.</u>  To my mind, sir, that's too much of a hypothetical for me to answer.

Mr. <u>Clay.</u>  Okay.  I understand that and respect it.  Do you

know Matthew Whitaker either in a professional or personal capacity?

Mr. <u>Comey.</u>  I know him a little bit from a professional capacity.  He was a U.S. attorney in Des Moines as I recall when I was the Deputy Attorney General, so he was one of the 93 U.S. attorneys who reported to me.

Mr. <u>Clay.</u>  Sure, sure.  Okay.  There is a longstanding Department of Justice policy against providing Congress information during ongoing criminal investigations, and could you briefly explain the rationale behind that policy?

Mr. <u>Comey.</u>  What you said is consistent with my recollection that there -- from decades and decades, the Department has resisted complying with oversight requests relating to active investigations, and the reason is because it risks jeopardizing the investigation, chilling witnesses; leaks could hurt an investigation, lots of other things that you can't even predict. It is the reason we try to conduct investigations in private, and also to protect the person being investigated because there may not be charges brought.

Mr. <u>Clay.</u>  And so that -- tell me -- and I know you don't like answering hypotheticals, but what damage might be caused if Congress were to obtain information in an ongoing criminal investigation and then share it with the target of that investigation?

Mr. <u>Comey.</u>  Well, I can't answer, won't answer a

hypothetical.  All I can say is that I can offer an explanation of the reason for the approach that the Justice Department has long taken.  You don't want to do anything to jeopardize your ability to investigate successfully, and that means both to come to a fair conclusion and apprehend people who have done something that's wrong and not smear somebody who is not going to be charged, so any time you start sharing information with anyone, including Congress, you risk both of those objectives.

Mr. Clay.  A growing concern of the minority members has been political interference of FBI matters on a wide variety of issue areas.  Understanding that you were fired in the spring of 2017, I would like to go through a few topics -- a topic that may have arisen during your tenure.

Are you aware of President Trump, White House officials, or senior DOJ leadership meeting or communicating with the FBI agents, officials, or other personnel from the Criminal, Cyber, Or Counterintelligence Divisions?  Are you aware of any of those meetings of the people I just -- Trump, White House officials, or senior DOJ leadership meeting or communicating?

Mr. Comey.  I'm certainly not aware and don't remember any involving the President.  It is a hard question to answer because I'm sure there are contacts between senior DOJ officials and FBI people in briefings, in meetings of all kinds.  I think there were also -- as a matter of course, there were counterintelligence briefings given and cyber threat briefings given to the incoming

administration.  I don't remember any of those with the President personally.  So that's why it is hard for me to answer as to the rest.

Mr. <u>Clay.</u>  And I'm concluding my questions and passing off to Mr. Johnson, but I just want to say thank you for your service to this country.  I first met you when you became the FBI Director, and I appreciate what you have done in the area of law enforcement in this Nation, so thank you.

And to Mr. Johnson.

Mr. <u>Comey.</u>  Thank you.

Mr. <u>Johnson of Georgia.</u>  Thank you, Representative Clay.

And, Director Comey, I want to thank you for your service to the Nation throughout your many years of service.  And I want to turn your attention now to confidential human sources and the public disclosure of sensitive information.

In previous testimony to Congress, FBI Director Christopher Wray explained the critical importance of protecting confidential human sources.  He said, quote, "The day we can't protect human sources is the day the American people start becoming less safe," end quote.  Do you agree with Director Wray?

Mr. <u>Comey.</u>  Yes, I do.

Mr. <u>Johnson of Georgia.</u>  Earlier this year, you tweeted, quote:  The FBI's use of confidential human sources, the actual term, is tightly regulated and essential to protecting the country.  Attacks on the FBI and lying about its work will do

lasting damage to our country.  How will Republicans explain this
to their grandchildren, end quote.

Director Comey, do you still stand by that statement?

Mr. Comey.  Very much.

Mr. Johnson of Georgia.  And I, too, am concerned about the
impact Congress and the President will have on law enforcement's
ability to use and retain confidential human sources.  I would
like to ask you about the politicized process through which the
identities of several confidential human sources relating to the
Russian collusion case have become public.

Are you concerned by Congress' demanding that law enforcement
agencies disclose personal identifying information relating to
confidential human sources, and if so, why?

Mr. Comey.  Well, this is echoed in Director Wray's
statement.  It is very important that when we make a promise of
confidentiality to a human being who is going to assist the United
States of America, that we do everything possible to abide that
promise, both so that future human beings will trust us and also
so that he with don't jeopardize the life, the well-being, the
occupation, and the family of the person who is the source now.

Mr. Johnson of Georgia.  What -- are you concerned about the
fact that personal identifying information relating to human
sources has been leaked to the public via Congress?

Mr. Comey.  I don't know enough about any particulars to
answer in the particular, and so I would have to give you the same

general answer:  Any time there's an unauthorized disclosure of information about a confidential human source, it is deeply concerning, or should be, to all of us.

Mr. Johnson of Georgia.  In your experience, can the leak of identifying details connected to a confidential source, such as the source's geographical location or the date on which that source conveyed a piece of information, create a potential security risk for a confidential human source?

Mr. Comey.  Well, sir, I don't want to answer a hypothetical question.  Again, protecting the location, the dates of meetings, all of the details of a confidential human source are essential to maintaining the integrity of the investigation and protecting their life, their livelihood, their family.

Mr. Johnson of Georgia.  Other than the consequences that you spoke about earlier, what are the potential effects of revealing the identity of a confidential human source?

Mr. Comey.  People get killed if their cooperation with the United States is revealed, whether they're gang members or representatives of adversary nations; people lose jobs; people's families are threatened; all the commonsense things you would expect to follow from being identified as someone who is cooperating with the United States Government.

Mr. Johnson of Georgia.  How could disclosing the identity of a confidential human source also compromise our national security?

Mr. Comey.  Well, again, I'm not even going to answer a

hypothetical question.  But I can say this responsibly:  When a source is cooperating in a terrorism case or an espionage case, for example, and they are revealed, there's obviously great jeopardy to them personally, but our ability as a country to defeat that terrorist threat or that counterintelligence threat is diminished, and, logically, our national security is diminished by virtue of that effect.

     Mr. Johnson of Georgia.  What effect could revealing a confidential human source have on the Department of Justice's ability to prosecute cases relying on information provided by human sources?

     Mr. Comey.  Well, as I said with respect to the national security impact, the impact on criminal cases can be direct if you lose a human being who could tell you what they saw, what they heard, what they found, but the knock-on effects are more severe than that, and I know this from personal experience, that it chills your other witnesses to see a witness exposed and retaliated against, even if it doesn't happen to them, and that affects your ability to present a case to a jury that results in the conviction of a defendant.

     Mr. Johnson of Georgia.  Thank you.  Earlier this year, the Carter Page FISA application was declassified and released by the Department of Justice, albeit in highly redacted form.  Are you aware of any other FISA applications the Justice Department has declassified and publicly released?

Mr. <u>Comey.</u>  I am not.

Mr. <u>Johnson of Georgia.</u>  So it is fair to say that the public release of Carter Page's FISA application was unprecedented?

Mr. <u>Comey.</u>  I believe it is the only time since the Foreign Intelligence Surveillance Act was passed in the late 1970s.

Mr. <u>Johnson of Georgia.</u>  In your experience, how closely have FISA applications and related information been protected by the Department of Justice?

Mr. <u>Comey.</u>  They are among the most important documents and processes the Department of Justice engages in, and they're held very, very tightly.

Mr. <u>Johnson of Georgia.</u>  And why is that?

Mr. <u>Comey.</u>  For several reasons.  First, they are all classified, and so just the protection of classified information warrants treating them very, very carefully, but beyond that, they reveal sources and methods of intelligence investigations, whether those are terrorism cases or counterintelligence cases that, if disclosed, could blow the investigation, harm our national security, and put people's lives in danger.  So it is taken very, very seriously by the Department of Justice, which obviously includes the FBI.

Mr. <u>Johnson of Georgia.</u>  Has the Department of Justice regularly provided FISA applications to Congress, the Gang of Eight, or any other body of Congress or Congresspeople?

Mr. <u>Comey.</u>  I am not aware of FISA documentation being shared

with Congress ever, with the exception of the FISA -- the FISA
application you mentioned.

Mr. Johnson of Georgia.  Are you concerned about the
precedent set by the Department of Justice in releasing this FISA
application to Members of Congress?

Mr. Comey.  I can't answer that because I don't know what
considerations went into it.

Mr. Johnson of Georgia.  What are the national security
implications of this breach of policy?

Mr. Comey.  Well, I don't know -- I can't speak to whether it
is a breach of policy because I don't know what the
considerations --

Mr. Johnson of Georgia.  -- DOJ has basically had a policy of
not providing the FISA applications to Congress, so breaching that
policy, does it have national security implications?

Mr. Comey.  Again, I'm not trying to be argumentative.  I
don't know whether they breached a policy or concluded that there
were exceptional circumstances that warranted an exception to the
policy.  So I can't speak to that in particular.  I was very
concerned as a private citizen with a long background in this work
when I saw that there had been a disclosure to Congress of a FISA
application and then when portions of it were released for a
number of the reasons that I have said earlier, but I can't speak
to the thinking behind the disclosure.

Mr. Johnson of Georgia.  Thank you.  I appreciate that.  Do

you share similar concerns when it comes to the leaking or declassifying of highly sensitive intelligence?

Mr. Comey.  Yes.  I think we as country have to be very thoughtful about how we handle and disclose classified information.

Mr. Johnson of Georgia.  Could you again go over the negative effects of leaking or declassifying highly sensitive intelligence?

Mr. Comey.  Well, they're similar to the ones that identify with respect to confidential human sources and FISA.  It puts at risk sources and methods that are vital to protecting the United States.  It affects our reputation with allied nations for our ability to protect classified information and to elicit their cooperation.  It potentially jeopardizes ongoing cases, and it puts literal lives in danger of our agents, our sources, and our colleagues around the world.

Mr. Johnson of Georgia.  Do you believe that publicly disclosing FISA sources and methods can cause damage to future FBI counterintelligence efforts?

Mr. Comey.  Again, I'm going to resist answering a hypothetical, but I can address it by saying just what I said earlier:  Any time you release information that is -- that relates to sources and methods, it risks jeopardizing the sources and methods in that particular investigation and chilling all future investigations.

Mr. Johnson of Georgia.  And it can have a chilling effect

among the rank and file counterintelligence professionals.  Is
that fair to say?

     Mr. <u>Comey.</u>  I can't speak to -- because there's never been a
circumstance -- well, let me back up.  You're talking about leaks.
Yes, leaks are discouraging to all of those who are responsible
for protecting our Nation's secrets.

     Mr. <u>Johnson of Georgia.</u>  And, of course, you would agree that
disclosing publicly our sources and methods help our foreign
adversaries?

     Mr. <u>Comey.</u>  And I think I alluded to that earlier as one of
the general reasons why you want to protect information is that if
the bad guys find out how we do things, they're able to defeat us
and harm our sources.

     Mr. <u>Johnson of Georgia.</u>  Thank you.  With respect to the
administration's evident mistrust of the intelligence community,
the President has repeatedly and publicly disagreed with the
conclusions of the intelligence agencies, especially if they
conflict with his own personal interest.  At the start of his
Presidency, he openly disagreed with the assessment that Russia
interfered in the 2016 election.  Most recently, when confronted
with the evidence that Crown Prince Mohammed bin Salman's
involvement in the killing of Washington Post journalist and U.S.
resident Jamal Khashoggi the President said, quote:  It could very
well be that the Crown Prince had knowledge of this tragic event.
Maybe he did; maybe he didn't.  We may never know all of the facts

surrounding the murder of Mr. Jamal Khashoggi, end quote.

In your experience, what impact do statements like these by the President of the United States have on the intelligence community?

Mr. Comey.  That's very hard for me to answer because I don't know, for good reason, the intelligence that underlies the assessments that you made reference to.  And so I can only answer in a general sense, which is any time the President runs down the men and women of the intelligence community, it is bad for those agencies and for our country in general, which is not to say there ought not to be healthy skepticism and back and forth between a consumer of intelligence and those providing the assessments, but when a President is openly running down the men and women who do that work, it is bad for our country.

Mr. Johnson of Georgia.  The President has also revoked the security clearances of former intelligence community officials, such as former Directors John Brennan and James Clapper.  The President has also publicly attacked the intelligence community with tweets, such as, quote:  Intelligence agencies should never have allowed this fake news to, quote, leak, end quote, into the public.  One last shot at me.  Are we living in Nazi Germany, end quote.

How is the intelligence community supposed to navigate its relationship with a Commander in Chief who is openly antagonistic towards his own national security apparatus?

Mr. Comey.  I honestly can't answer.  I don't know how they do it.  I'm glad that they continue to be committed to the safety and security of the United States, but I imagine their jobs are very difficult today.

Mr. Johnson of Georgia.  Do such statements by the President undermine the country's national security efforts?

Mr. Comey.  I don't think that's for me to say honestly.

Mr. Johnson of Georgia.  What does it tell you about an individual or a leader when he is willing to undermine his own employees in such a public fashion?

Mr. Comey.  I don't think that's one I'm qualified to answer. I can speak plenty, and you don't want me to talk about leadership in general, but the particular I'm not qualified to answer.

Mr. Johnson of Georgia.  A few lines wouldn't hurt.

Mr. Comey.  Yeah, I'm here --

Mr. Johnson of Georgia.  It is a --

Mr. Comey.  I'm here in a fact witness capacity, and so I have been very critical of this President's attacks on the rule of law and law enforcement and the truth, which deeply concerned me and should deeply concern all Americans, whether they're Republicans or Democrats, but I don't think this is the time for me to give you more of those speeches.

Mr. Johnson of Georgia.  Well, thank you, and by my smile, I don't mean to minimize the harm that is being perpetrated.

Mr. Comey.  No.  No, sometimes you have got to smile, or you

would cry.

     Mr. Johnson of Georgia.  You're correct.  I agree.  As I'm
sure you know, the President's former personal attorney Michael
Cohen has been in the headlines quite a bit recently.  I won't ask
you any specific questions about his case, but I wanted to clarify
for the record some of the legal and investigative processes that
lend itself to this type of case.  President Trump has kept up his
drum beat against his former fixer.  Most recently, the
President's attacks were in response to Mr. Cohen's plea deal with
the Special Counsel's Office in which he admitted to lying about
the Trump Tower Moscow project and contact with Russian Government
officials during the 2016 campaign.  How dangerous is it to have a
sitting President commenting on active criminal proceedings?

     Mr. Comey.  In general, it is deeply concerning when a
President offers a view of a pending case, no matter who the
President is, and because of its ability to -- of those comments
to affect the case at hand and also to send dangerous messages
about the commitment of this country to the apolitical exercise of
investigative power.

     Mr. Johnson of Georgia.  The President followed up his
attacks on Cohen to praise his political ally Roger Stone.  The
President tweeted, quote, "I will never testify against Trump,"
end quote, quoting Roger Stone in his tweet.  And Trump goes on in
his tweet:  This statement was recently made by Roger Stone,
essentially stating that he will not be forced by a rogue and

out-of-control prosecutor to make up lies and stories about President Trump.  Nice to know that some people still have guts, end quote.

That was the President's tweet.  Many have speculated that this is the President signaling to his allies to resist cooperating with Federal investigators and potentially qualifies as witness tampering.  Is this the type of conduct that is consistent with what organized crime bosses do to signal to their associates not to cooperate with the government?

Mr. Comey.  I can't answer that, well, because I don't think I'm qualified to in one respect, and, second, I would imagine that this conduct by the President may well be within the scope of the special counsel's investigation, so I don't want to be offering an opinion on it even if I knew.  But I can say this without regard to that:  I have a fair amount of experience with organized crime in general, and it is very important to organized crime leaders to try and enforce discipline within their organizations so people don't cooperate against them and assist law enforcement.

Mr. Johnson of Georgia.  Do you believe that this could have been a signal that a pardon could be available to those who don't cooperate with the special counsel?

Mr. Comey.  I can't answer that.

Mr. Johnson of Georgia.  Okay.  I have no further questions. Thank you.

Mr. Comey.  Thank you, sir.

EXAMINATION

BY MS. SHEN:

Q    Hi, Director Comey.  I just had a quick followup from I
believe something you said the previous round, which is that it
was your understanding that the special counsel told President
Trump that he was the subject of his investigation.  Is that
correct?

A    I have read in press accounts that the President or his
counsel were informed that he was the subject of an investigation.

Q    Okay.  So that is, I understand, from press accounts,
not your personal --

A    Again, there was no special counsel on May the 9th when
I was fired, and so anything I know since then about these kind of
things is from the media.

Q    Okay.  Thank you?

BY MS. HARIHARAN:

Q    Hey, sir, I'm Arya from Judiciary Democrats.  I just
want to quickly touch on the social media disinformation campaign
that was used by the Russians in 2016.  To the best of your
recollection, when did you first become aware of the threats of
these disinformation campaigns on social medias and gaming
platforms and what have you by Russia or another hostile foreign
adversary?

A    I don't think that's a question I can answer because it
is a subject matter that the special counsel -- I have tried very

carefully not to talk about things I knew about the FBI's
investigation of the Russian influence.

Q    And so I apologize if this may cross that same line
again.  Did at any point -- do you recall if the social media
companies involved in this at any point alerted the Bureau about
the involvement of Russian nationals or the Russian Government or
roughly when they alerted the Bureau?

A    I would have to give you the same answer.

Q    Prior to the 2016 election, was the FBI tracking these
types of efforts, whether they were by the Russians or another
government?

A    I guess what I can say is prior -- so not having to do
with the 2016 election, the Bureau as part of its
counterintelligence missions spent a lot of time and effort trying
to understand how foreign governments were trying to influence our
government and our democratic processes, and so that would include
trying to understand, are they using social media or other
vehicles as part of that influence effort?

Q    Before and leading into the 2016 election, did you
believe the FBI was adequately prepared to deal with this type of
threat, meaning from did the FBI have the necessary tools in place
and the resources in your time as Director?

A    I believe two things at the same time, which I think you
have to as the leader of an organization like the FBI, that we had
adequate resources, processes, and technology in place, but that

we were never good enough, and so you never want to be
overconfident when it comes to adversaries as sophisticated as the
ones we're up against.  So, in general, yes, my sense was that we
were adequately prepared, but I was never satisfied that we were
good enough.

     Q    With the benefit of, you know, time and reflection what
additional tools or resources do you think the Bureau should have
that could make them more successful in this endeavor, like in
fighting these types of campaigns moving forward?

     A    I don't think I can answer that, both because I would
want to think it -- be much more thoughtful about it than just
sitting here; and, second, surely a big part of whatever answer I
would give you would be classified, and so, for that reason, I
kind of have got to pass on both of those.

     Ms. Hariharan.  See, we would have asked you this when you
were here before are the committee, but didn't know about it.  I
think -- unless you have anything.

     Ms. Shen.  I think we're just going to end our round for the
time being and let the Republicans do their second round.

     Mr. Comey.  Okay.  I'm going to take a quick bathroom break.

     [Recess.]

     Mr. Ratcliffe.  Director Comey, are you good to go?

     Mr. Comey.  Yes, sir.

     Mr. Ratcliffe.  Director, I have handed to you an email dated
June 28, 2016.  Would you confirm for me that it appears to be an

email that was sent from Peter Strzok to your chief of staff Jim
Rybicki?

Mr. Comey.  I can't tell from this, Mr. Ratcliffe.  I see
email addresses; first looks like PP Strzok and then JE Rybicki.

Mr. Ratcliffe.  Okay.  Do you recognize those as being FBI
email addresses for Peter Strzok and your chief of staff, Jim
Rybicki?

Mr. Comey.  I actually don't.  I mean, I'm not trying to
dispute that they are; I just don't remember that particular
formulation of our email addresses.

Mr. Ratcliffe.  But you don't have any reason to doubt if the
Department produced these in the context of our investigation,
that they are --

Mr. Comey.  No, no.

Mr. Ratcliffe.  -- that it is an email exchange between Peter
Strzok and Jim Rybicki?

Mr. Comey.  I accept that.

Mr. Ratcliffe.  Okay.  And you see on there that it is time
dated June the 28th of 2016 on the far left-hand side?

Mr. Comey.  Yeah.  I see that.

Mr. Ratcliffe.  All right.  I'm going to read the content for
the record.  It says:  Jim, I have the POTUS, hyphen, HRC emails D
requested -- that's the letter D -- requested at the end of
briefing yesterday.  I hesitate to leave them.  Please let me know
a convenient time to drop them off.

Did I read that accurately?

Mr. <u>Comey.</u>  You did.

Mr. <u>Ratcliffe.</u>  Okay.  Do you know whether or not POTUS-HRC would be reference to the President of the United States and Hillary Rodham Clinton?

Mr. <u>Comey.</u>  It seems so to me.

Mr. <u>Ratcliffe.</u>  All right.  Do you recall there being a briefing -- well, first of all, there's a reference to a letter D, "that D requested."  In other emails, it appears that sometimes you were referred to as the Director by the letter D.  Do you recall that?

Mr. <u>Comey.</u>  Yes, I have seen that before.  I think that's fairly common with the Director no matter who it is.

Mr. <u>Ratcliffe.</u>  Okay.  So it would appear from this that there had been some type of briefing the day before, with reference to yesterday, June 27, 2016, where you had requested a copy of emails between President Obama and Hillary Clinton.

Mr. <u>Comey.</u>  I see that it says that.

Mr. <u>Ratcliffe.</u>  Any reason to doubt that?

Mr. <u>Comey.</u>  I don't recall it, but no reason to doubt that Jim is reporting -- or Pete is reporting that accurately to Jim. I don't remember asking for them, but --

Mr. <u>Ratcliffe.</u>  Well, whether you recall asking for them or not, do you remember reviewing emails between President Obama and Hillary Clinton?

Mr. <u>Comey.</u>  I remember for sure being aware that there were communications between them and sort of the general substance of it is.  I have some vague recollection of having seen them myself. I'm not certain of that, though, but I was aware that there were communications between the two of them.

Mr. <u>Ratcliffe.</u>  So, as you sit here today, you don't recall -- or let me ask it this way:  Do you recall anything about the content of the emails between President Obama and Hillary Clinton that are referenced in this?

Mr. <u>Comey.</u>  Yes, I have some -- I have some recollection. I'm probably going to screw this up, but I can remember I think her sending him some congratulations on something, a speech or -- oh, I know what it was actually, that she sent him a congratulations that I think was tied to a court decision I think on the Affordable Care Act and that she was overseas somewhere and sent him a congrats or something to that effect.

Mr. <u>Ratcliffe.</u>  Okay.

Mr. <u>Comey.</u>  That's all the -- maybe others will come back to me, but I remember that in particular.

Mr. <u>Ratcliffe.</u>  Do you have any recollection about how many emails there were?

Mr. <u>Comey.</u>  I don't.  My general sense is there weren't a lot, but there were some, but, again, I'm not certain of that.

Mr. <u>Ratcliffe.</u>  So the email here that we're reviewing makes a reference to the briefing yesterday.  The email is dated

June 28th, meaning the briefing was June the 27th of 2016, if this is accurate.  The significance of that is, as we talked about last time, June 27th of 2016 was also the date that Attorney General Lynch and former President Bill Clinton met on a tarmac in Phoenix, Arizona.  Do you recall whether or not this briefing was held at the FBI because of that tarmac meeting, or was it just happened to be a coincidence that it was held on that day?

Mr. Comey.  It would have to have been a coincidence.  I don't remember a meeting in response to the tarmac meeting.

Mr. Ratcliffe.  Do you know as you sit here those emails between President Obama and Secretary Clinton, whether or not they contained any classified information?

Mr. Comey.  My recollection is that they did not.  They did not is my recollection.  The concern was at least one of them was sent from overseas.  Actually, I have some recollection one was sent from [          ] while the Secretary of State was visiting, and the concern we had was about the exposure of his unclassified email account, which was not in his name.

Mr. Ratcliffe.  So, if your recollection is that they may not have contained classified information, do you know why the FBI or the Department of Justice would not have produced them to Congress in response to our request for them?

Mr. Comey.  I don't.

Mr. Ratcliffe.  Okay.  So, but to be clear, did these emails that you reviewed, do they reflect that Hillary Rodham Clinton and

President Obama were communicating via email through an unsecure, unclassified server?

Mr. Comey.  Yes, they were between her Clinton email.com account and his -- I don't know where his account, his unclassified account, was maintained.  So I'm sorry.  So, yes, there were communications unclassified between two accounts, hers and then his cover account.

Mr. Ratcliffe.  Yes.  And by "cover account" are you referring to the fact that President Obama emailed Secretary Clinton using a pseudonym?

Mr. Comey.  Yes.  I don't remember what it was, but it wasn't Barack Obama at such and such.

Mr. Ratcliffe.  But the communication was to her Clinton email.com address, not a State.gov address?

Mr. Comey.  That's right.  The only reason I hesitate is I don't know whether I ever saw him taking the initiative of emailing her or just replying to an email she sent and that that Clinton email.com address, my recollection is, wouldn't necessarily be visible in the body of the email, but it would definitely go to that Clinton email.com email address.

Mr. Ratcliffe.  Did your review of these emails or the content of these emails impact your decision to edit out a reference to President Obama in your July 5th, 2016, press conference remarks?

Mr. Comey.  I don't recall as I sit here.

Mr. Ratcliffe.  Do you have a recollection as to whether or not your draft remarks originally referenced President Obama and was subsequently changed to senior government official and then ultimately deleted any reference altogether?

Mr. Comey.  Now that you say that actually that refreshes my recollection.  There was an issue with respect to that, and it was that if the bad guys -- we didn't want to do anything to confirm to the bad guys that they might have Barack Obama's private cover email unclassified because let's imagine the Russians had captured that communication, they might not know what they had, and so, I remember some discussion about what we should say, if anything, in my public remarks about that.  So it is too long of an answer, Mr. Ratcliffe, but yes, it does refresh my recollection.

Mr. Ratcliffe.  Okay.  So it was your review of those emails that caused you to change -- make that change, or it was not?

Mr. Comey.  I don't know whether it was the review or a conversation with my staff about what they understood the risks to be associated with revealing that.

Mr. Ratcliffe.  Okay.  So do we have a copy of the IG report that I can hand to Director Comey?  Just for reference.  Go ahead, if you can.  I want to just be clear on this and have you turn to page 195 of the inspector general report.  The bottom paragraph, the last sentence, and I'll read it says:  That use included an email exchange with the President while Secretary Clinton was on (sic) the territory of such adversary.  On June the 30th, Rybicki

circulated another version that changed the second sentence to remove the reference to the President, replacing it with another senior government official.  The final version of the statement omitted this reference altogether and instead read, and then it adds a sentence.  Did I read that correctly?

Mr. Comey.  You did.

Mr. Ratcliffe.  Okay.  So the timing of that, June the 30th, it appears, is when that change was made.  Does that either refresh or confirm your recollection that it was your review of the emails on or about June the 28th between President Obama and Secretary Clinton that caused you to make that change?

Mr. Comey.  There was definitely some discussion that must have caused me to make that change.  Logically, it would include looking at the emails.  The only reason I'm saying it that way is I don't specifically remember reading the emails, but someone either communicated the substance of it to me or I read it. That's what must have driven this conversation.

Mr. Ratcliffe.  Well, that's why I'm asking you about the content of the emails, which we haven't had the benefit of seeing. If it wasn't the content of the emails that precipitated the references to President Obama's communications with Secretary Clinton, what was it?

Mr. Comey.  I think it was the fact of his communication.  I don't remember anything concerning about the substance of the communication, but the concern was we don't want the adversary to

know what they have if they collected emails that are between
Hillary Rodham -- HRC and, you know, John Smith 97, I don't
remember what it was but some innocuous-seeming email account,
congratulations about a court case.  It wasn't the substance that
would be useful to the adversary; it was knowing his email address
might permit them to exploit something that they wouldn't know
they had.

Mr. Ratcliffe.  So -- and is it your recollection that the
foreign adversary from where Secretary Clinton was communicating
at least one of the emails was, in fact, [          ]?

Mr. Comey.  I think so.  I probably wasn't supposed to say
that since it has been ellipsed out, but my -- I said this
already, and so my recollection is that there was at least one
communication -- and I don't think on the territory should be
sic'd -- from on the territory of [          ].

Mr. Ratcliffe.  Okay.  So --

Mr. Comey.  I think the Secretary was on a plane sitting on
the runway and sent an email from there.

Mr. Ratcliffe.  So did you have any discussion with President
Obama about his communication with Hillary Clinton on this
unsecured, unclassified server?

Mr. Comey.  No.

Mr. Ratcliffe.  Did you have any conversation with Secretary
Clinton about her communication with President Obama about
communicating with him on this unsecure, unclassified server?

Mr. Comey.  I didn't, and I don't remember her being asked about that during the interview.

Mr. Ratcliffe.  Well, I was going get to that next, but let me just give you the opportunity.  Obviously, it was just a few days after that that the FBI and the Department of Justice had the opportunity to question Secretary Clinton, and I can't find any reference in the 302 to any conversation about her communications with President Obama.  I want to stop the clock and give you an opportunity, if you need to, to confirm that that representation is accurate.

Mr. Comey.  Unless you want me to read the whole 302, I mean, I don't remember it being a subject in the 302.  I haven't read the 302 in a very long time, but I'm prepared to accept your representation that it is not in there.

Mr. Ratcliffe.  Okay.  So, again, to review the timeline: June 27th, tarmac meeting between Loretta Lynch and Bill Clinton. June 28th, we have this exhibit reflecting the emails between Secretary Clinton and President Obama.  You have requested reviewing them.  You reviewed them.  On June the 30th, your chief of staff edits out a reference to President Obama.  You didn't have any -- you just testified you didn't have any conversation with President Obama about it.  Why wouldn't investigators and prosecutors from the Department of Justice ask Hillary Clinton about this just a few days later?

Mr. Comey.  I don't know for sure, but as I said earlier in

response to your questions, I'm quite certain there were no classified communications between President Obama and Hillary Clinton, and there were a small number of innocuous communications, so I could imagine the agents -- I don't remember this, but I can imagine the agents making a judgment that it wasn't a significant topic for their interview.

Mr. Ratcliffe.  Well, one of the purposes of the interview though, Director, wasn't it to determine Hillary Clinton's knowledge or her intent about the communication of information across an unclassified server?

Mr. Comey.  Yes, of classified information.

Mr. Ratcliffe.  And, again, your recollection or your belief is that there was not classified information in those emails?

Mr. Comey.  Correct.  And I'm quite certain of that because that one would stick in my mind if she had communicated classified information with the President of the United States.

Mr. Ratcliffe.  Okay.  I want to turn back to what I referred to as the Comey memos.  Do you still have a copy of those?

Mr. Comey.  Yes, I do.

Mr. Ratcliffe.  Okay.  So, as I refer to those, just so the record is clear, I'm referring to it is actually a series of seven documents between January 7th, 2017, and April 11th, 2017.  It is actually seven separate documents.  Is that accurate?

Mr. Comey.  I think that's right.

Mr. Ratcliffe.  And those were all documents that you

created?

      Mr. <u>Comey.</u>  Correct.

      Mr. <u>Ratcliffe.</u>  Four of the seven documents have been determined either by you as the FBI Director or by someone else at the FBI or the Department of Justice to contain classified information.  Is that correct?

      Mr. <u>Comey.</u>  Yes.  I can't answer that.  I can tell you that there are portions of what I had before me that words have been marked -- have been blacked out and a classification has been assigned to the document that looks different from the original classification.

[12:25 p.m.]

Mr. Ratcliffe.  Okay.  So is it fair to say, though, that four of the seven bear classification markings of either "Secret" or "Confidential"?

Mr. Comey.  Let me check that.

Sorry.  I think that's right.  It's a little tricky because lines have been crossed out, but the -- maybe I should just say what they are.

The one dated the 7th of January at 1:42 bears a header and footer as "Secret."  The one dated January 28th bears the header "Confidential."  The one dated February the 8th bears the header and footer as "Secret."  The one dated -- sorry.  The one dated February 14th, unclassified.  The one dated March 30th, unclassified.  The one dated April 11th bears the header "Confidential."

Mr. Ratcliffe.  Okay.  And the classified portions would be reflected by those blacked-out redactions, correct?

Mr. Comey.  I'm sorry, say again.

Mr. Ratcliffe.  The classified portions would be reflected by the blacked-out redactions.

Mr. Comey.  Yeah, I don't know that, because I don't know what the -- certainly, yes, at least in part.  I don't know whether the Bureau withheld things when they redacted this for other reasons.  I don't remember what these little notations in the margin mean.

Mr. Ratcliffe.  And were all these generated in the course
and scope and in relation to your official duties as the FBI
Director?

Mr. Comey.  Yes, they were generated while I was Director of
the FBI.

Mr. Ratcliffe.  Okay.  And were they written and recorded
using FBI equipment?

Mr. Comey.  Some were; some weren't.

Mr. Ratcliffe.  So is it fair to say that the Comey memos, as
we have now described this aggregation of documents, that they are
government records, were generated by you as a government agent in
the course and in relation to your official government business?

Mr. Comey.  I can't answer that.  I can tell you how I viewed
them.  But the legal conclusion about the nature of the documents
in terms of government property or not is not for me to make.

Mr. Ratcliffe.  Okay.  So then tell me how you viewed them.
If they're not a government record, they must be something else.

Mr. Comey.  Well, several of them I viewed as my
aide-memoire, things that I was writing down for the benefit of
the FBI and for my personal protection.

Mr. Ratcliffe.  Okay.  I don't know what a personal aide- --

Mr. Comey.  I was trying to write down what happened so I
could remember it, both because I'm an FBI Director and a human
being.  And so it was to protect -- it was in my official capacity
and also in my personal capacity.  And so several -- at least

several of these I thought of as my record, not the FBI's record.

Mr. <u>Ratcliffe.</u>  Even though, you would agree with me, I think, that but for the fact that you had been the FBI Director, you would not have had these discussions with either the President-elect or the President of the United States about investigations and other matters discussed therein?

Mr. <u>Comey.</u>  Yeah, I hope not.  I think that's correct.

Mr. <u>Ratcliffe.</u>  I heard you use that term, "aide-memoire."  I also heard you use reference to sort of like a diary.  Do you remember saying that?

Mr. <u>Comey.</u>  I don't, but those, in my understanding, are consistent terms.

Mr. <u>Ratcliffe.</u>  Okay.  Well, that's --

Mr. <u>Comey.</u>  You write something down so you can remember it.

Mr. <u>Ratcliffe.</u>  All right.  So if your interpretation or opinion is correct, then you were just -- to the extent you shared them, you'd just be sharing personal information.  But, if not, if your opinion is not accurate, then you would be sharing information that belonged to the government.  Correct?

Mr. <u>Comey.</u>  I guess I'm struggling to understand the question fully, in part because you were using the term "they," and all of these were not the same, in my view.

Mr. <u>Ratcliffe.</u>  Okay.  Let's just approach it maybe broadly.  Did you sign an FD-291 or an FBI employment agreement when you were the FBI Director?

Mr. Comey.  I don't remember the form number, but I signed an employment agreement, yes.

Mr. Ratcliffe.  Okay.  Let me hand you a document.  Did it look anything like this one?

Mr. Comey.  I mean, I don't know for sure, but I'm sure -- if you're telling me this is the FBI's nondisclosure employment agreement form --

Mr. Ratcliffe.  I am.

Mr. Comey.  -- I signed one that was an FBI employment nondisclosure agreement.

Mr. Ratcliffe.  Well, I'm just trying to set the -- I don't have your actual employment agreement.  I know that you signed one.  But the standard FBI employment agreement states in paragraph No. 2 that "all information acquired by me in connection with my official duties with the FBI and all official material to which I have access remain the property of the United States of America."

Did I --

Mr. Comey.  You read that correctly.

Mr. Ratcliffe.  Okay.  So that's what I'm trying to determine, because the record, I think, is clear that, at least with respect to some of the Comey memos, you shared them with other people.  Is that accurate?

Mr. Comey.  Yes.  I gave a copy -- the classified one stayed on the systems, obviously, of the FBI.  I gave a copy of all of

them to my chief of staff and asked him to keep them in his files at the FBI.

    Mr. <u>Ratcliffe.</u>  Okay.  So other than --

    Mr. <u>Comey.</u>  These were at the FBI when I left the FBI.

    Mr. <u>Ratcliffe.</u>  So that would be Jim Rybicki.

    Mr. <u>Comey.</u>  Correct.

    Mr. <u>Ratcliffe.</u>  And did you do that while you were still at the FBI?

    Mr. <u>Comey.</u>  I believe so, yes.

    Mr. <u>Ratcliffe.</u>  A Okay.

    Mr. <u>Comey.</u>  I made two copies.  The ones that I had written -- and, again, the "they" is a problem here.  The ones that I had written that were not classified, in my judgment, I gave a copy to Rybicki to keep in his files, and I kept a copy in my personal safe at home.

    Mr. <u>Ratcliffe.</u>  Okay.  Is your personal safe at home, was that a GSA-approved storage facility?

    Mr. <u>Comey.</u>  No, not --

    Mr. <u>Ratcliffe.</u>  Was it a sensitive compartmented information facility?

    Mr. <u>Comey.</u>  Was it a SCIF --

    Mr. <u>Ratcliffe.</u>  Yes.

    Mr. <u>Comey.</u>  -- my personal safe?  No, it was not.

    Mr. <u>Ratcliffe.</u>  Okay.

So, when you gave these to Jim Rybicki, was that in

connection with your departure from the FBI?

Mr. <u>Comey.</u>  No.  My recollection is I gave them to him contemporaneous with their creation.

Mr. <u>Ratcliffe.</u>  Okay.  And that's consistent with what you testified earlier, that contemporaneous with the creation of many of these you shared them with senior FBI leadership.

Mr. <u>Comey.</u>  Correct.

Mr. <u>Ratcliffe.</u>  I want to focus on who outside of FBI leadership had access to or possession of any of these memos.

Mr. <u>Comey.</u>  Okay.

Mr. <u>Ratcliffe.</u>  One person that's been identified, at least publicly, is Daniel Richman.  How many of the Comey memos did Daniel Richman receive, and when did he receive them?

Mr. <u>Comey.</u>  Yeah.  I'm going to answer that -- I'm not going to answer communications in connection with my interactions with my counsel.  And so I can answer that in this respect:  I sent Dan Richman images of one memo, the unclassified February 14th memo, for the purpose of him sharing it with a journalist.

Mr. <u>Ratcliffe.</u>  Okay.  And when did you do that?

Mr. <u>Comey.</u>  In May of -- after I was fired, in May of 2017.

Mr. <u>Ratcliffe.</u>  Now, Mr. Richman has had, apparently, a number of professions.  In the public record, he's been identified by you as a friend, he's been identified by you as a Columbia law professor, he has been identified as a special government employee, and I believe he has been identified by you as counsel

representing you.  Is that accurate?

Mr. <u>Comey.</u>  Yes, he is representing me and has since I was fired.

Mr. <u>Ratcliffe.</u>  Okay.  So, when you shared the contents of the -- or you shared the February 14th memo -- or was it February 8th?

Mr. <u>Comey.</u>  February 14th.

Mr. <u>Ratcliffe.</u>  -- February 14th memo with Mr. Richman, in which capacity did you share it with him?

Mr. <u>Comey.</u>  I didn't consider my transmission to him of that to be an attorney-client communication, which is why I've spoken about it.  And so he was acting then in a personal capacity for me that I didn't consider to be an attorney responsibility.  Full stop.  He's also someone who's been representing me since I started, and so I've had a variety of communications with him and other members of my legal team that I'm not going to talk about.

Mr. <u>Ratcliffe.</u>  Well, I appreciate you not wanting to talk about the contents of any conversations with your legal team, but I think it's entirely appropriate for us to ask about whether or not members of your legal team received documents that were ever marked "classified."

Mr. <u>Comey.</u>  Yeah, I don't think it's appropriate -- well, you can ask anything you want.  I'm not going to answer questions about my communications with my lawyers for the purpose of them providing me legal advice.

Mr. Ratcliffe.  Do any of your lawyers have security clearances?

Mr. Comey.  I don't know.  They all had clearances at various points in their careers.  I don't know the current state of their clearances.

Mr. Ratcliffe.  Well, what I'm really trying to find out, Director, is:  Four of the seven of these memos have been identified either by you or by the FBI as containing classified information.  And whether they are your counsel or not, I'm trying to figure out whether or not you provided classified information to anyone that did not have security clearances.

I don't care about the content of communications that you had, beyond whether or not you provided classified information to anyone that did not have appropriate clearances to receive it.

Mr. Comey.  I can't -- I'm not going to answer questions about my communications with my lawyers.

But I want to say, again, what's confusing about when we use the term "they," four of these memos that I created I created.  They were unclassified at the time I created them.  The markings that are on them now were added months later, and -- but I'm not going to talk about my communications with my counsel.

Mr. Ratcliffe.  I understand that, but I need to ask these questions.

So did you provide any classified material -- and by that, I mean material that was classified at the time that you provided it

or that was later reclassified or up-classified by the FBI -- to Daniel Richman?

Mr. Comey. The only answer I can give you is the one I gave you earlier, that I sent a single unclassified email -- excuse me -- classified memo to Mr. Richman that was unclassified then and remains unclassified.

To the extent Mr. Richman was part of my legal team, I'm not going to talk beyond that about communications with my lawyers.

Mr. Ratcliffe. Same question as to Mr. Kelley. Did you provide classified information to David Kelley?

Mr. Comey. Same answer.

Mr. Ratcliffe. Did you provide classified information to Patrick Fitzgerald?

Mr. Comey. Same answer.

Mr. Jordan. Can I ask one question?

Mr. Ratcliffe. Sure.

Mr. Jordan. Was the February 14th memo the only one you gave Mr. Richman?

Mr. Comey. I'm not going to answer questions about communications I had with Mr. Richman in his role as a member of my legal team.

I gave Mr. Richman a single unclassified memo, the February 14th memo, in late May, with the understanding that he would communicate it publicly. So I didn't consider that to be an attorney-client communication, because I expected it to be

communicated publicly.

Mr. <u>Meadows.</u>  Director Comey, let me ask one followup there. When you gave those to these three individuals, I guess, that are part of your legal team now, were they part of your legal team then?

Mr. <u>Comey.</u>  I didn't say I gave anything to three individuals.  I'm not commenting one way or the other about any communications with my lawyers.

Mr. <u>Meadows.</u>  So did you give anything to any of the three individuals that Mr. Ratcliffe mentioned prior to them being your attorney?

Mr. <u>Comey.</u>  I'm not going to confirm -- I'm not saying I gave anything to my lawyers.  I'm just not touching communications with my lawyers.

Mr. <u>Meadows.</u>  Because there's an attorney-client privilege, but that doesn't exist if they were not your attorneys at the time.

Mr. <u>Comey.</u>  Here's what I can do.  Before the time those three individuals became my legal time, which was at the time I was fired, I had no communications of any kind in which I shared FBI documents or my personal aide-memoire with them.

Mr. <u>Meadows.</u>  So you hired them within hours of you being fired.  That's your testimony here today.

Mr. <u>Comey.</u>  I'm not going to answer as to the specifics.  But they were my legal team from shortly after I was fired.

Mr. Meadows.  Well, you understand why there's an importance of the timeframe, don't you, Director Comey?

Mr. Comey.  No, I don't, but I'm not going to talk about the timeframe.

Mr. Meadows.  All right.  I'll yield back.

Mr. Ratcliffe.  Director Comey, we're focusing on the sharing of classified information, which, of course, can be a violation of the law, but it can also be a violation of your employment agreement if you share nonpublic unclassified information. Correct?

Mr. Kelley.  We're here to answer questions about decisions not made and made by DOJ and the FBI in connection with the Hillary Rodham Clinton investigation and the Russian investigation.  This is talking about his firing.  Can you explain the relevance of these questions?  Because if this continues, we're just going to call it a day.

Mr. Ratcliffe.  Absolutely.  Absolutely, Mr. Kelley.  I'd be happy to explain it to you.

Mr. Kelley.  Please do.

Mr. Ratcliffe.  We have learned in the course of this investigation of incredible manifest bias from people like Peter Strzok and Lisa Page.  I'm trying to determine the level of bias, if any, that Director Comey had with respect to President-elect or President Trump and why he would have violated his employment agreement to share information, classified or unclassified, with

individuals who were not authorized to receive it.  That's why I'm asking these questions.

So do you have an answer?

Mr. Kelley.  That still seems to be outside the scope of what we agreed to come here to be interviewed about.

Mr. Ratcliffe.  Well, I need to find out, are you instructing Director Comey not to answer that question?

Mr. Comey.  Excuse me.  I'm sorry.  I'll try to answer your question.

Mr. Ratcliffe.  Okay.  Do you still have the employment agreement in front of you?

Mr. Comey.  I do.

Mr. Ratcliffe.  Okay.  Item 3 says, "I will not reveal by any means any information or material from or related to FBI files or any other information acquired by virtue of my official employment to any unauthorized recipient without prior written authorization by the FBI."

Did I read that accurately?

Mr. Comey.  You did.

Mr. Ratcliffe.  Okay.  Did you have written authorization from the FBI to share any of the Comey memos with Daniel Richman?

Mr. Comey.  I did not have written authorization from the FBI to share the February 14th memo, the unclassified memo, that I gave to Mr. Richman for the purpose of him communicating it publicly.

Mr. <u>Ratcliffe.</u>  If you shared any information with David Kelley or Patrick Fitzgerald, did you have written authorization from the FBI to do that?

Mr. <u>Comey.</u>  I'm not going to answer questions about my communications with my counsel.  And I'm really struggling to understand how that reflects on my bias.

Mr. <u>Ratcliffe.</u>  Well, do you understand that I'm currently asking questions of a former FBI Director, why he might have violated an employment agreement when there's no record that he ever violated an employment agreement with respect to anyone else?

Did you ever violate your employment agreement with respect to the dissemination of government records relating to anyone other than Donald Trump?

Mr. <u>Comey.</u>  I disagree with the premise of your question.  I don't agree that I've ever violated my employment agreement.

Mr. <u>Ratcliffe.</u>  Well, that's why I'm asking the questions, because we're making a record for folks to determine that.

Do you know whether or not the Inspector General is investigating as to whether or not you violated your employment agreement with the FBI?

Mr. <u>Comey.</u>  I know the Inspector General some time ago started looking at how I handled -- created and handled memos.  I don't know what conclusion they've come to.

Mr. <u>Ratcliffe.</u>  That's all we're trying to find out as well. That's why I'm asking the questions.

Mr. Comey.  Congress is investigating whether I violated my
employment agreement?

Mr. Ratcliffe.  To determine whether or not you had bias that
influenced the decisions made before and after the election of
2016 of Donald Trump as President of the United States.

Mr. Comey.  Okay.  After I was fired on May the 9th?

Mr. Ratcliffe.  Well, Director, it sounds like you were
sharing the information before you were fired.

Mr. Comey.  You should ask me questions about that.

Mr. Ratcliffe.  I have.

Mr. Comey.  I missed them.

Mr. Kelley.  Why don't you go back and repeat the question
that you posed about when you disclosed any information --

Mr. Gowdy.  I chose not to interrupt you when you were
talking to Director Comey.

Mr. Kelley.  I'm sorry, I didn't know you were talking.

Mr. Gowdy.  Just let me continue talking to him.

Director Comey, your --

[Discussion off the record.]

Mr. Comey.  Sorry.  Go ahead.

Mr. Gowdy.  Your attorney questioned the relevance of that
line of questioning by Mr. Ratcliffe.  I want to take another stab
at letting you know why we might be interested in it.

It's been publicly reported, but I'm going to give you a
chance to respond to it, that one of the reasons you instructed

Professor Richman to provide that memo to the media was to spur the appointment of special counsel.  Is that correct or incorrect?

Mr. Comey.  Yes, so that -- to pursue the tapes.

Mr. Gowdy.  Pardon me?

Mr. Comey.  To pursue the tapes that President Trump had tweeted at me about.  I was worried the Department of Justice, as currently led, would not go after White House tapes and that a special counsel would.

Mr. Gowdy.  Okay.  And you thought the appointment of special counsel on that fact pattern was important why?

Mr. Comey.  Because, given the way I've seen the leadership at the Department of Justice conduct itself in connection with my firing, I was deeply concerned that it would not -- that leadership would not pursue the existence of tapes that would show the President and I speaking on February the 14th and reflect what was in my memo.

Mr. Gowdy.  Did you really believe that there were tapes of that conversation, Director Comey?

Mr. Comey.  I didn't know -- first of all, it never entered my mind until the President tweeted that I better hope there aren't tapes of our conversations.  And, yes, honestly, it occurred to me there may be tapes.  I'd heard Donald Trump liked to tape, and all of a sudden it occurred to me there may be tapes. That was the central problem with this episode; it was my word against his --

Mr. <u>Gowdy.</u>  Well, it would be incongruent for him to ask you if the conversation was private if he was taping it, wouldn't it?

Mr. <u>Comey.</u>  You're mixing up conversations.  The one you're talking about is Reince Priebus on February the 8th.  The conversation I'm talking about is February the 14th when the President kicked everybody else out of the Oval Office to ask me to drop the Flynn investigation.

That was my word against his until he tweeted that I better hope there are not tapes.  And it occurred to me:  Oh, my gosh, there may be tapes of this.  Someone's got to go get them.  The current leadership of DOJ will not do that.  I've got to do something to make it clear it matters -- why it might matter to go pursue the tapes at the White House.  Only a special counsel is going to do that.

Mr. <u>Gowdy.</u>  Speaking of the word "matter," when Loretta Lynch asked you to call it a matter and not an investigation, did you consider calling for special counsel?

Mr. <u>Comey.</u>  I don't think I did then.

Mr. <u>Gowdy.</u>  When her name appeared in documents that could call into question the objectivity of the Department of Justice, did you consider calling for special counsel?

Mr. <u>Comey.</u>  Yes.

Mr. <u>Gowdy.</u>  Why didn't you do so?

Mr. <u>Comey.</u>  Because I decided I'd seen no indication of interference on the part of the Attorney General, so no substance

to any bias.  And the perception-of-bias question was mitigated by the fact that these documents wouldn't be public for 50 years. And so my judgment at the time was it wasn't necessary.

Mr. <u>Gowdy.</u>  Well, they wouldn't be public for 50 years, unless?

Mr. <u>Comey.</u>  Unless the Russians stole them and put them out.

Mr. <u>Gowdy.</u>  Yes.

Mr. <u>Comey.</u>  Yeah, which didn't occur to me then.  In March of 2016, that was not something I contemplated.

Mr. <u>Gowdy.</u>  When she had a meeting with the spouse of the target of your investigation, did you consider calling for special counsel?

Mr. <u>Comey.</u>  Yes.

Mr. <u>Gowdy.</u>  Did you?

Mr. <u>Comey.</u>  No.

Mr. <u>Gowdy.</u>  So you did not call for special counsel when she asked you to refer to it as a matter and not an investigation. You did not consider calling for special counsel when you saw evidence that, if released, could call into question the objectivity of the Department of Justice.  And you did not call for special counsel when she had the meeting with the spouse on the Tarmac.  But you did when you were fired.

Mr. <u>Comey.</u>  No.  There's a number of problems with your question.  The first is I think you said I didn't consider calling for special counsel.  On the second episode I did.

Mr. <u>Gowdy.</u>  What I meant to say was you did not call for special counsel.

Mr. <u>Comey.</u>  Correct.  I didn't.

And I didn't call for special counsel when I was fired.  In fact, it didn't even occur to me immediately after the President's tweet.  I woke up in the middle of the night a couple days later and it dawned on me that if there are tapes he will be heard on the tape telling me to drop the criminal investigation and something had to be done to go secure those.

Mr. <u>Gowdy.</u>  And what was it about the Department of Justice under President Trump that you did not trust enough to handle that case but you did not call for the appointment of special counsel under Attorney General Lynch?

Mr. <u>Comey.</u>  Well, to begin with, two very different circumstances, and so they're very difficult to compare.

My concern about the then-current leadership of the Department of Justice is that I did not think they'd acted in a straightforward, honorable way in connection with my firing, and so I worried that, given that, they wouldn't pursue it the way it needed to be pursued.

I knew without even talking to them I could count on the FBI to see what I saw and to try and pursue the tapes.  But I didn't think that the leadership of DOJ would support them and that something had to be done to force it.

Mr. <u>Gowdy.</u>  What was not straightforward about the way they

handled your firing?

Mr. <u>Gowdy.</u>  Well, the memo that Mr. Rosenstein created was, to my mind, nonsense and was inconsistent with my interactions with the man just in the days before.  And so I thought, I can't trust the Department of Justice leadership to pursue this.

Mr. <u>Gowdy.</u>  Did you ever tell Deputy Attorney General Sally Yates that you were contemplating or thinking about calling for a special counsel in the Clinton investigation?

Mr. <u>Comey.</u>  Yes, I did.

Mr. <u>Gowdy.</u>  Why did you tell her that?

Mr. <u>Comey.</u>  I told her that sometime in the spring when we were unable to get access to the laptops that the lawyers had used to cull Secretary Clinton's emails, the reported 60,000, cut them into 30 and 30.  And I said to her, in substance, "At some point this is going to drag on to a place where it can't be credibly completed by this Department of Justice, and I'm going to call for the appointment of a special prosecutor."

Mr. <u>Gowdy.</u>  Were you serious in that threat?

Mr. <u>Comey.</u>  Yes.

Mr. <u>Gowdy.</u>  So, if the Inspector General found otherwise, the Inspector General would be incorrect, that you were never seriously contemplating calling for special counsel?

Mr. <u>Comey.</u>  I don't know what they found in that regard.  I don't remember.  But I was not -- I shouldn't say "BSing" -- I was not playing a game with her.  There was a point at which we were

not going to be able to credibly complete that investigation and we needed special counsel to do it.  I believed that then.

Mr. Gowdy.  Well, I'm going to let Mr. Ratcliffe take back over his line of questioning, but I do think it is fair to ask what the relevance of a line questioning is.  But the relevance is:  You did take objections to spur the appointment of special counsel under the Trump administration.  And there were instances that you just testified to where you actually threatened to call for special counsel.  And there were other instances where, in the minds of some, you could have but you never did under the Obama administration.  Correct?

Mr. Comey.  No.  I disagree with your summary of it.

Mr. Gowdy.  All right.  Tell me where I'm wrong.

Mr. Comey.  The circumstances of the cases were very, very different.  And the most important particular was I was still the FBI Director and in a position to see how the investigation of the Clinton classified-email-mishandling investigation was going and to assess it.

I was not in that position after being fired and thought: Something has to be done, and now I'm a private citizen.  And so a private citizen can talk to the media about his communications with the President so long as they're not classified.

And so, in that circumstance -- the circumstances were totally different between the two.

Mr. Gowdy.  One final question.  When was Andy McCabe named

the Acting Director of the FBI after your firing?

Mr. <u>Comey.</u>  I don't know the answer to that.

Mr. <u>Gowdy.</u>  Well, from the time you were fired until the time he was named Acting Director, who ran the FBI?

Mr. <u>Comey.</u>  I don't know.  I have an assumption that the Deputy Director immediately became the Acting Director, but I don't know the answer to that.

Mr. <u>Gowdy.</u>  Do you have confidence in Deputy Director McCabe, Acting Director McCabe?

Mr. <u>Comey.</u>  Yes.

Mr. <u>Gowdy.</u>  So what you just said about you not being there in a position to make sure it was done right, you actually had confidence in the person who replaced you.  Did I hear that correctly?

Mr. <u>Comey.</u>  I had confidence in the person that replaced me. I did not have confidence in his ability to convince the leadership of the Department of Justice to do the right thing.

Mr. <u>Ratcliffe.</u>  Director Comey, I want to pick up where we left off.  I was asking you and I believe you answered that you did not have written authorization from the FBI to release information to Daniel Richman, correct?

Mr. <u>Comey.</u>  Correct.

Mr. <u>Ratcliffe.</u>  Did you have written authorization from the FBI to release any of the Comey memos to anyone?

Mr. <u>Comey.</u>  No.  Well --

Mr. Ratcliffe. Did -- I'm sorry. Go ahead.

Mr. Comey. -- let me hesitate. I have written authorization -- the substance of the Comey memos is in my book, so the FBI reviewed it and gave me written authorization to put it all there. So, at some point, yes, the substance of it.

Mr. Ratcliffe. The other requirement under an employment agreement at the FBI is to seek a determination from the FBI in writing prior to the disclosure of either classified or unclassified nonpublic information. Do you see that under number four?

Mr. Comey. Yes. That's a summary of the prepublication review process.

Mr. Ratcliffe. Okay. So did you have the written determination prior to making disclosure to Daniel Richman or anyone of the materials in the Comey memos?

Mr. Comey. I did not have any written authorization from the FBI with respect to anything related to the FBI or me until the end of 2016 in connection with my book.

Mr. Ratcliffe. Okay. And do you agree that as of the moment you were fired you were no longer empowered --

Chairman Goodlatte. I think that would be the end of 2017.

Mr. Comey. I'm sorry. I said '16? Sorry. 2017.

Mr. Ratcliffe. And do you agree that as of the moment you were fired you were no longer empowered to authorize the dissemination of nonpublic government information outside of the

government?

Mr. <u>Comey.</u>  Correct.  I was no longer a -- I had no
government authority whatsoever.

Mr. <u>Ratcliffe.</u>  All right.

I want you to turn to the March 30 Comey memo.

Chairman <u>Goodlatte.</u>  I wonder if we could pick this up
and let Mr. --

Mr. <u>Ratcliffe.</u>  I have one question about this.

Chairman <u>Goodlatte.</u>  Okay.  Go ahead.

Mr. <u>Ratcliffe.</u>  The March 30 --

Mr. <u>Comey.</u>  Yeah, I see it.

Mr. <u>Ratcliffe.</u>  -- memo?

The second-to-the-bottom paragraph on the first page, it's a
reference to a discussion between you and President Trump on that
date.  And there's a sentence that says:  "He," referring to
President Trump, I believe, "He said that if there was some
satellite (Note:  I took this to mean some associate of his or his
campaign) that did something, it would be good to find that out
but that he hadn't done anything and that I hoped I would find a
way to get out that we weren't investigating him."

Did I read that correctly?

Mr. <u>Comey.</u>  You did.

Mr. <u>Ratcliffe.</u>  All right.  So the reference there
that -- did President Trump -- as you sit here today, do you have
a recollection that he said it would be good to find out if

someone associated with his campaign was colluding, coordinating, conspiring with Russia?  Not using those terms.

Mr. Comey.  He did.  Those were the good old days.  He did.

Mr. Ratcliffe.  So, at least as of that date, March 30th, 2017, there's nothing that's reflected in here that reflects that President Trump was in any way obstructing justice.  Would you agree with that?

Mr. Comey.  I don't want to quibble with you, I don't want to reach the conclusion, but I agree with your characterization.  He was saying, if somebody associated with me did something wrong, it'd be good to find that out.

Mr. Ratcliffe.  So he was essentially directing you, as the head of the FBI, to -- it'd be good to find out.

Mr. Comey.  Yeah.  He was supporting the notion of the investigation.

Mr. Ratcliffe.  Okay.

Mr. Meadows?

Mr. Meadows.  Director Comey, I want to come back to a couple of small items as it relates to the Clinton investigation, but just two very minor items.  And then I'll go into some of the other things that have been covered here today.

When Frank Rucker and Mr. McCullough came to the FBI originally in what we now know is to be called the Midyear Exam, when they came to your agents, what was your initial response to their accusations?

Do you know who Frank Rucker is?

Mr. Comey.   No.  I know the name McCullough.  He was the IC --

Mr. Meadows.   Frank Rucker was along with him at that particular point.  I believe you interviewed him.  It was really the genesis of what is now the Midyear Exam.

When they came and made the allegations that they did, what was your initial response to that?

Mr. Comey.   I had no contact with them.  They met with someone, a case was opened, then it was briefed up.  And then the Deputy Director came and told me about the investigation that had just been started.

Mr. Meadows.   All right.  So, as they opened up this investigation, they came to you with real concerns about foreign agents or actors actually gaining access to Hillary Clinton's server, and yet, in your memo of July 5th, it doesn't really mention anything.  In fact, it goes to great lengths to not even address that initial concern, but more about a concern about her handling, either properly or improperly, of classified information.

Why would you have ignored the very predicate of their concerns when they brought it to the FBI?

Mr. Comey.   A big part of the investigation was to try and understand whether there was evidence to support concerns that there'd been infiltration, access by a foreign adversary.  And my

recollection is, in my July 5th statement, I specifically hit that and said --

Mr. <u>Meadows.</u>  Well, it was very nuanced.  I mean, so -- you know, we can pull that up, but it was a very --

Mr. <u>Comey.</u>  Nuanced in a way that I think infuriated the Clinton team that I said, as I recall, we didn't find evidence, but given the nature of the adversary, we wouldn't expect to find that evidence.

Mr. <u>Meadows.</u>  But I guess my question is, since their concern was more about foreign infiltration of a server, why did you spend the lion's share -- or why did your agents spend the lion's share of their information on whether it was intent or her handling of classified and not spend the majority of your time on whether a foreign actor actually did gain access?

Because, from the Inspector General's report and, you know, from the 302s, that wasn't the focus of your investigation, and yet that's what they brought to your attention.  Why would you have made that decision to change it?

Mr. <u>Comey.</u>  That's not consistent with my recollection.  I think we spent a lot of time on what you said, trying to understand what did the Secretary do and what was she thinking.  But my recollection is we spent a lot of time trying to understand, did anyone get access to these emails and --

Mr. <u>Meadows.</u>  Yeah, but that's not consistent with the IG's report, and it's not really consistent with what I've reviewed in

terms of your investigation.

I guess my question, then, goes a little bit further.  How many times did you interview Mr. Rucker and Mr. McCullough other than that initial time that they brought this to your attention?  How many times did you interview them in terms of their concerns?

Mr. Comey.  I know you all know this, but the transcript will contain the word "you."  The Director of the FBI does not interview people.  I ran a --

Mr. Meadows.  How many times did you assign special agents to have followup conversations where a 302 was written as it relates to their back-and-forth?

Mr. Comey.  I don't know.  And I wouldn't expect to know, as the Director.  But I'm sure it's in the record someplace.

Mr. Meadows.  Okay.  Would it surprise you if the number was zero?  Would that surprise you?

Mr. Comey.  I don't have a reaction.

Mr. Meadows.  If somebody brings an allegation and then you don't do any other followup interviews with them, would that surprise you?

Mr. Comey.  Yeah, I actually don't have a reaction one way or another, because it's possible they had conversations with them because they were colleagues, not witnesses.  They were reporting, as I understand it, all information they had collected.  So I don't know that even if there were conversations it'd be reflected in a 302.  But I don't have a reaction one way or another.

Mr. <u>Meadows.</u>  Well, just to be clear, Mr. McCullough has
indicated to Members of Congress that there was zero followup.
And so I just think you need --

Mr. <u>Comey.</u>  And he had something to offer that wasn't
offered?

Mr. <u>Meadows.</u>  I beg your pardon?

Mr. <u>Comey.</u>  He had something important to offer that wasn't
offered?

Mr. <u>Meadows.</u>  There are allegations they believe were largely
ignored by the FBI.

Mr. <u>Comey.</u>  I don't know what --

Mr. <u>Meadows.</u>  So let me go on a little bit further.

Andy McCabe, under questioning -- I don't want to
characterize how he reacted, but I think it would suffice to say
that he did not agree with your suggestion or demand that he
recuse himself in October of 2016 as it relates to when the
Clinton investigation opened back up.

Do you recall you asking him to recuse himself?

Mr. <u>Comey.</u>  I didn't ask him, but I -- he said he was
recusing himself and he --

Mr. <u>Meadows.</u>  Well, according to his testimony -- go ahead.
I'm sorry.  I'll let you finish.

Mr. <u>Comey.</u>  I'm going to agree with you.  Let me finish.

Mr. <u>Meadows.</u>  I'll let you finish.  Sorry.

Mr. <u>Comey.</u>  I'm going to agree with you, that I never got to

the point where I demanded it of him.  He understood how I felt about it through our staffs and came to me and said he was going to recuse himself but made clear he didn't think he needed to.

Mr. <u>Meadows.</u>  Yeah.  He indicated to this committee that he did not agree with your request or suggestion that he recuse himself.  Why did you believe that he should recuse himself?

Mr. <u>Comey.</u>  Because I had to make an incredibly important decision that was going to have, as it has had, significant public impacts.  And the American people's faith and confidence that that decision and all the other decisions in the case were made for the right reasons, in the right way, was really, really important.

And I wasn't worried about actual bias by Andy, but, given all that was in the news at that point in time with respect to his wife's campaign and whatnot, I didn't want to take any chance with this decision that someone would say it was tainted -- I know it's hard to imagine people would say our decisions were tainted -- but that our decision was tainted in any way by his involvement in it.  So, in an excess of caution, I wanted him out of it.

Mr. <u>Meadows.</u>  So you didn't believe he would do anything wrong.

Mr. <u>Comey.</u>  I didn't believe he was acting in any point during the Clinton case with any kind of bias.  But, again, there's two considerations:  actual bias and perception.  And there was so much happening at the end of that week that I didn't have time to sort it out, and so I just wanted him out of it.

And I understood his concern about that, but, in the interest of the FBI, I thought it important not to have him involved.

Mr. Meadows.  So it was more of a political decision to recuse himself versus any wrongdoing.

Mr. Comey.  No.  In a judgment based on concerns about perceptions of the FBI's impartiality --

Mr. Meadows.  But that's a political perception.

Mr. Comey.  Not in my view it's not.

Mr. Meadows.  So what kind of perception is it, Director Comey?  I don't -- if you're trying to add confidence, I mean, at some point -- so you're saying you were not concerned that he was going to do anything wrong.

Mr. Comey.  I was not.  But --

Mr. Meadows.  Okay.

Mr. Comey.  -- political --

Mr. Meadows.  That's fine.  Let me move on.

Mr. Kelley.  Will you let him finish his answer, please?

Mr. Meadows.  No, no.  I mean, he did answer.

Mr. Kelley.  You keep interrupting.  I'd appreciate it if you let him --

Mr. Meadows.  He did answer the question.

Mr. Kelley.  Let him finish.

Mr. Comey.  I just wanted the record to be clear that I did not accept your characterization of it as a political decision.

Mr. Meadows.  No, you made that you clear.  You had already

answered that.

Mr. Comey.  Okay.

Mr. Meadows.  That was already asked and answered.

So Mr. Gowdy, on the previous time when you were here,
Director Comey, he was asking you questions as it related to
Fusion GPS and Perkins Coie and when you knew what.  And I guess I
want to make sure that we give you an opportunity to clarify your
statement, because there may be a difference between learning and
being advised of something.

Mr. Gowdy said, "When did you learn that Fusion GPS was hired
by Perkins Coie?"  And your response was, "I never learned that.
Certainly not while I was Director."

Is that you correct?

Mr. Comey.  Yeah, that's my recollection.

Mr. Meadows.  All right.  So when were you informed that
Fusion GPS was hired by Perkins Coie?  Because maybe learning and
being informed are two different things.  Were you informed prior?

Mr. Comey.  I was not trying to slice the onion thinly here.
I don't remember ever hearing the name "Fusion GPS" or the names
"Perkins Coie" or "Coie."  I don't even know how to say that word.
I don't remember that.

I remember being told that Steele's work had been funded
first by Republicans opposed to Trump, then by Democrats opposed
to Trump.  Maybe someone mentioned it, but I don't remember it.  I
don't remember the specifics --

Mr. <u>Meadows.</u>  All right.  So --

Mr. <u>Comey.</u>  -- being communicated to me in any way.

Mr. <u>Meadows.</u>  So what you're saying is that, in part of your
investigation, you really didn't care who was funding Christopher
Steele's work.  Is that what you're saying?  It didn't matter to
you?

Mr. <u>Comey.</u>  It mattered to me to understand what this
material was that my folks were showing to me.  And I believe, in
the course of showing it to me, they communicated what you would
expect them to communicate:  that there may be bias associated
with this information; it was first funded by political opponents
on one side, then on the other side.  I don't remember them ever
giving me the details beyond that.

Mr. <u>Meadows.</u>  All right.  So, on the FOIA release two-page
document that was just released by the FBI, have you read that or
at least parts of that?

Mr. <u>Comey.</u>  Yes.  The thing that says "Annex A" at the top?

Mr. <u>Meadows.</u>  Yeah.  And when it talks about that you were
going in to inform the President that a private client had paid
for the dossier -- I think those are the words, "private client."

Mr. <u>Comey.</u>  No, those aren't the words.  You ought to get it
out.

Mr. <u>Meadows.</u>  Well, we'll be glad to give it to you.

Mr. <u>Comey.</u>  Yeah, I don't see the word "going in to inform
the President" here.

Mr. <u>Meadows.</u>  Well, you were using -- did you use the two-page as a briefer for the President?

Mr. <u>Comey.</u>  No.

Mr. <u>Meadows.</u>  What did you use the two pages for?

Mr. <u>Comey.</u>  I'm going to answer this -- I have to answer this very carefully, which I will.

These are two pages from a much larger classified document, classified at the TS/SCI level.  And this was one of the annexes in that large document.

Mr. <u>Meadows.</u>  Right.

Mr. <u>Comey.</u>  There are a variety of annexes.  This was not any kind of talkers.  And it was something written by the intelligence community analysts who produced the larger document.

Mr. <u>Meadows.</u>  All right.  So, when you saw this, who did you think the private client was?

Mr. <u>Comey.</u>  I don't know that I knew.

Mr. <u>Meadows.</u>  I didn't say you knew.  Who did you think it was?  Obviously -- are you saying you're so intellectually not curious that you would not say, "Who's the private client?"

Mr. <u>Comey.</u>  Show me where the word "client" is.  I'm struggling a little.

I see.  So the sentence reads, "The source collected this information on behalf of private clients and was not compensated for it by the FBI."

I don't remember asking -- other than knowing it was

political people opposed to Trump, I don't remember asking which firm, which law firm, those kinds of things.  And I don't remember being told.

Mr. Meadows.  So you're trying to share with this committee -- and I want to take you -- and that's why I was asking you to verify this.  You expect us to believe that you got notation that a private client is there and that you didn't -- you weren't inquisitive enough to figure out who the private client was?

Mr. Comey.  Who cares?  It was Republicans --

Mr. Meadows.  Well --

Mr. Comey.  -- opposed to Trump --

Mr. Meadows.  -- it makes a big difference.  I mean, if you --

Mr. Comey.  Let me finish my answer.  It was Republicans opposed to Trump, and then it was Democrats opposed to Trump. There was potential bias in this information.  That's really important.  Whether it was Sally Smith or Joe Jones, Republican, or Sally Smith, Democrat --

Mr. Meadows.  Director Comey --

Mr. Comey.  -- to me, it didn't matter.

Mr. Meadows.  -- it does make a difference.  If someone is paying for this and you're actually using that information to surveil American citizens with a FISA application, it does matter to me and most Americans.

Mr. Kelley.  Is that a question or an argument?  Because we're out of time now.

Mr. Meadows.  Counselor, you can quantify it any way that you want.  You get paid big bucks to figure it out.  So what I'm saying, it does matter, and that's why I'm asking the question.

Mr. Kelley.  Well, that wasn't a question.  It was an argument.

Mr. Meadows.  My question is the same.  At what point did Director Comey -- sir, when did you find out that the DNC, Perkins Coie, Fusion GPS, any of the above, when were you told -- were you ever told prior to you being fired that they had either directly or indirectly financed what is now known as the Steele dossier?

Mr. Comey.  I don't remember being told anything beyond Democrats and Republicans.

Mr. Meadows.  We're out of time.

Mr. Kelley.  We're going to take a lunch break after this.

Mr. Cummings.  Director Comey, first of all, good afternoon.

I'd like to ask you about one of President Trump's latest allegations against the FBI regarding his former private attorney Michael Cohen's decision to, quote, "flip," end quote, and cooperate with the Federal law enforcement.

Yesterday morning, President Trump tweeted, and I quote: "Remember, Michael Cohen only became a 'Rat' after the FBI did something which was absolutely unthinkable and unheard of until the Witch Hunt was illegally started.  They BROKE INTO AN

ATTORNEY'S OFFICE!  Why didn't they break into the DNC to get the Server, or Crooked's office?", end of quote.

Director Comey, a few hours later, you responded by tweeting this, and I quote:  "This is from the President of our country, lying about the lawful execution of a search warrant issued by a Federal judge.  Shame on the Republicans who don't speak up at this moment -- for the FBI, the rule of law, and the truth," end of quote.

President Trump has tweeted many times attacking the FBI and you personally.  Why do you believe that President Trump was, quote, "lying about the lawful execution of a search warrant" in the case of Michael Cohen?  And is that unusual -- that is, to search an attorney's office?

Mr. Comey.  I believe he was lying because he knows that the office was searched pursuant to a Federal judge's issuance of a search warrant, one.

Two, it is sufficiently common that the Department of Justice has a section in its procedures that lays out all the approvals that are required and the procedures that are necessary if you're going to execute a search warrant -- seek a search warrant for a lawyer's office.

And the notion that the President of the United States, who has taken an oath to faithfully execute the laws of the United States, is going to say that kind of thing about his own Department of Justice offended me.  And so I felt I had to defend

the FBI.

Mr. Cummings.  I don't know how much contact you've had with
agents, but you just said you felt that you had to defend the FBI.
Do you have any way of gauging the impact of such tweets on the
FBI, the agents in general?

Mr. Comey.  I have a general sense.  It's nonscientific
because it --

Mr. Cummings.  Yeah.  I mean, as best you can, just based on
what you believe.

Mr. Comey.  I believe it has two impacts:  It demoralizes,
and it inspires.

It demoralizes, in that our Nation is led by someone who has
contempt for the rule of law and the institutions that this
country needs to be a healthy democracy.  So it demoralizes them
in that sense.

And it inspires them and reminds them of the oath they took
to support and defend the Constitution of the United States.  And
so it wears them down, but it reminds them of why they chose to do
this work.  And so, in that sense, it inspires them and it
energizes them to be what they are, which is honest, competent,
independent people.

Mr. Cummings.  You know, Mr. Comey, Martin Luther King has a
quote that I love so much.  He said that, at some points, silence
becomes betrayal.

And it seems to me that when there is silence with regard to

issues like this, it seems like as if there's a chipping away at
the very foundation of our democracy.  And the FBI is one of
those -- I consider it one of the foundations.  The CIA, Office of
Government Ethics, the press, the right to vote, all of those
things, when you chip away at them, you're basically, I think,
pulling away the fabric and the foundation of our democracy.

Do you have those similar concerns?

Mr. Comey.  Yes.

You probably know this, but for most of my adult life I
consider myself a Republican.  And Republicans used to believe, I
think, that a President's words matter, that institutions matter,
that the rule of law matters, and that the truth matters.

And I get the importance of robust political disagreement.
It's great and wonderful and messy.  But there's a set of things
that are nonnegotiable that are at the foundation of this country
of ours, and I thought Republicans understood that, as well as
Democrats.  And those things are under attack.

And shame of on those who, because they're afraid of the base
or their job or being tweeted about, don't speak up.  I don't know
what they're going to tell their grandchildren, because that
silence is complicity.  That worries me deeply.

Mr. Cummings.  You know, it seems to me -- I tell my
constituents we're going through a storm right now.  And the
question is not whether the storm will end; the question is, where
will we be when the storm ends?  What will we have?  And will we

still have the same democracy?

And I tell them that my greatest fear is that a lot of the things that are happening right now will not be corrected during my lifetime.  And that pains me tremendously.

How do you see us getting back on track?  I mean, you've spent your whole life trying to keep us between these guardrails, and it seems as if the guardrails are being tossed aside and all kinds of things are happening.  And how do you see us -- what do we have to do to bring us back --

Mr. Comey.  Yeah.

Mr. Cummings.  -- to normal?

Mr. Comey.  Yeah.  We are going --

Mr. Cummings.  You do think that's important, I assume.

Mr. Comey.  Very much so.

We are going to be okay.  I'm asked all over the country that question, and people ask it with fear in their voice, "Are we going to be okay?"  Republicans, Democrats, and independents.  The answer is:  We're going to be okay.

Because the culture of this Nation, the culture of an institution like the FBI -- there's no deep state.  There's a deep culture, in the military, in the intelligence community, in the FBI -- those three I know very well -- a commitment to integrity and the rule of law.  No President serves long enough to screw that up.

So the damage, by definition, will be short-term.  Still

important, but short-term.  How short that term is depends upon the rest of us and whether we have the courage to risk our jobs and votes against us by standing up and saying this is not who we are and speaking out.

That will cabin the damage and reduce it, but, in the long term, this will be another one of those jags in American's line that we look at and say, look at the progress we made after this.

Every time there's great change in this country, we retreat. Right?  Our upward line is an upward line, but it's jagged. Right?  And every so often, we go down, then we go back up.

The key to going back up is, in my view, awakening the giant. Right?  That great lump in the middle of America is where our values sit.  We are a center-right, center-left country.  And every so often, the giant stirs.

And I'm going to get emotional if I say this.  No one on this Earth knows this better than you, but when little girls were killed in Sunday school at the 16th Street Baptist Church, the giant stirred, and we got a Voting Rights Act and a Civil Rights Act and our line started up again.

It's up and down with us, up and down with us.  The inflection back up depends upon the giant waking up.  And that's not a Republican statement or a Democratic statement; that's a values statement.

And then we'll get back to disagreeing about immigration and taxes and all of those important things, but this nonnegotiable

thing, everyone should speak up about it.

Mr. Cummings.  Finally, let me ask you this.  What is the harm and the concern to national security when the President makes these kinds of statements, like the tweets that I just read you?

Mr. Comey.  There's a risk that people -- not just a risk.  Millions of people believe what the President says.  Today, there are millions of Americans walking around thinking that the FBI is corrupt and out to get the President of the United States, that the Justice Department is corrupt and out to get the President of the United States.  And they believe it because he's said it over and over again.  A lot of people probably within walking distance of me right now have repeated those lies.

And that is a situation that puts us at risk in the short term, that the FBI and the Justice Department will not be trusted or believed.  At a doorway trying to recruit a source, in a courtroom where they say, "I found this in the left dresser drawer of this gang member," and they won't be believed because the President of the United States has convinced millions of people that they're corrupt, when that's a lie.  But millions of people believing a lie is dangerous for us -- again, in the short term.

Mr. Cummings.  Yeah.  Yeah.

Mr. Comey.  We're going to be okay in the long run.  That's my concern about our safety.  And that's what worries the FBI agents, that they won't be trusted and believed anymore because good Americans are getting lied to so much.

Mr. <u>Cummings.</u>  Mr. Comey, let me tell you, I've sat on the Board of Visitors for the Naval Academy for 13 years, and the thing I love about it so much is when I get a chance to meet with the midshipmen, and I see all these young men and women who are willing to die for their country.  I mean, these kids are only 18, 19, and they have a long-term vision -- you know, a long-term vision.  They're not going to school for tomorrow; they're going to school to make sure things are okay for generations.

And I just think we have to be the guardians of this democracy.  I don't think the democracy will just -- I mean, if we don't guard it, I think it's like anything else; you will have problems.  It's like maintenance of a house.

And so I want to thank you very much for all you've done.  And I know this has been at times -- you can say what you want, but it has been difficult at times, because we've seen each other a number of times.  But I thank you very much.

Mr. <u>Comey.</u>  Thank you, sir.

Mr. <u>Cummings.</u>  Thank you all.

Ms. <u>Sachsman Grooms.</u>  Let's go off the record.

[Recess.]

[2:10 p.m.]

Mr. Gowdy.  First thing I want to do, Madam Court Reporter, is thank my friends on the other side for allowing me to go out of order.  They did not have to do that, and I appreciate very much them doing it.

Would you let the Director see two exhibits that I may be making reference to?  One is a text, and one is a portion of the IG report.

Director, I will draw your attention towards the bottom of that page to a 26-05-04.  Do you see that?

Mr. Comey.  Yes, I see 05-04.  How many lines up?  I'm sorry.

Mr. Gowdy.  One, two, three, four, five, six.  It begins, "And."

Mr. Comey.  Got it.  "And holy"?  Yeah.

Mr. Gowdy.  Yeah.  I'm going to skip that and just hit the salient parts since you have it in front of you:  Cruz just dropped off the race.  It's going to be a Clinton/Trump race.  Unbelievable.

And then the response, which would be from Special Agent Strzok:  What?

And then Lisa Page:  You heard that right, my friend.

And then Strzok:  I saw Trump won.  Figured it would be a bit.

And then Page again:  Now the pressure really starts to finish MYE.

And Strzok's response:  It sure does.  We need to talk about followup call tomorrow.

What about Trump securing the nomination would lead to the need to speed up the investigation?

Mr. <u>Comey.</u>  I have no idea.

Mr. <u>Gowdy.</u>  Would you agree that there should be no connection between whether or not a candidate secures a nomination and the speed with which the Bureau conducts investigations?

Mr. <u>Comey.</u>  Yes, I agree.

Mr. <u>Gowdy.</u>  All right.  I want to move to one other -- I'm going to jump around, but that's just because there are a couple of different areas I want to hit.  In your previous career as a prosecutor, did you ever prosecute a false statement case?

Mr. <u>Comey.</u>  Yes.

Mr. <u>Gowdy.</u>  Would it be accurate -- let's take a hypothetical that you're interviewing someone, and they make a demonstrably false statement and you confront them with it and say, "I know that's a lie."  Have you lost the right to prosecute the person if they then say, "Okay, you got me"?

Mr. <u>Comey.</u>  I'm going to try to stick to what I said before, Mr. Gowdy.  I don't feel comfortable answering hypothetical questions.

Mr. <u>Gowdy.</u>  I'm trying to make it as generic as possible.  I don't see how you can lose the right -- now, you may not -- it may not have any jury appeal.  I'll grant you that.  And you may

decide to not exercise your discretion to go forward.  But legally
have you lost anything if someone lies to you and you confront
them in the interview with the fact that you know it's a lie?

    Mr. <u>Comey.</u>  If the elements of the offense are a knowing
false statement.

    Mr. <u>Gowdy.</u>  And where it takes place in the interview, lay
aside jury appeal, lay aside whether or not you'd exercise your
discretion, it's of no legal consequence?

    Mr. <u>Comey.</u>  I don't think it matters when the false statement
occurs in the interview so long as it's made knowingly.

    Mr. <u>Gowdy.</u>  All right.  Well, I do not have access to the
Flynn 302.  I don't know whether or not you've read it or not.  Do
you know whether the agents said, "General Flynn, we got exactly
what you said verbatim, verbatim.  It's a lie.  Why are you
lying?"

    That was the question that I think you and Deputy Director
McCabe said you had going into the interview:  Why is he lying?
Did the agents confront him with the fact that they knew it was a
lie and get to that point?

    Mr. <u>Comey.</u>  I don't remember for sure the -- I don't remember
getting the question answered about the why he's lying, even to
this day, and so I don't think the interview got to that point, in
part because I don't think he ever acknowledged he was lying,
despite being pressed by the agents.

    Mr. <u>Gowdy.</u>  I know the agents took specific clauses that he

had uttered and repeated them back to him.  What I don't know is whether they said, "General Flynn, we know exactly what you said verbatim, every word of it.  Who told you to call the Russian Ambassador?  Who did you report to after that call?  Do you know?"

Because your testimony was it's not about the Logan Act, and you're not trying to boost up your 1001 prosecutions.  You're trying to understand how this plays in with the Russia interference investigation.  Did I characterize that fairly?

Mr. <u>Comey.</u>  Yes, our focus was not the Logan Act.  It was the Russian counterintelligence investigation, correct.

Mr. <u>Gowdy.</u>  So why not confront him and say, "We know you're lying.  We're not giving anything up in terms of being able to hold you accountable for that.  We know you're lying.  Who directed you to call the Ambassador?  Who did you report to?  Who specifically told you what to address in that phone call with the Ambassador?"

Mr. <u>Comey.</u>  My recollection is they didn't get to a place, despite pressing him, where he acknowledged that he was lying, in fact, didn't acknowledge he was lying until he pled guilty in Federal court.  So I don't think they ever got to that place where they could then pursue that, okay, so why, so why, so why.

Mr. <u>Gowdy.</u>  Do you know whether they ever confronted him with any kind of memorialization of the conversation itself?

Mr. <u>Comey.</u>  I don't.  My best recollection is that they used words from the transcript to make clear to him that they were

quoting from something we had.  And still, in the face of that, he didn't admit that he had had the conversations.  I'm sorry.  He admitted he'd had conversations but didn't have conversations about that.

Mr. <u>Gowdy.</u>  You should have a copy of the IG report in front of you.  I think it's towards the bottom of the page and maybe the last full paragraph.

Mr. <u>Comey.</u>  This paragraph begins in April 2016?

Mr. <u>Gowdy.</u>  I gave you our copy.  Towards the end -- it may be the last paragraph.  It was the IG concluding that there was never any serious conversation about the appointment of special counsel.  And we mentioned it last time, and I want to give you a chance to read it and address it.

Mr. <u>Comey.</u>  Okay.  So I'm going to read it to myself on page 239, the paragraph beginning, "In April 2016."

Okay.  I've read it.

Mr. <u>Gowdy.</u>  What is your reaction to the IG statement that -- and I don't have it in front of me, so if I mischaracterize it, tell me I mischaracterized it -- that they found no evidence there was any serious consideration of calling for the appointment of special counsel?

Mr. <u>Comey.</u>  I see that.  I mean, that's their conclusion.  I don't -- since they're not here, I don't have a chance to ask them what they mean by "seriously considered."  I meant what I said earlier.  I wasn't messing with the Deputy Attorney General.  I

meant what I told her that, at some point, I'm going to call for
the appointment of special counsel as we -- if we get deep into
this thing.  So it doesn't change what I said to you earlier,
Mr. Gowdy.

    Mr. Gowdy.  Did it change her behavior?  Did it change the
decisions being made by the Department?

    Mr. Comey.  I don't know for sure, but something happened
that injected energy into the prosecutors that was supportive of
our effort to get the laptops.  That was the sticking point.  We
wanted the laptops, and it was hesitancy by the line prosecutors
and that, shortly after this conversation, they showed great
energy in trying to get those laptops.

    Mr. Gowdy.  And these would be the culling laptops?

    Mr. Comey.  Right, the -- I hope the name is right -- the
Samuelson and -- maybe they were both Samuelsons.  Two laptops
from the law firm that had deleted some emails and printed others
to produce.

    Mr. Gowdy.  Did anyone in Midyear -- did any witnesses in
Midyear Examination make false statements to the Bureau?

    Mr. Comey.  Did any witnesses in the Midyear Examination case
make false statements to the witnesses -- I mean to the Bureau?  I
have some recollection.  Yeah, I don't know for sure.  I'll give
you the full answer.  I have some recollection that one of the
guys you talked about last time --

    Mr. Gowdy.  Paul Combetta?

Mr. <u>Comey.</u>  Combetta, or there was another fellow whose name I can't remember right now, who were involved in the maintenance of the servers.  And there was an issue about whether one of them had been straight with us, I think, about whether -- what he knew, when he knew it, in terms of deleting the emails, something like that.  I have some recollection that there was conversation about him having exposure under 1001.

Mr. <u>Gowdy.</u>  Would it refresh your recollection to know that Paul Combetta was interviewed multiple times by the Bureau?

Mr. <u>Comey.</u>  No.

Mr. <u>Gowdy.</u>  The last time we were together I think Mr. Ratcliffe read you a sentence that included the representation that someone in the investigation had made misstatements to the Bureau and you agreed with that statement.  Does that sound familiar?

Mr. <u>Comey.</u>  You're asking me do I remember Ratcliffe's question to me; I don't specifically.  I remember talking to Mr. Ratcliffe about who got immunity and what form of immunity it was, but I don't remember that particular phrasing.

Mr. <u>Gowdy.</u>  How does the Bureau decide who gets charged with making a false statement and who does not?

Mr. <u>Comey.</u>  In general, through consultation with an assistant U.S. attorney; or if it's a case the Main Justice is involved in, one of their trial attorneys.

Mr. <u>Gowdy.</u>  Was there any conversation with respect to Paul

Combetta about pursuing a false statement?

Mr. Comey.  Not that I was a party to.

Mr. Gowdy.  Do you know who at the Department approved the filing of charges against Michael Flynn for making a false statement?

Mr. Comey.  Do I know whether the Department did?

Mr. Gowdy.  Who at the Department, if there was consultation with the Department?

Mr. Comey.  No.  I was fired on May the 9th.  I have no idea.

Mr. Gowdy.  I want to ask you about the IC assessment, late 2016.  Is that a fair timeframe, the intelligence community produced an assessment with respect to Russian interference?

Mr. Comey.  Yes.  The work was done in -- mostly in December of '16.  I think it was finished the first -- I think it was finished the first couple days of '17 January.

Mr. Gowdy.  Were you part of that assessment?

Mr. Comey.  The FBI was.  We contributed analysts to a team that the Director of National Intelligence analysts oversaw.

Mr. Gowdy.  Do you recall -- when I use the phrase "crown material," what does that refer to?

Mr. Comey.  I think it refers to material that -- now called the Steele dossier.  I mean, I could be wrong about that, but I think that's the name that the analysts use for that material.

Mr. Gowdy.  I think you're correct.  So do you recall whether any, quote, crown material or dossier material was included in the

IC assessment?

Mr. <u>Comey.</u>  Yes.  I'm going to be careful here because I'm talking about a document that's still classified.  The unclassified thing we talked about earlier today, the first paragraph you can see of exhibit A, is reflective of the fact that at least some of the material that Steele had collected was in the big thing called the intelligence community assessment in an annex called annex A.

Mr. <u>Gowdy.</u>  Do you recall the specific conversation or back and forth with then-Director Brennan on whether or not the material should be included in the IC assessment?

Mr. <u>Comey.</u>  Yes.  I remember conversation -- let me think about it for a second.

I remember there was conversation about what form its presentation should take in the overarching document; that is, should it be in an annex; should it be in the body; that the intelligence community broadly found its source credible and that it was corroborative of the central thesis of the intelligence community assessment, and the discussion was should we put it in the body or put it in an attachment.

I'm hesitating because I don't remember whether I had that conversation -- I had that conversation with John Brennan, but I remember that there was conversation about how it should be treated.

Mr. <u>Gowdy.</u>  Do you recall sharing the fruits or the results

of that conversation with your senior staff via email?

Mr. Comey.  It's possible.  I don't recall specifically, but if I had such a conversation about it and needed to brief the staff, email would be a logical way to do it, probably classified email at that point.

Mr. Gowdy.  Which is why I'm trying to dance around it, and I'm not showing it to you.

Mr. Comey.  Okay.

Mr. Gowdy.  There's one word in the email that I want to ask you about.

Mr. Comey.  Okay.

Mr. Gowdy.  "Unverified."

Mr. Comey.  Yeah.  What's the question about the word?

Mr. Gowdy.  The material was referred to as unverified.  This is December of 2016.  I'm trying to sync that up with Bureau efforts to either corroborate or contradict the assertions in the crown material or dossier.

Mr. Comey.  I don't remember using the term in an email, so that solves the classified problem.  But I think we talked about this last time.  The Bureau began an effort -- the information was from a credible source, was in its center consistent with other information we already have, right.  The heart of the Steele dossier is the Russians are coming to mess with our election. That was consistent with other information we had.  But it had lots of spokes off of that, and so that was from a credible source

with a known source network.  The Bureau was trying to replicate

the entire thing, see how many of those sources we could make our

own, and that was an effort under way when I left.

And so I think when the term -- at least to my recollection,

the term "unverified" means we haven't finished that work.  We

can't say this is now our work.  It remains source information

that we have not replicated.

Mr. Gowdy.  Two more lines of inquiry.  If I remember your

testimony correctly, four Americans were under investigation, but

you do not recall seeing the phrase "Trump campaign" in the

initiation documents for the late July Russia investigation.  Is

the name still classified?  I'll ask the Bureau lawyers.

Mr. [      ].  The name --

Mr. Gowdy.  Of the investigation.

Mr. Comey.  Of the four individuals, you mean?

Mr. Gowdy.  Just the name.

Mr. Comey.  Oh, the --

Mr. [      ].  Yeah, the code name is not the classified

portion.

Mr. Gowdy.  So it is still classified?  All right.  Well,

then I won't give you the name, just the four individuals.

Mr. Comey.  It's not.

Mr. [      ].  The code name is not.

Mr. Gowdy.  It's not?  Operation Crossfire, Cross Hurricane?

Crossfire Hurricane?

Mr. <u>Comey.</u>  Yes.

Mr. <u>Gowdy.</u>  Late July 2016?

Mr. <u>Comey.</u>  I think that was the code name for the investigative file that was opened in the -- late July of '16, yes.

[2:27 p.m.]

Mr. Gowdy.  And you do not recall seeing the phrase "Trump campaign" in those initiation documents?

Mr. Comey.  I do not.  I don't remember ever seeing the initiation documents.  I think the question I was asked last week was -- or maybe my answer was, to try and clarify, I don't remember an investigative file being opened on the Trump campaign.  We were investigating four individuals.

Mr. Gowdy.  Were those four individuals in some way connected with the Trump campaign?

Mr. Comey.  Some were; some weren't.

Mr. Gowdy.  Are you sure?

Mr. Comey.  I think so.  I don't think --

Mr. Gowdy.  Either officially or unofficially connected with the campaign.  Advisors?

Mr. Comey.  Well, they were all people with some connection at some point in time to the Trump campaign.  But I think at the time the investigation was open -- and, obviously, I could be wrong about the dates, but I don't think it's accurate to say all four were associated with the Trump campaign.

Now, it may be more accurate to say just what you said, that all four either were or at some point had been associated with the Trump campaign.  I think that's a fair way to say it.

Mr. Gowdy.  In late July of 2016, did the Bureau have any reason to believe that candidate Trump himself was working with

Russia to influence the election?

    Mr. <u>Comey.</u>  I can't answer that.  Yeah, I can't answer that.

    Mr. <u>Gowdy.</u>  Why can you not answer that?

    Mr. <u>Comey.</u>  Because I think it calls for information that falls within the special counsel's investigation, and I've been instructed by the Bureau not to be answering questions that fall within that.

    Mr. <u>Gowdy.</u>  Is there any reason the Bureau could not or did not give a defensive briefing to candidate Trump that you may want to be mindful of these new faces in your life or in your campaign's life?  Does the Bureau ever do that?  Do you ever give defensive briefings?

    Mr. <u>Comey.</u>  Yes, the defensive briefing is one of the tools in the counterintelligence toolbox.

    Mr. <u>Gowdy.</u>  Did you ever give any thought to giving a defensive briefing to candidate Trump?

    Mr. <u>Comey.</u>  I don't remember giving thought to it, and I don't know whether others did.  I know there were counterintelligence briefings given to both campaigns that covered the threat, I think, from the major adversaries of the United States.

    Mr. <u>Gowdy.</u>  But you don't recall whether or not -- did you contemplate it and decide not to do it?  Or do you not recall contemplating whether or not to give the candidate a defensive briefing on individuals that you were at least investigating, not

criminally but from a counterintelligence standpoint, for their potential connections with a hostile foreign power?

Mr. <u>Comey.</u>  No.  I don't remember considering that, and I wouldn't have considered it at the time.

Mr. <u>Gowdy.</u>  All right.

I don't know whether I cede back to my friends on the other side or whether -- well, if I am ceding, I will thank them again for the courtesy.

EXAMINATION

BY MR. SOMERS:

Q    Just to continue on the defensive briefing line that Mr. Gowdy was just on, I'm just trying to understand how that would work.  If DOJ was considering a defensive briefing -- Main Justice, not FBI -- was considering a defensive briefing, would you not be aware of that?

A    Considering a defensive briefing of whom?

Q    I'm sorry.  Of President Trump, or now-President Trump.

A    Then-candidate Trump?

Q    Then-candidate Trump.

A    I'm not going to answer the hypo, but I can answer the factual nugget within it.  I don't remember DOJ -- the issue of DOJ being interested in a briefing being raised to me.

Q    Does DOJ have the personnel, Main Justice, to do a defensive briefing, or would that more typically be done by FBI?

A    It typically would be done by FBI, but it's possible

that someone in the Office of Intelligence -- possible someone in the Office of Intelligence at National Security Division can do a defensive briefing.

Q   So, just to be absolutely clear, you never had a discussion with Loretta Lynch about doing a defensive briefing for then-candidate Trump?

A   I don't think so.  I don't remember having any such conversation.

Q   And in that period towards the end of July when Crossfire Hurricane was opened, what was your understanding of who George Papadopoulos was?

A   I'm not in a position to confirm that Papadopoulos was one of the four --

Q   No, I'm not -- yeah, okay.

A   You're separating --

Q   I'm sorry.  I'm just trying to -- I was trying to get a time period.

A   Got it.

Q   Towards the end of July.  And July 31st I think is when it was opened.  I'm just asking you, not connected, but during that time period, who was your understanding of who George Papadopoulos was?

A   I think my understanding was that he was a former foreign policy advisor to the Trump campaign.

Q   Same question, same time period, with regard to Carter

Page?

A   My recollection is that I understood that Carter Page,
in late July of 2016, was a current -- I don't know whether it was
foreign policy or national security advisor to the Trump campaign.

Q   Were you aware that Carter Page had had previous
dealings unrelated to the Trump campaign with the FBI?

A   I can't answer -- I could answer it, but this is an area
where the FBI has told me not to answer those kind of questions.

Q   Okay.

   BY MR. BAKER:

Q   I'm going to try not to make this a hypothetical, but I
really value your expertise, not just when you were the Director
of the FBI but in your other assignments in public service and
government.

   One of the outcomes of these two investigations, the public
reporting of them, the congressional interest in them, the public
or a larger portion of the public that maybe wasn't previously
available of the FISC is now aware that there is this other court
that a lot of people just aren't familiar with.

   I'm curious if, from where you've been in government, and
certainly at the top of the pyramid of the FBI, do you think or
have you ever -- and I know you're a very analytical person.  I
don't think you rapid-fire.  You analyze things before you choose
a course of action.  That's my impression of you.

   Have you ever considered a different model for the FISC

of -- some of the inefficiencies of having a court that is
centrally located for investigations that go all over the domain
of the FBI, and some of the differences when someone appears
before the FISC.  It's not generally the agent that's worked the
case; it's someone that has become familiar with it.

I'm just curious if you have an insight to a different model
than what the current FISC is set up as and the centralization of
it.

Mr. Kelley.  Just to be clear for the record, when you say
"FISC," you mean --

BY MR. BAKER:

Q   The Foreign Intelligence Surveillance Court, yes, sir.

A   I remember participating in a variety of conversations
since 9/11 about whether there were ways to streamline the FISA
process.  And that included technological conversations,
organizational.  Like, could we forward deploy more DOJ lawyers
into field offices?  Those kinds of things.  And I think, as part
of those conversations, I remember conversations about whether it
was possible to have the FISA judges distributed around the
country so it would be easier for people to appear in front of the
court.  I remember that.

And I also remember, from when I was Deputy Attorney General,
the importance of getting the FISA court its own space, which
would allow it to operate more efficiently.  And that came to me
because of budget stuff.

I don't remember any other restructuring ideas, or discussing them, about the Foreign Intelligence Surveillance Court's authorities generally.

Q    Do you remember any arguments against decentralizing?

A    Yes.  Mostly against the idea of pushing more FISA drafting and review authority out to the FBI field offices and allowing U.S. attorney's offices more autonomy in developing and submitting FISAs.  I remember those conversations.

And the concern, which is a very legitimate concern, is quality control and a risk that in that devolution of authority comes a necessary diminution in the standards.  And if you know the FISA process, you know how high the standards are.  That there was a danger that, in pushing it out too much to the field, you'd lose some of that rigor.

Q    Thank you very much.

Along the same lines of FISA, when you were the Director -- I think you answered this in our last session.  By the time a FISA application gets to you, it's been a lot of other places below you, and it has a lot of other places to go when it leaves the FBI.

What is the normal flow process for a FISA, to the best that you recall?  I mean, you can make it an example where it's coming from the field or from within headquarters.  I'm just curious, the different stops it makes at headquarters and at what levels it really gets the closest scrutiny.

146

I understand, as it sort of goes up the chain, I believe you and people immediately below you are really looking to make sure that it's gotten some of these other lower levels of review that would, I mean, I think, obviously, be more comprehensive, based on the other things you have on your plate as the Director of the FBI.

So could you just explain briefly how it flows through the FBI and at what levels people actually read the documents?

A   Yeah, I probably can't with any specificity.  If I actually had a live FISA in front of me, I could walk you through the signature levels.

Q   To the best of your recollection.

A   But it comes in at a relatively low level and then is worked in tandem by agents and lawyers within the FBI.  And then there is a cascading-up level of review.  Comes up to my desk.  My job under the statute is to certify as to the purpose of the -- it's a primary role of the Director -- certifying to the purpose of the FISA.  But to understand that, I would read a summary of the FISA to understand where it was and then could see the levels of review it went through.

My sense was that the most robust review was at the assistant-director level and below, but that also, my recollection is, there was a fairly robust process once it got over to the National Security Division too, where different sets of lawyers, the ones that interacted directly with the FISA Court, would

engage on it and scrub the Bureau's work.

Now, I don't remember that to be sequential.  I think there's a lot of back-and-forth between the folks working at the National Security Division at Justice and the people working at the National Security Law Branch at the FBI or the agent personnel assigned to it, so back-and-forth across the street.

And then a finished product comes up to me, then goes across the street.  And I didn't get the sense there was much change after my certification.  It would then go to the Deputy Attorney -- either the Assistant Attorney General or the Deputy Attorney General after me.

I think I got that right.

Q   Okay.  So it's a rather lengthy process.  It's nothing that's done very quickly.  I mean, there can be circumstances where something is expedited, but this application for the FISA order has a lot of different stops at the Bureau, at DOJ, some back-and-forth, as you've indicated.  And then, even when it's presented to the FISC, there can be some back-and-forth there between --

A   Right.  It's one of the things that is the most labor-intensive and supervision-heavy that the FBI does.  There are some other things I can think of that are also very, very carefully scrubbed, but it's in that top tier.

Q   Okay.

Kind of related, when you were discussing or when your team

was discussing possible statutes that might be applicable to Secretary Clinton's handling of emails and security awareness, when there wasn't a statute that seemed to actually fit the conduct that was under examination, was there any discussion by the Department to at least make a note that maybe the espionage section of the statutes needed to be relooked at to maybe modernize with what currently is the state of play for some of this?

I'm just curious if there was ever a discussion about letting Congress know that there were these statutes that the Department maybe didn't feel comfortable in charging to the facts that were presented and that maybe Congress needed to do something.

Were you aware of any discussion, either the Bureau wanted to maybe revisit these with Congress or the Department did, or any tweaking of the statutes at all?

A   No, not that I was aware of.

Q   Okay.

Changing gears just a little bit, we have asked many of our witnesses about a particular aspect of this case that certainly the public latched on to --

A   "This case"?

Q   The investigation of the emails.

A   Got it.

Q   And, really, the Peter Strzok-Lisa Page emails became very popular in the media.  And a lot of those emails and --

A   Texts.

Q   -- texts left a lot to the reader to decide really what they thought they were talking about.  And really it depended what you brought to the table, as to what you walked away thinking that the texts related to.

Several witnesses were asked about the affair that they had.  And the response to that issue by some of the people that were in at least one of those individuals' supervisory chain was kind of surprising.  It was to the -- and I'm paraphrasing -- something to the effect, "Well, as long as they were doing their work, I really wasn't going to be concerned with it."

And I realize that the FBI -- we are not the morality police, as we've been called with this line of questioning.  And you certainly had a lot of on your plate to do other things.  But the motto of the FBI, "Fidelity, Bravery, Integrity," has "Fidelity" as its very first word.

I wonder if someone in their supervisory chain, when they were aware of it -- and there were employees that supposedly went and told Mr. Strzok's supervisor about this affair -- if that had been taken more seriously and Mr. Strzok told to knock it off or whatever they wanted to do as far as discipline or quasi-discipline, that some of those texts would have stopped and not been the trove of texts that they turned out to be and resulted in people walking away with all different opinions on what the texts actually meant.

Did you know about the affair at any time of the investigation, or was this something you learned after you left public office?  Or, I mean, when did you learn about it?  And what was your position -- or what would your position have been, as the Director, to learn that your top-ranking or one of your top-ranking counterintelligence folks is involved in this sort of thing?

A    I never knew about it.  And so everything I know about it I've learned from public reporting afterwards.

I would be very concerned, as the Director.  There is H.R., which may tell you that as long as people aren't in the same supervisory chain they can do whatever they want with each other, and then there's questions about judgment.

And I actually don't see it as a fidelity question. "Fidelity" is there for fidelity to the rule of law.  I see it as an integrity question, that if you are cheating on your spouse, there are integrity issues, right?  You're clearly lying to your spouse; so is the other person.

And so I don't know that it would lead to automatic removal from a responsibility or a role, but it would be something I would take very seriously for the reasons I just said.

Q    Thank you.

You said earlier today -- and, again, I'm paraphrasing -- the best investigations are done promptly; get it done.  Do you recall that?

A   Uh-huh.

Q   What do you know about the timeline or the lack of attention to the Weiner laptop that I think is attributed to Mr. Strzok?

And then there's a conclusion drawn that maybe that was indicative of a bias to influence something.  I'm not so worried about that.  I'm just -- what do you know about the timing or the lack thereof of looking at that laptop?

A   Only what I read in the IG report, which found that there was a variety of people thinking other people were handling it, but, most importantly, found that there was not -- I was going to quibble with one part of your question -- was not an indication that the delay was reflective of any kind of bias either for or against Hillary Clinton.

But so, what I know is what I read in the IG report.

Q   Okay.  So do you know, as you sit here now, whether the laptop was, in fact, exploited?

A   What do you mean?

Q   Was it examined?

A   Ever, you mean?

Q   Ever.

A   Well, I believe the contents of the laptop were exploited.  A mere image -- what I was told was a mere image of the laptop was recovered as part of the search warrant in New York and that the content of it in that image was shared and exploited.

Q    Do you know where the laptop is now or where it was when you left the FBI?

A    I do not.  I never did.

Q    Okay.

Mr. <u>Brebbia.</u>  Art, could I jump in for a couple?  Thanks.

     BY MR. BREBBIA:

Q    Sticking on the Weiner laptop topic, you were told in a meeting on October 27th with the Midyear Exam team about the existence of the potential Hillary Clinton emails on the Weiner laptop?

Mr. <u>Kelley.</u>  Excuse me.  Could we just get your name?

Mr. <u>Brebbia.</u>  Sure.  Sean Brebbia, Oversight and Government Reform, majority.

Mr. <u>Kelley.</u>  Okay.

Mr. <u>Comey.</u>  I was briefed on the morning of the 27th about what had been found or what they believe was on the Weiner laptop. Sometime in, I think, the first week of October, someone said something to me, in substance, that there may be some connection between the Weiner case and Midyear.

[2:48 p.m.]

        BY MR. BREBBIA:

Q   That's exactly what I want to focus on.

A   Okay.

Q   And --

A   I didn't hear anything more about it until October 27th when they asked to meet with me and briefed me.

Q   And October 27th, that meeting and that briefing resulted in you taking certain actions?

A   Correct.  The FBI and the Department of Justice decided to seek a search warrant for the contents of the Weiner laptop as it related to the Midyear case.

Q   But the briefing on, I believe it was, September 28, you didn't take any actions subsequent to that information you received on September 28?

A   Yeah, I don't -- the briefing you're talking about September 28th, as I recall, is not a briefing of me.  I know this from reading the IG's report, that there was conversation between the New York office and headquarters in late September about the find on the Weiner laptop and that there was not action taken until, as you said, on October 27th.  After I was fully briefed, I said, "Let's go," and the question was, what's the reason for the delay?  And the IG concluded that everything that was known in late September could have been acted on then and not waited on until the end of October.

Q    Right.   And that's because Andrew McCabe knew about it in late September, knew about the potential for Hillary Clinton emails on the Weiner laptop, right?

A    That's what the IG report says.

Q    Did you -- the IG report also says that Peter Strzok was aware of the potential for Clinton emails on the Weiner laptop?

A    As of September 28th?

Q    Yes.

A    I don't remember that.   I mean, it says what it says obviously.   I didn't write it.

Q    So, when you found out on October 27th, were you made aware that Andrew McCabe had known about the emails since September 28th?

A    No, I was -- not that I remember.   I was made aware generally that we have had this for weeks and a variety of explanations were given to me I think then as to what occasioned the delay: technical, the team was disbursed, a bunch of other things.

Q    So, when you found out on October 27th, did you inquire of the Midyear Exam team why they had not investigated the Anthony Weiner laptop?

A    Yeah, I think so.   That's what prompted the explanations that I just laid out.   I think I, at some point, maybe during that morning briefing, said:   When did we find this out, and what have we been doing about it, and why?

Q    And according to -- sorry.

A    Sorry, go ahead.

Q    According to Peter Strzok, what reason did he give for why nothing had been done with the Weiner laptop since late September?

A    I don't remember Peter Strzok -- I don't remember an explanation coming from Peter Strzok.  It is possible he was part of a group that gave me one.  I just can't remember a Peter Strzok explanation.

Q    According to Andrew McCabe, what explanation did he give you for no -- for the Weiner laptop not being investigated when they found out about it early September?

A    I don't know that he did because you'll remember that I wanted him out of the conversations about what to do about it, and so he was on the phone when we first started discussing it and then dropped off, and I don't think he and I discussed it ever again actually because he recused himself.

Q    Who gave you the explanation for why nothing had been done with the Weiner laptop since the Midyear Examination team had found out about it in late September 2016?

A    I'm sorry if I didn't say this earlier; I meant to.  I don't remember, except I remember learning in the group discussions that morning, which involved six or seven or eight or more people, that the variety of reasons that had led to the delay -- it wasn't a huge focus of mine, so I'm trying to figure

156

out, so what do I do now that the Department of Justice and the FBI want to get a search warrant.  So I can't attribute the explanations to any particular people.  I can list all the people that I think were at the meeting, but it was from that group of people that I gained an understanding that there were a bunch of different reasons why we had delayed.

     Q    You have described the situation you got put in at the end of October as an almost existential threat to the FBI, that on one path of concealing it led to ruin.  Is that a fair characterization of some statements that you have made in your book and elsewhere?

     A    Yes, I thought of the path of concealing it as catastrophic impact to the institutions of justice, both the FBI and the Justice Department as a whole.

     Q    And finding out about this information in late October versus late September made a bad situation worse, is that also fair to say?

     A    Sure, in the sense that you -- if you could have investigated it and completed it a month earlier, you would have had much less prospect of having an impact on an election.

     Q    And so didn't you inquire as to why of your team why no one had investigated the laptop for a month?

     A    I think I -- didn't I already answer this question like three times?  I asked them or they volunteered the history of this and said:  We have had problems with the technology; something was

sent down that was corrupted; the team was disbanded; people thought other people were taking action on it.

And again, to my mind, I don't know whether you have led a large organization, but I have an incredibly difficult decision to make on behalf of an organization.  I'm not spending a lot of time looking backwards.  I'm looking forward saying, how do we do the right thing here?

BY MR. SOMERS:

Q    Within that, staying on the Weiner laptop, did anyone at the FBI express concern to you about the scope of the search warrant for that laptop?

A    The scope of the search warrant for the warrant that the Bureau sought for the Clinton emails?

Q    On the Weiner laptop, particularly the temporal scope.

A    No, not that I recall.

Q    Because I think the last time we were here, you testified basically something to the extent that, obviously, in looking at the emails, you would want to look at the emails at the very beginning when she set the server up in order to understand why that was done.  Was that roughly your testimony?

A    Yeah.  My understanding was the scope was going to be her tenure as Secretary of State.

Q    So, if there was -- if the search warrant did not cover that time period, that would be concerning?

A    I would want to understand why.

Q    What about the end, would you make the same comment?  I mean, once -- would it be important to know or to see the emails after, you know, there was a discovery that there was something wrong with the server after there was an investigation opened?

A    After she had left as Secretary of State?

Q    Yes.

A    Yeah, I don't know how you would get those.

Q    Well, if you're looking at an investigation as to why the server was created, wouldn't there be a possibility there would be discussion via email on that server as to, "Well, we screwed up here," after the investigation was discovered?

A    I can't answer that because I don't know what went into that, but I don't know how you would -- I just don't know is the answer.  I just don't know how you would shape the search warrant for her mishandling -- unless you had evidence of obstruction or something, I don't know how you would shape the search warrant's scope to go beyond her tenure of Secretary of State.

Q    Do you think that was the only thing valid for the search warrant in scope was the day she started, the day she left as Secretary of State?

A    That's what my common sense tells me.  I don't know whether they went otherwise.

Q    All right.  Just to jump around here a little bit, I have got questions I'll probably jump a little bit.  Where did you get your understanding of the DOJ policy on whether gross

negligence could be charged under the Espionage Act?  I believe last time you were here, you testified that you had an understanding that gross negligence couldn't be charged.

A   Not that it couldn't be charged, but that it was understood in the legislative history as something closer to willful misconduct, one; and, two, that it had never been charged once in 100 years and never convicted under.  So I got that from lawyers in the General Counsel's Office, so Jim Baker, Tricia Anderson, Sally Moyer.  I'm sure there were others, as well.

Q   And that was their explanation of their understanding or that's what they were told by the FBI -- I'm sorry, by Main Justice?

A   I'm sure it was a mix.  I don't remember sitting here today what the mix was.  I remember getting the legislative history myself to read it of the statute, and so I didn't have to rely on anybody else to characterize that for me, but I don't know what the mix was.

Q   All right.  To jump around again, was there any consideration ever to charging anyone else other than Hillary Clinton in connection with the Midyear Exam investigation?

Mr. [        ].  Obviously, it's a yes-or-no question; we can start with that.

Mr. Comey.  I guess I'm struggling with the word "consideration."  So I would say yes.

Mr. Somers.  But there were obviously no charges brought?

Mr. <u>Comey.</u>  Yeah, there weren't any brought that I'm -- certainly that I'm aware of.

Mr. <u>Somers.</u>  Any attempt to leverage anyone with charges to -- for immunity or something else along those lines in the Midyear Exam investigation?

Mr. <u>Comey.</u>  I can't answer that.  I mean, I don't -- I don't remember it clearly enough and wasn't present, obviously, because I'm the Director of the organization with conversations with the lawyers for individual subjects, so it wouldn't surprise me if there were, but I don't know of any.

Chairman <u>Goodlatte.</u>  Mr. Comey did any country other than Russia attempt to influence the 2016 election?

[Discussion off the record.]

Mr. <u>Comey.</u>  I don't think I can answer that, Mr. Chairman.

Chairman <u>Goodlatte.</u>  And what's the reason?

Mr. <u>Comey.</u>  I believe that's across the line the FBI told me to steer -- stay on one side of.

Chairman <u>Goodlatte.</u>  We need a reason why the FBI told you to steer clear of that.

Mr. <u>[      ].</u>  First, I think it is impacting the Special Counsel's Office purview; and, second of all, if you're going so far as to ask who were those investigations may be on, we --

Chairman <u>Goodlatte.</u>  I haven't asked that yet.

Mr. <u>[      ].</u>  I understand that.  I just don't want the witness to blurt something out either.

Chairman <u>Goodlatte.</u>  He doesn't seem disposed to blurt things out.  He can answer a straightforward question of, did any country other than Russia attempt to influence the 2016 election?

Mr. <u>Comey.</u>  So I can give you this answer.  One of the things I don't want to do is give adversaries -- we're in an unclassified setting -- an idea of what we didn't know as well as know, so the answer would be I believe so -- nations other than Russia.

Chairman <u>Goodlatte.</u>  Did the FBI have any evidence that another country was attempting to influence Hillary Clinton or her Presidential campaign?

Mr. <u>Comey.</u>  Mr. Chairman, I want to be careful answering that question because, again, I don't want to give -- a negative answer or a positive answer will give information to an adversary that I don't want to give them, and so I'm sure the FBI maybe could arrange for a briefing of you on that, sir, but I don't think I can responsibly answer that in an open setting.

Chairman <u>Goodlatte.</u>  Did the FBI provide Mrs. Clinton with any defensive briefings during this time?

Mr. <u>Comey.</u>  My recollection is that both candidates were offered, and I think both took counterintelligence briefings from the intelligence community run by the Director of the National Intelligence in which the Bureau participated.

Chairman <u>Goodlatte.</u>  Would those defensive briefings, would they have included discussions and a briefing regarding interference in the campaign?

Mr. Comey.  I don't know for sure.  I think, though, that they were confined to these are the bad guys out there, the things they tried to do, and the kind of things you ought to be aware of as a candidate for President of the United States.  I don't know that it extended to specifics about either this is what may be happening with your campaign or things to watch out for in your campaign.  I just don't know.

Chairman Goodlatte.  Would you have conducted those briefings yourself?

Mr. Comey.  No, the Director of National Intelligence organized them and had participants there from the relevant agencies.  I think, in fact, they were run by the National Counterintelligence Executive, who reported to the Director of National Intelligence, at that point Jim Clapper, and that they ran them and brought in the experts from around the community.  As the Director, I would have had no involvement with that.

Chairman Goodlatte.  We haven't talked about a timeframe, but when it later became clear that the FBI had concerns about individuals that were later the subject of ongoing investigations, was a defensive briefing offered to candidate Trump or later President Trump?

Mr. Comey.  Not to my knowledge, other than the general one we just talked about.

Chairman Goodlatte.  And what would be the reason for not alerting the candidate or the President to the potential

interference?

Mr. <u>Comey.</u>  For the same reason that my general counsel was concerned about me telling the President-elect he wasn't under investigation.  You're going to touch -- even if he is not -- you're going to touch pretty close to him and his campaign, and you would want to be very, very thoughtful about how you did that so you didn't smear innocent people or blow an investigation.

Chairman <u>Goodlatte.</u>  Sure.  Well, this wouldn't be conclusory.  I mean, it wouldn't be like telling somebody he is not under investigation.  It would be simply advising them of things to be cautious about so they don't jeopardize national security or do other things that would be obviously a problem for them individually but also a problem for the country.

Mr. <u>Comey.</u>  I hear what you're saying.  I just, for a variety of reasons, I don't think that happened.

Chairman <u>Goodlatte.</u>  Did the FBI or any government agency ever record President Trump or surreptitiously obtain recordings or transcripts of recordings, whether audio or video, of President Trump?

Mr. <u>Comey.</u>  Not to my knowledge.

Chairman <u>Goodlatte.</u>  And what about recordings or surveillance of his family members?

Mr. <u>Comey.</u>  Not to my knowledge.

Chairman <u>Goodlatte.</u>  Okay.  That's all I have.  Thank you.

Mr. <u>Breitenbach.</u>  Sir --

Mr. <u>Kelley.</u>  Give me one second.

Mr. <u>Breitenbach.</u>  Sure.

Mr. <u>Comey.</u>  Mr. Chairman, it occurs to me I may not have been clear about the difference between a defensive briefing, which I think we talked about earlier, and those intel briefings they got. A defensive briefing, at least in the way I understand the Bureau uses the term, is specific to warn you about someone who may be coming after you or some particular vulnerability, and that's a dicey thing to do when you're investigating people around the person who might be briefed.  The ones that the DNI arrange for are the broader ones saying:  Look, here's what the bad guys do around the world; you should be sensitive to these threats to your networks and those kinds of things.  And I'm worried I confused the two.

Chairman <u>Goodlatte.</u>  I understand, and now that you have made clear your understanding of the distinction between the two, let me ask you again, was Hillary Clinton ever provided with a defensive briefing?

Mr. <u>Comey.</u>  Not to my knowledge, no, nor was President Trump.

Chairman <u>Goodlatte.</u>  -- subject related to her or her campaign?

Mr. <u>Comey.</u>  Not to my knowledge, no.

Chairman <u>Goodlatte.</u>  And was Donald Trump ever provided with a defensive briefing?

Mr. <u>Comey.</u>  No, same answer.  They both got the general

threat briefing but not a defensive briefing in the way I understand the term.

Chairman Goodlatte.  Thank you very much.

Mr. Baker.  Just a quick followup to the chairman's question. Would you as the Director necessarily know about defensive briefings given?

Mr. Comey.  Not in general, but to the President of the United States or to one of the two candidates, very, very unlikely that I wouldn't be told.

Mr. Baker.  Thank you.

Mr. Somers.  Just to clarify that to any candidate Presidential candidate, same question, would you have been aware?

Mr. Comey.  I would expect so.  My mind was going to the period of 2016 when it was candidate Trump and candidate Clinton. I would be very surprised if a defensive briefing was given to them without talking to me first, whether a year earlier when there were 15 or 18 Republican candidates, it is possible that someone would go alert a candidate to a threat without telling me, still unlikely, but not as unlikely as when it is down to two.

Mr. Baker.  Thank you.

Mr. Parmiter.  Sir, good afternoon.  I'm Robert Parmiter with the Judiciary Committee majority staff.  Just a couple of followup questions on recordings, and then I have one other question as we're getting short on time during this hour.  I believe the last time you were here 10 days ago, the subject of the FBI policy on

noncustodial interviews came up and, you know, the recording of those or the nonrecording of those.  Do you recall that discussion?

        Mr. Comey.  I do.

        Mr. Parmiter.  When we had Mr. Papadopoulos before the committee for a transcribed interview, he stated that he believed he had been recorded by multiple individuals, including the FBI. Do you know whether or not that statement is accurate?

        Mr. Comey.  Can I just ask you a question?

        [Discussion off the record.]

        Mr. Comey.  Okay.  Great.  Yes.  I don't know of any such thing.

            BY MR. PARMITER:

        Q    Okay.  Can I show you a New York Times article from April 22nd of last year?  I have got a couple copies of it.  It is entitled "Comey Tried to Shield the FBI from Politics.  Then He Shaped an Election."  It is a lengthy article, and I'm not asking you to read it all right now, but I would like to direct your attention to a couple of quotations.  One is on the first page where the article refers to a couple of quotes that are attributed to you from closed-door meetings.  Do you see where I'm pointing?

        A    I see it.  Yes.  It begins, "Should you consider."

        Q    Right.  There's one there and then there's one in the following paragraph where it starts, "If we ever start considering."  And then so I guess I would ask, you know, did you

authorize disclosures of that information from that meeting to The New York Times?

A    No.

Q    And then I'll direct you to --

A    And I don't know what meeting they're talking about, but I didn't authorize any such disclosure.

Q    Okay.  Let me direct you to another page in here.  I believe on your copy, it is going to be page 4 towards the bottom.  It is a quote from George Toscas, and correct me if I'm wrong, but at the time Mr. Toscas was a Deputy Assistant Attorney General in the National Security Division.  Is that your understanding?

A    Yes.

Q    And the quote from Mr. Toscas, somewhat in jest, says: I guess you're the Federal Bureau of Matters now.

Do you recall the meeting that that occurred in?

A    Yes, I do.

Q    Okay.  And do you recall anyone -- did you authorize any disclosures from that meeting of information to the press?

A    No, no, huh-uh.

      BY MR. BREITENBACH:

Q    Sir, Ryan Breitenbach with Judiciary majority.  You stated earlier something to the effect I wrote down here that you spent a lot of time in the Hillary Clinton email investigation in trying to determine whether there had been any foreign access to any of her emails.  Do you recall saying that today?

A    Yeah, I didn't, but the investigative team did.

Q    That's right.  At any point did you actually learn that a foreign actor had obtained access to any of Hillary Clinton's emails?

A    No.  And, again, but the team said we wouldn't expect to see the digital dust that would indicate that.

Q    Okay.  I just want to introduce into the record an email.  This is I'll give you a copy here.  It is an email from the current, I believe, head of the counterintelligence division Bill Priestap sending to Peter Strzok entitled Midyear Exam, and it is forwarding an email from Peter Strzok to your former chief of staff Jim Rybicki, copying Andrew McCabe, Bill Priestap, and Jonathan Moffa, who I believe is one of the chief analysts on the case.  And I would like you to turn just to, while you're looking at it, to page -- the second page, and there are numbered paragraphs, and please look at paragraph No. 4, and I'll read it out loud.  It says "The state," and it is under a heading "Accuracy/Clarification Considerations," and, again, this is an email sent by Peter Strzok, and it states:  The statement that, quote, we assess it is reasonably likely that hostile actors gained access to Secretary Clinton's private email account is too strong.  It is more accurate to say we know foreign actors obtained access to some of her emails and, parenthetical, including at least one secret one via compromises of the private email accounts of some of the her staffers.

And it goes on.  In reading that statement is that something
that you had ever heard while on this case as Director?

A    Yes.

Q    So would it be accurate to say that, based off of this
statement, that at least one of Hillary Clinton's classified
emails was obtained by a foreign actor?

A    I actually don't remember that piece, but I do remember
being told that a foreign actor had infiltrated someone's email
account with whom she occasionally emailed and obtained access to
their email, so it would include emails the Secretary had sent
back and forth with that person.  I don't remember being told that
one of those was classified.

Q    You don't remember -- you weren't on this particular
email, but you don't recall Peter Strzok or anybody on your
investigative team indicating that, despite the fact that the
access by the foreign actor had been through, according to this,
some of her associate's email accounts, that at least some of her
email -- at least one in this case, marked secret had been
accessed by a foreign actor?

A    First of all, there were no emails that I ever saw that
were marked secret, but I don't remember ever being told that an
email Hillary Clinton sent to another person was then obtained by
a foreign adversary and that that email contained classified
information.

Q    Does it surprise you to see this statement at the

moment?

        A    The only piece of it being the piece about one of them
being -- containing secret information.  I remember being told
somebody she is emailing with -- she emailed a lot of
people -- one person she is emailing with, that person's Gmail
account, I think it was, has been penetrated by a foreign
adversary, and because they penetrated it, they're getting
everything in that person's inbox.  In that inbox, among the
hundreds of emails, are email communications with Hillary Clinton,
not that the adversary got into Hillary Clinton's system.  That's
what I remember.  I don't remember being told that one of the
emails harvested by the foreign adversary from that other person's
Gmail box contained secret information.  I don't remember that.

        Q    Do you think that would have changed at all in any way
your analysis of the case by knowing that a foreign actor had, in
fact, accessed some of her email?

        A    No.

        Q    And, in fact, not only some of her email, but according
to this statement, a secret email?

        A    No.  It wouldn't have.  I would have been keen -- what
I'm worried about is people reading this transcript is they're not
going to understand what you and I are talking about.  I never saw
any evidence -- and if you have it, I would love to see it -- that
a foreign adversary gained access to Hillary Clinton's email
server.  This is about people out the spokes of the wheel, one of

the persons who got emails from her had their system hacked, and the adversary got it that way; that I knew.  It doesn't change my view of the case at all.  I didn't know that -- and I don't even know today whether it is true -- that one of those in that guy's email box contained secret information and that the adversary likely got that.  I didn't know that.  That wouldn't change my view of the case overall.

Q   Well, all we know is what Peter Strzok is reporting here, that a classified email of Mrs. Clinton's had been obtained by a foreign actor, and as I understand it, you did not know that, within another associate's emails, that, in fact, one of Mrs. Clinton's emails that had been classified was, in fact, accessed by a foreign actor?

A   We're going down this rabbit hole again.  None of them have been classified.  They all contained discussions about stuff that was secret.  I did not know, and it wouldn't change my view, but I didn't know, at least I don't think I did, that there was one of those in somebody else's email box that an adversary might have gotten access to.  I didn't know that.

Mr. Breitenbach.  Okay.  Thank you.

BY MS. SHEN:

Q   Hi.  We're back on the record.  Director Comey, I just had one quick followup question.  I believe last round there was discussion about defensive briefings to the campaign, and I believe at one point you said that you did not -- the FBI did not

provide defensive briefings to either the Trump campaign or the Clinton campaign, correct?

A    Correct.  And I distinguished those from general threat briefings.

Q    And I believe you also said that, not only did they not happen, but you would not have considered giving a defensive briefing to the Trump campaign regarding the four individuals that were under investigation.  Is that correct?

A    Correct.

Q    And can you explain why?

A    Because the investigations were under way.  It was early.  We didn't know whether we had anything.  We wouldn't want to either alert people that we were investigating them or, by doing a defensive briefing, smear people who were innocent.  And the candidate himself was not under investigation, but people around were, and so you risk both of those harms by alerting the candidate to the investigation: smearing innocent people and also alerting them to your ongoing investigation.

Q    And so you didn't see any pros to giving defensive briefing?  I understand the risk that you're outlining, but were there any other considerations that you had that might lead you to want to give such a defensive briefing to the Trump campaign?

A    Not that I was aware of.

Ms. Shen.  Okay.  Thank you.  That's the end of our round.

Ms. Sachsman Grooms.  So thank you very much.  We're done for

the day.

        [Whereupon, at 3:18 p.m., the interview was concluded.]