**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:17-cv-60426-UU

ALEKSEJ GUBAREV, *et al.*,

      Plaintiffs,

v.

BUZZFEED, INC., *et al.*,

      Defendants.

_____/

**ORDER**

THIS CAUSE comes before the Court upon Defendants' Motion for Summary Judgment (D.E. 214/226)[1].  For the reasons discussed below the motion is granted.

**BACKGROUND**

The facts recited below are undisputed except as otherwise noted.

**I.**      **The Parties**

Plaintiff Aleksej Gubarev is a resident of the Republic of Cyprus.  D.E. 212-2 ¶ 3.  Until January 1, 2018, he was the chairman and CEO of Plaintiff XBT Holdings S.A. ("XBT").  *Id.* ¶ 1. XBT is a Luxembourg company.  D.E. 38 ¶ 7.  Plaintiff Webzilla, Inc. ("Webzilla"), which is a Florida corporation, is a subsidiary of XBT.  *Id.* ¶ 8; D.E. 212-2 ¶ 2.

Defendant BuzzFeed, Inc. ("BuzzFeed") is a Delaware corporation with offices in eighteen cities around the world, including New York.  D.E. 38 ¶ 9.  Defendant Ben Smith is BuzzFeed's editor-in-chief, and he resides in Brooklyn, New York.  *Id.* ¶ 10.

---

[1] Docket entries 214 and 226 are the same motion, the former filed under seal and the latter unsealed.

## II.    **The Dossier**

This case arises out of Defendants' decision to publish an article on January 10, 2017, entitled *These Reports Allege Trump Has Deep Ties to Russia* (the "Article"), which included a 35-page dossier (the "Dossier").  D.E. 1-3 ¶ 1; D.E. 38 ¶ 1; D.E. 1-2, p. 19–21.  In the Article, BuzzFeed described the Dossier as a compilation of memoranda assembled "for political opponents of Trump by a person who is understood to be a former British Intelligence agent." D.E. 1-2 p. 20.  The last of the seventeen memoranda ("Report 166" or "the Report"), dated December 13, 2016, contains statements about Plaintiffs.   As published by BuzzFeed, the pertinent portion of the Report appeared as follows:

> ████████ reported that over the period March-September 2016 a company called XBT/Webzilla and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data, and conduct "altering operations" against the Democratic Party leadership.  Entities linked to one Alexei GUBAROV [sic] were involved and he and another hacking expert, both recruited under duress by the FSB,[2] Seva KAPSUGOVICH were significant players in this operation. In Prague, COHEN[3] agreed [sic] contingency plans for various scenarios to protect the operation, but in particular what was to be done in the event that Hillary CLINTON won the presidency.  It was important in this event that all cash payments owed were made quickly and discreetly and that cyber and other operators were stood down/able to go effectively to ground to cover their traces. (We reported earlier that the involvement of political operatives Paul MANAFORT and Carter PAGE in the secret TRUMP-Kremlin liaison had been exposed in the media in the run-up to Prague and that damage limitation of these also was discussed by COHEN with the Kremlin representatives).

D.E. 1-3 ¶ 26, D.E. 1-2 p. 19–21.

> The Article included the following disclaimers:

> The dossier, which is a collection of memos written over a period of months, includes specific, unverified, and potentially unverifiable allegations . . . . BuzzFeed News reporters in the US and Europe have been investigating various alleged facts in the dossier but have not verified or falsified them . . . [The Dossier] is not just unconfirmed: It includes some clear errors.

---

[2] FSB refers to the Russian intelligence service.
[3] "COHEN" refers to Michal Cohen, then-candidate Donald Trump's lawyer.  D.E. 1-2, p. 18.

*Id*. ¶ 3, D.E. 1-2, p. 20.

Plaintiffs allege that the Dossier's statements about them are false.  D.E. 1-3 ¶ 27. Plaintiffs also allege that, although BuzzFeed tasked its reporters with investigating the allegations, Defendants never contacted Plaintiffs to determine whether the allegations that they hacked the Democratic Party had merit.  *Id*. ¶ 28; D.E. 38 ¶ 28.  Plaintiffs assert that because Defendants could not verify the Dossier and knew that it contained "some clear errors," Defendants published it without reasonable care for, or with reckless disregard as to, the truth. *Id*. ¶ 43.  They go on to allege that Defendants' decision to publish the Dossier defamed them. *Id*. ¶ 51.

Defendants assert, among other affirmative defenses, that their decision to publish the Dossier is protected by the fair report privilege.  D.E. 32.

### III.    The Origins of the Dossier

In the fall of 2015, Fusion GPS ("Fusion"), a private research firm headed by Glenn Simpson, was retained—first by a Republican and later by a law firm working for the Democratic National Committee—to conduct research on Donald Trump.  D.E. 214-2 ¶ 7. Fusion retained Orbis Business Intelligence Limited ("Orbis") to investigate business ties between Trump and Russian interests.  *Id*.  Orbis was founded by Christopher Steele, who worked for the Foreign and Commonwealth Office from 1987 until 2009.  *Id*.; D.E. 214-19, 31:11–20.  From 1990 to 1993 he served as Second Secretary in Moscow.  D.E. 214-19, 31:11– 20.[4]

During the course of his research, Steele received information that Russia was interfering in the 2016 presidential election to support Trump and that Russia held compromising

---

[4] Defendants assert that Steele was, in fact, an agent for MI6, based on Glenn Simpson's testimony to that effect. Plaintiffs, however, deny that assertion on the grounds that Simpson's testimony is based on inadmissible hearsay and Steele refused to testify about what he did during or after his time with the Foreign and Commonwealth Office.

information about the candidate. D.E. 214-2 ¶ 8.  Steele took the information he found credible and wrote a total of seventeen reports, which became the Dossier.  *Id*. ¶ 9.  In deciding what he found credible, Steele weighed the possibility that his sources might try to provide false information.  *Id*.

IV.  **Government Officials Receive Portions of The Dossier**

According to two congressionally drafted memoranda (the "Nunes Memo" and "Schiff Memo"), Steele had been a "longtime FBI source" who had credibly reported on Russia and other matters for several years.[5]  *Id*. ¶ 10; 214-30 (Nunes Memo); 214-31 (Schiff Memo).  Steele shared his research with an FBI agent until late October 2016.[6]  D.E. 214-2 ¶¶ 11–12; Nunes Memo, p. 5; Schiff Memo, p. 3.  Steele also shared his research with Associate Deputy Attorney General Bruce Ohr.  Nunes Memo, pp. 4–6; Schiff Memo, p 7.  However, before receiving Steele's reports, the FBI had opened a counterintelligence investigation into potential links between Russia and the Trump campaign.  D.E. 214-2 ¶ 13; Nunes Memo, pp. 4–6; Schiff Memo, pp. 2–3.

The FBI terminated its relationship with Steele in October 2016 after Steele spoke with journalists. D.E. 214-2 ¶ 17.  Nevertheless, after Steele's termination, an independent unit within the FBI conducted a "source validation" assessment of the credibility of Steele's reports.  *Id*. ¶ 19; Nunes Memo, p. 5.  Additionally, the Department of Justice used Steele's reports, as well

---

[5] Plaintiffs object to these facts as based on hearsay and unauthenticated documents.  Both of these objections lack merit.  Federal Rule of Evidence 803(A)(iii) provides an exception from the hearsay rule in a civil case for "factual findings from a legally authorized investigation."  In a discovery dispute arising out of this case, Judge Mehta of the District Court for the District of Columbia stated that it "can't be any clearer" that the facts contained in the Nunes Memo and other congressional memoranda are admissible under 803(A)(iii).  D.E. 255-2, p. 10. The Court agrees. As to authentication, congressional reports are self-authenticating pursuant to Rule of Evidence 902(5); *see also Schaghticoke Tribal Nation v. Kempthorne*, 587 F. Supp. 2d 389, 397 (D. Conn. 2008), aff'd, 587 F.3d 132 (2d Cir. 2009); 2 McCormick On Evid. § 229.1 (7th ed.).  Because these objections lack merit and Plaintiffs do not otherwise dispute these facts, the Court considers them undisputed for the purposes of this motion pursuant to Federal Rule of Civil Procedure 56(e)(2).

[6] At this point in time, Report 166 had not yet been written.  That memorandum was not written until December 13, 2016.  D.E. 1-3 ¶ 26.

as other source material, in its applications to obtain and renew a Foreign Intelligence Surveillance Act ("FISA") warrant to conduct surveillance on Carter Page, a Trump advisor that the FBI believed had been targeted for recruitment by Russian intelligence.  D.E. 214-2 ¶¶ 15, 46; Nunes Memo, p. 4; D.E. 214-33.

In November 2016, Senator John McCain and his chief of staff, Christopher Brose, attended the Halifax International Security Forum.  D.E. 214-2 ¶ 20.  There, they met David Kramer, a former Deputy Assistant Secretary of State responsible for Russia, Ukraine, Belarus, and Moldova.  *Id*. ¶ 21.  They also met Sir Andrew Wood, the former British Ambassador to Russia and an informal advisor to Orbis.  *Id*. ¶ 20.  Wood told the three others that he was aware of information collected by Steele suggesting that Russia both colluded with the Trump campaign and had compromising information about the candidate.  *Id*. ¶ 23.  McCain asked Kramer to go to London to meet with Steele, which he did on November 28.  *Id*. ¶ 23.  Kramer read the sixteen extant reports (again, Report 166 had not yet been written) in London and later obtained copies of them from Glenn Simpson in Washington, D.C.  *Id*. ¶¶ 25–28.

On November 30, Kramer met with McCain and Brose in Washington, D.C., where they reviewed Steele's reports.  *Id*. ¶ 28.  Kramer advised McCain to share the reports with the FBI and the CIA.  *Id*. ¶ 29.  Some days after that meeting, at McCain's behest, Kramer met with Victoria Nuland, the Assistant Secretary of State for Europe and Eurasia Affairs, and Celeste Wallender, the Senior Director for Russian Affairs at the National Security Council ("NSC"), to see if the Dossier "was being taken seriously."  *Id*. ¶ 30; D.E. 214-16, 113:1–117:11.  The two officials were aware of the existence of the Dossier and of Steele, whom they believed to be credible, but Kramer did not share the Dossier with them.  D.E. 214-16, 115:1–117:24.  After

those meetings, on December 9, McCain met with James Comey, the FBI Director, and gave him the first sixteen reports.  *Id.* ¶ 31.

## V.      Steele Drafts and Shares Report 166

On December 13, Steele wrote the last of the seventeen reports, Report 166, which names Plaintiffs.[7]  *Id.*  As with the sixteen prior reports, Steele compiled Report 166 using information he found credible.  *Id.* ¶ 32.  Steele gave Report 166 to Kramer, an unnamed senior British security official, Ms. Wallender at the NSC, Representative Adam Kinzinger (R-Ill.), and House Speaker Paul Ryan's Chief of Staff, John Burks.  *Id.* ¶¶ 34–39.  The record does not reveal what, if anything, these people did with the Report.  At some point prior to BuzzFeed's publication of the full Dossier, the FBI also possessed Report 166.  D.E. 214-11 ¶ 6 (FBI Declaration).

## VI.     Intelligence Directors Brief The President and President-Elect

On December 6, President Obama ordered an inter-agency assessment of Russian interference in the presidential election, which included the CIA, FBI, and NSA.  D.E. 214-2 ¶ 41; D.E. 214-36, pp. 38–39 (House Permanent Select Committee on Intelligence *Report on Russian Active Measures* ("HPSCI Report")).[8]  According the HPSCI report, an Intelligence Community Assessment ("ICA") was prepared on January 5, 2017, and shared with President Obama.  HPSCI Report, p. 37 n.16, p. 110 n.47.  Former CIA Director John Brennan testified before the Committee that the Dossier was not used as a basis for the ICA.  *Id.*, p. 110 n.47. However, in late December 2016, NSA Director Michael Rogers clarified that a two-page summary of the Dossier was added as an appendix to the ICA and that consideration of the

---

[7] The parties dispute whether Steele was still engaged by Fusion GPS when he authored the final report.
[8] As with the Nunes and Schiff reports, Plaintiffs object to facts derived from the HPSCI Report as derived from hearsay and/or unauthenticated documents.  For the same reasons as discussed in footnote 5 above, these objections lack merit.

appendix was part of the overall ICA review and approval process.[9]  *Id*.  In early January, at some point prior to BuzzFeed's publication of the Dossier, Brennan, Rogers, and former Director of National Intelligence, James Clapper, briefed President Obama about allegations in the Dossier.  D.E. 214-2 ¶ 44; D.E. 214-11 ¶ 6; HPSCI Report, p. 107.  Around the same time, intelligence community officials, including James Comey, briefed President-elect Trump about allegations in the Dossier.  HPSCI Report, p. 107; Nunes Memo, p. 5.

### VII.   BuzzFeed Obtains and Publishes the Dossier

On December 29, 2016, BuzzFeed reporter Ken Bensinger met with David Kramer at the McCain Institute.  D.E. 214-2 ¶ 48.  Kramer reviewed with Bensinger what he knew about the Dossier and explained that he took the allegations seriously.  *Id*.  Bensinger found Kramer to be a serious and credible Russia expert.  *Id*.  Kramer showed Bensinger the Dossier and told him that "some of the information was unverified."  *Id*. ¶ 50.  Bensinger left that meeting with copies of all seventeen memos.[10]  *Id*. ¶ 49; D.E. 234-2 ¶ 49.

He brought the Dossier to Mark Schoofs, BuzzFeed's senior editor in charge of investigative reporting.  *Id*. ¶ 52.  Schoofs decided that BuzzFeed should investigate some of the allegations in the Dossier and tasked reporters with doing that.  *Id*. ¶¶ 52–53.  BuzzFeed did not, however, investigate any of the allegations concerning Plaintiffs.  D.E. 234-5, p. 124.  Neither did BuzzFeed attempt to contact Plaintiffs.  D.E. 287-1.

On January 10, 2017, CNN reported the existence of the Dossier, the preparation and presentation of the two-page synopsis, the presidential briefings, and that the FBI was investigating the credibility of the allegations contained in the Dossier.  D.E. 214-2 ¶ 55.  The

---

[9] The two-page synopsis is not in the record and its contents are not known to the Court.
[10] The parties dispute whether Kramer gave Bensinger a copy or whether Bensinger took photos of the Dossier when Kramer was not looking.  Kramer testified that Bensinger took photos of the Dossier when Kramer was out of the room, even though he asked Bensinger not to.  D.E. 214-16, 62:4–12.  In a later declaration, Kramer stated that he had no objection to Bensinger taking a hard copy and had provided hard copies to other journalists.  D.E. 214-10 ¶ 3.

CNN article did not mention Plaintiffs.  D.E. 214-5, pp. 10–12.  After seeing the CNN article, Bensinger and Ben Smith decided to publish the Dossier with their own article on the BuzzFeed website.  D.E. 214-2 ¶ 56.  Smith knew that some of the allegations in the Dossier were unproven and that readers could reasonably doubt their veracity.  D.E. 214-2 ¶ 59.  Consistent with his concerns, BuzzFeed stated that the Dossier "includes specific, unverified, and potentially unverifiable allegations . . . ."  D.E. 1-2, pp. 19–21.  BuzzFeed also included a hyperlink to the CNN article and explained that CNN reported "that the two-page synopsis of the report was given to President Obama and Trump."  *Id.*

About three hours after publishing its article, BuzzFeed revised it by adding statements from the President-elect, Kellyanne Conway, and Michael Cohen denying the Dossier's claims. *Id*. ¶ 62.  BuzzFeed also redacted information pertaining to one source named in the Dossier, but Smith refused to redact other sources because he thought the Dossier was of grave national importance.  *Id*. ¶ 63.  In early February, 2017, BuzzFeed redacted Plaintiffs' names from the Dossier as it appeared on BuzzFeed's website.  D.E. 287-1, pp. 4–5.

## PROCEDURAL HISTORY

Defendants removed this case from the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida, on February 28, 2017.  D.E. 1.  On June 29, 2018, Defendants answered Plaintiffs' one count complaint for defamation.  D.E. 38.  In their answer, Defendants asserted affirmative defenses including the fair report privilege and the neutral report privilege.  *Id*.  Defendants also asserted as an affirmative defense, *inter alia*, Plaintiffs' status as public figures who, therefore, could not prove that the Defendants acted with actual malice when they published the Dossier.  *Id*.

During discovery and at the Court's invitation, Plaintiff filed a motion for judgment on the pleadings with respect to Defendants' two privilege defenses: the neutral report privilege and the fair report privilege.  D.E. 115.  In deciding that motion, the Court ruled that New York law, rather than Florida law, governed these affirmative defenses.  The Court further ruled that New York law does not recognize the neutral report privilege, and so granted the motion for judgment on the pleadings with respect to that affirmative defense.  D.E. 171, pp. 19–21.  As to the fair report privilege, the Court denied the motion because it could not "conclude as a matter of law that the Article [was] other than a fair and true report of an official proceeding."  *Id*., p. 18.  In deciding that motion, the Court took as true the allegations in the Complaint and drew all reasonable inferences in Defendants' favor.  *Id*. pp. 4–5.

Discovery closed on June 15, 2017, although certain discovery requests to and disputes with non-parties remained pending through the end of July.  Thereafter, the parties filed cross motions for summary judgment.  D.E. 208, 225, 214/226.  Both parties moved for summary judgment on Defendants' affirmative defense that Plaintiffs were public figures at the time of the alleged defamation.  Defendants also moved for summary judgment on their defense of the fair report privilege and on the elements of Plaintiffs' claim, arguing that the allegedly libelous statements were not defamatory and that Plaintiffs could not prove the requisite degree of fault necessary to sustain their claim.

## **LEGAL STANDARD**

Summary judgment is authorized only when the moving party meets its burden of demonstrating that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. When

determining whether the moving party has met this burden, the Court must view the evidence and all factual inferences in the light most favorable to the non-moving party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Rojas v. Florida*, 285 F.3d 1339, 1341-42 (11th Cir. 2002).

The party opposing the motion may not simply rest upon mere allegations or denials of the pleadings; after the moving party has met its burden of proving that no genuine issue of material fact exists, the non-moving party must make a showing "sufficient to establish the existence of an essential element of that party's case, and on which that party will bear the burden of proof at trial." *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997); *Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir. 1989).

If the record presents factual issues, the Court must not decide them; it must deny the motion and proceed to trial. *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981). Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co. v. Cont'l Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969). If reasonable minds might differ on the inferences arising from undisputed facts, then the Court should deny summary judgment. *Impossible Elec. Techs., Inc. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1031 (5th Cir. 1982); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

Moreover, the party opposing a motion for summary judgment need not respond to it with evidence unless and until the movant has properly supported the motion with sufficient

10

evidence. *Adickes*, 398 U.S. at 160. The moving party must demonstrate that the facts underlying the relevant legal questions raised by the pleadings are not otherwise in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 611-12 (5th Cir. 1967). The Court must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 255.

## ANALYSIS

### I. The Fair Report Privilege

Defendants argue that the record establishes that their decision to publish the Dossier is protected by the fair report privilege. The Court discussed the fair report privilege at length in its order on the motion for judgment on the pleadings. *See* D.E. 171. In that order, the Court determined that New York law applied, and made several rulings relevant to the present motion.[11] First, in accordance with New York law, the Court ruled that the term "official proceeding" applied broadly to "any actions taken by a person officially empowered to do so." D.E. 171, p. 15 (internal quotations omitted). Second, the Court ruled that BuzzFeed could rely on the official actions recounted in the CNN article to which the BuzzFeed article hyperlinked, even though BuzzFeed's article itself did not recount sufficient official action. *Id*., pp. 16–17. Third, taking the facts set forth in the Article and the hyperlinked CNN article as true, the Court ruled that an official proceeding would exist with respect to the Dossier. *Id*., p. 18. The CNN article stated that four intelligence directors gave classified briefings about the Dossier to the President and President-elect and that the FBI was investigating the truth of the Dossier's allegations. *Id*. Lastly, the Court ruled that the Article seemed to describe official action that

---

[11] No party has sought reconsideration of the ruling, and the Court perceives no reason to change that ruling at this juncture.

encompassed the allegations in the Dossier that concerned Plaintiffs. *Id.* p. 18. The Court explained:

> The Dossier alleges that Plaintiffs were part of a cyber-operations scheme coordinated, at least in part, by Michael Cohen and the FSB. The Article includes a statement from Michael Cohen denying all of the allegations in the Dossier. Meanwhile, the hyperlinked CNN article reports that the classified briefings concerned allegations about communications between the Trump campaign and the Russians. Thus, the official action as described would appear to include the allegations about Plaintiffs. Regardless, it would undermine the privilege to require that one who reports on official action tie every specific allegation in the report to a specific instance of official action. *See, e.g.*, *Reuber*, 925 F.2d at 712 ("In return for frequent and timely reports on governmental activity, defamation law has traditionally stopped short of imposing extensive investigatory requirements on a news organization reporting on a governmental activity or document."); *see also Holy Spirit Ass'n,* 49 N.Y.2d at 68 (holding that the court should not dissect a report with "a lexicographer's precision.").

*Id.*

The Court acknowledged, however, that its rulings on that motion did not mean that Defendants were, in fact, protected by the privilege—only that they might be. *Id.* pp. 18–19 ("application of the privilege turns on whether facts essential to its application are undisputed").

## A.  Scope of The Privilege

The fair report privilege is codified in New York Civil Rights Law section 74, which reads:

> A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published.

> This section does not apply to a libel contained in any other matter added by any person concerned in the publication; or in the report of anything said or done at the time and place of such a proceeding which was not a part thereof.

The purpose of this statute is to protect reports of proceedings which are "made in the public interest." *Williams v. Williams*, 23 N.Y.2d 592, 599 (N.Y. 1969). The press acts as the

agent of the public, gathering and compiling diffuse information in the public domain.  The press

also provides the public with the information it needs to exercise oversight of the government

and with information concerning the public welfare.  The fair report privilege exists to protect

the press as it carries out these functions.  *See, e.g.*, *Reuber v. Food Chem. News, Inc.*, 925 F.2d

703, 714 (4th Cir. 1991) (holding that the privilege exists so that the press is not punished for

serving its basic function).

New York courts have extended the term "official proceeding" to cover any official

investigation, even if it is not open to the public.  *See, e.g.*, *Freeze Right Refrigeration & Air

Conditioning Servs., Inc. v. City of New York*, 101 A.D.2d 175, 475 N.Y.S.2d 383 (1984) (New

York City Department of Consumer Affairs investigation); *Fine v. ESPN, Inc.*, 11 F. Supp. 3d

209 (N.D.N.Y. 2014) ("New York courts have broadly interpreted the meaning of an official

proceeding as used in Section 74") (collecting cases) (internal quotations omitted).  The test is

whether the "report concerns actions taken by a person officially empowered to do so."  *Freeze

Right*, 101 A.D.2d at 182 (internal quotation marks omitted) ("The report is protected as long as

it concerns activities which are within the prescribed duties of a public body.").

There are, however, two important limitations on this privilege.  First, there must be more

than a mere "overlap" between the subject matter of the report and the subject matter of the

proceeding: "the ordinary viewer or reader must be able to determine from the publication itself

that the publication is reporting on a proceeding."  *Fine*, 11 F. Supp. 3d at 216; *see also Wenz v.

Becker*, 948 F. Supp. 319, 323 (S.D.N.Y. 1996) ("If the context in which the statements are made

make[s] it impossible for the ordinary viewer to determine whether defendant was reporting [on

a proceeding], the absolute statutory privilege does not attach.") (internal quotations omitted).

And second, a formal proceeding must be underway at the time of publication.  *See, e.g.*,

*Abakporo v. Sahara Reporters*, No. 10 CV 3256 RJD VVP, 2011 WL 4460547 (E.D.N.Y. Sept. 26, 2011) (refusing to apply the privilege to a complaint sent to law enforcement where the complaint was not itself government action and did not initiate an investigation); *Komarov v. Advance Magazine Publishers, Inc.*, 180 Misc. 2d 658, 660 (N.Y. Sup. Ct. 1999) (holding that the privilege applies "to any pleading made within the course of the proceeding" and "to affidavits submitted in the proceeding.").

Where, as here, the parties have submitted the allegedly defamatory materials to the Court, the Court "may determine as a matter of law whether allegedly defamatory publications are 'fair and true' reports of official proceedings.'" *Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 457 (E.D.N.Y. 2013) (quoting *Fine v. ESPN, Inc.*, No. 12–CV–0836, 2013 WL 528468, at *3 (N.D.N.Y. Feb. 11, 2013)). And in making this determination, "the language used [in the report] should not be dissected and analyzed with a lexicographer's precision." *Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*, 49 N.Y.2d 63, 68 (1979).

### B. BuzzFeed Need Not Show Official Action with Respect to the Specific Allegations Concerning Plaintiffs

Defendants argue that their decision to publish the Dossier is protected because the record shows that the President and President-elect were briefed on the Dossier, and that the FBI investigated the truth of the Dossier and Carter Page's alleged connection to Russian intelligence. They are correct about the record, to a point. Intelligence community officials including Directors Brennan, Rogers, Clapper, and Comey briefed the President and President-elect about allegations in the Dossier. D.E. 214-2 ¶ 44; HPSCI Report, p. 107; Nunes Memo, p. 5. The FBI conducted a "source validation" assessment of the Dossier. D.E. 214-2 ¶ 19; Nunes Memo, p. 5. And the DOJ used the Dossier with other information to obtain and renew a FISA

warrant directed at Carter Page.   D.E. 214-2 ¶¶ 15, 46; Nunes Memo, p. 4; D.E. 214-33.   But missing from the record is whether the particular allegations about Plaintiffs were specifically the subject of these official actions.

Plaintiffs argue that Defendants cannot claim the privilege for that very reason.   They emphasize that the Dossier is not a single document but, rather, a collection of seventeen reports. And although the FBI admitted that it had a copy of Report 166 prior to BuzzFeed's publication of the full Dossier, the record does not reveal what, if any, official action was taken with respect to it.   *See* D.E. 214-11 ¶ 6.   Similarly, although the FBI admitted that President Obama was briefed about the Dossier, the record does not reveal whether information from Report 166 was part of that briefing.   *See id*.   Accordingly, Plaintiffs argue that Defendants cannot claim the privilege as a matter of law because they cannot show conclusively that the allegedly defamatory statements themselves were subject to official action.

As discovery has fleshed out the facts, the issue of whether there was official action with respect to the specific allegations about Plaintiffs has taken on more importance than previously. Distilled to its essence, Defendants' motion turns on the following question: may Defendants claim the privilege's protection when the record reveals that certain parts of the Dossier were subject to official action but does not reveal whether the specific allegations about Plaintiffs were subject to official action?  For the reasons discussed below, the answer is: yes.

The Court begins again with the text Section 74.  The second paragraph of that statute exempts from the privilege "anything said or done at the time and place of such a proceeding which was not a part thereof."  N.Y. Civ. Rights Law § 74.  Based on this provision, Plaintiffs take the position that Defendants must show that the particular statements about them were subject to official proceedings.  But Defendants respond that New York law does not require that

level of granularity; they have satisfied their burden by showing that the Dossier was subject to official action.  Alternatively, they argue that they have satisfied their burden because they have shown that parts of Report 166 were subject to official action (namely, those portions concerning Carter Page, and those concerning Russian connections with the Trump campaign) and that is sufficient to protect their publication of the whole Report.

How close the connection between the challenged Report and the official proceeding must be "has not been clearly defined." *Fine*, 11 F. Supp. at 216–17.  But as discussed previously, a report is to be given a degree of liberality.  *See* D.E. 171, p. 18 ("[I]t would undermine the privilege to require that one who reports on official action tie every specific allegation in the report to a specific instance of official action.") (citing *Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*, 49 N.Y.2d 63, 68 (1979) (holding that reports of official proceedings "must be accorded some degree of liberality" and "the language used [in the report] should not be dissected and analyzed with a lexicographer's precision."); *Alf v. Buffalo News, Inc.*, 21 N.Y.3d 988, 990, 995 N.E.2d 168, 169 (2013) (holding that to claim the privilege a report need not be more than "substantially accurate.")).  Additionally, New York law does not require line-by-line review of the report.  *See id.*  And lastly, Section 74 has been given "broad construction" such that "reports that bear a more attenuated relationship to a proceeding have been deemed sufficiently connected."  *Fine*, 11 F. Supp. at 217 (citing, among others, *McNally v. Yarnall*, 764 F.Supp. 853, 856 (S.D.N.Y.1991) (statement by attorney that "relate[d] directly to a *possible* position" his clients might take in pending litigation was sufficiently related to that proceeding (emphasis added)); *Fishof v. Abady*, 280 A.D.2d 417, 720 N.Y.S.2d 505, 505 (2001) (holding that privilege "extends to the release of background material with regard to the [proceeding]")).

Here, Report 166 discusses two issues that were indisputably the subject of official action.  First, the Report discusses allegations of cooperation between Trump's "team" and Russian operatives.  D.E. 1-2 pp. 19–21.  And, as described in the Nunes and Schiff Memos, the FBI was investigating those connections.  D.E. 214-2 ¶ 13; Nunes Memo, pp. 4–6; Schiff Memo, pp. 2–3.  Second, Report 166 references earlier reports in the Dossier about Carter Page's alleged relationship with Russian intelligence.  D.E. 1-2 p. 19 ("We reported earlier that the involvement of political operatives Paul MANAFORT and Carter PAGE in the secret TRUMP-Kremlin liaison had been exposed by the media in the run-up to Prague and that damage limitation of these was also discussed by COHEN with the Kremlin representatives.").  The FBI was investigating whether Carter Page was recruited by Russian intelligence, the DOJ obtained a FISA warrant to surveil him, and, in January 2017, the DOJ sought renewal of that warrant based, in part, on information contained in the Dossier.  D.E. 214-2 ¶¶ 15, 46; Nunes Memo, p. 4; D.E. 214-33.  Those portions of Report 166, therefore, are plainly covered by the privilege.  And in accordance with Section 74's broad construction and the degree of liberality which a media report is afforded, so too, by extension, is the remainder of the Report.  *See Fine*, 11 F. Supp. at 217.

Plaintiffs have cited to a number of cases in support of their argument that line-by-line scrutiny of Report 166 is required, but those cases are factually distinct and unpersuasive.  For example, Plaintiffs cite *Greenberg v. Spitzer*, 155 A.D.3d 27 (N.Y. App. Div. 2017), as a case in which the court reviewed a statement line-by-line and held that some parts of it were protected while others were not.  There, the defendant went on television and discussed a lawsuit pending against the plaintiff.  *Greenberg*, 155 A.D.3d at 33–34.  The defendant restated some allegations from the complaint but also made statements that went beyond the complaint.  *Id*.  The latter

statements were held not covered by the privilege. *Id.* at 47–48; *see also Freidman*, 884 F.3d at 95 (parsing an article summarizing a lawsuit); *Freeze Right Refrigeration & Air Conditioning Servs., Inc. v. City of New York*, 101 A.D.2d 175 (1984) (same).

These cases are fundamentally different from the present case. In those cases, the allegedly defamatory statements summarized, restated, and editorialized upon official proceedings. It was right in those cases to parse the statements line-by-line because the privilege obligates the press to faithfully recount official proceedings. *See Freidman*, 884 F.3d at 95. But here, BuzzFeed did not editorialize or restate the Dossier; it simply published it. *See* D.E. 171, p. 14. To go line-by-line to determine if official action existed with respect to each statement in Report 166 would not impose on BuzzFeed a duty to faithfully recount official proceedings, but instead, would impose on BuzzFeed a duty to investigate extensively the allegations of the Dossier and to determine whether the government was investigating each separate allegation. Defamation law does not impose that requirement on the press. *Reuber*, 925 F.2d at 712 (4th Cir. 1991) ("In return for frequent and timely reports on governmental activity, defamation law has traditionally stopped short of imposing extensive investigatory requirements on a news organization reporting on a governmental activity or document.").

Indeed, such a line-by-line review would curtail the scope of the privilege and thus restrict the press's ability to serve its basic function. *See Reuber*, 925 F.2d at 712 (4th Cir. 1991). As discussed above, the privilege exists to protect the media while they gather the information needed for the public to exercise effective oversight of the government. *Williams*, 23 N.Y.2d at 599; Dan B. Dobbs, Paul T. Hayden and Ellen M. Bublick, *The Law of Torts* § 548 (2d ed.) ("The privilege is based in part on the principle that government activities must always be conducted in the daylight of public scrutiny . . . ."). And, at least in New York, the privilege

protects the media even when they report on official action that the government would like to keep secret. *See, e.g.*, *Freeze Right*, 101 A.D.2d at 175.

For these reasons, the Court concludes that the Article reported on an official proceeding for the purposes of the fair report privilege.

## C.  The Article is "Fair and True"

Defendants argue that the Article is fair and true because it accurately reproduces the Dossier. *See* D.E. 171, p. 14.  Plaintiffs' argument here overlaps substantially with their argument that Defendants cannot show that there was an official proceeding.  They argue that because Defendants cannot show that the particular statements about Plaintiffs were subject to official action, Defendants' decision to publish the Dossier leads the average reader to mistakenly believe that the allegations about Plaintiffs were taken more seriously by government officials than they actually were. *See* Opp. pp. 3–6.

Specifically, Plaintiffs argue that the Article falsely elevates the importance of the allegations by collectively referring to the Dossier as "the documents" without distinguishing between all of the individual reports.  They point out that the Article says that former Senator Harry Reid had seen "the documents" before sending a letter to the FBI, but Reid did not see Report 166 when he sent that letter because it had not been written yet.  D.E. 235-5, p. 143. Additionally, they point out that the hyperlinked CNN article reported that Senator McCain provided James Comey with a "full" copy of the Dossier, but the record shows that at the time McCain passed the Dossier to Comey, Report 166 had not been written.  Accordingly, they argue that the Article conveys the false impression that government officials took the allegations about Plaintiffs more seriously than they really did.

This argument is unavailing for at least two reasons.  First, as the Court ruled in the order on the motion for judgment on the pleadings, the Article does not editorialize; it simply reproduces the Dossier.  D.E. 171, p. 14.  Second, Plaintiffs' cases in support of their false-by-implication argument are unpersuasive.

Plaintiffs rely on *Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 119 (2d Cir. 2005), and other similar cases.  *See, e.g.*, *D'Annunzio v. Ayken, Inc.*, 876 F. Supp. 2d 211 (E.D.N.Y. 2012) In *Karedes*, an article reported on a public meeting of a town's board of trustees.  At the meeting, the board released an audit of the town's golf course, which found that the plaintiff-manager had directed the town to pay invoices billed to another entity.  At the town meeting, the auditor clarified that the bills in question likely were, in fact, the town's bills, but that the vendors had erroneously printed the name of the other entity on them.  Nevertheless, the article reported that the plaintiff had caused the town to pay more than $170,000, which should have been paid by the other entity.  On these facts, the Court refused to afford the defendants the protection of the fair report privilege.  The Court explained, "[s]ection 74 does not afford protection if the specific statements at issue, considered in their context, suggest more serious conduct than that actually suggested in the official proceeding." *Id*. (internal quotations omitted).

*Karedes* and the others like it that Plaintiffs cite are not analogous to the present case. This case does not involve a summary and misstatement of an official proceeding that attributes to Plaintiffs misconduct beyond that alleged in the Dossier.  Here, BuzzFeed published the Dossier without editorializing.  *See* D.E. 171, p. 14.  The Article did not, therefore, make any misstatements about the allegations against Plaintiffs.  Accordingly, the Court concludes that it is fair and true.

### D. **The Average Reader Would Conclude that the Dossier Was Subject to Official Action**

In its order on the motion for judgment on the pleadings, the Court ruled that an ordinary reader of the Article would conclude that the Dossier was subject to official action because the official action was described in the hyperlinked CNN article, and the hyperlink was conspicuous. D.E. 171, pp. 16–18.  Analysis of the sufficiency of the hyperlink did not require facts beyond those already in the record, and so the Court's ruling on that issue was final.  *See Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 457 (E.D.N.Y. 2013) (quoting *Fine*, 2013 WL 528468, at *3 (holding that where the parties have submitted the allegedly defamatory report to the court, it is a matter of law whether the privilege applies)).

Central to the Court's ruling was *Adelson v. Harris*, 402 P.3d 665 (Nev. 2017).  There, the Supreme Court of Nevada held that a hyperlink to source material about an official proceeding rendered a report privileged provided the hyperlink was conspicuous.  402 P.3d at 669–70.  Finding that *Adelson* aligned with modern journalistic principles, the Court adopted its reasoning.  D.E. 171, p. 17.  The Court went on to find that the hyperlink in the Article was conspicuous because "[i]t appears in the body of the Article, within the words 'CNN reported,' which are written in blue."  *Id.*, p. 18.

In their opposition, Plaintiffs essentially move for reconsideration of that ruling on the grounds that the hyperlink in *Adelson* was materially different than the hyperlink here and that the hyperlink here was not, in fact, conspicuous.  Plaintiffs' first argument is that because the CNN article did not reveal any official action as to the specific allegations in the Dossier concerning Plaintiffs, it was materially different from the hyperlinked article in *Adelson*.  This is the same argument Plaintiffs raised with respect to each preceding element of the privilege, and

the Court rejects it for the same reason.  BuzzFeed is not required to show that there was official action with respect to each specific allegation concerning Plaintiffs.

Plaintiffs' second argument is that BuzzFeed was required to underline the hyperlink; it was not sufficient to merely put it in blue.  Plaintiffs cite no cases standing for the proposition that a hyperlink must conform to such strict formatting requirements to be conspicuous.  Cases (outside the defamation context)[12] have recognized that hyperlinks are typically blue and underlined, but they uniformly take a totality-of-the-circumstances approach when determining whether a hyperlink is conspicuous.  *See, e.g.*, *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 552 (S.D.N.Y. 2018); *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 62 (1st Cir. 2018); *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454 (S.D.N.Y. 2017) (coloring the hyperlink was not sufficiently conspicuous when the hyperlink was in the smallest font, and dwarfed by other much larger text on around it).

The Court is satisfied that its previous ruling was correct.  The hyperlink here is the same size as the text around it, it appears in the body of the text rather than hidden somewhere at the bottom or side, and it is the only blue text in the paragraph in which it appears.  *See* D.E. 234-5, p. 143.  Additionally, it is apparent from the face of Article that BuzzFeed used blue text to link to sources.  The words that BuzzFeed chose to print in blue naturally suggest an outside link:

- "CNN Reported . . . .";
- "Now BuzzFeed News is publishing the full document . . . .";
- "Michael Cohen, told *Mic* . . . .";
- "Kellyanne Conway[] also denied the claims during an appearance on *Late Night with Seth Meyers* . . . .""; and
- "David Corn referred to the documents in a late October column";

*Id*.  Lastly, at the end of the Article, BuzzFeed wrote: "To send us information confidentially, go here."  *Id*.  The blue "here" is obviously a hyperlink and so underscores that the other blue words

---

[12] Besides *Adelson*, the Court is aware of no hyperlink cases in the defamation context.

are also.  In sum, given the totality of the circumstances, the Court finds, again, that the hyperlink was conspicuous.

## **CONCLUSION**

Because the Court finds that Defendants have satisfied their burden as to each element of the fair report privilege, summary judgment is appropriate in Defendants' favor.  Additionally, because the privilege is absolute, the Court does not address Defendant's other arguments, *i.e.*, that Plaintiffs cannot prove (1) that Defendants made a defamatory statement or (2) acted with the requisite degree of fault.  It is, therefore, hereby

ORDERED AND ADJUDGED that the Motion (D.E. 214/226) is GRANTED.  The Court will enter a separate judgment.

DONE AND ORDERED in Chambers, Miami, Florida, this _19th_ day of December, 2018.

_____
URSULA UNGARO
UNITED STATES DISTRICT JUDGE

cc: counsel of record via cm/ecf