# __EXHIBIT 6__

# Exhibit 17



800.211.DEPO (3376)
EsquireSolutions.com

```
 1   BY MR. FRAY-WITZER:

 2        Q.   Sure.

 3             Outside of conversations at which your

 4   counsel was present --

 5        A.   Right.

 6        Q.   -- were there any conversations as to who

 7   would be the best witness to appear today as Fusion

 8   GPS 30 (b)(6)'s witness?

 9        A.   No, there were not.

10        Q.   Can you tell me generally what Fusion GPS

11   is?

12        A.   Sure.  I'm happy to.  Fusion GPS is a

13   premium research firm.  We are a collection of former

14   journalists.  Mr. Simpson and myself worked for

15   roughly 15, 20 years for the Wall Street Journal.

16   Thomas Catan worked for the Wall Street Journal and

17   the Financial Times.

18             Mr. Felch worked for the Los Angeles Times.

19             And then we have a number of other research

20   staff who have various specialized skills such as

21   computer coding, we have people who are trained
```



1  archivists, people who are experts in open source

2  research and collection.

3       So what we do primarily is collect

4  information, as I said, available in the open source,

5  open source meaning publicly available records,

6  filings, that sort of information.  Our typical client

7  base are large law firms engaged in complicated

8  disputes, companies -- large companies looking for

9  deeper situation -- situational awareness of a matter.

10      We work with large hedge funds, ambassadors

11  of private equity firms, those sorts of people.

12      Q.   Does the firm conduct what is typically

13  referred to as opposition research for a political

14  candidate?

15      A.   Yeah, I hear that term used a lot,

16  "opposition research."  It has a certain connotation

17  that I don't really think is very helpful in

18  understanding our methodology.

19      That said, I'll explain that we rarely are

20  involved in political -- what you would describe or

21  what anyone would describe as a political matter.



```
 1              We did so in 2012 and we did so in 2016.

 2    And, again, in both those instances what we were asked

 3    to do was collect, review, digest and articulate the

 4    meaning of public records.

 5         Q.   And if I understand it, I think -- and

 6    please correct me if I'm wrong -- I think your

 7    hesitation to use the phrase "opposition research" is

 8    that Fusion GPS sees itself as collecting more than

 9    just opposition as opposed to collecting, sort of, all

10    information about a subject.  Is that accurate?

11              MR. LEVY:  Objection, form.

12              But go ahead.

13              THE WITNESS:  I think the -- the intention

14    of my answer is -- resides more in -- in what is

15    typically known as opposition research, which is

16    campaign driven, which is typically a collection of

17    what you call votes and quotes that are then distilled

18    for purposes of a campaign; whether it's the cutting

19    of ads or whether it's talking points for a candidate

20    in a debate, that sort of thing.

21              What we are -- what we specialize in and our
```



```
 1   BY MR. FRAY-WITZER:

 2        Q.   At some point in time, was Fusion engaged by

 3   a client to do research into candidate Trump?

 4        A.   Yes, we were.

 5        Q.   When were you engaged to do that?

 6             MR. LEVY:  Objection to form.

 7             Go ahead and answer.

 8             THE WITNESS:  We were first engaged by a

 9   client to research Donald Trump, not Trump and Russia

10   in, I believe it was September, 2015.

11   BY MR. FRAY-WITZER:

12        Q.   And who was the original client that engaged

13   Fusion GPS to conduct that research?

14        A.    It was the Washington Free Beacon.

15        Q.   How did that engagement come about?

16             MR. LEVY:  I'm going to instruct the witness

17   not to answer that question at this time inasmuch as

18   it is outside the scope -- more specifically limited

19   by the Court's July 28th, 2018, order allowing

20   Plaintiff to question the 30 (b)(6) non-party witness

21   about any clients who may have been behind the
```



1    December memo, and any client who is involved in the

2    creation of the dossier as it is referred to in the

3    subpoena.

4          And beyond that, the Court's order

5    documentary 50 states that questions by other clients

6    are outside the scope of this deposition.

7          MR. FRAY-WITZER:  I'm not sure that I agree

8    with all of what you said but we'll move on for the

9    moment, and when it becomes an issue it'll become an

10   issue.

11   BY MR. FRAY-WITZER:

12       Q.   At some point in time, did Fusion's

13   engagement with the Washington Free Beacon end?

14       A.   Yes, it did.

15       Q.   And when was that?

16       A.   I can't recall specifically, but I believe

17   it was around May of 2016, maybe April.  You should

18   understand that sometimes our engagements kind of die

19   a natural death and we don't have formal bookends or

20   we don't memorialize the end of an engagement.

21          In this particular case the client's



```
 1   interests had dissipated with the de facto nomination

 2   of Mr. Trump as the republican candidate for

 3   president.

 4        Q.   Subsequent to the engagement with the

 5   Washington Free Beacon ending, did Fusion GPS acquire

 6   a -- another client who was interested in your

 7   continuing research on candidate Trump?

 8             MR. LEVY:  Objection to form.

 9             THE WITNESS:  Yes, we did.

10   BY MR. FRAY-WITZER:

11        Q.   When was that?

12        A.   In that same timeframe.  I think we -- I

13   can't remember precisely when we signed the contract.

14   It might have been April or May of 2016.

15        Q.   And who was the new client?

16        A.   Perkins Coie.

17        Q.   And --

18        A.   C-O-I-E.

19        Q.   Perkins Coie is a law firm.  Is that

20   correct?

21        A.   That's right.  They're a law firm.  I think
```



1    their headquarters is in Seattle.

2         Q.   And on whose behalf did Perkins Coie engage

3    Fusion GPS?

4         A.   We were not told explicitly at the time.

5    However it's pretty obvious that it was the DNC and

6    the Hillary for America campaign.

7         Q.   What specifically was the scope of

8    engagement from Perkins Coie?

9         A.   Very broad.  This gets back to what I was

10   trying to explain to you earlier, that what we sell --

11   and frankly, what we insist our clients buy is a very

12   holistic and broad inquiry that can take in any number

13   of subject matters.

14            So to fill that out a little bit, if you'd

15   like me to?

16        Q.   Go ahead.

17        A.   An organization like a national campaign or

18   major political party will have its own inhouse

19   researchers to conduct a lot of that, kind of more

20   sort of -- how would I call it without making it sound

21   insulting?  Mundane collection, devote some quotes,



```
 1   sort of book I was describing earlier, it's a more

 2   specialized skill to pull things like bankruptcy

 3   records, to collect those and to process them and

 4   digest them and make them understandable by common

 5   persons.

 6       Q.   I guess with respect to this particular

 7   engagement, to the best that you recall what was the

 8   scope of the engagement?  What was -- what was the

 9   scope of the engagement?

10           MR. LEVY:  I'm going to instruct the witness

11   not to answer this question inasmuch as it would

12   implicate the attorney-client privilege, the attorney

13   work product doctrine.

14           If you want to talk about how these matters

15   worked in a general manner, you can.

16           MR. FRAY-WITZER:  I believe that the Court

17   did require answers to this kind of category of

18   questions with respect to what they were hired to do.

19           MR. LEVY:  And I also believe that the Court

20   in the same order preserved the opportunity for

21   counsel to invoke attorney work product doctrine where
```



 1   applicable, while allowing the witness to answer

 2   questions that did not implicate privilege.

 3           Rule 30 (c)(2) is consistent with that

 4   order, of course.

 5           MR. FRAY-WITZER:  And just so I understand,

 6   which attorneys are you referring to for attorney work

 7   client privilege?

 8           MR. LEVY:  For any lawyer at Perkins Coie

 9   directing and communicating with Fusion GPS during the

10   course of the engagement.

11           MR. FRAY-WITZER:  And on what basis are you

12   asserting Perkins Coie's attorney-client privilege?

13           MR. LEVY:  The law firm has maintained both

14   privileges with Fusion GPS.  It has not authorized

15   Fusion GPS to waive those privileges.  It has only

16   released Fusion GPS to disclose the name of Perkins

17   Coie and its underlying clients.  There's a letter in

18   the public record to that effect.

19   BY MR. FRAY-WITZER:

20      Q.   What efforts did Fusion GPS initially

21   undertake in connection with the assignment from



1  Perkins Coie?

2     A.   I'm sorry.  I don't -- I'm not sure I

3  understand what you mean by efforts.

4     Q.   What did you actually do when you were hired

5  by the Democratic National Committee, Hillary for

6  American campaign through Perkins Coie?

7     A.   That I understood.

8          Again, it's an iteration of what I described

9  earlier.  I would boil it down as Donald Trump

10 discussed.  We were given a very broad mandate to

11 follow our instincts and our leads where they led.

12         Obviously we are a more specialized kind of

13 research firm, we used to work at the Wall Street

14 Journal, Candidate Trump had gone through four

15 bankruptcies.  That's a pile of paper.  And so we were

16 obviously looking at that.

17         We were looking at his business trajectory

18 and footprint, not just in the United States or New

19 York but globally.

20         So, is that helpful?

21     Q.   Yes.



1              I want to jump forward for a moment and

2     we'll come back.  But at some point in time, did

3     Fusion GPS's engagement with Perkins Coie on this

4     matter end?

5          A.   Yes, it did.

6          Q.   When was that?

7          A.   It ended on election day, 2016, early

8     November.  I think it was November 8th, 2016.

9          Q.   Was Fusion GPS subsequently hired to

10    continue the Trump research that you had been

11    conducting?

12         A.   I'm not sure I understand.  Hired by Perkins

13    Coie?

14         Q.   No.  Hired by anyone else?

15         A.   Yes.

16         Q.   When was Fusion GPS subsequently hired to

17    continue research?

18         A.   I believe February or March of 2017.

19              MR. LEVY:  And beyond that, I'm going to

20    instruct the witness not to discuss that matter

21    because it's limited by the Court's July 28th, 2018,



```
 1   order.

 2   BY MR. FRAY-WITZER:

 3        Q.   And your counsel has anticipated my next

 4   question, so let me ask it anyway and then you can

 5   give the instruction.

 6             It has been reported that Fusion GPS was

 7   retained by the Penn Quarter Group to continue

 8   research into President Trump.

 9             Is that the engagement that you're referring

10   to?

11             MR. LEVY:  I'm going to instruct the witness

12   not to discuss any client matters outside of what

13   you've already discussed --

14   BY MR. FRAY-WITZER:

15        Q.   At --

16             MR. LEVY:  -- consistent with the Court's

17   order.

18   BY MR. FRAY-WITZER:

19        Q.   At the time that the -- what we have

20   referred to as the December memo from Christopher

21   Steele, a memo dated December 13th, 2017 --
```



```
1        A.    '16.

2        Q.    '16.  Thank you.

3              At the time the December memo was created,

4   did Fusion GPS have a client that was paying for

5   research into President Trump?

6        A.    No, we did not.

7        Q.    ████████████████████████████████

    █████████████████████████

    ████████████████████████████

    ███████████████████████████████████

    ███████████████████████████████████████████████████

    ███████████████████████████████████████████████████

    █████████████████████████████████████████████████████

    ██████████████

    ██████████████████████████████████████████████████████████

    ██████████████████████████████████████████████████

    ████████████████████████████████████████████████████

    ███████████████████████████████

19            █████████████████████████████████

    █████████████████████████████████████████████████

    ██████████████████████████████████████████████████████
```





1

12      A.



```
1   public record research on behalf of one of their

2   clients.

3   BY MR. FRAY-WITZER:

4        Q.   And had Fusion hired Orbis prior to the

5   Trump investigation?

6        A.   I honestly don't recall.  We may have.  If

7   we had, it would have been a small, limited

8   engagement.  But I don't recall.

9        Q.   How did Fusion come to engage Mr. Steele

10  and/or Orbis in connection with the Trump

11  investigation?

12       A.   Sure.

13            As I testified earlier, we had been looking

14  at Mr. Trump and his business record for the better

15  part of eight or nine months, during which time we had

16  come to a couple of decisions.  One was that we were

17  exhausting some of the public record material,

18  especially as they related to Donald Trump's

19  engagement with Russia.  Public records aren't --

20  aren't easily accessed in Russia or the former Soviet

21  Union.
```



1          We decided that that was a major area of

2    inquiry in which we could add value.

3          So Mr. Simpson and myself decided that we

4    would like to supplement our research with some more

5    human inquiries.

6          We considered a number of contractors who do

7    that kind of work and we decided after much discussion

8    that Mr. Steele was the most highly qualified and

9    reliable contractor we could hire, and so we did so.

10         You have to understand, too, that in that

11   line of work and especially when you're dealing with

12   Russia and the former Soviet Union, there's a large

13   amount of bad information and disinformation that can

14   flow through to someone like a research company like

15   ours. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

20         ████████████████████████████████████

████████████████████████████████████████████████



1  ███████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

████████████

10        ████████████████████████████████

████████████████████████████████

██████████████████████████████████████████

13  BY MR. FRAY-WITZER:

14       Q.   When did -- when did you engage Mr. Simpson

15  and/or Orbis?

16            MR. LEVY:  Mr. Simpson?

17  BY MR. FRAY-WITZER:

18       Q.   Mr. Steele and/or Orbis?  Thank you.

19       A.   I believe it was in May, late May of 2016.

20       Q.   ████████████████████████████████

████████████████████████████████





1   ████████████████████████████████████████████

████████████████

3   BY MR. FRAY-WITZER:

4   ████████████████████████████████████████

████████████████████████████████████████████

████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

11  ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████

████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████









1    ████████████

████████████████████████████████████

████████████

4        Q.    What other colleagues at Orbis did you speak

5    with or did Fusion speak with other than Mr. Steele

6    himself?

7        A.    Christopher Burrows, B-U-R-R-O-W-S.

8              MR. LEVY:  We've been going on for about an

9    hour.  Can we take a break?

10             MR. FRAY-WITZER:  Yes.

11             THE VIDEOGRAPHER:  Going off the record at

12   11:08.

13             (Whereupon, a recess ensued.)

14             THE VIDEOGRAPHER:  Back on the record at

15   11:21.

16   BY MR. FRAY-WITZER:

17       Q.    So, I believe we were talking about Fusion

18   GPS's decision to engage Christopher Steele in

19   connection with the Trump investigation.  And I think

20   you told us some of the reasons why Fusion GPS decided

21   to engage Mr. Steele.



1            Once the decision was made, what was the

2    next step?  Who communicated with Mr. Steele?

3            MR. LEVY:  Which question do you want him to

4    answer?

5            MR. FRAY-WITZER:  There's only one there.

6    BY MR. FRAY-WITZER:

7        Q.   Who communicated with Mr. Steele?

8











1

2        Q.

18

```
1   BY MR. FRAY-WITZER:
2
```



```
13
```





```
1    ████████
2            ██████████████████████████████████████
    ████████████████████████████████████████████████
    ████████████████████████████████████████████████
    ████████████████████████████████████
6    BY MR. FRAY-WITZER:
7          ████████████████████████████████████████
    ████████████████████████████████████████████████
    ██████████████████
    ██████████████████████████████████████████████
    ██████████████████████████████████████████████
    ██████████████████████████████████████
    ██████████████████████████████████████████████
    ██████████████████████
    ████████████████████████████████████████████
    ██████████████████████████████████████████████
    ████████████
    ██████████████████████████████████████████
    ██████████████████████████████████████████████
    ██████████████████████████████████████████████
    ██████████████████████████████████████
```







2

5    BY MR. FRAY-WITZER:

6





1





1

10   BY MR. FRAY-WITZER:

11











1    It's just the document.
2    ████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████████████

10   ████████████████████████████████

████████████████████

████████████████████████████████████

████████████████████████

████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

████████████████

████████████████████████████████████



1    ███████

2         Q.   The memos that were produced between May of

3    2016 and November of 2016 have sometimes been referred

4    to as the pre-election memos.

5              Are you familiar with that term?

6         A.   I don't know that I'm familiar with it but I

7    don't dispute it.

8    ████████████████████████████████████████████████

     ████████████████

     ████████████████████████████████████████████████████

     ████████████████████████████

12        Q.   Did you review the memos in preparation for

13   today?

14        A.   I reviewed them carefully.  I didn't count

15   them.

16             MR. LEVY:  If you want to put them in front

17   of the witness, feel free.

18             MR. FRAY-WITZER:  I will at some point.

19   BY MR. FRAY-WITZER:

20        ████████████████████████████████████████

     ████████████████████████████████████████████████████





1

2

12









1    ████████████████████████████

████████████████████████████

█████████████████

█████████████████

██████████████████████████████

█████████████████████████████

████████████████████████

█████████████████

9       Q.   Did anyone at Fusion have conversations with

10   Congress concerning the pre-election memos?

11              MR. LEVY:   During the election campaign?

12              Exhibit 6 is a lengthy conversation about

13   the pre-election memos with Congress.

14   BY MR. FRAY-WITZER:

15       Q.   Prior to Mr. Simpson's testimony in front of

16   Congress, did Fusion have any communications with

17   anyone in Congress concerning the pre-election memos?

18       A.   No, we did not.

19       Q.   Did anyone at Fusion have communications

20   with the Department of Justice concerning the

21   pre-election memos?



```
 1            MR. LEVY:  At what time?

 2   BY MR. FRAY-WITZER:

 3       Q.   At any time.

 4       A.   At any time?

 5       Q.   At any time.

 6       A.   Yes.

 7       Q.   What conversations did Fusion have with the

 8   Department of Justice concerning the pre-election

 9   memos?

10       A.   We recall a meeting between Glenn Simpson

11   and Bruce Ohr, that's O-H-R, ███████████████████

     ███████████████████   for the purpose of transmitting to

13   Mr. Ohr a copy of these pre-election memoranda.

14            That would have taken place after the

15   election.

16       Q.   On what date?

17       A.   I don't recall the specific date.  I think

18   it was late November.

19       Q.   And did Mr. Simpson provide Mr. Ohr with a

20   copy of the pre-election memo?

21       A.   Yes.  ███████████████████████████████
```







1       Q.    Do you know if McCain Institute is a

2   government entity?

3       A.    I don't believe it is.

4       Q.    ████████████████████████████████

████████████████████████████████████████████

████████████

██████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████

████████████████████████

█████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

15      Q.    ███████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████

19           ██████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

ESQUIRE
DEPOSITION SOLUTIONS





1

8









1

13







1            MR. SIEGEL:  Objection.

2            THE WITNESS:  No, we don't.

3    BY MR. FRAY-WITZER:

4    ███████████████████████████████████████

███████████████████████████████

██████████████████

████████████████████████████████████████

██████████████████████████████████

██████████████████████████

███████████████████████████████

11           MR. LEVY:  Are you moving an exhibit?  Can I

12   just take a quick break?

13           MR. FRAY-WITZER:  Yeah.

14           THE VIDEOGRAPHER:  Going off the record at

15   1423.

16           (Whereupon, a recess ensued.)

17           THE VIDEOGRAPHER:  Back on the record at

18   1426.

19   BY MR. FRAY-WITZER:

20       Q.   So we've talked a bit about the pre-election

21   memos and I want to turn now to the -- what we've



1 | referred to as the December memo.  It's the memo of

2 | December 13th, 2016.

3 | And let me ask you first, when did you first

4 | learn -- and in this context I mean Fusion.  When did

5 | Fusion first learn that there was an additional memo

6 | that Mr. Steele had created?

7 | MR. LEVY:  Objection, vague.  When you say

8 | additional memo, additional to what?

9 | BY MR. FRAY-WITZER:

10 | Q.  Other than the -- what we've referred to as

11 | the December memo, were there any other post election

12 | memos prior to January 10th, 2017?

13 | MR. LEVY:  Objection.  Memos from whom?

14 | MR. FRAY-WITZER:  From Mr. Steele.

15 | MR. LEVY:  About what?

16 | MR. FRAY-WITZER:  About the Russia

17 | investigation, about the Trump investigation.

18 | THE WITNESS:  I don't believe so.

19 | BY MR. FRAY-WITZER:

20 | Q.  So post election but before January 10th,

21 | 2017, there's only one additional memo, correct?



1   receiving the December memo, ███████████████

███████████████████████████████████

3   ███████████████████████████

███████████████████████████████████

███████████████

6       Q.   I think you've testified that in December of

7   2016, Fusion no longer had a client for this work, for

8   the investigation that you were conducting, correct?

9           MR. LEVY:  Objection.  I just want to be

10  really precise here.  I'm objecting to form.  Can you

11  repeat the question, please, if there's a question?

12          MR. FRAY-WITZER:  I think there was.

13          Could you read it back, please?

14          (Requested portion of record read.)

15  BY MR. FRAY-WITZER:

16      Q.   The question is, is that correct?

17          MR. LEVY:  And I'm going to object because

18  it's vague.

19  BY MR. FRAY-WITZER:

20      Q.   In December of 2016 did Fusion GPS have a

21  client for whom it was working and conducting



```
 1   additional research into Donald Trump?
 2            MR. LEVY:  Objection, asked and answered.
 3            THE WITNESS:  No, we did not.
 4   BY MR. FRAY-WITZER:
 5       Q.   Given that you did not have a client at that
 6   time, was Fusion surprised to learn that there was an
 7   additional memo coming?
 8       A.   A little bit.  However, let me fill that in
 9   for you if I may.
10            The context, again, is our abiding belief at
11   this time that the United States had elected someone
12   who had been compromised by the Russian government and
13   was colluding in some way with the Russian government
14   and that Russia was interfering with our electoral
15   process to elect this specific individual who had won.
16            So there comes a point when this is not
17   about clients and money and dollars and cents, it's
18   about your national security.  That's where our head
19   was, ███████████████████████████████
20            So if there's more information that can shed
21   light on that emergency or the crime in progress I've
```



1    described, we were going to go get it and we were

2    going to deliver it.

3         Q.   You were going to deliver it to whom?

4         A.   In this case, James Comey.

5         Q.   ██████████████████████████████████████

     ██████████████████████

     ██████████████████████████████████

     ████████████████████████████████████████████████

     █████████████████████████████████████

     ██████████████████████████████████████

     ██████████████████████████████████████

     ████████████████████████████████████████████████

     ██████████████████████████████████

     ███████████████████████████████████████

     ████████████████████████

16        Q.   I'm going to -- I'm going to back up for

17   just a moment.

18             ████████████████████████████████████████

     ███████████████████████████████

     ██████████████████████████████████████████

     █████████████████████████████████████



1   ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

4       Q.   And I want to get a little specific with

5   you --

6       A.   Sure.

7       Q.   -- because I believe your testimony was that

8   those things were your understanding.   ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

15  BY MR. FRAY-WITZER:

16      ████████████████████████████████████████

████████████████████████████

████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████





1

8     Q.

16       Q.   Do you know when Fusion might have given the

17   memo to Mr. Ohr?

18       A.   I don't recall that.

19       Q.   Do you know for certain whether or not

20   Fusion did or did not give the memo to Mr. Ohr?

21       A.   I'm trying to remember and I just don't



1   recall.  I believe we did.

2        Q.   Was there a meeting with Mr. Ohr subsequent

3   to the meeting that you had described earlier today?

4        A.   There may have been but we don't recall one.

5        Q.   How would Fusion have provided the memo to

6   Mr. Ohr if there was no meeting?

7        A.   I don't think we would have.

8        Q.   The meeting that you described earlier was

9   before December 13th, 2016.  Is that correct?

10       A.   That's correct.

11       Q.   And so I guess I'm confused.  If the only

12  way that you would have provided the document to Mr.

13  Ohr if you did was in a meeting and there was no

14  meeting after the first meeting, how would you have

15  provided the document to Mr. Ohr?

16       A.   I'm sorry.  I'm just -- we're not able to

17  recall a subsequent meeting.  There may have been.

18       Q.   So Fusion -- and this is fine, but Fusion

19  doesn't know one way or another whether or not there

20  was a meeting and whether or not the document was

21  provided to Mr. Ohr?



```
1              MR. SIEGEL:  Objection.

2              MR. LEVY:  Asked and answered, object --

3    objection.

4              THE WITNESS:  Right.

5    BY MR. FRAY-WITZER:

6         Q.   Did --

7         A.   I don't dispute that if it would have been

8    we would have done that.

9         Q.   But you don't know if you did?

10        A.   I don't recall.

11        Q.   Did Fusion provide the December memo either

12   on its own or as part of the dossier to any media

13   outlets?

14        A.   The December 13th memo?

15        Q.   Yes.

16             MR. LEVY:  Before publication of the

17   dossier?

18             MR. FRAY-WITZER:  Before January 10th, 2017.

19             THE WITNESS:  No. We don't believe so.

20   BY MR. FRAY-WITZER:

21        Q.   ████████████████████████████████████████
```



```
1    ████████████████████████████████████████████
     ██████████████████████████████████

3         A.    Just to be clear, you're talking about the

4    December 13th memorandum?

5         Q.    Either on its own or as part of the

6    collection of memos?

7         A.    No, we did not.

8         Q.    ████████████████████████████████████

     █████████████████████████████████████████████

     ████████████████████████████████████████

     █████████████████████████████

     ██████████████████████

     ██████████████████████████████████████████████

     █████████████████████

15        ███████████████████████████████████████████

     ██████████████████████████████████████

     ██████████████████████████████████████

     ███████████████████████████████████

     ████████████████████████████████

     █████████████████████████████████████████████

     ████████████████████████
```





1        A.    █████████████████████████

█████████████████████████████

████████████████████████████

███████████████████████████████████████████

████████████████████████████

█████████████████████████████████████

████████████████████████████████████████████

██████████████

9                █████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

████████████████████

15       Q.    You are.  But I want to actually be

16   specific --

17       A.    Sure.

18       Q.    -- to understand whether or not.

19       A.    Yep.

20       ████████████████████████████████████

█████████████████████████████████████████



1      Q.   Do you see where it says Statement of Truth:

2   "The defendants believe the facts set out in the

3   particulars of the claim are true."

4          Do you see that?

5      A.   Yes, I do.

6      Q.   Do you recognize Mr. Steele's signature

7   under that?

8      A.   No, I don't.

9      Q.   Do you have any reason to believe that that

10  is not Mr. Steele's signature?

11     A.   I don't.

12     Q.   If you would turn to Page 3, please.

13     A.   (Witness complies.)

14     Q.   Paragraph 18, under a heading:  The

15  Confidential December Memorandum.  "Defendants

16  continued to receive unsolicited intelligence on the

17  matters covered by the pre-election memorandum after

18  the U.S. presidential election and the conclusion of

19  the assignment to Fusion."

20          ████████████████████████████████

    ████████████████████████████████████████████





```
 1
 7
```

17   BY MR. FRAY-WITZER:

18        Q.    Paragraph 20, "The defendants considered

19   correctly that the raw intelligence in the December

20   memo -- memorandum, A, was of considerable importance

21   in relation to alleged Russian interference in the



1  ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████

5          MR. LEVY:  Objection.

6          MR. SIEGEL:  Objection.

7          MR. LEVY:  Evan, you've got seven hours

8  under the rules.

9          MR. FRAY-WITZER:  Then please let the

10  witness answer the question and we can get past it.

11          MR. LEVY:  It's been answered.

12          THE WITNESS:  The question was -- repeat it

13  for me.  Sorry.  I'm just getting a little tired.

14  BY MR. FRAY-WITZER:

15  ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████
████████████████

21          MR. LEVY:  Objection, asked and answered.





1

3    BY MR. FRAY-WITZER:

4        Q.

7

21       Q.    On January 10th, 2017, did Fusion become



```
 1    aware that the memos written by Orbis and Christopher

 2    Steele had been published by BuzzFeed?

 3         A.   Yes, we did.

 4         Q.   How did Fusion first become aware of the

 5    publication?

 6         A.   I can't specifically recall.

 7         Q.   Do you recall how you first became aware of

 8    the publication?

 9         A.   Vaguely.

10         Q.   And how is that?

11         A.   In the internet age and the age of Twitter

12    things don't stay quiet for very long.  So someone in

13    the office -- I don't know if it was Glenn or another

14    colleague said these memos had been published.

15         Q.   To the best of your recollection, what was

16    Mr. Simpson's reaction to the publication of the memo?

17         A.   We shared the same reaction, which was

18    disappointment, extreme disappointment.  Because

19    publication of these memoranda in an un-redacted

20    fashion could have jeopardized sources and methods

21    that could jeopardize, in turn, the ultimate sources
```



1   of the information and their physical safety.  That

2   was our primary concern, and overarching concern I

3   would say.

4        Q.   What, if anything, did Fusion do on

5   January 10th of 2017 when it learned that the memos

6   had been published by BuzzFeed?

7        A.   We called, in the first instance, Ken

8   Bensinger.  It was myself and Mr. Simpson as we recall

9   it.  And we -- we called him because his name was on

10   the accompanying story and we knew him.  And we asked

11   him to immediately see if he could take those down

12   because we told him about our concerns about the

13   safety of sources and methods.

14       Q.   As specifically as you can recall, what did

15   Fusion say to Mr. Bensinger?

16       A.   You need to take those memos down right now.

17       Q.   What do you recall Mr. Bensinger saying in

18   response?

19       A.   I recall that he had no power to do that and

20   that we needed to speak to his superiors.

21       Q.   And did you -- by you in this instance I



1   mean Fusion, did Fusion subsequently speak to, as you

2   put it, Mr. Bensinger's superiors at BuzzFeed?

3        A.   We did.  As we recall we put in a phone call

4   to Ben Smith, who is the editor in chief or executive

5   editor of BuzzFeed with whom we were acquainted, and

6   we reiterated that same concern to him.

7        Q.   And what was Mr. Smith's response?

8        A.   He responded not unreasonably in my view and

9   in retrospect, that these memoranda -- at this point

10   it had been reported that these memoranda had been

11   summarized to the tune of two pages for the sitting

12   president of the United States and briefed to the

13   president elect by James Comey.  So he argued that it

14   was a clear matter of public and national interest.

15   And I should say as the former national security

16   editor of the Wall Street Journal, he's not wrong

17   about that.  We would -- I would have made the exact

18   same argument.

19           The narrow thing we were concerned about was

20   that issue of the security, physical security of

21   sources and method.  And we were concerned that there



1   were indicia of numbers of sources, of their placement

2   in Russia and outside of Russia that could have

3   jeopardized their safety.

4          That's all we were thinking about.  We

5   agreed that it was a matter, a vital matter of

6   national and public interest.

7      Q.   Does Fusion know what information was

8   contained in the supposed two-page summary?

9      A.   No, we do not.  However, I can tell you

10  again, I'm relying on my own experience as -- for what

11  that's worth of being the national security editor for

12  the Wall Street Journal, that a two-paged memorandum

13  does not reach the desk of the president of the United

14  States without multi-agency review, a thorough vetting

15  and thorough corroboration on some level.  It just

16  doesn't happen.

17     Q.   Do you have any information whatsoever in

18  this specific instance as to what steps were taken to

19  create that two-paged memo and what it contained?

20         MR. LEVY:  Objection, asked and answered.

21         THE WITNESS:  I do not have that specific



1      A.   Good afternoon.

2      Q.   I just have a few questions for you.

3           What is the -- just because the jury is

4  unlikely to be familiar with it, what is the

5  Washington Free Beacon?  What is it?

6      A.   It's a conservative leaning publication

7  based in Washington, D.C.

8      Q.   Okay.  And would it be fair to characterize

9  it as republican leaning?

10     A.   Yes, it would.

11     Q.   So, would it be accurate to say that between

12 roughly September of 2015 and the spring of 2016,

13 Fusion was retained to conduct research on Donald

14 Trump by a republican leaning organization and that it

15 subsequently was retained to conduct research by the

16 democratic party indirectly.  Is that accurate?

17     A.   That's correct.

18     Q.   I mean, you -- you did research for both

19 sides on this one.  Is that fair -- in a sense?  Not

20 -- I don't mean for both sides but you were retained

21 by both sides at different times to conduct research?



```
 1            MR. FRAY-WITZER:  Objection.

 2            THE WITNESS:  That's correct.

 3   BY MR. SIEGEL:

 4       Q.   You testified that as you received the

 5   memoranda from Mr. Steele, that Fusion undertook its

 6   own efforts to try to independently assess the

 7   credibility of the information.  And I believe you

 8   testified about Carter Page, you testified about Paul

 9   Manafort, you testified about Alexsei Gubarev and XBT.

10            Are there any other examples that you can

11   recall of people or topics within the dossier that

12   Fusion undertook to look at the credibility of those

13   -- of those allegations on its own?

14       A.   Sure.

15            I would say that the most prominent example

16   I probably overlooked is Michael Cohen who is Donald

17   Trump's -- or was Donald Trump's attorney, personal

18   attorney, and I believe worked with the Trump

19   Organization for many years.

20            Mr. Cohen who I believe has now pled guilty

21   to eight felonies is accused or it is written in --
```



 1  the dossier represents that he has made deniable cash

 2  payments to individuals.  I believe that's

 3  substantially what Mr. Cohen has pled guilty to.

 4      Q.   And did you -- at the time these memos came

 5  -- were coming in, did you make any efforts to look at

 6  Michael Cohen?

 7      A.   We made substantial efforts to look at

 8  Michael Cohen.

 9      Q.   And can you describe those?

10      A.   Sure.

11          We looked as his history, we looked at his

12  taxi business, we looked at his family background.

13  His taxi business it would appear was financed and

14  supported in part by Russians, Russian-Americans.

15          He himself is married to someone who is

16  Russian.

17          We looked at his background and his

18  relationships to people like Felix Sater with whom --

19  they were connected on social media.  And those were

20  just a few examples of many things we looked at

21  regarding Mr. Cohen.



1    Q.   Did those enhance your confidence in the

2    credibility of the statements in the dossier about Mr.

3    Cohen?

4    A.   Substantially so.

5    Q.   Do you know who Mr. Agalarov is?

6    A.   I do.

7    Q.   Did you undertake any efforts to investigate

8    the statements related to Mr. Agalarov?

9    A.   Yes, we did.

10    Q.   What did you do?

11    A.   We researched his history with Mr. Trump and

12    his support for the Miss Universe pageant.  We also

13    looked at -- just to be clear you're talking about

14    pre-publication?

15    Q.   Pre-publication, yes, as the memos are

16    coming in?

17    A.   We looked at his background.  We found

18    evidence of a substantial relationship between the

19    Agalarov family and Mr. Trump including a music video

20    cut by Aras Agalarov's son Emin in which Mr. Trump

21    appears.



1      Q.   And did the research you conducted about Mr.

2   Agalarov enhance your confidence level about the

3   credibility of the statements made to him -- or

4   connected, related to him?

5      A.   Yes, it did.

6      Q.   Do you know who Sergei Ivanov is?

7      A.   I do.

8      Q.   Did you undertake any efforts to assess

9   statements related to Sergei Ivanov in the dossier?

10      A.   Yes, we did.

11      Q.   What did you do?

12      A.   We read substantially about Mr. Ivanov who's

13   known to us.  He is the head of the presidential

14   administration or was.

15          The dossier recounts in large, in many

16   instances, a story of tension between various

17   individuals in the Kremlin, inside the Kremlin,

18   specifically between a camp related to Mr. Peskov, who

19   is the spokesman for the Kremlin and Mr. Ivanov.  It

20   talks about how those tensions are coming to a head.

21   Subsequently we learned that Mr. Ivanov did in fact --



1    was in fact let go by Mr. Putin, which was a

2    surprising development to us because of their long

3    history together going back to Saint Petersburg.

4         Q.   And did you look at all into whether there

5    was a pension payment system that involved Russian --

6         A.   We did.

7         Q.   What did you find?

8         A.   And there is such a system and we -- in fact

9    as recently as the other day, it was reported that

10   Sergey Kislyak the former ambassador to the United

11   States undertook such cash payments to people.  Mr.

12   Kislyak obviously is someone who had met with Michael

13   Flynn who is awaiting a plea agreement under -- with

14   Mr. Mueller and with -- Mr. Kislyak also met with

15   various other people in the Trump orbit including

16   Carter Page, including Jeff Sessions.

17        Q.   ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████





13      Q.   Mr. Fray-Witzer showed you today a number of

14   statements from other people that in one way or the

15   other used the word "verified", "further verified",

16   "unverified."  I'm not going to ask you what that

17   means to other people.

18           What did you understand the reference to

19   verification meant in connection with the statements

20   in the dossier?

21           MR. FRAY-WITZER:  Objection.  What context?



1   has issued a similar report that goes further and says

2   that specific elements of the dossier have been

3   corroborated and verified.  To me verified means

4   proven.

5          Q.   Mr. Fray-Witzer showed you also, 

18

21          Q.   In connection with the way the reports on





1

3    BY MR. SIEGEL:

4

7

12        Q.

20            MR. SIEGEL:  Give me a minute.

21            THE VIDEOGRAPHER:  Going off the record at

