**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

ALEKSEJ GUBAREV,
XBT HOLDING S.A., and
WEBZILLA, INC.
Plaintiffs,

v.

BUZZFEED, INC. and
BEN SMITH
Defendants.

**Case No.**

**0:17-cv-60426-UU**

**PLAINTIFFS' MOTION TO SUPPLEMENT THE RECORD WITH THE HOROWITZ REPORT AND FOR AN INDICATIVE RULING**

The present case comes before this Court on an explicitly "limited" remand from the Eleventh Circuit Court of Appeal permitting Plaintiffs only to "move the district court for relief that would allow the District Court to Supplement the Record with the Horowitz Report" (an official United States Government Report). The Eleventh Circuit's limited remand also permitted this Court to inform the Eleventh Circuit if supplementation of the record to include the Horowitz Report would "alter [*i.e.* reverse] the court's previously issued summary judgment order."[1]

Accordingly, and in conformity with the Order from the Eleventh Circuit, Plaintiffs respectfully move that this Court:

(a) Order that the record be supplemented to include the Horowitz Report; and

(b) Issue an Order informing the Eleventh Circuit Court of Appeals that, on a full remand, the Court would reverse its previously-issued order granting summary judgment to Defendants.

[1] The Eleventh Circuit's limited remand did *not* authorize Plaintiffs to seek, nor does it contemplate, this Court issuing the more comprehensive type of order required by Federal Rules of Civil Procedure 62.1. Instead, the Eleventh Circuit's remand instructs this Court *only* to either: a) deny the request for supplementation; or b) allow the request for supplementation and (should it wish) state that that supplementation would "alter" (*i.e.* reverse) its order granting summary judgment.

In further support of this Motion, Plaintiffs state as follows.

## INTRODUCTION

On December 9, 2019, the United States Office of the Inspector General ("OIG") released an official United States Government Report entitled "Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation," a comprehensive and extensive review of the genesis and methods of the FBI's investigation into President Trump's relationship with Russia and the FBI's subsequent efforts to support a warrant to surveil former Trump campaign advisor Carter Page (the "Horowitz Report").[2] A true and accurate copy of Horowitz Report, as publicly released by the United States Government, is filed herewith as Exhibit 1. As part of the Horowitz Report, the OIG sought to determine the relevance of a series of privately-produced opposition-research memoranda created by Christopher Steele, a former British spy who was operating his own private for-profit business research firm.

Some of the Horowitz Report's newly-released conclusions constitute significant and persuasive evidence that conflicts with a key factual claim upon which this Court based its summary judgment finding – namely that, in publishing the defamatory accusations about Plaintiffs contained in Steele's Report 166, Defendants made a "fair report" of "official proceedings," and are therefore immune from suit for defamation.

---

[2] This thorough review included materials previously-unavailable to the public, including interviews with (among others) then-Assistant Director of the FBI's Counterintelligence Division, E.W. "Bill" Priestap (who submitted an affidavit in this case, as discussed below), former FBI Director Comey, Department of Justice attorney Bruce Ohr, and Christopher Steele. More specifically, according to the Horowitz Report, "the OIG examined more than one million documents that were in the Department's and FBI's possession and conducted over 170 interviews involving more than 100 witnesses. These witnesses included former FBI Director Comey, former Attorney General (AG) Loretta Lynch, former Deputy Attorney General Sally Yates, former Deputy Attorney General Rod Rosenstein, former Acting-Attorney General and Acting-Deputy Attorney General and current FBI-General-Counsel Dana Boente, former FBI Deputy Director Andrew McCabe, former FBI General Counsel James Baker, and Department attorney Bruce Ohr and his wife. The OIG also interviewed Christopher Steele and current and former employees of other U.S. government agencies.... [The OIG was] given broad access to relevant materials by the Department and the FBI. In addition, [the OIG] reviewed relevant information that other U.S. government agencies provided the FBI in the course of the Crossfire Hurricane investigation." Horowitz Report, p. i.

More specifically, this Court concluded that Defendants met their burden of proving by a preponderance of the evidence that publishing Report 166 was a "fair and accurate" "report" of an "official proceeding" simply by presenting evidence that the FBI *possessed* Report 166 at the time that Defendants published.[3] Therefore, by necessity, this Court must also have concluded that no reasonable jury could find otherwise (since the privilege question must be submitted to a jury if underlying facts are in dispute). *See*, *e.g.*, *Wenz v. Becker*, 948 F.Supp. 319 (S.D.N.Y. 1996) (denying summary judgment where the plaintiff raised genuine issues of material fact as to whether the publication was a report on a judicial proceeding and, if it was, if it was fair and true); *Pisani v. Staten Island Univ. Hospital*, 440 F.Supp.2d 168, 178 (E.D.N.Y. 2006) ("[B]ecause the Court finds that a reasonable jury could decide that the Hospital statement was not a fair and true report, the Court cannot conclude that, as a matter of law, the Hospital statement is protected by the judicial proceeding privilege."); *Ocean State Seafood, Inc. v. Capital Newspaper, Div. of Hearst Corp*., 492 N.Y.S.2d 175, 179 (App.Div. 1985) ("We are similarly of the view that a jury question is also presented with respect to defendants' defense

[3] The only evidence presented by Defendants that the FBI even *possessed* Report 166 when they published was an affidavit signed only by the FBI's then Assistant Director, Bill Priestap. As is discussed in more detail below, the OIG interviewed Mr. Priestap extensively, and reviewed his contemporaneous notes as part of its investigation, yet still concluded that the FBI did ***not*** have Report 166 at the time Defendants published the defamatory materials. And, as Plaintiffs have argued on appeal, even if the FBI *had* possessed Report 166 at the time of publication, that was not sufficient, in itself, to satisfy Defendants' burden to prove: (1) that the FBI was then "investigating" claims in Report 166 (and, more specifically, accusations concerning Plaintiffs); and (2) that Defendants knew (i.e. relied upon) that fact in their reporting. Plaintiffs have explained that neither this Court, nor Defendants, nor their *amici*, cited *any* New York case in which §74 privilege was afforded to the purported content of any "investigation" that was not explicitly identified as relevant to that investigation by some specific record, report, memorandum, or other official statement or document, or by a culminating public action accusing the plaintiff, such as a firing or arrest, and Plaintiffs are unaware of any such case. *See* Appellants' Reply Brief to Eleventh Circuit ("Reply Brief"), filed herewith as Exhibit 4, p. 47. But, now that the Horowitz report has revealed findings regarding relevant and previously-classified matters, it would constitute a miscarriage of justice for the Court not to recognize that the Horowitz Report's findings conflict with Mr. Preistap's affidavit. Indeed, because the FBI could not have investigated the claims of a memo it did not yet have (Report 166), and Defendants could not have known of any investigation of that memo which did not, in fact, exist, this Court's consideration of the Horowitz Report's findings could obviate the need for an analysis of whether Defendants had met burdens (1) and (2) above.

that the article's account of the imposition of a fine against plaintiffs in Justice Court was statutorily privileged as a 'fair and true report of any judicial proceeding.'").

However, as the Court will see, the Horowitz Report concluded that the FBI had ***not***, in fact, received Report 166 before Defendants published it. *See* Horowitz Report, p. 94, fn. 215; pp. 175-176, fns. 317, 319, and 320; p. 176; *compare* DE 208-8 (memoranda as published by Buzzfeed), filed herewith as Exhibit 2.

Presented with this new, previously-classified, and previously-unavailable, information, Plaintiffs moved for the Eleventh Circuit Court of Appeals either to supplement the record with the Horowitz Report itself, or to issue a limited remand to this Court for the purpose of determining whether the record should be so supplemented.

On March 13, 2020, the Eleventh Circuit issued an explicitly limited remand to allow Plaintiffs to seek two *specific and discrete* rulings from this Court:

> The Court REMANDS this case for the limited purpose of permitting Plaintiffs to move the district court for relief that would allow the district court to supplement the record with the Horowitz Report.
>
> …If the district court issues an order stating that the record should be supplemented and the Horowitz Report would alter the court's previously issued summary judgment order, the parties shall seek a full remand of this case.

D.E. 444.

## BACKGROUND

### I. This Court's Summary Judgment Findings

On January 10, 2017, Defendants Buzzfeed, Inc. and Ben Smith published an article entitled *These Reports Allege Trump Has Deep Ties to Russia*, along with 17 separate and distinct reports authored by Christopher Steele. Included in this collection of reports – which Buzzfeed dubbed the "Dossier" – was Steele's Report 166, dated December 13, 2016.

Report 166, the only one of Steele's reports produced *after* the 2016 Presidential election, contained raw information that Steele himself categorized as "unsolicited" and needing verification. D.E. 234-5, Ex. 66, p.42. Report 166 was also the only report to mention the Plaintiffs, and it contained the false, defamatory, criminal accusations concerning the private Plaintiffs which are the subject of this action.

On December 19, 2018, this Court allowed Defendants' Motion for Summary Judgment, issuing an Order and Judgment dismissing Plaintiffs' Complaint. D.E. 388 [the "Summary

Judgment Order"]; D.E. 390. This Court based its dismissal on its choice of New York's privilege law and, more specifically, New York Civil Rights Law, §74 (a choice which Plaintiffs have disputed, both in this Court and on appeal).[4]

As this Court noted at summary judgment, it was undisputed at the time that the FBI received certain specific Steele reports at various times and from different sources. However, in its Summary Judgment Order, this Court (at Defendants' urging) largely considered the 17 separately-dated reports as if they constituted a unified whole, such that it deemed investigation of *any* information in *any* of them to be akin to investigation of *all* of the information in *every* report. Throughout its Summary Judgment Order, this Court applied the Buzzfeed-coined term "Dossier" to a collection of 17 separate documents that Buzzfeed received from David Kramer, a private individual who had received the documents from Steele.[5]

This Court's conclusion that the FBI's investigation included *all* of the so-called "Dossier" apparently rested upon its conclusion that, "prior to Buzzfeed's publication of the full Dossier, the FBI also possessed Report 166." Summary Judgment Order, p. 6. The Court presumably made this finding based upon the only evidence in the record to that effect: an affidavit signed by FBI Assistant Director Priestap, submitted by Defendants.

And, according to this Court's Summary Judgment Order, it was the FBI's mere possession of Report 166, purportedly at the moment of Buzzfeed's publication, which brought that report within the scope of the claimed "official proceedings" – a term the Court defined, in this case as either the FBI's investigation of allegations contained in Steele's Reports or summary briefings provided to Presidents Trump and Obama, based upon "some" of the allegations contained in some of the Steele reports. Thus, this Court's summary judgment order

---

[4] Section 74 provides that:

> A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published.
>
> This section does not apply to a libel contained in any other matter added by any person concerned in the publication; or in the report of anything said or done at the time and place of such a proceeding which was not a part thereof.

[5] Steele had created the reports as part of a paid private opposition-research project to compile information for the benefit of a political rival to then-candidate Trump

turned significantly upon the factual conclusion that the FBI possessed Report 166 at the time of those "official proceedings" (and prior to Buzzfeed's publication).

## II. The Report of the Office of the Inspector General

The Horowitz Report was not released until December 9, 2019 (and had not even been created until almost a year after summary judgement was granted). Thus, it could not have been discovered by Plaintiffs' counsel or presented to, or considered by, this Court, when summary judgment motions were decided.

But, the OIG's conclusions have several significant implications for this case – most particularly that ***the FBI did not, in fact, possess Report 166, until it was published by Buzzfeed***.

Specifically, on page 94, in discussing Steele's reporting, the Horowitz Report states that Steele's reports included some that were "provided to the FBI" and "others that were provided to the FBI by third parties, as described in Chapter Six."

At the end of that sentence, footnote 215 adds: "One report that was not provided to the FBI directly [i.e. by Steele] or via third parties was published by *BuzzFeed*."

Later, in the referenced "Chapter Six," and in describing these "other[]" reports "that were provided to the FBI by third parties," the OIG identifies the only three people from whom the FBI ever received Steele reports (other than Steele himself): 1) *Mother Jones* Reporter David Corn; 2) Senator John McCain; and 3) DOJ attorney Bruce Ohr. *Id.*, pp. 175-176, fns. 317-319.

And, more specifically, footnotes 317, 319 and 320 on pages 175 and 176 establish (by process of elimination) that the relevant "[o]ne report" mentioned at footnote 215 – *i.e.* the one "not provided to the FBI" by *any* source – was Report 166, since every other report published by Buzzfeed is accounted-for in those footnotes.[6]

---

[6] The Steele reports published by Buzzfeed were Report Nos. **80, 86, 94, 95, 97, 100, 101, 102, 105, 111, 112, 113, 130, 134, 135, 136,** and *166*. The report numbers have been placed in numerical order here for the Court's convenience. The reports listed in **bold** are those that the Horowitz Report identifies as having been provided to the FBI by ***some*** source – ***any*** source – prior to Buzzfeed's publication of the same. *Compare* Exhibit 2 (memoranda as published by Buzzfeed) *with* Horowitz Report, p. 175, fn. 317 ("The nine Steele reports [provided to the FBI by a *Mother Jones* reporter] were Reports 80, 94, 95, 97, 105, 111, 112, 134, and 136. The FBI had not previously obtained Reports 97, 105, and 112 from Steele."); fn. 319 (Indicating that the Reports received by the FBI from Senator John McCain "were Steele Reports 80, 86, 94, 95, 97,

Indeed, this process of elimination is hardly necessary given that, on p. 176, the Horowitz Report straightforwardly states:

> Finally, by early January 2017, *BuzzFeed* had obtained copies of some of the Steele election reports during a meeting with the McCain Institute staff member and published them as part of an article titled "These Reports Allege Trump Has Deep Ties to Russia." ***Included in this collection was Report 166, another report that previously had not been shared with the FBI.***

Horowitz Report, p. 176 (emphasis added).

The OIG reached this conclusion from having "examined more than one million documents that were in the Department's and FBI's possession and conducted over 170 interviews involving more than 100 witnesses" including interviews with the then Assistant Director of the FBI's Counterintelligence Division, E.W. "Bill" Priestap, and reviews of Priestap's contemporaneous notes. *See*, *e.g.*, Horowitz Report, pp. iii and 278. That is the very same Priestap who was the sole signatory to the FBI affidavit submitted by Defendants to this Court. More specifically, the report details some of its methodology and the information it reviewed, including as follows:

> [T]he OIG was given broad access to highly classified information. In July 2018, the FBI's then Assistant Director (AD) for the Counterintelligence Division (CD), E.W. "Bill" Priestap, briefed the OIG regarding the FBI CHSs [Confidential Human Sources] and UCEs [Undercover Employees] who provided information for the Crossfire Hurricane investigation. This briefing was based on CD's knowledge of the Crossfire Hurricane investigation as well as searches of the FBI's Sentinel and Delta databases. In this briefing, Priestap described the FBI's operational use of CHSs other than Steele and his subsources, and use of UCEs in the Crossfire Hurricane investigation.
>
> Separately, the OIG reviewed emails, text messages, and instant messages of the FBI agents, analysts, and supervisors working on the Crossfire Hurricane investigation, as well as contemporaneous handwritten notes, to identify references to CHSs and UCEs.

Horowitz Report, p. 306.

The OIG's findings and conclusions, after extensive and exhaustive interviews with Priestap himself, conflict with Priestap's declaration in this case that the FBI "possess[ed]"

100, 101, 102, 105, 111, 112, 113, 130, 134, 135, and 136. FBI records show that the FBI had not previously received Reports 86, 97, 105, 112 and 113 from Steele.").

Report 166 "prior to 5:20 p.m. EST on January 10, 2017" (D.E. 214-11, p. 3) – a claim which includes *no information* as to the basis for this purported knowledge.

## ARGUMENT

### I. **The Court Can and Should Supplement the Record to Include the Horowitz Report, an Official Government Record.**

#### A. Supplementation is Proper Here.

The Court's consideration of Plaintiffs' Motion to Supplement is governed by the explicit order of the Eleventh Circuit to determine, in the first instance (and subject to review), simply whether supplementation with the Horowitz Report should be allowed or denied and, if allowed, whether that that allowance would cause the court to reverse its grant of summary judgment to Defendants by this Court, subject to review by the Eleventh Circuit.

Frequently, when Courts allow motions to supplement the record, they have done so without extensive explanation (for example, after a summary judgment motion has been argued, but before it has been decided). *See*, *e.g.*, *Buckler v. Israel*, 2016 U.S. Dist. LEXIS 92159, at *11 (S.D. Fla. Jan. 28, 2016) ("After the summary judgment briefing concluded, Plaintiffs sought to supplement the record with additional discovery that Plaintiffs claim they did not receive until January of 2016. Defendant opposes this request, noting that some of this material was already in Plaintiffs' possession and the evidence is presented in a manner more akin to a sur-reply. To the extent Plaintiffs rely on additional evidence, the Court has considered this evidence in ruling on the motion for summary judgment. Thus, the motion to supplement is granted."); *Miller v. Comery*, 2014 U.S. Dist. LEXIS 177220, at *1-2 (S.D. Fla. Dec. 24, 2014) ("At the hearing of December 3, 2014, the Defendant made an *ore tenus* motion to supplement her two Motions for Summary Judgment to incorporate the deposition testimony of non-party eyewitness Wilma Bowney. The Court granted that request and allowed the Defendant to provide the Court with the deposition transcript and a corresponding 1-2 page notice summarizing the transcript testimony.").

Though not constrained here by Rule 60(b)(2), it may be useful for the Court to consider the policies expressed by that rule here because the rule envisions the Court providing relief from judgment in light of "newly discovered evidence that, with reasonable diligence, could not have been discovered…." Here, as outlined above, the Horowitz Report constitutes newly discovered evidence that Plaintiffs could not, with reasonable diligence, have discovered prior to the deadlines for filing summary judgment motions.

In their argument to the Eleventh Circuit, however, Defendants contended that Plaintiffs somehow could have discovered facts contained in the Horowitz Report had they simply conducted more discovery.

This argument was, and is, specious.

First, it was *Defendants'* burden to prove every element of their Fair Report Privilege affirmative defense. Specifically, it was *Defendants'* obligation to produce facts showing that: (a) Report 166 was part of an "official proceeding;"[7] (b) Buzzfeed *knew* that Report 166 was part of an "official proceeding" when it published the document;[8] and (c) the average reader of Buzzfeed's article would understand that Buzzfeed was reporting on an official proceeding in publishing Report 166.[9]

Defendants nonetheless argue now that *Plaintiffs* were obliged to pursue the same type of elusive and expensive discovery of classified matters that Defendants sought from U.S. government agencies, even though much of the information Defendants' sought was irrelevant to the three inquiries above, just as the FBI noted in response to its efforts. Indeed, the vast majority of discovery propounded by Defendants was both irrelevant and (then) undiscoverable because it was classified. Defendants' own failure to secure most of what they requested shows that any effort by Plaintiffs' to secure information now available in the Horowitz Report – whether or not relevant – would have been futile.

More specifically, in June of 2017, Defendants sent deposition and document subpoenas to the DOJ, FBI, CIA, Office of the Director of National Intelligence, former-FBI Director James Comey, former-CIA director John Brennan, and former-DNI James Clapper. Each subpoena identified numerous areas of inquiry and multiple categories of documents to be produced. Each agency and individual objected to providing documents or testimony.

In September of 2017, Defendants filed an action in the D.C. District Court to compel responses. *Buzzfeed v. DOJ*, 17-mc-02429-APM. In that litigation, the DOJ argued, *inter alia* (and as Plaintiffs have argued), that the vast majority of Defendants' requests were irrelevant to Defendants' defenses. *See* Shayefar Declaration filed herewith, Exhibit A, p. 20 ("It's true that if

---

[7] Appellants' Opening Brief to Eleventh Circuit ("Opening Brief"), filed herewith as Exhibit 3, pp. 37-39; Reply Brief, pp. 41-60.

[8] Opening Brief, pp. 34-36, 52; Reply Brief, pp. 60-62.

[9] Opening Brief, pp. 33, 38-45, 51; Reply Brief, pp. 62-64.

the DOJ didn't possess the document on January 10, it would vitiate the privilege. But even if the DOJ did have the document on January 10th, it still wouldn't allow Buzzfeed to assert the Fair Report Privilege because they didn't report that the DOJ possessed the document on that day."); pp. 22-23 ("The article that Buzzfeed published doesn't report that DOJ possessed all the pages of their 35-page embedded document on January 10th. And even if it did, mere possession of a document doesn't constitute an official government action or proceeding within the meaning of the Fair Report Privilege in any jurisdiction.").

After almost a year of litigation, Defendants failed to obtain a *single* document or deposition they had sought, and instead accepted a three-paragraph affidavit from the DOJ, answering three narrowly-tailored questions – answers that failed to actually establish the facts *Defendants* needed to meet their burden. Reply Brief, pp. 55, 59-62.[10]

Defendants also argued to the Eleventh Circuit that Plaintiffs should have moved (in the British Courts) to compel further testimony from Christopher Steele, who refused, in his deposition, to answer questions about whether he provided copies of Report 166 to U.S. government officials, testifying that he "would need consent from my Crown employer to answer the question and therefore I choose not to." Shayefar Declaration, Exhibit B, p. 122:14-16. In actuality, however, Plaintiffs took *extraordinary* steps, both in the United States, and London to secure, over objection, any deposition at all from Steele. *See* D.E. 52, 54, 55, 56, 58, 60; Loble Declaration filed herewith, *generally*. Steele intervened in this Court, opposing Plaintiffs' Request for International Judicial Assistance and also fought his deposition in the British Courts. *See* Loble Declaration filed herewith. Moreover, as Mr. Loble states, efforts to compel additional answers from Steele would likely have proven costly, time consuming, and – ultimately – unsuccessful. *Id.*

Even under Rule 60(b)(2), what is required of Plaintiffs is merely "reasonable diligence" not expensive fools' errands.

Additionally, this Court should consider under what circumstances the Eleventh Circuit has found supplementation to be appropriate, even within the more constrained legal determinations to be made on appeal, and even when the supplementation is not fully conclusive

[10] Because Plaintiffs rely extensively on arguments presented in their appellate briefs throughout this Motion, they attach the Opening Brief and Reply Brief to the Eleventh Circuit as Exhibits 3 and 4, respectively, each of which is incorporated herein by reference.

of any matter to be determined. *See*, *e.g.*, *Young v. City of Augusta ex rel. DeVaney*, 59 F.3d 1160, 1168 (11th Cir. 1995) ("Factors we have considered in deciding to grant a motion to supplement include whether the additional material would be dispositive of pending issues in the case[,] and whether interests of justice and judicial economy would thereby be served.... However, these are only guidelines for exercising our discretion. Even when the added material will not conclusively resolve an issue on appeal, we may allow supplementation in the aid of making an informed decision."); *Schwartz*, 341 F.3d at 1225 n.4 ("Even when the added material will not conclusively resolve an issue on appeal, we may allow supplementation in the aid of making an informed decision."); *Hinson*, 192 F.3d at 1344 n.2 (treating a motion to remand for addition of a contract to the record as, instead, a motion to supplement the record with the relevant contract, because doing so would result in a "record that will allow us to decide the immunity question fairly").

Accordingly, this Court should permit the supplementation of the record to include the Horowitz Report – either because such supplementation would alter this Court's determination of the Summary Judgment motion, or because such supplementation would provide the Eleventh Circuit with a "record that will all [it] to decide the… question fairly."

B. This Court Should Take Judicial Notice of the Horowitz Report and the Findings Contained Therein Just as it Did with the Nunes and Schiff Memos.

This Court may take judicial notice of the Horowitz Report as a U.S. government document. *See*, *e.g.*, *K.T. v. Royal Caribbean Cruises, Ltd.*, 931 F.3d 1041, 1047-48 (11th Cir. 2019) (Carnes, CJ., concurring) (taking judicial notice of Cruise Line Incident Reports compiled and published by the Department of Transportation pursuant to Fed. R. Evid. 201(b), (d)); *Terrebonne v. Blackburn*, 646 F.2d 997, 1000 n.4 (5th Cir. June 1981) (en banc) ("Absent some reason for mistrust, courts have not hesitated to take judicial notice of agency records and reports."); *Corrie v. Caterpillar*, 503 F.3d 974, 978 n.2 (9th Cir. 2007) (taking judicial notice of government publication and citing cases for the same); *Okoi v. El Al Isr. Airlines*, 378 F. App'x 9, 11 n.1 (2d Cir. 2010) (rejecting a motion to supplement the record for documents offered by appellant ***except*** "for the final three pages, which contain excerpts of a government publication of which this Court may take judicial notice.").

Indeed, in reaching its Summary Judgement decision (and at the urging of Appellees), this Court took judicial notice of competing memos written by Congressmen Devin Nunes and

Adam Schiff.[11] *See* D.E. 388, p. 4, fn. 5 (finding such documents admissible under FRE 803(8)(A)(iii) and self-authenticating under FRE 902(5)); D.E. 243, p. 2, fn. 1 (arguing admissibility and self-authentication under the same sections). Specifically, this Court held:

> Rule of Evidence 803(8)(A)(iii) provides an exception from the hearsay rule in a civil case for "factual findings from a legally authorized investigation." In a discovery dispute arising out of this case, Judge Mehta of the District Court for the District of Columbia stated that it "can't be any clearer" that the facts contained in the Nunes Memo and other congressional memoranda are admissible under 803(8)(A)(iii). D.E. 255-2, p. 10. The Court agrees. As to authentication, congressional reports are self-authenticating pursuant to Rule of Evidence 902(5)….

D.E. 388, p. 4, fn. 5.

The same rationale should apply to the Horowitz Report.

**II. <u>The Court Should Issue an Order Stating that Consideration of the Horowitz Report Would Reverse the Court's Previously Issued Summary Judgment Order.</u>**

A. <u>The Horowitz Report Undercuts a Key Factual Finding Made by This Court.</u>

It was Defendants' burden to prove every element of its affirmative defense based on the Fair Report Privilege. *See*, *e.g.*, *Saleh v. New York Post*, 78 A.D.3d 1149, 1151 (N.Y. App.Div. 2010) ("The privilege afforded by Civil Rights law § 74 is an affirmative defense...."); *Donawa v. United States AG*, 735 F.3d 1275, 1282 (11th Cir. 2013) ("[T]he defendant bears the burden of proving an affirmative defense.").

The plain language of §74 excludes from protection "the report of anything said or done at the time and place of such a proceeding *which was not a part thereof*." (Emphasis added.)

Defendants therefore had to prove, at a minimum, that the defamatory comments contained Report 166 were, in fact, part of an "official proceeding" *at the time of* Buzzfeed's publication. But Report 166 clearly could not have been part of the only relevant "official proceeding" identified by this Court (an FBI investigation) if it hadn't been received by the FBI at the time of publication.

Moreover, given the Horowitz Report, this Court should conclude that Defendants failed to meet their burden of proving that they *knew* that Report 166 was part of an "official

---

[11] This Court found it appropriate to take judicial notice of the facts asserted in the Nunes and Schiff memos even though the memos took partisan positions and often reached contradictory conclusions. D.E. 388, p. 4. The Horowitz Report, on the other hand, is a comprehensive report of a factual investigation by the non-partisan Office of the Inspector General.

proceeding" when they published, *and* had *relied on* that knowledge in deciding to publish Report 166. *See* Opening Brief, pp. 34-36; Reply Brief, p. 43, fn. 25; pp. 56-57, fn. 28; pp. 61-63.

Defendants' failure to prove, by a preponderance of evidence, *either* of these things – that the defamation was part of an "official proceeding," *or* that Buzzfeed relied on knowledge of that fact in its reporting – should be dispositive – leading the Court upon any full remand to deny Defendants summary judgment.

Report 166 clearly could not have been "part" of any "official proceeding" if no person who was part of the "official proceeding" even knew of it.

Defendants contend, however, that, even if the FBI did *not* possess Report 166, "the National Security Council" (*i.e.* Celeste Wallender), "at least one member of Congress," (Representative Adam Kinzinger) and "the House Speaker's chief of staff" (John Burks) were in possession of Report 166 at the time of publication.[12] It is true that David Kramer testified he provided a copy of Report 166 to Wallander, saying she was "someone I have known for many years, who I consider ... a friend." D.E. 214-15, 113:5-8. But Kramer never testified (and this Court had *no* evidence before it) that: he asked Wallander to do anything with the Reports; that she was *empowered* to do anything with them; or that she *did* do anything with them.

It is also true that Kramer testified that he provided a copy of Report 166 to Representative Kinzinger. But, when specifically asked what Kinzinger did with the Reports, Kramer testified merely: "I think he put it in his safe or desk drawer and kept it there. I'm not aware that he did anything further with it." *Id.* at 120:20-23.

And, Kramer testified only that he *showed* House Speaker Paul Ryan's Chief of Staff, John Burks, a copy of the Reports, that he didn't know if Burks "read it all the way through," and that Burks "didn't have a reaction one way or the other." D.E. 214-15, 121-22; D.E. 214-15, 124:24. The record certainly contains no suggestion that any of these three individuals *did* anything with Report 166, *provided* Report 166 to anyone else, or *had the authority* to do

---

[12] In its summary judgment order, this Court inadvertently stated that *Christopher Steele* provided copies of Report 166 to "Ms. Wallander at the NSC, Representative Adam Kinzinger (R-Ill.), and House Speaker Paul Ryan's Chief of Staff, John Burks," even though (a) the portion of the record to which the Court cites shows that *David Kramer* gave Report 166 to Wallander and Kinzinger, and (b) that Kramer *showed* a copy of Report 166 to Burks, but did not provide him a copy. D.E. 214-2, ¶¶ 34-39.

anything with Report 166. Therefore, evidence other than Priestap's FBI affidavit was insufficient even to show *mere possession* by those actually involved in the "official proceedings" claimed. *See*, *e.g.*, *Crucey v. Jackall*, 713 N.Y.S.2d 20, 22-24 (App.Div. 2000) ("The test is whether the report concerns 'action taken by a person officially empowered to do so.'").

Thus, the Horowitz Report also underlines Plaintiffs' argument that New York cases warn courts against using "lexicographer's precision" *only in* matching the language of the defamatory statement to language used in "proceedings," *Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*, 49 N.Y.2d 63, 68 (1979), but require precision in ensuring that the defamatory statement be fully "part of" an "official proceeding" – an official "action taken by a person officially empowered to do so," *Freeze Right Refrig. & Air Conditioning Servs. v City of New York*, 101 A.D.2d 175, 182 (N.Y. 1984) – and that it *not* merely "overlap" what was subject to such a proceeding. *Fine v. ESPN, Inc.*, 11 F.Supp.3d 209, 216 (N.D.N.Y. 2014).[13]

Therefore, the Horowitz Report has fully kicked out the wobbly factual leg upon which the Court decided that Report 166 might somehow have been part of an official proceeding. And, at minimum, the Horowitz Report creates at least one substantial *factual* question precluding determination of the privilege as a matter of law, thus necessitating a jury trial on the disputed issue. For this reason, this Court should inform the Eleventh Circuit that inclusion of the Horowitz Report in the record would reverse the court's previously issued summary judgment order.

---

[13] The cases decrying a "lexicographer's precision" stand for the proposition that a reporter who is reporting on something that is actually part of a proceeding should be given some latitude in how he or she describes that which is part of the proceeding. So, for example, a reporter quoting from an affidavit filed in a judicial proceeding should be afforded latitude in reporting on the wording of that affidavit (so long as the report is still substantially accurate). The reporter is ***not*** however to be afforded ***any*** latitude in misrepresenting what was actually "part of" the proceeding. So, if what the reporter thought was an affidavit filed in court was actually an unfiled letter, the reporter could be liable for defamation contained in that letter, even if the reporter quoted the letter precisely. And, that makes sense: The "fair report" privilege is designed to protect full reporting of proceedings, even when they contain defamatory statements – it is not designed to keep the press from having to be careful or accurate in reporting what was "part of" official proceedings, or not.

B. The Horowitz Report Makes Clearer That Application of New York's Fair Report Privilege is Inconsistent with the Public Policy Underlying the Privilege.

The Horowitz Report also underlines the New York courts' explicit concerns limiting application of the Fair Report Privilege. As Plaintiffs have explained (Opening Brief, pp. 29-31; Reply Brief, pp. 43-47), the public policy underlying the application of the Fair Report Privilege counsels against extending it to reporting on materials that may have been provided to an investigatory body, but which were not themselves relied upon, or truly investigated, as part of the official activity. *See*, *e.g.*, *Kelley v. Hearst Corp*., 157 N.Y.S.2d 498, 502 (App.Div. 1956) ("The only reference to official action of any kind in the texts pleaded in the complaint as libelous are the words 'police said' in the first publication described. The narration in private to newspaper reporters by police officers of acts of other persons is not 'a public and official proceeding' coming within the range of the statute."); *Wynn v. Smith*, 117 Nev. 6, 16 (2001) (report prepared by Scotland Yard that was "unsubstantiated" was not entitled to protections of the fair report privilege: "We conclude that this privilege should not be extended to allow the spread of common innuendo that is not afforded the protection accorded to official or judicial proceedings.").

By exposing the Steele memos as largely "common innuendo" or, as the CIA Intel Section Chief classified the Steele reports, "internet rumor" (Horowitz Report, p. 178), the Horowitz Report illuminates the wisdom of courts' reluctance to extend the Fair Report Privilege, at the behest of the publishing industry, to classified materials merely overlapping official proceedings.

For this reason as well, this Court should issue an order stating that supplementation of the record to include the Horowitz Report would lead it to reverse the court's previously issued summary judgment order upon full remand.

## CONCLUSION

For the reasons stated hereinabove, and in accordance with the directive from the Eleventh Circuit Court of Appeals, Plaintiffs respectfully request that:

(a) the Court Order that the record be supplemented to include the Horowitz Report; and

(b) the Court Issue an Order informing the Eleventh Circuit Court of Appeals that, on a full remand, the Court would reverse its previously-issued order granting summary judgment to Defendants.

Respectfully Submitted,

/s/ Evan Fray-Witzer
Evan Fray-Witzer (pro hac vice)
Ciampa Fray-Witzer, LLP
20 Park Plaza, Suite 505
Boston, MA 02116
617-426-0000
Evan@CFWLegal.com

/s/ Valentin Gurvits
Valentin Gurvits (pro hac vice)
Boston Law Group, PC
825 Beacon Street, Ste 20
Newton, MA 02459
617-928-1800
vgurvits@bostonlawgroup.com

/s/ Matthew Shayefar
Matthew Shayefar (Fla. Bar. No. 126465)
Law Office of Matthew Shayefar, PC
925 N La Brea Ave
W. Hollywood, CA 90038
323-948-8101
matt@shayefar.com

Dated: March 23, 2020

**CERTIFICATE OF SERVICE**

**I hereby certify** that a true and correct copy of the foregoing was served electronically via the CM/ECF electronic filing system on all counsel for all parties on the date set forth below.

Dated: March 23, 2020

/s/ Matthew Shayefar
Matthew Shayefar