Exhibit
1
Part
1

**REDACTED FOR PUBLIC RELEASE**



# Office of the Inspector General
## U.S. Department of Justice

**OVERSIGHT ★ INTEGRITY ★ GUIDANCE**



# Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation

Oversight and Review Division 20-012

December 2019

All information contained herein is unclassified
Date: 12/8/2019   BY: C28W34B64
This redacted version only

**REDACTED FOR PUBLIC RELEASE**



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

## Background

The Department of Justice (Department) Office of the Inspector General (OIG) undertook this review to examine certain actions by the Federal Bureau of Investigation (FBI) and the Department during an FBI investigation opened on July 31, 2016, known as "Crossfire Hurricane," into whether individuals associated with the Donald J. Trump for President Campaign were coordinating, wittingly or unwittingly, with the Russian government's efforts to interfere in the 2016 U.S. presidential election. Our review included examining:

- The decision to open Crossfire Hurricane and four individual cases on current and former members of the Trump campaign, George Papadopoulos, Carter Page, Paul Manafort, and Michael Flynn; the early investigative steps taken; and whether the openings and early steps complied with Department and FBI policies;

- The FBI's relationship with Christopher Steele, whom the FBI considered to be a confidential human source (CHS); its receipt, use, and evaluation of election reports from Steele; and its decision to close Steele as an FBI CHS;

- Four FBI applications filed with the Foreign Intelligence Surveillance Court (FISC) in 2016 and 2017 to conduct Foreign Intelligence Surveillance Act (FISA) surveillance targeting Carter Page; and whether these applications complied with Department and FBI policies and satisfied the government's obligations to the FISC;

- The interactions of Department attorney Bruce Ohr with Steele, the FBI, Glenn Simpson of Fusion GPS, and the State Department; whether work Ohr's spouse performed for Fusion GPS implicated ethical rules applicable to Ohr; and Ohr's interactions with Department attorneys regarding the Manafort criminal case; and

- The FBI's use of Undercover Employees (UCEs) and CHSs other than Steele in the Crossfire Hurricane investigation; whether the FBI placed any CHSs within the Trump campaign or tasked any CHSs to report on the Trump campaign; whether the use of CHSs and UCEs complied with Department and FBI policies; and the attendance of a Crossfire Hurricane supervisory agent at counterintelligence briefings given to the 2016 presidential candidates and certain campaign advisors.

## OIG Methodology

The OIG examined more than one million documents that were in the Department's and FBI's possession and conducted over 170 interviews involving more than 100 witnesses. These witnesses included former FBI Director Comey, former Attorney General (AG) Loretta Lynch, former Deputy Attorney General (DAG) Sally Yates, former DAG Rod Rosenstein, former Acting AG and Acting DAG and current FBI General Counsel Dana Boente, former FBI Deputy Director Andrew McCabe, former FBI General Counsel James Baker, and Department attorney Bruce Ohr and his wife. The OIG also interviewed Christopher Steele and current and former employees of other U.S. government agencies. Two witnesses, Glenn Simpson and Jonathan Winer (a former Department of State official), declined our requests for voluntary interviews, and we were unable to compel their testimony.

We were given broad access to relevant materials by the Department and the FBI. In addition, we reviewed relevant information that other U.S. government agencies provided the FBI in the course of the Crossfire Hurricane investigation. However, because the activities of other agencies are outside our jurisdiction, we did not seek to obtain records from them that the FBI never received or reviewed, except for a limited amount of State Department records relating to Steele; we also did not seek to assess any actions other agencies may have taken. Additionally, our review did not independently seek to determine whether corroboration existed for the Steele election reporting; rather, our review was focused on information that was available to the FBI concerning Steele's reports prior to and during the pendency of the Carter Page FISA authority.

Our role in this review was not to second-guess discretionary judgments by Department personnel about whether to open an investigation, or specific judgment calls made during the course of an investigation, where those decisions complied with or were authorized by Department rules, policies, or procedures. We do not criticize particular decisions merely because we might have recommended a different investigative strategy or tactic based on the facts learned during our investigation. The question we considered was not whether a particular investigative decision was ideal or could have been handled more effectively, but rather whether the Department and the FBI complied with applicable legal requirements, policies, and procedures in taking the actions we reviewed or, alternatively, whether the circumstances surrounding the decision indicated that it was based on



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

inaccurate or incomplete information, or considerations other than the merits of the investigation. If the explanations we were given for a particular decision were consistent with legal requirements, policies, procedures, and not unreasonable, we did not conclude that the decision was based on improper considerations in the absence of documentary or testimonial evidence to the contrary.

## The Opening of Crossfire Hurricane and Four Related Investigations, and Early Investigative Steps

*The Opening of Crossfire Hurricane and Four Individual Cases*

As we describe in Chapter Three, the FBI opened Crossfire Hurricane on July 31, 2016, just days after its receipt of information from a Friendly Foreign Government (FFG) reporting that, in May 2016, during a meeting with the FFG, then Trump campaign foreign policy advisor George Papadopoulos "suggested the Trump team had received some kind of suggestion from Russia that it could assist this process with the anonymous release of information during the campaign that would be damaging to Mrs. Clinton (and President Obama)." The FBI Electronic Communication (EC) opening the Crossfire Hurricane investigation stated that, based on the FFG information, "this investigation is being opened to determine whether individual(s) associated with the Trump campaign are witting of and/or coordinating activities with the Government of Russia." We did not find information in FBI or Department ECs, emails, or other documents, or through witness testimony, indicating that any information other than the FFG information was relied upon to predicate the opening of the Crossfire Hurricane investigation. Although not mentioned in the EC, at the time, FBI officials involved in opening the investigation had reason to believe that Russia may have been connected to the WikiLeaks disclosures that occurred earlier in July 2016, and were aware of information regarding Russia's efforts to interfere with the 2016 U.S. elections. These officials, though, did not become aware of Steele's election reporting until weeks later and we therefore determined that Steele's reports played no role in the Crossfire Hurricane opening.

The FBI assembled a Headquarters-based investigative team of special agents, analysts, and supervisory special agents (referred to throughout this report as "the Crossfire Hurricane team") who conducted an initial analysis of links between Trump campaign members and Russia. Based upon this

analysis, the Crossfire Hurricane team opened individual cases in August 2016 on four U.S. persons—Papadopoulos, Carter Page, Paul Manafort, and Michael Flynn—all of whom were affiliated with the Trump campaign at the time the cases were opened.

As detailed in Chapter Two, the Attorney General's Guidelines for Domestic Operations (AG Guidelines) and the FBI's Domestic Investigations Operations Guide (DIOG) both require that FBI investigations be undertaken for an "authorized purpose"—that is, "to detect, obtain information about, or prevent or protect against federal crimes or threats to the national security or to collect foreign intelligence." Additionally, both the AG Guidelines and the DIOG permit the FBI to conduct an investigation, even if it might impact First Amendment or other constitutionally protected activity, so long as there is some legitimate law enforcement purpose associated with the investigation.

In addition to requiring an authorized purpose, FBI investigations must have adequate factual predication before being initiated. The predication requirement is not a legal requirement but rather a prudential one imposed by Department and FBI policy. The DIOG provides for two types of investigations, Preliminary Investigations and Full Investigations. A Preliminary Investigation may be opened based upon "any allegation or information" indicative of possible criminal activity or threats to the national security. A Full Investigation may be opened based upon an "articulable factual basis" that "reasonably indicates" any one of three defined circumstances exists, including:

> An activity constituting a federal crime or a threat to the national security has or may have occurred, is or may be occurring, or will or may occur and the investigation may obtain information relating to the activity or the involvement or role of an individual, group, or organization in such activity.

In Full Investigations such as Crossfire Hurricane, all lawful investigative methods are allowed. In Preliminary Investigations, all lawful investigative methods (including the use of CHSs and UCEs) are permitted except for mail opening, physical searches requiring a search warrant, electronic surveillance requiring a judicial order or warrant (Title III wiretap or a FISA order), or requests under Title VII of FISA. An investigation opened as a Preliminary Investigation may be converted subsequently to a Full Investigation if



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

information becomes available that meets the predication standard.  As we describe in the report, all of the investigative actions taken by the Crossfire Hurricane team, from the date the case was opened on July 31 until October 21 (the date of the first FISA order) would have been permitted whether the case was opened as a Preliminary or Full Investigation.

The AG Guidelines and the DIOG do not provide heightened predication standards for sensitive matters, or allegations potentially impacting constitutionally protected activity, such as First Amendment rights.  Rather, the approval and notification requirements contained in the AG Guidelines and the DIOG are, in part, intended to provide the means by which such concerns can be considered by senior officials.  However, we were concerned to find that neither the AG Guidelines nor the DIOG contain a provision requiring Department consultation before opening an investigation such as the one here involving the alleged conduct of individuals associated with a major party presidential campaign.

Crossfire Hurricane was opened as a Full Investigation and all of the senior FBI officials who participated in discussions about whether to open a case told us the information warranted opening it.  For example, then Counterintelligence Division (CD) Assistant Director (AD) E.W. "Bill" Priestap, who approved the case opening, told us that the combination of the FFG information and the FBI's ongoing cyber intrusion investigation of the July 2016 hacks of the Democratic National Committee's (DNC) emails, created a counterintelligence concern that the FBI was "obligated" to investigate.  Priestap stated that he considered whether the FBI should conduct defensive briefings for the Trump campaign but ultimately decided that providing such briefings created the risk that "if someone on the campaign was engaged with the Russians, he/she would very likely change his/her tactics and/or otherwise seek to cover-up his/her activities, thereby preventing us from finding the truth."  We did not identify any Department or FBI policy that applied to this decision and therefore determined that the decision was a judgment call that Department and FBI policy leaves to the discretion of FBI officials.  We also concluded that, under the AG Guidelines and the DIOG, the FBI had an authorized purpose when it opened Crossfire Hurricane to obtain information about, or protect against, a national security threat or federal crime, even though the investigation also had the potential to impact constitutionally protected activity.

Additionally, given the low threshold for predication in the AG Guidelines and the DIOG, we concluded that the FFG information, provided by a government the United States Intelligence Community (USIC) deems trustworthy, and describing a first-hand account from an FFG employee of a conversation with Papadopoulos, was sufficient to predicate the investigation.  This information provided the FBI with an articulable factual basis that, if true, reasonably indicated activity constituting either a federal crime or a threat to national security, or both, may have occurred or may be occurring.  For similar reasons, as we detail in Chapter Three, we concluded that the quantum of information articulated by the FBI to open the individual investigations on Papadopoulos, Page, Flynn, and Manafort in August 2016 was sufficient to satisfy the low threshold established by the Department and the FBI.

As part of our review, we also sought to determine whether there was evidence that political bias or other improper considerations affected decision making in Crossfire Hurricane, including the decision to open the investigation.  We discussed the issue of political bias in a prior OIG report, *Review of Various Actions in Advance of the 2016 Election*, where we described text and instant messages between then Special Counsel to the Deputy Director Lisa Page and then Section Chief Peter Strzok, among others, that included statements of hostility toward then candidate Trump and statements of support for then candidate Hillary Clinton.  In this review, we found that, while Lisa Page attended some of the discussions regarding the opening of the investigations, she did not play a role in the decision to open Crossfire Hurricane or the four individual cases.  We further found that while Strzok was directly involved in the decisions to open Crossfire Hurricane and the four individual cases, he was not the sole, or even the highest-level, decision maker as to any of those matters.  As noted above, then CD AD Priestap, Strzok's supervisor, was the official who ultimately made the decision to open the investigation, and evidence reflected that this decision by Priestap was reached by consensus after multiple days of discussions and meetings that included Strzok and other leadership in CD, the FBI Deputy Director, the FBI General Counsel, and a FBI Deputy General Counsel.  We concluded that Priestap's exercise of discretion in opening the investigation was in compliance with Department and FBI policies, and we did not find documentary or testimonial evidence that political bias or improper motivation influenced his decision.  We similarly found that, while the formal documentation opening each of the four individual investigations was approved by Strzok (as required by the DIOG), the



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

decisions to do so were reached by a consensus among the Crossfire Hurricane agents and analysts who identified individuals associated with the Trump campaign who had recently traveled to Russia or had other alleged ties to Russia. Priestap was involved in these decisions. We did not find documentary or testimonial evidence that political bias or improper motivation influenced the decisions to open the four individual investigations.

*Sensitive Investigative Matter Designation*

The Crossfire Hurricane investigation was properly designated as a "sensitive investigative matter," or SIM, by the FBI because it involved the activities of a domestic political organization or individuals prominent in such an organization. The DIOG requires that SIMs be reviewed in advance by the FBI Office of the General Counsel (OGC) and approved by the appropriate FBI Headquarters operational section chief, and that an "appropriate [National Security Division] official" receive notification after the case has been opened.

We concluded that the FBI satisfied the DIOG's approval and notification requirements for SIMs. As we describe in Chapter Three, the Crossfire Hurricane opening was reviewed by an OGC Unit Chief and approved by AD Priestap (two levels above Section Chief). The team also orally briefed National Security Division (NSD) officials within the first few days of the investigations being initiated. We were concerned, however, that Department and FBI policies do not require that a senior Department official be notified prior to the opening of a particularly sensitive case such as this one, nor do they place any additional requirements for SIMs beyond the approval and notification requirements at the time of opening, and therefore we include a recommendation to address this issue.

*Early Investigative Steps and Adherence to the Least Intrusive Method*

The AG Guidelines and the DIOG require that the "least intrusive" means or method be "considered" when selecting investigative techniques and, "if reasonable based upon the circumstances of the investigation," be used to obtain information instead of a more intrusive method. The DIOG states that the degree of procedural protection the law and Department and FBI policy provide for the use of a particular investigative method helps to determine its intrusiveness. As described in Chapter Three, immediately after opening the investigation, the

Crossfire Hurricane team submitted name trace requests to other U.S. government agencies and a foreign intelligence agency, and conducted law enforcement database and open source searches, to identify individuals associated with the Trump campaign in a position to have received the alleged offer of assistance from Russia. The FBI also sent Strzok and a Supervisory Special Agent (SSA) abroad to interview the source of the information the FBI received from the FFG, and also searched the FBI's database of CHSs to identify sources who potentially could provide information about connections between individuals associated with the Trump campaign and Russia. Each of these steps is authorized under the DIOG and was a less intrusive investigative technique.

Thereafter, the Crossfire Hurricane team used more intrusive techniques, including CHSs to interact and consensually record multiple conversations with Page and Papadopoulos, both before and after they were working for the Trump campaign, as well as on one occasion with a high-level Trump campaign official who was not a subject of the investigation. We found that, under Department and FBI policy, although this CHS activity implicated First Amendment protected activity, the operations were permitted because their use was not for the sole purpose of monitoring activities protected by the First Amendment or the lawful exercise of other rights secured by the Constitution or laws of the United States. Additionally, we found that under FBI policy, the use of a CHS to conduct consensual monitoring is a matter of investigative judgment that, absent certain circumstances, can be authorized by a first-line supervisor (an SSA). We determined that the CHS operations conducted during Crossfire Hurricane received the necessary FBI approvals and that, while AD Priestap knew about and approved of all of the operations, review beyond a first-level FBI supervisor was not required by Department or FBI policy.

We found it concerning that Department and FBI policy did not require the FBI to consult with any Department official in advance of conducting CHS operations involving advisors to a major party candidate's presidential campaign, and we found no evidence that the FBI consulted with any Department officials before conducting these CHS operations. As we describe in Chapter Two, consultation, at a minimum, is required by Department and FBI policies in numerous other sensitive circumstances, and we include a recommendation to address this issue.

Shortly after opening the Carter Page investigation in August 2016, the Crossfire Hurricane team discussed the possible use of FISA-authorized



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

electronic surveillance targeting Page, which is among the most sensitive and intrusive investigative techniques. As we describe in Chapter Five, the FBI ultimately did not seek a FISA order at that time because OGC, NSD's Office of Intelligence (OI), or both determined that more information was needed to support probable cause that Page was an agent of a foreign power. However, immediately after the Crossfire Hurricane team received Steele's election reporting on September 19, the team reinitiated their discussions with OI and their efforts to obtain FISA surveillance authority for Page, which they received from the FISC on October 21.

The decision to seek to use this highly intrusive investigative technique was known and approved at multiple levels of the Department, including by then DAG Yates for the initial FISA application and first renewal, and by then Acting Attorney General Boente and then DAG Rosenstein for the second and third renewals, respectively. However, as we explain later, the Crossfire Hurricane team failed to inform Department officials of significant information that was available to the team at the time that the FISA applications were drafted and filed. Much of that information was inconsistent with, or undercut, the assertions contained in the FISA applications that were used to support probable cause and, in some instances, resulted in inaccurate information being included in the applications. While we do not speculate whether Department officials would have authorized the FBI to seek to use FISA authority had they been made aware of all relevant information, it was clearly the responsibility of Crossfire Hurricane team members to advise them of such critical information so that they could make a fully informed decision.

## The FBI's Relationship with Christopher Steele, and Its Receipt and Evaluation of His Election Reporting before the First FISA Application

As we describe in Chapter Four, Steele is a former intelligence officer ▮▮▮▮▮▮ who, in 2009, formed a consulting firm specializing in corporate intelligence and investigative services. In 2010, Steele was introduced by Ohr to an FBI agent, and for several years provided information to the FBI about various matters, such as corruption in the International Federation of Association Football (FIFA). Steele also provided the FBI agent with reporting about Russian oligarchs.

In 2013, the FBI completed the paperwork allowing the FBI to designate Steele as a CHS. However, as described in Chapter Four, we found that the FBI and Steele held significantly differing views about the nature of their relationship. Steele's handling agent viewed Steele as a former intelligence officer colleague and FBI CHS, with obligations to the FBI. Steele, on the other hand, told us that he was a businessperson whose firm (not Steele) had a contractual agreement with the FBI and whose obligations were to his paying clients, not the FBI. We concluded that this disagreement affected the FBI's control over Steele during the Crossfire Hurricane investigation, led to divergent expectations about Steele's conduct in connection with his election reporting, and ultimately resulted in the FBI formally closing Steele as a CHS in November 2016 (although, as discussed below, the FBI continued its relationship with Steele through Ohr).

In June 2016, Steele and his consulting firm were hired by Fusion GPS, a Washington, D.C., investigative firm, to obtain information about whether Russia was trying to achieve a particular outcome in the 2016 U.S. elections, what personal and business ties then candidate Trump had in Russia, and whether there were any ties between the Russian government and Trump or his campaign. Steele's work for Fusion GPS resulted in his producing numerous election-related reports, which have been referred to collectively as the "Steele Dossier." Steele himself was not the originating source of any of the factual information in his reporting. Steele instead relied on a Primary Sub-source for information, who used his/her network of sub-sources to gather information that was then passed to Steele. With Fusion GPS's authorization, Steele directly provided more than a dozen of his reports to the FBI between July and October 2016, and several others to the FBI through Ohr and other third parties. The Crossfire Hurricane team received the first six election reports on September 19, 2016—more than two months after Steele first gave his handling agent six of the six reports. We describe the reasons it took two months for the reports to reach the team in Chapter Four.

*FBI's Efforts to Evaluate the Steele Reporting*

Steele's handling agent told us that when Steele provided him with the first election reports in July 2016 and described his engagement with Fusion GPS, it was obvious to him that the request for the research was politically motivated. The supervisory intelligence analyst who supervised the analytical efforts for the Crossfire Hurricane team (Supervisory Intel Analyst)



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

explained that he also was aware of the potential for political influences on the Steele reporting.

The fact that the FBI believed Steele had been retained to conduct political opposition research did not require the FBI, under either DOJ or FBI policy, to ignore his reporting. The FBI regularly receives information from individuals with potentially significant biases and motivations, including drug traffickers, convicted felons, and even terrorists. The FBI is not required to set aside such information; rather, FBI policy requires that it critically assess the information. We found that after receiving Steele's reporting, the Crossfire Hurricane team began those efforts in earnest.

We determined that the FBI's decision to receive Steele's information for Crossfire Hurricane was based on multiple factors, including:  (1) Steele's prior work as an intelligence professional for ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉; (2) his expertise on Russia; (3) his record as an FBI CHS; (4) the assessment of Steele's handling agent that Steele was reliable and had provided helpful information to the FBI in the past; and (5) the themes of Steele's reporting were consistent with the FBI's knowledge at the time of Russian efforts to interfere in the 2016 U.S. elections.

However, as we describe later, as the FBI obtained additional information raising significant questions about the reliability of the Steele election reporting, the FBI failed to reassess the Steele reporting relied upon in the FISA applications, and did not fully advise NSD or OI officials. We also found that the FBI did not aggressively seek to obtain certain potentially important information from Steele. For example, the FBI did not press Steele for information about the actual funding source for his election reporting work. Agents also did not question Steele about his role in a September 23, 2016 *Yahoo News* article entitled, "*U.S. intel officials probe ties between Trump advisor and Kremlin*," that described efforts by U.S. intelligence to determine whether Carter Page had opened communication channels with Kremlin officials. As we discuss in Chapters Five and Eight, the FBI assessed in the Carter Page FISA applications, without any support, that Steele had not "directly provided" the information to *Yahoo News*.

## The First Application for FISA Authority on Carter Page

At the request of the FBI, the Department filed four applications with the FISC seeking FISA authority

targeting Carter Page:  the first application on October ▉, 2016, and three renewal applications on January ▉, April ▉, and June ▉, 2017.  A different FISC judge considered each application and issued the requested orders, collectively resulting in approximately 11 months of FISA coverage targeting Carter Page from October ▉, 2016, to September ▉, 2017.  We discuss the first FISA application in this section and in Chapter Five.

### Decision to Seek FISA Authority

We determined that the Crossfire Hurricane team's receipt of Steele's election reporting on September 19, 2016 played a central and essential role in the FBI's and Department's decision to seek the FISA order.  As noted above, when the team first sought to pursue a FISA order for Page in August 2016, a decision was made by OGC, OI, or both that more information was needed to support a probable cause finding that Page was an agent of a foreign power.  As a result, FBI OGC ceased discussions with OI about a Page FISA order at that time.

On September 19, 2016, the same day that the Crossfire Hurricane team first received Steele's election reporting, the team contacted FBI OGC again about seeking a FISA order for Page and specifically focused on Steele's reporting in drafting the FISA request.  Two days later, on September 21, the FBI OGC Unit Chief contacted the NSD OI Unit Chief to advise him that the FBI believed it was ready to submit a formal FISA request to OI relating to Page. Almost immediately thereafter, OI assigned an attorney (OI Attorney) to begin preparation of the application.

Although the team also was interested in seeking FISA surveillance targeting Papadopoulos, the FBI OGC attorneys were not supportive.  FBI and NSD officials told us that the Crossfire Hurricane team ultimately did not seek FISA surveillance of Papadopoulos, and we are aware of no information indicating that the team requested or seriously considered FISA surveillance of Manafort or Flynn.

We did not find documentary or testimonial evidence that political bias or improper motivation influenced the FBI's decision to seek FISA authority on Carter Page.

### Preparation and Review Process

As we detail in Chapter Two, the FISC Rules of Procedure and FBI policy required that the Carter Page FISA applications contain all material facts.  Although



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

the FISC Rules do not define or otherwise explain what constitutes a "material" fact, FBI policy guidance states that a fact is "material" if it is relevant to the court's probable cause determination. Additionally, FBI policy mandates that the case agent ensure that all factual statements in a FISA application are "scrupulously accurate."

On or about September 23, the OI Attorney began work on the FISA application. Over the next several weeks, the OI Attorney prepared and edited a draft application using information principally provided by the FBI case agent assigned to the Carter Page investigation at the time and, in a few instances, by an OGC attorney (OGC Attorney) or other Crossfire Hurricane team members. The drafting process culminated in an application that asserted that the Russian government was attempting to undermine and influence the upcoming U.S. presidential election, and that the FBI believed Carter Page was acting in conjunction with the Russians in those efforts. The application's statement of facts supporting probable cause to believe that Page was an agent of Russia was broken down into five main elements:

- The efforts of Russian Intelligence Services (RIS) to influence the upcoming U.S. presidential election;
- The Russian government's attempted coordination with members of the Trump campaign, based on the FFG information reporting the suggestion of assistance from the Russians to someone associated with the Trump campaign;
- Page's historical connections to Russia and RIS;
- Page's alleged coordination with the Russian government on 2016 U.S. presidential election activities, based on Steele's reporting; and
- Page's statements to an FBI CHS in October 2016 that that he had an "open checkbook" from certain Russians to fund a think tank project.

In addition, the statement of facts described Page's denials of coordination with the Russian government, as reported in two news articles and asserted by Page in a September 25 letter to then FBI Director Comey.

The application received the necessary Department approvals and certifications as required by law. As we fully describe in Chapter Five, this application received more attention and scrutiny than a typical FISA application in terms of the additional layers of review and number of high-level officials who read the application before it was signed. These officials included NSD's Acting Assistant Attorney General, NSD's Deputy Assistant Attorney General with oversight over OI, OI's Operations Section Chief and Deputy Section Chief, the DAG, Principal Associate Deputy Attorney General, and the Associate Deputy Attorney General responsible for ODAG's national security portfolio. However, as we explain below, the Department decision makers who supported and approved the application were not given all relevant information.

## Role of Steele Election Reporting in the First Application

In support of the fourth element in the FISA application—Carter Page's alleged coordination with the Russian government on 2016 U.S. presidential election activities—the application relied entirely on the following information from Steele Reports 80, 94, 95, and 102:

- Compromising information about Hillary Clinton had been compiled for many years, was controlled by the Kremlin, and had been fed by the Kremlin to the Trump campaign for an extended period of time (Report 80);

- During a July 2016 trip to Moscow, Page met secretly with Igor Sechin, Chairman of Russian energy conglomerate Rosneft and close associate of Putin, to discuss future cooperation and the lifting of Ukraine-related sanctions against Russia; and with Igor Divyekin, a highly-placed Russian official, to discuss sharing with the Trump campaign derogatory information about Clinton (Report 94);

- Page was an intermediary between Russia and the Trump campaign's then manager (Manafort) in a "well-developed conspiracy" of cooperation, which led to Russia's disclosure of hacked DNC emails to WikiLeaks in exchange for the Trump campaign's agreement to sideline Russian intervention in Ukraine as a campaign issue (Report 95); and

- Russia released the DNC emails to WikiLeaks in an attempt to swing voters to Trump, an objective conceived and promoted by Page and others (Report 102).

We determined that the FBI's decision to rely upon Steele's election reporting to help establish probable cause that Page was an agent of Russia was a judgment reached initially by the case agents on the



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

Crossfire Hurricane team. We further determined that FBI officials at every level concurred with this judgment, from the OGC attorneys assigned to the investigation to senior CD officials, then General Counsel James Baker, then Deputy Director Andrew McCabe, and then Director James Comey. FBI leadership supported relying on Steele's reporting to seek a FISA order on Page after being advised of, and giving consideration to, concerns expressed by Stuart Evans, then NSD's Deputy Assistant Attorney General with oversight responsibility over OI, that Steele may have been hired by someone associated with presidential candidate Clinton or the DNC, and that the foreign intelligence to be collected through the FISA order would probably not be worth the "risk" of being criticized later for collecting communications of someone (Carter Page) who was "politically sensitive." According to McCabe, the FBI "felt strongly" that the FISA application should move forward because the team believed they had to get to the bottom of what they considered to be a potentially serious threat to national security, even if the FBI would later be criticized for taking such action. McCabe and others discussed the FBI's position with NSD and ODAG officials, and these officials accepted the FBI's decision to move forward with the application, based substantially on the Steele information.

We found that the FBI did not have information corroborating the specific allegations against Carter Page in Steele's reporting when it relied upon his reports in the first FISA application or subsequent renewal applications. OGC and NSD attorneys told us that, while the FBI's "Woods Procedures" (described in Chapter Two) require that every factual assertion in a FISA application be "verified," when information is attributed to a FBI CHS, the Woods Procedures require only that the agent verify, with supporting documentation, that the application accurately reflects what the CHS told the FBI. The procedures do not require that the agent corroborate, through a second, independent source, that what the CHS told the FBI is true. We did not identify anything in the Woods Procedures that is inconsistent with these officials' description of the procedures.

However, absent corroboration for the factual assertions in the election reporting, it was particularly important for the FISA applications to articulate the FBI's knowledge of Steele's background and its assessment of his reliability. On these points, the applications advised the court that Steele was believed to be a reliable source for three reasons: his professional background; his history of work as an FBI CHS since 2013; and his prior non-election reporting,

which the FBI described as "corroborated and used in criminal proceedings." As discussed below, the representations about Steele's prior reporting were overstated and had not been approved by Steele's handling agent, as required by the Woods Procedures.

Due to Evans's persistent inquiries, the FISA application also included a footnote, developed by OI based on information provided by the Crossfire Hurricane team, to address Evans's concern about the potential political bias of Steele's research. The footnote stated that Steele was hired by an identified U.S. person (Glenn Simpson) to conduct research regarding "Candidate #1's" (Donald Trump) ties to Russia and that the FBI "speculates" that this U.S. person was likely looking for information that could be used to discredit the Trump campaign.

*Relevant Information Inaccurately Stated, Omitted, or Undocumented in the First Application*

Our review found that FBI personnel fell far short of the requirement in FBI policy that they ensure that all factual statements in a FISA application are "scrupulously accurate." We identified multiple instances in which factual assertions relied upon in the first FISA application were inaccurate, incomplete, or unsupported by appropriate documentation, based upon information the FBI had in its possession at the time the application was filed. We found that the problems we identified were primarily caused by the Crossfire Hurricane team failing to share all relevant information with OI and, consequently, the information was not considered by the Department decision makers who ultimately decided to support the applications.

As more fully described in Chapter Five, based upon the information known to the FBI in October 2016, the first application contained the following seven significant inaccuracies and omissions:

1. Omitted information the FBI had obtained from another U.S. government agency detailing its prior relationship with Page, including that Page had been approved as an "operational contact" for the other agency from 2008 to 2013, and that Page had provided information to the other agency concerning his prior contacts with certain Russian intelligence officers, one of which overlapped with facts asserted in the FISA application;

2. Included a source characterization statement asserting that Steele's prior reporting had been "corroborated and used in criminal proceedings,"



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

which overstated the significance of Steele's past reporting and was not approved by Steele's handling agent, as required by the Woods Procedures;

3. Omitted information relevant to the reliability of Person 1, a key Steele sub-source (who was attributed with providing the information in Report 95 and some of the information in Reports 80 and 102 relied upon in the application), namely that (1) Steele himself told members of the Crossfire Hurricane team that Person 1 was a "boaster" and an "egoist" and "may engage in some embellishment" and (2) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮;

4. Asserted that the FBI had assessed that Steele did not directly provide to the press information in the September 23 *Yahoo News* article based on the premise that Steele had told the FBI that he only shared his election-related research with the FBI and Fusion GPS, his client; this premise was incorrect and contradicted by documentation in the Woods File—Steele had told the FBI that he also gave his information to the State Department;

5. Omitted Papadopoulos's consensually monitored statements to an FBI CHS in September 2016 denying that anyone associated with the Trump campaign was collaborating with Russia or with outside groups like WikiLeaks in the release of emails;

6. Omitted Page's consensually monitored statements to an FBI CHS in August 2016 that Page had "literally never met" or "said one word to" Paul Manafort and that Manafort had not responded to any of Page's emails; if true, those statements were in tension with claims in Report 95 that Page was participating in a conspiracy with Russia by acting as an intermediary for Manafort on behalf of the Trump campaign; and

7. Included Page's consensually monitored statements to an FBI CHS in October 2016 that the FBI believed supported its theory that Page was an agent of Russia but omitted other statements Page made that were inconsistent with its theory, including denying having met with Sechin and Divyekin, or even knowing who Divyekin was; if true, those statements contradicted the claims in Report 94 that Page

had met secretly with Sechin and Divyekin about future cooperation with Russia and shared derogatory information about candidate Clinton.

None of these inaccuracies and omissions were brought to the attention of OI before the last FISA application was filed in June 2017. Consequently, these failures were repeated in all three renewal applications. Further, as we discuss later, we identified 10 additional significant errors in the renewal applications.

The failure to provide accurate and complete information to the OI Attorney concerning Page's prior relationship with another U.S. government agency (item 1 above) was particularly concerning because the OI Attorney had specifically asked the case agent in late September 2016 whether Carter Page had a current or prior relationship with the other agency. In response to that inquiry, the case agent advised the OI Attorney that Page's relationship was "dated" (claiming it was when Page lived in Moscow in 2004-2007) and "outside scope." This representation, however, was contrary to information that the other agency had provided to the FBI in August 2016, which stated that Page was approved as an "operational contact" of the other agency from 2008 to 2013 (after Page had left Moscow). Moreover, rather than being "outside scope," Page's status with the other agency overlapped in time with some of the interactions between Page and known Russian intelligence officers that were relied upon in the FISA applications to establish probable cause. Indeed, Page had provided information to the other agency about his past contacts with a Russian Intelligence Officer (Intelligence Officer 1), which were among the historical connections to Russian intelligence officers that the FBI relied upon in the first FISA application (and subsequent renewal applications). According to the information from the other agency, an employee of the other agency had assessed that Page "candidly described his contact with" Intelligence Officer 1 to the other agency. Thus, the FBI relied upon Page's contacts with Intelligence Officer 1, among others, in support of its probable cause statement in the FISA application, while failing to disclose to OI or the FISC that (1) Page had been approved as an operational contact by the other agency during a five-year period that overlapped with allegations in the FISA application, (2) Page had disclosed to the other agency contacts that he had with Intelligence Officer 1 and certain other individuals, and (3) the other agency's employee had given a positive assessment of Page's candor.

Further, we were concerned by the FBI's inaccurate assertion in the application that Steele's prior reporting had been "corroborated and used in criminal



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

proceedings," which we were told was primarily a reference to Steele's role in the FIFA corruption investigation. We found that the team had speculated that Steele's prior reporting had been corroborated and used in criminal proceedings without clearing the representation with Steele's handling agent, as required by the Woods Procedures. According to the handling agent, he would not have approved the representation in the application because only "some" of Steele's prior reporting had been corroborated—most of it had not—and because Steele's information was never used in a criminal proceeding. We concluded that these failures created the inaccurate impression in the applications that at least some of Steele's past reporting had been deemed sufficiently reliable by prosecutors to use in court, and that more of his information had been corroborated than was actually the case.

We found no evidence that the OI Attorney, NSD supervisors, ODAG officials, or Yates were made aware of these issues before the first application was submitted to the court. Although we also found no evidence that Comey had been made aware of these issues at the time he certified the application, as discussed in our analysis in Chapter Eleven, multiple factors made it difficult for us to precisely determine the extent of FBI leadership's knowledge as to each fact that was not shared with OI and not included, or inaccurately stated, in the FISA applications. These factors included, among other things, limited recollections, the inability to question Comey or refresh his recollection with relevant, classified documentation because of his lack of a security clearance, and the absence of meeting minutes that would show the specific details shared with Comey and McCabe during briefings they received, beyond the more general investigative updates that we know they were provided.

## FBI Activities After the First FISA Application and FBI Efforts to Assess Steele's Election Reporting

On October 31, 2016, shortly after the first FISA application was signed, an article entitled "A Veteran Spy Has Given the FBI Information Alleging a Russian Operation to Cultivate Donald Trump," was published by *Mother Jones.* Steele admitted to the FBI that he was a source for the article, and the FBI closed him as a CHS for cause in November 2016. However, as we describe below, despite having been closed for cause, the Crossfire Hurricane team continued to obtain information from Steele through Ohr, who met with the FBI on 13 occasions to pass along information he had been provided by Steele.

In Chapter Six, we describe the events that followed Steele's closing as a CHS, including the FBI's receipt of information from several third parties who had acquired copies of the Steele election reports, use of information from the Steele reports in an interagency assessment of Russian interference in the U.S. 2016 elections, and continuing efforts to learn about Steele and his source network and to verify information from the reports following Steele's closure.

Starting in December 2016, FBI staff participated in an interagency effort to assess the Russian government's intentions and actions concerning the 2016 U.S. elections. We learned that whether and how to present Steele's reporting in the Intelligence Community Assessment (ICA) was a topic of significant discussion between the FBI and the other agencies participating in it. According to FBI staff, as the interagency editing process for the ICA progressed, the Central Intelligence Agency (CIA) expressed concern about the lack of vetting for the Steele election reporting and asserted it did not merit inclusion in the body of the report. An FBI Intel Section Chief told us the CIA viewed it as "internet rumor." In contrast, as we describe in Chapter Six, the FBI, including Comey and McCabe, sought to include the reporting in the ICA. Limited information from the Steele reporting ultimately was presented in an appendix to the ICA.

FBI efforts to verify information in the Steele election reports, and to learn about Steele and his source network continued after Steele's closure as a CHS. In November and December 2016, FBI officials travelled abroad and met with persons who previously had professional contacts with Steele or had knowledge of his work. Information these FBI officials obtained about Steele was both positive and negative. We found, however, that the information about Steele was not placed in his FBI CHS file.

We further learned that the FBI's Validation Management Unit (VMU) completed a human source validation review of Steele in early 2017. The VMU review found that Steele's past criminal reporting was "minimally corroborated," and included this finding in its report that was provided to the Crossfire Hurricane team. This determination by the VMU was in tension with the source characterization statement included in the initial FISA application, which represented that Steele's prior reporting had been "corroborated and used in criminal proceedings." The VMU review also did not identify any corroboration for Steele's election reporting among the information that the Crossfire Hurricane team had collected. However, the VMU did not include this finding in its written validation report



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

and therefore members of the Crossfire Hurricane team and FBI executives were unaware of it.

We also found that the FBI's interviews of Steele, his Primary Sub-source, a second sub-source, and other investigative activity, revealed potentially serious problems with Steele's descriptions of information in his reports. For example, as detailed in Chapters Six and Eight, the Primary Sub-source made statements during his/her January 2017 FBI interview that were inconsistent with multiple sections of the Steele reports, including some that were relied upon in the FISA applications. Among other things, regarding the allegations attributed to Person 1, the Primary Sub-source's account of these communications, if true, was not consistent with and, in fact, contradicted the allegations of a "well-developed conspiracy" in Reports 95 and 102 attributed to Person 1.

We further determined that the Crossfire Hurricane team was unable to corroborate any of the specific substantive allegations regarding Carter Page contained in Steele's election reporting which the FBI relied on in the FISA applications. We were told by the Supervisory Intel Analyst that, as of September 2017, the FBI had corroborated limited information in the Steele election reporting, and much of that was publicly available information. Most relevant to the Carter Page FISA applications, the allegations contained in Reports 80, 94, 95, and 102, which were relied upon in all four applications, remained uncorroborated and, in several instances, were inconsistent with information gathered by the Crossfire Hurricane team.



## The Three Renewal Applications for Continued FISA Authority on Carter Page

As noted above, the FBI filed three renewal applications with the FISC, on January ▮▮, April ▮, and June ▮, 2017. In addition to repeating the seven significant errors contained in the first FISA application and outlined above, we identified 10 additional

significant errors in the three renewal applications, based upon information known to the FBI after the first application and before one or more of the renewals. We describe the circumstances surrounding these 10 errors in Chapter Eight, and provide a chart listing additional errors in Appendix One. As more fully described in Chapter Eight, the renewal applications:

8. Omitted the fact that Steele's Primary Sub-source, who the FBI found credible, had made statements in January 2017 raising significant questions about the reliability of allegations included in the FISA applications, including, for example, that he/she had no discussion with Person 1 concerning WikiLeaks and there was "nothing bad" about the communications between the Kremlin and the Trump team, and that he/she did not report to Steele in July 2016 that Page had met with Sechin;

9. Omitted Page's prior relationship with another U.S. government agency, despite being reminded by the other agency in June 2017, prior to the filing of the final renewal application, about Page's past status with that other agency; instead of including this information in the final renewal application, the OGC Attorney altered an email from the other agency so that the email stated that Page was "not a source" for the other agency, which the FBI affiant relied upon in signing the final renewal application;

10. Omitted information from persons who previously had professional contacts with Steele or had direct knowledge of his work-related performance, including statements that Steele had no history of reporting in bad faith but "[d]emonstrates lack of self-awareness, poor judgment," "pursued people with political risk but no intelligence value," "didn't always exercise great judgment," and it was "not clear what he would have done to validate" his reporting;

11. Omitted information obtained from Ohr about Steele and his election reporting, including that (1) Steele's reporting was going to Clinton's presidential campaign and others, (2) Simpson was paying Steele to discuss his reporting with the media, and (3) Steele was "desperate that Donald Trump not get elected and was passionate about him not being the U.S. President";

12. Failed to update the description of Steele after information became known to the Crossfire



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

Hurricane team, from Ohr and others, that provided greater clarity on the political origins and connections of Steele's reporting, including that Simpson was hired by someone associated with the Democratic Party and/or the DNC;

13. Failed to correct the assertion in the first FISA application that the FBI did not believe that Steele directly provided information to the reporter who wrote the September 23 *Yahoo News* article, even though there was no information in the Woods File to support this claim and even after certain Crossfire Hurricane officials learned in 2017, before the third renewal application, of an admission that Steele made in a court filing about his interactions with the news media in the late summer and early fall of 2016;

14. Omitted the finding from a FBI source validation report that Steele was suitable for continued operation but that his past contributions to the FBI's criminal program had been "minimally corroborated," and instead continued to assert in the source characterization statement that Steele's prior reporting had been "corroborated and used in criminal proceedings";

15. Omitted Papadopoulos's statements to an FBI CHS in late October 2016 denying that the Trump campaign was involved in the circumstances of the DNC email hack;

16. Omitted Joseph Mifsud's denials to the FBI that he supplied Papadopoulos with the information Papadopoulos shared with the FFG (suggesting that the campaign received an offer or suggestion of assistance from Russia); and

17. Omitted information indicating that Page played no role in the Republican platform change on Russia's annexation of Ukraine as alleged in the Report 95, which was inconsistent with a factual assertion relied upon to support probable cause in all four FISA applications.

Among the most serious of the 10 additional errors we found in the renewal applications was the FBI's failure to advise OI or the court of the inconsistences, described in detail in Chapter Six, between Steele and his Primary Sub-source on the reporting relied upon in the FISA applications. Although the Primary Sub-source's account of these communications, if true, was not consistent with and, in fact, contradicted the allegations of a "well-developed conspiracy" in Reports 95 and 102 attributed to Person 1, the FBI did not share this information with OI. The

FBI also failed to share other inconsistencies with OI, including the Primary Sub-source's account of the alleged meeting between Page and Sechin in Steele's Report 94 and his/her descriptions of the source network. The fact that the Primary Sub-source's account contradicted key assertions attributed to his/her own sub-sources in Steele's Reports 94, 95, and 102 should have generated significant discussions between the Crossfire Hurricane team and OI prior to submitting the next FISA renewal application. According to Evans, had OI been made aware of the information, such discussions might have included the possibility of foregoing the renewal request altogether, at least until the FBI reconciled the differences between Steele's account and the Primary Sub-source's account to the satisfaction of OI. However, we found no evidence that the Crossfire Hurricane team ever considered whether any of the inconsistencies warranted reconsideration of the FBI's assessment of the reliability of the Steele reports or notice to OI before the subsequent renewal applications were filed.

Instead, the second and third renewal applications provided no substantive information concerning the Primary Sub-source's interview, and offered only a brief conclusory statement that the FBI met with the Primary Sub-source "[i]n an effort to further corroborate Steele's reporting" and found the Primary Sub-source to be "truthful and cooperative." We believe that including this statement, without also informing OI and the court that the Primary Sub-source's account of events contradicted key assertions in Steele's reporting, left a misimpression that the Primary Sub-source had corroborated the Steele reporting. Indeed, in a letter to the FISC in July 2018, before learning of these inconsistencies from us during this review, the Department defended the reliability of Steele's reporting and the FISA applications by citing, in part, to the Primary Sub-source's interview as "additional information corroborating [Steele's] reporting" and noting the FBI's determination that he/she was "truthful and cooperative."

The renewal applications also continued to fail to include information regarding Carter Page's past relationship with another U.S. government agency, even though both OI and members of the Crossfire Hurricane expressed concern about the possibility of a prior relationship following interviews that Page gave to news outlets in April and May 2017 stating that he had assisted other U.S. government agencies in the past. As we describe in Chapter Eight, SSA 2, who was to be the affiant for Renewal Application No. 3 and had been the affiant for the first two renewals, told us that he wanted a definitive answer to whether Page



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

had ever been a source for another U.S. government agency before he signed the final renewal application. This led to interactions between the OGC Attorney assigned to Crossfire Hurricane and a liaison from the other U.S. government agency. In an email from the liaison to the OGC Attorney, the liaison provided written guidance, including that it was the liaison's recollection that Page had or continued to have a relationship with the other agency, and directed the OGC Attorney to review the information that the other agency had provided to the FBI in August 2016. As noted above, that August 2016 information stated that Page did, in fact, have a prior relationship with that other agency. The next morning, immediately following a 28 minute telephone call between the OGC Attorney and the OI Attorney, the OGC Attorney forwarded to the OI Attorney the liaison's email (but not the original email from the OGC Attorney to the liaison setting out the questions he was asking). The OI Attorney responded to the OGC Attorney, "thanks I think we are good and no need to carry it any further." However, when the OGC Attorney subsequently sent the liaison's email to SSA 2, the OGC Attorney altered the liaison's email by inserting the words "not a source" into it, thus making it appear that the liaison had said that Page was "not a source" for the other agency. Relying upon this altered email, SSA 2 signed the third renewal application that again failed to disclose Page's past relationship with the other agency. Consistent with the Inspector General Act of 1978, following the OIG's discovery that the OGC Attorney had altered and sent the email to SSA 2, who thereafter relied on it to swear out the third FISA application, the OIG promptly informed the Attorney General and the FBI Director and provided them with the relevant information about the OGC Attorney's actions.

None of the inaccuracies and omissions that we identified in the renewal applications were brought to the attention of OI before the applications were filed. As a result, similar to the first application, the Department officials who reviewed one or more of the renewal applications, including Yates, Boente, and Rosenstein, did not have accurate and complete information at the time they approved them.

We do not speculate whether or how having accurate and complete information might have influenced the decisions of senior Department leaders who supported the four FISA applications, or the court, if they had known all of the relevant information. Nevertheless, it was the obligation of the FBI agents and supervisors who were aware of the information to ensure that the FISA applications were "scrupulously accurate" and that OI, the Department's decision

makers, and ultimately, the court had the opportunity to consider the additional information and the information omitted from the first application. The individuals involved did not meet this obligation.

## Conclusions Concerning All Four FISA Applications

We concluded that the failures described above and in this report represent serious performance failures by the supervisory and non-supervisory agents with responsibility over the FISA applications. These failures prevented OI from fully performing its gatekeeper function and deprived the decision makers the opportunity to make fully informed decisions. Although some of the factual misstatements and omissions we found in this review were arguably more significant than others, we believe that all of them taken together resulted in FISA applications that made it appear that the information supporting probable cause was stronger than was actually the case.

We identified at least 17 significant errors or omissions in the Carter Page FISA applications, and many additional errors in the Woods Procedures. These errors and omissions resulted from case agents providing wrong or incomplete information to OI and failing to flag important issues for discussion. While we did not find documentary or testimonial evidence of intentional misconduct on the part of the case agents who assisted OI in preparing the applications, or the agents and supervisors who performed the Woods Procedures, we also did not receive satisfactory explanations for the errors or problems we identified. In most instances, the agents and supervisors told us that they either did not know or recall why the information was not shared with OI, that the failure to do so may have been an oversight, that they did not recognize at the time the relevance of the information to the FISA application, or that they did not believe the missing information to be significant. On this last point, we believe that case agents may have improperly substituted their own judgments in place of the judgment of OI, or in place of the court, to weigh the probative value of the information. Further, the failure to update OI on all significant case developments relevant to the FISA applications led us to conclude that the agents and supervisors did not give appropriate attention or treatment to the facts that cut against probable cause, or reassess the information supporting probable cause as the investigation progressed. The agents and SSAs also did not follow, or appear to even know, the requirements in the Woods Procedures to re-verify the factual assertions from previous applications



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

that are repeated in renewal applications and verify source characterization statements with the CHS handling agent and document the verification in the Woods File.

That so many basic and fundamental errors were made by three separate, hand-picked teams on one of the most sensitive FBI investigations that was briefed to the highest levels within the FBI, and that FBI officials expected would eventually be subjected to close scrutiny, raised significant questions regarding the FBI chain of command's management and supervision of the FISA process. FBI Headquarters established a chain of command for Crossfire Hurricane that included close supervision by senior CD managers, who then briefed FBI leadership throughout the investigation. Although we do not expect managers and supervisors to know every fact about an investigation, or senior officials to know all the details of cases about which they are briefed, in a sensitive, high-priority matter like this one, it is reasonable to expect that they will take the necessary steps to ensure that they are sufficiently familiar with the facts and circumstances supporting and potentially undermining a FISA application in order to provide effective oversight, consistent with their level of supervisory responsibility. We concluded that the information that was known to the managers, supervisors, and senior officials should have resulted in questions being raised regarding the reliability of the Steele reporting and the probable cause supporting the FISA applications, but did not.

In our view, this was a failure of not only the operational team, but also of the managers and supervisors, including senior officials, in the chain of command. For these reasons, we recommend that the FBI review the performance of the employees who had responsibility for the preparation, Woods review, or approval of the FISA applications, as well as the managers and supervisors in the chain of command of the Carter Page investigation, including senior officials, and take any action deemed appropriate. In addition, given the extensive compliance failures we identified in this review, we believe that additional OIG oversight work is required to assess the FBI's compliance with Department and FBI FISA-related policies that seek to protect the civil liberties of U.S. persons. Accordingly, we have today initiated an OIG audit that will further examine the FBI's compliance with the Woods Procedures in FISA applications that target U.S. persons in both counterintelligence and counterterrorism investigations. This audit will be informed by the findings in this review, as well as by our prior work over the past 15 years on the Department's and FBI's use of

national security and surveillance authorities, including authorities under FISA, as detailed in Chapter One.

## Issues Relating to Department Attorney Bruce Ohr

In Chapter Nine, we describe the interactions Department attorney Bruce Ohr had with Christopher Steele, the FBI, Glenn Simpson (the owner of Fusion GPS), and the State Department during the Crossfire Hurricane investigation. At the time of these interactions, which took place from about July 2016 to May 2017, Ohr was an Associate Deputy Attorney General in the Office of the Deputy Attorney General (ODAG) and the Director of the Organized Crime and Drug Enforcement Task Force (OCDETF).

*Ohr's Interactions with Steele, the FBI, Simpson, and the State Department*

Beginning in July 2016, at about the same time that Steele was engaging with the FBI on his election reporting, Steele contacted Ohr, who he had known since at least 2007, to discuss information from Steele's election reports. At Steele's suggestion, Ohr also met in August 2016 with Simpson to discuss Steele's reports. At the time, Ohr's wife, Nellie Ohr, worked at Fusion GPS as an independent contractor. Ohr also met with Simpson in December 2016, at which time Simpson gave Ohr a thumb drive containing numerous Steele election reports that Ohr thereafter provided to the FBI.

On October 18, 2016, after speaking with Steele that morning, Ohr met with McCabe to share Steele's and Simpson's information with him. Thereafter, Ohr met with members of the Crossfire Hurricane team 13 times between November 21, 2016, and May 15, 2017, concerning his contacts with Steele and Simpson. All 13 meetings occurred after the FBI had closed Steele as a CHS and, except for the November 21 meeting, each meeting was initiated at Ohr's request. Ohr told us that he did not recall the FBI asking him to take any action regarding Steele or Simpson, but Ohr also stated that "the general instruction was to let [the FBI] know…when I got information from Steele." The Crossfire Hurricane team memorialized each of the meetings with Ohr as an "interview" using an FBI FD-302 form. Separately, in November 2016, Ohr met with senior State Department officials regarding Steele's election reporting.

Department leadership, including Ohr's supervisors in ODAG and the ODAG officials who



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

reviewed and approved the Carter Page FISA applications, were unaware of Ohr's meetings with FBI officials, Steele, Simpson, and the State Department until after Congress requested information from the Department regarding Ohr's activities in late November 2017.

We did not identify a specific Department policy prohibiting Ohr from meeting with Steele, Simpson, or the State Department and providing the information he learned from those meetings to the FBI. However, Ohr was clearly cognizant of his responsibility to inform his supervisors of these interactions, and acknowledged to the OIG that the possibility that he would have been told by his supervisors to stop having such contact may have factored into his decision not to tell them about it.

We concluded that Ohr committed consequential errors in judgment by (1) failing to advise his direct supervisors or the DAG that he was communicating with Steele and Simpson and then requesting meetings with the FBI's Deputy Director and Crossfire Hurricane team on matters that were outside of his areas of responsibility, and (2) making himself a witness in the investigation by meeting with Steele and providing Steele's information to the FBI. As we describe in Chapter Eight, the late discovery of Ohr's meetings with the FBI prompted NSD to notify the FISC in July 2018, over a year after the final FISA renewal order was issued, of information that Ohr had provided to the FBI but that the FBI had failed to inform NSD and OI about (and therefore was not included in the FISA applications), including that Steele was "desperate that Donald Trump not get elected and was passionate about him not being the U.S. President."

## FBI Compliance with Policies

The FBI's CHS Policy Guide (CHSPG) provides guidance to agents concerning contacts with CHSs after they have been closed for cause, as was the case with Steele as of November 2016. According to the CHSPG, a handling agent must not initiate contact with or respond to contacts from a former CHS who has been closed for cause absent exceptional circumstances that are approved by an SSA. The CHSPG also requires reopening of the CHS if the relationship between the FBI and a closed CHS is expected to continue beyond the initial contact or debriefing. Reopening requires high levels of supervisory approval, including a finding that the benefits of reopening the CHS outweigh the risks.

We found that, while the Crossfire Hurricane team did not initiate direct contact with Steele after his

closure, it responded to numerous contacts made by Steele through Ohr. Ohr himself was not a direct witness in the Crossfire Hurricane investigation; rather, his purpose in communicating with the FBI was to pass along information from Steele. While the FBI's CHS policy does not explicitly address indirect contact between an FBI agent and a closed CHS, we concluded that the repeated contacts with Steele should have triggered the CHS policy requiring that such contacts occur only after an SSA determines that exceptional circumstances exist. While an SSA was present for the meetings with Ohr, we found no evidence that the SSAs made considered judgments that exceptional circumstances existed for the repeated contacts. We also found that, given that there were 13 different meetings with Ohr over a period of months, the use of Ohr as a conduit between the FBI and Steele created a relationship by proxy that should have triggered, pursuant to FBI policy, a supervisory decision about whether to reopen Steele as a CHS or discontinue accepting information indirectly from him through Ohr.

## Ethics Issues Raised by Nellie Ohr's Former Employment with Fusion GPS

Fusion GPS employed Nellie Ohr as an independent contractor from October 2015 to September 2016. On his annual financial disclosure forms covering calendar years 2015 and 2016, Ohr listed Nellie Ohr as an "independent contractor" and reported her income from that work on the form. We determined that financial disclosure rules, 5 C.F.R. Part 2634, did not require Ohr to list on the form the specific organizations, such as Fusion GPS, that paid Nellie Ohr as an independent contractor during the reporting period.

In addition, for reasons we explain in Chapter Eleven, we concluded that the federal ethics rules did not require Ohr to obtain Department ethics counsel approval before engaging with the FBI in connection with the Crossfire Hurricane matter because of Nellie Ohr's prior work for Fusion GPS. However, we found that, given the factual circumstances that existed, and the appearance that they created, Ohr displayed a lapse in judgment by not availing himself of the process described in the ethics rules to consult with the Department ethics official about his involvement in the investigation.

## Meetings Involving Ohr, CRM officials, and the FBI Regarding the MLARS Investigation



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

Ohr's supervisors in ODAG also were unaware that Ohr, shortly after the U.S. elections in November 2016, and again in early 2017, participated in discussions about a money laundering investigation of Manafort that was then being led by prosecutors from the Money Laundering and Asset Recovery Section (MLARS), which is located in the Criminal Division (CRM) at the Department's headquarters.

As described in more detail in Chapter Nine, in November 2016, Ohr told CRM Deputy Assistant Attorney General Bruce Swartz and Counsel to the CRM Assistant Attorney General Zainab Ahmad about information he was getting from Steele and Simpson about Manafort. Between November 16, 2016 and December 15, 2016, Ohr participated in several meetings that were attended, at various times, by some or all of the following individuals: Swartz, Ahmad, Andrew Weissmann (then Section Chief of CRM's Fraud Section), Strzok, and Lisa Page. The meetings involving Ohr, Swartz, Ahmad, and Weissmann focused on their shared concern that MLARS was not moving quickly enough on the Manafort criminal investigation and whether there were steps they could take to move the investigation forward. The meetings with Strzok and Page focused primarily on whether the FBI could assess the case's relevance, if any, to the FBI's Russian interference investigation. MLARS was not represented at any of these meetings or told about them, and none of attendees had supervisory responsibility over the MLARS investigation.

There were no meetings about the Manafort case involving Ohr, Swartz, Ahmad, and Weissmann from December 16, 2016 to January 30, 2017. On January 31, 2017, one day after Yates was removed as DAG, Ahmad, by then an Acting CRM Deputy Assistant Attorney General, after consulting with Swartz and Weissmann, sent an email to Lisa Page, copying Weissmann, Swartz, and Ohr, requesting a meeting the next day to discuss "a few Criminal Division related developments." The next day, February 1, Swartz, Ohr, Ahmad, and Weissmann met with Strzok, Lisa Page, and an FBI Acting Section Chief. None of the attendees at the meeting could explain to us what the "Criminal Division related developments" were, and we did not find any. Meeting notes reflect, among other things, that the group discussed the Manafort criminal investigation and efforts that the Department could undertake to investigate attempts by Russia to influence the 2016 elections. MLARS was not represented at, or told about, the meeting.

We are not aware of information indicating that any of the discussions involving Ohr, Swartz,

Weissmann, Ahmad, Strzok, and Lisa Page resulted in any actions taken or not taken in the MLARS investigation, and ultimately the investigation remained with MLARS until it was transferred to the Office of the Special Counsel in May 2017. We also did not identify any Department policies prohibiting internal discussions about a pending investigation among officials not assigned to the matter, or between those officials and senior officials from the FBI. However, as described in Chapter Nine, we were told that there was a decision not to inform the leadership of CRM, both before and after the change in presidential administrations, of these discussions in order to insulate the MLARS investigation from becoming "politicized." We concluded that this decision, made in the absence of concerns of potential wrongdoing or misconduct, and for the purpose of avoiding the appearance that an investigation is "politicized," fundamentally misconstrued who is ultimately responsible and accountable for the Department's work. We agree with the concerns expressed to us by then DAG Yates and then CRM Assistant Attorney General Leslie Caldwell. Department leaders cannot fulfill their management responsibilities, and be held accountable for the Department's actions, if subordinates intentionally withhold information from them in such circumstances.

## The Use of Confidential Sources (Other Than Steele) and Undercover Employees

As discussed in Chapter Ten, we determined that, during the 2016 presidential campaign, the Crossfire Hurricane team tasked several CHSs, which resulted in multiple interactions with Carter Page and George Papadopoulos, both before and after they were affiliated with the Trump campaign, and one with a high-level Trump campaign official who was not a subject of the investigation. All of these CHS interactions were consensually monitored and recorded by the FBI. As noted above, under Department and FBI policy, the use of a CHS to conduct consensual monitoring is a matter of investigative judgment that, absent certain circumstances, can be authorized by a first-line supervisor (a supervisory special agent). We determined that the CHS operations conducted during Crossfire Hurricane received the necessary FBI approvals, and that AD Priestap knew about, and approved of, all of the Crossfire Hurricane CHS operations, even in circumstances where a first-level supervisory special agent could have approved the operations. We found no evidence that the FBI used CHSs or UCEs to interact with members of the Trump campaign prior to the opening of the Crossfire Hurricane investigation. After the opening of the investigation, we



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

found no evidence that the FBI placed any CHSs or UCEs within the Trump campaign or tasked any CHSs or UCEs to report on the Trump campaign. Finally, we also found no documentary or testimonial evidence that political bias or improper motivations influenced the FBI's decision to use CHSs or UCEs to interact with Trump campaign officials in the Crossfire Hurricane investigation.

Although the Crossfire Hurricane team's use of CHSs and UCEs complied with applicable policies, we are concerned that, under these policies, it was sufficient for a first-level FBI supervisor to authorize the domestic CHS operations that were undertaken in Crossfire Hurricane, and that there was no applicable Department or FBI policy requiring the FBI to notify Department officials of the investigative team's decision to task CHSs to consensually monitor conversations with members of a presidential campaign. We found no evidence that the FBI consulted with any Department officials before conducting these CHS operations. We believe that current Department and FBI policies are not sufficient to ensure appropriate oversight and accountability when such operations potentially implicate sensitive, constitutionally protected activity, and that they should require, at minimum, Department consultation. As noted above, we include a recommendation in this report to address this issue.

Consistent with current Department and FBI policy, we learned that decisions about the use of CHSs and UCEs were made by the case agents and the supervisory special agents assigned to Crossfire Hurricane. These agents told the OIG that they focused the CHS operations on the FFG information and the four investigative subjects, and that they viewed CHS operations as one of the best methods available to quickly obtain information about the predicating allegations, while preventing information about the nature and existence of the investigation from becoming public, and potentially impacting the presidential election.

During the meeting between a CHS and the high-level Trump campaign official who was not a subject of the investigation, the CHS asked about the role of three Crossfire Hurricane subjects—Page, Papadopoulos, and Manafort—in the Trump campaign. The CHS also asked about allegations in public reports concerning Russian interference in the 2016 elections, the campaign's response to ideas featured in Page's Moscow speech, and the possibility of an "October Surprise." In response, the campaign official made no comments of note about those topics. The CHS and the high-level campaign official also discussed ▮▮▮▮

 We found that the Crossfire Hurricane team made no use of any information collected from the high-level Trump campaign official, because the team determined that none of the information gathered was "germane" to the allegations under investigation. However, we were concerned that the Crossfire Hurricane team did not recall having in place a plan, prior to the operation involving the high-level campaign official, to address the possible collection of politically sensitive information.

As discussed in Chapter Ten, through the use of CHSs, the investigative team obtained statements from Carter Page and Papadopoulos that raised questions about the validity of allegations under investigation. For example, when questioned in August 2016 about other individuals who were subjects in the investigation, Page told a CHS that he had "literally never met" or "said one word to" Manafort and that Manafort had not responded to any of Page's emails. As another example, Papadopoulos denied to a CHS that anyone associated with the Trump campaign was collaborating with Russia or with outside groups like WikiLeaks in the release of emails. Papadopoulos stated that the "campaign, of course, [does not] advocate for this type of activity because at the end of the day it's…illegal" and that "our campaign is not…engag[ing] or reaching out to WikiLeaks or to the whoever it is to tell them please work with us, collaborate because we don't, no one does that…." Papadopoulos also said that "as far as I understand…no one's collaborating, there's been no collusion and it's going to remain that way." In another interaction, Papadopoulos told a CHS that he knew "for a fact" that no one from the Trump campaign had anything to do with releasing emails from the DNC, as a result of Papadopoulos's involvement in the Trump campaign. Despite the relevance of this material, as described in Chapters Five and Seven, none of Papadopoulos's statements were provided by the Crossfire Hurricane team to the OI Attorney and Page's statements were not provided to the OI attorney until June 2017, approximately ten months after the initial Carter Page FISA application was granted by the FISC.

Through our review, we also determined that there were other CHSs tasked by the FBI to attempt to contact Papadopoulos, but that those attempted contacts did not lead to any operational activity. We also identified several individuals who had either a connection to candidate Trump or a role in the Trump



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

campaign, and were also FBI CHSs, but who were not tasked as part of the Crossfire Hurricane investigation. One such CHS did provide the Crossfire Hurricane team with general information about Crossfire Hurricane subjects Page and Manafort, but we found that this CHS had no further involvement in the investigation.

We identified another CHS that the Crossfire Hurricane team first learned about in 2017, after the CHS voluntarily provided his/her handling agent with an ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ —and the handling agent forwarded the material, through his supervisor and FBI Headquarters, to the Crossfire Hurricane team. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ The handling agent told us that, when he subsequently informed the Crossfire Hurricane team that the CHS had access to ▆▆▆▆▆▆▆▆▆▆▆, a Crossfire Hurricane team intelligence analyst asked the handling agent to collect ▆▆▆▆ from the CHS, which the handling agent did. We found that the Crossfire Hurricane team determined that there was not "anything significant" in this ▆▆ collection, and did not seek to task the CHS. While we found that no action was taken by the Crossfire Hurricane team in response to receiving ▆▆▆▆▆▆▆, we nevertheless were concerned to learn that the handling agent for the CHS placed ▆▆▆▆▆▆▆▆▆▆▆▆▆▆ into the FBI's files, and we promptly notified the FBI upon learning that they were still being maintained in the FBI's files. We further concluded that, because the CHS's handling agent did not understand the CHS's political involvement, no assessment was performed by the source's handling agent or his supervisors (none of whom were members of the Crossfire Hurricane team) to determine whether the CHS required re-designation as a "sensitive source" or should have been closed during the pendency of the campaign.

While we concluded that the investigative activities undertaken by the Crossfire Hurricane team involving CHSs and UCEs complied with applicable Department and FBI policies, we believe that in certain circumstances Department and FBI policies do not provide sufficient oversight and accountability for investigative activities that have the potential to gather sensitive information involving protected First Amendment activity, and therefore include recommendations to address these issues.

Finally, as we also describe in Chapter Ten, we learned during the course of our review that in August

2016, the supervisor of the Crossfire Hurricane investigation, SSA 1, participated on behalf of the FBI in a strategic intelligence briefing given by Office of the Director of National Intelligence (ODNI) to candidate Trump and his national security advisors, including Michael Flynn, and in a separate strategic intelligence briefing given to candidate Clinton and her national security advisors. The stated purpose of the FBI portion of the briefing was to provide the recipients "a baseline on the presence and threat posed by foreign intelligence services to the National Security of the U.S." However, we found that SSA 1 was selected to provide the FBI briefings, in part, because Flynn, who was a subject in the ongoing Crossfire Hurricane investigation, would be attending the Trump campaign briefing.

Following his participation in the briefing of candidate Trump, Flynn, and another Trump advisor, SSA 1 drafted an EC documenting his participation in the briefing, and added the EC to the Crossfire Hurricane investigative file. We were told that the decision to select SSA 1 to participate in the ODNI briefing was reached by consensus among a group of senior FBI officials, including McCabe and Baker. We noted that no one at the Department or ODNI was informed that the FBI was using the ODNI briefing of a presidential candidate for investigative purposes, and found no applicable FBI or Department policies addressing this issue. We concluded that the FBI's use of this briefing for investigative reasons could potentially interfere with the expectation of trust and good faith among participants in strategic intelligence briefings, thereby frustrating their purpose. We therefore include a recommendation to address this issue.

## Recommendations

Our report makes nine recommendations to the FBI and the Department to assist them in addressing the issues that we identified in this review:

- The Department and the FBI should ensure that adequate procedures are in place for OI to obtain all relevant and accurate information needed to prepare FISA applications and renewal applications, including CHS information. In Chapter Twelve, we identify a few specific steps to assist in this effort.

...



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

- The Department and FBI should evaluate which types of SIMs require advance notification to a senior Department official, such as the DAG, in addition to the notifications currently required for SIMs, especially for case openings that implicate core First Amendment activity and raise policy considerations or heighten enterprise risk, and establish implementing policies and guidance, as necessary.

- The FBI should develop protocols and guidelines for staffing and administrating any future sensitive investigative matters from FBI Headquarters.

- The FBI should address the problems with the administration and assessment of CHSs identified in this report, including, at a minimum, revising the FBI's standard CHS admonishments, improving the documentation of CHS information, revising FBI policy to address the acceptance of information from a closed CHS indirectly through a third party, and taking other steps we identify in Chapter Twelve.

- The Department and FBI should clarify the terms (1) "sensitive monitoring circumstance" in the AG Guidelines and the DIOG to determine whether to expand its scope to include consensual monitoring of a domestic political candidate or an individual prominent within a domestic political organization, or a subset of these persons, so that consensual monitoring of such individuals would require consultation with or advance notification to a senior Department official, such as the DAG, and (2) "prominent in a domestic political organization" so that agents understand which campaign officials fall within that definition as it relates to "sensitive investigative matters," "sensitive UDP," the designation of "sensitive sources," and "sensitive monitoring circumstance."

- The FBI should ensure that appropriate training on DIOG § 4 is provided to emphasize the constitutional implications of certain monitoring situations and to ensure that agents account for these concerns, both in the tasking of CHSs and in the way they document interactions with and tasking of CHSs.

- The FBI should establish a policy regarding the use of defensive and transition briefings for investigative purposes, including the factors to be considered and approval by senior leaders at the FBI with notice to a senior Department official, such as the DAG.

- The Department's Office of Professional Responsibility should review our findings related to the conduct of Department attorney Bruce Ohr for any action it deems appropriate. Ohr's current supervisors in CRM should also review our findings related to Ohr's performance for any action they deem appropriate.

- The FBI should review the performance of all employees who had responsibility for the preparation, Woods review, or approval of the FISA applications, as well as the managers, supervisors, and senior officials in the chain of command of the Carter Page investigation for any action it deems appropriate.

**[PAGE INTENTIONALLY LEFT BLANK]**

# **TABLE OF CONTENTS**

CHAPTER ONE  INTRODUCTION ........................................................................ 1

I.   Background and Overview ...................................................................... 1

II.  Prior OIG Reports on FISA and Related Issues .......................................... 9

III. Methodology ..................................................................................... 11

IV.  Structure of the Report......................................................................... 14

CHAPTER TWO: APPLICABLE LAWS AND DEPARTMENT AND FBI POLICIES .......... 16

I.   FBI Counterintelligence Investigations ................................................... 16

     A.   Predicated Investigations ........................................................... 19

     B.   Sensitive Investigative Matters (SIM) .......................................... 21

II.  Department and FBI Policies Governing the Use of Confidential Human
     Sources (CHS) ................................................................................. 22

     A.   Risk Management Issues Related to CHSs ..................................... 22

     B.   Documenting CHS Activities ....................................................... 25

     C.   Validation Process for CHSs........................................................ 26

     D.   Closure and Re-Opening of CHSs ................................................ 28

     E.   Use of CHSs in Sensitive Monitoring Circumstances ....................... 29

     F.   Use of CHS Reporting in FISA Applications.................................... 30

III. The Foreign Intelligence Surveillance Act (FISA)..................................... 31

     A.   Statutory Requirements and the Foreign Intelligence Surveillance
          Court ..................................................................................... 31

     B.   FBI and Department FISA Procedures .......................................... 39

          1.   Preparation and Approval of FISA Applications ..................... 39
          2.   "Woods Procedures" ......................................................... 42

IV.  Ethics Regulations............................................................................... 45

V.   Examples of Other Department and FBI Policies Regulating Investigative
     Activity that Could Potentially Impact Civil Liberties ................................. 46

     A.   Undisclosed Participation ........................................................... 46

     B.   Investigative Activities Concerning Members of the News Media, White
          House and Executive Branch Personnel, and Members of Congress .. 47

          1.   Members of the News Media .............................................. 47

2.    White House and Executive Branch Personnel ...................... 48
3.    Members of Congress and Their Staff.................................. 48

CHAPTER THREE  THE OPENING OF CROSSFIRE HURRICANE, STAFFING, AND THE EARLY STAGES OF THE INVESTIGATION ............................................... 49

I.    Intelligence Community Awareness of Attempted Russian Interference in the 2016 U.S. Elections............................................................................ 49

II.   The Friendly Foreign Government Information and the FBI's Decision to Open Crossfire Hurricane and Four Related Counterintelligence Investigations .... 50

      A.    Receipt of Information from the Friendly Foreign Government and the Opening of Crossfire Hurricane .................................................... 51

      B.    The FBI Opens Counterintelligence Investigations on Papadopoulos, Carter Page, Manafort, and Flynn ................................................. 59

      C.    The Pre-Existing FBI New York Field Office Counterintelligence Investigation of Carter Page ........................................................ 61

III.  Organization and Oversight of the Crossfire Hurricane Investigation.......... 63

      A.    FBI Staffing of the Crossfire Hurricane Investigation ...................... 64

            1.    The Management and Structure of the Crossfire Hurricane Team ............................................................................. 64
            2.    The Role of Peter Strzok and Lisa Page in Crossfire Hurricane and Relevant Text Messages............................................... 66

      B.    The Role of Senior FBI and Department Leadership in the Crossfire Hurricane Investigation ............................................................. 68

            1.    FBI Leadership ............................................................... 68
            2.    Department of Justice ..................................................... 69
            3.    White House Briefings ..................................................... 76

IV.   Investigative Steps in Crossfire Hurricane Prior to Receipt of Christopher Steele Reporting on September 19........................................................ 77

CHAPTER FOUR: THE FBI'S RECEIPT AND EVALUATION OF INFORMATION FROM CHRISTOPHER STEELE PRIOR TO THE FIRST FISA APPLICATION .............. 84

I.    Steele and His Assistance to the FBI Prior to June 2016............................ 84

      A.    Introduction to Handling Agent 1 and Early Assistance ................... 84

      B.    The FBI Opens Steele as a CHS in October 2013 ............................ 86

      C.    Steele's Work for the FBI During 2014-2015 ................................. 90

II.   Steele Provides the FBI with Election Reporting in 2016 ........................... 93

      A.    Steele's Engagement by Fusion GPS in June 2016 .......................... 93

B.      Steele Informs Handling Agent 1 in July 2016 about his Election
        Reporting Work ........................................................................ 95

C.      The Crossfire Hurricane Team Receives Steele's Reports on September
        19 .......................................................................................... 98

D.      The Crossfire Hurricane Team's Initial Handling of the Steele Reporting
        in September 2016 .................................................................101

E.      Steele Discusses His Reporting with Third Parties in Late September
        2016 and the *Yahoo News* Article ............................................104

F.      The FBI's Early October Meeting with Steele ...............................108

G.      FBI Disclosures to Steele during the Early October Meeting...........114

H.      Steele's Reporting to the FBI Following the Early October Meeting and
        Continuing Media Contacts ......................................................116

CHAPTER FIVE: THE FIRST APPLICATION FOR FISA AUTHORITY ON CARTER
PAGE ...........................................................................................121

I.      Decision to Seek FISA Authority..........................................................121

        A.      Early Consideration of a Potential FISA .......................................121

        B.      The FBI's Submission of a FISA Request Following Receipt of the
                Steele Reporting .....................................................................124

II.     Preparation and Approval of the First FISA Application ...........................128

        A.      Initial Drafts ...........................................................................128

        B.      Review and Approval Process ...................................................133

                1.      Initial Feedback and NSD Concerns over Steele's Potential
                        Motivation and Bias........................................................134
                2.      FBI Leadership Supports Moving Forward with the FISA
                        Application and OI Drafts Additional Disclosures Concerning
                        Steele ...........................................................................139
                3.      Other Substantive Changes to the Application before ODAG
                        Review ..........................................................................144
                4.      October Meeting between Page and an FBI CHS .................146
                5.      Feedback from ODAG and Submission of the Read Copy.......147

III.    Feedback from the FISC on the Read Copy, Completion of the Woods
        Procedures, and Final Briefing and Signatures......................................150

        A.      Feedback from the FISC and Revisions to the Application .............150

        B.      The FBI's Completion of the Factual Accuracy Review ("Woods
                Procedures") ...........................................................................151

        C.      FBI Director's Certification .......................................................153

        D.      DAG Oral Briefing and Approval ...............................................154

E.   Final Orders ............................................................................156

IV.  Inaccurate, Incomplete, or Undocumented Information in the First FISA
     Application...................................................................................156

     A.   Information about Page's Prior Relationship with Another U.S.
          Government Agency and Information Page Provided to the Other
          Agency that Overlapped with Facts Asserted in the FISA Application157

     B.   Source Characterization Statement ...........................................160

     C.   Information about a Steele Sub-Source Relied Upon in the FISA
          Application (Person 1) ..............................................................163

     D.   September 23 Media Disclosure ................................................165

     E.   Papadopoulos's Denials to an FBI CHS in September 2016.............166

     F.   Carter Page's Denials to an FBI CHS in August and October 2016 ...168

CHAPTER SIX: FBI ACTIVITIES INVOLVING CHRISTOPHER STEELE AFTER THE
FIRST FISA AND FBI EFFORTS TO ASSESS STEELE'S ELECTION
REPORTING ....................................................................................172

I.   Steele's Briefing to *Mother Jones* and the FBI's Closure of Steele as a CHS in
     November 2016..............................................................................172

II.  The FBI Receives Additional Steele Reporting Post-Election.....................175

III. The FBI Disseminates the Steele Reporting to the U.S. Intelligence
     Community and Seeks to Have It Included in the January 2017 Intelligence
     Community Assessment.....................................................................177

IV.  FBI Validation Efforts Following Steele's Closure as a CHS ......................182

     A.   Information from Persons with Direct Knowledge of Steele's Work-
          Related Performance in a Prior Position ......................................182

     B.   The FBI's Human Source Validation Review of Steele in March 2017183

     C.   The FBI Identifies and Interviews the Primary Sub-Source in Early
          2017......................................................................................186

     D.   The FBI Obtains Additional Information about the Reliability of Steele's
          Reporting after FISA Renewal Application No. 3.............................190

     E.   Crossfire Hurricane Team's Assessment of Potential Russian Influence
          on the Steele Election Reporting ...............................................193

V.   The FBI's Efforts to Assess Steele's Election Reporting in 2016 and 2017 ..195

CHAPTER SEVEN: THE THREE RENEWAL APPLICATIONS FOR CONTINUED FISA
AUTHORITYON CARTER PAGE .............................................................197

I.   FISA Renewal Application No. 1 (January ██, 2017)................................197

A.    Investigative Developments and Decision to Seek Renewal ...........198

B.    Preparation and Approval of Renewal Application No. 1 .................199

1.    Draft Renewal Application ...............................................199
2.    Review and Approval Process ..........................................204
3.    Feedback from the FISC, Completion of the Final Renewal Application and Woods Procedures, and Final Legal Review ...207
4.    FBI Director's Certification...............................................208
5.    DAG Oral Briefing and Approval .......................................209
6.    Final Orders .................................................................209

II.    FISA Renewal Application No. 2 (April ■, 2017) .....................................210

A.    Case Reorganization, Investigative Developments, and Decision to Seek Renewal .......................................................................210

B.    Preparation and Approval of Renewal Application No. 2 .................212

1.    Draft Renewal Application ...............................................212
2.    Review and Approval Process ..........................................215
3.    Feedback from the FISC, Completion of the Final Renewal Application and Woods Procedures, and Final Legal Review ...216
4.    FBI Director's Certification...............................................218
5.    Oral Briefing and Approval ..............................................218
6.    Final Orders .................................................................219

III.    FISA Renewal Application No. 3 (June ■, 2017) ...................................219

A.    Investigative Developments and Decision to Seek FISA Renewal ....219

B.    Preparation and Approval of Renewal Application No. 3 .................220

1.    Draft Renewal Application ...............................................220
2.    Review and Approval Process ..........................................224
3.    Feedback from the FISC, Completion of the Final Renewal Application and Woods Procedures, and FBI Director Certification .................................................................224
4.    DAG Oral Briefing and Approval .......................................226
5.    Final Orders .................................................................227

CHAPTER EIGHT: MISSTATEMENTS, OMISSIONS, AND ERRORS IN THE FISA RENEWAL APPLICATIONS.................................................................229

I.    Omissions in the FISA Applications, as NSD Reported to the FISC in July 2018.......................................................................................230

A.    Papadopoulos's Denials to FBI Confidential Human Sources ..........232

B.    Information the FBI Received From Bruce Ohr Concerning Steele and His Reporting .........................................................................233

C.    Inaccuracies Regarding Steele's Disclosures to Third Parties and Admissions Concerning Steele's *Yahoo News* Contact ....................238

II.    Other Inaccurate, Incomplete, or Undocumented Information in the Three FISA Renewal Applications ...............................................................240

     A.    Inconsistencies between Steele's Reporting and Information His Primary Sub-source Provided to the FBI ......................................241

     B.    Information about Page's Prior Relationship with Another U.S. Government Agency and Information Page Provided the Other Agency that Overlapped with Facts Asserted in the FISA Applications .........247

         1.    June 15, 2017—FBI OGC Attorney Requests Information about Page from Other U.S. Government Agency .........................249
         2.    June 16, 2017—FBI OGC Attorney Provides the Liaison's Response to the OI Attorney ...........................................251
         3.    June 19, 2017—FBI OGC Attorney Provides SSA 2 with Inaccurate Information ...................................................252

     C.    Information Concerning Steele's Past Work-Related Performance....256

     D.    Information Regarding Steele Reporting's Ties to the Democratic Party, the Democratic National Committee, and the Hillary Clinton Campaign ...............................................................................258

     E.    FBI's Source Validation Report Concerning Steele .........................261

     F.    Joseph Mifsud's Denials to the FBI.............................................262

     G.    Carter Page's Alleged Role in Changing the Republican Platform on Russia's Annexation of Ukraine .................................................263

CHAPTER NINE: DEPARTMENT ATTORNEY BRUCE OHR'S ACTIVITIES DURING THE CROSSFIRE HURRICANE INVESTIGATION............................................268

I.    Bruce Ohr's Background ...................................................................268

     A.    Department Positions and Responsibilities ...................................268

     B.    Ohr's Relationship with Steele and Glenn Simpson.......................269

         1.    Ohr's Relationship with Steele from 2007 to March 2016 ......269
         2.    Ohr's Relationship with Simpson ......................................270

     C.    Nellie Ohr's Relationship with Steele and Work for Fusion GPS........271

II.    Ohr's Communications with Steele, Simpson, and the FBI in 2016 and 2017...............................................................................................271

     A.    Ohr's 2016 Contacts with Steele and Simpson Regarding Russian Issues..................................................................................272

         1.    Ohr's July 30, 2016 Meeting with Steele.............................272
         2.    Ohr's August 22, 2016 Meeting with Simpson .....................274
         3.    Ohr's September 23, 2016 Meeting with Steele ...................274
         4.    Ohr's Early October 2016 Activities Regarding Steele's Information...............................................................275

          5.     Ohr's October 18-19, 2016 Communications with Steele and Meeting with McCabe and Lisa Page....................................276

          6.     Ohr's November 2016 Communications with the FBI and State Department Regarding Steele...........................................278

          7.     Ohr's December 2016 Meetings with the FBI and Simpson ....281

    B.    Ohr's Continued Contacts with Steele and Simpson from January to November 2017.......................................................................283

    C.    Ohr's Lack of Notification to ODAG, NSD, and Others Regarding His Contacts with Steele, Simpson, and the FBI.................................284

III.    The FBI's Understanding of Its Relationship and Communications with Ohr.........................................................................................................286

    A.    The Crossfire Hurricane Team's Understanding of Ohr's Activities Related to the Investigation ......................................................286

    B.    FBI Management's Knowledge of Ohr's Activities ...........................288

IV.    Ohr's Activities Relating to the Criminal Division's Manafort Investigation .291

    A.    November 2016 to December 2016 ...........................................291

    B.    January 31 and February 1, 2017 Meetings .................................295

V.    Ohr's Removal from ODAG and OCDETF.............................................298

    A.    ODAG's Communication Expectations and Lack of Knowledge of Ohr's Activities ...............................................................................298

    B.    Ohr Provides Rosenstein with Limited Information about His Connection with Steele and Fusion GPS.......................................301

    C.    ODAG Learns of Ohr's Activities in Connection to the Russian Investigation and Transfers Ohr.................................................302

CHAPTER TEN: THE USE OF OTHER CONFIDENTIAL HUMAN SOURCES AND UNDERCOVER EMPLOYEES IN CROSSFIRE HURRICANE ...........................305

I.    Methodology ...................................................................................306

II.    Background ....................................................................................307

III.    Strategy and Planning for Use of CHSs and UCEs in the Crossfire Hurricane Investigation....................................................................................308

    A.    Strategy for Use of CHSs and UCEs in Crossfire Hurricane .............308

    B.    Planning for Operations Involving CHSs and UCEs .......................309

    C.    Absence of FBI CHSs Inside the Trump Campaign........................311

IV.    Use of CHSs and UCEs in the Crossfire Hurricane Investigation................312

    A.    No CHSs and UCEs Used Prior to the Opening of the Crossfire Hurricane Investigation ...........................................................312

|   | B. | CHS and UCE Involvement in Crossfire Hurricane ..........................313 |
|   |   | 1. | Source 2.........................................................................313 |
|   |   | 2. | Source 3.........................................................................333 |
|   | B. | Other CHSs Who Were Not Tasked As Part of Crossfire Hurricane ...336 |

**V.** ODNI Strategic Intelligence Briefing Provided to Candidate Trump, Flynn, and Another Trump Campaign Advisor ......................................................340

**CHAPTER ELEVEN  ANALYSIS** ......................................................................345

**I.** The Opening of Crossfire Hurricane and Four Related Counterintelligence Investigations .................................................................................346

|   | A. | Authorized Purpose .................................................................347 |
|   | B. | Factual Predication..................................................................350 |
|   | C. | Sensitive Investigative Matters (SIMs) .........................................352 |
|   | D. | Staffing of Investigation ...........................................................354 |
|   | E. | Least Intrusive Investigative Techniques ......................................355 |

**II.** The FISA Applications.......................................................................357

|   | A. | The Role of the Steele Election Reporting in the Applications..........359 |
|   | B. | Inaccurate, Incomplete, or Undocumented Information in the FISA Applications ...........................................................................361 |
|   |   | 1. | The First FISA Application ................................................363 |
|   |   | 2. | The Three Renewal Applications.........................................368 |
|   |   | 3. | Failures in the Woods Process............................................373 |
|   | C. | Conclusions Regarding the FISA Applications ................................375 |
|   |   | 1. | The Failure to Share Relevant Factual Information with OI, the Department's Decision Makers, and the Court, and Other FISA Related Errors ...............................................................375 |
|   |   | 2. | Failure of Managers and Supervisors, including Senior Officials, in the Chain of Command................................................378 |
|   |   | 3. | Clarification Regarding OGC Legal Review During the Woods Process .......................................................................380 |

**III.** The FBI's Relationship with Christopher Steele and Its Receipt and Use of His Election Reporting.............................................................................380

|   | A. | The FBI's Receipt, Use, and Assessment of Steele's Reporting........382 |
|   | B. | The Lack of Agreement on Steele's Status as an FBI CHS and its Effect on the Crossfire Hurricane Team's Relationship with Steele............386 |

**IV.** Issues Relating to Department Attorney Bruce Ohr ................................390

A.     Bruce Ohr's Interactions with Steele, Simpson, the State Department, and the FBI..............................................................................392

B.     FBI Interactions with Ohr Concerning Steele and Simpson .............394

C.     Ethics Issues Raised by Nellie Ohr's Former Employment with Fusion GPS ...................................................................................396

D.     Meetings Involving Ohr, CRM officials, and the FBI Regarding the MLARS Investigation ...............................................................397

V.     The Use of Other Confidential Human Sources and Undercover Employees and Compliance with Applicable Policies ...............................................399

E.     Use of CHSs and UCEs...........................................................401

F.     Compliance with FBI Policies ...................................................403

G.     Participation in ODNI Strategic Intelligence Briefing .....................407

CHAPTER TWELVE  CONCLUSIONS AND RECOMMENDATIONS ..........................410

I.     Conclusions ...................................................................................410

II.     Recommendations ..........................................................................414

APPENDIX 1:  WOODS PROCEDURES...........................................................418

APPENDIX 2:  FBI RESPONSE ....................................................................424

**[PAGE INTENTIONALLY LEFT BLANK]**

# CHAPTER ONE
# INTRODUCTION

## I.   Background and Overview

The Department of Justice (Department) Office of the Inspector General (OIG) undertook this review to examine certain actions by the Federal Bureau of Investigation (FBI) and the Department during an FBI investigation into whether individuals associated with the Donald J. Trump for President Campaign were coordinating, wittingly or unwittingly, with the Russian government. The FBI's counterintelligence investigation, known as "Crossfire Hurricane," was opened on July 31, 2016, weeks after the Republican National Convention (RNC) formally nominated Trump as its candidate for President, and several months before the November 8, 2016 elections, through which Trump was elected President of the United States. On May 17, 2017, the Crossfire Hurricane investigation was transferred from the FBI to the Office of Special Counsel upon the appointment of Special Counsel Robert S. Mueller III to investigate Russian interference with the 2016 presidential election and related matters.

The FBI opened Crossfire Hurricane in July 2016 following the receipt of certain information from a Friendly Foreign Government (FFG). According to the information provided by the FFG, in May 2016, a Trump campaign foreign policy advisor, George Papadopoulos, "suggested" to an FFG official that the Trump campaign had received "some kind of suggestion" from Russia that it could assist with the anonymous release of information that would be damaging to Hillary Clinton (Trump's opponent in the presidential election) and President Barack Obama. At the time the FBI received the FFG information, the U.S. Intelligence Community (USIC), which includes the FBI, was aware of Russian efforts to interfere with the 2016 U.S. elections, including efforts to infiltrate servers and steal emails belonging to the Democratic National Committee (DNC) and the Democratic Congressional Campaign Committee. The FFG shared this information with the State Department on July 26, 2016, after the internet site WikiLeaks began releasing emails hacked from computers belonging to the DNC and Clinton's campaign manager. The State Department advised the FBI of the information the next day.

Crossfire Hurricane was opened several weeks after the FBI's July 5, 2016 conclusion of its "Midyear Exam" investigation into Clinton's handling of government emails during her tenure as Secretary of State.[1] Some of the same FBI officials, supervisors, and attorneys responsible for the Midyear investigation were assigned to the newly opened Crossfire Hurricane investigation, but there was almost no

---

[1] *See* U.S. Department of Justice (DOJ) Office of the Inspector General (OIG), *A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*, Oversight and Review Division Report 18-04 (June 2018), https://www.justice.gov/file/1071991/download (accessed November 12, 2019), 2 (hereinafter *Review of Various Actions in Advance of the 2016 Election*).

overlap between the FBI agents and analysts assigned to the Midyear and Crossfire Hurricane investigations.

The FBI opened Crossfire Hurricane as an umbrella counterintelligence investigation, without identifying any specific subjects or targets. FBI officials told us that they did not immediately identify subjects or targets because it was unclear from the FFG information who within the Trump campaign may have received the reported offer of assistance and might be coordinating, wittingly or unwittingly, with the Russian government. By August 10, 2016, the FBI had assembled an investigative team of special agents, analysts, and supervisory special agents (the Crossfire Hurricane team) and conducted an initial analysis of links between Trump campaign members and Russia. Based upon this analysis, the FBI opened individual cases under the Crossfire Hurricane umbrella on three U.S. persons— Papadopoulos, Carter Page, and Paul Manafort—all of whom were affiliated with the Trump campaign at the time the cases were opened.[2] On August 16, 2016, the FBI opened a fourth individual case under Crossfire Hurricane on Michael Flynn, who was serving at the time as the Trump campaign's National Security Advisor.[3]

Two of the four Crossfire Hurricane subjects were already the subjects of other existing federal investigations. Carter Page was the subject of an ongoing counterintelligence investigation opened by the FBI's New York Field Office (NYFO) on April 4, 2016, relating to his contacts with suspected Russian intelligence officers. Manafort was the subject of an ongoing criminal investigation, supervised by the Money Laundering and Asset Recovery Section (MLARS) in the Department's Criminal Division, concerning millions of dollars Manafort allegedly received from the government of Ukraine.[4]

---

[2] According to public reporting, Carter Page ceased being associated with the Trump campaign as of September 26, 2016, and Manafort resigned as of August 19, 2016. As noted in Chapter Ten, accounts vary as to when Papadopoulos left the Trump campaign; according to The Special Counsel's *Report on the Investigation into Russian Interference with the 2016 Presidential Election*, Papadopoulos was dismissed from the campaign in early October 2016. *See* Special Counsel Robert S. Mueller III, *Report on the Investigation Into Russian Interference in the 2016 Presidential Election*, Vol. I (March 2019), 93 (hereinafter *The Special Counsel's Report*).

[3] Flynn remained on the Trump campaign through the election and was subsequently appointed as National Security Advisor. Flynn resigned that position on February 13, 2017. Papadopoulos, Manafort, and Flynn were later indicted in federal district court for crimes prosecuted by the Special Counsel. On October 5, 2017, and December 1, 2017, respectively, Papadopoulos and Flynn pleaded guilty to making material false statements and material omissions during interviews with the FBI. On August 21, 2018, Manafort was convicted after trial on tax and bank fraud charges, and on September 14, 2018, pleaded guilty to charges of conspiracy against the United States and conspiracy to obstruct justice.

The indictments and sentencing documents are publicly available and therefore we refer to these individuals by name in this report. We also refer to Carter Page by name in this report because the Department publicly released, in response to Freedom of Information Act (FOIA) requests, redacted versions of the Foreign Intelligence Surveillance Act (FISA) applications and orders that name him.

[4] Prior to January 2017, MLARS was named the Asset Forfeiture and Money Laundering Section.

Some of the early investigative steps taken by the Crossfire Hurricane team immediately after opening the investigation were to develop profiles on each subject; send names of, among others, individuals associated with the Trump campaign to other U.S. government intelligence agencies for any further information; and review FBI files for potential FBI Confidential Human Sources (CHSs) who might be able to assist the investigation. FBI witnesses we interviewed told us they believed that using CHSs in covert operations would be an efficient way to develop a better understanding of the information received from the FFG. We determined that the Crossfire Hurricane team tasked several CHSs and Undercover Employees (UCEs) during the 2016 presidential campaign, which resulted in interactions with Carter Page, Papadopoulos, and a high-level Trump campaign official who was not a subject of the investigation. All of these interactions were consensually monitored and recorded by the FBI. The interactions between CHSs and Page and Papadopoulos occurred both during the time Page and Papadopoulos were advisors to the Trump campaign, and after Page and Papadopoulos were no longer affiliated with the Trump campaign. We also learned that in August 2016, a supervisor of the Crossfire Hurricane investigation participated on behalf of the FBI in a strategic intelligence briefing given by the Office of the Director of National Intelligence (ODNI) to candidate Trump and his national security advisors, including investigative subject Flynn, and also participated in a separate strategic intelligence briefing given to candidate Clinton and her national security advisors. The FBI viewed the briefing of candidate Trump and his advisors as a possible opportunity to collect information potentially relevant to the Crossfire Hurricane and Flynn investigations. The supervisor memorialized the results of the briefing in an official FBI document, including instances where he was engaged by Trump and Flynn, as well as anything he considered related to the FBI or pertinent to the Crossfire Hurricane investigation. The supervisor did not memorialize the results of the briefing of candidate Clinton and her advisors.

An early investigative step considered but not initially taken by the Crossfire Hurricane team was to seek court orders under the Foreign Intelligence Surveillance Act (FISA) authorizing surveillance of Page and Papadopoulos. The U.S. Foreign Intelligence Surveillance Court (FISC) may approve FISA surveillance of an American citizen for a period of up to 90 days, subject to renewal, if the government's FISA application establishes probable cause to believe that the targeted individual is an agent of a foreign power by knowingly engaging in at least one of the five activities enumerated in the FISA statute.[5] The Crossfire Hurricane team initially considered seeking FISA surveillance of Papadopoulos as a result of his statement to the FFG and of Page based upon information the FBI had collected about his prior and more recent contacts with known and suspected Russian intelligence officers, as well as Page's financial, political, and business ties to the

[5] See 50 U.S.C. §§ 1801(b)(2)(A) through (E). In the case of the Carter Page FISA applications, the government relied upon the definition of an agent of a foreign power in Section 1801(b)(2)(E), which covers, among other things, any person who knowingly aids or abets any other person who knowingly engages in clandestine intelligence activities (other than intelligence gathering activities) that involve or are about to involve a violation of the criminal statutes of the United States, pursuant to the direction of an intelligence service or network of a foreign power, or knowingly conspires with other persons in such activities.

Russian government.  Officials determined there was an insufficient basis to proceed with a FISA application concerning Papadopoulos, and the Crossfire Hurricane team never submitted a FISA application for Papadopoulos.  With regard to Page, on August 15, 2016, the Crossfire Hurricane team requested assistance from the FBI's Office of the General Counsel (OGC) to prepare a FISA application for submission to the FISC.  However, after consultation between FBI OGC and attorneys in the Office of Intelligence (OI) in the Department's National Security Division (NSD), which is responsible for preparing FISA applications and appearing before the FISC, the Crossfire Hurricane team was told in late August 2016 that more information was needed to establish probable cause for a FISA on Page.

A few weeks later, on September 19, 2016, the Crossfire Hurricane team received a set of six reports prepared by Christopher Steele concerning Russian interference in the 2016 U.S. election and alleged connections between this Russian effort and individuals associated with the Trump campaign.[6]  Steele is a former intelligence officer ██████████████████████████████████████████ who, following his retirement, opened a consulting firm and furnished information to the FBI beginning in 2010, primarily on matters concerning organized crime and corruption in Russia and Eastern Europe.  In 2013, the FBI prepared paperwork to enable it to open Steele as an FBI CHS.  In providing the first two election reports to his FBI handling agent in July 2016, Steele told the handling agent that he had been hired by an investigative firm, Fusion GPS, to collect information on the relationship between candidate Trump's businesses and Russia.  Steele further informed the FBI handling agent that Fusion GPS had been retained by a law firm to conduct this research.  According to the handling agent, it was obvious to him that the request for the research was politically motivated.

Two of the six Steele reports received by the Crossfire Hurricane team on September 19 referenced Carter Page by name.  One stated that Page had held secret meetings with two high level Russian officials during Page's July 2016 trip to Moscow.  This report also indicated that one of the alleged meetings included a discussion about the Kremlin potentially releasing compromising information about Democratic candidate Hillary Clinton to Trump's campaign team.  Another report from Steele described "a well-developed conspiracy of co-operation" between the Russian government and Trump's campaign to defeat Clinton, using Carter Page and others as intermediaries.[7]  On September 21, 2016, 2 days after the team received these reports, FBI OGC advised OI that the FBI believed it was ready to

---

[6] As described in this report, information from Christopher Steele's reports—sometimes collectively referred to as the "Steele dossier"—that pertained to Carter Page was relied upon in the Carter Page FISA applications.  In those applications, Steele was referred to as "Source #1."  We refer to Steele by name in this report because the Department and the FBI have publicly revealed Steele's identity as Source #1 in connection with FOIA litigation.

[7] A third report from Steele, which did not reference Carter Page, stated that Russian intelligence services had used concealed cameras to film Trump's alleged sexual activities with prostitutes at a Moscow hotel, and claimed that the Russians could blackmail Trump by threatening to release this compromising material.  These allegations, which have come to be known publicly as the "salacious and unverified" portion of the reporting, were not included in the original Carter Page FISA application or any of the renewal applications.

submit a request for FISA authority on Carter Page, and OI and the FBI began drafting the first FISA application. Among the FBI's purposes in seeking a FISA order for Page was to obtain information about Page's trip to Russia in July 2016, when Page was still a member of the Trump campaign.

On September 23, 2016, *Yahoo News* published an article stating that U.S. intelligence officials had received reports regarding Carter Page's private meetings in Moscow with senior Russian officials. The article cited a "well-placed Western intelligence source," and contained details about Carter Page's activities in Russia that closely paralleled the information contained in the reporting that Steele had provided to the FBI. We found no evidence that anyone from the FBI asked Steele in September 2016 or at any other time, if he had spoken with the *Yahoo News* reporter. Steele had, in fact, spoken with the reporter prior to the article's publication, which the FBI would learn from public records after the submission of the first FISA application.

On October ▇, 2016, NSD submitted the Carter Page FISA application to the FISC, asserting that there was probable cause to believe that Page was an agent of the Russian government. The application relied on, among other things:

- The information provided by the FFG about its interaction with Papadopoulos;
- Information from the FBI's previously opened counterintelligence investigation relating to Page arising from his contacts with Russian intelligence officers;
- Information from Steele's reports that pertained specifically to Carter Page; and
- Information from a meeting between Page and an FBI CHS that was consensually monitored by Crossfire Hurricane investigators.

The application also stated in a footnote that the FBI "speculates that the [person who hired Steele] was likely looking for information that could be used to discredit [candidate Trump's] campaign." Further, the application advised the court of information reported in the September 23, 2016 *Yahoo News* article and stated that (a) the FBI "does not believe that Source #1 directly provided...to the press" the information in the article, (b) according to the article and other news articles, individuals affiliated with the Trump campaign made statements distancing the campaign from Carter Page, and (c) Page himself denied the accusations in the *Yahoo News* article and reiterated that denial in a September 25, 2016 letter to the FBI Director and in a September 26, 2016 media interview.

However, the application, as well as the renewal applications, did not include significant relevant information, and contained inaccurate and incomplete information, that was known to the Crossfire Hurricane team at the time but that it did not share with NSD attorneys. For example, when asked by an NSD attorney who was involved in helping to draft the first FISA application whether Page had provided information to another U.S. government agency or was a source for that other agency, a Crossfire Hurricane agent incorrectly told the NSD attorney that

5

Page's contact with the other U.S. government agency was "dated" and "outside scope." The Crossfire Hurricane agent made this statement despite the fact that the Crossfire Hurricane team had been told by the other agency in a written memorandum that Page had been approved as an operational contact for the other agency from 2008 to 2013 and that Page had provided information to the other agency that was relevant to the FISA application.[8] The Crossfire Hurricane team also failed to inform NSD attorneys about information obtained by the FBI during CHS operations and interviews that was inconsistent with the allegations contained in the Steele reporting that was being relied upon in the FISA application.

The FISA application was reviewed by numerous FBI agents, FBI attorneys, and NSD attorneys and, as required by law, was ultimately certified by then FBI Director James Comey and approved by then Deputy Attorney General Sally Yates. The FISC granted the first FISA application on October ▮, 2016, authorizing the use of FISA authority on Carter Page.

On October 31, 2016, *Mother Jones* magazine published an online news article titled "A Veteran Spy has Given the FBI Information Alleging a Russian Operation to Cultivate Donald Trump." The October 31 article quoted a "well-placed Western intelligence source," and described how that individual had provided reports to the FBI about connections between Trump and the Russian government. According to the article, the source was continuing to provide information to the FBI, and was quoted as saying "it's quite clear there was or is a pretty substantial inquiry going on." On November 1, 2016, Steele's FBI handling agent questioned Steele, who admitted speaking to the reporter who wrote the October 31 article. The handling agent advised Steele at that time that his relationship with the FBI would likely be terminated for disclosing his relationship with the FBI to the press, and the FBI officially closed Steele for cause on November 17, 2016. Steele was never paid by the FBI for any of the reports or information that he provided concerning Carter Page or connections between the Russian government and the Trump campaign.

After Steele was closed as an FBI CHS, Crossfire Hurricane agents continued to receive information from him through a conduit, Department attorney Bruce Ohr, who at the time was an Associate Deputy Attorney General in the Office of the Deputy Attorney General (ODAG). Ohr had known Steele, through work, since at least 2007 and, starting in July 2016, Steele had contacted Ohr on multiple occasions to discuss information from Steele's reports. At Steele's suggestion, Ohr also met in August and December 2016 with Glenn Simpson, the owner of Fusion GPS, which Ohr's wife had worked for as an independent contractor through September 2016. During those meetings, Simpson provided Ohr with several of

---

[8] According to the other U.S. government agency, "operational contact," as that term is used in the memorandum about Page, provides "Contact Approval," which allows the other agency to contact and discuss sensitive information with a U.S. person and to collect information from that person via "passive debriefing," or debriefing a person of information that is within the knowledge of an individual and has been acquired through the normal course of that individual's activities. According to the U.S. government agency, a "Contact Approval" does not allow for operational use of a U.S. person or tasking of that person.

Steele's election reports.  Ohr also communicated with a senior State Department official concerning, among other matters, the Steele reporting.  Between the date of Steele's closing as an FBI CHS in November 2016 and May 15, 2017, Ohr met with the FBI on 13 occasions.  In his meetings with the FBI, Ohr provided the FBI with information that Steele had provided to him, the Steele election reports that Ohr had received from Simpson, as well as a thumb drive containing information Ohr had received from his wife that contained open source research she had compiled while working for Fusion GPS.  Department leaders, including Ohr's supervisors within ODAG, were unaware of Ohr's meetings with Steele, Simpson, the FBI, or the State Department, or of Ohr's wife's connection to Fusion GPS, until late November 2017, when Congress requested information from the Department regarding Ohr's activities.

As the FBI's Crossfire Hurricane investigation proceeded, the Department submitted three renewal applications to the FISC seeking authority to continue FISA surveillance of Carter Page.  Comey and Yates approved the first renewal application, Comey and then Acting Attorney General Dana Boente approved the second renewal, and then Acting FBI Director Andrew McCabe and then Deputy Attorney General (DAG) Rod Rosenstein approved the third renewal.  In total, at the request of the FBI, the Department filed four FISA applications, each of which was granted by the FISC:  the first FISA application on October ▮, 2016, and three renewal applications on January ▮, April ▮, and June ▮, 2017.  A different FISC judge considered each application before issuing the requested orders, which collectively resulted in approximately 11 months of FISA coverage of Carter Page from October ▮, 2016, until September ▮, 2017.

Each of the FISA orders issued by the FISC authorized the U.S. government to conduct electronic surveillance ▮▮▮▮▮▮▮▮▮▮ targeting Carter Page for a period of up to 90 days.  The authority permitted the government to, among other things, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ by Carter Page.  This included ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ during the 90-day period. The authority also permitted the government to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮.  The orders expressly limited the electronic surveillance ▮▮▮▮▮▮▮▮▮▮ to only ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ specifically identified in the order and in the manner specified by the order. Further, the orders required the government to adhere to standard procedures designed to minimize the government's acquisition and retention of non-public information about a U.S. person that did not constitute foreign intelligence information.  At the request of the government, the orders also included special procedures restricting access to acquired information to only those individuals assigned to the Crossfire Hurricane investigation (and their supervisors), which the Department interpreted to include Department attorneys and officials assisting in and overseeing the investigation.  The orders also required higher approval than would normally be required before disseminating the information outside the FBI.

7

In April and May 2017, following news reports that the FBI had obtained a FISA for Carter Page, Page gave interviews to news outlets denying that he had collected intelligence for the Russian government and asserting instead that he had previously assisted U.S. government agencies. Shortly before the FBI filed the final renewal application with the FISC in mid-June 2017, and in response to concerns expressed by the investigative team and NSD about Page's claim, an FBI OGC Attorney emailed the U.S. government agency that had provided information to the FBI in August 2016, referenced above, about its prior interactions with Carter Page to inquire about Page's past status. The other U.S. government agency's liaison to the Crossfire Hurricane team responded by email to the FBI OGC attorney by directing the attorney to a memoranda previously sent to the FBI by the other U.S. government agency informing the FBI that Page had been approved as an operational contact for the other agency from 2008 to 2013. The email also stated, using the other agency's terminology, that it was the other agency liaison's recollection that Page had prior interactions with that other agency. However, when asked by one of the supervisory special agents (SSA) on the Crossfire Hurricane team (who was going to be the affiant on the final FISA renewal application) about Page's prior interactions with that other agency, the OGC Attorney advised the SSA that Page was "never a source" for the other U.S. government agency. In addition, the OGC Attorney altered the email that the other U.S. government agency had sent to the OGC Attorney so that the email inaccurately stated that Page was "not a source" for the other agency; the OGC Attorney then forwarded the altered email to the SSA. Shortly thereafter, on June ██, 2017, the SSA served as the affiant on the final renewal application, which was again silent about Page's prior relationship with the other U.S. government agency.

On July 12, 2018, while the OIG's review was ongoing, NSD submitted a letter to the FISC advising the court of certain factual omissions in the Carter Page FISA applications that had come to NSD's attention after the final renewal application was filed on June ██, 2017.[9] The Department's letter stated that, despite the omissions, it was the Department's view that the applications contained sufficient information to support the FISC's earlier probable cause findings as to Page.

On March 28, 2018, the OIG publicly announced that, in response to requests from the Attorney General and Members of Congress, it had initiated this review to examine:

- Whether the Department and the FBI complied with legal requirements and applicable policies and procedures in FISA applications filed with the FISC relating to surveillance of Carter Page;

- What information was known to the Department and FBI at the time the applications were filed about Christopher Steele; and

---

[9] At the time of this letter, NSD was unaware of the numerous factual assertions made in the FISA applications that were inaccurate, incomplete, or unsupported by appropriate documentation that the OIG identified during the course of our review and that we detail in this report.

- How the Department's and FBI's relationships and communications with Steele related to the FISA applications.[10]

In addition, during the OIG's *Review of Various Actions in Advance of the 2016 Election*, we discovered text messages and instant messages between some FBI employees, using FBI mobile devices and computers, which expressed statements of hostility toward then candidate Trump and expressed statements of support for then candidate Clinton.[11]  Because some of the FBI employees responsible for those communications, including Section Chief Peter Strzok and FBI Attorney Lisa Page, also had involvement in the Crossfire Hurricane investigation, we examined whether their communications evidencing a potential bias affected investigative decisions made in Crossfire Hurricane.[12]  We also examined, where available, the government emails, text messages, and instant messages of all Department and FBI employees who played a substantive role in Crossfire Hurricane to determine if there were any additional communications evidencing a potential bias and, if so, whether the views expressed influenced any investigative decisions.

The March 28, 2018 OIG announcement also stated that "if circumstances warrant, the OIG will consider including other issues that may arise during the course of the review."  In May 2018, in response to Rosenstein's request, the OIG added to the scope of this review to determine whether the FBI infiltrated or surveilled the Trump campaign.  Accordingly, we examined the FBI's use of CHSs in the Crossfire Hurricane investigation, up through November 8, 2016 (the date of the 2016 U.S. elections) to evaluate whether the FBI had placed any CHSs within the Trump campaign or tasked any CHSs to report on the Trump campaign, and, if so, whether any such use of CHSs was in violation of applicable Department and FBI policies or was politically motivated.  We subsequently learned of and included in our review certain other CHS activities that took place after the 2016 election.

## II.   Prior OIG Reports on FISA and Related Issues

In addition to the requests described above from the Attorney General, the Deputy Attorney General, and Members of Congress, our initiation of this review was informed by our prior work over the past 15 years on the Department's and FBI's use of national security and surveillance authorities, including authorities under FISA.  This prior OIG work considered the challenges faced by the Department and the FBI as they utilized national security authorities while also striving to safeguard civil liberties and privacy.  In every year since 2006, the OIG's

---

[10] As part of our review of this issue, the OIG examined the interactions between Ohr and the Crossfire Hurricane team as well as Ohr's communications with Steele and Simpson, both before and after the FBI closed Steele as a CHS.  Our review also examined Ohr's interactions with Department attorneys regarding the Manafort criminal case.

[11] DOJ OIG, *Review of Various Actions in Advance of the 2016 Election*, 3.

[12] FBI Attorney Lisa Page is not related to Carter Page, the individual affiliated with the Trump campaign who was the subject of the FISA surveillance in Crossfire Hurricane.

annual report on "*Top Management and Performance Challenges Facing the Department of Justice* has highlighted the difficulty faced by the Department and the FBI in maintaining a balance between protecting national security and safeguarding civil liberties.

The OIG's prior oversight work, some of which was congressionally mandated, informed our decision to initiate this review. That prior oversight work included OIG reviews of the FBI's use of specific FISA authorities,[13] the FBI's use of other national security-related surveillance authorities,[14] and the FBI's or other Department law enforcement components' use of CHSs and administrative subpoenas.[15] We also conducted reviews that specifically examined the impact of

---

[13] DOJ OIG, *A Review of the FBI's Handling of Intelligence Information Related to the September 11 Attacks*, Oversight and Review Division (November 2004), https://oig.justice.gov/special/s0606/final.pdf (accessed November 12, 2019); DOJ OIG, *A Review of the Federal Bureau of Investigation's Activities Under Section 702 of the* Foreign Intelligence Surveillance Act Amendments Act of 2008, Oversight and Review Division (September 2012), https://oig.justice.gov/reports/2016/o1601a.pdf (accessed November 12, 2019); DOJ OIG, *A Review of the Federal Bureau of Investigation's Use of Section 215 Order for Business Records*, Oversight and Review Division (March 2007), https://oig.justice.gov/reports/2014/215-I.pdf (accessed November 12, 2019); DOJ OIG, *A Review of the FBI's Use of Section 215 Orders for Business Records in 2006*, Oversight and Review Division (March 2008), https://oig.justice.gov/reports/2016/215-2008.pdf (accessed November 12, 2019); DOJ OIG, *FBI's Use of Section 215 Orders: Assessment of Progress in Implementing Recommendations and Examination of Use in 2007 through 2009*, Oversight and Review Division Report 15-05 (May 2015), https://oig.justice.gov/reports/2015/o1505.pdf (accessed November 12, 2019); DOJ OIG, *A Review of the FBI's Use of Section 215 Orders for Business Records in 2012 through 2014*, Oversight and Review Division Report 16-04 (September 2016), https://oig.justice.gov/reports/2016/o1604.pdf (accessed November 12, 2019); DOJ OIG, *A Review of the FBI's Use of Trap and Trace Devices Under the Foreign Intelligence Surveillance Act in 2007 through 2009*, Oversight and Review Division 15-06 (June 2015), https://oig.justice.gov/reports/2015/o1506.pdf (accessed November 12, 2019).

[14] DOJ OIG, *A Review of the Federal Bureau of Investigation's Use of National Security Letters*, Oversight and Review Division (March 2007), https://oig.justice.gov/reports/2016/NSL-2007.pdf (accessed November 12, 2019); DOJ OIG, *A Review of the FBI's Use of National Security Letters: Assessment of Corrective Actions and Examination of NSL Usage in 2006*, Oversight and Review Division (March 2008), https://oig.justice.gov/reports/2014/s1410a.pdf (accessed November 12, 2019); DOJ OIG, A Review of the Federal Bureau of Investigation's Use of National Security Letters: *Assessment of Progress in Implementing Recommendations and Examination of Use in 2007 through 2009*, Oversight and Review Division (August 2014), https://oig.justice.gov/reports/2014/s1408.pdf (accessed November 12, 2019); DOJ OIG, *A Review of the Federal Bureau of Investigation's Use of Exigent Letters and Other Informal Requests for Telephone Records,* Oversight and Review Division (January 2010), https://oig.justice.gov/reports/2014/o1411.pdf (accessed November 12, 2019); DOJ OIG, *A Review of the Department of Justice's Involvement with the President's Surveillance Program*, Oversight and Review Division (July 2009), https://oig.justice.gov/reports/2016/PSP-01-08-16-vol-3.pdf (accessed November 12, 2019).

[15] DOJ OIG, *Audit of the Bureau of Alcohol, Tobacco, Firearms and Explosives' Management and Oversight of Confidential Informants,* Audit Division 17-17 (March 2017), https://oig.justice.gov/reports/2017/a1717.pdf (accessed November 12, 2019); DOJ OIG*, Audit of the Drug Enforcement Administration's Confidential Source Policies and Oversight of Higher-Risk Confidential Sources,* Audit Division 15-28 (July 2015), https://oig.justice.gov/reports/2015/a1528.pdf (accessed November 12, 2019); DOJ OIG, *Audit of the Drug Enforcement Administration's Management and Oversight of its Confidential Source Program*, Audit Division 16-33 (September 2016), https://oig.justice.gov/reports/2016/a1633.pdf (accessed November 12, 2019); DOJ OIG,

the FBI's use of investigative authorities on U.S. persons engaged in activities that are protected by the First Amendment of the U.S. Constitution.[16]

## III.   Methodology

During the course of this review, the OIG conducted over 170 interviews involving more than 100 witnesses.  These interviews included former FBI Director Comey, former Attorney General Loretta Lynch, former DAG Yates, former Acting Attorney General and Acting DAG and current FBI General Counsel Dana Boente, former FBI Deputy Director McCabe, former DAG Rod Rosenstein, former FBI General Counsel James Baker, FBI agents, analysts, and supervisors who worked on the Crossfire Hurricane investigation, attorneys from the FBI's National Security and Cyber Law Branch, NSD attorneys who prepared or reviewed the FISA applications, Department attorneys from ODAG who reviewed the FISA applications, former and current members of the FBI's senior executive leadership, Department attorney Bruce Ohr and his wife, Nellie Ohr, and additional Department attorneys who supervised and worked with Ohr on matters relevant to this review.

The OIG also interviewed witnesses who were not current or former Department employees regarding their interactions with the FBI on matters falling with the scope of this review, including Christopher Steele and employees of other U.S. government agencies.[17]  Steele provided the OIG with access to, but not copies of, memoranda regarding interactions he had with FBI personnel and Bruce Ohr in 2010, 2011, and 2016.  Steele represented to us that he drafted the memoranda shortly after each interaction.  In addition, we reviewed relevant information that other U.S. government agencies provided to the FBI in the course of the Crossfire Hurricane investigation.  Because the activities of other agencies were not within the scope of this review, we did not seek to obtain records from them that the FBI never received or reviewed, except for a limited amount of State

---

*Public Summary of the Addendum to the Audit of the Drug Enforcement Administration's Management and Oversight of its Confidential Source Program,* Audit Division 16-33a (March 2017), https://oig.justice.gov/reports/2017/a1633a.pdf (accessed November 12, 2019); DOJ OIG, *A Review of the Drug Enforcement Administration's Use of Administrative Subpoenas to Collect or Exploit Bulk Data,* Oversight and Review Division 19-01 (March 2019), https://oig.justice.gov/reports/2019/o1901.pdf (accessed November 12, 2019); DOJ OIG, *The Federal Bureau of Investigation's Management of Confidential Case Funds and Telecommunication Costs,* Audit Division 18-03 (January 2008), https://oig.justice.gov/reports/FBI/a0803/final.pdf (accessed November 12, 2019).

[16]   DOJ OIG, *A Review of the FBI's Investigative Activities Concerning Potential Protesters at the 2004 Democratic and Republican National Conventions,* Oversight and Review Division (April 2006), https://oig.justice.gov/special/s0604/final.pdf (accessed November 12, 2019); DOJ OIG, *A Review of the FBI's Investigations of Certain Domestic Advocacy Groups,* Oversight and Review Division (September 2010), https://oig.justice.gov/special/s1009r.pdf (accessed November 12, 2019).

[17]   According to Steele, his cooperation with our investigation ███████████████████████ ███████.

Department records relating to Steele.[18]  Additionally, our review also did not seek to independently determine whether corroboration existed for the Steele election reporting; rather, our review was focused on information that was available to the FBI prior to and during the pendency of the Carter Page FISAs that related to the Steele reporting.

Two witnesses, Glenn Simpson and Jonathan Winer (a former State Department official), declined our requests for voluntary interviews, and we were unable to compel their testimony.[19]  The OIG does not have authority to subpoena for testimony former Department employees or third parties who may have relevant information about an FBI or Department program or operation.[20]  Certain former FBI employees who agreed to interviews, including Comey and Baker, chose not to request that their security clearances be reinstated for their OIG interviews. Therefore, we were unable to provide classified information or documents to them during their interviews to develop their testimony, or to assist their recollections of relevant events.

We also received and reviewed more than one million documents that were in the Department's and FBI's possession.  Among these were electronic communications of Department and FBI employees and documents from the Crossfire Hurricane investigation, including interview reports (FD-302s and Electronic Communications or ECs), contemporaneous notes from agents, analysts, and supervisors involved in case-related meetings, documents describing and analyzing Steele's reporting and information obtained through FISA coverage on

---

[18]  In this review, we also did not seek to assess the actions taken by or information available to U.S. government agencies outside the Department of Justice, as those agencies are outside our jurisdiction.

[19]  The OIG did not seek to interview Carter Page or any other subject in the Crossfire Hurricane investigation because their actions were not the focus of our review.  Rather, consistent with the OIG's jurisdiction, we examined the actions of the FBI and Department.  In response to a request from Page to review a draft of our report, the OIG advised Page in correspondence in November 2019 that the OIG would notify him of the report's anticipated release date shortly before the report is made public.  This courtesy is consistent with the OIG's practice in other matters where the actions we reviewed affected the personal interests of a private citizen.

[20]  In 2016, Congress passed the "Inspector General Empowerment Act" (IGEA) (P. L. 114-317).  Timely completion of this review would not have been possible without the IGEA's statutory clarification that OIGs must be granted access to all agency records and information, including highly sensitive records, such as FISA materials.  We note that the Department and the FBI gave us broad and timely access to all such material, and provided us with their full cooperation.

Earlier versions of the IGEA also included a provision to authorize all OIGs to issue testimonial subpoenas (the Department of Defense OIG already has such authority, as does the Health and Human Services OIG in certain circumstances), but the provision was removed from the IGEA prior to its passage.  The OIG would have directly benefited from the ability to subpoena former government and non-government individuals in this review.  In addition to being able to compel the testimony of the small number of individuals who did not testify voluntarily, the ability to subpoena witnesses would have expedited completion of the review, as multiple individuals only agreed to interviews at a late stage in the review.  In September 2018, the House of Representatives unanimously passed legislation that would provide testimonial subpoena authority to OIGs.  No similar legislation has been introduced in the current Congress.

Carter Page, and draft and final versions of materials used to prepare the FISA applications and renewals filed with the FISC.[21] We also obtained documents from attorneys and supervisors in NSD, Criminal Division (CRM), ODAG, and the Office of the Attorney General (OAG).

As with the OIG's *Review of Various Actions in Advance of the 2016 Election*, we obtained electronic communications between and among FBI agents, analysts, and supervisors, and FBI and Department officials to understand what happened during the investigation and identify what was known by the members of the Crossfire Hurricane team as the investigation progressed. In addition to a large volume of unclassified and classified emails, we received and reviewed hundreds of thousands of text messages and instant messages to or from FBI personnel who worked on the investigation.[22] We also were provided with and reviewed transcripts of testimony from numerous witnesses who participated in hearings jointly conducted during the 115th Congress by the House Committee on the Judiciary and the House Committee on Oversight and Government Reform.

Our review included the examination of highly classified information. We were given broad access to relevant materials by the Department and the FBI, including emails, text messages, and instant messages from both the FBI's Top Secret SCINet and Secret FBINet systems, as well as access to the FBI's classified Delta database, which FBI agents use to record their interactions with, and information received from, CHSs. Chapter Ten provides more information on the methodology we employed to examine the FBI's use of CHSs.

As with the OIG's handling of past reviews, we did not analyze all of the decisions made during the Crossfire Hurricane investigation. Rather, we reviewed the issues described below in Section IV of this chapter. Moreover, our role in this review was not to second-guess discretionary judgments by Department personnel about whether to open an investigation, or specific judgment calls made during the course of an investigation, where those decisions complied with or were authorized by Department rules, policies, or procedures. We do not criticize particular decisions merely because we might have recommended a different investigative strategy or tactic based on the facts learned during our investigation. The question we considered was not whether a particular investigative decision was ideal or could have been handled more effectively, but whether the Department and the FBI complied with applicable legal requirements, policies, and procedures in taking the actions we reviewed or, alternatively, whether the circumstances surrounding the

---

[21] We did not review the entirety of FISA ████████ obtained through FISA surveillance ██████ ████████████ targeting Carter Page. We reviewed only those documents ██████ under FISA authority that were pertinent to our review.

[22] During our review, we identified a small number of text messages and instant messages, beyond those discussed in the OIG's *Review of Various Actions in Advance of the 2016 Election*, in which FBI employees involved in the Crossfire Hurricane investigation discussed political issues and candidates. Unlike the messages in the OIG's *Review of Various Actions in Advance of the 2016 Election,* the messages here did not raise significant questions of potential bias or improper motivation because of the potential connection to investigative activity.

decision indicated that it was based on inaccurate or incomplete information, or considerations other than the merits of the investigation. If the explanations we were given for a particular decision were consistent with legal requirements, policies and procedures, reflected rational investigative strategy and were not unreasonable, we did not conclude that the decision was based on improper considerations in the absence of documentary or testimonial evidence to the contrary.[23]

## IV. Structure of the Report

This report consists of twelve chapters. The public version of this report contains limited redactions of information that the FBI and other agencies determined is classified or too sensitive for public release.[24] Following this introduction, Chapter Two summarizes relevant Department and FBI policies concerning counterintelligence investigations, including the policies governing the FBI's use of CHSs and FISA authority in the context of counterintelligence investigations.

In Chapter Three, we provide an overview of the Crossfire Hurricane investigation, including the information that predicated the investigation, the identification of the subjects of the investigation, the organization and staffing of the Crossfire Hurricane team, and the involvement of Department and FBI leadership. We also describe the context surrounding the Crossfire Hurricane investigation, in particular the conclusion by the USIC that the Russian government was attempting to interfere with the 2016 U.S. elections. In Chapter Four, we discuss the FBI's receipt and evaluation of information from Steele up and through the first Carter Page FISA application. In Chapter Five, we describe the preparation of the first FISA application which, once granted by the FISC, authorized FISA surveillance of Carter Page. We also describe instances in which information in the first FISA application was inaccurate, incomplete, or unsupported by appropriate documentation.

Chapter Six discusses the FBI's activities involving Steele after the first FISA application, including the FBI's decision to close Steele as a CHS and the FBI's efforts to assess Steele's election reports. Chapter Seven describes the three renewal applications for FISA surveillance of Carter Page as the Crossfire Hurricane investigation proceeded. In Chapter Eight, we discuss a letter NSD sent to the FISC

---

[23] As part of the standard practice in our reviews, we provided a draft copy of this report to the Department and the FBI to conduct a factual accuracy review. Also consistent with our standard practice, we contacted individuals who were interviewed as part of the review and whose conduct is addressed in this report, and certain other witnesses, to provide them an opportunity to review the portions of the report that pertain to their testimony to the OIG. With limited exceptions, these witnesses availed themselves of this opportunity, and we provided those who did conduct such a review with the opportunity to provide oral or written comments directly to the OIG concerning the portions they reviewed, consistent with rules to protect classified information.

[24] Consistent with our standard practice, we provided a draft copy of this report to the Department and the FBI, and as appropriate, other government agencies, for the purpose of conducting a classification review and providing final classification markings.

in July 2018, about one year after the final renewal application was filed, outlining omissions from the FISA applications. We also describe additional instances of inaccurate, incomplete, or undocumented information in the three FISA renewal applications that were not identified in NSD's letter.

In Chapter Nine, we discuss the interactions between Ohr and the Crossfire Hurricane team, Ohr's communications with Steele and Simpson, both before and after the FBI closed Steele as a CHS, and Ohr's interactions with Department attorneys regarding the Manafort criminal case. Chapter Ten discusses the FBI's use of CHSs other than Steele and its use of Undercover Employees (UCEs) as part of the Crossfire Hurricane investigation. We also describe several individuals we identified who had either a connection to candidate Trump or a role in the Trump campaign, and were also FBI CHSs, and provide the reasons such individuals were not tasked as part of the Crossfire Hurricane investigation. Finally, we describe the attendance of an SSA on the Crossfire Hurricane team at counterintelligence briefings given to the presidential candidates and certain campaign advisors.

Chapter Eleven contains our analysis of the factual information presented in Chapters Three through Ten. Chapter Twelve provides our conclusions and our nine recommendations.

Appendix One to this report contains a chart illustrating the results of our review of the FBI's compliance with the FISA "Woods Procedures" that are described in Chapter Two. Appendix Two is the FBI's official response to this report and the report's recommendations.

**[PAGE INTENTIONALLY LEFT BLANK]**

# CHAPTER TWO
# APPLICABLE LAWS AND DEPARTMENT AND FBI POLICIES

In this chapter, we describe the standards set forth in the Attorney General's Guidelines for Domestic FBI Operations (AG Guidelines) and implemented through the FBI's Domestic Investigations and Operations Guide (DIOG) and the Counterintelligence Division (CD) Policy Directive and Policy Guide (CDPG) for the opening of predicated counterintelligence investigations. We then describe the FBI's process for opening and overseeing Sensitive Investigative Matters (SIMs), such as those involving political candidates or officials. Next, we discuss relevant policies governing the use and handling of Confidential Human Sources (CHS), focusing on the validation process, the use of sub-sources, and the continued receipt of intelligence from a closed CHS.

We then summarize the legal standards for obtaining approval to conduct electronic surveillance and physical searches under the Foreign Intelligence Surveillance Act of 1978 (FISA), as well as the procedural steps, approval and certification standards, and accuracy requirements necessary to obtain such approvals. Because our review focuses on the process the FBI used to obtain authorization to conduct electronic surveillance and physical searches targeting Carter Page, the discussion of FISA in this chapter is limited to the provisions applicable to these authorities. We also describe government ethics regulations concerning conflicts of interests that apply to certain events discussed in Chapter Nine.

Finally, we discuss examples of other Department and FBI policies regulating investigative activity that could potentially impact civil liberties, including policies that address when someone acting on behalf of the FBI becomes a member of, or participates in, the activity of an organization without disclosing their FBI affiliation to an appropriate official of the organization, and when investigative actions involve members of the news media, White House personnel, and Members of Congress.

## I.    FBI Counterintelligence Investigations

The FBI has the authority to investigate federal crimes that are not exclusively assigned to other agencies.[25] In addition, under Executive Order (EO) 12333 and various statutory authorities, the FBI has the primary domestic responsibility for investigating threats within the United States to the national security. Such threats are defined to include the following:

- International terrorism;
- Espionage and other intelligence activities, sabotage, and assassination, conducted by, for, or on behalf of foreign powers, organizations, or persons;

---

[25] *See* AG Guidelines § A.1; DIOG §§ 6.4.1, 7.4.1.

- Foreign computer intrusion; and
- Other matters determined by the Attorney General, consistent with E.O. 12333 or any successor order.

Beyond these investigative functions, the FBI also serves as a domestic intelligence agency and has the authority to collect and analyze foreign intelligence as a member of the U.S. Intelligence Community (USIC).[26]

The standards that the FBI must follow when conducting investigative and intelligence gathering activities are set forth in the AG Guidelines and implemented through the DIOG. The AG Guidelines and the DIOG both require that FBI investigations be undertaken for an authorized purpose—that is, "to detect, obtain information about, or prevent or protect against federal crimes or threats to the national security or to collect foreign intelligence."[27] The DIOG requires that the authorized purpose be "well-founded and well-documented," and states that this threshold requirement is a safeguard intended to ensure that FBI employees respect the constitutional rights of Americans. Under both the AG Guidelines and the DIOG, no investigation may be conducted for the sole purpose of monitoring activities protected by the First Amendment or the lawful exercise of other rights secured by the Constitution or laws of the United States.[28] However, the DIOG also recognizes that

> the law does not preclude FBI employees from observing and collecting any of the forms of protected speech and considering its content—as long as those activities are done for a valid law enforcement or national security purpose and are conducted in a manner that does not unduly infringe upon the ability of the speaker to deliver his or her message.[29]

Balancing individual rights and the FBI's legitimate investigative needs requires "a rational relationship between the authorized purpose and the protected speech to be collected such that a reasonable person with knowledge of the circumstances could understand why the information is being collected."[30]

The AG Guidelines recognize that activities subject to investigation as "threats to the national security" also may involve violations or potential violations of federal criminal laws, or may serve important purposes outside the ambit of normal criminal investigation and prosecution by informing national security decisions.[31] Given such potential overlaps in subject matter, the AG Guidelines

---

[26] *See* AG Guidelines §§ A.2, B.

[27] AG Guidelines § II.B.1; DIOG § 7.2.; *see also* AG Guidelines §§ I.B.1, II; DIOG §§ 2.2.1, 6.2.

[28] *See* AG Guidelines §§ I.B.1, I.C.3; DIOG § 4.1.2.

[29] DIOG § 4.2.1.

[30] DIOG § 4.2.1.

[31] *See* AG Guidelines § A.2.

state that the FBI is not required to differently label its activities as criminal investigations, national security investigations, or foreign intelligence collection, nor is it required to segregate FBI personnel based on the subject areas in which they operate. Rather, the AG Guidelines state that, where an authorized purpose exists, all of the FBI's legal authorities are available for deployment in all cases to which they apply.[32]

The AG Guidelines and the DIOG require that the "least intrusive" means or method be "considered" when selecting investigative techniques and, "if reasonable based upon the circumstances of the investigation," be used to obtain information instead of a more intrusive method.[33] In choosing whether an investigative method is appropriate, the DIOG requires FBI agents to balance the level of intrusion against the investigative needs, particularly where the information sought involves clearly established constitutional, statutory, or evidentiary rights, or sensitive circumstances. Considerations include the seriousness of the crime or national security threat; the strength and significance of the intelligence or information to be gained; the amount of information already known about the subject or group under investigation; and the requirements of operational security, including protection of sources and methods.[34] The DIOG states that the degree of procedural protection the law and Department and FBI policy provide for the use of a particular investigative method helps to determine its intrusiveness.[35] According to the DIOG, search warrants, wiretaps, and undercover operations are considered to be very intrusive, while database searches and communication with established sources are less intrusive.[36] The least intrusive method principle reflects an attempt to balance the FBI's ability to effectively conduct investigations with the potential negative impact an investigation can have on the privacy and civil liberties of individuals encompassed within an investigation.[37] However, the DIOG states that investigators "must not hesitate to use any lawful method consistent with the [AG Guidelines] when the degree of intrusiveness is warranted in light of the seriousness of the matter concerned."[38] According to the DIOG, "[i]n the final analysis, choosing the method that [most] appropriately balances the impact on privacy and civil liberties with operational needs, is a matter of judgment, based on training and experience."[39]

Where the authorized purpose involves a threat to the national security, the AG Guidelines require the FBI to coordinate with other Department components,

---

[32] See AG Guidelines § A, II.

[33] See AG Guidelines § I.C.2; DIOG § 4.4.1.

[34] See DIOG § 4.4.4.

[35] See DIOG § 4.4.3.

[36] See DIOG § 4.4.3.

[37] See DIOG § 4.4.4.

[38] See DIOG § 4.1.1(F).

[39] See DIOG § 4.4.5.

specifically including the National Security Division (NSD), and to share information with other agencies with national security responsibilities, including other USIC agencies, the Department of Homeland Security, and the White House. Section VI.D of the AG Guidelines governs the FBI's responsibility to provide information concerning threats to the national security to NSD and to the White House. Where there is "compromising" information about U.S. officials or political organizations, or information concerning activities of U.S. persons intended to affect the political process, the FBI may disseminate it to the White House with the approval of the Attorney General, based on a determination that the dissemination is needed for foreign intelligence purposes, to protect against international terrorism or other threats to the national security, or for the conduct of foreign affairs.[40]

## A.    Predicated Investigations

Where the FBI has an authorized purpose and factual predication—that is, allegations, reports, facts or circumstances indicative of possible criminal activity or a national security threat, or the potential for acquiring information responsive to foreign intelligence requirements—it may initiate an investigation. The predication requirement is not a legal requirement but rather a prudential one imposed by Department and FBI policy.[41]

Predicated investigations that concern federal crimes or threats to the national security are divided into Preliminary Investigations and Full Investigations.[42] Preliminary Investigations may be opened on the basis of any "allegation or information" indicative of possible criminal activity or threats to the national security. Authorized investigative methods in Preliminary Investigations include all lawful methods (to include CHS and UCE operations) except mail opening, search warrants, electronic surveillance requiring a judicial order or warrant (Title III or FISA), or requests under Title VII of FISA. A Preliminary Investigation may also be converted to a Full Investigation if the available information provides predication for a Full Investigation.[43] As described in more detail in Chapter Three, both Crossfire Hurricane and an earlier counterintelligence investigation on Carter Page were initiated as Full Investigations, and thus we focus on the requirements for this level of predicated investigation.[44]

---

[40] *See* AG Guidelines § VI.D.2.b.

[41] For example, the Supreme Court has held that the Department and FBI can lawfully open a federal criminal grand jury investigation even in the absence of predication. *See United States* v. *Morton Salt*, 338 U.S. 632, 642-43 (1950) (a grand jury "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not"); *see also United States* v. *R. Enterprises*, 498 U.S. 292, 297 (1991).

[42] *See* AG Guidelines § II.B.3.

[43] *See* AG Guidelines §§ II.B.3, II.B.4; DIOG §§ 6.1, 6.4, 6.6, 6.7.2, 6.9 (Preliminary Investigations); DIOG §§ 7.5, 7.6, 7.7.3, 7.9 (Full Investigations).

[44] In addition to predicated investigations, the AG Guidelines and the DIOG also authorize the FBI to use relatively non-intrusive means to conduct assessments when it receives or obtains allegations or other information concerning crimes or threats to the national security. Assessments

Under Section II.B.3 of the AG Guidelines and Section 7 of the DIOG, the FBI may open a Full Investigation if there is an "articulable factual basis" that reasonably indicates one of the following circumstances exists:

- An activity constituting a federal crime or a threat to the national security has or may have occurred, is or may be occurring, or will or may occur and the investigation may obtain information relating to the activity or the involvement or role of an individual, group, or organization in such activity;

- An individual, group, organization, entity, information, property, or activity is or may be a target of attack, victimization, acquisition, infiltration, or recruitment in connection with criminal activity in violation of federal law or a threat to the national security and the investigation may obtain information that would help to protect against such activity or threat; or

- The investigation may obtain foreign intelligence that is responsive to a requirement that the FBI collect positive foreign intelligence—*i.e.*, information relating to the capabilities, intentions, or activities of foreign governments or elements thereof, foreign organizations or foreign persons, or international terrorists.

The DIOG provides examples of information that is sufficient to initiate a Full Investigation, including corroborated information from an intelligence agency stating that an individual is a member of a terrorist group, or a threat to a specific individual or group made on a blog combined with additional information connecting the blogger to a known terrorist group.[45]

A Full Investigation may be opened if there is an "articulable factual basis" of possible criminal or national threat activity.  When opening a Full Investigation, an FBI employee must certify that an authorized purpose and adequate predication exist; that the investigation is not based solely on the exercise of First Amendment rights or certain characteristics of the subject, such as race, religion, national origin, or ethnicity; and that the investigation is an appropriate use of personnel and financial resources.  The factual predication must be documented in an electronic communication (EC) or other form, and the case initiation must be approved by the relevant FBI personnel, which, in most instances, can be a Supervisory Special Agent (SSA) in a field office or at Headquarters.  As described in more detail below, if an investigation is designated as a Sensitive Investigative Matter, that designation must appear in the caption or heading of the opening EC, and special approval requirements apply.

---

require an authorized purpose but no particular factual predication, and are the lowest level of investigation permitted under the AG Guidelines and the DIOG. *See* AG Guidelines § II.A; DIOG § 5.2. The investigations opened on Carter Page were not assessments.

[45]  DIOG § 7.5.

All lawful investigative methods may be used in a Full Investigation, including electronic surveillance and physical searches under FISA.[46]  However, as described above, the FBI must consider the least intrusive means or method to accomplish the operational objectives of the investigation.

## B.    Sensitive Investigative Matters (SIM)

The DIOG states that certain investigative matters, known as Sensitive Investigative Matters or SIMs, should be brought to the attention of FBI management and Department officials, as described in further detail below, because of the possibility of public notoriety and sensitivity.[47]  Section 10.1.2.1 of the DIOG, in relevant part, defines a SIM as an assessment or predicated investigation of the activities of a domestic public official or domestic political candidate (involving corruption or a threat to the national security), or a domestic political organization or an individual prominent in such an organization.  The term "domestic political candidate" includes an individual who is seeking nomination or election to federal or other political office, while the term "domestic political organization" includes, in relevant part, a committee or group formed to elect an individual to public office.  Under the DIOG, if an assessment or predicated investigation concerns a person prominent in a "domestic political organization" but not the political organization itself, it nonetheless must be treated as a SIM.[48]

Section 10.1.3 of the DIOG states that the following factors are to be considered when deciding to open a SIM:

- The seriousness or severity of the violation or threat;
- The significance of the information sought to the violation or threat;
- The probability that the proposed course of action will be successful;
- The risk of public exposure, and if there is such a risk, the adverse impact or the perception of the adverse impact on civil liberties and public confidence; and
- The risk to the national security or the public welfare if the proposed course of action is not approved (*i.e.*, the risk of doing nothing).

The DIOG cautions that, when conducting a SIM, the FBI should take particular care to consider whether a planned course of action is the least intrusive method if reasonable, based upon the circumstances of the investigation.[49]  As noted above, when balancing the needs of the investigation and the intrusiveness of an investigative method, the FBI must consider the seriousness of the crime or national security threat, the strength and significance of the intelligence or

---

[46] *See* AG Guidelines § II.B.4(b)(ii); *see also* DIOG §§ 7.9, 18.7.1.

[47] DIOG § 10.1.1

[48] *See* DIOG § 10.1.2.2.3.

[49] *See* DIOG § 10.1.3

information to be gained, the amount of information already known about the subject or group under investigation, and the requirements of operational security, including protection of sources and methods.[50]

The DIOG and CDPG impose special approval and notification requirements for initiating a Full Investigation of a U.S. person relating to a threat to the national security or any investigation involving a SIM. When a case is opened and designated a SIM by FBI Headquarters, these include review by the FBI Office of the General Counsel (OGC), approval by the FBI Headquarters operational Section Chief (SC), and notification to NSD.[51] At NSD, counterintelligence investigations fall within the purview of the Counterintelligence and Export Control Section (CES), which has the responsibility of supervising and coordinating, among other things, the criminal investigation and prosecution of national security cases, except counterterrorism cases, nationwide. CES receives a steady volume of investigation notifications from the FBI, referred to as letterhead memoranda or LHMs, and on counterintelligence matters CES officials meet regularly with officials from the FBI's Counterintelligence Division.

## II.   Department and FBI Policies Governing the Use of Confidential Human Sources (CHS)

CHSs play a crucial role in the FBI's efforts to combat crime and protect national security. CHSs provide the FBI with information and insights about the inner workings of criminal, terrorist, and espionage networks that otherwise would be unavailable. The intelligence that CHSs generate has enabled the FBI to thwart terrorist plots, combat intelligence gathering by malign foreign actors, and collect critical evidence for criminal prosecutions.

### A.   Risk Management Issues Related to CHSs

The operation of CHSs carries numerous risks, both for the CHSs and for law enforcement.[52] CHSs oftentimes place themselves in significant danger because

---

[50] *See* DIOG § 4.4.4.

[51] The DIOG states "an appropriate NSD official" should be notified and provides a general email account for notification. *See* DIOG §§ 7.7, 7.10, DIOG Appendix G § G.9.1 (classified); CDPG § 3.1.2.

[52] The OIG has conducted numerous reviews of the CHS Programs at the Department's law enforcement components, including most recently the OIG's *Audit of the Federal Bureau of Investigation's Management of its Confidential Human Source Validation Processes*, Audit Division Report 20-009 (November 2019), http://oig.justice.gov/reports/2019/a20009.pdf (accessed December 1, 2019). *See also* DOJ OIG, *Audit of the Bureau of Alcohol, Tobacco, Firearms and Explosives' Management and Oversight of Confidential Informants*, Audit Division 17-17 (March 2017), https://oig.justice.gov/reports/2017/a1717.pdf (accessed November 12, 2019); DOJ OIG, *Audit of the Drug Enforcement Administration's Confidential Source Policies and Oversight of Higher-Risk Confidential Sources*, Audit Division 15-28 (July 2015), https://oig.justice.gov/reports/2015/a1528.pdf (accessed November 12, 2019); DOJ OIG, *Audit of the Drug Enforcement Administration's Management and Oversight of its Confidential Source Program*, Audit Division 16-33 (September 2016), https://oig.justice.gov/reports/2016/a1633.pdf (accessed November 12, 2019); DOJ OIG,

disclosure of their cooperation with the FBI can result in retaliation by the persons on whom they are reporting, including physical abuse and even death.  Maintaining the confidential nature of the FBI's relationship with its human sources consequently is a priority for the FBI and the Department.  Without such secrecy, the safety of CHSs and the FBI's ability to recruit CHSs would be severely jeopardized.

Law enforcement agencies, including the FBI, also assume various risks when utilizing CHSs.  Sources may fail to follow instructions and engage in criminal activities that are not authorized, or they may lie or otherwise provide inaccurate information.  In light of these risks, the Department and the FBI have established detailed policies to govern the use of CHSs, which seek to mitigate the various risks that such use creates.  The Department has established AG Guidelines for FBI CHSs (AG CHS Guidelines) and baseline risk and mitigation protocols for CHS operations.[53]  The AG CHS Guidelines and protocols require, for example, that the FBI:  (1) complete an initial suitability or validation review prior to operating a CHS; (2) admonish the CHS regarding the parameters of his or her service, such as a prohibition on unauthorized illegal activity, and the requirement to abide by the FBI's instructions; (3) maintain proper payment documentation; and (4) subject the CHS to an on-going validation review, to include quarterly and annual reporting on the CHS's activities.[54]  Sources that the FBI operates outside of the United States are subject to further requirements under a separate set of Attorney General's Guidelines.[55]

The FBI's CHS policies provide additional guidance about source operation procedures and include the DIOG, the Confidential Human Source Policy Guide (CHSPG), and the Confidential Human Source Validation Standards Manual (VSM).[56]  Under these policies, FBI case agents (handling agents) are responsible for recruiting and operating CHSs, as well as securing approvals for CHS activities and maintaining accurate CHS case files.[57]  These policies expressly recognize that the "FBI must, to the extent practicable, ensure that the information collected from

---

Public Summary of the Addendum to the Audit of the Drug Enforcement Administration's Management and Oversight of its Confidential Source Program, Audit Division 16-33a (March 2017), https://oig.justice.gov/reports/2017/a1633a.pdf (accessed November 12, 2019);

[53] Alberto Gonzales, Attorney General's Guidelines Regarding the Use of FBI Confidential Human Sources ("AG CHS Guidelines") (Dec. 13, 2006); James M. Cole, Deputy Attorney General, Baseline Risk Assessment and Mitigation Policies for Law Enforcement Operations in Criminal Matters (December 7, 2013) at 6-10.

[54] AG CHS Guidelines §§ II.A, II.B, II.C & IV.C.4.

[55] William P. Barr, Attorney General's Guidelines on the Development and Operation of FBI Criminal Informants and Cooperative Witnesses in Extraterritorial Jurisdictions (January 15, 1993); See also Confidential Human Source Policy Guide (CHSPG) § 19.

[56] The FBI is in the process of drafting new guidance to replace the Confidential Human Source Validation Standards Manual ("VSM"), 0258PG (March 26, 2010).  Witnesses we interviewed told the OIG that the FBI has changed its validation process, and no longer follows much of the VSM, but it has not yet been replaced by more recent guidance.

[57] DIOG § 18.5.5; CHSPG § 1.0; VSM § 1.0.

23

every CHS is accurate and current, and not given to the FBI in an effort to distract, mislead, or misdirect FBI organizational or governmental efforts."[58]

The CHSPG recognizes that the decision to open an individual as a CHS will not only forever affect the life of that individual, but that the FBI will also be viewed, fairly or unfairly, in light of the conduct or misconduct of that individual.[59] Accordingly, the CHSPG identifies criteria that handling agents must consider when assessing the risks associated with the potential CHS.

[60]  These risks must be weighed against the benefits associated with use of the potential CHS.[61]

Once a CHS has been evaluated and recruited, the CHSPG does not allow for tasking until after the CHS has been approved for opening by an FBI SSA; the required approvals for a specific tasking have been granted; and the CHS has met with the co-handling agent assigned to his or her file, who has the same duties, responsibilities, and file access as the handling agent.[62]  The CHSPG requires additional supervisory approval by a Special Agent in Charge (SAC) and review by a Chief Division Counsel (CDC) to open CHSs that are "sensitive" sources,

.[63]

Before a CHS may be tasked, the CHS must also be admonished by the handling agent regarding the nature and parameters of the CHS's relationship with

---

[58]  VSM § 1.0.

[59]  CHSPG § 3.1.

[60]  CHSPG § 3.1.

[61]  Criteria used by agents and analysts to weigh the risks and benefits are:

. CHSPG § 3.1.

[62]  CHSPG §§ 2.2.1, 4.2.

[63]  CHSPG § 3.5.1.1.

the FBI.[64]  Admonishments must also be given to the CHS "whenever it appears necessary or prudent to do so, and at least annually."[65]  The CHSPG contains a list of required admonishments, which include that the CHS's assistance to the FBI is voluntary; that the CHS must abide by the admonishments of the FBI and must not take any independent actions on behalf of the U.S. government; and that the CHS must provide truthful information to the FBI.[66]  The required admonishments listed in the CHSPG do not include a specific statement that the CHS must keep his or her relationship with the FBI confidential.

Exceptions to the requirements of the CHSPG and the DIOG may be made in "extraordinary circumstances" and require the approval of the Assistant Director of the Directorate of Intelligence.[67]

### B.    Documenting CHS Activities

The FBI maintains an automated case management system for all CHS records, which the FBI refers to as "Delta."[68]  The Delta file for each CHS contains

[69]

.[70]  The handling agent also assigns the CHS a _____, which enables the CHS to sign payment receipts, admonishments, and consent forms without indicating the CHS's true identity.[71]  The FBI permanently retains its CHS files, as directed by the National Archives and Records Administration (NARA).[72]

Within Delta, handling agents are required to document information reported by the CHS, as well as a wide variety of other information, including interactions between the handling agent and the CHS,

---

[64]  CHSPG § 5.1.

[65]  CHSPG § 5.1.

[66]  CHSPG § 5.2.

[67]  CHSPG § 1.5.2.

[68]  CHSPG §§ 3.10.1, 16.1.1.

[69]  CHSPG § 16.1.5.  The FBI's CHS Policy requires case agents to enter all communications concerning their CHSs into Delta, unless an exemption for "compelling circumstances" has been granted.  CHSPG § 16.1.2.  Even if such an exemption is granted, however, all CHSs must nevertheless be "registered" in the FBI's Delta database in a source-opening communication.  CHSPG §§ 16.1.2, 16.1.4.

[70]  CHSPG § 16.2.

[71]  CHSPG § 16.3.

[72]  CHSPG § 16.1.8.

██████.[73] Handling agents are also specifically required to document derogatory information about the CHS, which the FBI broadly defines as "[i]nformation that detracts from the character or standing" of an individual.[74] Derogatory information can take many forms, including, for example, involvement in criminal activity, drug use or possession, financial delinquency or bankruptcy, shifts in beliefs and values, unfavorable comments from individuals who know the CHS, undisclosed allegiances, or inaccurate or incomplete reporting.[75] Documenting derogatory information is critical to the CHS risk management process because, as recognized by the CHSPG, "past activities and observable characteristics can provide insights that point to future control or handling issues, reliability problems, or lack of credibility" on the part of the CHS. The OIG has previously recommended that the FBI create a sub-section within each CHS Delta file that contains, in a single location, all of the information concerning the reliability of the CHS, including any red flags, derogatory reporting, anomalies, or other counterintelligence concerns. The FBI has not implemented this recommendation.[76]

The CHSPG prohibits FBI personnel from disclosing investigative information to a CHS, including "the identity of...actual or potential subjects" of an investigation "other than what is strictly necessary for operational reasons."[77] If an agent believes that the disclosure of classified information to a source is necessary, the agent is required to obtain authorization from an FBI Assistant Director before disclosing the classified information.

## C. Validation Process for CHSs

Validation is the process used by the FBI to measure the value and mitigate the risks associated with the operation of CHSs.[78] By design, the validation process



- ██████ (██████████████████);

---

[73] CHSPG §§ 5.1, 16.1.7.

[74] CHSPG § 16.1.7; FBI National Name Check Derogatory Information Policy Implementation Guide (FBI NNCPG), 0317PG (July 25, 2010), B-1.

[75] See, e.g., FBI NNCPG § 3.1.1.

[76] See DOJ OIG, A Review of the FBI's Handling and Oversight of FBI Asset Katrina Leung, Oversight and Review Division, Special Report (May 2006), 229.

[77] CHSPG § 2.3; see also AG CHS Guidelines § I.D.5.

[78] VSM § 2.1.1.

[79] VSM § 2.2.

- ███████████████████████████████████████ );
- ███████████████████████████████ ); and
- ████████████████████████████████████████
███████████ ).[80]

Each year, the handling agent must complete a Field Office Annual Source Report (FOASR), ██████████████████████████████████████████████████████████████████████.[81] FOASRs must be maintained in the CHS's Delta validation sub-file, where they are reviewed and approved by the SSA and an Assistant Special Agent in Charge (ASAC), then submitted to the FBI Headquarters' Validation Management Unit (VMU), which assesses each CHS for continued operation.[82]

SSAs are responsible for daily oversight of CHSs operated by handling agents on the SSA's squad.  SSAs review all communications regarding those CHSs, and perform required reviews of documentation collected in each CHS's Delta file.[83] Every 90 days, the SSA must also complete a Quarterly Supervisory Source Report (QSSR) for each CHS operated by a handling agent under that SSA's supervisory authority.[84]  As part of the QSSR, the SSA must review the Delta file for each CHS to note any significant anomalies (for example, potential derogatory information, sudden requests for money, or substantial changes in behavior, lifestyle, or viewpoint) that occurred in the last 90 days.[85]

VMU independently conducts Human Source Validation Reviews (HSVRs), which are separate evaluations of the CHS that are completed, among other reasons, because an FBI Field Office or Operational Division has requested enhanced review.[86]  These HSVRs involve:

- Independent review and analysis of the ██████████████ ██.[87];
- Appropriate traces to █████████████████, criminal activities, or interactions with other intelligence services, terrorist groups, or criminal organizations;[88]

---

[80] VSM § 2.1.2.

[81] CHSPG § 16.7; VSM § 4.1.2.

[82] CHSPG §§ 16.7, 4.1.2.1.

[83] CHSPG §§ 2.1.1, 16.7 & 16.8.

[84] CHSPG § 16.8.

[85] CHSPG § 16.8.

[86] VSM §§ 4.1, 4.1.2, 4.1.3 & 4.1.4.

[87] VSM §§ 4.1.3, 4.1.4.

[88] VSM §§ 4.1.3, 4.1.4.



- ███████████████████████████████████████████████ ;"[89] and
- ████████████████████████████████████████████████.[90]

In the validation context, the term "corroborated" has a specific meaning—that an independent source (for example, ██████████████████████████████████ has provided the FBI with the same information. ████████████████████████████████████████████████████████████[91]

The FBI's validation process also addresses the use of sub-sources by a CHS.[92] For example, the VSM requires the FOASR to assess the CHS's access to information, ████████████████████████████████████████.[93] If the latter, the FOASR should ████████████████████████████████████████████████████████████████[94]

## D.   Closure and Re-Opening of CHSs

Closing a CHS requires documentation of the reason for the closure, which must be included in the CHS's Delta file.[95] A CHS may be closed for general reasons or for cause. General reasons include considerations such as a lack of productivity, poor health, or transfer of the handling agent.[96] However, a CHS must be closed for cause "if there is grievous action by the CHS or a discovery of previously unknown facts or circumstances that make the individual unsuitable for use as a CHS."[97] Reasons that justify closing a CHS for cause include commission

---

[89] VSM §§ 4.1.4, 4.1.4.1.

[90] VSM §§ 4.1.4., 4.1.4.2.

[91] VSM § 2.2.

[92] CHSPG § 10.12; VSM § 4.1.2.1.7.

[93] VSM § 4.1.2.1.7.

[94] VSM § 4.1.2.1.7.

[95] CHSPG § 18.1.

[96] CHSPG § 18.1.1.

[97] CHSPG § 18.1.2.

of unauthorized illegal activity, unwillingness to follow instructions, unreliability, or serious control problems.[98]  The handling agent must advise the CHS that he or she has been closed, and document such notification in the CHS's validation sub-file, including a statement as to whether the CHS acknowledged or refused to acknowledge the closure.[99]

Absent exceptional circumstances that are approved (in advance, whenever possible) by an SSA, a handling agent must not initiate contact with or respond to contacts from a former CHS who has been closed for cause.[100]  Where there is contact with a CHS following closure (whether or not for cause), new information "may be documented" to a closed CHS file.[101]  However, the CHSPG requires reopening of the CHS if the relationship between the FBI and the CHS is expected to continue beyond the initial contact or debriefing.[102]

A request to reopen a CHS that has previously been closed for cause requires high levels of supervisory approval, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ A CHS who has been closed for cause ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮[104]

### E.    Use of CHSs in Sensitive Monitoring Circumstances

The CHSPG "emphasizes the importance of oversight and self-regulation to ensure that CHS Program activities are conducted within Constitutional and statutory parameters and that civil liberties and privacy are protected."[105]  To protect such rights, the FBI must meet additional requirements for use of CHSs in what the AG Guidelines and the DIOG define as "sensitive monitoring circumstances."[106]

One of the investigative techniques that the FBI may use in predicated investigations is consensual monitoring, which means the monitoring and/or recording of conversations, telephone calls, and electronic communications based on the consent of one party involved, such as an FBI CHS.[107]  SSAs may approve the use of CHSs for consensual monitoring in ordinary cases, so long as the consent

---

[98]  CHSPG § 18.1.2.

[99]  CHSPG § 18.2.

[100]  CHSPG § 18.3.

[101]  CHSPG § 18.3

[102]  CHSPG § 18.3.

[103]  CHSPG § 4.5.1.

[104]  CHSPG § 4.5.1.

[105]  CHSPG § 1.2.

[106]  AG Guidelines § VII.O; DIOG § 18.6.1.6.3.

[107]  AG Guidelines § V.A.4; DIOG §§ 18.6.1.2, 18.6.1.4.

of the CHS has been documented, and the CDC or OGC has determined that, given the facts of the case, the consensual monitoring is legal.[108]

For investigations concerning threats to national security, the FBI is required to obtain approval from the Department for consensual monitoring in a "sensitive monitoring circumstance."[109] A "sensitive monitoring circumstance" as defined by the AG Guidelines and the DIOG is not the same as a "sensitive investigative matter" or "SIM." As described in Section I.B of this chapter, DIOG § 10.1.2 defines a SIM to include predicated investigations of the activities of a domestic public official or political candidate (involving corruption or a threat to the national security), or a domestic political organization or an individual prominent in such an organization.[110] In contrast, a "sensitive monitoring circumstance" is defined more narrowly. As it pertains to this report, a "sensitive monitoring circumstance" arises only when the FBI seeks to record communications of officials who have already been elected or appointed, such as Members of Congress, federal judges, or high ranking members of the executive branch.[111]

The AG Guidelines and the DIOG do not mandate prior notice to, or approval by, the Department before the FBI conducts consensual monitoring of candidates for political office or prominent officials in domestic political organizations, including the most senior officials in a national presidential campaign. However, the definition of a sensitive monitoring circumstance provides that the Attorney General, the DAG, or an Assistant Attorney General (AAG) can require that the FBI obtain Department approval prior to conducting consensual monitoring for a specific investigation of which they are aware.[112] As described in Chapter Ten of this report, the consensual monitoring conducted in the Crossfire Hurricane investigation did not meet the definition of sensitive monitoring circumstances provided by the AG Guidelines and the DIOG.

## F.    Use of CHS Reporting in FISA Applications

The CHSPG allows the use of CHS reporting in FISA applications without revealing the identity of the CHS, so long as the handling agent provides the relevant FBI Headquarters operational unit (*e.g.,* Counterintelligence, Counterterrorism) with the CHS file number, duration of service to the FBI, and a statement on whether the CHS is reliable and has provided reporting that has been corroborated.[113] The CHS handling agent must also be prepared to furnish information to NSD concerning the CHS's criminal history, payments, and any

---

[108]  DIOG §§ 18.6.1.5.1, 18.6.1.5.1.7.

[109]  AG Guidelines § VII.O; DIOG § 18.6.1.6.3.

[110]  AG Guidelines §§ VII.N, VII.O; DIOG §§ 10.1.2, 18.6.1.6.3.

[111]  AG Guidelines §§ VII.N, VII.O; DIOG §§ 10.1.2, 18.6.1.6.3.

[112]  AG Guidelines § VII.O(4); DIOG § 18.6.1.6.3.

[113]  CHSPG § 10.13.

impeachment information.[114] All information provided to support a FISA application must also be documented in the CHS's Delta file.[115]

Further, the FBI's Foreign Intelligence Surveillance Act and Standard Minimization Procedures Policy Guide (FISA SMP PG) requires that the FISA accuracy or "Woods" file, described in more detail in the next section, contains documentation from the CHS handling agent stating that the handling agent has reviewed the facts presented in the FISA application regarding the CHS's reliability and background, and that, based upon a review of the CHS file, the facts presented in the application concerning the CHS are accurate.

## III.  The Foreign Intelligence Surveillance Act (FISA)

The FBI identified Carter Page as a U.S. person during all times relevant herein.[116] Accordingly, in this section, we briefly describe the statutory requirements and Department policies and procedures for obtaining approval to conduct electronic surveillance and physical searches targeting a U.S. person under FISA.[117]

### A.    Statutory Requirements and the Foreign Intelligence Surveillance Court

FISA authorizes the U.S. government to apply for and obtain an order from the Foreign Intelligence Surveillance Court (FISC) to conduct electronic surveillance and physical searches for foreign intelligence purposes.  The government's application for electronic surveillance must be approved by the Attorney General (or his or her designee) and contain certain specified information, including a statement of the facts and circumstances relied upon by the applicant to support the belief that the target is a foreign power or an agent of a foreign power, and that each facility or place at which the electronic surveillance is directed is being used,

---

[114] CHSPG § 10.13.

[115] CHSPG § 10.13.

[116] A U.S. person means a U.S. citizen, a lawful permanent resident (*i.e.*, a green card holder*)*, an unincorporated association with a substantial number of members who are citizens of the United States or lawful permanent residents, or a corporation that is incorporated in the United States—provided such corporation does not constitute a foreign government or any component thereof, a faction of a foreign nation, or an entity that is openly acknowledged by a foreign government to be directed and controlled by the foreign government. *See* 50 U.S.C. § 1801(i).  FISA treats U.S. persons and non-U.S. persons differently in various aspects, including by setting forth different definitions of an "agent of a foreign power" for non-U.S. persons, and authorizing initial electronic surveillance and physical searches targeting a non-U.S. person for a longer duration (120 days versus 90 days for a U.S. person).

[117] This report does not describe other FISA provisions not relevant here, including the statutory requirements for obtaining similar FISA authority on a non-U.S. person, *see* 50 U.S.C. §§ 1801-1805, 1821-1825; *see also* E.O. 12139 (May 23, 1979); E.O. 12949 (Feb. 9, 1995).  Also not relevant here are the circumstances under which the U.S. government may conduct emergency electronic surveillance or physical searches without a court order (for not more than 7 days).  For the emergency provisions, *see* 50 U.S.C. §§ 1805(e), 1824(e).

or is about to be used, by a foreign power or an agent of a foreign power; proposed minimization procedures; and a description of the nature of the information sought and the type of communications or activities subject to surveillance.

An application for physical searches requires substantially similar information, except that it also must state the facts and circumstances justifying the applicant's belief that the premises or property to be searched contains "foreign intelligence information" and "is or is about to be, owned, used, possessed by, or is in transit to or from" the target.[118]  Electronic surveillance and physical searches targeting a U.S. person may be approved for up to 90 days, and subsequent extensions may be approved for up to 90 days provided the government submits another application that meets the requirements of FISA.[119]  The approvals and certifications required for applications for electronic surveillance and physical searches are discussed in more detail below.

In addition, 50 U.S.C. § 1881d(b) allows the U.S. government to apply for and obtain concurrent authorization to continue targeting a U.S. person reasonably believed to be outside the United States when applying for authorization to conduct electronic surveillance and physical searches within the United States.  Because the requirements for such applications are substantially similar to those for surveillance and searches within the United States, we discuss them together.

### Probable Cause

The electronic surveillance and physical search provisions of FISA require the FISC to make a probable cause finding based on information submitted by the government.  Specifically, the FISC must find probable cause to believe that:  (1) the target of the electronic surveillance and physical searches is a foreign power or, as described in more detail below, the agent of a foreign power; (2) for electronic surveillance, that each of the facilities or places at which the surveillance is being directed is being used, or is about to be used, by the foreign power or agent of a foreign power; and (3) for physical searches, that each of the premises or property to be searched is or is about to be owned, used, possessed by, or is in transit to or from the foreign power or agent of a foreign power.  In determining whether probable cause exists, a judge may consider the target's past activities, as well as the facts and circumstances relating to his current or future activities.[120]  Where the

---

[118] *See* 50 U.S.C. §§ 1823(a)(1)-(8).  Foreign intelligence information means information that relates to, and if concerning a U.S. person is necessary to, the ability of the United States to protect against actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power; sabotage, international terrorism, or the international proliferation of weapons of mass destruction by a foreign power or an agent of a foreign power; or clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power. *See, e.g.*, 50 U.S.C. § 1801(e)(1).

[119] An order for electronic surveillance or physical searches may be extended on the same basis as the original order.  The extension for a U.S. person may not exceed 90 days, whereas for non-U.S. person who is an agent of a foreign power it may be for a period not to exceed 1 year. *See* 50 U.S.C. §§ 1801(b)(1)-(2), 1805(d), 1824(d).

[120] 50 U.S.C. §§ 1805(a)(2), 1805(b), 1824(a)(2), 1824(b).

FISC authorizes the electronic surveillance or physical search of a U.S. person, the Attorney General may authorize, for the effective period of the FISC's order, the targeting of the U.S. person for the purpose of acquiring foreign intelligence information while such person is reasonably believed to be located outside the United States.[121]

According to FISA guidance issued by OGC, probable cause means the following:

> "[P]robable cause" is reason to believe, based on the available facts and circumstances, as well as the logical inferences that can be drawn from them.  It is determined by the totality of the facts and circumstances, as viewed from the perspective of a reasonable person.  Probable cause [means] probability, not certainty, and, thus, is significantly lower than the "proof beyond a reasonable doubt" necessary to support a criminal conviction.  It is also lower than the "preponderance of the evidence" required in most civil cases.

The FISA guidance also states:

> [OGC] recommends that a field agent seeking a FISA order focus on the *object* of the belief required, *i.e.*, the facts and circumstances demonstrating that the target of the proposed search or surveillance is an agent of a foreign power and that the premises to be surveilled…is used by that agent of a foreign power, rather than on the *quantum* of the belief involved.  If you can show that a target is engaged in certain activities, and that he is engaged in them for or on behalf of a foreign power, you have won most of the battle.[122]

Unlike wiretap applications in a criminal case, which require the government to establish probable cause to believe that an individual is committing, has committed, or is about to commit a specific criminal offense, among other requirements, FISA does not require that the government show a nexus to criminality.[123]  Rather, a probable cause finding under FISA "focuses on the status of the target as a foreign power or the agent of a foreign power," which is discussed in more detail below.[124]  The Report of the Senate Select Committee on Intelligence

---

[121] *See* 50 U.S.C. § 1881b(c)(B)(i).

[122] FBI OGC, *What Do I Have to Do to Get a FISA?* ("FISA guidance"), Jan. 23, 2003 (emphasis in original); *see also United States* v. *Rosen*, 447 F. Supp. 2d 538, 549 (E.D. Va. 2006).

[123] *See, e.g., United States* v. *Daoud*, 761 F.3d 678, 681 (7th Cir. 2014); *United States* v. *Abu-Jihaad*, 630 F.2d 102, 122, 127 (2d Cir 2010); *United States* v. *Duka*, 671 F.3d 329, 339-41 (3d Cir. 2011); *United States* v. *Wen*, 477 F.3d 896, 898 (7th Cir. 2007); *In re Sealed Case*, 310 F.3d 717, 738 (Foreign Intel. Surv. Ct. Rev 2002) (per curiam); *United States* v. *Cavanagh*, 807 F.2d 787, 790 (9th Cir. 1987).

[124] *See, e.g., United States* v. *El-Mezain*, 664 F.3d 467, 564 (5th Cir. 2011); *see also United States* v. *Duggan*, 743 F.2d 59, 72-73 (2d Cir. 1984).

(SSCI) that accompanied the 1978 passage of FISA explains the rationale for the different probable cause standards:

> [I]f electronic surveillance is to make an effective contribution to foreign counterintelligence, it must be available for use when necessary for the investigative process.  The criminal laws are enacted to establish standards for arrest and conviction[,] and they supply guidance for investigations conducted to collect evidence for prosecution.  Foreign counterintelligence investigations have different objectives.  They succeed when the United States can insure that an intelligence network is not obtaining vital information, that a suspected agent's future access to such information is controlled effectively, and that security precautions are strengthened in areas of top priority for the foreign intelligence service....  Therefore, procedures appropriate in regular criminal investigations need modification to fit the counterintelligence context.  [FISA] adopts probable cause standards that allow surveillance at an early stage in the investigative process by not requiring that a crime be imminent or that the elements of a specific offense exist.[125]

Given these differences, the FISA guidance notes that the strictures developed to assess the reliability of informants providing information used to support a wiretap application in criminal cases do not necessarily apply to FISA.[126] However, the FISA guidance nonetheless cautions that probable cause determinations should take into account "the same aspects of reliability...as in the ordinary criminal context, including the reliability of any informant, the circumstances of the informant's knowledge, and the age of the information relied upon."  The FISA guidance instructs agents to "look to the totality of the information and consider its reliability on a case-by-case basis" when judging the information supporting a FISA application.[127]

### Agent of a Foreign Power

As described above, the probable cause finding required under FISA focuses on the status of the target as a foreign power or the agent of a foreign power. Under FISA § 1801(b)(2), the definition of "agent of a foreign power" includes, in relevant part, "any person" (including any U.S. person) who engages in the following conduct:

A.    Knowingly engages in clandestine intelligence gathering activities for or on behalf of a foreign power, which activities

---

[125] Report of the Senate Select Committee on Intelligence, *Foreign Intelligence Surveillance Act of 1978*, S. Rep. No. 701, 95th Cong., 2d Sess. 34 (Mar. 14, 1978) (S. Rep. 95-701), 3981.

[126] The rules for assessing the reliability of information provided by confidential informants or sources in counterintelligence cases are discussed above in Section II.

[127] *See* FISA guidance, *supra* (*citing Illinois* v. *Gates*, 462 U.S. 213 (1983)).

involve or may involve a violation of the criminal statutes of the United States; or

B.    Pursuant to the direction of an intelligence service or network of a foreign power, knowingly engages in any other clandestine intelligence activities for or on behalf of such foreign power, which activities involve or are about to involve a violation of the criminal statutes of the United States.[128]

Further, under FISA § 1801(b)(2)(E), the provision the Department relied upon in the Carter Page FISA applications, an agent of a foreign power also includes any person who knowingly aids or abets any person, or conspires with any person, in the conduct described above.

FISA provides that a U.S. person may not be found to be a foreign power or an agent of a foreign power solely upon the basis of activities protected by the First Amendment.[129]  Congress added this language to reinforce that lawful political activities may not serve as the only basis for a probable cause finding, recognizing that "there may often be a narrow line between covert action and lawful activities undertaken by Americans in the exercise of the [F]irst [A]mendment rights," particularly between legitimate political activity and "other clandestine intelligence activities."[130]  The Report by SSCI accompanying the passage of FISA states that there must be "willful" deception about the origin or intent of political activity to support a finding that it constitutes "other clandestine intelligence activities":

If...foreign intelligence services hide behind the cover of some person or organization in order to influence American political events and deceive Americans into believing that the opinions or influence are of domestic origin and initiative and such deception is willfully maintained in violation of the Foreign Agents Registration Act, then electronic

---

[128] FISA does not define what constitutes "other clandestine intelligence activities."  However, the 1978 House Permanent Select Committee on Intelligence (HPSCI) Report accompanying the passage of FISA states the following:

The term "any other clandestine intelligence activities" is intended to refer to covert actions by intelligence services of foreign powers.  Not only do foreign powers engage in spying in the United States to obtain information, they also engage in activities which are intended to harm the Nation's security by affecting the course of our Government, the course of public opinion, or the activities of individuals.  Such activities may include political action (recruiting, bribery or influencing of public officials to act in favor of the foreign power), disguised propaganda (including the planting of false or misleading articles or stories), and harassment, intimidation, or even assassination of individuals who oppose the foreign power.  Such activity can undermine our democratic institutions as well as directly threaten the peace and safety of our citizens.  Report of the House Permanent Select Committee on Intelligence, *Foreign Intelligence Surveillance Act of 1978*, H. Rep. No. 1283, 95th Cong., 2d Sess. 41 (Jun. 8, 1978) (H. Rep. 95-1283).

[129] *See* 50 U.S.C. §§ 1805(a)(2)(A), 1824(a)(2)(A).

[130] H. Rep. 95-1283 at 41, 79-80; FISA guidance at 7-8; *see also Rosen*, 447 F. Supp. 2d at 547-48 (probable cause finding may be based partly on First Amendment protected activity).

surveillance might be justified under ["other clandestine intelligence activities"] if all the other criteria of [FISA] were met.[131]

*Approval and Certification Requirements*

Each application for electronic surveillance or physical searches under FISA must be approved by the "Attorney General," defined to include the Attorney General, Acting Attorney General, DAG, or, upon designation, the AAG of NSD.[132] The Attorney General (or his or her designee) must provide written approval that an application satisfies the statutory requirements—namely, that the facts and circumstances set forth in the affidavit support a finding of probable cause, and that the application meets all other statutory criteria.[133]  During times relevant herein, the general practice was to submit FISA applications to the NSD AAG for approval and, in instances where the NSD AAG was unavailable or in an acting position, to the DAG.  Similarly, in the event the DAG was unavailable or in an acting position, the FISA application was submitted to the Attorney General for approval.

Applications submitted to the FISC must also include written certification by certain specified high-ranking executive branch officials.  In the case of FISA applications for FBI investigations, the application is usually certified by the FBI Director or Deputy Director.[134]  The written certification must include the following:

- A statement that the certifying official deems the information sought to be "foreign intelligence information;"

- A statement that a "significant purpose" of the electronic surveillance or physical searches is to obtain foreign intelligence information;

- A statement that such information cannot reasonably be obtained by normal investigative techniques;

- A designation of the type of foreign intelligence information being sought (*e.g.*, information concerning a U.S. person that is necessary to the ability of the United States to protect against clandestine

---

[131] *See* S. Rep. 95-701 at 24-25.  The Foreign Agents Registration Act, 22 U.S.C. § 611 *et seq.*, is a disclosure statute that requires persons acting as agents of foreign principals such as a foreign government or foreign political party in a political or quasi-political capacity to make periodic public disclosure of their relationship with the foreign principal, as well as activities, receipts and disbursements in support of those activities.

[132] *See* 50 U.S.C. §§ 1801(g), 1804(a), 1821(1), 1823(a).

[133] *See generally* David S. Kris and J. Douglas Wilson, National Security Investigations and Prosecutions § 6:5 (2016).  In certain cases, the Director of the FBI, the Secretary of Defense, the Secretary of State, the Director of National Intelligence (DNI), or the Director of the CIA may request that the Attorney General personally review a FISA application.  This obligation is not delegable by the Attorney General (or any of the other officials mentioned) except "when disabled or otherwise unavailable." *See* 50 U.S.C. §§ 1804(d), 1823(d).

[134] *See* 50 U.S.C. §§ 1804(a)(6), 1823(a)(6); E.O. 12139 (May 23, 1979) (electronic surveillance); E.O. 12949 (Feb. 9, 1995) (physical search).

intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power).

- A "statement of the basis" for the certification that the information sought is the type of foreign intelligence designated and that it cannot reasonably be obtained by normal investigative means.[135]

As described in more detail below, the FISC must find that an application includes all of the required statements and certifications (among other requirements) before issuing an order authorizing electronic surveillance or physical searches. Where the target is a U.S. person, the FISC must find that the certifications are not clearly erroneous.[136]

### Foreign Intelligence Surveillance Court (FISC)

The FISC was established in 1978 to hear applications and grant orders for electronic surveillance.[137] Subsequent amendments to FISA expanded the FISC's jurisdiction to the collection of foreign intelligence information by other means, including physical searches.[138] The FISC consists of 11 federal district court judges, chosen by the Chief Justice of the United States, from at least 7 judicial circuits, with at least 3 judges required to reside within 20 miles of the District of Columbia.[139] Judges on the FISC sit for staggered 7-year terms, during which time they also continue to serve as judges in their home districts.[140] According to former FISC Presiding Judge John D. Bates, district court judges selected to sit on the FISC are typically experienced judges with significant national security or Fourth Amendment experience.[141]

The FISC's Rules of Procedure require the government to submit a proposed application for authorization to conduct FISA surveillance and physical searches no later than 7 days before the government seeks to have the matter entertained, except that the 7-day requirement is waived when submitting an application

---

[135] See 50 U.S.C. §§ 1804(a)(6)(A)-(E), 1823(a)(6); see also H. Rep. 95-1283 at 76.

[136] See 50 U.S.C. § 1881b(c)(1)(D). The certifications submitted in support of a FISA application are presumed valid. The certifications are upheld absent a "substantial preliminary showing" that the application knowingly and intentionally, or with reckless disregard for the truth, included a false statement, and that the allegedly false statement was "necessary" to the approval of the application. In 2002, the Foreign Intelligence Surveillance Court of Review stated: "We think the government's purpose...is to be judged by the national security official's articulation and not be a FISA [C]ourt inquiry into the origins of the investigation nor an examination of the personnel involved...." In re Sealed Case, 310 F.3d at 736.

[137] See National Security Investigations and Prosecutions § 5:3.

[138] See In re Motion for Release of Court Records, 526 F. Supp. 2d 484, 487-88 (FISA Ct. 2007).

[139] See 50 U.S.C. § 1803(a)(1); Rule 4, FISC Rules of Procedure (Nov. 1, 2010).

[140] See 50 U.S.C. § 1803(d).

[141] See Culper Rule of Law Series:  Judge John Bates, Lawfare Podcast at 32:00, https://www.lawfareblog.com/lawfare-podcast-culper-partners-rule-law-series-judge-john-bates (accessed Dec. 2, 2019) (hereinafter Lawfare Podcast).

following emergency authorization (not applicable here) or when the court agrees to expedite its consideration of an application at the government's request.[142] The proposed application typically is referred to as the "read copy," which is prepared by an attorney in NSD's Office of Intelligence (OI) based upon information provided by the FBI. The FISC will review the read copy, evaluate whether it meets the requirements of the statute, and, through a legal advisor, discuss with the assigned OI attorney, any issues the legal advisor or judge identified. The read copy allows FISC legal advisors to have informal interaction with OI to convey any questions, concerns, or requests for additional information from the legal advisor or judge before a final application is filed.[143] The OI attorney then works with the FBI to provide additional information to the FISC legal advisor and makes any necessary revisions before submitting the final application to the FISC.[144]

Once a final application is submitted, the judge may request that the OI attorney present it at a scheduled hearing, or may approve the application based on the written submission.[145] The judge is authorized to enter an order approving electronic surveillance or physical searches if he or she finds that the facts presented in the application are sufficient to establish probable cause, as discussed above; that the application includes "minimization procedures" sufficient to minimize the acquisition and retention, and prohibit the dissemination, of non-public information about a U.S. person unless it meets certain criteria; and that the application includes all required statements and certifications.[146]

---

[142] *See* Rules 6(a), 9(a), FISC Rules of Procedure (2010). The FISC Rules specifically address emergency authorizations but do not address expedited applications. However, Rule 9(a) states that the 7-day requirement does not apply to emergency authorizations or "as otherwise permitted by the Court." According to NSD, in instances where the government seeks the court's expedited consideration of a FISA application, and the court is able to do so, the court will rely upon "as otherwise permitted by the Court" to waive the 7-day requirement.

[143] According to a 2013 letter explaining how the FISC operates, FISC legal advisors interact with NSD on a daily basis. *See* Letter from Judge Reggie Walton to Senator Patrick Leahy, U.S. Senate Committee on the Judiciary (Jul. 29, 2013) (2013 Judge Walton Letter), http://www.fisc.uscourts.gov/sites/default/files/Leahy.pdf (accessed Dec. 2, 2019).

[144] *See* 2013 Judge Walton Letter, at 6 & n.3.

[145] If the judge denies a final application, he or she is required to draft a statement of reasons explaining the basis for the denial. *See* 50 U.S.C. §§ 1803(a)(1), 1822(c). Denials of applications for electronic surveillance or physical searches may be appealed to the Foreign Intelligence Surveillance Court of Review. *See* 50 U.S.C. §§ 1803(b), 1822(d). Alternatively, if the judge indicates that he or she will deny a proposed or final application, NSD may decide not to submit a final application, or may withdraw a final application after submission. *See* 2013 Judge Walton Letter at 3.

[146] *See* 50 U.S.C. §§ 1805(a), 1824(a); *see also* 50 U.S.C. § 1881d(b) (concurrent authorization to conduct electronic surveillance and physical searches targeting a U.S. person inside and outside the United States). In addition to the standard minimization procedures, which apply to all information acquired through electronic surveillance and physical searches, each application may describe other minimization procedures that are appropriate for the particular surveillance or search in question. The FISC may modify the government's proposed minimization procedures if it concludes they do not meet the statutory requirements. *See* National Security Investigations and Prosecutions, § 9.1.

If the FISC approves a FISA application, it issues a primary order finding that the statutory requirements were met and authorizing the electronic surveillance or physical searches. The primary order also must direct the government to follow the minimization procedures proposed in the application.[147] Where assistance from a third party (such as an email provider, telephone company, or landlord) is required, the FISC also issues a secondary order directing the third party to "furnish…all information, facilities, or technical assistance necessary" to accomplish the search or surveillance "in such a manner as will protect its secrecy and produce a minimum of interference."[148]

In addition, under Rule 13(a) of the FISC Rules of Procedure, if the government subsequently identifies a misstatement or omission of material fact in an application or other document submitted to the FISC, the government, in writing, must immediately inform the judge to whom the submission was made of the following: (1) the misstatement or omission, (2) any necessary correction, (3) the facts and circumstances of the misstatement or omission, (4) any modifications the government has made or proposes to make to how it will implement any authority or approval granted by the FISC, and (5) the government's proposal for disposal of or treatment of any information obtained as a result of the misstatement or omission.[149]

## B.    FBI and Department FISA Procedures

### 1.    Preparation and Approval of FISA Applications

The FBI's policies and procedures for the preparation and approval of applications for authorization to conduct electronic surveillance or physical searches under FISA are contained in the FBI's online FISA Management System (FISAMS), the FISA Verification Form (described below), the DIOG, and the FISA SMP PG. We will describe the typical preparation and approval process below. The preparation and approval process taken with respect to the four Carter Page FISA applications, including steps that were taken in addition to the steps typically completed during the FISA process, are discussed in Chapters Five and Seven.

The FBI's FISA process is initiated when a case agent begins drafting a FISA Request Form for submission to OI. The FISA Request Form requires that the case agent provide specific categories of information to OI, the most important of which is a description of the facts and circumstances that the agent views as establishing probable cause to believe the target of the application is a foreign power or an agent of a foreign power. In particular, the FISA Request Form states that the case agent should provide a complete description of all material facts regarding a target to justify FISA authority or, in the case of renewals, to justify continued FISA coverage. In the case of FISA renewals, the form also asks the case agent to describe in detail any previous information that requires modification or correction.

---

[147] *See* 50 U.S.C. §§ 1805(c)(2)(A), 1824(c)(2)(A).

[148] *See* 50 U.S.C. § 1805(c)(2)(B).

[149] *See* Rule 13(a), FISC Rules of Procedure.

The form does not specifically require the case agent disclose exculpatory facts or facts that, if accurate, would tend to undermine the factual assertions being relied upon to support the government's theory, in whole or in part, that the target is a foreign power or an agent of a foreign power.

After the case agent prepares the FISA Request Form, in ordinary circumstances, the supervisory chain in the relevant field office will receive the request for approval, including the SSA, CDC, ASAC, and the SAC, before the request is sent to the appropriate FBI Headquarters substantive division Unit Chief (UC). The UC reviews and approves the request, assigns it to the appropriate FBI Headquarters substantive division SSA Program Manager, and to OGC's National Security and Cyber Law Branch (NSCLB) for assignment and review. As described in Chapter Five, in the case of Carter Page, because the investigation was close-hold and being conducted from FBI Headquarters instead of a field office, the case agent submitted the FISA Request Form directly to the NSCLB line attorney assigned to Crossfire Hurricane.

Once the FISA Request Form is submitted to NSCLB, an NSCLB line attorney reviews the request and provides feedback to the case agent. Once the draft is finalized, the NSCLB line attorney approves the FISAMS request and routes the form to the appropriate FBI Headquarters Section Chief for review and approval. The FBI Headquarters Section Chief reviews the request and, if approved, submits the request to the appropriate Deputy Assistant Director (DAD) for approval in the case of an expedited request, or, if not, directly to OI. Once in OI, the request is then assigned to an OI line attorney from one of three units within OI's Operations Section: the Counterintelligence Unit, the Counterterrorism Unit, or the Special Operations Unit. In this instance, an OI attorney in the Counterintelligence Unit was assigned to the Carter Page FISA request.

The OI attorney prepares the read copy application using the information provided by the FBI and works with the NSCLB attorney and FBI case agent to obtain additional information, frequently resulting in a "back and forth" between OI and the FBI. According to NSD, as part of this back and forth process, OI will ask whether the FBI is aware of any "exculpatory" information that relates to the target of the application, as well as any derogatory information that relates to sources relied upon in the application. An OI supervisor, usually the relevant Unit Chief or Deputy Unit Chief, then reviews the draft read copy. Neither the FISA statute nor FISC procedures dictate who in the Department must approve the read copy before it is submitted to the FISC. In most instances, once the FBI case agent affirms the accuracy of the information in the read copy, the OI supervisor conducts the final review and approval before a read copy is submitted with the FISC. However, in some cases, multiple OI supervisors, or even senior NSD leadership, may review the read copy, particularly if it presents a novel or complicated issue or otherwise has been flagged by the OI supervisor for further review.

NSD's Deputy Assistant Attorney General (Deputy AAG) for Intelligence is responsible for, among other things, overseeing OI. According to the Deputy AAG for Intelligence at the time of the Carter Page FISA applications and renewals, not all FISA requests from the FBI culminate in the filing of an application with the

FISC. Sometimes the back and forth process between the OI attorney and the case agent does result in sufficient factual information for a showing of probable cause or sometimes investigative objectives and needs change during the drafting process, obviating the FBI's desire for FISA authority on a particular target.

However, as described previously, after a read copy is filed, OI may receive feedback from the court through the FISC legal advisor. The OI attorney will then work with the case agent to address any issues raised by the legal advisor, such as by providing additional information to the FISC legal advisor and making any requested revisions before preparing the final application. Occasionally, the feedback from the court leads the FBI, in consultation with OI, to decide not to submit a final application, or to limit the authorities sought in the final application.

At the same time the read copy is filed with the FISC, OI sends the completed FISA application (referred to as the "FISA Certification Copy" or "cert copy") and a one-page cover memorandum (cert memo) signed by the OI supervisor to the case agent for final review within the FBI. This process in OI is sometimes referred to as "signing out" a FISA.

After receiving the cert copy and cert memo, an FBI agent, not necessarily the case agent, is assigned to complete an accuracy review of the application, which is discussed in more detail in Section III.B.2 below. After any additional edits necessitated by the accuracy review are made, the agent and an SSA sign the FISA Verification Form, also known as the Woods Procedures (described further below) or "Woods Form," and send the application package to the FBI Headquarters substantive division Program Manager who, according to the FISA SMP PG, must review the FISA application and coordinate the FISA accuracy and approval process that takes place at FBI Headquarters.

The Headquarters Program Manager is responsible for ensuring that the supervisory personnel in the field office have completed and documented their reviews of the application; determining whether another field office should also review the application for factual accuracy; verifying and providing documentation for any factual assertions identified by the field office as requiring Headquarters verification; and notifying OI and NSCLB of any factual assertions in the application that could not be verified so that the necessary action is taken to remove the unverified information from the declaration. If all factual assertions have been verified and documented, the Headquarters Program Manager will sign the affidavit in the application declaring under penalty of perjury that the information in the application is true and correct. The Program Manager then submits the application package to NSCLB for final legal review and approval by an NSCLB line attorney and Senior Executive Service-level supervisor. Witnesses told us that usually the Senior Executive Service-level supervisor is an NSCLB Section Chief or a Deputy General Counsel, but that, on occasion, the role is delegated to a GS-15 Unit Chief.

FBI procedures do not specify what steps must be taken during the final legal review. As described in Chapter Five, the FBI's Deputy General Counsel at the time of the Carter Page FISA applications told us that she typically reviewed the cert memo and FISA Verification Form to determine whether the FISA application

package was complete, all the steps of the Woods Procedures were completed, the probable cause standard was met, and there were no outstanding issues.[150] Ultimately, if the NSCLB line attorney and a Senior Executive Service-level supervisor approve the FISA cert copy, they both sign the cert memo, and the complete application package is then taken to the FBI Director's Office for review and approval. If the FBI Director signs the cert copy, the paper copy of the signed application is delivered to OI. OI then provides the signed application package to the final signatory who, as discussed above, is usually the NSD AAG but can sometimes be the DAG or Attorney General.

In addition to receiving the final application and cert memo, the NSD AAG (or DAG or Attorney General) typically receives an oral briefing from senior OI managers. The NSD AAG receives the application for the first time during or shortly before the oral briefing, unless the application was submitted for his or her review beforehand, which is not typical. During the oral briefing, senior OI managers present all the FISA applications awaiting final Department approval, which, according to NSD, in 2016 generally ranged from 20 to 30 total applications in any given week (though the quantity sometimes varied outside that range). Once the FISA application is approved and signed by the NSD AAG, OI will submit it to the FISC for its final consideration.

## 2.    "Woods Procedures"

In April 2001, the FBI implemented FISA verification procedures (known as "Woods Procedures") for applications for electronic surveillance or physical searches under FISA.[151] These procedures were adopted following errors in numerous FISA applications in FBI counterterrorism investigations, virtually all of which "involved information sharing and unauthorized disseminations to criminal investigators and prosecutors."[152]

To address these concerns, the procedures focused on ensuring accuracy in three areas: (1) the specific factual information supporting probable cause, (2) the existence and nature of any related criminal investigations or prosecutions involving the target of the FISA authorization, and (3) the existence and nature of any ongoing asset relationship between the FISA target and the FBI. The procedures required FBI agents and supervisors to undertake specific steps before filing a FISA application, which included a determination of whether the target is the subject of a

---

[150] As discussed in Chapter Five, the then Deputy General Counsel told us that she would sometimes read the FISA application if she determined, based on the cert memo or otherwise, that there was a reason to do so.

[151] Memorandum from Michael J. Woods, Unit Chief, FBI Office of the General Counsel, National Security Law Unit, to FBI Field Offices (Apr. 5, 2001). https://fas.org/irp/agency/doj/fisa/woods.pdf (accessed Dec. 2, 2019); see generally National Security Investigations and Prosecutions § 6.3.

[152] In re All Matters Submitted to the Foreign Intelligence Surveillance Court, 218 F. Supp. 2d 611, 620-21 (FISA Ct. 2002), rev'd, In re Sealed Case, 310 F.3d at 736.

past or current criminal investigation, negative or positive search results in FBI
databases on the target, and a review of the affidavit for factual accuracy.

The Woods Procedures in the original memorandum were subsequently
expanded and incorporated into other policy documents, including the 2016 FISA
SMP PG, which was the applicable FBI policy guide in effect during the period
relevant to this review, and a 2009 joint NSD-FBI guidance memorandum on FISA
application accuracy (2009 Accuracy Memorandum).[153]  Both the FISA SMP PG and
2009 Accuracy Memorandum state that the U.S. government's ability to obtain FISA
authority depends on the accuracy of applications submitted to the FISC and that
because FISA proceedings are *ex parte*, the FISC relies on the U.S. government's
"full and accurate presentation of the facts to make its probable cause
determinations."  The FISA SMP PG further states that it is the case agent's
responsibility to ensure that statements contained in applications submitted to the
FISC are "scrupulously accurate."

Like the original procedures, the accuracy procedures in the FISA SMP PG
require relevant FBI personnel to conduct database searches ████████████████
█████████████████████ to identify any previous or ongoing criminal
investigations and to determine the target's immigration status; ███████████████
████████████
█████████; and identify the source of every fact asserted in a FISA application.  The
results of these steps must be documented in the FISA Verification or Woods Form
and must be reviewed for accuracy and verified by relevant FBI personnel, with the
results of the factual review documented and included in the final FISA package.

The FISA SMP PG requires that the case agent who requested the FISA
application create and maintain an accuracy sub-file (known as a "Woods File") that
contains:  (1) supporting documentation for every factual assertion contained in a
FISA application, and (2) supporting documentation and the results of the required
searches and verifications.  The Woods File must include the documented results of
the required database and CHS file searches, as well as copies of the "most
authoritative documents" supporting the facts asserted in the application.  The FISA
SMP PG advises that while there is some "latitude" as to what documents meet this
requirement, the case agent "should endeavor to obtain the original documentation
and/or best evidence of any given fact."

Further, as described earlier in this chapter, where a FISA application
contains reporting from a CHS, the Woods File must contain a memorandum, email,
or other documentation from the handling agent, CHS coordinator, or either of their
immediate supervisors, stating that:  (1) this individual has reviewed the facts
presented in the FISA application regarding the CHS's reliability and background,

---

[153]  Foreign Intelligence Surveillance Act and Standard Minimization Procedures, 0828PG, Aug.
11, 2016; Matthew G. Olsen, NSD Acting Assistant Attorney General and Valerie Caproni, FBI General
Counsel, Memorandum for All Office of Intelligence Attorneys, All National Security Law Branch
Attorneys, and All Chief Division Counsels, Guidance to Ensure the Accuracy of Federal Bureau of
Investigation Applications under the Foreign Intelligence Surveillance Act, February 11, 2009; *see also*
previous FBI policy guide, FBI FISA Accuracy Policy Implementation Guide, 0394PG, Mar. 31, 2011
(superseded by 0828PG).

and (2) based on this review of the CHS file documentation, the facts presented in the FISA application are accurate.  Common accuracy documentation for a CHS include, among other things, ██████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████  and reliability of the CHS.

After the Woods File is created, the case agent is responsible for verifying each factual assertion in the FISA application and ensuring that the supporting documentation is in the Woods File.  In the case of renewal applications, the case agent must re-verify the accuracy of each factual assertion that is carried over from the first application and also verify and obtain supporting documentation for any new factual assertions that are added.  After the case agent completes this process, the agent signs the Woods Form affirming the accuracy and documentation of every factual assertion in the application.  The case agent then submits the Woods Form and Woods File to his or her SSA.  The SSA is responsible for reviewing the Woods File and confirming that it contains supporting documentation of every factual assertion in the application.  After the SSA completes this process, the SSA signs the Woods Form, and then the Woods Form, but not the Woods File, is transmitted to Headquarters.  As described previously, one of the responsibilities of the Headquarters Program Manager is to verify any factual assertions that require Headquarters verification and provide supporting documentation for the Woods File.  After doing so, the Program Manager signs the Woods Form affirming that he or she has verified the accuracy of those factual assertions and has transmitted the necessary documentation to the field office for inclusion in the Woods File.

According to FBI training materials, "everyone in the FISA process" relies on the case agent's signature on the Woods Form verifying that the factual assertions contained in the application are accurate.  According to the FISA SMP PG, the Headquarters Program Manager, who signs the FISA application under penalty of perjury certifying that the information in the application is true and correct, does not typically have the personal or programmatic knowledge of the factual information necessary for a FISA application and therefore must rely on the field office for the accuracy of the information in the application.  The case agent's signature allows the Program Manager to sign and swear to the application and the Director or Deputy Director to certify the application.  Further, OI, NSD, the approving official (NSD AAG, DAG, or Attorney General), and the FISC rely on the Headquarters Program Manager, or declarant, that the application contains a complete and accurate recitation of the relevant facts.

The FISA SMP PG states that information in a FISA application that cannot be verified as true and correct must be removed from the application, or the entire application must be delayed until the information is verified and the verification is documented.  According to FBI and NSD officials, in the case of information provided by a CHS, the verification process does not require that the FBI establish the accuracy of the CHS's information before that information may be relied upon in a FISA application.  The OGC Unit Chief who supervised the attorney assigned to assist the Carter Page FISA applications told us that the Woods Procedures require that the case agent identify documentation stating what the CHS told the FBI, but

does not require the agent to corroborate the underlying accuracy of the information. Similarly, according to NSD supervisors, although the Woods Procedures require that every factual assertion in a FISA application be "verified," when a particular fact is attributed to a source, an agent must only verify that the fact came from the source and that the application accurately states what the source said. The Woods Procedures do not require that the FBI have corroboration from a second source for the same information. According to the Deputy AAG who had oversight over OI at the time of the Carter Page FISA applications, the FISC is aware of how the FBI "verifies" information that is attributed to a CHS, and the court has not requested a change to their Woods Procedures. Further, NSD officials told us that in all instances, a FISA application will include an FBI assessment of the reliability of the CHS's information, which may come from factual corroboration or, in the absence of factual corroboration, from information about the CHS's general reliability.

## IV.    Ethics Regulations

Government ethics regulations, specifically those providing guidance on conflicts of interests pertain to the events discussed in Chapter Nine concerning Department attorney Bruce Ohr.

The Standards of Ethical Conduct for Employees of the Executive Branch (Standards of Ethical Conduct), 5 C.F.R. § 2635, is a comprehensive set of regulations that set forth the principles of ethical conduct to which all executive branch employees must adhere. In addition to the basic obligations of public service, the regulations address such ethical issues as gifts from outside sources and impartiality in performing official duties. Specifically, 5 C.F.R. § 2635.502 seeks to avoid any appearance of the loss of impartiality in the performance of official government duties by an employee due to a financial interest that the employee may have. It applies in circumstances:

> [w]here an employee knows that a particular matter involving specific parties is likely to have a direct and predictable effect on the financial interest of a member of his household...and where the employee determines that the circumstances would cause a reasonable person with knowledge of the relevant facts to question his impartiality in the matter....

Another portion of the regulations, 5 C.F.R. § 2635.402(b)(1), defines "direct and predictable effect" as "a close causal link between any decision or action to be taken in the matter and any expected effect of the matter on the financial interest."

Section 502 also includes a catch-all provision, which states:

> An employee who is concerned that circumstances other than those specifically described in this section would raise a question regarding his impartiality should use the process described in this section to

45

determine whether he should or should not participate in a particular matter.  5 C.F.R. § 2635.502(a)(2).

The process referenced in this section is for the employee to describe the circumstances that would raise an impartiality question to a Department ethics officer for the purpose of receiving guidance on how to address potential conflicts of interest, including whether the employee should be disqualified from participation. 5 C.F.R. § 2635.502(c).

## V.   Examples of Other Department and FBI Policies Regulating Investigative Activity that Could Potentially Impact Civil Liberties

On occasion, the Department and the FBI investigate alleged illegal activity that is intertwined with, or take investigative steps with the potential to implicate, what is otherwise constitutionally protected activity.  Examples include investigations of allegations of illegal campaign finance activity, allegations of violations of the Foreign Agent Registration Act, or the use of legal process to obtain information about the media or Members of Congress.  The Department and the FBI have promulgated specific policies intended to ensure appropriate oversight of and accountability for many of these investigative activities.  Some of these policies, such as the notification requirement described above for a "Sensitive Investigative Matter," applied to the Crossfire Hurricane investigation.  In this section, we provide examples of other Department and FBI policies and procedures, not applicable to the Crossfire Hurricane investigation, that establish senior-level approval requirements and other procedures to regulate certain investigative activity capable of implicating civil liberties and constitutional concerns.

### A.   Undisclosed Participation

Undisclosed Participation (UDP) takes place when anyone acting on behalf of the FBI, including a CHS, becomes a member of, or participates in, the activity of an organization on behalf of the U.S. government without disclosing their FBI affiliation to an appropriate official of the organization.[154]  A CHS who participates in an organization entirely on his or her own behalf and who is not tasked by the FBI to obtain information or undertake other activities in that organization is not engaging in UDP—regardless of whether the CHS volunteers information to the FBI and regardless of whether the CHS's affiliation with the FBI is known.  However, if the CHS is tasked by the FBI to join an organization, obtain specific information through participation in the organization, or take specific actions, those activities are on behalf of the FBI, and require compliance with the UDP policies set forth in the DIOG.[155]

---

[154]  DIOG § 16.1.

[155]  DIOG §§ 16.2.3.1, 16.3.



160

In our review, we identified an FBI CHS who, months after the presidential campaign was concluded, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ to the FBI, without being tasked by the FBI to gather that information, or directed by the FBI to participate in the campaign.  This type of voluntary activity does not meet the definition of UDP and therefore does not implicate the FBI's requirements for approval of UDP.

**B.    Investigative Activities Concerning Members of the News Media, White House and Executive Branch Personnel, and Members of Congress**

The Department and the FBI have policies to ensure appropriate oversight and accountability for investigative activities involving members of the news media, White House personnel, and Members of Congress.

### 1.    Members of the News Media

The Department and the FBI have numerous regulations and policies regarding investigations that involve members of the news media that relate to events arising from their profession.  For example, 28 C.F.R. § 50.10 and the

---

[156]  DIOG § 16.2.3.5.

[157]  DIOG § 16.4(A).

[158]  DIOG § 16.3.1.5.1(B).

[159]  DIOG § 16.2.3.2.

[160]  DIOG § 16.3.1.5.3(C).

Department's Justice Manual § 9-13.400 govern obtaining information from, or records of, members of the news media and questioning, arresting, or charging members of the news media.  The rules require, with certain exceptions, the Attorney General to approve subpoenas issued to members of the news media; warrants to search premises, properties, communications records, or business records of a member of the news media; and questioning, arresting, or charging members of the news media.

Pursuant to DIOG § 18.5.9.3.1, FBI agents must obtain higher-level authority, consistent with 28 C.F.R. § 50.10, when seeking the issuance of a subpoena for records relating to members of the news media.  Similarly, DIOG § 18.6.4.3.4.3 requires the FBI to obtain the Attorney General's approval when using an administrative subpoena directed to a telecommunications provider for toll records associated with members of the news media.

### 2.   White House and Executive Branch Personnel

The Department's Justice Manual states that any monitoring of oral communications without the consent of all parties, when it is known that the monitoring concerns an investigation into an allegation of misconduct committed by a senior member of the executive branch, must be approved by a Deputy AAG from the Department's Criminal Division.[161]

DIOG § 18.5.6.4.7 states that an FBI agent may only initiate contact with White House personnel as part of an investigation after consulting with the FBI OGC and obtaining SAC and appropriate FBI Assistant Director approval.

### 3.   Members of Congress and Their Staff

The Department's Justice Manual states that any monitoring of oral communications without the consent of all parties when it is known that the monitoring concerns an investigation into an allegation of misconduct committed by a Member of Congress must be approved by a Deputy AAG from the Department's Criminal Division.[162]

DIOG § 18.5.6.4.6 requires FBI agents to obtain SAC and appropriate FBI Assistant Director approval, along with notice to the AD for the Office of Congressional Affairs, when seeking to interview a Member of Congress or Congressional staff in connection with a public corruption matter or a foreign counterintelligence matter.

---

[161] Section 9-7.302.

[162] Sections 9-7.302, 9-85.110.

**[PAGE INTENTIONALLY LEFT BLANK]**

## CHAPTER THREE
# THE OPENING OF CROSSFIRE HURRICANE, STAFFING, AND THE EARLY STAGES OF THE INVESTIGATION

On July 31, 2016, the FBI opened a counterintelligence investigation known as "Crossfire Hurricane." In this chapter, we provide an overview of the opening and initial steps of the Crossfire Hurricane investigation and its related cases. We first summarize the intelligence available to the FBI in the summer of 2016 regarding the Russian government's efforts to interfere with the 2016 U.S. elections. We then describe the events that led to the opening of the Crossfire Hurricane umbrella investigation and the related counterintelligence investigations of George Papadopoulos, Carter Page, Paul Manafort, and Michael Flynn. We also describe the structure and oversight of these investigations, including the FBI's staffing of the cases and the involvement of senior FBI and Department officials. Finally, we describe the early investigative steps taken in furtherance of the investigations.

## I. Intelligence Community Awareness of Attempted Russian Interference in the 2016 U.S. Elections

At the time the Crossfire Hurricane investigation was opened in July 2016, the U.S. Intelligence Community (USIC), which includes the FBI, was aware of Russian efforts to interfere with the 2016 U.S. elections. The Russian efforts included cyber intrusions into various political organizations, including the Democratic National Committee (DNC) and Democratic Congressional Campaign Committee (DCCC). Throughout spring and early summer 2016, the FBI became aware of specific cyber intrusions for which the Russian government was responsible, through ongoing investigations into Russian hacking operations conducted by the FBI's Cyber Division and the FBI's Counterintelligence Division (CD).

In March and May 2016, FBI field offices identified a spear phishing campaign by the Russian military intelligence agency, known as the General Staff Intelligence Directorate (GRU), targeting email addresses associated with the DNC and the Hillary Clinton campaign, as well as efforts to place malware on DNC and DCCC computer networks. In June and July 2016, stolen materials were released online through the fictitious personas "Guccifer 2.0" and "DCLeaks." In addition, in late July 2016, WikiLeaks released emails obtained from DNC servers as part of its "Hillary Leak Series." By August 2016, the USIC assessed that in the weeks leading up to the 2016 U.S. elections, Russia was considering further intelligence operations to impact or disrupt the elections.

In addition to the Russian infiltration of DNC and DCCC computer systems, between March and August 2016, the FBI became aware of numerous attempts to hack into state election systems. These included confirmed access into elements of multiple state or local electoral boards using tactics, techniques, and procedures

associated with Russian state-sponsored actors.[163]  The FBI learned that Russian efforts also included cyber-enabled scanning and probing of election related infrastructure in several states.

It was in this context that the FBI received information on July 28, 2016, about a conversation between Papadopoulos and an official of a Friendly Foreign Government (FFG) in May 2016 during which Papadopoulos "suggested the Trump team had received some kind of suggestion" from Russia that it could assist this process with the anonymous release of information during the campaign that would be damaging to candidate Clinton and President Obama.  As described below, the FBI opened the Crossfire Hurricane investigation 3 days after receiving this information.

## II. The Friendly Foreign Government Information and the FBI's Decision to Open Crossfire Hurricane and Four Related Counterintelligence Investigations

On July 31, 2016, the FBI opened the Crossfire Hurricane counterintelligence investigation to determine whether individuals associated with the Donald J. Trump for President Campaign were coordinating or cooperating, wittingly or unwittingly, with the Russian government to influence or interfere with the 2016 U.S. elections. According to the opening Electronic Communication (EC), the investigation was predicated on intelligence from an FFG.  In this section, we describe the receipt of the information from the FFG and the decisions to open the Crossfire Hurricane

---

[163] Beginning in January 2017 and continuing into 2019, several U.S. government agencies, as well as senior intelligence officials, reported on Russia's efforts to interfere with the 2016 U.S. elections.  For example, the Intelligence Community Assessment (ICA) titled "Assessing Russian Activities and Intentions in Recent U.S. Elections," published on January 6, 2017, concluded that Russian President Vladimir Putin and the Russian government conducted an influence campaign followed by a Russian messaging strategy that blended covert intelligence operations, such as cyber activity, with overt efforts in order to undermine public faith in the U.S. democratic process, denigrate then candidate Clinton, and harm Clinton's electability and potential presidency.  Additionally, in June 2017, during a Senate Select Committee on Intelligence Hearing on Russian Interference in the 2016 U.S. Elections, USIC leadership concurred with the ICA and acknowledged that the Russian government was responsible for compromises of and leaks from political figures and institutions, among other activities, as part of its efforts to influence and interfere in U.S. elections.  Similarly, the Senate Select Committee on Intelligence in 2019 and the House Permanent Select Committee on Intelligence in 2018 found, in part, that the Russian government historically has attempted to interfere in U.S. elections and attempted to interfere in the 2016 U.S. elections through attacks on state voter registration databases, cyber operations targeting governments and businesses using tactics such as spear phishing, hacking operations to include the DNC network, and social media campaigns.  U.S. House Permanent Select Committee on Intelligence, *Report on Russian Active Measures*, 115th Cong., 2d sess., 2018, 114-130.  U.S. Senate Select Committee on Intelligence, *Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Volume 1: Russian Efforts Against Election Infrastructure with Additional Views*, 116th Cong., 1st sess., 2019, 1-10.  Further, Special Counsel Robert S. Mueller III concluded that the Russian government interfered with the 2016 U.S. elections through a social media campaign that favored then candidate Trump and disparaged then candidate Clinton, and through cyber intrusion operations against entities and individuals working on the Clinton Campaign. *See The Special Counsel's Report*, Vol. I at 1, 4-7.

counterintelligence investigation and the related investigations of Papadopoulos, Page, Manafort, and Flynn.

### A.   Receipt of Information from the Friendly Foreign Government and the Opening of Crossfire Hurricane

By March 2016, Papadopoulos, Page, and Flynn were among several individuals serving as foreign policy advisors for the Trump campaign.  Manafort joined the Trump campaign in March 2016 as the campaign convention manager. In the weeks that followed, Papadopoulos met with officials of an FFG in a European city that had arranged several meetings in May 2016 to engage with members of the Trump campaign.  During one of these meetings, Papadopoulos reportedly "suggested" to an FFG official that the Trump campaign "received some kind of a suggestion from Russia" that it could assist the campaign by anonymously releasing derogatory information about presidential candidate Hillary Clinton.[164]  However, the FFG did not provide information about Papadopoulos's statements to the U.S. government at that time.

On July 26, 2016, 4 days after WikiLeaks publicly released hacked emails from the DNC, the FFG official spoke with a U.S. government (USG) official in the European city about an "urgent matter" that required an in-person meeting.  At the meeting, the FFG official informed the USG official of the meeting with Papadopoulos.  The FFG official also provided ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ information from ▮▮▮▮▮▮ FFG officials ▮▮▮▮▮ following the May 2016 meeting (hereinafter referred to as the FFG information).  ▮▮▮▮▮▮▮ stated, in part, that Papadopoulos

---

[164]  During October 25, 2018 testimony before the House Judiciary and House Committee on Government Reform and Oversight, Papadopoulos stated that the source of the information he shared with the FFG official was a professor from London, Joseph Mifsud.  Papadopoulos testified that Mifsud provided him with information about the Russians possessing "dirt" on Hillary Clinton.  Papadopoulos raised the possibility during his Congressional testimony that Mifsud might have been "working with the FBI and this was some sort of operation" to entrap Papadopoulos.  As discussed in Chapter Ten of this report, the OIG searched the FBI's database of Confidential Human Sources (CHS), and did not find any records indicating that Mifsud was an FBI CHS, or that Mifsud's discussions with Papadopoulos were part of any FBI operation.  In Chapter Ten, we also note that the FBI requested information ▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

We refer to Joseph Mifsud by name in this report because the Department publicly revealed Mifsud's identity in The Special Counsel's Report (public version).  According to The Special Counsel's Report, Papadopoulos first met Mifsud in March 2016, after Papadopoulos had already learned that he would be serving as a foreign policy advisor for the Trump campaign.  According to The Special Counsel's Report, Mifsud only showed interest in Papadopoulos after learning of Papadopoulos's role in the campaign, and told Papadopoulos about the Russians possessing "dirt" on then candidate Clinton in late April 2016.  The Special Counsel found that Papadopoulos lied to the FBI about the timing of his discussions with Mifsud, as well as the nature and extent of his communications with Mifsud.  The Special Counsel charged Papadopoulos under Title 18 U.S.C. § 1001 with making false statements. Papadopoulos pled guilty and was sentenced to 14 days in prison. *See The Special Counsel's Report*, Vol. 1, at 192-94.

suggested the Trump team had received some kind of suggestion from Russia that it could assist this process with the anonymous release of information during the campaign that would be damaging to Mrs. Clinton (and President Obama). It was unclear whether he or the Russians were referring to material acquired publicly of [sic] through other means. It was also unclear how Mr. Trump's team reacted to the offer. We note the Trump team's reaction could, in the end, have little bearing of what Russia decides to do, with or without Mr. Trump's cooperation.

On July 27, 2016, the USG official called the FBI's Legal Attaché (Legat) and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in the European city to her office and provided them with the FFG information.[165] The Legat told us he was not provided any other information about the meetings between the FFG and Papadopoulos.[166] The Legat also told us that he did not know under what FBI case number the FFG information should be documented and transmitted. At the recommendation of the European city Assistant Legal Attaché (ALAT) for Counterintelligence, the Legat contacted a former ALAT who at the time was an Assistant Special Agent in Charge (ASAC) in the FBI's Philadelphia Field Office. The ASAC told the Legat that he believed the FFG information was related to the hack of DNC emails and identified a case number for that investigation for the Legat to use to transmit the information. The following day, on July 28, 2016, the Legat sent an EC documenting the FFG information to the Philadelphia Field Office ASAC. The same day, the information in the EC was emailed to the Section Chief of the Cyber Counterintelligence Coordination Section at FBI Headquarters.

From July 28 to July 31, officials at FBI Headquarters discussed the FFG information and whether it warranted opening a counterintelligence investigation. The Assistant Director (AD) for CD, E.W. "Bill" Priestap, was a central figure in these discussions. According to Priestap, he discussed the matter with then Section Chief of CD's Counterespionage Section Peter Strzok, as well as the Section Chief of CD's Counterintelligence Analysis Section I (Intel Section Chief); and with representatives of the FBI's Office of the General Counsel (OGC), including Deputy General Counsel Trisha Anderson and a unit chief (OGC Unit Chief) in OGC's National Security and Cyber Law Branch (NSCLB). Priestap told us that he also discussed the matter with either then Deputy Director (DD) Andrew McCabe or then Executive Assistant Director (EAD) Michael Steinbach, but did not recall discussing the matter with then Director James Comey. Comey told the OIG that he did not recall being briefed on the FFG information until after the Crossfire Hurricane investigation was opened, and that he was not involved in the decision to open the case. McCabe said that although he did not specifically recall meeting with Comey immediately after the FFG information was received, it was "the kind of thing that would have been brought to Director Comey's attention immediately." McCabe's

---

[165] A Legal Attaché (Legat) is the FBI Director's personal representative in a country in which the FBI has regional responsibility.

[166] According to the Legat, the ▮▮▮▮▮▮▮▮▮▮▮▮▮ stated at the meeting with the USG official that the FFG information "sounds like an FBI matter."

contemporaneous notes reflect that the FFG information, Carter Page, and
Manafort, were discussed on July 29, after a regularly scheduled morning meeting
of senior FBI leadership with the Director. Although McCabe told us he did not have
an independent recollection of this discussion, he told us that, based upon his
notes, this discussion likely included the Director. McCabe's notes reflect only the
topic of the discussion and not the substance of what was discussed.

McCabe told us that he recalled discussing the FFG information with Priestap,
Strzok, then Special Counsel to the Deputy Director Lisa Page, and Comey,
sometime before Crossfire Hurricane was opened, and he agreed with opening a
counterintelligence investigation based on the FFG information. He told us the
decision to open the case was unanimous. McCabe said the FBI viewed the FFG
information in the context of Russian attempts to interfere with the 2016 U.S.
elections in the years and months prior, as well as the FBI's ongoing investigation
into the DNC hack by a Russian Intelligence Service (RIS). He also said that when
the FBI received the FFG information it was a "tipping point" in terms of opening a
counterintelligence investigation regarding Russia's attempts to influence and
interfere with the 2016 U.S. elections because not only was there information that
Russia was targeting U.S. political institutions, but now the FBI had received an
allegation from a trusted partner that there had been some sort of contact between
the Russians and the Trump campaign. McCabe said that he did not recall any
discussion about whether the FFG information constituted sufficient predication for
opening a Full Investigation, as opposed to a Preliminary Investigation, but said
that his belief at the time, based on his experience, was that the FFG information
was adequate predication.[167]

According to Priestap, he authorized opening the Crossfire Hurricane
counterintelligence investigation on July 31, 2016, based upon these discussions.
He told us that the FFG information was provided by a trusted source—the FFG—
and he therefore felt it "wise to open an investigation to look into" whether
someone associated with the Trump campaign may have accepted the reported
offer from the Russians. Priestap also told us that the combination of the FFG
information and the FBI's ongoing cyber intrusion investigation of the DNC hacks
created a counterintelligence concern that the FBI was "obligated" to investigate.
Priestap said that he did not recall any disagreement about the decision to open
Crossfire Hurricane, and told us that he was not pressured to open the case.

We interviewed all of the senior FBI officials who participated in these
discussions about their reactions to the FFG information and assessments of it as

---

[167] As detailed in Chapter Two, the DIOG provides for two types of predicated investigations,
Preliminary Investigations and Full Investigations. A Preliminary Investigation may be opened based
upon "any allegation or information" indicative of possible criminal activity or threats to the national
security; a Full Investigation may be opened based upon an "articulable factual basis" of possible
criminal activity or threats to the national security. In cases opened as Preliminary Investigations, all
lawful investigative methods (including CHS and UCE operations) may be used except for mail
opening, physical searches requiring a search warrant, electronic surveillance requiring a judicial order
or warrant (Title III wiretap or a FISA order), or requests under Title VII of FISA. A Preliminary
Investigation may be converted to a Full Investigation if the available information provides predication
for a Full Investigation.

predication for Crossfire Hurricane. Each of these officials told us the information warranted opening a counterintelligence investigation. For example, Anderson told us that when the information from the Legat arrived it was "really disturbing," and that she told Priestap the information needed to be reviewed by the Deputy Director immediately (Anderson and Priestap, in fact, briefed McCabe that day, July 28). She also told us that the decision to open the case was based upon the concern that the U.S. democratic process could be manipulated by a foreign power. Anderson also told us that "[the FBI] would have been derelict in our responsibilities had we not opened the case," and that a foreign power allegedly colluding with a presidential candidate or his team members was a threat to our nation that the FBI was obligated to investigate under its counterintelligence mission.

Similarly, then FBI General Counsel James Baker told us that everyone was in agreement about opening an investigation because the information came from a trusted intelligence partner, and it concerned a "Russian connection to the Trump campaign." He told us the FBI had information about the Russian's hacking activities, which they considered "a threat." Baker could not specifically recall whether Crossfire Hurricane was opened as a Preliminary Investigation or a Full Investigation, but told us that a Full Investigation "would have been justified under these facts."

The Intel Section Chief also told us that he recalled the discussions about the FFG information when it arrived and said no one disagreed with opening a counterintelligence investigation based on the information. The Intel Section Chief also said that in the context of what was occurring with the DNC hacks and the release of the DNC emails, there was a possibility that the Russians reached out to a campaign to offer their assistance, and the FBI needed to investigate the allegation. The OGC Unit Chief had the same recollection, telling us that there was no real question about whether to investigate and that her impression was everyone thought the FFG information was so serious that the FBI had to investigate the allegations: "[T]his is not something we were looking to do, but given the allegations, we thought they were serious enough [that] we had to investigate."

Like Priestap, these officials told us that their evaluation of the FFG information was informed by the FBI's ongoing cyber investigation involving Russia and the DNC hack. According to the Intel Section Chief and Strzok, when the FFG information arrived, the FBI already had strong corroborating information indicating that senior officials in the Russian government were responsible for directing attacks on the 2016 U.S. elections, including the hack of the DNC. Anderson said the FBI's ongoing cyber investigation supported the decision to open a counterintelligence case based on the FFG information. Anderson stated:

> …I don't remember exactly when we felt, you know, the moment in time when we felt that we had Russian attribution, not just to the hack, but also to the release of the emails. So though that was suspected or we had some information to support that theory for quite some time, but whether you…can attribute that to the Russians with a

> high degree of certainty or...not, it sort of puts the whole thing together.  On the one hand you've got the Russian efforts to obtain material that could be used as part of a foreign influence campaign and then on the other hand you've got [this] information about the possibility of collusion between the Russians and members of a presidential candidate's campaign.

Priestap told the OIG that before arriving at a final decision, he considered whether to provide a "defensive briefing" to any member of the Trump campaign in lieu of opening an investigation.  According to Priestap, defensive briefings occur when U.S. government or corporate officials are being targeted by a foreign adversary and the FBI determines the officials should be alerted to the potential threat.  Priestap did not recall who first raised the issue of defensive briefings, but said he discussed the subject collaboratively with other FBI officials.  Priestap told us that he ultimately decided not to conduct defensive briefings and explained his reasoning:

> While the Counterintelligence Division does regularly provide defensive briefings to U.S. government officials or possible soon to be officials, in my experience, we do this when there is no indication, whatsoever, that the person to whom we would brief could be working with the relevant foreign adversary.  In other words, we provide defensive briefings when we obtain information indicating a foreign adversary is trying or will try to influence a specific U.S. person, and when there is no indication that the specific U.S. person could be working with the adversary.  In regard to the information the [FFG] provided us, we had no indication as to which person in the Trump campaign allegedly received the offer from the Russians.  There was no specific U.S. person identified.  We also had no indication, whatsoever, that the person affiliated with the Trump campaign had rejected the alleged offer from the Russians.  In fact, the information we received indicated that Papadopoulos told the [FFG] he felt confident Mr. Trump would win the election, and Papadopoulos commented that the Clintons had a lot of baggage and that the Trump team had plenty of material to use in its campaign.  While Papadopoulos didn't say where the Trump team had received the "material," one could reasonably infer that some of the material might have come from the Russians.  Had we provided a defensive briefing to someone on the Trump campaign, we would have alerted the campaign to what we were looking into, and, if someone on the campaign was engaged with the Russians, he/she would very likely change his/her tactics and/or otherwise seek to cover-up his/her activities, thereby preventing us from finding the truth.  On the other hand, if no one on the Trump campaign was working with the Russians, an investigation could prove that.  Because the possibility existed that someone on the Trump campaign could have taken the Russians up on their offer, I thought it wise to open an investigation to look into the situation.

McCabe said that he did not consider a defensive briefing as an alternative to opening a counterintelligence case. He said that based on the FFG information, the FBI did not know if any member of the campaign was coordinating with Russia and that the FBI did not brief people who "could potentially be the subjects that you are investigating or looking for." McCabe told us that in a sensitive counterintelligence matter, it was essential to have a better understanding of what was occurring before taking an overt step such as providing a defensive briefing.[168]

We also asked those FBI officials involved in the decision to open Crossfire Hurricane whether the FBI received any other information, such as from members of the USIC, that the FBI relied upon to predicate Crossfire Hurricane. All of them told us that there was no such information and that predication for the case was based solely on the FFG information.[169] We also asked Comey and McCabe about then CIA Director John Brennan's statements reported in several news articles that he provided to the FBI intelligence on Russian contacts with U.S. persons that predicated or prompted the opening of Crossfire Hurricane. Comey told us that while Brennan shared intelligence on the overarching efforts by the Russian government to interfere in the 2016 U.S. elections, Brennan did not provide any information that predicated or prompted the FBI to open Crossfire Hurricane. McCabe said that he did not recall Brennan providing the FBI with information before the FBI's decision to open an investigation about any U.S person potentially cooperating with Russia in the efforts to interfere with the 2016 U.S. elections. Priestap and the Intel Section Chief also told us that Brennan did not provide the FBI any intelligence that predicated the opening of Crossfire Hurricane. We did not find information in FBI or Department electronic communications, emails, or other documents, or through witness testimony, indicating otherwise.

On July 31, 2016, the FBI opened a full counterintelligence investigation under the code name Crossfire Hurricane "to determine whether individual(s) associated with the Trump campaign are witting of and/or coordinating activities with the Government of Russia." As the predicating information did not indicate a specific individual, the opening EC did not include a specific subject or subjects. As described in Chapter Two, the factual predication required to open a Full Investigation under the Attorney General's Guidelines for Domestic Operations (AG

---

[168] McCabe told us that the decision to brief the DNC and Clinton campaign about the DNC hack was a different situation than the decision not to brief the Trump campaign about allegations of Russian efforts to assist the Trump campaign. He said that the DNC was a victim of hacking and the FBI had known that the DNC was not responsible for the hacks for some time.

[169] As we describe in Chapter Four, although the FBI first received reporting from Christopher Steele regarding alleged Russian interference in the 2016 U.S. elections in early July 2016, the agents and analysts investigating the FFG information (the Crossfire Hurricane team) did not become aware of the Steele reporting until September 19, 2016. We found no evidence the Steele election reporting was known to or used by FBI officials involved in the decision to open the Crossfire Hurricane investigation.

In the OIG's *Review of Various Actions in Advance of the 2016 Election*, we describe in Classified Appendix One certain information that the FBI was in possession of in 2016 but the vast majority of which the FBI had not reviewed by June 2018. Given that timing, we did not see any evidence that any of that information was considered for or part of the predication for the opening of Crossfire Hurricane.

Guidelines) and the FBI's Domestic Investigations and Operations Guide (DIOG) is
an "articulable factual basis" that reasonably indicates that one of several
circumstances exist:

- An activity constituting a federal crime or a threat to the national
  security has or may have occurred, is or may be occurring, or will or
  may occur and the investigation may obtain information relating to the
  activity or the involvement or role of an individual, group, or
  organization in such activity;

- An individual, group, organization, entity, information, property, or
  activity is or may be a target of attack, victimization, acquisition,
  infiltration, or recruitment in connection with criminal activity in
  violation of federal law or a threat to the national security and the
  investigation may obtain information that would help to protect against
  such activity or threat; or

- The investigation may obtain foreign intelligence that is responsive to
  a requirement that the FBI collect positive foreign intelligence—*i.e.*,
  information relating to the capabilities, intentions, or activities of
  foreign governments or elements thereof, foreign organizations or
  foreign persons, or international terrorists.

The opening EC describing the predication for Crossfire Hurricane relied
exclusively on Papadopoulos's statements to the FFG ▉▉▉▉▉▉▉▉ in the FFG
information.

Crossfire Hurricane was opened by CD and was assigned a case number used
by the FBI for possible violations of the Foreign Agents Registration Act (FARA),
Title 18 U.S.C. § 951, which makes it a crime to act as an agent of a foreign
government without making periodic public disclosures of the relationship.[170]  As
described in Chapter Two, the AG Guidelines recognize that activities subject to
investigation as "threats to the national security" may also involve violations or
potential violations of federal criminal laws, or may serve important purposes
outside the ambit of normal criminal investigation and prosecution by informing
national security decisions.  Given such potential overlap in subject matter, neither
the AG Guidelines nor the DIOG require the FBI to differently label its activities as
criminal investigations, national security investigations, or foreign intelligence
collections.  Rather, the AG Guidelines state that, where an authorized purpose
exists, all of the FBI's legal authorities are available for deployment in all cases to
which they apply.[171]

The opening EC also designated Crossfire Hurricane as a "sensitive
investigative matter," or SIM, which as described in Chapter Two, includes matters

---

[170]  The FARA statute defines an "agent of a foreign government" as an individual who agrees
to operate in the United States subject to the direction or control of a foreign government or official.
18 U.S.C. § 951(d).

[171]  *See* AG Guidelines § A, II.

involving the activities of a domestic public official or political candidate (involving corruption or a threat to the national security), or a domestic political organization or an individual prominent in such an organization.[172]  The term "domestic political organization" includes, in relevant part, a committee or group formed to elect an individual to public office.  According to David Laufman, then Chief of the National Security Division's (NSD) Counterintelligence and Export Control Section (CES), the case was designated a SIM because it involved a campaign and "people associated with a campaign."  The DIOG requires that cases opened and designated as SIMs by FBI Headquarters be reviewed by OGC and approved by the appropriate FBI Headquarters operational section chief.  The DIOG also requires that the FBI provide an "appropriate NSD official" with written notification of the opening of a SIM.[173]  The DIOG does not impose any additional special requirements on SIMs, but does state particular care should be taken when considering whether a planned course of action is the least intrusive method and if reasonable based upon the circumstances of the investigation.[174]

After Priestap authorized the opening of Crossfire Hurricane, Strzok, with input from the OGC Unit Chief, drafted and approved the opening EC.[175]  Strzok told us that the case agent normally drafts the opening EC for an investigation, but that Strzok did so for Crossfire Hurricane because a case agent was not yet assigned and there was an immediate need to travel to the European city to interview the FFG officials who had met with Papadopoulos.  With respect to the DIOG's notification requirement to NSD, we located in the Crossfire Hurricane case file a Letterhead Memorandum (LHM) dated August 3, 2016, addressed to NSD.  However, NSD officials told us that NSD has no record showing it received the LHM, and we were unable to determine whether the FBI in fact provided the LHM to NSD.[176]

In addition to being designated a SIM, witnesses told us that, because the information being investigated related to an ongoing presidential election campaign, the Crossfire Hurricane case file was designated as "prohibited" meaning that access to the file was restricted and viewable to only those individuals assigned to

---

[172] The DIOG requires that if a case is designated as a SIM at the time of opening, the title or case caption must contain the words "Sensitive Investigative Matter."  The opening EC for Crossfire Hurricane met this DIOG requirement.

[173] There is no requirement under the AG Guidelines or the DIOG that a senior Department official approve of or be consulted prior to the opening of an investigation designated a SIM.

[174] The DIOG requires that the least intrusive means or method be considered and—if reasonable based upon the circumstances of the investigation—used to obtain intelligence or evidence in lieu of a more intrusive method.  The concept of least intrusive method applies to the collection of all information.

[175] Strzok was promoted to a CD Section Chief in February 2016, and later to Deputy Assistant Director (DAD) of CD's Operations Branch I on September 4, 2016.

[176] According to FBI documents, although the FBI usually provides an LHM to NSD, "due to the extreme sensitivity of both predication and subject of [Crossfire Hurricane], NSD was orally briefed."  Notes and testimony reflect that in early August, NSD officials were briefed on at least two occasions at FBI Headquarters about the Crossfire Hurricane investigation.

work on the investigation.  Agents and analysts referred to the investigation as "close-hold" and, as discussed later in this chapter, used covert investigative techniques to ensure information about the investigation remained known only to the team and FBI and Department officials.

### B.    The FBI Opens Counterintelligence Investigations on Papadopoulos, Carter Page, Manafort, and Flynn

On August 1, 2016, Strzok and a supervisory special agent (SSA 1) traveled to the European city to interview the FFG officials who met with Papadopoulos in May 2016.[177]  According to Strzok and SSA 1, during the interview they learned that Papadopoulos did not say that he had direct contact with the Russians; that while his statement did not include him, it did not exclude him either; and that Papadopoulos stated the Russians told "us."  Strzok and SSA 1 also said they learned that Papadopoulos did not specify any other individual who received the Russian suggestion.  Strzok, the Intel Section Chief, the Supervisory Intelligence Analyst (Supervisory Intel Analyst), and Case Agent 2 told the OIG that, based on this information, the initial investigative objective of Crossfire Hurricane was to determine which individuals associated with the Trump campaign may have been in a position to have received the alleged offer of assistance from Russia.

After conducting preliminary open source and FBI database inquiries, intelligence analysts on the Crossfire Hurricane team identified three individuals— Carter Page, Paul Manafort, and Michael Flynn—associated with the Trump campaign with either ties to Russia or a history of travel to Russia.  On August 10, 2016, the team opened separate counterintelligence FARA cases on Carter Page, Manafort, and Papadopoulos, under code names assigned by the FBI.  On August 16, 2016, a counterintelligence FARA case was opened on Flynn under a code name assigned by the FBI.  The opening ECs for all four investigations were drafted by either of the two Special Agents assigned to serve as the Case Agents for the investigation (Case Agent 1 or Case Agent 2) and were approved by Strzok, as required by the DIOG.[178]  Each case was designated a SIM because the individual subjects were believed to be "prominent in a domestic political campaign."[179]

As summarized below, the opening ECs for the investigations provided similar descriptions of the predicating information relied upon to open the cases.  The ECs

---

[177] Email exchanges reflect that the FBI planned to interview the FFG officials by telephone; however, the Legat told Strzok that a Senior Executive Service-level (SES) FBI official from CD should make the trip and meet with the FFG officials.  Emails also reflect that  a USG official advised the FBI that one of the FFG officials the FBI planned to interview would be unavailable on August 9 and suggested the interview take place prior to that date.

[178] Although the opening ECs identified Strzok, SSA 1, and the OGC Unit Chief as approvers, the OGC Unit Chief said that she provided legal review of the opening ECs only.  As we described in Chapter Two, when a case is opened and designated a SIM by FBI Headquarters, the case opening requires review by OGC and approval by the FBI Headquarters operational Section Chief (SC).

[179] We did not locate any records that indicated the FBI provided written notification to NSD about the opening of these cases.  However, as we described earlier in this chapter, the FBI orally briefed NSD officials on at least two occasions in August 2016 about the Crossfire Hurricane investigation to include Papadopoulos, Manafort, Flynn, and Carter Page.

differed in their descriptions of the particular activities of the subjects that gained the FBI's attention.

- The opening EC for the Carter Page investigation stated that there was an articulable factual basis that Carter Page "may wittingly or unwittingly be involved in activity on behalf of the Russian Federation which may constitute a federal crime or threat to the national security." The EC cross-referenced the predication for Crossfire Hurricane and stated that Page was a senior foreign policy advisor for the Trump campaign, had extensive ties to various Russia-owned entities, and had traveled to Russia as recently as July 2016. The EC also noted that Carter Page was the subject of an open, ongoing counterintelligence investigation assigned to the FBI's New York Field Office (NYFO), which we describe in the next section.

- The opening EC for the Manafort investigation stated that there was an articulable factual basis that Manafort "may wittingly or unwittingly be involved in activity on behalf of the Russian Federation which may constitute a federal crime or threat to the national security." The EC cross-referenced the predication for Crossfire Hurricane and stated that Manafort was designated the Delegate Process and Convention Manager for the Trump campaign, was promoted to Campaign Manager for the Trump campaign, and had extensive ties to pro-Russian entities of the Ukrainian government.

- The opening EC for the Papadopoulos investigation stated that there was an articulable factual basis that Papadopoulos "may wittingly or unwittingly be involved in activity on behalf of the Russian Federation which may constitute a federal crime or threat to the national security." The EC cross-referenced the predication for Crossfire Hurricane and stated that Papadopoulos was a senior foreign advisor for the Trump campaign and had "made statements indicating that he is knowledgeable that the Russians made a suggestion to the Trump team that they could assist the Trump campaign with an anonymous release of information during the campaign that would be damaging to the Clinton Campaign."

- The opening EC for the Flynn investigation stated that there was an articulable factual basis that Flynn "may wittingly or unwittingly be involved in activity on behalf of the Russian Federation which may constitute a federal crime or threat to the national security." The EC cross-referenced the predication for Crossfire Hurricane and stated that Flynn was an advisor to the Trump campaign, had various ties to state-affiliated entities of Russia, and traveled to Russia in December 2015.

## C.    The Pre-Existing FBI New York Field Office Counterintelligence Investigation of Carter Page

The OGC Unit Chief told us that of all the individuals associated with the Trump campaign best positioned to have received the alleged offer of assistance from Russia, Carter Page "quickly rose to the top" of the list because of his past connections to Russian officials and the FBI's previous contacts with Page.  As reflected in the FISA applications described in Chapters Five and Seven, as well as in other FBI documents, NYFO had an interest in Carter Page for several years before August 2016 and had interviewed him on multiple occasions because of his relationships with individuals the FBI knew to be Russian intelligence officers.

An FBI counterintelligence agent in NYFO (NYFO CI Agent) with extensive experience in Russian matters told the OIG that Carter Page had been on NYFO's radar since 2009, when he had contact with a known Russian intelligence officer (Intelligence Officer 1).  According to the EC documenting NYFO's June 2009 interview with Page, Page told NYFO agents that he knew and kept in regular contact with Intelligence Officer 1 and provided him with a copy of a non-public annual report from an American company.  The EC stated that Page "immediately advised [the agents] that due to his work and overseas experiences, he has been questioned by and provides information to representatives of [another U.S. government agency] on an ongoing basis."  The EC also noted that agents did not ask Page any questions about his dealings with the other U.S. government agency during the interviews.[180]

NYFO CI agents believed that Carter Page was "passed" from Intelligence Officer 1 to a successor Russian intelligence officer (Intelligence Officer 2) in 2013 and that Page would continue to be introduced to other Russian intelligence officers in the future.[181]  In June 2013, NYFO CI agents interviewed Carter Page about these contacts.  Page acknowledged meeting Intelligence Officer 2 following an introduction earlier in 2013.  When agents intimated to Carter Page during the interview that Intelligence Officer 2 may be a Russian intelligence officer, specifically, an "SVR" officer, Page told them he believed in "openness" and because

---

[180]  On or about August 17, 2016, the Crossfire Hurricane team received a memorandum from the other U.S. government agency detailing its prior relationship with Carter Page, including that Page had been approved as an operational contact for the other agency from 2008 to 2013 and information that Page had provided to the other agency concerning Page's prior contacts with certain Russian intelligence officers.  We found no evidence that, after receiving the August 17 Memorandum, the Crossfire Hurricane team requested additional information from the other agency prior to submission of the first FISA application in order to deconflict on issues that we believe were relevant to the FISA application.  According to the U.S. government agency, "operational contact," as that term is used in the August 17 Memorandum, provides "Contact Approval," which allows the agency to contact and discuss sensitive information with a U.S. person and to collect information from that person via "passive debriefing," or debriefing a person of information that is within the knowledge of an individual and has been acquired through the normal course of that individual's activities.  According to the U.S. government agency, a "Contact Approval" does not allow for operational use of a U.S. person or tasking of that person.

[181]  CI agents refer to this as "slot succession," whereby a departing intelligence officer "passes" his or her contacts to an incoming intelligence officer.

he did not have access to classified information, his acquaintance with Intelligence
Officer 2 was a "positive" for him.  In August 2013, NYFO CI agents again
interviewed Page regarding his contacts with Intelligence Officer 2.  Page
acknowledged meeting with Intelligence Officer 2 since his June 2013 FBI interview.

In January 2015, three Russian intelligence officers, including Intelligence
Officer 2, were charged in a sealed complaint, and subsequently indicted, in the
Southern District of New York (SDNY) for conspiring to act in the United States as
unregistered agents of the Russian Federation.[182]  The indictment referenced
Intelligence Officer 2's attempts to recruit "Male-1" as an asset for gathering
intelligence on behalf of Russia.

On March 2, 2016, the NYFO CI Agent and SDNY Assistant United States
Attorneys interviewed Carter Page in preparation for the trial of one of the indicted
Russian intelligence officers.  During the interview, Page stated that he knew he
was the person referred to as Male-1 in the indictment and further said that he had
identified himself as Male-1 to a Russian Minister and various Russian officials at a
United Nations event in "the spirit of openness."  The NYFO CI Agent told us she
returned to her office after the interview and discussed with her supervisor opening
a counterintelligence case on Page based on his statement to Russian officials that
he believed he was Male-1 in the indictment and his continued contact with Russian
intelligence officers.

The FBI's NYFO CI squad supervisor (NYFO CI Supervisor) told us she
believed she should have opened a counterintelligence case on Carter Page prior to
March 2, 2016 based on his continued contacts with Russian intelligence officers;
however, she said the squad was preparing for a big trial, and they did not focus on
Page until he was interviewed again on March 2.  She told us that after the March 2
interview, she called CD's Counterespionage Section at FBI Headquarters to
determine whether Page had any security clearances and to ask for guidance as to
what type of investigation to open on Page.[183]  On April 1, 2016, the NYFO CI
Supervisor received an email from the Counterespionage Section advising her to
open a ▆▆▆▆ investigation on Page.  The NYFO CI Supervisor said that ▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ In addition, according to FBI
records, the relevant CD section at FBI Headquarters, in consultation with OGC,
determined at that time that the Page investigation opened by NYFO was not a SIM,
but also noted, "should his status change, the appropriate case modification would
be made."  The NYFO CI Supervisor told us that based on what was documented in

---

[182] Intelligence Officer 3 pled guilty in March 2016.  The remaining two indicted Russian
intelligence officers were no longer in the United States.

[183] CI agents in NYFO told us that the databases containing security clearance information
were located at FBI Headquarters.  When a subject possesses a security clearance, the FBI opens an
espionage investigation; if the subject does not possess a security clearance, the FBI typically opens a
counterintelligence investigation.

the file and what was known at that time, the NYFO Carter Page investigation was not a SIM.

Although Carter Page was announced as a foreign policy advisor for the Trump campaign prior to NYFO receiving this guidance from FBI Headquarters, the NYFO CI Supervisor and CI Agent both told the OIG that this announcement did not influence their decision to open a case on Page and that their concerns about Page, particularly his disclosure to the Russians about his role in the indictment, pre-dated the announcement. However, the NYFO CI Supervisor said that the announcement required noting his new position in the case file should his new position require he obtain a security clearance.

On April 6, 2016, NYFO opened a counterintelligence ▮▮▮▮▮ investigation on Carter Page under a code name the FBI assigned to him (NYFO investigation) based on his contacts with Russian intelligence officers and his statement to Russian officials that he was "Male-1" in the SDNY indictment. Based on our review of documents in the NYFO case file, as well as our interview of the NYFO CI Agent, there was limited investigative activity in the NYFO investigation between April 6 and the Crossfire Hurricane team's opening of its investigation of Page on August 10. The NYFO CI Agent told the OIG that the steps she took in the first few months of the case were to observe whether any other intelligence officers contacted Page and to prepare national security letters seeking Carter Page's cell phone number(s) and residence information. The NYFO CI agent said that she did not use any CHSs to target Page during the NYFO investigation. The NYFO investigation was transferred to the Crossfire Hurricane team on August 10 and became part of the Crossfire Hurricane investigation.

## III.   Organization and Oversight of the Crossfire Hurricane Investigation

The FBI conducted and oversaw the Crossfire Hurricane investigation from July 31, 2016, to May 17, 2017, at which time it was transferred to the Special Counsel's Office. Over that 10-month period, three different teams of agents and analysts were assigned to the case: the first team worked out of FBI Headquarters from the opening of the case through December 2016; the second team worked out of three FBI field offices and FBI Headquarters from approximately January 2017 through April 2017; and the third team worked, like the second team, out of the three FBI field offices and FBI Headquarters from April 2017 to May 17, 2017. In this section, we describe the organization and staffing of the three investigative teams and the FBI's reasons for making changes as to how the investigation was organized. We also describe the role played by FBI and Department senior leadership in the investigation.

## A.    FBI Staffing of the Crossfire Hurricane Investigation

### 1.    The Management and Structure of the Crossfire Hurricane Team

Witnesses told us that because of the sensitivity of the investigation, CD officials originally decided to conduct the investigation out of FBI Headquarters, under the program management of Operational Branch I, Section CD-4, rather than out of one or more field offices, which is more typical.  The original team consisted of intelligence analysts, special agents, and SSAs from multiple field offices who were assigned to Headquarters for 90-day temporary duty assignments (TDYs).  CD assigned the original team to the same office space at Headquarters, with both agents and analysts working together in close proximity.  Agents and analysts on the Crossfire Hurricane team told the OIG that the decision to conduct the investigation out of FBI Headquarters instead of a field office presented multiple challenges, such as difficulties in obtaining needed investigative resources, including surveillance teams, electronic evidence storage, technically trained agents, and other investigative assets standard in field offices to support investigations.  We were told that these were known risks consciously taken by CD officials, including Priestap, in order to minimize the potential for unauthorized public disclosure of the investigation and allow for better coordination with Headquarters and interagency partners.

Priestap told us that although he was ultimately responsible for the investigation, Strzok and the Intel Section Chief managed Crossfire Hurricane. Following the opening of the case, the team held meetings three times a week to discuss and determine the next investigative and analytical steps.  The agents and analysts told us that the investigative and analytical decisions for the investigation were made at these meetings by the agents and analysts and then presented to the supervisors.  Priestap said that while Strzok managed the operational side of Crossfire Hurricane, Priestap also sought the opinions of the Intel Section Chief and the OGC Unit Chief on operational decisions.  Priestap also told us that he originally wanted to assign the investigation to a Deputy Assistant Director (DAD) other than Strzok because, although he had confidence in Strzok's counterintelligence capabilities, he had concerns about Strzok's personal relationship with Lisa Page affecting the Crossfire Hurricane team.  According to Priestap, he told Steinbach about his concerns and Steinbach was supportive of his decision to remove Strzok from the team, but his decision was overruled by McCabe.  Steinbach told us that he had concerns about Strzok and Lisa Page working together because he was aware of instances where they bypassed the chain of command to advise McCabe about case related information that had not been provided to Priestap or Steinbach. Priestap and Steinbach said they did not know why McCabe kept Strzok assigned to the investigation.  Strzok told the OIG he did not ask McCabe to keep him on the investigation and does not know whether Lisa Page requested Strzok remain on the investigation in conversations with McCabe.  We found no evidence that Page made any such request of McCabe.

McCabe told us that he recalled separate conversations with Steinbach and Priestap about Strzok's work on Crossfire Hurricane, but he said that in neither

conversation did he (McCabe) overrule a decision by Priestap to remove Strzok from the case. According to McCabe, Steinbach said that he wanted to remove Strzok from his role on Crossfire Hurricane after Strzok became DAD (in September 2016) so that Strzok could have a "traditional DAD experience," rather than spending too much attention on a single, major sensitive case. McCabe told us that he did not disagree with Steinbach, and he saw it as a decision for Steinbach and Priestap to make on their own. McCabe said that in a separate conversation with Priestap, Priestap raised a concern about Strzok and Page, but that it was not about any personal relationship between the two, which McCabe said he did not know about at the time. According to McCabe, Priestap expressed frustration about the amount of time Page and Strzok were spending together talking about casework and that it was interfering with Strzok's ability to carry out his other responsibilities. McCabe told us that he did not recall Priestap requesting that Strzok be removed from the case because of this concern, but McCabe said that he talked to Page about reducing the amount of time she was interacting with Strzok.

Over a dozen agents, analysts, and one Staff Operations Specialist (SOS) were originally assigned on a full-time basis to the Crossfire Hurricane team. Only one of the team members on Crossfire Hurricane, Case Agent 3, had previously been assigned to the team that conducted the investigation, known as "Midyear Exam" or "Midyear," of Secretary of State Hillary Clinton's use of personal email for official purposes. However, the supervisory chain of DAD Strzok, the Intel Section Chief, AD Priestap, EAD Steinbach, Deputy Director McCabe, and Director Comey was the same for the Midyear and Crossfire Hurricane investigations. EAD Steinbach retired in February 2017 and was succeeded by Carl Ghattas. The Crossfire Hurricane team members were selected by Strzok, the Intel Section Chief, and SSA 1. The agents reported to SSA 1 and the analysts reported to the Supervisory Intel Analyst. SSA 1 reported operational activities to Strzok. The Supervisory Intel Analyst reported analytical findings to the Intel Section Chief. In addition, an OGC line attorney (OGC Attorney) was supervised by the OGC Unit Chief and provided legal support to the team.[184] The OGC Unit Chief reported to Anderson, who reported to Baker.

Case Agent 1 and the SOS were the original Crossfire Hurricane team members who had primary responsibility over the Carter Page investigation. They were joined by Case Agent 3 and Case Agent 4 who worked on the Papadopoulos and Manafort investigations, respectively.

Following the November 2016 U.S. elections, the 90-day TDY assignments ended for the agents and analysts on the original investigative team, and many of the team members, including SSA 1, returned to their field offices. In addition, in January 2017, CD reorganized the structure of the Crossfire Hurricane investigation by transferring the day-to-day operations of the four individual investigations to three field offices, and dividing oversight of the investigations between two operational branches at FBI Headquarters—Operations Branch I and Operations Branch II. According to Priestap, he transferred the cases to the field offices

---

[184] Both of these attorneys were also assigned to the Midyear team to provide legal support.

because of the need to conduct investigative activities in cities where the subjects of the investigations were located and to do so efficiently. Priestap told us that he also wanted to incorporate Operations Branch II into the program management of some of the Crossfire Hurricane cases for its expertise on RIS.

With respect to the four individual investigations, CD transferred the Carter Page investigation to NYFO, and it remained assigned to Case Agent 1, who returned to that office following his 90-day TDY. DAD Jennifer Boone and SSA 3 of Operations Branch II at FBI Headquarters assumed program management responsibilities over the case. The Papadopoulos investigation was transferred to the Chicago Field Office and assigned to Case Agent 3. The Flynn investigation was transferred to the Washington Field Office (WFO) and assigned to Case Agent 4. Strzok and SSA 2 of Operations Branch I retained program management responsibilities over both of these investigations. The Manafort investigation was transferred to a white collar criminal squad at WFO.[185]

The Supervisory Intel Analyst told us that the shifting makeup of the teams and the changing leadership created a divide between the analysts and the agents, which resulted in less interaction between the two groups. In April 2017, CD again reorganized the Crossfire Hurricane investigation by restructuring the day-to-day operations of the cases at FBI Headquarters to recentralize the case. Officials told us that the investigation had become too decentralized and that the reason to restructure the investigation at Headquarters was to impose greater structure on the team's investigative and analytical efforts. In addition, in March 2017, Comey notified Congress about the existence of the Crossfire Hurricane investigation. Witnesses told us that this created a need for a more cohesive effort by the Crossfire Hurricane team to keep Priestap regularly informed of case activities so that he was better able to respond to Congressional inquiries.

At the end of this chapter, Figure 3.1 illustrates the FBI chain of command for the Crossfire Hurricane investigation from the opening of the case on July 31, 2016 through December 2016. Figure 3.2 illustrates the chain of command from January 2017 through April 2017, and Figure 3.3 from April 2017 until the cases were transferred to the Special Counsel's Office on May 17, 2017.

### 2.    The Role of Peter Strzok and Lisa Page in Crossfire Hurricane and Relevant Text Messages

In the OIG's June 2018 *Review of Various Actions in Advance of the 2016 Election*, we described text messages between Strzok and Lisa Page expressing statements of hostility toward then candidate Trump and statements of support for then candidate Clinton, and several text messages that appeared to mix political opinions with discussions of the investigation into candidate Clinton's email use and references to the Crossfire Hurricane investigation. One such exchange occurred on July 31, 2016, the date of the opening of the Crossfire Hurricane investigation,

---

[185] As described further in Chapter Nine, in January 2016, the FBI initiated a money laundering and tax evasion investigation of Manafort predicated on his activities as a political consultant to members of the Ukrainian government and Ukrainian politicians.

when Strzok texted Page: "And damn this feels momentous. Because this matters.
The other one did, too, but that was to ensure we didn't F something up. This
matters because this MATTERS. So super glad to be on this voyage with you."
(Emphasis in original).

The following week, in an exchange on August 6, 2016, Lisa Page forwarded
to Strzok a news article relating to Trump's criticism of a Gold Star family who
appeared at the Democratic National Convention. The text message stated, in part,
"And Trump should go f himself." Strzok responded favorably to the article and
added, "And F Trump." Page replied, "So. This is not to take away from the
unfairness of it all, but we are both deeply fortunate people." She then forwarded
another news article and texted, "And maybe you're meant to stay where you are
because you're meant to protect the country from that menace." Strzok
responded, "Thanks. It's absolutely true that we're both very fortunate. And of
course I'll try and approach it that way. I just know it will be tough at times. I can
protect our country at many levels, not sure if that helps...."

Two days later, on August 8, 2016, Lisa Page texted Strzok, "[Trump's] not
ever going to become president, right? Right?!" and Strzok replied, "No. No he's
not. We'll stop it." In Chapter Twelve of the OIG's June 2018 *Review of Various
Actions in Advance of the 2016 Election*, we detail additional text messages by
Strzok and Page and the explanations that they provided to the OIG for these and
the other text messages and our findings regarding them. *See*
https://www.justice.gov/file/1071991/download.

In that review, we found that Strzok led the Midyear investigation shortly
after its opening through its conclusion, and that he was deeply and actively
involved in investigative decision making throughout the course of that
investigation. We further found that Lisa Page served as a liaison between the
investigative team and McCabe, and that she also regularly participated in team
meetings and in investigative decision making.

As part of this review, in order to determine whether there was any bias in
the investigative activities for Crossfire Hurricane that we reviewed, we asked
agents and analysts assigned to the case about the roles Strzok and Page played in
the Crossfire Hurricane investigation and their level of involvement in decision
making. With respect to Strzok, these witnesses told us that while he approved the
team's investigative decisions during the time he was in the supervisory chain of
command for the investigation, he did not unilaterally make any decisions or
override any proposed investigative steps. Priestap, in addition to telling us that it
was his (Priestap's) decision to initiate the investigation, told us that to his
knowledge, Strzok was not the primary or sole decision maker on any investigative
step in Crossfire Hurricane. Further, as described above, in January 2017, the
Crossfire Hurricane cases were divided between two operational branches within
CD, and Strzok no longer supervised the Carter Page investigation, which was
transferred to Operations Branch II, CD-1, under the supervision of then DAD
Boone. In this report, we describe those occasions when Strzok was involved in
investigative decisions.

With respect to Lisa Page, witnesses told us that she did not work with the team on a regular basis or make any decisions that impacted the investigation. Priestap told us that Lisa Page was "not in charge of anything" and that he never witnessed her attempt to steer the investigation or dictate investigative actions. Baker said that Lisa Page attended high-level meetings and knew the facts of the case, but was not in a "decision making position" and had no "decision making authority." Lisa Page told us that she did not have a formal role in the Crossfire Hurricane investigation but may have participated in team meetings to keep McCabe aware of the status of the investigation. McCabe also told us that she was the "facilitation point" between CD and his office during the investigation. As with Strzok, when we learned in this review of Lisa Page's presence at meetings or involvement in any investigative activity, we include that information in this report.

### B.    The Role of Senior FBI and Department Leadership in the Crossfire Hurricane Investigation

As part of our review, we examined the role that senior FBI and Department leaders played in Crossfire Hurricane, as well as their knowledge of critical events in the case, including its opening, the use of CHSs to gather information, and the decision to seek authority to conduct electronic surveillance. Throughout the chapters of this report, we highlight and describe this involvement and knowledge, where relevant. In this section, we summarize the role of FBI leadership and Department officials in the early stages of the investigation until May 2017 when the Papadopoulos, Carter Page, Manafort, and Flynn cases were transferred to the Special Counsel's Office.

### 1.    FBI Leadership

We learned that CD officials briefed the Crossfire Hurricane investigation to FBI senior leadership throughout the investigation. Comey told the OIG that the FBI had "hundreds of thousands" of counterintelligence cases opened while he was Director, and he would not be involved in a counterintelligence case unless the chain of command made a judgment call about whether the nature of the case required the Director's involvement. He said the decision to brief the Director was based on several things, including whether the case required engagement with Department leadership or whether it was of interest to Congress. Comey said his level of involvement in Crossfire Hurricane was similar to some cases and dissimilar to others. He said:

> I would put [cases in] three buckets. One, cases they'd never tell me about because of a judgment by the leadership chain that it wasn't for the Director to know. Cases that I would be told about, simply to be aware of. And then cases, the third category would be cases that I was told about and, in some detail, and kept informed of as the investigation went on. Crossfire Hurricane was in that third bucket.

According to records reviewed by the OIG, Comey received his first, formal briefing on August 15, 2016, though, as described previously, McCabe's contemporaneous notes suggest Comey may have been told about the FFG

information on July 29. Comey told us that he was updated on the status of the investigation every 2 to 4 weeks. These status updates were provided at the end of his regularly scheduled morning national security briefings conducted by, among others, McCabe, Steinbach, Priestap, and Strzok. According to Comey, these briefings did not typically include discussions about investigative strategy, but he was often briefed on specific investigative actions the Crossfire Hurricane team had taken or planned to take. Comey said that he did not recall playing a role in making any significant investigative decisions and did not have any concerns or disagreements with the investigative actions described by senior CD officials during briefings.

Comey told us that he recalled a discussion with the briefers about taking precautions to keep the case close-hold. Comey said he was mindful that the investigation involved a political campaign, and he advised the team to keep in mind that, "[although] it's smoke that we see, we don't know whether there's fire there." McCabe also told us the FBI wanted "to keep our inquiry as quiet as we could." He said that it was important to keep the investigation covert to avoid alerting the subjects of the investigation or others, and, specifically in this case, it was important due to the pending election.

McCabe told us he received regular briefings on the progress of Crossfire Hurricane and discussed the investigation with Comey at regular briefings. Strzok told us the team briefed McCabe approximately 5-10 times during the investigation, and the OGC Unit Chief told us McCabe was briefed every few weeks until the election in November and less frequently thereafter. According to both Strzok and the OGC Unit Chief, these briefings provided updates on the team's investigative activities and typically were not discussions about what steps to take. The OGC Unit Chief also said that McCabe directed the team to "get to the bottom of this as quickly as possible, but with a light footprint."

Priestap told us that Strzok, the Intel Section Chief, and the OGC Unit Chief frequently briefed him on the investigation and kept him apprised of significant developments. In addition to approving the opening of the Crossfire Hurricane cases, Priestap told us that he was involved in discussions as to whether to seek authority under FISA to conduct electronic surveillance ▮▮▮▮▮▮▮▮▮▮ targeting Carter Page, a subject we describe in detail in Chapter Five. Priestap said he briefed Steinbach nearly every day on the case and provided Comey or McCabe with updates on an as-needed basis.

### 2. Department of Justice

### a. National Security Division

The Department was first notified about the opening of Crossfire Hurricane on August 2, 2016, when Priestap and the Intel Section Chief briefed several representatives from NSD, including Deputy Assistant Attorney General (Deputy AAG) George Toscas, Deputy AAG Adam Hickey, and David Laufman, who as

described previously was the CES Section Chief.[186]  According to Laufman and his contemporaneous notes of the briefing, FBI officials described the FFG information and the four individuals the FBI had identified through its initial investigative work who were members of the campaign and had ties to Russia.  Laufman told us that his impression was that the information from the FFG had "raised obvious alarm bells in the FBI" and he said the information "resonated" with him.  He also said that the information the FBI provided at the briefing presented the question of whether someone in the Russian government was working with the campaign of a major party candidate to influence the U.S. elections.  Laufman told us that "we certainly understood the significance of the matter and the need for further investigation" and that it would have been "a dereliction of duty and responsibility of the highest order not to commit the appropriate resources as urgently as possible to run these facts to the ground, and find out what was going on."

After this initial briefing, Toscas contacted Deputy AAG Stuart Evans who oversaw NSD's Office of Intelligence (OI), which prepares and files FISA applications.  Evans told us that he met with Toscas, Hickey, and FBI representatives on or about August 11, 2016, concerning the opening of Crossfire Hurricane.  Evans said he believed the FBI described the information from the FFG that led to the opening of the case and the FBI's preliminary assessment that led the team to focus on the four individuals associated with the Trump campaign.  He said the basis for the investigation did not strike him as "thin" at the time of this briefing or in retrospect, and the steps the FBI had taken up to that point were not dissimilar to how he had seen the FBI handle other counterintelligence cases involving insider threat information reported by a credible source.  Evans told the OIG that he did not recall anyone raising the issue of seeking FISA authority targeting Carter Page at this August briefing.

Following these initial briefings, the FBI invited NSD to attend weekly meetings with the Crossfire Hurricane team.  According to Evans, he and Toscas attended some of the meetings, as did representatives from CES, including Laufman, and OI.  Laufman's notes reflect that Hickey attended some of the meetings as well.  According to Evans, CES and OI maintained "loose involvement and knowledge" of the status of the investigation in case the FBI requested assistance from CES on criminal legal process or from OI on a FISA application.  However, Evans told us that his reaction to these meetings was that the investigation seemed "pretty slow moving," with not much changing week-to-week in terms of the updates the FBI was providing to NSD.

According to Laufman and his deputy, the FBI did not ask CES to assist with criminal legal process at any time before the 2016 U.S. elections.  In December 2016, the FBI briefed NSD officials on the status of the Crossfire Hurricane cases, and, according to Laufman's notes, advised NSD of CD's reorganization of the investigation.  According to his notes, the FBI decided that it would be establishing a new unit or team to focus on Russian influence activities and that none of the

---

[186]  Lisa Page was the other FBI representative who attended this briefing.  As described earlier, Strzok was meeting with the FFG officials about their conversations with Papadopoulos on this date.

Crossfire cases had been closed "so far." Laufman told us that he advised the FBI that CES wanted to be in a position to provide input should the FBI decide to close any of the Crossfire Hurricane cases, just to be sure the FBI had exhausted all investigative steps, but he did not recall this ever arising.

Mary McCord was NSD's Principal Deputy AAG when Crossfire Hurricane was opened. She told us that she received a comprehensive briefing from the FBI on the investigation in January 2017, by which time she was the Acting AAG of NSD.[187] She said that prior to that time, she was involved in certain aspects of the investigation through OI's assistance with the first Carter Page FISA application in September and October 2016, as well as through meetings she attended in November and December 2016 about aspects of the Manafort and Flynn cases. She said that she neither attended nor received long debriefs about the weekly Crossfire Hurricane meetings attended by other NSD officials before the election. According to McCord, as a general matter, it was typical for Department attorneys not to become directly involved in a counterintelligence investigation until the case required legal guidance or legal process.

According to McCord, by January 2017, developments in some of the cases, particularly the Flynn and Manafort cases, led to the need for a comprehensive briefing for Department officials on the different cases the FBI was pursuing, as well as for the greater involvement of prosecutors moving forward. In late February 2017, Laufman assigned a CES trial attorney (CES Trial Attorney) to assist the FBI's Crossfire Hurricane team by providing legal guidance as needed on any of the cases. Laufman told us, and his notes reflect, that CES did not receive regular briefings on the investigation from the FBI between December 2016 and March 2017.[188] As we described earlier in this chapter, during this period of time, the Crossfire Hurricane investigation was decentralized, with the individual cases being handled by three different FBI field offices. Witnesses from NYFO who worked on the Carter Page investigation told us that as a result of this, there were no regular team meetings with officials at FBI Headquarters.

### b.    Office of the Deputy Attorney General

Sally Yates was the Deputy Attorney General (DAG) when Crossfire Hurricane was opened on July 31, 2016. Yates told the OIG that she did not specifically recall receiving a formal briefing from the FBI in the summer of 2016 about the case, or at any time before she left the Department on January 30, 2017, though she left open the possibility that such a briefing could have occurred. According to Yates, her office was typically less involved in counterintelligence investigations than criminal investigations.[189] Yates said that although she and others in the Office of

---

[187] McCord became the acting AAG in mid-October 2016 and continued in both roles until Dana Boente became the Acting AAG for NSD in April 2017.

[188] Laufman did not attend the meetings in January, February, and March 2017 that were attended by Boente, McCord, and other senior Department officials.

[189] Matthew Axelrod, then Principal Assistant Deputy Attorney General, told us that ODAG had less involvement in counterintelligence investigations than criminal investigations because most

the Deputy Attorney General (ODAG) attended Monday, Wednesday, and Friday morning threat intelligence briefings with the FBI Director on national security issues, typically those briefings focused on matters involving imminent national security threats and criminal cases. According to Yates, the primary counterintelligence issue for ODAG in the summer of 2016 was the broader issue of Russian interference in the elections and the possible infiltration of voting machines.

Yates told us that she did recall that following one of the morning threat intelligence briefings, Comey pulled her aside to discuss the FFG information the FBI had received regarding Papadopoulos. Yates did not recall specifically when this conversation took place, except that it was some time before she received the first Carter Page FISA application for approval.[190]   Yates told us that she did not recall the specific details Comey provided, but did recall that they discussed why the FFG had not notified U.S. officials sooner.  She said she recalled learning during that conversation that the FFG did not determine the significance of the information about Papadopoulos until the WikiLeaks release of DNC emails in July 2016.  She also said that she did not recall whether Comey told her the FBI had opened an investigation in response to the FFG information.  However, she said that an investigation "would be the natural consequence of that," and "[i]t would be strange not to" open an investigation given that what Papadopoulos said in May 2016 would happen, *i.e.*, the release of information damaging to then candidate Clinton, did, in fact, happen in July 2016.

We asked Comey and McCabe about any discussions they had with Yates about the FFG information.  Comey told us that he did not recall providing any briefing to Yates, but that the topic was likely discussed at one of the threat intelligence briefings.  Comey also told us that the FBI generally tried to keep Department leadership informed about all significant activities to include important public corruption or espionage cases concerning Russian efforts to interfere with the 2016 U.S. elections. McCabe told us that he did not recall briefing Crossfire Hurricane to Yates; however, his contemporaneous notes of a regularly scheduled meeting with the DAG on August 10 reflect that Yates was briefed on the FFG information at that time. According to McCabe, the FBI did not provide regular briefings to Yates on Crossfire Hurricane after this meeting, but the FBI provided updates on developments in the investigation to ODAG following the Attorney General's morning briefings, which Yates typically attended.

Yates told us that she did not recall specific discussions about any of the Crossfire Hurricane cases after her initial conversation with Comey, though she said she was confident that such discussions took place and thought that Tashina Gauhar, the Associate Deputy Attorney General responsible for ODAG's national security portfolio, likely had such discussions with NSD or the FBI.  Yates did recall

---

counterintelligence investigations do not lead to prosecution and can last for years while agents gather intelligence.

    [190] As described in Chapter Five, ODAG received the first FISA application on or about October 14, 2016.

having a conversation with McCabe regarding the ongoing money laundering investigation of Manafort (described in more detail in Chapter Nine) and about not taking any overt investigative steps before the election. She told us that even though Manafort was no longer chair of the Trump campaign at the time of this conversation, she and McCabe agreed that they did not want to do anything that could potentially impact candidate Trump. She said she did not recall having a similar conversation with McCabe or Comey about the Crossfire Hurricane cases and thought that this was because, to her knowledge, the FBI was not contemplating any overt steps in those cases before the election.

Gauhar told the OIG that she was sure she attended discussions about the Crossfire Hurricane cases, likely during regularly scheduled meetings ODAG held with NSD officials, or possibly during the regularly scheduled morning threat intelligence briefings, but she did not recall any discussions specifically. According to Gauhar, discussions she attended before the election about Russia tended to focus on the broader topic of what Russia was trying to do to influence the upcoming election. She said she did not recall the Crossfire Hurricane cases being an ongoing topic of conversation from her vantage point, until issues came up in the Flynn case in early January 2017. Gauhar also told us that she learned more about the individual Crossfire Hurricane cases and the investigation after Boente requested regular briefings in February 2017.

On January 30, 2017, Boente became the Acting Attorney General after Yates was removed, and ten days later became the Acting DAG after Jefferson Sessions was confirmed and sworn in as Attorney General. Boente simultaneously served as the Acting Attorney General on the FBI's Russia related investigations after Sessions recused himself from overseeing matters "arising from the campaigns for President of the United States." Boente told the OIG that after reading the January 2017 Intelligence Community Assessment (ICA) report on Russia's election influence efforts (described in Chapter Six), he requested a briefing on Crossfire Hurricane. That briefing took place on February 16, and Boente said that he sought regular briefings on the case thereafter because he believed that it was extraordinarily important to the Department and its reputation that the allegations of Russian interference in the 2016 U.S. elections were investigated. Boente told us that he also was concerned that the investigation lacked cohesion because the individual Crossfire Hurricane cases had been assigned to multiple field offices. In addition, he said that he had the impression that the investigation had not been moving with a sense of urgency—an impression that was based, at least in part, on "not a lot" of criminal legal process being used. To gain more visibility into Crossfire Hurricane, improve coordination, and speed up the investigation, Boente directed ODAG staff to attend weekly or bi-weekly meetings with NSD for Crossfire Hurricane case updates.

Boente's calendar entries and handwritten notes reflect multiple briefings in March and April 2017. Boente's handwritten notes of the March meetings reflect that he was briefed on the predication for opening Crossfire Hurricane, the four individual cases, and the status of certain aspects of the Flynn case. Boente told us that when he was briefed on the predication for the investigation, he did not question it and did not have any concerns about the decision to open Crossfire

Hurricane. Boente's handwritten notes of the meetings focused on the Flynn investigation and potential criminal violations of the Logan Act, the FBI's efforts to corroborate information contained in the source reporting that we describe in Chapters Four and Six, and the FBI's investigative efforts in the Carter Page and Manafort cases.[191] According to Boente's handwritten notes, he was last briefed on Crossfire Hurricane the day after Rod Rosenstein was sworn in as DAG on April 26, 2017.

Rosenstein told us that he recalled being briefed three times during his initial two weeks as DAG on aspects of the investigation and Russian efforts to influence the 2016 U.S. elections. The first briefing occurred within a day or two of being sworn in and was provided by Boente and then Principal Associate Deputy Attorney General James Crowell. That briefing was followed by a meeting with Comey, McCord, and several others from the FBI and NSD. Rosenstein said he also received a briefing from representatives of the USIC that included an overview of Russian interference with the U.S. elections.

Rosenstein told us that during the initial Department briefings he was most focused on information that had developed into criminal investigations, which he believed were going to be more immediately relevant to his work as DAG. Rosenstein said he did not recall the details provided during the briefings regarding Carter Page other than Page was suspected of being a foreign agent. Rosenstein said he also did not recall the details of what was explained to him about the predication for opening the Crossfire Hurricane investigation.[192] He said he would have been focused on the status and direction of the cases at the time of the briefings, and not as much on any historical information concerning their initiation.

In Chapters Five and Seven, we describe ODAG's role in the four Carter Page FISA applications. As described in Chapter Seven, Yates approved the first Carter Page FISA application on October ▉, 2016 and FISA Renewal Application No. 1 on January ▉, 2017, Boente approved FISA Renewal Application No. 2 on April ▉, 2017, and Rosenstein approved the FISA Renewal Application No. 3 on June ▉, 2017.

### c.    Office of the Attorney General

Loretta Lynch was sworn in as Attorney General on April 27, 2015. Lynch told the OIG that she did not recall receiving a briefing on the Crossfire Hurricane investigation. Lynch's National Security Counselor told us that she did not receive any briefing on the case and did not know if Lynch received a briefing. Lynch said

---

[191] The Logan Act, Title 18 U.S.C. § 953, makes it a crime for a citizen to confer with foreign governments against the interest of the United States. Specifically, it prohibits citizens from negotiating with other nations on behalf of the United States without authorization.

[192] Rosenstein told us that at some later point—most likely in 2018—FBI officials represented to him that the basis for opening Crossfire Hurricane was the FFG information concerning Papadopoulos, and nothing else. He told us that he did not receive any information from the FBI indicating otherwise. He also told us that he did not have an opinion about whether the FFG information provided a sufficient basis to open the case.

she did not recall providing any guidance or direction to the FBI on the investigation, or having any awareness of the Carter Page FISA applications before she left the Department on January 20, 2017. She told us that her office generally did not oversee counterintelligence investigations, but that sometimes counterintelligence issues were raised during morning threat intelligence briefings. She said that she remembered knowing that Papadopoulos was a concern for the FBI, but she did not recall learning the specific information that came from the FFG relating to him.

Office of the Attorney General (OAG) officials told us that they did not read the Carter Page FISA applications or provide any feedback to OI, but email communications reflect that they were aware the FBI was seeking FISA authority targeting Carter Page before the first application was filed. These officials included Lynch's Chief of Staff and her National Security Counselor. The Chief of Staff told us she had no recollection of the email that referenced the FISA application. The National Security Counselor told us that she believed she would have advised the Attorney General of the application, but she did not have any specific recollection of having done so.

Lynch told the OIG that after one of her weekly security meetings at FBI Headquarters in the spring of 2016, Comey and McCabe pulled her aside and provided information about Carter Page, which Lynch believed they learned from another member of the Intelligence Community. According to Lynch, Comey and McCabe provided her with information indicating that Russian intelligence reportedly planned to use Page for information and to develop other contacts in the United States, and that they were interested in his affiliation with the campaign. Lynch told us that her understanding was that this information from Comey and McCabe was "preliminary" in that they did not state that any decisions or actions needed to be taken that day. She said that they discussed the possibility of providing a defensive briefing to the Trump campaign, but she believed it was "preliminary" and "something that might happen down the road." According to Lynch, she did not recall receiving any further updates on this issue following this conversation. Lynch's recollection of what Comey and McCabe told her is consistent with information referenced in connection with the 2015 SDNY indictment and subsequent conviction of a Russian intelligence officer referenced earlier in this chapter.

Comey told the OIG that he did not recall having such a conversation with Lynch, and that he did not think it was possible for such conversation to have occurred in the spring of 2016 because the FBI did not receive the FFG information concerning Papadopoulos until late July (as we described earlier in this chapter). He also said that he did not recall himself having any knowledge of Carter Page's existence until the middle of 2016.[193] Similarly, McCabe told us that he did not

---

[193] The OIG was unable to question Comey further using classified details Lynch described to us because, as noted in Chapter One, Comey chose not to have his security clearances reinstated for our interview. Internal email communications reflect that in April 2016 NYFO prepared summaries of the information that ultimately led NYFO to open a counterintelligence investigation on Carter Page on

recall having any knowledge of Carter Page at this time.  He told us he had no recollection of briefing Lynch in the spring of 2016 about Carter Page and did not know Carter Page was the subject of an open investigation in NYFO.

### 3.    White House Briefings

Lynch told us that in her interactions with the White House in 2016, she did not recall substantive discussions about the Crossfire Hurricane investigations but did recall discussions about the broader topic of Russian interference in the 2016 U.S. elections.  Lynch said that the FBI, and not the Attorney General, would brief the White House on the investigation if the FBI was able to share information it received, but she did not recall that occurring.  Yates also told us she did not attend any White House briefings where Crossfire Hurricane or the Carter Page FISA application was briefed or discussed, and she had no knowledge of whether any such meetings occurred.

Priestap told the OIG that the FBI does not routinely brief ongoing cases to the White House with the exception of mass shootings, major terrorist attacks, or intelligence that suggests an imminent attack on the United States.  Priestap said that due to certain national security considerations, information from ongoing investigations may also need to be briefed to the White House by the Director.

Comey told us that he received no requests from the White House to investigate members of the Trump campaign or inquiries about whether the campaign was involved with the efforts by the Russians to interfere in the 2016 U.S. elections.  Comey said that he recalled generally the administration's interest in what the FBI was doing as a member of the USIC to understand and defeat Russia's efforts to interfere with the elections.  In fact, according to Strzok, the White House requested a briefing from the USIC in the fall of 2016 about actions the Russians were taking to interfere in the elections.  On September 2, 2016, Lisa Page and Strzok exchanged the following text:

9:41 a.m., Strzok to Lisa Page:  "Checkout my 9:30 mtg on the 7th"

9:42 a.m., Lisa Page to Strzok:  "I can tell you why you're having that meeting."

9:42 a.m., Lisa Page to Strzok:  "It's not what you think."

9:49 a.m., Strzok to Lisa Page:  "TPs [Talking Points] for D [Director]?"

9:50 a.m., Lisa Page to Strzok:  "Yes bc POTUS wants to know everything we are doing."

Strzok told us that these texts referred to the request by the White House to know everything the USIC knew about what Russia was doing to interfere in the 2016 U.S. elections and did not refer to the Crossfire Hurricane cases investigating

---

April 6, 2016 (described previously), and provided them to CD officials at Headquarters to be used for a "Director's note" and a separate "Director's Brief" to be held on April 27, 2016.

U.S. subjects.  Strzok told us that he never attended any White House briefings about Crossfire Hurricane.

McCabe's notes from a morning meeting with Comey and others in late July 2016 reflect that McCabe learned from Comey during the meeting that another U.S. government agency had briefed President Obama on intelligence that agency had suggesting that a RIS was engaged in covert actions to influence the U.S. presidential election in favor of Trump.  McCabe told us he did not attend this White House briefing; however, based on his notes, he said he did not believe the FFG information would have been discussed during this meeting, and our review of his notes did not indicate otherwise.  According to McCabe's notes of what he had been told by Comey, President Obama stated that the FBI should think about doing "defensive briefs."  The notes do not provide any further details about what Obama said regarding defensive briefings, and McCabe told us he did not recall that any further details were provided to him.  However, McCabe said he surmised from his notes that the briefings under discussion were to be given to the Trump campaign.  As more fully described in Chapter Ten, the FBI participated in ODNI strategic intelligence briefings that were provided to members of both the Trump campaign and the Clinton campaign, including the candidates, in August and September 2016.  However, those were not defensive briefings and did not address the allegations contained in the FFG information.

When we asked Comey about meetings with the White House concerning Crossfire Hurricane, he said that although he did not brief the White House about the investigation, he did mention to President Obama and others at a meeting in the Situation Room that the FBI was trying to determine whether any U.S. person had worked with the Russians in their efforts to interfere in the 2016 U.S. election.[194]  Comey said he thought it was important that the President know the nature of the FBI's efforts without providing any specifics.  Comey said although he did not recall exactly what he said, he may have said there were four individuals with "some association or connection to the Trump campaign."  Comey stated that after he provided this information, no one at the meeting responded or followed up with any questions.  Comey did not recall specifically when this meeting took place, but believed it may have been in August 2016.  We were unable to determine whether this meeting was part of the same meeting reflected in McCabe's notes discussed above.

## IV.   Investigative Steps in Crossfire Hurricane Prior to Receipt of Christopher Steele Reporting on September 19

According to FBI officials, the early investigative steps taken in Crossfire Hurricane were structured to maintain a close-hold on the investigation and avoid any impact on the 2016 U.S. elections.  FBI officials told us that no steps were

---

[194]  Comey told us that this meeting was attended by then Chief of Staff Dennis McDonough, then National Security Advisor Susan Rice, then Director of National Intelligence (DNI) James Clapper, then CIA Director John Brennan, and then Director of the National Security Agency Michael Rogers.

taken to investigate anyone associated with the Trump campaign prior to the opening of Crossfire Hurricane on July 31.[195]  Department officials including Rosenstein, Evans, Laufman, and Gauhar said they did not learn anything at any time suggesting otherwise.  We reviewed emails of senior CD officials from the 2 months prior to the opening of Crossfire Hurricane and did not find any communications suggesting any investigative actions relating to Trump campaign personnel were taken prior to July 31, 2016, with the exception of the pre-existing Page and Manafort cases discussed previously.

Anderson told us that the investigation began on July 31 with covert investigative techniques to be "very quiet" prior to the election.  We were told that the team's concern was that if the information about the investigation became public, it would disrupt the investigative efforts and could potentially impact the 2016 U.S. elections.  Anderson also told us that counterintelligence investigations are typically "conducted in the dark" because any public confirmation of the existence of the investigation "might alert the hostile foreign power...that we were onto them."  She also said that early on in the investigation, FBI managers overseeing the Crossfire Hurricane team "took off the table any idea of legal process" in conducting the investigation, because the FBI was "trying to move very quietly."  The FBI did not use national security letters or compulsory process prior to obtaining the first FISA orders.

At the outset of the investigation, as described earlier in this chapter, Strzok and SSA 1 traveled to verify the FFG information while analysts conducted open source and database research on the Crossfire Hurricane subjects and monitored their travel.  Analysts also developed profiles on each of the four subjects and reviewed FBI files for information and to identify potential FBI CHSs with useful contacts for the investigation.[196]  Additionally, almost immediately after opening the Page, Papadopoulos, and Manafort investigations on August 10, the case agent assigned to the Carter Page investigation, Case Agent 1, contacted OGC about the possibility of seeking FISA authority for Carter Page.  As we discuss in Chapter Five, FBI documents indicate that by late August, Case Agent 1 had been told that he had not yet presented enough information to support a FISA application targeting Carter Page.

The FBI also sent names of individuals associated with the Trump campaign to other U.S. government agencies and a foreign intelligence agency and requested any information about those individuals.  McCabe said that requesting a name trace from other U.S government agencies is a standard step in counterterrorism and counterintelligence cases that assists investigators by providing information on the

---

[195]  As referenced in Chapter Nine, prior to his involvement with the Trump campaign, Manafort was the subject of a federal criminal investigation by the Department for alleged white collar offenses.  Further, as referenced earlier in this chapter, prior to his involvement with the Trump campaign, Carter Page was the subject of a NYFO counterintelligence investigation for his contacts with Russian intelligence officers.

[196]  As described in Chapter Ten, early in the investigation, the Crossfire Hurricane team discovered that they had an existing FBI CHS who had previously interacted with three of the named subjects of the investigation.

kind of network surrounding a person in whom the FBI is interested. He told us that the FBI requests a name check on an individual who is the subject of an investigation, or who the FBI is considering as a subject, but is not certain that an investigation is warranted. McCabe said that the FBI also uses the information received from such name checks to eliminate individuals as subjects. The FBI received information from the name trace requests and serialized that information to the Crossfire Hurricane case file.

As we describe in Chapter Five, on or about August 17, 2016, the Crossfire Hurricane team received information from another U.S. government agency advising the team that Carter Page had been approved as an operational contact for the other agency from 2008 to 2013 and detailing information that Page had provided to the other agency regarding Page's past contacts with certain Russian intelligence officers. However, this information was not provided to NSD attorneys and was not included in any of the FISA applications. We also found no evidence that the Crossfire Hurricane team requested additional information from the other agency prior to submission of the first FISA application in order to deconflict on issues that were relevant to the FISA application.

FBI officials told us that the early steps in the investigation focused on developing information about the four subjects and conducting CHS operations to obtain relevant subject specific information. According to McCabe, using sources is a logical first step in an investigation to learn what information the FBI may have access to that could be of value in the investigation. Agents told us that CHS operations can be an effective tool for quickly obtaining information, including, for example, the telephone numbers and email addresses of the named subjects. In determining how to use CHSs in the Crossfire Hurricane investigation, SSA 1 and the case agents told the OIG that they focused their CHS operations on the predicating information and the four named subjects. Case Agent 1 told the OIG that the team "had a very narrow mandate" and that was "a mandate to look at these four individuals...and see if there's any potential cooperation between themselves and the Russian government...that was our goal in that investigation." He added that they were focused on the information provided by the FFG and "we wanted to prove or disprove it, [as] best we could" but also "wanted to make sure that it didn't get broadcast out and we didn't harm the electoral process." Case Agent 2 stated that the core of the investigation was "literally looking at the predication and saying, okay, who reasonably could have had been in a position to receive suggestions from the Russians?"

As summarized in Chapter Ten, the Crossfire Hurricane team conducted three CHS operations prior to the team's initial receipt of Steele's reporting on September 19, 2016. All three CHS operations were with individuals who were still with the Trump campaign. The first was a consensually recorded meeting in August 2016 between Carter Page and an FBI CHS. During the meeting, Page discussed his recent trip to Moscow, a pending "October Surprise" discussed further in Chapters Five, Seven, and Ten, and his involvement with the Russian energy company Gazprom. Page also told the CHS that he had "literally never met" Paul Manafort, had "never said one word to him," and that Manafort had not responded to any of

Carter Page's emails.[197]  SSA 1 and Case Agent 1 told the OIG that this meeting was important for the investigation as it helped the team determine where Page lived and what he was currently working on as well as developing a successful contact between an established FBI source and one of the Crossfire Hurricane targets.

The second CHS operation took place in September 2016, between an FBI CHS and a high-level official in the Trump campaign who was not a subject of the investigation.  Case Agent 1 told the OIG that the plan for this operation was for the CHS to ask the high-level official about Papadopoulos and Carter Page "because they were…unknowns" and the Crossfire Hurricane team was trying to find out how "these two individuals who are not known in political circles…[got] introduced to the campaign," including whether the person responsible for those introductions had ties to RIS.  During the consensually recorded meeting, the CHS raised a number of issues that were pertinent to the investigation, but received little information from the high-level official in response.[198]

The third CHS operation took place in September 2016, and involved Papadopoulos.  The Crossfire Hurricane case agents told the OIG that, during this CHS operation, they were trying to recreate the conditions that resulted in Papadopoulos's comments to the FFG official about the suggestion from Russia that it could assist the Trump campaign by anonymously releasing derogatory information about then candidate Clinton, which we described earlier in this chapter.  Among other things, when the CHS asked Papadopoulos whether help "from a third party like WikiLeaks for example or some other third party like the Russians, could be incredibly helpful" in securing a campaign victory, Papadopoulos responded that the "campaign, of course, [does not] advocate for this type of activity because at the end of the day it's…illegal."  Papadopoulos also stated that the campaign is not "reaching out to WikiLeaks or to whoever it is to tell them please work with us, collaborate because we don't, no one does that…."[199]

Thereafter, on September 19, 2016, the Crossfire Hurricane team received information from an FBI source (Christopher Steele) on election matters that became an important part of the Crossfire Hurricane investigation and the FBI seeking FISA authority targeting one of the Crossfire Hurricane subjects, Carter Page.  The information the Crossfire Hurricane team received from Steele and the team's use of the information is described in the next chapter.

---

[197] As we discuss later in this report, Carter Page's comment about his lack of a relationship with Manafort was relevant to one of the allegations in the Steele reporting that was relied upon in the Carter Page FISA applications, but information about the August 2016 CHS meeting was not shared with the OI attorneys handling the FISA applications until June 2017.

[198] We found no evidence that the information learned at this meeting was put to use by the Crossfire Hurricane team or disclosed to the OI attorneys handling the Carter Page FISA applications.

[199] The Crossfire Hurricane team did not provide information about this meeting to OI attorneys handling the Carter Page FISA applications.  As described in Chapter Eight, OI learned of the information from ODAG in May 2018.

**Figure 3.1**
**FBI Chain of Command and Legal Support**
**for the Crossfire Hurricane Investigation**
**July 31, 2016 to December 2016**



**Figure 3.2
FBI Chain of Command and Legal Support
for the Crossfire Hurricane Investigation
January 2017 to April 2017**

**Figure 3.3**
**FBI Chain of Command and Legal Support**
**for the Crossfire Hurricane Investigation**
**April 2017 to May 17, 2017**

**[PAGE INTENTIONALLY LEFT BLANK]**

# CHAPTER FOUR
## THE FBI'S RECEIPT AND EVALUATION OF INFORMATION FROM CHRISTOPHER STEELE PRIOR TO THE FIRST FISA APPLICATION

In this chapter, we describe the FBI's relationship with Christopher Steele, who furnished information that was used in the Carter Page FISA applications (Steele is referred to in those applications as "Source #1"). Steele is a former intelligence officer █████████████████████████████ who, following his retirement, opened a consulting firm and furnished information to the FBI beginning in 2010, primarily on matters concerning organized crime and corruption in Russia and Eastern Europe. In 2013, the FBI prepared paperwork to enable it to open Steele as an FBI CHS.[200] We examine the considerations that led the FBI to conclude that Steele was a reliable CHS before submitting the first FISA application. According to FBI personnel we interviewed, these considerations included Steele's past record of furnishing information to the FBI; recommendations from persons familiar with his work; Steele's extensive experience with matters involving Russia; and the assessment by Steele's FBI handling agent. We also examine Steele's development of reporting concerning the 2016 U.S. elections, his initial production of that information to the FBI, the FBI's early efforts to assess the reporting, and Steele's contacts with the media prior to the first FISA application.

## I.    Steele and His Assistance to the FBI Prior to June 2016

### A.    Introduction to Handling Agent 1 and Early Assistance

Steele is a former intelligence officer of ████████████████████ █████████████████ who, following his retirement, was enrolled by the FBI as a CHS furnishing information to the FBI primarily on matters concerning organized crime and corruption in Russia and Eastern Europe. Steele told the OIG that during his service as an intelligence officer ██████████████, he developed a particular expertise on Russia and was stationed for a period in Moscow. Steele stated that, after he stopped ████████████████████, he formed a consulting firm specializing in corporate intelligence and investigative services.

Steele's introduction in 2010 to the FBI agent who later became Steele's primary handling agent (Handling Agent 1) was facilitated by Department attorney Bruce Ohr, who was then Chief of the Organized Crime and Racketeering Section in the Department's Criminal Division in Washington, D.C. Ohr told the OIG that he first met Steele in 2007 when he attended a meeting hosted by a foreign government during which Steele addressed the threat posed by Russian organized crime. Ohr said that, after this first meeting with Steele, he probably met with him less than once a year, and after Steele opened his consulting firm, Orbis Business Intelligence, he furnished Ohr with reports produced by Orbis for its commercial clients that he thought may be of interest to the U.S. government. Ohr said that he

---

[200] As we describe below, Steele contends that he was never a CHS for the FBI but rather that his consulting firm had a contractual relationship with the FBI.

eventually put Steele in contact with Handling Agent 1, with whom Ohr had previously worked.

Handling Agent 1 told the OIG that he first met Steele in the spring of 2010 during a trip abroad with Ohr.[201] He recalled that prior to the meeting, Ohr described Steele's background, including his work as an intelligence officer, assignment to Moscow, and Russia expertise. Based on his past experiences working with Ohr, Handling Agent 1 said he respected Ohr's judgment and had no reason to doubt his representations about Steele. Handling Agent 1 told us that Steele had relationships with reputable clients, and this fact bolstered Handling Agent 1's view of Steele's credibility. He also said that he had met with some of Steele's clients and knew of others, and that a representative of one of Steele's clients informed him that Steele "was solid and that his reporting was very interesting and good." Handling Agent 1 stated, however, that with the exception of Steele's work for Fusion GPS, a Washington, D.C. investigative firm, he did not request information from Steele about his firm's clients.[202]

Handling Agent 1 said he came away from his first meeting with Steele favorably impressed. Handling Agent 1 told the OIG that Steele was very professional and knowledgeable and "clearly an expert on Russia," including the activities of Russian oligarchs and Russian criminal networks. Handling Agent 1 told the OIG that although he was interested in the information from Steele, as of 2010 he was not yet prepared to enter into a formal CHS relationship with Steele. Handling Agent 1 explained that it is administratively burdensome to open a CHS who resides overseas and that prior to 2013 he was not receiving a "steady stream" of information from Steele. Handling Agent 1 said that following their initial meeting, Steele would provide information only every couple of months and that he met with him only infrequently, such as when Steele visited the United States. Steele was not compensated by the FBI during this period. Steele told us that this information originated from work performed for Orbis's private clients.

Handling Agent 1 stated that in the summer of 2010 Steele introduced him to a contact who had allegedly obtained information about corruption in the International Federation of Association Football (FIFA). According to Handling Agent 1, but for Steele's assistance in arranging this meeting, the FBI would not have had the impetus to open the FIFA investigation in 2010. The lead FBI agent assigned to the FIFA matter told us that after Russia won the right to host the 2018 World Cup in September 2012, he approached Handling Agent 1 to request permission to examine possible corruption in the bidding process. According to the agent, Handling Agent 1 recalled his earlier interview with the contact that he met through Steele, retrieved a copy of the FBI FD-302 form memorializing the interview, and instructed the agent to open a case. The agent said that Steele's

---

[201] Steele told us that he believed he met Handling Agent 1 and Ohr together at a conference in Europe before he left government service. Handling Agent 1 stated that his first meeting with Steele did not occur at a conference.

[202] Handling Agent 1 said he expected Steele to alert him if any of the clients were "bad actors," such as organized crime figures or others that would be of concern to the FBI. Handling Agent 1 stated that Steele never provided any such notification to him.

role in the FIFA investigation was limited to recommending to Handling Agent 1 that the FBI talk to the contact, whose information eventually proved valuable and helped predicate the opening of the investigation. The agent said he did not recall having any communication with Steele after the investigation's opening.

Additionally, Handling Agent 1 told us that Steele provided two other investigative leads to the FBI in connection with the FIFA investigation. First, in July 2011, Steele provided a report that summarized an alleged conversation between then Russian President Dmitry Medvedev and then Prime Minister Vladimir Putin in which, according to the report, Putin acknowledged that a Russian oligarch had bribed the President of FIFA so that Russia could win the right to host the World Cup tournament in 2018. Second, in 2012, Steele introduced the FBI to two British officials with information concerning Russia's alleged efforts to bribe FIFA executives. Our review of Steele's Delta file also revealed that Steele furnished the FBI with a report dated June 2015 that quoted a Kremlin official as having admitted that the Kremlin bribed FIFA executives in order to secure rights to host the 2018 World Cup.[203]

According to the U.S. Attorney's Office for the Eastern District of New York, as of December 2019, the FIFA investigation has resulted in 26 individual guilty pleas, 2 trial convictions, 4 corporate guilty pleas, and one corporate deferred prosecution agreement. Total forfeitures in the matter exceed $120 million. The OIG interviewed a prosecutor on the FIFA case who told us that Steele did not provide testimony in any court proceeding. Handling Agent 1 also told the OIG that Steele's information was not used to obtain any compulsory legal process in the FIFA case.

In addition to leads provided for the FIFA investigation, we were advised by the FBI that Steele furnished information about Russian oligarchs, some of whom were under investigation by the FBI. For example, we learned that, in October 2013, Steele provided lengthy and detailed reports to the FBI on three Russian oligarchs, one of whom was among the FBI's most wanted fugitives. According to an FBI document, an analyst who reviewed Steele's reporting on this fugitive found the reporting "extremely valuable and informative" and determined it was corroborated by other information that the FBI had obtained.

## B.    The FBI Opens Steele as a CHS in October 2013

Handling Agent 1 told the OIG that in late October 2013, he concluded that the FBI needed to enroll Steele as a CHS. By that time, Steele had been providing information to the FBI intermittently for 3 years without compensation. According to Handling Agent 1, the volume of Steele's reporting had increased and involved persons of interest to the FBI, such as the oligarchs noted above, and Handling Agent 1 wanted to task Steele to collect additional information. Handling Agent 1

---

[203] As described in Chapter Two, the FBI maintains an automated case management system for all CHS records, which the FBI refers to as "Delta." The Delta file for each CHS contains all of the personal and administrative information about the CHS, as well as sub-files for unclassified reporting, classified reporting, validation documentation, and payment records.

said that he also wanted to compensate Steele for his fruitful lead in the FIFA investigation. Another consideration for Handling Agent 1 was Handling Agent 1's pending transfer in late spring 2014 to an FBI office in a European city to serve as the Legal Attaché (Legat). Handling Agent 1 said that the logistics of obtaining and using information from Steele while Handling Agent 1 was stationed abroad would be easier if Steele was formally opened as a CHS.



Steele told us that after Handling Agent 1 indicated he wanted to begin tasking Steele to collect information and provide compensation, Steele explained to Handling Agent 1 that ████████████████████████████ ██ ████ ████████ and that any relationship would need to be between the FBI and Steele's consulting firm. Steele said that Handling Agent 1 contacted ████████████████████ and obtained a "green light" to proceed. Prior to opening Steele as a CHS, Handling Agent 1 contributed information to a memorandum from the FBI's Legal Attaché (Legat) in Steele's home country notifying ████████████ ██████ of Steele's proposed relationship with the FBI. The memorandum to ████████████ included the following:

> Our New York Office is currently working with Christopher Steele, ████ ████████████████████████████. Mr. Steele is providing the FBI with information to support several ongoing criminal investigations involving transnational organized crime organizations. This information, provided primarily through Mr. Steele's privately owned company, Orbis Business Intelligence, is necessary to support our efforts to fully identify subjects with ties to European, Eurasian and Asian organized crime organizations and whose activities directly impact the United States.

> In order to properly protect this information and Mr. Steele's relationship with the FBI, our New York Office will treat any material provided as information obtained through a Confidential Human Source.

Handling Agent 1 told us that he did not recall seeing a draft of the memorandum before it was sent by the Legat. The author of the memorandum, an FBI Assistant Legal Attaché (ALAT 1), told us that Handling Agent 1 probably provided him with the text of the memorandum because he was not familiar with the FBI's use of Steele.

In addition, Steele made available for our review a letter on his consulting firm's letterhead from Steele ████████████████ dated approximately around the same time as the FBI's memorandum ████████. The letter explained that Steele's consulting firm is expected to enter into "a proposed commercial relationship" with the FBI. A substantial portion of the letter described the consulting firm and its work, and the letter stated that information furnished to the U.S. government would come from the firm.

On October 30, 2013, Handling Agent 1 and another agent completed the paperwork to open Steele as an FBI CHS. As required by FBI policy, Handling Agent 1 provided the FBI's standard "admonishments" to Steele at the outset of

Steele's enrollment as a CHS and on an annual basis thereafter. The admonishments advised Steele, for example, that he was not authorized to commit illegal acts, that he must provide truthful information to the FBI, and that he must follow the instructions of the FBI. According to FBI records, Steele signed paperwork captioned "CHS admonishments" acknowledging his receipt of the admonishments for the period covering Crossfire Hurricane, and signed CHS payment receipts using an FBI assigned payment codename.[204]

Handling Agent 1 told the OIG that he instructed Steele not to divulge his relationship with the FBI to others, although the FBI's standard written CHS admonishments do not include such an instruction. According to Handling Agent 1, he told Steele not to share the information he was providing to the FBI with others, with one caveat. Handling Agent 1 explained that Steele would sometimes share with the FBI reports he had generated for his consulting firm's clients, and in that circumstance the clients would also be privy to the information that the FBI had obtained. Handling Agent 1 said he did not provide a specific instruction to Steele that he was not to disclose information that he was sharing with the FBI to the media. According to Handling Agent 1, he did not need to give that specific instruction because that prohibition was addressed by instructing Steele not to share the information he was providing to the FBI with others except for clients.

Steele told us, however, that he was never a CHS for the FBI, and that he advised Handling Agent 1 that he could not be a "clandestine source" due to his prior service as an intelligence officer of another country. Steele made available for the OIG's review documentation referring to such a prohibition. Steele stated that he never recalled being told that he was a CHS and that he never would have accepted such an arrangement, despite the fact that he signed FBI admonishment and payment paperwork indicating that he was an FBI CHS.[205] He also said that his relationship with the FBI was not that of a "confidential human source" because he would meet with Handling Agent 1 at Steele's office as well as in the presence of third parties, which included at times his Orbis business partner. Instead, he explained that the relationship with the FBI was "contractual" with his firm and that he was paid by the FBI "on a results basis" for information his firm furnished in response to taskings.[206] Steele said that he was told by Handling Agent 1 that such a relationship with the FBI was "unorthodox and groundbreaking," and that Handling Agent 1 was interested in similar relationships with others. Steele told us that he discussed with Handling Agent 1 how the FBI could be a client of his firm.

[204] The FBI-1057 memorializing Steele's receipt of admonishments in 2016 states that Handling Agent 1 "verbally admonished the CHS with CHS admonishments, which the CHS fully acknowledged, signed and dated." The FBI could not locate the signed admonishment form, however.

[205] During his time as an FBI CHS, Steele received a total of $95,000 from the FBI. We reviewed the FBI paperwork for those payments, each of which required Steele's signed acknowledgment. On each document, of which there were eight, was the caption "CHS's Payment" and "CHS's ███████████" A signature page was missing for one of the payments.

[206] FBI records that we reviewed included an invoice dated January 25, 2016, from Steele's consulting firm requesting payment "[f]or consultancy services, including 7 meetings with contact, briefing, and reports" as well as for travel and accommodations. The FBI paid Steele (not the consulting firm) $15,000 in May 2016 for services rendered from July 2015 through February 2016.

According to Steele, the issue of the nature of his relationship with the FBI "was never really resolved and both sides turned a blind eye to it. It was not really ideal." However, he said that because the FBI "was keen to stay in touch and draw upon our work" the relationship continued without fully resolving the question of his status.

Among the material that Steele made available to the OIG for review prior to and after his OIG interview were three memoranda written by Steele, that Steele said he maintained in his firm's files, which summarized meetings in 2010 involving Steele, Handling Agent 1, and Ohr. The memoranda reflect that Steele indicated during those meetings that he was not amenable to becoming a CHS and that he wanted the FBI to enter into a consulting agreement with his firm. However, also included in the materials was an undated draft letter from Steele to Handling Agent 1 describing events that post-dated the three earlier memoranda, and stating that although Steele preferred that the FBI enter into a contract with his firm, he was prepared to sign a contract with the FBI as an individual. According to Steele, he did not recall sending the letter but the letter reflected his willingness to accommodate the FBI's administrative requirements. He stated that his firm would not handle the FBI's work as anything other than as an account with the firm. We did not find a copy of these memoranda or the letter in Steele's Delta file. Handling Agent 1 told us that Steele never presented him with copies of these materials.

In light of Steele's assertions, we asked Handling Agent 1 whether Steele ever advised him that he was prohibited from working for the FBI as a CHS and whether the FBI ever had a contract with Steele's firm. Handling Agent 1 responded "no" to both questions. We also asked Handling Agent 1 about the memorandum described above that was sent by ALAT 1 in 2013 to ▮▮▮▮▮▮ ▮▮▮▮▮, especially its description that information from Steele would be "provided primarily through [Steele's] privately owned company," and that the FBI would "treat any material provided as information obtained through a Confidential Human Source." We wanted to know the rationale for including these statements if in fact the purpose of the memorandum was to alert ▮▮▮▮▮▮▮▮ that Steele was going to be working as a CHS for the FBI. Handling Agent 1 told us that he believed the FBI was trying to be as inclusive as possible in its description of Steele and therefore referenced information about Steele's firm, even though the FBI never had a relationship with the firm. Handling Agent 1 said that he did not know why the memorandum stated that material obtained from Steele would be "treated as information from a CHS" if in fact Steele was an FBI CHS. According to Handling Agent 1, there was no ambiguity in Steele's status as a CHS by late 2013. Handling Agent 1 said that he expressly informed Steele that he was a CHS, he provided Steele with CHS admonishments each year, and that Steele signed CHS payment paperwork using his CHS codename on multiple occasions. In the view of Handling Agent 1, Steele's contention that he was not a CHS is not credible.

We also asked ALAT 1 about the memorandum from the FBI to ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮. He said that the purpose of the memorandum was to notify ▮▮▮▮▮▮▮▮▮▮▮ that Steele would be a CHS for the FBI, and that the memorandum's reference to the FBI's "working with [Steele]" and explanation that material from him would be handled as information from a CHS were sufficient to

notify ███████████████ of Steele's status as a CHS.  He further stated, however, that the memorandum alerted ████████████████ that the FBI was going to have "some interaction with [Steele's] firm as well as [Steele]" given that the memorandum states that information from Steele would be furnished primarily through his firm.  ALAT 1 said that this language was included in the memorandum to make clear that the information obtained from the firm would be treated as information from a CHS.  ALAT 1 did not believe that he received any response to the memorandum from ████████████████, and we did not find any such response in Steele's Delta file.

## C.    Steele's Work for the FBI During 2014-2015

Handling Agent 1 said that during 2014 and 2015 he communicated with Steele more regularly and met with him several times in Steele's home country and in a city in Europe.  Steele furnished intelligence information that the FBI disseminated, including in four Intelligence Information Reports (IIRs) sent throughout the U.S. Intelligence Community (USIC) concerning the activities of Russian oligarchs.[207]  Handling Agent 1 recalled receiving positive feedback from the USIC in response to some of the IIRs containing Steele's information before Steele began delivering election related information in 2016.  Handling Agent 1 said that the response to the IIRs was that the information was "really good" and there were requests for additional reporting from Steele.  By the time Steele was closed by the FBI as a CHS in November 2016, the FBI had disseminated 10 IIRs based on Steele's reporting.

Ohr told us that, during this time period, he and Handling Agent 1 asked Steele to inquire whether Russian oligarchs would be interested in entering into discussions with them.  Handling Agent 1 stated that he did not recall tasking Steele to contact Russian oligarchs though he ████████████████████████ ███████████████████.  According to Handling Agent 1, Steele originally proposed the idea of having him approach Russian oligarchs for the purpose of arranging meetings between the oligarchs and representatives of the U.S. government.  In our review of Steele's CHS file, other pertinent documents, and interviews with Handling Agent 1, Ohr, and Steele, we observed that Steele had multiple contacts with representatives of Russian oligarchs with connections to Russian Intelligence Services (RIS) and senior Kremlin officials.[208]  For example, in

---



[207] Each of the IIRs noted the limitations on the reporting and included the following standard warning: "WARNING:  This is a raw information report, not finally evaluated intelligence.  It is being shared for informational purposes, but has not been fully evaluated, integrated with other information, interpreted or analyzed."

[208] ████████████████████████████ written by the FBI's Transnational Organized Crime Intelligence Unit (TOCIU) ████████████████████████████████████████████ ██████████████████████████████ Steele. █████████████████████ Steele's ████████████████████████████████████████████████ recommended that a validation review be completed on Steele ████████████████.  The FBI's Validation Management Unit did not perform such an assessment on Steele until early 2017 after, as described in Chapter Six, the Crossfire Hurricane team requested an assessment in the context of Steele's election reporting. Handling Agent 1 told us he had seen the TOCIU report and was not concerned about its findings concerning Steele because he was aware of Steele's ████████████████████.  We found

late November 2014, Handling Agent 1 met with Steele who advised Handling Agent 1 that he had received overtures from "interlocutors" for several Russian oligarchs seeking to arrange FBI interviews of the oligarchs.

Handling Agent 1 told the OIG that Steele facilitated meetings in a European city that included Handling Agent 1, Ohr, an attorney of Russian Oligarch 1, and a representative of another Russian oligarch.[209]  Russian Oligarch 1 subsequently met with Ohr as well as other representatives of the U.S. government at a different location.  Ohr told the OIG that, based on information that Steele told him about Russian Oligarch 1, such as when Russian Oligarch 1 would be visiting the United States or applying for a visa, and based on Steele at times seeming to be speaking on Russian Oligarch 1's behalf, Ohr said he had the impression that Russian Oligarch 1 was a client of Steele.[210]

We asked Steele about whether he had a relationship with Russian Oligarch 1.  Steele stated that he did not have a relationship and indicated that he had met Russian Oligarch 1 one time.  He explained that he worked for Russian Oligarch 1's attorney on litigation matters that involved Russian Oligarch 1 but that he could not provide "specifics" about them for confidentiality reasons.  Steele stated that Russian Oligarch 1 had no influence on the substance of his election reporting and no contact with any of his sources.  He also stated that he was not aware of any information indicating that Russian Oligarch 1 knew of his investigation relating to the 2016 U.S. elections.[211]

Steele's prior reporting to the FBI addressed issues other than Russian oligarchs.  For example, we reviewed FBI records reflecting that he provided information on the hack of computer systems of an international corporation, and corruption involving former Ukrainian President Viktor Yanukovych.  In addition, Steele told us he introduced Handling Agent 1 to sources with knowledge of Russian athletic doping and obtained samples of material for the FBI to analyze.  Handling Agent 1 could not recall meeting with these sources or obtaining samples for analysis, though he did remember obtaining information from Steele concerning Russian athletic doping.  Handling Agent 1 said he forwarded the information to the FBI New York Field Office (NYFO) which had an open investigation concerning doping.

Handling Agent 1 also recounted for us a situation involving Steele that reinforced his view that Steele was "very professional" and primarily motivated by a

---

that the TOCIU report was not included in Steele's Delta file.  Handling Agent 1 said that he found preparation of the TOCIU report "curious" because he believed that TOCIU was aware of Steele's ██████████████ and fully supported them.

[209] Handling Agent 1 told us that he was aware that Steele had a relationship with Russian Oligarch 1's attorney and assumed it may have been a business relationship.

[210] As we discuss in Chapter Six, members of the Crossfire Hurricane team were unaware of Steele's connections to Russian Oligarch 1. ████████████████████████████████
████████████████████████████████████████████████████████

[211] ████████████████████████████████████████████████
████████████████████████████████████████████████

desire to counter threats posed by Russia. According to Handling Agent 1, on two occasions Steele made arrangements for a meeting between the FBI and a ██████ individual who had potentially important information. In both instances the meetings did not occur due to the FBI's failure to attend. According to Handling Agent 1, the FBI's failure to meet with the individual was the FBI's fault, cost Steele financially in the short term, and likely caused a loss of reputation with the intermediaries who arranged the individual's attendance at the meeting. Handling Agent 1 told the OIG that Steele's professionalism in seeking to arrange the meeting and then not seeking to "nickel and dime" the FBI in the process impressed him. Steele was eventually reimbursed by the FBI for his expenses, but it was over a year later.

We asked Handling Agent 1 about what information the FBI had corroborated from Steele's reporting prior to spring 2016 and whether Steele had been proven to be a reliable source. Handling Agent 1 said that Steele provided reliable information to the FBI in the past, but that not all of the information Steele furnished had been corroborated and verified. Handling Agent 1 cited several examples of information from Steele that the FBI had been able to corroborate prior to the spring of 2016, such as corruption in FIFA's bid selection process, information regarding ██████ Russian oligarchs, and corruption involving Yanukovych, but could not recall more. He also told the OIG that he was not aware of any information Steele provided prior to 2016 that had been shown to be false, inaccurate, or problematic. Handling Agent 1 said that the FBI found Steele's information to be valuable and that it warranted compensation. As a result, in 2014 and 2015, the FBI made five payments to Steele totaling $64,000. By the time the FBI closed Steele in November 2016, his cumulative compensation totaled $95,000, including reimbursement for expenses. Steele was not compensated by the FBI for the election reporting we discuss below.

We asked Steele how he would characterize his relationship with the FBI prior to furnishing reports on the 2016 election. He told us it was "good" except for the tardiness of the FBI's payments to him. He stated that he had confidence in Handling Agent 1.

We also inquired whether Steele's work for the FBI intruded on his work for his private clients. Steele told us that overall his work could be categorized in one of two ways. The first was work he performed for other clients of his consulting firm. He called this work "Pipeline 1." Steele stated however that he sometimes provided his work product from these engagements to the FBI at no cost, which he said he did because he believed the information possibly could be helpful to the U.S. government. The second category was work Steele performed for the FBI in response to taskings and for which the FBI provided compensation. Steele referred to this work as "Pipeline 2." According to Steele, Pipeline 1 and Pipeline 2 were mutually exclusive and did not overlap. Steele explained that his Pipeline 1 work for his clients was not affected by his Pipeline 2 work for the FBI, and he therefore was at liberty to discuss his work for his clients with his clients and with third parties, as necessary, without gaining permission from the FBI. He stated that any promises or commitments he made to the FBI did not affect the work of his

consulting firm for its clients and that his FBI commitments only applied to work where the FBI was the client (*i.e.,* Pipeline 2).

## II.    Steele Provides the FBI with Election Reporting in 2016

### A.    Steele's Engagement by Fusion GPS in June 2016

Steele said that in approximately June 2016, he was hired for a short-term assignment by Fusion GPS, a Washington, D.C., investigative firm founded by former journalist Glenn Simpson and a partner.[212]  Steele told us that he first met Simpson in 2010 and had completed a number of projects for him, some of which related to Russia.  In May 2016, Simpson met Steele at a European airport and inquired whether Steele could assist in determining Russia's actions related to the 2016 U.S. elections, whether Russia was trying to achieve a particular election outcome, whether candidate Donald Trump had any personal and business ties in Russia, and whether there were any ties between the Russian government and Trump and his campaign.[213]  Steele stated that he began work for Fusion GPS on the 2016 election assignment after Fusion GPS had completed a similar Trump related assignment for an entity connected to the Republican Party.

Steele told us he had a source network in place with a proven "track record" that could deliver on Fusion GPS's requirements.  Steele added that this source network previously had furnished intelligence on Russian interference in European affairs.[214]  Steele said he understood from Simpson that his assignment would end with the election in November 2016.  He also stated that, prior to this request, he had not conducted any research on Trump.

We asked Steele when he learned who had retained Fusion GPS to obtain information concerning Trump and the Trump campaign.  He told us he could not recall when he first learned that it was the law firm Perkins Coie and the Democratic National Committee (DNC), though he was certain that it was not at the outset of the engagement with Fusion GPS.  Steele further stated that, by late July 2016, Steele had met with Simpson and an attorney from Perkins Coie, which

---

[212] Simpson declined the OIG's request to be interviewed.  According to testimony that Simpson provided to Congress, the *Washington Free Beacon* retained Fusion GPS from approximately September or October 2015 to April/May 2016 to take "an open-ended look at Donald Trump's business career and his litigation history and his relationships with questionable people, how much he was really worth, how he ran his casinos, [and] what kind of performance he had in other lines of work."  *See Testimony of Glenn Simpson before the House Permanent Select Committee on Intelligence, U.S. House of Representatives* (November 8, 2017) (hereinafter *Simpson House Testimony*) at 7, 12.

[213] According to interrogatory responses Steele provided in foreign litigation, Fusion GPS retained Steele "to investigate and report, by way of preparing confidential Intelligence Memorandum, on Russian efforts to influence the U.S. Presidential election process in 2016 and on links between Russia and the then Republican candidate and now President Donald Trump."

[214] Steele told us that this source network did not involve sources from his time as a ████████ ████████████████████████ and was developed entirely in the period after he retired from government service.

represented the DNC, and Steele said that by that time he was aware of the DNC's role.  He stated that he could not remember whether he provided Perkins Coie's name to the FBI but believed it was probable that he did so, but not in July 2016.

Steele stated that he finalized arrangements with Simpson over the terms of his engagement a few weeks after their meeting at the European airport and that he started to collect information in June 2016.  According to FBI records, Steele thereafter produced ▆ reports related to the 2016 U.S. elections, ▆ of which he provided to the FBI and ▌ others that were provided to the FBI by third parties, as described in Chapter Six.[215]  The FBI obtained reports directly from Steele during the time period of July through October 2016.

Steele told us that the reports he generated were not designed to be "finished products" and instead were "to be briefed off of orally versus consumed as a written product."  He said that the reports were "mostly single source reporting" and were uncorroborated intelligence "up to a point," but were informed by background research and his judgment as an intelligence professional.  Steele explained that it was his firm's practice to faithfully report everything a reliable source provided and not to withhold information because it was controversial.  He denied "tailoring" his reporting to meet the needs of his clients and explained that doing so ultimately was not a good business practice because it would result in loss of reputation.  We also asked Steele whether his research was "opposition research" and biased.  He provided a similar response and explained that his firm would not be in business if it provided biased information.[216]  Steele called the allegation that he was biased against Trump from the start "ridiculous."[217]  He stated that if anything he was "favorably disposed" toward the Trump family before he began his research because he had visited a Trump family member at Trump Tower and "been friendly" with [the family member] for some years.  He described their relationship as "personal" and said that he once gifted a family tartan from Scotland to the family member.

---

[215] One report that was not provided to the FBI directly or via third parties was published by *BuzzFeed*.  One of the reports provided to the FBI by third parties was a near duplicate of a report that Steele previously had furnished to the FBI.  Steele also provided the FBI, from July through October 2016, with several reports that addressed Russian activities but were not election related.

[216] We also asked about obvious errors in the reporting, such a misspellings and the reference to a Russian consulate in Miami which did not exist.  Steele told us that such errors are typical in intelligence work and were a function, in part, of the fast turnaround between his receipt of information from his sources and the dissemination of the reporting.  He explained that he was accountable for any errors as the election reporting was "his baby."

[217] As we describe in Chapter Six, however, according to an FBI FD-302, when the FBI interviewed Steele in September 2017, he and a colleague from his firm described Trump as their "main opponent."  Ohr also advised SSA 1 that Steele was "desperate that Donald Trump not get elected and was passionate about him not being the U.S. President."  As we describe in Chapter Nine, SSA 1 met with Ohr on November 21, 2016, and memorialized Ohr's statements in a FBI FD-302 report.  When we interviewed Steele, he told us that he did not state that he was "desperate" that Trump not be elected and thought Ohr might have been paraphrasing his sentiments.  Steele told us that he was concerned that Trump was a national security risk, and he had no particular animus against Trump otherwise.

The first election report that Steele provided to the FBI, which, as described in Chapters Five and Seven, was one of four of Steele's reports that the FBI relied upon to support probable cause in the Carter Page FISA applications, is captioned "Company Intelligence Report 2016/080—U.S. Presidential Election: Republican Candidate Donald Trump's Activities in Russia and Compromising Relationship with the Kremlin," and is dated June 20, 2016 (Report 80). It was provided to Handling Agent 1 on July 5, 2016, and contains numerous allegations about the presidential candidates, including that: (1) the "Russian regime has been cultivating, supporting, and assisting [Trump] for at least 5 years;" (2) "[Trump] and his inner circle have accepted a regular flow of intelligence from the Kremlin, including on his Democratic and other political rivals;" (3) Trump's activities in Moscow, including "perverted sexual acts," make him vulnerable to blackmail; (4) Russian Intelligence Services have collected "compromising material" on Hillary Clinton; and (5) the Kremlin has been "feeding" information to Trump's campaign for an extended period of time. Steele said that he debated with his business colleague whether to include the sexual material in Report 80 but refused to omit it because he felt that as a matter of professional practice, when reporting information from a source, "we have to be faithful to all of the information the source provided" and not avoid material because it is controversial. Then Director James Comey later described this aspect of Steele's reporting as "salacious and unverified."[218]

Steele explained that shortly after drafting Report 80 he had discussions with his business partner and Simpson about what to do with the information. He said that he and his partner considered the contents of the report to have national security implications and that the report therefore needed to be shared with the FBI. He said that Simpson agreed to Steele's proposal, and thereafter, Steele contacted the FBI.[219]

## B.    Steele Informs Handling Agent 1 in July 2016 about his Election Reporting Work

Shortly before the Fourth of July 2016, Handling Agent 1 told the OIG that he received a call from Steele requesting an in-person meeting as soon as possible. Handling Agent 1 said he departed his duty station in Europe on July 5 and met with Steele in Steele's office that day. During their meeting, Steele provided Handling Agent 1 with a copy of Report 80 and explained that he had been hired by Fusion GPS to collect information on the relationship between candidate Trump's businesses and Russia. Handling Agent 1 said Steele had become concerned about the possibility of the Russians compromising Trump in the event Trump became

---

[218]   We further discuss Comey's views of this information in Chapter Six.

[219]   Simpson has testified before Congress that he assented to Steele's request to provide the information to the FBI, and that he viewed the situation as "potentially a crime in progress" that needed to be reported. *Simpson House Testimony* at 61; *Testimony of Glenn Simpson before the Senate Judiciary Committee*, United States Senate (August 22, 2017) (hereinafter *Simpson Senate Testimony*) at 160.

President.[220]  According to Handling Agent 1, Steele informed him that Fusion GPS had been hired by a law firm to conduct research, though Steele stated that he did not know the law firm's name or its political affiliation.[221]  Handling Agent 1 told the OIG, however, that he did not have to ask Steele to know that the request for the research was politically motivated as the connection to politics was obvious to Handling Agent 1 from the circumstances.  Handling Agent 1 also told us that he asked Steele to try to identify the law firm.  However, Handling Agent 1 said that he did not "continually ask" Steele about the firm's identity as his work with Steele progressed.  When asked by the OIG about an October 2016 email from a member of the Crossfire Hurricane team stating that Handling Agent 1 had avoided tasking Steele to obtain the name of the law firm, Handling Agent 1 told us that information was incorrect and that he would never avoid asking a material question.  When we asked the email's author about the email, he stated that it accurately represented what Handling Agent 1 had told him during a telephone call in October 2016.

We reviewed what Steele represented were his contemporaneous notes of his July 5 meeting with Handling Agent 1.  Steele told us these notes were written within a day or two of the meeting.  The notes reflect that Steele told Handling Agent 1 that Steele was aware that "Democratic Party associates" were paying for Fusion GPS's research, the "ultimate client" was the leadership of the Clinton presidential campaign, and "the candidate" was aware of Steele's reporting.  Steele told us that he was "pretty candid" with Handling Agent 1.  He also said it was clear that Fusion GPS was backed by Clinton supporters and senior Democrats who were supporting her.  When we asked Handling Agent 1 about the information contained in Steele's notes, Handling Agent 1 told us that he did not recall Steele mentioning these facts to him during their meeting.

After being provided with a copy of Report 80 at the July 5 meeting, Handling Agent 1 said he asked Steele whether he was still collecting information for Fusion GPS.  Handling Agent 1 said Steele responded that he was working on another report for Simpson.  Handling Agent 1 said that, at that point, he advised Steele that Steele was not working on behalf of the FBI to collect the information Fusion GPS was seeking:  "I said we are not asking you to do it and I'm not tasking you to do it."  Steele provided the OIG with a similar interpretation of these events.  He told us that Report 80, as well as all his other election reports, was "Pipeline 1" information and not subject to FBI controls.  Handling Agent 1 said that he also advised Steele that because a law firm was involved there could be privilege issues that Handling Agent 1 would need to evaluate.  Handling Agent 1 told the OIG that he returned to his duty station the same day with a copy of the reports Steele provided him, only one of which was election related.

---

[220]  Handling Agent 1's records indicate that, during this meeting, Steele also provided Handling Agent 1 with reporting on Russian doping in athletics, Russian cyber activities, and Russian interference in European political affairs.

[221]  As described earlier, Steele told us that by late July 2016, he had met with Simpson and an attorney from Perkins Coie, which represented the DNC, and by that time he was aware of the DNC's role.

Steele told us that Handling Agent 1 was "taken aback" by the contents of Report 80, and that Handling Agent 1 said he needed to send the Report back to the U.S. and would contact Steele at a later time after Handling Agent 1 had conferred with others about how to handle it. Steele said that he waited approximately one week and then contacted Handling Agent 1 to inquire whether he wanted to receive additional reports. According to Steele, Handling Agent 1 responded, "[N]ot yet. I'm still dealing with this. I'll get back to you." Steele said it was not until mid-August that he heard back from Handling Agent 1 and that Handling Agent 1 told him at that time that he wanted to receive additional reports.

Handling Agent 1 said he discussed Steele's reporting with his supervisor, the Legat, and both agreed that Handling Agent 1 should try to determine where to send the information in FBI Headquarters. However, due to the sensitivity of the reporting, Handling Agent 1 said that he wanted to be discrete and avoid a situation where he was "broadcasting" the information. Handling Agent 1 said that he informed his supervisor that he wanted to consult with NYFO (where Handling Agent 1 previously had worked) before taking further action, and that his goal was to put the information directly in the hands of people who needed to see it. According to Handling Agent 1, his supervisor approved, stating "Good idea. Call whoever you have to call. Do whatever you have to do."[222]

The Legat told us that he recalled Handling Agent 1's proposal to contact NYFO, which he concurred with, but that his expectation was that Handling Agent 1 would provide Steele's reporting to the Counterintelligence Division (CD) at FBI Headquarters within a matter of days. The Legat stated that he recalled inquiring about the handling of the reporting when Handling Agent 1 obtained another report from Steele, Report 94 described below, on July 19, 2016, as well as prior to a meeting members of the Crossfire Hurricane team had with Steele in October 2016. The Legat said that during this time, "I just assumed [Handling Agent 1] was handling it…[and] had sent it off."

Approximately 1 week after his July 5 meeting with Steele, Handling Agent 1 contacted an Assistant Special Agent in Charge (ASAC 1) in NYFO, whom Handling Agent 1 had known for many years and described as having experience with "sensitive matters." Handling Agent 1 said that he described the "gist" of the situation to ASAC 1, who responded that he would assess what to do and contact Handling Agent 1 later. ASAC 1 told us that the information that Handling Agent 1 explained to him "[c]learly [was] something that needs to be handled immediately" and "definitely of interest to the Counterintelligence folks." ASAC 1 said that after hearing from Handling Agent 1, he spoke with his Special Agent in Charge (SAC 1) the same day. ASAC 1's notes from his July 13 call with Handling Agent 1 closely track the contents of Report 80, identify Simpson as a client of a law firm, and include the following: "law firm works for the Republican party or Hillary and will

---

[222] Handling Agent 1 said that he did not contact the International Operations Division (IOD) at FBI Headquarters, which supports the Legats, about the reporting.

use [the information described in Report 80] at some point."[223]  ASAC 1 told us that he would not have made this notation if Handling Agent 1 had not stated it to him.

On July 19, 2016, Steele sent an email to Handling Agent 1 that included another report, Report 94, which was captioned "Company Intelligence Report 2016/94—Russia: Secret Kremlin Meetings Attended by Trump Advisor Carter Page in Moscow (July 2016)."  Report 94, which as described in Chapters Five and Seven was one of 4 reports the FBI relied upon to support the probable cause in the Carter Page FISA applications, alleged that during a visit to Moscow in July 2016, Page met with:  (1) Igor Sechin, Chairman of Russian energy conglomerate Rosneft, and discussed the "lifting of western sanctions against Russia over Ukraine;" and (2) Igor Divyekin, a staff member in the Russian Presidential Administration, who informed Page of compromising information the Kremlin possessed on Hillary Clinton and its possible release to the Republican campaign. Report 94 further alleged that Divyekin advised Page that the Russians had derogatory information on Trump, which the candidate should bear in mind in future dealings with Russian leadership.  Report 94 described conversations involving a limited number of persons (e.g., Sechin confided the details of a secret meeting with Page; Sergei Ivanov confided in a compatriot that Divyekin had met secretly with Page).

Handling Agent 1 said that when he read Report 94 for the first time he recognized Sechin's name from intelligence reporting but did not recognize the other names, including Carter Page.  He told the OIG that he was in no position to assess the reliability of the reporting and for that reason he was eager to forward the reporting to persons who could evaluate it.  Steele's reporting, however, did not reach investigators at FBI Headquarters until 2 months later, a circumstance we describe further below.

### C.  The Crossfire Hurricane Team Receives Steele's Reports on September 19

On July 28, 2016, three days prior to the opening of the Crossfire Hurricane investigation, Handling Agent 1 sent Reports 80 and 94 to ASAC 1 in NYFO, who forwarded them to SAC 1.[224]  Handling Agent 1's sharing of the reports with ASAC 1 resulted in a meeting in NYFO on August 3 among ASAC 1, the Chief Division Counsel (CDC), an Associate Division Counsel (ADC), and a Supervisory Special Agent (SSA).  Notes taken by the ADC show that the meeting participants discussed

---

[223] As we summarize in Chapter Ten, at approximately the same time that Handling Agent 1 was reporting information about Simpson to ASAC 1, an FBI agent from another FBI field office sent an email to his supervisor stating that he had been contacted by a former CHS who "was contacted recently by a colleague who runs an investigative firm.  The firm had been hired by two entities (the Democratic National Committee as well as another individual...not name[d]) to explore Donald J. Trump's longstanding ties to Russian entities."  On or about August 2, 2016, this information was shared by a CD supervisor with the Section Chief of CD's Counterintelligence Analysis Section I (Intel Section Chief), who provided it that day to members of the Crossfire Hurricane team (then Section Chief Peter Strzok, SSA 1, and the Supervisory Intel Analyst).

[224] ASAC 1 told us that he was not sure why nothing happened with the reports between July 13, the date he first spoke with Handling Agent 1, and July 28.

in general terms the information contained in Reports 80 and 94 and the relationship between Steele, Simpson, and a "law firm."

The ADC told the OIG that he was assigned the responsibility of reading Steele's reports and determining whether they were pertinent to any crimes involving public corruption. The ADC said he spoke with Handling Agent 1 on August 4, and Handling Agent 1 emailed Reports 80 and 94 to him the next day. Handling Agent 1 stated that, prior to sending the reports, ASAC 1 had contacted him to explain that the reports would be placed in a sub-file in NYFO and thereby "walled off" from agents in NYFO, and that the Assistant Director in Charge of NYFO and the "Executive Assistant Director (EAD) level" at FBI Headquarters were aware of the reports' existence. Handling Agent 1 stated that the ADC informed him in August that he was conferring with management in NYFO about how to handle the reports and would notify him after a determination had been made. Handling Agent 1 also stated that the engagement of an EAD was significant to him because he believed that "appropriate people were communicating" about the reports as a result and that he therefore should wait for further guidance about how to handle the reports.

As we discuss in detail in Chapter Nine, Handling Agent 1 also told us that, in mid to late August, he heard from Ohr "out of the blue," who inquired whether Handling Agent 1 had seen Steele's reports. According to Handling Agent 1, Ohr contacted him to confirm that the FBI was aware of the reports and was "handling" them. Handling Agent 1 told the OIG that he advised Ohr that news of the reports had reached the "EAD level" at FBI Headquarters and that executive management at NYFO was aware of the reports and trying to determine where to forward them. Ohr stated that he recalled Handling Agent 1 telling him this, but that at some later date Ohr said he became concerned that the right people at FBI Headquarters did not know about the reporting.

On August 25, 2016, according to a Supervisory Special Agent 1 (SSA 1) who was assigned to the Crossfire Hurricane investigation, during a briefing for then Deputy Director Andrew McCabe on the investigation, McCabe asked SSA 1 to contact NYFO about information that potentially could assist the Crossfire Hurricane investigation.[225] SSA 1 said he reached out to counterintelligence agents and analysts in NYFO within approximately 24 hours following the meeting. Instant messages show that on September 1, SSA 1 spoke with a NYFO counterintelligence supervisor, and that the counterintelligence supervisor was attempting to set up a call between SSA 1 and the ADC.

On September 2, 2016, Handling Agent 1, who had been waiting for NYFO to inform him where to forward Steele's reports, sent the following email to the ADC and counterintelligence supervisor: "Do we have a name yet? The stuff is burning a hole." The ADC responded the same day explaining that SSA 1 had created an electronic sub-file for Handling Agent 1 in the Crossfire Hurricane case and that he

---

[225] During his interview with the OIG, McCabe told us that he did not remember asking SSA 1 to contact NYFO, and he said he did not remember knowing in August 2016 that NYFO had information relevant to the Crossfire Hurricane investigation.

should forward the Steele reports to it. However, SSA 1 told us that there was a problem with his attempt to send an email to Handling Agent 1 in early September. SSA 1 said he did not recognize the problem until September 13 and emailed Handling Agent 1 that day with the case information necessary to upload the reports.

On September 19, 2016, the Crossfire Hurricane team received the Steele reporting for the first time when Handling Agent 1 emailed SSA 1 six reports for SSA 1 to upload himself to the sub-file: Reports 80 and 94, and four additional reports (Reports 95, 100, 101, and 102) that Handling Agent 1 had since received from Steele.[226] FBI officials we interviewed told us that the length of time it took for Steele's election reporting to reach FBI Headquarters was excessive and that the reports should have been sent promptly after their receipt by the Legat. Members of the Crossfire Hurricane team told us that their assessment of the Steele election reporting could have started much earlier if the reporting had been made available to them.

As described in Chapters Five and Seven, the FBI relied upon Report 95 to support probable cause in the Carter Page FISA applications. Report 95 was entitled "Russia/US Presidential Election: Further Indications of Extensive Conspiracy Between Trump's Campaign Team and the Kremlin" and cited repeatedly to information provided by "Source E." Report 95 alleged the existence of "a well-developed conspiracy of co-operation" between the Trump campaign and Russian leadership, and claimed that the campaign's manager, Manafort, used Carter Page and others as "intermediaries" to further the conspiracy. According to Source E, the "Russian regime" was behind the leak of DNC emails to WikiLeaks with the "full knowledge and support" of Trump and his campaign team, and the WikiLeaks platform was used by Russia to afford it "plausible deniability" of its involvement in the leak. Also, as we describe in Chapter Eight, Report 95 included an allegation that Page and possibly others agreed to sideline Russian intervention in Ukraine as a campaign issue in exchange for Russia's disclosure of hacked DNC emails to WikiLeaks. The FBI used this information in all of the Carter Page FISA applications to support its assessment that Page helped influence the Republican Party to change its platform to be more sympathetic to Russia's interests by eliminating language from the Republican platform about providing weapons to Ukraine.

Report 102, as described in Chapters Five and Seven, was also one of the 4 reports relied upon to support probable cause in the Carter Page FISA applications. The Report was titled, "Russia/US Presidential Election: Reaction in Trump Camp to Recent Negative Publicity About Russian Interference and Likely Resulting Tactics Going Forward." Report 102 alleged that the purpose of the recent DNC email leaks was to shift votes from Bernie Sanders to Trump following Clinton's nomination.

---

[226] Additional reports included the following information: Report 100 (Premier Medvedev's office was furious over DNC hacking and associated anti-Russian publicity) and Report 101 (The Kremlin is supporting various U.S. political figures and indirectly funding their travel to Moscow). Reports 95 and 102 are described below.

Report 102 also alleged that Carter Page conceived of and promoted the idea that
the release of the DNC emails would shift voter support to Trump.

### D.    The Crossfire Hurricane Team's Initial Handling of the Steele Reporting in September 2016

As described in Chapter Three, by the date the Crossfire Hurricane team
received the six Steele reports on September 19, the investigation had been
underway for approximately 6 weeks and the team had opened investigations on
four individuals:  Carter Page, George Papadopoulos, Paul Manafort, and Michael
Flynn.  In addition, during the prior 6 weeks, the team had used CHSs to conduct
operations against Page, Papadopoulos, and a high-level Trump campaign official,
although those operations had not resulted in the collection of any inculpatory
information.  Further, as described in Chapter Five, the team had discussions about
the possibility of obtaining FISAs targeting Page and Papadopoulos, but it was
determined that there was insufficient information at the time to proceed with an
application to the court.

As also described in Chapter Three, the FBI had an ongoing cyber
counterintelligence investigation into the Russian hacking of the DNC and was
aware of other Russian efforts to interfere with the upcoming 2016 U.S. elections.
We were told by several FBI witnesses that certain broad themes of the Steele
reporting were consistent with information already known by the FBI and other U.S.
government intelligence agencies.  These themes included that the Russian
government was seeking to sow discord and disunity within the United States and
Trans-Atlantic alliance, that the Russian government was working to support
Trump's election as President, and that Russian state-sponsored cyber operations
were responsible for hacking activity focused on the Clinton campaign.  Comey told
the OIG that, in his view, the "heart of the [Steele] reporting was that there's a
massive Russian effort to influence the American election and weaponize stolen
information."  Comey said he believed those themes from the Steele reporting were
"entirely consistent with information developed by the [USIC] wholly separate and
apart from the [Steele] reporting," as well as consistent with what "our eyes and
ears could also see."

After obtaining the six Steele reports on September 19, analysts on the
Crossfire Hurricane team immediately began to evaluate the information in the
reports.  By the next day, they had completed a draft Intelligence Memorandum
that summarized key points from the reports and identified actions that needed to
be taken to assess the information.  For example, Report 95 stated that Russian
diplomatic staff in the United States were rewarding assets (cooperators) using the
émigré pension distribution system as cover, and the Intelligence Memorandum
described ███████████████████████████████████████████████
████████████

The FBI's analytical efforts also included developing various diagrams, charts,
and timelines to document relationships and events pertinent to the Crossfire
Hurricane investigation.  In order to analyze the Steele election reports, the FBI
developed a spreadsheet of excerpts from the reports with analyst notes indicating

the source of the excerpt and verification information, such as whether information contained in the excerpt had been corroborated.[227]  We discuss in Chapter Six these efforts by the FBI over time to assess the Steele election reporting.

Assistant Director (AD) E.W. "Bill" Priestap and then Deputy Assistant Director (DAD) Peter Strzok told the OIG that the FBI's assessment of Steele's information was not different from the approach the FBI typically uses in evaluating CHS information.  They explained that the assessment involved determining the credibility of Steele, including understanding his record of furnishing reliable information, motivation, and possible biases; and verifying the information he provided through independent sources.  Priestap described the FBI's approach to the reporting in the following terms:

> [W]e did not ever take the information he provided at face value….
> We went to great lengths to try to independently verify the source's
> credibility and to prove or disprove every single assertion in the
> dossier….  We absolutely understood that the information in the so-
> called dossier could be inaccurate.  We also understood that some
> parts could be true and other parts false.  We understood that
> information could be embellished or exaggerated.  We also understood
> that the information could have been provided by the Russians as part
> of a disinformation campaign.

The Supervisory Intelligence Analyst (Supervisory Intel Analyst) assigned to Crossfire Hurricane told the OIG that an early focus of the FBI's analytical effort to assess Steele's reporting was trying to identify Steele's sources.  According to the Supervisory Intel Analyst, it was important to determine whether the reporting of those individuals matched their access to information.  The Supervisory Intel Analyst said that, in order to evaluate that issue and fully assess the reporting, the FBI sought assistance from other USIC agencies by, for example, vetting Russian names identified in the reports.

We asked the Supervisory Intel Analyst whether the FBI sought to determine who was financing Steele's election related research.  He said that the focus of the analysts was on Russian interference in the campaign and on any connections between Russia and the Trump campaign.  He stated that he was aware of the potential for political influences on the reporting.  He said that, because of that awareness, whether the reporting was "opposition research" that was politically motivated was not an issue that occupied his or his analysts' attention and that further research on the issue was nearly "immaterial."  He explained that because "opposition research can be true, it can be false," his focus was on vetting the reporting to determine whether its contents were accurate.

---

[227]  The OIG was advised that the spreadsheet does not include highly classified material, and therefore its presentation of information known to the FBI about corroboration of the Steele election reporting is partial.

On September 23, 2016, Case Agent 1, the lead case agent for the Carter Page investigation, emailed Handling Agent 1 to inquire about Steele. Handling Agent 1 responded: "[CHS] has been signed up for 3 years and is reliable. [CHS] responds to taskings and obtains info from a network of sub sources. Some of the [CHS'] info has been corroborated when possible."[228] This outreach was followed shortly thereafter by a request to Handling Agent 1 from one of the Crossfire Hurricane investigation supervisors, SSA 1, to participate in a video conference call with members of the Crossfire Hurricane team on September 27. According to participants on the call, the purpose of the call was to set a meeting with Steele to discuss his reports, learn about his source network, and gain his cooperation to collect additional information in support of the Crossfire Hurricane investigation.[229]

We asked Strzok who made the decision to use Steele as a source in the Crossfire Hurricane investigation. He said that McCabe and Comey were briefed on Steele's reporting and "okayed" the Crossfire Hurricane team's approach to use Steele in the investigation. Comey told us that he recalled being briefed about Steele but did not have a specific recollection beyond obtaining copies of Steele's reports and learning about Steele's background; his prior record of furnishing information to the FBI, including FIFA; and his work for political entities (first Republican, then Democratic).[230] McCabe told us that although he was sometimes present during discussions about the use of CHSs in Crossfire Hurricane, he left decisions about which sources to use and how to use them to the team.

As we describe below, in early October 2016 a meeting was held between members of the Crossfire Hurricane team and Steele in a European city. Unknown to the FBI at the time, Steele was working with his client, Fusion GPS, to alert select media outlets about his reporting concerning Russian interference with the 2016 U.S elections and allegations regarding the Trump campaign and candidate Trump. Additionally, the FBI was unaware at the time that Steele had not made available to the FBI all of the reports he prepared as of mid-September concerning Russia.[231] As described in Chapter Six, these and other reports were provided to

---

[228] We did not find this communication in Steele's Delta file.

[229] We found that the first time the Crossfire Hurricane team accessed Steele's Delta file was in November 2016. The Supervisory Intel Analyst told us that the team was in contact with Handling Agent 1 beginning in September and relied on him for information about Steele. Handling Agent 1 expressed surprise that the Crossfire Hurricane team did not access Steele's Delta file earlier. He said that the team should have "turned the file upside down" looking for information 2 months earlier and that he assumed that some members of the team had thoroughly reviewed the file.

[230] As noted earlier, Steele told us that he began work for Fusion GPS on the 2016 election assignment after Fusion GPS had completed a similar Trump related assignment for a Republican Party connected entity.

[231] The following are reports with select highlights that Steele did not furnish to the FBI, which range in date from July 30 to September 14, 2016:

- Report 97 (the Kremlin is concerned that political fallout from the DNC hacking operation is spiraling out of control; a source close to the Trump campaign confirms that the regular exchange of intelligence between the Trump team and the Kremlin had existed for at least 8 years; the Kremlin had determined not to use compromising

the FBI in November and December 2016 by a journalist, Senator John McCain, and
Ohr.  When we asked Steele why he failed to provide all of his then-existing reports
to the FBI, he could not provide us with an explanation and said that he should
have given them to the FBI at the time.

### E.    Steele Discusses His Reporting with Third Parties in Late September 2016 and the *Yahoo News* Article

During late September 2016, with Fusion GPS's authorization, Steele met
with numerous persons outside the FBI to discuss the intelligence he had obtained,
as part of his paid work for Fusion GPS, concerning Russian interference with the
2016 U.S. elections and allegations regarding the Trump campaign and candidate
Trump.[232]  For example, as we discuss in Chapter Nine, emails exchanged between
Steele and Ohr show that Steele visited Washington, D.C., beginning around
September 21, 2016, and met with Ohr on September 23, at which time the two
discussed multiple issues involving election related intelligence that Steele had
collected.  Steele told us that during this visit he also met with an attorney from
Perkins Coie, who was general counsel to the Clinton campaign.[233]

Steele also met with journalists during his September trip to Washington,
D.C.  According to a filing that Steele made in 2017 in foreign litigation, at Fusion
GPS's instruction, he briefed reporters from *The New York Times, The Washington*

---

information against Trump given how cooperative his team had been over several
years and of late);

- Report 105 (during a secret meeting between Putin and ex-Ukrainian President
Yanukovych, Yanukovych confided to Putin that he did authorize and order substantial
kick-back payments to Manafort but reassured Putin that no documentary trail was left
behind; Putin and Russian leadership were skeptical of the ex-President's assurances
that there were no traces of the payments; Manafort's departure from the Trump
campaign was attributable to Ukrainian corruption revelations as well as infighting with
campaign advisors);

- Report 112 (the leading figures of the Alpha group of businesses led by three Russian
oligarchs are on very good terms with Putin; Alpha held compromising information on
Putin and his corrupt business activities from the 1990s); and

- Report 113 (sources based in St. Petersburg reported that Trump has paid bribes and
engaged in sexual activities in St. Petersburg, including participating in sex parties,
but that witnesses had been "silenced," *i.e.*, bribed or coerced to disappear).

[232] This was not the first time that information included in Steele's reports concerning the
Trump campaign was known to individuals outside the FBI.  For example, Handling Agent 1 emailed an
FBI supervisor on July 28, 2016, explaining that Steele had advised him that information from Reports
80 and 94 "may already be circulating at a 'high level' in Washington, D.C."  Two days earlier,
according to a text between Carter Page and a *Wall Street Journal* reporter (that Page has since made
public), the reporter contacted Page inquiring whether Page had met with Sechin and Divyekin.  The
FBI also received correspondence from Members of Congress in August 2016 that described
information included in the Steele reports.  Additionally, then Assistant Secretary of State for
European and Eurasian Affairs Victoria Nuland publicly stated during an interview in 2018 that Steele's
election reporting was first provided to the State Department in July 2016.

[233] Steele told us that he had a second meeting with this attorney in October 2016, and that
he had met with another attorney from Perkins Coie in July 2016.

*Post, Yahoo News, The New Yorker*, and CNN.  The filing states that the briefings were verbal, occurred at the end of September, and "involved the disclosure of limited intelligence regarding indications of Russian interference with the U.S. election process and the possible coordination of members of Trump's campaign team and Russian government officials."

Steele told us that the press briefings were taskings from his client, Fusion GPS, that his firm had to honor, and Simpson has testified that Simpson attended the briefings.[234]  Steele said that they were "off-the-record" and, while he made mention of the reports, Steele did not distribute them to the journalists.  Steele explained that he discussed "general themes" from his reporting that lacked sufficient specificity to identify his sources, and that he avoided answering questions about whether he had reported his findings to authorities.[235]

We asked Steele whether he believed his participation in the press briefings was contrary to any admonishments that he had received previously from Handling Agent 1.  He said that he did not recall the FBI telling him he could not talk to journalists about work that he performed on behalf of his firm's clients.  According to Steele, the election reporting was a "Pipeline 1" assignment and therefore the FBI did not have a role in setting terms for his interactions with third parties, such as news organizations.  He said that if the FBI had tried to interfere in his assignment for Fusion GPS, he would have objected and that such an attempt would have been a "showstopper."  Steele stated that Orbis' client for the election reporting was Fusion GPS, which controlled and directed the terms for interactions with third parties.

Handling Agent 1 told us that he understood why Steele would believe in September 2016 that he did not have an obligation to discuss his press contacts with him given that:  (1) Steele's work resulted from a private client engagement; and (2) Handling Agent 1 told Steele on July 5 that he was not collecting his election reporting on behalf of the FBI.  However, Handling Agent 1's view was that while it was obvious that Fusion GPS would want to publicize Steele's election information, it was not apparent that Steele would be conducting press briefings and otherwise interjecting himself into the media spotlight.  Handling Agent 1 told us that he would have recommended that Steele be closed in September 2016 if he had known about the attention that Steele was attracting to himself.  According to Handling Agent 1, Steele should have had the foresight to recognize this fact and the professionalism to afford Handling Agent 1 an opportunity to assess the situation.  However, we are unaware of any FBI admonishments that Steele violated by speaking to third parties, including the press, about work that he had

---

[234] *Simpson Senate Testimony,* at 207.

[235] According to a book co-authored by a *Yahoo News* reporter who was present for a Steele September 2016 press briefing, Steele told him at the meeting that he had provided his election reporting to the FBI and that there were "people in the [FBI] taking this very seriously."  *See Russian Roulette: The Inside Story of Putin's War on America and the Election of Donald Trump* (New York: Grand Central Publishing, 2018), 226.

done solely for his firm's clients and where he made no mention of his relationship with the FBI.

On September 23, 2016, *Yahoo News* published an article entitled, "*U.S. Intel Officials Probe Ties Between Trump Advisor and Kremlin*." The September 23 article described efforts by U.S. government intelligence agencies to determine whether Carter Page had opened communication channels with Kremlin officials. Steele told us that because his briefing with *Yahoo News* was "off-the-record," he did not believe that he was the source for the article. He stated that it was his understanding based on discussions with Simpson that the sourcing for the article came from within the U.S. government.[236] However, portions of the article align with information contained in Steele's Report 94. For example, the article stated that U.S. officials had received intelligence reporting that Page had met with Igor Sechin, Chairman of Rosneft, and Igor Divyekin, Deputy Chief in the Russian Presidential Administration. The article cited "a well-placed Western intelligence source" for this information, and the article's author has confirmed that Steele contributed information for the article and that Steele was the "Western intelligence source."[237]

We asked FBI agents and analysts assigned to the Crossfire Hurricane investigation whether, following publication of the *Yahoo News* article, they had concerns that Steele was briefing the press about the reports that he had provided to the FBI, and they expressed varying points of view. The Supervisory Intel Analyst told us that it was unclear to him in September 2016 whether Steele was briefing the press. He stated that because Steele was providing his reporting to Fusion GPS, the Supervisory Intel Analyst's view at the time was that it could have been Fusion GPS or its clients who were discussing the reporting with news outlets. The supervisory attorney from the FBI Office of the General Counsel assigned to the Crossfire Hurricane investigation (the OGC Unit Chief) stated that she and others assumed that Steele's clients, or others with whom the clients had shared the information, were responsible for the press stories, but that the Crossfire Hurricane team would not have been surprised if Steele's reporting was the basis for the *Yahoo News* article. In contrast, Case Agent 1 sent instant messages indicating his belief that Steele was the "Western intelligence source" mentioned in the *Yahoo News* article and Steele "was selling his stuff to others." Case Agent 1 told us that the Crossfire Hurricane team later assessed that Simpson or someone else who had the Steele information, rather than Steele himself, was responsible for furnishing the information to *Yahoo News*. However, as we describe below, the team had no factual basis to support this assessment.

SSA 1 told us that his first concern was that someone from inside the FBI had disclosed information to the media. He stated that there was a "paranoia with leaks" inside the FBI in light of recent problems with leaks, and that it seemed

---

[236] *Yahoo News* has reported that the author of the September 23 article relied on a "senior U.S. law enforcement official" for information. *See* "Yahoo News' Michael Isikoff Describes Crucial Meeting Cited in Nunes Memo," *Yahoo News* (February 2, 2018).

[237] *Russian Roulette, at* 227.

"foreign" that Steele—as ███████████████████—would be involved in such a breach.  However, SSA 1's notes from a meeting on September 30 contain the following notation:  "control issues—reports acknowledged in *Yahoo News*."  We asked SSA 1 whether he was concerned at the time that there were control issues with Steele.  He stated that he was concerned but that he was not sure that Steele was responsible for providing information to *Yahoo News*.  In addition, he said he was focused on Steele's discussions with the State Department about his work with the FBI.[238]  SSA 1 stated that an important objective of the planned meeting with Steele in early October was to obtain "exclusivity" in Steele's reporting relationship, meaning that Steele would provide his intelligence related to the election exclusively to the FBI.

As we describe in Chapter Five, drafts of the Carter Page FISA application stated, until October 14, 2016, that Steele was responsible for the leak that led to the September 23 *Yahoo News* article.  One of the drafts specifically stated that Steele "was acting on his/her own volition and has since been admonished by the FBI."  In contrast, the final version of the first FISA application stated:

> Given that the information contained in the September 23rd News Article generally matches the information about Page that Source #1 discovered during his/her research, the FBI assesses that Source #1's business associate or the law firm that hired the business associate likely provided this information to the press.  The FBI also assesses that whoever gave the information to the press stated that the information was provided by a 'well-placed Western intelligence source.' The FBI does not believe that Source #1 directly provided this information to the Press.

The OI Attorney told us that at some point during the drafting process, the FBI assured him that Steele had not spoken with *Yahoo News* because the source was "a professional."  As we discuss in greater detail in Chapter Five, no one at the FBI or the National Security Division (NSD) was able to explain to us the source of the information that resulted in, or supported, either the draft language that existed until October 14 or the final language regarding the *Yahoo News* article.

Steele told us that he did not recall the FBI ever asking him whether he was the source for the *Yahoo News* story, no one from the FBI recalled having asked Steele if he was the source of the *Yahoo News* story, and we found no documentary evidence to suggest that Steele had ever been asked this question by the FBI.  As described in Chapters Seven and Eight, even after receiving additional information about Steele's media contacts, the Crossfire Hurricane team did not change the language in any of the three renewal applications regarding the FBI's assessment of Steele's role in the September 23 article.

---

[238] SSA 1 had been forwarded an email on September 30 from the State Department's Bureau of European and Eurasian Affairs indicating that senior staff there, including Assistant Secretary Nuland, were aware of a planned meeting between Steele and the FBI in early October in a European city, and that FBI officials from Headquarters were flying to Europe to participate in the meeting.

**F.   The FBI's Early October Meeting with Steele**

Handling Agent 1 told us that he took the lead in organizing the logistics for a meeting in early October between Steele and members of the Crossfire Hurricane team in a European city.  An Acting Section Chief from CD (Acting Section Chief 1), Case Agent 2, and the Supervisory Intel Analyst, attended the meeting for the Crossfire Hurricane team.  Case Agent 2 had extensive experience in counterintelligence and managing CHSs, including previously holding a supervisory training position where he provided instruction on those topics.  The Supervisory Intel Analyst was one of the FBI's leading experts on Russia.

Case Agent 2 and SSA 1 told the OIG that the FBI had several objectives for the meeting, the most important of which were learning about Steele's source network; persuading Steele to work collaboratively with the Crossfire Hurricane team in the future; and, as noted above, obtaining assurances from Steele that he would provide the intelligence that the FBI was seeking exclusively to the FBI. According to Case Agent 2, the task for him was a difficult one because he was asking Steele—an experienced intelligence professional—to reveal how he gathered intelligence.  Case Agent 2 stated that he needed to be careful to avoid use of heavy-handed tactics that would cause Steele to walk out.  We also were told by Case Agent 2 that the team's primary objectives for the meeting came from discussions he had with Strzok and SSA 1.  Strzok said that he discussed the goals of the early October meeting with the team and recalled attending meetings where taskings for Steele were discussed in anticipation of the meeting.  However, Strzok said he was not involved in developing the taskings and left that effort to the Crossfire Hurricane team.  He also stated that he was not asked to authorize the team's taskings for Steele.  SSA 1 said that the team had specific objectives for the early October meeting with Steele and that he provided guidance to the team before they left, but he did not recall his specific instructions.  SSA 1 stated that he trusted Case Agent 2, Acting Section Chief 1, and the Supervisory Intel Analyst to do their job when meeting with Steele.

The meeting was set for early October.  According to Handling Agent 1, Steele contacted him three days prior to the meeting and advised Handling Agent 1 that Steele had previously shared the reports he had given to the FBI with then State Department official Jonathan Winer.  Handling Agent 1 said that Steele also informed him that Winer was aware of the upcoming FBI meeting in October.

Handling Agent 1 stated that the Crossfire Hurricane team arrived in the European city the day before the meeting and that he conferred with them about Steele.[239]  Handling Agent 1 said he recalled providing advice to the team to ask Steele "anything and everything….  Don't hold back."  Handling Agent 1 also remembered that at least one member of the team asked Handling Agent 1 if Steele had said anything about the *Yahoo News* article.  Handling Agent 1 said that he responded "no" and that he was not familiar with the article in question.

---

[239]  After reviewing this report, the Supervisory Intel Analyst told us that he believed that the Crossfire Hurricane team arrived in the European city the morning of the meeting with Steele.

Handling Agent 1 also recalled the team discussing that the State Department was aware of the Steele reporting and that the team would need to discuss that with Steele.[240]  Handling Agent 1 told us that he advised the team that Steele had contacted Jonathan Winer at the State Department.  Case Agent 2 said that Handling Agent 1 did not mention to him that Steele had possible connections to Russian Oligarch 1 and that he would have wanted to know that information because it could have indicated that Steele was being used in a Russian "controlled operation" to influence perceptions (i.e., a disinformation campaign).  Handling Agent 1 did not recall if he told the Crossfire Hurricane team about Steele's connection to Russian Oligarch 1; however, he said he did inform the team that Steele collected intelligence on Russian oligarchs and had tried to arrange meetings between the FBI and Russian oligarchs.

The day of the meeting, Handling Agent 1 met with Steele prior to introducing him to the Crossfire Hurricane team and explained to Steele that he would be asked questions about his source network.  Handling Agent 1 said that he encouraged Steele to be forthcoming with the Crossfire Hurricane team.  Handling Agent 1 told the OIG that he attended the meeting but that Case Agent 2 did the majority of the talking for the FBI with the Supervisory Intel Analyst asking questions primarily about the source network.

The meeting lasted approximately 2.5 to 3 hours, according to the Supervisory Intel Analyst.  According to Case Agent 2's written summary of the meeting, Case Agent 2 provided Steele with a "general overview" of the Crossfire Hurricane investigation, which included a description of events involving Papadopoulos and the Friendly Foreign Government (FFG) information that furnished the predication for the investigation.  Case Agent 2's written summary also states that Case Agent 2 informed Steele that Papadopoulos's actions had resulted in a "small analytical effort" that had expanded to include Manafort, Flynn, and Carter Page.

Case Agent 2 told the OIG that he informed Steele that the FBI was interested in obtaining information in "3 buckets."  According to Case Agent 2's written summary of the meeting, as well as the Supervisory Intel Analyst's notes, these 3 buckets were:

(1) Additional intelligence/reporting on specific, named individuals (such as [Page] or [Flynn]) involved in facilitating the Trump campaign-Russian relationship;[241] (2) Physical evidence of specific individuals involved in facilitating the Trump campaign-Russian relationship (such as emails, photos, ledgers, memorandums etc); [and] (3) Any individuals or sub sources who [Steele] could identify

---

[240] According to Case Agent 2's written summary of the meeting with Steele in early October, Steele disclosed to the participants that he was furnishing information to the State Department "to ensure that the information was reaching the proper elements of the [U.S. government]."

[241] The written summary used codenames to identify Page and Flynn.

who could serve as cooperating witnesses to assist in identifying persons involved in the Trump campaign-Russian relationship.[242]

Case Agent 2's written summary of the meeting also indicates that Case Agent 2 explained that the FBI was willing to compensate Steele "significantly" for information concerning the "3 buckets" and that Steele would be paid $15,000 for his trip to the European city for the early October meeting.[243]

Case Agent 2 told the OIG that Steele sat throughout the meeting with his arms folded and he could tell from Steele's body language that he was "going to be difficult to handle." According to Case Agent 2, Steele was not "excited" to hear what information the FBI was hoping to obtain, and Case Agent 2's notes indicate that Steele was "caught off guard" with the tasking request. Case Agent 2 stated that Steele was focused instead during the meeting on candidate Trump and recalled that Steele responded to the "3 buckets" by stating "maybe I can go back to the hotel [in Russia] and get the manager for you to meet to talk about the prostitutes being there."

Notes taken by Case Agent 2 and the Supervisory Intel Analyst show that Steele provided some information during the meeting about his source network and furnished several other names that could be of interest to the FBI. For example, Steele identified a sub-source (Person 1) who Steele said was in direct contact with Steele's primary source (Primary Sub-source).[244] The notes further reflect that Steele described some of Person 1's reporting but caveated this information by explaining that Person 1 is a "boaster" and "egotist" and "may engage in some embellishment." As described in Chapters Five and Eight, the FBI did not provide this description of Person 1 to NSD's Office of Intelligence (OI) for inclusion in the Carter Page FISA applications despite relying on Person 1's information to establish probable cause in the applications.

The Supervisory Intel Analyst's notes also indicate that Steele explained that the information he obtained about Carter Page resulted from research he had been retained to conduct related to a litigation matter concerning debts allegedly owed by Paul Manafort.[245]

---

[242] The FBI advised the OIG that the Crossfire Hurricane investigation was a national security investigation, and these activities therefore involved national security ███████████ CHS operations██.

[243] As we discuss below, after the FBI learned in November that Steele had disclosed information to *Mother Jones* in late October 2016, the FBI declined to make this payment.

[244] Person 1 ██████████████████████████████████████████

[245] At the time, according to FBI records that we reviewed, Manafort was involved in litigation with Russian Oligarch 1, and Steele had a relationship with one or more of the attorneys representing Russian Oligarch 1. In his interview with the OIG, Steele denied that his reporting on Carter Page resulted from work he performed on Russian Oligarch 1's behalf. Steele described as "ridiculous" any claim that Russian Oligarch 1 was involved in his reporting or influenced it.

Lastly, Steele provided the name of a Russian national, who he said may have connections with a Russian energy company, and who Steele claimed may be acting as Carter Page's possible "handler" for Russian intelligence. As noted in Chapter Three, Carter Page previously had a relationship with another U.S. government agency; Page had provided that agency with information on the same Russian national that Steele reported was Page's possible handler. According to an Assistant Legal Attaché (ALAT 2), Steele's allegations about the Russian national were investigated ███████████████████████████████████████████, but no information was uncovered to substantiate the allegations.[246]

We were told by the Crossfire Hurricane team members that Steele refrained from providing the level of detail about his source network that the FBI had hoped to obtain. Steele told the team members that he did not want to identify his sources because he was concerned about their safety and security. He explained that he was ████████████████████████████████████████Primary Sub-source, and that due to leaks, his source network was "drying up." According to Case Agent 2, Steele complained to the FBI during the meeting about these leaks.

We were also told by Case Agent 2 that Steele did not disclose information about the identity of Fusion GPS's client, a law firm which was funding Steele's work due to a confidentiality agreement that prevented him from sharing that information.[247] We asked Steele what he told the FBI during the meeting about his client. He said that his notes from the meeting, which he told us he prepared two days after the meeting, and are dated that day, were the best source for that information. We reviewed Steele's notes, which show that Steele stated during the meeting that Simpson was an "intermediary" and that Simpson had been retained by "people seeking to prevent Trump becoming President." The notes did not reflect that any additional information had been provided by Steele during the meeting regarding the identity of Fusion GPS's client. Steele told us that the FBI did not press him to identify Fusion GPS's client.

During the meeting, Case Agent 2 said he advised Steele of the need to establish an exclusive reporting relationship with the FBI concerning the information that he was being tasked to collect. Case Agent 2 drafted an Electronic

---

[246] Steele also reiterated some of the information in his election reporting identified other U.S. persons that he believed may be involved in or have knowledge of Russia and Trump connections. Additionally, he told the FBI that he was personal friends with a Trump family member and that the FBI may become aware of email communications concerning their friendship. Steele stated that he could not see the Trump family member being involved in any nefarious activities concerning the Trump-Russia matter.

[247] On October 14, 2016, Case Agent 2 wrote in an email to SSA 1, Case Agent 1, the Intel Section Chief, and Strzok, among others stating that Handling Agent 1 did not believe Steele knew the identity of the Fusion GPS client. As we described in Section II.B. above, Steele told Handling Agent 1 in July that he did not know the precise identity of the client; however, it is unclear whether Handling Agent 1 subsequently asked Steele whether he had acquired that information. Handling Agent 1 told us that he did not "continually ask" Steele about the firm's identity after his meeting with Steele on July 5, 2016.

Communication (EC) following the early October meeting that was serialized into the Crossfire Hurricane case file and described the FBI request for exclusivity:

> [T]he CHS was admonished that if the CHS and FBI were going to have a reporting relationship regarding specific items of interest to the CROSSFIRE HURRICANE team (*i.e.*, [Manafort] and [Page]), that the CHS must have an exclusive reporting relationship with the FBI, rather than providing that information to the clients that hired the CHS's firm to provide reporting on Trump and [Manafort].

Recollections of the Crossfire Hurricane team members who attended the meeting varied about Steele's response to this request, except all agreed that Steele did not affirmatively disagree with it. Handling Agent 1 told us that Steele was told at the meeting "you do not talk to anybody else including anybody else in the United States government" about information Steele collected for the three buckets and that Steele agreed. Handling Agent 1 said that Steele left him with the impression that he would assist the FBI following the meeting and would abide by the FBI's instruction on exclusivity, and that he "did not buy for one second" the notion that Steele was not a CHS at this time with an obligation to follow FBI instructions. The Supervisory Intel Analyst said he could not recall Steele's response, but said that by the end of the meeting he was left with the impression that Steele would abide by the FBI's request. He further stated that, if Steele had rejected the FBI's request, it would have been documented. Case Agent 2 said that Steele never committed to share information regarding the "3 buckets" exclusively with the FBI. According to Case Agent 2, Steele's response instead was that he would consider ways to help the FBI.

Steele told us that the FBI indicated at the meeting in early October that the FBI wanted to take over the "election project" and control it, alternatively describing the FBI's actions as an attempt to get Steele to convert a "Pipeline 1" project into a "Pipeline 2" project. Steele recalled that, in response, he made it clear that was not going to happen because he was obligated to his client and was "not dumping the client" in favor of the FBI. He stated, however, that he wanted to be as helpful to the FBI as he could. According to Steele, the FBI accepted his position though they requested that he not share his election intelligence with other U.S. government agencies or with third-party clients (other than the client that retained him initially). Steele said he did not know whether he agreed to this request and pointed out that his notes from the meeting do not reflect his response.[248] We asked whether he would have recorded a response in the notes if he had rejected the request. He responded "yes," and said the lack of a response in his notes suggested he did not agree or disagree.

We asked Handling Agent 1 and members of the Crossfire Hurricane team whether it was realistic for the FBI to expect that Steele would abide by the FBI's request given that his consulting firm had been retained by a paying client to perform this work. Handling Agent 1 told us that he thought it was realistic

---

[248] The notes that Steele made available to the OIG to review, which Steele told us he prepared two days after the meeting, were consistent with his testimony to the OIG.

because Steele "was now being offered compensation to go forward from the United States government." Acting Section Chief 1 said he was not sure at the time how realistic the request was because he did not know how many clients Steele had, though he "rationalized" that given Steele's intelligence background his business probably "was wide to a lot of audiences" and he could afford to have an exclusive reporting relationship with the FBI on certain issues.

We also asked the FBI team members who attended whether there was any discussion during the meeting about the September 23 *Yahoo News* article. Case Agent 2 told the OIG that he could not remember asking Steele about the *Yahoo News* article during the meeting, and that he was more focused on getting Steele to "play ball." The Supervisory Intel Analyst also said he did not recall Steele being asked whether he was a source of the *Yahoo News* article. Handling Agent 1 stated that he could not recall if the article was raised during the meeting with Steele. According to Steele, he did not recall any discussion of the media during the early October meeting, and none was reflected in his notes. Steele further told us that if the issue of the media had been raised he would have recorded it in his notes given that he already had met with media groups in September.

According to the Crossfire Hurricane team members, the outcome of the early October meeting was less than desired. Case Agent 2 said he could not recall Steele agreeing to anything during the meeting. Both Case Agent 2 and the Supervisory Intel Analyst told the OIG that, although Steele continued to provide written reports to Handling Agent 1 after the meeting, Steele did not provide information specifically addressing the "3 buckets."[249] Case Agent 2 also expressed skepticism after the meeting as to whether Steele would abide by the FBI's request for exclusivity in his reporting. In response to an inquiry in mid-October from the OI Attorney who was drafting the first Carter Page FISA application, about whether Steele was refraining from providing information to Simpson that was relevant to the Crossfire Hurricane investigation, Case Agent 2 responded in an email that "we need to be realistic about that." Case Agent 2 wrote:

> We made a good faith effort and admonished the CHS [at the early October meeting] that any further information that s/he developed in regard to our subjects, Page[,] Manafort, Papadopoulos, Flynn should be exclusively provided to the FBI for further evaluation. Whether or not that happens remains to be seen.

Handling Agent 1 told us that after the early October meeting Steele failed to abide by the FBI's instructions when he continued to meet with the media and the State Department about issues over which the FBI had sought to establish an exclusive reporting relationship at the early October meeting. According to Handling Agent 1, while Steele appeared to follow the directions of Fusion GPS, he did not treat his other client – the FBI – fairly. According to Handling Agent 1, if Steele "had been straight with the FBI," he would not have been closed as a CHS. Handling Agent 1 added that it "blew his mind" that, given Steele's intelligence

---

[249] As we describe below, Steele did provide some limited information in mid-October 2016 concerning Carter Page.

background, Steele was meeting with the press and taking actions that endangered the safety of those in his source network. Case Agent 2 told the OIG that he thought it was "terrible" for Steele to complain to the FBI about leaks during the early October meeting given that he had been meeting with media outlets in September and had provided information that was used in the *Yahoo News* article. According to Case Agent 2, in hindsight, "[c]learly he wasn't truthful with us. Clearly."

We asked Steele whether during the early October meeting he lied or otherwise misled the FBI. He responded "no" and that he did not believe he ever lied to the FBI.

### G.    FBI Disclosures to Steele during the Early October Meeting

In addition to inquiring about Steele's conduct at the early October meeting, we also asked whether the Crossfire Hurricane team members provided too much information to Steele during the meeting, including classified information. According to Case Agent 2's written summary of the meeting, Case Agent 2 provided Steele with a "general overview" of the Crossfire Hurricane investigation, which included a description of events involving Papadopoulos and the FFG, which furnished the predication for the investigation. Case Agent 2's written summary also states that Case Agent 2 informed Steele that Papadopoulos's actions had resulted in a "small analytical effort" that had expanded to include Manafort, Flynn, and Page.[250] FBI attendees at the meeting confirmed that Case Agent 2 led the discussion on these points, though Case Agent 2 told us that his written summary does not present the actual words he used in his explanations to Steele. The contents of both the "analytical effort" and the FFG's notice to the U.S. government are classified.

Handling Agent 1 told the OIG that he agreed it was peculiar that Case Agent 2 gave Steele an overview of the Crossfire Hurricane investigation, including providing names of persons related to the investigation. As an example, Handling Agent 1 explained that during the FIFA investigation he never informed Steele that the FBI was investigating FIFA. The Supervisory Intel Analyst told the OIG that he was concerned that Case Agent 2 had divulged too much information to Steele and that he notified his supervisor about his concern upon returning to Washington D.C.

---

[250] The relevant text from Case Agent 2's summary reads:

The CHS was then given a general overview of the FBI's CROSSFIRE HURRICANE investigation and told that it was a small cell that was exploring a small piece of the overall problem of Russian interference in the U.S. Electoral process. CHS was advised that the CH team was made aware of [Papadopoulos's] May 2016 comments in the U.K in late July by a friendly foreign service and that [Papadopoulos] had predicated a small analytical effort that eventually expanded to include [Manafort, Flynn, and Page]. CHS advised that he was not aware of [Papadopoulos].

The Supervisory Intel Analyst stated that he was concerned that Case Agent 2 had shared names as well as information related to the FFG information.[251]

Case Agent 2 said that he believed he had authority from CD to discuss classified information with Steele, though he agreed that in the "heat of the moment" he made a mistake and provided more information than he should have provided about the role of the FFG. He explained that his disclosure resulted from "trying in good faith to accomplish the mission." He stated that he remembered telling Steele that the FBI was investigating possible Russian penetrations of the Trump campaign but did not recall telling Steele that Papadopoulos, Manafort, Flynn, and Page were being investigated by the FBI. Rather, he recalled asking for information about those persons in light of press coverage that they had received. Steele told us that he did not believe the Crossfire Hurricane team members told him whether there was an open investigation on those persons. Case Agent 2 further stated that there was no effort on his part to conceal what he had said to Steele from his supervisors. After the meeting concluded, Case Agent 2 circulated a written summary of the meeting that included a description of the information he provided to Steele. Acting Section Chief 1 also attended the meeting in the European city and did not object at the time or afterwards to Case Agent 2's conduct.

We asked Case Agent 2's supervisors—Strzok and Priestap—about the information that the Crossfire Hurricane team communicated to Steele and whether Case Agent 2 had been authorized to disclose classified information during the early October meeting.[252] Priestap said that he did not recall being briefed beforehand about what information the team intended to convey to Steele. He explained, however, that given Steele's background in intelligence work, it was necessary to provide him with sufficient contextual information to understand the taskings. Priestap also said that there is an "art" to deciding how much information to convey to a CHS so that the CHS can be effective without divulging the sensitive details of an investigation. Strzok stated that he did not recall authorizing Case Agent 2 to disclose the specific information presented in Case Agent 2's written summary though Strzok said he recalled general discussions with the Crossfire Hurricane team members who were meeting with Steele about how much information to share with Steele. Strzok explained that "[y]ou provide as much information as needed to give effective direction, and as little as possible to compartment and protect what we're doing." After reading Case Agent 2's written summary of the information he presented to Steele, both Priestap and Strzok said that it appeared that Case Agent 2 provided more information than was necessary to Steele.

[251] Steele informed Simpson about the content of the discussions during the early October meeting, including that the FBI had information from "an internal Trump campaign source" that corroborated Steele's reporting, according to Simpson's testimony to the Senate Judiciary Committee. *Simpson Senate Testimony,* at 175.

[252] FBI Security staff told us that the Assistant Director for CD can authorize the disclosure of classified information. We found that the CHS Policy Guide (CHSPG) does not address the disclosure of sensitive or classified information to CHSs and that the FBI has not otherwise developed guidance on the issue.

**H.    Steele's Reporting to the FBI Following the Early October Meeting and Continuing Media Contacts**

Steele continued to furnish the FBI with written reports following the early October meeting.  Handling Agent 1 told us that he became a "middleman" between Steele and the Crossfire Hurricane team and forwarded Steele's reports to the team.  According to Handling Agent 1's records, during October 2016, Steele communicated with him four times and provided seven written reports, one of which concerned Carter Page and thus was responsive to the FBI's request for information concerning Page's activities.[253]

On October 19, 2016, Steele also forwarded to Handling Agent 1 a report that Steele said he had obtained from State Department official Jonathan Winer.  Steele included a notation on the report explaining that Winer had been given the report by a friend of a well-known Clinton supporter, and that the friend had obtained the report from a Turkish businessman with strong links to Russia, including the Federal Security Service of the Russian Federation (FSB).[254]  The report included numerous allegations attributed to an FSB source, including that (1) a "'pervasive' and 'sophisticated' intelligence operation" was focused in part on

---

[253] These seven reports, with selected highlights, were:

- Report 130 (Putin and his colleagues were surprised and disappointed that leaks of Clinton's emails had not had a greater impact on the campaign; a stream of hacked Clinton material had been injected by the Kremlin into compliant western media outlets like WikiLeaks and the stream would continue until the election);

- Report ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮;

- Report 134 (a close associate of Rosneft President Sechin confirmed a secret meeting with Carter Page in July; Sechin was keen to have sanctions on the company lifted and offered up to a 19 percent stake in return);

- Report 135 (Trump attorney Michael Cohen was heavily engaged in a cover up and damage control in an attempt to prevent the full details of Trump's relationship with Russia being exposed; Cohen had met secretly with several Russian Presidential Administration Legal Department officials; immediate issues were efforts to contain further scandals involving Manafort's commercial and political role in Russia/Ukraine and to limit damage from the exposure of Carter Page's secret meetings with Russian leadership figures in Moscow the previous month);

- Report 136 (Kremlin insider reports that Cohen's secret meeting/s with Kremlin officials in August 2016 was/were held in Prague);

- Report ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; and

- Report ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

[254] According to open source reporting, the FSB serves as Russia's domestic intelligence and security service that retains a broad mission of counterintelligence, counterterrorism, cyber defense, border security, and economic security, in addition to overseeing Russia's vast technical monitoring system known as SORM.

Trump and was an "open secret" in Putin's government; (2) sex videos existed of Trump; and (3) the FSB funneled payments to Trump through an Azerbaijani family.  According to Steele's notation to the report, Steele did not have a way to verify the source(s) or the information but noted that, even though the reporting originated from a different source network, some of it was "remarkably similar" to Steele's reporting, especially with regard to the alleged 2013 Ritz Carlton incident involving Trump and prostitutes, Trump's compromise by the FSB, and the Kremlin's funding of the Trump campaign by way of the Azerbaijani family.  The Supervisory Intel Analyst characterized the report as "yet another report that would need to be evaluated."

In addition to continuing to provide reporting to the FBI, Steele also was, unbeknownst to the FBI at the time, continuing his outreach to the media concerning alleged contacts between the Trump campaign and the Russian government.  According to information from the foreign litigation noted above, Steele returned to Washington, D.C., in mid-October and provided additional briefings to *The New York Times*, *The Washington Post*, and *Yahoo News*.  We asked Steele why he did not advise the FBI of his engagements with the media.  He stated that he did not alert the FBI because the media briefings were part of his contract with Fusion GPS and were set up and attended by Simpson.  As noted above, Steele did not believe that the FBI had raised the issue of media contacts with him at the early October meeting, and his contemporaneous notes from that meeting do not mention the issue.

Further, Steele met on October 11 at the State Department with Winer and Deputy Assistant Secretary Kathleen Kavalec, who was a deputy to then Assistant Secretary Victoria Nuland.  Steele told us that Winer had originally contacted him to request that he meet with Nuland, who ultimately did not attend.[255]  Notes of the meeting taken by State Department staff reflect that Steele addressed a wide array of topics during the meeting, including:

- Derogatory information on Trump;

- Manafort's role as a "go-between" with the campaign and Kremlin;

- The role of Alfa Bank, one of Russia's largest privately owned banks, as a conduit for secret communications between Manafort and the Kremlin;

- Manafort's debts to the Russians;

- Carter Page's meeting with Sechin;

- The Russian Embassy's management of a network of Russian émigrés in the United States who carry out hacking and recruiting operations; and

---

[255] Steele told us that he was delayed from the airport and arrived late for the meeting, by which time Nuland had departed.

- The Russian cyber penetration of the DNC.[256]

The notes also indicate that Steele explained that the information his firm collected on the connection between Trump and Russia came from ███████████, ██



███████████████████████████ According to the notes, Steele stated that ██ ███████████████████████ The notes also state that Steele's firm had ███ ███████████

We asked Kavalec about the meeting with Steele. She stated that Nuland did not ask to meet with Steele and that Nuland requested she attend the meeting because Nuland did not want to devote time to it. It was Kavalec's understanding that Steele sought the meeting with Nuland as part of a wider effort to disseminate his election report findings to persons in Washington, D.C. She stated that during the meeting Steele expressed frustration that the FBI had not acted on his reporting and explained that when he first offered information to the FBI he found a lack of interest.

Kavalec told us that shortly after the meeting with Steele, she encountered the FBI's liaison to the State Department and mentioned the meeting to him. According to Kavalec, she explained to the liaison that she was willing to be interviewed by the FBI regarding her meeting with Steele, though Steele had informed her that he had already been in contact with the FBI to share his reporting. The FBI liaison told us that Kavalec also informed him that a particular piece of information in Steele's reporting appeared to be incorrect. She explained to the FBI liaison that Russia did not have a consulate in Miami as indicated by Steele's reporting, which claimed that a cyber-hacking operation was being run, in part, out of the Russian consulate in Miami.[257] The FBI liaison informed SSA 1 and Case Agent 1 via email on November 18 that Kavalec had met with Steele, she had taken notes of their meeting, the liaison could obtain information from Kavalec about the meeting, and, according to Kavalec, the information from Steele's reporting about a Russian consulate being located in Miami was inaccurate.[258] The

---

[256] Much of the information presented by Steele at the State Department briefing can be found in Reports 130 and 132, both of which Steele provided to the FBI in October.

[257] Kavalec's typed notes from Steele's October 11, 2016 briefing stated that Steele told her that a Russian cyber hacking operation targeting the 2016 U.S. elections was making payments to involved persons from "the Russian [c]onsulate in Miami." Steele's election Report 95 contained similar, but not fully consistent, information. Report 95 did not explicitly state that there was a Russian consulate in Miami. Instead, Report 95 stated that Russian consular officials and diplomatic staff in Miami were making payments in order to facilitate a secret exchange of intelligence between persons affiliated with Trump and the Russian government.

[258] After reviewing a portion of our draft report and his November 18, 2016 email to SSA 1 and Case Agent 1, the FBI liaison told us that he believes that he first learned about Kavalec's meeting with Steele on or about November 18, 2016.

FBI liaison told us that he received no directives from the Crossfire Hurricane team to gather information from Kavalec regarding her contact with Steele.

In anticipation of an FBI interview, Kavalec said she prepared a typewritten summary of the meeting within 1 to 2 weeks after talking with the liaison. The typed summary began by noting that Steele said at the meeting that he had undertaken the investigation "at the behest of an institution he declined to identify that had been hacked." The summary also noted that Steele told the attendees that the "institution...is keen to see this information come to light prior to November 8." However, the FBI did not interview Kavalec nor did they seek her notes.

Two days after the meeting with Steele, Kavalec emailed an FBI CD Section Chief a document that Kavalec received from Winer discussing allegations about a linkage between Alfa Bank and the Trump campaign, a topic that was discussed at the October 11 meeting.[259] Kavalec advised the FBI Section Chief in the email that the information related to an investigation that Steele's firm had been conducting. The Section Chief forwarded the document to SSA 1 the same day.

We asked Steele why he did not inform the FBI of the meeting at the State Department and why he did not abide by the FBI's request for exclusivity. He said he did not think it was appropriate to turn down a meeting request from an Assistant Secretary of State, which he said he received on short notice. He also stated that, at the time he received the meeting request, the meeting agenda was unclear, and he was uncertain what topics he would be asked to discuss. He said it was his understanding that the FBI did not object to his discussing general themes with other agencies as opposed to "details" about his intelligence and source network.

Handling Agent 1 told us that he believed Steele should have alerted him to both his media contacts in September and October and his meeting with State Department staff in October. As noted above, the Crossfire Hurricane team first learned of Steele's October meeting with the State Department from the FBI liaison on November 18, by which date the FBI had already closed Steele as a CHS because of his *Mother Jones* disclosure, which we discuss in Chapter Six. Handling Agent 1 explained that Steele should have recognized the need to provide this notice to the FBI, especially given the discussions that took place with the Crossfire Hurricane team in early October.

---

[259] Steele separately wrote in Report 112, dated September 14, 2016, that Alfa Bank allegedly had close ties to Putin. The Crossfire Hurricane team received Report 112 on or about November 6, 2016, from a *Mother Jones* journalist through then FBI General Counsel James Baker. Additionally, Ohr advised the FBI on November 21, 2016, according to an FBI FD-302, that Steele had told Ohr that the Alfa Bank server was a link to the Trump campaign and that Person 1's Russia/American organization in the U.S. had used the Alfa Bank server two weeks prior. Steele told us that the information about Alfa Bank was not generated by Orbis. The FBI investigated whether there were cyber links between the Trump Organization and Alfa Bank, but had concluded by early February 2017 that there were no such links. The Supervisory Intel Analyst told us that he factored the Alfa Bank/Trump server allegations into his assessment of Steele's reporting.

In the next chapter we describe the first Carter Page FISA application, filed on October ██, 2016, which relied significantly on Steele's reporting.

**[PAGE INTENTIONALLY LEFT BLANK]**

# CHAPTER FIVE
# THE FIRST APPLICATION FOR FISA AUTHORITY ON CARTER PAGE

At the request of the FBI, the Department filed four applications with the Foreign Intelligence Surveillance Court (FISC) seeking FISA authority to conduct electronic surveillance ███████████████ targeting Carter Page: the first application on October ██, 2016, and three renewal applications on January ██, April █, and June ██, 2017. A different FISC judge considered each application and issued the requested orders, collectively resulting in approximately 11 months of FISA coverage targeting Carter Page from October ██, 2016, to September ██, 2017.

In this chapter, we describe the first of the four FISA applications, beginning with the early consideration of a potential FISA targeting Carter Page in August 2016, shortly after the FBI opened the Crossfire Hurricane investigation, and the FBI's eventual submission of a FISA request to the Office of Intelligence (OI) in the National Security Division (NSD) in September 2016, a few days after the Crossfire Hurricane team received Christopher Steele's reporting. We discuss the significance of the Steele reporting to the decision of FBI attorneys to proceed with the FISA request. We also describe the development of the first FISA application and the attention it received during the review and approval process from the FBI, OI, NSD management, and the Office of the Deputy Attorney General (ODAG). We further describe the filing of the read copy with the FISC, the feedback OI received from the court, revisions made to the application to address that feedback, and the last steps taken before the final application was filed and the orders were issued. These last steps included the completion of the Woods Procedures described in Chapter Two, then FBI Director James Comey's certification of the application, and the oral briefing provided to, and final approval given by, then Deputy Attorney General (DAG) Sally Yates. Finally, we describe the most significant instances in which information in the FISA application was inaccurately stated, incomplete at the time the application was filed, or unsupported by documentation in the Woods File.

## I.      Decision to Seek FISA Authority

### A.      Early Consideration of a Potential FISA

As described in Chapter Three, on August 10, 2016, under the umbrella of Crossfire Hurricane, FBI Headquarters opened a new full counterintelligence investigation on Carter Page. The pre-existing counterintelligence case on Page was then transferred from the FBI's New York Field Office (NYFO) to FBI Headquarters and merged into the new case. At about the same time, the Crossfire Hurricane team began planning for Confidential Human Source (CHS) operations (discussed later in this chapter and in Chapter Ten) targeting Carter Page and George Papadopoulos. Also at about the same time, the case agent assigned to the Carter Page investigation, Case Agent 1, contacted FBI's Office of the General Counsel (OGC) about the possibility of seeking FISA authority targeting Carter Page

to conduct electronic surveillance ⬛⬛⬛⬛⬛⬛⬛⬛. This was the first
potential use of FISA authority considered by the Crossfire Hurricane team.

The Crossfire Hurricane team told us that the proposal for FISA coverage
targeting Carter Page originated from the team, not an instruction from
management. The team also told us that its interest in obtaining a FISA was based
upon Page's prior contacts with known Russian intelligence officers, which the team
believed made him most receptive to receiving the offer of assistance from the
Russians reported in the FFG information (described in Chapter Three) provided to
the FBI in late July 2016. Case Agent 1 said that he had hoped that emails and
other communications obtained through FISA electronic surveillance would help
provide valuable information about what Page did while in Moscow in July 2016 and
the Russian officials with whom he may have spoken.

For these reasons, on August 15, 2016, Case Agent 1 emailed a written
summary on Carter Page to the OGC Unit Chief, stating that he thought the
information provided "a pretty solid basis" for requesting FISA authority. This
summary, which a Staff Operations Specialist (SOS) prepared, briefly described
Page's Russian business and financial ties, his prior contacts with Russian
intelligence officers, and his recent travel to Russia. According to Case Agent 1,
both he and the SOS believed that they had enough information to establish the
probable cause necessary to request FISA authority on Carter Page. Case Agent 1
told us that Page's contacts with known Russian intelligence officers (described in
Chapter Three) provided a "pretty good link" for a FISA.

Later the same day, the OGC Unit Chief responded to Case Agent 1 with
requests for additional information about what Page had previously told the FBI
regarding his relationship with Russian intelligence officers in order to compare it
with information the FBI had from other reporting sources. She said that this
information would be helpful to determine whether Page had a clandestine
relationship with Russia. The OGC Unit Chief added that she would reach out to her
OI counterparts to get their thoughts, "but I think we'll need more for PC," meaning
probable cause.

The next day, on August 16, the OGC Unit Chief contacted Stuart Evans, then
NSD's Deputy Assistant Attorney General with oversight responsibility over OI,
stating:

> We have some facts which may lead to a FISA on one of our subjects—
> mostly past contacts and connections to [Russian Intelligence
> Services] and a financial interest in [a] Russian-government controlled
> gas business. I don't think we're quite there yet, but given the
> sensitivity and urgency of this matter, I would like to get OI involved
> as early as possible.

The OGC Unit Chief told Evans he had permission to brief a small group of OI
attorneys into Crossfire Hurricane, including the Operations Section Chief, Gabriel

Sanz-Rexach; the Deputy Section Chief; the Counterintelligence Unit Chief (OI Unit Chief); and one line attorney.[260]

The OGC Unit Chief and OGC Attorney assigned to assist the Crossfire Hurricane team met with the OI Unit Chief the same day to brief him on Crossfire Hurricane and the four individual subjects. During his OIG interview, the OI Unit Chief recalled that the OGC attorneys mentioned the possibility of seeking FISA authority targeting Carter Page, but he did not recall a decision being made at the meeting about whether to do so.[261] The OI Unit Chief said that, at the request of Evans, he advised OGC that the FBI would need to submit a formal FISA request before OI would begin the back-and-forth process with the FBI on a potential application. He told us that it was over a month later when OGC told him for the first time that the FBI was ready to move forward with the request.

While FISA discussions were ongoing, on or about August 17, 2016, the Crossfire Hurricane team received information from another U.S. government agency relating to Page's prior relationship with that agency and prior contacts with Russian intelligence officers about which the agency was aware. We found that, although this information was highly relevant to the potential FISA application, the Crossfire Hurricane team did not engage with the other agency regarding this information until June 2017, just prior to the final Carter Page FISA renewal application.[262] As we discuss later in this chapter, when Case Agent 1 was explicitly asked in late September 2016 by the OI Attorney assisting on the FISA application about Page's prior relationship with this other agency, Case Agent 1 did not accurately describe the nature and extent of the information the FBI received from the other agency.

Also in August, while FISA discussions were ongoing, the Crossfire Hurricane team conducted a consensually monitored meeting between an FBI CHS and Carter Page in an attempt to obtain information from Page about links between the Donald J. Trump for President Campaign and Russia. During the operation, which we describe in greater detail below, Page made statements to the CHS that would have, if true, contradicted the notion that Page was conspiring with Russia. Page

---

[260] OI's Operations Section is divided into three units: Counterintelligence, Counterterrorism, and Special Operations. Among other responsibilities, all three units prepare and file FISA applications with the FISC. Because the Carter Page investigation was a counterintelligence matter, the Counterintelligence Unit handled the Carter Page FISA applications.

[261] The OI Unit Chief did not recall providing specific feedback concerning a potential Carter Page FISA application during or in response to this meeting. He said they did not discuss at that time the specific information the Crossfire Hurricane team had to support a FISA application. He recalled only a general discussion about the case that included a heads up that they believed that at some later point they would want to move forward on a FISA request targeting Carter Page. The OGC Unit Chief and OGC Attorney told us they also did not recall the feedback from OI, if any, at this time. The OGC Attorney did not recall attending the meeting at all, even though the OI Unit Chief's meeting notes indicate he was present.

[262] We describe in Chapter Eight the circumstances surrounding the FBI's engagement with the other agency in June 2017 and the FBI's failure to include the information in the final FISA renewal application.

also made statements that contradicted the Steele reporting received by the team in September, in particular the assertion that Manafort was using Page as an intermediary with Russia. However, as we detail later in this chapter, we found no evidence the FBI made Page's statements from this CHS meeting available to OI or NSD until mid-June 2017.

FBI documents reviewed by the OIG indicate that by late August 2016, Case Agent 1 had been told that he had not yet presented enough information to support a FISA application targeting Carter Page. Case Agent 1's handwritten notes dated August 22, 2016 state: "Not there yet: OI" below a reference to a FISA request targeting Carter Page.[263] Case Agent 1 told us that he remembered being told that he had not yet presented enough information to support probable cause, but he could not recall whether OGC or OI, or both, had made that assessment.

Handwritten notes taken by David Laufman, then Chief of NSD's Counterintelligence and Export Control Section (CES), indicate that on August 25, 2016, FBI and NSD officials discussed the status of FISA coverage targeting Carter Page during a weekly Crossfire Hurricane meeting and that someone at the meeting conveyed that there was "[n]o FISA up on Page; currently no PC." Laufman told us that he did not remember who conveyed this information, but he thought it was probably one of the FBI officials in attendance, which included the OGC Unit Chief, the Section Chief of CD's Counterintelligence Analysis Section I (Intel Section Chief), and Assistant Director E.W. "Bill" Priestap.

As discussed below, the FBI OGC Unit Chief contacted the NSD OI Unit Chief on September 21, 2016, two days after the Crossfire Hurricane team received six of Steele's reports, to advise that the FBI believed it was ready to submit a formal FISA request to OI. As the OGC Unit Chief stated in an October 19, 2016 email to members of the Crossfire Hurricane team, "we first raised the issue of [a] potential FISA [targeting Carter Page] early on—maybe the 2nd or 3rd week of the case. But we didn't have serious discussions until we got the actual [Steele] reports (maybe the day after?)."

## B.   The FBI's Submission of a FISA Request Following Receipt of the Steele Reporting

As described in Chapter Four, the Crossfire Hurricane team received the first set of Steele's reports on September 19, 2016. Upon receipt of these reports, the team immediately began the process of evaluating Steele and the information he provided. For example, that same day, SSA 1 sent an email to Handling Agent 1 and others, stating, "Our team is very interested in obtaining a source symbol number/source characterization statement and specifics on veracity of past reporting, motivations, last validation, how long on the books, how much paid to

---

[263] It is unclear whether Case Agent 1 took this note during a meeting or at some other time. Case Agent 1 told us that the team had regular discussions during this time period, but did not specifically recall this particular discussion.