# Exhibit 1 Part 2

date, etc." SSA 1 told us that he did not receive a response from Handling Agent 1 to this email, and we did not find one during the course of our review.

Also on September 19, the team began discussions with OGC to consider Steele's reporting as part of a FISA application targeting Carter Page. In an email to the OGC Unit Chief and OGC Attorney, the Supervisory Intelligence Analyst (Supervisory Intel Analyst) forwarded an excerpt from Steele's Report 94 (described in more detail below) concerning Page's alleged secret meeting with Igor Divyekin in July 2016 and asked, "Does this put us at least *that* much closer to a full FISA on [Carter Page]?" (Emphasis in original). The Supervisory Intel Analyst told us that, earlier that day, he had researched information on Divyekin that "elevated" the significance of this particular allegation. He said that he wondered whether OGC would find that this information, along with the totality of the other information on Carter Page, brought them closer to probable cause on Page. Similarly, Case Agent 1 told us that the team's receipt of the reporting from Steele supplied missing information in terms of what Page may have been doing during his July 2016 visit to Moscow and provided enough information on Page's recent activities that Case Agent 1 thought would satisfy OI.

Two days later, on September 21, the OGC Attorney and OGC Unit Chief requested a meeting with the OI Unit Chief to discuss, among other things, a potential FISA application targeting Carter Page. The OGC Unit Chief told the OIG that the receipt of the Steele reporting changed her mind on whether they could establish probable cause. She said that although there could be differing opinions, she thought it was a "close call" when they first discussed a FISA targeting Page in August, and that the Steele reporting in September "pushed it over" the line in terms of establishing probable cause. She explained that the Steele reporting presented information that Page had recent contact with the Russians and that this contact was consistent with the information received from the FFG that someone on the campaign had received an offer or suggestion of assistance from the Russians. She said that before the Steele reporting, the FBI did not have information concerning what Page's current activities with the Russians might have been or information suggesting a connection between Page and the FFG information. Similarly, the OGC Attorney told us that he thought probable cause was "probably 50/50" before the Steele reporting; however, in his view, it was a combination of the Steele reporting, Carter Page's historical contacts with Russian intelligence officers, and statements Page made in October 2016 during a consensually monitored meeting with an FBI CHS (described later in this chapter and in Chapter Ten) just before the FISA application was filed with the court, that made the OGC Attorney comfortable about establishing probable cause.[264]

---

[264] We asked then Deputy Director Andrew McCabe about the testimony attributed to him in the January 18, 2018 House Permanent Select Committee on Intelligence Memorandum from Majority Staff on *Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation* (HPSCI Majority Memorandum) that "Deputy Director McCabe testified before the Committee in December 2017 that no surveillance warrant would have been sought from the FISC without the Steele dossier information." *See* HPSCI Majority Memorandum at 3, declassified on February 2, 2018, and available at https://republicans-

On September 21, the OGC attorneys met with the OI Unit Chief and described the reporting from Steele concerning Carter Page that the team had recently received. According to notes of the meeting, the OGC Attorney and OGC Unit Chief told the OI Unit Chief about the allegations contained in the Steele reporting that Page had a secret meeting with a high-level Russian official in July 2016, that Page may have received a Russian dossier on Hillary Clinton, and that there was a "well-developed conspiracy" between associates of the Trump campaign and Russian leadership being managed, in part, by Carter Page. The OI Unit Chief told us that he recalled that the Steele reporting was "what kind of pushed it over the line" in terms of the FBI being ready to pursue FISA authority targeting Page. He recalled thinking that if the information bears out during the drafting process, there would probably be sufficient information to support a FISA application targeting Page. Conversely, he said that without the Steele reporting concerning Page, he would not have thought they could establish probable cause based on the other information the FBI presented at that time (Page's historical contacts with Russia).

On September 22, the OI Unit Chief assigned a line attorney (OI Attorney) to work on the Carter Page FISA, and he and the OI Attorney met with the OGC Unit Chief to brief the OI Attorney into the case and discuss the essential points for the FISA. The same day, OGC submitted a FISA request form to OI providing, among other things, a description of the factual information to establish probable cause to believe that Carter Page was an agent of a foreign power, the "facilities" to be targeted under the proposed FISA coverage, and the FBI's investigative plan.[265] Case Agent 1 said he prepared the FISA request form, and the OGC Attorney said he may have provided a "very quick review" before sending it to OI. The OGC Attorney told us that the FISA request form was not as "robust" as it could have been because the FBI wanted to submit it to OI as soon as possible.

The FISA request form drew almost entirely from Steele's reporting in describing the factual basis to establish probable cause to believe that Page was an agent of a foreign power, including the secret meeting between Carter Page and Divyekin alleged in Steele's Report 94 and the role of Page as an intermediary between Russia and the Trump campaign's then manager, Paul Manafort, in the "well-developed conspiracy" alleged in Steele's Report 95. The only additional information cited in the FISA request form to support a probable cause finding as to Page was (1) a statement that Page was a senior foreign policy advisor for the

---

intelligence.house.gov/uploadedfiles/memo_and_white_house_letter.pdf (last accessed December 2, 2019). McCabe told us that he did not recall his exact testimony, but that his view was that the FBI would have "absolutely" sought FISA authority on Carter Page, even without the Steele reporting, based upon Page's historical interactions with known Russian intelligence officers and the fact that Page told known Russian intelligence officers about the FBI's knowledge of those interactions. However, McCabe also told us that he was not privy to the discussions that took place between attorneys in FBI OGC and Case Agent 1 on the sufficiency of the evidence to establish probable cause before the Crossfire Hurricane team received Steele's election reports. McCabe said he could not speculate as to whether the FBI would have been successful in obtaining FISA authority from the FISC without the inclusion of the Steele reporting.

[265] "Facilities" are ███████████████████████████████████████

Trump campaign and had extensive ties to various state-owned or affiliated entities of the Russian Federation, (2) Papadopoulos's statement to the FFG in May 2016, and (3) open source articles discussing Trump campaign policy positions sympathetic to Russia, including that the campaign's tone changed after it began to receive advice from, among others, Manafort and Page.

The FISA request form submitted to OI did not include information that the FBI obtained as a result of CHS meetings in August and September referenced in Chapter Three and summarized in Chapter Ten. These meetings were an attempt by the FBI to better understand what Papadopoulos meant when he advised the FFG about the alleged offer of assistance from the Russians, to probe Page and Papadopoulos about links between the campaign and Russia and to determine whatever Page and Papadopoulos may have known about Russia's use of emails to benefit the Trump campaign. The first meeting involved a consensually monitored conversation between an FBI CHS and Page in August 2016, and the second involved consensually monitored conversations between an FBI CHS ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ and Papadopoulos in September 2016.

During the meeting in August, Carter Page stated, among other things, that he had "literally never met" or "said one word to" Paul Manafort, and that Manafort had not responded to any of Page's emails. Page made other statements that did not add support to the notion that Page was conspiring with Russia. During the meetings in September, Papadopoulos stated, among other things, that to his knowledge no one associated with the Trump campaign was collaborating with Russia or with outside groups like WikiLeaks in the release of emails. As described in Chapter Eight, the OI Attorney told us that he did not think the FBI told him about these meetings before the FISA application was filed with the court. We found no information suggesting otherwise.

The FISA request form also did not include information the Crossfire Hurricane team received from another U.S. government agency on August 17, 2016, relating to Page's prior relationship with that agency and prior contacts with Russian intelligence officers.

Finally, the FISA request form referred to Steele as a "reliable source, whose previous reporting to the FBI has been corroborated and used in criminal proceedings." As noted later in this chapter, while Steele had previously provided information to the FBI that helped the FBI further criminal investigations, his reporting had never been used in a criminal proceeding.

After receiving clarifying questions from OI in response to the FISA request form, the FBI submitted a revised, formal request for an expedited FISA application on September 30. As described in Chapter Two, an expedited FISA application seeks to have the FISC waive the requirement in its Rules of Procedure that the government submit a proposed application no later than 7 days before it seeks to have the matter considered by the FISC. Requests by the FBI that OI seek an expedited FISA application require the approval of a Deputy Assistant Director (DAD) or higher. In this instance, the expedited request was approved by DAD Strzok. Strzok told the OIG that he approved the request to expedite the FISA

because there was a sense of urgency to complete the investigation as quickly and thoroughly as possible. According to Strzok, the team was not given an explicit instruction to finish the investigation before Election Day or Inauguration Day, but everyone involved understood the importance of moving quickly.

At the same time the Crossfire Hurricane team moved forward with a FISA request targeting Carter Page, FBI documents reflect that the team was also interested in a FISA request targeting George Papadopoulos to further the investigation. However, FBI OGC was not supportive. Instant messages between the OGC Attorney and the OGC Unit Chief indicate that they, the Intel Section Chief and Strzok, agreed that there was not a sufficient basis for FISA surveillance targeting Papadopoulos. The instant messages also show that the Intel Section Chief and Strzok were much more interested in pursuing the request for FISA coverage targeting Page.

The OGC Unit Chief told the OIG that she recalled that the difference between these two subjects with respect to a potential FISA application was that Carter Page had previous connections with Russian intelligence officers as well as the recent allegations in the Steele reporting that Page was an intermediary between Russia and the Trump campaign. With respect to Papadopoulos, the Crossfire Hurricane team had the information from the FFG that mentioned him, but no specific information that Papadopoulos was a person being directed by the Russians. Ultimately, the Crossfire Hurricane team did not seek FISA authority targeting Papadopoulos.

## II.    Preparation and Approval of the First FISA Application

Following receipt of the FISA request form on September 22, the OI Attorney immediately began work on the FISA application, preparing the initial drafts with information provided by the FBI. The preparation and approval process for the application took four weeks to complete. We were told that the application received more attention and scrutiny than the typical FISA application in terms of additional layers of review and the number of high-level officials who read the application. We describe this process in detail below.

### A.    Initial Drafts

On or about September 23, the OI Attorney began work on the initial draft FISA application. At this early stage of the drafting process, Evans told us that he instructed the OI Attorney and OI Unit Chief to handle the Carter Page FISA application as they would any other FISA application—to make sure the work was as thorough as possible so that NSD could answer the legal question of whether the facts meet the probable cause standard—and leave any policy questions to the decision makers down the road.

As described in Chapter Two, the read copy of a FISA application is prepared by an OI attorney using information provided by the FBI, primarily the case agent. The OI attorney relies heavily on the case agent to supply the necessary

information and identify significant issues.  NSD officials told us that the nature of FISA practice requires that OI rely on the FBI agents who are familiar with the investigation to provide accurate and complete information.  Unlike federal prosecutors, OI attorneys are usually not involved in an investigation, or even aware of a case's existence, unless and until OI receives a request to initiate a FISA application.  Once they receive a request, OI attorneys generally interact with field offices remotely and do not have broad access to FBI case files or sensitive source files.  According to NSD officials, even if OI received broader access to FBI case files, the number of FISA requests that OI attorneys are responsible for handling makes it impracticable for an OI attorney to become intimately familiar with an FBI case file, particular one about which they have had little to no prior awareness.[266] In addition, NSD told us that OI attorneys are not in the best position to sift through a voluminous FBI case file because they do not have the background knowledge and context to meaningfully assess all the information.

In this case, based upon the information the FBI initially provided in the September 22 draft FISA request, the OI Attorney sent his first questions to the OGC Attorney on September 23.   Case Agent 1 sent back responses the same day.  Over the course of the next two weeks, the OI Attorney exchanged various emails and telephone calls with the FBI and prepared initial drafts using information principally provided by Case Agent 1 and, in a few instances, by the OGC Attorney or other Crossfire Hurricane team members.  The culmination of this process led to the first drafts of the FISA application being shared with OI and NSD management on October 5 and 6, 2016.

In these initial drafts, the statement of facts in support of probable cause asserted that the Russians were attempting to undermine and influence the upcoming U.S. presidential election, and that the FBI believed Carter Page was acting in conjunction with the Russians in those efforts.  The statement of facts supporting probable cause was broken down into four main elements:

(1)  The efforts of Russian Intelligence Services (RIS) to influence the upcoming 2016 U.S. presidential election;

(2)  The Russian government's attempted coordination with members of the Trump campaign, which was based on the FFG information concerning the alleged offer or suggestion of assistance from the Russians to someone associated with the Trump campaign;

(3)  Page's historical connections to Russia and RIS, which included his business dealings with the Russian energy company Gazprom, his professional relationships with known Russian intelligence officers, and his disclosure to the FBI and a Russian Minister that he was Male-1 in an indictment against Russian intelligence officers; and

---

[266] NSD officials cautioned further that it is not unusual for OI to receive requests for emergency authorizations with only a few hours to evaluate the request.

(4)  Page's alleged coordination with the Russian government on 2016 U.S. presidential election activities, based on some of the reporting from Steele.

In addition, the statement of facts described Page's denials of coordination with the Russian government as reported in two news articles and as asserted by Page in a September 25 letter to the FBI Director.  Except for the addition of new information from an October 2016 CHS operation discussed later, the read copy and final application submitted to the FISC were organized in the same way.

In support of the fourth element concerning Carter Page's alleged coordination with the Russian government on 2016 U.S. presidential election activities, the drafts of the application—and later the read copy and final application—relied entirely on information from Steele that Steele said was provided to him by his Primary Sub-source.  Specifically, the following aspects of Steele's Reports 80, 94, 95, and 102 were used to support the application:

- Compromising information about Hillary Clinton had been compiled for many years, was controlled by the Kremlin, and the Kremlin had been feeding information to the Trump campaign for an extended period of time (Report 80);

- During his July 2016 trip to Moscow, Carter Page attended a secret meeting with Igor Sechin, Chairman of Rosneft and close associate of Putin, to discuss future cooperation and the lifting of Ukraine-related sanctions against Russia; and a secret meeting with Igor Divyekin, another highly placed Russian official, to discuss sharing compromising information about Clinton with the Trump campaign (Report 94);

- Page was an intermediary between Russia and the Trump campaign's then manager (Manafort) in a "well-developed conspiracy" of cooperation, which led, with at least Page's knowledge and agreement, to Russia's disclosure of hacked DNC emails to WikiLeaks in exchange for the Trump campaign's agreement to sideline Russian intervention in Ukraine as a campaign issue (Report 95);[267] and

- Russia released the DNC emails to WikiLeaks in an attempt to swing voters to Trump, an objective conceived and promoted by Carter Page and others (Report 102).

The development of the statement of facts concerning Steele's reporting resulted from the back-and-forth exchange described above between the OI Attorney and the FBI, during which the OI Attorney asked many questions about

---

[267] In further support of this allegation from Report 95, the FISA application described two news articles from July and August 2016 reporting that the Trump campaign had worked behind the scenes to change the Republican Party's platform on providing weapons to Ukraine to fight Russian and rebel forces and that candidate Trump appeared to have adopted a "milder" tone on Russia's annexation of Crimea.

Page, as well as about Steele's reporting and the structure and access of his source network.

Among the questions regarding Carter Page, on September 29, the OI Attorney asked the Crossfire Hurricane team, "do we know if there is any truth to Page's claim that he has provided information to [another U.S. government agency]—was he considered a source/asset/whatever?" According to the OI Attorney, it would have been a significant fact to disclose to OI if Page had interactions with the other U.S. government agency that overlapped in time with his interactions with known Russian intelligence officers described in the FISA applications because it would raise the issue of whether Page interacted with the Russian intelligence officers at the behest of the other U.S. government agency or with the intent to assist the U.S. government. In response to the OI Attorney's question, Case Agent 1 advised him that Page did meet with the other U.S. government agency, but that the interactions took place while Page was in Moscow (which was between 2004 and 2007) and were "outside scope." Based upon this response, the OI Attorney did not include information about Page's prior interactions with the other U.S. government agency in the application. However, as fully described later in this chapter, the information Case Agent 1 provided to the OI Attorney was incomplete, inaccurate, and in certain respects contrary to the information the other agency provided to the Crossfire Hurricane team on August 17, 2016 and that Carter Page had provided to the FBI in 2009 and 2013. This information indicated that Page had a prior relationship with the other U.S. government agency and that his interactions with the other agency occurred more recently than the 2004-2007 time period and actually overlapped with information alleged in the FISA application concerning his alleged ties to Russian intelligence officers.

With respect to Steele, when the drafting process began, the Crossfire Hurricane team had only just begun the process of conducting the evaluation process (described in Chapters Four and Six) to assess Steele, his source network, and the information provided in his reports. That source evaluation process and the FISA drafting process were taking place simultaneously, and the FBI had not corroborated the Steele information being considered for the FISA application. Evans and other witnesses told us that the fact that the source information in the FISA application had not yet been corroborated was not unusual in the FISA context.[268] Officials told us that a significant fact in their consideration of the Steele information for the FISA application was that the Steele reporting on Carter Page appeared to be consistent with the information from the FFG that came from an independent reporting stream.[269]

---

[268] As described in Chapter Two, corroboration of source information is not required by the FBI's Woods Procedures. Although the Woods Procedures require that every fact in a FISA application be "verified," when a particular fact is attributed to a source, an agent must only verify that the fact came from the source and the application accurately states what the source said. The Woods Procedures do not require that the FBI have a second source for the same information.

[269] The Crossfire Hurricane team had information available to it by early October 2016 that the two reporting streams could have connectivity because they had learned that Person 1, an

Evans and other witnesses also emphasized that in the absence of corroboration, it was particularly important for the FISA application to articulate to the court the reliability of the source as assessed by the FBI.  As the OGC Unit Chief advised Case Agent 1 on September 22 during the drafting of the FISA request form, "One last thing—we probably need a little bit more on the source—███████████████████████████ Since this is essentially a single source FISA, we have to give a fulsome description of the source."  Therefore, on September 29, during the early drafting phase, Case Agent 1 provided OI with the following characterization of Steele for inclusion in the FISA application:

> This information comes from a sensitive FBI source whose reporting has been corroborated and used in criminal proceedings, and who obtains information from a number of ostensibly well-positioned sub-sources.  The scope of the source's reporting is from 20 June 2016 through 20 August 2016.

The OI Attorney incorporated this information with other information the case agent provided to draft the following in the application:

> [Steele] has been an FBI source since in or about October 2013.  [Steele's] reporting has been corroborated and used in criminal proceedings and the FBI assesses [Steele] to be reliable.  [Steele] has been compensated approximately $95,000 and the FBI is unaware of any derogatory information pertaining to [Steele].

The final Carter Page application included this source characterization statement:

> [Steele] is a former ██████████████████ ████████████ and has been an FBI source since in or about October 2013.  [Steele's] reporting has been corroborated and used in criminal proceedings and the FBI assesses [Steele] to be reliable.  [Steele] has been compensated approximately $95,000 by the FBI and the FBI is unaware of any derogatory information pertaining to [Steele].

The OI Attorney told us that he does not have access to the CHS files of FBI sources and, therefore, tries to adhere closely to what a case agent sends him when he drafts a source characterization statement for a FISA application.  He stated that he also relies on the fact that the Woods Procedures require that the source handling agent approve the language.  However, as described later in this chapter, the source characterization statement in the application overstated the significance of Steele's past reporting and was not approved by the FBI agent who served as Steele's handling agent.

To further address reliability, the OI Attorney sought information from the FBI to describe the source network in the FISA application.  On multiple occasions, the OI Attorney asked the FBI questions about the sub-sources, including in a September 30, 2016 email in which he asked Case Agent 1 and the Crossfire

---

important Steele election reporting sub-source, had been engaging in "sustained" contact with Papadopoulos since at least August 2016.

Hurricane team: "If the reporting is being made by a primary source, but based on sub-sources, why is it reliable—even though second/third hand?" The OIG did not find a written response to this specific question, and the OI Attorney did not recall a response. However, the OI Attorney told us that the Crossfire Hurricane team eventually briefed him on the sub-source information they learned from Steele after their early October meeting with him (described in Chapter Four). He also received a written summary of this information that the Supervisory Intel Analyst prepared shortly after the October meeting. The OI Attorney told us that based on the information the FBI provided, he thought at the time that some of the sub-sources were "definitely" in a position to have had access to the information Steele was reporting.

Ultimately, the initial drafts provided to OI management, the read copy, and the final application submitted to the FISC contained a description of the source network that included the fact that Steele relied upon a Primary Sub-source who used a network of sub-sources, and that neither Steele nor the Primary Sub-source had direct access to the information being reported. The drafts, read copy, and final application also contained a separate footnote on each sub-source with a brief description of his/her position or access to the information he/she was reporting. The Supervisory Intel Analyst assisted the case agent in providing information on the sub-sources and reviewed the footnotes for accuracy. According to the OI Attorney, the application contained more information about the sources than is typically provided to the court in FISA applications. According to Evans, the idea was to present the source network to the court so that the court would have as much information as possible.

## B. Review and Approval Process

As described in Chapter Two, once an FBI case agent affirms the accuracy of the information in the read copy of an application, an OI Unit Chief or Deputy Unit Chief is usually the final and only approver before a read copy is submitted to the FISC. The Unit Chief or Deputy is also usually the final approver that "signs out" the final application (cert copy) to the FBI for completion of the Woods Procedures and Director's certification before presentation to either the Assistant Attorney General (AAG) of NSD, the DAG, or Attorney General for final signature. The final signatory receives an oral briefing, the cert copy, and a cover memorandum (cert memo) describing each application. In most cases, the start of the oral briefing, or shortly beforehand, is the first time the application is presented to the final signatory. According to NSD, most FISA applications do not get singled out for additional review and, to place that in perspective, there are approximately 1,300 applications submitted to the FISC each year and roughly 25-40 final applications go to the AAG, DAG, or the Attorney General for signature in any given week.

However, in some cases, according to NSD, a FISA application will receive additional review and scrutiny, particularly if it presents a novel or complicated issue or otherwise has been flagged for further review. In this case, as described immediately below, documents and witness testimony reflect that the first Carter Page FISA application underwent a lengthy review and editing process within NSD, the FBI, and ODAG. According to Evans and other witnesses, this application had

heightened sensitivity and therefore received additional attention because of the apparent effort by a foreign power to influence the upcoming 2016 U.S. elections and the prior connection of the FISA target (Carter Page) to one of the presidential campaigns.

### 1. Initial Feedback and NSD Concerns over Steele's Potential Motivation and Bias

Sanz-Rexach, Chief of OI's Operations Section, and his Deputy Section Chief were the first layers above the OI Unit Chief to receive a draft of the Carter Page application. After they provided feedback, the OI Attorney provided the draft on October 6, 2016 to Evans and, at the request of FBI OGC, to FBI General Counsel James Baker for concurrent review.

Baker told us that a review by the General Counsel was not a necessary step in the FBI's FISA approval process, but said that he would sometimes review an application when he thought it was warranted. Baker said that in this case, he asked to read the application because he recognized its sensitivities, including that the target had been associated with a presidential campaign and that the whole case was about Russian efforts to influence the presidential election and whether those efforts included any interactions with the Trump campaign. He said that he expected that the FBI would be called upon after-the-fact to justify its actions, and he wanted to ensure that his significant FISA experience was "brought to bear" on the application.[270]

For these reasons, Baker said he asked his Deputy General Counsel, Trisha Anderson, to give him the draft application before it was "too gelled" so that he could have influence over the drafting without disrupting the process. FBI documents indicate that Baker reviewed the draft on October 6 or 7. Baker told us that he read the probable cause section of the application, as well as the description in the Director's certification section of the foreign intelligence purpose of the requested FISA authority. He said that he thought it was important that the foreign intelligence purpose of the FISA authority was made clear in the application by focusing on the FBI's objective of learning the capabilities and tradecraft of Russia. He stated that he remembered being satisfied that the foreign intelligence purpose was properly articulated in the draft he reviewed.

Baker told us that he also remembered being satisfied at the time that there was probable cause articulated in the draft application to believe that Carter Page was an agent of a foreign power. He said that it was difficult for him to fully explain to us the basis for his assessment without reviewing the entire application again, but that he recalled Page's continuing relationships with Russian intelligence officers, even after the FBI made Page aware that they were Russian intelligence

---

[270] In addition to serving as the FBI's General Counsel from 2014 to 2018, Baker had held positions in OI's predecessor office, the Department's Office of Intelligence Policy and Review, from 1996 to 2007, and later as an Associate Deputy Attorney General in ODAG responsible for national security matters from 2009 to 2011.

officers, being "key" facts in his mind.[271]  Further, he said that, in retrospect, he thought that Page's knowing interactions with Russian intelligence officers could have established probable cause even without reliance on the reporting from Steele.  However, Baker did not recall being involved in the FISA discussions the team was having before the Steele reporting came in, and because of the redactions in the public version of the FISA application, he was unable to speak to how recent Page's interactions with Russian intelligence officers had been at the time the application was filed.

Baker said that he did not recall his specific line edits to the draft, but that another theme of his comments was to ensure that the court was fully apprised of all material factual information regarding Steele and his reliability as well as any derogatory information about Steele, so that the court could make its own assessment of the Steele reporting.  Questions attributed to Baker in an October 7 draft reflect that he, among other things, asked the FBI to provide more information about Steele's prior employment to help establish his credibility and explain why he would have a source network.  He also asked questions regarding Carter Page in an apparent attempt to clarify some of the facts regarding Page's travel history and past relationships with Russian intelligence officers.  According to Baker, he did not read the application a second time before it was submitted to the court, but Anderson told him that his comments were adequately addressed.

Anderson also reviewed a draft of the application; however, we could not determine the timing of her review.  Documents indicate that Anderson requested the draft on October 5 and received it the next day, but Anderson told us she recalled reading the draft after Baker, and closer in time to ODAG's review of the draft, which was almost 2 weeks later.  Anderson said that she did not recall providing feedback on the draft and explained that Baker and the OGC Unit Chief were directly involved in the review process.  Anderson did recall that she made sure the draft incorporated Baker's previous edits in some fashion, but she did not recall what those edits were.[272]

Review or approval of the FISA application by senior Counterintelligence Division (CD) officials was not a required step in the FBI's FISA procedures. Priestap, Strzok, and the Intel Section Chief told us that they did not play roles in the preparation or approval of the Carter Page FISA application.  These officials told us that they were aware that FISA authority was being sought and, as described previously, Strzok provided DAD approval of the team's request for an expedited FISA application, as required by FBI procedures.  Further, as described later in this chapter, Strzok had conversations with Evans about the status of the application.

---

[271]  Because Baker requested not to have his security clearance reinstated for his OIG interview, Baker was unable to review the entire FISA application before or during the interview, and we were unable to ask questions that would reveal classified information.

[272]  Similar to Baker, Anderson did not typically review FISA applications.  The OGC Unit Chief said that she worked with the OGC Attorney and OI during the FISA process and was more involved in this FISA application than she was in some others.  She told us that she did not recall providing or suggesting specific edits for this application.

However, we found no information suggesting that senior CD officials contributed to the substance of the application.

Evans shared his own feedback with the OI Unit Chief and OI Attorney, which included, among other issues, asking the Crossfire Hurricane team whether Steele "is affiliated with either campaign and/or has contributed to either campaign." On October 7, the OI Unit Chief emailed Evans's question to the team, and on October 10, Case Agent 1 addressed the second part of Evans's question, stating that Steele was most likely a foreign national and therefore unable to contribute to either campaign. Because Case Agent 1 did not fully address Evans's question, the OI Unit Chief asked the agent again, on October 11, whether Steele was affiliated with and/or had contributed to either presidential campaign. Again the case agent answered only the second part of the question, confirming that Steele had not contributed to any campaign and was not a U.S. person. Evans told us that he remembered being somewhat frustrated and annoyed by this answer and asked the question a third time to be sure that nothing was missed in terms of any potential political bias on the part of the source.

According to Evans, later in the day on October 11, after OI circulated a new draft application and, in response to his questions, he and OI learned for the first time from the FBI that Steele had been paid to develop political opposition research. He told us that he recalled that he, the OI Unit Chief and the OI Attorney were all quite surprised by this new information and that it was frustrating that they had not been informed sooner. Evans said that the new information, coupled with the sensitive nature of the case, made him concerned that the source might have a bias that needed to be disclosed to the court. Consequently, Evans placed a temporary hold on the application so that OI could further explore and evaluate with the FBI the information OI had just learned.

Evans told the OIG, and emails and instant and text messages reflect, that over the next three days, he and OI asked additional questions about Steele to better understand his potential motivations, bias, and overall reliability. Before being asked these questions, the Crossfire Hurricane team had expected that the October 11 draft would be the final version submitted to the court as the read copy. However, on the evening of October 11, Evans had a telephone conversation with his counterpart at the FBI, DAD Strzok, to discuss Evans's concerns and let him know that OI needed more time to understand and evaluate the information it had just learned concerning Steele.[273] According to Evans, there was frustration expressed on both sides, with Strzok frustrated that the FISA process was not moving at the desired pace and Evans responding to the effect that "it doesn't help that just now, at the eleventh hour, I have for the first time learned that information about Steele." As detailed below, text messages between Strzok and the OGC Attorney reflect that Strzok believed the FBI had previously informed OI

---

[273] Evans said he also contacted Baker to let him know that OI needed time to explore the new information. Baker told us that he did not specifically recall whether Evans told him that OI needed more time to explore the FBI's information regarding Steele. However, Baker said that he remembered having a telephone conversation with Evans about this particular application, the substance of which we describe in the next section.

about Steele's source of payment. The conversation ended with Strzok agreeing to allow the Crossfire Hurricane team to answer whatever questions about the source OI needed to ask. Similarly, during her OIG interview, then NSD Principal Deputy Assistant Attorney General Mary McCord recalled that she had a telephone conversation with then Deputy Director Andrew McCabe during which she advised him that she believed the FISA application needed to include more information about who hired Steele, and that McCabe did not push back.[274] McCabe told us that he did not recall any specific conversations with McCord about this FISA application.

Internal FBI emails, as well as instant messages and text messages, reflect the FBI's discussions with Evans and reactions to his concerns. For example, following his telephone call with Evans on the evening of October 11, Strzok reached out to Lisa Page and advised her that support from McCabe might be necessary to move the FISA application forward:

> 6:21 p.m., Strzok to Lisa Page: "Currently fighting with Stu [Evans] for this fisa."

> 6:50 p.m., Strzok to Page: "Hey—The FISA will probably not go forward without a call from the [Deputy Director]. Even as is, the court may not hear it this week."

At the same time, Strzok also had communications with the OGC Attorney:

> 6:56 p.m., Strzok to OGC Attorney: "Stu is nervous. Didn't help that he just found out today about [Steele's] source of payment/direction for this particular reporting. I thought we had told OI earlier?"

> 6:56 p.m., OGC Attorney to Strzok: "Yes, we absolutely informed [OI Unit Chief] and [OI Attorney] about the source." "Multiple meetings, actually, with [Case Agent 1] and [the SOS]."

> 6:57 p.m., Strzok to OGC Attorney: "Ok—including the named intermediary, with the unnamed client (presumed to be connected to the campaign in some way)? Well, they didn't tell Stu..."

> 6:59 p.m., OGC Attorney to Strzok: "Yes, we provided source descriptions for all of the sub-sources, sources, etc. That is confusing because that seemed to be what put [OI Unit Chief] and [OI Attorney] at ease."

> 6:59 p.m., OGC Attorney to Strzok: "Is he going to hold the FISA?"

> 7:06 p.m., Strzok to OGC Attorney: "no, but I'm concerned about how they preload the Court/court advisor"

> 7:06 p.m., Strzok to OGC Attorney: "I think he wants more words in there about it...."

---

[274] McCord became the Acting AAG for NSD upon the departure of AAG John Carlin, which occurred in this timeframe.

> 7:07 p.m., OGC Attorney to Strzok:  "Roger.  I'll reach out to [OI Unit Chief] to see if he is in the office by chance.

Later the same evening, Strzok communicated with the OGC Unit Chief:

> 7:34 p.m., OGC Unit Chief to Strzok: "So Stu called you about his concerns about the [Page] FISA?  Not sure why he didn't reach out to the [FBI General Counsel/Deputy General Counsel] or the [Deputy Director]/Director, as they've all approved moving forward with this.  What was the point of his [sic]?  Was he trying to get you to pull it?"

> 7:53 p.m., OGC Unit Chief to Strzok: "I got further clarification from [OI Unit Chief].  I think it's all good.  We should have more from DOJ tomorrow."

> 7:53 p.m., Strzok to OGC Unit Chief: "Ok.  Stu is very nervous."

> 7:54 p.m., Strzok to OGC Unit Chief: "He said he wasn't aware of the fact until a few hours ago that [Steele] was employed to find this information by a named client, in turn hired by an unnamed client presumably affiliated with the Clinton campaign in some manner."

Between 7:54 p.m. and 7:59 p.m., [Strzok and the OGC Unit Chief exchanged messages on an unrelated topic.]

> 7:59 p.m., Strzok to OGC Unit Chief:  "Is OI still sending copy to FISC tomorrow?"

> 7:59 p.m., Strzok to OGC Unit Chief:  "I'm worried about what Stu whispers in Court Advisors ear."

> 7:59 p.m., OGC Unit Chief to Strzok:  "Yeah.  I think so.  Stu's going to think about it overnight.  Not for attribution, but apparently he's the only one over there worried about it."

> 7:59 p.m., OGC Unit Chief to Strzok:  "Yeah, me too."

> 8:00 p.m., Strzok to OGC Unit Chief:  "Jim [Baker] or [Deputy Director] or someone may need to weigh in with [NSD Assistant Attorney General John] Carlin."

> 8:00 p.m., Strzok to OGC Unit Chief:  "I'll bring it up at the prep SVTC tomorrow."

> 8:00 p.m., OGC Unit Chief to Strzok:  "If it goes beyond noon, I would tend to agree."

The next morning, at 7:44 a.m., the OGC Attorney sent the following text message to Strzok:

> Pete, I talked to [OI Unit Chief] last night.  It doesn't sound like Stu is concerned about the FISA itself, but more of fleshing out the details of [Steele] (e.g., how he began his reporting).  All of that information was obtained from [Case Agent 1].  We should be in good shape once OI bats it around a little more internally this AM.

Although the OGC Attorney stated in these text messages that the OI Unit Chief and the OI Attorney had been briefed before October 11 on who had commissioned Steele's reporting, the OI Unit Chief told the OIG that he believed they did not learn about the potential political connections to Steele's reporting until after Evans raised his questions. The OI Attorney told us that he did not recall exactly when he learned about them, but that it was later in the drafting process, and that Evans's inquiries led to a better understanding of the nature of Steele's research. The OI Attorney told us that he did not recall asking the agent any specific questions about who Steele's clients were. Case Agent 1 told us that he did not recall any conversations with the OI Attorney about the source reporting's connection to political opposition research before OI asked questions about it. He explained that the Crossfire Hurricane team only suspected, but did not know in mid-October 2016, that Steele's reporting was generated through political opposition research.

The OIG did not find any written communications indicating that anyone on the Crossfire Hurricane team advised OI about the potential or suspected political connections to Steele's reporting before Evans raised his questions on October 11, and nothing to that effect appeared in the October 11 draft FISA application. Further, the emails described above containing Evans's questions about Steele's campaign affiliation or contributions suggest that OI did not have prior knowledge.

### 2. FBI Leadership Supports Moving Forward with the FISA Application and OI Drafts Additional Disclosures Concerning Steele

On October 12, 2016, Evans's concerns about Steele were briefed to Comey and McCabe in a meeting attended by at least Priestap, Strzok, Lisa Page, and the OGC Unit Chief. According to notes of the meeting, the group discussed that Evans was concerned Steele may have been hired by someone associated with Hillary Clinton or the Democratic National Committee (DNC) and that the read copy of the FISA application would not be filed with the court that day so that Evans could further assess the potential bias. The notes reflect that the group discussed that Evans was also concerned that the foreign intelligence to be collected through the FISA would not be "worth [the] risk." Following the meeting, the OGC Unit Chief emailed Anderson and the OGC Attorney on October 12 and advised them that the concerns Evans had raised were discussed with Comey and McCabe and that both were "supportive" of moving forward despite those concerns.

During his OIG interview, Evans told us that he thought he did not raise the concern about the potential value of the collection outweighing the risk until sometime after OI worked through the bias issue with the FBI. According to Evans, he raised on multiple occasions with the FBI, including with Strzok, Lisa Page, and later McCabe, whether seeking FISA authority targeting Carter Page was a good idea, even if the legal standard was met. He explained that he did not see a compelling "upside" to the FISA because Carter Page knew he was under FBI investigation (according to news reports) and was therefore not likely to say anything incriminating over the telephone or in email. On the other hand, Evans saw significant "downside" because the target of the FISA was politically sensitive

and the Department would be criticized later if this FISA was ever disclosed
publicly. He told the OIG that he thought there was no right or wrong answer to
this question, which he characterized as a prudential question of risk vs. reward,
but he wanted to make sure he raised the issue for the decision makers to consider.
According to Evans, the reactions he received from the FBI to this prudential
question were some variations of—we understand your concerns, those are valid
points, but if you are telling us it's legal, we cannot pull any punches just because
there could be criticism afterward.

Baker told us that he recalled having a telephone conversation with Evans
after learning about Evans's prudential concerns from Anderson and the OGC Unit
Chief. According to Baker, he told Evans that he understood the matter was
sensitive but that he (Baker) thought there was probable cause and that the FBI
was seeking the FISA for a legitimate purpose and thought the application should
go forward. Baker told us that he did not think he had persuaded Evans, and Baker
said he was left with the impression that Evans planned to raise the issue with
others in the Department.

Evans told us that he discussed this prudential question with Tashina Gauhar,
the Associate Deputy Attorney General responsible for ODAG's national security
portfolio, and McCord. According to Evans, Gauhar seemed to share his concern,
but Gauhar said that she did not think anyone was going to tell the FBI not to
pursue the FISA if the legal standard was met. Gauhar told us that ODAG's position
was first to ensure that the legal standard for the FISA application was met, and
that everyone, including NSD, thought that it was. She said that there was a
separate question about the "policy decision to go forward," and on that question
she understood that FBI leadership believed strongly that the application should go
forward. She said that although it was possible, she did not remember stating
ODAG's position in terms of deferring to the FBI or not being inclined to overrule
the FBI if the FBI wanted to move forward.

According to Evans, McCord said that she would discuss the prudential issue
with McCabe, but the discussion did not happen before Evans raised the issue
directly with McCabe after a regularly scheduled meeting on October 19.[275]
According to Evans, McCabe told Evans on October 19 something to the effect of, "I
hear you. I understand. [B]ut we can't pull any punches and we've got to do it,
and…let the chips fall where they may." McCabe told us that he did not recall the
specific words he used with Evans, but he believed he conveyed to Evans that the
FBI "felt strongly" that the FISA application should move forward. McCabe said that
he understood at the time that the FBI would likely be criticized no matter what the

---

[275] McCord told us that she spoke to McCabe almost every day on various matters and had
more than one conversation with him about the Carter Page FISA application, but she did not
specifically recall whether she had a conversation with McCabe on or about October 17, and if she did,
what specific issue would have prompted a conversation at that time. She said that she believed her
most significant conversation with McCabe about the first FISA occurred in October. She said it was
the telephone call described earlier, before or during the drafting of the Steele footnote, in which she
and McCabe discussed Steele and the need to include more information about the source in the
application. McCabe told us that he did not specifically recall any conversations with McCord about
this application.

team did or did not do, but he believed that the team had to get to the bottom of this potentially serious threat to national security. He said that if the FBI had not sought FISA authority under the circumstances presented here simply because the team was afraid of the "political nature" of the information, the FBI would have failed to do its job.

The email on October 12, referenced above, from the OGC Unit Chief to Anderson and the OGC Attorney following the meeting with Comey and McCabe, said that Lisa Page would inform Evans of the FBI's decision to move forward with the FISA application. Text messages from Lisa Page to McCabe indicate that Page communicated with Evans later that same day:

> 3:11 p.m., Lisa Page to McCabe: "OI now has a robust explanation re any possible bias of the chs in the package. Don't know what the holdup is now, other than Stu's continued concerns. Strong operational need to have in place before Monday if at all possible, which means ct tomorrow.[276] I communicated you and boss's green light to Stu earlier, and just sent an email to Stu asking where things stood. This might take a high-level push. Will keep you posted.

> 3:13 p.m., Page to McCabe: "If I have not heard back from Stu in an hour, I will invoke your name to say you want to know where things are, so long as okay with you."

Later the same day, Page sent a text message to McCabe stating that she "[s]poke to Stu. Let's talk in the morning." Available text message records are unclear as to whether McCabe responded directly to this text or to the previous text message at 3:13 p.m., but to one or the other, McCabe responded, "Ok."[277]

Shortly before Lisa Page's first text to McCabe above, the Crossfire Hurricane team provided to OI additional information regarding Steele that the OI Attorney had requested. In an email on October 12, OI asked the FBI team what Steele had been specifically hired to do, what the FBI knew about the motivation of the individual who hired Steele, including whether that individual was a supporter of Hillary Clinton or the Democratic Party, and if the FBI could "articulate why it deems [Steele's] reporting to be credible notwithstanding [Steele] did the investigation based on [a] private citizen's motivation to help [Hillary Clinton/Democratic Party]." Through SSA 1, the team advised OI that based on information from Steele, Steele was specifically hired by an individual to provide information on candidate Trump's business affairs and contacts in Russia, Steele was never advised of the motivation of the individual who hired him, the individual who hired him was hired by an unidentified law firm in Washington, D.C., and

---

[276] As described below, it appears the desire to have FISA authority in place before ██████████ ███████, was due, at least in part, to the fact that ███████████████████████████████ ███████████████████████████████, and the Crossfire Hurricane team wanted FISA coverage targeting Carter Page ██████████████.

[277] We did not find evidence of any further involvement by Lisa Page in the FBI's efforts to file the FISA application, other than receiving a telephone call on October 18 from ODAG, described later in this chapter, to advise FBI leadership regarding the status of ODAG's review of the application.

"anything further would be speculation." In response to OI's final question about Steele's credibility, SSA 1 responded that: (1) the FBI has had an established relationship with the source since 2013; (2) the source was generating reporting well before the opening of Crossfire Hurricane and the leaks concerning the DNC emails, and therefore this was not a situation where a source was attempting to steer an ongoing investigation; and (3) Steele was not a U.S. citizen and therefore had no vested interest in the outcome of the election. The OI Attorney forwarded this information to the OI Unit Chief, noting that, "This creates more questions for me now...."

During further back and forth over a 3-day period, the Crossfire Hurricane team advised OI that Steele was hired by Glenn Simpson of Fusion GPS, they did not know Simpson's motivations, and they did not know the name of the law firm that retained Fusion GPS or its connections to Hillary Clinton or the Democratic Party because Steele did not believe asking Simpson about his client was appropriate. However, we found no evidence that Steele advised the FBI that he believed asking Simpson about the name of his client would be inappropriate. Rather, as described in Chapter Four, we obtained conflicting testimony as to whether Steele was even requested by the FBI to ask Simpson for the name of the law firm. Steele's FBI handler (Handling Agent 1) told us that he informed Steele during their July 5 meeting that the FBI would be interested in finding out the name of the law firm. SSA 2 told us that he understood Handling Agent 1 "stayed away from tasking [Steele] about the identity of the U.S. law firm." During his OIG interview, Steele told us that he did not know the identity of the law firm when he met with Handling Agent 1 on July 5. Steele said that he learned of it later in July and probably told the FBI the law firm's name at some later date, but he did not specifically recall.

The Crossfire Hurricane team further advised OI that Steele's Primary Sub-source recently provided unrelated information that was found by ▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓ to be consistent with other reporting on the same topic. OI asked the team what the FBI knew about the September 23, 2016 *Yahoo News* article that quoted a "well-placed Western intelligence source" for information ostensibly coming from Steele's reporting about Carter Page's alleged meetings with Sechin and Divyekin. The team responded that they did not have any additional details regarding the leak.

On October 14, the OI Attorney consolidated in writing for Evans and OI management the additional details concerning Steele, described above, that the FBI provided over the previous 3 days. According to Evans, at this point, he and the others in OI believed that they had received all the information the FBI had on Steele.[278] The OI Attorney and the OI Unit Chief then revised the footnote in the draft application on Steele to address the potential that Steele, or those who hired

---

[278] This is consistent with an instant message from Strzok to Lisa Page on October 14, 2016, 11:45 a.m.: "I'm going to email Stu and let him know we've gotten all the info we're going to get re [Steele] and sourcing questions."

him, had a bias. Specifically, they added the following paragraph, which became part of Footnote 8 in the read copy and final application:

> [Steele], who now owns a foreign business/financial intelligence firm, was approached by an identified U.S. person, who indicated to [Steele] that a U.S.-based law firm had hired the identified U.S. person to conduct research regarding Candidate #1's ties to Russia (the identified U.S. person and [Steele] have a long-standing business relationship). The identified U.S. person hired [Steele] to conduct this research. The identified U.S. person never advised [Steele] as to the motivation behind the research into Candidate #1's ties to Russia. The FBI speculates that the identified U.S. person was likely looking for information that could be used to discredit Candidate #1's campaign.[279]

According to Evans, the use of the term "speculates" in the footnote was intended to convey that even though the FBI did not know at the time who Simpson's and the U.S. law firm's ultimate client was, the FBI believed it was likely that it was someone who was seeking political opposition research against candidate Trump. The FBI represented to Evans and OI that the Crossfire Hurricane team assumed, but did not know, that someone associated with the Hillary Clinton campaign or the Democratic Party paid for the research.[280] According to Evans, the use of "speculates" in a FISA application was unusual, but, in this context, he believed it was necessary to fully advise the court of the potential for bias. Evans told us that this additional information made him comfortable with the way that Steele was described in the application, specifically by making clear to the court that Steele had conducted opposition research on behalf of someone who appeared to have the intention of discrediting the Trump campaign.[281]

---

[279] The Carter Page FISA application did not identify by name Steele's clients or the presidential candidates, which is consistent with the Department's general practice of not disclosing the true identities of U.S. persons who are not the surveillance targets in FISA applications.

[280] McCabe told us that he thought he had heard by the time of the first FISA application that Simpson had been working first for a Republican client and then later for a Democratic client. However, McCabe also told us that his memory on the timing of events is not always reliable, and other FBI officials told us that the team did not know who hired Simpson until after the first FISA application. As described in Chapter Nine, documentation we reviewed indicates that FBI officials obtained greater clarity on who Glenn Simpson was working for through interviews with Bruce Ohr in November and December 2016. Documentation indicates that by February and March 2017 it was broadly known among FBI officials that Simpson was hired first by a candidate during the Republican primaries and then later by someone related to the Democratic Party. Further, at least some team members knew by early 2017 that Simpson was hired by the DNC and another unidentified entity to research candidate Trump's ties to Russia.

[281] As described in Chapter Ten, in early August 2016, before the Crossfire Hurricane team became aware of Steele's election reports, information from a former FBI CHS was shared with members of the Crossfire Hurricane team indicating that the former CHS was recently contacted "by a colleague who runs an investigative firm. The firm had been hired by two entities (the Democratic National Committee [DNC] as well as another individual he did not name) to explore Donald Trump's

Evans told us that sources often have "baggage" and can have a bias, but that does not necessarily make their information unreliable, especially if the FBI has a long history of assessing the source's reporting as reliable. In his experience, the important thing is to make sure that enough information is presented to the court so that the judge understands the issue. His general approach with this particular footnote was to exceed "what was even legally required and just mak[e] sure there was nothing...left on the table about this source that we could be open to criticism on afterwards, based on what the FBI was giving us."

After OI made this revision to the footnote, OI submitted an updated draft application to McCord for her review on October 14.[282] McCord remembered reading an early draft of the probable cause section and believed she probably read an updated probable cause section at least one more time before the read copy was filed focused on the questions OI asked the FBI and the revisions that were made to address those questions. Based upon our review of relevant emails, it appears that McCord provided comments on the October 14 draft. She said her strongest memory was asking about Steele's fee arrangement with Fusion GPS, which is also reflected in an October 18 email from the OI Unit Chief to his supervisors. McCord also remembered discussions within NSD and with ODAG about the prudential question described earlier as to whether to file the application even if it was legally supportable. She said the collective thinking was that filing the application was a legitimate investigative step even though it may later be criticized unfairly.

### 3.    Other Substantive Changes to the Application before ODAG Review

In addition to the revisions made to the Steele footnote, the October 14 draft application contained another substantive change from earlier drafts, concerning the FBI's assessment of whether Steele was the source for the September 23 *Yahoo News* article described earlier in this chapter.

The draft FISA applications, and later the read copy and final application, advised the court that the *Yahoo News* article reported that U.S. intelligence officials were investigating Carter Page's involvement in suspected efforts by the Russian government to influence the U.S. presidential election and that a "well-placed Western intelligence source" told *Yahoo News* about Carter Page's alleged secret meetings with Sechin and Divyekin. The applications stated that, based on statements made in the *Yahoo News* article and in other news articles, individuals affiliated with the Trump campaign made statements distancing the campaign from

---

longstanding ties to Russian entities." The Supervisory Intel Analyst told us that he did not recall making a connection when the Steele reporting came in between this investigative firm hired by the DNC and the firm that hired Steele to conduct his election-related research. FBI emails reflect that he and SSA 1 made that connection by January 11, 2017, at the latest. We found no evidence that this information was shared with OI.

[282] As noted previously, on or about October 17, 2016, McCord became the Acting AAG for NSD. She replaced AAG John Carlin who left the Department on October 14, 2016. Evans told us that Carlin had very limited involvement in the Carter Page FISA prior to his departure and did not review a draft of the application. We found no information suggesting otherwise and therefore did not seek to interview Carlin.

Carter Page. Further, the applications noted that Page himself denied the accusations in the *Yahoo News* article and reiterated that denial in a September 25 letter to the FBI Director and in a September 26 media interview.

Evans told the OIG that OI included the reference to the September 23 *Yahoo News* article in the FISA application solely because it was favorable to Carter Page and not as corroboration for the Steele reporting in the application. According to Evans, the application's treatment of the article was favorable to Page in three respects: (1) the application described statements in the article that the campaign distanced itself from Page and minimized his role as an advisor; (2) the application stated that Page denied the allegations in the news article in a letter to the Director; and (3) as described below, the application made clear that the people who financed Steele's reporting were likely the same source for the information in the article.

The drafts of the FISA application that preceded the October 14 draft—including the October 11 draft that the FBI expected would be submitted to the FISC as the final read copy—stated that the FBI "believes that the 'well-placed Western intelligence source' is Steele." After reviewing the initial drafts, Evans asked OI to "drill down" on why Steele disclosed information to the media. For example, in an October 11 email to OI staff, Evans asked "does the FBI know why the source provided this info to the press…. Is there anything about his decision to speak to the press that suggests he's got a bias?"

The result of this effort culminated in new language in the October 14 draft stating that the FBI believed it was Glenn Simpson or the law firm who hired Simpson, and not Steele, who provided Steele's reporting to the media. With respect to the basis for the FBI's assessment, the language that appeared in Footnote 18 of the read copy and final application stated the following:

> As discussed above, [Steele] was hired by a business associate to conduct research into Candidate #1's ties to Russia. [Steele] provided the results of his research to the business associate, and the FBI assesses that the business associate likely provided this information to the law firm that hired the business associate in the first place. [Steele] told the FBI that he/she only provided this information to the business associate and the FBI. Given that the information contained in the September 23rd News Article generally matches the information about Page that [Steele] discovered during his/her research, the FBI assesses that [Steele's] business associate or the law firm that hired the business associate likely provided this information to the press. The FBI also assesses that whoever gave the information to the press stated that the information was provided by a "well-placed Western intelligence source." The FBI does not believe that [Steele] directly provided this information to the press.

Case Agent 1 told the OIG that he did not recall why the October 11 draft stated that Steele was the "well-placed Western intelligence source" or the reason the language was changed in the updated draft to state that the FBI did not believe

Steele directly provided the information in the article.  He said he did not recall the details regarding what he was told, or what he told OI, about whether Steele was the source for the *Yahoo News* article leak.  The OGC Attorney told us that he was not familiar with how the change between drafts occurred.

The OI Attorney said he could not recall the circumstances that led to the change in the drafts, including whether the Crossfire Hurricane team originally told him that Steele had disclosed the information to *Yahoo News*.  The OI Attorney said that it was possible he had assumed that that was the case and wrote the initial drafts in that manner for the FBI's consideration.  The OI Attorney told us that at some point during the drafting process, the FBI assured him that Steele had not spoken with *Yahoo News* because the source was "a professional."

We did not find any evidence that the FBI asked Steele whether he was a source for the information in the September 23 *Yahoo News* article.   As described later in this chapter, the basis the FBI asserted in the application for its assessment that Steele was not a source was inaccurate and the documentation in the Woods File did not support it.

Another change from the early drafts of the first FISA application was the addition of particularized minimization procedures (PMPs) at the request of Evans. The final PMPs restricted access to the information collected through FISA authority to the individuals assigned to the Crossfire Hurricane team and required the approval of a DAD or higher before any FISA-derived information could be disseminated outside the FBI.  In normal circumstances, the FBI is given more latitude to disseminate FISA-derived information that appears to be foreign intelligence information or evidence of a crime.  Evans told us that he believed these added restrictions were warranted here because of the possibility that the FISA collection would include sensitive political campaign related information.

### 4.    October Meeting between Page and an FBI CHS

As we summarize in Chapter Ten, in October 2016, before the FBI obtained the initial FISA authority targeting Carter Page, an FBI CHS had a consensually monitored meeting with Page.  During the meeting, among other things, Page said that he wanted to develop a research institute and, in talking about how he would fund the institute, Page said, "I don't want to say there'd be an open checkbook, but the Russians would definitely…."  According to the partial transcript, the sentence trailed off as Carter Page laughed.  The CHS then stated "they would fund it—yeah you could do alright there" and Page responded "Yeah, but that has its pros and cons, right?"  At another point in the conversation, Page noted that he had "a longstanding constructive relationship with the Russians going back throughout" his life.  When asked about the link between the Russians and WikiLeaks, Page said that, "[as he has] made clear in a lot of…subsequent discussions/interviews…I know nothing about that—on a personal level, you know no one's ever said a word to me."  With regard to the platform committee during the Republican National Convention, Page said that he "stayed clear of that—there was a lot of conspiracy theories that I was one of them…[but] totally off the record…members of our team

were working on that, and…in retrospect it's way better off that I…remained at arms length."

Carter Page also told the CHS during the meeting that the "core lie" against him in the media "is that [Page] met with these sanctioned Russian officials, several of which I've never met in my entire life." Page said that the "core lie" concerned "Sechin [who] is the main guy, the head of Rosneft…[and] there's another guy I had never even heard of, you know he's like, in the inner circle." When asked about that person's name, Page said "I can't even remember, it's just so outrageous."

The Crossfire Hurricane team provided to OI some, but not all, of the information obtained during this meeting for inclusion in the first FISA application. According to the description in the FISA application, Page met with the FBI CHS on a particular date in October and made statements that led the FBI to believe that Page continued to be closely tied to Russian officials, including the suggestion that "the Russians" would be giving him an "open checkbook" to fund a foreign policy think tank project. The description also stated that Page told the CHS that he may be appearing in a televised interview to discuss the potential for change in U.S. foreign policy toward Russia and Syria in the event Trump wins the presidential election. However, as discussed later in this chapter, the application filed with the court did not fully or accurately describe the information obtained by the FBI as a result of this meeting because the FBI did not advise OI that Page denied meeting with Sechin and Divyekin, as alleged in Report 94, or that Page denied knowing anything about the disclosure by WikiLeaks of hacked DNC emails, as alleged in Report 95.

In addition, the FBI did not advise OI that Carter Page denied having been involved with the Republican Platform Committee. Page's statements to the FBI CHS, if true, would have been inconsistent with the FBI's assessment in the FISA application that Page helped influence the Republican Party to change its platform to be more sympathetic to Russia's interests by eliminating language in the Republican platform about providing weapons to Ukraine. The FBI's assessment was based in part on Report 95's allegation that Page and possibly others agreed to sideline Russian intervention in Ukraine as a campaign issue in exchange for Russia's disclosure of hacked DNC emails to WikiLeaks. The assessment also drew upon news articles in July and August 2016 reporting that the Trump campaign influenced the Republican Party to change its platform to not call for giving Ukraine weapons to fight Russian and rebel forces.

### 5.   Feedback from ODAG and Submission of the Read Copy

At the time OI submitted the October 14 draft application to McCord, OI simultaneously sent the draft to ODAG for review. Over the next few days, the application was reviewed by Gauhar, an OI attorney on detail in ODAG, Principal Associate Deputy Attorney General Matthew Axelrod, and later Yates, who ultimately approved and signed the final application.

As noted previously, in instances where the DAG approves and signs FISA applications, OI typically submits the application package to ODAG as a finished product after the read copy has been filed with the court and shortly before or during the oral briefing on the final application.  However, in cases with heightened sensitivity, which can occur for a variety of reasons, OI may proactively flag the application for ODAG earlier in the process for special attention, which OI did in this case.  Further, although sometimes NSD will ask ODAG whether it wants to read a flagged application in advance, Evans told us that in this case NSD decided that it would not submit the read copy to the FISC until Yates had personally read it and said she was comfortable moving forward.

Gauhar and the OI attorney on detail, both of whom had prior FISA experience in OI before joining ODAG, were the first to review the draft Carter Page application.[283]  On October 18, the two met with OI to discuss specific suggestions they had for the probable cause section, and later in the day, OI circulated an updated draft incorporating new edits to address ODAG's suggestions.  According to Gauhar, and as reflected in the October 18 updated draft, her office had suggested edits to add more emphasis and focus on Carter Page in the probable cause section, while at the same time making changes in tone to characterize the Trump campaign in a more neutral manner.[284]  She explained that ODAG wanted to make sure that the court was not left with the misimpression that the FBI had information indicating that there were current members of the Trump campaign who were wittingly conspiring with Russia.  Gauhar said she did not think that OI intentionally drafted the application in that direction, and she thought that some additional changes would help ensure that there was no misimpression.

Axelrod said he read the October 18 draft the next morning and had some suggested edits to further address the theme of the edits from the day before.  ODAG sent NSD the additional suggested changes, and NSD and the FBI accepted the changes and incorporated them into the read copy.

ODAG's edits did not suggest significant changes to the Steele information in the application.  Gauhar said that she was in communication with Evans when he

---

[283] Immediately before Gauhar joined ODAG, from 2009 to 2014, she was the Deputy Assistant Attorney General in NSD with responsibility over OI (the position Evans held at the time of the Page FISA applications).  Gauhar joined the Department in 2001 as an attorney in OIPR, which, as described previously, was OI's predecessor office.  In OIPR, she was responsible for preparing FISA applications and later oversaw the FISA process as a supervisor and Deputy Chief of OI's Operations Section.  The OI attorney on detail had served as an attorney in OIPR starting in late 2006 where she prepared FISA applications and then later oversaw the FISA process when she became the Deputy Chief and then Chief of the Counterterrorism Unit in OI's Operations Section.

[284] Examples of the edits addressing tone included describing Carter Page as *an individual associated with* the Trump campaign, rather than as a member of the Trump campaign, and describing the conspiracy alleged in Steele's Report 95 as between Russia and *individuals involved in* the Trump campaign, rather than the campaign itself.

was asking his questions about Steele and by the time that she reviewed the draft, she knew that Evans and others had drilled down on the source.[285]

On October 18, Gauhar reached out to Lisa Page, her contact in the Deputy Director's office, to advise her that the Carter Page FISA application was under review in ODAG. According to Gauhar, she was aware at the time that the FBI had been pushing OI to complete the process on the application, and she wanted McCabe to know that the application was now with ODAG and they were working on it.[286] Page advised Gauhar that it was possible that McCabe might ask Yates about the status of application during a regularly scheduled meeting the following morning on October 19. We did not find any evidence reflecting that McCabe asked Yates during that morning meeting on October 19 about the status of the application, and McCabe told us that he did not have a specific recollection of having done so.

As noted earlier, Evans told the OIG that he discussed the issue of whether this FISA application was a good idea with McCabe after a regularly scheduled meeting on October 19. Gauhar told us that sometime around this date, she believes that Yates may have had a similar discussion with McCabe. According to Gauhar, she advised Axelrod that Evans had raised his prudential question with the FBI, and she said she had a general recollection that Yates may have had direct conversations with McCabe to discuss FBI leadership's position on moving forward with the application. Gauhar said she was not present during any such conversations between Yates and FBI leadership and did not recall the details, but she believed Yates was told that FBI leadership felt strongly that the FISA was an important investigative step.

Yates told the OIG that she did not specifically recall any conversations with either McCabe or Comey about the Carter Page FISA application, but that such conversations could have happened. Yates said she had a general recollection that the FBI believed that they really needed to take this investigative step, but whether that understanding was the result of a specific conversation or just by virtue of the fact that Comey was prepared to sign off on the FISA application, she did not recall. Comey and McCabe told us that they did not recall a discussion with Yates about the FISA application.

On October 19, after incorporating Axelrod's edits, OI finalized the read copy of the Carter Page FISA application and sent it to the Crossfire Hurricane team for final review. Late in the evening, Strzok notified Evans that the FBI was

---

[285] Emails indicate that on October 17, Gauhar asked a question about Steele, specifically how the FBI reconciled its belief that Steele did not disclose information in the September 23 *Yahoo News* article given the article's reference to a "well-placed Western intelligence source." OI advised that Steele told the FBI that he only provided information to his business associate and the FBI, and that the FBI believed that the business associate or the law firm disclosed the information to the media.

[286] For example, on October 17, Strzok had emailed Evans to advise him of upcoming operations in the investigation of Carter Page that would be assisted by the requested FISA coverage. Case Agent 1 told us that he became frustrated with the pace of the FISA application process and asked Strzok to do whatever he could to help move it along.

comfortable with its accuracy and content.  Separately, Evans received notice from ODAG that, as he requested, Yates had read the application and had cleared NSD to file the read copy with the court.  OI filed the read copy with the FISC the next day.

The OIG found no indication that then Attorney General Loretta Lynch or anyone in the Office of the Attorney General (OAG) was involved in the preparation, review, or approval of the Carter Page FISA application.  Gauhar told us that she had brief conversations with Lynch's National Security Counselor and Chief of Staff to advise them for their situational awareness that a FISA application targeting Carter Page was expected to be filed.  Neither the National Security Counselor nor the Chief of Staff read the application prior to its filing with the court.  Lynch also said she did not read the application and did not recall any conversations about it.

### III.   Feedback from the FISC on the Read Copy, Completion of the Woods Procedures, and Final Briefing and Signatures

#### A.   Feedback from the FISC and Revisions to the Application

On October 20, 2016, the FISC legal advisor assigned to the Carter Page application provided OI with four comments and questions regarding the read copy.  Two related to information in the footnote about Steele, and two related to certain facilities believed to be used by Carter Page:

- The FISC legal advisor inquired about a sentence in the footnote that stated, "In addition to the specific information pertaining to Page reported in this application, [Steele] has provided other information, which the FBI is currently investigating."  To clarify, the final application was revised to state, "In addition to the specific information pertaining to Page reported in this application, [Steele] has provided other information relating to the Russian Government's efforts to influence the election that do not directly pertain to Page, including the possibility of the Russian's [sic] also possessing a dossier on Candidate #1, which the FBI is currently investigating."

- The legal advisor asked how it was that Steele had a network of sub-sources, and the OI Attorney provided additional information to him regarding Steele's past employment history.  At the request of the legal advisor, OI included the additional information in the final application, including the identity of █████████████

- The legal advisor asked OI for clarification regarding the information used to establish Carter Page's use of a particular email account, and OI corrected an error in the description of the supporting documentation.

- The legal advisor requested additional information to establish the ████████ of Carter Page's ████████████.  The FBI provided the OI Attorney with some additional information; however, the information was somewhat stale, and the FBI elected instead to remove ██

, rather than hold up the final application to investigate ████████████████ further.

According to the OI Attorney, the FISC legal advisor raised no other issues and did not further question the application's reliance on Steele's reporting.

## B.     The FBI's Completion of the Factual Accuracy Review ("Woods Procedures")

On October 19, the OI Unit Chief "signed out" the cert copy of the application and cert memo, so that the FBI could complete the FISA verification process known as the Woods Procedures, described in Chapter Two. Case Agent 1 was the agent responsible for compiling the supporting documentation into a Woods File, performing the field office database checks on Carter Page, and completing the accuracy review of each fact asserted in the FISA application. His supervisor for the Carter Page investigation, SSA 1, was responsible for confirming that the Woods File was complete and for double checking the factual accuracy review to confirm that the file contained appropriate documentation for each of the factual assertions in the FISA application.

With respect to the factual accuracy review, Case Agent 1 told us that he personally compiled the supporting documentation in the Woods File and then went through the factual statements in the cert copy one-by-one and made sure that each factual assertion was verified by a corresponding document in the Woods File. After he completed his review of all the factual information, he said he turned the Woods File over to SSA 1, and SSA 1 and Case Agent 1 then performed a second factual accuracy review of the same information together. SSA 1 said he found that each factual assertion was supported by documentation in the Woods File, and he had no concerns with how the Woods Procedures were completed. SSA 1 told us that he relied on Case Agent 1 to highlight each relevant fact in the supporting document in the Woods File, and that once he verified that each highlighted fact corresponded to a factual assertion in the application, he would move on to the next fact, without necessarily reviewing the entire document.[287] On the evening of October 20, Case Agent 1 and SSA 1 signed the "FISA Verification Form" or "Woods Form" affirming the verification and documentation of each factual assertion in the application.[288]

---

[287] We do not believe that this process, even when faithfully executed, is sufficient to ensure that all factual assertions in the application had adequate supporting documentation.

[288] As discussed in detail in Section IV below, we examined the completeness of the Woods File by comparing the facts asserted in the first FISA application to the documents maintained in the Woods File. Our comparison identified instances in which facts asserted in the application were not supported by documentation in the Woods File. Specifically, we found facts asserted in the FISA application that have no supporting documentation in the Woods File, facts that have purported supporting documentation in the Woods File but the documentation does not state the fact asserted in the FISA application, or facts that have purported supporting documentation in the Woods File but the documentation shows the fact asserted is inaccurate. The three most significant Woods errors, which are among the five problematic issues we describe later in Section IV, were:  (1) the failure to seek and document Handling Agent 1's approval of the source characterization statement for Steele; (2)

After Case Agent 1 and SSA 1 signed the Woods Form, they passed the Woods Form, cert copy, and cert memo (collectively referred to as the FISA or application "package") to a Headquarters Program Manager assigned the responsibility of signing the final application under oath attesting that the factual information was true and correct. The Headquarters Program Manager was an SSA in the CD's Counterespionage Section. His official duties at the time did not include supervising the Carter Page investigation, contrary to what was stated in boilerplate language in the FISA application. Instead, he was briefed into the Crossfire Hurricane investigation on or about September 23 for the purpose of swearing out the Carter Page FISA.[289] The Headquarters Program Manager told us that after he was briefed, he attended some of the team meetings and had multiple conversations with Case Agent 1, SSA 1, and the OGC attorneys for updates on the status of and changes to the application. He said he read the entire application before it was final and, as changes were made to the application, he reviewed the changes. He said he had no specific memory of reviewing the Woods Form or Woods File (as described in Chapter Two, the Woods Procedures do not require the affiant to review the Woods File), but he believes that he would have done both since the Woods File was compiled at Headquarters, and thus he would have had access to it. However, he said he trusted that the case agent verified the accuracy of the factual assertions, as the case agent was required to do as part of the Woods Procedures. Further, the Headquarters Program Manager said that he was not independently aware of any information suggesting that the information in the application was inaccurate. After the Headquarters Program Manager signed the affidavit in the application declaring under penalty of perjury that the information in the application was true and correct, he submitted the application package to the OGC Attorney.

The OGC Attorney and Deputy General Counsel Anderson reviewed the application package on behalf of OGC's National Security and Cyber Law Branch. However, as discussed in Chapter Two, FBI procedures do not specify what steps must be taken during the final OGC legal review.[290] The OGC Attorney, who had participated in the drafting process and was familiar with the content of the application, told us that he reviewed the Woods Form with the Headquarters Program Manager. After the OGC Attorney confirmed that all of the Woods Procedures had been completed, he signed the cert memo below the OI Unit Chief's signature and submitted the package to Anderson.

---

the fact that documentation in the Woods File used to support the FBI's statement that Steele only shared his election related information with Glenn Simpson actually stated that Steele also shared the information with the State Department; and (3) the fact that documentation in the Woods File used to support the FBI's assertion that Carter Page did not refute his alleged contacts with Sechin and Divyekin to an FBI CHS in actuality stated that Page specifically denied meeting with Sechin and Divyekin to the CHS. We provide examples of other Woods related errors in Appendix One.

[289] According to the Headquarters Program Manager, because the investigation was closely-held and being run out of Headquarters, it was initially not assigned to a specific unit in the Counterintelligence Division and therefore did not have an assigned program manager.

[290] We make a recommendation in Chapter Eleven that addresses this issue.

Anderson told us that she reviewed the cert memo and Woods Form and determined that the application package was complete, all the steps of the Woods Procedures were represented to have been taken, the probable cause standard was met, and there were no outstanding issues. She then signed the cert memo below the other signatures, signifying that the application was ready for certification, and she gave the application package to the OGC Unit Chief for submission to the FBI Director.[291]

## C.    FBI Director's Certification

Comey certified the Carter Page application on behalf of the FBI. In Chapter Two, we described the elements of the certification required by the FBI Director or Deputy Director, including that the information sought through the requested FISA authority is foreign intelligence information that cannot reasonably be obtained by normal investigative techniques and is necessary to protect the United States against clandestine intelligence activities. In this regard, the Director's certification is different from the approval of the NSD AAG, DAG, or the Attorney General, which requires that the signatory find that the application satisfies the FISA's statutory requirements.

Comey told the OIG that when he was Director his practice varied in terms of whether he would read a FISA application itself before certifying an application, or whether he would rely solely on the description of the application in the cert memo. He said that he would read applications if they required special attention, but that from time to time he would also select others to read for quality control purposes. In this instance, Comey said he read the application because of its sensitivity. He further stated that he read the application once, after Baker presented the final package to him. He said he did not recall any conversations with Baker or with others about the application.

Baker told us that he presented the final package to Comey because he wanted to discuss the foreign intelligence purpose with Comey before Comey signed the certification. Baker said that in addition to explaining the foreign intelligence purpose to Comey, he wanted to make sure that Comey knew that he (Baker) had read the FISA and was satisfied that the probable cause standard was met. According to Baker, Comey told him that he understood, was satisfied with the foreign intelligence purpose, and was glad Baker read the application.

Comey told us that the application seemed factually and legally sufficient when he read it, and he had no questions or concerns before he signed. When we

---

[291] Anderson told us that she did not read the FISA application at this stage in the process, which she said was not unusual. She said that her general practice was to rely upon the cert memo's description of the probable cause, unless there was a reason to dig deeper into the application based on her review of the cert memo or if she was familiar with the case from an earlier stage. As described previously, in this case, Anderson had read the Carter Page FISA application once before during the review process and she believed that both Baker and the OGC Unit Chief had also read and provided feedback on the application. As described previously, Baker provided comments on a draft of the application. The OGC Unit Chief told us that she read the application and was involved in discussions about it, but she said she did not recall requesting edits.

asked him why the FBI moved forward with an application on a target who was formerly connected to a presidential campaign, based in part on source reporting that may have been funded by the opposing political party and had not yet been corroborated, Comey said that the reason was because there was probable cause to believe that Page was an agent of a foreign power. He said that simply because the information regarding Page was uncorroborated at the time of the application did not mean that it was unreliable. He stated that in this case, he understood that the FBI assessed that Steele was a credible source, with a network of sub-sources in positions to receive information, and the core of the Steele reporting was consistent with other information the FBI had at the time.

Comey signed the application on October 20, and the application package was presented to Yates on October 21.

## D.    DAG Oral Briefing and Approval

Yates told the OIG that she did not recall the discussion that took place at the October 21 oral briefing when NSD presented the final application package to her. Evans said that he recalled that because Yates had already read the FISA application and was familiar with its contents, the OI Attorney used the oral briefing to advise her of the FISC legal advisor's questions and the changes made in the final application to address those questions. Evans said that he recalled little discussion during the oral briefing on this application before Yates signed the application.

The OIG asked Yates about her views on the application. Yates told us that, in her view, the application did not present a close call from a legal sufficiency standpoint, and she was comfortable that it was an appropriate investigative step to take. In terms of the specific reasons she approved the application, Yates stated:

> Well, several things here. First, the context of the issue that we're talking about here, which is the Russian attempt to interfere in the 2016 presidential election, and the potential involvement of U.S. persons in that, is obviously a critically important topic. This is not some tangential run-of-the-mill crime. This is, to state the obvious here, critically important to the country. So we start sort of with the premise of, this is a topic that we need to get to the bottom of.
>
> Secondly, Carter Page is not someone who just popped up out of the blue on the FBI's radar, with respect to his relationship with the Russian government. He is someone who had been on the radar for quite some time, both in terms of, and I think it's laid out in the FISA, the attempts to recruit him that had been laid out in a prior criminal case, and the FBI's knowledge of interaction that he had had in the past, and was continuing to have, with high-level people in the Russian government. So, it's not as if, just some guy who had never had any relationship with Russia has been alleged to be involved in the Russians' interference in the election.

[T]hat's also against the backdrop of the information that Papadopoulos had provided, and that then was corroborated to the extent that then WikiLeaks did do the email dump, as predicted there, and identified that a person in the campaign that was coordinating that.

Combined with [Steele], who had been someone with whom the FBI had worked for many years, both in an official capacity at [███████████ ███████████], and then afterwards, whom they had found to be credible. I believe criminal cases had been made, or he had participated in criminal cases[.]  So again, not just somebody out of the blue.  And he was also very knowledgeable of Russia, which is not an easy place to break into, in terms of getting information.

...[I]t may have been, the information that [Steele] had acquired, may have been at the behest of the Clinton campaign or the DNC.  I guess I would emphasize the word "may" there.  That again, my understanding was that the FBI did not know who he was working for. In fact, and this is one of these things I have a hard time teasing out, what I knew then versus what I may know now, or have learned since, is that [Steele], my understanding is at one point, was actually working for someone connected with the Republican Party.  I don't know, again, whether I knew that at the time, or not.  I'm not at all sure about that.  So, while certainly there was [an] implication that he was doing opposition research, it's gotta be for somebody.  I mean, he's been hired by someone.  My understanding was that the FBI didn't know who.  And that is a factor to consider in this.[292]

But that was not the determinative factor, when you're talking about gathering foreign intelligence, not when it's against the backdrop of all of the other information there.  And the FBI, who are experts in this, who have people who do this all day, every day, and the folks in DOJ who work with them on that, all believed that this was an important FISA to get, and to get now.  So it's against the back-drop of that, of believing that it met the legal standards for a FISA, which appear to be borne out, given that it's been signed and reauthorized a number of times through the FISA court.  It, I believed then and I believe now, it was the appropriate step to take.  They're not all easy decisions that you make when you're DAG.

---

[292] FBI officials told us that the Crossfire Hurricane team did not know who hired Fusion GPS (which hired Steele) until after the first FISA application was filed, though, as described previously, the Crossfire Hurricane team and Steele's handling agent suspected Steele had been hired to conduct political opposition research.  Documents indicate that by February and March 2017 it was broadly known among FBI officials involved with the investigation, and shared with senior NSD and ODAG officials, that Fusion GPS was hired first by a candidate during the Republican primaries and then later by someone related to the Democratic Party.  Yates was removed as Acting Attorney General on January 30, 2017.

Following OI's presentation, Yates signed the application, and OI submitted the application to the FISC the same day.  By her signature, and as stated in the application, Yates found that the application satisfied the criteria and requirements of the FISA statute and approved its filing with the court.[293]

### E.    Final Orders

The final FISA application included proposed orders, which were signed by then Chief Judge of the FISC, Rosemary Collyer, on October ▉, 2016.  According to NSD, the Chief Judge signed the final orders as proposed by the government in their entirety, without holding a hearing.

The primary order and warrant stated that the court found, based upon the facts submitted in the verified application, that there was probable cause to believe that Russia is a foreign power and that Carter Page was an agent of Russia under 50 U.S.C. § 1801(b)(2)(E).  The court also found that the ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.  The court authorized the requested electronic surveillance ▉▉▉▉▉ for 90 days ▉▉▉▉▉ to effectuate the electronic surveillance ▉▉▉▉▉ authorized by the court.  The authorization permitted the government to, among other things, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ by Carter Page.  This included ▉▉▉▉▉▉▉▉▉▉▉▉▉▉ during the 90-day period.  The authorization also permitted the government to ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

### IV.    Inaccurate, Incomplete, or Undocumented Information in the First FISA Application

Our review revealed instances in which factual assertions relied upon in the first FISA application targeting Carter Page were inaccurate, incomplete, or unsupported by appropriate documentation, based upon information the FBI had in its possession at the time the application was filed.  We describe the most significant instances below and provide additional examples in a chart in Appendix One.  We found no evidence that the OI Attorney, NSD supervisors, ODAG officials, or Yates were made aware of these issues by the FBI before the first FISA application was submitted to the court.  Although we also found no evidence that Comey had been made aware of these issues at the time he certified the application, as more fully discussed in our analysis in Chapter Eleven, multiple factors made it difficult for us to precisely determine the extent of Comey's or

---

[293]  Her signature also specifically authorized ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

McCabe's knowledge as to each fact that was not shared with OI and not included, or inaccurately stated, in the FISA applications. These factors included, among other things, limited recollections, the inability to question Comey about classified material because of his lack of a security clearance, and the absence of meeting minutes that would show the specific details shared with Comey and McCabe during briefings they received, beyond the more general investigative updates that we know they were provided.

### A. Information about Page's Prior Relationship with Another U.S. Government Agency and Information Page Provided to the Other Agency that Overlapped with Facts Asserted in the FISA Application

The OI Attorney told us that it is relevant to know if the target of a FISA is or had been working on behalf of another U.S. government agency to "make sure that the left hand knows what the right hand is doing" when seeking FISA authority. As noted previously, according to the OI Attorney, it would have been a significant fact if Page had a relationship with the other U.S. government agency that overlapped in time with his interactions with known Russian intelligence officers described in the FISA applications because it would raise the issue of whether Page interacted with the Russian intelligence officers at the behest of the other agency or with the intent to assist the U.S. government. Evans told us that information about a FISA target's relationship with another U.S. government agency is typically included in a FISA application. Evans also stated that OI would work with the FBI to fully understand any such relationship and describe it accurately in the relevant application.

Toward that end, on September 28, 2016, the OI Attorney emailed Case Agent 1 a draft of the FISA application, copying other members of the Crossfire Hurricane team. In a comment in the draft application, the OI Attorney asked "do we know if there is any truth to Page's claim that he has provided information to [another U.S. government agency]—was he considered a source/asset/whatever?" In response to the OI Attorney's question, on September 29, Case Agent 1 inserted the following comment in the draft:

> "He did meet with [the other U.S. government agency], however, it's dated and I would argue it was/is outside scope, I don't think we need it in. It was years ago, when he was in Moscow. If you want to keep it, I can get the language from the [August 17 Memorandum] we were provided [by the other U.S. government agency]."[294]

Based upon this response, the OI Attorney did not include information about Page's prior relationship with the other agency in the FISA application.

However, the information Case Agent 1 provided to the OI Attorney was inaccurate. As described in the August 17 Memorandum from the other U.S.

---

[294] As noted previously, on or about August 17, 2016, the Crossfire Hurricane team received information from another U.S. government agency detailing Carter Page's relationship with that other agency.

government agency to the FBI, Page first met with the other agency in April 2008, after he left Moscow (Page had lived in Moscow from 2004 to 2007), and he had been approved as an operational contact for the other agency from 2008 to 2013. Additionally, rather than being outside the scope of the FISA application, the FISA application included allegations about meetings that Page had with Russian intelligence officers that Page had disclosed to the other agency.  Specifically, according to the August 17 Memorandum, Page provided information to the other agency in October 2010 about contacts that Page had with a Russian intelligence officer (Intelligence Officer 1), which the other agency assessed likely began in 2008. Page's contacts with Intelligence Officer 1 in 2007 and 2008 were among the historical connections to Russian intelligence officers that the FBI relied upon in the first FISA application (and subsequent renewal applications) to help support probable cause.[295]  The August 17 Memorandum stated that Page told the other agency that he met with Intelligence Officer 1 four times, characterized him as a "compelling, nice guy," and described Intelligence Officer 1's alleged interest in contacting an identified U.S. person.  According to the August 17 Memorandum, the employee of the other U.S. government agency who met with Page assessed that Page "candidly described his contact with" Intelligence Officer 1.  Page's relationship with the other agency was not mentioned in any of the four FISA applications.

Further, the FBI had information in its own files indicating that Page had told the FBI about meeting with the other U.S. government agency after the period he lived in Moscow and during the period alleged in the FISA application.  For example, according to the FBI Electronic Communication (EC) documenting a June 18, 2009 FBI interview of Page, Page had informed the FBI agents that "due to his work and overseas experiences, he has been questioned by and provides information to representatives of the [other U.S. government agency] on an ongoing basis," and that the "interviewing agents acknowledged this fact, and stated to Page that no questions would be asked about Page's dealings with the other U.S. government agency during the interview."  According to another FBI EC, Page told the FBI during a June 2013 interview that, although he had not spoken to the other U.S. government agency for "about a year or so" Page had spoken to them "since his last interview with the FBI."

The Woods File for the first FISA application, which was prepared by Case Agent 1, included the EC documenting the 2009 FBI interview of Page. Additionally, Case Agent 1 received an email on August 10, 2016, containing an attachment titled "Carter Page-Profile," which had been prepared by a Crossfire Hurricane Staff Operations Specialist (SOS).  The profile, dated August 1, 2016, quoted the 2009 EC regarding Page's statements to the FBI about his contact with the other U.S. government agency.  We did not find any electronic communications indicating that the FBI provided OI with this Carter Page profile.

---

[295] The other agency did not provide the FBI with information indicating it had knowledge of Page's reported contacts with another particular intelligence officer.  The FBI also relied on Page's contacts with this intelligence officer in the FISA application.

We asked Case Agent 1 about his knowledge in 2016 of Page's historical contacts with the other U.S. government agency and Case Agent 1's response to the OI Attorney's question on September 29, 2016, about any such contacts. Case Agent 1 told us that he did not recall his state of knowledge in 2016 regarding Page's history with the other U.S. government agency, but said he believed that he likely would have reviewed the August 17 Memorandum about Page sent to the Crossfire Hurricane team by the other U.S. government agency. He said he recalled believing that Page's involvement with the other U.S. government agency was "dated." After reviewing a synopsis of the information contained in the August 17 Memorandum during his OIG interview, Case Agent 1 reiterated to the OIG that he believed the information was dated, but also said that he "probably saw it." According to Case Agent 1, "I think I would have reviewed it with the team. I think that it would have been, you know, as we looked at it. It wasn't just me. But, we, you know, there was a determination made that it was dated." Case Agent 1 also said it was possible that he never reviewed the August 17 Memorandum from the other U.S. government agency.

The OI Attorney told us that he could not recall much about the issue of Page's historical contacts with the other U.S. government agency. After being shown his exchange with Case Agent 1 on September 29, 2016, the OI Attorney stated that if Case Agent 1 told him that Page's contacts with the other U.S. government agency were "out of scope" and dated, then he would have deferred to Case Agent 1's assessment on this issue. The OI Attorney also told us, after being informed about information in the August 17 Memorandum from the other U.S. government agency, that if OI had been aware of this information at the time the application was being prepared, OI would have discussed it internally and likely would have disclosed the information to the FISC to "err on the side of disclosure." When we discussed the information in the August 17 Memorandum with Evans, he responded similarly and told us "I think it would go in the application somewhere, be it in a footnote or elsewhere, if for no other reason than it also goes to the question of where the person's loyalties lie."

As described later in Chapters Seven and Eight, none of the three renewal applications describe Page's prior historical contacts and relationship with the other U.S. government agency, even after the FBI received additional information from the other agency in June 2017. In April and May 2017, following news reports that the FBI had obtained a FISA targeting Carter Page, Page gave interviews to news outlets denying that he had collected intelligence for the Russian government and asserting instead that he had previously shared information that he had learned with the U.S. intelligence community. In mid-June 2017, in response to concerns expressed by members of the Crossfire Hurricane team, the OGC Attorney contacted the other U.S. government agency by email to seek clarification about Page's past status with that agency. The other U.S. government agency responded by email to the FBI OGC attorney by directing the attorney to memoranda previously sent to the FBI by the other U.S. government agency that informed the FBI that Page did previously have a relationship with that other agency and that the last contact occurred in July 2011. The email also stated, using the other agency's terminology, that Page had a relationship with that other agency. However, when

asked about Page's prior status with that other agency by a Crossfire Hurricane supervisor, SSA 2, who was going to be the affiant on the final FISA renewal application, the OGC Attorney told SSA 2 that Page had never had a relationship with the other U.S. government agency. In addition, the OGC Attorney altered the email that the other U.S. government agency had sent to the OGC Attorney so that the email stated that Page had not been a source for the other agency; the OGC Attorney then forwarded the altered email to SSA 2, who told us he relied on the email. Shortly thereafter, SSA 2 served as the affiant on the final renewal application, which was again silent on Page's prior relationship with the other U.S. government agency.

## B.   Source Characterization Statement

As described earlier, because the FBI did not have information corroborating the Steele reporting relied upon in the Carter Page FISA application, it was particularly important for the application to articulate to the court the FBI's assessment of the reliability of the source. Toward that end, the final application included in a footnote the following source characterization statement regarding Steele:

> [Steele] is a former ███████████  ████████████
> ██████ and has been an FBI source since in or about October 2013.
> [Steele's] reporting has been corroborated and used in criminal
> proceedings and the FBI assesses [Steele] to be reliable.[296]  [Steele]
> has been compensated approximately $95,000 by the FBI and the FBI
> is unaware of any derogatory information pertaining to [Steele].[297]

The OIG found no documentation in the Woods File indicating that Steele's handling agent, Handling Agent 1, approved this language, as required by Foreign Intelligence Surveillance Act and Standard Minimization Procedures Policy Guide (FISA SMP PG) discussed in Chapter Two. Case Agent 1, who as described earlier compiled the Woods File and completed the Woods Procedures, told us that he was not aware of this requirement.[298]  Handling Agent 1 told the OIG that he did not approve this language, and that his OIG interview was the first time he ever saw it. Further, Handling Agent 1 said that although he found Steele to be reliable in the past, only "some" of Steele's past reporting had been corroborated and most of it

---

[296]  Although Case Agent 2's summary of the early October meeting with Steele states that Steele described his ████████████ in a manner consistent with the footnote in the FISA application, other documentation (discussed in Chapter Eight) indicates that Steele's ████████████ told the FBI in November 2016, after the first application was filed, that Steele had ████████████ ████████████.

[297]  As described later in Chapter Seven, after Steele admitted to a disclosure of information to *Mother Jones* in late October 2016, the renewal applications removed the reference to no derogatory information concerning Steele and stated that the FBI continued to assess that Steele was reliable "as previous reporting from Steele has been corroborated and used in criminal proceedings."

[298]  Case Agent 1 told us that his experience with previous FISA applications had always involved CHSs for whom he (Case Agent 1) was the handling agent, and that, therefore, he never had the need to seek approval from a separate handling agent.

had not. He also stated that Steele's reporting had never been used in a criminal proceeding.

Handling Agent 1 also told us, and FBI emails and instant messages reflect, that he had provided language on September 23 to Case Agent 1 for the source characterization statement that was substantively different from the final language used in the FISA application:

> CHS has been signed up for 3 years and is reliable. CHS responds to taskings and obtains info from a network of sub sources. Some of the chs' info has been corroborated when possible.

Case Agent 1 provided this language from Handling Agent 1 to the OGC Unit Chief, who had requested that he reach out to the handling agent for a description of Steele's reliability and corroboration. However, the language Case Agent 1 provided to the OI Attorney on September 29, which was later used to draft the reliability footnote 8, differed from the language provided by Handling Agent 1 and instead stated the following:

> This information comes from a sensitive FBI source whose reporting has been corroborated and used in criminal proceedings, and who obtains information from a number of ostensibly well-positioned sub-sources. The scope of the source's reporting is from 20 June 2016 through 20 August 2016.

Case Agent 1, the OGC Unit Chief, and the OGC Attorney told us that they did not recall or know the specific circumstances that led to the use of "corroborated and used in criminal proceedings" in the final application instead of language that more closely tracked what Handling Agent 1 had provided. Emails and other FBI documents reflect that Case Agent 1 borrowed the exact language used in the final application from an Intelligence Memorandum on the Steele reporting, which the Supervisory Intel Analyst and Staff Operations Specialist (SOS) had prepared in late September 2016.[299] Case Agent 1 told us that he most likely wanted to make sure that the language in the FISA application was consistent with how Steele was described in that document, which he believed had been vetted by analysts.

The Supervisory Intel Analyst told us that the phrase "corroborated and used in criminal proceedings" was a reference to Steele's reporting in the FIFA investigation. He said that neither he nor anyone else on the team reviewed any of the documents or court filings in the FIFA case file, and he did not "dig into" exactly how Steele's reporting was used in the FIFA case. He said that his entire knowledge about Steele's role in and significance to the FIFA investigation came from Handling Agent 1, though he said he did not recall what he specifically learned from Handling Agent 1 regarding how Steele's information was used in the FIFA

---

[299] The Supervisory Intel Analyst told us that he did not specifically recall developing this specific language for the Intelligence Memorandum, but he said that metadata on the document itself reflected that he personally added the information.

investigation. Handwritten notes documenting conversations with Handling Agent 1 indicate that the Crossfire Hurricane team was left with the understanding that Steele was the original source for the FIFA investigation. SSA 1 told the OIG that the team "speculated" that Steele's information was corroborated and used in criminal proceedings because they knew Steele had been "a part of, if not predicated, the FIFA investigation" and was known to have an extensive source network into Russian organized crime. SSA 1 told us that the email he sent to Handling Agent 1 and others on September 19, requesting a "source characterization statement," among other information on Steele, reflected his "intent" as the case supervisor to provide accurate information in the FISA application about Steele's history with the FBI. As noted in Chapter Four, in connection with the FIFA matter, Steele had provided leads to the FBI, namely that the FBI should talk to a contact who had information on corruption in the FIFA organization. It was the contact's information, in part, that led to the opening of the FIFA investigation. However, the FIFA case agent and a prosecutor on the case told us that, to their knowledge, Steele did not have any role in the investigation itself, he did not provide court testimony, and his information did not appear in any indictments, search warrants, or other court filings. According to Handling Agent 1, he was clear with the Crossfire Hurricane team concerning Steele's role and that Steele had provided leads and not evidence in the FIFA case.

Witnesses gave us different understandings as to the meaning and scope of the phrase, "used in criminal proceedings." Handling Agent 1 told us that he never told the Crossfire Hurricane team that Steele's past reporting was "used in criminal proceedings," and he was bothered that the team used that phrase. Other witnesses said that the phrase could include providing a lead that helped bring about a criminal investigation, such as Evans who told us that a tip that leads to evidence of criminal wrongdoing could meet the "spirit" of "used in criminal proceedings." However, some witnesses, including attorneys who served in FBI OGC, NSD, and ODAG, interpreted the phrase to mean that the source information was used in some sort of formal court proceeding or legal process. In particular, Baker told us that, in his view, the phrase implies that the information "wasn't just a tip," but that it was used as evidence in a trial, in an affidavit, or in some other court filing or legal process.

Given the importance of a source's bona fides to a court's determination of credibility—particularly in cases where, as here, the source information supporting probable cause is uncorroborated—we believe the failure to comply with FBI policy requiring that Steele's handling agent review and approve the language in the source characterization statement was an important one. This failure may have resulted in the court being left with the misimpression that Steele's past reporting (or at least some of it) had been deemed worthy by prosecutors of being relied upon in court or that more of his information had been corroborated than was actually the case. Further, as we describe in Chapters Six and Eight, additional documentation became available to the Crossfire Hurricane team subsequent to the first FISA application that provided information contrary to the characterization of Steele in the first FISA application, including the finding of a formal FBI source validation review in March 2017 that Steele's past reporting on criminal matters,

which included the FIFA case, was "minimally corroborated."  Despite this information, the description of Steele in the FISA renewal applications did not change.

### C.    Information about a Steele Sub-Source Relied Upon in the FISA Application (Person 1)

As described earlier in this chapter, the information in the FISA application relied upon to establish probable cause to believe that Carter Page was coordinating with the Russian government on 2016 U.S. presidential election activities was based upon certain aspects of Steele's reporting.  This reporting included the alleged secret meetings between Page and Russian officials in July 2016 described in Steele's Report 94.  We found that the most descriptive information in the FISA application of alleged coordination between Page and Russia came from Steele's Report 95, which attributed the information to "Source E."

The FISA application stated that, according to this sub-source, Carter Page was an intermediary between Russian leadership and an individual associated with the Trump campaign (Manafort) in a "well-developed conspiracy of co-operation" that led to the disclosure of hacked DNC emails by WikiLeaks in exchange for the Trump campaign team's agreement, which the FBI assessed included at least Carter Page, to sideline Russian intervention in Ukraine as a campaign issue.  The application also stated that this same sub-source provided information contained in Steele's Report 80 that the Kremlin had been feeding information to Trump's campaign for an extended period of time and that the information had reportedly been "very helpful," as well as information contained in Report 102 that the DNC email leak had been done, at least in part, to swing supporters from Hillary Clinton to Donald Trump.[300]  Because the FBI had no independent corroboration for this information, as witnesses have mentioned, the reliability of Steele and his source network was important to the inclusion of these allegations in the FISA application.

Before the initial FISA application was filed, FBI documents and witness testimony indicate that the Crossfire Hurricane team had assessed, particularly following the information Steele provided in early October, that Source E was most likely a person previously known to the FBI, referred to hereinafter as Person 1.[301] The Supervisory Intel Analyst's written summary of the early October meeting with Steele specifically attributed the information in Report 95 to Person 1 and also described information that Steele provided to the FBI team about Person 1, including that Person 1 "is a 'boaster' and an 'egoist' and may engage in some embellishment."  The day after the early October meeting, the Supervisory Intel Analyst emailed this written summary to the Crossfire Hurricane team, as well as Strzok and the Intel Section Chief.  The OIG found no documents or written communications in which the Crossfire Hurricane team evaluated Steele's statement characterizing Person 1 as a boaster or embellisher.  SSA 1, who received the

---

[300]  In Report 80, this sub-source was referred to as "Source D" and in Report 102 as an "associate" of candidate Donald Trump.

[301]  As discussed in Chapter Four, Person 1 ███████████████████████████

written summary from the Supervisory Intel Analyst, told us that he did not recall any such conversations.

The footnote describing this sub-source in the FISA application did not include any information about how Steele had described Person 1 as a boaster or embellisher. Documents reflect that, on or about October 12, the OI Attorney received the Supervisory Intel Analyst's written summary of the early October meeting that attributed the information in Report 95 to Person 1 and stated that Steele had described Person 1 as a boaster and embellisher. The OI Attorney made handwritten notes on the written summary when he met with members of the Crossfire Hurricane team to learn more about the source network. The OI Attorney told us that he did not recall the team flagging this issue for him or that he independently made the connection between the sub-source in the FISA application and Steele's characterization of Person 1. Case Agent 1 and the OI Attorney told the OIG that they did not recall any conversations about Steele's statement about Person 1 at the time of the FISA application. We found no evidence that Steele's characterization of Person 1 was shared with Evans or the OI managers involved in the FISA application, and they told us that they did not recall being made aware of it. Evans and the OI Attorney told us that they would have wanted to discuss the issue internally in NSD and with the FBI and likely would have, at a minimum, disclosed the information to the court.

In addition, we learned that Person 1 ███████████████████████
███████████████████████████████.[302] We also were concerned that the FISA application did not disclose to the court the FBI's belief that this sub-source was, at the time of the application, ███████████████████████████. We were told that the Department will usually share with the FISC the fact that ███████████████
███████████████. The OI Attorney told us he did not recall knowing this information at the time of the first application, even though NYFO opened the case after consulting with and notifying Case Agent 1 and SSA 1 prior to October 12, 2016, nine days before the FISA application was filed. Case Agent 1 said that he may have mentioned the case to the OI Attorney "in passing," but he did not specifically recall doing so.[303]

We believe the FBI should have specifically and explicitly advised OI about the FBI's assessment that this particular sub-source relied upon in the FISA application was Person 1, that Steele had provided derogatory information

---

[302] According to a document circulated among Crossfire Hurricane team members and supervisors in early October 2016, Person 1 had █████████████████████ ███████
████████. The document described reporting ██████████████████████████
███████████████. In addition, in late December 2016, Department Attorney Bruce Ohr told SSA 1 that he had met with Glenn Simpson and that Simpson had assessed that Person 1 was ████████ who was central in connecting Trump to Russia.

[303] Although an email indicates that the OI Attorney learned in March 2017 that ████████ ████████████████, the subsequent renewal applications did not include this fact. According to the OI Attorney, and as reflected in Renewal Application Nos. 2 and 3, the FBI expressed uncertainty about whether this sub-source was Person 1. However, other FBI documents in the same time period reflect that the ongoing assumption by the Crossfire Hurricane team was that this sub-source was Person 1.

regarding Person 1, and that ███████████████████████████████████ ████████. Those facts were relevant to OI's assessment of the strength of the information in the FISA application and, based on what we were told was the Department's practice, likely would have been included by OI in the application so that the FISC could consider the information in deciding whether to grant the requested FISA authority.

### D.   September 23 Media Disclosure

As described earlier, the final FISA application included the FBI's assessment in Footnote 18 that the FBI "does not believe that [Steele] directly provided...to the press" the information in the September 23 *Yahoo News* article concerning the investigation of Carter Page and his alleged meetings with Sechin and Divyekin. The basis for this assessment, as asserted in the application, was that Steele told the FBI that he "only provided this information to the business associate and the FBI." However, this assertion of what Steele said was inaccurate, and the documentation in the Woods File did not support it.

The documentation in the Woods File relied upon for this assertion was a written summary of the meeting in early October with Steele. The summary was drafted by Case Agent 2 and, as noted above, was emailed to the Crossfire Hurricane team a day after the meeting. This Woods document, however, did not state or otherwise indicate that Steele only provided the information to his business associate and the FBI. Indeed, the Woods document noted that Steele told the team that he also had provided his election reports to his contacts at the State Department. Neither Case Agent 1 nor SSA 1, who performed the Woods Procedures on this application, noted this error, and it is not clear upon what basis they believed they had verified the factual assertion in the footnote about the FBI's assessment of who provided information to the media for the September 23 news article. Both Case Agent 1 and SSA 1 told the OIG that they may have mistakenly been thinking the footnote said Steele gave the information to the "U.S. government" rather than "the FBI."

As described in Chapter Six, during his OIG interview, Steele told us that in September he and Simpson gave an "off-the-record" briefing to a small number of journalists about his reporting. Steele said he did not have permission to disclose to the OIG who attended this briefing but acknowledged that *Yahoo News* was identified in one of the court filings in the foreign litigation as having been present.[304] The author of the *Yahoo News* article reported publicly in February 2018 that he received a briefing from Steele on the information discussed in the article

---

[304] Steele told us that he did not know if the "Western intelligence source" cited in the September 23 *Yahoo News* article was a reference to him. He said he had understood that the media briefing he gave was "off-the-record." He said that he believed that *Yahoo News* had a source in the FBI or otherwise in the U.S. government who provided the information in the article. As we described in Chapter Four, the author of the *Yahoo News* article has written that Steele was the "Western intelligence source." *See Russian Roulette: The Inside Story of Putin's War on America and the Election of Donald Trump* (New York:  Grand Central Publishing, 2018), 227.

before the article was published, although the author also stated that he did not rely solely on Steele in his reporting.[305]

Neither of the FBI's two written summaries of the meeting in early October 2016 with Steele indicate that Steele was asked specifically about the article or generally about contacts with the media. During our interview with Steele, he told us that he was "fairly sure" the FBI team did not ask him at the meeting or at any other time, but that had they asked, he would have told them about his interactions with the media. The OI Attorney surmised in an October 14 email to the OI Unit Chief that the FBI team had not asked Steele those questions. The OI Attorney told us that he did not recall whether he sought or received clarity on whether the FBI team had specifically asked Steele about the *Yahoo News* disclosure. He said that he probably would have included more information in the application if he had additional clarity on that point.

As detailed in Chapter Four, we found no documentation demonstrating that Steele was asked by the FBI whether he was the source of the *Yahoo News* article disclosure or told the FBI he was not. Handling Agent 1 told us that he had no idea how the FBI made its assessment that Steele's business associate or the law firm likely provided the information to the media. We found that the basis for that assessment was neither accurate nor supported by appropriate documentation, demonstrating a failure in the Woods process. Further, as we describe in Chapter Seven, as the FBI learned new information about Steele's disclosures to the media—from the source himself, from Department attorney Bruce Ohr, and from media reports of the source's admissions in court filings in the foreign litigation—the FBI did not make changes in any of the three later FISA renewal applications to reflect this new information.

### E. Papadopoulos's Denials to an FBI CHS in September 2016

As described earlier, one of the main elements relied upon by the FBI in support of its probable cause showing was the FFG information concerning George Papadopoulos and the reported offer or suggestion of assistance from the Russians to someone associated with the Trump campaign. Specifically, the government stated the following in the FISA application:

> In or about March 2016, George Papadopoulos [footnote omitted] and Carter Page (the target of this application) were publicly identified by Candidate #1 as part of his/her foreign policy team. Based on reporting from a friendly foreign government, which has provided reliable information in the past…the FBI believes that the Russian Government's efforts are being coordinated with Page and perhaps other individuals associated with Candidate #1's campaign. In or about July 2016, the above-referenced friendly foreign government provided information to a senior official within the U.S. [government]

---

[305] *See* "*Yahoo News*' Michael Isikoff Describes Crucial Meeting Cited in Nunes Memo," *Yahoo News,* February 2, 2018, www.yahoo.com/news/yahoo-news-michael-isikoff-describes-crucial-meeting-cited-nunes-memo-231005733.html (accessed Dec. 2, 2019).

regarding efforts made by the Russian Government to influence the 2016 U.S. Presidential election. Specifically, according to this information, during a meeting in or about April 2016 between officials of the friendly foreign government and George Papadopoulos...Papadopoulos suggested that Candidate #1's campaign had received some kind of suggestion from Russia that Russia could assist with the anonymous release of information during the campaign that would be damaging to another candidate for U.S. President (Candidate #2). It was unclear whether Papadopoulos or the Russians were referring to material acquired publicly or through other means. It was also unclear from this reporting how Candidate #1's campaign reacted to the alleged Russian offer. Nevertheless, as discussed below, the FBI believes that election influence efforts are being coordinated between the RIS and Page, and possibly others.[306]

However, during a September 2016 CHS meeting conducted by the FBI, which was consensually monitored, Papadopoulos told an FBI CHS that, to his knowledge, no one associated with the Trump campaign was collaborating with Russia or with outside groups like WikiLeaks in the release of emails. The FISA application did not include the statements Papadopoulos made to this CHS that were in conflict with information included in the FISA application.

Case Agent 1 told us that he did not recall whether he advised the OI Attorney about Papadopoulos's denial in September 2016 but that, if he did not, it may have been an oversight. He also said that the Crossfire Hurricane team's assessment was that the Papadopoulos denial was a rehearsed response, and that he did not view the information as particularly germane to the investigation of Carter Page.[307] We were advised by NSD that it did not know about this denial by Papadopoulos until May 2018, after ODAG found the information while reviewing documents for possible production to Congressional committees. The OI Attorney told us that he had no memory of being aware of this CHS meeting at any time before May 2018.

As described in Chapter Eight, in July 2018, after learning this information, NSD submitted a letter to the FISC under Rule 13(a) of the Court's Rules of Procedure, notifying the court of additional information relevant to the Carter Page FISA applications. The Rule 13(a) letter included Papadopoulos's statements to the

---

[306] Although the application stated that the meeting between the FFG and Papadopoulos occurred in April 2016, FBI documents indicate the meeting occurred in May 2016.

[307] After reviewing a draft of this report, Case Agent 1 told the OIG that he and the team discounted Papadopoulos's denials for several reasons, but that, in hindsight, he now realizes that those denials, and the team's assessment of those denials, should have been shared with OI "in order for [OI] to make the determination whether [those denials] should be in the application."

FBI CHS in September 2016, as well as similar statements Papadopoulos made to a CHS in late October 2016, after the first application was filed.[308]  The letter stated:

> The above-described additional background information concerning Papadopoulos's September 2016 meeting with [an FBI CHS] and October 2016 discussion with a separate CHS would have been included in the applications had it been known to NSD at the time, as Papadopoulos's statements relate to the question of whether Papadopoulos was aware of or involved in coordination of election influence efforts between the RIS and members of Candidate #1's campaign.  Even had this information been included, the totality of information submitted in these applications concerning Page's activities was sufficient to support the Court's finding of probable cause that Page was acting as an agent of a foreign power.  [Footnote omitted].

Evans told the OIG that a FISA target's denial of facts asserted in a FISA application should be included in the application, even in instances where the FBI makes an assessment that the target making the denial is not being candid or truthful.  According to Evans, there was no question in his mind that the Papadopoulos denial to the CHS in September 2016 was relevant to the court's consideration of the first application.  In fact, later renewal applications advised the court of denials made by Papadopoulos to the FBI over the course of several interviews in 2017, as well as the FBI's belief that Papadopoulos provided misleading and incomplete information.[309]

## F.    Carter Page's Denials to an FBI CHS in August and October 2016

As described earlier in this chapter, the FBI conducted CHS meetings involving Carter Page in August and October 2016.  We found that statements made by Page during these meetings, which conflicted with information included in the first FISA application, were not provided by the FBI to OI, and were not disclosed in the first FISA application.

In August 2016, as we describe in Chapter Ten, the FBI consensually monitored and recorded a meeting between Carter Page and an FBI CHS, during which Page said that he had "literally never met" or "said one word to" Paul Manafort, and that Manafort had not responded to any of Page's emails.  Page

---

[308]  In a footnote, the letter also advised the court that Papadopoulos made similar statements to the FBI during an interview in late January 2017, after Renewal Application No. 1 was filed and before Renewal Application No. 2.

[309]  As described later in Chapter Eight, in February 2017, the FBI interviewed Joseph Mifsud who the FBI believed communicated to Papadopoulos the alleged offer from the Russians. According to FBI documents, Mifsud denied having advance knowledge that Russia was in possession of DNC emails and denied passing any offers or proffers to Papadopoulos.  As described in Chapter Eight, this information was not included in the later renewal applications.

made similar statements during one of his interviews with the FBI in March 2017.[310] Although the first Carter Page FISA application and subsequent renewal applications alleged that Page was acting as an intermediary between Manafort and the Russian government as part of a "well-developed conspiracy" (from Report 95), none of the applications included statements from Carter Page to the CHS that conflicted with the conspiracy allegation.

The statements made by Page in August 2016 were not provided to OI prior to the filing of the first FISA application. The OI Attorney told us that, like the September 2016 CHS meeting involving Papadopoulos, he had no memory of being made aware of Page's August 2016 statements regarding Manafort before the first FISA application was filed. Case Agent 1 told us that he did not discuss these statements with the OI Attorney because he did not view them as contrary to the allegations in Report 95, in that it was possible that Manafort used Page as an intermediary without communicating directly with Page.[311]

We found that information about the August 2016 meeting was first shared with the OI Attorney on or about June 20, 2017, when Case Agent 6 sent the OI Attorney a 163-page document containing the statements made by Page during the meeting. As described in Chapter Seven, Case Agent 6, to bolster probable cause, had added to the draft of FISA Renewal Application No. 3 statements that Page made during this meeting about an "October Surprise" involving an "email dump" of "33 thousand" emails. The OI Attorney told us that he used the 163-page document to accurately quote in the final renewal application Page's statements concerning the "October Surprise," but that he did not read the other aspects of the document and that the case agent did not flag for him the statements Page made about Manafort. The OI Attorney told us that these statements, which were available to the FBI before the first application, should have been flagged by the FBI for inclusion in all of the FISA applications because they were relevant to the court's assessment of the allegations concerning Manafort's use of Page as an intermediary with Russia. Case Agent 6 told us that he did not know that Page made the statement about Manafort because the August 2016 meeting took place before he was assigned to the investigation. He said that the reason he knew about the "October Surprise" statements in the document was that he had heard about them from Case Agent 1 and did a word search to find the specific discussion of that topic.

Regarding the similar statement Page made during one of his March 2017 interviews with the FBI, the OI Attorney told us that Case Agent 6 also did not flag this statement for him, but added that he (OI Attorney) should have noticed the

---

[310] According to Evans, Page's statement concerning Manafort in August 2016 "arguably carries more significance" than Page's later statements because the August 2016 statements took place before Page would have learned from the media that he was under investigation by the FBI.

[311] After reviewing a draft of this report, Case Agent 1 told the OIG that, because the Crossfire Hurricane team did not receive Report 95 until several weeks after Page told the CHS that he had "literally never met" Manafort, Case Agent 1 "may have overlooked" this statement when the FISA application was being prepared. He acknowledged that he should have provided the information to the OI attorney.

statement himself in the interview summary Case Agent 6 forwarded to him on March 24, 2017, since it was only five pages, and the OI Attorney had read the entire document.

As described previously, the FISA application contained several statements Carter Page made to an FBI CHS during a consensually monitored and recorded meeting in October 2016, before the first FISA application was filed. In an email sent the same day as the CHS meeting to Case Agent 1 and other members of the Crossfire Hurricane team, the OGC Attorney asked the team to promptly send OI information about the meeting, including, among other things, any "exculpatory" statements made by Carter Page during this meeting, which was "probably the most important" information to provide to OI. Case Agent 1 thereafter provided to OI, on the same day as the October 2016 meeting, some of the statements made by Page to the CHS.

We determined, however, that the information Case Agent 1 provided to OI, which was incorporated into the first FISA application, did not fully or accurately describe the information obtained by the FBI as a result of the meeting. According to the first FISA application, Page told the CHS during the meeting that the Russians would be giving him an "open checkbook." The application further stated that Page did not "provide [the CHS] any specific details to refute, dispel, or clarify the media reporting" regarding Page's contacts with Russian officials Sechin and Divyekin, but that he made "vague statements that minimized his activities." However, the application failed to include Page's statement during the meeting in which Page specifically denied meeting with Sechin and Divyekin, and denied even knowing who Divyekin was. The application did not contain these denials even though the application relied upon the allegations in Report 94 that Page had secret meetings with both Sechin and Divyekin while in Moscow in July 2016. The application also failed to include the fact that Page denied to the CHS knowing anything about the disclosure by WikiLeaks of hacked DNC emails, which was contrary to the information from Report 95 in the application. Further, the application alleged that "Page helped influence" the Republican Party "to alter [its] platform to be more sympathetic to the Russian cause." However, it did not reference the fact that Page said to the CHS during their meeting that he "stayed clear of that—there was a lot of conspiracy theories that I was one of them...[but] totally off the record...members of our team were working on that, and...in retrospect it's way better off that I...remained at arms length."[312]

When we asked Case Agent 1 why he failed to provide this information from the October CHS meeting to the OI Attorney in advance of the first FISA application, he told us that he did not think that Page's statements on these issues were specific. We noted, however, Case Agent 1 used the transcripts of the recording as the support in the Woods File for the statements in the FISA

---

[312] Page made other statements denying culpability to a FBI CHS during a consensually recorded meeting in January 2017, in which he generally criticized the Steele reports that had recently been published by *BuzzFeed*, calling them "complete lies," and said that the FBI was provided "false" evidence against him. We found no evidence that the FBI provided this information to OI for its consideration.

applications. We further noted that the documents in the Woods File specifically stated that Page "denied meeting with Sechin/Divyekin," and said he "stayed clear" of the efforts of the Republican platform committee and knew "nothing about" WikiLeaks. Neither Case Agent 1 nor SSA 1 noted the inconsistency during the Woods Procedures, even though instant messages show that SSA 1 also knew as of October 17 that Page denied ever knowing Divyekin. This inconsistency was also not noted during the Woods Procedures on the subsequent FISA renewal applications, and none of the three later FISA renewal applications included Page's denials to the CHS.

We found no information indicating that the FBI provided OI with the documents containing Page's denials before finalizing the first FISA application. Instead, Case Agent 1 provided a summary that did not contain those denials to the OI Attorney and that the OI Attorney relied upon that summary in drafting the first application. Evans told us that had NSD known of Page's denials regarding Sechin and Divyekin, it was the kind of information that would have been included in the application.

Before FISA Renewal Application No. 1, was filed in January 2017, the OI Attorney did receive the documents containing the denials Page made to the CHS in October 2016. Yet, the information about the meeting remained unchanged in the renewal applications. The OI Attorney told us that he did not recall the circumstances surrounding this, but he acknowledged that he should have updated the descriptions in the renewal applications to include Page's denials.

In the next chapter, we describe the FBI's activities involving Steele after the first FISA application, including the FBI's decision to close Steele as a CHS and the FBI's efforts to assess Steele's election reporting in 2016 and 2017.

**[PAGE INTENTIONALLY LEFT BLANK]**

# CHAPTER SIX
# FBI ACTIVITIES INVOLVING CHRISTOPHER STEELE AFTER THE FIRST FISA AND FBI EFFORTS TO ASSESS STEELE'S ELECTION REPORTING

As detailed in this chapter, shortly after the Foreign Intelligence Surveillance Court (FISC) issued orders under FISA authorizing surveillance of Carter Page by the FBI, the FBI closed Steele as a Confidential Human Source (CHS) because Steele disclosed his relationship with the FBI to a reporter.  Following the FBI's closure of Steele, which we describe below, several other individuals provided the FBI with reports prepared by Steele, some of which the FBI had not previously received.  Among the individuals who provided Steele's information to the FBI were Department attorney Bruce Ohr, who we discuss below and in more detail in Chapter Nine.

Additionally, following Steele's closure, the FBI disseminated the Steele election reporting to the U.S. Intelligence Community (USIC) and sought to have it included in the January 2017 Intelligence Community Assessment (ICA) relating to Russian interference with the U.S. elections, in large part because the FBI believed the information in Steele's reports to be credible, although the FBI made clear to the USIC that the information in the reports had not been fully corroborated.  The FBI also made attempts in 2016 and 2017 to further assess the reliability of Steele's reports.  Through those efforts, as we discuss in this chapter, the FBI discovered discrepancies between Steele's reporting and statements sub-sources made to the FBI, which raised doubts about the reliability of some of Steele's reports.  The FBI also assessed the possibility that Russia was funneling disinformation to Steele, and the possibility that disinformation was included in his election reports.

As we describe in this chapter, the FBI concluded, among other things, that although consistent with known efforts by Russia to interfere in the 2016 U.S. elections, much of the material in the Steele election reports, including allegations about Donald Trump and members of the Trump campaign relied upon in the Carter Page FISA applications, could not be corroborated; that certain allegations were inaccurate or inconsistent with information gathered by the Crossfire Hurricane team; and that the limited information that was corroborated related to time, location, and title information, much of which was publicly available.

## I.  Steele's Briefing to *Mother Jones* and the FBI's Closure of Steele as a CHS in November 2016

At the end of October 2016, Steele provided a briefing to a *Mother Jones* reporter in which Steele disclosed that he had provided the FBI with information showing connections between candidate Trump and his campaign and the Russian government.  On October 31, 2016, three days after then FBI Director James Comey's public announcement that the FBI was reopening its investigation into then Secretary Clinton's use of a private email server based on the receipt of new

evidence, *Mother Jones* published an article titled "A Veteran Spy Has Given the FBI Information Alleging a Russian Operation to Cultivate Donald Trump." The article described the work of a "well-placed Western intelligence source" with a background in Russian intelligence who was sharing information with the FBI. The article presented information contained in Report 80, and quoted the officer as stating that, based on his interactions with the FBI, "[i]t's quite clear there was or is a pretty substantial inquiry going on."

Steele's handling agent, Handling Agent 1, told the OIG that he first learned of the *Mother Jones* article on November 1 when SSA 1 emailed him a copy. Handling Agent 1 telephoned Steele that day and asked him if he had spoken with the author of the article. According to Handling Agent 1's records, Steele confirmed that he had spoken with the author. Handling Agent 1's notes state that Steele was "concerned about the behavior of [the FBI] and was troubled by the actions of [the FBI] last Friday" (*i.e.*, Comey's announcement concerning the discovery of additional Clinton emails). The notes also state that Handling Agent 1 advised Steele that he must cease collecting information for the FBI, and it was unlikely that the FBI would continue a relationship with him. Handling Agent 1 told us he had no further contact with Steele after the November 1 telephone call.

Upon learning of Steele's actions, then Assistant Director E.W. "Bill" Priestap decided that Steele had to be closed immediately. Senior leaders in the FBI's International Operations Division concurred with this decision during a meeting on November 3 and advised the FBI's Legal Attaché (Legat) in the European city where, as described in Chapter Four, members of the Crossfire Hurricane team met with Steele in early October, that the decision to close Steele was "non-negotiable." Handling Agent 1 finalized the necessary paperwork on November 17, 2016, which stated that Steele was closed on November 1 and was being closed for cause due to his disclosure of his confidential relationship with the FBI to a third party.[313] Strzok told the OIG that the FBI closed Steele "because he was a control problem. We did not close him because we thought he was [a] fabricator." According to Strzok, Steele's decisions to discuss his reporting with the media and to disclose his relationship with the FBI were "horrible and it hurt what we were doing, and no question, he shouldn't have done it."

As a consequence of his closing, Handling Agent 1 halted payment of $15,000 to Steele. Handling Agent 1 told the OIG that the FBI never paid Steele for information related to the 2016 U.S. elections. FBI records show that Steele's last payment occurred on August 12, 2016, and was for information furnished to the FBI's Cyber and Counterintelligence Divisions (CD) that was unrelated to the 2016 U.S. elections.

Steele told us that by the time of the *Mother Jones* interview, he and Glenn Simpson of Fusion GPS had decided not to continue with the FBI because the FBI

---

[313] The Source Closing Communication document included the following: "Was the individual aware of his/her status as a CHS? Yes." As we described in Chapter Four, Steele told us he was not a CHS for the FBI and was never advised by Handling Agent 1 that he was a CHS—a claim that Handling Agent 1 disputes.

"was being deceitful." In particular, Steele stated that he had asked Ohr and possibly Handling Agent 1 prior to late October 2016 why the U.S. government had not announced that the FBI was investigating allegations concerning the Trump campaign. Steele said that he was told in response that the Hatch Act made it a criminal offense for a federal official to make a public statement within 90 days of an election to the detriment or benefit of a candidate.[314] Both Ohr and Handling Agent 1 told us that they had no recollection of discussing the Hatch Act with Steele. Steele explained that he became frustrated with the FBI at the end of October when Comey notified Congress close to the election that the FBI was reopening the Clinton email investigation and *The New York Times* quoted law enforcement officials as saying that they had found no direct link between Trump and the Russian government.[315] Steele said that he, his firm, and his clients believed it was not appropriate for the FBI to make announcements in violation of the Hatch Act while at the same time not disclosing its investigative activity concerning the Trump campaign. According to Steele, the FBI's conduct compelled him to choose between his client and the FBI, and he chose his client because he believed that the FBI had misled him. Steele said that Simpson arranged for the video conference interview with *Mother Jones* and Simpson actively participated in the call along with Steele. Steele told us that he believed the interview was "off the record" and under the same rules as his other interviews arranged by Simpson. He does not know whether Simpson either before or after the interview may have changed the rules.

According to FBI officials, knowledge of Steele's disclosure to *Mother Jones* did not cause the team to reassess whether Steele was also the source of the disclosures to *Yahoo News* in September 2016. As described in Chapter Seven, the language in the Carter Page FISA Renewal Application No. 1 regarding the September 23 *Yahoo News* article remained unchanged, again stating that the FBI "does not believe that Source #1 [Steele] directly provided this information to [*Yahoo News*]." The National Security Division's (NSD) Office of Intelligence (OI) Unit Chief's notes from a November 29 meeting with the OI Attorney drafting the Carter Page FISA renewal application and the FBI Office of the General Counsel (OGC) Attorney stated "[Steele] was not the leaker to *Yahoo*" and noted "DD [Deputy Director] has signed off on requesting the FISA renewal."[316] The OI Unit Chief told us that the OGC Attorney made this statement, but that the OGC Attorney did not provide a basis for the assertion regarding the *Yahoo News* article. During his OIG interview, we asked the OGC Attorney if he knew the reason for the FBI's belief that Steele was not the leaker to *Yahoo News* and he said he was under the impression that Simpson was sharing the information with other entities. SSA 1

---

[314] The Hatch Act is codified at 5 U.S.C. §§ 7321-7326. Section 7323(a)(1) provides that "an employee may not use his official authority or influence for the purpose of interfering with or affecting the result of an election."

[315] "Investigating Donald Trump, F.B.I. Sees No Clear Link to Russia," *The New York Times,* October 31, 2016.

[316] As described in Chapter Seven, then Deputy Director Andrew McCabe told us that as Deputy Director he did not approve FISA requests before they were submitted to OI, but following the disclosures to *Mother Jones,* the FBI was comfortable seeking a FISA renewal targeting Carter Page.

and Case Agent 1 told us they did not recall any discussions about changing the FBI's assessment in the FISA application concerning the *Yahoo News* disclosure after learning Steele was responsible for the disclosure to *Mother Jones*. On December 19, 2016, Case Agent 1 interviewed then FBI General Counsel James Baker regarding his interactions with a *Mother Jones* reporter and Baker told Case Agent 1 that the reporter advised Baker that a former intelligence official "was passing information 'around town'" about Trump. Case Agent 1 said that by this time, the team had also heard rumors that Steele's reporting had been "floated around," so it was not clear to them who made the *Yahoo News* disclosure. Further, we were told that, after the FBI closed Steele as a CHS, the team was not going to have further communications with Steele.

## II.    The FBI Receives Additional Steele Reporting Post-Election

Following the November 2016 U.S. elections, several third parties provided the FBI with additional Steele election reporting, which the FBI included in its validation efforts. Baker told the OIG that a *Mother Jones* reporter contacted him and furnished him with nine reports from Steele, four of which Steele had not previously provided to the FBI.[317] As described above, Baker was interviewed by Case Agent 1 and Baker's discussion with the *Mother Jones* reporter was documented in an FBI FD-302 report. According to the FD-302, Baker received a collection of Steele's reports from the *Mother Jones* reporter, which Baker forwarded to Priestap for analysis.[318]

Several weeks later, on December 9, 2016, Senator John McCain provided Comey with a collection of 16 Steele election reports, 5 of which Steele had not given the FBI.[319] McCain had obtained these reports from a staff member at the McCain Institute. The McCain Institute staff member had met with Steele and later acquired the reports from Simpson. Steele told the OIG that a former European Ambassador to Russia who generally was familiar with Steele's election reporting informed Steele that the former Ambassador would be meeting with Senator McCain at a conference in Nova Scotia in November, and asked Steele whether he wanted the former Ambassador to talk with McCain about the election reporting. Steele said he replied that he did, which resulted in the McCain Institute staff member visiting Steele in Europe in late November. According to deposition testimony the McCain Institute staff member provided in foreign litigation, during

---

[317] The nine Steele reports were Reports 80, 94, 95, 97, 105, 111, 112, 134, and 136. The FBI had not previously obtained Reports 97, 105, and 112 from Steele. According to an FBI FD-302, in a conversation later that month, the *Mother Jones* reporter advised Baker that the Steele reports also had been furnished to two Members of Congress, and that Steele was surprised that his reporting had not received more attention in the media.

[318] The *Mother Jones* reporter has stated publicly that he provided Steele reports to Baker. *See* "A New Right-Wing Smear Campaign Targets a Former FBI Official to Distract From Russia Scandal," *Mother Jones*, www.motherjones.com/politics/2019/01/a-new-right-wing-smear-campaign-targets-a-former-fbi-official-to-distract-from-russia-scandal/ (accessed November 22, 2019).

[319] These were Steele Reports 80, 86, 94, 95, 97, 100, 101, 102, 105, 111, 112, 113, 130, 134, 135, and 136. FBI records show that the FBI had not previously received Reports 86, 97, 105, 112 and 113 from Steele.

this visit Steele discussed his reporting with the staff member and showed the staff member a piece of paper on which Steele had written the true names of his sub-sources, although the staff member could not recall them. Steele told us that he shared some of the sub-source names with the staff member because the staff member was a "Russia expert" and had been tasked by Senator McCain to determine whether Steele's reporting was serious. The staff member also testified that Steele explained to him that the information in the reports needed to be corroborated and verified and that Steele was not in a position "to vouch for everything that was produced...."

Additionally, as we detail in Chapter Nine, on December 10, Department attorney Bruce Ohr received a thumb drive from Simpson containing some of Steele's election reports and provided the thumb drive to the FBI.[320] Included among the reports on the thumb drive was a document that the Crossfire Hurricane team had not previously seen, which recounted that a senior official in the Russian Ministry of Foreign Affairs had reported that a rumor was circulating that President-elect Trump's delay in appointing a new Secretary of State was the result of an "intervention" by Putin and the Kremlin, and that they had requested Trump appoint a "Russia-friendly" figure who was prepared to lift sanctions against Russia.

Finally, by early January 2017, *BuzzFeed* had obtained copies of some of the Steele election reports during a meeting with the McCain Institute staff member and published them as part of an article titled "These Reports Allege Trump Has Deep Ties to Russia."[321] Included in this collection was Report 166, another report that previously had not been shared with the FBI. It included allegations that Trump attorney Michael Cohen had held secret discussions in Prague in late summer 2016 with representatives of the Kremlin and "associated operators/hackers," and that the "anti-Clinton hackers" had been paid by the "[Trump] team" and Kremlin.[322] The FBI eventually concluded that these allegations against Cohen and the "Trump team" were not true.

---

[320] These were the same Steele reports that Senator McCain gave to Comey on December 9, except that the thumb drive did not include Report 130.

[321] Steele testified in foreign litigation that he did not provide his reports to journalists or media organizations and did not authorize anyone to share them. According to the McCain Institute staff member's testimony in the same litigation, Steele requested that the staff member meet with *BuzzFeed*, and that Steele neither requested nor prohibited the staff member from sharing the reports with *BuzzFeed*. Additionally, the staff member testified that Steele was aware that the staff member was furnishing Steele's reports to *The Washington Post*. Steele told the OIG that he trusted the staff member to handle his reports discretely and that the staff member betrayed that trust. Steele explained that the staff member had spent his career handling sensitive intelligence. Steele also said he understood from a former Ambassador that Senator McCain requested that Steele trust the staff member. Steele said he was "absolutely flabbergasted" when *BuzzFeed* published his election reports.

[322] On January 10, 2017, following the media release of the Steele election reports, Strzok texted Lisa Page:

6:09 p.m.: "Sitting with Bill watching CNN. A TON more out."

### III.   The FBI Disseminates the Steele Reporting to the U.S. Intelligence Community and Seeks to Have It Included in the January 2017 Intelligence Community Assessment

According to the Supervisory Intelligence Analyst (Supervisory Intel Analyst), the FBI first shared Steele's reporting with other U.S. government intelligence agencies in December 2016, when the FBI provided it to an interagency ICA drafting team that was set up in response to a request from President Obama to complete a comprehensive assessment of the Russian government's intentions and actions concerning the 2016 elections.[323]  Members of the interagency ICA drafting team from the FBI, National Security Agency (NSA), and Central Intelligence Agency (CIA), with oversight from the Office of the Director of National Intelligence (ODNI), worked jointly to prepare a report known as the Intelligence Community Assessment (ICA).  As part of these efforts, both Priestap and the FBI's Section Chief of CD's Analysis Section 1 (Intel Section Chief) wrote to the CIA in separate correspondence and described Steele as "reliable."

Whether and how to present Steele's reporting in the ICA was a topic of significant discussion within the FBI and with the other agencies participating in drafting the ICA.  On December 16, 2016, the Intel Section Chief explained in an email to the FBI:

> DD [Deputy Director] wants the [Steele] reporting included in the submission with some level of detail, to include the newest stuff that [Supervisory Intel Analyst] can send you on the red side.  Include details like the potential compromising material, etc.  Can you please add a section (characterizing [Steele] obviously) in coordination with [Supervisory Intel Analyst]?

The Intel Section Chief told us that he asked then Deputy Director Andrew McCabe whether McCabe wanted to limit the FBI's submission to information concerning Russian election interference or to also include allegations against candidate Trump.  The Intel Section Chief said that McCabe understood President Obama's request for the ICA to require the participating agencies to share all information relevant to Russia and the 2016 elections, and the Steele election reporting qualified at a minimum due to concerns over possible Russian attempts to blackmail Trump.  That same day, the Intel Section Chief sent to Priestap, Strzok, and another senior official in CD an updated draft of the FBI's submission for the

---

6:18 p.m.:  "Hey let me know when you can talk.  We're discussing whether, now that this is out, we use it as a pretext to go interview some people."

Strzok told the OIG that he believed these texts were referencing the possibility of interviewing one of Trump's attorneys, Michael Cohen, and Manafort using the release of the Steele reports as the stated reason for seeking the interview, without revealing the ongoing investigation. Strzok said the media release of the reports would be a logical reason for the FBI to interview Cohen and Manafort without alerting them to the Crossfire Hurricane investigation.

[323]  Strzok said that he believed that the FBI also may have furnished the Steele election reports to the intelligence service of a friendly foreign government but he did not have a specific recollection of it.

ICA with the following explanation: "Attached is the updated draft of [the] FBI's submission to the POTUS-tasked election targeting study. It now incorporates the [Steele] reporting at the DD's [Deputy Director's] request. This has obviously increased the sensitivity of the attached document." The Intel Section Chief said that the heightened sensitivity resulted from the reporting's allegations of collusion: "The minute we put the [Steele election reporting] in there, it goes from what you'd expect the FBI to be collecting in a counterintelligence context to direct allegations about collusion with the Trump campaign."

The following day, December 17, Comey completed his review of the FBI's draft submission for the ICA and emailed Priestap, McCabe, Strzok, the Intel Section Chief, the FBI Director's Chief of Staff, and Baker describing a call he had with then Director of National Intelligence (DNI) James Clapper:

> Thanks. Looks okay to me. FYI: During a secure call last night on this general topic, I informed the DNI that we would be contributing the [Steele] reporting (although I didn't use that name) to the IC [Intelligence Community] effort. I stressed that we were proceeding cautiously to understand and attempt to verify the reporting as best we can, but we thought it important to bring it forward to the IC effort. I told him the source of the material, which included salacious material about the President-Elect, was a former [█████████████████████ █████████] who appears to be a credible person with a source and sub-source network in position to report on such things, but we could not vouch for the material. (I said nothing further about the source or our efforts to verify).
>
> I added that I believed that the material, in some form or fashion, had been widely circulated in Washington and that Senator McCain had delivered to me a copy of the reports and Senator Burr had mentioned to me the part about Russian knowledge of sexual activity by the President-Elect while in Russia. The DNI asked whether anyone in the White House was aware of this and I said "not to my knowledge." He thanked me for letting him know and we didn't discuss further.

According to the Intel Section Chief and Supervisory Intel Analyst, as the interagency editing process for the ICA progressed, the CIA expressed concern about using the Steele election reporting in the text of the ICA. The Supervisory Intel Analyst explained that the CIA believed that the Steele election reporting was not completely vetted and did not merit inclusion in the body of the report. The Intel Section Chief stated that the CIA viewed it as "internet rumor."

On December 28, 2016, McCabe wrote to the then ODNI Principal Deputy Director objecting to the CIA's proposal to present the Steele information in an appendix to the ICA. McCabe wrote:

> I would also like to speak with you tomorrow about my concerns about where the [Steele] references will appear in the joint report, notwithstanding the fact that it is officially part of the assessment. We

oppose CIA's current plan to include it as an appendix; there are a number of reasons why I feel strongly that it needs to appear in some fashion in the main body of the reporting, and I would welcome the chance to talk to you about it tomorrow.

McCabe told the OIG that he had three reasons for believing that the Steele election reporting needed to be included in the ICA: (1) President Obama had requested "everything you have relevant to this topic of Russian influence"; (2) the Steele election reporting was not completely vetted, but was consistent with information from other sources and came from a source with "a good track record" that the FBI had "confidence in"; and (3) McCabe believed the FBI, as an institution, needed to advise the President about the Steele election reporting because it had been widely circulated throughout government and media circles, and was likely to leak into the public realm. McCabe said he felt strongly that the Steele election reporting belonged in the body of the ICA, because he feared that placing it in an appendix was "tacking it on" in a way that would "minimiz[e]" the information and prevent it from being properly considered.

McCabe's view did not prevail. The final ICA report was completed early in the first week of January 2017, and included a short summary and assessment of the Steele election reporting, which was incorporated in an appendix. In the appendix, the intelligence agencies explained that there was "only limited corroboration of the source's reporting" and that Steele's election reports were not used "to reach analytic conclusions of the CIA/FBI/NSA assessment." The Intel Section Chief told us that the reference to "limited corroboration" was addressed to the "whole body" of Steele's reporting and not just those portions concerning Trump. He said that there was corroboration of certain facts as well as "the thrust" of the reporting regarding Russia's actions to disrupt the election and cause discord in the western alliance.

We asked Comey whether he recalled having any conversations with then CIA Director John Brennan or other members of the USIC about how the Steele election reports should be presented to the President. Comey stated:

I remember being part of a conversation, maybe more than one conversation, where the topic was how the [Steele] reporting would be integrated, if at all, into the IC assessment. And I don't remember participating in debates about that. I think I was just told, in, I think, in a meeting with Clapper and Brennan and Rogers [then NSA Director], that the IC analysts found it credible on its face and gravamen of it, and consistent with our other information, but not in a position where they would integrate it into the IC assessment. But they thought it was important enough and consistent enough that it ought to be part of the package in some way, and so they had come up with this idea to make an [appendix]. I remember, I don't think I was part of a debate about that, as I said, but I remember a conversation where I was told that's how it would be handled and my reaction was, okay, that's reasonable.

According to Comey, the inclusion of the Steele election reporting as an appendix to the ICA was not a value judgment about the quality of the information. Instead, it reflected the relatively uncorroborated and incomplete status of the FBI's assessment. Comey told the OIG that the Steele election reporting was "not ripe enough, mature enough, to be in a finished intelligence product."

On January 5, 2017, Clapper, then NSA Director Michael Rogers, Brennan, and Comey briefed the ICA report to President Obama and his national security team, followed by a briefing for Congressional leadership on the morning of January 6, 2017, and finally a briefing for then President-elect Trump and his national security team on the afternoon of January 6, 2017. Comey told the OIG that the plan for the ICA briefing of President-elect Trump had two parts. The first part of the briefing, jointly conducted by Clapper, Brennan, Rogers, and Comey, involved advising Trump and his national security team of the overall conclusions of the ICA. The second part of the briefing involved notifying the President-elect of information from Steele's reporting that concerned Trump's alleged sexual activities in Moscow several years earlier. Comey stated that the other USIC Directors agreed that Trump had to be briefed on this information, and Clapper decided the briefing should be done by Comey in a small group or alone with the President-elect.

According to an email Comey sent to FBI officials on January 7, 2017, Comey mentioned during the initial portion of the briefing a piece of Steele's reporting that indicated Russia had files of derogatory information on both Clinton and the President-elect. Comey's email stated that a member of Trump's national security team asked during the briefing whether the FBI was "trying to dig into the sub-sources" to gain a better understanding of the situation, and Comey responded in the affirmative.

Comey's email reflects that, after the first portion of the meeting ended, Comey stayed behind to speak with President-elect Trump alone about the part of the Steele election reporting that dealt with Trump's alleged sexual activity. Comey's email reflects that he explained that according to Steele's sub-sources, the Russians had a file on the President-elect's alleged sexual activities while in Russia and possessed tapes of him with prostitutes at the Presidential Suite at the Ritz Carlton hotel in Moscow. The email further states that Comey explained that the material was "inflammatory stuff" and that a news organization "would get killed for reporting straight up from the source reports." In testimony before Congress, Comey has described this part of his email as communicating that "it was salacious and unverified material that a responsible journalist wouldn't report without corroborating in some way." Comey told the OIG that he informed President-elect Trump that the FBI did not know whether the allegations were true or false and that the FBI was not investigating them.[324]

---

[324] In the OIG's *Report of Investigation of Former Federal Bureau of Investigation Director James Comey's Disclosure of Sensitive Investigative Information and Handling of Certain Memoranda* (August 2019), we described Comey's creation of the January 7, 2017 email that memorialized his January 6, 2017 meeting with Trump. Prior to this meeting, Comey met with senior leaders of the FBI and the Crossfire Hurricane investigation and discussed a number of concerns about Comey meeting

After *BuzzFeed* published the Steele election reports on January 10, 2017, and news reports began describing the January 6 ICA briefing of President-elect Trump, Clapper informed Comey by email on January 11 that he had a telephone conversation with President-elect Trump that included discussion of the Steele "[election reporting]." Clapper included in the email to Comey a draft media statement by Clapper for public release, which stated that "[t]he IC [Intelligence Community] has not made any judgment that the information in [the Steele election reporting] is reliable, and we did not rely upon it in any way for our conclusions" in the ICA. Comey responded to the email with proposed revisions to Clapper's text:

> I just had a chance to review the proposed talking points on this for today. Perhaps it is a nit, but I worry that it may not be best to say "The IC has not made any judgment that the information in the document is reliable." I say that because we HAVE concluded that the source [Steele] is reliable and has a track record with us of reporting reliable information; we have some visibility into his source network, some of which we have determined to be sub-sources in a position to report on such things; and much of what he reports in the current document is consistent with and corroborative of other reporting included in the body of the main IC report. That said, we are not able to sufficiently corroborate the reporting to include in the body of the [ICA] report.

> That all rings in my ears as more complicated than "we have not made a judgment that the information in the document is reliable." It might be better to say that "we have not be [sic] able to sufficiently corroborate the information to include it in the body of our Russia report but, for a variety of reasons, we thought it important to include it in our report to our senior-most audience.

The ODNI released Clapper's media statement on January 11, 2017, which was captioned "DNI Clapper Statement on Conversation with President-elect Trump."[325] The sentence that Comey had raised concerns about in his email to Clapper remained unchanged and thus Clapper's statement included the following sentence regarding Steele's election reporting: "The IC has not made any

---

alone with Trump. One of the topics discussed was Trump's potential responses to being told about the "salacious" information, including that Trump might make statements, or provide information of value, to the Crossfire Hurricane investigation. Witnesses recalled agreeing that Comey should memorialize his meeting with Trump immediately after it occurred. Comey told the OIG that, in his view, it was important for the FBI executive managers to be "able to share in [Comey's] recall of the...salient details of those conversations" with Trump, and that if the meeting became "a source of controversy" it would be important to have a clear, contemporaneous record because Comey was concerned that Trump might "misrepresent what happened in the encounter."

[325] The statement can be found at https://www.dni.gov/index.php/newsroom/press-releases/item/1736-dni-clapper-statement-on-conversation-with-president-elect-trump (accessed Dec. 8, 2019).

judgment that the information in [the Steele election reporting] is reliable, and we did not rely upon it in any way for our conclusions" in the ICA.

## IV. FBI Validation Efforts Following Steele's Closure as a CHS

As described in Chapter Four, the FBI closed Steele as a CHS in November 2016 after he disclosed his relationship with the FBI to a news outlet. Although Steele was no longer a CHS, the FBI continued with its efforts to validate his reporting. This section describes those efforts.

### A. Information from Persons with Direct Knowledge of Steele's Work-Related Performance in a Prior Position

In mid-November and December 2016, FBI officials travelled abroad and met with persons who previously had professional contacts with Steele or had knowledge of his work.[326] According to Strzok, one of the purposes of the trips was to obtain information regarding Steele from persons with direct knowledge of Steele's work-related performance in a prior position in order to help the FBI assess Steele's reliability. Priestap said that it was not standard practice to take such a trip to assess a CHS, but in this case he believed it was important due to the nature of the information that the CHS provided and because the FBI was under a great deal of scrutiny. In his view, "[t]he bottom line is we had concerns about the reporting the day we got it…. [S]ome of it was so sensational, that we just, we did not take it at face value."

Priestap and Strzok took notes of the feedback that they received about Steele, some of which was positive and some of which was negative.[327] Their notes included positive comments such as "smart," "person of integrity," "no reason to doubt integrity" and "[i]f he reported it, he believed it." Priestap told us that his impression was that Steele's former colleagues considered Steele to be a "Russia expert" and very competent in his work. However, Priestap and Strzok also were provided with various negative comments concerning Steele's judgment. Their notes stated: "[d]emonstrates lack of self-awareness, poor judgment;" "[k]een to help" but "underpinned by poor judgment;" "Judgment: pursuing people with political risk but no intel value;" "[d]idn't always exercise great judgment— sometimes [he] believes he knows best;" and "[r]eporting in good faith, but not clear what he would have done to validate." Priestap told us that he understood the commentary on Steele's judgment to mean that Steele strongly believed in his convictions, which did not always align with management's convictions, leading to conflicts over priorities. Strzok described the feedback as follows:

And many of them…almost without exception said, look, he is truthful. He has never been accused of, nor did anybody think he is an

---

[326] Strzok and Priestap traveled in November; Strzok, Lisa Page, the Supervisory Intel Analyst, SSA 1, and the OGC Unit Chief traveled in December.

[327] We discuss Priestap's and Strzok's impressions of this feedback in greater detail in Chapter Eight.

embellisher, let alone a fabricator.  That, if anything, he, to the extent there were negatives, it was that he was the type of person who would sometimes follow the shiny object without, perhaps, a deep set of judgment about the risk that may or may not be there in terms of following the shiny object.  But in any event, he was not the type of person who would fabricate something or make something up or mischaracterize it, either intentionally or unintentionally.

Priestap said he interpreted the comments about Steele's judgment to mean that "if he latched on to something...he thought that was the most important thing on the face of this earth" and added that this personality trait doesn't necessarily "jump out as a particularly bad or horrible [one]" because, as a manager, it can be helpful if the "people reporting to [you] think the stuff they're working on is the most important thing going on" and use their best efforts to pursue it.  Information from these meetings was shared with the Crossfire Hurricane team.  However, we found that it was not memorialized in Steele's Delta file and therefore not considered in a validation review conducted by the FBI's Validation Management Unit (VMU) in early 2017.[328]  In addition, as described in Chapter Eight, some of the relevant details about Steele's work-related performance in a prior position were not shared with OI and were not included in any of the Carter Page FISA renewal applications, even though the applications relied upon Steele's reporting.

## B.    The FBI's Human Source Validation Review of Steele in March 2017

Another method that the FBI utilized to evaluate Steele was the FBI's standard validation process.  As we described in Chapter Two, the validation process ███████████████████████████████████████████ .  Throughout the FBI's operation of Steele as a CHS, Handling Agent 1 regularly submitted ████████████ source reports that furnished information relevant to these factors.  With the exception of Steele's last annual report, which described his disclosure of information to the media and resulted in his closure for cause, the reports depict Steele positively with no derogatory information noted.  For example, the 2015 annual report states that "[s]ource provided relevant and significant intel on activities of Eurasian criminals to include OC [organized crime] members and associates, businessmen/oligarchs and politicians."  The annual reports also noted that some of Steele's information had been corroborated.

The FBI continued its validation efforts into 2017 after SSA 1 requested that VMU perform a Human Source Validation Review (HSVR) on Steele.[329]  SSA 1

---

[328]  Priestap told the OIG that he recalled that he may have made a commitment to ████████ ██████████ .

[329]  SSA 1 initially requested the HSVR in November 2016, which the Unit Chief of VMU confirmed.  However, CD delayed the initiation of the HSVR due to the sensitivity of the subject matter and concerns over leaks.  Strzok stated that another consideration was uncertainty about whether the assessment would add significant value.  The HSVR was restarted in early February 2017.

explained that "I wanted to ensure that an independent asset validation was conducted by our Directorate of Intelligence, and not just the people that were working the Crossfire Hurricane case, to ensure the totality of his information was being looked at." SSA 3, who started work on the Crossfire Hurricane investigation in January 2017, and others recalled that there were multiple discussions about the need to complete an HSVR and that initiation of the review had been delayed for several weeks. VMU completed its report on March 23, 2017 after evaluating Steele's Delta file, conducting various database searches, and engaging in a limited email exchange with Handling Agent 1 as well as an agent on the Crossfire Hurricane team. The VMU assessment did not independently corroborate information in the Steele election reporting, but it did include searching inside FBI and U.S. government holdings, including Delta, for such corroboration.[330]

The validation report made a number of findings. The VMU found no issues regarding Steele's reliability or nothing to suggest that he had fabricated information, and determined that he was "suitable for continued operation" based on his authenticity and reliability. The report noted, however, that Steele was closed due to his disclosure of his FBI relationship to an online publication. The report also noted two compliance issues. First, ███████████████████ ████████████████████████████████████. Second, the report noted that ████████████████████████████ ████████████████.

The "Summary" portion of the validation report included the following text:

> VMU assesses it is likely [Steele] has contributed to the FBI's Criminal Program. VMU makes this assessment with medium confidence, based on the fact that [Steele's] reporting has been minimally corroborated; his or her access and placement is commensurate with his or her reporting; and on the presence of one major control issue [the disclosure to the media] noted in [Steele's] Delta file.

Handling Agent 1 told us that the finding that Steele's past criminal reporting was "minimally corroborated" was consistent with his understanding of the entire collection of Steele's reporting to the FBI. However, Priestap, who previously oversaw the work of VMU in his capacity as Deputy Assistant Director in the Directorate of Intelligence, explained that when he reviewed the Steele validation report it "jump[ed] out" to him that the report indicated that Steele's reporting was "minimally corroborated." He stated: "I had always understood that [Steele] had a long, successful track record of reporting, that had withstood, in effect, judicial or

---

[330] As noted above, Steele's Delta file did not include the views of persons with direct knowledge of Steele's work-related performance in a prior position, obtained by Strzok and Priestap in December 2016, or information generated by the Transnational Organized Crime Intelligence Unit, as described in Chapter Four, that raised questions about the extent of Steele's apparent connections to Russian oligarchs.

court-of-law scrutiny, and so when I saw 'minimally corroborated,' that was different than I had understood it."[331]

The validation report summary did not appear to assess Steele's counterintelligence and election reporting. We asked the Unit Chief of VMU (Validation SSA), about this and he told us "[w]e did not find corroboration for the [Steele election reporting]" from the holdings that VMU examined. He explained that, within the validation context, the term "corroboration" means that the FBI has received the same information from a separate source, and added that "uncorroborated" does not mean the information is untrue or provide a basis for closing the source. We asked why that finding did not appear in the validation report. The Validation SSA explained that "it's not common practice for us to go in and state the negative upfront," and "what we do is we speak to what we positively find."[332] He added: "I think it is a logical way to stay within the bounds of staying with what we know. As opposed to telling you all the things we don't know."

The VMU's decision to not include in the validation report that it did not find corroboration for Steele's election reporting came as a surprise to the FBI officials we interviewed. For example, Priestap told us that omitting that the "[Steele election reporting]" information was uncorroborated "defeats the whole purpose of us asking them to do the validation reporting." Priestap continued:

> [T]hat makes no sense to me. The whole point of having a human source validation section outside of the operational divisions is to provide an absolutely independent, unbiased, completely unbiased, look at the human sources. They have to do a report at the end. It's simply the way in which they document their findings. It is beyond me how somebody would undertake that effort and then not document their findings in that regard. That, to me, that goes against everything I stand for. It goes against what my organization stands for, it's like you are burying the results.

Strzok said that the validation report's lack of clarity was consistent with his past experience with VMU, and that VMU's work is "frequently ambiguous or perhaps not written with the level of precision and specificity and expertise that might be desired." He also stated that validation reports are "rarely helpful." Both the Intel Section Chief and Supervisory Intel Analyst said that they did not agree with the Validation SSA's conclusion that the Steele [election reporting] was "uncorroborated." They explained that there is a distinction between facts and

---

[331] We discuss in Chapters Five and Eight the FISA application's source characterization statement that Steele's reporting had been "corroborated and used in criminal proceedings."

[332] The OIG's Audit Division recently completed a review of the FBI's CHS validation processes finding, among other things, that FBI validation personnel were discouraged from documenting conclusions from CHS validation reviews in their written reports. The OIG report made numerous recommendations to the FBI to revise and improve the validation process. *See* U.S. Department of Justice (DOJ) Office of the Inspector General (OIG), *Audit of the Federal Bureau of Investigation's Management of its Confidential Human Source Validation Processes*, Audit Report 20-009 (November 2019), at 24-26.

allegations, and that it would not be appropriate to characterize all of the factual information in the Steele election reporting as "uncorroborated."[333]

Lastly, the validation report included a recommendation that ███████████████ ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████

███████████████ Source reporting must accurately describe the reliability of the information or its origin.

## C.   The FBI Identifies and Interviews the Primary Sub-Source in Early 2017

An important aspect of the FBI's assessment of Steele's election reporting involved evaluating Steele's source network, especially whether the sub-sources had access to reliable information.  As noted in the first FISA application, Steele relied on a primary sub-source (Primary Sub-source) for information, and this Primary Sub-source used a network of sub-sources to gather the information that was relayed to Steele; Steele himself was not the originating source of any of the factual information in his reporting.[334]  The FBI employed multiple methods in an effort to ascertain the identities of the sub-sources within the network, including meeting with Steele in October 2016 (prior to him being closed for cause) and conducting various investigative inquiries.  For example, the FBI determined it was plausible that at least some of the sub-sources had access to intelligence pertinent to events described in Steele's election reporting.  Additionally, the FBI's evaluation of Steele's sub-sources generated some corroboration for the election reporting (primarily routine facts about dates, locations, and occupational positions that was mostly public source information).  Further, by January 2017 the FBI was able to identify and arrange a meeting with the Primary Sub-source.[335]

The FBI conducted interviews of the Primary Sub-source in January, March, and May 2017 that raised significant questions about the reliability of the Steele election reporting.  In particular, the FBI's interview with Steele's Primary Sub-source in January 2017, shortly after the FBI filed the Carter Page FISA Renewal

---

[333]  We discuss the FBI's conclusions about the reporting in Section V of this chapter.

[334]  When interviewed by the FBI, the Primary Sub-source stated that █████████████ ███████████████████████████████████████████████████████████████

The Primary Sub-source was █████████████████████████████████████████████

[335]  Steele did not disclose the identity of the Primary Sub-source to the FBI.

Application No. 1 and months prior to Renewal Application No. 2, raised doubts about the reliability of Steele's descriptions of information in his election reports. During the FBI's January interview, at which Case Agent 1, the Supervisory Intel Analyst, and representatives of NSD were present, the Primary Sub-source told the FBI that he/she had not seen Steele's reports until they became public that month, and that he/she made statements indicating that Steele misstated or exaggerated the Primary Sub-source's statements in multiple sections of the reporting.[336]  For example, the Primary Sub-source told the FBI that, while Report 80 stated that Trump's alleged sexual activities at the Ritz Carlton hotel in Moscow had been "confirmed" by a senior, western staff member at the hotel, the Primary Sub-source explained that he/she reported to Steele that Trump's alleged unorthodox sexual activity at the Ritz Carlton hotel was "rumor and speculation" and that he/she had not been able to confirm the story.  A second example provided by the Primary Sub-source was Report 134's description of a meeting allegedly held between Carter Page and Igor Sechin, the President of Rosneft, a Russian energy conglomerate.[337]  Report 134 stated that, according to a "close associate" of Sechin, Sechin offered "PAGE/TRUMP's associates the brokerage of up to a 19 percent (privatized) stake in Rosneft" in return for the lifting of sanctions against the company.[338]  The Primary Sub-source told the FBI that one of his/her sub-sources furnished information for that part of Report 134 through a text message, but said that the sub-source never stated that Sechin had offered a brokerage interest to Page.[339]  We reviewed the texts and did not find any discussion of a bribe, whether as an interest in Rosneft itself or a "brokerage."[340]

---

[336]  David Laufman, then Chief of NSD's Counterintelligence and Export Control Section (CES), covered the first portion of the January interview and his Deputy Section Chief covered the remaining portions of the January interview.  Laufman told us that he negotiated with the Primary Sub-source's counsel to facilitate the FBI's interview and sought to "build a cooperative relationship that could…result in the Bureau's being in a position to assess the validity of information in the [Steele election reporting] resulting from [the Primary Sub-source's] activities or the collection of [his/her] sub-subsources. So I saw my role as a broker to get that relationship consolidated." Laufman said that the portion of the interview he attended established the line of communication with the Primary Sub-source and, as he recalled, generally covered the facts in a "superficial" way.  He said that after the completion of the interview, he never saw the FBI's written summary of the interview.

[337]  According to the Supervisory Intel Analyst, the FBI was not able to prove or disprove Page's meeting with Sechin.  The Analyst explained that Page did meet with a Rosneft official—Andrey Baranov, during his July 2016 trip to Moscow and that Page told the FBI that Baranov might have mentioned the possible sale of a stake in Rosneft.  The Analyst stated that Report 134's mention of Sechin could be a "garble" for Baranov.

[338]  Report 134 contained differing information on the alleged bribe offered by Sechin to Page. The Report first stated that Sechin offered Page a "large stake in Rosneft in return for lifting sanctions on Russia." Later, the same report stated that Sechin had offered Page a much smaller sum of money, "the brokerage of up to a 19 per cent (privatized) stake in Rosneft."

[339]  The Primary Sub-source also told the FBI at these interviews that the sub-source who provided the information about the Carter Page-Sechin meeting ███████████████████████████
████████████████████████████████████████████████████████████████████████.

[340]  According to a press report prior to the date of Report 134, a 19-percent stake in Rosneft could have sold for more than $10 billion.  *See* https://www.cnbc.com/2016/06/08/russias-oil-giant-

The Primary Sub-source was questioned again by the FBI beginning in March 2017 about the election reporting and his/her communications with Steele.  The Washington Field Office agent (WFO Agent 1) who conducted that interview and others after it told the OIG that the Primary Sub-source felt that the tenor of Steele's reports was far more "conclusive" than was justified.  The Primary Sub-source also stated that he/she never expected Steele to put the Primary Sub-source's statements in reports or present them as facts.  According to WFO Agent 1, the Primary Sub-source said he/she made it clear to Steele that he/she had no proof to support the statements from his/her sub-sources and that "it was just talk."  WFO Agent 1 said that the Primary Sub-source explained that his/her information came from "word of mouth and hearsay;" "conversation that [he/she] had with friends over beers;" and that some of the information, such as allegations about Trump's sexual activities, were statements he/she heard made in "jest."[341] The Primary Sub-source also told WFO Agent 1 that he/she believed that the other sub-sources exaggerated their access to information and the relevance of that information to his/her requests.  The Primary Sub-source told WFO Agent 1 that he/she "takes what [sub-sources] tell [him/her] with 'a grain of salt.'"

In addition, the FBI interviews with the Primary Sub-source revealed that Steele did not have good insight into how many degrees of separation existed between the Primary Sub-source's sub-sources and the persons quoted in the reporting, and that it could have been multiple layers of hearsay upon hearsay.  For example, the Primary Sub-source stated to WFO Agent 1 that, in contrast to the impression left from the election reports, his/her sub-sources did not have direct access to the persons they were reporting on.  Instead, the Primary Sub-source told WFO Agent 1 that their information was "from someone else who may have had access."

The Primary Sub-source also informed WFO Agent 1 that Steele tasked him/her after the 2016 U.S. elections to find corroboration for the election reporting and that the Primary Sub-source could find none.  According to WFO Agent 1, during an interview in May 2017, the Primary Sub-source said the corroboration was "zero."  The Primary Sub-source had reported the same conclusion to the Crossfire Hurricane team members who interviewed him/her in January 2017.

Following the January interview with the Primary Sub-source, on February 15, 2017, Strzok forwarded by email to Priestap and others a news article referencing the Steele election reporting; Strzok commented that "recent interviews and investigation, however, reveal [Steele] may not be in a position to judge the reliability of his sub-source network."  According to the Supervisory Intel Analyst, the cause for the discrepancies between the election reporting and explanations

---

just-saw-its-profits-drop-75.html (accessed Dec. 8, 2019).  We discuss below the issue of Steele or the sub-sources presenting their analyses as statements of Kremlin officials or others.

[341] According to WFO Agent 1, the Primary Sub-source told him that he/she spoke with at least one staff member at the Ritz Carlton hotel in Moscow who said that there were stories concerning Trump's alleged sexual activities, not that the activities themselves had been confirmed by the staff member as stated in Report 80.

later provided to the FBI by Steele's Primary Sub-source and sub-sources about the reporting was difficult to discern and could be attributed to a number of factors. These included miscommunications between Steele and the Primary Sub-source, exaggerations or misrepresentations by Steele about the information he obtained, or misrepresentations by the Primary Sub-source and/or sub-sources when questioned by the FBI about the information they conveyed to Steele or the Primary Sub-source.[342]

Another factor complicating the FBI's assessment of the Steele election reporting was the Primary Sub-source's statement to the FBI that he/she believed that information presented as fact in the reporting included his/her and Steele's "analytical conclusions" and "analytical judgments," and not just reporting from sub-sources. For example, Report 80 provides that:

> Speaking separately in June 2016, Source B (the former top-level Russian intelligence officer) asserted that TRUMP's unorthodox behavior in Russia over the years had provided the authorities there with enough embarrassing material on the now Republican presidential candidate to be able to blackmail him if they so wished.

The Primary Sub-source told the FBI that "the ability to blackmail Trump was [the sub-source's] 'logical conclusion' rather than reporting," even though it is presented as a statement from a sub-source. The Primary Sub-source noted another example of this practice in Report 135, which states:

> Referring back to the (surprise) sacking of Sergei IVANOV as Head of PA [Presidential Administration] in August 2016, his replacement by Anton VAINO and the appointment of former Russian premier Sergei KIRIYENKO to another senior position in the PA, the Kremlin insider repeated that this had been directly connected to the TRUMP support operation and the need to cover up now that it was being exposed by the USG and in the western media.

Report 111 also contains similar information to Report 135, namely that Ivanov was "sacked" due to his association with the Russian's U.S. election operation. The Primary Sub-source explained to the FBI that the connection between Ivanov's replacement and "fallout over Russia's influence efforts against the U.S. election" was the Primary Sub-source's "analytical conclusion." The Primary Sub-source told the FBI that he/she was careful to identify his/her

---

[342] 

analytical conclusions to Steele and to offer a confidence level in them (*e.g.* possible vs. likely).  We took note of the fact that, on December 1, 2016, ███

███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

The Supervisory Intel Analyst, as well as Steele, told us that blending judgments with assertions is not an appropriate way to report intelligence.  Steele told us that he would hope that his reports were clear on what a source stated, what was assumed by the source, and what was analysis.  However, Strzok told the OIG that the blending in Steele's reporting of analysis with statements from the sub-sources "posed problems" for the FBI.  Strzok explained that "to understand what the individual source said we can no longer assume this guy said all of this.  It's really [Steele] added on or [the Primary Sub-source] added on."

As discussed in Chapter Eight, Carter Page FISA Renewal Application Nos. 2 and 3 advised the court that following the January interview with the Primary Sub-source, "the FBI found the Russian-based sub-source to be truthful and cooperative."  Renewal Application Nos. 2 and 3 continued to rely on the Steele information, without any revisions or notice to the court that the Primary Sub-source contradicted the Steele election reporting on key issues described in the renewal applications.  We found no evidence that the Crossfire Hurricane team ever considered whether any of the inconsistencies warranted reconsideration of the FBI's previous assessment of the reliability of the Steele election reports, or notice to OI or the court for the subsequent renewal applications.

### D.    The FBI Obtains Additional Information about the Reliability of Steele's Reporting after FISA Renewal Application No. 3

Crossfire Hurricane team members told us that in the spring 2017 they determined that they needed to interview Steele more extensively about his election reporting and ask questions to account for new information that the Primary Sub-source had provided during his/her interview.  The Supervisory Intel Analyst explained that the team members believed that an interview with Steele "would be a good way of potentially looking to see whether or not [the Primary Sub-source] is giving us accurate information [or] did [the Primary Sub-source] tell [Steele] something different."  The FBI sought to obtain additional information about Steele's sub-sources prior to the interview and encountered some logistical delays in arranging it.  The interview ended up occurring during two days in September 2017, following the Carter Page FISA Renewal Application No. 3.

The FBI's interview with Steele in September 2017 further highlighted discrepancies between Steele's presentation of information in the election reporting

and the views of his Primary Sub-source.[343]  For example, Steele told the interviewing agent and analyst that Reports 80, 95, 97, and 102, which range in date from June 20 to August 10, 2016, included information from a sub-source who was "close" to Trump.[344]  Steele further advised the FBI staff that this sub-source was the same person who originally provided the Primary Sub-source with the information concerning Trump's alleged sexual activities at the Ritz Carlton hotel in Moscow, and that the Primary Sub-source met with this sub-source two or three times.  However, we were told by WFO Agent 1 that the Primary Sub-source stated that he/she never met this sub-source and that other sub-sources were responsible for the Ritz Carlton reporting.  The Primary Sub-source also told the FBI interviewers as well as WFO Agent 1 that he/she received a telephone call from an individual he/she believed was this sub-source but was not certain of the person's identity and that the person never identified him/herself during the call.[345]  The FBI's written summary of the Primary Sub-source's interview describes this call as follows:

> [The Primary Sub-source] recalls that this 10-15 minute conversation included a general discussion about Trump and the Kremlin, that there was "communication" between the parties, and that it was an ongoing relationship.  [The Primary Sub-source] recalls that the individual believed to be [Source E in Report 95] said that there was "exchange of information" between Trump and the Kremlin, and that there was "nothing bad about it."  [Source E] said that some of this information exchange could be good for Russia, and some could be damaging to Trump, but deniable.  The individual said that the Kremlin might be of help to get Trump elected, but [the Primary Sub-source] did not recall any discussion or mention of Wiki[L]eaks.

Report 95, however, attributes to this sub-source information concerning the release of DNC emails to WikiLeaks.  Report 95 states:  "Source E, acknowledged that the Russian regime had been behind the recent leak of embarrassing e-mail messages, emanating from the Democratic National Committee (DNC), to the WikiLeaks platform."  Report 95 describes the relationship between the Trump campaign and "the Russian leadership" as a "well-developed conspiracy of co-operation."  As described in Chapters Five, Seven, and Eight, all four Carter Page FISA applications relied on Report 95 to support probable cause.[346]

---

[343]  The September interview was conducted by an FBI agent and analyst on assignment to the Special Counsel's Office.

[344]  The reports describe this sub-source in varying ways:  Report 80 ("Source D, a close associate of TRUMP...."); Report 95 ("Source E, an ethnic Russian close associate of Republican US presidential candidate Donald TRUMP...."); Report 97 ("a Russian émigré figure close to the Republican U.S. presidential candidate Donald TRUMP's campaign team...."); and Report 102 ("[A]n ethnic Russian associate of Republican US presidential candidate Donald TRUMP...").

[345]  The Primary Sub-source told WFO Agent 1 that he/she found a YouTube video of the sub-source speaking and that it sounded like the person on the telephone call.

[346]  The FISA applications also relied upon Reports 80, 94, and 102.

Report 97 contains four paragraphs of information with numerous allegations attributed to the sub-source (and hence is purportedly derived from the Primary Sub-source's 10-15 minute call). The information attributed to the sub-source includes that (1) the Kremlin was concerned that "political fallout from the DNC email hacking operation is spiraling out of control," (2) the Kremlin had intelligence on Clinton and her campaign but that the sub-source did not know when or if it would be released, and (3) that derogatory material possessed by the Russians would not be used against Trump "given how helpful and co-operative his team had been over several years, and particularly of late." Report 102 likewise contains numerous insights about the Trump campaign and Russian tactics. It includes allegations that the "aim of leaking the DNC e-mails to WikiLeaks during the Democratic Convention had been to swing supporters of Bernie SANDERS away from Hillary CLINTON and across to TRUMP," and that Carter Page "conceived and promoted" this "objective" and had discussed it directly with the sub-source.

The Supervisory Intel Analyst told the OIG that he found the Primary Sub-source's explanations about his/her contacts with this sub-source "peculiar" and that the Primary Sub-source could have been minimizing his/her relationship with the sub-source. The Supervisory Intel Analyst agreed that press reports discussing the sub-source's alleged contacts with the Trump campaign may have motivated the Primary Sub-source to minimize the extent of his/her relationship with the sub-source. We asked the Supervisory Intel Analyst whether he thought the Primary Sub-source had been truthful during his/her interview with the FBI. He said that he believed that there were instances where the Primary Sub-source was "minimizing" certain facts but did not believe that he/she was "completely fabricating" events. The Supervisory Intel Analyst stated that he did not know whether he could support a "blanket statement" that the Primary Sub-source had been truthful.

In Steele's September 2017 interview with the FBI, Steele also made statements that conflicted with explanations from two of his sub-sources about their access to Russian officials. For example, Steele explained that the Primary Sub-source had direct access to a particular former senior Russian government official and that they had been "speaking for a while." The Primary Sub-source told the FBI, however, that he/she had never met or spoken with the official. Steele also stated that one sub-source was ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ one of a few persons in a "circle" close to a particular senior official. The FBI obtained information from the sub-source that contradicted Steele's interpretation.

FBI documents reflect that another of Steele's sub-sources who reviewed the election reporting told the FBI in August 2017 that whatever information in the Steele reports that was attributable to him/her had been "exaggerated" and that he/she did not recognize anything as originating specifically from him/her.[347] The

---

347 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Primary Sub-source told the FBI that he/she believed this sub-source was "one of the key sources for the 'Trump dossier'" and the source for allegations concerning Michael Cohen and events in Prague contained in Reports 135, 136, and 166, as well as Report 94's allegations concerning the alleged meeting between Carter Page and Igor Divyekin. The Supervisory Intel Analyst told us that he believed this Steele sub-source may have been attempting to minimize his/her role in the election reporting following its release to the public.

Steele's September 2017 interview with the FBI, which was conducted 2 months after the final Carter Page FISA renewal application was submitted to the court, also revealed bias against Trump. According to the FBI FD-302 of the interview, Steele and his business colleague described Trump as their "main opponent" and said that they were "fearful" about the negative impact of the Trump presidency on the relationship between the United States and United Kingdom. The Supervisory Intel Analyst stated that he viewed Steele's description of Trump as the "main opponent" as an expression of "clear bias." Steele told us that he did not begin his investigation with any bias against Trump, but based on the information he learned during the investigation became very concerned about the consequences of a Trump presidency.

### E.    Crossfire Hurricane Team's Assessment of Potential Russian Influence on the Steele Election Reporting

Although an investigation into whether Steele's election reports, or aspects of them, were the product of a Russian disinformation campaign was not within the scope of this review, or within the scope of the OIG's oversight role, we examined the extent to which the Crossfire Hurricane team considered this possibility in its assessment of Steele's reporting. Priestap told us that he recognized that the Russians are "masters at disinformation" and that the Crossfire Hurricane team was aware of the potential for Russian disinformation to influence Steele's reporting. According to Priestap:

> [W]e had a lot of concurrent efforts to try to understand, is [the reporting] true or not, and if it's not, you know, why is it not? Is it the motivation of [Steele] or one of his sources, meaning [Steele's] sources?... [Or were they] flipped, they're actually working for the Russians, and providing disinformation? We considered all of that....

Steele told us that Russian intelligence is "sophisticated" and relies on disinformation. He said it can involve "planted information," which he described as "controlled information," and that often the information is true but with "bits missing and changed." For his part, Steele told us that he had no evidence that his reporting was "polluted" with Russian disinformation.

The Intel Section Chief told the OIG that the FBI's efforts to identify possible Russian disinformation in the Steele election reporting included trying to corroborate the reporting, learning as much as possible about Steele's sub-sources, and fully assessing Steele. According to an FBI memorandum prepared in December 2017 for a Congressional briefing, by the time the Crossfire Hurricane investigation was transferred to the Special Counsel in May 2017, the FBI "did not assess it likely that the [Steele] [election reporting] was generated in connection to a Russian disinformation campaign." Priestap told us that the FBI "didn't have any indication whatsoever" by May 2017 that the Russians were running a disinformation campaign through the Steele election reporting. Priestap explained, however, that if the Russians, in fact, were attempting to funnel disinformation through Steele to the FBI using Russian Oligarch 1, he did not understand the goal. Priestap told us that what he has

> tried to explain to anybody who will listen is if that's the theory [that Russian Oligarch 1 ran a disinformation campaign through [Steele] to the FBI], then I'm struggling with what the goal was. So, because, obviously, what [Steele] reported was not helpful, you could argue, to then [candidate] Trump. And if you guys recall, nobody thought then candidate Trump was going to win the election. Why the Russians, and [Russian Oligarch 1] is supposed to be close, very close to the Kremlin, why the Russians would try to denigrate an opponent that the intel community later said they were in favor of who didn't really have a chance at winning, I'm struggling with, when you know the Russians, and this I know from my Intelligence Community work: they favored Trump, they're trying to denigrate Clinton, and they wanted to sow chaos. I don't know why you'd run a disinformation campaign to denigrate Trump on the side.

As discussed in Chapter Four, Steele performed work for Russian Oligarch 1's attorney on Russian Oligarch 1's litigation matters, and, as described later in Chapter Nine, passed information to Department attorney Bruce Ohr advocating on behalf of one of Russian Oligarch 1's companies regarding U.S. sanctions.[348] Priestap, the Intel Section Chief, and other members of Crossfire Hurricane told us that they were unaware of Steele's connections to Russian Oligarch 1, who was the subject of a Crossfire Hurricane case, and that they would have wanted to know about them.[349] Priestap, for example, told us "I don't recall knowing that there was

---

[348] An FBI FD-302 dated February 15, 2017, and written by an FBI agent assigned to the Crossfire Hurricane investigation, documented the FBI's interview of Ohr on February 14, and specifically stated that Steele's company was continuing to work for a particular attorney of Russian Oligarch 1.

[349] The Supervisory Intel Analyst and SSA 2 told us that they did not recall reviewing information in Steele's Delta file documenting Steele's frequent contacts with representatives for multiple Russian oligarchs in 2015. The Supervisory Intel Analyst explained that he did not recall doing a "deep dive" on Steele's past history as a source and relied in part on Handling Agent 1 for information about Steele. The first access of Steele's Delta file by a Crossfire Hurricane team member (the Supervisory Intel Analyst) occurred on November 18, 2016, after Steele had been closed as a CHS and a month after submission of the first Page FISA application. As described in Chapter Five,

any connectivity between [Steele] and [Russian Oligarch 1]." Priestap told us that he believed it was "completely fair" to say that the FBI should have assessed Steele's relationship with Russian Oligarch 1.

Stuart Evans, NSD's Deputy Assistant Attorney General who oversaw OI, stated that if OI had been aware of the information about Steele's connections to Russian Oligarch 1, it would have been evaluated by OI. He told us: "Counterintelligence investigations are complex, and often involve as I said, you know, double dealing, and people playing all sides.... I think that [the connection between Steele and Russian Oligarch 1] would have been yet another thing we would have wanted to dive into."[350]

## V.    The FBI's Efforts to Assess Steele's Election Reporting in 2016 and 2017

The FBI's assessment of the Steele election reporting began in mid-September 2016 and concluded approximately 1 year later, roughly 3 months after the submission of Carter Page FISA Renewal Application No. 3 to the Foreign Intelligence Surveillance Court (FISC). The FBI acquired the vast majority of its information about the Steele election reporting prior to the end of September 2017, when FISA surveillance of Carter Page expired.

To evaluate Steele's election reporting, intelligence analysts on the Crossfire Hurricane team created a spreadsheet identifying each statement that appeared in the Steele election reports in order to have a record of what the FBI learned during

---

the FISA application relied in part on Steele's reporting. In Chapter Four we noted that Steele's frequent contacts with Russian oligarchs in 2015 had raised concerns in the FBI Transnational Organized Crime Intelligence Unit. SSA 1 told us that he was unaware of these concerns, but said he would have found this information useful and would have wanted to know about it while supervising the Crossfire Hurricane investigation. Handling Agent 1 expressed surprise that the Crossfire Hurricane team did not access Steele's Delta file earlier. He said that the team should have "turned the file upside down" looking for information 2 months earlier and that he assumed that some members of the team had thoroughly reviewed the file.

[350] In addition to the information in Steele's Delta file documenting Steele's frequent contacts with representatives for multiple Russian oligarchs, we identified reporting the █████████████

its assessment regarding those statements.[351] The intelligence analysts also attempted to determine the true identities of the sub-source(s) responsible for each statement in Steele's election reporting, and made assessments of each sub-source's likely access to the type of information described. FBI CD officials also travelled abroad and met with persons who previously had professional contacts with Steele to gather information about his reliability and the quality of his work.

According to FBI officials, it was challenging to corroborate the information in the Steele election reporting because much of it was "singular source intelligence," and thus could not be verified given the manner in which the events took place. For example, officials told us that a meeting or conversation between just a few people in Russia may only be known to the individuals involved. According to a Supervisory Special Agent who investigated the Steele election reporting, the Crossfire Hurricane team could not independently verify those types of allegations "without speaking to...folks that are high-level in Russia... ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ Strzok told us that, for this kind of information, the "frustration of it was...[the FBI] couldn't necessarily prove it and couldn't disprove it either."

Despite the FBI's efforts to corroborate and evaluate the Steele election reporting, we were told by the Supervisory Intel Analyst that, as of September 2017, the FBI had corroborated limited information in the Steele election reporting, and much of that information was publicly available.[352] Most relevant to the Carter Page FISA applications, the specific substantive allegations contained in Reports 80, 94, 95, and 102, which were relied upon in all four FISA applications, remained uncorroborated and, in several instances, were inconsistent with information gathered by the Crossfire Hurricane team. For example, as detailed in Chapters Five and Seven, these allegations included, among other things, that Page had secret meetings with Igor Sechin and Igor Divyekin in July 2016 and served as an "intermediary" between Manafort and the Russian government. As we describe in Chapters Five and Eight, certain information the FBI had obtained did not support these allegations or the theory in Steele's election reporting that Page was coordinating, or had coordinated, with Russian government officials on 2016 U.S. election activities. Additionally, the FBI determined that some of the allegations in the Steele reporting, including that Trump attorney Michael Cohen had traveled to Prague in late summer 2016 to meet with Kremlin representatives and that "anti-Clinton hackers" had been paid by the "[Trump] team" and Kremlin, were not true.

In the next two chapters, we describe the FBI's use of the Steele election reporting in the three Carter Page FISA renewal applications and the changes that were made, and not made, to the applications to reflect the additional information the FBI developed about Steele and his reporting.

---

[351] As we described in Chapter Four, the spreadsheet omitted certain highly classified information and therefore its scope was partial.

[352] Examples included that Carter Page was in Moscow as reported, that other individuals mentioned in the reporting existed, and that some individuals held the positions in the Russian government that were attributed to them in the reporting.

**[PAGE INTENTIONALLY LEFT BLANK]**

# CHAPTER SEVEN
# THE THREE RENEWAL APPLICATIONS FOR CONTINUED FISA AUTHORITYON CARTER PAGE

In this chapter, we describe the three FISA renewal applications to continue surveillance ███████████████ targeting Carter Page between a period of January █, 2017, when the FISA authority granted by the first FISA orders expired, and September █, 2017, when the last renewal's authority expired. As described in Chapter Two, the Foreign Intelligence Surveillance Court (FISC) may approve FISA surveillance and physical searches targeting a U.S. person for a period of up to 90 days, subject to renewal, if the government's FISA application establishes probable cause to conclude that the targeted individual is an agent of a foreign power. A renewal permits the government to continue FISA authority targeting a U.S. person for an additional 90 days if the facts of the investigation continue to support a finding that there is probable cause to believe the targeted individual is an agent of a foreign power.[353]

The process to renew FISA authority, including who reviews and approves the renewal application, is the same process as with an initial application, which we described in Chapters Two and Five. When conducting the Woods Procedures for a renewal, the agent conducting the accuracy review must re-verify that factual assertions repeated from the prior FISA application remain true and must obtain supporting documentation for any new factual assertions. The National Security Division's (NSD) Office of Intelligence (OI) relies upon the FBI to accurately update the prior FISA application and conduct the accuracy review to determine whether factual information carried over from the prior FISA application remains true.

We describe in this chapter the facts asserted in the three renewal applications submitted to the FISC to demonstrate probable cause that Carter Page was an agent of a foreign power, including new information the FBI intercepted and collected during surveillance of Page. We also describe other factual assertions added to or modified in the renewal applications for the court's consideration. Finally, we discuss the completion of the Woods Procedures, including who reviewed, certified, and approved each of the three renewal applications, and the court's final orders. As we describe in Chapter Eight, we found instances in which factual representations made in the three Carter Page renewal applications were inaccurate, incomplete, or unsupported by appropriate documentation, based upon information in the FBI's possession at the time the applications were filed.

## I.     FISA Renewal Application No. 1 (January █, 2017)

On January █, 2017, a day before the initial FISA authority targeting Carter Page was set to expire, and at the request of the FBI, the Department filed an application with the FISC requesting an additional 90 days of FISA coverage

---

[353] The Office of Intelligence (OI) in the National Security Division (NSD) expects that the FBI will request a renewal on a targeted individual 45 days prior to the expiration of the existing FISA authority.

targeting Carter Page.  A FISC judge reviewed and issued the requested orders resulting in an additional 90 days of surveillance ████████████ targeting Carter Page from January ██, 2017 to April █, 2017.

## A.    Investigative Developments and Decision to Seek Renewal

Emails and other communications reflect that in the first week of surveillance on Carter Page████████████, following the granting of the first FISA application in October 2016, the Crossfire Hurricane team collected ████████████
████.[354]  Based on our review of the Woods Files and communications between the FBI and OI, we identified a few emails between Page and members of the Donald J. Trump for President Campaign concerning campaign related matters. Emails between Supervisory Special Agent 1 (SSA 1) and Case Agent 1 show that during the initial weeks of FISA surveillance, they discussed several ████████████████████ they believed were significant, including references to ████

████.  The analysts and agents who reviewed the FISA ████████ prepared a packet ████████████████ that they believed demonstrated Carter Page's contacts with and references to Russia or Russian officials for OI to consider for a renewal application.

In addition to reviewing the FISA collection, the team continued its efforts (described in Chapter Six) to assess the accuracy of the information in Steele's election reports.  According to the Supervisory Intelligence Analyst (Supervisory Intel Analyst), the team had not corroborated the reporting concerning Carter Page's activities by the time of Renewal Application No. 1 (or subsequent renewal applications), other than confirming Carter Page's travel to Russia in July 2016.

As detailed in Chapter Six, in November 2016, the FBI closed Steele as a Confidential Human Source (CHS) for his disclosures to *Mother Jones* concerning his election reports and relationship with the FBI.  FBI officials told us that after these disclosures, they continued to assess that Steele was reliable.  They said that they viewed the *Mother Jones* disclosure as a "control" issue, based on their understanding that it was a reaction to the letter then FBI Director James Comey sent to Congress in late October about the Clinton email investigation.  Then Deputy Director Andrew McCabe recalled that Steele's disclosure to *Mother Jones* was viewed by the Crossfire Hurricane team as a control issue rather than a reliability issue, and the team was comfortable going forward with seeking a FISA renewal targeting Carter Page.  SSA 1 told us that he believed the reason Steele provided for his disclosure to *Mother Jones* "politicized" Steele and identified an agenda.  SSA 1 said that after Steele's disclosure to *Mother Jones*, he thought the team needed to have an independent validation review completed, which we discussed in Chapter Six.

---

[354]  We did not review the entirety of FISA ████████ obtained through FISA surveillance ████
████████████ targeting Carter Page.  We reviewed only those ████████████ under FISA authority that were relevant to our review.

However, to further assess Steele's reliability, as described in Chapters Six and Eight, senior Counterintelligence Division (CD) officials met with persons with direct knowledge of Steele's work-related performance in a prior position in mid-November 2016, and told us that they were reassured by the fact that the former employer said that Steele had no history of fabricating, embellishing, or otherwise "spinning" information in his reporting.[355]  In addition, FBI officials told us that they were reassured by statements from Department attorney Bruce Ohr (described in Chapters Eight and Nine) that Ohr believed Steele was never untruthful in his reporting.

Case Agent 1's handwritten notes from a December 2016 Crossfire Hurricane team meeting reflect that the team discussed the information about Steele's prior work-related performance and Ohr and decided that they "can continue to rely on reporting for FISA." Case Agent 1 told us he did not recall this discussion or who said that they could continue to rely on Steele's reporting in the next FISA application.

Before this team meeting, and around 45 days prior to the expiration of the first FISA authority, Case Agent 1 notified the FBI's Office of the General Counsel (OGC) and OI that the Crossfire Hurricane team was interested in an additional 90 days of FISA authority targeting Carter Page. Case Agent 1 told us that the Crossfire Hurricane team sought a renewal to determine whether Carter Page had ongoing contact with Russia beyond the 90-day period covered by the first FISA orders. Case Agent 1 said that while it is not automatic to seek a renewal after a first application, there is an "understanding" that the FBI will typically seek a renewal because at the time they are required to notify OI, they have only had 45 days of surveillance, which is usually not sufficient time to gather enough information, or review the information collected, to determine whether or not there is evidence to continue the investigation. Case Agent 1 told us that the team had not reviewed all of the emails the first FISA application yielded and believed there were additional emails not yet collected. The OGC Unit Chief told us that unless there is no evidence collected with an initial FISA application, the FBI will usually seek a renewal to obtain more information.

### B.    Preparation and Approval of Renewal Application No. 1

#### 1.    Draft Renewal Application

Similar to the first Carter Page FISA application, Case Agent 1 and the OGC Attorney assisted the OI Attorney with the preparation of Renewal Application No. 1. However, the OGC Attorney told us that he was less involved in the preparation of this application as compared to the first application, which he said was typical of OGC involvement in renewal applications.

---

[355] We describe in Chapters Six and Eight the negative feedback received concerning Steele, including comments about his judgment. We found that the team did not share all relevant details about this feedback with OI.

Emails between OI, the OGC Attorney, and Case Agent 1 following the FISC's approval of the first FISA application on October ▮, 2016, reflect that Case Agent 1 provided updates to OI on relevant FISA collections and case activities in the Carter Page investigation throughout the fall.  The OI Attorney reviewed this information for inclusion into a renewal application and began drafting Renewal Application No. 1 in December.  The OI Attorney told the OIG that, when drafting a renewal application, he relies on the FBI to provide him information relevant to the ongoing investigation, including any new information that may contradict or may be different from information presented to the FISC in prior FISA applications.

NSD officials told us that the drafting of Renewal Application No. 1 followed the same process and received the same level of scrutiny as the first FISA application signed in October, but because OI's questions about Steele and his election reporting were addressed in the first application, there were fewer discussions about the renewal application, as compared to the first application, and Renewal Application No. 1 was completed in less time.  By December 28, 2016, the OI Attorney had completed a draft of Renewal Application No. 1, described below, and selected relevant FISA intercepts and results of the ongoing investigation to incorporate in the draft.

As in the first FISA application, the statement of facts in support of probable cause for the renewal stated that the Russians attempted to undermine and influence the 2016 presidential election, and that the FBI believed Carter Page was acting in conjunction with the Russians in those efforts.  The statement of facts supported this assessment with the five main elements enumerated in the first application (described in Chapter Five) and added recent investigative results.  Specifically, the elements that carried over from the first FISA application were:

(1)  The efforts of Russian Intelligence Services (RIS) to influence the 2016 presidential election—the renewal application stated that although the elections had concluded, the FBI believed that the Russian government would continue efforts to use U.S. persons, such as Carter Page, to covertly influence U.S. foreign policy and support Russia's perception management efforts;

(2)  The Russian government's attempted coordination with members of the Trump campaign, which was based on the Friendly Foreign Government (FFG) information concerning the offer or suggestion of assistance from the Russians to someone associated with the Trump campaign;

(3)  Carter Page's historical connections to Russia and RIS, which included his business dealings with the Russian energy company Gazprom, his relationships with known Russian intelligence officers, and his disclosure to the FBI and a Russian Minister that he was Male-1 in an indictment against Russian intelligence officers;

(4)  Carter Page's alleged coordination with the Russian government in 2016 U.S. presidential election activities, based on some of the reporting from Steele; and

(5)  Carter Page's continued connections to Russian officials, based on the FBI's assessment of a consensually monitored October 17, 2016 conversation between Page and an FBI CHS.[356]

In addition, the recent investigative results section of the application included references to the following:



- Page traveled to Russia in December 2016;

- In December 2016, Carter Page made statements to an FBI CHS (summarized in Chapter Ten), distancing himself from his October suggestion of establishing a Russian-funded think tank, citing funding issues as a reason, which the FBI assessed was an indication that Page

---

[356] The statement of facts in Renewal Application No. 1 also carried over from the first application the description of Carter Page's denials of coordination with the Russian government, as reported in two news articles and asserted by Page in his September 25 letter to then FBI Director James Comey.

was likely trying to distance himself from Russia as a result of media
reporting that continued to tie Page to Russia.

The renewal application stated that the FBI believed the recent investigative results
demonstrated that Carter Page continued to try to influence U.S. foreign policy on
behalf of Russia. The renewal application, like the first FISA application, failed to
include information provided to the FBI by another U.S. government agency in
August 2016 that Carter Page had a prior relationship with that other agency and
had provided information to the other agency.

Renewal Application No. 1 included the same information from Steele's
reporting that appeared in the first FISA application. However, the renewal
application advised the court of Steele's disclosure to *Mother Jones* and that the FBI
had "suspended" its relationship with Steele. Specifically, the source
characterization statement for Steele in the renewal application stated the
following:

> [Steele] is a ███████████████████████████████
> ████████ and has been an FBI source since in or about October 2013.
> [Steele] has been compensated approximately $95,000 by the FBI.
> **As discussed below in footnote 19, in or about October 2016,
> the FBI suspended its relationship with [Steele] due to
> [Steele's] unauthorized disclosure of information to the press.
> Notwithstanding the suspension of its relationship with
> [Steele], the FBI assesses [Steele] to be reliable as previous
> reporting from [Steele] has been corroborated and used in
> criminal proceedings. Moreover, the FBI notes that the
> incident that led to the FBI suspending its relationship with
> [Steele] occurred after [Steele] provided the reporting that is
> described herein.**[357] (Emphasis in original).

Later in the renewal application, footnote 19 referenced both the *Yahoo News*
article, with the unsupported language from the first FISA application unchanged,
and the *Mother Jones* article, and stated:

> As discussed above, [Steele] was hired by a business associate to
> conduct research into Candidate #1's ties to Russia. [Steele] provided
> the results of his research to the business associate, and the FBI
> assesses that the business associate likely provided this information to
> the law firm that hired the business associate in the first place.
> [Steele] told the FBI that he/she only provided this information to the
> business associate and the FBI. Given that the information contained
> in the September 23rd News Article generally matches the information
> about Page that [Steele] discovered during his/her research, the FBI
> assesses that [Steele's] business associate or the law firm that hired

---

[357] OI often indicates new information in a renewal application to the FISC by using a bold
font. The text from the applications cited in this chapter is cited as it appears in the renewal FISA
applications.

the business associate likely provided this information to the press. The FBI also assesses that whoever gave the information to the press stated that the information was provided by a "well-placed Western intelligence source." The FBI does not believe that [Steele] directly provided this information to the identified news organization that published the September 23rd News Article.

**In or about late October 2016, however, after the Director of the FBI sent a letter to the U.S. Congress, which stated that the FBI had learned of new information that might be pertinent to an investigation that the FBI was conducting of Candidate #2, [Steele] told the FBI that he/she was frustrated with this action and believed it would likely influence the 2016 U.S. Presidential election. In response to [Steele's] concerns, [Steele] independently, and against the prior admonishment from the FBI to speak only with the FBI on this matter, released the reporting discussed herein to an identified news organization. Although the FBI continues to assess [that] [Steele's] reporting is reliable, as noted above, the FBI has suspended its relationship with [Steele] because of this disclosure.** (Emphasis in original).

We found no evidence that the FBI "suspended" its relationship with Steele; rather, FBI paperwork reflects that Steele was closed for cause as an FBI CHS in November 2016.[358] However, as we describe in Chapters Six and Nine, as a practical matter, the FBI continued to collect information from Steele over a period of months through a conduit, Department attorney Bruce Ohr.

Additionally, as discussed in Chapter Five, contrary to FBI policy, the characterization of Steele's prior reporting had not been approved by his handling agent, who told us that the characterization was inaccurate—according to the handling agent, only some of Steele's prior reporting had been corroborated, most of it had not, and Steele's information had never been used in a criminal proceeding. This inaccuracy was not corrected in Renewal Application No. 1 or in the subsequent renewal applications, even after a formal FBI human source validation review of Steele in March 2017 found that his past contributions to the FBI's criminal program had been "minimally corroborated." Further, as described in Chapter Eight, the FBI did not reassess Steele's reliability in the renewal applications, or advise OI, after the Crossfire Hurricane team obtained additional information that was highly relevant to the reliability of his election reporting. This included information received before Renewal Application No. 1 about Steele's work-related performance in a prior position and before Renewal Application Nos. 2

---

[358] As described in Chapter Six, Handling Agent 1 told us that he informed Steele on November 1, 2016, that it was unlikely that the FBI would continue a relationship with him and that Steele must cease collecting information for the FBI. Handling Agent 1 completed a Source Closing Communication document on November 17, 2016, indicating that Steele had been closed for cause on November 1, 2016.

The disclosures of Steele's reports are further discussed in Chapters Four and Six.

and 3 from Steele's Primary Sub-source that contradicted the source reporting in the FISA applications. In addition, as we also discuss in Chapter Eight, Renewal Application No. 1 and the subsequent renewal applications did not describe information that the FBI obtained from Department attorney Bruce Ohr regarding Steele's possible motivations and bias.

Finally, the information in Renewal Application No. 1 regarding early CHS meetings remained unchanged from the prior application. The renewal application also did not include information about the August 2016 meeting between Carter Page and an FBI CHS or the September 2016 meetings between Papadopoulos and an FBI CHS, discussed in Chapters Five and Ten. It also did not include an accurate description of the October 2016 meeting between Page and an FBI CHS, also discussed in Chapters Five and Ten. In addition, as described in Chapters Eight and Ten, Renewal Application No. 1 and the subsequent renewal applications did not include information about an October 2016 CHS meeting involving an FBI CHS and Papadopoulos during which Papadopoulos said that he knew "for a fact" that the Trump campaign was not involved in releasing emails from the DNC.

## 2. Review and Approval Process

As described previously, according to Department and FBI procedures, once an FBI case agent affirms the accuracy of the information in the proposed FISA application (read copy), an OI Unit Chief or Deputy Unit Chief is usually the final and only approver before a read copy is submitted to the FISC. The Unit Chief or Deputy is also usually the final approver who "signs out" the final application (cert copy) to the FBI for completion of the Woods Procedures and Director's certification, before presentation to either the Assistant Attorney General (AAG) of NSD, the Deputy Attorney General (DAG), or the Attorney General for final signature. However, as reflected in Chapter Five, in some instances, FISA applications presenting novel issues or otherwise deemed to have heightened sensitivity will receive additional supervisory review within the FBI, the Department, or both. As described below, FISA Renewal Application No. 1 did not receive the same level of review in FBI OGC as the first Carter Page FISA application, but it did receive additional review within NSD and the Office of the Deputy Attorney General (ODAG).

### a. Supervisory Review and Finalization of Read Copy

Unlike the first FISA application, then FBI General Counsel James Baker and then Deputy General Counsel, Trisha Anderson, did not review FISA Renewal Application No. 1 before the read copy was submitted to the court. Baker told us that he did not review any of the renewal applications. He said that, in general, if none of the relevant factual information had changed from the first application, and the foreign intelligence purpose for the FISA remained the same, he did not believe it was necessary to review renewal applications. In addition, he told us that in at least one instance, he did not know that the FBI was planning to seek a renewal on Carter Page until the application was already with the Director for certification. According to the OGC Unit Chief, OGC is usually less involved in renewal applications because they generally only require updates to the factual information

already asserted in an initial FISA application. She said that the interactions on renewal applications mostly take place at the OI attorney and case agent levels. McCabe told us that, as the Deputy Director, he did not approve requests before they were submitted to OI for FISA application renewals, but he would have been briefed on the collections from the ongoing FISA surveillance. McCabe said that he understood that the first Carter Page FISA was "very productive" and the team wanted to pursue a renewal.

Within NSD, Renewal Application No. 1 received additional supervisory review above the OI Unit Chief. On December 28, after reviewing the draft, the OI Unit Chief emailed the OI Attorney to approve of the new information and assessments included in the draft. On December 29, the OI Attorney emailed a draft of Renewal Application No. 1 to Stuart Evans, NSD's then Deputy AAG for Intelligence, Gabriel Sanz-Rexach, the Chief of OI's Operations Section, and OI's Deputy Operations Section Chief for their review, advising them that the draft was "about 95% complete" and that an additional update would be added before the final draft was completed.

Sanz-Rexach told the OIG that he reviewed Renewal Application No. 1, but did not recall any specific comments he made to the read copy. He said that he recalled that prior to the renewal, the FBI ███████████████████████

██████████████. He also said that the evidence collected during the first FISA application time period demonstrated that Carter Page had access to individuals in Russia and he was communicating with people in the Trump campaign, which created a concern that Russia could use their influence with Carter Page to effect policy. The Deputy Operations Section Chief told us that she reviewed the new factual information in the renewal application, but did not recall as many meetings or discussions about the renewals and did not recall making any comments on any of the renewal applications.

Emails reflect that Evans reviewed the draft renewal application and provided two minor edits, one of which added more detail concerning Carter Page's December 2016 meeting with an FBI CHS. Evans told us that he focused his attention primarily on the footnote describing Steele's *Mother Jones* disclosure that led to a change in Steele's relationship with the FBI, and did not edit the footnote following his review.

On January 3, Evans emailed the read copy to NSD's then Acting AAG Mary McCord for her review with a request to discuss a few points in the renewal. Although the emails did not specify the points for discussion, McCord told us she recalled a discussion with Evans about the information the FBI collected from the FISA coverage targeting Carter Page up to that point and whether it was sufficient to sustain a renewal. McCord told us she also wanted to make sure that the renewal application described the closure of Steele after his disclosures to the media, which was already included in the read copy she reviewed.

### b.      ODAG Review and Approval of Read Copy

Although not a required step in the FISA procedures, ODAG officials reviewed the read copy for Renewal Application No. 1 before it was submitted to the court. Similar to the first application, the renewal application was reviewed by Tashina Gauhar, the Associate Deputy Attorney General responsible for ODAG's national security portfolio, an OI attorney on detail in ODAG, Principal Associate Deputy Attorney General (PADAG) Matthew Axelrod, and DAG Sally Yates, who ultimately approved and signed the final application.

On December 30, 2016, the OI Unit Chief emailed the read copy of Renewal Application No. 1 to Gauhar, and the OI attorney on detail advising that it was "95% complete" with one question for ODAG to consider.  Documents do not indicate that ODAG made any edits to the December 30 draft.  The question for ODAG was whether to include an expansion to the particularized minimization procedures, or PMPs, restriction on who could access the FISA collections to include the agents and analysts investigating the ongoing perception management activities by Russia.[359]  The final renewal application included the expanded PMPs, restricting access to the FISA collection to only those individuals assigned to investigate Russia's efforts to influence the 2016 U.S. elections and Russia's attempts at perception management and influence activities against the U.S.

On January 4, the OI attorney on detail in ODAG advised OI that the OI attorney had provided "a couple of suggestions…which we did not think (and hopefully are not) significant" and advised that Axelrod would want to review the read copy.  We did not find documentation showing the suggestions ODAG recommended for the draft.  According to Gauhar, ODAG did not make significant edits or have many questions after it reviewed Renewal Application No. 1.  Gauhar also told us that she believed the first renewal was significant because it demonstrated that, despite the questions about whether to seek a Carter Page FISA prior to the first application, the surveillance yielded relevant and useful information.  Gauhar said she recalled that the FISA collection included, among other things, ███████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
███████████████████████████████████████.

As with the first FISA application, NSD decided that although it was not a required step, it would not submit the read copy to the FISC until Yates had personally read it and said she was comfortable moving forward.  According to Gauhar, Yates and Axelrod reviewed Renewal Application No. 1, and following Yates's review, OI submitted the read copy to the FISC.  Yates and Axelrod told us that they did not have a specific recollection of reviewing Renewal Application No. 1 but said they may have done so.

---

[359]  As described in Chapter Five, the PMPs in the first FISA application restricted access to the information collected through the FISA authority to the individuals assigned to the Crossfire Hurricane team and required the approval of a Deputy Assistant Director or higher before any FISA-derived information could be disseminated outside the FBI.

### 3. Feedback from the FISC, Completion of the Final Renewal Application and Woods Procedures, and Final Legal Review

On January 10, 2017, the OI Attorney advised Evans and OI management that the FISC judge reviewed the renewal application, had "no issue" with the application, and would sign the application without an appearance.

The day before, the OI Unit Chief "signed out" the cert copy of the application and cert memo to the FBI, so that the FBI could complete the Woods Procedures (previously described in Chapters Two and Five). Case Agent 1 was the agent responsible for compiling the supporting documentation into the Woods File and performing the field office database checks on Carter Page and the accuracy review of each fact asserted in the FISA application. His new supervisor at FBI Headquarters for the Carter Page investigation, SSA 3, was responsible for confirming that the Woods File was complete and double checking the factual accuracy review to confirm that the file contained appropriate documentation for the factual assertions in the FISA application.

As noted previously, in the case of renewal applications, the FISA Standard Minimization Procedures Policy Guide (FISA SMP PG) requires that a case agent re-verify the accuracy of each factual assertion from an initial application that is repeated in a renewal application and verify and obtain supporting documentation for any new factual assertions that are added to a renewal application. Case Agent 1 did not recall whether he reviewed every factual assertion or just the newly added information when he conducted the accuracy review for Renewal Application No. 1. Case Agent 1 told us that his general practice on a renewal application is not to necessarily review the factual information carried over from the prior application. He said that if the factual information does not materially change from the prior FISA application, he will review just the newly added information. According to Case Agent 6, Case Agent 1 told him that when he (Case Agent 1) performed the factual accuracy review on Renewal Application No. 1, he only reviewed the new factual assertions in the application, not the factual assertions that carried over from the prior application. At the time Case Agent 1 conducted the accuracy review of Renewal Application No. 1, he had been transferred back to the New York Field Office (NYFO) and was conducting the Carter Page investigation from that office. After he completed his review, he faxed the signed FISA Verification Form (Woods Form) to SSA 3 at FBI Headquarters.

SSA 3 reviewed the Woods File at Headquarters, signed the Woods Form on January 10, affirming the verification and documentation of each factual assertion in the application, and then sent the FISA application package containing the Woods Form, cert copy, and a cover memorandum (cert memo) to the Headquarters Program Manager assigned the responsibility, as the affiant, of signing the final application under oath that the factual information was true and correct. SSA 3 told us that when he signed the Woods Form, he was verifying that every fact contained in Renewal Application No. 1 had a supporting document confirming the accuracy of the statement. However, like Case Agent 1, SSA 3 also told us that, when he performs a Woods review, he does not re-verify the factual assertions

carried over from previous applications, but only checks the new information, which is noted in bold font.[360]

The Headquarters Program Manager assigned as the affiant was SSA 2, who was assigned to the Crossfire Hurricane investigation in late December 2016.[361] He told us he received the renewal package from the OI Attorney and reviewed the first FISA application and the newly added information to Renewal Application No. 1. SSA 2 told us that he did not recall reviewing the Woods Form, but that it was his practice at the time to do so before signing a FISA application (as described in Chapter Two, the Woods Procedures do not require the affiant to review the Woods File, only the case agent and his or her supervisor). SSA 2 said that he believed everything in the application to be true and correct based on the Woods Verification completed by Case Agent 1 and SSA 3. SSA 2 told us that he identified no issues or questions after reviewing Renewal Application No. 1 and signed the affidavit affirming under penalty of perjury that the information in the package was true and correct. He then submitted the FISA application package to either the OGC Attorney or the OGC Unit Chief for final legal review.

As described in Chapter Two, after the affiant signs the affidavit, the application package is submitted to the FBI's National Security and Cyber Law Branch (NSCLB) for final legal review and approval by both a line attorney and Senior Executive Service-level supervisor. Once they approve the application, the line attorney and supervisor sign the cert memo. The OGC Attorney told the OIG that he did not recall reviewing any prior drafts of the application before he received the cert copy on January 10. He said that when he received the cert copy, he focused his legal review on the newly added material. We were advised that the FBI and NSD were unable to locate a fully signed copy of the cert memo that accompanied Renewal Application No. 1, and we were unable to independently determine who reviewed the FISA application package on behalf of OGC's NSCLB. Instant messages suggest that the OGC Attorney performed the line attorney review for NSCLB and submitted the package to Anderson for her review and signature.

### 4.    FBI Director's Certification

Comey reviewed and certified the Carter Page FISA Renewal Application No. 1 on behalf of the FBI on January 12. Chapter Two describes the elements of the

---

[360] The OIG examined the completeness of the Woods File by comparing the facts asserted in Renewal Application No. 1 to the documents maintained in the Woods File. Our comparison identified instances in which facts asserted in the application were not supported by documentation in the Woods File. Specifically, we found facts asserted in the FISA application that have no supporting documentation in the Woods File, facts that have purported supporting documentation in the Woods File but the documentation does not state the fact asserted in the FISA application, or facts that have purported supporting documentation in the Woods File but the documentation shows the fact asserted is inaccurate. We provide examples of specific errors in Appendix One.

[361] As described in Chapters Two and Five, the affiant for a FISA application is the Headquarters Program Manager in the relevant Operations Branch and Section. In the case of this renewal application, the investigation was conducted from Headquarters, and SSA 2 was one of the Supervisory Special Agents supervising aspects of the investigation.

certification required by the Director or Deputy Director, including that the information sought through the requested FISA authority is foreign intelligence information that cannot reasonably be obtained by normal investigative techniques and is necessary to protect the United States against clandestine intelligence activities. Comey told the OIG that he had no specific memory of reviewing or signing any of the Carter Page FISA renewal application packages. As we discussed in Chapter Five, Comey recalled reading the first Carter Page application before he certified it and being satisfied that the application seemed factually and legally sufficient when he read it, and he had no questions or concerns before he signed.

### 5.    DAG Oral Briefing and Approval

Yates did not specifically recall the oral briefing on Renewal Application No. 1. OI's Deputy Operations Section Chief conducted the briefing and told the OIG that she did not recall anyone having any questions about Renewal Application No. 1. Yates told the OIG she did not recall if she read the entire renewal or just the additions and changes.

Yates told us that she did not have any concerns with the FBI seeking renewal authorization for the Carter Page FISA, although she wanted to make sure that the representation to the FISC was that the focus remained on Carter Page. Yates also told us that she had been briefed by McCabe prior to reviewing Renewal Application No. 1 on Steele's closure due to his disclosure to the media, and was aware that information would be included in the renewal. Yates said it was a brief discussion and she did not recall if McCabe told her whether there was an additional reason the FBI closed Steele or anything further about Steele. On January ███, Yates signed the application, and the application was submitted to the FISC the same day. By her signature, and as stated in the application, Yates found that the application satisfied the criteria and requirements of the FISA statute and approved its filing with the court.[362]

### 6.    Final Orders

The final FISA application included proposed orders, which were signed by FISC Judge Michael W. Mosman, on January ███, 2017. According to NSD, the judge signed the final orders, as proposed by the government in their entirety, without holding a hearing.

The primary order and warrant stated that the court found, based upon the facts submitted in the verified application, that there was probable cause to believe that Russia is a foreign power and that Carter Page was an agent of Russia under 50 U.S.C. § 1801(b)(2)(E). The court also found that the ███████████

███████████████████████████████████████████████ The court authorized the requested electronic surveillance ███████████  for 90

---

[362] Her signature also specifically authorized ███████████.

days and ██████████████████████████████████████
necessary to effectuate the electronic surveillance ████████████████ that the
court authorized.

## II.    FISA Renewal Application No. 2 (April █, 2017)

On April █, 2017, the day FISA coverage targeting Carter Page was set to
expire, and at the request of the FBI, the Department filed an application with the
FISC requesting an additional 90 days of FISA coverage targeting Carter Page.  A
FISC judge reviewed and issued the requested orders resulting in an additional 90
days of electronic surveillance ████████████████ targeting Carter Page from
April █, 2017 to June █, 2017.

### A.    Case Reorganization, Investigative Developments, and Decision to Seek Renewal

As described in Chapter Three, in January 2017, CD reorganized the Crossfire
Hurricane investigation and divided the cases among two of the three branches in
CD.  As a result of the reorganization, there were new supervisory special agents
and case agents working on the Carter Page investigation.  Deputy Assistant
Director (DAD) Jennifer Boone and SSA 3 were the supervisors at Headquarters
overseeing the Carter Page investigation, which was transferred to NYFO when the
cases were reorganized.  In March 2017, Case Agent 1 was promoted to a
supervisory position, and Case Agent 6 became the new case agent handling the
Carter Page investigation in NYFO, with assistance from Case Agent 1 and SSA 5.

Email communications reflect that the Crossfire Hurricane team continued to
review evidence from the FISA collections after the court reauthorized FISA
authority in January 2017, targeting Carter Page.  In January and February 2017,
the FBI provided updates to the OI Attorney, which were passed on to his
supervisors and ODAG.  These updates included:



3.  Page met with an FBI CHS regarding Page's think tank idea and
wanted help/insight from the CHS.  Page revealed to the CHS that he
wanted the think tank to focus on countering anti-Western views on
Russia.  He also revealed that a senior Russian government official
pledged a million dollars toward the project.

In addition, the team continued its efforts to corroborate the information in
Steele's reports, including identifying Steele's sub-sources.  As described in Chapter

Six, after the FBI identified Steele's Primary Sub-source and in January 2017 (after Renewal Application No. 1 was signed), Case Agent 1 and the Supervisory Intel Analyst interviewed him/her. Following the January interview, the Supervisory Intel Analyst, with assistance from Case Agent 1, wrote a lengthy summary of the interview. As described in Chapter Six, the Primary Sub-source told the FBI that he/she provided Steele with some of the information in Steele's reports. The Supervisory Intel Analyst said that the information from the interview with the Primary Sub-source provided details used to identify sub-sources referenced in Steele's reports, which assisted the investigation. However, in some instances, statements the Primary Sub-source made about what his/her sources told him/her—and what he/she then provided to Steele—were inconsistent with information attributed to his/her sources in Steele's reporting, as well as in the first Carter Page FISA application and Renewal Application No. 1. As described in Chapter Eight, most team members told us that they either were not aware of the inconsistences or, if they were aware, did not make the connection that the inconsistencies affected aspects of the FISA applications. Further, Case Agent 1 and the Supervisory Intel Analyst told us that the Primary Sub-source may have been "minimizing" certain aspects of what he/she told Steele.

Further, in March 2017, Case Agent 1 and Case Agent 6 conducted five voluntary interviews with Carter Page. During those interviews, Carter Page provided the following: information about his July and December 2016 trips to Moscow; individuals he denied meeting to include Igor Sechin and Paul Manafort; a trip to Singapore in February 2017 for Gazprom Investor Day; and his lack of involvement in the Republican National Committee's (RNC) platform change on assistance to Ukraine. Carter Page also discussed his contacts with Gazprom, his assumption that he was under FBI surveillance, and he denied that anyone from Russia asked him to relay any messages to anyone in the campaign. Carter Page told the agents that he knew he had previously communicated with Russian intelligence officers in New York but stated his interactions were not a "back-channel," and he wanted nothing to do with espionage. He said that because of his interactions with these Russian intelligence officers, he knew he was "on the books" and understood that this meant RIS considered him a source, witting or unwitting. He also said that in mid-October 2016, while crossing a street in New York City, his cell phone fell out of his pocket and was smashed by a car, resulting in a loss of encrypted communications.

Following the interviews with Carter Page and review of the FISA collections, agents working on the Carter Page investigation discussed and had differing opinions about seeking a second renewal. Case Agent 6 told us that although he reviewed the FISA collections when he was assigned to the Carter Page investigation in February 2017, he had not reviewed enough information to make a determination as to whether seeking a renewal was necessary. He told us that he reviewed ██████████████████████████ in which Carter Page ████████████ ██████████ Case Agent 6 told us that although this email and Page's statement in an interview caused him to question whether it was worth seeking Renewal Application No. 2, he ultimately did not disagree with Case Agent 1 and SSA 5 who

told him they wanted to continue the surveillance of Page.  He also said that he discussed seeking the renewal with his NYFO Special Agent in Charge and did not recall any disagreement about seeking a second renewal from anyone working on the investigation.

SSA 3 told the OIG that there were discussions at Headquarters among members of the Crossfire Hurricane team, including SSA 2 and Boone, about Carter Page and whether he was a significant target at that point in the investigation. According to SSA 3, he and SSA 2 believed at the time they approached the decision point on a second FISA renewal that, based upon the evidence already collected, Carter Page was a distraction in the investigation, not a key player in the Trump campaign, and was not critical to the overarching investigation.  SSA 2 told us that he questioned whether seeking a second renewal was the best use of FBI resources as Carter Page had "deviated from a consistent pattern of life" and was no longer communicating in the same way as he had in 2016.  SSA 2 and SSA 3 told us that they did not know or recall who at the FBI ultimately made the decision to seek the second renewal or the reasons why.

Boone told us that the team discussed what further steps to take in the investigation of Carter Page and not solely whether or not to seek a second FISA renewal.  Boone recalled a conversation with SSA 2 about whether a second renewal was necessary, but did not recall if she was directed from management to pursue a second renewal or if the team decided to seek a renewal after discussing whether it would add any value to the investigation.  Boone did not recall who ultimately decided to move forward with Renewal Application No. 2, and available documents do not indicate.

### B.    Preparation and Approval of Renewal Application No. 2

#### 1.    Draft Renewal Application

Case Agent 6 and the OGC Attorney assisted the OI Attorney in the preparation of Renewal Application No. 2.  On March 20, Case Agent 6 sent the OI Attorney an email with an attachment that included "my first round of additions so you can get started."  The additions that Case Agent 6 sent included information Carter Page provided in his FBI interviews in March 2017 about his involvement with a Russian business, Page's discussion with Russian officials about a Southern District of New York (SDNY) indictment, Page's denials about meeting a Russian government official, and his lack of involvement in the drafting of the RNC's platform provision on Ukraine.[363]  Emails reflect that on March 23 and March 29, Case Agent 6 sent a draft of Renewal Application No. 2 to Case Agent 1 for his review; however, we did not find a response from Case Agent 1 to Case Agent 6 about the draft.

---

[363]  As discussed in Chapter Eight, all of the Carter Page FISA applications alleged that Page participated in drafting the RNC's platform change on providing lethal assistance to Ukraine.  The FISA applications alleged that the platform change on Ukraine would not include a provision to provide weapons to Ukraine to fight Russian and rebel forces, controverting Republican Party policy.

On March 23, Case Agent 6 emailed the OI Attorney additional information from recent FISA collections, recent Carter Page interviews, and other information derived from the ongoing investigation for inclusion in Renewal Application No. 2. Case Agent 6 did not provide the OI Attorney with the written summary of the Primary Sub-source's interview in January 2017, but instead included in his March 20 write-up for the OI Attorney two brief references to aspects of the January interview, neither of which identified the key inconsistencies between the Primary Sub-source and Steele that we address in Chapter Eight. The OI Attorney completed an initial draft of Renewal Application No. 2 on March 23 and emails reflect that, over the next few days, Case Agent 6 and the OI Attorney edited the initial draft. On March 29, the OI Attorney sent the OGC Attorney a draft for his review and advised that, following the OGC Attorney's review, the OI Attorney would finalize the draft for an "up the chain review."

The statement of facts in the draft and final second renewal application contained the same information used to support probable cause as in Renewal Application No. 1. This included the assessment that post-election, the FBI believed that the Russian government would continue efforts to use U.S. persons, such as Carter Page, to covertly influence U.S. foreign policy and support Russia's perception management efforts. In addition, Renewal Application No. 2 advised the court of recent investigative results, including:

- ████████████████████████████████████████████████████████████████████████████████;

- The results of recent FBI interviews with Carter Page in which he revealed that during his December 2016 travel to Russia, he met the Russian Deputy Prime Minister who asked him how to connect for "future cooperation," and in which Page also revealed that during travel to Singapore, he met a Vice President of Gazprombank, which the FBI assessed revealed Russia's continued interest in Page;[364]

- Carter Page's denial during a March 2017 FBI interview that he told Russian officials that he was "Male-1" in the indictment of three Russian intelligence officers, described in Chapter Three. When asked a second time about this statement, Page said he "forgot the exact statement," which the FBI assessed showed that Page was not completely forthcoming during this interview;

- ████████████████████████████████████████████████████████████;

- ████████████████████████████████████████████████████████████████████████

---

[364] As with other denials made by Carter Page (described in Chapters Five and Ten), Renewal Application No. 2 did not include denials Carter Page made during a meeting with an FBI CHS in January 2017 concerning Steele's election reports. During that recorded meeting, Carter Page characterized the Steele election reporting as "just so false" and "complete lies and spin."



- A February 2017 letter Carter Page sent to the Department of Justice, Civil Rights Division's Voting Section, urging the review of "severe election fraud in the form of disinformation, suppression of dissent, hate crimes and other extensive abuses" by members of the Clinton campaign, which the FBI assessed was self-serving and untrue.

Renewal Application No. 2 also included a new footnote stating that the FBI conducted several interviews of Papadopoulos, during which Papadopoulos confirmed he met with officials from the FFG but denied discussing anything related to the Russian government, which the FBI assessed were misleading or incomplete statements. The footnote did not include that Papadopoulos made other statements during these interviews, including statements that minimized Carter Page's role in the Trump campaign and a claim that Person 1 (whom the FBI assessed was the likely source for some of the Steele reporting relied upon in the applications, including the allegations against Page) told Papadopoulos that he/she (Person 1) had no knowledge of the information reported in "the recent Trump Dossier." Renewal Application Nos. 2 and 3 did advise the court of a news article claiming that Person 1 was a source for some of the Steele reports and that Person 1 denied having any compromising information regarding the President.[365]

The source characterization statement for Steele, reliance on Steele's reporting, and the information concerning the positions and access of the sub-sources remained the same as in the first FISA application and Renewal Application No. 1, with the exception of changing Steele's status with the FBI from "suspended" to "closed" as a result of the *Mother Jones* disclosure. The OI Attorney told us that there had been prior instances in other investigations where the FBI has closed a source, and OI disclosed it to the FISC as they did in the Carter Page Renewal Application No. 2. The OI Attorney told us that OI expects the FBI to assess the information provided by a closed source, and how closure of the source impacts the information from the source cited in an application. In this instance, he said the FBI told him that it continued to believe Steele was reliable.

---

[365] In Chapter Five, we describe how the FBI did not specifically and explicitly advise OI about the FBI's assessment before the first FISA application that Person 1 was the sub-source who provided the information relied upon in the application from Steele Reports 80, 95, and 102; that Steele had provided derogatory information regarding Person 1; and that ▇▇▇▇▇▇▇▇▇▇. As noted previously, in the next chapter, we describe the information from the Primary Sub-source interview concerning Person 1 and the information that was not shared with OI about inconsistences between the Primary Sub-source and Steele concerning information provided by Person 1.

Finally, the draft and final FISA Renewal Application No. 2 advised the court in a footnote that the FBI interviewed Steele's Primary Sub-source and found him/her to be "truthful and cooperative." ████████████████████████████ ████████████████████████████ the application did not otherwise describe the information the Primary Sub-source provided to the FBI or identify any statements made by Primary Sub-source that contradicted or were inconsistent with information from Steele's reports relied on in the application. Emails reflect that on March 31, the OI Attorney drafted this footnote with feedback from the OGC Attorney. The OGC Attorney edited the footnote to reflect that the FBI was undertaking "additional investigative activity to further corroborate the information provide [sic] by [Steele]." The descriptor that the Primary Sub-source was "truthful and cooperative" was not edited by the OGC Attorney, who told us that although he did not receive a full briefing on the interview of the Primary Sub-source, he was present at meetings where the interview was discussed. The OGC Attorney said he recalled that he learned during these meetings that the information from the Primary Sub-source "echoed what the reporting was that [Steele] provided to us." We asked why the application did not include the information the Primary Sub-source provided during the interview and the OGC Attorney told us that he did not believe the OI Attorney was "looking to provide that level of detail in the application."

### 2.   Review and Approval Process

As described below, FISA Renewal Application No. 2 received supervisory review similar to Renewal Application No. 1, including review by NSD supervisors and ODAG.

#### a.   Supervisory Review and Finalization of Read Copy

As with Renewal Application No. 1, Baker told us that he did not review Renewal Application No. 2. Anderson was on leave during this time, and we found no evidence that anyone in OGC above the OGC Unit Chief level reviewed Renewal Application No. 2.

On March 30, the OI Attorney emailed a draft of Renewal Application No. 2 to Evans, Sanz-Rexach, OI's Deputy Operations Section Chief, and the OI Unit Chief for their review. Sanz-Rexach told us that he read Renewal Application No. 2 and did not have any concerns with the probable cause stated in the application. He said that with each renewal application, the FBI was obtaining "nuggets" of additional information that furthered the probable cause. The Deputy Operations Section Chief told us that she reviewed this renewal application and may have provided comments, but she did not recall any specific discussions about Renewal Application No. 2.

On April 3, Evans emailed McCord the draft application for her review and advised her that the read copy would be filed with the FISC later that day. McCord told us that while she did not have a specific recollection of Renewal Application No. 2, she did recall that after the first FISA renewal, there were ████████████████

▊▊▊▊▊ and more information developed in the investigation. Specifically, she recalled that the team had developed information confirming Carter Page's July trip, behavior by Page that was "at least suspicious," and that he made self-serving statements.

### b.   ODAG Review and Approval of Read Copy

On January 30, 2017, Dana Boente became the Acting Attorney General. On February 9, 2017, following the confirmation of Jefferson Sessions to be the Attorney General, Boente became the Acting DAG, a position in which he served until April 25, 2017. On March 31, 2017, Boente became the Acting Attorney General with respect to the Crossfire Hurricane investigation by virtue of then Attorney General Sessions's recusal. Some of the personnel in ODAG also changed after January 30, and James Crowell became Acting PADAG. Gauhar remained in ODAG and continued in her position as the Associate Deputy Attorney General responsible for ODAG's national security portfolio.

On April 2, Gauhar gave the draft application to Boente and Crowell, along with a memorandum containing questions and notations to assist in their review of the renewal application. Gauhar said that because this was Boente's first review of a FISA application targeting Carter Page, Boente wanted to ensure he had "good visibility" into the application. Boente told us that he did not specifically recall reading the Gauhar memorandum or reviewing the read copy, although contemporaneous documents and emails reflect that Boente did, in fact, review the read copy prior to it being filed with the court.

Gauhar told us, and notes reflect, that after Boente reviewed the footnote in the renewal application concerning the closure of Steele as an FBI CHS, Boente asked whether there was concern about the potential bias of Steele. Gauhar told us that she did not recall the specific discussions they may have had on this issue, but she recalled that Boente was very engaged on the issue of Steele's potential bias, and said they had multiple discussions on that specific issue. Boente told us that he did not recall what information he was provided about Steele or what Boente knew about Steele or his reporting when Boente considered the second renewal application.

As with the previous two Carter Page FISA applications, OI waited for approval from ODAG before submitting the read copy to the FISC. On April 3, Gauhar notified Evans that Boente approved sending the read copy to the FISC.

### 3.   Feedback from the FISC, Completion of the Final Renewal Application and Woods Procedures, and Final Legal Review

On April 3, the read copy was filed with the FISC. On April 6, the OI Attorney advised Evans and the OI supervisors that the FISC judge reviewed the renewal application, had one non-substantive edit to a signature page, and would sign the application without an appearance.

On April 3, the OI Unit Chief "signed out" the cert copy of the application and cert memo to the FBI, so that the FBI could complete the Woods Procedures. Case Agent 6 asked Case Agent 1 to assist with the Woods Procedures because Case Agent 6 recently joined the investigation and was not familiar with all of the historical facts related to Carter Page. Case Agent 6 provided documents to Case Agent 1, who was the agent responsible for compiling the supporting documentation into the Woods File and performing the field office database checks on Carter Page and the accuracy review of each fact asserted in the FISA application. SSA 5 was responsible for confirming that the Woods File contained appropriate documentation for the factual assertions in the FISA application.

As noted previously, Case Agent 1 told us that his general practice on a renewal application is not to necessarily review the factual assertions carried over from the prior application. He said that if the factual information does not materially change from the prior FISA application, he will just review the newly added information. However, in this case, Case Agent 1 told us that he was "pretty sure" he reviewed the factual assertions from the prior renewal application in addition to the new factual assertions to confirm the Woods File contained the appropriate documentation for Renewal Application No. 2.[366] After Case Agent 1 completed the Woods process, he signed the Woods Form and gave the Woods Form and Woods File to SSA 5 who was his supervisor in NYFO. SSA 5 told us he made sure every fact in the application had a supporting document in the Woods File. SSA 5 then signed the Woods Form on April 4, affirming the verification and documentation of each factual assertion in the application, and sent the FISA application package containing the Woods Form, cert copy, and cert memo to the Headquarters Program Manager assigned the responsibility of signing the final application as the affiant under oath that the factual information was true and correct.[367]

As in the case of Renewal Application No. 1, SSA 2 served as the affiant for Renewal Application No. 2. SSA 2 told us that he reviewed the newly added information in Renewal Application No. 2 and identified no issues with any of the information in the application. SSA 2 told us that he believed everything in the application was true and correct. SSA 2 told us that he did not recall reviewing the Woods Form, but that it was his practice at the time to do so before signing a FISA application (as described in Chapter Two, the Woods Procedures do not require the

---

[366] As we noted previously, according to Case Agent 6, Case Agent 1 told him that when he (Case Agent 1) performed the factual accuracy review on Renewal Application No. 1, he only reviewed the new factual assertions in the application, not the factual assertions that carried over from the prior application. Case Agent 6 told us that they did not discuss how Case Agent 1 performed the factual accuracy review on Renewal Application No. 2.

[367] The OIG examined the completeness of the Woods File by comparing the facts asserted in Renewal Application No. 2 to the documents maintained in the Woods File. Our comparison identified instances in which facts asserted in the application were not supported by documentation in the Woods File. Specifically, we found facts asserted in the FISA application that have no supporting documentation in the Woods File, facts that have purported supporting documentation in the Woods File but the documentation does not state the fact asserted in the FISA application, or facts that have purported supporting documentation in the Woods File but the document shows the fact asserted is inaccurate. We provide examples of specific errors in Appendix One.

affiant to review the Woods File, only the case agent and his or her supervisor). After doing so, SSA 2 signed the affidavit affirming under penalty of perjury that the information in the package was true and correct before he submitted it to an OGC Attorney.

The OGC Attorney said that while he was aware of the FBI seeking renewal authority for the Carter Page FISA, he had less awareness of the specific issues in Renewal Application No. 2 and did not recall reviewing any drafts other than the cert copy. We were advised that the FBI and NSD were unable to locate a fully signed copy of the cert memo that accompanied Renewal Application No. 2, and we were therefore unable to independently determine who reviewed the FISA application package on behalf of OGC's NSCLB.

### 4.    FBI Director's Certification

Comey signed FISA Renewal Application No. 2 on behalf of the FBI on April 5, 2017, certifying that the information sought was foreign intelligence information that could not reasonably be obtained by normal investigative techniques and was necessary to protect the United States against clandestine intelligence activities. Although Comey did not specifically recall reviewing FISA Renewal Application No. 2, for the reasons described in Chapter Five, Comey told us that he reviewed the first Carter Page application and was satisfied that the requested FISA authority had a sufficient foreign intelligence purpose.

### 5.    Oral Briefing and Approval

Sanz-Rexach briefed Boente on Renewal Application No. 2 and told us that it was a short briefing, and Boente did not raise any questions before he signed the application. Boente had requested regular briefings on the investigation after he became the Acting Attorney General and was familiar with the case at the time he reviewed and approved Renewal Application No. 2.

Although, as noted above, contemporaneous documents and emails reflect that Boente read the application prior to it being filed with the court, Boente told us that he did not have an independent recollection of having read the application. After showing him the documentation indicating that he had read it, Boente said that he was sure he would have read the application provided to him. Boente told us that although he did not recall specific discussions about Steele in connection with this application, he remembered being aware that the origin of Steele's reports was opposition research, and he thought the footnote identifying Steele's reporting as political opposition research was "very clear." Boente told us when he signed the application following NSD's short oral briefing, he was satisfied that there was sufficient probable cause to believe Page was an agent of a foreign power. He also told us that he knew at the time that two different judges had previously found probable cause, and that it was important to acquire whatever evidence the Department could regarding Russia's interference with the 2016 U.S. elections.

On April ▮, Boente signed the application as Acting Attorney General, and the application was submitted to the FISC the same day. By his signature, and as

stated in the application, Boente found that the application satisfied the criteria and requirements of the FISA statute and approved its filing with the court.[368]

### 6.    Final Orders

The final FISA application included proposed orders, which were signed by FISC Judge Anne C. Conway on April █, 2017.  According to NSD, the judge signed the final orders, as proposed by the government in their entirety, without holding a hearing.

The primary order and warrant stated that the court found, based upon the facts submitted in the verified application, that there was probable cause to believe that Russia is a foreign power and that Carter Page was an agent of Russia under 50 U.S.C. § 1801(b)(2)(E).  The court also found that ███████████████████
████████████████████████████████████████████████
████████████████████████████████████████  The court authorized the requested electronic surveillance ████████████ for 90 days and ████████ necessary to effectuate the electronic surveillance ████████████ authorized by the court.

## III.  FISA Renewal Application No. 3 (June █, 2017)

On June █, 2017, a day before FISA coverage on Carter Page was going to expire, and at the request of the FBI, the Department filed an application with the FISC requesting an additional 90 days of FISA coverage targeting Carter Page.[369]  A FISC judge reviewed and issued the requested orders resulting in an additional 90 days of electronic surveillance ████████████ targeting Carter Page from June █, 2017 to September █, 2017.

### A.    Investigative Developments and Decision to Seek FISA Renewal

After the second renewal of FISA authority, the FBI continued its FISA collection of communications and other evidence pertaining to Carter Page.  In addition, available documents indicate that one of the focuses of the Carter Page investigation at this time was obtaining his financial records.  NYFO sought compulsory legal process in April 2017 for banking and financial records for Carter Page and his company, Global Energy Capital, as well as information relating to two encrypted online applications, one of which Page utilized on his cell phone.

---

[368] Boente's signature also specifically authorized ████████████████████████
████████████

[369] On May 17, 2017, the Crossfire Hurricane cases were transferred to the Office of the Special Counsel.  Although agents and analysts were working with the Special Counsel, the FISA application was still subject to Department approval and notification requirements.

Documents reflect that agents also conducted multiple interviews of individuals associated with Carter Page.

Case Agent 6 told us, and documents reflect, that despite the ongoing investigation, the team did not expect to renew the Carter Page FISA before Renewal Application No. 2's authority expired on June 30.  Case Agent 6 said that the FISA collection the FBI had received during the second renewal period was not yielding any new information.  The OGC Attorney told us that when the FBI was considering whether to seek further FISA authority following Renewal Application No. 2, the FISA was "starting to go dark."  During one of the March 2017 interviews, Page told Case Agent 1 and Case Agent 6 that he believed he was under surveillance and the agents did not believe continued surveillance would provide any relevant information.  Case Agent 6 said ███████████████████████████████████████████████████████████████████████████████████████.

SSA 5 and SSA 2 said that further investigation yielded previously unknown locations that they believed could provide information of investigative value, and they decided to seek another renewal.  Specifically, SSA 5 and Case Agent 6 told us, and documents reflect, that ██████████████████████████████████████████████████ they decided to seek a third renewal. ██████████████████████████████████████████████████████████.

## B.    Preparation and Approval of Renewal Application No. 3

### 1.    Draft Renewal Application

Case Agent 6 assisted the OI Attorney in the preparation of Renewal Application No. 3.  Emails reflect that Case Agent 6 and the OI Attorney exchanged information on recent investigative findings and relevant FISA collections for the draft of Renewal Application No. 3.[370]  On June 16, the OI Attorney emailed the OGC Attorney and Case Agent 6 the first draft of Renewal Application No. 3 for their review.  On June 18, Case Agent 6 responded to the email by providing answers to the remaining questions in the draft application.  Emails reflect that on June 19, the Supervisory Intel Analyst and SSA 2 received a copy of the renewal draft from Case Agent 6 for review; however, the Supervisory Intel Analyst did not recall reviewing the renewal application.  SSA 2 said he had no comments, and we found no documentation indicating one way or the other.

The statement of facts in the third renewal application contained the same information used to support probable cause as in Renewal Application No. 2.  This

---

[370]  Although there were no recent relevant FISA collections the team found useful, we were told that the FBI was still reviewing FISA collections identified prior to Renewal Application No. 2.

included the assessment that post-election, the FBI believed that the Russian government would continue efforts to use U.S. persons, such as Carter Page, to covertly influence U.S. foreign policy and support Russia's perception management efforts. In addition, Renewal Application No. 3 advised the court of recent investigative results, including:

- A June 2017 interview by the FBI of an individual closely tied to the President of the New Economic School in Moscow who stated that Carter Page was selected to give a commencement speech in July 2016 because he was candidate Trump's "Russia-guy." This individual also told the FBI that while in Russia in July 2016, Carter Page was picked up in a chauffeured car and it was rumored he met with Igor Sechin. However, the FD-302 documenting this interview, which was included in the Woods File for Renewal Application No. 3, does not contain any reference to a chauffeured car picking up Carter Page. We were unable to locate any document or information in the Woods File that supported this assertion.[371]

- A June 2017 interview by the FBI of a different individual closely tied to the New Economic School in Moscow who told investigators that he did not think it likely that Carter Page and Sechin met during Page's visit to Moscow in July 2016. The FBI assessed that, because this individual was unaware of a meeting that Carter Page had with a different Russian official while in Moscow in July 2016, the individual did not know about all the meetings that Page had while in Moscow in July 2016, and the FBI assessed that, based on the rumored meeting between Page and Sechin described in the prior bullet point, Page likely met with Sechin prior to the time that Page joined this individual at the New Economic School;



- ████████████████████████████████████████ .[372]

- ████████████████████████████████████████ ;

---

[371] We asked both agents that interviewed this individual, Case Agent 6 and Case Agent 7, if this individual stated during the interview that Page was picked up in a chauffeured car. Case Agent 6 told us he did recall the individual making this statement; Case Agent 7 did not recall and stated he may have made the statement during a telephone interview that occurred later.

[372] The third renewal application stated that ████████████████████████████████
████████████████████████████████████████████ .

- ███████████████████████████████████████████████;

- A statement by Carter Page during a March 30 interview with the FBI about the loss and destruction of his cell phone at the same time media reports were discussing the FBI's possible investigation of Page; and

- Carter Page's meetings with media outlets, which the FBI assessed may have been undertaken to promote his theories on U.S. foreign policy and refute claims of involvement with the Russian government's efforts to influence the 2016 U.S. election. The FBI believed Page was instructed by Russian officials to deny in the media Russian involvement with the election.

The application also stated the following:

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████ Additionally, based on Page's history of willingness to assist Russian IOs, which as discussed above the FBI believes began as early as 2007…, and his comment to the FBI that he believes he is "on the [SVR] books," the FBI believes that Page remains favorable to future RIS taskings.

Steele's source characterization statement, reliance on Steele's reporting, and the information concerning the positions and access of Steele's sub-sources remained the same as in Renewal Application No. 2. The short description of the FBI's January 2017 interview with Steele's Primary Sub-source also remained the same. Renewal Application No. 3 also added ██████████████████████████ ████████████████████████████

In support of probable cause, the FBI added statements Carter Page made during his first consensually monitored meeting with an FBI CHS in August 2016 (summarized in Chapter Ten). These statements included Page's response to a reference to "the 1980 October Surprise," where Page stated that there would be a "different October Surprise" this year and later stated that "well I want to have the conspiracy theory about the, uh, the Ru- the next email dump with these, uh, 33 thousand, you know." In the application, the FBI assessed that these statements, along with other evidence, indicated that Page was aware of the pending leak of DNC emails.[373] As previously described in Chapter Five, none of the applications advised the court of other statements Page made during this meeting, including

---

[373] On or about November 6, 2016, WikiLeaks released a second set of DNC emails.

that he had "literally never met" Manafort, had "never said one word to him," and that Manafort had not responded to any of Carter Page's emails.

As described in Chapter Five, we found that information about the August 2016 meeting was not included in any of the three prior FISA applications because it was not shared with the OI Attorney until on or about June 20, 2017, when Case Agent 6 sent the OI Attorney a 163-page document containing the statements made by Carter Page during the meeting. The OI Attorney told us that he used the 163-page document to accurately quote Page's statements concerning the "October Surprise" in the final renewal application but that the OI Attorney did not read the other aspects of the document and that the case agent did not flag for him the statements Page made about Manafort. The OI Attorney told us that these statements, which were available to the FBI before the first application, should have been flagged by the FBI for inclusion in the FISA applications at that time because the statements were relevant to the court's assessment of the allegations concerning Manafort using Page as an intermediary with Russia. Case Agent 6 told us that he did not know that Page made the statement about Manafort because the August 2016 meeting took place before he was assigned to the investigation. He said that the reason he knew about the "October Surprise" statements in the document was that he had heard about them from Case Agent 1 and did a word search to find the specific discussion on that topic. Case Agent 6 further told us that he added the "October Surprise" statements in consultation with the OI Attorney after the OI Attorney asked him if there was other information in the case file that would help support probable cause.

Case Agent 1 assisted in the preparation of the first application and told us that he did not recall why he did not include the "October Surprise" statements in the first application. He told us that he remembered that he thought it was an "odd exchange" between Page and the CHS at the time, and he said may have thought that it would have been difficult to convey to the court what Page's words meant.

Similar to the previous applications, Renewal Application No. 3 did not advise the court of information provided to the FBI in August 2016 regarding Carter Page's relationship with another U.S. government agency and information Page had shared with the other agency about his contacts with Russian intelligence officers, contacts that overlapped with facts asserted in the FISA application. This was so even though the FBI re-engaged with the other U.S. government agency in June 2017, following interviews that Page gave to news outlets in April and May 2017 during which Page stated that he had assisted the USIC in the past. SSA 2, who was to be the affiant for the third renewal and had been the affiant for the first two renewals, told us that he wanted a definitive answer as to whether Page had ever been a source for the other U.S. government agency before the final renewal application because he was concerned that Page could claim that he had been acting on behalf of the U.S. government in engaging with certain Russians. As we describe in Chapter Eight, this led to interactions between the FBI OGC Attorney and a liaison from the other U.S. government agency, who reconfirmed the information that the other agency had provided to the FBI in August 2016 that Page did have a prior relationship with that other agency. However, for reasons we detail in Chapter

Eight, that information was not accurately provided to either SSA 2 or OI by the OGC Attorney and was therefore not included in the third renewal application.

### 2.    Review and Approval Process

As with Renewal Application Nos. 1 and 2, Baker told us he did not review Renewal Application No. 3.  Baker told us that he questioned whether it was worthwhile to seek another renewal because Carter Page was no longer using the facilities the FBI was monitoring, and that from a management perspective, an additional renewal was not worth the expenditure of resources.  Baker recalled discussions about whether the FISA was still productive and providing any foreign intelligence, but the decision was made to continue with the renewal because there was still an opportunity to obtain foreign intelligence information.  Anderson did not recall whether she reviewed the third renewal application, and we found no evidence that anyone else in OGC above the OGC Unit Chief level did so.

On June 21, the OI Unit Chief sent the OI Attorney, Case Agent 6, and the OGC Attorney questions after reviewing the draft application.  The OI Unit Chief's questions focused on whether there were updates to assessments from the prior renewals.  On June 22, following email communications with Case Agent 6 to finalize the edits and questions from the OI Unit Chief, the OI Attorney emailed the read copy to Evans, Sanz-Rexach, the Deputy Operations Section Chief, and Case Agent 6.  The OI managers and Evans told us that they did not recall their feedback, and Evans said he was not sure whether he reviewed this final application before it was filed.

On June 23, the same day the read copy was submitted to the court, Evans emailed Gauhar the application for ODAG's review.  Unlike the read copy for the three prior Carter Page FISA applications, we found no information indicating that ODAG received and approved the read copy in advance of OI filing it with the court.  With Renewal Application No. 3, it appears NSD followed the more typical practice of submitting the application to ODAG shortly before the DAG approved and signed the final application.

### 3.    Feedback from the FISC, Completion of the Final Renewal Application and Woods Procedures, and FBI Director Certification

On June 28, the OI Attorney advised Evans, Sanz-Rexach, and OI's Deputy Operations Section Chief that, based on the read copy, the judge would approve Renewal Application No. 3.  According to the OI Attorney's email to his supervisors, the judge "believed there was enough to let us go one more time and he will approve without a hearing."  The OI Attorney told the OIG that the words, "let us go one more time" were his words and not the words of the judge.  He said that he was not trying to imply that the judge said that the court would not approve another renewal.

Before the court's feedback, the OI Unit Chief "signed out" the cert copy of the application and cert memo to the FBI, so that the FBI could complete the

Woods Procedures. Emails reflect that a few additional minor edits were made to the cert copy after the read copy was filed and prior to the completion of the Woods Procedures.

Case Agent 7 was a relatively new FBI special agent who was responsible for compiling the supporting documentation into a Woods File and performing the field office database checks on Carter Page and the accuracy review of each fact asserted in the FISA application. Case Agent 7 told us that he had been assigned to assist in the Carter Page investigation sometime in spring 2017. Case Agent 7 was responsible for confirming that the file contained appropriate documentation for the factual assertions in the FISA application. Case Agent 7 told us that when he conducted the factual accuracy review on Renewal Application No. 3, he reviewed every fact to re-verify the accuracy of factual assertions carried over from prior applications and made sure every factual assertion had appropriate documentation in the Woods File. During the Woods process, Case Agent 6 and Case Agent 7, identified some documents that were missing from the Woods File, and added them in order to provide support for the pertinent factual assertions in Renewal Application No. 3. After Case Agent 7 completed the Woods process, he signed the Woods Form and gave the Woods Form and Woods File to SSA 5, who was Case Agent 7's supervisor in NYFO. SSA 5 told us he made sure every factual assertion in the application had a supporting document in the Woods File. SSA 5 signed the Woods Form on June 27, affirming the verification and documentation of each factual assertion in the application, and then sent the FISA application package containing the Woods Form, cert copy, and cert memo to the Headquarters Program Manager assigned the responsibility of signing the final application, as the affiant, under oath that the factual information was true and correct.[374]

As with the prior renewal applications, the Headquarters Program Manager assigned as the affiant for the final renewal application was SSA 2. SSA 2 told us that he believed he reviewed the newly added information in the renewal. In addition, SSA 2 said that as the affiant, it was his practice to review the Woods Form to make sure it was completed by the case agent and an SSA before signing off on the application and submitting it to an OGC attorney (as described in Chapter Two, the Woods Procedures did not require the affiant to review the Woods File, only the case agent and his or her supervisor). SSA 2 told us that he believed everything in the application was true and correct. SSA 2 signed the affidavit affirming under penalty of perjury that the information in the package was true and correct. He then submitted the FISA application package to the OGC Attorney for legal review.

---

[374] The OIG examined the completeness of the Woods File by comparing the facts asserted in Renewal Application No. 3 to the documents maintained in the Woods File. Our comparison identified instances in which facts asserted in the application were not supported by documentation in the Woods File. Specifically, we found facts that are asserted in the FISA application that have no supporting documentation in the Woods File, facts that have purported supporting documentation in the Woods File but the documentation does not state the fact asserted in the FISA application, or facts that have purported supporting documentation in the Woods File but the documentation shows the fact asserted is inaccurate. We provide examples of specific errors in Appendix One.

The OGC Attorney, who had participated in the drafting process and was familiar with the content of the application, told us that he reviewed the Woods Form with the Headquarters Program Manager. After the OGC Attorney confirmed that all of the Woods Procedures had been completed, he signed the cert memo below the OI Unit Chief's signature and submitted the package to OGC Unit Chief 2 who was assigned to perform the supervisory legal review.[375]

OGC Unit Chief 2 told us that he could not recall whether he read Renewal Application No. 3 in its entirety or just the probable cause portion. He said that his general practice is to rely upon the cert memo's description, and if something "triggers" his inclination to go further, he will read some or all of the application. OGC Unit Chief 2 told us that he was sure he reviewed the cert memo and Woods Form and, based on those documents, determined that the application package was complete, all the steps of the Woods Procedures were represented to have been taken, the probable cause standard was met, and there were no outstanding issues. He then signed the cert memo, signifying that the application was ready for certification and for submission to the FBI Director.

Then Acting Director McCabe signed Renewal Application No. 3 on June 28, certifying that the information sought was foreign intelligence information that could not reasonably be obtained by normal investigative techniques and was necessary to protect the United States against clandestine intelligence activities. McCabe told us that he did not recall whether he reviewed the entire FISA application package or whether he relied primarily upon the cert memo and his familiarity with the Carter Page investigation before he made the required certification. He told us that he understood at the time he signed the application that the FBI, Department, and FISC were comfortable with the application such that it was not "a great stretch" for him to sign the certification.

## 4. DAG Oral Briefing and Approval

On April 26, 2017, Rod Rosenstein was confirmed as the Deputy Attorney General. Gauhar remained the Associate Deputy Attorney General (ADAG) responsible for ODAG's national security portfolio and told us that she worked primarily with Crowell to complete the ODAG review of Renewal Application No. 3. Crowell told us he read the application but relied on Gauhar and NSD to advise Rosenstein on this application.

Shortly after he was sworn in as DAG, Rosenstein received briefings about the Crossfire Hurricane investigation. Rosenstein told us that, as a result, he was more familiar with the facts of the case than is typical for FISA applications. Rosenstein received a copy of the application in advance of NSD's oral briefing, and told us he "would have looked through it." Although he could not recall whether he

---

[375] Chapter Two describes the signature from NSCLB necessary for approval on the cert memo as Senior Executive Service (SES) level. Witnesses told us that usually the SES-level supervisor is an NSCLB section chief or a Deputy General Counsel, but that, on occasions, the role is delegated to a GS-15 Unit Chief.

reviewed the application in its entirety, he recalled reading enough to understand the substance of the allegations involved.

Rosenstein told us that he had reviewed FISA applications almost every day after his confirmation, and he believed Renewal Application No. 3 was "above average" in terms of the justification for the continued coverage in the renewal. He said that he was in a different position than those who considered the previous applications because by the time he received the application, many different Department officials had approved the prior ones and three different federal judges had found probable cause. He also said he had a conversation with Boente about the application in which Boente expressed the view that a DAG should not refuse to sign a FISA application that establishes probable cause, and when there is a legitimate basis for conducting the investigation, just because it could end up becoming "politically embarrassing" at some later point.[376]  Further, Rosenstein told us that he did not view the application as being "particularly sensitive" when he received it in June 2017 because at that time the campaign was over, and Carter Page did not have any connection to the Trump Administration.

On June 29, OI's Deputy Operations Section Chief provided a briefing on the June renewal application to Rosenstein, and, according to Gauhar, Rosenstein brought his copy of Renewal Application No. 3 to the briefing.  Gauhar and the Deputy Operations Section Chief did not recall any significant questions during the briefing about the renewal.  However, Rosenstein told us that he recalled raising a question (at this briefing or immediately before it) about whether continued FISA coverage was going to produce useful information given that the FISA coverage targeting Carter Page had been leaked to the media.  He said that he remembered being told that this renewal would likely be the last one unless new evidence was uncovered.

On June ██, Rosenstein signed the application, and the application was submitted to the FISC the same day.  By his signature, and as stated in the application, Rosenstein found that the application satisfied the criteria and requirements of the FISA and approved its filing with the court.[377]

### 5.    Final Orders

The final FISA application included proposed orders, which were signed by FISC Judge Raymond J. Dearie, on June ██, 2017.  According to NSD, the judge signed the final orders, as proposed by the government in their entirety, without holding a hearing.

The primary order and warrant stated that the court found, based upon the facts submitted in the verified application, that there was probable cause to believe

---

[376]  On June 26, Boente, who at the time was serving as the Acting Assistant Attorney General for NSD, received the read copy of Renewal Application No. 3.  Boente told us he had no recollection of reading the application.

[377]  Rosenstein's signature also specifically authorized ████████████████████████
████████████████████████████████████████████████

that Russia is a foreign power and that Carter Page was an agent of Russia under 50 U.S.C. § 1801(b)(2)(E).  The court also found that 

court authorized the requested electronic surveillance for 90 days and necessary to effectuate the electronic surveillance authorized by the court.

Approximately 1 year after this final FISA application, in July 2018, NSD submitted a letter to the FISC, advising the court of certain factual omissions in the Carter Page FISA applications that came to NSD's attention after the last renewal application was filed.  In the next chapter we describe this compliance letter to the FISC and the omissions detailed in it, as well as other instances, not known to NSD at the time but identified by the OIG during this review, in which factual assertions relied upon in the three Carter Page renewal applications were inaccurate, incomplete, or unsupported by appropriate documentation, based upon information in the FBI's possession at the time the applications were filed.

# CHAPTER EIGHT
# MISSTATEMENTS, OMISSIONS, AND ERRORS IN THE FISA RENEWAL APPLICATIONS

As we describe in this chapter, the three Carter Page renewal applications contained a number of factual representations that were inaccurate, incomplete, or unsupported by appropriate documentation, based upon information in the FBI's possession at the time the applications were filed.  On July 12, 2018, approximately one year after the final FISA renewal application, the National Security Division (NSD) sent a letter to the Foreign Intelligence Surveillance Court (FISC) advising the court of certain factual omissions in the Carter Page FISA applications that came to NSD's attention after the last renewal application was filed.  The information, which had been in the FBI's possession, included certain statements made by George Papadopoulos to FBI confidential human sources (CHSs), information provided to the FBI by Department attorney Bruce Ohr as a result of Ohr's conversations with Christopher Steele, and admissions Steele made in court filings in foreign litigation regarding his interactions with the media.  We found no evidence that officials in NSD had been told of this information or were aware of these omissions at the time the four FISA applications were filed with the court. Further, we found no evidence suggesting that the senior Department officials who approved the various FISA applications—Deputy Attorney General (DAG) Sally Yates (the first application and first renewal), Acting Attorney General Dana Boente (the second renewal), or DAG Rod Rosenstein (the third renewal)—were aware of these issues at the time they signed the FISA applications.

We also detail instances not described in the July 2018 letter to the FISC, but identified by the OIG during the course of this review, in which factual assertions made in the three renewal applications were inaccurate, incomplete, or unsupported by appropriate documentation, based upon information in the FBI's possession at the time the applications were filed.  These included inconsistencies between Steele's reporting and information provided by his Primary Sub-source to the FBI; information provided to the FBI by another U.S. government agency about Page's prior relationship with that agency; information concerning Steele's past work-related performance; information regarding the connection between Steele's reporting and the Democratic Party, the Democratic National Committee (DNC), and the Hillary Clinton campaign; information from the FBI's human source validation report concerning Steele; denials by Joseph Mifsud to the FBI; and information about Carter Page's lack of involvement in the change in the Republican Party platform concerning Russia and Ukraine.  We found no evidence that Yates was aware of these issues at the time she approved the first FISA renewal application.  We found that Boente was also unaware of these issues when he approved the second renewal application, with one exception concerning information regarding the ties between Steele's reporting and the Democratic Party. Boente recalled knowing the information at the time he approved the second renewal.  We found that Rosenstein was unaware of the issues we identified at the time he approved the third renewal application.  With respect to the ties between Steele's reporting and the Democratic Party, Rosenstein told us he believes he

learned that information from news media accounts, but did not recall whether he knew it at the time he approved the third renewal.

## I. Omissions in the FISA Applications, as NSD Reported to the FISC in July 2018

Under Rule 13(a) of the FISC Rules of Procedure, the government has an obligation to correct any and all misstatements or omissions of material fact in its submissions to the court. Although the Rules do not define or otherwise explain what constitutes "material" facts or omissions, the FBI's Foreign Intelligence Surveillance Act and Standard Minimization Procedures Policy Guide (FISA SMP PG) states that a fact or omission is "material" if it is relevant to the court's probable cause determination. According to NSD supervisors, NSD will consider a fact or omission material if the information is capable of influencing the court's probable cause determination, but NSD will err on the side of disclosure and advise the court of information that NSD believes the court would want to know.

On July 12, 2018, about1 year after the last Carter Page FISA application was filed with the FISC, the NSD Assistant Attorney General submitted a letter to FISC Presiding Judge Rosemary Collyer under Rule 13(a), advising the court of certain factual omissions in the Carter Page FISA applications. These omissions included:

1.  Statements made by George Papadopoulos to FBI CHSs in September and October 2016 denying that anyone involved in the Donald J. Trump for President Campaign was coordinating with Russia in the DNC hack or release of emails;

2.  Information Department attorney Bruce Ohr provided to the FBI in November and December 2016 relevant to Steele's motivations and reliability; and

3.  Admissions Steele made in April and May 2017 regarding his interactions with the news media in the summer and fall of 2016.

According to NSD supervisors, the Rule 13 Letter was initially prompted by NSD's receipt and review of the Ohr information in late January 2018. At about the same time, the FBI advised NSD and the Office of the Deputy Attorney General (ODAG) of admissions Steele made in court filings in foreign litigation in April and May 2017 concerning his media contacts. Later, in May 2018, while a draft of the letter was under review, NSD learned of Papadopoulos's September 2016 denial from ODAG, which ODAG had recently identified during a review of FBI documents. Then, in June 2018, NSD learned of Papadopoulos's October 2016 denial from the FBI, after asking the FBI to recheck its files for any other information that should be disclosed to the court.

In the Rule 13 Letter, NSD stated that, after the filing of the Carter Page FISA applications, NSD became aware of additional information relevant to the applications, and that some of this information was subject to Rule 13(a). The letter did not specify which information the government believed was material and

therefore subject to Rule 13(a), and which information it believed was not. However, the letter stated that some of the additional information had been discussed publicly and that the government was providing all of the information "out of an abundance of caution" to ensure that the court had a complete understanding of the additional information.[378] The letter concluded by asserting that "even considering the additional information regarding Papadopoulos'[s] conversations with [an FBI CHS] and others, and regarding [Steele], the applications contained sufficient predication for the Court to have found probable cause that Page was acting as an agent of the Government of Russia."

According to NSD supervisors, as of October 2019, NSD had not received a formal response from the FISC to the Rule 13 Letter.[379] According to then Deputy Assistant Attorney General Stuart Evans, in his experience, although not in every case, there have been occasions in which the FISC has responded to Rule 13 letters, either by issuing a supplemental order, asking the government for more information, or holding a hearing. On January 31, 2019, Evans told the OIG that NSD had advised FISC Presiding Judge Rosemary Collyer that, through participation in OIG interviews, NSD Office of Intelligence (OI) officials learned of additional information that was possibly material to the Carter Page FISA applications, and that NSD planned to wait until after the OIG completed its review and provided its findings to the Department before determining whether to submit another Rule 13 letter to the court.[380] NSD supervisors told us that they believe the court may be waiting for the completion of the OIG's review, and the submission of any potential supplemental filings by NSD, before taking responsive steps, if any.

---

[378] Regarding the public discussion referenced in the letter, NSD cited to the memoranda from the House Permanent Select Committee on Intelligence (HPSCI) majority and HPSCI minority regarding the Carter Page FISA applications, and a memorandum from Senators Charles Grassley and Lindsey Graham to DAG Rosenstein and FBI Director Christopher Wray concerning Steele and his reporting, which were all publicly released in February 2018.

[379] On May 10, 2019, NSD sent a second letter to the FISC concerning the Carter Page FISA applications, advising the court of two incidents in which the FBI failed to comply with the Standard Minimization Procedures (SMPs) applicable ▮▮▮▮▮▮▮▮▮▮▮▮ pursuant to the final FISA orders issued by the court on June ▮, 2017. According to the letter, the FBI took and retained on an FBI-issued cell phone ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ which NSD assessed did not comport with the SMPs. In addition, in a separate incident ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to an electronic folder on the FBI's classified secret network, which NSD assessed also did not comport with the SMPs. According to NSD, court staff contacted an NSD official in response to this letter and asked when the information at issue would be removed from non-compliant FBI systems, and asked about other cases that might be impacted by the same problem. On October 9, 2019, NSD sent another letter to the FISC advising the court that the FBI completed the remedial process for the information associated with the Page FISA applications and information from other cases impacted by the same problem.

[380] Later in the chapter, we discuss other instances, not described in the July 2018 Rule 13 Letter, in which the three Carter Page renewal applications were inaccurate, incomplete, or unsupported by appropriate documentation, based upon information in the FBI's possession at the time the applications were filed.

## A.   Papadopoulos's Denials to FBI Confidential Human Sources

In Chapter Five, we described how the first Carter Page FISA application did not include statements Papadopoulos made to an FBI CHS in September 2016 that were in tension with other information included in the application.[381]  Specifically, in September 2016, Papadopoulos told the CHS that, to his knowledge, no one associated with the Trump campaign was collaborating with Russia or with outside groups like WikiLeaks in the release of emails.  We were advised by NSD that it did not know about this denial by Papadopoulos until May 2018, after ODAG found the information while reviewing documents in response to Congressional information requests.  Upon learning the information, NSD incorporated Papadopoulos's denial into the Rule 13 Letter.[382]

As described in Chapter Five, Case Agent 1 told us that he did not recall whether he advised the OI Attorney about Papadopoulos's denial in September 2016 but that, if he did not, it may have been an oversight.  He also told us that the Crossfire Hurricane team's assessment was that Papadopoulos's denial to the CHS was a rehearsed response, and Case Agent 1 did not view the information as particularly germane to the investigation of Carter Page.[383]  However, Evans told us that because Papadopoulos's denial was inconsistent with the theory that Papadopoulos had received (or was aware of) an offer from the Russians involving the release of emails, there was no question in Evans's mind that the information was material and would have been disclosed to the court had NSD known about it at the time of the FISA applications.

After NSD incorporated Papadopoulos's statements into the Rule 13 Letter, and before the final letter was submitted to the court, the FBI advised NSD of similar, previously undisclosed statements made by Papadopoulos to a CHS after the first Carter Page FISA application was filed but before the renewal applications.[384]  Specifically, in October 2016, when asked if the Trump campaign was involved in the DNC email hack, Papadopoulos told the CHS that the campaign was not involved and that it would have been illegal to have done so.  Papadopoulos also said that he did not think Russia was "playing" with the election

---

[381]  We summarize the information this CHS obtained from Papadopoulos in Chapter Ten.

[382]  In a footnote, NSD advised the court that Papadopoulos made similar statements directly to the FBI in a January 2017 interview.  The renewal applications did not advise the court of these January 2017 statements, but did advise the court that Papadopoulos had been interviewed by the FBI and denied that he discussed anything related to the Russian government with FFG officials.  As discussed in Chapter Seven, the renewal applications did not include that Papadopoulos made other statements during his interviews with the FBI, including statements that minimized Carter Page's role in the Trump campaign and statements that Person 1 (whom the FBI assessed was the likely source for some of the Steele reporting relied upon in the applications, including the allegations against Page) told Papadopoulos that he/she (Person 1) had no knowledge of the information reported in "the recent Trump Dossier."

[383]  As noted previously, after reviewing a draft of this report, Case Agent 1 told us that he and the team discounted Papadopoulos's denials for several reasons, but that, in hindsight, he now realizes that the denials, and the team's assessment of those denials, should have been shared with OI.

[384]  We summarize the information the CHS obtained from Papadopoulos in Chapter Ten.

or had any interest in it.  Case Agent 1 received a document with these Papadopoulos statements included in it a few days after the October 2016 meeting (well before Renewal Application No. 1 was filed).  Case Agent 1 told us that he was familiar with this CHS meeting at the time and probably reviewed the summary of the interview containing these statements, but Case Agent 1 said he did not recall why the statements were not shared with OI or included in the subsequent renewal applications.  He said that the information would not have been purposely withheld from OI, but it may have been accidentally omitted from the information provided to OI for the renewal application.

In the Rule 13 Letter, NSD advised the court of these statements and added that Papadopoulos told the CHS in October 2016 that ███████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████. The letter further stated that by March 2017, Papadopoulos had denied any campaign involvement in the release of DNC emails on WikiLeaks during interviews conducted by the FBI and that those denials were included in Renewal Application Nos. 2 and 3.

The Rule 13 Letter stated that NSD would have included Papadopoulos' denials to the FBI CHSs in the Carter Page FISA applications had NSD known about them at the time.  The letter further stated that, even if the information had been included in the FISA applications, it was the government's position that the "totality of information submitted in these applications concerning Page's activities was sufficient to support the Court's finding of probable cause that Page was acting as an agent of a foreign power."  The letter included a footnote advising the court that Papadopoulos had been charged and pled guilty to making false statements and omissions that impeded the FBI's investigation.  Evans told the OIG that the government's position was based in part on the fact that the FFG information concerning Papadopoulos was only one of many different pieces of information that supported the court's probable cause determination as to Carter Page.  Further, according to Evans, this new information concerning Papadopoulos's denials was "cumulative" in that Renewal Application Nos. 2 and 3 had already advised the court that Papadopoulos had denied informing the FFG of any campaign involvement in the release of DNC emails on WikiLeaks during interviews with the FBI.

## B.  Information the FBI Received From Bruce Ohr Concerning Steele and His Reporting

In Chapter Nine, we describe the relationships and communications Ohr had with Steele and Glenn Simpson whose company, Fusion GPS, hired Steele to conduct the research on Trump's ties to Russia.  We also describe the information Ohr passed to then Deputy Director Andrew McCabe in mid-October 2016 about Steele and his reporting, as well as the information Ohr passed to the Crossfire Hurricane investigative team beginning in November 2016 and continuing until the Special Counsel's appointment in mid-May 2017.  At the time of these

communications, Ohr was an Associate Deputy Attorney General (ADAG) and Director of the Organized Crime and Drug Enforcement Task Force (OCDETF) within ODAG. However, as we describe in the next chapter, Ohr's interactions with Steele and Simpson were outside Ohr's areas of responsibility, and he did not advise anyone in ODAG that he was meeting with Steele, Simpson, or the FBI about Steele's election reporting.

As described in Chapter Nine, the FBI interviewed Ohr on multiple occasions in 2016 and 2017 and those interviews were memorialized in FD-302s. Of particular relevance to the Carter Page FISA renewal applications, during the first interview of Ohr on November 21, 2016, which was attended by FBI officials overseeing the Crossfire Hurricane investigation—including Deputy Assistant Director (DAD) Peter Strzok, the Chief of the Counterintelligence Division's (CD) Analysis Section 1 (Intel Section Chief), and SSA 1—and by the FBI's Office of the General Counsel (OGC) Unit Chief, Ohr advised the FBI of the following:[385]

- Ohr met with Steele in July and September 2016 during which Steele advised Ohr of Steele's election reporting and who had hired him;

- Simpson, who hired Steele, was himself hired by a lawyer "who does opposition research," and Steele's reporting was going to Hillary Clinton's presidential campaign, an identified State Department official, and the FBI;

- Simpson was passing Steele's reporting to "many individuals or entities," and at times Steele would attend meetings with Simpson;

- Steele was "desperate that Donald Trump not get elected and was passionate about him not being the U.S. President;"

- Steele and Simpson could have met with *Yahoo News* or the author of the September 23 news article jointly, but Ohr did not know if they met jointly; and

- Ohr never believed Steele was "making up information or shading it."

Further, during subsequent interviews on December 5 and 12, 2016, Ohr advised members of the Crossfire Hurricane team that:

- Simpson directed Steele to speak to the press, which was part of what Simpson was paying Steele to do. Ohr did not know whether speaking with *Mother Jones* was Simpson's idea or not; and

- Simpson asked Steele to speak to *Mother Jones* as it was Simpson's "Hail Mary attempt."

---

[385] The FD-302 documenting this November 2016 interview stated that the interview took place on November 22, 2016, which SSA 1 told us was incorrect. Because the date noted on the FD-302 incorrectly stated that the interview took place on November 22, the Rule 13 Letter also incorrectly stated that the interview took place on November 22.

None of the Carter Page FISA renewal applications included any information obtained from Ohr during the course of the Crossfire Hurricane investigation, even though the interviews described above took place before Renewal Application No. 1 was filed in January 2017. In the Rule 13 Letter, NSD advised the court that NSD officials were not aware of the FBI's interviews of Ohr at the time of the renewal applications, and we found no documentation indicating otherwise. Further, Evans, the OI supervisors, and the OI Attorney who drafted the applications told us that they were not aware at the time of the renewal applications that Ohr had provided information to the FBI related to the Crossfire Hurricane investigation. Similarly, Yates, Boente, Rosenstein, and the ODAG officials who reviewed the renewal applications told us that they were also not aware that Ohr had provided the FBI with information related to the Crossfire Hurricane investigation.

As described in Chapter Nine, handwritten notes of an FBI briefing Boente received in February 2017 indicate that the FBI advised Boente and others at that time—including Evans, then Acting Assistant Attorney General Mary McCord, then Deputy Assistant Attorney General George Toscas from NSD, ADAG Tashina Gauhar, ADAG Scott Schools, and Principal ADAG James Crowell—that Ohr knew Steele for several years and remained in contact with him, and that Ohr's wife worked for Simpson as a Russian linguist. However, none of these handwritten notes—which include separate notes taken by Boente, Schools, and Gauhar—stated that the FBI had interviewed Ohr or that Ohr had provided the FBI with information regarding Steele's election reporting or Steele's feelings toward candidate Trump. Schools told us that he recalled a meeting in which the OGC Unit Chief referenced Ohr having contact with Simpson, but Schools was not sure if it was during this February 2017 briefing or another briefing. Further, he said that it was a "passing reference," and he never would have imagined that Ohr was having regular contact with the Crossfire Hurricane team and providing the information that appeared in the FD-302s. Boente and the other attendees of the February 2017 briefing told the OIG that they did not recall the FBI mentioning Ohr at any time during the investigation, and that they did not know about the FBI's interviews with Ohr at the time of the FISA applications. According to Gauhar, she was surprised to find a reference to Ohr in her notes, and, regardless, she "would never have dreamt" back then what she knows now concerning the extent of Ohr's interactions with Steele, Simpson, and the FBI on Steele's election reporting.

According to Gauhar, she first learned of Ohr's connections to the Crossfire Hurricane investigation from media reports in early January 2018. She said that around this same time, Schools gave her a copy of a January 4, 2018 letter from Senators Grassley and Graham to the Department, which referenced the FBI's interviews of Ohr. Emails reflect that on January 8, Gauhar forwarded this letter to Evans, and 2 days later Evans forwarded the letter to OI. According to Evans, this was the first time he learned about Ohr's interactions with the FBI on the Crossfire Hurricane investigation. Evans also said that when he consulted with the OI supervisors and OI Attorney who had worked on the Carter Page FISA applications, he learned that Ohr's involvement was "a surprise to all of us." Shortly thereafter, Evans requested and obtained the FD-302s documenting the Ohr interviews, and days later OI completed a first draft of the Rule 13 Letter.

Handwritten notes taken during a meeting in late January 2018 indicate that OGC's Deputy General Counsel Trisha Anderson told Gauhar, Evans, and OI supervisors that it had been reported to her that the FBI's New York Field Office (NYFO), which at the time had responsibility for the Carter Page investigation, had reviewed the FD-302s contemporaneously with Renewal Application No. 1 and decided that the information from Ohr was not relevant to the Carter Page FISA request. The notes further stated that the case agent handling the FISA request had been focused at that time on information relating to Carter Page's own activities and the FBI's termination of its source relationship with Steele.

Case Agent 1, who, as described previously in Chapter Seven, worked with OI in preparing Renewal Application No. 1 and later assisted Case Agent 6 with Renewal Application No. 2, told the OIG that he did not attend any of the interviews with Ohr. He also said that the information coming from Ohr was not a main focus for him personally. He told us, and documents reflect, that he received information about the Ohr interviews during at least one team meeting in December 2016 and through instant messages with SSA 1 that same month. Case Agent 1 told us that he recalled hearing about Steele being "desperate" about Trump, possibly during the team meeting in December 2016, but Case Agent 1 said he was unable to explain why that information was not included in the renewal applications. He said that he could not recall why he did not share the FD-302s of the Ohr interviews with OI. He said that he did not recall the details very well about the "desperate" comment or the discussions the team had about it, but he remembered thinking that the comment reflected the same potential bias as political opposition research, which was already articulated to the court. He further stated that, with respect to Ohr, he was primarily concerned with whether Ohr had any additional reports from Steele that the FBI did not possess. Because Case Agent 1 understood that there were no differences in the reporting Ohr and the FBI possessed, he said his thought was "unless [Ohr] gets more information that's germane to the investigation," he was going to keep his attention focused on other aspects of the investigation.

Other FBI officials responsible for helping OI draft the renewal applications or performing the Woods Procedures were also unable to explain why the FBI did not include any information from Ohr about Steele. SSA 3, who, as described previously, performed the supervisory factual accuracy review for Renewal Application No. 1 after Case Agent 1 completed the initial review, told us that he had just joined the case at the time he performed the Woods Procedures. SSA 3 said he had not been part of any discussions about what information to include or not to include in the renewal application and did not know why information from the Ohr interviews was not included. Case Agent 6, who helped OI draft the final two renewal applications, told us that he could not explain why information from Ohr was not included in the applications. Case Agent 6 said that no one told him about the Ohr interviews when he joined the case after Renewal Application No. 1 was filed. He said that he saw the FD-302s in the case file and glanced at them, but he did not think he knew at the time about the "desperate" comment or the information from Ohr about Steele's media contacts. His supervisor, SSA 5, who also joined the case after Renewal Application No. 1, said that he did not recall being aware at the time he performed the supervisory factual accuracy review on

Renewal Application Nos. 2 and 3 that Ohr had been interviewed by the FBI and had provided information about Steele.

The OGC Attorney did not attend the Ohr interviews or read the FD-302s, but he told us, and documentation reflects, that he attended the team meeting in December 2016 during which the first two Ohr interviews were discussed. He told us that although he recalled learning about the "desperate" comment, he did not believe at the time that it needed to be included in the renewal applications because the comment was only Ohr's opinion of Steele's feelings toward Trump. In addition, he said he believed that the renewal applications already addressed Steele's personal motivations through the new footnote advising the court of the circumstances that led to Steele's disclosures to *Mother Jones* and his closure as a CHS.

The OGC Unit Chief attended the first interview of Ohr in November 2016 and heard the information Ohr provided first hand. She said that the information did not change her perspective on Steele or cause her to believe the renewal applications needed to be updated. In particular, she explained that she was given the impression during Ohr's interview that Steele's research led to his views about Trump being elected president, rather than the other way around. She said she was reassured by Ohr's statements about Steele's truthfulness. She told the OIG that she believed at the time that the FBI had provided the FISC with all necessary information concerning Steele's potential bias and motivations through the footnotes describing the genesis of his research and the reasons the FBI eventually closed him as a CHS. For these reasons, she said it did not occur to her at the time to advise OI of the information Ohr provided, and that in any event, she would have deferred to the agents on the investigative team who were responsible for assisting OI with the application to advise OI. However, she said that given the "second-guessing" that occurred on that point after the Ohr interviews became more broadly known, she now believes that the investigative team should have provided the information to OI at the time of the renewal applications.

In the Rule 13 Letter, NSD advised the court that some of the information Ohr provided to the FBI during his November and December 2016 interviews

> goes beyond what was included in the applications. In particular, the Ohr information states specifically that the source's work was "going to" Candidate #2's [Hillary Clinton's] campaign. This information is consistent with, although goes somewhat further than the applications, which informed the Court, that "the FBI speculates that the identified U.S. person [who hired Source #1] was likely looking for information that could be used to discredit Candidate #1's [Donald Trump's] campaign." With respect to Ohr's statements concerning the strength of the Source's desire to see Candidate #1 lose and the Source's October 2016 media engagement, this information is additional to but consistent with the applications, already informing the Court that Source #1 spoke with the press in October 2016, in violation of the FBI's admonishment, and was motivated to do so because he was "frustrated" that the FBI Director's actions "would likely influence the

2016 U.S. Presidential election." The applications further stated that the FBI had suspended, and then closed its relationship with Source #1, and then closed him as a source, due to these actions. Moreover, during the November 22nd interview Ohr also stated that in his dealings with Source #1 he "never believed [Source #1] was making up information or shading it." Ultimately, none of the additional information altered the FBI's assessment of Source #1's reliability.

According to Evans, there was no question that OI would have included the Ohr information in the renewal applications had OI been made aware of it, because of its practice of erring on the side of disclosing information to the FISC. However, Evans told us that NSD ultimately did not believe that any of the information was material to the court's probable cause determination because the information was "largely cumulative" of other information in the applications concerning Steele's potential bias. He agreed, however, that the "desperate" comment provided "another strain of potential bias" because the "desperate" comment pertained specifically to Steele's own potential bias and motivations, whereas the disclosures in the FISA applications concerning the origins of Steele's research focused on the motivation of Simpson, who hired Steele, not Steele specifically.

### C.   Inaccuracies Regarding Steele's Disclosures to Third Parties and Admissions Concerning Steele's *Yahoo News* Contact

In Chapter Five, we described the footnote in the first Carter Page FISA application providing the FBI's assessment that Steele was not the direct source of the disclosure to *Yahoo News* in September 2016 about the FBI's investigation of Carter Page and Page's alleged meetings with Igor Sechin and Igor Divyekin. The basis for this assessment–that Steele told the FBI that he "only provided his information to [Simpson] and the FBI"–was neither accurate at the time nor supported by appropriate documentation. Nevertheless, the FBI repeated this error in all three renewal applications. In the Rule 13 Letter, NSD advised the FISC of this error, noting that the FBI knew before the first application that Steele also provided his information to a State Department official and knew before the first renewal that Steele provided his information to Ohr and Senator John McCain's office.

The Rule 13 Letter also advised the court of additional information the FBI obtained after the first FISA application—but that was not included in any of the renewal applications—that further undermined the FBI's assessment that Steele was not a direct source of the *Yahoo News* disclosure. Specifically, the Rule 13 Letter advised the court that in November 2016, Ohr told the FBI that it was possible that Steele and Simpson, who hired Steele, met jointly with *Yahoo News*, based on information Ohr learned from Steele in late September 2016. In addition, the letter advised that in December 2016, Ohr told the FBI that part of the work Simpson was paying Steele to do included speaking with the media. We found no evidence that the Crossfire Hurricane team, or any FBI officials overseeing the investigation, considered advising the court or OI of this information at the time of the renewal applications. As referenced above, FBI personnel involved in the FISA

applications said they did not believe at the time that information from Ohr warranted any changes to the application.

However, by the time of Renewal Application No. 3, the FBI had learned information that more strongly indicated that Steele had directly provided information to *Yahoo News* around the time of the September 23 article. Yet, no revisions were made to the FBI's assessment, contained in Renewal Application No. 3, that Steele had not directly provided the information to the press. Media reporting in late April 2017 described statements Steele made in a court filing (pertinent to a lawsuit filed against him and others in a foreign court) concerning his interactions with the media. Specifically, one article excerpted a sworn statement dated April 3, 2017, in which Steele admitted that he gave "off-the-record briefings to a small number of journalists about the pre-election memoranda in late summer/autumn 2016." Emails reflect that on April 26, 2017, Strzok circulated this article to the Intel Section Chief and the Unit Chief assigned to take over the Crossfire Hurricane investigation in April 2017 (Unit Chief 1).

Other documentation indicates that the foreign lawsuit against Steele was discussed during a meeting with then Director James Comey on May 1, 2017.[386] The OGC Unit Chief took handwritten notes during the meeting, which stated "did not change our assessment, no need to update FISA" below references to the lawsuit. The OGC Unit Chief told us that she did not recall this discussion or who concluded that the FISC did not need to be updated with information from the foreign litigation. She also said that she did not recall specifically discussing or knowing prior to January 2018 that Steele admitted to talking to the media in these court filings and therefore she did not believe that the FBI advised OI of this information at the time of the Carter Page FISA applications. Comey told the OIG that he did not recall being advised of the court filings.

Approximately two weeks after the May 1, 2017 meeting, in a separate court filing submitted on his behalf, Steele admitted that he and Fusion GPS briefed journalists from five media outlets, including *Yahoo News*, at the end of September 2016, and also admitted the briefings involved "the disclosure of limited intelligence regarding indications of Russian interference in the U.S. election process and the possible co-ordination of members of Trump's campaign team and Russian government officials."

According to the Rule 13 Letter and FBI officials, although there had been open source reporting in May 2017 about Steele's statements in the foreign litigation, the FBI did not obtain Steele's court filings until the receipt of Senators Grassley and Graham's January 2018 letter to DAG Rosenstein and FBI Director Christopher Wray with the filings enclosed. We found no evidence that the FBI made any attempts in May or June 2017 to obtain the filings to assist a determination of whether to change the FBI's assessment concerning the

---

[386] The OGC Unit Chief's notes of the meeting do not reflect who else attended the meeting, but she told us that this meeting with the Director would have included a large group of FBI officials.

September 23 news article in the final renewal application.[387]  However, the OGC Unit Chief's notes suggest that on May 1, without consulting OI, and relying only upon open source reporting concerning the filings, the FBI decided that Steele's April 3, 2017 sworn statement in the foreign litigation did not warrant any changes to Renewal Application No. 3.

We were unable to determine whether FBI personnel responsible for assisting OI on Renewal Application No. 3 were told about Steele's admissions in the foreign litigation regarding his media contacts.  Case Agent 6 and the OGC Attorney told us that they did not recall whether they were aware of Steele's admissions in the foreign litigation before the final renewal application was filed.  We are not aware of any other evidence on this point.  The Supervisory Intelligence Analyst (Supervisory Intel Analyst) told us that although he was aware at the time, he did not recall making a connection between the open source reporting about Steele's court filings and the information in the FISA application concerning Steele's media contacts.  He told us that if he had made such a connection, he would have made sure Case Agent 6 and the OGC Attorney were advised.

According to Evans, the failure to include this information in the prior FISA renewals was not the most significant error identified in the Rule 13 Letter.  Evans told us that he was not sure an updated assessment would have been particularly relevant to the court's probable cause determination because whether Steele or the people who hired him were the source of the disclosure, the applications made clear that Steele's research was relied upon in the article.  In addition, Evans said that as a result of the disclosure in the renewal applications concerning the *Mother Jones* article in October 2016, the court was already on notice that Steele had talked to one media organization when it approved the renewal of FISA authority.

In the Rule 13 Letter, NSD advised the court that the FBI should have updated its assessment in Renewal Application No. 3 about the source of the *Yahoo News* disclosure.  The letter further stated that "irrespective of whether Source #1 directly spoke with the press in connection with the September 23 News Article, or was forthright with the FBI regarding his contacts with the press in September 2016," for the reasons described in the letter and in the FISA applications, "the FBI continued to assess that [Steele's] prior reporting was reliable."

## II.   Other Inaccurate, Incomplete, or Undocumented Information in the Three FISA Renewal Applications

In addition to the issues raised in the July 2018 Rule 13 Letter to the FISC, our review revealed other instances in which the three Carter Page renewal applications were inaccurate, incomplete, or unsupported by appropriate documentation, based upon information in the FBI's possession at the time the

---

[387] The OGC Attorney told us that a later (unsuccessful) attempt to obtain the court filings may have been made in the summer of 2017, probably in August, as part of a continuing effort to validate Steele's reporting.

applications were filed.  We describe the more significant instances below and
identify other instances in Appendix One.

### A.    Inconsistencies between Steele's Reporting and Information His Primary Sub-source Provided to the FBI

As described previously, all four Carter Page FISA applications relied upon
the following aspects of Steele's reporting to support the government's position that
there was probable cause to believe that Carter Page was an agent of a foreign
power:

- From Report 80:  Derogatory information about Hillary Clinton had
  been compiled for many years, was controlled by the Kremlin, and the
  Kremlin had been feeding information to the Trump campaign for an
  extended period of time;

- From Report 94:  During his July 2016 trip to Moscow, Carter Page
  attended a secret meeting with Igor Sechin, Chairman of Rosneft and
  a close associate of Putin, and discussed future cooperation and the
  lifting of Ukraine-related sanctions against Russia; and a separate
  meeting Page attended with Igor Divyekin, a highly-placed Russian
  government official, and discussed sharing derogatory information
  about Clinton with the Trump campaign;

- From Report 95:  Carter Page was an intermediary between Russia
  and the Trump campaign in a "well-developed conspiracy of co-
  operation," managed by Trump's then campaign manager, Paul
  Manafort, using Page as an intermediary, which led to Russia's
  disclosure of hacked DNC emails to WikiLeaks in exchange for the
  Trump team's agreement, to include at least Page, to sideline Russian
  intervention in Ukraine as a campaign issue; and

- From Report 102:  Russia released the DNC emails to WikiLeaks in an
  attempt to swing voters to Trump, an objective conceived of and
  promoted by Page and others.

All four FISA applications clearly stated that Steele did not obtain the
information described above directly from his source network.  Instead, as
described in the FISA applications, Steele received the information from a Primary
Sub-source who obtained the information from his/her own source network.

In Chapter Six, we described the FBI's interview of the Primary Sub-source in
January 2017, after FISA Renewal Application No. 1 was filed but before the last
two renewal applications were filed.  After the interview, the Supervisory Intel
Analyst and Case Agent 1 memorialized the information in a lengthy written
summary.  As described in Chapter Six, the Primary Sub-source confirmed for the
FBI that he/she provided Steele with some of the information in Steele's reports.
However, in some instances, the information the Primary Sub-source told the FBI
about what his/her sources told him/her—and what he/she then provided to
Steele—was inconsistent with information attributed to his/her sources in Steele's
reporting.  Of particular relevance to the FISA applications, we found that the

Primary Sub-source's account to the FBI (based on the written interview summary) differed from Steele's reporting on the following points:

- With respect to the information from Reports 95 and 102 that the FBI assessed had come from Person 1 (described in prior chapters) concerning the alleged "conspiracy" between Russia and individuals associated with the Trump campaign, and Russia's release of DNC emails to WikiLeaks in an attempt to swing voters to Trump: the Primary Sub-source said, among other things, that he/she had no discussion with Person 1 concerning WikiLeaks and that there was "nothing bad" about the communications between the Kremlin and the Trump team;

- With respect to the alleged secret meeting between Carter Page and Sechin in July 2016: the Primary Sub-source said he/she was not told by his/her sub-source that this meeting had taken place until October 2016, well after Steele prepared and circulated Report 94, and that he/she only told Steele in July 2016 that he/she had heard that the meeting would be taking place; and

- With respect to the positions and access of the sub-sources: the Primary Sub-source's description of each of his/her sources indicated that their position and access to the information they were reporting was more attenuated than represented by Steele and described in the FISA applications.

Regarding the information in the first bullet above, in early October 2016, the FBI learned the true name of Person 1 (described in Report 95 as "Source E"). As described in Chapter Six, the Primary Sub-source told the FBI that he/she had one 10- to 15-minute telephone call with someone he/she believed to be Person 1, but who did not identify him/herself on the call. We found that, during his/her interview with the FBI, the Primary Sub-source did not describe a "conspiracy" between Russia and individuals associated with the Trump campaign or state that Carter Page served as an "intermediary" between Manafort and the Russian government. In addition, the FBI's summary of the Primary Sub-source's interview did not describe any discussions between the parties concerning the disclosure of DNC emails to WikiLeaks in exchange for a campaign platform change on the Ukrainian issue. To the contrary, according to the interview summary, the Primary Sub-source told the FBI that Person 1 told him/her that there was "nothing bad" about the communications between the Kremlin and Trump, and that Person 1 made no mention at all to WikiLeaks. Further, although Steele informed the FBI that he had received all of the information in Report 95 from the Primary Sub-source, and Steele told the OIG the same thing when we interviewed him, the

Primary Sub-source told the FBI that he/she did not know where some of the information attributed to Source E in Report 95 came from.[388]

Despite the inconsistencies between Steele's reporting and the information his Primary Sub-source provided to the FBI, the subsequent FISA renewal applications continued to rely on the Steele information, without any revisions or notice to the court that the Primary Sub-source had contradicted the Steele reporting on key issues described in the renewal applications. Instead, as described previously, FISA Renewal Application Nos. 2 and 3 advised the court:



> In an effort to further corroborate [Steele's] reporting, the FBI has met with [Steele's] ▮▮▮▮▮▮▮▮ sub-source [Primary Sub-source] described immediately above. During these interviews, the FBI found the ▮▮▮▮▮▮▮▮ sub-source to be truthful and cooperative. ▮▮▮
> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The FBI is undertaking additional investigative steps to further corroborate the information provide [sic] by [Steele] and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
> ▮▮▮▮▮

NSD cited this language from the renewal applications in its July 2018 Rule 13 Letter as an example of information "corroborating" Steele's reporting, noting that "the FBI met with [Steele's] [Primary] sub-source, whom the FBI found to be truthful and cooperative." Evans and the OI officials who participated in the preparation of the renewal applications and Rule 13 Letter told us that they were not advised of the inconsistences between Steele's reporting and the Primary Sub-source's interview, and that they did not believe that the FBI provided them with the lengthy written summary of the interview. We did not find any evidence indicating otherwise.

We found no evidence that the Crossfire Hurricane team ever considered whether any of the inconsistencies warranted reconsideration of the FBI's previous assessment of the reliability of the Steele reports or notice to OI or the court in the subsequent renewal applications. As described below, team members told us that they either were not aware of the inconsistences or, if they were, did not make the connection that the inconsistencies affected aspects of the FISA applications.

Case Agent 1, who led the January 2017 interview of the Primary Sub-source, was closely familiar with the Carter Page FISA applications because, as described previously, he originally requested FISA authority targeting Carter Page and assisted OI with drafting the first two FISA applications. In addition, after the Carter Page investigation was reassigned to Case Agent 6 in early 2017, Case Agent 1 assisted Case Agent 6 with the completion of the Woods Procedures for Renewal

---

[388] According to Steele and his reports, Report 80 (dated June 20, 2016), Report 95 (dated July 28, 2016), Report 97 (dated July 30, 2016), and Report 102 (dated August 10, 2016) all contain information from Person 1. If these reports were accurate regarding Person 1's contributions to the reporting and the Primary Sub-source's estimate was accurate concerning his/her debrief of Person 1, then all of the information attributed to Person 1 came from a single, 10-to-15-minute telephone call between the Primary Sub-source and Person 1.

Application No. 2 by performing the factual accuracy review. The Woods File used during that review contained the interview summary of the Primary Sub-source. Case Agent 1 told us that he could not explain why changes had not been made to the renewal applications to account for the inconsistencies between the Primary Sub-source and Steele on facts asserted in the applications. Case Agent 1 said that although he thought the Primary Sub-source may have been minimizing the extent of his/her interactions with Person 1, it did not occur to Case Agent 1 at the time that the information from the Primary Sub-source contradicted information in the FISA applications. In particular, Case Agent 1 said that he did not know enough about some of the details concerning Person 1 to necessarily understand that the Primary Sub-source's account potentially conflicted with information in the FISA applications. For example, he said he did not know whether Steele had his own relationship with Person 1 such that Steele could have had another basis for attributing all the information in Report 95 to Person 1. Case Agent 1 added that he believed that someone else should have highlighted the issue for the agents working on the FISA application.

Case Agent 6 told us that he read the written summary of the Primary Sub-source's January 2017 interview before he assisted the OI Attorney with FISA Renewal Application No. 2, and Case Agent 6's written contributions to the draft application contain two references to information the FBI learned during the interview. However, Case Agent 6 did not identify for OI inconsistences between the Primary Sub-source and Steele on the facts asserted in the FISA application. Case Agent 6 did not participate in the Primary Sub-source's interview, which took place before he took over the Carter Page case from Case Agent 1. Case Agent 6 told us that he read the written summary of the interview after he took over and realized that he did not yet understand all the details of the case. He said that for this reason, he asked Case Agent 1 to assist him with the Woods Procedures for Renewal Application No. 2. Case Agent 6 told us that he did not recall Case Agent 1 or Supervisory Intel Analyst advising him during the Woods process of the inconsistencies.

Analytical documents prepared by, or with the assistance of, the Supervisory Intel Analyst after the Primary Sub-source interview identified inconsistences between Steele and the Primary Sub-source regarding some of the information contained in Reports 94 and 95. The Supervisory Intel Analyst told us that, after the January 2017 interview, his impression was that the Primary Sub-source's account did not line up completely with Steele's reporting, but the Supervisory Intel Analyst said he did not have any "pains or heartburn" about the accuracy of the Steele reporting based on what the Primary Sub-source had said. The Supervisory Intel Analyst said that his thinking at the time was focused instead on using the additional information learned from the Primary Sub-source, particularly the identity of his/her sub-sources, to see what other investigative leads could be generated for the team.

The Supervisory Intel Analyst told us that he played a supportive role for the agents preparing the FISA applications, including reading the probable cause section of the first application and providing the agents with some of the information on the identity of the sub-sources noted in the application. He said that

he had some interaction with the agents preparing the renewal applications, but he
believed those interactions were less extensive than his involvement in the first
application. The Supervisory Intel Analyst did not recall anyone asking him
whether he thought the Primary Sub-source was "truthful and cooperative," as
noted in the renewal applications.[389] He told us it was his impression that the
Primary Sub-source may not have been "completely truthful" and may have been
minimizing certain aspects of what he/she told Steele. However, the Supervisory
Intel Analyst told the OIG that, on the whole, he did not see any reason to doubt
the information the Primary Sub-source provided about who he/she received
his/her information from, which was the Supervisory Intel Analyst's focus.

SSA 5, who performed the supervisory factual accuracy review during the
Woods Procedures for Renewal Application Nos. 2 and 3, told us that he did not
recall whether he was briefed on the Primary Sub-source's interview, and he did not
appear during his OIG interview to know anything about the Primary Sub-source.
Similarly, Case Agent 7, who performed the Woods Procedures for Renewal
Application No. 3, told us that he did not know, or have the case knowledge
necessary to determine, that the Primary Sub-source provided information
inconsistent with facts asserted in the FISA application.

Program managers supervising the investigation from FBI Headquarters—
SSA 2 and SSA 3—were aware of the Primary Sub-source's interview and had read
the written summary of it. However, we found no evidence that either of them
identified issues with or raised any questions about how the Primary Sub-source's
interview may have impacted the information in the FISA applications. As
described previously, SSA 3 did not play a direct role in Renewal Application No. 2,
but he was familiar with the prior FISA applications, having performed the
supervisory factual accuracy review during the Woods Procedures for Renewal
Application No. 1. SSA 3 told us that he did not recall noticing any information
from the Primary Sub-source's interview that was inconsistent with information in
the FISA application. SSA 2 was the affiant who declared, based on the completion
of the Woods Procedures, that the information in Renewal Application Nos. 2 and 3
was true and correct. He told us that he did not recall any discussion about
whether the Primary Sub-source's interview warranted revisions to the FISA
applications, but said he had some recollection that the investigators believed at
the time that the Primary Sub-source was holding something back about his/her
interaction with Person 1.

The OGC Unit Chief and the OGC Attorney told us that they did not review or
receive the written summary of the Primary Sub-source's January 2017 interview at

---

[389] Email communications reflect that in March 2017—after the first FISA application and first
renewal were filed and before the last two renewals—the Supervisory Intel Analyst reviewed the first
FISA application and the first renewal at OGC's request to assist with potential redactions before the
Department responded to Congressional information requests. The Supervisory Intel Analyst provided
comments to the OGC Attorney, including advising him that the Primary Sub-source was not ▨▨▨▨
▨▨▨ as stated in the FISA applications, and asking whether a correction should be made. The
Supervisory Intel Analyst did not provide any other comments relating to the Primary Sub-source, and
he told us that he did not notice anything else potentially inaccurate or incomplete in the applications
at that time.

any time before Renewal Application No. 2 was submitted to the court. However, they said that they knew the interview had taken place and had the general understanding from the team that the information provided to the FBI by the Primary Sub-source "essentially echoed," "was consistent with," or "corroborated" the information in Steele's reporting. The OGC Unit Chief said that her understanding was that the Primary Sub-source raised some questions about how Steele wrote his reports or the wording Steele used, and that the agents and analysts had looked into it but did not think the wording choices were substantively different. The OGC Attorney said that he had some vague recollection that the team thought Steele may have conflated some of his sourcing on WikiLeaks based on information provided by the Primary Sub-source. However, they both said that they did not recall the details of these discussions.

Although documents provided to the OIG indicate that senior FBI officials were told about some aspects of the Primary Sub-source's interview, the documents do not reflect that senior FBI officials were advised of the inconsistences. For example, in late February 2017, the Supervisory Intel Analyst circulated a 2-page Intelligence Memorandum to CD Assistant Director E.W. "Bill" Priestap and other CD officials highlighting aspects of the Primary Sub-source's interview. In March 2017, Priestap forwarded the memorandum to Comey's and McCabe's offices. The memorandum stated that the Primary Sub-source told the FBI that Steele's reporting contained "some of [his/her] reporting, what appear to be [his/her] analytical conclusions, and what [he/she] believes to be [Steele's] analytical judgments." The memorandum provided some details concerning what the Primary Sub-source said about his/her own sources, but the memorandum did not describe the inconsistences we noted earlier.[390]

Senior CD officials overseeing the Crossfire Hurricane investigation—including Priestap, Strzok, the Intel Section Chief, and CD DAD Jennifer Boone—told us that they did not recall being advised that the information from the Primary Sub-source significantly differed from the information in Steele's reporting. Boone told us that she recalled being told after the Primary Sub-source's interview that the team assessed that Steele may have gotten some of his information from a source other than the Primary Sub-source. Boone said that she did not recall being advised that the interview created inconsistences between Steele and his Primary Sub-source as to facts relied upon in the FISA applications. Boone further stated that she would have expected to have been told that information. Strzok told us that he did remember learning as a result of the Primary Sub-source interview that Steele did not receive his reporting directly from the sub-sources, but rather solely through

---

[390] For example, the memorandum stated that, according to the Primary Sub-source, a particular person told the Primary Sub-source that the secret meeting between Carter Page and Sechin had taken place. However, the memorandum failed to note that the Primary Sub-source told the FBI that he/she was not told until October 2016 that the meeting had occurred, which was well after Steele drafted Report 94 in July 2016 (Report 94 asserted that the meeting had taken place, that Page and Sechin discussed the lifting of sanctions, and that Page reacted positively but was noncommittal). As the Primary Sub-source described to the FBI, he/she had only told Steele in July that he/she was aware of a rumor that Page was going to be meeting with Sechin. As noted previously, Page denied to an FBI CHS that he had met with Sechin in July 2016, and the FBI was unable to determine whether a meeting between Sechin and Page took place.

the Primary Sub-source as the intermediary.  Strzok said he recalled having a "little
bit of concern" about that.  He later wrote to Comey's Chief of Staff, Priestap, and
others that "[r]ecent interviews and investigation, however, reveal Steele may not
be in a position to judge the reliability of his sub-source network."

Comey told us that he did not know whether the team interviewed any of
Steele's sub-sources.  Because Comey decided not to have his security clearance
reinstated for his OIG interview, we were unable to question him further or refresh
his recollection with relevant, classified documentation.

The NSD's Counterintelligence and Export Control Section (CES)
representatives who attended the Primary Sub-source's January 2017 interview—
Section Chief David Laufman and his Deputy Section Chief—told us that they did
not recall discussing the interview with OI officials afterward.  They told us that
they did not have knowledge of the information in the Carter Page FISA applications
at the time, and that they were not sufficiently familiar with the Steele reports to
have understood that there were inconsistencies between the Primary Sub-source
and Steele.  We did not find any information to the contrary.  They told us that they
attended the interview because CES had helped negotiate the terms of the
interview with the Primary Sub-source's attorney, and, as noted previously, their
role during the interview was primarily to address any issues or concerns raised by
the attorney during the interview.

The OI Attorney told the OIG that if had he known about the inconsistencies
between the Primary Sub-source and Steele on the facts asserted in the FISA
applications, he would have wanted an opportunity to ask questions and gather
more information.  In particular, after we asked the OI Attorney to read the written
summary of the Primary Sub-source's interview regarding the telephone call with
Person 1, the OI Attorney was surprised, agreed it was not consistent with the
information in the FISA applications concerning Report 95, and said "it doesn't
seem like the same story."  Evans told us that OI would have sought to determine
how the new information impacted the FISA applications, including obtaining the
FBI's own assessment of how to reconcile the apparent inconsistencies.  Evans said
that at a minimum, OI would have advised the court of the inconsistencies and the
FBI's assessment of those inconsistences.  He further stated that, depending on the
information from the FBI, OI may have decided to delay or abandon the filing of the
next renewal application altogether.

**B.    Information about Page's Prior Relationship with Another U.S.
Government Agency and Information Page Provided the Other
Agency that Overlapped with Facts Asserted in the FISA
Applications**

As noted in Chapter Five, on or about August 17, 2016, while early FISA
discussions were ongoing, the Crossfire Hurricane team received a memorandum
(August 17 Memorandum) from another U.S. government agency relating to Page's
prior relationship with that agency, including that Page had been approved for
operational contact from 2008 to 2013.  The information also described Page's prior
interactions with Russian intelligence officers about which the agency was aware,

247

including contacts Page had with a Russian intelligence officer (Intelligence Officer 1), which were among the historical connections to Russian intelligence officers that the FBI later relied upon in the first FISA application (and subsequent renewal applications) to help support probable cause.[391] We found that, although this information was highly relevant to the FISA application, the Crossfire Hurricane team did not engage with the other agency regarding this information. In addition, in response to a question from the OI Attorney in September 2016 as to whether Carter Page had a current or prior relationship with the other agency, Case Agent 1 provided the OI Attorney with inaccurate information that failed to disclose the extent and nature of Page's relationship with that agency. As a result, the first FISA application, and FISA Renewal Application Nos. 1 and 2, contained no information regarding Page's relationship with the other U.S. government agency, and did not reveal that his relationship with the other agency overlapped in part with facts asserted in the application regarding Page's ties to particular Russian intelligence officers.

Before Renewal Application No. 3 was submitted to the court, and following news reports about the Carter Page FISAs, Page conducted news interviews in April and May 2017 in which he publicly stated that he had assisted the USIC in the past. Thereafter, the FBI re-engaged with the other U.S. government agency about its prior relationship with Page. SSA 2, who had been the affiant for the first two renewals and would be the affiant for FISA Renewal Application No. 3, told the OIG that in June 2017 he wanted a definitive answer as to whether Page had a prior relationship with the USIC before SSA 2 signed the last renewal application. SSA 2 also told us that he was concerned that Page could claim that he had been acting on behalf of the U.S. government in engaging with certain Russians. SSA 2 stated that he contacted the OGC Attorney assisting with the Crossfire Hurricane investigation to help resolve this issue.[392] According to the OGC Attorney and SSA 2, the OGC Attorney was responsible for handling questions or concerns involving the other U.S. government agency for the Crossfire Hurricane team.

The OGC Attorney told us he recalled that the Supervisory Intel Analyst on the Crossfire Hurricane team had raised a concern that Page may have had a prior

---

[391] As described in Chapter Five, according to the August 17 Memorandum provided to the FBI by the other U.S. government agency, Page told the other agency in October 2010 that he met with Intelligence Officer 1 four times (which the other agency assessed began in 2008), characterized Intelligence Officer 1 as a "compelling, nice guy," and described Intelligence Officer 1's alleged interest in contacting an identified U.S. person. According to the August 17 Memorandum, the employee of the other U.S. government agency who met with Page assessed that Page "candidly described his contact with" Intelligence Officer 1.

As further described in Chapter Five, the other agency's memorandum did not provide the FBI with information indicating it had knowledge of Page's reported contacts with another particular intelligence officer. The FBI also relied on Page's contacts with this intelligence officer in the FISA application.

[392] On May 17, 2017, the Crossfire Hurricane investigation was transferred from the FBI to the Office of Special Counsel upon the appointment of Special Counsel Robert S. Mueller III to investigate Russian interference with the 2016 presidential election and related matters.

relationship with the other U.S. government agency in the past.[393]  The OGC Attorney said it was "a big, big concern from both OI and from the FBI that we had been targeting [an individual with a prior relationship with the other agency], because that should never happen without us knowing about it."  The OGC Attorney characterized the Crossfire Hurricane team as "spun up" about this concern, and said he knew that if it were true, they would "need to provide that to the court" because such information would "drastically change[] the way that we would handle…[the] FISA application."  SSA 2 told the OIG that this issue was very important to resolve, because if Page

> was being tasked by another agency, especially if he was being tasked to engage Russians, then it would absolutely be relevant for the Court to know…[and] could also seriously impact the predication of our entire investigation which focused on [Page's] close and continuous contact with Russian/Russia-linked individuals.

In mid-June 2017, the OGC Attorney contacted the other U.S. government agency to seek additional information about Page's prior relationship with that other agency, and then communicated back to the OI Attorney and SSA 2.  Because we determined that the OGC Attorney did not accurately convey, and in fact altered, the information he received from the other agency, we provide these communications in detail below.

### 1.  June 15, 2017—FBI OGC Attorney Requests Information about Page from Other U.S. Government Agency

On June 15, 2017, the OGC Attorney emailed the liaison for the other U.S. government agency (Liaison) about Carter Page's past, stating:

> We need some clarification on Carter Page.  There is an indication that he may be a "[digraph]" source.[394]  This is a fact we would need to disclose in our next FISA renewal (we would not name the [U.S. government agency] of course).
>
> To that end, can we get two items from you?
>
> 1) Source Check/Is Page a source in any capacity?
>
> …

---

[393]  The Supervisory Intel Analyst said that he did not recall raising a concern about this issue, but that he did recall being aware that Page had been a "type of source" with this other agency in the past.  Although the Supervisory Intel Analyst did not recall discussions about including this information in the FISA application, he did recall general discussions about Page's relationship with the other U.S. government agency.

[394]  The Liaison told the OIG that the other U.S. government agency uses a specific two-letter designation, or digraph, to describe a U.S. person who has been approved by the other agency for operational contact.

2) If he is, what is a "[digraph]" source (or whatever type of source he is)?

If you would like to discuss more, please let me know.[395]

The Liaison responded that same day by providing the OGC Attorney with a list of documents previously provided by the other agency to the FBI mentioning Page's name, including the August 17 Memorandum. The Liaison also wrote that the U.S. government agency uses

the [digraph] to show that the encrypted individual...is a [U.S. person]. We encrypt the [U.S. persons] when they provide reporting to us. My recollection is that Page was or is...[digraph] but the [documents] will explain the details. If you need a formal definition for the FISA, please let me know and we'll work up some language and get it cleared for use.

The OGC Attorney responded, "Thanks so much for this information. We're digging into the [documents] now, but I think the definition of the [digraph] answers our questions." That same day, the OGC Attorney forwarded the Liaison's email response to Case Agent 6 and an FBI SSA assigned to the Special Counsel's Office, without adding any explanation or comment. The SSA responded by telling Case Agent 6 that she would "pull these [documents] for you tomorrow and get you what you need." The OGC Attorney also sent an instant message to his supervisor, the OGC Unit Chief, stating that Carter Page was a "U.S. subsource of a source" and that "[digraph]=encrypted USPER."

We asked the OGC Attorney if he read the documents identified by the Liaison in her June 15, 2017 email. The OGC Attorney told the OIG that he "didn't know the details of...the content of the [documents]" and did not think he was involved in reviewing them. He also said he "didn't have access to the [documents] in the OGC space," but that the investigative team was provided the list of documents and that they would have been reviewing them. The OGC Attorney said he understood the Liaison's response to mean that Page had not been a source—which the OGC Attorney described as a "recruited asset"—but rather someone who had some interaction with a source for the other U.S. government agency, and not a direct relationship with the other agency. He stated his understanding was that the other U.S. government agency

identified that [Page] was ["digraph"], and ["digraph"] refers to a U.S. person...who's incidentally picked up...[in] reporting out from a source of theirs. So their recruited asset is at a meeting, and [Page] happened to be there too. And then, in the reporting, the source mentions [Page] is there, so the agency protects [Page's] true name by using...["digraph" for Page].

---

[395] In an email sent to Case Agent 6 on June 13, 2017, and in an instant message sent to Case Agent 6 on June 15, 2017, the OGC Attorney referred to this request as "that source check" and "that [digraph] check," respectively.

The OGC Attorney told us that— his belief that Page had never been a source for the other U.S. government agency, but instead interacted with a source—was based on telephone conversations with the Liaison.  He said he recalled the Liaison "saying that [Page] was not a source of theirs," but rather "incidentally reporting information via a source of theirs" and that they "ended up not actually opening him."[396]

When we asked the Liaison about the OGC Attorney's interpretation of the Liaison's email, the Liaison told us that her email stated just the opposite, namely that Page was a U.S. person who had provided direct reporting to the other U.S. government agency in the past.  The Liaison also said that the reason she offered, in her email, to assist in providing language for the FISA application was because she was telling the OGC Attorney that, using the FBI's terminology, Page had been a source for the other agency.  The Liaison also stated that she saw no basis for the OGC Attorney to have concluded, based on their communications and the August 17 Memorandum, that Page never had a direct relationship with the other agency.

The Liaison also said that she did not recall having any telephone discussions with the OGC Attorney on this issue.  She added that, even if she had, she did not think the OGC Attorney would have been able to draw any conclusions from such a conversation.  The Liaison explained that she would not have had the documents in front of her at the time of any such conversation, and therefore would not have given the OGC Attorney a definitive answer.  She emphasized the need to read the documents in order to accurately understand the relationship between Page and the other U.S. government agency.

### 2.    June 16, 2017—FBI OGC Attorney Provides the Liaison's Response to the OI Attorney

On the evening of June 15, 2017, the OGC Attorney contacted the OI Attorney to request a time to talk the next day.  FBI telephone records confirm they spoke the next morning for approximately 28 minutes, until 11:46 a.m.  Also at 11:46 a.m. on June 16, the OGC Attorney forwarded to the OI Attorney the Liaison's June 15 email response.  However, in forwarding the Liaison's response to the OI Attorney, the OGC Attorney did not include the initial email that he sent to the Liaison inquiring about Page's status as a "[digraph] source."  The OGC Attorney told us that he could not recall why he did not include the initial email, in which he asked, "Is Page a source in any capacity?"

The OI Attorney responded to the OGC Attorney's email, "thanks I think we are good and no need to carry it any further."  The OGC Attorney replied, "Music to my ears."

The OI Attorney told us that he did not recall this email exchange with the OGC Attorney or the telephone call on June 16 with the OGC Attorney indicated in

---

[396] When questioned further on this point, the OGC Attorney told us that he only recalled engaging with the Liaison on this issue and not any other person from the other U.S. government agency.

FBI telephone records.  When we asked the OI Attorney whether he reviewed the August 17 Memorandum, he said he did not recall if he had asked to see it, but also stated that he would have relied on the case agent's assessment of that document.

The OGC Attorney initially told us that he recalled providing a detailed briefing to the OI Attorney about Page's status, and telling him that the OGC Attorney had conferred with the Liaison and that Page had not been a source for the other agency.  However, in a subsequent OIG interview months later, the OGC Attorney said he did not recall a specific conversation with the OI Attorney on this subject matter, but thought he would have conveyed to the OI Attorney the details of what the Liaison had told him.

### 3.   June 19, 2017—FBI OGC Attorney Provides SSA 2 with Inaccurate Information

#### a.   June 19, 2017 Instant Message Exchange

On June 19, 2017, the OGC Attorney and SSA 2 exchanged instant messages about Carter Page's past relationship with the other agency.[397]  As described above, SSA 2 would be the affiant on Renewal Application No. 3 and was seeking a definitive answer as to whether Page had a prior relationship with the other agency.  The relevant portions of the instant message exchange were as follows:

> 15:26:35, SSA 2:  "Do we have any update on the [agency] CHS request?  Also, [Case Agent 6] said [OI Attorney] is not so optimistic."
>
> 15:27:53, OGC Attorney:  "[agency] CHS: You are referring to [Carter Page]?"
>
> 15:28:01, SSA 2:  "Yes."
>
> 15:28:05, OGC Attorney:  "He is cleared."
>
> 15:28:15, SSA 2:  "Cleared to fly?"
>
> 15:28:16, OGC Attorney:  "[digraph]=Masked USPER."
>
> 15:28:34, SSA 2:  "So he was and the relationship officially ended?"
>
> 15:28:37, OGC Attorney:  "So, essentially, the real...source was using [Carter Page] as a [Steele]-like subsource."
>
> 15:28:47, OGC Attorney:  "[Carter Page] was never a source."
>
> 15:28:59, SSA 2:  "You mean the [agency] officer?"
>
> 15:29:19, OGC Attorney:  "Right.  Whomever generated the reporting from the [documents]."

---

[397] These instant messages were exchanged on an internal FBINet application for FBI personnel.  All instant messages produced to the OIG reflected Greenwich Mean Time.  We have corrected the time stamps to reflect the time in the Eastern Time Zone.  Some of the instant messages also contained emojis, which we omitted unless they affected the meaning of the message.  We also do not include other intervening instant messages about unrelated topics unless they contributed to an understanding of the relevant messages.

15:29:45, OGC Attorney: "It was just liaison with [Carter Page] which resulted in reporting, eventually they closed it out as unhelpful."

15:30:39, OGC Attorney: "So, in discussing with [OI Attorney], he agreed we do not need to address it in the FISA."

15:31:16, OGC Attorney: "[OI Attorney] is always Eeyore in drafting these special FISA applications."

15:31:27, SSA 2: "So [Carter Page] was a [digraph] or [Carter Page] was a subsource of the [digraph]."

15:32:00, OGC Attorney: "It's [sic] sounds like a subsource of the [digraph]."

15:32:31, OGC Attorney: "And yes, [the other agency] confirmed explicitly he was never a source."

15:33:05, SSA 2: "Interesting."

15:33:21, OGC Attorney: "But like, interesting good, right?"

15:33:54, OGC Attorney: "I mean, at least we don't have to have a terrible footnote."

15:33:57, SSA 2: "Sure. Just interesting they say not a source. We thought otherwise based on the writing...I will re-read."

15:34:28, OGC Attorney: "At most, it's [the Supervisory Intel Analyst] being the CHS, and you talking to [the Supervisory Intel Analyst]."

15:34:54, SSA 2: "Got it. Thank you. Do we have that in writing."

15:35:19, OGC Attorney: "On TS. I'll forward/"

We asked the OGC Attorney about this instant message exchange with SSA 2 in which he told SSA 2 that Carter Page was never a source. The OGC Attorney stated, "That was my, the impression that I was given, yes." We also asked why he told SSA 2 in the instant message exchange that the other U.S. government agency "confirmed explicitly that he was never a source." The OGC Attorney explained that his statement was just "shorthand" for the information provided by the other agency about Page and that he had no particular reason to use the word "explicitly." As to his comment about a "terrible footnote" in the instant messages, the OGC Attorney told us that he was referring to how "laborious" it would be to draft such a footnote for the FISA application, not that such a footnote might undermine or conflict with the overall narrative presented in the FISA applications.

SSA 2 told us that the most important part of this interaction with the OGC Attorney was when the OGC Attorney told SSA 2 that the other agency had said "explicitly" that Page had never been a source. SSA 2 characterized that statement as "the confirmation that I need[ed]." SSA 2 also said that he understood the OGC Attorney's comment about not having to draft a "terrible footnote" to mean that the team could avoid having to explain in Renewal Application No. 3 that they had "just now come to determine that [Page] was an asset of the [other agency] and

probably being tasked to engage...[with] Russians which is...why we opened a case on him." SSA 2 said that he understood the OGC Attorney to be saying that "the optic...would be terrible" if the prior FISA applications were "dubious" in light of a relationship between Page and the other agency, and the FBI was only becoming aware of that relationship in the third renewal application and after Page's public statements.

We showed the instant message exchange between the OGC Attorney and SSA 2 to the Liaison and the OI Attorney. Neither had previously been aware of this exchange. The OI Attorney told us that the OGC Attorney's description of Page as a sub-source did not sound familiar to him. He said:

> I feel like if the [OGC Attorney] would have said, well he was a sub-source, I mean to me that's like a flag.... [T]hat means he was being handled by somebody. That means that there was...something more; let's dig more into it.

The OI Attorney also focused on the portion of the exchange where SSA 2 expressed a belief that Page was a source and where the OGC Attorney mentioned not having to prepare a "terrible footnote." He told us that OI should have been made aware of any "internal debate" within the FBI about whether Page was a source for another U.S. government agency, because with the FISC there is no "defense counsel on the other side," and it is up to OI "to over tell the story."

The Liaison focused on the portion of the exchange in which the OGC Attorney stated that Page "was never a source." The Liaison told us that this statement was wrong, as was the OGC Attorney's statement that Page "was a U.S. sub-source of a source." The Liaison said that such an assertion is "directly contradictory to the [documents]" the agency provided to the FBI. The Liaison also said it was inaccurate to describe Carter Page as "like a sub-source of [a digraph]" and to state that the other agency had "confirmed explicitly that [Page] was never a source." We asked the Liaison whether the Liaison ever told the OGC Attorney that Page was not a source. The Liaison said that, to the best of the Liaison's recollection, the Liaison did not and would not have characterized the status of a "[digraph]" without either first reaching out to the other agency's experts responsible for the underlying reporting, or relying on the proper supporting documentation for an answer. The Liaison stated, "I have no recollection of there being any basis for [the OGC Attorney] to reach that conclusion, and it is directly contradicted by the documents."

### b.    The OGC Attorney Sends SSA 2 an Altered Version of the Liaison's June 15 Email

Immediately following the June 19 instant message exchange between the OGC Attorney and SSA 2, SSA 2 received an email from the OGC Attorney that appeared to be forwarding the Liaison's June 15 response email concerning Page's historical contact with the other U.S. government agency. However, the OIG determined that this forwarded version of the Liaison's response email had been altered. Specifically, the words "and not a 'source'" had been inserted in the

Liaison's June 15 response after the word "[digraph]."  Thus, the Liaison's email was altered to read:  "My recollection is that Page was or is and [sic] '[digraph]' **and not a 'source'** but the [documents] will explain the details."  (Emphasis added).  The OGC Attorney also did not include in the email sent to SSA 2 the initial email inquiry from the OGC Attorney to the Liaison about Page's status as a "[digraph] source."[398]

In response to the June 19 email, SSA 2 asked the OGC Attorney if SSA 2 could send the email to the FBI agents working on the matter.  The OGC Attorney responded:  "Yes.  I actually already did on Friday when [the OI Attorney] said we're good to go.  Sorry for not cc'ing you."[399]

We asked the OGC Attorney about the alteration in the email he sent to SSA 2.  He initially stated that he was not certain how the alteration occurred, but subsequently acknowledged that he made the change.  He also stated it was consistent with his impression of the information that he had been provided by the Liaison.

We discussed the altered email with SSA 2, who told us that the OGC Attorney was the person he relied upon to resolve the issue of whether Carter Page was or had been a source for the other U.S. government agency.  SSA 2 told us that the statement inserted into the Liaison's email—that Page was "not a source"— was the most important part of the email for him.  SSA 2 said "if they say [he's] not a source, then you know we're good."  SSA 2 also said that if the email from the Liaison had not contained the words "not a source" then, for him, the issue would have remained unresolved, and he would have had to seek further clarification.  SSA 2 stated:  "If you take out 'and not a source,' it's not wrong, but it doesn't really answer the question."  He also said that something lesser, such as a verbal statement from the Liaison through the OGC Attorney, would not have resolved the issue for him.  SSA 2 also told us it was important to him that the OGC Attorney had first sent the Liaison's response email to the OI Attorney, because if they discussed the issue and they have "decided we don't have to do a footnote that he's not a source…we've resolved this.  We're good to move forward."  He also said that he "would assume that the [OI Attorney]…received exactly what [SSA 2] received since it was a forward."

We also showed the altered June 19, 2017 email to the Liaison.  She told us that the combination of the omission of the OGC Attorney's question to the Liaison about Page's status as a "[digraph] source," along with the addition of the words "not a 'source'" to her response, was misleading.  She explained that by omitting

---

[398] However, the email the OGC Attorney sent to SSA 2 did include header information from the June 16 email sent by the OGC Attorney to the OI Attorney, reflecting that the OI Attorney had been provided the Liaison's response email.  It therefore appeared to SSA 2 that he and the OI Attorney had received the same information about Page's past status with the U.S. government agency.  However, as described above, the email the OGC Attorney sent to the OI attorney did not contain the altered text that was included in the email that the OGC Attorney sent to SSA 2.

[399] The OGC Attorney did not alter the email he had previously forwarded to the other FBI agents.

how the OGC Attorney phrased his questions to her, it took away the context necessary to fully understand her response. We also asked the Liaison whether "not a 'source'" is language she would use to describe a "[digraph]." She said she would not have included the "not a 'source'" language in an email to the OGC Attorney because the Liaison's agency does "not call them sources." The Liaison added that the phrase "not a 'source'" is contradictory to the term "[digraph]," because "[digraph]" indicates that the person is providing information to the Liaison's agency.

Consistent with the Inspector General Act of 1978, following the OIG's discovery that the OGC Attorney had altered the email that he sent to SSA 2, who thereafter relied on it to swear out the final FISA application, the OIG promptly informed the Attorney General and the FBI Director, and provided them with the relevant information about the OGC Attorney's actions.[400]

### C.    Information Concerning Steele's Past Work-Related Performance

As described in Chapter Five, NSD told us that in the absence of information corroborating the facts from Steele's reporting asserted in the Carter Page FISA application, it was particularly important for the application to articulate to the court the FBI's assessment of the reliability of the source. Therefore, all four FISA applications articulated for the court the basis for the FBI's assessment that Steele was reliable. In all four applications, the FBI's source characterization statement began with the identification of Steele as a former ███████████████████. FBI and NSD officials told us that in assessing Steele's reliability, the FBI placed great weight on Steele's ███████████. Additionally,

---

[400] Prior to the Crossfire Hurricane investigation, the OGC Attorney had been assigned to provide legal support to the FBI's "Midyear Exam" investigation, which concerned former Secretary of State Hillary Clinton's use of a private email server. In the OIG's June 2018 report, *Review of Various Actions in Advance of the 2016 Election*, we referred to the OGC Attorney as FBI Attorney 2. In that report, we described improper political instant messages that the OGC Attorney sent to other FBI employees using FBI information technology systems. For example, on the day after the 2016 U.S. elections, the OGC Attorney sent an instant message to another FBI employee regarding the election outcome, stating:

> I am so stressed about what I could have done differently...I just can't imagine the systematic disassembly of the progress we made over the last 8 years. ACA is gone. Who knows if the rhetoric about deporting people, walls, and crap is true. I honestly feel like there is going to be a lot more gun issues, too, the crazies won finally. This is the tea party on steroids. And the GOP is going to be lost, they have to deal with an incumbent in 4 years. We have to fight this again. Also Pence is stupid.

Two weeks later, the OGC Attorney sent an instant message to another FBI colleague about the amount of money the subject of an FBI investigation had been paid while working on the Trump campaign. The FBI colleague responded, "Is it making you rethink your commitment to the Trump administration?" The OGC Attorney replied, "Hell no," and then added "Viva le resistance."

We note that the OGC Attorney's alteration of the Liaison's email in connection with the Crossfire Hurricane investigation described in this report occurred in June 2017, one year prior to our June 2018 referral to the FBI of his actions in connection with the Midyear Exam investigation.

as described in Chapter Five, the FISC legal advisor asked NSD to explicitly identify ███████████████████ in the source characterization statement.

As described in Chapter Six, after the first FISA application was filed, but before Renewal Application No. 1, Priestap and Strzok obtained information about Steele from persons with direct knowledge of his performance of his work duties in a prior position in an effort to further assess Steele's reliability. This was the first time anyone associated with the Crossfire Hurricane investigation discussed Steele with these persons, and it was prompted, at least in part, by Steele's disclosures to *Mother Jones* in late October 2016. Priestap and Strzok took handwritten notes of the feedback they received from the former employer about Steele. These notes referenced that Steele had held a "moderately senior" position in Moscow, as the Crossfire Hurricane team had originally thought and advised OI. Nothing in the notes indicated that Steele was "high-ranking" as stated in the applications. The notes described positive feedback about Steele, such as "smart," "person of integrity," "no reason to doubt integrity," and "[i]f he reported it, he believed it." Priestap told us that his impression was that Steele was considered to be a "Russia expert" and very competent in his work. However, Priestap and Strzok were also provided negative feedback concerning Steele's judgment, including "[d]emonstrates lack of self-awareness, [demonstrates] poor judgment;" "[k]een to help but underpinned by poor judgment;" "[j]udgment: pursuing people [with] political risk but no intel value;" "[r]eporting in good faith, but not clear what he would have done to validate;" and "[d]idn't always exercise great judgment—sometimes [he] believes he knows best."

Priestap and Strzok told us that they did not change their overall assessment of Steele's reliability after being provided this information because they were told that Steele was never untruthful. According to Priestap, he interpreted the negative feedback about Steele's judgment to mean that Steele was a person who strongly believed in his convictions and that those convictions did not always align with management's convictions. Priestap said he himself confronted similar disagreements over prioritization with his own staff, and what stood out more to Priestap were the statements indicating that Steele had never been intentionally dishonest in his prior work. Priestap also told us that, according to the feedback he received, Steele's past reporting accurately reflected what he was told, but Priestap said the question was the accuracy of what he was told, which could not addressed in this instance without knowing the identity of Steele's sources for the election reporting. Strzok interpreted the feedback regarding Steele's judgment to mean that Steele sometimes followed the "shiny object" without a judgment about whether the shiny thing was really worth pursuing given the risks involved, which was seen as a hindrance to his career progression, but that Steele had no history of fabricating, embellishing, or otherwise "spinning" information.

FBI officials told us, and documents reflect, that Strzok briefed the Crossfire Hurricane team regarding the information he received about Steele. Case Agent 1's handwritten notes from a December 2016 team meeting reflect that the team was told that Steele "may have some judgment problems" but that the team could "continue to rely on reports for FISA." Case Agent 1 did not recall this discussion or

who said that they could continue to rely on Steele's reporting in the next FISA application.

Handwritten notes from the OI Unit Chief reflect that the OGC Attorney advised the OI Unit Chief and the OI Attorney at the end of November 2016 that the team had met with persons with direct knowledge of Steele's performance of his work duties in a prior position. According to the notes, the OGC Attorney told OI that Steele's past contacts said he "could be prone to rash judgments." The notes also indicate that the OGC Attorney advised OI that the FBI did an internal review and found no indication that any of Steele's reporting was false or misleading and that McCabe had signed off on requesting a FISA renewal targeting Carter Page.

The OI Attorney told us that he only vaguely recalled this discussion, but the OI Unit Chief said that he recalled being told that Steele was prone to rash judgment in his actions but not in his reporting. The OI Unit Chief told us he also recalled that the FBI believed it had no reason to question Steele's reporting and therefore had not changed its assessment of his reliability. Evans recalled that one or both of them later advised him, probably in December 2016, that the FBI had been told Steele had "questionable judgment" but was otherwise professional and reliable.

As for why Renewal Application No. 1 (and the subsequent renewal applications) did not include this information about Steele, Evans and the OI Unit Chief told us that, because the information did not change the FBI's assessment as to Steele's reliability, the circumstances leading to the FBI's closure of Steele as a CHS was the more critical update for the court. However, during their OIG interviews, Evans and the OI Unit Chief were shown Strzok's notes. After reviewing the notes, both Evans and the OI Unit Chief said that the notes contained more detail than what they recalled being told by the FBI, including the statement that it was "not clear what [Steele] would have done to validate" his reporting. Both said that they would have asked for more detail about that particular comment if they had known at the time. According to Evans, he would have considered whether to include information in the renewal application if he had known.

### D.     Information Regarding Steele Reporting's Ties to the Democratic Party, the Democratic National Committee, and the Hillary Clinton Campaign

As described in Chapter Five, the first Carter Page FISA application contained a footnote advising the court that Steele's election reporting may have originated from a request for political opposition research:

> [Steele], who now owns a foreign/business/financial intelligence firm, was approached by an identified U.S. person, who indicated to [Steele] that a U.S.-based law firm had hired the identified U.S. person to conduct research regarding Candidate#1's ties to Russia (the identified U.S. person and [Steele] have a long-standing business relationship). The identified U.S. person hired [Steele] to conduct this research. The

identified U.S. person never advised [Steele] as to the motivation behind the research into Candidate #1's ties to Russia. *The FBI speculates that the identified U.S. person was likely looking for information that could be used to discredit Candidate #1's campaign.* (Emphasis added).

According to FBI officials, and as represented to OI at the time of the first application, the Crossfire Hurricane team was told by Steele that he had been hired by Fusion GPS's Glenn Simpson to perform his election-related work, was advised by Steele that Fusion GPS had been retained by an unnamed law firm, and had not been informed by Steele of the motivation of Fusion GPS. Additionally, as we discuss in Chapter Four, the FBI assumed, but did not know at the time of the first application, that Steele was conducting opposition research. As described in Chapter Five, McCabe told us that he thought he had heard by the time of the first application that Simpson had been working first for a Republican and then later for a Democrat. However, McCabe also told the OIG that his memory on the timing of events is not always reliable. Other FBI officials told us that the team did not know who hired Simpson until after the first FISA application. We were told by Evans that the use of the term "speculates" in the footnote was intended to convey that even though the FBI did not know at the time the identity of Simpson's and the U.S. law firm's ultimate client, the FBI believed it was likely that it was someone who was seeking political opposition research against candidate Trump.[401]

According to FBI officials, the Crossfire Hurricane team did not investigate who ultimately paid for Steele's reporting. The OGC Unit Chief and the Supervisory Intel Analyst told us that the team focused instead on vetting the accuracy of the information in Steele's reporting because, if the reporting turned out to be true, it would not matter to the team who ultimately paid for the research.

Nevertheless, in the months following the first FISA application, information became known to the Crossfire Hurricane team that provided greater clarity about the political origins and connections of Steele's reporting. As described in Chapter Nine, by no later than November 21, 2016, Ohr had advised FBI officials that Steele's reporting had been given to the Hillary Clinton campaign (among other entities) and that Steele was "desperate" that Trump not be elected. SSA 1 and the Supervisory Intel Analyst told us, and email communications reflect, that by no later than January 11, 2017, SSA 1 and the Supervisory Intel Analyst understood that Fusion GPS had been hired by the DNC and another unidentified entity to research candidate Trump's ties to Russia. Finally, handwritten notes and other documentation reflect that in February and March 2017 it was broadly known among FBI officials working on and supervising the investigation, and shared with senior NSD and ODAG officials, that Simpson (who hired Steele) was himself hired first by a candidate during the Republican primaries and then later by someone

---

[401] As we describe in Chapter Five, OI officials told us that the FBI did not advise them of the FBI's belief that Steele was conducting political opposition research until October 11, 2016, when Evans asked the FBI three rounds of questions about Steele's political affiliations in connection with Evans's review of the first FISA application probing the FBI for information. Evans said that he expressed his frustration that the FBI had not informed OI of its belief earlier in the FISA process.

related to the Democratic Party. Nevertheless, the footnote in Renewal Application Nos. 1, 2 and 3, was not revised to reflect this additional information.

Case Agent 6 told us that after he took over the Carter Page investigation, he believed he had a conversation with Case Agent 1 about the identity of Steele's client, but he did not recall any details about what he was told. Case Agent 1 and the OGC Attorney told us that they did not recall when they learned who ultimately paid for the research, and Case Agent 1 said that it may have been sometime after he left the case. The OI Attorney told us that he did not recall being advised that the FBI had more clarity on who had paid for Steele's research.

By March 2017, Evans had received information indicating that Simpson was first hired by a Republican primary candidate and then later by someone related to the Democratic Party. Evans told us that he did not recall revisiting the language in the footnote after learning this information. He said that he interpreted the word "speculates" in the footnote to have the same meaning as the FBI "assesses" or "believes." Further, in his opinion, the footnote clearly advised the court of the potential for political bias, such that he could not see how the additional information would have made a real difference for the court. He said that he did not know that members of the Crossfire Hurricane team had learned that Fusion GPS was hired specifically by the DNC and that, if that were true, he would have wanted to update the court about that information, not because it was material, but just in the interest of candor with the court.

The OGC Unit Chief recalled the team briefing Comey that the research was conducted first for a Republican primary candidate and then later for the Democratic Party. We determined this briefing likely occurred in March 2017. Comey told us that he remembered being advised of this information. He also told us that he did not recall taking notice of the word "speculates" at the time he reviewed the FISA applications, but that in reviewing the language again he thought it "fairly conveyed" that the research originated from a biased source.

Yates told us that she remembered hearing that Steele's research was conducted first for a Republican and then later for a Democrat, but she said she did not recall whether she heard that before or after she left the Department in late January 2017. Yates was removed as Acting Attorney General on January 30, 2017, and we did not find evidence that she was informed of this information prior to that time. We identified notes indicating that by February and March 2017 it was broadly known that Simpson was hired first by a Republican primary candidate and then later by someone related to the Democratic Party. Boente told us that he remembered knowing before he approved Renewal Application No. 2 in April 2017 that Simpson had been hired by a Republican primary candidate and then a Democratic candidate, but Boente said he did not recall any discussion about whether to revise the language in the footnote. He said that whether, in hindsight, the FBI should have revised the language was not a question he could answer during his OIG interview without first having the benefit of an analysis. Rosenstein told us that he did not recall the FBI telling him about the political origins of Steele's reporting before he approved Renewal Application No. 3 in June 2017 or whether he just inferred that after reading the footnote. Rosenstein said that he

did not recall the word "speculates" striking him at the time, but that if the FBI had information at the time of this final FISA application that the research had been funded by the Democratic Party, and that it was going to the Hillary Clinton campaign, he would have expected the FBI to revise the language to be more explicit.  He said that if the FBI had such knowledge, the application should say that, or say that a witness told them that, because the additional clarity about the ultimate clients for Steele's reporting would be a relevant fact, though not necessarily dispositive.  Similarly, although he did not read the renewal applications before they were filed, then FBI General Counsel James Baker told us that if the team had known the identity of Simpson's clients at the time, such that it was not speculation anymore, then Baker would have expected the language to have been updated.

### E.    FBI's Source Validation Report Concerning Steele

To establish Steele's reliability, all four Carter Page FISA applications included the statement that Steele's reporting "has been corroborated and used in criminal proceedings."  As described in Chapter Five, members of the Crossfire Hurricane team, including the Supervisory Intel Analyst and SSA 1, told us that the phrase "corroborated and used in criminal proceedings" was a reference to Steele's past reporting in the FIFA investigation.  Although the team did not review the FIFA case file, SSA 1 stated that they "speculated" that Steele's information was corroborated and used in criminal proceedings because they knew Steele had been "a part of, if not predicated, the FIFA investigation" and was known to have had an extensive source network into Russian organized crime.  However, as also described in Chapter Five, no one provided the source characterization statement to Steele's handling agent (Handling Agent 1) for approval, as required by the Woods Procedures.  Handling Agent 1 told us that he would not have approved the statement because most of Steele's past reporting had not been corroborated and it had never been used in a criminal proceeding.

As we described in Chapter Six, the Crossfire Hurricane team requested that the FBI's Validation Management Unit (VMU) conduct a formal human source validation review of Steele in early 2017.  VMU completed its evaluation and issued its report on March 23, 2017, which stated that Steele was "suitable for continued operation" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  However, the validation report stated that Steele's past reporting in support of the FBI's Criminal Program had been "minimally corroborated," which included Steele's contributions to the FIFA case.[402]  Handling Agent 1 told us that "minimally corroborated" was consistent with his understanding of the entire collection of Steele's reporting to the FBI.  Although this finding was different from the source characterization statement contained in

---

[402] As noted in Chapter Six, the validation report did not include the Validation Management Unit's (VMU) determination that Steele's election reporting was not corroborated. According to the Unit Chief of VMU, it is not common practice for VMU to include negative findings in its reports, only what they "positively find." The Unit Chief of VMU also said that within the validation context, the term "corroboration" means that the FBI has received the same information from a separate source, and added that uncorroborated does not mean the information is untrue or provide a basis for shutting down a source.

the Carter Page FISA applications, the two renewal applications filed after the March 2017 validation report did not revise the source characterization statement or at least advise the court of VMU's finding.

Although SSA 2 and SSA 3, the Headquarters Program Managers who supervised Crossfire Hurricane from FBI Headquarters, had received the validation report and were aware of its findings, we found no evidence that this information was circulated to NYFO, where the Carter Page investigation was being conducted at the time. Case Agent 1 and Case Agent 6, both of whom were working out of NYFO at the time, told us that they did not recall ever receiving the VMU report or being aware of its findings. Case Agent 6 told us that he would have wanted to know about the findings so that he could have asked questions, and he would have expected that the OI Attorney drafting the next FISA renewal application would have wanted to do the same. The OGC Unit Chief and OGC Attorney also told us they did not recall receiving the VMU report or learning its findings, though the OGC Unit Chief told us she had a general understanding that the FBI officials who reviewed the report thought the information was consistent with the FISA applications.

OI officials told us that they did not recall having been advised of VMU's findings at any time before the second and third renewals, and the OI Attorney said that, had he known, he would have sought additional information from the FBI about the validation that was undertaken. Further, Evans told us that the finding sounded like something he would have thought warranted an update to the court in the next FISA application.

### F. Joseph Mifsud's Denials to the FBI

As described in Chapter Three, Priestap and other FBI officials told the OIG that the sole predication for opening the Crossfire Hurricane investigation was the statement George Papadopoulos made to FFG officials that the Trump campaign had received a suggestion or offer of assistance from Russia that involved the anonymous release of disparaging information about then presidential candidate Hillary Clinton. All four Carter Page FISA applications relied upon this information in the probable cause section to help support the FBI's assessment that Russia was attempting to influence the 2016 presidential election and that those efforts were being coordinated by Carter Page and possibly others associated with the Trump campaign.

During an interview with the FBI in late January 2017, Papadopoulos told the FBI that a Maltese citizen, Joseph Mifsud, who was living in London and serving as a university professor, told him that the Russians had "dirt" on Clinton in the form of "thousands of emails." In an interview in February 2017, Papadopoulos told the FBI that Mifsud told him that Clinton had "problems with her emails." In the same interview, Papadopoulos said that the "Russians had her emails" because the Russians told him (Mifsud) they have them. The FBI determined that Mifsud provided this information to Papadopoulos on April 26, 2016, shortly before Papadopoulos's meeting with the FFG.

As part of its investigation, the FBI interviewed Mifsud in February 2017, after Renewal Application No. 1 was filed but before Renewal Application No. 2. According to the FD-302 documenting the interview, Mifsud admitted to having met with Papadopoulos but denied having told him about any suggestion or offer from Russia.[403] Additionally, according to the FD-302, Mifsud told the FBI that "he had no advance knowledge Russia was in possession of emails from the Democratic National Committee (DNC) and, therefore, did not make any offers or proffer any information to Papadopoulos." Renewal Application Nos. 2 and 3 did not include these statements Mifsud made to the FBI.

A written case update indicates that Mifsud's denial was circulated to the Crossfire Hurricane team no later than late April 2017. Case Agent 6 told us that he was not sure he was aware at the time that Mifsud had been interviewed.[404] The OI officials handling Carter Page FISA applications told us that they either had not been advised of the denial or did not recall being advised at the time. Evans told us that he could not say definitively whether OI would have included this information in subsequent renewal applications without discussing the issue with the team (the FBI and OI), but Evans also said that Mifsud's denial as described by the OIG sounded like something "potentially factually similarly situated" to the denials made by Papadopoulos that OI determined should have been included.[405]

### G.    Carter Page's Alleged Role in Changing the Republican Platform on Russia's Annexation of Ukraine

As described previously, all four FISA applications relied upon information attributed in the Steele reporting to Person 1, including that:

> [A]ccording to [the sub-Source], Candidate #1's [Trump's] team, which the FBI assesses includes at least Page, agreed to sideline Russian intervention in Ukraine as a campaign issue and to raise U.S./NATO defense commitments in the Baltics and Eastern Europe to deflect attention away from Ukraine.

This assessment was based upon information in Steele Report 95 that purportedly came from Person 1 ("Source E" in Report 95), as well as news articles in July and August 2016 reporting that the Trump campaign adopted a milder tone toward

---

[403] According to the Special Counsel's Report, Mifsud made inaccurate statements during this FBI interview about his interactions with Papadopoulos. *See The Special Counsel's Report*, Vol. I at 193.

[404] We did not find any information in the documents we reviewed indicating that Case Agent 6 received the written case update containing the description of Mifsud's interview.

[405] As described in Chapter Seven, Renewal Application Nos. 2 and 3 advised the court in a footnote that, over the course of several interviews with the FBI in early 2017, Papadopoulos confirmed that he met with officials from the FFG but denied that he discussed anything with them relating to the Russian government. However, as described earlier in this chapter, none of the FISA applications advised the court that Papadopoulos denied to FBI CHSs and the FBI that anyone associated with the Trump campaign was involved in the DNC email hack or was collaborating with Russia or with outside groups like WikiLeaks in the release of emails.

Russia's annexation of Crimea and influenced changes to the Republican Party's platform on providing weapons to Ukraine.

We found that, other than this information from Report 95, the FBI's investigation did not reveal any information to demonstrate that Carter Page had any involvement with the Republican Platform Committee. We further found that, even after the FBI identified the individuals who were involved with influencing the Republican Platform change on Ukraine (which did not include Page), the FBI never altered their assessment. The FBI also did not include in any subsequent Carter Page FISA applications information that contradicted the assertion that Carter Page was involved with the Republican Platform Committee's provision on Ukraine, nor did OI provide such information at any time to the FISC.

As discussed in Chapter Ten, in October 2016, Carter Page met with an FBI CHS and, two days later, pertinent statements from that meeting were sent to Case Agent 1, SSA 1, and other agents and analysts on the Crossfire Hurricane team. The excerpts included statements Page made to the CHS about the platform committee during the Republican National Convention. Page told the CHS that he "stayed clear of that—there was a lot of conspiracy theories that I was one of them...[but] totally off the record...members of our team were working on that, and...in retrospect it's way better off that I...remained at arms length."

Case Agent 1 told the OIG that he did not believe Carter Page's statements on the platform issue were "that specific" and said that Page "minimized" and "vacillated on some things." SSA 1 told us he did not recall why Page's denial that he participated in the Republican Platform Committee was not included in the first FISA application. Before FISA Renewal Application No. 1, which was filed in January 2017, the OI Attorney did receive the documents containing Page's October 2016 denials. Yet, the information about the meeting remained unchanged in the renewal applications. The OI Attorney told us that he did not recall the circumstances surrounding this, but he acknowledged that he should have updated the descriptions in the renewal applications to include Page's denials.

Subsequently, an FBI November 30, 2016 Intelligence Memorandum titled "The Trump Campaign and US-Russia-Ukraine Policy—A Quick Overview," stated:

> During a RNC platform sub-committee meeting, Diana Denman, a platform committee member, attempted to insert amendment language calling for the United States to "provide lethal defensive weapons to the Ukrainian government," adding that the Ukraine [sic] was presently "fighting a [Russian-backed] separatist insurrection." In response to Denman's amendment, two Trump campaign members—one of whom was Jeff [JD] Gordon—approached the sub-committee co-chairman and asked for the amendment to be set aside. Denman's amendment was subsequently tabled, and the Trump staffers instead convinced the platform subcommittee to change the language from "lethal defensive weapons" to calling for "appropriate assistance."

The Intelligence Memorandum did not identify or reference Carter Page as the second individual involved, or state that he was involved in any capacity in the platform change. Case Agent 1 said he did not recall reading the November 30 Intelligence Memorandum but said that, at that time, the team was still trying to determine if there was any information connecting Carter Page to the platform change. Case Agent 1 told us that although the FBI did not know who from the Trump campaign approved Carter Page's trip to Moscow prior to the Republican Convention, and the platform change was made shortly after Page returned from his trip to Russia, the belief was that Page was involved in the platform change and the team was hoping to find evidence of that in their review of the FISA collections of Page's email accounts.

Additionally, as described in Chapter Six and earlier in this chapter, in January 2017, Steele's Primary Sub-source provided the FBI with information that was inconsistent with the information Steele reported from Person 1 (Source E in Report 95), including the reporting that Page was involved in the Republican Platform Committee changes on Ukraine. Indeed, the Primary Sub-source made no reference to discussing the Republican Platform Committee or Ukraine provision with Person 1.

Further, on March 16, 2017, Case Agent 1 and Case Agent 6 interviewed Carter Page and asked him about his activities at the 2016 Republican National Convention. Carter Page told them he had no part in the decision by the Platform Committee to omit the reference to "lethal assistance" involving Ukraine, but that he supported the omission of the reference. Page said he learned of the policy change upon receiving an email from Gordon dated July 14, 2016, to himself, Papadopoulos, and four members of the campaign foreign policy team. The email, which Page provided to the FBI during the interview, stated, in part:

> I hope you had a chance to read some of the press coverage over Platform [sic]. We are proud to say it is the strongest pro-Israel policy statement in the history of the Republican Party. We are also pleased to say we defeated red line amendments like providing lethal assistance to Ukraine.

That same day, Carter Page replied to this email, "Fantastic, J.D. thanks a lot for the useful insights and context. As for the Ukrainian amendment, excellent work."

Case Agent 6 sent this email to members of the Crossfire Hurricane investigative team, including SSA 2. The OI Unit Chief told us that he did not recall specifically seeing this email but said that if the FBI had any information suggesting Carter Page might not have been involved with the Republican platform, then it should have been discussed with OI.

Renewal Application Nos. 2 and 3 included Carter Page's denials about his involvement in the Republican Platform Committee's changes on assistance to Ukraine from the March 16 interview with the FBI. After including these denials in the applications, the renewal applications stated that,

As the FBI believes that Page also holds pro-Russian views and appears to still have been a member of Candidate #1's [Trump's] campaign in August 2016, the FBI assesses that Page may have been downplaying his role in advocating for the change to Political Party #1's [Republican] platform.

We observed among the NSD's Counterintelligence and Export Control Section (CES) records an April 2017 version of an investigation outline CES prepared and periodically updated reflecting that Carter Page received an email from Gordon in July 2016 about the platform change and that the email "suggests Page was not involved in the decision." Also included in the CES outline were Page's denials to the FBI. Former CES Chief David Laufman told us that, at that time, the FBI was at an "investigative dead end" with respect to Page and the platform issue with no new evidence emerging. During his OIG interview, we provided Laufman with the July 2016 email that Carter Page provided to FBI agents during his March 16 interview. After reviewing the email, Laufman told us that he would reword the reference in the CES outline stating that the email "suggests Page was not involved in the decision to" instead read: "there's no indication in the email that Page was involved."

An FBI March 20, 2017 Intelligence Memorandum titled "Overview of Trump Campaign Advisor Jeff D. [J.D.] Gordon" again attributed the change in the Republican Platform Committee's Ukraine provision to Gordon and an unnamed campaign staffer. The updated memorandum did not include any reference to Carter Page working with Gordon or communicating with the Republican Platform Committee. On May 5, 2017, the Counterintelligence Division updated this Intelligence Memorandum to include open source reporting on the intervention of Trump campaign members during the Republican platform discussions at the Convention to include Gordon's public comments on his role. This memorandum still made no reference to involvement by Carter Page with the Republican Platform Committee or with the provision on Ukraine.

On June 7, 2017, the FBI interviewed a Republican Platform Committee member. This interview occurred three weeks before Renewal Application No. 3 was filed. According to the FBI FD-302 documenting the interview, this individual told the FBI that J.D. Gordon was the Trump campaign official that flagged the Ukrainian amendment, and that another person (not Carter Page) was the second campaign staffer present at the July 11 meeting of the National Security and Defense Platform Subcommittee meeting when the issue was tabled.

Although the FBI did not develop any information that Carter Page was involved in the Republican Platform Committee's change regarding assistance to Ukraine, and the FBI developed evidence that Gordon and another campaign official were responsible for the change, the FBI did not alter its assessment of Page's involvement in the FISA applications. Case Agent 6 told us that when Carter Page denied any involvement with the Republican Platform Committee's provision on Ukraine, Case Agent 6 "did not take that statement at face value." He told us that at the time of the renewals, he did not believe Carter Page's denial and it was the team's "belief" that Carter Page had been involved with the platform change. We

asked Case Agent 6 if the FBI had any information to support its continued assessment that Carter Page was involved in the Republican Platform Committee's provision on Ukraine, and he provided no further information.

In the next chapter, we discuss the interactions career Department attorney Bruce Ohr had with the Crossfire Hurricane team, the information he provided to the team regarding his interactions with Steele and Glenn Simpson, and the work Ohr's wife performed for Fusion GPS. We also describe Ohr's actions following the 2016 elections relating to the investigation of Paul Manafort.

[PAGE INTENTIONALLY LEFT BLANK]

# CHAPTER NINE
# DEPARTMENT ATTORNEY BRUCE OHR'S ACTIVITIES DURING THE CROSSFIRE HURRICANE INVESTIGATION

In this chapter, we describe Department attorney Bruce Ohr's activities during the Crossfire Hurricane investigation, primarily relating to his interactions with Christopher Steele. Ohr was an Associate Deputy Attorney General (ADAG) in the Office of the Deputy Attorney General (ODAG) and the Director of the Organized Crime and Drug Enforcement Task Force (OCDETF) at the time of the Crossfire Hurricane investigation, and was personally acquainted with Steele and Fusion GPS co-founder Glenn Simpson. In addition, Ohr's wife Nellie Ohr was employed as an independent contractor by Fusion GPS. During 2016 and 2017, Ohr received information from Steele and Simpson describing alleged links between the Russian government and the Donald J. Trump campaign and suggesting that the Russian government had leverage over Trump. Ohr provided the information he received from Steele and Simpson to the FBI, which had already received much, but not all, of the same information through its direct contact with Steele. Ohr did not advise any of his supervisors in ODAG about his contacts with Steele and Simpson, about his wife's work for Fusion GPS, or about his acting as a conduit of this information to the FBI, until ODAG leadership confronted Ohr about his activities in late 2017.

We also describe in this chapter Ohr's and several other Department attorneys' activities before and after the November 2016 elections relating to the Department's then ongoing criminal money laundering investigation of Paul Manafort.

## I.    Bruce Ohr's Background

### A.    Department Positions and Responsibilities

Bruce Ohr joined the Department on January 31, 1991, as an Assistant U.S. Attorney (AUSA) in the U.S. Attorney's Office for the Southern District of New York (SDNY). Ohr remained with SDNY until 1999 when he transferred to the Department's Criminal Division (CRM) in Washington, D.C., as Chief of the Organized Crime and Racketeering Section (OCRS). Ohr told the OIG that as Chief of OCRS, he tried to develop the Department's capacity for fighting transnational organized crime and that this was when he began tracking Russian organized crime.

In 2011, Ohr became Counsel for Transnational Organized Crime and International Affairs to the Assistant Attorney General in CRM and worked primarily for CRM Deputy Assistant Attorney General Bruce Swartz. According to Ohr, in that position he focused on policy issues relating to transnational organized crime and had no prosecutorial responsibilities. He stated that he was often the Department's "public face" at conferences and was sometimes approached by individuals who provided information about transnational organized crime.

In November 2014, Ohr became an ADAG in ODAG and the Director of OCDETF, a Senior Executive Service-level (SES) position. Ohr reported to the Principal Associate Deputy Attorney General (PADAG) and the Deputy Attorney General (DAG) in both of these positions. Ohr stated that as OCDETF Director, he oversaw OCDETF in its "mission…to coordinate organized crime and primarily drug investigations across the different parts of the U.S. government." He said OCDETF is responsible for aspects of the national drug and organized crime policies and provides funding for agents and prosecutors working on drug and organized crime cases. OCDETF is not an operational entity and does not direct prosecutorial actions in any cases. Ohr told us that when he became the OCDETF Director, then DAG Jim Cole expressed his desire for Ohr to expand OCDETF's mission to include transnational organized crime matters. He said that, as a result, he continued working on transnational organized crime policy and, in order to maintain awareness, tracked Russian organized crime issues.

As an ADAG, Ohr also served as Director of the Attorney General's Organized Crime Council, as the Department's Liaison to the Office of National Drug Control Policy, and as a member of the Attorney General's Capital Case Committee. He also assisted with implementing portions of the 2017 Executive Order on Transnational Organized Crime and developing a Transnational Organized Crime initiative.

Throughout his tenure in the Department, Ohr has been a career employee and not a political appointee.

## B.    Ohr's Relationship with Steele and Glenn Simpson

### 1.    Ohr's Relationship with Steele from 2007 to March 2016

Ohr stated that he met Christopher Steele in late 2007 during meetings with an allied country's government officials.[406] He said that after the meetings, he met Steele for lunch and spoke about the threat of Russian organized crime. Ohr stated that after Steele left government service, Steele set up a private investigations firm and remained in contact with Ohr. Ohr told us that he and Steele spoke "probably less than once a year" and that he would see Steele for social visits, such as breakfast or lunch, if Steele visited Washington, D.C. He described his relationship with Steele as being "primarily professional," but also "friendly" because they shared with each other information about their families. Steele likewise told us that he and Ohr were personal friends and that he would see Ohr whenever he was in Washington, D.C., which was about once or twice a year.

Ohr stated that Steele provided him reports that Steele prepared for his clients, which Steele thought the U.S. government might find interesting. He told

---

[406] Steele told us he recalled meeting Ohr in 2008 while he was visiting a U.S. government agency, and his contact at that agency arranged for him to meet Ohr.

us that he initially did nothing with the information he received from Steele because it was general and not directly useful for an investigation.

Ohr said he introduced Steele to Handling Agent 1 so that Steele could provide information directly to the FBI in approximately spring 2010.[407] He told us that he "pushed" to make Steele an FBI Confidential Human Source (CHS) because Steele's information was valuable. Ohr also said that it was "not efficient" for him to pass Steele's information to the FBI and he preferred having Steele work directly with an FBI agent. According to Steele, Ohr and Handling Agent 1 coordinated over a period of time with Steele to set up his relationship with the FBI.

Ohr's contact with Steele did not end after Steele formalized his relationship with Handling Agent 1 and the FBI.[408] Ohr met or talked with Steele multiple times from 2014 through fall 2016, and on occasion those in-person meetings or video calls included Handling Agent 1. Ohr told us that he viewed meeting with Steele as part of his job because he needed to maintain awareness of Russian organized crime activities and Steele knew Russian organized crime trends better than anyone else. He said he knew Steele was also speaking to Handling Agent 1 at this time because Steele would say that he provided the same information to Handling Agent 1. Handling Agent 1 told us that he knew Steele and Ohr were in contact and talked about issues "at a higher policy level," but stated that he did not know anything further regarding their interactions.

Ohr and Steele also communicated frequently over the years regarding Russian Oligarch 1, including in 2016 during the time period before and after Steele was closed as an FBI CHS.[409] Steele told us his communications with Ohr concerning Russian Oligarch 1 were the result of an outreach effort started in 2014 with Ohr and Handling Agent 1, to approach oligarchs about cooperating with the U.S. government. Ohr confirmed that he and Handling Agent 1 asked Steele to contact Russian oligarchs for this purpose. This effort resulted in Ohr meeting with Russian Oligarch 1 and an FBI agent in September 2015.

## 2.    Ohr's Relationship with Simpson

Ohr told the OIG that he could not recall how he first met Fusion GPS co-founder Glenn Simpson.[410] He estimated that he saw Simpson less than ten times over several years. According to Ohr, Simpson usually reached out to him to

---

[407] Ohr stated that he met Handling Agent 1 when he was with SDNY and remained in contact with him through 2017. As described in Chapter Four, Steele stated he recalled meeting Handling Agent 1 when he was with Ohr at a European seminar on Russian related issues in June 2009.

[408] Ohr stated that he talked to other individuals he met through his job duties over the years and discussed Russian organized crime whenever the opportunity arose. He told us that he spoke with Steele more often than other individuals because Steele contacted him more frequently. Ohr also stated that Steele was the only contact that he introduced to the FBI.

[409] The United States imposed sanctions on Russian Oligarch 1 and his business interests, including his Russian company, for his links to senior Russian government officials, suspected criminal activities, and ties to Russian organized crime.

[410] As noted in Chapter One, Simpson declined our request for an interview.

provide information about Russian organized crime figures. Ohr stated that most of Simpson's past information was not actionable, so he did not do anything with it and did not try to introduce Simpson to the FBI. However, as described below, Ohr told us that when Simpson provided names in 2016 of possible intermediaries between Russia and the Trump campaign, he wanted to introduce Simpson to the FBI, but thought Simpson seemed reluctant and did not do so.

### C.   Nellie Ohr's Relationship with Steele and Work for Fusion GPS

Nellie Ohr, Bruce Ohr's wife, told the OIG that she met Steele in 2009 through her husband, and that she recalled meeting him two more times— sometime after 2014 and then at the July 30, 2016 breakfast meeting discussed later in this chapter. She stated that she knew of Steele's interest in Russian oligarchs and understood him to be a Russia analyst. She described his relationship with her husband as a "professional associate" and considered them to be friendly, but not friends.

Nellie Ohr, who has a doctorate in Russian history and is fluent in Russian, told us that she contacted Simpson in October 2015 to ask for a job with Fusion GPS. She stated that she was familiar with Simpson from reading published newspaper articles he wrote relating to Russian criminal activity. She said that she was hired by Fusion GPS as an independent contractor shortly thereafter. According to Nellie Ohr, she worked remotely from home for Fusion GPS, conducting online open source research. Bruce Ohr told us that he did not play any role in Nellie Ohr's hiring by Fusion GPS.

Nellie Ohr stated that while working for Fusion GPS, she initially conducted online, open source research about a Russian company suspected of human trafficking. She told us that, after her first project, Fusion GPS tasked her to research then candidate Trump and his Russian business associates, which involved searching Russian and other foreign language websites and databases and providing periodic reports detailing her findings. Nellie Ohr stated that she was not told who was funding this project and did not know that Steele was also working for Fusion GPS until July 2016. She said that she stopped working for Fusion GPS on September 24, 2016, when she began a full-time job elsewhere.

### II.   Ohr's Communications with Steele, Simpson, and the FBI in 2016 and 2017

This section details Ohr's communications in 2016 and 2017 with Steele and Simpson regarding alleged Russian connections with Trump or persons associated with the Trump campaign, Ohr's meetings with FBI personnel concerning the information he received from Steele and Simpson, and the FBI's internal communications regarding Ohr.

### A. Ohr's 2016 Contacts with Steele and Simpson Regarding Russian Issues

#### 1. Ohr's July 30, 2016 Meeting with Steele

On Saturday, July 30, 2016, at Steele's invitation, Ohr and Nellie Ohr had breakfast with Steele and an associate in Washington, D.C. Nellie Ohr told us she initially thought it was going to be a social brunch, but came to understand that Steele wanted to share his current Russia reporting with Ohr. According to Steele, he intended the gathering to be a social brunch, but Ohr asked him what he was working on. Steele told us that he told Ohr about his work related to Russian interference with the election. Ohr told us that, among other things, Steele discussed Carter Page's travel to Russia and interactions with Russian officials. He also said that Steele told Ohr that Russian Oligarch 1's attorney was gathering evidence that Paul Manafort stole money from Russian Oligarch 1. Ohr also stated that Steele told him that Russian officials were claiming to have Trump "over a barrel." According to Ohr, Steele mentioned that he provided two reports concerning these topics to Handling Agent 1 and that Simpson, who owned Fusion GPS, had all of Steele's reports relating to the election. Steele did not provide Ohr with copies of any of these reports at this time. Later that evening, Steele wrote to Ohr asking to "keep in touch on the substantive issues" and advised Ohr that Simpson was available to speak with him.[411]

Ohr told the OIG that he did not know before the breakfast that Steele was working with Nellie Ohr's then employer, Fusion GPS, and did not know whether Steele was aware of Nellie Ohr's employment with Fusion GPS. However, Nellie Ohr told us that Steele made a comment during the breakfast indicating to her that he knew about her connection to Fusion GPS and that Simpson was "okay" with Steele talking to her and Ohr. Steele told us he knew Nellie Ohr was working for Fusion GPS, but he did not know she was doing work related to his project—Russian interference with the 2016 U.S. elections.

Ohr stated that because Nellie Ohr was unaware of Steele's information and had never been involved in similar situations, he became uncomfortable during the breakfast and spoke to Steele privately. Ohr said that he did not discuss "the details of the cases that [he was] working on" with Nellie Ohr. He said he explained to Steele that he did not want Nellie Ohr involved and that he made sure that she was not present for any future conversations he had with Steele. Steele told us that Ohr advised him not to discuss his reporting in front of Nellie Ohr.

Ohr said that he knew the information Steele provided to him was opposition research, but did not know who was paying for it. He told us that it was "clear" to him, due to the nature of the research, that Steele and Simpson were hired by a private party "somehow related to the Clinton campaign." He said he also surmised that Steele thought that by giving the information to Ohr, the U.S. government would do "something." Nellie Ohr similarly stated that she understood from the

---

[411] Ohr memorialized each of his meetings with Steele and Simpson with detailed notes about what they told him.

meeting that Steele hoped Ohr would speak with the FBI regarding the information concerning then candidate Trump.

Steele later told the FBI that, prior to the 2016 elections, he provided information to Ohr and was "pushing Ohr to do something about the [election] reports."

Following the July 30 breakfast, Ohr reached out to officials in the FBI and the Department about the information Steele had provided, but did not discuss this information with the DAG or anyone in ODAG. On August 3, 2016, Ohr emailed Handling Agent 1 asking to speak to him. Handling Agent 1 told us he talked with Ohr, who asked him if he had seen Steele's election reports and whether the FBI was doing anything with them. Handling Agent 1 stated that he told Ohr that an executive assistant director at FBI Headquarters and executive management in the New York Field Office (NYFO) knew about Steele's reporting and were addressing it.[412]

Ohr told us that because the information provided by Steele on July 30 was "scary" and he was unsure what to do with it, he also reached out to CRM Deputy Assistant Attorney General Bruce Swartz. According to Ohr's calendar, he met with Swartz on August 4, and both Ohr and Swartz told us that Ohr provided Swartz with specific details of what Steele had told Ohr on July 30.

Swartz told us that he did not tell his immediate supervisor, CRM Assistant Attorney General Leslie Caldwell (who was a political appointee), or any other senior Department political appointees that Ohr was meeting with Steele or the FBI because he did not want to politicize Steele's information by providing it to political appointees.

We asked Ohr whether he contemporaneously sought any ethics guidance regarding any of the events connected with Steele, Simpson, and Nellie Ohr. Ohr stated that he did not recall considering at the time whether the connections between Nellie Ohr's employment and his receipt of information from Steele and Simpson presented any ethics issues, nor did he recall contacting an ethics official for advice. Ohr stated it was possible he did not seek ethics advice because he did not want to "spread" the information around the Department before it was evaluated.[413]

---

[412] Chapter Four details Handling Agent 1's actions once he received the election reports from Steele, including how the reports made their way to FBI Headquarters and, eventually, to the Crossfire Hurricane team. Handling Agent 1 also told us that, in October 2016, he advised the members of the Crossfire Hurricane team who came to Europe to interview Steele about his August 2016 conversation with Ohr. Handling Agent 1 stated that they did not appear to be surprised by the information, so he assumed the team knew about Ohr's involvement with Steele. However, when we interviewed the Crossfire Hurricane team members, none of them recalled Handling Agent 1 telling them about Ohr.

[413] Ohr told us that although he did not seek any ethics advice concerning his wife's presence at the July 30, 2016 breakfast, he ensured that Nellie Ohr was not present for any future conversations with Steele.

### 2. Ohr's August 22, 2016 Meeting with Simpson

On August 22, 2016, Simpson emailed Ohr requesting that Ohr call him. Later that same day, at Simpson's request, Ohr met with Simpson, and Simpson provided Ohr with the names of three individuals who Simpson thought were potential intermediaries between Russia and the Trump campaign.[414] The three names are included in notes that Ohr told us he wrote on the same day as his meeting with Simpson. According to these notes, one of the three names provided by Simpson was one of the sub-sources in Steele's election reports, who we reference as Person 1 in previous chapters. Another of the names was Carter Page's "[b]usiness partner" who was an "[a]lleged" Russian intelligence officer and "the 'brains' behind [Carter] Page's company—Global Energy Capital." Ohr stated that he was uncomfortable receiving this information from Simpson and did not recall Simpson asking him to do anything with it.

Ohr told the OIG that he was troubled by Simpson's information. He stated that he could not remember when or how he provided Simpson's information to the FBI, but would have likely contacted Handling Agent 1 or the FBI's Transnational Organized Crime-East (TOC-East) Section Chief. Emails indicate that Ohr and Handling Agent 1 spoke on August 24, 2016, but neither of them could recall what they discussed.[415]

On September 12, 2016, Ohr and Handling Agent 1 exchanged emails referencing Steele. In one email, Handling Agent 1 informed Ohr that an FBI team was looking into Steele's information. In response, Ohr asked Handling Agent 1 to let him know who to contact with additional information. Handling Agent 1 told us that he did not reply to Ohr's question, and we did not find a response.

### 3. Ohr's September 23, 2016 Meeting with Steele

On September 23, 2016, at Steele's request, Steele met with Ohr in Washington, D.C. Ohr told us they spoke about various topics related to Russia, including information regarding Russian Oligarch 1's willingness to talk with the U.S. government about Manafort. Ohr said that Steele identified the person who was funding Fusion GPS's opposition research; however, according to Ohr, he did not recognize the name and could not remember it long enough to write it down after the meeting. Ohr also said that he and Steele also discussed allegations that an Alfa Bank server in the United States was a link between Russia and the Trump campaign; that Person 1's Russian/American organization in the United States had

---

[414] On November 14, 2017, Simpson testified before the House Permanent Select Committee on Intelligence. During his testimony, Simpson told the Committee that he did not meet with Ohr prior to the November 2016 presidential election. He stated further that he met with Ohr one time after Thanksgiving 2016. *See Interview of Glenn Simpson Before the Executive Session of the H. Perm. Select Comm. On Intelligence*, 115th Cong. 78 (November 14, 2017) (hereinafter *HPSCI Interview of Glenn Simpson*).

[415] Department emails indicate that Ohr first spoke with the TOC-East Section Chief regarding Steele and Simpson's information in October 2016, which we discuss below.

used the Alfa Bank server earlier in September; and that an individual working with Carter Page was a Russian intelligence officer.

According to Steele, he and Ohr also discussed Steele's concerns that if Trump won the election, Steele's source network may be in jeopardy. Steele said that a new FBI Director and new agency heads appointed by Trump would have a higher degree of loyalty to the new President, and could decide to take action against Steele and his source network. Steele told us that Ohr explained that the FBI Director had a 10-year term and could not be removed from the position by the President, so information about Steele's source network should be protected.[416] According to Steele, he also asked Ohr about why it appeared from the news that the U.S. government was not addressing his election reporting. Steele said that Ohr told him that the Hatch Act made it a criminal offense for a federal official to make a public statement to the detriment or benefit of a candidate within 90 days of an election.[417] When we asked Ohr about this, he told us he did not recall talking to Steele about either of these concerns.

Ohr did not recall whether he provided anyone with the information he received from Steele at this meeting, but stated that he might have spoken to Swartz and Handling Agent 1 about it. Swartz told us that Ohr provided him with specific information at the time regarding Steele's reporting, but he could not recall the specific information when interviewed by the OIG. Handling Agent 1 told us he did not recall discussing these topics with Ohr.

### 4. Ohr's Early October 2016 Activities Regarding Steele's Information

Sometime prior to October 13, 2016, Ohr talked to the FBI's TOC-East Section Chief about Steele's information, but Ohr could not recall what he told him. The TOC-East Section Chief recalled Ohr mentioning Steele to him starting in mid-2016, but stated that he could not specifically recall the information Ohr relayed concerning Steele's election reporting.[418]

In an October 13, 2016 email, the TOC-East Section Chief told Ohr that counterintelligence agents had traveled to a European city and spoken with Handling Agent 1. Ohr responded that he had additional information to share,

---

[416] This statement concerning the FBI Director's term is incorrect. The President has the authority to remove the FBI Director prior to the expiration of the 10-year term. See Pub. L. No. 94-503, § 203, 90 Stat. 2407 (1976); 5 U.S.C. § 532 notes.

[417] The Hatch Act does not address this issue. Rather, among other things, it prohibits federal employees from participating in certain political activities on and off duty. Section 7323(a)(1) provides that "an employee may not use his official authority or influence for the purpose of interfering with or affecting the result of an election." 5 U.S.C. § 7323(a)(1); 5 C.F.R. §§ 734, 734.401(a)(2), 734.407, 734.411.

[418] The TOC-East Section Chief noted that while it was odd to have a high-level Department official in contact with Russian oligarchs, it did not surprise him that Ohr would be approached by individuals, such as Steele, who wanted to talk to the U.S. government. The TOC-East Section Chief said that it would be "outside [of Ohr's] lane" to continue the relationship with these potential sources after their introduction to the FBI.

specifically names of possible intermediaries, and asked if the counterintelligence agents had an interest in receiving this information. We did not find a response to Ohr's email and the TOC-East Section Chief did not recall providing a name to Ohr, but the TOC-East Section Chief said he likely passed the email to a relevant point of contact who could follow up with Ohr.

### 5. Ohr's October 18-19, 2016 Communications with Steele and Meeting with McCabe and Lisa Page

Early in the morning of October 18, 2016, Steele emailed Ohr, stating "I have something quite urgent I would like to discuss with you, preferably by [video call] (even before work if you can)." Records reflect that Steele and Ohr spoke around 7:00 a.m. Later that morning, Steele wrote Ohr an email referring to U.S. sanctions on the Russian company controlled by Russian Oligarch 1. In the email, Steele referenced their earlier video call and stated that Russian Oligarch 1's attorney wanted Ohr to receive the information. Ohr told us he could not recall what he talked with Steele about that morning, or what the urgent issue was, but based on this email, he said he believed they likely discussed Russian Oligarch 1. Likewise, Steele said he could not recall the topic of the call, but after reviewing the follow-up email, he said he assumed that the conversation included information about Russian Oligarch 1.

Records reflect that shortly after the video call between Ohr and Steele, Ohr called then Deputy Director Andrew McCabe and made a calendar entry indicating a meeting with McCabe for later that day. Ohr told us he set up the meeting to share Steele's and Simpson's information with McCabe. He told us that he contacted McCabe because Ohr had previously worked with McCabe on issues associated with Russian Oligarch 1 and Russian organized crime. Ohr explained that when Ohr was an AUSA in the SDNY, McCabe was leading the Russian organized crime squad at the NYFO. Ohr also stated that he wanted to ensure McCabe knew about Steele's information and assumed McCabe would provide the information to the right people in the FBI.

We asked Ohr if Steele had asked Ohr to meet with the FBI in order to provide the information that Steele had shared with Ohr. Ohr said that he did not think so. We asked Ohr what prompted him to seek a meeting at that time with McCabe, if it was not at Steele's request. He responded that he recalled being concerned sometime between his August conversations with Handling Agent 1 and his later conversation with the TOC-East Section Chief that NYFO was not talking to FBI Headquarters about Steele's reports. Ohr stated that he wanted to meet with McCabe to ensure that McCabe knew about Steele's information and then McCabe could direct it to the right place within the FBI. We asked Ohr why the TOC-East Section Chief's October 13 email advising Ohr that counterintelligence agents were examining Steele's allegations did not alleviate his concern. He responded that he could not recall.

Ohr met with McCabe during the afternoon of October 18, 2016.[419]  Ohr told us that he recalled only meeting with McCabe once concerning Steele's information. McCabe's Special Counsel Lisa Page was also present.  Ohr told us that he informed McCabe and Lisa Page about his background with Steele and the reporting Steele provided to him.  He stated that he told them that Steele and Simpson were hired by a private party to provide opposition research, but said he could not recall whether he specifically mentioned the Clinton campaign.  Ohr thought he also shared with them that Steele and Simpson were communicating with others and that their information was generated for a political client and not for the U.S. government.  Although Ohr told us that he believed Steele and Simpson were communicating with the media, he said he could not recall whether he specifically mentioned that to McCabe and Lisa Page.

Ohr said that he also told McCabe and Lisa Page that Nellie Ohr had worked for Fusion GPS (by the date of this meeting, Nellie Ohr was no longer working for Fusion GPS).  He said he did so because the information he was providing to McCabe and Lisa Page came from Fusion GPS and Steele and that they needed to consider any possible bias.  Ohr told us that this was "another reason [for the FBI] to be cautious" when assessing the information's credibility.  According to Ohr, he understood from his meeting with McCabe and Lisa Page that he should contact the FBI if Steele contacted him again.  Ohr stated that neither McCabe nor Lisa Page discussed the Crossfire Hurricane investigation with him during the meeting.

McCabe told us that he recalled meeting with Ohr in fall 2016.  He did not remember Ohr calling him to set up the meeting or how it came to be scheduled.[420] He said that the Crossfire Hurricane team previously told him that Ohr knew Steele and that it was not until the meeting that he better understood Ohr's connection to Steele.  McCabe stated that he could not recall specific details from the meeting with Ohr, but believed that the October 18, 2016 notes by Lisa Page and Deputy Assistant Director (DAD) Peter Strzok (as detailed below) accurately captured the meeting's details.

Lisa Page told us she attended the meeting, but did not recall Ohr conveying much substantive information.  She stated that in general, Ohr told McCabe that Steele had information he wanted to provide to the FBI.  Lisa Page's notes from the meeting show that Ohr discussed Steele, provided Steele's previous employment background, talked about issues concerning Russian Oligarch 1, and indicated that Simpson provided Ohr with names of intermediaries between the Kremlin and the

---

[419] Ohr testified on August 28, 2018, before the House Committees on the Judiciary and on Government Reform and Oversight.  He told the committee members that he met with McCabe shortly after his July 30, 2016 meeting with Steele.  Based on the documentary evidence, including Ohr's calendar entry and Lisa Page's handwritten notes, along with Ohr's testimony that he met with McCabe a single time, we believe that Ohr met with McCabe on October 18, 2016.  We asked Ohr about the date of his meeting with McCabe in light of the documentary evidence.  He told us that he did not recall exactly when he contacted McCabe.

[420] McCabe said that he and Ohr first met in 2003, when McCabe was assigned to NYFO's Eurasian Organized Crime Task Force and Ohr was Chief of OCRS.  According to McCabe, the two spoke periodically between 2003 and 2016 regarding Russian Oligarch 1.

Trump campaign. Lisa Page also wrote that Ohr met with Russian Oligarch 1 the previous year and "Need report?"

We also reviewed Strzok's notes dated October 18 that detail information concerning Ohr. Strzok told us he believed either Lisa Page or McCabe provided the information to him. In addition to the information contained in Lisa Page's notes, Strzok's notes also stated: "Bruce's wife fluent Russian speaker," "Simpson hired Ohr's wife to find connections," and "She saw no connections [at] first." Additionally, we reviewed Assistant Director E.W. "Bill" Priestap's notes, which reflect an entry dated October 19 that states: "DOJ Bruce [Ohr]—Steele is providing reporting to a variety of people." Priestap told us that he did not recall who told him or how he learned this information.

Steele and Ohr spoke on October 19 at Ohr's request. Ohr and Steele both told us that they could not recall what they spoke about, but Ohr claimed that he did not advise Steele or Simpson that he met with McCabe and Lisa Page.

### 6. Ohr's November 2016 Communications with the FBI and State Department Regarding Steele

As described in Chapter Six, Handling Agent 1 determined that Steele should be closed as a CHS on November 1, 2016, following the October 31 publication of the *Mother Jones* article.[421] Handling Agent 1 told us that he spoke with Ohr that same day and recommended to Ohr that he read the article. According to Handling Agent 1, as a courtesy, he told Ohr that he was not engaging with Steele anymore, warned Ohr to be careful when dealing with Steele, and said that Steele could not be trusted.

Ohr said that he did not recall whether Handling Agent 1 informed him that Steele was closed as a CHS during the November 1 telephone call, but remembered Handling Agent 1 telling him that he would no longer be working with Steele because Steele spoke to the press. Ohr told the OIG that he was not surprised that Steele talked to the press because he knew that Steele and Simpson were collecting the information for political purposes and that they had previously talked to others about it. According to Ohr, his understanding was that Steele was not collecting the information for the U.S. government, so he was not functioning as an FBI source.

Handling Agent 1 met with Ohr 1 week later in Washington, D.C. According to Handling Agent 1, Ohr apologized for introducing him to Steele and said that he had not realized the impact of the *Mother Jones* article.[422] Ohr told us that he

---

[421] Handling Agent 1 told us that he informed Steele on November 1, 2016, that it was unlikely the FBI would continue a relationship with him and that Steele must cease collecting information for the FBI. Handling Agent 1 completed a Source Closing Communication document on November 17, 2016, stating that Steele had been closed for cause on November 1, 2016.

[422] Handling Agent 1 told us that Ohr also commented to him at this meeting that Nellie Ohr worked at Fusion GPS. Handling Agent 1 stated he never met Nellie Ohr and did not learn her name until the media publicized the Ohrs' involvement.

recalled meeting Handling Agent 1 and discussing the FBI's closure of Steele as a CHS.  He also said that Handling Agent 1 told him that the FBI wanted to interview Ohr about his contacts with Steele.[423]

On the morning of November 21, 2016, at the State Department's request, Ohr met with Deputy Assistant Secretary Kathleen Kavalec and several other senior State Department officials regarding State Department efforts to investigate Russian influence in foreign elections and how the Department of Justice might assist those efforts.  During a break in this meeting, Ohr and Kavalec discussed together Kavalec's interactions with Steele.  Ohr told us that he could not recall how he discovered that Kavalec knew Steele or how he and Kavalec began discussing Steele.  Ohr also stated that he recalled meeting with Kavalec on more than one occasion because Ohr was interested in obtaining relevant information about Steele from Kavalec so that he could share it with the FBI's Crossfire Hurricane team.[424]  We asked Ohr if he provided Kavalec with any of the information Steele or Simpson shared with him during these conversations.  He said that he could not recall.

Kavalec told us that she could not recall the specifics of her conversations with Ohr regarding Steele.  She stated that, just before or after the November 21, 2016 meeting, she asked Ohr if he knew Steele.  Kavalec said that she generally shared with Ohr the information that Steele had provided, and she said Ohr appeared to be aware of it already.  She told us that Ohr responded that Steele's information was "kind of crazy…kind of wild…quite a tale."  She told us that she provided this information to Ohr believing that he would pass it along to whoever needed it.  Kavalec said that she did not specifically ask Ohr to do anything with the information and did not expect to receive any feedback from Ohr.

Later on November 21, 2016, in a meeting previously arranged by Lisa Page at Strzok's request, Ohr met with Lisa Page, Strzok, SSA 1, the Office of the General Counsel (OGC) Unit Chief, and the Chief of the Counterintelligence Division's (CD) Counterintelligence Analysis Section I (Intel Section Chief).  Strzok, the OGC Unit Chief, SSA 1, and the Intel Section Chief told us the purpose of the meeting was to better understand Steele's background and reliability as a source and to identify his source network.

Notes taken by meeting participants indicate that Ohr shared the following information:

- Ohr thought Steele had "great expertise" concerning Russia;

---

[423]  Ohr is mentioned in Strzok's notes in connection with a November 9, 2016 Crossfire Hurricane team meeting, but Strzok could not tell us what his handwritten notes said, nor could he recall the conversation.

[424]  Ohr stated that obtaining information from Kavalec was not part of his Department responsibilities, and even though he had previously provided her name to individuals who were part of the Crossfire Hurricane team, he actively sought information from her because he thought it could be important to whatever investigation the FBI was conducting about Russian interference in the 2016 U.S. elections.

- Steele wrote well-sourced reports using a variety of sub-sources that he wrote for other purposes and shared with the FBI;

- Steele had participated in past efforts to connect Ohr to Russian oligarchs through intermediaries;

- Simpson hired Steele to research Trump and hired Nellie Ohr to perform open source research on Trump;

- Ohr met with Simpson in August 2016 and Simpson provided Ohr with the names of three "potential conduits" of information between Russia and the Trump campaign;[425]

- Steele's reporting was shared by Simpson with "a lot of people" including the Clinton campaign and the Department of State;[426]

- Steele was "desperate" that Trump not be elected, but was providing reports for ideological reasons, specifically that "Russia [was] bad;"[427] and

- Reporting of Kremlin activities "may be exaggerated or conspiracy theory talk," so Steele cannot know whether all the reporting is true.

According to Ohr, he asked the FBI personnel whether there was a prosecutor assigned to their investigation and was told "no." He also said that no one at the meeting told him about the Crossfire Hurricane investigation, but that he was advised that the FBI was "pushing ahead" on a Manafort case.

SSA 1 memorialized the meeting with Ohr in an FD-302, which largely mirrored the attendees' notes, but also provided additional details.[428] SSA 1 documented in the FD-302 that Ohr told the FBI that:

- Steele was "desperate that Donald Trump not get elected and was passionate about him not being the U.S. President;"

- "Ohr never believed Steele was making up information or shading it;"

- "Simpson and Steele could have met with [*Yahoo*] or [*Yahoo News* reporter] jointly, but Ohr [did] not know if they did;" and

---

[425] *See* Section II.A.2 of this chapter regarding the individuals mentioned by Simpson. At the November 21 meeting, Ohr provided SSA 1 with a copy of his notes containing these three names and a short summary of their alleged roles.

[426] Strzok and SSA 1's notes specifically mention then State Department Assistant Secretary Victoria Nuland and then Special Assistant to the Special Envoy to Libya, Jonathan Winer.

[427] When we interviewed Steele, he told us that he did not state that he was "desperate" that Trump not be elected and thought Ohr might have been paraphrasing his sentiments. Steele told us that based on what he learned during his research he was concerned that Trump was a national security risk and he had no particular animus against Trump otherwise.

[428] SSA 1 told us that the FD-302 documenting the meeting with Ohr was incorrectly dated as having occurred on November 22, 2016, instead of November 21, 2016.

- Ohr "knew" that Simpson was "hired by a lawyer who does opposition research" and that Steele's reporting was being distributed to "the Clinton Campaign, Jon Winer at the U.S. State Department and the FBI."[429]

The FD-302 also documented that Ohr provided the FBI with copies of the notes he took about the meetings with Steele on July 30, 2016, and in late September 2016. The FBI did not insert this FD-302 into Steele's closed CHS file.[430]

SSA 1 told us that no one in the meeting directed Ohr to contact Steele or take any action on behalf of the FBI, but added that Ohr likely left the meeting with the impression that he should contact the FBI if Steele contacted him. When asked if the FBI provided him any guidance on what to do if Steele contacted him, Ohr stated that "the general instruction was to let them know...when I got information from Steele," though he could not recall who told him this or whether he was told this at the October 18 or November 21 meeting. Ohr told us that SSA 1 became his initial FBI point of contact when Ohr sought to provide more of Steele's information to the FBI.

### 7.    Ohr's December 2016 Meetings with the FBI and Simpson

On December 5, 2016, Ohr had a follow-up interview with SSA 1 concerning his contacts with Steele and Simpson. During the interview, Ohr told SSA 1 that Simpson directed Steele to speak to the press, which was part of what Simpson was paying Steele to do, but that Ohr did not know whether speaking with *Mother Jones* was Simpson's idea or not. Additionally, according to the FD-302, Ohr gave SSA 1 a document that Nellie Ohr had created, titled "Manafort Chronology" and told SSA 1 that he would provide the FBI with additional research compiled by Nellie Ohr while working for Fusion GPS.

Ohr told us that he did not recall when or why Nellie Ohr provided him with the Manafort Chronology, but pointed to the July 2016 breakfast with Steele as a possible reason she provided it to him. Nellie Ohr told us that she offered Ohr her Fusion GPS research at the end of September 2016, which included the Manafort Chronology, in an effort to supplement what she believed Ohr would tell the FBI after the July 30 meeting with Steele.[431]

On December 7, 2016, Ohr convened an interagency meeting (including representatives from the FBI) regarding strategy in dealing with Russian Oligarch 1. One of Ohr's junior Department colleagues who attended the meeting told us that, after the meeting, she talked with Ohr about why the U.S. government would support trying to work with Russian Oligarch 1. Ohr's colleague said that Ohr told her that Steele provided information that the Trump campaign had been corrupted

---

[429]  The FD-302 also stated that Ohr knew "Simpson and others" were talking to Victoria Nuland at the State Department, but did not provide any details.

[430]  The FBI drafted a total of 13 FD-302s documenting its meetings with Ohr. None of the FD-302s were added to Steele's closed CHS file.

[431]  As discussed above, Nellie Ohr stopped working for Fusion GPS in September 2016.

281