Exhibit
1
Part
3

by the Russians.  The colleague told us that she asked Ohr if the allegations went "all the way to the President" and that Ohr responded "yes."  She told us that Ohr said to her that this information was "the basis for the [Russian Oligarch 1] discussion."  Ohr told us he recalled telling his colleague generally about the information he received from Steele, but said he could not recall when he told her or what prompted him to do so.

According to Ohr's telephone log, Ohr called Simpson on December 8 and arranged a time to meet, but Ohr told us he could not recall why he contacted Simpson.  Ohr said that he met with Simpson on December 10, 2016, and that Simpson gave him a thumb drive.  Ohr stated that Simpson did not tell him what was on the thumb drive and that Ohr did not ask him, but that Ohr believed it contained Steele's election reports.[432]  In testimony to the House Permanent Select Committee on Intelligence, Simpson stated that Ohr requested that he provide information regarding Steele's election reporting.[433]

Ohr stated, and his contemporaneous notes reflect, that Simpson told him during the meeting that Trump's attorney, Michael Cohen, was an intermediary between the Russian government and the Trump campaign and had replaced Manafort and Carter Page as intermediaries.  According to Ohr's notes, during the meeting Simpson referenced several other alleged links between the Trump campaign and the Russian government.  Ohr's notes show that Simpson told Ohr that Simpson "still thinks [Person 1] is a key figure connecting Trump to Russia."  Additionally, Ohr's notes reflect that Simpson told Ohr that it was Simpson who asked Steele to speak with the *Mother Jones* reporter as a "Hail Mary attempt."

On December 11, 2016, Simpson forwarded an article to a personal email account shared by Ohr and his wife (which Nellie Ohr forwarded to Ohr's Department email account) about a Russian senator's possible support of Trump.  The next day, December 12, Simpson wrote another email, this time requesting to speak with Ohr on the telephone.  According to Ohr's telephone log, he spoke with Simpson that same day, but Ohr could not recall what he and Simpson discussed.

Also on December 12, Ohr met with SSA 1 and told SSA 1 that Simpson had explained to Ohr that it was Simpson who asked Steele to speak with the *Mother Jones* reporter as a "Hail Mary attempt" to stop Trump from being elected.  Ohr also gave SSA 1 the thumb drive that he had received from Simpson during their December 10 meeting.

On December 20, 2016, Ohr provided SSA 1 with another thumb drive, this one containing open source research that Nellie Ohr had produced for Fusion GPS.

---

[432]  As mentioned in Chapter Six, the thumb drive included 15 election reports and 1 additional document.  The FBI had previously received 9 of the 15 election reports from Steele and 4 additional election reports from the *Mother Jones* reporter through then FBI General Counsel James Baker.  Two election reports were new to the FBI, but the FBI also received those two reports at about the same time from then Senator McCain through then Director James Comey.  The FBI only received one additional document from the thumb drive Ohr provided to the FBI.

[433]  *HPSCI Interview of Glenn Simpson, at 78.*

Nellie Ohr stated that after the July 30, 2016 brunch, she understood that Ohr was going to talk to the FBI "on request of Steele" and so she provided her work product to her husband at the end of September 2016 as she finished working for Fusion GPS. Ohr told us he could not recall when Nellie Ohr provided him with her research. According to Nellie Ohr, she removed the Fusion GPS headers from her research because she had not asked Simpson for permission to provide the reports to the FBI and wanted the reports to stand on their own merit.

### B. Ohr's Continued Contacts with Steele and Simpson from January to November 2017

In 2017, Ohr's written communications with Steele transitioned from emails using Ohr's Department email account to communications using an encrypted electronic messaging forum. Ohr provided the OIG with a transcript of his encrypted electronic communications with Steele, dating from January 25 to November 27, 2017, and his notes from their conversations. These documents indicate that Ohr and Steele communicated multiple times in 2017 and that Ohr typically informed the FBI of those communications shortly thereafter. The FBI's interviews with Ohr between January and mid-May 2017 were summarized in nine FD-302s, which we discuss below.[434]

During this timeframe, Ohr's FBI point of contact changed. As described in Chapter Three, SSA 1 rotated off the Crossfire Hurricane team in January 2017, and SSA 3 became Ohr's FBI point of contact until April 2017. From approximately May to June 2017, SSA 4 became Ohr's third point of contact. An agent from the Special Counsel's Office became Ohr's final point of contact through November 2017.

In January 2017, Steele expressed concerns to Ohr that the media would identify, and therefore endanger, his employee and the employee's sub-sources. Ohr conveyed Steele's concerns to SSA 3 and SSA 4 several times in the early months of 2017.[435] Steele told us that it was clear to him that Ohr was a conduit to the FBI. He said that Ohr told him that he had talked to the FBI about his concern for his sources' safety, and the FBI had offered to help.

At the end of January 2017 and aware that President Trump had removed Acting Attorney General Sally Yates, Steele asked Ohr for an FBI contact if Ohr were to leave the Department. Ohr provided Steele's concerns to the FBI and, on February 6, 2017, SSA 3 and Case Agent 8 requested Ohr to ask Steele if he would be willing to talk to the FBI again.

On February 14, 2017, Ohr shared with SSA 3 and Case Agent 8 information on topics Steele was working on for different clients, unrelated to Russia or

---

[434] In addition to the information summarized in this section, Ohr also provided information to the FBI from Steele and other individuals on unrelated matters.

[435] Ohr stated that by the end of January 2017, Steele knew that Ohr was talking with the FBI because he informed Steele that the FBI could protect Steele's employee.

Crossfire Hurricane.[436]  Ohr also informed the agents that he did not speak to Steele about re-engaging directly with the FBI.  Ohr told us that the FBI's offers to talk with Steele in early 2017 were for the purpose of assisting with an emergency with Steele's sub-sources, but when the danger to the sub-sources passed, the need to re-engage disappeared.

On May 8, 2017, Ohr told SSA 4 and Case Agent 5 that Steele was willing to work with the FBI again.  Ohr said that Steele had independently raised with Ohr the subject of re-engaging with the FBI.  On May 12, 2017, SSA 4 requested that Ohr ask Steele if he was willing to meet with FBI agents in Europe.  According to Ohr, he contacted Steele, who agreed to talk with the FBI agents on May 15, 2017.  This meeting did not take place, and, as discussed in Chapter Six, the FBI did not have contact with Steele until September 2017 when he was interviewed by agents assigned to the Special Counsel's Office.  Ohr told us he continued to communicate with Steele through the end of November 2017 and provided the details of those communications to the FBI, which primarily focused on Steele's interest in being interviewed by the Special Counsel.  However, the FBI did not memorialize any meetings its agents had with Ohr after the Crossfire Hurricane investigation was transferred to the Special Counsel's Office in May 2017.  Ohr told us that Steele stopped contacting him after Ohr's name appeared in news articles at the end of 2017.

### C.    Ohr's Lack of Notification to ODAG, NSD, and Others Regarding His Contacts with Steele, Simpson, and the FBI

Ohr stated that it was both his "duty as a citizen" and a Department employee to provide Steele's and Simpson's allegations concerning Russian connections to the Trump campaign to the FBI.  Ohr did not inform his supervisors or political leadership in ODAG that he was meeting with Steele, Simpson, or the FBI, and did not seek any ethics advice regarding these activities in light of his wife's employment with Fusion GPS from October 2015 to September 2016.

Ohr told us that while he had the opportunities to do so, he did not advise ODAG's political leadership of his interactions with Steele and Simpson, or of the information they provided and that he shared with the FBI, because he viewed the information as "raw" and "unfinished" Russian source information that the FBI needed to evaluate.  Asked whether he instead considered informing a career employee within ODAG of the information, Ohr responded, "I think if I told another ODAG person, then they might have said, well we just got to tell the DAG."  Asked whether a factor in his reluctance to tell then DAG Yates was because she may have told him to stop speaking with Steele, Ohr responded, "It may have been, yeah…."

---

[436]  Ohr said that he understood Steele was "angling" for Ohr to assist him with his clients' issues.  For example, Ohr stated that Steele was hoping that Ohr would intercede on his behalf with the Department attorney handling a matter involving a European company.  Ohr denied providing any assistance to Steele in this regard, and we found no evidence that he did.  The Department attorney handling the matter involving the European company told us that Ohr never spoke with her about the matter.  Steele told us that he asked Ohr about the Department attorney involved in the case because he was considering contacting the attorney about an issue involving his client.

He further·stated that he did not want to stop talking to Steele because he was alarmed by the information he was receiving and believed he needed to get it to the FBI.

Ohr told Swartz about his meetings with Steele and Simpson and the information they had provided.  Ohr told us that it was possible that he also told then Counsel to the Criminal Division Assistant Attorney General, Zainab Ahmad,[437] and Chief of the Fraud Section, Andrew Weissmann, about his meetings with Steele, Simpson, and McCabe.  When asked why he thought he may have told these Department employees as opposed to individuals in ODAG, Ohr stated he wanted "to get the information to career people...to evaluate it and figure out what to do."

Weissmann told us that Ohr told him "nothing" about the allegations Ohr received from Steele.  Ahmad told us that Ohr did not provide her with detailed information about what Ohr was hearing from Steele and that Ohr only alluded to the fact that Steele had derogatory information about President-elect Trump.

Former members of ODAG leadership told us they were unaware of Ohr's communications with Steele, Simpson, and the FBI at the time those communications were occurring.  Former DAG Yates told the OIG that she was "stunned" to learn through media reports in late 2017 that Ohr had engaged in these activities without telling her, and that she would have expected Ohr to inform her about his communications with Steele because they were outside of his area of responsibility and involved the Russia investigation.  Yates added that she "would have hoped that [Ohr and the FBI] would have both told me" of Ohr's meetings with Steele and the FBI.  She further stated that Ohr's activities needed to be coordinated with the overall Crossfire Hurricane investigation, which included ensuring that the chain of command at both the Department and FBI were jointly deciding what actions, if any, Ohr might take relating to the Russian interference investigation.

Yates told us that had she learned of Ohr's activities as they were occurring, she would have ensured that all Department and FBI personnel involved in the investigation were informed and consulted.  Specifically with respect to Ohr's October 18, 2016 meeting with McCabe, Yates told us she expected Ohr to inform her of any meeting with someone at McCabe's level, regardless of the subject matter, but especially about something "outside of [Ohr's] area" of responsibility.

Then Principal Associate Deputy Attorney General Matthew Axelrod similarly told us that he would have expected to know about Ohr's activities, communicating with Steele and providing information to the FBI, because these were not responsibilities assigned to Ohr and his activities related to a "sensitive" matter.  Axelrod said that if had he learned of Ohr's activities as they were occurring, he would have asked questions and sought to determine whether the FBI could stop receiving Steele's information through Ohr.  Axelrod told us that he thought ODAG would have been uncomfortable with Ohr continuing to provide Steele's information

---

[437] Ahmad was an Acting Deputy Assistant Attorney General in the Criminal Division from January to April 2017.

to the FBI. Then Associate Deputy Attorney General Scott Schools, who was the highest-ranking career official in the Department, and ODAG's ethics advisor, stated that the FBI had a responsibility to fully report Ohr's involvement to the Department's National Security Division (NSD) and that Ohr had a duty to report his involvement to ODAG's managers.

Dana Boente, who became Acting DAG when Yates was removed from the position on January 30, 2017, told us that he was "really surprised" when he learned that Ohr had multiple conversations with Steele, particularly because Ohr had been a prosecutor and knew that an attorney should never talk to a potential witness without an agent being present. Boente stated that if he had learned about Ohr's contacts with Steele while he was Acting DAG, he may have allowed Ohr to meet with Steele for the limited purpose of putting Steele in direct contact with an FBI agent.

Ohr also told the OIG that he did not approach anyone in NSD because he talked to Swartz, who once oversaw counterintelligence cases for the Department, and thought Swartz was in contact with NSD concerning "Russia stuff."[438] Ohr also said that he did not know whether Swartz passed any of the information to NSD. Ohr said that, in hindsight, he thought he should have told people in ODAG and NSD about his communications with Steele and Simpson so that they could deal with the issues presented and so that Ohr could have guidance about how to proceed when communicating with Steele or Simpson. Swartz told us that he had no recollection of Ohr asking him to do anything with Steele's information. Swartz further stated that he did not think he informed anyone in NSD about Steele's information.

### III.   The FBI's Understanding of Its Relationship and Communications with Ohr

In this section, we describe the Crossfire Hurricane team's and FBI leadership's knowledge and understanding of Ohr's activities with Steele, and the information Ohr provided to the FBI.

#### A.   The Crossfire Hurricane Team's Understanding of Ohr's Activities Related to the Investigation

As described earlier in this chapter, Ohr met with FBI agents 13 times between November 21, 2016 and May 15, 2017, to discuss his contacts with Steele and Simpson. At two of these meetings, in December 2016 after Nellie Ohr had left Fusion GPS, Ohr provided the FBI with open source research Nellie Ohr compiled while employed by Fusion GPS. All 13 meetings between Ohr and the FBI were memorialized in FBI FD-302s and, except for the first meeting, each meeting was held at Ohr's request. Ohr told us that, other than the FBI's request to inquire about Steele's interest in talking with the FBI again, Ohr did not recall the FBI

---

[438] Swartz's responsibility for overseeing counterintelligence cases for the Department ended when NSD was created in 2006, but he continues to advise NSD's leadership on international matters.

asking him to take any action regarding Steele or Simpson. However, Ohr also stated that "the general instruction was to let [the FBI] know...when I got information from Steele."

The FBI personnel we interviewed generally told us that Ohr did not make any requests of the FBI, nor did he inquire about any ongoing cases or make any recommendations about potential investigative steps. None of the FBI witnesses we interviewed recalled anyone tasking Ohr to gather information from Steele or to act as an intermediary between the FBI and Steele.

However, SSA 1, the first FBI supervisory agent to meet with Ohr in November 2016, told us that after their meetings, Ohr likely knew that the FBI was seeking information regarding Russian interference in the 2016 elections and would subsequently inform SSA 1 about anything relevant he learned from Nellie Ohr, Steele, Simpson, or elsewhere. SSA 1 stated that he was in "receive mode" with respect to Ohr's information and was trying to glean from it as much as he could about Steele's source network. He also said that Ohr was well-versed in Russian organized crime and that, in SSA 1's view, Ohr's motives for coming to the FBI were "pure."

Case Agent 1, the lead agent on the Carter Page investigation, told us he recalled learning about Ohr from SSA 1, likely before the first Carter Page FISA application was filed on October ■■, 2016. Case Agent 1 recalled that contacting Ohr was one of many things on the Crossfire Hurricane team's "to do" list in fall 2016, but it was not as urgent as some of the others. He further stated that the team viewed Ohr as another "stream of reporting" with potentially new information on Steele's election reports. Case Agent 1 told us that ultimately he did not think that Ohr's information presented anything new and said it did not impact the FBI's work on the Carter Page investigation. He also said that once Steele was closed as a CHS, Case Agent 1 did not believe there were any issues with Ohr being a "conduit" to Steele, but the team never discussed specifically tasking Ohr. Case Agent 1 told us that he thought it was "a patriotic thing" for Ohr to provide information to the FBI. Case Agent 1 also stated that Nellie Ohr's former employment with Fusion GPS did not cause him any concern in November and December 2016 because the team was still trying to understand Fusion GPS's role, and the team trusted that Ohr was a professional, career Department official.

SSA 3, one of the supervisory agents who replaced SSA 1, stated that in January 2017, SSA 1 briefed him on the case during their changeover and identified Ohr only as a "DOJ official" and Nellie Ohr as working for Fusion GPS. He recalled SSA 1 informing him that Ohr provided a version of Steele's election reports to the FBI. SSA 3 also told us that Ohr forwarded other information to the team regarding Russian oligarchs and other issues unrelated to the Crossfire Hurricane investigation. SSA 3 stated that he received the information but took no action and did not provide feedback to Ohr because he did not want Ohr to perceive anything as a tasking or discern the focus of the investigation. SSA 3 also stated that he did not task Ohr because of the appearance of using Ohr to obtain information from a closed source. According to SSA 3, he had two main concerns: 1) Ohr's and Nellie Ohr's connections to Steele and Fusion GPS, the latter of which appeared to have

political connections, and 2) the FBI's continual contact with Steele through Ohr about such a sensitive matter, particularly because such contact with a closed source was "out of the norm." He told us that the members of his team shared these concerns, and he expressed them to his supervisor, DAD Jennifer Boone. SSA 3 stated that each time Ohr asked to meet with him, he consulted Boone and was directed to attend the meeting. He told us he fully informed Boone about the information Ohr provided after each interview and provided her with the FD-302s.[439] SSA 3 stated that it was his understanding that Boone would then determine what information to share at the executive level meetings.

SSA 4, who became the third SSA to meet with Ohr after SSA 3 rotated off the investigation in May 2017, said that SSA 3 told him that Ohr would come in and talk about "stuff" related to Steele and the agents would listen to Ohr's information, but that they did not consider the information important. According to SSA 4, SSA 3 stated that Ohr was "just some [person] you [had] to talk to when [he] call[ed]." SSA 4 was working from the FBI's Washington Field Office (WFO) and said that he provided updates regarding his communications with Ohr through WFO's chain of command to FBI Headquarters. SSA 4 also said he updated SSA 2 at FBI Headquarters.[440] SSA 2 told us he talked with SSA 4 about it being a "bad idea" to continue engaging with Ohr regarding his contacts with Steele. SSA 2 also said that by May 2017 he was "completely tired" of dealing with Ohr as an intermediary and thought the team should cease doing so.

The Supervisory Intelligence Analyst (Supervisory Intel Analyst) who was assigned to the Crossfire Hurricane investigation from its opening in July 2016 and participated in an interview with Ohr in January 2017, told the OIG that the Crossfire Hurricane team was initially receptive to Ohr's information and cited the Simpson thumb drive containing some of Steele's reports the FBI did not already possess as an example of useful information from Ohr. However, the Supervisory Intel Analyst also said that when Ohr began relaying Steele's concerns about the sub-sources and talking about topics unrelated to Crossfire Hurricane, he believed that Ohr was "acting or trying to act more as a conduit."

## B.   FBI Management's Knowledge of Ohr's Activities

Strzok told the OIG that he did not know whether Ohr continued to meet with Steele after Steele was closed. Strzok said that, if Ohr had continued to meet with Steele, he hoped Ohr would not have talked about anything work related. Strzok also said that he did not recall having any indication or concern that Ohr was meeting with Steele and did not recall anyone having such concerns. However, Strzok's handwritten notes indicate that he received updates from SSA 1 and others on December 12, 2016, December 20, 2016, December 22, 2016, and January 23,

---

[439] SSA 3's notes also reflect he briefed Boone and several others regarding Ohr or the information Ohr provided.

[440] As mentioned in Chapter Seven, SSA 2 was the Headquarters Program Manager assigned to the Crossfire Hurricane investigation and the affiant for the three Carter Page FISA renewal applications.

2017, regarding Ohr's ongoing communications with Steele and Simpson about Steele's election reporting and Steele's concerns about his sub-sources.

In January 2017, Boone and the new team of agents assigned to Crossfire Hurricane assumed responsibility for communicating with Ohr. Boone stated that she knew SSA 3 had spoken with Ohr regarding his contacts with Steele and was documenting the communications in FD-302s, but she did not recall receiving or reviewing them, but said it was possible that she did. She told us that she recalled advising Priestap about the team's contacts with Ohr and the information they received from him, including how to respond to Steele's interest in re-establishing contact with the FBI. Priestap told us that Boone may have briefed him on the team's interviews of Ohr, but he did not remember her doing so.[441]

Priestap told us he knew that the Crossfire Hurricane team met with Ohr, but was unaware of how often the meetings occurred and did not know the full extent of Ohr's involvement with Steele until mid-to-late 2017. Priestap stated that the FBI's engagement with Ohr to learn what Steele had shared with Ohr was potentially useful in understanding Steele and verifying his reporting. Priestap said that he believed Ohr was not a "major factor" in the investigation, but instead saw Ohr as a liaison due to his relationship with Steele.

Priestap said he told the team to document what they learned from Ohr to compare it to the other information gathered. Priestap said he was surprised to later learn that the FBI treated Ohr more like a witness or a source. Priestap also stated that he was not told about Ohr's meetings with Simpson, Nellie Ohr's employment with Fusion GPS, or that Ohr provided Simpson's and Nellie Ohr's thumb drives to the FBI—information that was provided by Ohr to the FBI between November 21 and December 20, 2016. He told us that he did not inform Comey or McCabe about Ohr's involvement in the Crossfire Hurricane investigation, because he was unaware of the full extent of it.

Priestap stated that knowing the full extent of Ohr's activities would have raised "red flags" for him because the situation would have been different than Ohr merely having a pre-existing relationship with Steele. He told us that had he been fully aware of the extent of Ohr's activities, he would have inquired about Ohr's motivations and involvement with Steele, Simpson, and the Crossfire Hurricane investigation.

General Counsel Baker stated that he understood from Crossfire Hurricane leadership briefings he attended in fall 2016 that Ohr had a pre-existing relationship with Steele and that Steele may have had conversations with Ohr about Steele's election reporting. He told us that he did not understand Ohr to be acting as a conduit between Steele and the FBI at this time. According to Baker, he was concerned that if the FBI took an action with which Steele disagreed, Steele would

---

[441] We reviewed notes taken by a Counterintelligence Division DAD. Her notes from January 23, 2017, contain a reference to Ohr's interview that day and specific information provided by Ohr concerning Steele's sub-sources. Although the notes do not list the attendees of this meeting, they appear to be from a Crossfire Hurricane update meeting.

complain to Ohr, whom Baker viewed as being a prominent Department official. He explained that if Steele complained, Ohr would feel compelled to intervene on Steele's behalf.

Baker told us that he obtained more information regarding Ohr's interactions with Steele during a Crossfire Hurricane leadership meeting with Comey and McCabe in spring 2017. He stated that he did not recall Ohr being critical of how the FBI was handling Steele, but that Ohr had become involved to a greater degree than he had in the past. Baker told us that he learned that Ohr was providing to the FBI information that Ohr had received from Steele, and it was Baker's view that "this [was] not good." He said that he could not recall who was discussing this, but he believed it was McCabe and maybe Priestap and then Executive Assistant Director Michael Steinbach.[442] He also stated that he thought it was "imprudent" to have Ohr involved and "a bit of a mess," but that he believed that McCabe, Steinbach, and Priestap were "on top of it." Baker told us he "may have mentioned" the issue to OGC Principal Deputy General Counsel Trisha Anderson, and asked her to look into it. Anderson told us that she had limited contemporaneous knowledge about Ohr's interactions with Steele and the FBI. In particular, she told us that she did not know at the time that Ohr had repeatedly provided information from Steele to the investigative team or that Ohr's interviews with the FBI were documented in FD-302s. McCabe told us he did not recall the discussion Baker described.

We asked Baker if he had concerns about Ohr receiving information from Steele. He told us that Ohr was "arguably a source," and the situation needed to be handled carefully to protect Ohr and the Department. Baker further stated that accepting information from a closed source through Ohr was "not the right way to run a railroad" and either the FBI needed to reopen Steele or tell Ohr to stop taking information from him. According to Baker, the decision about whether to utilize Ohr, a senior Department official, as an ongoing, frequent conduit with Steele was not a decision for the investigative team to make, but for the Director. He also said the FBI's use of Ohr in this fashion should have been shared with the Department, but he did not recall anyone doing so.

McCabe told us that he knew Ohr was meeting with the investigative team concerning his contacts with Steele, but did not know how often the team met with Ohr until it was reported in the news media. He said he did not recall knowing that Ohr provided the investigative team with a thumb drive from Simpson or from Nellie Ohr. McCabe told us that Ohr was doing the "responsible thing" by informing the investigative team about his conversations with Steele and that he did not tell the Department about Ohr's involvement because he viewed doing so as Ohr's responsibility. Lisa Page stated that she met with Ohr twice in fall 2016 and had no knowledge of Ohr providing information from Steele and Simpson to the FBI.

Comey told us he had no knowledge of Ohr's communications with members of the Crossfire Hurricane investigative team and only discovered Ohr's association

---

[442] Steinbach told us he did not recall ever knowing about Ohr's involvement with Steele. Steinbach retired from the FBI on February 24, 2017.

with Steele and the Crossfire Hurricane investigation when the media reported on it. However, notes taken by Strzok during a November 23, 2016 Crossfire Hurricane update meeting attended by Comey, McCabe, Baker, Lisa Page, Anderson, the OGC Unit Chief, the FBI Chief of Staff, and Priestap, reference a discussion at the meeting concerning "strategy for engagement [with Handling Agent 1] and Ohr" regarding Steele's reporting. Strzok stated that, based on his notes, he believed he informed FBI leadership that Ohr approached the FBI concerning his relationship with Steele and that Ohr relayed Steele's information regarding Russia to the team. Although the OGC Unit Chief could not recall when it occurred, she recalled discussing with executive leadership that the FBI should not use Ohr to direct Steele's actions. Because Strzok's notes of the meeting were classified at the time we interviewed Comey, and Comey chose not to have his security clearances reinstated for his OIG interview, we were unable to show him the notes and ask about the reference in them to Steele and Ohr.

## IV. Ohr's Activities Relating to the Criminal Division's Manafort Investigation

In addition to Ohr's interactions with the FBI and Steele in connection with the Crossfire Hurricane investigation, Ohr also participated in discussions about a separate money laundering investigation of Paul Manafort that was then being led by prosecutors from the Money Laundering and Asset Recovery Section (MLARS), which is located in the Criminal Division at the Department's headquarters. That criminal investigation was opened by the FBI's Criminal Investigation Division in January 2016, approximately 2 months before Manafort joined the Trump campaign as an advisor, and concerned allegations that Manafort had engaged in money laundering and tax evasion while acting as a political consultant to members of the Ukrainian government and Ukrainian politicians.

Shortly after the 2016 elections, Ohr participated in several meetings with three senior attorneys from the Department's Criminal Division during which they discussed ways to move the Manafort investigation forward more quickly. Ohr and the three senior Criminal Division attorneys were not assigned to the MLARS Manafort investigation and did not advise MLARS or anyone in their respective chain of command of their discussions. In this section, we describe these meetings regarding the MLARS money laundering case.

### A. November 2016 to December 2016

Between November 16, 2016 and December 15, 2016, Ohr attended four meetings to discuss the MLARS investigation. These meetings were attended, at various times, by some or all of the following individuals: Bruce Swartz, Criminal Division Deputy Assistant Attorney General (Deputy AAG); Zainab Ahmad, then Counsel to the Criminal Division's Assistant Attorney General; Andrew Weissmann,

then Section Chief of the Criminal Division's Fraud Section; Strzok; and Lisa Page. MLARS was not represented at any of these meetings or told about them.[443]

The meetings involving Ohr, Swartz, Ahmad, and Weissmann focused on their shared concern that MLARS was not moving quickly enough on the Manafort investigation and whether there were steps they could take to move the investigation forward. The meetings with Strzok and Page focused primarily on whether the FBI was aware of the Manafort investigation so that it could assess the case's relevance, if any, to the FBI's Russian interference investigation.

Then Section Chief of MLARS, Kendall Day, told us that Ohr, Ahmad, and Weissmann did not have any role in the MLARS Manafort investigation. Day told us that Swartz provided assistance to the investigation because it involved gathering foreign evidence and working with foreign governments, but that his assistance was limited to consulting on those specific issues. According to Swartz, he had a long standing interest in the investigation and prosecution of Manafort, dating to at least 2014, and it was therefore appropriate for him to "strategize" with others about how best to move the MLARS Manafort investigation forward. However, Day and Swartz told us that Swartz could not direct the manner in which such investigations progressed. Swartz also told us that as the Deputy AAG responsible for, among other things, the Office of International Affairs, he could not make prosecutorial decisions relating to cases, but "might weigh in on" case-related decisions such as the timing or sensitivities of charges.[444]

Ohr told the OIG that during a meeting with Swartz and Ahmad on November 16, 2016, he advised them of information "about [Paul] Manafort and Trump and possible Russian influence that [Ohr] was getting from Steele and Glenn Simpson," and that he recalled their response was that they should look into the MLARS Manafort investigation.[445] Ohr and Swartz both told us that they felt an urgency to move the Manafort investigation forward because of Trump's election and a concern that the new administration would shut the investigation down. Ahmad said that her concerns regarding the Manafort investigation, which were based upon her conversations with Swartz and Ohr, were focused on the line prosecutors not adequately working the investigation. Weissmann stated that Ahmad expressed to him that there was a concern, with which he later agreed, that MLARS was not

---

[443] Swartz, Ohr, and Weissmann were members of the Senior Executive Service (SES). Ahmad was on detail to the Criminal Division from the U.S. Attorney's Office for the Eastern District of New York and was not a member of the SES.

[444] As a Deputy Assistant Attorney General, Swartz supervised three sections in the Department's Criminal Division: the Office of International Affairs (OIA), the Overseas Prosecutorial Development Office (OPDAT), and the Department's police training organization. He also acted as an advisor to the Attorney General, the DAG, and the Assistant Attorney General for the Criminal Division on international affairs issues.

[445] Swartz told us that he became aware of allegations that Manafort may have engaged in criminal conduct through the media when former Ukrainian President Victor Yanukovych was ousted from office in February 2014. Swartz said that because he was aware of Manafort's connection to the Russian-backed Yanukovych and other alleged misconduct through MLARS's Manafort investigation, he was concerned when the Trump Campaign named Manafort as its manager in May 2016.

moving quickly enough on its Manafort investigation and that he accepted an invitation from Ahmad to attend a meeting with Ohr and Swartz.

The Fraud Section that Weissmann supervised at the time was part of the Department team that had indicted a foreign national whom Ohr, Swartz, Ahmad, and Weissmann came to believe had information relating to Manafort's alleged criminal conduct. Swartz said that because MLARS had not moved the Manafort investigation forward, he thought it appropriate to meet with Weissmann and discuss the possibility of seeking to obtain information from this foreign national regarding Manafort. In December 2016, the four of them discussed a plan for the Department to approach this foreign national and seek his cooperation against Manafort. Because the extradition of this foreign national was being handled by OIA, Swartz had supervisory responsibility for the extradition aspect of that matter.

Ohr told us that after his November 21, 2016 meeting with FBI officials concerning Steele's information, discussed above, Ohr was advised that the FBI was "pushing ahead" on its Manafort case. Ohr said that he probably shared this information with Swartz. According to Ohr, because "we [had] information that Manafort [was]…somehow…a possible connection between the Russian government and the Trump campaign" it was important to get "national security people" involved in that investigation. Ohr said that because Swartz, Strzok, and Lisa Page were all working on matters involving Manafort, he wanted them to meet and get on the "same page." Consequently, at Ohr's suggestion, Ohr, Swartz, and Ahmad met with Strzok and Lisa Page on December 15, 2016.

Strzok told us that the December 15 meeting consisted mainly of Ohr, Swartz, and Ahmad describing information they had regarding Manafort, and inquiring if they could assist the FBI's investigation. He stated that Swartz discussed the MLARS Manafort investigation and stated that the investigation had stalled. Strzok told us that Swartz wanted him to "kick that [investigation] in the ass and get it moving." We asked Strzok if he understood that Swartz was speaking on behalf of the Department about the Manafort investigation. He responded that his "assumption and belief was that [Swartz] and Bruce Ohr were speaking about topics for which they had relevant supervision and authority over."

Swartz stated that the reason he wanted to talk to Strzok about Manafort was to see if Strzok had any counterintelligence information that would be relevant to what Manafort may have been doing and to push the MLARS Manafort investigation forward. Strzok later sent an email to Boone and others, including the OGC Unit Chief, stating that Boone and he needed to speak with the FBI's Criminal Investigation Division regarding its Manafort investigation to get a better understanding its investigative efforts. The OGC Unit Chief responded: "we have got to get our arms around what CID investigated and what it means for [Manafort]…figure what resources, if any, we can bring to bear to get a better understanding of [Manafort's] foreign power connections and the money that passed hands (if any)."

Ohr, Swartz, Ahmad, and Weissmann all told us that they did not inform anyone in their chain of command, such as the leadership of the Criminal Division

or ODAG, about these meetings.[446]  Ohr stated that he should have advised ODAG leadership that he was participating in meetings about the MLARS Manafort investigation because it was a sensitive matter.  Swartz told us that the political appointees leading the Criminal Division knew the Manafort investigation existed, and therefore they should only be briefed if "steps were going to be taken" to move the case forward.  Swartz added that he did not advise them of his meetings with Ohr, Ahmad, and Weissmann, as well as those with Strzok and Lisa Page, because he was keeping the Manafort investigation from being "politicized" and protecting the Department from allegations that its investigation of Manafort was politically motivated.

Weissmann told us that at around the time of these meetings, he and Ahmad had a conversation in which Ahmad told him that she and Swartz were not going to tell the Department's political leadership about their efforts to move the Manafort investigation forward.  Weissmann said that he remembered thinking, at the time, that this was because Swartz and Ahmad wanted to insulate the political leadership from an allegation of politically targeting Manafort.  He stated further that he thought it was "an incorrect judgment call," but could not recall if he told that to Ahmad and said he satisfied himself that it was appropriate because the Criminal Division's front office was aware of the fact MLARS had an open investigation of Manafort.  Ahmad told us that she did not recall telling Weissmann that political appointees would not be advised of the meetings and that being the "junior person" in the meetings, she would not have made such a decision, but that Swartz may have done so.

The then Section Chief of MLARS, Kendall Day, a career Department official, told us that he was unaware of the meetings discussed above.[447]  He stated that, given that he was supervising MLARS's Manafort investigation, he should have been invited to these meetings because none of those involved knew the strength of the evidence amassed by MLARS against Manafort or the investigation's status.  Day also stated that, because the Manafort investigation was a "sensitive matter," it was imperative to keep the Criminal Division's leadership aware of relevant events to ensure that there were no surprises.  He stated further that he was providing briefings regarding MLARS's investigation to his political supervisors, including then Criminal Division Assistant Attorney General Leslie Caldwell.

Caldwell told us that she was unaware of any meetings involving Ohr, Swartz, Ahmad, and Weissmann in which they discussed the MLARS investigation of Manafort.  She stated further that she thought that not advising political supervisors about the meetings "suggest[ed] a lack of trust or a lack of confidence in the political appointee…and that seem[ed] a little bit paranoid to [her]."  She stated further that a rationale that not advising political appointees of the meetings

---

[446] Ahmad told us that she did not advise her chain of command of work she did with Swartz. She said that Swartz was a higher-level supervisor within the Criminal Division and, to her knowledge, was reporting on those activities.

[447] Day, who had been Chief of MLARS, became an Acting Deputy Assistant Attorney General in the Criminal Division in January 2017.

protected them from an allegation of engaging in a political prosecution was "inappropriate," showed "poor judgment" and was "in itself political."

Yates told us that she too was unaware of the meetings involving Ohr, Swartz, Ahmad, and Weissmann.  She said that not telling political appointees about these activities "trouble[d]" her because the Department of Justice does not "operate that way."  Yates then stated that there is not "a career Department of Justice and a political appointees' Department of Justice.  It's all one DOJ."

## B.    January 31 and February 1, 2017 Meetings

There were no meetings about the Manafort case involving Ohr, Swartz, Ahmad, and Weissmann from December 16, 2016 to January 30, 2017.  On the morning of January 31, 2017, the day after Yates was removed as Acting Attorney General, Ahmad, then an Acting Deputy AAG, sent an email to Ohr, copying Swartz, stating that Weissmann "had something he wanted to discuss with us" and asking Ohr if he was free to meet with Weissmann that morning.  Due to scheduling conflicts, Ohr could not attend the meeting, which went forward with Weissmann, Swartz, and Ahmad.  Neither Swartz, Weissmann, nor Ahmad could remember what occurred at this meeting.  However, each of them speculated that they may have discussed the case involving the indicted foreign national pending extradition, referenced above, who they believed might have evidence detrimental to Manafort.

After the meeting, Ahmad sent an email to Lisa Page, copying Weissmann, Swartz, and Ohr, requesting a meeting the next day, February 1.  Ahmad wrote:

> Do you by chance have time to meet around 11 tomorrow to follow up on our last discussion?  There have been a few Criminal Division related developments that we wanted to discuss.  Bruce Swartz is leaving for Mexico tomorrow afternoon, so we were hoping we could squeeze this in before he leaves....

On February 1, 2017, Swartz, Ohr, Ahmad, and Weissmann met with Strzok, Lisa Page, and Acting Section Chief 1 of the FBI.[448]  Strzok told us that the meeting was "largely a discussion about [the Criminal] Division's work on Manafort" and that he did not find the meeting "notable."  According to contemporaneous notes taken by Strzok and Lisa Page, they discussed efforts that the Department could undertake to investigate attempts by Russia to influence the 2016 elections.  Specifically, the FBI was advised that, with regard to Manafort, the Department was "looking just at [Money Laundering]/Kleptocracy" violations and wanted to bring financial analysis experts into the investigation.  The notes also show that Swartz inquired whether there were other types of offenses relating to Manafort that could be investigated, such as Foreign Corrupt Practices Act violations.  MLARS was not represented at the meeting and was not notified of it.  None of the attendees recalled any discussion of new "Criminal Division related developments," and

---

[448] Acting Section Chief 1 attended the meeting because his section was handling the Manafort counterintelligence investigation.  As discussed in Chapter Four, Acting Section Chief 1 attended the FBI's meeting with Steele in early October 2016.

neither Ahmad nor Weissmann could recall what the reference in Ahmad's email concerned.

We asked Weissmann, Ahmad, Ohr, and Swartz whether there was a connection between the removal of Yates and these meeting requests. Weissmann and Ahmad denied that this was the case. Ohr, on the other hand, told us that it made sense that Yates's firing influenced the decision to have a meeting with Strzok and Lisa Page. Ohr stated further that he could not specifically recall the discussion, but Yates's name may have been mentioned in connection with this meeting. Swartz stated that Yates's departure obviously could have come up, and he was sure they discussed how to proceed with the Manafort investigation in light of her removal.

Ohr stated that Swartz and Ahmad were worried that the Trump Administration would shut down the Manafort investigation after Yates's departure from the Department. Swartz told us that he may have speculated that the Trump Administration would shut down the MLARS Manafort investigation. Weissmann told us that he was not concerned by Yates's removal and did not recall anyone discussing the impact her removal might have on the Manafort investigation. Ahmad similarly told us that she did not recall anyone expressing concerns to her about political appointees interfering with the Manafort investigation.

No one in MLARS, or the Criminal Division's or ODAG's leadership were made aware of this meeting. Then Principal Associate Deputy Attorney General James Crowell told us that career employees do not get to brief the FBI on a very important case without going through Department leadership. He told us that the Manafort case was important with "potentially…national implications" and that not briefing the AG or the AG's staff was not "okay." Crowell further stated that it was "unbelievable" that Ohr was involved in these meetings because as OCDETF Director it was not his job to involve himself in the Manafort investigation.

When we told then Acting DAG Boente that political appointees may not have been advised of these meetings for the purpose of insulating them from allegations of engaging in a political prosecution of Manafort, Boente responded that that was a "less than satisfying answer." He stated that "political appointees make tough calls on political cases every day," and "[that is] not a reason not to tell [political appointees] about [the case]." He stated further that career officials, such as Swartz, Ohr, Ahmad, and Weissmann, have to depend on the Department's political appointees to do the "right thing."

Boente also told us that the Manafort investigation was an MLARS case and that MLARS ought to be prosecuting it. He added that if Swartz, Weissmann, or Ahmad were unhappy with MLARS's prosecution of the matter, they could have spoken with the then Acting Assistant Attorney General, who was a career Department employee, to see if one of them could take over the investigation.

On February 23, 2017, Swartz sent an email to Ohr, Ahmad, and Weissmann proposing a "check-in meeting" and suggested that they invite Lisa Page to attend. Weissmann responded that Lisa Page should not be invited to the meeting, but that

the new Acting Chief of MLARS should be.[449]  Weissmann told us that he wanted the Acting Chief included in the meeting because she had "equity" in the Manafort investigation.  He stated further that he had spoken with the Acting Chief about the Manafort case, but had no recollection if he had told her about his prior meetings with Swartz, Ohr, and Ahmad.

The then Acting Chief of MLARS told us that she only learned about the November 2016 to early February 2017 meetings involving Ohr, Swartz, Weissmann, and Ahmad as a result of her OIG interview.  Day, the Acting Deputy AAG overseeing MLARS, told us that he discovered in late March or early April 2017 that Weissmann was planning a meeting with reporters to obtain evidence associated with MLARS's Manafort investigation and that Swartz, Ohr, Weissmann and Ahmad were "collectively interested" in the investigation.[450]  He stated further that he met with Swartz and Ahmad in his office and inquired about Weissmann's meeting and their interest in the Manafort investigation.  Day recalled telling Swartz and Ahmad that, given their high-ranking positions in the Department, their "unusual level of interest" in the Manafort investigation could create a perception that the Department was investigating Manafort for inappropriate reasons.  According to Day, Swartz expressed concern that "because of the change in the administration" the Manafort investigation "might not be allowed to progress."  Day said he told Swartz and Ahmad that the investigation would be handled "just like any other" and that Swartz even asking the question suggested that it was going to be treated differently, which was not going to happen.  He also told us that he was "comfortable that no decisions were made for any improper reasons" because he "owned" the Manafort investigation and supervised the attorneys working on it.  Swartz told us that he did not recall this conversation with Day.[451]

The Manafort money laundering investigation remained with MLARS until it was transferred to the Special Counsel's Office in May 2017.  Manafort was subsequently indicted on a series of criminal charges.  On August 21, 2018, a jury in the United States District Court for the Eastern District of Virginia found Manafort guilty of five counts of filing false tax returns, failing to report foreign bank accounts, and two counts of bank fraud.  He was sentenced to 47 months in federal prison.  On September 14, 2018, Manafort pled guilty in the United States District Court for the District of Columbia to one count of conspiracy to launder money, tax fraud, failing to file foreign bank account reports, violating the Foreign Agents Registration Act, and making false statements to the Department of Justice.  He was sentenced to 43 months in federal prison.

---

[449] In early 2017, after Day had been appointed an Acting Criminal Division Deputy AAG, a new Acting Chief was appointed to lead MLARS.

[450] Weissmann told us that on or about March 31, 2017, an Associated Press (AP) reporter contacted him and stated that he had information regarding Manafort having a storage locker in Virginia.  Weissmann said that he believed the information was worth obtaining and set up a meeting with the AP reporter.

[451] After reviewing a draft copy of this report, Ahmad told us that she did not recall having this conversation with Day.

## V.     Ohr's Removal from ODAG and OCDETF

Prior to fall 2017, ODAG management had no knowledge of Ohr's ongoing relationship with Steele, Ohr's meetings with the FBI, or Fusion GPS's employment of Nellie Ohr.  In November 2017, shortly after the Department received a Congressional request to interview Ohr, ODAG received from the FBI the FD-302s detailing Ohr's relationship with Steele and Ohr's subsequent meetings with the FBI.  Shortly after receiving the FD-302s, then DAG Rod Rosenstein directed Ohr's removal from his ADAG position.  In January 2018, Ohr was removed as Director of OCDETF.  This section discusses ODAG's communication expectations, lack of knowledge regarding Ohr's activities with Steele and Simpson, the limited information Ohr provided to Rosenstein in October 2017 about his connection to Steele and Fusion GPS, the eventual full accounting of Ohr's activities provided to ODAG, and ODAG leadership's decisions to remove Ohr from ODAG and OCDETF.

### A.     ODAG's Communication Expectations and Lack of Knowledge of Ohr's Activities

Several leaders and managers in ODAG during the time period of our review told us that communication within ODAG is imperative.[452]  As explained below, the DAG relies upon assistance from the career Associate Deputy Attorneys General (ADAGs), such as Ohr, to ensure the Department's effective operation.  Among other things, the ADAGs contribute to that effort by keeping ODAG leadership aware of pertinent information and issues affecting the Department.

Then PADAG Axelrod explained that, as the PADAG, he was the day-to-day manager of ODAG, and Ohr reported to Yates through him.  Axelrod told us that when he started in ODAG, he told everyone in that office to be "canaries in the coal mine" and advise ODAG management of any issues affecting the Department.  Axelrod explained that to properly manage ODAG, he needed to be aware of the issues that ODAG personnel were addressing to ensure that work was not being duplicated, nothing "[fell] through the cracks," and Department components knew who to speak with if questions arose.  Yates also stressed that raising significant issues to her enabled her decision making process and prevented her from being surprised.

New ODAG leadership reiterated this theme on January 23, 2017, when Crowell sent an email to the Department's top leadership, including Ohr, directing "timely and complete communication" including the details of "any sensitive or

---

[452] From summer 2016 through December 2017, ODAG leadership and management changed several times, with three separate DAGs and several iterations of their staff.  Yates was DAG until President Trump removed her on January 30, 2017, at which time Boente was appointed Acting DAG.  On April 26, 2017, Rosenstein was sworn in as the DAG.  Matt Axelrod was Yates's PADAG until he left the Department on January 30, 2017.  Crowell joined ODAG in January 2017 and served as Acting PADAG until June 28, 2017, when Robert Hur arrived, at which point Crowell served as Rosenstein's Chief of Staff until December 9, 2017.  Tashina Gauhar was the Associate Deputy Attorney General (ADAG) responsible for ODAG's national security portfolio at this time.  Scott Schools, who had served in ODAG during a prior tenure in the Department, rejoined ODAG on October 31, 2016, and served as an ADAG until his departure from the Department on July 6, 2018.

high-profile matters" or issues "[l]ikely to generate significant press attention." Additionally, Crowell requested that "unexpected and/or urgent matters" be raised with ODAG to allow for proper collaboration and response.

When asked why he did not alert anyone in ODAG about his contacts with Steele and Simpson after Crowell's January 24, 2017 email, Ohr stated that his contacts with Simpson and Steele were not part of any of his OCDETF cases, so he provided the information to the FBI and career people instead. Ohr told us he felt that he should talk to career people with experience in dealing with Russian information instead of talking to a supervisor within ODAG. According to Ohr, he did not view the fact that he, as a member of ODAG, was receiving information from Steele as significant or problematic, but rather he viewed the information itself as significant and thought it needed to be provided to the FBI.

Crowell stated that he was "flabbergasted" when he learned about Ohr's involvement with Steele and the FBI. He stated that Ohr should have informed ODAG officials of his relationships with Steele and Simpson and his provision of information from them to the FBI, especially when Rosenstein appointed the Special Counsel and began supervising the investigation, because "a potential fact witness" was on Rosenstein's staff.

Crowell told us that if he had known about Nellie Ohr's connection to Fusion GPS or Ohr's involvement with the Russia investigation, he would have moved Ohr away from the DAG to eliminate any appearance that Ohr was involved in the DAG's oversight of the investigation. Crowell also opined that knowing this information about Nellie Ohr or about Ohr's relationship with Steele earlier would have given Department leadership the time and opportunity to determine how to handle the situation as "the American public need[ed] to have confidence that [the investigation was] done the right way…."

Rosenstein stated that, like his predecessor, his Chief of Staff or PADAG ran weekly staff meetings with the ADAGs. He told us that if Ohr or other members of ODAG had any issues or problems, he expected them to talk to his Chief of Staff, the PADAG, or Scott Schools, who was the ODAG ethics advisor and a career Department employee. According to Rosenstein, "everybody understood that if you had…an ethical issue or just a difficult process issue, that's what [Schools was] there for" and that he expected anyone with a sensitive issue to bring it to Schools.

In his position as ADAG, Ohr was not briefed on the existence of the Crossfire Hurricane investigation and the naming of U.S. persons as subjects. This information was known by ODAG leadership and those ADAGs with national security portfolios, which did not include Ohr. However, as detailed in earlier chapters, by fall 2016, rumors about the investigation were in the press; by January 2017, Steele's election reports were published online; and by March 2017, Comey publicly acknowledged the investigation to Congress in a public hearing. Yates told us that the Russian interference investigation in general was well known within ODAG by the time Ohr met with McCabe in October 2016, and that Ohr knew to speak with Tashina Gauhar, the ADAG responsible for ODAG's national security portfolio, about his involvement with Steele and the FBI. Ohr told us he knew from his November

21, 2016 meeting with members of the Crossfire Hurricane investigative team, Strzok, and Lisa Page that the FBI was doing something regarding the allegations, but he did not know prior to that that the FBI had opened a "specific" investigation. During this period, Ohr never disclosed to anyone in ODAG his contacts with Steele regarding Steele's election reporting.  Ohr told us that he could have gone to Gauhar as the national security ADAG, but he decided to speak with Swartz instead. Boente told us that at least after the release of the Intelligence Community Assessment (ICA) on Russian interference with the 2016 presidential elections in January 2017, Boente thought Ohr would have appreciated the potential for an investigation into Russia's activities even if nobody in ODAG mentioned it specifically to Ohr.

As discussed above, Ohr also told us that he did not tell any career attorneys within ODAG about his contacts with Steele and Simpson because he thought that if he told another "ODAG person…they might have said, well we just got to tell the DAG."  He said another factor may have been concern that the DAG may tell him to stop speaking with Steele.

The OIG identified notes taken during three FBI Russia briefings to Department personnel that mention Ohr.[453]  In connection with a Department meeting with FBI representatives (including Strzok) on February 16, 2017, notes by Boente, Gauhar, and Schools indicate that someone likely from the FBI mentioned that Nellie Ohr was employed by Simpson and that Ohr and Steele were in contact.[454]  Additionally, notes from an FBI briefing for Boente on March 6, 2017, indicate that someone in the meeting stated that Ohr and Swartz had a "discussion of kleptocracy + Russian org. crime" in relation to the Manafort criminal case in an effort to "re-energize [the] CRM case."  Finally, a section of Boente's notes from a March 22, 2017 meeting include the names Weismann, Swartz, and Ohr next to a section of notes regarding Manafort.

After reviewing these notes, none of the ODAG personnel at these meetings could remember Ohr being mentioned, or recall any additional information provided during these briefings beyond what was stated in these notes.  Boente, Gauhar, and Schools did not remember the references to Ohr until they reviewed their notes.  Gauhar and Schools stated that without more of the salient information now known concerning Ohr's involvement, the remarks about Ohr did not make an impression on them or indicate to them that Ohr was substantially involved in the investigation.  Gauhar told us that had the FBI provided any additional information regarding Ohr's involvement at the February 16, 2017 meeting, she would have included that in her notes.[455]  Gauhar further stated that, given the information now available regarding the extent of Ohr's contributions to the FBI's investigation, the

---

[453] See Chapter Three for further information regarding these briefings.

[454] Schools stated that he also recalled that sometime after the February 16, 2017 meeting, the FBI OGC Unit Chief made a passing reference to Ohr knowing Simpson and Steele.

[455] Gauhar took extensive notes during Crossfire Hurricane meetings.  For example, her notes for the February 16, 2017 meeting are eight pages long.

FBI should have alerted somebody at the Department about Ohr's activities, or Ohr should have alerted ODAG leadership about what he was doing.[456]

### B.    Ohr Provides Rosenstein with Limited Information about His Connection with Steele and Fusion GPS

Ohr told the OIG that in October 2017, Nellie Ohr received a call from someone at Fusion GPS who told her that the company was providing documents to Congress that identified her as a Fusion GPS contractor and that he realized that then DAG Rosenstein may need to know about this, so he asked to speak with him. He stated that he informed Rosenstein that his wife, Nellie Ohr, worked for Fusion GPS, and that it may become public that Ohr knew Steele and introduced him to the FBI. Ohr told the OIG that he was "prepared to go into more detail [with Rosenstein], but there really wasn't time."

Rosenstein recalled having this conversation in Ohr's office and told us he remembered Ohr stating he knew Steele and that Nellie Ohr worked for Fusion GPS. Rosenstein told us that during this conversation, Ohr may have also said that he introduced Steele to the FBI and that all this information may become public. Rosenstein described the meeting with Ohr as casual and noted that he was in Ohr's office for another reason, which indicated to him that Ohr did not make a special effort to notify him. Rosenstein stated that he left the conversation under the impression that it was only a "strange coincidence" that Ohr knew Steele.

Schools recalled that Ohr, at some point, "stuck his head in the door and said, hey I just wanted to make sure there's nothing I need to do. My wife works at Fusion GPS. I don't know if there's anything, like, a recusal, or anything I need to deal with." Schools stated that he responded to Ohr by saying that "you don't have anything to do with that case. We don't typically in the Department recuse individuals who aren't responsible for the matter giving rise to a potential conflict." Schools believed this conversation occurred a couple months before Ohr's conduct became public and may have coincided with Ohr's October 2017 conversation with Rosenstein.

Ohr told us that a few weeks after his first conversation with Rosenstein on this issue, he spoke with Rosenstein again and told him that he still talked to Steele from time to time and provided information to the FBI when Steele called him. Rosenstein told us that he recalled a second conversation with Ohr concerning Steele, which he believed occurred in early December 2017. According to Rosenstein, Ohr told him that he delivered a thumb drive containing Steele's election reports to the FBI. Rosenstein said this information changed his perspective of the situation. Rosenstein told us the fact that Ohr

---

[456] As explained in previous chapters, no one in NSD had knowledge of Ohr's substantive contacts with Steele. Nor were they aware of his delivery to the FBI of Simpson's and Nellie Ohr's thumb drives. NSD attorneys only learned of Ohr's participation in Crossfire Hurricane in late 2017 or early 2018. NSD witnesses told the OIG that they would have expected the FBI or Ohr to have informed them of Ohr's involvement in the investigation as it occurred.

> knew Steele was kind of just an unusual coincidence, but the idea that he had actually had some role in this Russia investigation was shocking to me…. [W]e had been fending off these Congressional inquiries.  And they were asking for all sorts of stuff, [FD-]302s and things, and…I had no idea that somebody on my staff had actually been involved in…an operational way in the investigation.

According to Rosenstein, he learned that day or the next day that there were several FD-302s from Ohr's interviews with the FBI.  He said that Ohr appeared to be serving as an "intermediary" with Steele.

### C.   ODAG Learns of Ohr's Activities in Connection to the Russian Investigation and Transfers Ohr

On November 28, 2017, the Department received a letter from the Senate Select Committee on Intelligence (SSCI) requesting a closed interview of Ohr as part of its inquiry into Russian interference with the 2016 presidential election.  SSCI's request was forwarded to Ohr and Crowell the next day, and the FBI subsequently provided ODAG with the Ohr FD-302s, which Crowell and Schools reviewed.  Schools told us he was shocked by the number of FD-302s concerning Ohr because no one from the FBI had mentioned meeting with Ohr as part of the FBI's efforts to corroborate Steele's reporting.

Following ODAG receiving this information, there were a series of meetings within ODAG involving Rosenstein, Crowell, then PADAG Robert Hur, and Schools.  These meetings concerned Ohr's involvement in the investigation and what Ohr had previously described as his limited connection to Steele in his conversations with Rosenstein and Schools.  Rosenstein stated he was uncomfortable with Ohr's failure to fully inform anyone in ODAG about his communications with Steele and Simpson.  Crowell told us that, after reading the FD-302s, he thought Ohr essentially functioned as a source for the FBI on a sensitive investigation without informing his leadership and was surprised that Ohr provided a version of Steele's election reporting to the FBI.  Likewise, Schools told us:

> [I]t's just inconceivable to me that somebody in the DAG's office would be having those communications [with Steele], and not report them to the DAG and the PADAG.  Just because [the DAG and PADAG] have a right to know.

On December 5, 2017, Crowell and Schools met with Ohr to discuss Ohr's contacts with Steele.  Crowell stated that they informed Ohr that they reviewed the FD-302s of his meetings with the FBI and asked Ohr why he did not inform anyone in ODAG about his activities.  Schools stated that Ohr told them that he thought Steele's information needed to go to the FBI and not to ODAG political leadership because it was a political matter.  According to Crowell and Schools, Ohr also stated that he should have let someone know and apologized.

Rosenstein told us Crowell and Schools reported back to him with their findings, and at that point, he realized Congress likely knew more about Ohr's activities with Steele and the FBI than anyone in ODAG did.  Rosenstein told us:

> [It] was really disappointing to me that he had made the decision originally not to brief anybody [on] our staff and then even after it was clear it was going to be…of national interest…he chose not to disclose, at least to [Schools], that he had actually had an active role….I felt like, if you're in the DAG's office, and the DAG is getting criticized by Congress for the handling of the Russia investigation, you ought to tell him that you had some role in it.

Rosenstein told us he focused on Ohr's role as essentially the equivalent of an FBI agent when dealing with Steele, over the substance of the information Ohr provided to the FBI. According to Rosenstein, the fact that Ohr had extensive conversations with Steele regarding the allegations of Russian interference and transmitted this information from Steele to the FBI—essentially acting as an intermediary, which was not a normal attorney role—formed the basis for Rosenstein's decision to remove Ohr from ODAG. According to Rosenstein, he viewed what Ohr did as collateral to his primary Department responsibilities, and that Ohr should have informed his supervisors about his involvement or sought ethics advice before taking these actions. Rosenstein said he expected an ADAG in these situations to err on the side of disclosure.

Crowell stated his recommendation, as Chief of Staff, was to remove Ohr as an ADAG and alert the appropriate investigative entities for further determination of the extent of Ohr's activities. According to Rosenstein, Crowell, and Schools, Rosenstein decided to use his discretion to move Senior Executive Service-level (SES) employees. He removed Ohr as an ADAG and reassigned him to the Criminal Division.

Crowell and Schools talked to Ohr again on December 6, 2017. They informed him that he was no longer an ADAG, but would remain Director of OCDETF. Crowell stated that he led Ohr through his options to dispute the decision or accept his removal as an ADAG, and that Ohr agreed to the reassignment.

According to Schools, on December 20, 2017, he met with Ohr to inform him that he also was being removed from his position as Director of OCDETF. Ohr stated that Schools told him that then Attorney General Jefferson Sessions and DAG Rosenstein decided to remove him as Director of OCDETF because the position required coordination with the White House, which was something they no longer wanted Ohr to do. During his OIG interview, Schools told us he could not recall what he told Ohr about the reason for his removal; however, after reviewing a draft of this report, Schools stated that Ohr was correct in his recollection of the reason Schools had provided to him for his removal as OCDETF Director.

Rosenstein told the OIG that he and Sessions were both involved in the decision to move Ohr from OCDETF to the Criminal Division. Rosenstein said that Sessions did not want Ohr running the transnational organized crime program and wanted to replace Ohr as a member of the associated threat management working group at the White House. He said that, independently from Sessions, he wanted to take OCDETF in a different direction with a more proactive OCDETF Director. Rosenstein stated that neither of Ohr's moves were disciplinary actions.

In the next chapter, we discuss the FBI's use of CHSs other than Steele and its use of Undercover Employees as part of the Crossfire Hurricane investigation. We also describe several individuals we identified who had either a connection to candidate Trump or a role in the Trump campaign, and were also FBI CHSs, and explain why such individuals were not tasked as part of the Crossfire Hurricane investigation.  Finally, we describe the participation of the SSA supervising Crossfire Hurricane at ODNI strategic intelligence briefings given to the presidential candidates and certain campaign advisors.

**[PAGE INTENTIONALLY LEFT BLANK]**

# CHAPTER TEN
# THE USE OF OTHER CONFIDENTIAL HUMAN SOURCES AND UNDERCOVER EMPLOYEES IN CROSSFIRE HURRICANE

In this chapter, we examine the FBI's use of Confidential Human Sources (CHSs) other than Steele and its use of Undercover Employees (UCEs) in the Crossfire Hurricane investigation to determine whether the FBI had placed any CHSs within the Donald J. Trump for President Campaign or tasked any CHSs to report on the Trump campaign. We found no evidence that the FBI placed any CHSs or UCEs within the Trump campaign or tasked any CHSs or UCEs to report on the Trump campaign. However, we found that the Crossfire Hurricane team did task several CHSs and UCEs during the 2016 presidential campaign, which resulted in interactions with Carter Page, George Papadopoulos, and a high-level Trump campaign official who was not a subject of the investigation. All of the CHS interactions were consensually monitored by the FBI. We found that the Crossfire Hurricane team tasked CHSs to interact with Page and Papadopoulos both during the time Page and Papadopoulos were advisors to the Trump campaign, and after Page and Papadopoulos were no longer affiliated with the Trump campaign. We describe the types of information the CHSs sought to elicit from Page, Papadopoulos, and the high-level campaign official, as well as the information the CHSs obtained and the use, if any, that the Crossfire Hurricane team made of that information.

We also determined that additional CHSs were tasked by the FBI to attempt to contact Papadopoulos, but that those attempted contacts did not lead to any operational activity. In addition, we identified several individuals who had either a connection to candidate Trump or a role in the Trump campaign, and were also FBI CHSs, but who were not tasked as part of the Crossfire Hurricane investigation. One such CHS did provide the Crossfire Hurricane team with general information about Crossfire Hurricane subjects Carter Page and Paul Manafort, but we found that this CHS had no further involvement in the investigation. We identified another CHS that the Crossfire Hurricane team first learned about in 2017, when the CHS voluntarily provided his/her Handling Agent with █████████████

███████████████. These ██████ were placed into the FBI's files and provided to the Crossfire Hurricane team for review, which determined there was not "anything significant" in the ████████████. Below, we provide additional information about the individuals who had either a connection to candidate Trump or a role in the Trump campaign, and who were also FBI CHSs, and explain why they were not tasked in the Crossfire Hurricane investigation.

Finally, we learned during the course of our review that, in August 2016, the supervisor of the Crossfire Hurricane investigation, SSA 1, participated on behalf of the FBI in a strategic intelligence briefing given by the Office of the Director of National Intelligence (ODNI) to candidate Trump and his national security advisors, including Michael Flynn, and in a separate strategic intelligence briefing given to candidate Clinton and her national security advisors. Although the briefing of candidate Trump and his advisors was not an undercover operation, because SSA 1

was introduced to the briefing participants as an FBI agent, we discuss this briefing in this chapter, including the reason why SSA 1 was in attendance, and the observations that SSA 1 made as a result of his participation.

## I.    Methodology

To review the FBI's use of CHSs and UCEs in the Crossfire Hurricane investigation, the OIG was given broad access to highly classified information. In July 2018, the FBI's then Assistant Director (AD) for the Counterintelligence Division (CD), E.W. "Bill" Priestap, briefed the OIG regarding the FBI CHSs and UCEs who provided information for the Crossfire Hurricane investigation. This briefing was based on CD's knowledge of the Crossfire Hurricane investigation as well as searches of the FBI's Sentinel and Delta databases.[457]  In this briefing, Priestap described the FBI's operational use of CHSs other than Steele and his sub-sources, and use of UCEs in the Crossfire Hurricane investigation.

Separately, the OIG reviewed emails, text messages, and instant messages of the FBI agents, analysts, and supervisors working on the Crossfire Hurricane investigation, as well as contemporaneous handwritten notes, to identify references to CHSs and UCEs.  Through our Delta searches and review of documents, we learned of additional CHSs who were discussed for potential use in Crossfire Hurricane, but ultimately were not tasked by the FBI.  We describe these CHSs in greater detail below.

We also obtained and analyzed the FBI's index for the Crossfire Hurricane case file, as well as the indices of the Crossfire Hurricane sub-files for Papadopoulos, Carter Page, Manafort, and Flynn, who were named subjects of the Crossfire Hurricane investigation.  These indices reference activities undertaken by the Crossfire Hurricane team involving CHSs by listing the CHS ▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮ in each line item that pertains to CHS activity.  We then analyzed the underlying documents from the Crossfire Hurricane case file and sub-files that further described any activities involving CHSs.

The OIG was also given access to the FBI's classified Delta database, which is the FBI's automated case management system for all CHS records.  We were able to review ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the files of CHSs who were used, as well as those who were considered for use, in the Crossfire Hurricane investigation. The Delta files for these CHSs contained historical information, including when the FBI opened each CHS; the issues on which the CHS had reported; contact reports for all interactions with the FBI; quarterly (QSSR) reports and annual (FOASR) reviews of each CHS; and, where one had been performed, a human source

---

[457]  As described in Chapter Two, the FBI maintains an automated case management system for all CHS records, which the FBI refers to as "Delta."  The Delta file for each CHS contains all of the personal and administrative information about the CHS, as well as sub-files for unclassified reporting, classified reporting, validation documentation, and payment records.

validation report.  For any CHS that had been closed by the FBI, the Delta file also described the events that led to the closure, and the basis for the FBI's decision.

We also conducted word searches within the FBI's Delta database for a number of terms, including "Trump" and "campaign," as well as the names of individuals who held leadership positions within the Trump campaign.  We analyzed each of the Delta documents containing the search terms related to the Trump campaign and its members.  In addition, for any CHS identified through these word searches, we reviewed that CHS's Delta file index for at least the 2016-2017 time period, as well as CHS reports within that file, as appropriate, to determine whether the CHS contributed to Crossfire Hurricane, and, if so, how.  We also interviewed numerous former and current Department and FBI officials concerning the FBI's use of CHSs and UCEs during the Crossfire Hurricane investigation.

## II.    Background

CHSs play an important role in the FBI's efforts to combat crime and protect national security, by allowing law enforcement direct access to information that is often not available through other investigative means.  At any one time, the FBI has thousands of active CHSs from diverse backgrounds who report on a wide variety of threats.  We were told by the FBI that the relationship between a CHS and the FBI may continue for many years, during which time a source may become inactive, and then become active again.  We also were advised that it is commonplace for CHSs to bring information to the FBI that is outside of his or her typical focus, because that individual believes the information may be of interest or value to the FBI.

According to the FBI, its use of CHSs in counterintelligence investigations is common.  Priestap told the OIG that CHSs are an "ordinary investigative tool" that are "part and parcel of what [FBI] agents do in an investigative sense every day."  Priestap added that the upper levels of FBI management, including the Assistant Director and the Deputy Director, are not usually advised when an investigative team wants to use a CHS for a particular investigation.  Indeed, the FBI Confidential Human Source Policy Guide (CHSPG) specifies that "daily oversight responsibility for…CHSs resides with the [Supervisory Special Agent (SSA)], who must review all communications regarding the CHSs on his or her squad and supervise the special agents (SAs) operating those CHSs."

With respect to the involvement of CHSs in political campaign activities, as described in Chapter Two, FBI policies allow for the use of "sensitive" sources (a category which includes individuals who are "prominent within domestic political organizations"), the use of CHSs in sensitive monitoring circumstances, and the undisclosed participation of CHSs in organizations exercising First Amendment rights.  The use of CHSs in these circumstances requires heightened levels of supervisory approval to safeguard Constitutional rights and protect civil liberties. In our analysis in Chapter Eleven, we explain why those requirements did not apply to any of the CHS or UCE activities undertaken in the Crossfire Hurricane investigation, from its inception through the November 8, 2016 elections.

### III. Strategy and Planning for Use of CHSs and UCEs in the Crossfire Hurricane Investigation

#### A. Strategy for Use of CHSs and UCEs in Crossfire Hurricane

The agents, analysts, and supervisors who worked on Crossfire Hurricane told the OIG that CHSs played an important role in the investigation. The Section Chief of CD's Counterintelligence Analysis Section I (Intel Section Chief) told the OIG that the use of CHSs was

> viewed as...one of the best avenues to potentially get some meat on the bones of the allegation that came through that started the case, to get somebody talking about what that reality was, even if the reality was, this guy Papadopoulos knows nothing or...this is what happened that actually explains that predication.... [I]t was one of those few avenues...available to us in that moment, where you could start to get some clarity around...that initial predicating allegation.... [The idea] was to get...[a] source...to develop enough of a relationship to be able to ask some relatively pointed questions around the Russia issue to try to get clarity on that predicating information.

Case Agent 2 agreed that the best way to find the truth was to get a human source to gather information "to tell [us] where the problem is, period. Period."

The witnesses we interviewed gave the OIG three practical reasons for focusing on operations using CHSs in the investigation. First, the case agents said they were conscious that they were working on a compressed time frame, and told us that CHSs can be an effective tool for quickly obtaining information, such as the telephone numbers and email addresses of the named subjects.

Second, early in the investigation, the Crossfire Hurricane team discovered that it had an existing FBI CHS who had previously interacted with named subjects of the investigation. Then Deputy General Counsel Trisha Anderson told the OIG that using such a source operationally in a counterintelligence investigation is "an obvious selection because of those preexisting relationships." SSA 1 told the OIG that "if we have a source...who has direct contact with...predicated subjects, we can run potential consensual monitoring operations and us[e]...undercovers, and...that was a better use of our limited time and resources." Case Agent 2 added that in thinking about which CHSs to use, the Crossfire Hurricane team "didn't have resources to start going out to every Field Office and sensitizing sources," so using an existing CHS to conduct operations against the Crossfire Hurricane subjects made sense.

Third, multiple witnesses told the OIG that they were very concerned about preventing leaks regarding the nature and existence of the Crossfire Hurricane investigation. SSA 1 told the OIG that one of the overriding concerns was keeping information about the investigation out of the public realm, because the team did not want to impact the presidential election in any way. Priestap said that, in an effort to prevent leaks, the investigative team was kept to a "small group...to try to control the information from getting out."

## B.    Planning for Operations Involving CHSs and UCEs

SSA 1 told the OIG that he and the case agents were responsible for planning how to use CHSs in the Crossfire Hurricane investigation.[458]  Case Agent 1, Case Agent 2, and Case Agent 3 likewise told us that plans for the operational activities using CHSs and UCEs were driven by the agents and SSA 1.  Case Agent 1 said that the investigative team was not "told to do anything specifically.  It usually emanated from us coming up with our plans and operations."  The Intel Section Chief told the OIG the same thing—that the decisions about the use of CHSs and UCEs for Crossfire Hurricane were made by the case agents and SSA 1, and then approved through the chain of command.

SSA 1 told the OIG he did not remember any instances of then Section Chief Peter Strzok expressing opinions about how CHSs should be used or not used, or instructing the team on how to task the CHSs.[459]  Case Agent 1 told the OIG that he did not recall Strzok "telling us to do anything or directing us to do anything" and did not remember "anything [Strzok] did on his own."[460]  Similarly, Case Agent 2 told the OIG that he had no memory of Strzok ever "com[ing] in and say[ing], nope, I don't want this; I want this."  Case Agent 3 told us he remembered talking to Strzok on "a couple of occasions" but Case Agent 3 said he could not "remember engaging him in a whole lot."  Priestap told the OIG that there were no operational decisions involving CHSs for which Strzok was the sole decision maker.

Strzok's description of his role matched the information provided by the case agents, SSA 1, and Priestap.  Strzok told the OIG that there were no investigative steps or operational decisions that he made on his own, independent of the team.  With respect to CHS operations, Strzok told the OIG that his role was not exercising decision making authority, but rather "awareness and oversight."  Strzok told the OIG he received briefings on the use of CHSs, but that "by and large, the kind of day-to-day operational use of sources was at a lower level than me."  Strzok said that decisions on operations involving CHSs were made at the team level, and FBI managers were told by the team "[w]e've got these operations coming up.  This is how we're going to use" each CHS.

---

[458]  The FBI's CHSPG allowed an SSA to approve the operation of CHSs for all of the circumstances involved in the Crossfire Hurricane investigation, except for a heightened approval requirement for extraterritorial operation of a CHS, which applied to one of the Crossfire Hurricane CHS operations addressed in this chapter.  We determined that the heightened approval requirement was met in the applicable circumstance.  See CHSPG §§ 19.2 & n.12.

[459]  Strzok was promoted to CD Section Chief in February 2016, and later to Deputy Assistant Director (DAD) of CD's Operations Branch I on September 4, 2016.

[460]  The one issue Case Agent 1 remembered Strzok weighing in on was how aggressively to task one of the CHSs.  Case Agent 1 told the OIG he remembered Strzok voicing concern that the investigative team was using the CHS "too often" and that repeated use of a CHS could possibly raise suspicions.  Case Agent 1 told the OIG he disagreed and thought the team should be more aggressive "given the compressed time frame in which we had to operate" but characterized the discussion as "just a normal kind of give and take" that occurs in planning CHS operations.

The FBI's Office of the General Counsel (OGC) Unit Chief told the OIG that, following a briefing in August 2016, then Deputy Director Andrew McCabe was "on board with using the sources and using them quickly given the timing issue." However, the OGC Unit Chief added that McCabe did not give direction about what sources to use and how.[461]  The OGC Unit Chief also did not remember any position that Lisa Page ever took about whether to use any of the CHSs, and said that Lisa Page had no final say over decisions on operations involving CHSs.[462]  Priestap told the OIG that, in the updates that the Director, Deputy Director, and EAD received, they were not provided with the "detail[s] of how…[each] confidential human source was going to be used going forward."  During his OIG interview, McCabe said that he did not expect the Crossfire Hurricane team to brief him on every CHS, and that he did not direct the Crossfire Hurricane team to use any specific CHSs. Rather, he said that it was the responsibility of the investigative team "to make [the] assessments" of which CHSs to use and how to use them.  He added that FBI policies contain no requirement for a case agent to "get[] the Deputy Director's opinion on whether [a] source operation is a good idea or not or what the limitations should be."

The OGC Unit Chief also told us that members of the investigative team identified the CHSs and UCEs they wanted to use, and proposed the operational activities, as "the best way to try to get [the] answer quickly and covertly."  She said that, under FBI policy, SSA 1 had the authority to approve the types of CHS operations used in the Crossfire Hurricane investigation.  The Department was not part of the discussions regarding how to use FBI CHSs and UCEs to further the investigation.  Department approval was not required to conduct operations using CHSs and UCEs, and the OGC Unit Chief told the OIG that the FBI does not "generally loop in DOJ…to discuss source operations" in counterintelligence investigations because the FBI is very protective of its source base and the identity of its CHSs.

In determining how to use CHSs in the Crossfire Hurricane investigation, SSA 1 and the case agents told the OIG that they focused their CHS operations on the predicating information and the four named subjects.  Case Agent 1 told the OIG

---

[461]  The only express direction we found that McCabe gave regarding the use of a CHS concerned a former FBI CHS, who contacted an FBI agent in an FBI field office in late July 2016 to report information from "a colleague who runs an investigative firm…hired by two entities (the Democratic National Committee [DNC] as well as another individual…[who was] not name[d]) to explore Donald Trump's longstanding ties to Russian entities."  The former CHS also gave the FBI agent a list of "individuals and entities who have surfaced in [the investigative firm's] examination," which the former CHS described as "mostly public source material."  In mid-September 2016, McCabe told SSA 1 to instruct the FBI agent from the field office not to have any further contact with the former CHS, and not to accept any information regarding the Crossfire Hurricane investigation. McCabe told the OIG he did not remember giving those instructions, and could not tell us why he might have done so.  We found no evidence that the FBI reopened the former CHS for the Crossfire Hurricane investigation, or tasked the former CHS in connection with the Crossfire Hurricane investigation.

[462]  Case Agent 1, Case Agent 2, and Case Agent 3 each told us that they were not aware of any decision making by Lisa Page in the investigation and that they had little to no interaction with her.

that the team "had a very narrow mandate" and that was "a mandate to look at these four individuals...and see if there's any potential cooperation between themselves and the Russian government...that was our goal in that investigation." He added that they were focused on the information from the Friendly Foreign Government (FFG) "and wanted to prove or disprove it, [as] best we could" but also "wanted to make sure that it didn't get broadcast out and we didn't harm the electoral process." Case Agent 2 told the OIG that the Crossfire Hurricane team was "focused on four predicated subjects." He stated that the core of the investigation was "literally looking at the predication and saying, okay, who reasonably could have had been in a position to receive suggestions from the Russians?" Case Agent 2 also said that in his "experience over twenty years [in the FBI]...a human source every time is going to answer that question" and so the team had "to start thinking about what human sources we can use."

SSA 1 also told the OIG that he did not have any information that the use of the CHSs was motivated in any way by political objectives rather than investigative objectives. He said that there was "no inkling of that. I never detected that, or had any indication of that." Priestap likewise told the OIG he was not aware of anyone's political preferences playing any role in the tasking of the CHSs. Priestap said that if he had seen any indication that Strzok was taking investigative actions for political reasons, Priestap would have removed Strzok from the Crossfire Hurricane team. Priestap said that he "absolutely would not have tolerated" politicization of the investigation, and that he never saw anything to indicate that type of activity was occurring.

## C.    Absence of FBI CHSs Inside the Trump Campaign

All of the witnesses we interviewed told the OIG that the FBI did not try to recruit members of the Trump campaign as CHSs, did not send CHSs to collect information in Trump campaign headquarters or Trump campaign spaces, and did not ask CHSs to join the Trump campaign or otherwise attend campaign related events as part of the investigation. Using the methodology described above, we found no information indicating otherwise.

Priestap told the OIG he knew of no effort by the FBI to infiltrate the Trump campaign. He said the investigation

> was about a foreign adversary trying to mess with our free and fair election system. We wanted to know if any U.S. persons assisted in any way. In no way was it an investigation into...the political process.... [I]t's not the FBI's role in any way to try to monitor or...investigate campaigns.

Priestap added that the FBI wasn't

> after policy and plans. We were after some specific information about possible collusion with the Russians.... We never tried to develop somebody and insert them into the campaign. I'm actually pretty darn confident we could have been able to do that...if that was the objective. The FBI is pretty good at developing sources and inserting

them into situations to advance our investigations.  I know of no conversation in which that was a plan on the part of the FBI's.

McCabe told the OIG that he was never involved in any discussions about placing an FBI CHS into the Trump campaign to further the Crossfire Hurricane investigation, or for any other purpose.  Former Director James Comey told the OIG that, if there had been an effort to place a CHS within the Trump campaign, he would have expected to have been notified of that.  He also said he had no knowledge of any FBI CHSs that had been asked by the FBI to join the Trump campaign in any capacity, and no information that would support an allegation that the FBI had been spying on the Trump campaign.

## IV.    Use of CHSs and UCEs in the Crossfire Hurricane Investigation

### A.    No CHSs and UCEs Used Prior to the Opening of the Crossfire Hurricane Investigation

In our review, we did not find any evidence that the FBI used CHSs or UCEs to interact with members of the Trump campaign prior to the opening of the Crossfire Hurricane investigation.  All of the members of the Crossfire Hurricane team told the OIG that no investigative steps of any type were taken prior to receipt of the predicating information for the Crossfire Hurricane investigation on July 28, 2016, and we found no evidence to the contrary.

We investigated allegations that the FBI used specific individuals to undertake CHS activities prior to the predication of Crossfire Hurricane.  For example, we investigated an allegation that the FBI sent a CHS (known as "Henry Greenberg" by other aliases) to meet with Trump advisors Roger Stone and Michael Caputo in March 2016, to offer to sell derogatory information about Hillary Clinton for $2 million.  We found no evidence in the FBI's Delta files or from witness testimony that this individual was acting as an FBI CHS for any purpose in 2016.

We also investigated an allegation, raised by Papadopoulos, that the FBI used Joseph Mifsud, a Maltese citizen who was living in London and serving as a university professor, to pass information to Papadopoulos in April 2016 as a set up, so that the FBI could predicate the Crossfire Hurricane investigation.  Papadopoulos raised this possibility during his October 25, 2018 testimony before the House Judiciary Committee and House Committee on Government Reform and Oversight, by stating that Mifsud might have been "working with the FBI and this was some sort of operation" to entrap Papadopoulos.  The FBI's Delta files contain no evidence that Mifsud has ever acted as an FBI CHS,[463] and none of the witnesses

---

[463]  As previously noted, we searched the FBI's Delta database for evidence of FBI CHSs interacting with Papadopoulos and other targets of the Crossfire Hurricane investigation, and found no evidence of such interactions, other than the CHSs specifically described in this chapter.

we interviewed or documents we reviewed had any information to support such an allegation.[464]

In addition, we investigated whether the FBI tasked any CHSs to meet with Carter Page prior to the opening of Crossfire Hurricane. We found no evidence that the FBI had. Case Agent 1, SSA 1, and the Supervisory Intelligence Analyst (Supervisory Intel Analyst) each told the OIG that the FBI did not have anything to do with any operational activities against Carter Page prior to the start of the Crossfire Hurricane investigation on July 31, 2016.[465]

## B.    CHS and UCE Involvement in Crossfire Hurricane

We found no evidence that the FBI placed any CHSs or UCEs within the Trump campaign or tasked any CHSs or UCEs to report on the Trump campaign. However, through our review, we determined that, during the 2016 presidential campaign, the Crossfire Hurricane team tasked four CHSs and a few UCEs, which resulted in interactions with Carter Page, George Papadopoulos, and a high-level Trump campaign official who was not a subject of the investigation. We found that the Crossfire Hurricane team tasked CHSs to interact with Page and Papadopoulos both during the time Page and Papadopoulos were advisors for the Trump campaign, and after Page and Papadopoulos were no longer affiliated with the Trump campaign. All of the CHS interactions were consensually monitored by the FBI. Two of the CHSs tasked by the FBI are referred to below as Source 2 and Source 3. Below we discuss the types of information these CHSs sought to elicit from Page, Papadopoulos, and the high-level campaign official, the information that the CHSs obtained, and the use, if any, that the Crossfire Hurricane team made of that information.

We also determined that two additional CHSs were tasked by the FBI to attempt to contact Papadopoulos, but that those attempted contacts did not lead to any operational activity, and those CHSs are not discussed further in this report.

### 1.    Source 2

Source 2 was closed by the FBI in 2011 for "aggressiveness toward handling agents as a result of what [Source 2] perceived as not enough compensation" and "questionable allegiance to the [intelligence] targets" with which Source 2 maintained contact. However, Source 2 was re-opened 2 months later by Case Agent 1, and was handled by Case Agent 1 from 2011 through 2016 as part of Case Agent 1's regular investigative activities at an FBI field office. The FBI conducted human source validation reviews on Source 2 in 2011, 2013, and 2017.

---

[464] The FBI also requested information on ██████████████████████████████

[465] As noted in Chapter Three, a New York Field Office (NYFO) Counterintelligence (CI) Agent also told us that the FBI did not use any CHSs to target Carter Page during the NYFO counterintelligence investigation of Page, which was opened on April 6, 2016, and transferred to the Crossfire Hurricane team on August 10, 2016.

Case Agent 1 told the OIG that Source 2 can be "mercurial" and explained that Source 2 was closed for cause in 2011 because the former FBI handler, although very skilled, was "not the right match" for Source 2, which resulted in interpersonal conflict. Case Agent 1 said that when he reopened Source 2, he told Source 2 that this was the "last opportunity" and that the FBI would not tolerate the issues that had arisen in the past. According to Case Agent 1, since that time Case Agent 1 has not experienced any aggressiveness, and has not seen any indication that Source 2 has questionable allegiances to intelligence targets. Instead, Case Agent 1 described Source 2 as willing to assist the FBI "without any hesitation." He added that Source 2 has never given Case Agent 1 any reason to doubt the veracity of Source 2's reporting. Case Agent 1 and SSA 1 both told the OIG that nothing happened in the Crossfire Hurricane investigation to suggest that the concerns leading to Source 2's closure for cause in 2011 had any impact on Crossfire Hurricane.

### a. Crossfire Hurricane Team's Initial Meeting with Source 2 on August 11, 2016

Source 2's involvement in the Crossfire Hurricane investigation arose out of Case Agent 1's pre-existing relationship with Source 2. Case Agent 1 told the OIG that when he arrived in Washington, D.C. in early August 2016 to join the Crossfire Hurricane team, he had never previously dealt with the "realm" of political campaigns. He said he lacked a basic understanding of simple issues, for example what the role of a "foreign policy advisor" entails, and how that person interacts with the rest of the campaign. Case Agent 1 said he proposed meeting with Source 2 to ask these questions because Case Agent 1 knew that Source 2 had been affiliated with national political campaigns since the early 1970s. Case Agent 1 also believed Source 2 might have information about, and potentially may have met, one or more of the Crossfire Hurricane subjects. Case Agent 1 told the OIG that he did not know at the time he proposed the meeting that Source 2 had been invited to join the Trump campaign. SSA 1 told the OIG that he did not know about Source 2, or know that Case Agent 1 was Source 2's handler, prior to Case Agent 1 proposing the meeting, which SSA 1 approved.

On August 11, 2016, Case Agent 1, Case Agent 2, and a Staff Operations Specialist (SOS) met with Source 2. Case Agent 1 told the OIG that the plan going into the meeting was to talk generally with Source 2 about Russian "interference in the election, what [Source 2] may know, and…to bring up Papadopoulos." Case Agent 1 added that the team used media reports concerning the release of emails and allegations of Russian hacking to frame the discussion. The Electronic Communication (EC) documenting the meeting states that the investigative team told Source 2 they were "assigned to a project" concerning Russian interference in the Presidential campaign. Case Agent 1 said they did not tell Source 2 that there was an open investigation or who the subjects were. Case Agent 1 also said they did not tell Source 2 about any specifics, including the information the FBI had received from the Friendly Foreign Government (FFG) that led to the opening of the investigation.

Case Agent 1 told the OIG that the team asked Source 2 about Papadopoulos, but Source 2 said he had never heard of him. The EC documenting the meeting reflects that Source 2 agreed to work with the Crossfire Hurricane team by reaching out to Papadopoulos which would allow the Crossfire Hurricane team to collect assessment information on Papadopoulos and potentially conduct an operation.

Case Agent 1 told the OIG that Source 2 then asked whether the team had any interest in an individual named Carter Page. Case Agent 1 said that the members of the investigative team "didn't react because at that point we didn't know where we were going to go with it" but asked some questions about how Source 2 knew Carter Page. Source 2 explained that, in mid-July 2016, Carter Page attended a three-day conference, during which Page had approached Source 2 and asked Source 2 to be a foreign policy advisor for the Trump campaign. According to the EC summarizing the August 11, 2016 meeting, Source 2 said he/she had been "non-committal" about joining the campaign when discussing it with Carter Page in mid-July, but during the August 11, 2016 meeting with the Crossfire Hurricane team, Source 2 "stated that [he/she] had no intention of joining the campaign, but [Source 2] had not conveyed that to anyone related to how Trump campaign." Source 2 further stated he/she "was willing to assist with the ongoing investigation and to not notify the Trump campaign about [Source 2's] decision not to join." Source 2 also told the Crossfire Hurricane team that Source 2 was expecting to be contacted in the near future by one of the senior leaders of the Trump campaign about joining the campaign.

In addition, Source 2 told the Crossfire Hurricane team that Source 2 had known Trump's then campaign manager, Manafort, for a number of years and that he had been previously acquainted with Michael Flynn. Case Agent 1 told the OIG that "quite honestly…we kind of stumbled upon [Source 2] knowing these folks." He said that it was "serendipitous" and that the Crossfire Hurricane team "couldn't believe [their] luck" that Source 2 had contacts with three of their four subjects, including Carter Page.

### b.  Internal FBI Discussions Concerning Source 2 and the Trump Campaign

Case Agent 1 told the OIG that, after meeting with Source 2 on August 11, 2016, he drove back to FBI Headquarters with Case Agent 2 and the SOS, and met with other members of the Crossfire Hurricane team to discuss how to proceed. During that meeting, the OGC Unit Chief, SSA 1, Strzok, and Priestap learned that Source 2 had been invited to join the Trump campaign by Carter Page and that Source 2 was going to turn down the invitation. All of the FBI witnesses we interviewed said that they would not have used Source 2 for the Crossfire Hurricane investigation if Source 2 had actually wanted to join the Trump campaign. SSA 1 said he did not remember anyone on the Crossfire Hurricane team advocating for Source 2 to actually join the Trump campaign and told the OIG he was relieved that Source 2 did not want to join the campaign "at all." Strzok told the OIG his reaction was "no, no, no, no, no, no…. [O]h god no. Absolutely not" when he learned that Source 2 had been invited to join the Trump campaign. Case Agent 1

told the OIG that if Source 2 had joined the campaign, the Crossfire Hurricane team would not have used Source 2 "because that's not what we were after." He added that having Source 2 in the campaign would have been difficult because "then [Source 2] actually has a job to do and [Source 2 is] going to actually have to do that job." Case Agent 2 told us that the reaction of the OGC attorneys advising the Crossfire Hurricane team was "no freaking way" and that the team was not "pushing for that...[because they were] not trying to get into the campaign." Case Agent 2 said that by using Source 2 outside of the campaign, the Crossfire Hurricane team could find "smart ways, and quiet ways to get information that we can corroborate, that helps us understand what the heck Mr. Papadopoulos meant by...the Trump team received a suggestion from the Russians." Priestap said that his first question was "what was Source 2's answer?" and that the response was Source 2 did not want to join the campaign.

The OGC Unit Chief said that she remembered the team seeking her advice, and said she told them they should not direct Source 2 to join the campaign, but they also should not tell Source 2 not to join the campaign. She told the OIG her advice was that Source 2 "should do what [Source 2] would normally do" and that the Crossfire Hurricane team should "follow [Source 2's] lead." She added that she was "grateful" when she learned that Source 2 did not want to join the Trump campaign, because she said that if the Crossfire Hurricane team had wanted to operate a CHS within the campaign (which she said none of the team members ever proposed to her), that would have raised a host of complicated issues under the FBI's Domestic Investigations and Operations Guide (DIOG), including undisclosed participation in political activities, appearance issues if it became publicly known an FBI source was in the Trump campaign, and the potential that the source could influence campaign policy or strategy.

### c. Follow-up Crossfire Hurricane Team Meeting with Source 2 on August 12, 2016

The next day, August 12, 2016, Case Agent 1, Case Agent 2, and the SOS met with Source 2 again. During the August 12, 2016 meeting, Source 2 provided additional information about the role of a foreign policy advisor in a presidential campaign. Case Agent 1 described this portion of their conversation as "more of a generic question, like what is the foreign policy advisor doing" and who does that person report to? Case Agent 1 said that the Crossfire Hurricane team was not interested in the Trump campaign's "policies or any of their positions," but more generally just needed to understand the role of a foreign policy advisor.

During the August 12, 2016 meeting, Case Agent 1, Case Agent 2, and the SOS also told Source 2 that the FBI was interested in Carter Page, and asked whether Source 2 would be willing to contact Carter Page for a private meeting, as a follow-up to their meeting in July 2016. The investigative team told Source 2 that, because the Trump campaign appeared interested in recruiting Source 2, Source 2 was in a perfect position to directly ask Carter Page about media reports regarding links between the campaign and Russia. The team also discussed with Source 2 plans regarding Papadopoulos. As discussed below, Source 2 ultimately met with three members of the Trump campaign on behalf of the FBI—Carter Page,

George Papadopoulos, and a high-level campaign official who was not a subject of the investigation—and the FBI consensually monitored Source 2's conversations with each of these individuals.

### d.    Source 2's Meetings with Carter Page

### (1)    August 20, 2016

The first consensually monitored meeting between Source 2 and Carter Page took place on August 20, 2016. As described in Chapter Seven, some of the information obtained from this meeting was referenced in the Carter Page FISA Renewal Application No. 3. Case Agent 1 said that he instructed Source 2 to use the information in the media regarding Russia and Hillary Clinton's emails, and to ask questions Source 2 would normally ask if Source 2 was talking to a foreign policy advisor to a campaign. Members of the Crossfire Hurricane team told the OIG that they expected Source 2 to ask whether the campaign was planning an "October Surprise," as had been reported in the media, in addition to asking Carter Page if he maintained contacts with Russians or knew whether the Russians had been releasing emails to benefit the campaign.

We reviewed the transcript of Source 2's August 20, 2016 meeting with Carter Page. Through their conversations, Source 2 learned where Page was staying while in Washington for campaign meetings. Page also claimed to "personally…have no ambition" to seek a position in the administration if Trump won the election. Page also stated that he had "literally never met" Manafort, had "never said one word to him," and that Manafort had not responded to any of Carter Page's emails. Source 2 (who had known Manafort for decades) told Carter Page not to "feel bad" because everybody who has ever sent emails to Manafort "never got a response."[466]

During their conversation, Page told Source 2 that his July 2016 trip to Moscow "was the most incredible experience of my life." However, Page repeatedly complained about the negative, and highly personal, media attention he was receiving. For example, Page described an article from *The Washington Post* and how "95% of it was complete garbage." Page also complained that, next to Manafort (who he called "public enemy number one") Page was being treated as "public enemy number two." Page said that as a result of a "hit job" in Bloomberg News he had been branded as "Trump's Russia Advisor" with "close ties with the Russian government," and that idea had become "the consistent narrative ever since." Page told Source 2 that he was "just a shareholder" in the Russian energy company Gazprom, but that the media's approach was to highlight "anything that they can kind of spin in a…negative way." As a result of the negative media coverage, Page said that others working for the campaign were joking with him

---

[466] As described in Chapters Five and Seven, the FBI did not advise NSD's Office of Intelligence or the Foreign Intelligence Surveillance Court (FISC) of Carter Page's statements concerning Manafort, which contradicted information from Steele's election reporting that was relied upon in the Carter Page FISA applications.

about "attract[ing] all the attention" and keeping the rest of them "off the radar screen."

When Source 2 raised the issue of an "October Surprise," Carter Page said "there's a different October Surprise…[a]lthough maybe some similarities" to the October Surprise in the 1980 Presidential Campaign.  Page did not elaborate. Source 2 raised the issue again later in the meeting, and asked if the Trump campaign could access information that might have been obtained by the Russians from the DNC files.  Source 2 added that in past campaigns "we would have used [it] in a heartbeat."  Page's response was that, because he had been attacked by the media for his connections to Russia, he was "perhaps…[being] overly cautious." When the October Surprise issue came up again, Page alluded to "the conspiracy theory about…the next email dump with…33 thousand" additional emails, but did not further explain what he meant.  Source 2 asked "[w]ell the Russians have all that don't they?" to which Page responded "I don't, I-I don't know."

Page also said that "we were not on the front lines of this DNC thing" during the Philadelphia convention and wondered aloud "who's better to do this?"  Page asked Source 2 whether the Trump campaign should just leave it to the "other forces that be" and just let it "run its course," with the Trump campaign "egg[ing] it a long a little bit" but without being "seen as the one advancing this in concert with the Russians."  Source 2 responded "it needs to be done very delicately and with no fingerprints" to which Page said "[o]kay."  Page asked Source 2 if "picking out a couple trusted journalists" and giving them "some ideas of…potential big stories" would be the right way to handle it.  Page also suggested that "there may be people that kind of work this angle" but that Page was being "very cautious, you know, right now."

Source 2 also asked Page for information about Papadopoulos.  Page said that Papadopoulos was the youngest guy on the campaign, that he used to live in London, and that he had not been to the last campaign meeting.  Page also said he had "no comment" on whether Papadopoulos was easily triggered emotionally.

At one point, Source 2 steered the conversation toward Source 2's contacts in the Russian ████████████████████, and described how Source 2 arranged fully paid trips for the ████████████████ and other Russians to speak ████████. ████████████████. Source 2 asked if Page knew anyone of that type that might be interested in coming to speak ████████████, and Page responded that he "know[s] a couple of people in London" but that he wanted to be "doubly cautious…to limit conspiracy theories" and that his preference would be to "pass along names discreetly."  Page added that he would need to "think about the easiest[,] most efficient[,] frankly safest way to…navigate this."

Throughout the meeting, Page asked Source 2 to assist the Trump campaign by writing op-eds.  Source 2 stated a willingness "to be helpful to the campaign" but also said that Source 2 would like to know "what the plan is" before committing.  Page responded that it was "unfortunate" that Source 2 had not yet gotten to meet a high-level campaign official who was not a subject of the investigation, and Source 2 responded that Source 2 was available whenever that

high-level campaign official "wants to chat."  Later in the meeting, Source 2 told Page that Source 2 would like to meet with the high-level campaign official to discuss "what I'm getting in to" because Source 2 said there are "some things that have to be done at this part of...the campaign....  And if you don't do them you're going to lose."

Case Agent 1 told the OIG that Page's comment about the "October Surprise" was meaningful to the Crossfire Hurricane team.  He said that when Page was asked the question, Page

> kind of trailed off and it...piqued our interest because it seemed like that he knew of something, but he wasn't 100 percent sure and was just kind of alluding to something, but he didn't really give much more information to it.  So that kind of pique[d] our interest.

Case Agent 1 said that within the investigative team "there was a discussion whether or not [Carter Page] knew more than he was [letting] on."  SSA 1 told the OIG that the Crossfire Hurricane team viewed Page's responses to questions as "less than forthright"  and Case Agent 3 described Page as not "as forthcoming as he could have been."  As described previously in Chapters Five and Seven, however, the FBI did not include any of the information from the August 20, 2016 meeting between Source 2 and Carter Page in the first FISA application, or Renewal Application Nos. 1 and 2, but did include some of Page's comments to Source 2 about the "October Surprise" in Renewal Application No. 3.

SSA 1 and Case Agent 1 told the OIG that this meeting between Source 2 and Carter Page was important for the investigation in other ways.  SSA 1 told the OIG that it was important for the team to determine "where [Carter Page] was living, [and] what he was up to."  Case Agent 1 said that, as a result of this operation, "we now had a successful contact between the established FBI source and one of our targets" which gave the Crossfire Hurricane team confidence that they could "find out investigatively what we've been charged to do."  Case Agent 1 also said that, because "there were several emails sent back and forth thanking [Source 2]," the FBI obtained Carter Page's email address and telephone number, which could be used in the first FISA application.

Consensual monitoring of the August 20 meeting between Source 2 and Carter Page was presented to McCabe, Priestap, then FBI General Counsel James Baker, Strzok, Anderson and other FBI personnel during briefings on August 25, 2016.  Baker told the OIG that what he remembered about the briefing

> was feeling comfortable that the focus was on the Russians, the focus was on trying to get foreign-intelligence information, [and] that this other stuff [regarding the campaign] was part of the cover story and not what we were interested in, and something that we...just weren't going to make any use of.

He added that "even though the FBI was collecting some type of political information" through Source 2's conversation with Carter Page, the political information "was not the focus of what we were after...[and] it was being minimized

in the sense that it was just extra crap that we got that we didn't really want." He also said that at the time he felt the people presented the monitoring were appropriately focused on the fact that Source 2 "couldn't get Carter Page to say anything about the Russians." Anderson told the OIG that her impression of the consensual monitoring was that Carter Page was "pretty guarded" in talking to Source 2. McCabe told the OIG he remembered that "there weren't any...smoking guns from the conversation" but that "Page seemed kind of evasive." McCabe did not remember being told about any portions of the conversation other than what was contained on the consensual monitoring that the Crossfire Hurricane team provided to him for review. McCabe also said he remembered having an "expectation that [the Crossfire Hurricane team] would continue to use [Source 2, who] obviously had access to" Carter Page, but McCabe could not remember any follow-up discussions or what the investigative team planned to do next.As described previously in Chapters Five and Seven, the FBI did not inform the National Security Division (NSD) attorney in the Office of Intelligence (OI) who was working on the Carter Page FISA applications about Page's August 2016 interaction with Source 2 until 10 months later, in June 2017. As a result, none of the information from this interaction was considered by OI for inclusion in the first FISA application, or Renewal Application Nos. 1 and 2. Page's comments about the "October Surprise" were included in Renewal Application No. 3, which was filed in June 2017, after Case Agent 6 sent the OI Attorney a 163-page document for the purpose of showing him Page's statements about the "October Surprise." The OI Attorney told the OIG that he used the 163-page document to accurately quote Page's statements concerning the "October Surprise" in Renewal Application No. 3, but that he did not read the other aspects of the 163-page document and that Case Agent 6 did not flag for him Page's statements about Manafort. The OI Attorney told us that these statements, which were available to the FBI before the first application, should have been flagged by the FBI for inclusion in the FISA applications at the time the statements were made because they were relevant to the court's assessment of the allegations concerning Manafort using Page as an intermediary with Russia. Case Agent 6 told the OIG that he did not know that Page made the statement about Manafort because the August 2016 meeting between Source 2 and Page took place before Case Agent 6 was assigned to the investigation. He said that the reason he knew about the "October Surprise" statements in the document was that he had heard about them from Case Agent 1 and did a word search to find the specific discussion on that topic.

### (2)   October 17, 2016

The second consensually monitored meeting between Source 2 and Carter Page took place on October 17, 2016, 4 days before the FBI obtained the first FISA targeting Page, and after Page had left the Trump campaign. As described in Chapter Five, Page made statements to Source 2 that led the FBI to believe that Page was continuing to be closely tied to Russian officials, including Page's suggestion (described below) that "the Russians" may be giving him an "open checkbook" to fund a foreign policy think tank.

Case Agent 1 told the OIG that the Crossfire Hurricane team had learned through travel records that Page was planning a trip.  Case Agent 1 said that the Crossfire Hurricane team

> wanted to find out what he was going to do...because at that point he was no longer affiliated with the campaign.  He was out.  As far as we could tell he was no longer a part of the campaign.  We still didn't have the FISA up, but we wanted to see who he was going to be in contact with..., and why he was going...because it just seemed very odd.

Case Agent 1 told the OIG that the investigative team believed that Page may be going to meet an individual with ties to Russian Intelligence.  The investigative team was also aware of a Russian responsible for "recruiting U.S. government employees and handling U.S. government employees."  Case Agent 1 said that the plan was for Source 2 to help determine where Page was planning to stay and what he was planning to do during his trip.

Case Agent 1 told the OIG that the Crossfire Hurricane team did not get a complete transcript of the meeting, which was consensually monitored, but instead "wrote up only the pertinent parts of whatever meetings occurred just because...doing a full transcript would have taken too long and it was just not pertinent."  We reviewed the Crossfire Hurricane team's partial transcript of Source 2's October 17, 2016 meeting with Carter Page.

During the meeting, Page told Source 2 that Page "never had any ambitions to go into government regardless of who won" the upcoming presidential election, and instead called himself the "equivalent" of influential diplomat and academic George Kennan.  Page said that, like Kennan who "found[ed] his Institute of Advanced Study," Page would like to develop a research institute to be "a rare voice that talks against this consensus" of Russian containment, which Page believes is too "hawkish and aggressive in a lot of ways against the Russians."  In talking about how he would fund this institute, Page told Source 2 "I don't want to say there'd be an open checkbook, but the Russians would definitely..." then, according to the partial transcript, the sentence trailed off as Page laughed.  Source 2 asked "they would fund it—yeah you could do alright there" and Page responded "Yeah, but that has its pros and cons, right?"

At other points in the conversation, Page stated that he had "a longstanding constructive relationship with the Russians going back throughout" his life, and that he "could talk for the next 5 hours about all these sneaky little approaches that the [U.S. government] has been taking against Russia—going back...a couple decades."  Page also stated his belief that "if these ridiculous approaches and these failed policies continue next January, you know...we're on the brink of war."

When asked about the link between the Russians and WikiLeaks, Page said that, as he has

> made clear in a lot of...subsequent discussions/interviews...I know nothing about that—on a personal level, you know no one's ever said

> one word to me.  But it's interesting, you know, off the record between us—if the only source of transparency and the truth is an external source, you know, c'est la vie right?

Page also mentioned to Source 2 "very deep off the record" that the Clinton campaign had "hired investigators to come after me, including some in London," and that Page had "very good sources…[and knew] the names of the investigators as well."

As for the platform committee during the Republican National Convention, Page told Source 2 that he "stayed clear of that—there was a lot of conspiracy theories that I was one of them….  [But] totally off the record…members of our team were working on that, and…in retrospect it's way better off that I…remained at arms' length.  But again, our team was working on that."

Page also told Source 2 that the "core lie" against Page in the media "is that [Page] met with these sanctioned Russian officials, several of which I've never even met in my entire life."  Page said that the lies concern "Sechin [who] is the main guy, the head of Rosneft…[and] there's another guy I had never even heard of, you know he's like in the inner circle."  When Source 2 asked Page about that person's name, Page said "I can't even remember, it's just so outrageous."[467]  Page stated that he did meet a number of people when he was the commencement speaker at the July 2016 New Economic School graduation in Moscow, and told Source 2 that "the irony of it [was]…there's no law against meeting with sanctioned officials" and that his lawyer said everything would be fine "as long as you don't take gifts or have any sort of business dealings…the lawyer quote was 'don't even take a pen.'"

When Source 2 asked whether Page could introduce Source 2 to Russians who might be interested in speaking ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Page laughed and said "[m]y lawyers would probably advise me to…" then laughed again and mentioned Harry Reid's letter to FBI Director Comey asking the FBI to "please look into Carter Page's connections to these people."  When asked again, Carter Page reiterated that "lawyers are always cautious…and… this would be setting off such big alarm bells."  Page also told Source 2 that Page did not have their "contact details."

Members of the Crossfire Hurricane team and FBI OGC told the OIG they considered Page's discussion of having a potentially "open checkbook" as the most useful and concerning piece of information from the October 17, 2016 meeting between Source 2 and Page.  Case Agent 1 told the OIG that, as a result of that comment, the Crossfire Hurricane team was "trying to figure out at the time if that was part of a quid pro quo."  SSA 1 told the OIG that Page's comment on funding a research institute using "an open checkbook" from Russia brought SSA 1 closer to believing that Carter Page may actually be acting as an agent of a foreign power.  The OGC Attorney told us that he viewed the remark as an indication that Page had "connections that he expected to be able to use to his advantage as a result of the

---

[467] As described in Chapters Five and Seven, the FBI did not include Carter Page's denials of these meetings with Russian officials in its description of this CHS operation in the FISA applications.

potential election of Donald Trump." The OGC Unit Chief told the OIG she viewed this as a suggestion "that the Russians would pay for [Page] to operate a think tank in the United States...basically as a propaganda machine."

As discussed in Chapters Five and Seven, these statements about "an open checkbook" from Page's interaction with Source 2 were included in the FISA applications, but Page's statements denying knowing about a WikiLeaks connection to Russia, having involvement in the platform committee, or having met with the sanctioned Russian officials, or even knowing who one of them was, were not included in any of the FISA applications.

### (3) December 15, 2016

The third consensually monitored meeting between Source 2 and Carter Page took place on December 15, 2016, which was several days after Page returned from giving a lecture at the New Economic School in Moscow. The New Economic School was the university in Moscow where Page had spoken in July 2016. During their lunch meeting, Page described his recent trip to Moscow as involving "18 hour days for a...week." Page also told Source 2 that Page would be traveling back to Moscow "after the New Year" and that Page had been invited to Christmas parties at Gazprom and Rosneft, but declined those invitations because of recent media reports suggesting that Page was being investigated by the FBI. Page also complained that media outlets had been "bad mouthing" him earlier that day, and told Source 2 that one of the issues Page wanted to discuss was "damage control."

During the meeting, Page and Source 2 discussed some of the individuals who were under consideration for prominent positions in the Trump Administration. With respect to President-elect Trump's announcement that he would nominate Rex Tillerson to be Secretary of State, Page stated that one of the things Tillerson will "get[] hit the worst on" by critics is his relationship with Igor Sechin. However, Page added "[t]hey tried it on me...[and] [t]hey've already played that card so they['ve] got to come up with something new." When Source 2 asked Page how the Russians viewed Tillerson, Page stated that the Russians are "almost in awe" of him, and that they view him as "[s]omeone who has real knowledge as opposed to just standard rhetoric that's been in place for 70-some years."

When asked by Source 2 about where the Russians might take the relationship with the United States, Page said that the Russians are "[e]xcited but cautious" because the Russians had "been...burned a lot in the past." Page also told Source 2 that he thought the question with respect to the relationship between the United States and Russia was whether the United States was going to be "scolding or nasty or [have an] actual friendship."

Source 2 also asked Page about Congressional inquiries into whether the Russians had been leaking Hillary Clinton's emails to try to alter the results of the presidential election. Page responded by saying that, even if they were to "assume [the allegations] are correct," Page believed the real impact was "giving some transparency to the actual corruption of...the people that [the Russians] were exposing," and that was important to the functioning of the democratic process

because "democracy is based on information." Page told Source 2 that the difference between Hillary Clinton's "public versus private positions...never would have come to the forefront" otherwise, and that without such transparency, the American people would have been left with "lies and false information." Page stated that democracy had been "actually made more pure by this exposure, public versus private" of Hillary Clinton's positions, such that the disclosure of her emails "actually served a positive role." When Source 2 suggested that information in U.S. government elections should not be provided by "actors outside the process," Page asked Source 2 "how many times have parties within this town...the U.S. government, interfered in the direction of governments around the world?" Page then stated that he had "an even more controversial statement" which was that the Russian media organizations RT and Sputnik "may...warrant a Nobel Peace Prize" for "providing this transparency and helping to facilitate a pure democracy."

Source 2 also asked Page about the think tank they had discussed in their October 17, 2016 meeting. Page told Source 2 that he had been talking with the New Economic School "a little bit," that "they were actually quite...positive" about the idea, they were thinking about "doing something jointly or...actually based there," and that the New Economic School was "possibly" going to help with the financing. Page added that the New Economic School had a "lot of support internally...[f]rom the government.... High level." When Source 2 asked about Page's statement, during their October 17, 2016 meeting, about Russians giving Page a "blank check" for the think tank, Page stated that he didn't "know that [he] went that far" but that "there was some support...[and] this trip proved it." According to Page, the New Economic School told him to "come back to us with a proposal" and that "very high-level people were quite supportive." Page added that he was weighing the "pros and cons" and that "some people have warned [him to] be careful with having too much Russia connection for obvious reasons."

During their meeting, Page used his personal laptop to show Source 2 the PowerPoint presentation from his most recent lecture, and then gave Source 2 a thumb drive containing a copy of the PowerPoint presentation. Page told Source 2 that one of Page's comments during the Moscow lecture was a play on Trump's phrase "[d]rain the swamp." According to Page, in his lecture he said the "reference for U.S.–Russia relations is, '[d]rain the septic tank,'" by which Page meant that prior dealings with Moscow could be characterized as "deep misunderstandings and...huge missed opportunities." Page pointed out one of the slides from the presentation, which was a "score card" Page had put together concerning previous administrations' positions on Russia. In discussing the "score card," Page told Source 2 that when Hillary Clinton was Secretary of State in 2011, she was interfering with other governments in the same way "that people...are accusing Russia of doing" in the 2016 elections.

As described in Chapter Seven, the Crossfire Hurricane team incorporated some of the information from this December 15, 2016 meeting between Carter Page and Source 2 into Renewal Application No. 1.

### (4)   January 25, 2017

The final consensually monitored meeting between Source 2 and Carter Page took place on January 25, 2017.  None of the information from this meeting was included in any of the Carter Page FISA applications.

During the January 25, 2017 meeting between Page and Source 2, Page asked whether Source 2 had ever "come across that [Steele] guy."  Source 2 told Page that he did not know Steele.  Page then stated that the reports were "just so false."  Page said that he wished the reports "had come out...three [or] four months earlier because...all the stuff...against [Page was] based...directly upon that."  Page stated that the reporting, which included "some sort of sex escapade...discredits itself so much" and contains "a lot of factual errors," although Page did not specify which part of the reporting he viewed as erroneous.  Page characterized the reporting as "a bigger fraud" than the allegations of voter fraud made by President Trump reported by the media that morning, because Hillary Clinton "was playing against [Page] and...everyone around [Trump] and this [reporting] is the basis of it," which Page described as "complete lies and spin."  Page added that, in his view, the lies in the reporting were comparable to the obstruction of justice at issue in Watergate, because "[o]ne of the key elements of obstruction of justice is false evidence" and this "false evidence is directly traceable back to [Hillary Clinton]...sending this over to...the authorities at the J. Edgar Hoover building."  In addition, Page told Source 2 that, according to "the front page of the Wall Street Journal," Page was "under surveillance."  Page said he thought there was an analogy to Dr. Martin Luther King Jr., "[w]here J. Edgar Hoover was all over this guy," and that Page felt he was being targeted by those in "positions of power, [using] government resources to come after someone [for exercising] freedom of speech" because Page had spoken out on his views regarding Russia.  Page told Source 2 he thought it was "completely outrageous" but that he would have to talk to Source 2 "about this offline...[because Page was] not going to put this in email or [discuss it] on a phone call."

Page also told Source 2 that Page was scheduled to meet with Steve Bannon later that afternoon.  At the time, Bannon was President Trump's Chief Strategist.  Page said he would be "curious to hear" any ideas Source 2 had about ways Page could be "helpful" to the Trump Administration.  Page asked for Source 2's advice on whether Page should "take this [fraud] on aggressively and...go on the offensive and fight back" because the allegations against him are "not going away."  Page also suggested that if he were offered a position in the Trump Administration and went through a Senate confirmation hearing, he could use the opportunity as "a way of getting it all out there...what a complete lie and what a complete sham...this is" and that it was all done "using government resources based on completely false evidence."  Page said that he wanted to show how "this all started based on complete utter lies."  Page told Source 2 that he thought Bannon might be receptive to this "forward leaning approach" through which the "lies are exposed and everyone[] kind of understands how this all came about and the impact."  In response, Source 2 suggested that the Trump Administration was unlikely to put Page "through a Senate confirmation, [because] everybody who objects to [Page's] viewpoint on [Russia] will be rounded up and trotted through in front of the

cameras" and it would be politically impossible to get the votes needed for confirmation.

Source 2 asked Page whether he had made any more progress on the think tank, which Source 2 said could be helpful by undertaking projects "exploring how…international business leads to international political cooperation," for example.  Source 2 stated that he thought Page "might be able to create something useful in London," and added that if Page "could bring some Russian money to the table…[Source 2] might be able to help…get some US money."  Page told Source 2 that he was concerned about "anything that's sort of balanced, getting that weight correct."  Page said he was trying to take his time and weigh the pros and cons, but also was "kind of anxious…[based on] conversations last month in Moscow…[that the] momentum is building" toward another potential Cold War.  Page said that, based on his conversations with Deputy Prime Minister Arkady Dvorkovich, who Page described as the "de facto chairman" of the New Economic School, the Russians are "fully on board" and want to "get started."  But Page said that he was concerned that doing this "on that side that can be a black mark for people like McCain" who might view it as "[t]oo un-American."  When Source 2 asked Page if Page could "tie him down to…a dollar amount…that then [Source 2] can try to match" Page responded "a million and a million?" but Source 2 expressed doubt about whether Source 2 could raise a million dollars to contribute to the think tank.

The only other subject of the Crossfire Hurricane investigation that was mentioned during the January 25, 2017 conversation was Michael Flynn.  Source 2 asked Page if he knew Flynn "pretty well," and Page responded that he "kind of" knew Flynn's "number two."

As with other denials made by Page to an FBI CHS, these statements about the Steele reports were not included in FISA Renewal Application No. 2 or FISA Renewal Application No. 3.

### e.    Source 2's Meeting on September 1, 2016 with a High-Level Trump Campaign Official Who Was Not a Subject of the Crossfire Hurricane Investigation

At the request of the Crossfire Hurricane team, Source 2 also reached out to a high-level official of the Trump campaign, who was not a subject of the investigation.  Source 2 succeeded in arranging a meeting with the high-level Trump campaign official on September 1, 2016, and their meeting was consensually monitored by the Crossfire Hurricane team.  Case Agent 1 told the OIG that this meeting occurred after Case Agent 1 got approval from the OGC Unit Chief to consensually monitor the conversation, as required by the DIOG.  Priestap told the OIG that from an operational standpoint, he personally reviewed and approved the operation even though review at his level was not required by the DIOG.  McCabe's handwritten notes reflect that he was told ahead of time that Source 2 was going to be meeting with the high-level Trump campaign official, but McCabe told the OIG he did not remember anything specific about that discussion.  He added that his approval was not required for such an operation, and if he was told ahead of time, it was "likely that [he] asked…who [that] was because that [name] would not

have…stood out to [him] independently." FBI and Department policy did not require that the FBI obtain Department approval to consensually monitor this conversation. Then Chief of NSD's Counterintelligence and Export Control Section (CES) David Laufman told the OIG that he had no recollection of being informed that the FBI was planning to consensually monitor a conversation between a CHS and a high-level official of the Trump campaign, and we are not aware of any Department official having been informed in advance by the FBI.

Case Agent 1 told the OIG that the plan for this meeting was for Source 2 to ask the high-level campaign official about Papadopoulos and Carter Page "because they were…unknowns" and the Crossfire Hurricane team was trying to find out how "these two individuals who are not known in political circles…[got] introduced to the campaign," including whether the person responsible for those introductions had ties to Russian Intelligence Services (RIS). SSA 1 told the OIG that he did not remember having a plan in place in case the FBI monitored information that was politically sensitive. He told the OIG that "if we received that information and recognized it for what it was, our first call would be to our general counsel to talk to them about how we need to ingest that." SSA 1 also told the OIG that he did not think the Crossfire Hurricane team gathered any of that type of information through Source 2's meeting with the high-level campaign official.

The OGC Unit Chief remembered discussing with the team, with respect to the use of Source 2, the need to be careful about First Amendment-protected activities. However, she said that her concern about a CHS collecting that type of information arises if the operation seeks information falling outside the authorized purpose of the investigation or if the FBI is "broadly disseminating that information and/or using it in a way that would undermine or promote" one candidate or the other. The OGC Unit Chief said the Crossfire Hurricane investigation did not really raise that concern, because the FBI did not seek information outside the authorized purpose of the investigation and was not disseminating the information it gathered from the CHSs or using it "in a way that would expose it to people that didn't need to know it." The OGC Unit Chief also said that her main concern about CHSs interacting with members of the Trump campaign was ensuring that CHSs were not "influencing steps the campaign was going to take."

Priestap told the OIG he remembered multiple meetings where the team discussed the objectives of having Source 2 engage with members of the Trump campaign and former members of the Trump campaign, and the "need to steer clear" of collecting campaign information "deal[ing] with policies, plans, staffing decisions, [or] anything related." Priestap also said that "it's not always possible…[o]nce people start talking" to a source to stay on point, because the target of the operation may tell a source about the topic that interests the FBI, as well as a lot of additional information. He added that "the FBI tries really hard to take the information we're authorized to collect and to disregard the information it [isn't], no matter how embarrassing, scintillating, or whatever else that information might be to others."

Case Agent 1 told the OIG that none of the information collected from monitoring Source 2's conversation with the high-level Trump campaign official was

ever used in the Crossfire Hurricane investigation. He said that the team determined that "the conversation wasn't germane to any of the investigative activity we were taking, so we didn't do anything with that." We found that the Crossfire Hurricane team did not transcribe the meeting. Instead, Case Agent 1 said that the consensual monitoring was "check[ed]...into evidence and that was about it. We didn't do anything with that conversation."

We reviewed the consensual monitoring of the September 1, 2016 meeting between Source 2 and the high-level Trump campaign official who was not a subject of the investigation.[468] In the consensual monitoring, Source 2 raised a number of issues that were pertinent to the investigation, but received little information in response. For example, Source 2 asked whether the Trump campaign was planning an "October Surprise." The high-level Trump campaign official responded that the real issue was that the Trump campaign needed to "give people a reason to vote for him, not just vote against Hillary." When asked about the allegations of Russian interference in the 2016 elections, the high-level Trump campaign official told Source 2:

> Honestly, I think for the average voter it's a non-starter. I think in this city [Washington, D.C.] it's a big deal. I think in New York it's a big deal, but I think from the perspective of the average voter, I just don't think they make the connection.

The high-level Trump campaign official added that in his view, the key for the Trump campaign "is to say what we have said all along—we need to raise the level of abstraction, we need to talk about the security of the election system, which includes things like voter IDs."

Source 2 also asked about George Papadopoulos, who the high-level Trump campaign official described as "very eager" and "a climber." The high-level campaign official added that he was "always suspicious of people like that." The high-level campaign official described Carter Page as a "treasure," but agreed with Source 2 that Carter Page is "ambiguous" in his thinking, and that it can be hard to get a clear answer out of him. When Source 2 asked whether the Trump campaign needed to do something to put the ideas raised by Carter Page's Moscow speech in perspective, the high-level campaign official told Source 2 that "it's not that it's not important," but that the campaign official was "not sure it was something that in the grand scheme of things rises to the level of the campaign making an open effort" to do "other than to say we should never have any interference in our electoral process." As for the relationship between candidate Trump and Manafort, Source 2 was told that the high-level campaign official thought Trump and Manafort did not "ever hit it off" and that Manafort "was trying to do a traditional campaign, and Mr. Trump wasn't buying it." The high-level campaign official made a few additional comments about the internal structure, organization, and functioning of

---

[468] At the beginning of this consensual monitoring, Source 2 has a brief conversation with the FBI agent. The FBI agent clearly instructs Source 2 that, in meeting with the high-level campaign official, "consistent with our theme...listen to him, talk to him with your points, we are not directing you to join the campaign."

the Trump campaign.  During the conversation, Source 2 and the high-level campaign official also discussed issues unrelated to the Crossfire Hurricane investigation, such as an internal campaign debate about Trump's immigration strategy, efforts to reach out to minority groups and the impact of those efforts, and the campaign's strategies for responding to questions about Trump's decision not to release his tax returns.  We found no evidence that any information contained on the consensual monitoring was put to any use by the Crossfire Hurricane team.

### f.    Source 2's Meetings with George Papadopoulos

At the direction of the Crossfire Hurricane team, Source 2 invited Papadopoulos to meet with Source 2 in September 2016, to discuss a project.  Case Agent 1 said that the Crossfire Hurricane team thought it would play to "Papadopoulos's ego to help take part in a project."  The project was based on Papadopoulos's past writings about the Leviathan oil fields off the coast of Israel and Turkey, and was not related to Papadopoulos's role in the Trump campaign.  The FBI, through Source 2, covered the costs of Papadopoulos's travel, and paid Papadopoulos $3,000 for the project.

The Crossfire Hurricane case agents told the OIG that they were trying to recreate the conditions that resulted in Papadopoulos's comments to the FFG officials about the suggestion from Russia that it could assist the Trump campaign by anonymously releasing derogatory information about presidential candidate Hillary Clinton, which we described in Chapter Three.  Case Agent 1 said that by taking Papadopoulos to another country, Papadopoulos might "feel a little freer to talk outside the confines of the United States and…repeat that conversation" he had with the FFG officials.  Case Agent 3 said that it made sense to take him  there, "have a political discussion over a couple drinks and reproduce" Papadopoulos's statements to the representative of the FFG if possible.

The members of the Crossfire Hurricane team who traveled for the operation were Case Agent 1, Case Agent 2, and the SOS.  The written plan for the operation stated that Papadopoulos would meet with Source 2 to discuss the project.  The written plan stated that during that time "there will be ample opportunity and various angles to have [Papadopoulos] expound on the initial comments made in May 2016" to the FFG regarding the anonymous release of emails by the Russians that would damage the Clinton presidential campaign.

SSA 1 told the OIG that it was his understanding that FBI executive managers were "briefed consistently" during the planning for this operation, and orally approved the operation before it took place.[469]  Case Agent 1 said that he did not remember any FBI managers voicing concerns about this operation.  Priestap

---

[469] There is no requirement in the CHSPG for the FBI to inform the Department of extraterritorial CHS operations in support of national security investigations.  In fact, the CHSPG states: "Pursuant to the AG memo dated May 5, 2006, the AG delegated to the FBI Director the authority to approve national security [extraterritorial] operations," which the Director then delegated to the Assistant Director.

told the OIG that he recalled being aware of the operation and approving it. McCabe told the OIG that he did not remember knowing ahead of time that the FBI was going to be consensually monitoring Source 2's meetings, but that approval for such an operation by the Deputy Director was not required.

The OGC Unit Chief told the OIG that because the operation targeted Papadopoulos individually and wasn't directed at anything related to the campaign, she thought that it was appropriate. She said that her main concern about using Source 2 to interact with members of the Trump campaign was ensuring that Source 2 was not "influencing steps the campaign was going to take" and that "asking questions of Papadopoulos to collect information did not raise those kinds of concerns." Priestap signed the formal authorization for the operation on September 15, 2016, the day the operation concluded. SSA 1 told the OIG that it was "just standard practice...[to] get verbal authority" before such an operation and to have the paperwork "signed after the fact."

### (1) September 15, 2016 Brunch Meeting with Source 2 and Papadopoulos

On September 15, 2016, Papadopoulos met for brunch with Source 2 and to discuss the project. The meeting was consensually monitored by the FBI, and later transcribed. Much of the conversation between Source 2 and Papadopoulos concerned Papadopoulos's academic pursuits, his work with the Hudson Institute, and his research on the Arab Spring, Greek energy production, and the strategic importance of Cyprus. During the meeting, Source 2 told Papadopoulos that the paper Papadopoulos was writing should focus on geopolitical dimensions in the eastern Mediterranean, including the energy sector and Russia's engagement with the Israelis. Source 2 offered Papadopoulos $3,000 for the paper, and asked for Papadopoulos to complete it within three weeks.

During the meeting, Source 2 told Papadopoulos that Carter Page "always says nice things about you." Papadopoulos told Source 2 that although Carter Page was one of the campaign's "Russian people," Page "has never actually met Trump...[and] hasn't actually advised him on Russia...[but] [h]e might be advising him indirectly through [another campaign official]." Papadopoulos also told Source 2 that General Flynn "does want to cooperate with the Russians and the Russians are willing to...embrace adult issues." As for Papadopoulos's own connections with Russia, Papadopoulos told Source 2 he thought that "we have to be wary of the Russians" and mentioned that "they actually invited me to their...faith talk. I didn't go though." Papadopoulos explained to Source 2 that he made the decision not to go because it is "just too sensitive...[as an] advisor on the campaign trail...especially with what is going [on] with Paul Manafort." Source 2 also asked Papadopoulos about the possibility of the public release of additional information that would be harmful to Hillary Clinton's campaign. Papadopoulos responded that Julian Assange of WikiLeaks had said in public statements to "get ready for October...[but] [w]hatever that means no one knows."

As a result of this brunch meeting, the Crossfire Hurricane team assessed that Papadopoulos was "responding in a deferential mode" to Source 2, and decided

that Source 2 would set a follow-up meeting for drinks with Papadopoulos later that afternoon "to ask direct questions…pertaining to the Crossfire Hurricane predicating material."

### (2) September 15, 2016 Evening Meeting with Source 2 and Papadopoulos

On the evening of September 15, 2016, Source 2 and Papadopoulos met for pre-dinner drinks and further discussion.  The meeting was consensually monitored by the FBI, and later transcribed.  According to the executive summary written by Case Agent 2 after the operation, the goal of this meeting was for Source 2 to ask Papadopoulos direct questions about whether the Trump campaign benefitted from, or anyone in the Trump campaign had knowledge of, Russian assistance or the WikiLeaks release of information that was damaging to the Clinton campaign.

When Source 2 initially asked about WikiLeaks, Papadopoulos commented that with respect to Assange "no one knows what he's going to release" and that he could release information on Trump as a "ploy to basically dismantle… [or] undercut the…next President of the United States regardless of who it's going to be." Papadopoulos also stated that "no one has proven that the Russians actually did the hacking," then continued to discuss hacking by pointing out that he had "actually had a few…Israelis trying to hack" his cell phone, which Papadopoulos said "shocked" him because he had "done some sensitive work for that government," and he said the Israelis had "allowed [him] quite a high level of access." Papadopoulos also stated that "no one else" did the work that he did for the Israelis, and that it had led "some folks [to] joke…[that Papadopoulos] should go into the CIA after this if [Trump] ends up losing."

Later in the conversation, Source 2 asked Papadopoulos directly whether help "from a third party like WikiLeaks for example or some other third party like the Russians, could be incredibly helpful" in securing a campaign victory.  Papadopoulos responded:

> Well as a campaign, of course, we don't advocate for this type of activity because at the end of the day it's, ah, illegal.  First and foremost it compromises the US national security and third it sets a very bad precedence [sic]….  So the campaign does not advocate for this, does not support what is happening.  The indirect consequences are out of our hands….  [F]or example, our campaign is not…engag[ing] or reaching out to wiki leaks or to the whoever it is to tell them please work with us, collaborate because we don't, no one does that….  Unless there's something going on that I don't know which I don't because I don't think anybody would risk their, their life, ah, potentially going to prison over doing something like that. Um…because at the end of the day, you know, it's an illegal, it's an illegal activity.  Espionage is, ah, treason.  This is a form of treason…. I mean that's why, you know, it became a very big issue when Mr. Trump said, "Russia if you're listening…."  Do you remember?…  And you know we had to retract it because, of course, he didn't mean for

them to actively engage in espionage but the media then took and ran with it.

When Source 2 raised the issue again, Papadopoulos added:

> to run a shop like that…of course it's illegal. No one's looking to…obviously get into trouble like that and, you know, as far as I understand that's, no one's collaborating, there's been no collusion and it's going to remain that way. But the media, of course, wants to take a statement that Trump made, an off-the-cuff statement, about [how] Russia helped find the 30,000 emails and use that as a tool to advance their [story]…that Trump is…a stooge and if he's elected he'll permit the Russians to have carte blanche throughout Eastern Europe and the Middle East while the Americans sit back and twiddle their thumbs. And that's not correct.[470]

The meeting ended with Papadopoulos offering to introduce Source 2 to more members of the Trump campaign team, and offering to set up a follow-up meeting the next time Source 2 is in Washington, D.C. Source 2 advised Papadopoulos that Source 2 did not "really want to be in government again" but was "wanting to help on China" and willing to provide Papadopoulos with written materials, such as speeches and pre-position papers, which might be helpful on foreign policy issues involving China.

Case Agent 1 told the OIG that Papadopoulos's "response to the direct questions seemed weird" to the Crossfire Hurricane team because it "seemed rehearsed and almost rote." Case Agent 1 added that at these points in the conversation, Papadopoulos "went from a free-flowing conversation with [Source 2] to almost a canned response. You could tell in the demeanor of how [Papadopoulos] changed his tone, and to [the Crossfire Hurricane team] it seemed almost rehearsed." Case Agent 1 emailed SSA 1 and others to report that Papadopoulos "gave…a canned answer, which he was probably prepped to say when asked." According to Case Agent 1, it remained a topic of conversation on the Crossfire Hurricane team for days afterward whether Papadopoulos had "been coached by a legal team to deny" any involvement because of the "noticeable change" in "the tenor of the conversation."

Case Agent 2 told the OIG that his concern after Papadopoulos's meetings with Source 2 was that the team was not "any closer to answering the question of whether…any of these guys have information on penetration" of the Trump campaign. Case Agent 3 added that because Papadopoulos "made statements about doing sensitive work for [a foreign] government" that opened a new area of inquiry with respect to Papadopoulos's foreign contacts.

SSA 1 told the OIG that his main observation was that when Papadopoulos was pushed for answers, he seemed to have a "prepared statement. It sounded

---

[470] As described in Chapters Five and Seven, none of the Carter Page FISA applications advised the FISC of Papadopoulos's denials to Source 2 that the Trump campaign had any involvement in the release of DNC emails by WikiLeaks.

like a lawyer wrote it."  OGC Deputy General Counsel Trisha Anderson similarly said that, when she learned of Papadopoulos's responses in 2018 while working on the Rule 13 Letter to the FISC (described in Chapter Eight), she viewed them as "self-serving" and "sound[ing] like a lawyered statement."  SSA 1 said that, as a result of Source 2's meetings with Papadopoulos, SSA 1 did not have any concerns that the information gathered intruded upon planning or strategy of the Trump campaign.

### 2.    Source 3

Case Agent 3 and an Intelligence Analyst identified Source 3 as an individual with a connection to Papadopoulos who may be willing to act as a CHS, based on statements Source 3 had made to the FBI several years prior, during an interview in an unrelated investigation.  Source 3 had never previously worked for the FBI as a CHS, and the Delta records for Source 3 state that the opening of this CHS "was accelerated due to operational necessity."

Case Agent 3 said that he considered Source 3 to be a reliable CHS because Source 3 was always available when the FBI needed Source 3, provided good descriptions of the conversations with Papadopoulos, and the summaries that Source 3 provided to the FBI were corroborated by the consensual monitoring.  The FBI performed a human source validation review on Source 3 in 2017, and recommended Source 3 for continued operation.

Papadopoulos and Source 3 met multiple times between October 2016 and June 2017, all of which occurred after the FBI understood that Papadopoulos had ceased working on the Trump campaign.[471]  All but one of their meetings were consensually monitored by the FBI; however, not all of them were transcribed by the FBI.  Instead, Case Agent 3 said that he and the Intelligence Analyst would review the recordings to find portions that were of investigative interest, and those portions were written up or reviewed.

Case Agent 3 told the OIG that, with respect to Source 3, the topics that Case Agent 3 "was interested in didn't pertain to the [Trump] campaign.  They

---

[471] The precise date that Papadopoulos left the Trump campaign is unclear.  Case Agent 3 told the OIG that it was his understanding that Papadopoulos left the Trump campaign on October 4, 2016. We noted that, on October 10, 2016, Papadopoulos sent a text message stating that he was "no longer with the campaign."  However, we also reviewed a text message that Papadopoulos sent to a different contact on October 17, 2016, stating that he was still working for the Trump campaign, but that he was "laying low" after getting in trouble for comments during an "interview on Russia."  The Special Counsel's Report stated that Papadopoulos was dismissed from the Trump campaign in early October 2016, after the September 30, 2016 publication of an interview he gave to a Russian news agency created negative publicity.  *See The Special Counsel's Report*, Vol. I at 93 & n. 492.  In his interview with the House Judiciary Committee and House Committee on Government Reform and Oversight on October 25, 2018, Papadopoulos said that the date he was removed from the campaign was unclear, and that he did not think he "ever really left the campaign."  *See Transcript of Interview of George Papadopoulos before the House Judiciary Committee and House Committee on Government Reform and Oversight*, October 25, 2018, 133.  For the purpose of this report, we have used early October as the approximate date of Papadopoulos's separation from the Trump campaign, as that is the date that the FBI believed such separation occurred.

pertained to Russia and [another foreign country], with regard to whatever Papadopoulos was doing." Case Agent 3 said the guidance he gave to Source 3 was that the FBI was "interested in these foreign activities, and we're not interested in the campaign stuff."

Case Agent 3 told the OIG that Source 3 collected information about Papadopoulos's contacts with Russians through their monitored conversations. However, Case Agent 3 said that the consensual monitoring revealed that Papadopoulos had contacts with, and an interest in selling access to the United States government, which Case Agent 3 said he pursued as a separate "prong" of the Crossfire Hurricane investigation. Case Agent 3 said that, as a result, he "pivoted with the source to try to passively collect the Russia stuff and bring that up subtly during conversation" while collecting information about Papadopoulos's contacts with the other foreign government. Case Agent 3 also said that the monitored conversations between Source 3 and Papadopoulos gave the FBI information about how Papadopoulos "reacts to different topics…[which] was incredibly useful" in the FBI's preparation to interview Papadopoulos.

We reviewed the transcripts of two conversations between Source 3 and Papadopoulos that were monitored prior to the November 8, 2016 elections. In the first consensually monitored conversation, during the third week of October 2016, Papadopoulos described how he had worked for the presidential campaign of Ben Carson before joining the Trump campaign, and that when he was with the Trump campaign, he "set up a meeting with…[t]he President of Egypt and Trump." Papadopoulos also told Source 3 that, since leaving the Trump campaign, Papadopoulos had "transitioned into like my own private brand." Papadopoulos later stated he was "still with…the campaign indirectly" and that he had made "a lot of cool [connections] and I'm going to see what's going to happen after the election." He added that he had learned "[i]t's all about connections now days, man." Papadopoulos did not say much about Russia during the first conversation with Source 3, other than to mention a "friend Sergey…[who] lives in…Brooklyn," and invite Source 3 to travel with Papadopoulos to Russia in the summertime.

In the second consensually monitored conversation, at the end of October 2016, Papadopoulos told Source 3 that Papadopoulos had been "on the front page of Russia's biggest newspaper" for an interview he had given 2 to 3 weeks earlier. Papadopoulos said that he was asked "[w]hat's Mr. Trump going to do about Russia if he wins, what are your thoughts on ISIS, what are your thoughts on this?" and stated that he did not "understand why the U.S. has such a problem with Russia." Papadopoulos also said that he thinks Putin "exudes power, confidence." When Source 3 asked Papadopoulos if he had ever met Putin, Papadopoulos said that he was invited "to go and thank God I didn't go though." Papadopoulos said that it was a "weird story" from when he "was working at…this law firm in London" that involved a guy who was "well connected to the Russian government." Papadopoulos also said that he was introduced to "Putin's niece" and the Russian

Ambassador in London.[472] Papadopoulos did not elaborate on the story, but he added that he needed to figure out

> how I'm going monetize it, but I have to be an idiot not to monetize it, get it? Even if [Trump] loses. If anything, I feel like if he loses probably could be better for my personal business because if he wins I'm going to be in some bureaucracy I can't do jack…, you know?

Papadopoulos added that there are plenty of people who aren't even smart who are cashing in, and asked Source 3 "Do you know how many Members of Congress I've met that know jack…about anything? Except what their advisors tell them?… They can barely put a sentence together…. I'm talking about Members of Congress dude." In other portions of the conversation with Source 3, Papadopoulos repeated that what he really wanted to figure out was how to "monetize…[his] connections" because Papadopoulos felt like he knew "a lot of Ambassadors…[and] a lot of Presidents." Papadopoulos said that once the election was over, Papadopoulos was going

> to sit down and systematically write who I know, what they want, and how I can leverage that because if you know like government guys and ambassadors you should be making money, that's all I know because there's not one person I know who has those connections that isn't making…money.

He observed that what he had to "sell is access," and "[t]hat's what people pay millions of dollars for every year. It's the cleanest job."

However, when Source 3 asked Papadopoulos whether Papadopoulos thought "Russia's playing a big game in this election," Papadopoulos said he believed "That's all bull[]." Papadopoulos said "[n]o one knows who's hacking [the DNC]…. Could be the Chinese, could be the Iranians, it could be some Bernie…supporters." Papadopoulos added that arguments about the Russians are "all…conspiracy theories." He said that he knew "for a fact" that no one from the Trump campaign had anything to do with releasing emails from the DNC, because Papadopoulos said he had "been working with them for the last nine months…. And all of this stuff has been happening, what, the last four months?" Papadopoulos added that he had been asked the same question by Source 2. Papadopoulos said he believed Source 2 was going to go

> and tell the CIA or something if I'd have told him something else. I assume that's why he was asking. And I told him, absolutely not.…it's illegal, you know, to do that….

The FBI did not inform OI of these conversations at the time they occurred and, as described in Chapters Seven and Eight, the subsequent FISA renewal applications

---

[472] As described in The Special Counsel's Report, Papadopoulos later learned that the woman he had met was not actually Putin's niece. *See The Special Counsel's Report*, Vol. I at 84 & n.424.

on Carter Page did not include these statements.  In its July 12, 2018 Rule 13 Letter to the FISC, NSD advised the court of this information.

### B.   Other CHSs Who Were Not Tasked As Part of Crossfire Hurricane

In our review, we also learned that, in 2016, the FBI had several other CHSs with either a connection to candidate Trump or a role in the Trump campaign. Some of these sources were known to and available for use by the Crossfire Hurricane team during the 2016 presidential campaign, while others were not.

As one example, the Crossfire Hurricane team received general information about Page and Manafort in August 2016 from one such CHS.  This CHS was not involved in the presidential campaign but, according to the Handling Agent, knew candidate Trump and had been in contact with the candidate.  The Handling Agent for this CHS told the OIG that he was given "zero context" about the Crossfire Hurricane investigation, "told absolutely nothing."  According to the Handling Agent, the information the CHS provided about Page was "open-source information" that was "[a]ll over the Internet."  The Handling Agent also said that, once FBI Headquarters received this general information, the "matter was dropped."  We found no evidence that any members of the Crossfire Hurricane team ever suggested inserting this CHS into the Trump campaign to gather investigative information.  SSA 1 told the OIG "that was not what we were looking to do."  SSA 1 added that the Crossfire Hurricane team was "looking for information about the predicate, and didn't want it to be construed later…as something other than what we were really after."[473]

---

[473] SSA 1 did contact the Handling Agent for this CHS after the November 8, 2016 election, and asked for "a read-out from your CHS regarding possible positions in administration."  SSA 1 told the OIG that he sent this email because he thought that the CHS might receive "a position somewhere in the administration" which would become a "sensitive matter that we would need to handle differently."  In late November 2016, the Handling Agent met with the CHS.  The Handling Agent later wrote a document stating one purpose of the meeting was "to obtain insight regarding the upcoming Trump Administration following the recent U.S. Presidential elections."  We asked the members of the Crossfire Hurricane team about this statement in the document.  SSA 1 told the OIG that he had never seen this document before and that this was not what he intended the Handling Agent to discuss with the CHS.  Priestap told the OIG that this statement "absolutely" would have raised concerns if he had learned of it in real time.  He said he was not aware that this type of information was being collected from a CHS and that he "hope[d] it was misstated [in the document], because we don't, well, it's not what we should be doing."  The Handling Agent told the OIG that, to him, the phrase "obtain insight" was a synonym for asking a "[p]ersonal opinion," and that he was just making "small talk" with the CHS, the way you would expect to converse with those "tied to political circles" immediately following an election.  The Handling Agent added that this information was "not investigative in nature" and was not placed into any case file.  The Handling Agent's SSA said that "because the Trump Administration…was not under any kind of investigation" by her squad, she was not concerned about this sentence when she saw it, and she understood it to be written in the general context of preparation for the CHS's meeting with a foreign intelligence officer unrelated to the Crossfire Hurricane investigation.  The Handling Agent added that he was not aware of this document being shared with or accessible to the Crossfire Hurricane team, and we found no evidence that members of the Crossfire Hurricane team ever received this document.

We also learned about a different CHS who at one point held a position in the Trump campaign. However, by the time that the CHS told his/her Handling Agent about this involvement, the CHS was no longer part of the Trump campaign. After Crossfire Hurricane team members learned about this CHS, they reviewed the CHS's file, but did not task the CHS as part of the investigation. The OGC Attorney told the OIG that he distinctly remembered the OGC Unit Chief "strongly advising [the Crossfire Hurricane agents] to be cautious with this particular CHS." Case Agent 1 recalled that, because this CHS was "at one point…part of the campaign…we just said, hey, hands off." Documents in the CHS's Delta file reflect that the Handling Agent minimized contact with the CHS because of the CHS's campaign activities, even though the CHS was no longer involved in the Trump campaign.[474]

As part of our review, we also discovered an October 2016 email written to SSA 1 by an Intelligence Analyst on the Crossfire Hurricane team. The email copied information out of a CHS's Delta file stating that the CHS is "scheduled to attend a 'private' national security forum with Donald Trump" in October 2016, after which the CHS will provide "an update on the Trump meeting." However, none of the Crossfire Hurricane case agents remembered knowing that any FBI CHS had been scheduled to attend a private forum with candidate Trump. SSA 1 told the OIG he did not remember this CHS "at all" and had no information about whether the CHS actually attended such a meeting. The Handling Agent for this CHS told the OIG that what was described in the document was a gathering at a hotel that was "more of a…campaign speech or campaign discussion" and "more like a campaign stop than a meeting." The Handling Agent told the OIG he could not remember if the CHS ended up attending or not, and added that he "would certainly not be tasking a source to go attend some private meeting with a candidate, any candidate, for president or for other office, to collect the information on what that candidate is saying." We found no evidence that this CHS ever reported any information collected from a meeting with Trump or a Trump campaign event.

Although the Crossfire Hurricane team was aware of these CHSs during the 2016 presidential campaign, we were told that operational use of these CHSs would

---

[474] The email stating that the CHS would not be used in Crossfire Hurricane said:

> After careful consideration, the CROSSFIRE HURRICANE team has decided, at this time, it is best to utilize your CHS as a passive listening post regarding any observations [he/she] has of the campaign so far. Base[d] on current, on-going operations/developments in the CROSSFIRE HURRICANE investigation, we are not going to directly task or sensitize the CHS at this point in time. We appreciate [your] assistance in this matter and remain interested in any campaign related reporting that you guys may receive from the CHS during normal debriefs.

Case Agent 2, who wrote the email, told the OIG that the email was "incorrect" and what he was asking for was any information about attempts by Russia "to screw around with the campaign or the elections." He also acknowledged that it was "a mistake" not to make that clear in the email. The Handling Agent for this CHS told the OIG he "dismissed the e-mail…outright" because the CHS was "not even in the campaign" by that time. He added that within the field office, they had "made the decision…that we weren't touching this…right prior to a Presidential election." We found no evidence that the Crossfire Hurricane team received any information from this CHS in response to Case Agent 2's email.

not have furthered the investigation, and so these CHSs were not tasked with any investigative activities.  Moreover, SSA 1 told the OIG that the members of the Crossfire Hurricane team "never [had] any intent, never any desire...to collect...campaign or privileged information with regard to the presidential election."



We also learned of two other FBI CHSs, one of whom held a position ████ and the other of whom ███████████████ ██████████████████ We found no evidence that the Crossfire Hurricane team ever knew about the CHS who held a position ████████████████ and, accordingly, no evidence that the CHS was tasked to do anything as part of the Crossfire Hurricane investigation.

With respect to the CHS with connections to ████████████████ ███████████, the Handling Agent told the OIG that this CHS regularly provides "a ton of information on all sorts of things" to the FBI without being tasked and brings "reams of information" to their meetings.  In March 2017, after the campaign had ended, the CHS voluntarily provided his/her Handling Agent with five sets of documents on multiple topics ███████████████ ██████████████████.  According to the Handling Agent, this was not information that he had asked the CHS to obtain or provide to the FBI.  The Handling Agent told the OIG that the CHS gave the ███████████████ to the FBI because the CHS "thought it was of interest to the U.S. government."  The Handling Agent placed the materials into the FBI's files.[475]  Also in March 2017, the Handling Agent forwarded the ████ ███ to his supervisor, who sent it to FBI Headquarters, after which it was provided to the Crossfire Hurricane team for review.[476]  Later, the Handling Agent learned from the CHS ████.  An Intelligence Analyst assigned to the Crossfire Hurricane team asked the Handling Agent ██████████████████ from the CHS, which the Handling Agent placed in the FBI's files and sent to the Crossfire Hurricane team.  The Crossfire Hurricane Intelligence Analyst who reviewed ████████ advised Crossfire Hurricane supervisors and case agents that there was not "anything significant" in ██████████████.  Moreover, the Crossfire Hurricane team ██████████████████████████

The OGC Unit Chief told the OIG she had no concerns about the Crossfire Hurricane team receiving ██████████████████ was over and that, because the focus of the Crossfire Hurricane

---

[475] We notified the FBI upon learning during our review that ████████ materials that the CHS had provided to the FBI were still maintained in FBI files.

[476] The Handling Agent for this CHS and the Handling Agent's SSA were aware that FBI Headquarters was conducting a "special" investigation because the Handling Agent assisted the Crossfire Hurricane team by serving a court order in October 2016 related to the investigation. However, neither the Handling Agent nor his SSA was provided any information about the nature or scope of the Crossfire Hurricane investigation.

investigation was "trying to identify whether or not the Russians had infiltrated or were working with U.S. persons associated with the Trump campaign,…[it] would have been fine to collect it either during the campaign or afterwards" because it went to "the heart of the question of whether or not there was any sort of conspiracy."



The Handling Agent for this CHS told the OIG that he did not recall asking this CHS any questions ███████████████████████████████████████████████ ███████████████████████████████████████████████ The Handling Agent said he was aware that the CHS "may have had some political meanderings toward… ████████████████ , and was trying to be associated with that," but the Handling Agent did not understand, or inquire about, the full extent of the CHS's involvement.  The SSA in the field office who supervised the Handling Agent told the OIG that he had no memory of knowing ████████████████████ ████████████████ .  He characterized the CHS's involvement as the source's "hobby" or "outside interests."  He said:

> the FBI did not have a source in the campaign, ██████████████████ ██████████████████████████████████ , that we didn't even know about at the time or didn't care about at the time.

He said that, in his view, any ████████████████████ "was totally separate from [the CHS's] work with the FBI."  He added that, because the CHS was a Trump supporter, he was "not worried about [the source] trying to provide information or getting dirty information on Trump."  He said any suggestion this CHS "was directed to damage or investigate the Trump Administration is just absurd."[477]

---

[477] We reviewed the text and instant messages sent and received by the Handling Agent, the co-case Handling Agent, and the SSA for this CHS, which reflect their support for Trump in the 2016 elections.  On November 9, the day after the election, the SSA contacted another FBI employee via an instant messaging program to discuss some recent CHS reporting regarding the Clinton Foundation and offered that "if you hear talk of a special prosecutor…I will volunteer to work [on] the Clinton Foundation."  The SSA's November 9, 2016 instant messages also stated that he "was so elated with the election" and compared the election coverage to "watching a Superbowl comeback."  The SSA explained this comment to the OIG by saying that he "fully expected Hillary Clinton to walk away with the election.  But as the returns [came] in…it was just energizing to me to see….[because] I didn't want a criminal to be in the White House."

On November 9, 2016, the Handling Agent and co-case Handling Agent for this CHS also discussed the results of the election in an instant message exchange that reads:

Handling Agent: "Trump!"

Co-Case Handling Agent: "Hahaha.  Shit just got real."

Handling Agent: "Yes it did."

Co-Case Handling Agent: "I saw a lot of scared MFers on…[my way to work] this morning.  Start looking for new jobs fellas.  Haha."

Handling Agent: "LOL"

No one involved with the Crossfire Hurricane investigation, including Strzok, Priestap and Comey, knew about this CHS during the campaign, or when the CHS was ████████████████████████████████, or when the CHS met with ██████████████. Priestap told the OIG he "did not know it was happening," and that, as the AD of the Counterintelligence Division, he "absolutely" should have been told that there was an active FBI CHS with access to ████████ ████████████████████████████████. He said that, no matter what level of approval was required to continue operating such a CHS, that as a matter of "common sense" this was a situation where "[t]he bosses need to know." We make a recommendation in Chapter Eleven to address this issue. We found no evidence that this CHS was tasked by the FBI to interact with any members of the Trump campaign, transition team, or Administration.

## V.   ODNI Strategic Intelligence Briefing Provided to Candidate Trump, Flynn, and Another Trump Campaign Advisor

As we described in Chapter Three, the FBI decided not to conduct defensive briefings for any members of the Trump campaign about the information the FFG provided to the U.S. government that served as the predicate for opening Crossfire Hurricane. However, we learned during the course of our review that, during the presidential election campaign, the FBI was invited by ODNI to provide a baseline counterintelligence and security briefing (security briefing) as part of ODNI's strategic intelligence briefing given to members of both the Trump campaign and the Clinton campaign, consistent with ODNI's and the FBI's practice in prior presidential election cycles. We also learned that, because Flynn was expected to attend the first such briefing for members of the Trump campaign on August 17, 2016, the FBI viewed that briefing as a possible opportunity to collect information potentially relevant to the Crossfire Hurricane and Flynn investigations. We found no evidence that the FBI consulted with Department leadership or ODNI officials about this plan.

In the first week of August 2016, the FBI's Presidential Transition Team requested that CD begin preparations for providing unclassified "counterintelligence awareness" briefings to the transition teams for the Trump and Clinton campaigns. The FBI participated in strategic intelligence briefings conducted by ODNI on August 17, 2016, for Trump and his selected advisors, including Flynn; and on August 27, 2016, for Clinton and her selected advisors. The FBI also participated in ODNI strategic intelligence briefings for members of each campaign:  on August 31, 2016, to Trump campaign staff; on August 31, 2016, to Clinton campaign staff; on September 8, 2016, to Vice Presidential candidate Tim Kaine; and on September 9, 2016, to Vice Presidential candidate Michael Pence.

---

Co-Case Handling Agent:  "Come January I'm going to just get a big bowl of popcorn and sit back and watch."

Handling Agent:  "That's hilarious!"

The FBI selected SSA 1, the supervisor for the Crossfire Hurricane investigation, to provide the FBI security briefings for Trump and Clinton.[478]  SSA 1 told us that one of the reasons for his selection was that ODNI had informed the FBI that one of the two Trump campaign advisors attending the August 17 briefing would be Flynn.  He further stated that the briefing provided him "the opportunity to gain assessment and possibly have some level of familiarity with [Flynn].  So, should we get to the point where we need to do a subject interview…I would have that to fall back on."  Asked to explain what he meant by "assessment," the SSA 1 continued,

> [Flynn's] overall mannerisms.  That overall mannerisms and then also if there was anything specific to Russia, or anything specific to our investigation that was mentioned by him, or quite frankly we had an…investigation, right.  And any of the other two individuals in the room, if they, any kind of admission, or overhear, whatever it was, I was there to record that.

SSA 1 told us that he did not recall specific internal FBI discussions about having him provide the FBI security briefings for Trump and Clinton, but believes that the group who likely would have been part of any such discussions—Strzok, the Intel Section Chief, and possibly Lisa Page—shared a general understanding of the reasons for doing so.  SSA 1 also told us that using an opportunity to interact with the subject of an investigation is not unusual for the FBI, and that in this instance, it actually proved useful because SSA 1 was able to compare Flynn's "norms" from the briefing with Flynn's conduct at the interview that SSA 1 conducted on January 24, 2017, in connection with the FBI's investigation of Flynn.

We asked SSA 1 whether he was aware of any discussions within the FBI about the appropriateness of the FBI using an ODNI strategic intelligence briefing for a presidential candidate, organized by ODNI as part of the presidential transition process, as an opportunity to gather potentially relevant investigative information about or from a staff member who is the subject of an FBI investigation.  SSA 1 responded that he did not recall if there were any such discussions, but that if there were, they would have occurred at levels above him.  He also told us that he did not personally have any concerns with the plan.

According to Baker, discussions about using SSA 1 as the FBI briefer did occur at higher levels.  Baker told us that he recalled these discussions included himself, McCabe, Priestap, Strzok, possibly Lisa Page, and the FBI's then Executive Assistant Director of the National Security Branch.  Baker said the decision to use SSA 1 for the briefing was reached by consensus within this group.  Baker told us that he did not raise any concerns about using SSA 1 as the briefer because "[h]e was not there to induce anybody to say anything….  He was not there to do an undercover operation or…elicit some type of statement or testimony….  He was there on the off chance that somebody said something that might be useful."  From Baker's perspective, the benefit of having SSA 1 at the briefing was to pick up on

---

[478]  SSA 1 also provided the FBI security briefings on behalf of the FBI to Kaine and Pence, but not to the campaigns' staffs.

any statements by the attendees that might have relevance to the Crossfire Hurricane investigation:

> [I]f somebody said something, you want someone in the room who knew enough about the investigation that they would be able to understand the significance of something, or some type of statement, whereas…a regular briefer who didn't know anything about that might just let it go, and it might not even register with them.  And so…that was the reason to have [SSA 1] there.

We asked Baker whether he recalled any discussion about the potential chilling effect on, and the FBI's participation in, future presidential transition briefings if the FBI's use of SSA 1 in this manner became known.  Baker told us that he did not recall that issue being discussed, and added that the use of SSA 1 was focused on the FBI's counterintelligence investigation and Russian activities, including any directed at the Trump campaign; it was not the intention to collect any "political intelligence about campaign strategy, about campaign personalities, or anything that could be used in any political way."

We asked McCabe about his knowledge of the ODNI strategic intelligence briefings of the presidential campaigns and the decision to use SSA 1 as the FBI briefer because of SSA 1's role in the Crossfire Hurricane investigation.  McCabe told us that ODNI was primarily responsible for providing national security threat briefings, and that the FBI was given a limited period of time in this instance to cover what it needed to address.  He told us that he could not recall if he was aware in advance of the briefing that SSA 1 would attend for the FBI, or why SSA 1 was selected.  McCabe acknowledged that it was possible he was part of a conversation about whether SSA 1 should handle the briefing because of his involvement with Crossfire Hurricane, but said he could not recall any such conversation.  Asked whether he was aware there was an investigative purpose for SSA 1 handling the briefing, McCabe told us that he did not recall such a conversation and was not aware there was an investigative purpose for SSA 1 attending.

SSA 1 told us that he recalled Strzok being primarily responsible for providing SSA 1 with instruction on how to handle the FBI's portion of the ODNI strategic intelligence briefings, but that others also assisted, including the Intel Section Chief and possibly Lisa Page.  SSA 1 did not recall Priestap having any role.  SSA 1 told us that he believed he and Strzok created the briefing outline together, and that he prepared himself through mock briefings attended by Strzok, Lisa Page, the Intel Section Chief, and possibly the OGC Unit Chief.  According to SSA 1, the briefing outline was not tailored to serve the investigative interests of Crossfire Hurricane and there was nothing he did differently for the Trump briefing as compared to the Clinton briefing:  "that was one of the things that was very key. [The briefings] needed to be consistent."

The OIG reviewed the briefing outline prepared by SSA 1 and Strzok. According to the outline, the purpose of the briefing was to "give [the recipients] a baseline on the presence and threat posed by Foreign Intelligence Services to the

National Security of the U.S."  The outline described the type of information that Foreign Intelligence Services (FIS) seek to obtain, the presence of FIS intelligence officers in the United States, and the primary methodologies FIS intelligence officers use to collect information.  The outline also identified the Russian FIS and the Chinese as posing the greatest threat to the United States and described generally the difference in how the two countries conduct intelligence operations.

SSA 1 told us that he was the only FBI representative at the ODNI briefing on August 17, 2016, which was attended by Trump, Flynn, and another Trump campaign advisor.  According to SSA 1, he understood the ODNI briefing would take about 2 hours to complete and that SSA 1 would have about 10 minutes to conduct the FBI's security briefing.  After completing his briefing, SSA 1 said he remained for the duration of the ODNI briefing.  About a week after the briefing, SSA 1 communicated separately with the OGC Attorney and Strzok about whether to formally document the briefing.  There was agreement that he should.  SSA 1 told us that given the "[b]ig stakes" involved, it was important to document the interaction with the subject of an FBI investigation so that there was a clear record of what was said.  There was also agreement that an Electronic Communication (EC) instead of an FD-302 was the better document form to use because the briefing was not an interview and there was nothing testimonial to memorialize.

The August 30, 2016 EC was drafted by SSA 1 and approved by Strzok and the OGC Attorney.  The 3-page document describes the purpose, location, and attendees of the briefing.  It states that the FBI security briefing lasted approximately 13 minutes, and describes how one of the ODNI briefers initiated the briefing, explained the ground rules, and introduced SSA 1.  The EC then recounts in summary fashion the briefing SSA 1 provided.  In this regard, the EC is consistent with the outline of the briefing described above.  Woven into the briefing summary are questions posed to SSA 1 by Trump and Flynn, and SSA 1's responses, as well as comments made by Trump and Flynn.

Other than identifying the ODNI briefers and the length of the ODNI strategic intelligence briefing, the EC does not contain any details about the information that was provided by ODNI.  With regard to comments made by Trump or Flynn during the ODNI briefing, the EC describes two questions asked by Trump.  SSA 1 told us that Flynn made comments during exchanges with the ODNI briefers on many subjects unrelated to Russia that SSA 1 did not document because the information was not pertinent to any FBI interests.  SSA 1 told us that he documented those instances where he was engaged by the attendees, as well as anything related to the FBI or pertinent to the FBI Crossfire Hurricane investigation, such as comments about the Russian Federation.  SSA 1 said that he also documented information that may not have been relevant at the time he recorded it, but might prove relevant in the future.  After completing the EC, SSA 1 added it to the Crossfire Hurricane case file.[479]

---

[479]  FBI records indicate the EC was uploaded to the FBI's Sentinel case management system on August 30, 2016.

With respect to the FBI security briefings SSA 1 provided to Clinton, Kaine, and Pence, SSA 1 told us that he did not memorialize those briefings in writing because the attendees did not include a subject of an FBI investigation.[480]  He also told us that there was nothing from the other briefings that was of investigative value to the Crossfire Hurricane team; had there been, he said he would have documented it.  We also asked SSA 1 whether he participated in any post-presidential election transition briefings.[481]  He told us that he did not and that he would be surprised if the FBI provided any such briefings that included Flynn without SSA 1's knowledge.

We identified no Department or FBI policies or procedures regarding the handling of presidential transition briefings, and no requirement that Department leadership be consulted before using a presidential transition briefing, or a defensive briefing, for possible investigative purposes.  Because we believe doing so presents important policy issues, we make a recommendation in Chapter Eleven that addresses this issue.

---

[480]  We identified text messages between Strzok and Lisa Page from November 2016 suggesting the FBI may have considered using a connection between a then member of Pence's staff and an FBI employee in some manner to further the Crossfire Hurricane investigation.  We asked SSA 1 about this.  He said that he had been told of the connection but did not personally know the FBI employee, and that he did not change his approach to Pence's FBI security briefing because of the connection.  He also said he could not recall any discussions about using the connection to further the Crossfire Hurricane investigation, and we did not find any evidence that it was used.

[481]  On September 2, 2016, ODNI provided a second strategic intelligence briefing to Trump, Flynn, and another Trump campaign advisor.  We found no evidence that SSA 1 or anyone from the FBI attended this briefing, although instant messages indicate that the FBI had contacted ODNI about including SSA 1 at the briefing.

# CHAPTER ELEVEN
## ANALYSIS

In this chapter, we provide the OIG's analysis of the events described in Chapter Three through Chapter Ten. We divide our analysis into five sections. In Section I, we discuss whether the opening of the Crossfire Hurricane investigation and four related investigations, and whether certain early investigative techniques used by the FBI, complied with the requirements of the Attorney General's Guidelines for Domestic FBI Operations (AG Guidelines) and the FBI's Domestic Investigations and Operations Guide (DIOG).

In Section II, we analyze the role of Christopher Steele's election reporting in the four Carter Page Foreign Intelligence Surveillance Act (FISA) applications and the numerous instances in which factual representations in those applications were inaccurate, incomplete, or unsupported by appropriate documentation, based upon information the FBI had in its possession at the time the applications were filed. In Section III, we analyze the FBI's handling of Christopher Steele and his election reporting, and whether the FBI's receipt and use of his reporting during the Crossfire Hurricane investigation complied with FBI Confidential Human Source (CHS) policies and procedures.

Section IV examines issues relating to Department attorney Bruce Ohr's interactions with Steele, Glenn Simpson, the FBI, and the State Department during the Crossfire Hurricane investigation, as well as whether the work Ohr's spouse performed for Simpson's firm implicated any ethical rules applicable to Ohr. We also analyze Ohr's interactions with Department attorneys and FBI officials concerning the Department's criminal investigation of Paul Manafort.

Lastly, in Section V, we focus on the FBI's use of CHSs, other than Steele, and Undercover Employees (UCEs) in the Crossfire Hurricane investigation and analyze whether the Crossfire Hurricane team's use of such individuals complied with Department and FBI policies. We also analyze the attendance of an FBI Supervisory Special Agent (SSA) assigned to the Crossfire Hurricane investigation at counterintelligence briefings given to the 2016 presidential candidates and certain campaign advisors.

As we explained in Chapter One, we did not analyze all of the decisions in the Crossfire Hurricane investigation. Rather, we reviewed the topics described above. Moreover, our role in this review was not to second-guess discretionary judgments by Department personnel about whether to open an investigation, or specific judgment calls made during the course of an investigation, where those decisions complied with or were authorized by Department rules, policies, or procedures. We do not criticize particular decisions merely because we might have recommended a different investigative strategy or tactic based on the facts learned during our investigation. The question we considered was not whether a particular investigative decision was ideal or could have been handled more effectively, but rather whether the Department and the FBI complied with applicable legal requirements, policies, and procedures in taking the actions we reviewed, or,

alternatively, whether the circumstances surrounding a decision indicated that it was based on inaccurate or incomplete information, or considerations other than the merits of the investigation. If the explanations we were given for a particular decision were consistent with legal requirements, policies, and procedures, and were not unreasonable, we did not conclude that the decision was based on improper considerations in the absence of documentary or testimonial evidence to the contrary.

## I.   The Opening of Crossfire Hurricane and Four Related Counterintelligence Investigations

In this section, we examine the opening of Crossfire Hurricane and four related counterintelligence investigations of individuals associated with the Donald J. Trump for President Campaign. Specifically, we analyze whether, in opening these investigations, the FBI complied with the requirements set forth in the AG Guidelines and the DIOG.

The applicable provisions of the AG Guidelines and the DIOG require that FBI investigations be undertaken for an "authorized purpose"—that is, "to detect, obtain information about, or prevent or protect against federal crimes or threats to the national security or to collect foreign intelligence." The AG Guidelines also require that FBI investigations have adequate factual predication—that is, allegations, reports, facts, or circumstances indicative of possible criminal activity or a national security threat. In addition, for investigations designated as Sensitive Investigative Matters (SIMs), such as Crossfire Hurricane, the DIOG imposes special approval and notification requirements when opening such a matter. The DIOG also emphasizes that investigators take particular care to consider whether a planned investigative activity is the least intrusive method and is reasonably based upon the needs of the investigation.

As described in Chapter Three, on July 31, 2016, the FBI's Counterintelligence Division (CD) opened a Full Investigation titled "Crossfire Hurricane" to determine whether individual(s) associated with the Trump campaign were "witting of and/or coordinating activities with the Government of Russia." The opening of the investigation occurred days after WikiLeaks publicly released hacked emails from the Democratic National Committee (DNC). According to the FBI Electronic Communication (EC) documenting the decision, the investigation was opened in response to information CD officials received on July 28, 2016, from a Friendly Foreign Government (FFG) indicating that in a May 2016 meeting with the FFG, George Papadopoulos, an advisor to the Trump campaign, "suggested the Trump team had received some kind of a suggestion" from Russia that it could assist in the election process with the anonymous release of information during the campaign that would be damaging to candidate Clinton and President Obama. We did not find information in FBI or Department emails, or other documents, or through witness testimony, indicating that any information other than the FFG information was relied upon to predicate the opening of the Crossfire Hurricane investigation. However, as noted below, the FBI received the FFG information at a time when it had reason to believe that Russia may have been connected to the

WikiLeaks disclosures that occurred earlier in July 2016, and when the U.S. Intelligence Community (USIC), including the FBI, was aware of Russia's efforts to interfere with 2016 U.S. elections.

In the following weeks, the FBI also opened related counterintelligence investigations into four individuals associated with the Trump campaign— Papadopoulos, Carter Page, Michael Flynn, and Paul Manafort—because the FBI identified these individuals as having alleged ties to Russia or a history of travel to Russia.

We concluded that the FBI's decision to open Crossfire Hurricane and the four related individual investigations was, under Department and FBI policy, a discretionary judgment call and that the FBI's exercise of discretion was in compliance with those policies. For the reasons described below, we found that each investigation was opened for an authorized purpose and, in light of the low threshold established by Department and FBI predication policy, with adequate factual predication. We also found that the FBI satisfied the DIOG's notification and approval requirements for designating Crossfire Hurricane and the four related individual investigations as SIMs. Nevertheless, we were concerned about the limited notice requirements under Department and FBI policy before opening investigations such as these, relating to constitutionally protected activity occurring during a national presidential campaign. We were also concerned about the limited notice requirements before using more intrusive investigative techniques that could impact constitutionally protected activity. Accordingly, we make several recommendations below to address these concerns.

## A.   Authorized Purpose

The AG Guidelines and the DIOG both require that FBI investigations be undertaken for an "authorized purpose"—that is, "to detect, obtain information about, or prevent or protect against federal crimes or threats to the national security or to collect foreign intelligence." Under both the AG Guidelines and the DIOG, the FBI may not undertake an investigation for the sole purpose of monitoring activities protected by the First Amendment or to interfere with the lawful exercise of other rights secured by the Constitution or laws of the United States. However, both the AG Guidelines and the DIOG permit the FBI to conduct an investigation, even if it might impact First Amendment or other constitutionally protected activity, so long as there is a legitimate law enforcement purpose associated with the investigation.

We concluded that, under the AG Guidelines and the DIOG, the FBI had an authorized purpose when it opened Crossfire Hurricane to obtain information about, or to protect against, a national security threat or federal crime, even though the investigation also had the potential to impact constitutionally protected activity. The FBI's opening EC referenced the Foreign Agents Registration Act (FARA) and stated, "[b]ased on the information provided by [the FBI Legal Attaché], this investigation is being opened to determine whether individual(s) associated with the Trump campaign are witting of and/or coordinating activities with the Government of Russia." We found that the FBI opened the Crossfire Hurricane

investigation shortly after officials in CD received the FFG information on July 28. The opening EC documented the pertinent FFG information verbatim and described relevant background information.  All of the senior FBI officials who participated in the discussions about whether to open a case told us the information from the FFG warranted investigation.  For example, the FBI's then Deputy General Counsel told us that the FBI "would have been derelict in our responsibilities had we not opened the case," because a foreign power allegedly colluding with a presidential candidate or his campaign was a threat to our nation that the FBI was obligated to investigate under its counterintelligence mission.

Then CD Assistant Director E.W. "Bill" Priestap, who approved opening the case, told us that the combination of the FFG information and the FBI's ongoing cyber intrusion investigation into the July 2016 hacks of the DNC's emails created a counterintelligence concern that the FBI was "obligated" to investigate.  Priestap also told us that, prior to making the final decision to approve the opening of Crossfire Hurricane, he considered whether the FBI should conduct defensive briefings for the Trump campaign about the information from the FFG.  However, Priestap ultimately decided that providing such briefings created the risk that "if someone on the campaign was engaged with the Russians, he/she would very likely change his/her tactics and/or otherwise seek to cover-up his/her activities, thereby preventing us from finding the truth."  We did not identify any Department or FBI policy that applied to this decision and therefore determined that the decision whether to conduct defensive briefings in lieu of opening an investigation, or at any time during an investigation, was a judgment call that is left to the discretion of FBI officials.[482]

As part of our review, we sought to determine whether there was evidence that political bias or other improper considerations affected decision making in Crossfire Hurricane, including the decision to open the investigation.  Such evidence would raise questions as to whether Crossfire Hurricane was opened for an authorized purpose, and serious concerns about whether the decision compromised the constitutional rights of any U.S. persons.  We discussed the issue of political bias in a prior OIG report, *Review of Various Actions in Advance of the 2016 Election*, where we described text messages between then Special Counsel to the Deputy Director Lisa Page and then Section Chief Peter Strzok, among others. These text messages included statements of hostility toward then candidate Trump and statements of support for then candidate Hillary Clinton.  These messages, most of which pertained to the Russia investigation, potentially indicated or created the appearance that investigative decisions were impacted by bias or improper considerations.  Our prior review stated that the text messages were "not only

---

[482] Later in this chapter, we recommend that the Department and FBI evaluate which types of sensitive investigative matters should require advance notification to a senior Department official, such as the Deputy Attorney General, in addition to the notifications currently required for such matters, especially for opening investigations that implicate core First Amendment activity and raise policy considerations or heighten enterprise risk.  Such a requirement would not only give senior Department leadership the opportunity to consider the constitutional and prudential issues associated with opening certain investigations but also the opportunity to consult with the FBI about whether to conduct a defensive briefing in a circumstance such as this one.

indicative of a biased state of mind but, even more seriously, impl[y] a willingness to take official action to impact [Trump's] electoral prospects." For example, on July 31, 2016, in connection with the formal opening of Crossfire Hurricane, Strzok texted Page: "And damn this feels momentous. Because this matters. The [Clinton email investigation] did, too, but that was to ensure we didn't F something up. This matters because this MATTERS. So super glad to be on this voyage with you." Additionally, on August 8, 2016, Page sent a text message to Strzok that stated, "[Trump's] not ever going to become president, right? Right?!" Strzok responded, "No. No he's not. We'll stop it." Although we did not find in our prior report any documentary or testimonial evidence directly connecting the political views stated in the text messages to the specific investigative actions in Midyear that we reviewed, we concluded that Strzok's text messages with Page indicated or created the appearance of bias against Trump. We further concluded that the messages raised serious questions about the propriety of any investigative decisions in which Strzok and Lisa Page played a role. Because several of these inappropriate and troubling messages occurred at or near the time of the opening of Crossfire Hurricane, we closely reviewed the roles of Strzok and Lisa Page in the investigation's opening and whether there was any documentary or testimonial evidence that their views impacted the decision to open the investigation.

We found that while she attended some of the discussions, Lisa Page did not play a role in the decision to open Crossfire Hurricane or the four individual cases. Strzok was directly involved in the decisions to open Crossfire Hurricane and the four individual cases, but we found that he was not the sole, or even the highest level decision maker as to any of those matters. Priestap, Strzok's supervisor, told us that ultimately he was the official who made the decision to open the Crossfire Hurricane investigation, and Strzok then prepared and approved the formal documentation, as required by the DIOG. Evidence reflected that this decision by Priestap was reached by consensus after multiple days of discussions and meetings that included Strzok and other leadership in CD, the FBI Deputy Director, the FBI General Counsel, and the FBI Deputy General Counsel. We similarly found that the decisions to open the four individual cases were reached by consensus of Crossfire Hurricane agents and analysts who identified individuals associated with the Trump campaign who had recently travelled to Russia or had other alleged ties to Russia, and that Priestap was involved in those decisions. The formal documentation opening each of these four investigations was approved by Strzok, as required by the DIOG.

We did not find documentary or testimonial evidence that political bias or improper motivation influenced Priestap's decision to open Crossfire Hurricane. The evidence also showed that FBI officials responsible for and involved in the case opening decisions were unanimous in their belief that, together with the July 2016 release by WikiLeaks of hacked DNC emails, the Papadopoulos statement described in the FFG information reflected the Russian government's potential next step to interfere with the 2016 U.S. elections. These FBI officials were similarly unanimous in their belief that the FFG information represented a threat to national security that warranted further investigation by the FBI. Witnesses told us that they did not

recall observing during these discussions any instances or indications of improper motivations or political bias on the part of the participants, including Strzok.

We also reviewed the text messages and emails of each of the FBI officials, in addition to Strzok, who participated in the decision to open Crossfire Hurricane and the four individual cases, and did not identify any statements in those communications that indicated or suggested the decision could have been affected by political bias or other improper considerations. We also reviewed other contemporaneous documents, such as meeting notes, and asked witnesses who were not involved in the decision to open Crossfire Hurricane but who were familiar with the predication for the case for any evidence of political bias or improper motivation in the FBI's decision making. Again, we found no such evidence, including from Department officials briefed about Crossfire Hurricane subsequent to it being opened. These officials also did not express any concerns about the FBI's decision to open the investigation. By way of example, David Laufman, then Chief of the National Security Division's (NSD) Counterintelligence and Export Control Section (CES), told us that it would have been "a dereliction of duty and responsibility of the highest order not to commit the appropriate resources as urgently as possible to run these facts to the ground, and find out what was going on."

We therefore concluded the FBI met the requirement in the AG Guidelines and the DIOG that Crossfire Hurricane be opened for an "authorized purpose," namely "to detect, obtain information about, or prevent or protect against federal crimes or threats to the national security or to collect foreign intelligence." We also determined that, although the investigation had the potential to impact constitutionally protected activity, the FBI's decision to open the investigation was permissible under both Department and FBI policies because there was a legitimate law enforcement purpose associated with the investigation. Nevertheless, we believe that investigations affecting core First Amendment activity and national political campaigns raise significant constitutional and prudential issues and therefore we recommend below that Department policy require advance notification to a senior Department official, such as the Deputy Attorney General (DAG), before a Department component opens such an investigation so that Department leadership can consider these issues from the outset.

## B.    Factual Predication

In addition to requiring an authorized purpose, Department and FBI policy also mandate that each case have adequate factual predication before being initiated. The predication requirement is not a legal requirement but rather a prudential one imposed by Department and FBI policy. For example, the Supreme Court has held that the Department and FBI can lawfully open a federal criminal grand jury investigation even in the absence of predication. *See United States* v. *Morton Salt*, 338 U.S. 632, 642-43 (1950) (a grand jury "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not"); *see also United States* v. *R. Enterprises*, 498 U.S. 292, 297 (1991).

The AG Guidelines generally describe predication as allegations, reports, facts, or circumstances indicative of possible criminal activity or a national security threat, or the potential for acquiring information responsive to foreign intelligence collection requirements.  For full counterintelligence investigations such as Crossfire Hurricane and the four related individual investigations, Section II.B.4 of the AG Guidelines and Section 7 of the DIOG state that the required level of predication is an "articulable factual basis" that "reasonably indicates" that any one of three defined circumstances exists, including:

> An activity constituting a federal crime or a threat to the national security has or may have occurred, is or may be occurring, or will or may occur and the investigation may obtain information relating to the activity or the involvement or role of an individual, group, or organization in such activity.[483]

The AG Guidelines and the DIOG do not provide heightened predication standards for sensitive matters, or for allegations potentially impacting constitutionally protected activity, such as First Amendment rights.  Rather, as we discuss below, the approval and notification requirements contained in the AG Guidelines and DIOG are, in part, intended to provide the means by which such concerns can be considered by senior officials.

In Crossfire Hurricane, the "articulable factual basis" set forth in the opening EC was the FFG information received from an FBI Legal Attaché stating that Papadopoulos had suggested during a meeting in May 2016 with officials from a "trusted foreign partner" that the Trump team had received some kind of suggestion from Russia that it could assist by releasing information damaging to candidate Clinton and President Obama.[484]  Additionally, by July 31, 2016, although not specifically mentioned in the EC, the FBI had reason to believe that Russia may have been connected to the WikiLeaks disclosures that occurred earlier in July 2016.  Further, as we note in Chapter Three, the FBI received the FFG information at a time when the USIC, including the FBI, was aware of Russia's efforts to interfere with the 2016 U.S. elections.  Given the low threshold for predication in

---

[483] As detailed in Chapter Two, the DIOG separately provides that a Preliminary Investigation may be opened based upon "any allegation or information" indicative of possible criminal activity or threats to the national security.  In cases opened as Preliminary Investigations, the DIOG provides that all lawful investigative methods (including CHS and UCE operations) may be used except for mail opening, physical searches requiring a search warrant, electronic surveillance requiring a judicial order or warrant (Title III wiretap or a FISA order), or requests under Title VII of FISA.  A Preliminary Investigation may be converted to a Full Investigation if the available information provides predication for a Full Investigation.

[484] Papadopoulos has stated that the source of the information he shared with the FFG was a professor from London, Joseph Mifsud, and has raised the possibility that Mifsud may have been working with the FBI.  As described in Chapter Ten of this report, the OIG searched the FBI's database of Confidential Human Sources (CHSs) and did not find any records indicating that Mifsud was an FBI CHS, or that Mifsud's discussions with Papadopoulos were part of any FBI operation.  The FBI also requested information on ███████████████████████████████████████

the AG Guidelines and the DIOG, we concluded that the FFG information, provided by a government the USIC deems trustworthy, and describing a first-hand account from an FFG employee of the content of a conversation with Papadopoulos, was sufficient to predicate the full counterintelligence investigation because it provided the FBI an articulable factual basis that, if true, reasonably indicated activity constituting either a federal crime or a threat to national security may have occurred or may be occurring.[485]

We similarly concluded that the FBI had sufficient predication to open full counterintelligence investigations of Papadopoulos, Page, Flynn, and Manafort in August 2016. The investigation of Papadopoulos was predicated upon his alleged statements in May 2016 to an employee of the FFG. According to the opening EC, Papadopoulos was "identical to the individual who made statements indicating that he is knowledgeable that the Russians made a suggestion to the Trump team that they could assist the Trump campaign with an anonymous release of information during the campaign that would be damaging to the Clinton campaign." The three other cases were predicated on information developed by the Crossfire Hurricane team through law enforcement database and open source searches, conducted to determine which individuals associated with the Trump campaign may have been in a position to have received the alleged offer of assistance from Russia. As described in Chapter Three, through these efforts, the Crossfire Hurricane team identified three individuals—Page, Manafort, and Flynn—associated with the Trump campaign with either ties to Russia or a history of travel to Russia, two of whom (Page and Manafort) were already the subjects of open FBI investigations pertaining to, in part, their Russia-related activities. The FBI determined that this information, taken together with the information from the FFG indicating Russia had made a suggestion to the Trump team that it could assist by releasing information damaging to candidate Clinton, stated an articulable factual basis reasonably indicating activity may be occurring that may constitute a federal crime or a threat to national security. As with the opening of Crossfire Hurricane, we concluded that the quantum of information articulated by the FBI to open these individual investigations was sufficient to satisfy the low threshold established by Department and FBI predication policy, particularly in the context of the FBI's separate and ongoing investigative efforts to address Russian interference in 2016 U.S. elections.

## C.   Sensitive Investigative Matters (SIMs)

We concluded that the FBI appropriately designated Crossfire Hurricane and each of the four individual counterintelligence investigations as SIMs, or Sensitive

---

[485] We determined that the election reporting from Christopher Steele played no role in the opening of Crossfire Hurricane. As described in Chapter Four, while some individuals in the FBI, including Steele's handling agent, had received Steele's election reporting as early as July 2016, the CD officials at FBI Headquarters and the members of the Crossfire Hurricane team did not receive the first Steele reports until September 19—weeks after the Crossfire Hurricane investigation was opened—and were not aware of any of the information in the reports prior to that date. We also found no evidence that the FBI undertook any investigative activities directed at the Trump campaign or members of the Trump campaign before opening Crossfire Hurricane on July 31, 2016. As described in Chapters Three and Nine, the FBI had ongoing investigations of Paul Manafort and Carter Page at that time, which were unrelated to the information that predicated Crossfire Hurricane.

Investigative Matters. As described in Chapter Two, a SIM is an investigative matter that must be approved for opening by FBI management and brought to the attention of Department officials because of the possibility of public notoriety and sensitivity. The categories of matters designated as SIMs include investigations involving the activities of a domestic political organization or an individual prominent in such an organization. Under the DIOG's definition, the term "domestic political organization" includes a committee or group formed to elect an individual to public office. Moreover, if an assessment or predicated investigation concerns a person prominent in a "domestic political organization" but not the political organization itself, it nonetheless must be treated as a SIM.

For Crossfire Hurricane, the FBI believed that any potential subjects of the investigation would be "prominent" members of a political campaign. With the four individual cases, the FBI determined that the individuals identified as subjects—foreign policy advisors Page, Papadopoulos, and Flynn; and campaign manager Manafort—were "prominent" in the Trump political campaign. We found the decision to designate the cases as SIMs to be appropriate. However, as discussed later in this chapter, our interviews with certain FBI agents revealed significant confusion over the meaning of the phrase "prominent within a domestic political organization" in the context of the policies applicable to CHSs, with some agents interpreting that phrase as limited to a person "running for office," and other agents questioning whether a presidential campaign was a "domestic political organization." We recommend later in this chapter that the FBI establish guidance to better define this phrase with respect to CHS use. Because the phrase is also used in FBI policies applicable to SIMs, we recommend that any additional guidance also take into account and be applied to the SIM requirements.

We also determined that the FBI satisfied the DIOG's approval and notification requirements for SIMs. At the FBI, these requirements included review of the opening by the FBI Office of the General Counsel (OGC), which in this case was conducted by the OGC Unit Chief; and approval by the FBI Headquarters operational Section Chief, which was provided here by then Section Chief Strzok. The DIOG also requires that NSD be notified of the opening of a SIM. The FBI satisfied this requirement by briefing NSD officials in the Counterintelligence and Export Control Section—orally, due to the sensitivity of the cases—about the openings within days of the investigations being initiated.[486]

Although the FBI satisfied the approval and notification requirements for SIMs, we believe such sensitive cases should also include advance notice to Department senior management officials, especially for case openings such as this one that implicated core First Amendment activity and a national political campaign. The FBI did not formally brief anyone in Department leadership at the time that Crossfire Hurricane was opened. While the then FBI Deputy Director was aware of

---

[486] Technically, the DIOG's notice requirement for cases designated as a SIM provides that notice be emailed to a NSD email account within 30 days of the case opening. As described in Chapter Three, the Crossfire Hurricane team orally briefed NSD and Department officials on two occasions within days of the case opening rather than email notice to a general email account due to the sensitivity of the cases.

and gave his approval for the investigation prior to its opening, the investigation—concerning the actions of individuals associated with a presidential campaign—could have been opened, consistent with FBI and Department policy, without any notice to FBI or Department leadership and based solely on the decision of an FBI Headquarters Section Chief, with review by FBI OGC and notice to an "appropriate NSD official." As noted in Chapter Two, current Department and FBI policies require high-level notice and approval in other circumstances where investigative activity could substantially impact certain civil liberties. The purpose of such notice and approval is to allow senior Department officials to consider the potential constitutional and prudential implications of opening certain investigations, even where there is sufficient predication to do so. Accordingly, we recommend that the Department and FBI evaluate which types of SIMs should require advance notification to a senior Department official, such as the DAG, in addition to the notifications currently required for SIMs, especially for cases that implicate core First Amendment activity and a national political campaign, and establish, as necessary, implementing policies and guidance.

### D. Staffing of Investigation

Due to the sensitivity of the investigation, FBI leadership initially ran the investigation out of FBI Headquarters, rather than out of one or more field offices as is typically done in FBI investigations. We found that the decision to run the investigation out of FBI Headquarters created challenges for the team, which we were told were known risks consciously taken by CD officials, including Priestap, in order to minimize the potential of an unauthorized public disclosure of the investigation and allow for better coordination with Headquarters and interagency partners. These challenges included difficulties in obtaining needed investigative resources, such as surveillance teams, electronic evidence storage, technically trained agents, and other investigative assets standard in field offices to support investigations. Additionally, the FBI had to detail agents to FBI Headquarters from field offices for 90-day temporary duty assignments (TDYs). Then, when these 90-day TDY assignments expired, new agents were detailed to FBI Headquarters, resulting in three iterations of Crossfire Hurricane teams and supervisors from July 31, 2016, to the transfer of the case to the Special Counsel's Office in May 2017.

We found that this ad hoc staffing presented challenges compared to the established chain of command structure that exists in FBI field offices. The turnover of agents and supervisors resulted in a loss of institutional knowledge and a lack of communication among agents, analysts, and supervisors. While we did not find that conducting the investigation from FBI Headquarters was the cause of the problematic issues we identify in this report, witnesses we interviewed told us that investigating Crossfire Hurricane from FBI Headquarters created significant challenges. We therefore recommend that the FBI develop specific protocols and guidelines for staffing and running any future sensitive investigations from FBI Headquarters.

### E.   Least Intrusive Investigative Techniques

The AG Guidelines and the DIOG require that the "least intrusive" means or method be "considered" when selecting investigative techniques and, "if reasonable based upon the circumstances of the investigation," be used to obtain information instead of a more intrusive method.  The least intrusive method principle reflects an attempt to balance the FBI's ability to effectively conduct investigations with the potential negative impact an investigation can have on the privacy and civil liberties of individuals encompassed within an investigation.  The DIOG emphasizes that in the context of cases designated as SIMs, particular care should be taken when considering whether the planned course of action is the least intrusive method if reasonable based upon the circumstances of the investigation.  However, DIOG § 4.1.1 states that investigators "must not hesitate to use any lawful method consistent with the [AG Guidelines] when the degree of intrusiveness is warranted in light of the seriousness of the matter concerned."  According to DIOG § 4.4.5, "[i]n the final analysis, choosing the method that [most] appropriately balances the impact on privacy and civil liberties with operational needs, is a matter of judgment, based on training and experience."

As described in Chapter Three, immediately after opening the investigation, the Crossfire Hurricane team submitted name trace requests to other U.S. government agencies and a foreign intelligence agency, and conducted law enforcement database and open source searches, to identify individuals associated with the Trump campaign in a position to have received the alleged offer of assistance from Russia.  Members of the Crossfire Hurricane team told us that they avoided the use of compulsory legal process to obtain information at this time in order to prevent any public disclosure of the investigation's existence and to avoid any potential impact on the election.  The FBI also sent Strzok and an SSA to a European city to interview the source of the information the FBI received from the FFG, and also searched the FBI's CHS database to identify sources who potentially could provide information about connections between individuals associated with the Trump campaign and Russia.  Each of these early steps is authorized under the DIOG and was a less intrusive investigative technique.

After the FBI opened the four individual cases based on information obtained through the above-described efforts, the Crossfire Hurricane team used CHSs to interact and consensually record conversations with two of the investigative subjects—Page and Papadopoulos—on multiple occasions in an effort to obtain specific information relevant to the allegations.  The FBI also used a CHS to consensually record a conversation with a high-level Trump campaign official who was not a subject of the Crossfire Hurricane investigation.  Use of a CHS to conduct consensual monitoring is a more intrusive investigative technique than the ones used immediately after Crossfire Hurricane was opened, but is also one that FBI witnesses told us is commonly used in FBI counterintelligence investigations.  For example, Priestap told the OIG that CHSs are an "ordinary investigative tool" that

are "part and parcel of what [FBI] agents do in an investigative sense every day."[487]

As noted above, FBI policy provides that these decisions are matters of judgment to be made based on an investigator's training and experience. We found that, in making these judgments about using CHSs to interact with investigative subjects, the Crossfire Hurricane team complied with applicable Department and FBI policies for these operations, and obtained all requisite approvals. Although the CHS operations implicated constitutionally protected activity, we found no evidence that they were undertaken solely for the purpose of monitoring constitutionally protected activity, which is prohibited by the DIOG. We also found no testimonial or documentary evidence that these operations resulted from political bias or other improper considerations. We therefore concluded that these early investigative activities undertaken by the Crossfire Hurricane team were matters of judgment that were permitted by the AG Guidelines and the DIOG. However, as discussed later in this chapter, we are concerned that current Department and FBI policies do not require, at a minimum, consultation with the Department before using a CHS to monitor conversations with members of a major party candidate's presidential campaign, including a high-level campaign official who was not a subject of the investigation. Further, we are concerned that the FBI did not have a plan or process in place to address what the team should have done in the event a CHS operation resulted in the FBI's incidental receipt of sensitive campaign information. Accordingly, we make a recommendation below to ensure additional oversight, accountability, and consideration of the constitutional interests at stake in such operations.

In addition to these CHS operations, the FBI also discussed in August 2016, within days of opening the Carter Page investigation, the possible use of a separate, highly intrusive technique to obtain information: FISA-authorized electronic surveillance ██████████████ targeting Carter Page. According to Case Agent 1, the Crossfire Hurricane team had hoped that emails and other communications obtained through surveillance would help provide valuable information about what Page did while in Moscow in the previous month and the Russian officials with whom he may have spoken. As detailed in Chapter Five, the FBI ultimately did not seek a FISA order in August 2016 because OGC, NSD's Office of Intelligence (OI), or both determined that more evidence was needed to support a probable cause determination that Page was an agent of a foreign power.

As discussed below, after the Crossfire Hurricane team received the election reporting from Christopher Steele on September 19, they reinitiated discussions with OI and efforts to obtain authority for FISA surveillance ████████████ targeting Page, which they received from the Foreign Intelligence Surveillance Court (FISC) on October ██. Because of the reviews and approvals required before submitting a FISA application to the FISC, the decision to seek to use this highly

---

[487] As we summarize in Chapter Ten, the consensual recordings done by the CHSs did not generate information tending to support the allegation that Page and Papadopoulos were, wittingly or unwittingly, providing assistance to Russia. Members of the Crossfire Hurricane team told us that the recordings nevertheless provided important background information about the subjects.

intrusive investigative technique was reviewed and approved at multiple levels of the Department, including by then DAG Sally Yates for the initial FISA application and first renewal and by then Acting Attorney General Dana Boente and then DAG Rod Rosenstein for the second and third renewals. However, as we explain in the next section, the Crossfire Hurricane team failed to inform the Department of significant information that was available to the team at the time that the FISA applications, including the first application, were drafted and filed. Much of that information was inconsistent with, or undercut, the allegations contained in the FISA applications to support probable cause and, in some instances, resulted in inaccurate information being included in the applications. Accordingly, we questioned the judgment and performance of members of the Crossfire Hurricane team involved in the FISA applications, and determined that, as a result of their actions, senior Department officials authorized the FBI to seek to use this highly intrusive investigative technique targeting Carter Page based on significant omissions and inaccurate information in the initial and renewal FISA applications. While we do not speculate whether senior Department officials would have authorized the FBI to seek to use FISA authority had they been made aware of all relevant information, it was clearly the responsibility of Crossfire Hurricane team members to advise Department officials of such critical information so that they could have made a fully informed decision.

## II.   The FISA Applications

In this section, we analyze the role of Christopher Steele's election reporting in the four Carter Page FISA applications filed with the FISC. Additionally, we detail and analyze the numerous instances in which factual representations in the applications were inaccurate, incomplete, or unsupported by appropriate documentation, based upon information the FBI had in its possession at the time the applications were filed.

As described in Chapter Five, within days of opening the Carter Page and George Papadopoulos cases on August 10, 2016, the FBI first considered the possibility of seeking to obtain a FISA order authorizing electronic surveillance █████ ████████████ targeting Carter Page and George Papadopoulos. We found that the Crossfire Hurricane team initially focused its efforts on obtaining FISA authority targeting Page, more than on efforts to surveil Papadopoulos or other members of the Trump campaign, because of Page's prior contacts with known Russian intelligence officers, which the Crossfire Hurricane team believed would have made Page most susceptible, and most likely, to have received, the suggestion or offer of assistance reported in the FFG information.[488]

---

[488] As described in Chapter Five, although the Crossfire Hurricane team was also interested in seeking FISA surveillance targeting Papadopoulos, the FBI OGC attorneys were not supportive because the FBI had no information that Papadopoulos was being directed by the Russians. FBI and NSD officials told us that the Crossfire Hurricane team ultimately did not seek FISA surveillance of Papadopoulos. We were also told that the team also did not seek FISA surveillance of Manafort or Flynn, and we are aware of no information indicating that the Crossfire Hurricane team requested or seriously considered FISA surveillance of Manafort or Flynn.

We determined that, on August 15, 2016, Case Agent 1 sent a written summary by email to the OGC Unit Chief describing Page's Russian business and financial ties, his prior contacts with known Russian intelligence officers, and his recent travel to Russia. In this email, Case Agent 1 stated his belief that the information provided "a pretty solid basis" for requesting authority under FISA to conduct surveillance targeting Page. The next day, August 16, the OGC Unit Chief emailed Stuart Evans, then NSD's Deputy Assistant Attorney General with oversight responsibility over OI, to advise him of the possible FBI request for a FISA order to surveil Page. The email from the OGC Unit Chief stated that "I don't think we are quite there yet, but given the sensitivity and urgency of this matter, I would like to get OI involved as early as possible."

On or about August 17, 2016, in response to the Crossfire Hurricane team's prior Carter Page name trace request, the Crossfire Hurricane team received a memorandum from another U.S. government agency detailing its prior interactions with Page, including that Page had been approved as an "operational contact" for the other agency from 2008 to 2013.[489] The memorandum also detailed the information that Page had provided to the other agency concerning his prior contacts with certain Russian intelligence officers. As detailed in Chapters Five and Eight, the Crossfire Hurricane team did not accurately describe to OI the nature and extent of the information that the FBI received from the other agency, which we found was highly relevant to an evaluation of the FISA request.

Additionally, in August 2016, Page made statements to an FBI CHS that, if true, were in tension with the reporting the FBI received subsequently from Steele, alleging that Page was being used as an intermediary by Manafort to conspire with Russia. The FBI did not inform OI of Page's statements before any of the four FISA applications were filed, and did not inform OI of the CHS operation until June 2017, shortly before filing the last FISA application.

On or about August 22, 2016, a decision was made by the FBI OGC, OI, or both that more evidence was needed to support probable cause that Carter Page was an agent of a foreign power. The OGC ceased its discussions with OI about seeking a FISA order targeting Page. However, on September 19, 2016, the same day that the Crossfire Hurricane team first received Steele's election reporting, the team reinitiated discussions with OGC about seeking a FISA order authorizing surveillance targeting Page and specifically focused on Steele's reporting in drafting the FISA request. Two days later, on September 21, the OGC Unit Chief contacted the NSD OI Unit Chief to advise him that the FBI believed it was ready to submit a formal FISA request to OI relating to Page.

---

[489] As described in Chapter Five, according to the U.S. government agency, "operational contact," as that term is used in the memorandum about Page, provides "Contact Approval," which allows the agency to contact and discuss sensitive information with a U.S. Person and to collect information from that person via "passive debriefing," or debriefing a person of information that is within the knowledge of an individual and has been acquired through the normal course of that individual's activities. According to the U.S. government agency, a "Contact Approval" does not allow for operational use of a U.S. Person or tasking of that person.

Over the next several weeks, the FBI and OI prepared the FISA application targeting Carter Page, which was filed with the FISC on October ██, 2016.  The FISC granted the first FISA warrant the same day, authorizing electronic surveillance ████████████████ targeting Page for 90 days.  As the Crossfire Hurricane investigation proceeded, the Department submitted three renewal applications with the FISC on January ██, April ██, and June ██, 2017, seeking authority to continue electronic surveillance ████████████████ targeting Carter Page.  A different FISC judge considered each application before issuing the requested orders, which collectively resulted in approximately 11 months of FISA coverage from October ██, 2016, until September ██, 2017.

As noted above, in the OIG's June 2018 report, *Review of Various Actions in Advance of the 2016 Election*, we described text messages between Peter Strzok and Lisa Page discussing statements of hostility toward then candidate Trump and statements of support for candidate Clinton.  Several of these text messages appeared to mix political opinions with discussions about the investigation into candidate Clinton's email use and refer to the Crossfire Hurricane investigation.  As part of our review of the Carter Page FISA applications, we sought to determine whether there was evidence that Strzok or Page affected the preparation of or decision to file any of the applications.  As described in Chapter Five, Strzok approved the request to expedite the FISA application proposed by the Crossfire Hurricane team, and he and Lisa Page communicated with Department officials, as did other FBI officials, in an effort to move the first application forward.  This included conversations with NSD officials during which Strzok expressed frustration that the FISA process was not moving forward at the pace desired by the FBI.  However, testimonial and documentary evidence we reviewed established that Strzok and Lisa Page played no role in the substantive preparation or approval of any of the four FISA applications, including the Woods process.  We did not find documentary or testimonial evidence that political bias or improper motivation influenced the FBI's decision to seek FISA authority on Carter Page.

## A.    The Role of the Steele Election Reporting in the Applications

We concluded that the Crossfire Hurricane team's receipt of Steele's election reporting on September 19, 2016, played a central and essential role in the decision by FBI OGC to support the request for FISA surveillance targeting Carter Page, as well as the Department's ultimate decision to seek the FISA order.  In particular, the OGC Unit Chief told us that she thought probable cause was a "close call" when the team first proposed seeking a FISA in mid-August and separately when she discussed the idea with OI around the same time.  She said that it was the Steele reporting received in September, concerning Page's alleged activities with Russian officials in the summer of 2016, that "pushed it over" the line in terms of establishing probable cause that Page was acting in concert with Russian officials.  The OGC Unit Chief's testimony was consistent with the testimony of the OI Unit Chief who told us that the Steele reporting was "what kind of pushed it over the line" in terms of the FBI being ready to pursue FISA authority targeting Page.  Contemporaneous handwritten notes from Case Agent 1 and the then Chief of NSD's Counterintelligence and Export Control Section similarly indicated that in late

August 2016 an assessment had been made, by FBI OGC, OI, or both, that the information known at that time did not establish probable cause.

In addition, we found no evidence of further discussions between the FBI and OI between late August and September 19 concerning the possibility of obtaining a FISA order targeting Page. We determined those discussions were effectively reinitiated on September 21, two days after the Crossfire Hurricane team's receipt of the Steele election reporting. At that time, FBI OGC attorneys advised OI of the reporting from Steele and said for the first time that the FBI was ready to move forward with a FISA application targeting Page. Further, we found that the first FISA application drew heavily, although not entirely, upon the Steele reporting to support the government's position that Page was an agent of a foreign power.

We found that the FBI's decision to rely upon Steele's election reporting to help establish probable cause that Page was an agent of Russia was a judgment reached initially by the case agents on the Crossfire Hurricane team. We further found that FBI officials at every level concurred with this judgment, from the OGC attorneys assigned to the investigation to senior CD officials, then FBI General Counsel James Baker, then Deputy Director Andrew McCabe, and then Director James Comey. FBI leadership supported relying on Steele's reporting to seek a FISA order authorizing surveillance targeting Page after being advised of, and giving consideration to, the concerns expressed by Evans that Steele may have been hired by someone associated with presidential candidate Clinton or the DNC, and that the foreign intelligence to be collected through the FISA order would probably not be worth the "risk" of being criticized later for collecting communications of someone (Carter Page) who was "politically sensitive." According to McCabe, the FBI "felt strongly" that the FISA application should move forward because the team believed they had to get to the bottom of what they considered to be a potentially serious threat to national security, even if the FBI would later be criticized for taking such action. As described in Chapter Five, McCabe and others discussed the FBI's position with NSD and ODAG officials, and these officials accepted the FBI's decision to move forward with the application, based substantially on the Steele information.

The FISA statute and FISC Rules of Procedure (FISC Rules) do not establish requirements specific to the use of CHS information, such as Steele's, to support probable cause in a FISA application. The FBI OGC's FISA guidance (described in Chapter Two) specifies that agents should take into account the reliability of any "informant," the circumstances of the informant's knowledge, and the age of the information relied upon when judging the evidence to support probable cause in any given case. As described in earlier chapters, we found that the FBI did not have information corroborating the specific allegations against Carter Page in Steele's reports when it relied upon them in the FISA applications. FBI OGC and NSD officials told us that the verification process set forth in the FBI's Woods Procedures does not require that the FBI have corroboration for the CHS information presented in an application. According to these officials, when information in a FISA application is attributed to a CHS, the Woods Procedures require only that the agent verify, with supporting documentation, that the application accurately reflects what the CHS told the FBI. The procedures do not

require that the agent verify, through a second, independent source, that what the CHS told the FBI is true. We did not identify anything in the Woods Procedures that is inconsistent with these officials' description of the procedures. According to Evans, the FISC is aware of how the FBI "verifies" information in a FISA application under the Woods Procedures, including information attributed to a CHS.

However, without corroboration, it was particularly important for the FISA applications to articulate to the court the FBI's knowledge of Steele's background and its assessment of his reliability. On these points, the applications advised the court that Steele was believed to be a reliable source for three reasons: his professional background, his history of work as an FBI CHS since 2013, and his prior reporting, which the FBI described as "corroborated and used in criminal proceedings." As described below, the representations about Steele's prior reporting were overstated and not approved by Steele's handling agent, as required by the Woods Procedures. Our analysis of the FBI's assessment of the Steele reporting is described later in this chapter.

Following the FBI's decision to proceed with seeking a FISA order after consideration of the risks identified by Evans, OI developed a footnote, based on information provided by the Crossfire Hurricane team, to address Evans's concern about the potential political bias of Steele's research. The footnote stated that Steele was hired by an identified U.S. person (Glenn Simpson) to conduct research regarding "Candidate #1's" (Donald Trump) ties to Russia and that the FBI "speculates" that this U.S. person was likely looking for information that could be used to discredit the Trump campaign. Evans told us that this additional information made him comfortable with the way Steele was described in the application, based upon the information the FBI provided to OI at that time. However, Evans also expressed frustration to the FBI at the time, and later to the OIG, that the FBI had not advised OI of the political origins of Steele's election reporting until late in the drafting process on the first FISA application, and only after OI asked the team three times for information about Steele's possible political connections.

## B.    Inaccurate, Incomplete, or Undocumented Information in the FISA Applications

The FBI's FISA and Standard Minimization Procedures Policy Guide (FISA SMP PG) states that the U.S. government's "ability to obtain FISA authority depends on the accuracy of applications submitted to the FISC. Because FISA proceedings are *ex parte*, the FISC relies on the [U.S. government's] full and accurate presentation of the facts to make its probable cause determinations." It further states that it is the case agent's responsibility to ensure that statements contained in applications submitted to the FISC are "scrupulously accurate." As we discuss below, we found that the FBI failed to fulfill this obligation to the court. This failure falls most immediately on the shoulders of the case agents and supervisors who were responsible for assisting OI in the preparation of the FISA applications and performing the factual accuracy review during the Woods process. However, as we discuss below, we identified (1) numerous serious factual errors and omissions in the applications, (2) a failure across three investigative teams to advise NSD

attorneys of significant information that undercut certain allegations in the FISA applications, (3) a lack of satisfactory explanations for these failures, and (4) a continuous failure to reassess the factual assertions supporting probable cause in the FISA applications as the investigation proceeded and information was obtained raising significant questions about the Steele reporting.  We concluded that these facts demonstrated a failure on the part of the managers and supervisors in the Crossfire Hurricane chain of command, including FBI senior officials.

As described in Chapter Five, NSD officials told us that the nature of FISA practice requires that OI rely on the FBI agents who are familiar with the investigation to provide accurate and complete information.  Unlike federal prosecutors, OI attorneys are usually not involved in an investigation, or even aware of a case's existence, unless and until OI receives a request to initiate a FISA application.  Once OI receives a FISA request, OI attorneys generally interact with field offices remotely and do not have broad access to FBI case files or sensitive source files.  NSD officials cautioned that even if OI received broader access to FBI case and source files, they still believe that the case agents and source handling agents are better positioned to identify all relevant information in the files.  In addition, NSD officials told us that OI attorneys often do not have enough time to go through the files themselves, as it is not unusual for OI to receive requests for emergency authorizations with only a few hours to evaluate the request.

Despite the necessity that OI receive complete and accurate information from the FBI, our review identified numerous instances in which the FBI did not provide information relevant to the probable cause determination to OI and, therefore, that information was not shared with either the decision makers in the Department who ultimately approved the applications, or with the court, which ultimately found probable cause to believe that Carter Page was an agent of a foreign power and authorized FISA surveillance of him on four separate occasions.  We found this failure by the FBI particularly concerning given the critical gatekeeper role that OI attorneys have in ensuring that FISA applications (a) contain sufficient evidence, in NSD's view, to support a probable cause finding, and (b) include information that is inconsistent with or contrary to the information presented in support of establishing probable cause.  We concluded that OI attorneys were unable to fulfill this responsibility because members of the Crossfire Hurricane team repeatedly failed to provide OI with all relevant information.  As a consequence, the factual representations in the initial and renewal FISA applications filed with the FISC contained information that was inaccurate, incomplete, or unsupported by appropriate documentation, based upon information the FBI had in its possession at the time the applications were filed.

In addition, we identified significant errors with the Crossfire Hurricane team's compliance with the FBI's Woods Procedures, which were adopted by the FBI in 2001 after errors were identified in numerous FISA applications in FBI counterterrorism investigations.  The Woods Procedures are intended to ensure the accuracy of every piece of information asserted in a FISA application by requiring that both an agent and a supervisory agent verify, with supporting documentation that must be maintained in the Woods File, that each factual assertion is accurately

stated.  We determined that these requirements were not met with regard to any of the four Carter Page FISA applications.

Below we highlight the significant instances of inaccurate, incomplete, or undocumented information identified during our review, beginning with the first application.  After the first application, we highlight significant additional errors and omissions in the renewal applications, including the agents' failures to update factual assertions repeated in the renewal applications, disclose new relevant information, and reassess the evidence supporting probable cause as the investigation progressed.  Finally, we describe the failures in the performance of the Woods Procedures that could have prevented some, but not all, of the errors and omissions we identified.[490]

### 1.    The First FISA Application

As with all applications, the FISC Rules and FBI procedures required that the Carter Page FISA applications contain all material facts.  Although the FISC Rules do not define or otherwise explain what constitutes a "material" fact, the FISA SMP PG states that a fact is "material" if it is relevant to the court's probable cause determination.

In all four applications, the factual basis supporting probable cause relied upon Page's historical (pre-2016) contacts with known Russian intelligence officers, as well as information from four Steele reports (Reports 80, 94, 95, and 102).  The most prominent of the Steele reports were Report 94 concerning alleged secret meetings between Carter Page and two Russian nationals (Igor Sechin and Igor Divyekin) in July 2016, and Report 95 concerning the alleged role of Page as an intermediary between the Trump campaign and Russia.  According to Report 95, Paul Manafort was using Page as an intermediary between the Trump campaign and Russia in a "well-developed conspiracy" that involved Russia's agreement to disclose hacked DNC emails to WikiLeaks in exchange for the Trump campaign's agreement, to include at least Page, to sideline Russian intervention in Ukraine as a campaign issue.  Steele told us that the allegations in Report 95 came from one person (Person 1) and were provided to Steele by Steele's Primary Sub-source. The allegation in Report 102 that Russia released the DNC emails to WikiLeaks in an attempt to swing voters to Trump, an objective allegedly conceived and promoted by Page and others, also came from Person 1 and was provided to Steele by Steele's Primary Sub-source.[491]

However, as more fully described in Chapter Five, based upon the information known to the FBI in October 2016, the first application:

---

[490]  Chapters Five and Eight more fully describe the most significant instances of inaccurate, incomplete, and undocumented information we identified during our review, and Appendix One provides a complete list of the failures we identified in the Woods Procedures.

[491]  Person 1 was also one of two sources for the allegation in Report 80 that derogatory information about Hillary Clinton had been compiled for many years, was controlled by the Kremlin, and had been fed by the Kremlin to the Trump campaign for an extended period of time.

1.    Omitted information from another U.S. government agency detailing its prior relationship with Page, including that Page had been approved as an operational contact for the other agency from 2008 to 2013, and that Page had provided information to the other agency concerning his prior contacts with certain Russian intelligence officers, one of which overlapped with facts asserted in the FISA application;

2.    Included a source characterization statement asserting that Steele's prior reporting had been "corroborated and used in criminal proceedings," which overstated the significance of Steele's past reporting and was not approved by Steele's FBI handling agent, as required by the Woods Procedures;

3.    Omitted information relevant to the reliability of Person 1, a key Steele sub-source (who, as previously noted, was attributed with providing the information in Report 95 and some of the information in Reports 80 and 102 relied upon in the application), namely that (1) Steele himself told members of the Crossfire Hurricane team that Person 1 was a "boaster" and an "egoist" and "may engage in some embellishment" and (2) ███████████████████████████ ████ ;

4.    Asserted that the FBI had assessed that Steele did not directly provide to the press information in the September 23 *Yahoo News* article, based on the premise that Steele had told the FBI that he only shared his election-related research with the FBI and Simpson; this premise was factually incorrect (Steele had provided direct information to *Yahoo News*) and also contradicted by documentation in the Woods File—Steele had told the FBI that he also gave his information to the State Department;

5.    Omitted Papadopoulos's statements to an FBI CHS in September 2016 denying that anyone associated with the Trump campaign was collaborating with Russia or with outside groups like WikiLeaks in the release of emails;

6.    Omitted Page's statements to an FBI CHS in August 2016 that Page had "literally never met" or "said one word to" Paul Manafort and that Manafort had not responded to any of Page's emails; if true, those statements were in tension with claims in Steele's Report 95 that Page was participating in a "conspiracy" with Russia by acting as an intermediary for Manafort on behalf of the Trump campaign; and

7.    Selectively included Page's statements to an FBI CHS in October 2016 that the FBI believed supported its theory that Page was an agent of Russia but omitted other statements Page made, including denying having met with Sechin and Divyekin, or even knowing who Divyekin was; if true, those statements contradicted the claims in Steele's Report 94 that Page had met secretly with Sechin and Divyekin about

future cooperation with Russia and shared derogatory information about candidate Clinton.

We found no indication that NSD officials were aware of these issues at the time they prepared or reviewed the first FISA application. Regarding the third listed item above, the OI Attorney who drafted the application had received an email from Case Agent 1 before the first application was filed containing the information about Steele's "boaster" and "embellishment" characterization of Person 1, whom the FBI believed to be Source E in Report 95 and the source of other allegations in the application derived from Reports 80 and 102. This information was part of a lengthy email that included descriptions of various individuals in Steele's source network and other information Steele provided to the Crossfire Hurricane team in early October 2016. The OI Attorney told us that he did not recall the Crossfire Hurricane team flagging this issue for him or that he independently made the connection between this sub-source and Steele's characterization of Person 1 as an embellisher. We believe Case Agent 1 should have specifically discussed with the OI Attorney the FBI's assessment that this sub-source was Person 1, that Steele had provided derogatory information regarding Person 1, and that ███████████████████████, so that OI could have assessed how these facts might impact the FISA application. As described in Chapter Five, Evans and the OI Attorney told us that they would have wanted to discuss this information internally within NSD and with the FBI and likely would have, at a minimum, disclosed the information to the court.

We were particularly concerned by Case Agent 1's failure to provide accurate and complete information to the OI Attorney concerning Page's relationship status with the other U.S. government agency and Page's communications with the other agency about his contacts with Russian intelligence officers. As described in Chapter Five, in response to a question from the OI Attorney in late September 2016 as to whether Carter Page had a current or prior relationship with the other agency, Case Agent 1 stated that Page's relationship was "dated" (when Page lived in Moscow in 2004-2007) and "outside scope." This representation was contrary to the information that the other agency provided in its August 17, 2016 Memorandum to the FBI, which stated that Page was approved as an operational contact of the other agency from 2008 to 2013 (after Page had left Moscow); it also was contrary to information in the FBI's own case files regarding Page's claims of interactions with the other agency. Moreover, rather than being outside the scope of the FISA application, Page's status with the other agency overlapped in time with some of the interactions between Page and known Russian intelligence officers alleged in the FISA applications. Further, Page provided information to the other agency about his past contacts with a Russian intelligence officer (Intelligence Officer 1), which were among the historical connections to Russian intelligence officers that the FBI relied upon in the first FISA application (and subsequent renewal applications) to

help support probable cause.[492]  According to the August 17 Memorandum, an employee of the other agency assessed that Page "candidly described his contact with" Intelligence Officer 1 to the other agency.  Thus, the FBI relied upon Page's contacts with Intelligence Officer 1, among others, in support of its probable cause statement, while failing to disclose to OI or the FISC that (1) Page had been approved as an operational contact by the other agency during a five-year period that overlapped with allegations in the FISA application, (2) Page had disclosed to the other agency contacts that he had with Intelligence Officer 1 and certain other individuals, and (3) the other agency's employee had given a positive assessment of Page's candor.  The FBI also did not engage with the other U.S. government agency to understand what it meant for Page to have been approved as an operational contact, whether Page interacted with Russian intelligence officers at the behest of the other agency or with the intent to assist the U.S. government, and the breadth of the other agency's information concerning Page's interactions with Intelligence Officer 1, all information that would have been highly relevant to the FISC's probable cause determination.[493]

Case Agent 1 was unable to reconcile for us the information he provided to the OI Attorney with the information in the August 17 Memorandum or FBI case files, explaining to the OIG that he did not recall his state of knowledge in 2016 regarding Page's history with the other U.S. government agency.  We concluded that Case Agent 1 failed to provide accurate and complete information to the OI Attorney concerning Page's relationship and cooperation with the other agency.  Further, we believe Case Agent 1 or his supervisor, SSA 1, should have ensured that someone on the team contacted the other agency after receiving the August 17 Memorandum to determine what it meant for Page to have been approved as an operational contact, whether Page interacted with Russian intelligence officers at the behest of the other agency or with the intent to assist the U.S. government, and to seek additional information concerning Page's interactions with Intelligence Officer 1.

We also found troubling the Crossfire Hurricane team's failure to advise OI of statements Page made, as noted in the sixth item above, to an FBI CHS in August 2016 during a consensually monitored meeting through which the Crossfire Hurricane team had sought to obtain information from Page about possible links between the Trump campaign and Russia.  This CHS operation was one of the first investigative steps in the Carter Page investigation and took place before the media had publicly reported the allegations in the Steele reports.  During the operation, Page made statements that, if true, undercut the allegation in Steele's Report 95 (received by the team in September) that Manafort was using Page as an intermediary with Russia.  According to the transcript of the operation, Page told the CHS that he had "literally never met" or "said one word to" Manafort, and that

---

[492]  The other agency did not provide the FBI with information indicating it had knowledge of Page's reported contacts with another particular intelligence officer.  The FBI also relied on Page's contacts with this intelligence officer in the FISA application.

[493]  As noted earlier in this chapter, according to the U.S. government agency that approved Page as an operational contact, the approval did not allow for the operational use or tasking of Page.

Manafort had not responded to any of Page's emails.  Page's statements concerning Manafort, which Page made before he had reason to know about Steele's reporting connecting him to Manafort in a conspiracy with Russia, were not provided to OI prior to the filing of the first FISA application.  We agree with the OI Attorney who told us that the FBI should have flagged these statements for inclusion in the FISA application because they were relevant to the court's assessment of the allegations in Report 95 concerning Manafort using Page as an intermediary with Russia.  We also believe that as the case proceeded and the FBI gathered substantial evidence of Page's past electronic communications, the lack of evidence showing substantive communications between Page and Manafort bolstered the need to, at a minimum, include Page's statements regarding Manafort in the renewal applications.

Further, we were concerned by the Crossfire Hurricane team's assertion, without approval from Steele's handling agent (Handling Agent 1), that Steele's prior reporting had been "corroborated and used in criminal proceedings" (second item noted above), which we were told was primarily a reference to Steele's role in the International Federation of Association Football (FIFA) corruption investigation. According to Handling Agent 1, he would not have approved the representation in the application because only "some" of Steele's prior reporting had been corroborated—most of it had not—and because Steele's information was never used in a criminal proceeding.  The Supervisory Intelligence Analyst (Supervisory Intel Analyst), who told us he originally provided this language for an intelligence product prepared by his analytical team, told us that he did not review the FIFA case file or "dig into" exactly how Steele's information was used in the FIFA case. SSA 1 told us that the team had "speculated" that Steele's prior reporting had been corroborated and used in criminal proceedings because they knew Steele had been "a part of, if not predicated, the FIFA investigation" and was known to have an extensive source network into Russian organized crime.

The source characterization statement in all four FISA applications stated that Steele's prior reporting had been corroborated and used in criminal proceedings, and the renewal applications further relied upon this assertion as the basis for the FBI's assessment that Steele was still reliable despite his disclosure of the FBI's investigation to media outlet *Mother Jones* in late October 2016.  Given the importance of a source's bona fides to a court's determination of reliability— particularly in cases where, as here, the source information supporting probable cause is uncorroborated—we concluded that the repeated failure in all four applications by the agents and the SSAs involved to comply with FBI policy requiring that the handling agent review and approve the language was significant. This created the impression that at least some of Steele's past reporting had been deemed sufficiently reliable by prosecutors to use in court, and that more of his information had been corroborated than was actually the case.

None of the inaccuracies and omissions we identified in the first application were brought to the attention of OI before the last FISA application was filed in June 2017.  Consequently, these failures were repeated in all three renewal applications.  As a result, the Department officials who reviewed one or more of the applications, including DAG Yates, Acting Attorney General Boente, and DAG Rosenstein, did not have accurate and complete information at the time they

approved the applications.  We do not speculate as to whether or how this additional information might have influenced the decisions of senior leaders who supported the applications, if they had known all of the relevant information. Nevertheless, we believe it was the obligation of the agents who were aware of the information to ensure that OI and the decision makers had the opportunity to consider it, both to decide whether to proceed with the applications and, if so, how to present this information to the court.  We also do not speculate as to whether this additional information would have influenced the court's decision on probable cause if the court had accurate and complete information at the time of the first application.  However, it was the Department's and FBI's obligation to ensure that the applications were "scrupulously accurate" and that the court was provided with a complete and accurate recitation of the relevant facts, which we found did not occur.

## 2.    The Three Renewal Applications

In addition to repeating the errors contained in the first FISA application, we identified other, similarly significant errors in the three renewal applications, based upon information known to the FBI after the first application was filed and before one or more of the renewals was filed.  As more fully described in Chapter Eight, the renewal applications:

8. Omitted the fact that Steele's Primary Sub-source, who the FBI found credible, had made statements in January 2017 raising significant questions about the reliability of allegations included in the FISA applications, including, for example, that he/she had no discussion with Person 1 concerning WikiLeaks and there was "nothing bad" about the communications between the Kremlin and the Trump team, and that he/she did not report to Steele in July 2016 that Page had met with Sechin;

9. Omitted Page's prior relationship with another U.S. government agency, despite being reminded by the other agency in June 2017, prior to the filing of the final renewal application, about Page's past status with that other agency; instead of including this information in the final renewal application, the FBI OGC Attorney altered an email from the other agency so that the email stated that Page was "not a source" for the other agency, which the FBI affiant relied upon in signing the final renewal application;

10. Omitted information provided by persons with direct knowledge of Steele's work-related performance in a prior position about Steele's professional judgment, including statements that Steele had held a "moderately senior" position (not "high-ranking" as noted in the applications), had no history of reporting in bad faith but demonstrated "poor judgment," "pursued people with political risk but no intelligence value," "didn't always exercise great judgment," and it was "not clear what he would have done to validate" his reporting;

11. Omitted information from Department attorney Bruce Ohr about Steele and his election reporting, including that (1) Steele's reporting was going to Clinton's presidential campaign and others, (2) Simpson was paying Steele to discuss his reporting with the media, and (3) Steele was "desperate that Donald Trump not get elected and was passionate about him not being the U.S. President";

12. Failed to update the description of Steele after information became known to the Crossfire Hurricane team, not only from Ohr but from others, that provided greater clarity on the political origins and connections of Steele's reporting, including that Simpson was hired by someone associated with the Democratic Party and/or the DNC;

13. Failed to correct the assertion in the first FISA application that the FBI did not believe that Steele directly provided information to the reporter who wrote the September 23 *Yahoo News* article, even though there was no information in the Woods File to support this claim and even after certain FBI officials involved in Crossfire Hurricane learned in 2017, before the third renewal application, of an admission that Steele made in a court filing about his interactions with the news media in the late summer and early fall of 2016;

14. Omitted the finding from a formal FBI source validation report that Steele was suitable for continued operation but that his past contributions to the FBI's criminal program had been "minimally corroborated," and instead continued to assert in the source characterization statement that Steele's prior reporting had been "corroborated and used in criminal proceedings";

15. Omitted Papadopoulos's statements to an FBI CHS in late October 2016 (after the first application was filed) denying that the Trump campaign was involved in the circumstances of the DNC email hack;

16. Omitted Joseph Mifsud's denials to the FBI that he supplied Papadopoulos with the information Papadopoulos shared with the FFG (suggesting that the campaign received an offer or suggestion of assistance from Russia);[494] and

17. Omitted evidence indicating that Page played no role in the Republican platform change on Russia's annexation of Ukraine as alleged in Steele Report 95, which was inconsistent with a factual assertion relied upon to support probable cause in all four FISA applications.

We found the FBI's failure, noted in the eighth listed item above, to advise OI or the court of the inconsistences between Steele and his Primary Sub-source to be among the most serious omissions of information. As described in Chapter Four,

---

[494] According to The Special Counsel's Report, Mifsud made inaccurate statements during this FBI interview about his interactions with Papadopoulos. *See The Special Counsel's Report*, Vol. I at 193. Nevertheless, Evans told us that Mifsud's denials during his FBI interview sounded like something "potentially factually similarly situated" to the denials made by Papadopoulos that OI determined should have been included in the applications.

Steele himself was not the originating source of any of the factual information in his reporting; Steele instead relied on his Primary Sub-source for information, who used his/her network of sub-sources to gather information that was then passed to Steele. As described in Chapters Six and Eight, during his/her January 2017 interview with the FBI, the Primary Sub-source made statements that were inconsistent with multiple sections of the Steele reports, including the allegations relied upon in the FISA applications. These inconsistencies should have resulted in serious discussions about the reliability of Steele's reporting—particularly to support a probable cause showing in a court filing—but did not. For example, regarding the allegations in Report 95 that came from Person 1 (Source E), the Primary Sub-source said, among other things, that he/she had only one, 10- to 15-minute telephone call with someone he/she believed was Person 1 and that during this call they had no discussion at all regarding WikiLeaks. Further, the Primary Sub-source told the FBI that there was "nothing bad" about communications between the Kremlin and the Trump team. The Primary Sub-source's account of these communications, if true, was not consistent with the allegations of a "well-developed conspiracy" in Reports 95 and 102 attributed to Source E (Person 1). Further, his/her assertion that he/she and Person 1 had no discussion at all regarding WikiLeaks directly contradicted those allegations. However, the FBI did not share this information with OI. The FBI also failed to share other inconsistencies with OI, including the Primary Sub-source's account of the alleged meeting between Page and Sechin in Steele's Report 94 and his/her descriptions of the source network.[495]

The fact that the Primary Sub-source's account was inconsistent with key assertions attributed to his/her own sub-sources in Reports 94, 95, and 102 should have generated significant discussions between the Crossfire Hurricane team and OI prior to submitting the next FISA renewal application. According to Evans, had OI been made aware of the information, such discussions might have included the possibility of foregoing the renewal request altogether, at least until the FBI reconciled the differences between Steele's account and the Primary Sub-source's account to the satisfaction of OI. However, we found no evidence that the Crossfire Hurricane team ever considered whether any of the inconsistencies warranted reconsideration of the FBI's previous assessment of the reliability of the Steele reports or notice to OI before the subsequent renewal applications were filed.

As a result, the second and third renewal applications provided no substantive information concerning the Primary Sub-source's interview, and instead offered a brief conclusory statement that the FBI met with the Primary Sub-source

---

[495] As more fully described in Chapter Eight, according to the Primary Sub-source, he/she was not told until October 2016 that the Page-Sechin meeting had taken place the previous July. According to the Primary Sub-source, he/she had only told Steele in July 2016 that he/she had heard that the meeting would be taking place. However, Steele authored Report 94 in July 2016 alleging that the Page-Sechin meeting had taken place that month and describing the topics that were discussed at the meeting. As noted previously, Page denied to an FBI CHS that he had met with Sechin in July 2016, and, as of the date of the last FISA application, the FBI had not determined whether a meeting between Sechin and Page took place. In addition, the Primary Sub-source's description of each of his/her sources indicated that their positions and access to the information they were reporting were more attenuated than represented by Steele and described in the FISA applications.

"[i]n an effort to further corroborate Steele's reporting" and found the Primary Sub-source to be "truthful and cooperative." We believe that including this statement, without also informing the court that the Primary Sub-source gave an account of the events that was inconsistent with key assertions in Steele's reporting, left a misimpression that the Primary Sub-source had corroborated the Steele reporting. Indeed, as we describe in Chapter Eight, in its July 2018 Rule 13 letter to the court, the Department—which was continuing to rely on the FBI's representations regarding the Primary Sub-source's interview—defended the reliability of Steele's reporting and the FISA applications by citing, in part, to the Primary Sub-source's interview as "additional information corroborating [Steele's] reporting" and noting the FBI's determination that he/she was "truthful and cooperative."

When we asked the case agents and supervisory agents who participated in the preparation or Woods review of the second and third renewal applications, they either told us that they were not aware of the inconsistences or, if they were aware, they did not make the connection that the inconsistencies affected aspects of the FISA applications. For example, Case Agent 1 told us that he believed that someone else should have highlighted the issue for the agents working on the second renewal application because he did not know some of the details concerning Person 1 that would have helped him make the necessary connections. He told us that he did not know whether Steele had his own relationship with Person 1 such that Steele could have had another basis for attributing all the information in Report 95 to Person 1. However, given Case Agent 1's central role in the Page investigation, the Primary Sub-source interview, and the preparation of the first two FISA applications and factual accuracy review on the third, we believe he should have been one of the first to notice, and advise others about, the problems the Primary Sub-source's accounts created for the FISA applications. Similarly, we believe the Supervisory Intel Analyst also should have noticed and advised others about the conflicting information, given he participated in the January 2017 Primary Sub-source interview, helped supervise the team's evaluation of the Steele reporting, and played a supportive role in the preparation of the prior FISA applications. Instead, as discussed in Chapter Eight, the Supervisory Intel Analyst circulated a 2-page intelligence memorandum to senior FBI officials highlighting aspects of the Primary Sub-source's account but failed to advise them of the inconsistencies between Steele and his Primary Sub-source on, among other things, the key allegations against Page in Reports 94 and 95.

In addition to the Primary Sub-source's interview, we found other information in the FBI's possession that raised questions about the accuracy of the Steele reporting regarding Carter Page, but that was not included in the renewal applications. As described in Chapter Five, to support the allegations in Report 95 that Page worked to sideline Ukraine as a campaign issue, the first FISA application described two news articles from July and August 2016 reporting that the Trump campaign had worked behind the scenes to change the Republican Party's platform on providing weapons to Ukraine. As more fully described in Chapter Eight, after the first application, the Crossfire Hurricane team did not learn of any information that Page was involved in the platform change and instead developed evidence tending to show that two other Trump campaign officials were responsible for the

change. Despite this, as noted in the seventeenth item above, the FBI did not include this information in any of the renewal applications or alter its assessment that Page was involved in the platform change. Instead, the renewal applications stated that Page had denied any role in the platform change to the FBI in March 2017 but that the FBI assessed Page may have been downplaying his role.

The renewal applications also continued to fail to include information regarding Carter Page's relationship with another U.S. government agency and information Page had shared with the other agency about his contacts with Russian intelligence officers, even after the Crossfire Hurricane team re-engaged with the other U.S. government agency in June 2017 (item nine above). As described in Chapter Eight, following interviews that Page gave to news outlets in April and May 2017 stating that he had assisted the U.S. intelligence community in the past, one of the SSAs supervising Crossfire Hurricane sought additional information about the issue. SSA 2, who was to be the affiant for Renewal Application No. 3 and had been the affiant for the first two renewals, told us that he wanted a definitive answer to whether Page had ever been a source for another U.S. government agency before he signed the final renewal application, because he was concerned that Page could claim that he had been acting on behalf of the U.S. government when engaging with certain Russians. This led to interactions between the OGC Attorney assigned to Crossfire Hurricane and a liaison from the other U.S. government agency. In an email from the liaison to the OGC Attorney, the liaison provided written guidance, including that it was the liaison's recollection that Page had a relationship with the other agency, and directed the OGC Attorney to review the information that the other agency had provided to the FBI in August 2016. As noted above, that August 2016 information stated that Page did, in fact, have a prior relationship with that other agency. However, the OGC Attorney altered the liaison's email by inserting the words "not a source" into it, thus making it appear that the liaison had said that Page was "not a source"; the OGC Attorney then sent the altered email to SSA 2. Relying upon this altered email, SSA 2 signed the third renewal application (that again failed to disclose Page's past relationship with the other agency). Consistent with the Inspector General Act of 1978, following the OIG's discovery that the OGC Attorney had altered and sent the email to SSA 2, who thereafter relied on it to swear out the final FISA application, the OIG promptly informed the Attorney General and the FBI Director and provided them with the relevant information about the OGC Attorney's actions.

None of these inaccuracies and omissions that we identified in the renewal applications were brought to the attention of OI before the applications were filed. As a result, similar to the first application, the Department officials who reviewed one or more of the renewal applications, including Yates, Boente, and Rosenstein, did not have accurate and complete information at the time they approved them. An exception with respect to Boente concerned information regarding the ties between Steele's reporting and the Democratic Party, which documents indicate were broadly known among relevant Department officials by February and March 2017. Boente recalled knowing the information at the time he approved the second renewal. Rosenstein told us he believes he learned that information from news media accounts, but did not recall whether he knew at the time he approved the

third renewal. As with the first FISA application, we do not speculate whether or how having accurate and complete information might have influenced the decisions of senior Department leaders who supported the renewal applications, or the court, if they had known all of the relevant information. Nevertheless, it was the obligation of the FBI agents and supervisors who were aware of the information to ensure that the FISA applications were "scrupulously accurate" and that OI, the Department's decision makers, and ultimately, the court had the opportunity to consider the additional information and the information omitted from the first application. The individuals involved did not meet this obligation.

Multiple factors made it difficult for us to assess the extent of FBI leadership's knowledge as to each fact stated incorrectly or omitted from the FISA applications. As described in prior chapters, Comey certified the first three applications as the FBI Director, and McCabe certified the final renewal application as the Acting FBI Director. As the FBI's senior leaders, Comey and McCabe would have had greater access to case information than Department leadership and also more interaction with senior CD officials and the investigation team. Further, as described in Chapter Three, CD officials orally briefed the Crossfire Hurricane cases to FBI senior leadership throughout the investigation. McCabe received more briefings than Comey, but both received oral briefings of the team's investigative activities. During one such briefing, McCabe listened to parts of the recording of the conversation between Carter Page and an FBI CHS in August 2016. In addition, in her capacity as the Deputy Director's counsel, Lisa Page attended meetings with Strzok and the Crossfire Hurricane team and reported information back to McCabe. However, limited recollections and the absence of detailed documentation of meetings made it impracticable for us to determine, beyond the more general investigative updates that we know were provided, what specific information was described during these leadership briefings and the precise nature of FBI leadership awareness of critical facts.[496] Moreover, we identified instances in which senior FBI officials were not provided with complete information. For example, although we found that Comey and McCabe had been informed that the FBI had interviewed Steele's Primary Sub-source, the 2-page intelligence memorandum that they were sent highlighting aspects of the Primary Sub-source's account failed to advise them of inconsistencies between Steele's reporting and the Primary Sub-source on key allegations. Thus, while we believe the opportunities for learning investigative details were greater for FBI leadership than for Department leadership, we were unable to conclusively determine whether FBI leadership was provided with sufficient information, or sufficiently probed the investigative team, to enable them to effectively assess the evidence as the case progressed.

### 3.   Failures in the Woods Process

As more fully described in Chapter Two, the FBI's Woods Procedures seek to ensure the accuracy of every factual assertion in a FISA application by requiring that an agent and his or her supervisor verify, with supporting documentation, that

---

[496] In addition, Comey's decision not to reinstate his security clearance for his OIG interview made the OIG unable to question him or refresh his recollection with relevant, classified documentation.

the assertion is correct and maintain the supporting document in the Woods File. In the case of renewal applications, this process involves re-verifying the accuracy of "old facts" from prior applications that are repeated and verifying and obtaining supporting documentation for any "new facts" that are added.

We examined the FBI's compliance with the Woods Procedures by comparing the facts asserted in the probable cause sections of the FISA applications to the documents maintained in each application's Woods File. Our comparison identified numerous instances in which a fact asserted in the application was not supported by appropriate documentation in the Woods File. The Woods errors we identified generally fell into three categories: (1) a fact asserted in the FISA application that had no supporting documentation in the Woods File, (2) a factual assertion had a corresponding document in the Woods File, but the document did not state the fact asserted in the FISA application, or (3) the corresponding document in the Woods File indicated that the fact asserted in the FISA application was inaccurate.

Among the most significant Woods errors we identified in this review were: (1) the failure to obtain the handling agent's approval of the source characterization statements for Steele and another FBI CHS whose information was relied upon in the applications; (2) documentation in the Woods File used to support the FBI's statement that Steele only shared his election related research with Simpson actually stated that Steele also shared the information with the State Department; and (3) documentation in the Woods File to support the FBI's assertion that Page did not refute his alleged contacts with Sechin and Divyekin to an FBI CHS actually stated that Page specifically denied meeting with Sechin and Divyekin to the CHS. Appendix One describes additional Woods errors that our review identified.

Some of the Woods errors, including the ones highlighted above, were repeated in all four applications, demonstrating that the agents and supervisors performing the Woods Procedures did not attempt to re-verify the accuracy of factual assertions repeated from prior applications—or if they did, they did not read the documents completely but only confirmed that a corresponding document appeared in the Woods File.

As described in Chapter Two, the Woods Procedures were adopted in 2001 following errors in numerous FISA applications in counterterrorism investigations. When properly followed, the Woods Procedures help reduce errors in the information supporting a FISA application by requiring an agent to identify and maintain a source document for every fact asserted in the application and complete a list of database searches on the FISA target and any CHSs relied upon in the application. We observed that the Woods process focuses on the facts actually asserted in an application and will not necessarily identify relevant facts that are missing from an application. For this reason, performance of the Woods Procedures, alone, would have caught some but not all of the many problems we identified. We believe these problems nevertheless would have been caught, or never would have existed in the first place, had the Crossfire Hurricane team adequately performed its duty of sharing all relevant information with OI.

**C.    Conclusions Regarding the FISA Applications**

    **1.    The Failure to Share Relevant Factual Information with OI, the Department's Decision Makers, and the Court, and Other FISA Related Errors**

As described in Chapters Five and Seven, all four FISA applications received the necessary Department approvals and certifications—in each instance the approval required for submission of the proposed application (read copy) was appropriately executed by the OI Unit Chief, and the final application was certified by the FBI Director or Acting Director and approved by the DAG or, in the case of the second renewal application, the Acting Attorney General.  Further, we found that all four applications received more attention and scrutiny than a typical FISA application in terms of the additional layers of review and number of high-level officials who read the application.  This was particularly true of the first application, which underwent a lengthy review and editing process within NSD, the FBI OGC, and ODAG.

However, as discussed above, relevant information was not shared with, and consequently not considered by, the decision makers who ultimately decided to support the applications.  The failure to update OI with accurate and complete information resulted in FISA applications that made it appear that the evidence supporting probable cause was stronger than was actually the case.  Based upon the information in the application, Yates told us that when she approved and signed the first application, she did not believe it presented a close call from a legal sufficiency standpoint, and she was comfortable that the request for FISA authority sought by the FBI was an appropriate investigative step to take.  Similarly, Rosenstein told us that by the time he signed Renewal Application No. 3 probable cause was not "a great stretch" and seemed obvious to him, given that the prior applications relied upon the same information that had been approved and granted three times by federal judges.  As detailed in this report, these assessments by these decision makers were not based on a complete understanding of all relevant information that was available to the FBI at the time the applications were submitted.  Indeed, by the time Rosenstein signed the final application, among other things, the following information had not been provided to the decision makers:  (1) Steele's Primary Sub-source had not confirmed the allegations regarding Carter Page to the FBI and instead gave an account that was inconsistent with and contradicted them, and (2) testimonial and documentary evidence obtained by the FBI tended to show that other Trump campaign officials, not Page, were responsible for influencing the Republican platform change.

Some factual misstatements and omissions were arguably more significant than others, but we concluded that the case agents' failures to share all relevant information with OI made OI unable to perform its gatekeeper function and deprived the decision makers the opportunity to make fully informed decisions.  While we found isolated instances where a case agent forwarded documentation to the OI Attorney that included, among other things, information omitted from the FISA applications, we noted that, in those instances, the Crossfire Hurricane team did not alert the OI Attorney to the information.  For example, when Case Agent 6

provided the OI Attorney in June 2017 with the 163-page document detailing Page's meeting with the FBI CHS in August 2016, he directed the OI Attorney's attention to statements that Page made that the FBI believed furthered the FISA application but did not identify for the OI Attorney relevant information that tended to undercut the probable cause analysis.[497]  Although we agreed with the OI Attorney that he should have examined material that the FBI provided to him more carefully, we concluded that the responsibility to raise relevant issues for OI fell squarely on the case agents who were most familiar with the case information.  Further, we found instances when the OI Attorney asked the Crossfire Hurricane team the right questions, such as in September 2016 when he asked the case agent about Page's relationship with the other U.S. government agency, yet was provided with inaccurate or incomplete information.  As noted previously, we do not speculate whether the correction of any particular misstatement or omission, or some combination thereof, would have resulted in a different outcome.  Nevertheless, the decision makers should have been given complete and accurate information so that they could have meaningfully performed their duty to evaluate probable cause.

The failure to update OI on all significant case developments relevant to the FISA applications led us to conclude that the agents did not give equal attention or treatment to the relevant facts that did not support probable cause, or reassess the evidence supporting probable cause as the investigation progressed.  The FISA Request Form does not specifically ask the case agent to share with OI information that, if accurate, would tend to undermine or would be inconsistent with the information being relied upon to support the government's theory, in whole or in part, that the target is a foreign power or an agent of a foreign power.  We believe sworn law enforcement officers should already understand this basic obligation based on their training and experience.  Nevertheless, we recommend that the FBI and the Department take additional steps to re-emphasize this obligation in the FISA context and help ensure that agents focus their attention equally on their obligation to share information with OI that might detract from a probable cause finding, regardless of whether they believe it to be true.  FBI procedures should also ensure that OI receives all information that bears on the reliability of every CHS whose information the FBI intends to rely upon in the FISA application.  This should include all information from the derogatory information sub-file, recommended later in our analysis of the FBI's relationship with Steele and its assessment of Steele's election reporting.  A more robust questionnaire in the FISA Request Form could also help ensure that all relevant information is shared with OI so that its attorneys can do their job, and that case agents are not leaving to themselves the determination that is also properly OI's of what information might be significant or relevant to probable cause, or should be disclosed to the court.

We also found the quantity of omissions and inaccuracies in the applications and the obvious errors in the Woods Procedures deeply concerning.  Although we

---

[497]  As described in Chapter Five, Case Agent 6 told us that he did not know that Page made the statement about Manafort because the August 2016 meeting took place before he was assigned to the investigation.  He said that the reason he knew about the "October Surprise" statements in the 163-page document was that he had heard about them from Case Agent 1 and did a word search to find the specific discussion of that topic.

did not find documentary or testimonial evidence of intentional misconduct on the part of the case agents who assisted OI in preparing the applications, or the agents and supervisors who performed the Woods Procedures, we also did not receive satisfactory explanations for the errors or missing information.  In most instances, witnesses told us that they either did not know or recall why the information was not shared with OI, that the failure to do so may have been an oversight, that they did not recognize at the time the relevance of the information to the FISA application, or that they did not believe the missing information to be significant.  On this last point, we believe that case agents may have improperly substituted their own judgments in place of the judgment of OI to consider the potential materiality of the information, or in place of the court to weigh the probative value of the information.  As described above, given that certain factual misstatements were repeated in all four applications, across three different investigative teams, we also concluded that agents and supervisors failed to appropriately perform the Woods Procedures on the renewal applications by not giving much, if any, attention to re-verifying "old facts."  We recommend that the Woods Form be revised to emphasize to agents and their supervisors this obligation and to have them certify that they re-verified factual assertions repeated from prior applications.

As noted throughout this report, Case Agent 1 was primarily responsible for some of the most significant errors and omissions in the FISA applications, including (1) the mischaracterization of Steele's prior reporting resulting from his failure to seek review and approval of the statement from the handling agent, as the Woods Procedures required, (2) the failure to advise OI of Papadopoulos's statements to FBI CHSs that were inconsistent with the Steele reporting relied upon in the FISA applications that there was a "well-developed conspiracy of co-operation" between individuals associated with the Trump campaign and Russia, (3) the failure to advise OI of Page's statements to an FBI CHS regarding him having no communications with Manafort and denying the alleged meetings with Sechin and Divyekin, (4) providing inaccurate and incomplete information to OI about information provided by another U.S. government agency regarding its past relationship with Page that was highly relevant to the applications, (5) the failure to advise OI of the information from Bruce Ohr about Steele and his election reporting, and (6) the failure to advise OI of the inconsistencies between Steele and his Primary Sub-source.  The explanations that Case Agent 1 provided for these errors and omissions are summarized in Chapter Five and Chapter Eight of this report.  While we found no documentary or testimonial evidence that this pattern of errors by Case Agent 1 was intentional, we also did not find his explanations for so many significant and repeated failures to be satisfactory.  We therefore concluded that these explanations did not excuse his failure to meet his responsibility to ensure that the initial FISA application, the first renewal application, and the third renewal application were "scrupulously accurate."

We similarly found errors by supervisory FBI employees with responsibility for the accuracy of the FBI applications.  For example, SSA 1 performed the supervisory accuracy review for the first application required under the Woods Procedures and did not correct the errors we identified before the application was filed.  We found that the team "speculated" that Steele's prior reporting had been

corroborated and used in criminal proceedings, but did not take reasonable steps to
ensure the accuracy of this statement and did not confirm that Handling Agent 1
had reviewed and approved its content, as required by the Woods Procedures.
Separately, SSA 3 and SSA 5 failed to correct all of the errors we identified in the
renewal applications, as did Case Agent 1 and Case Agent 7, when they performed
the accuracy review under the Woods Procedures for one or more of the
renewals.[498]

These failures by supervisory and non-supervisory agents represent serious
performance failures.[499]  However, as we next discuss, the breadth and significance
of these and other errors raised broader concerns as well.

### 2.    Failure of Managers and Supervisors, including Senior Officials, in the Chain of Command

As this chapter summarizes, we identified at least 17 significant errors and
omissions in the Carter Page FISA applications, and many additional Woods related
errors.  These errors and omissions resulted from case agents providing wrong or
incomplete information to OI and failing to flag important issues for discussion,
without any satisfactory explanations.  Moreover, case agents and SSAs did not
give equal attention or treatment to the relevant facts that did not support probable
cause, or reassess the evidence supporting probable cause as the investigation
progressed and the information gathered undercut the assertions in the FISA
applications.  Further, the agents and SSAs did not follow, or appear to even know,
the requirements in the Woods Procedures to re-verify the factual assertions from
previous applications that are repeated in renewal applications and verify source
characterization statements with the CHS handling agent and document the
verification in the Woods File.  That so many basic and fundamental errors were
made on four FISA applications by three separate, hand-picked teams, on one of
the most sensitive FBI investigations that was briefed to the highest levels within
the FBI and that FBI officials expected would eventually be subjected to close
scrutiny, raised significant questions regarding the FBI chain of command's
management and supervision of the FISA process.

As described in prior chapters, FBI Headquarters established a chain of
command for Crossfire Hurricane that included close supervision by senior CD
managers, who then briefed FBI leadership throughout the investigation.  Although
we do not expect managers and supervisors to know every fact about an

---

[498]  Case Agent 7 was a relatively new FBI special agent who was recently assigned to assist
Case Agent 6 with the Carter Page investigation when he conducted the Woods Procedures on
Renewal Application No. 3.  During the Woods process, Case Agent 7 and Case Agent 6 identified and
added some documents missing from the Woods File to provide support for the factual assertions in
Renewal Application No. 3.  In addition, SSA 5 said that on numerous occasions, Case Agent 1 and
Case Agent 6 told him that the OI Attorney preparing the Carter Page FISA applications had "already
seen all of the supporting documentation."

[499]  After reading a draft of our report, SSA 1 and other members of the Crossfire Hurricane
team told us that their performance should be assessed in light of the full scope of responsibilities they
had in 2016, in connection with the FBI's Russian counterintelligence investigation, and that the Carter
Page FISA was a narrow aspect of their overall responsibilities.

investigation, or senior leaders to know all the details of cases they are briefed on, in a sensitive, high-priority matter like this one, it is reasonable to expect that they will take the necessary steps to ensure that they are sufficiently familiar with the facts and circumstances supporting and potentially undermining a FISA application in order to provide effective oversight consistent with their level of supervisory responsibility.  We did not find that this was the case with the Carter Page FISA applications.  Time and again, when we questioned managers, supervisors, and senior officials during their OIG interviews about the breadth of issues we identified during the review, the answers we received reflected a lack of understanding or awareness of important information that related to many of the problems we identified.

Nevertheless, we found that managers, supervisors, and senior officials in the chain of command were aware of sufficient information that should have resulted in questions being raised regarding the reliability of the Steele reporting and the probable cause supporting the FISA applications.  For example, after months of effort, the Crossfire Hurricane team had not corroborated any of the specific substantive allegations against Carter Page contained in the election reporting and relied on in the FISA applications (confirming only limited factual details such as Page's dates of travel), or any other evidence implicating Page.  In fact, as discussed in Chapter Seven, before Renewal Application No. 2 was submitted to the court in April 2017, the Deputy Assistant Director and SSAs at FBI Headquarters supervising the Carter Page case had actually discussed, based upon the information gathered by that time, whether Page was a significant subject in the FBI's investigation by that time, let alone be the target of a FISA order.[500]  In addition, senior FBI officials were aware of Steele's political ties, and his disclosures of information to *Mother Jones* and other third parties.  The Crossfire Hurricane team had also received information directly from persons with direct knowledge of Steele's work-related performance in a prior position that he had a history of demonstrating poor judgment, and they were aware of the information from Ohr concerning Steele's motivations and potential bias.  Additionally, before the final FISA renewal application, the team had received the results of the FBI's source validation review of Steele, including the finding that Steele's past assistance to the FBI's criminal program had been "minimally corroborated," and Strzok and other supervisors had received information that Steele had been a source for the *Yahoo News* article.  We recognize that FBI managers, supervisors, and senior officials in the chain of command were not made aware of all of the significant information undermining the Steele reporting, such as the inconsistencies between the reporting relied upon in the FISA applications and the Primary Sub-source's accounts of this information.  Nevertheless, we concluded that the information that was known to them should have resulted in greater vigilance in overseeing the use of a highly intrusive technique in such a sensitive case, but did not.  In our view,

---

[500] Under existing FBI policy the CD Assistant Director has no role in the review or approval of FISA applications.  Priestap told us that, in comparison to the FBI Director, Deputy Director, and their staffs, the Assistant Director is in a better position to understand the facts supporting FISA applications, though he cautioned that review and approval of FISA applications by an Assistant Director should be limited to the only the most significant cases, if FBI policy is changed in this way.

this was a failure of not only the operational team, but also the managers and supervisors, including senior officials, in the chain of command.

For these reasons, we recommend that the FBI review the performance of the employees who had responsibility for the preparation, Woods review, or approval of the FISA applications, as well as the managers, supervisors, and senior officials in the chain of command of the Carter Page investigation, and take any action deemed appropriate. In addition, given the extensive compliance failures we identified in this review, we believe that additional OIG oversight work is required to assess the FBI's compliance with Department and FBI FISA-related policies that seek to protect the civil liberties of U.S. persons. Accordingly, we have initiated an OIG audit that will further examine the FBI's compliance with the Woods Procedures in FISA applications that target U.S. persons in both counterintelligence and counterterrorism investigations. This audit will be informed by the findings in this review, as well as by our prior work over the past 15 years on the Department's and FBI's use of national security and surveillance authorities, including authorities under FISA, as detailed in Chapter One.

### 3. Clarification Regarding OGC Legal Review During the Woods Process

As described in Chapter Two, the Woods Procedures do not currently explain the steps that should be taken during OGC's final legal review of a FISA application or require that documentation of the final legal review be maintained in an appropriate FBI file. And, as described in Chapter Seven, the FBI was unable to provide the OIG with documentation of the OGC legal review of Renewal Application Nos. 1 and 2. We therefore recommend that the FBI revise the Woods Procedures to specify what steps must be taken and documented during the legal review performed by an OGC line attorney and SES-level supervisor before submitting the FISA application package to the FBI Director for certification. Because we were advised that the SES-level review is sometimes delegated to a non-SES-level supervisor, we also recommend that the FBI revise the Woods Procedures to clarify which positions may serve as the supervisory reviewer for OGC.

## III. The FBI's Relationship with Christopher Steele and Its Receipt and Use of His Election Reporting

In this section, we analyze the FBI's handling of Christopher Steele and its use of his election reporting in Crossfire Hurricane, and whether the FBI's receipt and use of his reporting during that investigation complied with FBI CHS policies and procedures. As described in Chapter Four, Steele is a former intelligence officer ███████████████████████████████████ who in 2009 formed a consulting firm specializing in corporate intelligence and investigative services. In 2010, Steele was introduced by Department attorney Bruce Ohr to an FBI agent, and for several years provided information to the FBI about various matters, such as corruption in the International Federation of Association Football (FIFA). In October 2013, the FBI agent, referred to in our report as Handling Agent 1, completed the paperwork to make Steele an FBI CHS. Handling Agent 1 took

this step because the volume of Steele's reporting had increased and involved persons of interest to the FBI, and he wanted to task Steele to collect additional information and compensate him for this work.  Over the next 3 years, Steele provided the FBI with reporting primarily about Russian oligarchs.

In June 2016, Steele and his consulting firm were hired by Fusion GPS, a Washington, D.C. investigative firm, to obtain information about whether Russia was trying to achieve a particular outcome in the 2016 U.S. elections, what personal and business ties then candidate Trump had in Russia, and whether there were any ties between the Russian government and Trump or his campaign. Steele's work for Fusion GPS resulted in at least ▮ reports related to the election and, with Fusion GPS's authorization, Steele provided ▮ of the reports to the FBI between July and October 2016, and ▮ others to the FBI through Ohr and other third parties (as we described in Chapters Six and Nine).[501]  As noted earlier, we determined that Steele's election reporting played a central and essential role in the Department's decision in connection with the Crossfire Hurricane investigation to seek a FISA order in October 2016 authorizing electronic surveillance ▮▮▮▮ ▮▮▮▮ targeting Carter Page.

We found that FBI policy permitted the receipt and use of Steele's election reporting in the Crossfire Hurricane investigation, and we did not find documentary or testimonial evidence that this decision was the result of political bias or other improper considerations.  We further found that the FBI was aware of the potential for political influences on Steele's reporting from the outset of receiving it in July 2016 and, in part to account for those potential influences, the Crossfire Hurricane team undertook substantial efforts to evaluate the accuracy of the reporting and the reliability of the sources of Steele's information.  We determined that these investigative efforts raised significant questions about the accuracy and reliability of Steele's election reporting.  However, as described in Chapters Seven and Eight and earlier in this chapter, we concluded that the FBI did not share these questions about the reporting with Department attorneys working on the Carter Page FISA applications and failed to reassess its reliance on Steele's reporting in the Crossfire Hurricane investigation.

We also found the FBI and Steele held differing views about the nature of their relationship during this time period.  Steele had signed CHS paperwork with the FBI following his opening as a CHS in 2013.  Accordingly, the FBI considered

---

[501] Following his attorney's review of a draft of this report, Steele advised us through his attorney that it was important to note that his election reporting consisted of information transmitted by word of mouth by a number of individual sources. According to Steele, this is a necessary practice to obtain information in a closed society like Russia and the election reports are descriptions of what certain individual sources, deemed to be reliable by Steele's consulting firm (Orbis), stated.  Further, in Steele's view, his election reports should not have been treated as facts or allegations but as the starting point for further investigation, which he said was the intended use of the reports furnished to Fusion GPS.  Steele advised us through his attorney that "it is with that lens that the accuracy and value of Steele's reporting should be assessed."  Steele told us that it was his hope and expectation that the FBI would have used its resources to investigate the report information.  We found no evidence that Steele communicated this view of his reporting to Handling Agent 1 or members of the Crossfire Hurricane team.

Steele a CHS bound by certain obligations. Steele, however, considered himself a businessperson whose firm (not Steele) had a contractual CHS agreement with the FBI and whose election related work was not undertaken pursuant to that agreement, but instead was conducted solely on behalf of his firm's client (Fusion GPS), not the FBI. This disagreement led to divergent expectations about Steele's conduct, affected the FBI's control over Steele during the Crossfire Hurricane investigation, and ultimately resulted in the FBI formally closing Steele as a CHS (although, as we discuss later in this chapter, we found the FBI continued its relationship with Steele through Ohr).

### A. The FBI's Receipt, Use, and Assessment of Steele's Reporting

As described in Chapter Four, the Crossfire Hurricane team first learned of Steele's reports when they received six of them from Handling Agent 1 in September 2016.[502] The reporting was not the result of any proactive FBI investigative action, or any FBI tasking or direction to Steele. Rather, Steele's election reporting was developed at the request of his consulting firm's client, Fusion GPS, and was provided to the FBI with his client's consent. We found that the FBI was aware of the potential for political bias in the Steele election reporting from the outset of obtaining it. Handling Agent 1 told us that when Steele provided him with Report 80 in July 2016 and described his engagement with Fusion GPS, it was obvious to Handling Agent 1 that the request for the research was politically motivated.[503] The Supervisory Intel Analyst explained that he also was aware of the potential for political influence on the Steele election reporting when it became available to the Crossfire Hurricane team in September 2016.

We determined that the FBI's decisions to use Steele's information in Crossfire Hurricane and to task him in October 2016 were based on multiple factors unrelated to political considerations, including: (1) Steele's prior work as an intelligence professional for a █████████████████████ █████; (2) his expertise on Russia; (3) his past record as an FBI CHS, which included furnishing information concerning the activities of Russian oligarchs and investigative leads involving corruption in FIFA; (4) the assessment of Handling Agent 1 that Steele was reliable and had provided information to the FBI in the past

---

[502] Steele first gave Handling Agent 1 two of these six reports in July 2016, approximately 2 months before the Crossfire Hurricane team received them on September 19. We describe in Chapter Four the various explanations we received for this delay in transmitting the reports to the team, none of which we found to be satisfactory.

[503] As described in Chapter Four, Handling Agent 1 told us that Steele informed him at their July 2016 meeting that Fusion GPS had been hired by a law firm to conduct research, though, according to Handling Agent 1, Steele stated that he did not know the law firm's name or its political affiliation. Notes that Steele allowed us to review and that he represented were written contemporaneously with the meeting state that Steele told Handling Agent 1 that "Democratic Party associates" were paying for Fusion GPS's research, the "ultimate client" was the leadership of the Clinton presidential campaign, and "the candidate" was aware of Steele's reporting. We also reviewed notes made by an Assistant Special Agent in Charge (ASAC) in the FBI's New York Field Office (NYFO) of a July 13 call the ASAC had with Handling Agent 1 about Report 80. Among other things, the notes identify Simpson as a client of a law firm and that the "law firm works for the Republican party or Hillary and will use [the information described in Report 80] at some point."

that had been corroborated; and (5) that Steele's reporting was consistent with the FBI's knowledge at the time of alleged Russian efforts to interfere in the 2016 U.S. elections.

The fact that Steele had been retained to conduct political opposition research did not require the FBI, under either Department or FBI policies, to ignore the information.  The FBI and federal law enforcement regularly receive information from individuals with potentially significant biases and motivations, including drug traffickers, convicted felons, and even terrorists.  The FBI is not required to set aside such information; rather, under CHS policy, the FBI is required to critically assess the information in light of any potentially significant biases and motivations.  The "FBI must, to the extent practicable, ensure that the information collected from every CHS is accurate and current, and not given to the FBI in an effort to distract, mislead, or misdirect FBI organizational or governmental efforts."[504]  Past OIG reviews of the Department's law enforcement components have found that the use of information from such individuals presents significant risks.[505]

In the Crossfire Hurricane investigation, as described in detail in Chapters Four and Six of this report, the team undertook substantial efforts to verify Steele's election reporting, including interviewing Steele; identifying and interviewing certain of Steele's sub-sources; undertaking CHS and Under Cover Employee (UCE) meetings with Papadopoulos, Page, and a high-level Trump campaign official; conducting database inquiries; open source research; and seeking information from other U.S. government intelligence agencies.[506]  However, we found that corroboration for the election reporting proved to be elusive for the FBI to identify.  FBI officials told us that the singular nature of the reporting (*e.g.*, its recounting of conversations between a small number of persons) made it extremely difficult to verify.  We determined that prior to and during the pendency of the FISAs the FBI was unable to corroborate any of the specific substantive allegations against Carter Page contained in the election reporting and relied on in the FISA applications, and was only able to confirm the accuracy of a limited number of circumstantial facts, most of which were in the public domain, such as the dates that Page traveled to Russia, the timing of events, and the occupational positions of individuals referenced in the reports.

---

[504] *Confidential Human Source Validation Standards Manual* ("VSM"), 0258PG (March 26, 2010), § 1.0.

[505] U.S. Department of Justice (DOJ) Office of the Inspector General (OIG), *Audit of the Bureau of Alcohol, Tobacco, Firearms, and Explosives' Management and Oversight of Confidential Informants*, Audit Report 17-17 (March 2017); DOJ OIG, *Audit of the Drug Enforcement Administration's Confidential Source Policies and Oversight of Higher-Risk Confidential Sources*, Audit Report 15-28 (July 2015); DOJ OIG, *A Review of ATF's Operation Fast and Furious and Related Matters* (September 2012); and DOJ OIG, *The FBI's Compliance with the Attorney General's Investigative Guidelines* (September 2005).

[506] FBI staff told us that because they knew of the potential for political influences on the election reporting, they did not devote resources to determine precisely which organization or persons were sponsoring Steele's reporting.  Consistent with what we were told, we found that the FBI did not focus much attention on seeking to identify the client of Fusion GPS that was funding Steele's research.

In addition to the lack of corroboration, we found that the FBI's interviews of Steele, the Primary Sub-source, and a second sub-source, and other investigative activity, revealed potentially serious problems with Steele's description of information in his election reports.  For example, as noted above, the Primary Sub-source's accounting of events during his/her January 2017 interview with the FBI (after the filing of the first FISA application and Renewal Application No. 1, but before the filing of Renewal Application No. 2) was not consistent with and, in fact, contradicted the allegations in Reports 95 and 102 attributed to Person 1, as well as those in Report 94 concerning the meeting between Page and Sechin.  In addition, another sub-source told the FBI in August 2017 (after the filing of Renewal Application No. 3) that information in Steele's election reporting attributable to him/her had been "exaggerated."  Because the sub-sources themselves could have furnished exaggerated or false information to Steele, as well as to the FBI during their interviews, the cause of these inconsistencies remains unknown.  According to the Supervisory Intel Analyst, the FBI ultimately determined that some of the allegations contained in Steele's election reporting were inaccurate, such as the allegation that Manafort used Page as an intermediary (Report 95) and that Michael Cohen had travelled to Prague for meetings with representatives of the Kremlin (Reports 134, 135, 136, and 166).  Although the Supervisory Intel Analyst also stated that some of the broader themes in Steele's election reporting were consistent with USIC assessments, such as Russia's desire to sow discord in the Western Alliance, he further told us that, as of September 2017, the FBI had corroborated limited information in the Steele election reporting, and much of that information was publicly available.[507]

As we described earlier in our analysis, the FBI failed to notify OI, which was working on the Carter Page FISA applications, of the potentially serious problems identified with Steele's election reporting that arose as early as January 2017 through the efforts described above.  As previously stated, we believe it was the obligation of the agents who were aware of this information to ensure that OI and the decision makers had the opportunity to consider it, both for their own assessment of probable cause and for consideration of whether to include the information in the applications so that the FISC received a complete and accurate recitation of the relevant facts.  Moreover, even as the FBI developed this

---

[507] As discussed in detail in Chapter Six, FBI leadership, including Comey and McCabe, advocated for the Steele election reporting to be included in the Intelligence Community Assessment (ICA) on Russian election interference that was being prepared in December 2016.  For example, in a December 17 telephone call with the Director of National Intelligence (DNI), Comey stated that the FBI was "proceeding cautiously to understand and attempt to verify the reporting as best we can, but we thought it important to bring it forward to the IC effort."  However, according to the Intel Section Chief and Supervisory Intel Analyst, as the interagency editing process for the ICA progressed, the CIA expressed concern about using the Steele election reporting in the body of the ICA, and recommended that it be moved to an appendix.  In a December 28, 2016 email to the Office of the Director of National Intelligence (ODNI) Principal Deputy Director, McCabe objected to this recommendation, stating, "We oppose CIA's current plan to include [the election reporting] as an appendix."  However, the FBI Intel Section Chief told us that the CIA viewed the Steele reporting as "internet rumor."  The FBI's view did not prevail, and the final ICA report included a short summary of the Steele election reporting in an appendix.

information, we found no evidence that the Crossfire Hurricane team reconsidered its reliance on the Steele reporting in the FISA renewal applications.

In addition to these investigative efforts by the Crossfire Hurricane team to evaluate Steele as a source, the FBI's Validation Management Unit (VMU) completed a human source validation review of Steele in March 2017. We examined VMU's assessment, and in doing so, identified two procedural problems that affected the usefulness of its work product that, if not addressed by the FBI, could negatively affect VMU's future CHS assessments.[508] First, we found instances where information we deemed significant about Steele was not included in his Delta file, and therefore was not available to VMU so that it could be taken into account during VMU's validation review. The information omitted from Steele's Delta file included facts that the Crossfire Hurricane team learned in December 2016 about Steele relating to his work-related performance in a prior position, and the FBI Transnational Organized Crime Intelligence Unit's concerns about the number of contacts that Steele purportedly had with Russian oligarchs. We have raised issues in prior OIG reviews about the FBI's handling of derogatory CHS information.[509] We believe the FBI needs to assess how to better ensure that derogatory information about its CHSs is included in Delta and is readily identifiable once added. The FBI should establish enhanced procedures to ensure the completeness of its Delta files, including for investigations that are operated from FBI Headquarters.

Second, we determined that it was an error for VMU to omit from the Steele validation report its finding that its assessment of Steele's work for the FBI failed to reveal corroboration for the election reporting from the FBI and other U.S. government holdings that VMU examined. The supervising Unit Chief told us that the reason for the omission was VMU's practice of reporting on "what we positively find" and not on what is lacking. As a result, the VMU report acknowledged Steele's contribution to the FBI criminal program but did not elaborate on his contributions, or lack thereof, to the counterintelligence program. In Steele's case, VMU's approach misapprehended the reason for CD's request for the validation review. CD's interest in Steele resulted from his election reporting so any conclusions that VMU reached about it would be of intense interest to CD. According to Priestap, who had previously overseen the work of VMU in his capacity as Deputy Assistant Director in the Directorate of Intelligence, VMU's decision to omit its conclusion that Steele's election reporting was uncorroborated "defeats the whole purpose of us asking [VMU] to do the validation reporting." We believe the FBI should evaluate the reporting practices of VMU.

Finally, we found that the FBI was aware of the potential for disinformation in the Steele election reporting and, in part to address that issue, made some effort to

---

[508] We note that, by the date of the VMU human source validation review in March 2017, the Crossfire Hurricane team had identified potentially significant issues with Steele's reporting and the VMU validation review did not make any findings that would have altered that judgment.

[509] U.S. Department of Justice (DOJ) Office of the Inspector General (OIG), *Audit of the Federal Bureau of Investigation's Management of its Confidential Human Source Validation Process*, Audit Report 20-009 (November 2019); DOJ OIG, *A Review of the FBI's Handling and Oversight of FBI Asset Katrina Leung* (May 2006).

assess that possibility.  However, in view of information we found in FBI files we reviewed, and that was available to the Crossfire Hurricane team during the relevant time period, we believe that more should have been done to examine Steele's contacts with intermediaries of Russian oligarchs in order to assess those contacts as potential sources of disinformation that could have influenced Steele's reporting or, at a minimum, influenced Steele's understanding of events in Russia that furnished context for the analytical judgments he used to evaluate the reporting.  We agree with the assessment of Priestap and Evans that this issue warranted more scrutiny than it was afforded.

> ### B. The Lack of Agreement on Steele's Status as an FBI CHS and its Effect on the Crossfire Hurricane Team's Relationship with Steele

We determined that, from the outset of the FBI's formal relationship with Steele in 2013 (when Steele first received FBI CHS admonishments), the FBI and Steele had differing views on the nature of Steele's relationship with the FBI.  The FBI considered Steele to be an FBI CHS following his enrollment as a CHS, which was reinforced by Steele's later signing of CHS payment and admonishment paperwork, while Steele considered the CHS documentation to be a business arrangement between him, on behalf of his consulting firm, and the FBI.  As detailed in Chapter Four, we found evidence during our review that supported both the FBI's view and Steele's position.

The paperwork enrolling Steele as a CHS in 2013 was the FBI's standard CHS opening documentation; the FBI documented Steele's receipt of CHS admonishments; and the documentation did not reference in any way a relationship between the FBI and Steele's consulting firm.  Similarly, on multiple occasions thereafter, Steele signed, using his FBI assigned code name, FBI payment forms that were plainly denominated as CHS documentation and that did not reference his consulting firm.  However, we also identified material indicating that Steele made known to Handling Agent 1 from the outset of their discussions in 2010 that he could not be a CHS for the FBI due to his prior work as a foreign intelligence professional.  We also identified a memorandum that the FBI sent to Steele's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, prior to opening Steele as a CHS in 2013, explaining that "Mr. Steele is providing the FBI with information," while also stating that the information that the FBI was to obtain would be furnished "primarily through Mr. Steele's privately owned company" and that the FBI would "treat any material provided as information obtained through a Confidential Human Source."  Similarly, Steele's letter to his ▮▮▮▮▮▮▮▮, dated at around the same time as the FBI memorandum, informed the ▮▮▮▮▮▮▮▮▮ that Steele's consulting firm (rather than Steele) was planning to enter into a commercial relationship with the FBI.  Given the similarities between the FBI and Steele memoranda to Steele's ▮▮▮▮▮▮▮▮, the FBI's description of Steele appears crafted to satisfy Steele's concerns and, in our view, is indicative of the understanding reached between Steele and the FBI concerning his status—that both sides would leave unresolved their differing perspectives on the nature of their relationship in order to keep information flowing to the FBI and to ensure that Steele could be paid for any work he performed on behalf of the FBI.

This uncertainty about the nature of the relationship had an impact on each side's understanding of Steele's obligations to the FBI in the Crossfire Hurricane investigation, particularly after the meeting between the FBI and Steele in early October 2016 about Steele's election reporting. Steele told us that he never viewed himself or his firm as performing election-related work on behalf of the FBI; rather, Steele considered himself to be functioning as a consultant to a paying client of his firm, which was seeking information about Russian interference in the 2016 U.S. elections from Steele's source network. Steele reported the information to his client, Fusion GPS, as he acquired it and followed his client's instructions. In contrast, we found that the FBI agents viewed Steele as a former intelligence officer colleague who was an FBI CHS with obligations to the FBI, and that the agents displayed insufficient awareness of the priority Steele placed on his business commitments.[510]

We concluded that, at the outset of Steele's interactions with the FBI in July 2016 regarding his election reporting work, it was clear that Steele was operating as a businessperson working on behalf of a client of his firm, rather than as a CHS for the FBI. Indeed, as detailed in Chapter Four, when Steele met Handling Agent 1 on July 5, 2016, Steele told him about his consulting firm having been retained by Fusion GPS, and provided Handling Agent 1 with Report 80. Handling Agent 1 made clear to Steele that he was not working for the FBI on his election assignment and was not being tasked to collect election related information. We found that Handling Agent 1's caution to Steele was unnecessary from Steele's perspective, as he did not view himself as working on behalf of the FBI to gather election related information, and he and his client were taking steps to disseminate the election reporting to other parties. Handling Agent 1 told us, however, that from his perspective he believed his caution to Steele was necessary because he believed Steele was a CHS and his election related activity would be harmful to Steele's relationship with the FBI.

As detailed in Chapter Nine and discussed later in this chapter, beginning in July 2016, Steele had multiple contacts with Department attorney Bruce Ohr about his reports. That same month, Steele first provided his election reporting to the State Department. In August 2016, the FBI received correspondence from Members of Congress that described information included in the Steele reports, and in September 2016, Steele met with journalists from The *New York Times, The Washington Post, Yahoo News, The New Yorker*, and CNN about his work. Steele in fact was the "Western intelligence source" referenced in the September 23, *Yahoo News* article entitled, "*U.S. Intel Officials Probe Ties Between Trump Advisor and Kremlin*," that described efforts by U.S. intelligence to determine whether Carter Page had opened communication channels with Kremlin officials. The FBI did not ask Steele whether he was a source for the article, nor did it question Steele about the apparent dissemination of his election reporting to other parties.

---

[510] In comments on this report, Handling Agent 1 told us that he was well aware of Steele's business priorities, but that he was not aware that Steele would be a "front man" in dealings with the press and that Steele would fail to inform him of these and other contacts that violated the FBI's instructions at the early October meeting.

However, the caution provided by Handling Agent 1 to Steele at their July 2016 meeting—that Steele was not being tasked to collect election related information—changed in early October 2016 when Crossfire Hurricane investigators met with Steele and attempted to task him as a CHS.  During that meeting, the FBI requested that Steele collect "3 buckets" of information, which was a small subset of information related to the FBI's investigation into Russian interference in the 2016 U.S. elections.[511]  The FBI told Steele that the FBI was willing to compensate him "significantly" for this information, and that he would be paid $15,000 just for attending the October meeting.[512]  Additionally, investigators told us that they orally instructed Steele to report information he gathered in response to these taskings exclusively to the FBI.  These taskings and instructions were consistent with the FBI considering Steele to be a CHS going forward.[513]

Based on the testimony we obtained from participants in the early October meeting and the documents we reviewed that memorialized it, Steele appears to have made no commitments in response to this FBI request for exclusivity, though we found that he did not expressly reject it either.  From the surrounding circumstances, we concluded it was unlikely that Steele agreed to the FBI's request.  Steele was a businessperson with a paying client for whom he had worked on other projects and had committed to assist the client on the election project.  Steele told us that any attempt by the FBI to interfere in his assignment from Fusion GPS would have been a "showstopper."  Case Agent 2 could not recall Steele agreeing to anything during the meeting in early October, and acknowledged to OI following the meeting that they needed to be "realistic" about the prospects of Steele limiting the dissemination of his reporting to the FBI.[514]

---

[511]  The 3 buckets concerned (1) information on the Crossfire Hurricane subjects; (2) physical evidence; and (3) leads for sources.

[512]  Although the FBI did not condition this payment on Steele's future performance, the FBI cancelled the payment after it decided to close Steele as a CHS in November 2016.

[513]  We also examined whether the FBI disclosed classified information to Steele during the early October meeting.  We determined that Case Agent 2 did when he discussed information with Steele that the FBI received from the FFG, and that he did not have prior authorization to make the disclosure.  However, we found that:  (1) Case Agent 2 was given significant latitude from his supervisors to frame his discussions with Steele; (2) Case Agent 2 believed he had authorization to discuss classified information with Steele based on prior discussions with his supervisors; (3) a CD Section Chief was present when Case Agent 2 made the disclosure, and the CD Section Chief did not voice objection to it at the time or afterward; and (4) Case Agent 2 included the disclosure in a written summary he prepared of the early October meeting that was uploaded to the Crossfire Hurricane case file.  We also found that the CHS Policy Guide (CHSPG) does not address the disclosure of sensitive or classified information to CHSs and that the FBI has not otherwise developed guidance on the issue.  We found no evidence that Case Agent 2 attempted to conceal his disclosure or that it was for any purpose other than advancing the objectives of the Crossfire Hurricane investigation.  Case Agent 2 is retired from the FBI.  We make a recommendation in this report that the FBI establish guidance for sharing sensitive information with CHSs.

[514]  As we described in Chapter Four, Handling Agent 1 believed that Steele failed to abide by FBI instructions when he continued to meet with the media and the State Department about issues over which the FBI had sought to establish an exclusive reporting relationship at the early October meeting.  Case Agent 2 told the OIG that he thought it was "terrible" for Steele to complain to the FBI about leaks during the meeting given that he had been meeting with media outlets in September and

Nevertheless, we found that, following this October meeting, the FBI viewed Steele as a CHS with respect to these taskings and considered him bound by the standard "CHS admonishments" that he had received initially in 2013 and renewed most recently in January 2016, which committed him to "abide by the instructions of the FBI" and to "provide truthful information to the FBI."[515]  Handling Agent 1 told us that he previously had provided oral instructions to Steele that included not divulging the existence of his relationship with the FBI to others, and not sharing with third parties the information he was providing to the FBI aside from his client paying for the research.  However, these oral instructions were not documented in Steele's Delta file, and Steele told us that he did not recall receiving them, but understood that the FBI did not want him to reveal their relationship to others.  We also found that the FBI's standard admonishment form does not include an instruction to the CHS not to disclose the existence of the CHS's relationship with the FBI to others absent the FBI's permission.[516]

In contrast, Steele told us that, from the outset of his relationship with the FBI, the FBI acquiesced in practice to an arrangement that recognized the existence of the "two pipelines" of information that Steele described to us and which we discussed more fully in Chapter Four.  In Steele's view, any FBI admonishments and instructions were relevant only to his FBI assignments (i.e. Pipeline 2 work), but not to his work for his firm's clients that Steele chose to share with the FBI (i.e. Pipeline 1 work).  Steele stated that he was free to discuss Pipeline 1 work with his clients and with third parties, as necessary, without gaining permission from the FBI.  Steele told us that the FBI indicated at the meeting in early October that it sought to convert his Pipeline 1 election project for Fusion GPS into a Pipeline 2 project for the FBI, and take control of it.  Steele also told us that he made it clear during the meeting that was not going to happen because he was obligated to his client and was "not dumping the client" in favor of the FBI, but that he also wanted to be as helpful to the FBI as he could.  According to Steele, the FBI accepted his position, though they requested that he not share his election reporting with other U.S. government entities or with third-party clients other than Fusion GPS.  Steele said he could not recall if he agreed to this FBI request but believed that the request was not resolved at the meeting.  FBI attendees at the early October meeting told us they had no recollection of Steele rejecting their request that he provide information on the "3 buckets" exclusively to the FBI, and if he had rejected their request it would have been documented.

Consistent with their inability in 2013 to reach a shared understanding on Steele's status with the FBI, we concluded that the FBI and Steele in October 2016

---

had provided information that was used in the *Yahoo News* article.  According to Case Agent 2, in hindsight "[c]learly [Steele] wasn't truthful with us.  Clearly."  Steele denied to us that he ever lied or purposely misled the FBI.

[515]  The FBI form memorializing Steele's receipt of admonishments in 2016 states that Handling Agent 1 "verbally admonished the CHS with CHS admonishments, which the CHS fully acknowledged, signed and dated."  The FBI could not locate the signed admonishment form, however.

[516]  For safety and security reasons, among others, we believe such an instruction should be a part of the standard admonishments provided by the Department's law enforcement components to its CHSs, and we therefore include a recommendation to that effect in this report.

appeared to reach a similarly imperfect arrangement that reflected the competing needs and interests of each party.  The FBI provided instructions to Steele, but Steele did not make any express commitment to abide by specific terms.  The FBI also sought exclusivity for information Steele developed in response to the tasking, but we found that Steele did not make an express commitment to the FBI to honor this request.

As described in Chapter Six, the FBI closed Steele as a CHS for cause in November 2016, after determining that Steele breached an obligation when he divulged his FBI relationship to a journalist for *Mother Jones* the month before.  This obligation was based upon the oral admonishment the FBI said it previously provided to Steele, an admonishment Steele said he did not recall receiving or agreeing to, but one that he said reflected an expectation he understood.  Steele also told us, in explaining his disclosure to *Mother Jones*, that he believed the FBI had misled him when Comey notified Congress in late October 2016 that the FBI was reopening the Clinton email investigation while at the same time an FBI official was quoted in *The New York Times* as saying that there was no investigation of Trump or the Trump campaign.

We believe that the FBI's decision to close Steele, as well as its failure to press him about his role in the September 2016 *Yahoo News* story and his October 2016 visit to the State Department, were consequences of the FBI's and Steele's inability to come to a shared understanding on the terms of their relationship.  We also believe that the FBI allowed the arrangement with Steele to exist because its expectations about Steele's behavior were heavily influenced by his background as a former intelligence officer and his past assistance to the FBI in that capacity, with insufficient focus on Steele's current business interests and obligations, even though Steele disclosed them to the FBI.  Indeed, as we describe in the next section, we found that even after the FBI closed Steele as a CHS in November 2016 for cause, and as a result, under FBI policy should have ceased its contact with Steele absent exceptional circumstances or reopening him as a CHS, the FBI continued its relationship with Steele by allowing Steele to regularly provide information to the FBI through a senior Department attorney, Bruce Ohr, with whom Steele was friendly.

## IV.    Issues Relating to Department Attorney Bruce Ohr

In this section, we analyze the interactions Department attorney Bruce Ohr had with Christopher Steele, Simpson, the FBI, and the State Department during the Crossfire Hurricane investigation.  We also analyze Ohr's interactions with Department attorneys and FBI officials concerning the Department's criminal investigation of Paul Manafort.  At the time of these activities, Ohr was an Associate Deputy Attorney General in ODAG and the Director of the Organized Crime and Drug Enforcement Task Force (OCDETF).

As described more fully in Chapter Nine, at about the same time that Steele was engaging with the FBI on his election reporting, Steele was also sharing his reporting with Ohr, with whom he had a pre-existing professional and "friendly"

relationship since at least 2007.  Beginning in July 2016, Steele had contacted Ohr on multiple occasions to discuss information from Steele's election reports.  At Steele's suggestion, Ohr also met in August 2016 with Simpson, the owner of Fusion GPS, to discuss Steele's reports.  At the time, Ohr's wife, Nellie Ohr, worked at Fusion GPS as an independent contractor.  Ohr had a second meeting with Simpson in December 2016, at which time Simpson gave Ohr a thumb drive containing numerous Steele election reports.

On October 18, 2016, three days before the first FISA application was submitted to the FISC, and after speaking with Steele that morning, Ohr requested a meeting with, and that same day met with McCabe to share Steele's and Simpson's information with him.  Thereafter, Ohr met with members of the Crossfire Hurricane team 13 times between November 21, 2016, and May 15, 2017, concerning his contacts with Steele and Simpson.  All 13 meetings occurred after the FBI had closed Steele as a CHS for disclosing information to *Mother Jones* and, except for the November 21 meeting, each meeting was initiated at Ohr's request.  Ohr told us he did not recall the FBI asking him to take any action regarding Steele or Simpson, but Ohr also stated that "the general instruction was to let [the FBI] know…when I got information from Steele."  At two of these meetings, both in December 2016, after Nellie Ohr had left Fusion GPS, Ohr provided the FBI with open source research Nellie Ohr conducted on Manafort while working at Fusion GPS.  The Crossfire Hurricane team memorialized each meeting with Ohr as an "interview" using an FBI FD-302 form.

In addition to the FBI, Ohr met with senior State Department officials in November 2016 to discuss State Department efforts to investigate Russian influence in foreign elections.  On this and several other days Ohr had separate discussions with State Department Deputy Assistant Secretary Kathleen Kavalec about Steele and his election information specifically to obtain relevant information that he could share with the FBI.

Department leadership, including Ohr's supervisors in ODAG and ODAG officials who reviewed and approved the Carter Page FISA applications, were unaware of Ohr's meetings with FBI officials, Steele, Simpson, and the State Department until after Congress requested information from the Department regarding Ohr's activities in late November 2017.

In addition, shortly after the U.S. elections in November 2016, Ohr participated in several meetings with Deputy Assistant Attorney General (Deputy AAG) Bruce Swartz, Chief of the Fraud Section Andrew Weissmann, and Counsel to the Criminal Division Assistant Attorney General Zainab Ahmad regarding the Department's money laundering investigation of Manafort.  Two of these meetings included FBI officials Peter Strzok and Lisa Page.[517]  The FBI opened the Manafort money laundering investigation in January 2016, before the opening of Crossfire Hurricane and before Manafort joined the Trump campaign, and the case was being led in 2016 by prosecutors from the Criminal Division's (CRM) Money Laundering

---

[517] One of the two meetings attended by Strzok and Page was also attended by Acting Section Chief 1 of the FBI.

and Asset Recovery Section (MLARS).  Ohr and the three CRM officials he met with did not have supervisory authority over the MLARS criminal investigation, and they did not advise their supervisors in ODAG and CRM MLARS prosecutors of the meetings.  However, we did not find evidence that these meetings progressed beyond discussion into any specific actions that interfered with the MLARS investigation or Department leadership's oversight of that matter.

In light of these activities, we considered the following issues addressed below:  (1) whether Ohr's interactions with Steele, Simpson, the FBI, and State Department violated Department policy or resulted in any specific performance failures, (2) whether the FBI's interactions with Ohr concerning Steele and Simpson after Steele was closed as an FBI CHS violated Department or FBI policy, (3) whether Nellie Ohr's work for Fusion GPS implicated any ethical rules applicable to Ohr, and (4) whether the meetings between Ohr, CRM officials, and the FBI regarding the MLARS investigation violated Department policy or resulted in any specific performance failures.

### A.    Bruce Ohr's Interactions with Steele, Simpson, the State Department, and the FBI

We did not identify a specific Department policy prohibiting Ohr from meeting with Steele, Simpson, or the State Department and providing the information he learned from those meetings to the FBI.  Further, we found no evidence that the FBI expressly requested that Ohr obtain information from Steele, or anyone else, on the FBI's behalf.  However, as described in Chapter Nine, Ohr told us that "the general instruction [he received from the FBI] was to let them know…when I got information from Steele."  Similarly, SSA 1 told us that Ohr likely left their initial November 21, 2016 meeting with the impression that he should contact the FBI if Steele contacted him, which is what Ohr did.

In this regard, we concluded that Ohr committed consequential errors in judgment by (1) failing to advise his direct supervisors or the DAG that he was communicating with Steele and Simpson and then requesting meetings with the FBI's Deputy Director and Crossfire Hurricane team on matters that were outside his areas of responsibility, and (2) making himself a witness in the investigation by having direct communications with Steele about his reporting and activities and providing Steele's information to the FBI.[518]

We found that Ohr's failure to advise his supervisors resulted in Ohr being aware of relevant information that was not made known to Department officials, thereby interfering with those officials' supervisory responsibility for the Crossfire Hurricane investigation and the Carter Page FISA applications.  As described in Chapter Eight, Yates, Boente, and Rosenstein told us that they had no knowledge at the time they reviewed and approved the Page FISA applications that Ohr had provided the FBI with information related to the Crossfire Hurricane investigation and that was relevant to the FISA applications.  Other ODAG officials who reviewed one or more of the applications told us that they were also unaware of Ohr's

---

[518]  We did not find evidence that Ohr shared non-public information with Steele or Simpson.

activities at the time, including the Associate Deputy Attorney General responsible for ODAG's national security portfolio who interacted with NSD and OI officials on the FISA applications and was aware of their efforts described in Chapter Five to evaluate the Steele information being relied upon to support probable cause. Although we found no information suggesting that Ohr knew about any of the FISA applications before they were filed, by failing to advise his supervisors of his interactions with Steele, Simpson, and the FBI, Ohr deprived those supervisors of the ability to ensure that the ODAG officials working on the applications were made aware of information relevant to evaluating the Steele reporting in the applications. It also deprived ODAG officials of the opportunity to ensure that NSD and OI were made aware of the information that Ohr knew from his Steele interactions so that NSD and OI could consider whether to include the information in the next FISA application, though we believe that the FBI case agent should have been the first to advise NSD and OI of Ohr's activities.  As described in Chapter Eight, the late discovery of Ohr's interviews with the FBI prompted NSD to submit a Rule 13 letter to the court, over a year after the final FISA orders were issued, to inform the court, among other things, of information that Ohr had provided to the FBI but that the FBI had failed to inform NSD and OI about, including that Steele was "desperate that Donald Trump not get elected and was passionate about him not being the U.S. President."

Additionally, as described in earlier chapters, beginning in early 2017, Boente and later Rosenstein requested multiple briefings on the Crossfire Hurricane investigation, which included, among many topics, updates on the FBI's continued efforts to assess Steele and his information.  Because Ohr did not advise anyone in ODAG about his activities, Boente, Rosenstein, and the other ODAG officials briefed into Crossfire Hurricane had no idea that one of the senior attorneys on their staff, with no responsibility over counterintelligence investigations, had made himself a witness in the investigation by having direct communications with Steele about his reporting and activities and initiating contact with the Crossfire Hurricane team to provide the FBI with information he received from Steele, as well as information he received separately from Simpson, Kavalec, and Nellie Ohr.

Further, we found that Ohr's failure to advise his supervisors of his activities deprived the DAG and senior ODAG officials of the ability to decide for themselves the prudential question of whether to have an ODAG attorney act as a conduit between a closed FBI CHS and the FBI on matters relating to an open investigation. The opportunity to consider that question for themselves was particularly important here, given the connections to a high priority, politically sensitive investigation and the involvement of a closed CHS with ties to a political party and candidate for President, and indirect connections to the ODAG attorney's spouse.  Former Principal Associate Deputy Attorney General (PADAG) Matthew Axelrod, Ohr's direct supervisor in 2016, told us that he would have expected to know about Ohr's communications with Steele and the FBI.  Axelrod stated that if ODAG officials had known, they would have questioned Ohr's involvement and determined whether the FBI had the ability to "pull him out" of acting as a conduit between Steele and the FBI.  He said that he thought it "unlikely that we would have been comfortable with [Ohr] continuing to play that role."  Axelrod's immediate successor, former Acting

PADAG James Crowell, who supervised Ohr in 2017, told us that he was "flabbergasted" when he learned of Ohr's interactions with the FBI regarding Steele. According to Crowell, Ohr should have informed ODAG officials of his relationship with Steele and Simpson and his interactions with the FBI, especially after Rosenstein appointed the Special Counsel and began directly supervising the investigation, because "a potential fact witness" was on Rosenstein's staff. Crowell told us that he would have taken steps to eliminate any appearance that Ohr was involved in ODAG's oversight of the investigation.

We found that, while no Department or ODAG policy specifically prohibited Ohr's activities, Ohr was clearly cognizant of his responsibility to inform his supervisors of his interactions with Steele, the FBI, and State Department. Indeed, Ohr acknowledged to the OIG that the possibility that he would have been told by his supervisors to stop having such contact may have factored into his decision not to tell them about it. Precisely because of this possibility, and the reasons more fully described above, we concluded that Ohr committed consequential errors in judgment by failing to advise his direct supervisors or the DAG that he was communicating with Steele, Simpson, and the FBI on matters related to the Crossfire Hurricane investigation, and that this performance failure had a negative impact on the investigation and ODAG's fulfillment of its own management responsibilities. We are referring our finding to the Department's Office of Professional Responsibility for any action it deems appropriate. We are also providing our finding to Ohr's current supervisors in CRM for any action they deem appropriate.

## B.   FBI Interactions with Ohr Concerning Steele and Simpson

As described in Chapter Two, the FBI's CHS Policy Guide (CHSPG) provides guidance to agents concerning contacts with CHSs after they have been closed for cause, as was the case with Steele as of November 1, 2016. According to the CHSPG, a handling agent must not initiate contact with or respond to contacts from a former CHS who has been closed for cause absent exceptional circumstances that are approved (in advance, whenever possible) by an SSA. Where there is contact with a CHS following closure (whether or not for cause), new information "may be documented" to a closed CHS file. However, the CHSPG requires the reopening of the CHS if the relationship between the FBI and the CHS is expected to continue beyond the initial contact or debriefing. Reopening requires high levels of supervisory approval, including a finding that the benefits of reopening the CHS outweigh the risks.

In this instance, we found that the FBI did not initiate direct contact with Steele after his closure on November 1, 2016. However, the FBI did respond to numerous contacts made by Steele to the FBI through Ohr. Ohr himself was not a direct witness to the facts and circumstances that were the focus of the Crossfire Hurricane investigation; rather, his purpose in communicating with the FBI was to pass along information from Steele. Further, although Ohr initiated his meetings with the Crossfire Hurricane team, as noted above, the team gave Ohr the impression that he should contact them in the event he had additional contact with Steele. While the FBI's CHS policy does not explicitly address indirect contact

between an FBI agent and a closed CHS, we concluded that the FBI's repeated acceptance of information from Steele through a conduit (Ohr) was equivalent to responding to a contact from Steele and therefore should have triggered the CHS policy requiring that such contact occur only after an SSA determines that exceptional circumstances exist.  Here, the SSAs on the Crossfire Hurricane team attended the meetings with Ohr and served as Ohr's points of contact, and in this manner approved the contact.  However, we found no evidence that the SSAs made a considered judgment that exceptional circumstances existed for the repeated contact; in the absence of such a circumstance, the FBI's re-engagement of Steele did not fully comply with the FBI's CHS policy.

In addition, the Crossfire Hurricane team memorialized the meetings with Ohr and the information Ohr provided in FD-302 forms serialized to the case file.  Although the information was not separately documented in Steele's closed CHS file, the guidance regarding documentation is discretionary (new information "may be documented" to a closed CHS file).  We believe the FBI should make such documentation mandatory so that the CHS file contains all relevant information about the CHS.

As noted above, the CHSPG contemplates the reopening of the CHS if the relationship between the FBI and the CHS is expected to continue beyond the initial contact or debriefing, which helps to ensure that high level supervisors weigh the risks presented by reengagement with the CHS and that operational assessments of the CHS are undertaken.  Although the FBI met with Ohr on 13 occasions and accepted information that Ohr received from Steele, the FBI never assessed whether to re-open Steele as a CHS.  As described in Chapter Nine, there were differing views about whether the information Ohr was providing had any investigative value.  SSAs on the investigation also told us that they had some concern at the time that continuing to engage with Ohr regarding his interactions with Steele was "out of the norm" and a "bad idea."  Although the FBI did not have a direct "relationship" with Steele after November 1, 2016, we believe the use of Ohr as a conduit between the two created a relationship by proxy that should have triggered a supervisory decision early in the process about whether to reopen Steele as a CHS or discontinue accepting information indirectly through Ohr.  We concluded that not obtaining supervisory review was inconsistent with the CHS policy's intent to have a higher level official determine whether the "exceptional circumstances" that an SSA believes are present to authorize an initial contact with a closed CHS warrant reopening of the CHS.[519]

We found that the Crossfire Hurricane team did not consider Ohr providing the FBI with information from Steele to be a re-engagement of their relationship with Steele.  Rather, the team viewed Ohr as just another "stream of reporting."  On the other hand, Priestap told us that he was not aware of the full extent of Ohr's communications with Steele and the Crossfire Hurricane team and that the number

---

[519] Even if the SSAs had determined that exigent circumstances existed for the initial re-engagement with Steele, once it was clear the contact between FBI and Ohr was expected to continue beyond the initial contact, we believe FBI policy required the SSAs to either reopen Steele at that time or discontinue accepting his information indirectly through Ohr.

of times Ohr provided the FBI with information from Steele would have raised "red flags" for him.  We believe that additional policy guidance would be helpful to clarify the considerations and requirements that apply in the third-party context.  Accordingly, we recommend that the FBI revise its CHS policy to explicitly address the situation that occurred here, namely the steps that should be followed before and after accepting information from a closed CHS indirectly through a third party, and the considerations that should be taken into account before doing so.  Further, we recommend that the CHS policy be clarified to require that contact with a closed CHS be documented in the CHS file.

### C.   Ethics Issues Raised by Nellie Ohr's Former Employment with Fusion GPS

Fusion GPS employed Nellie Ohr as an independent contractor from October 2015 to September 2016.  We considered whether Bruce Ohr complied with his financial disclosure reporting obligations under 5 C.F.R. part 2634 related to Nellie Ohr's employment.  On his annual financial disclosure forms covering calendar years 2015 and 2016, Ohr listed Nellie Ohr as an "independent contractor" and reported her income from that work on the form.  We determined that 5 C.F.R. part 2634, which sets forth the financial disclosure rules for executive branch employees, and the supplemental guidance from the Office of Government Ethics (OGE), did not require Ohr to list on the form the specific organizations, such as Fusion GPS, that retained and paid Nellie Ohr as an independent contractor during the reporting period.  We further noted that, consistent with OGE practice, Ohr's financial disclosure form, which listed Nellie Ohr as an "independent contractor" and reported her total income but not the specific source(s) of the income, was reviewed and approved for filing by the ODAG and Department ethics officers before being submitted to OGE.  Accordingly, we determined that Ohr complied with his financial disclosure reporting obligations.

We separately considered whether the Standards of Ethical Conduct for Employees of the Executive Branch required Ohr to recuse himself from participating in activity related to the Crossfire Hurricane investigation because of Nellie Ohr's prior work for Fusion GPS as an independent contractor.  Specifically, 5 C.F.R. § 2635.502(a) provides that an employee should not participate in a matter, unless agency ethics counsel authorizes participation, "[w]here an employee knows that a particular matter involving specific parties is likely to have a direct and predictable effect on the financial interest of a member of his household...and where the employee determines that the circumstances would cause a reasonable person with knowledge of the relevant facts to question his impartiality in the matter...."  Section 402(b)(1) defines "direct and predictable effect" as "a close causal link between any decision or action to be taken in the matter and any expected effect of the matter on the financial interest."  We found that Nellie Ohr's relationship with Fusion GPS ceased on September 24, 2016, which was prior to Ohr's meeting with McCabe on October 18, 2016, as well as all 13 of his meetings with the Crossfire Hurricane team, the first of which was on November 21, 2016.  Accordingly, by those dates, Ohr's activities could not have had a direct and predictable effect on his or his wife's financial interests, and federal ethics rules did

not require that Ohr obtain Department ethics counsel approval before engaging with the FBI in connection with the Crossfire Hurricane matter.

The federal ethics rules further provide in Section 502(a)(2) that an employee "who is concerned that circumstances other than those specifically described in this section would raise a question regarding his impartiality should use the process described in this section [namely, to consult with Department ethics officials] to determine whether he should or should not participate in a particular matter." However, while OGE has made clear that employees are "encouraged" to use this process, it also has stated that "[t]he election not to use that process should not be characterized…as an 'ethical lapse.'" OGE 94 x 10(1), Letter to a Department Acting Secretary, March 30, 1994; see also, OGE 01 x 8 Letter to a Designated Agency Ethics Official, August 23, 2001. While OGE guidance establishes that Ohr did not commit a formal ethical violation, we nevertheless concluded that Ohr, an experienced Department attorney and a member of the SES, should have been more cognizant of the appearance concerns created by Nellie Ohr's employment with Fusion GPS and availed himself of the process described in Section 502(a). We found that his failure to take this step displayed a lapse in judgment.

### D.   Meetings Involving Ohr, CRM officials, and the FBI Regarding the MLARS Investigation

As described in more detail in Chapter Nine, on November 16, 2016, Ohr advised CRM officials Bruce Swartz and Zainab Ahmad of information "about [Paul] Manafort and Trump and possible Russian influence that [Ohr] was getting from Steele and Glenn Simpson." This discussion led to subsequent meetings with them and Andrew Weissmann about the pre-existing MLARS investigation of Manafort and whether the Fraud Section could move the investigation forward. At the time of these meetings, Swartz was a CRM Deputy AAG and Weissmann was the Chief of the Fraud Section. During this period, Ahmad was initially Counsel to the Criminal Division AAG and then became an Acting CRM Deputy AAG.[520] None of these CRM officials had supervisory responsibility over the MLARS investigation. Ahmad and Weissmann did not have prior direct involvement in the investigation. Swartz had assisted MLARS with gathering evidence from abroad, and therefore, had extensive prior knowledge and involvement with the investigation, but was not responsible for investigative decisions. The MLARS Manafort investigation was outside Ohr's areas of responsibility. At Ohr's suggestion, Ohr, Swartz, and Ahmad also met with FBI officials Peter Strzok and Lisa Page in December 2016 to discuss the MLARS investigation because Ohr knew by that time that the FBI's CD was working on a separate matter involving Manafort. On January 31, 2017, one day after Yates was removed as Deputy Attorney General, Ahmad, after consulting with Swartz and Weissmann, called a second meeting, citing to "a few Criminal Division related developments." None of the attendees of the meeting could explain to us what the "Criminal Division related developments" were, and we did not find any. However,

---

[520] Swartz, Ohr, and Weissmann were members of the Senior Executive Service (SES). Ahmad was on detail to the Criminal Division from the U.S. Attorney's Office for the Eastern District of New York and was not a member of the SES.

we are not aware of any information indicating that these discussions resulted in any actions taken or not taken in the MLARS investigation and ultimately the investigation remained in MLARS until it was transferred to The Special Counsel's Office in May 2017.

MLARS officials were not invited to these meetings or informed of them.  The then Chief of MLARS, Kendall Day and the acting Chief who replaced him in January 2017, both told us that they were unaware at the time that these CRM officials and Ohr were discussing the MLARS investigation and engaging with the FBI Day told us that when he learned in March or April 2017 that Swartz, Ohr, Ahmad, and Weissmann were "collectively interested" in the Manafort investigation, he met with Swartz and Ahmad and told them that their "unusual level of interest" could create a perception that the Department was investigating Manafort for inappropriate reasons.[521]

In addition, Ohr, Swartz, Ahmad, and Weissmann told us that they did not advise their supervisors of their meetings, and senior CRM and ODAG officials told us that they were unaware of them.  Further, Swartz told us that he specifically did not advise political appointees leading the Criminal Division of the meetings. According to Swartz, he did not believe at the time that he needed to advise political appointees because the meetings had not resulted in any steps being taken in the MLARS investigation, and by not informing them he was keeping the MLARS investigation from being "politicized" and protecting the Department from allegations that its MLARS investigation of Manafort was politically motivated. Swartz stated that he would have informed his political superiors if any decision to take action had been made as a consequence of the meetings.  Weissmann told us that he thought not telling Department leadership was an "incorrect judgment call," but could not recall if he expressed this view to Swartz or Ahmad.

The former senior Department leaders we interviewed expressed serious concern about Swartz's assertion that not informing Department leadership about case related investigative activities somehow protected the Department.  For example, after Yates learned during her OIG interview of the meetings involving Ohr, Swartz, Ahmad, and Weissmann, she told us that a decision not to advise political appointees "trouble[d]" her because the Department does not "operate that way."  Yates said that there is not "a career Department of Justice and a political appointees' Department of Justice.  It's all one DOJ."  Former CRM Assistant

---

[521] After reviewing a draft of this report, Swartz told us that he had provided information to the OIG demonstrating his long standing interest and official involvement in reviewing Manafort's conduct, dating back to at least 2014, and that he was concerned by what he perceived as the "languishing" pace at which the MLARS investigation was progressing, and that it was his "duty" to attempt to move it forward.  He therefore believed it was appropriate for him to meet with Weissmann to discuss potential avenues for doing this, and to meet with FBI officials to ensure that the FBI was aware of MLARS' investigation.  Although we acknowledge Swartz's long-standing interest and official involvement in Manafort-related inquiries, we believe that Swartz could have raised his concerns directly with MLARS, Day, or others in MLARS' direct supervisory chain.  Indeed, when asked about Swartz's concerns, then Acting DAG Boente told us that the Manafort investigation was an MLARS case, and Swartz could have taken his concerns to the then Acting Assistant Attorney General, who was a career Department employee, to attempt to address his concerns.

Attorney General (AAG) Leslie Caldwell told us that a decision to not advise political appointees of meetings they were having relating to the MLARS investigation to avoid "politicizing" it was "inappropriate" and showed "poor judgment" because it "suggest[ed] a lack of trust or a lack of confidence in the political appointee . . . and that seem[ed] a little bit paranoid to [her]."

We did not identify any Department policies prohibiting internal discussions about a pending investigation among officials not assigned to a matter, or between those officials and senior officials from the FBI. However, we were troubled by the testimony more fully described in Chapter Nine that there was a deliberate decision not to inform the political appointees, or the Acting AAG of CRM after the change in presidential administrations – who was a career Department employee – of these discussions in order to insulate the MLARS investigation from becoming "politicized." We concluded that the decision to intentionally withhold information from the Department's leadership in both the prior and current administrations, in the absence of concerns of potential wrongdoing or misconduct fundamentally misconstrued who is ultimately responsible and accountable for the Department's work.[522] We agree with the concerns expressed to us by Yates and Caldwell. Department leaders cannot fulfill their management responsibilities, and be held accountable for the Department's actions, if subordinates intentionally withhold information from them in such circumstances. The Department's leadership, which is nominated by the President and confirmed by the Senate, is ultimately answerable within the Executive Branch, to Congress, and in the courts for the investigations, prosecutions, and other activities of the Department, whether politically sensitive or routine. Ultimately, however, we did not find evidence that the meetings between Ohr and CRM officials Swartz, Ahmad, and Weissmann, amongst themselves and with FBI officials Strzok, Lisa Page, and Acting Section Chief 1, progressed beyond discussion to any specific actions that interfered with the MLARS investigation or Department leadership's oversight of that matter.

## V.     The Use of Other Confidential Human Sources and Undercover Employees and Compliance with Applicable Policies

In this section, we analyze the FBI's use of CHSs, other than Steele, and Under Cover Employees (UCEs) in the Crossfire Hurricane investigation, and discuss whether the FBI placed any CHSs or UCEs within the Trump campaign or tasked any CHSs or UCEs to report on the Trump campaign. Additionally, we analyze whether the Crossfire Hurricane team's use of such individuals complied with Department and FBI policies. We also discuss SSA 1's participation on behalf of the FBI in a strategic intelligence briefing given by the Office of the Director of National Intelligence (ODNI) to candidate Trump and his national security advisors, including Michael Flynn, and a separate strategic intelligence briefing given to candidate

---

[522] Had Ohr and the CRM officials believed that the circumstances involved potential wrongdoing or misconduct, they should have reported their concerns to the OIG or the Department's Office of Professional Responsibility; they also could have reported their concerns to Congress.

Clinton and her national security advisors, and the observations that SSA 1 made of Flynn and others as a result of his participation in those briefings.

Overall, we determined that the Crossfire Hurricane team tasked several CHSs and UCEs during the 2016 presidential campaign, which resulted in multiple interactions with Carter Page and Papadopoulos, before and after they were affiliated with the Trump campaign, and an interaction with a high-level Trump campaign official who was not a subject of the investigation. The Crossfire Hurricane team also attempted to contact Papadopoulos through additional CHSs, but those efforts were unsuccessful. We further determined that the Crossfire Hurricane team received general information about Page and Manafort from another FBI CHS, but that this CHS had no further role in the Crossfire Hurricane investigation. Additionally, we identified several individuals who had either a connection to candidate Trump or a role in the Trump campaign, and were also FBI CHSs, who the Crossfire Hurricane team could have tasked, but did not. We found no evidence that the FBI placed any CHSs or UCEs within the Trump campaign or tasked any CHSs or UCEs to report on the Trump campaign. We also did not find documentary or testimonial evidence that political bias or improper motivation influenced the FBI's decision to use CHSs to interact with Page, Papadopoulos, and the high-level Trump campaign official in the Crossfire Hurricane investigation.

We concluded that the investigative activities undertaken by the Crossfire Hurricane team involving CHSs and UCEs received the necessary FBI approvals and complied with applicable Department and FBI policies. However, we also determined that neither the Department's nor the FBI's policies required the FBI to notify the Department of these investigative activities, and we are unaware of any Department official having had advance knowledge of the FBI's plans to consensually monitor conversations between FBI CHSs and Page, Papadopoulos, and a high-level official of the Trump campaign. We concluded that Department and FBI policies do not, in these circumstances, provide sufficient oversight and accountability for investigative activity that has the potential to gather sensitive information involving protected First Amendment activity. For example, prior to the operation involving the high-level campaign official, SSA 1 told the OIG that he did not remember having a plan in place in case the FBI recorded information that was politically sensitive. We believe that notification to Department officials in such situations would help to ensure that the FBI has planned sufficiently to address the incidental collection of political information, and make an assessment prior to that collection of whether the potential impact on constitutionally protected activity outweighs any potential investigative benefit.

We therefore make several recommendations to strengthen Department and FBI CHS policies to require Department consultation, at a minimum, when tasking a CHS to interact with officials in national political campaigns; to provide additional guidance to FBI handling agents about how to document the affiliations of CHSs who, on their own, participate in political organizations or activities and then voluntarily provide information to the FBI; and to provide FBI supervisors with the information necessary to assess whether to close a CHS, or designate that individual as a "sensitive source," depending on the level of CHS participation in political organizations or activities.

### E.    Use of CHSs and UCEs

The agents, analysts, and supervisors assigned to the Crossfire Hurricane investigation told us that CHSs are routinely used in FBI counterintelligence investigations, and that they viewed CHS operations as one of the best methods available to quickly obtain information about the predicating allegations in the Crossfire Hurricane investigation, while preventing information about the nature and existence of the investigation from becoming public, and potentially impacting the presidential election.  In Chapter Ten we described multiple CHS operations undertaken by the Crossfire Hurricane team, including the tasking of CHSs and UCEs during the 2016 presidential campaign.  These investigative activities included numerous CHS interactions with Page and Papadopoulos to collect information about the predicating allegations while both were Trump campaign advisors and after they were no longer affiliated with the Trump campaign.  In addition, an FBI CHS was tasked to interact with a high-level Trump campaign official who was not a subject of the Crossfire Hurricane investigation in an effort to gather information potentially relevant to the predicating allegations.  We also determined that the FBI attempted to contact Papadopoulos through additional CHSs, but those attempted contacts did not lead to any operational activity.

In our review, we also learned that, in 2016, there were several other individuals who had either a connection to candidate Trump or a role in the Trump campaign, and were also FBI CHSs.  Some of these sources were known to and available for use by the Crossfire Hurricane team during the 2016 presidential campaign.  The Crossfire Hurricane team received general information about Page and Manafort from one such CHS, but that CHS did not further assist the Crossfire Hurricane team in any way.  We found no evidence that any members of the Crossfire Hurricane team ever suggested inserting this CHS into the Trump campaign to gather investigative information.  SSA 1 told the OIG, "that was not what we were looking to do."  For a different CHS who held a position in the Trump campaign, we learned that the Crossfire Hurricane team decided not to task the CHS, and the FBI Handling Agent minimized contact with the CHS, because of the CHS's campaign involvement.  The Crossfire Hurricane team also made no use of an FBI CHS who had a potential opportunity for a private meeting with candidate Trump.  That CHS's Handling Agent told the OIG that he "would certainly not be tasking a source to go attend some private meeting with a candidate, any candidate, for president or for other office, to collect the information on what that candidate is saying."  Although the Crossfire Hurricane team was aware of these CHSs during the 2016 presidential campaign, we were told that operational use of these CHSs would not have furthered the investigation, and so these CHSs were not tasked with any investigative activities.[523]  Moreover, SSA 1 told the OIG that the members of the Crossfire Hurricane team "never [had] any intent, never any

---

[523]  We were troubled by some of the language contained in certain documents we reviewed regarding the use and possible use of some of the CHSs, as we detail in Chapter 10.  However, we saw no evidence that the FBI, or specifically the Crossfire Hurricane team, actually used any CHSs as a "passive listening post" for the Trump campaign or to "obtain insight" regarding the incoming Trump Administration.

desire...to collect...campaign or privileged information with regard to the presidential election."

We also learned of two other FBI CHSs, one of whom held a position ▮▮▮▮ and the other of whom ▮▮▮▮ ▮▮▮▮ We found no evidence that the Crossfire Hurricane team ever knew about the first CHS, who held a position ▮▮▮▮ and, accordingly, no evidence that the first CHS was tasked to do anything as part of the Crossfire Hurricane investigation.

We found that the Crossfire Hurricane team did not learn about the second CHS until months after the election. In 2017, the Crossfire Hurricane team learned about the second CHS after the CHS voluntarily provided to the CHS's Handling Agent, after the campaign was over and prompted by events reported in the media, ▮▮▮▮ and the Handling Agent forwarded the material, through his supervisor and FBI Headquarters, to the Crossfire Hurricane team. The team determined that ▮▮▮▮ . The Handling Agent told us that, when he subsequently informed the Crossfire Hurricane team that the CHS had ▮▮▮▮ an Intelligence Analyst assigned to the Crossfire Hurricane team asked the Handling Agent to collect ▮▮▮▮ from the CHS, which the Handling Agent did. We learned that the Crossfire Hurricane team determined that there was not "anything significant" in this ▮▮▮▮ , and never tasked the CHS to interact with anyone ▮▮▮▮

While we found that no action was taken by the Crossfire Hurricane team in response to receiving ▮▮▮▮ , we nevertheless were concerned to learn that the Handling Agent for the second CHS ▮▮▮▮ ▮▮▮▮ that the CHS had voluntarily provided into the FBI's files, and we promptly notified the FBI upon learning that they were still being maintained in the FBI's files. We further concluded that because the second CHS's Handling Agent did not understand the CHS's political involvement, no assessment was performed by the source's Handling Agent or his supervisors (none of whom were members of the Crossfire Hurricane team) to determine whether the CHS required re-designation as a "sensitive source" or should have been closed during the pendency of the campaign. To address this issue, we recommend the FBI provide additional guidance to handling agents concerning their responsibility to inquire whether their CHS participates in the types of groups or activities that would bring their CHS within the definition of a "sensitive source." Handling agents should document (and update as needed) those affiliations, and any others voluntarily provided to them by the CHS, in the Source Opening Communication, the "Sensitive Categories" portion of each CHS's Quarterly Supervisory Source Report, the "Life Changes" portion of CHS Contact Reports, or as otherwise directed by the FBI, so that the FBI can assess the appropriateness of continuing to use a CHS, particularly where the CHS

is participating in political organizations or activities and then voluntarily providing information to the FBI.

Finally, we found no evidence that the Crossfire Hurricane team tasked any CHSs or UCEs to join the Trump campaign, sent any CHSs or UCEs to campaign offices or to campaign events to collect information for the Crossfire Hurricane investigation, or tasked any CHSs or UCEs to report on the Trump campaign.

### F.    Compliance with FBI Policies

We determined that the Crossfire Hurricane investigation was opened before any CHSs or UCEs were tasked to interact with any members of the Trump campaign.  Once the Crossfire Hurricane investigation was opened, the use of CHSs and UCEs was authorized under the AG Guidelines and the DIOG, which permit use of "all lawful investigative methods in the conduct of a Full Investigation" including specifically "CHS use and recruitment," "consensual monitoring of communications," and "Undercover Operations."[524]

As noted previously, the Crossfire Hurricane investigation was designated a SIM under DIOG § 10.1.2, because the FBI determined that any potential subjects of the investigation would be "prominent" members of a political campaign.  The same designation was assigned to the four individual cases because the FBI determined that the individuals identified as subjects were "prominent" in the Trump campaign.  However, the CHS operations undertaken in Crossfire Hurricane did not require heightened review by FBI supervisors or Department approval because, under the DIOG, the operations did not involve the use of "sensitive" sources, "Undisclosed Participation" (UDP) in political organizations, or "sensitive monitoring circumstances."  As discussed in Chapter Two, the DIOG requires SAC approval to open a "sensitive" source; SAC approval with notice to the Sensitive Operations Review Committee (a panel that includes Department AAGs or their designees) for UDP in a political organization or other organization exercising First Amendment rights; and Department approval for a CHS to record conversations in a "sensitive monitoring circumstance."  We determined that none of these approval requirements applied to the investigative activities undertaken by the Crossfire Hurricane team.

FBI policy defines "sensitive" sources to include CHSs who are political candidates or who are "prominent within a domestic political organization."  None of the CHSs tasked in the Crossfire Hurricane investigation fell within these categories, because none of the CHSs were themselves candidates or prominent members of a campaign.  The agents, analysts, and supervisors on the Crossfire Hurricane team told the OIG that they did not attempt to recruit or use members of the Trump campaign as CHSs, and we found no evidence suggesting otherwise.  However, our interviews with FBI handling agents revealed significant confusion over the meaning

---

[524]  AG Guidelines § II.B.4(b)(ii); DIOG §§ 7.3, 7.9(E), 7.9(I), 7.9(U).  As noted in Chapter Two, had the investigation been opened as a Preliminary Investigation, rather than a Full Investigation, the use of CHSs and UCEs would similarly have been authorized under the AG Guidelines and the DIOG.

of the phrase "prominent within a domestic political organization," with some agents interpreting that phrase as limited to a person "running for office," and other agents questioning whether a presidential primary campaign was a "domestic political organization." Accordingly, we recommend that the FBI establish guidance to better define this phrase, so that agents understand the meaning of this phrase as it is used in FBI policy.

FBI policies concerning "Undisclosed Participation" (UDP) apply when anyone acting on behalf of the FBI, to include CHSs and UCEs, becomes a member of, or participates in, the activity of an organization without disclosing to the organization their FBI affiliation. These policies likewise did not apply to the Crossfire Hurricane case because we found no evidence that any of the FBI CHSs or UCEs used in Crossfire Hurricane joined or participated in the Trump campaign at all, and certainly not at the direction of, or otherwise on behalf of, the FBI. During our review, this issue briefly arose because we learned that one of the subjects of the Crossfire Hurricane investigation had invited an FBI CHS to join the Trump campaign, prior to the opening of the investigation. However, we found that when the Crossfire Hurricane team learned about this invitation following the investigation's opening, the team did not consider using this opportunity to engage in UDP. Rather, every FBI witness we interviewed said they would not have done so even if the FBI CHS had actually wanted to join the campaign. Strzok's reaction to the possibility—"[O]h god no. Absolutely not"—and the reaction Case Agent 2 attributed to the OGC attorneys—"no freaking way"—were indicative of the reactions we heard from all members of the Crossfire Hurricane team when we questioned them about whether they considered the possibility of inserting an FBI CHS into the Trump campaign to collect investigative information. None of the documents we reviewed indicated that any member of the Crossfire Hurricane team ever advocated for that type of investigative activity.

The use of CHSs and UCEs by the Crossfire Hurricane team also did not present a "sensitive monitoring circumstance," as defined by the AG Guidelines and the DIOG. As described in these policies, a "sensitive monitoring circumstance" arises when the FBI seeks to record communications with officials who have already been elected or appointed, such as Members of Congress, federal judges, or high ranking members of the executive branch. The AG Guidelines and the DIOG do not require prior notice to, or approval by, the Department when the FBI uses a CHS to consensually monitor communications with candidates for political office or prominent officials within their campaigns.

Because the CHS operations conducted during the Crossfire Hurricane investigation did not implicate the FBI's policies regarding sensitive sources, UDP, or sensitive monitoring circumstances, Department or higher level FBI notice or approval was not required for such operations. Under the CHSPG, which vests SSAs with daily oversight responsibility for CHSs in routine investigations, approval at the SSA level was sufficient.[525] The only relevant exception for the Crossfire

---

[525] CHSPG § 2.1.1.

Hurricane investigation were counterintelligence CHS extraterritorial operations, which required approval by an FBI Assistant Director, and which we found received approval by Priestap.[526]  We determined that the day-to-day decisions concerning whether and how to use CHSs and UCEs in the Crossfire Hurricane investigation were made by the investigative team, with the approval of SSA 1 as required by FBI policy.  We further found that SSA 1 briefed the FBI supervisors in his chain of command—Strzok, Priestap, and on one occasion McCabe—about the CHS operations planned by the investigative team.  Priestap told the OIG that he remembered knowing about, and approving of, all of the CHS operations in Crossfire Hurricane, even though review and approval at his level was not required by the DIOG for operations conducted within the United States.

We further concluded that the use of CHSs and UCEs in the Crossfire Hurricane investigation complied with the DIOG's requirement that "investigative activities be conducted for an authorized purpose."[527]  As discussed previously, the Crossfire Hurricane investigation was opened for an authorized purpose—which means "to detect, obtain information about, or prevent or protect against federal crimes or threats to the national security or to collect foreign intelligence."[528]  The DIOG also provides that the underlying purpose of the investigative activity "may not be solely to monitor the exercise of constitutional rights...."[529]  While the investigative activity in this case clearly implicated First Amendment protected activity, we did not find evidence that members of Crossfire Hurricane team attempted to use CHSs or UCEs for the sole purpose of monitoring activities protected by the First Amendment.  Rather, we determined that these investigative activities were focused on obtaining information that would enable investigators to better assess the predicating information.  Indeed, a significant amount of the information gathered during these operations was inconsistent with the Steele election reporting and should have been provided to Department attorneys, but was not.

For example, our review of CHS interactions with Page indicated that they were initiated to obtain information relevant to the allegations under investigation.  Page was asked about his ongoing ties to Russia, contacts with Russian intelligence officials, views on media reports linking the Trump campaign and Russia, involvement in the committee responsible for the Republican platform language concerning aiding Ukraine, and views on the possibility of an "October Surprise" if the Trump campaign could access information obtained by the Russians from the

---



[526] As described in Chapter Two, the ███████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ Because the Crossfire Hurricane investigation at the outset was a national security investigation, the ███████████████ ███████████████████████████████████████████.

[527] DIOG § 4.1.2.

[528] DIOG § 7.2.

[529] DIOG § 4.1.2.

DNC emails. Similarly, CHS operations aimed at Papadopoulos were linked to the allegations under investigation in Crossfire Hurricane. For example, when Papadopoulos was asked about the Trump campaign, the questions were focused on obtaining information about other Crossfire Hurricane subjects (Page and Flynn) or determining whether the Trump campaign benefitted from, or anyone in the Trump campaign had knowledge of, Russian assistance or the WikiLeaks release of information that was damaging to the Clinton campaign. Papadopoulos's response—that the Trump campaign was not "advocat[ing] for this type of activity because at the end of the day it's…illegal"—clearly pertained to the issues under investigation and, as discussed elsewhere in this report, should have been provided to the Department's attorneys for evaluation as part of the FISA applications. Likewise, the high-level Trump campaign official was asked about the role of three Crossfire Hurricane subjects—Page, Papadopoulos, and Manafort—in the Trump campaign, and also asked about allegations in public reports concerning Russian interference in the 2016 U.S. elections, the campaign's response to ideas featured in Page's Moscow speech, and the possibility of an "October Surprise." These areas of inquiry were focused on the allegations under investigation in an effort to elicit pertinent information.

However, the CHS and the high-level campaign official ███████████████

███████████████████████████████████████████████████████

████. We found that the Crossfire Hurricane team made no use of any information collected from the high-level Trump campaign official, because the team determined that none of the information gathered was "germane" to the allegations under investigation. However, as noted above, we were concerned that the Crossfire Hurricane team did not recall having in place a plan, prior to the operation involving the high-level campaign official, to address the possible collection of politically sensitive information.

We also looked for, but did not find, documentary evidence that investigative activities involving CHSs and UCEs during Crossfire Hurricane were undertaken for political purposes, rather than investigative objectives. Similarly, none of the witnesses provided any such information to us. In addition, we evaluated the roles of Lisa Page and Strzok in decision making about how to use CHSs and UCEs in the Crossfire Hurricane investigation. We learned that the Crossfire Hurricane case agents had limited and, in some cases, no interaction with Lisa Page, and that she had no authority over, or even involvement in, decision making concerning the use of CHSs or UCEs. Although we found that Strzok oversaw aspects of Crossfire Hurricane, and was briefed regarding the plans for the use of CHSs and UCEs, we found no evidence that Strzok gave specific directions as to which CHSs to task and how to task them, or acted as the sole decision maker for any of the CHS or UCE operations. In addition, none of the Crossfire Hurricane team members stated that they believed Strzok's political views impacted the use of CHSs or UCEs, and we did not find any documentary evidence suggesting such an impact.

Although we found that the Crossfire Hurricane team complied with all applicable Department and FBI policies regarding the use of CHSs, we are

concerned that current FBI and Department policies are not sufficient to ensure appropriate oversight and accountability when such operations potentially implicate sensitive, constitutionally protected activity. During Crossfire Hurricane, the FBI conducted multiple CHS operations that involved interactions with members of a major party candidate's presidential campaign, including a high-level campaign official who was not an investigative subject. Under current Department guidelines and FBI policy, those operations only required the approval of an FBI SSA, a first-level supervisor (although here, as noted above, an FBI Assistant Director approved of all of the CHS operations). The FBI was not required to notify the Department of those investigative activities and we are unaware of any Department official having had advance knowledge of the FBI's plan to consensually monitor conversations between CHSs and Page and Papadopoulos, both before and after they were affiliated with the Trump campaign, and a conversation with a high-level Trump campaign official. The then Chief of NSD's Counterintelligence and Export Control Section David Laufman told the OIG that he believed such activity should require Department authorization. We agree.

We recommend that the Department and FBI assess the definition of a "sensitive monitoring circumstance" contained in the AG Guidelines and the DIOG to determine whether to expand its scope to include consensual monitoring of major party domestic political candidates for federal office or individuals prominent within those domestic political organizations, so that at a minimum, Department consultation is required when tasking a CHS to interact with officials in national political campaigns. Such a change would be consistent with other currently-existing FBI and Department policies intended to ensure appropriate approval and oversight where certain constitutionally protected activity is concerned. Examples include the FBI's heightened approval requirements for sensitive UDP that is likely to affect the exercise of First Amendment rights by members of an organization, the FBI's definition of "Sensitive Investigative Matters" (which includes domestic political candidates and prominent members of domestic political organizations), the Department's approval requirements for consensual monitoring when investigating alleged misconduct by a senior member of the executive branch or a Member of Congress, and the Department's requirement for Attorney General approval for toll record subpoenas and search warrants directed at members of the media. We believe the same considerations that resulted in the adoption of these provisions to protect the exercise of constitutional rights similarly apply to the situation present in Crossfire Hurricane, where the Department and FBI were conducting CHS operations of officials affiliated with a major party candidate's national political campaign.

## G.    Participation in ODNI Strategic Intelligence Briefing

As described in Section V of Chapter Ten, we learned during the course of our review that in August 2016, the supervisor of the Crossfire Hurricane investigation, SSA 1, participated on behalf of the FBI in an ODNI strategic intelligence briefing given to candidate Trump and his national security advisors, including Flynn, and in a separate briefing given to candidate Clinton and her national security advisors. The stated purpose of the FBI's counterintelligence and security portion of the briefings was to provide the recipients "a baseline on the

presence and threat posed by foreign intelligence services to the National Security
of the U.S." However, we found the FBI also had an investigative purpose when it
specifically selected SSA 1, a supervisor for the Crossfire Hurricane investigation, to
provide the FBI briefings. SSA 1 was selected, in part, because Flynn, who would
be attending the briefing with candidate Trump, was a subject in one of the ongoing
investigations related to Crossfire Hurricane. SSA 1 told us that the briefing
provided him "the opportunity to gain assessment and possibly some level of
familiarity with [Flynn]. So, should we get to the point where we need to do a
subject interview…I would have that to fall back on."

After the meeting, SSA 1 drafted an Electronic Communication (EC)
documenting his participation in the ODNI strategic intelligence briefing attended by
Trump, Flynn, and another advisor, and added the EC to the Crossfire Hurricane
investigative file. The EC described the purpose, location, and attendees of the
briefing, and recounted in summary fashion the portion of the briefing SSA 1
provided. Woven into the briefing summary were questions posed to SSA 1 by
Trump and Flynn, and SSA 1's responses, as well as comments made by Trump and
Flynn. SSA 1 told us that he documented those instances where he was engaged
by the attendees, as well as anything related to the FBI or pertinent to the Crossfire
Hurricane investigation, such as comments about the Russian Federation. SSA 1
said that he also documented information that may not have been relevant at the
time he recorded it, but might prove relevant in the future. SSA 1 told us that he
did not memorialize in writing the briefing he participated in of candidate Clinton
and her national security advisors because the attendees did not include a subject
of an FBI investigation, and because there was nothing from the other briefings that
was of investigative value to the Crossfire Hurricane team.

As we described earlier in connection with the FBI's decision not to conduct
defensive briefings to the Trump campaign about the information the FBI received
from the FFG, we did not identify any Department or FBI policy that applied to that
decision and determined that those decisions are judgment calls left to the
discretion of FBI officials. Similarly, we did not identify any Department or FBI
policy or guidance that specifically addresses using FBI counterintelligence and
security briefings to members of political campaigns for investigative purposes, as
occurred in Crossfire Hurricane. We believe there should be.

Baker told us that the decision to select SSA 1 to participate in the ODNI
briefing because of his involvement with Crossfire Hurricane was reached by
consensus among a group that he recalled involved multiple FBI officials, including
McCabe.[530] If accurate, SSA 1's selection at least was discussed and approved by
high-level officials at the FBI, which we believe should occur in advance of such
activity. However, there is nothing in FBI policy requiring high-level approval.
Further, the Department was not informed that the FBI was using the ODNI briefing
of a presidential candidate for investigative purposes, nor was ODNI made aware
that the individual providing the FBI's portion of the briefing would be

---

[530] McCabe told us that it was possible he participated in conversations about whether SSA 1
should conduct the briefings, but could not recall any.

memorializing information from the briefing into an FBI case file for investigative purposes.

ODNI strategic intelligence briefings of the type that were provided to candidates Trump and Clinton convey sensitive information to familiarize the recipients with certain national security issues; and the FBI's counterintelligence and security portion of the briefings highlights why the recipients, once given access to such information, should assume they will be targets of foreign intelligence services. The briefings are important because they attempt to prepare both national political party candidates, on an equal footing, for the national security threats facing them if elected. The transfer of information, the exchanges of questions and answers that can occur, and the effectiveness of this process rely on an expectation of trust and good faith among the participants. The FBI's use of such briefings for investigative purposes potentially interferes with this expectation and could frustrate the purpose of future counterintelligence briefings. For this reason, we recommend that any decision to use FBI counterintelligence and security briefings to members of political campaigns for investigative purposes should require the approval of senior leaders at both the FBI and the Department, and approval should be documented and based on factors set forth in FBI policy.

**[PAGE INTENTIONALLY LEFT BLANK]**

# CHAPTER TWELVE
# CONCLUSIONS AND RECOMMENDATIONS

## I.      Conclusions

In July 2016, 3 weeks after then FBI Director James Comey announced the conclusion of the FBI's "Midyear Exam" investigation into presidential candidate Hillary Clinton's handling of government emails during her tenure as Secretary of State, the FBI received reporting from a Friendly Foreign Government (FFG) that, in a May 2016 meeting with the FFG, Trump campaign foreign policy advisor George Papadopoulos "suggested the Trump team had received some kind of a suggestion" from Russia that it could assist in the election process with the anonymous release of information during the campaign that would be damaging to candidate Clinton and President Obama.  Days later, on July 31, the FBI initiated the Crossfire Hurricane investigation that is the subject of this report.

As we noted last year in our review of the Midyear investigation, the FBI has developed and earned a reputation as one of the world's premier law enforcement agencies in significant part because of its tradition of professionalism, impartiality, non-political enforcement of the law, and adherence to detailed policies, practices, and norms.  It was precisely these qualities that were required as the FBI initiated and conducted Crossfire Hurricane.  However, as we describe in this report, our review identified significant concerns with how certain aspects of the investigation were conducted and supervised, particularly the FBI's failure to adhere to its own standards of accuracy and completeness when filing applications for Foreign Intelligence Surveillance Act (FISA) authority to surveil Carter Page, a U.S. person who was connected to the Donald J. Trump for President Campaign.  We also identified what we believe is an absence of sufficient policies to ensure appropriate Department oversight of significant investigative decisions that could affect constitutionally protected activity.

### The Opening of Crossfire Hurricane and the Use of Confidential Human Sources

The decision to open the Crossfire Hurricane investigation was made by the FBI's then Counterintelligence Division (CD) Assistant Director (AD), E.W. "Bill" Priestap, and reflected a consensus reached after multiple days of discussions and meetings among senior FBI officials.  We concluded that AD Priestap's exercise of discretion in opening the investigation was in compliance with Department and FBI policies, and we did not find documentary or testimonial evidence that political bias or improper motivation influenced his decision.  While the information in the FBI's possession at the time was limited, in light of the low threshold established by Department and FBI predication policy, we found that Crossfire Hurricane was opened for an authorized investigative purpose and with sufficient factual predication.

However, we also determined that, under Department and FBI policy, the decision whether to open the Crossfire Hurricane counterintelligence investigation,

which involved the activities of individuals associated with a national major party campaign for president, was a discretionary judgment call left to the FBI. There was no requirement that Department officials be consulted, or even notified, prior to the FBI making that decision. We further found that, consistent with this policy, the FBI advised supervisors in the Department's National Security Division (NSD) of the investigation only after it had been initiated. As we detail in Chapter Two, high-level Department notice and approval is required in other circumstances where investigative activity could substantially impact certain civil liberties, and that notice allows senior Department officials to consider the potential constitutional and prudential implications in advance of these activities. We concluded that similar advance notice should be required in circumstances such as those that were present here.

Shortly after the FBI opened the Crossfire Hurricane investigation, the FBI conducted several consensually monitored meetings between FBI confidential human sources (CHS) and individuals affiliated with the Trump campaign, including a high-level campaign official who was not a subject of the investigation. We found that the CHS operations received the necessary approvals under FBI policy; that an Assistant Director knew about and approved of each operation, even in circumstances where a first-level supervisory special agent could have approved the operations; and that the operations were permitted under Department and FBI policy because their use was not for the sole purpose of monitoring activities protected by the First Amendment or the lawful exercise of other rights secured by the Constitution or laws of the United States. We did not find any documentary or testimonial evidence that political bias or improper motivation influenced the FBI's decision to conduct these operations. Additionally, we found no evidence that the FBI attempted to place any CHSs within the Trump campaign, recruit members of the Trump campaign as CHSs, or task CHSs to report on the Trump campaign.

However, we are concerned that, under applicable Department and FBI policy, it would have been sufficient for a first-level FBI supervisor to authorize the sensitive domestic CHS operations undertaken in Crossfire Hurricane, and that there is no applicable Department or FBI policy requiring the FBI to notify Department officials of a decision to task CHSs to consensually monitor conversations with members of a presidential campaign. Specifically, in Crossfire Hurricane, where one of the CHS operations involved consensually monitoring a high-level official on the Trump campaign who was not a subject of the investigation, and all of the operations had the potential to gather sensitive information of the campaign about protected First Amendment activity, we found no evidence that the FBI consulted with any Department officials before conducting the CHS operations—and no policy requiring the FBI to do so. We therefore believe that current Department and FBI policies are not sufficient to ensure appropriate oversight and accountability when such operations potentially implicate sensitive, constitutionally protected activity, and that requiring Department consultation, at a minimum, would be appropriate.

### *The FISA Applications to Conduct Surveillance of Carter Page*

One investigative tool for which Department and FBI policy expressly require advance approval by a senior Department official is the seeking of a court order under the Foreign Intelligence Surveillance Act (FISA).  When the Crossfire Hurricane team first proposed seeking a FISA order targeting Carter Page in mid-August 2016, FBI attorneys assisting the investigation considered it a "close call" whether they had developed the probable cause necessary to obtain the order, and a FISA order was not requested at that time.  However, in September 2016, immediately after the Crossfire Hurricane team received reporting from Christopher Steele concerning Page's alleged recent activities with Russian officials, FBI attorneys advised the Department that the team was ready to move forward with a request to obtain FISA authority to surveil Page.  FBI and Department officials told us the Steele reporting "pushed [the FISA proposal] over the line" in terms of establishing probable cause.  FBI leadership supported relying on Steele's reporting to seek a FISA order targeting Page after being advised of, and giving consideration to, concerns expressed by a Department attorney that Steele may have been hired by someone associated with a rival candidate or campaign.

The authority under FISA to conduct electronic surveillance and physical searches targeting individuals significantly assists the government's efforts to combat terrorism, clandestine intelligence activity, and other threats to the national security.  At the same time, the use of this authority unavoidably raises civil liberties concerns.  FISA orders can be used to surveil U.S. persons, like Carter Page, and in some cases the surveillance will foreseeably collect information about the individual's constitutionally protected activities, such as Page's legitimate activities on behalf of a presidential campaign.  Moreover, proceedings before the Foreign Intelligence Surveillance Court (FISC)—which is responsible for ruling on applications for FISA orders—are *ex parte*, meaning that unlike most court proceedings, the government is present but the government's counterparty is not.  In addition, unlike the use of other intrusive investigative techniques (such as wiretaps under Title III and traditional criminal search warrants) that are granted in *ex parte* hearings but can potentially be subject to later court challenge, FISA orders have not been subject to scrutiny through subsequent adversarial proceedings.

In light of these concerns, Congress through the FISA statute, and the Department and FBI through policies and procedures, have established important safeguards to protect the FISA application process from irregularities and abuse.  Among the most important are the requirements in FBI policy that every FISA application must contain a "full and accurate" presentation of the facts, and that agents must ensure that all factual statements in FISA applications are "scrupulously accurate."  These are the standards for all FISA applications, regardless of the investigation's sensitivity, and it is incumbent upon the FBI to meet them in every application.  That said, in the context of an investigation involving persons associated with a presidential campaign, where the target of the FISA is a former campaign official and the goal of the FISA is to uncover, among other things, information about the individual's allegedly illegal campaign-related activities, members of the Crossfire Hurricane investigative team should have

anticipated, and told us they in fact did anticipate, that these FISA applications would be subjected to especially close scrutiny.

Nevertheless, we found that members of the Crossfire Hurricane team failed to meet the basic obligation to ensure that the Carter Page FISA applications were "scrupulously accurate."  We identified significant inaccuracies and omissions in each of the four applications—7 in the first FISA application and a total of 17 by the final renewal application.  For example, the Crossfire Hurricane team obtained information from Steele's Primary Sub-source in January 2017 that raised significant questions about the reliability of the Steele reporting that was used in the Carter Page FISA applications.  But members of the Crossfire Hurricane team failed to share the information with the Department, and it was therefore omitted from the three renewal applications.  All of the applications also omitted information the FBI had obtained from another U.S. government agency detailing its prior relationship with Page, including that Page had been approved as an operational contact for the other agency from 2008 to 2013, and that Page had provided information to the other agency concerning his prior contacts with certain Russian intelligence officers, one of which overlapped with facts asserted in the FISA application.

As a result of the 17 significant inaccuracies and omissions we identified, relevant information was not shared with, and consequently not considered by, important Department decision makers and the court, and the FISA applications made it appear as though the evidence supporting probable cause was stronger than was actually the case.  We also found basic, fundamental, and serious errors during the completion of the FBI's factual accuracy reviews, known as the Woods Procedures, which are designed to ensure that FISA applications contain a full and accurate presentation of the facts.

We do not speculate whether the correction of any particular misstatement or omission, or some combination thereof, would have resulted in a different outcome.  Nevertheless, the Department's decision makers and the court should have been given complete and accurate information so that they could meaningfully evaluate probable cause before authorizing the surveillance of a U.S. person associated with a presidential campaign.  That did not occur, and as a result, the surveillance of Carter Page continued even as the FBI gathered information that weakened the assessment of probable cause and made the FISA applications less accurate.

We determined that the inaccuracies and omissions we identified in the applications resulted from case agents providing wrong or incomplete information to Department attorneys and failing to identify important issues for discussion.  Moreover, we concluded that case agents and SSAs did not give appropriate attention to facts that cut against probable cause, and that as the investigation progressed and more information tended to undermine or weaken the assertions in the FISA applications, the agents and SSAs did not reassess the information supporting probable cause.  Further, the agents and SSAs did not follow, or even appear to know, certain basic requirements in the Woods Procedures.  Although we did not find documentary or testimonial evidence of intentional misconduct on the part of the case agents who assisted NSD's Office of Intelligence (OI) in preparing

the applications, or the agents and supervisors who performed the Woods Procedures, we also did not receive satisfactory explanations for the errors or missing information. We found that the offered explanations for these serious errors did not excuse them, or the repeated failures to ensure the accuracy of information presented to the FISC.

We are deeply concerned that so many basic and fundamental errors were made by three separate, hand-picked investigative teams; on one of the most sensitive FBI investigations; after the matter had been briefed to the highest levels within the FBI; even though the information sought through use of FISA authority related so closely to an ongoing presidential campaign; and even though those involved with the investigation knew that their actions were likely to be subjected to close scrutiny. We believe this circumstance reflects a failure not just by those who prepared the FISA applications, but also by the managers and supervisors in the Crossfire Hurricane chain of command, including FBI senior officials who were briefed as the investigation progressed. We do not expect managers and supervisors to know every fact about an investigation, or senior leaders to know all the details of cases about which they are briefed. However, especially in the FBI's most sensitive and high-priority matters, and especially when seeking court permission to use an intrusive tool such as a FISA order, it is incumbent upon the entire chain of command, including senior officials, to take the necessary steps to ensure that they are sufficiently familiar with the facts and circumstances supporting and potentially undermining a FISA application in order to provide effective oversight consistent with their level of supervisory responsibility. Such oversight requires greater familiarity with the facts than we saw in this review, where time and again during OIG interviews FBI managers, supervisors, and senior officials displayed a lack of understanding or awareness of important information concerning many of the problems we identified.

In the preparation of the FISA applications to surveil Carter Page, the Crossfire Hurricane team failed to comply with FBI policies, and in so doing fell short of what is rightfully expected from a premier law enforcement agency entrusted with such an intrusive surveillance tool. In light of the significant concerns identified with the Carter Page FISA applications and the other issues described in this report, the OIG today initiated an audit that will further examine the FBI's compliance with the Woods Procedures in FISA applications that target U.S. persons in both counterintelligence and counterterrorism investigations. We also make the following recommendations to assist the Department and the FBI in avoiding similar failures in future investigations.

## II.    Recommendations

For the reasons fully described in previous chapters, we recommend the following:

      1.   The Department and the FBI should ensure that adequate procedures are in place for the Office of Intelligence (OI) to obtain all relevant and accurate information, including access to Confidential Human Source

(CHS) information, needed to prepare FISA applications and renewal applications.  This effort should include revising:

a.  the FISA Request Form:  to ensure information is identified for OI:  (i) that tends to disprove, does not support, or is inconsistent with a finding or an allegation that the target is a foreign power or an agent of a foreign power, or (ii) that bears on the reliability of every CHS whose information is relied upon in the FISA application, including all information from the derogatory information sub-file, recommended below;

b.  the Woods Form: (i) to emphasize to agents and their supervisors the obligation to re-verify factual assertions repeated from prior applications and to obtain written approval from CHS handling agents of all CHS source characterization statements in applications, and (ii) to specify what steps must be taken and documented during the legal review performed by an FBI Office of General Counsel (OGC) line attorney and SES-level supervisor before submitting the FISA application package to the FBI Director for certification;

c.  the FISA Procedures:  to clarify which positions may serve as the supervisory reviewer for OGC; and

d.  taking any other steps deemed appropriate to ensure the accuracy and completeness of information provided to OI.

2.  The Department and FBI should evaluate which types of Sensitive Investigative Matters (SIM) require advance notification to a senior Department official, such as the Deputy Attorney General, in addition to the notifications currently required for SIMs, especially for case openings that implicate core First Amendment activity and raise policy considerations or heighten enterprise risk, and establish implementing policies and guidance, as necessary.

3.  The FBI should develop protocols and guidelines for staffing and administrating any future sensitive investigative matters from FBI Headquarters.

4.  The FBI should address the problems with the administration and assessment of CHSs identified in this report and, at a minimum, should:

a.  revise its standard CHS admonishment form to include a prohibition on the disclosure of the CHS's relationship with the FBI to third parties absent the FBI's permission, and assess the need to include other admonishments in the standard CHS admonishments;

      b.      develop enhanced procedures to ensure that CHS information is documented in Delta, including information generated from Headquarters-led investigations, substantive contacts with closed CHSs (directly or through third parties), and derogatory information. We renew our recommendation that the FBI create a derogatory information sub-file in Delta;

      c.      assess VMU's practices regarding reporting source validation findings and non-findings;

      d.      establish guidance for sharing sensitive information with CHSs;

      e.      establish guidance to handling agents for inquiring whether their CHS participates in the types of groups or activities that would bring the CHS within the definition of a "sensitive source," and ensure handling agents document (and update as needed) those affiliations and any others voluntarily provided to them by the CHS in the Source Opening Communication, the "Sensitive Categories" portion of each CHS's Quarterly Supervisory Source Report, the "Life Changes" portion of CHS Contact Reports, or as otherwise directed by the FBI so that the FBI can assess whether active CHSs are engaged in activities (such as political campaigns) at a level that might require re-designation as a "sensitive source" or necessitate closure of the CHS; and

      f.      revise its CHS policy to address the considerations that should be taken into account and the steps that should be followed before and after accepting information from a closed CHS indirectly through a third party.

5.      The Department and FBI should clarify the following terms in their policies:

      a.      assess the definition of a "Sensitive Monitoring Circumstance" in the AG Guidelines and the FBI's DIOG to determine whether to expand its scope to include consensual monitoring of a domestic political candidate or an individual prominent within a domestic political organization, or a subset of these persons, so that consensual monitoring of such individuals would require consultation with or advance notification to a senior Department official, such as the Deputy Attorney General; and

      b.      establish guidance, and include examples in the DIOG, to better define the meaning of the phrase "prominent in a domestic political organization" so that agents understand which campaign officials fall within that definition as it relates to "Sensitive Investigative Matters," "Sensitive UDP," and the designation of "sensitive sources." Further, if the Department expands the scope of "Sensitive Monitoring Circumstance," as

recommended above, the FBI should apply the guidance on "prominent in a domestic political organization" to "Sensitive Monitoring Circumstance" as well.

6.  The FBI should ensure that appropriate training on DIOG § 4 is provided to emphasize the constitutional implications of certain monitoring situations and to ensure that agents account for these concerns, both in the tasking of CHSs and in the way they document interactions with and tasking of CHSs.

7.  The FBI should establish a policy regarding the use of defensive and transition briefings for investigative purposes, including the factors to be considered and approval by senior leaders at the FBI with notice to a senior Department official, such as the Deputy Attorney General.

8.  The Department's Office of Professional Responsibility should review our findings related to the conduct of Department attorney Bruce Ohr for any action it deems appropriate.  Ohr's current supervisors in the Department's Criminal Division should also review our findings related to Ohr's performance for any action they deem appropriate.

9.  The FBI should review the performance of all employees who had responsibility for the preparation, Woods review, or approval of the FISA applications, as well as the managers, supervisors, and senior officials in the chain of command of the Carter Page investigation, for any action deemed appropriate.

APPENDIX 1

## WOODS PROCEDURES[531]
## FIRST FISA APPLICATION

| Factual Assertion in FISA Application | Page # or FN | No supporting documentation | Supporting documentation does not state this fact | Supporting document shows that the factual assertion is inaccurate |
|---|---|---|---|---|
| The DNI commented that this influence included providing money to particular candidates or providing disinformation. | 5 | | X | |
| Although Page did not provide any specific details to refute, dispel, or clarify the media reporting, he made vague statements that minimized his activities. | 27 | | | X |
| In or about May 2016, Buryakov was sentenced to 30 months in prison. | FN 6 | X | | |
| [Steele] is a former ▇▇▇▇▇▇▇ ▇▇▇▇▇ and has been an FBI source since in or about October 2013. [Steele's] reporting has been corroborated and used in criminal proceedings and the FBI assesses [Steele] to be reliable.  [Steele] has been compensated approx. $95,000 by the FBI and the FBI is unaware of any derogatory information pertaining to [Steele].[532] | FN 8 | X | | |
| [Steele] reported the information contained therein to the FBI over the course of several meetings with the FBI from in or about June 2016 through August 2016. | FN 8 | X | | |
| [Steele] told the FBI that he/she only provided this information to the business associate and the FBI. | FN 18 | | | X |
| Since that time, Source #2 has routinely provided reliable information that has been corroborated by the FBI. | FN 20 | X | | |
| Source #2 has been compensated in excess of ▇▇▇▇▇ since 2008. | FN 20 | X | | |

---

[531] This Appendix describes errors we identified in the Woods process for the four Carter Page FISA applications.  We did not examine the "facilities" section of the applications.  This Appendix does not include non-Woods-related errors in the applications described in Chapters Five and Eight.  As described in Chapter Two, the Woods Procedures seek to ensure the accuracy of every factual assertion in a FISA application.  These procedures require that the case agent who requests an application create and maintain a "Woods File" that contains:  (1) supporting documentation for every factual assertion contained in the application, and (2) results and supporting documentation of the required searches and verifications.  In this appendix, we identify each factual assertion in the FISA applications for which we found (1) no supporting documentation in the Woods File, (2) purported supporting documentation in the Woods File that did not state the fact asserted in the FISA application, or (3) purported supporting documentation in the Woods File that actually indicates the fact asserted is inaccurate.

[532] The Woods Procedures require that when an application contains reporting from a Confidential Human Source (CHS), the Woods File must contain documentation from the CHS handling agent verifying that the handling agent has reviewed the facts on the CHS's background and reliability and that the representations in the FISA about the CHS are accurate.

**APPENDIX 1**

## WOODS PROCEDURES
## RENEWAL APPLICATION NO. 1

| Factual assertion in FISA Application | Page # or FN | No supporting documentation | Supporting documentation does not state this fact | Supporting document shows that the factual assertion is inaccurate |
|---|---|---|---|---|
| The DNI commented that this influence included providing money to particular candidates or providing disinformation. | 6 | | X | |
| Although Page did not provide any specific details to refute, dispel, or clarify the media reporting, he made vague statements that minimized his activities. | 29 | | | X |
| According to Source #2, Page initially attempted to distance the think tank from Russian funding. | 35 | X | | |
| Papadopoulos is a current subject of an FBI investigation.[533] | FN 3 | X | | |
| In or about May 2016, Buryakov was sentenced to 30 months in prison. | FN 7 | X | | |
| [Steele] is a former ▆▆▆▆▆▆▆▆ ] and has been an FBI source since in or about October 2013. [Steele] has been compensated approx. $95,000 by the FBI.  [T]he FBI assesses [Steele] to be reliable as previous reporting from [Steele] has been corroborated and used in criminal proceedings. | FN 9 | X | | |
| [I]n or about October 2016, the FBI suspended its relationship with [Steele] due to [Steele's] unauthorized disclosure of information to the press. | FN 9 | | X | |
| [Steele] reported the information contained therein to the FBI over the course of several meetings with the FBI from in or about June 2016 through August 2016. | FN 9 | X | | |
| [Steele] told the FBI that he/she only provided this information to the business associate and the FBI. | FN 19 | | | X |
| Since that time, Source #2 has routinely provided reliable information that has been corroborated by the FBI. | FN 21 | X | | |
| Source #2 has been compensated in excess of ▆▆▆▆▆▆ since 2008. | FN 21 | X | | |

---

[533] Although the Crossfire Hurricane team knew the FBI had an ongoing investigation of Papadopoulos, the Woods File did not contain documentation supporting this factual assertion.  The Woods Procedures do not exempt information known to the case agent from having supporting documentation.

APPENDIX 1

## WOODS PROCEDURES
## RENEWAL APPLICATION NO. 2[534]

| Factual assertion in FISA Application | Page # or FN | No supporting documentation | Supporting documentation does not state this fact | Supporting document shows that the factual assertion is inaccurate |
|---|---|---|---|---|
| The DNI commented that this influence included providing money to particular candidates or providing disinformation. | 6 | | X | |
| Although Page did not provide any specific details to refute, dispel, or clarify the media reporting, he made vague statements that minimized his activities. | 30 | | | X |
| According to Source #2, Page initially attempted to distance the think tank from Russian funding. | 35 | X | | |
| Page stated that he believed that he was the subject of electronic surveillance by the U.S. government. | 35 | X | | |
| The FBI's ongoing investigation has revealed that Page has moved out of his New York City residence and does not currently maintain a permanent address; rather Page lives in and out of hotels inside New York City and other cities. | 36 | X | | |
| Court-authorized ▮▮▮▮▮▮▮ revealed a document titled ▮▮▮▮▮▮▮." The document outlines what appear to be talking points that are meant to counter media reports that cast Page in a negative light. | 42 | X | | |
| At a later point in the interview, after the FBI explained to Page how Page could be viewed as having a source-handler or co-optee relationship with the Russian intelligence officers, Page claimed that he believed that he was "on the books," but that he only provided the Russian intelligence officers with "immaterial non-public" information. | 46-7 | X | | |
| Also during the interviews, Page denied ever meeting with Sechin or Divyekin. | 47 | X | | |

[534] The Woods File for Renewal Application No. 2 contains a piece of paper that states "Strat Plan" and another piece of paper that states "New 302," "Feb. Article," and "March Article." The case agent who compiled the Woods File for this application told us that these pieces of paper were "placeholders" he inserted into the file to indicate to the SSA reviewer that a supporting document existed, but that a copy of it was not placed into the file. We do not believe these placeholders met the Woods requirements because the descriptions of the referenced documents were vague and it was not clear to us why the actual documents could not have been included in the Woods File. We also observed that there was no notation or other record indicating that the agent and supervisor performing the factual accuracy review in fact examined the documents identified by the placeholders.

**APPENDIX 1**

| Factual assertion in FISA Application | Page # or FN | No supporting documentation | Supporting documentation does not state this fact | Supporting document shows that the factual assertion is inaccurate |
|---|---|---|---|---|
| As of March 2017, the FBI has conducted several interviews with Papadopoulos.  During these interviews, Papadopoulos confirmed that he met with officials from the above-referenced friendly foreign government, but he denied that he discussed anything related to the Russian Government during these meetings. | FN 4 | | | X |
| In or about May 2016, Buryakov was sentenced to 30 months in prison. | FN 8 | X | | |
| [Steele] is a former ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ and has been an FBI source since in or about October 2013. [Steele] has been compensated approx. $95,000 by the FBI.  [T]he FBI assesses [Steele] to be reliable as previous reporting from [Steele] has been corroborated and used in criminal proceedings. | FN 10 | X | | |
| [I]n or about October 2016, the FBI suspended its relationship with [Steele] due to [Steele's] unauthorized disclosure of information to the press. | FN 10 | | X | |
| [Steele] reported the information contained therein to the FBI over the course of several meetings with the FBI from in or about June 2016 through August 2016. | FN 10 | X | | |
| [Steele] told the FBI that he/she only provided this information to the business associate and the FBI. | FN 20 | | | X |
| Since that time, Source #2 has routinely provided reliable information that has been corroborated by the FBI. | FN 22 | X | | |
| Source #2 has been compensated in excess of ▮▮▮▮▮▮▮ since 2008. | FN 22 | X | | |

APPENDIX 1

## WOODS PROCEDURES
## RENEWAL APPLICATION NO. 3[535]

| Factual assertion in FISA Application | Page # or FN | No supporting documentation | Supporting documentation does not state this fact | Supporting document indicates the factual assertion is inaccurate |
|---|---|---|---|---|
| The DNI commented that this influence included providing money to particular candidates or providing disinformation. | 6 | | X | |
| Russian President Vladimir Putin said in or about September 2016 that Russia was not responsible for the hack, but that the release of the DNC documents was a net positive: "The important thing is the content that was given to the public." | 7 | X | | |
| U.S. Person #1 recalled an instance where Page was picked-up in a chauffeured car and it was rumored at that time that Page had met with Igor Sechin. | 21 | | X | |
| Although Page did not provide any specific details to refute, dispel, or clarify the media reporting, he made vague statements that minimized his activities. | 33 | | | X |
| Court-authorized ███████████████████ that appears to confirm that Page did, in fact, meet with such officials. | 35 | X | | |
| Court-authorized ███████████████████ Page planned to visit members or employees of "Inter RAO." | 42 | X | | |
| According to Source #2, Page initially attempted to distance the think tank from Russian funding.  When Source #2 reminded Page of his previous statement regarding the "open checkbook," Page did not refute his previous comment and provided some reassurance to Source #2 about the likelihood of Russian financial support. | 44 | X | | |
| Court-authorized ███████████████████ The document outlines what appear to be talking points that are meant to counter media reports that cast Page in a negative light. | 47-8 | X | | |

[535] Similar to the Woods File for Renewal Application No. 2, the file for Renewal Application 3 contains a "placeholder" piece of paper that states "Strat Plan," indicating to the SSA reviewer that a supporting document existed for the factual assertion, but that it was not placed into the Woods File. For the reasons noted above, we do not believe this placeholder met the Woods requirements.

# APPENDIX 1

| Factual assertion in FISA Application | Page # or FN | No supporting documentation | Supporting documentation does not state this fact | Supporting document indicates the factual assertion is inaccurate |
|---|---|---|---|---|
| Page downplayed his interactions with Dvorkovich during his March 2017 interviews with the FBI.  During these interviews, Page characterized his interaction with Dvorkovich in July 2016 as a simple introduction in passing and a brief handshake. | 53 | | X | |
| [Steele] is a former ██████████ ██████████ and has been an FBI source since in or about October 2013. [Steele] has been compensated approx. $95,000 by the FBI. [T]he FBI assesses [Steele] to be reliable as previous reporting from [Steele] has been corroborated and used in criminal proceedings. | FN 10 | X | | |
| [I]n or about October 2016, the FBI suspended its relationship with [Steele] due to [Steele's] unauthorized disclosure of information to the press. | FN 10 | | X | |
| [Steele] reported the information contained therein to the FBI over the course of several meetings with the FBI from in or about June 2016 through August 2016. | FN 10 | X | | |
| In or about December 2008, Source #2 was opened as an FBI source.  In or about January 2011, Source #2 was closed as an FBI source for, among other things, motivation for reporting, but not for validity of reporting. Source #2 was reopened in or about March 2011.  Since that time, Source #2 has routinely provided reliable information that has been corroborated by the FBI. | FN 21 | X | | |
| Source #2 has been compensated in excess of ████████ since 2008. | FN 21 | X | | |
| [Steele] told the FBI that he/she only provided this information to the business associate and the FBI. | FN 22 | | | X |
| According to information on its website, Gazprombank was founded by Gazprom to provide banking services for gas industry enterprises. | FN 26 | X | | |

**APPENDIX 2**

## FBI'S RESPONSE



**U.S. Department of Justice**

Federal Bureau of Investigation

Office of the Director                                    *Washington, D.C. 20535-0001*

December 6, 2019

The Honorable Michael Horowitz
Inspector General
U.S. Department of Justice
Washington, D.C. 20530

Dear Inspector General Horowitz:

Thank you for the opportunity to respond to the Office of the Inspector General (OIG) Report titled, *"Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation"* (Report).

The Federal Bureau of Investigation (FBI) appreciates the OIG's crucial independent oversight role and the thoroughness and professionalism your office brought to this work. The Report's findings and recommendations represent constructive criticism that will make us stronger as an organization. We also appreciate the Report's recognition that the FBI cooperated fully with this review and provided broad and timely access to all information requested by the OIG, including highly classified and sensitive material involving national security.

The Report concludes that the FBI's Crossfire Hurricane investigation and related investigations of certain individuals were opened in 2016 for an authorized purpose and with adequate factual predication. The Report also details instances in which certain FBI personnel, at times during the 2016-2017 period reviewed by the OIG, did not comply with existing policies, neglected to exercise appropriate diligence, or otherwise failed to meet the standard of conduct that the FBI expects of its employees — and that our country expects of the FBI. We are vested with significant authorities, and it is our obligation as public servants to ensure that

**APPENDIX 2**

these authorities are exercised with objectivity and integrity.  Anything less falls short of the FBI's duty to the American people.

Accordingly, the FBI accepts the Report's findings and embraces the need for thoughtful, meaningful remedial action.  I have ordered more than 40 corrective steps to address the Report's recommendations.  Because our credibility and brand are central to fulfilling our mission, we are also making improvements beyond those recommended by the OIG.  And where certain individuals have been referred by the OIG for review of their conduct, the FBI will not hesitate to take appropriate disciplinary action if warranted at the completion of the required procedures for disciplinary review.

Below is a summary of the actions we are taking, which we describe in more detail in the attachment to this letter.

First, we are modifying our processes under the Foreign Intelligence Surveillance Act (FISA), both for initial applications and renewals, to enhance accuracy and completeness.  The FBI relies on FISA every day in national security investigations to prevent terrorists and foreign intelligence services from harming the United States.  We are making concrete changes to ensure that our FISA protocols, verifications, layers of review, record-keeping requirements, and audits are more stringent and less susceptible to mistake or inaccuracy.  These new processes will also ensure that the FISA Court and the Department of Justice (DOJ) are apprised of all information in the FBI's holdings relevant to a determination of probable cause.

Second, we undertook an extensive review of investigative activity based out of FBI Headquarters.  The FBI is a field-based law enforcement organization, and the vast majority of our investigations should continue to be worked by our field offices.  Moving forward, in the very rare instance when FBI Headquarters runs a sensitive investigation, we are requiring prior approval by the FBI Deputy Director and consultation with the Assistant Director in Charge or Special Agent in Charge of the affected field offices.

2

**APPENDIX 2**

Third, we are making significant changes to how the FBI manages its Confidential Human Source (CHS) Program. Many FBI investigations rely on human sources, but the investigative value derived from CHS-provided information rests in part on the CHS's credibility, which demands rigorous assessment of the source. The modifications we are making to how the FBI collects, documents, and shares information about CHSs will strengthen our assessment of the information these sources are providing.

Fourth, I am establishing new protocols for the FBI's participation in Office of the Director of National Intelligence (ODNI)-led counterintelligence transition briefings (*i.e.*, strategic intelligence briefings) provided to presidential nominees. The FBI's role in these briefings should be for national security purposes and <u>not</u> for investigative purposes. Continued participation by the FBI in these transition briefings is critical to ensuring continuity in the event of a change in administrations. The new FBI protocols about transition briefings will complement procedures already implemented by the FBI earlier this year to govern the separate category of defensive briefings. The FBI gives defensive briefings, which are based on specific threat information, in a wide variety of contexts and for myriad federal, state, and other public and private individuals and entities. The procedures we recently established for defensive briefings regarding malign foreign influence efforts have brought a new rigor and discipline to whether and how such briefings should proceed.

Fifth, I am mandating a specialized, semiannual training requirement for FBI personnel at all levels who handle FISA and CHS matters. This training will be experience-based, and it will cover specific lessons learned from this Report, along with other new and revised material. Earlier in my tenure as Director, I reinstated an annual ethics training program for all FBI employees, because I learned the training had been discontinued in prior years. While that training was not introduced in response to this Report, all current FBI employees involved in the 2016-2017 events reviewed by the OIG have since completed this additional training in ethics and professional responsibility.

Finally, we will review the performance and conduct of certain FBI employees who were referenced in the Report's recommendations — including managers, supervisors, and senior

3

**APPENDIX 2**

officials at the time. The FBI will take appropriate disciplinary action where warranted. Notably, many of the employees described in the report are no longer employed at the FBI.

\*    \*    \*

I want to emphasize that the FBI's participation in this process was undertaken with my express direction to be as transparent as possible, while honoring our duty to protect sources and methods that, if disclosed, might make Americans less safe. Where protection of certain sensitive information is well-founded, I remain committed to upholding the laws and longstanding policies governing classification and public release. I am just as committed to the principle that possible embarrassment and chagrin to the FBI or its employees is not, and should never be, the basis of a decision not to divulge FBI information. The FBI has worked closely with the OIG and DOJ on the classification issues implicated by the Report. Our joint process with the OIG and DOJ has ensured all material facts could be presented in this Report, with redactions carefully limited and narrowly tailored to specific national security and operational concerns. I am grateful for the mutual assistance of the OIG and DOJ in responsible presentation of this extremely sensitive information.

Since becoming FBI Director in August 2017, I have emphasized to FBI agents, analysts, and staff the importance of doing things the right way, by the book. I am humbled to serve alongside these dedicated men and women, and I am confident that the actions we are taking will strengthen our historic institution, ensure that we continue to discharge our responsibilities objectively and free from political bias, and better position us to protect the American people against threats while upholding the Constitution.

Sincerely,

Christopher A. Wray
Director

Enclosure

4

**APPENDIX 2**

The Federal Bureau of Investigation's Response to the Report
December 6, 2019

[Recommendations from the OIG appear verbatim in *italics*.]

1. *The Department and the FBI should ensure that adequate procedures are in place for the Office of Intelligence (OI) to obtain all relevant and accurate information, including access to Confidential Human Source (CHS) information, needed to prepare FISA applications and renewal applications. This effort should include revising:*
   a. *the FISA Request Form: to ensure information is identified for OI: (i) that tends to disprove, does not support, or is inconsistent with a finding or an allegation that the target is a foreign power or an agent of a foreign power, or (ii) that bears on the reliability of every CHS whose information is relied upon in the FISA application, including all information from the derogatory sub-file, recommended below;*
   b. *the Woods Form: (i) to emphasize to agents and their supervisors the obligation to re-verify factual assertions repeated from prior applications and to obtain written approval from CHS handling agents of all CHS source characterization statements in applications, and (ii) to specify what steps must be taken and documented during the legal review performed by an FBI Office of General Counsel (OGC) line attorney and SES-level supervisor before submitting the FISA application package to the FBI Director for certification;*
   c. *the FISA Procedures: to clarify which positions may serve as the supervisory reviewer for OGC; and*
   d. *taking any other steps deemed appropriate to ensure the accuracy and completeness of information provided to OI.*

**The FBI fully accepts these recommendations and is taking the following actions, many of which exceed the OIG's specific recommendations:**

1. Supplementing the FISA Request Form with new questions, including a checklist of relevant information, which will direct agents to provide additional information and to collect all details relevant to the consideration of a probable cause finding, emphasizing the need to err on the side of disclosure;
2. Requiring that all information known at the time of the request and bearing on the reliability of a CHS whose information is used to support the FISA application is captured in the FISA Request Form and verified by the CHS handler;
3. Adding reverification directives to the FISA Verification Form, known as the Woods Form, which will require agents and their supervisors to attest to their diligence in re-verifying facts from prior factual applications and to confirm that any changes or clarifying facts, to the extent needed, are in the FISA renewal application;
4. Improving the FISA Verification Form by adding a section devoted to CHSs, including a new certification related to the CHS-originated content in the FISA application by the CHS handler, and CHS-related information that requires confirmation by the CHS handler, which will be maintained in the CHS's file;
5. Adding an affirmation to the FISA Verification Form that, to the best of the agent's and supervisor's knowledge, OI has been apprised of all information that might reasonably

**APPENDIX 2**

The Federal Bureau of Investigation's Response to the Report, *continued from previous page*
December 6, 2019

call into question the accuracy of the information in the application or otherwise raise doubts about the requested probable cause finding or the theory of the case;

6. Adding a checklist to the FISA Verification Form that walks through the new and existing steps for the supervisor who is affirming the case agent's accuracy review prior to his or her signature, affirming the completeness of the accuracy review;

7. Formalizing the role of FBI attorneys in the legal review process for FISA applications, to include identification of the point at which SES-level FBI OGC personnel will be involved, which positions may serve as the supervisory legal reviewer, and establishing the documentation required for the legal review;

8. Creating and teaching a case study based on the OIG Report findings, analyzing all steps of that particular FISA application and its renewals to show FBI personnel the errors, omissions, failures to follow policy, and communication breakdowns, and to instruct where new or revised policies and procedures will apply, so that mistakes of the past are not repeated;

9. Requiring serialization of completed FISA Verification Forms in the FBI's case management system to increase accountability and transparency;

10. Developing and requiring new training focused on FISA process rigor and the steps FBI personnel must take, at all levels, to make sure that OI and the FISC are apprised of all information in the FBI's holdings at the time of an application that would be relevant to a determination of probable cause;

11. Identifying and pursuing short- and long-term technological improvements, in partnership with DOJ, that will aid in consistency and accountability; and,

12. Directing the FBI's recently expanded Office of Integrity and Compliance to work with the FBI's Resource Planning Office to identify and propose audit, review, and compliance mechanisms to ensure the above changes to the FISA process are effective. In addition, OIC has been directed to evaluate whether other compliance mechanisms would be beneficial to the implementation of the changes detailed below.

2. *The Department and FBI should evaluate which types of Sensitive Investigative Matters (SIM) require advance notification to a senior Department official, such as the Deputy Attorney General, in addition to the notifications currently required for SIMs, especially for case openings that implicate core First Amendment activity, and establish implementing policies and guidance, as necessary.*

**The FBI fully accepts this recommendation and is taking the following actions:**

1. Identifying, in consultation with the DOJ, which types of SIMs warrant coordination with a senior Department official, implementing heightened FBI approval requirements for the opening of these SIMs, and establishing related processes; and,

2. Training FBI personnel on the changes to ensure that the FBI workforce is consistently recognizing and applying the new requirements and processes for the identified types of SIMs.

2

**APPENDIX 2**

The Federal Bureau of Investigation's Response to the Report, *continued from previous page*
December 6, 2019

3. *The FBI should develop protocols and guidelines for staffing and administrating any future sensitive investigative matters from FBI Headquarters.*

**The FBI fully accepts this recommendation. Prior to receiving this recommendation, the FBI established a working group that reviewed all FBI Headquarters investigations. This review resulted in the closing of those investigations not falling within certain limited exceptions or transferring those cases to the appropriate field offices. In addition, the FBI is taking the following actions, affecting all potential FBI Headquarters investigations:**

1. Establishing protocols and guidelines for the rare circumstance when a FBI Headquarters-led investigation might be appropriate;
2. Requiring consultation with the Assistant Director(s) in Charge or Special Agent(s) in Charge of all affected field offices prior to the opening of any FBI Headquarters investigation;
3. Requiring FBI Deputy Director approval prior to opening any FBI Headquarters SIM;
4. Developing and implementing protocols to ensure FBI Headquarters-led investigations follow the structure of field-led investigations, apply the same investigative rigor, and engage in timely and relevant information sharing with the appropriate field offices; and,
5. Instituting an annual audit of investigative files opened at FBI Headquarters during the previous year. The purpose of the audit will be to determine whether each investigation complies with policy and if it should remain an FBI Headquarters-run investigation.

4. *The FBI should address the problems with the administration and assessment of CHSs identified in this report and, at a minimum, should:*
   a. *revise its standard CHS admonishment form to include a prohibition on the disclosure of the CHS's relationship with the FBI to third parties absent the FBI's permission, and assess the need to include other admonishments in the standard CHS admonishments;*
   b. *develop enhanced procedures to ensure that CHS information is documented in Delta, including information generated from Headquarters-led investigations, substantive contacts with closed CHSs (directly or through third parties), and derogatory information. We renew our recommendation that the FBI create a derogatory sub-file in Delta;*
   c. *assess VMU's practices regarding reporting source validation findings and non-findings;*
   d. *establish guidance for sharing sensitive information with CHSs;*
   e. *establish guidance to handling agents for inquiring whether their CHS participates in the types of groups or activities that would bring the CHS within the definition of a "sensitive source," and ensure handling agents document (and update as needed) those affiliations and any other voluntarily provided to them by the CHS in the Source Opening Communications, the "Sensitive Categories" portion of each CHS's Quarterly Supervisory Source Report, the "Life Changes" portion of the CHS Contact Reports, or as otherwise directed by the FBI so that the FBI can assess whether active CHSs are engaged in activities (such as political campaigns) at a level that might require re-designation as a "sensitive source" or necessitate closure of the CHS; and*

3

**APPENDIX 2**

The Federal Bureau of Investigation's Response to the Report, *continued from previous page*
December 6, 2019

   *f. revise its CHS policy to address the considerations that should be taken into the account and the steps that should be followed before and after accepting information from a closed CHS indirectly through a third party.*

**The FBI fully accepts these recommendation and is taking the following actions, which also include improvements separately identified in the OIG's parallel review of CHS validation or by the FBI's own analysis:**

1. Creating a new admonishment to sources relating to the confidential nature of the FBI-CHS relationship;
2. Adopting additional admonishments, as necessary, to manage the FBI's relationship with the CHS and to improve the FBI's ability to identify when the CHS's status has changed or should be reevaluated;
3. Creating a new subfile, which will supplement the existing Validation subfile created in 2013, specifically dedicated to holding certain information, including derogatory information, necessary for consideration when CHS-originated information is relied on;
4. Creating a mandatory checklist for CHS handlers so that, in instances where CHS-originated information is used in legal process, relevant information from the new subfile is properly disclosed to the attorneys relying on such CHS-originated information;
5. Adding new documentation requirements to ensure that CHS-originated information and contact with a CHS is captured in the correct FBI recordkeeping system(s), even when it occurs in an atypical circumstance or as part of a separate investigation;
6. Updating and modifying the Validation Management Unit's current practices regarding reporting source validation findings and non-findings to ensure all relevant information is shared with FBI and DOJ personnel;
7. Modifying policy and clarifying guidance for both new and long-term CHSs with a focus on source validation;
8. Revising the policy related to potentially higher-risk CHSs to enhance the scrutiny of those CHSs, including periodic reevaluation for potential closure of the CHS;
9. Establishing guidance and mandatory training for FBI personnel on sharing sensitive information or classified information with CHSs;
10. Expanding the definition of a sensitive source that requires additional approval, scrutiny, and oversight to include CHSs who may have access to certain categories of individuals, such as national-level campaign staff, or who report on subjects in a SIM investigation;
11. Revising policy and adding guidance for handling agents so they know when to ask a CHS about participation in the types of groups or activities that would bring the CHS within the newly expanded definition of a "sensitive source" or require their closure;
12. Requiring agents to update the designation of the CHS to a sensitive CHS if, over the course of the CHS relationship with the FBI, the CHS's position or access changes, triggering a need for additional approvals and oversight;
13. Clarifying documentation and updating requirements related to a CHS's status;
14. Clarifying and enhancing guidance on how to respond in the situation where a CHS, acting independently and not in response to an FBI tasking, provides information about a sensitive target or operation;

4

**APPENDIX 2**

**The Federal Bureau of Investigation's Response to the Report,** *continued from previous page*
**December 6, 2019**

15. Revising policy to establish the requirements and procedures for receiving information from a closed source, whether directly or through a third party, and the necessary approvals and processes to permit or preclude acceptance of such information; and,

16. Creating a CHS Management Working Group directed to identify and deliver additional improvements to FBI CHS policies and procedures.

5. *The Department and FBI should clarify the following terms in their policies:*
   a. *assess the definition of a "Sensitive Monitoring Circumstance" in the AG Guidelines and the FBI's DIOG to determine whether to expand its scope to include consensual monitoring of a domestic political candidate or an individual prominent within a domestic political organization, or a subset of these persons, so that consensual monitoring of such individuals would require consultation with or advance notification to a senior Department official, such as the Deputy Attorney General; and*
   b. *establish guidance, and include examples in the DIOG, to better define the meaning of the phrase "prominent in a domestic political organization" so that agents understand which campaign officials fall within that definition as it relates to "Sensitive Investigative Matters," "Sensitive UDP," and the designation of "sensitive sources." Further, if the Department expands the scope of "Sensitive Monitoring Circumstance," as recommended above, the FBI should apply the guidance on "prominent in a domestic political organization" to "Sensitive Monitoring Circumstance" as well.*

**The FBI fully accepts these recommendation and is taking the following actions:**

1. Assessing, in consultation with the DOJ, the current definition of a "Sensitive Monitoring Circumstance" and determining whether to expand the definition;
2. Identifying, in consultation with the DOJ, the appropriate level of coordination for a Sensitive Monitoring Circumstance;
3. Establishing guidance and, to the extent necessary, adding or modifying the DIOG, including by introducing examples, to better define and explain the phrase "prominent in a domestic political organization";
4. Making any further changes to FBI policy that are required upon an expansion of the definition of a Sensitive Monitoring Circumstance; and,
5. Ensuring that training and guidance are enhanced and provided to FBI personnel pursuant to any revised or expanded definitions.

6. *The FBI should ensure that appropriate training on DIOG § 4 is provided to emphasize the constitutional implications of certain monitoring situations and to ensure that agents account for these concerns, both in the tasking of CHSs and in the way they document interactions with and tasking of CHSs.*

**The FBI fully accepts this recommendation and is taking the following actions:**

1. Establishing and providing at least semiannual, mandatory training for all relevant personnel on CHS handling, source sensitivities, and other source-related topics, such

5

432

**APPENDIX 2**

as the constitutional implications of certain monitoring situations. Part of this training will include discussion of the constitutional implications of certain monitoring situations, how to approach these considerations, and how to document situations where core constitutional issues, such as First Amendment activity, may be present; and,

2. Instituting regular and mandatory continuing legal training for FBI personnel at all levels and in all investigative roles, in addition to already existing legal and ethics training, to make sure that FBI personnel fully understand and apply their obligations as required by policy and law, including an emphasis on privacy and civil liberties.

7. *The FBI should establish a policy regarding the use of defensive and transition briefings for investigative purposes, including the factors to be considered and approval by senior leaders at the FBI with notice to a senior Department official, such as the Deputy Attorney General.*

**The FBI fully accepts this recommendation and is taking the following actions:**

1. Instituting a policy that the FBI's counterintelligence and security portion of the Office of the Director of National Intelligence-led strategic intelligence briefings (also known transition briefings) are solely intended to provide candidates and elected officials with relevant intelligence and threat awareness, and thus FBI briefers will not be associated with any ongoing FBI investigation related to any reasonably foreseeable attendee at the strategic intelligence briefing, will be selected based on their knowledge of the threat or threats to be briefed, and to the extent feasible, the same team of briefers will be used for all recipients of a particular strategic intelligence briefing; and,

2. Continuing to refine the FBI's newly implemented review process for malign foreign influence defensive briefings, and in particular briefings to Legislative and Executive Branch officials. This will encompass actions taken after receipt of specific threat information that identifies malign foreign influence operations – that is, foreign operations that are subversive, undeclared, coercive, or criminal – including convening the FBI's Foreign Influence Defensive Briefing Board (FIDBB) to evaluate whether and how to provide defensive briefings to affected parties. To determine whether notification is warranted and appropriate in each case, the FIDBB uses consistent, standardized criteria guided by principles that include, for example, the protection of sources and methods and the integrity and independence of ongoing criminal investigations and prosecutions.

8. *The Department's Office of Professional Responsibility should review our findings related to the conduct of Department attorney Bruce Ohr for any action it deems appropriate. Ohr's supervisors in the Department's Criminal Division should also review our findings related to Ohr's performance for any action they deem appropriate.*

**This recommendation is directed to the DOJ, thus the FBI is taking the following action:**

With regards to Mr. Ohr, an employee of the DOJ, the FBI respectfully defers to the DOJ for addressing the OIG's recommendation.

6

**APPENDIX 2**

The Federal Bureau of Investigation's Response to the Report, *continued from previous page*
December 6, 2019

9.  *The FBI should review the performance of all employees who had responsibility for the preparation, Woods review, or approval of the FISA applications, as well as the managers, supervisors, and senior officials in the chain of command of the Carter Page investigation, and take any action deemed appropriate.*

**The FBI fully accepts this recommendation and is taking the following actions:**

Recognizing that many of the individuals involved in this matter are no longer with the FBI, undertaking the review of FBI personnel and taking actions as appropriate.

7

**[PAGE INTENTIONALLY LEFT BLANK]**

**REDACTED FOR PUBLIC RELEASE**



The Department of Justice Office of the Inspector General (DOJ OIG) is a statutorily created independent entity whose mission is to detect and deter waste, fraud, abuse, and misconduct in the Department of Justice, and to promote economy and efficiency in the Department's operations.

To report allegations of waste, fraud, abuse, or misconduct regarding DOJ programs, employees, contractors, grants, or contracts please visit or call the **DOJ OIG Hotline** at oig.justice.gov/hotline or (800) 869-4499.

**U.S. DEPARTMENT OF JUSTICE OFFICE OF THE INSPECTOR GENERAL**
950 Pennsylvania Avenue, Northwest
Suite 4760
Washington, DC 20530-0001

| **Website** | **Twitter** | **YouTube** |
|---|---|---|
| oig.justice.gov | @JusticeOIG | JusticeOIG |

Also at Oversight.gov