Exhibit
3

No. 18-15295-JJ

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

ALEKSEJ GUBAREV, et al.,
*Plaintiffs-Appellants*

v.

BUZZFEED, INC., et al.,
*Defendants-Appellees*

_____

On Appeal from the United States District Court
for the Southern District of Florida
Case No. 1:17-cv-60426-UU (Hon. Ursula Ungaro)

_____

## PLAINTIFFS-APPELLANTS' OPENING BRIEF

_____

| | | |
|---|---|---|
| Evan Fray-Witzer | Valentin Gurvits | Matthew Shayefar |
| Ciampa Fray-Witzer, LLP | Boston Law Group, PC | Law Office of Matthew Shayefar, PC |
| 20 Park Plaza, Suite 505 | 825 Beacon Street, Ste 20 | 925 N La Brea Ave |
| Boston, MA 02116 | Newton, MA 02459 | W. Hollywood, CA 90038 |
| 617-426-0000 | 617-928-1800 | 323-948-8101 |
| Evan@CFWLegal.com | vgurvits@bostonlawgroup.com | matt@shayefar.com |
| | (Admission Pending) | |

*Attorneys for Plaintiffs-Appellants*

## <u>STATEMENT OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Plaintiff-Appellant Webzilla, Inc.'s parent corporation is Plaintiff-Appellant XBT Holdings, S.A.  Plaintiff-Appellant XBT Holdings, S.A. does not have a parent corporation and is not a publicly held corporation.

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Eleventh Circuit Rule 26.1-1, counsel for the Appellants, Aleksej Gubarev, Webzilla, Inc., and XBT Holding, S.A, verify that the persons listed below have or may have an interest in the outcome of this case:

1.  Cobb, Brady, Esq., attorney for Plaintiff-Appellants

2.  Fray-Witzer, Evan, Esq., attorney for Plaintiff-Appellants

3.  Fulop, Dylan, Esq., attorney for Plaintiff-Appellants

4.  Gubarev, Aleksej, Plaintiff-Appellant

5.  Gurvits, Valentin, Esq., Plaintiff-Appellants

6.  Shayefar, Matthew, Esq., attorney for Plaintiff-Appellants

7.  The Hon. Ursula Ungaro, District Court Judge

8.  Webzilla, Inc., Plaintiff-Appellant

9.  XBT Holding, S.A., Plaintiff-Appellant

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellants state that oral argument is warranted in this case as the appeal deals with both important questions concerning the proper choice of law for internet defamation actions, as well as issues of first impression in any federal court, including whether an article that does not itself report on an official proceeding is nevertheless entitled to the protections of the fair report privilege based solely on a hyperlink to a separate article written by a different news organization.

*"The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being – a concept at the root of any decent system of ordered liberty....*

*Moreover, the preventive effect of liability for defamation serves an important public purpose.  For the rights and values of private personality far transcend mere personal interests. Surely if the 1950's taught us anything, they taught us that the poisonous atmosphere of the easy lie can infect and degrade a whole society."*

*Rosenblatt v. Baer*, 383 U.S. 75, 92-94 (1966)

(Justice Potter Stewart, Concurring)

## **TABLE OF CONTENTS**

STATEMENT OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ...................................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................. ii

TABLE OF CONTENTS....................................................................... iv

TABLE OF CITATIONS ...................................................................... vii

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION ....x

STATEMENT OF THE ISSUES.................................................................1

STATEMENT OF THE CASE....................................................................3

I.      Procedural History ................................................................3

II.     Statement of the Facts...........................................................5

III.    Standard of Review...............................................................10

SUMMARY OF THE ARGUMENT ......................................................11

ARGUMENT ..........................................................................................13

I.      The District Court Erred in Finding that New York Law Should Apply with
        Respect to the Application of the Fair Report Privilege. ..............13

        A.      The Place Where the Injury Occurred..................................14

        B.      The Place Where the Conduct Occurred...........................17

        C.      The Location of the Parties .................................................18

        D.      The Section 6 Factors ........................................................20

II.     Under Florida Law, Defendants Were Not Entitled to the Protection of the
        Fair Report Privilege...........................................................25

III.   Even if the Choice of New York Law was Proper, the District Court Erred in Finding that New York's Fair Report Privilege Applied Here, Where the Application of the Privilege is not Supported by the Policies Underlying the Privilege. ...................................................................................................28

IV.    The District Court Erred in Holding that, Even Though an Average Reader Would Not Have Understood Buzzfeed's Article to be Reporting on an Official Proceeding, Buzzfeed was Nonetheless Entitled to the Protections of New York's Fair Report Privilege. ...........................................................31

       A.   Protection Under the Statute is Dependent on the Ability of an Average Reader to Understand that the Defamatory Statements were Part of an Official Proceeding, Which Was Being Reported on in the Article in Question ...........................................................................31

       B.   The District Court Erred in Finding a Hyperlink to a CNN Article to be a Sufficient Basis to Extend the Fair Report Privilege Protection to the Defendants ..................................................................................38

            1.   The District Court Erred in Adopting the *Adelson* Test ..........39

            2.   Even Applying the *Adelson* Test, the District Court Erred in Finding the Hyperlink at Issue Here to be Sufficient as a Matter of Law.........................................................................41

            3.   Even if Readers had Clicked on the Hyperlink, the Reporting there was Insufficient to Qualify Buzzfeed's Article for Protection Under the Fair Report Privilege ..............................45

       C.   Given the Specific Issues Mentioned in Report 166 that the District Court Found to be "The Subject Of Official Action," it Was Error to Find the Fair Report Privilege Applied................................................50

CONCLUSION.......................................................................................................55

TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS..........57

ADDENDUM .......................................................................................................58

I.     New York Civil Rights Law, Section 74.....................................................58

II.      Restatement (Second) on Conflict of Laws, Section 145.............................58

III.     Restatement (Second) on Conflict of Laws, Section 6................................58

IV.     Restatement (Second) on Conflict of Laws, Section 150.............................59

CERTIFICATE OF SERVICE ................................................................................61

# TABLE OF CITATIONS

## Cases

*Abakporo v. Sahara Reporters*, 2011 LEXIS 109056
  (E.D.N.Y. Sept. 26, 2011)....................................................................................37

*Adelson v. Harris*, 402 P.3d 665 (Nev. 2017)....... 38, 39, 40, 41, 42, 43, 44, 45, 46

*Adelson v. Harris*, 973 F.Supp.2d 467 (S.D.N.Y. 2013) ........................................42

*Applebaum v. Lyft, Inc.*, 263 F.Supp.3d 454 (S.D.N.Y. 2017) ...............................45

*Bishop v. Fla. Specialty Paint Co.*, 389 So.2d 999 (Fla. 1980)...............................15

*Bufalino v. Associated Press*, 692 F.2d 266 (2d Cir. 1982)....................................34

*Butcher v. Univ. of Mass.*, 94 Mass.App.Ct. 33 (2018).........................................29

*Carson v. News-Journal Corp.*, 790 So.2d 1120 (Fla. Dist.Ct.App. 2001).............26

*CBS Broad. Inc. v. Counterr Grp.*, 2008 LEXIS 126089
  (S.D.N.Y. Aug. 26, 2008) ........................................................................... 32, 36

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................................10

*Cholowsky v Civiletti*, 887 A.D.3d 110 (N.Y. App.Div. 2009) .............................32

*Connell v. Riggins*, 944 So. 2d 1174 (Fla. Dist.Ct.App. 2006) ..............................15

*Coopers & Lybrand v. Livesay*, 437 U.S. 463 (1978) ............................................13

*Corp. Training Unlimited v. NBC*, 868 F.Supp. 501  (E.D.N.Y. 1994) ........... 32, 33

*Dameron v. Wash Magazine*, 779 F.2d 736 (D.C. Cir. 1985) ........................ 33, 34

*Donawa v. United States AG*, 735 F.3d 1275 (11th Cir. 2013) ..............................29

*Farmer v. United Bhd. of Carpenters & Joiners*, 430 U.S. 290 (1977).................23

*Fine v. ESPN, Inc.*, 11 F.Supp.3d 209 (N.D.N.Y. 2014).......................... 32, 33, 36

*Freeze Right Refrigeration & Air Conditioning Servs., Inc. v. New York*,
101 A.D.2d 175 (N.Y. App.Div. 1984) ...............................................................53

*Friedman v. Bloomberg L.P.*, 884 F.3d 83 (2d Cir. 2017) .....................................53

*Gertz v. Robert Welch*, 418 U.S. 323 (1974) ..................................................... 22, 23

*Greenberg v. Spitzer*, 155 A.D.3d 27 (N.Y. App.Div. 2017)..................................53

*Hechler v. Int'l Bhd. of Elec. Workers*, 772 F.2d 788 (11th Cir. 1985)...................23

*Hendrix v. Evenflo Co.*, 609 F.3d 1183 (11th Cir. 2010) ........................................10

*Inetianbor v. Cashcall, Inc.*, 2016 U.S. Dist. LEXIS 194888
(S.D.Fla. Jan. 26, 2016) .................................................................................13

*Internet Solutions Corp. v. Marshall*, 39 So. 3d 1201 (Fla. 2010) ........................16

*Kamelgard v. Macura*, 585 F.3d 334 (7th Cir. 2009)..............................................15

*Kelley v. Hearst Corp.*, 2 A.D.3d 480 (N.Y. App.Div. 1956) .................................30

*Klayman v. City Pages,* 2015 U.S. Dist. LEXIS 49134
(M.D.Fla. Apr. 3, 2015) ............................................................................ 40, 41

*Klayman v. Judicial Watch, Inc.*, 22 F.Supp.3d 1240 (S.D. Fla. 2014) .................16

*Linn v. United Plant Guard Workers of America*, 383 U.S. 53 (1966)...................23

*Masson v. New Yorker Magazine*, 501 U.S. 496 (1991)..........................................23

*Milkovich v. Lorain Journal Co.,* 497 U.S. 1 (1990)...............................................22

*Ortega v. Post-Newsweek Stations, Florida, Inc.*, 510 So.2d 972
(Fla. Dist.Ct.App. 1987) .................................................................................26

*Reilly v. AP*, 797 N.E.2d 1204 (Mass.App.Ct. 2003) .............................................30

*Rodgers v. AWB Indus.*, 2019 U.S. App. LEXIS 4990
(11th Cir. Feb. 21, 2019)..................................................................................10

*Rosenblatt v. Baer*, 383 U.S. 75 (1966)..................................................................22

*Saleh v. New York Post*, 78 A.D.3d 1149 (N.Y. App.Div. 2010)..................... 29, 36

*Silver v. Levinson*, 648 So. 2d 240 (Fla. Dist.Ct.App. 1994) ..................................23

*Stuart v. Press Pub. Co.*, 82 N.Y.S. 401 (N.Y. App.Div. 1903) ............................36

*Suulutaaq, Inc. v. Williams*, 782 F.Supp.2d 795  (D. Alaska 2010)......................34

*Trujillo v. Banco Cent. Del Ecuador*, 17 F.Supp.2d 1334 (S.D. Fla. 1998) ...........25

*\*Wenz v. Becker*, 948 F.Supp. 319 (S.D.N.Y. 1996)........................................ 32, 36

*\*Wilkow v. Forbes, Inc.*, 2000 U.S. Dist. LEXIS 6587
   (N.D. Ill. May 12, 2000) ...................................................................................21

*Woodard v. Sunbeam Television Corp.*, 616 So.2d 501
   (Fla. Dist.Ct.App. 1993) .............................................................................. 25, 26

*\*Wynn v. Smith*, 117 Nev. 6 (2001) .................................................................. 30, 31

## Statutes

New York Civil Rights Law, Section 74 ...................... 28, 29, 32, 33, 36, 37, 52, 53

## Other Authorities

Restatement (Second) of Conflict of Laws, Section 145...................... 13, 14, 20, 24

Restatement (Second) of Conflict of Laws, Section 150........................................15

Restatement (Second) of Conflict of Laws, Section 6................................ 20, 21, 24

## Rules

Fed. R. Civ. P. 56 .................................................................................................10

## Articles

Eng, Donna, et al., "Online Defamation: Do Hyperlinks Constitute
   Republication for Florida Defamation and Trade Libel Claims?," 90 FLA.
   BAR J. 58 (May 2016) .........................................................................................40

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

(A)     The District Court had subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1441(a) on the basis that the amount in controversy in this case exceeds $75,000.00, exclusive of interest and costs, and is between citizens of a state and citizens of different states with citizens or subjects of foreign states as additional parties.  The case was removed from the Seventeenth Judicial Circuit Court in and for Broward County, Florida pursuant to 28 U.S.C. § 1441(a).

(B)     The present case is an appeal from a final decision of the District Court for the Southern District of Florida.  Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. §1291.

(C)     The Judgment in the District Court issued on December 19, 2018. Plaintiffs-Appellants timely filed their Notice of Appeal on December 19, 2018.

(D)     This appeal is from a final judgment of the District Court that disposed of all parties' claims.

## STATEMENT OF THE ISSUES

1.     Whether the District Court erred in finding that New York law should apply to the question of privileges available to Defendants as opposed to Florida law, despite Florida having the most significant contacts to the issue under the factors delineated by the Restatement (Second) of Conflict of Laws.

2.     Whether the proper application of Florida law would have required a finding, as a matter of law, that Defendants cannot take advantage of the Florida Fair Report Privilege given that the Florida privilege generally protects only reports of proceedings 'open to the public' and is, therefore, inapplicable here.

3.     Whether the District Court erred in allowing Defendants the protections of New York's Fair Report Privilege under circumstances contrary to the policies underlying that privilege.

4.     Whether the District Court erred in allowing Defendants the protections of New York's Fair Report Privilege despite having found that Defendants' own reporting did not meet the requirements of the privilege.

5.     Whether the District Court erred in allowing Defendants the protections of New York's Fair Report Privilege based solely on Defendants' inclusion of a hyperlink to a CNN article which also would not have immunized Defendants' article from the present action.

6.     Whether the District Court erred in allowing Defendants the protections of New York's Fair Report Privilege where an average reader would be unable to conclude that the defamatory comments printed by Defendants were connected to an official proceeding.

7.     Whether the District Court erred in allowing Defendants the protections of New York's Fair Report Privilege where an average reader would be unable to conclude that Defendants' reporting concerned the specific official action identified by the District Court.

## STATEMENT OF THE CASE

### I.    Procedural History

On February 3, 2017, Plaintiffs Aleksej Gubarev ("**Mr. Gubarev**"),

Webzilla, Inc. ("**Webzilla**"), and XBT Holding, S.A. ("**XBT**"), filed their

Complaint in the Circuit Court of the Seventeenth Judicial Circuit in and for

Broward County, Florida.  D.E.1, p.2.  On February 28, 2017, Defendants

Buzzfeed, Inc. ("**Buzzfeed**") and Ben Smith ("**Mr. Smith**") filed a Notice of

Removal, removing the case to the Federal District Court for the Southern District

of Florida.  Dkt., p.1 (D.E.1).

On March 14, 2017, Defendants filed a Motion to Dismiss or Transfer (Dkt.,

p.2 – D.E.15) and on March 27, 2017, Plaintiffs filed their Opposition to the same

(Dkt., p.3 – D.E.21).  On April 3, 2017, Defendants filed their Reply Brief in

support of their Motion to Dismiss.  Dkt., p.3 (D.E.23).  On May 22, 2017, the

District Court issued its Order denying Defendants' Motion to Dismiss or Transfer.

Dkt., p.4 (D.E.27).

On June 9, 2017, Defendants filed their Answer and Affirmative Defenses.

Dkt., p.4 (D.E.32).  On June 29, 2017, Defendants filed their Amended Answer

and Affirmative Defenses.  Dkt., p.5 (D.E.38).

On January 18, 2018, at the suggestion of the District Court, Plaintiffs filed a

Motion for Partial Judgment on the Pleadings with Respect to Defendants'

Affirmative Defenses of "Fair and True Reporting Privilege" and "Neutral Reporting Privilege."  Dkt., p.12 (D.E.115).  On February 9, 2018, Defendants filed their Opposition to that motion (Dkt., pp.13-14 – D.E.133) and on February 20, 2018, Plaintiffs filed their reply brief.  Dkt., p.14 (D.E.137).  On June 4, 2018, the District Court issued its Order partially allowing and partially denying Plaintiffs' Motion (Dkt., p.17 – D.E.169) and, on June 5, 2018, the Court issued a Corrected Order partially allowing and partially denying Plaintiffs' Motion.  Dkt., p.14 (D.E.171, hereinafter the "**Pleadings Order**").

On October 1, 2018, Defendants filed a Motion for Summary Judgment. Dkt., p.21 (D.E.214).  On October 12, 2018, Plaintiffs filed their Opposition to Defendants' Motion for Summary Judgment (Dkt., p.24 – D.E.234), and on October 19, 2018, Defendants filed their Reply Brief in Support of their Motion for Summary Judgment (Dkt., p.24 – D.E.243).  On December 19, 2018, the Court allowed Defendants' Motion for Summary Judgment and issued an Order and Judgment dismissing Plaintiffs' Complaint.  Dkt., p.36 (D.E.388, hereinafter the "**Summary Judgment Order**," and D.E.390).[1]

---

[1] Plaintiffs also filed a Motion for Partial Summary Judgment seeking a ruling that they were private figures for the purpose of their defamation claim.  Defendants opposed and filed a separate Motion for Summary Judgment on the same limited issue.  On December 18, 2018, the Court ruled in Plaintiffs' favor, finding that each of the Plaintiffs were private figures.  Dkt., p.36 (D.E.385).  Defendants have sought to conditionally cross-appeal that Order.  Dkt., p.38 (D.E.418).

On December 19, 2018, Plaintiffs filed a timely Notice of Appeal.  Dkt.,

p.36 (D.E.392).

## II.    Statement of the Facts[2]

Mr. Gubarev is a resident of the Republic of Cyprus.  D.E.388, p.1.  Until

January 1, 2018, he was the chairman and CEO of XBT.  *Id.*  Webzilla, a Florida

corporation with offices in Fort Lauderdale, is a subsidiary of XBT.  D.E.27, pp.1-

2.  XBT has two other subsidiaries incorporated in Florida, Dedicated Servers, Inc.

and IP Transit, Inc.  D.E. 21-12, ¶ 26.  As is discussed in detail in the Argument

section, Plaintiffs have extensive and long-standing connections to Florida.

BuzzFeed is a Delaware corporation and Mr. Smith is BuzzFeed's editor-in-

chief.  D.E.388, p.1.  Buzzfeed has an office in New York and Mr. Smith is a

resident of New York.  *Id.*  As detailed below, the District Court found that

"Defendants' connections to Florida are extensive."  D.E.27, p.11.

In the fall of 2015, Fusion GPS ("**Fusion**"), a private research firm was

retained – first by a conservative news website and later by a law firm working for

the Democratic National Committee – to conduct research on Donald Trump.

D.E.388, p.3.  Fusion, in turn, retained Orbis Business Intelligence Limited

---

[2] The facts as presented herein are taken almost entirely from the factual findings
of the District Court, except as noted.  Plaintiffs provide the Court with a statement
of the basic facts here and provide additional factual citations as needed throughout
the Argument section.

("**Orbis**"), founded by Christopher Steele, a former British Intelligence officer, to investigate ties between Trump and Russian interests. *Id.* During the course of his research, Steele received information from his sources and wrote seventeen separate and distinct memos concerning the information he had gathered. *Id.*, pp.3-4.

Steele shared his research with the FBI until late October 2016, when the FBI terminated its relationship with Steele after he spoke with journalists. *Id.*, p.4. However, even before receiving Steele's reports, the FBI had opened a counterintelligence investigation into potential links between Russia and the Trump campaign. *Id.*

In November 2016, Senator John McCain and a Mr. David Kramer met with Sir Andrew Wood, an informal advisor to Orbis. *Id.*, p.5. Wood told them about Steele's research and McCain asked Kramer to go to London to meet Steele, which he did on November 28. *Id.* Kramer read sixteen extant reports (as a last one had not yet been written) in London and later obtained copies of them from Fusion in Washington, D.C. *Id.* Kramer gave copies of these pre-election reports to McCain and spoke about the reports with other administration officials. *Id.* On December 9, Senator McCain met with James Comey, the FBI Director, and gave him the first sixteen reports. *Id.*, p.6.

On December 13, Steele wrote the last of the seventeen reports, Report 166, which is the only report that names Plaintiffs.  *Id.*  At some point prior to BuzzFeed's publication, the FBI received a copy of Report 166.  *Id.*

In early January 2017, an inter-agency assessment of Russian interference in the presidential election was prepared at President Obama's request.  *Id.*, p. 6. Steele's memoranda were not a part of the assessment, but a two-page summary of information contained in some or all of the Steele's memos were added as an appendix to the assessment and included as part of a briefing to President Obama. *Id.* at 6-7.  James Comey also briefed President-elect Trump about certain of the allegations contained in Steele's memos.  *Id.*, p.7.  As detailed below, Comey testified that his briefings to President Trump were solely about the "salacious" aspects of the Dossier[3] (e.g., allegations of prostitution and *kompromat* on President Trump) and there is no evidence whatsoever that either President was briefed on Report 166 or any of the allegations concerning Plaintiffs contained therein.

Indeed, there is no evidence that the allegations concerning Plaintiffs were ever subject to any government investigation: none of the Plaintiffs have ever been

---

[3] The Buzzfeed Article referred to these seventeen separate memos collectively as the "**Dossier**" and, as the District Court adopted this term as well, Plaintiffs will (for clarity's sake) similarly refer to the collection of Steele's memos as the "Dossier."

contacted by Special Counsel Robert Mueller, the F.B.I., the C.I.A., or any other government entity investigating the hacking of the DNC.   D.E.234-4, Ex.64, ¶11. To the contrary, as a result of his extensive investigation, Special Counsel Mueller indicted twelve Russian intelligence officers as the perpetrators of the DNC hack. D.E.234-4, Ex.65.

On December 29, BuzzFeed reporter Ken Bensinger obtained a copy of the Dossier from Kramer.  D.E.388, p.7.  BuzzFeed then began to investigate some of the allegations in the Dossier, but it did not investigate any of the allegations concerning Plaintiffs, nor did it attempt to contact any of the Plaintiffs.  *Id.*

At approximately 5:00 p.m. on January 10, 2017, CNN published an article entitled "Intel chiefs presented Trump with claims of Russian efforts to compromise him."  D.E.214-5, Ex.1.  The article reported that Presidents Obama and Trump had been presented with a "two page synopsis" of memos written by "a former British intelligence operative" that included "allegations that Russian operatives claim to have compromising personal and financial information about Mr. Trump."  *Id.*  The article also specifically stated that the "synopsis was not an official part of the report from the intelligence community case about Russian hacks…"  *Id.*  The CNN article did not mention Plaintiffs; did not attach any of the Dossier (or any portions thereof).  Indeed, the CNN article specifically stated,

"CNN is not reporting on details of the memos, as it has not independently corroborated the specific allegations." *Id.*

After seeing the CNN article, Smith decided to publish the Dossier as part of an Article on BuzzFeed's website. D.E.388, p.8. Mr. Smith consulted with Mr. Bensinger, who was on vacation in Florida and, a little more than one hour after the CNN article was published, Defendants published an article on Buzzfeed's website titled *These Reports Allege Trump Has Deep Ties to Russia* (the "**Article**"), which included a compilation of all seventeen of Steele's memos (the Dossier). D.E.388, p.2; D.E.214-4, Exs. 2 and 3. The last of the seventeen memoranda, dated December 13, 2016 and titled "**Report 166**," contained the following statements about Plaintiffs:

> [Redacted] reported that over the period March-September 2016 a company called XBT/Webzilla and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data, and conduct "altering operations" against the Democratic Party leadership. Entities linked to one Alexei GUBAROV [sic] were involved and he and another hacking expert, both recruited under duress by the FSB, Seva KAPSUGOVICH were significant players in this operation.

D.E.388, p.2.

Plaintiffs maintain that the statements about them in Report 166 are false and defamatory. *Id.*, p.3.

The Article itself, containing approximately 465 actual words, announced the existence of a series of memos "prepared for political opponents of Trump by a

person who is understood to be a former British intelligence agent," noting that the

memos were "unverified" and contained "some clear errors."  D.E.214-4, Ex. 2.

The Article also declared its purpose, stating that "BuzzFeed News is publishing

the full document so that Americans can make up their own minds about

allegations about the president-elect that have circulated at the highest levels of the

US government."  *Id.*

The Article also included a hyperlink to the CNN article referenced above

and explained that CNN reported "that the two-page synopsis of the report was

given to President Obama and Trump."  *Id.*

## III.    Standard of Review

This Court reviews a district court's ruling on a motion for summary

judgment *de novo*, viewing all evidence and factual inferences reasonably drawn

from the evidence in the light most favorable to the nonmoving party, here the

Plaintiffs-Appellants.  *Rodgers v. AWB Indus.*, 2019 U.S. App. LEXIS 4990, at

\*12-13 (11th Cir. Feb. 21, 2019).  Allowance of a motion for summary judgment is

appropriate only "when the pleading, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, show there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of

law."  *Hendrix v. Evenflo Co.*, 609 F.3d 1183, 1191 (11th Cir. 2010) (citing Fed. R.

Civ. P. 56(c) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## SUMMARY OF THE ARGUMENT

The District Court committed several significant errors when it dismissed Plaintiffs' defamation claim on summary judgment, based on its application of New York's Fair Report Privilege, New York Civil Rights Law, §74.

First, the District Court erred in its choice of law analysis, resulting in the application of New York law, as opposed to Florida law, to the question of the applicable privileges available to Defendants.  The District Court's errors arose first from its failure to properly consider and weigh the factors outlined in Section 145 of the Restatement (Second) of Conflict of Laws.  This resulted in its resort to Section 6 factors, which it also misapplied, including by failing entirely to consider Florida's policies and interests in enforcing its defamation law and how application of New York law would be harmful to Florida's interests.

Had the District Court properly resolved the choice of law question in favor of the application of Florida law, it would have concluded as a matter of law that Defendants did not qualify for Florida's Fair Report Privilege because Florida's privilege applies only to documents received from government officials or publicly-available government documents, neither of which applied here.

Nevertheless, even if the application of New York law was proper, the District Court erred in finding the defendants entitled to protection under New York's statute. First, consideration of the policies underlying the New York

privilege make clear that it should not apply to unconfirmed allegations that have simply been provided to law enforcement by private individuals, as is the case here.  Second, the District Court erred in applying New York's privilege inasmuch as the average reader of Defendants' defamatory publication would not have understood that the defamatory statements were a part of an official proceeding. Indeed, despite concluding that Buzzfeed's own reporting did not qualify it for protection under the Fair Report Privilege, it nevertheless extended the privilege to Defendants based solely on a hyperlink contained in the Buzzfeed story to a separate CNN report.  This, too, constituted error inasmuch as the District Court adopted the wrong test to determine whether the hyperlink should extend the privilege based on the material located at that link.  Even if this Court were to find that the test adopted by the District Court was the proper one, it would find that the District Court's application of that test was erroneous based on the facts, including that neither the link (nor the CNN story that it linked lead to) would allow an average reader to understand that the defamatory statements were in any way part of an official proceeding, as required by statute.

Finally, the District Court erred in applying the Fair Report Privilege to the defamatory statements concerning Plaintiffs, where it concluded that there was only "official action" concerning subjects unrelated to the defamatory statements themselves.

## ARGUMENT

### I.    The District Court Erred in Finding that New York Law Should Apply with Respect to the Application of the Fair Report Privilege.

In the District Court's Pleading Order, it acknowledged that a "true conflict" existed between New York's statutory version of the fair report privilege and Florida's recognition of the common law version of the privilege.  D.E.171, pp.5-6. Having made this determination, the District Court next held that, as a "federal court sitting in diversity," it "must apply the conflict-of-laws rules of the forum state."  *Id.*, p.6.  In doing so, the District Court properly held that Florida would apply the "'most significant relationship test' outlined in the Restatement (Second) of Conflict of Laws section 145."  *Id.*  Having properly identified the relevant test, however, the District Court erred in finding that it would apply New York law to the question of defamation privileges in this matter (and then erred in actually applying New York law in rendering its decision on Defendants' Motion for Summary Judgment).[4]

---

[4] The Pleadings Order – in which the District Court held only that Defendants *might* be entitled to take advantage of New York's fair report privilege – was not the type of order for which interlocutory appeal would have been proper or permissible.  *See*, *e.g.*, *Inetianbor v. Cashcall, Inc.*, 2016 U.S. Dist. LEXIS 194888, at *5-9 (S.D.Fla. Jan. 26, 2016) (holding that a decision concerning choice of law issues was not the type of "exceptional circumstances [that would] justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 474 (1978))).

Section 145 provides for the consideration of four primary factors:

(a)     the place where the injury occurred,

(b)     the place where the conduct causing the injury occurred,

(c)     the domicile, residence, nationality, place of incorporation, and place of business of the parties, and

(d)     the place where the relationship, if any, between the parties is centered.

*Id.* at 7 (citing Restatement (Second) of Conflict of Law, §145 (1971)).  The District Court properly excluded consideration of the fourth factor given that the parties had no pre-existing relationship.  *Id.* at 9.

## A.     The Place Where the Injury Occurred

With respect to the first factor, the District Court acknowledged that Webzilla and XBT each had offices in Florida (and, as such, suffered injury in Florida), but nevertheless found that this factor only weighed "weakly" in favor of applying Florida law because Plaintiffs were also injured in other states (and countries) by Defendants' online publication which was "accessible anywhere in the world."  *Id.* at 8.

And, although it is certainly true that Plaintiffs' injuries were not *limited* to Florida, the Pleadings Order erred in failing to give proper weight to the fact that the injury to Plaintiffs is felt most acutely in those places where the Plaintiffs are actually located.  As the Seventh Circuit has noted:

[W]here the principal injury from a defamation will occur ... is where the victim works and lives and where (in the usual case) most of the people – family, friends, business associates, etc. – are found with

> whom he has personal or commercial transactions, which might be impaired by defamation.... And it is where, according to Learned Hand, he feels the sting of defamation. Hand said that "the gravamen of the wrong in defamation is not so much the injury to reputation, measured by the opinions of others, as the feelings, that is, the repulsion or the light esteem, which those opinions engender."

*Kamelgard v. Macura*, 585 F.3d 334, 342 (7th Cir. 2009) (citation omitted).

This is also consistent with Florida choice of law precedent. As the Florida Supreme Court held, "the state where the injury occurred would, under most circumstances, be the decisive consideration in determining the applicable choice of law." *Bishop v. Fla. Specialty Paint Co.*, 389 So.2d 999, 1001 (Fla. 1980). *See*, *also*, *Connell v. Riggins*, 944 So. 2d 1174, 1177 (Fla. Dist.Ct.App. 2006) ("[U]nder most circumstances, the state where the injury occurred will be 'the decisive consideration in determining the applicable choice of law.'").

Indeed, the Restatement itself recognizes the importance of the state in which a corporation is located as a primary factor for consideration. *See* Restatement, §150 and *comment f* to §150. Nor is this surprising, given that (for jurisdictional purposes), Florida deems the tort of defamation to have occurred in Florida, regardless of where the decision to publish an online article was made or effectuated, when the article is accessible and viewed within Florida. *See*, *e.g.*, *Klayman v. Judicial Watch, Inc.*, 22 F.Supp.3d 1240, 1246 (S.D.Fla. 2014) ("Florida law is appropriate as the statement published on Taitz's website constitutes an electronic communication into Florida where the online material is

15

accessed by readers in Florida, and the content of the statement concerns a Florida resident.").

Similarly, the Florida Supreme Court – in answering a question certified to it by this Court – held that:

> We conclude that allegedly defamatory material about a Florida resident placed on the Web and accessible in Florida constitutes an "electronic communication into Florida" when the material is accessed (or "published") in Florida.

*Internet Solutions Corp. v. Marshall*, 39 So. 3d 1201, 1214-15 (Fla. 2010).

In the present case, as Constantin Luchian, Webzilla's Financial Director, demonstrated in his sworn declaration, Webzilla (a Florida corporation) had a long-standing presence in Florida and both Webzilla and its parent corporation, XBT, had significant business operations in Florida. *See*, *generally*, D.E.21-12. Mr. Luchian (a full-time resident of Florida for more than 13 years), had served as Webzilla's Financial Director since 2009 and performed all of his corporate duties from Florida. *Id.*, ¶¶ 2-3, 6-7, 16. During his time as Webzilla's Financial Director, Webzilla had always maintained both a physical presence and telephone number in Florida and, indeed, Webzilla's website listed its Florida address and phone number as the sole point of contact in North America. *Id.*, ¶¶ 7-13. Whenever someone attempted to contact Webzilla through the contact information provided on Webzilla's website, they were contacting Mr. Luchian in Florida. *Id.*, ¶ 14. Mr. Luchian oversaw much of Webzilla's accounting from Florida, as well

as the filing of Florida tax returns, the maintenance of a Florida bank account, acceptance of service of process as the resident agent, acceptance of notifications of claimed copyright infringement (regardless of where in the world such claims originated), the receipt and payment of invoices, and the issuance of invoices. *Id.*, ¶¶ 16-23, 25. Webzilla also had clients located in Florida. *Id.*, ¶ 28.

And, with respect to XBT (and in addition to the services he provided to Webzilla), Mr. Luchian also served (in Florida) as the registered agent for two other XBT companies (Dedicated Servers, Inc. and IP Transit, Inc.), each of which is a Florida Corporation. *Id.*, ¶ 26; D.E.21-13, ¶ 7. Mr. Luchian received correspondence and invoices for each of these Florida corporations while in Florida. D.E.21-12, ¶ 26. As with Webzilla, IP Transit's website listed a Florida address and Florida telephone number for contact purposes. *Id.* It is undisputed that Buzzfeed's article was accessible in (and viewed in) Florida. *Id.*, ¶ 29; D.E.21-1, ¶¶ 3-4.

Given Webzilla's and XBT's significant connections and presence in Florida, it was an error for the District Court to fail to give proper weight to Florida as the place of injury to Plaintiffs.

## B. The Place Where the Conduct Occurred

While recognizing that the Article was "published online and therefore was viewable anywhere" and acknowledging that this factor "is of 'less significance' in

cases of multistate defamation," the District Court nevertheless concluded that "this factor weighs somewhat in favor of applying New York law because the decision to publish the Dossier was made in New York."  D.E.171, p.8.  Even recognizing that the District Court afforded this factor somewhat "less significance," it nonetheless afforded it more weight than it should have given that the decision to publish was in direct consultation with the lead reporter Ken Bensinger, who was in Florida at the time the article was published, who reviewed and edited the article while in Florida, who participated in multiple phone calls from Florida in which the decision to publish the article was made, and who subsequently spoke with his sources from Florida to explain the decision to publish the article.  *See* D.E.015-6, ¶¶ 4-6; D.E.015-5, ¶ 3; D.E.234-5, Ex.73, p.3; D.E.214-6, ¶¶ 30-36.

Given all of this, the District Court erred in finding this factor to weigh in favor of the application of New York law even somewhat and it should have, instead, found the second factor to be immaterial in determining the applicable law.

## C.    The Location of the Parties

Finally, the District Court found that the location of the parties weighed slightly in favor of the application of New York law.  D.E.171, p.8.  The District Court reached this conclusion after noting that Buzzfeed was headquartered in

New York and Mr. Smith resided in New York.  *Id.*  Despite Webzilla's and XBT's strong connections to Florida as detailed above, however, the District Court erred in failing to give these connections ample consideration simply because neither corporation was "headquartered" in Florida.  *Id.*, pp.8-9.  Indeed, the Restatement upon which the District Court relied does not speak in terms of where a business is "headquartered," but instead it speaks of the "place of incorporation and place of business of the parties."  *Id.*, p.7.  Webzilla is unquestionably incorporated in Florida, as are two other of XBT's wholly-owned subsidiary companies.  There is no question but that Webzilla and XBT maintained a presence in, conducted business in, and made many of their financial decisions in Florida.

And, while it is true that Defendants are headquartered in (or reside in) New York,[5] it is also true that Defendants have "extensive" connections to Florida.  As the District Court held in denying Defendants' Motion to Dismiss or Transfer:

> Defendants' connections to Florida are extensive – Defendants regularly send reporters to Florida to cover Florida-based stories (D.E. 21-1 ¶¶ 5-13); regularly author and publish articles that are aimed at a Florida audience (*Id.*, Exs. 19, 29-30, 32-34); and Defendants derive revenues from Florida-based advertising client, including VisitFlorida.com, which is the Official Florida Tourism Industry Marketing Corporation (*Id.* ¶¶ 10, 26, 28).  Thus, the Court finds a direct relationship between Defendants, the State of Florida, and Plaintiffs' defamation claims.

D.E.27, p.11.

---

[5] Buzzfeed is incorporated in Delaware.  D.E.1, p.3.

There is no countervailing argument that Plaintiffs have any connection whatsoever to New York.  Taken as a whole, then, both Plaintiffs and Defendants had significant connections to Florida, whereas only Defendants had any connection to New York.  Had the District Court given proper weight to Plaintiffs' connections to Florida (as well as Defendants' own "extensive" connections to Florida), it would have properly concluded that this factor was, at best, neutral (if not somewhat favoring the application of Florida law).

Because the first, and most significant, factor weighed in favor of the application of Florida law and the remaining two factors were (at most) neutral, the District Court should have concluded on this basis alone that the application of Florida law was proper, and the Court's failure to do so was in error.

### D.    The Section 6 Factors

Having erroneously found that the Section 145 factors weighed slightly (though not conclusively) in favor of the application of New York law, the District Court then proceeded to examine the general choice of law principles outlined in Section 6 of the Restatement (Second) of the Conflict of Laws.[6]  In considering the Section 6 factors, however, the Court found only three of the seven listed factors to be relevant: "(1) the interest of other states in the determination of the particular

---

[6] As the District Court acknowledged, consideration of the Section 6 factors is only necessary where the examination of the Section 145 factors results in a standoff. D.E.171, p.7.

issue; (2) the basic policies underlying the particular field of law; and (3) certainty, predictability, and uniformity of result."  D.E.171, p.9.

In limiting the factors to be examined, however, the District Court improperly considered only one side of the equation.  More specifically, the District Court by its own admission, did not factor into the equation Section 6's second factor, the policies of the forum, here, Florida.  Instead, the District Court combined the first two factors and, citing to *Wilkow v. Forbes, Inc.*, 99 C 3477, 2000 U.S. Dist. LEXIS 6587 (N.D. Ill. May 12, 2000), held that, because the purpose of the fair report privilege was "to protect speakers, not to provide Plaintiffs a remedy," the first two factors favored the application of New York law. D.E.171, pp.9-10.

The District Court's analysis, however, fails to consider the other side of the coin, namely that the application of New York's more restrictive fair report privilege, by necessity, impinges upon the interests of Florida in protecting its citizens and residents (including corporate citizens and residents) from defamation.[7]

---

[7] The *Wilkow* Court found it unacceptable that the application of the privilege law of the plaintiff's home state might "eviscerate" the privilege law of the defendants' home state.  2000 WL 631344 at *7.  While this is certainly a legitimate concern, the flip-side is true as well: there is a danger that the application of a defendant's home-state privileges might eviscerate the protections and entitlement to relief afforded to a plaintiff by the plaintiff's home state.

As a starting point, the importance of the protections afforded by a state against damage to one's reputation can hardly be overstated.  As Supreme Court Justice Potter Stewart opined:

> The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being – a concept at the root of any decent system of ordered liberty....
>
> Moreover, the preventive effect of liability for defamation serves an important public purpose.  For the rights and values of private personality far transcend mere personal interests. Surely if the 1950's taught us anything, they taught us that the poisonous atmosphere of the easy lie can infect and degrade a whole society.

*Rosenblatt v. Baer*, 383 U.S. 75, 92-94 (1966) (J. Potter Stewart, concurring).  *See, also*, *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 22 (1990) ("[W]e have regularly acknowledged the important social values which underlie the law of defamation, and recognized that society has a pervasive and strong interest in preventing and redressing attacks upon reputation." (internal citations and quotation marks omitted)); *Gertz v. Robert Welch*, 418 U.S. 323, 341 (1974) ("The legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood....  The protection of private personality, like the protection of life itself, is left primarily to the individual States.... But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system.").

Given the importance placed on the right to be free from defamation, it is hardly surprising that courts have routinely recognized states' interests in protecting its citizens and residents from such defamation. *See*, *e.g.*, *Masson v. New Yorker Magazine*, 501 U.S. 496, 516 (1991) ("As we have recognized, '[t]he legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood.'" (quoting *Gertz*, 418 U.S. at 341); *Farmer v. United Bhd. of Carpenters & Joiners*, 430 U.S. 290, 298 (1977) ("[T]he Court recognized that there was 'an overriding state interest' in protecting residents from malicious libels, and that this state interest was 'deeply rooted in local feeling and responsibility.'" (quoting *Linn v. United Plant Guard Workers of America*, 383 U.S. 53, 61, 62 (1966))); *Hechler v. Int'l Bhd. of Elec. Workers*, 772 F.2d 788, 798 (11th Cir. 1985) ("[T]he Supreme Court ... has ascribed to the states an interest in preventing defamation no less strong than its interest in protection from physical injury.'"); *Silver v. Levinson*, 648 So. 2d 240, 244 (Fla. Dist.Ct.App. 1994) ("This state has an interest in adjudicating a dispute where the reputation of one of its citizens has been allegedly damaged as a result of purposeful actions of a nonresident aimed specifically at Florida.").

Contrary to the District Court's holding, then, a proper consideration of *both* New York's interests and Florida's interests might be seen (in a vacuum) to offset one another, resulting in these two factors being neutral. However, given that *both*

Plaintiffs and Defendants have substantial connections to Florida – indeed, as the District Court held, Defendants have "extensive" contacts with Florida – but *only* Defendants have any contacts with New York, these two factors should weigh to some extent towards the application of Florida law.

Finally, the District Court found its third-listed Section 6 factor – certainty, predictability, and uniformity of result – to weigh somewhat, though "not as forcefully" towards the application of New York law.  While it is true that the application of New York privilege law – which may have the effect of depriving residents of all other states the protections otherwise afforded by the legislatures of their home state – a certain amount of "uniformity," it is also true that the Restatement warns that uniformity, predictability, and certainty are values that "can, however, be purchased at too great a price."  Restatement, § 6, *comment i.* And, as the District Court here recognized, the very "nature of our federalist system" means that sometimes result will differ depending on where the parties to similar litigations are located.  D.E.171, p.10.  As such, the third factor should be given minimal weight, if any at all.

Ultimately, a proper consideration of either the Section 145 factors or the Section 6 factors should have led the District Court to conclude that the application of Florida law to both the substance of the defamation case and the applicable

24

privileges was proper and its failure to so find was error that this Court should
reverse.

## II.  Under Florida Law, Defendants Were Not Entitled to the Protection of the Fair Report Privilege.

Because the District Court (erroneously) applied New York privilege law to
the case, the Court did not fully analyze Defendants' fair report privilege under
Florida law.  Nevertheless, the District Court did: (1) find there to be a "conflict"
between the Florida and New York privileges, strongly suggesting that application
of Florida law would "produce a different result;" and (2) express its strong
skepticism that the Florida fair report privilege would apply to the present case
given that the Florida privilege "generally protects only reports of proceedings
'open to the public….'"  D.E.171, pp.5-6.

If this Court finds that the District Court erred in its application of New
York law to the question of privileges, it can (and should) also find that, as a
matter of law, Defendants are not entitled to the protections afforded by the Florida
privilege.  In Florida, the "news media has been given a qualified privilege to
accurately report on the information they receive from government officials."
*Woodard v. Sunbeam Television Corp.*, 616 So.2d 501, 502 (Fla. Dist.Ct.App.
1993).  *See*, *also*, *Trujillo v. Banco Cent. Del Ecuador*, 17 F.Supp.2d 1334, 1338
(S.D. Fla. 1998) ("The fair reporting privilege is extended to news media 'to

accurately report on the information they receive from government officials,'
protecting the reporting media if that information is inaccurate.").

Alternately, some Florida cases discuss the fair report privilege as applying
to the publication of official publicly-available government documents. *See*, *e.g.*,
*Carson v. News-Journal Corp.*, 790 So.2d 1120, 1121 (Fla. Dist.Ct.App. 2001)
("The fair reports privilege requires that, in order to be privileged, a news report of
a public document must contain the substance of the subject the document
undertakes to present, or any separable part thereof."). Finally, some Florida
courts have also found that the fair report privilege extends to reporting "on
matters brought out in public proceedings." *Ortega v. Post-Newsweek Stations,
Florida, Inc.*, 510 So.2d 972, 975 (Fla. Dist.Ct.App. 1987) (applying privilege to
newspaper report of testimony made to a subcommittee of the Florida legislature).

It is clear that, as a matter of law, the Defendants cannot take advantage of
the protections of Florida's fair report privilege. First, it is undisputed that
Buzzfeed did not receive the Dossier from a government official or any other
government source. Defendants obtained their copy of the Dossier from David
Kramer, a private individual who had himself received the first 16 memos from
Glenn Simpson of Fusion GPS, after having first travelled to London to meet
Christopher Steele. Mr. Kramer was later provided with Report 166 at Mr.
Steele's direction. D.E.388, pp.3-8.

Similarly, it is undisputed that the Dossier, which was compiled by a private individual (Mr. Steele) at the direction of an opposition research firm hired by private interests (the DNC and the Hillary Clinton presidential campaign, acting through their attorneys), is not a "publicly available government document," or a government document at all.  Indeed, the Department of Justice made precisely this point in its Opposition to Defendants' motion to compel:

> The "report" in Buzzfeed's Article is not a government document, but a "collection of memos" allegedly compiled by "a person who is understood to be a former British intelligence agent."

D.E.115-1, p.19.  Fusion GPS, at whose direction the memos were prepared, stressed the same point in its Congressional testimony:

> Q.  And can you just explain to us so that we understand the document, [the memo] has a heading "Company Intelligence Report."  I'm just looking at the first page.  That one says "Company Intelligence Report 2016/080."  What would that have signified?
>
> A.  Company Intelligence Report is just a way of saying it's not a government document.  In the event that, you know, someone stole it or it leaked or there was some sort of breach, you know, they're not going to have their own name on it, but they want to make sure that no one mistakes it for a government document.

D.E.115-3, p.140.

While the Dossier may have been provided to or read by government officials, that does not turn them into a "publicly available government document." The Department of Justice made this point as well:

> [T]o the extent that any government activity is discussed at all in the
> Article, it is the assertion that this private report [the Dossier] was
> "circulating among" unnamed government officials and that some such
> officials have "seen" the report....   The [Buzzfeed] Article never
> attributes its account of this purportedly official government activity to
> any official document or statement of any government official.

D.E.115-1, p.19.

Nor can publication of a private series of memos created for an opposition research firm constitute reporting on "matters brought out in public proceedings." Defendants have not alleged that the Dossier was presented in a "public proceeding," nor does the Article purport in any way to be reporting on such a proceeding.

Accordingly, and as a matter of law, this Court should hold that, on remand, the District Court should find that Florida's fair reporting privilege does not protect the Defendants.

**III.    Even if the Choice of New York Law was Proper, the District Court Erred in Finding that New York's Fair Report Privilege Applied Here, Where the Application of the Privilege is not Supported by the Policies Underlying the Privilege.**

Even if the choice of New York law was proper, the District Court nonetheless erred in finding New York's fair report privilege applicable as a matter of law and dismissing Plaintiffs' complaint on that basis.  Under New York law, the fair report privilege has been codified as New York Civil Rights Law, Section 74, which provides that:

> A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published.
>
> This section does not apply to a libel contained in any other matter added by any person concerned in the publication; or in the report of anything said or done at the time and place of such a proceeding which was not a part thereof.

NYCRL §74.

It was Defendants' burden to prove every element of this affirmative defense. *See*, *e.g.*, *Saleh v. New York Post*, 78 A.D.3d 1149, 1151 (N.Y. App.Div. 2010) ("The privilege afforded by Civil Rights law § 74 is an affirmative defense...."); *Donawa v. United States AG*, 735 F.3d 1275, 1282 (11th Cir. 2013) ("[T]he defendant bears the burden of proving an affirmative defense.").

Consideration of the policies underlying the Fair Report Privilege is crucial to a proper analysis. Specifically, although some cases have extended the Fair Report Privilege to include reporting on official investigations, most have rejected the extension of the privilege to include unconfirmed allegations that have simply been provided to law enforcement by private individuals, as is the case here. *See*, *e.g.*, *Butcher v. Univ. of Mass.*, 94 Mass.App.Ct. 33, 40 (2018) ("[T]he fair report privilege 'does not apply to witness statements to police, whether appearing in an official police report or not, where no official police action is taken.'... Extending the privilege to a witness's allegations merely because they appear in a police

blotter does not further the doctrine's purpose of allowing the public to learn of official actions affecting the public interest."); *Wynn v. Smith*, 117 Nev. 6, 16 (2001) (report prepared by Scotland Yard that was "unsubstantiated" was not entitled to protections of the fair report privilege because "Inclusion of such a report within the ambit of the fair report privilege would directly conflict with the protections provided by our libel laws, and would undermine the basis of the privilege itself.  We conclude that this privilege should not be extended to allow the spread of common innuendo that is not afforded the protection accorded to official or judicial proceedings."); *Kelley v. Hearst Corp.*, 2 A.D.3d 480, 483 (N.Y. App.Div. 1956) ("The narration in private to newspaper reporters by police officers of acts of other persons is not 'a public and official proceeding' coming within the range of the statute."); *Reilly v. AP*, 797 N.E.2d 1204, 1215 (Mass.App.Ct. 2003) ("The privilege applies to reports by news media outlets of official government action, including police action, such as the fact of an arrest, a search warrant issued, or a crime charged; but it does not apply to witness statements to police, whether appearing in an official police report or not, where no official police action is taken. Such reports to police are unverified hearsay.").

In the present case, this basic premise underlying the privilege is completely absent.  Here, an unidentified individual allegedly provided unsolicited information to Steele, a private British citizen who owns and operates an opposition research

firm, that Plaintiffs were responsible for the hack of the DNC.  Steele included this uncorroborated "raw" information in a memorandum that he provided to Fusion GPS, another for-profit private opposition research firm, that had been hired to conduct opposition research on the Trump campaign.  Publishing wholesale the unverified defamatory allegations of an anonymous individual, simply because those allegations appeared in a document subsequently provided to the government does not advance the purposes of Section 74 but instead is the "spread of common innuendo that is not afforded the protection accorded to official or judicial proceedings." *Wynn*, 117 Nev. at 16.

As such, the District Court's application of the Fair Report Privilege to the defamatory statements concerning Plaintiffs in Report 166 was an error that must be reversed.

**IV.    The District Court Erred in Holding that, Even Though an Average Reader Would Not Have Understood Buzzfeed's Article to be Reporting on an Official Proceeding, Buzzfeed was Nonetheless Entitled to the Protections of New York's Fair Report Privilege.**

**A.    Protection Under the Statute is Dependent on the Ability of an Average Reader to Understand that the Defamatory Statements were Part of an Official Proceeding, Which Was Being Reported on in the Article in Question**

Under New York law, for the Fair Report Privilege to apply, an average reader would have to understand *both*: (1) that the article containing the defamatory statements was reporting on an official proceeding, *and* (2) that the

defamatory statements were themselves part of the same official proceeding. *CBS Broad. Inc. v. Counterr Grp.*, 2008 U.S. Dist. LEXIS 126089, at *35-36 (S.D.N.Y. Aug. 26, 2008) ("The fair reporting privilege applies only where (1) the allegedly defamatory statement is connected to a judicial proceeding; and (2) the statement fairly and accurately reports the judicial proceeding.").

The first prong requires that the average reader understand the article in question to be reporting on an official proceeding. *See*, *e.g.*, *Cholowsky v Civiletti*, 887 A.D.3d 110, 114 (N.Y. App.Div. 2009) ("[I]t is also incumbent on the party asserting the privilege to establish that the statements at issue reported on a judicial proceeding....  If the publication does not purport to comment on a judicial proceeding, Civil Rights Law § 74 is inapplicable....  If the context in which the statements are made make it impossible for the ordinary viewer listener or reader to determine whether defendant was reporting on a judicial proceeding, the absolute privilege does not apply...." (internal citations, quotation marks and edits omitted)); *Fine v. ESPN, Inc.*, 11 F.Supp.3d 209, 216 (N.D.N.Y. 2014) ("Section 74 applies only where the challenged report is 'of' a proceeding."); *Corp. Training Unlimited v. NBC*, 868 F.Supp. 501, 508-09 (E.D.N.Y. 1994) ("The statute, by its very terms, protects only *reports of judicial proceedings*."); *Wenz v. Becker*, 948 F.Supp. 319, 323 (S.D.N.Y. 1996) ("If the context in which the statements are made make[s] it 'impossible for the ordinary viewer to determine whether

32

defendant was reporting [on a proceeding], the absolute statutory privilege does not attach.'" (quoting *Corp. Training*, 868 F.Supp. at 509)).

It is insufficient to satisfy this first prong that the article in question make mere passing reference to some official action. *Fine*, 11 F.Supp.3d at 217 ("An overlap between the subject matter of the report and the subject matter of a proceeding does not suffice....  [A] report's mere mention of an official proceeding does not extend the privilege to an entire publication...."); *Dameron v. Wash Magazine*, 779 F.2d 736, 739-40 (D.C. Cir. 1985) ("The public's strong interest in keeping abreast of public affairs, however, is not served by reports that are so minimally related to governmental proceedings that the reader would not realize that any governmental report or proceeding was being described."); *Corp. Training*, 868 F.Supp. at 508-09 (holding that Section 74 protections were not available to the defendant even though the reporter actually attended the relevant criminal trial and prepared the news report "at least in part on her observation of those proceedings," finding that "this argument misapprehends the nature of the fair report privilege" and "the defense to be unavailable here. The statute, by its very terms, protects only reports of judicial proceedings....  Plaintiffs' argument, therefore, that NBC is unfairly attempting to 'back-in' the facts from the Icelandic trial transcripts into the Broadcast has significant force").

Indeed, courts have held that satisfaction of the first prong requires proof that the party seeking to assert the Privilege was, *at the time of publication*, aware that the defamatory statements were part of, and subject to, official action. *See*, *e.g.*, *Bufalino v. Associated Press*, 692 F.2d 266, 271 (2d Cir. 1982) ("[T]he privilege cannot be divorced from its underlying policy of encouraging the broad dissemination of public records. The rule applied by the District Court does not serve that policy because it does nothing to encourage the initial reporting of public records and proceedings. Certainly §611 should not be interpreted to protect unattributed, defamatory statements supported after-the-fact through a frantic search of official records. For where the media does not directly or indirectly rely upon official records, the policy underlying the privilege is inapplicable and the privilege itself should not be applied. We thus conclude that AP is not entitled to summary judgment on the basis of records upon which it did not actually rely."); *Dameron*, 779 F.2d at 739 (fair report privilege is unavailable where it is not "apparent either from specific attribution or from the overall context that the article is quoting, paraphrasing, or otherwise drawing upon official documents or proceedings"); *Suulutaaq, Inc. v. Williams*, 782 F.Supp.2d 795, 806-07 (D. Alaska 2010) ("[T]he problem is that even if the information does appear in the public record, that does not establish that Defendants relied on it, which would be necessary in order for them to assert the fair report privilege.").

In the present case, Defendants concede that – aside from the CNN article referenced in Buzzfeed's story – they had no *independent* knowledge of any official action concerning Report 166. *See, e.g.*, D.E.234-7, Ex.90, pp.12-13 (Smith admitting that Buzzfeed had not itself confirmed that the President had been briefed on the contents of the memos); D.E.115-5, p.2-3 (acknowledging that Defendants' belief that there had been presidential briefings came from the CNN report); D.E.214-5, ¶16 ("From the CNN report, we learned that the Dossier had been briefed to the President and the President elect....").

The problem for Defendants in their reliance on the CNN article, however, is that Defendants had (and have) no way of knowing if the "memos" referenced in CNN's article are the same as the "memos" that Buzzfeed published in full.[8]  The FBI had multiple versions of the so-called "Dossier," including versions that it received from a reporter and from Senator John McCain, neither of which contained the only memo relevant here, Report 166. *See, e.g.* D.E.234-7, Exs. 87, 88, and 89 p.6.  Indeed, because there were multiple versions of the "Dossier," the problem goes a step further: there is no indication that even *CNN* could say for sure

---

[8] Not only did CNN not publish the memos itself, it did not even provide details of what the memos contained.  As the CNN story explained, "At this point, CNN is not reporting on details of the memos, as it has not independently corroborated the specific allegations."  D.E.214-5, Ex.1, p.2.

that the memos that it had "reviewed" were the same memos that formed the basis of the synopsis provided to Presidents Obama and Trump.[9]

The second prong requires that the average reader also be able to understand that the *defamatory statements at issue* were fully part of the same official proceeding which justifies the report. *See*, *e.g.*, *Wenz*, 948 F. Supp. at 323 ("Allegedly defamatory statements are protected by Section 74 only where the statements report on a judicial proceeding...."); *CBS Broad.*, 2008 U.S. Dist. LEXIS 126089, at *36 (same); *Saleh*, 78 A.D.3d at 1152 (examining each of the eleven alleged defamatory statements to determine if any "essentially summarize or restate the allegations of a pleading filed in an action" because only such statements "fall within section 74's privilege"); *Fine*, 11 F.Supp.3d at 218 (examining individually each of the "putatively defamatory parts of Publications" to determine if they "constitute a report of official proceedings"); *Stuart v. Press Pub. Co.*, 82 N.Y.S. 401 (N.Y. App.Div. 1903) (finding that the privilege did not extend so far as to protect defamatory statements that were not actually contained within the relevant judicial proceeding).

---

[9] The CNN article itself illustrates CNN's own confusion about the multiple versions of the "Dossier." For example, the CNN article claims that, on December 9, Senator McCain gave "a full copy of the memos" to FBI Director James Comey. This "full copy," however could not (and did not) include the only memorandum at issue in this case – Report 166 – which was not written until December 13. D.E.214-5, Ex.1, p.2.

Indeed, in the Pleadings Order, the District Court itself recognized Defendants' burden to prove this connection, holding that the limitations placed on the Fair Report privilege were intended to "insure that the reader can ascertain that what is reported as true is that there is an official proceeding underway or official action being taken *regarding the allegedly defamatory statements*...." D.E.171, p.13 (emphasis added).

The second prong cannot be satisfied merely by demonstrating that the government had in its *possession* private documents containing the defamatory statements without proof that the specific documents were part of a proceeding already underway at the time of the publication. *See*, *e.g.*, *Abakporo v. Sahara Reporters*, 2011 LEXIS 109056 at *28-29 (E.D.N.Y. Sept. 26, 2011) ("Even assuming that the Petition reached the relevant Nigerian authorities, however, this fact would not transform the Petition into part of an 'official proceeding' under Section 74.... Construing the statutory privilege in the suggested manner would create a recipe for libel, as specious allegations could be broadcast with impunity once sent, even anonymously, to a government agency.").

With all of this in mind, the District Court in the present case held correctly in both the Pleadings Order and again in the Summary Judgment Order that Buzzfeed was, as a matter of law, ***not*** entitled to the protection of the Fair Report Privilege based on its ***own*** article. D.E.171, p.16 ("The Article itself does not

permit an ordinary reader to understand that the Dossier was the subject of classified briefings or an FBI investigation."); D.E.388, p.11 ("...Buzzfeed's article does not recount sufficient official action.").

Instead, the District Court held that Buzzfeed was entitled to the protection of the Fair Report Privilege *solely because of the inclusion of a hypertext link in the Buzzfeed article to a separate article posted at CNN.com*. D.E.388, p.21. For the reasons discussed below, this was error requiring reversal.

**B.    The District Court Erred in Finding a Hyperlink to a CNN Article to be a Sufficient Basis to Extend the Fair Report Privilege Protection to the Defendants**

Having first ruled that the Buzzfeed article itself would not be seen by an average reader to have been reporting on official government action, the District Court went on to frame the relevant inquiry in this way:

> [I]t is the hyperlinked CNN article that describes the confidential briefings and asserts that the FBI is investigating the truth of the Dossier's allegations. The question then is: would an ordinary reader of the [Buzzfeed] Article conclude that the Dossier was subject to these official actions when these official actions are mentioned only in the hyperlinked CNN article?

D.E.171, p.16.

The District Court then noted that only one other court had addressed an analogous question directly – the Nevada Supreme Court in *Adelson v. Harris*, 402 P.3d 665 (Nev. 2017). D.E.171, p.16. The *Adelson* court, in turn, noted that *it* was facing "an issue of first impression, whether a hyperlink in an Internet publication

that provides specific attribution to a document protected by the fair report privilege qualifies as a protected report for purposes of that privilege." *Id.*, at 668. The *Adelson* court went on to state that, "although courts have not addressed hyperlinks in the context of the fair report privilege ... courts have extensively discussed hyperlinks in the context of whether they impart notice for the purposes of contract formation." *Id.*, at 669. Finally, the *Adelson* court deemed the two contexts analogous, "because both standards ask whether an average person can identify and understand a hyperlink's importance." *Id.*, at 670.

Thus, the *Adelson* court held that – as long as the material to be found upon following the hyperlink would itself qualify for the protections of the Fair Report Privilege – the only relevant question is whether the hyperlink is sufficiently conspicuous that an average reader would have been on notice that the article was referring to, and thereby fully incorporating, the information located at the hyperlink.

For a variety of reasons which follow, however, it was either error for the District Court to adopt the *Adelson* test in the present case, or it applied that test erroneously.

        1.    <u>The District Court Erred in Adopting the *Adelson* Test</u>

Although the *Adelson* court was correct in noting that "courts have not addressed hyperlinks in the context of the fair report privilege," it did not need to

venture outside of the world of defamation law to find a better and more analogous line of cases. *Id.*, at 669. Prior to the *Adelson* decision, numerous courts had addressed the question of whether a hyperlink to an article containing defamatory material constituted a republication of the defamation. Routinely, those courts found that a mere "link" to an article containing defamatory information had not republished the information, unless the linking website, itself, had repeated the defamatory statements. *See*, *e.g.*, *Klayman v. City Pages*, 2015 U.S. Dist. LEXIS 49134 (M.D.Fla. Apr. 3, 2015) (noting that the court "could not find any Florida authority for the proposition that providing links to statements already published, without more, republishes those statements" and citing to cases in other jurisdictions rejecting the proposition), *aff'd* 650 F. App'x 744, 746 (11th Cir. 2016); Eng, Donna, et al., "Online Defamation: Do Hyperlinks Constitute Republication for Florida Defamation and Trade Libel Claims?," 90 FLA. BAR J. 58 (May 2016) (noting the paucity of cases in Florida, collecting cases nationally and concluding that "the overwhelming majority position in other jurisdictions appears to be that so long as the hyperlink merely references the reader to a previously published article, and does not restate the original contents, alter the allegedly defamatory information, or present the allegedly defamatory information to a new audience, a defamation action predicated thereupon will fail as a matter of law.").

Given that these defamation cases refuse to treat the content of the

40

hyperlinked articles as being incorporated by reference, it would not make sense to ask – solely for Fair Report Privilege purposes – whether a hypertext link is sufficient to direct the reader to a page that links the defamatory statements to an official action (a connection which, as discussed below, the CNN report in this case did not even make). Instead, it would make sense to ask whether the article that includes the hyperlink itself contains enough information that an average reader would understand – before clicking – that clicking on the hyperlink would lead the reader to the underlying material needed supporting the connection between the defamatory statements and a particular official action.

If the District Court had correctly applied a *Klayman*-like test – according to principles well-established within the realm of defamation law – it would have concluded that Buzzfeed's article failed to provide the necessary information (even with its inclusion of the link to CNN) for an average reader to connect the allegations concerning Plaintiffs to any official action.

> 2.   Even Applying the *Adelson* Test, the District Court Erred in Finding the Hyperlink at Issue Here to be Sufficient as a Matter of Law

Even if this Court were to approve of the *Adelson* test, it could not deem that test satisfied here.

First, it is important to recognize a crucial distinction between the hyperlink at issue in *Adelson* and the hyperlink at issue in the present case. It is a difference

that compels a different outcome.  In *Adelson*, the defendant had published an online petition that stated, among other things, that "Adelson 'personally approved' of prostitution in his Macau casinos."  *Adelson v. Harris*, 973 F.Supp.2d 467, 473 (S.D.N.Y. 2013).  The phrase "personally approved" was hyperlinked to an Associated Press story "discussing ongoing litigation from Nevada....  The AP article provided a summary of a sworn declaration… filed in the litigation alleging that Adelson had approved of prostitution in his Macau casino resorts.  Specifically, the article quotes a portion of the declaration… [stating] that a 'prostitution strategy had been personally approved by Adelson.'"  *Adelson*, 402 P.3d at 666-67.

The material found immediately upon clicking the hyperlink in *Adelson* thereby fully completed the crucial connection between the ***defamatory statement itself*** and the sworn statement presented as evidence within the official proceeding from which the defamatory statement was drawn.  In other words, the hyperlinked material in *Adelson* was sufficient by itself to allow the reader to understand that ***the defamatory statement itself*** was part of, and explicitly drawn from, an official proceeding.  In that context, the holding of *Adelson* is entirely understandable: where the hyperlink itself enables the average reader to understand that the defamatory statement arises out of the official proceeding, conspicuous placement of the hyperlink serves precisely the function the *Adelson* court envisioned.

42

Indeed, the *Adelson* court made this very point in its opinion:

[I]t is important to note that the hyperlink was placed in the same sentence as the content it purported to support.  That is to say, the AP news article supported the proposition that a report existed stating that "Adelson 'personally approved' of prostitution."  Thus, although the hyperlink was not conspicuous in a general sense, when reading the specific sentence the hyperlink functioned like a footnote.  For this reason, we conclude that the hyperlink was conspicuous in the context of supporting a specific claim.

…The hyperlink also provides support for the text it covers (i.e., the AP report supports the proposition that Adelson personally approved of prostitution).

*Adelson*, 402 P.3d at 670.

The hyperlink at issue in the present case, however, does not serve the same function.  Here, the sentence containing the hyperlink read: "CNN reported Tuesday that a two-page synopsis of the report was given to President Obama and Trump," with the words "CNN reported" rendered in blue (though not underlined) as the relevant hyperlink.  *See* D.E.234-5, Ex.75, p.2.  Unlike the hyperlink in *Adelson,* the hyperlink at issue here: (1) did not include the defamatory statements; (2) did not relate to or reference the defamatory statements; and (3) did not provide the reader with any connection between the defamatory statements and the existence of any official action concerning them.  As such, the very rationale underpinning the *Adelson* court's decision is absent here.

Next, as a simple factual matter, the District Court erred in ignoring entirely the factual evidence that the material in the hyperlinked CNN article did not – in

actuality – inform the average reader of the existence of any official activity

involving the defamatory statements inasmuch as the overwhelming majority of

those who read the Buzzfeed article never clicked on the CNN hyperlink.

According to information produced by CNN, approximately *one-third of one-*

*percent of the people* who viewed the Buzzfeed article actually clicked through to

the CNN article. Specifically, between January 10, 2017 (when Buzzfeed first

published the article) and February 3, 2017 (when Plaintiffs' names were

redacted), the article was viewed more than 5.95 million times. D.E.234-5, Ex.73,

p.11. According to CNN, during a similar time period, the link from the Buzzfeed

article to the CNN article was only clicked on 20,671 times. D.E.234-7, Ex.81.

This means that less than 0.35% of unique viewers of the Buzzfeed article actually

clicked through to the CNN article, leaving 99.65% of readers who did not do so.

> As the *Adelson* court itself held:

> [T]here is a drawback to hyperlinks as attributions—an average reader must identify a hyperlink, understand its importance, and ultimately open the link. *When a hyperlink is not found, understood, or opened by a reader, it has failed as a source of attribution*.

*Adelson*, 402 P.3d at 669 (emphasis added). Here, there can be little question that,

even under the *Adelson* test, the hyperlink included in Buzzfeed's Article "failed as

a source of attribution," inasmuch as it was "not found, understood, or opened" by

99.65% of the readers of its article. To hold otherwise – and, indeed, to hold

otherwise as a matter of law – is clearly error.

Finally, the hyperlink at issue here was insufficient as a source of attribution inasmuch as it was *insufficiently conspicuous as defined in the contract line of cases to which* Adelson *analogizes*.  Here, the relevant hyperlink in Buzzfeed's article included only the words "CNN reported," which were colored blue, but not otherwise distinguished by the typical signifiers of a hyperlink, such as the text being underlined, italicized, bolded, or in all-caps.  D.E.234-5, Ex.75, p.2.  New York courts (and others) have held that simply setting off words on a webpage in blue, without more, is insufficiently conspicuous to put the ordinary user on notice that the words contained a hyperlink.  *See*, *e.g.*, *Applebaum v. Lyft, Inc.*, 263 F.Supp.3d 454, 467 (S.D.N.Y. 2017).  As the *Applebaum* court specifically held:

> A reasonable consumer would not have understood that the light blue "Terms of Service" hyperlinked to a contract for review.  Lyft argues that coloring words signals "hyperlink" to the reasonable consumer, but the tech company assumes too much.  Coloring can be for aesthetic purposes.  Courts have required more than mere coloring to indicate the existence of a hyperlink to a contract....  Beyond the coloring, there were no familiar indicia to inform consumers that there was in fact a hyperlink that should be clicked and that a contract should be reviewed, such as words to that effect, underlining, bolding, capitalization, italicization, or large font.

*Id.* (and cases cited therein).

3.   <u>Even if Readers had Clicked on the Hyperlink, the Reporting there was Insufficient to Qualify Buzzfeed's Article for Protection Under the Fair Report Privilege</u>

In *Adelson*, the court specifically noted that: "At the outset of our discussion, we note that Adelson has conceded that the underlying AP article quoting Jacobs'

45

declaration itself is protected by the fair report privilege." *Adelson*, 402 P.3d at

668.  The opposite is true here.  Even if readers of the Buzzfeed Article had clicked

on the "CNN Reported" hyperlink (something 99.65% of them did not do), the

information they would have found would not have resulted in the average reader

understanding that the Buzzfeed article was (a) reporting on official activity

concerning Report 166, or (b) reporting on official activity concerning the

defamatory statements at issue in this case.

The hyperlink in question here was contained in the sentence "CNN reported

Tuesday that a two-page synopsis of the report was given to President Obama and

Trump."  If readers clicked "CNN Reported," they were taken to an article posted

at CNN.com entitled "Intel chiefs presented Trump with claims of Russian efforts

to compromise him."  D.E.214-5, Ex.1.  That story begins by stating:

> Classified documents presented last week to President Obama and
> President-elect Trump included allegations that Russian operatives
> claim to have compromising personal and financial information about
> Mr. Trump, multiple US officials with direct knowledge of the briefings
> tell CNN.
>
> The allegations were presented in a two-page synopsis that was
> appended to a report on Russian interference in the 2016 election.  The
> allegations came, in part, from memos compiled by a former British
> intelligence operative, whose past work US intelligence officials
> consider credible.  The FBI is investigating the credibility and accuracy
> of these allegations, which are based primarily on information from
> Russian sources, but has not confirmed many essential details in the
> memos about Mr. Trump.

D.E.214-5, Ex.1, p.1.

The article goes on to state that one of the reasons for the briefing was to "make the President-elect aware that such allegations involving him are circulating among intelligence agencies, senior members of Congress and other government officials in Washington...." *Id.*

On its face, then, to the extent that the CNN article discusses briefings to Presidents Trump and Obama, it does so not in the context of discussing the hacking of the DNC, but rather in the context of alerting Presidents Obama and Trump of memos that alleged the existence of *kompromat* concerning President Trump and the possibility that such information might be revealed by the media.

Indeed, the CNN story specifically disclaims any notion that the briefing to the Presidents concerned the hacking of the DNC at all, stating:

> ***This synopsis was not an official part of the report from the intelligence community case about Russian hacks***, but some officials said it augmented the evidence that Moscow intended to harm Clinton's candidacy and help Trump's, several officials with knowledge of the briefings tell CNN.

*Id.*, pp. 1-2 (emphasis added).

This is consistent with the many public statements of both former FBI Director James Comey and former Director of National Intelligence James Clapper, each of whom has stated that that the two-page synopsis related only to the "salacious" allegations about then-President-elect Trump. *See*, *e.g.*, Comey testimony before the Senate Intelligence Committee, D.E.234-5, Ex.67, p.30 ("I

47

was briefing him about salacious and unverified material."); Comey Testimony

before the House Committee on the Judiciary, D.E.387-2, pp.32-33, 35-36 ("[Q.]

Mr. Jordan[:] ...  Why didn't you brief him on the whole thing, talk about this

dossier put together by a foreign intelligence source, we have this information?

Why just the salacious part?  Why not the whole thing?  [A.] Mr. Comey[:]  I don't

think -- again, I could be wrong that he brought it up, but I don't think he brought

it up in the first session, because it wasn't central to the conclusions of the joint

intelligence community assessment.  There were lots of other sources to support

the conclusions, and because it wasn't important to the conclusion, I don't think he

brought it up in his oral presentation.  It was brought up in my -- just that piece, it

was brought up privately, because the goal of the private session was to alert the

incoming President to this piece of it that we thought was about to become

public...."); Comey Statement for the Record to Senate Select Committee on

Intelligence, D.E.214-41, p.1 ("The IC leadership thought it important, for a

variety of reasons, to alert the incoming President to the existence of this material,

even though it was salacious and unverified.  Among those reasons were: (1) we

knew the media was about to publicly report the material and we believed the IC

should not keep knowledge of the material and its imminent release from the

President-Elect; and (2) to the extent there was some effort to compromise an

incoming President, we could blunt any such effort with a defensive briefing.");

Comey Interview, D.E.234-5, Ex.68 ("BAIER: ... You briefed the president-elect on the sliver of the dossier, really the salacious part about prostitutes in Moscow and that allegation.... COMEY: Correct. My mission in that private briefing was just to tell him about that slice of it.").

Indeed, the closest that the CNN article gets to anything even remotely relevant to the present case is the single sentence that reads:

> The two-page synopsis also included allegations that there was a continuing exchange of information during the campaign between Trump surrogates and intermediaries for the Russian government, according to two national security officials.

D.E.214-5, Ex.1, p.2.

Preliminarily, the repeated statements of Messrs. Clapper and Comey, quoted above, contradict this reporting, attributed only to two unnamed "national security officials."

And, if CNN's reporting on this point was erroneous, then the privilege would not attach.  *See*, *e.g.*, Pleadings Order, D.E.171, p.19 ("At this stage, the Court takes as true that the official actions described in the CNN article (the classified briefings and FBI investigation) actually occurred.  If discovery reveals that they did not, then there was, in fact, no official action....  It would, after all, be contrary to the purpose of the privilege to allow the press to falsely report that official action was underway in order to publish otherwise defamatory statements." (multiple citations omitted)).

More to the point, though, this single sentence in the CNN article still fails to make any connection between Report 166 – much less the defamatory allegations concerning the Plaintiffs contained only in Report 166 – and any official government activity.  This sentence, if accurate, could have as easily been referring to any of the other sixteen memos written by Mr. Steele or to information obtained by the intelligence community from different sources entirely.  In short, there is no way that the average reader could have concluded even that the CNN article itself was reporting on official government activity concerning either Report 166 or the defamatory statements at issue in this case.

**C.    Given the Specific Issues Mentioned in Report 166 that the District Court Found to be "The Subject Of Official Action," it Was Error to Find the Fair Report Privilege Applied**

As the District Court recognized throughout its Summary Judgment Order, the proper analysis here involves not an examination of all seventeen memos prepared by Christopher Steele, but rather a limited examination of Report 166. D.E.388, p.17.

Looking to Report 166, then, the District Court found that two subjects discussed in Report 166 "were indisputably the subject of official action."  *Id.* Specifically, the District Court found that Report 166: (1) "discusses allegations of cooperation between Trump's 'team' and Russian Operatives," and (2) "references earlier reports in the Dossier about Carter Page's alleged relationship with Russian

intelligence." *Id.* Citing to the "Nunes" and "Schiff" Memos, the District Court then stated that, according to those two memos, the FBI was investigating both the connections between Trump's "team" and Russian operatives, as well as Page's connections to Russian intelligence. *Id.* With respect to Page, the District Court also noted that the DOJ obtained a FISA warrant (and subsequent renewals of that warrant) "based, in part, on information contained in the Dossier." *Id.*

And, although the District Court pointedly did *not* hold that either of these subjects had anything to do with the defamatory statements concerning *Plaintiffs* in Report 166, it nevertheless held that "by extension" the remainder of Report 166 was also covered by the Fair Report Privilege. This holding was erroneous for multiple reasons.

First and foremost, the District Court failed to connect any of the three pillars required to support the Fair Report Privilege. For example, given that the only relevant "official action" contained in Report 166, as identified by the District Court, was the FBI's investigation of links between the Trump team and Russian operatives, and the FBI's investigation of Page, there is no way that the hyperlinked sentence "CNN reported Tuesday that a two-page synopsis of the report was given to President Obama and Trump" put *any* reader (much less the average reader) on notice that Buzzfeed (or CNN) were reporting on the "official

action" of an FBI's investigation.[10]  Nor would the CNN story – which makes no mention whatsoever of either Page or of an FBI investigation into links between the Trump team and Russian operatives – allow the average reader (or any reader) to understand that the story was "reporting on" those official actions.  Similarly, the fact that these two issues happened to be mentioned in Report 166 and these two issues are also under investigation by the FBI does not (in and of itself) mean that the FBI used Report 166 as part of its official investigation.

Next, because the FBI's investigation and the DOJ's FISA warrant applications were not public knowledge until January of *2018* – when the Nunes and Schiff memos were publicly released – it is impossible for Buzzfeed to claim that it knew of these official actions and was relying on their existence when it published its article in January of *2017*.

Finally, the District Court's holding that the mere fact that two discrete issues mentioned in Report 166 were also the subject of official action extends the privilege to the portions of Report 166 that are unconnected to any official action runs counter to both the plain language of Section 74 and the cases interpreting the statute.

---

[10] It is understandable why the District Court did not identify the briefings to Presidents Obama and Trump as the "official action," as Defendants had urged: Defendants have been able to produce no evidence that those briefings contained *any* information from Report 166.

Section 74 specifically excludes from protection "the report of anything said or done at the time and place of such a proceeding which was not a part thereof." This is precisely why courts interpreting the statute have looked at each individual statement *alleged to be defamatory* and asked the question of whether *that particular defamatory statement* was part of the judicial, legislative, or other official proceeding.  *See*, *e.g.*, *Greenberg v. Spitzer*, 155 A.D.3d 27, 43 (N.Y. App.Div. 2017) (first holding that "it is incumbent on the party asserting the privilege 'to establish that the statements at issue reported on a judicial proceeding'" and then proceeding to determine, one by one, whether each alleged defamatory statement was part of a judicial proceeding); *Friedman v. Bloomberg L.P.*, 884 F.3d 83, 95 (2d Cir. 2017) (finding that while one alleged defamatory statement was entitled to protection under Section 74 as a fair report of a judicial proceeding, because a second alleged defamatory comment "was in no way informing the public of what was 'go[ing] on in the courts' ... The § 74 privilege does not apply"); *Freeze Right Refrigeration & Air Conditioning Servs., Inc. v. New York*, 101 A.D.2d 175, 183 (N.Y. App.Div. 1984) (although reporting on statements contained in a complaint were protected by Section 74, reporting on the defendant's denials of the allegations was not because "section 74 also provides: [']This section does not apply to a libel contained in any other matter added by any person concerned in the publication; or in the report of anything said or done at the

53

time and place of such a proceeding which was not a part thereof.[']  Thus, in order

for the entire article to be beyond the reach of this complaint, recourse must be had

to some doctrine in the law of defamation other than the absolute statutory

privilege accorded to a report of an official proceeding").

## <u>CONCLUSION</u>

For the reasons outlined hereinabove, Plaintiffs respectfully request that this Court:

(1)    Reverse the District Court's allowance of Defendants' Motion for Summary Judgment; and

(2)    Reverse the District Court's holding that New York law should apply to the determination of the applicable privileges in this case, find instead that, as a matter of law, Florida law should apply to the determination of privileges and find that, as a matter of law under Florida law, Defendants are not entitled to the protection of the Fair Report Privilege, or, alternatively;

(3)    Reverse the District Court's holding that under New York law, Defendants were entitled, as a matter of law, to the protections of New York Civil Rights Law §74, and find instead that, as a matter of law, Defendants were not entitled to the protections of that statute, or, alternatively;

(4)    Reverse the District Court's holding that under New York law, Defendants were entitled, as a matter of law, to the protections of New York Civil Rights Law §74; and find instead that factual questions preclude a determination on the privilege question as a matter of law, necessitating a jury trial on the issue; and

(5)     Order the District Court to return this case to the trial docket for

further proceedings consistent with this order.


Respectfully Submitted,

/s/ Evan Fray-Witzer
Evan Fray-Witzer
Ciampa Fray-Witzer, LLP
20 Park Plaza, Suite 505
Boston, MA 02116
617-426-0000
Evan@CFWLegal.com

/s/ Valentin Gurvits
Valentin Gurvits (admission pending)
Boston Law Group, PC
825 Beacon Street, Ste 20
Newton, MA 02459
617-928-1800
vgurvits@bostonlawgroup.com

/s/ Matthew Shayefar
Matthew Shayefar
Law Office of Matthew Shayefar, PC
925 N La Brea Ave
W. Hollywood, CA 90038
323-948-8101
matt@shayefar.com

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.      This document complies with the type-volume limit of Fed. R. App.

P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed.

R. App. P. 32(f), the documents contains 12,945 words.

2.      This document complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6)

because this document has been prepared in a proportionally spaced typeface using

Microsoft Word for Office 365 in size 14 font of the font style Time New Roman.


/s/ Matthew Shayefar, Esq.

Attorney for Aleksej Gubarev, XBT Holding S.A. and Webzilla, Inc.

Dated: February 28, 2019

# **ADDENDUM**

## **I.      New York Civil Rights Law, Section 74**

§ 74. Privileges in action for libel

A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published.

This section does not apply to a libel contained in any other matter added by any person concerned in the publication; or in the report of anything said or done at the time and place of such a proceeding which was not a part thereof.

## **II.      Restatement (Second) on Conflict of Laws, Section 145**

§ 145 The General Principle

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
  (a) the place where the injury occurred,
  (b) the place where the conduct causing the injury occurred,
  (c) the domicil, residence, nationality, place of incorporation and place of
        business of the parties, and
  (d) the place where the relationship, if any, between the parties is centered.
These contacts are to be evaluated according to their relative importance with respect to the particular issue.

## **III.    Restatement (Second) on Conflict of Laws, Section 6**

§ 6 Choice-of-Law Principles

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

58

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

*Comment i. Predictability and uniformity of result.* These are important values in all areas of the law. To the extent that they are attained in choice of law, forum shopping will be discouraged. These values can, however, be purchased at too great a price. In a rapidly developing area, such as choice of law, it is often more important that good rules be developed than that predictability and uniformity of result should be assured through continued adherence to existing rules. Predictability and uniformity of result are of particular importance in areas where the parties are likely to give advance thought to the legal consequences of their transactions. It is partly on account of these factors that the parties are permitted within broad limits to choose the law that will determine the validity and effect of their contract (see § 187) and that the law that would be applied by the courts of the state of the situs is applied to determine the validity of transfers of interests in land (see § 223). Uniformity of result is also important when the transfer of an aggregate of movables, situated in two or more states, is involved. Partly for this reason, the law that would be applied by the courts of the state of a decedent's domicil at death is applied to determine the validity of his will in so far as it concerns movables (see § 263) and the distribution of his movables in the event of intestacy (see § 260).

## IV.    Restatement (Second) on Conflict of Laws, Section 150

§150 Multistate Defamation

(1) The rights and liabilities that arise from defamatory matter in any one edition of a book or newspaper, or any one broadcast over radio or television, exhibition of a motion picture, or similar aggregate communication are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) When a natural person claims that he has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the person was domiciled at the time, if the matter complained of was published in that state.

(3) When a corporation, or other legal person, claims that it has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the corporation, or other legal person, had its principal place of business at the time, if the matter complained of was published in that state.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 28, 2019, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically generate and send by e-mail a Notice of Docket Activity to all the following attorney filers participating in the case:

Katherine M. Bolger
Davis Wright Tremaine, LLC
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
katebolger@dwt.com

Nathan Siegel
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, Suite 800
Washington, DC 20006
nathansiegel@dwt.com

Dated:        February 28, 2019                /s/ Matthew Shayefar
                                               Matthew Shayefar