# Exhibit
# 4

No. 18-15295-JJ, 19-10261

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

_____

ALEKSEJ GUBAREV, et al.,
*Plaintiffs-Appellants-Cross-Appellees*

v.

BUZZFEED, INC., et al.,
*Defendants-Appellees-Cross-Appellants*

_____

On Appeal from the United States District Court
for the Southern District of Florida
Case No. 1:17-cv-60426-UU (Hon. Ursula Ungaro)

_____

**PLAINTIFFS-APPELLANTS'-CROSS-APPELLEES' REPLY/RESPONSE
BRIEF**

_____

| | | |
|---|---|---|
| Evan Fray-Witzer | Valentin Gurvits | Matthew Shayefar |
| Ciampa Fray-Witzer, LLP | Boston Law Group, PC | Law Office of Matthew |
| 20 Park Plaza, Suite 505 | 825 Beacon Street, Ste 20 | Shayefar, PC |
| Boston, MA 02116 | Newton, MA 02459 | 925 N La Brea Ave |
| 617-426-0000 | 617-928-1800 | W. Hollywood, CA 90038 |
| Evan@CFWLegal.com | vgurvits@bostonlawgroup.com | 323-948-8101 |
| | | matt@shayefar.com |

*Attorneys for Plaintiffs-Appellants-Cross-Appellees*

## <u>STATEMENT OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Plaintiff-Appellant-Cross-Appellant Webzilla, Inc.'s parent corporation is Plaintiff-Appellant-Cross-Appellant XBT Holding, S.A.  Plaintiff-Appellant-Cross-Appellant XBT Holdings, S.A. does not have a parent corporation and is not a publicly held corporation.

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Eleventh Circuit Rule 26.1-1, counsel for the Appellants, Aleksej Gubarev, Webzilla, Inc., and XBT Holding, S.A, verify that the persons listed below have or may have an interest in the outcome of this case:

1.     Black, Roy

2.     Black, Srebnick, Kornspan & Stumpf, P.A.

3.     Bolger, Katherine M.

4.     Boston Law Group, PC

5.     Buzzfeed, Inc.

6.     Ciampa Fray-Witzer, LLP

7.     Cobb, Brady

8.     Cobb Eddy, PLLC

9.     Davis Wright Tremaine LLP

10.     Fray-Witzer, Evan, Esq.

11.     Fulop, Dylan, Esq.

12.     Gubarev, Aleksej

13.     Gurvits, Valentin D.

14.     Kelly, Chealsea T.

15.     Law Office of Matthew Shayefar, PC

16.     Lazier, Adam

17.     Lopez, Jared

18.     Schary, Alison

19.     Shayefar, Matthew, Esq.

20.     Siegel, Nathan

21.     Smith, Ben

22.     The Hon. Ursula Ungaro

23.     Webzilla, Inc.

24.     XBT Holding, S.A.

# **TABLE OF CONTENTS**

STATEMENT OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ....................................................................... i

TABLE OF CONTENTS......................................................................... iii

TABLE OF CITATIONS ........................................................................ vi

ARGUMENT .........................................................................................2

I.      Plaintiffs Have Not Waived Their Choice of Law Argument.........................2

II.     If a Choice Needs to Be Made, This Court Should Choose Forum State
        Florida's Majority, Common-Law, Restatement section 611 Rule And Not
        New York's Outlier "Door-Closing" Statute ...................................5

III.    In An Entirely Separate Order which Defendants Have *Not* Appealed, The
        District Court Properly Concluded That Plaintiffs Were Private Figures With
        Respect to the Defamatory Allegations Published by Buzzfeed...................12

        A.      Defendants Have Waived Their Right to Pursue an Appeal of the
                Public/Private Figure Decision.......................................12

        B.      The District Court Properly Concluded that Plaintiffs Were Private
                Figures ..............................................................13

IV.     A Reasonable Jury Could Easily Find That Defendants Acted With the
        Requisite Degree of Fault ....................................................19

        A.      Plaintiffs Can Meet Even the Most Exacting, "Actual Malice," Test 20

        B.      Plaintiffs Can Satisfy New York's Lesser-Standard of "Gross
                Irresponsibility."....................................................24

        C.      Plaintiffs Can Easily Meet Florida's Negligence Standard ............29

V.      Defendants Clearly Published Accusations About Plaintiffs Which Were Not
        Only Defamatory, but Defamatory *Per Se*. ...................................30

VI.    The District Court Properly Dismissed the Controversial, and Widely
       Derided, "Neutral Reporting" Defense...........................................................31

VII.   What "Dossier?" ............................................................................................35

VIII.  Even if New York Law Applies, Defendants Did Not Show "*Fair and True*"
       "*Report*" of the Accusations OF Plaintiffs. ...............................................37

       A.    Application of §74 is strictly limited by its language and "public
             interest" purpose (see Br.28-31)...........................................................37

       B.    Report of "Classified" Proceedings is Not Privileged by §74. (*See*
             D.E.115, pp.10-13; D.Br.7-13).............................................................39

       C.    There Was No "Official Proceeding" Because There Was No Exercise
             of Official Duty or Power Trusted to Safeguard the "Public Interest"
             Purpose of §74 (Br.37-39)....................................................................42

             1.    Merely "reviewing" documents, even a synopsis "provided" to
                   Presidents (D.Br.19), was not a "proceeding."........................43

                   a. Distinction of Defendants' "Proceeding"/"Investigation"
                   Cases, Generally.......................................................................46

                   b. Distinction and Criticism of Medico v. Time, by Bufalino v.
                   Associated Press, and others ....................................................47

                   c. *Fine v. ESPN* Supports Plaintiffs, not Defendants................48

             2.    *"Source Validation" (D.Br.19) is Not a "Proceeding"* ....................51

       D.    There Was No "Fair and True Report" (*see* Br.32,36-37,45-50,53-54).
             ..................................................................................................................52

             1.    Requirements of Fair and True Report .....................................52

             2.    The Article Was Not "Fair" ......................................................55

             3.    The Article Was Not "True" ....................................................55

             4.    The Article Was Not a "Report of" a Proceeding....................61

a. .. There was no reliance a on proceeding Defendants knew of, and therefore relied upon (Br.34-36,52). ..................................61

b. .. No attribution made it "clear" or "apparent" to the "average reader" that the Article was "intended" as any "report" of any "proceeding." (Br.33,38-45,51) .................................................63

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS..........67

ADDENDUM ......................................................................................68

I.     New York Civil Rights Law, Section 74 ......................................68

II.    Restatement (Second) on Conflict of Laws, Section 6..................68

III.   Restatement (Second) on Conflict of Laws, Section 145............70

IV.    Restatement (Second) on Conflict of Laws, Section 150............73

V.     Restatement (Second) of Torts, Section 578 ..............................74

VI.    Restatement (Second) of Torts, Section 611 ..............................75

VII.   Buzzfeed Article ....................................................................76

VIII.  CNN Article ............................................................................79

CERTIFICATE OF SERVICE ..............................................................82

# TABLE OF CITATIONS

**Cases**

*AroChem Int'l v. Buirkle*, 968 F.2d 266 (2d Cir. 1992)...........................................7

*Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989)..............................................4, 5

*Bennett v. Hendrix*, 426 F.App'x 864 (11th Cir. 2011)...........................................15

*Biro v. Conde Nast*, 883 F.Supp.2d 441 (S.D.N.Y. 2012).......................................31

*Bradford v. Pette*, 204 Misc. 308 (N.Y.Sup.Ct. 1953) ...........................................11

*Bufalino v. Associated Press*, 692 F.2d 266 (2d Cir. 1982)............................. 48, 62

*Calvin Klein Trademark Tr. v. Wachner*, 129 F.Supp.2d 248 (S.D.N.Y. 2001).....53

*Campbell v. N.Y. Evening Post, Inc.*, 245 N.Y. 320 (1927) ...................................38

*Cano v. City of N.Y.*, 44 F.Supp.3d 324 (E.D.N.Y. 2014) ........................................3

*Cavic v. Grand Bahama Dev. Co.*, 701 F.2d 879 (11th Cir. 1983) ......................6, 8

*Chapadeau v. Utica Observer-Dispatch, Inc.*, 38 N.Y.2d 196 (App.Div. 1975).. 24, 25

*Cholowsky v. Civiletti*, 887 N.Y.S.2d 592 (App.Div. 2009) ...................... 50, 53, 62

*Cianci v. New Times Pub. Co.*, 639 F.2d 54 (2d Cir. 1980) ...................................30

*Cobb v. Lewis*, 488 F.2d 41 (5th Cir. 1974)............................................................2

*Corp. Training Training Unlimited, Inc. v. Nat'l Broadcasting Co.*, 868 F.Supp. 501 (E.D.N.Y. 2004) ................................................................. 54, 64

*Crucey v. Jackall,* 275 A.D.2d 258 (N.Y.App.Div. 2000) ............................... 42, 51

*D'Agrosa v. Newsday*, 558 N.Y.S.2d 961 (App.Div. 1990)....................................25

*D'Annunzio v. Ayken, Inc.*, 876 F.Supp.2d 211 (E.D.N.Y. 2012) ..........................52

*Dameron v. Walsh Magazine*, 779 F.2d 736 (D.C. Cir. 1985) ............. 12, 37, 62, 63

*Daniel Goldreyer, Ltd. v. Van de Wetering*, 630 N.Y.S.2d 18 (App.Div. 1995) ....53

*Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017) ........................................................3

*Davis v. Costa-Gavras*, 580 F.Supp.1082 (S.D.N.Y. 1984) .....................................7

*Edwards v. National Audubon Soc.*, 556 F.2d 113 (2d Cir. 1977) .................. 32, 33

*Farrell v. N.Y.Evening Post, Inc.*, 3 N.Y.S.2d 1018 (1938) ...................................38

*Fine v. ESPN, Inc.*, 11 F.Supp.3d 209 (N.D.N.Y. 2014).......... 39, 46, 48, 49, 50, 64

*Fine v. ESPN, Inc.*, 2013 U.S. Dist. LEXIS 17729 (N.D.N.Y. Feb. 11, 2013) 41, 49

*Foman v. Davis*, 371 U.S. 178 (1962) .......................................................................4

*Fortenbaugh v. New Jersey Press, Inc.*, 722 A.2d 568 (N.J.App.Div. 1999) .........40

*Fraser v. Park Newspapers*, 668 N.Y.S.2d 284 (App.Div. 1998)...........................25

*Freeze Right Refrig. & Air Conditioning Servs. v City of New York*, 101 A.D.2d 175 (N.Y. 1984) ............................................................................................ 39, 45

*Gaeta v. N.Y. News, Inc.*, 454 N.Y.S.2d 179 (Sup.Ct. 1982) ..................................27

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)................................. 14, 15, 19, 33

*Greenberg v. CBS, Inc.*, 419 N.Y.S.2d 988 (App.Div. 1979) .................................26

*Gross v. New York Times Co.*, 587 N.Y.S.2d 293 (App.Div. 1992) .......................32

*Hatfill v. The New York Times Co.*, 532 F.3d 312 (4th Cir. 2008).........................15

*Hill v. BellSouth Telecomms., Inc.*, 364 F.3d 1308 (11th Cir. 2004) .......................5

*Hogan v. Herald Co.*, 446 N.Y.S.2d 836 (App.Div. 1982) ........................ 32, 35, 41

*Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*, 49 N.Y.2d 63 (1979)............................................................................................ 38, 55

*Hughes v. Washington Daily News Co.*, 193 F.2d 922 (D.C. Cir. 1952) ...............37

*Hunt v. Liberty Lobby*, 720 F.2d 631 (11th Cir. 1983)............................... 20, 21, 23

*Huszar v. Gross*, 468 So.2d 512 (Fla. D.C.A. 1985) ........................................ 33, 34

*Immuno, AG. v. Moor-Jankowski*, 145 A.D.2d 114 (N.Y.App.Div. 1989).............25

*Internet Solutions Corp. v. Marshall*, 39 So.3d 1201 (Fla. 2010) ...........................10

*Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107 (2d Cir. 2005)..................................52

*Kelley v. Hearst Corp.*, 157 N.Y.S.2d 498 (App.Div. 1956)............................ 43, 50

*Keogh v. N.Y. Herald Tribune, Inc.*, 51 Misc.2d 888 (N.Y. 1966)............ 41, 54, 62

*Khan v. N.Y. Times Co.*, 710 N.Y.S.2d 41 (App.Div. 2000) ...................................25

*Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92 (2d Cir. 2000).......................32

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 2015 U.S. Dist. LEXIS
    162359 (D. Colo. Dec. 3, 2015) ...............................................................................3

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114 (10th Cir.
    2014).........................................................................................................................3

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221 (10th Cir.
    2017).........................................................................................................................3

*Long v. Cooper*, 848 F.2d 1202 (11th Cir. 1988) ...................................................16

*Long v. Marubeni Am. Corp.*, 406 F.Supp.2d 285 (S.D.N.Y. 2005)............... 45, 51

*Lopez v. Ingram Micro, Inc.*, 1997 WL 401585 (S.D. Fla. Mar. 18, 1997) ...........29

*Lucas v. Evans*, 695 F.App'x 807 (5th Cir. 2017).....................................................3

*McCormack v. Cty. of Westchester*, 731 N.Y.S.2d 58 (App.Div. 2001) ................25

*Medico v. Time*, 643 F.2d 134 (3d Cir. 1981)................................................... 47, 48

*Miami Herald Pub. Co. v. Ane*, 458 So.2d 239 (Fla. 1984) ............................. 29, 35

*Miller v. Gizmodo Media Grp., LLC*, 2019 U.S.Dist. LEXIS 69428 (S.D.Fla. April 24, 2019) .......................................................................................... 38, 41, 42, 52

*Murray v. Brancato*, 290 N.Y. 52 (1943) ...............................................................11

*Nationwide Tarps, Inc. v. Midwest Canvas Corp.*, 228 F.Supp.2d 202 (N.D.N.Y. 2002) .......................................................................................................................11

*Nix v. ESPN, Inc.*, 2019 WL 2142038 (11th Cir. May 15, 2019)............................8

*Ortega v. Post-Newsweek Stations, Florida, Inc.*, 510 So.2d 972 (Fla. D.C.A 1987) ...................................................................................................................35

*Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78 (D.C. 1980) ......................45

*Pulte Home Corp. v. Osmose Wood Preserving*, 60 F.3d 734 (11th Cir. 1995) .......8

*Pycsa Pan., S.A. v. Tensar Earth Techs., Inc.*, 625 F.Supp.2d 1198 (S.D. Fla. 2008) ...............................................................................................................6, 8

*Saro Corp. v. Waterman Broadcasting Corp.*, 595 So.2d 87 (Fla. D.C.A. 1992)...30

*Schiavone Constr. Co. v. Time, Inc.*, 847 F.2d 1069 (3d Cir. 1998) ................ 40, 48

*Shiles v. News Syndicate Co.*, 27 N.Y.2d 9 (1970).......................... 6, 38, 41, 42, 45

*Silvester v. American Broadcast Companies, Inc.*, 839 F.2d 1491 (11th Cir. 1988) ......................................................................................................... 14, 16, 18

*Smith v. Taylor Cty. Pub. Co.*, 443 So.2d 1042 (Fla. D.C.A. 1983)................. 33, 34

*Snitowsky v. NBC Subsidiary (WMAQ-TV)*, 297 Ill.App.3d 304 (1998)................44

*St. Amant v. Thompson*, 390 U.S. 727 (1968)................................................... 20, 33

*Stuart v. Press Pub.*, 83 A.D. 467 (N.Y. 1903) ....................................................64

*Thomas v. Patton*, 2005 WL 3048033 (Fla.Cir.Ct. Oct. 21, 2005) ........................34

*Trumpet Vine Invs., N.V. v. Union Capital Partners I, Inc.*, 92 F.3d 1110 (11th Cir. 1996)....................................................................................................................5

*Turner v. Wells*, 879 F.3d 1254 (11th Cir. 2018)....................................................20

*United States v. Escobar-Urrego*, 110 F.3d 1556 (11th Cir. 1997) ........................4

*Waldbaum v. Fairchild Publ'ns*, 627 F.2d 1287 (D.C.Cir. 1980).................... 15, 19

*Wenz v. Becker*, 948 F.Supp. 319 (S.D.N.Y. 1996)................................................53

*Williams v. Williams*, 23 N.Y.2d 592 (1969)............................................... 12, 37

*Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157 (1977)................................18

*Wynn v. Smith*, 117 Nev. 6 (2001) ........................................................................48

*Zappin v. Cooper*, 2018 U.S. Dist. LEXIS 17520 (S.D.N.Y. Feb. 2, 2018) ..........11

*Zappin v. NYP*, 2018 U.S. Dist. LEXIS 49479 (S.D.N.Y. 2018) .................... 38, 41

**Statutes**

New York Civil Rights Law, Section 74 ... 11, 12, 37, 38, 39, 40, 41, 42, 44, 45, 47, 52, 53, 54, 55

**Other Authorities**

Restatement (Second) of Conflicts, §136 ..................................................................8

Restatement (Second) of Conflicts, §145 ...................................................... 7, 8, 12

Restatement (Second) of Conflicts, §150 ...........................................................8, 12

Restatement (Second) of Conflicts, §6 .......................................................... 11, 12

Restatement (Second) of Torts, §578..................................................................30

Restatement (Second) of Torts, §611................................................ 5, 34, 44, 47, 62

**Rules**

Federal Rule of Appellate Procedure 3 ....................................................................2

**Treatises**

Elder, David A, *Defamation Law*: *A Lawyer's Guide* (2018) ............... 6, 31, 40, 48

F. Harper, F. James & O. Gray, *The Law of Torts* (2d ed. 1986) ...........................48

*Prosser and Keeton on Torts* ...................................................................45

Sack, Robert D., *Sack on Defamation: Libel, Slander, and Related Problems* (2017)....................................................................................6, 10

Seelman, *The Law of Libel and Slander in the State of New York* (1964) ..............64

## Academic Articles

Note: The Developing Privilege of Neutral Reportage, 69 Va. L. Rev. 853 (June 1983) ................................................................................................31

## Other Articles

"'I made mistakes': Jill Abramson responds to plagiarism charges around her new book," *Vox* (Feb. 8, 2019) ...................................................................26

"BuzzFeed drops a Trump bombshell, irresponsibly," *The Poynter Institute* (Jan. 11, 2017)..................................................................................................27

"BuzzFeed Posts Unverified Claims on Trump, Igniting a Debate," *The New York Times* (Jan. 10, 2017)............................................................................27

"How BuzzFeed crossed the line in publishing salacious 'dossier' on Trump," *The Washington Post* (Jan. 11, 2017)........................................................28

"The Trouble With Publishing the Trump Dossier," *The Atlantic* (Jan. 11, 2017).28

"Why BuzzFeed Was Wrong to Publish the Trump Dossier," *Neiman Reports* (Jan. 11, 2017)..................................................................................................28

*"If… WikiLeaks really means what it says – that WikiLeaks is nothing more or less than a conduit for the transmission of secrets from sources to the public – it seems to me to be not so much an answer as a confession.*

*At the least, it is a confession that WikiLeaks is not engaged in journalism, for surely journalists do more and different things than that.*

-- Floyd Abrams, *Friend of the Court* Yale University Press (2013)

1

**ARGUMENT**

## I.   PLAINTIFFS HAVE NOT WAIVED THEIR CHOICE OF LAW ARGUMENT

Under this Circuit's doctrine discouraging re-litigation of already-decided issues – and under the federal courts' policies favoring "the right of appeal" – this Court *can*, and *should*, consider Plaintiffs' choice-of-law appeal.  *See* Fed.R.App.P. 3(c) Committee notes (citing *Cobb v. Lewis*, 488 F.2d 41 (5th Cir. 1974) (finding notice requirement may be satisfied by any statement clearly evincing intent to appeal where both parties, and the court, were on notice)).

Here, Plaintiffs' Notice of Appeal was of all "orders," "including but not limited to" that granting summary judgment based on the "fair report privilege," an order inexorably intertwined with (indeed, effectively integrating), the Court's earlier choice of New York law for privilege issues. [1]  D.E.392.  Indeed, Plaintiffs' Civil Appeal Statement specifically indicated, "Issues will include, but are not limited to, ***the District Court's choice of New York law***."  (Emphasis added).  So, appeal of that matter did not surprise Defendants, and they have cited no prejudice as a result of the form of the Notice of Appeal.

---

[1] The only "judgments and orders" from which the parties *could* have been appealing were the District Court's Order on Plaintiffs' Motion for Judgment on the Pleadings, and the District Court's two separate orders on Motions for Summary Judgment.

2

Defendants raise two arguments that Plaintiffs have waived their choice-of-law argument: neither is persuasive.  First, citing only easily distinguishable cases from other circuits,[2] Defendants argue that Plaintiffs were required to re-argue in their opposition to Defendants' Summary Judgment Motion precisely those arguments that they had recently made to the Court in their Motion for Judgment on the Pleadings.

Such arguments would not have been proper or successful under 11th Circuit precedent.  "Under the law-of-the-case doctrine, an issue decided at one

---

[2] *Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017) (where district court found that plaintiffs' complaint properly alleged individual defendants' personal involvement in alleged wrongs and defendants did not later challenge the sufficiency of the factual evidence adduced during discovery on summary judgment, the factual argument should be "addressed in the first instance by the District Court" as part of the appeals court's remand). *See, also*, *Cano v. City of N.Y.*, 44 F.Supp.3d 324 (E.D.N.Y. 2014) (underlying district court decision); *Lucas v. Evans*, 695 F.App'x 807, 809, n.1 (5th Cir. 2017) (where district court *never ruled on* argument in deciding motion to dismiss, failure to renew argument at the summary judgment stage precluded consideration on appeal); *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114 (10th Cir. 2014) (where district court, ruling from the bench, denied defendants' motion to dismiss on *res judicata* grounds, but allowed defendants' summary judgment motion on different grounds, appeals court would not affirm on *res judicata* argument not raised at summary judgment because of unresolved factual issues to be resolved in the first instance by the district court on remand); *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 2015 U.S.Dist.LEXIS 162359 (D. Colo. Dec. 3, 2015) (district court's subsequent consideration of *res judicata* issue on remand, but dismissing on other grounds); *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221 (10th Cir. 2017) (appeals court's subsequent affirmation of dismissal on alternate ground of *res judicata*).

stage of a case is binding at later stages of the same case." *United States v. Escobar-Urrego*, 110 F.3d 1556, 1560 (11th Cir. 1997).

In the present case, the legal theories and underlying facts supporting those theories did not change in the short span of time between the District Court's ruling on Plaintiffs' Motion for Judgment on the Pleadings (June 15, 2018), and Defendants' Motion for Summary Judgment (October 1, 2018) and, as such, any attempt to re-argue the choice of law issue at that time would have been futile.

Defendants' second argument – that Plaintiffs waived the argument on appeal because their Notice of Appeal did not specifically mention the Court's June 15, 2018 Order (declining to dismiss Defendants' Fair Report Privilege defense on a Rule 12 motion), fares no better.  Although it is true that, as a general rule, a Notice of Appeal should specify every order from which an appeal is taken, the Supreme Court and this Court have consistently held that an appellate court is ***not*** precluded from considering interlocutory rulings that make up (or are inexorably intertwined with) an order specified in the notice of appeal.  *See*, *e.g.*, *Foman v. Davis*, 371 U.S. 178 (1962) (appellate court has jurisdiction to consider appeal of the underlying judgment even though notice of appeal only referenced denial of motion to vacate the judgment); *Barfield v. Brierton*, 883 F.2d 923, 929-31 (11th Cir. 1989) (general rule does not apply where "plaintiff seeks review of the entire final judgment which implicates all non-final orders preceding it").

4

Indeed, in *Barfield*, this Court specifically held that "since this court usually cannot hear appeals from non-final orders, even from fully consummated decisions when they are but steps towards a final judgment into which they merge ... review of the final judgment opens for consideration the prior interlocutory orders." 883 F.2d at 931. *See*, *also*, *Hill v. BellSouth Telecomms., Inc.*, 364 F.3d 1308, 1313 (11th Cir. 2004) ("[T]his circuit also embraces 'a policy of liberal construction of notices of appeal' when (1) unnoticed claims or issues are inextricably intertwined with noticed ones and (2) the adverse party is not prejudiced.").

As outlined above, Plaintiffs' choice of law arguments came as no surprise to Defendants. Additionally, the District Court's Order on Plaintiffs' Motion for Judgment on the Pleadings was clearly interlocutory in nature; holding that the District Court could not – at that point in time – dismiss Defendants' Fair Report Privilege defense given outstanding factual questions.

## II.   IF A CHOICE NEEDS TO BE MADE, THIS COURT SHOULD CHOOSE FORUM STATE FLORIDA'S MAJORITY, COMMON-LAW, RESTATEMENT SECTION 611 RULE AND NOT NEW YORK'S OUTLIER "DOOR-CLOSING" STATUTE

This Court decides the choice of law *de novo*. *Trumpet Vine Invs., N.V. v. Union Capital Partners I, Inc.*, 92 F.3d 1110, 1115 (11th Cir. 1996). Here, if any choice is actually required, the Court should choose the law of the forum state, Florida, which applies the Restatement (Second) of Torts, §611, rule utilized in the majority of states, thus effecting an appropriate and consistent balance of interests,

by affording conditional, qualified privilege to non-malicious "fair reports" of meetings "open to the public." This Court should avoid moving the rest of the country towards New York's outlier, "door-closing" statute (influenced heavily by New York's media lobby).[3]

By **default**, and in the "absence of facts justifying the application of the law of some other jurisdiction," the "law of the forum ([Florida]) would govern the substantive issues" because the court "in this way [] can best do justice to the parties." *Cavic v. Grand Bahama Dev. Co.*, 701 F.2d 879, 882-83 (11th Cir. 1983). *See*, *also*, *Pycsa Pan., S.A. v. Tensar Earth Techs., Inc.*, 625 F.Supp.2d 1198, 1218 (S.D.Fla. 2008) (first steps in analysis is to determine which jurisdictions have an interest and whether a "true conflict" exists).

Here, the District Court should have defaulted to the forum state's law either because no true conflict exists or because no other jurisdiction had an interest sufficient to overcome the presumption that Florida law should apply.

Unsurprisingly, Defendants disagree. And, as the District Court noted, "Defendants [here] expend significant resources in arguing that New York law

---

[3] Elder, David A, *Defamation Law*: *A Lawyer's Guide* (2018) (available on Westlaw), §3:12 (citing *Shiles v. News Syndicate Co.*, 27 N.Y.2d 9, 21 (1970) (Beitel, J dissenting), recounting media lobbying); Sack, Robert D., *Sack on Defamation: Libel, Slander, and Related Problems* (2017), §7:3.5[B] (explaining minority "door-closing" rules).

applies." D.E.27, pp.27-28 (rejecting Defendants' argument against Florida personal jurisdiction and venue after they removed the case to federal court).

Now, Buzzfeed (a Delaware corporation) cites cases applying choice-of-law rules from states that follow rules other than the Florida Restatement approach applicable here. *See*, *e.g.*, *Davis v. Costa-Gavras*, 580 F.Supp.1082, 1091, 1093 (S.D.N.Y. 1984) (applying *New York's* choice-of-law rules, which depart from the Restatement with the nine-point contacts analysis); *AroChem Int'l v. Buirkle*, 968 F.2d 266, 271 (2d Cir. 1992) (applying New York choice-of-law analysis). Even those cases, though, do not point definitively to choosing New York law. And, in any event, New York's publishing-biased approach to choice-of-law should not control the law applicable to modern, multistate defamation.

Indeed, Florida's choice-of-law factors favor the application of its own, majority, Restatement rule. As detailed at Plaintiffs' opening brief, pp.13-20, the court first looks to three Restatement (Second) of Conflicts, §145, factors:[4]

(a)    the place where the injury occurred,

(b)    the place where the conduct causing the injury occurred, and

(c)    the domicile, residence, nationality, place of incorporation, and place of business of the parties.[5]

---

[4] As the District Court properly found, the fourth §145 factor is not applicable here.

[5] The Restatement speaks of the "place of business of the parties" and is not limited to the "*principle* place of business."

These factors favor Florida:

a)  Florida is more the locus of injury than New York, since Webzilla is

domiciled (incorporated) in Florida and conducts business there (Br.16-17).[6]  *See*

*Nix v. ESPN, Inc.*, 2019 WL 2142038 at *2 (11th Cir. May 15, 2019) ("[T]he

plaintiff will usually suffer greatest injury – by reason of loss of reputation – in the

state of domicile...."); *Pycsa Pan., S.A.*, 625 F.Supp.2d at 1219-20 ("[U]nder

Florida law, absent special circumstances, '[t]he state where the injury occurred

would ... be the decisive consideration....'").  That, alone, should decide the matter.

Indeed, Defendants concede that the applicable "Restatement analysis" does *not*

locate injury in New York (D.Br.41).[7]

b)  Preliminarily, "the place where the defendant's conduct occurred is of

less significance in situations where, such as in the case of multistate defamation

(see §150), a potential defendant might choose to conduct his activities in a state

whose tort rules are favorable to him."  Restatement (Second) of Conflicts, §145,

---

[6] "XBT/Webzilla" is not merely a "nominal" Plaintiff (D.Br.42).  Both parties were named in #166.

[7] Defendants argue here that Texas is the appropriate locus of injury under the restatement analysis for multistate defamation but they have never briefed Texas law and have therefore waived any argument that Texas law should apply.  *See, e.g.*, *Pulte Home Corp. v. Osmose Wood Preserving*, 60 F.3d 734, 739 n.15 (11th Cir. 1995) (choice of law waived).  *Cf. Cavic*, 701 F.2d at 882 (quoting Restatement (Second) of Conflicts, §136: "[Where] insufficient information, has been obtained about the foreign law, the forum will usually [apply] its own local law [to] do justice to the parties....").

comment e.  This is, of course, precisely what Defendants did – having located themselves in the most media-friendly jurisdiction in the country, they now seek to have that single factor determine of the rights of those whom they have injured.  It is not an outcome this Court should countenance.

Moreover, even if "place-of-conduct" mattered here, the District Court took much too narrow a view of that "conduct."  The article itself acknowledges that the reporting for the article was an international effort.  D.E.1-2, p.20 ("BuzzFeed News reporters in the US and Europe have been investigating various alleged facts in the dossier but have not verified or falsified them.").  Ken Bensinger, the lead author of the Buzzfeed article, lives and works in California, where he conducted his reporting and travelled to Washington, D.C. to meet with David Kramer and review "the Dossier." D.E. 1-2, p.21; D.E.124-1, p.16; D.E.214-6, ¶15.  Bensinger was in Florida at the time the article was published, reviewed and edited the article while in Florida, participated in multiple phone calls from Florida in which the decision to publish the article was made, and subsequently spoke with his sources from Florida to explain the decision to publish the article.  *See* D.E.15-6, ¶4; D.E.15-5, ¶3; D.E.234-5, Ex.73, p.3; D.E.214-6, ¶¶30-36.

In addition to Bensinger (who testified at his deposition that he was "quarterbacking" the operation), Buzzfeed reporters in New York, California (in addition to Bensinger), Washington, DC, and London all worked to report on "the

Dossier." D.E.83, p.6. And, of course, Defendants' conduct also "occurred" in Florida inasmuch as Florida considers internet defamation of a resident to take place in Florida, as "an electronic communication into Florida." *Internet Solutions Corp. v. Marshall*, 39 So.3d 1201,1214-15 (Fla. 2010). Because of such "problems [in] determining where the significant act – investigating, writing, editing, publishing – took place," courts have de-emphasized the "conduct" factor, to focus, again, on the plaintiff's domicile, as where "plaintiffs' reputation would be most greatly affected." *Sack on Defamation*, §15:3:1.

c)   As discussed in greater detail in Plaintiffs' Opening Brief, Webzilla, a Florida corporation domiciled in Florida, and XBT (with an office and multiple subsidiaries in Florida), have substantial connections to the forum. Br.18-19. Defendants, too, have (what the District Court found to be) "extensive" contacts with Florida including revenues from Florida advertisers, including the Official Florida Tourism Marketing Corporation. D.E.27, p.11; D.E.21, pp.5-8.

Defendants' other locations are somewhat diffuse. In addition to New York, Buzzfeed has offices and does business in "18 cities around the world...." D.E.27, p.2.

So, New York's interests here are, at most, thin enough such that the §145 factors either fully favor Florida or are at least are insufficient to overcome the presumption that the forum state's laws should apply. But, if additional analysis is

needed, the Restatement's §6 factors also favor the forum-state's, majority rule. Although those factors are discussed in greater detail in Plaintiffs' Opening Brief (Br.20-24), three factors merit more discussion.

● **Factors (b) and (c)**:  **The relevant policies and interests of the forum, and of other states, "in the determination of the particular issue."** Section 6, comment e, makes clear that, in weighing its factors, this Court "is under no compulsion to apply [a state's] statute or rule [to] out-of-state facts since the originating legislature or court had no ascertainable intentions on the subject." Indeed, New York courts have spoken to precisely this issue in discussing the precursor to §74:  "In no event could the statute confer immunity for publication outside the State."  *Murray v. Brancato*, 290 N.Y. 52, 59 (1943).[8]  *See*, *also*, *Bradford v. Pette*, 204 Misc. 308, 324 (N.Y.Sup.Ct. 1953) ("The statute, of course, does not confer immunity for a publication which [is] *first* given to the public, outside the State.").

---

[8] The Federal District Courts of New York disagree as to whether *Murray* remains good law.  *Contrast Nationwide Tarps, Inc. v. Midwest Canvas Corp*., 228 F.Supp.2d 202, 211 (N.D.N.Y. 2002) ("*Murray* is not the current law in New York.") *with Zappin v. Cooper*, 2018 U.S. Dist. LEXIS 17520, at *39 (S.D.N.Y. Feb. 2, 2018) (rejecting *Nationwide Tarps,* and holding:"[*Murray*] remains [the] law on the books, relic though it may be. This Court hesitates to defy the New York Court of Appeals' clear statement of [the] law in favor of implementing what this Court may think sensible."). Of course, this, and other contradictions in New York's own application of §74 offend the final §6 factor: "ease in the determination and application of the law to be applied."

- **Factor (e): "The basic policies underlying the particular field of law."**  The District Court erroneously narrowed its consideration of this factor, finding that the relevant "field" of law is designed "to protect speakers, not to provide Plaintiffs a remedy."  D.E.171, pp.9-10.  This view, however, ignores the larger interests of defamation law which include a strong interest in "protect[ing] reputation" (§150, comment e); and tort law's general interest in "deterrence" (important where, as here, lawyers "give thought [in advance] to [applicable] law" (§145 comments, *supra*]).  *See*, *also*, *Dameron v. Walsh Magazine*, 779 F.2d 736, 739-740 (D.C.Cir. 1985) ("[T]he intended beneficiary of the privilege is the public, not the press."); *Williams v. Williams*, 23 N.Y.2d 592, 599 (1969) (§74 is to "[protect] reports [of] proceedings which are made in the public interest").

## III. IN AN ENTIRELY SEPARATE ORDER WHICH DEFENDANTS HAVE *NOT* APPEALED, THE DISTRICT COURT PROPERLY CONCLUDED THAT PLAINTIFFS WERE PRIVATE FIGURES WITH RESPECT TO THE DEFAMATORY ALLEGATIONS PUBLISHED BY BUZZFEED

### A. Defendants Have Waived Their Right to Pursue an Appeal of the Public/Private Figure Decision

Ironically, while arguing that Plaintiffs waived the right to appeal choice-of-law, Defendants ask this Court to review a *completely separate summary judgment order* in which the District Court concluded that Plaintiffs were private individuals with respect to the defamatory allegations of criminal activity published by Buzzfeed.   This is despite the fact that: (a) Defendants did not state in their Notice

12

of Appeal that they intended to cross-appeal the separate summary judgement order that addressed only the public-private figure issue; (b) Defendants did not indicate in their Civil Appeals Statement that they intended to address the issue of public-private figure in their cross-appeal (denying Plaintiffs the opportunity to address it in their opening brief); and (c) unlike the choice-of-law issue, the District Court's decision on the fact-intensive public-private figure determination was wholly and completely unrelated to the Order that Defendants *did* cross-appeal.[9]

Because Defendants did not actually appeal from the District Court's order holding that Plaintiffs were private figures, this Court need not consider their arguments here.[10]

### B. The District Court Properly Concluded that Plaintiffs Were Private Figures

Even if the Court were to consider Defendants' arguments, the District Court properly concluded that Plaintiffs were not limited-purpose public figures. As Defendants acknowledge, the District Court properly identified the two-part

---

[9] Defendants' actual cross-appeal on "neutral report" effected a significant increase the number of words they could use on their main arguments in both their opening brief, but they have used only five paragraphs, and fewer than 800 words on that matter.

[10] Using a familiar theme, Defendants attempt to elide multiple documents – here, two unrelated orders. D.Br., p.52 ("[T]he District Court held that Plaintiffs are private figures....  That portion of its summary judgment rulings was erroneous.").

analysis involved in determining when a plaintiff is considered a limited public figure.  D.E.385, pp.10-11 (discussing two-part analysis outlined in *Silvester v. American Broadcast Companies, Inc*., 839 F.2d 1491 (11th Cir. 1988)).

Ultimately, the District Court found that both parts of the test first required a determination of the scope of the controversy at issue because "a limited public figure is a public figure only *with respect to the particular controversy at issue.*" *Id.* at p.11 (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974)).

Defendants do not dispute this, but rather argue that the District Court erred in not accepting Defendants' attempt to define the "controversy" at issue as sweeping generalized topics such as "cybercrime" and "cybersecurity."  The District Court properly rejected Defendants' argument, finding that, even though the "Dossier" as a whole mentions these topics:

> it does so only in the context of Russian interference with the election. Cybersecurity and cybercrime as general topics, however, are untethered from the Dossier and, more importantly, the public debate about Russian interference with the election…

D.E. 385, p.14.

Indeed, as the District Court held, the generalized topics proposed by Defendants "are not controversies in the normal sense of that word.  Cybercrime and cybersecurity are broad topics.  But, divorced from some specific event or debate, they are not controversies." *Id.* at p.14 n.7 (citing *Waldbaum v. Fairchild*

*Publ'ns*, 627 F.2d 1287, 1297 (D.C.Cir. 1980) ("A general concern or interest will

not suffice.")).

Moreover, the District Court properly held that, in defining the relevant

"public controversy," the court could not ignore the scope of the defamatory

publication:

> [T]he law does not allow the relevant public controversy to be divorced
> from the allegedly defamatory statements and the context in which they
> were made. *See*, *e.g.*, *Hatfill v. The New York Times Co.*, 532 F.3d 312,
> 323 (4th Cir. 2008) ("In light of the purpose of the public figure
> doctrine to encourage robust and uninhibited commentary on public
> issues, it stands to reason that we should look to the scope of the
> message conveyed in The New York Times through the articles that Dr.
> Hatfill is challenging.")....

*Id.* at pp.13-14.

This is, of course, what the Supreme Court intended when it first discussed

limited public figures in *Gertz*.  There, the Supreme Court specifically held that the

limited public-figure analysis must be reduced "to a more meaningful context by

looking to the nature and extent of an individual's participation in ***the particular***

***controversy giving rise to the defamation***.  418 U.S. at 352 (emphasis added).

The District Court's holding was also consistent in this way with other

decisions of this Court.  *See*, *e.g.*, *Bennett v. Hendrix*, 426 F.App'x 864, 866 (11th

Cir. 2011) ("[W]e have concluded that the defamation was not germane to the sole

public activity in which Bennett participated, and therefore he was not a limited

purpose public figure at the time that defamation occurred."); *Long v. Cooper*, 848

F.2d 1202, 1204-05 (11th Cir. 1988) (defining the "public controversy" in the same terms as the editorial containing the alleged defamatory statements); *Silvester*, 839 F.2d at 1493 (adopting the *Waldbaum* test and holding that, where the allegedly libelous news broadcast "focused on allegations of corruption in the American jai alai industry," the "public controversy" was defined as "corruption in the American jai alai industry").

Considering Buzzfeed's publication of the article and the accompanying Steele memos, the defamatory comments contained therein, and various news articles presented to the District Court by the parties, the District Court held the relevant "public controversy" to be "Russian interference in the 2016 election."[11] D.E. 385, p.14.

Having isolated the public controversy, the District Court examined the *sole* instance in which *any* of the Plaintiffs publicly commented even tangentially on anything even remotely related to public controversy, namely Gubarev's response to a *Bloomberg* reporter who asked Gubarev for technical assistance for an article he was writing.

---

[11] Ironically, Defendants' counsel originally identified the "public controversy" in precisely the same way as held by the District Court. D.E.184-1, p.24 ("And here, we feel like we're going to be able to show you, one, there was a preexisting controversy before the dossier was published about the meddling of the Russian Government in the election in the United States of America....").

Specifically, as the record showed, on October 31, 2016, the online

magazine *Slate* published an article asking if a Trump organization server was

communicating with a server maintained by Alfa Bank (and, if so, what that

connection might mean).  D.E.385, p.6; D.E.212-2, ¶56.  In response to that article,

on November 1, 2016, *Bloomberg View* published an article written by a Leonid

Bershidsky, entitled "Clinton Pugs Another Weak Story About Trump's Ties to

Putin."  D.E.385, pp.6-7; D.E.211-8.  In researching his article, Bershidsky

contacted Gubarev via email "out of the blue" to ask for Gubarev's technical

opinion as to the technical allegations contained in the *Slate* article.  D.E.211-2,

¶29.  This contact was initiated by Bershidsky and not Gubarev.  *Id.*  Prior to this

contact, Gubarev had not commented publicly on any topic even remotely

connected to Donald Trump or any alleged connections between Mr. Trump (or the

Trump Organization) and Russia (or Alfa Bank).  *Id.*  Indeed, Gubarev did not

consider even *that* request to be political in nature.  Rather, he believed it to be – as

Bershidsky specified – a technical question posed to him by a journalist who knew

that he headed Servers.com.  *Id.*, ¶¶28, 30 ("Could you help me sort out technical

details of what is described here?").

Bershidsky confirmed that he contacted Gubarev not because Gubarev had

any involvement in the story (or in politics at all for that matter), but rather because

Bershidsky knew Gubarev to have technological knowledge concerning servers.

*Id.*, at ¶32; D.E.211-4; Gubarev provided Bershidsky with some limited technical information in response to specific questions posed by Bershidsky.  D.E.211-2, ¶31.  Ultimately, Gubarev was mentioned (and not directly quoted) in a single sentence in the *Bloomberg* article:

> Alexey Gubarev, chief executive officer of Luxembourg-registered XBT Holding, which owns the infrastructure-as-a-service-provider Servers.com, told me there was no legitimate way to get access to the full logs of a server that you do not control.

D.E.211-2, ¶33; D.E.211-8.

> Considering all of this, the District Court properly held:

> This is Plaintiffs' only public statement predating BuzzFeed's publication of the Dossier that was related to Russian interference in the 2016 election.  And it is only tangentially related.  It is not related to the Russian hacking allegations which were at the heart of the public controversy…. Rather, it is a technical opinion about whether someone could have reviewed the full logs of a campaign server, which may have been in communication with the servers at a Russian bank.  This one technical opinion cannot reasonably be read as an attempt to influence the outcome of the public debate about Russian interference in the election.  Nor could it realistically have been expected to have an impact on the resolution of that controversy.  *See Silvester*, 839 F.2d at 1496 ("It is clear that plaintiffs must be more than tangential participants in the controversy."); *see also Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 165 (1977) (holding that the plaintiff was not a limited public figure where his involvement was limited to grand jury testimony and a citation for contempt).  Accordingly, Plaintiffs do not have "special prominence" within the controversy and are not limited public figures.

D.E.385, p.16.

18

The District Court's holding was consistent with the Supreme Court's requirement that limited-purpose public figures are only those individuals (or corporate entities) that "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz*, 418 U.S. at 345. *See*, *also*, *Waldbaum*, 627 F.2d at 1297-98 ("Once the court has defined the controversy, it must analyze the plaintiff's role in it. Trivial or tangential participation is not enough. The language of *Gertz* is clear that plaintiffs must have "thrust themselves to the forefront" of the controversies so as to become factors in their ultimate resolution.... They must have achieved a "special prominence" in the debate....").

Accordingly, the District Court's holding that the Plaintiffs are private figures should be affirmed.

## IV. A REASONABLE JURY COULD EASILY FIND THAT DEFENDANTS ACTED WITH THE REQUISITE DEGREE OF FAULT

Defendants contend that this Court could also affirm the District Court's summary judgment decision on the alternate grounds that Plaintiffs would not be able, at trial, to prove the requisite degree of fault, which they assert is the "actual malice" standard applicable to public figures. Defendants are mistaken. Given the record evidence, a reasonable jury could easily find that Defendants defamed

Plaintiffs, not merely negligently, or "grossly irresponsibly," but also "actual malice."[12]

### A.   Plaintiffs Can Meet Even the Most Exacting, "Actual Malice," Test

The actual malice test is a subjective one, "focusing on whether the defendant actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false." *Turner v. Wells*, 879 F.3d 1254, 1273 (11th Cir. 2018).  "Absent an admission by the defendant that he knew his material was false or that he doubted its truth, a public figure must rely upon circumstantial evidence to prove his case." *Hunt v. Liberty Lobby*, 720 F.2d 631, 643 (11th Cir. 1983).   "[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).  *See*, *also*, *Hunt*, 720 F.2d at 643 (quoting *St. Amant* and collecting appellate decisions finding actual malice when there were "obvious reasons to doubt" the source of the information or the accuracy of his reports).

---

[12] The District Court reserved decision on which state's law to choose for this standard but never reached the question.  As *this* Court will see, however, Plaintiffs are able to meet any of the three possible standards that could be utilized by the District Court on remand.

Acknowledging that direct admissions from a defendant are near non-existent, this Court's seminal *Hunt* case went on to discuss some of the circumstantial factors that might lead a jury to conclude that a defendant acted with actual malice.  And, although the facts of this case *also* fit well within the parameters outlined in *Hunt*, the present case is the rare one in which the Defendants *have* explicitly and *repeatedly* admitted that – at the time of publication – they harbored serious doubts about the veracity of the materials they were publishing.  First, Buzzfeed's article itself states that:

- "The dossier, which is a collection of memos written over a period of months, includes specific, unverified, and potentially unverifiable allegations…."

- "BuzzFeed News reporters in the US and Europe have been investigating various alleged facts in the dossier but have not verified or falsified them."

- "The document was prepared for political opponents of Trump…."

- "It is not just unconfirmed: It includes some clear errors…."

D.E.234-2, ¶57(a).

Next, immediately after Buzzfeed published the collection of Steele Memos, Defendant Smith wrote to Buzzfeed's entire staff to explain his decision to publish "explosive and unverified allegations about Donald Trump and Russia."  In that

21

email, Mr. Smith admitted again that "***there is serious reason to doubt the***

***allegations***."  *Id.*; D.E.234-7, Ex.85.  The next day, Mr. Smith appeared on

MSNBC's Meet the Press Daily, where he was interviewed by Chuck Todd.  In the

course of that interview, Mr. Smith admitted:

- That the Buzzfeed article "stressed that there were *real solid reasons*

  *to distrust this* [the collection of memos] and it noted two specific

  errors."

- "There are false claims."

- "I think that we are now in a media environment where you have to

  engage in false statements."

D.E.234-2, ¶57(a); D.E.234-7, Ex.90.

Four days after that, Mr. Smith appeared on CNN and again admitted that:

- "[Buzzfeed] said not only is this unverified, we know that there are

  specific things wrong."

- "We really stressed that there were false things in this document…"

- "We did point out the things that we were really very confident were

  false in part to say to the reader 'caveat emptor.'"

D.E.234-2, ¶57(a); D.E.234-7, Ex.84.

In addition to this direct evidence that Buzzfeed and Smith had serious

doubts as to the veracity of the information contained in the Steele Memos, the

record evidence would allow a reasonable jury applying the *Hunt* factors to conclude that there was additional, circumstantial evidence that Defendants acted with actual malice [13] Specifically, as the *Hunt* court held, although it is ordinarily true that a failure to investigate will not "by itself, prove actual malice," "when an article is not in the category of 'hot news,' that is, information that must be printed immediately or it will lose its newsworthy value, 'actual malice may be inferred when the investigation for a story ... was grossly inadequate in the circumstances.'" *Hunt*, 720 F.2d at 642.

Buzzfeed has freely admitted that it had possession of the "dossier" for weeks before it published;[14] that despite its efforts to verify *some* aspects of the "dossier," it had only succeeded only in *disproving* parts of it;[15] *that it made no efforts whatsoever to contact any of the Plaintiffs or to verify the allegations of criminal behavior that it was publishing about them*;[16] and that it had specifically

---

[13] In addition to Defendants' direct admissions, it is undisputed that, when Kramer showed Bensinger the Steele memos, he cautioned Bensinger that: (a) he (Kramer) was not himself in a position to "verify or refute" the information contained in the memos; (b) some of the information in the memos was unverified (by anyone); and (c) Kramer believed that the allegations contained in the memos should be "looked at in a professional way, and that professional journalists were arguably in a position to look into the matter. And I stressed to him the sensitivity of it; and that it had to be handled very carefully." D.E.124-1, pp.15, 17.

[14] D.E.316-7 ("BuzzFeed News decided to publish the dossier … only after we had spent weeks with reporters in the United States and Europe trying to confirm or disprove specific claims.").

[15] D.E.234-2, ¶¶57(a), (f).

[16] D.E.234-2, ¶¶52, 57(c-e).

considered the potential fame and profit it would reap from being first to publish the "dossier."[17]

In the present case, then, where Buzzfeed was not faced with "hot news," but rather had the opportunity to investigate the allegations of criminal behavior it intended to publish concerning Plaintiffs, yet chose not to, a jury could well infer the level of recklessness necessary to show "actual malice."

## B.     Plaintiffs Can Satisfy New York's Lesser-Standard of "Gross Irresponsibility."

Under New York law, where "the content of the article is arguably within the sphere of legitimate public concern," a private plaintiff must be able to show that "the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." *Chapadeau v. Utica Observer-Dispatch, Inc.*, 38 N.Y.2d 196, 199 (App.Div. 1975).

"A wide variety of factors may enter into a determination of whether the 'grossly irresponsible' standard has been met, such as whether sound journalistic practices were followed in preparing the defamatory article … whether normal procedures were followed and whether an editor reviewed the copy … whether there was any reason to doubt the accuracy of the source relied upon so as to

---

[17] D.E.234-2, ¶56.

produce a duty to make further inquiry to verify the information, for example, by checking secondary sources … and whether the truth was easily accessible." *Hawks v. Record Printing & Pub. Co.*, 486 N.Y.S.2d 463, 466 (App.Div. 1985). *See*, *also*, *Fraser v. Park Newspapers*, 668 N.Y.S.2d 284 (App.Div. 1998) (jury could find gross irresponsibility from failure to "take any steps to verify" allegations given "relative ease" in doing so).

Compared to actual malice, "the *Chapadeau* standard is a 'less demanding' standard, and focuses on the journalist's satisfaction of objective professional standards…." *Khan v. N.Y. Times Co.*, 710 N.Y.S.2d 41, 44 (App.Div. 2000). *See*, *also*, *Immuno, AG. v. Moor-Jankowski*, 145 A.D.2d 114, 125-26 (N.Y.App.Div. 1989) ("*Chapadeau* allowed a private figure plaintiff to recover upon a showing of fault less demanding than that constitutionally required of public figure plaintiffs.").

A determination of "gross irresponsibility" is typically a factual question for determination by a jury even where (unlike here), the defendants actually took steps to verify the defamatory statements prior to publication.  For example, in *D'Agrosa v. Newsday*, 558 N.Y.S.2d 961, 964-66 (App.Div. 1990), despite having "no doubt" that the defendants "consulted with two unquestionably authoritative sources" before misidentifying plaintiff in news article, and crediting the defendants' claim that the "mistake was an 'honest one,'" the court submitted the

question of "gross irresponsibility" to a jury to determine if defendant had "yielded

to temptations of expediency" because of deadline pressure and therefore had

"acted in a 'grossly irresponsible manner' by printing the information without

conducting further investigation…. The question of whether the defendants

breached controlling standards of news gathering and dissemination, in light of the

information set forth above, was clearly an issue of fact."

The determination of whether a defendant's actions constitute "gross

irresponsibility" is made "by the reasonable individual" and does not require expert

testimony.[18] *Greenberg v. CBS, Inc.*, 419 N.Y.S.2d 988, 997-98 (App.Div. 1979)

("Professional journalistic principles are well known and courts have frequently

applied these principles in conjunction with the constitutionally mandated standard

in order to establish the parameters of recoverable libel…. This facility on the part

of the judiciary leads to the conclusion that the affidavits of experts are welcome

but not required on a motion for summary judgment. Indeed, the submission of

---

[18] Plaintiffs acknowledge that they *considered* utilizing an expert witness and made preliminary inquiries with potential experts before determining that, on the facts of this case, no expert was necessary. Defendants make much of the fact that *one* such person approached – Jill Abramson – responded that she agreed with Buzzfeed's decision. Plaintiffs were then unaware that Abramson was spending significant time at Buzzfeed as she worked on her book, *Merchants of Truth*. *See* "'I made mistakes': Jill Abramson responds to plagiarism charges around her new book," *Vox* (Feb. 8, 2019) available at https://www.vox.com/2019/2/8/18206892/jill-abramson-plagiarism-book-merchants-of-truth ("I spent a ton of time at BuzzFeed and was amazed by what I saw, and not in a negative way at all.").

such affidavits might create more factual questions than they resolve…. Moreover, on the facts of this case, expert testimony was unnecessary. The elementary standards of basic news reporting are common knowledge."). *See*, *also*, *Gaeta v. N.Y. News, Inc.*, 454 N.Y.S.2d 179, 181 (Sup.Ct. 1982) ("The standard of care required of news reporters may be determined without the benefit of expert opinion.").

As Mr. Smith admitted in his New York Times Op-Ed, "Since BuzzFeed News published a 35-page dossier of unverified allegations about ties between President Donald J. Trump and Russia, I've heard a chorus of criticism from journalists who say we abdicated our role as gatekeeper…." D.E.316-7. Far from "presenting no evidence," as claimed by Defendants, Plaintiffs designated as trial exhibits more than 20 articles from journalists, academics, and media outlets from every part of the political spectrum arguing that Buzzfeed breached traditional journalistic standards in publishing unverified accusations.[19]  D.E.379-2, pp.10-12.

---

[19] *See*, *e.g.*, "BuzzFeed drops a Trump bombshell, irresponsibly," *The Poynter Institute* (Jan. 11, 2017) ("[P]ublishing an entirely unvetted document is a significant departure from the way editors of most significant publications would define the role of reporting"); "BuzzFeed Posts Unverified Claims on Trump, Igniting a Debate," *The New York Times* (Jan. 10, 2017) ("Dean Baquet, the executive editor of The Times, said the paper would not publish the document because the allegations were 'totally unsubstantiated.' 'We, like others, investigated the allegations and haven't corroborated them, and we felt we're not in the business of publishing things we can't stand by,' Mr. Baquet said."); "BuzzFeed was wrong to publish the Trump rumours. Here's why," *The Guardian*, (Jan. 12, 2017) ("It is wrong for any respected news organisation to publish

That Buzzfeed believes that it can point to individuals who would have made the

same decision does not mean that the issue is not one for a jury.  To the contrary, it

simply highlights the factual dispute precluding a grant of summary judgment.

Plaintiffs also designated as a trial exhibit Buzzfeed's own "Standards and Ethics

Guide," which has a "no surprises" policy, and Ben Smith's deposition testimony

in which he confirmed Buzzfeed's usual practice of sending subject of articles a

"no surprises" letter, which was not followed in this case.  D.E.234-4, Ex.76, p.77

("I do think before you publish something, at least, you should not surprise people.

And we have a practice here of writing what we call a 'no surprises' letter to the

subject of an investigation that lays out in great, great detail what's in a story.  And

then you make sure you slip that under their door, you mail it to them, you e-mail it

---

information it knows may not be true"); "How BuzzFeed crossed the line in
publishing salacious 'dossier' on Trump," *The Washington Post* (Jan. 11, 2017)
("It's never been acceptable to publish rumor and innuendo. And none of the
circumstances surrounding this episode — not CNN's story, not Trump's dubious
history with Russia, not the fact that the intelligence community made a report on
it — should change that ethical rule"); "Why BuzzFeed Was Wrong to Publish the
Trump Dossier," *Neiman Reports* (Jan. 11, 2017) ("When your first sentence
includes the words 'explosive' and 'unverified' and 'allegations,' that's a strong
clue you should not publish.  That's the height of irresponsibility."); "The Trouble
With Publishing the Trump Dossier," *The Atlantic* (Jan. 11, 2017) ("[T]his
represents an abdication of the basic responsibility of journalism. The reporter's
job is not to simply dump as much information as possible into the public domain...
It is to gather information, sift through it, and determine what is true and what is
not.  The point of a professional journalist corps is to have people whose job it is to
do that work on behalf of society, and who can cultivate sources and expertise to
help them adjudicate it.").

to them, you send it to their lawyer.  It often adds to your reporting.  There's no reason that the subject of a story should be surprised."). *See*, *also*, *generally*, Plaintiffs' Opposition to Defendants' Motion *in Limine* No. 3, D.E.316-1.

So, Plaintiffs have presented ample evidence from which a reasonable jury could conclude that Defendants acted with "gross irresponsibility" having violated sound journalistic practices; violated their own standard procedures; had reason to – and did – doubt the accuracy of the information presented in the Steele memos, and failed to conduct the inquiries necessary to verify the defamatory information concerning Plaintiffs (such as contacting them, or redacting their names, which they could have done easily).

### C.    Plaintiffs Can Easily Meet Florida's Negligence Standard

Clearly, if Plaintiffs presented enough evidence to satisfy the two more stringent standards, discussed above, they could meet Florida's ordinary negligence standard easily.  In Florida "it is sufficient that a private plaintiff prove negligence...." *Miami Herald Pub. Co. v. Ane*, 458 So.2d 239, 242 (Fla. 1984). *See*, *also*, *Lopez v. Ingram Micro, Inc.*, 1997 WL 401585 at * 4 (S.D.Fla. Mar. 18, 1997) (private plaintiff must prove that defendant published "without reasonable care as to whether that statement was true").  And, the question of negligence in a libel case in Florida is a "jury question[] which preclude[s] the granting of

summary judgment." *Saro Corp. v. Waterman Broadcasting Corp.*, 595 So.2d 87, 89 (Fla.D.C.A. 1992).

## V. DEFENDANTS CLEARLY PUBLISHED ACCUSATIONS ABOUT PLAINTIFFS WHICH WERE NOT ONLY DEFAMATORY, BUT DEFAMATORY *PER SE.*

Defendants, despite having published the December Memo – which falsely accused Plaintiffs (among other things), of being Russian FSB agents, and committing felonies in order to undermine the United States presidential election – assert that they made no defamatory statements about the Plaintiffs.  As the basis for this truly remarkable argument, Defendants insist that they cannot be found liable for defamation based on their publication of the December Memo because, when they published it, they essentially shrugged and said that they had no idea if the things they were printing were true or not.

Defendants' assertion is precisely the opposite of black letter law. Restatement (Second) of Torts, §578 and comment e ("[O]ne who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it.  The rule stated in this Section is applicable to make the republisher of either a libel or a slander subject to liability *even though he expressly states that he does not believe the statement that he repeats to be true*." (emphasis added)).  *See*, *also*, *Cianci v. New Times Pub. Co.*, 639 F.2d 54, 60-61 (2d Cir. 1980) ("A federal court has recently referred to the 'black-letter rule that

one who republishes a libel is subject to liability just as if he had published it originally, even though he attributes the libelous statement to the original publisher, and even though he expressly disavows the truth of the statement.'"); *Biro v. Conde Nast*, 883 F.Supp.2d 441, 461 (S.D.N.Y. 2012) ("The Second Circuit has expressly embraced the 'widely recognized' rule that 'one who republishes a libel is subject to liability just as if he had published it originally, even though he attributes the libelous statement to the original publisher, and even though he expressly disavows the truth of the statement.'").

## VI. THE DISTRICT COURT PROPERLY DISMISSED THE CONTROVERSIAL, AND WIDELY DERIDED, "NEUTRAL REPORTING" DEFENSE.

Defendants cross-appealed the District Court's dismissal of their so-called "neutral reporting privilege" affirmative defense, a judicially-created defense that has been rejected by a majority of jurisdictions and courts, and has been widely-criticized by scholars. *See*, *e.g.*, Elder, *Defamation*, §3:27 ("The doctrine of neutral reportage: a highly dubious, absolutist extension of *New York Times* and *St. Amant* – An overview"); Note: The Developing Privilege of Neutral Reportage, 69 Va.L.Rev. 853, 855 n.10 and 863 (June 1983) ("Most courts that have faced the privilege have either found it inapplicable or have rejected it outright.... Some courts – including some leading state courts – have explicitly refused to adopt [it].").

The "neutral reporting privilege" made a first appearance in *Edwards v.*
*National Audubon Soc.*, 556 F.2d 113 (2d Cir. 1977). It purports to provide a
qualified privilege for the news media broadly to provide "accurate and
disinterested reporting" on "serious charges against a *public figure*" made by "a
responsible, prominent organization." *Id.* at 120 (emphasis added).

As the District Court noted, New York courts have explicitly ***rejected***
*Edwards*. D.E.171, p.20 ("New York law does not recognize this privilege.
Indeed, New York courts have roundly rejected *Edwards* as contrary to the policy
underpinning the fair report privilege and contrary to Supreme Court precedent.").
*See*, *also*, *Hogan v. Herald Co.*, 446 N.Y.S.2d 836, 842 (App.Div. 1982) ("The
Supreme Court has not adopted *Edwards* ... and in our view it is not possible to
reconcile it with that court's prior decision in *Gertz*...."); *Gross v. New York Times
Co.*, 587 N.Y.S.2d 293, 296 (App.Div. 1992) ("The Court of Appeals has rejected
the adoption of a neutral reporting privilege which would allow a newspaper to
freely repeat statements made by third parties provided that the newspaper does not
endorse the statements reported.").[20]

---

[20] Defendants' citation to *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 105
n.11 (2d Cir. 2000), for the proposition that New York has *only* "rejected the
existence of a neutral reportage privilege for private plaintiffs," D.Br.65, is at best
misleading. That footnote does nothing more than note that *Edwards* was limited
to circumstances in which public figure is charged, and then recognize that New
York courts (including *Hogan*) had rejected even that holding.

32

Here, the District Court also considered whether it should adopt *Edwards* as part of federal constitutional law, and declined to do so, holding:

> [T]he Court agrees with *Edwards*'s critics.  *Edwards* stands for the proposition that the press is free to publish defamatory statements provided the statements are newsworthy and originate from a source which is – in some amorphous sense – "trustworthy."  This cannot be reconciled with *Gertz* and *St. Amant* ... which make liability for defamation dependent upon the public or private status of the plaintiff, and the defendant's knowledge as to the falsity of the statement....  For these reasons, the Court declines to follow *Edwards*, and declines to recognize the neutral report privilege under the First Amendment.

D.E.171, pp.21-22.

Finally, Defendants claim that *Huszar v. Gross*, 468 So.2d 512 (Fla.D.C.A. 1985), and *Smith v. Taylor Cty. Pub. Co.*, 443 So.2d 1042, 1044 (Fla.D.C.A. 1983), stand for the proposition that "Florida likely recognizes a neutral report privilege as a matter of state law."  D.Br.64, n.11.  Those cases do no such thing.

In *Huszar*, the appellate court first upheld the trial court's dismissal of the plaintiffs' complaint because the alleged defamatory statements were made by a "member of the executive branch, [who] was immune from liability because his statements were made in the course and scope of his employment and, thus, absolutely privileged."  *Huszar*, 468 So.2d at 515.  The court next considered the other bases for the trial court's dismissal – specifically, that the "article was a fair and accurate report of Gross' official statements and of a judicial proceeding."  It went to say "*such* neutral reportage is protected by the First Amendment;" and that

the "article was a fair and accurate report of an official action, a lawsuit initiated by the comptroller against one of Huszar's clients." *Id.* (emphasis added).  Clearly, the court was using the phrase "neutral reportage" merely to describe the *fair report* privilege.  And that is confirmed by the court then using the phrase "neutral reporting" also to describe the privilege outlined in Torts Restatement §611.  *Id.* at 516.

Defendants' reliance on *Smith* fares no better.  There, the court there did mention, in passing and without explanation, the *trial court's* finding that one of the articles complained of was a "neutral report."  But, it went on to discuss only *other* issues, ultimately reversing and *remanding* the case to the trial court for a determination of whether the plaintiff was a private or public individual, without any additional discussion whatsoever of "neutral report."  443 So.2d at 1044-49.

Here, the District Court did not analyze "neutral report" under Florida law other than to note (in its choice of law analysis) that one Florida trial court seemed to have assumed the existence of the privilege.  D.E.171, p.6 (citing *Thomas v. Patton*, 2005 WL 3048033, at *3 (Fla.Cir.Ct. Oct. 21, 2005) (unpublished)).  In *Thomas*, the court first found that the plaintiff was a public figure, and that the defendant was entitled to summary judgment based on the fair report privilege. The court went on to say, in what was presumably merely dicta, that "neutral

report" and non-defamatory meaning were alternative grounds for summary judgment. *Id.* at *4.

It is clear, however, that, even if Florida were to (one day) recognize the "neutral report privilege," it would (like *Hogan*) limit its application to reports regarding public figures, not private figures, like Plaintiffs. *See*, *e.g.*, *Miami Herald Pub. Co. v. Ane*, 458 So.2d 239, 241 (Fla. 1984) ("This Court has not previously held that there is a qualified privilege for a newspaper or a private person to defame a private person merely because the defamatory communication is directed to a matter of public or general concern, and we decline to do so now."); *Ortega v. Post-Newsweek Stations, Florida, Inc.*, 510 So.2d 972, 975 (Fla.D.C.A 1987) ("At the outset, it should be noted that in Florida the press has no qualified privilege to defame a private individual simply by virtue of the matter being of public concern.").

As such, the privilege, even if it were to be recognized under Florida law, would be inapplicable here, where Plaintiffs are not public figures.

## VII.   WHAT "DOSSIER?"

It is not Plaintiffs', but Defendants' arguments that hinge on a single, fanciful claim: that the "Dossier" – so dubbed and designated by Buzzfeed when it published a compilation of 17 separate privately-created opposition-research memos, written over a span of many months, utilizing different sources, and

provided to different people – is actually an inseparable "whole," a magnum opus that cannot be appreciated except in the form as published by Buzzfeed.[21]

On that single word, "Dossier," Buzzfeed hangs all of its further claims, including that:

1)      CNN reported on an identifiable "proceeding," namely an "investigation" of the "Dossier" as a singular entity, even though CNN itself never uses the word "dossier;"

2)      Buzzfeed, therefore knew that what it was calling the "dossier" was part of that "proceeding;"

3)      What Buzzfeed understood as the "Dossier" was the same as what CNN understood as the "Dossier" was the same as what CNN's *sources* understood as the "Dossier," was the same as what the FBI understood was the "Dossier," was the same as what (someone) used (along with other materials) to create a two-page synopsis to brief the Presidents; and

4)      None of the above issues presents any fact question for a jury.

---

[21] It is unclear how Buzzfeed squares this world view with: (a) Senator Chuck Grassley's assertion that an additional Steele memo exists that Buzzfeed did not publish (D.E.176-9), or (b) the fact that the FBI had multiple versions of the Steele memos.  D.E.234-7, Exs.87-89.

But the "Dossier" – as a singular entity – is "Just my Imagination" (see D.Br.14,

(citing The Temptations)) and Defendants' attempts to cast it that way stands on

"Shaky Ground."

## VIII.  EVEN IF NEW YORK LAW APPLIES, DEFENDANTS DID NOT SHOW "*FAIR AND TRUE*" "*REPORT*" OF THE ACCUSATIONS OF PLAINTIFFS.

### A.    Application of §74 is strictly limited by its language and "public interest" purpose (see Br.28-31).

The District Court erred, in part, because it failed to subordinate §74's

protection of reporters to its larger purpose of promoting accurate reporting on

"proceedings" in the "public interest."  *See Williams v. Williams*, 23 N.Y.2d 592

(1969).

*Dameron* said of the common-law fair-report privilege (which New York

has codified in §74): "[T]he intended beneficiary of the privilege is the public, not

the press.  The privilege is not simply a convenient means for shielding the media

from tort liability....  The public's strong interest in keeping abreast of public

affairs…is not served ... by inaccurate or faithless summaries of [governmental

reports or proceedings]."  779 F.2d at 739-40.  *See*, *also*, *Hughes v. Washington

Daily News Co*., 193 F.2d 922, 923 (D.C. Cir. 1952) ("The privilege of fair report

is no broader than the public interest which creates it.  That interest is in public

knowledge of official conduct.").

§74 is similarly interpreted, always with "public interest" in mind. *See*, *e.g.*, *Farrell v. N.Y.Evening Post, Inc.*, 3 N.Y.S.2d 1018 (1938) ("the right of the press to report matters of public concern" comes with "the obligation to report them fairly and truthfully," and the "obligation should be scrupulously enforced in order to safeguard one's reputation from defamatory misstatements," otherwise "we would be living in a 'paradise for gossips'" (quoting Cardozo, J.))). *See*, *also*, *Campbell v. N.Y. Evening Post, Inc.*, 245 N.Y. 320, 329 (1927) ("The privilege ... must be kept strictly within proper bounds ... and not extended beyond the limits of the statute.").

To keep §74 within that "public interest" purpose, courts have refused to extend even its relatively broad protections to reports of *legally shielded* proceedings. *Shiles*, 27 N.Y.2d at 13-19 (reviewing legislative history, and explaining that deletion of "public" was not intended to significantly expand the statute's scope). *Accord Miller v. Gizmodo Media Grp., LLC*, 2019 U.S.Dist. LEXIS 69428 (S.D.Fla. April 24, 2019) (citing *Shiles*)**;** *Zappin v. NYP*, 2018 U.S. Dist. LEXIS 49479, at *16 (S.D.N.Y. 2018).

Moreover, though cases warn courts against analyzing reports of defamation with "lexicographer's precision" in matching the language of *"condens[ed]"* defamation to "proceedings," *Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*, 49 N.Y.2d 63, 68 (1979), to protect "public

38

interest," §74 nonetheless requires that privileged defamation be fully "part of" a "proceeding" – defined as official "action taken by a person officially empowered to do so," *Freeze Right Refrig. & Air Conditioning Servs. v City of New York*, 101 A.D.2d 175, 182 (N.Y. 1984) – and not merely an "overlap" with that proceeding. *Fine v. ESPN, Inc.*, 11 F.Supp.3d 209, 216 (N.D.N.Y. 2014).

Indeed, New York courts make exceptions to §74 when necessary to hedge against abuse of its "public interest" purpose by those who might try to plant defamatory material. *See*, *e.g.*, *Williams*, 23 N.Y.2d at 599 (making exception for abuse of process to protect "public interest" purpose).

Applying the privilege here, to a "document" and "proceeding," defined as such only by the publisher of the defamatory comments, without evidence that accusations against Plaintiffs were considered by *any* government official, would thwart the "public interest" concern by allowing abuse of the privilege.

But this Court need not blaze any new public-policy trail to determine that §74 should not apply here. As discussed below, many of the statute's well-settled requirements were not met.

**B.    Report of "Classified" Proceedings is Not Privileged by §74. (*See* D.E.115, pp.10-13; D.Br.7-13).**

Contrary to the District Court's (and *Fridman*'s) assertion (D.E.388, pp.12-19)**,** §74 does *not* encompass the "classified" "briefing," and "investigation,"

reported by CNN that Defendants claim is the relevant "proceeding," precisely because that would *not* be in the "public interest."

Indeed, in most states, the fair-report privilege cannot apply even to "confidential" proceedings, precisely because it makes little sense to incentivize release of such information.  *See*, *e.g.*, Elder, *Defamation*, §3:12 (discussing the "nearly unanimous view of the common law fair report jurisprudence, which declined to extend the privilege to non-public proceedings"); *Fortenbaugh v. New Jersey Press, Inc.*, 722 A.2d 568, 574-75 (N.J.App.Div. 1999) (rejecting fair report where  the plaintiff's identity was protected by an order of confidentiality.").[22]

And, despite the District Court's holding here, cases decided under §74 have been inconsistent as to whether non-public proceedings are entitled to the privilege.  *See*, *e.g.*, *Fine v. ESPN, Inc.*, 2013 U.S. Dist. LEXIS 17729, *8,

---

[22] *See*, *also*, *Schiavone Constr. Co. v. Time, Inc.*, 847 F.2d 1069, 1086 (3d Cir. 1998):

> We are skeptical whether the unauthorized leak of a confidential FBI document qualifies as an "official action or proceeding" under the Restatement as interpreted by New Jersey law.…  The historical justification of the privilege, which operates as an exception to the general rule that one who republishes a defamation commits libel, is that the report is already in the public domain.  …Under the facts of this case, the Webster memorandum was not in the public sphere until Smith unearthed it and Time published it.  …Such leaks could become powerful tools for injuring citizens with impunity.  It is for these reasons that we seriously doubt that the privilege is applicable here.

(N.D.N.Y. Feb. 11, 2013) (§74 inapplicable where "proceedings were not public to begin with'); *Hogan*, 446 N.Y.S.2d at 841 ("The principal theory behind the rule of fair report is that the publisher acts as the agent of the public, reporting only that which others could hear for themselves were they to attend the proceedings.").

Therefore, it should be no surprise that even §74 cannot apply to the legally-shielded "classified" proceedings which CNN reported. *See Shiles*, 27 N.Y.2d at 14-19. *Accord Miller*, *supra*; *Zappin*, *supra* at *16.[23] Though *Shiles* involved sealed matrimonial proceedings, its review of §74's legislative history makes clear that it was not limited to that context. *See Miller*, *supra* at *17-18 ("[S]ealing ... is significant because New York's privilege applies only where media coverage of information advances the administration of justice."). Indeed, the general lack of cases on "classified" proceedings suggests that defendants know better than to assert §74 in such contexts.[24]

As the court noted, some *lower* New York courts have now applied §74 to official activities "not open to the public." D.E.388, p.13. Even those lower-court

---

[23] The CNN report was the only evidence Defendants had of the proceedings when they published (other than the earlier David Corn, Mother Jones article, which added nothing significant). CNN specifically reported, not only that the briefing of Presidents was "classified," but also that the Congressional "briefings, and the "material," itself, were "classified" – i.e. protected from public eyes by law.

[24] Although a pre-*Shiles* trial court decision afforded the privilege to a report on grand jury proceedings (*Keogh v. N.Y. Herald Tribune, Inc.*, 51 Misc.2d 888, 891 (N.Y. 1966)), *Shiles* later rejected its analysis.

cases, however, make no indication that the proceedings were legally-sealed; they may well have been accessible through record requests, at least. And when Plaintiffs argued that fair-report privilege should not apply to non-public proceedings (D.E.115, pp.10-11,13), Defendants cited no case from New York's *highest court* applying §74 to such proceedings. And, as noted in *Miller*, *supra* at *5, *Shiles* remains New York law.

### C. There Was No "Official Proceeding" Because There Was No Exercise of Official Duty or Power Trusted to Safeguard the "Public Interest" Purpose of §74 (Br.37-39).

Contrary to Defendants' and the District Courts' assumptions, D.E.388, p.11, it is not true that CNN reported "the Dossier" to be "the subject" of "official proceedings" within the meaning of §74. *See* D.Br.11.

An "official proceeding" must be, not merely some action by officials, but truly a "proceeding" by "public bodies [established] and authorized to perform such work and issue such statements or reports." *Crucey v. Jackall,* 275 A.D.2d 258, 263 (N.Y.App.Div. 2000) ("The fact that an elected official takes some particular action does not alone render that conduct 'official proceeding[s]....' Municipal employees may act in their official capacity, and yet, even when their work is part of their official job description, it may not fall within the parameters of the term 'official proceeding' as contemplated in the statute.").

Defendants claim they reported the "dossier" was part of two "sets" of official "proceedings" involving Memo #166 (D.Br.19-20).  Addressing each, in turn, shows that neither are "proceedings" at all.[25]

> 1.  *Merely "reviewing" documents, even a synopsis "provided" to Presidents (D.Br.19), was not a "proceeding."*

Defendants cite no case holding that merely "reviewing" documents to determine whether any part of them requires investigation creates a "proceeding."  *If* "reviewing" was construed as a "duty" "empowered" by office, such that it could be deemed a "proceeding" under §74, that would unwisely extend the privilege to include every piece of information touched by the government, regardless of whether it had any relevance to an investigation or not.  *See*, *e.g.*, *Kelley v. Hearst Corp.*, 157 N.Y.S.2d 498, 502 (App.Div. 1956) ("The only reference to official action of any kind in the texts pleaded in the complaint as libelous are the words 'police said' in the first publication described.  The narration in private to newspaper reporters by police officers of acts of other persons is not 'a public and

---

[25] Though both the District Court and Defendants mention it, D.E.388, pp.4-5, D.Br.4,8,20, they do not claim that the FISA warrant-application made in October, before Memo #166 was written (or, for that matter, the warrant-application renewal) involved #166, let alone that Defendants *knew* that it did when they published.  There is also no evidence of any renewal prior to publication.  Indeed, the Nunes and Schiff Memos, read together, suggest that #166 was never used to support the warrant.  Certainly, there is no evidence that *accusation about Plaintiffs* were so used.  Nor do Defendants, or the District Court, claim that mere "scrutin[y]" by people who happen to be at the "highest levels of government" (D.Br.16) suffices to create a "proceeding," for good reason: it is not.

official proceeding' coming within the range of the statute."); *Snitowsky v. NBC Subsidiary (WMAQ-TV)*, 297 Ill.App.3d 304, 313-14 (1998) ("The privilege applies to a news report of an 'official action or proceeding' or of a public meeting; WMAQ does not argue that a public meeting took place here.  We note that in general charges made to the police are not rendered official acts by the officer's act of recording the charge."); Restatement (Second) of Torts § 611, Comment h ("[S]tatements made by the police or by the complainant or other witnesses ... as to the facts of the case or the evidence expected to be given are not yet part of the judicial proceeding or of the arrest itself and are not privileged under this Section.").

If §74 were extended as urged by Defendants and, for example, the government confiscated a suspect's hard drive in connection with a tax evasion investigation and, while *reviewing* the suspect's drive police found evidence that suggested the suspect was having an illicit affair – information that the investigators immediately determined to be irrelevant to their investigation – a newspaper could nonetheless publish that information because the investigators had "reviewed" it.  So, too, for information that investigators see, but immediately deem unreliable and not worthy of follow-up.  Such wide-ranging expansion of New York's already-expansive privilege would be contrary to §74's public interest purpose.

44

Nor have Defendants cited any case in which a classified "briefing" (the actual content of which remains unknown) was deemed a "proceeding," and deeming it so would be a slippery slope, such that discussion anywhere within government, of any material, would constitute a "proceeding" reportable *with impunity*, subverting §74's public interest purpose. *See*, *e.g*, *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 89 (D.C. 1980) (police hotline log made available to press consisted "of nothing more sanctified than unofficial statements of police regarding a crime" and were not entitled to fair report protection under Restatement §611).

Instead, the case law seems clear that a "proceeding" must involve, at least, an exercise of officially-conferred decision-making power – at least an "announcement" of an investigation. *See Freeze Right Refrigeration*, 101 A.D.2d at 182; *Long v. Marubeni Am. Corp.*, 406 F.Supp.2d 285, 293 (S.D.N.Y. 2005) (§74 "was not designed to effect any change in the scope of the privilege as it had been previously applied to judicial proceedings," but simply to extend the common-law privilege for fair reporting of judicial proceedings to cover certain administrative and *other quasi-judicial proceedings*" (citing *Shiles*; emphasis added)); *Prosser and Keeton on Torts*, §§836–37 ("There is no privilege to report the unofficial talk of such officials as policemen, as distinct from their official utterances or acts, such as an arrest;" "Because of the opportunity afforded for

malicious public defamation and even extortion, through suits began and promptly discontinued, most courts [agree] that some official action is essential to the privilege.").

This is not a case in which a government-issued report "indicated" that every memo the FBI received from Senator McCain, let alone #166 (which Senator McCain neither received nor passed along), or any claims against Plaintiffs contained in #166, were subject to any official "proceeding." *Cf. Fine*, 11 F.Supp.3d at 216-217. Indeed, this case illustrates well the folly of attempting to define the scope of a "classified" proceeding merely from the inevitably second-hand, anonymous reports of "officials" (as done in the CNN report) who may not have been exercising any duties of their own in the claimed "proceeding." The bounds of an "official proceeding" should instead be defined *officially*.

> a.   Distinction of Defendants' "Proceeding"/"Investigation" Cases, Generally

Although Defendants and their Amici claim that even initial preparations for "investigation" are "proceedings," all "investigation" cases which they (and the District Court) cite involve some *statement or document* by an *official or agency* that was part of the "investigation" at issue – such as a filing, memorandum, or press release – such that the bounds of the official "investigation" "proceeding"

were officially delineated.[26]  Indeed, the District Court, Defendants, and *amici* cite
to no New York cases in which §74 protection was afforded to the content of an
"investigation," as opposed to a specific record, report, memorandum, or other
official statement or document that was part of the investigation, or that culminated
in a public action accusing the plaintiff, such as a firing or arrest (and Plaintiffs are
unaware of any such cases).

> b.    Distinction and Criticism of Medico v. Time, by Bufalino
>        v. Associated Press, and others

The fact-bound and widely-criticized ruling in *Medico v. Time*, 643 F.2d 134
(3d Cir. 1981), does not support Defendants' argument.  *Medico* applied
Pennsylvania law to claims of defamation brought by a Plaintiff-Congressman (*i.e.*,
a public figure) as a result of reporting on FBI-compiled reports.  *Id*. at 138-140
(citing Restatement §611, comment d, for proposition that filing a report brings it
within the privilege, but noting that comment h casts doubt on its application).
*Medico*'s narrow ruling emphasized the *public interest* in the actions of *elected
officials*, while warning against overbroad application of the privilege.  *Id.* at 140
("[N]o more effectual way of doing malicious mischief with impunity could be
devised than filing papers containing false and scurrilous charges, and getting

---

[26] The *Fridman* case did not examine whether the CNN-reported "briefing" or
"investigation" were "proceedings" because the plaintiffs there conceded as much
at oral argument.

those printed as news" (quoting Holmes,J.)); at 142-43 ("[C]are must be taken ... to

ensure that ...rationales not expand into justification for reporting any defamatory

matter maintained in any government file."); at 143 n.30 (excesses of the

McCarthy era prompted calls for restriction of the privilege).

And, *Medico* has been widely criticized for offending the privilege's

underlying policies.  *See Wynn v. Smith*, 117 Nev. 6, 15-16 (2001) (recounting, and

following, the Third Circuit's later rejection of *Medico* in *Schiavone Construction*

*Co.*, based in part upon F. Harper, F. James & O. Gray, *The Law of Torts* § 5.24

n.33 (2d ed. 1986), and stating a confidential report – "a powerful tool of injury –

is not a proceeding; privilege is designed to avoid chilling of reports on *publicly-*

*accessible* statements); *Bufalino v. Associated Press*, 692 F.2d 266, 271 (2d Cir.

1982) (decrying *Medico*'s willingness to afford privilege without *reliance* on

official records for publication, stating  "§611 should not ... protect unattributed,

defamatory statements supported after-the-fact through a frantic search of official

records").  *Accord* Elder, *Defamation* §3:12, §3:10 & n.17.

> c.     *Fine v. ESPN* Supports Plaintiffs, not Defendants

A careful reading of *Fine v. ESPN*, 11 F.Supp.3d 209 (N.D.N.Y. 2014),

ultimately supports Plaintiffs' argument, not Defendants', regarding the scope of a

"proceeding," and numerous other matters.

Perhaps to inoculate themselves from *Fine*, Defendants' counsel (also ESPN's counsel in *Fine*) point to its *dicta,* claiming it conveys holdings about "quotes" and other reports of a tape, which a police report identified as significant to its conclusions.  D.Br.17-18, 23-24, 30-31.  But *Fine* merely explains what was "arguable" *if* the tape from which defamatory reports were made was in fact the one police had referred to (a matter which was disputed), such that the "quotes" were, indeed, "substantially accurate" reports of a "proceeding."  11 F.Supp.3d at 218, n.8, and 220-24.

More specifically:

The initial ruling in *Fine* merely refused to dismiss a fair-report defense, because Fine conceded that a report on an affidavit filed in court was a fair-and-true-report of the content of a judicial "proceeding."  2013 WL 528468 at *3 (N.D.N.Y. Feb. 11, 2013).

The later *Fine* ruling determined there was a "proceeding" for purposes of analysis because: 1) some lower-court cases seemed to treat "investigations" as "proceedings;"  and 2) there was a publicly-released *police-department* "report" of investigatory conclusions which "explicitly identifies," as a part of the investigation, a bit of tape which might contain the defamatory statements.  11 F.Supp.3d at 216-224.

*Fine* acknowledged that "older" cases had refused to deem mere investigations "proceedings" and held "a report's mere mention of an official proceeding does not automatically extend the privilege to an entire publication." *Id.* at 215 n.4 (citing *Kelley*, *supra*) and 217. *Fine* also held that "Section 74 applies only where the challenged report is 'of' a proceeding.... An overlap between the subject matter of the report and the subject matter of a proceeding does not suffice; the ordinary viewer or reader must be able to determine from the publication itself that the publication is reporting on the proceeding." *Id.* at 216. *See*, *also*, *Cholowsky v. Civiletti*, 887 N.Y.S.2d 592, 596 (App.Div. 2009) ("An overlap between the subject matter of the report and the subject matter of a proceeding does not suffice....").

Ultimately, *Fine* denied the defendants judgment on the pleadings because, even assuming the investigation was a "proceeding," it was disputed whether and which reports of the tape ESPN had obtained independently of the "proceeding" were fair and true reports of the tape upon which police had actually relied for their conclusions. *Id.* at 218 & fn.8, 220-24. That makes *Fine*, which articulates this as a reason to refuse relief to those defendants, very much like the present case.

Moreover, because *Fine* involved a police-report, it never explored whether it could have discerned the content of any "proceeding" had there been no official statement of it.

Here, other than the "two-page synopsis" (the content of which remains unknown), CNN reported no relevant statement or document drafted by any official.  The claims of "proceedings" came merely second-hand (through CNN), from anonymous "US officials with direct knowledge of the briefings."  (A copy of the CNN report, originally D.E.214-5, Ex.1, is enclosed as Addendum VIII hereto for ease).  And, it was not at all clear that *those* "officials" had the "duty" or "power" to conduct a proceeding, were those who did so, or even that they were accurate in their statements to CNN.

## 2.    *"Source Validation" (D.Br.19) is Not a "Proceeding"*

The District Court erred in finding that the CNN article reported "investigation" of the "truth" of all claims in "the Dossier."  D.E.388, p.11.  Not even Defendants claim as much.

As outlined above, preparatory steps in "investigation" – including assessing the credibility of sources – should not be, themselves, deemed a "proceeding."  So, it seems highly doubtful even that the preliminary evaluation of Steele's sources for credibility – claimed only by CNN's anonymous sources – was the kind of "quasi-judicial" "proceeding" by a "public body" that the legislature intended to protect.  *See Crucey*, 275 A.D.2d at 263; *Long*, 406 F.Supp.2d at 293.  Indeed, it seems like exactly this sort of initial vetting that is generally deemed to be outside the "public interest" function of §74, for good reason.

And, in any event, as outlined below, there is no evidence that any such investigation involved Plaintiffs.

**D.  There Was No "Fair and True Report" (*see* Br.32,36-37,45-50,53-54).**

### 1.  *Requirements of Fair and True Report*

Even if there had been "official proceedings," a report of such a proceeding is only entitled to protection if it is a "fair and true" report.  N.Y.C.R.L. §74.  It is well established that a "report cannot be 'substantially accurate' ... if it would have a 'different effect' on the mind of the recipient than the 'actual truth.'  In other words, Section 74 does not afford protection if the specific statements at issue, considered in their content, suggest more serious conduct than that actually suggested in the official proceeding."  *Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 119 (2d Cir. 2005) (some internal quotation marks omitted).  *See*, *also*, *Miller*, *supra* at *22-23 (jury could find defamation suggested "more serious conduct" than "proceeding" because it "arguably misattribute[ed]" allegations, so would have a "different effect" on average reader than truth; therefore, it is not "substantially accurate"); *D'Annunzio v. Ayken, Inc.*, 876 F.Supp.2d 211, 218 (E.D.N.Y. 2012) ("[T]he privilege does not extend to statements in a report that imply misconduct beyond that alleged in the judicial proceeding on which the report is based.  'If the published account, along with the rest of the article, suggests more serious conduct than that actually suggested in the official

proceeding, then the privilege does not attach, as a matter of law.'" (quoting

*Daniel Goldreyer, Ltd. v. Van de Wetering*, 630 N.Y.S.2d 18, 22 (App.Div.

1995))); *Calvin Klein Trademark Tr. v. Wachner*, 129 F.Supp.2d 248, 253

(S.D.N.Y. 2001) ("Section 74 does not afford protection if the specific statements

at issue, considered in their context, 'suggest[] more serious conduct than that

actually suggested in the official proceeding.'").

Additionally, a "report" must truly be a report of a proceeding meaning that

the defendants had to have *known* that the defamatory materials were part of

proceeding (and relied upon the same), and the report must clearly convey to the

average reader that it is intended as such a report (on an official proceeding).  To

sustain §74's "public interest" purpose, courts enforce all of these elements

carefully.  *See*, *e.g.*, *Cholowsky*, 887 N.Y.S.2d at 596 ("[I]t is also incumbent on

the party asserting the privilege to establish that the statements at issue reported on

a judicial proceeding....  If the publication does not purport to comment on a

judicial proceeding, Civil Rights Law § 74 is inapplicable....  If the context in

which the statements are made make it impossible for the ordinary viewer listener

or reader to determine whether defendant was reporting on a judicial proceeding,

the absolute privilege does not apply...." (internal citations, quotation marks and

edits omitted)); *Wenz v. Becker*, 948 F.Supp. 319, 323 (S.D.N.Y. 1996) ("If the

context in which the statements are made make[s] it 'impossible for the ordinary

viewer to determine whether defendant was reporting [on a proceeding], the absolute statutory privilege does not attach.'"); *Corp. Training Training Unlimited, Inc. v. Nat'l Broadcasting Co.*, 868 F.Supp. 501, 508-09 (E.D.N.Y. 2004) (Section 74 protections were not available to defendant even though reporter actually attended the relevant criminal trial and prepared the news report "at least in part on her observation of those proceedings," finding that "this argument misapprehends the nature of the fair report privilege" and "the defense to be unavailable here. The statute, by its very terms, protects only reports of judicial proceedings.... Plaintiffs' argument, therefore, that NBC is unfairly attempting to 'back-in' the facts from the Icelandic trial transcripts into the Broadcast has significant force"); *Keogh*, 51 Misc.2d at 890-93 (grand jury minutes that were furnished at a later date are immaterial because the defense is not that they published the truth, but that it was privileged as a report of a proceeding).

Here, as the court found, the *Buzzfeed article by itself* was no "report" of any "proceeding" – it said merely that "CNN reported [a] two-page synopsis of the report was given [by no one specified] to President Obama and Trump." D.E.1-2, p.20.

And, even if the CNN report could be deemed part of Buzzfeed's article, its recounting of "proceedings" did not "report" that the claims against Plaintiffs,

Memo #166 generally, or the rest of the "Dossier" as a whole --were "part of" them.

### 2. The Article Was Not "Fair"

Above all, Defendants have failed to meet their burden to show that the Article was "fair," given the Article's suggestion that the claims against *Plaintiffs* (i.e., that Plaintiffs hacked the DNC) were being considered by federal investigators. As such, the article was not "fair," because it made a false and unjust impression. N.Y.C.R.L. §74. At a minimum, the article was "misleading". *Holy Spirit*, 49 N.Y.2d at 68.

### 3. The Article Was Not "True"

Defendants have shown no evidence that #166 generally, or the accusation against Plaintiffs, was *actually* "part of" any claimed "proceeding." Br.45-50. Indeed, the District Court explicitly found that the record ***did not*** show whether Plaintiffs were "part of" the claimed "proceedings." D.E.388, pp.14-15. This Court cannot say that this finding was clear error.

Even if Defendants could be said to have "reported" matters that they only learned of *after publication*, even *now* there is no evidence that any President was briefed on claims against Plaintiffs, or that Plaintiffs were under investigation.[27]

---

[27] As noted above, special counsel Mueller indicted those actually responsible for hacking the DNC; but the government never contacted Plaintiffs about that. D.E.234-4, Ex.64, ¶11; D.E.234-4, Ex.65.

The contents of the "two-page synopsis" is still, for the most part, unknown.  The Nunez and Schiff memos, read closely, and together, suggest that Steele's memos played little role, and #166 played ***no*** role (given its date), in the warrant application for surveillance of Carter Page.  D.E.214-30 (Nunes Memo); D.E.214-31 (Schiff Memo).  And, Comey claimed the "briefing" of the Presidents from the "dossier" was confined to salacious claims about Trump.  Br.47-49.

Indeed, Defendants cite *no* evidence placing claims against Plaintiffs in any proceeding; and the only "evidence" they cite to connect #166 generally to "proceedings" are the FBI affidavit, and the CNN report.  Even *that* is unpersuasive.

The FBI affidavit said only that it *possessed* #166 by the time of Buzzfeed's *publication* (and *not* by the time of the reported "proceedings"), and that it had, in some way, briefed Obama on allegations generally "contained" in "the dossier" (more generally) at some time before publication.  D.E.214-11.  In other words, it certainly said no more than the CNN report about the matter.

And, an exhaustive review of the CNN report shows that *it* reported no "proceeding" which clearly included Plaintiffs, #166 generally, or the "Dossier" as a whole – only a "two-page synopsis" and investigation of claims therein.[28]

---

[28] Defendants will no doubt argue that a careful parsing of CNN's report is the type of "lexicographer's precision" courts are advised to avoid.  Defendants – like the District Court – misapprehend the concerns.  The cases decrying "precision" stand

In the first paragraph of the CNN report, the only "allegations" identified were "allegations that Russian operatives claim to have *compromising personal and financial information about Mr. Trump.*" Addendum VIII.  The second paragraph, referring back, then says that these allegations were "presented in a two-page synopsis."  *Id.*  It continues, stating that the allegations in the synopsis "came, in part, from memos compiled by a former British intelligence operative, not specifying which memos but stating that a "full copy" of the memos were provided to the FBI by Senator McCain on December 9.  *Id.*

According to CNN, it was these allegations in the synopsis that the FBI was purportedly investigating, which may or may not be based on statements in the Steele memos since, according to CNN, the allegations came only "in part" from

---

for the proposition that a reporter who is *reporting on something that is actually part of a proceeding*, should be given some latitude in how he or she describes that which is part of the proceeding.  So, for example, a reporter quoting from an affidavit *filed in a judicial proceeding* should be afforded latitude in reporting on the wording of that affidavit (so long as the report is still *substantially* accurate).  The reporter is **not** however to be afforded **any** latitude in misrepresenting what was actually "part of" the proceeding.  So, if what the reporter thought was an affidavit filed in court was actually an unfiled letter, the reporter could be liable for defamation in that letter, even if the reporter quoted it precisely.  And that make sense:  The "fair report" privilege is designed to protect full reporting of proceedings, even when they contain defamation – it is not designed to keep the press from having to be careful/accurate in reporting what was "part of" official proceedings, or not.  Here, however, the District Court erred applying the law *backward*:  granting summary judgment because Buzzfeed quoted #166 accurately, and impermissibly affording Buzzfeed "latitude" in reporting that #166 was "part of" some proceeding (D.E.388, pp.17-19) – though it has never been established that that actually happened, let alone that Buzzfeed knew it had.

the memos.  *Id.*  Later, the article adds that the synopsis "included allegations that there was a continuing exchange of information during the campaign between Trump surrogates and intermediaries for the Russian government, according to two unnamed 'national security officers.'"  *Id.*

And it was "these same allegations" [i.e. those previously referenced] about "communications between the Trump campaign and the Russians" which were allegedly included in "classified briefings for Congressional leaders."  *Id.*  It is not even clear from CNN's report which, if any, of Steele's memos were used in the Congressional briefings.  CNN also reported that Steele was found credible enough to include only "some of the information in the presentations" to the Presidents.  *Id.*  And CNN suggested that many synopsis "allegations" had not yet been investigated, since an unnamed official told them his understanding that the concern in briefing was "setting down the pieces so this must be investigated seriously and run down."  *Id.*

So, in sum, CNN's anonymous sources said the classified briefing contained only the "two-page synopsis" of some claims in some of the memos, and that there was an investigation only some of those claims.  Moreover, CNN explicitly reported that the synopsis did *not* contain the "detail[s]" in the memos.  *Id.*

The CNN report certainly cannot be read to report that the allegations in the synopsis that were investigated were all the allegations contained in all the memos,

particularly any drafted after December 9th.  Nor can it be read to report that the memos that were part of the synopsis or investigation included claims against Plaintiffs or even that all of the memos were reviewed in preparing the synopsis.

Indeed, if the memos reviewed to draft the synopsis were, in fact, those that Buzzfeed published, Buzzfeed should have known that the allegations described as included within the synopsis did not touch all claims in all "Dossier" memos. CNN's report effectively precluded the possibility that the December 13th Memo #166 was part of the claimed proceedings because CNN described the memos as having been transmitted on December 9th or earlier.

And, it takes no precision to discern that CNN never reported any claim of DNC hacking, let alone any claim against the Plaintiffs or briefing or investigation of #166.

Nor does it require precision to distinguish a proceeding in which the private-figure Plaintiffs are *accused of infamous crime*, from one in which no such crime is claimed against anyone, let alone Plaintiffs.  Finally, it takes no precision to distinguish an ongoing investigation of Russian *kompromat* on public figures from criminal accusations against *non-public* figures by unsolicited anonymous sources.

And, *n*o "line by line" analysis is required to distinguish between separate memos, on different subjects, written on different dates, sent to the FBI separately

(especially when Buzzfeed has shown no reason it had to think the FBI had received #166 when Buzzfeed published).

Indeed, no "line by line" review was required here, even of the CNN article, because there is no evidence that any particular memo Buzzfeed collected from a non-governmental source was "part of" any "proceeding."

Not even the reported investigation of the credibility of Steele sources, could place the claims in #166 within any "proceeding," in part because, unlike the pre-election memos, the information contained in #166 was unsolicited and in part because #166 was connected to the "proceeding" only through the specious word "dossier," coined by Defendants. *See* D.Br.19-20. One could not glean from CNN's report that sources for #166 were among those investigated.

Finally, Steele's sources were redacted from the "Dossier." So, even under Buzzfeed's whole-"dossier" argument, the "source-validation" did not bring the claims against Plaintiffs within the CNN-reported "investigation."

Although an FBI affidavit provided after publication acknowledged that the FBI possessed #166 at the time of publication, there is no evidence the FBI had even received #166 by the date on which the Presidents were briefed.

Moreover, this was not a case in which the "exigencies of [a] deadline" should excuse an otherwise-careful investigative-journalist's mistakes. *See Holy Spirit*, 49 N.Y.2d at 68. Buzzfeed served only itself by publishing the "Dossier"

without redaction (and only an hour after CNN's story broke), despite having reporters around the globe researching Steele's memos for weeks and having been unable to verify any of the information contained therein.

### 4. *The Article Was Not a "Report of" a Proceeding*

    a.    There was no reliance a on proceeding Defendants knew of, and therefore relied upon (Br.34-36,52).

As outlined above, the only evidence Buzzfeed has shown that it knew of "briefings" or "investigation" when it published was CNN's report of a two-page synopsis of some allegations from some Steele memos conveyed by McCain to the FBI on December 9, 2016 (before #166 was written), and an FBI "investigation" of those synopsized allegations (as well as an investigation of "sources" not named in #166). And, again, CNN never reported of a synopsis of #166, or of any allegations against Plaintiffs. Indeed, CNN strongly implied that synopsis could not have included a memo drafted after December 9th.

And, even if the FBI's affidavit could somehow prove *now* that FBI officials possessed #166 at the time of the reported "proceedings," and even if their merely having possessed that document by January 10, 2017 was somehow sufficient to bring it within a "proceeding" reported as having occurred by January 7, 2017, Buzzfeed's publication was not privileged because Defendants must show they knew this all at the time of publication. §74 immunity cannot turn on a retrospective understanding of the "proceedings" – Defendants must show that

they relied upon a proceeding at the time of publication.  *See Bufalino*, 692 F.2d at

271 ("§611 should not be interpreted to protect unattributed, defamatory statements

supported after-the-fact through a frantic search of official records."); *Dameron*,

779 F.2d at 739 (same); *Cholowsky*, 887 N.Y.S.2d at 596 (although a reporter need

not have personal knowledge of the proceeding he should at least rely on an

intermediary that does); *Keogh*, 51 Misc.2d at 890-93.

 Defendants have shown no evidence that they knew the "whole dossier" was

part of any claimed proceeding reported, let alone that they knew it included #166,

or the accusation against Plaintiffs.  Indeed, Defendants concede that the FBI

parted ways with Steele long before December, and that not even McCain had

received #166 by the time of the purported "proceedings."  D.Br.4-5.

 Though the FBI never said it received #166 by any reported "proceeding", or

that they used it any way, Defendants nonetheless cite the affidavit, five times

(D.Br.7,8,19,20,32), as evidence that the President was briefed on every allegation

in every memo Buzzfeed published – combining it at one point with a repeated

claim from another document, similarly drafted after publication, but by someone

without any independent knowledge of the "proceedings" – that the two-page

summary was "derived" from a "35 page Dossier." D.Br.8,19, citing D.E.214-39.

In truth Defendants' repeated use of the phrase "derived from" in their brief is

shockingly misleading.  While Defendants would have the Court believe that the

DOJ said that the two-page summary was "derived from" a 35-page Dossier this is

absolutely not the case.  The DOJ was sent a FOIA request in which the *requestor*

inquired about a two-page summary "derived from" a "35 page Dossier."

D.E.214-40, ¶¶11-12.  In responding to that request, the DOJ quoted back to the

requestor the language of his request. *Id.*  Buzzfeed's willingness to represent this

to the Court as the DOJ's stated position is an indication of how little Buzzfeed has

to connect the two-page summary to the "Dossier."

Defendants have established, at most, and only in retrospect, that there *may*

have been some mere "overlap," between what they published and what they knew

of a "proceeding" they purport to have "reported on."  *Fine*, 11 F.Supp.3d at 216.

But their "report" exceeded the scope of any knowledge of a "proceeding" and,

therefore, it is not privileged.

> b.  No attribution made it "clear" or "apparent" to the
> "average reader" that the Article was "intended" as any
> "report" of any "proceeding." (Br.33,38-45,51)

To be covered under §74, a publication must "clearly attribute" the

defamatory statements to the "proceeding or document on which it is reporting."

*Adelson*, 973 F.Supp.2d at 482-83.  It must be fully "apparent," even to the

"average reader", that it reports on a "proceeding." *Dameron*, 779 F.2d at 739-40.

The reader must be "likely" to understand, "either from specific attribution or from

the overall context that the [defamation] is quoting, paraphrasing, or otherwise

drawing upon official documents or proceedings." *Adelson*, 973 F.Supp.2d at 483. In short, the "report" of a "proceeding" must clearly appear "on the face of the publication." Seelman, *The Law of Libel and Slander in the State of New York* (1964) §216 (citing *Stuart v. Press Pub.*, 83 A.D. 467 (N.Y. 1903)). Moreover, "a report's mere mention of an official proceeding does not automatically extend the privilege to an entire publication." *Fine*, 11 F.Supp.3d at 217. *See*, *also*, *Corp. Training*, 868 F.Supp. at 509 (no privilege where the references to proceedings appear "mostly in passing and only towards the end").

As discussed herein and in Plaintiffs' Opening Brief, Buzzfeed's article, and its buried, non-underlined hyperlink to CNN's report was insufficient to make it clear or apparent to the average reader that any or all of the "dossier" – let alone #166, or the claims against Plaintiffs – was "part of" any official "proceeding."

(1)     Buzzfeed's article was not, by itself, a "fair report" of accusations against Plaintiffs as "part of" any "proceeding." To the contrary, the court properly concluded that Buzzfeed's article was not, itself, a "report" of any "proceeding." D.E.171, p.16 ("The Article itself does not permit an ordinary reader to understand that the Dossier was the subject of classified briefings or an FBI investigation."); D.E.388, p.11 ("Buzzfeed's article does not recount sufficient official action.").

(2)     The CNN report made no "fair report" of claims against Plaintiffs. Indeed, the CNN report never mentioned a "dossier," #166, or Plaintiffs, and therefore never reported that the "dossier", or Plaintiffs, were part of any "proceeding."

(3)     Buzzfeed's hyperlinking to the CNN report, which did not itself allow the reader to understand that even the CNN story was reporting on a "proceeding" involving #166 or Plaintiffs, was insufficient attribution for the defamatory statements to be privileged under §74.

Because the District Court found properly that there was no evidence that claims against Plaintiffs were part of any "proceeding" – i.e. that it was not part of any "official action" at all, let alone that Defendants had good reason to believe it to be the case when they published, Defendants were not entitled to protection under §74 and their motion for summary judgment should have been denied.

Respectfully Submitted,

/s/ Evan Fray-Witzer
Evan Fray-Witzer
Ciampa Fray-Witzer, LLP
20 Park Plaza, Suite 505
Boston, MA 02116
617-426-0000
Evan@CFWLegal.com

/s/ Valentin Gurvits
Valentin Gurvits
Boston Law Group, PC
825 Beacon Street, Ste 20
Newton, MA 02459
617-928-1800
vgurvits@bostonlawgroup.com

/s/ Matthew Shayefar
Matthew Shayefar
Law Office of Matthew Shayefar, PC
925 N La Brea Ave
W. Hollywood, CA 90038
323-948-8101
matt@shayefar.com

Dated:        June 3, 2019

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS</u>

1.      Excluding the parts of the document exempted by Fed. R. App. P. 32(f), the documents contains 15,288 words.  Concurrently herewith, Plaintiffs are filing a motion to modify the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i).

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in size 14 font of the font style Time New Roman.


<u>/s/ Matthew Shayefar, Esq.    </u>

Attorney for Aleksej Gubarev, XBT Holding S.A., and Webzilla, Inc.

Dated: June 3, 2019

67

# **ADDENDUM**

## I.   **NEW YORK CIVIL RIGHTS LAW, SECTION 74**

§ 74. Privileges in action for libel

A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published.

This section does not apply to a libel contained in any other matter added by any person concerned in the publication; or in the report of anything said or done at the time and place of such a proceeding which was not a part thereof.

## II.   **RESTATEMENT (SECOND) ON CONFLICT OF LAWS, SECTION 6**

§ 6 Choice-of-Law Principles

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
      (a) the needs of the interstate and international systems,
      (b) the relevant policies of the forum,
      (c) the relevant policies of other interested states and the relative interests of
         those states in the determination of the particular issue,
      (d) the protection of justified expectations,
      (e) the basic policies underlying the particular field of law,
      (f) certainty, predictability and uniformity of result, and
      (g) ease in the determination and application of the law to be applied.

*Comment e.   Relevant policies of the state of the forum.* Two situations should be distinguished. One is where the state of the forum has no interest in the case apart from the fact that it is the place of the trial of the action. Here the only relevant policies of the state of the forum will be embodied in its rules relating to trial administration (see Chapter 6). The second situation is where the state of the forum has an interest in the case apart from the fact that it is the place of trial. In this

latter situation, relevant policies of the state of the forum may be embodied in rules that do not relate to trial administration.

The problem dealt with in this Comment arises in the common situation where a statute or common law rule of the forum was formulated solely with the intrastate situation in mind or, at least, where there is no evidence to suggest that the statute or rule was intended to have extraterritorial application. If the legislature or court (in the case of a common law rule) did have intentions with respect to the range of application of a statute or common law rule and these intentions can be ascertained, the rule of Subsection (1) is applicable. If not, the court will interpret the statute or rule in the light of the factors stated in Subsection (2).

Every rule of law, whether embodied in a statute or in a common law rule, was designed to achieve one or more purposes. A court should have regard for these purposes in determining whether to apply its own rule or the rule of another state in the decision of a particular issue. If the purposes sought to be achieved by a local statute or common law rule would be furthered by its application to out-of-state facts, this is a weighty reason why such application should be made. On the other hand, the court is under no compulsion to apply the statute or rule to such out-of-state facts since the originating legislature or court had no ascertainable intentions on the subject. The court must decide for itself whether the purposes sought to be achieved by a local statute or rule should be furthered at the expense of the other choice-of-law factors mentioned in this Subsection.

*Comment i.  Predictability and uniformity of result.*  These are important values in all areas of the law. To the extent that they are attained in choice of law, forum shopping will be discouraged. These values can, however, be purchased at too great a price. In a rapidly developing area, such as choice of law, it is often more important that good rules be developed than that predictability and uniformity of result should be assured through continued adherence to existing rules. Predictability and uniformity of result are of particular importance in areas where the parties are likely to give advance thought to the legal consequences of their transactions. It is partly on account of these factors that the parties are permitted within broad limits to choose the law that will determine the validity and effect of their contract (see § 187) and that the law that would be applied by the courts of the state of the situs is applied to determine the validity of transfers of interests in land (see § 223). Uniformity of result is also important when the transfer of an aggregate of movables, situated in two or more states, is involved. Partly for this reason, the law that would be applied by the courts of the state of a decedent's domicil at death is applied to determine the validity of his will in so far as it

concerns movables (see § 263) and the distribution of his movables in the event of intestacy (see § 260).

## III.   RESTATEMENT (SECOND) ON CONFLICT OF LAWS, SECTION 145

§ 145 The General Principle

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury occurred,
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
> (d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*Comment e.  Important contacts in determining state of most significant relationship.* In applying the principles of § 6 to determine the state of most significant relationship, the forum should give consideration to the relevant policies of all potentially interested states and the relevant interests of those states in the decision of the particular issue. Those states which are most likely to be interested are those which have one or more of the following contacts with the occurrence and the parties. Some of these contacts also figure prominently in the formulation of the applicable rules of choice of law.

*The place where injury occurred.* In the case of personal injuries or of injuries to tangible things, the place where the injury occurred is a contact that, as to most issues, plays an important role in the selection of the state of the applicable law (see §§ 146- 147). This contact likewise plays an important role in the selection of the state of the applicable law in the case of other kinds of torts, provided that the injury occurred in a single, clearly ascertainable, state. This is so for the reason among others that persons who cause injury in a state should not ordinarily escape liabilities imposed by the local law of that state on account of the injury. So in the

case of false imprisonment, the local law of the state where the plaintiff was imprisoned will usually be applied. Likewise, when a person in state X writes a letter about the plaintiff which is received by a person in state Y, the local law of Y, the state where the publication occurred, will govern most issues involving the tort, unless the contacts which some other state has with the occurrence and the parties are sufficient to make that other state the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties (see § 149).

Situations do arise, however, where the place of injury will not play an important role in the selection of the state of the applicable law. This will be so, for example, when the place of injury can be said to be fortuitous or when for other reasons it bears little relation to the occurrence and the parties with respect to the particular issue (see § 146, Comments *d-e*). This will also be so when, such as in the case of fraud and misrepresentation (see § 148), there may be little reason in logic or persuasiveness to say that one state rather than another is the place of injury, or when, such as in the case of multistate defamation (see § 150), injury has occurred in two or more states. Situations may also arise where the defendant had little, or no, reason to foresee that his act would result in injury in the particular state. Such lack of foreseeability on the part of the defendant is a factor that will militate against selection of the state of injury as the state of the applicable law. Indeed, application of the local law of the state of injury in such circumstances might on occasion raise jurisdictional questions (see § 9, Comment *f*).

*The place where conduct occurred.* When the injury occurred in a single, clearly ascertainable state and when the conduct which caused the injury also occurred there, that state will usually be the state of the applicable law with respect to most issues involving the tort. This is particularly likely to be so with respect to issues involving standards of conduct, since the state of conduct and injury will have a natural concern in the determination of such issues.

Choice of the applicable law becomes more difficult in situations where the defendant's conduct and the resulting injury occurred in different states. When the injury occurred in two or more states, or when the place of injury cannot be ascertained or is fortuitous and, with respect to the particular issue, bears little relation to the occurrence and the parties, the place where the defendant's conduct occurred will usually be given particular weight in determining the state of the applicable law. For example, the place where the conduct occurred is given particular weight in the case of torts involving interference with a marriage relationship (see § 154) or unfair competition (see Comment *f*), since in the case of

such torts there is often no one clearly demonstrable place of injury. Likewise, when the primary purpose of the tort rule involved is to deter or punish misconduct, the place where the conduct occurred has peculiar significance (see Comment *c*). And the same is true when the conduct was required or privileged by the local law of the state where it took place (see § 163, Comment *a*).

The place where the defendant's conduct occurred is of less significance in situations where, such as in the case of multistate defamation (see § 150), a potential defendant might choose to conduct his activities in a state whose tort rules are favorable to him.

*The domicil, residence, nationality, place of incorporation and place of business of the parties.* These are all places of enduring relationship to the parties. Their relative importance varies with the nature of the interest affected. When the interest affected is a personal one such as a person's interest in his reputation, or in his right of privacy or in the affections of his wife, domicil, residence and nationality are of greater importance than if the interest is a business or financial one, such as in the case of unfair competition, interference with contractual relations or trade disparagement. In these latter instances, the place of business is the more important contact. At least with respect to most issues, a corporation's principal place of business is a more important contact than the place of incorporation, and this is particularly true in situations where the corporation does little, or no, business in the latter place.

These contacts are of importance in situations where injury occurs in two or more states. So the place of the plaintiff's domicil, or on occasion his principal place of business, is the single most important contact for determining the state of the applicable law as to most issues in situations involving the multistate publication of matter that injures plaintiff's reputation (see § 150) or causes him financial injury (see § 151) or invades his right of privacy (see § 153).

In the case of other torts, the importance of these contacts depends largely upon the extent to which they are grouped with other contacts. The fact, for example, that one of the parties is domiciled or does business in a given state will usually carry little weight of itself. On the other hand, the fact that the domicil and place of business of all parties are grouped in a single state is an important factor to be considered in determining the state of the applicable law. The state where these contacts are grouped is particularly likely to be the state of the applicable law if either the defendant's conduct or the plaintiff's injury occurred there. This state may also be the state of the applicable law when conduct and injury occurred in a

72

place that is fortuitous and bears little relation to the occurrence and the parties (see § 146, Comments *d-e*).

The importance of those contacts will frequently depend upon the particular issue involved (see Comment *d*).

## IV.   RESTATEMENT (SECOND) ON CONFLICT OF LAWS, SECTION 150

§150 Multistate Defamation

(1) The rights and liabilities that arise from defamatory matter in any one edition of a book or newspaper, or any one broadcast over radio or television, exhibition of a motion picture, or similar aggregate communication are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) When a natural person claims that he has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the person was domiciled at the time, if the matter complained of was published in that state.

(3) When a corporation, or other legal person, claims that it has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the corporation, or other legal person, had its principal place of business at the time, if the matter complained of was published in that state.

*Comment e. Multistate communication involving natural person.* Rules of defamation are designed to protect a person's interest in his reputation. When there has been publication in two or more states of an aggregate communication claimed to be defamatory, at least most issues involving the tort should be determined, subject to the possible limitation stated in Comment *d*, by the local law of the state where the plaintiff has suffered the greatest injury by reason of his loss of reputation. This will usually be the state of the plaintiff's domicil if the matter complained of has there been published.

If the defamer's act or acts of communication are done in the state of the plaintiff's domicil and if the matter claimed to be defamatory is there published, the local law of this state will usually be applied to determine most issues involving the tort (see § 145, Comments *d-e*). The local law of the state of the plaintiff's domicil will also

usually be so applied, even though some or all of the defamer's acts of communication were done in another state, if there was publication in the state of plaintiff's domicil and if the plaintiff is known only in this state and consequently his reputation only suffered injury there. Determination of the state of the applicable law is more difficult when the defamer's act or acts of communication are done in a state other than that of the plaintiff's domicil and when the matter complained of is published in the state of the plaintiff's domicil and in one or more other states to which the plaintiff has a substantial relationship. In this last situation, the local law of the state of the plaintiff's domicil will be applied unless, with respect to the particular issue, one of the other states has a more significant relationship to the occurrence and the parties.

A state, which is not the state of the plaintiff's domicil, may be that of most significant relationship if it is the state where the defamatory communication caused plaintiff the greatest injury to his reputation. This may be so, for example, in situations where (a) the plaintiff is better known in this state than in the state of his domicil, or (b) the matter claimed to be defamatory related to an activity of the plaintiff that is principally located in this state, or (c) the plaintiff suffered greater special damages in this state than in the state of his domicil, or (d) the place of principal circulation of the matter claimed to be defamatory was in this state.

Other contacts that the forum will consider in determining which is the state of most significant relationship with respect to the particular issue include (a) the state or states where the defendant did his act or acts of communication, such as assembling, printing and distributing a magazine or book and (b) the state or states of the defendant's domicil, incorporation or organization and principal place of business.

## V.   RESTATEMENT (SECOND) OF TORTS, SECTION 578

§ 578 Liability of Republisher

Except as to those who only deliver or transmit defamation published by a third person, one who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it.

*Comment e. Disbelief.*  The rule stated in this Section is applicable to make the republisher of either a libel or a slander subject to liability even though he expressly states that he does not believe the statement that he repeats to be true. The fact that he expresses belief or disbelief may, however, be taken into account

in determining the damages for the harm to the reputation of the person defamed for which the repeater will be liable.

## VI.    RESTATEMENT (SECOND) OF TORTS, SECTION 611

§ 611 Report of Official Proceeding or Public Meeting

The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

*Comment h.  Arrest.* An arrest by an officer is an official action, and a report of the fact of the arrest or of the charge of crime made by the officer in making or returning the arrest is therefore within the conditional privilege covered by this Section. On the other hand statements made by the police or by the complainant or other witnesses or by the prosecuting attorney as to the facts of the case or the evidence expected to be given are not yet part of the judicial proceeding or of the arrest itself and are not privileged under this Section.

## VII.   BUZZFEED ARTICLE



circulating among elected officials, intelligence agents, and journalists for weeks.

The dossier, which is a collection of memos written over a period of months, includes specific, unverified, and potentially unverifiable allegations of contact between Trump aides and Russian operatives, and graphic claims of sexual acts documented by the Russians. BuzzFeed News reporters in the US and Europe have been investigating various alleged facts in the dossier but have not verified or falsified them. CNN reported Tuesday that a two-page synopsis of the report was given to President Obama and Trump.

Now BuzzFeed News is publishing the full document so that Americans can make up their own minds about allegations about the president-elect that have circulated at the highest levels of the US government.

The document was prepared for political opponents of Trump by a person who is understood to be a former British intelligence agent. It is not just unconfirmed: It includes some clear errors. The report misspells the name of one company, "Alpha Group," throughout. It is Alfa Group. The report says the settlement of Barvikha, outside Moscow, is "reserved for the residences of the top leadership and their close associates." It is not reserved for anyone, and it is also populated by the very wealthy.

The Trump administration's transition team did not immediately respond to BuzzFeed News' request for comment. However, the president-elect's attorney, Michael Cohen, told *Mic* that the allegations were absolutely false.

"It's so ridiculous on so many levels," he said. "Clearly, the person who created this did so from their imagination or did so hoping that the liberal media would run with this fake story for whatever rationale they might have."

And Trump shot back against the reports a short time later on Twitter.

His former campaign manager and current senior White House adviser, Kellyanne Conway, also denied the claims during an appearance on *Late Night With Seth Meyers,* adding that "nothing has been confirmed." She also said Trump was "not aware" of any briefing on the matter.

The documents have circulated for months and acquired a kind of legendary status among journalists, lawmakers, and intelligence officials who have seen them. *Mother Jones* writer David Corn referred to the documents in a late October column.

Harry Reid spokesman Adam Jentleson tweeted Tuesday that the former Senate Democratic leader had seen the documents before writing a public letter to FBI Director James Comey about Trump's ties to Russia. And CNN reported Tuesday that Arizona Republican John McCain gave a "full copy" of the memos to Comey on Dec. 9, but that the FBI already had copies of many of the memos.

**If you have tips related to this story, write us at trumpstories@buzzfeed.com. To send us information confidentially, go here.**

News moves fast. Keep up with the BuzzFeed News daily email.



More News



Mexico's President Canceled His Meeting With Trump Rather Than Pay For The Wall



Gorsuch Would Join The Supreme Court Millionaires' Club If He's Confirmed



The White House Thinks Crimea Sanctions Should Stay Until Russia Returns It



Pentagon Report: The Military Spun Their Intel To Make ISIS Seem Weaker

These Reports Allege Trump Has Deep Ties To Russia - BuzzFeed News

## Read the report here:





**Israeli Officials Actually Don't Want The US To Move Its Embassy To Jerusalem**



**Trump To Publish Weekly List Of Crimes Committed By Undocumented Immigrants In Sanctuary Cities**



**Trump's Immigration Order Is Seriously Complicating The CIA's Job**



**Thousands Of Harvard Alumni Implore Jared Kushner For A Meeting**



**Meet The "Good Trolls" Secretly Spying On Trump Supporters And Neo-Nazis**



Suspect in Quebec mosque terror attack was of Moroccan origin, reports show fxn.ws/2k9is8W

**Fox News Deleted A Tweet About The Quebec Shooting After Canada's Government Objected**

**More News**

Ken Bensinger is an investigative reporter for BuzzFeed News and is based in Los Angeles. His secure PGP fingerprint is 97CC 6E32 10A2 23FE 4E84 98B4 9CFF 4214 9D26 8AA7

Contact Ken Bensinger at ken.bensinger@buzzfeed.com.

Miriam Elder is the world editor for BuzzFeed News and is based in New York. Her secure PGP fingerprint is 5B5F EC17 C20B C11F 226D 3EBE 6205 F92F AC14 DCB1 Contact Miriam Elder at miriam.elder@buzzfeed.com.

Pulitzer-prize winner Mark Schoofs is the investigations and projects editor for BuzzFeed News. While working at The Village Voice, Schoofs won the 2000 Pulitzer Prize for International Reporting for his series on AIDS in Africa. Contact Mark Schoofs at mark.schoofs@buzzfeed.com.

## VIII. CNN ARTICLE

# Intel chiefs presented Trump with claims of Russian efforts to compromise him

By **Evan Perez, Jim Sciutto** and **Jake Tapper** and **Carl Bernstein, CNN**

⏱ Updated 5:09 PM ET, Tue January 10, 2017

**(CNN)** — Classified documents presented last week to President Obama and President-elect Trump included allegations that Russian operatives claim to have compromising personal and financial information about Mr. Trump, multiple US officials with direct knowledge of the briefings tell CNN.

The allegations were presented in a two-page synopsis that was appended to a report on Russian interference in the 2016 election. The allegations came, in part, from memos compiled by a former British intelligence operative, whose past work US intelligence officials consider credible. The FBI is investigating the credibility and accuracy of these allegations, which are based primarily on information from Russian sources, but has not confirmed many essential details in the memos about Mr. Trump.

The classified briefings last week were presented by four of the senior-most US intelligence chiefs -- Director of National Intelligence James Clapper, FBI Director James Comey, CIA Director John Brennan, and NSA Director Admiral Mike Rogers.

One reason the nation's intelligence chiefs took the extraordinary step of including the synopsis in the briefing documents was to make the President-elect aware that such allegations involving him are circulating among intelligence agencies, senior members of Congress and other government officials in Washington, multiple sources tell CNN.

These senior intelligence officials also included the synopsis to demonstrate that Russia had compiled information potentially harmful to both political parties, but only released information damaging to Hillary Clinton and Democrats. This synopsis was not an official part of the report from the intelligence community case about Russian

hacks, but some officials said it augmented the evidence that Moscow intended to harm Clinton's candidacy and help Trump's, several officials with knowledge of the briefings tell CNN.

The two-page synopsis also included allegations that there was a continuing exchange of information during the campaign between Trump surrogates and intermediaries for the Russian government, according to two national security officials.

Sources tell CNN that these same allegations about communications between the Trump campaign and the Russians, mentioned in classified briefings for congressional leaders last year, prompted then-Senate Democratic Leader Harry Reid to send a letter to FBI Director Comey in October, in which he wrote, "It has become clear that you possess explosive information about close ties and coordination between Donald Trump, his top advisors, and the Russian government -- a foreign interest openly hostile to the United States."

CNN has confirmed that the synopsis was included in the documents that were presented to Mr. Trump but cannot confirm if it was discussed in his meeting with the intelligence chiefs.

The Trump transition team declined repeated requests for comment.

CNN has reviewed a 35-page compilation of the memos, from which the two-page synopsis was drawn. The memos originated as opposition research, first commissioned by anti-Trump Republicans, and later by Democrats. At this point, CNN is not reporting on details of the memos, as it has not independently corroborated the specific allegations. But, in preparing this story, CNN has spoken to multiple high ranking intelligence, administration, congressional and law enforcement officials, as well as foreign officials and others in the private sector with direct knowledge of the memos.

Some of the memos were circulating as far back as last summer. What has changed since then is that US intelligence agencies have now checked out the former British intelligence operative and his vast network throughout Europe and find him and his sources to be credible enough to include some of the information in the presentations to the President and President-elect a few days ago.

On the same day that the President-elect was briefed by the intelligence community, the top four Congressional leaders, and chairmen and ranking members of the House and Senate intelligence committees -- the so-called "Gang of Eight" -- were also provided a summary of the memos regarding Mr. Trump, according to law enforcement, intelligence and administration sources.

The two-page summary was written without the detailed specifics and information about sources and methods included in the memos by the former British intelligence official. That said, the synopsis was considered so sensitive it was not included in the classified report about Russian hacking that was more widely distributed, but rather in an annex only shared at the most senior levels of the government: President Obama, the President-elect, and the eight Congressional leaders.

CNN has also learned that on December 9, Senator John McCain gave a full copy of the memos -- dated from June through December, 2016 -- to FBI Director James Comey. McCain became aware of the memos from a former British diplomat who had been posted in Moscow. But the FBI had already been given a set of the memos compiled up to August 2016, when the former MI6 agent presented them to an FBI official in Rome, according to national security officials.

The raw memos on which the synopsis is based were prepared by the former MI6 agent, who was posted in Russia in the 1990s and now runs a private intelligence gathering firm. His investigations related to Mr. Trump were initially funded by groups and donors supporting Republican opponents of Mr. Trump during the GOP primaries, multiple sources confirmed to CNN. Those sources also said that once Mr. Trump became the nominee, further investigation was funded by groups and donors supporting Hillary Clinton.

Spokespeople for the FBI and the Director of National Intelligence declined to comment. Officials who spoke to CNN declined to do so on the record given the classified nature of the material.

Some of the allegations were first reported publicly in Mother Jones one week before the election.

One high level administration official told CNN, "I have a sense the outgoing administration and intelligence community is setting down the pieces so this must be investigated seriously and run down. I think [the] concern was to be sure that whatever information was out there is put into the system so it is evaluated as it should be and acted upon as necessary."

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 3, 2019, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically generate and send by e-mail a Notice of Docket Activity to all counsel and parties registered to receive electronic notice of the same.

Dated:      June 3, 2019                   /s/ Matthew Shayefar
                                           Matthew Shayefar